RETURN TO

PROJECTS ENGINEERING SECTION

# LAKE PONTCHARTRAIN AND VICINITY, LOUISIANA

## LETTER

FROM

## THE SECRETARY OF THE ARMY

TRANSMITTING

A LETTER FROM THE CHIEF OF ENGINEERS, DEPART-
MENT OF THE ARMY, DATED MARCH 4, 1964, SUBMIT-
TING A REPORT, TOGETHER WITH ACCOMPANYING
PAPERS AND ILLUSTRATIONS, ON A REVIEW OF THE
REPORTS ON, AND AN INTERIM HURRICANE SURVEY
OF LAKE PONTCHARTRAIN AND VICINITY, LOUISIANA,
REQUESTED BY RESOLUTIONS OF THE COMMITTEE ON
PUBLIC WORKS, UNITED STATES SENATE, ADOPTED
JANUARY 28, 1949, AND FEBRUARY 4, 1957, AND AUTHOR-
IZED BY THE RIVER AND HARBOR ACT APPROVED
MARCH 2, 1945.   IT IS ALSO IN PARTIAL RESPONSE TO
PUBLIC LAW 71, 84TH CONGRESS, APPROVED JUNE 15, 1955



JULY 6, 1965.—Referred to the Committee on Public Works and
ordered to be printed with illustrations

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1965

50-264 O

COMMENTS OF THE DEPARTMENT OF THE INTERIOR



UNITED STATES
DEPARTMENT OF THE INTERIOR
OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

December 11, 1963

Dear General Wilson:

This Department has reviewed reports on Lake Pontchartrain, Louisiana and Vicinity, submitted with your letter of September 10, 1963. The total construction cost of the recommended improvements is estimated at $84,826,000.

The Fish and Wildlife Service advises that Lake Pontchartrain is a part of the total interrelated estuarine complex of southeastern Louisiana. All of the lake affords nursery habitat for marine fishes and the upper portion is of exceptional importance to menhaden and white shrimp. Stocks of these and other species utilizing the nursery habitat provide forage for desirable game and commercial fishes and contributes to the sport and commercial fisheries, not only within the lake, but also in a much larger area along the Gulf coast. The maintenance of the nursery habitat and the harvestable fish populations are dependent on the preservation of the existing salinity gradient in Lake Pontchartrain.

In its reports of March 13 and October 22, 1962, the Service recommended measures concerning the construction and operation of project structures to assure that a salinity regimen suitable for the preservation of the fishery resources would be maintained with the hurricane protection works in place. The recommendation of the Service, which would provide for the enlargement of structures in the tidal passes should the salinity gradient in Lake Pontchartrain be sufficiently altered to pose a threat to fishery resources, was not accepted by the District Engineer. In commenting on the recommendation, the District Engineer stated the design of control structures was considered adequate for the maintenance of the present salinity gradient in Lake Pontchartrain and that the lock at Seabrook will provide control of sufficient flexibility to regulate salinity in the lake within reasonable limits. The District Engineer also stated that the Seabrook Lock will be operated in cooperation with the Fish and Wildlife Service to control the salinity in Lake Pontchartrain and in the Mississippi River-Gulf Outlet area provided such operation will not interfere with navigation.

The Service questions whether the cross sectional dimensions of the control structures will provide sufficient capacity to accommodate the necessary flows for salinity control, particularly if operation of Seabrook Lock for control of salinity is subordinate to navigation interests. Alteration of the salinity regimen in Lake Pontchartrain will result in serious fishery losses.

**xvi**

NPM-015-000000014

We, therefore, recommend that your report recognize the importance of salinity control in the maintenance of the fishery resources of the project area and specifically provide for the modification of the structures in the tidal passes and the Seabrook Lock or their operation as necessary for the preservation of the present salinity gradient in Lake Pontchartrain.

The National Park Service reports that the project area very possibly contains considerable undisturbed archeological material.

The Regional Director, Southeast Regional Office, Federal Building, P. O. Box 10008, Richmond, Virginia, 23240, should be kept informed as to the progress on the project in order to program and initiate such survey, salvage, and preservation of historical and archeological evidence as may exist in accordance with the Act of June 27, 1960 (74 Stat. 220).

The opportunity of presenting our views is appreciated.

