# CONSERVATION OF WILDLIFE

# HEARINGS

BEFORE

## THE COMMITTEE ON AGRICULTURE
## HOUSE OF REPRESENTATIVES

SEVENTY-NINTH CONGRESS

SECOND SESSION

ON

# H. R. 3821 and H. R. 6097

BILLS AMENDING ACTS PROMOTING THE CONSERVA-
TION OF WILDLIFE, FISH, AND GAME, AND
FOR OTHER PURPOSES

FEBRUARY 13 AND APRIL 15, 1946

## Serial I

Printed for the use of the Committee on Agriculture



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1946

## COMMITTEE ON AGRICULTURE

JOHN W. FLANNAGAN, Jr., Virginia, *Chairman*

HAROLD D. COOLEY, North Carolina
ORVILLE ZIMMERMAN, Missouri
STEPHEN PACE, Georgia
W. R. POAGE, Texas
GEORGE M. GRANT, Alabama
PAT CANNON, Florida
VICTOR WICKERSHAM, Oklahoma
JERRY VOORHIS, California
WALTER K. GRANGER, Utah
E. C. GATHINGS, Arkansas
JOHN L. McMILLAN, South Carolina
EUGENE WORLEY, Texas
THOMAS G. ABERNETHY, Mississippi
EARLE C. CLEMENTS, Kentucky
HAROLD H. EARTHMAN, Tennessee

CLIFFORD R. HOPE, Kansas
J. ROLAND KINZER, Pennsylvania
AUGUST H. ANDRESEN, Minnesota
ANTON J. JOHNSON, Illinois
REID F. MURRAY, Wisconsin
CLIFF CLEVENGER, Ohio
GEORGE W. GILLIE, Indiana
EDWIN A. HALL, New York
ROSS RIZLEY, Oklahoma
WILLIAM S. HILL, Colorado
JOHN PHILLIPS, California
CHARLES B. HOEVEN, Iowa

JOS. R. FARRINGTON, Hawaii
JESÚS T. PIÑERO, Puerto Rico

KATHERINE WHEELER, *Clerk*

II

# CONTENTS

———

Page

Statement of—

Chaney, Donald J., Chief Counsel, Fish and Wildlife Service_____    38

Day, Albert M., Assistant Director, United States Fish and Wildlife Service _____    23

Granger, C. M., Assistant Chief, National Forest Division, United States Forest Service_____    30

Hudoba, Michael (submitted)_____    26

Hutson, J. B., Under Secretary of Agriculture (submitted)_____    27

Izaak Walton League of America, Inc., (submitted)_____    20

Robertson, Hon. A. Willis, Representative in Congress from Virginia\_\_    3, 29

President Truman (submitted)_____    26

III

# CONSERVATION OF WILDLIFE

---

**WEDNESDAY, FEBRUARY 13, 1946**

House of Representatives,
Committee on Agriculture,
*Washington, D. C.*

The committee met at 10 a. m., the Honorable John W. Flannagan (chairman) presiding.

The Chairman. The committee will come to order.

We have up this morning for consideration, H. R. 4503, to amend the act of March 10, 1934, entitled "An act to promote the conservation of wildlife, fish and game, and for other purposes."

(The bill is as follows:)

[H. R. 4503, 79th Cong., 1st sess.]

A BILL To amend the Act of March 10, 1934, entitled "An Act to promote the conservation of wildlife, fish and game, and for other purposes"

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Act of March 10, 1934 (48 Stat. 401), is hereby amended to read as follows:

"In order to promote effectual planning, development, maintenance, and coordination, of wildlife conservation, management, and rehabilitation in the United States, its Territories and possessions, the Secretary of the Interior, through the Fish and Wildlife Service, is authorized (a) to provide assistance to, and cooperate with, Federal, and public or private agencies and organizations in the development, protection, rearing, stocking, management, and administration of all species of wildlife, resources thereof, and their habitat, in controlling losses of the same from disease or other causes, in minimizing damages from overabundant species, in providing public shooting areas, and in carrying out other measures necessary to effectuate the purposes of this Act; and (b) to make surveys and investigations of the wildlife of the public domain, including lands and waters or interests therein acquired or controlled by any agency of the United States.

"Sec. 2. Whenever the waters of any stream or other body of water are impounded, diverted, or otherwise controlled for any purpose whatever by any department or agency of the United States, adequate provision consistent with the primary purposes of such impoundment, diversion, or other control shall be made for the use thereof, together with any areas of land, or interest therein, acquired or administered in connection therewith, for the conservation, maintenance, and management of wildlife, resources thereof, and its habitat thereon. In accordance with general plans, covering the use of such waters and other interests for these purposes, approved jointly by the head of the department or agency exercising primary administration thereof, the Secretary of the Interior, and the head of the agency exercising administration over the wildlife resources of the State wherein the waters and areas lie, such waters and other interests shall be made available without cost for administration by (a) such State agency, if the management thereof for the conservation of wildlife relates to other than migratory birds; or (b) the Secretary of the Interior, if the waters and other interests have particular value in carrying out the national migratory bird management program.

"No impoundment, diversion, or other water-control facility shall be constructed by any agency of the Federal Government, or by any public or private

1

agency under Federal permit, that does not include adequate means and measures so far as practicable, as approved by the Fish and Wildlife Service, in cooperation with the constructing or authorizing agency, to prevent loss of and damage to fish or aquatics dependent upon the waters affected by such impoundment, diversion, or other control facility.   The cost of planning for and the construction of installation and maintenance of any such means and measures shall be included in and shall constitute an integral part of the costs of the project, and necessary investigations to carry out the requirements of this section shall be conducted by the Fish and Wildlife Service in cooperation with the department or agency of the Federal Government, or other public or private agency under Federal permit, authorized to construct said water impoundment, diversion, or other control facility.   In the case of construction by a Federal agency, that agency is authorized and directed to transfer, out of appropriations or other funds made available for surveying, engineering, or construction to the Fish and Wildlife Service, such funds as may be necessary to conduct the required investigations.

"The reports and recommendations of the Secretary of the Interior, based on surveys and investigations conducted by the Fish and Wildlife Service for the purpose of preventing loss of and damage to fish or aquatics depending upon the waters affected by impoundments, diversions, or other control facility, shall be made an integral part of any reports submitted by any agency of the Federal Government responsible for engineering, surveys, and construction of such projects.

"Sec. 3. Such areas as are made available to the Secretary of the Interior for the purposes of this Act under sections 1 and 2, or by any other law, proclamation, or Executive order, shall be administered by the Secretary of the Interior under such rules and regulations for the conservation, maintenance, and management of wildlife, resources thereof, and its habitat thereon as may be adopted by him in accordance with general plans approved jointly by the Secretary of the Interior and the head of the department or agency exercising primary administration of such areas: *Provided*, That such rules and regulations shall not be inconsistent with the laws for the protection of fish and game of the States in which such area is situated.

' Sec. 4. The Secretary of the Interior, through the Fish and Wildlife Service and the Bureau of Mines, is authorized to make such investigations as he deems necessary to determine the effects of domestic sewage, mine, petroleum and industrial wastes, erosion silt, and other polluting substances on wildlife, and to make reports to the Congress concerning such investigations and of recommendations for alleviating dangerous and undesirable effects of such pollution.   These investigations shall include (1) the determination of standards of water quality for the maintenance of wildlife; (2) the study of methods of abating and preventing pollution, including methods for the recovery of useful or marketable products and byproducts of wastes; and (3) the collation and distribution of data on the progress and results of such investigations for the use of Federal, State, municipal, and private agencies, individuals, organizations, or enterprises.

"Sec. 5. There is authorized to be appropriated from time to time, out of any money in the Treasury not otherwise appropriated, such amounts as may be necessary to carry out the provisions of this Act and regulations made pursuant thereto, including the construction of such facilities, buildings, and other improvements necessary for economical administration of areas made available to the Secretary of the Interior under this Act, and the employment in the city of Washington and elsewhere of such persons and means as the Secretary of the Interior may deem necessary for such purposes.

"Sec. 6. Disposition or sale of surplus animals and products and the grant of privileges from areas administered by the Secretary of the Interior pursuant to this Act shall be in accordance with the provisions of section 401 of the Act of June 15, 1935 (49 Stat. 383).

"Sec. 7. Any person who shall violate any rule or regulation promulgated in accordance with this Act shall be guilty of a misdemeanor and upon conviction thereof shall be fined not more than $500 or imprisoned for not more than one year, or both.

"Sec. 8. The term 'wildlife' as used herein includes birds, fishes, mammals, and all other classes of wild animals."

The CHAIRMAN. This bill was introduced by Congressman Robertson of Virginia, who is with us this morning.   Mr. Robertson, we will be glad to hear from you.

**STATEMENT OF HON. A. WILLIS ROBERTSON, A REPRESENTATIVE
IN CONGRESS FROM THE STATE OF VIRGINIA**

Mr. ROBERTSON. Mr. Chairman, and gentlemen of the committee, the amendment to the Coordination Act of 1934 is designed to more fully protect the wildlife interests of the Nation in connection with future construction programs, largely in the nature of flood control and power dams.

The essence of this bill is that from the inception of a project to the time that a congressional committee approves the project consideration shall be given to what is to be done to the wildlife interests when the project is undertaken.

The bill, of course, admits that the primary purpose is flood control, or a power dam, or whatever the project may be. It sets out, however, that the wildlife interests are a valuable asset to the Nation, and those interests should not unnecessarily be affected or injured and retarded when something else that may be deemed desirable is undertaken.

The Western State commissioners were a little uneasy about the original language of H. R. 4503, because they felt that it did not adequately safeguard the common-law rights of the States, which, when the Federal Government was established, reserved to the States the complete title to and control over all wildlife interests.

Some years ago we negotiated a treaty with Canada, and later with Mexico, with respect to migratory birds, and pursuant to the provisions of that treaty the Federal Government under its treaty rights, took control of migratory birds, and, of course, still has control of migratory birds, and the States all recognize that control, and while a few of them may prefer to have control of the migratory birds, the consensus is, that being an international as well as national problem, it is desirable for the Federal Government to control the refuge systems for migratory birds, and the shooting provisions, in order that an adequate supply may at all times be preserved.

Mr. GRANGER. Did the Commonwealth of Massachusetts agree with you on that?

Mr. ROBERTSON. The Commonwealth of Massachusetts agrees to this extent, that they do not object to the Federal Government having control of migratory birds, but so far as the Parker River is concerned, some of them up there would just as soon not have a refuge established on the Parker River. That, of course, has become something of a famous case, and I will frankly admit there are two sides to it.

The project was originally endorsed by the game commission up there, and by a good many sportsmen. Some landowners do not want it. But that doesn't touch the fundamental proposition of control. It is purely local. They favor general control, but they just don't want this particular refuge established.

Mr. ANDRESEN. Is it your idea that the Federal Government would take complete control over the jurisdiction, the issuance of licenses and the policing of the migratory birds?

Mr. ROBERTSON. H. R. 4503 very specifically sets out that the Federal Government shall not do anything in the way of management that is inconsistent with the license provisions of any State, or inconsistent with the State's rights over upland game, and of the fur-bearing animals, and things of that kind. The only thing this bill does is to

reserve to the Federal Government its control of the migratory birds on these impounded water areas.   The area belongs to the Federal Government and the Federal Government should have the right to determine whether it should be a refuge or open to public shooting, and so forth, and the Federal Government shall continue to say when the season will open, the means you shall use to take ducks and geese, and how many you can take in a day, just as we have done ever since we have had Federal migratory bird laws.   This bill doesn't go any further than existing law with respect to Federal control over migratory birds.   The sole purpose of this bill is to compel the Army engineers, or whatever agency goes into an area to build a dam, or to build flood areas, to give recognition to the fact that there are a lot of people in those areas, and maybe in other sections, that are vitally interested in the fishing, in the hunting, in the purity of the streams, and in many things that come under the general purpose of coordinating the Federal activity.   This bill goes further than the original Coordination Act, which was merely permissive.   The original act said that when some Government agency starts on an impounding project they might give consideration.   This bill requires them to give consideration.   And it also is to be amended, I hope, in accordance with the agreement reached between the Fish and Wildlife Service and the western game commissioners, in Utah last month, so that the States shall have the right to submit to the Army engineers their views on what is involved.

Mr. GRANGER. Do you mean that every dam or flood-control project that will be built would automatically become a game refuge?

Mr. ROBERTSON. Oh, no; the chances are very few of them would. But if you had a project that dammed up, let us say, five or six thousand acres, or fifty thousand acres, it may be that somewhere in that impounded area that belonged to the Federal Government the Fish and Wildlife Service would think, in the interest of conservation and the maintenance of an adequate supply, it might be desirable for a refuge to be located there.   The purpose of this bill is to require the Army engineers, because they are the ones that do most of the building, to make a part of their records what is going to happen to your wildlife interests.   Then the Board of Army Engineers, which must act first before a project is approved, will have that information before them, and then if they say, "We will go ahead," they must indicate in their report what steps they are going to take.   Will they have fish ladders, for instance, or not; will they draw down these pools or not draw them down?

