Vol. 1

# The United States Senate

---

### Report of Proceedings

---

### Hearing held before

Committee on Agriculture and Forestry

H. R. 6097

# ORIGINAL

---

July 19, 1946

Washington, D. C.

---

WARD & PAUL

(ELECTREPORTER, INC.)

OFFICIAL REPORTERS

1760 PENNSYLVANIA AVE., N. W.

WASHINGTON, D. C.

NATIONAL {4266 / 4267 / 4268

# C O N T E N T S

STATEMENT OF                                                    PAGE

WHEELER, Lieutenant General R. A.
    Chief of Engineers, War Department                           5

ROBERTSON, Honorable A. Willis
    A Representative in Congress from the State
    of Virginia                                                  35

REID, Kenneth
    Executive Director, Isaac Walton League,
    Chicago, Illinois                                            44

CK
WLC

H. R. 6097

- - -

Friday, July 19, 1946

United States Senate,

Committee on Agriculture and Forestry,

Washington, D. C.

The committee met, pursuant to call, at 10:00 o'clock
a.m., in room 324 Senate Office Building, Senator Elmer
Thomas (chairman) presiding.

Present:   Senators Thomas (chairman), Hoey, Swift,
Capper, Shipsteed, Willis, Aiken, Bushfield, and Young.

- - - -

The Chairman:   The committee will please come to order.

This hearing was called to consider, among other bills,
H.R. 6097, a bill "To amend the Act of March 10, 1934, entitled
'An Act to promote the conservation of wildlife, fish, and
game, and for other purposes'."

The bill and the report of the House Committee on
Agriculture will be made a part of the record at this point.

(H.R. 6097 and the report referred to are as follows:)

   

The Chairman:  This bill was considered by the committee and reported to the Senate and was placed on the calendar. At the last calender call the bill was objected to, and I ascertained the reason.  The reason for the objection was due to the fact that the bill contains provisions that are not agreeable to the War Department.  As soon as I learned of the reason for the objection, I asked that the bill be re-referred to our committee for further study, so the bill is back here for further consideration.

Since the bill was re-referred I received a communication from Senator McKellar, which I will ask be placed in the record.  To Senator McKellar's letter is attached a telegram from Jack Carley of the Commercial Appeal, apparently, of Memphis, Tennessee.  The objections submitted by Mr. Carley to Senator McKellar are against section 7 of the bill, and Mr. Carley recommends that section 7 in toto be stricken from the bill, and Senator McKellar in effect sustains the recommendation made by Mr. Carley.  We will come to section 7 of the bill in due time.

I will ask that Senator McKellar's letter with the two telegrams be printed in the record at this particular place.

(The letter and telegrams referred to are as follows:)

The Chairman:  In addition, the committee has before it
the report on this bill from the Secretary of the Interior,
signed by Mr. Charman, Acting Secretary of the Interior.  I
will ask that the Chapman letter be printed at this point
in connection with the hearings.

(The letter referred to is as follows:)

The Chairman:   Also I have a letter from the Secretary of War, Mr. Patterson, and I will ask that his report on this bill be printed at this point in connection with the hearings.

(The letter referred to is as follows:)

The Chairman:  Now, we have before us this morning General Wheeler, Chief of Engineers.  I understand that the objections to the bill, as urged by the War Department, come from the engineering group.  Is that true, General Wheeler?

General Wheeler:  Yes, sir.

The Chairman:  All right.  If you will, General, you may state now your objections to the bill, and such suggestions or recommendations as you have for the consideration of the committee.

STATEMENT OF LIEUTENANT GENERAL R. A. WHEELER,

CHIEF OF ENGINEERS                    WAR DEPARTMENT.

General Wheeler:  Well, in general, we object to the entire bill and believe that if similar consideration is to be given to a provision for the conservation of wildlife, fish and game, that it should receive the consideration of all the other departments who are also interested in it at the same time, and come up to the Congress with a bill that is the coordinated action of the Army Engineers, the War Department, the Department of the Interior, Federal Power Commission, and perhaps the Department of Agriculture.

The section, however, which we think would affect all of the existing projects and cause great losses to the National Government is section 7, which requires that all the reels in our projects be maintained at uniform levels.

We feel that the views of navigation interests and flood-control interests should also be presented to the committee, because it will affect both navigation and flood control if the pools are required to be maintained at uniform pool levels.

We believe, in reference to section 7, that during the war, of course, there were withdrawals during the wintertime from our navigation pools in order to come as close to project depth as possible in sections of the river so as to maintain essential war traffic, referring specifically to the Upper Mississippi, which is the one that I believe has received the most consideration. The Middle Mississippi was maintained at a project depth of approximately nine feet through the winter months during the war and some tonnage, amounting to about a million tons, transported during the winter months in that section of the river. As you know, there were many canal vessels constructed in the mid-continent section of our country that were taken to the coast over these sections of the river.

Since the war the pools on the Upper Mississippi were manipulated only during a two-week period. In advance of that time full notice was given to all interests, State, local and other Federal interests, of the proposal to operate the pools by withdrawals for the purpose of improving navigation during that period. These are an index of different than the

pools for power purposes since the war.

Senator Shipstead: Were any withdrawn before the war?

General Wheeler: Yes, sir.    During the war there were withdrawals from the pools for power purposes to meet war requirements.

Senator Shipstead: During the war or before?

General Wheeler: During the war, sir.

Senator Shipstead: But before the war, were there any withdrawals?

General Wheeler: No, sir; none, sir.   We believe that canalization improves the river for fish and wildlife, because it maintains more uniform stages than exists during the natural conditions of the river.   Under the natural conditions of the river you have large variations in the stage, which you do not have in a canalized project, and we believe that canalization improves the conditions for fish and wildlife in our streams.

We believe that if our large reservoirs must be operated at a uniform level that the purpose for which they were built cannot be served, because these large reservoirs are created for the purpose of storing flood waters in order that we may use those waters beneifically later, which involves a draw-down.

Senator Shipstead: For navigation?

General Wheeler: For navigation and for conservation also, Senator. That water, which will have to be drawn down.    For

example, Fort Peck Reservoir, which was constructed at a cost of $125,000,000 and is operated through a total stage of about 90 feet for the purpose mainly of navigation and conservation, that purpose could not be served if it had to be maintained at a uniform level.

Senator Shipstead:  When you talk of conservation, you mean conservation of what?

General Wheeler:  To use the water for irrigation, for domestic supply, and as part of the water from the Upper Missouri is used for the dry sections in North Dakota and South Dakota.

Senator Shipstead:  For instance, on the Mississippi, if you have higher stage of water than is necessary for navigation, you could withdraw that without any damage.  .

General Wheeler:  Yes, sir.

Senator Shipstead:  Would you say that is for conservation?

General Wheeler:  No, sir, that would be for maintaining the proper levels in the pools.

Senator Shipstead:  What other conservation would you withdraw water for?

General Wheeler:  Domestic supply.

Senator Shipstead:  Oh, yes.

General Wheeler:  And similar uses.

Senator Shipstead:  You would never be faced with a lack of domestic supply, would you?

General Wheeler:  No, sir.

Senator Shipstead:  So that is out of the picture.  You would not have to withdraw water for domestic supply.

General Wheeler:  Well, we do withdraw water for that purpose, but it has a very small effect.

Senator Shipstead:  The only reason for withdrawing the water would be to maintain navigation?

GeneralWheeler:  Yes, sir.

Senator Shipstead:  No other purposes?

General Wheeler:  That is right.  On the Upper Mississippi that the only purpose.

Senator Shipstead:  Yes.

General Wheeler:  Now, we believe that we take into consideration the requirements of fish and wildlife.  We have an inter-agency committee in which the Department of the Interior is represented, and we iron out our problems, and then we also furnish funds for fish and wildlife.   We gave them an allocation of $100,000 for work on the Columbia River. We follow out their plans and suggestions for handling our projects on all of our streams.   That is not any failure to consider the views of the Fish and Wildlife Division of the Department of the Interior in the solution of our problems and projects on our big river basins.   We believe that we are operating now so as to give full consideration to fish and wildlife.

Senator Shipstead:  You draw water down usually in the winter, don't you?

General Wheeler:  Yes, sir, we draw it down in the winter, of course, but that is the time of low flow, when we need to build up the Middle Mississippi.

Senator Shipstead:  Yes.

General Wheeler:  But this past winter, Senator, we only needed draw-downs for a period of about two weeks.

In connection with that, there is an authorized project for improving the Middle Mississippi, and an appropriation has already been made, and we have started work on that, and when that chain of Rocks section of the Middle Mississippi is completed we do not anticipate that there will be any need for draw-downs.   As a matter of fact, administratively, as the Chief of Engineers, I directed the draw-down to be limited to only this two-week period, because we were able to take care of the traffic in partially loaded barges, not fully loaded, so it could meet all the needs of commerce.

Senator Shipstead:  How much did you lower the water level in the pools?

General Wheeler:  It varied with the pools, but I do not know that exact figure.  I do not know how much it lowered the upper pools.  I can furnish that for the record, Senator, but I think it would be in the neighborhood of a foot or

something like that.

Senator Shipstead:   A foot?

General Wheeler:   Yes.

Senator Shipstead:   What is the greatest lowering of the water level that you have had up to that time?

General Wheeler:   In the navigation pools?

Senator Shipstead:   Yes.

General Wheeler:   We never need to lower it much more than a foot.

Senator Shipstead:   Did not you during the war either?

General Wheeler:   I don't know the statistics during the war, as to how much it was lowered.

Senator Shipstead:   You mean to say that on an average the water level of those pools during the war, when you drew the water down in the Middle Mississippi, it did not lower the pools?

General Wheeler:   I do not know what it was during the war.

Senator Shipstead:   A complaint has been made by the conservation forces that the water came down so low that it endangered and damaged wildlife and fish.

General Wheeler:   I think that probably during the war, there was a very considerable variation, because they used it not only for navigation but for power purposes also.   But as to the amount that we would have to operate the pools with, in normal times like this past winter, to take care of the

commerce in that section, it was not a considerable amount.

Senator Shipstead: Well, the river was canalized primarily for transportation?

General Wheeler: Yes, for navigation.

Senator Shipstead: How did the power question become involved?

General Wheeler: Well, at each of these dams there is a power plant, and that is a standby plant and not operated except in an emergency.

Senator Shipstead: That is, the dams?

General Wheeler: That is, the dams, yes, sir. The water for the generating unit comes from the navigation pool. At Keokuk, however, we have a large power installation.

Senator Shipstead: Who owns that?

General Wheeler: It is privately owned. I think it is called the Iowa-Illinois Power Company or some name like that.

Senator Shipstead: Do you think they have a vested right in putting the water down and holding it back?

General Wheeler: No, sir; they have a permit for the operation of the power dam and the permit provides the amount of water which they may take from the lake, and that is .   supervised by the Army Engineers. During the war they were given increased amounts of water for the generation of power.

Senator Shipstead: Was that as a war emergency measure?

General Wheeler:  A war measure, yes, sir.

Senator Shipstead:  Not because they had a vested interest or right to the water?

General Wheeler:  No, sir.  Their rights are covered in a Federal permit which prescribes the amount of water they may use.

Senator Shipstead:  That would not be done in time of peace?

General Wheeler:  No, sir.  They have to conform to the terms of the permit in times of peace.

The Chairman:  State, if you will, General, just what this bill proposes that would be objectionable, disastrous and ruinous to your flood control and power program.

