**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| ——————————————————— | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| ——————————————————— | § | |

**DEFENDANT UNITED STATES' REPLY MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANT'S RENEWED MOTION TO DISMISS FOR**
**LACK OF SUBJECT MATTER JURISDICTION OR, IN**
**THE ALTERNATIVE ,FOR SUMMARY JUDGMENT**

To prove that their claims are encompassed by the Federal Tort Claims Act, 28 U.S.C.

§§ 1346(b)(1), 2671–2680, Plaintiffs adduce a series of demonstrably false legal propositions:

!   The discretionary function exception ("DFE") does not apply because the Fish and

Wildlife Coordination Act ("FWCA") prescribed a specific course for the Army Corps of

Engineers to follow— consultation with fish and wildlife agencies—*before* Congress authorized

construction of the Mississippi River-Gulf Outlet.

!   The DFE does not apply because the FWCA, as amended in 1958, prescribed a

specific course for the Corps to follow—reporting to Congress the views of fish and wildlife

agencies—*after* MRGO authorization.

!   The DFE does not apply because the National Environmental Policy Act ("NEPA")

prescribed a specific course for the Corps to follow—production of a Supplemental

Environmental Impact Statement ("SEIS") describing the cumulative effects of operating and

maintaining the MRGO.

    ❗ The DFE does not apply because the Chief of Engineers failed to decide whether or how to address the MRGO's "defects."

    ❗ The DFE applies only to the decision to construct the MRGO and does not apply to decisions subsequently made in the carrying out of that policy, even though discretionary decisions were constantly made as to how those acts were carried out.

    ❗ The DFE does not apply because the decisions not to build surge and saltwater barriers and not to "armor" the MRGO banks were based on "objective professional norms."

    ❗ The DFE does not apply because dredging activities on navigable waterways are not "inherently" immune discretionary functions.

    ❗ The due care exception ("DCE") does not apply because the Corps violated the FWCA and NEPA.

    ❗ The DCE does not apply because the Corps deviated from the statutory prescription of a five-hundred-foot channel width.

    ❗ The DCE does not apply because the Corps designed, built, operated, and maintained a dangerous and defective channel that created and perpetuated a flood hazard.

Plaintiffs' reliance on these erroneous *legal* propositions makes plain that there is no genuine issue of material *fact* concerning the application of 28 U.S.C. § 2680(a) to this case. Essentially, the disposition of this motion (and the disposition of Plaintiffs' motion) turns on (1) the construction of the FWCA, (2) the construction of NEPA, and (3) whether the challenged Corps decisions concerning the design of the MRGO and its maintenance are susceptible to policy analysis.  With respect to (1) and (2),  Plaintiffs contend that the FWCA and NEPA prevented the Corps from exercising judgment and choice by prescribing specific courses of action.  The United States contends that the FWCA and NEPA both allowed the Corps to

exercise judgment and choice and, insofar as they did not, that the Corps complied with the dictates of each statute.  It is undisputed that these decisions are susceptible to policy analysis.  Only the first prong of the DFE test is at issue with respect to the FWCA and NEPA.  With respect to (3), the design and maintenance decisions, Plaintiffs contend that these are unprotected because they cannot reasonably be thought to have been grounded in social, political, or economic policies.  It is undisputed that these decisions were discretionary.  Only the second prong is at issue with respect to the design and maintenance of the MRGO.

Inasmuch as there is no genuine issue of material fact, this Court can determine whether 28 U.S.C. § 2680(a) applies to this case.  If the Court determines that either the DFE or the DCE applies, the United States motion should be granted.

## ARGUMENT

I. THE DECISIONS TO DESIGN, CONSTRUCT, OPERATE, AND MAINTAIN THE MRGO WITHOUT BARRIERS AND WITHOUT "ARMORED" BANKS ARE SUSCEPTIBLE TO POLICY ANALYSIS.

Plaintiffs effectively concede that the Corps's decision to design, construct, operate, and maintain the MRGO without surge barriers and without "armored" banks were permissible discretionary acts under the authorizing statute and controlling regulations.  *See* Plt. Opp. at 10-11 (Corps had "feasible measures" by which it could have blocked surge and prevented erosion), 13-15 (asserting that "[i]n approving the project, Congress endorsed only the concept  of the ship channel" and consequently "relied on the Corps to exercise prudent professional judgment" in designing, operating and maintaining the MRGO).  This concession is unsurprising, given the express latitude that the statute and regulations afforded the Corps. *See* Pub. L. No. 84-455, 70 Stat. 65 (1956) (Ex. 1); Engineer Reg. 1130-2-520 (Ex. 16); Engineer Reg. 1130-2-307 (1968) (Ex. 18); *cf.* H.R. Doc. No. 82-245 (Chief's Report) (Ex. 2) at 5 (recommending that the MRGO be constructed "generally in accordance with the plans of the division engineer and with such

modifications thereof as in the discretion of the Secretary of the Army and the Chief of Engineers may be desirable").

Plaintiffs' concession that the first prong of the DFE test is satisfied has a decisive ramification. Given the discretion-affording statute and regulations, a "strong presumption" arises that the second prong is also satisfied. *See United States v. Gaubert,* 499 U.S. 315, 324 (1991). The presumption is decisive here because Plaintiffs have adduced no evidence and have established no facts from which it can be concluded that the challenged conduct could not have involved policy considerations.[1] *See id.* ("When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.").

---

[1]Plaintiffs' inability to establish any genuine issue of material fact leads them into two culs-de-sac. First, they approach this motion in the same manner as they did the United States' initial motion to dismiss, asserting that this motion should be denied because the United States has not established that "every challenged act" was both discretionary and grounded in policy considerations. *See* Plt. Opp. at 16, 21. In February of 2007, before discovery had even commenced, the Court decided not to "accept *on the record before it* that all actions done by the Corps were based on policy determinations." *In re Katrina Canal Breaches Consol. Litig.,* 471 F. Supp. 2d 684, 699 (emphasis added). Now, at the summary judgment stage, after years of discovery, Plaintiffs can no longer rest on mere allegations. Their failure to adduce "specific facts" establishing that their claims lie within this Court's subject matter jurisdiction requires that this motion now be granted. *See Ford v. Nylcare Health Plans of the Gulf Coast, Inc.,* 301 F.3d 329, 332-33 (5th Cir. 2002).

