# Exhibit 44

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


**IN RE:** KATRINA CANAL BREACHES          CIVIL ACTION

CONSOLIDATED LITIGATION              NO. 05-4182 K2

                                     JUDGE DUVAL

PERTAINS TO                          MAG. WILKINSON

(Robinson, No. 06-2268)


        Deposition of EDMOND JOSEPH RUSSO,

JR., given at the U.S. Army Corps of Engineers,

ERDC, 3909 Halls Ferry Road, Vicksburg,

Mississippi 39180, on May 21st, 2008.


REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

78145971-3aae-4e24-8465-33ccad14221d

Page 30

1  division.  Okay, but you were doing engineering
2  work.
3      A.  Um -- at the time, yeah.  If you're
4  going back to this 1992 to '95.
5      Q.  Yeah.
6      A.  Yes.
7      Q.  All right.  Okay.  So the ops manager
8  has his own engineers.
9      A.  Not under direct supervision.
10     Q.  Who would have supervised you?
11     A.  Um -- at the time, a section chief
12  would have been the supervisor.
13     Q.  A section chief is -- let's see.  In
14  this organizational chart, who is the section
15  chief?
16     A.  Let me see it.
17     Q.  (Tendering.)  Looking at ops?  It says
18  at the bottom of the column where the page is
19  for ops.  You see it?
20     A.  There's been some reorganization, but
21  not drastic, but I would have been, at that
22  time, in this area here.
23     Q.  Okay.  This area being, under dredging
24  it says civil engineers, and --
25     A.  Yeah.  I would have probably been one

Page 31

1  of these civil engineers here.
2      Q.  Okay.
3          MR. BRUNO:
4              Witness has indicated on Page 15
5          of the document we've previously
6          marked as Colletti Number 2, under the
7          box entitled dredging, one of the two
8          civil engineers, who were GS-11s.
9  EXAMINATION BY MR. BRUNO:
10     Q.  Okay.  So the op division has its own
11  technical support branch.
12     A.  Yes.
13     Q.  Which includes whole bunch of
14  engineers.
15     A.  Yes.
16     Q.  Flood control, navigation,
17  environmental, natural resources, channel
18  survey, and dredging.  Right?
19     A.  Right.
20     Q.  Okay.  And was that true back in 1992
21  to '95, generally?
22     A.  It was a lot smaller, but similar
23  makeup.
24     Q.  Okay.  Fair enough.  All right.  Let's
25  see.  After that, according to the vitae, you

Page 32

1  were -- from '95 to '97, you were the lead
2  design engineer, channel maintenance dredging.
3  You're still in the op division.  And your
4  section chief, is he still in dredging?
5      A.  Um -- there was a section chief of
6  dredging, yeah.
7      Q.  Okay.  Like on 15?  (Indicating.)
8  Dredging.
9      A.  Yeah.  It would have been -- the
10  supervisory civil engineer.
11     Q.  Okay.  All right.  Then from '97 to
12  2000 you're a project manager, so you moved
13  into the Planning, Programs and Project
14  Management branch.
15     A.  Right.
16     Q.  Right?
17     A.  Right.
18     Q.  So we go to Page -- if we look at Page
19  2, you're in the column that's entitled
20  planning, programs and management division,
21  right?
22     A.  Uh-huh.
23     Q.  And what section?
24     A.  Um -- it would have been a CWPPRA
25  area.  I don't know if it's quite listed on

Page 33

1  that chart.  Let's see.  They've also gone
2  under some reorganization.  CWPPRA falls under
3  coastal restoration branch, now, but that
4  branch didn't exist at that time.
5      Q.  All right.  Would you please tell me
6  what the acronym CWPPRA means?
7      A.  Coastal Wetlands Planning Protection
8  and Restoration Act.
9      Q.  Have you ever read that act?
10     A.  Yes.
11     Q.  I don't mean to test your memory.
12         Do you recall when it was passed?
13     A.  It might have been around 1990.
14     Q.  Okay.  I'm not asking for a legal
15  conclusion, before I ask this question, so I
16  know what I'm going to get.  Okay?
17         But you having read the act, what was
18  your understanding of what the Congress was
19  authorizing the United States Army Corps of
20  Engineers to do?
21     A.  That, to my recollection, directs the
22  Secretary of the Army, in so many words, to
23  form a task force led by the District
24  Commander, and involving EPA, U.S. Fish &
25  Wildlife Service, National Oceanographic and

EDMOND JOSEPH RUSSO                                              May 21, 2008

(Pages 34 to 37)

Page 34

1  Atmospheric Administration, the Natural
2  Resources Conservation Service, the State of
3  Louisiana -- let's see -- I believe, to execute
4  that act by developing annual priority project
5  lists through an interactive process with
6  Louisiana stakeholders --
7      Q.  Uh-huh.
8      A.  -- to address coastal land loss
9  problems.
10     Q.  All right.  Coastal land loss
11  problems.  Okay.  That's a pretty broad term;
12  right?
13     A.  Yeah.
14     Q.  Would that include the loss of the
15  marsh in and around the MRGO?
16     A.  Yes.
17     Q.  Okay.  Now, we talked a bit ago about
18  authorizations.  Did you have an understanding
19  that the Congress was authorizing the Corps to,
20  even on the most preliminary level, take an
21  interest in coastal restoration?
22     MR. WOODCOCK:
23         Objection insofar as it calls for
24      a legal opinion.
25     MR. BRUNO:

Page 35

1          That's what why I always preface
2       it by what is your understanding?
3      A.  Can you say it again?
4  EXAMINATION BY MR. BRUNO:
5      Q.  Well, what I'm just generally -- I
6  mean, if they're directing the Corps to
7  establish a list of priority -- forgive me.  If
8  the authorization is indicating to the Corps in
9  concert with other agencies to establish a list
10  of priority projects -- right?  And the end
11  game, the purpose of those priority projects,
12  is to respond to the loss of Louisiana coast,
13  isn't that sending a message to the Corps that
14  the Congress is authorizing the Corps to be
15  interested in coastal restoration?
16     A.  I wouldn't say that that's
17  particularly the case.
18     Q.  Why not?
19     A.  In the way you phrase it.  The act
20  requires the Corps, as the lead on the task
21  force involving the other federal agencies and
22  the state, to go through a deliberative process
23  to identify priority projects that address
24  coastal land loss.  That's the way I would
25  phrase it.

Page 36

1      Q.  Let me see if I understand what
2  coastal land loss means.  Does it mean only the
3  loss of the coast -- and I'm going to define
4  coast to be that section of swamp and/or marsh
5  and/or land which is a boundary between
6  Louisiana and the Gulf of Mexico?
7          Is it that limiting.
8      A.  Actually not.  The scope of CWPPRA, to
9  my knowledge, does include the entire United
10  States coastal wetlands, but the way the act is
11  written, to the best of my knowledge, um -- the
12  provisions are far more favorable for
13  implementation in Louisiana.  So effectively
14  it's only been implemented in Louisiana, that I
15  know of.
16     Q.  All right.  I appreciate that, but
17  that really wasn't my question.  I was trying
18  the understand what geography, if you will,
19  would have been included in this legislation.
20  And when we say coastal land loss, I have in my
21  mind a coast coupled with land loss.  Okay?
22  And I'm trying to see what the scope or the
23  breadth of that phrase would include.  I'm
24  hearing you tell me that it really, first of
25  all, includes more than just the coast, it

Page 37

1  includes also the wetlands.
2      A.  Um -- the coastal wetlands.
3      Q.  Okay.  All right.  Can you define for
4  me what your understanding is of coastal
5  wetlands so that you and I can -- I want to
6  make certain I'm on the same page with you.
7      A.  The emergent land on the coast that is
8  subject to the ebb and flow of sea tides.
9      Q.  Okay.  All right.  Well, let me be
10  very specific then.
11         You're familiar with the MRGO; right?
12     A.  Yes.
13     Q.  You know where it is in Louisiana.
14     A.  Right.
15     Q.  If I used the phrase Reach 2 or Reach
16  1, does that have any meaning to you?
17     A.  If I looked at a map, maybe.
18     MR. BRUNO:
19         Give me a document, please,
20      somebody.
21  EXAMINATION BY MR. BRUNO:
22     Q.  Do you know where these came from?
23  There's a circle drawn.  I see JG Exhibit 9.
24  No?  Well, then I'm just going to attach.
25         First, it's pretty clear this is a

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                      May 21, 2008

(Pages 38 to 41)

Page 38

1    satellite image.  Does what's depicted in this
2    satellite image look familiar to you at all?
3        A.  Yes.
4        Q.  Okay.  Do you see the MRGO depicted?
5        A.  Yes.
6        Q.  All right.  Now, let me, for the
7    purpose of this question, define Reach 2.
8        A.  Okay.
9        Q.  Okay?  Reach 2 is that section of the
10   MRGO that goes from the intersection with the
11   Intracoastal Waterway down to the Gulf of
12   Mexico.
13       A.  Okay.
14       Q.  That's all Reach 2.
15           Reach 1 is the beginning of the MRGO
16   as it intersects with the Intracoastal waterway
17   and Reach 2.
18           And then Reach 3 is that section of
19   gulf that was dredged as far out as that might
20   have been.
21       MR. LEVINE:
22           Have you got that by mile
23       numbers?
24       MR. BRUNO:
25           I don't.  We've had difficulty

Page 39

1           with the mile numbers, so --
2    EXAMINATION BY MR. BRUNO:
3        Q.  I think that's pretty simple, though.
4            Don't you agree?
5        A.  Generally.
6        Q.  Generally enough.  All right.
7            Now, I just want to understand what
8    land masses, as you understand CWPPRA, would
9    have been included within the purview of that
10   legislation.  First of all, the area that's
11   circled here on the map, that's probably
12   convenient, would that be considered coastal
13   wetlands?
14       A.  Except for the portion of the circle
15   that --
16       Q.  Is north of the Intracoastal Waterway.
17       A.  Right.
18       Q.  Okay.  How about the circle which
19   appears to the bottom right of this document;
20   is that -- would that be part of the CWPPRA?
21       A.  That would be within the scope of the
22   act.
23       Q.  Okay.  All right.  And we don't
24   have --
25       MR. BRUNO:

Page 40

1            Do we have a photograph of the
2        rest of Reach 2, by any chance?
3            I want to mark this as Russo
4        Number 2.
5        (Exhibit 2 was marked for
6    identification and is attached hereto.)
7    EXAMINATION BY MR. BRUNO:
8        Q.  You know that obviously the MRGO
9    continues out into the gulf, and I'll
10   represent -- you can see this yellow line.
11           Do you know what that yellow line
12   represents?
13       A.  It should be the alignment of the
14   levee.
15       Q.  Yes.  Okay.  Would you agree with me
16   that everything to the southeast -- I'm sorry.
17   If we drew a line which along the MRGO --
18       A.  Uh-huh.
19       Q.  -- from the Violet levee down to the
20   Gulf of Mexico -- all right?  Everything north
21   of that line would be included in CWPPRA, as
22   well, right?
23       A.  Uh-huh.
24       Q.  Okay.  And a certain portion of the
25   southern part of that line where it's wet.

Page 41

1        A.  Right.
2        Q.  Okay.  All right.  So in terms of what
3    CWPPRA was supposed to do, when we say -- now,
4    we talked about, the purpose is to establish
5    priority project lists on this area.  Now, the
6    next question I have is, well, what were the
7    projects intended to accomplish that were to be
8    put on this priority project list?
9        A.  The intent was to address the coastal
10   land loss problems that are described in
11   particular projects that become considered in
12   that process.
13       Q.  All right.  Well, let me just ask it
14   to you, then:  We know you've written on the
15   subject many words to describe the fact that
16   the MRGO has caused erosion of its banks.
17           Wouldn't you agree?
18       A.  Activities in the waterway have
19   contributed to that.
20       Q.  All right.  Well, no channel, no
21   erosion.
22       A.  No.  That's not true.
23       Q.  Wouldn't you have land if there was no
24   channel.  The channel was dug by the Corps.
25       A.  Correct.

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                                    May 21, 2008

(Pages 42 to 45)

Page 42

1       Q.   All right.  So the first thing you
2   have is a channel, which the Corps dug.
3       A.   Right.
4       Q.   And once you have a channel, you got
5   water in it.  And once you had water in it then
6   you have boats in it.  So if you take away the
7   channel you don't have land loss.  Fair enough?
8       A.   That's not true either, no.
9       Q.   Why?
10      A.   There's lots of different ways that
11  land is being lost in the area.  There's
12  natural subsidence, there's sea level rise that
13  coastal wetlands are very sensitive to and will
14  break up under, and we know the rates those are
15  occurring.  We know the rates of the land
16  subsidence, to some degree.
17      Q.   Uh-huh.
18      A.   There is also edge erosion of those
19  wetlands that occur on a constant basis under
20  the patterns of tidal fluctuation, wave
21  activity and circulation patterns.
22      Q.   Right.
23      A.   There is also significant land loss
24  due to minerals extraction that is heavily done
25  in the coast which stems from oil and gas canal

Page 43

1   dredging, pipeline dredging, um -- the collapse
2   of the coastal marsh platform due to minerals
3   extraction which you can clearly see in many of
4   these locations occurring and can be easily
5   connected to documented activities in those
6   areas.
7       Q.   Okay.
8       A.   Also, there's wind-driven fetch that
9   causes wave action in interior marsh areas
10  which cause them to unravel and open up all by
11  themselves which cause a problem.  So there's
12  lots of contributing factors to the coastal
13  land loss issue.
14      Q.   Uh-huh.  All right.  But you would
15  agree with me that at least one of those
16  contributors is the wave wash caused by vessel
17  activity on the MRGO.
18      A.   Yes.
19      Q.   And so my question to you is, does
20  CWPPRA include considerations of how to address
21  the loss of the banks due to -- I'm sorry.  Not
22  does it.  Could CWPPRA include projects to
23  address the loss of bank as the result of
24  navigation activity on the MRGO?
25      MR. WOODCOCK:

Page 44

1       Same objection I've been making.
2       You can answer.
3   EXAMINATION BY MR. BRUNO:
4       Q.   Yeah.
5       A.   I believe it could.
6       Q.   Okay.  While we're on the subject, let
7   me show you, also -- have you ever seen this
8   statute?  It is called River and Harbor Act of
9   1968, it is Public Law 90-483, it was passed on
10  August 13 of 1968.  And the particular
11  provision, and I'll show you this but I went
12  the read it into the record, is as follows at
13  Section 111:  The Secretary of the Army, acting
14  through the Chief of Engineers, is authorized
15  to investigate, study and construct projects
16  for the prevention or mitigation of shore
17  damages attributable to federal navigation
18  works.  The cost of installing, operating and
19  maintaining such projects shall be borne
20  entirely by the United States.  No such project
21  shall be constructed without specific
22  authorization by Congress if the estimated
23  first cost exceeds one million dollars.
24      Now let me show it to you.  Take a
25  look at it before you answer.

Page 45

1       A.   I guess if I've seen it is probably
2   been so long that I can tell you I don't
3   remember reading it in the past, but it's
4   possible.
5       Q.   All right.  Well, at least would you
6   agree with me that, again, as a manager who
7   might be reading this document, it certainly
8   looks like it gives the Corps of Engineers
9   authority to address bank erosion on the MRGO.
10      A.   It looks like --
11      MR. WOODCOCK:
12          Same objection.
13          You can answer.
14      A.   It looks like it says you can study
15  it, and then you have to -- the Corps would act
16  on Congress' authorization provided money was
17  given.
18  EXAMINATION BY MR. BRUNO:
19      Q.   Okay.  But it at least gives them a
20  million bucks to study it.
21      A.   Does it?  No, it doesn't.
22      Q.   It doesn't?
23      A.   It says, no such project shall be
24  constructed without specific authorization by
25  Congress if the estimated first cost exceeds a

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                          May 21, 2008

(Pages 46 to 49)

Page 46

1    million dollars.  That means they're putting
2    provisos on the construction project that would
3    be authorized by Congress.
4        Q.  So let me see if I understand what I
5    think you're saying.  If the construction of
6    the project was less than a million bucks, you
7    don't need any further Congressional
8    authorization.
9        A.  No.  It says, if the estimated first
10   cost exceeds a million dollars.
11       Q.  Well, I don't understand.  What does
12   first cost mean?
13       A.  Oh.  In a project, there's a life
14   cycle of costs from construction, operation and
15   maintenance.
16       Q.  Right.
17       A.  Over that period of time.
18       Q.  So first cost is what part, is that
19   the feasibility?
20       A.  That's the -- typically, all those
21   costs to install the feature.
22       Q.  So it would include feasibility, it
23   would include -- I'm sorry.  Reconnaissance, it
24   would include feasibility and then the
25   construction.  It would have to be less than a

Page 47

1    million bucks.
2        A.  Most likely the study parts would be a
3    different appropriation.  It wouldn't normally,
4    to my knowledge, include the study parts, just
5    the first cost construction.  And those things
6    related to install the feature.
7        Q.  All right.  Let me show you another
8    statute.  This is United States Public Law,
9    99th Congress, Second Section, Public Law
10   99-662, November 17, 1986.  And in
11   particular -- it's the Water Resource
12   Development Act, and we're looking at
13   Section 101C which says, costs of constructing
14   projects or measures for the prevention or
15   mitigation of erosion or shoaling damages
16   attributable to federal navigation works shall
17   be shared in the same proportion as the
18   cost-sharing provisions applicable to the
19   project causing such erosion or shoaling.  The
20   non federal interest for the project causing
21   the erosion or shoaling agree to operate and
22   maintain such measures.
23            MR. LEVINE:
24                Would you state the statute
25            number again?

Page 48

1            MR. BRUNO:
2                Again, it's Public Law 99-662,
3            but it's also 33 USC 2201, apparently.
4            And they cite it as the water
5            Resources Development Act of 1986.
6    EXAMINATION BY MR. BRUNO:
7        Q.  Let me let you take a look at it
8    first.
9        A.  Um -- I don't specifically recall
10   looking at it, but I could have during the
11   course of management.
12       Q.  No, I understand.  Just asking.  It
13   seems, by at least my review of these various
14   acts, that there are opportunities that the
15   Corps has to get funding from more than one
16   source.  Or I should say one more authorization
17   source.  Is that true or false?  For any
18   particular project.  In other words, if you
19   have a project, it could fall under the
20   original authorization of the MRGO or a
21   component could fall under this CWPPRA or
22   perhaps some other bank erosion authorization.
23            Is that something that you're familiar
24   with the Corps recognizing?
25            MR. WOODCOCK:

Page 49

1                Objection.  Vague.
2                You can answer.
3        A.  Um -- yeah.
4    EXAMINATION BY MR. BRUNO:
5        Q.  Okay.  Like any other agency, you're
6    going to look for the authorizations that
7    Congress has given you and try to use them;
8    right?
9        A.  Correct.
10       Q.  And in particular, if Congress has
11   authorized money which could be fairly
12   characterized in such a way for you to use it
13   within a particular authorization, then you're
14   going to do that.  Right?
15       A.  Correct.
16       Q.  Okay.  When you served in this role as
17   project manager from '97 to 2000, did you look
18   at the MRGO as possibly being a beneficiary of
19   this authorization and/or budget?
20       A.  I'm pretty sure that we considered
21   projects in that area during that time.
22       Q.  Okay.  Can you remember any particular
23   projects that perhaps were considered?
24       A.  Um -- not to tie us specifically to
25   that time frame when I was in that position,

78145971-3aae-4e24-8465-33ccad14221d

(Pages 50 to 53)

Page 50

1  but generally in that time frame, and maybe
2  beyond, CWPPRA did consider some bank
3  protection projects in that area.
4      Q.  Can you give me an idea of what those
5  projects may have been?  Were they for the
6  entire length of the MRGO, for example, or
7  certain sections of MRGO?
8      A.  Certain sections.
9      Q.  Which sections were --
10     A.  Generally in the vicinity of Lake
11 Borgne.
12     Q.  Can you recall why it was that that
13 was an area of particularized interest?
14     A.  Mainly because of the significance of
15 the coastal features that make up the historic
16 lake rim and other associated water features in
17 the area.
18     Q.  Okay.  What about those features made
19 it interesting or significant, or worthy of
20 inquiry?
21     A.  From a lot of different perspectives,
22 the stakeholders in the area, the agencies,
23 um -- saw the, I guess, just mere presence of
24 these historic features as, um -- relatively
25 important; likewise, across the coast there's,

Page 51

1  um -- there was a general interest in that
2  because of the geometry and historical
3  features, connecting waterways and so fourth.
4      Q.  Right.
5      A.  Um --
6      Q.  Well, the local interests would have
7  included St. Bernard Parish?
8      A.  Yes.
9      Q.  And they had expressly indicated a
10 concern for hurricane protection as it relates
11 to those features, did they not?
12     A.  Um -- yeah.  When expressed in the
13 CWPPRA program, it was, to my recollection,
14 mostly emphasizing the wetland features because
15 that's the emphasis of that program.
16     Q.  Right.  In other words, CWPPRA says
17 let's preserve the wetlands.  Right?  CWPPRA
18 doesn't say let's preserve the wetlands because
19 they provide a buffer for hurricane protection.
20     Is that how you're drawing the
21 distinction?
22     A.  That's correct.
23     Q.  And so because you have to work within
24 the framework of the authorizing legislation,
25 if the thing says, okay, let's focus on coastal

