# Exhibit 45

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

**IN RE:** KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION            NO. 05-4182 K2

JUDGE DUVAL

**PERTAINS TO:**  MRGO AND ROBINSON

(No. 06-2268)

(V O L U M E   II)

Rule 30(b)(6) deposition of THE UNITED STATES OF AMERICA, BY AND THROUGH THE UNITED STATES ARMY CORPS OF ENGINEERS' DESIGNEE THOMAS PODANY, given at the U.S. Army Corps of Engineers New Orleans District offices, 7400 Leake Avenue, New Orleans, Louisiana 70118-3651, on October 9th, 2008.

REPORTED BY:

JOSEPH A. FAIRBANKS, JR., CCR, RPR

CERTIFIED COURT REPORTER #75005

PODANY (VOL II), GEORGE

10/9/2008

(Pages 247 to 250)

Page 247

1  And did New Orleans successfully respond to all
2  their comments?
3      MR. SMITH:
4          Objection. Compound.
5   A.  Well, I can tell you one of the
6  important things that happened was the modeling
7  on that key point of where the benefits were
8  coming from was completed.
9  EXAMINATION BY MR. BRUNO:
10  Q.  Okay.
11  A.  That was an important part of the way
12  ahead.
13  Q.  So would that be the next thing that
14  occurred?
15  A.  Yes. Well, it was one of the more
16  important things that happened.
17  Q.  All right. Is there a document that
18  was produced that would give us the findings of
19  the evaluation of the WES?
20  A.  The summary of it is in the '94 recon
21  report.
22  Q.  Okay.
23  A.  Short summary.
24  Q.  All right. Why don't we go to that,
25  then. Did we mark that yet? Have we marked

Page 248

1  the '94?
2      MR. SMITH:
3          Not with this witness.
4      MR. BRUNO:
5          We have marked it many, many
6      thousand of times in the course of
7      these depositions. Robin is right.
8      But we have to mark it again unless we
9      can find it.
10     MR. SMITH:
11         It's Number 11.
12     (Off the record.)
13  EXAMINATION BY MR. BRUNO:
14  Q.  All right. The WES studies came out
15  and apparently suggested that the dredging
16  benefits were overestimated by approximately
17  two 200 or 300 percent, right?
18  A.  Yeah. Or they're probably about twice
19  what they should be, right.
20  Q.  Well, 200 percent.
21  A.  Yeah.
22  Q.  Okay. So that came out in about what,
23  May of '89. Did that effectively stop whatever
24  it was that was going on up to that point in
25  connection with the GDM?

Page 249

1   A.  It very likely did. And the reason is
2  it took away the primary part of the recon
3  report was that there were -- appears to be at
4  least one economically feasible project out
5  there, alternative, and it cast a lot of doubt
6  that there was even one. Because the basis for
7  the benefits -- if you divide the benefits by
8  half and the benefit cost ratio is a 1.1, then
9  you're below 1 in your benefit cost ratios.
10  Q.  The only problem we have of course is
11  that they didn't really ever consider the
12  closure option, so that we don't know whether
13  or not that would have been a cost benefit of
14  better than 1.
15  A.  It was considered in the '94 report.
16  Q.  I understand. I'm just saying as
17  we --
18  A.  Right.
19  Q.  -- as we looked at the world in the
20  middle of 1989, we didn't know.
21  A.  It wasn't in the '88 report.
22  Q.  Right. So they didn't do it.
23  A.  Right.
24  Q.  And they should have done it.
25  A.  Well, it was a comment to the '88

Page 250

1  report.
2   Q.  All right. Vicksburg thought they
3  should have done it. How about that?
4   A.  Yeah. After the report was completed.
5      (Brief recess.)
6  EXAMINATION BY MR. BRUNO:
7   Q.  All right. I think we were about mid
8  1989 when the WES report came out, and let's
9  kind of see where we are here. We know that we
10 have a severe problem, and that problem is the
11 erosion of the banks, the loss of marsh,
12 increased salinity, loss of trees, it's been
13 well documented by the 1998 bank erosion
14 reconnaisance report. Isn't that true?
15  A.  The 1988 we're talking about?
16  Q.  Yeah. We got a pretty good document
17 which describes a whole host of environmental
18 problems that the Corps itself sees as directly
19 related to the MRGO. Isn't that an absolute
20 fact?
21  A.  I think the problems, needs and
22 opportunities are described in the report,
23 um -- starting on Page 26. So all the
24 identified problems, needs and opportunities
25 are listed starting on Page 26 --

PODANY (VOL II), GEORGE

10/9/2008

(Pages 255 to 258)

### Page 255

```
 1   MR. SMITH:
 2       Severe.  Loss of trees.
 3   MR. BRUNO:
 4       You mean to tell me that the
 5   reconnaisance report itself doesn't
 6   use the word severe?  Are you going to
 7   tell me that this report doesn't talk
 8   about the loss of trees and the loss
 9   of swamps?  Those are not my
10   characterizations, those are yours.
11   MR. SMITH:
12       Your question was does he agree
13   with your characterization.  We can
14   read that question back. That was your
15   question.
16   MR. BRUNO:
17       That was my question.
18   MR. SMITH:
19       Whether he agrees with your
20   characterization is irrelevant.
21   MR. BRUNO:
22       That's fine.  Then make your
23   relevance objection and we'll move on.
24   Okay?
25   EXAMINATION BY MR. BRUNO:
```

### Page 256

```
 1    Q.  I'd like to know, Mr. Podany -- I'm
 2   trying to get a sense of where the Corps is mid
 3   '89.
 4    A.  Uh-huh.
 5    Q.  I mean, the fact is that you had a
 6   Congressional request for information, did you
 7   not, from Congressman Livingston's resolution?
 8    A.  That's correct.
 9    Q.  It says, look, I need some answers
10   here.  The Congress is asking for something,
11   right?
12    A.  Uh-huh.
13    Q.  It wasn't the Chief of the Engineers
14   asking for something, it was Congress asking
15   for something.
16      MR. SMITH:
17         Objection.  Asked and answered.
18   EXAMINATION BY MR. BRUNO:
19    Q.  Now, at the end of this process, at
20   least the beginning part of this process, the
21   Corps has some information.  I'd like to know
22   what the Corps knows as of middle of 1989.
23      MR. SMITH:
24         Objection.  Vague.
25   EXAMINATION BY MR. BRUNO:
```

### Page 257

```
 1    Q.  That's the context of my question.  So
 2   at that time, is it not true that the Corps has
 3   affirmatively established that the MRGO channel
 4   as designed is causing the banks to erode?
 5   Isn't that true?
 6      MR. SMITH:
 7         Objection.  Asked and answered.
 8    A.  But I think the way it is described on
 9   Pages 26, 27 and 28 in Exhibit 37 is the best
10   technical way to describe the problems, needs
11   and opportunities out there.
12   EXAMINATION BY MR. BRUNO:
13    Q.  All right.  And do these problems
14   needs and opportunities describe the fact that
15   the MRGO is eroding its banks?
16    A.  It describes the fact that there is
17   bank erosion occurring along the MRGO.
18    Q.  All right.  And you said yesterday,
19   did you not, that if the channel were wider
20   there would be less wave wash from large ships?
21   Isn't that so?
22    A.  Yes, I did say that.
23    Q.  Okay.  Thank you.  Now, given the
24   knowledge that the Corps now has as of that
25   point in time, what if anything is the Corps
```

### Page 258

```
 1   supposed to do about these problems?
 2      MR. SMITH:
 3         Objection.  Asked and answered.
 4    A.  At what point in time are we --
 5   EXAMINATION BY MR. BRUNO:
 6    Q.  That's why I started it with the
 7   middle of '89.
 8    A.  The middle of '89, there is a dilemma.
 9   Once the modeling is done, the modeling
10   demonstrates that the recommendations of the
11   '88 report may not be valid because there may
12   not necessarily be feasible alternative out
13   there.
14    Q.  Okay.
15    A.  So we're left with the situation where
16   with have no authority, we don't have a process
17   necessarily to evaluate bank protection, not an
18   accepted one, you know, like we do for
19   commercial navigation, flood control and
20   navaid.  And we don't have a sponsor.  And, you
21   know, so where do we -- how do we address the
22   concerns that people have about that area?
23    Q.  Okay.
24    A.  We're in a dilemma right now.
25    Q.  So what do you do?
```

PODANY (VOL II), GEORGE

10/9/2008

(Pages 259 to 262)

Page 259

1    A.   Well, then that's how the '94 report
2  came out.
3    Q.   All right, sir.  Well, how did the '94
4  report come out?
5    A.   The '94 report was done to look at
6  another way, to expand the thinking on how you
7  might be able to justify bank protection --
8  bank erosion protection measures.
9    Q.   All right.  Let's start in the same
10 fashion that we did in the '88.
11   A.   Okay.
12   Q.   We went to the resolution.  On Page --
13 well, there's no page number, but there is a
14 page which is entitled Introduction --
15   A.   Right.
16   Q.   -- and it says, study authority.
17 Right?
18   A.   Right.
19   Q.   And interestingly enough it refers to
20 the exact same resolution that was the reason
21 for the '88 study.  Right?
22   A.   Uh-huh.
23   Q.   All right.  Now, so the Corps did one
24 study and ran into a roadblock.
25   A.   Yes.

