# Exhibit 46

PODANY, THOMAS

10/8/2008

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


**IN RE:** KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION          NO. 05-4182 K2

JUDGE DUVAL

**PERTAINS TO:**  MRGO AND ROBINSON

(No. 06-2268)


(V O L U M E  I)

Rule 30(b)(6) deposition of THE UNITED

STATES OF AMERICA, BY AND THROUGH THE UNITED

STATES ARMY CORPS OF ENGINEERS' DESIGNEE THOMAS

PODANY, given at the U.S. Army Corps of

Engineers New Orleans District offices, 7400

Leake Avenue, New Orleans, Louisiana

70118-3651, on October 8th, 2008.


REPORTED BY:

JOSEPH A. FAIRBANKS, JR., CCR, RPR

CERTIFIED COURT REPORTER #75005

bd959b3f-d362-4a50-9373-43595f4a5aca

PODANY, THOMAS

10/8/2008

(Pages 114 to 117)

Page 114

1     erosion itself that we would be looking at.
2     But also, the material that falls into the
3     channel because of the bank erosion and causes
4     increased maintenance costs.  So the fact that
5     you have silt falling into the channel as the
6     banks erode, and that is an issue maintaining
7     the channel so that issue would be looked at.
8         Q.  Right.
9         A.  And then you have the marsh itself
10    which is eroding and has -- you know, um --
11    quantifying that to the extent you can, and
12    then looking at the quality of that and
13    addressing -- you know, addressing that from an
14    environmental quality -- or environmental loss.
15        Q.  Was there any intent to quantify the
16    amount of environmental damage that these
17    erosion related problems may have been causing
18    in the study area?
19        MR. SMITH:
20            Objection.  Calls for
21            speculation.
22        A.  Well, there is an estimate of what the
23    original construction footprint did to the
24    marsh --
25    EXAMINATION BY MR. BRUNO:

Page 115

1         Q.  Right.
2         A.  -- and how many acres were destroyed
3     of the marsh when the original project was
4     constructed.  And there is an estimate of what
5     the average erosion rate is, the bank erosion
6     rate is, and that is directly, you know,
7     directly -- it's all marsh that's eroding, in
8     this study area anyway.
9         Q.  Okay.  Now, it says the reconnaissance
10    study involved using available data.
11        A.  Uh-huh.
12        Q.  Meaning, I guess, that the Corps had
13    data available to it already.  Right?
14        A.  Right.  That's correct.
15        Q.  Well, how could it have data available
16    to it already if it didn't have the authority
17    to study the issue before now?
18        A.  Well, there was information available
19    like aerial photography that you already have.
20        Q.  Okay.
21        A.  Surveys that were done for another
22    purpose, potentially, like surveys of the
23    channel and the channel widths may have been
24    done as part of the navigation project for
25    operation and maintenance purposes.

Page 116

1         Q.  Okay.
2         A.  Um -- there's just other information
3     that others can provide -- the reports that are
4     listed here, in fact would have been used as a
5     source of information.
6         Q.  Now, you talked about the fact that
7     when the shore erodes, necessarily the bank
8     needs to go somewhere, it's going into the
9     channel.
10        A.  Uh-huh.
11        Q.  So it goes into the channel which
12    necessitates that the channel be dredged.
13            As I understand it, the Corps is
14    already spending money dredging the channel to
15    keep it open for navigation.  Right?
16        A.  Correct.
17        Q.  And as I understand it, because there
18    was no channel when the MRGO was contemplated,
19    that it was dredging that created the channel
20    in the first instance.
21        A.  Uh-huh.
22        Q.  Right?  So how does the Corps make the
23    distinction between the dredging that it did to
24    build the channel and the dredging that it does
25    to keep the channel open?

Page 117

1         MR. SMITH:
2             Objection.  He's not designated
3         to discuss dredging.
4         MR. BRUNO:
5             I'm not really talking about
6         dredging.  I'm talking about in the
7         contacts of this bank erosion and
8         erosion related problems, do they make
9         some distinction?
10        MR. SMITH:
11            The question was what's the
12        difference between dredging to build a
13        channel and dredging to keep it open?
14        MR. BRUNO:
15            Right.  And that's all in the
16        context of the reconnaissance report,
17        Robin.
18        MR. SMITH:
19            They talk about dredging in the
20        reconnaisance report?
21        MR. BRUNO:
22            Of course we do.  The witness
23        said --
24        A.  Yes.  They did.  But let me say this:
25    That in general, when you construct a project

Johns Pendleton Court Reporters                                    800 562-1285

PODANY, THOMAS

10/8/2008

(Pages 118 to 121)

Page 118

1  you use construction general funds, and those
2  funds were used to dredge the original project
3  and construct the other features.  And then
4  Congress will appropriate operation and
5  maintenance funds on an annual basis.  And
6  depending on where the need is, certain parts
7  of that project would have to be dredged.  Now
8  in this particular project it's the jetty
9  reaches, the offshore reaches that are more
10  prone to shoaling and require the greatest
11  maintenance effort.  The inshore reaches do
12  shoal in, a lot of that shoaling material does
13  come from eroded marsh in the vicinity of the
14  project, um -- but that would be the
15  distinction right there, is that you do have
16  two sources of funding, and that there's a
17  limitation on the O&M, operation and
18  maintenance, funds provided by Congress every
19  year.  The question would be best addressed by
20  the operations manager.
21  EXAMINATION BY MR. BRUNO:
22      Q.  Right.  Okay.  But the way you've
23  defined it, it's a money issue.  It's that
24  you've got something is operations because
25  that's what money we need to spend in order to

Page 119

1  keep the thing open once it's been opened.
2      A.  Well, it's also an authority issue.
3  The original construction general funds were
4  provided to construct the project but not to
5  maintain it.  The operation and maintenance
6  funds are provided to maintain the project but
7  not to construct it.  So there's a limitation
8  on how you spent those funds, too.
9      Q.  Well, when you build something it
10  seems to me you want to take into consideration
11  what you can build into your design to keep it
12  easier to maintain.
13      A.  Yes.
14      Q.  That's a component, too, isn't it?
15      A.  Yes.
16      Q.  All right.  So that the degree to
17  which you may need to -- and that's why I keep
18  going back to this authorization thing.  If
19  you're authorized to build a channel of a
20  certain width and a certain depth and the way
21  you chose to build it is making it more
22  expensive to maintain it in that fashion, then
23  it sounds like you had the authority to design
24  it, you just have to change the design a little
25  bit.

Page 120

1      A.  And, um --
2      MR. SMITH:
3          Wait a minute.  There's no
4      question pending.
5  EXAMINATION BY MR. BRUNO:
6      Q.  Isn't that true?
7      A.  I'm sorry.
8  EXAMINATION BY MR. BRUNO:
9      Q.  No, it's getting hyper technical here.
10      A.  What I'm saying is that does kind of
11  show the evolution of this project, and in '96
12  a report was prepared to address that very
13  fact; is there a way to reduce the cost of
14  maintaining this project by putting in bank
15  protection?
16      Q.  That's the '96 document.
17      A.  The '96 document.
18      Q.  So that had nothing to do with the
19  feasibility component.
20      A.  Not it's a this point, no.
21      Q.  Okay.  So back in '88, though -- all
22  we're trying to figure out is it seems like, at
23  Page 2, the extent of erosion and erosion
24  related problems.  In other words, what kind of
25  problems are we creating?  Right?

Page 121

1      A.  Right.
2      Q.  Okay.  And apparently we're also
3  trying to identify opportunities to implement
4  potential solutions to that problem.
5      A.  Correct.
6      Q.  All right.  So do I gather then that
7  this really wasn't the intent, the intent here
8  wasn't to make maintenance easier or less
9  expensive, it was the broader goal of just what
10  kind of problem are we creating?  Is that true?
11      A.  Well, that would have been part of it.
12  I mean, part of it would be looking at, you
13  know, on Page 46 of Exhibit 37.  You can see
14  that they did address the savings in average
15  annual maintenance.  They tried to put a value
16  on the average annual marsh acres saved.  So
17  they were looking at the erosion, or erosion
18  prevented to the marsh.  And then they were
19  looking at the avoidance of even additional
20  further disposal area purchases that might be
21  needed because you've reduced the maintenance
22  costs and you have less material to dispose
23  now.  So they didn't actually consider that.
24      Q.  All right.
25          (Off the record.)

bd959b3f-d362-4a50-9373-43595f4a5aca

PODANY, THOMAS

10/8/2008

(Pages 10 to 13)

Page 10

1  different because now we're asking for the
2  institutional response to a question.  So it's
3  really -- it really gets into what is the
4  position of the institution as well as what it
5  may or may not know.
6      A.  Uh-huh.
7      Q.  So it's not necessary that you know
8  these facts yourself, you can talk about things
9  that you've learned through conversations with
10  others and through positions taken by the
11  institution.  You understand that?
12      A.  Yes.
13      Q.  Okay.  All right.  And here are the
14  rules:  If you don't understand my question,
15  please tell me.  I'll try to rephrase it as
16  best I can.  You know more about the subject
17  than I do since you live here and I don't.
18      A.  Uh-huh.
19      Q.  If something is confusing, tell me.
20  If you don't tell me I'm going to assume that
21  you understand my question.
22         When it comes to the need for you to
23  take a break, anytime you want one, you just
24  hold up your hand and ask for a break and we'll
25  stop.  Okay?  We have to get off the record

