# Exhibit 47 Part A

Case 2:05-cv-04182-SRD-JCW Document 16923-4 Filed 01/05/09 Page 2 of 21

# MISSISSIPPI RIVER-GULF OUTLET

---

## LETTER

FROM

# THE SECRETARY OF THE ARMY

TRANSMITTING

A LETTER FROM THE CHIEF OF ENGINEERS, UNITED STATES ARMY, DATED MAY 5, 1948, SUBMITTING A REPORT, TOGETHER WITH ACCOMPANYING PAPERS AND AN ILLUSTRATION ON A REVIEW OF REPORTS ON, AND A PRELIMINARY EXAMINATION AND SURVEY OF, THE MISSISSIPPI RIVER–GULF OUTLET AND THE MOBILE TO NEW ORLEANS INTRACOASTAL WATERWAY, REQUESTED BY RESOLUTIONS OF THE COMMITTEE ON RIVERS AND HARBORS, HOUSE OF REPRESENTATIVES, ADOPTED ON MAY 5, 1943, AND THE COMMITTEE ON COMMERCE, UNITED STATES SENATE, ADOPTED ON APRIL 19, 1943, AND ALSO AUTHORIZED BY THE RIVER AND HARBOR ACT APPROVED ON MARCH 2, 1945

---

OCTOBER 1, 1951.—Referred to the Committee on Public Works and ordered to be printed, with one illustration

---

## LETTER OF TRANSMITTAL

DEPARTMENT OF THE ARMY,
*Washington 25, D. C., September 25, 1951.*

The SPEAKER OF THE HOUSE OF REPRESENTATIVES.

DEAR MR. SPEAKER: I am transmitting herewith a report dated May 5, 1948, from the Chief of Engineers, United States Army, together with accompanying papers and an illustration, on a review of reports on, and a preliminary examination and survey of, the Mississippi River-Gulf outlet. This investigation was requested by resolutions of the Committee on Rivers and Harbors, House of Representatives, adopted on May 5, 1943, and the Committee on Commerce, United States Senate, adopted on April 19, 1943, and also authorized by the River and Harbor Act approved on March 2, 1945.

In accordance with section 1 of Public Law 14, Seventy-ninth Congress, the views of the Governor of the State of Louisiana are set forth in the enclosed communication.

1

$1,635,000 from reduced sailing time of coastwise vessels, reductions in hazards to navigation, savings in terminal handling charges and annual charges on wharves, and enhancement in value of water-front property.

The economic justification for the project as presented in the report is based largely on savings to shipping and ship-borne commodities once they reach the harbor and the direct monetary benefits from the outlet channel to the Gulf when considered as a separate incremental feature would not appear to warrant the large ultimate cost. However, while the inner harbor basin part of the plan can be operated feasibly as a separate unit without the seaway through use of existing and proposed connections to the Intracoastal Waterway and the Mississippi River, it is apparent that many of the advantages of convenience and efficiency which could be offered by the inner harbor would be lost without the tidal connection and that the economic benefits of the combined harbor and channel project would appear to justify its costs.

It is considered that the inner harbor and outlet channel works, taken together, are valuable long-range improvements which may be added to the backlog of work to be undertaken as conditions permit. Accordingly, you are advised that there would be no objection to authorization of the recommended works, with the understanding, however, that no appropriation for construction of the project will be sought until such time as the budgetary situation clearly makes possible the initiation of such improvements.

Sincerely yours,

ELMER B. STATTS,
*Acting Director.*

————

COMMENTS OF THE GOVERNOR OF LOUISIANA

[Telegram]

BATON ROUGE, LA., *April 28, 1948.*

Lt. Gen. R. A. WHEELER,
*Chief of Engineers, United States Army,*
*Washington, D. C.:*

Reference is made to the review of reports on the Mississippi River-Gulf and Mobile to New Orleans Intracoastal Waterway as proposed by the Chief of Engineers, United States Army.

I am familiar with the provisions of this proposed report and thoroughly concur in the views and recommendations expressed therein. The project recommended will be of inestimable benefit to the State of Louisiana and to the Nation. A tidewater channel to the sea will permit rapid development of sorely needed additional port facilities by the Board of Commissioners, Port of New Orleans, and will provide great additional benefits to the port.

Support of the State of Louisiana for a tidewater canal from New Orleans to the Gulf on the eastern side of the Mississippi River is well shown by Concurrent Resolution No. 18 of the Louisiana Legislature of 1944, in which it was resolved that the Governor of Louisiana be specifically empowered to aid and assist the Federal Government in obtaining and completing such a project.

JAMES H. DAVIS,
*Governor of Louisiana.*

REPORT OF THE CHIEF OF ENGINEERS, UNITED STATES ARMY

DEPARTMENT OF THE ARMY,
OFFICE OF THE CHIEF OF ENGINEERS,
*Washington, D. C., May 5, 1948.*

Subject: Mississippi River-Gulf outlet and the Mobile to New Orleans Intracoastal Waterway.

To: The Secretary of the Army.

1. There is submitted herewith for transmission to Congress the report of the Board of Engineers for Rivers and Harbors in response to resolution of the Committee on Commerce of the United States Senate, adopted April 19, 1943, requesting the Board to review the reports on Mississippi River-Gulf outlet submitted in Committee on Rivers and Harbors, House of Representatives, Document No. 46, Seventy-first Congress, second session, and previous reports, and to review the reports on the Mobile, Ala., to New Orleans Intracoastal Waterway submitted in the report of the Chief of Engineers dated April 27, 1942, and previous reports, with a view to determining whether any modification of the recommendations contained therein is advisable at this time, particularly with respect to the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce by the construction and maintenance of a permanent deep-draft channel 40 feet deep or of such lesser depth as may be determined to be an economical ship channel, from the Industrial Canal, New Orleans, La., eastward along the authorized route of the Intracoastal Waterway to a point at or near the Mississippi Sound, mouth of the Rigolets, thence to the 40-foot contour in the vicinity of the Government light at the northern extremity of the Chandeleur Islands; and also a resolution of the Committee on Rivers and Harbors of the House of Representatives, adopted May 5, 1943, requesting the Board to review the reports on Mississippi River-Gulf outlet submitted in Committee on Rivers and Harbors, House of Representatives, Document No. 46, Seventy-first Congress, second session, and previous reports; and to review the reports on the Mobile, Ala., to New Orleans Intracoastal Waterway submitted in the report of the Chief of Engineers dated April 27, 1942, and previous reports, with a view to determining whether any modification of the recommendations contained therein is advisable at this time, particularly with respect to the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce by the construction and maintenance of a permanent deep-draft channel 40 feet deep or of such lesser depth as may be determined to be an economical ship channel, from the Industrial Canal, New Orleans, La., eastward along the authorized route of the Intracoastal Waterway to a point at or near the Mississippi Sound, mouth of the Rigolets, thence to the 40-foot contour in the vicinity of the Government light at the northern extremity of the Chandeleur Islands. It is also in review of the report of the division engineer on a ship canal to extend from the Mississippi River at a point at or near the city of New Orleans, La., to the Gulf of Mexico, by way of the best available route or routes, authorized by the River and Harbor Act approved March 2, 1945.

