# Exhibit 47 Part B

in the 1875 report (H. Ex. Doc. No. 114, 43d Cong., 1st sess.). Improvement of South Pass with provision for jetty construction (the Eads contract) was authorized by the River and Harbor Act of March 3, 1875. On completion of the prescribed maintenance period, January 28, 1901, the improvement was accepted and has since been maintained by the Department. . The South Pass improvement provided a dependable outlet, but it became evident that a larger outlet channel was required for increasing requirements of ocean commerce. Reports, based on investigations and surveys prosecuted in 1898 and 1899 for a channel 35 feet deep and adequate width through Southwest Pass (H. Doc. No. 122, 55th Cong., 3d sess. and H. Doc. No. 329, 56th Cong., 1st sess.), are project documents for improvement of Southwest Pass (pars. 19 and 20).

45. Improvement of deep-draft channels through the bars at the passes involved solution of engineering problems for which there was a dearth of precedent. In consequence, work was carried on gradually through many years. Experience revealed that bar channels at the passes should be located, not in prolongation of jettied channels, but on divergent alinements directed across littoral currents and into prevailing winds. Accordingly, bar channels for South Pass and Southwest Pass are inclined left at the lower end of the jettied channels with angles of divergence between 35° and 40°. As southeast winds are dominant in the vicinity of the passes, the littoral current deflects fresh-water discharge with its load of sediment to west (right) sectors of bars where deposition of sand and silt and attendant bar advance involves minimum encroachment of bar channels.

46. Observations made in 1931–33 indicated that during low river stages marine currents scour bar channel areas at the passes to but not below a depth of 32 feet to maintain project depth across the South Pass bar and to facilitate maintenance of the Southwest Pass bar channel. Eventual alteration of direction and effectiveness of marine currents incident to growth and advance of bars may be expected to involve extension of jetties and reconstruction of entrance channels. However, accelerated bar advance in recent years (1941–45) indicates that jetty extension and bar channel relocation will be necessary in the early future. Advance of bar contours, as revealed by hydrographic surveys, is shown on plate 3.[1]

47. Prior to adoption of the principle of divergent bar channels for the passes, continued maintenance of satisfactory entrance channels was open to question. In the report under review (Rivers and Harbors Committee Doc. No. 46, 71st Cong., 2d sess., 1930), the Board of Engineers for Rivers and Harbors found—

there was no serious difficulty in maintaining adequate channels during the past 5 years, and conditions are now such that it is believed that continued maintenance on a reasonable basis is assured.

The record evidences that such maintenance is practicable, and attendant costs to date are reasonably in line with those at other major American ports (table 3 [1]). However, the necessity for jetty extension due to bar advance, will cause maintenance to become increasingly costly and difficult.

---

[1] Not printed.

Case 2:05-cv-04182-SRD-JCW    Document 16923-5    Filed 01/05/09    Page 3 of 15

## X. ADDITIONAL OUTLETS

48. Consideration was given to nine alternative outlets in reports contained in House Document No. 46, 71st Cong., 2d sess. The route outlined in authorizing resolutions and those proposed at and subsequent to the public hearing for this review (fig. 1 [1]) generally correspond to those discussed in reference reports as Chandeleur, Lake Borgne, and Barataria routes. Comparative estimates under uniform postulates (table 6 [1]) indicate that relatively slight difference in over-all cost of east-bank outlets and appurtenances results from change in alinement between common termini.

49. An east-bank outlet from New Orleans necessarily traverses marshlands and open waters (Lake Borgne, Mississippi, Chandeleur, or Breton Sounds) to the Gulf of Mexico. Construction and maintenance of inland sections of such a channel involve only routine dredging operations. Offshore sections, however, present more complex problems. Departmental experience in developing and maintaining harbors along the Gulf coast has shown it to be difficult to maintain deep channels in open shoal waters, particularly if alinement transverses prevailing winds and currents unless dikes of some type are provided. A nearby project, pertinent to a Mississippi east-bank outlet, is that for Gulfport-Ship Island Pass across Mississippi Sound. Here the authorized 26- by 220-foot channel, substantially in line with prevailing southeast winds but transverse to tidal currents through the sound, has been maintained by dredging alone since 1934 at an average annual cost of about $10,000 per mile, it being noted that shoals may consist of soft mud even though the dredged bottom is sand (reference, H. Doc. No. 692, 69th Cong., 2d sess, p. 25).

