# Exhibit 48

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

- - - - - - - - - - - - - - - x

**IN RE:** KATRINA CANAL BREACHES : CIVIL ACTION
**CONSOL**IDATED LITIGATION      : NUMBER: 05-4182 "K" (2)
                                  :
                                  : JUDGE DUVAL
                                  :
PERTAINS TO: MRGO, Robinson   :  MAG. WILKINSON
(No. 06-2268)                 :
- - - - - - - - - - - - - - - x


Videotaped Deposition of ZOLTAN MONTVAI

VOLUME I

Washington, D.C.

Tuesday, October 7, 2008

8:59 a.m.


*    *    *    *


Reported by:  Okeemah S. Henderson, LSR

MONTVAI, ZOLTAN

10/7/2008

(Pages 2 to 5)

| Page 2 |
|---|

1       Deposition of ZOLTAN MONTVAI, held at the

2   offices of:

3

4       U.S. Department of Justice

5       1331 Pennsylvania Avenue, Northwest

6       Washington, D.C.  20004

7       (202) 353-2574

8

9

10

11

12

13

14

15

16

17       Pursuant to agreement, before Okeemah S.

18   Henderson, Licensed Shorthand Reporter and Notary

19   Public in and for The District of Columbia.

20

21          *    *    *    *    *

22

| Page 4 |
|---|

1                  I-N-D-E-X

2

3          Deposition of ZOLTAN MONTVAI

4              October 7, 2008

5   **EXAMINATION BY:**                    PAGE:

6   Mr. O'Donnell                7

7

8   EXHIBITS                         PAGE

9    1  Mississippi Gulf Outlet letter of
        transmittal             10

10

     2  Post 1997 reorganization chart      14

11

     3  Pre 1997 reorganization chart       14

12

     4  Digest of water resources policies
13      and activities          19

14   5  2/98 Mississippi River Gulf Outlet
        bank erosion report          57

15

     6  1/94 Mississippi River Gulf Outlet
16      bank erosion report          59

17   7  11/07 final report to Congress      87

18   8  Lake Portchartrain & vicinity,
        Louisiana letter          116

19

20      (Exhibits included with transcript.)

21

22

| Page 3 |
|---|

1          A P P E A R A N C E S

    ON BEHALF OF THE PLAINTIFFS:

2       PIERCE O'DONNELL, ESQUIRE
        O'DONNELL & ASSOCIATES PC

3       550 South Hope Street, Suite 1000
        Los Angeles, CA  90071

4       (213) 347-0290
        E-mail:  pod@oslaw.com

5

         - and -

6

    JOSEPH M. BRUNO, ESQUIRE

7    BRUNO & BRUNO
     855 Baronne Street

8    New Orleans, Louisiana  70113
     (504) 525-1335

9

    ON BEHALF OF THE UNITED STATES OF AMERICA:

10      JEFFREY P. EHRLICH, ESQUIRE
        DANIEL BAEZA, ESQUIRE

11      ROBIN SMITH, ESQUIRE
        UNITED STATES DEPARTMENT OF JUSTICE,

12      CIVIL DIVISION, TORTS BRANCH
        P.O. Box 888

13      Benjamin Franklin Station
        Washington, D.C.  20044

14      (202) 353-2574
        E-mail:  jeff.ehrlich@usdoj.gov

15

    ON BEHALF OF THE U.S. ARMY CORPS OF ENGINEERS

16   CORPS OF ENGINEERS, OFFICE OF COUNSEL:
        MARTIN R. COHEN, ESQUIRE

17      441 G Street, NW
        Washington, DC  20314

18      (202) 761-8545
        E-mail:  Martin.R.Cohen@usace.army.mil

19

    ALSO PRESENT:

20      TJ O'Toole, Video Operator
     (Via Telephone)

21   Richard Pavlick, Esq.,  Darcy Decker, Esq., Darryl
     Decnem, Esq., Brendan O'Brien, Esq.,  Adam Chud,

22   Esq.,  Matthew Clark, Esq., Mark Raffman, Esq.

| Page 5 |
|---|

1              P-R-O-C-E-E-D-I-N-G-S

2          (9:24 a.m.)

3          **THE VIDEO OPERATOR:**  On the record with

4   disk No. 1 of the video deposition of Zoltan

5   Montvai taken by the plaintiff in the matter of

6   Katrina Canal Breaches Consolidated Litigation in

7   the United States District Court for the Eastern

8   District of Louisiana.  Civil Action No. 05-4182

9   K.

10       This deposition is being held at the Offices

11   of the United States Department of Justice located

12   at 1331 Pennsylvania Avenue, Northwest in

13   Washington, D.C. on October 7, 2008 at

14   approximately 9:24 a.m.  My name is TJ O'Toole.  I

15   am the certified legal video specialist.  The

16   Court Reporter is Okeemah Henderson.  The both of

17   us are representing Gregory Edwards, LLC Court

18   Reporter.

19       Will counsel, please, introduce themselves

20   and indicate which parties they represent.

21       MR. O'DONNELL:  Pierce O'Donnell for

22   the Robinson plaintiffs.

MONTVAI, ZOLTAN

(Pages 6 to 9)

| Page 6 |
|---|

1        **MR. BRUNO:**  Joseph Bruno, Plaintiffs.
2        **MR. SMITH:**  Robin Smith for the United
3    States.
4        **MR. BAEZA:**  Dan Baeza for the United
5    States.
6        **MR. EHRLICH:**  Jeff Ehrlich for the
7    United States.
8        **THE VIDEO OPERATOR:**  Folks on the
9    telephone?
10        **MR. DECNEM:**  Darryl Decnem, plaintiff.
11        **MR. DECKER:**  Darcy Decker, Orleans Levy
12    District.
13        MR. O'BRIEN:  Brendan O'Brien,
14    plaintiff.
15        **MR. CHUD:**  Adam Chud, LeFarge.
16        **MR. CLARK:**  Matthew Clark, plaintiffs.
17        **THE VIDEO OPERATOR:**  Thank you.  Will
18    the Court Reporter please swear in the witness.
19    Whereupon,
20              ZOLTAN MONTVAI,
21    called as a witness, having been first duly sworn
22    to tell the truth, the whole truth, and nothing

| Page 7 |
|---|

1    but the truth, was examined and testified as
2    follows:
3        EXAMINATION BY COUNSEL FOR THE PLAINTIFF:
4    BY MR. O'DONNELL:
5        **Q.**  Good morning, sir.  Can you pronounce
6    your name for me?
7        A.   Zoltan Montvai.
8        **Q.**  M-O-N-T-V-A-I?
9        A.   Correc5t.
10        **Q.**  Great.  Super.  And how are you
11    employed?
12        A.   I work for the U.S. Army Corp. of
13    Engineers.
14        **Q.**  What's your position?
15        (Off record discussion held.)
16        MR. O'DONNELL:  Excuse me, we're taking
17    a deposition here.
18        MR. EHRLICH:  Can you all hear us?
19        MS. DECKER:  No.
20        MR. DECNEM:  No.
21        MR. O'DONNELL:  Can you hear us now?
22        **MR. DECNEM:**  Yes.

| Page 8 |
|---|

1        MR. O'DONNELL:  Great.  Okay.  I'm
2    going to start again.  Your name is Zoltan
3    Montvai.
4        A.   Correct.
5        **Q.**  M-O-N-T-V-A-I.  And you work for the
6    **Army Corp. of Engineers?**
7        A.   Yes, sir.
8        **Q.**  What's your position, sir?
9        A.   I'm the civil deputy for the
10    Mississippi Valley Division Regional Integration
11    Team at our headquarters office in the directorate
12    of civil works.
13        **Q.**  You're the civil deputy for the
14    **Mississippi Valley Division?**
15        A.   Regional Integration Team.
16        **Q.**  And said something else?
17        A.   The directorate of civil works in our
18    headquarters office.
19        **Q.**  That's here in Washington, D.C.?
20        A.   Yes.
21        **Q.**  And that's the same place where the
22    **chief of engineers is located?**

| Page 9 |
|---|

1        A.   They are down the hallway, yes.
2        **Q.**  How long have you worked for the Army
3    **Corps?**
4        A.   I have worked for a little more than
5    32 years.
6        **Q.**  And you understand that you've been
7    **designated by the United States to be what we call**
8    **a rule 30(B)(6) witness as to certain topics**
9    **involved in this litigation?**
10        A.   Yes, sir.
11        **Q.**  And you understand that you will be
12    **testifying in part about topic one, which I'll**
13    **summarize as the Army Corps procedures for**
14    **obtaining congressional authorization for the**
15    **MRGO?**
16        A.   Yes, sir.
17        **Q.**  And also on topic No. 22 you have been
18    **designated by the United States to discuss the**
19    **Army Corps procedures for congressional**
20    **authorization of civil works projects including**
21    **decisions on when and how to seek approval for**
22    **modifications and plans that span over time?**

MONTVAI, ZOLTAN

10/7/2008

(Pages 10 to 13)

Page 10

1    A.   Yes.
2        Q.   What did you do to prepare for today's
3    deposition?
4        A.   Talk to some of the attorneys that are
5    here briefly.  I just kind of gathered some
6    thoughts on the process that we have in place.
7        Q.   Did you review any documents?
8        A.   I have looked at some documents rather
9    briefly.
10       Q.   What documents did you briefly look
11   at?
12       A.   The house document that authorized was
13   the basis for authorization of the MRGO outlet,
14   the navigation project in question.
15           MR. O'DONNELL:  We'll mark this as
16   Montvai Exhibit No. 1.
17   (Montvai Deposition Exhibit No. 1 was marked for
18           identification.)
19           BY MR. O'DONNELL:
20       Q.   Sir, I have placed before you a copy
21   of what has been previously identified as House of
22   Representatives Document No. 245 in the 82nd

Page 11

1    Congress First Session.  Is this the document
2    you're referring to?
3        A.   Yes, it is.
4        Q.   Had you seen that before you began
5    your preparation for today's deposition?  Had you
6    seen it before then?
7        A.   I have seen it before.
8        Q.   Okay.  Fine.  Now, is one of your
9    responsibilities it's a long title but on the
10   regional integration team for the Mississippi
11   Valley Division MRGO?
12       A.   Essentially, yes.  All the civil works
13   activities from the Mississippi Valley Division
14   area come up through our office and my staff
15   working for the director of civil works process
16   those documents.
17       Q.   Are you the No. 2 person in your
18   division?
19       A.   It's hard to say.  The No. 2 person in
20   our division is the directorate of civil works,
21   the senior executive service person, that's Mr.
22   Steve Stockton.  He's my boss's boss essentially.

Page 12

1        Q.   I'll get into that.  Let's talk about
2    your 32 years at the Corp. and what preceded that.
3    Do you have a college education?
4        A.   Yes.  I've got a civil engineering
5    degree, a bachelor of science degree and I have a
6    masters in water resources.
7        Q.   Where did you get your civil
8    engineering degree?
9        A.   Both of those degrees I have gotten
10   them at the University of Buffalo.  It's the
11   University of New York at Buffalo.
12       Q.   What year did you get your BS degree?
13       A.   '76 and I think I got my masters in
14   '82.
15       Q.   When did you go to work for the Army
16   Corps?
17       A.   I started working for the Corps in
18   June of 1976.
19       Q.   And can you trace just briefly for me
20   your work history and promotions in the Corps?
21       A.   I started at the relatively entry
22   level and rotational training program civil

Page 13

1    engineering, you know, and engineering training I
2    think is the term they used at the New Orleans
3    District in 1976.
4        Went through that program about nine months
5    of it.  Following that I worked about another
6    close to a year in New Orleans in hydraulics.  I
7    was a hydraulic engineer.  After that I relocate
8    to the Buffalo where there's an Army Corps of
9    Engineers office there.
10       Worked in hydraulics for some time, about
11   five years there and then I worked another close
12   to five years in planning organization.  I moved
13   to headquarters office in 1987.  I have been there
14   about 21 years now, here in Washington in various
15   capacities; planning program manager, working
16   different regions across the country.
17       Became a planning branch chief in 2001.
18   Following that we went through some
19   reorganizations in about 2004 when we have set up
20   the structure that we have the regional
21   integration team, which is just really a group of
22   folks dedicated to a certain area to process and

MONTVAI, ZOLTAN

10/7/2008

(Pages 14 to 17)

| Page 14 | Page 16 |
|---|---|
| 1  work actions from there. | 1  Division -- |
| 2      I have been in that position at the civil | 2      Q.   I know that? |
| 3  deputy for the Mississippi Valley Division region. | 3      A.   -- but I work at the headquarters |
| 4          MR. O'DONNELL:  I'm going to mark this | 4  level. |
| 5  as Montvai Exhibit 2.  It's an org chart.  I'm | 5      Q.   And the Mississippi Valley is |
| 6  going to leave the stickum on it that says pre1997 | 6  headquartered in Vicksburg? |
| 7  reorganization.  But this will be Exhibit 2.  And | 7      A.   Correct. |
| 8  then I'm going to mark this at the same time as | 8      Q.   Then there's a position in this |
| 9  Exhibit 3 and this is called post1997 | 9  structure of the Army Corps known as the director |
| 10  reorganization. | 10  of civil works? |
| 11  (Montvai Deposition Exhibit Nos. 2-3 were marked | 11      A.   Correct. |
| 12          for identification.) | 12      Q.   Is that where you work? |
| 13      BY MR. O'DONNELL: | 13      A.   Yes. |
| 14      Q.   I'll represent to you, sir, that these | 14      Q.   And then there's various directorates |
| 15  Exhibits 2 and 3 are our attempt to depict the | 15  and then they report in turn ultimately to the |
| 16  pecking order hierarchy reporting levels of Army | 16  chief of engineers? |
| 17  Corps and we understand from the Corps Web site | 17      A.   Correct. |
| 18  and other sources that there was some kind of | 18      Q.   Who has a deputy? |
| 19  reorganization around 1997, okay?  Is that your | 19      A.   Yes. |
| 20  understanding of the reorganization? | 20      Q.   Then the Chief of Engineers reports to |
| 21      A.   I'm just trying to remember when -- | 21  the chief of staff of the Army? |
| 22  the regional integration team that I'm part of | 22      A.   Yes. |

| Page 15 | Page 17 |
|---|---|
| 1  now, I believe that was a later process than 1997 | 1      Q.   Who in turn reports to the secretary |
| 2  but -- | 2  of the Army? |
| 3      Q.   I'm mostly focusing on that but we'll | 3      A.   Correct. |
| 4  get to that -- | 4      Q.   And that's a presidential appointee, |
| 5      A.   That may have been a reorganization in | 5  the secretary of the Army? |
| 6  1997 and I don't recall it. | 6      A.   Yes. |
| 7      Q.   Let's look at Exhibit 2 because you've | 7      Q.   Then the secretary of the Army reports |
| 8  been with the Corps since the '70s, right? | 8  ultimately to the secretary of defense? |
| 9      A.   Right. | 9      A.   Yes.  I would presume so. |
| 10      Q.   And I'm going to go from the bottom | 10      Q.   Then ultimately to the President of |
| 11  up.  You started your work you said in 1972 upon | 11  the United States? |
| 12  graduation from college in the New Orleans | 12      A.   Yes. |
| 13  District? | 13      Q.   Now, there's an OMB here, that's the |
| 14      A.   Yes, sir. | 14  office of management and budget? |
| 15      Q.   And it's my understanding the New | 15      A.   Correct. |
| 16  Orleans District reports to the Mississippi Valley | 16      Q.   You have to deal with them, as we'll |
| 17  Division? | 17  learn I think later today, when you're processing |
| 18      A.   Correct. | 18  budget proposals for the Army Corps to Congress? |
| 19      Q.   And at the national level | 19      A.   Not only the budget proposals but the |
| 20  nonintegration team in civil works, that's where | 20  reports themselves are looked at by the office of |
| 21  you work, correct? | 21  management and budget as the Corps may request |
| 22      A.   I don't work at the Mississippi Valley | 22  authorization from Congress. |

