# Exhibit 57 Part A

Rec'd. Late.

7146

| 71ST CONGRESS | COMMITTEE ON RIVERS AND HARBORS, | DOCUMENT |
| 2d Session | HOUSE OF REPRESENTATIVES U. S. | No. 46 |

# MISSISSIPPI RIVER—GULF OUTLET

## LETTER

FROM

## THE CHIEF OF ENGINEERS, UNITED STATES ARMY

TRANSMITTING

**REPORT OF THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS ON REVIEW OF REPORTS HERETOFORE SUBMITTED ON MISSISSIPPI RIVER—GULF OUTLET AND NEW ORLEANS INDUSTRIAL CANAL**

WAR DEPARTMENT,
OFFICE OF THE CHIEF OF ENGINEERS,
*Washington, June 11, 1930.*

Hon. S. WALLACE DEMPSEY,
  *Chairman Committee on Rivers and Harbors,*
    *House of Representatives, Washington, D. C.*

MY DEAR MR. DEMPSEY: 1. Referring to letter of the chairman of the Committee on Rivers and Harbors of the House of Representatives, dated February 27, 1929, inclosing a copy of a resolution of the committee of the same date, requesting the Board of Engineers for Rivers and Harbors to review the reports on Mississippi River, La., with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel of a depth not exceeding 35 feet, submitted in response to a provision in the river and harbor act approved June 5, 1920, with a view to determining the advisability of constructing an outlet of this nature at this time, and for the purpose particularly of ascertaining the desirability and advisability of the United States reimbursing local interests for the expenditures made in constructing the industrial canal and finding its importance as a part of the inland waterways, I inclose herewith the report of the board in response thereto.

2. Recommendation was made in the reports under review that no modification be made of the existing projects, since adequate facilities were already provided for deep-draft vessels between New Orleans and the Gulf of Mexico. The particular improvement now desired is that the Federal Government take over the New Orleans Industrial

118919—R. and H. Doc. 46, 71-2——1

Canal for use in connection with an additional outlet to the Gulf or provide a toll-free route for the intracoastal canal.

3. A large commerce moves through the passes of the Mississippi River, the tonnage in 1928 having been 17,107,959 tons, exclusive of cargoes in transit, amounting to 2,384,788. The foreign commerce amounted to 11,738,614 tons. The total number of ocean vessels arriving at and departing from New Orleans was 6,228, the maximum draft being about 32 feet.

4. An artificial waterway between New Orleans and the Gulf would have to be not less than 500 feet wide and 35 feet deep. Duplicate locks would be necessary to overcome the difference in the elevation of the water in the Mississippi and in the Gulf and to facilitate shipping. Nine possible routes for such a waterway have been given consideration, the estimated costs ranging from about $19,400,000 to about $41,000,000. Some of these routes would be exceedingly difficult to maintain. The most advantageous is probably one passing through Barataria Bay, which is somewhat shorter to western points than the routes via the passes. Allowing 50 minutes for passing through the lock, however, the sailing time would be about the same by way of Southwest Pass and by way of Barataria Bay. Vessels bound from New Orleans to eastern points would find the route via South Pass more advantageous than any of those considered.

5. The industrial canal is already part of the existing intracoastal route between the Mississippi River and New Orleans. The commerce on this route is increasing and the district engineer believes that the industrial canal has some prospective value as part of the inland waterway system. Reimbursement of the owners for the cost of the canal is not considered advisable by him, since the improvement has been carried out on a much more extensive scale than is required for the intracoastal service. The owner might be reimbursed, in the opinion of the district engineer, in an amount equivalent to the cost of constructing a 9 by 100 foot canal with a suitable lock, the estimated cost of which is $2,270,000, assuming that all rights of way and highway bridges were furnished at local expense. Since the question of improving the inland waterway from New Orleans to Columbus, Ga., is now being studied, the district engineer considers it preferable to consider the question of the industrial canal in connection with that report. He finds no necessity for an auxiliary route between the Mississippi River at New Orleans and the Gulf, as the continued maintenance of reliable channels in the two passes is now assured. He therefore recommends that no further steps be taken toward providing such a route or toward the acquisition of the industrial canal at the present time.

6. The division engineer concurs in the opinion of the district engineer. He points out that the toll charge for the movement of inland waterway traffic through the industrial canal is 5 cents per gross ton, and that the total payments made by the Federal barge line average less than $10,000 annually. The cost to the United States, in interest charges alone, of providing a toll-free canal, should such be possible by the payment of $2,270,000 to the owners, would be nearly 10 times the toll charges now paid by the Federal barge line.

