# Exhibit 57 Part C

or by the operations of land forces, during high water, would, by diversion of a large percentage of the flow, injuriously affect the channel in the pass below the break, including the outer bar channel.

109. Under the present program of providing ample bank width at all critical localities along the passes, and of aiding nature in the formation of land areas along the jetties as far seaward as practicable, conditions in a few years will be such that only the outermost portions of the jetties will be easily vulnerable in this respect.

110. In any case, considering the small "head" of water obtaining in the passes, it is hardly conceivable that any breach could be made of such extent that under the pressure of war emergency methods it could not be effectively closed within a reasonable period.

111. The most effective method of blocking the passes would consist in sinking a substantial vessel across the channel. The ease with which this could be done would depend upon the precautionary measures taken against the possibility of such an occurrence. This contingency, however, would be applicable to any channel into the open sea.

112. As a whole, it is not believed that the channels through the passes are subject to any greater hazard from hostile design than most other sea entrances to large ports and are probably less vulnerable to attack from the air than a lock.

## VIII. EROSION AND DIVERSIONS OF FLOW

113. Jeopardy to the channels through the passes from the above causes was discussed in some of its phases under the heading of "Discharge".

114. The channels through the passes would be injuriously affected in the event of any marked increase in the flow through one or more of the outlets above Head of Passes, if such diversion reduced the flow through Southwest Pass to proportions insufficient for maintenance of project dimensions.

115. All of these outlets, however, extending as they do into the shallower waters on the sides of the main river stem, are lengthening at a more rapid rate than are the three main passses, with consequent more rapid increase in resistance to flow, and decrease in discharge. Metering of these outlets made in the past show that they are on the decline, and there is no reason to believe that this decline will not continue.

116. Had not artificial control works been provided at the head of South Pass, it is probable that the South Pass, on account of its greater hydraulic efficiency, would have, in the course of time, become the largest of the three main outlets to the river, with the probable coordinated effect of the decline of Southwest Pass to insignificant size. This tendency seems to have been entirely arrested by the control works at the head of South Pass and by the improved efficiency of Southwest Pass. Unless the discharge of South Pass is increased by extensive artificial means, which are not now contemplated, and there is no reason to believe they ever will be necessary, it is probable that the discharge of this pass can be held at its present amount by the possible provision of additional control works. Should this prove impossible, it is probable that the change will be slow, giving ample time for the execution of measures that would properly prepare the pass for

the increased flow, and insure the economic maintenance of the channel under the changed conditions.

## IX. WORKS OF FLOOD CONTROL

117. It has been suggested that the diversion of the flood waters of the Mississippi River as contemplated in the flood-control plan may adversely affect the maintenance of the passes. Since the channels at both passes, and especially the South Pass, have been satisfactorily maintained during many floods of considerably under 18 feet maximum height, it is obvious that such diversions as may be effected by flood control measures will not only have no deleterious effect on these channels but may, by reducing the burden of sediment to be transported through them to the sea, be of some actual benefit.

## X. PRESENT AND FUTURE NAVIGABILITY

118. There are two turns in South Pass where the curvature is sufficiently sharp to require cautious navigating, but it is not considered that these bends introduce unreasonable hazards to navigation. Just below the head of South Pass, very high current velocities obtain during high river, making the navigation of underpowered vessels difficult. However, regulations for navigating the pass, if followed, eliminate all danger of collisions at these localities, the only adverse effect being an occasional slowing up of ships necessary to meet the requirements of the regulations.

119. At the mouth of the pass, there is some difficulty in navigating the turn from the lower jetty channel into the lateral channel across the outer bar, during high river, and there have been frequent groundings at times during the high river stage. In 1926, two vessels collided at this point, one of which immediately sank and partially obstructed the pass for eight or nine months until it could be removed. This accident, however, resulted from a failure to adhere to the regulations and can not be attributed to channel deficiency or to hazards beyond the ordinary risks that shipping is subject to.

120. The difficulty of navigating the turn above mentioned arises by virtue of the fact that the bow of a vessel, on making entrance to the pass strikes the strong outflowing river current, while its stern is in comparatively slack water, and unless good steerage way and power are available, the vessel is apt to be "veered" off by the current and grounded on the bar to the right of the entrance channel. On leaving the jetties at this point, a nicety of judgment is required to make the turn without the stern of the vessel being swung by the currents onto the same shoal. The surface flow at this locality attains a maximum of somewhat over 5 miles per hour during extreme floods.

121. The Southwest Pass channel is comparatively straight, and due to its greater width is more easily navigable than the South Pass, although the latter has the advantage of steeper banks which render serious grounding in this pass almost impossible.

122. Negotiation of the outer bar channel at Southwest Pass is subject to the same difficulties as mentioned above for the South Pass.

