UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

CIVIL ACTION
NUMBER:  05-4182 "K"(2)
JUDGE DUVAL
MAG. WILKINSON

PERTAINS TO:  *Robinson*
(No. 06-2268)

**JOINT SUPPLEMENTAL BRIEFING CONCERNING THE NATIONAL
ENVIRONMENTAL POLICY ACT SUBMITTED BY PLAINTIFFS AND AMICI THE
STATE OF LOUISIANA, ST. BERNARD PARISH GOVERNMENT, ENTERGY
CORPORATION, ENTERGY NEW ORLEANS, INC., ENTERGY LOUISIANA, L.L.C.,
AND HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY**

As the record establishes, the Corps committed multiple NEPA violations that are directly linked to Plaintiffs' losses.

I.      **NEPA'S STATUTORY FRAMEWORK**

      A.   <u>**Environmental Impact Statements**</u>

As outlined in the underlying briefs of both Plaintiff and their Amici, The Natural Environmental Policy Act (NEPA) requires the preparation of Environmental Impact Statement (EIS) to allow decision makers to give serious weight to environmental factors in making decisions about governmental actions. *State of Louisiana v. Lee*, 758 F.2d 1081, 1084 (5th Cir 1985) *citing Sierra Club v. Morton,* 510 F.2d 813, 819 (5th Cir.1975); *see Sierra Club v. Sigler,* 695 F.2d 957, 964-65 (5th Cir.1983).

      B.   <u>**The CEQ Process**</u>

NEPA mandates that agencies prepare an EIS for "proposals for *legislation* and other major Federal actions significantly affecting the quality of the human environment...."  42 USC § 4332 (C) (emphasis added) .The Council on Environmental Quality ("CEQ"),  regulations expressly provide that NEPA shall be applicable to actions begun *before* January 1, 1970.  40 CFR §1506.12(b).  The CEQ environmental process (except for Legislative EISs, discussed *infra*) requires that *first:* an agency conduct a less detailed study of the project in an Environmental Assessment (EA) and *then*, after analysis, either issue a Finding of No Significant Impact (FONSI) and discontinue the environmental analysis, or produce a detailed study in the form of an EIS.  40 CFR § 1508.9; *see* 40 CFR §§ 1501.3, 1501.4; *see* 42 USC § 4332(2)(E).

NEPA mandates that both the EA and the EIS examine agency action in terms of both its direct environmental effects (which are caused by the action and occur at the same time and

place) and indirect effects (which are reasonably foreseeable but occur later in time or further removed in distance).  42 USC §§ 4332 (C) and (E); 40 CFR §§ 1506.16, 1508.9, 1508.8.

In addition, NEPA requires that the Agency address the cumulative effects of incremental impacts added to other "past, present, and reasonably foreseeable future actions."  40 CFR § 1508.7.  "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  *Id.*

## II.   THE CORPS VIOLATED NEPA

### A.  Summary of Violations

The Corps violated its mandatory legal obligations under NEPA by failing to: (1) prepare mandatory detailed EISs within 30 days of authorizing legislation; (2) prepare detailed EISs for requests for appropriations; (3) fully examine the direct, indirect but foreseeable consequences of the storm hazards presented by the MR-GO; (4) prepare EIS to evaluate cumulative impacts of ongoing agency actions on the MR-GO's O&M; (5) prepare supplemental EISs when necessary.[1]

### B.  The Corps Did Not File Mandatory Legislative EISs Within 30 Days of the Authorizing Legislation

#### 1.  NEPA Requirements

For legislative acts, within 30 days of the legislative request for Congressional action, the agency *must* include the detailed EIS in its request and/or report to Congress.  40 CFR § 1506.8(a) A legislative EIS may not be replaced by an EA (which is not submitted to Congress):

> a) A legislative environmental impact statement is the detailed statement *required by law* to be included in a recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement *shall* be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later in order to allow time for completion of an accurate statement which can serve as the basis for public and

---

[1] Attached hereto as Appendix "D" is summary chart detailing NEPA's statutorily mandated conduct, the Corps' violation of that mandate, and the resulting consequence and causal connection to Plaintiffs' damages.

Congressional debate. The statement *must* be available in time for
Congressional hearings and deliberations.

