**Disaster Recovery Initiative**
**U.S. Department of Housing and Urban Development (HUD)**
*[Docket No. FR–5051–N–01]*
*Federal Register / Volume 71, Number 29*
**Department of Defense Appropriations Act, 2006**

## Louisiana Office of Community Development, Division of Administration

# Louisiana Recovery Authority

## The Road Home Housing Programs Action Plan Amendment for Disaster Recovery Funds





**Kathleen Babineaux Blanco**
**Governor**

**Mitch Landrieu**
**Lieutenant Governor**

**Jerry Luke LeBlanc**
**Commissioner of Administration**

**Dr. Norman Francis**
**Chairman, LRA Board**



**Office of Community Development**
**1201 North Third Street, Suite 7-270**
**P.O. Box 94095**
**Baton Rouge, LA 70804-9095**
**http://www.LouisianaRebuilds.info**
**http://www.doa.louisiana.gov/cdbg/cdbg.htm**



# TABLE OF CONTENTS

1. Introduction ................................................................................. 2

2. Assistance to Homeowners ................................................................ 5

3. Workforce and Affordable Rental Housing Programs ....................... 17

4. Homeless Housing Programs ........................................................... 26

5. Developer Incentives...................................................................... 27

6. Administration ............................................................................... 31

7. Planning ........................................................................................ 31

8. Technical Assistance ...................................................................... 31

9. Other Requirements........................................................................ 31

10. Appendix 1 ................................................................................... 40

11. Appendix 2 ................................................................................... 42

12. Appendix 3 ................................................................................... 47

13. Appendix 4 ................................................................................... 48

# 1. Introduction

Hurricane Katrina hit the State of Louisiana on August 29, 2005, and Rita slammed into the state on September 24, 2005.  They were the second and third Category 5 hurricanes of the 2005 hurricane season. The storms were deadly and costly to communities throughout the Gulf and particularly destructive to Louisiana.  More than 1,100 persons lost their lives in Louisiana; approximately 18,000 businesses were destroyed; roads, schools, public facilities, medical services were washed away; and thousands of people were forced to relocate.

In the wake of the storms an unprecedented number of homes were destroyed or severely damaged.
- 123,000 homes were destroyed or suffered major damage.
- 82,000 rental properties were destroyed or suffered major damaged.
- Housing repair costs are estimated at $32 billion. Some, but not all, of this was insured.
- Of the rental and owner occupied units that are now uninhabitable, a substantial portion were occupied by low income households.

HR 2863 provided $11.5 billion to the states of Mississippi, Louisiana, Alabama, Florida and Texas through the U.S. Department of Housing and Urban Development's Community Development Block Grant (CDBG) Program. Louisiana received $6.2 billion of those funds. President Bush has asked Congress for an additional $4.2 billion in CDBG for Louisiana, which is pending appropriation, to fund the housing programs described in this Action Plan amendment.

As the target of investment of this supplemental CDBG assistance, Governor Kathleen Babineaux Blanco has prioritized housing redevelopment, infrastructure rehabilitation, and economic development. The CDBG funds are available to the State subject to HUD approval of action plans which describe how the funds will be used. The Louisiana Recovery Authority (LRA) has been charged by the Governor and Louisiana Legislature with statutory responsibility for developing policy and action plans for the CDBG funds. The Louisiana Office of Community Development, the agency that runs the State's annual CDBG Program, will administer the supplemental CDBG recovery program.

To promote sound short- and long-term recovery planning at the state and local levels that impact land use decisions that reflect the need for responsible flood plain management and growth, the State, through the LRA, is leading community planning efforts in its most affected parishes.  Dubbed "Louisiana Speaks", this effort is a multifaceted planning process to develop a sustainable, long-term vision for South Louisiana in the wake of the destruction caused by Hurricanes Katrina and Rita.  The plans developed locally through Louisiana Speaks will be supported by CDBG allocations. The redevelopment of the housing stock funded partially by CDBG as described herein will follow the plans derived through Louisiana Speaks and other local efforts.

This Action Plan amendment describes *The Road Home* Housing Programs, consisting of four sets of programs for the restoration of Louisiana's housing stock and its communities:  Homeowner Assistance Program, Workforce and Affordable Rental Housing Programs, Homeless Housing Programs, and Developer Incentives.  Future Action Plan amendments will describe other aspects of the State's CDBG recovery program.

## 1.1  Goals of *The Road Home* Housing Programs

*The Road Home* Housing Programs have several goals. They will:

- Repair and rebuild quality housing in neighborhoods that are safe to live in;
- Restore pre-storm value to homeowners who want to return;
- Provide affordable rental housing opportunities for displaced residents; and
- Provide housing for the return of critical workforce.

*The Road Home* Housing Programs will achieve their goals by ensuring, among other things, that:

- Neighborhoods are rebuilt pursuant to locally driven plans that emphasize safety and reduce risks in rebuilding;
- Homes are rebuilt in ways that ensure safer and smarter construction and meet the State's codes and the latest available FEMA advisory base flood elevations[1];
- Neighborhoods are rebuilt in a manner that promotes mixed income communities; and
- Households with special needs such as the elderly and those with disabilities are provided housing opportunities;

## 1.2  Basis for Recommendations

*The Road Home* Housing Programs are based on the best available information on housing needs, housing costs, potential public funding and the ability of the programs to leverage private resources. Funding for *The Road Home* Housing Programs come from the supplemental appropriation of Community Development Block Grant Program funds and Stafford Act Hazard Mitigation Grant Program Funds.

This Action Plan amendment describes funding for *The Road Home* programs in two phases: partially funded and fully funded.

The need for assistance among homeowners far exceeds the initial allotment of CDBG funds made in HR 2863. To meet that need and fully fund *The Road Home*, Louisiana has worked with the Bush Administration to request from Congress an additional $4.2 billion in CDBG resources. In this Action Plan amendment, the program allocations

---

[1] FEMA Advisory Based Flood Elevations are the first step in developing new required flood elevations for the National Flood Insurance Program.  Wherever this document refers to advisory base flood elevations, we mean the most up-to-date flood elevations regulations or guidance from FEMA and the National Flood Insurance Program.

entitled "fully funded" amount to proposed levels of funding in anticipation of the appropriation of an additional $4.2 billion for housing needs.

Partial funding levels are based on CDBG funds currently available to Louisiana. The plan specifically details the allocation of $4.6 billion of the initial $6.2 billion of supplemental CDBG funds to *The Road Home*.

Subject to further refinement of the program guidelines and structure of operations, following are preliminary estimates of housing program costs:

### *The Road Home* Program Budgets[2]

|  | Partially Funded | Fully Funded |
|---|---|---|
| Assistance to owner-occupants | $3,551,600,000 | $6,347,400,000 |
| Homeless supports and housing | $25,900,000 | $25,900,000 |
| Workforce and affordable rental housing | $892,700,000 | $1,535,700,000 |
| Developer incentives and code enforcement | $32,100,000 | $32,100,000 |
| State administrative costs | $79,700,000 | $120,900,000 |
| Housing costs in Action Plan #1 | $18,000,000 | $18,000,000 |
| **TOTAL** | **$4,600,000,000** | **$8,080,000,000** |

*The Road Home* will be fully funded with a total of $8.08 billion of CDBG funds based upon damage and demand estimates grounded in the most current FEMA and HUD damage data.  Louisiana's damages exceed that of other states impacted by the hurricanes of 2005 by three to four times, in nearly every category of damages. Working with the Federal Coordinator of the Office of Gulf Coast Rebuilding, the LRA has demonstrated that the cost of recovery based on the damages to owner-occupied properties, rental properties, and other critical infrastructure such as hospitals, schools, un-funded state and local infrastructure repairs, and sewer and water infrastructure will require no less than $12.1 billion.  The current supplemental CDBG funding of $6.21 billion, combined with anticipated Hazard Mitigation Grant Program funds available through the Stafford Act, fall short of this total need by $4.2 billion.  Without this additional CDBG funding, the State of Louisiana cannot fully fund its housing program for homeowners and renters, to meet the scale of the challenge.  President Bush's commitment to this funding was made in recognition of this need.

The CDBG funds directed to workforce and affordable rental housing will supplement an estimated $1.7 billion in private equity investments derived from Low Income Housing Tax Credits allotted to Louisiana through the federal Gulf Opportunity Zone legislation. In addition, the State will supplement assistance to owner-occupants with an estimated $1.17 billion in housing-related Hazard Mitigation Grant Program funds.

---

[2] Budgets are exclusive of FEMA Hazard Mitigation Grant Program funds that may be spent on housing.

The damage from Hurricanes Katrina and Rita disproportionately impacted families with low to moderate incomes. HUD therefore requires that at least fifty percent of the supplemental CDBG dollars allocated to Louisiana for recovery be invested in programs that directly support those families.  Accordingly, in both the partially and fully funded housing programs described herein, the great majority of funds will go to low- and moderate-income families.

If federal agencies require changes to the State's proposed Action Plan amendment or program costs exceed projections and available funding, Louisiana will be required to modify this proposed Action Plan amendment.

# 2.  Assistance to Homeowners[3]

## 2.1  Overview of  the Homeowner Assistance Program

In the aftermath of Hurricanes Katrina and Rita, an estimated 123,000 owner-occupied homes were destroyed or suffered major damage, according to FEMA. In response to this unprecedented disaster, Louisiana will use $3,551,600,000 of current supplemental CDBG funds and approximately $1.17 billion of Hazard Mitigation funds to help selected owner-occupants repair or rebuild their homes, buy or build replacement homes, or sell unwanted properties so they can be redeveloped or converted to open space. In order to avoid future flood losses, all reconstruction work will meet or exceed the latest available FEMA advisory base flood elevations and meet the legal requirements under the State Uniform Construction Code.

Note that the State will require an additional $4.2 billion of CGBG in order to provide the full proposed assistance to *all* of the Louisiana homeowners who suffered major or severe damage. President Bush has requested those additional funds from Congress. The budget for owner-occupant assistance following that additional appropriation is anticipated to be $6,347,400,000 in CDBG funds, with additional funds from the State's Hazard Mitigation Grant Program

The overarching purpose of *The Road Home* is to rebuild Louisiana's impacted communities. Devastated communities will be blighted by abandoned homes, clouded land titles, and disinvestments if a large portion of the financial assistance is not directly invested in rebuilding homes or buying replacement homes in the affected areas. Therefore, the most comprehensive financial and technical assistance packages will be made available to those pre-Katrina and Rita homeowners who make the effort and take the risks to move back to play a part in rebuilding Louisiana.

---

[3] For the purpose of this Action Plan amendment homeowner and owner occupant are used interchangeably.

Financial incentives and advisory services will be available for homeowners who wish to:

- Repair – incentives to promote rehabilitation
- Rebuild – financial incentives to reconstruct on the same site if repair is infeasible or not economically viable;
- Buyout/Relocate – purchase of the home by the program in exchange for an agreement to resettle in Louisiana; or
- Sell – voluntary sale of the home with no requirements to resettle or otherwise remain in the community.

## 2.2  Eligibility for Homeowner Assistance

To be eligible for the Homeowner Assistance Program:

- The owner must be able to prove that he or she owned and occupied the property as a primary residence at the time of the Katrina/Rita disasters, prior to August 29, 2005;
- The home must in be a single-unit or double-unit structure[4]; and
- The owner must have registered for FEMA Individual Assistance and the home must be categorized by FEMA as having been "destroyed" or having suffered "major" damage. Homeowners who were approved by FEMA for $5,200 or more in FEMA home repair assistance (a component of the Individual Assistance Program) will fall into one of these categories. In certain cases, FEMA may fail to notify a homeowner that the home has been classified as destroyed or suffering major damage, or FEMA has declared a home with such damage ineligible for its home repair assistance program because the home was covered by insurance. These homeowners will still be eligible for assistance, though damage severity that meets the FEMA damage classification at the destroyed and major damage levels will be verified through alternative means.

Applicants must meet all of the above requirements to receive assistance. Homeowners that believe they have suffered major or severe damage, but did not qualify for FEMA assistance will be able to appeal their eligibility for *The Road Home.* Homeowners who believe they will be eligible for the program are currently encouraged to register with *The Road Home* registry at www.LouisianaRebuilds.info or by calling 1-888-ROAD-2-LA.

During the process of reviewing applications to *The Road Home*, the LRA shall make available information about the repair, rebuilding and relocation preferences of applicants in order to inform local planning processes.  In areas where a high proportion

---

[4] If the Homeowner Assistance Program is chosen, the full double-unit structure will serve as the basis for calculation of assistance up to the program cap of $150,000. For **all** other owner-occupied multi-unit structures, if the homeowner chooses the Homeowner Assistance Program, funding of up to $150,000 is available, but is based only on the damages to and value of *the unit in which the owner resides.* The owner occupant landlord may also choose the Small Rental Property Repair Program instead.

of homeowners are choosing not to invest, state or local authorities may limit access only to Buyout/Relocate and Sell programs.

## 2.3  Requirements for Receiving Homeowner Assistance

To accomplish the State's goal to resurrect damaged communities, the LRA proposes to encourage homeowners' investment of federal recovery funds in Louisiana. To that end, homeowners that make the decision to reinvest in Louisiana will be eligible for the most generous levels of assistance. They will be required to demonstrate that commitment to the State by signing a legally binding covenant described below.

In exchange for financial incentives, homeowners must:

- Be willing to sign a release so that information given to FEMA can be verified by the Program;

- Independently from FEMA, agree to verification of their ownership status and the amount of disaster-related damage to the home;

- Swear to the accuracy and completeness of all information provided to the Program under penalty of law;

- Agree in legally binding documents to follow through on certain actions related to a home in exchange for compensation, including but not limited to the following:
    o Ensure that the home they occupy meets the legal requirements under the State Uniform Construction Code,[5] complies with local zoning, and complies with the latest available FEMA guidance for base flood elevations unless exceptions are granted by the LRA based on reasonable alternatives where safety is not minimzed;[6]
    o Assure the home will remain owner-occupied for at least three years after the completion of repairs/replacement or new home purchase;
    o Maintain residential hazard insurance;
    o Maintain flood insurance if the home was previously flooded or is located in a flood zone;
    o Agree to subrogate claims for unpaid and outstanding insurance claims back to the Program;
    o If relocating, move to another home in Louisiana;
    o Ensure mitigation efforts are undertaken, if mitigation can be done to make a home safer and are cost beneficial to undertake, and if the homeowner's eligible assistance allows funds for such purposes; and
    o If selling the property to the State and the home has no historic value or is not salvageable, convey the property as a cleared site, agree in

---

[5] A number of communities have not yet adopted or implemented the State Uniform Construction Code. Pursuant to the State's commitment to rebuild safer and stronger communities, homeowner assistance provided by *The Road Home* will be contingent upon local enforcement of and individual compliance with all legal requirements under the code.
[6] Federal and state law may require homes in historic districts to meet additional standards.

writing to allow the Army Corps of Engineers or another governmental entity to clear the property, or provide funds from the sale proceeds for demolition and clearance by the acquiring entity.

The above terms and conditions apply to the home that is repaired, rebuilt or purchased using program funds.  Homeowners that fail to meet all of these terms and conditions will forfeit the property that is repaired, rebuilt or purchased using program funds and/or be required to repay the financial assistance provided through this program.

## 2.4  Amounts and Forms of Homeowner Assistance

### 2.4.1 Maximum Assistance

The maximum financial assistance from all program resources for owner occupants is up to $150,000.  The proposed ceiling assumes that:

- All federal funds currently allocated to and sought for the program will be available, including the additional $4.2 billion that will fully fund *The Road Home*; and
- Estimates of likely demand for assistance derived from HUD, FEMA and SBA data are accurate.

The partial funding levels for programs contained herein are based on the current supplemental CDBG appropriation. If sufficient funds are ultimately unavailable to fully fund the proposed program or demand exceeds estimates, the maximum amount of financial assistance per household must be lowered.  Because Congress has not yet fully funded *The Road Home*, this Action Plan amendment proposes to provide an initial installment of assistance to homeowners toward their full assistance of up to $150,000. To provide this installment, a homeowner's eligible assistance will be calculated under the fully funded program design and then allocated as half of that amount.

It is the intent of the program to provide a homeowner the resources to get into a home, based upon the homeowner's financial means, needs, and the pre-storm value of the damaged home. Not every homeowner is necessarily entitled to the maximum amount of financial assistance, however, and in many cases *The Road Home* will not provide 100% of the required resources for repair, rebuilding or resettlement. This is true for many reasons, such as the fact that assistance is capped, and that assistance will be reduced by any insurance payments for damage to the structure of the home, by any FEMA assistance for home repairs or replacement, and by other compensation for the loss.

### 2.4.2  Financial Incentives to Repair/Rebuild

The program will provide financial incentives for homeowners that repair or rebuild their homes on the same site. Homeowners will receive varying amounts of assistance depending on the condition of their home and the compensation received from other sources.

Homeowners remaining in Louisiana will be eligible for assistance in three tiers: an incentive grant to cover uninsured, uncompensated losses to the home and restore pre-storm value; a hazard mitigation grant, whenever the home can be repaired or rebuilt with cost-effective mitigation measures; and, where a homeowner cannot secure conventional financing, an affordable incentive loan, structured within the homeowner's financial means, for any gap between the damaged home's pre-storm value and allowed repair/rebuilding costs.

Pursuant to federal statute and HUD requirements for the CDBG program, homeowner assistance may not duplicate any benefits, derived from any source, that are received by the homeowner as a result of damages incurred during Hurricanes Katrina and Rita. Thus the State must not duplicate insurance of any type, FEMA, or other payments received by the homeowner for structural repairs required for such damages.

