

**(Publication page references are not available for this document.)**

NOTICES

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR-5250-N-01]

Allocations and Common Application and Reporting Waivers Granted to and
Alternative Requirements for Midwest Flood Community Development Block Grant
(CDBG) Disaster Recovery Grantees Under the Supplemental Appropriations Act,
2008

Thursday, September 11, 2008

AGENCY: Office of the Secretary, HUD.

ACTION: Notice of allocations, waivers, and alternative requirements.

SUMMARY: This Notice advises the public of the initial allocation for grant funds
for CDBG disaster recovery grants for the purpose of assisting in the recovery in
areas covered by a declaration of major disaster under title IV of the Robert T.
Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.) as a
result of recent natural disasters. As described in the SUPPLEMENTARY INFORMATION
section of this Notice, HUD is authorized by statute and regulations to waive
statutory and regulatory requirements and specify alternative requirements for this
purpose, upon the request of the state grantees. This Notice also describes the
common application, eligibility, and administrative waivers and the common alterna-
tive and statutory requirements for the grants.

DATES: Effective Date: September 16, 2008.

FOR FURTHER INFORMATION CONTACT: Jessie Handforth Kome, Director, Disaster Recovery
and Special Issues Division, Office of Block Grant Assistance, Department of Hous-
ing and Urban Development, 451 7th Street, SW., Room 7286, Washington, DC 20410,
telephone number 202-708-3587. Persons with hearing or speech impairments may ac-
cess this number via TTY by calling the Federal Information Relay Service at 800-
877-8339. Facsimile inquiries may be sent to Ms. Kome at 202-401-2044. (Except for
the "800" number, these telephone numbers are not toll-free.)

SUPPLEMENTARY INFORMATION:

Authority To Grant Waivers

 The Supplemental Appropriations Act, 2008 (Pub. L. 110-252, approved June 30,
2008) (Supplemental Appropriations Act) appropriates $300 million, to remain avail-
able until expended, in CDBG funds for necessary expenses related to disaster re-
lief, long-term recovery, and restoration of infrastructure in areas covered by a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 52870-02                                                                                   Page 2
**(Publication page references are not available for this document.)**

declaration of major disaster under title IV of the Robert T. Stafford Disaster Re-
lief and Emergency Assistance Act (42 U.S.C. 5121 et seq.) as a result of recent
natural disasters. The Supplemental Appropriations Act authorizes the Secretary to
waive, or specify alternative requirements for, any provision of any statute or
regulation that the Secretary administers in connection with the obligation by the
Secretary or use by the recipient of these funds and guarantees, except for re-
quirements related to fair housing, nondiscrimination, labor standards, and the en-
vironment (including requirements concerning lead based paint), upon a request by
the state and a finding by the Secretary that such a waiver would not be inconsis-
tent with the overall purpose of the statute. Additionally, regulatory waiver au-
thority is provided by 24 CFR 5.110, 91.600, and 570.5. The following application
and reporting waivers and alternative requirements are in response to requests from
each of the states receiving an allocation under this Notice.

 The Secretary finds that the following waivers and alternative requirements, as
described below, are not inconsistent with the overall purpose of Title I of the
Housing and Community Development Act of 1974, as amended (HCD Act), or the Cran-
ston-Gonzalez National Affordable Housing Act, as amended.

 Under the requirements of the Department of Housing and Urban Development Reform
Act of 1989 (the HUD Reform Act), regulatory waivers must be justified and pub-
lished in the Federal Register.

 Except as described in this Notice, statutory and regulatory provisions governing
the CDBG program for states, including those at 24 CFR part 570, shall apply to the
use of these funds. In accordance with the Supplemental Appropriations Act, HUD
will reconsider every waiver in this Notice on the two-year anniversary of the day
this Notice is published.

*Additional Waivers*

 Each state receiving an allocation may request additional waivers from the Depart-
ment as needed to address the specific needs related to that state's recovery ac-
tivities. The Department will respond separately to the state's requests for waiv-
ers of provisions not covered in this Notice, after working with the state to tai-
lor the program to best meet the unique disaster recovery needs in its impacted ar-
eas.

Allocations

 The Supplemental Appropriations Act provides $300 million of supplemental appro-
priation for the CDBG program for:

 Necessary expenses related to disaster relief, long-term recovery, and restoration
of infrastructure in areas covered by a declaration of major disaster under title
IV of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42
U.S.C. 5121 et seq.) as a result of recent natural disasters.

The law further notes:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**


   That funds provided under this heading shall be administered through an entity or
entities designated by the Governor of each state. Provided further, that funds al-
located under this heading shall not adversely affect the amount of any formula as-
sistance received by a state under this heading: Provided further, that each state
may use up to five percent of its allocation for administrative costs.

HUD computes allocations based on data that is generally available covering all the
eligible affected areas. Two challenges arose in making this allocation. First, the
statute gave very little guidance on what states are to receive funding, so HUD had
to determine the eligible universe of grantees. The appropriation calls for funding
"recent natural disasters." Since this appropriation was enacted on June 30, 2008,
and was developed while there was significant awareness of flooding in the Midwest,
the Department's primary assumption was that the funds were targeted to the Midwest
flooding. However, there were also several other severe storms, flooding, and tor-
nado events that received major disaster declarations during the same time frame.
There were no declared disasters in April 2008, which allows for a natural break
and argues that "recent disasters" is most likely to be those occurring after this
lull. Therefore, HUD is defining "recent natural disasters" to be all major natural
disasters that occurred and were declared from May 1, 2008, through June 30, 2008.
This would limit the eligibility for an allocation to disasters in the states shown
below.

Table 1--Federally Declared Disasters in May and June 2008

| No. | Declared date | State | Title |
|-----|---------------|-------|-------|
| 1773 | 25-Jun-08 | Missouri | Severe Storms and Flooding. |
| 1772 | 25-Jun-08 | Minnesota | Severe Storms and Flooding. |
| 1771 | 24-Jun-08 | Illinois | Severe Storms and Flooding. |
| 1770 | 20-Jun-08 | Nebraska | Severe Storms, Tornadoes, and Flooding. |
| 1769 | 19-Jun-08 | West Virginia | Severe Storms, Tornadoes, Flooding, Mudslides, and Landslides. |
| 1768 | 14-Jun-08 | Wisconsin | Severe Storms, Tornadoes, and Flooding. |
| 1766 | 8-Jun-08 | Indiana | Severe Storms and Flooding. |
| 1763 | 27-May-08 | Iowa | Severe Storms, Tornadoes, and Flooding. |
| 1762 | 26-May-08 | Colorado | Severe Storms and Tornadoes. |
| 1760 | 23-May-08 | Missouri | Severe Storms and Tornadoes. |
| 1758 | 20-May-08 | Arkansas | Severe Storms, Flooding, and Tornadoes. |
| 1756 | 14-May-08 | Oklahoma | Severe Storms, Tornadoes, and Flooding. |
| 1755 | 9-May-08 | Maine | Severe Storms and Flooding. |
| 1753 | 8-May-08 | Mississippi | Severe Storms and Flooding. |

HUD is aware that other federal programs, such as Federal Emergency Management
Agency (FEMA) Public Assistance and Small Business Administration (SBA) loans, ex-
ist to support disaster recovery. Compared to the number of major disaster declara-
tions, the number of times Congress has appropriated CDBG supplemental disaster re-
covery funds is very small. The Department believes it is reasonable to limit the
allocations to places experiencing a significant need for additional federal assis-
tance to facilitate long-term recovery and generally applies a funding threshold,
in this case, of $2 million. Thus, it is very likely that not all of the eligible

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 52870-02                                                                          Page 4
**(Publication page references are not available for this document.)**


universe will be funded.

 The second challenge in allocating supplemental disaster appropriations is the
trade off of a timely allocation versus having the most complete data needed to
make a fully informed allocation. CDBG disaster recovery assistance is intended to
fund long-term disaster recovery. States need to know relatively quickly how much
they are to receive so that they can begin developing their recovery plans. How-
ever, a fair allocation generally depends on having good data similarly collected
for all eligible states so that the needs of each state are fully taken into con-
sideration. In this case, where funds were appropriated at a time when some of the
disasters were still ongoing, the data for most disasters and thus most states is
still incomplete. Complete data to make a full allocation may not be available un-
til mid- to late September at the earliest. However, HUD believed it was unreason-
able to hold funds that are currently needed as the Department waits for more com-
plete data. As such, HUD is making a two-stage allocation: $100 million was allo-
cated on August 4, 2008, to the three most affected states and the remaining funds
will be allocated in mid-September or October when more complete data are avail-
able. Enough data were available from FEMA, SBA, and other sources to make reason-
able initial allocation to the states with the most severe damage due to the inci-
dents noted in the table above. The Department was concerned that the first stage
of the two-stage allocation not over-fund a grantee. Currently, the Department can
say with confidence that the following grants would not be over-funding the disas-
ter recovery needs of the states receiving allocations.

```
--------------------------------
   State      Amount allocated
--------------------------------
Indiana ..........  $10,000,000
Iowa .............. 85,000,000
Wisconsin .......... 5,000,000
--------------------------------
```

As soon as better data are available, HUD will compute allocations for the remain-
ing $200 million and announce them. A state included in that announcement may imme-
diately proceed to prepare and submit an Action Plan for disaster recovery in ac-
cordance with this Notice, although HUD will not be able to make the grant until
the allocations are published in the Federal Register. Therefore, HUD commits to
determining, announcing, and publishing the additional allocations swiftly once the
data are available.

 HUD will invite each grantee receiving an allocation under the Supplemental Appro-
priations Act to submit an Action Plan for Disaster Recovery in accordance with
this Notice.

 The Supplemental Appropriations Act requires funds be used only for disaster re-
lief, long-term recovery, and restoration of infrastructure in areas covered by a
declaration of major disaster under title IV of the Robert T. Stafford Disaster Re-
lief and Emergency Assistance Act (42 U.S.C. 5121 et seq.) as a result of recent
natural disasters. The statute directs that each grantee will describe in its Ac-
tion Plan for Disaster Recovery how the use of the grant funds will address long-
term recovery and infrastructure restoration. HUD will monitor compliance with this

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

direction and may be compelled to disallow expenditures if it finds uses of funds
are not disaster-related, or funds allocated duplicate other benefits. HUD encour-
ages grantees to contact their assigned HUD offices for guidance in complying with
these requirements during development of their Action Plans for Disaster Recovery
or if they have any questions regarding meeting these requirements.

 As provided for in the Supplemental Appropriations Act, the funds may not be used
for activities reimbursable by or for which funds are made available by the Federal
Emergency Management Agency or the Army Corps of Engineers.

Prevention of Fraud, Abuse, and **Duplication** of Benefits

 The Supplemental Appropriations Act also directs the Secretary to:

 Establish procedures to prevent recipients from receiving any **duplication** of bene-
fits and report quarterly to the Committees on Appropriations with regard to all
steps taken to prevent fraud and abuse of funds made available under this heading
including **duplication** of benefits.

To meet this directive, HUD is pursuing four courses of action. First, this Notice
includes specific reporting, written procedures, monitoring, and internal audit re-
quirements for grantees. Second, to the extent its resources allow, HUD will insti-
tute risk analysis and on-site monitoring of grantee management of the grants and
of the specific uses of funds. Third, HUD will be extremely cautious in considering
any waiver related to basic financial management requirements. The standard, time-
tested CDBG financial requirements will continue to apply. Fourth, HUD is collabo-
rating with the HUD Office of Inspector General to plan and implement oversight of
these funds.

Waiver Justification

 This section of the Notice briefly describes the basis for each waiver and related
alternative requirements, if any.

 Each state eligible for a disaster recovery grant receives annual CDBG alloca-
tions, has a consolidated plan, a citizen participation plan, a monitoring plan,
and has made CDBG certifications. HUD encourages each CDBG disaster recovery
grantee to carry out CDBG disaster recovery activities in the context of its ongo-
ing community development program to the extent feasible (for example, by selecting
activities consistent with the consolidated plan, by providing overall benefit to
at least 70 percent low- and moderate-income persons, and by holding hearings or
meetings to solicit public comment).

 The waivers, alternative requirements, and statutory changes described in this No-
tice apply only to the CDBG supplemental disaster recovery funds appropriated in
the Supplemental Appropriations Act, not to funds provided under the regular CDBG
program. These actions provide additional flexibility in program design and imple-
mentation and implement statutory requirements unique to this appropriation.

Application for Allocations Under the Supplemental Appropriations Act

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 52870-02                                                                                    Page 6
**(Publication page references are not available for this document.)**

 These waivers and alternative requirements streamline the pre-grant process and
set the guidelines for states' applications for their allocations. HUD encourages
each grantee that receives an allocation to submit an Action Plan for Disaster Re-
covery to HUD as soon as practicable following an allocation announcement.

Overall Benefit to Low- and Moderate-Income Persons

 Pursuant to explicit authority in the Supplemental Appropriations Act, HUD is
granting an overall benefit waiver that allows for up to 50 percent of the grant to
assist activities under the urgent need or prevention or elimination of slums and
blight national objectives, rather than the 30 percent allowed in the annual state
CDBG program. The primary objective of Title I of the Housing and Community Devel-
opment Act and of the funding program of each grantee is "development of viable ur-
ban communities, by providing decent housing and a suitable living environment and
expanding economic opportunities, principally for persons of low and moderate in-
come." The statute goes on to set the standard of performance for this primary ob-
jective at 70 percent of the aggregate of the funds used for support of activities
producing benefit to low- and moderate-income persons. Since extensive damage to
community structures and housing affected those with varying incomes, and income-
producing jobs are often lost for a period of time following a disaster, HUD is
waiving the 70 percent overall benefit requirement, leaving the 50 percent require-
ment, to give grantees even greater flexibility to carry out recovery activities
within the confines of the CDBG program national objectives. HUD may only provide
additional waivers of this requirement if it makes a finding of compelling need.
The requirement that each activity meet one of the three national objectives is not
waived.

Expanded Distribution and Direct Action

 The waivers and alternative requirements allowing distribution of funds by a state
to entitlement communities and Indian tribes, and to allow a state to carry out ac-
tivities directly rather than distribute all funds to units of local government are
consistent with waivers granted for previous, similar disaster recovery cases. HUD
believes that, in using very similar statutory language to that used for the CDBG
supplemental appropriations for Hurricane **Katrina**, **Rita**, and **Wilma** recovery, Con-
gress is signaling its intent that the states under this appropriation also be able
to carry out activities directly. Therefore, HUD is waiving program requirements to
support this. HUD is also including in this Notice the necessary complementary
waivers and alternative requirements related to subrecipients to ensure proper man-
agement and disposition of funds during the grant execution and at closeout.

Consistency With the Consolidated Plan

 HUD is waiving the requirement for consistency with the consolidated plan because
the effects of a major disaster usually alter a grantee's priorities for meeting
housing, employment, and infrastructure needs. To emphasize that uses of grant
funds must be consistent with the overall purposes of the HCD Act, HUD is limiting
the scope of the waiver for consistency with the consolidated plan; it applies only
until the grantee first updates its consolidated plan priorities following the dis-
aster.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

Action Plan for Disaster Recovery

 HUD is waiving the CDBG action plan requirements and substituting an Action Plan
for Disaster Recovery. This will allow rapid implementation of disaster recovery
grant programs and ensure conformance with provisions of the Supplemental Appro-
priations Act. Where possible, the Action Plan for Disaster Recovery, including
certifications, does not repeat common action plan elements the grantee has already
committed to carry out as part of its annual CDBG submission. Although a state as
the grantee may designate an entity or entities to administer the funds, the state
is responsible for compliance with federal requirements. During the course of the
grant, HUD will monitor the state's use of funds and its actions for consistency
with the Action Plan. The state may submit an initial partial Action Plan and amend
it one or more times subsequently until the Action Plan describes uses for the to-
tal grant amount. The state may also amend activities in its Action Plan.

Citizen Participation

 The citizen participation waiver and alternative requirements will permit a more
streamlined public process, but one that still provides for reasonable public no-
tice, appraisal, examination, and comment on the activities proposed for the use of
CDBG disaster recovery grant funds. The waiver removes the requirement at both the
grantee and state grant recipient levels for public hearings or meetings as the
method for disseminating information or collecting citizen comments. Instead,
grantees are encouraged to employ innovative methods to communicate with citizens
and solicit their views on proposed uses of disaster recovery funds, and then to
indicate in the Action Plan how it has addressed these views.

Administration Limitation

 State program administration requirements must be modified to be consistent with
the Supplemental Appropriations Act, which allows up to five percent of the grant
to be used for the state's administrative costs. The provisions at 42 U.S.C.
5306(d) and 24 CFR 570.489(a)(1)(i) and (iii) will not apply to the extent that
they cap state administration expenditures and require a dollar for dollar match of
state funds for administrative costs exceeding $100,000. HUD does not waive 24 CFR
570.489(a)(3) to allow the state to exceed the overall planning, management and ad-
ministrative cap of 20 percent.

Use of Subrecipients

 The State CDBG program rule does not make specific provision for the treatment of
the entities called "subrecipients" in the CDBG entitlement program. The waiver al-
lowing the state to carry out activities directly creates a situation in which the
state may use subrecipients to carry out activities in a manner similar to entitle-
ment communities rather than using a method of distributing funds to local govern-
ments. HUD and its Office of Inspector General have long identified the use of
subrecipients as a practice that increases the risk of abuse of funds. HUD's ex-
perience is that this risk can be successfully managed by following the CDBG enti-
tlement requirements and related guidance. Therefore, HUD is requiring that a state
taking advantage of the waiver allowing it to carry out activities directly must

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

follow the alternative requirements drawn from the CDBG entitlement rule and speci-
fied in this Notice when using subrecipients.

Reporting

 HUD is waiving the annual reporting requirement because the Congress requires
quarterly reports from the grantees and from HUD on various aspects of the uses of
funds and of the activities funded with these grants. Many of the data elements the
grantees will report to Congress quarterly are the same as those that HUD will use
to exercise oversight for compliance with the requirements of this Notice and for
prevention of fraud, abuse of funds, and **duplication** of benefits. To collect these
data elements and to meet its reporting requirements, HUD is requiring each grantee
to report to HUD quarterly using the online Disaster Recovery Grant Reporting
(DRGR) system, which uses a streamlined, Internet-based format. HUD will use
grantee reports to monitor for anomalies or performance problems that suggest
fraud, abuse of funds, and **duplication** of benefits; to reconcile budgets, obliga-
tions, fund draws, and expenditures; and to calculate applicable administrative and
public service limitations and the overall percent of benefit to low- and moderate-
income persons, and as a basis for risk analysis in determining a monitoring plan.

 The grantee must post the report on a Web site for its citizens within 3 days of
the report's submission to HUD. If a grantee chooses, it may use this report, to-
gether with a statement regarding any sole source procurements, as its required
quarterly submission to the Committees on Appropriations. Each quarter, HUD will
submit to the Committees a summary description of its report reviews, other HUD
monitoring and technical assistance activities undertaken during the quarter, and
any significant conclusions related to fraud or abuse of funds or **duplication** of
benefits.

Eligibility--Housing Related

 The waiver of Section 105(a) of the 1974 Act that allows new housing construction
and of Section 105(a)(24), to allow homeownership assistance for families whose in-
come is up to 120 percent of median income and payment of up to 100 percent of a
housing down payment is necessary following major disasters in which large numbers
of affordable housing units have been damaged or destroyed, as is the case in the
disaster eligible under this notice. The broadening of the Section 105(a)(24)
waiver, in accordance with the state's request, will allow the state to implement
mixed-use housing recovery programs included in its HUD-accepted action plan.

Anti-Pirating

 The limited waiver of the anti-pirating requirements allows the flexibility to
provide assistance to a business located in another state or market area within the
same state if the business was displaced from a declared area within the state by
the disaster and the business wishes to return. This waiver is necessary to allow a
grantee affected by a major disaster to rebuild its employment base.

Relocation Requirements

 The states' plan to engage in voluntary acquisition and optional relocation ac-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

tivities (in a form often called "buyouts") by using waivers related to acquisition and relocation requirements under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, (42 U.S.C. 4601 et seq.) (URA) and the replacement of housing and relocation assistance provisions under section 104(d) of the HCD Act. The states asked for waivers to help promote the acquisition of property and the replacement of housing in a timely and efficient manner.

 CDBG funds are federal financial assistance so their use in projects that involve acquisition of property necessary for a federally assisted project, or that involve acquisition, demolition, or rehabilitation that force a person to move permanently, are subject to the URA and the government-wide implementing regulations found at 49 CFR part 24. The URA provides assistance and protections to individuals and businesses affected by Federal or federally assisted projects. HUD is waiving the following URA requirements to help promote accessibility to suitable decent, safe, and sanitary housing for Midwest flooding victims.

 The acquisition requirements of the URA and implementing regulations are waived so that they do not apply to an arm's length voluntary purchase carried out by a person that does not have the power of eminent domain, in connection with the purchase and occupancy of a principal residence by that person. The failure to suspend these requirements would impede disaster recovery and may result in windfall payments.

 A limited waiver of the URA implementing regulations to the extent that they require grantees to provide URA financial assistance sufficient to reduce the displaced person's post-displacement rent/utility cost to 30 percent of household income. The failure to suspend these one-size-fits-all requirements could impede disaster recovery. To the extent that a tenant has been paying rents in excess of 30 percent of household income without demonstrable hardship, rental assistance payments to reduce tenant costs to 30 percent would not be required.

 The URA and implementing regulations to the extent necessary to permit a grantee to meet all or a portion of a grantee's replacement housing financial assistance obligation to a displaced renter by offering rental housing through a tenant-based rental assistance (TBRA) housing program subsidy (e.g., Section 8 rental voucher or certificate) provided that the renter is also provided referrals to suitable, available rental replacement dwellings where the owner is willing to participate in the TBRA program, and the period of authorized assistance is at least 42 months. Failure to grant the waiver would impede disaster recovery whenever TBRA program subsidies are available but funds for cash relocation assistance are limited. The change provides access to an additional relocation resource option.

 The URA and implementing regulations to the extent that they require a grantee to offer a person displaced from a dwelling unit the option to receive a "moving expense and dislocation allowance" based on the current schedule of allowances prepared by the Federal Highway Administration, provided that the grantee establishes and offers the person a moving expense and dislocation allowance under a schedule of allowances that is reasonable for the jurisdiction and takes into account the number of rooms in the displacement dwelling, whether the person owns and must move the furniture, and, at a minimum, the kinds of expenses described in 49 CFR 24.301. Failure to suspend this provision would impede disaster recovery by requiring grantees to offer allowances that do not reflect current local labor and transpor-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

tation costs. Persons displaced from a dwelling remain entitled to choose a payment
for actual reasonable moving and related expenses if they find that approach pref-
erable to the locally established moving expense and dislocation allowance.

  In addition to the URA waivers, HUD is waiving requirements of section 104(d) of
the HCD Act dealing with one-for-one replacement of low- and moderate-income hous-
ing units demolished or converted in connection with a CDBG-assisted development
project for housing units damaged by one or more disasters. HUD is waiving this re-
quirement because it does not take into account the large, sudden changes a major
disaster may cause to the local housing stock, population, or local economy. Fur-
ther, the requirement does not take into account the threats to public health and
safety and to economic revitalization that may be caused by the presence of disas-
ter-damaged structures that are unsuitable for rehabilitation. As it stands, the
requirement would impede disaster recovery and discourage grantees from acquiring,
converting, or demolishing disaster-damaged housing because of excessive costs that
would result from replacing all such units within the specified timeframe. HUD is
also waiving the relocation assistance requirements contained in section 104(d) of
the HCD Act to the extent they differ from those of the URA (42 U.S.C. 4601 et
seq.). This change will simplify implementation while preserving statutory protec-
tions for persons displaced by projects assisted with CDBG disaster recovery grant
funds.

  Iowa has indicated that an additional reason for these waivers is related to its
decision to administer some buyouts that will include in the same project funds un-
der this notice and FEMA mitigation funding. The statutory requirements of the URA
are also applicable to the administration of FEMA assistance, and disparities in
rental assistance payments for activities funded by HUD and that agency will thus
be eliminated. FEMA is subject to the requirements of the URA. Pursuant to this au-
thority, FEMA requires that rental assistance payments be calculated on the basis
of the amount necessary to lease or rent comparable housing for a period of 42
months. HUD is also subject to these requirements, but is also covered by alterna-
tive relocation provisions authorized under 42 U.S.C. 5304(d)(2)(A)(iii) and (iv)
and implementing regulations at 24 CFR 42.350. These alternative relocation bene-
fits, available to low- and moderate-income displacees opting to receive them in
certain HUD programs, require the calculation of similar rental assistance payments
on the basis of 60 months, rather than 42 months, thereby creating a disparity be-
tween the available benefits offered by HUD and FEMA (although not always an actual
cash difference). The waiver assures uniform and equitable treatment by allowing
the URA benefits requirements to be the standard for assistance under this notice.

Program Income

  A combination of CDBG provisions limits the flexibility available to the states
for the use of program income. Prior to 2002, program income earned on disaster re-
covery grants has usually been program income in accordance with the rules of the
regular CDBG program of the applicable state and has lost its disaster grant iden-
tity, thus losing use of the waivers and streamlined alternative requirements.
Also, the State CDBG program rule and law are designed for a program in which the
state distributes all funds rather than carrying out activities directly. The HCD
Act specifically provides for a local government receiving CDBG grants from a state
to retain program income if it uses the funds for additional eligible activities
under the annual CDBG program. The HCD Act allows the state to require return of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

the program income to the state under certain circumstances. This notice waives the existing statute and regulations to give the states, in all circumstances, the choice of whether a local government receiving a distribution of CDBG disaster re-covery funds and using program income for activities in the Action Plan may retain this income and use it for additional disaster recovery activities. In addition, this notice allows program income to the disaster recovery grant generated by ac-tivities undertaken directly by the state or its agent(s) to retain the original disaster recovery grant's alternative requirements and waivers and to remain under the state's discretion until grant closeout, at which point any program income on hand or received subsequently will become program income to the state's annual CDBG program. The alternative requirements provide all the necessary conforming changes to the program income regulations.

Certifications

 HUD is waiving the standard certifications and substituting alternative certifica-tions. The alternative certifications are tailored to CDBG disaster recovery grants and remove certifications and references that are redundant or appropriate to the annual CDBG formula program.

Applicable Rules, Statutes, Waivers, and Alternative Requirements

*Pre-Grant Process*

 1. General note. Prerequisites to a grantee's receipt of CDBG disaster recovery assistance include adoption of a citizen participation plan; publication of its proposed Action Plan for Disaster Recovery; public notice and comment; and submis-sion to HUD of an Action Plan for Disaster Recovery, including certifications. Ex-cept as described in this Notice, statutory and regulatory provisions governing the Community Development Block Grant program for states, including those at 42 U.S.C. 5301 et seq. and 24 CFR part 570, shall apply to the use of these funds.

 2. Overall benefit waiver and alternative requirement. The requirements at 42 U.S.C. 5301(c), 42 U.S.C. 5304(b)(3)(A), and 24 CFR 570.484 that 70 percent of funds are for activities that benefit low- and moderate-income persons are waived to stipulate that at least 50 percent of disaster recovery grant funds are for ac-tivities that principally benefit low- and moderate-income persons.

 3. Direct grant administration by states and means of carrying out eligible ac-tivities. Requirements at 42 U.S.C. 5306 are waived to the extent necessary to al-low a state to use its disaster recovery grant allocation directly to carry out state-administered activities eligible under this Notice. Activities eligible under this Notice may be undertaken, subject to state law, by the recipient through its employees, or through procurement contracts, or through loans or grants under agreements with subrecipients, or by one or more entities that are designated by the chief executive officer of the state. Unless a waiver provides otherwise, ac-tivities made eligible under section 105(a)(15) of the HCD Act, as amended, may only be undertaken by entities specified in that section, whether the assistance is provided to such an entity from the state or from a unit of general local govern-ment.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 52870-02                                                                    Page 12
**(Publication page references are not available for this document.)**

4. Consolidated Plan waiver. Requirements at 42 U.S.C. 12706 and 24 CFR 91.325(a)(6), that housing activities undertaken with CDBG funds be consistent with the strategic plan, are waived. Further, 42 U.S.C. 5304(e), to the extent that it would require HUD to annually review grantee performance under the consistency criteria, is also waived. These waivers apply only until the time that the grantee first updates the consolidated plan priorities following the disaster.

5. Citizen participation waiver and alternative requirement. Provisions of 42 U.S.C. 5304(a)(2) and (3), 42 U.S.C. 12707, 24 CFR 570.486, and 24 CFR 91.115(b) with respect to citizen participation requirements are waived and replaced by the requirements below. The streamlined requirements do not mandate public hearings at either the state or local government level, but do require providing a reasonable opportunity (at least 7 days) for citizen comment and ongoing citizen access to information about the use of grant funds. The streamlined citizen participation requirements for this grant are:

a. Before the grantee adopts the action plan for this grant or any substantial amendment to this grant, the grantee will publish the proposed plan or amendment (including the information required in this Notice for an Action Plan for Disaster Recovery). The manner of publication (including prominent posting on the state, local, or other relevant Web site) must afford citizens, affected local governments and other interested parties a reasonable opportunity to examine the plan or amendment's contents. Subsequent to publication, the grantee must provide a reasonable time period and method(s) (including electronic submission) for receiving comments on the plan or substantial amendment. The grantee's plans to minimize displacement of persons or entities and to assist any persons or entities displaced must be published with the action plan.

b. In the action plan, each grantee will specify its criteria for determining what changes in the grantee's activities constitute a substantial amendment to the plan. At a minimum, adding or deleting an activity or changing the planned beneficiaries of an activity will constitute a substantial change. The grantee may modify or substantially amend the action plan if it follows the same procedures required in this Notice for the preparation and submission of an Action Plan for Disaster Recovery. The grantee must notify HUD, but is not required to notify the public, when it makes any plan amendment that is not substantial.

c. The grantee must consider all comments received on the action plan or any substantial amendment and submit to HUD a summary of those comments and the grantee's response with the action plan or substantial amendment.

d. The grantee must make the action plan, any substantial amendments, and all performance reports available to the public. HUD recommends posting them on the Internet. In addition, the grantee must make these documents available in a form accessible to persons with disabilities and non-English-speaking persons. During the term of this grant, the grantee will provide citizens, affected local governments, and other interested parties reasonable and timely access to information and records relating to the action plan and the grantee's use of this grant.

e. The grantee will provide a timely written response to every citizen complaint. Such response will be provided within 15 working days of the receipt of the com-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 52870-02                                                              Page 13
**(Publication page references are not available for this document.)**

plaint, if practicable.

  6. Modify requirement for consultation with local governments. Currently, the
statute and regulations require consultation with affected units of local govern-
ment in the non-entitlement area of the state regarding the state's proposed method
of distribution. HUD is waiving 42 U.S.C. 5306(d)(2)(C)(iv), 24 CFR 91.325(b), and
24 CFR 91.110, with the alternative requirement that the state consult with all
disaster-affected units of general local government, including any CDBG entitlement
communities, in determining the use of funds.

  7. Action Plan waiver and alternative requirement. The requirements at 42 U.S.C.
12705(a)(2), 42 U.S.C. 5304(a)(1), 42 U.S.C. 5304(m), 42 U.S.C. 5306(d)(2)(C)(iii),
24 CFR 1003.604, and 24 CFR 91.320 are waived for these disaster recovery grants.
Each state must submit to HUD an Action Plan for Disaster Recovery that describes:

  a. The effects of the covered disasters, especially in the most impacted areas and
populations, and the greatest recovery needs resulting from the covered disasters
that have not been addressed by **insurance** proceeds, other federal assistance or any
other funding source;

  b. The grantee's overall plan for disaster recovery including:

  (1) How the state will promote sound short- and long-term recovery planning at the
state and local levels, especially land use decisions that reflect responsible
flood plain management, removal of regulatory barriers to reconstruction, and prior
coordination with planning requirements of other state and Federal programs and en-
tities;

  (2) How the state will encourage construction methods that emphasize high quality,
durability, energy efficiency, sustainability, and mold resistance, including how
the state will promote enactment and enforcement of modern building codes and miti-
gation of flood risk where appropriate; and

  (3) How the state will provide or encourage provision of adequate, flood-resistant
housing for all income groups that lived in the disaster affected areas prior to
the incident date(s) of the applicable disaster(s), including a description of the
activities it plans to undertake to address emergency shelter and transitional
housing needs of homeless individuals and families (including subpopulations), to
prevent low-income individuals and families with children (especially those with
incomes below 30 percent of median) from becoming homeless, to help homeless per-
sons make the transition to permanent housing and independent living, and to ad-
dress the special needs of persons who are not homeless identified in accordance
with 24 CFR 91.315(d);

  c. Monitoring standards and procedures that are sufficient to ensure program re-
quirements, including non-**duplication** of benefits, are met and that provide for
continual quality assurance, investigation, and internal audit functions, with re-
sponsible staff reporting independently to the Governor of the state or, at a mini-
mum, to the chief officer of the governing body of any designated administering en-
tity;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

   d. A description of the steps the state will take to avoid or mitigate occurrences of fraud, abuse, and mismanagement, especially with respect to accounting, procurement, and accountability, with a description of how the state will provide for increasing the capacity for implementation and compliance of local government grant recipients, subrecipients, subgrantees, contractors, and any other entity responsible for administering activities under this grant; and

   e. Method of distribution. The state's method of distribution shall include descriptions of the method of allocating funds to units of local government and of specific projects the state will carry out directly, as applicable. The descriptions will include:

   (1) When funds are to be allocated to units of local government, all criteria used to select applications from local governments for funding, including the relative importance of each criterion, and including a description of how the disaster recovery grant resources will be allocated among all funding categories and the threshold factors and grant size limits that are to be applied; and

   (2) When the state will carry out activities directly, the projected uses for the CDBG disaster recovery funds by responsible entity, activity, and geographic area;

   (3) How the method of distribution to local governments or use of funds described in accordance with the above subparagraphs will result in eligible uses of grant funds related to long-term recovery from specific effects of the disaster(s) or restoration of infrastructure; and

   (4) Sufficient information so that citizens, units of general local government and other eligible subgrantees or subrecipients will be able to understand and comment on the action plan and, if applicable, be able to prepare responsive applications to the state.

   f. Required certifications (see the applicable Certifications section of this Notice); and

   g. A completed and executed Federal form SF-424.

   8. Allow reimbursement for pre-agreement costs. The provisions of 24 CFR 570.489(b) are applied to permit a grantee to reimburse itself for otherwise allowable costs incurred on or after the incident date of the covered disaster.

   9. Clarifying note on the process for environmental release of funds when a state carries out activities directly. Usually, a state distributes CDBG funds to units of local government and takes on HUD's role in receiving environmental certifications from the grant recipients and approving releases of funds. For this grant, HUD will allow a state grantee to also carry out activities directly instead of distributing them to other governments. According to the environmental regulations at 24 CFR 58.4, when a state carries out activities directly, the state must submit the certification and request for release of funds to HUD for approval.

   10. **Duplication** of benefits. In general, 42 U.S.C. 5155 (section 312 of the Robert

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 52870-02                                                                    Page 15
(Publication page references are not available for this document.)

T. Stafford Disaster Assistance and Emergency Relief Act, as amended) prohibits any person, business concern, or other entity from receiving financial assistance with respect to any part of a loss resulting from a major disaster as to which he has received financial assistance under any other program or from **insurance** or any other source. The Supplemental Appropriations Act stipulates that funds may not be used for activities reimbursable by or for which funds have been made available by the Federal Emergency Management Agency or by the Army Corps of Engineers.

  11. Waiver and alternative requirement for distribution to CDBG metropolitan cities and urban counties.

  a. Section 5302(a)(7) of title 42, U.S.C. (definition of "nonentitlement area") and provisions of 24 CFR part 570 that would prohibit a state from distributing CDBG funds to units of general local government regardless of their status in the entitlement CDBG program and to Indian tribes, are waived, including 24 CFR 570.480(a), to the extent that such provisions limit the distribution of funds to units of general local government located in entitlement areas and to state or Federally recognized Indian tribes. The state is required instead to distribute funds to the most affected and impacted areas related to the consequences of the covered disaster(s) without regard to a local government or Indian tribe status under any other CDBG program.

  b. Additionally, because a state grantee under this appropriation may carry out activities directly, HUD is applying the regulations at 24 CFR 570.480(c) with respect to the basis for HUD determining whether the state has failed to carry out its certifications so that such basis shall be that the state has failed to carry out its certifications in compliance with applicable program requirements. Also, 24 CFR 570.494 regarding timely distribution of funds is waived. However, HUD expects each state grantee to expeditiously obligate and expend all funds, including any recaptured funds or program income, and to carry out activities in a timely manner.

  12. Program income alternative requirement. 42 U.S.C. 5304(j) and 24 CFR 570.489(e) are waived to the extent necessary to allow additional flexibility in the administration of program income. The requirements that are retained are republished here for the convenience of the grantees.

  a. Program income.

  (1) For the purposes of this subpart, "program income" is defined as gross income received by a state, a unit of general local government, a tribe or a subrecipient of a state, a unit of general local government or a tribe that was generated from the use of CDBG funds, except as provided in paragraph (a)(2) of this section. When income is generated by an activity that is only partially assisted with CDBG funds, the income shall be prorated to reflect the percentage of CDBG funds used (e.g., a single loan supported by CDBG funds and other funds; a single parcel of land purchased with CDBG funds and other funds). Program income includes, but is not limited to, the following:

  (i) Proceeds from the disposition by sale or long-term lease of real property purchased or improved with CDBG funds;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 52870-02                                                                   Page 16
**(Publication page references are not available for this document.)**

(ii) Proceeds from the disposition of equipment purchased with CDBG funds;

(iii) Gross income from the use or rental of real or personal property acquired by the unit of general local government or tribe or subrecipient of a state, a tribe or a unit of general local government with CDBG funds; less the costs incidental to the generation of the income;

(iv) Gross income from the use or rental of real property owned by a state, tribe or the unit of general local government or a subrecipient of a state, tribe or unit of general local government, that was constructed or improved with CDBG funds, less the costs incidental to the generation of the income;

(v) Payments of principal and interest on loans made using CDBG funds;

(vi) Proceeds from the sale of loans made with CDBG funds;

(vii) Proceeds from the sale of obligations secured by loans made with CDBG funds;

(viii) Interest earned on program income pending disposition of the income, but excluding interest earned on funds held in a revolving fund account;

(ix) Funds collected through special assessments made against properties owned and occupied by households not of low and moderate income, where the special assessments are used to recover all or part of the CDBG portion of a public improvement; and

(x) Gross income paid to a state, tribe or a unit of general local government or subrecipient from the ownership interest in a for-profit entity acquired in return for the provision of CDBG assistance.

(2) "Program income" does not include the following:

(i) The total amount of funds which is less than $25,000 received in a single year that is retained by a unit of general local government, tribe or subrecipient;

(ii) Amounts generated by activities eligible under section 105(a)(15) of the HCD Act and carried out by an entity under the authority of section 105(a)(15) of the HCD Act;

(3) The state may permit the unit of general local government or tribe which receives or will receive program income to retain the program income, subject to the requirements of paragraph (a)(3)(ii) of this section, or the state may require the unit of general local government or tribe to pay the program income to the state.

(i) Program income paid to the state. Program income that is paid to the state or received by the state is treated as additional disaster recovery CDBG funds subject to the requirements of this notice and must be used by the state or distributed to units of general local government in accordance with the state's Action Plan for Disaster Recovery. To the maximum extent feasible, program income shall be used or distributed before the state makes additional withdrawals from the Treasury, except

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

as provided in paragraph (b) of this section.

(ii) Program income retained by a unit of general local government or tribe.

(A) Program income that is received and retained by the unit of general local gov-
ernment or tribe before closeout of the grant that generated the program income is
treated as additional disaster recovery CDBG funds and is subject to the require-
ments of this notice.

(B) Program income that is received and retained by the unit of general local gov-
ernment or tribe after closeout of the grant that generated the program income, but
that is used to continue the disaster recovery activity that generated the program
income, is subject to the waivers and alternative requirements of this notice.

(C) All other program income is subject to the requirements of 42 U.S.C. 5304(j)
and subpart I of 24 CFR part 570.

(D) The state shall require units of general local government or tribes, to the
maximum extent feasible, to disburse program income that is subject to the require-
ments of this notice before requesting additional funds from the state for activi-
ties, except as provided in paragraph (b) of this section.

(b) Revolving funds.

(1) The state may establish or permit units of general local government or tribes
to establish revolving funds to carry out specific, identified activities. A re-
volving fund, for this purpose, is a separate fund (with a set of accounts that are
independent of other program accounts) established to carry out specific activities
which, in turn, generate payments to the fund for use in carrying out such activi-
ties. These payments to the revolving fund are program income and must be substan-
tially disbursed from the revolving fund before additional grant funds are drawn
from the Treasury for revolving fund activities. Such program income is not re-
quired to be disbursed for non-revolving fund activities.

(2) The state may also establish a revolving fund to distribute funds to units of
general local government or tribes to carry out specific, identified activities. A
revolving fund, for this purpose, is a separate fund (with a set of accounts that
are independent of other program accounts) established to fund grants to units of
general local government to carry out specific activities which, in turn, generate
payments to the fund for additional grants to units of general local government to
carry out such activities. Program income in the revolving fund must be disbursed
from the fund before additional grant funds are drawn from the Treasury for pay-
ments to units of general local government which could be funded from the revolving
fund.

(3) A revolving fund established by either the state or unit of general local gov-
ernment shall not be directly funded or capitalized with grant funds.

(c) Transfer of program income. Notwithstanding other provisions of this notice,
the state may transfer program income before closeout of the grant that generated

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

the program income to its own annual CDBG program or to any annual CDBG-funded ac-
tivities administered by a unit of general local government or Indian tribe within
the state.

 (d) Program income on hand at the state or its subrecipients at the time of grant
closeout by HUD and program income received by the state after such grant closeout
shall be program income to the most recent annual CDBG program grant of the state.


13. Note that use of grant funds must relate to the covered disaster(s). In addi-
tion to being eligible under 42 U.S.C. 5305(a) or this Notice and meeting a CDBG
national objective, the Supplemental Appropriations Act requires that activities
funded under this Notice must also be for necessary expenses related to disaster
relief, long-term recovery, and restoration of infrastructure in areas covered by a
declaration of major disaster under title IV of the Robert T. Stafford Disaster Re-
lief and Emergency Assistance Act (42 U.S.C. 5121 et seq.) as a result of the re-
cent natural disaster or disasters listed in this Notice for which the state re-
ceived a funding allocation.


13a. Note on change to administration limitation. Up to five percent of the grant
amount may be used for the state's administrative costs. The provisions of 42
U.S.C. 5306(d) and 24 CFR 570.489(a)(1)(i) and (iii) will not apply to the extent
that they cap state administration expenditures, limit a state's ability to charge
a de minimis application fee for grant applications for activities the state car-
ries out directly, and require a dollar for dollar match of state funds for admin-
istrative costs exceeding $100,000. HUD does not waive 24 CFR 570.489(a)(3) to al-
low the state to exceed the overall planning, management and administrative cap of
20 percent.


*Reporting*

14. Waiver of performance report and alternative requirement. The requirements for
submission of a Performance Evaluation Report (PER) pursuant to 42 U.S.C. 12708 and
24 CFR 91.520 are waived. The alternative requirement is that--


 a. Each grantee must submit its Action Plan for Disaster Recovery, including per-
formance measures, into HUD's Web-based Disaster Recovery Grant Reporting (DRGR)
system. (The signed certifications and the SF-424 must be submitted in hard copy.)
As additional detail about uses of funds becomes available to the grantee, the
grantee must enter this detail into DRGR, in sufficient detail to serve as the ba-
sis for acceptable performance reports.


 b. Each grantee must submit a quarterly performance report, as HUD prescribes, no
later than 30 days following each calendar quarter, beginning after the first full
calendar quarter after grant award and continuing until all funds have been ex-
pended and all expenditures reported. Each quarterly report will include informa-
tion about the uses of funds during the applicable quarter including (but not lim-
ited to) the project name, activity, location, and national objective, funds budg-
eted, obligated, drawn down, and expended; the funding source and total amount of
any non-CDBG disaster funds; beginning and ending dates of activities; and perform-
ance measures such as numbers of low-and moderate-income persons or households
benefiting. Quarterly reports to HUD must be submitted using HUD's Web-based DRGR

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

system and, within 3 days of submission, posted on the grantee's official Internet site open to the public.

15. Use of subrecipients. The following alternative requirement applies for any activity that a state carries out directly by funding a subrecipient:

a. 24 CFR 570.503, except that specific references to 24 CFR parts 84 and 85 need not be included in subrecipient agreements.

b. 24 CFR 570.502(b), except that HUD recommends but does not require application of the requirements of 24 CFR part 84.

16. Recordkeeping. Recognizing that the state may carry out activities directly, 24 CFR 570.490(b) is waived in such a case and the following alternative provision shall apply: state records. The state shall establish and maintain such records as may be necessary to facilitate review and audit by HUD of the state's administration of CDBG disaster recovery funds under 24 CFR 570.493. Consistent with applicable statutes, regulations, waivers and alternative requirements, and other federal requirements, the content of records maintained by the state shall be sufficient to: enable HUD to make the applicable determinations described at 24 CFR 570.493; make compliance determinations for activities carried out directly by the state; and show how activities funded are consistent with the descriptions of activities proposed for funding in the action plan. For fair housing and equal opportunity purposes, and as applicable, such records shall include data on the racial, ethnic, and gender characteristics of persons who are applicants for, participants in, or beneficiaries of the program.

17. Change of use of real property. This waiver conforms the change of use of real property rule to the waiver allowing a state to carry out activities directly. For purposes of this program, in 24 CFR 570.489(j), (j)(1), and the last sentence of (j)(2), "unit of general local government" shall be read as "unit of general local government or state."

18. Responsibility for state review and handling of noncompliance. This change conforms the rule with the waiver allowing the state to carry out activities directly. 24 CFR 570.492 is waived and the following alternative requirement applies: The state shall make reviews and audits including on-site reviews of any subrecipients, designated public agencies, and units of general local government as may be necessary or appropriate to meet the requirements of section 104(e)(2) of the HCD Act, as amended, as modified by this Notice. In the case of noncompliance with these requirements, the state shall take such actions as may be appropriate to prevent a continuance of the deficiency, mitigate any adverse effects or consequences and prevent a recurrence. The state shall establish remedies for noncompliance by any designated public agencies or units of general local governments and for its subrecipients.

19. Housing-related eligibility waivers. 42 U.S.C. 5305(a) is waived to the extent necessary to allow homeownership assistance for households with up to 120 percent of area median income and downpayment assistance for up to 100 percent of the down payment (42 U.S.C. 5305(a)(24)(D)) and to allow new housing construction.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

20. Waiver and modification of the anti-pirating clause to permit assistance to help a business return. 42 U.S.C. 5305(h) and 24 CFR 570.482 are hereby waived only to allow the grantee to provide assistance under this grant to any business that was operating in the covered disaster area before the incident date of the applicable disaster, and has since moved in whole or in part from the affected area to another state or to a labor market area within the same state to continue business.

*Relocation Requirements*

21. Waiver of one-for-one replacement of units damaged by disaster.

a. One-for-one replacement requirements at 42 U.S.C. 5304(d)(2) and (d)(3), and 24 CFR 42.375(a) are waived for low- and moderate-income dwelling units (1) damaged by the disaster, (2) for which CDBG funds are used for demolition, and (3) which are not suitable for rehabilitation.

b. Relocation assistance requirements at 42 U.S.C. 5304(d)(2)(A), and 24 CFR 42.350 are waived to the extent they differ from those of the URA and its implementing regulations at 49 CFR part 24 following waivers to activities involving buyouts and other activities covered by the URA and related to disaster recovery housing activities assisted by the funds covered by this notice and included in an approved Action Plan.

c. The requirements at 49 CFR 24.101(b)(2)(i)-(ii) are waived to the extent that they apply to an arm's length voluntary purchase carried out by a person that does not have the power of eminent domain, in connection with the purchase and occupancy of a principal residence by that person.

d. The requirements at sections 204(a) and 206 of the URA, 49 CFR 24.2, 24.402(b)(2) and 24.404 are waived to the extent that they require the state to provide URA financial assistance sufficient to reduce the displaced person's post-displacement rent/utility cost to 30 percent of household income. To the extent that a tenant has been paying rents in excess of 30 percent of household income without demonstrable hardship, rental assistance payments to reduce tenant costs to 30 percent would not be required. Before using this waiver, the state must establish a definition of "demonstrable hardship."

e. The requirements of sections 204 and 205 of the URA, and 49 CFR 24.402(b) are waived to the extent necessary to permit a grantee to meet all or a portion of a grantee's replacement housing financial assistance obligation to a displaced renter by offering rental housing through a tenant-based rental assistance (TBRA) housing program subsidy (e.g., Section 8 rental voucher or certificate) provided that the renter is also provided referrals to suitable, available rental replacement dwellings where the owner is willing to participate in the TBRA program, and the period of authorized assistance is at least 42 months.

f. The requirements of section 202(b) of the URA and 49 CFR 24.302 are waived to the extent that they require a grantee to offer a person displaced from a dwelling unit the option to receive a "moving expense and dislocation allowance" based on the current schedule of allowances prepared by the Federal Highway Administration, provided that the grantee establishes and offers the person a moving expense and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

dislocation allowance under a schedule of allowances that is reasonable for the ju-
risdiction and takes into account the number of rooms in the displacement dwelling,
whether the person owns and must move the furniture, and, at a minimum, the kinds
of expenses described in 49 CFR 24.301.

22. Notes on flood buyouts: a. Payment of pre-flood values for buyouts. HUD disas-
ter recovery state grant recipients and Indian tribes have the discretion to pay
pre-flood or post-flood values for the acquisition of properties located in a flood
way or floodplain. In using CDBG disaster recovery funds for such acquisitions, the
grantee must uniformly apply whichever valuation method it chooses.

b. Ownership and maintenance of acquired property. Any property acquired with dis-
aster recovery grants funds being used to match FEMA Section 404 Hazard Mitigation
Grant Program funds is subject to section 404(b)(2) of the Robert T. Stafford Dis-
aster Relief and Emergency Assistance Act, as amended, which requires that such
property be dedicated and maintained in perpetuity for a use that is compatible
with open space, recreational, or wetlands management practices. In addition, with
minor exceptions, no new structure may be erected on the property and no subsequent
application for Federal disaster assistance may be made for any purpose. The ac-
quiring entity may want to lease such property to adjacent property owners or other
parties for compatible uses in return for a maintenance agreement. Although Federal
policy encourages leasing rather than selling such property, the property may be
sold. In all cases, a deed restriction or covenant running with the land must re-
quire that the property be dedicated and maintained for compatible uses in perpetu-
ity.

c. Future Federal assistance to owners remaining in floodplain.

(1) Section 582 of the National Flood **Insurance** Reform Act of 1994, as amended,
(42 U.S.C. 5154(a)) prohibits flood disaster assistance in certain circumstances.
In general, it provides that no Federal disaster relief assistance made available
in a flood disaster area may be used to make a payment (including any loan assis-
tance payment) to a person for repair, replacement, or restoration for damage to
any personal, residential, or commercial property, if that person at any time has
received Federal flood disaster assistance that was conditional on the person first
having obtained flood **insurance** under applicable Federal law and the person has
subsequently failed to obtain and maintain **insurance** as required under appli-
cable Federal law on such property. (Section 582 is self-implementing without regu-
lations.) This means that a grantee may not provide disaster assistance for the
above-mentioned repair, replacement, or restoration to a person that has failed to
meet this requirement.

(2) Section 582 also implies a responsibility for a grantee that receives CDBG
disaster recovery funds or that, under 42 U.S.C. 5321, designates annually appro-
priated CDBG funds for disaster recovery. That responsibility is to inform property
owners receiving disaster assistance that triggers the flood **insurance** purchase re-
quirement that they have a statutory responsibility to notify any transferee of the
requirement to obtain and maintain flood **insurance**, and that the transferring owner
may be liable if he or she fails to do so. These requirements are described below.

(3) Duty to notify. In the event of the transfer of any property described in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

paragraph d., the transferor shall, not later than the date on which such transfer
occurs, notify the transferee in writing of the requirements to:

 (i) Obtain flood **insurance** in accordance with applicable Federal law with respect
to such property, if the property is not so insured as of the date on which the
property is transferred; and

 (ii) Maintain flood **insurance** in accordance with applicable Federal law with re-
spect to such property. Such written notification shall be contained in documents
evidencing the transfer of ownership of the property.

 (4) Failure to notify. If a transferor fails to provide notice as described above
and, subsequent to the transfer of the property:

 (i) The transferee fails to obtain or maintain flood **insurance**, in accordance with
applicable Federal law, with respect to the property;

 (ii) The property is damaged by a flood disaster; and

 (iii) Federal disaster relief assistance is provided for the repair, replacement,
or restoration of the property as a result of such damage, the transferor shall be
required to reimburse the Federal Government in an amount equal to the amount of
the Federal disaster relief assistance provided with respect to the property.

 d. The notification requirements apply to personal, commercial, or residential
property for which Federal disaster relief assistance made available in a flood
disaster area has been provided, prior to the date on which the property is trans-
ferred, for repair, replacement, or restoration of the property, if such assistance
was conditioned upon obtaining flood **insurance** in accordance with applicable Fed-
eral law with respect to such property.

 e. The term "Federal disaster relief assistance" applies to HUD or other Federal
assistance for disaster relief in "flood disaster areas." The term "flood disaster
area" is defined in section 582(d)(2) of the National Flood **Insurance** Reform Act of
1994, as amended, to include an area receiving a Presidential declaration of a ma-
jor disaster or emergency as a result of flood conditions.

 23. Information collection approval note. HUD has approval for information collec-
tion requirements in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C.
3501-3520) under OMB control number 2506-0165. In accordance with the Paperwork Re-
duction Act, HUD may not conduct or sponsor, nor is a person required to respond
to, a collection of information unless the collection displays a valid control num-
ber.

*Certifications*

 24. Certifications for state governments, waiver and alternative requirement.
Section 91.325 of title 24 of the Code of Federal Regulations is waived. Each state
must make the following certifications prior to receiving a CDBG disaster recovery
grant:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 52870-02                                                                    Page 23
**(Publication page references are not available for this document.)**


a. The state certifies that it will affirmatively further fair housing, which means that it will conduct an analysis to identify impediments to fair housing choice within the state, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard. (See 24 CFR 570.487(b)(2).)

b. The state certifies that it has in effect and is following a residential anti-displacement and relocation assistance plan in connection with any activity assisted with funding under the CDBG program.

c. The state certifies its compliance with restrictions on lobbying required by 24 CFR part 87, together with disclosure forms, if required by part 87.

d. The state certifies that the Action Plan for Disaster Recovery is authorized under state law and that the state, and any entity or entities designated by the state, possesses the legal authority to carry out the program for which it is seeking funding, in accordance with applicable HUD regulations and this Notice.

e. The state certifies that it will comply with the acquisition and relocation requirements of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, and implementing regulations at 49 CFR part 24, except where waivers or alternative requirements are provided for this grant.

f. The state certifies that it will comply with section 3 of the Housing and Urban Development Act of 1968 (12 U.S.C. 1701u), and implementing regulations at 24 CFR part 135.

g. The state certifies that it is following a detailed citizen participation plan that satisfies the requirements of 24 CFR 91.115 (except as provided for in notices providing waivers and alternative requirements for this grant), and that each unit of general local government that is receiving assistance from the state is following a detailed citizen participation plan that satisfies the requirements of 24 CFR 570.486 (except as provided for in notices providing waivers and alternative requirements for this grant).

h. The state certifies that it has consulted with affected units of local government in counties designated in covered major disaster declarations in the nonentitlement, entitlement and tribal areas of the state in determining the method of distribution of funding;

i. The state certifies that it is complying with each of the following criteria:

(1) Funds will be used solely for necessary expenses related to disaster relief, long-term recovery, and restoration of infrastructure in areas covered by a declaration of major disaster under title IV of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.) as a result of recent natural disasters.

(2) With respect to activities expected to be assisted with CDBG disaster recovery

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 52870-02
**(Publication page references are not available for this document.)**

funds, the action plan has been developed so as to give the maximum feasible prior-
ity to activities that will benefit low- and moderate-income families.

(3) The aggregate use of CDBG disaster recovery funds shall principally benefit
low- and moderate-income families in a manner that ensures that at least 50 percent
of the amount is expended for activities that benefit such persons during the des-
ignated period.

(4) The state will not attempt to recover any capital costs of public improvements
assisted with CDBG disaster recovery grant funds, by assessing any amount against
properties owned and occupied by persons of low- and moderate-income, including any
fee charged or assessment made as a condition of obtaining access to such public
improvements, unless (A) disaster recovery grant funds are used to pay the propor-
tion of such fee or assessment that relates to the capital costs of such public im-
provements that are financed from revenue sources other than under this title; or
(B) for purposes of assessing any amount against properties owned and occupied by
persons of moderate income, the grantee certifies to the Secretary that it lacks
sufficient CDBG funds (in any form) to comply with the requirements of clause (A).

j. The state certifies that the grant will be conducted and administered in con-
formity with title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d) and the
Fair Housing Act (42 U.S.C. 3601-3619) and implementing regulations.

k. The state certifies that it has and that it will require units of general local
government that receive grant funds to certify that they have adopted and are en-
forcing:

(1) A policy prohibiting the use of excessive force by law enforcement agencies
within its jurisdiction against any individuals engaged in non-violent civil rights
demonstrations; and

(2) A policy of enforcing applicable state and local laws against physically bar-
ring entrance to or exit from a facility or location that is the subject of such
non-violent civil rights demonstrations within its jurisdiction.

l. The state certifies that each state grant recipient or administering entity has
the capacity to carry out disaster recovery activities in a timely manner, or the
state has a plan to increase the capacity of any state grant recipient or adminis-
tering entity who lacks such capacity.

m. The state certifies that it will not use CDBG disaster recovery funds for any
activity in an area delineated as a special flood hazard area in FEMA's most cur-
rent flood advisory maps unless it also ensures that the action is designed or
modified to minimize harm to or within the floodplain in accordance with Executive
Order 11988 and 24 CFR part 55.

n. The state certifies that it will comply with applicable laws.

Duration of Funding

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 52870-02                                                                                    Page 25
**(Publication page references are not available for this document.)**

  Availability of funds provisions in 31 U.S.C. 1551-1557, added by section 1405 of
the National Defense Authorization Act for Fiscal Year 1991 (Pub. L. 101-510),
limit the availability of certain appropriations for expenditure. This limitation
may not be waived. However, the Supplemental Appropriations Act for these grants
directs that these funds be available until expended unless, in accordance with 31
U.S.C. 1555, the Department determines that the purposes for which the appropria-
tion has been made have been carried out and no disbursement has been made against
the appropriation for two consecutive fiscal years. In such case, the Department
shall close out the grant prior to expenditure of all funds.

Catalog of Federal Domestic Assistance

  The Catalog of Federal Domestic Assistance numbers for the disaster recovery
grants under this Notice are as follows: 14.219; 14.228.

Finding of No Significant Impact

  A Finding of No Significant Impact (FONSI) with respect to the environment has
been made in accordance with HUD regulations at 24 CFR part 50, which implement
section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C.
4332). The FONSI is available for public inspection between 8 a.m. and 5 p.m. week-
days in the Regulations Division, Office of General Counsel, Department of Housing
and Urban Development, Room 10276, 451 7th Street, SW., Washington, DC 20410-0500.
Due to security measures at the HUD Headquarters building, an advance appointment
to review the docket file must be scheduled by calling the Regulations Division at
202-708-3055 (this is not a toll-free number). Hearing- or speech-impaired indi-
viduals may access this number through TTY by calling the toll-free Federal Infor-
mation Relay Service at 800-877-8339.

  Dated: September 8, 2008.

Roy A Bernardi,

Deputy Secretary.

[FR Doc. E8-21092 Filed 9-10-08; 8:45 am]

BILLING CODE 4210-67-P

73 FR 52870-02

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



73 FR 46312-01                                                                                           Page 1
**(Publication page references are not available for this document.)**

NOTICES

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR-5224-N-01]

Reconsideration of Waivers Granted to and Alternative Requirements for
Community Development Block Grant Disaster Recovery Grantees Under Public
Laws 109-148 and 109-234

Friday, August 8, 2008

AGENCY: Office of the Secretary, HUD.

ACTION: Notice.

SUMMARY: This Notice reconsiders and generally affirms the waivers made under the
three "common" Notices governing grant funds for Community Development Block Grant
(CDBG) disaster recovery grants for the purpose of assisting in the recovery in the
most impacted and distressed areas related to the consequences of Hurricanes
**Katrina**, **Rita**, and **Wilma** in the Gulf of Mexico in 2005. These prior notices were
published in the Federal Register on February 13, 2006, October 30, 2006, and Au-
gust 24, 2007. The Notice published today addresses the purpose and use of these
funds, while highlighting unique components of the three notices and noting any
changes made by HUD as the result of the required reconsideration of the waivers.
For the most part, HUD is repeating or restating the original explanatory text so
that grantees and program administrators may continue to have the explanation of a
changed requirement and the requirement itself in a single document.

DATES: Effective Date: August 8, 2008.

FOR FURTHER INFORMATION CONTACT: Jessie Handforth Kome, Director, Disaster Recovery
and Special Issues Division, Office of Block Grant Assistance, Department of Hous-
ing and Urban Development, 451 Seventh Street, SW., Room 7286, Washington, DC
20410, telephone number 202-708-3587. Persons with hearing or speech impairments
may access this number via TTY by calling the Federal Information Relay Service at
800-877-8339. Fax inquiries may be sent to Ms. Kome at 202-401-2044. (Except for
the 800 number, these telephone numbers are not toll-free.)

SUPPLEMENTARY INFORMATION:

Authority To Grant Waivers

 The Department of Defense, Emergency Supplemental Appropriations to Address Hurri-
canes in the Gulf of Mexico, and Pandemic Influenza Act, 2006 (Pub. L. 109-148, ap-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                                Page 2
**(Publication page references are not available for this document.)**

proved December 30, 2005) (Appropriations Act) appropriated $11.5 billion, and
Chapter 9 of Title II of the Emergency Supplemental Appropriations Act for Defense,
the Global War on Terror, and Hurricane Recovery, 2006 (Pub. L. 109-234, approved
June 15, 2006), appropriated $5.2 billion for a combined total of $16.7 billion in
CDBG funds for necessary expenses related to disaster relief, long-term recovery,
and restoration of infrastructure directly related to the consequences of the cov-
ered disasters. These 2006 Acts (collectively "the supplemental Acts") authorize
the Secretary to waive, or specify alternative requirements for, any provision of
any statute or regulation that the Secretary administers in connection with the ob-
ligation by the Secretary or by the five eligible states' use of these funds, ex-
cept for requirements related to fair housing, nondiscrimination, labor standards,
and the environment, upon a request by one of the five states and a finding by the
Secretary that such a waiver would not be inconsistent with the overall purpose of
the statute. The difference between the waiver authorizations in the supplemental
Acts is that Public Law 109-148 directs that the Secretary "shall" make the waivers
in response to a state's request and a consistency finding, while Public Law 109-
234 states that the Secretary "may" make such waivers.

 This Notice reconsiders and generally affirms the waivers made under the three
"common" Notices governing grant funds for CDBG disaster recovery grants for the
purpose of assisting in the recovery in the most impacted and distressed areas re-
lated to the consequences of Hurricanes **Katrina**, **Rita**, and **Wilma** in the Gulf of
Mexico in 2005. These prior notices were published in the Federal Register on Feb-
ruary 13, 2006 (71 FR 7666), October 30, 2006 (71 FR 63337), and August 24, 2007
(72 FR 48804). The reconsideration of the February 13, 2006, Notice is required at
this time. HUD is reconsidering the October 30, 2006, and August 24, 2007, Notices
earlier than required by statute because publication of all common waivers and al-
ternative requirements in a single Notice will produce a more sensible administra-
tive and regulatory result.

 The following waivers and alternative requirements for funds provided under either
2006 Act are in response to requests from all five states receiving CDBG disaster
recovery grants under those Acts. In accordance with the states' earlier requests
for administrative consistency to the extent feasible (noted in 71 FR 63337, pub-
lished October 30, 2006), each waiver or alternative requirement will apply to as-
sistance provided under either Act wherever appropriate and possible.

 After reconsideration, the Secretary affirms that the following waivers and alter-
native requirements, as described below, are not inconsistent with the overall pur-
pose of Title I of the Housing and Community Development Act of 1974, as amended,
or the Cranston-Gonzalez National Affordable Housing Act, as amended.

 Under the requirements of the Department of Housing and Urban Development Reform
Act of 1989 (the HUD Reform Act), as amended 42 U.S.C. 3535(q), regulatory waivers
must be justified and published in the Federal Register.

 Further, the supplemental Acts direct the Secretary to publish in the Federal Reg-
ister any waiver (or reconsideration thereof) of any statute or regulation that the
Secretary administers pursuant to Title I of the Housing and Community Development
Act of 1974, no later than 5 days before the effective date of such waiver.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                                                   Page 3
**(Publication page references are not available for this document.)**

Except as described in this and other notices applicable to these grants, statu-
tory and regulatory provisions governing the CDBG program for states, including
those at 24 CFR part 570, shall apply to the use of these funds. In accordance with
the supplemental Acts, HUD is reconsidering every published waiver 2 years from its
date of publication.

Allocations

The supplemental Acts provide a combined total of $16.7 billion for the CDBG pro-
gram for:

Necessary expenses related to disaster relief, long-term recovery, and restoration
of infrastructure in the most impacted and distressed areas related to the conse-
quences of Hurricanes **Katrina**, **Rita**, or **Wilma** in the Gulf of Mexico in 2005.

The $11.5 billion allocation appropriated under Public Law 109-148 is also dis-
cussed and expanded upon in the conference report (H.R. Rep. No. 109-359). The con-
ference agreement included $11.5 billion for necessary expenses related to disaster
relief, long-term recovery, restoration of infrastructure, and mitigation in commu-
nities in any declared disaster area in Louisiana, Mississippi, Alabama, Florida,
and Texas related to Hurricanes **Katrina**, **Rita**, or **Wilma**. The conference agreement
emphasizes the requirement that the states with the most impacted and distressed
areas in connection with the Gulf of Mexico hurricanes receive priority considera-
tion in the allocation of funds by HUD.

Public Law 109-148 further states:

That funds provided under this heading shall be administered through an entity or
entities designated by the Governor of each state. And that no state shall receive
more than 54 percent of the amount provided under this heading.

Public Law 109-234 also states:

That funds provided under this heading shall be administered through an entity or
entities designated by the Governor of each state. And that no state shall receive
more than $4.2 billion of the amount provided under this heading.

As provided for in Public Law 109-148 and Public Law 109-234, the funds may not be
used for activities reimbursable by or for which funds are made available by the
Federal Emergency Management Agency (FEMA) or the Army Corps of Engineers. Further,
none of the funds made available under Public Law 109-234 may be used by a state or
locality as a matching requirement, share, or contribution for any other federal
program.

Also as required by Public Law 109-234, not less than $1.0 billion of the $5.2
billion appropriation (which computes to 19.3311 percent of any state's allocation,
excluding $27.0 million in administrative set-asides) shall be used for repair, re-
habilitation, and reconstruction (including demolition, site clearance, and reme-
diation) of the affordable rental housing stock (including public and other HUD-
assisted housing) in the impacted areas. Therefore, HUD requires that not less than

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01
**(Publication page references are not available for this document.)**


19.3311 percent of each state's grant under Public Law 109-234 be used for these
activities.

The allocations from Public Law 109-148 are as follows:

Table 1--February 13, 2006, Disaster Recovery Allocation

| State | Disaster | Allocation amount ($) |
|-------|----------|------------------------|
| Alabama ...... | Hurricane Katrina (FEMA-1605-DR) ................... | 74,388,000 |
| Florida ...... | Hurricane Katrina (FEMA-1602-DR), Hurricane Wilma (FEMA-1609-DR) ............................ | 82,904,000 |
| Louisiana .... | Hurricane Katrina (FEMA-1603-DR), Hurricane Rita (FEMA-1607-DR) .......................... | 6,210,000,000 |
| Mississippi .. | Hurricane Katrina (FEMA-1604-DR) ................ | 5,058,185,000 |
| Texas ........ | Hurricane Rita (FEMA-1606-DR) ....................... | 74,523,000 |

The allocations from the supplemental appropriation, as provided for in Public
Law 109-234, are as follows:

Table 2--October 30, 2006, Disaster Recovery Supplemental Allocation

| State | Disaster | Allocation amount ($) | Minimum amount for affordable rental housing ($) |
|-------|----------|------------------------|---------------------------------------------------|
| Alabama ...... | Hurricane Katrina (FEMA-1605-DR) ................... | 21,225,574 | 4,103,146 |
| Florida ...... | Hurricane Katrina (FEMA-1602-DR), Hurricane Wilma (FEMA-1609-DR) ............ | 100,066,518 | 19,344,001 |
| Louisiana .... | Hurricane Katrina (FEMA-1603-DR), Hurricane Rita (FEMA-1607-DR) ........... | 4,200,000,000 | 811,907,984 |
| Mississippi .. | Hurricane Katrina (FEMA-1604-DR) ................. | 423,036,059 | 81,777,703 |
| Texas ........ | Hurricane Rita (FEMA-1606-DR) ..... | 428,671,849 | 82,867,166 |

The amounts in Table 2 include the minimum amount of the allocations each state is
required to use, pursuant to Public Law 109-234, for repair, rehabilitation, and
reconstruction (including demolition, site clearance, and remediation) of the af-
fordable rental housing stock (including public and other HUD-assisted housing) in
the impacted areas.

In the case of Louisiana, the Department reviewed data chronicling the massive im-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                                              Page 5
**(Publication page references are not available for this document.)**

pact of the disasters on affordable rental housing, including public housing, in
the areas of the state most affected by the disasters. In light of the state's un-
precedented housing needs resulting from the disasters, the Secretary gave priority
to affordable rental housing through an alternative requirement on the grant under
Public Law 109-234. Under a prior Notice, HUD required that before the state of
Louisiana expended any funds to meet the minimum requirement for affordable rental
housing (see table above), the Governor of Louisiana had to demonstrate to the Sec-
retary's satisfaction that the state will provide funds or has identified dedicated
resources sufficient to meet the key disaster recovery needs for repair, rehabili-
tation, and reconstruction of affordable rental housing stock, including public
housing, in the most impacted areas of the state. This notice continues the re-
quirement to ensure that any fund reprogramming continues to prioritize such hous-
ing.

  Pursuant to this Notice, HUD continues to invite each of the five states to submit
an Action Plan for Disaster Recovery in accordance with prior Notices.

  The supplemental Acts require that funds be used only for disaster relief, long-
term recovery, and restoration of infrastructure in the most impacted and dis-
tressed areas related to the consequences of hurricanes in the Gulf of Mexico in
2005. The supplemental Acts direct that each grantee describe in its Action Plan
for Disaster Recovery how the use of the grant funds gives priority to infrastruc-
ture development and the rehabilitation and reconstruction of the affordable rental
housing stock, including public and other HUD-assisted housing. HUD monitors com-
pliance with this direction and may be compelled to disallow expenditures if it
finds that uses of funds are not disaster-related, or that funds allocated dupli-
cate other benefits. HUD encourages grantees to contact their assigned HUD offices
for guidance in complying with these requirements during development of their Ac-
tion Plans for Disaster Recovery and any amendments or if they have any questions
regarding meeting these requirements.

  For the state of Louisiana, which suffered major impacts from two of the hurri-
canes, HUD estimated that more than 85 percent of the major and severe damage due
to those storms was in the New Orleans-Metairie-Bogalusa Metropolitan Area (Jeffer-
son, Orleans, Plaquemines, St. Bernard, St. Charles, St. John the Baptist, and St.
Tammany parishes). HUD, therefore, expects the state to target a substantial major-
ity of its disaster recovery funds under Public Law 109-234 toward the disaster re-
covery needs in the New Orleans-Metairie-Bogalusa Metropolitan Area, and included
an alternative requirement to that effect.

Prevention of Fraud, Abuse, and **Duplication** of Benefits

  The supplemental Acts also directed the Secretary to: Establish procedures to pre-
vent recipients from receiving any **duplication** of benefits and report quarterly to
the Committees on Appropriations with regard to all steps taken to prevent fraud
and abuse of funds made available under this heading, including **duplication** of
benefits.

  To meet this directive, HUD has taken five courses of action. First, HUD estab-
lished by Notice specific reporting, written procedures, monitoring, and internal
audit requirements for grantees. Second, to the extent that its resources allowed,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                              Page 6
**(Publication page references are not available for this document.)**


HUD instituted risk analysis and on-site monitoring of grantee management of the
grants and of the specific uses of funds. Third, HUD has been extremely cautious in
considering any waiver related to basic financial management requirements. The
standard, time-tested CDBG financial requirements will continue to apply to future
waiver requests. Fourth, HUD collaborated with the HUD Office of Inspector General
to plan and implement oversight of these funds. Fifth, HUD followed the direction
of the conference report for Public Law 109-494 and applied $6 million of funds ap-
propriated for the Working Capital Fund for "immediate enhancement of the capabili-
ties of the Disaster Recovery Grant Reporting system by building additional elec-
tronic controls that are intended to increase accountability while further decreas-
ing the risk of fraud, waste, or abuse."


Waiver Justification

 In general, waivers already granted to the states of Alabama, Florida, Louisiana,
Mississippi, and Texas and alternative requirements already specified for CDBG dis-
aster recovery grant funds provided under the supplemental Acts apply unless deter-
mined to be excepted or limited under this Notice. The notices in which these prior
waivers and alternative requirements appear are shown in the table below.


| Notice | Date | Applicability |
|---|---|---|
| 71 FR 7666, FR-5051-N-01 ..... | 02/13/2006 | Common Allocation/Application for $11.5 billion. |
| 71 FR 34448, FR-5051-N-02 .... | 06/14/2006 | State of Alabama. |
| 71 FR 34451, FR-5051-N-04 .... | 06/14/2006 | State of Louisiana. |
| 71 FR 34457, FR-5051-N-03 .... | 06/14/2006 | State of Mississippi. |
| 71 FR 43622, FR-5051-N-05 .... | 08/01/2006 | State of Texas. |
| 71 FR 51678, FR-5051-N-06 .... | 08/30/2006 | State of Florida. |
| 71 FR 62372, FR 5051-N-07 .... | 10/24/2006 | State of Mississippi. |
| 71 FR 63337, FR-5089-N-01 .... | 10/30/2006 | Common Allocation/Application, and Applicability of Prior Waivers for $5.2 billion. |
| 72 FR 10014, FR-5089-N-03 .... | 03/06/2007 | State of Louisiana. |
| 72 FR 10020, FR-5089-N-04 .... | 03/06/2007 | State of Mississippi. |
| 72 FR 48804, FR-5089-N-05 .... | 08/24/2007 | Common waiver of Section 414 of the Stafford Act and alternative requirements. |
| 72 FR 48808, FR-5051-N-08 .... | 08/24/2007 | State of Mississippi. |
| 72 FR 61788, FR-5051-N-09 .... | 10/31/2007 | State of Mississippi. |
| 72 FR 70472, FR-5183-N-01 .... | 12/11/2007 | State of Louisiana for $3 billion. |


 The provisions of this Notice do not apply to funds provided under the regular
CDBG program or other HUD or federally funded programs. The provisions provide ad-
ditional flexibility in program design and implementation and implement statutory
requirements unique to these appropriations.


Section 414 of the Stafford Act


© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

   The states requested and were granted a waiver of Section 414 of the Robert T.
Stafford Disaster Relief and Emergency Assistance Act, as amended, for all their
disaster recovery programs. Section 414 requires special measures that are designed
to assist the efforts of the five states in expediting the rendering of aid and
emergency services and in the reconstruction and rehabilitation of devastated ar-
eas, as necessary. In addition, the Secretary provided alternative requirements
more consistent with the purpose of the supplemental Acts, which have assisted and
supported disaster recovery in the areas most impacted by the effects of the three
2005 Gulf hurricanes. Hurricanes **Katrina**, **Rita**, and **Wilma** resulted in unprecedented
destruction in the Gulf states, which will continue to require reconstruction for
many years (and possibly decades) to come. The Department surveyed other federal
agencies' administration of Section 414 and found varying interpretations for long-
term, post-disaster projects involving the acquisition, rehabilitation, or demoli-
tion of disaster-damaged housing. The five states have also launched programs, such
as rental rehabilitation, that could be affected by this statute if a clear direc-
tion to restore affordable rental housing to the devastated areas is not realized.
Therefore, to avoid possible risk to the recovery effort by further delay in pro-
viding the states with a definitive answer, the Department issued a partial statu-
tory waiver and specified alternative requirements. HUD is continuing this statu-
tory waiver by this Notice because affordable housing programs are under way in all
five of the states that rely on this waiver and alternative requirements. For pro-
grams or projects covered by this waiver ("covered programs or projects") that are
initiated within 3 years after the applicable disaster, an affected state must se-
lect one of the two alternative requirements specified in 72 FR 48804 and restated
in this Notice.


Alternative One

   The state may provide relocation assistance to a former residential occupant whose
former dwelling is acquired, rehabilitated, or demolished for a covered program or
project initiated within 3 years after the disaster, even though the actual dis-
placements were caused by the effects of the disaster. To the extent practicable,
such relocation assistance must be offered in a manner consistent with the Uniform
Relocation Assistance and Real Property Acquisition Policies Act of 1970, as
amended, (URA) and its implementing regulations, except as modified by applicable
waivers and alternative requirements.


Alternative Two

   If the state determines that the first alternative would substantially conflict
with meeting the disaster recovery purposes of the supplemental Acts, the state may
establish a re-housing plan for a covered program or project initiated within 3
years after the disaster. Such determinations must be made on a program or project
basis (not person or household). The re-housing plan must include, at minimum, the
following:

   1. A description of the class(es) of persons eligible for assistance, including
all persons displaced from their residences by particular enumerated, or all, ef-
fects of the disaster, and including all persons still receiving temporary housing
assistance from FEMA for the covered disaster(s);

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

2. A description of the types and amount of financial assistance to be offered, if any;

3. A description of other services to be made available, including, at minimum, outreach efforts to eligible persons and housing counseling providing information about available housing resources. Outreach efforts and housing counseling information should be provided in languages other than English to persons with limited English proficiency; and

4. Contact information and a description of any applicable application process, including any deadlines.

5. If the program or project involves rental housing, the re-housing plan must also include the following:

(i) Placement services for former and prospective tenants;

(ii) A public registry of available rental units assisted with CDBG disaster recovery and/or other funds; and

(iii) A description of application materials, award letters, and operating procedures requiring property owners to make reasonable attempts to contact their former residential tenants and offer them a unit upon completion if they meet the program's eligibility requirements.

Justification for Waiver

This section of the Notice describes the basis for granting the section 414 waivers represented by the states in their requests. The principal reasons are highlighted here:

• Hurricanes **Katrina, Rita,** and **Wilma** caused unprecedented destruction in the Gulf Coast region. The magnitude of destruction resulted in massive displacements and decimated the region's affordable housing stock. Continued ambiguity on Section 414's applicability may cause substantial delays in long-term recovery along the Gulf Coast, particularly in Louisiana, Mississippi, and Texas;

• URA assistance may duplicate **insurance** proceeds and federal, state, or local housing assistance that has already been disbursed; and

• The opportunity to simplify the administration of disaster recovery projects or programs initiated years following the disaster.

Persons in physical occupancy who are displaced by a HUD-assisted disaster recovery project will continue to be eligible for URA assistance. Persons displaced by the effects of the disaster may continue to apply for assistance under the states' approved disaster recovery programs, which are designed to bring affordable housing to the affected areas. This waiver does not address programs or projects receiving other HUD funding, or funding from other federal sources.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**


 A state may already be performing some elements of a re-housing plan, such as pro-
viding a public rental registry or undertaking outreach and placement services to
those former residents still receiving FEMA housing assistance. Description in the
re-housing plan of how those existing efforts will be available for covered pro-
grams or projects may be used in satisfying the requirements of this Notice. These
waivers and alternative requirements streamline the pre-grant process and set the
guidelines for a state's application for allocations.

Application for Allocations Under Public Laws 109-148 and 109-234

 Overall benefit to low- and moderate-income persons. Pursuant to explicit author-
ity in the supplemental Acts, HUD granted an overall benefit waiver that allows for
up to 50 percent of the grants to assist activities under the urgent need or under
the prevention or elimination of slums and blight national objectives, rather than
the 30 percent allowed in the annual state CDBG program. The primary objective of
Title I of the Housing and Community Development Act of 1974 and of the funding
program of each grantee is "development of viable urban communities, by providing
decent housing and a suitable living environment and expanding economic opportuni-
ties, principally for persons of low and moderate income." The statute goes on to
set the standard of performance for this primary objective for the annual CDBG pro-
gram at 70 percent of the aggregate of the funds used for support of activities
producing benefit to low- and moderate-income persons. Because extensive damage to
community development and housing affected those with varying incomes, and the
hardest-hit grantees have designed their programs to take advantage of this waiver,
HUD is retaining the waiver of the 70 percent overall benefit requirement and leav-
ing the 50 percent requirement, in order to give grantees continued flexibility to
carry out recovery activities within the confines of the CDBG program national ob-
jectives. HUD may provide additional waivers of this requirement only if it makes a
finding of compelling need. The requirement that each activity meet one of the
three national objectives is not waived. HUD did reconsider, but is not altering
this waiver. The states have already budgeted the vast majority of the funds under
the terms of the initial waiver. Changing the waiver and alternative requirement
now might be counter-productive to the recovery efforts across the Gulf Coast and,
most particularly, in Louisiana. The state of Mississippi has been granted addi-
tional overall benefit waivers and alternative requirements as published in Notices
other than the three under reconsideration in the current Notice. The first of Mis-
sissippi's other Notices is scheduled for reconsideration in June 2008.


 Expanded distribution and direct action. The waivers and alternative requirements
allowing distribution of funds by a state to entitlement communities and Indian
tribes, and to allow a state to carry out activities directly rather than distrib-
ute all funds to units of local government, are consistent with waivers granted for
previous similar disaster recovery cases. HUD believes that, in recommending the
Lower Manhattan Development Corporation (LMDC) as a model and in increasing the ad-
ministrative cap, Congress is signaling its intent that the states under this ap-
propriation also be able to carry out activities directly. Therefore, HUD waived
and continues its waiver of certain program requirements to support direct imple-
mentation of activities by the states. HUD stated in prior Notices and restates in
this Notice the necessary complementary waivers and alternative requirements re-
lated to subrecipients to ensure proper management and disposition of funds during
the grant execution and at closeout.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                                              Page 10
(Publication page references are not available for this document.)

Consistency with the consolidated plan. HUD waived the requirement for consistency with the consolidated plan priorities because the effects of a major disaster usually alter a grantee's priorities for meeting housing, employment, and infrastructure needs. To emphasize that uses of grant funds must be consistent with the overall purposes of the Housing and Community Development Act of 1974, HUD requires the scope of the waiver to be consistent with the consolidated plan; the waiver applies only until the grantee first updates its consolidated plan priorities following the disaster. Because of limited data availability or staff resources, not all grantees have completely updated their consolidated plans. Therefore, HUD is continuing this waiver.

Action Plan for Disaster Recovery. HUD waived the CDBG action plan requirements and substituted an Action Plan for Disaster Recovery. HUD is continuing this waiver and restates the Action Plan for Disaster Recovery requirements under this Notice. This waiver allowed for rapid implementation of disaster recovery grant programs and ensured conformance with provisions of the supplemental Acts. Where possible, the Action Plan for Disaster Recovery, including certifications, does not repeat common action plan elements that the grantee already committed to carry out as part of its annual CDBG submission. Although a state as the grantee may designate an entity or entities to administer the funds, the state is responsible for compliance with federal requirements. During the course of these grants, HUD is monitoring the states' uses of funds and their actions for consistency with the Action Plan. A state may submit an initial, partial Action Plan and amend it one or more times subsequently until the Action Plan describes uses for the combined total grant amount. A state may also amend activities in its Action Plan.

The following new elements to a state's Action Plan for Disaster Recovery apply only to the supplemental funds allocated under Public Law 109-234:

These elements include a description of how the state gives priority to infrastructure development and rehabilitation and how the state gives priority to the rehabilitation and reconstruction of the affordable rental housing stock, including public and other HUD-assisted housing. The state must explain how its choices for the use of funds will result in the state meeting the requirement to use not less than 19.3311 percent of its allocation under Public Law 109-234 for repair, rehabilitation, and reconstruction (including demolition, site clearance, and remediation) of the affordable rental housing stock (including public and other HUD-assisted housing) in the impacted areas. The explanation should include how the state has considered the unique challenges that individuals with disabilities face in finding accessible and affordable housing.

Citizen participation. The citizen participation waiver and alternative requirements permit a more streamlined public process, but one that still provides for reasonable public notice, appraisal, examination, and comment on the CDBG disaster recovery grant fund activities. The waiver removes the requirement at both the grantee and state grant recipient levels for public hearings or meetings as the method for disseminating information or collecting citizen comments. Instead, grantees are encouraged to employ innovative methods to communicate with citizens and solicit their views on proposed uses of disaster recovery funds, and to indicate in the Action Plan how the grantee has addressed these views. After reconsidering this waiver, HUD decided to leave it in place because the need for speedy decision-making is still necessary in some of the states. However, HUD is providing

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                                    Page 11
**(Publication page references are not available for this document.)**

guidance that, as time since the hurricanes elapses, HUD expects grantees to pro-
vide for increased time for public comments and for provision of public hearings
related to amendments to the Action Plan whenever hearings are administratively
feasible. HUD notes that most grantees are making good use of the Internet to pro-
vide disaster recovery information on plan amendments and resources for their citi-
zens, and HUD expects this practice will continue.

 Administration limitation. State program administration requirements must be modi-
fied to be consistent with the Appropriations Act, which allows up to 5 percent of
the grant to be used for the state's administrative costs. The provisions at 42
U.S.C. 5306(d) and 24 CFR 570.489(a)(1)(i) and (iii) will not apply to the extent
that they cap state administration expenditures and require a dollar-for-dollar
match of state funds for administrative costs exceeding $100,000. HUD does not
waive 24 CFR 570.489(a)(3) to allow the state to exceed the overall planning, man-
agement, and administrative cap of 20 percent.

Use of Subrecipients

 The state CDBG program rule does not make specific provision for the treatment of
the entities called "subrecipients" in the CDBG entitlement program. The waiver al-
lowing a state to carry out activities directly creates a situation in which the
state may use subrecipients to carry out activities in a manner similar to entitle-
ment communities. HUD and its Office of Inspector General have long identified the
use of subrecipients as a practice that increases the risk of abuse of funds. HUD's
experience is that this risk can be successfully managed by adhering to the CDBG
entitlement requirements and related guidance. Therefore, HUD requires that a state
taking advantage of the waiver allowing it to carry out activities directly must
follow the alternative requirements that are drawn from the CDBG entitlement rule
and specified in this Notice, when using subrecipients.

Reporting

 HUD waives the annual reporting requirement because Congress requires quarterly
reports from the grantees and from HUD on various aspects of the uses of funds and
of the activities funded with these grants. Many of the data elements the grantees
will report to Congress quarterly are the same as those that HUD uses to exercise
oversight for compliance with the requirements of this Notice and for prevention of
fraud, abuse of funds, and **duplication** of benefits. To collect these data elements
and to meet its reporting requirements, HUD requires each grantee to report to HUD
quarterly using the online Disaster Recovery Grant Reporting system. HUD uses
grantee reports to monitor for anomalies or performance problems that suggest
fraud, abuse of funds, and **duplication** of benefits; to reconcile budgets, obliga-
tions, fund draws, and expenditures; to calculate applicable administrative and
public service limitations and the overall percent of benefit to low- and moderate-
income persons; and to establish a basis for risk analysis in determining a moni-
toring plan.

 Originally, HUD's guidance was that after HUD reviews each report and accepts a
report, the grantee must post the report on an Internet site with public access for
its citizens. On reconsideration, HUD is requiring grantees to post each report as
it is submitted. After HUD reviews the report, the grantee may also post the re-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                         Page 12
**(Publication page references are not available for this document.)**

viewed version, if HUD makes any changes. If a grantee chooses, it may use its re-
port, together with a statement regarding any sole source procurements, as its re-
quired quarterly submissions to the Committees on Appropriations. Each quarter, HUD
will submit to the Committees a summary description of its report reviews, of other
HUD monitoring and technical assistance activities undertaken during the quarter,
and of any significant conclusions related to fraud, abuse of funds, or **duplication**
of benefits.

Certifications

 HUD waived the standard certifications and substituted alternative certifications.
The alternative certifications are tailored to CDBG disaster recovery grants and
remove certifications and references that are redundant or appropriate to the an-
nual CDBG formula program.

Applicable Rules, Statutes, Waivers, and Alternative Requirements

 The following discussion is comprised of two parts: a common section that applies
to Federal Register notices 71 FR 7666, 71 FR 63337, and 72 FR 48804, and a unique
section that highlights components of these three notices that are different.

Common Section

 1. General note. Prerequisites to a grantee's receipt of CDBG disaster recovery
assistance include adoption of a citizen participation plan; publication of its
proposed Action Plan for Disaster Recovery; public notice and comment; and submis-
sion to HUD of an Action Plan for Disaster Recovery, including certifications. Ex-
cept as described in this Notice, the statutory, regulatory, and notice provisions
that shall apply to the use of these funds are:

 a. The state-specific Notices governing the funds appropriated under Public Law
109-148 and Public Law 109-234 (the supplemental Acts) and already published in the
Federal Register;

 b. Those governing the CDBG program for states, including those at 42 U.S.C. 5301
et seq. and 24 CFR part 570.

 2. Overall benefit waiver and alternative requirement. The requirements at 42
U.S.C. 5301(c), 42 U.S.C. 5304(b)(3)(A), and 24 CFR 570.484 that at least 70 per-
cent of funds are for activities that benefit low- and moderate-income persons are
waived to stipulate that at least 50 percent of disaster recovery grant funds from
each grant must assist activities that principally benefit low- and moderate-income
persons.

 3. Section 414 of the Stafford Act waiver and alternative requirements.

 a. Section 414 of the Stafford Act, 42 U.S.C. 5181 (including its implementing
regulation at 49 CFR 24.403(d)), is waived to the extent that it would apply to
CDBG disaster recovery-funded programs or projects initiated at least one year af-
ter the incident-date of Hurricane **Katrina, Rita,** or **Wilma** (as applicable) by the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                                     Page 13
**(Publication page references are not available for this document.)**

states of Alabama, Florida, Louisiana, Mississippi, and Texas under an approved Action Plan for Disaster Recovery for its grants under Public Law 109-148 or Public Law 109-234; provided that such program or project was not planned, approved, or otherwise under way prior to the disaster.

b. For all programs or projects covered by this waiver ("covered programs or projects") that are initiated at least one year after but within no more than 3 years after the applicable disaster, the states of Alabama, Florida, Louisiana, Mississippi, and Texas must comply with one of the following two alternative requirements (for programs or projects initiated after the 3-year period, the alternative requirements would not apply; only the waiver would be applicable):

1. Relocation Assistance. The state may provide relocation assistance to a former residential occupant whose former dwelling is acquired, rehabilitated, or demolished for a covered program or project initiated within 3 years after the disaster, even though the actual displacements were caused by the effects of the disaster. To the extent practicable, such relocation assistance must be offered in a manner consistent with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, and its implementing regulations, except as modified by prior waivers and alternative requirements granted to the states.

2. Re-housing Plan. If the state determines that the first alternative would substantially conflict with meeting the disaster recovery purposes of the supplemental Acts, the grantee may establish a re-housing plan for a covered program or project initiated at least one year after, but within no more than 3 years after, the disaster. Such a determination must be made on a program or project basis (not person or household). The re-housing plan must include, at minimum, the following:

i. A description of the class(es) of persons eligible for assistance, including all residents displaced from their residences by either certain enumerated or all effects of the covered disaster, and including all disaster-displaced residents still receiving temporary housing assistance from FEMA for the covered disasters;

ii. A description of the types and amount of financial assistance to be provided, if any;

iii. A description of other services to be made available, including, at a minimum, outreach efforts to eligible persons and housing counseling that provide information about available housing resources;

iv. Contact information for additional program information;

v. A description of any applicable application process, including any deadlines; and

vi. If the program or project covered by this waiver involves rental housing, the grantee shall establish procedures for the following:

A. Application materials, award letters, and operating procedures that require property owners to make reasonable attempts to contact their former tenants and to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                          Page 14
**(Publication page references are not available for this document.)**

offer a unit, upon completion, to those tenants meeting the program's eligibility requirements;

 B. Placement services for former and prospective tenants; and

 C. A public registry of available rental units assisted with CDBG disaster recovery and/or other funds.

 c. Eligible Project Costs. The cost of relocation assistance and the reoccupancy plan are eligible project costs in the same manner and to the same extent as other project costs authorized under the supplemental Acts. For covered programs or projects involving affordable rental housing, the relocation and planning costs required by this Notice may be paid from funds reserved for the affordable rental housing stock in the impacted areas under Public Law 109-234.

 4. Direct grant administration by states and means of carrying out eligible activities. Requirements at 42 U.S.C. 5306 are waived to the extent necessary to allow the state to use its disaster recovery grant allocation directly to carry out state-administered activities eligible under this Notice. Activities eligible under this Notice may be undertaken, subject to state law, by the recipient through its employees or through procurement contracts, through loans or grants under agreements with subrecipients, or by one or more entities that are designated by the chief executive officer of the state. Activities made eligible under section 105(a)(15) of the Housing and Community Development Act of 1974, as amended, may be undertaken only by entities specified in that section, regardless of whether the assistance is provided to such an entity from the state or from a unit of general local government.

 5. Consolidated Plan waiver. Requirements at 42 U.S.C. 12706 and 24 CFR 91.325(a)(6), that housing activities undertaken with CDBG funds be consistent with the strategic plan, are waived. Further, the requirement at 42 U.S.C. 5304(e), to the extent that it would require HUD to annually review grantee performance under the consistency criteria, is also waived. These waivers apply only until the time that the grantee first updates its consolidated plan priorities following the hurricane.

 6. Citizen participation waiver and alternative requirement. Provisions of 42 U.S.C. 5304(a)(2) and (3), 42 U.S.C. 12707, 24 CFR 570.486, and 24 CFR 91.115(b), with respect to citizen participation requirements, are waived and replaced by the requirements below. The streamlined requirements do not mandate public hearings at either the state or local government level, but do require providing a reasonable opportunity for citizen comment and ongoing citizen access to information about the use of grant funds. The streamlined citizen participation requirements for this grant are:

 a. Before the grantee adopts the action plan for this grant or any substantial amendment to this grant, the grantee will publish the proposed plan or amendment (including the information required in this Notice for an Action Plan for Disaster Recovery). The manner of publication (including prominent posting on the state, local, or other relevant Web site) must afford citizens, affected local governments, and other interested parties a reasonable opportunity to examine the plan or amend-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                          Page 15
**(Publication page references are not available for this document.)**

ment's contents. Subsequent to publication, the grantee must provide a reasonable
time period and method(s) (including electronic submission) for receiving comments
on the plan or on any substantial amendment to it. The grantee's plans to minimize
displacement of persons or entities and to assist any persons or entities displaced
must be published with the action plan. HUD expects the grantee to hold a public
hearing on a proposed plan amendment unless doing so would hinder the provision of
expedient disaster recovery.

  b. In the action plan, each grantee will specify its criteria for determining what
changes in the grantee's activities constitute a substantial amendment to the plan.
At a minimum, adding or deleting an activity or changing the planned beneficiaries
of an activity will constitute a substantial change. The grantee may modify or sub-
stantially amend the action plan if it follows the same procedures required in this
Notice for the preparation and submission of an Action Plan for Disaster Recovery.
The grantee must notify HUD, but is not required to notify the public, when it
makes any plan amendment that is not substantial.

  c. The grantee must consider all comments received on the action plan or any sub-
stantial amendment and submit to HUD a summary of those comments and the grantee's
response with the action plan or substantial amendment.

  d. The grantee must make the action plan, any substantial amendments, and all per-
formance reports available to the public. HUD recommends posting them on the Inter-
net. In addition, the grantee must make these documents available in a form acces-
sible to persons with disabilities and non-English-speaking persons. During the
term of this grant, the grantee will provide citizens, affected local governments,
and other interested parties with reasonable and timely access to information and
records relating to the action plan and to the grantee's use of this grant.

  e. The grantee will provide a timely written response to every citizen complaint.
Such response will be provided within 15 working days of the receipt of the com-
plaint, if practicable.

  7. Modify requirement for consultation with local governments. Currently, the
statute and regulations require consultation with affected units of local govern-
ment in the non-entitlement area of the state regarding the state's proposed method
of distribution. HUD is waiving 42 U.S.C. 5306(d)(2)(C)(iv), 24 CFR 91.325(b), and
24 CFR 91.110, with the alternative requirement that the state consult with all
disaster-affected units of general local government, including any CDBG entitlement
communities, in determining the use of funds.

  8. Action Plan waiver and alternative requirement. The requirements at 42 U.S.C.
12705(a)(2), 42 U.S.C. 5304(a)(1), 42 U.S.C. 5304(m), 42 U.S.C. 5306(d)(2)(C)(iii),
24 CFR 1003.604, and 24 CFR 91.320 are waived for these disaster recovery grants.
Each state must submit to HUD an Action Plan for Disaster Recovery that describes:

  a. The effects of the covered disaster, especially in the most impacted areas and
populations, and the greatest recovery needs resulting from the covered disaster
that have not been addressed by **insurance** proceeds, other federal assistance, or
any other funding source;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

  b. The grantee's overall plan for disaster recovery, including:

  1. How the state will promote sound short- and long-term recovery planning at the
state and local levels, especially land use decisions that reflect responsible
flood plain management, removal of regulatory barriers to reconstruction, and prior
coordination with planning requirements of other state and federal programs and en-
tities;

  2. How the state will encourage construction methods that emphasize high quality,
durability, energy efficiency, and mold resistance, including how the state will
promote enactment and enforcement of modern building codes and mitigation of flood
risk, where appropriate;

  3. How the state will provide or encourage provision of adequate, flood-resistant
housing for all income groups that lived in the disaster-impacted areas prior to
the incident date(s) of the applicable disaster(s), including a description of the
activities it plans to undertake to address emergency shelter and transitional
housing needs of homeless individuals and families (including subpopulations), to
prevent low-income individuals and families with children (especially those with
incomes below 30 percent of median) from becoming homeless, to help homeless per-
sons make the transition to permanent housing and independent living, and to ad-
dress the special needs of persons who are not homeless-identified, in accordance
with 24 CFR 91.315(d);

  c. Monitoring standards and procedures that are sufficient to ensure that program
requirements, including non-**duplication** of benefits, are met and that provide for
continual quality assurance, investigation, and internal audit functions, with re-
sponsible staff reporting independently to the Governor of the state or, at a mini-
mum, to the chief officer of the governing body of any designated administering en-
tity;

  d. A description of the steps the state will take to avoid or mitigate occurrences
of fraud, abuse, and mismanagement, especially with respect to accounting, procure-
ment, and accountability, with a description of how the state will provide for in-
creasing the capacity for implementation and compliance of local governments,
subrecipients, subgrantees, contractors, and any other entity responsible for ad-
ministering activities under this grant; and

  e. The state's method of distribution. The method of distribution shall include
descriptions of the method of allocating funds to units of local government and of
specific projects the state will carry out directly, as applicable. The descrip-
tions will include:

  1. When funds are to be allocated to units of local government; and all criteria
used to select applications from local governments for funding, including the rela-
tive importance of each criterion, and including a description of how the disaster
recovery grant resources will be allocated among all funding categories, plus the
threshold factors and grant size limits that are to be applied; and

  2. In cases where the state will carry out activities directly, the projected uses
for the CDBG disaster recovery funds broken down by responsible entity, activity,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

and geographic area;

 3. How the method of distribution or use of funds described in accordance with the above subparagraphs will result in eligible uses of grant funds related to long-term recovery from specific effects of the disaster(s) or restoration of infra-structure; and

 4. Sufficient information so that citizens, units of general local government, and other eligible subgrantees or subrecipients will be able to understand and comment on the action plan and, if applicable, be able to prepare responsive applications to the state.

 f. Required certifications (see the applicable Certifications section of this Notice); and

 g. A completed and executed federal form SF-424.

 9. Allow reimbursement for pre-agreement costs. The provisions of 24 CFR 570.489(b) are applied to permit a grantee to reimburse itself for otherwise allowable costs incurred on or after the incident date of the covered disaster.

 10. Clarifying note on the process for environmental release of funds when a state carries out activities directly. Usually, a state distributes CDBG funds to units of local government and takes on HUD's role in receiving environmental certifications from the grant recipients and approving releases of funds. For this grant, HUD will allow a state grantee to also carry out activities directly instead of distributing all funds to other governments. According to the environmental regulations at 24 CFR 58.4, when a state carries out activities directly, the state must submit the certification and request for release of funds to HUD for approval.

 11. **Duplication** of benefits. In general, 42 U.S.C. 5155 (section 312 of the Robert T. Stafford Disaster Assistance and Emergency Relief Act, as amended) prohibits any person, business concern, or other entity from receiving financial assistance with respect to any part of a loss resulting from a major disaster as to which such person/business/entity has received financial assistance under any other program or from **insurance** or any other source. The appropriations acts stipulate that funds may not be used for activities reimbursable by, or for which funds have been made available by, the Federal Emergency Management Agency or by the Army Corps of Engineers.

 12. Waiver and alternative requirement for distribution to CDBG metropolitan cities and urban counties.

 a. Section 5302(a)(7) of title 42, U.S.C. (definition of "non-entitlement area"), and provisions of 24 CFR part 570 that would prohibit a state from distributing CDBG funds to units of general local government in entitlement communities and to Indian tribes, are waived, including 24 CFR 570.480(a), to the extent that such provisions limit the distribution of funds to units of general local government located in entitlement areas and to state or federally recognized Indian tribes. The state is required instead to distribute funds to the most adversely affected and impacted areas related to the consequences of the covered disaster(s) without re-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                                    Page 18
**(Publication page references are not available for this document.)**

gard to a local government or Indian tribe status under any other CDBG program.

 b. Additionally, because a state grantee under this appropriation may carry out activities directly, HUD is applying the regulations at 24 CFR 570.480(c) with re-spect to the basis under which HUD determines whether the state has failed to carry out its certifications; the basis shall be that the state has failed to carry out its certifications in compliance with applicable program requirements. Also, HUD is waiving 24 CFR 570.494, regarding timely distribution of funds. However, HUD ex-pects each state grantee to expeditiously obligate and expend all funds, including any recaptured funds or program income, and to carry out activities in a timely manner.

 13. Note that use of grant funds must relate to the covered disaster(s). The sup-plemental Acts impose fundability criteria in addition to the annual CDBG require-ment that each activity must be eligible under 42 U.S.C. 5305(a) or this Notice and meet a CDBG national objective under the penultimate paragraph of 42 U.S.C. 5304(b)(3). Public Laws 109-148 and 109-234 require that each activity assisted must be related to disaster relief, long-term recovery, and restoration of infra-structure in the most impacted and distressed areas related to the consequences of Hurricanes **Katrina**, **Rita**, and **Wilma** in communities included in Presidential disas-ter declarations.

 14. Note on the change to the administration limitation. Up to 5 percent of the grant amount may be used for the state's administrative costs. The provisions of 42 U.S.C. 5306(d) and 24 CFR 570.489(a)(1)(i) and (iii) will not apply to the extent that they cap state administration expenditures and require a dollar-for-dollar match of state funds for administrative costs exceeding $100,000. HUD does not waive 24 CFR 570.489(a)(3) to allow a state to exceed the overall planning, manage-ment, and administrative cap of 20 percent.

Reporting

 15. Waiver of performance report and alternative requirement. The requirements for submission of a Performance Evaluation Report (PER) pursuant to 42 U.S.C. 12708 and 24 CFR 91.520 are waived. The alternative requirement is that:

 a. Each grantee must submit its Action Plan for Disaster Recovery, including per-formance measures, into HUD's Web-based Disaster Recovery Grant Reporting (DRGR) system. (The signed certifications and the form SF-424 must be submitted in hard copy.) As additional detail about uses of funds becomes available to the grantee, the grantee must enter this detail into DRGR, in sufficient detail to serve as the basis for acceptable performance reports.

 b. Each grantee must submit a quarterly performance report, as HUD prescribes, no later than 30 days following each calendar quarter, beginning after the first full calendar quarter, after grant award and continuing until all funds have been ex-pended and all expenditures reported. Each quarterly report will include informa-tion about the uses of funds during the applicable quarter, including (but not lim-ited to) the project name, activity, location, and national objective; funds budg-eted, obligated, drawn down, and expended; the funding source and total amount of any non-CDBG disaster funds; beginning and ending dates of activities; and perform-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

ance measures such as numbers of low-and moderate-income persons or households
benefiting. Quarterly reports to HUD must be submitted using HUD's Web-based DRGR
system.

16. Use of subrecipients. The following alternative requirement applies for any
activity that a state carries out directly by funding a subrecipient:

 a. 24 CFR 570.503, except that specific references to 24 CFR parts 84 and 85 need
not be included in subrecipient agreements.

 b. 570.502(b), except to the extent that it mandates compliance with Office of
Management and Budget (OMB) Circular A-110 (implemented at 24 CFR part 84, "Uniform
Administrative Requirements for Grants and Agreements with Institutions of Higher
Education, Hospitals and Other Non-Profit Organizations"). HUD recommends applica-
tion of 24 CFR part 84, but does not require it.

17. Recordkeeping. Recognizing that the state may carry out activities directly,
24 CFR 570.490(b) is waived in such a case and the following alternative provision
shall then apply: state records. The state shall establish and maintain such re-
cords as may be necessary to facilitate review and audit by HUD of the state's ad-
ministration of CDBG disaster recovery funds under 24 CFR 570.493. Consistent with
applicable statutes, regulations, waivers and alternative requirements, and other
federal requirements, the content of records maintained by the state shall be suf-
ficient to: enable HUD to make the applicable determinations described at 24 CFR
570.493; make compliance determinations for activities carried out directly by the
state; and show how activities funded by the state are consistent with the descrip-
tions of activities proposed for funding in the action plan. For fair housing and equal oppor-
tunity purposes and, as applicable, such records shall include data on the racial,
ethnic, and gender characteristics of persons who are applicants for, participants
in, or beneficiaries of the program.

18. Change of use of real property. This waiver conforms the change of use of real
property rule to the waiver allowing a state to carry out activities directly. For
purposes of this program, in 24 CFR 570.489(j), (j)(1), and the last sentence of
(j)(2), "unit of general local government" shall be read as "unit of general local
government or state."

19. Responsibility for state review and handling of noncompliance. This change
conforms the rule with the waiver allowing the state to carry out activities di-
rectly. 24 CFR 570.492 is waived and the following alternative requirement applies:
The state shall make reviews and audits, including on-site reviews of any subre-
cipients, designated public agencies, and units of general local government as may
be necessary or appropriate to meet the requirements of section 104(e)(2) of the
Housing and Community Development Act of 1974, as amended, and modified by this No-
tice. In the case of noncompliance with these requirements, the state shall take
such actions as may be appropriate to prevent a continuance of the deficiency, to
mitigate any adverse effects or consequences, and to prevent a recurrence. The
state shall establish remedies for noncompliance by any designated public agencies
or units of general local governments and for its subrecipients.

20. Information collection approval note. HUD has approval for information collec-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                                                   Page 20
**(Publication page references are not available for this document.)**

tion requirements in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3520) under OMB control number 2506-0165. In accordance with the Paperwork Reduction Act, HUD may not conduct or sponsor, nor is a person required to respond to, a collection of information, unless the collection displays a valid control number.

Certifications

  21. Certifications for state governments, waiver, and alternative requirement. Section 91.325 of title 24 of the Code of Federal Regulations is waived. Each state must make the following certifications prior to receiving a CDBG disaster recovery grant:

  a. The state certifies that it will affirmatively further fair housing, which means that it will conduct an analysis to identify impediments to fair housing choice within the state, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard. (See 24 CFR 570.487(b)(2).)

  b. The state certifies that it has in effect and is following a residential anti-displacement and relocation assistance plan in connection with any activity assisted with funding under the CDBG program.

  c. The state certifies its compliance with restrictions on lobbying required by 24 CFR part 87, together with disclosure forms, if required by that part.

  d. The state certifies that the Action Plan for Disaster Recovery is authorized under state law and that the state, and any entity or entities designated by the state, possesses the legal authority to carry out the program for which it is seeking funding, in accordance with applicable HUD regulations and this Notice.

  e. The state certifies that it will comply with the acquisition and relocation requirements of the URA, as amended, and implementing regulations at 49 CFR part 24, except where waivers or alternative requirements are provided for this grant.

  f. The state certifies that it will comply with section 3 of the Housing and Urban Development Act of 1968 (12 U.S.C. 1701u), and implementing regulations at 24 CFR part 135.

  g. The state certifies that it is following a detailed citizen participation plan that satisfies the requirements of 24 CFR 91.115 (except as provided for in notices providing waivers and alternative requirements for this grant), and that each unit of general local government that is receiving assistance from the state is following a detailed citizen participation plan that satisfies the requirements of 24 CFR 570.486 (except as provided for in notices providing waivers and alternative requirements for this grant).

  h. The state certifies that it has consulted with affected units of local government in counties designated in covered major disaster declarations in the non-entitlement, entitlement, and tribal areas of the state in determining the method

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                                    Page 21
**(Publication page references are not available for this document.)**


of distribution of funding;

 i. The state certifies that it is complying with each of the following criteria:

 1. Funds will be used solely for necessary expenses related to disaster relief, long-term recovery, and restoration of infrastructure in the most impacted and distressed areas related to the consequences of the Gulf Coast hurricanes of 2005 in communities included in Presidential disaster declarations.

 2. With respect to activities expected to be assisted with CDBG disaster recovery funds, the action plan has been developed so as to give the maximum feasible priority to activities that will benefit low- and moderate-income families.

 3. The aggregate use of CDBG disaster recovery funds shall principally benefit low- and moderate-income families in a manner that ensures that at least 50 percent of the amount is expended for activities that benefit such persons during the designated period.

 4. The state will not attempt to recover any capital costs of public improvements assisted with CDBG disaster recovery grant funds, by assessing any amount against properties owned and occupied by persons of low- and moderate-income, including any fee charged or assessment made as a condition of obtaining access to such public improvements, unless: (A) disaster recovery grant funds are used to pay the proportion of such fee or assessment that relates to the capital costs of such public improvements that are financed from revenue sources other than under this title; or (B) for purposes of assessing any amount against properties owned and occupied by persons of moderate income, the grantee certifies to the Secretary that it lacks sufficient CDBG funds (in any form) to comply with the requirements of clause (A).

 j. The state certifies that the grant will be conducted and administered in conformity with title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d) and the Fair Housing Act (42 U.S.C. 3601-3619) and implementing regulations.

 k. The state certifies that it has and that it will require units of general local government that receive grant funds to certify that they have adopted and are enforcing:

 1. A policy prohibiting the use of excessive force by law enforcement agencies within its jurisdiction against any individuals engaged in non-violent civil rights demonstrations; and

 2. A policy of enforcing applicable state and local laws against physically barring entrance to or exit from a facility or location that is the subject of such non-violent civil rights demonstrations within its jurisdiction.

 l. The state certifies that each state grant recipient or administering entity has the capacity to carry out disaster recovery activities in a timely manner, or that the state has a plan to increase the capacity of any state grant recipient or administering entity that lacks such capacity.


© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 46312-01                                                         Page 22
**(Publication page references are not available for this document.)**

m. The state certifies that it will not use CDBG disaster recovery funds for any activity in an area delineated as a special flood hazard area in FEMA's most current flood advisory maps, unless it also ensures that the action is designed or modified to minimize harm to or within the floodplain in accordance with Executive Order 11988 and 24 CFR part 55.

n. The state certifies that it will comply with applicable laws.

22. Duration of funding. Availability of funds provisions in 31 U.S.C. 1551–1557, added by section 1405 of the National Defense Authorization Act for Fiscal Year 1991 (Public Law 101–510), limit the availability of certain appropriations for expenditure. This limitation may not be waived. However, the appropriations acts for these grants direct that these funds be available until expended unless, in accordance with 31 U.S.C. 1555, the Department determines that the purposes for which the appropriation has been made have been carried out and that no disbursement has been made against the appropriation for 2 consecutive fiscal years. In such a case, the Department shall close out the grant prior to expenditure of all funds.

Provisions Unique to Grants Under Public Law 109–234

23. Action Plan additional elements. The disaster recovery grantees receiving funding under Public Law 109–234 must provide the following elements as part of the overall plan for disaster recovery:

a. An explanation of how the state will give priority to the rehabilitation and reconstruction of the affordable rental housing stock, including public and other HUD-assisted housing, a description of the activities the state plans to undertake with grant funds under this priority, and a description of the unique challenges that individuals with disabilities face in finding accessible and affordable housing;

b. An explanation of how the state will give priority to infrastructure development and rehabilitation, and a description of the infrastructure activities it plans to undertake with grant funds; and

c. An explanation of how the method of distribution or use of funds described in accordance with the applicable notices will result in the state meeting the requirement that at least 19.3311 percent of its allocation under this notice shall be used for repair, rehabilitation, and reconstruction (including demolition, site clearance, and remediation) of the affordable rental housing stock (including public and other HUD-assisted housing) in the impacted areas.

24. Alternative requirements regarding targeting in Louisiana.

a. The State of Louisiana will target 70 percent of its disaster recovery funds under Public Law 109–234 toward the disaster recovery needs in the New Orleans-Metairie-Bogalusa Metropolitan Area; and

b. Before Louisiana expends any funds to meet the minimum requirement for affordable rental housing under this notice, the Governor of Louisiana shall demonstrate

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**


to the Secretary's satisfaction that the state will provide funds or has identified
dedicated resources sufficient to meet the key disaster recovery needs for repair,
rehabilitation, and reconstruction of affordable rental housing stock, including
public housing disaster recovery in the most impacted areas of the state.

Catalog of Federal Domestic Assistance

 The Catalog of Federal Domestic Assistance numbers for the disaster recovery
grants under this Notice are as follows: 14.219; 14.228.

Finding of No Significant Impact

 A Finding of No Significant Impact (FONSI) with respect to the environment has
been made in accordance with HUD regulations at 24 CFR part 50, which implement
section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C.
4332(2)(C)). The FONSI is available for public inspection between 8 a.m. and 5 p.m.
weekdays in the Office of the Rules Docket Clerk, Office of General Counsel, De-
partment of Housing and Urban Development, 451 Seventh Street, SW., Room 10276,
Washington, DC 20410-0500. Due to security measures at the HUD Headquarters build-
ing, please schedule an appointment to review the finding by calling the Regula-
tions Division at 202-402-3055 (this is not a toll-free number).

 Dated: July 28, 2008.

Roy A. Bernardi,

Deputy Secretary.

[FR Doc. E8-18281 Filed 8-7-08; 8:45 am]

BILLING CODE 4210-67-P

73 FR 46312-01

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



**(Publication page references are not available for this document.)**

RULES and REGULATIONS

DEPARTMENT OF HOMELAND SECURITY

Federal Emergency Management Agency

44 CFR Parts 59, 61, 78, 79, 80, 201, and 206

[Docket ID FEMA-2006-0010]

RIN 1660-AA36

Flood Mitigation Grants and Hazard Mitigation Planning

Wednesday, October 31, 2007

AGENCY: Federal Emergency Management Agency, DHS.

ACTION: Interim rule.

SUMMARY: This interim rule implements certain provisions of the Bunning-Bereuter-Blumenauer Flood **Insurance** Reform Act of 2004 to provide new incentives for States and communities to mitigate the effects of flood damage to severe repetitive loss properties by creating the Severe Repetitive Loss program (SRL), and through re-duced cost-share requirements in the existing Flood Mitigation Assistance program (FMA). In addition, the rule ensures that the FMA planning requirements are consis-tent with other applicable regulations, and streamlines the planning requirements for Indian tribal governments. It also describes requirements for the acquisition of property for open space with mitigation funds, including under SRL and FMA. Fi-nally, this interim rule makes technical changes to clarify current practices and implements conforming amendments to reflect current authorities, including the re-cent change to the standard amount of authorized Hazard Mitigation Grant Program assistance.

DATES: Effective Date: December 3, 2007.

   Comment Date: Comments on the rule including the new Paperwork Reduction Act col-lections are due on or before December 31, 2007.

   Applicability Date: Part 78 will continue to apply to the administration of funds awarded for which the application period opened prior to December 3, 2007. Parts 79 and 80 will apply to the administration of funds awarded for which the application period opens on or after December 3, 2007, except that § 80.19 will apply as of De-cember 3, 2007 regardless of the original project date.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                                          Page 2
**(Publication page references are not available for this document.)**

ADDRESSES: You may submit comments, identified by Docket ID FEMA-2006-0010, by one of the following methods:

 Federal eRulemaking Portal: http://www.regulations.gov. Follow the instructions for submitting comments.

 E-mail: FEMA-RULES@dhs.gov. Include Docket ID FEMA-2006-0010 in the subject line of the message.

 Fax: 866-466-5370.

 Mail/Hand Delivery/Courier: Rules Docket Clerk, Office of Chief Counsel, Federal Emergency Management Agency, Room 835, 500 C Street, SW., Washington, DC 20472.

FOR FURTHER INFORMATION CONTACT: Cecelia Rosenberg, Mitigation Directorate, Federal Emergency Management Agency, 500 C Street, SW., Washington DC 20472, (phone) 202-646-3321, (facsimile) 202-646-2719, or (e-mail) cecelia.rosenberg @dhs.gov.

SUPPLEMENTARY INFORMATION:

Request for Comments

 FEMA encourages public participation in this rulemaking. Comments will be most helpful if they state a particular section (or sections) of the rule, and offer specific proposals for change, as needed. All submissions received must include the agency name and docket ID (FEMA-2006-0010). Regardless of the method used for submitting comments or material, all submissions will be posted, without change, to the Federal eRulemaking Portal at http://www.regulations.gov, and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to read the Privacy Act notice that is available on the Privacy and Use Notice link on the Administration Navigation Bar of www.regulations.gov.

 All comments received, as well as this document are available on the public docket for this rulemaking. For access to the docket, go to the Federal eRulemaking Portal at http://www.regulations.gov. Submitted comments may also be inspected at FEMA, Office of Chief Counsel, Room 835, 500 C Street, SW., Washington, DC 20472.

 At this time, FEMA does not anticipate it will hold a public meeting for this rulemaking project.

Table of Abbreviations

 BC--Benefit Cost

 BCA--Benefit Cost Analysis

 CAP-SSE--Community Assistance Program-State Support Services Element

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

CRS--Community Rating System

DHS--Department of Homeland Security

FEMA--Federal Emergency Management Agency

FIRM--Flood **Insurance** Rate Map

FIS--Flood **Insurance** Study

FMA--Flood Mitigation Assistance

HMGP--Hazard Mitigation Grant Program

ICC--Increased Cost of Compliance

NEPA--National Environmental Policy Act of 1969

NFIA--National Flood **Insurance** Act of 1968

NFIF--National Flood **Insurance** Fund

NFIP--National Flood **Insurance** Program

OMB--Office of Management and Budget

PDM--Pre-disaster Mitigation

POC--Point of Contact

PRA--Paperwork Reduction Act of 1995

RFC--Repetitive Flood Claims

SHMO--State Hazard Mitigation Officer

SQA Net--Simple and Quick Access Net

SRL--Severe Repetitive Loss

USACE--United States Army Corps of Engineers

I. Background

 This rule implements provisions of the Bunning-Bereuter-Blumenauer Flood **Insurance**
Reform Act of 2004 (the Act), Public Law 108-264, 118 Stat. 714, found at 42 U.S.C.
4102a. The Act amends the National Flood **Insurance** Act of 1968 to provide new pro-
grams and incentives for States and communities to mitigate flood damage to severe

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

repetitive loss properties. Severe repetitive loss properties are residential prop-
erties covered under a contract for flood **insurance** that have incurred flood-
related damage (i) for which 4 or more separate claims payments have been made un-
der flood **insurance** coverage, with the amount of each such claim exceeding $5,000,
and with the cumulative amount exceeding $20,000; or (ii) for which at least 2
separate claims payments have been made under such coverage, with the cumulative
amount exceeding the value of the property. Pursuant to the Act, this interim rule
implements the new Severe Repetitive Loss (SRL) program, which is authorized by the
Act until September 30, 2009, and amends the existing Flood Mitigation Assistance
(FMA) program to meet the requirements of the Act. In addition, FEMA is modifying
the mitigation planning regulations to minimize the burden on State, local, and In-
dian tribal governments, to streamline the planning process, and to ensure consis-
tency in the local planning requirements that apply to all FEMA mitigation pro-
grams, including the SRL and FMA programs.

 Also, effective October 4, 2006, section 684 of the Post-Katrina Emergency Manage-
ment Reform Act of 2006, Public Law 109-295, amended the amount of Hazard Mitiga-
tion Grant Program (HMGP) assistance authorized for States with an approved Stan-
dard State Mitigation Plan from 7.5 percent to 15 percent of the total estimated
Federal assistance (excluding administrative costs) provided for a major disaster
under FEMA Public and Individual Assistance programs for amounts spent up to $2
billion, and established a sliding scale for HMGP assistance, based on the amount
of the total estimated Federal assistance. This interim rule amends FEMA's regula-
tions to reflect this statutory change.

II. Discussion of Interim Rule

 The SRL grant program was created pursuant to Section 1361A of the National Flood
**Insurance** Act of 1968 (NFIA, or "the Act"), 42 U.S.C. 4030, as amended by the Bun-
ning-Bereuter-Blumenauer Flood **Insurance** Reform Act of 2004, Public Law 108-264,
with the goal of reducing flood damages to SRL properties. The long-term goal of
the SRL program is to reduce or eliminate claims under the NFIP through project ac-
tivities that will result in the greatest savings to the NFIF in the shortest pe-
riod of time.

 The new program, the SRL program, is authorized through September 30, 2009 and is
designed to provide mitigation assistance to address properties that have experi-
enced repetitive flood losses and that are insured under the NFIP. The SRL program
focuses on a subset of all repetitive flood loss properties: Those residential
properties with a high frequency of losses or a high value of claims. The mitiga-
tion of losses sustained by these properties, through projects such as buyouts,
elevation, relocation, or floodproofing, will produce savings for policyholders un-
der the NFIP and for Federal taxpayers through reduced flood **insurance** losses and
reduced Federal disaster assistance. The program relies on a strategy of making
mitigation offers to these severe repetitive loss property owners and shifting more
of the burden of recovery costs to those property owners who decline the offer of
mitigation assistance, and choose to remain vulnerable to repetitive flood damage,
by incrementally increasing their rates for flood **insurance**. As established by Con-
gress, the sale of flood **insurance** under the NFIP is subject to the rules and regu-
lations of FEMA. FEMA has elected to have State-licensed **insurance** companies'
agents and brokers sell flood **insurance** to consumers. Those whose rates are in-
creased will be eligible to appeal this increase via an independent third party

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

from a list based on professional qualifications impartially developed by FEMA's Alternative Dispute Resolution (ADR) office. To reduce costs, the property owner may request that the Administrator substitute a reviewer from FEMA's ADR office for the independent third party.

 With respect to grant programs, FEMA has actively engaged in flood mitigation through its HMGP, FMA, PDM and Repetitive Flood Claims (RFC) programs. Each of these programs was created under different legislative authorities, and as a result, have varied impacts on reducing the nation's inventory of the most floodprone structures. What has not existed is a program that specifically addresses and provides funds for the elimination of, or reduction of risk to, the subset of those properties that create the largest impact on claims paid from the NFIF. Most of these properties existed before the inception of the NFIP and its associated floodplain management standards, and are thus eligible for discounted **insurance** rates. Furthermore, none of these other programs feature a formal mitigation offer process whereby **insurance** rates may be increased if the property owner declines the offer.

 FEMA intends to focus the SRL program in communities and on property owners who choose to participate in the program. This will maximize the benefits of the program, while minimizing adverse impacts on communities and property owners. The program will provide an opportunity for many property owners to address recurring flooding problems, and reduce the impact of these events.

 The legislation also provides an incentive to mitigate damage to severe repetitive loss properties through reduced non-Federal cost-share requirements for the SRL and FMA programs (from 25 percent to 10 percent) for projects in States with approved State Mitigation Plans that meet the additional repetitive loss requirements. The reduced cost share would be available only for projects that address severe repetitive loss properties.

 While the SRL and FMA programs will be implemented as separate programs, with different funding accounts, they are similar in their goals and purpose. FEMA has included both of these programs in one implementing regulation to ensure as much consistency as reasonable between the programs and to limit the confusion around program implementation, since both programs will likely be managed by the same State agency staff.

 The final rule implementing the FMA program is published elsewhere in today's Federal Register. (It follows an interim rule published March 20, 1997 at 62 FR 13346.) See 44 CFR part 78. This part will continue to be used to implement the FMA program for all grants awarded for which the application period opened prior to December 3, 2007.

 This new interim rule creates a new part (part 79, with details specific to acquisition projects at a new part 80), that restates the requirements for the existing FMA program in a format more consistent with the approach to all of FEMA's mitigation grant programs. Part 79 will implement the FMA program for all grants awarded for which the application period opens on or after December 3, 2007.

 Part 79 also implements a change to the cost share available to States under the FMA program if their approved mitigation plan meets certain criteria, described

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                              Page 6
**(Publication page references are not available for this document.)**

herein in § 201.4. States would be eligible for a reduced cost share if their miti-
gation plan addresses actions related to reducing the risk to repetitive loss prop-
erties that they have already taken, and those actions that they intend to take.

 The requirements for the new SRL program are incorporated into this rule. In addi-
tion, this interim rule brings the FMA program regulations into conformance with
current policies, and ensures better conformance to existing grants management re-
quirements. In authorizing the SRL program in section 102 of the Act, and amending
the FMA program in section 103 of the Act, Congress directed FEMA to "provide as-
sistance for properties in the order that will result in the greatest amount of
savings to the National Flood **Insurance** Fund in the shortest period of time" and to
provide assistance for activities that are "in the best interest of the National
Flood **Insurance** Fund." FEMA has concluded that Congress' stated goals for the two
programs are similar. Therefore, there is no substantial difference in how FEMA
will determine the funding priority for the two programs.

 As an additional aspect of implementing these programs, this rule includes a new
part (part 80) which describes the requirements and procedures for open space prop-
erty acquisition which applies to the SRL and FMA programs, as well as all FEMA
hazard mitigation assistance programs. In light of the Act's requirements regarding
property acquisition, FEMA determined that a central reference point for all miti-
gation grant program property acquisitions would make the programs more consistent
overall and easier to implement.

 Elsewhere in today's Federal Register, FEMA published a final rule implementing
section 322 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act
(Stafford Act), 42 U.S.C. 5165. (It follows an interim rule published February 26,
2002 at 67 FR 8844.) The final rule identified the requirements for State, Tribal,
and local mitigation plans. This new interim rule streamlines the mitigation plan-
ning requirements contained in that rule by making the FMA planning requirements,
currently implemented in a separate part of the regulation at § 78.5, consistent
with the mitigation planning requirements outlined in part 201. This will ensure
that local governments can comply with one set of mitigation planning requirements
in order to be eligible to apply for all FEMA mitigation project grant funding, in-
cluding the FMA and SRL programs.

 In addition, this interim rule streamlines the roles and responsibilities of In-
dian tribal governments in mitigation planning. In the preexisting regulations, In-
dian tribal governments were given the option of preparing either a State-level
Mitigation Plan, or a Local-level Mitigation Plan, depending on whether or not they
intended to apply directly to FEMA as a grantee or whether they would apply through
the State as a subgrantee. FEMA has found, however, that neither of these options
has sufficiently met the needs of the Indian tribal governments.

 To address this problem, this interim rule establishes a specific planning re-
quirement for Indian tribal governments that recognizes some of the unique aspects
of these governments. The rule establishes Tribal Mitigation Plans for plans pre-
pared and approved after December 3, 2007. The rule provides that plans prepared
and approved under the preexisting rule, under either the State or local require-
ments, would also be recognized as Tribal Mitigation Plans. These older plans, how-
ever, would be required to meet the revised criteria when the original approval ex-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                                          Page 7
**(Publication page references are not available for this document.)**

pires. Most Indian tribal governments fit the local planning model, in that they do not have sub-jurisdictions as States do; however, if they are grantees, the rule would require that they provide the capability assessment and identification of funding options that are listed in the State plan requirements. This rule combines the appropriate aspects of these planning requirements into one section, with a single plan required for Indian tribal governments.

This rule also implements section 106 of the Act, which modifies the **insurance** rates for property leased from the Federal government "located on the river-facing side of any dike, levee, or other riverine flood control structure, or seaward of any seawall or other coastal flood control structure." These properties will be charged the full actuarial **insurance** premium rates.

Finally, this rule makes conforming amendments, as well as technical corrections to clarify current authorities and practices. This rule thus makes revisions to the amount of assistance available to States under the Hazard Mitigation Grant Program in § 79.4 as a result of changes made to the Stafford Act in the Post-Katrina Emergency Management Reform Act passed in October 2006.

III. Solicitation of Public Comments

Section 102 of the Act required FEMA, within 90 days of the Act, to consult with State and local officials in carrying out the development of procedures for the distribution of funds to States and communities to carry out eligible mitigation activities. To meet this requirement, FEMA published a Federal Register notice on September 15, 2004, at 69 FR 55642, to initiate consultation with State and local officials, as well as members of the public. In the notice, FEMA solicited responses to the following questions: What key factors FEMA should consider in developing the SRL program; the parameters that FEMA should use to define severe repetitive loss for multifamily structures; the process FEMA should use to notify property owners that their property is considered a severe repetitive loss property by virtue of the legislative definition; the criteria FEMA should use to allocate funds to States, including whether or not there should be caps on the funding as is the case under the FMA program; the criteria that should be used to approve State mitigation plans to take advantage of the increased Federal cost share; the criteria FEMA should use to determine projects that will result in the greatest amount of savings to the National Flood **Insurance** Fund (NFIF); and, what types of assistance should FEMA provide to States and communities when making offers to owners of SRL properties. Interested parties initially had until November 30, 2004, to submit written comments in response to these questions. FEMA extended the deadline for comments until December 7, 2004. FEMA received 26 written comments. Eight of those comments were received from States, ten from communities and eight were from associations. On November 17, 2004, as part of the consultation process, FEMA held a meeting in Washington DC with representative officials of State and local governments, organizations representing emergency management, floodplain management, and **insurance** professions, and other interested parties.

FEMA reviewed and considered all oral and written responses as FEMA developed the SRL grant program and this interim rule. FEMA's questions, the public comments, and FEMA's responses to the public comments are listed below.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                                      Page 8
**(Publication page references are not available for this document.)**


*Question 1: What key factors should FEMA consider in developing the Pilot Program for Severe Repetitive Loss Properties under section 1361A?*

 Multiple commenters stated that the program should be administered by the States, similar to existing FEMA mitigation grant programs, including FMA and Pre-Disaster Mitigation (PDM). However, once commenter wrote that the existing programs take too long to implement.

 Multiple commenters stated that funding allocations should be disbursed based on the location of SRL properties (those with the greatest drain, greatest losses, most number of SRL properties, etc.), rather than disbursing funds evenly among States. Multiple comments indicated that the ranking of properties should ensure that those properties with the most loss claims should be addressed first. Multiple commenters stated that allocations should also consider the State and/or community capability, defined as having plans in place, past performance shown to mitigate repetitive loss properties, projects lined-up, and/or matching funds available. Multiple comments also indicated that funds should be prioritized to those communities with experience managing FEMA funds and/or with matching funds and projects lined-up. Multiple commenters indicated that reallocations should occur quickly to move funds to communities that need them.

 A considerable number of commenters stated that the data used for determining those properties that meet the SRL property definition was not accurate and needed to be updated/corrected, and that real-time claim reporting was needed.

 Multiple commenters stated that the parameters for demolition rebuild projects need to be clarified. Multiple commenters stated that property owners, communities, and States must be able to determine the most appropriate mitigation measures.

 Multiple commenters stated that there needs to be clear definitions for "notices" and "offers," and that both need to include clear details of the appeals process and **insurance** implications. Further, multiple commenters stated that there needs to be a clear description of the property value in an offer.

 Multiple commenters stated that FEMA would need additional staff with National Flood **Insurance** Program (NFIP) expertise to manage the program.

 Multiple commenters stated that the Increased Cost of Compliance (ICC) should be made available for match, or indicated that many communities would not be able to provide the cost share.

 Multiple commenters indicated that the program should focus on cost effectiveness, and Benefit/Cost analysis in particular.

 Multiple commenters indicated that the planning requirement should be clearly defined, and multiple commenters suggested a plan be required to prioritize funding.

 Multiple commenters requested that a streamlined, simple, or tailored application and grants management process be implemented; and that guidance needs to be clear regarding the roles and responsibilities of FEMA, States and communities.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

  Multiple commenters stated that mitigation funds should be directed to only those covered under an NFIP policy. Multiple respondents indicated that **insurance** policy writers needed education and awareness/outreach, both to understand the program and the ICC benefits.

FEMA's Response

  In response to comments regarding administration of the program by the States, the new <u>Part 79</u> added in this rulemaking deals with the States' program administration responsibilities, which are being designed similar to the way FEMA's other mitigation grant programs operate. In response to comments regarding the accuracy of data used to identify SRL properties, **insurance** and claims information for properties validated as meeting the legislative characteristics of SRL are now available to States on a web-based site (SQA Net), which is updated monthly. Furthermore, regulations and program procedures clearly describe the notice, offer, and appeals processes. Program procedures have been developed to define the parameters and limitations imposed for the demolition/rebuild activity type. State, local and tribal mitigation plans will be required and are described in this interim rule; allocation of funds will be based on the number of SRL properties within each State, in accordance with the authorizing legislation; it is also described in this interim rule. Awards shall be prioritized in order of the greatest savings to the National Flood **Insurance** Fund, by virtue of the Benefit Cost Ratio.

  With respect to concerns over the accuracy of claims data, FEMA has continually worked to update the claims information data to increase accuracy, including field verification of property information when necessary. Furthermore, property owners can discuss errors in their claim history with NFIP representatives. As described under the response to Question 3, a property owner is given a toll-free number to call if they have questions about their designation as an SRL property.

  With respect to concerns regarding the details of receiving a mitigation offer, particularly for an acquisition, FEMA has developed an offer letter that will contain information regarding the mitigation project type; the amount of the purchase offer, including the basis and methodology for calculating the purchase offer, and the final offer amount that reflects applicable deductions; notification that participation in the SRL program is voluntary; the amount of time the property owner has to accept or reject the offer; the right of the property owner to appeal the increase in flood **insurance** rates if they refuse the offer; a summary of the consultation process, and other pertinent information.

  In response to the comment that funds should only be directed to those covered under a NFIP policy, the definition of a SRL property includes the requirement that the property is covered by a NFIP policy.

  ICC coverage under the Standard Flood **Insurance** Policy (SFIP) provides for the payment of a claim to help pay for the cost to comply with State or community floodplain management laws or ordinances from a flood event in which a building has been declared substantially damaged or repetitively damaged. When an insured building is damaged by a flood and the State or community declares the building to be substantially or repetitively damaged, ICC coverage will help pay for the cost to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                                      Page 10
(Publication page references are not available for this document.)

elevate, floodproof, demolish, or relocate the building up to a maximum benefit of $30,000. This coverage is in addition to the building coverage for the repair of actual physical damages from flood under the SFIP. ICC claims payments from previous flood events may be used to meet the non-Federal cost share requirements, as long as the period for making such a claim remains open.

*Question 2: What parameters should FEMA use to define severe repetitive loss for multifamily structures consisting of 5 or more residences?*

 Multiple commenters stated that the multifamily properties definition should be the same as the single-family properties definition. However, several alternative options to define multifamily properties were suggested including:

 • The ratio of cumulative loss versus replacement cost;

 • The determination of substantial damage for a structure;

 • A proportionate definition based on the number of units; or

 • Five or more residences covered under a single contract for flood **insurance** that have had 4 or more claims, each exceeding 6.25 percent of the replacement value of the structure, with cumulative payments exceeding 25 percent of the replacement value. Parameters to consider included total damages, number of losses, dollar loss per claim, and low-rise versus high-rise structures.

 Multiple commenters agreed that at least 2 claims payments that cumulatively exceed the replacement value of the structure (as stated in Section 1361A(b)(2) of the Act) should apply to single family as well as multifamily properties.

 Multiple commenters indicated that multifamily properties should follow single-family properties as the priority for mitigation funding.

 Multiple commenters indicated that Benefit Cost Analysis data applied to multifamily projects consider more than building damages, but also content damages, in order to make multifamily projects cost-effective.

FEMA's Response

 FEMA evaluated two options in selecting the definition of "multifamily property" for the purposes of this interim final rule. The first option was keeping the same claims thresholds as defined in the Act for single family properties. The second option FEMA evaluated was defining "multifamily property" as reflecting the increased property values and number of units typically associated with multifamily properties. FEMA analyzed claim information for multifamily properties and determined that a claim history including four separate claims of $25,000 with the cumulative amount of such payments exceeding $100,000 or having at least two separate claims payments with the cumulative amount of such claims exceeding the value of the property would be reasonable criteria to select for the meaning of the term "severe repetitive loss" for multifamilty properties.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                                    Page 11
**(Publication page references are not available for this document.)**

  Based on evaluating options, FEMA determined that selecting the first option al-
lowed properties for which a relatively inexpensive mitigation solution may be
available (such as elevating HVAC equipment or eliminating finished enclosures be-
low elevated floors) to be eligible for SRL program funds. These minimal mitigation
steps may also lead to a diminished need for disaster housing as well. This defini-
tion was chosen because it allows for the maximum number of multifamily residences
to be eligible for funding consideration under the SRL program by virtue of meeting
the definition of an SRL property.

  Thus, "multifamily property" is defined in part 79 as "a property consisting of
five or more residences". Furthermore, the definition of "Severe Repetitive Loss"
as defined in part 79 of this interim rule uses the same parameters for multifamily
properties as for single family.

*Question 3: What process should FEMA use to notify property owners that their prop-
erty is considered a severe repetitive loss property as defined by the statute?*

  A considerable number of commenters stated that notices to property owners needed
to be coordinated with, sent concurrently to, or shared with State, Tribal and lo-
cal communities. A considerable number of respondents stated that FEMA should be
responsible for notifying property owners, and multiple commenters indicated that
this notice should be in writing, either through certified or registered mail.

  A considerable number of respondents stated that the notice needed to include
clear, non-legal, plain English language that described the notice, the program,
the determination, the process, appeals, etc. Multiple commenters suggested a stan-
dard form or one-page document explaining the program. Furthermore, multiple re-
sponses wrote that the notice be provided with the property owner's **insurance** pol-
icy renewal to link the program to **insurance** coverage. Multiple commenters stated
that disclosure in property records, and real estate transactions needed to be en-
forced.

FEMA's Response

  FEMA's Special Direct Facility (SDF) is operated by the NFIP's Servicing Agent. It
has been in existence since 2000, when FEMA determined it needed to manage more
closely the loss adjustments to the subset of repetitive loss properties that had
the highest number of losses. For the same reasons, property owners whose claims
history meets the SRL criteria have been receiving letters approximately 150 days
before their policy is renewed that identify their properties as SRL properties. In
addition to managing loss adjustments, the SDF will manage the increase in premiums
should the property owner decline an offer of mitigation. The letters also explain
that their flood **insurance** policy will be transferred to FEMA's Special Direct Fa-
cility (if the policy is not already being serviced there). These letters are also
sent to the property owner's flood **insurance** agent, and to their mortgage lender.
This letter provides a toll-free number that the property owner can call if they
have questions about their designation as an SRL property, or any other questions
about the transfer of their policy.

*Question 4: What criteria should FEMA consider when allocating funds to States
and/or communities under the Pilot Program? Should FEMA consider base allocations*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

*for States with higher numbers of severe repetitive loss properties?*

 Multiple commenters stated that funds should target those properties with the most losses to the NFIF, therefore targeting the most egregious properties regardless of location. A considerable number of commenters indicated that allocations should be based on the total number of SRL properties per State. Finally, multiple commenters indicated that base allocations for those States with high numbers of SRL properties should be considered.

 Multiple commenters stated that any allocation should provide enough to cover the cost of at least 1 project or some acceptable number of properties, and multiple responses stated that allocations should consider variations in costs to mitigate.

 Commenters wrote that additional considerations for allocation included capability factors, such as project readiness, leveraged local investment, past mitigation grant performance, NFIP compliance, and Community Rating System (CRS) ratings. Multiple commenters suggested FEMA base allocations on approved mitigation plans.

 Commenters suggested several alternative bases for allocations, including: Insured values or market values, or values based on value of future losses.

FEMA's Response

 Subpart 79.4 of this interim rule provides for allocations to be based upon the percentage of the total number of SRL properties located within each State, as per the authorizing legislation, Flood **Insurance** Reform Act of 2004, Public Law 108-264. States with little or no allocation will be able to apply for 10 percent of the total funds appropriated in any fiscal year, provided that the State or Tribal applicant has at least 1 SRL property. State allocations will be large enough to permit the implementation of at least 1 project.

 FEMA considered several options in evaluating how to administer allocations based on the percentage of the total number of SRL properties located within each State, as per the authorizing legislation, Flood **Insurance** Reform Act of 2004, Public Law 108-264. States with little or no funding allocation will be able to apply for 10 percent of the total funds made available under SRL in any fiscal year, provided that the State or Tribal applicant has at least one SRL property. The options evaluated and not accepted included small allocations to all States; larger allocations to a limited number of States with numerous SRL properties; and a variety of allocation scenarios for States with a limited number of SRL properties.

 Ultimately FEMA decided on an allocation that could be adjusted annually based on the number of SRL properties in a particular State. FEMA would evaluate the point at which it is more beneficial for a State to compete for the 10 percent set-aside than to receive an allocation that was insufficient. This allocation approach provided the necessary funds to accomplish mitigation projects. The average flood mitigation project funded under FEMA's mitigation programs is approximately $70,000-$100,000.

 The legislation also required a 10 percent set-aside of the grant funds for States receiving little or no allocation. FEMA determined that "little or no allocation"

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                    Page 13
**(Publication page references are not available for this document.)**

meant the point at which it was more beneficial for a State to compete for appro-
priate funds to accomplish mitigation activities than to receive a small alloca-
tion, or one which is below the $70,000-$100,000 average mitigation project cost.
The allocation option that FEMA selected is a reasonable approach to both alloca-
tions and the 10 percent set-aside.

*Question 5: Should there be caps on Pilot Program funding for States and communi-
ties similar to Flood Mitigation Assistance program funds? If so, how would the cap
amounts be determined?*

 The overwhelming response was there should be no caps on funding.

 Multiple commenters requested FEMA remove the caps on funding currently imple-
mented under the FMA program as well.

FEMA's Response

 At the commenters' request, FEMA has not imposed any funding caps within the SRL
program. FMA caps are not changed by this rule, since they are statutorily based.

*Question 6: What criteria should FEMA use to review and approve State mitigation
plans consistent with 44 CFR part 201 to ensure that they contain recommended ac-
tions to mitigate severe repetitive loss properties?*

 Multiple commenters indicated that FEMA should be as flexible as possible in the
criteria used to review and approve plans, including simple goals and strategies
that acknowledge properties at risk.

 Multiple commenters indicated that mitigation is local, and therefore States
should not be held accountable for local strategies. Multiple commenters suggested
that existing State or local plans should be accepted, particularly given the lim-
ited timeframe of authority for the Pilot program.

 Suggestions, if a plan is required, included providing for amendments to existing
plans and approving projects while the amendments are being reviewed. Multiple com-
menters suggested that criteria to be reviewed focus on capability factors such as
plan implementation, past performance and effort, not the number of severe repeti-
tive loss properties mitigated. Multiple commenters were concerned that the lack of
accuracy in the repetitive loss database may affect their ability to meet the plan-
ning requirements related to severe repetitive loss property mitigation. Discrepan-
cies in claims information and property values as shown in the repetitive loss da-
tabase may result in not showing certain properties as being SRL properties, yet
those properties may in fact have been mitigated, "counting" towards a SRL property
mitigated. Similarly, database discrepancies may show a property as being SRL, when
in fact it may not be. Therefore, if the property has not been mitigated, it may
count "against" the state's efforts to indicate mitigation of SRL properties in
their state plan.

 Several commenters stated that disclosure of offer and **insurance** information
needed to be a part of the property's permanent record, and information needs to be

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                       Page 14
**(Publication page references are not available for this document.)**

conveyed to the existing and new homeowners regarding the mitigation offer. Fi-
nally, multiple commenters indicated that there were too many "lists" between re-
petitive loss and severe repetitive loss.

FEMA's Response

 In this interim rule, FEMA requires states to have an approved State Mitigation
Plan meeting the requirements of §§ 201.4 or 201.5 to qualify for the reduced non-
federal cost share. The plan must satisfy all standard requirements but also iden-
tify specific actions the state has taken to reduce the number of repetitive loss
properties; specify how the state intends to reduce the number of such properties;
and describe the state's strategy to ensure that local jurisdictions with SRL prop-
erties take actions to reduce the number of these properties, including the devel-
opment of local mitigation plans. Amendments to currently approved State plans will
be acceptable. However, at the time of the next required plan update, the amendment
must be incorporated into the plan and adopted as part of the plan. Until such time
as the amendment is approved by FEMA, grants could be awarded; but the lower non-
Federal cost share would not be available until the amendment is approved. While
State and local plans must contain different types of data, the two types of plan-
ning efforts must be linked via common mitigation goals and objectives.

 With respect to the number of repetitive loss lists, FEMA has made available a
separate list of SRL properties on SQA Net, which is available to State NFIP Coor-
dinators and State Hazard Mitigation Officers via FEMA Regional Offices. SQA Net is
a secure web portal that enables access of data from the NFIP flood **insurance** data-
base. Data is updated monthly. In pursuing a repetitive loss strategy, FEMA devel-
oped a definition of repetitive loss structures, and maintained a list of those
structures. A target repetitive loss list was also developed, which consisted of a
subset of the list of repetitive loss properties that had the highest number of
losses. FEMA does not consider these lists to be excessive, and finds that each
serves a valuable purpose.

*Question 7: What criteria should FEMA use to make the determination that a State
has taken actions to reduce the number of severe repetitive loss properties in its
communities?*

 Commenters characterized criteria in terms of qualitative and quantitative crite-
ria, as well as procedures for developing and reviewing plans.

 Qualitative factors suggested include the effort (that is, the number of offers
made or the most egregious properties approached, but not necessarily accepted or
mitigated); documentation that any actions were taken; partnerships with other pro-
grams and funding sources; level of outreach; and strength of the Community Assis-
tance Program-State Support Services Element (CAP-SSSE). This program provides
funding to States to provide technical assistance to communities in the National
Flood **Insurance** Program (NFIP) and to evaluate community performance in implement-
ing NFIP floodplain management activities. Quantitative factors proposed include
number of properties mitigated, higher regulatory standards, number of Community
Rating System (CRS) communities, number of repetitive loss properties, other pro-
grams in place, a plan in place, prioritization of properties, leveraging of match-
ing funds, and others.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

  Multiple commenters stated that States with approved mitigation plans in place
should not have to submit new plans or "prove" that actions have been taken. Con-
versely, multiple commenters suggested that States submit a report or other docu-
mentation each year to show actions taken.

 FEMA's Response

  Section § 201.5(c)(3)(v) of this interim rule addresses the State mitigation plan-
ning requirements for meeting this provision. The regulation requires documentation
of actions already taken that specifically focused on SRL properties. Because the
mitigation measures for each State and community could vary widely depending on the
factual circumstances of each state and community, FEMA opted not to set fixed cri-
teria.

  With respect to submitting plans and updates, since most States already have ap-
proved mitigation plans, they may only need to make limited revisions or clarifica-
tions to the plan that focus on this subset of properties. The entire plan will not
need to be resubmitted, only the amendment that pertains to the SRL mitigation ac-
tions. Finally, at a minimum, states are required to review and update their miti-
gation plans every 3 years. Although they may opt to submit revisions annually,
showing the mitigation actions taken, FEMA believed an annual requirement to be
overly burdensome.

*Question 8: What criteria should FEMA use to determine projects that will result in
the greatest amount of savings to the National Flood* **Insurance** *Fund? How should the
criteria relate to current FEMA procedures for determining cost effectiveness?*

  A considerable number of commenters stated that Benefit Cost Analysis (BCA) should
be used to determine the greatest amount of savings to the NFIF. Multiple comment-
ers indicated that the benefit cost analysis should be waived for all SRL proper-
ties or for those with 2 or more claims that cumulatively exceed the property
value. Additional suggestions for the use of benefit cost methodologies included
providing clear guidance, a request that it be simple to use, and that it allow
FEMA and applicants to consider all factors, not just damages. Commenters provided
alternative criteria for ranking properties such as: claims paid; claims relative
to property values; greatest cost savings to insured properties mitigated; or cost
effectiveness based on **insurance** premium costs.

  Multiple commenters expressed that the term "property value" needed to be defined
clearly, whether based on appraisal value, replacements value, insured value, or
fair market value.

 FEMA's Response

  All projects for which FEMA provides funding must be cost effective. For the pur-
pose of determining the amount of savings to the NFIF as a result of the project,
FEMA agreed with the commenters and used a Benefit Cost Ratio. In this rule, FEMA
determines an SRL property by the cumulative amount of claims when 4 or more claims
have been made, or by the market value of the property in relation to the cumula-
tive amount of two or more claims when that cumulative amount exceeds the market

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                                    Page 16
**(Publication page references are not available for this document.)**

value (§ 79.2(g)).

 Instead of using the term "property value", FEMA used the term "market value" and defined it in § 79.2. FEMA defined market value as the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of the valuation, after a reasonable exposure time on the open market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the valuation.

*Question 9: What types of assistance do States and communities want from FEMA when making offers to owners of severe repetitive loss properties?*

 Multiple commenters asked for funding for States and communities to assist with administrative costs, technical assistance needs, staff, and application develop-ment as part of making offers to owners of SRL properties. State and community com-menters also stated that legal assistance prior to initiating offers and negotiat-ing with owners would assist them.

 A considerable number of commenters stated that the data supporting the SRL prop-erties list needed to be updated for accuracy, including validating the data for addresses, names, claims history, and property values. In addition, commenters re-quested access to the database, SQA Net, flexibility to add structures or validate data, and verifying premiums. Commenters also suggested FEMA maintain a single na-tional database for projects, and provide information on the true actuarial rate in case of refusal at the time of the offer.

 Multiple commenters stated that adequate number of FEMA staff needed to be avail-able to manage the program, and that the staff needs to be trained in NFIP and FEMA mitigation programs.

 Multiple commenters stated that assistance was needed to notify property owners of the consequences of not accepting offers. The commenters also stated that a simple FEMA handout or document explaining the **insurance** repercussions and the appeals process would be extremely helpful. Multiple commenters also requested FEMA de-scribe the tax implications of accepting mitigation funds.

 Multiple commenters requested training be made available or improved for the pro-gram, and specifically identified **insurance** agents as a target for training.

FEMA's Response

 As with our other grant programs, administrative costs are available to applicants and subapplicants as a percentage of the grant award, once the grant is awarded. Furthermore, applicants and subapplicants may be reimbursed for pre-award costs for activities directly related to the development of the project proposal. These costs can only have been incurred during the open application period. These criteria are detailed in § 79.8 of this interim rule.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

Certain legal expenses may be considered eligible applicant and/or subapplicant management cost activities when associated with: solicitation, review and process- ing of the SRL subapplications and subgrant awards, obtaining pre-award consulta- tion agreements from SRL property owners, and staff salary costs directly related to performing the activities above. All management cost activities must be in con- formance with 44 CFR part 13, Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments and applicable program guid- ance.

Applicant management costs are limited to up to 10 percent of the grant award and subapplicant management costs are limited to up to 5 percent of the grant award. Eligible management costs incurred prior to the grant award, but after the SRL ap- plication period has opened are identified as pre-award management costs. Costs in- curred with respect to pre-award activities associated with project implementation are not eligible.

Data on SRL properties is available on the SQA Net to State NFIP Coordinators and State Hazard Mitigation Officers. This data is being validated and updated continu- ously. Over one third of the properties identified as having a data anomaly have been validated. New information is published each month on SQA Net. Information on the **insurance** premium rate increases for property owners refusing the mitigation offer will be provided during the consultation. Project-related data for the SRL program will be housed within the same database that is maintained for all other Pre-Disaster Mitigation (PDM) grant programs.

Only FEMA Regional and disaster related staff as well as State personnel, have been granted access to the repetitive loss and SRL data available to SQA Net. Sev- eral new features have been added to SQA Net recently including the ability to sub- mit requested updates to repetitive loss records electronically over the Internet. The ability to search for claims records and to view former and active policy re- cords via SQA Net is expected to be in place by Spring 2008. With respect to allow- ing local government access to SQA Net, there are concerns regarding potential se- curity issues and the increased possibility of the unintentional inappropriate re- lease of the data at the local level resulting in a Privacy Act violation. Although they do not have access to the SQA Net system, local communities continue to be ap- proved users of the repetitive loss data under the Privacy Act.

Program implementation information will contain information on premium rate in- creases, if a property owner refuses the mitigation offer. This program information also contains checklists of the types of information that the State or community would need to compile and make available as part of the consultations. The program information will be augmented further with mitigation consultation tools and re- sources for States and communities to aid in the consultation and offer process.

Tax implications of accepting mitigation offers must be answered by the property owner's tax advisor or other State or locally sponsored tax advisory service. FEMA does not have the authority to provide information on this issue.

Section 207 of the Bunning-Bereuter-Blumenauer Flood **Insurance** Reform Act of 2004 calls for the establishment of minimum training and education requirements for **in- surance** agents who sell flood **insurance** policies. FEMA is working with state **insur-**

72 FR 61720-01                                                                                    Page 18
**(Publication page references are not available for this document.)**

**ance** commissioners on training requirements for agents that sell flood **insurance** policies.

*Question 10: What role should states and communities have in the appeals process for severe repetitive loss property owners who decline mitigation offers under the Pilot Program? What rules and procedures should be contained in the Appeals Process?*

Of the comments received, 19 entities offered comments on question 10. A general synopsis of these comments is as follows:

| General comments on appeals process | States/ territories | Local communities | Associations/ organizations |
|---|---|---|---|
| Advocate information sharing between FEMA and States ........... 1 | | 3 | 4 |
| Advocate State and/or community involvement in Appeals Process ................... 5 | | 4 | 1 |
| Advocate that only FEMA be involved in Appeals Process . .............. | | 1 | .............. |
| State participants still discussing the issue with other State agencies .............. 1 | | .............. | .............. |

The following are the comments on the appeals requirement of the Pilot Program presented by State and local officials and representative organizations during the consultation:

• Clarity in the details, especially the Appeals Process and the **insurance** consequences.

• States and communities are also sensitive to any possibility of liability which may preclude much participation in the Appeals Process. However, States and communities may be willing to participate in an administrative capacity in collecting data for appeals and ensuring that applications are completed.

• Property owners should make an appeal in writing, along with supporting documentation. The jurisdiction can also file documentation either in support or against the property owner's reason for the appeal.

• The decision to accept or deny the appeal must come from FEMA, thereby removing the States and communities from the threat of legal action. FEMA should send written notice of its findings to the state, community and property owner.

• Appeals rule requirements should not be written in a way that allows the property owners to easily avoid mitigation activities or higher flood **insurance** premi-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

ums.

 • States and communities should be an informational role; again, concern to keep the States and communities from the potential legal liabilities.

 • The local communities and the State officials should just assist people with the appeals. FEMA should make all your final decisions and handle all the paperwork. We also feel that there should be some formal recommendation from your parishes or lo-cal communities or State.

 • The appeal process should start with the community. If the owner of a property rejects an offer but can easily show that in purchasing, that he relied on a FIRM [Flood **Insurance** Rate Map] map that indicated the property was not on the mapped flood hazard area, this should not have to go to FEMA.

 • The appeal should go through the local government. They are the ones with claims on the property; they could validate it. Should come through the state as the ad-ministrator of the program. We could validate it; just like with an appeal from the local government, you concur, you may not concur, no comment, but that provides the additional insight.

FEMA's Response

 As established in § 78.7(d) of this rule, an appeal on increased **insurance** rates is made in writing by the property owner to the FEMA Regional Administrator within 90 days of the date of the notice of **insurance** increase. The Regional Administrator may request the Grantee, and Sub-grantee (State and community) if applicable, to assist in the collection of data to support the property owner's appeal. The Re-gional Administrator will review the information provided by the property owner and may participate in discussions with the property owner, and if applicable, with the Grantee and Sub-grantee to resolve the appeal prior to sending it to an Independent Third Party or a reviewer from FEMA's Alternative Dispute Resolution office (at the property owner's discretion).

IV. Regulatory Requirements

*A. Administrative Procedure Act Statement*

 In general, FEMA publishes a rule for public comment before issuing a final rule, under the Administrative Procedure Act, 5 U.S.C. 533 and 44 CFR 1.12. The Adminis-trative Procedure Act, however, provides an exception from that general rule where the agency for good cause finds that the procedures for prior comment and response are impracticable, unnecessary, or contrary to public interest.

 This interim rule implements provisions of the Bunning-Bereuter-Blumenauer Flood **Insurance** Reform Act of 2004, which amended the National Flood **Insurance** Act of 1968. The key component of this rule includes implementation of the new SRL program as well as amending provisions of the existing FMA program. The rule also stream-lines the planning process, and clarifies the planning requirements to address ex-isting, unanticipated inconsistencies.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

  Authorization for the SRL program expires on September 30, 2009. Funding for the
new SRL program was made available as of fiscal year 2006, thus it is important to
allow States, tribes, communities, and property owners to access these funds so
that they may have the opportunity to reduce their flood losses to these high risk
properties as soon as possible. It is also in the public interest to mitigate these
SRL properties as soon as possible to minimize further costs resulting from upcom-
ing seasonal flooding. These properties often pose the highest costs to the Nation
in terms of discounted Federal flood **insurance** rates, as well as Federal disaster
assistance payments,

  Prior comment on this rule is not in the public interest where the implementation
of the new SRL program, as well as the modified FMA program, will assist States re-
covering from flood disasters nationwide, including Hurricanes Katrina and Rita, by
providing additional grant resources and increasing the Federal cost share for pro-
jects mitigating SRL properties. In particular, States and communities are at a
critical stage for identifying properties to be mitigated in the post-Katrina re-
covery efforts, and these funds are essential for targeting the most costly proper-
ties in the area. To be most effective, the funds need to be made available to the
Gulf Coast States and communities affected by Katrina and Rita as soon as possible.
At the end of August 2007, there were just under 8,100 properties identified as
meeting the definition of severe repetitive loss properties; approximately 58 per-
cent, or 4,685 properties, lie within the 5 States most affected by Hurricanes
Katrina and Rita. Mitigating these SRL properties will provide States the opportu-
nity to reduce future losses to these SRL properties, which represent the largest
drain on the NFIF and also will reduce future disaster costs to the local, State,
and Federal government.

  States, tribes, and communities also have a strong interest in accessing, as soon
as possible, information in the rule that outlines how the States can revise their
mitigation plans to receive the reduced cost share under the FMA and SRL programs.
This cost-share reduction is an important incentive and, in some cases, necessary
to allow communities, which otherwise would not be able to meet the match require-
ment, to mitigate SRL properties. It is essential that the availability of this in-
formation not be delayed, particularly where in many cases the revisions to mitiga-
tion plans will themselves, require time-consuming coordination across multiple
agencies.

  In accordance with the Administrative Procedure Act, 5 U.S.C. 553 (b), FEMA be-
lieves that prior notice and comment would be contrary to the public interest, as
it would serve only to delay the benefits of this rule to States, tribes, and com-
munities, and would continue imposing the costs of these at-risk properties on the
general public.

  FEMA nevertheless recognizes the importance of public input in the regulatory
process. To that end, FEMA involved the public in a consultation process prior to
the publication of this interim rule. To initiate the consultation process, FEMA
published a Federal Register notice on September 15, 2004, 69 FR 55642. The comment
period was supposed to close on November 30, 2004, but FEMA extended the deadline
for comments until December 7, 2004, and received 26 written comments from States,
communities, and associations. Also, as part of the consultation, FEMA invited rep-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                        Page 21
**(Publication page references are not available for this document.)**

resentative officials of State and local governments, organizations representing emergency management, floodplain management, and **insurance** professions, to provide oral presentations on the requirements and issues raised in the Federal Register notice. Comments received were given careful consideration in the preparation of this interim rule.

Finally, FEMA actively encourages and solicits comments on this interim rule from interested parties. These comments will be given careful consideration, and could result in changes to these regulations.

*B. National Environmental Policy Act*

FEMA has considered this rule in accordance with its implementing regulations for complying with the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321-4370f), which are found at 44 CFR part 10. This rule addresses applicant planning requirements, as well as eligibility, funding increases, and cost sharing/funding incentives relating to certain disaster mitigation programs and does not change the type or nature of mitigation actions that may be funded. This rulemaking would neither individually nor cumulatively have a significant effect on the human environment and, therefore, neither an environmental assessment nor an environmental impact statement is required. This rulemaking is among the category of actions included in the Categorical Exclusions listed at 44 CFR 10.8(d)(2)(ii), which excludes the preparation, revision and adoption of regulations from the preparation of an environmental assessment or environmental impact statement, where the rule relates to actions that qualify for categorical exclusions. The related actions of the development of plans and administrative activities that are included in this rule are also categorically excluded under 44 CFR 10.8(d)(2)(iii) and 44 CFR 10.8(d)(2)(i).

*C. Executive Order 11988, Floodplain Management*

FEMA has prepared and reviewed this rule under the provisions of Executive Order 11988, Floodplain Management. Part 9 sets forth FEMA's policy, procedures, and responsibilities in implementing this Executive Order. In summary, these are, to the greatest possible degree: To avoid long and short term adverse impacts associated with the occupancy and modification of floodplains; avoid direct and indirect support of floodplain development whenever there is a practical alternative; reduce the risk of flood loss; promote the use of nonstructural flood protection methods to reduce the risk of flood loss; minimize the impacts of floods on human health, safety and welfare; restore and preserve the natural and beneficial values served by floodplains; and adhere to the objectives of the Unified National Program for Floodplain Management. As stated in the rule, the purpose of the SRL and FMA programs is to mitigate insured property losses from floods, thereby minimizing impacts to the NFIF, which is consistent with the intent of the Executive Order. In addition, for project activities funded through the SRL and FMA programs, each project will go through the environmental review process, which will include compliance with Executive Order 11988.

*D. Executive Order 12866, Regulatory Planning and Review*

FEMA has prepared and reviewed this rule under the provisions of  Executive Order

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                    Page 22
**(Publication page references are not available for this document.)**


12866, Regulatory Planning and Review. Under Executive Order 12866, a significant
regulatory action is subject to the Office of Management and Budget (OMB) review
and the requirements of the Executive Order. The Executive Order defines "signifi-
cant regulatory action" as one that is likely to result in a rule that may:

 (1) Have an annual effect on the economy of $100 million or more or adversely af-
fect in a material way the economy, a sector of the economy, productivity, competi-
tion, jobs, the environment, public health or safety, or State, local, or tribal
governments or communities;

 (2) create a serious inconsistency or otherwise interfere with an action taken or
planned by another agency;

 (3) materially alter the budgetary impact of entitlements, grants, user fees, or
loan programs or the rights and obligations of recipients thereof; or

 (4) raise novel legal or policy issues arising out of legal mandates, the Presi-
dent's priorities, or the principles set forth in the Executive Order.

Regulatory Alternatives

 In determining how to move forward with this rule, two alternatives were consid-
ered. The first alternative was to issue an interim rule for the SRL program, and
to modify the existing separate FMA rule to incorporate changes made by the Act.
This would result in two sections of the CFR addressing mitigation grant programs
funded through the NFIP which could result in disjointed implementation of the two
similar programs.

 The second alternative (and the one adopted by FEMA) was to establish and proceed
with the implementation of the SRL and FMA programs as described in this interim
rule. This will allow FEMA to ensure a more consistent approach to implementation
and management of these programs. FEMA has been working to implement all of the
mitigation grant programs in a consistent manner, and this regulatory change fur-
thers that attempt. These changes are also expected to limit confusion around pro-
gram implementation since both programs will likely be managed by the same state
agency staff.

Congressional Appropriations

 The regulations implementing the FMA program were originally issued on March 20,
1997. Historically, the program has provided $20 million in grants on an annual ba-
sis to States and communities to reduce flood losses to properties insured under
the NFIP. In fiscal year 2007, $31 million was made available for the FMA program
to fund activities that help reduce repetitive flood **insurance** claims, thereby re-
ducing the drain on the NFIP from these properties. This program provides an oppor-
tunity for every State to fund planning and project activities but, since it is a
small program, it is unable to assist all those who could benefit from it. The Bun-
ning-Bereuter-Blumenauer Flood **Insurance** Reform Act of 2004 provides for additional
program funding for the FMA program, as well as makes it easier for some to par-
ticipate in the program, by providing the ability for States to reduce the cost
share for those properties that meet the definition of a severe repetitive loss

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                           Page 23
**(Publication page references are not available for this document.)**

property.

 The primary purpose of this rule is to implement the new SRL program, which will
provide grants to property owners to mitigate their risk from flooding, with incre-
mental increases in the **insurance** premiums imposed if they decline to accept the
offers of mitigation. In fiscal year 2007, $40 million was made available by Con-
gress for the SRL program. Therefore, in fiscal year 2007, a total of $71 million
was allocated for these programs ($31 million for FMA and $40 million for SRL).

Impact From Increase in **Insurance** Premiums

 Most severe repetitive loss properties were built prior to December 31, 1974, and
the **insurance** premiums for these properties are supported financially by other NFIP
policyholders. Repetitive loss properties only account for approximately 1 percent
of the current NFIP policies, yet these properties historically account for over 30
percent of the amount paid in claims. Under the SRL program, owners of severe re-
petitive loss properties will receive mitigation offers. Refusals of these offers
will result in increased premiums for owners of these properties. Thus, in either
case, this rule should help shift the disproportionate burden away from the major-
ity of NFIP policyholders who do not own SRL properties.

 Within the NFIP, the average discounted premium paid by owners of property built
before December 31, 1974 is $800 per year. However, if those properties were rated
on an actuarial basis, taking into account their actual flood risk, the annual pre-
miums they should be paying would average between $1,700 and $1,900 per year. Se-
vere repetitive loss properties as a subset of the pre-1974 properties have higher
flood risks than most properties with discounted premiums insured under the NFIP,
and their actuarial rates could be much higher. For purposes of estimating the an-
nual economic impact of this interim rule, FEMA used an average actuarial premium
rate of $5,000 for these severe repetitive loss properties. This average actuarial
rate does not reflect the discount premium rate; rather it more closely represents
the flood risk to the property.

 Of the $40 million available each year for the SRL program, FEMA assumes that  $37
million will be awarded as project grants, and that the average grant per property
is $75,000. Therefore, offers will be made to approximately 500 property owners in
the first year. It is assumed that up to 3 percent of those property owners might
decline the offer of mitigation assistance, and that these 15 properties would be
subject to the increased **insurance** premiums. This 3 percent figure is based on the
fact that although NFIP engages in litigation for less than 1 percent of its claims
in an average claims year, there have been 3 times the normal number of claims as a
result of Hurricanes **Katrina**, **Rita**, and **Wilma**. Also, after the wildfires of Cerro
Grande, FEMA instituted a similar grant program whereby homeowners received funds
for repair, with an appeals provision. Approximately 3 percent of those homeowners
appealed their grant amount.

 This increased cost of **insurance** for these 15 properties would result in an aver-
age discounted premium increase of approximately $400 per property owner (50% of
the $800 average discounted premium), for a total increase in **insurance** premiums of
$6,000 the first year. This premium rate can increase over time, until the actuar-
ial rate (averaged, for the purpose of this rule to $5,000) is reached. At no time,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

however, would the premium paid for the affected property exceed the actuarial
rate. If, over the remaining 1 year of the pilot SRL program, one expects the num-
ber of property owners declining the offer of assistance to remain the same, then
the total number of affected properties will be 30. Within 10 to 20 years, when all
30 of the affected properties whose owners declined the mitigation offer will each
pay actuarial premium rates described above as averaging $5,000 per year, the maxi-
mum annual impact of the program would be $150,000 ($5000 x 30).

Changes to HMGP

 The rulemaking makes a technical change to reflect existing HMGP post-disaster al-
location amounts in effect as a result of amendments to Section 404 of the
Stafford Act (42 U.S.C. 5170c, as amended by Pub. L. 109-295, § 684). The change
set non-discretionary standard allocation amounts for the program.

Open Space

 As part of implementing the SRL and FMA, this rule also includes a new part (part
80) which describes the requirements and procedures for open space acquisition
which will apply to these programs, as well as all FEMA mitigation grant programs.
The Act requires certain special acquisition procedures for SRL, however open space
acquisitions funded under all FEMA mitigation grant programs otherwise subject to
the same requirements to ensure mitigation objectives are met. Prior to this rule,
acquisition requirements for each mitigation grant program were addressed in the
respective mitigation grant program regulations or guidance, such as at § 78.12 for
FMA and § 206.434 for HMGP, including associated program guidance. A central refer-
ence point for all mitigation grant program property acquisitions is intended to
make the programs easier to implement. There will be no additional cost from this
change.

Increase in Federal Share

 The rule also implements the changes to the FMA program by allowing for a 90 per-
cent Federal share for the mitigation of severe repetitive loss properties, amend-
ing the method by which State funding allocations are calculated, and making the
FMA planning requirements and other program aspects consistent with other FEMA
mitigation planning and program requirements. Though there is no net change in the
funding allocated for FMA with this new cost share provision, the distribution of
the funding will shift to the Federal "side". In FY 2007, $31 million was made
available for the FMA program. Since the change in Federal share will be from 75
percent to 90 percent, the change in Federal outlay will be $4.65 million. This
figure includes two very conservative assumptions: That all properties mitigated
under FMA will be SRL properties; and that all States will seek this new cost share
by virtue of revising their State mitigation plans.

Intangible Benefit

 As of the end of August 2007, just under 8,100 properties were identified as meet-
ing the definition of severe repetitive loss. Of those, approximately 58 percent
are in the 5 States most affected by hurricanes Katrina and Rita. Alabama has 223
properties, Louisiana has 2,567 properties, Mississippi has 148 properties, Texas

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

has 1,275 properties, and Florida has 472 properties. Implementation of the new SRL program, as well as the modified FMA program, will assist these States in recovering from these disasters by providing additional grant resources and the ability to increase the Federal cost share for projects mitigating SRL properties.

The economic impact of this rule is approximately $76 million. This rulemaking has been determined to be a nonsignificant regulatory action under section 3(f) of Executive Order 12866 by OMB. This rule adheres to the principles of regulation of the Executive Order.

*E. Executive Order 12898, Environmental Justice*

Under Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 FR 7629, February 16, 1994, FEMA incorporates environmental justice into our policies and programs. The Executive Order requires each Federal agency to conduct its programs, policies, and activities that substantially affect human health or the environment, in a manner that ensures that those programs, policies, and activities do not have the effect of excluding persons from participation in our programs, denying persons the benefits of our programs, or subjecting persons to discrimination because of their race, color, or national origin.

No action that FEMA can anticipate under the interim rule will have a disproportionately high or adverse human health and environmental effect on any segment of the population. This rule implements the SRL program, providing mitigation grants to severe repetitive loss properties, and modifies aspects of the FMA program and the mitigation planning requirements. With respect to Indian tribal governments, the rule streamlines and simplifies the planning requirements. Finally, this interim rule amends § 206.432 to reflect statutory and technical changes to HMGP. Accordingly, the requirements of Executive Order 12898 do not apply to this interim rule.

*F. Paperwork Reduction Act of 1995*

This interim rule includes provisions constituting collections of information under the Paperwork Reduction Act (PRA) of 1995 (44 U.S.C. 3501 et seq.). Under section 3507(d) of the PRA, The Federal Emergency Management Agency (FEMA) will submit a copy of this rulemaking action to the Office of Management and Budget (OMB) for review. FEMA is submitting a request for review and approval of collections of information under OMB's emergency processing procedures. Through publication of this interim rule, FEMA is requesting a 6- month approval for these information collections. FEMA plans to follow this emergency approval request with a 3-year approval request. The 3-year request will be processed under OMB's normal clearance procedures in accordance with the provisions of OMB regulation at 5 CFR 1320.10. This interim rule also serves as the 60 day notice required by 5 CFR 1320.8. FEMA invites the public to comment on the proposed collections of information during this 60 day comment period.

Several collections of information referenced in this interim rule have existing OMB approvals under the PRA. The rule in §§ 79.3(b), 79.3(c), 79.3(d), 79.5(a)(2), 79.5(b), 79.6(b), 79.7(b), 79.9(a), 201.3, 201.6, and 201.7 contains collections of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                                      Page 26
**(Publication page references are not available for this document.)**

information under the PRA for which FEMA requests approval of amendments to exist-
ing collections by OMB. In addition, FEMA is requesting approval of two new collec-
tions of information for the interim rule contained under the new §§ 79.7(d),
80.13(a), 80.13(b), 80.17(e), 80.19(b), 80.19(d), 80.19(e), 80.21, and 206.434.


1. Collection of Information

 Part 201 under OMB Number 1660-0062, State/Local/Tribal Hazard Mitigation Plans--
under section 322 of Stafford Act clarifies the State, Tribal, and local mitigation
planning requirements. Before this interim rule goes into effect, applicants for
FMA funds are required to develop a plan that specifically addresses flood mitiga-
tion planning requirements under part 78. This plan is collected under OMB collec-
tion number 1660-0075; Flood Mitigation Assistance-- Flood Mitigation Plan. Appli-
cants for all other types of mitigation grant funding are required to develop a
plan that addresses all hazards for which the applicant seeks funds under part 201,
which may also include floods. This plan is collected under OMB collection number
1660-0062; State/Local/Tribal Hazard Mitigation Plans--under section 322 of Staf-
ford Act. With the revisions established by this interim rule, the all hazards plan
developed under part 201 will meet the requirements for all mitigation grants in-
cluding FMA, which means that applicants will no longer be required to submit the
flood specific plans under part 78. Because of this change FEMA is discontinuing
OMB collection number 1660-0075, and revising OMB collection number 1660-0062.

 Due to this change in the mitigation grant process, there are outstanding flood
mitigation grants that have been issued with the requirement that the grantee sub-
mit a flood mitigation plan pursuant to the requirements of part 78. Although FEMA
will no longer require the submission of flood mitigation plans for those funds
awarded during application periods that open on or after the effective date of this
rule, FEMA will continue to accept flood mitigation plans until the end of a
grantee's current period of performance to include any extensions granted pursuant
to § 78.9 and FEMA's Financial and Acquisition Management Division's Extension Pol-
icy.

 Title: State/Local/Tribal Hazard Mitigation Plans-Section 322 of the Disaster
Mitigation Act of 2000.

 OMB Number: 1660-0062.

 Abstract: The purpose of the State/Local/Tribal Hazard Mitigation Plan require-
ments is to outline the strategy by which State, tribal and local governments use
to demonstrate the goals, priorities, and commitment to reduce risks from natural
hazards and serves as a guide for State and local decision makers as they commit
resources to reducing the effects of natural hazards.

 Affected Public: State, Local or Tribal Government.

 Number of Respondents: 56.

 Estimated Time per Respondent: 2,408.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

Estimated Total Annual Burden Hours: 768,320.

Frequency of Response: On Occasion.

The authorized SRL grant program will be implemented under the new part 79. How-
ever, the administration of FMA funds for which application period opens prior to
publication of this rule will be subject to part 78, while the new part 79 is used
to administer new FMA grants.

2. Collection of Information

The SRL grant program was authorized by Congress in 2004 and expires on September
30, 2009. The SRL grant program focuses on a subset of all repetitive flood loss
properties, residential properties with a high frequency of losses or a high value
of claims, defined as severe repetitive loss properties. This is a non-disaster
grant program that is authorized annually and not as a result of a Presidential
Disaster Declaration. The information collection activity under the approved OMB
information collection 1660-0025, FEMA Grant Administrative Forms is a paper-based
collection used by States and local government to obtain grant information and is
being amended to include the following burden hours for the SRL grant program.

Title: FEMA Grant Administration Forms.

OMB Number: 1660-0025.

Abstract: This collection of information focuses on the standardization and con-
sistent use of standard and FEMA forms associated with grantees request for disas-
ter and non-disaster federal assistance, submission of financial and administrative
reporting and recordkeeping. The use of the forms will minimize burden on the re-
spondents and enable FEMA to continue to improve in its grants administration prac-
tices.

Affected Public: State, Local or Tribal Government.

Estimated Total Annual Burden Hours:

[Note:  The following TABLE/FORM is too wide to be displayed on one screen.
You must print it for a meaningful review of its contents.  The table has been
divided into multiple pieces with each piece containing information to help you
assemble a printout of the table.  The information for each piece includes: (1)
a three line message preceding the tabular data showing by line # and
character # the position of the upper left-hand corner of the piece and the
position of the piece within the entire table; and (2) a numeric scale
following the tabular data displaying the character positions.]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                   Page 28
(Publication page references are not available for this document.)

```
*********************************************************************
******** This is piece 1. -- It begins at character 1 of table line 1. ********
*********************************************************************
```

Disaster Programs

| Data collections activity/instruments | Number of respondents (A) | Frequency of responses (B) | Hour burden per response (C) | Annual responses (D) = (A x B) |
|---|---|---|---|---|
| PA: | | | | |
| SF 424 ...................... 56 | | 1 | 45 minutes .......... 56 | |
| FF 20-20 ..................... 56 | | 1 | 9.7 hours ........... 56 | |
| FF 20-16, A, B, C .......... 56 | | 1 | 1.7 hours ........... 56 | |
| FF 20-10 ..................... 56 | | 4 | 1 hour .............. 224 | |
| SF-LLL ....................... 56 | | 1 | 10 minutes .......... 56 | |
| Subtotal ................... 56 | | .......... | 13.3 hours ......... 392 | |
| SCC: | | | | |
| SF 424 ...................... 17 | | 1 | 45 minutes .......... 17 | |
| SF 20-20 ..................... 17 | | 1 | 9.7 hours ........... 17 | |
| FF 20-16, A, B, C .......... 17 | | 1 | 1.7 hours ........... 17 | |
| FF 20-10 (SF 269) .......... 17 | | 4 | 1 hour .............. 68 | |
| SF-LLL ....................... 17 | | 1 | 10 minutes .......... 17 | |
| Subtotal ................... 17 | | .......... | 13.3 hours ......... 119 | |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01
**(Publication page references are not available for this document.)**

```
ONA:
   SF 424 ..................... 40          1  45 minutes .......... 40

   FF 20-20 ................... 40          1  9.7 hours ........... 40

   FF 20-16, A, B, C .......... 40          1  1.7 hours ........... 40

   FF 20-10 ................... 40          4  1 hour .............. 160

   SF-LLL ..................... 40          1  10 minutes .......... 40
                                 ---------------------------------------------
   Subtotal ................. 40  .......... 13.3 hours ........ 320


HMGP:
   SF 424 ..................... 52          1  45 minutes .......... 52

   FF 20-20 ................... 52         15  9.7 hours .......... 780

   FF 20-16, A, B, C .......... 52          1  1.7 hours ........... 52
   FF 20-10 ................... 52          4  1 hour .............. 208

   FF 20-17 ................... 52         15  17.2 hours ......... 780

   FF 20-18 ................... 52          6  4.2 hours .......... 312

   FF 20-19 ................... 52          6  5 minutes .......... 312

   SF-LLL ..................... 52          1  10 minutes .......... 52
                                 ---------------------------------------------
   Subtotal ................. 52  .......... 35 hours ........ 2,548


FMAGP:
   SF 424 ..................... 12          4  45 minutes .......... 48
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01
**(Publication page references are not available for this document.)**

```
FF 20-20 ..................... 36        4  9.7 hours .......... 144

FF 20-16, A, B, C ........... 36         4  1.7 hours .......... 144

FF 20-15 ..................... 36        4  17.2 hours .......... 144

FF 20-10 ..................... 12        4  1 hour .............. 48

FF 20-18 ..................... 36        4  4.2 hours .......... 144

FF 20-19 ..................... 36        4  5 minutes .......... 144

SF-LLL ....................... 36        4  10 minutes ......... 144

                            -------------------------------------------
    Subtotal ................. 36   .........   35 hours ......... 960




                            -------------------------------------------
    Disaster Grants
    Total ...................... 56   .........   110 hours ....... 3,800

--------------------------------------------------------------------------
1...+...10....+...20....+...30....+...40....+...50....+...60....+...70....+.
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01

**(Publication page references are not available for this document.)**

```
**************************************************************************
******* This is piece 2. -- It begins at character 77 of table line 1. *******
**************************************************************************
```

```
---------
 Total
 annual
 burden
 hours
 (C x D)

---------

 42
  hours.
 543
  hours
 95
  hours.
 224
  hours.
 9 hours.
---------
 57 Disa-
  ster
  Decla-
  ratio-
  ns x
  913
  hours
  = 52,-
  041.

 13
  hours.
 165
  hours.
 29
  hours.
 68
  hours.
 3 hours.
---------
 57 Disa-
  ster
  Decla-
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

ratio-
ns x
278
hours
= 15,-
846.

30
  hours.
388
  hours.
68
  hours.
160
  hours.
7 hours.
---------
57 Disa-
  ster
  Decla-
  ratio-
  ns x
  653
  hours
  = 37,-
  221.

39
  hours.
7,566.
  hours.
88hours.
208
  hours.
13,416
  hours.
1,310
  hours.
25
  hours.
9 hours.
---------
57 Disa-
  ster
  Decla-
  ratio-
  ns x
  22,661
  hours
  = 1,2-
  91,67-
  7.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                    Page 33
**(Publication page references are not available for this document.)**

```
 36
   hours.
1,397
   hours.
245
   hours.
2,477
   hours.
48
   hours.
605
   hours.
12
   hours.
24
   hours.
---------
94 Disa-
   ster
   Decla-
   ratio-
   ns x
   4,844
   hours
   = 455-
   ,336.
---------

 1,852,1-
   21
   hours.
---------
77......+
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                                    Page 34
**(Publication page references are not available for this document.)**

```
[Note:  The following TABLE/FORM is too wide to be displayed on one screen.
You must print it for a meaningful review of its contents.  The table has been
divided into multiple pieces with each piece containing information to help you
assemble a printout of the table.  The information for each piece includes: (1)
a three line message preceding the tabular data showing by line # and
character # the position of the upper left-hand corner of the piece and the
position of the piece within the entire table; and (2) a numeric scale
following the tabular data displaying the character positions.]
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                          Page 35
(Publication page references are not available for this document.)

```
*****************************************************************************
******** This is piece 1. -- It begins at character 1 of table line 1. ********
*****************************************************************************
```

                              Non-Disaster Programs

| Data collection activity/instruments | Number of respondents (A) | Frequency of responses (B) | Hour burden per response (C) |
|---|---|---|---|
| **US&R:** | | | |
| SF 424 ........................... 28 | | 1 | 45 minutes .... |
| FF 20-20 .......................... 28 | | 1 | 9.7 hours ..... |
| FF 20-16, A, B, C ................. 28 | | 1 | 1.7 hours ..... |
| FF 76-10A ......................... 28 | | 1 | 1.2 hours ..... |
| FF 20-10 .......................... 28 | | 2 | 1 hour ........ |
| SF 270 ............................ 28 | | 1 | 1 hour ........ |
| SF LLL ............................ 28 | | 1 | 10 minutes .... |
| Subtotal .......................... 28 | | .......... | 16 hours ..... |
| **CAP-SSSE:** | | | |
| SF 424 ........................... 56 | | 1 | 45 minutes .... |
| FF 20-20 .......................... 56 | | 1 | 9.7 hours ..... |
| FF 20-15 .......................... 56 | | 1 | 17.2 hours ... |
| FF 20-16, A, B, C ................. 56 | | 1 | 1.7 hours ..... |
| FF 76-10A ......................... 56 | | 1 | 1.2 hours ..... |
| FF 20-10 .......................... 56 | | 2 | 1 hour ........ |
| FF 20-18 .......................... 56 | | 1 | 4.2 hours ..... |
| FF 20-19 .......................... 56 | | 1 | 5 minutes ..... |
| SF LLL ............................ 56 | | 1 | 10 minutes .... |
| Subtotal .......................... 56 | | .......... | 36 hours ..... |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                                              Page 36
**(Publication page references are not available for this document.)**

```
CSEPP:
   SF 424 ............................ 10          1  45 minutes ....

   FF 20-20 .......................... 10          1  9.7 hours .....

   FF 20-10 .......................... 10          4  1 hour ........

   FF 20-16, A, B, C ................. 10          1  1.7 hour ......

   FF 76-10A ......................... 10          1  1.2 hour ......

   FF 20-18 .......................... 10          1  4.2 hours .....

   FF 20-19 .......................... 10          1  5 minutes .....

   SF LLL ............................ 10          1  10 minutes ....

                      ---------------------------------------------
      Subtotal ....................... 10  .......... 19 hours .....

NDSP:
   SF 424 ............................ 51          1  45 minutes ....

   FF 20-20 .......................... 51          1  9.7 hours .....

   FF 20-16, A, B, C ................. 51          1  1.7 hours .....

   FF 76-10A ......................... 51          1  1.2 hours .....

   FF 20-10 .......................... 51          4  1 hour ........

   SF 270 ............................ 51          1  1 hour ........

   SF LLL ............................ 51          1  10 minutes ....

                      ---------------------------------------------
      Subtotal ....................... 51  .......... 16 hours .....

ICE:
   FF 20-10 .......................... 17          4  1 hour ........

                      ---------------------------------------------
      Subtotal ....................... 17  .......... 1 hour ........

EqC:
   FF 20-10 ........................... 3          2  1 hour ........
                      ---------------------------------------------
      Subtotal ........................ 3  .......... 1 hour ........
AIDMATRIX:
   SF 424 ............................. 1          1  45 minutes ....

   FF 20-20 ........................... 1          1  9.7 hours .....
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                Page 37
(Publication page references are not available for this document.)

```
    FF 20-10 ........................... 1         4  1 hour ........

    FF 20-16 A, B, C ................... 1         1  1.7 hours .....

    SF LLL ............................. 1         1  10 minutes ....

                         -----------------------------------------
       Subtotal ........................ 1    ..........  13 hours .....
AHPP:
    SF 424 ............................. 4         1  45 minutes ....

    FF 20-20 ........................... 4         1  9.7 hours .....

    FF 20-10 ........................... 4         4  1 hour ........

    FF 20-16, A, B, C .................. 4         1  1.7 hours .....

    SF LLL ............................. 4         1  10 minutes ....

                         -----------------------------------------
       Subtotal ........................ 4    ..........  13 hours .....

CTP:
    SF 424 ............................. 20        1  45 minutes ....

    FF 20-20 ........................... 20        1  9.7 hours .....

    FF 20-15 ........................... 20        1  17.2 hours ....

    FF 20-16, A, B, C .................. 20        1  1.7 hours .....

    FF 20-10 ........................... 20        4  1 hour ........

    SF LLL ............................. 20        1  10 minutes ....

                         -----------------------------------------
       Subtotal ........................ 20   ..........  31 hours .....

MMMS:
    SF 424 ............................. 20        1  45 minutes ....

    FF 20-20 ........................... 20        1  9.7 hours .....

    FF 20-15 ........................... 20        1  17.2 hours ....

    FF 20-16, A, B, C .................. 20        1  1.7 hours .....

    FF 20-10 ........................... 20        2  1 hour ........

    SF LLL ............................. 20        1  10 minutes ....

                         -----------------------------------------
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

```
    Subtotal ......................... 20   ..........   31 hours .....
RFC:
    SF 424 ........................... 56          1  45 minutes ....

    FF 20-20 ......................... 56          1  9.7 hours .....

    FF 76-10A ........................ 56          1  1.2 hours .....

    FF 20-16, A, B, C ................ 56          1  1.7 hours .....

    FF 20-10 ......................... 56          4  1 hour ........

    FF 20-18 ......................... 56          1  4.2 hours .....

    FF-20-19 ......................... 56          1  5 minutes .....

    SF LLL ........................... 56          1  10 minutes ....

                     ----------------------------------------------
    Subtotal ......................... 56   ..........   19 hours .....

SRL:
    FF 424 ........................... 56          1  45 minutes ....

    FF 20-20 ......................... 56          1  9.7 hours .....

    FF 76-10A ........................ 56          1  1.2 hours .....

    FF20-16, A, B, C ................. 56          1  1.7 hours .....

    FF 20-10 ......................... 56          4  1 hour ........

    FF 20-18 ......................... 56          1  4.2 hours .....

    FF 20-19 ......................... 56          1  5 minutes .....
    SF LLL ........................... 56          1  10 minutes ....

                     ----------------------------------------------
    Subtotal ......................... 56   ..........   19 hours .....

FMA:
    SF 424 ........................... 56          3  45 minutes ....

    FF 20-20 ......................... 56          3  9.7 hours .....

    FF 20-16, A, B, C ................ 56          1  1.7 hours .....

    FF 76-10A ........................ 56          3  1.2 hours .....

    FF 20-10 ......................... 56          4  1 hour ........

    FF 20-18 ......................... 56          1  4.2 hours .....
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

```
  FF 20-19 ........................... 56          1  5 minutes .....

  SF LLL ............................. 56          1  10 minutes ....

                      ---------------------------------------------
    Subtotal ........................ 56 ...........  19 hours .....

  -------------------------------------------------------------------
  1...+...10....+...20....+...30....+...40....+...50....+...60....+...70.
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                        Page 40
**(Publication page references are not available for this document.)**

```
************************************************************************
****** This is piece 2. -- It begins at character 72 of table line 1. *******
************************************************************************
```

| Annual responses | Total burden hours |
|---|---|
| (D) = (A x B) | (C x D) |
| ........ 28 | 21 hours. |
| ........ 28 | 272 hours. |
| ........ 28 | 48 hours. |
| ........ 28 | 34 hours. |
| ........ 56 | 56 hours. |
| ........ 28 | 28 hours. |
| ........ 28 | 5 hours. |
| ........ 224 | 498 hours. |
| ........ 56 | 42 hours. |
| ........ 56 | 543 hours. |
| ........ 56 | 963 hours. |
| ........ 56 | 95 hours. |
| ........ 56 | 67 hours. |
| ........ 112 | 112 hours. |
| ........ 56 | 235 hours. |
| ........ 56 | 4 hours. |
| ........ 56 | 9 hours. |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

```
........ 560  2,070 ho
              urs .

......... 10  8.0
              hours.
......... 10  97.0
              hours.
......... 40  40.0
              hours.
......... 10  17.0
              hours.
......... 10  12.0
              hours.
......... 10  42.0
              hours.
......... 10  1.0
              hours.
......... 10  2.0
              hours.
----------------------
........ 120  219
              hours.

......... 51  38.0
              hours.
......... 51  495.0
              hours.
......... 51  87.0
              hours.
......... 51  61.0 hou
              rs.
........ 204  204.0
              hours.
......... 51  51.0
              hours.
......... 51  8.0
              hours.
----------------------
........ 510  944
              hours.

......... 68  68.0
              hours.
----------------------
......... 17  68
              hours.

.......... 6  6 hours.
----------------------
.......... 6  6 hours.

.......... 1  .75 min-
              utes.
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                          Page 42
(Publication page references are not available for this document.)

```
..........  1  9.7
               hours.
..........  4  4.0
               hours.
..........  1  1.7
               hours.
..........  1  .16 min-
               utes.
-----------------------
..........  8  16hours.

..........  4  3.0
               hours.
..........  4  39.0
               hours.
.........  16  16.0
               hours.
..........  4  6.8
               hours.
..........  4  .66
               hours.
-----------------------
.........  32  65
               hours.

.........  20  15.0
               hours.
.........  20  194.0
               hours.
.........  20  344.0
               hours.
.........  20  34.0
               hours.
.........  80  80.0
               hours.
.........  20  3.3
               hours.
-----------------------
........  180  670.3
               hours.

.........  20  15.0
               hours.
.........  20  194.0
               hours.
.........  20  344.0
               hours.
.........  20  34.0
               hours.
.........  40  40.0
               hours.
.........  20  3.0
               hours.
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

```
----------------------
........ 120  630
              hours.

......... 56  42.0
              hours.
......... 56  543.0
              hours.
......... 56  67.0
              hours.
......... 56  95.0
              hours.
........ 224  224.0
              hours.
......... 56  235.0
              hours.
......... 56  5.0
              hours.
......... 56  9.0
              hours.
----------------------
........ 616  1,220
              hours.

......... 56  42.0
              hours.
......... 56  543.0
              hours.
......... 56  67.0
              hours.
......... 56  95.0
              hours.
........ 224  224.0
              hours.
......... 56  235.0
              hours.
......... 56  5 hours.
......... 56  9.0
              hours.
----------------------
........ 616  1,220
              hours.

........ 168  126.0
              hours.
....... 1683  1630.0
              hours.
......... 56  95.0
              hours.
........ 168  202.0
              hours.
........ 224  224.0
              hours.
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01 Page 44
**(Publication page references are not available for this document.)**

```
......... 56  235.0
              hours.
......... 56  4.0
              hours.
......... 56  9.0
              hours.
---------------------
........ 952  2,525
              hours.
---------------------
72.....80....+...90...
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                                                                    Page 45
**(Publication page references are not available for this document.)**

```
[Note:  The following TABLE/FORM is too wide to be displayed on one screen.
You must print it for a meaningful review of its contents.  The table has been
divided into multiple pieces with each piece containing information to help you
assemble a printout of the table.  The information for each piece includes: (1)
a three line message preceding the tabular data showing by line # and
character # the position of the upper left-hand corner of the piece and the
position of the piece within the entire table; and (2) a numeric scale
following the tabular data displaying the character positions.]
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                    Page 46
**(Publication page references are not available for this document.)**

```
********************************************************************************
********* This is piece 1. -- It begins at character 1 of table line 1. ********
********************************************************************************
```

                              Non-Disaster Programs
------------------------------------------------------------------------

| Data collection activity/instruments | Number of respondents (A) | Frequency of responses (B) | Hour burden per response (C) |
|---|---|---|---|
| PDM: | | | |
| SF 424 ............................ 56 | | 2 | 45 minutes .... |
| FF 20-15 .......................... 56 | | 1 | 17.2 hours .... |
| FF 20-20 .......................... 56 | | 2 | 9.7 hours ..... |
| FF 76-10A ......................... 56 | | 2 | 1.2 hours ..... |
| FF 20-16, A, B, C ................. 56 | | 2 | 1.7 hours ..... |
| FF 20-10 .......................... 56 | | 8 | 1 hour ........ |
| FF 20-17 .......................... 56 | | 20 | 17.2 hours .... |
| FF 20-18 .......................... 56 | | 2 | 4.2 hours ..... |
| FF 20-19 .......................... 56 | | 2 | 5 minutes ..... |
| SF LLL ............................ 56 | | 2 | 10 minutes .... |
| Subtotal ......................... 56 | .......... | | 53 hours ..... |
| AFG*: | | | |
| SF 424 ........................ 4,246 | | 1 | 45 minutes .... |
| FF 20-20 ...................... 4,246 | | 2 | 9.7 hours ..... |
| FF 76-10A ..................... 4,246 | | 2 | 1.2 hours ..... |
| FF 20-16, A, B, C ............. 4,246 | | 1 | 1.7 hours ..... |
| FF 20-10 ...................... 4,246 | | 2 | 1 hour ........ |
| FF 20-17 ...................... 4,246 | | 1 | 17.2 hour .... |
| FF 20-18 ...................... 4,246 | | 1 | 4.2 hours ..... |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

```
   FF 20-19 ........................ 4,246         1  5 minutes .....

SF LLL ............................ 4,246         1  10 minutes ....

                                   ------------------------------------------
   Subtotal ...................... 4,246 ..........  36 hours .....
SAFER*:
   SF 424 ........................... 243           1  45 minutes ....

   FF 20-20 ......................... 243           2  9.7 hours .....

   FF 76-10A ........................ 243           2  1.2 hours .....

   FF 20-16, A, B, C ................ 243           1  1.7 hours .....

   FF 20-10 ......................... 243           4  1 hour ........
   FF 20-17 ......................... 243           1  17.2 hours ....

   FF 20-18 ......................... 243           1  4.2 hours .....

   FF 20-19 ......................... 243           1  5 minutes .....

   SF LLL ........................... 243           1  10 minutes ....


                                   ------------------------------------------
      Subtotal ...................... 243 ..........  36 hours .....
                                   ------------------------------------------
   Non-Disaster Grants
   Total ................. ............. ..........        359 .
                                   ------------------------------------------
      Grand Total ........ ............. ..........        469 .
-----------------------------------------------------------------------
1...+...10....+...20....+...30....+...40....+...50....+...60....+...70.
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

```
****************************************************************************
******* This is piece 2. -- It begins at character 72 of table line 1. ********
****************************************************************************
```

| Annual responses (D) = (A x B) | Total burden hours (C x D) |
|---|---|
| ........ 112 | 84 hours. |
| ......... 56 | 963.2 hours. |
| ........ 112 | 1,086.4 hours. |
| ........ 112 | 134.4 hours. |
| ........ 112 | 190.4 hours. |
| ........ 448 | 448 hours. |
| ...... 1,120 | 19,264 hours. |
| ........ 112 | 470.4 hours. |
| ........ 112 | 9.3 hours. |
| ........ 112 | 18.6 hours. |
| ...... 2,408 | 22,668.7 hours. |
| ...... 4,246 | 3,185.0 hours. |
| ...... 8,492 | 82,372.0 hours. |
| ...... 8,492 | 10,190.0 hours. |
| ...... 4,246 | 7,218.0 hours. |
| ...... 8,492 | 8,492.0 hours. |
| ...... 4,246 | 73,031.0 hours. |
| ...... 4,246 | 17,833.0 hours. |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                    Page 49
**(Publication page references are not available for this document.)**

```
......  4,246   340.0
                hours.
......  4,246   705.0hour-
                s.
-----------------------
.....  50,952   203,366
                hours.

........   243   182.0
                hours.
........   486   4,714.0
                hours.
........   486   583.0
                hours.
........   243   413.1
                hours.
........   972   972 hours.
........   243   4,179.6
                hours.
........   243   1,020.6
                hours.
........   243   20.2
                hours.
........   243   40.5
                hours.
-----------------------
......  3,402   12,125.7h-
                ours.
-----------------------

.....  55,378   248,312.
-----------------------
.....  59,178   2,100,433.
-----------------------
72.....80....+...90....+
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                                    Page 50
**(Publication page references are not available for this document.)**

```
****************************************************************************
******* This is piece 3. -- It begins at character 1 of table line 79. ********
****************************************************************************

FN* AFG and SAFER grants are awarded directly to individual Fire departments.
1...+...10....+...20....+...30....+...40....+...50....+...60....+...70....+....
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

3. Collection of Information

 The information collection activity under the approved OMB information collection
1660-0072, Mitigation Grant Program/e-Grants (previous named Flood Mitigation As-
sistance (e-Grants)) and Grant Supplemental Information is an electronic system
used to meet the intent of the eGovernment initiative. This collection does not su-
persede the paper-based collection for Grants (OMB No. 1660-0025). Applicants may
apply using the e-Grants (1660-0072) application accessible on the Internet at
https://portal.fema.gov. The OMB approved collection 1660-0072 have been combined
with OMB No. 1660-0071, Pre-Disaster Mitigation (PDM) Grant Program/e-Grants to
streamline and simplify documentation of the same information collected for all
mitigation e-Grants program. Because of this change OMB No. 1660-0071 has been dis-
continued as a separate collection. This collection also includes the authorized
SRL program.

 Title: Mitigation Grant Program/ e-Grants.

 OMB Number: 1660-0072.

 Abstract: The States will utilize the Mitigation Grant Program/e-Grants, automated
application to report to FEMA on a quarterly basis, certify how funding is being
used and to report on the progress of mitigation activities funded under grant
awards, made to grantees by FEMA who will use the system to review the grantees
quarterly reports to ensure that mitigation grant activities are progressing on
schedule and to track the expenditures of funds.

 Affected Public: State, Local or Tribal Government.

 Estimated Total Annual Burden Hours:


[Note:  The following TABLE/FORM is too wide to be displayed on one screen.
You must print it for a meaningful review of its contents.  The table has been
divided into multiple pieces with each piece containing information to help you
assemble a printout of the table.  The information for each piece includes: (1)
a three line message preceding the tabular data showing by line # and
character # the position of the upper left-hand corner of the piece and the
position of the piece within the entire table; and (2) a numeric scale
following the tabular data displaying the character positions.]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                    Page 52
**(Publication page references are not available for this document.)**

```
*************************************************************************
******** This is piece 1. -- It begins at character 1 of table line 1. ********
*************************************************************************
```

| Project/activity (survey, forms(s), focus group, etc.) | Number of respondents | Frequency of responses | Burden hours per respondent |
|---|---|---|---|
| FMA: | | | |
| Benefit-Cost Determination ................... | 56 | 2 | 5 |
| Environmental Review ............. | 56 | 2 | 7.5 |
| Project Narrative--Sub-grant Application ..................... | 56 | 4 | 12 |
| Subtotal FMA ................... 56 | .......... | | 24.5 |
| RFC: | | | |
| Benefit-Cost Determination ................... | 56 | 1 | 5 |
| Environmental Review ............. | 56 | 1 | 7.5 |
| Project Narrative--Sub-grant A pplication ..................... | 56 | 2 | 12 |
| Subtotal RFC ................... 56 | .......... | | 24.5 |
| PDM: | | | |
| Benefit-Cost Determination ................... | 56 | 20 | 5 |
| Environmental Review ............. | 56 | 20 | 7.5 |
| Project Narrative--Sub-grant Application (including PDM Evaluation Information Questions [FN5]) ........................ | 56 | 20 | 12 |
| Subtotal PDM ................... 56 | .......... | | 24.5 |
| SRL: | | | |
| Benefit-Cost Determination ................... | 56 | 7 | 5 |
| Environment Review .............. | 56 | 7 | 7.5 |
| Project Narrative--Sub-grant Application ..................... | 56 | 8 | 12 |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01
**(Publication page references are not available for this document.)**

```
   Subtotal SRL ................... 56  ..........       24.5
                                ---------------------------------------
    Total ......................... 56  ..........          98
-----------------------------------------------------------------------
1...+...10....+...20....+...30....+...40....+...50....+...60....+...7
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                    Page 54
(Publication page references are not available for this document.)

```
*************************************************************************
******* This is piece 2. -- It begins at character 70 of table line 1. *******
*************************************************************************
```

| Annual responses | Total annual burden hours |
|---|---|
| 112 | 560 |
| 112 | 840 |
| 224 | 2,688 |
| 448 | 4,088 |
| 56 | 280 |
| 56 | 420 |
| 112 | 1,344 |
| 224 | 2,084 |
| 1,120 | 5,600 |
| 1,120 | 8,400 |
| 1,120 | 13,440 |
| 3,360 | 27,440 |
| 392 | 1,960 |
| 392 | 2,940 |
| 448 | 5,376 |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                        Page 55
**(Publication page references are not available for this document.)**

```
---------------------
      1,232    10,276
---------------------
      5264     43,888
---------------------
70..+...80....+...90.
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                    Page 56
**(Publication page references are not available for this document.)**

4. Collection of Information

 The Property Acquisition and Relocation for Open Space (part 80) will govern prop-
erty acquisitions for the creation of open space under all of FEMA mitigation grant
programs authorized under both the Stafford Act and the National Flood **Insurance**
Act of 1968, as amended. Acquisition and relocation of property for open space use
is one of the most common mitigation activities, and is an eligible activity type
authorized for Federal grant funds under all of FEMA mitigation grant programs.
FEMA mitigation grant programs require all properties acquired with FEMA funds to
be deed restricted and maintained as open space in perpetuity. This ensures that no
future risks from hazards occur to life or structures on that property, and no fu-
ture disaster assistance or **insurance** payments are made as a result of damages to
that property. This new collection of information is necessary to establish uniform
requirements for State and local implementation of acquisition activities, and to
enforce open space maintenance and monitoring requirements for properties acquired
with FEMA mitigation grant funds. This interim rule includes a conforming amendment
to the HMGP to refer to the new part 80 for acquisition and relocation activities,
and deletes § 206.434(f).

 Title: Property Acquisition and Relocation for Open Space.

 Type of Information Collection: New Collection.

 OMB Number: 1660-New23.

 Form Numbers: None.

 Abstract: FEMA and State and local recipients of FEMA mitigation grant programs
will use the information collected under the Property Acquisition requirements to
implement acquisition activities under the terms of grant agreements for acquisi-
tion and relocation activities. FEMA and State/local grant recipients will also use
the information to monitor and enforce the open space requirements for all proper-
ties acquired with FEMA mitigation grants.

 Affected Public: State, local, or Indian tribal government and individuals or
households.

 Estimated Total Annual Burden Hours:

| Data collection activity | Number of respondents | Frequency responses of | Number of responses | Hour burden per response | Total burden hours |
| --- | --- | --- | --- | --- | --- |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                    Page 57
**(Publication page references are not available for this document.)**

```
--------------------------------------------------------------------------------
Voluntary
  Participation
    Statement ................... 56        40         1        2240      2440
Deed Restriction
    Requirements ............... 56        40         4        2240      8960
Monitoring and
  Reporting
    Requirements ............... 56         1         4          56       224
Transfer
  Certification ...  .............  ..........  ..........  ..........  .......
Enforcement Notices  .............  ..........  ..........  ..........  .......
                         -------------------------------------------------------
    Total ................... 56  ..........             9       4,536   11,424
--------------------------------------------------------------------------------
```

5. Collection of Information

 The appeals process in § 79.7(d) outlines the process by which any owner of a se-
vere repetitive loss property may appeal the decision of FEMA to increase the
chargeable **insurance** premium rate on property. The legislation that created the SRL
program provides that any owner of a severe repetitive loss property who refuses an
offer of mitigation may appeal the decision of FEMA to increase the chargeable **in-
surance** premium rate on that property. The process requires the owner to submit a
written appeal, including any supporting documentation for their appeal to FEMA
within 90 days of the notice of the **insurance** rate increase. This new collection of
information is necessary to ensure that the property owner is given opportunity to
provide additional documentation that support one of the six allowable bases for
appeal, outlined in the authorizing legislation, and implemented at § 79.7(d).

 Title: Severe Repetitive Loss (SRL) Appeals Process.

 Type of Information Collection: New Collection.

 OMB Number: 1660-New36.

 Form Numbers: None.

 Abstract: The SRL program provides property owners with the ability to appeal an
increase in their flood **insurance** premium rate if they refuse an offer of mitiga-
tion under this program. The property owner must submit information to FEMA to sup-
port their appeal.

 Affected Public: Federal Government, and individuals or households.

 Estimated Total Annual Burden Hours:

```
--------------------------------------------------------------------------------
```

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                          Page 58
**(Publication page references are not available for this document.)**

| Data collection activity | Number of respondents | Frequency of responses | Number of responses | Hour burden per response | Total burden hours |
|---|---|---|---|---|---|
| Appeal written request and supporting documentation .............. | 10 | 1 | 10 | 10 | 100 |
| Total .................... | 10 | .......... | 10 | 10 | 100 |

 Comments: Written comments are solicited to (a) evaluate whether the proposed data collection is necessary for the proper performance of the agency, including whether the information shall have practical utility; (b) evaluate the accuracy of the agency's estimate of the burden of the proposed information collection, including the validity of the methodology and assumptions used; (c) enhance the quality, utility, and clarity of the information to be collected; and (d) minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technology, e.g., permitting electronic submission of responses. FEMA will continue to accept comments from interested persons through December 31, 2007. Submit comments by one of the methods provided in the ADDRESSES section at the beginning of this rule.

 Requests for additional information regarding FEMA's Paperwork Reduction Act requirements or copies of the information collection should be made to Chief, Records Management and Privacy, FEMA, 500 C Street, SW., Room 609, Washington, DC 20472, facsimile number (202) 646-3347, or e-mail address FEMA-Information-Collections@dhs.gov.

*G. Executive Order 13132, Federalism*

 Executive Order 13132, Federalism, dated August 4, 1999, sets forth principles and criteria that agencies must adhere to in formulating and implementing policies that have federalism implications, that is, regulations that have substantial direct effects on the States, or on the distribution of power and responsibilities among the various levels of government. Federal agencies must closely examine the statutory authority supporting any action that would limit the policymaking discretion of the States, and to the extent practicable, must consult with State and local officials before implementing any such action.

 FEMA published a Federal Register notice on September 15, 2004, 69 FR 55642, to initiate consultation with State and local officials, as well as members of the public in the formulation of this rule. Interested parties initially had until November 30, 2004, to submit written comments in response to the notice. FEMA extended the deadline for comments until December 7, 2004, and received 23 written comments from States, communities, and associations.

 On November 17, 2004, as part of the consultation process, FEMA held a meeting in Washington DC with representative officials of State and local governments; organi-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

zations representing emergency management, floodplain management, and **insurance** professions; and other interested parties.

  Both the written comments received and the oral comments presented at the meeting addressed aspects of the SRL program, including the circumstances affecting severe repetitive loss property owners, the mitigation offer process, the effects of **insurance** premium increases on individuals who refuse mitigation offers, and the appeals process. In the context of preparing this rule, FEMA reviewed and addressed all of the comments received in response to the Federal Register notice including the oral presentations made on November 17, 2004.

  FEMA has reviewed this rule under Executive Order 13132 and has concluded that the rule, which implements statutory requirements for a new SRL program as well as a potential increase in the Federal share for the FMA program, simplifies the planning requirements, and reflects a statutorily mandated change to the HMGP allocation, does not have federalism implications as defined by the Executive Order. FEMA has determined that the rule does not significantly affect the rights, roles, and responsibilities of States, and involves no preemption of State law nor does it limit State policymaking discretion.

  FEMA will continue to evaluate the new SRL and FMA programs, as well as the planning requirements, and will work with interested parties as FEMA implements the requirements of 44 CFR parts 59, 61, 78, 79, 80, 201, and 206. In addition, FEMA actively encourages and solicits comments on this interim rule from interested parties, and FEMA will consider those comments in preparing the final rule.

*H. Executive Order 13175, Consultation and Coordination With Indian Tribal Governments*

  FEMA has reviewed this interim rule under Executive Order 13175. In reviewing the portion of the interim rule which streamlines the mitigation planning requirements affecting Indian tribal governments, FEMA finds that, while it does have "tribal implications" as defined in Executive Order 13175, it will not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

  FEMA has worked with Indian tribal governments while implementing its programs, and has modified its procedures to accommodate some of the issues relating to the tribal governments. This rule clarifies those procedures and streamlines the roles and responsibilities of Indian tribal governments in mitigation planning. In the February 26, 2002 interim rule, Indian tribal governments were given the option of preparing either a State-level Mitigation Plan, or a Local-level Mitigation Plan depending on whether or not they intended to apply directly to FEMA as a grantee, or whether they would apply through the State as a subgrantee. Neither of these options has sufficiently met the needs of the Indian tribal governments. The new interim rule establishes a specific planning requirement for Indian tribal governments that recognizes some of the unique aspects of these governments. The rule establishes requirements for Tribal Mitigation Plans for plans prepared and approved after December 3, 2007. The rule provides that plans prepared and approved under the preexisting rule, either under the State or local requirements, would also be

72 FR 61720-01                                                                 Page 60
**(Publication page references are not available for this document.)**

recognized as Tribal Mitigation Plans. These older plans, however, would be re-
quired to meet the revised criteria when the original plan approval expires. This
rule combines the appropriate aspects of State and local planning requirements into
one section for Indian tribal governments. Prior to the preparation of this rule,
FEMA discussed the planning requirements with many of the Indian tribal governments
as they were developing their own plans, or while attending tribal training
courses, and heard the concerns regarding the planning requirements.

  In conclusion, the interim rule does not impose substantial direct compliance
costs on Indian tribal governments, nor does it preempt tribal law, impair treaty
rights nor limit the self-governing powers of Indian tribal governments.

*I. Congressional Review of Agency Rulemaking*

  FEMA has sent this interim rule to the Congress and to the General Accountability
Office under the Congressional Review of Agency Rulemaking Act, (Congressional Re-
view Act), Public Law 104-121. This interim rule is not a "major rule" within the
meaning of the Congressional Review Act. It implements statutory requirements cre-
ating the SRL program and statutory amendments providing for an increased Federal
share for FMA projects affecting severe repetitive loss properties; streamlines and
makes consistent the planning requirements for FMA and Indian tribal governments;
and makes a technical update to reflect a statutory change in the HMGP allocation.

  The interim rule will not result in a major increase in costs or prices for con-
sumers, individual industries, Federal, State, or local government agencies, or
geographic regions. It will not have "significant adverse effects" on competition,
employment, investment, productivity, innovation, or on the ability of United
States-based enterprises to compete with foreign-based enterprises. The rule is not
an unfunded Federal mandate within the meaning of the Unfunded Mandates Reform Act
of 1995, Public Law 104-4, and any enforceable duties that FEMA imposes are a con-
dition of Federal assistance or a duty arising from participation in a voluntary
Federal program.

*J. Regulatory Flexibility Act*

  The Regulatory Flexibility Act ("RFA") mandates that an agency conduct a RFA
analysis when an agency is "required by section 553 * * * to publish general notice
of proposed rulemaking for any proposed rule * * * 5 U.S.C. 603(a). Accordingly,
RFA analysis is not required when a rule is exempt from notice and comment rulemak-
ing under 5 U.S.C. 553(b). DHS has determined that good cause exists under 5 U.S.C.
553(b)(B) to exempt this rule from the notice and comment requirements of 5 U.S.C.
553(b). Therefore no RFA analysis under 5 U.S.C. 603 is required for this rule.

*K. Executive Order 12630, Taking of Private Property*

  This rule will not affect a taking of private property or otherwise have taking
implications under Executive Order 12630, Governmental Actions and Interference
with Constitutionally Protected Property Rights. In fact, § 80.5(a) states that

[e]ligible acquisition projects are those where the property owner participates
voluntarily, and the grantee/subgrantee will not use its eminent domain authority

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

to acquire the property for the open space purposes should negotiations fail.

*L. Executive Order 12988, Civil Justice Reform*

 This rule meets applicable standards in sections 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform, to minimize litigation, eliminate ambiguity, and reduce burden.

List of Subjects

*44 CFR Part 59*

 Flood **insurance**, Reporting and recordkeeping requirements.

*44 CFR Part 61*

 Flood **insurance**, Reporting and recordkeeping requirements.

*44 CFR Parts 78 and 79*

 Flood **insurance**, Grant programs.

*44 CFR Part 80*

 Acquisition and relocation for open space.

*44 CFR Part 201*

 Administrative practice and procedure, Disaster assistance, Grant programs, Reporting and recordkeeping requirements.

*44 CFR Part 206*

 Administrative practice and procedure, Coastal zone, Community facilities, Disaster assistance, Fire prevention, Grant programs--housing and community development, Housing, **Insurance**, Intergovernmental relations, Loan programs-- housing and community development, Natural resources, Penalties, Reporting and recordkeeping requirements.

 For the reasons set forth in the preamble, the Federal Emergency Management Agency amends 44 CFR chapter I as set forth below:

PART 59--GENERAL PROVISIONS

 1. The authority citation for part 59 continues to read as follows:

 Authority: 42 U.S.C. 4001 et seq.; Reorganization Plan No. 3 of 1978, 43 FR 41943, 3 CFR, 1978 Comp., p. 329; E.O. 12127 of Mar. 31, 1979, 44 FR 19367, 3 CFR, 1979

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                            Page 62
**(Publication page references are not available for this document.)**


Comp., p. 376.


44 CFR § 59.1


2. Section 59.1 is amended by revising the definition of State as follows:


44 CFR § 59.1


§ 59.1 Definitions.


* * * * *
 State means any State of the United States, the District of Columbia, Puerto Rico,
the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern
Mariana Islands.

* * * * *


PART 61--**INSURANCE** COVERAGE AND RATES

3. The authority citation for part 61 continues to read as follows:

 Authority: 42 U.S.C. 4001 et seq.; Reorganization Plan No. 3 of 1978, 43 FR 41943,
3 CFR, 1978 Comp., p. 329; E.O. 12127 of Mar. 31, 1979, 44 FR 19367, 3 CFR, 1979
Comp., p. 376.


44 CFR § 61.9


4. In § 61.9 add paragraphs (d) and (e) as follows:


44 CFR § 61.9


§ 61.9 Establishment of chargeable rates.


* * * * *
 (d) Properties that meet the definition of Severe Repetitive Loss properties as
defined in § 79.2(g) of this subchapter, and who refuse an offer of mitigation pur-
suant to § 79.7 of this subchapter are not eligible for the rates identified in
paragraphs (a) through (c) of this section.

 (e) Properties leased from the Federal Government and located either on the river-
facing side of a dike, levee, or other riverine flood control structure, or seaward
of any seawall or other coastal flood control structure are not eligible for the
rates identified in paragraphs (a) through (c) of this section.


PART 78--FLOOD MITIGATION ASSISTANCE

5. The authority citation for part 78 is revised to read as follows:

 Authority: 6 U.S.C. 101; 42 U.S.C. 4001 et seq.; 42 U.S.C. 4104c, 4104d; Reor-
ganization Plan No. 3 of 1978, 43 FR 41943, 3 CFR, 1978 Comp., p. 329; E.O. 12127,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

44 FR 19367, 3 CFR, 1979 Comp., p. 376; E.O. 12148, 44 FR 43239, 3 CFR, 1979 Comp., p. 412; E.O. 13286, 68 FR 10619, 3 CFR, 2003 Comp., p. 166.

44 CFR § 78.1

6. Revise § 78.1(a) to read as follows:

44 CFR § 78.1

§ 78.1 Purpose.

(a) The purpose of this part is to prescribe actions, procedures, and requirements for administration of the Flood Mitigation Assistance (FMA) program, authorized by Sections 1366 and 1367 of the National Flood **Insurance** Act of 1968, 42 U.S.C. 4104c and 4104d. The rules in this part apply to the administration of funds awarded under the FMA program for which the application period opened prior to December 3, 2007. On or after that date, the administration of funds awarded under FMA program shall be subject to the rules in part 79 of this subchapter.

* * * * *
7. Remove the undesignated center heading FEDERAL CRIME **INSURANCE** PROGRAM which precedes RESERVED PARTS 80-149.

8. Add part 79 to read as follows:

PART 79--FLOOD MITIGATION GRANTS

Sec.

79.1 Purpose.

79.2 Definitions.

79.3 Responsibilities.

79.4 Availability of funding.

79.5 Application process.

79.6 Eligibility.

79.7 Offers and appeals under the SRL program.

79.8 Allowable costs.

79.9 Grant administration.

Authority: 6 U.S.C. 101; 42 U.S.C. 4001 et seq.; 42 U.S.C. 4104c, 4104d; Reorganization Plan No. 3 of 1978, 43 FR 41943, 3 CFR, 1978 Comp., p. 329; E.O. 12127,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                    Page 64
**(Publication page references are not available for this document.)**


44 FR 19367, 3 CFR, 1979 Comp., p. 376; E.O. 12148, 44 FR 43239, 3 CFR, 1979 Comp., p. 412; E.O. 13286, 68 FR 10619, 3 CFR, 2003 Comp., p. 166.

                          44 CFR § 79.1

§ 79.1 Purpose.

  (a) The purpose of this part is to prescribe actions, procedures, and requirements for administration of the hazard mitigation grant programs made available under the National Flood **Insurance** Act of 1968, as amended, and the Flood Disaster Protection Act of 1973, as amended, 42 U.S.C. 4001 et seq. The Severe Repetitive Loss (SRL) and Flood Mitigation Assistance (FMA) grant programs mitigate losses from floods, minimizing impacts to the National Flood **Insurance** Fund (NFIF). The rules in this part apply to the administration of funds under the SRL and FMA programs for which the application period opens on or after December 3, 2007. Prior to this date, the administration of funds under the FMA program shall be subject to the rules in part 78 of this subchapter.

  (b) The purpose of the SRL program is to:

  (1) Assist State and local governments in funding actions that reduce or eliminate the risk of flood damage to residential properties insured under the National Flood **Insurance** Program (NFIP) that meet the definition of severe repetitive loss property;

  (2) Reduce the need to increase flood **insurance** premiums of NFIP policyholders that would otherwise be required to pay for potential future repetitive claims associated with severe repetitive loss properties; and

  (3) Reduce loss of life, property damage, outlays for the NFIF, and Federal disaster assistance by reducing or eliminating the risk of flood damage to those insured properties that have historically experienced the most severe flood losses.

  (c) The purpose of the FMA program is to assist State and local governments in funding cost-effective actions that reduce or eliminate the risk of flood damage to buildings, manufactured homes, and other structures insured under the NFIP.

                          44 CFR § 79.2

§ 79.2 Definitions.

  (a) Except as otherwise provided in this part, the definitions set forth in section 59.1 of this subchapter are applicable to this part.

  (b) Applicant is the State or Indian tribal government applying to FEMA for a grant, and which will be accountable for the use of the funds.

  (c) Community means:

  (1) A political subdivision, including any Indian tribe, authorized tribal organi-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

zation, Alaskan native village or authorized native organization, that has zoning and building code jurisdiction over a particular area having special flood hazards, and is participating in the NFIP; or

  (2) A political subdivision of a State, or other authority that is designated by a political subdivision to develop and administer a mitigation plan.

  (d) Grantee means the State or Indian tribal government to which FEMA awards a grant and which is accountable for the use of the funds provided. The grantee is the entire legal entity, even if only a particular component of the entity is designated in the grant award document.

  (e) Market Value is generally defined as the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of the valuation, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the valuation.

  (f) Multifamily Property means a property consisting of 5 or more residences.

  (g) Severe Repetitive Loss Properties are defined as single or multifamily residential properties that are covered under an NFIP flood **insurance** policy and:

  (1) That have incurred flood-related damage for which 4 or more separate claims payments have been made, with the amount of each claim (including building and contents payments) exceeding $5,000, and with the cumulative amount of such claims payments exceeding $20,000; or

  (2) For which at least 2 separate claims payments (building payments only) have been made under such coverage, with cumulative amount of such claims exceeding the market value of the building.

  (3) In both instances, at least 2 of the claims must be within 10 years of each other, and claims made within 10 days of each other will be counted as 1 claim.

  (h) Subapplicant means a State agency, community, or Indian tribal government submitting an application for planning or project activity to the applicant for assistance under the FMA or SRL programs. Upon grant award, the subapplicant is referred to as the subgrantee.

  (i) Subgrant means an award of financial assistance made under a grantee to an eligible subgrantee.

  (j) Subgrantee means the State agency, community, or Indian tribal government or other legal entity to which a subgrant is awarded and which is accountable to the grantee for the use of the funds provided.

  (k) Administrator means the head of the Federal Emergency Management Agency, or

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                    Page 66
**(Publication page references are not available for this document.)**

his/her designated representative, appointed under section 503 of the Post-Katrina Emergency Management Reform Act of 2006 (Pub. L. 109-295). The term also refers to the Director as discussed in part 2 of this chapter.

  (l) Regional Administrator means the head of a Federal Emergency Management Agency regional office, or his/her designated representative, appointed under section 507 of the Post-Katrina Emergency Management Reform Act of 2006 (Pub. L. 109-295). The term also refers to Regional Directors as discussed in part 2 of this chapter.

44 CFR § 79.3

§ 79.3 Responsibilities.

  (a) Federal Emergency Management Agency (FEMA). Administer and provide oversight to all FEMA-related hazard mitigation programs and grants, including:

  (1) Issue program implementation procedures, as necessary, which will include information on availability of funding;

  (2) Allocate funds to States for the FMA and for the SRL programs;

  (3) Award all grants to the grantee after evaluating subgrant applications for eligibility and ensuring compliance with applicable Federal laws, giving priority to such properties, or to the subset of such properties, as the Administrator may determine are in the best interest of the NFIF;

  (4) Provide technical assistance and training to State, local and Indian tribal governments regarding the mitigation and grants management process;

  (5) Review and approve State, Indian tribal, and local mitigation plans in accordance with part 201 of this chapter;

  (6) Comply with applicable Federal statutory, regulatory, and Executive Order requirements related to environmental and historic preservation compliance, including reviewing and supplementing, if necessary, the environmental analyses conducted by the State and subgrantee in accordance with part 10 of this chapter;

  (7) Establish and maintain an updated list of SRL properties and make such information available to States and communities; and

  (8) Notify owners of SRL properties that their properties meet the definition of a severe repetitive loss property and provide a summary of the opportunities and implications of being identified as such.

  (b) State. The State will serve as the applicant and grantee through a single Point of Contact (POC) for the FMA and SRL programs. The POC is a State agency that must have working knowledge of NFIP goals, requirements, and processes and ensure that the programs are coordinated with other mitigation activities at the State level. States will:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                                Page 67
(Publication page references are not available for this document.)

(1) Have a FEMA approved Mitigation Plan in accordance with part 201 of this chapter;

(2) Review and submit local mitigation plans to the FEMA Regional Administrator for final review and approval;

(3) Provide technical assistance and training to communities on mitigation planning, mitigation project activities, developing subgrant applications, and implementing approved subgrants;

(4) Prioritize and recommend subgrant applications to be approved by FEMA, based on the State Mitigation Plan, other State evaluation criteria and the eligibility criteria described in § 79.6;

(5) Award FEMA-approved subgrants; and

(6) Comply with program requirements under this part, grant management requirements identified under part 13 of this chapter, the grant agreement articles, and other applicable Federal, State, tribal and local laws and regulations.

(c) Indian tribal governments. The Indian tribal government will coordinate all tribal activities relating to hazard evaluation and mitigation including:

(1) Have a FEMA approved Tribal Mitigation Plan in accordance with § 201.7 of this chapter;

(2) A Federally Recognized Indian tribal government as defined by the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. 479a, applying directly to FEMA for mitigation grant funding will assume the responsibilities of the "State" as the term is used in this part, as applicant or grantee, described in paragraphs (b)(3) through (6) of this section; and

(3) A Federally Recognized Indian tribal government as defined by the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. 479a, applying through the State, will assume the responsibilities of the community (as the subapplicant or subgrantee) described in paragraphs (d)(2) through (4) of this section.

(d) Community. The community (referred to as both subapplicant and subgrantee) will:

(1) Prepare and submit a FEMA-approved Local Mitigation Plan, consistent with the requirements of part 201 of this chapter;

(2) Complete and submit subgrant applications to the State POC for FMA planning, project and management cost subgrants, and for SRL project and management cost subgrants;

(3) Implement all approved subgrants; notifying each holder of a recorded interest in severe repetitive loss properties when an offer of mitigation assistance has been made under the SRL program, and when such offer has been refused; and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01
**(Publication page references are not available for this document.)**

(4) Comply with program requirements under this part, grant management require-
ments identified under part 13 of this chapter, the grant agreement articles, and
other applicable Federal, State, tribal and local laws and regulations.

44 CFR § 79.4

§ 79.4 Availability of funding.

(a) Allocation. (1) For the amount made available for the SRL program, the Admin-
istrator will allocate the available funds to States each fiscal year based upon
the percentage of the total number of severe repetitive loss properties located
within that State. Ten percent of the total funds made available in any fiscal year
will be made available to States and Indian tribal applicants that have at least 1
SRL property and that receive little or no allocation.

(2) For the amount made available for the FMA program, the Administrator will al-
locate the available funds each fiscal year. Funds will be distributed based upon
the number of NFIP policies, repetitive loss structures, and any other such crite-
ria as the Administrator may determine are in the best interests of the NFIF.

(i) A maximum of 7.5 percent of the amount made available in any fiscal year may
be allocated for FMA planning grants nationally. A planning grant will not be
awarded to a State or community more than once every 5 years, and an individual
planning grant will not exceed $150,000 to any State agency applicant, or $50,000
to any community subapplicant. The total planning grant made in any fiscal year to
any State, including all communities located in the State, will not exceed
$300,000.

(ii) The total amount of FMA project grant funds provided during any 5-year period
will not exceed $10,000,000 to any State agency(s) or $3,300,000 to any community.
The total amount of project grant funds provided to any State, including all commu-
nities located in the State will not exceed $20,000,000 during any 5-year period.
The Administrator may waive the limits of this subsection for any 5-year period
when a major disaster or emergency is declared pursuant to the Robert T. Stafford
Disaster Relief and Emergency Assistance Act for flood conditions.

(b) Redistribution. Funds allocated to States who choose not to participate in ei-
ther the FMA or SRL program in any given year will be reallocated to participating
States and Indian tribal applicants. Any funds allocated to a State, and the commu-
nities within the State, which have not been obligated within the timeframes estab-
lished by the Administrator, shall be redistributed by the Administrator to other
States and communities to carry out eligible activities in accordance with this
part.

(c) Cost share. All mitigation activities approved under the State's grant will be
subject to the following cost-share provisions:

(1) FEMA may contribute up to 75 percent of the eligible cost of activities for
grants approved for funding; or

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                    Page 69
**(Publication page references are not available for this document.)**

 (2) FEMA may contribute up to 90 percent of the cost of the eligible activities
for each severe repetitive loss property for which grant amounts are provided if
the State has an approved State Mitigation Plan meeting the repetitive loss re-
quirements identified in § 201.4(c)(3)(v) of this chapter at the time the project
application is submitted;

 (3) For the FMA program only, of the non-Federal contribution, not more than one
half will be provided from in-kind contributions.

44 CFR § 79.5

§ 79.5 Application process.

 (a) Applicant or grantee. (1) States will be notified of the amount allocated to
them for the SRL and FMA programs each fiscal year, along with the application
timeframes.

 (2) The State will be responsible for soliciting applications from eligible commu-
nities, or subapplicants, and for reviewing and prioritizing applications prior to
forwarding them to FEMA for review and award.

 (3) Participation in these flood mitigation grant programs is voluntary, and
States may elect not to participate in either the SRL or FMA program in any fiscal
year without compromising their eligibility in future years.

 (4) Indian tribal governments interested in applying directly to FEMA for either
the FMA or SRL program grants should contact the appropriate FEMA Regional Adminis-
trator for application information.

 (b) Subapplicant or subgrantee. Participation in the SRL and the FMA program is
voluntary, and communities may elect not to apply. Communities or other subappli-
cants who choose to apply must develop applications within the timeframes and re-
quirements established by FEMA and must submit applications to the State.

44 CFR § 79.6

§ 79.6 Eligibility.

 (a) Eligible applicants and subapplicants. (1) States, Indian tribal governments,
and communities participating in the NFIP may apply for FMA planning and project
grants and associated management costs.

 (2) States, Indian tribal governments, and communities participating in the NFIP
may apply for SRL project grants and associated management costs.

 (3) Communities withdrawn, suspended, or not participating under part 60 of this
subchapter of the NFIP are not eligible for either the FMA or SRL programs.

 (b) Plan requirement. (1) States must have an approved State Mitigation Plan meet-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

ing the requirements of §§ 201.4 or 201.5 of this chapter in order to apply for grants through the FMA or SRL programs. Indian tribal governments must have an approved plan meeting the requirements of part 201 of this chapter at the time of application.

  (2) In order to be eligible for FMA and SRL project grants, subapplicants must have an approved mitigation plan at the time of application in accordance with part 201 of this chapter that, at a minimum, addresses flood hazards.

  (c) Eligible activities. (1) Planning. FMA planning grants may be used to develop or update State, Indian tribal and/or local mitigation plans which meet the planning criteria outlined in part 201 of this chapter. FMA planning grants are limited to those activities necessary to develop or update the flood portion of any mitigation plan. Planning grants are not eligible for funding under the SRL program.

  (2) Projects. Projects funded under the SRL program are limited to those activities that specifically reduce or eliminate flood damages to severe repetitive loss properties. Projects funded under the FMA program are limited to activities that reduce flood damages to properties insured under the NFIP. For either program, applications involving any activities for which implementation has already been initiated or completed are not eligible for funding, and will not be considered. Eligible activities are:

  (i) Acquisition of real property from property owners, and demolition or relocation of buildings to convert the property to open space use in perpetuity, in accordance with part 80 of this subchapter;

  (ii) Demolition or relocation of structures to areas outside of the floodplain;

  (iii) Elevation of existing structures to at least base flood levels or higher, if required by FEMA or if required by any State or local ordinance, and in accordance with criteria established by the Administrator;

  (iv) Floodproofing of existing non-residential structures in accordance with the requirements of the NFIP or higher standards if required by FEMA or if required by any State or local ordinance, and in accordance with criteria established by the Administrator;

  (v) Floodproofing of historic structures as defined in § 59.1 of this subchapter;

  (vi) For SRL only, demolition and rebuilding of properties to at least base flood levels or higher, if required by FEMA or if required by any State or local ordinance, and in accordance with criteria established by the Administrator; and

  (vii) Minor physical localized flood reduction measures that lessen the frequency or severity of flooding and decrease predicted flood damages, and that do not duplicate the flood prevention activities of other Federal agencies. Major flood control projects such as dikes, levees, floodwalls, seawalls, groins, jetties, dams and large-scale waterway channelization projects are not eligible.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01
**(Publication page references are not available for this document.)**


(d) Minimum project criteria. In addition to being an eligible project type, mitigation grant projects must also:

(1) Be in conformance with mitigation plans approved under part 201 of this chapter for the State and community where the project is located;

(2) Be in conformance with part 9 of this chapter, Floodplain management and protection of wetlands, part 10 of this chapter, Environmental considerations, § 60.3 of this subchapter, Flood plain management criteria for flood-prone areas, and other applicable Federal, State, tribal, and local laws and regulations;

(3) Be technically feasible;

(4) Solve a problem independently, or constitute a functional portion of a long-term solution where there is assurance that the project as a whole will be completed. This assurance will include documentation identifying the remaining funds necessary to complete the project, and the timeframe for completing the project;

(5) Be cost-effective and reduce the risk of future flood damage;

(6) Consider long-term changes to the areas and entities it protects, and have manageable future maintenance and modification requirements. The subgrantee is responsible for the continued maintenance needed to preserve the hazard mitigation benefits of these measures; and

(7) Not duplicate benefits available from another source for the same purpose or assistance that another Federal agency or program has more primary authority to provide.

44 CFR § 79.7

§ 79.7 Offers and appeals under the SRL program.

(a) Consultation. States and communities shall consult, to the extent practicable, and in accordance with criteria determined by the Administrator, with owners of the severe repetitive loss properties to select the most appropriate eligible mitigation activity. These consultations shall be initiated in the early stages of the project development, and shall continue throughout the process. After FEMA awards the project grant, the subgrantee shall continue to consult with the property owners to determine the specific conditions of the offer.

(b) Mitigation offer. After FEMA awards the grant and the subgrantee completes final consultations with the property owners, the subgrantee shall develop and present official offers to the property owners participating in the mitigation activities.

(1) The offer shall include all pertinent information regarding the mitigation activity, including a detailed description of the activity (e.g. property acquisition, elevation), the responsibilities of and benefits to the property owner, a summary of the consultation process, timeframes, and the consequences of refusing

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                    Page 72
(Publication page references are not available for this document.)

such offer. For open space acquisitions, it will also include the market value of
the property, the basis for the purchase offer, and the final offer amount. The of-
fer will also clearly state that the property owner's participation in the SRL pro-
gram is voluntary.

  (2) The subgrantee will send the written offer to the property owner's current
mailing address as a certified letter, along with a copy to the appropriate FEMA
Regional Administrator. In addition, the subgrantee will notify each holder of a
recorded interest on the property when such offer is extended, along with the iden-
tification of the mitigation assistance being offered.

  (3) The property owner will have 45 days from the date of the letter to accept or
refuse the offer of mitigation assistance in writing. Failure to respond in writing
within this time period will be deemed a refusal of the offer.

  (c) **Insurance** increases due to refusal of offer. In any case in which the property
owner refuses an offer of mitigation assistance made through the SRL program, the
Administrator shall provide written notice that the chargeable **insurance** rates with
respect to the property will increase effective on the next renewal of the policy.

  (1) The chargeable **insurance** premium rate shall be increased to the amount equal
to 150 percent of the chargeable rate for the property at the time that the offer
was made, as adjusted by any other premium adjustments otherwise applicable to the
property. Each time there is another claim payment in excess of $1,500, the charge-
able premium rate for that property shall be the amount equal to 150 percent over
the chargeable rate at the time of every such claim, as adjusted by any other pre-
mium adjustments otherwise applicable to the property. The increases shall end when
the actuarial rate is reached.

  (2) Upon each renewal or modification of the flood **insurance** coverage, the prop-
erty owner will be able to accept the original mitigation offer, if the community,
through the State, forwards the request to FEMA, and if sufficient funds are avail-
able.

  (d) Appeals of **insurance** rate increases. Any owner of a severe repetitive loss
property may appeal the decision to increase the chargeable **insurance** premium rate
as described in paragraph (c) of this section by submitting a written appeal, in-
cluding supporting documentation that is postmarked or delivered to the appropriate
FEMA Regional Administrator within 90 days of the date of the notice of the **insur-
ance** increase. The increase in the amount of chargeable premium rate for flood **in-
surance** coverage for the property will be suspended pending the outcome of the ap-
peal.

  (1) Appeals must be based upon one or more of the following grounds. The property
owner must include documentation to support each ground serving as a basis for the
appeal:

  (i) The offered mitigation activity is an acquisition and the property owner would
be unable to purchase a replacement of the primary residence that is of comparable
value and that is functionally equivalent. The property owner must document the ac-
tions taken to locate such replacement dwelling and demonstrate that no such dwell-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

ing is available.

(ii)(A) The amount of Federal funds offered for a mitigation activity, when com-
bined with funds from the required non-Federal sources, would not cover the actual
eligible costs of the mitigation activity contained in the mitigation offer, based
on independent information. In the case of an acquisition, the purchase offer is
not an accurate estimation of the market value of the property, based on independ-
ent information.

(B) For a mitigation activity other than acquisition, the property owner must sub-
mit independent estimates from professional engineers or registered architects to
support this claim. For an acquisition, the property owner must submit an appraisal
from a qualified appraiser to support this claim, and valuations will be considered
by a review appraiser.

(iii) The offered mitigation activity would diminish the integrity of a historic
district, site, building, or object's significant historic characteristics to the
extent where the historic resource would lose its status as listed or eligible for
inclusion on the National Register of Historic Places. The property owner must sub-
mit appropriate documentation from the State Historic Preservation Officer/Tribal
Historic Preservation Officer to support this claim.

(iv) For a multifamily property: Each of the flood **insurance** claims payments that
served as the basis for its designation as a severe repetitive loss property must
have resulted directly from the actions of a third party in violation of Federal,
State, or local law, ordinance, or regulation. The property owner(s) must submit
appropriate evidence, documentation, or data to support this claim.

(v) The property owner relied upon FEMA Flood **Insurance** Rate Maps (FIRMs) that
were current at the time the property was purchased, and the effective FIRM and as-
sociated Flood **Insurance** Study (FIS) did not indicate that the property was located
in an area having special flood hazards. The property owner must produce the dated
FIRM and FIS in effect at the time the property was purchased to support this
claim.

(vi) An alternative mitigation activity would be at least as cost effective as the
offered mitigation activity. The property owner must submit documentation of the
costs for a technically feasible and eligible alternative mitigation activity based
on estimates from qualified appraisers, professional engineers, or registered ar-
chitects, and information and documentation demonstrating the cost effectiveness
using a FEMA approved methodology to support this claim.

(2) The FEMA Regional Administrator will conduct an initial review of each appeal
that is filed on a timely basis to determine if the appeal complies with this sec-
tion and includes sufficient documentation to be evaluated. The Regional Adminis-
trator may reject an appeal on initial review if it is made on a basis other than
those listed in paragraph (d)(1) of this section; if the property owner does not
provide sufficient documentation, including, if applicable, supplemental informa-
tion requested by the Regional Administrator by the deadline established by the Re-
gional Administrator, which shall not exceed the timeframe described in paragraph
(d) of this section; or if the appeal otherwise fails to comply with this section.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

(3) If, upon initial review, the Regional Administrator determines that the basis for the offered mitigation activity was erroneous on its face and the appeal can be resolved in favor of the property owner, the appeal will be closed and no **insurance** increase will apply to the property. All other cases will be referred to the Administrator for assignment to an independent third party for review. The independent third party shall make a final determination on each appeal within 90 days of the date on which FEMA receives the appeal. As a low cost option, the property owner may request that the Administrator substitute a reviewer from FEMA's Alternative Dispute Resolution Office for the independent third party.

(4) A property owner who brings an appeal will be responsible for paying his/her attorneys' fees and costs to gather the necessary documentation and data to demonstrate the ground(s) for the appeal. Attorneys' fees and costs cannot be awarded by the independent third party.

(5) If the property owner prevails on appeal, the independent third party shall require the Administrator to charge the risk premium rate for flood **insurance** coverage of the property at the amount paid prior to the mitigation offer, as adjusted by any other premium adjustments otherwise applicable to the property. If the independent third party hearing the appeal is compensated for such service, the NFIF shall bear the costs of such compensation.

(6) If the property owner loses the appeal, the Administrator shall promptly increase the chargeable risk premium rate for flood **insurance** coverage of the property to the amount established pursuant to paragraph (c) of this section, and shall collect from the property owner the amount necessary to cover the stay of the applicability of such increased rates while the appeal was pending. If FEMA does not receive the additional premium by the date it is due, the amount of coverage will be reduced to match the amount of premium payment received. If the independent third party hearing the appeal is compensated for such service, the property owner shall bear the costs of such compensation.

44 CFR § 79.8

§ 79.8 Allowable costs.

(a) General. General policies for determining allowable costs are addressed in §§ 13.4, 13.6, and 13.22 of this chapter. Allowable costs are explained in this paragraph.

(1) Eligible Management Costs––(i) Grantee. States are eligible to receive management costs consisting of a maximum of 10 percent of the planning and project activities awarded to the State, each fiscal year under FMA and SRL, respectively. These costs must be included in the application to FEMA. An Indian tribal government applying directly to FEMA is eligible for management costs consisting of a maximum of 10 percent of grants awarded for planning and project activities under the SRL and FMA programs respectively.

(ii) Subgrantee. Subapplicants may include a maximum of 5 percent of the total funds requested for their subapplication for management costs to support the imple-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                          Page 75
**(Publication page references are not available for this document.)**

mentation of their planning or project activity. These costs must be included in the subapplication to the State.

(2) Indirect costs. Indirect costs of administering the FMA and SRL programs are eligible as part of the 10 percent management costs for the grantee or the 5 per-cent management costs of the subgrantee, but in no case do they make the recipient eligible for additional management costs that exceed the caps identified in para-graph (a)(1) of this section. In addition, all costs must be in accordance with the provisions of part 13 of this chapter and Office of Management and Budget Circular A-87.

(b) Pre-award costs. FEMA may fund eligible pre-award planning or project costs at its discretion and as funds are available. Grantees and subgrantees may be reim-bursed for eligible pre-award costs for activities directly related to the develop-ment of the project or planning proposal. These costs can only be incurred during the open application period of the respective grant program. Costs associated with implementation of the activity but incurred prior to grant award are not eligible. Therefore, activities where implementation is initiated or completed prior to award are not eligible and will not be reimbursed.

(c) **Duplication** of benefits. Grant funds may not duplicate benefits received by or available to applicants, subapplicants and project participants from **insurance**, other assistance programs, legal awards, or any other source related to address the same purpose. Such individual or entity must notify the grantee and FEMA of all benefits that it receives or anticipates from other sources for the same purpose. FEMA will reduce the subgrant award by the amounts available for the same purpose from an-other source.

(d) Negligence or other tortious conduct. FEMA grant funds are not available where an applicant, subapplicant, other project participant, or third party's negligence or intentional actions contributed to the conditions to be mitigated. If the appli-cant, subapplicant, or project participant suspects negligence or other tortious conduct by a third party for causing such condition, they are responsible for tak-ing all reasonable steps to recover all costs attributable to the tortious conduct of the third party. FEMA generally considers such amounts to be duplicated benefits available for the same purpose, and will treat them consistent with paragraph (c) of this section.

(e) FEMA grant funds are not available to satisfy or reimburse for legal obliga-tions, such as those imposed by a legal settlement, court order, or State law.

44 CFR § 79.9

§ 79.9 Grant administration.

(a) The Grantee must follow FEMA grant requirements, including submission of per-formance and financial status reports, and shall follow adequate competitive pro-curement procedures. In addition, grantees are responsible for ensuring that all subgrantees are aware of and follow the requirements contained in part 13 of this chapter.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

(b) During the implementation of an approved grant, the State POC may find that actual costs are exceeding the approved award amount. While there is no guarantee of additional funding, FEMA will only consider requests made by the State POC to pay for such overruns if:

(1) Funds are available to meet the requested increase in funding;

(2) The amended grant award meets the cost-share requirements identified in this section; and

(3) The total amount obligated to the State does not exceed the maximum funding amounts set in § 79.4(a)(2).

(c) Grantees may use cost underruns from ongoing subgrants to offset overruns incurred by another subgrant(s) awarded under the same grant. All costs for which funding is requested must have been included in the original application's cost estimate.

(d) For all cost overruns that exceed the amount approved under the grant, and which require additional Federal funds, the State POC shall submit a written request with a recommendation, including a justification for the additional funding to the Regional Administrator for a determination. If approved, the Regional Administrator shall increase the grant through an amendment to the original award document.

(e) At the time of closeout, FEMA will recapture any funds provided to a State or a community under these programs if the applicant has not provided the appropriate matching funds, the approved project has not been completed within the timeframes specified in the grant agreement, or the completed project does not meet the criteria specified in this part.

9. Add part 80 to read as follows:

PART 80--PROPERTY ACQUISITION AND RELOCATION FOR OPEN SPACE

Subpart A--General

Sec.

80.1 Purpose and scope.

80.3 Definitions.

80.5 Roles and responsibilities.

Subpart B--Requirements Prior to Award

80.7 General.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

80.9 Eligible and ineligible costs.

80.11 Project eligibility.

80.13 Application information.

Subpart C--Post-Award Requirements

80.15 General.

80.17 Project implementation.

80.19 Land use and oversight.

Subpart D--After the Grant Requirements

80.21 Closeout requirements.

 Authority: Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 through 5206; the National Flood **Insurance** Act of 1968, as amended, 42 U.S.C. 4001 et seq.; Reorganization Plan No. 3 of 1978, 43 FR 41943, 3 CFR, 1978 Comp., p. 329; Homeland Security Act of 2002, 6 U.S.C. 101; E.O. 12127, 44 FR 19367, 3 CFR, 1979 Comp., p. 376; E.O. 12148, 44 FR 43239, 3 CFR, 1979 Comp., p. 412; E.O. 13286, 68 FR 10619, 3 CFR, 2003 Comp., p. 166.

 Subpart A--General

                       44 CFR § 80.1

§ 80.1 Purpose and scope.

 This part provides guidance on the administration of FEMA mitigation assistance for projects to acquire property for open space purposes under all FEMA hazard mitigation assistance programs. It provides information on the eligibility and pro-cedures for implementing projects for acquisition and relocation of at-risk proper-ties from the hazard area to maintain the property for open space purposes. This part applies to property acquisition for open space project awards made under any FEMA hazard mitigation assistance program. This part supplements general program requirements of the funding grant program and must be read in conjunction with the relevant program regulations and guidance available at http://www.fema.gov. This part, with the exception of § 80.19 Land use and oversight, applies to projects for which the funding program application period opens or for which funding is made available pursuant to a major disaster declared on or after December 3, 2007. Prior to that date, applicable program regulations and guidance in effect for the funding program (available at http://www.fema.gov) shall apply. Section 80.19 Land use and oversight apply as of December 3, 2007 to all FEMA funded acquisitions for the pur-pose of open space.

                       44 CFR § 80.3

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

§ 80.3 Definitions.

 (a) Except as noted in this part, the definitions applicable to the funding pro-
gram apply to implementation of this part. In addition, for purposes of this part:

 (b) Applicant is the State or Indian tribal government applying to FEMA for a
grant, and which will be accountable for the use of the funds.

 (c) Grantee means the State or Indian tribal government to which FEMA awards a
grant and which is accountable for the use of the funds provided. The grantee is
the entire legal entity, even if only a particular component of the entity is des-
ignated in the grant award document.

 (d) Market Value is generally defined as the amount in cash, or on terms reasona-
bly equivalent to cash, for which in all probability the property would have sold
on the effective date of the valuation, after a reasonable exposure time on the
open competitive market, from a willing and reasonably knowledgeable seller to a
willing and reasonably knowledgeable buyer, with neither acting under any compul-
sion to buy or sell, giving due consideration to all available economic uses of the
property at the time of the valuation.

 (e) National of the United States means a person within the meaning of the term as
defined in the Immigration and Nationality Act, 8 U.S.C. section 1101(a)(22).

 (f) Purchase offer is the initial value assigned to the property, which is later
adjusted by applicable additions and deductions, resulting in a final offer amount
to a property owner.

 (g) Qualified alien means a person within the meaning of the term as defined at 8
U.S.C. 1641.

 (h) "Qualified conservation organization" means a qualified organization with a
conservation purpose pursuant to 26 CFR 1.170A-14 and applicable implementing regu-
lations, that is such an organization at the time it acquires the property interest
and that was such an organization at the time of the major disaster declaration, or
for at least 2 years prior to the opening of the grant application period.

 (i) Subapplicant means the entity that submits an application for FEMA mitigation
assistance to the State or Indian tribal applicant/grantee. With respect to open
space acquisition projects under the Hazard Mitigation Grant Program (HMGP), this
term has the same meaning as given to the term "applicant" in part 206, subpart N
of this chapter. Upon grant award, the subapplicant is referred to as the subgran-
tee.

 (j) Subgrant means an award of financial assistance made under a grantee to an
eligible subgrantee.

 (k) Subgrantee means the State agency, community, or Indian tribal government or
other legal entity to which a subgrant is awarded and which is accountable to the
grantee for the use of the funds provided.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01
**(Publication page references are not available for this document.)**

  (l) Administrator means the head of the Federal Emergency Management Agency, or his/her designated representative, appointed under section 503 of the Post-Katrina Emergency Management Reform Act of 2006 (Pub. L. 109–295). The term also refers to the Director as discussed in part 2 of this chapter.

  (m) Regional Administrator means the head of a Federal Emergency Management Agency regional office, or his/her designated representative, appointed under section 507 of the Post-Katrina Emergency Management Reform Act of 2006 (Pub. L. 109–295). The term also refers to Regional Directors as discussed in part 2 of this chapter.

                              44 CFR § 80.5

§ 80.5 Roles and responsibilities.

  The roles and responsibilities of FEMA, the State, the subapplicant/subgrantee, and participating property owners in the particular context of mitigation projects for the purpose of creating open space include the activities in this section. These are in addition to grants management roles and responsibilities identified in regulations and guidance of the program funding the project (available at http://www.fema.gov) and other responsibilities specified in this part.

  (a) Federal roles and responsibilities. Oversee property acquisition activities undertaken under FEMA mitigation grant programs, including:

  (1) Providing technical assistance to the applicant/grantee to assist in implementing project activities in compliance with this part;

  (2) Reviewing applications for eligibility and compliance with this part;

  (3) Reviewing proposals for subsequent transfer of a property interest and approving appropriate transferees;

  (4) Making determinations on the compatibility of proposed uses with the open space purpose, in accordance with § 80.19;

  (5) Complying with applicable Federal statutory, regulatory, and Executive Order requirements related to environmental and historic preservation compliance, including reviewing and supplementing, if necessary, environmental analyses conducted by the State and subgrantee in accordance with part 10 of this chapter;

  (6) Providing no Federal disaster assistance, flood **insurance** claims payments, or other FEMA assistance with respect to the property or any open-space related improvements, after the property interest transfers; and

  (7) Enforcing the requirements of this part and the deed restrictions to ensure that the property remains in open space use in perpetuity.

  (b) State (applicant/grantee) roles and responsibilities. Serve as the point of contact for all property acquisition activities by coordinating with the subappli-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                          Page 80
**(Publication page references are not available for this document.)**

cant/subgrantee and with FEMA to ensure that the project is implemented in compli-
ance with this part, including:

  (1) Providing technical assistance to the subapplicant/subgrantee to assist in im-
plementing project activities in compliance with this part;

  (2) Ensuring that applications are not framed in a manner that has the effect of
circumventing any requirements of this part;

  (3) Reviewing the application to ensure that the proposed activity complies with
this part, including ensuring that the property acquisition activities remain vol-
untary in nature, and that the subgrantee and property owners are made aware of
such;

  (4) Submitting to FEMA subapplications for proposed projects in accordance with
the respective program schedule and programmatic requirements, and including all
the requisite information to enable FEMA to determine the eligibility, technical
feasibility, cost effectiveness, and environmental and historic preservation com-
pliance of the proposed projects;

  (5) Reviewing proposals for subsequent transfer of property interest and obtaining
FEMA approval of such transfers; and ensuring that all uses proposed for the prop-
erty are compatible with open space project purposes;

  (6) Making no application for, nor providing, Federal disaster assistance or other
FEMA assistance for the property or any open-space related improvements, after the
property interest transfers;

  (7) Enforcing the terms of this part and the deed restrictions to ensure that the
property remains in open space use in perpetuity; and

  (8) Reporting on property compliance with the open space requirements after the
grant is awarded.

  (c) Subapplicant/Subgrantee roles and responsibilities. Coordinate with the appli-
cant/grantee and with the property owners to ensure that the project is implemented
in compliance with this part, including:

  (1) Submitting all applications for proposed projects in accordance with the re-
spective program schedule and programmatic requirements, and including all the req-
uisite information to enable the applicant/grantee and FEMA to determine the eligi-
bility, technical feasibility, cost effectiveness, and environmental and historic
preservation compliance of the proposed projects;

  (2) Ensuring that applications are not framed in a manner that has the effect of
circumventing any requirements of this part;

  (3) Coordinating with the property owners to ensure they understand the benefits
and responsibilities of participating in the project, including that participation
in the project is voluntary, and that the property owner(s) are made aware of such;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

(4) Developing the application and implementing property acquisition activities in compliance with this part, and ensuring that all terms of the deed restrictions and grant award are enforced;

(5) Ensuring fair procedures and processes are in place to compensate property owners and tenants affected by the purchase of property; such as determining property values and/or the amount of the mitigation offer, and reviewing property owner disputes regarding such offers;

(6) Making no application for Federal disaster assistance, flood **insurance,** or other FEMA benefits for the property or any open-space related improvements, after the property interest transfers;

(7) Taking and retaining full property interest, consistent with this part; or if transferring such interest, obtaining approval of the grantee and FEMA;

(8) Submitting to the grantee and FEMA proposed uses on the property for open space compatibility determinations; and

(9) Monitoring and reporting on property compliance after the grant is awarded.

(d) Participating property owner roles and responsibilities. Notify the subapplicant/subgrantee of its interest to participate, provide information to the subapplicant/subgrantee, and take all required actions necessary for the completion of the grant application and the implementation of property acquisition activities in accordance with this part.

Subpart B--Requirements Prior to Award

44 CFR § 80.7

§ 80.7 General.

 A project involving property acquisition or the relocation of structures for open space is eligible for hazard mitigation assistance only if the subapplicant meets the pre-award requirements set forth in this subpart. A project may not be framed in a manner that has the effect of circumventing the requirements of this subpart.

44 CFR § 80.9

§ 80.9 Eligible and ineligible costs.

(a) Allowable costs. Eligible project costs may include compensation for the value of structures, for their relocation or demolition, for associated land, and associated costs. For land that is already held by an eligible entity, compensation for the land is not an allowable cost, but compensation for development rights may be allowable.

(b) Pre-award costs. FEMA may fund eligible pre-award project costs at its discre-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion and as funds are available. Grantees and subgrantees may be reimbursed for
eligible pre-award costs for activities directly related to the development of the
project proposal. These costs can only be incurred during the open application pe-
riod of the respective grant program. Costs associated with implementation of the
project but incurred prior to grant award are not eligible. Therefore, activities
where implementation is initiated or completed prior to award are not eligible and
will not be reimbursed.

  (c) **Duplication** of benefits. Grant funds may not duplicate benefits received by or
available to applicants, subapplicants and other project participants from **insur-
ance**, other assistance programs, legal awards, or any other source to address the
same purpose. Such individual or entity must notify the subapplicant and FEMA of
all benefits that it receives, anticipates, or has available from other sources for
the same purpose. FEMA will reduce the subgrant award by the amounts available for
the same purpose from another source.

  (d) Negligence or other tortious conduct. FEMA acquisition funds are not available
where an applicant, subapplicant, other project participant, or third party's neg-
ligence or intentional actions contributed to the conditions to be mitigated. If
the applicant, subapplicant, or project participant suspects negligence or other
tortious conduct by a third party for causing such condition, they are responsible
for taking all reasonable steps to recover all costs attributable to the tortious
conduct of the third party. FEMA generally considers such amounts to be duplicated
benefits available for the same purpose, and will treat them consistent with para-
graph (c) of this section.

  (e) FEMA mitigation grant funds are not available to satisfy or reimburse for le-
gal obligations, such as those imposed by a legal settlement, court order, or State
law.

                              44 CFR § 80.11

§ 80.11 Project eligibility.

  (a) Voluntary participation. Eligible acquisition projects are those where the
property owner participates voluntarily, and the grantee/subgrantee will not use
its eminent domain authority to acquire the property for the open space purposes
should negotiations fail.

  (b) Acquisition of improved properties. Eligible properties are those with at-risk
structures on the property, including those that are damaged or destroyed due to an
event. In some cases, undeveloped, at-risk land adjacent to an eligible property
with existing structures may be eligible.

  (c) Subdivision restrictions. The land may not be subdivided prior to acquisition
except for portions outside the identified hazard area, such as the Special Flood
Hazard Area or any risk zone identified by FEMA.

  (d) Subapplicant property interest. To be eligible, the subapplicant must acquire
or retain fee title (full property interest) as part of the project implementation.
A pass through of funds from an eligible entity to an ineligible entity must not

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**


occur.

  (e) Hazardous materials. Eligible properties include only those that are not con-
taminated with hazardous materials, except for incidental demolition and household
hazardous waste.

  (f) Open space restrictions. Property acquired or from which a structure is re-
moved must be dedicated to and maintained as open space in perpetuity consistent
with this part.

                              44 CFR § 80.13

§ 80.13 Application information.

  (a) An application for acquisition of property for the purpose of open space must
include:

  (1) A photograph that represents the appearance of each property site at the time
of application;

  (2) Assurances that the subapplicant will implement the project grant award in
compliance with subparts C and D of this part;

  (3) The deed restriction language, which shall be consistent with the FEMA model
deed restriction that the local government will record with the property deeds. Any
variation from the model deed restriction language can only be made with prior ap-
proval from FEMA's Office of General Counsel;

  (4) The documentation of voluntary interest signed by each property owner, which
must include that the subapplicant has informed them in writing that it will not
use its eminent domain authority for the open space purpose; and

  (5) Assurance that the subject property is not part of an intended, planned, or
designated project area for which the land is to be acquired by a certain date, and
that local and State governments have no intention to use the property for any pub-
lic or private facility in the future inconsistent with this part;

  (6) If the applicant is offering pre-event value: certification that the property
owner is a National of the United States or qualified alien; and

  (7) Other information as determined by the Administrator.

  (b) Consultation regarding other ongoing Federal activities. (1) The subapplicant
must demonstrate that it has consulted with the United States Army Corps of Engi-
neers (USACE) regarding the subject land's potential future use for the construc-
tion of a levee system. The subapplicant must also demonstrate that it has, and
will, reject any future consideration of such use if it accepts FEMA assistance to
convert the property to permanent open space.

  (2) The subapplicant must demonstrate that it has coordinated with its State De-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01
**(Publication page references are not available for this document.)**

partment of Transportation to ensure that no future, planned modifications, im-
provements, or enhancements to Federal aid systems are under consideration that
will affect the subject property.

  (c) Restriction on alternate properties. Changes to the properties in an approved
mitigation project will be considered by FEMA but not approved automatically. The
subapplicant must identify the alternate properties in the project application and
each alternate property must meet eligibility requirements in order to be consid-
ered.

Subpart C--Post-Award Requirements

                              44 CFR § 80.15

§ 80.15 General.

 A project involving property acquisition or the relocation of structures for open
space must be implemented consistent with the requirements set forth in this sub-
part.

                              44 CFR § 80.17

§ 80.17 Project implementation.

  (a) Hazardous materials. The subgrantee shall take steps to ensure it does not ac-
quire or include in the project properties contaminated with hazardous materials by
seeking information from property owners and from other sources on the use and
presence of contaminants affecting the property from owners of properties that are
or were industrial or commercial, or adjacent to such. A contaminated property must
be certified clean prior to participation. This excludes permitted disposal of in-
cidental demolition and household hazardous wastes. FEMA mitigation grant funds may
not be used for clean up or remediation of contaminated properties.

  (b) Clear title. The subgrantee will obtain a title **insurance** policy demonstrating
that fee title conveys to the subgrantee for each property to ensure that it ac-
quires only a property with clear title. The property interest generally must
transfer by a general warranty deed. Any incompatible easements or other encum-
brances to the property must be extinguished before acquisition.

  (c) Purchase offer and supplemental payments. (1) The amount of purchase offer is
the current market value of the property or the market value of the property imme-
diately before the relevant event affecting the property ("pre-event").

  (i) The relevant event for Robert T. Stafford Disaster Relief and Emergency Assis-
tance Act assistance under HMGP is the major disaster under which funds are avail-
able; for assistance under the Pre-disaster Mitigation program (PDM) ( 42 U.S.C.
5133), it is the most recent major disaster. Where multiple disasters have affected
the same property, the grantee and subgrantee shall determine which is the relevant
event.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

(ii) The relevant event for assistance under the National Flood **Insurance** Act is the most recent event resulting in a National Flood **Insurance** Program (NFIP) claim of at least $5000.

(2) For acquisition of properties under the Severe Repetitive Loss program under part 79 of this subchapter, the purchase offer is not less than the greatest of the amount in paragraph (c)(1) of this section; the original purchase price paid by the participating property owner holding the flood **insurance** policy; or the outstanding amount of any loan to the participating property owner, which is secured by a recorded interest in the property at the time of the purchase offer.

(3) The grantee should coordinate with the subgrantee in their determination of whether the valuation should be based on pre-event or current market value. Generally, the same method to determine market value should be used for all participants in the project.

(4) A property owner who did not own the property at the time of the relevant event, or who is not a National of the United States or qualified alien, is not eligible for a purchase offer based on pre-event market value of the property. Subgrantees will ask each participating property owner to certify that they are either a National of the United States or qualified alien before offering pre-event market value for the property.

(5) Certain tenants who must relocate as a result of the project are entitled to relocation benefits under the Uniform Relocation Assistance and Real Property Acquisition Policies Act (such as moving expenses, replacement housing rental payments, and relocation assistance advisory services) in accordance with 49 CFR part 24.

(6) If a purchase offer for a residential property is less than the cost of the homeowner-occupant to purchase a comparable replacement dwelling outside the hazard-prone area in the same community, the subgrantee for funding under the Severe Repetitive Loss program implemented at part 79 of this subchapter shall make available a supplemental payment to the homeowner-occupant to apply to the difference. Subgrantees for other mitigation grant programs may make such a payment available in accordance with criteria determined by the Administrator.

(7) The subgrantee must inform each property owner, in writing, of what it considers to be the market value of the property, the method of valuation and basis for the purchase offer, and the final offer amount. The offer will also clearly state that the property owner's participation in the project is voluntary.

(d) Removal of Existing Buildings. Existing incompatible facilities must be removed by demolition or by relocation outside of the hazard area within 90 days of settlement of the property transaction. The FEMA Regional Administrator may grant an exception to this deadline only for a particular property based upon written justification if extenuating circumstances exist, but shall specify a final date for removal.

(e) Deed Restriction. The subgrantee, upon settlement of the property transaction, shall record with the deed of the subject property notice of applicable land use

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                    Page 86
**(Publication page references are not available for this document.)**

restrictions and related procedures described in this part, consistent with FEMA model deed restriction language.

44 CFR § 80.19

§ 80.19 Land use and oversight.

 This section applies to acquisitions for open space projects to address flood hazards. If the Administrator determines to mitigate in other circumstances, he/she will adapt the provisions of this section as appropriate.

 (a) Open space requirements. The property shall be dedicated and maintained in perpetuity as open space for the conservation of natural floodplain functions.

 (1) These uses may include: Parks for outdoor recreational activities; wetlands management; nature reserves; cultivation; grazing; camping (except where adequate warning time is not available to allow evacuation); unimproved, unpaved parking lots; buffer zones; and other uses FEMA determines compatible with this part.

 (i) Allowable uses generally do not include: Walled buildings, levees, dikes, or floodwalls, paved roads, highways, bridges, cemeteries, landfills, storage of any hazardous or toxic materials, above or below ground pumping and switching stations, above or below ground storage tanks, paved parking, off-site fill or other uses that obstruct the natural and beneficial functions of the floodplain.

 (ii) In the rare circumstances where the Administrator has determined competing Federal interests were unavoidable and has analyzed floodplain impacts for compliance with § 60.3 of this subchapter or higher standards, the Administrator may find only USACE projects recognized by FEMA in 2000 and improvements to pre-existing Federal-aid transportation systems to be allowable uses.

 (2) No new structures or improvements will be built on the property except as indicated below:

 (i) A public facility that is open on all sides and functionally related to a designated open space or recreational use;

 (ii) A public restroom; or

 (iii) A structure that is compatible with open space and conserves the natural function of the floodplain, which the Administrator approves in writing before the construction of the structure begins.

 (3) Any improvements on the property shall be in accordance with proper floodplain management policies and practices. Structures built on the property according to paragraph (a)(2) of this section shall be floodproofed or elevated to at least the base flood level plus 1 foot of freeboard, or greater, if required by FEMA, or if required by any State or local ordinance, and in accordance with criteria established by the Administrator.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

(4) After the date of property settlement, no Federal entity or source may provide disaster assistance for any purpose with respect to the property, nor may any application for such assistance be made to any Federal entity or source.

(5) The property is not eligible for coverage under the NFIP for damage to structures on the property occurring after the date of the property settlement, except for pre-existing structures being relocated off the property as a result of the project.

(b) Subsequent transfer. After acquiring the property interest, the subgrantee, including successors in interest, shall convey any interest in the property only if the Regional Administrator, through the State, gives prior written approval of the transferee in accordance with this paragraph.

(1) The request by the subgrantee, through the State, to the Regional Administrator must include a signed statement from the proposed transferee that it acknowledges and agrees to be bound by the terms of this section, and documentation of its status as a qualified conservation organization if applicable.

(2) The subgrantee may convey a property interest only to a public entity or to a qualified conservation organization. However, the subgrantee may convey an easement or lease to a private individual or entity for purposes compatible with the uses described in paragraph (a), of this section, with the prior approval of the Regional Administrator, and so long as the conveyance does not include authority to control and enforce the terms and conditions of this section.

(3) If title to the property is transferred to a public entity other than one with a conservation mission, it must be conveyed subject to a conservation easement that shall be recorded with the deed and shall incorporate all terms and conditions set forth in this section, including the easement holder's responsibility to enforce the easement. This shall be accomplished by one of the following means:

(i) The subgrantee shall convey, in accordance with this paragraph, a conservation easement to an entity other than the title holder, which shall be recorded with the deed, or

(ii) At the time of title transfer, the subgrantee shall retain such conservation easement, and record it with the deed.

(4) Conveyance of any property interest must reference and incorporate the original deed restrictions providing notice of the conditions in this section and must incorporate a provision for the property interest to revert to the subgrantee or grantee in the event that the transferee ceases to exist or loses its eligible status under this section.

(c) Inspection. FEMA, its representatives and assigns, including the grantee shall have the right to enter upon the property, at reasonable times and with reasonable notice, for the purpose of inspecting the property to ensure compliance with the terms of this part, the property conveyance and of the grant award.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

(d) Monitoring and reporting. Every 3 years the subgrantee (in coordination with
any current successor in interest) through the grantee, shall submit to the FEMA
Regional Administrator a report certifying that the subgrantee has inspected the
property within the month preceding the report, and that the property continues to
be maintained consistent with the provisions of this part, the property conveyance
and the grant award.

(e) Enforcement. The subgrantee, grantee, FEMA, and their respective representa-
tives, successors and assigns, are responsible for taking measures to bring the
property back into compliance if the property is not maintained according to the
terms of this part, the conveyance, and the grant award. The relative rights and
responsibilities of FEMA, the grantee, the subgrantee, and subsequent holders of
the property interest at the time of enforcement, shall include the following:

(1) The grantee will notify the subgrantee and any current holder of the property
interest in writing and advise them that they have 60 days to correct the viola-
tion.

(i) If the subgrantee or any current holder of the property interest fails to dem-
onstrate a good faith effort to come into compliance with the terms of the grant
within the 60-day period, the grantee shall enforce the terms of the grant by tak-
ing any measures it deems appropriate, including but not limited to bringing an ac-
tion at law or in equity in a court of competent jurisdiction.

(ii) FEMA, its representatives, and assignees may enforce the terms of the grant
by taking any measures it deems appropriate, including but not limited to 1 or more
of the following:

(A) Withholding FEMA mitigation awards or assistance from the State and subgran-
tee; and current holder of the property interest.

(B) Requiring transfer of title. The subgrantee or the current holder of the prop-
erty interest shall bear the costs of bringing the property back into compliance
with the terms of the grant; or

(C) Bringing an action at law or in equity in a court of competent jurisdiction
against any or all of the following parties: the grantee, the subgrantee, and their
respective successors.

Subpart D--After the Grant Requirements

44 CFR § 80.21

§ 80.21 Closeout requirements.

Upon closeout of the grant, the subgrantee, through the grantee, shall provide
FEMA, with the following:

(a) A copy of the deed recorded for each property, demonstrating that each prop-
erty approved in the original application was mitigated and that the deed restric-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

tions recorded are consistent with the FEMA model deed restriction language to meet the requirements of this part;

  (b) A photo of each property site after project completion;

  (c) The latitude-longitude coordinates of each property site;

  (d) Identification of each property as a repetitive loss property, if applicable; and

  (e) Other information as determined by the Administrator.

PART 201--MITIGATION PLANNING

  10. The authority citation for part 201 is revised to read as follows:

  Authority: Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 through 5206; Reorganization Plan No. 3 of 1978, 43 FR 41943, 3 CFR, 1978 Comp., p. 329; Homeland Security Act of 2002, 6 U.S.C. 101; E.O. 12127, 44 FR 19367, 3 CFR, 1979 Comp., p. 376; E.O. 12148, 44 FR 43239, 3 CFR, 1979 Comp., p. 412; E.O. 13286, 68 FR 10619, 3 CFR, 2003 Comp., p. 166.


                          44 CFR § 201.2


  11. Section 201.2 is amended by revising the definition of "Hazard Mitigation Grant Program" and by adding the following definitions to the alphabetical list of definitions:


                          44 CFR § 201.2


§ 201.2 Definitions.


  Administrator means the head of the Federal Emergency Management Agency, or his/her designated representative, appointed under section 503 of the Post-Katrina Emergency Management Reform Act of 2006 (Pub. L. 109-295). The term also refers to the Director as discussed in part 2 of this chapter.

  Flood Mitigation Assistance (FMA) means the program authorized by section 1366 of the National Flood **Insurance** Act of 1968, as amended, 42 U.S.C. 4104c, and imple- mented at parts 78 and 79.

* * * * *
  Hazard Mitigation Grant Program (HMGP) means the program authorized under section 404 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5170c, and implemented at part 206, subpart N of this chapter.

* * * * *
  Pre-Disaster Mitigation Program (PDM) means the program authorized under section 203 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5133.


© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

* * * * *
 Repetitive Flood Claims (RFC) program means the program authorized under section
1323 of the National Flood **Insurance** Act of 1968, as amended, 42 U.S.C. 4011, which
provides funding to reduce flood damages to individual properties for which 1 or
more claim payments for losses have been made under flood **insurance** coverage and
that will result in the greatest savings to the National Flood **Insurance** Program
(NFIP) in the shortest period of time.

 Severe Repetitive Loss (SRL) program means the program authorized under section
1361(a) of the National Flood **Insurance** Act of 1968, as amended, 42 U.S.C. 4102a,
and implemented at part 79 of this chapter.

 Severe Repetitive Loss properties are defined as single or multifamily residential
properties that are covered under an NFIP flood **insurance** policy and:

 (1) That have incurred flood-related damage for which 4 or more separate claims
payments have been made, with the amount of each claim (including building and con-
tents payments) exceeding $5,000, and with the cumulative amount of such claims
payments exceeding $20,000; or

 (2) For which at least 2 separate claims payments (building payments only) have
been made under such coverage, with cumulative amount of such claims exceeding the
market value of the property.

 (3) In both instances, at least 2 of the claims must be within 10 years of each
other, and claims made within 10 days of each other will be counted as 1 claim.

* * * * *


44 CFR § 201.3

 12. Revise paragraphs (c)(1), (c)(3), (d)(2) and (e) of § 201.3 to read as fol-
lows:


44 CFR § 201.3

§ 201.3 Responsibilities.

* * * * *
 (c) * * *

 (1) Prepare and submit to FEMA a Standard State Mitigation Plan following the cri-
teria established in § 201.4 as a condition of receiving non-emergency Stafford Act
assistance and FEMA mitigation grants. In addition, a State may choose to address
severe repetitive loss properties in their plan as identified in § 201.4(c)(3)(v)
to receive the reduced cost share for the Flood Mitigation Assistance (FMA) and Se-
vere Repetitive Loss (SRL) programs, pursuant to § 79.4(c)(2) of this chapter.

* * * * *

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                     Page 91
**(Publication page references are not available for this document.)**


(3) At a minimum, review and update the Standard State Mitigation Plan every 3
years from the date of the approval of the previous plan in order to continue pro-
gram eligibility.


* * * * *
 (d) * * *

(2) At a minimum, review and update the local mitigation plan every 5 years from
date of plan approval of the previous plan in order to continue program eligibil-
ity.

(e) Indian tribal governments. The key responsibilities of the Indian tribal gov-
ernment are to coordinate all tribal activities relating to hazard evaluation and
mitigation and to:

(1) Prepare and submit to FEMA a Tribal Mitigation Plan following the criteria es-
tablished in § 201.7 as a condition of receiving non-emergency Stafford Act assis-
tance as a grantee. This plan will also allow Indian tribal governments to apply
through the State, as a subgrantee, for any FEMA mitigation project grant. Indian
tribal governments with a plan approved by FEMA on or before October 1, 2008 under
§ 201.4 or § 201.6 will also meet this planning requirement. All Tribal Mitigation
Plans approved after that date must follow the criteria identified in § 201.7. In
addition, an Indian tribal government may choose to address severe repetitive loss
properties as identified in § 201.4(c)(3)(v) as a condition of receiving the re-
duced cost share for the FMA and SRL programs, pursuant to § 79.4(c)(2) of this
chapter.

(2) Review and update the Tribal Mitigation Plan at least every 5 years from the
date of approval of the previous plan in order to continue program eligibility.

(3) In order to be considered for the increased HMGP funding, the Tribal Mitiga-
tion Plan must meet the Enhanced State Mitigation Plan criteria identified in §
201.5. The plan must be reviewed and updated at least every 3 years from the date
of approval of the previous plan.


44 CFR § 201.4

13. Revise paragraphs (a) and (c)(7) and add paragraph (c)(3)(v) of § 201.4 to
read as follows:


44 CFR § 201.4

§ 201.4 Standard State Mitigation Plans.

(a) Plan requirement. States must have an approved Standard State Mitigation Plans
meeting the requirements of this section as a condition of receiving non-emergency
Stafford Act assistance and FEMA mitigation grants. Emergency assistance provided
under 42 U.S.C. 5170a, 5170b, 5173, 5174, 5177, 5179, 5180, 5182, 5183, 5184, 5192
will not be affected. Mitigation planning grants provided through the Pre-disaster
Mitigation (PDM) program, authorized under section 203 of the Stafford Act, 42
U.S.C. 5133, will also continue to be available. The mitigation plan is the demon-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                     Page 92
**(Publication page references are not available for this document.)**

stration of the State's commitment to reduce risks from natural hazards and serves
as a guide for State decision makers as they commit resources to reducing the ef-
fects of natural hazards.

* * * * *
 (c) * * *

 (3) * * *

 (v) A State may request the reduced cost share authorized under § 79.4(c)(2) of
this chapter for the FMA and SRL programs, if it has an approved State Mitigation
Plan meeting the requirements of this section that also identifies specific actions
the State has taken to reduce the number of repetitive loss properties (which must
include severe repetitive loss properties), and specifies how the State intends to
reduce the number of such repetitive loss properties. In addition, the plan must
describe the strategy the State has to ensure that local jurisdictions with severe
repetitive loss properties take actions to reduce the number of these properties,
including the development of local mitigation plans.

* * * * *
 (7) Assurances. The plan must include assurances that the State will comply with
all applicable Federal statutes and regulations in effect with respect to the peri-
ods for which it receives grant funding, in compliance with 44 CFR 13.11(c) of this
chapter. The State will amend its plan whenever necessary to reflect changes in
State or Federal statutes and regulations as required in 44 CFR 13.11(d) of this
chapter.

* * * * *

44 CFR § 201.6

 14. Revise paragraphs (a)(1), (a)(2), (c)(2)(ii) introductory text,  (d)(1), and
(d)(3) and add a sentence to the end of paragraph (c)(3)(ii) of § 201.6 to read as
follows:

44 CFR § 201.6

§ 201.6 Local Mitigation Plans.

* * * * *
 (a) * * *

 (1) A local government must have a mitigation plan approved pursuant to this sec-
tion in order to receive HMGP project grants. The Administrator may, at his discre-
tion, require a local mitigation plan for the Repetitive Flood Claims Program. A
local government must have a mitigation plan approved pursuant to this section in
order to apply for and receive mitigation project grants under all other mitigation
grant programs.

 (2) Plans prepared for the FMA program, described at part 79 of this chapter, need

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                Page 93
(Publication page references are not available for this document.)

only address these requirements as they relate to flood hazards in order to be eli-
gible for FMA project grants. However, these plans must be clearly identified as
being flood mitigation plans, and they will not meet the eligibility criteria for
other mitigation grant programs, unless flooding is the only natural hazard the ju-
risdiction faces.

* * * * *
 (c) * * *

 (2) * * *

 (ii) A description of the jurisdiction's vulnerability to the hazards described in
paragraph (c)(2)(i) of this section. This description shall include an overall sum-
mary of each hazard and its impact on the community. All plans approved after Octo-
ber 1, 2008 must also address NFIP insured structures that have been repetitively
damaged by floods. The plan should describe vulnerability in terms of:

* * * * *
 (3) * * *

 (ii) * * * All plans approved by FEMA after October 1, 2008, must also address the
jurisdiction's participation in the NFIP, and continued compliance with NFIP re-
quirements, as appropriate.

* * * * *
 (d) * * *

 (1) Plans must be submitted to the State Hazard Mitigation Officer (SHMO) for ini-
tial review and coordination. The State will then send the plan to the appropriate
FEMA Regional Office for formal review and approval. Where the State point of con-
tact for the FMA program is different from the SHMO, the SHMO will be responsible
for coordinating the local plan reviews between the FMA point of contact and FEMA.

* * * * *
 (3) A local jurisdiction must review and revise its plan to reflect changes in de-
velopment, progress in local mitigation efforts, and changes in priorities, and re-
submit it for approval within 5 years in order to continue to be eligible for miti-
gation project grant funding.

* * * * *

44 CFR § 201.7

 15. Add § 201.7 to read as follows:

44 CFR § 201.7

§ 201.7 Tribal Mitigation Plans.

 The Indian Tribal Mitigation Plan is the representation of the Indian tribal gov-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01

**(Publication page references are not available for this document.)**

ernment's commitment to reduce risks from natural hazards, serving as a guide for decision makers as they commit resources to reducing the effects of natural hazards.

(a) Plan requirement. (1) Indian tribal governments applying to FEMA as a grantee must have an approved Tribal Mitigation Plan meeting the requirements of this section as a condition of receiving non-emergency Stafford Act assistance and FEMA mitigation grants. Emergency assistance provided under 42 U.S.C. 5170a, 5170b, 5173, 5174, 5177, 5179, 5180, 5182, 5183, 5184, 5192 will not be affected. Mitigation planning grants provided through the PDM program, authorized under section 203 of the Stafford Act, 42 U.S.C. 5133, will also continue to be available.

(2) An Indian tribal government may choose to address severe repetitive loss properties in their plan, as identified in § 201.4(c)(3)(v), to receive the reduced cost share for the FMA and SRL programs.

(3) Indian tribal governments applying through the State as a subgrantee must have an approved Tribal Mitigation Plan meeting the requirements of this section in order to receive HMGP project grants. The Administrator, at his discretion may require a local mitigation plan for the Repetitive Flood Claims Program. A tribe must have an approved Tribal Mitigation Plan in order to apply for and receive FEMA mitigation project grants, under all other mitigation grant programs.

(4) Multi-jurisdictional plans (e.g. county-wide or watershed plans) may be accepted, as appropriate, as long as the Indian tribal government has participated in the process and has officially adopted the plan. Indian tribal governments must address all the elements identified in this section to ensure eligibility as a grantee or as a subgrantee.

(b) An effective planning process is essential in developing and maintaining a good plan. The mitigation planning process should include coordination with other tribal agencies, appropriate Federal agencies, adjacent jurisdictions, interested groups, and be integrated to the extent possible with other ongoing tribal planning efforts as well as other FEMA mitigation programs and initiatives.

(c) Plan content. The plan shall include the following:

(1) Documentation of the planning process used to develop the plan, including how it was prepared, who was involved in the process, and how the public was involved. This shall include:

(i) An opportunity for the public to comment on the plan during the drafting stage and prior to plan approval, including a description of how the Indian tribal government defined "public;"

(ii) As appropriate, an opportunity for neighboring communities, tribal and regional agencies involved in hazard mitigation activities, and agencies that have the authority to regulate development, as well as businesses, academia, and other private and nonprofit interests to be involved in the planning process;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                          Page 95
(Publication page references are not available for this document.)

(iii) Review and incorporation, if appropriate, of existing plans, studies, and reports; and

(iv) Be integrated to the extent possible with other ongoing tribal planning efforts as well as other FEMA programs and initiatives.

(2) A risk assessment that provides the factual basis for activities proposed in the strategy to reduce losses from identified hazards. Tribal risk assessments must provide sufficient information to enable the Indian tribal government to identify and prioritize appropriate mitigation actions to reduce losses from identified hazards. The risk assessment shall include:

(i) A description of the type, location, and extent of all natural hazards that can affect the tribal planning area. The plan shall include information on previous occurrences of hazard events and on the probability of future hazard events.

(ii) A description of the Indian tribal government's vulnerability to the hazards described in paragraph (c)(2)(i) of this section. This description shall include an overall summary of each hazard and its impact on the tribe. The plan should describe vulnerability in terms of:

(A) The types and numbers of existing and future buildings, infrastructure, and critical facilities located in the identified hazard areas;

(B) An estimate of the potential dollar losses to vulnerable structures identified in paragraph (c)(2)(i)(A) of this section and a description of the methodology used to prepare the estimate;

(C) A general description of land uses and development trends within the tribal planning area so that mitigation options can be considered in future land use decisions; and

(D) Cultural and sacred sites that are significant, even if they cannot be valued in monetary terms.

(3) A mitigation strategy that provides the Indian tribal government's blueprint for reducing the potential losses identified in the risk assessment, based on existing authorities, policies, programs and resources, and its ability to expand on and improve these existing tools. This section shall include:

(i) A description of mitigation goals to reduce or avoid long-term vulnerabilities to the identified hazards.

(ii) A section that identifies and analyzes a comprehensive range of specific mitigation actions and projects being considered to reduce the effects of each hazard, with particular emphasis on new and existing buildings and infrastructure.

(iii) An action plan describing how the actions identified in paragraph (c)(2)(ii) of this section will be prioritized, implemented, and administered by the Indian tribal government.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01
**(Publication page references are not available for this document.)**

(iv) A discussion of the Indian tribal government's pre- and post-disaster hazard management policies, programs, and capabilities to mitigate the hazards in the area, including: An evaluation of tribal laws, regulations, policies, and programs related to hazard mitigation as well as to development in hazard-prone areas; and a discussion of tribal funding capabilities for hazard mitigation projects.

(v) Identification of current and potential sources of Federal, tribal, or private funding to implement mitigation activities.

(vi) An Indian tribal government may request the reduced cost share authorized under § 79.4(c)(2) of this chapter of the FMA and SRL programs if they have an approved Tribal Mitigation Plan meeting the requirements of this section that also identify actions the Indian tribal government has taken to reduce the number of repetitive loss properties (which must include severe repetitive loss properties), and specifies how the Indian tribal government intends to reduce the number of such repetitive loss properties.

(4) A plan maintenance process that includes:

(i) A section describing the method and schedule of monitoring, evaluating, and updating the mitigation plan.

(ii) A system for monitoring implementation of mitigation measures and project closeouts.

(iii) A process by which the Indian tribal government incorporates the requirements of the mitigation plan into other planning mechanisms such as reservation master plans or capital improvement plans, when appropriate.

(iv) Discussion on how the Indian tribal government will continue public participation in the plan maintenance process.

(v) A system for reviewing progress on achieving goals as well as activities and projects identified in the mitigation strategy.

(5) Plan Adoption Process. The plan must be formally adopted by the governing body of the Indian tribal government prior to submittal to FEMA for final review and approval.

(6) Assurances. The plan must include assurances that the Indian tribal government will comply with all applicable Federal statutes and regulations in effect with respect to the periods for which it receives grant funding, in compliance with § 13.11(c) of this chapter. The Indian tribal government will amend its plan whenever necessary to reflect changes in tribal or Federal laws and statutes as required in § 13.11(d) of this chapter.

(d) Plan review and updates. (1) Plans must be submitted to the appropriate FEMA Regional Office for formal review and approval. Indian tribal governments who would like the option of being a subgrantee under the State must also submit their plan

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                      Page 97
**(Publication page references are not available for this document.)**

to the State Hazard Mitigation Officer for review and coordination.

 (2) The Regional review will be completed within 45 days after receipt from the Indian tribal government, whenever possible.

 (3) Indian tribal governments must review and revise their plan to reflect changes in development, progress in local mitigation efforts, and changes in priorities, and resubmit it for approval within 5 years in order to continue to be eligible for non-emergency Stafford Act assistance and FEMA mitigation grant funding, with the exception of the Repetitive Flood Claims program.

PART 206-FEDERAL DISASTER ASSISTANCE

 16. The authority citation for part 206 continues to read as follows:

 Authority: Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 through 5206; Reorganization Plan No. 3 of 1978, 43 FR 41943, 3 CFR, 1978 Comp., p. 329; Homeland Security Act of 2002, 6 U.S.C. 101; E.O. 12127, 44 FR 19367, 3 CFR, 1979 Comp., p. 376; E.O. 12148, 44 FR 43239, 3 CFR, 1979 Comp., p. 412; E.O. 13286, 68 FR 10619, 3 CFR, 2003 Comp., p. 166.

44 CFR § 206.432

 17. Section 206.432 is amended by revising paragraphs (b) introductory text and (b)(1) to read as follows:

44 CFR § 206.432

§ 206.432 Federal grant assistance.

* * * * *
 (b) Amounts of Assistance. The total Federal contribution of funds is based on the estimated aggregate grant amount to be made under 42 U.S.C. 5170b, 5172, 5173, 5174, 5177, 5178, and 5183 of the Stafford Act for the major disaster (less associated administrative costs), and shall be as follows:

 (1) Standard percentages. Not to exceed 15 percent for the first  $2,000,000,000 or less of such amounts; not to exceed 10 percent of the portion of such amounts over $2,000,000,000 and not more than $10,000,000,000; and not to exceed 7.5 percent of the portion of such amounts over $10,000,000,000 and not more than $35,333,000,000.

* * * * *

44 CFR § 206.433

 18. Section 206.433 is amended by revising paragraph (c) to read as follows:

44 CFR § 206.433

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

72 FR 61720-01                                                                      Page 98
(Publication page references are not available for this document.)

§ 206.433 State responsibilities.

* * * * *

 (c) Hazard Mitigation Officer. The State must appoint a Hazard Mitigation Officer who serves as the responsible individual for all matters related to the Hazard Mitigation Grant Program.

* * * * *

44 CFR § 206.434

 19. Revise paragraphs (a)(2), (c)(5)(ii), (e) introductory text; add a sentence after the first sentence of (d)(2); remove paragraph (f); and redesignate current paragraphs (g) and (h) as (f) and (g) of § 206.434 to read as follows:

44 CFR § 206.434

§ 206.434 Eligibility.

 (a) * * *

 (2) Private nonprofit organizations that own or operate a private nonprofit facility as defined in § 206.221(e). A qualified conservation organization as defined at § 80.3(h) of this chapter is the only private nonprofit organization eligible to apply for acquisition or relocation for open space projects;

* * * * *
 (c) * * *

 (5) * * *

 (ii) Will not cost more than the anticipated value of the reduction in both direct damages and subsequent negative impacts to the area if future disasters were to occur,

* * * * *
 (d) * * *

 (2) * * * Activities for which implementation has already been initiated or completed are not eligible for funding. * * *

* * * * *
 (e) Property acquisitions and relocation requirements. Property acquisitions and relocation projects for open space proposed for funding pursuant to a major disaster declared on or after December 3, 2007 must be implemented in accordance with part 80 of this chapter. For major disasters declared prior to December 3, 2007, a project involving property acquisition or the relocation of structures and individuals is eligible for assistance only if the applicant enters into an agreement with the FEMA Regional Director that provides assurances that:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**


\* \* \* \* \*

44 CFR § 206.439

20. Add new paragraph (c) to §206.439 to read as follows:

44 CFR § 206.439

§ 206.439 Allowable costs.

\* \* \* \* \*

(c) Pre-award costs. FEMA may fund eligible pre-award planning or project costs at its discretion and as funds are available. Grantees and subgrantees may be reimbursed for eligible pre-award costs for activities directly related to the development of the project or planning proposal. These costs can only be incurred during the open application period of the grant program. Costs associated with implementation of the activity but incurred prior to grant award are not eligible. Therefore, activities where implementation is initiated or completed prior to award are not eligible and will not be reimbursed.

Dated: October 24, 2007.

Harvey E. Johnson, Jr.,

Deputy Administrator/Chief Operating Officer, Federal Emergency Management Agency.

[FR Doc. E7-21265 Filed 10-30-07; 8:45 am]

BILLING CODE 9110-41-P

72 FR 61720-01

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



71 FR 7666-01                                                                                    Page 1
**(Publication page references are not available for this document.)**


NOTICES

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR-5051-N-01]

Allocations and Common Application and Reporting Waivers Granted to and
Alternative Requirements for CDBG Disaster Recovery Grantees Under the
Department of Defense Appropriations Act, 2006

Monday, February 13, 2006

AGENCY: Office of the Secretary, HUD.

ACTION: Notice of allocations, waivers, and alternative requirements.

SUMMARY: This Notice advises the public of the allocations for grant funds for Com-
munity Development Block Grant (CDBG) disaster recovery grants for the purpose of
assisting in the recovery in the most impacted and distressed areas related to the
consequences of Hurricanes **Katrina**, **Rita**, and **Wilma** in the Gulf of Mexico in 2005.
As described in the SUPPLEMENTARY INFORMATION section of this Notice, HUD is au-
thorized by statute to waive statutory and regulatory requirements and specify al-
ternative requirements for this purpose, upon the request of the state grantees.
This Notice also describes the common application and reporting waivers and the
common alternative requirements for the grants. Each State receiving an allocation
may request additional waivers from the Department as needed to address the spe-
cific needs related to that State's recovery activities.

DATES: Effective Date: February 13, 2006.

FOR FURTHER INFORMATION CONTACT: Jan C. Opper, Director, Disaster Recovery and Spe-
cial Issues Division, Office of Block Grant Assistance, Department of Housing and
Urban Development, Room 7286, 451 Seventh Street, SW., Washington, DC 20410, tele-
phone number (202) 708-3587. Persons with hearing or speech impairments may access
this number via TTY by calling the Federal Information Relay Service at (800) 877-
8339. FAX inquiries may be sent to Mr. Opper at (202) 401-2044. (Except for the
"800" number, these telephone numbers are not toll-free.)

SUPPLEMENTARY INFORMATION:

Authority To Grant Waivers

 The Department of Defense Appropriations Act, 2006 (Public Law 109-148, approved
December 30, 2005) (Appropriations Act) appropriates $11.5 billion in Community De-
velopment Block Grant funds for necessary expenses related to disaster relief,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

71 FR 7666-01                                                                                    Page 2
**(Publication page references are not available for this document.)**

long-term recovery, and restoration of infrastructure directly related to the con-
sequences of the covered disasters. The Appropriations Act authorizes the Secretary
to waive, or specify alternative requirements for, any provision of any statute or
regulation that the Secretary administers in connection with the obligation by the
Secretary or use by the recipient of these funds and guarantees, except for re-
quirements related to fair housing, nondiscrimination, labor standards, and the en-
vironment, upon a request by the State and a finding by the Secretary that such a
waiver would not be inconsistent with the overall purpose of the statute. The fol-
lowing application and reporting waivers and alternative requirements are in re-
sponse to requests from each of the States receiving an allocation under this No-
tice.

 The Secretary finds that the following waivers and alternative requirements, as
described below, are not inconsistent with the overall purpose of Title I of the
Housing and Community Development Act of 1974, as amended, or the Cranston-Gonzalez
National Affordable Housing Act, as amended.

 Under the requirements of the Department of Housing and Urban Development Reform
Act of 1989 (the HUD Reform Act), regulatory waivers must be justified and pub-
lished in the Federal Register.

 Except as described in this Notice, statutory and regulatory provisions governing
the Community Development Block Grant program for states, including those at 24 CFR
part 570, shall apply to the use of these funds. In accordance with the appropria-
tions act, HUD will reconsider every waiver in this Notice on the two-year anniver-
sary of the day this Notice is published.

Additional Waivers

 The Department will respond separately to each State's requests for waivers of
provisions not covered in this Notice, after working with the State to tailor the
program to best meet the unique disaster recovery needs in its impacted areas.

*Allocations*

 Public Law 109-148 (effective December 30, 2005) provides $11.5 billion of supple-
mental appropriation for the CDBG program for:

Necessary expenses related to disaster relief, long-term recovery, and restoration
of infrastructure in the most impacted and distressed areas related to the conse-
quences of hurricanes in the Gulf of Mexico in 2005.

The conference report (H.R. Rep. No. 109-359) echoes and expands on this direction,
stating:

The conference agreement includes $11,500,000,000 for necessary expenses related to
disaster relief, long-term recovery, restoration of infrastructure and mitigation
in communities in any declared disaster area in Louisiana, Mississippi, Alabama,
Florida, and Texas related to Hurricanes **Katrina, Rita** or **Wilma. * * ***

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

71 FR 7666-01                                                                    Page 3
**(Publication page references are not available for this document.)**


The conference agreement emphasizes the requirement that the States with the most
impacted and distressed areas in connection with the Gulf of Mexico hurricanes re-
ceive priority consideration in the allocation of funds by HUD.

The law further notes:

That funds provided under this heading shall be administered through an entity or
entities designated by the Governor of each State. And that: No state shall receive
more than 54 percent of the amount provided under this heading.

 Funds allocated are intended by HUD to be used toward meeting unmet housing needs
in areas of concentrated distress. "Unmet housing needs" is defined to include, but
not be limited to, those of uninsured homeowners whose homes had major or severe
damage. "Concentrated distress" is defined as the total number of housing units
with major or severe housing damage in counties where 50 percent or more of units
had major or severe damage. As provided for in Public Law 109-148, the funds may
not be used for activities reimbursable by or for which funds are made available by
the Federal Emergency Management Agency or the Army Corps of Engineers.

 The allocations are as follows:

```
--------------------------------------------------------------------------------
    State                    Disaster            Amount
--------------------------------------------------------------------------------
Alabama ...... Hurricane Katrina (FEMA-1605-DR) .................. $74,388,000
Florida ...... Hurricane Katrina (FEMA-1602-DR), Hurricane
               Wilma (FEMA-1609-DR) ............................. 82,904,000
Louisiana .... Hurricane Katrina (FEMA-1603-DR), Hurricane
               Rita (FEMA-1607-DR) ........................... 6,210,000,000
Mississippi .. Hurricane Katrina (FEMA-1604-DR) ................ 5,058,185,000
Texas ........ Hurricane Rita (FEMA-1606-DR) ...................... 74,523,000
--------------------------------------------------------------------------------
```

 HUD will invite each grantee named above to submit an Action Plan for Disaster Re-
covery in accordance with this Notice.

 The appropriations statute requires funds be used only for disaster relief, long-
term recovery, and restoration of infrastructure in the most impacted and dis-
tressed areas related to the consequences of hurricanes in the Gulf of Mexico in
2005. The statute directs that each grantee will describe in its Action Plan for
Disaster Recovery how the use of the grant funds will address long-term recovery
and infrastructure restoration. HUD will monitor compliance with this direction and
may be compelled to disallow expenditures if it finds uses of funds are not disas-
ter-related, or funds allocated duplicate other benefits. HUD encourages grantees
to contact their assigned HUD offices for guidance in complying with these require-
ments during development of their Action Plans for Disaster Recovery or if they
have any questions regarding meeting these requirements.

*Prevention of Fraud, Abuse, and* **Duplication** *of Benefits*

 The statute also directs the Secretary to:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

71 FR 7666-01                                                                    Page 4
(Publication page references are not available for this document.)

Establish procedures to prevent recipients from receiving any **duplication** of bene-
fits and report quarterly to the Committees on Appropriations with regard to all
steps taken to prevent fraud and abuse of funds made available under this heading
including **duplication** of benefits.

 To meet this directive, HUD is pursuing four courses of action. First, this Notice
includes specific reporting, written procedures, monitoring, and internal audit re-
quirements for grantees. Second, to the extent its resources allow, HUD will insti-
tute risk analysis and on-site monitoring of grantee management of the grants and
of the specific uses of funds. Third, HUD will be extremely cautious in considering
any waiver related to basic financial management requirements. The standard, time-
tested CDBG financial requirements will continue to apply. Fourth, HUD is collabo-
rating with the HUD Office of Inspector General to plan and implement oversight of
these funds.

*Waiver Justification*

 This section of the Notice briefly describes the basis for each waiver and related
alternative requirements, if any.

 The waivers, alternative requirements, and statutory changes described in this No-
tice apply only to the CDBG supplemental disaster recovery funds appropriated in
Public Law 109-148, not to funds provided under the regular CDBG program. These ac-
tions provide additional flexibility in program design and implementation and im-
plement statutory requirements unique to this appropriation.

Application for Allocation

 These waivers and alternative requirements streamline the pre-grant process and
set the guidelines for the State's application for its allocation. HUD encourages
each of the five eligible grantees to submit an Action Plan for Disaster Recovery
to HUD within 60 days of the publication date of this Notice.

 Overall benefit to low- and moderate-income persons. Pursuant to explicit author-
ity in the appropriations act, HUD is granting an overall benefit waiver that al-
lows for up to 50 percent of the grant to assist activities under the urgent need
or prevention or elimination of slums and blight national objectives, rather than
the 30 percent allowed in the annual State CDBG program. The primary objective of
Title I of the Housing and Community Development Act and of the funding program of
each grantee is "development of viable urban communities, by providing decent hous-
ing and a suitable living environment and expanding economic opportunities, princi-
pally for persons of low and moderate income." The statute goes on to set the stan-
dard of performance for this primary objective at 70 percent of the aggregate of
the funds used for support of activities producing benefit to low- and moderate-
income persons. Since extensive damage to community development and housing af-
fected those with varying incomes, and income-producing jobs are often lost for a
period of time following a disaster, HUD is waiving the 70 percent overall benefit
requirement, leaving the 50 percent requirement, to give grantees even greater
flexibility to carry out recovery activities within the confines of the CDBG pro-
gram national objectives. HUD may only provide additional waivers of this require-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

71 FR 7666-01                                                                                                    Page 5
**(Publication page references are not available for this document.)**

ment if it makes a finding of compelling need. The requirement that each activity
meet one of the three national objectives is not waived.

Expanded distribution and direct action. The waivers and alternative requirements
allowing distribution of funds by a state to entitlement communities and Indian
tribes, and to allow a state to carry out activities directly rather than distrib-
ute all funds to units of local government are consistent with waivers granted for
previous similar disaster recovery cases. HUD believes that, in recommending the
Lower Manhattan Development Corporation (LMDC) as a model and in increasing the ad-
ministrative cap, Congress is signaling its intent that the States under this ap-
propriation also be able to carry out activities directly. Therefore, HUD is waiv-
ing program requirements to support this. HUD is also including in this Notice the
necessary complementary waivers and alternative requirements related to subrecipi-
ents to ensure proper management and disposition of funds during the grant execu-
tion and at closeout.

Consistency with the consolidated plan. HUD is waiving the requirement for consis-
tency with the consolidated plan because the effects of a major disaster usually
alter a grantee's priorities for meeting housing, employment, and infrastructure
needs. To emphasize that uses of grant funds must be consistent with the overall
purposes of the Housing and Community Development Act of 1974, HUD is limiting the
scope of the waiver for consistency with the consolidated plan; it applies only un-
til the grantee first updates its consolidated plan priorities following the disas-
ter.

Action Plan for Disaster Recovery. HUD is waiving the CDBG action plan require-
ments and substituting an Action Plan for Disaster Recovery. This will allow rapid
implementation of disaster recovery grant programs and ensure conformance with pro-
visions of the Appropriations Act. Where possible, the Action Plan for Disaster Re-
covery, including certifications, does not repeat common action plan elements the
grantee has already committed to carry out as part of its annual CDBG submission.
Although a State as the grantee may designate an entity or entities to administer
the funds, the State is responsible for compliance with Federal requirements. Dur-
ing the course of the grant, HUD will monitor the State's use of funds and its ac-
tions for consistency with the Action Plan. The State may submit an initial partial
Action Plan and amend it one or more times subsequently until the Action Plan de-
scribes uses for the total grant amount. The State may also amend activities in its
Action Plan.

Citizen participation. The citizen participation waiver and alternative require-
ments will permit a more streamlined public process, but one that still provides
for reasonable public notice, appraisal, examination, and comment on the activities
proposed for the use of CDBG disaster recovery grant funds. The waiver removes the
requirement at both the grantee and state grant recipient levels for public hear-
ings or meetings as the method for disseminating information or collecting citizen
comments. Instead, grantees are encouraged to employ innovative methods to communi-
cate with citizens and solicit their views on proposed uses of disaster recovery
funds, and to indicate in the Action Plan how it has addressed these views.

Administration limitation. State program administration requirements must be modi-
fied to be consistent with the appropriations act, which allows up to five percent

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

of the grant to be used for the State's administrative costs. The provisions at 42 U.S.C. 5306(d) and 24 CFR 570.489(a)(1)(i) and (iii) will not apply to the extent that they cap State administration expenditures and require a dollar for dollar match of State funds for administrative costs exceeding $100,000. HUD does not waive 24 CFR 570.489(a)(3) to allow the State to exceed the overall planning, man-agement and administrative cap of 20 percent.

Use of Subrecipients

 The State CDBG program rule does not make specific provision for the treatment of the entities called "subrecipients" in the CDBG entitlement program. The waiver al-lowing the state to carry out activities directly creates a situation in which the state may use subrecipients to carry out activities in a manner similar to entitle-ment communities. HUD and its Office of Inspector General have long identified the use of subrecipients as a practice that increases the risk of abuse of funds. HUD's experience is that this risk can be successfully managed by following the CDBG en-titlement requirements and related guidance. Therefore, HUD is requiring that a state taking advantage of the waiver allowing it to carry out activities directly must follow the alternative requirements drawn from the CDBG entitlement rule and specified in this Notice when using subrecipients.

Reporting

 HUD is waiving the annual reporting requirement because the Congress requires quarterly reports from the grantees and from HUD on various aspects of the uses of funds and of the activities funded with these grants. Many of the data elements the grantees will report to Congress quarterly are the same as those that HUD will use to exercise oversight for compliance with the requirements of this Notice and for prevention of fraud, abuse of funds, and **duplication** of benefits. To collect these data elements and to meet its reporting requirements, HUD is requiring each grantee to report to HUD quarterly using the online Disaster Recovery Grant Reporting sys-tem, which has just converted to a streamlined, re-engineered, Internet-based for-mat. HUD will use grantee reports to monitor for anomalies or performance problems that suggest fraud, abuse of funds, and **duplication** of benefits; to reconcile budg-ets, obligations, fund draws, and expenditures; and to calculate applicable admin-istrative and public service limitations and the overall percent of benefit to low-and moderate-income persons, and as a basis for risk analysis in determining a monitoring plan.

 After HUD reviews each report and accepts a report, the grantee must post the re-port on a Web site for its citizens. If a grantee chooses, it may use this report, together with a statement regarding any sole source procurements, as its required quarterly submission to the Committees on Appropriations. Each quarter, HUD will submit to the Committees a summary description of its report reviews, other HUD monitoring and technical assistance activities undertaken during the quarter, and any significant conclusions related to fraud or abuse of funds or **duplication** of benefits.

Certifications

 HUD is waiving the standard certifications and substituting alternative certifica-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

tions. The alternative certifications are tailored to CDBG disaster recovery grants and remove certifications and references that are redundant or appropriate to the annual CDBG formula program.

Applicable Rules, Statutes, Waivers, and Alternative Requirements

*Pre-Grant Process*

1. General note. Prerequisites to a grantee's receipt of CDBG disaster recovery assistance include adoption of a citizen participation plan; publication of its proposed Action Plan for Disaster Recovery; public notice and comment; and submission to HUD of an Action Plan for Disaster Recovery, including certifications. Except as described in this Notice, statutory and regulatory provisions governing the Community Development Block Grant program for states, including those at 42 U.S.C. 5301 et seq. and 24 CFR part 570, shall apply to the use of these funds.

2. Overall benefit waiver and alternative requirement. The requirements at 42 U.S.C. 5301(c), 42 U.S.C. 5304(b)(3)(A), and 24 CFR 570.484 that 70 percent of funds are for activities that benefit low- and moderate-income persons are waived to stipulate that at least 50 percent of disaster recovery grant funds are for activities that principally benefit low- and moderate-income persons.

3. Direct grant administration by States and means of carrying out eligible activities. Requirements at 42 U.S.C. 5306 are waived to the extent necessary to allow the State to use its disaster recovery grant allocation directly to carry out state-administered activities eligible under this Notice. Activities eligible under this Notice may be undertaken, subject to State law, by the recipient through its employees, or through procurement contracts, or through loans or grants under agreements with subrecipients, or by one or more entities that are designated by the chief executive officer of the State. Activities made eligible under section 105(a)(15) of the Housing and Community Development Act of 1974, as amended, may only be undertaken by entities specified in that section, whether the assistance is provided to such an entity from the State or from a unit of general local government.

4. Consolidated Plan waiver. Requirements at 42 U.S.C. 12706 and 24 CFR 91.325(a)(6), that housing activities undertaken with CDBG funds be consistent with the strategic plan, are waived. Further, 42 U.S.C. 5304(e), to the extent that it would require HUD to annually review grantee performance under the consistency criteria, is also waived. These waivers apply only until the time that the grantee first updates the consolidated plan priorities following the disaster.

5. Citizen participation waiver and alternative requirement. Provisions of 42 U.S.C. 5304(a)(2) and (3), 42 U.S.C. 12707, 24 CFR 570.486, and 24 CFR 91.115(b) with respect to citizen participation requirements are waived and replaced by the requirements below. The streamlined requirements do not mandate public hearings at either the state or local government level, but do require providing a reasonable opportunity for citizen comment and ongoing citizen access to information about the use of grant funds. The streamlined citizen participation requirements for this grant are:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

71 FR 7666-01                                                              Page 8
**(Publication page references are not available for this document.)**


  a. Before the grantee adopts the action plan for this grant or any substantial
amendment to this grant, the grantee will publish the proposed plan or amendment
(including the information required in this Notice for an Action Plan for Disaster
Recovery). The manner of publication (including prominent posting on the state, lo-
cal, or other relevant website) must afford citizens, affected local governments
and other interested parties a reasonable opportunity to examine the plan or amend-
ment's contents. Subsequent to publication, the grantee must provide a reasonable
time period and method(s) (including electronic submission) for receiving comments
on the plan or substantial amendment. The grantee's plans to minimize displacement
of persons or entities and to assist any persons or entities displaced must be pub-
lished with the action plan.

  b. In the action plan, each grantee will specify its criteria for determining what
changes in the grantee's activities constitute a substantial amendment to the plan.
At a minimum, adding or deleting an activity or changing the planned beneficiaries
of an activity will constitute a substantial change. The grantee may modify or sub-
stantially amend the action plan if it follows the same procedures required in this
Notice for the preparation and submission of an Action Plan for Disaster Recovery.
The grantee must notify HUD, but is not required to notify the public, when it
makes any plan amendment that is not substantial.

  c. The grantee must consider all comments received on the action plan or any sub-
stantial amendment and submit to HUD a summary of those comments and the grantee's
response with the action plan or substantial amendment.

  d. The grantee must make the action plan, any substantial amendments, and all per-
formance reports available to the public. HUD recommends posting them on the Inter-
net. In addition, the grantee must make these documents available in a form access-
ible to persons with disabilities and non-English-speaking persons. During the
term of this grant, the grantee will provide citizens, affected local governments,
and other interested parties reasonable and timely access to information and re-
cords relating to the action plan and the grantee's use of this grant.

  e. The grantee will provide a timely written response to every citizen complaint.
Such response will be provided within 15 working days of the receipt of the com-
plaint, if practicable.

  6. Modify requirement for consultation with local governments. Currently, the
statute and regulations require consultation with affected units of local govern-
ment in the non-entitlement area of the State regarding the State's proposed method
of distribution. HUD is waiving 42 U.S.C. 5306(d)(2)(C)(iv), 24 CFR 91.325(b), and
24 CFR 91.110, with the alternative requirement that the State consult with all
disaster-affected units of general local government, including any CDBG entitlement
communities, in determining the use of funds.

  7. Action Plan waiver and alternative requirement. The requirements at 42 U.S.C.
12705(a)(2), 42 U.S.C. 5304(a)(1), 42 U.S.C. 5304(m), 42 U.S.C. 5306(d)(2)(C)(iii),
24 CFR 1003.604, and 24 CFR 91.320 are waived for these disaster recovery grants.
Each State must submit to HUD an Action Plan for Disaster Recovery that describes:

  a. The effects of the covered disaster, especially in the most impacted areas and

populations, and the greatest recovery needs resulting from the covered disaster
that have not been addressed by **insurance** proceeds, other federal assistance or any
other funding source;

 b. The grantee's overall plan for disaster recovery including:

 (i) How the State will promote sound short and long-term recovery planning at the
state and local levels, especially land use decisions that reflect responsible
flood plain management, removal of regulatory barriers to reconstruction, and prior
coordination with planning requirements of other State and Federal programs and en-
tities;

 (ii) How the State will encourage construction methods that emphasize high qual-
ity, durability, energy efficiency, and mold resistance including how the State
will promote enactment and enforcement of modern building codes and mitigation of
flood risk where appropriate;

 (iii) How the State will provide or encourage provision of adequate, flood-
resistant housing for all income groups that lived in the disaster impacted areas
prior to the incident date(s) of the applicable disaster(s), including a descrip-
tion of the activities it plans to undertake to address emergency shelter and tran-
sitional housing needs of homeless individuals and families (including subpopula-
tions), to prevent low-income individuals and families with children (especially
those with incomes below 30 percent of median) from becoming homeless, to help
homeless persons make the transition to permanent housing and independent living,
and to address the special needs of persons who are not homeless identified in ac-
cordance with 24 CFR 91.315(d);

 c. Monitoring standards and procedures that are sufficient to ensure program re-
quirements, including non-**duplication** of benefits, are met and that provide for
continual quality assurance, investigation, and internal audit functions, with re-
sponsible staff reporting independently to the Governor of the State or, at a mini-
mum, to the chief officer of the governing body of any designated administering en-
tity;

 d. A description of the steps the State will take to avoid or mitigate occurrences
of fraud, abuse, and mismanagement, especially with respect to accounting, procure-
ment, and accountability, with a description of how the State will provide for in-
creasing the capacity for implementation and compliance of local governments,
subrecipients, subgrantees, contractors, and any other entity responsible for ad-
ministering activities under this grant; and

 e. The state's method of distribution. The method of distribution shall include
descriptions of the method of allocating funds to units of local government and of
specific projects the state will carry out directly, as applicable. The descrip-
tions will include:

 (i) When funds are to be allocated to units of local government, all criteria used
to select applications from local governments for funding, including the relative
importance of each criterion, and including a description of how the disaster re-
covery grant resources will be allocated among all funding categories and the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**

threshold factors and grant size limits that are to be applied; and

 (ii) When the State will carry out activities directly, the projected uses for the
CDBG disaster recovery funds by responsible entity, activity, and geographic area;

 (iii) How the method of distribution or use of funds described in accordance with
the above subparagraphs will result in eligible uses of grant funds related to
long-term recovery from specific effects of the disaster(s) or restoration of in-
frastructure; and

 (iv) Sufficient information so that citizens, units of general local government
and other eligible subgrantees or subrecipients will be able to understand and com-
ment on the action plan and, if applicable, be able to prepare responsive applica-
tions to the State.

 f. Required certifications (see the applicable Certifications section of this No-
tice); and

 g. A completed and executed Federal form SF-424.

 8. Allow reimbursement for pre-agreement costs. The provisions of 24 CFR
570.489(b) are applied to permit a grantee to reimburse itself for otherwise allow-
able costs incurred on or after the incident date of the covered disaster.

 9. Clarifying note on the process for environmental release of funds when a State
carries out activities directly. Usually, a State distributes CDBG funds to units
of local government and takes on HUD's role in receiving environmental certifica-
tions from the grant recipients and approving releases of funds. For this grant,
HUD will allow a State grantee to also carry out activities directly instead of
distributing them to other governments. According to the environmental regulations
at 24 CFR 58.4, when a State carries out activities directly, the State must submit
the certification and request for release of funds to HUD for approval.

 10. **Duplication** of benefits. In general, 42 U.S.C. 5155 (section 312 of the Robert
T. Stafford Disaster Assistance and Emergency Relief Act, as amended) prohibits any
person, business concern, or other entity from receiving financial assistance with
respect to any part of a loss resulting from a major disaster as to which he has
received financial assistance under any other program or from **insurance** or any
other source. The Appropriations Act stipulates that funds may not be used for ac-
tivities reimbursable by or for which funds have been made available by the Federal
Emergency Management Agency or by the Army Corps of Engineers.

 11. Waiver and alternative requirement for distribution to CDBG metropolitan cit-
ies and urban counties.

 a. Section 5302(a)(7) of title 42, U.S.C. (definition of "nonentitlement area")
and provisions of 24 CFR part 570 that would prohibit a state from distributing
CDBG funds to units of general local government in entitlement communities and to
Indian tribes, are waived, including 24 CFR 570.480(a), to the extent that such
provisions limit the distribution of funds to units of general local government lo-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

cated in entitlement areas and to State or Federally recognized Indian tribes. The
state is required instead to distribute funds to the most affected and impacted ar-
eas related to the consequences of the covered disaster(s) without regard to a lo-
cal government or Indian tribe status under any other CDBG program.

  b. Additionally, because a State grantee under this appropriation may carry out
activities directly, HUD is applying the regulations at 24 CFR 570.480(c) with re-
spect to the basis for HUD determining whether the State has failed to carry out
its certifications so that such basis shall be that the State has failed to carry
out its certifications in compliance with applicable program requirements. Also, 24
CFR 570.494 regarding timely distribution of funds is waived. However, HUD expects
each State grantee to expeditiously obligate and expend all funds, including any
recaptured funds or program income, and to carry out activities in a timely manner.

  12. Note that use of grant funds must relate to the covered disaster(s). In addi-
tion to being eligible under 42 U.S.C. 5305(a) or this Notice and meeting a CDBG
national objective, the Appropriations Act requires that activities funded under
this Notice must also be for necessary expenses related to disaster relief, long-
term recovery, and restoration of infrastructure in the most impacted and dis-
tressed areas related to the consequences of the hurricanes in communities included
in Presidential disaster declarations.

  13. Note on change to administration limitation. Up to five percent of the grant
amount may be used for the State's administrative costs. The provisions of 42
U.S.C. 5306(d) and 24 CFR 570.489(a)(1)(i) and (iii) will not apply to the extent
that they cap State administration expenditures and require a dollar for dollar
match of State funds for administrative costs exceeding $100,000. HUD does not
waive 24 CFR 570.489(a)(3) to allow the State to exceed the overall planning, man-
agement and administrative cap of 20 percent.

*Reporting*

  14. Waiver of performance report and alternative requirement. The requirements for
submission of a Performance Evaluation Report (PER) pursuant to 42 U.S.C.12708 and
24 CFR 91.520 are waived. The alternative requirement is that--

  a. Each grantee must submit its Action Plan for Disaster Recovery, including per-
formance measures, into HUD's Web-based Disaster Recovery Grant Reporting (DRGR)
system. (The signed certfications and the SF-424 must be submitted in hard copy.)
As additional detail about uses of funds becomes available to the grantee, the
grantee must enter this detail into DRGR, in sufficient detail to serve as the ba-
sis for acceptable performance reports.

  b. Each grantee must submit a quarterly performance report, as HUD prescribes, no
later than 30 days following each calendar quarter, beginning after the first full
calendar quarter after grant award and continuing until all funds have been ex-
pended and all expenditures reported. Each quarterly report will include informa-
tion about the uses of funds during the applicable quarter including (but not lim-
ited to) the project name, activity, location, and national objective; funds budg-
eted, obligated, drawn down, and expended; the funding source and total amount of
any non-CDBG disaster funds; beginning and ending dates of activities; and perform-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

71 FR 7666-01                                                                    Page 12
**(Publication page references are not available for this document.)**

ance measures such as numbers of low-and moderate-income persons or households
benefiting. Quarterly reports to HUD must be submitted using HUD's Web-based DRGR
system.

  15. Use of subrecipients. The following alternative requirement applies for any
activity that a state carries out directly by funding a subrecipient:

  a. 24 CFR 570.503, except that specific references to 24 CFR parts 84 and 85 need
not be included in subrecipient agreements.

  b. 570.502(b).

  16. Recordkeeping. Recognizing that the State may carry out activities directly,
24 CFR 570.490(b) is waived in such a case and the following alternative provision
shall apply: State records. The State shall establish and maintain such records as
may be necessary to facilitate review and audit by HUD of the State's administra-
tion of CDBG disaster recovery funds under 24 CFR 570.493. Consistent with applica-
ble statutes, regulations, waivers and alternative requirements, and other Federal
requirements, the content of records maintained by the State shall be sufficient
to: enable HUD to make the applicable determinations described at 24 CFR 570.493;
make compliance determinations for activities carried out directly by the state;
and show how activities funded are consistent with the descriptions of activities
proposed for funding in the action plan. For fair housing and equal opportunity
purposes, and as applicable, such records shall include data on the racial, ethnic,
and gender characteristics of persons who are applicants for, participants in, or
beneficiaries of the program.

  17. Change of use of real property. This waiver conforms the change of use of real
property rule to the waiver allowing a State to carry out activities directly. For
purposes of this program, in 24 CFR 570.489(j), (j)(1), and the last sentence of
(j)(2), "unit of general local government" shall be read as "'unit of general local
government or State."

  18. Responsibility for State review and handling of noncompliance. This change
conforms the rule with the waiver allowing the State to carry out activities di-
rectly. 24 CFR 570.492 is waived and the following alternative requirement applies:
The State shall make reviews and audits including on-site reviews of any subrecipi-
ents, designated public agencies, and units of general local government as may be
necessary or appropriate to meet the requirements of section 104(e)(2) of the Hous-
ing and Community Development Act of 1974, as amended, as modified by this Notice.
In the case of noncompliance with these requirements, the State shall take such ac-
tions as may be appropriate to prevent a continuance of the deficiency, mitigate
any adverse effects or consequences, and prevent a recurrence. The State shall es-
tablish remedies for noncompliance by any designated public agencies or units of
general local governments and for its subrecipients.

  19. Information collection approval note. HUD has approval for information collec-
tion requirements in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C.
3501-3520) under OMB control number 2506-0165, which expires August 31, 2007. In
accordance with the Paperwork Reduction Act, HUD may not conduct or sponsor, nor is
a person required to respond to, a collection of information unless the collection

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

displays a valid control number.

*Certifications*

  20. Certifications for state governments, waiver and alternative requirement.
Section 91.325 of title 24 Code of Federal Regulations is waived. Each state must
make the following certifications prior to receiving a CDBG disaster recovery
grant:

  a. The state certifies that it will affirmatively further fair housing, which
means that it will conduct an analysis to identify impediments to fair housing
choice within the state, take appropriate actions to overcome the effects of any
impediments identified through that analysis, and maintain records reflecting the
analysis and actions in this regard. (See 24 CFR 570.487(b)(2)(ii).)

  b. The state certifies that it has in effect and is following a residential anti-
displacement and relocation assistance plan in connection with any activity as-
sisted with funding under the CDBG program.

  c. The state certifies its compliance with restrictions on lobbying required by 24
CFR part 87, together with disclosure forms, if required by that part.

  d. The state certifies that the Action Plan for Disaster Recovery is authorized
under state law and that the state, and any entity or entities designated by the
State, possesses the legal authority to carry out the program for which it is seek-
ing funding, in accordance with applicable HUD regulations and this Notice.

  e. The state certifies that it will comply with the acquisition and relocation re-
quirements of the Uniform Relocation Assistance and Real Property Acquisition Poli-
cies Act of 1970, as amended, and implementing regulations at 49 CFR part 24, ex-
cept where waivers or alternative requirements are provided for this grant.

  f. The state certifies that it will comply with section 3 of the Housing and Urban
Development Act of 1968 (12 U.S.C. 1701u), and implementing regulations at 24 CFR
part 135.

  g. The state certifies that it is following a detailed citizen participation plan
that satisfies the requirements of 24 CFR 91.115 (except as provided for in notices
providing waivers and alternative requirements for this grant), and that each unit
of general local government that is receiving assistance from the state is follow-
ing a detailed citizen participation plan that satisfies the requirements of 24 CFR
570.486 (except as provided for in notices providing waivers and alternative re-
quirements for this grant).

  h. The state certifies that it has consulted with affected units of local govern-
ment in counties designated in covered major disaster declarations in the nonenti-
tlement, entitlement and tribal areas of the state in determining the method of
distribution of funding;

  i. The state certifies that it is complying with each of the following criteria:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

71 FR 7666-01                                                                                    Page 14
**(Publication page references are not available for this document.)**

(1) Funds will be used solely for necessary expenses related to disaster relief, long-term recovery, and restoration of infrastructure in the most impacted and distressed areas related to the consequences of the Gulf Coast hurricanes of 2005 in communities included in Presidential disaster declarations.

(2) With respect to activities expected to be assisted with CDBG disaster recovery funds, the action plan has been developed so as to give the maximum feasible priority to activities that will benefit low- and moderate-income families.

(3) The aggregate use of CDBG disaster recovery funds shall principally benefit low- and moderate-income families in a manner that ensures that at least 50 percent of the amount is expended for activities that benefit such persons during the designated period.

(4) The state will not attempt to recover any capital costs of public improvements assisted with CDBG disaster recovery grant funds, by assessing any amount against properties owned and occupied by persons of low- and moderate-income, including any fee charged or assessment made as a condition of obtaining access to such public improvements, unless (A) disaster recovery grant funds are used to pay the proportion of such fee or assessment that relates to the capital costs of such public improvements that are financed from revenue sources other than under this title; or (B) for purposes of assessing any amount against properties owned and occupied by persons of moderate income, the grantee certifies to the Secretary that it lacks sufficient CDBG funds (in any form) to comply with the requirements of clause (A).

j. The state certifies that the grant will be conducted and administered in conformity with title VI of the Civil Rights Act of 1964 ([42 U.S.C. 2000d](#)) and the Fair Housing Act ([42 U.S.C. 3601](#)-[3619](#)) and implementing regulations.

k. The state certifies that it has and that it will require units of general local government that receive grant funds to certify that they have adopted and are enforcing:

(1) A policy prohibiting the use of excessive force by law enforcement agencies within its jurisdiction against any individuals engaged in non-violent civil rights demonstrations; and

(2) A policy of enforcing applicable state and local laws against physically barring entrance to or exit from a facility or location that is the subject of such non-violent civil rights demonstrations within its jurisdiction.

l. The state certifies that each state grant recipient or administering entity has the capacity to carry out disaster recovery activities in a timely manner, or the state has a plan to increase the capacity of any state grant recipient or administering entity who lacks such capacity.

m. The state certifies that it will not use CDBG disaster recovery funds for any activity in an area delineated as a special flood hazard area in FEMA's most current flood advisory maps unless it also ensures that the action is designed or

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Publication page references are not available for this document.)**


modified to minimize harm to or within the floodplain in accordance with Executive Order 11988 and 24 CFR part 55.

  n. The state certifies that it will comply with applicable laws.

*Duration of Funding*

  Availability of funds provisions in 31 U.S.C. 1551-1557, added by section 1405 of the National Defense Authorization Act for Fiscal Year 1991 (Public Law 101–510), limit the availability of certain appropriations for expenditure. This limitation may not be waived. However, the Appropriations Act for these grants directs that these funds be available until expended unless, in accordance with 31 U.S.C. 1555, the Department determines that the purposes for which the appropriation has been made have been carried out and no disbursement has been made against the appropriation for two consecutive fiscal years. In such case, the Department shall close out the grant prior to expenditure of all funds.

*Catalog of Federal Domestic Assistance*

  The Catalog of Federal Domestic Assistance numbers for the disaster recovery grants under this Notice are as follows: 14.219; 14.228.

*Finding of No Significant Impact*

  A Finding of No Significant Impact (FONSI) with respect to the environment has been made in accordance with HUD regulations at 24 CFR part 50, which implement section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332). The FONSI is available for public inspection between 8 a.m. and 5 p.m. weekdays in the Office of the Rules Docket Clerk, Office of General Counsel, Department of Housing and Urban Development, Room 10276, 451 Seventh Street, SW., Washington, DC 20410-0500.

  Dated: February 3, 2006.

Pamela H. Patenaude,

Assistant Secretary for Community Planning and Development.

[FR Doc. 06-1357 Filed 2-9-06; 2:51 pm]

BILLING CODE 4210-67-P

71 FR 7666-01

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.