# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. J. WILKINSON |
| | § | |
| PERTAINS TO: | § | |
| | § | |
| MRGO (*Robinson*, 06-2268) | § | |
| _____ | § | |

**UNITED STATES OF AMERICA'S RESPONSE TO THE SUPPLEMENTAL
BRIEF ON NEPA SUBMITTED BY PLAINTIFFS AND THEIR AMICI**

At the Court's insistence, Plaintiffs have finally attempted to show with specificity that the Corps violated NEPA or some other mandatory provision of law that would deprive the United States of its discretionary function immunity.  In their supplemental brief, Plaintiffs claim to have found six such instances.  *See* Doc. 17346 at 2-15.

First, Plaintiffs argue that the Corps violated a provision of NEPA that required it to produce a legislative environmental impact statement ("EIS") each time the MRGO authorizing legislation was amended (in 1976, 1986, and 1996).  *See id.* at 2-6.  Second, Plaintiffs argue that the Corps violated NEPA by failing to produce an EIS for each appropriations request it made between 1970 and 1979.  *Id.* at 6-7.  Third, Plaintiffs argue that the Corps violated Executive Order 11990, which governs construction in wetlands areas.  *Id.* at 7-8.  Fourth, Plaintiffs argue that the EIS that the Corps produced in 1976 failed to comply with NEPA because it did not address certain topics that Plaintiffs feel should have been included.  *Id.* at 8-10.  Fifth, Plaintiffs argue that the Corps violated NEPA by failing to supplement its 1976 EIS more than it did.  *Id.* at 10-13.  Sixth, and finally, Plaintiffs argue that the Corps violated NEPA by failing to produce a comprehensive EIS, rather than issuing more than two dozen environmental assessments ("EAs"), to determine the environmental impact of its dredging activities over the years.  *Id.* at 13-15.  Plaintiffs are wrong with respect to each of these arguments.  This Court must find that the United States is entitled to discretionary function immunity and dismiss this case.

**I.     The Corps Was Not Required To Produce An EIS Each Time The MRGO Authorizing Legislation Was Amended**

Plaintiffs argue (in section II.B. of their supplemental brief) that the Corps "violated its mandatory legal obligations under NEPA by failing to * * * prepare mandatory detailed EISs within 30 days of authorizing legislation."  *Id.* at 2.  Specifically, Plaintiffs point to three

amendments of the original 1956 MRGO authorizing legislation contained in the Water Resources Development Acts of 1976, 1986, and 1996, and argue that each of these amendments somehow triggered an obligation for the Corps to prepare a legislative EIS to address the overall environmental impact of the MRGO. *Id.* at 3. Plaintiffs are wrong.

Without describing the very limited nature of each of the three amendments, Plaintiffs repeatedly characterize them as a "reauthorizations" of the MRGO project which supposedly were proposed or requested by the Corps. This is a gross mischaracterization. In fact, we are aware of no evidence that any of the three amendments was proposed or requested by the Corps, nor did they have the effect of "reauthorizing" the entire MRGO project. Instead, all three amendments pertained to discrete features of the MRGO project which are not at issue in this case and can have no possible causal nexus to the damages claimed by the Plaintiffs.

### A.   1976 Amendment

The first amendment cited by the Plaintiffs was contained in section 186 of the Water Resources Development Act of 1976, Pub. Law 94-587, 90 Stat. 2917, 2941-2942 (1976). As its terms plainly show, the 1976 amendment simply modified the conditions for local cost sharing insofar as they pertained to bridges to be constructed over the MRGO channel:

> The Act entitled "An Act to authorize construction of the Mississippi River-Gulf outlet", approved March 29, 1956 (70 Stat. 65), is amended by inserting before the period at the end thereof a colon and the following: "*And provided further*, That such conditions of local cooperation shall not apply to the construction of bridges (at a cost not to exceed $71,000,000) required as a result of the Mississippi River-Gulf outlet channel if the Secretary of the Army, after consultation with the Secretary of Transportation, determines prior to construction of such bridges that the Federal Government will not assume the costs of such work in accordance with section 132(a) of the Federal-Aid Highway Act of 1976 (Public Law 94-280); and before construction of the bridges may be instituted the non-Federal public bodies involved shall agree pursuant to section 221 of the Flood Control Act of 1970 (Public Law 91-611) to (a) hold and save the United

> States free from damages resulting from construction of the bridges and their approaches, (b) provide without cost to the United States all lands, easements, and rights-of-way necessary for the construction of the bridges and their approaches, and (c) maintain and operate the bridges and their approaches after construction is completed".

