UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re:  KATRINA CANAL BREACHES            §        CIVIL ACTION
              CONSOLIDATED LITIGATION       §        NO. 05-4182 "K" (2)
                                                              §        JUDGE DUVAL
_____§        MAG. WILKINSON
                                                              §
PERTAINS TO: MRGO, Robinson (06-2268)   §
_____§


DEFENDANT UNITED STATES' NOTICE OF SUPPLEMENTATION
OF THE RECORD FOR ITS MOTION TO DISMISS, DOC. 16511

In support of its Motion to Dismiss or, in the Alternative, for Summary Judgment

(Doc. 16511), the United States previously filed 57 exhibits.  In response to questions by the

Court during and after oral argument, the United States now submits additional exhibits in

order to provide a record basis for answering the Court's questions.

At oral argument the Court asked whether the Army Corps of Engineers exercised

policy-based judgment in deciding how to respond to suggestions and concerns that the

Mississippi River-Gulf Outlet posed a danger of flooding during hurricanes. Following oral

argument, the Court inquired as to the purpose of Reconnaissance Reports and the recipients

of these reports. The following exhibits set forth the purposes of the MRGO Bank Erosion

Reconnaissance Reports, identifies the recipients of them, and traces the connection

between the 1988 report, the 1994 report, and the eventual construction of bank protection.

These exhibits also provide evidence that the Corps did exercise policy-based discretion with

regard to the putative threat posed by the MRGO. Finally, these exhibits include

post-argument testimony concerning the design of the MRGO, including the policy bases of

the design and the effects that followed from it.

EXHIBIT 58 (Manual Letter)

Exhibit 58 is a letter dated September 23, 1969, from the then Acting New Orleans

District Engineer, Maj. Harold E. Manual, Jr., to Senator John Breaux.  The letter

demonstrates that the Corps considered and rejected placing a surge barrier at the confluence

of the MRGO and the GIWW because it "could not be economically justified" and because it

would "represent a significant liability to the container industry and doubtless cause the loss

of cargoes, public investment, and jobs."  Exh. 59, at 2.  The letter also responded to concerns

about land loss and saltwater intrusion by noting that "[t]he salt marsh is . . . a valuable

nursery area and habitat for fish and shellfish, including red drum, speckled trout, shrimp,

oysters, and blue crabs."  Id. at 1.  The letter noted that "a number of commercial and

recreational fishing businesses and oil field service vendors are based near the channel . . .

and make heavy use of the MR-GO."  Id.  Closure was not considered economically justified

because it would result in annual losses of about $13 million or more.  Id. at 2.

EXHIBIT 59 (Haar Letter)

Exhibit 59 is a letter dated September 23, 1969 from the then New Orleans District

Engineer, Col. Herbert R. Haar, Jr., to Congressman F. Edward Hebert.  The letter is in

response to a constituent's concern that the Lake Pontchartrain and Vicinity Hurricane

Protection Project "will not have all the answers because it excludes flood gates at the Gulf

Outlet." Exh. 59, at 6.  The District Engineer's response demonstrates that the Corps

considered economic, political, and social policies, including public safety, in designing a

flood protection system that omitted flood gates at the MRGO.  The Corps rejected a flood

protection plan with surge barriers at the MRGO because it "would result in a substantial

increase in consts" with an "increase in benefits [that] was small by comparison."  Id. at 1.

The Corps also considered the political implications:  adoption of the plan featuring

surge barriers on the MRGO "would mean that none of the work already accomplished by

local interests . . . would be incorporated into the Federal project and no credit for such work

could be allowed."  Id. at 2.  Delays associated with adopting the plan would "likely" cause

local political entities "to proceed independently and at great cost with improvements to the

existing levee systems for interim protections.  For these reasons, the Orleans Levee District,

the agency designated by the Governor to provide the local cooperation required for the

project, and the Louisiana Department of Public Works, local coordinator for the project,

have expressed their opposition to such a plan."  Id.

