# EXHIBIT 62

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION            NO. 05-4182 K2

                                   JUDGE DUVAL

PERTAINS TO:  MRGO AND ROBINSON

              (No. 06-2268)


               (V O L U M E   I)

        Rule 30(b)(6) deposition of THE UNITED

STATES OF AMERICA, BY AND THROUGH THE UNITED

STATES ARMY CORPS OF ENGINEERS' DESIGNEE THOMAS

PODANY, given at the U.S. Army Corps of

Engineers New Orleans District offices, 7400

Leake Avenue, New Orleans, Louisiana

70118-3651, on October 8th, 2008.


REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

PODANY, THOMAS

10/8/2008

Page 2

```
 1    REPRESENTING THE PLAINTIFFS:

 2              BRUNO & BRUNO

 3              (BY:  JOSEPH M. BRUNO, ESQUIRE)

 4              (BY:  FLORIAN BUCHLER, ESQUIRE)

 5              855 Baronne Street

 6              New Orleans, Louisiana 70113

 7              504-525-1335

 8    - AND -

 9              THE GILBERT FIRM, LLC

10              (BY:  ELISA T. GILBERT, ESQUIRE)

11              325 E. 57th Street

12              New York, N.Y. 10022

13              212-286-8503

14    - AND -

15              MCKERNAN LAW FIRM

16              (BY:  ASHLEY E. PHILEN, ESQUIRE)

17              8710 Jefferson Highway

18              Baton Rouge, Louisiana 70809

19              225-926-1234

20    - AND -

21              ANDRY LAW FIRM

22              (BY:  KEA SHERMAN, ESQUIRE)

23              610 Baronne Street

24              New Orleans, Louisiana 70113

25              504-586-8899
```

PODANY, THOMAS

10/8/2008

Page 3

```
 1   REPRESENTING THE UNITED STATES OF AMERICA:

 2           UNITED STATES DEPARTMENT OF JUSTICE,

 3           TORTS BRANCH, CIVIL DIVISION

 4           (BY:  ROBIN SMITH, ESQUIRE)

 5           (BY:  CONOR KELLS, ESQUIRE)

 6           P.O. Box 888

 7           Benjamin Franklin Station

 8           Washington, D.C. 20044

 9           202-616-4289

10

11   REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS.

12           CORPS OF ENGINEERS, OFFICE OF COUNSEL

13           (BY:  JENNIFER LABOURDETTE, ESQUIRE)

14           7400 Leake Avenue

15           New Orleans, Louisiana 70118-3651

16           504-862-2843

17

18   ALSO PRESENT:

19           TIANA CHRISTOPHER, ESQ.

20           R. SCOTT HOGAN, ESQ.

21           RICK PAVLICK, ESQ.

22           WILLIAM GUSTE, IV, ESQ.

23           DARCY DECKER, ESQ.

24

25
```

PODANY, THOMAS

10/8/2008

```
                                                          Page 4
   1    PARTICIPATING VIA I-DEP:

   2            BRENDAN O'BRIEN, ESQ.

   3            ERIC GOLDBERG, ESQ.

   4            NICK DIETZEN, ESQ.

   5            ELWOOD STEVENS, ESQ.

   6

   7    VIDEOGRAPHER:

   8            GILLEY DELORIMIER (DEPO-VUE)

   9

  10

  11

  12

  13

  14

  15

  16

  17

  18

  19

  20

  21

  22

  23

  24

  25
```

PODANY, THOMAS

10/8/2008

Page 5

1           E X A M I N A T I O N   I N D E X

2

3    EXAMINATION BY:                        PAGE

4

5    MR. BRUNO    ...............................9

6           E X H I B I T   I N D E X

7

8    EXHIBIT NO.                            PAGE

9    Exhibit 37  ..............................39

10   Exhibit 38  ..............................40

11   Exhibit 39  ..............................43

12   Exhibit 40  ..............................60

13   Exhibit 41  ..............................74

14   Exhibit 42  ..............................75

15   Exhibit 43  ..............................78

16

17

18

19

20

21

22

23

24

25

PODANY, THOMAS

10/8/2008

Page 6

1                  S T I P U L A T I O N

2           IT IS STIPULATED AND AGREED by and

3    among counsel for the parties hereto that the

4    deposition of the aforementioned witness may be

5    taken for all purposes permitted within the

6    Federal Rules of Civil Procedure, in accordance

7    with law, pursuant to notice;

8                That all formalities, save reading

9    and signing of the original transcript by the

10   deponent, are hereby specifically waived;

11               That all objections, save those as to

12   the form of the question and the responsiveness

13   of the answer, are reserved until such time as

14   this deposition, or any part thereof, is used

15   or sought to be used in evidence.

16

17

18                         *    *    *

19

20

21

22           JOSEPH A. FAIRBANKS, JR., CCR, RPR,

23   Certified Court Reporter in and for the State

24   of Louisiana, officiated in administering the

25   oath to the witness.

PODANY, THOMAS

10/8/2008

Page 32

1       A.    Right.

2       Q.    That's not done.  That's ongoing right

3    now.

4       A.    Right.

5       Q.    Do you know whether or not the

6    reconnaissance report or the information

7    contained therein in any way motivated the

8    Corps to seek authority to do this coastal --

9    this technical evaluation?  Let's call it that.

10      A.    Well, the technical evaluation was

11   something that was, you know, developed by

12   Congressional interests.  And, um -- you know,

13   I'm not aware that the Corps was involved in

14   writing legislation or even providing a

15   drafting service.

16      Q.    Okay.  How about the Louisiana Coastal

17   Area Feasibility Study; did the reconnaissance

18   report play -- was that either the motivation

19   or did it provide information which caused the

20   Corps to believe that it was appropriate to

21   seek Congressional authorization for such a

22   feasibility study?

23          MR. SMITH:

24              Objection.  Vague.

25      A.    Well, I can say that the Louisiana

PODANY, THOMAS

10/8/2008

Page 33

```
 1   Coastal Area authority currently, the most
 2   recent part of that authority, is the Water
 3   Resource Development Act of 2007.  So -- and
 4   that is post-Katrina.  Okay?
 5   EXAMINATION BY MR. BRUNO:
 6       Q.   Okay.  Fair enough.
 7       A.   So that's what we're operating under
 8   right now.
 9       Q.   Okay.  I mean, the reconnaissance
10   report had as its purpose the desire to
11   understand the impact of the MRGO on the
12   environment, isn't that true?
13       A.   The purpose of the reconnaissance
14   report was to look at, in light of the erosion
15   along the unleveed banks of the MRGO, whether
16   any measures could be taken to reduce that bank
17   erosion.
18       Q.   Did it assume as a matter of fact that
19   the MRGO was causing the bank erosion?
20       A.   I don't know what it assumed.  Um --
21   but I think there was a connection between --
22   made between the bank erosion and the project.
23       Q.   All right.  And that's why I'm
24   wondering, did that -- as a result of the
25   reconnaissance report did that become an
```

PODANY, THOMAS

10/8/2008

Page 34

1    accepted fact in the Corps?

2         MR. SMITH:

3              Objection.  Vague.

4    A.   Well, I can answer it this way:  Um --

5    within coastal Louisiana there are channels of

6    various types that have been dredged through

7    marsh, and when that occurs and vessels move

8    through those channels erosion occurs along the

9    banks.  So that's something that happens in

10   the, you know, across coastal Louisiana.

11   EXAMINATION BY MR. BRUNO:

12   Q.   Right.  So the answer is that the

13   Corps accepts as a fact the existence of a

14   dredged channel will cause erosion of the

15   shore.  Right?

16        MR. SMITH:

17             Objection.  Vague.

18   EXAMINATION BY MR. BRUNO:

19   Q.   Based upon what you've just told me.

20   A.   Well, I can say that, you know, the

21   Corps would say that if you dredge a channel

22   through marsh areas and vessels transit that

23   channel there's likely to be bank erosion.

24   Q.   All right.  Now, for how long have you

25   been with the Corps?

PODANY, THOMAS

10/8/2008

Page 37

```
 1            MR. BRUNO:

 2                 So can I assume, Robin, that

 3            falls under 36, the reevaluation

 4            study?

 5            MR. SMITH:

 6                 Yes.

 7            MR. BRUNO:

 8                 Okay.  That's fine.  That helps

 9            me tremendously.

10   EXAMINATION BY MR. BRUNO:

11       Q.   Now, the Corps recognizes that the

12   first reconnaissance study was in fact a study

13   done by Coastal Environments, Inc. in October

14   of 1973, isn't that true?  (Tendering.)  I've

15   seen some Corps documents that say those exact

16   words.

17       A.   Well, I'm not familiar with this

18   particular study, but I've heard about it, but

19   I don't know.  This is something done by an AE

20   firm.

21       Q.   It is.

22       A.   So, I mean, it may have been

23   information that was available to people in

24   '88, but I'm not aware of it.

25       Q.   There are Corps documents which if I
```

PODANY, THOMAS

1    need to I'll go pull them sometime during the

2    day --

3         A.    Okay.

4         Q.    -- which suggest that this is the

5    first reconnaissance study.  And I will get

6    those documents for you.  But have you ever

7    heard that idea?

8         A.    No, because when we refer to

9    reconnaissance studies, we're very specific to

10   mean studies that Congress has authorized us to

11   perform.

12        Q.    Okay.

13        A.    And, um -- you know, we have -- in the

14   planning program, we have a two-step process

15   basically, a reconnaissance phase and a

16   feasibility phase.  So when people refer to a

17   reconnaissance study, generally they're talking

18   about one that was authorized and directed by

19   Congress to perform.

20             MR. SMITH:

21                  Could we have this marked, Joe,

22             the document you just asked him about?

23             MR. BRUNO:

24                  I'm not quite ready to do that,

25             but I will do it.

