# EXHIBIT 63

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

- - - - - - - - - - - - - - - - x

```
IN RE: KATRINA CANAL BREACHES  : CIVIL ACTION
CONSOLIDATED LITIGATION        : NUMBER: 05-4182 "K" (2)
                               :
                               : JUDGE DUVAL
                               :
PERTAINS TO: MRGO, Robinson    :  MAG. WILKINSON
(No. 06-2268)                  :
```
- - - - - - - - - - - - - - - - x

Videotaped Deposition of ZOLTAN MONTVAI

VOLUME I

Washington, D.C.

Tuesday, October 7, 2008

8:59 a.m.

\* \* \* \*

Reported by:  Okeemah S. Henderson, LSR

MONTVAI, ZOLTAN

10/7/2008

Page 2

1        Deposition of ZOLTAN MONTVAI, held at the
2   offices of:
3
4        U.S. Department of Justice
5        1331 Pennsylvania Avenue, Northwest
6        Washington, D.C.   20004
7        (202) 353-2574
8
9
10
11
12
13
14
15
16
17        Pursuant to agreement, before Okeemah S.
18   Henderson, Licensed Shorthand Reporter and Notary
19   Public in and for The District of Columbia.
20
21              *     *     *     *     *
22

```
 1                  A P P E A R A N C E S
     ON BEHALF OF THE PLAINTIFFS:
 2        PIERCE O'DONNELL, ESQUIRE
          O'DONNELL & ASSOCIATES PC
 3        550 South Hope Street, Suite 1000
          Los Angeles, CA  90071
 4        (213) 347-0290
          E-mail:  pod@oslaw.com
 5
                    - and -
 6
          JOSEPH M. BRUNO, ESQUIRE
 7        BRUNO & BRUNO
          855 Baronne Street
 8        New Orleans, Louisiana  70113
          (504) 525-1335
 9
     ON BEHALF OF THE UNITED STATES OF AMERICA:
10        JEFFREY P. EHRLICH, ESQUIRE
          DANIEL BAEZA, ESQUIRE
11        ROBIN SMITH, ESQUIRE
          UNITED STATES DEPARTMENT OF JUSTICE,
12        CIVIL DIVISION, TORTS BRANCH
          P.O. Box 888
13        Benjamin Franklin Station
          Washington, D.C.  20044
14        (202) 353-2574
          E-mail:  jeff.ehrlich@usdoj.gov
15
     ON BEHALF OF THE U.S. ARMY CORPS OF ENGINEERS
16   CORPS OF ENGINEERS, OFFICE OF COUNSEL:
          MARTIN R. COHEN, ESQUIRE
17        441 G Street, NW
          Washington, DC  20314
18        (202) 761-8545
          E-mail:  Martin.R.Cohen@usace.army.mil
19
     ALSO PRESENT:
20             TJ O'Toole, Video Operator
     (Via Telephone)
21   Richard Pavlick, Esq.,  Darcy Decker, Esq., Darryl
     Decnem, Esq., Brendan O'Brien, Esq.,  Adam Chud,
22   Esq.,  Matthew Clark, Esq., Mark Raffman, Esq.
```

```
 1                      I-N-D-E-X

 2

 3           Deposition of ZOLTAN MONTVAI

 4                 October 7, 2008

 5     EXAMINATION BY:                            PAGE:

 6     Mr. O'Donnell                                7

 7

 8     EXHIBITS                                    PAGE

 9       1   Mississippi Gulf Outlet letter of
             transmittal                           10
10
         2   Post 1997 reorganization chart        14
11
         3   Pre 1997 reorganization chart         14
12
         4   Digest of water resources policies
13           and activities                        19

14       5   2/98 Mississippi River Gulf Outlet
             bank erosion report                   57
15
         6   1/94 Mississippi River Gulf Outlet
16           bank erosion report                   59

17       7   11/07 final report to Congress        87

18       8   Lake Portchartrain & vicinity,
             Louisiana letter                      116
19

20          (Exhibits included with transcript.)

21

22
```

```
 1                  P-R-O-C-E-E-D-I-N-G-S
 2                       (9:24 a.m.)
 3           THE VIDEO OPERATOR:  On the record with
 4   disk No. 1 of the video deposition of Zoltan
 5   Montvai taken by the plaintiff in the matter of
 6   Katrina Canal Breaches Consolidated Litigation in
 7   the United States District Court for the Eastern
 8   District of Louisiana.  Civil Action No. 05-4182
 9   K.
10        This deposition is being held at the Offices
11   of the United States Department of Justice located
12   at 1331 Pennsylvania Avenue, Northwest in
13   Washington, D.C. on October 7, 2008 at
14   approximately 9:24 a.m.  My name is TJ O'Toole.  I
15   am the certified legal video specialist.  The
16   Court Reporter is Okeemah Henderson.  The both of
17   us are representing Gregory Edwards, LLC Court
18   Reporter.
19        Will counsel, please, introduce themselves
20   and indicate which parties they represent.
21           MR. O'DONNELL:  Pierce O'Donnell for
22   the Robinson plaintiffs.
```

