# EXHIBIT 67

KEMP, GEORGE P. KEMP

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES     CIVIL ACTION

CONSOLIDATED LITIGATION

NO. 05-4182

"K" (2)

PERTAINS TO: MRGO ROBINSON       JUDGE DUVAL

MAG. WILKINSON

VIDEOTAPED DEPOSITION OF

GEORGE PAUL KEMP,

633 Magnolia Wood Avenue, Baton Rouge,

Louisiana 70808, taken in the offices of

Joseph Bruno, 855 Baronne Street, New Orleans,

Louisiana, on Thursday, January 15, 2009.

KEMP, GEORGE P. KEMP

1/15/2009

Page 2

```
 1
     APPEARANCES:
 2
         DOMENGEAUX, WRIGHT, ROY & EDWARDS
 3       BY: JAMES PARKERSON ROY, ESQ.
         556 Jefferson Street
 4       Suite 500
         P. O. Box 3668
 5       Lafayette, Louisiana 70501 10022
             ATTORNEYS FOR THE PLAINTIFFS
 6
 7       LAW OFFICE OF JOSEPH M. BRUNO
         BY: JOSEPH BRUNO, ESQ.
 8           SCOTT JOANEN, ESQ.
         855 Baronne Street
 9       Third Floor
         New Orleans, Louisiana 70113
10           ATTORNEYS FOR PLAINTIFFS LIAISON
             COUNSEL
11
12       UNITED STATES DEPARTMENT OF JUSTICE
         BY: PAUL LEVINE, ESQ.
13           RUPERT MITSCH, ESQ.
         Torts Branch, Civil Division
14       1331 Pennsylvania Avenue NW
         Room 8095N
15       Washington, D.C. 20004
             ATTORNEYS FOR UNITED STATES OF
16           AMERICA
17
18
     VIDEO BY: Gilly Delarmal
19           Depo-Vue
20
21
     REPORTED BY:  ROGER D. JOHNS, RMR, CRR, CSR
22               Certified Court Reporter,
                 State of Louisiana
23
24
25
```

Johns Pendleton Court Reporters                    800 562-1285

KEMP, GEORGE P. KEMP

1/15/2009

Page 3

1              S T I P U L A T I O N

2

3      It is stipulated and agreed by and between

4  counsel for the parties hereto

5  that the deposition of the aforementioned

6  witness is hereby being taken under the

7  Federal Rules of Civil Procedure, for all

8  purposes, in accordance with law;

9      That the formality of reading and signing

10  is specifically not waived;

11      That all objections, save those as to the

12  form of the question and the responsiveness of

13  the answer, are hereby reserved until such

14  time as this deposition, or any part thereof,

15  may be used or sought to be used in evidence.

16

17              *   *   *   *

18

19      ROGER D. JOHNS, RDR, CRR Certified Court

20  Reporter, for the State of Louisiana,

21  officiated in administering the oath to the

22  witness.

23

24

25

KEMP, GEORGE P. KEMP

1/15/2009

Page 4

```
 1                   I N D E X

 2                                        PAGE

 3

 4    Exhibit Number 1............................. 7
      Exhibit Number 2............................ 10
 5    Exhibit Number 3............................ 11
      Exhibit 4................................... 24
 6    Exhibit 5................................... 46
      Exhibit 6................................... 48
 7    Exhibit 7................................... 52
      Exhibit 8................................... 67
 8    Exhibit 9................................... 67
      Exhibit 10.................................. 67
 9    Exhibit 5................................... 69
      Exhibit 10.................................. 75
10    Exhibit 11.................................. 78
      Exhibit 12................................. 110
11    Exhibit 13................................. 119
      Exhibit 14................................. 126
12    Exhibit 15................................. 126
      Exhibit 16................................. 127
13    Exhibit 17................................. 216
      Exhibit 18................................. 231
14    Exhibit 19................................. 243
      Exhibit 13................................. 253
15    Exhibit 20................................. 299
      Exhibit 21................................. 300
16    Exhibit 22................................. 300
      Exhibit 23................................. 300
17    Exhibit 24................................. 301
      Exhibit 25................................. 301
18    Exhibit 26................................. 305
```

```
19

20

21

22

23

24

25
```

