# EXHIBIT 68

# MISSISSIPPI RIVER GULF OUTLET EFFECTS ON STORM SURGE, WAVES AND FLOODING DURING HURRICANE KATRINA

EXPERT REPORT

BY

G. PAUL KEMP, Ph.D.

*ROBINSON V. UNITED STATES*

JULY 11, 2008

# MISSISSIPPI RIVER GULF OUTLET EFFECTS ON STORM SURGE, WAVES AND FLOODING DURING HURRICANE KATRINA

## TABLE OF CONTENTS

| | |
|---|---|
| **PREFACE** | **2** |
| **1.0 INTRODUCTION** | **5** |
| **2.0 FUNNEL GEOGRAPHY, TERMINOLOGY AND KATRINA FLOOD DAMAGES** | **8** |
| **3.0 BRIEF HISTORY** | **21** |
| **4.0 EARLIER SURGE STUDIES** | **40** |
| **5.0 METHODS** | **69** |
| **6.0 FUNNEL EFFECT ON SURGE** | **96** |
| **7.0 EFFECTS OF REACHES 1 AND 2 ON SURGE** | **148** |
| **8.0 EFFECTS ON WAVES** | **159** |
| **9.0 NEED FOR INSTITUTIONAL REFORM** | **185** |
| **10.0 CONCLUSIONS** | **197** |
| **11.0 REFERENCES** | **199** |
| **12.0 APPENDICES** | **205** |

    A. QUALIFICATIONS

    B. MRGO CHRONOLOGY

# MISSISSIPPI RIVER GULF OUTLET EFFECTS ON STORM SURGE, WAVES AND FLOODING DURING HURRICANE KATRINA

## G. PAUL KEMP, Ph.D.

## July 11, 2008

### PREFACE

I, G. Paul Kemp, am a geologist and oceanographer currently employed by the National Audubon Society, and at the time of Katrina by the Louisiana State University (LSU) Hurricane Center. My qualifications are attached as Appendix A. The opinions expressed in this report are solely my own, and not those of the National Audubon Society or LSU. This is the fourth expert report that I have written as a member of the Robinson expert team, including ones submitted to the Court on July 28, 2007 (Kemp Class Certification 2007a), September 14, 2007 (Kemp 702(c) immunity 2007b) and May 1, 2008. The current report supplements and essentially replaces the report of May 1, 2008, with the addition of information developed over the past two months. I incorporate by reference everything I have written in the three previous reports into the current report.

The Government takes the position that the Mississippi River Gulf Outlet navigation project (MRGO) had no effect on the catastrophic flooding of Greater New Orleans during Hurricane Katrina. Our analyses show that the Government is incorrect. It is my opinion that the MRGO navigation project:

> (1) created a funnel, the dangerous convergence of channels and spoil disposal areas, later augmented by addition of the Lake Pontchartrain & Vicinity (LPV) berms east of New Orleans, and by the subtraction of buffering wetlands, that foreseeably amplified the threat posed by hurricane surge to the Greater New Orleans area; and
>
> (2) greatly enlarged the original Gulf Intracoastal Waterway (GIWW) connection between the throat of the funnel and the IHNC (MRGO Reach 1), which foreseeably increased surge transmission into the city earlier, adding to the height and duration of surge experienced in the IHNC during Katrina and contributing to the early failure of floodwalls and levees adjacent to the IHNC; and
>
> (3) created a Reach 2 channel with unstable side slopes that caused it to predictably expand over time, reducing the natural marsh buffer that previously separated it from Lake Borgne and from the adjacent LPV berms, thereby compromising foreshore protection fort the man-made surge protection elements and hastening the onset of damaging wave action on these delicate structures (EBSBs) so that they breached earlier in the storm sequence; and

> (4) created a channel in Reach 2 that predictably exposed freshwater swamps and marshes within the Lake Borgne funnel to increased salinity, accelerating their conversion to open water and thereby reducing the wetland surge and wave buffer between Lake Borgne and populated areas; and
>
> (5) was a substantial contributing factor to the catastrophic flooding of the Robinson plaintiffs' homes and communities.

In addition, throughout the history of the MRGO project, up to the time of Hurricane Katrina, the U.S. Army Corps of Engineers (USACE or Corps), in my opinion, has continuously adopted a policy of denial and deliberate disregard of well documented adverse effects of the channel, most of which were known or suspected prior to construction and others that became apparent later, soon thereafter ensuring that a real threat for flooding during hurricanes remained unaddressed for five decades. Throughout this period, the USACE issued increasingly soothing but inaccurate statements to two generations of New Orleans and St. Bernard residents that they were well protected and that the MRGO project posed no hazard to their lives or property.

