# EXHIBIT 69

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

--oOo--

IN RE KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION,

                          No.  05-4182 "K" (2)

PERTAINS TO:  ROBINSON, NO.
06-2268
_____

DEPOSITION OF ROBERT GLENN BEA

Friday, January 30, 2009

Reported By:

KATHLEEN WILKINS, CSR #10068, RPR, CRR

1  lawyers do.

2     MR. STONE:  Q.  With that understanding,
3  then, your opinions regarding decisions ought to
4  be strictly based on science, correct?

5     A.  Incorrect.

6     Q.  Okay.  What would they -- what would
7  your opinions about all these decisions be based
8  on?

9     A.  For example, economics.  Cost-benefit
10 is a -- is a necessary part of the engineering.
11 It's not decoupled from it.

12    Q.  Okay.

13    A.  Social acceptability is a part of the
14 engineering decisions.  You can't subject people
15 to risks that they haven't acknowledged or
16 approved.

17        Law becomes an instrument in
18 engineering, to assure that what we construct is
19 in the interest and benefit of the public.

20        You can't -- you can't decouple
21 engineering from reality.

22    Q.  Isn't it fair to say that before MRGO
23 was built, before the levees were put up, the
24 State of Louisiana had to communicate their need
25 to Congress?

1     A.     That's correct.
2     Q.     Is it also fair to say that there were
3  problems with environmentalists in the Louisiana
4  area during the time of construction of levees?
5  That's a bad -- question's withdrawn.
6            Were environmentalists active,
7  particularly in court, during this time to prevent
8  certain projects that the Corps and the state were
9  trying to put in place?
10    A.     Yes.  And they should be active.
11    Q.     Okay.  And all of that enters into the
12 decision-making of the Corps or Congress when they
13 decide whether they're going to put in barriers or
14 build any kind of projects like this; is that
15 correct?
16    A.     It should.
17    Q.     All right.  You're talking about the
18 Corps should have selected a different route.
19    A.     Could have.
20    Q.     Well, okay.  Could have.
21           Once again, please correct me if I'm
22 wrong because I do not want to put words in your
23 mouth.
24    A.     We're working.
25    Q.     This is -- the question about that is,

1  though, what kind of judgment calls on the part of
2  the engineers would go into determining the route
3  that MRGO would take through the wetlands or
4  wherever down there?
5      A.   Well, one of the objectives that the
6  engineer would have is to minimize potential
7  negative environmental impacts.
8           Another constraint the engineer would
9  have to deal with would be economics. Another the
10 engineer would have to deal with would be the
11 available technology to accomplish what is
12 proposed to be constructed life cycle cycle.
13          Another thing the engineer would have to
14 consider would be the social/political
15 acceptability of the facilities that are proposed.
16          A wide range of constraints and factors
17 need to be considered by the engineer in
18 development of a coherent, constructive engineered
19 system.
20     Q.   Also including the need for exercise of
21 eminent domain, obtain land through state
22 processes, to be able to put something in
23 somewhere, correct?
24     A.   Certainly.
25     Q.   So have you done an analysis of what

BEA, ROBERT

1/30/2009

Page 58

```
 1        Q.   Okay.  And that is an issue related to
 2   design, construction and maintenance of the
 3   levees, correct?
 4        A.   And operation.
 5        Q.   And operation of the levees themselves?
 6        A.   That's correct.
 7        Q.   Okay.
 8             MRGO there is simply an opportunity to
 9   take materials to use for the levees, and the
10   Corps has taken that opportunity to do that?
11        A.   And to, at the same time, provide a
12   navigation channel and to provide for its
13   maintenance.
14        Q.   Okay.  The second half of that Opinion B
15   on page 6 seems to me to deal with the funnel
16   effect; is that correct?
17        A.   That is correct.
18        Q.   Okay.  And the funnel effect that you're
19   talking about here, tell me exactly what that
20   funnel effect is.
21             And let me set this up a little better
22   for you so you know what the focus of my question
23   is.
24             What does it have to with MRGO?  What
25   does it have to do with GIWW?  What does it have
```

BEA, ROBERT

1/30/2009

Page 60

1  the construction of the MRGO there, isn't it?
2      A.   That's correct.
3      Q.   MRGO was designed to bring the water up
4  so the ships could come up, and so the design is
5  the problem, in your opinion, there?
6      A.   That is incorrect.  In your statement,
7  they didn't design it to have the water come up.
8      Q.   Okay.
9      A.   They designed it for the construction of
10 a channel that would have sufficient depth to
11 keep -- to clear the keel drafts of the associated
12 shipping.
13     Q.   But any water that is associated with
14 the MRGO that gets to that channel, without a
15 hurricane surge or anything related, is a part of
16 the design.  It's necessarily expected from the
17 design, isn't it?
18     A.   It's -- it is logically expected from
19 the result of the design.  That expectation may
20 not be -- or might not be included in the design
21 itself.
22     Q.   Okay.  Well, let me talk about salinity
23 here for a second, to just do an aside.
24          Once you cut that MRGO through into the
25 gulf, salinity is going to come into the area.

