UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, Robinson (06-2268) | § | |
| | § | |

DEFENDANT UNITED STATES' OPPOSITION TO PLAINTIFFS' MOTION
TO STRIKE DEFENDANT'S NOTICE OF SUPPLEMENTATION
OF THE RECORD, DOC. 17703

In support of its Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. 16511), the United States has supplemented the record with 13 exhibits. These exhibits provide a record basis for resolving questions posed by the Court during and after oral argument. Plaintiffs "strongly oppose the Court accepting" this evidence and ask that it be stricken. Plt. Mot. at 1, 4 (Doc. 17706). Plaintiffs offer a mix of purely procedural objections and unfounded assertions of prejudice as bases for their motion. See Fed. R. Civ. P. 7(b). Without offering a shred of evidence, they accuse the United States of "inconsistency" in raising "novel" arguments that are "contradictory to positions previously taken." Id. at 3. They raise the specter of "additional (unjustified) delay" if the Court considers this evidence. Id. at 4.

Plaintiffs' arguments founder on the United States' sovereign immunity and the Court's circumscribed jurisdiction. Plaintiffs cannot rightly claim that they will suffer

1

prejudice if the Court takes as much time as is necessary to carefully consider whether its jurisdiction encompasses the subject matter that forms the basis of the plaintiffs' claims. Neither "[f]undamental justice, judicial economy, [nor] the orderly administration of justice" will be served by a flawed analysis of the Court's power to decide this case. Id.  Hastening to a trial of claims that lie beyond the Court's subject matter jurisdiction cannot be justified on these grounds.  Moreover, the United States' sovereign immunity demands that the Court's subject matter jurisdiction be firmly established before trial.  Sovereign immunity is an immunity from the burdens of becoming involved in any part of the litigation process, from pre-trial wrangling to trial itself.  Regardless of what the plaintiff seeks from the sovereign defendant, the risk of harm from having to defend the lawsuit remains constant and can result in an irreparable loss.  As the Court of Appeals recently reiterated, "Congress intended the discretionary function exception to shelter the government from the burdens of answering a lawsuit . . . not just from potential monetary liability."  Freeman v. United States, – F.3d – , 2009 WL 146579, at *13 (5th Cir. Jan. 22, 2009) (citation omitted).

Should the plaintiffs' motion to strike be granted, the prejudice to the United States will be great and will be irremediable.  Consequently, the Court should not grant the plaintiffs' motion to strike the filed exhibits but should instead provide a reasonable time for the plaintiffs to make a substantive response and then allow any additional proceedings that will aid in resolving the subject matter jurisdiction issues that are before the Court.

ARGUMENT

BECAUSE THIS COURT, LIKE ALL FEDERAL COURTS, IS A COURT OF LIMITED JURISDICTION AND BECAUSE THE SOVEREIGN UNITED STATES IS ENTITLED NOT TO BEAR THE BURDENS OF LITIGATION TO WHICH IT HAS NOT CONSENTED, THE COURT SHOULD CONSIDER THE EVIDENCE FILED BY THE UNITED STATES TO ENSURE THAT THE COURT HAS SUBJECT MATTER JURISDICTION BEFORE PROCEEDING TO TRIAL.

"Federal courts are courts of limited jurisdiction. As courts created by statute, they have no jurisdiction absent jurisdiction conferred by statute. Thus, there must be a statutory basis for federal court jurisdiction over [a litigant's] claims." Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the United States, 362 F.3d 333, 336 (5th Cir. 2004) (citations omitted). "The discretionary function exception is a barrier to subject matter jurisdiction. See Cope v. Scott, 45 F.3d 445, 448 (D.C. Cir. 1995). A district court thus has no authority to address the merits of claims allegedly arising under the FTCA in cases in which the plaintiff is unable to overcome this jurisdictional barrier." Loughlin v. United States, 393 F.3d 155, 162 (2d Cir. 2004). Although the Federal Tort Claims Act generally provides jurisdiction over claims against the United States that are analogous to claims as to which state law recognizes tort claims against private persons, the FTCA's discretionary function exception preserves the United States' immunity from suit. Consequently, and if the government's conduct falls within the discretionary function exception to the FTCA, then the case must be dismissed for lack of subject matter jurisdiction. See Buchanan v. United States, 915 F.2d 969, 970 (5th Cir. 1990).