Sincerely yours,

KENNETH HOLUM
Assistant Secretary of the Interior

Lt. General Walter E. Wilson, Jr.
Chief of Engineers
Department of the Army
Washington 25, D. C.

xvii

50-264 O-65—2

NPM-015-000000015

(1)  Lake Pontchartrain barrier plan.

| Item | First cost | Federal | Non-Federal |
|---|---|---|---|
| Construction | $59,676,000 | 70% | 30% |
| Lands, damages, and re-locations | 5,027,000 | | |
| Total | $64,703,000 | $45,292,000 | $19,411,000 |
| Less costs of lands, damages, and relocations | | | -5,027,000 |
| Cash contribution for construction | | | $14,384,000 |
| Cash contribution for capitalized annual maintenance and operation | | -4,092,000 | 4,092,000 |
| Total cash contribution | | | $18,476,000 |
| Plus costs of lands, damages, and relocations | | | 5,027,000 |
| FIRST COSTS | | $41,200,000 | $23,503,000 |

(2)  Chalmette.

| Item | First cost | Federal | Non-Federal |
|---|---|---|---|
| Construction | $14,244,000 | 70% | 30% |
| Lands, damages, and relocations | 899,000 | | |
| Total | $15,143,000 | $10,600,000 | $ 4,543,000 |
| Less costs of lands, damages, and relocations | | | -899,000 |
| Cash contribution | | | $ 3,644,000 |

25.  COORDINATION WITH OTHER AGENCIES

This study has been coordinated with Federal, state, and local
agencies that are concerned with hurricane problems, or that are
responsible for the protection of public and private property or

76

NPM-015-000000097

fish and wildlife resources. They have been consulted during the course of the study to obtain technical data, pertinent information, or cooperation where mutual responsibilities were involved. The participation of these agencies and a summary of their views are stated below.

a.    U. S. Department of Commerce.    The Weather Bureau furnished technical information regarding intensity, frequency, and duration of future hurricanes and expanded data related to historic hurricanes which were necessary for verification of procedures. Descriptions of these data are included in appendix A.

b.    U. S. Department of the Interior.

(1)  The Fish and Wildlife Service was kept fully informed of the plans of protection under consideration throughout the study.  Numerous conferences and discussions were held during the development and design phases of the plans of protection. The Service found that construction of the proposed hurricane tide barrier along the east side of Lake Pontchartrain would not significantly affect the existing salinity gradient pattern in the lake, and that improvement of existing levees, or construction of new levees would cause no significant project effects because of the normal metropolitan expansion that the area is presently undergoing.  The Service found, however, that the salt water intrusion problem induced by the construction of the Mississippi River-Gulf Outlet would be detrimental to existing conditions in the lake, the navigation channel area, and the contiguous areas, and that proper control should be provided.  Reports of the Fish and Wildlife Service are presented in appendix F.

(2)  The recommendations presented in the report dated 13 March 1962 are that:

(a)  "In the event you recommend the low level plan, your plan include provision for enlarging the structures in the tidal passes should the salinity gradient in Lake Pontchartrain, as established by a cooperative sampling program, be adversely affected.

(b)  "The existing salinity gradient in Lake Pontchartrain be maintained insofar as salt water intrusion control requirements in the overall Lake Pontchartrain-Gulf Outlet complex will permit.

(c)  "A structure, as necessary for salt water intrusion control, be built as a feature of the Gulf Outlet project in the Gulf Outlet-Industrial Canal connection with Lake Pontchartrain.

**77**

NPM-015-000000098

(d)  "The pertinent design-criteria and operational procedure for this structure be developed as a part of the continuing studies on the Gulf Outlet project."

(3)  The recommendations presented in the report dated 22 October 1962 are:

(a)  "That two floodgates proposed for the Chalmette section of the hurricane protection area be modified as necessary to provide, within feasible limits, for maintenance of the natural salinity regimen of interior waters.  Design and operation for this purpose be established during advanced planning for this project.

(b)  "Your request for authorization on this project should provide sufficient flexibility in regard to the Seabrook structure that design and operation can be established during advanced planning and in accordance with findings of salinity studies currently in progress."

(4)  The above recommendations are acceptable with the exception of that in par. 25.b.(2)(a).  The design of the control structures presented in this report is considered adequate for the preservation of the present salinity gradient of Lake Pontchartrain.  The design is based upon the most conservative application of engineering principles and results of extensive model tests, with the full cooperation and concurrence of the Service in the plan, and the structures will require no foreseeable enlargement.  In addition, the lock at Seabrook will provide control of sufficient flexibility to regulate salinity in the lake within reasonable limits.  Any modification later found necessary should be authorized through normal review procedures.