We have recently had an illustration of that, as Mr. Andresen so well knows, in the upper Mississippi River refuge.   We spent millions of dollars on that refuge, and it is involved in the deepening of the channel of the Mississippi River.   We have pools there to maintain the water flow.

The CHAIRMAN. Mr. Robertson, the legislation would require the Army engineers to make certain findings in their report?

Mr. ROBERTSON. That is right.

The CHAIRMAN. Suppose they do make certain findings that the Fish and Wildlife Administration does not agree with.   How would that controversy be settled?

CONSERVATION OF WILDLIFE                5

Mr. ROBERTSON. By the congressional committee that had to approve the project. And this bill will say that whatever is done or recommended for wildlife must be consistent with the primary purpose of what the project is to be for. We don't expect the Government to spend hundreds of millions of dollars and just give primary consideration to fish and game.

The CHAIRMAN. Let me get this straight: the Army engineers have made certain recommendations, have made certain determinations which would be set out in their report.

Mr. ROBERTSON. That is correct.

The CHAIRMAN. The Fish and Wildlife Administration does not agree with that——

Mr. ROBERTSON. Yes, sir.

The CHAIRMAN. Then the issue would be brought before a congressional committee?

Mr. ROBERTSON. That is right. We have an illustration of that in the proposal to build a series of dams on the Potomac River where the Fish and Wildlife Service submitted to the district engineer their views on what was going to happen to the wildlife that would be very costly and offset a lot of the advantages that were contemplated from the erection of those dams. The health interests came in and said, "You are going to build a dam with a draw-down of 90 feet, and that would leave thousands of acres of mud flats exposed at low water. That is a menace to health." That became a part of the record that went up to the Board of Engineers. The district engineer, centering his attention on the primary purpose, which I think was largely the building of power dams, said that the result from the primary purpose would more than offset the loss that would happen to health and to the fish, game, and recreation. But when the matter came to the Board of Engineers, they turned the project down, and one of the reasons that they turned it down was that they gave consideration—not to the loss of pleasure opportunities for people, but to the loss of dollars and cents to the fish interests and other interests, the monetary loss.

Suppose the Board of Engineers had agreed with the district engineer, then the issue would have come to Congress for final decision. But you would have a record to go on, and that is what this bill does.

In a moment I am going to ask that the Assistant Director of the Fish and Wildlife Service explain the amendments that he agreed on with the western game commissioners. In the meantime, I received this telegram from Mr. James O. Beck, of the Game Department of Idaho. It is dated the 12th, and reads:

Albert Day has consented to present views of Western Association at committee hearing.

They have all agreed, and the western commissioners were the only ones that had taken issue with the original language. Practically all the others, the eastern commissioners, and the central commissioners, had written me—I sent a copy of the bill to everybody with an explanation. I got the proposed amendments from the western game commissioners and analyzed them, and sent a statement of that analysis to the game commissioners of all the States, and they were all satisfied except the western commissioners, and they arranged for this conference at Salt Lake City, and at that conference they agreed on

amendments which I think will help the bill. I have a copy of the bill with these amendments set out, which I will leave with the chairman, and when you go into executive session I hope someone on the committee will be good enough to offer those amendments to the bill, because it will improve the bill. Then I think no one will object to the language of the bill.

The CHAIRMAN. Mr. Robertson, if the committee adopts the amendments, then all of these conflicting interests are in agreement?

Mr. ROBERTSON. They are all in agreement except to this extent: On page 2 of the bill, line 15, the bill says, starting there in section 2:

Whenever the waters of any stream or other body of water are impounded, diverted, or otherwise controlled—

And so forth—

adequate provision—

and the language they object to is—

consistent with the primary purpose of such impoundment, diversion, or other control shall be made for the use thereof, together with any areas of land, or interest therein, acquired or administered in connection therewith, for the conservation, maintenance, and management of wildlife, resources thereof, and its habitat thereon.

They would like for that language to be cut out. But I told them frankly I could not agree to that, because that subordinates your power projects, your flood-control projects, and all other projects to the wildlife interests. I couldn't go that far. There may come a time in our history when it may be desirable to go that far, but at this time that would just bring opposition to this bill. I don't think you gentlemen would report it out, and if you did, I don't think we could get it through the House.

The CHAIRMAN. Who is making that suggestion?

Mr. ROBERTSON. The western game commissioners. They say, however, they are not going to insist on that. They would have preferred that that be out, but they recognize the factual situation that we couldn't put through a bill in Congress, when we have already authorized a billion dollars for flood control, and five or six hundred million for rivers and harbors, and all that sort of thing, if those projects would be subordinated to the wildlife. We do not ask that. They are not going to take any exception on that ground; they know we can't put that in, and it is not in the present law.

Mr. HILL. You speak all along in your argument here concerning the work of the Army engineers. Do you include also the development in the West of irrigation projects by the Bureau of Reclamation?

Mr. ROBERTSON. In my opinion, those projects would not really be involved. I must plead a certain degree of ignorance of the great West. I have been in the West a little bit, but I haven't made any careful examination of the irrigation projects there. I know that we tied in a refuge there in Utah with the irrigation project in the Bear River marshes, and it was a good thing for everybody concerned. But my impression is that most of your irrigation projects are diversion projects where you take the water out of a stream and run it into a smaller stream, and then take off little streams from there on.

CONSERVATION OF WILDLIFE 7

Mr. HILL. But you must remember that we built dams. I have in mind one where we impounded enough water to make a lake of 6,000 acres.

Mr. ROBERTSON. Well, it might be that a lake of 6,000 acres would come under the provisions of this bill. But the Fish and Wildlife Service would have no control over the fishing in that lake. If it should be used for migratory birds, they would have the first say-so on what would be done about the migratory birds but consistent, as I have already indicated, with your State license laws. I can't see where there would ever be any conflict with an irrigation project any more than there would be a conflict with a power project, or a flood-control project. Because all this bill does is to say that when you plan to impound water in an area for any such development, you should give consideration to what you are liable to do to the wildlife interests in that particular area and work out the best plan you can not to unduly injure those wildlife interests.

Mr. HILL. Suppose the wildlife folks had not been in there at all, and assume the engineers of the Reclamation Service decided to impound a lot of water down a stream and build a series of dams, which would result in a number of lakes that would be or could be used for either fish or wildlife, and the Fish and Game Department, after they had recognized and understood what the plans were to be, came along and say they would like to take this thing now and put it under their wing—after the project had been fully planned, we will say, by the Army engineers and the Reclamation Bureau.

Mr. ROBERTSON. That is the situation now. The Army engineers can plan a project and start construction on it before anybody knows what they are up to, and then it is too late, sometimes, to find out what is going to happen. Under this bill they have to notify the Fish and Wildlife Service they are going to do this work.

Mr. HILL. Even though there was not any activity there on the part of the Fish and Wildlife Service before the project was started?

Mr. ROBERTSON. There is always fish in every stream. You can't make a dam without a stream, and if you have a stream you have fish, and you can't make floodwaters over five or six thousand acres without affecting fish or other wildlife. There may be nothing there but a groundhog or a gopher——

Mr. HILL. I am talking about fish—mountain trout.

Mr. ROBERTSON. I will tell you frankly that that is my favorite fish. If it is a speckled trout it is the best ever.

Mr. HILL. The rainbow trout is the best fish in the world.

Mr. ROBERTSON. The rainbow, where you have cold water, is just as game as the speckled trout. But our streams are too small for our fish to reach the size that yours do. You seem to have more food out there for them. But any fish that abounds in cold water and can get enough live food to make his meat pink, is a fighting fish. You can't go out there and dam up one of those mountatin streams without adversely affecting something.

Mr. HILL. Our Fish and Game Department of Colorado communicated with me yesterday, and I have a wire from them in support of this measure with the amendments.

Mr. ROBERTSON. That is right.

Mr. HILL. They attended that meeting you spoke of.

Mr. Robertson. They had a preliminary conference with Mr. Day and they agreed they were going to Salt Lake City for that meeting. They wrote me that they had agreed, and Mr. James O. Beck, who I think is now the president of the Western Game Association, wires me that Mr. Day will present these amendments and they are the ones I am asking you to adopt.

Mr. Hill. Mr. Pitt talked to me yesterday over the phone, and said that these amendments seemed to fit in with the ideas of the western boys in fine shape.

Mr. Robertson. No doubt about that.

Mr. Andresen. I am very much interested in your bill, but there are certain things I would like to have mandatory in the legislation, and I want to point out the situation in the Upper Mississippi Wildlife Refuge. That was created in 1924 by an act of Congress. We recognized that up until a few years ago the War Department and the Board of Engineers were only interested in navigation.

Mr. Robertson. That is right.

Mr. Andresen. Some years ago the late President Roosevelt issued an Executive order, taking land that the War Department had acquired for flowage rights, and turned that land over to the Biological Service, at that time, so that they could use it as a refuge, or for conservation purposes for wildlife. After the dams were completed and the pools created in the upper Mississippi River, from St. Paul down to Cairo, Ill., we have gone into an annual controversy with the War Department and the Board of Engineers about the draw-down of the pools in the river. Many of these pools have been completely drained so that tens of thousands of tons of fish have been either suffocated or killed; muskrats and other wildlife has been destroyed, the vegetation for migratory birds has been destroyed, and all up and down the river there has been tremendous complaint against this practice of the War Department in drawing down these pools so as to destroy this wildlife. I brought it up in our special committee. We have had the same situation this year. Fortunately we had some rain out there this year and the pools have been raised again and there will be no further draw-downs. But if we have to come up against this proposition every year, due to the failure of the Board of Engineers to cooperate, the wildlife in that area will soon be destroyed.

Now, what I would like to see in connection with this bill, and I am sure it won't have the support of the conservationists up and down the river, unless something is put in here in the shape of a mandatory provision requiring the Board of Engineers to maintain pool levels so that fish and other wildlife and vegetation can be maintained in the interest of conservation.

Mr. Robertson. No doubt that would be a very desirable program, but that is just a little bit out of the scope of this legislation.

Mr. Andresen. I don't think so.

Mr. Robertson. This legislation deals with what plans you are going to make when you start a new project, and we say on page 2, under the amendment agreed on at Salt Lake City—

Whenever the waters of any stream—

and so forth—

are to be impounded, diverted—

such department or agency as is going to do this work shall first con-
sult the Fish and Wildlife Service and the head of the agency exercis-
ing administration of the wildlife resources of the State wherein the
project is located.   Then on page 3 we say :

> No impoundment, diversion, or other water-control facility shall be constructed
> by any agency of the Federal Government, or by any public or private agency
> under Federal permit, that does not include adequate means and measures so far
> as practicable, as approved by the Fish and Wildlife Service, in cooperation with
> the constructing or authorizing agency, to prevent loss of and damage to fish
> or acquatics dependent upon the waters affected by such impoundment, diversion
> or other control facility.

That is as far as we can go without saying that the Fish and Wild-
life Service shall come first, and I say we would never get that through.
   Mr. ANDRESEN. I don't claim that, but there must be some reason-
ableness in the entire program.
   Mr. ROBERTSON. Yes.
   Mr. ANDRESEN. Now, if there be a uniform draw down in the pools
without draining certain pools completely, we could probably reach
some agreement, but the trouble is that certain pools are completely
drawn down, and others are left in the areas where they are drawn
down completely to the dam level, so that it becomes the normal stream
flow again.   In those areas vast quantities of territory are drained
and this wildlife and vegetation is destroyed.   Would you have any
objection to a section added to this bill requiring the type of coopera-
tion which I have mentioned, and which I seek, so that on existing
projects the War Department and the Board of Engineers would be
required to cooperate to that end?
   Mr. ROBERTSON. If you could frame such an amendment that
wouldn't go beyond the provisions that we have in this bill for new
projects, we, of course, would have no objection.
   Mr. ANDRESEN. This bill doesn't touch existing projects at all.
   Mr. ROBERTSON. I believe that the passage of this bill will so center
the attention of these construction agencies on the wildlife interests
that it is bound to extend to existing projects as well as to new proj-
ects.   And we say, "as far as practicable," and we say over on page 2,
"consistent with the primary purpose." I don't believe you are going
to get any bill through that takes those words out.   What we are after
is the protection of the wildlife interests, but consistent with the pri-
mary purpose of the project, and what is going to be done—if it is a
flood-control project, a power dam or an irrigation dam that is what
it is being built for.   The second thing is that they must not do any-
thing on that project to injure the wildlife if they can work out some
practicable way not to do it.
   Mr. ANDRESEN. That is on future projects.
   Mr. ROBERTSON. I will ask Mr. Day if he doesn't think the language
of this bill will be so construed by the construction agencies that they
would apply it to all their projects.   Or do you think it is necessary
to have an amendment to this bill relating to existing areas?
   Mr. DAY. I doubt it would make this bill apply to existing areas on
the upper Mississippi River.
   Mr. ROBERTSON. I will ask the counsel for the Fish and Wildlife
Service if it would be difficult to frame an amendment to carry out
what the Congressman suggests.