General Wheeler:  Well, it is section 7, Senator Thomas, which prescribes that we would have to maintain uniform pool levels in all of our projects.  You cannot maintain uniform pool levels and use the project for which the Government authorized their construction.

Senator Shipstead:  I believe you stated you have never lowered the pools more than a foot.  Is that right?

General Wheeler:  I do not know how much they were lowered during the war, Senator.  I think they were probably lowered more than that, and I will furnish that figure for the record.

Senator Shipstead:  There was a good deal of complaint last winter from our people along the river.

General Wheeler: Yes, sir, I know there was, but also the same State interests and Federal and National interests approved the operation of the pools during that time.

Senator Shipstead: During the war?

General Wheeler: During the war. This last winter we got out a notice in advance of what we proposed to do, sent it to all State and local interests along the Mississippi and it had the approval of the State agencies.

Senator Shipstead: What agencies?

General Wheeler: The Department of Conservation of Wisconsin. I do not know the name of it in Minnesota, but I mean the State agencies, the conservation agencies.

Senator Shipstead: That is, during the war?

General Wheeler: No, sir, just this past winter, Senator, since I have been Chief of Engineers. I am informed by the same State conservation agencies that in their view the navigation pools on the Upper Mississippi have improved the fish and wildlife in the Upper Mississippi.

Senator Shipstead: I think that is true.

Senator Hoey: What is your view about this bill generally? Do you think there is sufficient necessity for it?

General Wheeler: No, sir, I do not think there is any necessity for it, Senator. The Corps of Engineers is cooperating with the Fish and Wildlife. We are giving them funds from our Rivers and Harbors appropriation. While section

7 is the thing we object to most strenuously here, the other
provision gives them an authority to dip down in our river and
harbor and flood control funds for any work that they may have
in mind.

Senator Hoey:  A whole lot of this is just duplication of
what you are already doing?

General Wheeler:  Yes, sit, it is, sir.  We are now
cooperating with Fish and Wildlife and have given them an
appropriation of $100,000 from our river and harbor funds
and flood control funds to conduct studies for us on the
Columbia River.  We have constructed all of the facilities
and done all of the work as suggested by the Fish and Wildlife,
and are building them in accordance with their plans, and
we have spent large sums of money experimentally to determine
the best way to handle the facilities at a dam or reservoir
for the presentation of fish and wildlife.  I think that we
entirely meet the requirements of that service.

Senator Shinstead:  How long do you anticipate it would
take to build that new project?

General Wheeler:  I think that is scheduled for completion
at the end of 1948, Senator.  It involves the construction of
a lateral canal and a dam.

Senator Shinstead:  To get around the chain of rocks?

General Wheeler:  Yes, sir.  All of these reservoirs we
are constructing now on the upper reaches of the Missouri are

going to improve the navigation conditions so as to avoid
drawing down the pools.   It is best for navigation to canal
those pools on the Upper Mississippi at a uniform level.  That
is our objective, and that is what we are trying to do.  Except
for this one section, that is the way they would be always
operated and maintained.  We know that when this Middle
Mississippi section is completed in accordance with our present
plans for which we have already received an initial appropria-
tion, we believe that there will never be any need to affect
the level of the pools in the Upper Mississippi.

Senator Young:    How would that affect this Garrison dam
reservoir?

General Wheeler:  The Garrison  Reservoir will provide
increased flow for the lower reaches of the Missouri and for
the Middle Mississippi, which will improve the condition in
this chain of rocks section.

Senator Young:  Will that mean, by changing the pool
there, you would have to consult with Fish and Wildlife?

General Wheeler:  We would have to consult with Fish
and Wildlife.   The Congress approved those projects for a
specific purpose, for either flood control or for navigation,
or for multiple purposes.

Senator Young:    Fish and Wildlife certainly would not
be secondary to all the interests up there.

General Wheeler:  Well, I don't know.   We, in the

Engineers, are very happy that the fish are in our rivers, because we believe that has a recreational value of high importance in our project. We do not know how to evaluate fish, but we can evaluate power, we can evaluate navigation, and it involves millions of dollars of loss if we are not allowed to operate those pools, if we are required to keep the pools at a uniform level, in which case the project is not justified.

Senator Young: I do not know how you would do it. If it would cause delay everytime you wanted to change a pool it seems to me you would have a change quite often there.

General Wheeler: Yes, sir. We will always maintain in each of these pools - and I am sure the Fish and Wildlife Service appreciate that -- we would maintain what we call a dead pool. We never go below the stage of that permanent pool. In other words that permanent pool is there always and the fluctuation is above that level.

The Chairman: Every dam, as I understand, has a definite pool level below which you do not go.

General Wheeler: Yes, sir, and that pool level is approved by Congress itself -- twice, both in authorizing it and in the Appropriations Committee when the funds are appropriated.

The Chairman: Well, under our program with your depart ment the Engineers build all of our flood control works;

is that correct?

General Wheeler: Yes, sir.

The Chairman: Now, place in the record, if you will, the first consideration that your department gives to a flood control dam. By that I mean discuss the relative importance, first, of flood control, second, power, third, navigation, if there be any navigation, and then in order the other benefits that you give credit to in arriving at a decision as to whether or not the project is feasible.

General Wheeler: I could give you an outline now, Senator.

The Chairman: Yes, if you will.

General Wheeler: In the first place, we report on no project until Congress directs us to.   We do not initiate any of these projects. Congress directs that we will investigate certain sites and their directive requires us to report on every beneficial use of that site.  In other words, we examine the site with a view to constructing a multiple purpose project which will use all the beneficial uses, navigation, flood control, power, abatement of pollution, irrigation, and so forth. The sum of the benefits estimated from these various uses must exceed the annual cost of the project, and when that favorable ratio exists the project is favorably reported to the Congress.

Now, there are very few of these multiple purpose projects

where all the beneficial uses are incorporated in one compre-
hensive plan, because, due to the variation in the type of
streams, it is not economically justified to put them all in.
We can give as an example the Willamette River in the North-
west. Due to the nature of the storms that approach floods,
due to the fact there are seasonal floods there, that is almost
an ideal stream where we do have all the beneficial uses.
Power is generated at the dame site, power is generated at
the downstream plants, and it provides flood control for the
entire Willamette Basin. It provides about 1500 second feet
in the Willamette River to give a six-foot depth to naviga-
tion, and it provides another 1500 second feet to take care
of pollution, the pollution from the big paper mills on the
river.

That is one extreme. The other extreme is the Connecticut
River, where there are no seasonal floods.  There has been
a major flood every month of the year in the Connecticut
River, and the floods move from the mouth of the river to the
headwaters, which is a bad condition in storms, consequently we
cannot have a multiple purpose project for the Connecticut
River.

Now, in between the two extremes we have all these beneficial
uses fitted into the particular stream and they are recommened to
Congress if they are economically justified.

The Chairman: In the make. up of the evaluation of the component parts of a dam, what value do you give to the reservoir for the supplying of fish, and also to having a place for wildlife to hibernate?

General Wheeler: We haven't assigned any money value to the recreational advantages of our reservoirs. We assign only the value to these beneficial uses that I have named, and the priority is the relationship that exists with the proportionate part of the benefit that any particular item holds in the total.

The Chairman: In other words, your department has never and does not now contemplate the construction of any dam to create a reservoir especially for the propagation of fish and for its use for water power?

General Wheeler: No, sir.

The Chairman: You do not give either of those elements a monetary value in the making up of your report?

General Wheeler: No, sir, we do not.

The Chairman: Do you understand this bill to have the effect of turning over these various reservoirs -- I would not say for wildlife service but it has that effect -- and making them predominantly useful for fish and wildlife?

General Wheeler: That is the impression I have from reading the bill.

Senator Thomas, we would not be opposed to a similar

bill that embodies some of these principles, but we think it ought to be considered by all the Federal agencies that are interested, and that we should come up with a bill that we recommend to Congress, a bill that would involve the study of all the other interests, Federal Power, Department of Agriculture, and the Army Engineers.   We believe that the Army Engineers, on some of the most important items in this bill are already cooperating with the Fish and Wildlife, to secure the objective that they have in mind.

The Chairman:  Does this bill cover reclamation pools as well as power pools and flood control pools?

General Wheeler:  No, sir, only the War Department pools. I do not understand that either.  There are other pools in the United States that are constructed by the Department of the Interior, but it only refers to the War Department pools.

Senator Shipstead:  You keep records on the fluctuation of the water levels?

General Wheeler:  Yes, sir, we have a very accurate record, sir.

Senator Shipstead:  Could you have the records sent up here for the record?

General Wheeler:  For the Upper Mississippi, sir?

Senator Shipstead:  Yes.

General Wheeler:  Yes, sir, we will put that in the record.

Senator Shipstead:  There have been considerable complaints

from people along the Mississippi River around Winona, and
so forth.

General Wheeler: Yes, sir.  Senator, I built, when I was
District Engineer, 14 of those locks and dams.  I know the
sentiment there.  We like to have the people like our pro-
jects.  We are not trying to operate them in any way to
adversely affect fish and wildlife.  One of the things we
talk about in the Army Engineers is these pools that we create
for flood control and navigation do have these recreational
benefits, and fishing and boating are very important.

Senator Shipstead: Did you get some complaint from people
there last winter?

General Wheeler: Yes, sir.  Those were timed in a very
peculiar way.  When we approved their going ahead with the
operation of the pools, we sent out a notice.  I just have one
here to show.  We sent out a notice explaining everything
to everybody in the Upper Mississippi, and from the last
information I had everybody had agreed to it, and then we
began to get telegrams of opposition, and we operated the
pools for only two weeks.

The Chairman:  If section 7 should be stricken from this
bill would the remainder be objectionable to your department?

General Wheeler:  No, sir.  If we can get section 7, I
suppose I should be happy to settle on that basis, Senator.

I think the bill provides that they can dip down into

our funds. I don't know whether that is a correct principle,
that another agency for entirely different purposes can dip
into the flood control and river and harbor funds and take
those funds for any purpose that they choose for their
department. Every department ought to stand on its own
bottom and come before Congress like we do and present their
projects and explain them and get appropriations on that
basis.

Senator Aiken:  You already spend money for fish ways,
don't you?

General Wheeler:  Yes, sir, that was authorized by Congress,
for us to do that, sir.   In connection with that, we built
the fish ways and facilities in accordance with the plans of
the Fish and Wildlife service.

Senator Aiken:  When you say they can dip into your funds,
for what purposes would they use those funds?

General Wheeler:  For any purpose in connection with
protecting fish and wildlife.  I do not know whether that
means they could use it for hatcheries and all that or not.

Senator Aiken:  I have observed the ease with which you
get funds as compared with the difficulty that some other
agencies have, and it looks rather tempting.

General Wheeler:  It does not look very easy to me.  I have
to come before these committees, both in the House and Senate,
the hearings lasting for several days, and they go into great

detail on both sides of the table, so we feel we have been pretty thoroughly investigated when we get the funds.

Senator Aiken: Whether it is easy or not you usually come out with the funds, with what you need.

General Wheeler: Yes, sir.

Now, you asked me about these other sections. Of course, I hope that a bill could be considered by all the other Federal agencies, and this particular bill could be considered by the navigation and flood control interests who apparently have not had an opportunity to express their views, but there is some phraseology in sections 2 and 3 that I would like to call your attention to. If you are only going to strike out section 7, I would like to just hand you this marked copy, Senator, for your consideration.

The Chairman: We will be glad to have your suggestions in the form of a marked copy, General.