Plaintiffs' inability to establish the facts needed to establish jurisdiction also leads them to attempt to shift the burden of establishing subject matter jurisdiction to the United States. Citing *Ashford v. United States,* 511 F.3d 501 (5th Cir. 2007), they argue that the United States bears the burden of proving the applicability of the DFE. But *Ashford* merely suggests that the United States bears the burden of proving the application of the *first* prong of the DFE test. Plaintiffs have effectively conceded the first prong is satisfied here, however. The key legal point, which Plaintiffs ignore, is that the *second* prong is "presumed" to have been met because of the discretion-conferring statute and regulations.

The record reflects that the Corps's exercise of judgment and choice in deciding how to design, build, and maintain the MRGO is susceptible to policy analysis.  Edmond Russo, the MRGO project manager from 2000 until 2005, testified that he had to exercise judgment as to where dredging was most needed because limited funding prevented him from maintaining the entire waterway at its prescribed depth and width.  Russo Dep. at 87:13–88:22, 92:16-20 (Ex. 44).  He also testified that he considered alternatives to dredging when he was addressing the impact of erosion on navigation, to evaluate whether any alternative would be "a more efficient, effective and environmentally acceptable way to achieve the levels of service required, perhaps at a greater value, less cost." *Id.* at 97:25–98:6.  In particular, when erosion was occurring on lands owned by private citizens, Mr. Russo would "try to ascertain through investigation" whether a method of maintenance other than dredging would be a feasible option and would try to make the landowner aware of other programs that might offer a remedy. *Id.* at 97:6–105:20.  In 1988 and 1994 the Corps issued bank erosion reconnaissance reports in which national economic development benefits of various alternative remedial options were assessed and environmental effects of alternatives were weighed. *See* USACE Dep. (Oct. 9, 2008; Thomas Podany) at 318:3-9, 323:12-23 (Ex. 45).

These maintenance decisions, no less than the design decisions about whether to construct barriers or "armored" banks, were intended to serve the commercial and political policies that prompted Congress to authorize and fund the project.  Deciding how to accomplish these discretionary functions in the most economical fashion also can be analyzed in terms of these political and economic interests.  Budgetary constraints are often cited as a policy consideration that renders the discretionary function applicable. *See, e.g., Sydnes v. United States,* 523 F.3d 1179, 1186 (10th Cir. 2008); *Burkhart v. Washington Metro. Area. Transit*

*Auth.,* 112 F.3d 1207, 1217 (D.C. Cir. 1997); *Tonelli v. United States,* 60 F.3d 492, 496 (8th Cir.

1995).  Creating and maintaining the MRGO required millions of dollars.  *See, e.g.,* Pub. L. No.

84-455, 70 Stat. 65 (1956) (Ex. 1); H.R. Doc. No. 82-245 (Chief's Report) (Ex. 2) at 3; Russo

Dep. 89:7-13.  A surge barrier of the sort Plaintiffs say should have been constructed and bank

protection works would have been extremely costly undertakings that could have placed the

viability of the project in jeopardy.  USACE Dep. (Oct. 8, 2008; Thomas Podany) at

149:7–159:220 (Ex. 46); USACE Dep. (Oct. 9, 2008; Thomas Podany) at 247: 5–249:9, 258:8-

22) (Ex. 45); Russo Dep. 90:16–91:18 (Ex. 44).  At the very least, adding these expensive

features would have required difficult choices in resource allocation as the Corps attempted to

carry out its many water resource development responsibilities.  Russo Dep. 91:4-20.  The

magnitude of these choices is significant in terms of whether policies were implicated.  *See*

*Terbush v. United States,* 516 F.3d 1125, 1134 (9th Cir. 2008); *cf.* 33 U.S.C. § 541 (requiring

Corps to weigh "the amount and character of commerce existing or reasonably prospective which

will be benefited [sic] by the improvement, and the relation of the ultimate cost of such work,

both as to cost of construction and maintenance, to the public commercial interests involved, and

the public necessity for the work and propriety of its construction, continuance, or maintenance at

the expense of the United States").

    The cost of minor routine matters such as cleaning out mold from a store, as in *Whisnant*

*v. United States,* 400 F.3d 1177 (9th Cir. 2005), does not involve a balancing of policy

considerations or implicate broad agency mandates.  *Terbush,* 516 F.3d at 1134.  More complex

decisions, such as whether to combat storm surge by building barriers across the MRGO or

raising levees along the channel or "armoring" channel banks, do tend to implicate the broad

mandates facing a federal agency.  *See id.*; *Nat'l Union Fire Ins. v. United States,* 115 F.3d 1415,

1417-19 (9th Cir. 1997), *cert. denied,* 522 U.S. 1116 (1998); USACE Dep. (Oct. 8, 2008;

Thomas Podany) at 144:10–156:6 (purpose of feasibility study is to determine level of federal

involvement, to find a plan that maximizes net economic benefits while minimizing

environmental impacts, and to find a sponsor, and it attempts to accomplish these goals by

analyzing alternative courses of action) (Ex. 46); USACE Dep. (Oct. 9, 2008; Thomas Podany) at

258:8–262:18 (explaining how Corps attempted to find way to find way to accomplish bank

protection without local sponsorship), 285:16–293:11 (explaining that Congress appropriated

funds to construct bank protection for one reach because State of Louisiana withheld its approval

of Corps's Coastal Zone Management plan until Congress appropriated funds for bank

protection) (Ex. 45); *cf.* 33 U.S.C. § 541 .

      The MRGO was just one project among many that were examining the effects of

wetlands loss and methods of halting or reversing the trend. *See* Russo Dep. at 32:18–58:1

(discussing scope of Coastal Wetlands Planning, Protection, and Restoration Act), 111:4–233:4

(deciding how to address wetlands loss along MRGO involved considering various legal

authorities) (Ex. 44); USACE Dep. (Oct. 8, 2008; Thomas Podany) at 124:17–125:20 (La.