Page 52

1  protection, then we call it coastal protection,
2  right?
3      A.  Yeah.
4      Q.  Okay.  But in fact, all of those local
5  interests within the area of the MRGO had
6  advised the Corps on many, many, many, many
7  occasions that their major concern was flood
8  protection, isn't that true?  That was their
9  issue as relates to coastal preservation.
10     MR. WOODCOCK:
11        Objection.  Speculation.
12     A.  They have made that linkage.
13 EXAMINATION BY MR. BRUNO:
14     Q.  They made the linkage between the loss
15 of the wetlands and the potential for flooding
16 from hurricanes; isn't that true?  They have.
17 Not the Corps, but they have.
18     A.  Sure.
19     Q.  All right.  And they expressed that
20 concern to the Corps.
21     A.  Yes.
22     Q.  All right.  And the Corps, in
23 response -- and I don't want to put words in
24 your mouth, but I think what you said was that
25 as a result of the activities, expressions of

Page 53

1  local interests, the Corps took a
2  particularized interest -- is that fair?  In
3  that component of the Lake Borgne boundary.
4      A.  The agency body that made up CWPPRA
5  did.
6      Q.  I'm sorry.  Did.  Okay.  And the Corps
7  was the head of that.
8      A.  The chair.
9      Q.  The chair.  Okay.
10     All right.  Are you familiar with any
11 oil and gas activities that may have occurred
12 in the area of -- forgive me for saying this --
13 the funnel?
14     A.  Um -- I don't recall the particular,
15 you know, instances, but I do recall there
16 being lots of oil and gas activity all over the
17 place in here.  Um -- if you blew the map up,
18 you could see -- let's see.  There's a pipeline
19 canal right here, for instance, and there is
20 one here, and there's one there, and so forth.
21 There is one here. (Indicating.)
22     Q.  Uh-huh.
23     A.  There's oil and gas activity.
24     Q.  Now, there was this interest.  Did
25 the -- tell me, I forgot how to describe this

(Pages 54 to 57)

Page 54

1   group.  Can we just call it CWPPRA?
2        A.   Yeah.
3        Q.   Did CWPPRA recognize that a
4   contributor to the land loss along the boundary
5   of the Lake Borgne was the MRGO channel, or at
6   least the activities that were occurring on the
7   MRGO generally, to be very specific?
8        MR. WOODCOCK:
9             Objection insofar as it calls for
10   a legal opinion.
11        MR. BRUNO:
12             There ain't no legal in there,
13        man.  Sorry.  That's a factual --
14        MR. WOODCOCK:
15             You're asking about CWPPRA.
16        MR. BRUNO:
17             No.
18        MR. LAMBERT:
19             Well, don't argue with each
20        other.  He put in his objection.
21        MR. BRUNO:
22             I understand.
23   EXAMINATION BY MR. BRUNO:
24        Q.   I want the witness to know I'm not
25   asking any legal conclusions.  I'm asking what

Page 55

1   CWPPRA did or did not do.
2             So this body of people, they focused
3   on this boundary, and I'm wondering if they
4   recognized that the land loss that they
5   observed that was occurring was in any way
6   related to the MRGO or the activities on the
7   MRGO.
8        A.   Um -- to the best of my recollection,
9   the task force, when they reviewed the projects
10   under consideration, didn't focus so much on
11   the causes that resulted in the effect of land
12   lost from any number of possibilities but
13   focused on how to abate or correct the loss
14   problem for particular wetland areas of
15   interest.
16        Q.   Okay.  All right.  Well, did that body
17   consider whether or not the closure of the MRGO
18   would have abated or would have played a role
19   in wetlands restoration; was that on the
20   agenda?
21        A.   I don't recall that in the time I was
22   there being on the agenda, per se.  The scope
23   of the CWPPRA program was somewhat limited
24   because of the annual amounts of money that
25   were available to address the problems.  So

Page 56

1   they again focused on how to -- you know, for
2   areas that it was determined there's varying
3   loss rates for whatever reason they -- that was
4   a consideration along with the stakeholder and
5   agency input to determine.
6        Q.   Right.
7        A.   Which areas needed to be addressed.
8        Q.   Did CWPPRA consider including on the
9   priority projects list providing bank
10   protection on the MRGO in the area of the
11   boundary of Lake Borgne?
12        A.   Yes -- I don't recall whether that was
13   specifically during the time frame I was
14   involved, but generally in that time frame or
15   after I'm pretty sure there's some projects
16   that were considered.
17        Q.   All right.  And the particular
18   projects considered, was it just simply putting
19   riprap or was it the -- what do they call it,
20   the mesh, the mat, articulating mat?
21        A.   They, um -- to the best of my
22   knowledge, most likely looked at a few
23   alternatives, to include the rock.  They may
24   have looked at, um -- some competing
25   engineering measures, as well, just to

Page 57

1   understand what would be cost effective.
2        Q.   Okay.  Do you know if any project
3   related to the MRGO in particular made the
4   list?
5        A.   Um -- I believe that a project did
6   make the list.  I don't remember which agency
7   had it, but I'm pretty sure there was a project
8   that made that list.  I don't know -- I was --
9   I think I was moving on the other things.
10        Q.   All right.  Do you know, or can you
11   help me with regard to where I might go to look
12   or find out, were these lists published?
13        A.   Yeah.  I'm pretty sure you can
14   download those from the Internet.
15        Q.   And would I look under CWPPRA?
16        A.   Um -- if you Googled it I'm sure that
17   would get you there.
18        Q.   Okay.  And these lists, do they come
19   out annually or is it just one project?  I'm
20   sorry, I mean one effort, if you will.
21        A.   They're multiple, continuous,
22   repetitive cycles that more or less are on an
23   annual basis, but they're not mandated to be
24   annually --
25        Q.   Okay.

(Pages 58 to 61)

Page 58

1     A.  -- to my knowledge.
2     Q.  All right.  Let's see.  So from there,
3  you served as a supervisory civil engineer for
4  the ops manager from 2000 to 2005.
5        Were you the ops manager for MRGO at
6  that time?
7     A.  Yes.
8     Q.  All right.  So from 2000 to '05,
9  you're the ops manager for the MRGO?
10    A.  Uh-huh.
11    Q.  And Breerwood is your supervisor.
12    A.  Correct.
13    Q.  All right.  And it says here that you
14 were responsible for the operations and
15 maintenance of nine shallow and deep draft
16 navigation channels in coastal Louisiana.
17       Now, at the time, did you have the
18 name of Mississippi River Gulf Outlet Op
19 Manager?
20    A.  Yes.
21    Q.  Okay.  So apparently you've got more
22 than just the Mississippi River Gulf Outlet in
23 your jurisdiction.
24    A.  Yeah.  At the time.
25    Q.  At that time?  Did that change?

Page 59

1     A.  While I was there, I'm pretty sure
2  those were the channels I had.
3     Q.  All right.  So you had MRGO and eight
4  other channels?
5     A.  Correct.
6     Q.  Okay.  All right.  Let's see.  It says
7  you had the Caernarvon hydraulic river
8  diversion structure, and you ensured safe,
9  reliable project conditions by scheduling,
10 monitoring hydrographic channels and surveys.
11       Now, it doesn't get to you or your
12 jurisdiction until it's a finished project,
13 right?
14    A.  Um -- well, those nine projects were,
15 or are, in the operations and maintenance
16 phase.  So activities associated with that were
17 under that position.
18    Q.  All right.  It says you ensured safe,
19 reliable project conditions by scheduling,
20 monitoring hydrographic channel surveys, you
21 planned and executed, prioritized channel
22 maintenance, with beneficial use of dredge
23 materials for wetland creation and barrier
24 island restoration -- right?
25    A.  Correct.

Page 60

1     Q.  Now, does that mean that when you
2  conducted dredging that one of the goals was to
3  create some wetlands?
4     A.  It wasn't a goal, um -- it was done
5  opportunistically under the authorities
6  provided.
7     Q.  All right.  And barrier island
8  restoration?
9     A.  Likewise.
10    Q.  All right.  What barrier island was
11 that?
12    A.  Breton Island.
13    Q.  Okay.  Any the idea was to take the
14 dredge spoils and put them on the island in
15 order to preserve that island?
16    A.  We opportunistically would convey and
17 place maintenance dredge materials in the surf
18 zone of the island, and natural processes would
19 rework it and move it onto the island.
20    Q.  Can you help me understand your use of
21 the word opportunistically?
22    A.  Yes.
23    Q.  What does it mean?
24    A.  That means reviewing alternatives when
25 we're planning a maintenance dredging event of

Page 61

1  the channel that might include locations other
2  than the designated upland disposal area under
3  the various guidelines and authorities, to
4  include the federal standard.
5     Q.  Okay.  All right.  It says you also
6  led managed construction maintenance on
7  jetties, foreshore rock dike bank protection,
8  dredged materials retention structures and
9  revetment bank stabilization structures.
10       Okay.  Now, with regard to the
11 foreshore rock dike bank protection, were you,
12 as the manager of operations for the MRGO, in a
13 position that you could determine whether or
14 not foreshore rock dike bank protection was
15 necessary?
16    A.  Yes.
17    Q.  What were the criteria that you used
18 to determine whether or not foreshore rock dike
19 bank protection was necessary?
20    A.  It would be a life cycle alternatives
21 comparison to similar -- or I should say
22 options or engineering measures to accomplish
23 the levels of service required on the waterway,
24 whether that be for preventing the material
25 from going in or removing the material that was

EDMOND JOSEPH RUSSO                                      May 21, 2008

(Pages 86 to 89)

Page 86

1  replacement of its components?  That's true of
2  all projects, isn't it?
3      A.  Well, but those invoke, to my
4  knowledge, other provisions besides operations
5  and maintenance.
6      Q.  Well, all right.  Do you know --
7  you're there from 2000 to 2005.  Do you know of
8  anybody else in the New Orleans district office
9  that did any inspecting of the MRGO, other than
10  your office?
11     A.  Not for the purposes I would.
12     Q.  Any purpose at all.
13     A.  Oh.  There were lots of reviews, for
14  instance in the CWPPRA program or Louisiana
15  Coastal Area program, other programs, to meet
16  their particular objectives in the area.
17     Q.  Right.  I'm talking about specifically
18  with reference to meeting the objectives of the
19  Corps as regards to the construction and
20  operations as indicated by these design, um --
21  I mean, this document that I'm reading from
22  does not say that it doesn't apply to a project
23  where -- or a navigation project, for example;
24  it doesn't say that, does it?
25     A.  No.

Page 87

1      Q.  All right.
2      A.  We use discretion in which regulations
3  we apply, and that's not one that I operated
4  from.
5      Q.  All right.  Can we at least conclude
6  that while you were operations manager of the
7  MRGO you did not use the regulations that I've
8  shown you?
9      A.  I directly did not use those.  It may
10  have been that in engineering they would
11  reference those, but that was not a regulation
12  a manager would look at.
13     Q.  All right.  Fine.  I'm still going
14  back to my original question which was trying
15  to get a handle on what were your limitations
16  in terms of operating this project.  We've
17  established that we have an authorization by
18  the Congress that gives you design dimensions,
19  we've established that the design memorandum
20  gives you some dimensions as to its
21  construction.  I still don't know, though, what
22  limitations, if any, there are in connection
23  with the operation of the channel.
24         So what could you not do in connection
25  with the operation or maintenance of that

Page 88

1  channel?  And I gave you a for example.  Could
2  you dredge to fifty feet?
3      A.  We would never approach it that way.
4      Q.  How would you approach it?  Help me
5  understand, what is the approach?  What are the
6  criteria, the considerations that would guide
7  you in terms of how you properly manage this
8  project?
9      A.  During the time that I was there,
10  the -- and I suspect it still continues today
11  across the Corps, is that the annual operations
12  and maintenance budget for the Corps of
13  Engineers is so flat and underfunded that we
14  would typically examine the levels of service
15  that are required and, because there just is
16  not enough money to go around, um -- prescribe
17  dimensions usually less than those authorized
18  to dredge just to provide the levels of service
19  required, because there's just simply not
20  enough money on an annual basis to be able to
21  ever achieve the full dimensions.  It just --
22  it was not there.
23     Q.  All right.  Well, let's talk about
24  that, then.  The fact of the matter is that the
25  Corps of Engineers is the entity that told

Page 89

1  Congress that there was no need for bank
2  protection, right?  That's in the design memo.
3      A.  Um -- I'd have to see that part.
4  Where is that?
5      Q.  While Flo is looking for that let me
6  ask you some more questions.
7         How much money did you guys spend
8  every year dredging the MRGO?
9      A.  Um -- it varied during the time I was
10  there.  Um -- the annual budget that we
11  received was, best I can recall, somewhere on
12  the order of thirteen million dollars a year,
13  the President 's budget.
14     Q.  Okay.  So you guys were spending
15  thirteen million bucks a year to dredge the
16  channel.
17         Now -- and it is true, is it not, that
18  when the channel was designed and built that
19  the Corps did not expect to have to spend that
20  kind of money every year?  Isn't that true?
21     A.  Um -- where are you seeing that?
22     Q.  I'm just saying it's a matter of fact,
23  in your office it was not anticipated that the
24  cost of operating that channel, which would
25  include the maintenance, was never, ever

78145971-3aae-4e24-8465-33ccad14221d

(Pages 90 to 93)

Page 90

1  expected to be that high.
2      A.  Where is that written somewhere?
3      Q.  Just in past depositions that we've
4  taken.
5      A.  I don't know the history behind that.
6      Q.  All right.  That's fine.
7          When you got there, they were spending
8  about thirteen million bucks a year, so your
9  job was to continue to do that, right?
10     A.  Right.
11     Q.  Okay.  And you don't know anything
12  about what the Corps foresaw when it designed
13  and built the MRGO as to the future costs of
14  maintenance, is that fair?
15     A.  Right.
16     Q.  Okay.  That's good.  But would you
17  agree with me that when you do a cost-benefit
18  analysis in connection with the proposal of a
19  project to the Congress, one of the things that
20  goes into the cost-benefit analysis is the
21  projected future maintenance costs.  Right?
22         That's reasonable, isn't it?
23     A.  Best estimate.
24     Q.  Sure.  You do your best estimates.
25         And that's so that the Congress can

Page 91

1  decide whether or not it wants to do a
2  particular project, right?
3      A.  It's a factor.
4      Q.  Of course it is.
5          Now, in this instance you're spending
6  thirteen million bucks a year.  Did you sit
7  down with anybody and decide whether or not
8  that thirteen million dollars was economically
9  justified?
10     A.  That was not a criteria required to
11  review.
12     Q.  Wasn't your job.
13     A.  Correct.
14     Q.  Right.  Whose job was it?
15     A.  It was not required.  Once a project
16  goes into operations and maintenance, um --
17  there's no connection to further review of that
18  unless, um -- a subsequent action is directed.
19         (Lunch break.)
20  EXAMINATION BY MR. BRUNO:
21     Q.  We still haven't gotten an answer to
22  the fundamental question of what is it that
23  allows you to determine what your limits are.
24  Okay?
25         Now you told me that one thing we have

Page 92

1  established without question, the original
2  authorizing legislation is limiting.  Right?
3      A.  Um -- it is what it is.
4      Q.  Okay.  It is what it is, but then if
5  that's your answer then what is it that guides
6  you in terms of the limits of what you can and
7  cannot do as the operations manager for the
8  MRGO?
9      A.  Very complex question that we spend a
10 lot of time talking about, um -- and
11 interpretations made through trying to review
12 all the related, um -- legislation and guidance
13 and so forth.  So it's, um -- case specific.
14 When we're -- you know, as the problems come
15 up, you know, we have to understand that.
16        But again, you know, while I was
17 there, due to the budget constraints, we would
18 normally under dredge the dimensions just
19 because we couldn't afford to, um -- to even
20 achieve authorized dimensions.
21     Q.  All right.
22     A.  So that was the standard practice.
23 And it's the standard practice all over the
24 country.
25     Q.  Okay.  Now, I showed you Engineering

Page 93

1  Regulation 1110-2-1150 which is the engineering
2  and design for civil works projects.
3          Can you identify for me any other -- I
4  mean, you had alluded to earlier this morning
5  that there are some other regulations and/or
6  standards to which you may -- to which you
7  apparently alluded this morning.  But what are
8  they?
9      A.  Um -- there is one on operations and
10 maintenance for the navigation projects, so I
11 would --
12     Q.  It would say operations and
13 maintenance?
14     A.  I'm pretty sure.
15     MR. BRUNO:
16        Counsel, where can we get earlier
17 versions of these regs?  They're not
18 on the website.
19     MR. WOODCOCK:
20        I'm not really sure.  We can do
21 some investigating and get back to
22 you.
23     MR. LAMBERT:
24        Do you have a copy of the one you
25 worked from?

(Pages 94 to 97)

Page 94

1      THE WITNESS:
2           I may have a copy on the
3      computer, but it's on the Internet.
4      You can --
5      MR. LAMBERT:
6           How do we get to it?
7      THE WITNESS:
8           You can Google it.  You two to
9      the engineer -- USACE publications.
10     If you type in USACE publications,
11     there's pdf files out there for
12     everything that's out there for
13     everything that's --
14     MR. LAMBERT:
15          USA --
16     MR. WOODCOCK:
17          U.S. Army Corps of Engineers
18     publications.
19     THE WITNESS:
20          If you Google that, that will get
21     you.
22     MR. LAMBERT:
23          And exactly what is the -- and if
24     you were going to do this, what would
25     you type in to get to the document

Page 95

1      that you described as being one that
2      you would use for your limitations?
3      THE WITNESS:
4           I'd type that first and then look
5      down the list, um -- a list is going
6      to pop up -- and scroll down it.  It
7      should be something like, um --
8      operations and maintenance for
9      navigation projects or something like
10     that.
11     MR. LAMBERT:
12          During a break can you go use
13     your computer and do it?  Ours can't
14     get on line.
15     THE WITNESS:
16          Really?
17     MR. LAMBERT:
18          Yeah.
19     THE WITNESS:
20          Um -- yeah.
21     MR. LAMBERT:
22          Okay.
23     EXAMINATION BY MR. BRUNO:
24     Q.  All right.  Let me show you Engineer
25     Regulation 1110-2-100.  It's entitled Periodic

Page 96

1      Inspection and Continuing Evaluation of
2      Completed Civil Works Structures.
3           Have you ever seen that?
4      A.  Um -- I probably haven't really
5      reviewed this one.  However, the people in
6      engineering division -- because it says
7      engineering and design document at the top
8      here.
9      Q.  Okay.
10     A.  -- if it says operations and
11     maintenance, I probably or may have looked at
12     it, but engineering and design, being a
13     mountain of these type of things, they'll
14     mainly be looking at these.  And that may
15     advise the operations manager on things, um --
16     of that nature.
17     Q.  All right.  Did you all -- do you
18     remember ever having had an opportunity while
19     you were operations manager for the MRGO to sit
20     down and just talk about problems associated
21     with the MRGO generally?
22     A.  Um -- sometimes we would get
23     questions, um -- from any number of sources
24     and, um -- there may be discussions.
25     Q.  Okay.  All right.  Have you ever sat

Page 97

1      around -- did you ever have any meetings with
2      anybody in your section to discuss bank
3      erosion?
4      A.  Um -- yeah.  Yeah.
5      Q.  All right.
6      A.  Sure.
7      Q.  Now, tell me, how does bank erosion
8      fit within the context of operations?
9      A.  Um --
10     Q.  If it fits at all.
11     A.  What we try to do is, you know, under
12     the federal standard that guides us, determine
13     what's going to be the least costly approach
14     which is environmentally acceptable to provide
15     the levels of service required to navigation.
16     Q.  Okay.  So what does bank erosion have
17     to do with navigation?
18     A.  If it reaches -- we're trying to
19     understand, for sedimentation that occurs in
20     the channel -- you know, if we have an
21     understanding of where it's coming from, for
22     instance if it's erosion, or it could be
23     littoral drift, you know, further out, and so
24     forth, and it's something that we have a chance
25     of doing something about, as an alternative to

(Pages 98 to 101)

Page 98

1  dredging we would take a look at that in
2  different reaches to see is it a more
3  efficient, effective and environmentally
4  acceptable way to achieve the levels of service
5  required, perhaps at a greater value, less
6  cost.
7       Q.  All right.  So your analysis really is
8  an analysis to determine whether or not the
9  bank erosion has a negative impact on
10  navigation, right?
11      A.  Yeah.  That's primary.
12      Q.  Now, the banks obviously are owned by
13  someone.  Isn't that true?
14      A.  Yeah.
15      Q.  And you all have a right of way that
16  would include some portion of those banks.
17      A.  We obtain it for different maintenance
18  events as needed, through the Corps.
19      Q.  I meant right of way just for the
20  channel itself.
21      A.  For the channel itself?
22      Q.  Yes.
23      A.  Um -- I believe the limits of -- well,
24  I believe all water bottoms are state water
25  bottoms.  So the best of my knowledge, inside

Page 99

1  the channels themselves the state actually owns
2  the water bottom.
3       Q.  Right.  I wasn't talking about the
4  water bottom, I'm talking about the banks.
5       A.  The banks?  The banks are, um -- like
6  you say, different property owners.
7       Q.  Right.  And you've had, from time to
8  time, complaints by certain property owners
9  about the fact that the MRGO was taking away
10  their land, right?
11      A.  Um -- well, they -- there were
12  certainly property owners that, um -- were
13  experiencing land loss --
14      Q.  Right.
15      A.  -- along there, and expressed an
16  interest for us to take a look at it.
17      Q.  Right.  And one of those was Boysie
18  Bollinger?
19      A.  I don't remember dealing with him
20  directly.  Um --
21      Q.  Maybe dealing through one of his
22  companies?
23      A.  Potentially.
24      Q.  There was a problem with the MRGO
25  taking away his land in front of his hunting

Page 100

1  camp, wasn't there?
2       A.  I don't know the specifics.
3       Q.  All right.  Well, let's just say John
4  Doe.  You recall at least a person making a
5  complaint about loss of their land due to the
6  erosion of the banks of the MRGO, right?
7       A.  Yeah.  There's been --
8       Q.  At least one.
9       A.  Yeah.
10      Q.  All right.  Now, that involves -- did
11  you as the operations manager of the MRGO
12  regard that as a potential liability for the
13  Corps?
14      A.  No.
15      Q.  Okay.  So you felt like the fact that
16  that person's land may be eroding was the
17  landowner's problem and not the Corps of
18  Engineers' problem.
19      A.  Yes.
20      Q.  Okay.  And what recourse -- and I'm
21  not suggesting for a moment that you ever had a
22  conversation or you talked to anybody, but if
23  someone had complained to you as the operations
24  manager of the MRGO about the loss of their
25  land, what would you have told them to do?