Page 260

1    Q.   And so explain to me how doing the
2  same thing all over again was going to
3  eliminate that roadblock.
4    A.   Things had changed since then.
5    Q.   Okay.
6    A.   There was processes developed or in
7  the process of being developed to look at
8  environmental features of environmental
9  projects using not the traditional National
10 Economic Development process with a BC ratio
11 but evaluating environmental projects, projects
12 that had potential environmental outputs,
13 looking at it that way.  Looking at non
14 monetary benefits.  And that was something that
15 had just begun, um -- to be discussed within
16 the Corps and initial guidance was coming out
17 on how to address environmental outputs in a
18 project in a way that could we used to justify
19 potentially a project.
20   Q.   Okay.  Is there a new law that's
21 passed that provides the authority to have this
22 new way of thinking?
23   A.   I think what's changed, if you saw
24 from the '88 report the attempt to put monetary
25 benefits on the environmental outputs, you saw

Page 261

1  that we tried to put a dollar on an acre of
2  marsh.
3    Q.   Right.
4    A.   Around that time, there were still
5  people trying to do that, but between '88 and
6  '94 there was a realization that was not a
7  direction to go in and that there should be a
8  look at using some kind of non monetary
9  valuation of environmental outputs.
10   Q.   Okay.
11   A.   And that would mean something like a
12 wetland value assessment or habitat evaluation
13 assessment that the U.S. Fish and Wildlife
14 Service had done.  So there were those
15 discussions nationwide by that time.
16   Q.   All right.  I appreciate that.  But
17 the question is a simple one:  Was there some
18 Congressional mandate, Congressional mandate,
19 statute, authorization, permission, something
20 that came from the Congress that moved the
21 Corps into this new way of thinking, or did the
22 Corps come to this new way of thinking on its
23 own?
24            MR. SMITH:
25               Objection.  Compound.

Page 262

1    A.   Well, when a feasibility study is done
2  or a recon report is done and the results are
3  negative, there is sometimes a look at why did
4  it not work, and did you cover everything,
5  maybe there's a different way of looking at
6  this and finding a way to justify the project.
7           First attempt in '88 was looking at
8  maintenance savings, mostly navigation
9  benefits, and the belief at the time the report
10 was prepared was that that would justify the
11 project.  Once the modeling showed that that
12 was not true then it's natural to look at
13 whether there's a different approach that could
14 be made to derive the same -- a similar
15 justification for the project, look at maybe
16 there's another way to justify that project,
17 maybe it's still a good project but we have to
18 look at the benefits a different way.
19   Q.   I accept that, but that's not the
20 question.  You didn't answer the question.  I'm
21 sorry.
22   A.   All right.
23   Q.   I'm trying to learn whether or not
24 this new -- and I'm categorizing it as new
25 thinking because I believe you testified that

PODANY (VOL II), GEORGE

10/9/2008

(Pages 275 to 278)

Page 275

1   Louisiana Bank Erosion.  The date of it is 21
2   January '88.  It says, we will recommend in the
3   reconnaisance report that in lieu of proceeding
4   to cost shared feasibility studies problems
5   identified by the subject study be addressed
6   via a supplement to the GDM for the MRGO
7   navigation project.  Okay?
8       A.  Correct.
9       Q.  So it's crystal clear here, is it not,
10  that the idea was to move beyond feasibility,
11  straight through feasibility.  Right?
12          MR. SMITH:
13              May I see the document, Joe?  I'm
14          sure you don't have another copy.
15          MR. BRUNO:
16              Oh, that was a low blow.
17      A.  Okay, I'm not sure I understand the
18  question, because this is dated January 21,
19  1988.  The reconnaisance report is February,
20  1988.
21  EXAMINATION BY MR. BRUNO:
22      Q.  Right.  And it says we will recommend.
23      A.  And they both have the same
24  information.
25      Q.  Right.  And what I'm driving at is

Page 276

1   this:  That it was -- the intent was to not
2   have to do a feasibility study.  Right?
3       A.  That's correct.
4       Q.  And the reason why they didn't want to
5   do a feasibility study was why?
6       A.  A couple of reasons.  And this
7   documented in here, one is that -- because the
8   benefits are mainly due to navigation, then it
9   would be appropriate to use full federal
10  funding to do whatever studies were necessary
11  to achieve -- to request authorization.  The
12  second point is that the supplemental, the GDM,
13  or the supplement to the GDM is just another
14  mechanism of doing essentially the same
15  evaluation but in a different vehicle.  So
16  you'd have to do the same things you would
17  normally do in a feasibility study but you're
18  doing them in a supplement to the GDM and the
19  cost of that evaluation is 100 percent federal.
20      Q.  Well, the difference is that if you
21  had to do a feasibility study you have to find
22  a local sponsor.
23      A.  Correct.
24      Q.  So are you telling me that the Corps
25  was unafraid as to whether or not it could find

Page 277

1   a local sponsor for a feasibility study, that
2   it was a non issue?
3       A.  No, I think I remember hearing or
4   seeing somewhere that the sponsors in the
5   documents that we have here, the sponsors, you
6   know, would be reluctant to cost share in a
7   feasibility study if the benefits or outputs
8   were mainly navigation related.  Because
9   normally, if it's navigation, at that time, the
10  studies were 100 percent federal.  Commercial
11  navigation.
12      Q.  Okay.  All right.  So the degree to
13  which you reduced the navigation benefit would
14  increase the likelihood of a local sponsor 's
15  interest.  Is that what you're telling us?
16      A.  It would increase the need to have a
17  sponsor.
18      Q.  Well, I know it would increase the
19  need to have a sponsor, but it would also,
20  according to logic, increase the desire of a
21  local sponsor to participate.  Right?
22          MR. SMITH:
23              Objection.  Calls for
24          speculation.
25      A.  I don't know.  It could or it could

Page 278

1   not, depending on the sponsor.
2   EXAMINATION BY MR. BRUNO:
3       Q.  All I care about is what the Corps
4   thought.  Did the Corps believe that if the
5   navigation component was reduced -- the
6   navigation benefit component was reduced that
7   it would have any problems locating or
8   identifying a local sponsor?
9           MR. SMITH:
10              Objection.  Asked and answered.
11          Calls for speculation.
12      A.  It's very difficult to find a cost
13  shared sponsor for a feasibility study or a
14  project in this state.
15  EXAMINATION BY MR. BRUNO:
16      Q.  In this state, generally.
17      A.  Yeah, generally.  It's difficult.
18      Q.  All right.  So does that mean then
19  that the Corps tries to avoid feasibility
20  studies completely because of the difficulty?
21          MR. SMITH:
22              Objection.  Vague.
23      A.  No, I think in this case it made sense
24  to look at what is the best path ahead.  And if
25  there's not a need to have a cost shared