Page 11

1  first before we can do that.
2      A.  Okay.
3      Q.  And that's all I can think of for the
4  moment, so let's proceed.
5         I would like to learn a little bit
6  about you since you've not been deposed, and
7  certainly have not been deposed in this
8  litigation.  You are obviously currently
9  employed by the United States Army Corps of
10  Engineers, right?
11      A.  Yes.
12      Q.  Okay.  What is your current title?
13      A.  I'm chief of the protection and
14  restoration office at the New Orleans District
15  here.
16      Q.  All right.  Is that a new section?
17  How long has that section been around?
18      A.  Since around July, 2006.
19      Q.  Okay.  All right.  Well, then I was
20  correct in my belief that this is a brand-new
21  section within the New Orleans District.
22  Right?
23      A.  Yes.
24      Q.  Okay.  Before this section came into
25  being, were there any sections or divisions or

Page 12

1  branches within the New Orleans District that
2  had responsibility for any of the work that you
3  now do as chief of the protection and
4  restoration section?
5      A.  Yes, there were.
6      Q.  Okay.  Give me a hand as to where
7  those things resided.
8      A.  Okay.  First of all, my office is
9  under the planning, programs and project
10  management division.  And within that division
11  there was an office called the project
12  management east branch that had much of the
13  work that I'm currently doing them.  That east
14  branch no longer exists, it's been absorbed by
15  my office.
16      Q.  Okay.
17      A.  And then there was a coastal
18  restoration branch that stood alone under -- by
19  itself under the planning programs and project
20  management division and now it's part of my
21  office, this coastal restoration branch.
22         And then there was a planning division
23  years ago, that was I think in 1999,
24  thereabout, '98, '99 -- '98, it was absorbed by
25  project management overall.  So that was a

Page 13

1  separate division that did planning work.
2      Q.  Okay.
3      A.  So.
4      Q.  All right.  Thank you.  What is the
5  principal work of your current section, the
6  protection and restoration section?
7      A.  My office is responsible for the New
8  Orleans District portion of the hurricane
9  recovery work, which is the West Bank and
10  Vicinity Hurricane Protection Project, the Lake
11  Pontchartrain and Vicinity Project, and
12  Jefferson and St. Charles Parishes.  The
13  Louisiana Coastal Protection and Restoration
14  Act Technical Evaluation, the Louisiana Coastal
15  Area Feasibility Study and Authorization, the
16  CWPPRA program, also known as the Coastal
17  Wetlands Planning Protection and Restoration
18  Act, um -- also have -- involved in tree
19  removal for various aspects of the system.  The
20  Southeast Louisiana Urban Flood Control
21  Project, um -- and Mississippi River Gulf
22  Outlet Closure Project is under my office.
23  Mississippi River Gulf Outlet Ecosystem
24  Restoration Study, the Violet Diversion Study,
25  um -- let's see if I'm missing anything.

PODANY, THOMAS

10/8/2008

(Pages 14 to 17)

Page 14

1   Larose to Golden Meadow Project -- Hurricane
2   Protection Project, Morganza to the Gulf
3   Hurricane Protection Project.  That's mainly
4   where my work is.
5     **Q.  All right.  I'd like to go back for**
6   **the purposes of learning when each of these**
7   **projects came into being.  The first one you**
8   **discussed was -- and I was a little confused**
9   **because what I didn't hear was the -- that**
10  **component of hurricane protection that would**
11  **relate to Orleans Parish.  Is that somewhere**
12  **else?**
13     A.   That's in another office.
14     **Q.   Okay.  Why is that?**
15     A.   After the storm, because of the
16  magnitude of the work, it was decided to create
17  the Hurricane Protection Office that
18  Col. McCormick now is in charge of down the
19  hallway.  And it's so much work that we
20  basically split it in half.  And they handled
21  the -- the Hurricane Protection Office handles
22  a lot of the areas that were damaged after
23  Katrina, areas in Plaquemines Parish, Orleans
24  and St. Bernard.
25     **Q.  Okay.  I see.  So the line was divided**

Page 15

1   **by where the damage from Katrina occurred as**
2   **opposed to other protection areas within the**
3   **entire system?**
4     A.   I mean, it was done geographically.
5  The purpose of doing it, though, was really to
6  split the work between the two offices.  It
7  could have been split a lot of different ways,
8  it's just how it fell out that way.
9     **Q.  Right.  Well, am I wrong, though, in**
10  **the suggestion that the Lake Pontchartrain and**
11  **Vicinity Hurricane Protection system includes**
12  **Orleans, Jefferson, St. Bernard, as well as**
13  **St. Charles and the west bank areas?**
14     MR. SMITH:
15       We're getting a little far afield
16     here from our topics this morning.
17     MR. BRUNO:
18       I'm just getting a little
19     background on him, that's all.
20     MR. SMITH:
21       Well, you kind of got his
22     background.  Why don't we just get
23     into the topics here and find out
24     what -- he's not here to, you know,
25     talk about --

Page 16

1     MR. BRUNO:
2       I always want to know where we're
3     coming from so I can know where we're
4     going.
5     MR. SMITH:
6       Ask him some questions and maybe
7     we can get there.
8     MR. BRUNO:
9       I will.
10 EXAMINATION BY MR. BRUNO:
11     **Q.  That's all one big system; right?**
12     A.   We call it the Greater New Orleans
13 Hurricane Storm Damage Risk Reduction System.
14     **Q.  All right.  The Louisiana Coastal**
15  **Protection and Restoration act, does it have**
16  **anything to do with the restoration of any**
17  **damage that may have been caused by the MRGO?**
18     A.   The purpose of that authority is to
19 look at providing greater than 100-year levels
20 of protection for coastal Louisiana -- all of
21 coastal Louisiana.  So it's meant to be a
22 comprehensive, integrated approach to coastal
23 restoration, flood control and ecosystem
24 restoration.  And it's coast wide and looking
25 at greater than 100-year.  It's also mentioned

Page 17

1 in there Category 5 protection, in the specific
2 act language, looking at Category 5.
3     **Q.  Okay.  Well, my question was, and I**
4  **guess I have to break it up into smaller**
5  **pieces, it's called Louisiana Coastal**
6  **Protection and Restoration Act, and you're**
7  **telling me that it regards 100-year protection**
8  **from hurricanes.  Right?**
9     A.   Looking at greater than 100-year
10 protection.  100 and greater for areas that
11 don't have hurricane protection and areas that
12 maybe do have it but looking at greater levels
13 of protection.
14     **Q.  Does that imply that there is a**
15  **connection between coastal restoration and**
16  **hurricane protection?**
17     A.   That's I think the connection that is
18 being made, that there is a connection between
19 hurricane protection and coastal restoration.
20     **Q.  What is the connection?**
21     MR. SMITH:
22       I'm going to direct him not to
23     answer the question.  I'm going to
24     direct him not to answer the question.
25     Let's get onto the topics.

bd959b3f-d362-4a50-9373-43595f4a5aca

PODANY, THOMAS

10/8/2008

(Pages 122 to 125)

Page 122

1  EXAMINATION BY MR. BRUNO:
2      Q.  Okay.  At Page 3 we talk about the
3  prior studies, reports and existing water
4  projects, and therein there's the description
5  of the studies, reports and existing water
6  projects that they had available to consider.
7      A.  Yes.
8      Q.  And here is the reference to coastal
9  environments.  It was conducted for the
10  St. Bernard Parish Police Jury, and apparently
11  the police jury put up 25 percent of the money.
12  We have that in front of you that's Exhibit
13  Number 38.
14      A.  38.
15      Q.  So let's go to that for just a second.
16  It's entitled the Study of Bank Stabilization.
17  Do you know Coastal Environment, Inc.?  Do you
18  know who that is?
19      A.  Yes.  We've dealt with them over the
20  years.
21      Q.  Okay.  And apparently personnel from
22  the Corps contributed to this evaluation, at
23  Page IV.  Isn't that true?
24      A.  That's what it says.
25      Q.  Now, according to this report, it says

Page 123

1  that the United States Army Corps of Engineers,
2  the federal agency responsible for design and
3  construction of the MRGO, has recently
4  recognized -- has only recently recognized the
5  MRGO-related problems.  They have finally
6  characterized the MRGO as one of the eight
7  areas in south Louisiana where erosion
8  stabilization measures are urgently needed,
9  USACE 1984.
10         Is that a true statement, do you know?
11      A.  I don't know what they're referring
12  to, what document.
13      Q.  Okay.
14      A.  What page is that on?
15      Q.  Um -- General Introduction.  It
16  doesn't have a number on it?
17      A.  Okay.
18      Q.  I'm looking for a bibliography of some
19  kind.  The only '84 reference, in the back it
20  says letter the J.A. Stevens, 12 January 1948
21  by Mr. Chatry?
22      A.  Fred Chatry.
23      Q.  Chatry.
24      A.  Yes.  Okay.
25      Q.  I'm sorry.  It's called R3.  It says

Page 124

1      1984 Notice of Findings, Louisiana Coastal
2      Area, Shore and Barrier Erosion, Initial
3      Evaluation Study.
4      A.  Okay.
5      Q.  New Orleans District.  It says 12 pp.
6  I guess twelve pages.  Is that familiar to you
7  at all?
8      A.  I've seen that document before many
9  years ago.
10      Q.  Okay.  Is that the document which says
11  that erosion stabilization measures are
12  urgently needed?
13      A.  I'd have to reread to see if it says
14  that --
15      Q.  All right.  I'm sorry.
16      A.  -- but yeah.
17      Q.  All right.  Then it also refers to the
18  Louisiana Coastal Area study which you've said
19  that's still ongoing today.  Under this study,
20  the New Orleans District is investigating the
21  need and feasibility of improvement in
22  hurricane protection, erosion abatement,
23  prevention of saltwater intrusion, water
24  supply, preservation of fish and wildlife and
25  other related water resource problems in