9. Extensive terminal and transfer facilities for both deep- and shallow-draft traffic are located along the Mississippi River at Baton Rouge and downstream to the Head of Passes with the greatest concentration being at New Orleans. Terminal facilities on the east bank of Mississippi River at New Orleans form an almost continuous quay for 10 miles. Terminals on the west bank opposite the city are located at Westwego, Gretna, and Algiers. A United States naval dry dock is at Algiers. Four lateral slips and marginal wharves are located along the Industrial Canal. Most of the wharf area of the port of New Orleans is connected by rail, principally by the New Orleans Public Belt Railway. Public terminal business is controlled by the Board of Commissioners of the Port of New Orleans through supervision of public wharves owned by the State of Louisiana and covering about 62 percent of the improved water front. Port facilities at New Orleans also include a free port area for transshipment of foreign commerce without clearing through customs. Space for additional terminal facilities is available along the river banks but river-stage fluctuation and attenuation of surface-transportation facilities are restrictive factors on additional river-front developments. Industrial and terminal facility sites are available also along the Intracoastal Waterway east of New Orleans but rail and highway connections are limited.

10. Local interests desire provisions for the expansion of tidewater terminal facilities at New Orleans to serve further increase in waterborne commerce incident to continuing development of the Mississippi Valley and of New Orleans as a premier world port. They estimate that expansion of harbor space and general cargo handling facilities is required to provide an additional annual capacity of at least 3,000,000 tons. The Board of Commissioners of the Port of New Orleans proposes enlargement of the inner harbor to provide for expansion of harbor facilities, construction of a new lock for access to the Mississippi River, and construction of a seaway initially 500 feet wide and 36 feet deep from the Industrial Canal to the Gulf east of Chandeleur Islands. The Mississippi Valley Seaway Canal Association and other interests on the west bank of Mississippi River at New Orleans propose construction of a tidewater harbor and terminal facilities on the west bank near Westwego, connection with the river through duplicate deep-draft locks and construction of a seaway 600 feet wide and 40 feet deep from the proposed harbor southward to the Gulf in the vicinity of Grand Isle. Proponents of each route cite the availability of large areas of adjacent land for development of a tidewater port, the freedom of a seaway channel from shoaling due to river-borne sediment as is encountered in the improved channel through the Mississippi River and passes, the freedom from fog induced by the difference in temperature of river and gulf water at their junction, the advantage of the direct alinement as compared to the bends in the river channel, and the reduction in the congestion of river traffic within the existing port limits which would be provided by an additional outlet. Proponents of the west-bank route state that it provides the shortest distance between New Orleans and the Gulf, traverses unimproved lands rather than open water, and would facilitate construction of a canal-bank highway to Grand Isle to open up the area and enhance values of adjacent lands. It is stated that the Board of Commissioners, Port of New Orleans,

contemplates expenditure of $30,000,000 for further development of east-bank-harbor facilities but no definite offer of local cooperation has been received in connection with the proposed west-bank-development. Interests using the inland waterways suggest the expansion of lock facilities for light-draft traffic. Petroleum interests state their aversion to side channel outlets and advise that they prefer to use the improved river channel.

11. The division engineer has conducted surveys and studies of the existing and authorized improvements in the Mississippi River and pass channels and of the available sites for a tidewater harbor at New Orleans with essential connecting channels including the several available alinements for a seaway canal to the Gulf. He reports that the usual hazards encountered in restricted channels and their outlets attend navigation of the river and its passes and, under provisions made for their control, they are only minor. New Orleans enjoys equality with other major Gulf and Atlantic ports on rates for vessel and cargo insurance and pilotage charges. The division engineer finds that the river and its improved outlets afford seagoing vessels direct access to marginal wharves on both banks from Head of Passes to Baton Rouge and to inner harbor terminals through the Industrial-Canal lock, hence an additional outlet will supplement but not replace facilities afforded by the river and its improved passes under the existing project.

12. After consideration of the alternative locations and routes for an additional outlet, the division engineer selected two plans of improvement for detailed investigation. One plan provides for creation of a tidewater harbor on the east bank of the Mississippi River, generally as advocated by the Board of Commissioners of the Port of New Orleans, by construction of a channel 36 feet deep and 500 feet wide along the Gulf Intracoastal Waterway from the existing Industrial Canal to a turning basin south of Micheaud; the turning basin 36 feet deep, 1,000 feet wide, and 2,000 feet long; and a seaway canal, 36 feet deep and 500 feet wide, extending 70 miles as a land and water cut on tangents and easy curves from the turning basin southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Chandeleur Islands at or north of Errol Island, to deep water in the Gulf of Mexico. Provision is included for a permanent retention dike along the canal across Chandeleur Sound; for parallel jetties from Chandeleur Islands to the 20-foot contour in the Gulf, with a wing dike along the islands as required; and for the canal through the jetties and across the bar to be flared to a width of 600 feet at the 38-foot contour. The plan provides for the future construction of a channel and a lock at Meraux on the left bank of Mississippi River at mile 86, to furnish a connection from the tidewater harbor to the river additional to the existing industrial canal and lock when such construction is warranted by prospective commerce. Costs of the foregoing east-bank improvements, exclusive of the future connecting channel and lock, as estimated in 1946, total $53,500,000, of which $53,000,000 are Federal costs of construction, including $400,000 for aids to navigation, and $500,000 are non-Federal costs for rights-of-way and spoil-disposal areas. Corresponding annual carrying charges are estimated at $3,270,000, of which $3,240,000, including $810,000 for maintenance, are Federal and $30,000 are non-Federal. The

alternate plan provides for improvements on the west bank of Mississippi River, substantially as proposed by the Mississippi Valley Seaway Canal Association and other west-bank interests, to consist of an eased entrance channel 36 feet deep from the right bank of Mississippi River near Westwego at mile 103, leading into and combined with a riverside mooring basin and forebay; a lock tentatively 760 feet long and 110 feet wide with a depth of 40 feet on the sills; a landside forebay and turning basin suitable for development as a tidewater terminal harbor; a seaway canal, 36 feet deep and 500 feet wide, extending 55 miles as a land and water cut on tangents and easy curves from the terminal turning basin southerly to and through the Barataria marshes and Caminada Bay and Pass to deep water in the Gulf of Mexico; and readjustment of the Mississippi River main west-bank levee, relocation or reconstruction of highways, railways, and utilities, and construction of a movable railway and highway bridge. Provision is included for parallel jetties from Caminada Pass to the 20-foot contour in the Gulf and for the canal through the jetties and across the bar to be flared to a width of 600 feet at the 38-foot contour. Costs of the improvements under the alternate plan, as estimated in 1946, total $53,500,000, of which $53,000,000 are Federal costs of construction, including $300,000 for aids to navigation, and $500,000 are non-Federal costs for rights-of-way and spoil-disposal areas. Annual carrying charges are estimated at $2,870,000.