50. Construction work near New Orleans, notably that at the Industrial Canal lock where quicksand was encountered, and in the Gulf Intracoastal Waterway, indicates that subsurface strata in this part of the lower Delta comprise variable thicknesses of humus, clay, sand, and silt, and mixtures thereof. Borings in Chandeleur and Breton Sounds indicate that similar materials would be encountered there (plates 4 and 5 [1]).

51. The proposed west-bank outlet, as outlined in the brief (exhibit LXXIV-A [1]), leaves the river at or near mile 103, crosses the Texas & Pacific Railroad and then veers to a tangent extending southerly to and through Caminada Bay and Pass to the Gulf of Mexico west of Grand Isle. This route offers the obvious advantage that exposed shoal water is encountered only in Caminada Bay and at the Gulf entrance where protection works would be necessary.

52. *Sea level harbor basins.*—Proponents of east-bank outlets stressed the advantage of a tidewater channel and the benefits resulting from reclamation of marshlands for use in development of a tidewater port (par. 27). Generally tidewater harbor basins serve ports, such as London, Antwerp, and Le Havre, located on waterways where great tidal fluctuations make it advisable to provide constant level terminal basins connected with the tideway through locks. Use of such basins reduces foundation uncertainties and facilitates handling of cargoes at shipside. At New Orleans the range of tide

[1] Not printed.

is inconsequential but seasonal fluctuation of river stage, up to 20 feet, augments problems attendant upon construction and maintenance of marginal wharves or quays on unstable river banks.

53. The existing industrial canal affords tidewater terminal facilities for vessels not exceeding a draft of 31 feet in fresh water, but the alinement of the canal, transverse to railroads and highways, and use of the lock for inland waterway as well as oceangoing traffic cause serious congestion. However, the canal may readily be utilized as a feature of a tidewater harbor east of New Orleans along and south of the Intracoastal Waterway, development of which merits consideration in connection with further improvement of the Intracoastal Waterway as well as expansion of the port of New Orleans.

54. A sea level harbor on the east bank at New Orleans would serve oceangoing and inland-waterway commerce and should comprise a deep-draft turning basin with suitable slips and wharves, connecting channels leading to the Intracoastal Waterway and to the river through the existing lock and through a new deeper-draft lock, with or without an additional outlet to the Gulf (pl. 5 [1]). Similarly, a sea level harbor on the west bank would serve seagoing and Intracoastal Waterway commerce if it provides a deep-draft lock and a terminal turning basin with connecting deep-draft channel to the river and a shallow-draft channel to the Intracoastal Waterway, with or without an additional deep-draft outlet to the Gulf. Either alternative would provide a practically constant level tidewater harbor and, if implemented by adequate facilities to supplement marginal wharves now available on the river, would make New Orleans terminals equal if not superior to those of any world port.

55. *Relation between existing and proposed additional outlets.*— Characteristics of existing channels and proposed outlets with respect to channel dimensions, sailing distance, difficulties attending navigation, engineering problems, relation to sections of the ports, and cost are summarized as follows:

(a) *Channel dimensions.*—Initially, proponents proposed project dimensions of 40 by 600 feet for proposed outlets but in its latest brief (exhibit LVII-B [1]) the dock board suggests that a 36- by 500-foot channel will suffice. The existing project authorizes a 40-foot channel 800 feet wide through Southwest Pass and 600 feet across the bar, but these dimensions have not yet been secured.

(b) *Sailing distance.*—Proponents of east-bank outlets state that such improvement would provide a short route from New Orleans to deep water in the Gulf, and those supporting a west-bank outlet point out that their proposal would not only provide a short route to deep water in the Gulf, but also the shortest route from New Orleans (Harvey lock) to Dry Tortugas (Florida Straits) or Cape San Antonio (Yucatan Channel) on Gulf-Atlantic sea lanes. Sailing distance from New Orleans by way of the proposed west-bank outlet to Cape San Antonio is shorter than by South Pass by 12 miles but to Dry Tortugas sailing distances are equal. Similarly, distances from New Orleans to the same points by way of proposed east-bank outlets are longer than by South Pass by 32 and 10 miles, respectively (fig. 4 [1]). Speed limitations in restricted channels, time required for lockage, and efficiency of terminal operations and resulting time required for turn-around, are dominant factors and minor distance differentials are inconsequential.