MONTVAI, ZOLTAN

10/7/2008

(Pages 18 to 21)

Page 18

1    Q.   And Exhibit 3 is a post1997 -- we've
2  labeled it as the post1997 reorganization and it
3  would appear to me that there's more --
4    A.   I think you might have these
5  backwards.
6    Q.   I have them backwards?
7    A.   Well, the point being that in my
8  recent years, the Mississippi Valley Division is
9  called that currently.  And this one that you call
10  post shows it as lower Mississippi Valley Division
11  that was prior to the reorganization, I believe,
12  that you're referring to here.
13    Q.   Okay.  If I've got them in reverse, so
14  let's just try this for a second?
15    A.   I believe you probably do.
16    Q.   So I have now reversed them and now
17  we'll identify Exhibit 2 as the post' 97
18  reorganization and Exhibit 3 as the pre '97
19  reorganization.  And let me ask you a question.
20    As I see Exhibit 3 as we kind of look at
21  them side by side, in the reorganization there are
22  now fewer divisions, correct?

Page 19

1    A.   Correct.
2    Q.   So there must have been some
3  consolidation, I would presume?
4    A.   Yes.
5    Q.   And there are more districts?
6    A.   The districts I believe remained.
7  They were no district that I recall that may have
8  been eliminated but some of the districts were
9  reassigned to other divisions.
10    Q.   Okay.  Fine.  So we know where you
11  are.  You're located in that green block in the
12  middle of each organization chart?
13    A.   Yes, I am.  But I am not the director
14  of civil wars.
15    Q.   But you still have some time to go?
16    A.   I don't plan on doing that.
17    MR. O'DONNELL:  Let's mark this as
18  Montvai Exhibit 4 if we could.  Thank you.
19    (Montvai Deposition Exhibit No. 4 was marked for
20    identification.)
21    MR. O'DONNELL:  I only have one copy of
22  this.  I have marked this Exhibit 4, this is a

Page 20

1  Department of Army digestive Water Resources
2  Policy and activities, civil works, office of the
3  chief engineers.  It has the code or
4  classification capital EP 1165-2-1, December,
5  1972.
6    BY MR. O'DONNELL:
7    Q.   Can you identify that for me?
8    A.   Yes.
9    Q.   Can you identify that Exhibit 4 for
10  us, sir?
11    A.   Sure.  It's the digestive water
12  resources policies and activities for the
13  Department of the Army, Civil Works dated
14  December, 1972.
15    Q.   And you're familiar with that
16  document?
17    A.   I am.
18    Q.   You refer to it from time to time?
19    A.   We use it on and off.
20    Q.   What was the purpose of that document?
21    A.   It establishes very broadly the
22  policies of the Corps of Engineers working on the

Page 21

1  Department of the Army in implementing civil
2  works-related projects.
3    Q.   And MRGO would fall under that
4  category?
5    A.   Well, it would be MRGO is a project
6  that would have been developed by similar policies
7  but understanding many years ago prior to this
8  policy being established.
9    Q.   But to the extent that MRGO is an
10  ongoing project that post dated December, 1972,
11  would it be covered in those policies?
12    A.   It's operation and maintenance.  Yes.
13    Q.   We'll get to that in a minute.  So
14  that digest has procedures for decision making?
15    A.   I believe it does.
16    Q.   Reporting?
17    A.   I believe it does.
18    Q.   And chain of command?
19    A.   But again, this is a document that's
20  really not an ideal document.  There are other
21  documents that are more appropriate in those
22  terms.

fa1c151b-c542-4501-9eee-e3260c575a31

MONTVAI, ZOLTAN

10/7/2008

(Pages 22 to 25)

Page 22

1    Q.   What do you mean it's not an ideal
2  document?
3    A.   It's a very broad and general policy.
4  Procedures are more detailed and there are other
5  policies within the Corps that describe those more
6  accurately.
7    Q.   Is that document Exhibit 4 still
8  operative?
9    A.   Not this version, no.
10   Q.   Is there a more recent version?
11   A.   Yes, sir.
12   Q.   What's the most recent version?
13   A.   At least 1999 maybe more recently.  I
14  don't recall if the copy that I've got printed out
15  it says 1999.  Electronic versions on our Web
16  sites are probably more recent, more up to date.
17   Q.   So there's a '99 version on your Web
18  site?
19   A.   At least, if not more current.  I
20  don't recall what the version is on the Web site.
21   Q.   Do you know how many changes or
22  amendments the Exhibit 4 went through between 1972

Page 23

1  and 1999?
2    A.   I don't know that, no.
3    Q.   Did it go through any changes?
4    A.   I'm sure there had to have been some
5  revisions, that's why you update it.
6    Q.   May I borrow Exhibit 4 for a minute?
7    A.   Sure.
8    Q.   Thank you.  Now, you said in addition
9  to the digestive water resources policy and
10  activities there are more specific or detailed
11  policy manuals?
12   A.   Yes.
13   Q.   Governing civil works for water
14  resources projects?
15   A.   Basically the planning side, that's
16  what you're talking about here?
17   Q.   Okay.  Can you identify those
18  documents for me?
19   A.   Sure.  It's planning guidance
20  notebook, engineering regulation 1110-2-100.
21   Q.   Is that an EP?
22   A.   It's a regulation EP is just a policy.

Page 24

1    Q.   It's regulation number?
2    A.   1110-2-100.
3    Q.   When was that promulgated?
4    A.   It's been in place.  I don't recall
5  the first time that was issued but it's currently
6  being updated.  I believe the version that's up
7  there on our Web site may be about 2000.  I don't
8  recall precisely.
9    Q.   Fine.  I understand.  We'll get it.
10  What other documents are more specific than the
11  digestive water resources policies and activities
12  that guide your work?
13   A.   Possibly the budget circular that's
14  put out every year.
15   Q.   Is that an OMB document?
16   A.   No.  It's a Corps produced document
17  that provides guidance out on budgeting for
18  studies and projects.
19   Q.   Is that on your Web site?
20   A.   Yes, it is.
21   Q.   Can you give me the classification?
22   A.   I don't have it off the top of my

Page 25

1  head.
2    Q.   But it's a budget circular?
3    A.   Yes.
4    Q.   What other documents are there that
5  are more specific than the digest?
6    A.   Well, there are many regulations, you
7  know, we can look up on the Web site and see
8  what's appropriate but I don't -- I think those
9  are really the key documents.
10   Q.   What document would you go to if you
11  were thinking that maybe we need to go to Congress
12  to get some funding for preventing wetlands loss
13  in the area of the MRGO.  What documents would you
14  look at?
15   A.   You would need to have a decision
16  document completed, those regulations alone
17  wouldn't take you there.
18   Q.   What's a decision document?
19   A.   A document that reflects an evaluation
20  of the situation at hand and then makes a
21  recommendation upon evaluation of the conditions
22  to take a certain action out.

fa1c151b-c542-4501-9eee-e3260c575a31

MONTVAI, ZOLTAN

10/7/2008

(Pages 26 to 29)

Page 26

1    Q.    So it recommends a specific action?
2    A.    Correct.  Correct.
3    Q.    What's that document called
4    generically in the Corps?
5    A.    It's called typically a decision
6    document.  It could be a feasibility report.
7    Could be a post authorization change report,
8    there's different titles that fall within that
9    categories.
10    Q.    I'm interested in those titles.
11    Feasibility report is one?
12    A.    Yes.
13    Q.    And you said a post --
14    A.    Post authorization change report is
15    another.
16    Q.    Okay.  Any others?
17    A.    It could be general re-evaluation
18    report, which is essentially a feasibility
19    document but it's done post authorization.  A more
20    elaborate, more involved evaluation of change
21    conditions than say a post authorization change
22    report would be.

Page 27

1    Q.    For the MRGO from 1958 to the present,
2    has the feasibility report, the post authorization
3    change report or general evaluation report --
4    re-evaluation report ever been prepared by the
5    Corps?
6    A.    I'm sorry.  What was your question?  I
7    missed the last part.
8    Q.    Since 1958, has the Corps prepared for
9    the MRGO a feasibility report and/or a post
10    authorization change report and/or a general
11    re-evaluation report?
12    A.    I don't know.  I mean, maybe it's not
13    appropriate.  I mean, a feasibility report is
14    produced to recommend to Congress an
15    authorization.  That's what resulted in this
16    document, the one you just gave me a copy of.
17    Q.    Exhibit 1?
18    A.    Congress authorized the project and
19    from that authorization upon appropriations being
20    provided, the project was constructed.
21    Q.    Exhibit 1 was a 1951 document,
22    correct?

Page 28

1    A.    Correct.
2    Q.    Was that equivalent to what we'd call
3    today to a feasibility report?
4    A.    Essentially, the process has changed
5    from what was the process in the '50s to what we
6    have today but this document is essentially an
7    investigation in response to congressional
8    resolution asking for a study, an evaluation.
9    Q.    And money was appropriated for that
10    purpose?
11    A.    Must have been.  Otherwise you would
12    not have been able to accomplish the work.
13    Q.    I understand that house document 241
14    which is the 1951 document --
15    A.    245.
16    Q.    I misspoke.  245.  Was the equivalent
17    of a feasibility report studying and investigating
18    the prospects for a Mississippi River Gulf Outlet
19    and it was recommended to Congress in house
20    document 245?
21    A.    Correct.
22    Q.    Other than house document 245, are you

Page 29

1    aware of any Army Corps feasibility report, post
2    authorization change report and/or general
3    re-evaluation report for the MRGO?
4    A.    I'm not.
5    Q.    You're not aware of any?
6    A.    No.
7    Q.    Now, other than those three types of
8    records that you've identified for me --
9    withdrawn.  We got to these three types of reports
10    when you described for me what a decision document
11    was.  Do you recall that?
12    A.    Right.
13    Q.    And without a decision document, the
14    Corps does not go to Congress or up the rest of
15    the chain of command to get congressional
16    authorization for funding, correct?
17    A.    Not for authorization.  No.  Keep in
18    mind, authorization and funding are two separate
19    steps.
20    Q.    I understand that.  Let's be clear.
21    Authorization as opposed to appropriation?
22    A.    Correct.

fa1c151b-c542-4501-9eee-e3260c575a31

MONTVAI, ZOLTAN

10/7/2008

(Pages 30 to 33)

Page 30

1    Q.   So a decision document is required for
2    authorization for a project or activity by the
3    Corps, correct?
4    A.   Yes.
5    Q.   Now, distinguish authorization and a
6    decision document for me on the one hand to an
7    appropriation on the other.  What document, if
8    any, is required for the Army Corps to go to
9    Congress for an appropriation for something
10   involving say a MRGO.  And let's pick -- go ahead?
11   A.   The Corps puts together its annual
12   budget.  Within that budget if you have an
13   authorized project or well, let me just stay with
14   the project for a second.
15   Q.   Let's stick with the MRGO.  That's
16   fine.
17   A.   Okay.  MRGO.  The Corps will provide a
18   request operation and maintenance funds for that,
19   it's a federal responsibility.  So that is part of
20   the budget request that is submitted from the New
21   Orleans District through the division office at
22   the Mississippi Valley Division up to the

Page 31

1    directorate of civil works.
2    And then the budget is rolled into one
3    document and it's provide to the secretary -- the
4    assistance secretary Army for civil works and
5    ultimately the office of management and budget.
6    They in turn then combine it with other budget
7    requests from the other agencies and that becomes
8    part of the President's budget proposal for a
9    certain fiscal year.
10   Then Congress would presumably take that
11   into consideration as they provide appropriations
12   for that year.
13   Q.   And I understand along the process
14   after the New Orleans District puts together say
15   an O&M budget for the MRGO, changes can occur to
16   those items?
17   A.   Certainly.
18   Q.   Including at the congressional
19   committee level, right?
20   A.   Yes.
21   Q.   Now Mr. Saia, another Army Corps,
22   employee?

Page 32

1    A.   John Saia?
2    Q.   Yes.  Well, I think he had at least
3    four pronunciations in his deposition.
4    A.   I understand who you're referring to.
5    Q.   I think it's John Saia is the way I
6    understood.  He was a Rule 30 (B)(6) witness on a
7    related topic and just to get a frame of
8    reference, he said that in his experience, the
9    budget cycle from the time the New Orleans
10   District would first put together its budget say
11   for O&M for the MRGO to the time it was finally
12   appropriation was about an 18 month cycle; is that
13   about right?
14   A.   That's about right.
15   Q.   Have you had personal involvement
16   reviewing and commenting on the O&M budget for the
17   MRGO over the years?
18   A.   Not so much the O&M budget but I have
19   an individual that works for me that's the budget
20   program manager.  He would be the one to look at
21   that in more detail.  I normally wouldn't have a
22   reason to look at the O&M budget.