7. The board finds that the improvement of the mouths of the Mississippi has now reached a point where dependable channels can be assured indefinitely. The cost of maintaining these channels,

including the extension of the jetties, which may be necessary within 50 years, is less than the annual carrying charges on any of the auxiliary channels considered. While there are some dangers and hazards to navigation through the passes, it is not to be expected that any more favorable conditions would be found in the restricted side channels which have been considered. The two improved passes have a capacity of several times the present commerce of New Orleans, and there is no necessity for another deep-water outlet, either for emergencies or to provide for increasing commerce. The question of making the industrial canal an integral part of the intracoastal waterway extending eastward from New Orleans has been given consideration in connection with recent studies, on which was based the recommendation of the department for channel improvement between New Orleans and Mississippi Sound. The traffic moving over this route is small and there appears to be no justification for the United States to take over the industrial canal, reimbursing the owners for its cost. That privately owned waterway is a much more extensive improvement than is considered necessary for an inland waterway; and, should further consideration be given in the future to its acquisition by the Federal Government, it would not appear equitable for the United States to assume the total expense. The board recommends that the expenditures made in constructing the industrial canal be not reimbursed to local interests by the United States, and that no additional outlet to deep water in the Gulf of Mexico be provided at the present time.

8. After due consideration of the above mentioned reports, I concur in the recommendation of the board.

Very truly yours,

LYTLE BROWN,
*Major General, Chief of Engineers.*

---

REPORT OF THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS

WAR DEPARTMENT,
THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS,
*Washington, D. C., May 27, 1930.*

Subject: Mississippi River outlets to the Gulf of Mexico.
To: The Chief of Engineers, United States Army.

1. This report is submitted in response to the following resolution, adopted February 27, 1929:

*Resolved by the Committee on Rivers and Harbors of the House of Representatives, United States,* That the Board of Engineers for Rivers and Harbors created under section 3 of the rivers and harbors act approved June 13, 1902, be, and is hereby, requested to review the reports on Mississippi River, Louisiana, with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel of a depth not exceeding 35 feet, submitted in response to provision in the river and harbor act approved June 5, 1920, with a view to determining the advisability of constructing an outlet of this nature at this time, and for the purpose particularly of ascertaining the desirability and advisability of the United States reimbursing local interests for the expenditures made in constructing the industrial canal and finding its importance as a part of the inland waterways.

2. In the reports under review it was recommended that no modification be made in the existing projects, which provide adequately

for the movement of deep draft vessels between New Orleans and the Gulf of Mexico. The improvement now desired has particular reference to the acquisition of the industrial canal and its use in connection with an additional deep-water outlet to the Gulf, or in connection with the intracoastal waterway between New Orleans and the East. It is claimed that during high-river stages vessels are greatly delayed in making a trip up the river, and that a ship canal would at times be of great value. The industrial canal, being owned by New Orleans, charges tolls on all intracoastal traffic, and local interests believe that a free waterway should be provided by the Federal Government.

3. The commerce moving through the passes of the Mississippi River in 1928 amounted to 17,107,959 tons, exclusive of cargoes in transit, which are reported to have been 2,384,788 tons. The foreign commerce amounted to 11,738,614 tons, and the domestic to 5,369,345 tons. This traffic was handled in vessels drawing up to 32 feet, the total number of arrivals and departures having been 6,228.

4. The district engineer states that the importance of the commerce of New Orleans justifies the provision of adequate channel facilities. At the time the original request for a study of an additional outlet to the Gulf was brought to the attention of Congress, there was a feeling on the part of local interests that the maintenance of a satisfactory channel in South Pass or Southwest Pass was open to question. Since that time the channels through the passes have been so stabilized that full project depth of 30 feet is available in the South Pass, and full project depth of 35 feet is available in the Southwest Pass. These conditions have now continued for about five years. Narrow channels of greater depth are available through each pass. These routes have sufficient capacity to handle all prospective New Orleans traffic. Conditions are now such that there is no reason to expect that both of the improved channels would be out of commission at one time. It must be expected, however, that at some time in the future, which the district engineer estimates may be within the next 50 years, it will be necessary to extend the jetties. Taking this extension into account, together with the cost of maintaining the channels, the annual cost is estimated at $250,000 for the South Pass, and $400,000 for the Southwest Pass. This work can be carried on without interfering with navigation.