123. The surface currents through the passes vary from nearly zero during low river to a maximum of over 5 miles per hour during extreme floods, while the average strength of flow through a depth

equivalent to the draft of the deeper ships is somewhat less than the above figures.

124. The dense fogs that prevail at the passes present one of the most serious hazards to navigation through those outlets. The fact that these fogs sometimes occur during high river stages when the currents are swiftest increases the danger from this cause. The greatest danger is occasioned by the fogs of intermittent character which settle down when a vessel is under way through one of the passes and there is not sufficient seaway for anchorage.

125. There is no reason to believe that the above-described hazards will increase during future years or that new hazards will develop.

126. Although the dangers and hazards to navigation through the passes above described have caused some damages to vessels and to Government works, and some delay to shipping, the aggregate loss on this account, as compared to the total value of the traffic handled, has been exceedingly small.

127. In concluding the discussion of the South and Southwest Passes, it may be stated that it is probable that their discharges can be held within allowable limits, that the precautionary methods now employed preclude the possibility of a serious crevass, and that the maintenance of the bar channels for an indefinite period is economically feasible. There is therefore little likelihood of a rapid and simultaneous deterioration of both passes. The two passes have a capacity many times in excess of the present commerce of New Orleans and there is no apparent necessity for another deep water outlet, either for emergency or to provide for an increase in commerce.

128. *Facilities of canal routes.*—In considering requirements of a deep water route other than by the Mississippi Passes, it should be understood that one or more locks will be necessary because of the variation of the river surface. The lifts of these locks would vary from a maximum of about 20 feet at New Orleans to a maximum of 6½ feet at Fort St. Philip. In case the new route were to serve merely as an emergency route to be used in case of the sudden failure of both passes, it is believed that a single lock would suffice and that the industrial canal lock, although having a depth of only 31.3 feet over the miter sills, would be of great value. However, in view of the improbability of the simultaneous failure of both passes, there seems no necessity of an emergency route. The question therefore becomes an economic one, involving the relative economy of the most practicable artificial route with the continued maintenance of the passes. In other words, the only justification for providing another outlet to the Gulf must be based on the fact that such a route would be more economical than the continued maintenance of the passes. It is therefore believed that the facilities of a new route should at least be equal to those of the passes.

129. A single lock the size of that in the Industrial Canal, 75 by 640 feet, operating nearly continuously throughout every day in the year, could pass all the vessels which may be expected in the port within the next 20 years, but the provision of only a single lock would result in much delay to ships waiting their turns for locking. Moreover, it must be anticipated that a lock is subject to damage and must be placed out of commission for repairs at times, which on occasions might extend over considerable periods. It frequently happens, on Saturday afternoons and after foggy weather, that as

many as 12 ships clear from New Orleans within a period of two hours. Allowing 50 minutes for the lockage of each vessel, and making no allowance for inland waterway traffic, 10 hours would be required for locking these 12 ships. Shipping interests would seriously object to such delays. Further more, such a volume of traffic in the Industrial Canal would seriously interfere with street traffic, even if bridges additional to the one at St. Claude Street should be provided. It is therefore believed that two locks are essential on any canal route which is intended to replace the passes at the river mouth. Record of cargo vessels of less than 22,000 gross tons, exclusive of tank ships, which were constructed in 1907 to 1928, inclusive, show that the largest have lengths up to 620 feet, with one 655 feet long; and the breadth of these ships steadily increased to a maximum of 80½ feet. The dimensions of locks to accommodate this shipping should be at least 80 by 640 feet, and a minimum depth of 36 feet over the miter sills should be provided.

130. *Channel width.*—The following table gives the channel dimensions and tonnage for most of the important ports of the United States:

| Port | Channel dimensions | Ocean-going commerce, calendar year 1927 |
|---|---|---|
| | | *Tons* |
| Boston | 900 by 35 feet | 15,732,721 |
| Philadelphia | Least, 800 by 35 feet | 18,235,157 |
| Baltimore | Least, 600 by 35 feet | 11,934,968 |
| Norfolk | Least, 750 by 40 feet | 14,793,032 |
| Newport News | Least, 600 by 40 feet | 7,814,611 |
| Los Angeles | Least, 1,000 by 35 feet | 26,228,658 |
| San Francisco, including Oakland | Bar channel, 2,000 by 40 feet | 12,104,234 |
| Portland, Oreg | Bar channel, ½ mile by 40 feet | 4,978,982 |
| Port Arthur | 200 to 450 by 30 feet | 6,794,725 |
| Houston Ship Channel | 200 to 250 by 30 feet | } 19,577,647 |
| Galveston Harbor Channel | 200 to 1,200 by 32 feet | |
| Mobile | 200 to 300 by 30 feet | 2,354,592 |
| New Orleans, South Pass | 200 to 500 by 30 feet, average | } 16,681,478 |
| New Orleans, Southwest Pass | 200 to 1,000 by 35 feet, average | |
| Panama Canal, narrow section | 200 to 300 by 45 feet | 29,883,837 |

A study of the channel widths of the major ports of the United States above listed indicates that a port of the size of New Orleans should be served by a channel having a width of not less than 500 feet. While a channel 300 feet in width would serve existing commerce, provided vessels moved at reduced speeds, a channel of this width would not provide ease of navigation at all comparable with the existing route. As the commerce of the port increases it would offer increasing difficulties, and there would undoubtedly be a demand for a channel not less than 500 feet in width. The channel depth of any canal constructed should not be less than 35 feet. The costs of all artificial routes considered will therefore be based on two locks, 80 by 640 feet, and a channel 35 by 500 feet.