40 CFR §§ 1506.8(a) (emphasis added).

On April 30, 1970, the CEQ promulgated interim guidelines which provided that "major Federal actions" included "[r]ecommendations or reports relating to legislation and appropriations."  Council on Environmental Quality, First Annual Report: Environmental Quality 288 (1970); 36 Fed. Reg. 7724 (1971); 38 Fed. Reg. 20551 (1973); *see also Envtl. Def. Fund v. TVA,* 468 F.2d 1164, 1181 (6th Cir. 1972); *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079, 1088 (D.C. Cir. 1973)."  In 1979, the Supreme Court confirmed that the CEQ NEPA Regulations, 40 CFR §§ 1500-1508, were mandatory and applicable to every federal agency.  *Andrus v. Sierra Club,* 442 U.S. 347, 357 (1979).

### 2.  NEPA Violations

The original MR-GO authorizing legislation—70 Stat. 65 (1956)—was amended on three occasions prior to de-authorization in 2007:  Public Law 94-587 (1976), "An Act Authorizing the construction, repair, and preservation of certain public works on rivers and harbors for navigation, flood control, and for other purposes"; Water Resources Development Act § 844 (1986), "Mississippi River - Gulf Outlet"; Water Resources Development Act § 326 (1996), "Mississippi River - Gulf Outlet, Louisiana."

During oral argument on January 8, 2009, in response to questioning about the Corps' compliance with the mandatory legislative EIS, the Government's counsel represented that it had complied with NEPA by preparing "EAs."  This is incorrect.  First, as noted *supra*, an EA is not the mandated "detailed" environmental report required under NEPA to accompany legislative requests.  The EA is an abbreviated environmental assessment and is *not* furnished to Congress.

Second, the Corps never prepared any EA or EIS responsive to these legislative acts.

3

Third, the Corps did not prepare a legislative EIS in response to the 1976 reauthorization. The FEIS submitted in 1976 was expressly characterized as a Composite FEIS for "Operation and Maintenance."  Nonetheless, even this FEIS failed to satisfy mandatory requirements of a detailed report addressing the indirect, foreseeable impact of bank erosion, channel widening, wetlands loss and the funnel effect on storm surge potential on the human environment.  As will also be discussed *infra*, the deficiencies in the 1976 EIS violated the mandates of NEPA.  Indeed, the Corps repeatedly justified its refusal to elaborate on these significant impacts by asserting that the 1976 document was limited in scope and thus a full analysis of environmental impacts was "inappropriate."  PUF 48, 67, 80.

Fourth, without furnishing a legislative EIS, the Corps in 1986 requested reauthorization for the MR-GO and to modify the language of the authorization to permit construction of the IHNC lock project.  In violation of the mandates of NEPA, the Corps filed no detailed environmental report outlining the direct, indirect and cumulative effects of the MR-GO on the human environment to accompany its request for reauthorization.  The 1986 legislation was the:

> first major "omnibus" projects authorization bill for the Corps of Engineers in 16 years. It contained a number of environmental provisions addressing modification of Corps projects to improve the environment.  The Act authorized over 270 Corps projects for study of construction, 33 generic studies, 72 project modifications, 72 miscellaneous projects, *de-authorized 290 projects* and authorized $500 million in fish and wildlife mitigation/enhancement features.[2]

A survey of the Corps' environmental documents for the MR-GO reveals that the only putative NEPA compliance documents contemporaneous with this legislation were two FONSIs that permitted action without Congressional review.

---

[2] Description of Act in the Report for the HR6 of the Water Resources Development Act of 1986 (emphasis added) available at www.fws.gov/habitatconservation/Omnibus/WRDA1986.pdf.

In 1985, the Corps prepared a FONSI for EA #47 which purportedly evaluated the impacts of testing a proposed method of bank erosion protection along a very small section of the MR-GO's Reach 2.  *See* Plaintiffs' Exh. 76.  Significantly, the O&M activities that necessitated the foreshore protection are nowhere discussed.  Inexplicably, the FONSI was issued even where the EA noted that: "Impacts resulting from maintenance activities [of the MR-GO] are not expected to be *as severe* as those from initial construction."  *Id.* at p. 3, ¶2.4 (emphasis added).

In 1986, a FONSI was also issued for EA 54 which addressed removal of 800,000 cubic yards of material from the MR-GO for use in the LPV.  *See* Plaintiffs' Exh. 127.  Despite noting that the removal of this material would impact 55 acres of wetlands marsh and 31 acres of scrub/shrub upland habitat (*id*.), the Corps inexplicably issued a FONSI and offered no additional analysis of the impacts.  *See* Plaintiffs' Exh. 64 at p. 3.  The Corps' EA also omitted references to the direct impact of the dredging activities on the widening of the channel and on the indirect and foreseeable harm created by the removal of material from the already fragile marsh system.  Plaintiffs' Exh. 127.  These were significant omissions which violated not only NEPA but also Executive Order 11990.[3]  In light of these conclusions, the FONSI was an arbitrary and capricious finding that permitted action without Congressional review.