An explanation of the calculation of financial assistance under the fully funded Homeowner Asssistance Program follows below. **Appendix 2** provides two examples of how hypothetical households might be assisted to repair or rebuild their home.

Homeowners will first calculate their personal *Eligible Assistance Amount* using the following formula.

---

Eligible Assistance Amount to Repair/Rebuild equals
Lesser of:

- Pre-storm value of the home *(times)* Percent damage to the home *(plus)* Eligible Mitigation costs *(plus)* Gap to meet allowed repair/rebuilding costs

  *(minus)* Insurance *(minus)* FEMA Repair Payment *(minus)* any Other financial assistance for repair

  OR

- $150,000

---

Eligible assistance does not represent an entitlement to the homeowner, under any circumstances.

The Eligible Assistance Amount will generally be paid in three tiers.

- The first tier will be an Incentive Grant that is intended to restore the pre-storm value of the property. The Incentive Grant will be made under the conditions attached to the legal instrument described in Section 2.3. The amount is calculated as follows:

**Incentive Grant** = Lesser of

Eligible Assistance Amount

9

OR

Pre-Storm Value x Loss Percentage *(minus)* Insurance, FEMA Repair Payments and
Other Financial Assistance for Repair

The State will enlist inspectors, through the private contractor administering the
program, to determine the appropriate level of damages to the home. It is the
State's policy that participants in the Homeowner Assistance Program deserve a
fair and independent estimate of projection of damages from the storm,
regardless of cause of damage. The program also reserves the right to use
damage estimates catalogued by FEMA and insurance companies where those
estimates are deemed reliable.

To accurately calculate homeowner's loss, the program must base assistance on
a fair and equitable pre-storm valuation of the home.  There are several sources
of valuation available, each of which has benefits and drawbacks, including fair
market values determined through Automated Valuation Methods (AVM) and
other alternative methods such as insured value, a recent pre-storm appraisal, or
assessed value for property tax purposes.  The *Louisiana Recovery Authority
and Office of Community Development*  will determine the final method for
calculation of pre-storm value in conjunction with the private professional
services firm responsible for administering homeowner assistance, when full
consideration can be given to the capacity and expertise of the firm and any
subcontractors brought on to perform valuations.

While the program must apply a common method for valuation to all homes
qualifying for assistance to efficiently address all applications, there will be cases
in which the homeowner believes the standard assessment does not accurately
reflect the pre-storm value, due to unaccounted structural improvements or other
factors.  In such cases, homeowners will be able to appeal the valuation by
presenting a valid alternative assessment or other evidence. The process and
requirements for appeal will be determined in conjunction with the private
administrator.

Note that *The Road Home* is not an entitlement program and cannot go over
budget.  If costs exceed budgeted projections, grant assistance to homeowners
will have to be reduced, and the program would pro-rate benefits to all
homeowners.

Finally, for homeowners who did not carry the type of insurance required for the
home (for example, those who were living in a flood plain but did not have flood
insurance), the Incentive Grant will be reduced by 30%.

▪ The second tier will consist of mitigation assistance, with funding from either the
Hazard Mitigation Grant Program, provided through the federal Stafford Act, or
CDBG.  These funds will complement CDBG assistance for homes that are in

10

flood plains or otherwise eligible for FEMA-funded hazard mitigation assistance. The amount of the hazard mitigation grant will be calculated as follows:

**Mitigation Grant** = Eligible Mitigation Costs

OR

Eligible Assistance Amount – Incentive Grant

- If additional funds are required to help the homeowner get into a home and funding needs fall within the eligible assistance amount, the third tier will be an Incentive Loan.  When conventional financing options exceed homeowners' financial means under HUD guidelines for the monthly amount a homeowner can afford to pay for housing, and the homeowner demonstrates that they have pursued conventional financing and have been denied, the Incentive Loan will be offered to provide an affordable way for homeowners to return to a home when the Incentive and Mitigation Grants do not meet repair or replacement costs. The Incentive Loan will include an allocation for soft second mortgages repayable on sale of the property.  Additionally, it will leverage private capital to create larger pools of affordable loan investment capital through the use of mechanisms such as a loan loss guarantee pool and below market interest rates through rate reduction buy-down features.  For those cases where it is necessary to do so, the amount of Incentive Loan will be calculated as follows:

**Incentive Loan** = Eligible Assistance Amount *(minus)* Incentive, Mitigation Grants

As in the determination of pre-storm value, the procedures used to determine the reasonable additional costs to repair or rebuild a home will be established in conjunction with the capacity and expertise of the administering contractor.

The State may also offer additional incentives for homeowners who choose to repair or rebuild within the same parish.

For instances in which the sum of remaining pre-storm loans and the Incentive Loan exceed the market value of the home, the program will develop policies to mitigate the impacts of "negative equity" positions on the home and homeowner by adjusting the repayment terms.

In addition, the program shall give recognition and consideration during implementation to homeowners who may have been in a position of negative replacement value prior to the storms.  This occurs when a homeowner's pre-storm value would not have sufficiently covered their pre-storm rebuilding costs.

### 2.4.3   Buyout/Relocate

Homeowners choosing to move elsewhere in Louisiana will be able to sell their homes to the State and receive assistance under the guidelines described for homeowners that rebuild on the same site. Owners choosing this option must meet the same eligibility requirements and agree to the same legally binding actions applicable to those choosing to repair or rebuild. Those requirements are described in Sections 2.2 and 2.3 of this Action Plan amendment.  For these buyouts to occur, a lien holder may be asked to write off a portion of the current outstanding principal balances of the loan or other lien, and to give consideration to potential lost equity of the homeowner.

Homeowners who help to shoulder the burden of community recovery by choosing to rebuild within their parish will always be the highest priority of the program. The State may also offer additional incentives for homeowners who choose a buyout but relocate within the same parish.

### 2.4.4   Sale

Some owner-occupants may choose none of the basic options: to repair, rebuild or relocate in Louisiana. In these instances, the State will compensate the homeowner for 60% of the home's pre-storm value, less insurance and FEMA repair funds. Sale compensation will not exceed repair or rebuilding costs for the home. For these buyouts to occur, a lien holder may be asked to write off a portion of the current outstanding principal balances of the loan or other lien.

---

**Compensation for Selling Home
With No Other Obligations equals**
Lesser Of:
60% of Pre-storm value *(minus)* insurance *(minus)* FEMA repair payments *(minus)* Other repair assistance
*OR*
Incentive Grant for which they would otherwise be eligible

---

## 2.5  Redevelopment of Purchased Property

Properties purchased through *The Road Home* Homeowner Assistance program will be either redeveloped to be returned to commerce or preserved as green space, in a manner which is consistent with local land use plans and direction. Pursuant to a primary goal of the Homeowner Assistance Program, purchased land will not be left to blight and disrepair. The LRA recognizes two distinct options for assigning responsibility for management of land assets. Land acquisition, maintenance and redevelopment can be managed by a:

1. State Agency - Assign these properties to a new or existing state agency which will be charged with working in ways consistent with local land use plans and direction, packaging the properties for redevelopment, offering them for redevelopment through competitive bids, and overseeing the redevelopment of the property consistent with local plans.  Any proceeds derived through the sale of the property that exceed approved expenses associated with the redevelopment of the property would be returned to the Supplemental CDBG program.

2. Local redevelopment authority - Transfer specific properties from the state to a local redevelopment agency upon approval by the LRA of the authority's redevelopment plan that takes into account local land use guidelines.  The local authority would package the properties, offer them up for redevelopment through competitive bids, and oversee the redevelopment of the property.  Any proceeds derived through the sale of the property that exceed approved expenses associated with the redevelopment of the property would be returned to the Supplemental CDBG program.

For properties that are to become green space as a result of a decision by local authorities, those properties will be transferred to the appropriate local land management agency which will operate and maintain them.

The LRA has endorsed the findings and recommendations of the American Institute of Architects and the American Planning Association planning conference held on behalf of the LRA in November 2005.  Consistent with those recommendations, for properties that are acquired by the Homeowner Assistance Program or other land assembly program for redevelopment, the State will insure that 25% of the properties are used for affordable housing according to HUD guidelines for the HOME program.

Whether properties are managed by a state agency or local redevelopment authority, the properties acquired by the Homeowner Assistance Program or other land assembly programs must retain the affordability requirements defined by this program after their transfer.  The State should monitor the property to assure the requirements are met and maintained.

The final assignment of redevelopment authority will be resolved during the month of May by the State through ongoing deliberations with the Louisiana Congressional delegation, state legislators, local authorities, and civic leaders.

Under either scenario, the LRA recognizes the potential for a significant return on investment in property redevelopment, a scenario demonstrated with research in a recent report of the Gerson Lehrman Group.  The LRA is committed to reinvesting these proceeds in the comprehensive community redevelopment activities already supported by Supplemental CDBG funds allocated through state programs, including *The Road Home*.  The priorities of recycled funds shall include housing restoration, affordable

13

housing for homeowners and renters, infrastructure enhancements, and economic development activities designed to help recreate strong communities which are closely tied to transit, jobs, and public services.


## 2.6  Treatment of Homeowners with Special Circumstances

Assignability: Subsequent to the launch of *The Road Home*, the State will allow an owner to sell his or her home on the open market and to assign rights to program assistance to the new buyer. Assigned grants will require the new buyer to carry the same three-year owner-occupancy requirement and other legally binding terms and conditions that govern the repair and rebuild options.  The new owner to whom assistance benefits have been assigned will be eligible only for the repair/rebuild option.

Death or Infirmity of Eligible Owner: In the event that a homeowner has died since the time of the storms, an heir must have been placed into legal possession of the property to be eligible for homeowner assistance in place of the deceased owner.  If a homeowner is incapacitated due to illness or other infirmity, someone with a legal right to bind that person legally, such as is provided by a power of attorney, is eligible to apply for assistance on behalf of the homeowner.

If a homeowner who has received assistance from *The Road Home* dies after receiving assistance and signing the required legally binding commitments, the owner-occupancy requirement between the State and the homeowner will remain applicable to the property repaired, rebuilt or acquired using program funds.  If the homeowner received a soft second loan as the Incentive Loan, a transfer of the property as a result of death or infirmity will not trigger the repayment of the loan by the legal heir, unless some portion of the succession transaction is a cash transaction for a share of the property.

Owner-Occupants Who Have Already Sold Their Principal Residence: Some homeowners may have chosen to sell their homes prior to launch of the Homeowner Assistance Program. It is the goal of *The Road Home* to ensure that damaged properties qualifying under the Homeowner Assistance Program do not remain blighted and undeveloped. If the development goals of the program are met for the damaged property, a homeowner that can demonstrate that he or she remains in a loss situation after selling the damaged property to another party may receive assistance under the program to compensate for remaining losses.

Owners Who Have Started or Completed Repairs: Assistance will be provided to owners who have already commenced or completed home repairs or the construction of replacement homes, so long as all the requirements of the Program are met. Policies will be set for discounting assistance amounts for any grants or below-market interest rate loans from government agencies that may have been received by an owner from for these purposes.

<u>Owners Who Have Received Other Assistance</u>: Policies will be set for discounting compensation amounts for any grants or below-market interest rate loans from government agencies that may have been received by an owner for these purposes. Pursuant to federal statute, assistance from *The Road Home* must be used to repay any loans from the Small Business Administration (SBA) that a homeowner has received for the same losses.

<u>Owners of Manufactured Housing:</u> In order to qualify for homeowner assistance, the owner of a manufactured home must also own the land on which the damaged home was located.

Any homeowner may appeal the decision related to eligibility, damage assessments, amount of assistance and grant offsets made by the program.

## 2.7  Accounts for Receipt of Funds

To help ensure that Program incentive grants, incentive loans, insurance payments and FEMA household assistance payments provided to homeowners are invested in housing, owners will be encouraged and assisted, and may be required, to open deposit accounts in the owner's name. The Program will work with financial institutions to set up standard terms for managing such accounts and payouts from them.

## 2.8  Homeowner Assistance Centers – Process for Receiving Assistance

Louisiana has initiated a Call Center to allow former homeowners to indicate their interest in returning to their neighborhoods and investing in their homes.  The Call Center is the first step in what will be an aggressive campaign to solicit applications for the Homeowner Assistance Programs.

To open lines of contact between displaced Louisiana residents and *The Road Home*, citizens may now register key information about their damaged homes by calling 1-888-ROAD-2-LA (888-762-3252; TTY 1-800-566-4224 ) to submit that data to the State's registry, or logging on to a one-stop web portal - <u>www.LouisianaRebuilds.info</u>. This registry pertains only to homes that were occupied by homeowners and damaged by hurricanes Katrina or Rita.

When the program commences, eligible homeowners will be notified by mail, email and/or telephone to the greatest extent possible of the opportunity to apply for assistance. Information about financing programs and counseling services will be posted on public websites as well as provided through other resources such as Assistance Centers that will be established in various locations.

> The Program will not publish application forms or detailed descriptions of the process for receiving assistance until the comment period has ended and the State of Louisiana has determined the amount of federal funds that will be available for all recovery programs.

In order to rebuild, most homeowners will have to navigate a maze of obstacles such as negotiating insurance settlements, dealing with mortgage issues, understanding the implications of new flood maps, and dealing with building contractors. Before the amount of program financial compensation can be determined, an owner will have to make decisions on whether to repair their home, replace it on-site, accept a buyout and relocate in the parish or state, or sell. If an owner has been unable to return to the community, he or she will likely need help finding temporary housing to live in while managing this process. While some homeowners can overcome these barriers themselves, many homeowners will need expert, trustworthy advisors, in addition to receiving financial assistance.

To respond to these needs, Assistance Centers will be the "storefronts" where homeowners can apply for assistance and gain access to advisory services. Rebuilding Advisors will help homeowners accomplish the following:

- Provide information to help homeowners evaluate the four assistance options— repair, replace, relocate or sell—and the amount of financial assistance allowed for each;

- Provide information to owners on how to deal with mortgage issues, or refinance if necessary;

- Provide information to assist owners in selecting professional services providers such as home inspectors, architects, surveyors (for replacement homes) to design and prepare for repairing or replacing homes;

- Provide information to assist owners in selecting repair contractors, homebuilders and manufactured housing companies; and

- Provide information about fair housing rights and protections against housing discrimination.

The Assistance Centers will help mitigate the potential for misunderstanding and abuse by providing standardized, structured, and guided relationships between homeowners and service providers.  In addition, the Assistance Centers will maintain registries of professional service providers and building contractors.

Through the Solicitation for Offer, Assistance Centers will be directed by the selected management firm and staffed by contracted experts, which may include non-profit organizations specializing in providing advisory services to homeowners. See Section 5 for more details.

Registrants calling *The Road Home* or logging onto www.LouisianaRebuilds.info will be asked to provide important information, including the resident's name, current address and the location of the affected home, phone numbers, mortgage information, the status of any insurance settlements and any FEMA or U.S. Small Business Association (SBA) applications or assistance.

# 3.  Workforce and Affordable Rental Housing Programs

Approximately 82,000 rental housing units received major or severe damage in Hurricanes Katrina and Rita.  Replacement of the damaged or destroyed rental housing in the hurricane ravaged areas is vital to the return of a strong workforce, and is a lynchpin of Louisiana's economic recovery.  All sectors of the economy have reported a workforce shortage due to a lack of affordable housing.  Rental housing stock is also imperative to support the return of the high proportion of residents that were renters prior to the storms, particularly in New Orleans, as well as the return of homeowners transitioning into repaired and rebuilt homes over the coming months.

For these reasons, several programs are proposed to support the redevelopment of rental housing in the storm-impacted areas. To support the programs, the State has set aside a total of $892,700,000 of currently available CDBG funds, and proposed to be increased to $1,535,700,000 upon the appropriation of the additional CDBG funds pending in Congress.

*The Road Home* Workforce and Affordable Rental Housing Programs have four broad goals:

- To ensure that the workforce needed to accommodate full economic recovery has access to affordable rental housing;
- To provide affordable rental housing to low income households who could not otherwise afford to return to their communities;
- To ensure that affordable rental housing is provided in the context of high-quality, sustainable mixed-income communities; and
- To ensure that a portion of affordable rental units will host supportive services for families with special needs or high risks following their extended displacement.

To achieve these four goals, the programs described below prioritize **deep affordability** of rental units and the balanced allocation of these deeply affordable units within **mixed-income communities**.  The program will create an estimated 36,000 to 51,000 units, in a broad mixture of deeply affordable units, mixed income development, small rental properties, and other tax credit projects.

**Summary of Rental Units Built or Restored and Program
Dollars for Fully Funded Program**

| Program | Number of Units | CDBG Dollars |
|---|---|---|
| **LIHTC/CDBG Piggyback** | **18,000 – 33,000** | **$552,410,000** |
|     Market Rate Units | 5,000 – 15,000 | $0 |
|     Below Market Rate | 13,000 – 18,000 | $0 |
|     Very Low Income | 6,000 – 9,000 | $552,410,000 |
| **Supportive Housing Services** | **0 units built; 3,000 served** | **$72,730,000** |
| **Flexible Developer Incentives** | **N/A** | **$41,560,000** |
| **Small Rental Properties** | **18,000** | **$869,000,000** |
|     Market Rate Units | ~ 6,000 | |
|     Below Market Rate | ~ 12,000 | |
| **TOTAL** | **36,000 – 51,000 units** | **$1,535,700,000** |

Deep affordability refers to units reserved for individuals with incomes as low as 20% of the area median. Mixed-income communities will be prioritized when they are developments with market rate rental units or single family homes in the same development with a range of affordable and deeply affordable rental units, for renters 20% to 60% of the area median income.