The Corps was under no obligation to prepare a legislative EIS in connection with this amendment. The relevant provision of NEPA requires inclusion of an EIS "in every recommendation or report on proposals for legislation * * * significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C)(1). This provision does not require an agency to produce a legislative EIS for every piece of proposed legislation considered by Congress. *See State of Minnesota v. Block*, 660 F.2d 1240, 1259 (6th Cir. 1981) ("The passage of an act of Congress * * * does not create an obligation to prepare an EIS, despite any significant environmental impact resulting from the legislation."). To the contrary, by its terms NEPA requires an EIS to be included in "reports or recommendations on proposals for legislation." Thus, if an agency submits no report or recommendation on proposed legislation, no legislative EIS is required.

Here, Plaintiffs have adduced no evidence that the Corps ever submitted to Congress a recommendation or report relating to the 1976 amendment, let alone that the Corps proposed this amendment. Under these circumstances, the Corps was under no obligation to prepare or submit a legislative EIS with respect to the 1976 amendment.

Moreover, even if the Plaintiffs could adduce evidence that Congress had submitted such a recommendation or report, under NEPA the obligation to prepare and submit a legislative EIS would have been triggered only insofar as the proposed legislation "significantly affect[ed] the quality of the human environment." 42 U.S.C. § 4332(C)(1). *See State of Idaho v. Andrus*, 483 F. Supp. 255, 257 (D. N.D. 1980) ("The threshold determination of whether a legislative

3

proposal significantly affects the quality of the human environment is reserved to the federal agency. If the agency determines that the proposed legislation does not significantly affect the quality of the human environment, no detailed evaluation and consideration of the environmental impacts of the proposed legislation is necessary.").

As we shall discuss in greater detail below, determining whether a proposal for legislation (or a proposal for any other major Federal action) significantly affects the quality of the human environment involves weighing and balancing many factors, and therefore entails the exercise of judgment. While an agency's determination regarding whether a proposal for legislation or other major Federal action significantly affects the quality of the human environment is subject to judicial review under the standards prescribed by the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), such a determination cannot be second-guessed in the context of a tort suit against the United States. *See Baie v. Secretary of Defense*, 784 F.2d 1375, 1376 (9th Cir. 1986) ("[W]hether the Assistant Secretary's administrative interpretation * * * was arbitrary or contrary to law may not be tested in an action under the FTCA. * * * As the Supreme Court said recently in *Varig*, the discretionary function exception was designed to prevent 'judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'") (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).

Finally, even if Plaintiffs could establish that the Corps was somehow obligated to produce a legislative EIS in connection with the 1976 amendment, they could not show that the failure to do so had any causal relationship to the damages they claim in this action. As the statutory text quoted above establishes, the 1976 amendment did not represent a reauthorization

of the MRGO project as a whole, and instead merely modified the conditions for local cooperation insofar as they pertained to cost-sharing with regard to bridges to be constructed over the channel of MRGO. Such a modification clearly would have triggered no requirement to produce a legislative EIS concerning the MRGO project as a whole.

### B. 1986 and 1996 Amendments

The same analysis also applies to the 1986 and 1996 amendments, both of which pertained not to the MRGO project as a whole, but instead to the lock replacement project on the IHNC. The 1986 amendment was contained in section 844 of the Water Resources Development Act of 1986, Pub. Law 99-662, 100 Stat. 4082, 4177, which provided:

> (a) Subject to section 903(a) of this Act, the Mississippi River-Gulf outlet feature of the project for Mississippi River, Baton Rouge to Gulf of Mexico, authorized by the Act of March 29, 1956 (Public Law 455 of the Eighty-fourth Congress, 70 Stat. 65), is modified to provide that the replacement and expansion of the existing industrial canal lock and connecting channels or the construction of an additional lock and connecting channels shall be in the area of the existing lock or at the Violet site, at a total cost of $714,300,000. Before selecting the site under the preceding sentence, the Secretary shall consult with affected local communities. The costs of such modification shall be allocated between general cargo navigation and inland navigation, one-half of the Federal costs shall be paid from the Inland Waterways Trust Fund and one-half of the Federal costs shall be paid from the General Fund of the Treasury. With respect to the costs allocated to general cargo navigation, cost sharing provided in section 101 shall apply.
> (b) The Secretary is directed to make a maximum effort to assure the full participation of members of minority groups, living in the affected areas, in the construction of the replacement or additional lock and connecting channels authorized by subsection (a) of this section, including actions to encourage the use, wherever possible, of minority-owned firms. The Secretary is directed to report on July 1 of each year to the Congress on the implementation of this section, together with recommendations for any legislation that may be needed to assure the fuller and more equitable participation of members of minority groups in this project or others under the direction of the Secretary.