Public safety was also a consideration:

[T]he modifications involved are so broad in scope as to be beyond the
discretionary authority of the Chief of Engineers to adopt, so that project
review and subsequent Congressional action wold be required.  During the
time that this process was being accomplished, progress in planning and
constructing some of the most urgently needed project features would be
discontinued.

Id.

Commercial interests were also considered: "operation of two features of the plan, namely, the navigation gate in the Mississippi River-Gulf Outlet and the lock in the Gulf Intracoastal Waterway, would significantly impede seagoing and inland navigation." Id.

EXHIBIT 60 (Heiberg Letter)

Exhibit 60 is a letter dated April 21, 1975, from the District Engineer, Col. K.R. Heiberg III, to G.J. Lannes, Jr. The letter demonstrates that the Corps considered the economic, political, commercial, and social implications, including public safety implications, in deciding not to build a floodgate in the MRGO. See Exh. 60, at 1-2.

EXHIBIT 61 (Miller Testimony)

Exhibit 61 is testimony concerning the nature and purpose of Reconnaissance Reports. Greg Miller, a Senior Project Manager in the New Orleans District, testified that Reconnaissance Reports are produced in response to Congressional authorization for the purpose of determining whether there is a federal interest in ameliorating or eliminating a particular problem, whether cost-effective solutions exist, and whether a local (non-federal) sponsor will fund a more detailed study of the feasibility of possible solutions. See Exhibit 61, at 332:9-20. The 1988 MRGO Bank Erosion Reconnaissance Report was sent to many state and federal representatives, senators, and agencies. See id. at 360:19 to 361:21.

EXHIBIT 62 (Podany Testimony)

Exhibit 62 is testimony concerning the nature and purpose of Reconnaissance Reports. Thomas Podany, the Chief of the Protection and Restoration Office in the New Orleans District, testified that Reconnaissance Reports are produced in response to

Congressional authorization for the purpose of determining whether there is a federal interest in ameliorating or eliminating a particular problem, whether cost-effective solutions exist, and whether a local (non-federal) sponsor will fund a more detailed study of the feasibility of possible solutions.  See Exh. 62, at pp. 33:13-17, 38:8-11,150:7 to 151:2, 160:19 to 161:3,196:12-17, 199:21 to 200:1, 273:5-14, 279:19 to 280:2, 307:9 to 309:3, 325:20-24. Reconnaissance Reports provide a basis for determining whether to proceed to a more detailed study of the feasibility of potential solutions identified in the Reconnaissance Report.  Id. at 38:12-16, 150:4 to 151:2, 159:4 to 160:2, 198:8 to 199:3; see also Exh. 63 at 60:2 to 61:7.  Reconnaissance Reports are not ordinarily sent to Congress.  See id. at  179:9 to 180:11.

Mr. Podany explained the course of events that led from the 1988 Reconnaissance Report to the 1994 Reconnaissance Report and ultimately culminated in construction of several miles of bank protection.  Mr. Podany testified that less than a year after completion of the 1988 report, it was determined that the modeling that formed the basis of dredging costs in the 1988 report may have been inaccurate.  Id. at 258:6-13.  Left without a proper way to evaluate bank protection and absent a local sponsor, the Corps had a "dilemma."  Id. at 258:15-24.  As a result of this dilemma, work began on the Reconnaissance Report eventually released in 1994, in large part to re-evaluate and try to expand the ways in which bank erosion protection might be justified.  Id. at 258:25 to 259:1-8.  Included among the new attempts was placing a non-monetary value on environmental outputs, such as marshland.  Id. at 260:1 to 261:9.  The 1994 version, unlike the 1988 one, addressed closure

of the MRGO as an alternative to bank erosion protection.  Id. at 304:17-23; Exh. 65 (1994

Reconnaissance Report) at 36.  No feasability study was undertaken, however, because a

cost-sharing partner could not be found.  See Exh. 61 (Miller Dep.) at 321:2 to 322:3; Exh. 62

(Podany Dep.) at 327:18 to 328:23.  Finally, in 1996, the Corps found a way to tie funding for

foreshore protection to operation and maintenance dredging because it would reduce costs

for a five-and-a-half mile area, rendering a local sponsor unnecessary.  Exh. 62 (Podany

Dep.) at 363:8 to 366:24.