PODANY, THOMAS

10/8/2008

Page 39

1    EXAMINATION BY MR. BRUNO:

2        Q.    I think it may be more appropriate to

3    mark the reconnaissance report first, as it

4    references that, just logically.  I'm going to

5    mark the '88 recollection report as Exhibit

6    Number 37.

7            (Exhibit 37 was marked for

8    identification and is attached hereto.)

9            (Off the record.)

10   EXAMINATION BY MR. BRUNO:

11       Q.    I'm looking at the -- and I'm just

12   trying to orient us here before we get heavy

13   into it -- Page 3 of the report in '88.  It

14   says prior studies, reports and existing water

15   projects.

16       A.    Right.

17       Q.    If you look at -- on Page 4, it seems

18   to be referring to a coastal environments, Inc.

19   published results of a study of bank

20   stabilization for the MRGO in December of '84.

21           Okay, I'm going to mark this document,

22   now, which is entitled The Mississippi River

23   Gulf Outlet, a Study of Bank Stabilization, as

24   Number 38, if that's the document.

25   (Tendering.)

PODANY, THOMAS

10/8/2008

Page 149

```
 1          MR. SMITH:
 2              Is there a question?
 3          MR. BRUNO:
 4              Yeah.
 5    EXAMINATION BY MR. BRUNO:
 6      Q.   Isn't that true?
 7      A.   If the cost of the project increases
 8    to maintain and the benefits stay the same,
 9    there could be a point where the benefit-cost
10    ratio goes below 1.
11      Q.   Right.
12      A.   And, you know, it's questionable about
13    speculating how much traffic you may have on
14    the navigation project versus the cost of
15    maintaining it.  But this suggests that the
16    project could be in trouble because the
17    maintenance requirement could go up
18    substantially in the future, and if the dollars
19    to maintain it don't go up then you may not be
20    able to preserve its function.
21      Q.   Okay.  Why is this relevant at all to
22    a reconnaissance project to me?  How does it
23    plug into this whole thing?  We know that the
24    Congress said, all right, go and figure out how
25    bad the problem is.  Now we know how bad the
```

PODANY, THOMAS

10/8/2008

Page 150

1    problem is, we know that we've got a lot of

2    erosion of the banks, we've got increased

3    salinity, I mean, we've got all these physical

4    manifestations of the project.  How does that

5    connect to the money in a reconnaissance report

6    setting?

7         A.   All right.  One of the purposes of

8    doing a reconnaissance report, besides to find

9    a sponsor for the feasibility phase, is to

10   determine the level of federal involvement in

11   any of these solutions.  And the way the

12   federal government does that through their

13   Planning Guidance Notebook ER1105-2-100 is to

14   require the development of a benefit-cost ratio

15   and, you know, look at the plan that most --

16   what they call the National Economic

17   Development Plan, the plan that maximizes net

18   economic benefits when you compare the average

19   annual benefits of a project to its average

20   annual costs.  So all this work in this report

21   up to this point is trying to just get a

22   preliminary view of whether these projects,

23   these alternatives that are identified, would

24   perform well enough to -- and provide enough

25   benefit to outweigh their costs.  And then

PODANY, THOMAS

10/8/2008

Page 151

 1   there would be a federal interest in a plan

 2   such as that.

 3        Q.   So the cost of putting this foreshore

 4   protection, whatever that number is, let's say

 5   it's $100, do we amortize that over the life of

 6   the project?

 7        A.   Yes, we do.  If you go to Page 41,

 8   there's a table that shows the interest on

 9   initial cost.  Amortization over the life of

10   the project, the average annual maintenance

11   costs, and these are for the two, um -- this is

12   Structural Option 1.  And those I think are

13   believed to be the best alternatives at that

14   point, best structural options.

15        Q.   Okay.

16        A.   And you can see that at the very

17   bottom line they develop a benefit-cost ratio,

18   so they're comparing benefits to cost, and

19   they're looking to demonstrate that there might

20   be an alternative where the benefits exceed the

21   costs, and you have two that are close.  I

22   mean, you have -- well, two that do, but it's

23   pretty close.  You know, a 1.1 benefit-cost

24   ratio is not, um -- is considered to be a

25   marginally justified project.

PODANY, THOMAS

10/8/2008

Page 152

1      Q.    Marginally justified.  But the 1, is

2   that a justified project?

3      A.    The 1 is even.  I mean, if it was .99

4   it would be unjustified, so it's right under

5   the border there.  A benefit-cost ratio has to

6   be greater than 1 to be economically

7   justifiable.

8      Q.    Greater than 1.  Okay.  So the cost is

9   the numerator and the benefits are the

10  denominator?

11     A.    The other way around.  Benefits are

12  the numerator and costs are the denominator.

13            Is that what you said?

14     Q.    What I said was the costs were the

15  numerator, the top of the line, and the

16  benefits were the denominator, below the line.

17     A.    No, it's the other way around.

18     Q.    Benefits go on top.

19     A.    Right.

20     Q.    Costs go on the bottom.

21     A.    Yeah.  So you're looking for a BC

22  ration -- If it greater than 1 that means the

23  benefits outstrip the costs.

24     Q.    Now.  We're talking strictly dollars

25  here.  Now, what I don't know that we've

Johns Pendleton Court Reporters                    800 562-1285

PODANY, THOMAS

10/8/2008

Page 159

1    requirement to mitigate for that loss?

2         Q.    That would go into the cost.

3         A.    Yes.

4         Q.    All right.  Well, we're not doing that

5    yet.

6         A.    Well, yeah.  And I think most people

7    would -- because this is a project viewed to be

8    friendly to the environment, they will not

9    necessarily push hard that you mitigate for

10   that, but that's the kind of thing that you

11   would look at.  You know, in a typical project

12   you would look at, first, the impacts to

13   significant resources, some of which are listed

14   there, you know, the effects on water quality,

15   marsh, biological resources, cultural

16   resources, recreational resources, those

17   impacts are addressed in general.  And then if

18   you can find that the alternatives that are

19   being evaluated appear to be environmentally

20   acceptable and you have the economic piece in

21   the previous section, then you have a plan that

22   would be potentially feasible.

23        Q.    Got you.

24        A.    And it's only potential, because this

25   is preliminary, it's reconnaissance, it's not

PODANY,  THOMAS

10/8/2008

Page 160

 1   full feasibility.

 2       Q.    Now, going then back to the summary of

 3   the annual cost benefits and benefit-cost

 4   ratios, I note that on the benefits section

 5   that we only have $121,000 for marsh loss

 6   reduction savings.  Now, that cannot possibly

 7   include any assessment of the value of marsh as

 8   a tidal or surge barrier.  Can it?  I mean,

 9   especially look backwards to Katrina where

10   you're talking about a $100 billion loss.

11       A.    Right.  I will say that the Corps no

12   longer attempts to quantify the value of an

13   acre of marsh because it's very difficult to

14   get agreement, nationally, on what that value

15   is.  So this was an attempt to try to include

16   this as a benefit category to help maybe put

17   the project -- justify the project.

18       Q.    Well ---

19       A.    But it's very difficult to get

20   agreement on, you know, how marsh performs and

21   what value it has to the economy and what an

22   acre of marsh is valued at.  And even to this

23   day you can't find, I think -- I haven't --

24   there's not agreement on what that number would

25   be.

PODANY, THOMAS

10/8/2008

Page 161

1      Q.    Well, there may not be agreement, but

2    here's the problem:  You've only put one

3    $21,000 on that number, right?

4      A.    Right.

5      Q.    And that's a small number.

6      A.    Yeah.

7      Q.    And it would have a dramatic impact on

8    the cost-benefit ratio on Page 41, at least as

9    the numbers are presented to me there.  Right?

10     A.    Yeah.  If you increased it a lot it

11   would go up a lot.

12     Q.    Even if you just doubled it --

13     A.    Right.

14     Q.    -- it would go up.

15     A.    Uh-huh.

16     Q.    It would go up pretty significantly,

17   right?

18     A.    Right.  And here's the thing, though:

19   As far as the purpose of a recon report, since

20   they've demonstrated that there are two

21   projects that are at least marginally

22   economically feasible and that those

23   alternatives are generally considered

24   environmentally acceptable, the only thing

25   really missing is an non federal sponsor or

PODANY, THOMAS

10/8/2008

Page 162

1    approval to proceed some other way, if there

2    was such a thing, if there was such a thing to

3    just go ahead and proceed.

4         Q.   All right.

5         A.   But, so this -- from that standpoint,

6    this is a successful recon report.  You've got

7    at least two alternatives, you know, you only

8    need one to show that it's potentially feasible

9    economically.  You've got an environmentally

10   acceptable plan.  And you need a sponsor to

11   cost share in the feasibility, and that's what

12   it didn't have.  But the recommendation was to

13   move to a GDM.

14        Q.   Yeah.

15        A.   And that's another story.

16        Q.   We're going to get -- yeah.  We're

17   betting a little ahead of ourselves.  Because

18   we will go there, I just want -- I'd like to

19   finish the '88 report if I can.

20             So the numbers in here, those numbers

21   point to the project being cost effective,

22   right?

23        A.   Right.  So if the value of the marsh

24   was higher, you still -- you could still move

25   ahead.

PODANY, THOMAS

10/8/2008

Page 178

1      A.   Right.  And that would have been at

2  the MVD and headquarters level.  There should

3  be some kind of correspondence that says, you

4  can use these funds to do the GDM supplement.

5      Q.   Okay.

6      A.   The thing about that is, once it goes

7  to a GDM supplement it actually moves out of

8  the planning arena, kind of.  It goes to either

9  engineering or operations.  So I didn't see

10  that, you know.  And this, while I was in

11  planning division, um -- knowing that this was

12  going on, I can relate to it as a

13  reconnaissance report, but I can't relate it to

14  after that because it went outside the planning

15  center, until it came back to us again, the

16  updated one.  So I can't answer.

17          THE WITNESS:

18              I'm just saying I can't answer

19          his questions.