1  notified, they were part of the mailing list, it
2  was almost a normal process but that, was there a
3  formal letter sent or a final chief report sent to
4  Congress?  I'm not aware of that.
5      Q.   To your knowledge, there is not one,
6  correct?
7      A.   I'm not aware of it.  No.
8      Q.   Well, if anybody was in the Corps to
9  speak today about whether there was one, it would
10 be you, right?
11     A.   Well, I wasn't in the position at that
12 time and it's possible that --
13     Q.   Your designation includes the process
14 by which the Corps over the years of MRGO went to
15 Congress to deal with any deleterious or harmful
16 effects of the MRGO.  Have you studied that issue?
17     A.   We have studied in a general sense and
18 in fact, right now, the Corps is looking at an EXO
19 system restoration for MRGO.
20     Q.   To be exclusively federally funded?
21     A.   I don't believe there would be because
22 that's again goes back to the project that you're

1   looking at ecosystem restoration and the cost

2   sharing requirements reflected by the Water

3   Resources Act.

4        Q.    So with regard to the 1994

5   reconnaissance report, it's your understanding

6   that the Chief of Engineers did not send that

7   report to Congress with the recommendation for any

8   appropriations or authorization for funding,

9   correct?

10       A.    Correct.  You don't send

11  reconnaissance records to Congress because you

12  have to follow that up with a more detailed

13  investigation, that's the basis for the chiefs.

14       Q.    But it wasn't sent to Congress, to

15  your knowledge, by the Chief of Engineers?

16       A.    Correct.

17       Q.    If the Corps decided it needed to take

18  further actions because of the problems it

19  identified with regard to the widening of the

20  channel and the loss of the wetlands, what would

21  have been the next step after the 1984

22  reconnaissance report?

1    A.    The next step, in fact, was the New
2    Orleans District evaluated placing rock, rip rap
3    along the banks and the project purpose that they
4    were ultimately able to do it under the navigation
5    purpose by showing that placing the rock had
6    reduced their operation and maintenance
7    responsibility or requirements and based on that
8    shore protection was provided.
9    Q.    For a fairly short stretch, correct?
10   A.    Some stretches of it certain river
11   miles but I don't know what the total amount was.
12   Q.    That foreshore protection was on the
13   south side of Reach 2, correct?
14   A.    I thought there was some on the north
15   bank as well.
16   Q.    There was an area along the MRGO upper
17   part of Reach 2 where the channel had broken
18   through to Lake Borgne. Are you familiar with
19   that?
20   A.    Yes, that's the north part, not the
21   south part.
22   Q.    Was there any foreshore protection or