KEMP, GEORGE P. KEMP

1/15/2009

```
                                                    Page 5
 1              VIDEO OPERATOR:
 2                  This is the videotaped deposition
 3          of Dr. Paul Kemp.  This deposition is
 4          being held today at 855 Baronne
 5          Street, New Orleans, Louisiana, on
 6          January 15th, 2009.  The time is 9:16
 7          A.M.
 8                  Would the Court Reporter please
 9          now swear in the witness.
10              GEORGE PAUL KEMP,
11     633 Magnolia Wood Avenue, Baton Rouge,
12     Louisiana 70808, after having been duly sworn
13     by the before-mentioned court reporter, did
14     testify as follows:
15              MR. ROY:
16                  Jim Roy and Joe Bruno defending
17          on behalf of Plaintiffs.
18              MR. DYER:
19                  David Dyer, Corps of Engineers.
20              MR. MITSCH:
21                  Rupert Mitsch, DOJ.
22              MR. LEVINE:
23                  Paul Levine on behalf of the
24          United States.
25     EXAMINATION BY MR. LEVINE:
```

KEMP, GEORGE P. KEMP

1/15/2009

Page 6

```
 1        Q.    Good morning, Dr. Kemp.

 2        A.    Morning.

 3        Q.    I understand you have been deposed

 4   before?

 5        A.    I have.

 6        Q.    How many times?

 7        A.    In this case, I believe it's only

 8   once.

 9        Q.    Any other times prior to this case?

10        A.    Yes.  I can't remember how many

11   times.

12        Q.    Because you have been deposed

13   before, I am not going to cover all the rules

14   of a deposition.  A couple of things, though.

15   If you need to take a break, please let me

16   know; we can take a break.  However, I ask

17   that you not leave a question pending before

18   taking a break.  Do you agree?

19        A.    I agree.

20        Q.    Is there any reason today why you're

21   unable to give testimony in this case or are

22   you under any disability or on any medications

23   that might be affecting your ability to

24   remember things or to understand my

25   questions?
```

KEMP, GEORGE P. KEMP

1/15/2009

Page 7

```
 1        A.    No, sir.

 2        Q.    And if you don't understand

 3   something in my question, please let me know

 4   so we can try to clarify the question.

 5   Otherwise, I will assume you understand the

 6   question.  Do you agree?

 7        A.    I agree.

 8        Q.    All right.  Let me give you a copy

 9   of what we have marked Exhibit Number 1.  Do

10   you know what this is?

11        A.    This is a notice of the deposition.

12        Q.    Have you seen it before?

13        A.    I saw it a couple of days ago, yes.

14        Q.    If you can turn to page 3, it's

15   Exhibit A to Notice of Videotaped Deposition,

16   I just want to go through this list.  Number

17   1, "Any and all materials considered or relied

18   upon by the deponent in connection with this

19   litigation."  Did you bring any of those

20   materials with you today?

21        A.    I did.

22        Q.    What did you bring?

23        A.    I brought my Expert Report 4.  I

24   brought the Defendant's, three of the

25   Defendant's expert reports.  That is Resio,
```

KEMP, GEORGE P. KEMP

 1   with these same figures.

 2        Q.   Go back to page 11 of your report.

 3   That's Exhibit 4.  Let's see if I can find

 4   it.  "Farther south beyond the Chalmette LPV

 5   EBSBs, dredging for the MRGO breached the

 6   ridge constructed by Bayou LaLoutre when it

 7   was a distributary for the Mississippi

 8   River."  Did I read that correctly?

 9        A.   That's right.  That's the one

10   they're -- that's where they're putting the

11   dam today.

12        Q.   So in your opinion, was it the

13   original design of the MRGO that caused an

14   increase in salinity which in turn caused the

15   destruction of the wetlands?

16        A.   Pretty much.

17        Q.   Then similarly, on page 185 of this

18   report, --

19        A.   When you talk about salinity, that's

20   different from surge.

21        Q.   Correct.

22        A.   Salinity is an everyday thing.

23   Surge is a rarer thing.

24        Q.   If you look on page 185 of your

25   report, --

KEMP, GEORGE P. KEMP

1/15/2009

Page 105

1   probably at least -- almost half of the

2   channel is in open water.

3        Q.   What mile marker are the jetties

4   at?

5        A.   Let's see.  I can look in my figure

6   here.  It shows it at mile marker 27, around

7   there.