Furthermore, this approach is much the same today, in my opinion, coloring the conclusions of the Corps sponsored investigations that have followed Katrina, and the nature of solutions that have been proposed. This, in particular, includes an obdurate unwillingness to provide wave protection to the hastily rebuilt berms that parallel MRGO Reach 2 despite overwhelming evidence that they were largely destroyed by waves. Today, the Corps still refuses to acknowledge, in the face of compelling scientific evidence, that the MRGO project was a significant cause of the early and catastrophic flooding of the Upper and Lower 9th Ward, St. Bernard Parish and New Orleans East during Hurricane Katrina.

Ultimately, the extent of damage and the harm caused by the flooding of St. Bernard and the Lower 9th Ward through the MRGO was not significantly reduced by the LPV berms and floodwalls. The structures that Dr. Bea has described as "earthen berm/spoil banks" (EBSBs) (to differentiate them from properly engineered coastal defense dykes) along MRGO Reach 2 served merely as "speed bumps" that were swept aside during Katrina by the surge and waves generated in, and transmitted by the MRGO channel. Most of the flooding of the Lower 9th Ward and New Orleans East, as well as a significant portion of the early flooding of the Orleans Metro area, is attributable to the enlarged cross-section of MRGO Reach 1.

Finally, I believe that the USACE, and certainly the larger oceanographic community, possessed a knowledge base prior to the construction of the MRGO project, and certainly after the Betsy disaster, that should have led to actions to tightly integrate the MRGO economic development project with the LPV public safety project, and thereby reduce or eliminate the added and substantial hazards uniquely posed by the ship channel. Instead, with regard to this particular project and, significantly, not in all comparable cases around the country, the Corps adopted a policy of institutional denial that stymied efforts of local leaders, engineers and scientists to address critical, long-known deficiencies that were

fully manifested during the Katrina event. My reading of the record indicates that certainly by 1988, if not earlier, the Corps knew about the nexus between many of the deficiencies noted above and the likelihood of catastrophic flooding. Nevertheless, before Hurricane Katrina, the Corps never completed any study recommending a plan to Congress to mitigate known hazards. The storm has provided an opportunity for new leadership at the Corps to mobilize all of the authority, resources and expertise that it has been given by Congress to mitigate the damage that the MRGO has caused. We are still waiting.

I declare under the penalty of perjury under the laws of the United States of America and the State of Louisiana that the foregoing is true and correct.

Executed on July 14, in Baton Rouge, Louisiana.

G. Paul Kemp, Ph.D.

4

> argument. The same observations are used to verify the model that
> provided the basis for calibration. In other words, the authors started with
> a model, then readjusted it with data from one observational case, and then
> compared the models predicted results with the same observational case
> data. The approach virtually guarantees good agreement."
> (Hsu 1973, p. A-11)

Several proposals were developed by the USACE NOD and by local interests to provide enhanced hurricane surge protection for port facilities and developed areas adjacent to the combined MRGO Reach 1/GIWW and the IHNC in the years following Hurricane Betsy, and in the immediate aftermath of flooding caused by Hurricane Camille in 1969. These proposals included placing floodgates in the IHNC at its junction with the MRGO, a floating gate in MRGO Reach 1 in the vicinity of Paris Road, and a crescent-shaped levee to connect the proposed barrier structure at Chef Menteur Pass with the LPV in the vicinity of Bayou Bienvenue (**Figure 3.2**). Furthermore, the Corps realized that the enormous outflow of surge during Hurricanes Betsy and Camille from the IHNC to Lake Pontchartrain -- what Dr. Bea has called "venting"-- was effective in preventing surge levels from rising higher in the IHNC and causing more damage to the adjacent dock areas then more heavily populated by businesses than they are today. This led the USACE to reassess the controlling elevation of the "Seabrook Lock," at that time a proposed component of both the MRGO -- to prevent saltwater from entering Lake Pontchartrain under normal tides -- and LPV projects. Its role under LPV would be to prevent storm surge from entering the IHNC from the Lake, and vice versa. It is important to note that this first tentative step toward integrating the two projects never made it past the drawing board.

In all instances, the Corps chose the "no-action alternative." The three structural proposals to supply enhanced protection were rejected on the rationale that the incremental cost increase to the overall LPV project was not deemed justified by the incremental reduction in expected flood damage to businesses along the IHNC. *None of the relevant design memoranda discuss a weighing of public safety concerns, just property damage.* Significantly, one of these plans, known as the Crosby Plan, appeared as Alternate Plan C in the Citrus Back Levee Design Memorandum 2, (USACE 1967, App. C, Plate 4). This plan incorporated features similar to those included in the 1965 recommendations of the Citizens Committee (**Figure 3.2**). Additional reasons that the Corps rejected this plan were given in a September 23, 1969 letter from Colonel Herbert Haar, Jr., NOD District Engineer, to Congressman F. Edward Hebert (Haar,1969), stating:

> "Beyond the fact that the plan is not economically justified, it is
> undesirable for a number of other reasons. Its adoption would mean that
> none of the work already accomplished by local interests subsequent to the
> project authorization would be incorporated into the Federal project and
> no credit for such work would be allowed. Further, the modifications
> involved are so broad in scope as to be beyond the discretionary authority
> of the Chief of Engineers to adopt, so that project review and subsequent

23

> Congressional action would be required. During the time that this process was being accomplished, progress in planning and construction of some of the most urgently needed project features would be discontinued…In addition to the above, operation of two features of the plan, namely the navigation gate in the Mississippi River-Gulf Outlet and the lock in the Gulf Intracoastal Waterway, would significantly impede seagoing and inland navigation…The interest expressed by Mr. Crosby relative to the need for construction of the aforementioned project is greatly appreciated."
> (USACE Col. Haar, Jr., in 1969 letter to Congressman F. Edward Hebert)

Upon receiving this shot across the bows from the USACE with respect to the Crosby Plan, the Orleans Levee District and Louisiana Department of Public Works -- the two state agencies that had originally asked for its consideration -- quickly withdrew their support for this alternative. Ironically, a variant of this plan has re-emerged since Katrina as the 100-year protection plan for which the Corps has recently let a $750 million design-build construction contract, as will be discussed in more detail below.

This brings us to a central theme that I will return to several times in this report, namely, that the USACE adopted a policy of denial following Hurricane Betsy that effectively stifled acquisition or analysis of new information on the potential of the MRGO to increase hurricane surge, waves and flooding. This policy was clearly expressed in 1973 by Mr. P.A. Becnel, Jr., then Chief of the Hydraulics and Hydrologic Branch, NOD, in a "Memorandum for Record" addressing the "Apparent Funneling Effects of Citrus and Chalmette Hurricane Protection Levees" in 1973 (Becnel Memorandum 1973).



**Figure 3.2 Alternate Plan C from Citrus Back Levee Design Memorandum 2 showing a rejected proposal to incorporate the MRGO into the LPV flood protection plan through construction of a levee across the funnel and a floating closure gate across the MRGO (USACE 1967). See USACE post-Katrina "100-Year Hurricane Protection Plan" for comparison (Figure 3.6)**

**3.1  Failure to Integrate the MRGO and LPV**

The LPV had a public safety mission while the MRGO was strictly an economic development project.  One might expect that public safety would trump economic development whenever they conflict, particularly after the extreme flooding experienced during Hurricane Betsy.  The Dutch version of the Corps, called the Rijkwaterstaat, is, for example, guided by the motto "Safety above All."  On the east side of New Orleans, however, public safety was considered only to the degree that the design and operation of the MRGO channel might affect vessel maneuverability to avoid groundings and collisions.

The USACE chose the MRGO channel alignment partly to reduce future costs of maintaining the authorized channel by routing it as much as possible within the marsh, and partly to allow for development of potential industrial sites on the relatively high land created in the spoil disposal area along its south bank (**Figure 3.4**).  Later, when the LPV project was authorized in 1965, a decision was made to build the Chalmette loop of the federal flood control structures in the MRGO spoil disposal area even though foundation conditions were known to be poorer there than, for example, at the more inland 40 Arpent location where a levee already existed that was supported by sturdier soils.  It was further known in 1965 that founding the levee on this spoil material would delay completion because of subsidence and the long consolidation periods required between lifts.  More importantly, the Corps knew that a levee closer to Lake Borgne would be exposed to higher surge elevations and wave attack during hurricanes than a more sheltered line of defense farther inland.

These good reasons to look for a different right-of-way for the LPV levee were overwhelmed by considerations that did not include public safety, including the lure of 100 million cubic yards of inexpensive material that could be mined hydraulically from the MRGO to make earthen berms.  The end result, however, was to shift a portion of MRGO maintenance dredging costs from the navigation project to the under-funded hurricane protection project.

The opportunity to supply berm material by using hydraulic dredges to over-deepen the adjacent MRGO channel also trumped quality assurance concerns about whether material supplied in this way would be suitable to construct a structure that met USACE standards for a coastal defense dike, or indeed, an urban flood control levee of any kind.  In the end, as Dr. Bob Bea and Mr. Jesse Arnold have pointed out in earlier expert reports (relative to the 702 (c) immunity question), the LPV structures along MRGO Reach 2 never met any established USACE levee construction standards, and should not have been considered engineered "levees," but merely earthen berms/spoil banks (EBSBs).  Again, it appears that a narrow expedience prevailed over a careful weighing of the public safety risks.

The MRGO channel supplied material for the LPV Chalmette EBSBs, but the MRGO project was never incorporated into the LPV plan except as a pre-existing, static landscape feature.  We discussed earlier how the Corps rejected adding MRGO

32