Johns Pendleton Court Reporters                    800 562-1285

1   That also is a part of the design of the MRGO,
2   isn't it?
3        A.   That's correct.  And the Corps actually
4   ran laboratory experiments at Vicksburg to
5   determine what those salinity effects were.  Year,
6   approximately, 1954.
7        Q.   Correct me if I'm wrong, but I don't
8   find anything in your reports that says that the
9   current of the MRGO is relevant to the issues that
10  we're discussing here.
11       A.   That's incorrect.
12            We actually studied the effect of the
13  current on the performance of what I have chosen
14  to call earth and berm spoil banks.  We determined
15  that the effects of the currents that would be
16  flowing parallel to the faces of the EBSBs would
17  be a secondary player in the development of
18  erosion and breaching during intense hurricanes.
19       Q.   That would be places where the MRGO
20  water touches the -- what you call EBSBs?
21       A.   Correct.
22       Q.   Okay.  So other than that -- well, I may
23  have misstated earlier, because other than that,
24  if you're only talking about the current coming up
25  Reach 2, just talking about it, that doesn't seem

1    There's a term here at the end of
2    paragraph C, "Geometry of the constructed features
3    magnified the forces and effects of the storm
4    surge currents and waves in some sections."
5    Is that back to the funnel effect?
6    A.  Yes, sir.
7    Q.  Okay.  Paragraph D -- okay.  And what
8    constructed features are you talking about there?
9    A.  Those would be flood protection
10   structures.
11   Q.  Paragraph D, you're talking about
12   decisions "to maintain and operate the MRGO
13   channel in a manner that foreseeably allowed it to
14   erode its banks and widen."
15   Okay.  Have you looked at the design
16   memoranda for the construction of the MRGO?
17   A.  Yes.
18   Q.  And have you determined whether those
19   design memoranda took into consideration that
20   there would be erosion in the operation and
21   maintenance of the MRGO?
22   A.  I recur -- or I recall that the design
23   memoranda considered erosion of the banks of the
24   MRGO.
25   Q.  And do you know how they plan to account

BEA, ROBERT

1/30/2009

Page 71

```
 1   for that erosion?
 2       A.   At the time that this was developing,
 3   the consideration was to provide foreshore
 4   armoring of the MRGO channel banks.
 5       Q.   And is that decision to provide that
 6   foreshore armoring everywhere?
 7       A.   No.
 8       Q.   Where would they provide that?
 9       A.   Well, the place I was particularly
10   focused on that history of development was the
11   Reach 2 of MRGO.
12       Q.   Was there a requirement in that design
13   memorandum to provide armoring for the Reach 2 of
14   the MRGO for the entire region?
15       A.   I do not -- I do not recall that there
16   was a requirement, but the engineers were
17   considering the necessity of providing such
18   protection.
19       Q.   I got you.
20            But the design memorandum itself is what
21   regulates what happens with the maintenance and
22   the design of the MRGO, correct?
23       A.   No, that's not correct because
24   maintenance is a reactive process.  If you detect
25   damage developing to the structure, it is a duty
```

BEA, ROBERT

1/30/2009

Page 72

1  of the standard of care to appropriately react to
2  that information.
3       Q.   The design controls how the MRGO will be
4  constructed and whether foreshore protection will
5  be required under that design, correct?
6       A.   Correct.
7       Q.   Okay.  And you do not find any
8  requirement for foreshore protection for the
9  entire MRGO in that design, do you?
10      A.   That's correct.
11      Q.   Are you aware that the Corps of
12 Engineers placed foreshore protection where there
13 was a concern that the foreshore would erode and
14 affect the levees?
15      A.   At what stage during the life cycle?
16      Q.   At any time.
17      A.   No, I'm not.
18      Q.   Okay.  So you're not aware of whether
19 the Corps made specific decisions as to only
20 protecting the shoreline and the foreshore to
21 avoid encroachment on to the levees?
22      A.   They did make such decisions as the
23 history of the channel developed.
24      Q.   And that's an appropriate decision, to
25 protect the levees, correct?

BEA, ROBERT

1/30/2009

Page 126

```
 1        Q.   Once you got a route like that, things
 2   happen, you're saying that you -- there's more to
 3   the design --
 4        A.   Oh, yes.
 5        Q.   What is it that's wrong with the design
 6   for the MRGO that matters here?
 7        A.   Well, for -- one of the things that's of
 8   particular importance would be the itroduction of
 9   salinity into otherwise brackish or fresh water
10   areas.
11        Q.   We're stuck with that also --
12        A.   No, we're not.
13        Q.   -- because that's part of the design,
14   isn't it?
15        A.   No.
16        Q.   How do you reduce the flow -- how do you
17   reduce salinity on the MRGO, then?
18        A.   For example, you could put barriers on
19   the Gulf of Mexico, where the highly saline dense
20   waters are, that would prevent the intrusion into
21   the fresh water areas.
22             The ducts, as well, have used bubble
23   curtains.  Air is being bubbled through, or it can
24   be conducted, so the dense waters can't come
25   through.
```

Johns Pendleton Court Reporters                    800 562-1285

BEA, ROBERT

1/30/2009

Page 127

```
 1         Q.   And so that's a modification of the
 2    design that you would recommend to prevent
 3    salinity coming up the Gulf?
 4         A.   Correct.
 5         Q.   I'm sorry.  Up the MRGO.
 6         A.   Yes.
 7         Q.   Anything else for design on MRGO?
 8         A.   Sure.  The gates that you cited.
 9         Q.   Okay.
10         A.   Water control structures.
11         Q.   Anything else?  You talked earlier about
12    the erosion too.  So we'll include that in your
13    problem with the design.
14         A.   Correct.
15         Q.   The erosion was allowed?
16         A.   Well, erosion -- yeah.
17              Erosion was anticipated, but not
18    defended.
19         Q.   It was allowed?
20         A.   Correct.
21         Q.   Okay.  And it was allowed under the
22    design, wasn't it, the original design?
23         A.   Correct.
24         Q.   Okay.  So let's drop to the next
25    category, from design to construction.
```

Johns Pendleton Court Reporters                    800 562-1285