"'The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress.'" St. Tammany Parish v. FEMA, – F.3d – , 2009

WL 146582, at *6 (5th Cir. Jan. 22, 2009) (quoting Block v. North Dakota, 461 U.S. 273, 287 (1983) and citing Williamson v. U.S. Dep't of Agric., 815 F.2d 368, 373 (5th Cir. 1987)); see also Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 411-12 (1821) ("The universally received opinion is, that no suit can be commenced or prosecuted against the United States; that the judiciary act does not authorize such suits."); cf. In re Supreme Beef Processors, Inc., 486 F.3d 248, 258 (5th Cir. 2006) (Higginbotham, J., concurring) ("perhaps the best possible source of the federal government's immunity from suit in its own courts is Article III's grant to Congress of the power to control our jurisdiction").  "Sovereign immunity is jurisdictional in nature.  Indeed, the 'terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.'"  F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994) (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941), and citing United States v. Mitchell, 463 U.S. 206, 212 (1983)); cf. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'").

      The discretionary function exception's limitation on the district court's subject matter jurisdiction therefore fits hand-in-glove with the United States' sovereign immunity because "Congress intended the discretionary function exception to shelter the government from the burdens of answering a lawsuit . . . ."  Freeman v. United States, – F.3d – , 2009 WL 146579, at *13 (5th Cir. Jan. 22, 2009); see also Sydnes v. United States, 523 F.3d 1179, 1186 (10th Cir. 2008) ("'immunity entitles a [sovereign] not only to protection from liability, but also from

4

suit, including the burden of discovery'"). "At its core, sovereign immunity deprives the courts of jurisdiction irrespective of the merits of the underlying claim. If the specific terms of the statute are not met, the federal courts have no jurisdiction to address the merits of the plaintiff's claim." Koehler v. United States, 153 F.3d 263, 267 (5th Cir. 1998) ); see also Stanley v. CIA, 639 F.2d 1146, 1158 (5th Cir. 1981) (if claims do not withstand Fed. R. Civ. P. 12(b)(1) jurisdictional attack, district court has no jurisdiction to dispose of case on merits).

Before the Court is the United States' Motion to Dismiss based on the discretionary function exception (Doc. 16511). In support of that motion, the United States argued that it need not adduce evidence of the actual bases for decisions about the design, construction, operation, and maintenance of the Mississippi River-Gulf Outlet because application of the discretionary function exception is based on an abstract analysis of the challenged conduct. See USA Corrected Mem. (Doc. 16564) at 16. At oral argument, however, it became apparent that the Court was unpersuaded and wanted some evidence of the considerations that guided decisions about how to counteract storm surge and wetlands loss. Exhibits 58, 59, and 60 provide the evidence that the Court seemed to be seeking.

Exhibit 58 is a letter dated July 25, 1990, from the then Acting New Orleans District Engineer, Maj. Harold E. Manual, Jr., to Senator John Breaux. The letter demonstrates that the Corps considered and rejected placing a surge barrier at the confluence of the MRGO and the GIWW because it "could not be economically justified" and because it would "represent a significant liability to the container industry and would doubtless cause the loss of cargoes, public investment, and jobs." Exh. 58, at 3. The letter also responded to concerns about land

loss and saltwater intrusion by noting that "[t]he salt marsh is . . . a valuable nursery area and habitat for fish and shellfish, including red drum, speckled trout, shrimp, oysters, and blue crabs." Id. at 2. The letter noted that "a number of commercial and recreational fishing businesses and oil field service vendors are based near the channel . . . and make heavy use of the MR-GO." Id. Closure was not considered economically justified because it would result in annual losses of about $13 million or more. Id. at 3.