(5)  A report, entitled "A Detailed Report on Hurricane Study Area I, Lake Pontchartrain and Vicinity, Louisiana," was published by the U. S. Fish and Wildlife Service in June 1962. This report, supplement 5, provides detailed information supporting the summarized findings presented in the Service's letter report of 13 March 1962.

c.   U. S. Coast Guard.  The Coast Guard was consulted as to the requirements of aids to navigation and has stated that the proposed improvements will require no changes in the existing aids to navigation nor will additional Coast Guard aids to navigation be required.

d.   U. S. Department of Agriculture.  The Soil Conservation Service was consulted during the study and requested to furnish views and comments on the plans of protection.  The Service feels that agriculture holds a relatively unimportant position in the economy of the area, and that intensively developed agricultural

NPM-015-000000099

land is decreasing and will probably be converted to urban development within a few years.  It is not expected that the proposed project will adversely affect any potential P.L. 566 project or other Soil Conservation Service activities within the project area.

e.   State of Louisiana.

(1)  The Department of Public Works was consulted throughout the development phase of the study.  The Department concurs in the suitability of the proposed plans of protection.

(2)  The Department of Health was requested to furnish views and comments on the proposed plan of protection and stated that public health problems would not result from the plans presented.

(3)  The Wild Life and Fisheries Commission was requested to furnish its views and comments relative to the project.  The U. S. Fish and Wildlife Service has stated that the Commission concurs with the findings of the Service and has attached to its reports letters of confirmation from that organization, appendix F.

(4)  In the early phases of the study, the Department of Highways was consulted relative to the merits of a dual-purpose interstate highway-hurricane barrier embankment, but the plan was abandoned because of the incompatible schedules of the two projects. The minor modifications to U. S. Highway 90 in connection with the barrier plan are acceptable to the Highway Department.

(5)  The Board of Levee Commissioners of the Orleans Levee District and the Board of Commissioners of the Port of New Orleans have been consulted during the course of the study and have furnished important data in connection therewith.  Representatives of both Boards have reviewed the plans of protection and have expressed general concurrence with the recommendations of this report.

f.   Assurances of cooperation.  The State of Louisiana, Department of Public Works, the agency designated to act in such matters on behalf of the Governor of the State of Louisiana, has concurred in the suitability of the plans of protection, and has stated that assurances from local interests will be provided when required.

SECTION VII - RESULTS OF INVESTIGATION

26.   DISCUSSION AND CONCLUSIONS

a.   The Louisiana coastal area, including the shores of Lake Pontchartrain, is subject to flooding by hurricane surges.  Much of the

79

NPM-015-000000100

APPENDIX F

REPORT OF U. S. FISH AND WILDLIFE SERVICE

209

NPM-015-000000236



ADDRESS ONLY THE
REGIONAL DIRECTOR

UNITED STATES
DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE
BUREAU OF SPORT FISHERIES AND WILDLIFE
PEACHTREE-SEVENTH BUILDING
ATLANTA 23. GEORGIA

SOUTHEAST REGION
(REGION 4)
NORTH CAROLINA
SOUTH CAROLINA
GEORGIA
FLORIDA
KENTUCKY
TENNESSEE
ALABAMA
MISSISSIPPI
ARKANSAS
LOUISIANA
VIRGINIA
MARYLAND
PUERTO RICO
VIRGIN ISLANDS

March 13, 1962

CE-LM-po (Lake Pont-
chartrain, Louisiana)

District Engineer
U. S. Army, Corps of Engineers
New Orleans, Louisiana

Dear Sir:

Pursuant to the Fish and Wildlife Coordination Act (48 Stat. 401,
as amended; 16 U.S.C. 661 et seq.), the U. S. Fish and Wildlife Serv-
ice, in cooperation with the Louisiana Wild Life and Fisheries
Commission, has examined the fish and wildlife aspects of Lake
Pontchartrain and vicinity, Louisiana, in relation to proposed plans
for hurricane protection under consideration by your agency.  This
is a letter report of our findings, submitted for inclusion in your
survey report.

In addition to presenting the relation of fish and wildlife require-
ments to your plans for hurricane protection, this report considers
the project-associated probability of salt-water intrusion into the
lake via the Mississippi River-Gulf Outlet channel, a navigation
project currently under construction by your agency.

Report findings are based on intensive fish and wildlife investiga-
tions in both the primary project and the Mississippi River-Gulf
Outlet project areas.  Where appropriate, the resource appraisals
were coordinated with model studies conducted by the Waterways
Experiment Station, Vicksburg, Mississippi.  The model study limita-
tions are recognized, but for reporting purposes, the study data
have been used as furnished.