Mr. DONALD J. CHANEY (counsel, Fish and Wildlife Service). No; I don't think it would.

Mr. ROBERTSON. We have revised this bill three different times, and it is not an easy matter to get a bill that will meet all the objections that could possibly be raised to it. I would be happy to have such an amendment included in the bill, provided it so framed that it would not be a millstone on the bill when it comes up on the floor.

Mr. ANDRESEN. I can assure you it would not be a millstone, because I think the majority of the Members in the House are conservation minded, and they want to do everything they can to protect the wild-life of the country. I don't believe there will be any difficulty in that respect, and if I may have the cooperation of the gentlemen you just mentioned——

Mr. ROBERTSON. They will be happy to assist you with such an amendment.

Mr. GRANGER. After all, the flood control work is in the interest of the property and life of the individuals, as compared to the fish and wildlife. I would go as far as we can go, if it would not have the effect of confusing it.

Mr. ANDRESEN. I don't think so, because it would be in the interest of the people, too. During these days when we have meat shortages, it is a crime to see hundreds of thousands of tons of fish smothered and other wildlife and vegetation destroyed.

Mr. GRANGER. I know it, but when you have a flood control project, you don't want to have the reservoir already filled with water so that you can't put any more in it.

Mr. ANDRESEN. This doesn't have anything to do with flood-control projects. This is on the upper Mississippi River.

Mr. GRANGER. Under the provisions of this bill it would bring in every little reservoir, it wouldn't make any difference who built it, if it were used for migratory birds, under the jurisdiction of the Fish and Wildlife Service.

Mr. ROBERTSON. No; the first thing in the bill is that it only relates to land owned by the Federal Government. You just can't go out and build a dam on any land you want to. It is a Federal project and on a federally owned area. The next thing, the primary purpose of this bill is that when they make those plans, the Federal agencies must give due regard to what they are going to do to the wildlife interests and not needlessly injure the wildlife interests. That is all that it does.

Mr. GRANGER. I suppose in the migratory sense, the wildlife is confined to birds, is it not?

Mr. ROBERTSON. Migratory birds, as the name implies, are birds that fly across boundary lines. This committee, in its wisdom, put the eagle on the protected list. I was very happy to see you do it, but you didn't have any jurisdiction over him except as a migratory bird, and he is not, in my opinion, a migratory bird. But he is our national emblem. On some of the occasions when this committee considered those bills, I reported to the then chairman that I doubted the jurisdiction of the Federal Government to legislate on the eagle, because I didn't think the Federal Government had any power or control over any game or any type of bird unless it is migratory, and

Congress gets that power through the treaty making powers of the Government.

Mr. GRANGER. Of course, all these projects in the West, or 99 percent of them, are built on Government land to begin with.

Mr. ROBERTSON. Yes.

Mr. GRANGER. And they are built to impound water, and when you impound water out there the fish going over does not look to see if it is built for reclamation or flood control. It seems to me that this bill introduces into every one of these projects the fish and wildlife end of it.

Mr. ROBERTSON. The Federal Government now has control of migratory birds. The Western States started out on the assumption that it would be a good idea to return control of migratory birds to the States.

Mr. ZIMMERMAN. Wasn't there inserted in the last Flood Control Act a provision that required the cooperation with the conservation groups on wildlife?

Mr. ROBERTSON. We got inserted on the Senate side a little amendment——

Mr. ZIMMERMAN. It was put in on the House side.

Mr. ROBERTSON. I mean we had a broader amendment. I got Senator Overton, who was in charge of the bill on the Senate side, to offer it. That went as far as we could go, when the bill was almost ready for a vote. That gave us some help, but this goes much farther than that. It does a job that all the conservationists and all the State game departments say should be done, that is, that in these big projects we should have some definite law on the subject beyond an invitation to be considerate.

Mr. ZIMMERMAN. I have one of these flood-control dams in my district, and I have found the Army engineers and the Wildlife people get together and work out a program. We don't have any trouble down there.

Mr. ROBERTSON. No; in some instances you don't have any trouble at all. It depends largely on who the district engineer is that makes the original plans. If he is interested in fish and game he will go out of his way to try and protect wildlife interests. If he is not, some of them have had trouble.

Mr. ZIMMERMAN. I would like to accomplish what Mr. Granger says. You take a flood-control dam, at certain seasons you will impound water and, of course, if you have a lock that is already filled with water, you have destroyed the usefulness of that reservoir for flood control. It is just a little different from a combination dam, or a hydroelectric dam, where you have to keep a certain head of water all the time. I think the Army engineers are going to be disturbed about this matter. Don't you think so?

Mr. ROBERTSON. I don't think they will have any objection to this bill at all, because, as you say, they try to consider the wildlife interests now. But it is my understanding—and I will ask Mr. Day about that—that all the law that we have now is that we ask the Army engineers to consider the matter. That is all the law we have now, including the amendments to this last flood-control bill.

Mr. DAY. This amendment you mention was put in to provide that the States should be given opportunity to review the flood-control

plans after they were made. They have 90 days to review and voice
objections. This bill goes much deeper than that and proposes that
they come in on the original plans, so that it is original planning
rather than post-mortem planning.

Mr. GRANGER. The only objection I can see to this bill is that it is
a difficult matter to get a reclamation project started, or a flood-control
project, and the more agencies you get in there the more difficulty you
are going to have in getting approval of it.

Mr. ROBERTSON. I don't anticipate that it will add to the inherent
difficulties. It will just give you a better job and do your State more
good when you finally get it, if you include the wildlife interests in it.

The CHAIRMAN. Just what effect would this legislation have on
existing projects?

Mr. ROBERTSON. As I say, I don't think it would have any at all.

The CHAIRMAN. It is new projects coming in?

Mr. ROBERTSON. New projects, when this bill becomes law.

The CHAIRMAN. Now, for the purpose of the record, what would
happen when you establish a new project, say in Virginia?

Mr. ROBERTSON. If you are establishing a new project in Virginia
the Army engineers would notify the Fish and Wildlife Service what
they were going to do, and they would also notify the State of Virginia.
They now notify the State what they are going to do, but not with a
view to having recommendations about wildlife interests. The Wild-
life Service would submit its views to the district engineer before he
had submitted his report and before you had public hearings before
the board of Army engineers to see whether the Army was going to
approve the project or not, and that becomes a part of the record, and
you start from the ground floor and work up with everything that is
going to be considered as being involved. Heretofore we have often
acted on the assumption that we had an abundant supply of wildlife
and it didn't make much difference what was done with it. We know
now that is not true.

The CHAIRMAN. Let us get in the record what happens. The Fed-
eral Government contemplates the establishment of a project in Vir-
ginia; then the district engineers would notify the State authority
and the Wildlife Service?

Mr. ROBERTSON. That is right.

The CHAIRMAN. Now, would we have hearings?

Mr. ROBERTSON. They could have hearings, or they could submit
briefs. But they would get their views to him.

The CHAIRMAN. They could either have a hearing or submit briefs?

Mr. ROBERTSON. That is right.

The CHAIRMAN. Would that go into the record?

Mr. ROBERTSON. That would become a part of the record.

The CHAIRMAN. That would become a part of the record. Then
when it came up to the officials here in Washington for determination
they would have a complete record?

Mr. ROBERTSON. They would have a complete record. And here is
the new phase of this that does not now exist. After the State game
department and the Fish and Wildlife Service and the other con-
servation agencies tell this district engineer what was involved here
from a wildlife standpoint he would have to put in his report what
he was going to do about it, if anything.

The CHAIRMAN. He would put that in?

Mr. ROBERTSON. Yes, sir.

The CHAIRMAN. Then it comes up here for approval or disapproval?

Mr. ROBERTSON. Then the whole record comes before the committee that has to approve the project, which will be Flood Control or Rivers and Harbors, and they can decide whether or not the primary purpose, whether flood control or whatever it may be, is so important that the protest can be overridden.

The CHAIRMAN. When it comes before the committee the committee will have the complete record showing the views of not only the Army engineers, but of the Fish and Wildlife Service, and of the State in which the project is located?

Mr. ROBERTSON. That is correct.

Mr. GRANGER. Suppose the State and Wildlife Service do not agree on how it should be used as a wildlife sanctuary?

Mr. ROBERTSON. Well, I don't think that would come up in the hearings, as to any disagreement as to how it would be used.

Mr. GRANGER. Which one of these agencies would supervise the thing?

Mr. ROBERTSON. On everything except migratory birds the primary jurisdiction would be with the State authorities. You will find that on page 3—

That it be administered by such State agency——

The CHAIRMAN. What line?

Mr. ROBERTSON. Line 4, page 3:

\* \* \* for administration thereof by (a) such State agency, if the management thereof for the conservation of wildlife relates to other than migratory birds.

Mr. ANDRESEN. Let me ask you on that point: There are a good many navigable streams that are the dividing lines between the States. I happen to live on the Mississippi River. Wisconsin is across the river; the best duck hunting is on the other side of the river, on the Wisconsin side. To hunt over on the Wisconsin side in the bottoms of the Mississippi River it is required by the State of Wisconsin that I take out a nonresident license, and, of course, we have the same requirement in Minnesota, to wit, $25. Will this bill in any way change that, so that on boundary waters between States there will be no requirement for— or, will it take away jurisdiction from a State to charge nonresident license fees to hunt on those boundary waters?

Mr. ROBERTSON. I am sorry, the bill won't give you any relief on that. We have the same situation between Maryland and Virginia. This bill, unfortunately, cannot take care of that situation.

Mr. ZIMMERMAN. Don't you give the Fish and Wildlife Service almost complete control over all construction? [Reading:]

No impoundment, diversion, or other water-control facility shall be constructed by any agency of the Federal Government—

That includes reclamation, flood control, and everything. [Continuing:]

or by any public or private agency under Federal permit, that does not include adequate means and measures so far as practicable, as approved by the Fish and Wildlife Service, in cooperation with the constructing or authorizing agency——

Mr. ROBERTSON. All that amounts to is permission to make recommendations to the constructing agency as to what is a good way to protect the wildlife interests. That is in the section that relates to administration, and it doesn't give the Fish and Wildlife Service any jurisdiction at all.

Mr. ZIMMERMAN. That is a positive statement that "no impoundment——"

Mr. ROBERTSON. That relates to the initiation of the project.

Mr. ZIMMERMAN. No, no; I can't read that at all. "No impoundment or diversion, or other water-control facilities." That includes reclamation, flood control and everything.

Mr. ROBERTSON. I think, sir, you will find that the meaning is controlled by the three words in line 10, which say "Shall be constructed." We are dealing with something that is going to be constructed, and when you say these various things shall not be constructed until the Fish and Wildlife Service has first proposed a plan——

Mr. ZIMMERMAN. No, no. Until it is approved by them. It is positive language to me—approved by them. You look at that language there.

Mr. ROBERTSON. What is to be approved is the plan to protect the wildlife.

Mr. ZIMMERMAN. It doesn't say plan. It says "No impoundment, diversion; * * *." That means the work on the project cannot be done until it has had the approval.

Mr. ROBERTSON. Then read the whole thing, to see if we can't get you cleared up on that, because we have discussed this with all the conservationists, all the State departments, all their lawyers, and we all agree on what this part means. Some of them cannot agree on what the other means. I submit that this language on page 3, line 9, relates solely to the recommendation by the Fish and Wildlife Service, and another section says the States can come in. That is an amendment that is going to be offered—that none of these new projects shall be constructed until the plan for the protection of wildlife which has been approved by the Fish and Wildlife Service has been submitted and considered. They haven't got a thing to do with the approval of the project. All their approval relates to is the wildlife plan.

Mr. ZIMMERMAN. No, no; you don't say that there.

Mr. ROBERTSON. Well, that is what I mean. You can get any lawyer, or drafting expert, and if he says it means differently from what I say it does, I have no objection to changing it. But I contend that that approval relates only to the plan for the protection of wildlife and has nothing to do with whether we have a project or not.

The CHAIRMAN. Let me ask the counsel for the Wildlife Service; is that your construction of that language?

Mr. CHANEY. Yes, Mr. Flannagan. Another thing I would like to call attention to; the particular provision that Mr. Robertson is now speaking of relates only to fish. Mr. Robertson has a suggested amendment here which covers wildlife in general, and in answer to Mr. Zimmerman's query you will notice that—

No impoundment shall be built that does not include adequate means and measures, so far as practicable, as approved by the Fish and Wildlife Service, in cooperation with the constructing agencies.