I have a suggested amendment on page 7, instead of striking out section 7. Turn to pages 6 and 7. First, on page 6, in the last line, the committee struck out two words "and directed", which leaves the language to simply authorize you to give consideration, and so forth, rather than directs you to do it. That is already in the bill, so far as committee action is concerned.

Second, page 7, line 4, after the word "shall" insert the following: "so far as practical for navigation". What effect would that have upon it?

Senator Shinstead: Before he goes into that, where does this right, General, to draw the water down for power, for a private enterprise, come in?

General Wheeler: That was an act of Congress approved years ago, Senator. I know, as a young officer in 1911, when we went to the Mississippi River that project was just under construction at that time and had been authorized by an act of Congress.

Senator Shipstead: To a certain amount but not to ir ..-fere with the levels of the pools, was it?

General Wheeler: At that time we did not have a canalized project in the Upper Mississippi. They had just the pool of Keokuk Lake, for the power plant at Keokuk.

Senator Shipstead: Well, they have a vested right in a certain amount of water?

General Wheeler: Yes. Congress specified what their rights were.

Senator Shipstead: How can that interfere with the level of the pools unless you give them more water than they are entitled to?

General Wheeler: It cannot, sir, but during the war they did give them more water.

Senator Shipstead: That would not be done in time of peace?

General Wheeler: No, sir.

Senator Shinstead:  That was a matter of emergency?

General Wheeler:  No, sir, that was a war measure.

Senator Shinstead:  How far did you lower the pool?

General Wheeler:  I do not know, Senator.  I can furnish that for the record.  I do not know the amount that that Keokuk pool was lowered.

Senator Aiken:  Well, now, where it says you "shall consult with the head of the agency exercising administration over fish and other wildlife resources in the State wherein the navigation facilities are operated," you already do that, in a way, by reason of the so-called O'Mahoney Amendment?

General Wheeler:  Yes, sir.

Senator Aiken:  That is, you consult with the State itself, usually the Governor, or whomever he designates, but in any event you do consult with the Fish and Game Department in that State?

General Wheeler:  Oh, yes, sir, we do, definitely.

Senator Aiken:  Because if the Governor does as he should he naturally will receive recommendations from his own Fish and Game Department.

General Wheeler:  Yes.

Senator Aiken:  Then, where it says, "shall maintain uni form pool levels," you do have agreements in many States where you maintain minimum pool levels?

General Wheeler:  Yes, sir.

Senator Aiken:  I can see why you could not maintain a uniform pool level, because there is no natural lake or very few of them that maintain a uniform pool level.

General Wheeler:  Yes.   Another thing that is not generally know, we have a Federal inter-agency committee that meets in Washington.  I am a member of it representing the War Department, and Commissioner Strauss represents the Department of the Interior, Mr. Olds of the Federal Power Commission, Mr. Wicking of the Department of Agriculture.  That Federal inter-agency committee also has subcommittees. We have one on the Missouri Basin and one on the Columbia River Basin.  The members of those committees represent all the interests that are involved in the river, the Fish and Wildlife, National Park Service -- everything.   The member ship of these basin committees also includes the Governors of the States.  So we do have all the agencies that are interested receiving proper consideration in the construction of any project or plan of ours.

Senator Shipstead:  Have you had any complaints from State agencies from Minnesota?

General Wheeler:  On the Upper Mississippi?

Senator Shipstead:  Yes.

General Wheeler:  No, sir.   Right now, Senator, there is an Upper Mississippi Valley Water Use Council which has a membership of the four States, Wisconsin, Minnesota, Iowa, and

Illinois.   An Army Engineer was the one who got them together
and formed this committee.  They met recently in Dubuque, and
I was present at their meeting week before last.  The Minnesota
representative was a man by the name of Strong, whom I think
you probably know.

Senator Shipstead:  Yes.

General Wheeler:  And the Wisconsin representative was Mr.
Torkelson.  Now, the Wisconsin Conservation Commission was
satisfied with  the way we were operating it.   Mr. Torkelson
told me in Dubuque, he did not think any water should be
withdrawn from the pools.

Senator Shipstead:  What was Mr. Strong's attitude?

General Wheeler:  I think his attitude was the same as
Mr. Torkelson's.  He did not talk long, because Mr. Torkelson
was the chairman of the meeting and did the talking for the
group, and I assume that Mr. Strong felt the same way.  I dis-
cussed it at length with all those people, and I explained
that we believe that when the projects, as I stated before,
in the Middle Mississippi are completed there will be no need
to make any withdrawals for that section of the river.

Senator Shipstead:  Were there any men connected with
any conservation organization?

General Wheeler:  I do not know, sir.  There were appointed
by the Governors to represent the Governors so they must have
an official State position.

The Chairman:  Does that complete your statement on your objections, General?

General Wheeler:  Yes, sir, I think that is all, unless there are questions.

The Chairman:  Are there any questions to be submitted to General Wheeler?

Senator Shipstead:  These people down around Winona were very much upset last winter.  I would like to know if there is anything that can be done to dispel their fear?

General Wheeler:  Yes, sir.  I can tell you now, Senator, I am willing to appear in the record as saying that I would guarantee that there will not be any withdrawals from the pools in the upper reaches above Rock Island for this coming winter.

Senator Shipstead:  Well, in time of peace would a severe drought make that necessary?

General Wheeler:  Well, a severe drought under natural conditions, would have made, in our view a greater variation than would occur in the canalized project.

Senator Shirstead:  Well, would the project down around that chain of rocks eliminate this danger of fluctuation?

General Wheeler:  Yes, sir, that would eliminate it, because that gives us the project depth in that section of the river.

Senator Shirstead:  Of course, if those pools do not vary

more than one foot it does not seem to me that could be so objectionable, but maybe it makes a great deal of difference on the shorelines.

General Wheeler:  Yes, sir, it does.

Senator Shipstead:  And it would affect the spawning grounds.

General Wheeler:  A foot drop in level would cover a very wide area of the ground, due to the slopes.

Senator Aiken:  I would not think that would make so much difference in the wintertime.

General Wheeler:  Withdrawals are not beneficial for fish life.

Senator Shipstead:  What is that?

General Wheeler:  Withdrawals do adversely affect fish and wildlife, there is no question about that.

Senator Aiken:  That is, withdrawals at spawning time is particularly objectionable.

General Wheeler:  During the wintertime.

Senator Aiken:  And during the wintertime?

General Wheeler:  Yes, sir.

Senator Aiken:  How does it do that, in the wintertime particularly?

General Wheeler:  I have been told by the experts that it does, Senator, and I accept that.  I do not understand it.

The Chairman:  Are you familiar with the habits of the various kinds of fish, with respect to their propagation of their young?

General Wheeler:  No, sir, not very much.

The Chairman:  Take, for instance, bass, big-mouth bass and black bass, I know how they propagate; of course, they have to live in pools, they do not live in shallow water, but they go out on the banks of these pools -- and by banks I mean close to the banks where the water is not more than 18 inches or two feet deep, something like that, and they fan away the silt from the sand and gravel and make their nests, and their eggs are deposited on that sand and gravel.  I have seen a great number of their nests, and as far as I know they are never more than 18 inches or maybe two feet under water. Now, if at the time they are spawning you should draw the water down two or three feet, of course that would destroy absolutely any chance for the propagation of that fish in that particular time, and that comes along in the spring.

General Wheeler:  Yes, sir.

The Chairman:  I am not familiar with the spawning habits of other fish, I am just talking now about bass.

General Wheeler:  Yes, sir.

The Chairman:  It would appear, for the proper propagation of fish if other fish have similar habits that these pools should be maintained at as nearly a constant level at certain

times of the year as possible, especially during the spawning season.

General Wheeler: Yes. Of course, in the spring and summer we have plenty of water and there is no difficulty about that. It is only in the winter months that this adverse effect exists.

The Chairman: As I understand from your testimony, at the present time there is no occasion for any legislation on the theory, first, that you are now conferring with the Wildlife Service and other services that may be interested in the conservation of water for various purposes, and that the pools are managed and operated to the best advantage on the whole theory upon which they are constructed, first, for flood control and, second, the creation of power and navigation and other beneficial uses.

General Wheeler: Yes, sir

The Chairman: Is that correct?

General Wheeler: Yes, sir, that is correct.

The Chairman: Your second recommendation is that if the Congress desires to pass legislation along this line, that the legislation should be prepared and submitted to this inter-agency committee, or at least to your department and to the Federal Power Commission, and the Agricultural Department and Interior Department.

General Wheeler: Yes, sir.

The Chairman:   That is your recommendation, as I understand it.

General Wheeler:   And that we come up with a cooperative recommendation to the Congress.

The Chairman:   Well, if the pending bill should be reported minus section 7, would the bill in that form contain provisions that would seriously interfere with the operation of these waters?

General Wheeler:   No, sir; of course, it would make it possible for them to use our funds.

The Chairman:   Would that be disadvantageous to your program to have the Wildlife Service ask you for funds under authority of law, which would enable them to make legitimate and just demands?

General Wheeler:   It seems to me that they should go through the same processes that we go through to get the funds.   They would be getting money from Congress on a project which they have not explained to Congress in advance, and every bit of our money is spent on projects which we have explained in great detail to Congress before we get the funds.

The Chairman:   Under the present program you have to explain your requests to the Budget Bureau, first, do you not?

General Wheeler:   Yes, sir.

The Chairman:   You have to get by that department or

agency before you have any estimate?

General Wheeler:  Yes, sir.

The Chairman:  Then, that estimate is submitted to the House and Senate, and it has to be justified, first, before the Budget Bureau and, second, before the House Committee and, third, before the Senate Committee.

General Wheeler:  Yes, sir.

The Chairman:  So getting the money for your department is not as easy as some people think it is.

General Wheeler:  No, sir.

Senator Willis:  Isn't that included in section 6?

General Wheeler:  Yes, section 6 refers to funds.

The Chairman:  As I read section 6, it is an authorization for the appropriation of such funds as may be necessary to carry out the purposes of this bill.

Senator Hoey:  There is nothing specified as to the amount.

The Chairman:  Not the amount.  It does not authorize any particular group of agency to ask for funds, it says it shall be authorized.

General Wheeler:  On the bottom of page 3, Senator, is the one that he refers to.

The Chairman:  Now, who shall pass upon the question of the amount of such funds?

General Wheeler:  I suppose they have a right to ask us for any amount they want and for any purpose they consider

necessary.

The Chairman:  Do you construe this bill to give you a directive to send over such funds as may be requested?

General Wheeler:  Yes, sir, I do.

Senator Hoey:  That is what it looks like it says.

The Chairman:  There is a provision of law that permits the transfer of funds from one department to another.

General Wheeler:  Yes, that is the basis on which we transfer funds now to Fish and Wildlife.

The Chairman:  Are there further questions to be submitted to General Wheeler?  If not, General Wheeler, we thank you for your appearance before the committee.

Is there anybody present either for or against this bill, or any provision of it, that desires to be heard at this particular time?

STATEMENT OF HONORABLE A.WILLIS ROBERTSON, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF VIRGINIA.

The Chairman:  Mr. Robertson, you are the author of this bill, are you?

Mr. Robertson:  Mr. Chairman, I am the author of this bill.  We worked for it for two years.  With all due deference to the distinguished Chief of Army Engineers I think if they work for ten years they could not do a better job than the 48 State game departments and all the conservation agencies

of this country and all the other departments that have cooper-
ated in bringing the bill to you in its present form, with the
exception of section 7.