Coastal Area Study examined hurricane protection, erosion abatement, and saltwater intrusion);

USACE Dep. (Oct. 8, 2008; Thomas Podany) at 12:17–14:4 (describing many projects being

handled by the New Orleans District's Coastal Restoration Branch), 41:20–42:22 (current

Louisiana Coastal Area study has roots in 1967 congressional resolution concerning the Corps's

investigation of "the need and feasibility of improvements in hurricane protection, erosion

abatement, prevention of saltwater intrusion and the like"); USACE Dep. (Oct. 9, 2008; Thomas

Podany) at 293:12–29511 (explaining that various projects, though separate, were fully

coordinated to address foreshore protection).  Whether to protect wetlands by devoting meager

MRGO funds to the construction of channel protection (bank "armoring") or to attempt to protect wetlands through other programs is just the sort of decision that the DFE protects.  The fundamental decisions challenged by Plaintiffs not only implicated the Corps's favorable recommendation to Congress and its ability to "prosecute" the MRGO project as mandated by law but also the ability of the Dock Board to underwrite its share of the costs.  *See* H.R. Doc. No. 82-245 (Chief's Report) (Ex. 47) at 33, 37-39, 43 (describing location and features of recommended channel and benefit-cost ratio derived from those choices); Plt. Ex. 121 (Doc. 16886 manual attachment) (Corps annual reports to Congress) at 536 (1966 Corps annual report, referencing Dock Board funding of certain operations); *see generally* USACE Dep. (Oct. 7, 2008; Zoltan Montvai) (describing limitations that attach to appropriated funds and legal requirement that "local sponsor" partially underwrite cost of ecosystem restoration and hurricane protection) (Ex. 48).

Of particular significance, given Plaintiffs' complaint about bank erosion and wetlands loss, is the necessity that the Corps find a local sponsor willing to underwrite part of the cost of a feasibility study.  *See* USACE Dep. (Oct. 7, 2008; Zoltan Montvai) at 43:20–46:20, 73:1-12 (bank erosion study halted because no local sponsor came forward with funds); USACE Dep. (Oct. 8, 2008; Thomas Podany) at 160:2–165:1 (figuring out whether local sponsorship of bank protection was necessary and, if so, how to apportion costs was tricky because the project did not fit neatly into any single bailiwick—hurricane protection, flood control, ecosystem restoration, or commercial navigation) (Ex. 46); USACE Dep. (Oct. 9, 2008; Thomas Podany) at 258:8-22, 276:1–279:7 (Corps sought to proceed via an avenue that did not require local sponsorship because finding local sponsor willing to fund study was generally difficult hurdle to surmount), 323:24–328:23 (Corps approached potential sponsors of bank erosion feasibility study in 1993 or

1994 but no one volunteered to contribute funds) (Ex. 45); 1994 MRGO Bank Erosion Recon. Rpt. at 67 (preliminary results, draft feasibility cost-sharing agreement, and draft initial project management plan were provided to Dock Board; study was discussed at meetings involving St. Bernard Parish and State of Louisiana officials; Louisiana Department of Natural Resources expressed interest in sharing cost of feasibility studies) (Ex. 49).  As courts have recognized, this requirement of local funding renders the DFE applicable to such decisions.  *See Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1028 (9th Cir. 1989); USACE Dep. (Oct. 9, 2008; Thomas Podany) at 280:4–282:16 (if local sponsor refuses to provide funds or easements for new project feature such as foreshore protection, then implementing new feature is difficult); Water Res. Devel. Act of 1990, Pub. L. No. 101-640 § 116(k) (suspending St. Bernard Parish payment responsibility during study of whether LPV sponsors had received expected benefits and whether costs should be reallocated among sponsors).

The intersection of social, political, and economic policies in the decisions about how to address bank erosion and wetlands loss renders the DFE applicable and leaves this Court without jurisdiction.

II.  THE FWCA DID NOT REMOVE THE CORPS'S DISCRETION IN ITS DESIGN, CONSTRUCTION, OPERATION, AND MAINTENANCE OF THE MRGO, NOR DID THE STATUTE PRESCRIBE A COURSE OF ACTION THAT THE CORPS FAILED TO FOLLOW.

Unable to dispute that policy-based discretion was afforded by the authorizing statute and applicable regulations, Plaintiffs posit that the FWCA was a "mandatory statute" that "controlled" the actions of the Corps during the planning phase of the project.  *See Gaubert,* 499 U.S. at 328; Plt. Opp. at 2, 5-7, 16-17, 41.  Initially, this argument fails because Plaintiffs have

not adequately pled a claim of negligent planning.  Their complaint challenges the design, construction, operation, and maintenance of the MRGO, but not its planning.[2]

Moreover, as thoroughly demonstrated in the United States' Opposition to Plaintiffs' motion for summary judgment, the FWCA did not impose the limitations that Plaintiffs describe. *See* Doc. 16789, at 4-11.  While the MRGO was in the planning stage, prior to submission of the Chief's report in 1951, the Act's consultation requirement simply did not apply.  *See* Pub. L. No. 79-732, 60 Stat. 1080 (1946) (imposing consultation requirement "*[w]henever* the waters of any stream or other body of water are authorized to be impounded, diverted, or otherwise controlled") (emphasis added).  The planning of the MRGO and the submission of the Chief's MRGO report occurred at a time when the waters of any stream or other body of water were *not* "authorized to be impounded, diverted, or otherwise controlled."  *When* waters were authorized to be impounded, diverted, or otherwise controlled, the Corps did consult, as Plaintiffs concede.  *See* Plt. Statement of Facts (Doc. 16510-4) ¶¶ 16, 17.  Plaintiffs' argument that the FWCA (in its pre-authorization form) forecloses application of the DFE to their claims has no merit whatsoever.  Also without merit is the argument that the FWCA, as amended in 1958, required the Corps later to "forward to Congress information that the FWS and Louisiana Department of Wildlife had communicated to the agency."  Plt. Opp. at 7.  Even after the FWCA was revised in 1958, the Act did not impose a requirement that reports be made to Congress.  It simply required that *if* the

---

[2]Nor does it appear that such a claim could be sustained even if pled.  Whatever else may be proved about the planning of the MRGO, one indisputable fact certainly trumps all others: Congress approved the plans and required that the Corps of Engineers "prosecute" them.  Pub. L. No. 84-455, 70 Stat. 65 (1956) (Ex. 1).  Plaintiffs cannot trace their alleged damage to the pre-authorization conduct of the Corps or to the post-authorization "prosecution" of the authorized plan without also implicating the policy-based judgment of Congress.  The DFE protects legislative judgments no less than executive.  *See Gaubert,* 499 U.S. at 323 ("the purpose of the exception is to 'prevent judicial "second-guessing" of legislative and administrative decisions'").

Corps sent reports to Congress concerning authorization of construction or post-authorization changes then the views of fish and wildlife agencies should be included.  *See*  Pub. L. No. 85-624, 72 Stat. 463 (1958).[3]  None were sent.