Page 101

1       A.  Um -- well, we would usually -- or at
2  times, you know, interact with them, try to
3  take a look at their -- what they're talking
4  about and, um -- we would try to ascertain
5  through investigation, um -- whether we had the
6  option under this federal standard to take a
7  look at a reach that we may have otherwise just
8  periodically dredged to see whether or not it
9  was, um -- a competitive option to prevent that
10  source of erosion from causing sedimentation,
11  and if it appeared favorable, um -- you know,
12  we would pursue that.
13      Q.  Pursue what?
14      A.  Trying to use a different approach
15  than dredging.  We would try to, um -- limit
16  the migration of materials that may originate
17  from some bank into the channel.
18      Q.  Okay.  So dredging, then, is a cause
19  of bank erosion.
20      A.  No.
21      Q.  Well, I'm confused.  You just
22  testified that if a person complained about the
23  loss of their land due to erosion, one of the
24  things you would look at is perhaps
25  differentially dredging.  Isn't that what you

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                                    May 21, 2008

(Pages 102 to 105)

Page 102

1    just said?
2        A.  Well, let me clarify.  For the purpose
3    of ensuring the level of services provided in
4    the channel by whatever engineering measure
5    that is required, or that we could employ to
6    achieve that federal standard, least costly,
7    environmentally acceptable measure.
8        Q.  Sure.  Well, that has to do with
9    navigation, not with preventing bank erosion,
10   right?
11       A.  That's right.
12       Q.  It's got nothing to do with bank
13   erosion.
14       A.  That's right.  But we are trying to
15   determine the least or -- again, it doesn't
16   matter -- I don't care, really, um -- so much,
17   you know, the causes of where the sediment is
18   coming from when we're operating a navigation
19   project, but our main thing is to do some
20   comparison of the measures so that, um --
21   whether it's preventing material from going in
22   or, um -- repetitive, you know, cyclic dredging
23   to remove that material, that's our main
24   interest right there.
25       Q.  All right, I'm with you.  But that

Page 103

1    wasn't the question.  The question was, you
2    have a landowner who's complaining to you about
3    the fact that his land is being eroded along
4    the channel bank.  And I asked you to tell me
5    what would you tell him?
6            And you told me that you would
7    evaluate the dredging.
8        A.  No.  No.  That's not what I said.
9        Q.  And so I asked the question, well,
10   does that mean the dredging has something to do
11   bank erosion?  You said no.
12           Tell me what you would tell the
13   landowner.  You wouldn't talk about dredging
14   because that has nothing to do with bank
15   erosion.  So let's take that off the table.
16           What would you tell the landowner?
17       A.  If our determine -- our determination
18   was, um -- that we could more viably maintain
19   those levels of service by providing bank
20   protection as a alternative to dredging, we
21   would tell them that we would like to pursue
22   that -- that option and, um -- if they -- you
23   know, if we go through all the steps, um -- we
24   would request permission to, um -- to place
25   protection along that area, and if they agreed,

Page 104

1    you know, we would do that.
2        Q.  All right.  Well, are you saying to me
3    that bank erosion causes additional dredging
4    requirements?
5        A.  Um -- it is a contributor to, um --
6    shoaling in the channel.
7        Q.  Okay.  So the extent to which you take
8    steps to prevent bank erosion is a step which
9    will reduce your cost of dredging.  Is that
10   what you're saying?
11       A.  Um -- it would be a step to reduce the
12   life cycle operations and maintenance costs of
13   the MRGO as a system.
14       Q.  Okay.  That's fine.  But your job is
15   to reduce the cost to the government, to the
16   extent that you can --
17       A.  Right.
18       Q.  -- with regard to the operation and
19   maintenance of MRGO.  Right?
20       A.  Right.
21       Q.  You said that before.
22       A.  Right.
23       Q.  Everybody has said that to me.
24           So that if bank erosion is a potential
25   cause of additional dredging, then you have to,

Page 105

1    as the manager of operations for the MRGO,
2    evaluate whether or not the costs of bank
3    protection may be justifiable from the
4    perspective of reduced dredging costs by
5    themselves, right?
6        A.  Yeah, we compare those.  We compare
7    the alternative of periodic dredging to the
8    alternative of putting that structure in there.
9        Q.  But I've still got my landowner who's
10   losing his land, and you've done your analysis
11   and you've decided that, well, you know what?
12   It's still cheaper to dredge.  He's still
13   complaining to you about the loss of his land.
14           What do you tell him now?
15       A.  Well, many times we, um -- try
16   to connect them with, um -- managers of
17   agencies and other programs like CWPPRA and so
18   forth where they may be able to, um -- identify
19   a project that could get through the system and
20   affect that.
21       Q.  All right.  So do I gather from your
22   testimony that it's your opinion that you have
23   no role in preventing bank erosion along the
24   MRGO?
25       A.  Um -- I would kind of flip it upside

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                          May 21, 2008

(Pages 110 to 113)

Page 110

1    to be made aware.
2         In fact, there was a study done in
3    1988. A reconnaissance study. Are you aware
4    of that? (Tendering.)
5         Are you familiar with either of these
6    two reconnaissance studies?
7    A.   Yeah.  I'm familiar.
8    Q.   All right.  Now, before I get into
9    reconnaissance -- again, you're not the first
10   person we have deposed -- we were advised that
11   in the normal course of doing a project there's
12   something called a feasibility study first.
13   A.   Uh-huh.
14   Q.   And a reconnaissance study second.
15   A.   Unh-unh.  No.
16   Q.   Authorization third.
17   A.   That's wrong.  It's reconnaissance,
18   feasibility and authorization.
19   Q.   Okay.  Now, how does a reconnaissance
20   study get started?
21   A.   Um -- I think the guidance has
22   probably evolved over the years, but the best I
23   can recall, um -- I believe the non-federal --
24   potential non-federal sponsor may request an
25   initial appraisal report.  I'm pretty sure

Page 111

1    that's the protocol.
2    Q.   The non-federal sponsor.
3    A.   I think.
4    Q.   Before we get heavy into this, let me
5    finish up a few thoughts with regard to your
6    limitations.
7         Would you agree that the limitations
8    that are put upon you as the operations manager
9    of the MRGO are engineering and technical
10   standards, that you don't really have any
11   discretion other than the discretion that's
12   allowed by appropriate technical and
13   engineering standards?
14        MR. WOODCOCK:
15             Objection.  Vague.
16   A.   No.  Not at all.  You have to
17   understand, there's a tremendous amount of
18   uncertainty in management and technical
19   decisions.
20   EXAMINATION BY MR. BRUNO:
21   Q.   Right.
22   A.   And there's undefined bounds of
23   discretion because of uncertainty.
24   Q.   All right.  Well, we can conclude
25   this, can we not:  That the United States Army

Page 112

1    Corps of Engineers did not exercise its
2    discretion to fail to take the necessary steps
3    to protect the wetlands that were being damaged
4    by the MRGO?  Isn't that correct?
5    A.   I wouldn't say that.
6    Q.   Well, I thought you just told me that
7    you didn't have the discretion to protect the
8    wetlands.  You told me, in your prior
9    testimony, that we're required to make certain
10   that the channel was good for navigation.
11   Right?
12   A.   Correct.
13   Q.   Okay.
14   A.   Yeah.
15   Q.   You didn't have any discretion to go
16   protects the wetlands.  Right?
17   A.   Not under this authority.
18   Q.   I understand.  Under this authority --
19   what I'm trying to say to you is, doesn't it
20   logically follow, then, that the Corps was not
21   sitting at a table deciding to itself, we're
22   not going to protect the wetlands because we
23   have the discretion not to protect the
24   wetlands; on the contrary, the Corps takes the
25   position we did not have the discretion to

Page 113

1    protect the wet lands?
2         Isn't that what you're saying?
3         MR. WOODCOCK:
4             Objection.  Vague.
5    A.   Absolutely not.
6    EXAMINATION BY MR. BRUNO:
7    Q.   Well, then, I'm totally confused.  You
8    said to me, we could not install bank
9    protection if it was to preserve the bank.  You
10   said, the only way that we could install bank
11   protection is if it had a navigation purpose.
12        Did I --
13   A.   That's right.
14   Q.   -- get that wrong?
15   A.   You got it right.
16   Q.   Okay.  So that means, then, you did
17   not have the discretion to do bank protecting.
18   A.   Under that project.
19   Q.   Exactly.  So my point is, and I'm
20   asking you if you will confirm based upon what
21   you've told me today, the Corps was never in a
22   position, within the confines of the
23   authorization to build the MRGO, to decide to
24   or decide not to protect the banks from erosion
25   for any other purpose other than navigation?

78145971-3aae-4e24-8465-33ccad14221d

(Pages 114 to 117)

Page 114

1      MR. WOODCOCK:
2          Objection. Speculation.
3  A.  Um -- say it again.
4      MR. BRUNO:
5          Can you read that back, Joe?
6      (Whereupon the previous question was
7  read back.)
8  A.  If I understand the question, for the
9  purpose of navigation, um -- our only
10 discretion was to limit the rate of
11 sedimentation into the channel.
12 EXAMINATION BY MR. BRUNO:
13 Q.  Which means you did not have the
14 discretion, nor did you ever exercise any
15 discretion, not to protect those banks or to
16 save the wetlands or to prevent marsh erosion
17 and the like.
18 A.  Under that authority.
19 Q.  Exactly. Okay. That's all I'm
20 saying.
21      There are those who would say, well,
22 you know, the Corps had the authority to
23 protect and save those wetlands and it chose
24 not to.
25      That didn't happen, did it?

Page 115

1  A.  What authority was that?
2  Q.  Under the MRGO.
3  A.  I don't see where.
4  Q.  Okay. So the answer is no, they
5  didn't exercise any discretion in that regard
6  pursuant to the authorization outlined by the
7  MRGO. Isn't that true?
8  A.  To that authority, yes.
9  Q.  Okay. All right. Now, I want to
10 understand this reconnaissance report business.
11 We talked about the fact that the Corps knew
12 that the banks of the MRGO were eroding because
13 of the vessel traffic. Right?
14 A.  That was one contributor.
15 Q.  Fine. Well, the Corps recognized this
16 was a bad thing. Right?
17     MR. WOODCOCK:
18         If I could just interject, I want
19     to make sure that he's not speaking
20     for the Corps. It's just him.
21     MR. BRUNO:
22         No. This is -- he's not a
23     30(b)(6) witness, this is not a
24     30(b)(6) deposition, so the answer is
25     obviously he's not.

Page 116

1      MR. WOODCOCK:
2          Got you.
3      (Whereupon the previous question was
4  read back.)
5  EXAMINATION BY MR. BRUNO:
6  Q.  But you, as the manager of operations
7  for the MRGO, you recognized it was a bad
8  thing.
9  A.  Sure.
10 Q.  In fact, if I understand what you
11 wrote in your paper, you felt like it
12 undermined the cost-benefit analysis of the
13 MRGO itself.
14 A.  I don't recall that in particular.
15 Q.  Well, when you say it wasn't
16 sustainable for economic and environmental
17 reasons, what were you saying?
18 A.  Um -- the thirteen million dollars a
19 year just wasn't enough to, um -- perform the
20 bare minimum necessary, um -- to provide those
21 levels of service required.
22 Q.  All right. And I just want to make
23 sure that you and I are on the same page,
24 because I'm reading a sentence that says the
25 existing conditions of the MRGO bank lines are

Page 117

1  unsustainable.
2      What did you mean by unsustainable?
3  A.  That they're not stable, they are,
4  um -- eroding.
5  Q.  Okay.
6  A.  So that's by definition not
7  sustainable.
8  Q.  Well, but you said unsustainable from
9  economic -- how does economics play into the
10 stability of the banks?
11 A.  If you don't have enough money to
12 perform the bare minimum required, your
13 economics are impacted.
14 Q.  Yeah. But you told me you weren't
15 doing anything to the banks anyway. So I don't
16 get it. You told us before that the Corps
17 wasn't doing anything to those banks, they were
18 just there, the only thing that the Corps was
19 doing was dredging.
20     So how then can you say in this paper
21 that there's some economic component that
22 relates to the banks when you weren't doing
23 anything to the banks? I'm a little confused.
24 A.  Because it's more economical to, in
25 some cases, prevent the flow of material into

(Pages 118 to 121)

Page 118

1  the channel than to repetitively dredge the
2  channel in the same reach.  Is just more --
3  again, going back to federal standard, if you
4  read the language of that it says the Corps is
5  supposed to pick the most economical
6  alternative that's environmentally acceptable.
7  I'm just following the regulation.
8      Q.  Mr. Russo, if that's true then you
9  should have put bank erosion and stopped
10 dredging.  Why didn't you do that?
11     A.  We looked at that in different reaches
12 so we could find out where that would be a
13 better choice.
14     Q.  This is '03.  This is after you --
15 this is while you were in the middle of your
16 service.  So I'm very confused, because you're
17 saying it's economic to do bank protection and,
18 in fact, you didn't do bank protection, and
19 then you reach the conclusion here that it's
20 unsustainable.  Now, you've told us you've got
21 the discretion to put bank protection if you
22 want to or dredge if you want to.  You chose
23 the dredge, you didn't choose to put the banks
24 protection along the entire Reach 2, and yet --
25 and then you conclude that it's unsustainable.

Page 119

1  So I'm very confused as to how you could say
2  three years into your service, after you,
3  yourself, had the authority, the discretion to
4  put bank protection in if you have could say it
5  was for navigation purposes, and you didn't,
6  and then conclude in '03 that they're
7  unsustainable.  I'm very confused.
8      A.  Because of the budget limitations on
9  an annual basis, thirteen million dollars a
10 year is just not enough money to do everything
11 you recognize is needed to maintain that level
12 of service --
13     Q.  All right.  So you didn't have enough
14 money --
15     A.  -- in the most economically way
16 possible.
17     Q.  Even though the Corps recognized that
18 bank protection was cheaper than dredging, the
19 Corps did not have enough money to do the bank
20 protection.  Right?  And so it did what little
21 dredging it could do.  Is that what you're
22 saying to us?
23     A.  Um -- on a reach-by-reach basis, on an
24 annual basis, we tried to use our discretion
25 the best we could to, um -- do one or both of

Page 120

1  those to the limits that we had -- had that
2  short money available.  So it could have
3  taken -- I mean, you can just do the math.  The
4  limited amount of money that you had on an
5  annual basis, the escalating cost of dredging,
6  um --
7      Q.  All right.
8      A.  -- the escalating cost to buy rock,
9  you can do less and less on an annual basis
10 with a flat budget.  That's just a fact.
11     Q.  Did you ask for more money?
12     A.  Sure.
13     Q.  And you did that through those --
14     A.  Through the budget EC process.
15     Q.  All right.  Now you also say that the
16 bank lines are unsustainable from a social
17 perspective.  What did you mean by that?
18     A.  Well, just as you brought up before,
19 when, um -- when stakeholders would call, they
20 weren't happy about it, so that's an obvious
21 connection.
22     Q.  And you also say it wasn't sustainable
23 from an environmental perspective.  What did
24 you mean by that?
25     A.  Well, there's erosion to the wetlands,

Page 121

1  which clearly everyone recognizes, you know.
2  Um -- and the right authorities, you know,
3  could and should be addressed.  So.
4      Q.  All right.  So the Corps recognized
5  that the MRGO was causing damage to the
6  environment -- right?
7      A.  Sure.
8      Q.  Causing --
9      A.  Contributor.
10     Q.  Contributing to the damage to the
11 environment.  It was contributing to social
12 discord, people thought that that was a
13 problem, right?
14     A.  Sure.
15     Q.  And it was frankly just really
16 expensive to maintain.  Right?
17     A.  Sure.
18     Q.  All right.  But your testimony is, we
19 had no authority, within the MRGO
20 authorization, to fix the environmental problem
21 and we had no authority to fix the social
22 problem, only thing we could do was fix the
23 navigation problem, right?
24     A.  That's right.
25     Q.  Okay.  Now, so what is the -- is there

78145971-3aae-4e24-8465-33ccad14221d

(Pages 122 to 125)

Page 122

1    a process by which the Corps can initiate
2    something to address the social and
3    environmental problems?
4        A.   Yes.
5        Q.   What is that?
6        A.   Um -- there's various study, um --
7    provisions in the planning phase that can be,
8    um -- used.
9        Q.   All right.  So the Corps can initiate
10   a study or an evaluation of the problem and say
11   to Congress, look, this merits your attention,
12   right?
13       A.   Right.
14       Q.   Okay.  And who has the authority to
15   get that going?
16       A.   Um -- the re evaluation study that was
17   ongoing when I got in I think started in the
18   nineties.  Um -- and I'm not 100 percent sure
19   how that actually got started.  I wasn't paying
20   close enough attention before I got in the job.
21       Q.   I understand.  Did you liaison, or did
22   you liaise with any of the congressmen or
23   senators in Louisiana?
24       A.   Not directly --
25       Q.   Anybody --

Page 123

1        A.   -- that I recall.
2        Q.   Anybody in the district office?
3        A.   Um -- maybe some high level people.
4        Q.   Sure.  Okay.  And certainly they would
5    have the opportunity to say to a congressman or
6    a senator, you know, we've got a problem here,
7    we ought to address it.  Right?  Nothing
8    prohibits that.
9        A.   Right.
10       Q.   Okay.  Well, here we have the 1988
11   reconnaissance study.  And at Page 2, it says
12   the study was authorized by a resolution
13   adopted 23 September 1982 by the Committee on
14   Public Works and Transportation of the United
15   States House of Representatives at the request
16   of Representative Robert L. Livingston, the
17   resolution is as follows:  Resolved by the
18   Committee on Public Works and Transportation of
19   the House of Representatives that the Board of
20   Engineers for Rivers and Harbors is hereby
21   requested to review the report of the Chief of
22   Engineers on the Mississippi River Gulf Outlet
23   published as House Document 245, 82nd Congress,
24   First Session, and other pertinent reports,
25   with a view for determining whether in light of

Page 124

1    extensive erosion which has been occurring in
2    St. Bernard Parish along the unleveed banks of
3    the gulf outlet channel, any modifications to
4    the recommendations contained therein are
5    advisable at this time with reference to the
6    feasibility of bank protection measures.  Okay?
7        Now, first thing is, I note this is
8    not a Congressional request it's a house
9    committee.
10       So obviously the house Committee can
11   authorize that?
12       A.   Um -- well, and I'm not the expert in
13   that area, they're not authorizing anything,
14   per se, because the project is an existing
15   authority, and a parish official can send that
16   same wording in and request the same thing.  So
17   they're not really telling the Corps to do
18   anything beyond the confines of existing
19   authority --
20       Q.   All right.  So that --
21       A.   -- if I understand correctly.
22       Q.   Well, the Corps doesn't need this
23   resolution in order to start a reconnaissance
24   study is what you're saying to me.
25       A.   If it falls -- I think, and I'm not

Page 125

1    the expert in that area, um -- I think that a
2    re evaluation can occur under an existing
3    authority without anything to that magnitude.
4        Q.   All right.
5        A.   But I think you need go back and look
6    at the regulations.  It's pretty clear.
7        Q.   Well, we have what we have.  We've got
8    this piece of paper, it's a document, it
9    authorizes a study, we know a study occurred.
10   Right?
11       A.   Yeah.
12       Q.   And it says, this report contains the
13   results of reconnaissance phase studies, the
14   purpose of the reconnaissance study is to
15   accomplish the following objective.  It's here
16   in black and white, and the thing is signed off
17   by Lloyd K. Brown.  It say, I recommend that
18   this reconnaissance study report on Mississippi
19   River Gulf Outlet bank erosion be approved.
20   The report should be used as a basis to proceed
21   with more detailed studies.  Okay?
22       A.   Uh-huh.
23       Q.   So what happens next?  Or what is
24   supposed to happen next?
25       A.   Um -- that report probably had a cover

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                                    May 21, 2008

(Pages 126 to 129)

Page 126

1    letter memo to it -- again that's before my
2    time, but it probably, under memo, was
3    submitted the higher authority.
4        Q.  Okay.
5        A.  Um -- and the next step traditionally
6    is to do a feasibility study.
7        Q.  All right.  Well, to this date, has a
8    feasibility study ever been undertaken that you
9    know of?
10       A.  Um -- I don't think so.  I think that
11   just based on that alone, in the early
12   nineties, um -- they started -- they went ahead
13   and started doing -- as I mentioned, looking at
14   what under the federal standard can we -- and
15   we don't even need an additional study to do --
16   to begin placing, um -- foreshore protection
17   where it's more economically viable and
18   environmentally acceptable to prevent the flow
19   of the sediment into the channel.  So through
20   the nineties, I believe to the extent the
21   meager budget would allow and those criteria
22   were met, bank protection was put down.
23   There's a record of that.
24       Q.  Of bank protection that was done
25   within the limits of the, um --

Page 127

1        A.  (Nods affirmatively.)
2        Q.  It says here, the findings of this
3    study indicate that severe erosion is occurring
4    along the banks of the MRGO.
5            Nothing new there, right?  You've been
6    knowing that for a long time.
7            Is that something that's been known
8    for a long time?
9        A.  Yeah.
10       Q.  All right.  The current bank erosion
11   problem will become a major channel maintenance
12   problem in the future.  Right?
13           Now, this is 1988.  So the only thing
14   that the Corps did from 1988 until the time
15   that you have any knowledge of it is that the
16   Corps, to the extent that there was money
17   available, did some foreshore protection in
18   some locations.
19       A.  Uh-huh.
20       Q.  Right?  But the large majority of the
21   banks of the MRGO, even today -- no, I'm sorry,
22   pre-Katrina, have no foreshore protection.  Had
23   no foreshore protection.
24       A.  Right.
25       Q.  An estimated sixfold increase in

Page 128

1    required annual average maintenance dredging in
2    the MRGO could be realized by the year 2002.
3    So that means if you were spending ten million
4    in '88, you'd end up spending 60 million in
5    2002, right?
6        A.  And that exhibits the great
7    uncertainty in engineering.
8        Q.  Well, I don't know.  How much did you
9    spend in '88?
10       A.  Oh, I don't know.  But I'm saying, if
11   there's sixty million, if you're talking about
12   of $60 million, I never had that.  I had
13   thirteen.
14       Q.  You had thirteen.  Okay.
15       A.  So that shows you how off engineering
16   protections can be with great uncertainty.
17       Q.  It says, saltwater intrusion into
18   marsh that remains has significantly modified
19   the former fresh intermediate marsh character
20   of much of the study area.  Recreational
21   hunting and finishing resources have been
22   diminished and culture resources are threatened
23   by the currently unabated bank erosion.  It's
24   all what you've already told me.
25       A.  Uh-huh.