Page 279

1  feasibility study then that's one less hurdle
2  that you have to worry about. If you can do it
3  through a GDM supplement and it's 100 percent
4  federal, it increases the likelihood of
5  success, but then again you have to have the
6  rationale or justification to go that other
7  way.
8      Q. Did the reconnaisance report of 1988
9  establish the need for bank protection?
10     A. I believe it did, yes.
11     Q. All right. So the issue was whether
12 or not it could be justified using a
13 cost-benefit analysis, right?
14     A. That was an issue.
15     Q. Well, is it an issue or the issue?
16       MR. SMITH:
17         Objection. Vague.
18     A. That's one of the issues. As we
19 talked about yesterday, the purpose of a recon
20 report is to find at least one economically
21 feasible and environmentally acceptable plan.
22 You do also need a sponsor for the project,
23 even if it's 100 percent federal, because they
24 have to provide the local assurances in the
25 cost sharing agreement. And so all those

Page 280

1  things usually are assessed at the recon level.
2  Not always, but usually all those things are.
3  EXAMINATION BY MR. BRUNO:
4      Q. Do you need a local sponsor if the
5  chief decides to exercise his discretionary
6  authority to include something like bank
7  erosion protection in an ongoing, authorized,
8  existing project?
9      A. You would need a sponsor for that
10 feature of that project. In other words, the
11 local assuring -- either the existing sponsor
12 for the project would have to provide the
13 lands, easements and rights-of-way and other
14 local assurances that are in the standard
15 agreements, or you would have to find a new
16 sponsor to do that.
17     Q. All right. Well, when the Corps
18 exercised its discretion to put rock dike
19 protection at Reach 1 and Reach 2, who was the
20 local sponsor for that?
21     A. The local -- if it became part of the
22 project, which it did, it would have been the
23 Port of New Orleans.
24     Q. All right. So in the case that the
25 chief exercises his discretionary authority to

Page 281

1  expand the project --
2      A. Right.
3      Q. -- whoever is the sponsor at the
4  beginning becomes the sponsor of that expanded
5  project, right? You don't need a new one.
6      A. If they agreed -- if there's
7  additional lands, easements, rights-of-way that
8  are required for that new feature, then the
9  sponsor of that project would need to provide
10 it. If they refused to, then it would be
11 difficult to actually implement that feature of
12 the project.
13     Q. Do you think you'd need to add new
14 lands in order to do rock dike protection of
15 the shores of the MRGO channel?
16     A. You could. You'd have to do a real
17 estate analysis for that.
18     Q. And that's because the shores had
19 widened so much that they had exceeded the
20 rights-of-way, right?
21     A. I think that's a distinct possibility.
22       (Off the record.)
23 EXAMINATION BY MR. BRUNO:
24     Q. Just so we can get some clarification,
25 would you please explain what you mean when you

Page 282

1  say the local sponsor providing the easements?
2      A. Well, generally, when there's a new
3  feature of a project or a feature of a project,
4  any project, the requirements in the cost
5  sharing agreement are that the non-federal
6  sponsor provide lands, easements,
7  rights-of-way, in some cases relocations, hold
8  and save the United States -- there's a number
9  of clauses in there that they have to agree to
10 for that work. And so if there's additional
11 rights needed, even if it was the state that
12 owned those rights, it would be the
13 responsibility of the sponsor to ensure that
14 those right are given or provided to the
15 federal government and the contractor so that
16 the work can be executed.
17     Q. Okay. All right. Now, again, we're
18 still in May of '89, I think we were talking
19 about the fact that there was a Congressional
20 add to do some rock dike protection.
21     A. Right.
22     Q. And we had referred to NED 167-1828
23 and we talked about the fact that there were
24 some left over funds. And it says what we
25 request that the engineering division

Page 279

1  feasibility study then that's one less hurdle
2  that you have to worry about. If you can do it
3  through a GDM supplement and it's 100 percent
4  federal, it increases the likelihood of
5  success, but then again you have to have the
6  rationale or justification to go that other
7  way.
8      Q.  Did the reconnaisance report of 1988
9  establish the need for bank protection?
10     A.  I believe it did, yes.
11     Q.  All right. So the issue was whether
12 or not it could be justified using a
13 cost-benefit analysis, right?
14     A.  That was an issue.
15     Q.  Well, is it an issue or the issue?
16        MR. SMITH:
17            Objection. Vague.
18     A.  That's one of the issues. As we
19 talked about yesterday, the purpose of a recon
20 report is to find at least one economically
21 feasible and environmentally acceptable plan.
22 You do also need a sponsor for the project,
23 even if it's 100 percent federal, because they
24 have to provide the local assurances in the
25 cost sharing agreement. And so all those

Page 280

1  things usually are assessed at the recon level.
2  Not always, but usually all those things are.
3  EXAMINATION BY MR. BRUNO:
4      Q.  Do you need a local sponsor if the
5  chief decides to exercise his discretionary
6  authority to include something like bank
7  erosion protection in an ongoing, authorized,
8  existing project?
9      A.  You would need a sponsor for that
10 feature of that project. In other words, the
11 local assuring -- either the existing sponsor
12 for the project would have to provide the
13 lands, easements and rights-of-way and other
14 local assurances that are in the standard
15 agreements, or you would have to find a new
16 sponsor to do that.
17     Q.  All right. Well, when the Corps
18 exercised its discretion to put rock dike
19 protection at Reach 1 and Reach 2, who was the
20 local sponsor for that?
21     A.  The local -- if it became part of the
22 project, which it did, it would have been the
23 Port of New Orleans.
24     Q.  All right. So in the case that the
25 chief exercises his discretionary authority to

Page 281

1  expand the project --
2      A.  Right.
3      Q.  -- whoever is the sponsor at the
4  beginning becomes the sponsor of that expanded
5  project, right? You don't need a new one.
6      A.  If they agreed -- if there's
7  additional lands, easements, rights-of-way that
8  are required for that new feature, then the
9  sponsor of that project would need to provide
10 it. If they refused to, then it would be
11 difficult to actually implement that feature of
12 the project.
13     Q.  Do you think you'd need to add new
14 lands in order to do rock dike protection of
15 the shores of the MRGO channel?
16     A.  You could. You'd have to do a real
17 estate analysis for that.
18     Q.  And that's because the shores had
19 widened so much that they had exceeded the
20 rights-of-way, right?
21     A.  I think that's a distinct possibility.
22        (Off the record.)
23 EXAMINATION BY MR. BRUNO:
24     Q.  Just so we can get some clarification,
25 would you please explain what you mean when you

Page 282

1  say the local sponsor providing the easements?
2      A.  Well, generally, when there's a new
3  feature of a project or a feature of a project,
4  any project, the requirements in the cost
5  sharing agreement are that the non-federal
6  sponsor provide lands, easements,
7  rights-of-way, in some cases relocations, hold
8  and save the United States -- there's a number
9  of clauses in there that they have to agree to
10 for that work. And so if there's additional
11 rights needed, even if it was the state that
12 owned those rights, it would be the
13 responsibility of the sponsor to ensure that
14 those right are given or provided to the
15 federal government and the contractor so that
16 the work can be executed.
17     Q.  Okay. All right. Now, again, we're
18 still in May of '89, I think we were talking
19 about the fact that there was a Congressional
20 add to do some rock dike protection.
21     A.  Right.
22     Q.  And we had referred to NED 167-1828
23 and we talked about the fact that there were
24 some left over funds. And it says what we
25 request that the engineering division

Page 283

1  accomplish the following tasks with these
2  available funds:  Bank erosion, study
3  appropriate photographs and maps to verify the
4  estimated bank erosion rates along the north
5  bank.  This is October, 1992.
6      A.   Okay.
7      Q.   Why would they be doing that?
8      A.   Well, because the question is about
9  what the maintenance dredging requirements
10 would be and what the sedimentation or shoaling
11 would be in the channel.  And we're updating,
12 basically, the information that was done in
13 '88.  There could be new information that
14 changes what was in the '88 report.
15     Q.   All right.  The second thing they want
16 to do with these available funds is wave,
17 climate and other design conditions, determine
18 the wind, wave climate as well as establish the
19 ship wave criteria for ship drawdown and return
20 flow for the design of appropriate
21 alternatives.
22          Do you know what they're talking about
23 there?
24     A.   Yes.  I think they just wanted to have
25 a better depiction of how the vessels were