Page 125

1  coastal Louisiana.
2         Now, is that something different than
3  what this reconnaissance report is doing?
4      A.  Well, that's the same -- on Page 5 of
5  Exhibit 37 --
6      Q.  Yes.
7      A.  -- that's the same study referred to
8  on Page 5 --
9      Q.  Right.
10      A.  -- the Louisiana Coastal Area study.
11  So it's a separate authorization.
12      Q.  But is it studying something
13  different?
14      A.  It's studying or had studied all of
15  coastal Louisiana, problems, needs and
16  opportunities.
17      Q.  Okay.
18      A.  And it looked at hurricane protection,
19  erosion abatement, saltwater intrusion and so
20  on, other related water resource problems.
21      Q.  Okay.  It says, then, the next
22  subparagraph title is Problem Identification.
23  It says, defining existing conditions and
24  analyzing historical trends provide the base
25  for forecasting future conditions.  These

bd959b3f-d362-4a50-9373-43595f4a5aca

PODANY, THOMAS

10/8/2008

(Pages 142 to 145)

Page 142

1    armoring, shell core dike.  So those -- on Page
2    35 they show those designs that were looked at.
3        Q.   Right.  Did they consider some kind of
4    structural option which would deal with the
5    salinity problem?
6        A.   Not in this report.  There was no -- I
7    don't think there was a way in this particular
8    report that we addressed any kind of a
9    navigable gate.  There was none of that in this
10   particular -- when you go back to the original
11   report, while that might have been something we
12   identified as a potential problem need or
13   opportunity --
14       Q.   Right.
15       A.   -- it wasn't specifically in the
16   original authority as something to look at.
17   Bank erosion was the deal.
18       Q.   Well, the Seabrook lock was always
19   considered to be a potential feature of the
20   MRGO project, wasn't it?  In fact, that was
21   supposed to be a saltwater barrier.
22       A.   Yes, and at one time they were going
23   to have a lock -- an original lock replacement
24   for the IHNC was part of this project.
25       Q.   Right.

Page 143

1        A.   In Violet.  But the focus here is
2    clearly just on bank erosion.
3        Q.   Okay.  So it sounds to me like we're
4    not really interested, in this report, in
5    dealing with the problems that we have created,
6    we're dealing with stopping the problem from
7    getting worse.  Is that accurate?
8        A.   Well, I think going back to the
9    authorization, we're trying to address the
10   authorization, and we're trying to really focus
11   in on what they're saying.  And where they're
12   pointing us to, Congress is saying, in light of
13   the extensive erosion, so to me, that suggests
14   measures to modify the project to reduce that
15   erosion.
16       Q.   Right.
17       A.   And that's where the focus was.
18       Q.   Right.
19       A.   This wasn't -- this report didn't look
20   at ecosystem restoration projects that could be
21   done in the study area, diversion projects from
22   the Mississippi River or barrier island
23   restoration projects, it was far more focused
24   than that.
25       Q.   Okay.

Page 144

1        (Brief recess.)
2    EXAMINATION BY MR. BRUNO:
3        Q.   Okay.  Mr. Podany, now we're in the
4    management measures and I think we've pretty
5    much discussed the management options.  Right?
6        A.   Yes.
7        Q.   The next section regards the money
8    part, right?
9        A.   Okay.
10       Q.   And I'm just not sure that I
11   understand not so much the relevance of the
12   money but how they're going about plugging into
13   this analysis the money issues.  Because it
14   goes from -- the last thing it talks about is,
15   you know, the bank protection structure
16   options, and then it goes right into the costs.
17           Can you help me understand, how does
18   it make that bridge between these options and
19   the cost?
20       A.   Okay.
21       Q.   I'm looking at Page 38, the first time
22   I see these tables.
23       A.   Yeah.  You know, you've got the
24   alternatives identified, and then we tried to
25   identify how they're going to perform over

Page 145

1    time.  And that's what you see on Page 38.
2        Q.   Okay.  Let's see.  So we say -- first
3    it talks about the reach, then the distance.
4        A.   Yeah.
5        Q.   Now, what makes something critical or
6    not critical?
7        A.   Definition of critical -- let's see if
8    I can find it -- generally, if it was going to
9    break through to Lake Borgne, that's what they
10   designated as a critical reach.
11       Q.   Oh.  I see.
12       A.   So then, um -- it's based on -- Page
13   34, in the middle, it says they were designated
14   critical based on the potential for imminent
15   loss of the buffering marsh between MRGO and
16   Lake Borgne.  So that little narrow strip, if
17   that is at risk, then that's a critical reach.
18       Q.   I see, middle of Page 34.  I see that.
19   Okay.  All right.  Okay.  So then the next
20   column says present -- oh, present means today.
21       A.   Uh-huh.
22       Q.   Without bank protection, future
23   without bank protection --
24       A.   Right.
25       Q.   All right.  These are just dredging

bd959b3f-d362-4a50-9373-43595f4a5aca

Page 146

1 quantities.
2     A.   Yes.
3     Q.   Okay.  All right.  So at the end of
4 the day, what are we -- what conclusions do we
5 draw from this document?
6     A.   Well, for this table, each of the
7 alternatives are compared a little bit to the
8 without project condition and what they do.
9 And, um -- and also, they have the speed limit,
10 how much reduction in bank erosion is expected.
11 And the way they quantify the bank erosion is
12 in cubic yards per year.
13        This is also the way it's affecting
14 the maintenance dredging.  So that material is
15 soon to go into the channel and be deposited in
16 the channel for removal by an annual
17 maintenance or a regular maintenance event --
18 dredging event.  So they're looking at the
19 impact of the alternatives on dredging at this
20 point, dredging quantities.
21     Q.   All right.
22     A.   So those alternatives that reduce the
23 dredge quantities the most would be better than
24 those that don't.
25     Q.   Right.  Because you're actually

Page 147

1 saving --
2     A.   Right.
3     Q.   -- operation and maintenance money.
4     A.   Right.
5     Q.   Now, I guess I'm still a little bit
6 confused about this whole process.  The
7 operations and maintenance money comes to you
8 every year regardless, doesn't it?
9     A.   Best asked of the O&M manager but
10 there's a limit on how much money they receive
11 for a project every year.
12     Q.   All right.  So does this table project
13 that maintenance dredging will increase over
14 time?
15     A.   It does.  If you look at the column
16 that says Present Without Bank Protection, and
17 Future Without Bank Protection, if nothing is
18 done over time the maintenance required of the
19 project would increase.  And actually they're
20 showing a total increase pretty high from
21 1.4 million cubic yards per year to
22 7.9 million cubic yards.
23     Q.   Right.  Now, if -- forget about this
24 reconnaissance report.  You said there's a
25 maximum amount of money.  If you can't -- if

Page 148

1 you exceed your maximum operations allowance,
2 what happens to the project?  I mean if you
3 know.
4     A.   Typically, what happens for a project
5 where you don't get the dollars to maintain it,
6 you don't maintain it and it reduces its
7 function or it may even cease to function.
8     Q.   Well, doesn't that mean then that the
9 project needs to be shut down?
10     A.   Well, I mean if the cost to maintain
11 something exceeds the amount of money you
12 receive, then it will happen naturally.
13     Q.   Right.
14     A.   That it will be basically shut down.
15 If the impact of not having the dollars is
16 significant on the function of the project,
17 yes.
18     Q.   All right.  Well, if I was doing a
19 cost-benefit analysis, wouldn't that then
20 require me to suggest that if I don't make the
21 repairs there's no project, so if I want the
22 project then under the cost-benefit analysis
23 100 percent of the repairs are chargeable to
24 the project?  Because if I don't do it I don't
25 get a project anymore.