13. The division engineer has considered the prospective benefits under each of the two plans of improvement on the basis of economies that may be effected in pertinent present and prospective general cargo commerce (foreign and coastwise), inland-waterway commerce, and internal port traffic, together with savings on construction and operation costs of terminal facilities, and benefits due to enhancement of property values incident to creation of tidewater harbors. He notes that the proposed outlets at New Orleans would not benefit river terminals and installations above and below the port nor be utilized by petroleum interests now using the river channel in view of their aversion to locks and side channels. He estimates annual benefits of $5,260,000 as being reasonably prospective from the proposed improvements on the east side of Mississippi River, as a result of reduction in sailing and turn-round time and navigation hazards for deep-draft general-cargo vessels, savings in terminal handling and annual wharf charges, and enhancement of water-front property. The annual benefits from comparable items of savings to commerce and from land enhancement attributable to the alternate west-bank improvements are estimated to total $1,690,000. The ratio of estimated annual benefits to annual carrying charges is 1.61 under the plan providing for the supplementary outlet eastward of Mississippi River and 0.59 under the alternate plan for the west-bank outlet, therefore, the division engineer finds that the improvements to provide the eastward outlet are economically justified and those for the west-bank outlet lack economic justification. He also notes that the improvements would greatly enhance the capacity of the port for emergency war service by provision of an additional outlet and wide dispersion of terminal facilities for embarkation of personnel, material, and supplies in the interest of national defense. The division engineer recommends modification of the existing project "Mis-

sissippi River, Baton Rouge to the Gulf of Mexico" to provide for the
construction of the additional east-bank deep-draft outlet with turn-
ing basin and connecting harbor channel; with provision for the future
construction of an additional lock near Meraux and connecting chan-
nels and appurtenances between the turning basin and the Mississippi
River when such is found to be economically justifiable; generally as
outlined in his report subject to such modifications of location, aline-
ment, and dimensions as may be approved by the Chief of Engineers,
at an estimated initial cost of $53,000,000 for construction and $810,-
000 annually for maintenance and operation in addition to that now
required; subject to the provision that, prior to any construction
expenditures, local interests furnish free of cost to the United States
all lands, easements, rights-of-way, and spoil-disposal areas required
for initial construction and subsequent maintenance; and furnish
assurances satisfactory to the Secretary of the Army that they will
hold and save the United States free from claims for damage incident
to construction, maintenance, and operation of the improvement, and
will construct, maintain, and operate terminal facilities commensurate
with requirements of the expanded port, under regulations approved
by the Secretary of the Army, to insure its equitable operation in the
public interest.

14. Local interests were notified of the plan of improvement pro-
posed by the division engineer and afforded opportunity to present
additional information and comments to the Board.   At their request
the Board held a public hearing in New Orleans in order to further
develop the views of local interests.   Representatives of the Depart-
ment of Public Works, State of Louisiana, the Board of Commissioners
of the Port of New Orleans, the New Orleans Tidewater Development
Association, the New Orleans Association of Commerce, the Missis-
sippi Valley Association, and other agencies both inland and local, and
private interests, presented testimony on the commerce and com-
mercial potentialities of the port of New Orleans, and on the need for
improvement and expansion of port facilities to relieve congestion at
the public terminals and to provide for efficient and economical
transshipment of the expanding commerce.   They pointed out the
obsolescence and difficulty of maintenance of some of the present
river terminals and the lack of suitable space on the river front for
necessary expansion.   They claimed that the development of new
water-front areas is necessary to encourage industrial expansion at
New Orleans.   These interests expressed general approval of the
division engineer's recommended plan of improvement and urged its
adoption for early construction.   However, testimony was presented
to the effect that the new river lock and connecting channel to the
proposed tidewater harbor was not needed at this time.   The Board
of Commissioners of the port of New Orleans reiterated its willingness
and ability to provide the necessary local cooperation in the project
as recommended by the division engineer.   The Mississippi Valley
Seaway Canal Association, representatives of Jefferson Parish, and
other agencies and interests favoring the west-bank seaway route
presented testimony regarding the commerce of the west-bank termi-
nals at New Orleans and pointed out the possibilities for industrial
expansion in that area.   They urged the adoption of the west-bank
seaway location.   No definite offer of local cooperation on west-bank
improvements was received.

VIEWS AND RECOMMENDATIONS OF THE BOARD OF ENGINEERS FOR
RIVERS AND HARBORS

15. After careful consideration of the recommendations of the division engineer, of information presented by local interests at the hearing and through correspondence, and of data subsequently developed by additional field investigations, the Board is of the opinion that the most practicable plan for expansion of the harbor facilities of the port is by the creation of an off-river tidewater harbor with a seaway outlet as proposed by the division engineer.  Since the existing river terminals will continue to be used along with new tidewater terminals, an adequate connection between the tidewater harbor and the river is essential.  The existing Industrial Canal and lock would provide an adequate river connection for the east-bank harbor location but a new lock would be required for the west-bank location.  Hence the tidewater harbor with seaway outlet and river connection could be provided on either side of the river at approximately the same cost.  However, the east side location has certain advantages due to its relation to existing land access facilities and to the natural direction of harbor expansion for the benefit of shipping and industry.  It provides for development in a location consistent with the over-all planning of the Board of Commissioners of the port of New Orleans which is the authorized agency of the State of Louisiana responsible for administration and development of the port.

16. Consideration was also given to the advisability of providing a deep-draft lock at Meraux with a connecting channel to the east-bank tidewater harbor either to serve as a main entrance in lieu of the seaway canal or to serve in conjunction with the seaway canal.  While the substitution of the lock connection in lieu of the seaway canal would result in considerable reduction in initial expenditure, it would subject shipping to serious delays and possible damage from accidents with the attendant losses offsetting much of the saving in first cost.  Furthermore, future requirements for increased lock capacity to accommodate growth in commerce would probably result in expenditures nullifying any initial savings.  Provision of the new lock and channel in conjunction with the seaway canal is not justified at this time by the requirements of existing and prospective commerce.  The necessary river connection is available through the existing Industrial Canal and lock.  The need for an additional river connection and its proper location is a matter for later consideration when warranted by future development of the port and its commerce.

17. The Board is of the opinion that the exact location of the outlet to the Gulf and the alinement of the seaway should be determined after more complete studies of sand movement, wave action, and local currents are made in cooperation with the Beach Erosion Board.  Hence, if the improvement is authorized, ample provision should be made for modifications of the location and alinement of the canal should further studies show that a more suitable location is available.

18. The Board notes that construction costs have increased since the division engineer's estimates were prepared.  The Board estimates that the cost of the recommended improvements, based on 1948 price levels, would be $66,100,000, of which $65,490,000, including $490,000 for aids to navigation, would be Federal costs of construction, and $610,000 would be non-Federal costs of lands, rights-of-way, and spoil

disposal areas.   Corresponding annual carrying charges are estimated at $4,027,000, of which $4,004,000, including $1,000,000 for project maintenance, would be borne by the United States, and $23,000 by local interests.