(c) *Navigation difficulties.*—Most of the hazards attendant upon negotiation of restricted entrance channels, including those due to mechanical defects and human frailty, as well as those incident to fog and storm, are common to the river channel and proposed outlets alike. Those due to vagaries of river currents and unpredictable shoaling at entrances to the passes may be largely eliminated by recourse to an artificial outlet not subject to river currents if the outlet also is protected from transverse marine currents.

[1] Not printed.

(d) *Relation of outlets to sections of the port.*—For seagoing vessels, the river and its improved outlets afford direct access to marginal wharves on both banks from Head of Passes to Baton Rouge and to inner harbor terminals through the Industrial Canal lock. Proposed additional outlets would serve terminals on new tidewater terminal basins primarily with access to marginal river wharves through deep-draft locks. Hence an additional outlet will supplement but not replace facilities afforded by the river and its improved passes under the existing project.

(e) *Costs.*—As of June 30, 1945, costs of the existing project were about $25,000,000 for new work and $21,000,000 for maintenance, and modification to secure a 40-foot channel in Southwest Pass is authorized at an estimated cost of $4,200,000. Approved estimates for annual maintenance costs are $1,169,000 (pars. 19 and 20). Proposed additional plans of improvement on the east and west banks are estimated to cost $53,000,000 each (table 7 [1]).

## XI. ECONOMIC ASPECT

56. Major expansion of seagoing commerce in postwar years is expected by local interests, estimates of increase range from 50 percent suggested by shipping interests (exhibit LVII–A [1]) to 200 percent of previous peak years suggested by economists (p. 4, appendix B of exhibit LVII–A [1]). The United States Maritime Commission noted that total foreign and coastwise commerce doubled in the 17 years ending in 1940 and stated that analysis of trade prospects of New Orleans does not bear out traffic estimates of proponents but suggested that New Orleans should share in expansion of foreign trade expected by the Department of Commerce. The division engineer believes that continuing increase in seagoing commerce reasonably may be expected but notes that petroleum interests expressed their aversion to locks and side channels (par. 37). Accordingly he considers that a 50 percent increase in seagoing general cargo traffic of recent years (excluding war years, 1942–44), pertinent to specific sections of the port to be served directly by proposed outlets, is a reasonable expectancy. On this basis prospective annual commerce related to east and west bank proposals is estimated at 10,000,000 and 3,000,000 tons, respectively (pars. 37 and 38). Creation of a tidewater harbor on either bank at New Orleans effecting material economies in terminal-handling costs would tend to divert traffic to the improvement. However, the Board of Commissioners of the Port of New Orleans, a legally constituted agency of the State of Louisiana, has jurisdiction of the port and is a dominant factor in its development. Hence, assumption of a common percentage increase in commerce recorded for specific sections of the port directly affected by proposed improvements is a fair basis for estimating prospective commerce for the west-bank proposal and ultra conservative for the east-bank proposal sponsored by the dock board. Because traffic diversion that may result from provision of a tidewater harbor is unpredictable, prospective commerce for and the economic aspect of each of the proposed outlets is evaluated by extrapolating recorded traffic movements of recent years, war years excluded.

57. Economies adduced by proponents of additional outlets (seaways) and tidewater harbors include (a) savings in sailing time and attendant transportation costs; (b) reduction in hazards to navigation on the river and passes; (c) savings in port costs, including land transportation, pilotage, stevedoring, and maintenance charges on terminal wharves; (d) enhancement of land values; and (e) savings in

---

[1] Not printed.

cost and maintenance of Federal projects. With respect to economies adduced (table 8 [1]) it is considered that—