Page 33

1    Q.   Okay.  Is that because it's not that
2    large an item?
3    A.   Not necessarily.  It's just more of a
4    normal year-to-year process.  It's more of a
5    routine.
6    Q.   What does the operation budget entail?
7    What activities is money appropriated for?
8    A.   Normally it's appropriated for the
9    activities of the project to maintain it.  Where
10   we have federal maintenance responsibilities such
11   as like the MRGO and its normal operation
12   maintenance activities.
13   Q.   Does that include largely dredging?
14   A.   Dredging.
15   Q.   Anything else?
16   A.   Could include some measures relating
17   to dredging personnel, surveying of the
18   conditions, placement of rock, I believe, was also
19   done out of the O&M fund?
20   Q.   Rip rap?
21   A.   Rip rap can be part of that upon
22   justification being done for that purpose.

fa1c151b-c542-4501-9eee-e3260c575a31

MONTVAI, ZOLTAN

10/7/2008

(Pages 34 to 37)

Page 34

1      Q.    Would it be within the operation and
2   maintenance budget on this annual cycle if the
3   Corps wanted to propose measures to prevent the
4   widening of the MRGO channel?
5      A.    If it's related to the dredging
6   responsibility they could.
7      Q.    What if it was related to the
8   operations responsibility?  I want you to assume
9   hypothetically, there's a lot of documents on
10  this, that the MRGO was originally constructed to
11  a top width of about 650 feet.  Are you familiar
12  with that?
13     A.    Yes.
14     Q.    And a bottom width of about 500 feet?
15     A.    Correct.
16     Q.    But over the years the banks widen in
17  part from natural conditions but also because of
18  what's called wave wash or wave erosion.  Are you
19  familiar with that phenomenon?
20     A.    Yes.
21     Q.    If the Corps had wanted to do
22  something to arrest that widening process to tar

Page 35

1   it or even prevent it, would the money have been
2   proposed to be appropriated out of the O&M budget?
3      A.    If it's shown to be that there's
4   certain cost savings realized as a result of that
5   measure in maintaining that navigation channel.
6   In other words, the Corps just couldn't go out
7   there and they decide I want to use half of that
8   money and just put some stone there because I like
9   stone there, no, that's not the process.
10     Q.    What if the Corps was aware of
11  information that said if we put stone or other
12  kind of armoring along the banks we'll save, we'll
13  stop the widening process and also protect
14  wetlands.  Would that have been a justification
15  under O&M?
16     A.    No.  Because that's not a project
17  purpose, then the Corps would have had to look at
18  a document, would have to look at like a
19  reconnaissance, the study process that we just
20  talked about and recommend to Congress another
21  project purpose.
22     Q.    It has been the Corps interpretation

Page 36

1   over the years of MRGO that the project purpose
2   was navigation and the O&M activity was restricted
3   to dredging and other operations to maintain the
4   waterway as navigable?
5      A.    Yes.
6      Q.    But whether there was impact say from
7   wetlands that would require separate study and
8   separate appropriated funds?
9      A.    Correct.  And authorization to add
10  that as a second project purpose.
11     Q.    Okay.  So activities other than
12  dredging and related activities to keep the
13  waterway at the authorized depth for shipping
14  would have to be separately studied?
15     A.    Correct.
16     Q.    Congress would have to determine that
17  funds needed to be used for separate purpose like
18  wetlands preservation, right?
19     A.    Yes.
20     Q.    And therefore, there would have to be
21  appropriate congressional action --
22     A.    That's correct.

Page 37

1      Q.    -- of authorization on the one hand
2   and then appropriation, correct?
3      A.    Yes.
4      Q.    Are you aware of whether the Corps
5   ever from 1958 to the present went to Congress and
6   asked that the purpose of the MRGO be modified to
7   include wetlands preservation and appropriate
8   funding for wetlands preservation along the MRGO?
9      A.    That's a long question there.
10     Q.    Do you want me to break it down?
11     A.    If you would.
12     Q.    Please, go ahead?
13     A.    There were investigations under way to
14  deal with that problem.  That investigation,
15  however, did not proceed and get provided to
16  Congress.
17     Q.    Was not submitted to Congress, right?
18     A.    It wasn't completed.
19     Q.    Does that mean by the time of Katrina?
20     A.    Even as of now that I'm aware of.
21     Q.    What was -- I'm sorry.  Forgive me --
22     A.    There was a reconnaissance

MONTVAI, ZOLTAN

10/7/2008

(Pages 38 to 41)

Page 38

1  investigation done in the '80s time frame.  I
2  don't recall exactly, may have been like '88, '92.
3      Q.    Was that the bank erosion report?
4      A.    I believe it may have been focussed on
5  that.
6      Q.    And that was not completed to the
7  point where the Corps made a recommendation?
8      A.    Correct.
9      Q.    Recommendation to Congress?
10     A.    Yes.  It was not because of the lack
11 of a cost share sponsor to sponsor the feasibility
12 study.  The 1986 Act, the Water Resources
13 Development Act of 1986 required cost sharing of
14 activities the Corps undertakes.
15     Q.    Let me probe that.  You said earlier
16 and I don't think there's much of a dispute, that
17 MRGO is a federal project, correct?
18     A.    Correct.
19     Q.    And any responsibilities for operation
20 and maintenance are a federal responsibility?
21     A.    Correct.
22     Q.    So if a federal project is a federal

Page 39

1  responsibility and a consequence of that project
2  is wetlands loss, are you telling me that it's the
3  Corps position that the remediation of that
4  problem caused by the federal project it has to be
5  cost shared with local sponsors?
6      A.    No.  You have to look at the project
7  purpose involved.  The project purpose of MRGO is
8  navigation.  The O&M responsibility for navigation
9  projects is federal, but if you're looking at
10 ecosystem restoration or looking at other
11 restoring coastal wetlands, different cost sharing
12 and it's a nonfederal responsibility for operation
13 and maintenance.
14     Q.    Has it been the Corps position since
15 the construction of MRGO that to the extent there
16 might be a need to remedy the destruction or loss
17 of coastal wetlands or ecosystem caused by the
18 MRGO, it was not an exclusive federal
19 responsibility to pay for that?
20     A.    I think you're presuming Congress what
21 they might do on that but the Corps has not -- I
22 mean, right now we have laws that we go by, the

Page 40

1  Water Resources Development Act of 1986.
2      When it says you are looking at purpose of
3  coastal restoration and we've done investigations
4  other than just specific to MRGO, Louisiana
5  coastal area is an ecosystem restoration effort on
6  a large scale, that requires 65 percent federal,
7  35 percent nonfederal cost share and the act
8  itself requires that the operation maintenance is
9  a nonfederal responsibility.  Congress defines
10 those.
11     Q.    Are you telling me that WRDA, the 1986
12 Water Resources Development Act has a specific
13 provision with regard to the MRGO?
14     A.    I didn't say that.  I don't know.
15     Q.    You don't know one way or another?
16     A.    I don't recall.  I mean, that Act has
17 thousands of provisions in it.
18     Q.    Okay.  The Army Corps went to Congress
19 and got some funds for foreshore protection in the
20 upper part of Reach 2 of the MRGO, did it not?
21     A.    I believe it did.
22     Q.    What was the purpose of that foreshore

Page 41

1  protection?
2      A.    I believe it was to protect the bank
3  of the MRGO.
4      Q.    From what?
5      A.    From continued erosion.
6      Q.    So it didn't have any ecosystem
7  protection purpose?
8      A.    That wasn't the purpose.  No.
9      Q.    Now, at any time over the life of the
10 MRGO, the Corps could have gone to Congress and
11 recommended an amendment to the purpose of the
12 MRGO to include remediating adverse effects of the
13 MRGO, correct?
14     A.    Yes.
15     Q.    It did not do so, correct?
16     A.    I believe I said earlier that we
17 didn't have a feasibility cost sharing partner
18 that was willing, financially able to complete
19 that feasibility investigations.
20     Q.    I'd like you to assume hypothetically
21 with me what I believe is a fact but you can
22 assume it that prior to the Water Resources

fa1c151b-c542-4501-9eee-e3260c575a31

MONTVAI, ZOLTAN

(Pages 42 to 45)

Page 42

1 Development Act of 1986 the Corps had identified
2 the continuing widening of the MRGO banks and
3 destruction of the wetlands as a problem related
4 to the existence of the MRGO.  Will you assume
5 that?
6     A.   I believe there were widening
7 certainly did occur following construction of MRGO
8 and those conditions were known many years back.
9     Q.   Right.  Including the wetlands loss,
10 correct?
11     A.   Of course.  The widening resulted in
12 loss of wetlands.
13     Q.   So before the 1986 Water Resource
14 Development Act, this problem had been identified
15 by the Corps, correct?
16     A.   I'm sure it was.
17     Q.   But the Corps did not go to Congress
18 prior to 1986 to ask for an amendment for the
19 purpose of MRGO and any funds be appropriated for
20 remediation of the widening of the channel or loss
21 of wetlands, correct?
22     A.   I'm not aware of a specific document

Page 43

1 that would have been sent to Congress.  I can't
2 answer the question if there were documents sent
3 to Congress to notify them of that.
4     Q.   Well, sending a document to Congress
5 to notify Congress of a situation is not the same
6 as recommending to Congress that money be
7 appropriated for, correct?
8     A.   The only time you would ask for money
9 is once Congress gives us an authority to study
10 that problem.
11     Q.   The way the procedure works in your
12 experience is the Corps would go to Congress and
13 say we have a situation here that we think needs
14 funding, would you please fund it, correct?
15     A.   That's one process.  Another process
16 could very well be that local interest go to their
17 members and make them aware of a certain situation
18 and request that Congress ask the Corps to study
19 that problem.
20     Q.   To your knowledge, did that happen
21 with regard to MRGO?
22     A.   I believe there was a study resolution

Page 44

1 about in the early '80s, '82 or so time frame that
2 investigated or asked the Corps of Engineers to
3 investigate the erosion problem along the canal.
4     Q.   Is that what led to the soil
5 reconnaissance study?
6     A.   I'm not familiar with that.
7     Q.   But based on input from local
8 interests in the greater New Orleans area you're
9 referring to?
10     A.   I'm presuming, yes.
11     Q.   Congress authorized some money to
12 study what?
13     A.   Congress authorized the authority
14 itself asking for the Corps to look at the
15 condition that existed at that time.
16     Q.   Which conditions?
17     A.   The erosion of the banks.
18     Q.   Was that study -- that study was never
19 completed?
20     A.   There was a reconnaissance study that
21 was done in response to that resolution.  In fact,
22 there were, I believe, two reconnaissance studies.

Page 45

1     Q.   One in 1988 and one in 1984?
2     A.   That would be about right.
3     Q.   But they didn't come to a conclusion
4 or recommend anything to Congress, correct?
5     A.   I think the '94 reconnaissance being
6 the more recent one did not identify a sponsor
7 that I was referring to earlier to go into more
8 detailed investigations that could have resulted
9 in an action presuming there is federal interest
10 determined to send it to Congress.  Yes.
11     Q.   If you assume for purposes of my
12 discussion hypothetically that the problems caused
13 by the widening of the MRGO and the attendant loss
14 of wetlands was caused by a federal project of
15 MRGO, wouldn't that be a federal responsibility to
16 fund that 100 percent, the study of that problem?
17     A.   If you're looking at restoring coastal
18 wetlands as I described that requires a 65, 35
19 cost share.
20     Q.   I didn't ask you that question.  I
21 asked you was it the Corps position that if a
22 adverse effect such as widening of the channel and

MONTVAI, ZOLTAN

10/7/2008

(Pages 46 to 49)

Page 46

1   loss of wetlands is attributable to the MRGO, that
2   there never the less still has to be a local
3   sponsor to pay for 35 percent of the study?
4        A.   That's what the '86 SEC requires.
5        Q.   It would be fair to say that's at
6   least the Corps interpretation of the act?
7        A.   Yes.  And I may add there's amendments
8   to that act or certain previsions if you're
9   looking for that may be in subsequent Water
10  Resources Development Act.
11       Q.   To your knowledge after 1986, did the
12  Corps ever go out and seek a nonfederal local
13  sponsor to study the problems caused by the MRGO
14  including widening of the banks and loss of
15  wetlands?
16       A.   The '94 recon did specifically just
17  that.
18       Q.   And what was the conclusion?
19       A.   They were not able to find that
20  nonfederal sponsor.
21       Q.   Did they inform Congress of that fact?
22       A.   I'm sure they were, Congress was

Page 47

1   notified, they were part of the mailing list, it
2   was almost a normal process but that, was there a
3   formal letter sent or a final chief report sent to
4   Congress?  I'm not aware of that.
5        Q.   To your knowledge, there is not one,
6   correct?
7        A.   I'm not aware of it.  No.
8        Q.   Well, if anybody was in the Corps to
9   speak today about whether there was one, it would
10  be you, right?
11       A.   Well, I wasn't in the position at that
12  time and it's possible that --
13       Q.   Your designation includes the process
14  by which the Corps over the years of MRGO went to
15  Congress to deal with any deleterious or harmful
16  effects of the MRGO.  Have you studied that issue?
17       A.   We have studied in a general sense and
18  in fact, right now, the Corps is looking at an EXO
19  system restoration for MRGO.
20       Q.   To be exclusively federally funded?
21       A.   I don't believe there would be because
22  that's again goes back to the project that you're

Page 48

1   looking at ecosystem restoration and the cost
2   sharing requirements reflected by the Water
3   Resources Act.
4        Q.   So with regard to the 1994
5   reconnaissance report, it's your understanding
6   that the Chief of Engineers did not send that
7   report to Congress with the recommendation for any
8   appropriations or authorization for funding,
9   correct?
10       A.   Correct.  You don't send
11  reconnaissance records to Congress because you
12  have to follow that up with a more detailed
13  investigation, that's the basis for the chiefs.
14       Q.   But it wasn't sent to Congress, to
15  your knowledge, by the Chief of Engineers?
16       A.   Correct.
17       Q.   If the Corps decided it needed to take
18  further actions because of the problems it
19  identified with regard to the widening of the
20  channel and the loss of the wetlands, what would
21  have been the next step after the 1984
22  reconnaissance report?