5. In the study now presented consideration is given to nine possible routes between the Mississippi and the Gulf, in addition to South Pass and Southwest Pass. It is considered by the district engineer unnecessary to provide an alternate route for emergencies, but if the maintenance of the passes were to be abandoned an improvement would be required which would take care of the entire commerce of the port of New Orleans. Adequate facilities in a side channel for this purpose would necessitate the construction of duplicate locks and a channel not less than 500 feet wide and 35 feet deep.

6. The most advantageous route of those considered is one passing through Barataria Bay. For vessels bound from New Orleans to eastern ports, the route via South Pass is about 7 miles shorter than the Barataria route, while the route via Southwest Pass is about 13 miles longer. Allowing 50 minutes for passage through the lock, the sailing time would be about the same by way of Southwest Pass and by way of Barataria Bay. The sailing time to Atlantic ports by the South Pass is less than by any of the canal routes discussed.

The estimated annual cost of the Barataria route is $1,441,700, while the estimated annual cost of maintaining both the South and Southwest Passes, including the possible extension of the jetties at each pass, is $650,000. The following table gives a comparison of the several routes considered:

| Route | Distance by river from New Orleans to canal entrance | Length of route | Estimated cost [1] | Approximate cost of operation and maintenance |
|---|---|---|---|---|
| | *Miles* | *Miles* | | |
| Fort St. Philip | 82 | 19.0 | $19,369,700 | $500,000 |
| Fort Jackson | 72 | 15.3 | 40,912,300 | 600,000 |
| Barataria Bay | 29 | 30.8 | 29,944,300 | 375,000 |
| Chandeleur | 0 | 67.0 | 40,070,700 | 1,500,000 |
| Chandeleur, optional | 10 | 60.5 | 34,251,300 | 850,000 |
| Lake Borgne | 0 | 73.8 | 31,911,700 | 2,300,000 |
| Lake Borgne, south shore | 10 | 64.0 | 35,673,200 | 800,000 |
| Lake Pontchartrain | 0 | 75.0 | 31,966,800 | 2,775,000 |
| Lake Borgne, north shore | 0 | 73.0 | 33,392,400 | 1,930,000 |

[1] Including locks and dredging, together with bulkheads and jetties where required.

7. Traffic moving over the inland waterway between the Mississippi River and Mobile traverses the entire length of the industrial canal. Commerce on this route is increasing, and still greater increase is expected when the Louisiana and Texas waterway is completed. The district engineer believes that the industrial canal has a present and prospective value as part of the inland waterway system, and thinks that it would be proper to provide a toll-free route between New Orleans and Mississippi Sound. In lieu of purchasing the entire improvement, he states that the owner of the industrial canal might be reimbursed in an amount equivalent to the cost of constructing a 9-foot by 100-foot canal with a suitable lock. The estimated cost of this work is $2,270,000, on the assumption that local interests would contribute all rights of way and would bear the expense of all highway bridges. Since the question of improving the inland waterway from New Orleans to Columbus, Ga., is now being studied and consideration can be given to the value of the industrial canal as a part of the system, the district engineer does not recommend further study in connection with this report. With regard to the question of providing a new route to deep water in the Gulf of Mexico, he recommends that no further steps in that direction be taken at the present time.

8. The division engineer agrees with the district engineer that, in view of the adequacy, reliability, and low maintenance cost of the channels at South and Southwest Passes, no other deep-water outlet from the Mississippi River to the Gulf of Mexico is necessary. The industrial canal forms part of the present intracoastal waterway between the Mississippi River and Mississippi Sound. It is possible that when the volume of inland waterway traffic has assumed larger proportions, the United States might take steps to free this traffic from the payment of tolls. The toll rate on inland waterway traffic is 5 cents per gross ton, and the payments made by the Federal barge line average less than $10,000 annually. Should the owners of the industrial canal, which is understood to have cost approximately $22,000,000, be paid $2,270,000 on the basis of the estimate of the

Case 2:05-cv-04182-SRD-JCW   Document 16923-21   Filed 01/05/09   Page 5 of 8

district engineer to provide a toll-free canal for inland waterway traffic, the annual interest on that amount would be nearly ten times the toll charges now paid by the Federal barge line. The division engineer concludes that the burden of tolls is not of such magnitude as to be of large national significance calling for Federal relief.

9. Interested parties were advised of the tenor of the district engineer's report and given an opportunity to present their views. No communications on the subject have been received.