## XI. Canal Routes

### FORT ST. PHILIP ROUTE

131. *Location.*—This route as considered in the previous reports would join the left bank of the river at a point about 7 miles below Fort St. Philip, or 82 miles below New Orleans. This route was suggested in 1832, unfavorably reported on in 1858, and surveyed and favorably reported in 1871-72.

Another route, leaving the river 2 miles farther upstream and passing through the deep water in Breton Island Sound, would require considerably less excavation although it would be nearly 2½ miles longer than the other route. (See Coast and Geodetic Survey Charts Nos. 194 and 1272.)

132. *Lock.*—The estimated cost for a double lock at this locality, based on usable dimensions 80 by 640 feet, 35 draft, is $10,384,000. A lift of 6¼ feet would be sufficient for the maximum flood stage of the river, but the lock should be designed to withstand occasional hurricane tides of 8 to 10 feet above low water. When the levee system on the left bank of the river is not maintained, annual floods submerge this bank to a depth of about 1 foot. Plans which were recommended in 1872 included embankments on both sides of the canal and a guard gate near the shore line for storm protection.

133. *Foundation for locks.*—It is reasonably certain that a dependable foundation can be had at this location. Borings made in 1872, indicate a satisfactory formation for supporting the lock as then proposed, even without pile and grillage foundation. At the forts very heavy monolithic concrete batteries are supported by piles and grillage, and the subsidence, while considerable, has not been excessive. Sixty-foot piles were generally used. On these piles, 12 by 12 inch yellow-pine timbers were placed for caps and two layers of close grillage laid at right angles, the whole being drift-bolted to form as rigid foundation as practicable. At both forts a sand stratum 4 feet thick was encountered at a depth of 22 feet, and similar strata are commonly found along the lower river. Test piles have been driven to a depth of 120 feet and the penetration per blow remained nearly constant after passing through the sand stratum. When a pile is allowed to stand a few hours, much hammering is required to start it again. No attempt has been made to unwater a pit at this locality to the depth required for a lock, but it is not anticipated that insurmountable construction difficulties would be encountered.

134. *Canal and approach.*—Channel widths of 500 feet and side slopes of 3 on 1 are used in the estimates herein for 35-foot depths at all locations. The Fort St. Philip route, perpendicular to the river, would lie about N. 52½° E. for a distance of 8.3 miles, as follows:

One and five-tenths miles through sea marsh and lagoons; 1.5 miles through sheltered bay, 1 foot deep, without jetties; 3 miles through open water, 1 to 3 feet deep, to former Bird Islands; 2.3 miles through open water, increasing evenly from 1 to 30 feet in depth.

The outer 5½ miles of this section would require jetties. The approach channel, bearing about S. 68° E., would follow the axis of the channel which leads from Breton Island Pass to deep water in the Gulf of Mexico. Natural depths in this channel, seaward from the ends of the proposed jetties, are as follows:

Thirty to twenty-four feet, decreasing evenly, in the first 3.5 miles; 24 to 50 feet, increasing evenly, in the next 2.4 miles; 33 feet average depth in the outer 5 miles; length of approach, 10.7 miles.

The estimated cost of this route is $19,369,700.

135. *Maintenance.*—The cost of maintaining this route would be comparatively light. Due to the low elevation and natural drainage, it would not be necessary to empty the lock into the canal; hence there would be no shoaling from the river sediment. With both banks protected by levees and jetties as far out as the former Bird Islands, shoaling would result only from sloughing of the sides of the cut, and this would be minimized by using a flat slope, 3 on 1. Maintenance of the jetties in this section would consist of repair of occasional storm damage and building up at long-time intervals to offset subsidence. From Bird Islands to the angle in the route, little redredging would be required, but the jetties would suffer frequent damage from wave action. By using an easy curve instead of an angle, it might be found economical to shorten the jetties about one-half mile in the deep water and depend on frequent dredging to maintain the channel in the first mile outside of the jetties. The 10.7 miles of approach channel, lying fair with the tidal currents, would require very little redredging. Without attempting actual estimates, it is believed that maintenance and operation of the two locks on this route would cost about $500,000 per year.