Regardless, neither of these EAs address or comply with the requirement that within 30 days of requesting Legislative reauthorization, the Corps furnish a detailed EIS regarding the direct, indirect, foreseeable and cumulative impacts on the human environment created by the MR-GO project.  *See* 40 CFR §1506.8(a).

---

[3] EO 11990 mandated that after 1977, in furtherance of NEPA, agencies were not permitted to initiate actions in the wetlands and that any agency that initiated dredging in the wetlands had to assure that there was no alternative and that all mitigative measures be undertaken.  PUF 138-41.  EA 54 is wholly violative of NEPA and EO 11990.

Finally, the 1996 reauthorization was not accompanied with a detailed legislative EIS of the impacts of the MR-GO project on the human environment.  It cannot be emphasized enough that EAs are not submitted to Congress and are not a "detailed" analysis of the project as a whole.  Rather than the required legislative EIS, the only supposed environmental compliance documents prepared in 1996 were FONSIs relating to marsh protection and reconstruction efforts (EA #244) and 1.1 mile of Bank Stabilization (EA #247).  As discussed *infra*, the Corps, by 1996, had engaged in an extensive Bank Erosion Study of the problems created by the O&M of the MR-GO.  PUF 101-10.  In internal meetings held after the 1988 Bank Erosion Study, and before the date of this legislation, the Corps concluded that any bank stabilization and protection measures would require a full EIS.[4]  Rather than complete the EIS that the Corps itself concluded was necessary, only EAs were prepared, paradoxically repeating the "significant" impacts of the MR-GO O&M from the Bank Erosion Study (which in 1993 led to the conclusion that an EIS was mandatory) but now, by contrast, finding no significant impact to prompt Congressional scrutiny.  This is a plain violation of NEPA mandates.

### C.  Requests for Appropriations From 1970 Through 1979 Required Legislative EISs

In the years between NEPA's effective date (1970) and the year during which detailed legislative EISs ceased to be required for appropriations (1979), the Corps obtained over $50 million appropriated funds for maintenance dredging and new construction in the channel.  PUF 112.  During these years,[5] the Corps used these appropriated funds to undertake 27 new dredging projects, leading to the excavation of over 115 million cubic yards of material.  *See* Plaintiffs'

---

[4] *See* Oct. 6, 1993 memoranda regarding Foreshore Protection Measures.  PUF 103, 104, 110.

[5] The 1976 EIS also violated NEPA and was not responsive to the legislative actions.  In this year, there were an additional three dredging projects excavating 14,034,249 cubic yards of material from the MR-GO.  *See* Plaintiffs' Exh. 85 at p. 13.

Exh. 85 at pp. 12-13.  In violation of NEPA's mandates, the Corps did not accompany these

requests for maintenance and construction appropriations of the MR-GO with a detailed EIS.[6]

### D.  The Corps Violated Executive Order 11990 Relative to NEPA

Executive Order No. 11990 -- *Protection of Wetlands* -- provides that in furtherance of

NEPA and in order to avoid adverse impacts and new construction in the wetlands, agencies are

ordered through the CEQ to modify their procedures to:

> avoid undertaking or providing assistance for *new construction* located in
> wetlands unless the head of the agency finds (1) that there is no
> practicable alternative to such construction, and (2) that the proposed
> action includes all practicable measures to minimize harm to wetlands
> which may result from such use….

42 Fed. Reg. 29691 §2 (1977) (emphasis added).

In furtherance of this policy, Section 3 provides that:

> Any requests for new authorizations or appropriations transmitted to the
> Office of Management and Budget shall indicate, if an action to be
> proposed will be located in wetlands, whether the proposed action is in
> accord with this Order.

Section 5 identifies factors relevant to a proposal's effect on the survival and

quality of the wetland as:

> (a) public health, safety, and welfare, including water supply, quality,
> recharge and discharge; pollution; *flood and storm hazards*; and sediment
> and *erosion*;  (emphasis added)

Section 7(b) defines "new construction" as including dredging and related activities

and any structures or facilities begun or authorized after October 1977.

From October 1977 though Katrina, the Corps obtained appropriations for 18 new

maintenance dredging contracts that took place directly within the inland wetlands area and

excavated almost 49 million cubic yards of sediment.  *See* Plaintiffs' Exh. 85 at pp. 13-15.  The

---

[6] Despite the Government's representation at oral argument, *not a single EA was prepared*
during the years 1970 though 1979.