Based on current estimates, the Workforce and Affordable Rental Housing Programs and the Gulf Opportunity Zone's Low Income Housing Tax Credits may create between 25,000 and 30,000 units available for citizens at or below 60% of the area median income for the next twenty years. The State expects that as many as half of those units may rent at or below 50% of the area median income level for the next twenty years.

The LRA will allocate these funds for the Workforce and Affordable Rental Programs by formula to ensure that those parishes with the most damaged or destroyed rental housing have adequate resources to replace significant numbers of affordable rental units. It is the strong recommendation of the LRA that the Low Income Housing Tax Credits should also follow this geographic allocation formula and prioritization to meet affordability and mixed-income development goals, such that all projects benefiting from tax credit projects should be directed to include units of deeper affordability for very low income families.

The State proposes these rental programs as a means to focus on the housing needs of low to moderate income people in the most heavily damaged areas. According to the National Low Income Housing Coalition Research Note #05-02:

"Forty-seven percent of the housing units in the entire Katrina affected area [of the Gulf Coast] were rental units. In New Orleans, 55% were rental units. Fully 20% of the rental units lost in New Orleans were affordable to extremely low income households, i.e. households earning 30% of AMI or less, amounting to 16,000 units. This percentage was 16%, 22,000 units, for all Katrina affected areas. Thus, 73% of all the rental units

affordable to extremely low income households in the Katrina affected areas were in New Orleans and likely destroyed."

The table below summarizes the budget for all rental programs:

**Budgets for Rental Housing Programs**

| Rental Program | Partially Funded | Fully Funded |
| --- | --- | --- |
| LIHTC/CDBG Piggyback | $311,690,000 | $552,410,000 |
| Supportive Housing | $46,750,000 | $72,730,000 |
| Flexible Developer Incentives | $41,560,000 | $41,560,000 |
| Small Rental Properties | $492,700,000 | $869,000,000 |
| **TOTAL** | **$892,700,000** | **$1,535,700,000** |

## 3.1   Low-Income Housing Tax Credit (LIHTC) "Piggyback" Program

Through legislation creating the Gulf Opportunity Zone (GO Zone), Congress has authorized a special allocation of Low Income Housing Tax Credits (LIHTC) that are expected to generate an estimated $1.7 billion over three years in private investment in the repair and new construction of affordable rental housing. The combination of LIHTC incentives and CDBG funds that piggyback the tax credits will promote the twin goals of dramatically increasing the supply of rental units affordable to a wide range of low- to moderate-income families **and** expanding rental housing supply as a part of stable mixed-income developments and neighborhoods.

When *The Road Home* is fully funded, the State proposes to combine the resources of the LIHTC incentives, CDBG Piggyback funding, available HOME funds, Section 8 housing vouchers, and leveraged private investments to generate between 18,000 and 33,000 new or restored rental units, of which an estimated 5,000 to 15,000 units will be rented at market rates and 13,000 to 18,000 will have below-market rents.  In any single unit, other federal subsidies shall not duplicate assistance to the same beneficiary.

To support the development of mixed income communities and to ensure the restoration of rental housing in the most heavily impacted parishes, the LRA will work with the Louisiana Housing Finance Agency, which administers the LIHTC Program, to assure that all approved GO Zone LIHTC projects integrate multiple tiers of affordable rental units and prioritize the integration of affordable units with market-rate rental units. The intent of this program is to use the powerful financial incentives of the LIHTC program, CDBG Piggyback funding and the flexible incentives program described in Section 4.3 to motivate developers to build new mixed-income communities that accommodate families from across the income spectrum. If LIHTC applications without this deeper tiering of affordable units are able to qualify for tax credits, then it will be hard for the goals of this piggyback program to be met.  Furthermore, to ensure the success of the CDBG Piggyback Program, the LRA strongly urges the Louisiana Housing Finance Agency to direct that GO Zone LIHTC benefits be similarly targeted to parishes which

suffered the most damaged or destroyed rental properties as described for the Workforce and Affordable Rental Housing programs above.

Though units developed under the LIHTC must by law be affordable to households with incomes as high as 60% of area median income, the extra investment incentives built into the special GO Zone allocation of LIHTC mean that, by State estimates, rents for LIHTC units in Louisiana can be made affordable to families with incomes between 45% and 60% of area median income. The LRA will work with the Louisiana Housing Finance Agency to develop future Qualified Allocation Plans (QAP) for LIHTC to give preference to and fund projects that meet deeper affordability goals than the required 60% of area median income[7], and that use the full capacity of the Piggyback Program.

Louisiana intends to accommodate families with incomes below 45% AMI, however.  In order for the LIHTC program to create a rental supply for such very low-income households, additional subsidies are needed. The State will therefore make available CDBG funds to provide incentives to investors so that, when the program is fully funded by the anticipated $4.2 billion appropriation, an estimated 6,000 to 9,000 of the estimated 13,000 to 18,000 affordable rental units produced under the LIHTC program can be reserved for—and made affordable to—working families with incomes between 20% and 40% of AMI.  It is the strong intention of the State to reserve all CDBG money devoted to very affordable rental units for units that are built as a part of mixed-income developments, with a priority given to those including market rate units.

Furthermore, under the current partially funded program, the State proposes that a portion of the estimated 6,000 to 9,000 units targeted to very low-income families be made available to households with special needs such as persons with disabilities, families with disabled family members, and the elderly. The funding for such supportive services is outlined in Section 4.2 of this document.

Project Eligibility and Estimated Budgets[8]

Developers will be eligible for supplemental CDBG funding for approved LIHTC rental projects on which they agree to certain limitations on rents and occupant income for the first twenty years of the project. When *The Road Home* is fully funded, CDBG piggyback funds aimed at increasing the supply of units available to very low income households for renters, with incomes between 20% and 40% of the area median, is estimated in the table below.

---

[7] Area Median Income is defined annually by the federal Department of Housing and Urban Development for each metropolitan area and non-metropolitan parish in the United States.  FY2006 income estimates for Louisiana can be found at http://www.huduser.org/Datasets/IL/IL06/la_fy2006.pdf.
[8] Calculations used to determine the demand for CDBG funds based on assumed rents and income targets are available from the LRA.

| Target Household Income | Target Number of Units | Total Estimated CDBG Funding |
|---|---|---|
| 20% AMI | 2,000-3,000 | $263,460,000 |
| 30% AMI | 2,000-3,000 | $184,140,000 |
| 40% AMI | 2,000-3,000 | $104,810,000 |
| 50% AMI | 3,500- 4,500 | $0 |
| 60% AMI | 3,500-4,500 | $0 |
| Above 60% AMI | 5,000-15,000 | $0 |
| **TOTAL** | **18,000-33,000** | **$552,410,000** |

Among the CDBG financing mechanisms being considered to make it feasible for developers to provide the estimated 6,000 to 9,000 units that will be available to and rented by very low income tenants are:

- Gap financing to reduce the costs of debt service, so that lower rents (and lower cash flow) can be made feasible; and

- Funding of operating reserves for projects to enable rental property owners to charge lower rents.

The project costs for affordable units and LIHTC projects are likely to vary greatly because of the uncertainty of many cost factors and market conditions.  The State will prepare clear criteria by which projects will be ranked, such as quality of the development and units, experience of the development firm, the per-unit subsidies sought at varying levels of affordability between 20% and 60%, and the financial strength of the firm.  Proposals should be selected by the State based on the most competitive proposals that maximize these identified criteria.  Further, each application should be scrutinized by underwriters in light of the criteria and proposed project costs. The State should negotiate with applicants to seek the best possible outcomes for each project.

Officers of the LRA, Louisiana Office of Community Development, and Louisiana Housing Finance Agency will work together each year to propose affordability targets for specific numbers of housing units, integrate their targets into the annual Qualified Allocation Plan criteria for the LIHTC program, and set aside CDBG funds to be matched to those tax credit goals to meet overall program objectives. These officers will likewise evaluate actual numbers of units delivered annually. In the event of any shortfall versus those targets during a calendar year, those funds and targets will be added to the subsequent year's goals and allocations.

The State will direct that strong preference be given by development groups which are awarded Piggyback incentives to offer their properties to hurricane-displaced renters from the affected areas of Louisiana.  In doing so, the State will require that developers promote their available units through the proposed Renter's Registry described Section 3.5 below.

## 3.2   Services Funding for Supportive Housing

Under the partially funded plan, the State intends to use CDBG funds or other financial resources that can be obtained to fund supportive services for approximately 1,870 supportive housing units, the development of which will be financed by the LIHTC and CDBG piggyback program described above. Under the fully funded program, the program will support an estimated 3,000 units with supportive housing services.   Other HUD programs such as the McKinney Vento Act, Project Based Section 8 Vouchers, Section 811, and Section 202 program funds may supplement supportive efforts.

The supportive housing units will serve individuals and families with special needs, most importantly, renter households who are returning to Louisiana after having endured, very often, traumatic relocations from shelter to shelter, to hotels, and to other temporary living arrangements in other cities. Supportive housing units are also needed for returning families and individuals who are disabled, frail elderly, or have other special needs.

Supportive services will be provided in 30% of the 6,000 to 9,000 rental units targeted to households with incomes at or below 40% of area median income. In order to provide that level of services, the State proposes to allocate $46,750,000[9] of the currently available CDBG funds to help pay for the services. This program component and use of CDBG funds for supportive services is proposed with the recognition that the number of supportive housing units that can be developed in Louisiana over the next few years will be severely limited by the scarcity of public and private funding for the necessary resident services.

When the expected $4.2 billion in additional CDBG funds are appropriated for *The Road Home*, the budget for supportive housing services will be increased to $72,730,000 to fund services for an estimated 3,000 units.

## 3.3   Flexible Incentives for Mixed-Income Development

For mixed-income residential developments to occur on a larger scale—even if the affordable housing units are receiving supplemental CDBG funding as described above—the State recognizes that additional incentives may be required in certain instances to successfully promote market-rate housing to be mixed with affordable housing. Therefore, the State proposes to use $41,560,000 of CDBG funds to supplement mixed-income housing projects. These flexible subsidies will be used primarily in conjunction with the LIHTC incentives, but they will also be available for other projects offering rents or sale prices affordable to families both above and below 80% of AMI.

---

[9] Assumes 1,870 units with services costing an average of $5,000 per unit per year over five years.

The primary mechanism for providing these incentives will be recoverable grants provided to reduce the costs of land and infrastructure. Such grants will be offered on a competitive basis. Grants will be made subject to requirements that will be specific to each project, such as minimum requirements for providing a mix of rents or sale prices. Grants will be recovered if all mixed-income requirements set for selected projects are not met. Operating costs of this program will be covered through operating budgets for other housing programs described herein, such as the CDBG/LIHTC Piggyback Program or the Housing Development Loan Fund.

## 3.4  Small Rental Property Repair Program

Before the disaster, a large portion of very low income working families resided in single-family homes, "doubles" and small, multi-family buildings with ten or fewer units that were owned and operated by small-scale landlords. A sizeable number of these properties were underinsured or uninsured and no longer available for occupancy. The State proposes to provide gap financing for the repair of an estimated 10,500 small rental units in the partially funded program, and an estimated 18,000 rental housing units when the program is fully funded. The primary purposes of the gap financing are to enable repairs to occur and to limit the amount of debt (and therefore debt service) required for the properties, so that the owners will be able to charge affordable rents.

The program will, on a competitive basis, provide gap financing up to $25,000 to restore a rental unit renting at Fair Market Rental rates according to HUD guidelines, with higher funding amounts up to $75,000 per unit available to qualified landlords who agree to offer lower rents, with the maximum amount of subsidy going for rental units where rents are affordable for families with incomes at or below 50% AMI. To spark immediate development of scattered properties of all rent levels, units offered at Fair Market Rental rates will be eligible for assistance, but only for the first tier of assistance of up to $25,000 of incentives.  Eligible properties will be selected based upon a strong preference for well-designed residential communities and infill housing developments that also include families with incomes higher than the area median. Further, each application should be scrutinized by underwriters in light of the criteria and proposed project costs.  The State should negotiate with applicants to seek the best possible outcomes for each project.

In exchange for accepting financial incentives, property owners will be required to accept limitations on rents (with inflation clauses) and incomes of renters for a period of 10 years, to assure that the assisted housing is as affordable as possible and is occupied by families with incomes corresponding to several tiers of affordable rents. The amount of CDBG financing available will be provided in three tiers—$25,000 , $50,000 and $75,000 per unit—with the highest amount per unit being available to property owners who agree to offer the lowest rents. The assistance will be offered as

deferred payment loans at 0% interest, due only upon resale of the property or failure to comply with the agreed-upon restrictions on rents and household incomes.

The tiers with affordability requirements, representing two thirds of the program funds, are expected to produce roughly 12,000 units when the program is fully funded.

As with the homeowner program, small rental property owners will have access to expert financial and construction advisors to assist them with refinancing and reconstruction, or if they so desire, to sell their properties to developers using the LIHTC program.

Unlike the homeowner program, funds will be insufficient to provide every small-scale property owner with enough money to repair or replace their rental properties. Prioritization of properties that will be selected for assistance will be based on factors including, but not limited to, the following:

- Property owners demonstrating financial and technical capacity to obtain matching market-rate financing, if necessary, to carry out the repairs, and to provide excellent property management services; and

- Properties that are most cost-effective to repair or replace, and located in areas that have adequate infrastructure and redevelopment activities occurring.

- Properties held by small-scale landlords where rental revenue constituted a majority of household income and/or assets  so long as these investor-owners meet the threshold requirements for capacity necessary to repair or replace, and then manage their units.

As outlined in the Homeowner Assistance Program guidelines, owner-occupant program assistance and small rental property assistance cannot be combined in the same residential property. Where an owner-occupant rents units within a multi-unit structure, the owner must choose to participate in one program or the other.  If the Homeowner Assistance Program is chosen, the full double-unit structure will serve as the basis for calculation of assistance up to the program cap of $150,000. For all other owner-occupied multi-unit structures, funding up to $150,000 is available but is based on the damages to and value of the unit in which the owner resides.  If the owner selects the Small Rental Property Repair Program and the owner is selected for assistance, assistance to each unit, including the owner-occupied unit, will be limited to $25,000 to $75,000, as with all units under the program application, dependent on affordability levels on each rental unit.

The landlord applying for the Small Rental Property Repair Program will be able to receive incentives for a unit in the property in which he or she is an owner-occupant.

The formula for the amount of CDBG funding per rental unit is as follows:

> **Eligible Assistance per Rental Unit** = Lesser of:
> - Allowable Rebuilding Costs + Mitigation Costs *(minus)* Insurance *(minus)* Maximum private financing the property rents will support
>
> OR
>
> - The Maximum CDBG funding amount described above

To the extent that property owners do not request or qualify for the higher amounts of funding per unit, the program will be able to support the repair of more rental units, albeit at higher rents.

The LRA also proposes to allow variations of this program that will provide incentives, not only for repairing damaged rental properties, but converting them to owner-occupied housing. Two pilot programs may be created and expanded if successful. The first pilot program could allow a landlord to sell a repaired one-family or two-family rental property to a low- or moderate-income homeowner, rather than rent the home.  The second pilot program would allow low- and moderate-income homebuyers to  purchase unrepaired one-family and two-family rental units and to carry the home through the repair process. Creating first-time homebuyers will be a priority but the pilot program will also serve buyers who have previously owned homes.  Homeowners who are exercising the "sell" or "relocate" option may not receive additional financial assistance from the state through either of these pilot programs.  These pilot programs will be funded through the budget for the Small Rental Property Rental Program.  The incentives will be tiered similarly as above (based on the income of the first occupants), and the rental affordability requirements (for any rental units in two-family homes) will remain the same.

A total of $492,700,000 is budgeted for the Small Rental Property Repair Program under the partially funded budget, including program operating costs.  Upon the additional appropriation of $4.2 billion by Congress, the budget for this competitive program will increase to $869,000,000.


## 3.5    Renters' Registry

Because the replacement of rental housing will fall far short of the rental housing lost due to insufficient funds, and many residents displaced by hurricanes Rita and Katrina are far from home and inadequately housed, the State will give priority placement to hurricane displaced residents for all subsidized rental housing units.

A total of $2 million in CDBG funds has been budgeted to provide the following resources to displaced renters to help facilitate their return home:

- Louisiana has initiated a Call Center and Homeowner Registry to allow former homeowners to indicate their interest in returning to their neighborhoods and

investing in their homes.  The Call Center/Registry will add a component for renters to gather information about the current location of displaced renters who wish to return home. Initially, the Call Center/Registry will refer callers to emergency housing assistance resources posted on the web portal at www.LouisianaRebuilds.info.  As new or repaired subsidized affordable rental units come on line, renters will be referred to a web data base where affordable rental housing is listed, and where they can access applications for income-assisted housing.

- When the database referral system commences, eligible renters will be notified by mail, telephone, and the www.LouisianaRebuilds.info web portal to the greatest extent possible of the opportunity to access rental information and apply for assistance. Information about rental programs will be posted on public websites and at Housing Assistance Centers.

# 4.  Restoration of Homeless Supports and Housing

The State is proposing $25,900,000 of CDBG funds be allocated to address increased risks and demands related to homelessness.  In hurricane-impacted areas, many organizations serving the homeless lost facilities, housing capacity, shelter beds, and staff: Thirty-six shelters sustained considerable damage, and capacity to house up to 1,759 homeless individuals (i.e., 1,759 residential "beds" operated by "Continuum of Care" organizations serving the homeless) was lost.  In hurricane-impacted areas, there are reports that an increased number of persons are living on the streets or in parks, cars, and abandoned or uninhabitable buildings.  Many of these persons were not homeless prior to the storms.  Additionally, many older adults and persons with disabilities who resided in the community prior to the storms are currently being housed in nursing homes and other institutions, and many residents cannot be discharged or transitioned from these settings due to the lack of affordable, barrier-free, and/or supportive housing.  These funds will assist in providing a safe and permanent place for homeless and at risk of homeless individuals to reside and get the supportive services they need to remain housed and to be as independent and self-sufficient as possible.