The 1996 amendment was contained in section 326 of the Water Resource Act of 1996, Pub. Law 104-303, 110 Stat. 3658, 3717, which provided:

5

>Section 844 of the Water Resources Development Act of 1986 (100 Stat. 4177) is amended by adding at the end the following:
>
>"(c) COMMUNITY IMPACT MITIGATION PLAN.– Using funds made available under subsection (a), the Secretary shall implement a comprehensive community impact mitigation plan, as described in the evaluation report of the New Orleans District Engineer dated August 1995, that, to the maximum extent practicable, provides for mitigation or compensation, or both, for the direct and indirect social and cultural impacts that the project described in the subsection (a) will have on the affected areas described in subsection (b)."

By the time the legislation containing the 1986 and 1996 amendments was considered by Congress, the Council on Environmental Quality (CEQ) had issued final regulations pursuant to Executive Order 11991 to implement the procedural provisions of NEPA. *See* 43 Fed. Reg. 55978 (Nov. 29, 1978). Under these regulations, the term "legislation" was defined to include "a bill or legislative proposal to Congress *developed by or with the significant cooperation and support of a Federal agency * * *. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source.*" *Id.* at 56004 (codified at 40 C.F.R. § 1508.17) (emphasis supplied). The regulations further provided: "A legislative environmental impact statement is the detailed statement required by law to be included in a recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later in order to allow time for completion of an accurate statement which can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations." *Id.* at 56001 (codified at 40 C.F.R. § 1506.8(a)).

As these regulations make clear, the requirement to produce a legislative EIS applies only to the Corps' own legislative proposals, rather than to legislative proposals emanating from other

6

sources, such as local interests or members of Congress. Moreover, a legislative EIS is to be transmitted to Congress within 30 days of formal transmittal of legislative proposal by the Corps, and in any event before Congressional hearings or deliberations on the proposal. In other words, it is the transmittal by the Corps of a formal legislative proposal which triggers the 30-day period for transmittal of a legislative EIS; the enactment of legislation, whether proposed by the Corps or others, triggers no obligation on the part of the Corps to produce a legislative EIS.

Again, Plaintiffs have adduced no evidence (and we are aware of none) that the Corps proposed the 1986 and 1996 amendments to the 1956 MRGO legislation, let alone that the Corps ever formally transmitted a proposal to Congress recommending that these amendments be adopted. Since the Corps did not propose or recommend adoption of the 1986 or 1996 amendments, it was under no obligation to produce an EIS with respect to either amendment.

Furthermore, even if Plaintiffs could establish that the Corps did propose or recommend the adoption of either of these amendments, the determination of whether it was necessary to produce a legislative EIS would have entailed a protected exercise of judgment since it would have required a threshold determination by the Corps as to whether these legislative proposals significantly affected the quality of the human environment. *See Baie*, 784 F.2d at 1376 (such administrative determinations cannot be second-guessed through the medium of tort litigation); *State of Idaho v. Andrus*, 483 F. Supp. at 257.

As for Plaintiffs' assertion that the *enactment* of the 1986 or 1996 amendments somehow triggered an obligation on the part of the Corps to produce a legislative EIS, as noted above, it is the date of formal transmittal of a legislative proposal by an agency to Congress, rather than the enactment of a legislative proposal into law, which triggers the 30-day period to produce and

transmit to Congress a legislative EIS.  *See* 40 C.F.R. § 1506.8(a).

Assuming *arguendo* that Plaintiffs could demonstrate that the enactment of the 1986 or 1996 amendments somehow triggered an obligation on the part of the Corps to produce a legislative EIS, Plaintiffs cannot demonstrate that the Corps' failure to do so has any causal relationship with their claimed damages in this case.  As this Court is well aware, following the enactment of the 1986 and 1996 amendments, the Corps did produce an EIS concerning the lock replacement project, which was the discrete part of the MRGO project that was the subject of both of these amendments.  *See ACORN v. United States Army Corps of Eng'rs*, 2000 WL 433332, at *6-*8 (E.D. La. Apr. 20, 2000) (Duval, J.) (reciting history of the lock replacement project, selection of site of replacement lock, and preparation and issuance by Corps of EIS concerning the project).