EXHIBIT 63 (Montvai Testimony)

Exhibit 63 is testimony concerning the nature and purpose of Reconnaissance

Reports.  Zoltan Montvai, the Civil Deputy for the Mississippi Valley Division Regional

Integration Team, testified that Reconnaissance Reports are produced in response to

Congressional authorization for the purpose of determining whether there is a federal

interest in ameliorating or eliminating a particular problem, whether cost-effective solutions

exist, and whether a local (non-federal) sponsor will fund a more detailed study of the

feasibility of possible solutions.  See Exh. 63, at 60:7 to 61:7, 86:16 to 87:10.  The 1988 MRGO

Bank Erosion Reconnaissance Report was sent to many state and federal representatives,

senators, and agencies.  See id. at 62:11 to 63:17.  Reconnaissance Reports are not ordinarily

sent to Congress.  Id. at p. 48:4-16.

EXHIBIT 64 (1988 MRGO Bank Erosion Reconnaissance Report)

Exhibit 64 consists of two excerpts from the 1988 MRGO Bank Erosion

Reconnaissance Report.  The first excerpt sets forth the endorsements (comments,

suggestions, and criticisms) of various Corps entities, and a statement of the congressional authority, the purpose, and the scope of the report.  The second excerpt is an appendix listing the many state and federal representatives, senators, and agencies to whom the report was mailed.  See Exh. 64 (App. D), Bates No. MGP-003-000000429 to -000000448

EXHIBIT 65 (1994 MRGO Bank Erosion Reconnaissance Report)

Exhibit 65 is an excerpt from the 1994 MRGO Bank Erosion Reconnaissance Report. This excerpt sets forth the authority, purpose, and scope of the report.

EXHIBIT 66 (Wolff Testimony)

Exhibit 66 is testimony concerning the process by which Corps reports are reviewed at the final draft stage, resulting in the attachment of comments, suggestions, and criticisms, and the drafting component's responses. Thomas Wolff, the Assistant Dean of the College of Engineering at Michigan State University, testified that these "endorsements" are typically thereafter including in the report under the cover page, before the table of contents.  See Exh. 66, at 16 (describing the review process for MRGO General Design Memorandum No. 3).  The reviewers' comments on the 1988 MRGO Bank Erosion Reconnaissance Report were to be addressed in a GDM Supplement.  See Exh. 64, Memorandum For Record, dated November 30, 1988; Disposition Form, dated June 2, 1988; Exh. 62 (Podany) at 216:4 to 223:13 (explaining the nature of the comments and that the Division Office would not approve a GDM Supplement until comments had been resolved).  A GDM Supplement is similar to a feasability study, but avoids the problem of finding a local cost-sharing partner. Id. at 276:4-19.

EXHIBIT 67 (Kemp Testimony)

The post-hearing deposition of Plaintiffs' expert Paul Kemp addressed the putative effects of the design of the MRGO.  Dr. Kemp testified that it was the design of the MRGO which led to an increase in saltwater and caused the loss of wetlands.  Dr. Kemp further testified that the design of the MRGO created the funnel effect.  See Exh. 67, at 100:12-16, 105:15-21, 107:6-9.  Dr. Kemp also testified that the operation and maintenance of the MRGO flowed from the original design of the MRGO.  Id. at 272:15 to 273:6.  In order to perfectly operate and maintain the MRGO, Dr. Kemp testified that a surge barrier was required.  This surge barrier would require Congressional authorization and funding.  Id. at 269:25 to 271:8.  Moreover, Dr. Kemp testified that the Corps chose not to include bank stabilization features in the design of the MRGO to save costs, as local sponsors did not wish to share in these costs.  Id. at 284:3 to 285:13.