20  EXAMINATION BY MR. BRUNO:

21      Q.   All right.  I have this thing called

22  the fact sheet.  And I only offer it to help

23  with some of the facts that we're talking about

24  here.

25      A.   Uh-huh.

PODANY, THOMAS

10/8/2008

Page 179

```
 1      Q.   Let me show it to you.  It's dated 12

 2   May '04.  It's intended be an historical piece.

 3      A.   Uh-huh.

 4      Q.    It has a Bates number on it NOP 4-984

 5   in seriatim to NOP 4-994.  (Tendering.)

 6           Have you ever seen this?

 7           While he's looking, let me ask you a

 8   few more questions.

 9           There is no evidence that this

10   reconnaissance report was given to the Congress

11   of the United States; right?

12      A.   No.

13      Q.   And whatever it was that occurred that

14   the reconnaissance report of 1988 did not go

15   into a supplement to the general design

16   memorandum, it didn't get there because of

17   something that occurred within the United

18   States Army Corps of Engineers, isn't that

19   true?

20           MR. SMITH:

21                Objection.  Calls for

22           speculation.

23      A.   I don't know what happened to it.

24   EXAMINATION BY MR. BRUNO:

25      Q.   Well, whatever happened.  I'm not
```

PODANY, THOMAS

10/8/2008

Page 180

```
 1    suggesting for a moment that you knew what
 2    happened.  What I'm suggesting is whatever
 3    happened it was entirely within this United
 4    States Army Corps of Engineers.
 5              MR. SMITH:
 6                   Objection.  Asked and answered.
 7              Calls for speculation.
 8    EXAMINATION BY MR. BRUNO:
 9         Q.   Isn't that true?
10         A.   See, I don't know there is any way to
11    know that until you see what really happened.
12         Q.   Okay.  And as I understand what this
13    report says, the Corps decided -- based upon
14    its own evaluation of its own regulations,
15    Congressional authorization and the like, the
16    Corps decided that this reconnaissance report
17    gave it the authority to move to a supplement
18    to a general design memorandum which would have
19    included foreshore protection to the banks of
20    the MRGO, isn't that true?
21              MR. SMITH:
22                   Objection.  Calls for
23              speculation.
24         A.   I'm not sure I understand the question
25    here.
```

PODANY, THOMAS

10/8/2008

Page 181

1   EXAMINATION BY MR. BRUNO:

2        Q.   What I'm saying is that the

3   reconnaissance report was done by the Corps --

4        A.   Right.

5        Q.   -- it reached the conclusions that

6   you've talked about all afternoon --

7        A.   Right.

8        Q.   -- the conclusion was that we should

9   go to a supplement to the general design

10  memorandum which would include foreshore

11  protection exactly in the same fashion that we

12  had the supplement to the general design

13  memorandum for the foreshore protection at

14  Reach 1 and Reach 2.  So this conclusion is a

15  conclusion reached by the Corps based upon its

16  own policies, procedures, regulations and the

17  like.  Isn't that true?

18           MR. SMITH:

19                Objection.  Vague.

20       A.   The only thing I can say is that the

21  reconnaissance report recommended that

22  additional studies be done in preparation of a

23  supplement to the general design memorandum to

24  the MRGO navigation project.  That's the only

25  conclusion really that came out of this.

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

 5   CONSOLIDATED LITIGATION            NO. 05-4182 K2

 6                                      JUDGE DUVAL

 7   PERTAINS TO:  MRGO AND ROBINSON

 8                    (No. 06-2268)

 9

10              (V O L U M E   II)

11              Rule 30(b)(6) deposition of THE UNITED

12   STATES OF AMERICA, BY AND THROUGH THE UNITED

13   STATES ARMY CORPS OF ENGINEERS' DESIGNEE THOMAS

14   PODANY, given at the U.S. Army Corps of

15   Engineers New Orleans District offices, 7400

16   Leake Avenue, New Orleans, Louisiana

17   70118-3651, on October 9th, 2008.

18

19

20

21

22

23   REPORTED BY:

24           JOSEPH A. FAIRBANKS, JR., CCR, RPR

25           CERTIFIED COURT REPORTER #75005
```

```
1     REPRESENTING THE PLAINTIFFS:

2              BRUNO & BRUNO

3              (BY:  JOSEPH M. BRUNO, ESQUIRE)

4              (BY:  FLORIAN BUCHLER, ESQUIRE)

5              855 Baronne Street

6              New Orleans, Louisiana 70113

7              504-525-1335

8     - AND -

9              THE GILBERT FIRM, LLC

10             (BY:  ELISA T. GILBERT, ESQUIRE)

11             325 E. 57th Street

12             New York, N.Y. 10022

13             212-286-8503

14    - AND -

15             MCKERNAN LAW FIRM

16             (BY:  ASHLEY E. PHILEN, ESQUIRE)

17             8710 Jefferson Highway

18             Baton Rouge, Louisiana 70809

19             225-926-1234

20    - AND -

21             ANDRY LAW FIRM

22             (BY:  KEA SHERMAN, ESQUIRE)

23             610 Baronne Street

24             New Orleans, Louisiana 70113

25             504-586-8899
```

```
 1    REPRESENTING THE UNITED STATES OF AMERICA:

 2             UNITED STATES DEPARTMENT OF JUSTICE,

 3             TORTS BRANCH, CIVIL DIVISION

 4             (BY:  ROBIN SMITH, ESQUIRE)

 5             (BY:  CONOR KELLS, ESQUIRE)

 6             P.O. Box 888

 7             Benjamin Franklin Station

 8             Washington, D.C. 20044

 9             202-616-4289

10

11    REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS.

12             CORPS OF ENGINEERS, OFFICE OF COUNSEL

13             (BY:  RITA TROTTER, ESQUIRE)

14             7400 Leake Avenue

15             New Orleans, Louisiana 70118-3651

16             504-862-2843

17

18    ALSO PRESENT:

19             TIANA CHRISTOPHER, ESQ.

20             R. SCOTT HOGAN, ESQ.

21             RICK PAVLICK, ESQ.

22             JAIME CAMBRE, ESQ.

23             DARCY DECKER, ESQ.

24

25
```

1    PARTICIPATING VIA I-DEP:

2            BRENDAN O'BRIEN, ESQ.

3            NICK DIETZEN, ESQ.

4            ELWOOD STEVENS, ESQ.

5

6    VIDEOGRAPHER:

7            GILLEY DELORIMIER (DEPO-VUE)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                  S T I P U L A T I O N

2             IT IS STIPULATED AND AGREED by and

3     among counsel for the parties hereto that the

4     deposition of the aforementioned witness may be

5     taken for all purposes permitted within the

6     Federal Rules of Civil Procedure, in accordance

7     with law, pursuant to notice;

8             That all formalities, save reading

9     and signing of the original transcript by the

10    deponent, are hereby specifically waived;

11            That all objections, save those as to

12    the form of the question and the responsiveness

13    of the answer, are reserved until such time as

14    this deposition, or any part thereof, is used

15    or sought to be used in evidence.

16

17

18                        *   *   *

19

20

21

22            JOSEPH A. FAIRBANKS, JR., CCR, RPR,

23    Certified Court Reporter in and for the State

24    of Louisiana, officiated in administering the

25    oath to the witness.
```

```
 1                    THOMAS PODANY

 2   U.S. Army Corps of Engineers New Orleans

 3   District offices, 7400 Leake Avenue, New

 4   Orleans, Louisiana 70118-3651, a witness named

 5   in the above stipulation, having been first

 6   duly sworn, was examined and testified on his

 7   oath as follows:

 8   EXAMINATION BY MR. BRUNO:

 9        Q.   Okay.  Good afternoon.

10        A.   Good afternoon.

11        Q.   I'm not quite sure where we left off,

12   but we were talking about the reconnaissance

13   report of 1988.

14        A.   Yes.

15        Q.   And I just want to wrap up a couple of

16   points so we can kind of move on to the next

17   paragraphs.  Paragraph 23B says -- the topic is

18   the decision to initiate the development of the

19   reconnaisance report.  We talked a little bit

20   about the source of the resolution, but do we

21   know what the Corps did to initiate the

22   development of the reconnaisance report itself?

23   Did it do anything?

24        A.   I'm not aware that anything was done

25   other than react to the authority and funding
```

```
 1                    THOMAS PODANY

 2   U.S. Army Corps of Engineers New Orleans

 3   District offices, 7400 Leake Avenue, New

 4   Orleans, Louisiana 70118-3651, a witness named

 5   in the above stipulation, having been first

 6   duly sworn, was examined and testified on his

 7   oath as follows:

 8   EXAMINATION BY MR. BRUNO:

 9       Q.   Okay.  Good afternoon.

10       A.   Good afternoon.

11       Q.   I'm not quite sure where we left off,

12   but we were talking about the reconnaissance

13   report of 1988.

14       A.   Yes.

15       Q.   And I just want to wrap up a couple of

16   points so we can kind of move on to the next

17   paragraphs.  Paragraph 23B says -- the topic is

18   the decision to initiate the development of the

19   reconnaisance report.  We talked a little bit

20   about the source of the resolution, but do we

21   know what the Corps did to initiate the

22   development of the reconnaisance report itself?

23   Did it do anything?

24       A.   I'm not aware that anything was done

25   other than react to the authority and funding
```

1    provided by Congress.

2        Q.   Okay.  Now, we've established

3    yesterday that by the time of this

4    authorization, which was 23 September 1982, the

5    Corps had had a great deal of information about

6    the fact that the MRGO was eroding its banks

7    and causing damage to the environment in the

8    vicinity of the MRGO.  Is the reconnaisance

9    report something that the Corps can do in

10   response to the knowledge that those things

11   were occurring?

12       A.   The reconnaissance report was done in

13   response to the authority and the funding

14   provided for that fiscal year.  And, um --

15   there is not a way to initiate that type of

16   reconnaissance report with that funding without

17   receiving the funding authorization.