Page 59

```
 1              MR. O'DONNELL:
 2       Q.   Why don't we while we're doing this,
 3  mark this as Exhibit 6.
 4    (Montvai Deposition Exhibit No. 6 was marked for
 5                    identification.)
 6       A.   There may have been others but I'm not
 7  aware of all the documents that were done.
 8              BY MR. O'DONNELL:
 9       Q.   I'm going to show you Exhibit 6 for
10  identification which was an Army Corps, a document
11  as well.  It's the same words I said before,
12  Mississippi River Gulf Outlet, St. Bernard Parish,
13  Louisiana, bank erosion reconnaissance report.
14  This has a January, 1994 date.  Sir, have you
15  taken a look at Exhibit 6?
16       A.   I have looked at it just now.  Yes.
17       Q.   Have you seen that before?
18       A.   I have not.  I knew of its existence
19  but I have not read it.
20       Q.   You referred to a second
21  reconnaissance report on the MRGO for 1994.  Is
22  that the document that you're referring to?
```

1      A.     That's one of them.  Yes.

2      Q.     Let me see the first one, the 1988

3   just for a moment.  Is there a basic format that's

4   used to prepare reconnaissance reports in terms of

5   what's in the document, not the specifics but the

6   different --

7      A.     Generally speaking, there's a certain

8   requirement that a reconnaissance report will

9   have.  It will include to you some lead in like an

10  executive summary or syllabus.  It will make a

11  reference to a study resolution or what the

12  authority that is under which that study is being

13  conducted.

14         They'll have typical background information

15  leading anywhere from climatology to physical

16  settings of the project area.  It will identify

17  problems, needs and opportunities.  It will look

18  at one or two or more alternatives looking at ways

19  of addressing that problem but it will also make a

20  determination is there a potential federal

21  interest in moving out onto a more detailed

22  investigation.

1          And is there a nonfederal interest out there
2     who is financially able and is willing to cost
3     share in the more detailed investigation, the
4     feasibility study.  And it will identify or have a
5     project management plan for the next phase.  In
6     other words, what's the cost, the features of the
7     following study.
8          Q.    Okay.  The way I look at these
9     documents is I work backwards, so about, they're
10    not paginated, but maybe about a fifth of the way
11    into the document I have found something which has
12    the Department of the Army stationary and then it
13    says Mississippi River Gulf Outlet, St. Bernard
14    Parish, Louisiana, reconnaissance report on bank
15    erosion.  The next page is what you said is a
16    syllabus.  Is a syllabus like a summary?
17         A.    Like an executive summary.
18         Q.    Okay.  And then there's a table of
19    contents you mentioned and then there's various
20    couple hundred pages.  Do you see that?
21         A.    Okay.  I see what you have.
22         Q.    Then working toward the front of the

1   document there are other different documents like

2   correspondence and comments attached.  Can you

3   tell me what they are?

4        A.   I don't know.  I haven't seen it so

5   how can I tell you.

6        Q.   When the report is done by the New

7   Orleans District, okay, was this report done by

8   the New Orleans District?

9        A.   I'm presuming it is.  I don't know.  I

10  haven't seen it, sir.

11       Q.   Is it commented upon up the chain of

12  command?

13       A.   Reconnaissance reports, typically not.

14  Reconnaissance reports -- keep in mind that over

15  the years at one time headquarters looked at

16  reconnaissance reports so let me be clear in my

17  response.  Today we do not look at that.

18       This is what I was referring to earlier that

19  while the process is essentially the same

20  providing investigations and recommendations to

21  Congress, the level of review and involvement in

22  this documents over the years have been delegated

```
 1   more and more down to the district and division
 2   levels.
 3          So while at one point headquarters looked at
 4   the reconnaissance report, we no longer do that
 5   today.
 6          Q.   Does the Mississippi River Valley
 7   Division review reconnaissance reports?
 8          A.   Not today.
 9          Q.   How about 1988?
10          A.   1988 they probably did.  Yes.
11          Q.   I'll represent to you there are
12   comments in Louisiana -- the lower Mississippi
13   Valley Division in here.  Okay.
14          A.   I would not be surprised to see that
15   at all.  No.  There may have been an '88
16   headquarters comment on them as well.  I think in
17   '88, headquarters did look at the reconnaissance.
18          Q.   Into the document about 10 or 12 pages
19   is a section called LMVD.  Is that Lower
20   Mississippi Valley Division?
21          A.   Yes.
22          Q.   Comments relative to the Mississippi
```

1  River Outlet bank erosion reconnaissance report.

2  Do you see that?

3      A.    Yes.

4      Q.    Again, I'll represent to you and I'll

5  show you there are one, two, three, four pages of

6  typed plus some design sketches attached. Do you

7  see that?