8        Q.   Okay.  Under MRGO Reach 3 on page

9   12, it says "It served as a deep route for

10  saltwater to invade and damage inland

11  freshwater swamps and marshes that previously

12  were protected by the Bayou LaLoutre ridge."

13  Did I read that correctly?

14       A.   That's correct.

15       Q.   And again, was saltwater intrusion a

16  consequence of the design of MRGO -- of the

17  MRGO?

18       A.   Yes.  I mean it was -- it was a

19  foreseeable, predictable consequence of

20  building a deep channel across a shallow

21  estuary.

22       Q.   If we turn to the next page, page

23  13, you're talking about the funnel.  Where is

24  the funnel located just in real general terms?

25       A.   Okay.  The funnel is -- is the area

KEMP, GEORGE P. KEMP

1/15/2009

Page 107

1    the water piles up upon?

2        A.    That's correct.  You have the

3    conveyance associated with the channels in

4    conjunction with the -- with the boundaries

5    formed by the levees.

6        Q.    In your opinion, did the design and

7    construction of the MRGO create the funnel?

8        A.    Sure.  Bretschneider and Collins,

9    you know, directly address that.

10       Q.    And anything else create the

11   funnel?  I guess the design and construction

12   of the levees that bound the funnel?

13       A.    Well, he deals with them,

14   Bretschneider and Collins, remember, this is

15   in 1966, so the levees hadn't been constructed

16   yet, so he looks at the additive effect of

17   putting these structures on the edge of the

18   funnel.  But he dealt with it before, you

19   know, the funneling effect, before and after.

20   He's the only person who's really done that,

21   except until these -- this work.

22       Q.    On page 17 --

23       A.    Case 1 and case 3.

24       Q.    On page 17 of your report, in the

25   first paragraph you say "The extent of damage

Johns Pendleton Court Reporters                    800 562-1285

KEMP, GEORGE P. KEMP

1/15/2009

Page 268

1        Q.    Anything else?

2        A.    I'll leave it there.

3        Q.    Okay.

4        A.    I mean, I go through a fairly

5    detailed deconstruction of that claim that the

6    attorney made about weakening structures and

7    all of that, which I don't know where he got

8    that from.

9        Q.    On paragraph 16 of this declaration,

10    page 7, it says here, you say that "Generally

11    to perfectly operate and maintain the MRGO

12    project, you would have to include additional

13    features such as surge barriers."

14        A.    Yeah.

15        Q.    Is that correct?

16        A.    Yeah.

17        Q.    How does the surge barrier design

18    differ from the design of the levees?

19        A.    The problem is now I have got these

20    two projects in conjunction.  Okay.  So

21    they're influencing each other.  Okay.  I've

22    got to now modify one or both of the projects

23    to recognize that the other one is there and

24    causing problems.  That didn't happen.  Okay.

25    If I have got a problem with Reach 1 being

KEMP, GEORGE P. KEMP

1/15/2009

Page 269

1    enlarged so that it now admits a huge -- you

2    know, three times the amount of surge into the

3    city, I have got to figure out some way to

4    block that.

5         Q.    So your suggestion is to modify the

6    LPV project by installing a surge gate, a

7    surge barrier?

8         A.    Well, you probably have seen some of

9    the records going back in time about what

10   projects -- should the economic development

11   project pay for it or should the public safety

12   project pay for it, and they never could

13   figure it out so nothing was ever built.

14        Q.    But your suggestion is that they

15   should have changed the LPV project to include

16   a surge barrier?

17        A.    Either that or the -- or the MRGO

18   navigation project, you know.  They could have

19   put a gate on it, you know.  And so I don't

20   care who pays for it, but, you know, it comes

21   out of our pocket eventually anyway.  But, you

22   know, the fact is that wasn't done, now it's

23   being done.  You know, it's costing, what,

24   about $900 million, something like that.

25        Q.    But do you know if the Corps needed

KEMP, GEORGE P. KEMP

1/15/2009

Page 270

1    to obtain Congressional authorization for that

2    new surge barrier?

3        A.    I mean, the Corps has to obtain

4    Congressional authorization for most things

5    that it does.  And for things that they care

6    about, they get Congressional authorizations.

7    For things they don't care about, they don't.

8        Q.    So is that yes, they did have to

9    obtain Congressional authorization?

10       A.    Yeah, because you're talking about a

11    -- you know, when the flaw was discovered, it

12   was not included in the -- in the cost

13   estimate.