Exhibit 59 is a similar letter penned two decades earlier. On September 23, 1969, the New Orleans District Engineer, who at that time was Col. Herbert R. Haar, Jr., responded to a letter from Congressman F. Edward Hebert in which the congressman passed along a concern expressed by one of his constituents. The citizen worried that the Lake Pontchartrain and Vicinity Hurricane Protection Project "will not have all the answers because it excludes flood gates at the Gulf Outlet." Exh. 59, at 7. The District Engineer's response demonstrates that the Corps considered economic, political, and social policies, including public safety, in designing a flood protection system that omitted flood gates at the MRGO. The District Engineer explained that the Corps had considered and rejected a flood protection plan with surge barriers at the MRGO because it "would result in a substantial increase in costs" with an "increase in benefits [that] was small by comparison." Id. at 2.

The Corps also had considered the political implications: adoption of the plan featuring surge barriers on the MRGO "would mean that none of the work already accomplished by local interests . . . would be incorporated into the Federal project and no credit for such work could be allowed." Id. at 3. Delays associated with adopting the plan

6

would "likely" cause local political entities "to proceed independently and at great cost with improvements to the existing levee systems for interim protections. For these reasons, the Orleans Levee District, the agency designated by the Governor to provide the local cooperation required for the project, and the Louisiana Department of Public Works, local coordinator for the project, have expressed their opposition to such a plan." Id.

Public safety was also a consideration:

> [T]he modifications involved are so broad in scope as to be beyond the discretionary authority of the Chief of Engineers to adopt, so that project review and subsequent Congressional action would be required. During the time that this process was being accomplished, progress in planning and constructing some of the most urgently needed project features would be discontinued.

Id.

Commercial interests were also considered: "operation of two features of the plan, namely, the navigation gate in the Mississippi River-Gulf Outlet and the lock in the Gulf Intracoastal Waterway, would significantly impede seagoing and inland navigation." Id.

Exhibit 60 is a letter dated April 21, 1975, from the District Engineer, Col. K.R. Heiberg III, to G.J. Lannes, Jr. This letter too demonstrates that the Corps considered the economic, political, commercial, and social implications, including public safety implications, in deciding not to build a floodgate in the MRGO. See Exh. 60, at 2-3.

These three exhibits are short and unequivocal. They merely provide a basis for deciding the issues previously briefed and argued and do not call for extensive additional analysis or briefing.

The next six exhibits are similarly non-controversial.  They merely set forth the nature and purpose of Reconnaissance Reports, facts which are not in dispute.  They respond to a specific request for further information that was transmitted from the Court to counsel for the parties by email on February 10:  "Can you explain . . . the purpose of a 'Reconnaissance Report:'  1) For whom is it prepared? 2) To whom is it disseminated?  Specifically—Plaintiffs' Doc. 32 re: Bank Erosion.—were these comments part of the report?"  Exh. A (clerk's email to counsel).

Exhibit 61 consists of testimony obtained by the plaintiffs during their deposition of the Army Corps of Engineers, under Fed. R. Civ. P. 30(b)(6).  Gregory Miller, a Senior Project Manager in the New Orleans District, testified that Reconnaissance Reports are the first "part of the two-part study process for . . . potential new water resources projects.  The reconnaisance [sic] study in specific identifies whether there is a federal interest in a particular problem and the potential solutions and whether there appears to be . . . a cost effective solution available—or a technically feasible solution available."  See Exh. 61, at 22 (Miller Dep. p. 332:9-17).  The New Orleans District informed those higher in the chain of command about the environmental impact of the MRGO.  See id. at 31-32 (Miller Dep. at 360:19 to 361:21).