Frequent coordination meetings between this Service, your staff, and
the Louisiana Wild Life and Fisheries Commission have been of
invaluable assistance in directing the scope and approach of the
field investigations as well as use and interpretation of the model
study data.

DESCRIPTION OF THE AREA

Lake Pontchartrain is a shallow (14-foot average depth) 640 square-
mile tidal basin bordered on its south side by the New Orleans
metropolitan locale.  It is important to note the lake is only a
part of the total interrelated estuarine environmental complex of

210

this southeastern Louisiana coastal area. Likewise, it must be recognized that changes effected in the lake can result in changes within other segments of the complex. Accordingly, certain major factors that influence the final appreciation of the total fresh and saline contributions to the lake require explanation.

Lake Pontchartrain lies between the relatively salt water conditions of Lake Borgne and Mississippi Sound and the relatively fresh water conditions of Lake Maurepas. Local residents generally consider the lake to be fresh water west of the Lake Pontchartrain Causeway and salt water east of this division line. The upper or westward half of the lake has average annual salinities of about 1-2 p.p.t. in comparison to the $1\frac{1}{2}$-$4\frac{1}{2}$ p.p.t. obtained in the lower half of the area. It is, of course, recognized that this division line or salinity gradient varies as the result of influx from either of the contributing systems.

## Saline Waters

The transport of salt water into Lake Pontchartrain is currently accomplished through the Chef Menteur and Rigolets passages by Lunar and wind tides. These are natural passes, having average widths of about 1,000 feet and 3,500 feet, and controlling depths of 25 feet and 20 feet in the Chef Menteur and Rigolets channels, respectively.

The normal flow through the passes results from tidal head differential developed between Lake Pontchartrain and Lake Borgne-Mississippi Sound. Wind affects normal tidal exchange considerably, and at times wind tides are dominant. Easterly winds increase inflow through the passes, and at times, depending on source values, salinity. The salinities of sourcewaters of Lake Borgne and Mississippi Sound are subject to considerable variation caused by discharges from Pearl River.

The Mississippi River-Gulf Outlet navigation channel may have equal or greater importance than the natural passes for transporting saline waters to Lake Pontchartrain. This 36-foot deep, 500-foot bottom width channel, when completed, will afford a more direct connection between Lake Pontchartrain and the Gulf of Mexico. The controlling depth of this system will be the 30-foot deep Industrial Canal. Gulf waters entering the lake through this system would have salinities several times higher than waters entering through the natural passes.

## Fresh Water

The normal fresh water contributions arise from direct rainfall and runoff into both Lake Pontchartrain and Lake Maurepas. An atypical

211

freshwater source is the Bonnet Carre Floodway, a floodwater outlet designed to bypass certain Mississippi River flood stages through Lake Pontchartrain.  Operation of this system has been required only three times in its 27 years of existence.

## DESCRIPTION OF THE PROJECT

Two basic plans of hurricane protection have been studied (Plate 1).

### Low Level Plan

The low level plan provides for a system of levees on the south lake-shore adjacent to the New Orleans metropolitan area and a barrier across the east lakeshore with control structures in the two tidal passes.  A structure or lock would also be included at the junction of Industrial Canal and Lake Pontchartrain.

Structures would reduce the cross sectional area of each tidal pass 75 percent.  Sills would be at the present controlling depth of the passes (minus 25 feet in Chef Menteur and minus 20 feet in the Rigolets) and closure would be accomplished with tainter gates. Navigation locks would pass boat traffic around each structure. Gates would be closed only when a hurricane was approaching the Louisiana coast, and reopened when danger was past.  Hurricanes strike the Louisiana coast an average of 1.6 times a year between spring and fall.  Model tests of the operation were based on a maximum closure of two weeks.

### High Level Plan

The high level plan does not include the barrier along the eastern lakeshore which incorporates control structures in the tidal passes or the structure in the Gulf Outlet connection.  In most other respects the two plans are similar, except that higher levees would be required along the south lakeshore.

Under either plan drainage facilities would be included in the levee system.  Control gates in the drains from the marshes and swamp immediately east of Bonnet Carre spillway would remain open except when closure would be required to prevent hurricane flooding.  The levee portion of either plan would not necessarily be provided over the entire project area, but could be adapted as separate units, protecting those parishes giving the required local project assurances and participation.