We must have both.

Mr. ZIMMERMAN. That means they are cooperating, but, after all, they must have the approval of the Fish and Wildlife Service before they can do anything. "No construction shall be made" unless that is done.

Mr. CHANEY. May I call your attention to this, Mr. Zimmerman——

Mr. ZIMMERMAN. In other words, you are hamstringing the Army engineers.

The CHAIRMAN. How about those words "as far as practicable"?

Mr. ROBERTSON. Mr. Zimmerman, I may be able to clear up this misapprehension——

Mr. ZIMMERMAN. What I am thinking about is this, for example. We have authority for the MVA; then we have a big plan out there that embraces several States; it embraces navigation on the Missouri River and the Mississippi River; it embraces flood control, and it embraces reclamation. That is, it provides for irrigation on thousands of acres in these different States. Truly a great plan. Now, that is under the supervision, of course, of the Army engineers. Are we going to come in and say, "You boys can't construct something, or put into execution a great plan like that, which would mean billions of dollars to this Nation, unless certain things are agreed upon by certain other agencies"?

Mr. ROBERTSON. No, no; I wouldn't think of that. We are just copying the language of the present law we have been operating under for 10 years. Hear this:

Wherever and whenever any dam is authorized to be constructed, either by the Federal Government itself, or by any private agency under Federal permit, the Bureau of Fisheries shall be consulted, and before such construction is begun or permit granted, due and adequate provision shall be made for the migration of fish life from the upper to the lower and lower to the upper waters of said dam by means of fish ladders and other devices.

We are just carrying that forward into this present law, and that is all we are asking you to do. And you will notice this language on page 3, commencing at line 9, is all one sentence, and when you get down to the end you are dealing with nothing but fish.

The CHAIRMAN. Before you conclude, I would like to have your views on the suggestion made by Mr. Andresen. It strikes me with a good deal of force that these withdrawals should be uniform.

Mr. ROBERTSON. I endorse it 100 percent if the amendment merely makes the bill apply to existing as well as new projects. I think it is going to help us in our general program, especially with respect to fish. I have gotten right much discouraged about upland game. I don't believe we will ever again have any great hunting except on private preserves, but we can preserve decent fishing for 140 or 150 million people if we don't go out and needlessly ruin some of the fishing we have, and if we stop some of the pollution that is ruining the fish. This bill will maintain the present power of the Federal Government to go ahead with the primary purpose of irrigation, flood control, or whatever you want. But let us couple it with some other interests that may some day be very vital to us.

The CHAIRMAN. In the event that Mr. Andresen can get a satisfactory amendment worked out, do you have any objection to including that amendment in this legislation?

Mr. ROBERTSON. Not at all. I think it would help the bill. I didn't, at first, catch the full import of the proposal when it was first made, but if it is brought in line with the provisions of this bill and just makes the application to existing and to new on the same basis, it would be very helpful.

Mr. ANDERSEN. For the purpose of getting this amendment drafted properly, I don't know that this problem or situation exists in other areas of the country. It does exist on the Mississippi River, between St. Paul and, I think, Cairo. Ill. Would the gentleman feel that it would be better for use to make this amendment general on existing projects, or to confine it to the Mississippi River area?

Mr. ROBERTSON. I think it would be better to make it general. I don't like to legislate just for one project. I think general principles are much more effective.

Mr. ANDRESEN. I think it should be the general policy, but I just wanted to get the gentleman's views.

Mr. ROBERTSON. I prefer general application.

Mr. HILL. You will have to be careful in your western irrigation projects, because a lot of these lakes that have fish in them must be drawn off in the months of September and October in order to get the lake water. You will have to exclude that sort of reservoir.

Mr. ANDRESEN. What I had in mind particularly, and I am glad you brought this up, is the navigable streams where the War Department causes a draw-down, an ununiform draw-down to furnish more water for navigation in certain other areas.

Mr. HILL. That excludes us.

Mr. ANDRESEN. Yes; because you don't have navigation up there in those streams.

Mr. HILL. If you pass the Missouri Valley Authority, they will order our water down the river to float the steamships.

Mr. ANDRESEN. That has not been passed yet.

Mr. ROBERTSON. Mr. Chairman, when you go into executive session, I would be very happy to have my distinguished friend from Missouri move to strike out that word "approve" and put in the word "recommend," because that is all that it means.

The CHAIRMAN. What line is that?

Mr. ROBERTSON. In line 3. He thinks that word "approve" has to do with whether they start the project or not. If he strikes out that word "approve" and puts in the word "recommend" it would be agreeable to me. That is what I intended to do, and that is all I think it does do.

Mr. GRANGER. You are perhaps more familiar with this sort of legislation that any Member of Congress, I imagine. What might the Fish and Wildlife Service require of the Army engineers that they must do to build a dam? Could they say as to this area where they are going to flood that several miles back of it should be reserved for migratory birds?

Mr. ROBERTSON. On, no; they wouldn't say that.

Mr. GRANGER. Could they say it?

Mr. ROBERTSON. One thing they could say is, "We want you to provide for a fish ladder here, so that the fish can go up and down stream." Another thing that might be said by the Army engineers is, "We would like to get so many kilowatts of power, and we can do it if we

draw this dam down 150 feet, and we can get a few less kilowatts if we draw it down 100 feet." The Fish and Wildlife Service might say, "If you draw it down 150 feet you are, in dry seasons, going to kill all the fish in 50,000 acres of impounded waters. Why not limit your draw down to 100 feet, get a little less power, and save the fish?"

Mr. Granger. What about migratory birds?

Mr. Robertson. Migratory birds are under Federal control and under this bill they stay under Federal control, and we can't take it away. This bill doesn't change that at all. All this bill seeks to do is to get better coordination between the various activities of our Government and bring the conservation agencies into the picture from the start. That is all it does.

Mr. Andresen. Will the gentleman yield on that point?

Mr. Robertson. Yes.

Mr. Andresen. So far as the migratory birds are concerned, in the pools to which the gentleman has referred, in the spring of the year those pools are full up. We need the watered areas in breeding and nesting seasons, and when you have to have a draw down of these pools for irrigation purposes, there really is not as great a need, as I see it, for that water that was in the impounded area as there was in the spring of the year during the breeding and nesting season. So I don't think it would interefere at all with the migratory-bird proposition if the draw-down takes place later in the year.

Mr. Robertson. I don't think that is ever going to be a problem. The main thing we are dealing with here would be the fishing interests.

The Chairman. We thank you, Mr. Robertson.

Mr. Robertson. Mr. Chairman, if I may, before I leave the stand, have your kind permission to call attention to the fact that we have three other bills before you, introduced at the same time this one was, and on which I think there has been no objection, and if the committee would be willing to consider them along with this and report them out, I would be grateful.

One bill is H. R. 3821. It amends the Pittman-Robertson Act, which sets aside the 10-percent tax on sporting arms and ammunition for grants-in-aid to the States. They have been getting about $900,000 a year. The Budget this year carries $3,000,000. The States are required by the original law to use that to buy land for refuges and public shooting grounds and restocking them. All the States want the privilege of using a part of it for maintenance, because they say if we go ahead, we will get so many of these public shooting areas that they cannot maintain them. And they are afraid to go too far in land acquisition, because their local funds are not sufficient for maintenance. This bill merely authorizes them to use this fund for maintenance as well as for acquisition, and it is certainly in the interest of conservation, I think, to permit that to be done.

Mr. Granger. Does the bill read in the alternative, that they can use it for either purpose?

Mr. Robertson. Yes. It just adds this new feature, and all the State departments want it, and when we determine the amount—and I hope they do get the $3,000,000—we have $12,000,000 in the trust fund now——

Mr. Andresen. What percentage does this bill specify shall be used for maintenance?

18                    CONSERVATION OF WILDLIFE

Mr. ROBERTSON. I think the percentage was set up—not exceeding 25 percent of the total.

Mr. HILL. Each State would determine for itself what amount it would use?

Mr. ROBERTSON. They can't use more than 25 percent.

Mr. HILL. Within the State?

Mr. ROBERTSON. That is right.

Mr. HILL. There is no opposition to that?

Mr. ROBERTSON. So far as I know.  If we could get that out, it would help all the States.

Mr. ANDRESEN. Another thing about that is we wouldn't want to see them use this money to appoint a lot of political game wardens.

Mr. ROBERTSON. I don't think they ought to do that.  I don't reckon they would.  I think we have got our State game departments on a pretty efficient basis now.

The CHAIRMAN. Are the States in agreement on 3821?

Mr. ROBERTSON. I have agreement from all excepting the State of North Carolina, which raises some question about a minor change in the minimum that a State would get.  I don't think that is vital, and I think the plan as proposed is absolutely sound and right.  When we are going to allow them maintenance we have to make a little increase in the minimum allowance for the small State.  You might have a State as big as Virginia and not have as many people in it. They don't get the same amount, because the license fees are not there, but they may have a lot of game in it.

Mr. ANDRESEN. Are these disbursements made on the basis of population in the State or on the basis of collections made in the States?

Mr. ROBERTSON. The bill sets up several factors.  It is the area, the number of licenses, and the population.

Mr. ANDRESEN. Then the distribution, of course, should be on the basis of the number of licenses rather than on the population?

Mr. ROBERTSON. Oh, yes; but we take in the population, the licenses and the area to say that no State shall get less than so and so.  This amendment makes a very slight change in the minimum any State would get, and I think it is in the interst of everyone.

The CHAIRMAN. What is the other one?

Mr. ROBERTSON. The other one is H. R. 3461, and it authorizes the Fish and Wildlife Service to permit the feeding of migratory birds, principally ducks.  I can't say that we have unanimous support for that.  There were several sportsmen who appeared before our select committee and opposed that bill, because they construed it as a baiting bill.  Of course, I wouldn't want a baiting bill.  It is all under the jurisdiction of the Fish and Wildlife Service.  We are having a very peculiar thing happen to the flight along the Atlantic coast especially in Maryland, Virginia, and North Carolina.  We are just not getting the ducks.  And out in California they have the same problem.

Mr. HILL. Up in Massachusetts, too.  This committee had that just last week.

Mr. ROBERTSON. They claim they need a refuge up there.

Mr. ANDRESEN. Wouldn't it be just as well to let that bill lie over until we get more corn and feed?

Mr. ROBERTSON. Possibly so.  We don't press that.  A lot of people think the ducks are hungry and ought to be fed.  They say they are

running all around looking for food and are not coming here—are not coming to the Atlantic coast where they once got food.  We do not press that, but a lot of people say we are losing the ducks in certain areas along the coast.

The CHAIRMAN. What is the next one?

Mr. ROBERTSON. The next bill is a bill to put all the public refuges under the same law.

The CHAIRMAN. What is the number?

Mr. ROBERTSON. It is 3460.  When we passed the duck-stamp bill——

The CHAIRMAN. What does this bill do?

Mr. ROBERTSON. This bill provides that whether you buy with general funds, or whether you buy with duck-stamp money, the Fish and Wildlife Service should have the right to open up part of the area to public shooting if they think it is desirable to do so.  They have that power now under the general law, but we in drafting the duck-stamp law—and Dick Kleberg, a member of this committee, introduced it, and Mr. Andresen helped to draw it, and we put in there a very tight provision that it had to be an inviolate refuge.  They found in going out and getting this land, in order to get what they wanted, they sometimes had to take more than they could use, and there may be cases where it is desirable to use a part of it as a public shooting ground and the rest of it for refuge.  It just brings the duck-stamp law in line with the power under the migratory-bird law, and the Migratory Bird Commission, which is financed from the Public Treasury, to use up a little of it for public shooting if they want to do so.

Mr. ANDRESEN. As I recall it—I haven't examined the law at all lately—but the original Migratory Bird Act—and I was one of the authors of it—provided for inviolate sanctuaries.  If I am wrong, I would like to be corrected.

Mr. CHANEY. That is correct.

Mr. ANDRESEN. So that there was to be no public hunting or shooting on it.

Mr. CHANEY. The public shooting comes in in this way: Refuges on lands which are acquired out of the hunting-stamp funds are inviolate refuges.  However, other moneys have been appropriated and public lands have been reserved and are administered under general authority which do not have any limitations on them as to whether or not shooting can be permitted.  But you are correct, sir, in that all lands acquired out of moneys appropriated under the hunting-stamp fund must remain as inviolate refuges.

The CHAIRMAN. What change would this make in the law?

Mr. CHANEY. This would permit, under certain circumstances, and you will notice, Mr. Andresen, that reference is made to distribution of funds, economic value, breeding habits, times and lines of flight—the same words as used in the Migratory Bird Conservation Act—having taken those things into consideration, the Secretary may, if he determines that there are sufficient birds, open up not to exceed 25 percent of any inviolate area to hunting.