I would also say, with all due deference to  the Army
Engineers, that  ten years from now they would be as much
opposed to any other agencies telling them what they have to
do on any one of their projects as they are today.  That is
the essence of their objection, except section 7.

There is no provision in here that anybody can dip into
their funds for any purposes.

AL-1
follows
WLC

The bill provides that unless they and the Interior and State Game Departments agree on what should be done for wildlife, the Army engineers are not under any obligation to do anything.

There is no provision in here that anybody can dip into the fund for fish hatcheries, or anything pertaining to a fish hatchery. All that is carried on the bottom of page 3 is this:

"In the case of construction by a Federal agency, that agency is authorized to transfer, out of appropriations or other funds made available for surveying, engineering, or construction of the Fish and Wildlife Service, such funds as may be necessary to conduct the investigations required by this section to be made by it."

They do not have to transfer anything. The purpose of this bill, except Section 7 -- which was an amendment offered by my distinguished colleague from Minnesota, Mr. Andresen, when it was pending before the House Committee -- is that consistent -- and all the way through that is the language -- consistent with the primary purpose of the project, due regard shall be given to wildlife interests.

The General said that the Army engineers had been doing everything necessary. He may think that. He is a great engineer and a great soldier, and he may thing that everything necessary has been done, but I think 48 State Game Departments

38

AL-2

and all the conservation agencies of this country do not think so, and they think they need this legislation.

The reason they think they need this legislation is to do what he said they do not do, and that is  when they planned a project they did not go fully into what effect that project would have on the wildlife interests of this nation.

As a matter of fact, there are exceptions to the rule that the General mentioned, if that is the general rule, because when the District Engineer planned a project for multiple purpose dams on the Potomac River and its tributaries he tried to justify the expense, when the electricity that was to be sold in competition with private industry in that area would not carry the load, by adding $500,000 a year for recreational and conservations purposes as a justification for this project.

I asked the Fish and Wildlife Service to make an independent survey, and they reported that the recreational uses of the Potomac and Shenandoah would be ruined, and that the damage to fish and wildlife would probably mean a million and a half dollars a year, and when we went before the Army engineers they could not even prove that themselves, much less send it to Congress to be fought out on that issue.

Now the purpose of this bill, which the Isaac Walton League approves as Mr. Reid will tell you, is when they plan a project, let the Congress know, before we appropriate

the money, all that is involved, including what that project
is going to do to a great natural resource, and then the
Congress appropriates the fund, and if the War Department
then sees fit to transfer some of that to other than engineer-
ing purposes, we haven't dipped down to that fund, we have
merely used, in the public interest, the funds that Congress
appropriated, and in a proper way.

(14)        There is nothing in my bill that would take away from
the Army engineers the control of navigation, and I do not
wish to do so, but when it comes to fish and wildlife, that
is where the two are in hopeless conflict.

The General assured you today that they would not draw down
their pools in the Mississippi this year, and I understood
him to say that so far as it would be consistent with naviga-
tion, unless there was some extreme drought or peacetime
necessity, they would not draw them down. With that assurance,
and with the Army now realizing how much this Congress and
how much the people of this nation are concerned over what
is going to happen to the future of our wildlife resources,
I frankly feel we would be safe in eliminating Section 7 of
this bill, or else amending it according to the suggestion
offered by your distinguished Chairman, that we put in there
"consistent with navigation", or some language to that effect,
to see that nothing is to be done in the Mississippi River
that would nullify the expenditures made for barges and

ships going down the stream where it is navigable.

Gentlemen, I know you are busy, and I know in the House we are busy, and I am not going to take up your time.

I do believe this bill is important to the United States. If we can get together, either by amendment of Section 7 or striking it out completely, I hope you will make an effort to pass the rest of it.

There is nothing in here that will in any way impinge upon or unduly restrict the operations of the Army engineers. I have the House record for that.

In wartime I have always taken the position that the military must be unhampered by civilian control, but in peacetime, gentlemen, I say I do not want the military to be in control.  They are the stand-by if somebody attacks us, but they should not be allowed to operate like they do in some countries, they should not be allowed to run the Government, and run it unfortunately for purposes other than peace to which a democracy is dedicated.  I believe I am justified in telling the Army engineers -- and it is no reflection on you -- that in the future the peacetime purposes of conserving wildlife resources must be considered by you, along with the other peacetime agencies of the Government, in formulating your plans.

Mind you, this does not affect a single installation that is now in operation, not one, but we have appropriated

AL-5

over two billion dollars for flood control and power dams,
another billion dollars pending for that vast program that
is coming in the future, that we are looking to, and we feel
it ought to be provided for in legislation of this kind.

As I say, if they work for months or for years they
cannot do a better job than the experts in this field have
already done.

Senator Bushfield:  Mr. Robertson, I understood you to
say if Section 7 were amended as suggested by the Chairman
it would be satisfactory to you.

Mr. Robertson:  Quite so, as far as I am personally
concerned. That is a local problem in the distinguished
Senator's State of Minnesota, the level of the pools on
the Upper Mississippi.  It does not affect any other State,
as far as I know.

Now if we have either an amendment to that Section 7
to make it clear that we are not to interfere with navigation
or the complete elimination of that will satisfy the War
Department, it will safe the bill from defeat.

You know one objection now, before the closing days,
on the floor will stop this bill.  I would like to see it
go through, and with that amendment that would go to conference
we could agree on something and get something in return
that would have a lot of good in it.

(15)                    Senator Hoey:  This bill, as you introduce it, you say

AL-6

has been thoroughly discussed and agreed upon by the different States?  —

Mr. Robertson: It has the unanimous endorsement of every State Game Department, sir, and none more thoroughly than the State of North Carolina.

Senator Hoey:  It has been considered?

Mr. Robertson:  Yes, sir.  I introduced the bill and when I would find some objection I would change it and consult with the Forest Service, and I would change it to suit them, and we just got it in the best form possible.

Senator Shipstead:  Did you have hearings in the House?

Mr. Robertson:  Yes, sir, we had hearings on the 17th. This bill was introduced last year, and on the 17th of February the War Department was requested to make a report. They did not make it, and we waited until May, and they would not say yes or no, and we passed it on May 6th.  On May 14th your distinguished Chairman asked them for a report, and then he invited me over here on July 10, and on July 10 Judge Patterson wrote him a letter saying, "We are opposed to it."  They said they had not had time to get the report cleared by the Budget Bureau.  They have had over a year and they said nothing about it until the 10th of July, and then they come up here in the last week of the session and say "Why, let us clear this bill and give us a chance to work up another one."  You know the real meaning of that.

AL-7

Senator Willis:  If we amend Section 7 and say "with due respect to the need for navigation",  the House would accept that?

Mr. Robertson:  Yes.  If you leave Section 7 in there with an amendment indicating the desire of the Congress to not interfere with navigation, the House, I am sure, would accept that bill in conference.  I talked at quite great length with Mr. Andresen about that, and I am sure he would have no objection to it.

Senator Shipstead:  Do you think that would be satisfactory, to say, in line 4, "the War Department shall, so far as practical for navigation, maintain uniform pool levels", or so far as it does not interfere with navigation?

Mr. Robertson:  Well, I discussed that yesterday with the Clerk of the Senate Committee on Wildlife, and he discussed it with Senator Cordon, and I think with Senator White and some others, and that was his suggestion to me, that we ought to satisfy the War Department, and he thought that would make a satisfactory bill to everybody.

I believe, sir, that Mr. Andresen would accept it. He did tell me he hoped some of Section 7 would stay in there to center attention on that problem and not just leave it on the promise "We are going to take care of you all right, don't kick".

The Chairman:  Thank you, Mr. Robertson.

44

AL-8

Senator Shipstead:   There is some gentleman here from
the Isaac Walton League, I think.

STATEMENT OF KENNETH REID, EXECUTIVE DIRECTOR,

ISAAC WALTON LEAGUE, CHICAGO, ILLINOIS.

Mr. Reid:   Gentlemen, my organization subscribes most
heartily to the statement that Congressman Robertson just
made.   For 25 years we have been trying to cooperate with
the Army Engineer Corps on these river levels.   We have come
to the conclusion that their idea of cooperation is to do
everything they want for navigation and anything that is
left for fish and wildlife or for general public recreational
use the public is welcome to, but if it interferes in the
slightest degree with their operation for navigation, as
they see it, they will not do so.

(16)                     Let me cite you an illustration of that.   Some six or
seven years ago we learned that they were going to draw down
these pools in the Upper Mississippi.   Incidentally, this
talk of not drawing them down more than one foot is not in
accordance with the facts, and not in accordance with their
own statements.   I have many of them in my office where
draw-downs two or three or four years before the war were
as much as eight, ten and twelve feet.

So we called this conference over in Winona, Minnesota
about six years ago.   I outlined the problem.   I remember
the Senior Engineering Officer then taking the floor and

AL-9

saying -- and I am quoting him as nearly as I can from memory -- "Gentlemen, we don't want to destroy the fish, ducks and whatnot in the Upper Mississippi River, but we are charged by Congress with maintaining navigation and if, in order to maintain navigation, it means killing the last fish, the last duck and last muskrat in the Mississippi River, that is what we will do."

Gentlemen, I maintain an attitude like that is wholly unnecessary.  I think part of the fault, perhaps, is with Congress. It should revise some of these basic laws.

The Chairman:  Who made that statement?

Mr. Reid:  Colonel Malcolm Elliott.

The Chairman:  Who is he?

Mr. Reid:  He was the Senior Engineer from the St. Louis office at that time.

The Chairman:  He is still in the service?

Mr. Reid:  As far as I know, yes.

Now I will take another Federal agency, just to give you a comparison, the U.S. Forest Service.  The basic act of Congress creating the National Forests created them for two purposes and two purposes only, watershed protection and timber production.   The Forest Service, being awake to public values, realized that some of the national forests were more important for other purposes, and many of them are administered primarily for recreation.

The Army engineers can, if they will unbend a little
bit and take their blinders off, administer the water areas
for the benefit of the whole public rather than for one special
interest.

Over 25 years, throughout our national conventions, I
could submit to you a very imposing array of resolutions right
down the same line, trying to get some recognition for the
biology of water and public aquatic values.  Unfortunately
there is no one in our Federal Government who coordinates
the national water policy.  Water is the orphan of the whole
natural resources family.  There is a vital need for such
coordinated policy, and Congressman Robertson's bill is a
mild attempt to bring that about.

Summing up our carefully considered policy resolutions
on water over many years, it might be stated this way:  That
before any river development project be authorized there be
(17)      a comprehensive biological survey, on a par with and at the
same time as the engineering surveys.

Second, that before any appropriations are authorized
for engineering surveys adequate appropriations ought to be
made, concurrently with such authorization, for these nec-
essary biological surveys.

And, third, that full reports of both surveys constitute
a report to Congress, giving Congress a full and complete
balance sheet of all values, in order to give it the basis

for making intelligent determination as to whether or not
the particular project is in the public interest or merely
is desired by some special interest at public expense.

So far Congress has had the engineering data from one
viewpoint only.  It has not had the full information on all
values, and I submit to you,gentlemen, that there are many
values in a river besides navigation, besides kilowatt hours
and besides irrigation.

The Chairman:  Are those values such that it would justify
the Congress to appropriate money to establish them and main-
tain them?

Mr. Reid:  It is not necessary to establish them, they
are already there.  What is necessary is for Congress to
consider, in any appropriation for engineering surveys and
construction, the necessary appropriations so that the bio-
logical values of the water may get proper consideration,
and that is what this bill would tend to do.