III.  NEPA LEFT ROOM FOR THE EXERCISE OF CONSIDERABLE JUDGMENT AND CHOICE IN DECIDING WHETHER TO PRODUCE AN EIS DESCRIBING THE EFFECTS OF OPERATING AND MAINTAINING THE MRGO.

It is difficult to conceive of a more obviously erroneous argument than that which Plaintiffs put forward with respect to NEPA, *i.e.,* that NEPA "specifically prescribed the agency's conduct and eliminated its discretion." Plt. Opp. at 2.  The hallmark of NEPA is the discretion that it affords agencies.  NEPA does not "mandate particular results"; it "imposes only procedural requirements." *Winter v. Natural Resources Defense Council, Inc.,* 129 S.Ct. 365, 376 (2008) (citation omitted).  Indeed, NEPA's procedures *require* agencies to exercise policy-based discretion.  *See Kleppe v. Sierra Club,* 427 U.S. 390, 412 (1976).  Agencies exercise this legislatively afforded discretion in deciding whether to prepare an EIS.  *See Sabine River Auth. v. United States Dep't of Interior,* 951 F.2d 669, 677-78 (5th Cir. 1992); USACE Dep. (Oct. 9, 2008; Thomas Podany) at 297:18–306:9 (explaining why Gulf Outlet Revised Reconnaissance

---

[3]Plaintiffs construe the 1958 Act as requiring that the views of game agencies be included in each and every annual report that the Corps made to Congress, not just project-specific reports concerning (1) authorization of construction or (2) post-authorization modification or supplementation.  *See* Plt. Reply (Doc. 16886) at 11.  This argument fails because, like Plaintiffs' other arguments, it ignores inconvenient language of the statute.  Moreover, even if Plaintiffs' construction were correct, the Corps's failure to comply would not change the discretionary nature of the design and maintenance decisions that allegedly caused Plaintiffs' alleged damage. The Corps was authorized to construct and maintain the waterway and, as Plaintiffs have conceded, had room to exercise discretion in doing so.

Furthermore, Congress was fully aware of the FWS studies and reports *because the Corps informed Congress* of them.  *See* Plt. Exh. 121 (Doc. 16886 manual attachment) at 7 (1958 Corps annual report referencing Corps funding of FWS studies), 11 (1959 Corps annual report referencing FWS reports), 16 (1960 Corps annual report referencing funding of FWS studies).

and Feasibility Study participants were inclined toward producing an EIS rather than an EA) (Ex. 45).  And contrary to Plaintiffs' contention, the cumulative impact regulation does not remove discretion.  This regulation can be satisfied by producing *either* an EIS *or* an EA.  *See Dep't of Transp. v. Public Citizen,* 541 U.S. 752, 769-70 (2004); *cf. City of Shoreacres v. Waterworth,* 420 F.3d 440, 453-54 (5th Cir. 2005) (considering whether it was "an abuse of discretion for the Corps to treat deepening the Houston Ship Channel as too speculative to warrant consideration as a cumulative impact").  Plaintiffs' argument that "NEPA *mandated* that the Army Corps undertake a detailed EIS or SEIS, including a sufficient analysis of the cumulative impacts that the MR-GO would have," Plt. Opp. at 41-42, is utterly mistaken.[4]

_____

[4]Plaintiffs' argument about NEPA fails for the additional reason that no causal connection between the supposed defalcation and Plaintiffs' alleged damage can be established.  Plaintiffs argue at length that the Corps kept vital information from Congress, information that they speculate would have led Congress to make changes in the MRGO project.  *See, e.g.,* Plt. Opp. at 8 ("[i]gnorant of the problems, Congress never had the opportunity to evalute" the Corps's conduct), 9 ("[n]or did the Corps ever present to Congress an objective analysis of the dredging consequences"), 12 ("the Corps never presented an analysis of either the defects or their solutions to Congress").  These allegations are absurd.  The record reveals that Congress was well aware of the erosion and loss of wetlands long before Hurricane Katrina.

A 1982 congressional resolution requested that the Corps study the "extensive erosion which has been occurring in St. Bernard Parish along the unleveed banks of the Gulf Outlet Channel" to determine whether the MRGO project should be modified.  1988 MRGO Recon. Rpt. on Channel Bank Erosion (Ex. 50) at 2; *see also* USACE Dep. (Oct. 8, 2008; Thomas Podany)) at 43:14–49:16 (ex. 46).

As a result of the resolution, three bank erosion reports were prepared.  *See* 1988 MRGO Recon. Rpt. at 2; 1994 MRGO Recon. Rpt. at 2 (Ex. 49); 1996 MRGO North Bank Foreshore Protection Eval. Rpt. at 1 (Ex. 51).  Copies of the 1988 report were sent to the entire Louisiana congressional delegation, to the chairmen of the Senate Environmental Committee on Public Works and the House Committee on Public Works and Transportation, to numerous federal agencies, including notably the Department of the Interior, the U.S. Fish and Wildlife Service, and the EPA, and to 84 state senators and representatives.  Forty-four copies were delivered to state agencies.  1988 MRGO Recon. Rpt. App. D.

(continued...)

IV.  THE DFE APPLIES EVEN IF "THE CORPS (VIA THE CHIEF OF ENGINEERS) NEVER EXERCISED DISCRETION TO ADDRESS REMEDIAL MEASURES."

Plaintiffs argue that the DFE does not apply because "the Corps (via the Chief of Engineers) never exercised discretion to address remedial measures."  Plt. Opp. at 5.  In their view, "[t]he DFE presumes that a governmental actor in fact made a discretionary decision. The record here demonstrates . . . that at no time did the Chief of Engineers engage in a policy

---

[4](...continued)

In 1994 the Corps informed Congress that "severe erosion and resulting loss of vegetated wetlands continue adjacent to the non-leveed banks of the Mississippi River-Gulf Outlet navigation channel. Enlargement of the top width of the channel, caused principally by ship and boat wakes, has resulted in the loss of over 4,200 acres of highly productive marsh."  1995 *Energy and Water Development Appropriations for 1995:Hearings Before the Subcomm. on Energy and Water Development of the H. Comm. on Appropriations,* 103d Cong. 1233 (1994) (Ex. 52).