Page 129

1        Q.  So this is known in 1988.
2        A.  Uh-huh.
3        Q.  Okay.  Now, in '94 they do it again,
4    another reconnaissance study under the same
5    authorization.
6        A.  Uh-huh.
7        Q.  Do you know why that occurred?
8        A.  I don't know exactly.
9        Q.  Well, we have an approval by Michael
10   Diffly, Colonel, U.S. Engineers, District
11   Engineer.  He says, I recommend this
12   reconnaissance report be approved, and that the
13   study of bank protection measures along the
14   Mississippi River Gulf Outlet navigation
15   channel be continued into the feasibility
16   phase.
17           Now, he's saying something a little
18   different than the other guy.  He's saying this
19   needs to go into feasibility.
20           Now, did it ever go into feasibility?
21       A.  I don't know.
22       Q.  Do you know why not?
23       A.  Unh-unh.
24       Q.  All right.  Well, you get there in
25   2000.  So what is the status of this

78145971-3aae-4e24-8465-33ccad14221d

(Pages 130 to 133)

Page 130

1  reconnaissance, feasibility, when you arrive on
2  the scene?
3      A.  Well, first thing I did was read the
4  authority, um -- in the project map book that
5  described what our duties were and tried to
6  apply my discretion on what we ought to be
7  doing there.  Um -- because the environment out
8  there is so dynamic, it changes so much,
9  there's so much uncertainty involved, that
10  report was already stale.  It was already too
11  old to do anything off of.
12      Q.  Right.
13      A.  So the, um -- the thing which I wanted
14  to do was ensure the navigation level of
15  service required by employing these different
16  engineering measures and abiding by the federal
17  standards.  That's all you need to know.
18      Q.  Well, I appreciate that, but the
19  problem I've got here is I've got these two
20  reports both of which recognize a severe
21  problem, one of which says let's move into
22  feasibility, and no one seems to know what
23  happened or why it didn't go into feasibility.
24      A.  I don't know.
25      Q.  Who should I ask?

Page 131

1      A.  Whew.  Um -- maybe somebody who's
2  retired.  Um --
3      Q.  Well, when you took the -- let me ask
4  you this:  What role, if any, does the MRGO have in the
5  operations manager of the MRGO have in the
6  context of a reconnaissance report or a
7  feasibility study?
8      A.  Um -- those are typically done in the
9  planning arena, um -- just like they are for
10  many different other studies.
11      Q.  Uh-huh.
12      A.  So the operations manager provides
13  input or data or whatever they ask for to do
14  whatever studies they're going to be doing.
15      Q.  Right.
16      A.  Um -- so, you know, our job is to
17  provide information as they request it.
18      Q.  Well, you don't get upset, you don't
19  get up and make a little noise?  I mean, you
20  know, you're living with it, you're dealing
21  with it on a daily basis, you're having to
22  listen to people in St. Bernard bug you and
23  complain to, right?  I'm sure they did.
24      A.  Sure.
25      Q.  So you just turn a deaf ear to it and

Page 132

1  it's somebody else's problem, or do you say,
2  you know, I've had enough, and go complain to
3  the commander or talk to somebody, help me with
4  this problem?
5      A.  Sure, we did that.  We cooperated with
6  lots of other, um -- organizations or
7  authorities that were in the planning arena to
8  try the best we could to, um -- to see where we
9  could match those up, you know, match up
10  relevant authorities to address the issue.
11      Q.  All right.  Well, who did you complain
12  to, if you complained to anybody, about this
13  problem?
14      A.  Um -- I don't really have a good
15  recollection.  I know that we just didn't just
16  sit on our hands.  We, um -- we would go out
17  and survey the conditions quite regularly --
18      Q.  Sure.
19      A.  -- we would try to understand, um --
20  where problems were occurring, especially
21  somebody saying, um -- concern to us, we'd
22  check it out and, um -- to the limits that we
23  had of tools in our toolbox we tried to do
24  everything we could --
25      Q.  Well, one of the things you could have

Page 133

1  done is you could have walked over to the
2  Commander's office, asked to visit with him,
3  sit down with him, have a cup of coffee and
4  say, Commander, I've got problem.
5          You could have done that, right?
6      A.  Um -- sure, you could.
7      Q.  Did you do it?
8      A.  Um -- you know, being so long ago, I'm
9  trying to remember.  I mean, I've given lots of
10  presentations to higher level people on these
11  particular problems on numerous occasions, I
12  know that.
13      Q.  Like who?
14      A.  Um -- I'm trying to think now.  Most
15  likely to division and headquarters people.
16  I'm quite sure I can't remember all the names,
17  and it's kind of fuzzy in my mind, but we
18  pretty regularly tried to re-quantify, but you
19  know, what the nature of the problems were and
20  telegraph those in many different ways of
21  communication.
22      Q.  All right.
23      A.  And I don't remember them all.
24      Q.  I understand that.  So it's clear to
25  me, though, that from what you're saying to us

EDMOND JOSEPH RUSSO                                                May 21, 2008

(Pages 134 to 137)

Page 134

1  now, under oath, that it wasn't the district
2  that you were having your issues with, it was
3  higher up, it was the division.
4      A.  Well, I mean, it's such an intricate
5  governmental network that goes up many, you
6  know, avenues that require coordination, so,
7  you know, they -- the higher authority folks
8  would, um -- listen to those concerns, they'd
9  listen to the concerns about similar problems
10 on every other waterway --
11     Q.  Sure.
12     A.  -- and try to balance out what the
13 best course forward would be.
14     Q.  Help me understand.  Just give me one
15 example of a situation where you would have an
16 opportunity to make a presentation about the
17 MRGO and its bank erosion issues and how they
18 affected the social, environmental and economic
19 aspects of the folks in that area.
20         What would it be, would it be a
21 seminar, would it be a workshop, would it be a
22 meeting?  What -- what --
23     A.  Well, I was probably the first manager
24 to arrange an interactive tour in cooperative
25 partnership between the Corps, the Port of New

Page 135

1  Orleans and St. Bernard Parish, the levee
2  districts, to tour the waterway on a boat
3  altogether to show the problems and, um -- to
4  explain potential measures that we could
5  exercise under our limited -- you know,
6  limitations and various policies.
7      Q.  Right.  When was that?
8      A.  Probably the summer of, maybe the
9  summer -- one or --
10     Q.  Summer of '05.
11     A.  Yeah.  Probably the summer of '05.
12     Q.  All right.  Now, I appreciate that.
13 And that regards interaction with the local
14 interests.  But my question to you wasn't about
15 the local interests.  My question was about
16 your interaction with the folks above you.
17     A.  I had people from headquarters on that
18 tour.
19     Q.  Well, I'm sure that's not the first
20 time you spoke to headquarters.  What I want to
21 know is I want to know about opportunities
22 where you had a chance to give a presentation
23 to your superiors, that is, within the confines
24 of the United States Army Corps of Engineers,
25 with nobody else out there.

Page 136

1      A.  Uh-huh.
2      Q.  No St. Bernard, no nobody, just you
3  talking to your boss.
4      A.  I actually even Office of Management
5  and Budget representatives out on the waterway
6  to show them the problems and explain the story
7  and tell how if extra money were put in the
8  budget what we could do to, um -- increase our
9  ability to maintain the channel, but chip away
10 at the long laundry list of maintenance items
11 that we had.  And we knew, you know, from
12 estimates which reaches, if we could do
13 maintenance, would lean towards being a
14 foreshore protection or which one would lend
15 itself more to --
16     Q.  Right.
17     A.  -- dredging.
18     Q.  But we're still talking about that
19 June trip.  On that June trip was the
20 interaction trip.
21     A.  Uh-huh.
22     Q.  I thought you told me that you had had
23 opportunities o make presentations to your
24 superiors.  I'm think about a room like this.
25 I'm think about you standing in front of this

Page 137

1  group at the end of that table and you telling
2  these folks about the problems that you're
3  dealing with as the op manager of, MRGO, about
4  the phone calls you get, about the irate
5  St. Bernard folks, about Junior Rodriguez
6  calling you on the phone and yelling at you.
7  And they're screaming about hurricane
8  protection, among other things.
9          And that all happened, didn't it?
10     A.  What all happened?
11     Q.  People calling you on the phone,
12 saying, you know, you got to do something about
13 this MRGO, they're worried about hurricane
14 protection.  They told you specifically all of
15 these things, didn't they?
16     A.  Um -- they normally would call me
17 about the channel because they knew that was
18 all I dealt with.  The other stuff -- anything
19 else they knew to call other folks.
20     Q.  And they indicated to you that they
21 were concerned about the channel for many
22 reasons including hurricanes.
23     A.  Um -- yeah.  I mean, they would bring
24 it up, but they knew I couldn't do anything
25 about that.

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                                                May 21, 2008

(Pages 138 to 141)

Page 138

1    Q.  I understand that.  All I'm saying is
2    that they spoke to you.  All I'm trying to
3    understand is, we now know that these people
4    are calling you, they're making your life
5    difficult if not miserable -- right?
6        A.  No more different than any other day
7    of the week.
8        Q.  And --
9        A.  Find a pleasant job at the Corps, you
10   know.
11       Q.  But you did in fact talk to your
12   superiors about this problem on more than one
13   occasion, did you not?
14       A.  Sure.  We gave -- I can't remember all
15   of the presentations, but I've given them, yes.
16       Q.  I know.  And I'm just tying to get you
17   to give me the context of just one.  You gave a
18   presentation -- what was it, was it here in
19   Vicksburg?
20       A.  No.
21       Q.  Was it in Washington?  Was it in New
22   Orleans?
23       A.  Mostly in New Orleans.
24       Q.  All right.  And who might -- would
25   there have been some folks from Vicksburg in

Page 139

1    attendance?
2        A.  I'm pretty sure I've given a
3    presentation more than one time on the
4    conditions of the channel, the associated
5    issues and how we're approaching it, how we
6    visualized doing --
7        Q.  Right.
8        A.  -- um -- doing more if the budget
9    would allow, and here's the various plans that
10   we could enact.  That's just kind of sitting
11   there, you know.
12       Q.  Uh-huh.
13       A.  I'm pretty sure I've given more than
14   one presentation like that.
15       Q.  Right.  And I'm just trying to
16   understand the context.  Is this something that
17   you would have asked to do, or was there an
18   opportunity where you could put yourself on an
19   agenda and speak?
20       A.  It was opportunistic a lot of times.
21       Q.  Opportunistic.  Okay.  So maybe there
22   was a meeting where they said, okay, folks,
23   who's got problems?  And you sign up and say
24   let me talk.  That kind of thing?
25       A.  Um -- kind of like that, yeah.

Page 140

1        Q.  All right.  Now, you were aware of the
2    problem, you were aware -- you wrote a paper on
3    it.  You had to have had some curiosity as to
4    what happened after the reconnaissance report
5    and why it didn't turn into feasibility.  Isn't
6    that true?
7        A.  No, because, I mean, those documents
8    were so old they were stale, in my mind, and,
9    um -- you really -- I mean, if you're in the
10   operations and maintenance position,
11   particularly in a dynamic environment, it's
12   no use working with stale information.  It was
13   just better to go out and just resurvey
14   yourself and, um -- just start over.
15       Q.  Well, if anything, nothing in these
16   two reports has gotten better.  Everything in
17   those reports --
18       A.  That's right.
19       Q.  -- got worse.
20       A.  Sure.
21       Q.  So to the extent that these reports
22   say anything they provide the basis, and to the
23   extent that they suggested the need for
24   additional study and the need for additional
25   evaluation they weren't stale.

Page 141

1        A.  Right.  I didn't need more
2    information, as you said.  Why would I?  I
3    didn't need to study the problem anymore.
4        Q.  We knew there was a problem, we needed
5    action.
6        A.  Sure.
7        Q.  All right.  So what I'm trying to
8    figure out is how in the heck does a guy like
9    you get some action out of the Corps?  Can you
10   do it?
11       A.  You look for multiple opportunities.
12   You -- we would first logically apply the
13   federal standard, and we would look at the
14   different alternatives reach by reach and
15   ensure that we're using current information, we
16   would build engineeringly supported
17   construction cost estimates, we would
18   prioritize those to ensure our level of
19   services required, we would submit those on in
20   annual basis, and they would get blended with
21   the thousands of other budget requests, um --
22   integrated, forwarded up the line, and higher
23   authority would review the thousands of line
24   items and work with the elected officials to
25   decide what gets done.

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                                     May 21, 2008

(Pages 142 to 145)

Page 142

1    Q.  All right.  Well, I'm a little
2 confused because I thought I asked you this
3 morning whether or not you had included in any
4 of your budget ECs requests for money that went
5 beyond your authorization.  You told me no
6 because you couldn't do it.  So --
7    A.  Right.
8    Q.  Right?  I mean, you can't put in your
9 budget EC a request for money that exceeds your
10 authorization, right?
11    A.  Absolutely.
12    Q.  Okay.  So what is the process by which
13 you as op manager request more money to do
14 something that's not authorized?
15    A.  We can't.  You can't do that.
16    Q.  Okay.  You can't do that.  All right.
17 So if you can't ask for more money, the only
18 thing that you can do is say we have a problem,
19 and you can ask someone in the Corps to
20 communicate that problem to the Congress.
21 Right?
22    A.  Sure.
23    Q.  That's the only thing you can do.
24    A.  Sure.
25    Q.  Okay.  Do you know whether or not the

Page 143

1 United States Army Corps of Engineers ever
2 communicated your thinking as reflected in your
3 study that you did, the paper that you did, to
4 the Congress?
5    A.  Um -- most likely in that ongoing
6 re-evaluation study that information was
7 considered.  I can't be sure because I wasn't
8 managing that study, but as we had new
9 information they were surely interested to have
10 and use that.  As I said before, anytime
11 planning studies were done we would provide
12 them any information that we had that they
13 could use.
14    Q.  Well, you're listed as the contact
15 person for the '94 study, right?
16    A.  The '94 study?
17    Q.  Yeah.  Or was it the '88?  Let me see.
18    A.  Yeah.  But I was not in the position
19 at those times, so.
20    Q.  Let me show you that reference so I'll
21 know.  In this newspaper article that talks
22 about your trip in the summer of '05, they
23 quote you as saying the Corps spent 9.3 million
24 in fiscal year 2004 to create 543 acres of
25 wetland and to bolster another 846 acres said

Page 144

1 Edmond Russo, the Corps' operations manager for
2 the Gulf Outlet.  This comes from
3 Times-Picayune dated January 15, 2005, Metro
4 section.
5    A.  Uh-huh.
6    Q.  Is it an accurate quote?
7    A.  Um -- probably, yeah.
8    Q.  All right.  What does that 9.3 million
9 refer to?
10    A.  Um -- the best I can recall, during
11 that time period of the 13 million we had,
12 let's say, that we identified, um -- under the
13 federal standard, um -- an alternative to place
14 the dredge materials for beneficial use such as
15 that wetland creation --
16    Q.  Okay.
17    A.  -- as opposed to disposing in the
18 upper disposal areas.  So of that -- while
19 dredging the channel, we were simultaneously
20 rebuilding wetlands, um -- within the federal
21 standard.
22    MR. WOODCOCK:
23        Hugh, can you put a sticker on
24        that?  6.
25    (Exhibit 6 was marked for

Page 145

1 identification and is attached hereto.)
2 EXAMINATION BY MR. BRUNO:
3    Q.  Are you aware of the fact that the
4 project was modified -- the MRGO project was
5 modified pursuant to what was perceived to be
6 the discretionary authority of the Chief to
7 install foreshore protection in 1968 along the
8 MRGO reach to protect the hurricane protection
9 levees that were being constructed there?
10    A.  Um -- I can't explicitly say.  That's
11 a long time ago.
12    Q.  Well, I know.  I'm asking if you were
13 aware of that, not whether or not you were
14 there.
15    A.  Um -- yeah.  On the side of the MRGO
16 where there's protection, I was I guess
17 generally aware through word of mouth that the
18 protection feature along that reach was done in
19 association with the levee work.
20    Q.  Well, in fact, it wasn't paid for by
21 the hurricane protection project, it was paid
22 for by the MRGO.
23    A.  Um -- well --
24    Q.  Are you aware of a debate that
25 occurred back in that time frame about --

JOHNS PENDLETON COURT REPORTERS                              800  562-1285

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                          May 21, 2008

(Pages 146 to 149)

Page 146

1       A.   No, it wouldn't have mattered to me.
2       Q.   Okay.  You knew it was there, though,
3    when you got there.
4       A.   Yeah.
5       Q.   So the fact that it was there, did
6    that then mean that that was part of your
7    operation and maintenance obligation?
8       A.   No.  We, um -- in fact, um -- were
9    having an understanding that the folks dealing
10   with the levees in the Corps were actively
11   maintaining that.  So we didn't, um -- we
12   didn't have to deal with that.
13      Q.   You did not, as operations manager,
14   maintain the foreshore protection on the south
15   shore of the MRGO along Reach 2 that was near
16   to the MRGO levees?
17      A.   On the levee side?
18      Q.   Yeah.
19      A.   Um -- I never did.  We did put -- we
20   put miles of it on the north bank there on the
21   other side of the channel along that area.
22      Q.   Let's walk through this:  When you got
23   there in 2000, there was foreshore protection
24   on the south bank of what we've referred to as
25   Reach 2 up to where the hurricane protection

Page 147

1    levee makes a sharp right-hand turn toward the
2    Mississippi River, right?
3       A.   Uh-huh.
4       Q.   And your testimony is that you as
5    operations manager did not maintain that
6    foreshore protection, that was done by the
7    hurricane protection project.
8       A.   I was pretty sure.  Um -- I wasn't in
9    a, um -- it wasn't a need for me to maintain it
10   because it -- you know, in reviewing it, you
11   know, on occasion, it was in pretty good
12   condition compared to, um -- a lot of the other
13   pressing needs.  And all things being
14   considered --
15      Q.   Okay.
16      A.   -- we didn't have to -- you know, that
17   was a minor consideration to no consideration
18   because it was in good shape.  We didn't need
19   to --
20      Q.   Okay.  All right.
21      A.   So I didn't --
22      Q.   But you looked at it.
23      A.   Yeah, we --
24      Q.   You inspected it.
25      A.   Sure.