Page 284

1  transiting the channel, what kind of wave is
2  produced, the type of wave would be important,
3  when you're designing bank protection measures,
4  that is actually produced.  It's just a better
5  way of focusing in on what's happening.
6      Q.   All right.  So again, these are things
7  that the Corps is asking somebody to do,
8  they're using money that's in the budget.
9      A.   Uh-huh.
10     Q.   So this is not money that they have
11 gone to Congress and asked for a specific
12 allocation, this is just money that they've got
13 available and they can do with it what they
14 want, apparently, judging from these tasks.
15 Right?
16     A.   No.  These two studies would have had
17 general investigation funds, and within those
18 funds, from fiscal year to fiscal year, there
19 could be money left over from the previous year
20 that's used for the next year.  That's what
21 that's talking about.  Because there's specific
22 funding for that.
23     Q.   It goes on to say that we also request
24 that you begin work on the conceptual design
25 and selection of the proper alternative for

Page 285

1  bank protection as well as the alignments as
2  discussed during the 14 October meeting.  The
3  fiscal year '93 federal budget includes a
4  Congressional add authorizing the construction
5  of rock dike protection along the north bank of
6  the MRGO.  The protection would extend
7  approximately 3-1/2 miles between channel miles
8  50 and 54.  The design of this feature is
9  provided as Enclosure 2.  Construction is
10 scheduled to the begin this month.  We were
11 advised that subsequent maintenance will be
12 funded under O&M general for Mississippi River
13 Gulf Outlet Louisiana project.  We request that
14 you include this feature in your evaluation of
15 the future without project condition.
16          Okay.  Well, the whole purpose of the
17 reconnaisance report was to try to find a way
18 to get funding to build rock dike protection,
19 right?
20     A.   Yes.
21     Q.   And here we have Congress giving you
22 money to do rock dike protection.
23     A.   Yes.
24     Q.   So why wouldn't the Congress just give
25 you the money to do the rock dike protection?

Page 286

1  Why do we have to go through all this effort
2  through the reconnaisance of '88 and the
3  reconnaisance of '94 when apparently you quite
4  successfully, on your own, got this so-called
5  Congressional add-on?
6          MR. SMITH:
7              Objection.  Calls for
8          speculation.
9      A.   I mean, you often ask why Congress
10 doesn't just provide us money to build
11 projects.  It does just doesn't happen that way
12 most of the time.
13     Q.   Well, they gave you some.
14     A.   It happened this time.
15     Q.   Right.  Do you know how it happened?
16     A.   I know a little bit about it.  What
17 happened was the, um -- Louisiana Department of
18 Natural Resources reviewed our maintenance
19 plans for the Mississippi River Gulf Outlet,
20 and they were concerned about the impacts of
21 the project overall to the environment and
22 wanted to see us do something about the bank
23 erosion along the channel.  And as part of the
24 Coastal Zone Management review, they said
25 essentially that they wouldn't provide Coastal

PODANY (VOL II), GEORGE

10/9/2008

(Pages 287 to 290)

Page 287

1 Zone Management approval unless we did that
2 bank protection project. And the problem was,
3 you know, is there enough money to do that and
4 dredge the channel and keep it open -- keep the
5 project open for maintenance? And so I think
6 someone must have approached Congress that,
7 um -- you know, said this is a problem, you
8 know, and Congress then acted the way it did,
9 provided the funding and authority to construct
10 that piece of the bank protection project.
11    Q.  Okay. Well, that sounds to me like
12 the State of Louisiana could be of some
13 assistance in connection with you all getting
14 some money to build the rock dike protection.
15 Right?
16    A.  They could be, yeah.
17    Q.  All right. Well, what -- can you help
18 me understand what regulations the Louisiana --
19 I'm sorry. What commission was it?
20    A.  Department of Natural Resources.
21    Q.  The Department of -- let may see if I
22 understand this. The Department of Natural
23 Resources says to the Corps, stop doing
24 something, right?
25    A.  Uh-huh.

Page 288

1    Q.  What were they saying that they were
2 no longer going to let you do?
3    A.  They were not going to provide Coastal
4 Zone Management consistency unless something
5 was done to address the erosion in this area.
6    Q.  Can you help me understand what
7 Coastal Zone Management consistency is?
8    A.  Well, it's one of the environmental
9 acts that is out there -- let's see. I'm
10 probably not the best person to answer this, so
11 maybe I shouldn't. I mean, we could look to
12 the report and see -- on Page 26.
13    Q.  The report being? The '94 --
14    A.  Yeah. Exhibit 11.
15    Q.  11? What page? I'm sorry again.
16    A.  Page 26.
17    Q.  Okay.
18    A.  The Coastal Zone Management Act of
19 1972 --
20    Q.  All right.
21    A.  -- provides for certain procedures
22 for, um -- I forgot which agency overseas that.
23         MR. SMITH:
24            Look at Table 6. I think it
25         suggests --

Page 289

1         MR. BRUNO:
2            Yeah, that's where he was, Page
3         26.
4    A.  Yeah. I don't know if it was National
5 Marine Fisheries or what agency, but there is
6 an agency that overseas that nationwide and
7 states are given a role in reviewing plans --
8 construction plans for areas in the coastal
9 zone, and they can review that and comment
10 under that Act.
11 EXAMINATION BY MR. BRUNO:
12    Q.  Okay. So bottom line is, Louisiana
13 said, look, we're not going to give you
14 whatever it is that the Corps needs, we're not
15 quite sure what that is, right?
16    A.  Yeah. Approval -- Coastal Zone
17 Consistency determination.
18    Q.  All right. It's an approval.
19    A.  It's an approval that it's consistent
20 with the Coastal Zone Management plans for
21 coastal Louisiana.
22    Q.  All right. Unless you do some rock
23 dike protection.
24    A.  Yes.
25    Q.  And so the Corps said, well, we don't

Page 290

1 have enough money in our budget to do that as
2 on operation and maintenance component, right?
3    A.  Yes.
4    Q.  But we got to do it because -- and it
5 really is operations and maintenance because
6 we're trying to continue to dredge. Right? In
7 other words, it's a cost of business, if you
8 will.
9    A.  It appears to be a cost of business,
10 yes.
11    Q.  All right. So the cost of business is
12 compliance with at least one environmental act,
13 the Coastal Zone Management Act of 1972.
14    A.  Yes.
15    Q.  And it was the State of Louisiana -- I
16 mean, I guess I'm a little bit confused. You,
17 the Corps, had an independent obligation to
18 comply with the Coastal Zone Management Act
19 regardless of what the state did, right?
20    A.  We supply our plans to them and they
21 review them and comment.
22    Q.  Okay.
23    A.  And they issue the consistency.
24    Q.  Okay. So -- all right. Just to tie
25 this all together -- we're looking at Document

Page 291

1  AIN 167-20 through 51.  I'm not sure what this
2  is.  It's a Vicksburg House Questions and
3  Answers Budget Distribution.  The question is,
4  the fiscal year '92 Energy and Water
5  Development Appropriations Act provided an
6  additional $3.5 million for the Mississippi
7  River Gulf Outlet Louisiana project.  How are
8  these fund being used?
9      Answer:  Sir, the funds are being
10 utilized as the Act directed.  Approximately
11 3.5 miles of rock dike foreshore protection
12 located between Mile 56.1 and Mile 49.9 will be
13 constructed to prevent further erosion of the
14 north bank line of the MRGO navigation channel.
15 The foreshore protection will also serve as a
16 retaining dike for placement of maintenance
17 dredge material.  The contract is scheduled to
18 be awarded in April of 1992 provided we receive
19 real estate right-of-way entry requirements
20 from the local sponsor.  All work should be
21 completed by 30 September 1982.
22     So that's what we're talking about
23 here.
24     A.  Yes.
25     Q.  Okay.  All right.  So the point is

Page 292

1  that the Corps was able to get some money to do
2  the rock dike work at least for one reach, and
3  it's clear that, or was it clear to the Corps
4  that using the environmental regulations and
5  acts was a good vehicle by which to obtain that
6  money?
7      A.  I don't think the environmental
8  regulations or acts really was the method.  It
9  was the Congress decided to go ahead and
10 specifically authorize and fund this, and it
11 may have been because of concerns people saw
12 the impact of the CZM review this project and
13 potentially delaying maintenance of the
14 project.
15     Q.  Oh, I see.  Okay.  Because if you
16 didn't do the work you couldn't get the
17 permit --
18     A.  It's not a permit.
19     Q.  Other way around.  Not the permit.  If
20 you didn't get, whatever, the authorization --
21 what did you call it?
22     A.  Coastal Zone consistency
23 determination.
24     Q.  If you didn't get the Coastal Zone
25 consistency determination, you couldn't proceed