Page 149

1     MR. SMITH:
2         Is there a question?
3     MR. BRUNO:
4         Yeah.
5 EXAMINATION BY MR. BRUNO:
6     Q.   Isn't that true?
7     A.   If the cost of the project increases
8 to maintain and the benefits stay the same,
9 there could be a point where the benefit-cost
10 ratio goes below 1.
11     Q.   Right.
12     A.   And, you know, it's questionable about
13 speculating how much traffic you may have on
14 the navigation project versus the cost of
15 maintaining it.  But this suggests that the
16 project could be in trouble because the
17 maintenance requirement could go up
18 substantially in the future, and if the dollars
19 to maintain it don't go up then you may not be
20 able to preserve its function.
21     Q.   Okay.  Why is this relevant at all to
22 a reconnaissance project to me?  How does it
23 plug into this whole thing?  We know that the
24 Congress said, all right, go and figure out how
25 bad the problem is.  Now we know how bad the

PODANY, THOMAS

10/8/2008

(Pages 150 to 153)

Page 150

1  problem is, we know that we've got a lot of
2  erosion of the banks, we've got increased
3  salinity, I mean, we've got all these physical
4  manifestations of the project.  How does that
5  connect to the money in a reconnaissance report
6  setting?
7      A.  All right.  One of the purposes of
8  doing a reconnaissance report, besides to find
9  a sponsor for the feasibility phase, is to
10  determine the level of federal involvement in
11  any of these solutions.  And the way the
12  federal government does that through their
13  Planning Guidance Notebook ER1105-2-100 is to
14  require the development of a benefit-cost ratio
15  and, you know, look at the plan that most --
16  what they call the National Economic
17  Development Plan, the plan that maximizes net
18  economic benefits when you compare the average
19  annual benefits of a project to its average
20  annual costs.  So all this work in this report
21  up to this point is trying to just get a
22  preliminary view of whether these projects,
23  these alternatives that are identified, would
24  perform well enough to -- provide enough
25  benefit to outweigh their costs.  And then

Page 151

1  there would be a federal interest in a plan
2  such as that.
3      Q.  So the cost of putting this foreshore
4  protection, whatever that number is, let's say
5  it's $100, do we amortize that over the life of
6  the project?
7      A.  Yes, we do.  If you go to Page 41,
8  there's a table that shows the interest on
9  initial cost.  Amortization over the life of
10  the project, the average annual maintenance
11  costs, and these are for the two, um -- this is
12  Structural Option 1.  And those I think are
13  believed to be the best alternatives at that
14  point, best structural options.
15      Q.  Okay.
16      A.  And you can see that at the very
17  bottom line they develop a benefit-cost ratio,
18  so they're comparing benefits to cost, and
19  they're looking to demonstrate that there might
20  be an alternative where the benefits exceed the
21  costs, and you have two that are close.  I
22  mean, you have -- well, two that do, but it's
23  pretty close.  You know, a 1.1 benefit-cost
24  ratio is not, um -- is considered to be a
25  marginally justified project.

Page 152

1      Q.  Marginally justified.  But the 1, is
2  that a justified project?
3      A.  The 1 is even.  I mean, if it was .99
4  it would be unjustified, so it's right under
5  the border there.  A benefit-cost ratio has to
6  be greater than 1 to be economically
7  justifiable.
8      Q.  Greater than 1.  Okay.  So the cost is
9  the numerator and the benefits are the
10  denominator?
11      A.  The other way around.  Benefits are
12  the numerator and costs are the denominator.
13      Is that what you said?
14      Q.  What I said was the costs were the
15  numerator, the top of the line, and the
16  benefits were the denominator, below the line.
17      A.  No, it's the other way around.
18      Q.  Benefits go on top.
19      A.  Right.
20      Q.  Costs go on the bottom.
21      A.  Yeah.  So you're looking for a BC
22  ration -- If it greater than 1 that means the
23  benefits outstrip the costs.
24      Q.  Now.  We're talking strictly dollars
25  here.  Now, what I don't know that we've

Page 153

1  considered is, this extent to which the damages
2  that we've now determined result from MRGO may
3  be a violation of some statute or regulation.
4  And that apparently is not considered at all in
5  this analysis, right?
6      A.  I don't see anything like that in
7  here.
8      Q.  I mean, we have a table which suggests
9  that NEPA is an applicable regulation.  Do we
10  not?  Where's that chart?  I lost it already.
11      A.  Yes.
12      Q.  All right.  Okay.  Page 17.  We
13  know -- Let's see.  The Wetland Protection Act
14  is applicable, so we don't know the extent to
15  which the MRGO 's destruction of the shoreline
16  and the other erosion-related problems may be
17  in violation of the Wetland Protection Act.
18  But one thing you can acknowledge is that this
19  reconnaissance report does not acknowledge the
20  extent to which there is any negative impact
21  relative to the Wetland Protection Act.  Right?
22      A.  Right.
23      Q.  And that would be the same with regard
24  to -- what is CZMA?
25      A.  Coastal Zone Management Act.

bd959b3f-d362-4a50-9373-43595f4a5aca

PODANY, THOMAS

10/8/2008

(Pages 154 to 157)

Page 154

1     Q.  All right.  So there's no analysis
2  here as to whether or not any part of the
3  Coastal Zone Management Act is violated by the
4  destruction of wetlands, et cetera, right?
5     A.  No.  But I will say though, it's the
6  other way around.  They're looking at these
7  alternatives in a preliminary fashion to
8  address environmental impacts.
9     Q.  Right.
10    A.  So those alternatives of putting rock
11 out there are being addressed in a preliminary
12 way to look at their impacts.  So.
13    Q.  On these acts?
14    A.  Yes.  In other words, if we were to
15 move to a feasibility report you would see an
16 expanded version of what you see on Page 51 --
17    Q.  Right.
18    A.  -- in the form of an environmental
19 assessment or in the form of an EIS.
20    Q.  I'm with you, but here's my
21 difficulty:  If the law says you have to do
22 something -- okay?  And in the context of the
23 reconnaissance report.
24    A.  Uh-huh.
25    Q.  I mean, how do you put a cost or a

Page 155

1  benefit to either compliance or noncompliance
2  with an Act; number 1?  First question.  And
3  I'm going to ask you after you answer the
4  question, how do you do that?
5     A.  Okay.  Well, the authorization for the
6  study asks us to investigate modifications and
7  make recommendations.  The way we do that is
8  apply ER1105-2-100 which is the Planning Guides
9  Notebook, the regulations for doing planning
10 documents.
11    Q.  This is all money.
12    A.  It's all this.  It's all the
13 evaluation of significant resources, it's the
14 discussion of problems, needs and
15 opportunities, it's looking at the performance
16 of alternatives, significant impacts, so it's
17 everything.  It's everything you see here.  And
18 so at end of the day, if you can develop a
19 reconnaissance report that shows an economic
20 justification for the work --
21    Q.  Right.
22    A.  -- based on the rules at the time, and
23 you have a federal sponsor, then this report
24 could have recommended going to a feasibility
25 phase.  Um -- it had actually a different

Page 156

1  recommendation, just to go right into design
2  memorandum and do it and build the project.
3  But it could have -- that's why this
4  reconnaissance report is generally done, is to
5  identify at least one plan that's economically
6  feasible and environmentally acceptable.
7     Q.  Right.  I've got all that.  I guess
8  I'm just wanting to confirm, and maybe the
9  absence of information conveys the answer, but
10 the reconnaissance report doesn't seek to
11 assess the impact of not doing something being
12 a violation of some statutory scheme, like
13 NEPA, like Clean Water Act, like Coastal Zone
14 Management Act, like the -- what's FWCA --
15 Fisheries and Wildlife Conservation Act, like
16 all those things.  That's not --
17    A.  That's not part of this.
18    Q.  Not part of this at all.
19    A.  No.
20    Q.  So that apparently is not relevant to
21 the Corps in making the recommendation to
22 Congress about whether to proceed or not
23 proceed with a contract in the context of a
24 reconnaissance report.
25    A.  Well, it wasn't part of the study

Page 157

1  authority --
2     Q.  Right.
3     A.  -- to do that.  And, um -- you know,
4  it wasn't part of this analysis.
5     Q.  Well, it was part of the study
6  authority because it says, in light of
7  extensive erosion it's generally what
8  recommendations are advisable.  Wouldn't you
9  agree with me that if you're violating a law --
10 and I'm not saying you are, but if you were
11 violating a law, wouldn't you advise that you
12 not violate the law?
13    A.  Well, the key word here, and this is
14 just because of the planning side of this, is
15 that what you're looking at is the feasibility
16 of bank protection measures.  So that means
17 applying ER1105-2-100 and the process of
18 evaluating a project for feasibility, that
19 means looking at economic justification, net
20 average annual benefits have to exceed -- well,
21 you have to have average annual benefits that
22 exceed average annual costs, benefit-cost ratio
23 greater than 1, there's got to be an
24 environmentally acceptable solution.  So that's
25 where it keys you right into that.

bd959b3f-d362-4a50-9373-43595f4a5aca

PODANY, THOMAS

10/8/2008

(Pages 146 to 149)

Page 146

1  quantities.
2      A.  Yes.
3      Q.  Okay.  All right.  So at the end of
4  the day, what are we -- what conclusions do we
5  draw from this document?
6      A.  Well, for this table, each of the
7  alternatives are compared a little bit to the
8  without project condition and what they do.
9  And, um -- and also, they have the speed limit,
10  how much reduction in bank erosion is expected.
11  And the way they quantify the bank erosion is
12  in cubic yards per year.
13          This is also the way it's affecting
14  the maintenance dredging.  So that material is
15  soon to go into the channel and be deposited in
16  the channel for removal by an annual
17  maintenance or a regular maintenance event --
18  dredging event.  So they're looking at the
19  impact of the alternatives on dredging at this
20  point, dredging quantities.
21      Q.  All right.
22      A.  So those alternatives that reduce the
23  dredge quantities the most would be better than
24  those that don't.
25      Q.  Right.  Because you're actually

Page 147

1  saving --
2      A.  Right.
3      Q.  -- operation and maintenance money.
4      A.  Right.
5      Q.  Now, I guess I'm still a little bit
6  confused about this whole process.  The
7  operations and maintenance money comes to you
8  every year regardless, doesn't it?
9      A.  Best asked of the O&M manager but
10  there's a limit on how much money they receive
11  for a project every year.
12      Q.  All right.  So does this table project
13  that maintenance dredging will increase over
14  time?
15      A.  It does.  If you look at the column
16  that says Present Without Bank Protection, and
17  Future Without Bank Protection, if nothing is
18  done over time the maintenance required of the
19  project would increase.  And actually they're
20  showing a total increase pretty high from
21  1.4 million cubic yards per year to
22  7.9 million cubic yards.
23      Q.  Right.  Now, if -- forget about this
24  reconnaissance report.  You said there's a
25  maximum amount of money.  If you can't -- if

Page 148

1  you exceed your maximum operations allowance,
2  what happens to the project?  I mean if you
3  know.
4      A.  Typically, what happens for a project
5  where you don't get the dollars to maintain it,
6  you don't maintain it and it reduces its
7  function or it may even cease to function.
8      Q.  Well, doesn't that mean then that the
9  project needs to be shut down?
10      A.  Well, I mean if the cost to maintain
11  something exceeds the amount of money you
12  receive, then it will happen naturally.
13      Q.  Right.
14      A.  That it will be basically shut down.
15  If the impact of not having the dollars is
16  significant on the function of the project,
17  yes.
18      Q.  All right.  Well, if I was doing a
19  cost-benefit analysis, wouldn't that then
20  require me to suggest that if I don't make the
21  repairs there's no project, so if I want the
22  project then under the cost-benefit analysis
23  100 percent of the repairs are chargeable to
24  the project?  Because if I don't do it I don't
25  get a project anymore.