19.  The volume of deep-sea commerce of the port of New Orleans has shown a variation with national and world economic situations. A peak of 13,150,000 tons was reached in 1929, followed by a low of 8,000,000 tons in 1932, a peak of 13,100,000 tons in 1937, and a low of 6,200,000 tons during the recent war.   Commerce increased to 12,150,-000 tons in 1946.   Foreign commerce has been increasing generally since the early 1930's and has shown a remarkable growth since the low in 1942, but due to a reduction in the movement of petroleum products it is unlikely to reach the 1921 peak of 11,000,000 tons for some time to come.   Recent increases are due mainly to movements of general cargo.   Imports of general cargo in 1946 were about double those in 1932 with indications of a volume of 2,000,000 tons by the early 1950's.   Exports show indications of reaching a volume of 3,800,000 tons by the same time.   No distinct trend is shown by the coastwise receipts of general cargo but shipments are increasing with indications of attaining the prewar volume of 600,000 tons by 1950 and the previous peak of 900,000 tons a few years later.   Congestion of the existing terminal facilities has resulted in recent refusals by port authorities of shipments to the port.   The capacity of existing general-cargo terminals is limited to about 4,500,000 tons per year for economic and efficient movement of commerce and about 5,000,000 tons per year is their peak capability.   The lack of sufficient terminal facilities has become a dominant factor in limiting the current growth of commerce at New Orleans.   Conditioned on the provision of adequate port facilities, it is estimated that commerce in general cargo alone will reach an annual volume of 7,500,000 tons in about 10 years. The east-bank seaway channel and tidewater harbor improvements will permit the development of terminal facilities in addition to those existing on the river water front, and will provide for relief of congestion at the existing terminals and more efficient handling of cargo with resultant savings in cost of vessel operation because less time will be required in port.   Analysis of general-cargo commerce in 1946 shows that a volume of 4,254,000 tons moved over the general wharves, requiring 2,060 calls of deep-draft vessels.   The average movement per call was 2,065 tons.   Ship time in port for each call recently ranged from 1.5 to 21.75 days and averaged about 7 days.   Allowing for the most efficient and economical operation of the existing terminals, they would provide for movement of 4,250,000 tons leaving 3,250,000 tons of the estimated 7,500,000 tons of general cargo to be moved over new terminals to be provided in the proposed tidewater harbor.   On the basis of current tonnage movements, the 3,250,000 tons would require 1,550 calls of deep-draft vessels using the newer, more efficient terminal facilities.   Estimates by vessel operators show that savings in ship turn-round time provided by these facilities would be a minimum of 1.25 days per call.   A representative analysis of ship operating costs of all deep-draft vessels calling at New Orleans during a recent period shows an average of $70 per hour to be generally applicable.   On these bases the savings in ship time in transporting cargo to and from the new terminals is estimated at $3,250,000 annually.   In addition, relief of congestion at existing general cargo

terminals and in the landward access facilities to all the present terminal wharves will save ship time in loading and unloading and provide benefits to industrial and commercial tonnage using those facilities estimated at $950,000 annually. Further benefits creditable to the improvement would result from reduced sailing time of coastwise vessels, reduction in hazards to navigation, savings in terminal handling charges and annual charges on wharves, and enhancement in value of water-front property. These additional benefits are estimated to have an annual value of $1,635,000. The sum of the tangible benefits estimated by the Board is $5,835,000, which compared with annual charges of $4,027,000 shows a benefit-cost ratio of 1.45. Additional benefits to industry and employment would accrue throughout the vast tributary area and the improvements would greatly enhance the capacity of the port for emergency war service.

20. The Board concludes that the existing terminal facilities of the port of New Orleans are inadequate to serve the needs of the growing commerce. Possibilities are extremely limited for the development of additional terminal facilities in locations along the present water front which would provide for accessibility and economical operation. The creation of a tidewater harbor with free access to deep water in the Gulf of Mexico is required to provide for the necessary expansion of terminal facilities. The east-bank seaway channel, turning basin, and connecting channel would be adequate for and would best meet the requirements for terminal facility expansion. The estimated benefits to commerce substantially exceed the estimated annual carrying charges for the improvements, therefore, the project is economically justified. The division engineer's plan of improvement to create an east-bank tidewater harbor and outlet, if properly supported by the supplemental development and administration by local interests of modern, efficient terminal facilities will serve adequately the needs of the expanding commerce of the tributary area extending through the Mississippi Valley and into many of the adjoining States. The Board of Commissioners of the Port of New Orleans has signified its willingness and ability to meet the requirements of local cooperation including the construction and operation of terminal facilities sufficient for the needs of commerce.

21. The Board of Engineers for Rivers and Harbors recommends that the existing project for "Mississippi River, Baton Rouge to the Gulf of Mexico," be modified to provide for construction of a seaway canal 36 feet deep and 500 feet wide extending 70 miles as a land and water cut on tangents and easy curves from a point south of the Intracoastal Waterway at Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and across Chandeleur Sound to Chandeleur Islands at or north of Errol Island, thence increasing gradually to a width of 600 feet and depth of 38 feet in the Gulf of Mexico, with protective jetties at the entrance, a permanent retention dike through Chandeleur Sound, and a wing dike along the islands as required; a turning basin at the landward end of the seaway canal, 36 feet deep, 1,000 feet wide, and 2,000 feet long; and a connecting channel 36 feet deep and 500 feet wide extending westerly along the Gulf Intracoastal Waterway from the turning basin to the Industrial Canal; all generally in accordance with the plans of the

division engineer and with such modifications thereof as in the discretion of the Secretary of the Army and the Chief of Engineers may be desirable, at an estimated cost to the United States of $65,000,000 for construction exclusive of aids to navigation, and $1,000,000 annually for maintenance in addition to that now required; provided that, prior to any construction expenditures, local interests furnish free of cost to the United States all lands, easements, rights-of-way, and spoil-disposal areas required for initial construction and subsequent maintenance; make necessary highway, railway, and utility changes; and furnish assurances satisfactory to the Secretary of the Army that they will hold and save the United States free from all claims for damage due to construction, maintenance, and operation of the project, and will construct, maintain, and operate terminal facilities commensurate with requirements of the expanded port, under regulations approved by the Secretary of the Army.

For the Board:

R. C. CRAWFORD,
*Major General,*
*Senior Member.*

---

## REPORT OF THE DIVISION ENGINEER

### SYLLABUS

The Board of Commissioners of the Port of New Orleans, the State agency for operation of the port, requests Federal construction of an additional deep-draft outlet (seaway) from New Orleans to the Gulf of Mexico east of Chandeleur Islands. West-bank interests, by the Mississippi Valley Seaway Canal Association, request a deep-draft outlet (seaway) from the river at Westwego to the Gulf south of Caminada Bay.

Under uniform postulates, comparison of estimated annual charges and benefits indicates economic justification for proposed east bank but not for proposed west-bank improvements.

The division engineer finds that the proposed outlet and tidewater harbor east and southeast of New Orleans, in conjunction with the river and its improved passes and the Intracoastal Waterway and Industrial Canal, will facilitate expansion and improvement of port facilities to serve all water-borne commerce that may be attracted to the port with resulting benefits to present and prospective seagoing and inland waterway navigation and commerce considerably in excess of charges for construction and operation, and will greatly enhance the capacity of the port for war service by providing for dispersion of terminal facilities.