(a) Calculated savings in sailing time, based on traffic between New Orleans and Mobile, Pensacola, or Panama City (5,500 hours, p. 20, exhibit LVII–B [1]), adduced for an east-bank outlet, must be discounted as coastwise vessels do not necessarily make all ports of call. Reasonably not more than 50 percent of such savings in sailing time (say 2,500 hours) may be accepted. Similar saving in sailing time for coastwise traffic between New Orleans and Lake Charles, the Sabine ports or Galveston is applicable to a west-bank outlet. Sailing distance differentials for foreign commerce (between New Orleans and Florida Strait or Yucatan Channel and points beyond) are relatively inconsequential. A major saving incident to proposed east-bank improvements, adduced by east-bank proponents and accepted by analysts of the United States Maritime Commission, is reduction in turn-around time (time required in port, i. e., in-bound pratique to out-bound clearance). Reasonably up to 10,000,000 tons of prospective commerce may be expected to use proposed east-bank harbor facilities, involving, at trip tonnage rates indicated by traffic through the passes (pars. 29 and 35), upward of 2,000 vessel trips annually. Reduction in turn-around time, to be effected by installation and operation of modern terminal equipment "made possible by location in tidewater with central railroad yard service," is estimated at 1¼ days per trip (pp. 12 and 13, exhibit LVII–B [1]). Resulting savings in time (60,000 hours) are attributable to proposed east-bank improvements; i. e., tidewater harbor access and outlet channels. Similar reduction in turn-around time on 3,000,000 tons of prospective traffic involving 600 vessel trips would apply to proposed west-bank outlet and access channels if implemented by similar facilities with proportional savings in time (18,000 hours). Sailing time of general cargo vessels is currently valued at $65 per hour.

(b) Reduction in navigation hazards adduced by proponents of an east-bank outlet, some $120,000 (p. 30, exhibit LVII–B [1]), are applicable to side channels on either bank but must be discounted in amount because navigation accidents may be expected in any restricted channel and in the open seas. It is considered that not more than 25 percent of savings adduced may be accepted in support of proposed improvements on either bank.

(c) Savings in port costs adduced by east-bank proponents include several items found by analysts of the United States Maritime Commission to be exaggerated so only 50 percent of these savings (say $700,000) may be accepted in support of the proposal. Savings in pilotage may be disregarded since pilotage charges at New Orleans are in line with those at other Gulf and Atlantic ports. Savings in annual charges on wharves on a tidewater harbor as compared with those on the river ($750,000) may be accepted but such savings are attributable to both channel and terminal improvements and only 50 percent ($370,000) are accepted in support of the channel. Proportionate savings under this category are applicable to proposed west bank improvements.

(d) Proposed east-bank improvements would render adjacent lowlands suitable for development as terminal and industrial sites on the water front. Resulting increase in land values varies from $300

---

[1] Not printed.

Case 2:05-cv-04182-SRD-JCW   Document 16923-5   Filed 01/05/09   Page 7 of 15

to $800 per acre with corresponding enhancement estimated at
$100,000 per year. Similar enhancement for proposed west-bank
improvements is estimated at $30,000 per year.

(e) Proposed east-bank improvements include provision for a con-
necting channel for the Intracoastal Waterway to complete the sec-
tion from Mobile to New Orleans and obviate the need for continued
lease of Industrial Canal facilities. Appropriate allocation of cost
for the connection is indicated by the comparable alternate west-
bank connection authorized by the River and Harbor Act approved
March 2, 1945 (S. Doc. No. 188, 78th Cong., 2d sess.); i. e., $8,000,000
for Federal construction and $100,000 for non-Federal expenditures
for rights-of-way, with estimated annual Federal and non-Federal
charges of $500,000 and $30,000, respectively. Corresponding Federal
costs for leased facilities on the east bank now cost about $450,000,
including annual rental payment of $240,000 which may be eliminated
on termination of the lease. However, as only 2 percent of present
commerce would be unable to use this existing lock, its replacement
in the immediate future is not essential. Completion of the section
of the Intracoastal Waterway west of the river provided for by existing
authorizations is under construction, and the proposed west-
bank outlet cannot be substituted for authorized features thereof.
Proposed outlets on either bank would supplement but not replace
navigation facilities provided by the river and its improved passes, so
savings thereon may not be adduced in support of additional outlets.

58. In summary, annual benefits reasonably to be expected from
alternative additional outlets outlined herein, implemented by effec-
tive operation of superior modern terminal facilities, are estimated
at $5,260,000 for east-bank or $1,690,000 for west-bank outlets
(table 8[1]).