Page 49

1        A.   The next step, in fact, was the New
2   Orleans District evaluated placing rock, rip rap
3   along the banks and the project purpose that they
4   were ultimately able to do it under the navigation
5   purpose by showing that placing the rock had
6   reduced their operation and maintenance
7   responsibility or requirements and based on that
8   shore protection was provided.
9        Q.   For a fairly short stretch, correct?
10       A.   Some stretches of it certain river
11  miles but I don't know what the total amount was.
12       Q.   That foreshore protection was on the
13  south side of Reach 2, correct?
14       A.   I thought there was some on the north
15  bank as well.
16       Q.   There was an area along the MRGO upper
17  part of Reach 2 where the channel had broken
18  through to Lake Borgne.  Are you familiar with
19  that?
20       A.   Yes, that's the north part, not the
21  south part.
22       Q.   Was there any foreshore protection or

MONTVAI, ZOLTAN

10/7/2008

(Pages 50 to 53)

Page 50

1   rock put in that area?
2       A.   I'm not specific.  My analogy is not
3   specific exactly where they put it, but I believe
4   they tried to place the shore protection in there
5   to maintain that separation of MRGO from Lake
6   Borgne.
7       Q.   When was that done?
8       A.   I don't have a specific date.
9       Q.   Post Katrina?
10      A.   Prior to Katrina, I believe.
11      Q.   How far?
12      A.   It may have been some post Katrina
13  work as well.
14      Q.   I want to go back to this apparently
15  the Corps interpretation of the Water Resources
16  Development Act of 1986.  Okay.  Can you site to
17  me today where in that Act Congress specified that
18  if any study was to be done up to ameliorate the
19  adverse effects of an exclusively federal project
20  there still had to be a 35 percent nonfederal cost
21  sharing?
22      A.   I don't believe there is a provision

Page 51

1   that's specific to that.  Keep in mind there are
2   policies of the administration also has to move
3   forward with certain types of projects.
4       Q.   Can you point to me a policy, a
5   regulation, an opinion of --
6       A.   Budget policies circular.
7       Q.   Can you tell me which budget circular
8   I could go to in order to find a statement of
9   Corps policy or federal government policy to
10  ameliorate adverse effects caused by a federal
11  project, particularly the MRGO, 35 percent of any
12  funds to study a solution of that problem had to
13  come from a nonfederal source?
14      A.   Right now what I have described to you
15  earlier is the Corps completed a recon to
16  determine the appropriate cost sharing and cost
17  allocation, depending on what the project purposes
18  are, what the benefits of a certain measure may be
19  to navigation, the feasibility study would be the
20  one to precisely lay that out, make a
21  recommendation to Congress.
22      Q.   Reconnaissance reports are funded by

Page 52

1   the Corps?
2       A.   Yes.  100 percent federally funded.
3       Q.   But to move to the next step to try to
4   deal with the problem to get to Congress to ask
5   for appropriations for the problem, it is the
6   Corps policy and interpretation of WARDA, at
7   WARDA, the Water Resources Development Act 1986,
8   that a nonfederal sponsor has to be found to pay
9   for 35 percent of the feasibility study --
10      A.   No.  I'm sorry.  I didn't mean to
11  confuse you.  The study itself is 50 percent.
12  It's 50/50 for feasibility studies.  The 65/35
13  portion that I referred to, that's project
14  implementation.  And it's Section 103, I believe,
15  of the Water Resources Development Act of 1986 has
16  the concept of the two phase planning process, the
17  feasibility phase being the phase that is cost
18  shared 50/50.
19      It's sponsor providing credits and services,
20  you get credit for that but that would be the
21  vehicle then to produce reports to go back to
22  Congress for modification to a project.

Page 53

1       Q.   Let's cut this up into smaller pieces.
2   So now your testimony as I understand your
3   testimony is that to go from a reconnaissance
4   report, which essentially identifies a problem,
5   correct?
6       A.   Yes.
7       Q.   To a feasibility study a report, which
8   lays out proposed alternative solutions and
9   budgets for Congress is the Corps interpretation
10  of the Water Resources Development Act that that
11  study must be funded 50 percent by the United
12  States and 50 percent by a nonfederal sponsor?
13      A.   Correct.
14      Q.   Can you point to me anywhere in the
15  Act where it says with regard to a federal project
16  which has caused adverse effects that that is the
17  policy?
18      A.   I don't believe that policy is
19  reflected in the Act.  I'm not aware of it.
20      Q.   Can you show me any Corps regulation,
21  policy statement, interpretation, budget circular
22  that states this?

MONTVAI, ZOLTAN

10/7/2008

(Pages 54 to 57)

Page 54

1    A.   I guess you have to go back and
2    investigate that situation, that's the reason for
3    the study to begin with so you can identify --
4    because basically what you're doing, sir, is
5    you're jumping to a conclusion to know what the
6    outcome of that study is going to be.
7         MR. O'DONNELL:  No, I didn't.  Can you
8    read the question back, please?  I don't think I
9    did.
10   A.   I'm sorry.  I misunderstood you.
11        Q.   It's okay.  I'll restate it.  Can you
12   point to me any Corps policy statement, circular,
13   interpretation, regulation or other document that
14   says when a federal project like the MRGO causes
15   adverse affects, such as widening of the banks and
16   wetlands in this instance, that to prepare a
17   feasibility study on possible solutions, there
18   must be a 50 percent nonfederal sponsor to fund
19   that study?  Can you show me anywhere where I can
20   find that?
21   A.   That's the planning process that we
22   have in place.  I don't know where specifically

Page 55

1    that's written at the moment.  No.
2         Q.   You can't site it to me now?
3    A.   Not off the top of my head, no.
4         Q.   Can you site to me any Corps policy,
5    statement, interpretation, circular, regulation or
6    other document that says that for the
7    implementation of a recommended solution to a
8    federal project like the MRGO is adverse effects
9    such as widening of the banks and wetlands loss,
10   that the implementation costs must be shared
11   35 percent by a nonfederal sponsor?
12   A.   I believe the way you would look at
13   that is that project purpose.  What's the purpose
14   of that investigation?  That's why you go back to
15   ecosystem as the restoration purpose and the cost
16   sharing required for that, that's defined by the
17   Act itself.
18        Q.   Can you show me anything in writing
19   stating that interpretation?
20   A.   Can you be more specific?  What
21   interpretation?
22        Q.   It's a parallel question.  I'm now

Page 56

1    focussing on the 50/50 implementation requirement.
2    A.   50/50 cost sharing.
3         Q.   Right.  The one you corrected earlier?
4    A.   Right.  That's not implementation of
5    the.
6         Q.   No.  No.  I meant 65/35?
7    A.   65/35 restoration.
8         Q.   You said it's the Corps position that
9    with regard to the implementation of any solutions
10   to problems even though it's a problem caused by
11   the MRGO, a federal project, the remediation of
12   those adverse affects such as widening of the
13   channel and the loss of wetlands, the
14   implementation of any such solution requires in
15   the Corps interpretation of Water Resources
16   Development Act a 50/50 sharing between the
17   federal government, a nonfederal sponsor or
18   sponsors, correct?
19   A.   That's correct.
20        Q.   Can you point to me any document that
21   says that?
22   A.   Other than the budget document, the

Page 57

1    planning guidance notebook possibly looks at that
2    but it's a document yeah thick.  I can't recall
3    specific provisions of it.
4         Q.   In terms of something like a water
5    digest policies, a regulation, a circular, an
6    opinion of the general counsel of the Army Corps
7    of the U.S. Army, anybody, can you show me a
8    document that has that interpretation?
9    A.   I'm not aware of one.
10        MR. O'DONNELL:  Why don't we just take
11   a quick break.
12        THE VIDEO OPERATOR:  The time is
13   10:16:18.  Off the record.
14        On the record.  The time is 10:33:02.
15        MR. O'DONNELL:  Welcome back, sir.
16        THE WITNESS:  Thank you.
17        MR. O'DONNELL:  Let's mark this as the
18   next exhibit in order.
19   (Montvai Deposition Exhibit No. 5 was marked for
20        identification.)
21        BY MR. O'DONNELL:
22        Q.   I'll identify it and then pass it to

fa1c151b-c542-4501-9eee-e3260c575a31

MONTVAI, ZOLTAN

10/7/2008

(Pages 58 to 61)

Page 58

1  the witness.  I only have one copy but I think
2  that will be sufficient.  This is Exhibit 5 and
3  it's the Army Corps of Engineers Mississippi River
4  Gulf Outlet St. Bernard Parish, Louisiana bank
5  erosion report, reconnaissance report, February,
6  1998.  Have you seen this document?
7      A.  I have seen it when counsel showed it
8  to me.
9      Q.  I believe that was also Exhibit 9 in
10  the summary judgment exhibit list.  Sir, have you
11  seen that document before?
12      A.  I'm aware of it but I have not read
13  this document.  No.
14      Q.  And you refer to a type of decision
15  document one of which -- withdrawn.  No.  You
16  referred earlier to a reconnaissance report.  Is
17  that a reconnaissance report?
18      A.  Correct.
19      Q.  And you said there have been a couple
20  of reconnaissance reports done of the MRGO?  Is
21  that one of them?
22      A.  That is one of them.  Yes.

Page 59

1      MR. O'DONNELL:
2      Q.  Why don't we while we're doing this,
3  mark this as Exhibit 6.
4  (Montvai Deposition Exhibit No. 6 was marked for
5              identification.)
6      A.  There may have been others but I'm not
7  aware of all the documents that were done.
8      BY MR. O'DONNELL:
9      Q.  I'm going to show you Exhibit 6 for
10  identification which was an Army Corps, a document
11  as well.  It's the same words I said before,
12  Mississippi River Gulf Outlet, St. Bernard Parish,
13  Louisiana, bank erosion reconnaissance report.
14  This has a January, 1994 date.  Sir, have you
15  taken a look at Exhibit 6?
16      A.  I have looked at it just now.  Yes.
17      Q.  Have you seen that before?
18      A.  I have not.  I knew of its existence
19  but I have not read it.
20      Q.  You referred to a second
21  reconnaissance report on the MRGO for 1994.  Is
22  that the document that you're referring to?

Page 60

1      A.  That's one of them.  Yes.
2      Q.  Let me see the first one, the 1988
3  just for a moment.  Is there a basic format that's
4  used to prepare reconnaissance reports in terms of
5  what's in the document, not the specifics but the
6  different --
7      A.  Generally speaking, there's a certain
8  requirement that a reconnaissance report will
9  have.  It will include to you some lead in like an
10  executive summary or syllabus.  It will make a
11  reference to a study resolution or what the
12  authority that is under which that study is being
13  conducted.
14      They'll have typical background information
15  leading anywhere from climatology to physical
16  settings of the project area.  It will identify
17  problems, needs and opportunities.  It will look
18  at one or two or more alternatives looking at ways
19  of addressing that problem but it will also make a
20  determination is there a potential federal
21  interest in moving out onto a more detailed
22  investigation.

Page 61

1      And is there a nonfederal interest out there
2  who is financially able and is willing to cost
3  share in the more detailed investigation, the
4  feasibility study.  And it will identify or have a
5  project management plan for the next phase.  In
6  other words, what's the cost, the features of the
7  following study.
8      Q.  Okay.  The way I look at these
9  documents is I work backwards, so about, they're
10  not paginated, but maybe about a fifth of the way
11  into the document I have found something which has
12  the Department of the Army stationary and then it
13  says Mississippi River Gulf Outlet, St. Bernard
14  Parish, Louisiana, reconnaissance report on bank
15  erosion.  The next page is what you said is a
16  syllabus.  Is a syllabus like a summary?
17      A.  Like an executive summary.
18      Q.  Okay.  And then there's a table of
19  contents you mentioned and then there's various
20  couple hundred pages.  Do you see that?
21      A.  Okay.  I see what you have.
22      Q.  Then working toward the front of the

fa1c151b-c542-4501-9eee-e3260c575a31

MONTVAI, ZOLTAN

10/7/2008

(Pages 62 to 65)

Page 62

1  document there are other different documents like
2  correspondence and comments attached.  Can you
3  tell me what they are?
4      A.   I don't know.  I haven't seen it so
5  how can I tell you.
6      Q.   When the report is done by the New
7  Orleans District, okay, was this report done by
8  the New Orleans District?
9      A.   I'm presuming it is.  I don't know.  I
10 haven't seen it, sir.
11     Q.   Is it commented upon up the chain of
12 command?
13     A.   Reconnaissance reports, typically not.
14 Reconnaissance reports -- keep in mind that over
15 the years at one time headquarters looked at
16 reconnaissance reports so let me be clear in my
17 response.  Today we do not look at that.
18     This is what I was referring to earlier that
19 while the process is essentially the same
20 providing investigations and recommendations to
21 Congress, the level of review and involvement in
22 this documents over the years have been delegated

Page 63

1  more and more down to the district and division
2  levels.
3      So while at one point headquarters looked at
4  the reconnaissance report, we no longer do that
5  today.
6      Q.   Does the Mississippi River Valley
7  Division review reconnaissance reports?
8      A.   Not today.
9      Q.   How about 1988?
10     A.   1988 they probably did.  Yes.
11     Q.   I'll represent to you there are
12 comments in Louisiana -- the lower Mississippi
13 Valley Division in here.  Okay.
14     A.   I would not be surprised to see that
15 at all.  No.  There may have been an '88
16 headquarters comment on them as well.  I think in
17 '88, headquarters did look at the reconnaissance.
18     Q.   Into the document about 10 or 12 pages
19 is a section called LMVD.  Is that Lower
20 Mississippi Valley Division?
21     A.   Yes.
22     Q.   Comments relative to the Mississippi

Page 64

1  River Outlet bank erosion reconnaissance report.
2  Do you see that?
3      A.   Yes.
4      Q.   Again, I'll represent to you and I'll
5  show you there are one, two, three, four pages of
6  typed plus some design sketches attached.  Do you
7  see that?
8      A.   Yes.
9      Q.   Would that be typically the form in
10 which the comments would be made by the division?
11     A.   Correct.
12     Q.   And are those comments considered part
13 of the overall report?
14     A.   Yes.  They're part of the record.
15 Those comments may have raised questions on the
16 conclusions or comments may have been referring to
17 the study itself or may have made comments for
18 things to consider for the following
19 investigations.
20     Q.   There's a reference to a memorandum
21 for the record about a meeting that was held.
22 What's a memorandum for record?