## CONCLUSIONS OF THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS

10. The improvement of the mouths of the Mississippi has been complicated by the difficulty encountered in regulating the flow through the several outlets in proportion to the requirements of the projects. This and other features have now been worked out on a basis which appears to assure dependable channels in South Pass and in Southwest Pass. There has been no serious difficulty in maintining adequate channels during the past five years, and conditions are now such that it is believed that continued maintenance on a reasonable basis is assured. Eventually it will be necessary to extend the jetties farther into the Gulf, as otherwise the cost of maintaining a channel to deep water will become excessive. During extreme floods surface velocities through the passes may reach a maximum of over 5 miles per hour, but the average strength of flow at such times is somewhat less. Under these conditions the speed of vessels moving upstream is somewhat reduced, but this loss is largely compensated by the more rapid passage downstream. There are some dangers and hazards to navigation through the passes, some damage to vessels and Government works having occurred, but the aggregate losses on this account, as compared to the total value of the traffic handled, have been exceedingly small. It could not be expected that restricted side channels would be any less hazardous. The two passes have a capacity of several times the present commerce of New Orleans, and there is no apparent necessity for another deep-water outlet, either for emergency or to provide for an increase in commerce.

11. The question of making the industrial canal an integral part of the intracoastal waterway extending to the eastward from New Orleans was considered in connection with the recent studies, on which was based the recommendation of the department for channel improvement between New Orleans and Mississippi Sound. The section of the intracoastal waterway east of the industrial canal passes through natural waterways, so that the necessary improvement can be provided at small expense. The traffic moving over this route has not yet developed to a point where it appears advisable for the United States to take over the industrial canal, reimbursing the owners for its cost. Should some action of this nature appear advisable in the future, it would not appear equitable to reimburse the city for its total expenditures, which cover a much larger improvement than is considered necessary for an inland waterway. The board recommends that the expenditures made in constructing the

industrial canal be not reimbursed to local interests by the United States, and that no additional outlet to deep water in the Gulf of Mexico be provided at the present time.

For the board:

HERBERT DEAKYNE,
*Brigadier General, Assistant Chief of Engineers,*
*Senior Member.*

## REEXAMINATION OF THE OUTLETS OF THE MISSISSIPPI RIVER, INCLUDING ADVISABILITY OF REIMBURSING OWNERS FOR COST OF THE INDUSTRIAL CANAL, LOUISIANA

### SYLLABUS

The permanency of the navigable passes of the Mississippi River and the probable maintenance costs of these passes are discussed. Various routes are considered for a permanent channel of a depth not exceeding 35 feet from the Mississippi River to Gulf of Mexico. The value of the industrial canal and lock as a part of inland waterway between New Orleans and Mississippi Sound is also considered. The district engineer reports that both South and Southwest Passes provide adequate and reliable navigable channels which can be maintained at reasonable costs. All other routes will involve the use of locks, will have the disadvantage of constricted channels and consequent slow ship speed and be more expensive both in first cost and for maintenance. There being no apparent need of a deep-water route to the Gulf of Mexico other than those provided by South and Southwest Passes, the industrial canal has no value as part of a deep-water outlet. The advisability of the United States reimbursing the present owners of the industrial canal for a portion of the cost of that canal will depend on whether any part of this canal is authorized as a part of the proposed inland waterway between New Orleans, La., and Columbus, Ga.

WAR DEPARTMENT,
UNITED STATES ENGINEER OFFICE,
*New Orleans, La., September 14, 1929.*

Subject: Review of previous reports on the outlets of the Mississippi River to deep water in the Gulf of Mexico.
To: The Chief of Engineers, United States Army (through the division engineer).

### I. GENERAL

1. The river and harbor act of June 5, 1920, calls for a preliminary examination and survey of:

Mississippi River, La., with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel of a depth not exceeding 35 feet.

2. This report was submitted by Col. C. McD. Townsend, district engineer, on August 25, 1924.

3. On February 27, 1929, the Committee on Rivers and Harbors of the House of Representatives passed the following resolution:

*Resolved by the Committee on Rivers and Harbors of the House of Representatives, United States,* That the Board of Engineers for Rivers and Harbors created under section 3 of the river and harbor act approved June 13, 1902, be, and is hereby, requested to review the reports on Mississippi River, Louisiana, with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel to a depth not exceeding 35 feet, submitted in response to provision in the river and harbor act approved June 5, 1920, with a view to determining the advisability of constructing an outlet of this nature at this time, and for the purpose particularly of ascertaining the desirability and advisability of the United States reimbursing local interests for the expenditures made in constructing the industrial canal and finding its importance as a part of the inland waterways.