136. *Permanence.*—The river bank in this locality has changed very little in the last hundred years, hence there would be no danger of the lock being undermined. When this route was considered in 1872, the east bank of the river was narrow all the way from abreast of Breton Island Pass down to Pass a l'Outre. The Bird Islands were a chain of sand reefs extending 9.7 miles along the west side of the natural channel below Breton Island Pass. Since then, the Baptiste Collette delta has filled up Bird Island Sound, and Cubits Gap delta has built out to a distance of 10 miles from the river, with mud flats extending out another mile. The Baptiste Collette land is still building outward slowly. This would not interfere with the proposed route, but, on the other hand, it would give added protection on the exposed side. The Cubits Gap land has built outward at an average rate of 900 feet per year, but, due to the choking of other outlets in this delta, the mouth of Main Pass is now advancing at the rate of 0.2 mile (1050') per year, and it is only 1½ miles from the axis of the proposed route. Comparison with the Coast and Geodetic Survey chart of 1874 shows that the mouth of Main Pass, which has curved northward, is now one-fourth mile southwest of the thalweg line at that time. Between 1874 and 1917, the 18' depth contour at this locality has been moved 6 miles away from the river. This has caused a narrowing and a 15° orientation of the deep channel leading to Breton Island Pass, with practically no change in the maximum depths. The 18' depth contour on the opposite or northerly side of this channel has changed very little. At first glance, this appears to controvert the belief expressed in the report of the 1872 survey, that Breton Island and the shoals adjacent thereto would shift northeastward

118819—R. and H. Doc. 46, 71-2——3

as new land was formed near the river bank. It is probable, however, that such shifting will not become apparent until the cross-sectional area of the lower end of this channel becomes the same as that of Breton Island Pass. As these islands and shoals are of coast barrier formation, it is reasonable to assume that they will erode or shift position when the tidal currents become sufficiently strong. The disappearance of nearly all of the Bird Islands supports this theory. Because of the large size of Breton Sound, it is very likely that the ebb and flow through its southern outlet will maintain a permanent channel comparable in size to the present Breton Island Pass. This sound has not decreased in size since the earliest surveys were made. While true that the 11-mile spillway along the Mississippi River now discharges into the sound, the spillway flows only at bank-full stage, and most of the sediment is deposited on the existing land. It therefore appears that, although conditions are changing in the vicinity of this proposed navigation route, there will always be an easily maintained approach to it from the Gulf of Mexico.

### FORT JACKSON ROUTE

137. *Location.*—A definite location for a locked-canal route has never been selected or surveyed. At Triumph, 0.5 mile above the Reddick Light and 72 miles by river below New Orleans, the distance from river to shore of the Gulf of Mexico is shorter than at any other point. A canal on this route, except the approach to it in the open Gulf, would be excavated through marshland. A highway along the right bank of the river would require a bridge. The lock would be in the finest orange-producing section along the river, and the adjacent land is quite valuable. This land is protected by a local drainage system which extends one-half to three-quarters mile back from the river. The canal would cross Dry Cypress Bayou and would skirt the eastern side of Skipjack Bay. The waters in this vicinity are highly productive of fine oysters, and other sea foods are also abundant. The land is owned by various parties in small parcels. The first mile from the Gulf coast is in land which had been reserved "for military purposes" by the United States, but it is believed that this land was either released or sold some 2 or 3 years ago. (See Coast and Geodetic Survey charts Nos. 196 and 1272.)

138. *Locks.*—The same dimensions of locks and canal as for the Fort St. Philip route are herein considered. The locks should have a lift of 8 feet for maximum river floods, but less protection from storm tides would be needed. Twin locks at this site estimated to cost $10,382,000. As the site now considered is 3 miles upstream from the forts, it is believed that the conditions affecting foundation for a lock would be found similar to and as satisfactory as those of the Fort St. Philip route.

139. *Canal and approach.*—From river to seashore the canal would be 8 miles long. After the first half-mile from the river the route would be through typical sea marsh, which is about 1½ feet above mean low tide. The existence of a large lagoon near the river in this vicinity in which there were many old cypress stumps of large size indicates the possibility of encountering an old cypress forest on the route. As Dry Cypress Bayou was formerly an outlet of the river, higher and firmer ground and possibilities of old stumps may be

expected in the half-mile adjacent to the crossing of this bayou. Extensive deposits of oyster and clam shell are common along the seashore in this vicinity. Since 1845 there has been almost no change in the location of the seashore on this proposed route. Seaward from the shore line, the distance to the 30-foot depth is about 6 miles, and to the 35-foot depth is 7.3 miles. The surface material of the Gulf bottom is fine, easily shifting sand for about 2½ miles off shore, then changing to fine sand and blue mud and finally to soft mud at the 35-foot depth. The estimated cost of this route, including 6 miles of jetties extending to the 30-foot contour, is $40,912,300.