Corps prepared no NEPA related documentation for Congress assuring that no practicable

alternative existed to the dredging and that all practicable measures to minimize harm to the

wetlands would be utilized.  Nor did the Corps submit to Congress or the Office of Management

and Budget any NEPA related document to comply with the mandates of EO 11990.  The record

is devoid of any evidence that the Corps at any time complied with this critical aspect of NEPA.

### E.  The Corps' 1976 EIS Failed to Comply With NEPA

The 1976 FEIS failed to satisfy the mandatory obligation to analyze the direct, indirect

but foreseeable and cumulative "environmental impacts significantly affecting the human

environment".  42 USC § 4332 (C); 40 CFR §§ 1502.10, 1502.16, 1508.8, and 1508.9(b)  In

violation of NEPA and its implementing regulations, the 1976 FEIS also failed to address the

significant and foreseeable impact of the MR-GO on hurricane-caused storm surges.  As

illustrated by the Corps' own report on "Storm Surge Effects of the Mississippi River Gulf

Outlet" (1966), this significant impact was both known at the time of construction and was

foreseeable.  PUF 43-44.  The Corps' knowledge of these impacts is further evidenced by their

initial inclusion in the 1972 Draft Environmental Impact Statement.  PUF 56.  Sections relating

to storm surge and wetlands loss were removed from the subsequent finalized documentation in

the 1976 FEIS.  PUF 56-58.

The 1976 FEIS also omitted the MR-GO's known significant impact on marshes adjacent

to the channel and the role that vessel traffic and maintenance dredging as well as dredge

material disposal played in the channel widening, bank erosion and resulting loss of wetlands.

PUF 48, 65-80.  The Corps also failed to address these pertinent issues when raised through the

inter-agency comments received during the EIS review process.  *Id*.

The Environmental Protection Agency ("EPA") objected to the existing adverse long-

term and future impacts of increased *water salinity* in the vicinity caused by the MR-GO dredging action and recommended the Corps' consideration of mitigation measures for the operation and maintenance of the MR-GO project.  PUF 59-66.  The Corps did not address salinity impacts and responded that:  "*Consideration* of these measures in this assessment of the impacts of the project operation and maintenance *is not appropriate*."  PUF 48, 67 (emphasis added).

The Ninth Circuit has held that similarly dismissive responses by the Corps to comments by the EPA regarding inappropriate consideration of "synergistic impacts" are, as a matter of law, inadequate to satisfy the Corps' mandatory obligation under NEPA.  *See, Oregon Natural Resources Council v. Marsh,* 52 F. 3d 1485, 1489 (9th Cir. 1995); *see also, Oregon Natural Resources Council v. Marsh*, 832 F.2d 1489, 1497-98 (9th Cir. 1987).

The Department of the Interior ("DOI") sharply disputed the Corps' conclusion in the 1976 EIS that spoil disposal would "constrain erosion of the channel bank," something the Corps acknowledged was contributing to the widening of the surface of the MR-GO.  PUF 48, 70.  In violation of NEPA, the Corps merely rejected the DOI's comment.  PUF 71.

The Louisiana Wildlife and Fisheries Commission ("LWFC") objected to the Corps' failure to analyze the MR-GO's "significant" contribution to ecological changes of "considerable magnitude" caused by saltwater intrusion into the marshlands and estuaries of South Louisiana. The LWFC also objected to the proposed O&M dredging because it would "enhance the adverse effects of this channel and result in further deterioration of high quality marsh."  PUF 48, 78, 79. Although the Corps acknowledged the MR-GO's responsibility for the environmental impacts of wetlands loss and saltwater intrusion, it responded to the LWFC that it was "inappropriate" for the Corps to assess these impacts in their O&M EIS:

> This EIS recognizes the continual changes resulting from previous actions. We know of no definitive evidence which indicates that discontinuation of dredging operations would restore the salinity levels to pre-1960 conditions. Salinity control measures would require new construction features necessitating environmental and socio-economic investigation and impact analysis. *Consideration of these measures in this assessment of the impact of project operations and maintenance is not appropriate.*

PUF 80 (emphasis added).

The Fifth Circuit has expressly rejected this approach to NEPA compliance when evaluating the continuation of ongoing damage initially caused before the enactment of NEPA.

In *State of Louisiana v. Lee*, the Court noted that it is not acceptable:

> to continue a course of environmental disruption begun years ago. The fact that much damage to the benthic life occurred years ago does not automatically render the effect of the continued dredging *insignificant*. Such a conclusion would ignore the realities that even a badly damaged body of water may restore itself to ecological health if a disruptive activity is halted and that continued dredging may expand the areas of damage.