The proposed $25.9 million will support the State's goal to immediately restore and expand capacity in hurricane impacted areas and provide permanent supportive housing and assistance  for persons and families who are homeless and persons at-risk of becoming homeless who are low wage workers, unemployed, victims of domestic violence, low-income seniors, and/or low-income persons with any type of substantial disability (including physical or sensory disability, cognitive disability, chronic health problems, mental illness, or addictive disorders).

The proposal allows for funding to be prioritized as follows:
The highest priority for the use of these funds will be to repair and restore shelter capacity, transitional housing and permanent supportive housing that existed prior to Hurricanes Katrina and Rita.  The cost of restoring this capacity is estimated to be $3

million to $5 million. Priority for these funds will be given to members of the Continuums of Care. Non-member organizations may apply for funding but should document pre-storm homeless efforts in the community and indicate a commitment to coordinating with the local Continuums of Care upon receipt of these funds.

A second priority will be the acquisition and rehabilitation of new permanent supportive housing and services by non-profits in the hurricane-affected areas.  This priority also includes the option of funding rental assistance  (i.e., "bridge funding") linked to permanent supportive housing. The prioritization of non-profits is based on the understanding that some non-profit groups working with homeless and at-risk populations will not have the capacity to apply for tax credits and supportive services funds through the "piggyback" program

The third priority will be homeless prevention assistance to serve the hurricane affected areas, however not to duplicate any existing federal subsidies for this purpose. This priority includes traditional homeless prevention – such as funding the first month of rental assistance to avoid homelessness – as well as innovative practices to prevent homelessness, such as home modifications, repairs not covered by other parts of the Road Home program, and other supports that help individuals maintain residency in their home.

The fourth priority is the funding of new transitional housing and services targeted particularly for families who have experienced significant trauma as a result of the hurricanes and need the support of transitional housing rather than the groups addressed in the permanent supportive housing initiatives listed in the second priority.

The fifth priority is the creation and expansion of employment and housing search services for the homeless in the hurricane affected areas. These funded efforts should be in coordination with and non-duplicative of other recovery related employment and housing efforts such as the Louisiana Family Recovery Corps.  Applicants will propose a mechanism to ensure that individuals will not receive duplicative services.

# 5.  Developer Incentives

The State recognizes that communities that lost the most housing due to the Katrina and Rita disasters will need to have special incentives in place to attract new mixed-income housing development—to restore both the rental and owner-occupied housing stocks. Homeowners who elect to take the relocation option will make it necessary to have a steady and large supply of new homes. Therefore, the following developer incentives are proposed, with a special focus on the New Orleans metropolitan areas and other communities with major losses to their housing stock.

These programs and financial tools described in Section 5, and working in combination with the Workforce and Affordable Rental Housing Programs in Section 3, are proposed as a well-orchestrated toolkit that—working together—are more likely to encourage

developers to rebuild housing in the areas that suffered the greatest losses. All are intended to address very specific barriers: Lack of affordable, permanent financing for mixed-income rentals; the need for more risk-tolerant predevelopment capital; and the lack of available sites for development where housing development is most needed.

The budget for incentives is provided in the table below:

### Development Incentives

| Program | Partially Funded | Fully Funded |
|---|---|---|
| Development Loan Fund | $16,570,000 | $16,570,000 |
| Land Assembly | $2,070,000 | $2,070,000 |
| Capacity Building Grants | $2,070,000 | $2,070,000 |
| Building Code Enforcement | $11,390,000 | $11,390,000 |
| **TOTAL** | **$32,100,000** | **$32,100,000** |

## 5.1  Housing Development Loan Fund

The Housing Development Loan Fund would provide seed funding for a contractor or state agency to establish one or more loan funds that offer acquisition and predevelopment financing on flexible terms to developers of the most critically needed housing. Providing early, high-risk capital will be a powerful incentive for developers to build mixed-income housing in the communities that lost the most housing. Loans would be made to nonprofit and for-profit developers of new rental and single-family housing that is affordable to families with incomes that are below the area median, with a strong preference for well-designed residential communities and infill housing developments that also include families with incomes higher than the area median.

The Housing Development Loan Fund would be operated by a state agency or an experienced community development loan fund manager. A total of $16,570,000 in CDBG funds, including fund management costs, will be invested as "top loss" capital in order to leverage an estimated $30 million in additional lending capital. As two priorities, the loan fund would target developers participating in the rental assistance programs described in the previous section, as well as developers of mixed-income for-sale housing. As projects close their construction financing, the acquisition/predevelopment loans would be repaid and the lending capital would become available for additional investments. In a three-year period, it is expected that the funds will recycle two to three times.

As currently planned, the Housing Development Loan Fund would be operated on a contractual basis by one or more qualified financial institutions that are experienced in providing early-stage, high-risk property acquisition and predevelopment loans, as an incentive for developers to rebuild existing housing or build new housing at different price points, including affordable homes and rental units. These types of loans are typically not offered by conventional lenders, but instead by the numerous so-called "community development loan funds" across the country. These loan funds are able to

take higher risks in lending by attracting risk-tolerant capital and guarantees from foundations and socially motivated investors. The goal should be to lend the funds at 0% and to subordinate these loans to the private capital in order to provide a strong incentive for developers and to leverage private capital.  Many such funds receive some of their capital as grants from the Community Development Financial Institutions (CDFI) Fund of the Department of Treasury.

Congress specifically directed the states receiving supplemental CDBG funding should consider the use of up to $20 million to fund recovery activities of two organizations that are experienced in operating such loan funds:  Enterprise Community Partners, Inc., and Local Initiatives Support Corporation.

## 5.2  Land Assembly Operations

As an additional way to jump-start development in the communities that lost the most housing, the Land Assembly component of the housing program will provide seed money to acquire multiple properties in good locations for replacement housing and "package" them for sale or grant to maximize further affordable housing development—for example, to developers using CDBG-supported LIHTC tax incentives to develop rental housing, to supportive housing developers, to self-help ownership housing developers, etc. This program component will operate only in those jurisdictions where:

- These activities are requested or supported by local governments; and

- Local governments have substantially engaged in the planning work required to target areas that are suitable for the development of replacement housing.

A total of $2,070,000 of CDBG funds are budgeted for capital to purchase residential properties as well as operating costs. The capital used to purchase properties will be recycled through sales of properties to developers.

As a related activity, properties assembled through buy-out programs, funded through the State's homeowner assistance program, might be offered at below-market costs to developers of affordable or special needs housing. One of the targets of these sales of State-purchased properties would be to encourage the development of mixed income developments that include renters with incomes below 40% of area median income. If such assembled properties were not purchased and developed by affordable developers in accordance with strict income requirements, they still might carry an inclusionary housing redevelopment requirement that a certain percentage of the units developed on CDBG assembled land would be affordable with less stringent income and pricing requirements, but still ensuring that mixed-income developments occur in redevelopment areas.

However, the $2 million Land Assembly fund is fundamentally different from and should not be confused with the buyout provisions of the Homeowner Assistance Program.

This budget line item is not intended for purchases of single-family homes.  Instead, the intention is to contract out to one or more qualified organizations that can identify suitable sites for housing development in the most distressed parishes and obtain options on them.  The intention is to address a complicating barrier to housing developments: the lack of—and high asking prices for—suitable sites that are near functioning infrastructure and services (public services, retail etc.).  The State intends, through contractual arrangements, to fund a small team of property acquisition experts who will scout out, analyze and obtain options on suitable sites that are not currently on the open market.  These could include surplus properties held by government agencies, nonprofits, churches and businesses.  Some might be brownfield sites that could be cleaned up quickly and at feasible costs.  This Land Assembly operation would result in assignable options in the name of the State of Louisiana or some designated quasi-public entity.  These options, in turn, would be offered to developers on an open, competitive basis.

This Land Assembly operation should not be viewed in isolation.  It ties into the Louisiana Housing Finance Agency's LIHTC program, the proposed CDBG/LIHTC Piggyback program, the Services Funding for Supportive Housing program, and the Housing Development Loan Fund.

## 5.3   Support for Faith-Based and Community-Based Housing Recovery Programs

The State aims to strengthen community nonprofits and faith institutions already providing housing recovery services through the investment of $2,070,000 of CDBG funds in their activities. These entities may have opportunities to contract to provide some services in Housing Assistance Centers. They will be eligible to apply for grants to build capacity in providing supportive housing services. They will be eligible to apply for matching grants to supplement charitable fundraising they have done for housing recovery assisting low and moderate income homeowners in repairing or replacing their homes, as well as for seed money to develop repair and replacement housing for low and moderate income households.

These organizations will be encouraged to help expand the supply of supportive housing, affordable rental housing and affordable homes for sale by participating, as qualified, in program such as the LIHTC program, the CDBG piggyback program, the small rental program (if a nonprofit wishes to buy, repair and operate affordable rental properties), the flexible incentives program, and the Housing Development Loan Fund.

## 5.4  Funding of Building Code Enforcement by Local Governments

Without special assistance being provided to local governments, it is expected that a major impediment to housing development will be the lack of building, electrical and plumbing inspectors and permit processing staff. In addition, architects and builders will need inspectors and plan reviewers to help communities adapt to the new State Uniform

Construction Code and to interpret the latest available advisory base flood elevations. Therefore, the State has budgeted $11,390,000 for hiring such staff for local government over a number of years, based on the numbers of damaged/destroyed units in each parish. It is expected that this amount will fund at least 40 field inspectors and plan reviewers, as well as a limited number of support staff.  The State will also support the expansion of code enforcement capacity by sponsoring additional training opportunities for inspectors, engineers and architects.  While building code enforcement by local authorities will be supported by permitting and inspection fees in the long run, this initial CDBG funding is necessary to immediately expand enforcement capacity to expedite the construction of safer and stronger homes where the storm impact was most concentrated and building activity will be fervent in coming months.

# 6. Administration

With this amendment, the State is requesting a total of $148.68 million under current, partial funding levels, which includes the $8,810,400 requested in the first action plan and $189.880 when the program is fully funded.

# 7. Planning

With this amendment, the State is requesting $9.5 million of which $0 was requested in the first action plan.

# 8. Technical Assistance

With this amendment, the State is requesting $12.420 million, of which $500,000 was requested in the first action plan.

# 9. Other Requirements

### 9.1  Fair Housing Goals

Fair housing must be a goal of the programs described in *The Road Home* Housing Program.  If a homeowner or renter (from a unit developed through the benefits of this program) believes that he or she has been the victim of housing discrimination and suspects that he or she has been treated unfairly because of Race, Color, Religion, Sex, Age, Familial Status, National Origin, Marital Status, or Disability, he or she may file a complaint of discrimination with the Louisiana Attorney General's Office, Louisiana Public Protection Division of the US Department of Housing and Urban Development Fair Housing Division.

## 9.2  Program Income

Because the allocation of federal resources will not meet the entire need for housing replacement in Louisiana, and because the costs of replacement housing are escalating in the storm-impacted areas, the State will recycle all income from sales of properties, repayments of any program loans, funds recaptured through violations of guidelines, covenants, or other actions, and any collections of lien payments derived through actions of these CDBG housing programs.  From a regulatory standpoint, recycled CDBG funds can be used for any eligible CDBG activity as described in the State's Annual Plans. The revenue generated by the program can effectively be used to achieve focused long-term housing goals by dedicating and restricting the use of recycled housing funds for future affordable housing programs. This could, in effect, create a revenue stream for the Louisiana Housing Trust Fund. The policies shaping the housing reuse of revenues will be made at a later date, as detailed operational plans are being developed, but will continue to prioritize displaced residents and deeply affordable rental housing, and will help to sustain affordability as terms expire in many of the properties supported through the programs articulated herein in 10 to ~~15~~ 20 years.

## 9.3 Promotion of Short- and Long-Term Recovery Planning

To promote sound short- and long-term recovery planning at the state and local levels that impact land use decisions that reflect the need for responsible flood plain management and growth, the State, through the Louisiana Recovery Authority, is leading community planning efforts in its most affected parishes.  Dubbed "Louisiana Speaks", this effort is a multifaceted planning process to develop a sustainable, long-term vision for South Louisiana in the wake of the destruction caused by Hurricanes Katrina and Rita.  The community planning process accomplishes the following:

- Supports a deliberate and democratic process that relies on active participation;
- Empowers local communities to develop plans that meet individual needs;
- Establishes priorities at the local level to guide decisions;
- Supports communities with the best national planning experts working in partnership with local architects, planners, and engineers; and
- Provides a user-friendly interface to enable development of individual plans.

The goal of the long-term community planning process is to develop a comprehensive plan that integrates both parish plans (coordinated with the support of FEMA technical assistance) and regional recovery plans.  The LRA collaborated with planners from FEMA to develop a parish level planning process to address numerous recovery issues pertinent to the long-term recovery of severely damaged parishes.  A total of 26 parishes throughout Louisiana were identified to participate in this planning process, which runs from November 2005 through April 2006.  Louisiana Recovery Planning Day was an important part of the parish level planning process.  On January 21, 2006, which

was proclaimed Louisiana Recovery Planning Day by Governor Kathleen Babineaux Blanco, the Louisiana Recovery Authority (LRA) and FEMA's Long-Term Community Recovery (LTCR) team hosted a series of open houses to provide Louisianans with an opportunity to express their needs and to help define a community-based vision for Louisiana's recovery.

The parish level planning process will result in the development of initial parish recovery plans, which will be used to set funding priorities for the recovery effort.  The final plans will include a community baseline, a needs assessment, a recovery strategy including principles, vision, goals, a set of high value recovery projects and a strategic recovery timeline. The final section will describe opportunities for the integration of the local plan with regional and statewide plans. The section will also include an inventory of local resources, government structures and describe the level of technical expertise needed to implement the plan.  Emphasis in the planning process is on developing plans that are based on sound land use practices and plans that remain cognizant of the hazards of rebuilding in areas made more risky by new flood guidelines.

For a more detailed description of Louisiana's long-term and short-term recovery planning efforts, please visit:

http://www.louisianaspeaks.org/process.html

### 9.4  High Quality Construction Methods

In a special legislative session in November 2005, Louisiana enacted its first statewide building code. The law states: "The state uniform construction code shall establish uniform performance standards providing reasonable safeguards for health, safety, welfare, comfort, and security balanced with affordability for the residents of this state who are occupants and users of buildings, and will provide for the use of modern methods, devices, materials, and techniques. The state uniform construction code will encourage the use of construction materials of the greatest durability, lower long-term costs, and provide greater storm resistance."  The programs described in this Action Plan Amendment will adhere to this directive of the Louisiana Legislature.

The State Uniform Construction Code (UCC) sets a minimum statewide standard to ensure the homes and businesses are rebuilt to withstand the next hurricane. The LRA and other agencies of state government urge jurisdictions, especially those along the coast, to adopt all building safety standards in the UCC.  Most coastal communities have begun to enforce the UCC; the entire state must do so on January 1, 2007. Regardless of the location, however, it remains the State's commitment to rebuild safer and stronger communities, so all homeowner assistance provided by *The Road Home* will be contingent upon enforcement of the code on homes built with program funds.

The state has high standards for energy efficiency in buildings.  The State Uniform Construction Code includes a provision requiring energy saving construction provisions.

Act 12 specifically references the provisions of the International Residential Code which give direction regarding energy efficiency.

Where it is cost effective and improves the quality and sustainability of housing construction under the programs of this Action Plan Amendment, the State will encourage mold resistant construction, including modern methods, devices, materials, and techniques as directed by the State Uniform Construction Code.

RS 51:911.22 and RS 51:911.21 of the Louisiana Revised Statutes contain standards relative to manufactured housing construction and installation.

Louisiana has adopted HUD standards under the National Manufactured Housing Construction and Safety Standards Act of 1974, as amended.

Where it is cost effective to do so, the programs in this Action Plan Amendment will emphasize the quality and sustainability of housing construction, adhering to sustainable construction techniques emphasized by the federal government. These federal standards for sustainable construction techniques include:

- Optimizing site potential, including in ways that strengthen neighborhoods, promote economic opportunity, and improve transportation;
- Protecting and conserving natural resources, including water, materials, and the atmosphere;
- Expanding renewable energy consumption, and ultimately create net energy;
- Effectively and efficiently using materials, and ultimately recover materials for use in new products and services;
- Providing a safe, healthy, and productive built environment for inhabitants and users;
- Reducing facility life-cycle costs and optimizing operations and maintenance costs; and
- Using green products and services.

## 9.5  Monitoring

The OCD/DOA and the LRA will hire additional employees to carry out the administrative functions associated with the implementation and monitoring of the housing programs.  The OCD has the staff expertise to train additional employees on the federal and state regulations governing the CDBG program.  In addition, the State has contracted with ICF Consulting to provide additional training to staff, contractors, counselors, etc.  The LRA has a mandate from the Governor and Louisiana Legislature to assure the coordinated use of resources toward the recovery and to support the most efficient and effective use of such resources.  The OCD and the LRA will work together to achieve this goal.