Finally, as with the 1976 amendment, neither the 1986 nor 1996 amendment represented a reauthorization of the MRGO project as a whole, but instead both amendments concerned a discrete part of the MRGO project, namely, the lock replacement project.  Thus, even if the Corps was somehow obligated to produce a legislative EIS with regard to either the 1986 or the 1996 amendment, these amendments did not trigger an obligation to produce a legislative EIS with regard to the MRGO project as a whole, which was authorized in 1956.  Instead, if any legislative EIS was required, it would have been limited to examining the environmental impact of the lock replacement project.  However, this Court has already ruled that allegations concerning the IHNC lock replacement project are not part of this case.  *See In re Katrina Canal Breaches Consol. Litigation*, 2008 WL 4449970 (E.D. La. Sept. 29, 2008) (Duval, J.) (dismissing claims related to IHNC lock replacement project from this case).  Since claims related to the IHNC lock replacement project have been dismissed, the failure of the Corps to produce a legislative EIS related to this project has

no causal connection to the claims that Plaintiffs are asserting in this case.

## II. The Corps Was Not Required To Produce An EIS For Each Appropriations Request It Made From 1970 Through 1979

Plaintiffs argue (in section II.C. of their supplemental brief) that "Requests for Appropriations From 1970 Through 1979 Required Legislative EISs." *See* Doc. 17346 at 6. This argument is based entirely on the Corps' alleged violation of "interim guidelines" promulgated by the CEQ in 1970. *See id.* at 3 (noting that on "April 30, 1970, the CEQ promulgated interim guidelines which provided that 'major Federal actions' included '[r]ecommendations or reports relating to legislation and appropriations'"). To be sure, the "interim guidelines" on which Plaintiffs rely did define "legislation" to include appropriations requests.[1] For two reasons, however, those guidelines did not impose specific, mandatory obligations with which the Corps failed to comply.

First, as the Supreme Court recognized in *Andrus v. Sierra Club*, 442 U.S. 347, 356-57 (1979), the pre-1979 CEQ guidelines "were advisory in nature," and were therefore not binding on the Corps. Indeed, Plaintiffs' own supplemental brief recognizes that prior to 1979, the "regulation" on which they rely was nothing more than an "interim guideline[]." *See* Doc. 17346 at 3 ("On April 30, 1970, the CEQ promulgated *interim guidelines* which provided that 'major Federal actions' included '[r]ecommendations or reports relating to legislation and appropriations.'") (emphasis added). Such an "advisory" "guideline" cannot form the basis for stripping the United States of its discretionary function immunity.

---

[1] As Plaintiffs concede, these guidelines were revised in 1979 to state expressly that "legislation" under NEPA "does *not* include requests for appropriations." 43 Fed. Reg. 56004 (1978) (emphasis added); *see also Andrus*, 442 U.S. at 357 (explaining the history of the CEQ's guidelines). The regulation now provides: "Legislation includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations." *See* 40 C.F.R. § 1508.17.

Second, the Supreme Court has rejected the view—expressed in the CEQ's pre-1979 interim guidelines—that NEPA required agencies to produce a legislative EIS each time they made an appropriations request. *See Andrus*, 442 U.S. at 364-65 ("We conclude therefore * * * that appropriation requests constitute neither 'proposals for legislation' nor 'proposals for * * * major Federal actions,' and that therefore the procedural requirements of [NEPA] have no applications to such requests."); *see also Aluli v. Brown*, 602 F.2d 876, 877 (9th Cir. 1979) (quoting *Andrus* and holding that "the district court's judgment is reversed and its order vacated insofar as it requires the Government to prepare yearly environmental impact statements to accompany appropriations requests").[2]

The Court must therefore reject Plaintiffs' argument based on the Corps' 1970-79 appropriations requests.

## III.  The Corps Did Not Violate Executive Order 11990

Plaintiffs argue (in section II.D. of their supplemental brief) that the Corps violated Executive Order 11990, which pertains to new construction in wetlands areas.