In Dr. Kemp's opinion, the Corps selected the route for the MRGO to reduce future maintenance costs and to allow for the development of potential industrial sites.  Id. at 286:8 to 287:22; see also Exh. 68 (Kemp Report) at 32.  Dr. Kemp also believes that both the MRGO project and the LPV project were underfunded.  See Kemp Dep. at 291:3 to 291:24.

Furthermore, Dr. Kemp testified that the Corps, through a letter written by Colonel Haar, rejected construction of a surge barrier because the project: (1) was not economically justified; (2) would not include credits for the work already accomplished by local interests; (3) would require additional Congressional authorization; (4) would abandon work already

accomplished on building levees; and (5) would interfere with shipping and navigation interests.  Id. at 280:23 to 281:17, 282:18 to 283:1; Exh. 68, Kemp Report at 23-24.

EXHIBIT 68 (Kemp Report)

Exhibit 68 is an excerpt from a report prepared by Plaintiffs' expert Paul Kemp.  In it Dr. Kemp expresses his opinion that the Corps considered and rejected placing a surge barrier on the MRGO.

EXHIBIT 69 (Bea Testimony)

After the hearing on the motion to dismiss, Plaintiffs' expert Robert G. Bea addressed the numerous policy considerations implicated in the Corps's design of the MRGO.  Dr. Bea opined that the MRGO design decisions required a consideration of (1) environmental considerations and the potential for litigation seeking to enjoin certain projects; (2) economic concerns regarding cost-benefit ratios; (3) available technology; and (4) coordination with governmental and local interests.  See Exh. 68, Dr. Robert Bea deposition, dated Jan. 30-31, 2009, at 51:22 to 53:24.  Dr. Bea testified that the MRGO's design problems include (1) failure to include barriers to interrupt saltwater intrusion; (2) failure to include a storm surge barrier; and (3) failure to limit anticipated erosion of the channel.  Id. at 126:5 to 127:23.  Dr. Bea further testified that engineering decisions pertaining to the MRGO cannot be decoupled from policy analysis.  Id. at 51:2-21.

Dr. Bea also testified that the Corps's design did not include foreshore protection.  Id. at 72:3-10.  Dr. Bea stated that the increase in saltwater intrusion from the MRGO was part of the original design.   Id. at 60:22 to 61:6.

9

Lastly, Dr. Bea testified that the alignment of the levees creates the funnel effect, not the MRGO.  The funnel is the result of storm surge piling up against the levees, the highest structures in the hurricane protection system.  Id. at 58:18 to 59:23.

<u>EXHIBIT 70 (Naomi Letter)</u>

Exhibit 70 is a letter dated August 26, 2002, from then Senior Project Manager Alfred C. Naomi to Louisiana state representative Nita R. Hutter.  The letter demonstrates that the Corps was continuing to improve the federal hurricane protection system and was in the process of developing storm surge models that would address the threat of flooding that existed with the MRGO in place.  See Exh. 70.

EXHIBIT 71 (Budget Justification Sheets)

Exhibit 71 consists of Budget Justification Sheets which demonstrate that the Corps

annually calculated the benefits and costs of continuing to operate and maintain the MRGO.

Respectfully submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR
Assistant Director, Torts Branch

  s/ Robin D. Smith
ROBIN DOYLE SMITH
Senior Trial Counsel
Conor Kells
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 616-4289 / (202) 616-5200 (Fax)
Attorneys for the Defendant United States

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing Notice of Supplementation of the

Record was served by ECF on all parties of record on February 13, 2009.

s/  Robin D. Smith
ROBIN D. SMITH