18       Q.   All right.  I guess I understand that,

19   but my question is, can the Corps -- is there

20   anything that prohibits the Corps from

21   contacting the Congress and asking the Congress

22   to give it authority to do a reconnaisance

23   report?

24       A.   Generally, the Corps is prohibited

25   from lobbying Congress for funds or

1    authorities.  We do offer drafting services

2    when requested by a member of Congress to the

3    staff to provide those drafting services, but

4    we also provide them information on issues that

5    they may be concerned about.  You know, if we

6    don't have the authorities we may tell them in

7    our view we need additional authority if you

8    want us to look at that particular project.  So

9    when the subject comes up whether you can do

10   something or not, we look to see whether we

11   have existing authorities that will allow us to

12   address it or not.

13        Q.   Which would then require an analysis

14   of the original authorization by Congress, in

15   this case the 1956 authorization, correct?

16        A.   Correct.

17        Q.   All right.  Now going back to the

18   request which initiated the reconnaisance in

19   the first instance, which we've established

20   yesterday was the resolution of the Committee

21   on Public Works and Transportation of the House

22   on 23 September 1982.  That's what initiated

23   this whole thing, right?

24        A.   Yes.

25        Q.   Okay.  And essentially, they asked, we

1    established yesterday, for a report.  And the

2    report was supposed to answer the question

3    about whether or not any modifications to the

4    recommendations contained in the original

5    authorization were advisable at this time,

6    right?

7        A.    Correct.

8        Q.    Okay.  So what is the answer to that

9    question, and where do I find it in the '88

10   reconnaisance report?

11       A.    At the very end of the section where

12   it deals with conclusions and recommendations,

13   that would be the part of the report.

14       Q.    Page 54?

15       A.    Page 54 as well as on Page 62.

16       Q.    Okay.  Let's talk about --

17       A.    In that part of the report there's a

18   determination of whether -- you know, what to

19   recommend.  For a recon report, generally

20   you're looking at, generally speaking, one of

21   two outcomes; one is a recommendation to

22   proceed into the feasibility phase, or another

23   outcome potentially is that there's not enough

24   justification to proceed to the feasibility

25   phase and that the studies be terminated.

1    That's generally the types of recommendations

2    and conclusions that would be formed at the end

3    of a reconnaisance report.

4         Q.   Those are the types of recommendations

5    and conclusions within the policies and

6    procedures of the Corps; right?

7         A.   Correct.

8         Q.   Okay.  But in fairness to someone

9    who's not within the Corps, and someone who

10   would be reading the resolution, in particular

11   someone like Congressman Robert Livingston, is

12   there a way to answer the question posed

13   through analysis of this reconnaisance report,

14   and that is, is any modification to the

15   original recommendations contained in the

16   report of the chief necessary?  Should we

17   change or not change those recommendations?

18            MR. SMITH:

19                Objection.  Compound, vague,

20                calls for speculation.

21        A.   Okay, generally a recommendation on

22   pursuing a project itself is beyond the scope

23   of the recon report.  The reconnaisance report

24   is -- the purpose of the reconnaisance report

25   is to determine whether to proceed into the

1    feasibility phase.

2    EXAMINATION BY MR. BRUNO:

3        Q.    Okay.  All right.  Within the Corps'

4    policies and procedures, I understand that.  So

5    I guess what I'm confused by is, at this point

6    in the process we have a determination -- well,

7    withdraw.

8            Even though the resolution says they

9    want to know whether or not any modifications

10   to the recommendations contained therein are

11   advisable at this time with reference to the

12   feasibility of bank protection measures, what

13   we have here is the first step in a process to

14   answer that question, we haven't answered the

15   question yet.  Is that fair?

16       A.    That's correct.

17       Q.    Okay.  So the question at this time,

18   at the end of the '88 feasibility study, is

19   unanswered.

20       A.    That's correct.

21       Q.    Okay.  Because in order for us to

22   answer the question we have to answer the

23   feasibility question.

24       A.    Yes.

25       Q.    Okay.  Now, the conclusion -- you told

1   us yesterday that Corps policy and procedure as

2   well as regulation requires that before the

3   Corps can go to the feasibility phase it has to

4   find a local sponsor.  Is that correct?

5        A.   That's normally the case.  There are

6   certain types of studies that don't require

7   cost sharing.

8        Q.   Okay.  Well, let's talk about this

9   instance.  Okay?  This bank erosion study.  Is

10  this the kind of reconnaisance report moving

11  into feasibility that does require that the

12  Corps find a local sponsor?

13       A.   It could be.

14       Q.   Okay.  All right.  Who makes the

15  determination as to whether it could or could

16  not be?

17       A.   MVD and headquarters would review the

18  recommendations in the recon report.  If the

19  recon report recommended that we pursue the

20  studies at full federal expense, that

21  recommendation would have to be approved at our

22  division and headquarters office, generally.

23       Q.   Okay.  This reconnaisance report

24  recommends that it's full federal; right?

25       A.   Yes.  The study.

1    be a scratch out for hydraulic model studies

2    and data collection, 235,000 instead of

3    135,000.  And they've also changed the

4    contingencies downward by a hundred thousand.

5         Do you know what that's about?

6    A.    No, it's an update of the table from

7    the '88, the recon report, and it's an

8    estimate -- an updated estimate of what it

9    would take to complete the GDM.

10   Q.    Okay.  So this is a change to Table 13

11   within the '88 reconnaisance report?

12   A.    That's correct.

13   Q.    Okay.  So it's revising the numbers

14   upward.

15   A.    Yes.

16   Q.    And do we know who did that or how we

17   accounted for the difference in numbers?

18   A.    It actually could be in the

19   previous -- it's shown as Enclosure 2, so if we

20   can find the reference --

21   Q.    Well, I think -- wouldn't that

22   indicate that the table itself is Enclosure 2?

23   A.    Yeah, if it's the -- if it was

24   attached to this, um -- going a few documents

25   in front of that, if it was attached to this

1    memorandum sent from Mr. Lawhun to the New

2    Orleans District it may have been -- but it's

3    not apparent who updated it.

4         Q.   Okay.  All right.  Now the next thing

5    I see is Vicksburg's comments --

6         A.   Correct.

7         Q.   -- on the report.

8         A.   Yes.

9         Q.   And the first paragraph says, in view

10   of the sensitivity of project justification,

11   um -- to project maintenance dredging

12   requirements, the district should furnish the

13   rationale used for projecting annual

14   maintenance dredging quantities.  The

15   discussion on Page 24, future MRGO channel

16   maintenance is inadequate to verify data on

17   Plates 2 and 3.  Additional discussion is

18   needed to address the findings.  All right.

19            Why is there any sensitivity here?

20        A.   Okay.

21        MR. SMITH:

22              Objection.  Calls for

23        speculation.

24        MR. BRUNO:

25              This is a 30(b)(6), isn't it?  Am

1          I forgetting?

2          MR. SMITH:

3               I don't know.

4     A.   Well, I can tell you what I think that

5     means.

6     EXAMINATION BY MR. BRUNO:

7     Q.   Thank you.

8     A.   When you go to the recon report and

9     you look at the table that talks about the

10    alternatives and how they perform, a lot of the

11    benefits are based on the impact of those

12    alternatives on maintenance dredging

13    requirements in the future.  And in fact,

14    Page 38, Table 4, in the '88 recon report,

15    projects a large increase in maintenance

16    requirements if no bank protection is provided.

17    So what that means is the recon report has a

18    marginally justified project based on an

19    estimate of maintenance dredging requirements

20    and that category is what comprises most of the

21    benefits.  That's what that means.

22    Q.   Well, but why is it that it's

23    sensitive.  Is that going the hurt somebody's

24    feelings or something?  That's what I'm

25    missing.  Where's the sensitivity component?  I

1    realize --

2        A.   No, as you change -- okay, there's

3    some assumptions made here about how the future

4    without bank protection, how much dredging

5    would be required in the future.

6        Q.   Right.

7        A.   As you change that assumption, your

8    project justification goes up or down.

9        Q.   Exactly.

10       A.   And that's the sensitivity.

11       Q.   Right.  So it sounds to me like

12   somebody wants this thing to come out a certain

13   way, and they're basically saying, if you want

14   it to come out a certain way you better give me

15   a whole lot more justification.  Is that what

16   you mean by sensitivity?

17       A.   No.  That's if you want to verify what

18   you're proposing, you need to look at what is

19   causing or, you know, what contributes most to

20   your recommendation, which is the rationale for

21   projecting annual maintenance dredging

22   quantities.  That is what drives the project

23   feasibility at this point.  And what they're

24   saying is you need to furnish additional

25   information on that.

1      Q.   Okay.  All right.  Do you know who

2  Robert Buisson is?

3      A.   Yes, I do.

4      Q.   Who is he?

5      A.   He was chief of plan formulation

6  branch at one time, and is also assistant chief

7  planning division in planning division here at

8  New Orleans District.

9      Q.   He was at the New Orleans District?

10      A.   Yes.

11      Q.   Okay.  Next is that 10 March '88

12  letter which transmits the report that we

13  referred to earlier.

14      A.   Right.  Correct.

15      Q.   All right.  The next letter says --

16  it's for the Commander, and it's signed by D.E.

17  Lawhun, chief planning division.  Who is he?

18      A.   He's the chief or was the chief of

19  planning division at the Mississippi Valley

20  Division office.

21      Q.   Okay.

22      A.   Division office.

23      Q.   So Mississippi -- I'm sorry.

24  Vicksburg approves the reconnaisance report

25  here.

1       A.   Yes.

2       Q.   Okay.  Where does it go from here?

3       A.   Well, based on what he says, the

4   recommendation to proceed to the preparation of

5   a supplement to the GDM is not concurred until

6   all LMVD comments on the report have been

7   satisfactorily resolved.  The comments are

8   furnished as in as Enclosure 2 and should be

9   responded by separate correspondence.

10          So that the comments that we just kind

11  of looked through have to be satisfactorily

12  resolved before we are able to proceed fully

13  with the GDM.