8      A.    Yes.

9      Q.    Would that be typically the form in

10  which the comments would be made by the division?

11     A.    Correct.

12     Q.    And are those comments considered part

13  of the overall report?

14     A.    Yes. They're part of the record.

15  Those comments may have raised questions on the

16  conclusions or comments may have been referring to

17  the study itself or may have made comments for

18  things to consider for the following

19  investigations.

20     Q.    There's a reference to a memorandum

21  for the record about a meeting that was held.

22  What's a memorandum for record?

1  ships or bows, right?  Barges, whatever they're
2  called?
3      A.    We still have some dredges but over
4  the years a lot of the dredges were eliminated
5  because and now the dredging is done by
6  contractors, and I believe we still have but a few
7  dredges.
8      Q.    Let's assume in a period of time when
9  the Corps had its own dredging ship they call
10 them?  Boats?  Ships?
11     A.    Dredging fleet but I don't know what
12 the situation was at that time.  I don't remember
13 that.
14     Q.    Let's take the 1970s.  I don't think
15 there was privatization?
16     A.    Not much.
17     Q.    So and that the Coast Guard, I mean,
18 the Army Corp's hypothetical dredge hits a
19 commercial ship and causes damage to the
20 commercial ship.  Can you assume that
21 hypothetically?
22     A.    Sure.

1    Q.    That would be a federal
2  responsibility, would it not?
3         MR. EHRLICH:  This is outside the scope
4  of his designation.  We object on that ground.
5         BY MR. O'DONNELL:
6    Q.    Can you answer?
7    A.    There would be some action to take
8  care of that situation, I'm presuming.  I don't
9  know.
10   Q.    What I'm trying to get at is --
11 withdrawn.  When the Corps does a cost benefit
12 analysis and a reconnaissance report about
13 potential recommendations to remediate whatever
14 the problem is, who is it making those cost
15 benefit calculations for?
16   A.    Well, the purpose of the cost benefit
17 analysis and the reconnaissance report is to
18 determine potential federal interest to do a more
19 detailed investigation, to go into feasibility
20 study.
21         If a reconnaissance report looks at a
22 problem in response to a congressional resolution

1  but finds the benefit cost ratio is 0.5; in other

2  words, for every dollar that you would spend in

3  correcting the problem, you only gain benefits

4  half of that, that would not be a basis to

5  continue on to a federal feasibility study.

6        So the primary purpose of a benefit cost

7  ratio in a reconnaissance is just determine to go

8  should I proceed on to a more detailed

9  investigation. The reconnaissance is not a

10 decision document is what I'm trying to tell you

11      Q.   No, but it is an attempt to scope out

12 how you would allocate federal versus nonfederal

13 responsibilities, correct?

14      A.   It's the beginning of it. But the

15 feasibility phase would be the one to make that

16 further assessment in greater detail.

17          MR. O'DONNELL: Let me mark one page of

18 a very fat document. I'll mark this as the next.

19   (Montvai Deposition Exhibit No. 7 was marked for

20                identification.)

21          BY MR. O'DONNELL:

22      Q.   You said earlier that among the

1   decision documents, generically there was a

2   feasibility report and you also said a post

3   authorization change report?

4          A.    Correct.

5          Q.    And are you aware of any such document

6   that was done on the MRGO?

7          A.    The only one I'm aware of that was

8   done and that I remember was the deauthorization

9   report, which was a post authorization but it was

10  a deauthorization report and that's the one that

11  you're pulling out there?

12         Q.    Exhibit 7.  I'll get to that in a

13  moment.  Thank you?

14         A.    But I'm not aware of a PAC report, as

15  we used to call it, the post authorization change

16  report and those are usually or can be done when

17  you already have an authorized project but then

18  change conditions result in having to notify

19  Congress of that change as in requesting

20  presumably that Congress would authorize some

21  modifications.

22         The post authorization change report can