14       Q.    Did the Corps need to obtain --

15   Obviously the Corps needed to obtain

16   Congressional funding for the current surge

17   barrier.

18       A.    Yeah.  It was -- It's the most

19   expensive civil works project, I guess

20   domestic civil works project that they have.

21       Q.    Is it your opinion that any time the

22   Corps wanted to put in the surge barrier, they

23   probably would have had to go to Congress to

24   obtain authorization and funding?

25       A.    Right.  They would have had to raise

KEMP, GEORGE P. KEMP

1/15/2009

Page 271

```
 1    the alarm, say, "Look, you know, we're going
 2    to -- we're going to -- we're likely to -- you
 3    know, our calculations were wrong.  The LPV is
 4    not going to protect against, you know, the
 5    surge that we said, and we have got to take
 6    these other steps to enhance that protection."
 7    That alarm was never sounded.  In fact, they
 8    kept squelching any discussion of it.
 9         Q.    Let me ask you, in your opinion,
10    this is a different topic, but in your
11    opinion, why is it improper for the government
12    to isolate the effects of the operation and
13    maintenance on the MRGO?
14         A.    Why is it improper?
15         Q.    Yes.
16         A.    It's just illogical, I guess.
17         Q.    What's illogical about it?
18         A.    It's all one project and the effects
19    of the operations and maintenance are to
20    exacerbate the -- you know, cause -- increase
21    the widening, the rate of widening, that kind
22    of thing, that then exposes the levees to more
23    wave attack that then hastens the onset of
24    flooding.  So it's all -- it's all one thing.
25    I mean, I -- I suppose one can artificially
```

KEMP, GEORGE P. KEMP

Page 272

```
 1   separate these things anywhere one wants.  One

 2   can open a book to one page or another page,

 3   but it's all the same book.

 4        Q.   Sure, but don't we want to determine

 5   how much -- don't we want to determine what

 6   effects the channel widening and wetland loss

 7   contributed to Hurricane Katrina and the

 8   flooding?

 9        A.   I think we've performed an analysis

10   that gives you some pretty good indications of

11   that.  It's not my -- I mean, I put my

12   opinions in here about whether these things

13   are separable.  Maybe other people have other

14   ideas.  But to me it all seems of a cloth.

15        Q.   So you're just saying the operation

16   and maintenance, that just flows from the

17   original MRGO design?

18        A.   Of course it does.  Yeah.  I mean,

19   the -- the manner of construction necessitated

20   a certain amount of -- you know, made it a

21   high maintenance channel and dictated where

22   the sloughing would occur and how that would

23   affect the levee project.  So, you know, the

24   manner of maintenance is the same as the

25   manner of construction.  They dredged.  You
```

KEMP, GEORGE P. KEMP

1/15/2009

Page 273

1    know, it's the same thing.

2        Q.   It's just all coming from the

3    design?

4        A.   It's all coming out of the design.

5    You know, it's baked into the design like I

6    said earlier.

7        Q.   Paragraph 6, you talk about

8    essentially four adverse effects that resulted

9    from the MRGO.  They are the impact of the

10   wetlands is one.  Two is the --

11       A.   Where are you reading at?  I'm

12   sorry.

13       Q.   Paragraph 6.

14       A.   Okay.  So --

15       Q.   It says "Based on this

16   misperception, Defendant narrowly focuses only

17   on the impact of the wetlands and channel

18   width, while totally ignoring the cumulative

19   impact of two other adverse effects, namely

20   unimpeded surge and the funnel effect."

21       A.   Right.  And that was -- that was

22   because -- I don't know if you recall, but the

23   -- your colleague was trying to make the case

24   that this test that we ran on scenario 3 was

25   in fact the no -- what he called the "no

KEMP, GEORGE P. KEMP

1/15/2009

Page 277

1      A.   That's correct.  At -- As it was in

2  1958.  Right.  That gives you -- takes you

3  back in time to that time.

4      Q.   Can you turn back to Exhibit 4 and

5  look at page 23?

6      A.   Yes.

7      Q.   It says "The three structural

8  proposals to supply enhanced protection were

9  rejected on the rationale that the incremental

10  cost increase to the overall LPV project was

11  not deemed justified by the incremental

12  reduction in expected flood damages to

13  businesses along the IHNC."  Did I read that

14  correctly?