Exhibit 62 likewise consists of testimony concerning the nature and purpose of Reconnaissance Reports.  Thomas Podany, the Chief of the Protection and Restoration Office in the New Orleans District, testified that "[t]he purpose of the reconnaissance report was to look at, in light of the erosion along the unleveed banks of the MRGO, whether any

8

measures could be taken to reduce that bank erosion." See Exh. 62, at 9 (Podany Dep. at 33:13-17).  Reconnaissance studies are authorized by Congress, and they precede the "feasibility phase."  Id. at 12 (Podany Dep. at 38:8-19).   15-16, 19-20, 33, 36-37, 57, 63-64, 70-72, 75 (Podany Dep. at 33:13-17, 38:8-11,150:7 to 151:2, 160:19 to 161:3,196:12-17, 199:21 to 200:1, 273:5-14, 279:19 to 280:2, 307:9 to 309:3, 325:20-24).  "One of the purposes of doing a reconnaissance report, besides to find a sponsor for the feasibility phase, is to determine the level of federal involvement in any of these solutions" by developing "a benefit-cost ratio" based on a comparison of "the average annual benefits of a project to its average annual costs. So all this work in the report up to this point is trying to just get a preliminary view of whether these projects, these alternatives that are identified, would perform well enough to—and provide enough benefit to outweigh their costs."  Id. at 15 (Podany Dep. at 150:7-25; see also id. at 16 (Podany Dep. at 151:16-25), 35-36 (Podany Dep. at 198:17to 199:3).

Mr. Podany testified that "impacts to significant resources" are typically considered, including "the effects on water quality, marsh, biological resources, cultural resources, [and] recreational resources."  Id. at 18 (Podany Dep. at 159:12-16).  If the reconnaissance study demonstrates that there are "at least marginally economically feasible . . . alternatives [which] are generally considered environmentally acceptable, the only thing really missing is an [sic] non[-]federal sponsor or approval to proceed some other way . . . ."  Id. at 20-21 (Podany Dep. at 161:20 to 162:1).  With respect to the 1988 MRGO Bank Erosion Reconnaissance Report, Mr. Podany testified that the lack of "a sponsor to cost share in the feasibility" study led the New Orleans District to recommend further study of solutions to

9

the bank erosion problem through development of a general design memorandum ("GDM") or a GDM supplement. See id. at 21-22, 25 (Podany Dep. at 162:10-13, 178:1-9, 181:20-25).

Exhibit 63 also consists of testimony obtained by the plaintiffs under Rule 30(b)(6). Zoltan Montvai, the Civil Deputy for the Mississippi Valley Division Regional Integration Team, testified that a reconnaissance report "will identify problems, needs and opportunities. It will look at one or two or more alternatives looking at ways of addressing that problem but it will also make a determination is there a potential federal interest in moving out onto a more detailed investigation. And is there a nonfederal interest out there who is financially able and is willing to cost share in the more detailed investigation, the feasibility study. And it will identify or have a project management plan for the next phase. In other words, what's the cost, the features of the following study." Exh. 63, at 11-12 (Montvai Dep. at 60:7 to 61:7); see also id. at 17-18 (Montvai Dep. at 86:16 to 87:10). Mr. Montvai testified that questions and comments by the division and by headquarters would typically become part of the overall report. Id. at 13-15 (Montvai Dep. at 62:11 to 64:19). A reconnaissance report is not ordinarily sent to Congress because it is a preliminary study. It may be followed by a more detailed study that forms the basis of a report to Congress by the Chief of Engineers. See ld. at 8 (Montvai. Dep. at 48:4-13). This exhibit responds to direct questions posed by the Court after oral argument.

Exhibit 64 consists of two excerpts from the 1988 MRGO Bank Erosion Reconnaissance Report. The first excerpt sets forth the endorsements (comments, suggestions, and criticisms) of various Corps entities, and a statement of the congressional

authority, the purpose, and the scope of the report.  The second excerpt is an appendix listing the many state and federal representatives, senators, and agencies to whom the report was mailed.  See Exh. 64 (App. D), Bates No. MGP-003-000000429 to -000000448.  Exhibit 65 is an excerpt from the 1994 MRGO Bank Erosion Reconnaissance Report.  This excerpt sets forth the authority, purpose, and scope of the report.