## FISH AND WILDLIFE RESOURCES

Lake Pontchartrain, with its salinity gradient, sustains an important fishery resource.  Ninety-five percent of the sport fishing

212

NPM-015-000000239

harvest and 90 percent of the commercial fishery production are marine species. Bait sales of live and dead shrimp, live small fish, crabs, and clams to supply fisherman needs in the immediate Lake Pontchartrain area amount to 1/4 million dollars annually. With maintenance of existing salinities a without-the-project use of 800,000 man-days of sport fishing and sport and commercial fishery harvest of 5-1/4 million pounds of fish and shellfish are assignable to the lake.

While all of Lake Pontchartrain is considered a nursery area, the nursery value of the upper lake is of exceptional importance to such species as menhaden and white shrimp. These nursery stocks, in addition to contributing to the harvest elsewhere when they mature, also provide forage (food) for desirable sport and commercial fish species in the lower lake.

Since it is evident that the fishery complex is intimately related to the salinity gradient, it must be emphasized that a major change or shift in the salinity gradient could have significant effect upon the fishery resources both in the lake and adjacent areas. Both the harvest area of the lower lake and the valuable nursery area of the upper lake are related to the existing salinity gradient. Lowering lake salinity could reduce the area of marine fishery harvest. A significant salinity increase could reduce the nursery area value, and, indirectly, the harvest.

Wildlife of significant value is present in the area, primarily waterfowl and fur animals; however, considering the metropolitan expansion without the project, significant project-occasioned losses are not assignable to this resource.

## EFFECTS OF THE PROJECT

### Levees

Levee construction included in either plan for hurricane protection is not expected to affect fish and wildlife resources directly. Indirectly, both plans would hasten urbanization and industrialization of valuable marshes by providing basic features for further flood protection and reclamation. This applies especially to the area of marsh and swamp east of Bonnet Carre Spillway that now does not have levee protection.

Since the high level plan consists essentially of levee protection, it is not expected that significant project effects would occur. In contrast, the low level plan contains other features that must be considered; namely, the control structures in the tidal passes and in the Industrial Canal connecting the Gulf Outlet with Lake Pontchartrain.

213

NPM-015-000000240

## Structures in the Tidal Passes

The principal factor considered in project investigations was the possible adverse effect of reducing the tidal volume exchange between Lake Pontchartrain and the brackish waters of Mississippi Sound-Lake Borgne by restricting the tidal passes with control structures.  Of particular concern was the relation of tidal volume exchange to salinity, inasmuch as the salinity gradient in Lake Pontchartrain is dependent  upon tidal introduction of brackish waters.  Effect of project structures in the passes on velocity of flow and as a physical obstruction was also considered but is not believed to be significant to fish and wildlife.

Salinities were not altered significantly in model tests when the respective cross-sectional areas of the tidal passes were reduced by 75 percent.  Existing salinities in Lakes Maurepas, Pontchartrain, and Borgne, under the range of inflow or salinity conditions tested, were virtually unaffected.  It was also shown that the structures would not alter, to an appreciable degree, salinities which may occur in the lake system with the Gulf Outlet project completed.  The model tests indicated that severe salt water intrusion into Lake Pontchartrain would occur as a result of high salinities entering the lake via Gulf Outlet channel (Fig. 1 and 3).

Salinity control was shown to be possible by placement of a structure at the junction of Lake Pontchartrain and Industrial Canal.  Operation of this structure accomplished control of salt water intrusion into the lake system of the test models.  Structures in the tidal passes did not interfere with this control.  Figure 1 summarizes model test results showing effect of control structures in the tidal passes on existing Lake Pontchartrain salinity, effect of salt water intrusion via Gulf Outlet channel, and salt water intrusion control.

Structure closure for a period of two weeks did not alter, significantly, salinities, as modified by the Gulf Outlet channel, in Lakes Maurepas, Pontchartrain, or Borgne.  Salinities in the Gulf Outlet channel increased significantly during the closure period, but were reduced upon reopening the structures by evacuation from Lake Pontchartrain of accumulated hurricane rainfall (Figure 2).  Prolonged or permanent closure of the structure in the Gulf Outlet connection could have extremely adverse effects upon the Gulf Outlet channel area.

## Other Hydrological Factors

While model studies indicate that structures in the tidal passes would not affect salinity adversely, the structures would increase

NPM-015-000000241

velocities locally in the passes. Increased velocities could
present a hazard to small boats, and locking around the structures,
when required, could delay passage in and out of the lake. This
delay may be a problem for boats entering the lake ahead of a hurri-
cane. In addition, while the structures could possibly interfere
with movement of fish and shellfish in and out of the lake, it
appears that maintenance of the controlling depth of the passes
would tend to overcome this problem.