Mr. ANDRESEN. I think we ought to go into this bill rather carefully, so that we can fully understand that, because I don't think it would be the will of the conservationists of the country, except

possibly certain local areas, where they would want to open up these sanctuaries. Personally, I would want to give it quite a bit of thought, and hold some hearings on it before we tackled the bill.

Mr. ROBERTSON. I agree, of course, that it is a matter that could be subject to abuse. I have felt that we could very safely trust the Fish and Wildlife Service, because they have been overstrict in opening up anything that they had the power to open up.

Mr. ANDRESEN. I know that from experience.

Mr. ROBERTSON. And the Fish and Wildlife Service itself thinks that as a long-range program it should have the power, if they have got to acquire more land than they need for refuge purposes—why deny the public? After all, we love these birds of the air and the beasts of the field, but we believe they were put here for man's use. I don't criticize at all those who are unwilling to kill a bird or kill a game animal, but I think, to be consistent, they should not kill a domestic one either. I don't see the difference. If they are going to be vegetarians, that is all right, but if they are going to eat meat, they ought not criticize me if I prefer a canvasback duck to a Dominick rooster. I want to maintain the supply but, after all, we are trying to build up fishing for the sport of fishing, as well as the food we get out of it. We are trying to build up our supply of migratory birds, and that is one of the finest efforts we have in the country. It does everybody good.

In conclusion, I would like to insert in the record a telegram I received from the Maryland Sportsmen's Club. They wanted to come in and testify, but couldn't get here.

The CHAIRMAN. Without objection, you may include it in the record.

(The telegram is as follows:)

BALTIMORE, MD., *February 12, 1946.*

Hon. W. ROBERTSON:

Maryland Sportsmen's Club at today's meeting voted in favor of passage of H. R. 4503.

J. C. BORDURONT, *Secretary.*

The CHAIRMAN. I desire to insert in the record the statement of the Izaak Walton League of America, Inc., on H. R. 4503, that I received from the director this morniong, in favor of the bill; also an editorial which is a reprint from Field and Stream.

(The papers referred to are as follows:)

IZAAK WALTON LEAGUE OF AMERICA, INC.,
*Chicago 2, Ill., February 11, 1946.*

Congressman JOHN W. FLANNAGAN, Jr.,
*House Office Building, Washington 25, D. C.*

DEAR CONGRESSMAN FLANNAGAN: We are attaching a copy of a statement of the Izaak Walton League of America with reference to the Robertson bill, H. R. 4503, which we understand will be up for hearing before the House Agriculture Committee on February 13.

We earnestly request that you read the statement and that you support H. R. 4503. It is, in our opinion, one of the most important and vitally needed pieces of legislation that has been before the Congress in many years.

Sincerely yours,

KENNETH A. REID,
*Executive Director.*

### Statement of the Izaak Walton League on H. R. 4503

The Izaak Walton League of America has long advocated the vital need for coordinating legislation which would require such agencies as the Army Engineer Corps and the Bureau of Reclamation and any valley authority agencies that might be set up to give full consideration to broad public aquatic values as an integral part of their proposals, their engineering, and their construction plans. To this end, we have advocated that comprehensive biological surveys on a par with and, at the same time as the engineering surveys, be made an integral part of the report to Congress so that Congress may have before it a full and complete balance sheet of all values existing and potential as a basis for intelligent decisions as to the desirability or undesirability of the different projects.

We have consistently demonstrated our willingness to support any legislation designed to achieve this important end. Accordingly, we supported the earlier Cordon and Gerlach bills. When we did so we realized they were not perfect but, even more, we realized the vital necessity of having some legislation to curb the roughshod tactics of the Army Engineer Corps and the Bureau of Reclamation in ignoring public aquatic values while going blindly ahead with their engineering proposals on the narrow and selfish viewpoint of financial benefit to a few special interests.

Since the original Cordon and Gerlach bills, there have several rewrites of this basic idea by Congressman Robertson, the latest embodied in the current H. R. 4503. We have supported them all, and we support H. R. 4503, for we feel that the basic idea embodied in all of them for protecting public aquatic values against blind engineering projects by the Army Engineer Corps and Bureau of Reclamation and any other dam-building agencies is the all-important matter, while the minor details over jurisdiction of wildlife injected as objections by some of the State wildlife agencies are designed to cover imaginary rather than real dangers. The important thing is to get some bill embodying this basic principle passed before we have further needless destruction of America's aquatic resources because of complete lack of vitally needed curbs on dam-building programs that ignore public aquatic values.

We are familiar with the latest minor amendments to H. R. 4503 agreed upon by a group of western State fish and game commissioners and the Fish and Wildlife Service. These amendments are all right with us, but they are unimportant compared to the necessity for getting the basic theme of the bill enacted into law, which we consider the most vitally important conservation measure now before Congress. Our viewpoint is further amplified in the attached telegram and editorial.

Kenneth A. Reid,
*Executive Director, Izaak Walton League of America, Inc.*

[Telegram]

January 29, 1946.

Mr. Albert M. Cay,
*Care of R. S. Zimmerman, Salt Lake City, Utah:*

The real issue and the most vital one before Congress is to curb the blind engineering projects of the known enemies of sound conservation, namely, the Engineer Corps and Reclamation. Squabbles over minor differences in wildlife jurisdiction have already wasted months of valuable time while the two enemies continue unchecked. The need for curbing the Federal dam builders in real; that for curbing Federal wildlife jurisdiction potential and largely imaginary. Let's concentrate the attack on the real enemy and get the job done.

Kenneth A. Reid,
*Executive Director, Izaak Walton League of America,*

[Reprinted from the August 1945 issued of Field and Stream]

### Let's Pull Together

#### AN EDITORIAL

Water is the abused and neglected orphan of the whole natural-resource family. We have reasonably good land management in the public interest; great strides have been made in game and fish management—but the one conspicuous missing link in our growing conservation program is the utter lack of any rational

coordinated program for protection, or even consideration of broad public values inherent in natural waters.

The congressional hopper is overflowing with bills to authorize great dams and diversions from one end of the country to the other. There has been keen competition between the Army engineers and the Bureau of Reclamation to build the most and biggest dams, and now there is a third competitor—the valley authority plan.

But the pattern of all the bills, whatever the administrative agency, is' the same. On the false premise that a river as God made it is of no value and its water going to waste unless "improved" by the engineers, the bills call for the maximum possible development of hydro power, irrigation, navigation, and flood control. A few make gestures to fishing and aquatic resources, but always with the qualification, "provided these uses do not interfere with the primary purposes of the development." Unfortunately, protection or development of public aquatic values is never one of the primary purposes. Fishing is welcome to whatever may be left after the special-interest demands of power, irrigation, and navigation have been served—and after maximum development of these, there is little left.

To meet this need Senator Guy Cordon, as announced in June Field and Stream, has introduced S. 924. The companion House bill is H. R. 3315 by Gerlach. Its major provision requires comprehensive biological surveys by the Fish and Wildlife Service on a par with and at the same time as the engineering surveys, with appropriations for such surveys included in the cost of the project, and reports of such surveys an integral part of the report to Congress as the basis for approval or rejection of the project. Such consideration of all values in the survey and planning stages has long been advocated by the Izaak Walton League and other conservation organizations.

The bill is not perfect; none of them is. While we heartily approve of biological surveys by the Fish and Wildlife Service, we believe the base should be broadened to include at least the Soil Conservation Service and the Forest Service. Objection has also been raised by State fish and game departments to the exclusive jurisdiction conferred upon the Fish and Wildlife Service, contending that State agencies should be included. We agree ; and if space permitted, could add one or two other constructive suggestions.

But while advocating additions, deletions, or changes in details, we must not permit these considerations to blind us to the vital importance of the central basic theme—recognition of and consideration for the biology of water. That is vital to you as a fisherman at this time when the rivers of America are imminently threatened with conversion into a series of fluctuating slack water pools by impoundage, or dry beds by diversion. It would indeed be tragic if squabbles over details or mechanics of operation should divide and alienate support for the governmental recognition of public acquatic values so long overdue.

History will be written in the fate of S. 924 and H. R. 3315. Enactment will protect thousands of miles of fine fishing rivers from needless destruction without preventing any valid or needed developments. Their fate is in your hands, but you must make your wishes known to your Senators and Congressmen. And while you are about it, tell them you also want the Mundt-Myers clean streams bill enacted—H. R. 519 and S. 535. The Mundt-Myers bills to save America's waters from the polluters, and the Cordon-Gerlach bills to save them from unnecessary destruction by the dam builders, constitute the most important basic conservation legislation ever presented to Congress.

KENNETH A. REID,
*Executive Director; Izaak Walton League of America.*

Mr. ROBERTSON. Dr. Gabrielson, the director of the Fish and Wildlife Service, is sick today and could not come. The only other witness I would like you to hear today is Mr. Albert Day, assistant director, who will present the amendments agreed to by the western commissioners.

## STATEMENT OF ALBERT M. DAY, ASSISTANT DIRECTOR, UNITED STATES FISH AND WILDLIFE SERVICE

Mr. DAY. Mr. Chairman, and gentlemen, my name is Albert M. Day, Assistant Director, United States Fish and Wildlife Service.

We, of the Fish and Wildlife Service, consider this proposed legislation introduced by Congressman Robertson as one of the most important conservation bills that are up at the present time, for this reason: The fish and game departments and the Federal conservationists are worrying about a greater supply of fish and game, looking toward making these water impoundments that are going to be made, if they are going to be made anyhow, as a means of supplying new sources of sport.

After the last war there was an immediate increase of approximately 20 percent in hunting and fishing, and that has gone up and up, until at the present time there are about 8½ million people who buy hunting licenses, and about the same number who buy fishing licenses, to say nothing of those who do not. So there are probably some 20,000,000 people in this country, or 1 out of every 7, that participates in this outdoor recreation, and more and more there is difficulty in finding places where they can hunt and where they can fish.

If these impoundments are going to be made for other purposes, for other primary purposes, it is the feeling of the people in the conservation world that they should also yield as much as possible toward supplying this hunting and fishing, this type of outdoor recreation. In their present role the Reclamation Service is charged with providing impoundments with reclamation as their primary purpose. They cannot recognize fish and wildlife needs except very incidentally.

The same illustration goes for the Army engineers. Their primary purposes are flood control and navigation, and they are ordered under the law to consider those things.

The bill now proposes—it is a strengthening of the old Coordinating Act—to insist that the construction agencies, any construction agency, before it impounds waters, consider these fish and wildlife values. It sets up a formula how that shall be done. They shall consult the Fish and Wildlife Service, and the fish and game departments, through an amendment I wish to present for the western association, and if changes can be made not inconsistent with the primary purpose, those changes shall be made. In many instances that can be done at a slight additional cost, or no additional cost, if it can be included in the plans from the ground up. For instance, there are many areas of shallow waters, shallow bays, with a little side dike, where there is fresh water coming in, that could be held at an established water level and provide excellent waterfowl feeding and places for the fish to breed. That wouldn't be pulled down as a reservoir would be pulled down for other purposes. There are many things that can be done at a slight additional cost that will furnish additional recreational opportunities. That is all the bill proposes to do.

Mr. Granger. I understand you to say that this is purely recreational, the service that you are rendering.

Mr. Day. It is largely recreational. I would class hunting and fishing as recreational. There is probably $200,000,000 spent each year for hunting and fishing and recreation equipment. We class it as recreational.

There are a few points that I think should be brought out in this bill, and one is that after an impoundment is created there is an area that is particularly suited to waterfowl that may be set aside as a waterfowl refuge, if it is approved by the head of the constructing agency, the Fish and Wildlife Service, and the head of the State game department. Any areas to be administered will be by joint approval of a three-man board. The Interior Secretary is responsible only insofar as migratory waterfowl. If it pertains to fish or other species, that wouldn't apply.

The Western Association objected to this bill because they thought it went too far in giving the Secretary of Interior authority over resident species, and for that reason they requested that on page 1, in line 6, the word "management" be stricken; that on line 10, page 1, the word "State" be inserted immediately after "Federal," bringing the States into the picture; that on page 2, line 2, "management and administration" be stricken, again taking the Secretary out of any thought of participating in management.

The other amendment that they recommend is a new section, which reads os follows:

The Chairman. Where does that come in?

Mr. Day. It is suggested as section 2, on page 2, line 11, a new section:

Sec. 2. Whenever the waters of any stream or other body of water are authorized to be impounded, diverted, or otherwise controlled for any purpose whatever by any department or agency of the United States, such department or agency first shall consult with the Fish and Wildlife Service and the head of the agency exercising administration over the wildlife resources of the State wherein the impoundment, diversion, or other control facility is to be constructed with a view to preventing loss of and damage to wildlife resources, and the reports and recommendations of the Secretary of the Interior and of the head of the agency exercising administration over the wildlife resources of the State, based on surveys and investigations conducted by the Fish and Wildlife Service and by the said head of the agency exercising administration over the wildlife resources of the State, for the purpose of determining the possible damage to wildlife resources and of the means and measures that should be adopted to prevent loss of and damage to wildlife resources, shall be made an integral part of any report submitted by any agency of the Federal Government responsible for engineering surveys and construction of such projects.