To give you an idea of comparative values I will return
again to the Upper Mississippi.  I spent two days up there
two years ago, covering 80 miles of that river, and in that
time I saw one freight boat or two -- there may have been
two or may have been one, they moved so slowly.  Compared
with that, and speaking conservatively, I saw 500 fishing,
duck hunting, and what not, small boats there.  In other
words, the interest of the people in the aquatic values of

that river is much greater than the public value of naviga-
tion.   That is in the Upper Mississippi.   I am not talking
about the Lower Mississippi or Middle Mississippi.

As far as these water levels go, I recall when this
9 foot channel was first up for consideration in the Upper
Mississippi.   The Isaac Walton League opposed that until
it received what it believed to be adequate assurance from
the Army Engineer Corps that stable water levels would be
maintained in those pools.   Well, when they got the thing
they forgot all about the assurances and began juggling
them up and down.   It has been our experience that their
assurances in advance of these projects are not worth anything.
They just want to ride roughshod over everybody, according
to their ideas of things.

The Chairman:   These dams were built for flood control,
with everything else incident thereto.   Power is an incident,
and even navigation is an incident, excepting for the pools
built for navigation, and I do not know many of them.

As a rule, Congress considers the report of the engineers
and if the dam or reservoir is not evaluated as of sufficient
importance to justify its economic existence for flood con-
trol it is not constructed.   If power is incident, or anything
else is incident, that comes along and is considered, but
they are purely flood control projects.

As I understand it from your testimony, that is not the

AL-13                                                              · 49

(18)         case. You say that the power pools are more valuable for

             boats and canoes and yachts, and things of that kind, than

             they are for any other purpose, is that correct?

                  Mr. Reid: I do not want to make that as a blanket

             statement. I would say some of them are and some of them

             are not.

                  The Chairman: If that is the case, then that feature

             should be taken into consideration by the Congress. If the

             thing is a little bit shy on flood control values and power

             values and if it has a vast potential value for river purposes,

             it seems to me that should be brought to the attention of

             the Congress.

                  Mr. Reid: I think, Senator, what we need in this whole

             water program is a practice of that simple rule of good

             social behavior and that is consideration for the rights of

             others. A little giving way on the part of navigation interests,

             a little giving way on the part of power interests, a little

             giving way on the part of reclamation interests will often

             eliminate the major objection from the wildlife and recrea-

             tional interests. Slight modifications of plans, taking

             these public aquatic values into consideration, will often

             eliminate the major damage that is done. When they want to

             squeeze out the last kilowatt hour, or the last nth degree

             for navigation, that has been the trouble. They have not

             been willing to give that consideration.

AL-14

Senator Shipstead:  On the Upper Mississippi, from Minneapolis down as far as Keokuk, Iowa, there is not power dam, is there?

Mr. Reid:  No.

Senator Shipstead:  They are all low dams for the purpose of navigation?

Mr. Reid:  Yes.

Senator Shipstead:  With the exception of that Keokuk dam during the war, when they needed the power, they got more than they were entitled to.  That may have been done as a war measure, but in time of peace they are not entitled to that water, to draw it down, and I cannot see any reason why those pools above there should be lowered, unless you have a shortage of water that is great enough that you have to fill them.

Mr. Reid:  I would like to make one more comment on some of the testimony here.  I think it is obvious the Army Engineer Corps, from its own statement and its own record, does not know much about the biology of water, and there have been a whole lot of statements made that are very loose about the public aquatic values of these reservoirs.

Now it is a matter of record that your navigation dams, or flood control dams, or whatever they may be, often show a high productivity in the first few years.  When water floods the land for the first time there are a lot of land organisms

that provide a lot of food for fish, and decomposing land
vegetation forms an ideal environment for a tremendous
propagation of small organisms which are the basis of the
fish food system.  After a few years, when the water level
has fluctuated up and down, your water goes down and aquatic
vegetation has taken its place.  There is nothing that is
more of a biologic desert or sink, or eye sore than an
artificial reservoir that seems to be full of water but,
as a practical proposition, is empty of water.

(19)         The Upper Mississippi was at one time the premier of
small mouth bass in this nation; today it has carp, catfish
and buffalo in the stream.  The premier fish have gone by
the boards.  The bottom of the river is all silted up in
these pools.  It would be pretty hard for fish to find gravel
in there now.  I just mention this because I think there is
a lot of misunderstanding about the value of these artificial
reservoirs for fish and wildlife in general.

Senator Young: The problem in the Missouri is almost
directly opposite to that in the Mississippi.  At the present
time there is practically no fish or recreational value.
There is a tremendous amount of construction now in the
Garrison Dam that will provide flood control irrigation and
power development, and along with that a lot of possibilities
for fish and wildlife, much more than we have at the present
time.  I am afraid if we tie it down too closely in an area

you might affect the whole program for flood control and
irrigation.

Mr. Reid:   I am very glad you brought that up, because
I want to make it abundantly clear that neither I nor my
organization are opposed to dams per se.   I frequently made
the statement that in the Missouri River, after it comes
out of the mountains of Montana, and also the Yellowstone and
all the tributaries, your aquatic values are practically nil,
and therefore any dams that may be built on those rivers --
and that may be true, Senator, of many streams in your State --
would probably be on the assets side of the ledger.

Senator Young:   It seems to me a big pool in Garrison
Dam would back up the water in the streams and there would be
a lot of fish there.   If they would cooperate with you to
hold the average pool level back it would protect the fish
pretty well.

Mr. Reid: I think you have in the reservoirs on the
Missouri, and some streams like that, your multiple values,
and we are not objecting to those.   The kind of things we
are objecting to -- and this bill would be very important
in that respect -- is dams in the West.   For instance, the
Bureau of Navigation is planning a dam in the Gunnison River
in Colorado and make it run to the Arkansas.   I want to say
the fish in the Gunnison River is the biggest cash profit
of anything else.   I could name hundreds of cases of that sort

WLC

over the country where the destruction is going to be terrific,
and I do not know of any piece of legislation before this
Congress, and I would even go so far as to say that has ever
been passed by Congress, that we consider so vitally important
to the welfare of the future as this bill, H.R. 6097.  It is
particularly vital in view of the tremendous appropriations
that have been made for river development.  This bill would
not stop a single worthy river development.  All it would do
would be to provide you gentlemen with the facts in advance
and allow the biologists to get in on the planning, instead
of calling them in to hold a post mortem on the dead body
of the river.  That has been the practice in the past.

All of this talk of cooperating with the Fish and Wildlife
Service is just a gesture.  But if what the Fish and Wildlife
Service says is necessary to be done to protect the public
aquatic values, if it in the slightest degree interferes
with the plans of the Army Engineering Corps, they throw
it out the window.    They are very reluctant in even letting
the Fish and Wildlife Service, or anyone else, get in on their
plans at all.

Senator Shipstead:  Isn't it true that fishing in the
Tennessee Valley pools is very good?

Mr. Reid:    Yes, under the new impoundments, providing
the fluctuation is not too much.  In a few years it will show
a wonderful promotion in growth, but how long it will last I

do not know.   T ke the two dams, the Elephant Butte
Dam on the Rio Grande and the one in New Mexico, they will
grow up in a few years with a tremendous growth, and then they
will drop off.  That is the history of everyone of these
artificial dams.

Senator Aiken:  Mr. Chairman, I want to corroborate from
first-hand knowledge what the witness has said in regard to
the effect of river control upon the fish in that river.  We
have in New England what was at one time at least called
the most completely controlled small river, the Deerfield
River.  I would say it is not more than 60 miles long.  The
work there was done by the private power companies, but the
effect on the fish would be the same regardless of whether
private companies or the Government does the work.  They have
two dams on this river.  After the dams were put in the fish
that were already in there grew to a tremendous size.  The
trout began to disappear almost immediately, but the pike grew
to tremendous size.  Then, they put in the Harriman Dam at
Whitingham, which was the largest earth dam for that distance.
They tried to stock with that trout and other good fish, but
it just would not work.  Nobody has been able to catch any
of them.

The reason they could not possibly have higher grade
fish in the river is because they draw the water down at
spawning time.  For a time they would catch pickerel up to

ance

two and one-half feet long, weighing several pounds, but
pickerel is not good fish.   Now it has degenerated until
the pickerel is about a foot long, and the rest of the fish,
such like perch, six inches long.

The fish have almost completely gone from that river,
which is 100 percent regulated, according to the engineers.
At one point of the river they run up to the penstock for
five or six miles. During most of the year there is water
enough so you have a good looking river there, but in the
dry season all the water goes through the penstock, and that
is the end of the fish in the river itself.

1 do want to say what was once one of the best fishing
areas of New England has been virtually destroyed by being
regulated. What happened there must happen in any other
part of the country. In fact, in putting dams across the
Connecticut River 100 years ago destroyed one of the best
salmon grounds in North America. I daresay that   salmon
fishing alone in the river system would approach if not
equal the value of the power which is generated on that
system.

M$_r$. Reid:  I do not want to take up too much time of
this committee, but you brought up something there that I
would like to have just a couple minutes more to discuss.

We destroyed, by the erection of the dams and the secondary
pollution, salmon runs on the Atlantic Coast south of the
Canadian border.   I think there are a few on the Penobscot

River.  The Fish and Wildlife Service of the State of Maine
has spent a good deal of money trying to restore salmon runs
in the river.  I just want to put a word of warning in here.
Unless we do something to curb the unbridled dam building
proplivities of two of our Government agencies you are going
to destroy the salmon runs on the Pacific Coast.

The Chairman:  You mentioned two of our Federal agencies.
What are the two agencies?

Mr. Reid:  The Army Engineers Corps and the Bureau of
Reclamation.  They are both scouring the country like a
swarm of locusts trying to find every possible site for a
dam.

The Chairman:  Are you opposed to the construction of dams
for irrigation, power and flood control, and navigation?

Mr. Reid:  I am opposed to the construction of those
dams in advance of the consideration of all values.  I believe
we can alter the plans here and there, and some dams should not
be built at all.

The Chairman:  What is your reaction to the construction
of the Bonneville Dam and the Grand Coule Dam?

Mr. Reid:  I  think that the Grand Coule Dam may not
be as fine a looking thing in the future as it is now, because
there is no question that the Grand Coule Dam is a terrific
blow to the salmon runs in the Columbia River.  I think the

Grand Coule Dam now proposed on the Umatilla River will block
off the spawning grounds right off of the salmon in the
Columbia River.

Senator Willis:   You spoke about the Gunnison River in
Colorado.  Do you know anything about the effect of the
Thompson project on the Colorado River?

Mr. Reid:  Yes, very definitely, unless they alter their
plans, because I can recall the hearings on that some years
ago, when it was provided that there would be no releases of
water from the dam at anytime for any reason.   If that is
followed out it means there would be no water in the Colorado
River below Grande Dam, except what comes from lower tributaries.
I just returned from Oregon recently, and I would just like
to give you one personal experience.   The Deschutes River is
one of the famous places in the State of Oregon.  I fished
there 20 years ago.   The Deschutes River just does not exist
anymore below the dam.  They took five big irrigation diversions
out, so there was merely a trickle of water going over the dam.
The director of the Fish and Game Commission, Frank Wire,
wanted me to fish below the Deschutes, five miles below.
After this last new irrigation diversion had been taken out,
some 80 miles of that water had been suddenly dammed in, so
my fishing was ruined on both ends of the river by an inconsider-
ate use of the water.