Nor can it reasonably be thought that Congress failed to take decisive action because it was unaware of the threat of hurricane-induced flooding.  Every year, beginning not later than 1993 and continuing through 1997, if not longer, the Corps informed Congress of the danger of catastrophic flooding in New Orleans East and St. Bernard Parish and the Lower Ninth Ward:

> The eastern portion of the [Greater New Orleans Metropolitan] area is also subject to flooding by surges and waves that move directly from Lake Borgne and overtop the then existing inadequate protective system seaward of the developed land areas.  As a result, residences and industrial and commercial establishments suffer damage, business activities are disrupted, lives are endangered, and hazards to health are created.  *Hurricanes much more severe than any of record are possible. In the event of such a severe hurricane, catastrophic property damage and loss of human life would be experienced.*

*Energy and Water Development Appropriations for 1994:Hearings Before the Subcomm. on Energy and Water Development of the H. Comm. on Appropriations,* 103d Cong. 81 (1993) (Ex. 53) (emphasis added); *accord Energy and Water Development Appropriations for 1995: Hearings Before the Subcomm. on Energy and Water Development of the H. Comm. on Appropriations,* 103d Cong. 1232 (1994); *Energy and Water Development Appropriations for 1996:Hearings Before the Subcomm. on Energy and Water Development of the H. Comm. on Appropriations,* 104th Cong. 1162 (1995) (Ex. 54); *Energy and Water Development Appropriations for 1997:Hearings Before the Subcomm. on Energy and Water Development of the H. Comm. on Appropriations* 104th Cong. 103 (1996) (Ex. 55); *Energy and Water Development Appropriations for 1998:Hearings Before the Subcomm. on Energy and Water Development of the H. Comm. on Appropriations* 105th Cong. 108 (1997) (Ex. 56).

analysis or reach a decision—*i.e.*, exercise his discretion—about the impact of the MR-GO's

ongoing O&M . . . ." *Id.* at 11 (footnote omitted).  They think the DFE cannot apply unless a

"particular exercise of discretion—or a decision-making analysis" is "isolate[d]." *Id.* at 21.  Here

again Plaintiffs adopt an untenable position, one totally lacking in supporting legal authority and

flying in the face of uniform case law to the contrary.  *See, e.g., Andrade v. Chojnacki,* 338 F.3d

448, 457 (5th Cir. 2003), *cert. denied,* 541 U.S. 935 (2004); *Harrell v. United States,* 443 F.3d

1231, 1236 (10th Cir. 2006); *Loughlin v. United States,* 393 F.3d 155, 166 (D.C. Cir. 2004);

*Lopez v. United States,* 376 F.3d 1055, 1057 (10th Cir. 2004); *Tonelli v. United States,* 60 F.3d

492, 496 (8th Cir. 1995); *Cope v. Scott,* 45 F.3d 445, 449 (D.C. Cir. 1995); *Kiehn v. United*

*States,* 984 F.2d 1100, 1105 (10th Cir. 1993); *Richardson v. United States,* 943 F.2d 1107, 1111

(9th Cir. 1991); *Kennewick Irrig. Dist. v. United States,* 880 F.2d 1018, 1028 (9th Cir. 1989); *cf.*

*Sydnes v. United States,* 523 F.3d 1179, 1185 (10th Cir. 2008) ("[W]e do not inquire into the

intent . . . and neither do we ask 'whether policy analysis is the actual reason for the

decision' . . . . Instead, we operate at a higher level of generality . . . , asking categorically (rather

than case specifically) whether the kind of conduct at issue can be based on policy concerns.").

The only case cited by Plaintiffs, *Trevino v. Gen'l Dynamics Corp.,* 865 F.2d 1474 (5th Cir.

1989), is a government contractor case, which, as this Court has recently recognized, requires a

legal analysis that differs from the discretionary function analysis.  *In re Katrina Canal Breaches*

*Consol. Lit.,* 2008 WL 5234369, at *16 (E.D. La. Dec. 15, 2008).  Good reasons exist for

requiring a "considered policy choice" before applying the government contractor defense.  *See*

*id.*  Those reasons, however, do not exist when the question is whether the challenged conduct is

discretionary in nature and is susceptible to policy analysis.

V.  THE DFE APPLIES NOT ONLY TO THE DECISION TO CONSTRUCT THE MRGO BUT ALSO TO
    SUBSEQUENT DISCRETIONARY DECISIONS.

Bereft of any valid authority for their position, Plaintiffs cling to a legal position that the Supreme Court has rejected time and time again.  They argue that "implementation of the congressional authorization of the MR-GO is not protected by the DFE."  Plt. Opp. at 23.  The case law that they rely on either has effectively been overruled by *Gaubert* or is inapposite.  How wrong they are is illustrated by their description of *Indian Towing Co. v. United States,* 350 U.S. 61 (1955), as "seminal."  Plt. Opp. at 23.  *Indian Towing* certainly retains vitality for the legal principle that undergirds the decision:  the liability of the United States under the FTCA depends on the existence of analogous private-person state-law liability, not identical private-person conduct.  *See Indian Towing,* 350 U.S. at 64-68; *United States v. Olson,* 546 U.S. 43, 45-47 (2005) ("This Court has consistently adhered to this 'private person' standard" and has used "analogous . . . allegations of negligence by a private person" as the measure of liability); *cf. Dolan v. U.S. Postal Service,* 546 U.S. 481, 485 (2006) ("assum[ing] that under the applicable state law a person injured by tripping over a package or bundle of papers negligently left on the porch of a residence by a private party would have a cause of action for damages"); *Molzof v. United States,* 502 U.S. 301, 305 (1992) (citing *Indian Towing* for the proposition that "the extent of the United States' liability under the FTCA is generally determined by reference to state law"); *Johnson v. Sawyer,* 47 F.3d 716, 728-29 (5th Cir. 1995) (*Indian Towing* revealed that FTCA liability can be imposed on the basis of state law that is not "directly applicable to the conduct of federal employees or to the precise activity from which the claim arose").

In *Gaubert,* however, the Supreme Court expressly rejected the reading of *Indian Towing* that Plaintiffs press here.  The Court of Appeals had held that regulatory "'officials were only protected by the discretionary function exception until their actions became operational in nature

15

and thus crossed the line established in *Indian Towing,*'" 499 U.S. at 321 (citation omitted), which is essentially the position of Plaintiffs here.  The Supreme Court, however, roundly rejected this reading of *Indian Towing*:

> [T]he Government did not even claim the benefit of the [discretionary function] exception [in *Indian Towing*] but unsuccessfully urged that maintaining the light was a governmental function for which it could not be held liable.  The Court of Appeals misinterpreted *Berkovitz's* reference to *Indian Towing* as perpetuating a nonexistent dichotomy between discretionary functions and operational activities.