Page 148

1       Q.   All right.
2       A.   We look at it.
3       Q.   And because the rock was there, then
4    you didn't have the problem of the bank erosion
5    increasing the need for dredging at that
6    location.
7       A.   Actually, we did have, um -- dredging
8    needs there, but it was suspected to be mostly
9    sediment coming from the other side, the north
10   bank.  There's a lot of, um -- there was a lot
11   of exposed area on that side, which is why we
12   put a lot of rock along there.
13      Q.   All right.
14      A.   That's where we suspected it came
15   from.
16      Q.   All right.  Now, you put rock on the
17   north bank of the channel in that location --
18      A.   Uh-huh.
19      Q.   -- from about the Intracoastal
20   Waterway to Violet?
21      A.   Um -- yeah.  More or less.
22      Q.   Okay.  Well -- and that's because you
23   did a cost-benefit analysis and you felt like
24   from a navigation perspective the cost was
25   justified there?

Page 149

1       A.   Um -- we didn't really do a
2    cost-benefit analysis.  That's something that's
3    done in the planning group.  We do a comparison
4    of estimated, um -- engineering costs along
5    alternatives to maintain levels of service on
6    the channel.  So.
7       Q.   All right.  Let me just make sure
8    we're talking about the same place, if you
9    don't mind.  We've previously identified Russo
10   2, and I want you to just take a pen -- well,
11   just draw a straight line.  Just draw a
12   straight line where you think you put the
13   foreshore protection.
14      A.   Generally, the general area that we
15   were interested in was -- really, I had them
16   look at, um -- really, from there down to Lake
17   Ignacio which is off the map over here.
18      Q.   Okay.  Just put an arrow that way, so
19   indicating that you're not putting an end
20   point.  So from the intersection of the MRGO
21   and the Intracoastal Waterway all the way down
22   to beyond this map.
23      A.   Right.
24      Q.   And so that there was rock all along
25   this northern bank -- I'm going to call it

78145971-3aae-4e24-8465-33ccad14221d

(Pages 150 to 153)

Page 150

1   north, I guess it's really northeast bank -- of
2   the MRGO.
3       A.  Right.
4       Q.  Okay.  Now, this is dated.  This is
5   dated October, November '05.  And, I mean, I'm
6   not -- I don't have supermagnetic eyes, but
7   that coastline doesn't look very straight to
8   me.
9       Are you sure that was there was rock
10  there?
11      A.  Oh, yeah.  Well, there's a record,
12  um -- of the reaches that we constructed and
13  maintained along here.  So it's documented.
14      Q.  Okay.  All right.  Thank you.
15      What documents would I look for, ask
16  for, that would establish that the rocks were
17  in fact installed?
18      A.  Um -- one that's the easiest is a,
19  um -- project management plan for the project
20  that just kind of documents in a table.  But
21  there's, in the same table there's, um -- I
22  guess just working copy, you know, um -- that
23  we would update.  Every time a maintenance or a
24  new construction event was put in, we just add
25  that line.

Page 151

1       Q.  Is it your testimony then that if we
2   went out there -- if we had gone out there in
3   August, before Katrina, we would have seen rock
4   in the banks of the MRGO from its intersection
5   with the Intracoastal Waterway on the northeast
6   shore all the way down past Violet?
7       A.  Um -- we had miles of rock between
8   those two locations and most likely beyond in
9   some of the reaches that were better, um --
10  maintaining the channel by putting those in
11  place than dredging.  So I don't remember how
12  many miles, but all along there, in different
13  discontinuous reaches, we had rock.
14      Q.  Okay.  Well, I'm sorry, I
15  misunderstood.  I thought you said it was
16  continuous.  So it's not continuous rock.
17      A.  No.  Only, you know, reach by reach
18  where we would do the analysis of where, you
19  know, we could identify limits of where it
20  would be more effective, you know, economically
21  and environmentally acceptable to put that
22  rather than to do cyclic dredging in just
23  different discontinuous locations.
24      Q.  Well, I'm no scientist, nor am I an
25  engineer, but it just doesn't seem like it

Page 152

1   makes a whole lot of sense, given that you have
2   a channel with flowing water that moves, that
3   you could possibly affect the sedimentation
4   rate by installing a rock a couple of hundred
5   yards here and a couple of hundred yards there.
6       I mean, could that possibly have any
7   impact --
8       A.  Sure.
9       Q.  -- on your dredging?
10      A.  Sure.
11      Q.  Did you have anything to do with the
12  lock replacement project?
13      A.  Not really.  I wasn't -- I was sort of
14  on the periphery.  It was handled in planning.
15      Q.  Let me show you a document which is
16  labeled NPM 38-636 in seriatim to 648.
17  (Tendering.)
18      Are you familiar with that document?
19      A.  I probably never really looked into
20  this, because it was being -- this is the study
21  plan for the re-evaluation study to be
22  conducted, so the manager of this study
23  probably put this together and had intended to
24  follow it to conduct their work.  So they
25  normally would send -- they'd normally send a

Page 153

1   memo or an E-mail to the operations folks and
2   say, hey, we need this list of data.
3       Q.  Uh-huh.
4       A.  If you've got it, please send it on
5   over, we want to use it to analyze --
6       Q.  Right.  Well, that does that refresh
7   your recollection as to what was being done in
8   connection with any continued re-evaluation of
9   the MRGO under a reconnaissance or other type
10  evaluation?
11      A.  I know it was going on.
12      Q.  Okay.  What is the difference, if any,
13  between a re-evaluation study and a
14  reconnaissance?
15      A.  Um -- a reconnaissance study is
16  intended to identify whether there's sufficient
17  federal interest to conduct a feasibility
18  study.  So if a reconnaissance study is
19  negative based on the preliminary information,
20  a feasibility study wouldn't go forward;
21  whereas a re-evaluation would be for an
22  existing project that's active where something
23  has changed compared to the, I guess, original
24  authorization, which may be some level between
25  real and perceived, and a re-evaluation is

EDMOND JOSEPH RUSSO                                                    May 21, 2008

(Pages 154 to 157)

Page 154

1    usually done to explore that topic further and
2    get a better understanding.
3        Q.   Okay.  I have to say I didn't really
4    understand what the difference is between --
5    reconnaissance means --
6        A.   Reconnaissance means --
7        Q.   Are you leaving out -- is the
8    distinction between reconnaissance and
9    re-evaluation that reconnaissance does not
10   include the potential for closure or removal of
11   the project, whereas re-evaluation does?
12       A.   Um -- reconnaissance study is normally
13   done on some water resources aspect that is
14   considered a new problem to be looked at,
15   whereas a re evaluation is on an existing
16   project.  That's the general difference.  And
17   the re-evaluation could confirm that the
18   project is still intact, a re-evaluation could
19   actually suggest that a project be, um --
20   enhanced, improved somehow.  Um -- whereas,
21   again, the reconnaissance study is meant to
22   just use existing data and information to
23   establish whether there's sufficient federal
24   interest to warrant advancement of a
25   feasibility study.

Page 155

1        Q.   Okay.
2        A.   Which feasibility study is a lot
3    greater detail than reconnaissance.
4        Q.   Well, do you need Congressional
5    authorization to do a re-evaluation study?
6        A.   Um -- I don't really know the answer
7    to that, because I wasn't doing that study.  So
8    I'm not sure exactly how it got kicked off.
9        Q.   You participated in that study, did
10   you not?
11       A.   Yeah.  To the extent they needed
12   information or whatever, you know, they had a
13   meeting and they said I needed to come to it.
14       Q.   Well, you were a team member.
15       A.   Uh-huh.
16       Q.   Okay.  Well, it's more than just show
17   up if we need you, you were one of the guys
18   that was assigned to be a participant in the
19   study, weren't you?
20       A.   Yeah.  And whatever they needed we
21   would give them.
22       Q.   Well, but not whatever they needed.
23   You had a vote, you had a voice; did you not?
24       A.   No.  No.  That's not how it works.
25       Q.   Well, what -- well, I've got a

Page 156

1    document here which lists a whole bunch of team
2    members.  Is it your testimony that these folks
3    came together and met not to talk to each
4    other?  I mean, they would come in a room and
5    just look at each other?  What would they do?
6    I have, I have to believe that there was some
7    discussion.  It even had an agenda.
8        A.   Well, normally what the project
9    manager would do is ask the team to come in,
10   and there would be a member there from the
11   engineering division, economics, environmental,
12   real estate, contracts and construction,
13   operations, and the project manager would say,
14   hey, I've been given this project or study,
15   and, um -- this is the steps that I need to go
16   through, whatever regulations dictates the
17   study steps.  And the manager will say, hey,
18   um -- operations, if you have data records on
19   your maintenance activities, we'd like to have
20   a copy so we can use that for analysis.  And
21   people in engineering and economics and
22   environmental would use that information to,
23   um -- quantify the performance and costs of
24   different alternatives, to include what's
25   called the no action alternative.  That's the

Page 157

1    do nothing alternative.
2        Q.   Right.  Well, but it sounds like
3    somebody has decided what the alternatives are.
4    Right?
5        A.   Um -- the project manager will
6    normally take whatever information that they
7    have, and they may -- if they have limit
8    budget, they may ask for several different
9    alternatives to be looked at.  It could be --
10   in addition, it could be information from a
11   stakeholder or an agency who said we really
12   would like for you to look at this alternative.
13       Q.   Well, I'm very confused because I
14   thought that you don't have a project manager
15   unless you've got a project.
16       A.   Yeah.  Well, the term is used, um --
17   for people in charge of studies as well as
18   projects.  Projects meaning --
19       Q.   Who was in charge of the MRGO
20   re-evaluation study in November of 2001?
21       A.   It changed hands a lot.  Um -- it
22   could have been one of a number of people.
23   Um -- 2001?  This is a trick question.
24       Q.   Not a trick question.  Because the
25   piece of paper doesn't have a name.  So it is

JOHNS PENDLETON COURT REPORTERS                         800 562-1285

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                          May 21, 2008

(Pages 158 to 161)

Page 158

1  not a trick question.  I'm just trying to
2  figure it out because it doesn't make any sense
3  to me at all.  I don't know who would have
4  initiated the re-evaluation study.  I don't
5  know by what authorization it would have
6  occurred.  I have no idea as to where the money
7  came from.
8        And can you answer any of those
9  questions for me?
10    A.  Um -- I haven't worked in --
11    Q.  Good ahead.
12    A.  I haven't worked in operations -- you
13  know, that was not really my area so -- you
14  know, there was a manager, but I don't know the
15  details of that project.  I had a lot on my
16  plate.
17    Q.  I got you.
18    A.  I mean, I had enough to do to try to
19  do what I had to do, and --
20    Q.  Okay.
21    A.  -- you know, there were several
22  managers I got contacted by, and I know the
23  names of them, but it switched hands several
24  times.
25    Q.  Okay.  Fair enough.

Page 159

1    A.  I don't know who it was at that
2  particular time.
3        MR. BRUNO:
4            So we need to do a 30(b)(6) on
5        this.  This is critical.  Because
6        nobody seems to know any of that
7        stuff.
8  EXAMINATION BY MR. BRUNO:
9    Q.  Anyway, I've got this agenda here, and
10  what's curious, they've got the continue to
11  maintain the existing deep draft channel,
12  that's the no action alternative that you
13  referred to.
14        And then it says, 1B, continue to
15  maintain with coastal restoration.  That's one
16  of the things they're talking about here.
17        Then its says, redesign the channel to
18  be maintained at 125-foot width by 12 deep
19  channel by doing the following:  Allowing the
20  channel to silt in; constructing sills;
21  construct a navigation gated structure and a
22  lock.
23        Then it says, redesign to 160, same
24  thing:  Silt in, construct sills, construct a
25  gate.

Page 160

1        Then it says 200 feet with a 20-foot
2  deep channel:  Silt it in, construct a
3  navigable gated structure.
4        Fifth one says:  Redesign the channel
5  for total closure by allowing the channel to
6  silt in, construct a dam or a dike.  Okay?
7        Then it says, the effect of storm
8  surges should be included in all of the above
9  alternatives.
10        Now, the first thing that jumps off
11  the page for me is that we've established quite
12  clearly that the MRGO is a navigation project.
13  Right?
14    A.  Uh-huh.
15    Q.  That's the authorization, it's purpose
16  is to allow ships to go from the gulf to the
17  river through the back door.  Right?
18    A.  And access the tidewater terminals.
19    Q.  Okay.  Now, so why -- well, let me
20  ask, do you remember going to any of these
21  meetings?
22    A.  Sure.
23    Q.  Okay.  Do you remember why on earth
24  they're talking about constructing a gate -- a
25  navigable gated structure as a component to

Page 161

1  improve navigation?
2    A.  Um -- it's been a while, so I don't
3  remember exactly.  It could be also -- and I
4  was not involved with the ongoing hurricane
5  protection projects, but it could be that some
6  of that was being done in conjunction with the
7  hurricane protection project, um -- and I'm not
8  sure about what --
9    Q.  Fair enough?
10    A.  -- combinations were being looked at.
11    Q.  So what on earth did the MRGO have to
12  do with hurricane protection?
13    A.  They were not, um -- there was no
14  authority between the two.
15    Q.  Well, but I mean why would you think
16  about putting a gate in the MRGO?  If your
17  purpose is navigation, that's going to impede
18  navigation, that's not going to help
19  navigation; wouldn't you agree?
20    A.  Well, that's probably why it was on
21  the agenda.
22    Q.  Well, I understand that.  No.  Why
23  would it be on the agenda?  Because your whole
24  purpose is navigation, right?
25    A.  Yeah.  But --

JOHNS PENDLETON COURT REPORTERS                           800 562-1285

78145971-3aae-4e24-8465-33ccad14221d

(Pages 162 to 165)

Page 162

1    Q.  Is putting a lock going to help you
2  with your dredging problem?
3    A.  No.  But what I'm trying to say is, on
4  this agenda here you've got all kind of
5  projects going on all on top of each other, so
6  the hurricane --
7    Q.  Actually, you don't.  Take look at it.
8    A.  Yeah, you do.
9    Q.  There's only one concept at work here.
10   A.  You're not listening to me.
11   Q.  Well, read it.  Because -- how about
12 this:  You identified for me all the different
13 projects that are listed on that agenda.  Okay?
14 And then we can see how it may be different or
15 how similar they truly are.
16   A.  I suspect on this the reason why some
17 of these things were being looked at was of the
18 ongoing hurricane protection projects around
19 the area, there was a continual effort to
20 understand how the various hurricane protection
21 projects should be improved and upgraded and so
22 forth, and most certainly it had to be part of
23 a re-evaluation study for the MRGO if that was
24 going to be going on because it impacts that
25 study's, quote, unquote, boundary conditions,

Page 163

1  and it was needed -- it was a necessity to
2  figure into the equation, so to speak, of, you
3  know, okay, well, how long would vessels have
4  to wait, um -- through any kind of a navigation
5  structure or something like that to, um -- to
6  pass through there.  So, um -- are there any
7  negative impacts to navigation by these
8  various, um -- features?  That's the best I can
9  remember -- tell you because it's been a long
10 time ago.
11   Q.  If in fact you were truly evaluating
12 hurricane protection, your evaluation would not
13 be limited to the MRGO, would it?
14   A.  Um -- the hurricane protection project
15 would be looking at it from a different --
16 they'd be looking at it from their perspective.
17   Q.  Of course.
18   A.  And, um --
19   Q.  And on the contrary, rather than there
20 being a special re-evaluation of the MRGO,
21 rather there would be a re-evaluation of the
22 hurricane protection system with a request for
23 information from you to assist them in deciding
24 what recommendations to make as it affects you,
25 wouldn't that be the more logical approach to

Page 164

1  the problem?
2    A.  Um -- I don't think -- it wasn't
3  handled that way, I don't believe.  I believe
4  the way it was handled, and this is a long time
5  ago, was that the -- since there was a
6  re-evaluation study they had to know everything
7  that was going to impact navigation, um -- so
8  that they could figure that into their purpose,
9  the re-evaluation itself.
10   Q.  Well, if they were really concerned
11 about navigation, why on earth would they talk
12 about doing a 200-foot channel as opposed to a
13 500-foot channel?  You're not going to get very
14 large draft vessels through there, are you?
15   A.  Sure.  The beam on the biggest vessels
16 that can get through there is 110 feet, with a
17 36-foot draft.
18   Q.  Well, a 125-foot width would kind of
19 be tight, wouldn't it?
20   A.  You just said 200.
21   Q.  I know.  The other one says 125.  I
22 did that on purpose.
23   A.  Let me see.
24   Q.  (Tendering.)
25   A.  Um -- yeah.  But it also says, next to

Page 165

1  125, twelve foot deep channel.  Because they're
2  looking at increments to see where the break
3  point in economic feasibility is, and they have
4  to go through -- when you're doing a study, you
5  have to go through a full range of points so
6  that you can plot a curve and see where -- you
7  can't just put -- study one alternative -- one
8  increment of an alternative and say, ah, I have
9  the answer.  You have to look at that and
10 establish a curve.
11   Q.  I got you.  All right.
12   A.  And it could have been at the time the
13 team full well knew that was not viable but had
14 to establish a performance and cost --
15   Q.  Okay.
16   A.  -- to plot the curve.
17   Q.  I got you.  And so what we clearly can
18 get from this is that whoever wrote this had a
19 view that there's a possible relationship
20 between the need for a gated structure on the
21 MRGO channel and hurricane protection.  Right?
22   A.  As --
23   Q.  And if as you told me this is a
24 hurricane protection concept, and somebody is
25 saying, well, let's put the gate in, one can

EDMOND JOSEPH RUSSO                                                May 21, 2008

(Pages 166 to 169)

Page 166

1  only conclude that that gate must have
2  something to do with hurricane protection.
3  Because as you've already told me, it's got
4  nothing to do with navigation.  Right?
5       MR. WOODCOCK:
6            Objection.  Speculation.
7       A.  Um -- those features listed there
8  which would have some association with the,
9  um -- hurricane protection would have been
10  informed, most likely, to this re-evaluation
11  manager by the person running the hurricane
12  studies to say, hey, we're looking at this, you
13  guys ought to be considering that as it impacts
14  navigation.
15  EXAMINATION BY MR. BRUNO:
16       Q.  Well, I'm still needing to understand.
17  You've already told me if you put a navigable
18  gated structure in the MRGO, from your
19  perspective as the manager of operations for
20  the MRGO, you can tell me, and you could tell
21  anybody who would listen, that does not serve
22  navigation.  Right?
23       A.  No.  But we have to know about --
24       Q.  Well, I understand.  Simple question:
25  It doesn't serve navigation; right?

Page 167

1       A.  Right.
2       Q.  All right.  Now.  So the person
3  proposing this as an alternative --
4       A.  Uh-huh.
5       Q.  -- must have a reason to propose it as
6  an alternative.  Right?
7       A.  Right.  Because their project probably
8  was the hurricane protection.
9       Q.  Exactly.  And so one could reasonably
10  conclude that that person, whoever he or she
11  is, had the view that the MRGO had something to
12  do with surge.
13       MR. WOODCOCK:
14            Objection.  Speculation.
15       A.  No.
16  EXAMINATION BY MR. BRUNO:
17       Q.  No.  They were just putting the gate
18  in because they wanted to spend some money.
19  Right?
20       A.  Um -- no.  The, um -- gate would
21  provide, um -- or would limit the water that
22  would go past the intersection with the GIWW
23  and MRGO in that area.
24       Q.  And it would keep water out of the
25  Industrial Canal and keep from flooding the

Page 168

1  city.
2       A.  Sure.  That's an option.  I mean, if
3  you cut that one little short piece off, that
4  to the hurricane protection people is an
5  alternative to raising the levees and flood
6  walls all the way around the umpteen miles in
7  there.  So you know, a cutoff right there just
8  to shut it in the event of a storm coming is
9  certainly a viable thing to look at --
10       Q.  Right.
11       A.  -- beyond raising all the miles and
12  miles of flood protection on the interior.  So
13  during that time, obviously, navigation
14  couldn't pass, we would have to know that it
15  was impassable during a period of time, it
16  impacts the navigation project, so they need to
17  know that for the re-evaluation.
18       Q.  All right.  Are you aware specifically
19  of any re-evaluation of hurricane protection
20  that was going on at the same time as this?
21       A.  See, I wasn't really, um -- connected
22  to all these goings on.
23       Q.  I know.  Because so far we've just --
24  you've given me your assumption that this had
25  something to do with some hurricane activities.