Page 293

1  with the dredging.
2      A.  I'm not sure about that.  That's a
3  questionable issue.
4      Q.  I thought that's what you just said.
5      A.  Yeah.  Well, but that's -- I'm not
6  sure that that's really true.  It could cause a
7  delay, but whether they would actually prevent
8  the federal government -- the state could
9  actually prevent the federal government from
10 talking federal action, I'm not sure that
11 that's true.
12     Q.  All right.  Now let me just show you
13 this document, because again we're still in the
14 middle of 1989, kind of where are we, and what
15 are we going to do about the problem of the
16 erosion of the banks.  This is a 2 May 1989
17 document.  And the number is virtually cut off
18 but it looks like NED 192-147 in seriatim to
19 166.  Okay?  I'm going to show that to you and
20 see if you've seen that document before.
21     A.  Okay.  It looks familiar, but I don't
22 recall the details.
23     Q.  I know this is not specific to
24 reconnaisance, but what they're saying
25 apparently, to me, is that at the same time

Page 294

1  that you guys are studying foreshore protection
2  another section of the district office is also
3  studying bank protection.  Right?
4      A.  Uh-huh.
5      Q.  And I guess what's -- and then there's
6  a whole series of pages about the nature of the
7  types of protection that they're considering.
8      A.  Uh-huh.
9      Q.  Right?  They're considering planting
10 trees and vegetation, and rock dike, and all
11 kind of other things.  To what extent did you
12 all attempt to work with the other sections
13 within the New Orleans branch to see if there
14 could be some coordination of effort to address
15 the problem of this rock dike protection?
16     A.  Well, these efforts would have been
17 fully coordinated.  They are separate.  There's
18 some relationship in geography here.  What this
19 is about is looking at an alternative to place
20 the new lock -- ship channel lock that replaces
21 the Inner Harbor Navigation Canal lock, in
22 Violet, Louisiana.  And such an alternative
23 would likely require a mitigation plan because
24 it would impact the brackish marsh is what it
25 says here.  A tentative plan for mitigating the

Page 291

1    AIN 167-20 through 51.  I'm not sure what this
2    is.  It's a Vicksburg House Questions and
3    Answers Budget Distribution.  The question is,
4    the fiscal year '92 Energy and Water
5    Development Appropriations Act provided an
6    additional $3.5 million for the Mississippi
7    River Gulf Outlet Louisiana project.  How are
8    these fund being used?
9         Answer:  Sir, the funds are being
10   utilized as the Act directed.  Approximately
11   3.5 miles of rock dike foreshore protection
12   located between Mile 56.1 and Mile 49.9 will be
13   constructed to prevent further erosion of the
14   north bank line of the MRGO navigation channel.
15   The foreshore protection will also serve as a
16   retaining dike for placement of maintenance
17   dredge material.  The contract is scheduled to
18   be awarded in April of 1992 provided we receive
19   real estate right-of-way entry requirements
20   from the local sponsor.  All work should be
21   completed by 30 September 1982.
22        So that's what we're talking about
23   here.
24   A.   Yes.
25   Q.   Okay.  All right.  So the point is

Page 292

1    that the Corps was able to get some money to do
2    the rock dike work at least for one reach, and
3    it's clear that, or was it clear to the Corps
4    that using the environmental regulations and
5    acts was a good vehicle by which to obtain that
6    money?
7    A.   I don't think the environmental
8    regulations or acts really was the method.  It
9    was the Congress decided to go ahead and
10   specifically authorize and fund this, and it
11   may have been because of concerns people saw
12   the impact of the CZM review this project and
13   potentially delaying maintenance of the
14   project.
15   Q.   Oh, I see.  Okay.  Because if you
16   didn't do the work you couldn't get the
17   permit --
18   A.   It's not a permit.
19   Q.   Other way around.  Not the permit.  If
20   you didn't get, whatever, the authorization --
21   what did you call it?
22   A.   Coastal Zone consistency
23   determination.
24   Q.   If you didn't get the Coastal Zone
25   consistency determination, you couldn't proceed

Page 293

1    with the dredging.
2    A.   I'm not sure about that.  That's a
3    questionable issue.
4    Q.   I thought that's what you just said.
5    A.   Yeah.  Well, but that's -- I'm not
6    sure that that's really true.  It could cause a
7    delay, but whether they would actually prevent
8    the federal government -- the state could
9    actually prevent the federal government from
10   talking federal action, I'm not sure that
11   that's true.
12   Q.   All right.  Now let me just show you
13   this document, because again we're still in the
14   middle of 1989, kind of where are we, and what
15   are we going to do about the problem of the
16   erosion of the banks.  This is a 2 May 1989
17   document.  And the number is virtually cut off
18   but it looks like NED 192-147 in seriatim to
19   166.  Okay?  I'm going to show that to you and
20   see if you've seen that document before.
21   A.   Okay.  It looks familiar, but I don't
22   recall the details.
23   Q.   I know this is not specific to
24   reconnaisance, but what they're saying
25   apparently, to me, is that at the same time

Page 294

1    that you guys are studying foreshore protection
2    another section of the district office is also
3    studying bank protection.  Right?
4    A.   Uh-huh.
5    Q.   And I guess what's -- and then there's
6    a whole series of pages about the nature of the
7    types of protection that they're considering.
8    A.   Uh-huh.
9    Q.   Right?  They're considering planting
10   trees and vegetation, and rock dike, and all
11   kind of other things.  To what extent did you
12   all attempt to work with the other sections
13   within the New Orleans branch to see if there
14   could be some coordination of effort to address
15   the problem of this rock dike protection?
16   A.   Well, these efforts would have been
17   fully coordinated.  They are separate.  There's
18   some relationship in geography here.  What this
19   is about is looking at an alternative to place
20   the new lock -- ship channel lock that replaces
21   the Inner Harbor Navigation Canal lock, in
22   Violet, Louisiana.  And such an alternative
23   would likely require a mitigation plan because
24   it would impact the brackish marsh is what it
25   says here.  A tentative plan for mitigating the

PODANY (VOL II), GEORGE

10/9/2008

(Pages 295 to 298)

Page 295

1  loss of approximately 730 acres of brackish
2  marsh.
3       So one of the plans that they came up
4  with, and they could have looked at a lot of
5  different ways the mitigate for that potential
6  loss if that project was ever built, was
7  looking at bank stabilization along the MRGO.
8  And bank stabilization along the MRGO could
9  provide the benefits or marsh protection that
10 could be used as a mitigation for the violet
11 diversion project -- or Violet lock project.
12    Q.  Let me just show you this document AIN
13 130-1006.  This is just to give us a handle on
14 these costs.
15    A.  Okay.
16    Q.  I don't see any indication for '88,
17 but at least we've got the '94.
18    A.  Okay.  All right.
19    Q.  So we're here we -- this is indicating
20 that there was new money, 5 August '92 -- well,
21 these are cost estimates.  Is there some way --
22 is there some way we can determine what they
23 actually gave you?  It says that this study is
24 going to cost about $3 million.  Is that right?
25 The reconnaissance.  The '94 reconnaisance?

Page 296

1     A.  No, what this is referring to, this is
2  an annual update of the study cost estimate,
3  so -- also called a PB6.  And what this would
4  be would be an estimate of both the recon and
5  feasibility phases.  So it would reflect both
6  the recon and feasibility phase costs in it.
7     Q.  Okay.  Does that assume a local
8  sponsor?
9     A.  It may or may not.  Yes, it would
10 have -- on the second page it would show
11 whether there was a non federal responsibility
12 or not.  Oh, that's the wrong one.  Let me see.
13 Yeah.  The enclosure isn't -- let's see what it
14 says.  Okay, at that time it shows a non
15 federal sponsor share or phase.
16    Q.  Okay.
17    A.  Yes, it does.
18    Q.  It does?
19    A.  Yeah.
20    Q.  Okay.  How much?  Let's see.  Where am
21 I looking?  I'm looking at Page AIN 130-1004.
22 Fully estimated -- okay.  And, um -- where does
23 it show the sponsor?
24    A.  Okay.  What it shows is that there's a
25 cost associated with a non federal feasibility

Page 297

1  phase, so that would be either the sponsor
2  would provide that in funds or some of that
3  could be done in "in kind" work.  $1.4 million.
4     Q.  Okay.  And this was done 14 October
5  '94.  Was this before or after the study -- the
6  study comes out in January of '94.  So this is
7  a post reconnaisance report cost evaluation,
8  right?
9     A.  Correct.
10    Q.  Okay.  All right.  I show you NPM
11 36-1504.  It's stapled together.  I don't know
12 why.  But at least the first page is not
13 Page 1.  (Tendering.)  Take a look at that.
14    A.  Okay.
15    Q.  All right.  This is a meeting that you
16 attended; right?
17    A.  Okay.
18    Q.  Okay.  The subject is the Gulf Outlet
19 Revised Reconnaisance Study and Feasibility
20 Study.  So I'm gathering that by '93 you're
21 involved with this revised reconnaisance study.
22 Right?
23    A.  I was involved, yes, last part in '93
24 or --
25    Q.  What was your role?