Page 149

1      MR. SMITH:
2          Is there a question?
3      MR. BRUNO:
4          Yeah.
5  EXAMINATION BY MR. BRUNO:
6      Q.  Isn't that true?
7      A.  If the cost of the project increases
8  to maintain and the benefits stay the same,
9  there could be a point where the benefit-cost
10  ratio goes below 1.
11      Q.  Right.
12      A.  And, you know, it's questionable about
13  speculating how much traffic you may have on
14  the navigation project versus the cost of
15  maintaining it.  But this suggests that the
16  project could be in trouble because the
17  maintenance requirement could go up
18  substantially in the future, and if the dollars
19  to maintain it don't go up then you may not be
20  able to preserve its function.
21      Q.  Okay.  Why is this relevant at all to
22  a reconnaissance project to me?  How does it
23  plug into this whole thing?  We know that the
24  Congress said, all right, go and figure out how
25  bad the problem is.  Now we know how bad the

bd959b3f-d362-4a50-9373-43595f4a5aca

PODANY, THOMAS

10/8/2008

(Pages 150 to 153)

Page 150

1  **problem is, we know that we've got a lot of**
2  **erosion of the banks, we've got increased**
3  **salinity, I mean, we've got all these physical**
4  **manifestations of the project.  How does that**
5  **connect to the money in a reconnaissance report**
6  **setting?**
7  A.  All right.  One of the purposes of
8  doing a reconnaissance report, besides to find
9  a sponsor for the feasibility phase, is to
10  determine the level of federal involvement in
11  any of these solutions.  And the way the
12  federal government does that through their
13  Planning Guidance Notebook ER1105-2-100 is to
14  require the development of a benefit-cost ratio
15  and, you know, look at the plan that most --
16  what they call the National Economic
17  Development Plan, the plan that maximizes net
18  economic benefits when you compare the average
19  annual benefits of a project to its average
20  annual costs.  So all this work in this report
21  up to this point is trying to just get a
22  preliminary view of whether these projects,
23  these alternatives that are identified, would
24  perform well enough to -- provide enough
25  benefit to outweigh their costs.  And then

Page 151

1  there would be a federal interest in a plan
2  such as that.
3  Q.  So the cost of putting this foreshore
4  **protection, whatever that number is, let's say**
5  **it's $100, do we amortize that over the life of**
6  **the project?**
7  A.  Yes, we do.  If you go to Page 41,
8  there's a table that shows the interest on
9  initial cost.  Amortization over the life of
10  the project, the average annual maintenance
11  costs, and these are for the two, um -- this is
12  Structural Option 1.  And those I think are
13  believed to be the best alternatives at that
14  point, best structural options.
15  Q.  Okay.
16  A.  And you can see that at the very
17  bottom line they develop a benefit-cost ratio,
18  so they're comparing benefits to cost, and
19  they're looking to demonstrate that there might
20  be an alternative where the benefits exceed the
21  costs, and you have two that are close.  I
22  mean, you have -- well, two that do, but it's
23  pretty close.  You know, a 1.1 benefit-cost
24  ratio is not, um -- is considered to be a
25  marginally justified project.

Page 152

1  Q.  Marginally justified.  But the 1, is
2  **that a justified project?**
3  A.  The 1 is even.  I mean, if it was .99
4  it would be unjustified, so it's right under
5  the border there.  A benefit-cost ratio has to
6  be greater than 1 to be economically
7  justifiable.
8  Q.  Greater than 1.  Okay.  So the cost is
9  **the numerator and the benefits are the**
10  **denominator?**
11  A.  The other way around.  Benefits are
12  the numerator and costs are the denominator.
13  Is that what you said?
14  Q.  What I said was the costs were the
15  **numerator, the top of the line, and the**
16  **benefits were the denominator, below the line.**
17  A.  No, it's the other way around.
18  Q.  Benefits go on top.
19  A.  Right.
20  Q.  Costs go on the bottom.
21  A.  Yeah.  So you're looking for a BC
22  ration -- If it greater than 1 that means the
23  benefits outstrip the costs.
24  Q.  Now.  We're talking strictly dollars
25  **here.  Now, what I don't know that we've**

Page 153

1  **considered is, this extent to which the damages**
2  **that we've now determined result from MRGO may**
3  **be a violation of some statute or regulation.**
4  **And that apparently is not considered at all in**
5  **this analysis, right?**
6  A.  I don't see anything like that in
7  here.
8  Q.  I mean, we have a table which suggests
9  **that NEPA is an applicable regulation.  Do we**
10  **not?  Where's that chart?  I lost it already.**
11  A.  Yes.
12  Q.  All right.  Okay.  Page 17.  We
13  **know -- Let's see.  The Wetland Protection Act**
14  **is applicable, so we don't know the extent to**
15  **which the MRGO 's destruction of the shoreline**
16  **and the other erosion-related problems may be**
17  **in violation of the Wetland Protection Act.**
18  **But one thing you can acknowledge is that this**
19  **reconnaissance report does not acknowledge the**
20  **extent to which there is any negative impact**
21  **relative to the Wetland Protection Act.  Right?**
22  A.  Right.
23  Q.  And that would be the same with regard
24  **to -- what is CZMA?**
25  A.  Coastal Zone Management Act.

bd959b3f-d362-4a50-9373-43595f4a5aca

PODANY, THOMAS

10/8/2008

(Pages 154 to 157)

Page 154

1    Q.  All right.  So there's no analysis
2  here as to whether or not any part of the
3  Coastal Zone Management Act is violated by the
4  destruction of wetlands, et cetera, right?
5    A.  No.  But I will say though, it's the
6  other way around.  They're looking at these
7  alternatives in a preliminary fashion to
8  address environmental impacts.
9    Q.  Right.
10    A.  So those alternatives of putting rock
11  out there are being addressed in a preliminary
12  way to look at their impacts.  So.
13    Q.  On these acts?
14    A.  Yes.  In other words, if we were to
15  move to a feasibility report you would see an
16  expanded version of what you see on Page 51 --
17    Q.  Right.
18    A.  -- in the form of an environmental
19  assessment or in the form of an EIS.
20    Q.  I'm with you, but here's my
21  difficulty:  If the law says you have to do
22  something -- okay?  And in the context of the
23  reconnaissance report.
24    A.  Uh-huh.
25    Q.  I mean, how do you put a cost or a

Page 155

1  benefit to either compliance or noncompliance
2  with an Act; number 1?  First question.  And
3  I'm going to ask you after you answer the
4  question, how do you do that?
5    A.  Okay.  Well, the authorization for the
6  study asks us to investigate modifications and
7  make recommendations.  The way we do that is
8  apply ER1105-2-100 which is the Planning Guides
9  Notebook, the regulations for doing planning
10  documents.
11    Q.  This is all money.
12    A.  It's all this.  It's all the
13  evaluation of significant resources, it's the
14  discussion of problems, needs and
15  opportunities, it's looking at the performance
16  of alternatives, significant impacts, so it's
17  everything.  It's everything you see here.  And
18  so at end of the day, if you can develop a
19  reconnaissance report that shows an economic
20  justification for the work --
21    Q.  Right.
22    A.  -- based on the rules at the time, and
23  you have a federal sponsor, then this report
24  could have recommended going to a feasibility
25  phase.  Um -- it had actually a different

Page 156

1  recommendation, just to go right into design
2  memorandum and do it and build the project.
3  But it could have -- that's why this
4  reconnaissance report is generally done, is to
5  identify at least one plan that's economically
6  feasible and environmentally acceptable.
7    Q.  Right.  I've got all that.  I guess
8  I'm just wanting to confirm, and maybe the
9  absence of information conveys the answer, but
10  the reconnaissance report doesn't seek to
11  assess the impact of not doing something being
12  a violation of some statutory scheme, like
13  NEPA, like Clean Water Act, like Coastal Zone
14  Management Act, like the -- what's FWCA --
15  Fisheries and Wildlife Conservation Act, like
16  all those things.  That's not --
17    A.  That's not part of this.
18    Q.  Not part of this at all.
19    A.  No.
20    Q.  So that apparently is not relevant to
21  the Corps in making the recommendation to
22  Congress about whether to proceed or not
23  proceed with a contract in the context of a
24  reconnaissance report.
25    A.  Well, it wasn't part of the study