He recommends that the existing project, "Mississippi River, Baton Rouge to the Gulf of Mexico," be modified to provide for an additional east-bank, deep-draft outlet and tidewater harbor by construction of connecting harbor channel 36 feet deep and 500 feet wide extending from the existing inner harbor canal to a turning basin south of Michaud; and a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from this turning basin southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands, at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of approximately 70 miles, with provision for the future construction, when found to be economically justifiable, of an additional lock near Meraux with necessary channels and appurtenances for connections with the turning basin and the Mississippi River, generally as outlined in paragraph 60 hereof, subject to such modifications of location, alinement, and dimensions as may be approved by the Chief of Engineers, at an estimated cost of $53,000,000 for construction and $810,000 annually for maintenance and operation, in addition to that now required; subject to stated conditions of local cooperation.

a transhipment terminal for shallow-draft commerce utilizing the network of inland waterways formed by the river, its tributaries and connecting streams, including the Gulf Intracoastal Waterway. The area commercially tributary to the port is not limited by definite bounds. Inland water-borne commerce may originate in or be destined to any of the States between the Appalachian and Rocky Mountains. Ocean commerce is carried by ships which call at all major United States and world ports.

9. New Orleans (population 494,537 in 1940) is the principal port city. Its peacetime industries are allied with shipping and have been developed to utilize raw and semifinished products attracted to the port by its harbor and transportation facilities. Baton Rouge (population 34,719 in 1940) is an important oil-refinery center. Industrial operations of the port cities, expanded prodigiously by war activities, include shipbuilding and aircraft manufacturing at New Orleans; aluminum, synthetic rubber, and chemical plants as well as oil refineries at Baton Rouge. Much, if not most, of the increase in population and industrial activity may be permanent. Along the river between Baton Rouge and New Orleans, five major plants for handling or processing petroleum products and two sugar refineries are located; below New Orleans at Port Sulphur, mile 39, sulfur is produced and shipped.

10. Agricultural lands along the river below Baton Rouge are productive; principal crops being sugarcane, strawberries, tobacco, and garden produce. Below New Orleans, fishing and farming are the chief occupations of rural residents along the river. Garden truck and citrus fruits are principal crops. Shrimping and oyster fleets are based on bayous and canals which connect the river with coastal bays and sounds. Proven Louisiana oil fields have been extended by new discoveries in areas adjoining the Mississippi below New Orleans and continuing expansion of production and distribution of petroleum products along the Gulf coast make this commodity the outstanding item of inland and ocean commerce.

11. The area at and below New Orleans forms part of the Mississippi River Delta, a low alluvial plain of geologically recent deposits. Here the natural banks of the river and bayous vary from 0 to 12 feet in height and general ground elevations are little if any above or below mean sea level. Mississippi River levees, which extend below New Orleans to mile 11.5 left bank (except for Bohemia spillway, mile 33 to mile 44); and to mile 10.5, right bank, protect narrow strips of land from Mississippi River floods. There are numerous lakes, bayous, and sloughs between both river banks and the Gulf. Generally, bays and sounds along the coast are separated from the Gulf by detached islands or chains of islands.

12. The port area of New Orleans is served adequately by improved streets, highways, and railways. Rail service is provided by the Gulf, Mobile, & Ohio; Illinois Central; Southern Railway (New Orleans & Northeastern); Louisiana & Arkansas; Louisiana Southern; Louisville & Nashville; Missouri Pacific; Southern Pacific; and Texas & Pacific Railroads. The New Orleans Public Belt Railroad, the New Orleans Terminal Co., and the Texas Pacific-Missouri Pacific Terminal Railroad of New Orleans, provide switching service and interconnections between main line railroads and wharves.

project for the intracoastal waterway provides that local interests furnish, free of cost to the United States, all rights-of-way and spoil-disposal areas required for the improvement and defray the costs of alteration or reconstruction of highway bridges. These conditions have been complied with as required.

23. *Other improvements.*—The inner-harbor navigation canal (industrial canal), constructed by the New Orleans Dock Board, extends 5½ miles from the river to Lake Pontchartrain through the east section of the city. Controlling dimensions are 150 by 20 feet at the lake, the depth increasing to 30 feet at the turning basin, 2 miles from the river. Thence to the river the depth is 32 feet except through the lock, 2,000 feet from the river, where usable dimensions are 75 by 640 feet, with 31.5 feet depth over the sills. Under authority granted in the act approved July 23, 1942, acquisition of control of the Industrial-Canal lock and so much of the canal as is used by Intracoastal Canal traffic was effected by lease dated April 1, 1944, since which date the facility has been operated toll-free on a 24-hour-per-day basis.

24. *Terminal and transfer facilities.*—At Baton Rouge, these comprise a public concrete wharf and appurtenances for barge and deep-draft vessel traffic and private terminals and docks for handling oil and other commodities, located along the river front as far as the Baton Rouge Bridge (reference unpublished report, Survey of Terminals and Landings on the Inland Waterways of the United States, Board of Engineers for Rivers and Harbors, 1941).

25. Port facilities at New Orleans, described in detail in the Port of New Orleans, La., Port Series No. 5, revised 1938, include at least 100 wharves with depths varying from 12 to 40 feet. On the left bank, structures are located on the levee and form an almost continuous quay for 10 miles. Public terminal business is controlled by the Board of Commissioners, Port of New Orleans, with wharves covering about 62 percent of the improved water front. Most of the wharf area is served by modern transit sheds equipped with riverside aprons 20 to 30 feet wide for shipside loading, and with landside streets and railroad tracks, notably the New Orleans Public Belt Railroad, for interchange of commodities between terminals and railroads. On the right bank, railway and private terminal piers and wharves are sited at Westwego, Gretna, and Algiers. At the last-named location are drydocks for deep-draft vessels of which the largest is that of the United States naval installation, which is placed at the service of commercial craft when private docks are not available. Above New Orleans, private terminals for seagoing commerce are operated by five oil companies and two sugar refineries, and below the city at least four oil companies have private terminals; the pier of the Seatrain Line is located at Belle Chasse; and the Freeport Sulphur Co. operates its terminal at Port Sulphur. The inner-harbor navigation canal and lock, which provides access for vessels which can negotiate the sill (i. e., with fresh-water draft not more than 31 feet), affords four lateral slips, marginal wharves, a turning basin 1,000 feet square, and a connecting channel to the Intracoastal Waterway east from the city where industrial sites (including the Higgins Industries) were developed in war years. Here undeveloped terminal sites are available but railway and highway connections are limited. In general, terminal facilities at New Orleans, developed to meet increasing requirements of expanding commerce of a premier river

terminal and transfer port serving both deep- and shallow-draft traffic, have been installed along unstable river banks where stage fluctuation is a restrictive factor. The dock board states that these terminals must soon be augmented to serve further increase in water-borne commerce incident to continuing development of the Mississippi Valley and the Nation. Extension of marginal wharves above or below the city involves attenuation of surface transportation with attendant decreased efficiency of terminal transfer operations. Expansion along the Intracostal Waterway and development of a tide-water terminal basin on unimproved property is highly desirable if the improvement is located close enough to the city to facilitate continuing development of water-front terminals with highway and railroad connections. Establishment of a free port area for transshipment of foreign commerce of the port without clearance through customs, deferred during war years, has been authorized by the Department of Commerce and presumably will be activated in the early future as a feature of postwar reconstruction.