## XII. PLANS OF IMPROVEMENT

59. *General.*—Proponents of additional deep-draft outlets have
assumed that such channels can be secured and maintained by dredg-
ing, but departmental experience in maintenance and improvement
of Gulf-coast entrance channels does not support such assumption
where shallow exposed coastal lakes or sounds are encountered. It
has been demonstrated repeatedly that such channels should be sited
through land cuts or provided with effective barriers to preclude
return of dredged spoil into dredged channels. Hence the plan of
improvement presented herein for an east-bank outlet and tidewater
harbor provides for maximum use of land cuts, for a permanent
retention dike across the sound and for jetties at the Gulf entrance.
The proposed west-bank outlet would be land-locked so requires pro-
tection works (jetties) only at its Gulf entrance. Under criteria set
forth in table 6,[1] plans of improvement are set forth below and shown
on plates 1–5[1] for additional deep-draft outlets to the Gulf on the
east and west bank alternately. Each includes provision for access
and outlet channels, lock with forebays, and turning basins. East-
bank improvements outlined constitute a tidewater harbor and sea-
way outlet substantially as sponsored by the Board of Commissioners
of the Port of New Orleans. Those for the west bank are substan-
tially as proposed by the Mississippi Valley Seaway Canal Associa-
tion, an organization of west-bank interests.

[1] Not printed.

60. *East-bank improvements.*—These include complementary features as follows:

(*a*) *Tidewater harbor and connecting channels.*—Supplementing facilities provided by the existing projects "Mississippi River, Baton Rouge to the Gulf of Mexico" and "Gulf Intracoastal Waterway," this feature provides for creation of a tidewater harbor by construction of a 36- by 500-foot channel from the existing inner-harbor canal to a turning basin south of Michoud.   Provision is also made for an eased entrance channel 36 feet deep from the left bank of the Mississippi River near Meraux (mile 86) leading into and combined with a riverside mooring basin and forebay; a lock tentatively 760 feet long and 110 feet wide, with a depth of 40 feet on the sills; a landside forebay and mooring basin leading into a connecting harbor channel 36 feet deep and 500 feet wide when such construction is warranted by prospective commerce.

(*b*) *Outlet (seaway).*—This feature provides for construction of a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from a turning basin south of Michaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands, at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of 70 miles.   Provision is included for a permanent retention dike across the sound and for parallel jetties from Chandeleur Islands to the 20-foot-depth contour in the Gulf, with a wing dike along the islands, as required, the channel through the jetties and across the bar to be flared to provide a width of 600 feet at the 38-foot contour.

61. *Costs.*—Estimated costs and annual charges for proposed east bank improvements (table 7 [1]) are summarized as follows:

[Millions of dollars]

| Feature | First cost | | Annual charges | |
|---|---|---|---|---|
| | Federal | Non-Federal | Federal | Non-Federal |
| Tidewater harbor and outlet (seaway)............. | 53.00 | 0.50 | 3.24 | 0.03 |

62. *West-bank improvements.*—These include complementary features as follows:

(*a*) *Lock and appurtenances.*—This feature provides for construction of an eased entrance channel 36 feet deep from the right bank of the Mississippi River near Westwego (mile 103) leading into and combined with a riverside mooring basin and forebay; a lock tentatively 760 feet long and 110 feet wide with a depth of 40 feet on the sills; and a landside forebay and turning basin suitable for development as a tidewater terminal harbor as proposed by its sponsors.   The plan involves readjustment of the Mississippi River main west-bank levee; relocation or reconstruction of highways, railways, and utilities; and construction of a movable railway and highway bridge.

(*b*) *Outlet (seaway).*—This feature provides for a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from the terminal turning basin (feature (*a*)) to and through the Barataria marshes and Caminada Bay and Pass to deep

---

[1] Not printed.

Case 2:05-cv-04182-SRD-JCW   Document 16923-5   Filed 01/05/09   Page 9 of 15

water in the Gulf of Mexico, a distance of 55 miles.  Provision is included for parallel jetties from Caminada Pass to the 20-foot-depth contour in the Gulf; the channel through the jetties and across the bar to be flared to provide a width of 600 feet at the 38-foot contour.

63. *Costs.*—Estimated costs and annual charges for west bank improvements (table 7 [1]) are summarized as follows:

[Millions of dollars]

| Feature | First cost | | Annual charges | |
|---|---|---|---|---|
| | Federal | Non-Federal | Federal | Non-Federal |
| (a) Lock, access channel, and turning basin | 26.0 | 0.2 | 1.40 | 0.01 |
| (b) Outlet (seaway) | 27.0 | 0.3 | 1.44 | 0.02 |
| Total | 53.0 | 0.5 | 2.84 | 0.03 |