Page 65

1      A.   It's just a, basically what it says.
2  It's a memo that was written documenting the
3  discussions that took place at a particular
4  meeting.
5      Q.   There's a reference to a GDM
6  supplement.  What's a GDM?
7      A.   General design memorandum.
8      Q.   And what's a GDM supplement?
9      A.   Well, a supplement is something that
10 was prepared to the general design memorandum but
11 those are engineering documents that are prepared
12 typically following authorization by Congress.
13 The view being to develop the basic planning or
14 basic concept, the plans that were identified in
15 the feasibility report, a more detailed
16 feasibility report, they would then develop as
17 engineering details toward the view of being able
18 to prepare plans and specifications ultimately
19 leading your construction.
20     Q.   While the reconnaissance report was
21 being prepared, was the Corps in the New Orleans
22 District also processing a general design memo for

fa1c151b-c542-4501-9eee-e3260c575a31

MONTVAI, ZOLTAN

10/7/2008

(Pages 66 to 69)

Page 66

1  some fore shore protection?
2      A.   I don't know that other than what you
3  making a reference there but there were numerous
4  general design memos leading all the way back to
5  in the '50s, I know that for a fact.
6      But they just too numerous for me to know
7  what were the purposes or you would have to look
8  at each and every one of those individually and
9  find out what they were accomplishing.
10      Q.   Did the Army Corps of Engineers pay
11  for 100 percent of the 1988 reconnaissance report?
12      A.   Yes.  I mean, I don't have that
13  specifically but the policies being what they were
14  that the reconnaissance reports were 100 percent
15  federally funded, the answer would be yes.
16      Q.   And also the 1994 reconnaissance
17  report?
18      A.   Yes.
19      Q.   If the comments by the lower
20  Mississippi Valley Division suggested additional
21  evaluation say of the alternative completely
22  closing the MRGO, how would that comment move

Page 67

1  forward in the process if at all?
2      A.   I don't know how they move forward.
3  So you're asking me to speculate on something I
4  don't know how you --
5      Q.   Do you know if that comment moved
6  forward?
7      A.   I don't know because I haven't seen
8  that comment nor the response that the District
9  provided on that so I don't know that.
10      Q.   I think you said earlier in your
11  testimony this morning that the 1994
12  reconnaissance report on the MRGO bank erosion
13  stated that it could not find a potential
14  nonfinancial sponsor?
15      A.   I believe so.  Yes.  Whether it's in
16  the reconnaissance report there may have been
17  correspondence following the reconnaissance report
18  because sometime that goes on for some time
19  following completion of the report as you are
20  preparing to undertake the feasibility study.
21      So that document may or may not be in that
22  report.  It would be but I just don't know that

Page 68

1  for a fact.
2      Q.   Now, typically in 1994, a
3  reconnaissance report would be followed up by a
4  feasibility report?
5      A.   Correct.
6      Q.   And that's one that would be shared
7  50 percent federal funding and 50 percent
8  nonfederal sponsor funding?
9      A.   Yes.
10      Q.   On page 2 of the document numbered
11  page 2 of the syllabus it states as follows:  "The
12  report contains recommendation to proceed to the
13  feasibility phase."  Do you see that?
14      A.   I'm presuming that's what that says
15  but I can't see that far.
16      Q.   Take a look at it, page 2, first
17  sentence of the last paragraph here.  Does it say
18  that?
19      A.   Yes.
20      Q.   It did not proceed the feasibility
21  phase, correct?
22      A.   That's my understanding.  Yes.

Page 69

1      Q.   The opening paragraph of the syllabus,
2  would you read the first sentence to us into the
3  record?  The first paragraph of the syllabus?
4      A.   First paragraph first sentence, "This
5  report presents the results of continued
6  reconnaissance phase investigations of bank
7  erosion and erosion-related problems in the
8  vicinity of Mississippi River Gulf Outlet MRGO
9  channel."
10      Q.   From that, it would indicate that this
11  1994 reconnaissance report of that erosion was a
12  follow on study to the 1998 report?
13      A.   Yes.
14      MR. BRUNO:  And if you guys want to
15  make copies during the lunch hour, but I think we
16  all know this document and I just --
17      BY MR. O'DONNELL:
18      Q.   Were there any follow on
19  reconnaissance reports done on the bank erosion
20  wetlands problem of the MRGO after the 1994
21  reconnaissance report, to your knowledge?
22      A.   I believe there was a 96 recon report

fa1c151b-c542-4501-9eee-e3260c575a31

MONTVAI, ZOLTAN

(Pages 70 to 73)

Page 70

1  that was the one that the district ultimately
2  concluded that they could implement some measures
3  to protect the banks because it resulted in a cost
4  savings in the operation: in other words, dredging
5  of the channel.
6      Q.   Would that be called a reconnaissance
7  report or might it have a different --
8      A.   It think it was called a
9  reconnaissance report.
10     Q.   Is that what preceded the funding for
11 the foreshore protection we described earlier?
12     A.   I'm presuming that was it.  I don't
13 know what was the next document.  I'm just talking
14 to some folks I'm aware of that.
15     Q.   Even though it may be anecdotal or
16 secondhand I just need to ask some more questions.
17 If, in fact, the 1986 New Orleans District had a
18 reconnaissance report that showed a benefit versus
19 cost to doing some foreshore protection, was a
20 feasibility study done after that?
21     A.   It may not have been for the following
22 reason, because they concluded that the

Page 71

1  implementation of that measure was with an
2  existing authority.  In other words, it was a
3  navigation project purpose and cost savings
4  resulting to the operation and maintenance of that
5  existing project.
6      For that reason, they would not have
7  completed a feasibility report because the
8  feasibility report is produced with the primary
9  purpose to send that report to Congress and
10 requesting additional authorization.
11     So they, they had the authority to implement
12 so they did not have to go to the next phase.
13     Q.   And available funding within the
14 annual operation or maintenance?
15     A.   That's correct.  Was used to actually
16 accomplish that work.  So they may have done a GDM
17 or detail design, plans and specs and go to
18 construction.  One step those funds were made
19 available, so they may have budgeted for that as
20 part of their annual O&M budget requirements, and
21 I don't know if it took couple of years to get
22 that money because sometimes those things take

Page 72

1  time to make it a higher priority within the
2  administration or budgets tend to go up and down
3  from year to year.
4      So but I'm presuming that they were funded
5  and those measures I believe were implemented.
6      Q.   And it's your testimony as I
7  understand it that the reason the reconnaissance
8  report of 1994 did not proceed to a feasibility
9  report or study was because a nonfederal sponsor
10 to put up 50 percent of the cost of that study
11 could not be identified?
12     A.   I believe I said that and that's
13 correct.
14     Q.   So up to the time of Katrina, the
15 Corps never identified a nonfederal sponsor?
16     A.   You need to be more specific on that.
17 Nonfederal sponsor for what?
18     Q.   They measure the same mode --
19         MR. EHRLICH:  I'm sorry.  Just let
20 Mr. O'Donnell finish his question before you
21 answer.
22         BY MR. O'DONNELL:

Page 73

1      Q.   Up to the time of Katrina it's your
2  understanding and testimony that the Corps did
3  not identify a nonlocal sponsor to put 50 percent
4  of the cost to go to the next stage of a
5  feasibility study to ameliorate the adverse
6  effects of MRGO?
7      A.   Not under MRGO.  And you said nonlocal
8  sponsor, right?
9      Q.   Yeah.  Nonfederal or local sponsor?
10     A.   Yes.
11     Q.   It didn't find one?
12     A.   Correct.
13     Q.   Can you tell us, for the record, what
14 efforts were made to find such a nonfederal, local
15 sponsor?
16     A.   I am not familiar with that, the
17 District would have to provide that more detailed
18 assessment.  Now, there were other activities
19 ongoing as well besides directly related to MRGO.
20 The Corps was investigating a large scale coastal
21 restoration to address the issue of coastal
22 wetland losses.

MONTVAI, ZOLTAN

(Pages 74 to 77)

Page 74

1    That was the coastal restoration, the LCA,
2    Louisiana Coastal Area ecosystem restoration
3    report stemming from the coast 20/50 concept
4    because there have been many other man-made and
5    natural affects that have resulted in the loss of
6    coastal wetlands.
7        The Corps did finish a feasibility study for
8    that and provided that to Congress for
9    authorization as an authorized project to restore
10   costal wetlands in Louisiana including the
11   vicinity of MRGO.
12       **Q.    That study, however, is a broad**
13   **federal study dealing with impacts on the coastal**
14   **wetlands other than Army Corps impacts such as**
15   **MRGO, for example, oil and gas pipelines, correct?**
16       A.    You said other than Army includes?  It
17   never made the distinction of where the impacts
18   came from but recognizing there have been both
19   man-made and Army Corps was part of that man-made
20   as well as other projects, and I'm not even
21   talking about projects in Louisiana.
22       Well, there were projects, navigation

Page 75

1    projects, the flood control projects, the levies
2    themselves that were built along the Mississippi
3    River themselves were part of the reasons why
4    coastal subsidence, wetlands as you've stopped the
5    natural flow of the sediment.
6        So it looked at that without placing blame
7    on any one organization or activity or whether it
8    was natural or man-made process, the objective was
9    to identify a large scale restoration measure for
10   coastal Louisiana recognizing that the wetlands
11   were being eroded and were being lost.
12       **Q.    What's the name of that study?**
13       A.    Louisiana Coastal Area.
14       **Q.    LCA?**
15       A.    Yes.
16       **Q.    When did it start?**
17       A.    The reconnaissance report had to have
18   been in early 2000 maybe even late 1998 or so time
19   frame.  It resulted in a feasibility report of
20   2004 or so.  We had a chief report, January, 2005
21   that was formally sent to Congress recommending a
22   large scale restoration, that became authorized in

Page 76

1    the Water Resources Development Act of 2007.  It's
2    an authorized project as we speak right now.
3        **Q.    Was the reconnaissance report done by**
4    **the Army Corps of Engineers?**
5        A.    Yes.
6        **Q.    Funded by the Army Corps of Engineers?**
7        A.    Yes.
8        **Q.    No nonlocal sponsor?**
9        A.    No, not on national.
10       **Q.    On the feasibility report there was a**
11   **completion in 2004, who paid for that?**
12       A.    That was one half the Army Corps while
13   the federal government, the other half of it was
14   paid for by the State of Louisiana.
15       **Q.    Did the am back (phonetic) pay for it?**
16       A.    Yes.
17       **Q.    How about the chief's report of**
18   **January, 2005 who paid for that?**
19       A.    Well, that's, there's no payment
20   involved that comes out of folks producing it for
21   the Chief of Engineers like myself that are paid
22   from our general expense accounts.

Page 77

1        **Q.    When the Corps does a cost benefit**
2    **analysis an a reconnaissance report, does it take**
3    **into consideration nonmonetary environmental**
4    **benefits or only actual cost savings such as**
5    **dredging?**
6        A.    You have to look at the project
7    purpose for navigation.  What you would look at
8    was what's the monetary, so you're looking at
9    purely economics flood control similarly.  When
10   you're looking at ecosystem restoration and
11   benefit cost ratio is not computed but the outputs
12   of that effort is restoration of X number of acres
13   of wetland and described with a benefit cost ratio
14   is not produced for that.
15       **Q.    So the answer is that nonmonetary**
16   **benefits such as environmental benefits and**
17   **preserving wetlands from further loss and**
18   **restoring loss wetlands is not calculated in the**
19   **cost benefit equation?**
20       A.    That's correct.
21       **Q.    And why not?**
22       A.    Because it's not an appropriate --

MONTVAI, ZOLTAN

10/7/2008

(Pages 78 to 81)

Page 78

1  there's no way to put a dollar value on wetlands.
2      Q.   Well, are you aware of the Corps
3  studies and other studies that indicate wetlands
4  have a surge-buffering effect during hurricanes?
5      A.   Yes.
6      Q.   So could you monetite that a little
7  bit?
8      A.   Well, there's been a number of studies
9  done to try to put a dollar value on ecosystem and
10  again, then you have to look at well, what is
11  ecosystem?  How rare?  How significant that is?
12  And but we have not placed a benefit cost ratio in
13  our hurricane protection studies, for example, on
14  the value of wetlands.
15      But we do acknowledge and recognize that
16  they do have a tendency of, they have a surge
17  reduction and protection of the wave foundation so
18  we have not shown a benefit cost ratio, no.
19      Q.   For example, if we had healthy
20  wetlands in a certain place, you would have a
21  surge and wave reduction effect which could save a
22  billion dollars in potential property damage

Page 79

1  that's not done?
2      A.   No, it's not done.
3      Q.   And that's because it's not a
4  navigation purpose?
5      A.   No, because the science and the
6  modelling that would have been associated with
7  that to show that while there has been some rough
8  rule of thumbs, there has not been any defendable
9  or science done on that to exactly show how much a
10  mile worth of wetlands will reduce that surge as
11  well as depending upon the condition of that
12  wetland could be quite different.
13      A wetland could be also different when you
14  have different search conditions.
15      Q.   I understand that.  So what you're
16  saying is the Corps made a decision or choice not
17  to try to monetize the benefits that would come
18  from protecting wetlands from further destruction
19  and preserving wetlands.
20      A.   I'm not sure that's accurate.  I think
21  what has been is that we have not had done
22  sufficient studies on that to defend that benefit

Page 80

1  category.  Keep in mind when the Corps says that
2  if you have say 10 acres or whatever number of
3  wetlands it's going to reduce damages to an area,
4  we need to defend that.
5      And right now, the science and the models at
6  our Vicksburg research facility have not been
7  comfortable in being able to show that number.
8      Q.   Has the Corps asked Congress for any
9  funds to be appropriated to do such further
10  studies and modeling?
11      A.   I'm sure we have.
12      Q.   No.  I want to know in fact has the
13  Corps done it?
14      A.   I'm not aware of that but a lot of our
15  research and development funds that have been
16  provided to the Corps have been asked in that
17  area.
18      Q.   Can you site one specific request?
19      A.   You have to look at the research and
20  development program and I'm not involved in that
21  program.
22      Q.   So you're not competent or --

Page 81

1      A.   I'm not aware of specifically.
2      Q.   I mean, you're competent but it's not
3  your bailiwick?
4      A.   It's not my area of responsibility
5  that I would be all that intimately involved in
6  that to know that they actually have in there but
7  I know they have had a number of investigations in
8  this area.
9      Q.   But you speculated to whether they've
10  asked Congress for funding to do modeling and cost
11  benefit analysis to what a mile or an achor of
12  healthy wetlands would be in terms of a benefit in
13  storm protection for property and people?
14      A.   We have, the only way I could answer
15  that question if I looked at the research and
16  development program and I don't know.
17      Q.   Are you aware that in the 1994
18  reconnaissance report, Exhibit 6, the Corps
19  actually said that a case could be made that
20  100 percent of the next feasibility phase study,
21  project construction and operation and maintenance
22  of bank stabilization features could be

fa1c151b-c542-4501-9eee-e3260c575a31

MONTVAI, ZOLTAN

10/7/2008

(Pages 82 to 85)

Page 82

1    100 percent federal?
2         MR. EHRLICH:  Can you show him the
3    document?
4         A.   I'm not aware of that.  I haven't seen
5    that document.
6         BY MR. O'DONNELL:
7         Q.   I'd like you to, I'd like to show you
8    a paragraph at the bottom of 63 of the Exhibit 6,
9    the 1994 reconnaissance report.  It's under a
10   section called preliminary financial analysis and
11   cautionary proposal introduction.  If you read the
12   paragraph that begins as shown on table 20 and
13   skip over to 65 to the end of the first sentence
14   where it says 100 percent federal?
15        MR. EHRLICH:  I mean, he's asking you
16   questions about a document that you haven't seen.
17   I wanted you to have a chance to look at it.  It
18   isn't a pop quiz.
19        MR. O'DONNELL:  Well, why don't I just
20   read it in the record.  I'll do it --
21        MR. EHRLICH:  Well, it's an exhibit so,
22   you know, it's in the record I know but I want to

Page 83

1    follow up with it if you're going to ask him
2    further questions about it.
3         MR. O'DONNELL:  Did you read it?  It's
4    this one beginning as shown and then it skips over
5    to the up to the word 100 percent federal.
6         A.   What it says is that as shown in
7    table 20, 40 percent of quantifiable monetary
8    benefits for option 4, one of the alternatives I'm
9    presuming, are due to savings in a maintenance
10   dredging cost for the MRGO navigation project.
11   Since the majority of the project monitored
12   benefits are maintenance savings and maintenance
13   judges costs, the MRGO channel are borne
14   100 percent by the federal government.  A case
15   could be made that that feasibility phase project
16   construction and operation and maintenance of bank
17   stabilization features should also be 100 percent
18   federal.
19        But when you look at this sentence, it makes
20   that only about 30 percent of the overall problem
21   is directory related to the benefits for that are
22   savings and dredging.