Case 2:05-cv-04182-SRD-JCW   Document 16923-21   Filed 01/05/09   Page 6 of 8

4. Under date of March 11, 1929, the Chief of Engineers, United States Army, instructed this office to make the review called for.

5. Existing projects provide for outlet channels 30 feet deep through South Pass and 35 feet deep through Southwest Pass. The South Pass has been completed; it is satisfactory and universally used by vessels of suitable draft bound to or from points east. A change of direction at the jetty entrance causes some difficulty in navigating ships, while the high current velocities obtaining in this pass during very high river stages makes the navigation of underpowered upbound vessels somewhat difficult. The Southwest Pass channel is 95 per cent completed. This channel is wide, it has comparatively low current velocities at all river stages, and is easy to navigate. At high river stages, shoaling takes place opposite the jetty ends, reducing the width of the 35-foot channel for short periods. This channel has shown a marked improvement since 1924.

6. A public hearing was held in New Orleans, June 12, 1929, in order to learn the wishes of the interested parties. A copy of the record [1] is inclosed. At this hearing there was no demand for an additional deep-water route to the Gulf of Mexico, but the interested parties expressed a desire for an inland water route from the Mississippi River to Mississippi Sound via the industrial canal. Letters [1] have been received from various sources indicating a desire for a deep-water route. The board of commissioners, port of New Orleans, have stated that the industrial canal is now used as an inland waterway between the Mississippi River and Mississippi Sound and that it will provide the logical connection between these waters in case an inland waterway having a depth of 9 feet is to be provided between New Orleans and points to the east. In view of their large investment in this waterway, which, in their opinion, should be made available to the public toll free, they have requested that the United States adopt this canal as a part of an inland waterway and that they be reimbursed accordingly. They stated that the investment in this canal places a very heavy burden on the port of New Orleans, thereby increasing the port charges.

7. The following maps [1] accompany the report:

Mississippi River, La., routes for 35-foot outlet to Gulf of Mexico. (R. and S. 11/56.) Head of Passes. (So. Pass 18/157.) Bar channel, South Pass. (So. Pass 17/67–40.) Bar channel, Southwest Pass. (S. W. Pass 11/180–57.) Advance of contours. (So. Pass 17/80-a, 17/80-b, and 17/80-c.)

8. *Location and description.*—The routes considered for the proposed deep-water outlet are shown on drawing R. and S. 11/56.

9. The area shown is part of the Mississippi River Delta. It is a low plain formed by geologically recent alluvial deposits. The banks of the river and bayous vary from 0 to 12 feet in elevation above mean low water in the Gulf of Mexico. The remainder of the area is marshy and only slightly above mean Gulf level. There are numerous lakes, bayous, sloughs, bays, and sounds. Countless indentures and detached islands give to the coast a jagged, irregular outline. The more important features are described below.

10. *Mississippi River, New Orleans to Head of Passes.*—The watershed of the Mississippi River includes nearly the entire central valley from the Appalachian to the Rocky Mountains, and from Canada to the Gulf of Mexico. The area is about 1,240,000 square miles.

---
[1] Not printed.

About 25 per cent of the flood waters are discharged through the Atchafalaya River; the remaining 75 per cent pass New Orleans in a prolonged flood. At the crest of an average flood, the discharge at New Orleans exceeds 1,000,000 cubic feet per second. The maximum flood stage at New Orleans is over 21 feet, and at Head of Passes about 4 feet. Currents vary from 0 to 5 miles per hour, depending upon the stage of the river.

At New Orleans, the banks are about 8 feet above mean low Gulf, and at Head of Passes, about 4 feet. Levees extend down the right bank to The Jump, 84 miles below New Orleans, and on the left bank to Baptiste Collettes Bayou, 83 miles below the city, but between miles 50 and 61, the left bank levee has been removed as a flood-relief measure.

Three minor outlets exist between New Orleans and the Head of Passes: Baptiste Collettes Bayou, an opening through the left bank at mile 83; The Jump, an opening through the right bank at mile 84; and Cubits Gap, an opening through the left bank at mile 91.

From New Orleans to The Jump, the river has an average width of about 2,500 feet and a central depth of 70 to 200 feet. At about 2 miles below The Jump, the width begins to increase to a maximum of 4,300 feet and the depth decreases to a minimum of 48 feet.