140. *Maintenance and permanence.*—At this locality it would not be difficult to avoid emptying the lock into the canal, hence there would be no silting to require redredging. The inshore portion of the route would be permanent, but the approach in the Gulf presents a large problem. The above estimates include $23,670,500 as the cost of constructing jetties out to the 30-foot depth. The cost of jetties extending only to the 18-foot contour would be $4,803,200, and it is probable that economy might be effected by the shorter length of jetties. For purpose of estimate both lengths of jetties are herein considered. Jetties for the Fort Jackson route would be very much exposed and should be substantially built. The annual cost of lock operation, maintenance by dredging, and upkeep of jetties is roughly estimated as $600,000. Maintenance of the approach channel in the Gulf without jetties would, if practicable at all, probably require constant dredging. Should it be found possible to maintain the approach channel by dredging alone, the estimated expenditure for constructing jetties might not be justified.

141. *Optional routes in vicinity.*—If this canal route were located anywhere within the next 2½ miles west, or upstream, from the route just considered, practically the same conditions would be encountered except that nearly half the length of the canal would lie in the inland bays which are about 4 feet deep. This would result in smaller construction cost. There would be no difference in the approach channel. If located in the next 4½ miles upstream, which is above Buras, the conditions would be the same, but the canal would be about one-half mile longer, and bridges would be required for a railroad as well as a highway. As shown on Coast and Geodetic Survey chart No. 196, there is another near-by route which is worthy of consideration. Grand Bayou, a large tidal stream, parallels the river from opposite Pointe a la Hache down to Home Place, then flows south to the Gulf at the western side of Bastian Bay. Home Place is 57 miles by river from New Orleans and is above the bend around Sixty Mile Point. The route now suggested would lock from the river at Home Place, run 1¾ miles southwest to Grand Bayou, and follow Grand Bayou 11 miles to its mouth. This bayou is fairly straight, and its average width is believed to be about 350 feet. It is understood that depths of 20 to 30 feet may be found in the upper reaches, but the mouth is badly obstructed by a large shell reef, and depths as low as 1½ feet are found in the lower 2 miles. Deep water in the Gulf is nearer to the mouth of Grand Bayou than to the shore line on the Fort Jackson route, being 4.6 miles and 6.4 miles, respectively, from the 30 and 35 foot depths to the mouth of Grand Bayou. While this route appears to compare favorably with the Fort Jackson route, its feasibility

should be investigated further before attempting an estimate of the cost of its improvement.

### BARATARIA BAY ROUTE

142. *Location.*—This route contemplates a lock at Myrtle Grove, 29 miles by river from New Orleans, thence nearly due south through Marsh and Barataria Bay to the Gulf of Mexico at Fort Livingston. The upper 15 miles of the route would follow the existing Wilkinson (private) canal, which has dimensions about 5 by 40 feet. The next 12½ miles would be in Barataria Bay, where the average depth is 5 feet. Then 1½ miles through Barataria (or Grand) Pass, where the channel depth is more than 35 feet. From the shore line it is 1.9 miles to a 6½-foot depth on the crest of the bar, then 1.9 miles to the 30-foot depth and then 0.8 mile to the 35-foot depth. Jetties built out from the shore would be in water not over 12 feet deep for 2.5 miles, then 12 to 30 feet deep in the next 1.4 miles. (See Coast and Geodetic Survey charts 196 and 1271.)

143. *Locks.*—The locks would require a lift of 13½ feet for the highest river stage. It would be near the Myrtle Grove sugar refinery, and provision would have to be made for a highway and a railroad crossing. The cultivated land extends back about one-half mile. No great difficulty of lock foundation is anticipated, and the estimated cost of two locks is $9,930,000. The total estimated cost of this route, including about 12 miles of bulkheads through Barataria Bay and jetties to the 30-foot contour, is $29,944,300.

144. *Maintenance and permanence.*—Disposal of lockage water without discharging it into the canal is of doubtful feasibility, hence occasional removal of silt from the canal would be expected. The estimate includes an item for construction of a bulkhead along the east side of the 12 miles of channel through Barataria Bay, to protect it from shoaling by wave wash, and the cost of this bulkhead is estimated at $500,000. Omission of this bulkhead would add probably $50,000 for dredging to the annual maintenance. Conditions outside of Barataria Pass are favorable to the construction of jetties. The pass is about 1,800 feet wide. Convergent jetties could be built for a distance of 1.9 miles from shore and continued parallel for a further distance of 0.5 mile, without being in a depth greater than 8 feet. The remaining 1.5 miles to the 30-foot depth present no great difficulty to jetty construction. The ebb and flow to the large expanse of Barataria Bay and adjacent waters would maintain a jettied channel with a minimum amount of dredging. It is therefore believed that the annual cost of maintaining and operating the Barataria Bay route would be about $375,000 if the interior bulkhead is constructed, or $425,000 without this bulkhead.