*State of Louisiana v. Lee*, 758 F.2d 1081, 1086 (5th Cir. 1985) (emphasis added).

These interagency comments directly addressed the impacts that Plaintiffs claim are causally related to the harm inflicted by Katrina. In violation of NEPA's mandates, the Corps intentionally and knowingly refused to analyze -- and present for Congress' consideration -- these direct, indirect and foreseeable impacts of the MR-GO in its 1976 EIS.

### F.   The Corps Failed to Supplement its EIS When Necessary

The Corps is required to "prepare supplements" to its EIS where there were "substantial changes in the proposed action that are relevant to environmental concerns" (§ 1502.9(c)(i)) or where there are "significant new circumstances or information" relevant to environmental concerns and bearing on the proposed action or its impact. § 1502.9(c)(ii); *Sabine River Authority v. U.S. Dept. of Interior*, 951 F.2d 669, 676 (5th Cir. 1992). NEPA mandates that:

"Agencies have continuing obligations to reassess ongoing projects to avoid or minimize adverse environmental effects."  40 CFR §1500.13; *see also O'Reilly*, 477 F.3.d at 238.

As per Design Memorandum #1-A, dated July 1957, and subsequent design memoranda, the MR-GO channel design criteria authorized, or proposed for approval, a bottom width of 500 feet and channel side slopes of 1 on 2, resulting in an authorized top width of 650 feet.  *See* Defendant's Exh. 25 at pp. 3-4; *see also* Exh. 26 at p. 2, ¶7; Exh. 27 at p. 15, ¶5.  As noted, the O&M regime of the MR-GO resulted in a significant change in the geometry of the channel such that the top width had eroded to in excess of 1500-3000 feet in some locations.  PUF 84. Maintenance dredging operations of the MR-GO included approximately 147 dredging events along the channel.  PUF 100, 111, 118.  Dredging is a "significant circumstances" that requires the Corps to take a "hard look" at its impacts to supplement its EIS.  *See Lee*, 758 F.2d at 1081. Nonetheless, as noted, the Corps did not prepare a Supplemental EIS for its elaborate prolonged dredging regime.  PUF 119.

In the 1988 Bank Erosion Reconnaissance Report, the Corps acknowledged severe bank erosion on the MR-GO navigation channel; that approximately 41 miles of the 66 mile long channel consisted of land "cut through unstable marsh and shallow water areas and that the top width of the channel had increased from 650 feet to an average of 1,500 feet in 1987.  *See* Plaintiffs' Exh. 83 at "Syllabus."  The report also noted that approximately 4,200 acres of "highly productive marsh" had been lost and that the loss of buffering marsh will significantly increase dredging frequency.  *Id*.

The 1988 Bank Erosion Reconnaissance Report documented that Hurricane Juan in 1985 "broke records along the MR-GO" (*id.* at 7) and that "no erosion protection measures exist along the MR-GO north bank" where the erosion "is significant."  *Id.* at 24.  The loss of buffering

11

marsh along the unprotected north bank "will allow the open waters of areas of Lake Borgne and

Breton Sound and the MR-GO to merge" and that "the majority of the marsh on the north bank

of the MR-GO" would convert "to open water… during the 1990 to 2040 period." *Id.*

Although the Corps internally rejected closure of the MR-GO as a means of mitigating

the bank erosion problem (without presenting the option to Congress), the Corps acknowledged

that:

> In addition to solving the aforementioned problems, [closure] will also *reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up the waterway*.

PUF 35, 99, 102 (emphasis added).

The Corps violated NEPA by not preparing a supplement after having determined that an

EIS would be necessary.  In an internal memorandum, dated October 6, 1993, the Corps

observed that any necessary shore protection remedial activity would require alerting Congress

to the environmental concerns inherent in the MR-GO via a full EIS.  PUF 103.  The Corps,

however, also noted that a full EIS would necessitate public comment that would both challenge

any limited scale protection proposal and would prompt Congressional consideration of the

channel's closure.  PUF 104, 110.

> The locals don't want a small scale bank protection project—they want something more than a few miles that are being considered critical reaches.  When environmental organizations (LPBF) see how much this project is gong to cost, they will probably ask why we didn't evaluate the closure of the MR-GO.

PUF 103.

Between the Bank Erosion Reconnaissance Report (1988) and Katrina, the Corps entered

into 76 dredge contracts and removed over 182 million cubic yards of material from the channel

*without ever presenting any required NEPA environmental documentation to Congress*

*regarding these effects.*[7]  As noted *supra*, the Corps in 1996 ultimately proposed the limited bank

protection measures addressed previously for 1.1miles of Reach 2 (EA#247) despite its initial

conclusion that an EIS was mandatory, the Corps arbitrarily issued a FONSI for the action and

did not invite the public and Congressional scrutiny it sought to avoid in 1993.