The State has a monitoring plan for the regular CDBG program and will develop a monitoring guide for staff and contractors for each housing program.  The plan will be revised somewhat to accommodate the waivers given to the State and other provisions cited in the legislation.  The State has contracted with ICF to assist in the development of a monitoring plan for all housing related programs.  Particular attention will be paid to ensuring that the use of funds are disaster related and that funding allocated will not duplicate other benefits. The State will ensure through its design of programs, application process, monitoring of recipients, and oversight by the LRA Board's Audit Committee, that recipients are not receiving duplication of benefits and that funds are not used for projects or activities that are reimbursable by or for which funds have been made available by FEMA or by the Army Corps of Engineers and are abiding by state and federal regulations.  The State, drawing upon the resources of the LRA and under its guidance, will coordinate with FEMA, the Army Corps of Engineers, insurance companies, and other entities during the application process to ensure there is no duplication of benefits.  Recipients will be asked to sign a waiver of their privacy rights so that the State can obtain the appropriate information from FEMA and all other federal agencies.

The State shall hire an independent firm to assist the State in its efforts to achieve the community benefit requirements of the U. S. Department of Housing and Urban Development and in verifying that programs are meeting their required targets including the provisions of Section 3.  The firm shall report to OCD and LRA on progress towards meeting the community benefit requirements.  The firm shall also provide community outreach to low and moderate income citizens to apprise them of the recovery assistance  programs available to them including but not limited to housing programs and the benefits of the Section 3 provisions.

The State is in the process of developing a Request for Proposal to provide program management services for the homeowner and rental programs detailed in this Action Plan amendment.  The proposal will seek the best available management firm to assist in the implementation of these programs.  The State will have staff assigned to monitor the services being provided under the contract.

## 9.6  Mitigation of Fraud, Waste and Mismanagement

The State has a number of processes and procedures in place to avoid fraud, abuse and mismanagement. The Legislative Auditor serves as the watchdog of public spending, overseeing more than 3,500 audits of state and local governments and their related quasi-public enterprises. Conducting independent financial and performance audits of the State's agencies, colleges, and universities, auditors find ways to improve government and identify critical issues to protect public resources and tighten government control systems. When necessary, they follow up on allegations of fraud, waste, or abuse.  The Legislative Auditor will perform an annual audit of the DOA in accordance with A-133.

In addition, the State has an established Office of the Inspector General.  The office's mission is to help prevent waste, mismanagement, abuse, fraud and corruption in the executive branch of state government without regard to partisan politics, allegiances, status, or influence.  The Inspector General is appointed by the Governor.

The LRA Board has established an Audit Committee which, in conjunction with its LRA staff, is charged with ensuring that the work of the recovery is conducted in a manner consistent with the highest ethical standards.  Throughout the recovery, the LRA Audit Committee and staff will receive and review reports from all governmental entities working to detect, prevent, and eliminate instances of fraud and abuse. It will serve as the body to bring together multiple audit and oversight groups to provide an independent review of the audit efforts themselves.

The Office of Finance and Support Services (OFSS), a section of the DOA, has established clear designation of responsibilities in order to ensure separation of duties. This separation of duties, along with other established operational policies and procedures, provides assurance that fraud cannot be accomplished without collusion among employees in separate areas.

The OFSS is responsible for payments, federal draw down requests, and state and federal financial reporting.  The OCD is responsible for the day to day administration of the CDBG program.  Their staff reviews all requests for payment and accompanying invoices to ensure costs are reasonable and within the scope of the activity funded. Two signatures are required on a request for payment prior to being sent to OFSS for payment.  All payment requests are reviewed for proper authorized signatures prior to input into the financial system for payment.  One employee actually inputs the properly authorized payment request into the financial system and the request must be approved in the system by the payment unit supervisor.  Through financial system security, no one person can both input and approve a payment request.

The payment management unit of OFSS provides information to the appropriation accounting unit so that federal funds can be drawn.  The federal draw down request is reviewed and approved by a supervisor prior to the draw down request being processed. All funds are electronically transferred to the State Treasurer's central depository account to be used to liquidate the payables.  The financial reporting of the expenditure and revenue activities is prepared by the appropriation accounting unit.  All reports are prepared by one employee and reviewed by the appropriate manager prior to release of the report/statement.

In addition, the State will hire an internal auditor who will be placed within the OCD to oversee the internal functions of this office.  The auditor will report to the Commissioner of Administration and will make reports to the LRA Audit Committee as requested.

The State follows the State Procurement Code and all other sub recipients are required to follow Title 24 Part 84 and Part 85.  The monitoring plan outlines the requirements that must be followed.

Training and technical assistance will be provided to local governments, contractors, and any other entity responsible for administering activities under this grant.

## 9.7  Mitigation of Flood Hazards

To mitigate flood risk, the LRA approved an allocation of $250 million in hazard mitigation funding to help parishes prevent damage from future disasters.  Following approval of the Legislature, the Louisiana Recovery Authority (LRA) authorized the use of $150 million to help parishes prevent damage from future disasters by directing the Governor's Office of Homeland Security and Emergency Preparedness (GOSHEP) to distribute the first hazard mitigation funding available after Hurricanes Katrina and Rita to parish governments.

According to the formula approved by the LRA:
- $100 million will be dedicated to elevate and acquire severe repetitive loss properties.
- $136 million for other cost-effective acquisition or elevation projects, or for the retrofit of critical facilities.
- $14 million for mitigation planning and education.

The LRA has passed resolutions tying benefits and funding for communities and parishes to the adoption of the most up-to-date flood guidance as part of their floodplain management ordinances. The LRA has said it will only provide HMGP and CDBG funding in those parishes that adhere to the State's new building codes and adopt and enforce FEMA's Base Flood Elevation guidance in the construction or reconstruction of all homes, businesses, and other structures in the aftermath of Hurricanes Katrina and Rita

The LRA determined overall priorities for the use of HMGP funds that will serve as a tool for elevating projects for funding

The LRA also directed GOHSEP to prepare an application for HMGP funds for a five-year hazard mitigation outreach and education campaign aimed at educating Louisiana citizens, businesses and units of government about the best use of mitigation dollars

About 1,700 homes, or about one-third of the severely and repetitively damaged homes in America, are in Louisiana.  These are structures that have suffered damages of $1,000 or more on at least four occasions, or have suffered damages of more than 50 percent of their value on two or more occasions.

To access these hazard mitigation funds, parishes will submit proposals to OHSEP. The funds, which are provided under the Stafford Disaster Relief and Emergency Assistance Act, require a 25 percent match from parish governments or state agencies. Distribution of these funds is subject to a formal review process in accordance with the Inspector

General, Legislative Auditor, Commissioner of Administration and State Treasurer, as has been done for all funds distributed by GOSHEP since Hurricanes Katrina and Rita.

## 9.8  Encouragement of Energy Efficiency and Sound Environmental Practices

The State will encourage energy efficiency through implementation of its new state housing codes that include provisions for energy efficient repairs and construction. Further, the State will provide technical assistance to local governments and private and for profit developers to educate them on sound practices for eradication of mold and use of mold resistant materials and construction techniques.

## 9.9  Removal of Barriers to Reconstruction

Through the proposed Housing Assistance Centers the State will encourage expedited processing of assistance applications, permits for new construction, and constructions inspection. The staff of the Assistance Centers will provide feedback to the State on challenges they are encountering that interfere with the repair and production of housing. Based on the challenges identified, the State will work with local governments to expedite investments.

**APPENDICES**

# APPENDIX 1

# ACTION PLAN FEEDBACK FORMAT

First Name:
Last Name:
Organization:
Mailing Address:
      Street 1
      Street 2
      City              State         Zip code
Phone Number:
E-mail Address:
May we contact you if we have questions about your comments?  Yes      No

Affiliation: Check any of the following that apply.  Are you a:
      Evacuee____
      Homeowner whose property was damaged ____
      Rental Property owner whose property was damaged ____
      Local government official ____
      Real estate industry professional _____
      Other _____

Comments on Owner Occupied Programs:

1.  Eligibility of Homeowners to receive assistance

2.  Requirements for receiving homeowner assistance

3.  Financial benefits for homeowners to repair and rebuild

4.  Financial benefits for homeowners who resettle

5.  Financial benefits for homeowners who elect to sell their homes and move away

6.  Homeowners assistance centers and program administration

7.  Please provide any additional comments that you have on the owner occupant program

Comments on Rental Housing Programs

8.  Low-Income Housing "Piggyback" rental program

9.  Small scale rental repair program

Comments on Homeless and Supportive Service Program

10. Supportive services housing program

11. Homeless shelter repair program

Comments on Other Developer Incentives

 12. Housing Development Loan Fund

 13. Land assembly initiative

 14. Flexible Subsidies – Mixed Income

Other
 15. Please provide your comments on other aspects of the Action Plan amendment of concern to you

# APPENDIX 2

# SAMPLE BENEFIT CALCULATIONS

**Case 1 – Insured retired couple**
An older couple owns a home with a pre-storm value of $153,000. They bought the house for $50,000 in 1970 and had not increased their insurance coverage. After receiving an insurance award of $50,000 and a FEMA assistance grant of $10,500, **they still have $17,530 in uninsured damages**. What are their options under The Road Home housing plan?

**Homeowner Summary**
Pre-storm Value: $153,000
Loss to Home: $153,000 x 51% = $78,030
Insurance: $50,000
FEMA Assistance: $10,500
Cost to elevate home to meet FEMA standards: $30,000

**Repair or Rebuild**
Eligible Road Home Grant Award = $78,030 - $50,000 - $10,500 = $17,530
Hazard mitigation grant = $30,000

| Summary of Costs / Losses | | Summary of benefits | |
|---|---:|---|---:|
| | | Insurance: | $50,000 |
| | | FEMA: | $10,500 |
| Damage to Home: | $78,030 | Road Home: | $17,530 |
| Additional Mitigation Costs: | $30,000 | Mitigation: | $30,000 |
| **Total** | **$108,030** | **Total** | **$108,030** |

Note: Homeowners may be eligible for an affordable loan to cover the gap if there is a difference between repair costs and the grant they receive.

**Relocate/Buyout**
If they want to sell the rights to their home and move somewhere else in Louisiana, the state will pay them up to the amount of their damages, based on the pre-storm value of their home. They also may be eligible for an affordable loan to cover the gap if there is a difference between repair costs and the grant they receive. The grant and loan amounts would be the same as under the "repair/rebuild" model.

Eligible Road Home Grant Award = $78,030 - $50,000 - $10,500 = $17,530

| Summary of Costs / Losses | | Summary of benefits | |
|---|---|---|---|
| | | Insurance: | $50,000 |
| | | FEMA: | $10,500 |
| | | Road Home: | $17,530 |
| **Damage to Home:** | **$78,030** | **Total** | **$78,030** |

Note: If required, hazard mitigation funds will be available at the new location. Total *Road Home* assistance, including hazard mitigation funds and loan, cannot exceed $150,000.


**Sell**

If they wish to move somewhere outside of Louisiana, the state will buy their home for 60 percent of its pre-storm value or the amount of eligible assistance under the repair/rebuild program, whichever is less.

**Seller would receive lesser of:**
Pre-storm Value: $153,000 X 60% = $91,800
OR
Eligible Road Home Grant under Repair/Rebuild : $17,530

| Summary of Costs / Losses | | Summary of benefits | |
|---|---|---|---|
| | | Insurance: | $50,000 |
| | | FEMA: | $10,500 |
| **Pre-storm value of home** | | Road Home: | $17,530 |
| **sold:** | **$153,000** | **Total** | **$78,030** |

**In this case, the seller who relocates out of state is out the difference of $153,000 - $78,030 = $74,970**. The LRA acknowledges that the sell option is generally the least favorable; however, the goal of the Road Home program is to encourage our citizens to revitalize our communities here in Louisiana. A more favorable option financially for the homeowner choosing "Sell" could be to choose to repair to return the property to its original condition, use the assignability option, and then sell the property on the open market to a new resident homeowner that will agree to the covenants of the program.


**Case 2 – Uninsured single parent**
A single parent who inherited a home with a pre-storm value of $110,000 had a damage loss of 30%. She was uninsured and did not pay premiums over the years like her neighbors. She received a check from FEMA for $5,200. What are their options under The Road Home housing plan?

**Homeowner Summary**
Pre-storm Value: $110,000
Loss to Home: $110,000 x 30% = $33,000
Insurance: $0

FEMA Assistance: $5,200
Cost to elevate home to meet FEMA standards: $35,000

**Repair or Rebuild**
Eligible Road Home Grant Award = ($33,000 - $5,200) x 70% = $19,460
Note that a 30% penalty applies to those who failed to purchase insurance for their homes.
Penalty applies to those without flood insurance in a designated flood plane and those without
hazard insurance that were outside the flood plane.

Hazard mitigation grant = $35,000

| Summary of Costs / Losses | | Summary of benefits | |
|---|---|---|---|
| | | FEMA: | $5,200 |
| Damage to Home: | $33,000 | Road Home: | $19,460 |
| Additional Mitigation Costs: | $35,000 | Mitigation: | $35,000 |
| **Total** | **$68,000** | **Total** | **$59,660** |

In this case, there remains an uncompensated gap of $8,340 due to the homeowner's lack of
insurance.  The loan program is available to provide capital to fill this gap plus additional repair
costs beyond the amount of loss.

**Relocate/Buyout**
If you want to sell the rights to your home and move somewhere else in Louisiana, the state will
pay you up to the amount of your damages, based on the pre-storm value of your home. You also
may be eligible for an affordable loan to cover the gap if there is a difference between repair
costs and the grant you receive. The grant and loan amounts would be the same as under the
"repair/rebuild" model.

Eligible Road Home Grant Award = ($33,000 - $5,200) x 70% = $19,460

| Summary of Costs / Losses | | Summary of benefits | |
|---|---|---|---|
| | | FEMA: | $5,200 |
| | | Road Home: | $19,460 |
| **Damage to Home:** | **$33,000** | **Total** | **$24,660** |

If required, hazard mitigation funds will be available at the new location. Total *Road Home*
assistance, including hazard mitigation funds and loan, cannot exceed $150,000.  Generally, for a
person with only 30% damage, the relocate option is much less attractive than the repair
program.

**Sell**

If they wish to move somewhere outside of Louisiana, the state will buy their home for 60
percent of its pre-storm value or the amount of eligible assistance under the repair/rebuild
program, whichever is less.

**Seller would receive lesser of:**
Pre-storm Value: $110,000 X 60% = $66,000
OR
Eligible Road Home Grant under Repair/Rebuild : $19,460

| Summary of Costs / Losses | | Summary of benefits | |
|---|---|---|---|
| | | FEMA: | $5,200 |
| **Pre-storm value of home** | | Road Home: | $19,460 |
| **sold:** | **$110,000** | **Total** | **$24,660** |

**In this case, the seller who relocates out of state is out the difference of $110,000 - $24,660 = $85,340**. The sell program is especially unfavorable to those with only limited damage (in this case 30%). It is unlikely that anyone that has less than severe damage will take this option. The LRA acknowledges that the sell option is generally the least favorable; however, the goal of the Road Home program is to encourage our citizens to revitalize our communities here in Louisiana. The seller could use the assignability option and use the repair/rebuild program to return the property to its original condition, and then sell the property on the open market to a new resident homeowner that will agree to the covenants of the program.

**Case 3 – Insured family of four**
A two-income family of four with a home with a pre-storm value of $250,000 had a damage loss of 70%. They received an insurance payment of $150,000 and received a check from FEMA for $5,200. What are their options under The Road Home housing plan?

**Homeowner Summary**
Pre-storm Value: $250,000
Loss to Home: $250,000 x 70% = $175,000
Insurance: $150,000
FEMA Assistance: $5,200
Cost to elevate home to meet FEMA standards: $40,000

**Repair or Rebuild**
Eligible Road Home Grant Award = $175,000 - $150,000 - $5,200 = $19,800
Hazard mitigation grant = $40,000

| Summary of Costs / Losses | | Summary of benefits | |
|---|---|---|---|
| | | Insurance: | $150,000 |
| | | FEMA: | $5,200 |
| Damage to Home: | $175,000 | Road Home: | $19,800 |
| Additional Mitigation Costs: | $40,000 | Mitigation: | $40,000 |
| **Total** | **$215,000** | **Total** | **$215,000** |

Note: Homeowners may be eligible for an affordable loan to cover the gap if there is a difference between repair costs and the grant they receive.

**Relocate/Buyout**

If you want to sell the rights to your home and move somewhere else in Louisiana, the state will pay you up to the amount of your damages, based on the pre-storm value of your home. You also may be eligible for an affordable loan to cover the gap if there is a difference between repair costs and the grant you receive. The grant and loan amounts would be the same as under the "repair/rebuild" model.

Eligible Road Home Grant Award = $175,000 - $150,000 - $5,200 = $19,800

| Summary of Costs / Losses | | Summary of benefits | |
|---|---|---|---|
| | | Insurance: | $150,000 |
| | | FEMA: | $5,200 |
| | | Road Home: | $19,800 |
| **Damage to Home:** | **$175,000** | **Total** | **$175,000** |

If required, hazard mitigation funds will be available at the new location. Total *Road Home* assistance, including hazard mitigation funds and loan, cannot exceed $150,000.


**Sell**

If they wish to move somewhere outside of Louisiana, the state will buy their home for 60 percent of its pre-storm value or the amount of eligible assistance under the repair/rebuild program,, whichever is less.