Section 8 of the Executive Order provides that it does not apply to "projects and programs for which a draft or final environmental impact statement will be filed prior to October 1, 1977." Exec. Order No. 11990, 42 Fed. Reg. 26961, 26964 (May 25, 1977). As Plaintiffs noted in their Statement of Uncontested Facts in support of their motion for summary judgment (Doc. 16510-4),

---

[2]  Given its holding in *Andrus*, it is clear that even if the CEQ's pre-1979 guidelines had not been revised to exclude appropriations requests, *see supra* at 9 n.1, the Supreme Court would have struck those guidelines as inconsistent with the requirements of NEPA. Accordingly, the two cases cited by Plaintiffs in their supplemental brief (at page 3), *Environmental Defense Fund v. TVA*, 468 F.2d 1181 (6th Cir. 1972) and *Scientists Institute for Public Information, Inc. v. Atomic Energy Commission*, 481 F.2d 1088 (D.C. Cir. 1973)—both of which were decided based on the pre-1979 interim guidelines—cannot be relied upon by this Court.

"[i]n March 1976, the [Corps] completed a Final Environmental Impact Statement ('1976 EIS') for the MR-GO project pursuant to 40 CFR Part 1500.6(1)." *See* Doc. 16510-4 ¶ 58. Because the MRGO EIS was filed "prior to October 1, 1977," the Executive Order on which Plaintiffs rely did not apply. The Court must therefore reject Plaintiffs' argument based on Executive Order 11990.

## IV.     The 1976 EIS Did Not Violate NEPA

In section II.E. of their supplemental brief, Plaintiffs repeat the arguments they unsuccessfully made in their previous briefs regarding the supposed inadequacy of the Corps' 1976 EIS. *See, e.g.*, Doc. 16510-2 at 14. In short, Plaintiffs claim that the 1976 EIS should have discussed in greater detail topics relating to storm surge and wetlands loss.

As the United States has explained in its previous responses to this argument, under NEPA, decisions regarding what topics to include in an EIS are to be made by the agency, subject to judicial review under the APA. *See Town of Winthrop v. FAA*, 535 F.3d 1, 10 (1st Cir. 2008) (rejecting argument that NEPA required a more "detailed description" of the agency's consideration of a particular issue); *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008) (holding that "abuse of discretion" standard applies to "drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue"). Courts reviewing such decisions may not second-guess the agency or re-weigh the factors it considered, but must determine only whether the agency abused its discretion under NEPA. *See Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227-28 (1980) ("[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" (quoting *Kleppe v. Sierra*

11

*Club*, 427 U.S. 390, 410, n. 21 (1976)) (internal marks omitted).

The most that could be said for Plaintiffs' case—even if they are correct that the Corps should have discussed more fully in the 1976 EIS the topic of storm surge and its effect on marsh lands—is that in preparing the 1976 EIS, the Corps abused its discretion. But as this Court has already recognized:

> The discretionary function exception * * * protects *all* policy choices, *even those that are an abuse of discretion*.

*In re Katrina Canal Breaches Consol. Litig.*, 2008 WL 2186400, at *6 (May 27, 2008) (Duval, J.) (emphasis added). In other words, even if the Corps abused its discretion by failing to discuss certain topics in its 1976 EIS, discretionary function immunity would still apply.

## V. The Corps Did Not Violate NEPA By Failing To Supplement Its EIS Or By Performing Environmental Assessments Rather Than Another EIS

Finally, Plaintiffs repeat two more arguments that they presented before in their motion for summary judgment: that the Corps violated NEPA by failing to supplement its 1976 EIS and by failing to prepare a comprehensive EIS to examine the cumulative effects of its dredging activities. Neither of these arguments has merit.

First, as the United States demonstrated in its opposition to Plaintiffs' motion for summary judgment (Doc. 16789), Plaintiffs are wrong in their assertion that NEPA imposed a specific and mandatory obligation on the Corps to further supplement the 1976 EIS.[3]

---

[3] Factually speaking, too, Plaintiffs are wrong. In 1985, the Corps published a "Supplemental Information Report" designed to complement the 1976 EIS. *See* Doc. 16510-4 (Pls.' Stmt. of Undisputed Facts) ¶¶ 87-88. Additionally, between 1980 and 2004, the Corps performed a total of 26 Environmental Assessments ("EAs") concerning its MRGO-maintenance activities, *id.* ¶ 95, concluding each time that the Corps activities would have no significant impact on the environment. Moreover, it is worth noting that the Corps' maintenance dredging activities have been categorically excluded from the requirements of NEPA by the Corps'