14      Q.   All right.  All these -- let's see.

15  That takes us back to the comment page which

16  has eighteen comments, right?

17      A.   Yes.

18      Q.   Okay.  All right.  So there has to be

19  some kind of response by the New Orleans

20  Division and that response has to be approved

21  by Vicksburg.

22      A.   Correct.

23      Q.   So the next thing we see, it's just a

24  disposition form.  That just basically

25  transmits the information, right?

1      A.   Yeah, this disposition form transmits

2   the information internally within the district.

3      Q.   All right.   Now it says LMVD -- that's

4   Vicksburg, right?

5      A.   Yes.

6      Q.   -- has indicated that they do not

7   require a formal response since most of the

8   enclosed comments are related to engineering

9   and design.   Consequently, I request that you

10  prepare and transmit the formal response to

11  these comments directly to the LMVD engineering

12  division.

13          Now, and this Cletus Waganoff, he's

14  the chief of the planning division at

15  Vicksburg?

16     A.   Chief at the New Orleans District.

17     Q.   He's chief in New Orleans.

18     A.   Yes.  He's sending this information to

19  the chief of engineering within this district.

20     Q.   Well, is that really --

21     A.   Chief of engineering division in this

22  district.

23     Q.   So this is within the New Orleans

24  District?

25     A.   It's an internal document within this

1    district.

2         Q.   All right.  Well, he's saying that

3    there's no formal response, and yet the first

4    paragraph says we want a whole lot more

5    justification for your rationale using -- for

6    the rationale used for projecting annual

7    maintenance dredging quantities.  Is that an

8    engineering issue?

9         A.   Yes.

10        Q.   Okay.  So the next thing we see is

11   Calvin Shelton who's the chief of the projects

12   branch.  He says, it's been decided that the

13   enclosed Vicksburg comments will be addressed

14   in the proposed GDM supplement, and no

15   endorsement will be prepared by NOD.

16             Okay.  Is he really saying there that

17   we're going to do the GDM anyway?

18        A.   No, what I interpret that to mean is

19   that we are proceeding to respond to these

20   comments informally, it will be something we do

21   as a first order of business in the GDM phase.

22   Which is a little different than what -- but

23   there's got do be a way, a mechanism of

24   responding to these comments had, um --

25        Q.   Well, I've seen responses where they

1    actually do it in writing, just simply respond.

2    They could have done that.

3         A.   They could have.

4         Q.   All right.

5         A.   They may have, in fact.

6         Q.   But doesn't the Vicksburg memo say

7    don't do anything on the GDM until you respond

8    to our comments?

9         A.   It says they don't concur with our

10   recommendation to proceed to the preparation of

11   the supplement to the GDM is not concurred in

12   until all LMVD comments in the report have been

13   satisfactorily resolved.

14        Q.   Right.  So -- okay.  I'm in the New

15   Orleans -- does that tell me to go ahead and do

16   a general design memorandum or does that tell

17   me to respond to the comments first?

18             MR. SMITH:

19                  Objection.  Calls for

20                  speculation.

21        A.   Well, I'm looking at Cletus 's

22   response to that, at least internally.

23   EXAMINATION BY MR. BRUNO:

24        Q.   Sorry.  Where are you, man?

25        A.   It's the one just before that.

1      Q.    Okay.

2      A.    From Cletus Wagerhoff.  It says, we

3  will address the comments in preparing the GDM.

4  You see his initials there?

5      Q.    I'm sorry.  You are now referring to

6  the handwritten notes --

7      A.    Or maybe that's --

8      Q.    -- right?

9      A.    Yeah.  I'm not sure -- that that could

10  have been Fred Chatry there.  But what -- so

11  the plan, from the district 's perspective, was

12  to address the comments during the preparation

13  of the GDM.

14      Q.    Did the New Orleans District office

15  tell the Vicksburg office that that's what they

16  were going to do?

17      A.    I don't know.

18      Q.    Okay.  So the next thing we see in the

19  stack of paper here is a series of plates.

20  Well, yeah, which seem to start with Plate 8,

21  9, 10, 11, 12, 13, finishing with what appears

22  to be some kind of a erosion study which says

23  Enclosure 3.  Do you know what the plates are?

24      A.    Now, these are plates that say, and I

25  think they are, part of the reconnaisance

1      Q.   That's the context of my question.   So

2   at that time, is it not true that the Corps has

3   affirmatively established that the MRGO channel

4   as designed is causing the banks to erode?

5   Isn't that true?

6           MR. SMITH:

7               Objection.   Asked and answered.

8      A.   But I think the way it is described on

9   Pages 26, 27 and 28 in Exhibit 37 is the best

10   technical way to describe the problems, needs

11   and opportunities out there.

12   EXAMINATION BY MR. BRUNO:

13      Q.   All right.   And do these problems

14   needs and opportunities describe the fact that

15   the MRGO is eroding its banks?

16      A.   It describes the fact that there is

17   bank erosion occurring along the MRGO.

18      Q.   All right.   And you said yesterday,

19   did you not, that if the channel were wider

20   there would be less wave wash from large ships?

21   Isn't that so?

22      A.   Yes, I did say that.

23      Q.   Okay.   Thank you.   Now, given the

24   knowledge that the Corps now has as of that

25   point in time, what if anything is the Corps

1    supposed to do about these problems?

2              MR. SMITH:

3                   Objection.   Asked and answered.

4         A.   At what point in time are we --

5    EXAMINATION BY MR. BRUNO:

6         Q.   That's why I started it with the

7    middle of '89.

8         A.   The middle of '89, there is a dilemma.

9    Once the modeling is done, the modeling

10   demonstrates that the recommendations of the

11   '88 report may not be valid because there may

12   not necessarily be feasible alternative out

13   there.

14        Q.   Okay.

15        A.   So we're left with the situation where

16   with have no authority, we don't have a process

17   necessarily to evaluate bank protection, not an

18   accepted one, you know, like we do for

19   commercial navigation, flood control and

20   navaid.  And we don't have a sponsor.  And, you

21   know, so where do we -- how do we address the

22   concerns that people have about that area?

23        Q.   Okay.

24        A.   We're in a dilemma right now.

25        Q.   So what do you do?

1        A.   Well, then that's how the '94 report

2    came out.

3        Q.   All right, sir.  Well, how did the '94

4    report come out?

5        A.   The '94 report was done to look at

6    another way, to expand the thinking on how you

7    might be able to justify bank protection --

8    bank erosion protection measures.

9        Q.   All right.  Let's start in the same

10   fashion that we did in the '88.

11       A.   Okay.

12       Q.   We went to the resolution.  On Page --

13   well, there's no page number, but there is a

14   page which is entitled Introduction --

15       A.   Right.

16       Q.   -- and it says, study authority.

17   Right?

18       A.   Right.

19       Q.   And interestingly enough it refers to

20   the exact same resolution that was the reason

21   for the '88 study.  Right?

22       A.   Uh-huh.

23       Q.   All right.  Now, so the Corps did one

24   study and ran into a roadblock.

25       A.   Yes.

1      Q.   And so explain to me how doing the

2    same thing all over again was going to

3    eliminate that roadblock.

4      A.   Things had changed since then.

5      Q.   Okay.

6      A.   There was processes developed or in

7    the process of being developed to look at

8    environmental features of environmental

9    projects using not the traditional National

10   Economic Development process with a BC ratio

11   but evaluating environmental projects, projects

12   that had potential environmental outputs,

13   looking at it that way.  Looking at non

14   monetary benefits.  And that was something that

15   had just begun, um -- to be discussed within

16   the Corps and initial guidance was coming out

17   on how to address environmental outputs in a

18   project in a way that could we used to justify

19   potentially a project.

20      Q.   Okay.  Is there a new law that's

21   passed that provides the authority to have this

22   new way of thinking?

23      A.   I think what's changed, if you saw

24   from the '88 report the attempt to put monetary

25   benefits on the environmental outputs, you saw

1        Q.    And so explain to me how doing the

2    same thing all over again was going to

3    eliminate that roadblock.

4        A.    Things had changed since then.

5        Q.    Okay.

6        A.    There was processes developed or in

7    the process of being developed to look at

8    environmental features of environmental

9    projects using not the traditional National

10   Economic Development process with a BC ratio

11   but evaluating environmental projects, projects

12   that had potential environmental outputs,

13   looking at it that way.  Looking at non

14   monetary benefits.  And that was something that

15   had just begun, um -- to be discussed within

16   the Corps and initial guidance was coming out

17   on how to address environmental outputs in a

18   project in a way that could we used to justify

19   potentially a project.

20       Q.    Okay.  Is there a new law that's

21   passed that provides the authority to have this

22   new way of thinking?

23       A.    I think what's changed, if you saw

24   from the '88 report the attempt to put monetary

25   benefits on the environmental outputs, you saw

```
1    that we tried to put a dollar on an acre of
2    marsh.
3         Q.   Right.
4         A.   Around that time, there were still
5    people trying to do that, but between '88 and
6    '94 there was a realization that was not a
7    direction to go in and that there should be a
8    look at using some kind of non monetary
9    valuation of environmental outputs.
10        Q.   Okay.
11        A.   And that would mean something like a
12   wetland value assessment or habitat evaluation
13   assessment that the U.S. Fish and Wildlife
14   Service had done.  So there were those
15   discussions nationwide by that time.
16        Q.   All right.  I appreciate that.  But
17   the question is a simple one:  Was there some
18   Congressional mandate, Congressional mandate,
19   statute, authorization, permission, something
20   that came from the Congress that moved the
21   Corps into this new way of thinking, or did the
22   Corps come to this new way of thinking on its
23   own?
24             MR. SMITH:
25                  Objection.  Compound.
```

1      A.   Well, when a feasibility study is done

2    or a recon report is done and the results are

3    negative, there is sometimes a look at why did

4    it not work, and did you cover everything,

5    maybe there's a different way of looking at

6    this and finding a way to justify the project.