15      A.   I'm trying to catch up with you.

16  Okay.

17      Q.   It's the second full paragraph on

18  page 23.

19      A.   Okay.  Yeah.  All right.  Yeah.

20  Okay.  This is how -- why they weren't

21  weighing public safety concerns, yeah.

22      Q.   So essentially, in your opinion that

23  when the Corps into the balancing of their

24  analysis, they said the cost considerations

25  were more important than the public safety

KEMP, GEORGE P. KEMP

1/15/2009

Page 278

1    considerations?

2        A.   The public safety never entered into

3    it as far as I could tell.  I see no evidence

4    that public safety was ever a factor in any of

5    their weighing or considerations.  They did --

6    In this case what they were looking at, they

7    said, "Okay, I've got some businesses inside

8    the -- you know, adjacent to the IHNC that are

9    outside the -- or they're in -- they're inside

10   the flood protection, okay, so they're going

11   to flood a certain amount of time as a result

12   of unrestrained storm surge associated with

13   the widening of that channel.  You know, can I

14   justify giving -- providing a gate, for

15   example, to protect those guys from property

16   damage."  There was never any consideration

17   of, you know, "Can I keep people from

18   drowning?"  I have never seen in any part of

19   this whole 50 year record where there was any

20   concern about people drowning.  Or -- Or, you

21   know, --

22       Q.   Well, if you keep reading the whole

23   quote that you include from Colonel Haar, he

24   is talking about the installation of a surge

25   barrier.

Johns Pendleton Court Reporters                    800 562-1285

KEMP, GEORGE P. KEMP

1/15/2009

Page 279

```
 1        A.   Uh-huh (affirmatively).

 2        Q.   What are his reasons for rejecting

 3    the installation of a surge barrier?

 4        A.   Okay.  So he says it's not

 5    economically justified.  That is based on the

 6    very narrow criteria of the businesses along

 7    the channel.  Okay.  And then he says it's

 8    undesirable for other reasons.

 9        Q.   What other -- What are those

10    reasons?

11        A.   Well, some of them I think are, you

12    know, probably more spurious than others, but

13    this one about, you know, "The Federal project

14    has already been authorized, so if you change

15    it, then who's going to pay for the

16    incremental change?"  Okay.  This comes up

17    over and over again with the gates at the

18    mouth of the drainage canals and things like

19    that.  Okay.  Because, remember, there's going

20    to be a cost share involved.  Okay.  So

21    they're saying, "Oh, this will cost more

22    money.  Who's going to come up with up with

23    that money?"  Further, the modifications

24    involved, they're so broad in scope as to be

25     -- Okay.  So, "Ah, this is not something I
```

KEMP, GEORGE P. KEMP

1   can do.  I have got to go all the way to the

2   President of the United States to get

3   permission to do this, or Congress.  So do you

4   want me doing that?  It might take 20 years

5   for me to get permission on that.  So we'll

6   just stop the project and, you know, I'll --

7   I'll -- we'll start, you know, on -- How many

8    -- It took us 30 years to get this project

9   through Congress.  Now you want me to modify

10  it?  I am -- I'm telling you it might take

11  another 20 years and meanwhile, we wouldn't be

12  able to do anything."

13          "During the time that this

14  process was being accomplished, progress and

15  planning construction of some of this urgently

16  needed project features would be

17  discontinued."  Okay.  "In addition to the

18  above operation of two features of the plan,

19  namely, the navigation gate in the MRGO and

20  the lock in the Gulf Intracoastal Waterway --"

21  This is the main reason, you know.  Some boats

22  might have to wait.

23      Q.   So, according to this paragraph, I

24  see, one, the project, the surge barrier was

25  not economically justified; two, it would not

KEMP, GEORGE P. KEMP

```
 1   include the work already provided by the local

 2   interests and, therefore, it would interfere

 3   with the cost sharing; three, it's outside the

 4   scope of the Corps' authority so they would

 5   need a Congressional authorization; four, they

 6   already had some of the project features in

 7   the LPV already set and so they didn't want to

 8   kind of leave those waiting and so they wanted

 9   to keep working on that; and, five, they were

10   concerned about the shipping and navigation

11   interests that were involved?

12        A.   Right.  And what they were not

13   concerned about was public safety.

14        Q.   I mean, those were the five reasons

15   that they gave.

16        A.   Right.  And nowhere in there do you

17   see public safety.

18        Q.   In your opinion --

19        A.   And obviously now it's being

20   constructed, not for any of those reasons.

21   We're actually closing the channel to

22   navigation.  So it's not being constructed for

23   nav- -- The reason that it's being done is for

24   public safety and public safety only.

25        Q.   In your opinion, would these reasons
```

KEMP, GEORGE P. KEMP

1/15/2009

Page 282

1   listed by Colonel Haar, were they valid

2   reasons for not including the surge barrier?