Exhibit 66 responds to the Court's question concerning Plaintiffs' Exhibit 32.  The exhibit consists of an excerpt from the corpus of comments, suggestions, and criticisms, and the drafting component's responses that were appended to the front of the 1988 MRGO Bank Erosion Reconnaissance Report.  Dr. Thomas F. Wolff, the Associate Dean of the College of Engineering at Michigan State University, testified that these "indorsements" are typically including in the report under the cover page, before the table of contents.  See Exh. 66, at 9 (describing the review process for MRGO GDM No. 3).

The third category of exhibits consists of post-hearing deposition testimony of two of the plaintiffs' experts.  At his deposition on January 15, 2009, Dr. Paul Kemp addressed the putative effects of the design of the MRGO, tying the design to the putative flaws that allegedly caused the plaintiffs' alleged flood damage.  Exhibit 68 is an excerpt from one of Dr. Kemp's reports, in which he expresses his opinion that the Corps considered and rejected placing a surge barrier on the MRGO.  Exhibit 69 consists of the post-hearing testimony of Plaintiffs' expert Robert G. Bea, in which he addressed the numerous policy considerations implicated in the Corps's design of the MRGO.

The penultimate exhibit is pertinent to the Corps's awareness of the possibility of hurricane induced flooding and the need to continue to improve the federal hurricane protection system to combat the threat.  This was a focus of questions by the Court during oral argument.  Exhibit 70, a letter written by the manager of the Lake Pontchartrain and Vicinity Hurricane Protection Project, does not introduce any new issues but merely demonstrates that the Corps was addressing the threat of flooding that existed with the MRGO in place.  The final exhibit consists of Budget Justification Sheets demonstrating that the Corps annually calculated the benefits and costs of continuing to operate and maintain the MRGO.  Though voluminous, on account of the number of years that the project was operational, this exhibit makes essentially a single point that does not require extensive analysis or briefing.

The submission of these supplemental exhibits can be explained on the basis of not only developments during and after the January 8, 2009, hearing on the motion but also the tight schedule established for this gargantuan case.  At last count, more than 1.6 million images of hard-copy pages had been produced to the plaintiffs and other Katrina litigants.  More than 15 terabytes of electronically stored information had been produced, the equivalent of 912 million pages of information.  On the basis of this production, the litigation can be described as the largest ever in which the United States has been involved.  The teams of engineers, scientists, and academicians who studied the event that forms the basis for this litigation comprised hundreds of individuals spanning scores of technical disciplines.  All of those analyses and the underlying data generated in the course of those

studies are relevant to this litigation and require extensive and continuing analysis by the numerous experts retained by the parties. Consequently, the parties' experts have produced technical reports comprising thousands of pages. One of the plaintiffs' experts alone generated reports exceeding 2,600 pages in toto.

Since October of 2008, counsel have been engaged in continuous briefing of a series of motions for summary judgment. At the same time, the United States' experts were engaged in the production of their expert reports. The schedule of dispositive motions required that the motions be briefed and argued before the completion of discovery. Indeed, at the present time, depositions of experts is continuing and is not expected to be complete before the end of the month. After the hearing on the United States' motion, plaintiffs experts produced supplemental reports comprising hundreds of additional pages setting forth additional analysis and opinions not previously disclosed. Under these circumstances, the United States' supplementation of the record cannot in any sense be regarded as extraordinary or dilatory.

CONCLUSION

For these reasons, Plaintiffs' motion to strike the United States' supplemental exhibits should be denied.

Respectfully submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR
Assistant Director, Torts Branch

  s/ Robin D. Smith
ROBIN DOYLE SMITH
Senior Trial Counsel
Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 616-4289 / (202) 616-5200 (Fax)
Attorneys for the Defendant United States

<u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the foregoing Opposition to Plaintiffs' Motion to Strike Defendant's Supplementation of the Record was served by ECF on all parties of record on February 17, 2009.

<u>s/ Robin D. Smith</u>
ROBIN D. SMITH