## DISCUSSION AND CONCLUSIONS

The Service has appraised the two plans you have under considera-
tion for control of hurricane surges in Lake Pontchartrain. The
plans consist: one, of a high levee protection for certain areas
adjacent to the lake; and two, of a combination of lesser degree
of levee protection combined with control structures in Chef
Menteur and Rigolets passes and a structure located at the junction
of the Industrial Canal and the lake.

The determination of project-occasioned changes under either plan
are based primarily on model studies and data obtained from investi-
gations conducted on the Mississippi River-Gulf Outlet Navigation
project.

Lake Pontchartrain is a segment of the total estuarine environmental
complex of the Southeast Louisiana coastal zone. This particular
zone, which includes the total gradient between fresh and Gulf of
Mexico saline waters, results from conditions maintained by both
the water sources contributing to the complex.

In consequence, alteration of any segment of the complex will result
in changes in other areas within the complex.

In model studies existing lake salinities were not altered signifi-
cantly by control structures in Chef Menteur and Rigolets passes.
The structures could result in higher flow velocities through the
passes with the associated problems to boats. Also, the probability
of delay of boat entry into the lake during the period of an approach-
ing hurricane does require attention.

Model tests also established that intrusion of waters from the
Mississippi River-Gulf Outlet channel through the Industrial Canal
into Lake Pontchartrain, if not controlled, would result in
increased salinity conditions within the lake, as well as higher
salinities in the Gulf Outlet channel and adjacent areas. Oppor-
tunities to control salt water intrusion in the lake and to some
degree reduce the extent of intrusion within the navigation channel
appear feasible (Figures 3 and 4). Further Service studies are

215

NPM-015-000000242

being conducted to determine intrusion characteristics and to
define design and operational requirements for a control structure.
The Service studies will be coordinated with your efforts.  In this
regard, it appears further model studies or hydrological investiga-
tions conducted by your agency merit correlation with our proposed
investigations.

The Service concludes that the hurricane protection, essentially
by means of levee construction (High Level Plan), would have no
significant detrimental effects to the fish and wildlife resources
within the area of project influence.  Model study findings on the
low level plan indicate the two proposed control structures in the
natural passes would not significantly alter the salinity gradient
in Lake Pontchartrain.  The model studies did establish that salt
water intrusion problem through the Mississippi River-Gulf Outlet
navigation channel would be detrimental to existing conditions both
in the lake and in the navigation channel area.  Accordingly, the
Service finds that with a proper control facility the risk of
detrimental effects of the low level plan is within reason.

## RECOMMENDATIONS

The U. S. Fish and Wildlife Service therefore recommends that:

1.  In the event you recommend the low level plan, your plan
    include provision for enlarging the structures in the tidal
    passes should the salinity gradient in Lake Pontchartrain,
    as established by a cooperative sampling program, be
    adversely affected.

2.  The existing salinity gradient in Lake Pontchartrain be
    maintained insofar as salt water intrusion control require-
    ments in the overall Lake Pontchartrain-Gulf Outlet complex
    will permit.

3.  A structure, as necessary for salt water intrusion control,
    be built as a feature of the Gulf Outlet project in the Gulf
    Outlet-Industrial Canal connection with Lake Pontchartrain.

4.  The pertinent design criteria and operational procedure for
    this structure be developed as a part of the continuing
    studies on the Gulf Outlet project.

The Louisiana Wild Life and Fisheries Commission has reviewed this
report and their letter of concurrence is attached.

In the event your plans are modified, we request notification and
opportunity to revise fish and wildlife considerations accordingly.

216

NPM-015-000000243

Should either of the alternate plans for hurricane protection be found favorable and authorized for construction, we request opportunity to review and comment on your detailed plans prior to construction.

We are pleased to have had this opportunity to work with you and members of your staff.  It is requested that you notify us of your proposed action on our recommendations.