That, as Mr. Robertson explained, provides that the State reports, and the Fish and Wildlife reports shall be included in the report which will go eventually to the Congress.

Mr. Zimmerman. Has this bill been submitted to the Corps of Army Engineers, which are charged with this duty primarily?

Mr. Day. It has been discussed with some of them informally.

Mr. Zimmerman. Do they agree to it? Do you know their attitude?

Mr. Day. I discussed it with some of the local people, and the Army engineers would be glad to write in fish and wildlife benefits and values where they can, because it makes an added incentive for the Army engineers in Congress. They would like to recognize and

would like to obtain the support of the very element that is now quarreling with them on some of these occasions, if they can write in additional values. The Army engineers that I have discussed it with are sincerely interested in trying to do that, but their authority under existing law is primarily for other things. I think the Army engineers can be expected to support this, or at least not to fight it. That is my guess; I don't know.

Mr. GRANGER. As to fixing the days for shooting migratory birds, who does that, the States or Fish and Wildlife Service?

Mr. DAY. The President sets the regulations based upon recommendation of the Secretary of Interior. It is set only after full discussion with the State game departments. We hold meetings throughout the season, immediately prior to setting the regulations and get their advice, but the responsibility rests with the President to issue those regulations.

Mr. GRANGER. There has been no great controversy on that matter?

Mr. DAY. Oh, there is always local controversy, but nothing major. It is an annual affair.

The CHAIRMAN. I am going to put off a reading of the bill until Mr. Andresen has an opportunity to get together with the Department officials and see if they can agree on the wording of an amendment along the lines he has suggested.

Mr. ZIMMERMAN. I think the Army engineers ought to be given a chance to express their views.

The CHAIRMAN. Mr. Day, have you taken this up with the Army engineers?

Mr. DAY. Not formally. I might say, however, in instances, this is directly in line with work that is going on. At the present time in the Missouri River Basin the Congress has authorized the Fish and Wildlife Service to expend some $252,000 to do this very thing. The Army engineers and the Reclamation Service are submitting all their original plans from the beginning to the Fish and Wildlife Service, which has crews of biologists and personnel who are out working on this right now in the Missouri River Basin, and the plans of those biologists are being cleared through the Secretary's office, with the Army engineers and Reclamation, and they are becoming a part of that plan.

Mr. ZIMMERMAN. That was written into that bill, was it not?

Mr. DAY. Not in the flood-control bill.

Mr. ZIMMERMAN. I think you are wrong about that.

Mr. DAY. Not from a preliminary standpoint.

Mr. ROBERTSON. I would like to call the committee's attention to the fact that this bill was cleared by the Bureau of the Budget, who does not clear a bill that affects any department in the Government without getting an expression from them to see if they have any objection to it. I am sure that the Director of the Budget, before he gave clearance to this bill, consulted with the Army engineers. And the bill is also in line with the policy and the program announced by the President in a letter that he wrote November 13, 1945, to the Washington correspondent of Sports Afield. I would like unanimous consent to include that letter in the record.

The CHAIRMAN. Without objection, it may be included.

(The letter is as follows:)

[From Sports Afield, January 1946]

THE WHITE HOUSE,
*Washington, November 13, 1945.*

Mr. MICHAEL HUDOBA,
*Washington 7, D. C.*

MY DEAR MR. HUDOBA: Your letter of October 25 expresses the view that integrated programs of river-basin development should be so planned and administered as to avoid damage to fishery and wildlife resources, and to provide added benefits wherever possible. You suggest that I give assurance that such considerations will be given due weight. There can be no objection to the viewpoint that the development of river basins should not impair existing values and resources, including fish and wildlife, where it is humanly possible to avoid such impairment. It is likewise entirely in harmony with the purposes of the programs themselves to plan and administer them so as to yield supplementary benefits wherever possible. I heartily subscribe to this policy. The exact manner in which the interests of fish and wildlife recreation, and other collateral values may be safeguarded is the primary problem. The Congress is considering specific legislation intended to accomplish this objective.

I am confident that in the formulation of any future programs for the broad-scale development and utilization of our inland water resources, full opportunity will be afforded the conservation agencies of the State and Federal Governments to offer recommendations and plans designed to preserve wildlife and fishery values.

Sincerely yours,

HARRY S. TRUMAN.

In this letter to Michael Hudoba, Sports Afield's Washington reporter, President Truman makes his first official pronouncement on the subject of his wildlife policies since his accession to office. The President, in this very important statement, refers to the vital question of protecting fish and game resources which are threatened by future Federal water-use programs.

Mr. ROBERTSON. The President refers in that letter to legislation pending here now in line with this particular bill.

I would like also to have your permission to insert a short editorial from Sports Afield, from the January issue.

The CHAIRMAN. Without objection that may be included in the record.

(The editorial referred to is as follows:)

NEW WILDLIFE BILL GUARDS STATES' RIGHTS

As realists, the inescapable fact that sportsmen and conservationists face is that fish and wildlife considerations are at best of only secondary concern in the Federal programs of land and water use. In view of this, there is urgent need for constant vigilance by conservationists to integrate fish and wildlife considerations with the primary economic uses of these projects.

Under the voluntary provisions of the Coordination Act, wildlife protection is dependent on the will of the Federal construction agencies to cooperate. In any case, however, when the primary use of water conflicts with wildlife requirements, conservation interests invariably suffer.

The amount of contemplated construction in this field in the next few years is tremendous. Congress already has approved vast flood-control, river, and harbor, irrigation, and navigation-improvement projects, and is considering extensive river basin development. Each of these programs requires numerous water impoundments, and changing of streams and rivers. The impact on fish and wildlife will be tremendous.

At present the only Federal law promoting consideration of fish and wildlife in Federal construction matters is the voluntary Coordination Act. Fish and wildlife resources truly are facing a crisis by the nature of the impending Federal programs.

Sports Afield, in a series of four articles starting last February, showed that the Coordination Act is entirely ineffective. Senator Guy Cordon and Congressman A. Willis Robertson have introduced bills in the Senate and House (S. 924 and H. R. 4403) to amend that act to make it mandatory that fish and wildlife be given reasonable consideration in Federal construction plans before work begins. In these bills it also is provided that the areas created by Federal water impoundments shall be developed as fishing and hunting areas for public use.

Congressman Robertson's first bill, H. R. 3459, met objections from some State game commissions, which contended states' rights were not adequately protected. Mr. Robertson therefore revised the second and third sections of his bill and reintroduced it as H. R. 4503. These revisions clearly outline the rights of the States. The new bill provides that State game commissions shall administer the areas created by Federal water impoundments with respect to fish and wildlife, except migratory birds, which are under jurisdiction of the Fish and Wildlife Service. It reiterates the unquestioned Federal policy that States have authority over fish and game within their State boundaries. Senator Cordon is studying to prepare amendments of a similar nature to his bill, S. 924.

Unless a wildlife safeguard law is enacted, States in which new Federal areas are created by water development programs will have no jurisdiction over them at all. Moreover, a Federal agency can proceed with its development plans without regard for wildlife interests affected. This is the most important wildlife legislation affecting the country today. It requires the support of every sportsman. Your letters to Congressmen are receiving attention. A number of them have told me of your letters, and said they were glad to learn of your interest. Keep up this good work. H. R. 4503 and S. 924 must be acted on by the Congress.

Mr. ZIMMERMAN. I am in favor of the very thing you have stated there, but——

The CHAIRMAN. Mr. Zimmerman, I will state that I am going to adjourn further hearings until Mr. Andresen has had an opportunity to discuss the matter and write the amendment he has in mind. In the meantime, we will take it up with the Army engineers and ask if they desire to be heard. If they do, I think they should be heard. I do not see why the Army engineers should not cooperate with this program.

Mr. ZIMMERMAN. I think they have.

Mr. GRANGER. Why wouldn't it be better, before we take this bill to the House, where you will have the same questions raised as are in my own mind, to have evidence from the Army engineers?

The CHAIRMAN. I think it would be mighty helpful in order to clear up the point.

I am adjourning the hearings subject to call.

(Whereupon at 11:40 a. m. the committee adjourned subject to the call of the Chair.)

(The following was submitted for the record:)

DEPARTMENT OF AGRICULTURE,<br>
Washington 25, D. C., February 13, 1946.

Hon. JOHN W. FLANNAGAN, Jr.,
  Chairman, Committee on Agriculture,
House of Representatives.

DEAR MR. FLANNAGAN: This is in further reply to your letter of June 20, 1945, requesting a report on H. R. 3315, a bill to amend the act of March 10, 1934, entitled "An act to promote the conservation of wildlife, fish and game, and for other purposes." This letter also presents our views with respect to H. R. 3459 and H. R. 4503 which have been referred to your committee and which are almost identical with H. R. 3315.

Although it is understood that the principal purpose of the bill is to insure that proper attention is given to wildlife interests in connection with large water

storage or diversion projects such as are involved in flood control, navigation, reclamation and power undertakings, the language of the bill is such that it would apply to the smallest kind of a project involving water storage or diversion on all Federal lands and even possibly on private lands where Federal cooperation or assistance is involved, such as soil conservation districts. Furthermore, it is not clear from the language of the bill how far it may be interpreted to interfere with or complicate the responsibilities and authorities of Federal agencies administering lands for a combination of uses and services where, as a general rule, each use or service must be coordinated with other uses and services in a way to produce the largest net public benefit.

Most lands under the jurisdiction of the Department of Agriculture are administered under the multiple use principle and the administering agencies, such as the Forest Service and Soil Conservation Service, have long had cooperative agreements and relations with the Fish and Wildlife Service under which that Service carries on research necessary as a basis for proper wildlife management on such lands and furnishes the results of such research and technical advice to the agencies responsible for wildlife management on these lands, cooperating in every appropriate way with the States. We are sure that it is not intended that H. R. 3315 should disturb the present understanding and division of functions between the Fish and Wildlife Service and agencies of this Department.

For the reasons stated above and in order to remove all doubt as to the purpose of the bill, we recommend that the following amendment, which might appear at the end of section 3, be made in H. R. 3315.

"*Provided*, That as to any Federal agency which has as one of its established functions the protection and management of fish and wildlife on any lands and waters under its jurisdiction, this Act shall not be construed to abrogate or abridge in any particular the authority and control of such agency over such lands and waters or the resources thereof; but any such agency shall avail itself of the advice of the Fish and Wildlife Service in respect to the technical phases of fish and wildlife protection and management."

Section 4 of H. R. 3315 would authorize the Secretary of the Interior "to make such investigations as he deems necessary to determine the effects of domestic sewage, mine, petroleum, and industrial wastes, erosion silt, and other polluting substances on wildlife, and to make reports to the Congress concerning such investigations and of recommendations for alleviating dangerous and undesirable effects of such pollution." The major method for preventing pollution by erosion silt would be the control of soil erosion on tributary lands. Permanent responsibility for the control of soil erosion and for the conduct of surveys, investigations, and research for such control was placed in the Secretary of Agriculture by Public No. 46, Seventy-fourth Congress, approved April 27, 1935 (49 Stat. 163). This Department assumes, therefore, that it is not the intent of H. R. 3315 to abrogate or duplicate in another agency the responsibility or authority for soil erosion control vested in the Secretary of Agriculture by Public No. 46. In order to avoid possible misinterpretation, the committee may deem is advisable to clarify the language of the bill on this point.

With the amendment of section 3 as proposed herein and with the understanding that this bill would not affect the existing responsibility for soil erosion control and would not extend to improvements on private lands, this Department would have no objection to the enactment of H. R. 3315.

The Bureau of the Budget advises that there is no objection to the amendment of H. R. 3315 proposed herein but that this advice should not be construed as involving any commitment as to the relationship of the various other provisions of the bill to the program of the President.

Should your committee wish to discuss in greater detail the effects of the proposed legislation, we shall be glad to arrange for representatives to appear.

Sincerely,

                                        J. B. HUTSON, *Under Secretary*.

# CONSERVATION OF WILDLIFE

---

**MONDAY, APRIL 15, 1946**

House of Representatives,
Committee on Agriculture,
*Washington, D. C.*

The committee met at 10 a. m., Hon. John W. Flannagan, Jr. (chairman), presiding.

The CHAIRMAN. The committee will be in order.

Mr. Robertson, I understand that you gentlemen have gotten together on the language you wish to be included in the bill.