A lot of these things need not happen that way.   Referring

again to the Gunnison, I remember some years ago I was there during the 4th of July week, and with utter disregard for anything except water for irrigation they had released in one slug the water from the Taylor Dam on the Upper Gunnison, running a flood of water down the Gunnison River. Conservatively speaking, there were 1,000 people there that fished, and many of them had their only vacation all ruined because of that inconsiderate use.    Now, they did not have to open the gates all at once.  In all the 52 weeks of the year, the 4th of July week was the one week to do that!    They did not give consideration to anything except their own particular use of water.

hv

We need to have a formula prescribed by the Congress that will require them to give consideration to the rights of others. If we do that we can have what irrigation, what hydro power is needed, without ruining all of our rivers.

The Chairman:  Did I understand you to say that our rivers and streams, as we found them a couple of hundred years ago, should have been maintained in their primeval and natural state?

Mr. Reid:  No, sir.  That is impossible if civilization is to be maintained here, but in order to be civilized we do not have to ruin all of our natural values.  Even in little old England they still have salmon fishing.  We could have it here on the Atlantic Coast as well as the Pacific Coast if we

lndrs                   blinders off and recognized all the values.

The Chairman: We thank you, Mr. Reid.

Senator Hoey: Mr. Chairman, I move a favorable report of the bill with the amendment that the chairman has suggested to section 7.

Senator Aiken: It is already on the calendar.

The Chairman: The bill has been referred back to the committee for further consideration.

Senator Shipstead: I second the motion.

The Chairman: We should first take up the suggestion that was made by the engineers to strike out section 7.  That is taking the larger viewpoint.  Does anyone want to strike out section 7?

Senator Shipstead: No, I would not want to strike out section 7.

The Chairman: Off the record.

(Discussion was had outside the record.)

Senator Willis: Mr. Chairman, I move that on page 7, line 4, after the word "shall" we include these words: "with due respect to the needs of navigation".

The Chairman: You have heard the motion; is there any objection?

Senator Young: Mr. Chairman, could not you add "and flood control"?

The Chairman: Now, how would the amendment read, Senator

Willis?

Senator Willis: "In the management of pool elevations, the War Department shall, with due resrect to the needs of naviga- tion and flood control, maintain uniform pool levels", and so forth.

The Chairman: You have heard the motion on the amendment. Is there an objection to the amendment?

Senator Hoey: Mr. Chairman, do you think it is going to jeorardize the passage of the bill if we leave section 7 in?

The Chairman: There would be no chance of its passage.

Senator Hoey: I think, in view of what the gentlemen said on the bill, especially Mr. Robertson here, I think it would be bad to jeorerdize the passage of it.

How would it be to authorize the chairman, if that becomes necessary, to agree to strike it out, in order to get it passed?

Senator Aiken: I would be willing to do that.

The Chairman: Without objection then, the bill, as amended by the motion of Senator Willis, will be re-referred to the calendar. Of course that includes the amendment agreed to before. On page 6 we struck out "and directed".

Senator Aiken: Yes.

The Chairman: Without objection then, the bill as amended will be placed back on the calendar for further consideration.

79TH CONGRESS {      HOUSE OF REPRESENTATIVES     {      REPORT
2d Session    {                                    {      No. 1944

## RELATING TO THE COORDINATION OF ACTIVITIES FOR THE CONSERVATION OF WILDLIFE, FISH, AND GAME

APRIL 17, 1946.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. FLANNAGAN, from the Committee on Agriculture, submitted the following

## REPORT

[To accompany H. R. 6097]

The Committee on Agriculture, to whom was referred the bill (H. R. 6097) to amend the act of March 10, 1934, entitled "An act to promote the conservation of wildlife, fish, and game, and for other purposes," having considered the same, report thereon with a recommendation that it do pass.

### STATEMENT

The proposed bill would place in effect a much-needed program and facilities for the effectual planning, maintenance, and coordination of wildlife conservation, management, and rehabilitation. Although such a program was contemplated by the act of March 10, 1934 (48 Stat. 401), that legislation has proved to be inadequate in many respects and it now is proposed that it be amended to provide for more adequate procedures. With the ever-increasing pressure on the important national wildlife resources of the country, both because of extensive economic developments that have materially reduced the habitat heretofore available in the production of wildlife and because of the extended interest in the resource as a source of food and recreational enjoyment, it is essential that the plans for wildlife management be intelligently coordinated and given the necessary Federal assistance if this great national resource is to maintain its proper relation to the other resources of the country. Notwithstanding the widespread interest in wildlife of the hunting public, which represents an extremely large cross section of humanity, no unified effort, except with respect to certain migratory species, has been possible in the past.

A number of public hearings on several similar measures were held by the committee and, as a result of these hearings, the more important features of those measures together with suggested amendments

2   ACTIVITIES FOR CONSERVATION OF WILDLIFE, FISH, AND GAME

now have been incorporated in the provisions of H. R. 6097. The general purposes of the bill, namely the coordination of wildlife conservation, management, and rehabilitation, have wide support and the committee believes that the proposed bill reflects nearly all, if not all, of the various viewpoints with respect to the manner in which coordination of somewhat diverse interests may be accomplished.

State and Federal conservation interests working independently cannot adequately develop and maintain a resource that has no knowledge of, and gives no heed to, county, State, or even international boundaries.   A number of the States already have developed effective organizations and programs for the development and maintenance of the wildlife resources within their boundaries.   However, the migrant nature of the resource is such that there is no assurance that these programs will result in continuing benefits even to the States wherein effective management steps already have been taken. Other States have not as yet developed adequate wildlife management programs either because the State legislatures have not seen fit to provide sufficient funds or, in other instances, because proper studies of problems involved have not been made.   Again the relationship between wildlife as a resource and other economic developments has not been fully understood or effectively correlated.

From time to time both Federal and State agencies have made many impoundments, diversions, or other uses of waters that needlessly have destroyed the habitat upon which wildlife is dependent. Such destruction has been needless in the sense that these otherwise necessary economic developments could have been carried out, in many instances, without destroying wildlife or its habitat if adequate and reasonable provision had been made for the use of the lands and waters involved in such developments for wildlife conservation as a secondary use.   Restoration of the proper balance between uses of the lands and waters made by man and those made by wildlife may involve difficult problems and require considerable thought, but the solving of such problems is not impossible if intelligently handled.

In addition to providing for the necessary authority to cooperate with, and give assistance to, State and private agencies and organizations in all phases of wildlife conservation and protection, the proposed bill also would make available for administration for wildlife conservation purposes by State, public, or private agencies or organizations areas of land and water acquired by the Federal Government primarily for flood control, irrigation, and other uses but, at the same time, adaptable for the secondary use of wildlife conservation.   This feature of the bill alone is extremely important in facilitating proper cooperation in the management of the wildlife resource as well as in affording additional opportunity for the protection and management of the resource.

Both in the consideration of the proposed legislation before the committee and in the consideration of other legislation relating to flood control and similar matters, considerable discussion has been had with respect to the part that the States should play in the planning for impoundments, diversions, and other water-control facilities constructed or authorized by the Federal Government insofar as such planning would serve either as a means of mitigating damage to wildlife or as affording an opportunity to utilize the proposed facilities for the benefit of wildlife.   Although it is impossible to outline specifically in legislation all of the steps that should be taken in planning

ACTIVITIES FOR CONSERVATION OF WILDLIFE, FISH, AND GAME   3

flood control, irrigation, and similar projects so as to provide also for the conservation of wildlife resources, it is believed that the second and third parargaphs of the bill establish adequate procedures for the proper coordination of these seemingly diverse interests.   As drafted, these two sections require coordination between constructing and operating agencies of both the Federal and State Governments not alone after flood control, irrigation, or impoundment projects have been started but also in connection with the initial planning for such projects.   This type of coordination is extremely important from the standpoint of economical planning and construction as well as from the standpoint of effectuating conservation of wildlife.   There have been many instances in the past where minor changes in construction plans could have been made for the benefit of wildlife resources without increasing materially the cost of a project if consideration of the possible wildlife interests had been included in the initial planning of such projects.   It should be noted, however, that the bill purposely does not provide for the curtailment of flood control, irrigation, and other impoundment programs for the sole benefit of wildlife resources but rather it provides simply that due consideration be given to the requirements of these resources as well as the requirements of such other resources as may be affected by those programs.

During the course of hearings on the bill a question was raised by the Department of Agriculture as to whether certain provisions of the bill would make any change in the existing jurisdiction of that Department over the administration of wildlife resources within the national forests or other lands under its control.   It is the opinion of the committee that the provisions of the bill, and particularly those found in sections 2, 3, and 4, do not alter in any way the primary responsibilities for the administration of lands now vested in any agency of the Government, and the committee wishes to make it clear that other than to require consultation with the States in future water impounding or diversion projects, that it is not the intent of the bill to make any change in the jurisdiction of the Department of Agriculture over such areas or the resources thereof.

Section 5 of the bill authorizes the Secretary of the Interior, through the Fish and Wildlife Service and the Bureau of Mines, to study the effects of domestic sewerage, lime, petroleum, and industrial wastes, erosion silt, and other polluting substances, on wildlife, and to make reports to the Congress concerning such investigations.   Stream and water pollution has become in some instances a threat to public health, as well as a menace to aquatic life.

The studies of that problem authorized to be made should furnish the basis for appropriate Federal and State legislation on the subject. In compliance with clause 2a of rule XIII of the House of Representatives, there is set forth below in black brackets the entire text of the act of March 10, 1934, which the reported bill would supersede:

[(PUBLIC—No. 121—73D CONGRESS)]

[(S. 263)]

[AN ACT To promote the conservation of wildlife, fish, and game, and for other purposes

[Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of Agriculture and the Secretary of Commerce are authorized to provide expert assistance to and to cooperate with Federal, State, and other agencies in the rearing, stocking, and increasing

**4**   ACTIVITIES FOR CONSERVATION OF WILDLIFE, FISH, AND GAME

the supply of game and fur-bearing animals and fish, in combating diseases, and in developing a Nation-wide program of wild-life conservation and rehabilitation.

[SEC. 2. The Secretary of Agriculture and the Secretary of Commerce are authorized to make such investigations as they may deem necessary to determine the effects of domestic sewage, trade wastes, and other polluting substances on wildlife, with special reference to birds, mammals, fish, and shellfish, and to make reports to the Congress of their investigations with recommendations for remedial measures. Such investigations shall include studies of methods for the recovery of wastes and the collation of data on the progress being made in these fields for the use of Federal, State, municipal, and private agencies.

[SEC. 3. (a) Whenever the Federal Government through the Bureau of Reclamation or otherwise, impounds water for any use, opportunity shall be given to the Bureau of Fisheries and/or the Bureau of Biological Survey to make such uses of the impounded waters for fish-culture stations and migratory-bird resting and nesting areas as are not inconsistent with the primary use of the waters and/or the constitutional rights of the States. In the case of any waters heretofore impounded by the United States, through the Bureau of Reclamation or otherwise, the Bureau of Fisheries and/or the Bureau of Biological Survey may consult with the Bureau of Reclamation or other governmental agency controlling the impounded waters, with a view to securing a greater biological use of the waters not inconsistent with their primary use and/or the constitutional rights of the States and make such proper uses thereof as are not inconsistent with the primary use of the waters and/or the constitutional rights of the States.

[(b) Hereafter, whenever any dam is authorized to be constructed, either by the Federal Government itself or by any private agency under Government permit, the Bureau of Fisheries shall be consulted, and before such construction is begun or permit granted, when deemed necessary, due and adequate provision, if economically practicable, shall be made for the migration of fish life from the upper to the lower and from the lower to the upper waters of said dam by means of fish lifts, ladders, or other devices.