*Id.* at 326 (citation omitted).

Inexplicably, Plaintiffs now espouse the very dichotomy that the Supreme Court has described as "nonexistent."  *See* Plt Opp. at 23 (implementation of the MRGO authorization is not protected by DFE), 23-24 (DFE applies only to initial "discretionary decision" and "'does not apply to subsequent decisions made in the carrying out of that policy, "even though discretionary decisions are constantly made as to how those acts are carried out."'"), 32 ("'courts have generally drawn a line between decisions at a planning level, or decisions that exercise policy judgment, and decisions at an operational level, or decisions that are merely incident to carrying out a government policy'").  Further, they draw the wrong conclusion from the fact that the failure to maintain the light was not shown to be a matter of judgment or choice grounded in policy and was therefore conduct for which the United States could be held liable on the same Good Samaritan basis as a private person.  Plaintiffs conclude the following:  "*Indian Towing* therefore stands for the proposition that the decision to install a lighthouse was 'discretionary' (and thereby unassailable), but once that decision was made, the lighthouse's operation and maintenance was non-immune activity, thereby subjecting the Government to liability for its negligent failure to perform the work necessary to maintain the lighthouse in an 'operational' condition."  Plt. Opp. at 24-25.  This is nothing less than an attempt to make the case stand for

the discretionary function– operational activity dichotomy that we now know on good authority

is *not* what *Indian Towing* stands for.

Plaintiffs gravely err in asserting that the present case is indistinguishable from *Indian*

*Towing. See id.* at 26. There is nothing in *Indian Towing* from which it can be determined

whether the challenged conduct was discretionary or was susceptible to policy analysis. This is

unsurprising since the case did not involve the DFE. Exposition of facts relevant to the DFE

would have been gratuitous in the context of the legal issue presented. It may very well be that

one or both of the prerequisites to discretionary function immunity were absent. But only by

engaging in a gross over-generalization (based on the discredited planning-operational

dichotomy) can Plaintiffs turn the case into an illustration of any legal principle that would be

even remotely relevant to the issues raised by the motions that are now pending in this case.[5]

VI   THE CHALLENGED DECISIONS OCCURRED AT THE PLANNING/MANAGERIAL LEVEL OR ABOVE,
     WERE NOT OPERATIONAL IN NATURE, AND ARE READILY SUSCEPTIBLE TO POLICY ANALYSIS.

Plaintiffs chide the United States for having "offered no contemporaneous evidence of

any specific decision by any identified decision-maker or the reasons for any decision nor how

any putative decision about the MR-GO's implementation, operation, and maintenance is

'susceptible to policy analysis.'" Plt. Opp. at 6; *see also id* at 21-22 & n.11. But as noted *supra*

at 13-14, the case law uniformly holds that the DFE applies even in the absence of an actual

_____

[5]That Plaintiffs completely misrepresent the "continuing vitality" of *Indian Towing* is
evident from their total reliance on cases decided prior to *Gaubert. See* Plt. Opp. at 26-30.
Indeed, only three post-*Gaubert* Fifth Circuit cases are cited in their entire brief. One of them,
*Johnson v. Sawyer,* 47 F.3d 716 (5th Cir. 1995), is a perfectly good case and is indeed quite
helpful *when it is cited for the legal proposition for which it stands. See* citation *supra* at 12.
Why Plaintiffs have even cited it in their brief is a mystery, since they acknowledge that it applies
the "*Indian Towing* assumption of duty analysis." Plt. Opp. at 32. The only other post-*Gaubert*
Fifth Circuit cases cited by Plaintiffs, *Ashford* and *Coumou v. United States,* 114 F.3d 64 (5th
Cir. 1997), do not even mention *Indian Towing.*

decision.  *See, e.g., Andrade v. Chojnacki*, 338 F.3d 448, 457 (5th Cir. 2003), *cert. denied*, 541 U.S. 935 (2004).  What is truly remarkable is that *Plaintiffs*, after years of discovery, have failed to identify a single decision by *any* decision-maker that was not grounded in considerations of policy—not a single one, at any time over the half century of supposedly negligent design, construction, operation, and maintenance of the Mississippi River-Gulf Outlet, a seventy-mile-long deep-draft shipping channel.

A moment's reflection reveals why these omissions characterize the parties' papers. Plaintiffs' case is not founded on harms caused by any particular decision but on the supposed deleterious effects of "the complex and interdependent hydraulic system that was created by the project's design and construction."  Plt. Opp. to Def.  MSJ-CZN (Doc. 16063) at 12.  Plaintiffs' case is founded on what they perceive to be "the four salient adverse effects of the MR-GO caused by its negligent design, construction, operation, and maintenance —direct surge conduit from Gulf of Mexico and Lake Borgne, 'funnel effect,' destruction of surge absorbing wetlands, and substantially widened channel."  *Id.* at 1; *see also id.* at 10 ("Plaintiffs have alleged that the MR-GO was defective in *four* different, critical respects.").

Plaintiffs' case rests on an analysis of "the cumulative impact of all four dangerous conditions on the catastrophic flooding."  *Id.* at 12.  Their experts have opined "that the MR-GO's four major adverse effects —creation of a direct surge conduit from the Gulf of Mexico, the 'funnel effect,' destroyed wetlands, and substantial channel widening—were 'a substantial contributing factor to the catastrophic flooding.'"  *Id.* at 14-15 n.10.  They further opined that "the performance of the Reach 1, Reach 2, and IHNC flood protection and navigation structures during Hurricane Katrina is an integrated effect of the entire life-cycle of activities over the MR-GO's history from the time of its inception through its design, construction, operation, and

maintenance to the time of Hurricane Katrina." *Id.* at 13  (indirectly citing expert reports and declarations).  "MR-GO's multiple elements . . . interacted with a regional hydrologic system over half a century . . . causing flooding during Hurricane Katrina . . . ." *Id.*  "[A]ny analysis of its contribution to the catastrophic flooding must address the multiple, interconnected, and interactive elements constituting the MR-GO and the associated hydrologic system from the time of its inception to the time that the Plaintiffs' properties were flooded." *Id.*