Page 169

1  I'm asking you now specifically if you can
2  recall as you sit here that in fact there was
3  some evaluation or re-evaluation of hurricane
4  protection at that time.
5       A.  I'm pretty sure it was just an
6  ongoing -- you know, a persistent ongoing
7  effort to continually --
8       Q.  Well --
9       A.  -- investigate that and make
10  improvements.
11       Q.  Here's what's curious about it:  Isn't
12  it true that just like the MRGO, the hurricane
13  protection guys and gals are limited by their
14  initial authorization; in other words, they can
15  only do what the Congress told them they could
16  do, and for them to decide that they need to do
17  some more study or this or that or the other
18  thing, they need Congressional authorization,
19  they need money from Congress, just like you
20  did?  Isn't that true?
21       A.  Sure.
22       Q.  Okay.
23       MR. LEVINE:
24            Did you attach that?
25       MR. BRUNO:

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                                    May 21, 2008

(Pages 170 to 173)

Page 170

1        If you'd like.  Let's mark it.
2        (Exhibit 7 was marked for
3    identification and is attached hereto.)
4    EXAMINATION BY MR. BRUNO:
5        Q.  In the context of your work as
6    operations manager of the MRGO, did you have to
7    deal with any environmental regulations?
8        A.  Um -- environmental laws, regulations,
9    whatever.
10       Q.  Yeah.Things of that like.
11       A.  Yes.
12       Q.  Can you tell me which ones you had to
13   contend with?
14       A.  Um -- I can name a few.  I wasn't the
15   expert.  We had a specialist who ensured we did
16   all our environmental compliance, but there's
17   the National Environmental Policy Act, the
18   threatened and Endangered Species Act,
19   Magnuson-Stevens Act, um -- there's got to be a
20   couple dozen potential ones, and I don't recall
21   all of those off the top of my head.  But we
22   basically had to vigorously follow all
23   applicable ones for operations and maintenance.
24       Q.  Who's the specialist?
25       A.  At the time, it was, um --

Page 171

1    Dr. Mathies.
2        Q.  Let me show you a document labeled
3    NED-189-1299 in seriatim to 1303 and ask if
4    you've ever seen it.  It's not a great copy.
5    You have to forgive me, but it's what I got.
6    Looks like some kind of a slide presentation.
7        A.  Yeah.
8        (Brief recess.)
9    EXAMINATION BY MR. BRUNO:
10       Q.  Okay.  Mr. Russo, does that look
11   familiar to you at all?
12       A.  Uh-huh.
13       Q.  Tell me what it is.
14       A.  Um -- this is a note from engineering
15   division with some comments and questions to
16   project management on various measures that are
17   to be investigated under the MRGO re evaluation
18   study, and it looks like they're trying to get
19   a grasp on the scope of what kind of
20   engineering estimates they would like to
21   receive.
22       Q.  All right.  Fair enough.  But now
23   you're saying the MRGO re-evaluation study
24   itself.  Right?
25       A.  Right.

Page 172

1        Q.  It's not a hurricane protection study,
2    it's a MRGO he re-evaluation study.
3        A.  Correct.
4        Q.  So what are we evaluating MRGO for?
5        A.  Um -- the study, through a -- some
6    written instrument, I don't remember what type
7    it was, it might have been a policy guidance
8    letter or memo of some sort, I believe during
9    this time frame the Corps was -- I think the
10   memo said the Corps was able to look at, in
11   addition to economic benefits, environmental
12   restoration.  So this was an expansion, I
13   believe, to the scope of the MRGO re-evaluation
14   study asking for engineering design and cost
15   estimating for various alternatives for
16   ecosystem restoration.
17       And I believe at the time that
18   guidance, um -- gave the Corps some -- yeah,
19   gave the Corps some ability to provide
20   ecosystem restoration measures where there were
21   different types of problems out there, and
22   basically it could, um -- could be used to
23   quantify or maybe make a recommendation that
24   certain of those features be, um -- pursued.
25       Q.  All right.  It wasn't hurricane

Page 173

1    protection, was it?
2        A.  I don't believe any of this is
3    hurricane protection.
4        Q.  Right.  Okay.
5        MR. LAMBERT:
6            What's the get on that?
7        MR. BRUNO:
8            February 13, 2002.
9        MR. LEVINE:
10           Bates number?
11       MR. BRUNO:
12           It's Bates Number 189-1299 in
13       seriatim to 1303.
14       MR. LEVINE:
15           What's the first three letters?
16       MR. BRUNO:
17           NED.
18   EXAMINATION BY MR. BRUNO:
19       Q.  And what we're talking about here is,
20   among other things, a system of weirs or
21   baffles designed for shallow draft navigation.
22       What would be the purpose of weirs or
23   baffles?
24       A.  Um -- that probably was in
25   connection -- see, the ecosystem restoration

JOHNS PENDLETON COURT REPORTERS                           800  562-1285

(Pages 174 to 177)

Page 174

1  alternatives, these measures, were, from what I
2  understood, trying to be properly blended with
3  the investigation of the range of economic
4  alternatives that would be looked at, and that
5  barge channel, the 12 x 125 or whatever lesser
6  dimensions that were being looked at, just for
7  that purpose would be able to be potentially
8  coupled with this complementary ecosystem
9  restoration piece where, um -- purportedly the
10  weirs or baffles would, um -- reduce the tidal
11  exchange, tidal prism in the area, and would
12  reduce the, um -- salinity gradients behind
13  there for ecosystem restoration purposes.
14      Now, I don't -- I don't know to what
15  degree the benefits would be.  I suspect that
16  the -- you know, it was a proposed idea that
17  maybe somebody from a stakeholder community may
18  have suggested, and so it was an idea that was
19  going to go ahead to be looked at, um -- for
20  salinity control.
21      Q.  All right.  Now, in kind of going
22  through this with the idea of trying to
23  identify the project manager, on the agenda
24  there's is team members and there are folks who
25  are identified with their little letters, PM,

Page 175

1  OD, et cetera.  So PM is project management,
2  right?
3      A.  Yeah.
4      Q.  Okay.  So is it likely that one of
5  these folks with the PM is the project manager?
6      MR. LEVINE:
7          So you're looking at Russo 8 now?
8      MR. BRUNO:
9          Yeah.  I was going to go through
10          the names on the membership quickly.
11      (Exhibit 8 was marked for
12  identification and is attached hereto.)
13      A.  Yeah.  At this time, I guess, in
14  November of 2001, the first lady here listed is
15  the project manager at that time, I believe.
16  And the assistant was the second guy, Joey
17  Wagner, at that time.
18  EXAMINATION BY MR. BRUNO:
19      Q.  Okay.  So the name is Ada Benavides
20  and the assistant is Joey Wagner, you think.
21  Okay.  Fair enough.
22      Now, you know that the decision has
23  been made to close the MRGO, right?
24      A.  At this time.
25      Q.  Yes.

Page 176

1      A.  Yeah.
2      Q.  And that is the final result of this
3  re-evaluation study, isn't it?  That we've been
4  talking about?
5      A.  Actually not.  I think there was a new
6  legislation, um -- and I can't recall it right
7  away, but it's called the MRGO Deep Draft
8  De-authorization Study.
9      Q.  Right.
10      A.  Which they took information from this
11  previous effort and carried it forward and used
12  it in this other effort.
13      Q.  All right.  What was the ultimate
14  conclusion of the work of the MRGO
15  re-evaluation study that began on or about '01?
16      A.  I'm not sure that there was one.
17      Q.  Okay.  All right.  Do you know a
18  Dr. Winer?
19      A.  Yes.
20      Q.  Do you concur with Dr. Winer 's
21  opinion that the MRGO is being closed solely
22  for environmental considerations?
23      A.  You mean right now?
24      Q.  Yeah.
25      A.  Um -- well, not post-Katrina.  It was

Page 177

1  an easy analysis post-Katrina when the channel
2  silted in from the storm, combined with the
3  effects of the surge and waves, um -- flooding
4  out and damaging the tidewater terminal area
5  and everything back there, neither could you
6  get vessels in or out, nor did they have any
7  place to go, all that terminal area was
8  destroyed; so it was an easy calculation after
9  the storm.
10      Q.  Too much to repair.
11      A.  Too much to repair, yeah.  Too much
12  channel to be restored and so forth.
13      Q.  Do you have an opinion as to whether
14  or not the MRGO has any impact on storm surge?
15      A.  Um -- that's not really my area --
16      Q.  Fair enough.
17      A.  -- of expertise.
18      Q.  And do you have any opinion on the
19  funnel effect?
20      A.  That's another related thing.  I'm not
21  an expert in that area.
22      Q.  Are you familiar with the current plan
23  to build a, um -- barrier across the MRGO and
24  the funnel?
25      A.  For the hurricane work going on now?

EDMOND JOSEPH RUSSO                                               May 21, 2008

(Pages 178 to 181)

Page 178

1    Q.  Yeah.
2    A.  I'm somewhat familiar.
3    Q.  All right.  Okay.  All right.  As of
4  July 12, '01, there weren't very many ships
5  that drew greater than 36 feet that used the
6  MRGO, right?
7    A.  Um -- I don't remember the numbers off
8  the top of my head, but, um -- they used it.
9  They did use it.
10   Q.  Well, according to -- it's a very
11  short list of people who used it.
12   A.  Yeah.  It was a pretty short list.
13   Q.  All right.  Here's another one of
14  these meeting agendas, and now the folks
15  involved are only Ms. Benavides, Wagner, Boe,
16  Elmer, Palmieri, Williams and Russo.  And this
17  is 28 August of '01.
18       Do you recall that meeting?
19   A.  No.
20   Q.  And it says here, proposed
21  alternatives:  Continue to maintain; no action;
22  redesign the existing channel to provide for
23  reduced draft with a sealer dike; same thing
24  with a gate structure; and same thing by just
25  allowing it to silt in.  And then there is an

Page 179

1  alternate depths evaluation of 12, 16 and 20.
2       You don't recall that at all?
3    A.  I mean, I'm familiar with that stuff,
4  but they had many meetings so, um -- the
5  general nature of that I'm familiar with.
6    Q.  Well, do you recall evaluating any
7  hurricane stage modeling at those meetings?  Or
8  anybody giving you a presentation of hurricane
9  stages using the latest modeling techniques?
10   A.  I think they did do some of that under
11  this effort, and I think it was -- well, maybe
12  it was done under this effort.  I don't really
13  know.  It could have been done under the, um --
14  hurricane protection project, I'm not real
15  sure.  I know that there was some modeling done
16  in that area.
17   Q.  Well, I'm asking you, though, do you
18  recall a presentation of the models?
19   A.  I don't recall that at this particular
20  meeting.  I sure I've seen that, you know,
21  presentation more than one time, um -- at some
22  meeting, or more than one meeting.
23   Q.  Okay.  You do recall that at least at
24  one of these re-evaluation study meetings
25  somebody made a presentation of hurricane

Page 180

1  models.
2    A.  Either that one or another meeting
3  that I attended.
4    Q.  I show you a series of E-mails,
5  particularly one from Richard Boe where he
6  says, first, I'm not trying to take over the
7  study or tell anybody what to do.  I am trying
8  to help us move forward.  He says things like,
9  if the project manager doesn't or can't do it
10  for whatever reason, the operations manager
11  would be the next best suited to manage this
12  effort.  It's imperative that team members, the
13  district 's technical staff and the district
14  supervisory staff buy into the protection since
15  it will form the basis upon which all project
16  alternatives and some potential ecosystem
17  restoration plans will be based.  It is also
18  important that we all buy in because out
19  projections will likely be subject to public
20  criticism.
21       Take a look at these E-mails and see
22  if that refreshes your recollection about this
23  re-evaluation study.
24       (Exhibit 9 was marked for
25  identification and is attached hereto.)

Page 181

1    A.  Yeah.
2  EXAMINATION BY MR. BRUNO:
3    Q.  Do you remember this?
4    A.  Um --
5    Q.  No memory?
6    A.  Not from memory, but, um -- in
7  general.
8    Q.  Tell me in general what you do
9  remember.
10   A.  Um -- there was just -- there was
11  considerable amount of searching to understand
12  what the combination of all the, um --
13  authorities and guidance and so forth that came
14  down meant when it came together for this
15  re-evaluation study team to shape -- the scope
16  of what they're doing was constantly changing.
17   Q.  Meaning they didn't really understand
18  what they were doing?
19   A.  I think part of it was this constant
20  change of scope or directives -- not constant,
21  but there were many, many of those that came
22  about.  And I think the one in particular that
23  was of great difficulty to understand or
24  interpret, and it was the manager's -- really,
25  the manager's decision to try to figure that

78145971-3aae-4e24-8465-33ccad14221d

(Pages 182 to 185)

Page 182

1  out, I guess with higher authority's help and
2  the team, but, um -- there was really no
3  agreement, or little agreement for a while on
4  what the actual combination of directives meant
5  in order to say, hey, do we have the authority
6  to include the ecosystem restoration in the
7  re evaluation of the navigation piece and put
8  it together?  So it was just lot of, um --
9  going back and forth to get that established.
10  And I -- I don't remember what the final
11  outcome was and how that was documented.
12     Q.   Does this help you remember what the
13  directive was with regard to the MRGO?
14  Re-evaluation of it?  What were you
15  reevaluating about the MRGO?
16     A.   Well, they were reevaluating the
17  economics of the project under the NED
18  criteria, and --
19     Q.   NED is what?
20     A.   -- during mid -- the Corps, so to
21  speak.
22     Q.   NED, real quickly.
23     A.   National economic development
24  criteria.
25     Q.   Is that strictly how much does it cost

Page 183

1  to dredge, is it worth it, kind of analysis?
2     A.   That's, um -- that's generally the
3  case.  And what you do is, you have to look at
4  a range of alternatives so that you can find --
5  you can identify where the curves cross to
6  identify the alternative increment thereof that
7  maximizes economic benefit and minimizes cost.
8     Q.   Is that why the first comment here is,
9  the issues raised by Richard Boe need to be
10  addressed.  I agree with Richard that -- and he
11  put in quotes -- the future condition with
12  continued maintenance of the existing MRGO
13  project must first be determined.  Setting the
14  future without project condition will be
15  necessary for the proper re-evaluation of the
16  existing MRGO project.
17     In other words, you can't possibly
18  evaluate what you want to do if you don't have
19  any idea of what your future costs are going to
20  be so that you have something to measure
21  against, right?
22     A.   Sure.  Well, that's a baseline.  Um --
23     Q.   But how could there possibly have been
24  any disagreement on that point?
25     A.   Um -- I don't recall offhand, but I do

Page 184

1  know, you know, like I say, the dynamics of the
2  coast, the changing conditions for maintenance,
3  the changing costs for various types of
4  maintenance at that project and every other
5  project made it more and more uncertain when
6  that -- what really that future no action
7  condition was, and there needed to be some
8  clarity on that.  But that's a baseline we
9  all -- you know, we always do in a study.
10     Q.   Well, do you agree with the final
11  frustrating note this is not the way to do
12  business?  This is from Ronald Elmer to you
13  among other folks.
14     A.   Um -- I don't remember those right
15  offhand.
16     Q.   Here it is.
17     A.   Yeah.
18     Q.   Did you agree with him?
19     A.   I didn't have an opinion.  I mean,
20  that wasn't my project.
21     Q.   You were a team member.
22     A.   Sure.
23     Q.   But you had no opinion.  Right?  So
24  was it a good way to do business?
25     A.   I mean, certainly, um -- the way to do

Page 185

1  any business is by the protocol.
2     Q.   Right.
3     A.   So, you know --
4     Q.   And you had no protocol.
5     A.   That was -- the protocols were --
6     Q.   Right?
7     A.   -- in some process of trying to be
8  interpreted because of the various potentially
9  conflicting or fuzzy understanding of some of
10  that.  So I think there was a lot of difficulty
11  in trying to understand exactly what needed --
12     Q.   Protocol meant.
13     A.   Yeah.
14     Q.   So we had a problem with the protocol.
15     A.   Right.
16     Q.   Who wrote the protocol?
17     A.   Um -- that is usually issued by higher
18  authority.  It always issued by higher
19  authority to the field.
20     Q.   Outside of the district?
21     A.   Yes.
22     Q.   From here?  Vicksburg?
23     A.   Usually, headquarters through
24  Vicksburg to the field.
25     Q.   All right.

## Page 186

1    MR. WOODCOCK:
2        Joe, do you mind attaching that?
3    MR. BRUNO:
4        Not at all.
5    (Exhibit 10 was marked for
6    identification and is attached hereto.)
7    MR. LEVINE:
8        What's the Bates number on that,
9    too?
10   MR. BRUNO:
11       I gave it to you once before.
12       189-1299 to 1305. It's not the same
13       document. It's the guys commenting on
14       the other document. At least it
15       certainly looks that way.
16   EXAMINATION BY MR. BRUNO:
17       Q. All right. Now, you told me before
18   about this business of the extent of your
19   authorization. I have a letter here from you
20   that says, we have authority to dredge the bar
21   channel to dimensions of negative 38 feet MLG
22   at a width of 600 feet with advance maintenance
23   of two feet. Please change the elevation from
24   42 to 40.
25       Now, does this refresh your

## Page 187

1    recollection as to the limits of your authority
2    as regards the dredging?
3        A. It's not a limit. It's -- again, our
4    discretion. We, um --
5        Q. Why did you tell them to reduce the
6    depth by two feet?
7        A. Um -- let me see. I have to see what
8    the instance was.
9        Q. (Tendering.)
10       MR. BRUNO:
11           Mark it, if you don't mind. It's
12           Exhibit 11.
13       (Exhibit 11 was marked for
14       identification and is attached hereto.)
15       A. Yes. Well, the -- probably in the
16   draft plans and specifications there was --
17       Q. It went to 42.
18       A. -- a problem with the state.
19       Q. You told them to cut it back to 40
20   pursuant to the authorization. I'm just asking
21   you whether or not that refreshes your
22   recollection. You told me you had discretion.
23   It doesn't sound like a lot of discretion
24   there. It says, very specifically, 38 feet
25   plus 2. And therefore, you're directing

## Page 188

1    somebody to change the plans to reflect the
2    maximum of 40.
3        A. Sure.
4        Q. So that's your limit, was the original
5    project authorization, right?
6        A. Yeah.
7        Q. Okay. Here's another one where you
8    say the Mississippi River Gulf Outlet project
9    provides for a 36-foot deep by 500-foot wide
10   channel from Breton Sound to New Orleans and a
11   38 feet deep by 600 feet wide bar channel from
12   Breton Sound to the 38-foot contour to the Gulf
13   of Mexico.
14       Once again, this is confirming that
15   you instructed those who were preparing plans
16   and specifications for dredging to stay within
17   the authorization. Isn't that true?
18       MR. BRUNO:
19           Mark this one whatever the next
20       is.
21       (Exhibit 12 was marked for
22       identification and is attached hereto.)
23   EXAMINATION BY MR. BRUNO:
24       Q. Right?
25       A. Yeah. We're aspiring to meet the

## Page 189

1    intent of the authority, sure.
2        Q. Well, you're not aspiring. Here you
3    say, the authorizing language of the MRGO
4    states, as a performance measure, that the COE
5    shall maintain a set of prescribed dimensions
6    for navigation.
7        Sounds pretty specific to me. This is
8    your letter, isn't it? You got the same thing.
9    And that's Exhibit Number 13. It says shall.
10   Not maybe, not strive for, but shall.
11       (Exhibit 13 was marked for
12       identification and is attached hereto.)
13       A. That's what I wrote.
14   EXAMINATION BY MR. BRUNO:
15       Q. And it's true today. Right?
16       A. Yeah. Well, the reason and the intent
17   behind this was, um -- that we have options to
18   look at besides just dredging. That was the
19   intent of this, not trying to pinpoint some set
20   of dimensions. That's the intent here. That
21   we have -- hey, we have options, we can meet
22   the federal standard in a number of different
23   ways.
24       Q. Your testimony is that you had no
25   intent by suggesting in that document that you

EDMOND JOSEPH RUSSO                                    May 21, 2008

(Pages 190 to 193)

Page 190

1  were limited by any set of dimensions, right?
2  No limitation at all.
3     A.   That's not the intent of that
4  statement.
5     Q.   Is it the intent of the previous
6  statements that I just showed you?
7     A.   Um -- sure.  I mean, you know.
8     Q.   Okay.  Well, why would there be a
9  difference?
10    A.   Because I was trying to convey in that
11 message there that --
12        MR. LAMBERT:
13           That message; 13.
14        MR. BRUNO:
15           13.
16    A.   Yeah.  The intent there was to convey
17 that, hey, maintaining the channel isn't just
18 done by dredging.  I mean, you can limit the
19 amount of sediment that goes in the channel and
20 still attain the performance that you're trying
21 to attain.
22 EXAMINATION BY MR. BRUNO:
23    Q.   We'll just do it one more time, then,
24 to satisfy my co-counsel.  You had no
25 discretion to go outside of the limits of the

Page 191

1  authorization, that is, the 500 feet, the
2  36 feet, you did have discretion as to how you
3  would accomplish that width and that depth.
4     A.   Sure.
5     Q.   All right.  But you had no discretion
6  on the 500-foot depth.
7        MR. WOODCOCK:
8           Objection.  Vague.
9        MR. LAMBERT:
10           You still have to answer it.
11       MR. WOODCOCK:
12           Yeah.  If you can.
13    A.   You know, our intent was to provide a
14 level of service to those dimensions.  That was
15 our target, our goal.  And of course, you know,
16 the dredging process and any other process is
17 not an exact science.
18       MR. LAMBERT:
19           No, you've got tolerances, but
20       still, your discretion as to how to do
21       it, foreshoring or dredge it.
22       THE WITNESS:
23           Right.
24       MR. LAMBERT:
25           It's not make it bigger or

Page 192

1  smaller.  That's not up to you.
2        THE WITNESS:
3           Our --
4        MR. LEVINE:
5           Who's asking questions the
6        questions today?
7        MR. LAMBERT:
8           I am.  Joe's getting tired.
9        MR. LEVINE:
10           Really.
11       MR. LAMBERT:
12           No, go ahead and answer it.
13       THE WITNESS:
14           Our goal was to meet that to the
15       best of our ability.
16       MR. LAMBERT:
17           Right.  Within engineering
18       tolerances, plus or minus whatever.
19       THE WITNESS:
20           Right.
21       MR. LAMBERT:
22           Okay.
23       THE WITNESS:
24           That was our goal.
25       MR. LAMBERT:

Page 193

1           I understand.
2           Okay, Joe.  We got that one
3  right.
4        MR. BRUNO:
5           I'm so glad.
6        MR. LEVINE:
7           Objection.  Only one person is
8  allowed to be asking and objecting.
9  So I'm going to object.
10       MR. WOODCOCK:
11          I'll pass it off.  He'll object
12 to your questioning.
13       MR. LAMBERT:
14          Good.  That's fine.  That's good.
15 That's right.  The second string gets
16 to ask a question and enter an
17 objection.  That's good.  I like that.
18 EXAMINATION BY MR. BRUNO:
19    Q.   All right.  Again, on this business of
20 authorization, here we have a memo from Edward
21 Creef to Jeff Harris.  It says, Edmond Russo
22 has decided that such a reduction in dredging
23 the channel is manageable to a limited extent
24 and has agreed to reduce the upcoming
25 maintenance event from a full channel cut to

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                        May 21, 2008

(Pages 194 to 197)

Page 194

1    reduced dredging dimensions of a 39-foot depth
2    by 450-foot width.
3        So now you're fifty feet less than
4    what you're told by the Congress to do.  What
5    is the basis for your discretion to do that?
6        A.  Level of service required coupled with
7    an underfunded project.  Couldn't -- we just
8    couldn't make ends meet, you know, as far as
9    all the needs that are out there.  So we look
10   at the requirements for vessel passage and try
11   to determine what we can do to maintain it.  So
12   if, lo and behold, more money came in you could
13   go back in and make it wider.
14       Q.  Right.  Sure.  That also implies that
15   you had the discretion to just let it silt in.
16       A.  Um -- I don't follow why.
17       Q.  Well, you decided that you were going
18   to not dredge to 500, you said 450.  That might
19   keep some vessel from being able to pass
20   through the channel, right?  Possible?
21       A.  500 to 450?
22       Q.  No.  That would have no effect on the
23   channel?
24       A.  No.  Most of the vessels were passing
25   in one-way traffic conditions and the beam at

Page 195

1    the most being 110 feet, in a lot of cases it's
2    not going to be a problem.  The pilots
3    coordinate their passages anyway, so.
4        Q.  Okay.  You said you had $13 million to
5    dredge, but apparently you all had some budget
6    estimates that put that figure as high as
7    $22 million.
8        A.  Sometimes we would get more, sometimes
9    less.  It wasn't a flat, exact $13 million a
10   year.
11       Q.  Well, my point is that sometimes you
12   would need $22 million to stay within the
13   authorization.
14       A.  Um -- yeah.  If there was a storm that
15   passed and there was unanticipated additional
16   shoaling that had to be removed, um -- the
17   $13 million need would and could spike up.
18       Q.  All right.  Again, with regard to the
19   issue of the results of the -- I'm reading from
20   a letter.  The results of the re evaluation
21   study -- this is a letter by Don T. Riley,
22   Brigadier General, U.S. Army Division Engineer.
23       Do you know who he is?
24       A.  Yes.
25       Q.  Who was he?