Page 298

1     A.  My role was to assist the project
2  manager, the study manager Dale Gerdis who was
3  preparing the reconnaisance report.  My role
4  was mainly to do the time and cost estimate for
5  the feasibility phase.  They call it initial
6  project management plan.
7     Q.  All right.  Now, it says that the
8  discussion to prepare an environmental
9  assessment or an environmental impact statement
10 for the subject study was discussed in detail.
11       Was it the group 's understanding that
12 you would have to do an environmental
13 assessment for the study, or was it for the
14 work contemplated by the study?  I'm a little
15 confused.
16       MR. SMITH:
17          Objection.  Calls for
18       speculation.
19    A.  I'm trying to recall, but I think what
20 happened was during the discussion of the
21 feasibility phase -- which never did happen, by
22 the way.  Okay?  So we never did actually get
23 into the feasibility phase.  But during the
24 discussion of what would be required to do the
25 feasibility phase there was a consideration

PODANY (VOL II), GEORGE

10/9/2008

(Pages 295 to 298)

Page 295

1  loss of approximately 730 acres of brackish
2  marsh.
3       So one of the plans that they came up
4  with, and they could have looked at a lot of
5  different ways the mitigate for that potential
6  loss if that project was ever built, was
7  looking at bank stabilization along the MRGO.
8  And bank stabilization along the MRGO could
9  provide the benefits or marsh protection that
10 could be used as a mitigation for the violet
11 diversion project -- or Violet lock project.
12    Q.  Let me just show you this document AIN
13 130-1006.  This is just to give us a handle on
14 these costs.
15    A.  Okay.
16    Q.  I don't see any indication for '88,
17 but at least we've got the '94.
18    A.  Okay.  All right.
19    Q.  So we're here we -- this is indicating
20 that there was new money, 5 August '92 -- well,
21 these are cost estimates.  Is there some way --
22 is there some way we can determine what they
23 actually gave you?  It says that this study is
24 going to cost about $3 million.  Is that right?
25 The reconnaissance.  The '94 reconnaisance?

Page 296

1     A.  No, what this is referring to, this is
2  an annual update of the study cost estimate,
3  so -- also called a PB6.  And what this would
4  be would be an estimate of both the recon and
5  feasibility phases.  So it would reflect both
6  the recon and feasibility phase costs in it.
7     Q.  Okay.  Does that assume a local
8  sponsor?
9     A.  It may or may not.  Yes, it would
10 have -- on the second page it would show
11 whether there was a non federal responsibility
12 or not.  Oh, that's the wrong one.  Let me see.
13 Yeah.  The enclosure isn't -- let's see what it
14 says.  Okay, at that time it shows a non
15 federal sponsor share or phase.
16    Q.  Okay.
17    A.  Yes, it does.
18    Q.  It does?
19    A.  Yeah.
20    Q.  Okay.  How much?  Let's see.  Where am
21 I looking?  I'm looking at Page AIN 130-1004.
22 Fully estimated -- okay.  And, um -- where does
23 it show the sponsor?
24    A.  Okay.  What it shows is that there's a
25 cost associated with a non federal feasibility

Page 297

1  phase, so that would be either the sponsor
2  would provide that in funds or some of that
3  could be done in "in kind" work.  $1.4 million.
4     Q.  Okay.  And this was done 14 October
5  '94.  Was this before or after the study -- the
6  study comes out in January of '94.  So this is
7  a post reconnaisance report cost evaluation,
8  right?
9     A.  Correct.
10    Q.  Okay.  All right.  I show you NPM
11 36-1504.  It's stapled together.  I don't know
12 why.  But at least the first page is not
13 Page 1.  (Tendering.)  Take a look at that.
14    A.  Okay.
15    Q.  All right.  This is a meeting that you
16 attended; right?
17    A.  Okay.
18    Q.  Okay.  The subject is the Gulf Outlet
19 Revised Reconnaisance Study and Feasibility
20 Study.  So I'm gathering that by '93 you're
21 involved with this revised reconnaisance study.
22 Right?
23    A.  I was involved, yes, last part in '93
24 or --
25    Q.  What was your role?

Page 298

1     A.  My role was to assist the project
2  manager, the study manager Dale Gerdis who was
3  preparing the reconnaisance report.  My role
4  was mainly to do the time and cost estimate for
5  the feasibility phase.  They call it initial
6  project management plan.
7     Q.  All right.  Now, it says that the
8  discussion to prepare an environmental
9  assessment or an environmental impact statement
10 for the subject study was discussed in detail.
11       Was it the group's understanding that
12 you would have to do an environmental
13 assessment for the study, or was it for the
14 work contemplated by the study?  I'm a little
15 confused.
16    MR. SMITH:
17         Objection.  Calls for
18         speculation.
19    A.  I'm trying to recall, but I think what
20 happened was during the discussion of the
21 feasibility phase -- which never did happen, by
22 the way.  Okay?  So we never did actually get
23 into the feasibility phase.  But during the
24 discussion of what would be required to do the
25 feasibility phase there was a consideration

Johns Pendleton Court Reporters                              800 562-1285

62b84bc3-f09f-4893-ae84-3dc63f7ed9bb

Page 299

1    about doing an environmental assessment or an
2    EIS. And the discussion went along the lines,
3    well, a big EA is like a small EIS. And
4    ultimately what I think turned the tide toward
5    favoring an EIS was that if we were going to
6    look at closure of the channel that would have
7    significant impacts to the human environment,
8    and that would mean that we would have to do an
9    environmental impact statement.
10       Q.  So that you would have to do an
11   environmental impact statement only with regard
12   to the option of closure?
13       A.  That's what I recall. And it was
14   because it was going to change the port, the
15   recreation -- it would have recreation impacts
16   and navigation impacts to the human environment
17   that would be considered significant enough to
18   push us into the -- we probably would have to
19   do the environmental impact statement area.
20       Q.  Well, here they're saying several
21   reasons were given to prepare an EIS -- which
22   is how you drew same conclusion -- these
23   include, the placement of rock along the eroded
24   shoreline may increase the tidal scour at
25   points where breaches are made. These breaches

Page 300

1    would be left to allow the natural bayous and
2    waterways which enter the MRGO to function as
3    normal. What on earth does that mean?
4        A.  Well, what they're saying is, when you
5    place rock along a bank line like this, but
6    only in certain areas, those areas that don't
7    have rock are going to be under a little bit
8    more stress, potentially, because the water is
9    ponding on one side or the other, so it's
10   putting them -- that may or may not be true. I
11   mean, that may be somebody's position that that
12   could happen.
13       Q.  Right.
14       A.  But that would be a consideration.
15          And also, what they're saying is that
16   you want to have -- in many of these areas you
17   want this interchange -- this tidal interchange
18   to continue because that's generally considered
19   to be a good thing from an environmental
20   standpoint. You don't necessarily want to
21   block off the entire tidal exchange, you want
22   estuarine organisms to be able to move in and
23   out into areas.
24       Q.  Okay. Well, then it says, because of
25   the large scope of the proposed action, thirty