Page 157

1  authority --
2    Q.  Right.
3    A.  -- to do that.  And, um -- you know,
4  it wasn't part of this analysis.
5    Q.  Well, it was part of the study
6  authority because it says, in light of
7  extensive erosion it's generally what
8  recommendations are advisable.  Wouldn't you
9  agree with me that if you're violating a law --
10  and I'm not saying you are, but if you were
11  violating a law, wouldn't you advise that you
12  not violate the law?
13    A.  Well, the key word here, and this is
14  just because of the planning side of this, is
15  that what you're looking at is the feasibility
16  of bank protection measures.  So that means
17  applying ER1105-2-100 and the process of
18  evaluating a project for feasibility, that
19  means looking at economic justification, net
20  average annual benefits have to exceed -- well,
21  you have to have average annual benefits that
22  exceed average annual costs, benefit-cost ratio
23  greater than 1, there's got to be an
24  environmentally acceptable solution.  So that's
25  where it keys you right into that.

bd959b3f-d362-4a50-9373-43595f4a5aca

PODANY, THOMAS

10/8/2008

(Pages 158 to 161)

Page 158

1    Q.  All right.  So let's talk about
2  whether or not these solutions are
3  environmentally acceptable.  Where in this
4  report does it evaluate the -- let's see, where
5  are we?  Lost my page again, please forgive
6  me -- each of the scenarios for compliance
7  with, for example, NEPA?
8    A.  Well, because this is a preliminary
9  document, it's not an environmental assessment
10  or an EIS, but it's the beginning of one -- on
11  Page 51, you'll see the beginning of the
12  analysis of the impact of the alternatives, or
13  evaluation of environmental effects of
14  alternative plans.
15    Q.  Right.
16    A.  And this follows pretty closely, like
17  a basic -- if you were to start out doing an
18  environmental assessment it would look a little
19  bit like this.  So it's the beginnings of that.
20  And the purpose of doing this is to
21  demonstrate, well, do you have to mitigate
22  before constructing this project?  Are you
23  damaging the environment?  Potentially, you
24  could be placing the rock dikes on marsh and
25  destroying the marsh.  Would there be a

Page 159

1  requirement to mitigate for that loss?
2    Q.  That would go into the cost.
3    A.  Yes.
4    Q.  All right.  Well, we're not doing that
5  yet.
6    A.  Well, yeah.  And I think most people
7  would -- because this is a project viewed to be
8  friendly to the environment, they will not
9  necessarily push hard that you mitigate for
10  that, but that's the kind of thing that you
11  would look at.  You know, in a typical project
12  you would look at, first, the impacts to
13  significant resources, some of which are listed
14  there, you know, the effects on water quality,
15  marsh, biological resources, cultural
16  resources, recreational resources, those
17  impacts are addressed in general.  And then if
18  you can find that the alternatives that are
19  being evaluated appear to be environmentally
20  acceptable and you have the economic piece in
21  the previous section, then you have a plan that
22  would be potentially feasible.
23    Q.  Got you.
24    A.  And it's only potential, because this
25  is preliminary, it's reconnaissance, it's not

Page 160

1  full feasibility.
2    Q.  Now, going then back to the summary of
3  the annual cost benefits and benefit-cost
4  ratios, I note that on the benefits section
5  that we only have $121,000 for marsh loss
6  reduction savings.  Now, that cannot possibly
7  include any assessment of the value of marsh as
8  a tidal or surge barrier.  Can it?  I mean,
9  especially look backwards to Katrina where
10  you're talking about a $100 billion loss.
11    A.  Right.  I will say that the Corps no
12  longer attempts to quantify the value of an
13  acre of marsh because it's very difficult to
14  get agreement, nationally, on what that value
15  is.  So this was an attempt to try to include
16  this as a benefit category to help maybe put
17  the project -- justify the project.
18    Q.  Well ---
19    A.  But it's very difficult to get
20  agreement on, you know, how marsh performs and
21  what value it has to the economy and what an
22  acre of marsh is valued at.  And even to this
23  day you can't find, I think -- I haven't --
24  there's not agreement on what that number would
25  be.

Page 161

1    Q.  Well, there may not be agreement, but
2  here's the problem:  You've only got one
3  $21,000 on that number, right?
4    A.  Right.
5    Q.  And that's a small number.
6    A.  Yeah.
7    Q.  And it would have a dramatic impact on
8  the cost-benefit ratio on Page 41, at least as
9  the numbers are presented to me there.  Right?
10    A.  Yeah.  If you increased it a lot it
11  would go up a lot.
12    Q.  Even if you just doubled it --
13    A.  Right.
14    Q.  -- it would go up.
15    A.  Uh-huh.
16    Q.  It would go up pretty significantly,
17  right?
18    A.  Right.  And here's the thing, though:
19  As far as the purpose of a recon report, since
20  they've demonstrated that there are two
21  projects that are at least marginally
22  economically feasible and that those
23  alternatives are generally considered
24  environmentally acceptable, the only thing
25  really missing is an non federal sponsor or

bd959b3f-d362-4a50-9373-43595f4a5aca

PODANY, THOMAS

10/8/2008

(Pages 158 to 161)

Page 158

1    Q.  All right.  So let's talk about
2  whether or not these solutions are
3  environmentally acceptable.  Where in this
4  report does it evaluate the -- let's see, where
5  are we?  Lost my page again, please forgive
6  me -- each of the scenarios for compliance
7  with, for example, NEPA?
8    A.  Well, because this is a preliminary
9  document, it's not an environmental assessment
10  or an EIS, but it's the beginning of one -- on
11  Page 51, you'll see the beginning of the
12  analysis of the impact of the alternatives, or
13  evaluation of environmental effects of
14  alternative plans.
15    Q.  Right.
16    A.  And this follows pretty closely, like
17  a basic -- if you were to start out doing an
18  environmental assessment it would look a little
19  bit like this.  So it's the beginnings of that.
20  And the purpose of doing this is to
21  demonstrate, well, do you have to mitigate
22  before constructing this project?  Are you
23  damaging the environment?  Potentially, you
24  could be placing the rock dikes on marsh and
25  destroying the marsh.  Would there be a

Page 159

1  requirement to mitigate for that loss?
2    Q.  That would go into the cost.
3    A.  Yes.
4    Q.  All right.  Well, we're not doing that
5  yet.
6    A.  Well, yeah.  And I think most people
7  would -- because this is a project viewed to be
8  friendly to the environment, they will not
9  necessarily push hard that you mitigate for
10  that, but that's the kind of thing that you
11  would look at.  You know, in a typical project
12  you would look at, first, the impacts to
13  significant resources, some of which are listed
14  there, you know, the effects on water quality,
15  marsh, biological resources, cultural
16  resources, recreational resources, those
17  impacts are addressed in general.  And then if
18  you can find that the alternatives that are
19  being evaluated appear to be environmentally
20  acceptable and you have the economic piece in
21  the previous section, then you have a plan that
22  would be potentially feasible.
23    Q.  Got you.
24    A.  And it's only potential, because this
25  is preliminary, it's reconnaissance, it's not

Page 160

1  full feasibility.
2    Q.  Now, going then back to the summary of
3  the annual cost benefits and benefit-cost
4  ratios, I note that on the benefits section
5  that we only have $121,000 for marsh loss
6  reduction savings.  Now, that cannot possibly
7  include any assessment of the value of marsh as
8  a tidal or surge barrier.  Can it?  I mean,
9  especially look backwards to Katrina where
10  you're talking about a $100 billion loss.
11    A.  Right.  I will say that the Corps no
12  longer attempts to quantify the value of an
13  acre of marsh because it's very difficult to
14  get agreement, nationally, on what that value
15  is.  So this was an attempt to try to include
16  this as a benefit category to help maybe put
17  the project -- justify the project.
18    Q.  Well ---
19    A.  But it's very difficult to get
20  agreement on, you know, how marsh performs and
21  what value it has to the economy and what an
22  acre of marsh is valued at.  And even to this
23  day you can't find, I think -- I haven't --
24  there's not agreement on what that number would
25  be.

Page 161

1    Q.  Well, there may not be agreement, but
2  here's the problem:  You've only put one
3  $21,000 on that number, right?
4    A.  Right.
5    Q.  And that's a small number.
6    A.  Yeah.
7    Q.  And it would have a dramatic impact on
8  the cost-benefit ratio on Page 41, at least as
9  the numbers are presented to me there.  Right?
10    A.  Yeah.  If you increased it a lot it
11  would go up a lot.
12    Q.  Even if you just doubled it --
13    A.  Right.
14    Q.  -- it would go up.
15    A.  Uh-huh.
16    Q.  It would go up pretty significantly,
17  right?
18    A.  Right.  And here's the thing, though:
19  As far as the purpose of a recon report, since
20  they've demonstrated that there are two
21  projects that are at least marginally
22  economically feasible and that those
23  alternatives are generally considered
24  environmentally acceptable, the only thing
25  really missing is an non federal sponsor or

PODANY, THOMAS

10/8/2008

(Pages 162 to 165)

Page 162

1  approval to proceed some other way, if there
2  was such a thing, if there was such a thing to
3  just go ahead and proceed.
4      Q.  All right.
5      A.  But, so this -- from that standpoint,
6  this is a successful recon report.  You've got
7  at least two alternatives, you know, you only
8  need one to show that it's potentially feasible
9  economically.  You've got an environmentally
10  acceptable plan.  And you need a sponsor to
11  cost share in the feasibility, and that's what
12  it didn't have.  But the recommendation was to
13  move to a GDM.
14      Q.  Yeah.
15      A.  And that's another story.
16      Q.  We're going to get -- yeah.  We're
17  betting a little ahead of ourselves.  Because
18  we will go there, I just want -- I'd like to
19  finish the '88 report if I can.
20          So the numbers in here, those numbers
21  point to the project being cost effective,
22  right?
23      A.  Right.  So if the value of the marsh
24  was higher, you still -- you could still move
25  ahead.