### V. IMPROVEMENT DESIRED

26. *General.*—A public hearing held at New Orleans, August 5, 1943, was attended by some 500 representatives of Federal, State, city, and parish agencies; financial, commercial, industrial, and shipping interests; and numerous civic and social organizations. Transcript of hearing and exhibits I–LXXXIX,[1] presented at that time or later, are appended. The Board of Commissioners of the Port of New Orleans (the New Orleans Dock Board), and others proposed a deep-draft outlet channel (seaway) from the Industrial Canal to the Gulf, east of the Chandeleur Islands. Jefferson Parish officials, the Mississippi Valley Seaway Canal Association, and other west-bank interests proposed a similar channel on the west bank from West-wego to the Gulf at Grand Isle. The Inland Waterways Corporation and others suggested the advisability of expanding lock facilities for inland-waterway traffic.

27. *East bank outlets.*—The dock board stated (exhibit LVII [1]) that an additional east-bank outlet (seaway) would afford a deep, safe, and dependable tidewater channel from New Orleans to deep water in the Gulf, which would involve no difficult problems in engineering; that its cost would be reasonable in comparison with resulting benefits; that it would not be subject to shoaling by river-borne sediment; and that it would make available large areas of land for future development of a tidewater port. On July 16, 1945, the dock board submitted a second brief (exhibit LVII–A [1]) in which it outlines its status as an agency of the State of Louisiana, recounts addresses and briefs submitted at the public hearing, and presents engineering reports by Col. Elliot J. Dent, United States Army, retired, consulting engineer; Dr. Robert W. French, Louisiana State University; and V. J. Bedell Co., consulting engineers. Later, on June 1, 1946, the dock board submitted a supplementary brief (exhibit LVII–B,[1] report by Knappen Engineering Co.), in which it is pointed out that New Orleans needs to expand its general-cargo-handling facilities and harbor space to provide at least 3,000,000 tons additional annual capacity, and that such expansion may be effected

[1] Not printed.

economically by enlargement of the inner harbor and construction of a deep-draft outlet canal, for which channel dimentions of 500 by 36 feet would suffice initially, with estimated cost of $25,000,000 for dredging and $1,380,000 annually for maintenance of the proposed canal, unless provided with a permanent dike for retention of dredged spoil. It is noted that access to the tidewater harbor may be provided by an additional deep-draft lock (40 by 100 by 1,000 feet), with connecting channel to the river, at an estimated cost of $24,200,000. It is stated that the dock board has spent over $30,000,000 in 25 years on inner-harbor improvements and contemplates an additional expenditure of $30,000,000 for further development.

28. *West bank outlets.*—The Seaway Canal Association, in its brief (exhibit LXXIV-A [1]), lists "reasons" and "advantages" in support of a west bank outlet, stating, among other things, that it is the shortest route between New Orleans and deep water in the Gulf, traversing unimproved lands rather than open water, thus involving minimum maintenance costs and facilitating construction of a highway to Grand Isle, to open up the area and enhance values of adjacent lands.

### VI. COMMERCE

29. *Existing commerce.*—Total traffic on the lower river for the period 1936–45, comprising that reported in annual reports of the Chief of Engineers for Mississippi River passes and ports of New Orleans and Baton Rouge, was as follows:

[Thousands of tons]

| Year | Passes | Port of New Orleans | Port of Baton Rouge | Year | Passes | Port of New Orleans | Port of Baton Rouge |
|------|--------|---------------------|---------------------|------|--------|---------------------|---------------------|
| 1936 | 14,065 | 14,332 | 5,092 | 1941 | 13,533 | 20,007 | 8,150 |
| 1937 | 16,006 | 17,173 | 6,540 | 1942 | 8,200 | 22,637 | 7,744 |
| 1938 | 16,319 | 17,225 | 7,092 | 1943 | 7,025 | 21,320 | 6,863 |
| 1939 | 15,597 | 16,305 | 7,808 | 1944 | 9,093 | 23,949 | 7,844 |
| 1940 | 15,807 | 16,706 | 7,501 | 1945 | 13,387 | 25,205 | 6,967 |

30. Seagoing commerce through the passes, including foreign and coastwise traffic, for the years 1941 and 1945, consisted of commodities classified as follows:

[Thousands of tons]

| Commodity class [1] | 1941 | | 1945 | |
|---------------------|--------|---------|--------|---------|
| | Imports | Exports | Imports | Exports |
| Products of agriculture | 2,711 | 531 | 959 | 1,246 |
| Animal products | 101 | 75 | 141 | 87 |
| Products of mines | 400 | 436 | 173 | 2,169 |
| Products of forests | 154 | 557 | 102 | 171 |
| Manufacturing and miscellaneous | 1,114 | 7,445 | 2,672 | 5,667 |
| Total | | 13,533 | | 13,387 |

[1] Imports and exports in table include coastwise receipts and shipments.

31. Distribution of seagoing commerce at points on the river from Head of Passes to Baton Rouge for the years 1941 and 1945 is shown in the following table:

[1] Not printed.

[Thousands of tons]

| Points of loading or unloading | Receipts and shipments 1941 | Receipts and shipments 1945 | Points of loading or unloading | Receipts and shipments 1941 | Receipts and shipments 1945 |
|---|---|---|---|---|---|
| Below New Orleans: | | | Above New Orleans: | | |
| Pilottown | 252 | 234 | Avondale | | 170 |
| Port Sulphur | 323 | 362 | St. Rose | 297 | 294 |
| | | | Destrehan | 159 | 36 |
| Total, lower harbor | 575 | 596 | Good Hope | 186 | 165 |
| | | | Norco | 350 | 493 |
| Within port of New Orleans: | | | Gramercy | 11 | |
| Inner Harbor (Industrial Canal) | 121 | 250 | | | |
| East bank river wharves | 5,538 | 8,113 | Total, New Orleans to Baton Rouge | 913 | 1,164 |
| Total, east bank | 5,659 | 8,363 | Port of Baton Rouge | 4,118 | 2,505 |
| Belle Chasse | 538 | 220 | Grand total | 13,533 | 13,387 |
| Gretna | 175 | 2 | | | |
| Marrero | 946 | 296 | | | |
| Westwego | 609 | 241 | | | |
| Total, west bank | 2,268 | 759 | | | |

32. *Intracoastal waterway traffic.*—That east and west of the Mississippi River for the period 1939–45 was recorded by sections as follows:

[Thousands of tons]

| Year | Mobile Bay to New Orleans | Mississippi River, La., to Atchafalaya River — Harvey Lock | Mississippi River, La., to Atchafalaya River — Plaquemine Lock [1] | Year | Mobile Bay to New Orleans | Mississippi River, La., to Atchafalaya River — Harvey Lock | Mississippi River, La., to Atchafalaya River — Plaquemine Lock [1] |
|---|---|---|---|---|---|---|---|
| 1939 | 1,677 | 2,063 | 391 | 1943 | 4,470 | 9,753 | 3,201 |
| 1940 | 2,051 | 3,389 | 429 | 1944 | 5,807 | 11,441 | 2,362 |
| 1941 | 3,054 | 6,180 | 1,300 | 1945 | 5,172 | 9,253 | 1,606 |
| 1942 | 3,545 | 8,937 | 3,404 | | | | |

[1] Through traffic.