64. *Résumé of estimates of costs and benefits.*—As shown above, estimated costs for proposed east-bank improvements (tidewater harbor and additional deep-draft outlet to the Gulf with connecting channel to the inner harbor) are $53,000,000 for Federal construction and $500,000 for non-Federal expenditures for rights-of-way.  Attendant total annual charges, $3,270,000, are commensurate with annual benefits to commerce reasonably to be expected, $5,260,000 (table 8 [1]).  The economic ratio is 1.61.  Estimated costs for proposed west bank improvements (tidewater terminal and deep-draft outlet to the Gulf) are $53,000,000 for Federal construction and $300,000 for non-Federal expenditures for rights-of-way.  Attendant annual charges, $2,870,000, are considerably in excess of benefits to commerce reasonably to be expected, $1,690,000 (table 8 [1]).  The economic ratio is 0.59.

## XIII. SPECIAL SUBJECTS

65. *Shore line changes.*—Construction of a deep-draft channel across Chandeleur Sound with dredged material deposited seaward of a retention dike, as contemplated by the plan of improvement, will create a continuous barrier across the sound to intercept prevailing southeast seas, will reduce the magnitude of feeble rotary currents which obtain in the sound, and cause no material change in the mainland shore line.  Aids to navigation have not been defined but the local commandant of the United States Coast Guard service collaborated in preparation of cost estimates for navigation aids.  The proposed west-bank outlet, land-locked inshore from Caminada Bay, likewise would cause no material change on the mainland shore.  Aids to navigation for the proposed channel have not been defined.

## XIV. DISCUSSION

66. The Board of Commissioners for the Port of New Orleans, the legally constituted agency of the State of Louisiana for operation of the port, together with civic and political organizations and financial, industrial, and shipping interests of the city, State, and alluvial

[1] Not printed.

valley, sponsor Federal construction of an additional deep-draft outlet from the Mississippi River at New Orleans to and across Chandeleur Sound to the Gulf of Mexico. They point out that harbor expansion and improved terminals for general-cargo traffic are now urgently required for present and prospective commerce. The board's consultants advise that installation and operation of improved terminals on a tidewater harbor would effect a saving of 1¼ days per vessel trip with coincident economies in port charges and in construction and operation costs of terminal wharves and appurtenances. The board cites its large investment in marginal river wharves and Industrial-Canal facilities and contemplated new improved terminals on a tidewater harbor east of the city as an appropriate measure of local cooperation.

67. West-bank interests, including the Mississippi Valley Seaway Canal Association, request Federal construction of an additional outlet from the west bank of the river to the Gulf south of Caminada Bay. They stress the relatively short distance to the Gulf by the west-bank alinement and suggest that terminal development could be financed by the State of Louisiana.

68. Continued expansion of the great seagoing and inland waterway commerce of the port is assured by its location on the Mississippi River at the junction of the Gulf Intracoastal Waterway, where it constitutes the gateway to the great system of inland waterways of the central valley of the Nation. Obviously adequate outlets to the Gulf of Mexico are essential and expansion and improvement of harbor facilities are necessary to provide economically for the convenience and safety of expanding commerce.

69. Existing outlets through the improved passes suffice to serve present commerce but accelerating shoaling of the Southwest Pass bar indicates that expensive jetty extension and bar channel relocation will be necessary in the early future, in connection with operations required, but not initiated, to secure and maintain project channel dimensions now authorized. An additional outlet, not subject to vagaries of the river, obviously will provide added assurance of uninterrupted access to the sea for deep-draft shipping.

70. Existing riverside wharves normally serve a great volume of commerce, and during war years these terminals were severely overtaxed to move a vast tonnage of military supplies which was not reported in published statistics. Site restrictions incident to the location of marginal wharves on unstable leveed banks riverward of built-up city streets preclude expansion of these facilities to serve additional commerce, so the dock board plans construction of new and improved terminals on a tidewater harbor with direct egress to the sea through the proposed east-bank outlet (seaway).

71. Proposed outlets at New Orleans obviously would not directly benefit river terminals and installations above and below the port. Moreover, petroleum interests, notably the Standard Oil Co. at Baton Rouge, express preference for continued use of the river and aversion to locks and side channels. Hence economic justification for additional outlets is calculated on the basis of economics that may be effected in pertinent present and prospective general-cargo commerce (foreign and coastwise), inland-waterway commerce, and internal-port traffic, together with savings on construction and operation costs of terminal facilities, and on benefits due to enhancement of property

values incident to creation of tidewater harbors. On this basis it is found that the proposed west-bank outlet is not economically justified at this time (pars. 63 and 64).