Page 84

1         Q.   Well, in fact --
2         A.   I have mentioned earlier that the '96
3    report was able to ultimately justify measures
4    100 percent of the cost of that for reduction in
5    operation of maintenance.  So in that sense, that
6    portion of it because it relates back to the
7    navigation project purpose would be appropriate at
8    100 percent federal cost.
9         Q.   They chose not to do that, however,
10   correct?
11        A.   I mean, you have to look at the rest
12   of the 60 percent.  It's only a piece of the pie.
13   The rest of it what was the, what purposes I'm
14   presume ecosystem restoration and they needed a
15   feasibility study to address the total problem,
16   not just a percentage of it for that reason
17   because they were not able to identify it as I
18   understand it a sponsor for the remaining
19   60 percent essentially.  They were unable to go
20   into the feasibility phase.
21        Q.   Let me ask you a question, it's a
22   hypothetical.  If a -- Army Corps has dredging

Page 85

1    ships or bows, right?  Barges, whatever they're
2    called?
3         A.   We still have some dredges but over
4    the years a lot of the dredges were eliminated
5    because and now the dredging is done by
6    contractors, and I believe we still have but a few
7    dredges.
8         Q.   Let's assume in a period of time when
9    the Corps had its own dredging ship they call
10   them?  Boats?  Ships?
11        A.   Dredging fleet but I don't know what
12   the situation was at that time.  I don't remember
13   that.
14        Q.   Let's take the 1970s.  I don't think
15   there was privatization?
16        A.   Not much.
17        Q.   So and that the Coast Guard, I mean,
18   the Army Corp's hypothetical dredge hits a
19   commercial ship and causes damage to the
20   commercial ship.  Can you assume that
21   hypothetically?
22        A.   Sure.

fa1c151b-c542-4501-9eee-e3260c575a31

MONTVAI, ZOLTAN

10/7/2008

(Pages 86 to 89)

Page 86

1    Q.   That would be a federal
2  responsibility, would it not?
3         MR. EHRLICH:  This is outside the scope
4  of his designation.  We object on that ground.
5       BY MR. O'DONNELL:
6    Q.   Can you answer?
7    A.   There would be some action to take
8  care of that situation, I'm presuming.  I don't
9  know.
10   Q.   What I'm trying to get at is --
11 withdrawn.  When the Corps does a cost benefit
12 analysis and a reconnaissance report about
13 potential recommendations to remediate whatever
14 the problem is, who is it making those cost
15 benefit calculations for?
16   A.   Well, the purpose of the cost benefit
17 analysis and the reconnaissance report is to
18 determine potential federal interest to do a more
19 detailed investigation, to go into feasibility
20 study.
21      If a reconnaissance report looks at a
22 problem in response to a congressional resolution

Page 87

1  but finds the benefit cost ratio is 0.5:  in other
2  words, for every dollar that you would spend in
3  correcting the problem, you only gain benefits
4  half of that, that would not be a basis to
5  continue on to a federal feasibility study.
6       So the primary purpose of a benefit cost
7  ratio in a reconnaissance is just determine to go
8  should I proceed on to a more detailed
9  investigation.  The reconnaissance is not a
10 decision document is what I'm trying to tell you
11   Q.   No, but it is an attempt to scope out
12 how you would allocate federal versus nonfederal
13 responsibilities, correct?
14   A.   It's the beginning of it.  But the
15 feasibility phase would be the one to make that
16 further assessment in greater detail.
17      MR. O'DONNELL:  Let me mark one page of
18 a very fat document.  I'll mark this as the next.
19      (Montvai Deposition Exhibit No. 7 was marked for
20      identification.)
21      BY MR. O'DONNELL:
22   Q.   You said earlier that among the

Page 88

1  decision documents, generically there was a
2  feasibility report and you also said a post
3  authorization change report?
4    A.   Correct.
5    Q.   And are you aware of any such document
6  that was done on the MRGO?
7    A.   The only one I'm aware of that was
8  done and that I remember was the deauthorization
9  report, which was a post authorization but it was
10 a deauthorization report and that's the one that
11 you're pulling out there?
12   Q.   Exhibit 7.  I'll get to that in a
13 moment.  Thank you?
14   A.   But I'm not aware of a PAC report, as
15 we used to call it, the post authorization change
16 report and those are usually or can be done when
17 you already have an authorized project but then
18 change conditions result in having to notify
19 Congress of that change as in requesting
20 presumably that Congress would authorize some
21 modifications.
22      The post authorization change report can

Page 89

1  also be implemented depending on its scope with an
2  existing authority, depending on what that is.
3  You have to look at that, I guess
4    Q.   But to your knowledge, a PAC or post
5  authorization change report for MRGO was never
6  sent to Congress?
7    A.   No.
8    Q.   It could have been but they chose not
9  to do so?
10   A.   It didn't progress far enough for
11 whatever reasons.  I have no idea.
12   Q.   The third category of document besides
13 feasibility report and the PAC report you identify
14 was a general re-evaluation report.  Do you see
15 that?
16   A.   Correct.
17   Q.   Was it -- was a re-evaluation report
18 done on the MRGO?
19   A.   No.
20   Q.   And do you know why not?
21   A.   Normally the general re-evaluation
22 report would in more detail of the feasibility

MONTVAI, ZOLTAN

(Pages 90 to 93)

Page 90

1   level, a very detailed assessment of assessing the
2   project itself.
3        So in other words, you have a, give you
4   another example if I may, if you have a flood
5   control project but things change out there and
6   then the Corps has to go back after the project
7   has been authorized and go over and in effect redo
8   the feasibility study, that's really what results
9   in a general re-evaluation report.  For example, on
10  MRGO if -- I should wait.
11       Q.   I'm listening?
12       A.   On MRGO, if you had a certain channel
13  and all of a sudden you had much larger ships
14  coming in there than what the channel was designed
15  for, you can do a general re-evaluation report to
16  address that change in condition.
17       Q.   Did you study at all whether before
18  you testified today whether or not the Corps, in
19  fact, did a general re-evaluation study to MRGO?
20       A.   I did not.
21       Q.   I'll represent to you that we've had
22  produced in this case or we found one, two, three

Page 91

1   documents, and I'll read them into the record,
2   that bear the title variously re-evaluation study.
3   There's a 1999 to 2003 MRGO re-evaluation study.
4   This may be the same document, so maybe I'm wrong.
5        A.   I don't know what that is.  You said
6   it was a re-evaluation.  I don't know if it was a
7   general re-evaluation report.  We have many
8   documents with some varying names of it and I told
9   you right up earlier I'm not aware of all the
10  documents that were done for MRGO.
11       Q.   So you may have been in error or not,
12  didn't know, correct?  I'm not impugning --
13       A.   I was not aware of that is what I said
14  and I'm still not aware of it.
15       Q.   I have a 2003 MRGO report
16  re-evaluation study Army Corps New Orleans
17  District, February, 2003 and this may be the same
18  document but I also have a Mississippi River Gulf
19  Outlet general re-evaluation study report draft
20  May, 2005, final report September 1, 2005 and it
21  has a Bate stamp all caps NOP-003-000000591.
22       So let me deal with the 2005 because at

Page 92

1   least I have a Bate stamp number for that.  You're
2   not familiar with that document?
3        A.   I'm not.
4        Q.   What would be the purpose of a
5   re-evaluation or a general re-evaluation study
6   report?
7        A.   Some conditions that they were
8   addressing, maybe economics, some other things.  I
9   have no idea.  You would have to look at that
10  report and that should tell you what that is.
11       Q.   Do you know whether -- let me show you
12  what's the first page of a very apparently thick
13  document.  This is Exhibit 7.  It's the integrated
14  final report to Congress and legislative
15  environmental impact statement for the Mississippi
16  River Gulf Outlet deep draft deauthorization study
17  November, 2007, revised June, 2008.  You have seen
18  that document before?
19       A.   Yes, I have.
20       Q.   And for purposes of convenience, can
21  we just have the first page?  Is that all right?
22       A.   Yes.

Page 93

1        MR. EHRLICH:  Yes.
2        BY MR. O'DONNELL:
3        Q.   What is a deauthorization study?
4        A.   That was a report that was produced by
5   the Corps in response to a provision in Water
6   Resources Development Act of 2007, I believe, and
7   even though that study was started earlier than
8   already to deauthorize and eliminate MRGO as a
9   water weight.
10       As of right now, MRGO M-R-G-O is no longer a
11  navigation project.  That report, the one that you
12  have the first page of, was the basis and
13  recommendations that the Corps made resulting in a
14  chief's report to Congress to deauthorize the
15  water weight.
16       That was completed recommendation from that
17  was to place a plug at Bayou Lalutra, I believe,
18  in the waterway as a safety measure so that the
19  vessels no longer utilized the waterway.
20       Q.   Was there any purpose of that plug to
21  also keep salt water intrusion from the upper
22  reaches of the --

MONTVAI, ZOLTAN

10/7/2008

(Pages 94 to 97)

Page 94

1      A.    I think that was some of the purposes
2  whether that was the ultimately shown to be the
3  justification for that, I don't believe so because
4  salt water can still get through other bayous and
5  waterways through there.
6      So by placing a plug on that, you eliminate
7  some of that tidal exchange and salt water
8  intrusion, no question about that, but there's
9  still other tidal flushing and salt water exchange
10  that does take place.
11      Q.    I won't debate that with you but let
12  me ask you this question:  Was the 2005 general
13  re-evaluation study report any part of or a
14  precursor to the deauthorization study?
15      A.    I'm not aware of that.  And this is a
16  different project purpose.  This purpose was
17  simply to deauthorize the water weight.  I'm not
18  aware of what the purpose of the evaluation study
19  was that you were referring to.
20      Q.    The deauthorization study, Exhibit 7,
21  does not contain any recommendations to Congress,
22  does it, to deal with restoration of wetlands

Page 95

1  destroyed by the MRGO?
2      A.    It does address that but recognizing
3  that this report was done rather quickly to
4  eliminate the, some of the tidal salt water
5  intrusion and to eliminate this deauthorize the
6  waterway, that report make specifically a
7  recommendation for the Corps to initiate a study
8  along that same authority for coastal restoration.
9      A change report made that even more clearer
10  and that study is currently under way.
11      Q.    Another study, right?
12      A.    A study to make a specific
13  recommendation to Congress for coastal wetland or
14  coastal restoration measures.  Yes.
15      Q.    Within the confines of the area
16  affected by the history of the MRGO, correct?
17      A.    I don't think it's that specific but
18  it certainly would look at that.
19      Q.    Well, you said earlier that the
20  Louisiana -- the LCA, which is Louisiana
21  Coastal --
22      A.    Area.  Ecosystem restoration study.

Page 96

1      Q.    LCA study, okay, was a
2  comprehensive --
3      A.    Covered the entire state of Louisiana.
4      Q.    Covered the whole state of Louisiana
5  study, correct?
6      A.    Yes.
7      Q.    Which you believe has as a subset the
8  coast land -- the wetlands affected by the MRGO?
9      A.    That's part of evaluation.
10      Q.    In the deauthorization study, the
11  Chief of Engineers recommends further study of
12  amelioration of the wetlands affected by the MRGO
13  itself, correct?
14      A.    Yes.
15      Q.    What about does the deauthorization
16  study, Exhibit 7, make any recommendation to
17  Congress about what should be done about the fact
18  that the MRGO widened over the course of its
19  history from 650 top width to 2000 in some places,
20  3000 feet?
21      A.    I don't know if that's discussed in
22  the report but the purpose of that report was

Page 97

1  deauthorization.  That issue was not a significant
2  information in that context.
3      Q.    Has the Corps undertaken any study
4  with a view toward making a recommendation to
5  Congress what to do about the fact that MRGO while
6  it's close in navigation still has a width of 2000
7  in some places 3000 feet?
8      A.    What would be a purpose for that?
9      Q.    Well, protecting property and
10  population from wave run up, surge, further
11  erosion of the banks into nonfederal property,
12  there could be a bunch of possible reasons for
13  that.  Are you aware of any such study under way?
14      A.    Yes.  The Corps has a current
15  investigation called Louisiana Coastal Area
16  Protection and Restoration, LCAPR, that's a study
17  currently under way funded by Congress following
18  Katrina, Hurricane Katrina in August of 2005
19  that's a study that is 100 percent federally
20  funded, looking at providing increased hurricane
21  and storm damage risk reduction to coastal
22  Louisiana.

fa1c151b-c542-4501-9eee-e3260c575a31

MONTVAI, ZOLTAN

10/7/2008

(Pages 98 to 101)

Page 98

1    One of the purposes of that is to provide a
2    comprehensive plan that includes not only the
3    hurricane protection but also costal wetland
4    restoration navigation that provide a
5    comprehensive plan to restore and to protect
6    coastal Louisiana.
7        Q.    Including the area where MRGO
8    adversely affected wetlands?
9        A.    Yes.
10       Q.    This is 100 percent federally funded?
11       A.    Correct.
12       Q.    Did the Corps recommend this or did
13   Congress impose it?
14       A.    Congress provided in an appropriation
15   act shortly after Katrina hit the area two
16   studies, one was for Louisiana, one was for
17   Mississippi to look at providing a higher level of
18   hurricane protection, that was the specific
19   authority in an appropriation act as well as
20   funded in the act itself.
21       Q.    But the Louisiana Coastal Area
22   Protection and Restoration?