11. *Head of Passes.*—The shoals mentioned in Colonel Townsend's report as forming at a point 94 miles below New Orleans have been entirely eliminated by the spur dikes constructed at this locality. The minimum depth at this section is 36 feet. The following table gives principal facts in regard to the passes under existing conditions:

| Locality | Maximum discharge, 1929 (cubic feet per second) | Head of Passes to ends of jetties | | | Depth over bar July 1, 1929 |
|---|---|---|---|---|---|
| | | Length | Width | Central depth | |
| | | *Miles* | *Feet* | *Feet* | *Feet* |
| Southwest Pass | 361,100 | 19.8 | 1,700 | 38–100 | |
| South Pass | 188,065 | 13.0 | 750 | 38–106 | |
| Pass a l'Outre | 433,478 | 16.0 | 2,150 | 17–110 | |

12. *South Pass.*—South Pass, the middle and smallest of the three main outlets of the river, is 13 miles in length from the head to the seaward end of the jetties. It is about 750 feet in width and has a central depth ranging between 38 feet and over 100 feet. The limiting depth is found in the entrance channel to the head or on the bar at the mouth. In the past eight years this depth has varied between 30 and 35 feet. The mean tidal variation is 16 inches at the mouth and 9 inches at head. The maximum fluctuation of water surface, due to stage of river, is 4 feet at the head and 0 at the sea entrance. The velocity of current varies between 0 and 5½ miles per hour, depending upon the stage of the river and of the tide. The banks are low and marshy and are overflowed during flood stages. The sectional area just below the mattress sill at the head of this pass has undergone a considerable increase, due to deepening and increase in width caused by caving of the banks. This increase in sectional area has resulted in an increased current velocity, reaching a maximum of 5½ miles per hour during the highest river stages.

13. *Southwest Pass.*—The length of Southwest Pass is 19.4 miles from its head to the sea ends of the jetties. A 35-foot channel, with an average of 1,000 feet and a least width not less than 500 feet, is continuously available with the exception of short periods during extreme high water, when the least width is reduced to 250 feet. Limiting channel conditions obtain in a short stretch opposite the lower ends of the jetties where there is a persistent encroachment from the sides, necessitating the continuous operation of a dredge during high-water stages. Shoaling of a minor nature takes place at the head of the pass, requiring the occasional operation of a dredge. The shoaling above mentioned has not been of sufficient extent to break the continuity of the 35-foot channel.

14. *Pass a l'Outre.*—Pass a l'Outre is the most easterly of the three main outlets. It has not been improved for navigation. Comparatively deep water exists at and for some distance below the head, but the pass breaks up into numerous small shallow passes or bayous with extensive shoal areas at their mouths; the banks are low and marshy, and at the edges of the stream are covered with a growth of willows or reeds.

15. *Canals.*—Artificial canals entering the river below New Orleans are the Lake Borgne Canal and Quarantine Bay Canal on the east bank, and Doullet's Canal on the west bank. These are small canals, connected with the river by locks of comparatively small dimensions, and are capable of accommodating small and light-draft boats only. The inner harbor navigation canal, ordinarily referred to as the industrial canal, 30 feet deep, connecting the Mississippi River with Lake Pontchartrain in the lower portion of the city of New Orleans, is under development by the State of Louisiana.

16. *Lake Pontchartrain.*—Lake Pontchartrain, located just north of New Orleans is 40 miles long and 24 miles wide, with a maximum depth of 16 feet. The 12-foot contour is about 2 miles from the south shore. The bed of the lake consists generally of a very fine shifting sand with occasional beds of shell. The mean tidal range is about 6 inches. With the exception of high ground extending 4 miles on each side of Mandeville, the shores are marshy and between one-half and 1½ feet above mean Gulf level.

17. *Lake Borgne.*—Lake Borgne, about 12 miles east of New Orleans, is about 25 miles long, with an average width of 10 miles. The depth is 9 feet near the center and decreases to 4 feet near the shores. The bed, consists of fine sand, soft mud, and mud and shell mixed. The mean range of tide is about 0.9 foot. The banks are low and marshy, and the bottom is very soft.