145. *Optional routes in vicinity.*—Deflection of the channel so as to skirt around the western side of the open water of Barataria Bay would add a little more than 1 mile to the length of the route, but the increased cost of excavation would be a little less than the cost of the bulkhead which would be dispensed with. This route around the bay would change direction and run straight to Barataria Pass. If it were continued straight, it would reach the Gulf shore at Caminada Pass, and the canal would be 3½ miles longer. From Caminada Pass the distance to the 30 and 35 foot depth is 1½ miles less than from

Barataria Pass, but this advantage would be offset by the greater depth of water in which the jetties would have to be built. The scouring effect of the tidal flow would also be very much less at Caminada than at Barataria Pass. The length of the Barataria Bay route, as considered, would be, from river to coast, 27 miles, and from Myrtle Grove to Harvey the airline distance is another 20 miles. From Harvey to Barataria Pass the distance is 45 miles by airline, or 60 miles by the present navigation route. A ship canal route from Harvey to Barataria Pass would, therefore, be 47 to 60 miles in length, and some excavation could be saved by following the existing waterways. The upper 15 miles could be made to coincide with the Intracoastal Waterway route, the additional width of channel required being cared for by the appropriations for the Intracoastal route. The proposed Intracoastal Lock at Harvey will cost $1,400,000, and $9,930,000 is the estimated cost of a double lock for 35-foot draft at Myrtle Grove. The combined cost of these two locks would be $11,330,000, while the cost of one double lock for 35-foot draft at Harvey is estimated at $10,338,000. This saving of $992,000 would go far toward constructing the additional 20 to 33 miles of canal. This route would connect with the river at New Orleans, dispensing with the 29 miles of distance by river to Myrtle Grove. The principal disadvantage of the route would be the congestion of both land and water traffic at the Harvey Lock.

### CHANDELEUR ROUTE

146. *Location.*—This route, as considered in Colonel Townsend's report, would lie on a straight line nearly east from the Industrial Canal, New Orleans, to deep water north of Chandeleur Islands. The 67 miles of the length of this route would be classed as follows:

Ten miles in swamp and marsh, Industrial Canal to Lake Borgne.
Twenty miles in Lake Borgne in depth of 6 to 10 feet.
Twenty-two miles in broken marsh, about half lagoons.
Fifteen miles in exposed Chandeleur Sound, 0 to 35 feet deep.

This route is shown on Coast and Geodetic Survey charts Nos. 1267, 1268, and map of Bayou Bienvenue.

147. *Locks.*—The existing industrial canal lock, however, could not be used and a new lock with 36 feet over the miter sill would be necessary. A pair of locks at the Lake Borgne Canal, considered in connection with an optional route, has been estimated to cost $10,338,000.

148. *Canal and approaches.*—The westerly 10 miles of the route would be on the general line of Bayou Bienvenue. This bayou is tortuous, having a length of 15 miles, and is used as the outfall of the New Orleans drainage system. Along its upper half the bayou is bordered with timbered swamps, while the lower half is in open sea marsh. There are no bridges at present, but a State highway to cross the bayou about at right angles is now being surveyed. The lower 3½ miles of the bayou has a depth of 20 feet and a width of more than 300 feet. The next 20 miles, in Lake Borgne, would be in water with an average depth of 7 feet with soft, sticky mud bottom. The next 22 miles would be in marsh 1½ feet high and bays 3 feet deep, to the shore line at Door Point. In Chandeleur Sound, the depth is 4 to 12 feet for a distance of 9 miles, then increases evenly

to 35 feet. The bottom of the sound is soft and sticky. The estimated cost of jetties extending to the 30-foot contour in Chandeleur Sound is about $32,000,000, making their use prohibitive. The estimated cost of this route without jetties but including bulkheads through Lake Borgne is $40,070,700.

149. *Maintenance and practicability.*—Maintenance of the inland sections of this route would not be difficult or expensive. Upkeep of the jetties, 14.4 miles long, would probably cost $500,000 per year, and $400,000 would be required for redredging the route. Maintenance by dredging without jetties has been estimated at $975,000 per year, so the cost of the jetties is not justified. The section in Lake Borgne would be a difficult problem, and maintenance of it without bulkheads to protect the channel would involve such extensive and continuous redredging as to make the cost prohibitive and the route undesirable. In the maximum depth in the lake, the cross-section area to be excavated for a 500-foot channel, 35 feet deep and with 5:1 side slopes, would be 15,940 square feet. If half of this material were deposited on each side of the channel, the quantity of excavated material would be equivalent to an embankment with a 5:1 side slope and a crown 500 feet wide and 4.5 feet above the water surface. This would amount to a substantial double dam entirely across the lake. The material, being soft, would naturally spread and shoal a considerable area in the lake. In Sabine Lake, Galveston Bay, and other localities where conditions are similar to those in Lake Borgne, it has been found impracticable to maintain a deep channel in a large expanse of open water. The direct Chandeleur route, as considered above, is therefore believed to be not feasible.