Again, in 1996, the Corps separately acknowledged that changes in the MR-GO's

operation had unanticipated impacts on its surrounding environment.  *See* Plaintiffs' Exh. 126.

*The MR-GO North Bank Foreshore Protection Evaluation Report* noted that the channel was

originally designed for a relatively small freighter vessel; however, larger container vessels

utilize the channel and caused larger than anticipated wave-wash resulting in more severe bank

erosion.  *Id*. at p. 29.  The Corps did not supplement its EIS on these changed circumstances.

This 1996 report again acknowledged that the buffering marsh between MR-GO and

Lake Borgne was eroding at a rate of approximately 15 feet per year with the north bank very

close to being breached and that the top width of the channel had increased from 650 feet to an

average of 1,500 feet due to erosion.  *Id.* at pp. 26, 29.  In violation of NEPA's mandates, the

Corps did not supplement its EIS on these changed circumstances.  Instead there were another 50

dredging events removing nearly 112 million cubic yards of material from the channel.  PUF

111,118 and Plaintiffs' Exhibit 85.

### G.  The Corps Violated NEPA by Issuing Segmented EAs

Federal courts have long interpreted NEPA to "prohibit segmentation or require a

comprehensive EIS" of actions that have "cumulative or synergistic environmental impact".

*Envtl. Def. Fund v. Marsh*, 651 F. 2d 983, 999 (5th Cir. 1981).  With regard to actions affecting

---

[7] Additionally, from the date of the Corps memo documenting the need for an EIS in 1993
through Katrina, the Corps entered into 56 of those dredge contracts and removed over 103
million cubic yards of material.  *See* PUF 111, 118 and Plaintiffs' Exhibit 85.

wetlands the Fifth Circuit has held that: "'although a particular alteration of a wetland may constitute a minor change. . . the cumulative effect of numerous piecemeal changes can result in a major impairment of wetland resources.'"  *Buttrey v. United States*, 690 F.2d 1170, 1180 (5th Cir. 1982) quoting 33 CFR § 320.4(b)(3); *see also O'Reilly v. U.S. Army Corps of Engineers,* 477 F.3d 225, 235 (5th Cir. 2007) (Corps acted arbitrarily in issuing FONSI based on an EA that failed to consider the cumulative effects of the project); *Florida Wildlife Fed. v. U.S. Army Corps of Engineers*, 401 F. Supp. 2d 1298, 1308 (S.D. Fla. 2005) ("'Thus, the particular wetland site for which an application is made *will be evaluated* with the recognition that it may be part of a complete and interrelated wetland area.'") quoting 33 CFR § 320.4(b)(3) (emphasis added). The Corps violated NEPA by failing to furnish an EIS of the MR-GO's O&M for a 30-year period.

In determining whether preparation of an EIS when multiple EAs/FONSIs have been created, the courts utilize the "independent utility**"** test to determine whether the EAs are so connected as to mandate a single EIS.  Conduct is only appropriately evaluated in multiple EAs where the action "might reasonably have been completed without the existence of the other." *Wetlands Action Network v. U.S. Army Core of Engineers,* 222 F.3d 1105, 1118 (9th Cir. 2000); *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 894 (9th Cir. 2002); *see also*, *Great Basin Mine Watch v. Hankins,* 456 F.3d 955 (9th Cir. 2006); 40 CFR §§ 1508.7 and 1508.8.

The Corps twenty-six segmented EAs[8] all address discrete sub-projects integral to O&M of the MR-GO and failed to address the cumulative environmental impacts of that conduct or the underlying conduct.  These EAs fall into four categories of agency related action: (1) eight EAs

---

[8] *See* Plaintiffs' Exh. 64.

address proposed specific reaches of foreshore protection[9] (necessitated by the O&M of the MR-GO); (2) four EAs address proposals for rebuilding and reconstructing wetlands, marsh and other land loss[10] (necessitated by the damage inflicted by the O&M of the MR-GO); (3) three EAs address proposals for emergency alternative remedial dredging techniques[11] (necessitated by the O&M of the MR-GO); and (4) eleven EAs address specific incremental mile reaches proposed for dumping dredged material excavated from the MR-GO during dredging[12] (which contributed to the loss of land, need for foreshore protection, marsh reconstruction and land rehabilitation and was directly necessitated by the O&M of the MR-GO).