**Seller would receive lesser of:**
Pre-storm Value: $250,000 X 60% = $150,000
OR
Eligible Road Home Grant under Repair/Rebuild : $19,800

| Summary of Costs / Losses | | Summary of benefits | |
|---|---|---|---|
| | | Insurance: | $150,000 |
| | | FEMA: | $5,200 |
| **Pre-storm value of home** | | Road Home: | $19,800 |
| **sold:** | **$250,000** | **Total** | **$175,000** |

**In this case, the seller who relocates out of state is out the difference of $250,000 - $175,000 = $75,000**. The LRA acknowledges that the sell option is generally the least favorable; however, the goal of the Road Home program is to encourage our citizens to revitalize our communities here in Louisiana.  The seller could use the assignability option and use the repair/rebuild program to return the property to its original condition, and then sell the property on the open market to a new resident homeowner that will agree to the covenants of the program.

46

# APPENDIX 3
# ELIGIBLE ACTIVITIES AND NATIONAL OBJECTIVES

The funds used to support activities in this Action Plan are CDBG eligible activities and will meet one of the three CDBG National Objectives.  The Eligible Activities and National Objectives are:

| Eligible Activities | Regulatory Citation | Statute 42USC5305 |
|---|---|---|
| Acquisition | 570.201(a) | Section 105(a) (1) |
| Homeowner compensation and incentives | Pending waiver | Pending waiver |
| New construction | Pending waiver | Pending waiver |
| Housing Advisory services to property owners | 570.201(k) | Section 105(20) |
| Rehabilitation | 570.202 | Section 104(d) |
| Reconstruction | | P.l. 104-234 amendments to Section 105(a)(4) of 42USC5305 |
| Code enforcement | 570.202(c) | Section 105(a) (3) |
| Planning, Administration, and Technical Assistance | 570.205 and 570.206 and 570.201(p) | Section 105(12), 105(13), 105(19) |
| **National Objectives** | | |
| Activities benefiting L/M persons | 570.483 (b) | |
| Activities which aid in the prevention or elimination of blight | 570.483 (c) | |
| Activities that meet particular urgency | 570.483 (d) | |

47

# APPENDIX 4

## SUMMARY OF PUBLIC COMMENTS AND RESPONSES

This document summarizes the 1,025 comments received on The Road Home Housing Plan during the public comment period and at the April 13 public meetings held in New Orleans and Lake Charles. The first section outlines some vital statistics about the comments including the form in which comments were submitted, the number of comments received each day, and the organizations that submitted comments. The second section briefly reviews the comments and information collected at the Lake Charles and New Orleans public meetings held on April 13. The third section, Major Issues Raised in Comments, addresses in detail the specific comments made by the public.

**I.      VITAL STATISTICS**

| Total Number of Comments Received | 1,025 |
|---|---|
| Mailed Comments | 6 |
| Online Comment Forms | 312 |
| Emailed Comments | 258 |
| Faxed Comments | 15 |
| New Orleans Meeting Comments | 293 |
| Lake Charles Meeting Comments | 141 |

| Number of Comments Received by Date | |
|---|---|
| Prior to April 12 | 177 |
| April 12 | 347 |
| April 13 | 156 |
| April 14 | 31 |
| April 15 | 28 |
| April 16 | 0 |
| April 17 | 247 |
| April 18 | 16 |
| April 19 | 15 |
| April 20 | 8 |

**Commenter makeup**
The majority of the comments came from individual citizens, mostly homeowners, with questions and comments about the Plan. The following is the list of the 43 organizations which also submitted comments:

Advocacy Center
Bureau of Governmental Research
Consumer Mortgage Coalition
HCV Landlords Association
Housing Policy Council
Housing Assistance Council
HRI Properties
Kingswood Homeowners Association
Lakeview Civic

Leadership Conference on Civil Rights
Legislative Black Caucus
Louisiana Advocacy Coalition for the Homeless (LACH)
Louisiana Association of Non-Profit Organizations (LANO)
Louisiana Black Caucus
Louisiana Housing Alliance
Louisiana Housing Finance Agency
Mortgage Bankers Association
National AIDS Housing Coalition
National Alliance on Mental Illness
National Alliance to End Homelessness
National Alliance of Vietnamese American Service Agencies
National Coalition for Asian Pacific American Community Development
National Consumer Law Center and 12 other organizations
National Fair Housing Alliance
National Housing Conference and Center on Housing Policy
National Immigration Law Center
National Law Center on Homelessness & Poverty
National Low Income Housing Coalition
Neighborhood Housing Services of New Orleans
New Orleans Business Council
New Orleans Legal Assistance
New Orleans Neighborhood Development Collaborative (NONDC)
Newport Partners
Oak Island Homeowners Association
Oxfam America
Southern Mutual Help Association, Inc.
Standard Mortgage Corporation
SU Ag. Center
Technical Assistance Collaborative
Unity of Greater New Orleans Agency
US Jesuit Conference
Volunteers of America
YURCO Hope Group

## II.    PUBLIC MEETING COMMENTS

At the public meetings held on April 13 in Lake Charles and New Orleans, attendees filled out a response form and were asked the following question: "Although the proposed housing Plan may be new to you, do you think you will benefit from this program as it is currently designed?" Of the 72 responses submitted at the Lake Charles meeting, 51 circled "Yes" to this question. The remaining 21 were unsure or responded no. At the New Orleans meeting, 62 response forms were collected. There were 27 respondents who thought they would benefit from the program and 27 respondents who thought they would not benefit from the program. The remaining 14 were unsure or did not fill in an answer.

The comments expressed most often on the response forms concerned the following issues:
- Speed of the disbursement of funding assistance.
- Specific questions about individuals' eligibility to receive funding assistance through the program
- Income restrictions.

**Road Home Housing Plan**                                    **Public Comment Period Summary**

- Penalties for individuals without insurance.

At the public meetings, homeowners were asked to indicate whether they planned to repair, rebuild, relocate, or sell.  Renters were also asked to indicate if they planned on participating in the programs offered in the Plan.

| Lake Charles Public Meeting | |
|---|---|
| Homeowners | |
| Repair | 43 |
| Rebuild | 55 |
| Relocate | 33 |
| Sell | 1 |
| Renters | |
| Yes | 12 |
| No | 5 |

| New Orleans Public Meeting | |
|---|---|
| Homeowners | |
| Repair | 114 |
| Rebuild | 91 |
| Relocate | 34 |
| Sell | 29 |
| Renters | |
| Yes | 6 |
| No | 78 |

## III.     MAJOR ISSUES RAISED IN COMMENTS

The online comment form asked respondents to provide comments on any or all of the eleven categories listed below.  Comments were indexed to one of the eleven major categories and indicate whether the respondent was in favor of or opposed to that particular feature of the program.

| Category | Number of Comments | |
|---|---|---|
| | In favor | Opposed |
| Eligibility of homeowners to receive assistance | 17 | 387 |
| Requirements for receiving homeowner assistance | 8 | 119 |
| Financial benefits for homeowners to repair and rebuild | 58 | 147 |
| Financial benefits for homeowners who resettle | 25 | 84 |
| Financial benefits for persons who elect to sell their homes and move away | 18 | 68 |
| Homeowners assistance centers and program administration | 10 | 25 |
| Low-income housing "piggyback" rental program | 10 | 197 |
| Small landlord gap funding rental repair program | 19 | 17 |
| Supporting housing services rental program | 11 | 12 |
| Housing development loan fund | 7 | 24 |
| Land assembly initiative | 9 | 26 |

**Road Home Housing Plan**                                          **Public Comment Period Summary**

There were 171 respondents, representing approximately 17 percent of the total comments received, who submitted a form letter disagreeing with the insurance deduction for homeowners who did not purchase flood insurance and in favor of increased funding for affordable rental units.  The form letter read as follows:

> *"I recently learned about Governor Blanco's "Road Home" Plan and am concerned that this Plan does not provide sufficient resources to low and moderate-income households who are trying to rebuild their lives. I do not want this Plan to go through until the needs of those most affected by the storm are adequately met. The Community Development Block Grants only guarantee that 6,000 rental units can be rebuilt which are affordable to families that make less than $30,000 per year.  I know that at least 36,000 low-income families lived in New Orleans before the storm and, under this Plan, would have no hope of returning to rebuild their communities. Thousands will remain in un-sustainable trailer parks, living in their cars and subjected to continued suffering. The Blanco Plan's drastic shortfall in resources is unacceptable!*
>
> *Additionally, I am concerned that your Plan penalizes homeowners who did not purchase flood insurance. This policy will clearly function as a punishment to low-income homeowners who did not necessarily have the means to protect their property. It would make much more sense to give the most resources to the homeowners and renters who have the least and who have the farthest to go in their process of recovery.*
>
> *I hope you take these comments into consideration and that you delay the "Road Home" Plan until the needs of everyone are met in an equitable and just way."*

> **RESPONSE**: This Plan is one of the largest one-time investments in affordable rental housing in any area. These and other comments were noted, but the uncertainty of the development environment makes it impossible to estimate accurately how many units will be created. For more information, see page 17: "To achieve these four goals, the programs described below prioritize **deep affordability** of rental units and the balanced allocation of these deeply affordable units within **mixed income communities**. The program will create an estimated 36,000 to 51,000 units, in a broad mixture of deeply affordable units, mixed income development, small rental properties, and other tax credit projects."

> The LRA board considered removing the penalty for homeowners who did not have insurance but lived in the floodplain and believes that the 30% reduction is a balanced and fair policy.

Many of the comments did not fall into any of the listed categories.  These have been summarized below as one of the issues raised during the comment period.  The most common comment expressed opposition to the income eligibility requirements which many believed left the middle class out of the Plan.  Many individuals commented that their insurance payouts were not able to cover damage costs and/or they were forced to pay off their mortgage with the payouts rather than spend it on rebuilding.

**Road Home Housing Plan**                                    **Public Comment Period Summary**

**Income eligibility requirements**

Opposition to the income eligibility requirements was the most common comment submitted. Respondents believed that those with family incomes above 70 percent annual median income (AMI) were in need of assistance and that it was unjust to exclude them from receiving financial assistance based on their socioeconomic level pre-Katrina.  Specifically, the requirements are unfair to the middle class.   One organization suggested that the contingency Plan if the program is not fully funded should be modified to target owners at or below 80 percent of AMI and if funds are not exhausted, only then should those lying outside of the flood plain who were flooded be helped. The Louisiana House of Representatives, through House Resolution 32, suggested that the program remove any limits on assistance to homeowners based on income.

> **RESPONSE:** Under current, partial funding levels, *the Plan was revised to include all homeowners with major or severe damage*, providing them 50% of the assistance for which they will be eligible when Congress has appropriated the additional $4.2 billion. If the additional funds are appropriated, homeowners will receive the remainder of the assistance for which they have determined to be eligible.

**Eligibility of homeowners to receive assistance**

Most of the comments within this section expressed the sentiment that all homeowners who had damage to their home should receive funding assistance regardless of geographical location, income level, or insurance payouts.  Many believed that the hardest hit areas should receive priority.   Some believed that Gulf Opportunity Zone Low Income Housing Tax Credit (GO Zone LIHTC) projects should go to the most heavily impacted parishes. One respondent recommended total inclusion by spreading limited resources over a broader base by reducing compensation caps and expanding the pool of funds by reallocating other CDBG grants or limiting the number of developers eligible for funds.

Concern was raised about eligibility and assistance to homeowners and their heirs that were deceased or infirm as a result of or since the storms.

> **RESPONSE:** Under current, partial funding levels, the Plan was revised to include all homeowners with major or severe damage, providing them 50% of the assistance for which they will be eligible when Congress has appropriated the additional $4.2 billion. If the additional funds are appropriated, homeowners will receive the remainder of the assistance for which they have been determined to be eligible.
>
> The LRA clarified the guidelines for the assignment of benefits to legal heirs and holders of legal rights of homeowners that would otherwise be eligible for the program.  See Section 2.6 for more detail.
>
> The LRA established that a percentage of rental redevelopment funding will be allocated to the most affected parishes based on the estimated damage to rental units.
>
> The LRA strongly urges the Louisiana Housing Finance Agency to direct that GO Zone LIHTC benefits be similarly targeted to parishes which suffered the most damaged or destroyed rental properties, as described for the Workforce and Affordable Rental Housing programs (Section 3.1).

**Language and accessibility of the Plan**

Many of the respondents were confused about whether or not they are eligible for funding assistance and if so, how to go about applying for and receiving assistance**.**  Generally speaking,

**Road Home Housing Plan**                          **Public Comment Period Summary**

the eligibility guidelines require more clarification.  Some found the grant calculations to be confusing and overly complex.  Respondents found the Plan ambiguous in certain sections and were unclear about the following terms used throughout the Plan:

- "Damage" as well as the qualifiers "major," "severe", "destroyed", "substantial"
- "Affordable housing"
- "Disability"
- "Supportive Services"
- "Pre-storm value"
- "Allowed repair/rebuilding cost"
- "Mixed-income community"

The Plan was inaccessible to foreign language speakers who attended the public hearings where there were not enough interpreters.  The public hearings also offered no opportunity for formal dialogue and discussion.

One commenter suggested that a "Frequently Asked Questions" section be added to the website.

> **RESPONSE:** To combat that confusion, Appendix 2 was updated to better illustrate the total extent of costs and benefits to homeowners.  A third example was included to demonstrate a broader range of circumstances, and the LRA took the opportunity to correct an error in our previous version in which we did not include the penalty for being uninsured. In Section 2.4, the LRA clarified and gave more detail on determining pre-storm value, repair cost, and the overall value of the financial benefits of the program.

> A "Frequently Asked Questions" section is already present on the website and will be updated. As the program design is refined and implemented with the Contractor, program materials will include a glossary of these and other terms.

**Timeline**

One commenter mentioned that the levees should be repaired before housing funding assistance is distributed but all other comments, particularly those received during the Lake Charles and New Orleans public meetings, concerned the fact that the funds are not being dispersed quickly enough.

> **RESPONSE:** The LRA believes that safety in rebuilding is one of its primary priorities. Comment noted.

**The elderly and individuals with physical and mental disabilities**

The current Plan provides no provisions or assistance to the elderly and those with physical and mental disabilities and should be revised to do so.  The Advocacy Center had the following list of recommendations to provide for individuals with physical disabilities:

- Assistance should be provided to people with disabilities to help them rebuild with ramps and lifts, particularly for homes that need to be elevated.
- Additional incentives should be provided to landlords who build lifts and ramps thereby making their rental units more accessible and prioritize landlords under the small rental property program who make units accessible.
- Incentives for the set aside of accessible units.
- For the renter's registry, ensure that data indicate accessibility features for people with physical disabilities.
- Make sure that information on accessibility is available in Assistance Centers.

**Road Home Housing Plan**                                    **Public Comment Period Summary**

- Supportive services are not defined in Plan and must be defined as broadly as possible. One proposal calls for enough funds to support the creation of 5,000 new units of permanent supportive housing in New Orleans to ensure that all disabled, displaced residents can return.

> **RESPONSE**: Section 3.2 outlines funding set-aside for supportive services specifically targeted to the elderly and those with physical and mental disabilities, allowing an estimated 3,000 units to receive supportive services under the fully funded program. Section 4 describes allocations of funding for supportive services for the elderly and disabled in the homeless programs.

**Issues not considered in Plan**
- No funding dedicated to economic and business development or a strategy to attract outside investment to the area are missing from the Plan
- No commitment or funding for cultural preservation of the area
- No consideration of immigrants to receive assistance
- Lack of funding investment in infrastructure including schools, hospitals, airports, roads, and bike paths to attract outside investment in housing and businesses
- One commenter noted that the Plan should formally recognize that the failure of the levees was the responsibility of the United States Army Corps of Engineers.

> **RESPONSE**: As with all HUD programs, this program is available to legal immigrants and language accessibility is a priority in the development and administration of programs.

> Other comments related to economic development programs will be dealt with in future action plan amendments.

> CDBG funds are prioritized for housing, infrastructure and economic development and the LRA is supporting local planning efforts that will endorse cultural preservation initiatives.

**Penalty for lack of necessary insurance**
The current reduction by 30 percent of the incentive grant to a homeowner failing to carry the type of insurance required for the damaged home (i.e. individual did not carry flood insurance but lived in the flood plain) unfairly disadvantages the poor.  Respondents were opposed to this reduction to the grant, mainly on the grounds that the assistance is needed.  In addition, damage inside the flood plain was due to levee failure and therefore, homeowners should not be penalized for not having insurance.

> **RESPONSE**: The LRA board considered this proposal and believes that the 30% reduction is a balanced and fair policy.

**Deduction of insurance proceeds from assistance funding**
The Plan should not deduct insurance payouts when determining funding assistance.  Giving funding assistance to individuals without flood insurance is unfair to those with insurance.  Those who had homeowner's insurance but did not carry flood insurance should also be provided with some additional financial benefit.  Under the current grant calculations, the amount of funding that would be distributed to individuals who had insurance is not enough to cover losses.  A lot of individuals were forced to use their insurance settlements to pay off their mortgages and do not have money remaining to repair and rebuild.  In particular, the Plan does not compensate those

with large mortgages.  After paying off his mortgage with flood insurance, one respondent noted a replacement home will cost more than double their original mortgage but since the respondent received more than $150,000, the individual is not eligible for assistance. ACORN recommends structural assistance to these types of individuals.

> **RESPONSE:** The LRA explored the option and clarified with HUD that, pursuant to federal statute and HUD requirements for the CDBG program, homeowner assistance may not duplicate any benefits, derived from any source, that are received by the homeowner as a result of damages incurred during Hurricanes Katrina and Rita.

**Flood plain eligibility requirements**
Individuals who live in the flood plain should be eligible to receive funding. All areas of New Orleans are susceptible to flooding and it is important to consider what lies below New Orleans East.

> **RESPONSE:** Under current, partial funding levels, the Plan was revised to include all homeowners with major or severe damage, providing them 50% of the assistance for which they will be eligible when Congress has appropriated the additional $4.2 billion. If the additional funds are appropriated, homeowners will receive the remainder of the assistance for which they have determined to be eligible.