The CEQ's regulations provide that an agency must prepare a supplement to an EIS when "it makes substantial changes in the proposed action" or there "are significant new circumstances." 40 C.F.R. 1502.9(c)(1). These provisions are too general to deprive the United States of discretionary function immunity, because they do not mandate a specific course of conduct. "Only if a federal statute, regulation, or policy specifically prescribes a course of action embodying a *fixed or readily ascertainable standard*, will a government employee's conduct not fall within the discretionary function exception." *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997); *accord Autery v. United States*, 992 F.2d 1523, 1529 (11th Cir. 1993); *see also Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1540 (10th Cir. 1992); *Zumwalt v. United States*, 928 F.2d 951, 954 (10th Cir. 1991).

In *Daigle*, for example, the court addressed a statute defining environmental-remediation actions "necessary to prevent, minimize, or mitigate damage to the public health or welfare." The statute specified that the actions should attain a degree of cleanup * * * [which,] at a minimum * * * [en]sures protection of human health and the environment." *See Daigle*, 972 F.2d at 1540 (analyzing 42 U.S.C. §§ 9601(23) & 9621(d)(1)). It thus specified minimum attainments without specifying a course of action to maintain them. The court therefore held that the statute did not contain "specific and mandatory directives." *Id.*

Similarly, in *Zumwalt*, the plaintiff had wandered off a trail in a National Park and injured himself. He sued the United States, alleging that employees of the National Park Service had

---

regulations. *See* 33 C.F.R. § 230.9(c). Those regulations provide that "[m]inor maintenance dredging using existing disposal sites," whether considered individually *or cumulatively*, "do not have significant effects on the quality of the human environment and are categorically excluded from NEPA documentation." 33 C.F.R. § 230.9 & (c).

negligently marked the trail. In response to the assertion of discretionary function immunity by the United States, the plaintiff argued that the immunity did not apply because the Park Service had failed to follow its own mandatory policies, one of which required it to improve "those sections of the trail that have proven to be hazardous or difficult to follow." *Zumwalt*, 928 F.2d at 954 n.4. The Tenth Circuit rejected the plaintiff's argument:

> National Park Service personnel retain substantial discretion under the [policies]. To implement the Project Statement, Park Service personnel must first determine which sections of the Trail have proven to be hazardous or difficult to follow. The Project Statement does not provide any direction on how this determination should be made * * *. These factors demonstrate the need for individual judgment by Park Service employees * * *. Therefore, Zumwalt's argument that the conduct at issue did not involve the exercise of judgment or choice must fail.

*Id.* at 954.

The CEQ's regulations pertaining to when an agency must prepare a supplemental EIS, like those in *Daigle* and *Zumwalt*, fail to prescribe a course of action "embodying a fixed or readily ascertainable standard." While the regulations call for supplements in cases of "substantial changes" or "significant new circumstances," they provide agencies no guidance for determining when such "substantial changes" or "significant new circumstances" have occurred. In other words, the CEQ's regulations demonstrate the need for individualized judgment by agency employees and are therefore subject to the discretionary function exception.

Second, Plaintiffs are wrong that the Corps was required by NEPA to perform a comprehensive EIS to evaluate the cumulative effect of the Corps' dredging of the MRGO. The CEQ's regulations provide that an agency should consider cumulative actions which, "when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2). Like the situation for determining whether a supplemental EIS is required, the

decision whether the cumulative effects of proposed actions are such that they would have "significant impacts" involves the exercise of judgment by the agency. As the Supreme Court noted in *Kleppe v. Sierra Club*, 427 U.S. 390 (1976), determining whether to perform a comprehensive EIS "requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility." *Id.* at 412. The Court further observed that "[r]esolving these issues * * * is properly left to the informed *discretion* of the responsible federal agencies." *Id.* (emphasis added). Simply put, NEPA did not specifically mandate that the Corps complete a comprehensive EIS regarding its dredging activities prior to Hurricane Katrina.

## **CONCLUSION**

For the reasons stated, the Court should dismiss this action.

Respectfully submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General
PHYLLIS J. PYLES
Director, Torts Branch, Civil Division
JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch, Civil Division
ROBIN SMITH
Senior Trial Counsel, Torts Branch, Civil Division

/s/ Jeffrey P. Ehrlich
JEFFREY P. EHRLICH
Trial Attorney, Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C. 20044
(202) 616-4448/(202) 616-5200 (Fax)
Attorneys for the United States