7           First attempt in '88 was looking at

8    maintenance savings, mostly navigation

9    benefits, and the belief at the time the report

10   was prepared was that that would justify the

11   project.  Once the modeling showed that that

12   was not true then it's natural to look at

13   whether there's a different approach that could

14   be made to derive the same -- a similar

15   justification for the project, look at maybe

16   there's another way to justify that project,

17   maybe it's still a good project but we have to

18   look at the benefits a different way.

19     Q.   I accept that, but that's not the

20   question.  You didn't answer the question.  I'm

21   sorry.

22     A.   All right.

23     Q.   I'm trying to learn whether or not

24   this new -- and I'm categorizing it as new

25   thinking because I believe you testified that

1    discretionary authority, right?

2              MR. SMITH:

3                   Objection.   Vague.

4    EXAMINATION BY MR. BRUNO:

5         Q.   Isn't that true?

6              MR. SMITH:

7                   Objection.   Compound.

8         A.   Well, there's something you said about

9    two hundred or three hundred times the cost.

10   No, that's not the case.

11   EXAMINATION BY MR. BRUNO:

12        Q.   200 percent.   Sorry.   I meant 200

13   percent.   Forgive me.

14        A.   Based on the assumptions and the

15   evaluation that was done in the 1988 report,

16   the way the benefits were calculated for

17   maintenance savings and for environmental

18   outputs, the model demonstrated that the

19   dilemma I was talking about before, that you

20   may not in fact have a justified project if you

21   used those assumptions and methodologies.

22        Q.   Well, let's be careful about that.

23   It's not that we had a justified project.   We

24   have a justified project; the problem is that

25   we can't proceed with this project with a

1   requirement that we have to find a local

2   sponsor to put up half the money for a

3   feasibility study.  That's the problem; isn't

4   that true?

5        A.   No, when I say the justified project,

6   this -- the purpose of the 1988 reconnaisance

7   report was to identify whether there's a

8   potentially economically justified and

9   environmentally acceptable bank protection

10  project for the MRGO.  And what I'm saying is

11  that the model demonstrated that the

12  assumptions and ways that we looked at the

13  benefits would result in a non justified

14  project.

15       Q.   Well, maybe I'm confused.

16       A.   Okay.

17       Q.   The dredging numbers weren't used to

18  justify the project.  The dredging numbers were

19  used in order to suggest that the costs of the

20  GDM be borne 100 percent by the government.

21  That was the whole issue about the dredging

22  numbers.  It had nothing to do with anything

23  but that.

24            MR. SMITH:

25                 Objection.  Vague.

1    EXAMINATION BY MR. BRUNO:

2         Q.    Isn't that true?

3         A.    No, that's not true.  It's both.

4         Q.    Well --

5         A.    It's both things.  It's both the cost

6    sharing and whether the project is economically

7    justified.

8         Q.    Remember we talked about that

9    sensitivity issue?

10        A.    Right.

11        Q.    And the sensitivity you told me was --

12   the sensitivity was there because the local

13   office, the New Orleans District office, had

14   decided to go in and suggest that there be no

15   feasibility study, that we move straight to a

16   GDM.

17             (Off the record.)

18   EXAMINATION BY MR. BRUNO:

19        Q.    (Tendering.)  All right.  Thank you

20   for your patience, that's really appreciated.

21   I'm showing you a document which I didn't

22   identify for the record, let me do that now, it

23   is Bates Number NPM 36133.  It is a disposition

24   form.  It is -- the subject is the Mississippi

25   River Gulf Outlet, St. Bernard Parish,

 1    Louisiana Bank Erosion.  The date of it is 21

 2    January '88.  It says, we will recommend in the

 3    reconnaisance report that in lieu of proceeding

 4    to cost shared feasibility studies problems

 5    identified by the subject study be addressed

 6    via a supplement to the GDM for the MRGO

 7    navigation project.  Okay?

 8        A.   Correct.

 9        Q.   So it's crystal clear here, is it not,

10    that the idea was to move beyond feasibility,

11    straight through feasibility.  Right?

12            MR. SMITH:

13                May I see the document, Joe?  I'm

14            sure you don't have another copy.

15            MR. BRUNO:

16                Oh, that was a low blow.

17        A.   Okay, I'm not sure I understand the

18    question, because this is dated January 21,

19    1988.  The reconnaisance report is February,

20    1988.

21    EXAMINATION BY MR. BRUNO:

22        Q.   Right.  And it says we will recommend.

23        A.   And they both have the same

24    information.

25        Q.   Right.  And what I'm driving at is

1    this:  That it was -- the intent was to not

2    have to do a feasibility study.  Right?

3        A.   That's correct.

4        Q.   And the reason why they didn't want to

5    do a feasibility study was why?

6        A.   A couple of reasons.  And this

7    documented in here, one is that -- because the

8    benefits are mainly due to navigation, then it

9    would be appropriate to use full federal

10   funding to do whatever studies were necessary

11   to achieve -- to request authorization.  The

12   second point is that the supplemental, the GDM,

13   or the supplement to the GDM is just another

14   mechanism of doing essentially the same

15   evaluation but in a different vehicle.  So

16   you'd have to do the same things you would

17   normally do in a feasibility study but you're

18   doing them in a supplement to the GDM and the

19   cost of that evaluation is 100 percent federal.

20       Q.   Well, the difference is that if you

21   had to do a feasibility study you have to find

22   a local sponsor.

23       A.   Correct.

24       Q.   So are you telling me that the Corps

25   was unafraid as to whether or not it could find

1    a local sponsor for a feasibility study, that

2    it was a non issue?

3        A.    No, I think I remember hearing or

4    seeing somewhere that the sponsors in the

5    documents that we have here, the sponsors, you

6    know, would be reluctant to cost share in a

7    feasibility study if the benefits or outputs

8    were mainly navigation related.  Because

9    normally, if it's navigation, at that time, the

10   studies were 100 percent federal.  Commercial

11   navigation.

12       Q.    Okay.  All right.  So the degree to

13   which you reduced the navigation benefit would

14   increase the likelihood of a local sponsor 's

15   interest.  Is that what you're telling us?

16       A.    It would increase the need to have a

17   sponsor.

18       Q.    Well, I know it would increase the

19   need to have a sponsor, but it would also,

20   according to logic, increase the desire of a

21   local sponsor to participate.  Right?

22           MR. SMITH:

23               Objection.  Calls for

24               speculation.

25       A.    I don't know.  It could or it could

1    not, depending on the sponsor.

2    EXAMINATION BY MR. BRUNO:

3        Q.    All I care about is what the Corps

4    thought.  Did the Corps believe that if the

5    navigation component was reduced -- the

6    navigation benefit component was reduced that

7    it would have any problems locating or

8    identifying a local sponsor?

9            MR. SMITH:

10               Objection.  Asked and answered.

11           Calls for speculation.

12       A.    It's very difficult to find a cost

13    shared sponsor for a feasibility study or a

14    project in this state.

15    EXAMINATION BY MR. BRUNO:

16       Q.    In this state, generally.

17       A.    Yeah, generally. It's difficult.

18       Q.    All right.  So does that mean then

19    that the Corps tries to avoid feasibility

20    studies completely because of the difficulty?

21           MR. SMITH:

22               Objection.  Vague.

23       A.    No, I think in this case it made sense

24    to look at what is the best path ahead.  And if

25    there's not a need to have a cost shared

1    feasibility study then that's one less hurdle

2    that you have to worry about.  If you can do it

3    through a GDM supplement and it's 100 percent

4    federal, it increases the likelihood of

5    success, but then again you have to have the

6    rationale or justification to go that other

7    way.

8        Q.   Did the reconnaisance report of 1988

9    establish the need for bank protection?

10       A.   I believe it did, yes.

11       Q.   All right.  So the issue was whether

12   or not it could be justified using a

13   cost-benefit analysis, right?

14       A.   That was an issue.

15       Q.   Well, is it an issue or the issue?

16            MR. SMITH:

17                 Objection.  Vague.

18       A.   That's one of the issues.  As we

19   talked about yesterday, the purpose of a recon

20   report is to find at least one economically

21   feasible and environmentally acceptable plan.

22   You do also need a sponsor for the project,

23   even if it's 100 percent federal, because they

24   have to provide the local assurances in the

25   cost sharing agreement.  And so all those

1   things usually are assessed at the recon level.

2   Not always, but usually all those things are.

3   EXAMINATION BY MR. BRUNO:

4       Q.   Do you need a local sponsor if the

5   chief decides to exercise his discretionary

6   authority to include something like bank

7   erosion protection in an ongoing, authorized,

8   existing project?

9       A.   You would need a sponsor for that

10  feature of that project.  In other words, the

11  local assuring -- either the existing sponsor

12  for the project would have to provide the

13  lands, easements and rights-of-way and other

14  local assurances that are in the standard

15  agreements, or you would have to find a new

16  sponsor to do that.

17      Q.   All right.  Well, when the Corps

18  exercised its discretion to put rock dike

19  protection at Reach 1 and Reach 2, who was the

20  local sponsor for that?

21      A.   The local -- if it became part of the

22  project, which it did, it would have been the

23  Port of New Orleans.

24      Q.   All right.  So in the case that the

25  chief exercises his discretionary authority to

1    expand the project --

2        A.   Right.

3        Q.   -- whoever is the sponsor at the

4    beginning becomes the sponsor of that expanded

5    project, right?  You don't need a new one.

6        A.   If they agreed -- if there's

7    additional lands, easements, rights-of-way that

8    are required for that new feature, then the

9    sponsor of that project would need to provide

10   it.  If they refused to, then it would be

11   difficult to actually implement that feature of

12   the project.

13       Q.   Do you think you'd need to add new

14   lands in order to do rock dike protection of

15   the shores of the MRGO channel?

16       A.   You could.  You'd have to do a real

17   estate analysis for that.

18       Q.   And that's because the shores had

19   widened so much that they had exceeded the

20   rights-of-way, right?