3       A.   They were -- That is an example of,

4   you know, the worst kind of gamesmanship on

5   these -- This is how this project ended up the

6   way it is.

7       Q.   Do you think that making this

8   analysis, though, --

9       A.   Remember, here's the Colonel.  He is

10  the person most responsible for public safety,

11  for preventing flooding, and he is making all

12  the arguments for why he can't prevent public

13   -- why he can't protect public safety or

14  prevent flooding.  Okay?  This is your

15  advocate.  You know, this is the guy who's got

16  to go to Congress and say "We need it."  And

17  he is saying, "I am not going."

18      Q.   Do you dispute, though, that the

19  Corps could -- I mean, could consider these

20  factors?  I mean, these factors were valid

21  considerations for the Corps?

22      A.   They go into the mix.  You know, how

23  do they weigh against public safety?  I think

24  in hindsight, these would be minor

25  considerations compared to public safety,

KEMP, GEORGE P. KEMP

1/15/2009

Page 283

 1   given what happened.

 2       Q.   But, I mean, you say they're minor

 3   considerations.  So could someone else who did

 4   an analysis, someone else other than you who

 5   did an analysis like this come out the other

 6   way and say, well, these interests trumped

 7   public safety?  That's an analysis someone

 8   could make?

 9       A.   Yes, but nobody did that.  Because

10   public safety, we see no evidence that any --

11   at any time through this whole history of the

12   project that public safety ever entered into

13   consideration.  Okay?  Navigation, yes, it's

14   there every time.  You know, property damage,

15   sometimes.  But public safety?  Never.

16       Q.   Did the original design memorandum

17   for the MRGO call for any bank stabilization?

18       A.   It specifically did not call for

19   it.

20       Q.   What's the purpose of bank

21   stabilization?

22       A.   The purpose is to -- well, two

23   purposes.  One would be to -- to maintain the

24   channel at its authorized width.  And

25   secondly, to limit the amount of slumping of

KEMP, GEORGE P. KEMP

1/15/2009

Page 284

1    the sides into the channel, causing, you know,

2    a need for maintenance dredging.

3         Q.   Why did the Corps decide not to put

4    in bank stabilization measures along the banks

5    of the MRGO?

6         A.   They were -- They knew it would cost

7    money and they didn't -- they didn't want to

8    spend it.  And the local sponsors didn't want

9    to share in those costs.  And at that time

10   nobody cared much about the wetlands, so --

11        Q.   Did the Corps know -- What risks did

12   the Corps -- what risks --

13        A.   The Corps knew the banks -- Okay.

14   They put, what, one-on-two side slopes, okay,

15   in slump, marsh.  There was no chance that

16   they wouldn't slump, that they wouldn't --

17   that you wouldn't see widening.  So, of

18   course, they knew that was going to happen.

19   They only wanted to pay for the minimum cut.

20   And they got what they got.

21        Q.   And did the Corps know that, you

22   know, by putting in these one-on-two side

23   slopes that the banks of the MRGO were going

24   to widen over the course of time, that the

25   MRGO was going to get bigger?

KEMP, GEORGE P. KEMP

```
 1        A.    Sure.   And all they did was say,
 2     "Well, I have got a certain amount of
 3     right-of-way, you know.  Maybe in 20 years
 4     we'll be outside, or we'll be approaching the
 5     edge of the right-of-way.  Then we can deal
 6     with it."
 7        Q.    So while the original channel called
 8     for one-on-two slopes and a 500 foot bottom,
 9     the Corps always knew that the channel was
10     going to get bigger?
11        A.    Yeah, because, I mean, every other
12      -- every other channel through the marsh in
13     Louisiana has done that.
14        Q.    And this was all known at the time
15     of the design of MRGO and it was just one
16     factor that the Corps considered when
17     designing the MRGO?
18        A.    Oh, they specifically addressed
19     that, and I think I dealt with some of that
20     either in this report or in the Team
21     Louisiana.  You know, people complained that
22     it would -- that the sides would be unstable.
23     They said, "We know it and we don't care.
24     We'll deal with that down the road."  Okay?
25        Q.    Why --
```

KEMP, GEORGE P. KEMP

1/15/2009

Page 286

1      A.   That was before there was, you know,

2   a levee system there to worry about.  Later,

3   when the thing started eroding back into the

4   toe of the levee, that's when they started

5   worrying about it.  They had all of their test

6   projects out there to try and stop it, and

7   nothing would stop it.