Sincerely yours,

Walter A. Green
Regional Director, Bureau of
Sport Fisheries and Wildlife

Seton H. Thompson
Regional Director, Bureau of
Commercial Fisheries

Enclosures 6

217

50-264 O-65—16

NPM-015-000000244



HURRICANE STUDY

LAKE PONTCHARTRAIN AND VICINITY
LOUISIANA

PLAN OF PROTECTION

UNITED STATES DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE
BUREAU OF SPORT FISHERIES AND WILDLIFE

From USCE Map
Plate 3-File H-2-22077

WFY 2-14-62
Dwg. No.4-RB-536

PLATE I

218

# FIG. I - VARIATIONS IN LAKE PONTCHARTRAIN SALINITY
## -FROM MODEL TEST DATA-



219

FIG. 2 – EFFECT OF HURRICANE CLOSURE OPERATION
ON SURFACE SALINITY IN GULF OUTLET CHANNEL
AT BAYOU LA LOUTRE

– FROM MODEL TEST DATA –

HIGH INFLOW YEAR



NPM-015-000000247

## FIG. 3 — RESPONSE OF LAKE PONTCHARTRAIN SALINITY TO CONTROL OF GULF OUTLET CAPACITY FLOW

### —FROM MODEL TEST DATA—

### CONTROL POINT AT JCT. INDUSTRIAL CANAL / LAKE



PERCENT OF GULF OUTLET CAPACITY FLOW

221

NPM-015-000000248

# FIG. 4 — RESPONSE OF SALINITY IN GULF OUTLET CHANNEL TO CONTROLLED FLOW

## -FROM MODEL TEST DATA-



NOTE: LOW INFLOW DATA PARTIALLY CALCULATED

222



**WILD LIFE AND FISHERIES COMMISSION**
400 ROYAL STREET
**NEW ORLEANS 16**

L. D. YOUNG, JR.
DIRECTOR

February 28, 1962

Mr. F. C. Gillett, Acting Regional Director
U. S. Fish and Wildlife Service
Bureau of Sport Fisheries and Wildlife
Peachtree-Seventh Building
Atlanta 23, Georgia

Dear Mr. Gillett:

This is in reply to your letter of February 16, 1962 concerning the enclosed draft report on the Lake Pontchartrain Hurricane Study.

Various staff members have reviewed and discussed this report in detail and it is as previously decided upon by coordinated efforts between your agency and this Commission.

We do concur in this report and the provisions contained therein and do not have additional comments to make at this time.

We would like to obtain at least twenty-five copies of this report when it is released to the Corps of Engineers.

Thank you for your cooperation, and we appreciate the opportunity to review and comment on this report.

Sincerely,

L. D. Young, Jr.,
Director

LDY,Jr/sl.

223



UNITED STATES
DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE
BUREAU OF SPORT FISHERIES AND WILDLIFE
PEACHTREE-SEVENTH BUILDING
ATLANTA 23, GEORGIA

October 22, 1962

District Engineer                    CE-LM-po
U. S. Army, Corps of Engineers
New Orleans, Louisiana

Dear Sir:

Your letter of September 11, 1962, advised that you are consider-
ing a modification of the Lake Pontchartrain hurricane protection
plan in response to a local interests' request.  Comments on this
modification, by the U. S. Fish and Wildlife Service, to supple-
ment our report of March 13, 1962, were requested by October 15,
1962.

It is our understanding, on the basis of your September 11 letter
and additional information obtained from your office by our field
representatives, that the project modification would consist of an
extension of the protected area to include additional lands north
of Chalmette, Louisiana.

The modified plan would provide for the construction of new levees
along the south side of the Gulf Intracoastal Waterway from the
Inner Harbor Navigation Canal eastward to Paris Road, thence along
the south side of the Mississippi River-Gulf Outlet to Bayou Dupre,
thence southward along Bayou Dupre or Lake Borgne Canal (Violet
Canal) to Violet, Louisiana.  The hurricane levee along the south
side of the Mississippi River-Gulf Outlet between Paris Road and
Bayou Dupre, constructed on top of the existing spoil bank, would
cross and permanently close two openings through the spoil reten-
tion area designed to maintain the channels of Bayou Villere and
a navigable pipeline canal.

In order to provide for interior drainage and water exchange, two
hurricane sector-gated structures would be installed along the
Mississippi River-Gulf Outlet levee alignment.  One floodgate would
be constructed on Bayou Bienvenue; the other would be located on an
outlet to Bayou Dupre.

The present back-dike canal, paralleling the landward side of the
Mississippi River-Gulf Outlet spoil area, would be maintained or
enlarged to connect the two floodgate openings, thereby serving
as a collection ditch for interior drainage and providing for an
interchange of tidal flow.  You propose that the two floodgates
remain open except during the occurrence of a hurricane in the
vicinity.

224

The additional area which is to be enclosed by the hurricane pro-
tection levee consists principally of marsh, though a considerable
area of cypress swamp occurs adjacent to the higher ground along
the Mississippi River.  This wetland area has appreciable fish and
wildlife values which have been described in some detail in our
March 1962 report.