## STATEMENT OF HON. A. WILLIS ROBERTSON, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF VIRGINIA

Mr. ROBERTSON. Yes, Mr. Chairman. You will find the language covering Mr. Andresen's proposal incorporated in H. R. 6097.

The CHAIRMAN. Yes.

Mr. ROBERTSON. Which is in the nature of a clean bill for H. R. 4503. H. R. 6097 includes the amendments proposed by the Western Association of Game Commissioners, which we discussed at the last hearings on this measure; and it also includes the language proposed at that time by Mr. Andresen to protect the fishing interest in navigation pools. It has been examined by the Fish and Wildlife Service, and they think, as the language is proposed, it supports the objectives of the bill. It merely provides that, when drawing down, a pool level shall be maintained to prevent loss and damage to fish and wildlife resources.

The CHAIRMAN. As I understand, with the change that has been made there is no conflict.

Mr. ROBERTSON. There is no conflict.

The CHAIRMAN. And the Forest Service has raised a question?

Mr. ROBERTSON. The Forest Service wrote you a letter on the 13th of February signed by Under Secretary Hutson; in that they proposed an amendment, the effect of which was that all Government agencies should have the same jurisdiction that they now have.

I discussed that amendment with Mr. Swift, of the Forest Service, and I explained that that language would confer upon the War Department all the jurisdiction it now has and would nullify the provisions of the bill and completely destroy what we were trying to do.

The CHAIRMAN. Let us not bring the War Department into it now. What is the conflict as between the Wildlife Service and the Forest Service?

29

Mr. ROBERTSON. In my opinion there is no conflict at all. There is nothing in H. R. 6097, in my opinion, which gives the Fish and Wildlife Service any jurisdiction whatever over any area belonging to the Forest Service. It merely provides that if the Forest Service is engaged in a water-impounding project that it shall do what the Army engineers shall do, or what any other Government agency shall do, namely, consult with the Fish and Wildlife Service about the effect on wildlife interest, and consult with the States on the effect it has on wildlife interests, and shall take appropriate steps to protect the wildlife in connection with such impounding project. And that is all there is to it.

The CHAIRMAN. What is the position of the Forest Service?

## STATEMENT OF C. M. GRANGER, ASSISTANT CHIEF, NATIONAL FOREST DIVISION, UNITED STATES FOREST SERVICE

Mr. GRANGER. Mr. Chairman, I am glad to hear Mr. Robertson say what he did because it squares with our understanding of the real intent of this legislation.

The CHAIRMAN. If Mr. Robertson has given the correct interpretation of the bill, you have no objection; is that right?

Mr. GRANGER. Well, I would like to speak a little on that point.

The CHAIRMAN. Very well.

Mr. GRANGER. So far as the Department of Agriculture and the Forest Service is concerned we have no question about the basic intent of the bill as we understand it, which is, to require that adequate provision be made for the safeguarding of wildlife in the installations of the larger developments in case of impounding or the diversion of water, and as we assume that it was intended to apply to such developments as are made from time to time by the War Department, the Reclamation Service, the Federal Power Commission or where there is a responsible authority in that agency which takes into account the effect of such development on wildlife, in what it does, in order to minimize any adverse effect on wildlife.

But the language of the bill itself, if read without the benefit of the clarifying statement, seems to apply to every diversion or impounding of water, however small, and it was felt it requires that wherever water is diverted or impounded for any purpose whatever on any land under the jurisdiction of any Federal agency, that the resulting water and the lands which have been acquired in connection with the project, or which are administered in connection with the water, must be made available to either the State or the War Department for administration in the interest of wildlife.

As I understand it from what Mr. Robertson has said, that is not the intention, and all we are asking is legislation that will make it perfectly clear.

The CHAIRMAN. What language do you suggest?

Mr. GRANGER. The language was suggested, language to which reference was made by Mr. Robertson, which was made in the form of a report to your committee on this legislation which was then incorporated in H. R. 3315 and reintroduced in the form of H. R. 3459 and H. R. 4503. The various bills differ a little bit in their language and now we have this new submission, which carries some other changes,

but covers substantially the same language as the other versions to which I have just referred. But in the report, in response to a request from your committee, the Department proposes this clarifying language:

*Provided*, That as to any Federal agency which has exercised any established function in the protection and management of fish and wildlife on any land or water under the jurisdiction of this Act shall not be construed to abrogate or abridge in any particular the authority or control of such activity on such land or water which results therefrom, but any agency shall avail itself of the advice of the Fish and Wildlife Service and report its technical findings to Fish and Wildlife Protection and Management.

The CHAIRMAN. Mr. Robertson, do you wish to comment on that?

Mr. ROBERTSON. The Flood Control Act of 1944, which was passed in December of that year, puts certain restrictions upon the War Department with reference to wildlife. I am satisfied that the language proposed in the amendment that has just been read by Mr. Granger would be broad enough to include the War Department or any other agency, because under the Coordination Act and other acts the Department or agency has to give regard to the wildlife resources.

The CHAIRMAN. Do you have any objection to that language if it only applies to the Forest Service?

Mr. ROBERTSON. Yes.

The CHAIRMAN. Why?

Mr. ROBERTSON. I think the Forest Service, like all other Government agencies, should consult with the States in what they do when they impound water, and the States want them to do that.

The CHAIRMAN. Do you not think they would do that?

Mr. ROBERTSON. They do, but they do not have to. We have never had better cooperation from any Federal agency in the exercise of a Government power than we have had with the Forest Service in Virginia. They have cooperated with us in getting through legislation and have done everything they could, but that has been voluntary.

The CHAIRMAN. Yes.

Mr. ROBERTSON. But down in North Carolina, if you will excuse the unpleasant illustration, they put over a deal with the hunters in violation of the State's laws in North Carolina and the matter went to the courts and the court found in behalf of the Forest Service, and after a bitter fight it went to the circuit court of appeals. The case turned on the point that in ceding to the Federal Government the right to acquire forest areas the State of North Carolina had also ceded to the Federal Government jurisdiction over fish and wildlife in general in those areas. That was not true in Virginia. But some States have given that jurisdiction to the Federal Government where it has no public domain. But here, they allowed the employees, in violation of the licensed laws with respect to killing does under the laws of North Carolina. The Forest Service issued a new regulation by which it voluntarily agreed to observe all the State hunting and fishing laws and you are cooperating on that.

Mr. GRANGER. Yes.

Mr. ROBERTSON. But it is voluntary; it is not the law. Now, this puts the Forest Service on the same basis as the Fish and Wildlife Service. The people feel that the game of the State belongs to the people, and to the people of the State, and the Federal Government

got jurisdiction over migratory birds by reason of its treaty-making power. And no one challenges that treaty, but the States would like it limited to that restriction in the Federal Government.

The CHAIRMAN. Is that not the law, that is as far as the Federal Government can go?

Mr. ROBERTSON. No, sir. The circuit court of appeals held as to the Pisgah National Forest that they could send men in to the Federal land, the national forest, and hunt doe; they charged a fee of $5, which the Forest Service got.

Mr. GRANGER. The case in North Carolina was based on the Federal game refuge which had been set up, as was stated, under complete Federal jurisdiction under the Federal Government over all wildlife and game in this area, and the reason for the action by the Forest Service was an overpopulation of deer which was seriously injuring the tree growth and shrubs in the area. The Forest Service felt that it was necessary to remove a certain percentage of the deer herd. There was some conflict with the State on the question of shooting doe and on the question of taking some of the excess deer population for areas where the population was less.

The CHAIRMAN. But the conflict was due to the fact that the State had ceded to the Federal Government that area.

Mr. GRANGER. Yes.

The CHAIRMAN. And that is not true with reference to other forest area.

Mr. GRANGER. No. There are other places where it is true, but in general the game on the national forests, that is, the control of the game on the national forests is exercised by the State just the same as it is elsewhere. We have now a cooperating agreement with the various States whereby we are trying to build up the game population; there is a special charge made; it varies in form with the States, so that we have over the years brought about broad arrangement of cooperation by and between the Fish and Wildlife Service and the States in this matter and there is no thought of further diversion from that pattern.

Mr. ROBERTSON. Mr. Chairman, right on that point: I do not have in mind and have not carefully examined all of the differences between the areas by ceding to the Federal Government by State action and the areas which the Federal Government has always owned and which the States never owned. Many of the national forests in the West were not purchased; they were carved out of the public domain.

I am of the opinion that if the matter went into court and the court followed the precedent of the circuit court of appeals in the North Carolina case, that in such areas the rights of the Federal Government would take precedent over the rights of the States.

I do not think the Forest Service would ever dare to do that; public sentiment would be so strong that they would not dare do it, but if we write this thing in the way the amendment is proposed we might be buttressing the States against any future situation under which they would claim the right over wildlife in the national forests, and I am sure that the Western State commissioners would claim, if I did not insists upon this being put in, that I had not kept faith with them in preserving the jurisdiction over fish and wildlife.

Mr. ANDRESEN. The proposal of the Forest Service, you think, would destroy the effectiveness of the bill.

Mr. ROBERTSON. I am afraid it would. As the patron of the pending bill if I might suggest that the committee put in its own committee report what is the intention of the Congress which is controlling, where the language is susceptible of a different interpretation, and the report then would govern as to what the language means in any court, and if you say that the language was not intended to give the Fish and Wildlife any jurisdiction whatsoever over national forests that will control the language of the bill.

The CHAIRMAN. Right on that point, Mr. Granger, would you be satisfied with the legislation under Mr. Robertson's proposal?

Mr. GRANGER. Mr. Chairman, if the committee should write into the report in substance that it is not intended to replace the jurisdiction of the Forest Service which now exists I think that would be satisfactory.

Mr. ROBERTSON. That would be perfectly agreeable, because it is not intended to do so.

The CHAIRMAN. It seems to me that is the way it should be handled.

Mr. GRANGER. Yes. May we have an opportunity, Mr. Chairman, to see the language of the report before it is finally adopted?

The CHAIRMAN. That is all right.

Mr. ROBERTSON. I am sure there will be no trouble in agreeing on that.

The CHAIRMAN. Mr. Robertson, I think the meaning is clearly stated, and if the report contains that interpretation then you are in accord, and I do not see how there can be any future difficulty over the question.

Mr. ROBERTSON. There should not be any in the world. And I will certainly stand on what I have said.

I want to call the committee's attention to the provisions in section 3 and in section 4 if there is any doubt about its meaning.

Section 3 provides that when an area is set up, under this bill, where there is diversion or impounding of water, if the waters and other interests have peculiar value in carrying out the national migratory bird management program, that jurisdiction shall be under the Fish and Wildlife Service. That is all it means. And certainly the Forest Service is not going to have any difficulty under section 3 as to jurisdiction, which leaves to the States, and that is what the States want, administration by such State agency if the management thereof for the conservation of wildlife relates to other than migratory birds.

Now as to decisions about this management, in the first place, it is left to the agency that exercises the primary administration, as set out in line 16, page 4 of the bill. You have first got to approach it.

Now in section 4, in order to meet any contingency that might arise in the future, if some law is passed, or if someone points to some case that has been decided, and this section goes on to say that if any new agency is created it has got to approach the agency exercising primary administration over such area. That is set out in line 14, page 5, and if any impounded area is in the Forest Service it will have primary administration, and the Fish and Wildlife Service could not possibly come in unless it had an agreement from them.

The CHAIRMAN. There is no conflict, is there?

Mr. ROBERTSON. I do not think there is any conflict; I am perfectly willing to have the report of the committee state what the language means, but clearly the language does not give to the Fish and Wildlife Service any jurisdiction, and we did not so intend it to.

The CHAIRMAN. I think the best way to get at the matter is to clear it up in the committee's report.

Mr. Andresen has moved that the bill be reported favorably with that understanding.

Mr. ANDRESEN. Yes.

Mr. CLEVENGER. Right in that connection, Mr. Robertson, we have a rather unique situation in the Great Lakes area, under the control of the Migratory Bird Act, through which Michigan, Ohio, Pennsylvania, and New York have lost, probably will lose control over fishing in the Lakes area out to the international line by virtue of the treaty that has destroyed certain State rights in that respect.

And the same thing applies, as I understand it, to a considerable portion of the country where they may lose control by reason of the treaty that superimposes itself over State lines by virtue of it being a treaty.

Mr. ROBERTSON. I cannot deny that possibility. I am merely saying that the pending bill seeks to hold what we now have with respect to upland game and fishing in inland waters and to tell you gentlemen that that is what the States of this Nation want done.

The CHAIRMAN. It has been moved by Mr. Andresen that a favorable report be made with the understanding that the report of the committee clear up any apparent conflicts between Mr. Robertson and the Forest Service. Those in favor of the motion will signify by the usual sign.

The motion is carried.

I would like to insert in the record at this point a letter addressed to me under date of April 11, 1946, by Mr. Robertson; and also a letter under date of April 3, 1946, by Mr. Robertson, both relating to the pending legislation.