[SEC. 4. The Office of Indian Affairs, the Bureau of Fisheries, and the Bureau of Biological Survey are authorized, jointly, to prepare plans for the better protection of the wildlife resources, including fish, migratory waterfowl, and upland game birds, game animals and fur-bearing animals, upon all the Indian reservations and unallotted Indian lands coming under the supervision of the Federal Government. When such plans have been prepared they shall be promulgated by the Secretary of the Interior, the Secretary of Commerce, and the Secretary of Agriculture, who are authorized to make the necessary regulations for enforcement thereof and from time to time to change, alter, or amend such regulations.

[SEC. 5. The Bureau of Biological Survey and the Bureau of Fisheries are hereby authorized to make surveys of the wildlife resources of the public domain or of any lands owned or leased by the Government, to conduct such investigations as may be necessary for the development of a program for the maintenance of an adequate supply of wildlife in these areas, to establish thereon game farms and fish-cultural stations commensurate with the need for replenishing the supply of game and fur-bearing animals and fish, and, in cooperation with the National Park Service, The Forest Service, or other Federal agencies, the State agencies, to coordinate and establish adequate measures for wildlife control on such game farms and fish-cultural stations: *Provided*, That no such game farm shall hereafter be established in any State without the consent of the legislature of such State.

[SEC. 6. In carrying out the provisions of this Act the Federal agencies charged with its enforcement may cooperate with other Federal agencies and with States, counties, municipalities, individuals, and public and private agencies, organizations, and institutions, and may accept donations of lands, funds, and other aids to the development of the program authorized in this Act: *Provided, however,* That no such donations of land shall be accepted without consent of the legislature of the State in which such land may be situated: *Provided,* That no authority is given in this Act for setting up any additional bureau or division in any department or commission, and shall not authorize any additional appropriation for carrying out its purposes.

[Approved, March 10, 1931.]

O

79TH CONGRESS
2D SESSION

# H. R. 6097

## IN THE SENATE OF THE UNITED STATES

MAY 8 (legislative day, MARCH 5), 1946
Read twice and referred to the Committee on Agriculture and Forestry

JULY 10 (legislative day, JULY 5), 1946
Reported by Mr. THOMAS of Oklahoma, with an amendment

[Omit the part struck through]

JULY 17 (legislative day, JULY 5), 1946
Recommitted to the Committee on Agriculture and Forestry

# AN ACT

To amend the Act of March 10, 1934, entitled "An Act to promote the conservation of wildlife, fish, and game, and for other purposes".

1    *Be it enacted by the Senate and House of Representa-*
2    *tives of the United States of America in Congress assembled,*
3    That the Act of March 10, 1934 (48 Stat. 401), is hereby
4    amended to read as follows:

5    "In order to promote effectual planning, development,
6    maintenance, and coordination of wildlife conservation and
7    rehabilitation in the United States, its Territories and posses-
8    sions, the Secretary of the Interior, through the Fish and
9    Wildlife Service, is authorized (a) to provide assistance to,
10   and cooperate with, Federal, State, and public or private

2

1  agencies and organizations in the development, protection,
2  rearing, and stocking of all species of wildlife, resources
3  thereof, and their habitat, in controlling losses of the same
4  from disease or other causes, in minimizing damages from
5  overabundant species, in providing public shooting areas, and
6  in carrying out other measures necessary to effectuate the
7  purposes of this Act; and (b) to make surveys and investiga-
8  tions of the wildlife of the public domain, including lands and
9  waters or interests therein acquired or controlled by any
10 agency of the United States.

11     "SEC. 2. Whenever the waters of any stream or other
12 body of water are authorized to be impounded, diverted, or
13 otherwise controlled for any purpose whatever by any de-
14 partment or agency of the United States, or by any public
15 or private agency under Federal permit, such department
16 or agency first shall consult with the Fish and Wildlife
17 Service and the head of the agency exercising administra-
18 tion over the wildlife resources of the State wherein the
19 impoundment, diversion, or other control facility is to be
20 constructed with a view to preventing loss of and damage
21 to wildlife resources, and the reports and recommendations
22 of the Secretary of the Interior and of the head of the
23 agency exercising administration over the wildlife resources
24 of the State, based on surveys and investigations conducted
25 by the Fish and Wildlife Service and by the said head of

3

1 the agency exercising administration over the wildlife re-
2 sources of the State, for the purpose of determining the
3 possible damage to wildlife resources and of the means and
4 measures that should be adopted to prevent loss of and
5 damage to wildlife resources, shall be made an integral
6 part of any report submitted by any agency of the Fed-
7 eral Government responsible for engineering surveys and
8 construction of such projects.

9    "The cost of planning for and the construction or in-
10 stallation and maintenance of any such means and measures
11 shall be included in and shall constitute an integral part of
12 the costs of such projects: *Provided*, That, in the case of
13 projects hereafter authorized to be constructed, operated,
14 and maintained in accordance with the Federal reclamation
15 laws (Act of June 17, 1902, 32 Stat. 388, and Acts
16 amendatory thereof or supplementary thereto), the Secre-
17 tary of the Interior shall, in addition to allocations to be
18 made under section 9 of the Reclamation Project Act of
19 1939 (53 Stat. 1187), make findings on the part of the
20 estimated cost of the project which can properly be allocated
21 to the preservation and propagation of fish and wildlife, and
22 costs allocated pursuant to such findings shall not be reim-
23 bursable.  In the case of construction by a Federal agency,
24 that agency is authorized to transfer, out of appropriations
25 or other funds made available for surveying, engineering,

"                    4

1  or construction to the Fish and Wildlife Service, such funds

2  as may be necessary to conduct the investigations required

3  by this section to be made by it.

4      "SEC. 3. Whenever the waters of any stream or other

5  body of water are impounded, diverted, or otherwise con-

6  trolled for any purpose whatever by any department or

7  agency of the United States, adequate provision consistent

8  with the primary purposes of such impoundment, diversion,

9  or other control shall be made for the use thereof, together

10  with any areas of land, or interest therein, acquired or

11  administered in connection therewith, for the conservation,

12  maintenance, and management of wildlife, resources thereof,

13  and its habitat thereon.  In accordance with general plans,

14  covering the use of such waters and other interests for

15  these purposes, approved jointly by the head of the depart-

16  ment or agency exercising primary administration thereof,

17  the Secretary of the Interior, and the head of the agency

18  exercising administration over the wildlife resources of

19  the State wherein the waters and areas lie, such waters

20  and other interests shall be made available without cost

21  for administration (a) by such State agency, if the man-

22  agement thereof for the conservation of wildlife relates to

23  other than migratory birds; (b) by the Secretary of the

24  Interior, if the waters and other interests have particular

1 value in carrying out the national migratory bird manage-
2 ment program.

3 "SEC. 4. Such areas as are made available to the
4 Secretary of the Interior for the purposes of this Act under
5 sections 1 and 3, or by any other law, proclamation, or
6 Executive order, shall be administered directly or under
7 cooperative agreements entered into pursuant to the pro-
8 visions of section 1 by the Secretary of the Interior under
9 such rules and regulations for the conservation, mainte-
10 nance, and management of wildlife, resources thereof, and
11 its habitat thereon, as may be adopted by him in accord-
12 ance with general plans approved jointly by the Secretary
13 of the Interior and the head of the department or agency
14 exercising primary administration of such areas: *Provided,*
15 That such rules and regulations shall not be inconsistent
16 with the laws for the protection of fish and game of the
17 States in which such area is situated.

18 "SEC. 5. The Secretary of the Interior, through the
19 Fish and Wildlife Service and the Bureau of Mines, is
20 authorized to make such investigations as he deems neces-
21 sary to determine the effects of domestic sewage, mine,
22 petroleum, and industrial wastes, erosion silt, and other
23 polluting substances on wildlife, and to make reports to
24 the Congress concerning such investigations and of recom-

6

1  mendations for alleviating dangerous and undesirable effects

2  of such pollution. These investigations shall include (1)

3  the determination of standards of water quality for the

4  maintenance of wildlife; (2) the study of methods of abating

5  and preventing pollution, including methods for the recovery

6  of useful or marketable products and byproducts of wastes;

7  and (3) the collation and distribution of data on the progress

8  and results of such investigations for the use of Federal,

9  State, municipal, and private agencies, individuals, organ-

10  izations, or enterprises.

11      "SEC. 6. There is authorized to be appropriated from

12  time to time, out of any money in the Treasury not other-

13  wise appropriated, such amounts as may be necessary to

14  carry out the provisions of this Act and regulations made

15  pursuant thereto, including the construction of such facilities,

16  buildings, and other improvements necessary for economical

17  administration of areas made available to the Secretary of

18  the Interior under this Act, and the employment in the city

19  of Washington and elsewhere of such persons and means

20  as the Secretary of the Interior may deem necessary for

21  such purposes.

22      "SEC. 7. That in the management of existing facilities

23  (including locks, dams, and pools) on navigable waters in

24  the United States, administered by the War Department,

25  that Department is hereby authorized and directed to give

7

1   full consideration and recognition to the needs of fish and
2   other wildlife resources and their habitat dependent on such
3   waters.  In the management of pool elevations, the War
4   Department shall maintain uniform pool levels and, in any
5   series of pools, uniform levels throughout such series, to
6   prevent the loss of and damage to such fish and other wild-
7   life resources.  In the exercise of the authority granted
8   herein, the War Department shall consult with the head of
9   the agency exercising administration over fish and other
10  wildlife resources in the State wherein the navigation facili-
11  ties are operated and with the Fish and Wildlife Service
12  of the Department of the Interior and with local conserva-
13  tion organizations in such State and area, for the purpose
14  of determining the required water needs of the fish and
15  other wildlife resources and the habitat thereof.

16      "SEC. 8. Any person who shall violate any rule or
17  regulation promulgated in accordance with this Act shall
18  be guilty of a misdemeanor and upon conviction thereof
19  shall be fined not more than $500 or imprisoned for not
20  more than one year, or both.

21      "SEC. 9. The terms 'wildlife' and 'wildlife resources' as
22  used herein include birds, fishes, mammals, and all other
23  classes of wild animals and all types of aquatic and land
24  vegetation upon which wildlife is dependent.

8

1        "SEC. 10. The provisions of this Act shall not apply to

2    the Tennessee Valley Authority."

Passed the House of Representatives May 7, 1946.

Attest:                          SOUTH TRIMBLE,

Clerk.

79TH CONGRESS
2D SESSION

H. R. 6097

AN ACT

To amend the Act of March 10, 1934, entitled "An Act to promote the conservation of wildlife, fish, and game, and for other purposes".

May 8 (legislative day, MARCH 5), 1946

Read twice and referred to the Committee on Agriculture and Forestry

JULY 10 (legislative day, JULY 5), 1946
Reported with an amendment

JULY 17 (legislative day, JULY 5), 1946
Recommitted to the Committee on Agriculture and Forestry

KENNETH MC KELLAR, TENN., CHAIRMAN

CARL HAYDEN, ARIZ.
ELMER THOMAS, OKLA.
MILLARD E. TYDINGS, MD.
RICHARD B. RUSSELL, GA.
PAT MC CARRAN, NEV.,
JOHN H. OVERTON, LA.
JOSEPH C. O'MAHONEY, WYO.
THEODORE FRANCIS GREEN, R. I.
DENNIS CHAVEZ, N. MEX.
JAMES M. MEAD, N. Y.
BURNET R. MAYBANK, S. C.
ABE MURDOCK, UTAH

STYLES BRIDGES, N. H.
WALLACE H. WHITE, JR., MAINE
CHAN GURNEY, S. DAK.
C. WAYLAND BROOKS, ILL.
CLYDE M. REED, KANS.
JOSEPH H. BALL, MINN.
RAYMOND E. WILLIS, IND.
HOMER FERGUSON, MICH.
KENNETH S. WHERRY, NEBR.
GUY CORDON, OREG.