Plaintiffs' case remains today what it was at its inception:  a challenge to the entire MRGO project.  Given the macro level at which Plaintiffs' case challenges the conduct of the Corps of Engineers, it is not necessary to identify any particular decision of any specific Corps employee in analyzing the application of the DFE.  It is the "challenged conduct" that must be analyzed, *see Gaubert,* 499 U.S. at 322-34, and the challenged conduct is "the design, construction, operation, and maintenance" of the MRGO.  *See, e.g.,* First Amended Complaint ¶¶ 1, 2, 5, 6, 93, 97, 102; Plt. Opp. to U.S. MSJ CZN (Doc. 16063) at 1, 2, 4, 10-13, 15-16 n.12, 18 n.14, 22; Plt. Opp. to U.S. MTD-MSJ DFE (Doc. 16790) at 3, 14, 15, 39, 42, 44, 42.  At this level of generality, Plaintiffs' assertion that these activities are not susceptible to policy analysis borders on the absurd.  Of course the MRGO project (every phase of it) was grounded in and driven by policy considerations.  The deep-draft shipping channel was designed, constructed, operated, and maintained to serve commercial and national defense interests and was wholeheartedly supported by both state and local political entities.  *See, e.g.,* H.R. Doc. No. 82-245 (1956) (Chief's MRGO Report) 3, 4, 10-17, 21, 24-44 (Ex. 47).

In reality, Plaintiffs' complaints target the discretionary decisions that were made by the Chief of Engineers, on the advice of the Division Engineer for the Lower Mississippi Valley Division, at the outset of the project, even before construction was authorized.  The "four salient

adverse effects of the MR-GO caused by its negligent design, construction, operation, and maintenance —[1] direct surge conduit from Gulf of Mexico and Lake Borgne, [2] 'funnel effect,' [3] destruction of surge absorbing wetlands, and [4] substantially widened channel," Plt. Opp. to U.S. MSJ CZN at 1, all flow from the plan recommended for construction by the Chief.

Constructing a deep-draft channel from the Gulf, through Chandeleur Sound, through the marsh along Lake Borgne to the GIWW, and on into the IHNC created the "direct surge conduit" that Plaintiffs say was the first of four "critical defects" in the MRGO. *See id.* at 10; FAC ¶ 49 ("MR-GO's design was flawed" in its "its failure to take account of the waterway's inherent and known capability of serving as a funnel or conduit"). The choice of this route rather than another was the Chief's, and it was ratified by Congress. *See* H.R. Doc. No. 82-245 (Chief's MRGO Report) 11 ("After consideration of the alternative locations and routes for an additional outlet, the division engineer selected two plans of improvement for detailed investigation.") (Ex. 47); *cf.* H.R. Doc. No. 71-46 (1930) (Chief's Report recommending against MRGO construction based on review of alternative routes and existing Mississippi River capacity) (Ex. 57). The Division Engineer's plan included no barriers to impede the flow of storm surge or saltwater. Given the other details set forth in the plan, it can be inferred that this was a considered judgment. *See* H.R. Doc. 82-245 at 38 (describing the "complementary features" of the recommended plan, including a tidewater harbor, an "eased entrance channel," a riverside mooring basin and forebay, a lock, a permanent retention dike, and parallel jetties with a wing dike). These features were used to calculate the estimated costs and charges and were essential to the Division Engineer's recommendation. *See id.* at 38-39, 43.

The second supposed defect in the MRGO, the creation of a "funnel" that focused and amplified storm surge, is also attributable to the Chief's decision to recommend construction of

the plan recommended by the Division Engineer.  The selection of the east-bank route created the

"funnel."  *See* H.R. Doc. No. 82-245 (Chief's MRGO Report) Plate 2 ("Plan of Improvement")

(depicting convergence of proposed MRGO channel and existing GIWW near Lake Borgne).

The third and fourth supposed defects, like the first two, are directly traceable to the

Division Engineer's plan.  He recommended that the channel be constructed through the marsh in

order to minimize costs, on the view that inland sections of the channel could be constructed and

maintained by dredging alone, without the construction of dikes.  *Id.* at 33, 37 ("Hence the plan

of improvement presented herein for an east-bank outlet . . . provides for maximum use of land

cuts . . . .").  In keeping with this plan, the design specified certain features that would be

necessary by virtue of the Division Engineer's decision not to include bank protection works.

*See* MRGO Gen'l Design Mem. No. 2 (1959) ¶ 47, at 22 (specifying "a berm of approximately

630 ft., thus providing an adequate factor of safety for surface widening due to erosion") (Ex. 7).

Plaintiffs have conceded that these supposed defects originated in the conception of the

entire project and were consequently incorporated in the design that flowed from the plan as

conceived by the Division Engineer and recommended to Congress by the Chief of Engineers.[6]  It

---

[6]*See* FAC ¶ 1 ("destructive forces of the MR-GO during Hurricane Katrina . . . were foreseeable consequences of . . . (1) the destruction of the marshlands surrounding the MR-GO . . . and (2) the funnel effect stemming from the MR-GO's faulty design), ¶ 3 (as a result of "the faulty design of the MR-GO," the channel was "'a shotgun pointed straight at New Orleans'"), ¶ 49 ("MR-GO's design was flawed in several respects" including (1) "fail[ure] to take account of the waterway's inherent and known capability of serving as a funnel or conduit" and (2) "fail[ure] to 'armor' levees on both banks of the MR-GO"), ¶ 50 ("design and construction . . . failed to account for the devastation of the wetlands that the MR-GO, by its design, would facilitate . . . thereby exacerbating the funnel effect created by the MR-GO's design"), ¶ 54 ("the negligent design of the MR-GO invited destruction of the surrounding wetlands"), ¶ 72 ("devastating flooding" was predicted "as a result of MR-GO's design"), ¶ 88 ("engineers had actual notice from the outset of constructing MR-GO that its design would only exacerbate a hurricane's power and destructive effect"); *cf.* Plt. Opp. to U.S. MSJ CZN (Doc. 16063) at 18 n.14 (citing "concept development" as cause of MRGO's "integrated [hydraulic] effects").

is equally clear that all four of the alleged deleterious effects of the MRGO are effects that resulted from the implementation of the plan conceived by the Division Engineer, recommended for construction by the Chief of Engineers, and authorized by the Congress of the United States.