Page 196

1        A.  Yeah.  I knew him.
2        Q.  You knew him?
3        A.  Uh-huh.
4        Q.  And what did he have to do with MRGO?
5        A.  Well, I suppose at that time he was
6    the, um -- Mississippi Valley Division
7    commander here in Vicksburg, and as the
8    commander his purview over all the different
9    districts in the division.
10       Q.  All right.  Do you know a Mr. Carlton
11   Dufrechou?
12       A.  Yeah.
13       Q.  Who is he?
14       A.  He's with the Lake Pontchartrain Basin
15   Foundation.
16       Q.  Is he one of those folks that would
17   call you from time to time with complaints
18   about the MRGO?
19       A.  Sure.
20       Q.  He says, we do remain concerned about
21   the environmental impacts of the channel and,
22   as you indicated in your letter, the New
23   Orleans District is presently conducting a
24   re evaluation for economic feasibility study of
25   the project.  This study will address possible

Page 197

1    alternatives to maintaining the project as
2    currently authorized, to include possible
3    closure of the channel.  A draft report that
4    includes the results of the study is scheduled
5    to be issued in September '04 with a final
6    report scheduled for March '05.  I've asked the
7    district to address advance maintenance in this
8    study.
9        Does this refresh your recollection as
10   to whether or not the re-evaluation study was
11   for hurricane protection purposes?
12       A.  It wasn't for that.
13       Q.  Well, you remember I showed you the
14   agenda of one of the first meetings, and you
15   suggested that the reason why those alternate
16   proposals were being considered was for
17   hurricane protection?  Remember you said that
18   to me?
19       A.  Yeah.  In connection with the -- most
20   likely the hurricane protection project that
21   overlaps and intersects the channel, which is a
22   different authority.
23       Q.  Wouldn't that be inconsistent with the
24   general's statement here that the purpose of
25   the study is to address possible alternatives

JOHNS PENDLETON COURT REPORTERS                       800  562-1285

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                              May 21, 2008

(Pages 198 to 201)

Page 198

1    to maintaining the project as currently
2    authorized, to include the possible closure of
3    the channel?
4        A.   That's all navigation related, I
5    think.
6        Q.   Sure, it is.
7        A.   Yeah.
8        Q.   Well, did the nature of the
9    re-evaluation study change over time?
10       A.   Um -- the most significant change that
11   I knew about was from the policy guidance to
12   include ecosystem restoration in concert with
13   reanalysis of the economics.
14       Q.   Well, you didn't answer my question.
15           Did it change over time?  Yes or no?
16       A.   Sure.
17       Q.   Did it ever include hurricane
18   protection as its purpose?
19       A.   Not to my knowledge.
20       Q.   Okay.  Well, if it never contained
21   hurricane protection as its purpose, why are
22   you telling us today under oath that the first
23   meeting was to address hurricane protection?
24       A.   Because it's a related intersecting
25   feature of another project that must be done

Page 199

1    compatibly, consistently.  And those -- they
2    can't conflict.
3        Q.   Well, are you saying that the meeting
4    was held to assess whether or not the proposals
5    would conflict with hurricane protection or are
6    you saying that hurricane protection issues are
7    the reason why the meeting was held in the
8    first place?
9        A.   No.  Those are basically boundary
10   conditions, if you will, to the re-evaluation
11   navigation economics that had to be looked at
12   under the scope of its directives.  Since there
13   was an intersection, so to speak, with the
14   levee -- you know, the hurricane protection
15   work, um -- they had to -- they had to ensure
16   compatibility.  I mean, you can't -- the
17   navigation economics study couldn't ignore,
18   um -- the fact that a gate was being looked at
19   as an alternative to not have to build the
20   miles and miles of levee around the interior of
21   the inner harbor as an alternative under that
22   project.  So they had to ensure consistency,
23   and as a boundary condition that would have to
24   be addressed so that it's not overlooked as
25   a -- an aid to navigation that could

Page 200

1    occur.
2        Q.   Well, that's inconsistent with what
3    the General is saying, isn't it?  The General
4    is at the saying we're having a re-evaluation
5    of the MRGO in order to assess its impact on
6    hurricane protection.  We're evaluating the
7    MRGO to determine whether or not for economic
8    feasibility it will address possible
9    alternatives to maintaining the project as
10   currently authorized.  That's what he says
11   here.
12           Isn't it more logical that the
13   evaluation of the MRGO must include whether or
14   not the re evaluation will affect hurricane
15   protection, instead of the other way around?
16       A.   That's not what the, um -- that wasn't
17   the scope of the study, to my knowledge.
18       Q.   Okay.  And as you sit here today, you
19   don't know of any re-evaluation study of the
20   hurricane protection system.
21       A.   See, I wasn't involved enough to know
22   all those, you know, workings.  I'm sure that
23   there was improvements being looked at, or else
24   that wouldn't have been, um -- in the scope
25   of --

Page 201

1        MR. WOODCOCK:
2            Joe, would you mind putting that
3        letter in, since you've referenced it?
4        MR. BRUNO:
5            Yes.  14.
6        (Exhibit 14 was marked for
7    identification and is attached hereto.)
8        A.   Bottom line is --
9        MR. LAMBERT:
10           The date of it, please?  That
11       letter?
12       MR. JOANEN:
13           March 15th, 2004.
14       A.   Bottom line is I didn't keep up enough
15   with that, considering everything I had on my
16   plate, to know all the workings of the
17   hurricane protection projects.
18   EXAMINATION BY MR. BRUNO:
19       Q.   That's fine.  You would expect,
20   though, that there would be a bunch of
21   documents that will document this hurricane
22   evaluation that you think occurred.
23       A.   If there was one going on, I'm sure
24   there --
25       Q.   There would be lots of documents.

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

EDMOND JOSEPH RUSSO                                              May 21, 2008

(Pages 202 to 205)

Page 202

1     A.   There should be.
2     Q.   And if there are no documents, then
3  obviously your assumption is wrong.  Right?
4     A.   Right.
5     Q.   Do you recall an incident where a dike
6  failed in a disposal area owned or which
7  perhaps affected property owned by Pine Bluff
8  Sand & Gravel?
9     A.   On MRGO?  I don't -- owned by Pine
10  Bluff?  Not that I know of.
11     Q.   It's '04, you were manager of the
12  operations division.  You recall Mr. Fernandez?
13     A.   Uh-huh.
14     Q.   He's the one that owned the land.  And
15  basically he was saying that your disposal was
16  impairing his property, right?
17     A.   Um -- let me see what you're talking
18  about.
19     Q.   Sure.
20        MR. BRUNO:
21           Mark it, please.
22        (Exhibit 15 was marked for
23  identification and is attached hereto.)
24     A.   What is this from?
25  EXAMINATION BY MR. BRUNO:

Page 203

1     Q.   This is from the Corps document
2  production.  Talks about a chronology of
3  events.  It talks about Mr. Edmond Russo, who I
4  believe is you, understands and concurs that as
5  a result of the following chronology of events
6  the construction division must proceed with
7  resolving the conditions and problems
8  associated with the dike failure in Disposal
9  Area 18A through an equitable adjustment with
10  Pine Bluff Sand & Gravel.
11     A.   Oh, okay.  I remember now.  Okay.
12     Q.   So there's a constituent or a local
13  interest person who has been damaged by
14  something the Corps did, and you guys are
15  fixing it.  Right?
16     A.   Right.
17     Q.   Now, help me understand the business
18  of authorization and discretion in the context
19  of this event.  You don't have the discretion
20  to damage somebody's property, do you?
21     A.   We don't aspire to do that.  We don't
22  intend to do that.
23     Q.   And you don't have the discretion by
24  the Congress to do that either.  Right?
25     A.   I mean, we don't do that.

Page 204

1     Q.   Exactly.  And when you do damage
2  somebody's property, you fix it, which is what
3  you did here.
4     A.   Right.  And I will say that this was
5  done, um -- under a contract where we
6  prescribed the specifications on what should be
7  done.
8     Q.   Right.
9     A.   And the contractor is, um --
10     Q.   Pine Bluff.
11     A.   -- given --
12     Q.   More money.
13     A.   -- the job to execute those -- that
14  contract, those plans and specifications, and
15  so they, um --
16     Q.   The bottom line here is, the Corps
17  spent more money to fix this guy 's property.
18  Isn't that true?
19     A.   Sure.  Yeah.
20     Q.   Okay.  That's all I wanted.  All
21  right.  Thank you.
22        Another letter regarding, again,
23  Mr. Fernandez who apparently was someone you
24  had some issues with.  He's complaining about
25  the salinity levels?  Potential salinity

Page 205

1  impacts resulting from dredge materials and his
2  live oak trees?
3        MR. BRUNO:
4           Mark that, please.
5        (Exhibit 16 was marked for
6  identification and is attached hereto.)
7  EXAMINATION BY MR. BRUNO:
8     Q.   You recall that?
9     A.   Let's see.
10     Q.   We are able to reach an acceptable
11  agreement with Mr. Tony Fernandez, a landowner
12  within the project area, on measures to avoid
13  potential salinity impacts resulting from
14  dredge material effluent to live oak trees on a
15  ridge located southwest of Disposal Area 18A.
16     A.   Yep.
17     Q.   So you fixed his problem, too.  The
18  Corps decides not to put spoils there anymore,
19  right?
20     A.   Um -- no, I think what we did there
21  was, um -- ensure that the design of this
22  area -- this is a wetland creation area.
23     Q.   Uh-huh.
24     A.   We ensured that the design, um -- of
25  the effluent wouldn't impact the adjacent

EDMOND JOSEPH RUSSO                                                    May 21, 2008

(Pages 206 to 209)

Page 206

1    habitat to the best of our ability.  So it's
2    all part of the design.
3        Q.  Let me show you the next document
4    which we'll mark as Exhibit 17 and ask if you
5    can just explain to me what's going on here.
6        (Exhibit 17 was marked for
7    identification and is attached hereto.)
8    EXAMINATION BY MR. BRUNO:
9        Q.  17.  It is a letter or an E-mail from
10   Edward D. Creef.
11       A.  This is between the environmental
12   specialist who worked for Lynn Mathies.
13   They're having a dialogue with the state
14   Department of Natural Resources to answer their
15   questions in regard to obtaining a coastal zone
16   consistency determination to proceed.  It's
17   just a standard environmental compliance
18   process, and the state usually likes to ask
19   different types of questions to understand to
20   the best of their ability what the different
21   options are and what we might be able to do
22   with emphasis on beneficial use of dredge
23   material.  So we're trying to explain answers
24   to their questions.
25       Q.  Okay.

Page 207

1        (Brief recess.)
2    EXAMINATION BY MR. BRUNO:
3        Q.  I need to clarify something.  I'm a
4    little confused.  Did you not tell me that the
5    decision to first of all install foreshore
6    protection was based solely upon the
7    determination that it was cheaper than
8    dredging?
9        A.  No.  It's the federal standard that we
10   use as a decision rule.  It has to be the least
11   cost environmentally acceptable alternative of
12   ones that we take a look at.
13       Q.  So the first criteria is it has to be
14   acceptable.
15       A.  The first criteria is the most
16   economical and the most environmentally
17   acceptable.
18       Q.  Well, which comes first?  Obviously,
19   the environmentally acceptable component has to
20   come first because if it's not economically
21   acceptable why would you do the cost analysis?
22       A.  I'm telling you that you can go read
23   the federal standard word for word.
24       Q.  All right.  Which one is first?  Does
25   it say which one it does first?

Page 208

1        A.  Uh-huh.
2        Q.  It says do the cost first and
3    environmentally acceptable second?
4        A.  Yes.
5        Q.  Okay.  So the first issue is it has to
6    cost less, and then the second issue is it has
7    to not negatively impact the environment,
8    right?
9        A.  No.  It has to be environmental
10   acceptable.
11       Q.  Environmentally acceptable.  So it is
12   a smell test.  If it's not environmentally
13   acceptable, you can't do it.
14       A.  It has -- and the definition of
15   environmentally acceptable is going through all
16   of the applicable environmental compliance
17   laws, statutes and what have you, that apply to
18   that particular set of actions.
19       Q.  All right.  And the determination of
20   whether or not it's environmentally acceptable
21   is a determination made through the application
22   of engineering and technical standards.  Right?
23       A.  You build the alternative and quantify
24   it.  Its likely performance and likely cost --
25       Q.  Uh-huh.

Page 209

1        A.  -- using science and engineering
2    methods.
3        Q.  Right.  Specifically, though, with
4    regard to the environmental side of it, the
5    environmental acceptability component is
6    determined by the application of technical and
7    environmental standards, right?
8        A.  Right.  The environmental specialists
9    will do their work.
10       Q.  Okay.
11       A.  After they -- the engineers put
12   together the alternative, indicate how does it
13   work, how much does it cost, they take a look
14   at it in their shop.
15       Q.  All right.  It's not a discretionary
16   issue.
17       A.  That's where some of the greatest
18   discretion is.  Because it's such a complex
19   issue.
20       Q.  What is complex?
21       A.  The environmental acceptability.
22       Q.  Environmental acceptability is a
23   complex issue?
24       A.  Right.  Very complex.
25       Q.  Okay.  What are some of the criteria?

JOHNS PENDLETON COURT REPORTERS                              800  562-1285

78145971-3aae-4e24-8465-33ccad14221d

(Pages 210 to 213)

Page 210

1    A.   I won't say criteria, I'll say
2  consideration.
3      Q.   What are the considerations?
4    A.   For instance, for a particular
5  alternative the engineering folks may attempt
6  to estimate or characterize change in flow
7  regime, and of course that's an estimate based
8  on all kinds of ingoing assumptions and how
9  much data is had and so forth, how much
10  modeling is done, and the environmental folks
11  will then do their even more difficult task to
12  understand, okay, what changes in hydrology
13  that the engineering folks have indicated may
14  occur will have on the ecosystem habitat and,
15  um -- community of fish and wildlife that --
16  and that's very complicated.
17      Q.   Well, but it's still engineering
18  judgment.
19    A.   Um -- engineering judgment comes into
20  play, but there is also the -- you know, the
21  environmental specialists' judgment in their
22  area of work, too.
23      Q.   All right.  Okay.  But as regards
24  rocks, is that environmentally acceptable?
25    A.   Um -- depends on who you ask.

Page 211

1      Q.   Well, rocks along the foreshore of the
2  MRGO are there right now, so either you've
3  violated the environmental acceptability
4  standard or somebody said it was
5  environmentally acceptable.  Right?
6    A.   Um -- we went through the process of
7  attaining the environmental compliance, and
8  most people found that to be more acceptable
9  than the alternative for dredging where we
10  could show we met the federal standard.
11      Q.   The question was, yes or no, are rocks
12  environmentally acceptable?
13    A.   To most.
14      Q.   Okay.  What's the name of the guy and
15  his telephone number who says no?
16    A.   Um -- for instance, some fishermen
17  don't particularly like rocks because the ones
18  that don't carry charts, who are supposed to
19  all carry charts, when they're running at dusk
20  and they hit the rocks they don't particularly
21  like them.
22      Q.   They're engineers?
23    A.   Does it matter?
24      Q.   Well, I'm asking you.  Are you telling
25  me that you're going to let a fisherman tell

Page 212

1  you how to protect the shore?  If that's how
2  it's done -- if that's how you guys do
3  business, please put it under oath on this
4  record.  I'm happy to take it to the judge.
5      Do fishermen make your engineering
6  judgments?
7    A.   That's played into the NEPA, um --
8  process.
9      Q.   Uh-huh.
10    A.   It has to be considered.  All views
11  have to be considered.
12      Q.   Considered.  And how often is it does
13  the Corps accept the fisherman 's view over the
14  engineer's view?  Does that happen very often?
15    A.   The engineer doesn't make the
16  decision, the engineer develops the design for
17  each alternative, will tell you what it will
18  do, how it will perform and how much it will
19  cost.
20      Q.   Right.
21    A.   The environmental specialist will then
22  take those various alternatives, vet those with
23  various resource agencies and stakeholders and
24  so forth and -- again, I'm not an environmental
25  specialist so I can't really speak expertly in

Page 213

1  that field, but, um -- they have to determine
2  if there is substantial support for a certain
3  alternative maybe with a particular number of
4  folks who may not like it as much, they have to
5  then weigh those out to determine whether that
6  meets the criteria.  And that's a real
7  discretionary thing.  And that could be tough
8  because what if you have -- what if you have
9  three alternatives, of any type, or in any
10  project, and, um -- 30 percent of the people
11  like Alternative A, 70 percent people don't;
12  Alternative B, 60 percent like the alternative,
13  40 percent don't; and Alternative C it's split
14  down the middle?
15      Q.   If you took a vote in St. Bernard
16  today, do you really believe that there would
17  not be an overwhelming majority that would say
18  close the MRGO?  And if that's so why haven't
19  you closed it before?  Based upon what you've
20  just told me, if that is such a large and
21  important consideration for the Corps in
22  determining what it does, you've told me
23  already today, all day long, that you've had
24  numerous and consistent complaints by the local
25  interests, from the parish president, from the

78145971-3aae-4e24-8465-33ccad14221d

(Pages 214 to 217)

Page 214

1  Wildlife and Fisheries Commission, from the
2  Lake Pontchartrain Basin Foundation.  All of
3  those people have said to you, over and over
4  again, close the MRGO.
5       So if the local interests have that
6  much power and that much influence, why haven't
7  you closed it before?
8    A.  It's not a, as you said, large
9  consideration, it is one that has to be
10 considered.  But let's back up a step.  I never
11 was the project manager of the re-evaluation
12 study or any such thing.  I was the operations
13 manager charged with maintaining an existing
14 authorized project.  So I was not in the
15 position to entertain that, number one.  And
16 number two, it must be a consideration in the
17 evaluation of formulated alternatives in the
18 environmental compliance arena, which is not
19 the planning arena where the steps of planning
20 are taken into consideration.
21    Q.  Uh-huh.
22    A.  Further, you're going to need to talk
23 to someone who's an environmental specialist to
24 further understand how those decisions are made
25 within the discretion of the complexities in