Page 301

1    miles of shoreline along the north bank of the
2    MRGO, the various designs of shoreline
3    protection and the possible consideration of
4    small scale construction of various critical
5    segments of the MRGO that may be prioritized,
6    an EIS would be necessary. What does that
7    mean?
8        A.  It's a position that you need to do an
9    EIS because -- and I'm not sure I understand
10   that either, but it looks like that because of
11   the scope of the project over many miles of the
12   channel, that it would require an EIS.
13          Of course, this is the kind of
14   discussion you have every time you have a
15   project. You know, what do you need to do?
16   What's the best way to achieve NEPA compliance?
17   You know, what path do we need to follow?
18       Q.  All right. Then it says public
19   involvement. The locals don't want a small
20   scale bank protection project, they want
21   something more than just a few miles that are
22   being considered critical reaches.
23          Okay. How does that help or weigh in
24   favor of an EIS, if you know?
25       A.  I'm not sure that it does, except

Page 302

1    that, you know, it means that the local
2    interests want a big project, so a big project
3    is going to have bigger impacts, so projects
4    with bigger impacts more likely result in an
5    EIS.
6        Q.  Okay. When environmental
7    organizations, LPBF -- that's the Lake
8    Pontchartrain Basin Foundation; right?
9        A.  Correct.
10       Q.  -- see how much this project is going
11   to cost they'll probably ask why we didn't
12   evaluation the closure of the MRGO as a
13   possible alternative.
14       A.  Right.
15       Q.  How does that relate to an EIS?
16       A.  Well, I think the discussion, just
17   like you said before, when you look at closure
18   of the MRGO, that's going to have a major
19   impact on the human environment, so -- I
20   remember at the time people saying if that's an
21   alternative that would trigger an EIS by
22   itself, potentially.
23       Q.  Because it's having a major impact on
24   the human environment.
25       A.  Right.

Page 303

1   Q.  Well, doesn't the shoreline erosion
2  itself have a major impact on the human
3  environment?  I mean, the no action
4  alternative, doesn't that also have the same
5  impact?
6   A.  I think you could make a case that it
7  has an impact, yes.
8   Q.  And you probably could make the case
9  that because dredging increases the likelihood
10 of shoreline falling in that it's also -- that
11 the dredging also has a major impact, as well,
12 right?
13  A.  Right.  You can make the case that
14 dredging and bank erosion, and closure of the
15 MRGO, all to varying degrees have impacts to
16 the human environment.
17  Q.  Okay. Let's see.  It says, because
18 the proposed action requires detailed
19 engineering to decide what type of shoreline
20 protection would function best in certain
21 reaches of the MRGO, then the detailed
22 description required in the impacts of the
23 alternatives on significant resources would
24 probably follow the format of an EIS better
25 than an EA.

Page 304

1   Can you help me understand that?
2   A.  No, not sure, but I know the
3  environmental folks who wrote that are more
4  comfortable using the EIS process for very
5  large projects.  I think that's all he's
6  saying.
7   Q.  Okay.  What's an EA?
8   A.  Environmental assessment.
9   Q.  And when do you have to do that, if
10 you know?
11      MR. SMITH:
12          I object.  We've had another
13      witness already address EAs.
14  A.  Yeah.  It's probably better somebody
15 else.
16 EXAMINATION BY MR. BRUNO:
17  Q.  Okay. Next sentence:  Because we may
18 consider the closure of the MRGO as a non
19 structural alternative -- why would it be a non
20 structural alternative?  It would have to be
21 structural, wouldn't it?
22  A.  Not necessary.  You could just abandon
23 the channel.
24  Q.  But if you did something -- if you
25 blocked it off, it would be structural.

Page 305

1   A.  That's true.
2   Q.  All right.  Then the socioeconomic
3  impacts of that alternative would be
4  significant and an EISs would be required.  And
5  you've told us about that already.
6   A.  Right.
7   Q.  At anytime during the review process,
8  the Corps, another federal agency, the state or
9  a public organization/citizen could argue that
10 the proposed action would have a significant
11 effect on the human environment or that we
12 overlooked a significant resource, and we would
13 have an additional analysis.  This would not be
14 much of a problem if we were already doing an
15 EIS, but if we were doing an EA the whole
16 process would have to start over again and an
17 EIS would have to be prepared, adding 4 to 8
18 months to the report/EIS schedule.
19      Do you know what that means?
20  A.  Well, there's basically two ways to
21 address NEPA compliance; one is through an EA,
22 and one is through an EIS.  They're similar
23 reports, the EIS is just a more deliberate
24 approach.
25  Q.  Okay.

Page 306

1   A.  And usually an EA is done when there's
2  the potential for no significant impact.  It's
3  more of streamlined way of doing it sometimes.
4   Q.  So bottom line, the decision was made
5  to prepare a supplemental EISs to the existing
6  MRGO EIS which was prepared in 1976.
7   A.  That would have been the path that we
8  would have gone on if we had in fact done the
9  feasibility study.
10  Q.  Okay. Thank you.  So I think you've
11 already testified you don't know when the
12 decision was made to do this revised
13 reconnaisance report.  Right?
14  A.  I don't know.
15  Q.  And you don't know who made the
16 decision.
17  A.  No.
18  Q.  Okay.  But certainly it happened
19 sometime after the middle of May -- I'm sorry,
20 the middle of 1989.  Right?
21  A.  Probably so.  Yes.
22  Q.  How long did it take to do the 1994
23 reconnaisance report?
24  A.  You know, I'm not really sure.  I was
25 in Washington, D.C. for a year, came back in,

PODANY (VOL II), GEORGE

10/9/2008

(Pages 315 to 318)

Page 315

1    answer again.
2    MR. BRUNO:
3        It wasn't answered the first
4    time.
5    MR. SMITH:
6        Are you going to go to the
7    magistrate over this?
8    MR. BRUNO:
9        No, apparently I have to file a
10   motion, according to this, which I
11   will file. I mean, it's so stupid,
12   it's beyond the pale.
13   MR. SMITH:
14       It is.
15   MR. BRUNO:
16       Yeah. So why don't you let the
17   witness give me the answer to the
18   question.
19   MR. SMITH:
20       He has answered it.
21   EXAMINATION BY MR. BRUNO:
22       Q. Well, what does it mean then when you
23   say here determine based upon the appraisal of
24   the federal interests, what does that mean,
25   whether planning should proceed beyond the

Page 316

1    reconnaisance phase?
2        A. That means to evaluate the federal
3    interests and determine whether planning should
4    proceed. Whether you continue into the
5    feasibility phase or not.
6        Q. What exactly are you evaluating, is it
7    strictly money?
8        A. You're evaluating, um -- the
9    alternatives in terms of the Planning Guidance
10   Notebook, ER 1105-2-100, you're going through
11   that planning process to determine whether
12   federal participation is warranted, advisable,
13   that type of thing.
14       Q. What is the federal interest?
15       A. The federal interest in water resource
16   planning, I think it's defined, let me see, in
17   the national objective. Let me look in here.
18   There's a section on that. If you go down to
19   Page 8 --
20       Q. Okay.
21       A. -- in the middle of the page it says,
22   the national objective. I think this is a
23   pretty general definition of what the federal
24   interest is.
25       Q. Okay.

Page 317

1        A. But it's a standard definition. The
2    national objective in federal water resources
3    planning is to contribute to the national
4    economic development in a manner consistent
5    with protecting the nation's environment in
6    accordance with national environmental
7    statutes, applicable executive orders and other
8    federal planning requirements. And then it
9    goes on to talk about what contributions to the
10   national economic development are, and Corps
11   planning from an environmental quality
12   standpoint.
13       Q. Well, it would seem to me that this
14   requires an assessment that would necessitate
15   balancing economic development with protecting
16   the nation's environment. Is that a fair
17   conclusion to reach?
18   MR. SMITH:
19       Objection. Calls for
20       speculation.
21       A. Well, what it talks about is, just as
22   it says, the national objective is to
23   contribute to the national economic development
24   in a manner consistent with protecting the
25   nation's environment.