Page 163

1      Q.  All right.  Now, do you use those
2  numbers in connection with the valuation of the
3  federal versus the local sponsor's
4  participation?  Or do you make up some new
5  numbers?
6      A.  No.  In fact, the decision on what the
7  ultimate cost sharing is something that
8  could be made at a later date.  And the report
9  tries to talk about a suggested cost sharing,
10  suggesting that on Page -- this is in the
11  syllabus.  It's probably also in the back of
12  the book, but in the syllabus it's summarized a
13  little better, which is like Page 2 of the
14  syllabus right after the main title page, the
15  very beginning.  It says that since greater
16  than 85 percent of the quantified potential
17  benefits reduce the cost of maintaining the
18  MRGO, then this should be a federal project --
19  100 percent federal project and be done, um --
20  or, you know, do a GDM, a supplement to the
21  GDM.  That was the proposal at the time.
22      Q.  What are you reading from?  I'm sorry.
23      A.  It's right at the beginning.  It's on
24  the bottom of Page 2 before that.  It's at
25  the -- it's even before the, um -- it's even

Page 164

1  before the -- right after the title page.
2          And that's discussed in a little bit
3  more detail later on, but at least in the
4  syllabus it just summarizes that greater than
5  85 percent of the benefits would be due to
6  savings in maintenance; therefore, we should
7  just go to a GDM.  And, you know, as far as
8  working out the cost sharing, even if it showed
9  different alternatives for cost sharing the
10  project itself, that would still be subject to
11  somebody's review and approval later on.  So
12  even if it suggests one or two cost sharing,
13  you really won't know what it is until the
14  feasibility report is done for something like
15  this which is not a typical recon report.
16      Q.  Why is that?
17      A.  Because it's -- it doesn't fit neatly
18  into the, um -- areas of hurricane protection,
19  flood control, ecosystem restoration or
20  commercial navigation.  It's bank erosion.  And
21  so it's a little bit -- I think you'll see the
22  comments from MVD or from the division office
23  talking about that, too.  It's kind of a non
24  typical project, so it's not clear how the
25  handle it.  Let's put it that way.  It's not

Page 165

1  clear where it really fits.
2      Q.  Right.
3      A.  That's all that means.
4      Q.  Well, if one would have put a larger
5  number on the destruction -- of the value of
6  the destruction of wetlands, whatever they may
7  do or not do with regard to hurricane
8  protection, would that point toward 100 percent
9  federal payment of the project or would it
10  suggest that it be a lower percentage?
11      A.  Yeah.  Based on what the syllabus is
12  saying is that if all of the benefits were just
13  for maintenance savings it's the clear
14  indication it should be 100 percent federal,
15  but because there's some environmental maybe
16  somebody could say it should be ecosystem
17  restoration and that would be a different cost
18  sharing.
19          So actually, at least at this time the
20  view was that 85 percent of the benefits are
21  maintenance savings, those are mostly federal,
22  so let's go ahead and evaluate this into the
23  GDM.  Which suggests they were going to try to
24  make this part of the project.
25      Q.  Right.  Well, but what's confusing me

bd959b3f-d362-4a50-9373-43595f4a5aca

PODANY, THOMAS

10/8/2008

(Pages 38 to 41)

Page 38

1  need to I'll go pull them sometime during the
2  day --
3      A.  Okay.
4      Q.  -- which suggest that this is the
5  first reconnaissance study.  And I will get
6  those documents for you.  But have you ever
7  heard that idea?
8      A.  No, because when we refer to
9  reconnaissance studies, we're very specific to
10  mean studies that Congress has authorized us to
11  perform.
12     Q.  Okay.
13     A.  And, um -- you know, we have -- in the
14  planning program, we have a two-step process
15  basically, a reconnaissance phase and a
16  feasibility phase.  So when people refer to a
17  reconnaissance study, generally they're talking
18  about one that was authorized and directed by
19  Congress to perform.
20     MR. SMITH:
21          Could we have this marked, Joe,
22          the document you just asked him about?
23     MR. BRUNO:
24          I'm not quite ready to do that,
25          but I will do it.

Page 39

1  EXAMINATION BY MR. BRUNO:
2      Q.  I think it may be more appropriate to
3  mark the reconnaissance report first, as it
4  references that, just logically.  I'm going to
5  mark the '88 recollection report as Exhibit
6  Number 37.
7          (Exhibit 37 was marked for
8          identification and is attached hereto.)
9          (Off the record.)
10  EXAMINATION BY MR. BRUNO:
11     Q.  I'm looking at the -- and I'm just
12  trying to orient us here before we get heavy
13  into it -- Page 3 of the report in '88.  It
14  says prior studies, reports and existing water
15  projects.
16     A.  Right.
17     Q.  If you look at -- on Page 4, it seems
18  to be referring to a coastal environments, Inc.
19  published results of a study of bank
20  stabilization for the MRGO in December of '84.
21          Okay, I'm going to mark this document,
22  now, which is entitled The Mississippi River
23  Gulf Outlet, a Study of Bank Stabilization, as
24  Number 38, if that's the document.
25          (Tendering.)

Page 40

1          (Exhibit 38 was marked for
2  identification and is attached hereto.)
3      A.  Okay.
4  EXAMINATION BY MR. BRUNO:
5      Q.  If you need some time, this is
6  probably as good a time as any to break for
7  lunch, and you can just study it over the break
8  if you'd like.  Okay?
9      A.  Okay.
10     Q.  Let me just mark a few documents
11  before we break, and you can see what we're
12  going to get into.  The next thing I'm going to
13  show you is the House Document 245 which is the
14  original -- which is the letter referred to in
15  the original authorization of the Congress.
16          Are you familiar with that?
17          (Off the record.)
18  EXAMINATION BY MR. BRUNO:
19     Q.  If you look at Page 3 of the
20  reconnaissance report, you'll see there's a
21  reference to that document at the bottom of the
22  page.
23     A.  Right.
24     Q.  Okay.  You see that.  And it says, a
25  miscellaneous paper which reported the results

Page 41

1  of a geotechnical investigation in 1958.  Have
2  you ever seen that?  It's at Page 4.
3      A.  I'm not familiar with that.
4      Q.  All right.  The next thing that they
5  describe as a prior study is an interim
6  evaluation report on test sections of selected
7  foreshore protection structure designs which
8  was prepared in '83.  Have you seen that?
9      A.  I know a little bit about the results
10  of that but do not have a copy of that report.
11     Q.  All right.  Then there's a '78 report
12  on Page 5 that St. Bernard Parish did.  Have
13  you seen that?
14     A.  No, I don't recall that one.
15     Q.  And below that you'll see St. Bernard
16  Parish completed a draft coastal management
17  program document in May of '82.  Have you seen
18  that?
19     A.  No.
20     Q.  And then there's finally the Louisiana
21  Coastal Area Study was authorized by
22  Resolutions of the Committee on Public Works of
23  the United States Senate and House of
24  Representatives, adopted 19 April 1967 and 19
25  October 1967, and then it says, under this

bd959b3f-d362-4a50-9373-43595f4a5aca

PODANY, THOMAS

10/8/2008

(Pages 42 to 45)

Page 42

1    study the New Orleans District is investigating
2    the need and feasibility of improvements in
3    hurricane protection, erosion abatement,
4    prevention of saltwater intrusion and the like.
5    Have you seen that?
6        A.   Yes, I've seen that.
7        Q.   Is that connected to one of these
8    Louisiana coastal studies that you talked about
9    that you're working on today?
10       A.   That would be the original study
11   authority associated with the currently
12   authorized water project in 2007 that I
13   mentioned earlier.
14       Q.   Yeah.  What's it's correct name,
15   though?
16       A.   Louisiana Coastal Area.
17       Q.   Oh, it's got the same name?
18       A.   Uh-huh.
19       Q.   It's just been re authorized?
20       A.   Yeah.  Order 2007 has a section in
21   there authorizing the project and providing for
22   additional investigations.
23       Q.   Well, then, you've got enough reading
24   for the break.
25       A.   All right.

Page 43

1        Q.   So we'll break now for lunch.
2            (Off the record.)
3    EXAMINATION BY MR. BRUNO:
4        Q.   Let me go back on the record just to
5    identify as Exhibit Number 39 the letter of the
6    Secretary of the Army which is House Document
7    245, and which is -- describes the authority
8    for the Corps to build the MRGO.  Okay.  That's
9    it.  Break for lunch.
10           (Exhibit 39 was marked for
11   identification and is attached hereto.)
12           (Lunch break.)
13   EXAMINATION BY MR. BRUNO:
14       Q.   All right.  We've marked the
15   reconnaissance study of 1988 as Exhibit Number
16   37.  All right.  So when did the germ of the
17   idea for the reconnaissance study come into
18   being?
19       A.   Okay.  If you go to Page 2, you'll see
20   under the study authority section that there
21   was a resolution adopted by the Committee on
22   Public Works in 1982, September --
23       Q.   Right.
24       A.   -- that provided the authority for the
25   study to be done.