33. Through freight traffic on the Intracoastal Waterway for sections east and west of the Mississippi River for the years 1941 and 1945 consisted of commodities classified as follows:

[Thousands of tons]

| Commodity class | Mobile Bay to New Orleans [1] East | Mobile Bay to New Orleans [1] West | Mississippi River to Atchafalaya River — Harvey Lock East | Mississippi River to Atchafalaya River — Harvey Lock West | Mississippi River to Atchafalaya River — Plaquemine Lock [1] East | Mississippi River to Atchafalaya River — Plaquemine Lock [1] West |
|---|---|---|---|---|---|---|
| 1941—Products of agriculture | 185 | 24 | 37 | 66 | 9 | 12 |
| Animal products | 72 | 11 | 25 | 3 | | 9 |
| Products of mines | 11 | 50 | 94 | 346 | | 2 |
| Products of forests | 70 | 23 | 29 | 17 | 27 | |
| Manufacturing and miscellaneous | 1,629 | 809 | 4,503 | 1,060 | 1,073 | 168 |
| Total | 2,884 | | 6,180 | | 1,300 | |
| 1945—Products of agriculture | 13 | 1 | 14 | 25 | | 2 |
| Animal products | 109 | | 6 | 3 | | |
| Products of mines | 94 | 522 | 2,926 | 149 | 949 | 88 |
| Products of forests | 72 | | 4 | 1 | | 1 |
| Manufacturing and miscellaneous | 4,254 | 106 | 5,620 | 505 | 534 | 32 |
| Total | 5,172 | | 9,253 | | 1,606 | |

[1] Through traffic.

34. *Industrial-canal traffic.*—Statistics relating to Intracoastal Waterway (pars. 32 and 33) do not cover commerce pertinent to the industrial canal and lock.   Traffic served by this facility, as recorded by the dock board for fiscal years 1934–43, consisted of vessels and cargoes as follows:

*Traffic through Industrial Canal and lock*

| Fiscal year | Vessels | Cargo | Fiscal year | Vessels | Cargo |
|---|---|---|---|---|---|
| | | *Thous. tons* | | | *Thous. tons* |
| 1934 | 13,382 | 5,353 | 1939 | 16,194 | 5,905 |
| 1935 | 12,566 | 5,595 | 1940 | 17,079 | 6,081 |
| 1936 | 13,451 | 5,151 | 1941 | 10,705 | 7,040 |
| 1937 | 14,491 | 5,625 | 1942 | 21,986 | 7,509 |
| 1938 | 15,499 | 5,002 | 1943 | 25,700 | 9,826 |

35. *Vessel traffic.*—The following tabulation shows trips and drafts of vessels traversing the passes during the years 1941 and 1945:

| Draft (feet) | Steamers | | | | Barges | |
|---|---|---|---|---|---|---|
| | South Pass | | Southwest Pass | | Both passes | |
| | In-bound | Out-bound | In-bound | Out-bound | In-bound | Out-bound |
| 1941—33 to 34 | | | | 25 | | |
| 32 to 33 | | | 4 | 33 | | |
| 31 to 32 | 3 | 16 | 9 | 76 | | |
| 30 to 31 | 1 | 23 | 5 | 30 | | |
| 28 to 30 | 20 | 198 | 35 | 72 | | |
| 26 to 28 | 62 | 216 | 96 | 47 | | |
| 24 to 26 | 176 | 231 | 116 | 28 | | 2 |
| 22 to 24 | 232 | 174 | 78 | 30 | 2 | |
| 20 to 22 | 235 | 169 | 82 | 47 | | 2 |
| 18 to 20 | 385 | 234 | 97 | 63 | 2 | 1 |
| Under 18 | 718 | 529 | 152 | 265 | 10 | 9 |
| Total | 1,832 | 1,793 | 674 | 716 | 14 | 14 |
| 1945—35 to 36 | | | | 1 | | |
| 33 to 34 | | | | 21 | | |
| 32 to 33 | | 4 | 7 | 46 | | |
| 31 to 32 | | 31 | 1 | 49 | | |
| 30 to 31 | 2 | 12 | 5 | 13 | | |
| 28 to 30 | 36 | 215 | 71 | 90 | | |
| 26 to 28 | 99 | 156 | 78 | 47 | | |
| 24 to 26 | 77 | 146 | 58 | 45 | | 12 |
| 22 to 24 | 144 | 149 | 68 | 35 | | |
| 20 to 22 | 169 | 176 | 70 | 71 | | |
| 18 to 20 | 347 | 248 | 116 | 107 | 1 | |
| Under 18 | 647 | 569 | 338 | 104 | 18 | 16 |
| Total | 1,521 | 1,706 | 812 | 710 | 19 | 28 |

36. Trips and drafts of vessels which moved through sections of the Intracoastal Waterway during 1941 and 1945 are shown in the following tabulation:

| Draft (feet) | 1941 | | | | 1945 | | | |
|---|---|---|---|---|---|---|---|---|
| | East-bound | | West-bound | | East-bound | | West-bound | |
| | Self-propelled | Barges | Self-propelled | Barges | Self-propelled | Barges | Self-propelled | Barges |
| **Mobile Bay to New Orleans** | | | | | | | | |
| 9 to 12 | | | | | 145 | 22 | 145 | 757 |
| 6 to 9 | 2,661 | 2,331 | 2,321 | 1,307 | 2,349 | 4,101 | 1,878 | 757 |
| 3 to 6 | 6,520 | 644 | 6,824 | 258 | 1,120 | 101 | 1,027 | 29 |
| Under 3 | 597 | 1,158 | 657 | 2,399 | 216 | 211 | 219 | 4,225 |
| Total | 13,811 | | 13,826 | | 8,325 | | 8,280 | |
| **Mississippi River, La., to Sabine River, Tex.** | | | | | | | | |
| 9 to 12 | | | | | 781 | 745 | 714 | 405 |
| 6 to 9 | 4,630 | 5,548 | 4,508 | 5,634 | 5,295 | 8,865 | 5,397 | 4,684 |
| 3 to 6 | 4,976 | 1,865 | 4,817 | 1,927 | 4,551 | 999 | 4,355 | 1,470 |
| Under 3 | 462 | 7,162 | 637 | 7,029 | 306 | 6,773 | 162 | 10,468 |
| Total [1] | 24,643 | | 24,642 | | 28,315 | | 27,055 | |
| **Plaquemine to Morgan City** | | | | | | | | |
| 6 to 9 | | 1,071 | | 308 | 488 | 700 | 489 | 157 |
| 3 to 6 | 669 | 85 | 1,112 | 52 | 200 | 64 | 290 | 89 |
| Under 3 | 561 | 392 | 19 | 1,183 | 30 | 269 | 30 | 879 |
| Total | 2,678 | | 2,674 | | 1,940 | | 1,943 | |

[1] East and west through Harvey lock, 13,115 and 13,852 in 1941; 17,755 and 18,053 in 1945.