72. Prospective seagoing commerce, general cargo, pertinent to an east-bank outlet developed as a tidewater harbor is estimated at not less than 10,000,000 tons annually (par. 37). This estimate excludes all seagoing traffic in oil, the dominant commodity of water-borne commerce, and disregards possible diversion of traffic not served by east-bank terminals heretofore. It is considered ultraconservative. Prospective waterway commerce east of New Orleans, greatly expanded in war years, may be expected to decline, but such decline presumably will be offset by diversion of Mississippi River commerce to the authorized Tombigbee-Tennessee waterway (par. 39). The east-bank improvement outlined herein may in the future be amplified, when found justifiable, by the construction of an additional lock and connecting channels to the Mississippi River, which will complete the Mobile-New Orleans section of the Gulf Intracoastal Waterway (which now utilizes leased facilities of the State-owned Industrial Canal) and relieve congestion in the harbor. The improvement, implemented by improved port facilities, will effect reduction in turn-around time for seagoing general-cargo vessels, savings in terminal and transfer charges, and in costs for construction and operation of terminal facilities. Resulting benefits are estimated at $5,260,000 annually (par. 64).

73. Estimated costs for the east-bank improvement are $53,000,000 for Federal construction and $500,000 for non-Federal expenditures for rights-of-way (par. 61). Corresponding annual charges, Federal and non-Federal, are $3,240,000 and $30,000, respectively. The indicated ratio of charges to benefits is 1.61.

74. Under established practice, port development is effected co-operatively, with harbor channels and connections (access, outlet and inland waterway channels), turning basins and locks, as well as bridges over land cuts, generally provided by the Federal Government. Rights-of-way and terminal facilities (including slips, piers, warehouses, land transportation, and other port facilities) are responsibilities of port authorities, subject to regulations approved by the Secretary of War to ensure equitable operation. The plan outlined in paragraph 60 supra is predicated on such cooperative development to create a tidewater harbor with alternate outlets to the river and sea. Full utilization of existing river, inner harbor, and Intracoastal Waterway facilities is contemplated. The plan lends itself to step construction, with priorities and definitive location of features fixed in the discretion of the Chief of Engineers to fit into a flexible, long-range program of port development to serve the public through many generations.

75. Comprehensive development of a national port such as New Orleans properly should be planned to facilitate its use for national defense in emergencies. In the recent World War, the port of New Orleans, the Mississippi River, and the system of inland waterways were important factors in deployment of war supplies, but locks and terminals at New Orleans were greatly overtaxed. With continuing growth of population and development of resources of the Mississippi Valley and decentralization of industry, it is believed that the port, the river, and the inland waterways will be used to a still greater extent in another national emergency.

76. Although future technical developments of warfare cannot be foreseen clearly, the basic principle of dispersion undoubtedly will continue to apply to protection of important installations, such as national ports of embarkation. The recent war demonstrated that harbor facilities, if dispersed and provided with unrestricted or alternate exits to the sea, are rendered inoperative by air or sea action with great difficulty, and if damaged can be restored to usable condition quickly, in part if not completely. Hence wide dispersion of harbor facilities should be provided for in any plan for comprehensive port development. New Orleans riverside wharves, of timber construction on long wood piles, cannot be expected to resist destruction by bombing as practiced in the recent war, and attack by atomic bombing is now possible. These terminals, sited on unstable banks subject to shoaling and scour by a river with a 20-foot range of stage, cannot be developed for efficiency and permanence to the degree possible on constant level harbors, so preferably additional installations in the interest of national defense should be located off the river with unrestricted outlet to the sea and access to the river through locks which, from a security standpoint, can be considered as alternate entrances. Locks are attractive targets for aerial bombing and are subject to sabotage unless well guarded. However, recent war experience disclosed that massive lock structures resist bombing attacks and damaged gates can be repaired or replaced, so locked harbors are not easily rendered inoperative by aerial attack. Recourse to alternate locks and access channels ensures the availability of part if not all of a dispersed harbor.

77. No expression as to possible use of proposed port improvements by the United States Navy has been received. Naval officers advise (exhibit HH [1]) that the Navy would not construct a base without unobstructed outlet to the sea, but that any aid to shipping would be of value (exhibit XLI [1]).