Page 99

1        A.    LACPR.  Yes.
2        Q.    CPR?
3        A.    LACPR, that's the abbreviations for
4    that.
5        Q.    I can't resist, is that CPR for the
6    wetlands?
7        A.    No.  No.  But that's part of it.
8    LACPR for wetlands.
9        Q.    Did the Corps recommend this or did
10   Congress initiate this?
11       A.    The reason I'm not 100 percent sure
12   there was a lot of communications going out
13   shortly after Katrina committees requested the
14   Corps for impacts to projects.  I don't know if
15   the study was proposed.
16       I believe Congress was the one that asked
17   for the study, not the Corps.  There may have been
18   communications at the, you know, between the
19   committees but I'm not sure.
20       I would have to review some Excel
21   spreadsheets whether we proposed this to Congress
22   or whether Congress funded it.

Page 100

1        Q.    The local senators, Mary Andrews and
2    David Bitter were active in proposing it, were
3    they not?
4        A.    They were supportive of this.  Yes.
5        Q.    Now, when is the study supposed to be
6    finished?
7        A.    It was supposed to have been completed
8    in December of 2008.  It was a two-year, like, a
9    $20 million study.  Due to complexities and just
10   it's a very complex problem to evaluate and many
11   alternatives being looked at, that study is now
12   being completed.  Drafts will be available
13   somewheres around early January of '09.  Internal
14   drafts are being prepared right now that will go
15   through policy review but a public draft, I
16   believe, will not be available until springtime or
17   so, but the final report to Congress is scheduled
18   for about the summer of '09?
19       Q.    About six or seven months after it was
20   targeted?
21       A.    Yes.  And the -- that's what happens
22   sometimes, you know.

Page 101

1        Q.    And one of the reasons why the study
2    is being undertaken is a recognition that the loss
3    of wetlands is partially attributable to the MRGO,
4    correct?
5        A.    I'm not aware of that at all.
6        Q.    One of the reasons this study is being
7    undertaken is a recognition that the coastal
8    wetlands play a part in protecting people and
9    property from storms, hurricanes?
10       A.    I believe it will try to make that
11   case but that was not the purpose for that study.
12       Q.    What was the purpose of it?
13       A.    The purpose of the study was to
14   provide category five level of protection to
15   Louisiana coastal area.
16       Q.    And does the LCAPR study deal with
17   hurricane levies and flood protection structures
18   or does it deal with other protective measures
19   such as restoration of wetlands or both?
20       A.    It deals with both as well as
21   nonstructural measurers.  It's a comprehensive
22   evaluation of multipurposes.

MONTVAI, ZOLTAN

(Pages 102 to 105)

Page 102

1      Q.    Is this part of the Corp's 100 years
2    study?
3      A.    No.  This is beyond, this is to
4    provide a higher level of protection certainly
5    than New Orleans than what the current 100 year
6    plan that's ongoing.
7      Q.    What is the 100 year plan category
8    protection; category 3?
9         MR. EHRLICH:  Objection.
10     A.    It's difficult to put a category on it
11   because a category is a reflection of wind speed.
12   When you're looking at 100 year, it's more of a
13   surge.  What happens as a result of a coastal
14   storm, and no two storms are alike.
15       So for that reason, it's really complicated
16   and not difficult to put a category one or two on
17   100 year level of protection.
18        BY MR. O'DONNELL:
19     Q.    Would it be fair to say that the LCAPR
20   study process --
21     A.    It's LACPR.
22     Q.    LACPR.  I'm sorry.  LACPR was

Page 103

1    initiated as a result of the devastation of
2    Hurricane Katrina?
3      A.    Yes.
4      Q.    Do you have any understanding whether
5    the deauthorization study for MRGO, Exhibit 7,
6    discusses at all the case for closing the MRGO for
7    not economic reasons?
8      A.    I believe it makes a case that there
9    are economic benefits to be gained by not
10   maintaining a water weight.  It concluded that
11   navigation benefits were not sufficient to
12   continue to operate and maintain MRGO.  It had a
13   benefit cost ratio below one.
14     Q.    As early as less than 10 years earlier
15   than the Exhibit 7, the Corps had reached an
16   opposite conclusion on the cost benefit analysis,
17   had it not?
18     A.    I believe it must have concluded
19   because it was continuing to operate and maintain
20   a water weight.
21     Q.    What happened?  What facts existed in
22   199 -- in 2007 when the Corps recommended closure

Page 104

1    that did not exist say 5 to 10 years earlier?
2      A.    Hurricane Katrina changed a number of
3    the businesses along the inner harbor navigation
4    canal.  Some of the project benefits were
5    relocation costs avoided of businesses that
6    benefit from the water weight.
7      Q.    Isn't it true that for since at least
8    some point in the 1970s, there had been declining
9    ship usage of the MRGO?
10     A.    That is true.
11     Q.    And at the time of Hurricane Katrina
12   do you know what the average monthly usage was of
13   the MRGO?
14     A.    I have seen that number but I couldn't
15   tell you what it is.  I'm sure you have it.
16     Q.    I do.  But I'm not going to waste your
17   time.  Was any of the articulated reason for the
18   closure of the MRGO the possibility that MRGO
19   somehow affected storm surge or currents during a
20   hurricane?
21        MR. EHRLICH:  Objection.  Vague.
22        BY MR. O'DONNELL:

Page 105

1      Q.    Is there any discussion of public
2    safety in the deauthorization study as a reason
3    for closure of MRGO or recommending closure of
4    MRGO?
5      A.    Public safety as a result of damages
6    or collision occurring on the waterway itself.
7      Q.    Other than that?
8      A.    I'm not aware of it.
9      Q.    Let's go to the first exhibit I
10   marked.  Exhibit 1.  This is house document 245,
11   is it not, sir?
12     A.    Yes.  That's what it says.
13     Q.    Now, let's go through this document if
14   I may.  It's my understanding that this was the
15   report of the Chief of Engineers of the Army Corps
16   of Engineers recommending to Congress that it
17   authorized an appropriate funds for the
18   construction of the Mississippi Gulf River Outlet?
19     A.    That's not totally accurate because
20   the report is for the secretary of Army to
21   Congress, not the Chief of Engineers.
22     Q.    I'm sorry.  The transmittal to the

MONTVAI, ZOLTAN

10/7/2008

(Pages 106 to 109)

Page 106

1  speaker of the House of Representatives dated
2  September 25, 1951 is in fact from Frank Pace,
3  Jr., Secretary of Army?
4      A.   That's correct.
5      Q.   That's on the first page, on the top
6  part of the second page of the document, right?
7      A.   Correct.
8      Q.   And for the purposes of the record
9  this has a Bates number of 10060004.  And then
10 page No. 001, et cetera.  Do you see that?
11     A.   Yes.
12     Q.   And when I say page 2, I'm referring
13 to the last number of the Bate stamp.  Do you see
14 that?
15     A.   Yes.
16     Q.   So on page 2, after Frank Pace Jr.,
17 secretary of the Army's name, we then have a next
18 part of this document called comments of the
19 Bureau of the Budget, correct?
20     A.   Yes.
21     Q.   And signed on page 3 by one Elmer D.
22 Statts, S-T-A-T-T-S, acting director of the Bureau

Page 107

1  of the Budget?
2      A.   That's what it says.
3      Q.   And he is endorsing the recommendation
4  of the Secretary of the Army to build the MRGO?
5      A.   Yes.
6      Q.   And --
7      A.   With some conditions, I might add but
8  essentially that's true.
9      Q.   What was the condition; is that the
10 Seabrook line?
11     A.   No.  At the time, recommend with
12 understanding, however, that no appropriation for
13 construction of the project will be sought until
14 such time as the budgetary situation clearly makes
15 possible the initiation of such improvement.  So
16 it's some conditions in there but essentially they
17 cleared this report, the executive office and the
18 President allowing the Corps to budget for this
19 effort.  They did not object to it.
20     Q.   Okay.  Then we have printed in the
21 report comments of the governor of Louisiana, one
22 James H. Davis, right?

Page 108

1      A.   Correct.
2      Q.   Supporting the waterway?
3      A.   Yes, they were.
4      Q.   Then we have starting on page 4,
5  report of Chief of Engineers of U.S. Army dated
6  May 5, 1948?
7      A.   Correct.
8      Q.   And his report comprises pages 4 and
9  5?
10     A.   That's what it shows it.  Yes.
11     Q.   And he concurs in the views and
12 recommendations stated in the report, correct?
13     A.   That's correct.
14     Q.   And just for the record, that was
15 Lieutenant General R.A. Wheeler.  Does the Chief
16 of Engineers usually have the rank lieutenant
17 general?
18     A.   Not always.  There have been in the
19 very early times some that were not lieutenant
20 generals but certainly from the '50s on to today,
21 they have always been lieutenant general as a
22 rank.

Page 109

1      Q.   Tell me the pecking order of generals.
2  What's the first general?
3      A.   First general is a brigadier general,
4  that's a one start; major general, that's 2 star;
5  Lieutenant general is 3 star and general is a four
6  star.
7      Q.   So lieutenant general is a 3 star?
8      A.   Yes.
9      Q.   It's a very high-ranking officer,
10 right?
11     A.   Relatively speaking.  Yes.
12     Q.   Is the current incumbent a lieutenant
13 general?
14     A.   Yes.
15     Q.   Next we have on page 6 report of Board
16 of Engineers for Rivers and Harbors.  Do you see
17 that?
18     A.   Yes.
19     Q.   And what is or was the Board of
20 Engineers for Rivers and Harbors?
21     A.   It's a body that consist of the
22 division engineers, usually one or two star

MONTVAI, ZOLTAN

10/7/2008

(Pages 110 to 113)

Page 110

1  generals that sit on this board and this board has
2  since been abolished by Congress.  So this board
3  no longer exists today.
4      Q.   But in those days it was a reviewing
5  body?
6      A.   It was a body to review
7  recommendations from a Corps of Engineers district
8  or division office.
9      Q.   And on page --
10     A.   Division office normally because they
11  would be the ones to send it.
12     Q.   And they were usually generals?
13     A.   They were all generals as I said,
14  either one or two star.  Now, that's possible that
15  you might have had a division commander that was a
16  Colonel but was promotable but may not have gotten
17  a star yet.
18     Q.   Was their endorsement during this
19  period of time required?
20     A.   Essentially, yes.
21     Q.   Now, on page 17 of the document we
22  have something that begins report of division

Page 111

1  engineer.  Do you see that?
2      A.   Yes.
3      Q.   And it is my understanding that the
4  rest of the document from page 17 through 45
5  comprises the report of the division engineer or
6  am I wrong about that?
7      A.   That's what it looks like.
8      Q.   Now, the division engineer would have
9  been the person at this point in time who was the
10  head of the lower Mississippi Valley Division?
11     A.   Correct.
12     Q.   Would that person have received input
13  from the New Orleans District for this report?
14     A.   Yes.  As well as the board of
15  commissioners report of New Orleans, the governors
16  office and other local stakeholders and
17  constituents.
18     Q.   So if I wanted to understand what in
19  fact was being recommended to Congress, I would
20  look at the report of the division engineer,
21  correct?
22     A.   That would be the place to start.

Page 112

1      Q.   Now, in the reports that are on top of
2  that one, if you will, that precede it, for
3  example, the board of harbors --
4      A.   Board of Engineers for Rivers and
5  Harbors.
6      Q.   But I also have to look in that report
7  to understand any changes?
8      A.   Right.  They could recommend changes
9  to Congress.  They could endorse the division and
10  district engineers reports in its entirety and in
11  fact the board does its own evaluation and review
12  of the document as to how the division does it as
13  well and then the Board of Engineers for Rivers
14  and Harbors would then send that report to the
15  Chief of Engineers.
16      And the chief likely had a staff that looked
17  at that report and made a recommendation and
18  provided him with a draft chief's report before
19  the Chief Engineers that then he forward it to
20  secretary of the Army.
21     Q.   Now, if you look at page 5 on the
22  bottom?

Page 113

1      A.   I'm there.
2      Q.   This is the second page of the report
3  of the Chief of Engineers.  Okay.  And you notice
4  in paragraph 3 and I'm not going to go through the
5  whole thing.  It says, "I recommend modification
6  of the existing project for Mississippi River,
7  Baton Rouge, to the Gulf of Mexico to provide for
8  construction of a seaway canal, et cetera."  Do
9  you see that?
10     A.   I do.
11     Q.   Was this a modification of MRGO
12  proposal or is that a separate project?
13     A.   That's a project that allows
14  navigation to take place in the Mississippi or
15  through the Mississippi all the way up to Baton
16  Rouge, so that's the basic navigation project
17  authority.
18      What the recommendation here is to modify
19  that navigation project by allowing an extension
20  or another waterway from that basic project MRGO
21  so that it allows exit into the Gulf of Mexico in
22  a faster time through the MRGO waterway.

fa1c151b-c542-4501-9eee-e3260c575a31

MONTVAI, ZOLTAN

10/7/2008

(Pages 114 to 117)

Page 114

1    Q.    So essentially from the Mississippi
2  River through the eye agents, the industrial
3  harbor navigation canal locks then into the MRGO?
4    A.    Correct.
5    Q.    So this is actually part of the
6  overall project and technically there had to be a
7  recommendation of the recommended modifying
8  existing project to fit the MRGO within it?
9    A.    Congress looked to this basic project.
10 The Mississippi River from Baton Rouge to the Gulf
11 and identified another exit to that project to get
12 into the Gulf.  So it's a modification to that
13 basic investigation project that was in place
14 already.
15   Q.    Now, the Bureau of Budget does not
16 recommend ordinarily changes in a project,
17 correct?
18   A.    No.
19   Q.    And the Secretary of the Army is just
20 transmitting the whole thing to Congress, right?
21   A.    Correct.  That's typical because they
22 normally don't get into those technical issues.