18. *Barataria Bay.*—Barataria Bay is about 10 miles southwest from the Mississippi River opposite Point-a-la-Hache. The length is about 11 miles, and the average width about 5 miles. Depths vary from 3 to 6 feet. The bed is generally a delta formation of soft material with occasional deposits of shell. The bay is connected with the Gulf by Grand Pass, through the neck of which a maximum depth of about 49 feet is maintained by tidal flow. The bar outside of Grand Pass has a depth of about 6.5 feet. (See United States Coast and Geodetic Survey Chart No. 196.)

19. *Mississippi Sound.*—Mississippi Sound lies south of the State of Mississippi and portions of Louisiana and Alabama. It is 78 miles long and has an average width of about 8 miles. The depths are

irregular and vary from a few feet near the shore to a maximum of about 17 feet in the east central portion. In some localities near the protecting islands, where the tides are concentrated, natural channels up to 30 feet in depth are maintained. The tidal variation is about 1 foot. The shores are low and marshy near the western end, being about 1 foot above mean Gulf level, and are sandy and wooded in the eastern portion, the height varying from 2 to 6 feet above the same plane.

20. *Chandeleur Sound.*—Chandeleur Sound lies between the east coast of southern Louisiana and the Chandeleur Islands. It is about 32 miles long and 20 miles wide. The depth is about 16 feet near the central portion, decreasing to a few feet near the shores. The mean tidal variation is about 1 foot.

21. *Breton Sound.*—Breton Sound lies between the east coast of southern Louisiana and Breton Island. It is contiguous to and southwest of Chandeleur Sound. It is about 22 miles long and 20 miles wide. The depth is 17 feet near Errol and Breton Islands, diminishing regularly to 2 or 3 feet near the Louisiana coast. The mean tidal variation is about 1 foot.

22. *Breton Island Pass.*—Breton Island Pass connects Breton Island South with the Gulf of Mexico. A channel about 8,000 feet wide and 27 feet deep is maintained through this pass by tidal flow. (See United States Coast and Geodetic Chart No. 192.) The mean tidal variation is a little over 1 foot.

II. REFERENCES TO PREVIOUS EXAMINATION OR SURVEY REPORTS

23. The first appropriation, $75,000, for improvement of the entrances to the Mississippi River, was made in 1836, by the river and harbor act of July 4 of that year. River and harbor act of March 3, 1837, provided $210,000 for the same purpose and upon recommendation of a board of engineers the funds were expended in an attempt to open Southwest Pass by using the ordinary bucket dredge. No permanent improvement was effected.

24. In 1852 a board, reporting on the application of $75,000 appropriated by the river and harbor act of August 30, 1852, for opening a ship channel, recommended four methods: Stirring bottom; dredging; narrowing; revetting and jettying (at the passes); and, if these failed, a ship canal. Report is published in Executive Document No. 16, Thirty-third Congress, first session. Only stirring was undertaken, and no permanent improvement was effected.

25. The river and harbor act of July 8, 1856, appropriated $330,000 for a channel through Southwest Pass and Pass a l'Outre. A board recommended stirring the bottom and building jetties at these two passes and closing the other outlets. Their report is printed in House Executive Document No. 139, Thirty-fifth Congress, first session. Stirring was undertaken and a short jetty of light construction was built on the west side of Southwest Pass. No permanent improvement was obtained.

26. In 1867, $200,000 was appropriated, and a dredge was purchased to stir up and deflect sediment at Southwest Pass. No permanent improvement was effected.

27. In 1869 an examination was made as to the best means of deepening the Southwest Pass Channel. The report is printed in

House Document No. 28, Forty-first Congress, second session. The plan of stirring the bottom by dragging harrows or scrapers over the bar was recommended.

28. In 1871 an examination and survey was made for a ship canal to connect the Mississippi River with the Gulf of Mexico. The report, dated February 4, 1874, is printed in House Document No. 113, Forty-third Congress, first session. The board reported as feasible the construction of a canal from near Fort St. Philip to the Gulf at a cost of $10,273,000, this canal to be 27 by 200 feet, and the lock 60 by 500 feet with 25 feet over the sill. A minority report was in favor of a jettied channel through one of the passes.

29. In February, 1874, Mr. James B. Eads submitted a proposition to obtain and maintain for 10 years a channel through Southwest Pass by jetties for $10,000,000. The proposition was not accepted.

30. On June 25, 1874, an act was passed creating a commission to investigate and report upon the improvement of the mouth of the Mississippi River. The report, dated January 13, 1875, is printed in House Executive Document No. 114, Forty-third Congress, second session, and in the Annual Report of the Chief of Engineers for 1875, page 948. The board reported the cost of a canal below New Orleans at $10,296,500 and $60,885 per annum for maintenance, but recommended the construction of jetties at an estimated cost of $5,340,000 with $130,000 per annum for maintenance for South Pass, and $8,253,000 with $390,000 per annum for maintenance for Southwest Pass.