### CHANDELEUR OPTIONAL ROUTE.

150. This route as considered would leave the river 10 miles below New Orleans at Violet, La., and extend almost due east across the narrow portion of Lake Borgne, Bay Boudreau, and Chandeleur Sound to the 35-foot contour in the Gulf south of Ship Island. This is the shortest and most direct route to deep water in the Gulf of all the routes leaving the river near New Orleans. The length of the lake crossing would be 7 miles as against 20 miles for the Chandeleur route. The same objection exists to the excavation of the channel through Lake Borgne as explained for the Chandeleur route, although the crossing length is reduced by 13 miles. For reasons explained under the Lake Pontchartrain route and others, jetties and bulkheads were considered for this route, but are not included in the estimate. The maintenance cost of this route is high but the route is feasible since there are no unreasonable difficulties in its construction. The estimated cost of this route is $34,251,300.

### LAKE BORGNE ROUTE

151. Consideration has been given to a route connecting with the industrial canal at New Orleans, thence extending due east through the marsh to Lake Borgne and along the north shore of this lake to deep water in the Gulf via Grand Pass and the Cat Island Channel. There is the same objection to the excavation of this channel through Lake Borgne as explained for the Chandeleur route and it is also ex-

posed to the movement of littoral sand in Mississippi and Chandeleur Sounds. There is, however, a tidal action between the Gulf and Lake Pontchartrain which could be utilized along this route to materially reduce the cost of maintenance. Interest on the cost of bulkheads along the lake channel and jetties along the Grand Pass Cat Island Channel so far as exceeds the estimated yearly cost of maintenance by dredging that these two items were not included in the estimated cost for this route as shown on the tabulated comparison of canal routes. The estimated cost of this route is $31,911,700.

### LAKE BORGNE SOUTH SHORE ROUTE

152. Further deflection so as to skirt the southwestern shore of Lake Borgne would avoid the open-water section in the lake, but the length of the route would be increased 3 miles. As shown on Coast and Geodetic Survey chart No. 1271, it would then be preferable to connect the route with the river at the Lake Borgne Canal (Violet, La.). There would be a highway and a railroad crossing near the river, but there are no unsurmountable obstacles in this route, and its length would be 61 miles. The cost of this route is estimated at $35,673,200. In the tabulated comparison of canal routes the cost of jetties has been omitted since the interest charge on the investment exceeds the cost of maintenance by dredging. From Violet, La., to the 35-foot depth in the Gulf, the distance is the same, 61 miles, by the Lake Borgne south shore route just considered and by another route which would run southeast near the mouth of Bayou Terre aux Boeufs and through Breton Island Pass. This is shown by Coast and Geodetic Survey charts Nos. 1271 and 1272. The outer 10.7 miles of the latter route would be identical with the approach to the Fort St. Philip route, which it is believed could be maintained without jetties. Twenty-two miles of channel across Breton Sound would require bulkheading, this being analogous to the Chandeleur route crossing of Lake Borgne. The shorter length, the favorable direction for navigation, and the large saving in the cost of jetties combine to make this Lake Borgne Canal-Breton Island Pass route much preferable to the Chandeleur route. On the other hand, this southeastern route is nearly parallel with the Mississippi River to the Fort St. Philip route, and the large expenditure for its construction would be wholly unjustified.

### LAKE PONTCHARTRAIN ROUTE

153. This route begins at the Lake Pontchartrain end of the industrial canal and follows the south shore of Lake Pontchartrain to the south draw of the New Orleans & Northeastern Railroad trestle. From this draw span the route crosses the shoal or middle grounds to the westerly end of the Rigolets, and then follows the Rigolets. From the easterly end of the Rigolets the route passes through Grand Island Pass and Cat Island Pass to the 35-foot contour in the Gulf of Mexico south of Ship Island. The total distance is about 75 miles.

154. United States Coast and Geodetic Survey charts Nos. 190 and 191 show the depths which will be encountered along this route, and an examination indicates that along the south shore of Lake Pontchartrain the bottom is covered with a layer of fine compact

sand. Between the south draw span of the New Orleans & Northeastern Railroad trestle and the Rigolets the bottom is alternately soft sand, stiff clay, shell, and sand. Through the Rigolets a natural depth of over 35 feet exists. From the easterly end of the Rigolets to deep water in the Gulf the bottom is generally soft, and in several sections sand and shell reefs abound. The conditions of the lake bed appear to be no more favorable for the maintenance of a channel than that found either at Mobile, Gulfport, or in the Houston Channel across Galveston Bay, and it is believed that the cost of maintenance dredging would be very heavy. Aside from the great cost of the route, one of the most objectionable features is that it is crossed by a total of eight bridges, four of which would offer considerable hazard to navigation because of wave action and tidal currents. Interest on the cost of bulkheads for the lake section of the canal and jetties from the east end of the Rigolets to the 35-foot contour in the Gulf so far exceeds the estimated cost of maintenance by dredging that these items were omitted from the tabulated comparison of canal routes. The cost of this route is $31,966,800.