The Corps issued a separate FONSI for each individual proposed action in violation of NEPA's clear mandates.  The Corps never evaluated the need for all of these proposed actions, the direct, indirect and foreseeable results of the 147 dredging events, and the operation vessel traffic along the MR-GO.  As the Corps' own 2005 internal analysis acknowledged, by segmenting its analysis of the actions to seemingly insignificant proposals for sub-parts of the project, the Corps illegally ignored the cumulative impacts which mandate an EIS.  PUF 119.

## III.  CAUSAL CONNECTION TO PLAINTIFFS' HARM

In the thirty-five year history of NEPA, Congress and the courts have implored the Corps and other federal agencies to appreciate and contribute to the Congressional objectives of protecting the health and safety of the human environment from the direct, indirect, and foreseeable impacts of Agency action.  This objective was clearly re-emphasized in 1977 when

---

[9] *Id.* (EAs: 38 (1983), 47 (1985), 152 (1991), 247 (1996), 288 (1999), 361 (2003), 402 (2004), 411(2004)).

[10] *Id*. (EAs: 72 (1988), 154 (1991), 162 (1992), 255(1997)).

[11] *Id*. (EAs: 143 (1991), 355(2003), 403 (2004)).

[12] *Id*. (EAs: 15 (1980), 54 (1986), 244 (1996), 269 (1998), 274 (1998), 269-B (2000), 277(2001), 277-A (2001), 269-C (2001), 349 (2002), 354 (2004)).

the President Carter signed Executive Order 11990 elaborating the Congressional concern for wetlands protection for the express purpose of protecting "public health, safety, and welfare… *flood and storm hazards*; and sediment and *erosion*"  EO 11990(a) (emphasis added).

The Corps acknowledged in 2005 that the MR-GO's O&M cumulatively had a significant impact on the MR-GO that necessitated supplementing its 1976 EIS.  PUF 119.  The Corps' failure to advise Congress of the known impacts that the O&M of the MR-GO had on bank erosion, wetlands loss and widening of the channel – as well as the enhanced "possibility of catastrophic damage" due to flooding – wholly prevented any "hard look" at these hazards and any potentially mitigation measures that may have been employed.  This conduct also prevented Congress from specifically considering mitigating measures and the "alternative" actions associated with the project, including, as the Corps noted in its 1993 memo, the very viable inquiry into channel closure.  PUF 103-04, 110.  In 1988, the Corps fully appreciated that closure would "reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up the waterway."  PUF 35, 99, 102.

The Corps' systematic refusal to present Congress with the full, truthful picture of the MR-GO's significant adverse impacts on the human environment caused the very harm that Congress sought to avoid with NEPA -- the inability to fully evaluate the MR-GO's impacts on the human environment and to reach an informed decision about the project as a whole and the necessity for remedial measures and alternatives to prevent or mitigate these significant adverse impact, including the very real and admitted risk of catastrophic flooding caused by the MR-GO. At each stage that the Corps neglected to furnish an EIS or Supplemental EIS, Congress could have instructed the Corps to discontinue the operation of the channel or could have instructed the Corps to employ comprehensive bank armoring to protect the health and safety of the human

environment.  After all, what is the purpose of reporting to Congress unless Congress can mandate change?

The Corps' deliberate failure to offer Congress the opportunity to make that informed decision denied the lawmakers the opportunity to knowingly consent to the Corps' actions (and inactions) and thus deprived the Corps' actions of any immunity.  NEPA is designed to prevent the exact harm that plaintiffs have suffered and thus, the Corps' tortious conduct is not protected by the DFE.  Indeed, the proof that greater disclosures to Congress can lead to decisive action to protect the human environment is Congressional closure of the MR-GO after Katrina.  PUF 52.

Dated: January 23, 2009                                    Respectfully submitted,

**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell

Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298


**Law Offices of Joseph M. Bruno**
By: s/ Joseph M. Bruno
Joseph M. Bruno (LSBA No. 3604)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**The Andry Law Firm, LLC**                    **Domengeaux Wright Roy & Edwards LLC**
By: s/ Jonathan B. Andry                        Bob F. Wright (LSBA No. 13691)
Jonathan B. Andry (LSBA No. 20081)              James P. Roy (LSBA No. 11511)
610 Baronne Street                              556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                    P.O. Box 3668
Telephone: (504) 586-8899                       Lafayette, Louisiana 70502-3668
Facsimile:  (504) 585-1788                      Telephone: (337) 233-3033
                                                Facsimile:  (337) 233-2796