**Deduction of FEMA repair assistance grant**
The FEMA repair assistance grant should not be deducted from the eligible assistance grant.

> **RESPONSE:** The LRA explored the option and clarified with HUD that, pursuant to federal statute and HUD requirements for the CDBG program, homeowner assistance may not duplicate any benefits, derived from any source, that are received by the homeowner as a result of damages incurred during Hurricanes Katrina and Rita.

**Using FEMA to establish eligibility**
FEMA damage assessments are inaccurate because many inspectors were not well-trained enough to determine the extent of damage that is a requirement to be eligible for funding.  As a result, many houses were not properly registered with FEMA Individual Assistance and people were unfairly turned away or the damage on their properties was undervalued.  Because so many people had trouble with the FEMA application process, it is necessary to develop an alternate route for demonstrating major damage rather than simply an appeal.

In addition, non-English speakers were largely excluded from this process due to a lack of foreign language materials explaining the process.  The FEMA regulations unjustly exclude many lawfully present legal immigrants who have lived in Louisiana for years.  Language barriers and sheltering in Honduran and Vietnamese communities that did not have access to FEMA program and deadline information prevented thousands from applying for assistance.  For these reasons, assistance should not be tied to the status of the FEMA claim or alternatively, the Plan should be amended to require that households prove that their homes were damaged through FEMA's findings or some other means.

One commenter thought the Plan should align itself with the letter and spirit of FEMA's definition of "substantially damaged."

> **RESPONSE:** Recognizing that FEMA has not been uniform in its assessment of damage in all cases, nor have they been uniform in notifying homeowners of damage

assessments, the Plan has been amended to make it clear that homeowners may appeal their eligibility based on an alternative damage estimate. In certain cases, FEMA may fail to notify a homeowner that the home has been classified as destroyed or suffering major damage, or FEMA has declared a home with such damage ineligible for its home repair assistance program because the home was covered by insurance. These homeowners will still be eligible for assistance, though damage severity that meets the FEMA damage classification at the destroyed and major damage levels will be verified through alternative means. The Plan states on page 6: "Homeowners that believe they have suffered major or severe damage, but did not qualify for FEMA assistance will be able to appeal their eligibility for The Road Home."

**Primary residence provision**
Proof of primary residence is an unfair provision and secondary homes should also be considered eligible to receive assistance. Requiring proof of home ownership is too inflexible and would unfairly affect those who inherited their homes but did not file paperwork and those who lost ownership documents.  Alternative forms of proof ownership including payment of real estate taxes, and certification by other family members, neighbors or local officials should be accepted.

> **RESPONSE**: Comments noted and will be addressed as program implementation is designed.

**Owner-occupants of doubles**
The housing stock of New Orleans includes many doubles which include a rental unit as well as the owner's residence. These people should not have to choose between the small rental property or the homeowner assistance program. Instead, a hybrid program should be developed that allows the homeowner to receive funding for the rental unit with the same rent restrictions that apply to the small landlord program.  The number of owner-occupied units in New Orleans is especially high.  Allowing owner-occupants of doubles to participate in the homeowner assistance program and receive adequate assistance to repair the rental unit would ensure that they are not penalized by the Plan.  Another alternative would be to allow these types of homeowners to benefit from the homeowner program for both halves.

The existing terms for eligibility required of residents who live in doubles is unclear and requires clarification even if no changes are made to the provisions.

> **RESPONSE:** The valuation and damage calculations on doubles, in which the owner resides in one of the units, have been expanded to encompass the full structure, not just the single owner-occupied unit (see section 2.2 and footnote 4 on page 6).

**Requirements for receiving homeowner assistance**
- Forfeiture of property for failure to meet all the requirements for eligibility is too harsh a penalty.
- The flood elevation requirements are unfair.
- Requiring recipients of funding assistance, who may not be in control of their future living situation, to occupy house for three years is unfair.
- An appeals process should be established for automated assessments.

> **RESPONSE:** Any homeowner may appeal the decision related to eligibility, damage assessments, amount of assistance and grant offsets made by the program. Other comments noted.

**Road Home Housing Plan**                                    **Public Comment Period Summary**

**Requiring insurance coverage**
Since many insurers refuse to underwrite new hazard policies, and premiums have been increasing, the availability of flood and hazard insurance is uncertain and the state should monitor the insurance market if is wants to require that homeowners carry policies.

> **RESPONSE:** Comments noted.

**Conditions attached to payments for homeowners**
Homeowners should be forced to sign a document that clearly outlines the property owner's responsibility to expeditiously clear or develop the property, to maintain the property, and to pay property taxes as a condition of receiving payment. This type of agreement could be attached to land title and expire after at least ten years. One respondent thought a deadline should be set for homeowners to return or demolish their homes.

> **RESPONSE:** Comments noted. See Section 2.3 for more information on the requirements to receive homeowner assistance.

**Financial benefits for homeowners to repair and rebuild**
The assistance is not enough to cover losses, especially for individuals who had insurance and for low-income individuals. There should be tax credits at both the state and federal level for those who include mitigation efforts and projects in their rebuilding Plan. The financial incentives to Repair/Rebuild uses a formula determining percent damage to the home that makes no sense. Under the usage in this Plan, percent damage is really a binary (0 percent or 100 percent) condition. Houses with less than 50 percent damage would not be eligible because they were not over 50 percent damaged. Houses with over 50 percent damage would be considered totaled and should be figured as 100 percent damaged. In the case of someone attempting to repair a house that was, for example, 90 percent damaged, the formula would pay them twice: once for the adjusted pre-storm value and again for the gap which would probably be greater than the cost to rebuild. One commenter thought that the formula to calculate funding assistance should simply be the cost of damage minus whatever insurance payouts were received.

There is no consideration for individuals who want to move their existing homes to a different location. Funding should also be set aside for individuals who want to invest in building a hurricane resistant home.

> **RESPONSE**: Clarifications have been added to Section 2.4 that describe how the amount of assistance will be determined. Hazard mitigation funds are allocated in this program to invest in building more hurricane resistant homes.

**Determining the value of a home**
The Plan asks for the assessed amount of the property "before or after" the storm, but in many cases, this assessment will be quite different. The value of lost homes should be determined using either the pre-storm appraisal value or the cost of replacement construction, whichever is higher. In addition, the value of homes could be determined using the assessed value. Others had these thoughts about determining the value of the home:
- Homeowners should receive full funding for value of home pre-Katrina or $150,000 cap
- Assessment of house value should also include devaluation of the home after neighborhood destruction

**Road Home Housing Plan**                    **Public Comment Period Summary**

- Pre-storm value should be determined based on a method for establishing market values that multiplies a home's assessed value by an equalization factor that is established for each neighborhood by comparing pre-Katrina sales prices to assessed values.
- Benefit calculation should take into account the increased costs of construction

The Plan should also include sales of homes prior to launch of the program to prevent a sales freeze.

> **RESPONSE:** The Plan has been amended to clarify that the LRA expects that, while it cannot be finally established until the administering private contractor is selected, the method for determining pre-storm value will balance efficiency, fairness and equality. But most importantly, any homeowner believing that the damaged home's pre-storm value has been inaccurately established will have the opportunity to appeal on the basis of an acceptable alternative valuation.
>
> The Plan outlines what assistance may be available to the homeowners of homes whose homes have sold prior to the launch of the program in Section 2.6.

**Incentive Loan for Repair and Rebuilding**
The terms and conditions of the incentive loans should be spelled out.  The Plan is silent on the pricing and underwriting of the loan portion of the homeowner program and a clear commitment to subsidized rates is needed. Loan approval process cannot be limited to an automated credit score driven process.

Additionally, comments from the Legislative Black Caucus, bankers and lenders, and low-income housing advocates made recommendations on the viability and structure of the incentive loan portion of assistance.

> **RESPONSE:** Pursuant to many of these recommendations, the LRA determined that the Incentive Loan will include an allocation for soft second mortgages repayable on sale of the property.  Additionally, it will leverage private capital to create larger pools of affordable loan investment capital through the use of mechanisms such as a loan loss guarantee pool and below market interest rates through rate reduction buy-down features.

**Financial benefits for homeowners who resettle**
There was no consensus on the financial benefits provided to persons who sell their homes and move away.  Some felt that the benefits to those who move away are too generous while others felt that the benefits to those who move away are not generous enough.

The policy of giving homeowners the ability to sell to the state as long as they stay in Louisiana could negatively effect property values in communities hardest hit by Katrina.  The Plan should explicitly state that if the state does buy the property, it will pay any existing liens on the property.

> **RESPONSE**: Sections 2.4.3 and 2.5 were expanded to provide greater detail on the Redevelopment of Purchased Property.

**Financial benefits for persons who elect to sell their homes and move away**
There was no consensus among comments on the financial benefits provided to persons who resettle.  Some felt that the benefits to those who resettle are too generous while others felt that the benefits to those who resettle are not generous enough.

**Road Home Housing Plan**                                    **Public Comment Period Summary**

The policy could negatively affect property values in affected areas.  This provision is difficult to evaluate because no guidance is given on how much the lender will be asked to write off.  The LRA, major investors, mortgage companies and the like should work closely to make sure that this program works effectively.

> **RESPONSE:** Through *The Road Home,* the redevelopment of acquired property, and investment of CDBG funds in infrastructure and economic development, the State intends to restore and enhance property values in devastated communities. See Section 2.4.4 for more information on the sale of property.

**Redevelopment of purchased property**
Management and redevelopment of property sold by homeowners to the state will require an entity focused on those responsibilities.  To receive CDBG monies, the local jurisdiction must adopt a Plan that clearly establishes the rules for redevelopment in that area. One commenter thought that only local communities, not the State should make decisions about which areas to designate as no-rebuild zones.  Another thought the government should not be involved at all in the land development as a way to minimize corruption.  Instead, any property purchased by the government should be converted to green space or used for some other governmental purpose or sold at auction.

> **RESPONSE:** The Plan makes it clear that the LRA will, working with state and local elected officials and civic leaders, assign responsibility to either a dedicated state entity or local redevelopment authorities for managing, packaging and redeveloping acquired land. In addition, pursuant to the recommendations of Congressman Baker, members of the Legislature, community advocacy organizations and others:
> 1. The land will be placed into commerce where it is safe to do so and turned into green space where safety requires; and
> 2. Redevelopment plans must match local community planning priorities and guidelines.

Another comment on Land Management and Redevelopment is that properties that are redeveloped through *The Road Home* should contribute to the availability of affordable housing.

> **RESPONSE:** The LRA has endorsed the findings and recommendations of the American Institute of Architects and the American Planning Association planning conference held on behalf of the LRA in November 2005. Consistent with those recommendations, for properties that are acquired by the Homeowner Assistance Program or other land assembly programs for redevelopment, the State will insure that 25% of the properties are used for affordable housing according to HUD guidelines for the HOME program.

**Protecting homeowner equity**
Proposed buyouts are grants to homeowners, but program is silent on the treatment of equity.  There is concern that homeowner assistance may primarily go toward paying off an existing mortgage, rather than equitably or fairly replacing a homeowner's loss of equity.

> **RESPONSE:** The LRA shares the concern regarding the loss of equity to the homeowner and has added the following language to the buyout and sale sections of the Action Plan: "… a lien holder may be asked to write off a portion of the current outstanding principal balances of the loan or other lien, and to give consideration to potential lost equity of the homeowner."

5/11/2006                                                                              12

**Viability of buyout option**

Proposed assistance to homeowners is based on the damaged home's pre-storm value and may not satisfy existing lien holders.  There is concern about the execution of buyouts by the state in these circumstances.  If a home is declared unsafe for redevelopment, the state should fully compensate the homeowner.  There is opposition to the provision to sell for 60 percent of the pre-storm value and support for making the repair and rebuilding of properties on original sites more attractive through increased incentives when compared to the sell/relocate option.

> **RESPONSE:** In those cases, the homeowner will be treated as one that has accepted the buy/relocate option which would provide maximum assistance.

**Dispersing payments**

The mortgage industry does not have standard terms for managing this type of funding and the LRA must make it clear to homeowners exactly how the funds are to be used and the conditions, if any, for disbursement.  The most commonly cited recommendation was modeling the distribution of funds after the escrow approach currently used in the mortgage industry.  Mortgage lenders call for check proceeds to be made payable to both the lender and the homeowner.  One respondent suggested the money be provided to the homeowner in the form of construction loans.  Administration of the funds also should provide that consumers are not required to advance any personal funds to a contractor prior to a mortgage company releasing initial funds for rebuilding and mortgage companies should be required to provide for approval of expenditures and contractors within a reasonable time.  Funds can be disbursed to contractors as they demonstrate acceptable progress on the construction.

It was also mentioned that it may be difficult, given the terms and fees, to require deposit accounts to receive payments.  This is one reason a loan escrow account, which allows the government to take advantage of the private sector, is a better approach.  It ensures that work is completed according to contract and that payouts are made correctly versus forcing individuals to take responsibility.  If none of these suggestions are taken then several changes need to be made to the allocation process.  The current Plan does not specify with whom the deposit accounts will be established (here, mortgage lenders should be included).  Clear guidelines should be established dictating the standards to be met before funds are disbursed and in cases where the homeowner decides not to rebuild, the Plan should ensure the outstanding balance due on the mortgage be repaid before disbursing the balance to the homeowner.

Existing real estate laws do not require a lien holder to reduce the amount owed by a debtor because of a decision by the state to discriminate against its citizens.  Therefore, Section 2.4.4 should be modified to make clear that the lien holder is under no obligation to reduce debts.  In addition, Section 2.4.2 should be modified to make clear that the phrase "repayment terms" refers to the repayment terms on the Incentive Loan and not the existing mortgage loan on the property.

> **RESPONSE**: These implementation aspects of the Plan are still being discussed with stakeholders and lenders.

**Help with existing mortgages**
- Requests a set-aside of $100 million for the Louisiana Housing Finance Agency to offset the closing costs and supplement down payments towards a resident's acquisition of a new mortgage.  This would be specifically targeted to essential personnel such as police and fire.

**Road Home Housing Plan**                    **Public Comment Period Summary**

- Opposes the requirement of lenders to write off a portion of the loan on properties that the State buys from residents but not opposed to the possibility of this being an option.
- Recorded restrictive covenant is unnecessary and could lead to defects or clouds on title. Instead a contract should be signed that ensures that the borrower is legally bound to the restrictions and that the requirements are legally enforceable.
- Freddie Mac expects that lenders will not be required to subrogate the lenders' interests in future insurance proceeds even though homeowners agree to subrogate claims for unpaid and outstanding insurance claims.
- There is also support for the development of new products such as the silent mortgage and subsidized interest rate loans.
- One commenter thought that assistance should be in the form of a second mortgage to be repaid if the terms are violated

  **RESPONSE**: These implementation aspects of the Plan are still being discussed with stakeholders and lenders. Silent mortgages, second mortgages and subsidized interest rate loans have all been amended into the plan as options for the incentive loan.

**Creating a first-time homebuyer program**
A first-time homebuyer assistance program has been proposed to help lifelong tenants become homeowners.  The Bring New Orleans Back Commission proposed funding such a program for $288 million. Helping low-income residents become homeowners could be better achieved through low interest loans and down payment matching programs.

  **RESPONSE:** In Section 3.4, the Plan states: "The LRA also proposes to allow variations of this program that will provide incentives, not only for repairing damaged rental properties, but converting them to owner-occupied housing," in reference to the Small Rental Property Repair Program.

**Housing Assistance Centers**
The idea of Housing Assistance Centers was positively received and strongly encouraged in the comments submitted.  One commenter felt there should be a homeowner's assistance center in every parish.  Another commented that the centers are not helpful to individuals currently living outside of the state or outside the affected area and who lack the means to receive help from such a distance.  For these reasons, satellite centers should be set up.  Knowledgeable on-site representatives (with, perhaps, certification as a HUD certified Housing Counseling Agency) are needed to respond to cases and problems as they arise.  The administration of these centers and related functions should be done through local agencies rather than state agencies.  Free legal assistance should be offered at every Center and the Centers should also act as a referral resource for renters' needs as well.  The inclusion of a homeowner counseling component to the CDBG recovery program is also suggested.  Information on fair housing rights should also be distributed at these centers. Call centers should be set up to assist homeowners and renters.

  **RESPONSE:** Comments noted. Assistance Centers will be directed by the selected management firm and staffed by contracted experts, which may include non-profit organizations specializing in providing advisory services to homeowners. These centers will also distribute information on fair housing rights and protections against housing discrimination.

**Road Home Housing Plan**                         **Public Comment Period Summary**

**Enhancing resources devoted to building code enforcement**
In addition to providing training and technical assistance on the new building codes it is
imperative that local government officials, builders, developers, and architects receive training
and technical assistance on the accessibility design and construction requirements of the Fair
Housing Act.  The cost of bringing homes to code compliance must be figured into calculation of
assistance.

One commenter believed the program is not focused enough on avoiding construction errors and
promoting energy efficiency goals.  A small amount of the funding should be allocated to the
State's HERO program and subsidence damage should be included in the damages estimates.
The Green Project and the Alliance for Affordable Energy should be encouraged to apply for
grants and technical assistance is needed in hiring and training building code inspectors.  The
state should solicit a database of what residential construction details work and what does not
work in Southern Louisiana.  This information could be translated into publicly distributed fact
sheets.