21       A.   I think that's a distinct possibility.

22           (Off the record.)

23   EXAMINATION BY MR. BRUNO:

24       Q.   Just so we can get some clarification,

25   would you please explain what you mean when you

1     Q.   Well, doesn't the shoreline erosion

2    itself have a major impact on the human

3    environment?  I mean, the no action

4    alternative, doesn't that also have the same

5    impact?

6     A.   I think you could make a case that it

7    has an impact, yes.

8     Q.   And you probably could make the case

9    that because dredging increases the likelihood

10   of shoreline falling in that it's also -- that

11   the dredging also has a major impact, as well,

12   right?

13    A.   Right.  You can make the case that

14   dredging and bank erosion, and closure of the

15   MRGO, all to varying degrees have impacts to

16   the human environment.

17    Q.   Okay.  Let's see.  It says, because

18   the proposed action requires detailed

19   engineering to decide what type of shoreline

20   protection would function best in certain

21   reaches of the MRGO, then the detailed

22   description required in the impacts of the

23   alternatives on significant resources would

24   probably follow the format of an EIS better

25   than an EA.

```
 1              Can you help me understand that?

 2         A.   No, not sure, but I know the

 3    environmental folks who wrote that are more

 4    comfortable using the EIS process for very

 5    large projects.  I think that's all he's

 6    saying.

 7         Q.   Okay.  What's an EA?

 8         A.   Environmental assessment.

 9         Q.   And when do you have to do that, if

10    you know?

11              MR. SMITH:

12                   I object.  We've had another

13                   witness already address EAs.

14         A.   Yeah.  It's probably better somebody

15    else.

16    EXAMINATION BY MR. BRUNO:

17         Q.   Okay.  Next sentence:  Because we may

18    consider the closure of the MRGO as a non

19    structural alternative -- why would it be a non

20    structural alternative?  It would have to be

21    structural, wouldn't it?

22         A.   Not necessary.  You could just abandon

23    the channel.

24         Q.   But if you did something -- if you

25    blocked it off, it would be structural.
```

1        A.    That's true.

2        Q.    All right.   Then the socioeconomic

3    impacts of that alternative would be

4    significant and an EISs would be required.   And

5    you've told us about that already.

6        A.    Right.

7        Q.    At anytime during the review process,

8    the Corps, another federal agency, the state or

9    a public organization/citizen could argue that

10   the proposed action would have a significant

11   effect on the human environment or that we

12   overlooked a significant resource, and we would

13   have an additional analysis.   This would not be

14   much of a problem if we were already doing an

15   EIS, but if we were doing an EA the whole

16   process would have to start over again and an

17   EIS would have to be prepared, adding 4 to 8

18   months to the report/EIS schedule.

19          Do you know what that means?

20       A.    Well, there's basically two ways to

21   address NEPA compliance; one is through an EA,

22   and one is through an EIS.   They're similar

23   reports, the EIS is just a more deliberate

24   approach.

25       Q.    Okay.

1     A.   And usually an EA is done when there's

2  the potential for no significant impact.   It's

3  more of streamlined way of doing it sometimes.

4     Q.   So bottom line, the decision was made

5  to prepare a supplemental EISs to the existing

6  MRGO EIS which was prepared in 1976.

7     A.   That would have been the path that we

8  would have gone on if we had in fact done the

9  feasibility study.

10    Q.   Okay.  Thank you.  So I think you've

11 already testified you don't know when the

12 decision was made to do this revised

13 reconnaisance report.   Right?

14    A.   I don't know.

15    Q.   And you don't know who made the

16 decision.

17    A.   No.

18    Q.   Okay.  But certainly it happened

19 sometime after the middle of May -- I'm sorry,

20 the middle of 1989.  Right?

21    A.   Probably so.  Yes.

22    Q.   How long did it take to do the 1994

23 reconnaisance report?

24    A.   You know, I'm not really sure.  I was

25 in Washington, D.C. for a year, came back in,

1   um -- around August of '93, and by that time it

2   had been underway for some time.  So I don't

3   really know.

4        Q.   All right.  So the -- let's go to the

5   '94.  And we have the syllabus is where we

6   begin, and once again Page 1 we already know,

7   severe bank erosion is occurring on the MRGO

8   navigation channel.  That's not new news.

9             Let's see.  Let's see.  Okay.  So what

10   was the goal of this report?

11        A.   I think if you go to Page 1.

12        Q.   Introduction?

13        A.   The study purpose, yes.  Study purpose

14   there is typical of a recon report, but it has

15   a little bit more information in there.  But

16   that's -- basically the goal of the report is

17   in those sentences in the top of Page 2 in

18   Exhibit 11.  Actually, there might be another

19   goal statement later on, too.

20        Q.   Okay.

21        A.   Let's see.  National objective --

22        Q.   All right.  Let's see.

23        A.   No, that's probably it.

24        Q.   Well, in terms of comparison to the

25   '88 study, this reconnaisance report, insofar

1    as it defines the extent of erosion and erosion

2    related problems projected to occur in the

3    study area, that's the same.

4         A.   Right.

5         Q.   By the way, did the study area change

6    or did it remain the same?

7         A.   Let's look at the study again.

8         Q.   We have to look at the table, huh?

9         A.   Plate 1.  It's essentially the same

10   study area.

11        Q.   Okay.  All right.  Let's see.

12   Identify opportunities to implement potential

13   solutions to the defined problems.  And that's

14   same as '88, right?

15        A.   Uh-huh.

16        Q.   Apprise the federal interests in

17   potential solutions to define problems by

18   evaluating the cost benefits and environmental

19   effects of the potential solutions.

20             Now that's different, right?  That

21   wasn't in the '88 study.

22        A.   It's stated a little differently in

23   the '88 study.  It says, appraise the federal

24   interests of potential solutions to define

25   problems by evaluating the costs, benefits and

1    environmental impacts of potential solutions.

2    Where it says environmental effects, that's

3    about the same, really.

4         Q.   Okay.  Well, the federal interest is

5    Congress?

6         A.   The federal interest is, um -- all

7    of -- the entire federal government, I guess.

8    It's Congress and the administration.

9         Q.   All right.  Well, did the federal

10   interests include Congress?  How about that?

11        A.   I would say that the federal interest

12   does include Congress' interests.

13        Q.   Did the '88 report get transmitted to

14   the Congress?

15        A.   The '88 report wasn't formally

16   transmitted to Congress.  I don't know whether

17   it was informally transmitted or discussed.

18        Q.   All right.  Was the '94 reconnaisance

19   report transmitted to Congress?  Formally.

20        A.   No, I don't believe it was.

21        Q.   Informally?

22        A.   Because normally it would not be.  A

23   reconnaisance report would normally not go to

24   Congress.  A chief 's report would, you know.

25        Q.   All right.  So the only way the

 1   federal interest gets apprised of the problems

 2   and the solutions is if you can successfully

 3   find a local sponsor, complete a feasibility

 4   study -- is that what you're saying?

 5            MR. SMITH:

 6                 Objection.  The document says

 7            appraise, not apprise.

 8            MR. BRUNO:

 9                 Appraise.

10      A.   Appraise.

11   EXAMINATION BY MR. BRUNO:

12      Q.   What does appraise mean?

13      A.   Evaluate.

14      Q.   Does it men communicate?

15      A.   To me it means evaluate.

16      Q.   Okay.  It doesn't many communicate?

17            MR. SMITH:

18                 Objection.  Asked and answered.

19                 You don't get the answer you

20            want, you ask again.

21   EXAMINATION BY MR. BRUNO:

22      Q.   No, I'm asking the question.

23            MR. SMITH:

24                 No, you asked it and he answered

25            it, and then you asked it again

1    environmental benefits that that would

2    necessitate locating a local sponsor in order

3    to advance this project to the feasibility

4    stage?

5         A.    That would likely be the case, yes.

6         Q.    And didn't they know as early as 1988

7    that it was likely never to happen?

8         A.    Well, I don't know.  That's

9    speculation.

10        Q.    Well, you've already told us through

11   your testimony yesterday and today that the

12   Corps knows and understands that it's difficult

13   in all cases, and it's certainly difficult in

14   Louisiana, I think you made that point -- did

15   you not?

16        A.    Uh-huh.  It's difficult.

17        Q.    Right.  And so we know its difficult,

18   and we know this is a project that's been

19   disliked and hated by the local interests since

20   its inception, so what was the possible chance

21   given the knowledge that this thing was going

22   to require a local sponsor --

23             MR. SMITH:

24                  Objection.  Calls for

25             speculation.  And object to the form

1         of the question.

2              MR. BRUNO:

3                   That's because I didn't finish.

4    EXAMINATION BY MR. BRUNO:

5         Q.   What was the possible chance of the

6    Corps locating a local sponsor, based upon all

7    that the Corps knew about the feelings of the

8    local sponsors about this project, about the

9    fact that it was going to necessarily go to a

10   feasibility study and all the other information

11   that it had available to it?

12             MR. SMITH:

13                  Are you finished?

14             MR. BRUNO:

15                  Yes.

16             MR. SMITH:

17                  I object.  Calls for speculation.

18             MR. BRUNO:

19                  All right.

20        A.   One of the purposes of doing a

21   reconnaissance report, and I mentioned this

22   yesterday, is to look and determine whether

23   there's a potential sponsor -- non-federal

24   sponsor for the project.

25   EXAMINATION BY MR. BRUNO:

1        Q.    Right.

2        A.    We sometimes start these reports not

3    knowing what the probability is of having a non

4    federal sponsor.  And we have people that might

5    guess at what it is.  But you don't really know

6    until you finish the report.  And you may be

7    working with them all along, potential

8    sponsors.  But you won't really know for sure

9    until at the end of the report you're looking

10   for a Letter of Intent for them to cost share

11   in a feasibility report, and sometimes they

12   provide that Letter of Intent and sometimes

13   they don't.