8      Q.   Why did the Corps choose the

9   particular alignment they did for the MRGO?

10     A.   I am not -- I am not the -- You

11  know, I don't think I know 100 percent why

12  that is.  It has something to do with just

13  being a straight cut.  You know, that -- You

14  know, get you out to deep water in the

15  shortest possible way.  It also, I know they

16  wanted to keep it as much as possible inside

17  the wetlands because they never have been able

18  to maintain channels in open water very well.

19     Q.   Can you turn to page 32 of Exhibit

20  4?  In the second paragraph there, you write

21   "The Corps chose the MRGO channel alignment

22  partly to reduce future costs of maintaining

23  the authorized channel by routing it as much

24  as possible within the marsh and partly to

25  allow for development of potential industrial

Johns Pendleton Court Reporters                800 562-1285

KEMP, GEORGE P. KEMP

1/15/2009

Page 287

1    sites under relatively high land created in

2    the spoil disposal area along its south bank."

3    I mean, were these the reasons why they --

4    some of the reasons --

5          A.    Yes.

6          Q.    -- why they chose to --

7          A.    Yeah, they had -- There was some

8    people that had a scheme to develop the -- you

9    know, remember the -- all the spoil gets put

10   along one side, not on both sides.  So there

11   was -- and there was a notion that the spoil

12   bank area could become some kind of industrial

13   site and so their -- you know, it was -- you

14   know, it was part of the economic development

15   project.

16         Q.    I don't think I got a chance to

17   finish my question, so just make it clear.

18   You were answering the question, though,

19   that's why the Corps chose that particular

20   MRGO alignment?

21         A.    That's my opinion about it.  Other

22   people might have other opinions.

23         Q.    Now, how did they pick the LPV

24   alignment?  I think it's also on this page,

25   too.

KEMP, GEORGE P. KEMP

1/15/2009

Page 291

1   They're just there because that's where they

2   were.

3       Q.   Do you believe the MRGO project was

4   under-funded?

5       A.   I think that the MRGO project for

6   most of its lifetime has had to fight for

7   money because it's been such a loss leader in

8   terms of -- You know, the economic benefits

9   that were supposed to accrue in terms of

10  traffic and development never -- never came

11  and, as a result, the Congressional support

12  for maintaining it was always hard to come by

13  and it had to be kind of buried -- you know,

14  the money for it had to be kind of buried in

15  other -- in the overall budget for dredging

16  and, of course, it was very expensive to

17  maintain.  Every time a thunderstorm went

18  through, it filled up with, you know, silt

19  and, you know, most of the time you couldn't

20  get the boats in it.  For half the career it

21  had, they only maintained -- they didn't --

22  they didn't actually maintain the whole cross

23  section because they didn't have -- they

24  couldn't justify getting the money for it.

25      Q.   Do you believe the LPV project was

KEMP, GEORGE P. KEMP

1/15/2009

Page 292

1    under-funded?

2        A.   I would have to say in hindsight it

3    was very under-funded because now we're

4    spending 15 billion and we're not quite

5    getting the same level of protection that they

6    promised with the $1 billion project.

7        Q.   When dealing with the MRGO, do you

8    think the Corps favored the shipping interests

9    over other interests?

10       A.   Absolutely.  They do today.

11       Q.   Turn to page --

12       A.   I mean, there's --

13       Q.   -- 193 of your expert report.

14       A.   They regard the shipping industry as

15   their customer.

16       Q.   There's two paragraphs at the top of

17   the page there that were written by Wooley and

18   Shadman that you cite to.  Do you know what

19   these paragraphs say?

20       A.   Okay.  You know, Wooley and Shadman

21   have provided essentially the Corps' official

22   apology for why they did things the way they

23   did.  This is -- That was the purpose of

24   that.  And this is I think, you know, a good

25   example of the kind of rationale that -- I