Since you have stated that the plan would provide for maintenance
of the brackish water circulatory system, it does not appear that
the hurricane levees would directly affect fish and wildlife
resources to any major degree.  However, as we have pointed out in
the previous report, levee protection would hasten land reclamation
for industrial and other developments, thereby paving the way for
reduction in total habitat area.

Installation of hurricane control features of the modified plan
may provide opportunity for environmental control within the pro-
tected area to lessen damaging effects anticipated from the
Mississippi River-Gulf Outlet project, and this possibility should
be considered in design and operation of the floodgates.  Continu-
ing studies on salinity intrusion via the Mississippi River-Gulf
Outlet channel indicate that significant increases in salinity
would occur from this source and that adjacent marshes would be
detrimentally affected.  Attention, therefore, should be given to
the feasibility of modifying the structures for purpose of
salinity control within the leveed area.

Apart from the change in levee alignment, we note that a lock
structure, labeled "Seabrook Lock", is shown on the diagram
attached to your September 19 letter.  Location of this proposed
lock is at the confluence of the Inner Harbor Navigation Canal
and Lake Pontchartrain, in the vicinity of the existing Seabrook
Bridge.  Follow-up communication with your office reveals that
this lock structure has been included in your draft report on this
project.

Our March 1962 report recommended that a structure be built in
the Seabrook location for salt-water intrusion control.  It
recommended, also, that the pertinent design criteria and opera-
tional procedure for this structure be developed as a part of
the continuing studies on the Gulf Outlet project.

In view of the fact that the model studies conducted by the
Waterways Experiment Station were not sufficiently detailed to
establish criteria for the control structure, and that our joint
studies of salinity intrusion in this area are still in progress,
we do not believe that structure specifications should be final-
ized at this time.

225

Salinity control apparently will be a complex problem. This was indicated in a general way in our previous report, and is becoming more evident as additional records of salinity intrusion become available. It will be desirable not only to control saline waters entering the lake from the Gulf Outlet channel, but also to utilize outflowing lake water to depress excessively high saline concentrations in the channel. Since stratification also may be an important factor, accomplishment of these objectives may require vertical control of water flow in addition to directional control. Additional data will need to be accumulated and salinity intrusion patterns ascertained before design and operational requirements of a control structure can be reasonably defined.

It is the opinion of the Service, therefore, that the design specifications for the Seabrook structure as included in your report to higher authority should be sufficiently flexible to permit such modifications as may become advisable following studies now in progress.

In view of events which have transpired since release of the Service's March 1962 report, the Service wishes to make two recommendations additional to those contained in the earlier report.

  1. The two floodgates proposed for the Chalmette section of the hurricane protection area be modified as necessary to provide, within feasible limits, for maintenance of the natural salinity regimen of interior waters. Design and operation for this purpose be established during advanced planning for this project.

  2. Your request for authorization on this project should provide sufficient flexibility in regard to the Seabrook structure that design and operation can be established during advanced planning and in accordance with findings of salinity studies currently in progress.

This supplement to the Lake Pontchartrain hurricane study report has been reviewed by the Louisiana Wild Life and Fisheries Commission and their letter of concurrence is attached.

We appreciate the opportunity for commenting on the modified

226

plans and request that you keep us advised of the status of your
studies and reporting on this project.

Sincerely yours,

W. L. Towns
Acting Regional Director
Bureau of Sport Fisheries
and Wildlife

Seton H. Thompson
Regional Director, Bureau
of Commercial Fisheries

Enclosure

227

NPM-015-000000254



STATE OF LOUISIANA

WILD LIFE AND FISHERIES COMMISSION
400 ROYAL STREET

NEW ORLEANS 16

October 16, 1962

Mr. W. L. Towns, Acting Regional Director
U. S. Fish and Wildlife Service
Bureau of Sport Fisheries and Wildlife
Peachtree-Seventh Building
Atlanta 23, Georgia

Dear Mr. Towns:

Reference is made to your letter of October 5
and enclosed letter report concerning the modification of
the Lake Pontchartrain hurricane protection plan, Chalmette
extension.

We were also asked to submit our views directly to
the District Engineer concerning this project. Your field
office provided us with a draft copy of your proposed com-
ments in order to expedite necessary coordination.

Our views have been prepared and are very similar
to the provisions and recommendations contained in your
report.

Your report has been reviewed and we concur with
its details and recommendations.

Thank you for your early submission of the field
draft to us for review. We appreciate the opportunity to
review and comment on this report.

Sincerely,

L. D. Young, Jr.,
Director

LDYJr/cl.

228