(The letters referred to follow:)

HOUSE OF REPRESENTATIVES,
SELECT COMMITTEE ON CONSERVATION OF WILDLIFE RESOURCES,
*Washington, D. C., April 11, 1946.*

Hon. JOHN W. FLANNAGAN, Jr.,
*House of Representatives.*

DEAR JOHN: I enclose a revised edition of H. R. 4503. Since I must leave the city at 8 o'clock tomorrow, I wish you would drop this bill in for me when the House meets.

It includes all of the amendments agreed upon with the Western States game associations and the Andresen amendment. It does not include an amendment that was proposed by the United States Forest Service. That is something your committee can, of course, consider if you wish on Monday.

In my opinion, the amendment proposed by the Forest Service is not in harmony with the philosophy of this bill, which deals with impounded waters and in doing so reserves to the States all of their present jurisdiction over fish and upland game and requires all agencies, including the Fish and Wildlife Service, the Forest Service, etc., to confer with and cooperate with State agencies in all game-management projects.

Under existing laws, the Fish and Wildlife Service has exclusive jurisdiction over migratory birds, with the exception that States can provide shorter seasons and can impose license fees in addition to the $1 duck stamp.

Mr. Swift, of the Forest Service, speaking for the Under Secretary of Agriculture, Mr. J. B. Hutson, thinks the bill should include the amendment suggested

in a letter to you of February 13. Ordinarily, I would not object to that language being included in this bill, since it merely restates the rights over wildlife which the Forest Service now has. But there is nothing in my bill that takes those rights from the Forest Service and I am sure the inclusion of this language would be construed by many State commissioners as an effort to encroach upon the jurisdiction of fish and upland game.

Mr. Swift calls my attention to the language of section 4 of the amended bill and section 3 of the amended bill, which is to some extent carried forward into section 4. He contends that the language of those two sections will authorize the Fish and Wildlife Service to set up a game management area in the national forests. I contend that the Fish and Wildlife Service, under the language of section 3 and section 4, could not set up any management area without the concurring agreement of whoever is the agency exercising primary jurisdiction. For instance if the jurisdiction is with the State, the Fish and Wildlife Service, with the exception of migratory birds, can do nothing except by State consent.

If it happens to be a national forest which is under the jurisdiction of the Forest Service and therefore the primary administration, it would have to be with the consent of the Forest Service. The Fish and Wildlife Service, of course, has neither the desire nor intention to encroach upon the jurisdiction of the national forest, and I do not think the bill, as written, would permit them to do so.

The Executive order, which of course will come from the President, mentioned in section 4, is of necessity related and bound by the provisions of section 3. So even if the Forest Service thought there was a possibility of some future Executive order transferring jurisdiction from it to the Fish and Wildlife Service over some part of the national forest, I do not think it could be done under the provisions of section 3.

However, I understand that Mr. Swift or Mr. Granger will be before your committee on Monday to explain the viewpoint of the Forest Service. I am very sorry that I will not be able to appear on Monday, but Mr. Chaney of the Fish and Wildlife Service will be there.

With best wishes, I am
    Cordially yours,

                          A. WILLIS ROBERTSON.

P. S. If all existing agencies are to have all existing powers that would include the Army engineers and the bill would be worthless.

----

HOUSE OF REPRESENTATIVES,
SELECT COMMITTEE ON CONSERVATION OF WILDLIFE RESOURCES,
*Washington, D. C., April 13, 1946.*

Hon. JOHN W. FLANNAGAN, Jr.,
    *Chairman, House Agricultural Committee,*
    *House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: It has come to my attention that certain officials of the United States Forest Service are of the opinion that the language of sections 3 and 4 of H. R. 6097 are broad enough to permit the United States Fish and Wildlife Service to take jurisdiction over any future water areas that may be established in national forests which are under the jurisdiction of the Forest Service. Is it not contended that there is any specific language in the bill to that effect. It is only contended that at some future date someone might attempt to construe the language in the two sections in question as having that implied meaning.

As the patron of the pending bill I would like for the record to show that neither I nor anyone else, so far as I know, who was supporting this legislation has any desire or any intention to have the Fish and Wildlife Service by means of the bill in question to encroach upon the pending jurisdiction of the Forest Service. I would like for your record to show that, in my opinion, the language of section 3 and section 4 of the bill could not properly be construed to authorize the Fish and Wildlife Service to assume management jurisdiction over any impounded waters unless such waters have particular value in carrying out the national migratory bird management program and then management is limited to the migratory-bird program. I also invite your attention to the fact that section 3 specifically provides that no management plan for migratory birds can

be set up in any area except on the basis of general plans approved jointly by the head of the department or agency exercising primary administration thereof and the head of the agency exercising administration over the wildlife resources of the State wherein the areas or waters lie. That language necessarily means that if waters be impounded in any national forest, the Fish and Wildlife Service could not exercise management jurisdiction even over migratory birds except under a plan approved both by the Forest Service and the State. Section 4 of the bill merely provides for the continuance of some new type of water development either by act of Congress or by act of the President, but the administration of such new projects are definitely tied to the management plan specified in section 3 by carrying forward the provision of approval by the agency exercising primary administration with the further proviso, included at the request of the western game commissioners, that the plan shall not be inconsistent with State laws.

No jurisdiction now enjoyed by the Forest Service is taken away from it by this bill. But, of course, it is true that in all future water impounding projects the Forest Service is included with all other Federal agencies in the general requirement to give due consideration to the wildlife interest involved and to work out management plans in cooperation with the State in which the area lies. That, in my opinion, is as it should be, is what all the States and all interested conservationists want, and if the United States Forest Service wishes to be relieved of that responsibility it will be asking to be placed on a different basis from any other Federal agency and asking for greater power than I think it should be permitted to exercise. In that connection the States are not unmindful of the unfortunate dispute a few years ago between the Forest Service and the Game Department of the State of North Carolina over the killing of deer in the Pisgah National Forest under Forest Service rules and regulations in violation of State laws. That contest was decided in favor of the Forest Service by the Federal courts on the ground that when North Carolina, by legislative act, granted to the United States Government the right to aquire forest areas in that State it also conferred upon the Federal Government jurisdiction over the wildlife in such areas. Fortunately, an agreement was worked out between the Forest Service and all of the State game departments under which the Forest Service agreed, in the future, to take no action on national forests that was inconsistent with local State fishing and hunting laws. But that is merely a voluntary agreement and is not a law in those States which have conferred upon the Government jurisdiction over wildlife nor is it a law with respect to national forests created from the public domain.

Sincerely yours,

A. WILLIS ROBERTSON.

(Whereupon the committee proceeded to the consideration of other business.)

# CONSERVATION OF WILDLIFE

---

**MONDAY, APRIL 15, 1946**

HOUSE OF REPRESENTATIVES,
COMMITTEE ON AGRICULTURE,
*Washington, D. C.*

The committee met at 10 a. m., Hon. John W. Flannagan, Jr. (chairman), presiding.

The CHAIRMAN. The committee will be in order.

I have been furnished a copy of H. R. 3821, a bill introduced by Mr. Robertson, on July 17, 1945, proposing to amend sections 4 and 8 of the act of September 2, 1937, as amended.

Mr. Robertson, we will be glad to have a statement from you on this bill.

Mr. ROBERTSON. Mr. Chairman and gentlemen of the committee, this is a suggestion that on several occasions has come to the Select Committee on Wildlife Resources, from a number of State game departments, based upon the fact that they have been using Pittman-Robertson Act funds to acquire areas, and that it has given some of them so many of these areas that it is a burden on them to properly administer and maintain them.

The law as originally written contemplated the funds should be used to stimulate the acquisition of areas that could be used for public hunting and for refuge purposes and to keep down the use of it for employees, you might say.

But now we have reached a point in this development where the States need to have some funds for maintenance, and they have got to have more funds for administrative purposes. So after consultation with the fish and game administrators in the various States and with the Fish and Wildlife Service, we felt that funds had reached the point where there would be enough for the acquisition program plus a reasonable amount for maintenance, and it would be only fair to the States to let them use a part of it, but not exceeding 25 percent of the funds that they get, for maintenance purposes.

Mr. GRANGER. For the record, where does the money come from?

Mr. ROBERTSON. The money is derived from an excise tax on guns and ammunition. It is paid by the sportsman, and there is something over $12,000,000 to the credit of that fund. The States have been getting $900,000 during the war years. Our budget recommendation for this purpose is $3,000,000 for this year. The States testified before the committee, and the Fish and Wildlife Service confirmed it, that they could well use $3,000,000. Whether the subcommittee on the Interior supply bill is going to put that money in the current bill I do not know, but we will probably find out late this week.

The CHAIRMAN. Mr. Robertson, how much does that tax bring in now?

Mr. ROBERTSON. The tax amounts to between $2,000,000 and $3,000,-000 a year; did over the last period, and when we again have guns and ammunition it would not surprise me if it brings in $3,000,000 a year. Of course, it did not bring in so much during the war but each year brought in more than we paid out.

The CHAIRMAN. It has been self-sustaining?

Mr. ROBERTSON. It has accumulated a surplus of $12,000,000 already.

Mr. ANDRESEN. I am not quite sure about this bill, Mr. Robertson. I know some of the conservationists want the whole $12,000,000 appropriated, but I have not heard anything about this bill, or the need for this type of legislation, except from those we have had before the committee.

Mr. ROBERTSON. Well, you remember the testimony before the committee was that they all wanted it.

Mr. ANDRESEN. All those that appeared there; yes.

Mr. ROBERTSON. Yes. Mr. Day who is head of the division handling the grants or allotment of the funds in connection with this work with the States indicates there was a great demand for this fund. Of course, they do not have to use it this way; this is merely permissive.

Mr. ANDRESEN. It authorizes the use of 25 percent a year for wages and salaries when it was originally provided for conservation. That is quite a bit of money.

Mr. ROBERTSON. I do not imagine that all of the maintenance funds would go for salaries and wages and I think a lot of the States would not use as much as 25 percent for that purpose.

Mr. ANDRESEN. I am not against the legislation but I would like to inquire into it further, and would like to have a few days to consider it, and to discuss the matter further with you.

The CHAIRMAN. Should we have another hearing on the matter after the recess?

Mr. WICKERSHAM. Have we not had this matter under consideration before?

Mr. ANDRESEN. Not this particular bill.

Mr. ROBERTSON. I testified about this at the same time.

I would like, Mr. Chairman, for the committee to hear Mr. Chaney, Chief Counsel of the Fish and Wildlife Service.

The CHAIRMAN. We will be glad to hear you, Mr. Chaney.

## STATEMENT OF DONALD J. CHANEY, CHIEF COUNSEL, FISH AND WILDLIFE SERVICE

Mr. CHANEY. Mr. Chairman, in answer to Mr. Andresen's inquiry or question as to whether the States have pushed for this additional amendment for maintenance, I believe in the testimony of Mr. Day, when he was here before, the statement is that in at least three of the recent meetings of the national meetings of the State game and conservation commissioners, that this question was brought up and the States have felt very definitely that it is almost useless to acquire more land than they can properly manage and to meet the costs on areas

acquired and maybe acquired if funds are allotted this year and next, probably exceed and do exceed a total amount of moneys that are available for maintenance purposes.

Mr. Robertson mentioned wages and salaries; but the funds will be used for general maintenance. Now under the present law the funds can be used only for acquisition or for reserve projects.

Mr. ROBERTSON. That is, stocking.

Mr. CHANEY. Yes; and the amendment would allow the States to use a percentage of the money that is allocated to them for maintenance purposes. It does not increase the amount that comes to the States; it merely provides that the amount that is allocated to the States can be used within the limitation provided, for maintenance.

Mr. ROBERTSON. And I may add right there if any one State needs the full 25 percent for maintenance purposes it does not deduct by 1 cent the amount that will be available or that will go to the States, which is fixed by a certain formula.

The CHAIRMAN. Under the present law allocations are made to the States.

Mr. CHANEY. Yes.

The CHAIRMAN. And this legislation would give to the States the right to use not to exceed 25 percent of the funds allocated for maintenance purposes?

Mr. CHANEY. That is right.

The CHAIRMAN. Is there any disagreement among the State authorities on this proposed legislation?

Mr. CHANEY. None whatsoever that I have found out.

Mr. ANDRESEN. Mr. Chairman, in view of that statement it is satisfactory to me.

The CHAIRMAN. I think we ought to bring the bills out together.

Mr. ROBERTSON. Yes.

The CHAIRMAN. Do you move the favorable report of the bill?

Mr. ANDRESEN. Yes.

The CHAIRMAN. Mr. Andresen has moved that we make a favorable report on H. R. 3821.

(The question was put and motion was agreed to, and the hearing was adjourned.)

×