EVERARD H. SMITH, CLERK
CECIL H. TOLBERT, ASST. CLERK

# United States Senate

COMMITTEE ON APPROPRIATIONS

July 18, 1946

Honorable Elmer Thomas,
United States Senate,
Washington, D. C.

Dear Senator:

Enclosed I hand you correspondence about Section 7 of HR 6097 which was recommitted to your committee yesterday for further study.

Mr. Carley is a very fine man and I will be greatly obliged to you if you can see your way clear to strike out Section 7.

With kindest regards, I am

Sincerely your friend,

Kenneth M. Keller.



CLASS OF SERVICE

This is a full-rate Telegram or Cablegram unless its deferred character is indicated by a suitable symbol above or preceding the address.

# WESTERN UNION (57)

A. N. WILLIAMS
PRESIDENT

SYMBOLS

DL = Day Letter

NL = Night Letter

LC = Deferred Cable

NLT = Cable Night Letter

Ship Radiogram

The filing time shown in the date line on telegrams and day letters is STANDARD TIME at point of origin.   Time of receipt is STANDARD TIME at point of destination

:YB04  QA66

QaMGB197  65=CA MEMPHIS TENN 15 225P

HON KENNETH D MCKELLAR=

 :SENATE OFFICE BLDG WASHDC=

AFTER CLOSE STUDY H R 6097 AND REPORT AND PRATICULALLY
SECTION SEVEN THOROUGHLY  CONVENCED SECTION SEVEN SHOULD BE
KILLED OUTRIGHT OR BILL BE  RECOMMITTED. ITS PASSAGE INTO LAW
WOULD SERIOUSLY INTERFERE WITH WAR DEPARTMENT AND ENGINEERS
WHOSE OPPPOSITION TO SCHEME NEVER GOT TO HOUSE OR SENATE
COMMITTEES IN TIME TO PREVENT APPROVAL. DEEPLY GRATEFUL FOR
YOUR HELP EVERYTHING WELL AT THIS END. REGARDS=

    :JACK CARLEY

H R 6097.



# WESTERN UNION

A. N. WILLIAMS
PRESIDENT

1220

**CLASS OF SERVICE**
This is a full-rate Telegram or Cablegram unless its deferred character is indicated by a suitable symbol above or preceding the address.

**SYMBOLS**
DL = Day Letter
NL = Night Letter
LC = Deferred Cable
NLT = Cable Night Letter
Ship Radiogram

The filing time shown in the date line on telegrams and day letters is STANDARD TIME at point of origin. Time of receipt is STANDARD TIME at point of destination

;QCO5

.Q.MGC68 DL PD=CA MEMPHIS TENN 12 310P      '7'6 JUL 12  PM 6 41

SENATOR KENNETH D MCKELLAR=

'SENATE OFFICE BLDG WASHDC=

'SECTION SEVEN HOUSE BILL SIX NAUGHT NINE SEVEN NOW BEFORE
SENATE ENTITLED QUOTE AN ACT TO PROMOTE THE CONSERVATION OF
WILD LIFE. FISH AND GAME AND OTHER PURPOSES UNQUOTE MAKES
IT MANDATORY FOR CORPS OF ENGINEERS TO SUBORDINATE ACTIVITIES
AT FLOOD CONTROL AND MULTIPLE PURPOSE DAMS AND RESERVOIRS TO
THOSE OF INTERIOR DEPARTMENT CONSERVATION EFFORTS AND
REGARDLESS OF BEST ENGINEER JUDGMENT. THIS IS DANGEROUS AND
HIGHLY INIMICAL TO SOUND FLOOD CONTROL PRINCIPLES. THE BILL.
AND PARTICULARLY SECTION SEVEN. SHOULD CERTAINLY BE
RECOMITTED TO THE AGRICULTURE COMMITTEE THAT OFFICE CHIEF
ENGINEERS MAY HAVE FULL OPPORTUNITY TO BE HEARD IN
OPPOSITION. SECTION SEVEN APPARENTLY A SLEEPER PUT OVER
WHILE EVERYONE BUSY ON FLOOD CONTROL AND RIVERS AND HARBORS
BILLS. PLEASE ADVISE. THANKS AND REGARDS=.

JACK CARLEY COMMERCIAL APPEAL.

*Reported from the ....... ..
Agriculture and Forestry July 10, 1946.
On Calender No. 1733, page 24.*

THE COMPANY WILL APPRECIATE SUGGESTIONS FROM ITS PATRONS CONCERNING ITS SERVICE



**THE SECRETARY OF THE INTERIOR**
**WASHINGTON 25, D. C.**
**JUN 2 5 1946**

My dear Senator Thomas:

Reference is made to your recent letter, requesting a report on H. R. 6097, a bill "To amend the Act of March 10, 1934, entitled 'An Act to promote the conservation of wildlife, fish, and game, and for other purposes.'"

I recommend that H. R. 6097 be enacted.

This proposed legislation would place in effect a much-needed program and facilities for the effectual planning, maintenance, and coordination of wildlife conservation, management, and rehabilitation. With the ever increasing pressure on the important national wildlife resources of the country, both because of extensive economic developments that have materially reduced the habitat heretofore available in the production of wildlife and because of the extended interest in the resource as a source of food and recreational enjoyment, it is essential that the plans for wildlife management be intelligently coordinated and given the necessary Federal assistance if this great national resource is to maintain its proper relation to the other resources of the country. Notwithstanding the widespread interest in wildlife of the hunting public, which represents an extremely large cross section of humanity, no unified effort, except with respect to certain migratory species, has been possible in the past.

State and Federal conservation interests working independently cannot adequately develop and maintain a resource that has no knowledge of and gives no heed to county, state, or even international boundaries. A number of the States already have developed effective organizations and programs for the development and maintenance of the wildlife resources within their boundaries. However, the migrant nature of the resource is such that there is no assurance that these programs will result in continuing benefits even to the States wherein effective management steps already have been taken. Other States have not as yet developed adequate wildlife management programs either because the State legislatures have not seen fit to provide sufficient funds or, in other instances, because proper studies of problems involved have not been made. Again the relationship between wildlife as a resource and other economic developments has not been fully understood or effectively correlated.

From time to time both Federal and State agencies have made many impoundments, diversions, or other uses of waters that needlessly have destroyed the habitat upon which wildlife is dependent. Such destruction has been needless in the sense that these otherwise



necessary economic developments could have been carried out, in many instances, without destroying wildlife or its habitat if adequate and reasonable provision had been made for the use of the lands and waters involved in such developments for wildlife conservation as a secondary use. Restoration of the proper balance between uses of the lands and waters made by man and those made by wildlife may involve difficult problems and require considerable thought, but the solving of such problems is not impossible if intelligently handled.

In addition to providing for the necessary authority to cooperate with, and give assistance to, State and private agencies and organizations in all phases of wildlife conservation and protection, the bill also would make available for administration for wildlife conservation purposes by State, public, or private agencies or organizations areas of land and water acquired by the Federal Government primarily for flood control, irrigation, and other uses but, at the same time, adaptable for the secondary use of wildlife conservation. This feature of the bill alone is extremely important in facilitating proper cooperation in the management of the wildlife resource as well as in affording additional opportunity for the protection and management of the resource.

The bill also authorizes investigations and the making of a report to Congress concerning such investigations relating to the effects of domestic sewage, mine, petroleum, and industrial waste, erosion, silt, and other polluting substances on wildlife. Heretofore what little attention has been given to pollution has related primarily to its effect on the human race, and little attention has been given to its effect on wildlife. Unfortunately, treatment of pollutants for the purpose of affording protection to the health of the human race frequently results in the destruction of wildlife. The problems involved in effective pollution control are extremely complex and will require unified action. This feature of the bill may afford some means of attacking the problem.

It is to be noted that the bill recognizes quite clearly the proper relationship between the Federal Government and the State governments in the development and management of wildlife resources which, although national in scope, in the last instance are enjoyed locally.

I have had no opportunity to obtain the views of the Director of the Bureau of the Budget on this report. Accordingly, I am unable to advise you of the relation between the recommendations I have made and the President's program.

Sincerely yours,

Oscar L. Chapman,
Acting Secretary of the Interior.

Hon. Elmer Thomas, Chairman,
 Committee on Agriculture and Forestry,
  United States Senate.

2

# WAR DEPARTMENT

## WASHINGTON

**3**   ⌐⌐ 1946

Honorable Elmer Thomas
Chairman, Committee on Agriculture and Forestry
United States Senate
Washington, D. C.

Dear Senator Thomas:

Reference is made to your letter of May 14, 1946, requesting a report on House Bill No. 6097, "To amend the Act of March 10, 1934, entitled 'An Act to promote the conservation of wildlife, fish, and game, and for other purposes'."

The bill relates to wildlife conservation and its purpose is to enlarge the functions and powers of the Fish and Wildlife Service, an agency of the Department of the Interior. It is desired to invite your attention to certain of its provisions, as follows:

(a) That whenever the waters of any stream are impounded or otherwise controlled for any purpose whatever by any Federal Department, adequate provision, consistent with the primary purpose of such control, shall be made for the use thereof, and of any land acquired in connection therewith, for wildlife conservation and maintenance;

(b) That the reports and recommendations of the Secretary of the Interior, based on surveys and investigations conducted by the Fish and Wildlife Service, as to the means and measures that should be adopted to prevent damage to wildlife resources shall be made an integral part of the reports of any Federal agency responsible for the formulation and construction of water control projects; and the cost of planning, construction and maintenance of such means and measures shall be included in and constitute an integral part of the costs of projects for water control facilities;

(c) That funds appropriated for the formulation or construction of projects for water control facilities by a Federal agency may be transferred by that agency to the Fish and Wildlife Service to enable it to conduct its aforesaid surveys and investigations;

(d) That in the management of existing facilities on navigable waters, including locks, dams and pools, the War Department shall give full recognition to the needs of fish and other wildlife resources; and in the management of pools shall maintain uniform pool levels and, in any series of pools, uniform pools throughout such series, to prevent damage and loss to such resources.

The War Department is a construction agency within the meaning of the provisions recited. By authority of Congress it is charged with the planning and construction of works and structures for flood control and navigation improvement and for these purposes exercises a measure of control over the waterways of the nation. These mandatory provisions of the bill would affect adversely the operations of the Department in carrying out its commitments and they would not be conducive to good administration. In the formulation of river and harbor projects and in their construction and maintenance appropriate consideration is given to the needs of wildlife conservation, and the Department is always glad to cooperate with the Fish and Wildlife Service in the planning and installation of protective measures. It is not believed, however, that the orderly prosecution and maintenance of projects for flood control and navigation improvements should be tied in with projects for the conservation of wildlife in the manner set forth in the bill, or that appropriations for the former should be burdened with the costs incident to the latter. In the circumstances the War Department does not favor the enactment of the proposed legislation in its present form.

Inasmuch as the Committee has asked that this report be expedited, it is submitted without a determination by the Bureau of the Budget as to whether it is in accordance with the program of the President.

Sincerely yours,

Secretary of War