Plaintiffs' complaints about maintenance and operation are essentially complaints that the putative design flaws were not subsequently remedied.  *See* FAC ¶ 51 (silting "has been a major problem" from the beginning and has required perpetual dredging "to remove deposited soil and silt and to retain its originally designed 36-foot depth") ¶ 52 ("proper dredging would ameliorate the 'funneling effect' of the waterway"), ¶ 53 ("maintenance dredging significantly widened the MR-GO"); Plt. Opp. at 42 ("Plaintiffs challenge the Corps' election to knowingly continue the harm and exacerbate the hazardous and dangerous condition that it created.").  But adding features to the project that were not in the original designs does not constitute maintenance, nor can it be properly characterized as operation.  Plaintiffs' complaint that the Corps did not install surge barriers and did not install channel protection ("armoring") on both banks of the MRGO is a complaint about the design of the project, not its operation or maintenance.  Even the complaint about maintenance dredging and the widening of the channel is in reality a complaint that the original design did not specify "armoring."  Plaintiffs' complaint is not that dredging was performed incorrectly or in the wrong places.  Their complaint is that it was performed too often and that the frequent (virtually continuous) dredging caused a loss of adjacent wetlands.  But as the Plaintiffs recognize, the frequent dredging and widening of the waterway were results of the failure to design channel protection that would prevent silting and widening.

Plaintiffs implicitly concede that the design and construction of the MRGO were protected discretionary functions.  Design itself is not specifically addressed by any of their arguments.  Their initial arguments are directed at the supposed violations of the FWCA and

NEPA, *see* Plt. Opp. at 17-20, and their concluding arguments are directed at the operation and maintenance of the MRGO, *see id.* at 33-41.  Sandwiched in the middle are the untenable arguments about the planning/operational dichotomy and the continuing vitality of *Indian Towing* as a DFE authority.  Their failure to specifically address the DFE immunity that attaches to the design and construction of the MRGO undoubtedly stems from their recognition that both the discretionary nature and the policy basis of these phases are beyond dispute.  Inasmuch as *all* of the alleged defects in the MRGO are design defects, the DFE clearly bars this action and the Court is without jurisdiction over the subject matter of this case.[7]

VII.  THE DCE APPLIES TO THE DECISIONS TO CONSTRUCT THE MRGO ALONG A ROUTE THAT CREATED A "FUNNEL" AND TO CONSTRUCT IT WITHOUT SURGE OR SALTWATER BARRIERS OR CHANNEL PROTECTION.

Plaintiffs argue that the DCE does not apply because (1) they are not challenging the validity of the Act that authorized MRGO construction but are instead challenging noncompliance with the FWCA and NEPA; (2) the authorizing statute allowed the Corps to exercise "professional engineering judgment and expense"; (3) the authorizing statute did not exempt the Corps from FWCA and NEPA compliance; (4) the Corps deviated from the authorizing statute by allowing the top of the MRGO to widen; and (5) the Corps did not exercise due care for the rights of others.  Plt. Opp. at 43-45.  These arguments can be addressed best by distinguishing what the United States is *not* arguing from what it is.  The United States is *not*

---

[7]Even if the maintenance of which they complain were not merely an outgrowth of the design decisions made at the outset, the DFE would apply to them.  The maintenance decisions of which they complain, where to build bank protection and where to rely solely on dredging were decisions made at the management level.  *See* USACE Dep. (Oct. 8, 2008; Thomas Podany) at 117:24–118:20 (Ex. 46); Russo Dep. at 97:6–105:20 (Ex. 44).  The project manager was balancing the mandate to keep the channel as free from obstruction as possible against the desire to impact adjacent property owners' properties as little as possible and attempting to do so in environmentally acceptable ways.  These decisions were constrained by funding that was inadequate to accomplish all three goals completely.

arguing that every single action undertaken by the Corps in designing, constructing, operating, and maintaining the MRGO is protected by the DCE. The argument is not that the Corps was prevented from exercising its engineering judgment in deciding what angle to prescribe for the sides of the MRGO or what type of dredging to employ or even exactly what route the channel should take. As set forth above, the Corps exercised considerable policy judgment in deciding how to address the problem of bank erosion and wetlands loss. All of those decisions and actions were properly matters as to which the Corps was free to use its judgment in determining how to proceed with the project.

But the Corps was *not* free to decide to build the MRGO in an entirely different location in order to avoid creating the "funnel" that Plaintiffs' allege was one of the four fundamental defects in the MRGO. This was necessitated by the congressional mandate that the MRGO be constructed "substantially in accordance with" the LMVD Division Engineer's plan, which the Chief of Engineers recommended for construction and Congress ratified. Plaintiffs' claims about the supposed "funnel effect" are barred by the DCE. Likewise, Plaintiffs' claim about the creation of a "conduit" for storm surge from the Gulf to the IHNC is barred by the DCE. This claim is barred because the authorizing legislation required the construction of such a "conduit." The Corps was *not* free to decide that building a channel from the Gulf to the IHNC was a dangerous idea that should not be effectuated.

Nor was the Corps free to decide that channel protection should be added to prevent erosion of adjacent wetlands. Channel protection was not included in the Division Engineer's plan, and wetlands protection was not an authorized purpose of the project. *See* USACE Dep. (Oct. 7, 2008; Zoltan Montvai) at 34:21–36:22, 38:22–39:13 (Ex. 48). As the MRGO project manager made plain in his testimony, he was not free to divert MRGO funds to wetlands

protection no matter how worthy the effort might have been in its own right.  Russo Dep. at 230:11-22 (Ex. 44).  The Corps was not free to decide to add surge or saltwater barriers to the project for the same reasons.

Finally, the Plaintiffs' argument that they are not challenging the validity of the authorizing statute is refuted by their complaints about these supposed "defects" in the project that Congress authorized and which the Corps was not free to remedy under the authority conferred by the statute.  Plaintiffs are *implicitly* challenging the statute by saying that "due care" required that the Corps not construct the MRGO as the law required.

CONCLUSION

For these reasons, the United States' motion to dismiss for lack of subject matter jurisdiction or, alternatively, for summary judgment should be granted.

Respectfully Submitted,

GREGORY G. KATSAS
Assistant Attorney General

THOMAS DUPREE
Principal Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR
Assistant Director, Torts Branch

  s/ Robin D. Smith
ROBIN DOYLE SMITH
Senior Trial Counsel
Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 616-4289 / (202) 616-5200 (Fax)

January 5, 2009                              Attorneys for the Defendant United States

<u>CERTIFICATE OF SERVICE</u>

      I certify that the foregoing was served by ECF on all counsel of record on January 5, 2009.


                        <u>  s/ Robin D. Smith   </u>
                        ROBIN DOYLE SMITH