Page 215

1  the engineering as it relates to environmental
2  compliance or performance in that area for the
3  environmental compliance, um -- decisions to be
4  made.
5    Q.  Who makes the decision?
6    A.  The decisions are -- actually made by
7  the division commander, if I'm not mistaken,
8  um -- on the environmental assessment level.
9  He is, I think, probably one of the lower
10 levels, and that's through what's called a
11 FONSI, Finding of no significant impact.  FONSI
12 is an acronym.  And the commander, I believe,
13 needs to sign that.  And there is an impact
14 analysis of the various alternatives done by
15 the environmental specialist using the input
16 from the engineering folks and their special
17 background in science and biology and so forth
18 to understand what the array of environmental
19 impacts are, and they need to establish that
20 finding of no significant impact.  If there is
21 a significant impact, well, you can't issue a
22 FONSI, obviously.
23    Q.  Uh-huh.
24    A.  So the, um -- that letter has to be
25 signed and has to be forwarded.  That's how the

Page 216

1  environmental compliance at that lower level is
2  done.
3       Now, on the MRGO when I was the
4  operations manager, that's about the only sort
5  of low level type of environmental compliance
6  that we would do in our particular area.  But
7  there's larger, more complex types of
8  environmental compliance that are done in the
9  planning arena that at that time I really
10 didn't get into.
11    Q.  Were you ever told by anyone above you
12 in authority that you couldn't put rocks along
13 the banks of the MRGO in any location because
14 of the environmental unacceptability of such a
15 plan?
16    A.  Um --
17        MR. LAMBERT:
18           Can you answer it yes or no?
19        MR. LEVINE:
20           Can you let him answer the
21        question?
22        MR. LAMBERT:
23           Maybe we'll get out of here.
24    A.  I'm trying to think --
25        MR. LEVINE:

Page 217

1           He hasn't even answered yet.
2        MR. LAMBERT:
3           No, I know the answer.
4        MR. LEVINE:
5           He hasn't answered yet, and
6        you're trying to tell him what the
7        answer is.
8        MR. LAMBERT:
9           I know what it is.
10       MR. LEVINE:
11           Why do we want your testimony?
12       MR. LAMBERT:
13           I'm just saying I've been
14       listening to four thousand word
15       answers to simple questions.
16 EXAMINATION BY MR. BRUNO:
17    Q.  Let's just get an answer, please, and
18 we can move on.  We all would like to get out
19 of hear at some point before 6:00.
20       MR. LAMBERT:
21           Do you remember the question?
22       THE WITNESS:
23           Why don't you say it again.
24       MR. LAMBERT:
25           Did anybody ever tell you not to

(Pages 218 to 221)

Page 218

1      use rocks on the foreshoring on the
2      MRGO?
3      MR. LEVINE:
4          That's not the question.
5      MR. LAMBERT:
6          Yeah it was.
7      MR. LEVINE:
8          Can you read the question back,
9      please?
10      (Whereupon the previous question was
11 read back.)
12      MR. LEVINE:
13          That's not the same thing as you
14      said.
15      MR. BRUNO:
16          Okay. Come on. It doesn't
17      matter.
18 EXAMINATION BY MR. BRUNO:
19      Q.   Can you give me a bleeding answer?
20 Come on, It doesn't take that long.
21      A.   Not that I recall.
22      MR. LAMBERT:
23          There you go.  See, I was right.
24 EXAMINATION BY MR. BRUNO:
25      Q.   Can you recall ever being told by

Page 219

1 anyone in authority that you couldn't do any
2 particular thing on the MRGO while you were
3 operations manager from 2000 to 2005 because
4 what you proposed was environmentally
5 unacceptable?
6      A.   They don't -- they don't make that
7 decision.  I mean, that's made at a much lower
8 level.  The analysis is done --
9      Q.   By anybody, I don't care who it is.
10 By your brother, your mama, anybody.  Has
11 anybody told you that you couldn't do something
12 you wanted to do on MRGO while you were
13 operations manager, okay, because it was
14 environmentally unacceptable?
15      A.   Um -- we wouldn't propose something
16 that was environmentally unacceptable.
17      Q.   Please answer my question.  The answer
18 is either yes or the answer is no, and then you
19 can explain it until the cows come home.
20      MR. LAMBERT:
21          It's no.
22      A.   No, caveated by the fact that we're
23 not -- we wouldn't further consider anything
24 that was knowingly environmentally
25 unacceptable.

Page 220

1 EXAMINATION BY MR. BRUNO:
2      Q.   Do you believe that the installation
3 of rocks for the purposes of foreshore
4 protection is environmentally unacceptable?
5      A.   I don't.
6      Q.   Okay.  Would that be the we, since you
7 started to tell me we don't do?  Can you also
8 tell me that we would not find that to be
9 environmentally unacceptable?
10      A.   Who is we?
11      Q.   You said, a few moment ago, we don't
12 propose things that are environmentally
13 unacceptable.  You said we.
14      A.   Yes.
15      Q.   I understand that.  But because you
16 said we, now I got to ask you whether or not
17 the we would agree that the installation of
18 rocks for the purposes of foreshore protection
19 is environmentally acceptable.
20      A.   I and we are the same.
21      Q.   Thank you.  Would you agree with the
22 statement that where stone structures are not a
23 cost competitive alternative for channel
24 maintenance banks left unprotected have eroded
25 significantly along the MRGO channel?

Page 221

1      A.   Yes.  I probably wrote that.  Sounds
2 like me.
3      Q.   I really can't tell who wrote this,
4 tell you the truth.  It's Memorandum 4
5 CEMVD-PD-WM.
6      MR. WOODCOCK:
7          You mind attaching that?
8      (Exhibit 18 was marked for
9 identification and is attached hereto.)
10 EXAMINATION BY MR. BRUNO:
11      Q.   Explain to me how the construction of
12 the limestone enclosure dikes that you guys
13 built for, to -- for spoil, um -- deposition
14 were included in your authorization or your
15 operations budget.
16      A.   Um -- that would be part of the
17 alternatives of analysis that were done when
18 looking it a particular reach that has to be
19 dredged.
20      Q.   Right.
21      A.   And we could compare alternatives like
22 that to building dikes in the designated upland
23 disposal area and pumping material into that
24 area so that if this other option for creation
25 of wetlands instead of disposing material was

EDMOND JOSEPH RUSSO                                          May 21, 2008

(Pages 222 to 225)

Page 222

1   as economical or better than building up these
2   dikes and pumping in that upland disposal area,
3   um -- and environmentally acceptable, which it
4   was because it was wetland creation, then we
5   could, um -- do that because it was meeting the
6   criteria of the federal standard.
7       Q.  So dikes are not part of your
8   authorization unless you can demonstrate that
9   it's an economically equal alternative.
10      A.  Well, dikes -- any kind of engineering
11  feature, it doesn't matter what it is, isn't
12  really, um -- talked about in terms of the
13  details of maintenance like that.  I mean, if
14  it was hay bales that you could use to hold
15  material back, they don't really specify it,
16  but if it works and it's something that can be
17  engineered, then --
18      Q.  Well, I'm with you, but what I'm
19  confused about is how is it part of the
20  dredging budget?  I mean, dredging is dredging.
21  It's scooping material out of a bottom of a
22  channel, and then you dump it on the side.
23  Now, so now we have this new feature.  This new
24  feature is a dike to contain the material.
25      A.  Right.

Page 223

1       Q.  Don't you agree with me that the dike
2   is something that really isn't included in the
3   original authorization or in the maintenance of
4   the MRGO?
5       A.  It's not specifically called out, but,
6   um -- neither is removal of the material from
7   the bottom with any particular type of dredging
8   equipment.  It doesn't --
9       Q.  Right.
10      A.  It doesn't say you shall use this kind
11  or that kind of equipment to remove the
12  materials.  So that kind of level of detail
13  isn't normally included.
14      Q.  It's not a detail item.  It's a cost
15  item.  Because if you don't have to build a
16  dike, you're spending less money.  Right?  Am I
17  wrong about that?
18      A.  But when we compare this, the upland
19  disposal area dikes, um -- have to be --
20  they're much more substantial.  They're very
21  wide and tall, and the cost to build those up
22  in the upland disposal area can be pretty
23  expensive.
24      Q.  But the upland disposal area itself
25  wasn't originally -- did not originally include

Page 224

1   the dikes either.  Originally, the spoil was
2   just thrown on the side of the banks.  I'm
3   trying to understand how you guys were able to
4   build dikes using your dredging money.
5       A.  It's parts of a dredging project.
6   Now, what limited information -- I mean, to my
7   knowledge, I'm pretty sure the original channel
8   that was constructed had dikes to contain the
9   material off to the side.  So I don't know if
10  I --
11      Q.  No.  We have old pictures that they
12  just dumped it on -- in fact, if you look at
13  the photographs -- have you seen those pictures
14  where they've created almost like a hundred or
15  two hundred foot area where they took the spoil
16  from the dredging of the MRGO and just threw it
17  to the north, if you will, which is now where
18  the levee is located?
19      A.  Um -- yeah, I've seen the pictures.
20  Um -- I was pretty sure that that was all
21  contained with some sort of dikes.  But I
22  haven't seen all the pictures, maybe, so.
23          But in any case, it -- that, to us,
24  according to our interpretation of managing the
25  project, the different kind of details don't

Page 225

1   really matter if the dike and the wetland
2   creation bottom line is the most
3   economically -- most economical plan when you
4   compare it with some sort of upland disposal that would
5   include all kind of dike work, then we can --
6   we can met that federal standard criteria by
7   doing wetland creation.  So.
8       Q.  No, I know you can meet the -- I'm not
9   worried about meeting the standard for that.
10  I'm trying to figure out how you're able to
11  spend money if there's no authorization for a
12  dike.  That's what I'm having confusion about.
13      A.  Our interpretation is that there's no
14  requirement for that because you'd have to, by
15  engineering standards, contain the material
16  somehow when you remove it.  So that's just an
17  engineering practice.
18      Q.  Okay.  Did you tell me that you had
19  the discretion to decide what engineering
20  standards published by the United States Army
21  Corps of Engineers you were going to use or a
22  not use?
23      A.  Um -- that normally wasn't decided in,
24  um -- the management area, per se.  The
25  engineering division would normally recommend

78145971-3aae-4e24-8465-33ccad14221d

EDMOND JOSEPH RUSSO                                      May 21, 2008

(Pages 226 to 229)

Page 226

1   designs, tell how they worked, how much they
2   cost, for the manager to interact.
3       Q.   Right.  Now you've told me very
4   generally there is an operations sort of
5   section of standards or regulations and I can
6   look those up on the Internet and get those.
7   Right?
8       A.   (Nods affirmatively.)
9       Q.   Now, what I'm trying to figure out is,
10  to the extent that they tell you to do
11  something or not do something, are you telling
12  me that you don't have to follow those
13  guidelines?  If there's a guideline, for
14  example, that said, I don't know, just making
15  this up, you must inspect once every year the
16  MRGO channel, are you saying to me you don't
17  have to do that if those standards say to do
18  that?
19      A.   They're generally not that specific.
20  But if there are minimum standards, you know,
21  we'll do our best to meet the minimum
22  standards.  I mean, that's -- you know, that's
23  a standard practice to do that.  And we'll get
24  advised by engineering on just what the
25  engineering standards are that we would need to

Page 227

1   meet.
2       Q.   Okay.
3       A.   So.
4       Q.   All right.  Well, let me ask you this:
5   While you were there, did you all, on any
6   regular basis, inspect the MRGO to evaluate the
7   amount of bank erosion that was occurring over
8   any period of time as chosen by you?
9       A.   Yeah.  We did a, um -- well, it was a,
10  um -- more like an office study done using,
11  um -- aerial photography to try to understand
12  what the rates of erosion were reach by reach
13  along the waterway.
14      Q.   Okay.  How often did you do the fly
15  over?
16      A.   Well, because it was somewhat of a
17  considerable effort, I was only able during the
18  time I was there to get something like that
19  done one time, um -- for the purpose of trying
20  to quantify just where we were having some
21  major sediment influxes that may be related to
22  that.
23      Q.   Well, based upon what you've told me
24  today, it's the depth of the water that's going
25  to determine the likelihood that the bank

Page 228

1   erosion is causing a problem, right?
2       A.   Yeah.  We try to make a connection
3   there.
4       Q.   Sure.  So it seems to me you would go
5   to those places where you had the largest
6   amount of shoaling, and then you would evaluate
7   that shoaling against the bank erosion.  Right?
8       A.   Right.
9       Q.   All right.  But I'll hearing you say
10  that you did something different, you did an
11  evaluation of bank erosion along the length of
12  the entire MRGO.
13      A.   Yeah.  That was to try to connect the
14  dots between the surveys, so to speak, surveys
15  that are conducted in the channel, to say,
16  okay, we've got shoaling occurring in these
17  locations, well, can we further support, um --
18  where we would look at alternatives to dredging
19  under this federal standard and use this aerial
20  photography as an indicator of where foreshore
21  protection may be a competitive option under
22  this federal standard.  So it was a data
23  collection.  Information.
24      Q.   Did your office, while you were in
25  charge, evaluate the water for increases in

Page 229

1   salinity or determine --
2       A.   My office, I don't think we did.
3       Q.   Okay.  But your office had previously
4   recognized that the MRGO was causing increased
5   salinity in a variety of areas along the MRGO,
6   including all way up to the Lake Pontchartrain.
7       A.   Um -- I want to say that the office
8   really looking into that was the project
9   management office in charge of the
10  re-evaluation study.  I don't know that we -- I
11  don't recall that our office in particular
12  was -- had ever really looked at that.  They
13  were really focused on the channel itself.
14      Q.   Do you know why whoever it was that
15  was evaluating the salinity levels was
16  evaluating the salinity levels?
17      A.   Um -- they were trying to make that
18  connection to the condition of the wetlands
19  that may be impacted by changing salinity
20  levels.
21      Q.   And that was done pursuant to the
22  evaluation of wetlands loss?
23      A.   Um -- I think the first -- and I don't
24  know that I really read the document, the
25  environmental specialist sort of explained and

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

May 21, 2008

(Pages 230 to 233)

Page 230

1    summarized some of that to me.  I believe some
2    of the first looks at that were in the original
3    MRGO EIS that was done in the seventies.
4        Q.  Okay.
5        A.  And they basically, in there, from
6    what I understand, described that, you know,
7    with the construction of this channel there
8    will be those types of habitat changes and
9    these types of impacts due to a variety of
10   reasons, to include salinity.
11       Q.  All right.  Now, I recognize that you
12   have testified today that you had an
13   authorization and that you have testified that
14   you didn't believe that you could go outside of
15   that authorization.  But you've not been able
16   to tell me how you determined how far outside
17   of that authorization you can go.  But you have
18   testified that it's your understanding of the
19   authorization that you were not permitted to
20   correct bank erosion unless you could find a
21   navigation justification for it.  Right?
22       A.  Some linkage to the primary purpose.
23       Q.  All right.  Now, recognizing your
24   testimony, did you feel like you had an
25   obligation if you couldn't fix it to simply

Page 231

1    identify the fact that there was bank erosion?
2        A.  Um -- I didn't feel like there was an
3    obligation in the position I was in, but it
4    turns out that the data that we have -- you
5    know, we collected could be useful and was
6    turned over as information and data to the
7    re-evaluation people who were able to use it, I
8    do believe.
9        Q.  Right.  Well, does it then not follow
10   logically that if the -- if there wasn't a
11   relationship between bank erosion and dredging,
12   and the cost of dredging in particular, that
13   your office may have let that channel get as
14   wide as five thousand feet and not have been
15   concerned about it?
16       A.  Yeah.  That really didn't enter into
17   the, um -- into the scope of what we could
18   consider.
19       Q.  Okay.  I want to make it -- I need an
20   affirmative answer.  As far as you were
21   concerned, if the MRGO caused the loss of fifty
22   thousand acres of wetlands, it was not relevant
23   to your work as manager of operations for the
24   MRGO to either be aware of that loss or to
25   report that loss to anybody; is that accurate?

Page 232

1        A.  I think -- I think that we were -- we
2    needed to be aware of those loss rates, and as
3    a testament to that we did analyses while I was
4    there, and again for the specific purposes that
5    I needed.  We reported that by being a member
6    of this team and providing all data and
7    information that we had available to those who
8    had the authority to look beyond the confines
9    of what we could do.
10       Q.  Okay.  All right.  So you do accept
11   the fact that you had the obligation to, once
12   you were aware of wetlands loss caused by the
13   MRGO, that you should it least advise somebody
14   of that.  Right?
15       A.  As part of that team, we did.
16       Q.  Well, that's a different answer to a
17   different question.  I'm asking you whether or
18   not independent of that team or that report, or
19   that investigation, you felt that you had any
20   obligation, as operations manager for the MRGO,
21   to report the loss of wetlands that you
22   believed to be related to the MRGO?
23       A.  Hmm.
24       Q.  Did you have that obligation you felt
25   or you didn't?

Page 233

1        A.  I -- you know, that's a good question.
2    I don't believe under the various things that,
3    you know, governed me that we were obligated to
4    that.
5        Q.  All right.  Now, you will remember
6    that I showed you those engineering standards
7    that called upon somebody to inspect, and you
8    told me that, you know, those engineering
9    standards, as far as you were concerned, didn't
10   apply to you.
11       A.  I mean, they -- at least the work that
12   I did, my management work.
13       Q.  Right.  All I'm saying to you, though,
14   is those engineering standards do call upon the
15   Corps to, on some periodic basis, to evaluate a
16   project to determine whether or not it is
17   having a negative impact on property or people.
18       A.  I don't -- it doesn't say that.
19       Q.  It doesn't.
20           MR. BRUNO:
21           Can I have that back, please?
22   EXAMINATION BY MR. BRUNO:
23       Q.  Under engineering during the
24   operations phase, it says, the Corps shall
25   periodically inspect the project and shall

(Pages 230 to 233)

Page 230

1  summarized some of that to me.  I believe some
2  of the first looks at that were in the original
3  MRGO EIS that was done in the seventies.
4      Q.  Okay.
5      A.  And they basically, in there, from
6  what I understand, described that, you know,
7  with the construction of this channel there
8  will be those types of habitat changes and
9  these types of impacts due to a variety of
10  reasons, to include salinity.
11      Q.  All right.  Now, I recognize that you
12  have testified today that you had an
13  authorization and that you have testified that
14  you didn't believe that you could go outside of
15  that authorization.  But you've not been able
16  to tell me how you determined how far outside
17  of that authorization you can go.  But you have
18  testified that it's your understanding of the
19  authorization that you were not permitted to
20  correct bank erosion unless you could find a
21  navigation justification for it.  Right?
22      A.  Some linkage to the primary purpose.
23      Q.  All right.  Now, recognizing your
24  testimony, did you feel like you had an
25  obligation if you couldn't fix it to simply

Page 231

1  identify the fact that there was bank erosion?
2      A.  Um -- I didn't feel like there was an
3  obligation in the position I was in, but it
4  turns out that the data that we have -- you
5  know, we collected could be useful and was
6  turned over as information and data to the
7  re-evaluation people who were able to use it, I
8  do believe.
9      Q.  Right.  Well, does it then not follow
10  logically that if the -- if there wasn't a
11  relationship between bank erosion and dredging,
12  and the cost of dredging in particular, that
13  your office may have let that channel get as
14  wide as five thousand feet and not have been
15  concerned about it?
16      A.  Yeah.  That really didn't enter into
17  the, um -- into the scope of what we could
18  consider.
19      Q.  Okay.  I want to make it -- I need an
20  affirmative answer.  As far as you were
21  concerned, if the MRGO caused the loss of fifty
22  thousand acres of wetlands, it was not relevant
23  to your work as manager of operations for the
24  MRGO to either be aware of that loss or to
25  report that loss to anybody; is that accurate?

Page 232

1      A.  I think -- I think that we were -- we
2  needed to be aware of those loss rates, and as
3  a testament to that we did analyses while I was
4  there, and again for the specific purposes that
5  I needed.  We reported that by being a member
6  of this team and providing all data and
7  information that we had available to those who
8  had the authority to look beyond the confines
9  of what we could do.
10      Q.  Okay.  All right.  So you do accept
11  the fact that you had the obligation to, once
12  you were aware of wetlands loss caused by the
13  MRGO, that you should it least advise somebody
14  of that.  Right?
15      A.  As part of that team, we did.
16      Q.  Well, that's a different answer to a
17  different question.  I'm asking you whether or
18  not independent of that team or that report, or
19  that investigation, you felt that you had any
20  obligation, as operations manager for the MRGO,
21  to report the loss of wetlands that you
22  believed to be related to the MRGO?
23      A.  Hmm.
24      Q.  Did you have that obligation you felt
25  or you didn't?

Page 233

1      A.  I -- you know, that's a good question.
2  I don't believe under the various things that,
3  you know, governed me that we were obligated to
4  that.
5      Q.  All right.  Now, you will remember
6  that I showed you those engineering standards
7  that called upon somebody to inspect, and you
8  told me that, you know, those engineering
9  standards, as far as you were concerned, didn't
10  apply to you.
11      A.  I mean, they -- at least the work that
12  I did, my management work.
13      Q.  Right.  All I'm saying to you, though,
14  is those engineering standards do call upon the
15  Corps to, on some periodic basis, to evaluate a
16  project to determine whether or not it is
17  having a negative impact on property or people.
18      A.  I don't -- it doesn't say that.
19      Q.  It doesn't.
20          MR. BRUNO:
21              Can I have that back, please?
22  EXAMINATION BY MR. BRUNO:
23      Q.  Under engineering during the
24  operations phase, it says, the Corps shall
25  periodically inspect the project and shall

78145971-3aae-4e24-8465-33ccad14221d