Page 318

1    EXAMINATION BY MR. BRUNO:
2        Q. Right.
3        A. So one of the things we do in a
4    reconnaisance report is look at how it impacts
5    the national economic development through an
6    assessment of benefits and costs, national
7    economic development benefits, and we look at
8    environmental effects and assess how those
9    alternatives are affecting the environment.
10       Q. Well, but it's more specific than
11   that, is it not? It says, in accordance with
12   national environmental statutes. So doesn't
13   that imply that whatever planning you do can't
14   violate whatever national environmental
15   statutes are on the books at the time?
16       A. Yeah. It says, in accordance with
17   those national statutes.
18       Q. All right. So the appraisal of the
19   federal interests, is that a determination --
20   is that an economic -- is the use of that word
21   there relating to an economic or a
22   quantification of the federal interest?
23       A. Yes. I mean, part of determining the
24   federal interest is looking at the national
25   economic development outputs of alternatives

PODANY (VOL II), GEORGE

10/9/2008

(Pages 323 to 326)

Page 323

1  Q. And you see this reference to the WES
2  report in the first dot at Page 3 --
3  A. Yes.
4  Q. -- where it indicates that model
5  results show that there's a 50 percent
6  probability that the ultimate increase in
7  channel shoaling due to continued erosion is
8  300 percent higher than current rates?  That's
9  the WES report; right?
10  A. Right.  That's correct.
11  Q. It says, based upon these results, the
12  New Orleans District concluded that bank
13  stabilization measures are not likely to be
14  economically justified if the project benefits
15  are based solely on maintenance savings.
16  Right?
17  A. Correct.
18  Q. Okay.  Well, going in didn't the Corps
19  know that there really wasn't anything else to
20  consider other than maintenance savings?
21  A. No, in both reports, the '88 and '94
22  reports, they look at environmental benefits,
23  as well.
24  Q. But didn't they already conclude as
25  early as 1988 that if you included

Page 324

1  environmental benefits that that would
2  necessitate locating a local sponsor in order
3  to advance this project to the feasibility
4  stage?
5  A. That would likely be the case, yes.
6  Q. And didn't they know as early as 1988
7  that it was likely never to happen?
8  A. Well, I don't know.  That's
9  speculation.
10  Q. Well, you've already told us through
11  your testimony yesterday and today that the
12  Corps knows and understands that it's difficult
13  in all cases, and it's certainly difficult in
14  Louisiana, I think you made that point -- did
15  you not?
16  A. Uh-huh.  It's difficult.
17  Q. Right.  And so we know its difficult,
18  and we know this is a project that's been
19  disliked and hated by the local interests since
20  its inception, so what was the possible chance
21  given the knowledge that this thing was going
22  to require a local sponsor --
23      MR. SMITH:
24          Objection.  Calls for
25      speculation.  And object to the form

Page 325

1  of the question.
2      MR. BRUNO:
3          That's because I didn't finish.
4  EXAMINATION BY MR. BRUNO:
5  Q. What was the possible chance of the
6  Corps locating a local sponsor, based upon all
7  that the Corps knew about the feelings of the
8  local sponsors about this project, about the
9  fact that it was going to necessarily go to a
10  feasibility study and all the other information
11  that it had available to it?
12      MR. SMITH:
13          Are you finished?
14      MR. BRUNO:
15          Yes.
16      MR. SMITH:
17          I object.  Calls for speculation.
18      MR. BRUNO:
19          All right.
20  A. One of the purposes of doing a
21  reconnaissance report, and I mentioned this
22  yesterday, is to look and determine whether
23  there's a potential sponsor -- non-federal
24  sponsor for the project.
25  EXAMINATION BY MR. BRUNO:

Page 326

1  Q. Right.
2  A. We sometimes start these reports not
3  knowing what the probability is of having a non
4  federal sponsor.  And we have people that might
5  guess at what it is.  But you don't really know
6  until you finish the report.  And you may be
7  working with them all along, potential
8  sponsors.  But you won't really know for sure
9  until at the end of the report you're looking
10  for a Letter of Intent for them to cost share
11  in a feasibility report, and sometimes they
12  provide that Letter of Intent and sometimes
13  they don't.
14  Q. In this case, you knew you had a small
15  pool of likely potential local sponsors, right?
16      MR. SMITH:
17          Objection.  Vague.
18  A. During the preparation of the initial
19  project management plan we identified potential
20  sponsors being either the Port of New Orleans,
21  State of Louisiana Department of Transportation
22  and Development, DNR, St. Bernard Parish,
23  people that might have an interest in seeing
24  the project constructed.
25  EXAMINATION BY MR. BRUNO:

Johns Pendleton Court Reporters                                    800 562-1285

62b84bc3-f09f-4893-ae84-3dc63f7ed9bb

Page 327

1    Q.  Sure.  You already, before you even
2   started, had a handle on what the thing was
3   going to cost, right?
4    A.  Generally, at a recon report level you
5   would have a preliminary estimate of the cost.
6   Before a sponsor provides a Letter of Intent
7   they want to know not only what the feasibility
8   study might cost but what they might be getting
9   into as far as total project cost and what
10  their share might be of that.
11   Q.  Well, because of '88, you knew that,
12  too, didn't you?  You had a pretty good handle
13  on the cost, didn't you?
14   A.  You should have a good handle on the
15  cost, yes.
16   Q.  Right.  But I mean y'all did.
17   A.  Yes.
18   Q.  So wouldn't it have been prudent to
19  call on each of these potential sponsors, talk
20  to them, let them know what was going on, see
21  if they had any interest before you spent two
22  billion bucks of my money and everybody else's
23  money in this room?
24   A.  Yes, it would be prudent to do that.
25   Q.  Did it happen?

Page 328

1    A.  It happened.
2    Q.  All right.  So who did y'all talk to?
3    A.  A number of different people.  Um --
4   sometime, it was either late 2003 -- I mean,
5   I'm sorry, late 1993 or early 1994, we had a
6   meeting with George Duffy who was the chairman
7   of the maritime -- the Governor's Task Force
8   of the Maritime Industry.  Colonel Diffley
9   asked Mr. Duffy whether he would help, since
10  he's part of the state, to help identify who a
11  potential sponsor might be.  And Mr. Duffy
12  agreed, so Mr. Duffy had a meeting of his
13  maritime industry and at that meeting he
14  invited people from DNR, DOTD, St. Bernard
15  Parish, others, and there was a discussion
16  about the project -- or the recon report and
17  the need to have sponsor for the feasibility
18  report, and the result was that there was no
19  non-federal sponsor coming forward.  The Port
20  of New Orleans eventually told us that they
21  were not able or in a position to sponsor the
22  project.  And, um -- so at that point, you
23  know, it didn't -- no sponsor was identified.
24   Q.  Well, so why did you go forward with
25  the recon report if you knew you were never

Page 329

1   going to get a sponsor?
2    A.  Well, this is after the recon report.
3    Q.  Well, the question was about before
4   the recon report.
5       Did you ask around -- before you spent
6   the two million bucks, or three million bucks,
7   whatever it was, did you ask any of these
8   folks, given the fact that you knew that there
9   was going to be a need for a feasibility study,
10  given the fact that you knew what the cost of
11  that feasibility study was going to be, given
12  that you knew what the likely cost of the
13  project was, given that you knew what the
14  likely local sponsor contribution was going to
15  be, did you do that before the study was done?
16   MR. SMITH:
17      Objection.  Vague.
18   A.  I'll point you to the Page 67.  I
19  think you may be confusing the cost of the
20  feasibility study with the cost of the recon.
21  EXAMINATION BY MR. BRUNO:
22   Q.  You told me they were together.
23   A.  Yeah.  They were estimated together,
24  but the feasibility report, the expenses -- you
25  don't spend the money until you start the

Page 330

1   feasibility report.  So.
2    Q.  All right.
3    A.  So the recon report was done, and the
4   estimate is on that piece of paper that you
5   have.  But once again, the purpose of a recon
6   report is to make that very determination that
7   you were talking about.  So during the
8   reconnaisance phase.  The difficulty of making
9   it at the very beginning is you don't
10  necessarily want to say, here's the results of
11  the recon report, are you interested, and if
12  you're not we're going to stop.  There's still
13  a process of refining costs and benefits during
14  the recon phase and also assessing what's
15  needed for a feasibility phase.  That's redone
16  during a recon report.  And you really don't
17  have all that information until toward the end.
18      So if you look on Page 67, you'll see
19  that a public notice went out about the fact
20  that we were doing this study in 1987, but
21  then -- and it doesn't give time frames for --
22  but if you read what it says, you know, that
23  paragraph under -- second paragraph.
24   Q.  Right.  Several intra-agency meetings?
25   A.  Several intra-agency meetings were