Page 44

1        Q.   All right.  Well, that's not the germ
2    of the idea.  That's the authorization.
3        A.   Right.
4        Q.   Somebody had to talk to Congressman
5    Livingston and ask him to propose this
6    resolution.  Isn't that true?
7        A.   That's probably true, yeah.
8        Q.   Okay.  So and that somebody probably
9    was somebody within the United States Army
10   Corps of Engineers.  Right?
11       A.   Um -- no, sometimes those study
12   authorities come from local interests.  I mean
13   it could be.  I'm not aware of whether it came
14   from the Corps or not, but --
15       Q.   Okay.
16       A.   -- it could come from almost any
17   source, somebody coming to Congress and saying,
18   way need --
19       Q.   Yeah.  We've had lots of testimony on
20   that point, but in this case with regard to the
21   MRGO and bank erosion and the reconnaissance,
22   is it not a fact that it was the Corps of
23   Engineers that requested Congressman Livingston
24   to introduce this resolution?
25           MR. SMITH:

Page 45

1            Objection.  Asked and answered.
2            MR. BRUNO:
3            I don't have an answer.  And if I
4            do, I would like to have it read back.
5        A.   I'm not aware of this.
6    EXAMINATION BY MR. BRUNO:
7        Q.   So you don't know the answer.
8        A.   I don't know the answer.
9        Q.   All right.  That's fine.  If the Corps
10   had been the -- and you've already told me that
11   the Corps could have been the entity that may
12   have approached Congressman Livingston for such
13   a resolution, right?
14       A.   It's possible.
15       Q.   All right.  Can you describe for us
16   the process by which if that were the case that
17   would have occurred?  And I'm not talking about
18   what did occur, I'm talking about what's the
19   process, if it was the Corps that would have
20   made the initial contact?
21       A.   Well, that's -- you know, that's very
22   speculative, but it could have been that
23   somebody says, here's an issue, what can the
24   Corps do about it?  And the answer might have
25   been, well, if we have no existing authority to

PODANY, THOMAS

10/8/2008

(Pages 42 to 45)

Page 42

1  study the New Orleans District is investigating
2  the need and feasibility of improvements in
3  hurricane protection, erosion abatement,
4  prevention of saltwater intrusion and the like.
5  Have you seen that?
6      A.  Yes, I've seen that.
7      Q.  Is that connected to one of these
8  Louisiana coastal studies that you talked about
9  that you're working on today?
10     A.  That would be the original study
11 authority associated with the currently
12 authorized water project in 2007 that I
13 mentioned earlier.
14     Q.  Yeah.  What's it's correct name,
15 though?
16     A.  Louisiana Coastal Area.
17     Q.  Oh, it's got the same name?
18     A.  Uh-huh.
19     Q.  It's just been re authorized?
20     A.  Yeah.  Order 2007 has a section in
21 there authorizing the project and providing for
22 additional investigations.
23     Q.  Well, then, you've got enough reading
24 for the break.
25     A.  All right.

Page 43

1      Q.  So we'll break now for lunch.
2          (Off the record.)
3  EXAMINATION BY MR. BRUNO:
4      Q.  Let me go back on the record just to
5  identify as Exhibit Number 39 the letter of the
6  Secretary of the Army which is House Document
7  245, and which is -- describes the authority
8  for the Corps to build the MRGO.  Okay.  That's
9  it.  Break for lunch.
10         (Exhibit 39 was marked for
11         identification and is attached hereto.)
12         (Lunch break.)
13 EXAMINATION BY MR. BRUNO:
14     Q.  All right.  We've marked the
15 reconnaissance study of 1988 as Exhibit Number
16 37.  All right.  So when did the germ of the
17 idea for the reconnaissance study come into
18 being?
19     A.  Okay.  If you go to Page 2, you'll see
20 under the study authority section that there
21 was a resolution adopted by the Committee on
22 Public Works in 1982, September --
23     Q.  Right.
24     A.  -- that provided the authority for the
25 study to be done.

Page 44

1      Q.  All right.  Well, that's not the germ
2  of the idea.  That's the authorization.
3      A.  Right.
4      Q.  Somebody had to talk to Congressman
5  Livingston and ask him to propose this
6  resolution.  Isn't that true?
7      A.  That's probably true, yeah.
8      Q.  Okay.  So and that somebody probably
9  was somebody within the United States Army
10 Corps of Engineers.  Right?
11     A.  Um -- no, sometimes those study
12 authorities come from local interests.  I mean
13 it could be.  I'm not aware of whether it came
14 from the Corps or not, but --
15     Q.  Okay.
16     A.  -- it could come from almost any
17 source, somebody coming to Congress and saying,
18 way need --
19     Q.  Yeah.  We've had lots of testimony on
20 that point, but in this case with regard to the
21 MRGO and bank erosion and the reconnaissance,
22 is it not a fact that it was the Corps of
23 Engineers that requested Congressman Livingston
24 to introduce this resolution?
25         MR. SMITH:

Page 45

1          Objection.  Asked and answered.
2          MR. BRUNO:
3          I don't have an answer.  And if I
4          do, I would like to have it read back.
5      A.  I'm not aware of this.
6  EXAMINATION BY MR. BRUNO:
7      Q.  So you don't know the answer.
8      A.  I don't know the answer.
9      Q.  All right.  That's fine.  If the Corps
10 had been the -- and you've already told me that
11 the Corps could have been the entity that may
12 have approached Congressman Livingston for such
13 a resolution, right?
14     A.  It's possible.
15     Q.  All right.  Can you describe for us
16 the process by which if that were the case that
17 would have occurred?  And I'm not talking about
18 what did occur, I'm talking about what's the
19 process, if it was the Corps that would have
20 made the initial contact?
21     A.  Well, that's -- you know, that's very
22 speculative, but it could have been that
23 somebody says, here's an issue, what can the
24 Corps do about it?  And the answer might have
25 been, well, if we have no existing authority to

bd959b3f-d362-4a50-9373-43595f4a5aca

PODANY, THOMAS

10/8/2008

(Pages 46 to 49)

Page 46

1   address it we might be able to at least do a
2   study to address it and see whether there's a
3   federal interest.
4       Q.   Okay.
5       A.   That's a possibility.
6       Q.   Is there any expenditure of money by
7   the Corps that takes place in connection with
8   the Corps' desire to approach Congress for a
9   resolution like the resolution which authorized
10  the Corps to do the reconnaissance report?
11      MR. SMITH:
12          Objection.  This is beyond the
13      topic this witness is designated to
14      answer.  This was covered yesterday
15      with Mr. Montavi, the Army Corps'
16      procedures for Congressional
17      authorization of civil works projects,
18      procedure for obtaining Congressional
19      authorizations --
20      MR. BRUNO:
21          This is not a project.  This is a
22      reconnaissance study.
23      MR. SMITH:
24          -- when to advise as to the need
25      for capital improvements that will

Page 47

1       mitigate or stop damage or deleterious
2       effects.
3       MR. BRUNO:
4           Right.  That's not this.  I'm
5       trying to figure out what is it that
6       the Corps does if it has to like do
7       some study, or is it just a phone
8       call?  Could it be as little as a
9       phone call or a contact with
10      Congressman Livingston and say,
11      listen, I'd like you to -- you know,
12      I'd like you to sponsor this
13      resolution?
14      MR. SMITH:
15          Objection.  Calls for
16      speculation.
17      A.   The only thing that I'm aware of in
18  the past, and it's not in this particular case,
19  but in the past when there is an interest in
20  the Corps doing something and there is no
21  current authority --
22  EXAMINATION BY MR. BRUNO:
23      Q.   Right.
24      A.   -- there will be times when Congress
25  will specifically request that we perform a

Page 48

1   drafting service.  That drafting service is for
2   a resolution or a legislation like this.
3       Q.   All right.
4       A.   And that will go generally to our
5   headquarters or to our district, and then the
6   district will coordinate with the headquarters
7   and prepare a response.
8       Q.   All right.  So the bottom line is, we
9   don't know who, if anyone, approached
10  Representative Robert Livingston and asked him
11  to put forth this resolution.  Isn't that true?
12      A.   I'm not aware of who sponsored this
13  resolution, no.
14      Q.   We don't even know if it was something
15  that Representative Livingston came on by
16  himself; right?
17      A.   Well, it's possible that he was aware
18  of this himself.
19      Q.   Right.
20      A.   He could have been notified by local
21  interests of the problem or from the state.
22      Q.   Exactly.
23      A.   And he could have pursued it just on
24  that basis alone.
25      Q.   Okay.  So what we have to start with,

Page 49

1   then, is the resolution itself, isn't that
2   true?
3       A.   That's how we would start.  We start
4   with the resolution, and that's why it's up
5   front.  That describes -- and generally, um --
6   there's funding that comes, I mean, in another
7   step, but you have the authorization.  You may
8   not get any funding.  So the actual work to
9   address the problem won't begin until Congress
10  also appropriates funding.  And I don't know
11  when -- if there was a delay -- there usually
12  is a delay between the time the authorization
13  shows up --
14      Q.   Yeah.
15      A.   -- for a study and then when it's
16  funded.
17      Q.   Well, let me slow you down a little
18  bit because you said the problem.  It is not
19  necessarily the case that every time the
20  Congress authorizes the Corps to do a
21  reconnaissance study that there's a problem;
22  right?
23      A.   Yeah.  Well, um -- I guess in the
24  planning language, we would say problems, needs
25  and opportunities.  We would say -- that's the

bd959b3f-d362-4a50-9373-43595f4a5aca