37. *Prospective seagoing traffic.*—Shipping interests anticipate (exhibit LVII–A[1]) an increase of 50 percent or more in seagoing commerce at New Orleans. Analysis by the United States Maritime Commission (exhibit LXXXVIII[1]) discloses that general-cargo foreign trade of the port did not increase between 1923 and 1940 but that coastwise shipping and internal traffic in the decade ending in 1940 was more than twice that of the decade of the twenties, and that the total general-cargo traffic in foreign, coastwise, and internal trade almost doubled in 17 years ending in 1940. Noting that analysis of trade prospects of New Orleans does not bear out traffic estimates of proponents, the Maritime Commission suggests that New Orleans should share in expansion of general-cargo foreign trade expected by the Department of Commerce and will need the proposed additional channel and port facilities to care for that expansion. Petroleum interests state (exhibit LXXXII[1]) their aversion to side channel outlets and advise that they prefer to use the improved river channel. Terminals for bulk traffic in oil and sulfur are outside the port of New Orleans and these commodities properly may be excluded in estimates of prospective commerce for proposed outlets. Thus seagoing commerce that may be

[1] Not printed.

served by proposed east-bank outlets consists of general cargo which is served by east-bank and inner-harbor terminals (par. 31) and a 50-percent increase in this traffic is a reasonable expectancy; hence, prospective commerce pertinent to this section of the port may be expected to expand to more than 10,000,000 tons, terminal handling of which would be facilitated by a tidewater harbor with a direct outlet to the Gulf, especially if proposed tidewater facilities and existing east bank terminals are operated by a single agency, i. e., the New Orleans Dock Board.

38. Prospective deep-draft commerce, that may be served by the proposed west-bank outlet, consists of general cargo which now uses west-bank terminals between Belle Chasse and Westwego (par. 31), and this traffic also may be expected to increase by 50 percent to more than 3,000,000 tons, handling difficulties for which would be lessened by a tidewater harbor with direct outlet to the Gulf.

39. *Inland-waterway traffic.*—During the period 1939-45, Intra-coastal Waterway commerce between Mobile and New Orleans varied between 1,500,000 and 6,000,000 tons, and during the war years (1941-45), averaged nearly 4,500,000 tons. Reasonably, some decline in postwar waterway traffic may be expected, but improvement of the waterway connecting the Tombigbee and Tennessee Rivers, authorized by the River and Harbor Act approved July 24, 1946, presupposes diversion of Mississippi River traffic of 3,000,000 tons or more (H. Doc. No. 486, 79th Cong., 2d sess.). If such diversion is effected, traffic on the Mobile-New Orleans section of the Gulf Intracoastal will be increased correspondingly. Thus prospective Intracoastal Water-way commerce (Mobile-New Orleans section) may be far greater than that reported for war years and may exceed 10,000,000 tons.

40. During the period 1939-45, Intracoastal Waterway commerce through Harvey lock, i. e., west of New Orleans, varied between 2,000,000 and 11,500,000 tons, and in war years (1941-45) averaged more than 9,000,000 tons. Some decline in this great traffic may be expected as a feature of postwar reconversion, especially in view of the recommended enlargement and extension of the Plaquemine alter-nate route to the Mississippi River opposite Baton Rouge; but some, if not all, of such decline may be offset by expanding oil production in the Gulf area.

## VII. DIFFICULTIES ATTENDING NAVIGATION

41. Usual hazards encountered in restricted channels and outlets therefrom attend navigation of the river and its passes. Fog obser-vations by the New Orleans district for 1941 disclosed that in that year there were 50 occurrences at Burrwood on Southwest Pass, of which those characterized as "moderate" (visibility less than ⅝ mile) obtained 134 hours; "thick" (visibility less than ³⁄₆ mile) 48 hours; and "dense" (visibility less than ⅛ mile) 14 hours, indicating that fog is only a minor navigation hazard for traffic to and from New Orleans. River currents, less than a knot at low stages and more than 6 knots at crest of flood at and below New Orleans, retard up-bound and accelerate down-bound traffic but do not constitute a serious hazard for modern full-powered vessels. A traffic-control-signal system in New Orleans Harbor is operated during high stages. Flood flows up to 3 knots down Southwest Pass and 4 knots down South Pass emerge

to meet littoral currents of varying strength (up to 2 knots), generally from east to west across the bar channels. Attendant highwater shoaling at the bar entrance of Southwest Pass entails restricting drafts of vessels when adequate depth cannot be maintained by dredging operations. Such restriction prescribes a maximum draft, generally not less than 31 feet, during high stages of prolonged floods, but in 1946 it was necessary to restrict maximum draft to 30 feet for 10 days (March 12–22).

Low-powered vessels, when encountering cross currents at the entrance to South Pass, find it difficult to negotiate the turn at the junction of bar and jetty channels. Similar difficulty at Southwest Pass is less drastic. Regulations promulgated in 1931, directing vessels with speed less than 9 knots to negotiate Southwest Pass rather than South Pass when Mississippi River stage at Carrollton exceeds 15 feet, effected material reduction in frequency of navigation casualties. There were but 33 accidents (20 in South Pass) incident to 51,764 trips through the passes in the period 1932–41 as compared to 116 incident to 48,384 trips in the period 1922–31. Accidents reported (tables 4 and 5 [1]) include those due to mechanical defects of vessels and lack of knowledge or errors in judgment by navigators as well as those due to fog, currents, and storms. On the river between Head of Passes and Baton Rouge there are few navigation difficulties. The channel is well defined by trees along the banks and well marked by modern aids to navigation.

42. Freight and insurance rates and pilotage charges reflect conditions affecting ship operations at ports. Major Gulf ports have equal rates to United States Atlantic ports and to foreign ports within a given range. The port equality principle is likewise preserved in determination of vessel and cargo insurance. Comparative pilotage charges (30-foot draft) are $180 at New Orleans, Mobile, Jacksonville, and Charleston; $220 at Savannah; and $165 at Houston.

### VIII. SURVEYS

43. Gage observations and hydrographic surveys of the river and passes necessary for a continuing record of changing conditions have been made regularly by the New Orleans district. These records together with hydrographic charts and coastal current observations of the United States Coast and Geodetic Survey, and summary report of the geology of the lower alluvial valley, prepared for the Mississippi River Commission, were supplemented by marine current observations, fathometer surveys, and subsurface exploration.

### IX. DEVELOPMENT OF EXISTING OUTLETS, BAR ADVANCE

44. Alternative routes for outlets from the Mississippi River to the Gulf of Mexico have been investigated in the interest of seagoing navigation, from time to time for almost a century. Recourse to a ship canal was considered, but not recommended except as a last resort, in the 1852 report (Ex. Doc. No. 16, 33d Cong., 1st sess.). A ship canal from the river near Fort St. Phillip to the Gulf was reported as feasible in the 1874 report (H. Doc. No. 113, 43d Cong., 1st sess.) A canal was considered but construction of jetties was recommended

[1] Not printed.