78. National defense not only involves military installations, but also complete systems of transportation by air, land, and water to facilitate mobilization and deployment of personnel, materials, and supplies. Due to the unpredictable nature of future wars, the hazards inherent in industrial concentrations at coastal ports, and the possibility of attack without warning, it well may be necessary to use national ports of embarkation such as New Orleans to an unprecedented degree, so port-development plans should include provision for potential sites for new facilities required by new emergencies.

79. The improvement outlined in paragraph 60 will provide a tidewater outlet and harbor sufficiently spacious for dispersion of docks and cargo-handling facilities, thus permitting flexible operation of inland and seagoing commerce utilizing the river and passes, the tidewater harbor and outlet, and the Intracoastal Waterway. Provision of such facilities in time of peace so that they may be available for adaptation to the requirements of any emergency is patently in the national interest.

80. *Coordination with other agencies.*—After perusal of the report, the director of the Louisiana Department of Public Works, designee for the Governor of Louisiana, expressed full concurrence with findings presented; the president of the New Orleans Tidewater Develop-

[1] Not printed.

ment Association also concurs, but favors construction priority for the outlet channel in preference to the lock and access channel; and the chief engineer of the Board of Commissioners for the Port of New Orleans advises that the plan is substantially that proposed by that agency.

## XV. Conclusion and Recommendation

81. *Conclusion.*—Taking cognizance of the favorable economic aspect of the proposed additional deep-draft outlet from New Orleans to the Gulf of Mexico seaward of the Chandeleur Islands if developed comprehensively as a tidewater harbor, with access to the river, and the Intracoastal and Industrial Canals, and implemented by superior port terminals and facilities; the division engineer considers it advisable to adopt a long-range development program for the port of New Orleans as a major feature of existing projects for "Mississippi River, Baton Rouge to the Gulf of Mexico," and "Gulf Intracoastal Waterway," to be prosecuted in cooperation with the local port authority, the Board of Commissioners of the port of New Orleans, as agent for the State of Louisiana. He finds that the proposed outlet and tidewater harbor east and southeast of New Orleans, in conjunction with the river and its improved passes, will permit expansion and improvement of port facilities to serve all water-borne commerce that may be attracted to the port as the gateway to the Mississippi Valley and its improved inland waterways, with resulting benefits to present and prospective seagoing and inland-waterway navigation and commerce considerably in excess of charges for construction and operation. He also considers that the proposed improvement will greatly enhance the capacity of the port for emergency war service, since it provides for wide dispersion of terminal facilities for embarkation of personnel, material, and supplies in the interest of national defense.

82. *Recommendation.*—The division engineer recommends that the existing project, "Mississippi River, Baton Rouge to the Gulf of Mexico," be modified to provide for an additional east bank, deep-draft outlet and tidewater harbor by construction of a connecting harbor channel 36 feet deep and 500 feet wide extending from the existing inner harbor canal to a turning basin south of Micheaud, and a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from a turning basin south of Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands, at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of approximately 70 miles; with provision for the future construction of an additional lock near Meraux and connecting channels and appurtenances between the turning basin and the Mississippi when such is found to be economically justifiable, generally as outlined in paragraph 60 hereof, subject to such modifications of location, alinement, and dimensions as may be approved by the Chief of Engineers, at an estimated initial cost of $53,000,000 for construction and $810,000 annually for maintenance and operation, in addition to that now required; subject to the provision that, prior to any construction expenditures, local interests furnish, free of cost to the United States, all lands, easements, rights-of-way, and spoil-

disposal areas required for initial construction and subsequent maintenance; and furnish assurances, satisfactory to the Secretary of War, that they will hold and save the United States free from claims for damage incident to construction, maintenance, and operation of the improvement; and will construct, maintain, and operate terminal facilities commensurate with requirements of the expanded port, under regulations approved by the Secretary of War, to ensure its equitable operation in the public interest.

R. W. CRAWFORD,
*Major General, United States Army,*
*Division Engineer.*

LIST OF ILLUSTRATIONS MADE IN CONNECTION WITH THE REPORT OF THE DIVISION ENGINEER

(only plate 2 printed)

Plate 1—Index.
Plate 2—Plan of Improvement.
Plate 3—Hydrographic bar surveys and advance of contours, Southwest Pass.
Plate 4—Physical data and tentative sections.
Plate 5—Ship canal termini and locks.

O