Page 115

1    Q.    Now, MRGO was authorized by Congress
2  in the River and Harbor Act of 1956.  Okay.  In
3  the language of that bill, Congress said that it
4  was authorizing the project, quote, substantially
5  in accordance with the recommendation of the Chief
6  of Engineers as contained in house document 245
7  82nd Congress first session, et cetera.  Okay?
8          THE VIDEO OPERATOR:  Excuse me,
9  Counsel, we've run out of time.
10         MR. O'DONNELL:  Well, then we'll stop
11 it.  We'll pick up after a quick 5 minute bathroom
12 break.
13         THE VIDEO OPERATOR:  This ends disk
14 No. 1 of the Montvai deposition.  The time is
15 11:36:51 off the record.
16         On the record with disk No. 2 of the
17 testimony of Zoltan Montvai in the matter of
18 Katrina Canal Breaches Consolidated Litigation.
19 The date is October 7, 2008.  The time is
20 11:54:27.
21         BY MR. O'DONNELL:
22   Q.    We're back on the record.  I'm going

Page 116

1  to skip to another document I'm going to mark then
2  I'm going to go back to house document 245.  I'm
3  going to mark as the next exhibit house document
4  231.
5  (Montvai Deposition Exhibit No. 8 was marked for
6                identification.)
7          BY MR. O'DONNELL:
8    Q.    Sir, I have marked for you a document
9  called Lake Pontchartrain and Vicinity, Louisiana,
10 letter from the Secretary of the Army transmitting
11 some Corps of Engineers information.  House
12 document 231 dated July 6, 1955.  It deals with
13 the Lake Pontchartrain and Vicinity, Louisiana
14 Hurricane Protection Project.  Have you seen this
15 document before?
16   A.    I think I have seen portions of this
17 document, not in connection with MRGO but with
18 other investigative acts.
19   Q.    And I'll represent to you that that is
20 the house report -- house document 231 was the
21 recommendation of the Army Corps of Engineers and
22 US Army and everybody else, Secretary of Army for

Page 117

1  the construction of the what we call the LPV, the
2  Lake Pontchartrain and Vicinity Hurricane
3  Protection Project.  You're familiar with that,
4  right?
5    A.    Yes.
6    Q.    This document is not unlike the
7  previous one we looked at, Exhibit 1, house
8  document 245 dealing with the recommendations of
9  the Army Corps for the construction of the MRGO,
10 correct?
11   A.    This is a similar document.  Yes.
12   Q.    And obviously different projects?
13   A.    Different level of detail as obviously
14 by the size of it.
15   Q.    And Congress authorized the I'll call
16 it LPV for short under an authorization separate
17 from the MRGO earlier authorization, correct?
18   A.    Correct.  They filed another act.
19   Q.    We saw that the house -- withdrawn.
20 Do you know whether house document 231 dealing
21 with the LPV made any recommendations with regard
22 to any modifications of MRGO itself?

MONTVAI, ZOLTAN

(Pages 118 to 121)

Page 118

1     A.    I'm not aware of it.  If it did, it
2   may be there but I have never read it that
3   closely.
4     Q.    Typically after Congress authorizes a
5   project like the MRGO, the project will go through
6   a series of general design, GDM, is that what
7   they're called?
8     A.    General design memorandums.  Now a
9   days it's a different process but just presenting
10  detailed design so that the project can move
11  towards plans and specs of construction.
12    Q.    Moving from a conceptual to a detailed
13  engineering study?
14    A.    Right.
15    Q.    Now, what do they call, MRGO had
16  general design memos.  What do they call them
17  today?  Do they call them something else?
18    A.    Preconstruction engineering and
19  design, PED.
20    Q.    Preconstruction and engineering?
21    A.    Preconstruction engineering and
22  design.  Same.  Essentially the same document.

Page 119

1     Q.    The act of Congress authorizing the
2   MRGO I read to you some of the language said that
3   it was authorizing the project substantially in
4   accordance with the recommendation of the Chief of
5   Engineers contained in house document 245.  Do you
6   recall that?
7     A.    I believe so.  Yes.
8     Q.    What is your understanding of the
9   latitude or discretion that the Chief of Engineers
10  has to deviate from the plans that are set forth
11  in house document 245?
12    A.    The chief has some discretion and the
13  reason for that is to allow fine-tuning and
14  implementation of the project so that it's a
15  better project than what may have been identified
16  in the house document from the less detailed
17  engineering.
18        So that gives the Chief flexibility to shift
19  some location, modify some features but it's a
20  limited discretion.  Clearly the Chief could not
21  go ahead, you know, if Congress authorized, for
22  example, a 50 foot bottom channel, the Chief using

Page 120

1   that discretion couldn't build a 250 foot bottom.
2   So it's a limited discretion.
3     Q.    If Congress approved a recommendation
4   for a project that said it's going to go from
5   point A to point C, the Chief wouldn't have the
6   authority to change it from point A to point Z,
7   which would be a significant change?
8     A.    He can reduce the duration to the
9   extent of it but typically you would not extend
10  upon it, that would require additional studies and
11  authorization by Congress.
12    Q.    Or just relocate it?  I'll give you a
13  hypothetical.  If MRGO was authorized essentially
14  to go from the, I'll make it very simple, from the
15  port of New Orleans through 40 something miles of
16  marshland out into to Gulf, correct?  If the Chief
17  decided he was going to take it out through Lake
18  Borgne and down another direction, he wouldn't be
19  authorized to do that?
20    A.    He would not.
21    Q.    If Congress said you shall armor or
22  protect the banks of the MRGO, he wouldn't have

Page 121

1   authority not to do that, correct?
2     A.    He would have authority.  Congress
3   gave him authority.  So he would have the
4   authority to do that.  Now, the question is one of
5   funding.  You have authority.  Whether you
6   implement that authority, that's a separate
7   decision.
8         (Off record discussion was held.)
9         BY MR. O'DONNELL:
10    Q.    Well, I want you to assume
11  hypothetically that Congress did approve the MRGO
12  project with a provision in the report that
13  contemplated armoring of the banks, No. 1?
14    A.    Yes.
15    Q.    I'd like you to assume that by the
16  time Katrina except for the small stretch we
17  talked about earlier, that was never done.  So
18  Congress in my hypothetical authorized it but it
19  was never done.  Do you know why?
20        MR. EHRLICH:  Object.
21    A.    How could I possibly answer that
22  question its a hypothesis.

MONTVAI, ZOLTAN

10/7/2008

(Pages 122 to 125)

Page 122

1          BY MR. O'DONNELL:
2          Q.    If I am correct that it was authorized
3    but never done, do you have any idea why not?
4          MR. EHRLICH:  Objection.  Calls for
5    speculation.
6          BY MR. O'DONNELL:
7          Q.    Do you know?
8          A.    I can't answer that question.
9          Q.    Okay.  Fine.  There was original cost
10   estimates associated with the MRGO project when it
11   was approved, correct?
12         A.    There were different costs in the
13   document from the report of the division engineers
14   to the chief reports to the secretary of the Army
15   because time elapsed and they updated the cost
16   estimate.
17         Q.    Was the estimated cost at the time of
18   approval in 1956 about $88 million?
19         A.    Depends on what document you're
20   looking at.  If you go back to the authorizing
21   document that may be a number if I remember in the
22   authorizing document, because time elapsed, that

Page 123

1    was my response, that as a result the cost
2    estimate went up.
3          Q.    The original report was a 1951 report?
4    Actually, I'm sorry.  The original report was a
5    1948 report, the division engineer.
6          A.    I have to look at file.
7          Q.    Which I represent to you was a 1948
8    report only because I have slept with this
9    document more than -- never mind.  I know the
10   document.  I'll represent to you --
11         A.    That's what it is.
12         Q.    My point is that let's assume that I
13   think the division engineers report is '48?
14         A.    Okay.
15         Q.    But its transmitted approximately
16   three years later in '51, correct?
17         A.    Okay.
18         Q.    Congress doesn't approve the --
19         A.    It authorized it.
20         Q.    It authorized it until '56?
21         A.    Correct.
22         Q.    So I'm making your point.  If the cost

Page 124

1    is estimated to be X million in '48, it would have
2    gone up by '56 likely?
3          A.    And by the time they actually
4    implement it, the cost went up again I assure you.
5          Q.    So do you know what the actual cost
6    was of MRGO?
7          A.    Off the top of my head, I do not know.
8          Q.    You don't know what the number was,
9    right?
10         A.    I do not know something higher than
11   what was authorized.
12         Q.    Well, if you have an operation of
13   maintenance cost, obviously it would be a lot more
14   than that?
15         A.    It's an expensive waterway to operate
16   and maintain.
17         Q.    Largely because of the periodic
18   dredging requirements to stay at 36 feet?
19         A.    As well as the fact that a lot of the
20   banks left in vessel wakes causing erosion and had
21   to have increase dredging than what may have been
22   anticipated in the original document.

Page 125

1          Q.    Right.  The Army Corps had built
2    before and after the MRGO other navigable
3    waterways, had it not?
4          A.    I'm sure we have.  Yes.
5          Q.    Do you know whether there's any other
6    navigable waterway that the Army Corps build but
7    it cost more to maintain than the MRGO?
8          MR. EHRLICH:  Objection.  Outside the
9    scope of the designation.
10         MR. O'DONNELL:  Sustained.  It was sort
11   of a have you stopped beating your wife question
12   too, I would sustain it on that grounds, too.
13   Argumentative.
14         BY MR. O'DONNELL:
15         Q.    Where could I find a written statement
16   of the extent to which the Chief of Engineers has
17   discretion to vary the implementation of a project
18   like the MRGO approved by Congress?
19         A.    It's expressed in some of our planning
20   documents.  I'm sure it's in the ER 10 that I had
21   mentioned, the planning guidance notebook.
22   There's some reference to that and there's

MONTVAI, ZOLTAN

(Pages 126 to 129)

Page 126

1    different tests and conditions.
2         And we rely on our lawyers to assess on a
3    case-by-case basis whether the proposal falls
4    within the discretionary authority.
5         Q.   Were those planning notebooks in
6    existence in the late '50s and 1960s?
7         A.   Not those planning.  Used to be a
8    combination of different regulations.  They were
9    ERs as well but they were separate documents and
10   they became one that most combining to this one
11   comprehensive document covering all the planning
12   principals and guidelines and I do not recall when
13   that was pulled into that one document.
14        Q.   Can I borrow your Exhibit 1, please.
15        A.   Yes.
16             MR. O'DONNELL:  Please bear with me for
17   a second.  I'm trying to find something.  Let's go
18   off the record for one minute.
19             THE VIDEO OPERATOR:  The time is
20   12:10:44.  Off the record.
21        On the record.  The time is 12:17:10.
22             BY MR. O'DONNELL:

Page 127

1         Q.   I want to go back and see if I
2    understood some of your earlier testimony about
3    the annual budgeting process.  There's an annual
4    budget cycle for the MRGO operation and
5    maintenance, correct?
6         A.   That's correct.
7         Q.   And it starts in the New Orleans
8    District and with a budget justification --
9         A.   Let me clarify that.  That's no longer
10   the case today but up to this point, that was
11   correct.
12        Q.   Up to 2005?
13        A.   Correct.
14        Q.   What is done today?
15        A.   It's deauthorized.
16        Q.   But up to the time of Katrina, there
17   was and annual budgeting cycle?
18        A.   Yes.
19   (Mr. Bruno excused from deposition proceedings.)
20             BY MR. O'DONNELL:
21        Q.   And operation maintenance was largely
22   comprised of the ongoing dredging required along

Page 128

1    various stretches of the MRGO, correct?
2         A.   Activities directly related to
3    maintain the navigation channel.
4         Q.   Would the Corps overhead, like, people

Page 129

1    within the Corps who were responsible, would that
2    be covered by that request as well?
3         A.   I'm not sure that I can answer that
4    question for you.  I'm not knowledgeable in that
5    area.
6             MR. EHRLICH:  Just one thing, there's
7    another topic in the 30(B)(6) that's dedicated to
8    budget appropriations, proposals, request for
9    funding associated with the construction and
10   maintenance of MRGO, so.
11             MR. O'DONNELL:  That's 22.
12             MR. EHRLICH:  No.  No. 3.
13             MR. O'DONNELL:  That was Saia and I
14   covered it in the New Orleans.
15             MR. EHRLICH:  Okay.  My point is that
16   you're asking questions that are obviously within
17   No. 3.
18             MR. O'DONNELL:  Well, actually not
19   because I'm about to ask for authorization about
20   something.  It's preliminarily but I got what I
21   needed from Mr. Saia.  Okay.
22             BY MR. O'DONNELL:

MONTVAI, ZOLTAN

(Pages 130 to 133)



Page 130

1    Q.   Let me ask you this question:  If the
2  Court concluded, and I think you've answered this
3  but I want to be sure I got it in the record.
4    If the Court concluded that it needed to
5  have funding for other than dredging because it
6  was concerned about the need to deal with
7  wetlands, okay, or surge whatever the problem was,
8  okay, it would have to go to Congress through the
9  chain of command you've described and first get an
10  amendment or modification to the purpose of the
11  project, correct?
12    A.   Let me answer it this way.  If the
13  activity that they were proposing was determined
14  to be something other than navigation purpose,
15  they would have to acquire or get additional
16  purpose from Congress for those, then they could
17  budget for that.
18    Q.   So you got to get authorization from
19  Congress for an additional or modified purpose,
20  then you got to get funding for that project?
21    A.   That's correct.
22    Q.   And that never happened up to the time

Page 131

1  of Katrina, to your knowledge?
2    A.   I'm not aware of that.
3    MR. O'DONNELL:  All right.  Nothing
4  further and thank you very much.
5    MR. EHRLICH:  Nothing, and we will read
6  & sign.
7    THE COURT REPORTER:  Counsel on the
8  phone, can I get orders on the record, please.
9  Counsel on the phone, may I get your orders on the
10  record, please if you're ordering transcripts or
11  video?
12    MR. O'DONNELL:  The plaintiffs are
13  covered by Mr. Bruno.
14    THE COURT REPORTER:  Okay.
15    MS. DECKER:  For the Orleans Levy
16  District, I think we'll probably need a copy of
17  the transcript.
18    THE COURT REPORTER:  And that's who.
19    MS. DECKER:  New Orleans Levy District.
20    MR. PAVLICK:  Richard Pavlick on behalf
21  of Jefferson Parish we would like a transcript,
22  please.

Page 132

1    THE COURT REPORTER:  Anyone else?
2  Anyone else on the phone?
3    MR. CHUD:  This is Adam Chud for
4  LeFarge, we're not going to order a transcript at
5  this time.
6    THE VIDEO OPERATOR:  This ends tap
7  No. 2 and concludes the testimony of Zoltan
8  Montvai as 30(B)(6) witness in the matter of
9  Katrina Canal Breaches, et cetera.
10    The date is October 7th, 2008.  The time is
11  12:21:27.  Off the record.
12  (Signature having not been waived, the deposition
13    of ZOLTAN MONTVAI was concluded at 12:21 p.m.)
14
15
16
17
18
19
20
21
22

Page 133

1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2    I, Okeemah S. Henderson, LSR and Notary
3  Public, the officer before whom the foregoing
4  deposition was taken, do hereby certify that the
5  foregoing transcript is a true and correct record
6  of the testimony given; that said testimony was
7  taken by me stenographically and thereafter
8  reduced to typewriting under my direction and that
9  I am neither counsel for, related to, nor employed
10  by any of the parties to this case and have no
11  interest, financial or otherwise, in its outcome.
12    IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed my notarial seal this      day
14  of          , 2008.
15
16  My Commission Expires:
   February 28, 2010.
17
18
   Okeemah S. Henderson, LSR
19  NOTARY PUBLIC IN AND FOR
   THE DISTRICT OF COLUMBIA
20
21
22