31. After considerable controversy as to the advisability of improving the entrances to the river by jetties either at South Pass, or Southwest Pass, or by a ship canal at Fort St. Philip, the proposition of James B. Eads to improve South Pass was accepted under section 4 of the river and harbor act of March 3, 1875. This act authorized Mr. Eads and associates to construct jetties and other works necessary to secure and maintain for a period of 20 years through the pass a channel 26 feet deep and not less than 200 feet wide at the bottom, with a central depth of 30 feet without regard to width. The work was completed in 1879, and the maintenance period ended with January 28, 1901, since which date maintenance has been carried on by the United States. The total cost of the Eads contract was $8,000,000.

32. Notwithstanding the success of this work, it became evident that in the course of time, greater depths than were provided for in this project would be required by the rapidly increasing commerce. Accordingly, the act of February 17, 1898, provided for a survey by a board of engineer officers for a channel 35 feet deep and of adequate width through Southwest Pass. The report, dated January 7, 1899, is printed in House Document No. 142, Fifty-fifth Congress, third session; also on page 1863 of annual report for 1899. The board recommended the construction of parallel jetties 2,400 feet apart from the land's end to and beyond the crest of the bar, and certain auxiliary works, including two dredges. The estimated coast was $13,000,000, and 3 per cent annually for maintenance and future jetty extensions. This project was not adopted.

33. The river and harbor act of March 3, 1899, provided for the appointment of four engineers, at least two to be from civil life, to report on the Southwest Pass project and "especially, whether it is necessary to construct inner jetties." The report, dated January 11, 1900, is printed in House Document No. 329, Fifty-sixth Congress, first session, and in annual report for 1900, page 2287. The board recommended a project for securing the stipulated channel by dredging; construction of jetties 7,000 feet apart at inner ends and 3,000 feet apart at sea ends; sills across the Jump, Cubits Gap, and Batiste Colet's Bayou; the closure of all minor outlets to the pass, and stated that inner jetties were not necessary. The estimated cost was $6,000,000 and $150,000 annually for maintenance. The river and harbor act of June 30, 1902, provided for the adoption of this project subject to modification of details at the discretion of the Secretary of War. (See H. Doc. No. 329, 56th Cong., 1st sess.) Act of May 28, 1908, authorized dredging at Head of Passes whenever necessary to secure a depth of 35 feet.

34. The project, as carried out, differed in detail from the report of the 1899 board in that the jetties were built to a height of 4 feet above mean high tide and were located on straight converging lines to near the bar, then became parallel and crossed the bar with a width of 3,500 feet between them, whereas the board of 1899 located the inner portion of the jetties along lines at first diverging, then converging and then bringing them sharply together to a width of 3,000 feet and crossing the bar on parallel lines with this width. The board's plan contemplated a foundation mattress carrying a timber grillage, upon which the concrete superstructure rested. As built, the jetties consist of superimposed tiers of brush mattressed capped with stone or concrete above the water surface.

35. The channel was somewhat deepened by these works, but the 35-foot depth was maintained for a few short periods only. On March 1, 1916, a board of engineer officers was appointed to report on the work necessary to secure a channel of project dimensions through Southwest Pass and what modifications, if any, should be made in the adopted project. The board's report, dated August 8, 1916, is printed on page 2420 of annual report for 1916. The board recommended the construction of parallel inner jetties or bulkheads, 2,400 feet apart, inside the original jetties; dredging, extension of original jetties along the lines of the inner bulkheads to deep water across the bar; a sill across the head of South Pass to limit the flow through that outlet, and a system of spur dikes above Head of Passes, contracting the width of river to about 5,000 feet. The board estimated $4,600,000 as the cost of the work outlined.

36. In 1921 the plan for the bar channel was changed to conform more closely with the experience at South Pass. The new channel was located at an angle with the axis of the jettied channel. It was assumed that the currents themselves must maintain a deep channel between the jetties and for a short distance beyond their outer ends. From this deep channel to the 35-foot contour in the Gulf of Mexico, a channel inclining to the left and largely beyond the influence of the river sediment was to be maintained by dredging. In 1922 the project was further modified by reducing the width of the jetty channel to 1,750 feet by means of spur dikes extending from the jetties.