### LAKE BORGNE NORTH SHORE ROUTE

155. This route traverses the marshes south of the Louisville & Nashville Railroad. As laid out, its length is about 27 miles from the industrial canal to the Rigolets, and the distance from the railroad track is about 1 mile. This route is identical with the Lake Pontchartrain route from the Rigolets to deep water in the Gulf of Mexico. It involves the removal of a greater yardage than either the Lake Borgne or Lake Pontchartrain routes, but the cost of maintenance would be less than in the open waters of either lake. There is also more uncertainty as to the character of the material which would be dredged along this route. In excavating the industrial canal, layers of cypress stumps were found to depths of 15 feet below gulf level and greatly increased the cost of dredging, and there is a possibility that material of a similar character may be found for several miles along this route. This route would have five bridges less than the Pontchartrain route, and navigation through the three bridges on this route would not be made difficult by wave action or adverse currents. The estimated cost of this route is $33,392,400, most of which would be for dredging. As in the case of the Lake Pontchartrain route, the construction of jetties is not contemplated.

156. The table below gives the records of average maintenance per mile for the past five years for Mobile, Gulfport, and Houston Ship Channel. It is believed that the conditions at Mobile more nearly approach those to be found in Lake Pontchartrain, Lake Borgne, and Barataria Bay.

| Channel | Annual maintenance, cubic yards per mile | Channel dimensions |
|---|---|---|
| Mobile Channel | 196,000 | 300 by 30 feet. |
| Gulfport Channel | 472,000 | 300 by 19 feet. |
| Houston Ship Channel | 93,000 | 250 by 30 feet. |

A study of the above table shows that in maintenance there could be expected an annual removal of about 200,000 cubic yards per mile for a channel 300 by 30 feet and possibly 350,000 cubic yards per mile for a channel 500 by 35 feet.

### COMPARISON OF CANAL ROUTES

157. (a) All canal routes are considered practicable from a construction standpoint although there is some question as to the permanence of Breton Island Pass, a part of the Fort St. Philip route. It is believed that the excessive cost of maintenance makes the routes traversing Lake Pontchartrain and Lake Borgne impracticable.

(b) Records show that 70 per cent of the traffic to and from New Orleans uses South Pass, indicating that at least this percentage of traffic is bound for ports located in an easterly direction.

*Table of distances*

| | New Orleans, La., to— | | |
|---|---|---|---|
| | Key West, Fla. | Colon, Panama | Galveston, Tex. |
| Southwest Pass | 673 | 1,624 | 451 |
| South Pass | 658 | 1,616 | 453 |
| Barataria | 665 | 1,605 | 428 |
| Fort Jackson | 670 | 1,615 | 442 |
| Fort St. Philip | 661 | 1,632 | 437 |
| Chandeleur | 658 | 1,648 | 514 |
| Chandeleur (optional) | 662 | 1,649 | 515 |
| Lake Borgne | 669 | 1,659 | 525 |
| Lake Borgne (South Shore route) | 663 | 1,651 | 517 |
| Lake Borgne (North Shore route) | 659 | 1,657 | 521 |
| Lake Pontchartrain | 672 | 1,662 | 523 |

Distances are approximate and are measured in statute miles from Canal Street, New Orleans, La.

A perusal of the above table shows that the existing route through South Pass provides as short a route for eastbound traffic as any canal route considered, while the Barataria route alone offers any advantage for traffic bound for Panama. The Barataria and Fort Jackson routes offer some advantage for westbound traffic, but all routes utilizing the Ship Island Channel are very disadvantageous for this class of traffic. Of the practicable canal routes the Barataria route seems to offer the most advantages in sailing distance.

(c) *General.*—The preceding table gives the estimated costs of the various routes. The routes using the industrial canal Pontchartrain, Lake Borgne-North Shore, Lake Borgne, and Chandeleur, are dropped from further comparison due to their unfavorable direction for westbound traffic, great length, excessive cost for construction and maintenance, and traffic interference and congestion, which would result from shipping using the industrial canal. The latter canal is now crossed by 4 drawbridges, 3 for railroad crossings, and 1 for pedestrian, vehicular, and street-car traffic. Should New Orleans continue to grow as a world port, which is a reasonable assumption, traffic both through and over the industrial canal would increase correspondingly and result in greater congestion and delays to the several lines of traffic as the years pass. Also shipping waiting at the