**Fayard & Honeycutt**                          **Girardi & Keese**

Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile:  (225) 664-6925

**Ranier, Gayle & Elliot, LLC**
N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

**McKernan Law Firm**
Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile: (225) 926-1202

**Law Office of Elwood C. Stevens, Jr., a
Professional Law Corporation**
Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile:  (213) 481-1554

**Levin, Papantonio, Thomas, Mitchell
Echsner & Proctor, P.A.**
Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**Gainsburgh, Benjamin, David, Meunier &
Warshauer, LLC**
Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Cotchett, Pitre, Simon & McCarthy**
Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**
Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Robinson, Calcagnie & Robinson, Inc.**
Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

The Honorable James D. "Buddy" Caldwell (No. 2211)
**ATTORNEY GENERAL,**
**STATE OF LOUISIANA**
James Trey Phillips (No.19978)
ASSISTANT ATTORNEY GENERAL,
STATE OF LOUISIANA
Sallie J. Sanders (No. 11703)
ASSISTANT ATTORNEY GENERAL,
STATE OF LOUISIANA
1885 North Third Street, 6th Floor
Baton Rouge, LA 70802
Telephone: (225)326-6040
Telefax: (225)326-6097
**By: /s/ James D. "Buddy" Caldwell**
**Attorney for Amicus, THE STATE OF LOUISIANA**

Craig P. Taffaro, Jr., St. Bernard Parish President
Wayne J. Landry, Chairman of the St. Bernard Parish Council
RICHARD A. TONRY (LSB #12859)
MICHAEL C. GINART, JR. (LSB#18910)
CULLEN A. TONRY (LSB#29457)
**LAW OFFICES OF TONRY & GINART**
2114 Paris Road
P.O. Box 32
Chalmette, Louisiana 70044-0032
Telephone: 504-271-0471
Facsimile: 504-271-6293
**By: /s/ RICHARD A. TONRY, Esq**
**Attorney for Amicus, St. Bernard Parish Government**

O.H. Storey (Arkansas Bar No. 69078)
Marcus V. Brown (La. Bar No. 18817)
Leila A. D'Aquin (La. Bar No. 18884)
Entergy Services, Inc.
639 Loyola Avenue, Suite 2600
New Orleans, LA  70113
Tel:  504-576-2765
Fax:  504-294-5302
and
Ewell E. Eagan Jr. (La. Bar No. 5239), T.A.
A. Gregory Grimsal (La. Bar No. 6332)
Wendy Hickok Robinson (La. Bar No. 25225)
Gordon, Arata, McCollam, Duplantis & Eagan, L.L.P.
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana  70170-4000
Telephone: (504) 582-1111
Fax: (504) 582-1121

**By**: _/s/ Ewell Eagan, Jr Esq.,_ _____
**Attorneys for Amicus, Entergy New**
**Orleans, Inc., Entergy Louisiana, L.L.C.,**
**Entergy Services, Inc., and Entergy**
**Corporation**

Elisa T. Gilbert, Esq (ETG 5713), T.A.
Brendan R. O'Brien (BO 9033)
The Gilbert Firm, LLC
325 East 57th Street
New York, NY 10022
Telephone (212) 286-8524
Fax: (212) 286-8522
and
Ernest Svenson, Esq. (17164)
The Svenson Law Firm, LLC
432 Henry Clay Avenue
New Orleans, LA 70118-5724
504-208-5199

**By: /s/** _Elisa T. Gilbert, Esq._
**Elisa T. Gilbert, Esq.**
**Attorneys for Amicus, Hartford Steam Boiler**
**Inspection and Insurance Company a/s/o Entergy New**
**Orleans, Inc., Entergy Louisiana, L.L.C.,**
**Entergy Services, Inc., and Entergy Corporation**

<u>**CERTIFICATE OF SERVICE**</u>

I, Pierce O'Donnell, hereby certify that on January 23, 2009, I caused to be served

**JOINT SUPPLEMENTAL BRIEFING CONCERNING THE NATIONAL
ENVIRONMENTAL POLICY ACT SUBMITTED BY PLAINTIFFS AND AMICI THE
STATE OF LOUISIANA, ST. BERNARD PARISH GOVERNMENT, ENTERGY
CORPORATION, ENTERGY NEW ORLEANS, INC., ENTERGY LOUISIANA, L.L.C.,
AND HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY**,

upon Defendants' counsel, Robin D. Smith, George Carter, Keith Liddle, and Richard Stone by

ECF and email at robin.doyle.smith@usdoj.gov; george.carter@usdoj.gov,

keith.liddle@usdoj.gov, and richard.stone@usdoj.gov.

<u>/s/ Pierce O'Donnell</u>