> **RESPONSE:** Section 5.4 describes assistance provided for building code enforcement
> and meeting increased costs of code compliance. Section 9.1 clearly states that one of
> the State's goals is meeting all requirements pursuant to Fair Housing regulations.  Training
> on meeting Fair Housing requirements will also be provided.
>
> The Plan provides for Incentive Loans designed to help people meet increased costs of
> repairing or rebuilding, including costs related to code compliance. For more
> information, see page 11 of the Plan.
>
> Section 9.4 discusses quality construction expectations for all housing developed under
> The Road Home, including green building techniques and energy efficiency.
>
> Energy Efficiency is addressed in Section 9.8 of the Plan: "The State will encourage
> energy efficiency through implementation of its new state housing codes that include
> provisions for energy efficient repairs and construction. Further, the State will provide
> technical assistance to local governments and private and for profit developers to educate
> them on sound practices for eradication of mold and use of mold resistant materials and
> construction techniques."

**Environmental concerns**
Preliminary issues of site preparation and environmental review are left out of the Plan especially
as they relate to removal and disposal of waste and debris in disaster areas, the clean up of
hazardous waste from non-operational sites, and the need for the development of a
communication strategy for distribution of environmental information.

HUD regulations specifically include CDBG grants among the activities that trigger NEPA
review and there appears to be no legal basis for concluding that an unrestricted grant program
under CDBG is exempt or excluded from this review.

There is the opportunity to develop Smart Growth neighborhoods.

> **RESPONSE:** The Office of Community Development will be following all of the
> environmental regulations required by HUD (24 CFR 58) in the implementation of this
> program.

**Road Home Housing Plan**                                  **Public Comment Period Summary**

The LRA has endorsed the findings and recommendations of the American Institute of Architects and the American Planning Association planning conference held on behalf of the LRA in November 2005. Consistent with these recommendations, the LRA has embraced New Urbanism, a component of the Smart Growth philosophy. The LRA will work with state agencies and local governments to ensure that these issues are addressed as the program is implemented.

**The role of non-profits**

Comments are included elsewhere concerning non-profits but generally speaking, the Plan should include the hundreds of local non-profit organizations that are active in recovery as part of the implementation plan.  Non-profits are vital to the recovery and rebuilding phase.

> **RESPONSE:** Section 5.3 of the Plan addresses the assistance available to non-profits through the Faith Based and Community-Based Housing Recovery Programs.

> Through the Solicitation for Offers, Assistance Centers will be directed by the selected management firm and staffed by contracted experts, which may include non-profit organizations specializing in providing advisory and outreach services to homeowners. See Section 2.8 for more information.

> Section 4 of the Plan addresses the needs of the homeless community and the organizations that focus on the homeless. Section 4 also outlines the assistance that will be available to these organizations.

**Implementation of the Plan**

While the Plan (Section 9.2) indicates that national planning experts are to work in partnership with local planners, this is not occurring. Local communities should be able to decide what planning expertise they want and who they want and it should be funded by LRA.  Long term recovery planning should be centered at the local universities.

> **RESPONSE:** Comment noted.

The Plan does not assure that the funds will be used to assure the creation of jobs, and the provision of safe conditions on all worksites as contractors engage in rehabilitation, clean up and reconstruction.

> **RESPONSE:** The Solicitation for Offers emphasizes the hiring of Louisiana citizens. HUD requires that all CDBG projects comply with Section 3 regulations, and the Davis-Bacon and related Acts.

**Program administration**

- Aggressive public outreach is required

> **RESPONSE:** The firm hired via the Solicitation for Offers shall also provide community outreach to low and moderate income citizens to apprise them of the recovery assistance programs available to them, including but not limited to housing programs and the benefits of the Section 3 provisions.

- The comment period was too short and should be reopened.

**RESPONSE:** Comment noted.

- The location of public hearings should be posted on the website.

  **RESPONSE:** Location and times of public hearings were posted on the LRA website.

- Several improvements could be made to the online Road Home Registry Form.  There is currently no 'landowner only' category for those that owned property with no house on it.

  **RESPONSE:** Comment noted.

- Clarification is needed to establish how the programs will be administered, particularly regarding underwriting standards that may adversely impact low-income residents.

  **RESPONSE:** Clarification on these issues will be determined in conjunction with the management firm hired via the Solicitation for Offers.

- The Plan does not provide details as to the number of residents that will benefit from these proposals

  **RESPONSE:** The Plan provides detailed figures on the beneficiaries of each program.

- Standards of transparency and substantial public participation should be a condition for receiving planning and technical assistance grants from the LRA and are needed at both the local and state level

  **RESPONSE:** Comments noted.

**Rental funding levels and unit targets**
- Rental housing redevelopment activities are under funded.
- Increase the amount of funds allocated to the rental program and increase the number of affordable rental units repaired or rebuilt and those targeted directly at the rental housing for extremely low and very low income people
- While 41% (84,000) of the major and damaged residences were rental units only 15% of the funds are proposed for rental programs. This is unconscionable and should be rectified.
- The under funding of rental housing in the Plan is likely to hurt New Orleans, where proportionately fewer of the damaged units were owned, the hardest.
- At a minimum, the former target of 9,000 affordable units should be restored.  It is unclear if this was intentional or an error because two different dollar amounts are listed as the "fully funded" level for the piggyback program.
- Affordability timelines for rental units developed under the LIHTC piggyback program should be out to twenty years.

  **RESPONSE:** The LRA reinforced, in all the rental redevelopment programs, the expectation that CDBG assistance will be focused on achieving the twin goals of deep affordability and the restoration of rental housing stock in the context of mixed-income communities.

The current expectation of the LRA is that affordability will extend to 20 years.  Housing program consultants are exploring the feasibility of this extension.

Regarding the underfunding of the rental programs, the LRA feels other non-CDBG resources are available to address the needs for restoring the rental stock namely the GO Zone LIHTC program. The Plan works to leverage these sources of revenue with its CDBG funds.

The other comments have been noted.

**Rental targeting**
- All CDBG funding for rental property redevelopment should be directed to the areas with the highest rental property loss.
- Direct support workers should be targeted for assistance
- Due to limited dollars allocated to the small rental property program, they should only be directed to landlords who agree to offer below market rate rents.
- Plan fails to address the status of federally assisted housing stock.
- All temporary rental assistance programs should be shifted to HUD's Disaster Voucher Program (DVP)
- Reallocate requested Section 8 voucher funding to make tax credit funded housing affordable to poor households
- The incentive scale does not spread the incentives evenly enough across the income tiers. The higher incentives should not be concentrated so much on the lower income tiers and the $390 million under the CDBG Piggyback should be moved to the Flexible Incentives category of funding. A disproportionate share of funds is directed to the owner occupied houses in the Plan and is relatively neglectful of the rental housing.  Using figures supplied by HUD, the Plan addresses only 12.5% of the extremely low income renter need.  If the program is fully funded at $10.5 billion, only 3.75 % of that is targeted directly at the rental housing for extremely low and very low income people, assuring that these citizens will have the *fewest* housing opportunities and the *least* chance of returning home.
- Developers should be required to have at least 25% of units affordable to extremely low income people in all LIHTC projects.
- The Plan should increase funding for homeless supports, clarify the process to access funds, demonstrate a commitment to work with HUD and the continuums of care on a comprehensive strategy to address the need for increased homeless housing and services. The Plan and the LRA and LHFA should encourage developers to set-aside units for the homeless and provide direct technical assistance to providers to develop their own units.

**RESPONSE:** The LRA established that the majority of rental redevelopment funding will be allocated to the most affected parishes based on the estimated damage to rental units.

The proposed $25.9 million for homeless supports was realigned to support the State's goal to immediately restore and expand capacity in hurricane impacted areas and provide permanent supportive housing and assistance for persons and families who are homeless and persons at-risk of becoming homeless who are low wage workers, unemployed, victims of domestic violence, low-income seniors, and/or low-income persons with any type of substantial disability (including physical or sensory disability, cognitive disability, chronic health problems, mental illness, or addictive disorders).

Local homeless advocates, housing advocates and other members of the public consistently articulated the need for priorities for this funding. Consensus emerged around a handful of priorities beginning with repair of damaged shelters, transitional housing, and permanent supportive housing.

Additional identified priorities included assistance to construct new permanent supportive housing, homeless prevention assistance, and investments in housing and employment search services. The current Plan reflects these suggested priorities in Section 4 primarily.

Additionally, public comment requested a broader definition of those at-risk of becoming homeless. This section was expanded to include low wage workers, unemployed, victims of domestic violence, low-income seniors, and/or low-income persons with any type of substantial disability (including physical or sensory disability, chronic health problems, cognitive disability, mental illness or addictive disorder).

Finally, public comment requested consideration of the needs of the newly homeless. Depending on each individual's circumstances, this population could be provided with supportive services, home modifications, or assistance with rent to enable an individual to return home.

For further information please refer to Section 4.

**Mixed income rentals**
- CDBG funding for rental development may go toward building market-rate units that do not need assistance
- The Plan, as currently written, does not recognize the high cost of mixed-income housing construction in New Orleans, especially in areas that did not flood. In addition, the Plan seeks to channel CDBG funds on a per unit formula based on the amount of very low income families served, not the mixed-income community as a whole, based upon a belief that the CDBG funds must act as rental subsidies in order to target these very low family income levels. Unique challenges exist in creating high quality mixed-income multi-family apartments, including higher operating costs, discounted market rents in order to attract higher-income tenants, high cost of attractive land, and escalating construction costs. The combination of all these factors, require CDBG funding per mixed-income unit of up to approximately $75,000. Recommendations include clearly defining a mixed-income community (suggest using LHFA's definition) and setting aside 40% of mixed income units for households below 60% AMI, half of which would be restricted at 40% AMI (making them eligible for Section 8 assistance).
- Mixed income housing goals should be integrated with HUD and HOPE funds

**RESPONSE:** The LRA reinforced, in all the rental redevelopment programs, the expectation that CDBG assistance will be focused on achieving the twin goals of deep affordability and the restoration of rental housing stock in the context of mixed-income communities.

The current expectation of the LRA is that affordability will extend to 20 years. Housing program consultants are exploring the feasibility of this extension.

**Road Home Housing Plan**                    **Public Comment Period Summary**

**Leveraging funds for rentals**
- CDBG dollars may be stretched more efficiently to expand the supply of affordable rental properties by letting bidders request the per-unit subsidy they need.  This could be accomplished by combining other federal funding sources with industry practices.
- The availability of other funds such as the CDBG funding through the New Orleans Housing Authority needs to be acknowledged and leveraged in the Plan.

    **RESPONSE:** The LRA worked with housing development experts and the commenters to convert the CDBG Piggyback subsidies to be awarded on a competitive basis. That is, rather than set a certain amount of subsidy per unit for certain affordability levels, developers must request CDBG assistance for each unit, and the lowest requests will receive priority in allocation of funds.

    Applicants for rental funds will score higher on their applications if they find alternate sources of funding.

**Program income**
- Program income should go back to the state housing trust fund to ensure increased production of affordable housing.
- Set aside all loan repayments from the Small Rental Property Repair Program to the state housing trust fund.

    **RESPONSE:** The LRA recognizes the potential for a significant return on investment in property redevelopment, and we have added to the Action Plan amendment a commitment to recycle these proceeds into further housing restoration, infrastructure enhancements, and economic development activities designed to help recreate strong communities which are closely tied to transit, jobs, and public services.  In addition, the LRA is supporting and coordinating the resurrection of whole communities through direct investment of CDBG resources in state and local infrastructure projects and economic development.

    See Section 9.2 of the Plan for a detailed description of which funds will be transferred to affordable housing activities.

**Project monitoring for rentals**
- Must be robust reporting, monitoring and compliance to ensure that low to moderate income citizens are benefited by these programs.

    **RESPONSE:** See Section 9.5 for information on the State's activities with regard to monitoring.

**Fair housing for rentals**
- The Plan must reexamine the new impediments to fair housing that have arisen after the storms and must address them in the Plan.
- Fair housing goals are notably absent from the Plan. Must add language to the Plan that explicitly makes the achievement of fair housing a goal for the protected classes: race, color, religion, sex, national origin or familial status.
- Informing homeowners of their rights to fair housing should be a goal that the Housing Assistance Center must pursue.
- Provide a clear rental registration process and make it available for public comment.

**Road Home Housing Plan**                    **Public Comment Period Summary**

- Make racial and ethnic integration and integrated housing for those with disabilities a goal of the Plan.

  **RESPONSE:** The Plan was amended to include Section 9.1: "Fair housing must be a goal of the programs described in *The Road Home* Housing Program. If a homeowner or renter (from a unit developed through the benefits of this program) believes that he or she has been the victim of housing discrimination and suspects that he or she has been treated unfairly because of Race, Color, Religion, Sex, Age, Familial Status, National Origin, Marital Status, or Disability, he or she may file a complaint of discrimination with the Louisiana Attorney General's Office, Louisiana Public Protection Division of the US Department of Housing and Urban Development Fair Housing Division."

**Small landlord rental program**
- Funding is needed for rental property owners who need aid quickly to do repairs to existing units.
- Quickly dispersing funding to landlords of the estimated 20,000 vacant apartments in need of relatively modest repairs would quickly revive the housing stock
- The Small Rental Property Repair Program is significantly over funded; funding could be reduced from $869 million to about $400 million; savings can be used to increase the total number of affordable rental units, supportive housing funding, and support for community-based and non-profit organizations.  The program should be restructured to assure full financing of repair/rebuilding costs to take advantage of the SBA Disaster Loan Program, and to avoid predatory lending
- Under the Small Rental Property Repair Program, a law similar to one that was passed by the European Parliament three and half years ago called the "European Union Directive on the Energy Performance of Buildings," should be passed.
- The Small Rental Owners Recovery Plan should include the following features: rental owners living inside flood plain receive 60% of cost of repair (minus insurance); rental owners living outside flood plain receive 80% of cost of repair (minus insurance); low rate 10 year term loan offered by increasing the funding available; loan not to exceed 80% of pre-Katrina value; and match CBDG funds 1 to 4 with LHFA low rate bonds.
- 2 of the 3 priorities/selection criteria favor landlords in the best financial situation

  **RESPONSE:** The details of implementation and administration are being developed currently based on these comments and others. The goals of these programs are clearly outlined in Section 3.

**Housing development loan fund**
The loan fund should be competitively allocated by making the amount of public subsidy a factor in awarding grants and contracts.  The loan fund should prioritize affordable housing and make funds available to non-profit developers.  For example, owners should be allowed to sell their homes to a non-profit who will sell to qualified low-income buyers.  This type of campaign would require aggressive outreach.  One respondent suggested allocating $50 million to this fund. Program income generated from this fund and from other loan programs in this Plan should be allocated to the State Housing Trust Fund.

  **RESPONSE:** Comment noted. See Section 5.1 for additions made on the basis of these comments.

**Road Home Housing Plan**                    **Public Comment Period Summary**

**Land assembly initiative**
The funding allocated to the Land Assembly Initiative is not enough to create a viable program.
The bulk of the funding for the "Piggyback" rental program should be moved into the Land
Assembly Initiative.  At least 10 times the $2.0 million recommended should be allocated.  The
use of eminent domain authority is absolutely essential and must be a part of the Plan.

> **RESPONSE:** Comment noted.

**Restoration of homeless supports and housing**
More resources should be devoted to long-term housing needs to prevent homelessness and fewer
resources to temporary shelters.  Comments to ensure effective implementation of the State's
Supportive Housing Plan include:

- Funding for 5,000 units of Permanent Supportive Housing must be assured in order to
  meet the need.
- New funding from HUD's rental subsidy programs to ensure that Supportive Housing is
  affordable to the people who need it most
- Develop an organizational structure of relevant state agencies partnering with state
  homeless Continuums of Care and nonprofit disability agencies so that the most
  vulnerable received priority and all funding is appropriately set aside for programs
- Link the Small Rental Property Repair program with the rental subsidy programs to
  ensure immediate development of small-scale Permanent Supportive Housing
- The $26 million should be prioritized as follows: repair of existing Continuum of Care
  housing, assistance to construct new Permanent Supportive Housing, homelessness
  prevention assistance activities, and creation and expansion of transitional housing,
  housing search and employment search services.

> **RESPONSE:** Local homeless advocates, housing advocates and other members of the
> public consistently articulated the need for priorities for this funding. Consensus emerged
> around a handful of priorities beginning with repair of damaged shelters, transitional
> housing, and permanent supportive housing.
>
> Additional identified priorities included assistance to construct new permanent
> supportive housing, homeless prevention assistance, and investments in housing and
> employment search services. The current Plan reflects these suggested priorities. Refer to
> Section 4 of the Plan for a description of the proposed activities.
>
> Additionally, public comment requested a broader definition of those at-risk of becoming
> homeless. This section was expanded to include low wage workers, unemployed, victims
> of domestic violence, low-income seniors, and/or low-income persons with any type of
> substantial disability (including physical or sensory disability, chronic health problems,
> cognitive disability, mental illness or addictive disorder). Section 3.2 outlines a funding
> set-aside for supportive services for these populations allowing an estimated 3,000 units
> to receive supportive services under the fully funded program.
>
> Finally, public comment requested consideration of the needs of the newly homeless.
> Depending on each individual's circumstances, this population could be provided with
> supportive services, home modifications, or assistance with rent to enable an individual
> to return home.

**Road Home Housing Plan**                    **Public Comment Period Summary**

**Developer incentives**
Incentives should be provided to developers that succeed in leveraging their own equity or private sector capital.  Gentilly Public, a cooperative housing alternative that serves the needs of low income New Orleans residents, suggests that a cooperative housing arrangement is necessary in New Orleans and allows residents to self-manage their living space and surrounding green space.

   **RESPONSE:** Comments noted.