14       Q.    In this case, you knew you had a small

15   pool of likely potential local sponsors, right?

16            MR. SMITH:

17                  Objection.  Vague.

18       A.    During the preparation of the initial

19   project management plan we identified potential

20   sponsors being either the Port of New Orleans,

21   State of Louisiana Department of Transportation

22   and Development, DNR, St. Bernard Parish,

23   people that might have an interest in seeing

24   the project constructed.

25   EXAMINATION BY MR. BRUNO:

1          Q.    Right.

2          A.    We sometimes start these reports not

3     knowing what the probability is of having a non

4     federal sponsor.  And we have people that might

5     guess at what it is.  But you don't really know

6     until you finish the report.  And you may be

7     working with them all along, potential

8     sponsors.  But you won't really know for sure

9     until at the end of the report you're looking

10    for a Letter of Intent for them to cost share

11    in a feasibility report, and sometimes they

12    provide that Letter of Intent and sometimes

13    they don't.

14         Q.    In this case, you knew you had a small

15    pool of likely potential local sponsors, right?

16              MR. SMITH:

17                   Objection.  Vague.

18         A.    During the preparation of the initial

19    project management plan we identified potential

20    sponsors being either the Port of New Orleans,

21    State of Louisiana Department of Transportation

22    and Development, DNR, St. Bernard Parish,

23    people that might have an interest in seeing

24    the project constructed.

25    EXAMINATION BY MR. BRUNO:

1      Q.   Sure.  You already, before you even

2   started, had a handle on what the thing was

3   going to cost, right?

4      A.   Generally, at a recon report level you

5   would have a preliminary estimate of the cost.

6   Before a sponsor provides a Letter of Intent

7   they want to know not only what the feasibility

8   study might cost but what they might be getting

9   into as far as total project cost and what

10  their share might be of that.

11     Q.   Well, because of '88, you knew that,

12  too, didn't you?  You had a pretty good handle

13  on the cost, didn't you?

14     A.   You should have a good handle on the

15  cost, yes.

16     Q.   Right.  But I mean y'all did.

17     A.   Yes.

18     Q.   So wouldn't it have been prudent to

19  call on each of these potential sponsors, talk

20  to them, let them know what was going on, see

21  if they had any interest before you spent two

22  billion bucks of my money and everybody else 's

23  money in this room?

24     A.   Yes, it would be prudent to do that.

25     Q.   Did it happen?

1        A.    It happened.

2        Q.    All right.  So who did y'all talk to?

3        A.    A number of different people.  Um --

4    sometime, it was either late 2003 -- I mean,

5    I'm sorry, late 1993 or early 1994, we had a

6    meeting with George Duffy who was the chairman

7    of the maritime -- the Governor 's Task Force

8    of the Maritime Industry.  Colonel Diffley

9    asked Mr. Duffy whether he would help, since

10   he's part of the state, to help identify who a

11   potential sponsor might be.  And Mr. Duffy

12   agreed, so Mr. Duffy had a meeting of his

13   maritime industry and at that meeting he

14   invited people from DNR, DOTD, St. Bernard

15   Parish, others, and there was a discussion

16   about the project -- or the recon report and

17   the need to have sponsor for the feasibility

18   report, and the result was that there was no

19   non-federal sponsor coming forward.  The Port

20   of New Orleans eventually told us that they

21   were not able or in a position to sponsor the

22   project.  And, um -- so at that point, you

23   know, it didn't -- no sponsor was identified.

24       Q.    Well, so why did you go forward with

25   the recon report if you knew you were never

1    going to get a sponsor?

2          A.   Well, this is after the recon report.

3          Q.   Well, the question was about before

4    the recon report.

5               Did you ask around -- before you spent

6    the two million bucks, or three million bucks,

7    whatever it was, did you ask any of these

8    folks, given the fact that you knew that there

9    was going to be a need for a feasibility study,

10   given the fact that you knew what the cost of

11   that feasibility study was going to be, given

12   that you knew what the likely cost of the

13   project was, given that you knew what the

14   likely local sponsor contribution was going to

15   be, did you do that before the study was done?

16          MR. SMITH:

17               Objection.  Vague.

18          A.   I'll point you to the Page 67.  I

19   think you may be confusing the cost of the

20   feasibility study with the cost of the recon.

21   EXAMINATION BY MR. BRUNO:

22          Q.   You told me they were together.

23          A.   Yeah.  They were estimated together,

24   but the feasibility report, the expenses -- you

25   don't spend the money until you start the

1          Before we talked about economically

2     feasible.  To demonstrate that you have an

3     environmentally feasible restoration plan you

4     freed to compare it to other restoration

5     alternatives.  So what we're saying there is,

6     because it's so expensive to do bank

7     protection, there might be other things you

8     could do with that dollar that would achieve

9     more environmental output that you have to

10    consider.

11         Q.   Right.  I understand.

12         A.   That's all that means.

13         Q.   I understand.  Okay.  All right.

14              Now, this '94 reconnaisance report,

15    and maybe it just wasn't in this copy, doesn't

16    seem to have all that back and forth between

17    the New Orleans office and the Vicksburg

18    office.  Did that occur?

19         A.   I think there was some -- there should

20    be some correspondence somewhere that came down

21    on that report providing guidance and a

22    recommended path forward.

23         Q.   Did Vicksburg approve it?

24         A.   It would have been subject to having a

25    cost shared sponsor identified.  They would

1    have wanted to have a sort of like a

2    preliminary issue resolution conference at the

3    beginning, because some issues -- we're

4    recommending exceptions in there, so they would

5    have wanted that up front.  But they were going

6    to wait, if I recall right, to have that until

7    we had a sponsor identified.

8        Q.   All right.  Okay.  So tell us about

9    this '96 or -- I guess we don't have it, but --

10   we may.  But we may not.

11       A.   It's called the '96 evaluation report,

12   yeah.  Evaluation study.  It looks a lot like

13   these two reconnaissance studies.

14       Q.   Well, they all look alike.

15       A.   There was a third attempt to do it a

16   little differently to see if we could succeed.

17       Q.   All right.  So it was another

18   reconnaisance?

19       A.    It wasn't technically a reconnaisance

20   report, it was done with O&M funds to see if

21   putting bank protection out there could be

22   justified from the standpoint if you reduce at

23   least a dollar of dredging with a dollar of

24   bank protection, you might suggest doing it.

25   You hope it's more than a dollar of dredging

1    reduced, but at least a dollar.

2        Q.   Why would you have needed -- and I'm

3    asking this question because we did ask this

4    question to the gentleman that we deposed in

5    Vicksburg, Russo, who told us that the Corps

6    always had the authority to do bank protection

7    if it could determine that you were saving a

8    dollar on dredging.

9        A.   Uh-huh.

10       Q.   So in view of that, why would you

11   need -- you know, why would you need to study

12   that?

13       A.   Well, you know, we needed to make the

14   case that it was indeed a good investment and

15   get approval to use, um -- project funds for

16   that purpose.  And basically, if there's ever a

17   situation where you're operating and

18   maintaining a project and there's something you

19   can do a little differently that's cheaper,

20   that achieves the same output, generally you

21   can do that and analyze and implement it.  It's

22   just a matter of making sure that that --

23   you're not stepping outside the boundaries of

24   that authority when you do it.  And that

25   question had to be addressed in a simple way,

1    that we could use existing O&M funds to put

2    bank protection measures along the channel to

3    reduce the cost of dredging in a way that

4    would, um -- make it a reasonable thing to do.

5    You still have to do the environmental

6    documentation for that.  So there's a little

7    bit of reporting that has to be done but it's a

8    much simpler analysis.

9         Q.   Now, what was the Congress involvement

10   in that, if any?

11        A.   There was a, um -- there were some

12   language in that report, at the very beginning,

13   that talks about guidance from a committee that

14   says considered -- in light of all the problems

15   we're having with the channel, why don't you

16   look at using available O&M funds to start

17   putting bank protection out there.

18             It's at the very beginning of that

19   report.

20        Q.   All right.  So it wasn't a resolution

21   to say go study --

22        A.   No.

23        Q.   -- it just said, why don't y'all just

24   did this.

25        A.   Yeah.

1        Q.    Okay.  All right.  And then that

2    resulted in a study, but you funded it

3    yourself.

4        A.    Right.  Yeah.

5        Q.    And the idea of the study was to, I

6    guess, do the engineering calculations to see

7    if in fact --

8        A.    It was to update the information in

9    the '94 report and then look at the dredging.

10   You know, it would have to be justified then

11   solely on dredging benefits, and the

12   environmental benefits would have been

13   incidental because of the nature of the

14   authorization for the original project.

15       Q.    And what was the conclusion?

16       A.    The conclusion was that there was five

17   and half miles that appeared to be justified

18   from an economic standpoint that you would get

19   at least a dollar of maintenance dredging

20   savings for every dollar of bank protection you

21   put in, and that we move ahead and build that

22   work -- build those projects, and then over

23   time reevaluate the project to see if we can do

24   more of it with available funding.

25       Q.    Uh-huh.  Did either of these

1    reconnaisance reports, or that report, to the

2    extent that it is a reconnaisance report or

3    not --

4         A.    Uh-huh.

5         Q.    -- address the question of whether or

6    not the original design of the MRGO should have

7    included bank protection?

8         A.    Not specifically.  But if it turned

9    out that as you look at this project that the

10   maintenance dredging would be so expensive

11   because of the bank erosion, then -- and bank

12   protection was a way to reduce that, then they

13   may have come to that anyway, but that was the

14   only way to keep the project viable

15   economically.  Potentially.

16        Q.    I'm gathering that you all did in fact

17   reach that conclusion.  You reached the

18   conclusion in '96 that bank protection was

19   necessary because of the -- of its connection

20   with the increased maintenance costs.  And

21   that's how you justified the use of your O&M

22   budget for bank protection.

23        A.    What we said in that '96 report was

24   that there are some areas where you could put

25   bank protection and achieve at least a dollar