## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**IN RE: KATRINA CANAL BREACHES**
**CONSOLIDATED LITIGATION**

**CIVIL ACTION**

**NO. 05-4182**

**PERTAINS TO: ROAD HOME**
**LOUISIANA STATE, 07-5528**

**SECTION "K"(2)**

## ORDER AND REASONS

Before the Court are two motions filed by the opposing parties in this matter. The various insurance companies named as defendants in this matter ("Insurers" or "Defendants") have filed a Motion to Dismiss (Rec. Doc. 16493) ("Mot.").[1] The State of Louisiana ("the State") has filed an opposition (Rec. Doc. 17067) ("Opp."), and the Insurers in turn have filed a reply (Rec. Doc. 17342) ("Reply"). The State has filed a Motion to Sever and Remand (Rec. Doc. 16480) ("Mot. Sever"), to which the Insurers have filed an opposition (Rec. Doc. 16797) ("Opp. Sever"). For the following reasons, the Court will deny the State's Motion to Sever, and grant in part and deny in part the Insurers' Motion to Dismiss.

## I. BACKGROUND

The Louisiana Road Home program is a grant program funded by the United States Department of Housing and Urban Development ("HUD") and operated by the Louisiana Recovery Authority. In the wake of Hurricanes Katrina and Rita, Congress appropriated funds

---

[1]All references to pleadings refer to those docketed on Civ. A. No. 05-4182. To the extent other documents are referenced, the docket number will be otherwise noted.

for disaster relief to be administered through HUD's Community Development Block Grant Program. HUD distributed some of these funds to Louisiana, which in turn created the Road Home program to distribute these funds as grants to homeowners. Road Home grants are designed to compensate homeowners up to $150,000.00 for structural damage, exclusive of contents damages, caused by Hurricanes Katrina or Rita. State's Amended Complaint ¶ 8 (Civ. A. No. 07-5528, Rec. Doc. 1) ("Compl.").

Consistent with federal law, the Road Home program prohibits providing any relief funds that would duplicate payments from other sources, and therefore the Road Home program deducts any insurance payments from the federal grants that it receives. Individual recipients of grant money must likewise reimburse the State insofar as they subsequently receive insurance payments or other payments for losses covered by their Road Home grants. To the extent that the State recovers funds pursuant to these Agreements, the State recycles such funds within the Road Home Program. As part of the closing process, the Road Home program requires that individual recipients execute the Road Home Limited Subrogation/Assignment Agreement ("Agreement") in which the recipient promises to pay back any Road Home funds that are duplicated through other sources, such as through insurance payments for building coverage. The recipient further assigns the right to such duplicate funds to the State, and further agrees to provide notice to the State if he/she chooses to "abandon, dismiss, or release the claims against [his/her] insurance company . . . to allow the State to individually pursue recovery of the rights which have been assigned to the State herein." Agreement at 1, Rec. Doc. 1, Ex. A (Civ. A. No. 07-5528).

The State asserts that approximately 90,000 Agreements have been executed, and it has made in excess of eight billion dollars of federal funds available to Louisiana citizens through the Road Home program.  Opp. 2-3.  It commenced the present class action on August 23, 2007 in the Civil District Court for the Parish of Orleans in an effort to recover those funds from Insurers to which Road Home recipients were entitled that had been assigned to the State via the Road Home Limited Subrogation/Assignment Agreements.  The matter was removed to this Court on September 11, 2007.

## II.  ANALYSIS

This Court will first address the State's Motion to Sever and Remand, followed by the Insurers' Motion to Dismiss.

### A.  The State's Motion to Sever and Remand

Federal Rule of Civil Procedure 21 permits a district court "[o]n motion or on its own . . . [to] sever any claim against a party."  Fed. R. Civ. P. 21.  "Under Rules 20 and 21, the district court has the discretion to sever an action if it is misjoined or might otherwise cause delay or prejudice."  *Applewhite v. Reichhold Chemicals, Inc.*, 67 F.3d 571, 574 (5th Cir. 1995).  The State originally filed suit in August 2007 against "a number of property and casualty insurance companies (e.g., homeowner policies) in state court to recover all state monies expended under the Road Home Program that should have been paid by the defendant insurers under the terms of the policies they provided to the Program's recipients."  Mot. at 3.  The State points out that it

was styled as a class action and filed "to principally interrupt pending statute of limitation prescription issues looming and threatening to terminate the State's rights to recover its money in the future for applicants who had not closed their Road Home grant and executed a Subrogation Agreement." Mot. at 3-4. The Insurers removed the case to this Court, and the State timely moved to remand. After this Court held that the Class Action Fairness Act ("CAFA") required this case to remain in federal court, the State appealed.

The Fifth Circuit affirmed this Court, holding that the action indeed was removable under CAFA, and moreover that any sovereign immunity from removal to federal court was waived by the State's addition of a class of private citizens. *In re Katrina Canal Breaches Consol. Lithog..*, 524 F.3d 700 (5th Cir. 2008). However, as cited by the State, the Fifth Circuit concluded:

> At the oral hearing on removal in district court, Plaintiffs raised the possibility of splitting the action in two, leaving the Plaintiff citizens to pursue the class action in federal court and allowing Louisiana to remand its portion of the case to state court, perhaps staying the federal case to await the decision of the Louisiana courts, which will control in any event. The district court considered this remedy but did not implement it, denying the motion for remand.
> We trust that given our caution in this matter of state sovereignty, the district court will explore the possibility of returning Louisiana to the state court while retaining the class suit-perhaps with new class representatives drawn from its membership. We express no opinion regarding either the permissible or the practicable segmenting of this case. We make these observations against the backdrop of the settled power of the district courts. We will affirm the decision not to remand and will remand the case to the district court. That court is the able manager of this complex litigation and we will not extend these appellate hands into that endeavor.

*Id.* at 711-12. The State argues that this portion suggests that this Court should sever the action and remand Louisiana's claims to state court. However, the Fifth Circuit's language is clearly *dicta*, and moreover expresses its deference to this Court's decision to sever and remand.

This Court finds it inappropriate to sever the State's claims and remand them. The maintenance of a class action in this case requires that it remain in district court for practical reasons. As discussed by the parties during oral argument, if this Court were to sever the State's class action and remand the State's claims, the class action left in this Court would lack any class representatives or class counsel. Moreover, some members of the homeowner class will be entitled to any excess recovery of insurance funds above the $150,000.00 maximum that the State has granted in Road Home funds. Granting a severance would therefore give the peculiar result of the State and a plaintiff class member seeking reimbursement on the same insurance claim in two different courts.[2] The problems in managing two simultaneous litigations would be significant in the least. This result, however, could be avoided if the State dismissed its own class allegations. After the Fifth Circuit's decision, this Court gave the State the opportunity to dismiss its class action. While dismissal would not necessarily defeat jurisdiction under CAFA,[3]

---

[2]The Court recognizes that there may be additional issues here, including whether the State has standing to assert a claim for funds above the $150,000.00 maximum; however, such issues would be better addressed when this Court considers class certification.

[3]*See Braud v. Transp. Serv. Co. of Ill.*, 445 F.3d 801, 808 (5th Cir. 2006) (rejecting "plaintiff's contention that [defendant's] dismissal after removal ousted the district court of subject matter jurisdiction" under CAFA); S. Comm. on the Judiciary, Class Action Fairness Act of 2005, S. Rep. No. 109-14, at 43 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 41:

> The law is clear that, once a federal court properly has jurisdiction over a case removed to federal court, subsequent events generally cannot "oust" the federal court of jurisdiction. While plaintiffs undoubtedly possess some power to seek to avoid federal jurisdiction by defining a proposed class in particular ways, they lose that power once a defendant has properly removed a class action to federal court.

*Id.*, *citing St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 293, 58 S.Ct. 586, 82 L.Ed. 845 (1938).

this Court made it appropriately clear that dismissal of the class action would persuade the Court to consider discretionary remand of the State's claims. *See* 28 U.S.C. § 1367(c) (permitting district court to decline supplemental jurisdiction over state law claims). Despite this Court's suggestions, however, the State has maintained its class action, and neither a motion to certify class nor a motion to strike has yet been filed. Accordingly, the motion to sever and remand is denied.

**B. The Insurers' Motion to Dismiss**

The second and more substantial motion before the Court is the Motion to Dismiss filed by the Defendant Insurers. "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Elsensohn v. St. Tammany Parish Sheriff's Office,* 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)). This Court will therefore "accept the plaintiff's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Chauvin v. State Farm Fire & Cas. Co.,* 495 F.3d 232, 237 (5th Cir. 2007).

The Insurers assert that the State's complaint should be dismissed for the following reasons. They first allege that the State has no standing to sue because the assignments to the State from homeowners are invalid, either as a full or partial assignment of rights. They assert that any flood claims by the State are barred by Louisiana Supreme Court precedent that bars flood recovery due to levee breach where a policy contains a flood damage exclusion. Insurers

claim that any attempt to recover under Louisiana's Valued Policy Law must also fail under established Louisiana Supreme Court and Fifth Circuit precedent.  They additionally assert that the State has no standing to make extra-contractual bad faith or breach of fiduciary duty claims. The Insurers also argue that any Katrina claims not assigned by September 1, 2007 and any Rita claims not assigned by October 1, 2007 are prescribed and/or perempted. Lastly, they aver that the State has not adequately alleged that the various homeowners have given their claims to the State or that the homeowners have fulfilled the conditions precedent to file a claim against Insurers.

### 1.  Anti-Assignment Provision and La. Civ. Code Article 2653

Defendants contend that any purported assignment by individual claimants of their insurance contracts to the State are barred by anti-assignment clauses in all of the insurance policies.  Under the Civil Code, "[c]ontracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law."  La. Civ. Code. art. 1983.  Article 2642 sets forth the general rule: "All rights may be assigned, with the exception of those pertaining to obligations that are strictly personal.  The assignee is subrogated to the rights of the assignor against the debtor."  La. Civ. Code art. 2642.  However, the Code provides for an exception, permitting the enforcement of anti-assignment clauses:

> A right cannot be assigned when the contract from which it arises prohibits the assignment of that right.  Such a prohibition has no effect against an assignee who has no knowledge of its existence.

La. Civ. Code art. 2653.  There appears no dispute that all of the relevant insurance contracts contain an anti-assignment clause that, by their terms, would act to bar any assignment.[4] However, in the present case the Court is faced with a post-loss assignment, *i.e.*, the individual homeowners assigned their rights under the policies to the State after their loss from Hurricanes Katrina or Rita.  A review of case law shows that the Louisiana Supreme Court has not addressed whether Article 2653 mandates enforcement of anti-assignment clauses against post-loss assignments of insurance claims.  Accordingly, this Court must make an "*Erie* guess" as to how the Louisiana Supreme Court would resolve the issue.  *Moore v. State Farm Fire & Cas. Co.*, --- F.3d ----, 2009 WL 130204, at *4 (5th Cir. 2009).  "When faced with unsettled questions of Louisiana law, [this Court] adhere[s] to Louisiana's civilian decision-making process, by first examining primary sources of law: the constitution, codes, and statutes."  *Id.* (citations omitted).

### a.  **Assignments or Subrogations**?

The State first attempts to avoid the application of the anti-assignment clauses here by asserting that the assignment contracts were subrogations, not assignments.  The State replies that, while an assignment may be prohibited by Article 2653, a subrogation is not prohibited by the anti-assignment clause, and individual claimants here actually subrogated their rights to the State.  However, the State's argument is flawed.  Two types of subrogation are recognized under

---

[4]Relevant examples of policy language includes: "Assignment of this policy will not be valid unless we give our written consent." (Scottsdale Insurance Company); "You may not assign your right to receive any portion of the loss payments without the prior consent of our representatives, and any such assignment shall be invalid and may be disregarded by us." (Meritplan); "Transfer of This Policy.  No interest in this policy can be transferred without our written consent." (Voyager Property and Casualty Insurance Company).  Mot., App. A, App. B.

Louisiana law: conventional subrogation and legal subrogation.  As to conventional subrogation, the Insurers appear to be correct that the Code has eliminated the distinction between conventional subrogation and assignment.  Under La. Civ. Code art. 1827:

> An obligee who receives performance from a third person may subrogate that person to the rights of the obligee, even without the obligor's consent.  That subrogation is subject to the rules governing the assignment of rights.

La. Civ. Code art. 1827.  Comment (a) to the article further explains:

> This Article is new.  It is based on C.C. Art. 2160(1) (1870), but changes the law insofar as it eliminates the distinction between conventional subrogation by the obligee and assignment of rights.

La. Civ. Code art. 1827, comment (a).  Therefore, if the State asserts that it has received a conventional subrogation, that subrogation is governed by the same rules as an assignment.  As such, Article 2653's enforcement of anti-assignment clauses would likewise bar a conventional subrogation.  *Atlas Assur. Co. of Am. v. Aetna Cas. & Sur. Co.*, Civ. A. No. 86-5035, 1987 WL 25120, at *2 (E.D. La. Nov. 25, 1987) ("Conventional subrogation under Louisiana Civil Code Article 2160, re-enacted as Article 1827, requires that conventional subrogation be accomplished in accordance with the rules pertaining to the assignment of rights.") (footnotes omitted).

Insurers cite *Alvis v. CIT Group/Equip. Fin., Inc.*, 918 So. 2d 1177, 1184 (La. Ct. App. 3d Cir. 2005), as support for their argument. In *Alvis*, a case involving a convoluted contract dispute, the Louisiana Third Circuit considered whether the plaintiffs had acquired any subrogation rights against the defendants due to the plaintiffs' settlement with a third party.  *Id.*  The court concluded that the plaintiffs had "derived nothing more than a conventional subrogation and assignment of whatever rights [the third party] had against defendants."  *Id.*  In

evaluating what rights this conventional subrogation gave to the plaintiffs, the appeals court

cited comment (a) to Article 1827, which notes the similarity of conventional subrogation and

assignments, and then proceeded to analyze the rights of plaintiffs under Article 2642, which

governs rights after an assignment. *Id. Alvis* accordingly supports the conclusion that an

assignment and a conventional subrogation should be treated identically.

      The alternative to a conventional subrogation is a legal subrogation. Under the Civil

Code, "Subrogation takes place by operation of law:"

> (1) In favor of an obligee who pays another obligee whose right is preferred to his because of a privilege, pledge, mortgage, or security interest;

> (2) In favor of a purchaser of movable or immovable property who uses the purchase money to pay creditors holding any privilege, pledge, mortgage, or security interest on the property;

> (3) In favor of an obligor who pays a debt he owes with others or for others and who has recourse against those others as a result of the payment;

> (4) In favor of a successor who pays estate debts with his own funds; and

> (5) In the other cases provided by law.

La. Civ. Code. art. 1829.

      No argument has been made that this subrogation falls within any of the first four

categories of legal subrogation. Looking to the fifth category, Comment to Article 1829

provides some examples of "other cases provided by law":

> (e) Besides the situations provided for in this Article, legal subrogation takes place in other instances, such as subrogation of a state supported charity hospital to the rights of a patient (R.S. 46:8, as amended by Acts 1978, No. 786, § 6); subrogation of an employer or insurer who pays an employee workmen's compensation to the rights of that employee against a third person under the Workmen's Compensation Act (R.S. 23:1101, as amended by Acts 1976, No. 147,

§ 2); and subrogation of a taxpayer to the right of the collecting authorities under R.S. 47:2105.

La. Civ. Code art. 1829, comment (e).  Again, the State does not point to any statute authorizing or establishing a category of legal subrogation that accords with the alleged subrogation here in the Road Home program.  Despite the request of this Court, the State could not point to any federal statute or regulation governing the Road Home program that could create a legal subrogation.[5]  It bears noting that subrogations by operation of law are generally deemed "exceptional in nature," and therefore the statutes permitting legal subrogation should be "strictly construed."[6]

Instead, the State argues that Article 1827 of the Civil Code allows the subrogation in this case because it broadly states that "[a]n obligee who receives performance from a third

_____

[5]It is mere speculation by this Court that a federal law could create the basis for a legal subrogation under Louisiana law, particularly where case law suggests that only Louisiana statutes can authorize a legal subrogation.  *See Society of the Roman Catholic Church of the Diocese of Lafayette, Inc. v. Interstate Fire & Cas. Co.*, 126 F.3d 727, 743 (5th Cir. 1997) (citing Comment (e) to Article 1827 and noting that "[t]hese other cases [of legal subrogation are] all . . . in the Louisiana statutes").

[6]5 Louisiana Civil Law Treatise § 11.51 (2d ed. 2001).  As fully explained by Professor Litvinoff:

> The language of some Louisiana decisions suggests a liberal approach to subrogation by operation of law, as when a court expressed that the right to legal subrogation is to be recognized in every case where a person pays a debt which he has an interest in discharging.  At other times, however, Louisiana courts concluded that, under well-known rules of statutory interpretation, the exceptions to the rule that payment extinguishes the obligation, and no subrogation takes place, should be strictly construed.  It should be clear that the latter approach is the correct one because of the exceptional nature of subrogation by operation of law.

*Id.*

person may subrogate that person to the rights of the obligee, even without the obligor's consent." However, as pointed out *supra*, Article 1827 governs conventional subrogations, and it further provides the caveat: "That subrogation is subject to the rules governing the assignment of rights." Again, this article sends the State head-on into Article 2653's rule against of assignments where the contract has an anti-assignment clause, and therefore would require the State to prove that its assignment is a legal subrogation. The State asserts that, "[i]t may be argued that the subsequent adoption of Art. 2653 applies to subrogated interest but the notes and comments do not so suggest. The cross references in the Act address assignment Articles not the subrogation Articles addressed here." Opp. at 10. This appears to be a feeble attempt at a distinction. Article 1827 clearly states that conventional subrogations are subject to the rules governing assignments, and accordingly Article 2653 applies whether the individual claimants gave the State an assignment or conventional subrogation.

### b. Can a Post-Loss Assignment be Made Despite an Anti-Assignment Clause?

Although the State's briefing on this issue was virtually non-existent, it appears that assignments may be permitted under Louisiana law, despite anti-assignment clauses, where the assignment is made after a loss. The Defendants attempted to preempt this argument in their motion, arguing that Article 2653 does not make any distinction between pre-loss and post-loss assignments. The State made no effort to rebut this argument. This Court has evaluated this issue, and it finds that a post-loss assignment would be permitted despite an anti-assignment clause under Article 2653.

This Court's analysis on this point focuses on Article 2653. The article was enacted in 1993, and the commentary to the article explains that it is a new addition; however, the commentary proceeds to explain that Article 2653 "clarifies the law by stating a rule that is consistent with general principles of Louisiana law." La. Civ. Code art. 2653, comment (a). Thus, Article 2653 served to codify these principles of Louisiana law as understood prior to its enactment in 1993.

Article 2653 was added along with a series of other updates to the Louisiana Civil Code in 1993, becoming effective in 1995. At that time, the Louisiana legislature added several articles regarding the assignment of rights, and it provided some background on the history of assignments in the civil law in the report on the bill enacting these articles:

> In his monumental treatise on the civil law, Planiol defines an assignment of rights as follows: "The assignment of credits is the contract whereby a creditor voluntarily transfers his rights against the debtor to a third person who becomes creditor in his place. The person who transfers takes the name of transferor or assignor. The person who acquires the credit is the transferee or assignee. The debtor against whom the credit exists and which is the object of the cession is called the 'cede'." Planiol et Ripert, Traite elementaire de droit civil, Part 1, n. 1, at 890 (La. St. L. Ins. transl. 1959). Revised Article 2642 provides in part: "The assignee is subrogated to the rights of the assignor against the debtor." In early Roman law, obligations were regarded as strictly personal rights, and therefore insusceptible of assignment. . . .

> In modern doctrine, an assignment of rights is viewed as a transaction whereby a new creditor is substituted for the original one by way of a transfer. Where the transaction involves the payment of a price in money, it is a sale. IV Messineo, Manuale di Diritto Civile e Commerciale, vol. 2, Part II, § 136 (8th ed. 1952). The assignment may involve the transfer of a credit, but it may also involve any other incorporeal, such as a copyright, a license, a patent, a real right, or the like etc. The debtor's consent vel non to the transfer does not affect the validity of the assignment, since, as a general rule, the identity of the creditor should be immaterial to the debtor who owes a performance. *See* Messineo, *supra*.

1993 La. Sess. Law Serv. Act 841 (H.B. 106) (West). Thus, the legislature recognized that the civil law over time developed to permit assignments of rights because generally the identity of the creditor does not modify the duties of the debtor. The only requirement for a valid assignment was notice of the assignment to the debtor "to let the debtor know that he has changed creditors and to tell him who the new creditor is." *Id.* (citing XIX Baudry-Lacantinerie et Saignat, Traite theorique et pratique de droit civil 813 (3d ed. 1908)). Indeed, even with regards to partial assignments, the legislative notes state, "Under the civil law as properly understood, the debtor's consent is never necessary; the debtor need only be notified of the assignment." *Id.* Thus, the Civil Code broadly permits assignments, consistent with the civil law. *See In re Supernatural Foods, LLC*, 268 B.R. 759, 790 (Bankr. M.D. La. 2001) ("The Louisiana Civil Code contains an overriding general presumption that all obligations are heritable (assignable)."). The relevant issue becomes: How does Article 2653 apply to assignments of insurance policies?

While, due to Article 2653's nascency, the Louisiana Supreme Court has not considered its application to a case, the legal concept that Article 2653 propounds is not unique to this jurisdiction. Indeed, it is an accepted rule of law that anti-assignment clauses in contracts are generally enforced. The Restatement (Second) of Contracts provides that "[a] contractual right can be assigned unless . . . assignment is validly precluded by the contract." Restatement (Second) of Contracts § 317 (2008). Williston similarly points out, "Contract provisions prohibiting the assignment of rights under the contract will ordinarily be upheld, depending on

the particular facts and circumstances." 29 Williston on Contracts § 74:22 (4th ed.) (footnote omitted).

Courts' religious enforcement of anti-assignment clauses changes slightly when insurance policies are at issue. Where an insurance policy bars any assignment of the policy, courts generally will permit the assignment of an insurance claim as long as that assignment occurs post-loss. The states that do not permit post-loss assignments of insurance policies are in the minority. *See, e.g.*, *Malbco Holdings, LLC v. AMCO Ins. Co.*, No. CV-08-585-ST, 2008 WL 5205202, at *13 (D. Or. 2008) ("Oregon law does not carve out exceptions for post-loss assignments . . . ."); *BuyRite Auto Glass, Inc. v. Illinois Farmers Ins. Co.*, No. 06-4462, 2008 WL 706608, at *3-4 (D. Minn. 2008) (holding Minnesota law prohibited post-loss assignments of contract with an anti-assignment clause). The Fifth Circuit has affirmed the efficacy of anti-assignment clauses against post-loss assignments; however, the sole opinion on the issue was unpublished and only addressed Texas law, concluding: "The present state of the law in Texas and in this circuit (whatever may be the case elsewhere) is that no showing of prejudice is required to enforce the anti-assignment clause contained in the [] policy, and that clause applies here to bar a post-loss assignment." *Insurance Co. of Penn. v. Hutter*, 34 Fed. Appx. 963, 2002 WL 663778, at *1 (5th Cir. 2002). The majority of states instead allow post-loss assignments of insurance policies, regardless of the existence of anti-assignment clauses in the policy. *See, e.g.*, *R.L. Vallee v. American Intern. Specialty Lines Ins. Co.*, 431 F. Supp. 2d 428, 435 (D. Vt. 2006) (affirming magistrate recommendation finding "that the assignment of rights from MFI to Vallee is valid, and the anti-assignment clause of the Policy is unenforceable, because MFI assigned its

rights under the Policy to Vallee after the covered loss occurred."); *Century Indem. Co. v. Aero-Motive Co.*, No. 1:02-CV-108, 2004 WL 5642427, at *4 (W.D. Mich. 2004) ("When the event giving rise to the insurer's liability occurs, the reason for enforcing an anti-assignment clause disappears because the insurer's liability becomes fixed, and its risk is no longer dependent upon the unique characteristics of the insured."); *accord In re Ambassador Ins. Co., Inc.*, --- A.2d ----, ¶ 12-13, 2008 WL 3490600 (Vt. 2008); *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 861 N.E.2d 121, 128 (Ohio 2006); *Egger v. Gulf Ins. Co.*, 903 A.2d 1219, 1229 (Pa. 2006), *Conrad Bros. v. John Deere Ins. Co.*, 640 N.W.2d 231, 236-37 (Iowa 2001) (collecting cases); *Lexington Ins. Co. v. Simkins Indus., Inc.*, 704 So.2d 1384, 1386 n.3 (Fla. 1998); *Antal's Restaurant, Inc. v. Lumbermen's Mut. Cas. Co.*, 680 A.2d 1386, 1389 (D.C. 1996).

In permitting post-loss assignments of insurance policies, courts reason that pre-loss assignments can modify risk, and legitimately an insurance company would want to restrict the holder of the policy to the party with whom the company has negotiated. However, after the loss has occurred, assignment of the claim does not modify the risk; therefore, there is no reason to limit the assignment of a claim, regardless of an anti-assignment clause. Couch on Insurance explains:

> Although there is some authority to the contrary, the great majority of courts adhere to the rule that general stipulations in policies prohibiting assignments thereof except with the consent of the insurer apply only to assignments before loss, and do not prevent an assignment after loss, for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignment of the policy, as distinguished from a claim arising thereunder, and the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim. The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the

insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.

3 Lee Russ & Thomas Segalla, Couch on Insurance § 35:7 (3d ed. 2008); *see In re Ambassador Ins. Co.*, --- A.2d ----, ¶ 12 ("An insurer has a legitimate interest in deciding whether to allow assignment of rights under an insurance policy because the identity of the insured determines the risk to the insurer. In contrast, once an event occurs that triggers an insurer's liability, 'the insurer's risk cannot be increased by a change in the insured's identity.'") (quoting 3 Couch on Insurance § 35:7).  Williston similarly recognizes that casualty insurance policies have received special treatment by the courts with regards to post-loss assignments:

> Antiassignment clauses in insurance policies are strictly enforced against attempted transfers of the policy itself before a loss has occurred, because this type of assignment involves a transfer of the contractual relationship and, in most cases, would materially increase the risk to the insurer.  Policy provisions that require the company's consent for an assignment of rights are generally enforceable only before a loss occurs, however.  As a general principle, a clause restricting assignment does not in any way limit the policyholder's power to make an assignment of the rights under the policy—consisting of the right to receive the proceeds of the policy—after a loss has occurred.  The reasoning here is that once a loss occurs, an assignment of the policyholder's rights regarding that loss in no way materially increases the risk to the insurer.  After a loss occurs, the indemnity policy is no longer an executory contract of insurance.  It is now a vested claim against the insurer and can be freely assigned or sold like any other chose in action or piece of property.

Richard A. Lord, 17 Williston on Contracts § 49:126 (4th ed. 2008) (footnotes omitted); 44 A. Jur. 2d Insurance § 787 (2008) ("General stipulations in policies prohibiting their assignment except with the insurer's consent or upon giving notice, or like conditions, apply only to assignments before loss, and accordingly do not prevent an assignment of a claim or an interest in insurance money then due.") (citing cases).

This Court has located one case after Article 2653's enactment that applies Louisiana law to determine the enforceability of an anti-assignment clause to a post-loss assignment of an insurance claim. In *LeMoyne's Restaurant, Inc. v. Axis Surplus Lines Ins. Co.*, Civ. A. No. 07-8445, 2008 WL 1988798, at *1 (E.D. La. May 2, 2008) (Barbier, J.), Judge Barbier of this Court was presented with an insurance claim arising out of Hurricane Katrina. Three trusts, named as plaintiffs, leased a property to plaintiff LeMoyne's Restaurant. LeMoyne's obtained an insurance policy, as required by the lease. After the restaurant sustained hurricane damage, LeMoyne's reported the loss to its insurance carrier, defendant Axis, and then assigned and subrogated its rights under the policy to the owners of the building. The policy contained an anti-assignment clause, "Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured." *Id.* at *1. Axis sought dismissal of the case, claiming that the policy's anti-assignment provision precluded the property owners' claims. Judge Barbier rejected this defense, noting the broad swath of courts that have refused to enforce ant-assignment clauses for post-loss assignments of insurance policies. *Id.* at *2 (citing cases). The court further explained that, in at least one instance, the Louisiana Supreme Court did not enforce an anti-assignment clause in a life insurance contract where the assignment was made post-loss. *Id.* at *2 (quoting *Geddes & Moss Undertaking & Embalming Co. v. Metro. Life Ins. Co.*, 167 So. 209 (La. Ct. App. Orleans Cir. 1936)). Indeed, in *Geddes & Moss*, the Louisiana court noted that anti-assignment clauses are generally "held effective," but proceeded to evaluate prevailing commentary (including an earlier edition of

Couch on Insurance) and relevant case law in Colorado, Iowa, Alabama, and Missouri to conclude:

> It appears to us, however, that a distinction is to be made between the assignment of a policy before and after loss has accrued thereon, and that the majority opinion sustains the view that such stipulations in policies do not prevent assignment after the loss has occurred.

*Geddes & Moss*, 167 So. at 210. Having likewise evaluated the relevant commentary and the prevalent tide of case law, Judge Barbier held that the post-loss assignment of an insurance claim was not barred by the policy's anti-assignment provision. *Lemoyne's Restaurant,* 2008 WL 1988798, at *3.

This Court is similarly persuaded to conclude that insurance claims may be assigned post-loss, Article 2653 and any anti-assignment clause notwithstanding. The only relevant state court decision, *Geddes & Moss*, used both legal commentary and the prevailing law of other states to conclude that post-loss assignments are permissible. In doing so, that court endorsed the public policy behind this exception: that an assignment post-loss does nothing to impact that risk of the insurer and instead simply changes the identity of the creditor, a result that is consistent with the Civil Code. Judge Barbier of this Court used similar rationale in a case directly on point to the present one, and in likewise evaluating the relevant commentary and case law, it is clear that a vast majority of courts along with scholars have concluded that post-loss assignments are acceptable in spite of any anti-assignment clauses. This Court recognizes that Article 2653 does not explicitly contain any exception, but Article 2653 also states that it was enacted only to "clarif[y] the law by stating a rule that is consistent with general principles of Louisiana law." La. Civ. Code art. 2653, comment (a). As discussed *supra*, prevailing

Louisiana law holds that assignments should be upheld as long as the debtor is notified of the assignment. Considering that this conclusion is supported by *Geddes & Moss*, apparently the only Louisiana case addressing this issue, and considering that this rule is in line with a majority of courts of the country, this Court concludes that the post-loss assignments to the Attorney General are not barred by the anti-assignment clauses contained in the insurance policies.

### 2.  Partial Assignments Without Consent and Article 2643

The Insurers assert that the State has no right to sue here because each individual claimant only assigned part of their claim to the State and Louisiana law only permits such partial assignments where the obligors, here the Insurers, consent to be sued. Insurers argue that a long line of case law establishing that partial assignments are prohibited unless the debtor consents. They cite several Louisiana cases holding that partial assignments are invalid without consent based on the reasoning that "a debtor has a right to stand upon the contract with his creditor as originally made and to pay the debt as a whole. The creditor should not be allowed to divide an obligation . . . thereby subjecting the debtor to the necessity of depending more than one suit for the same cause of action in the event he has a defense to the contract as originally made." Mot. at 11, *citing Staples v. Rush*, 99 So. 2d 502, 505 (La. Ct. App. 2d Cir. 1957). Insurers note that the assignment/subrogation agreements between the homeowners and the State are entitled "Limited Subrogation/Assignment Agreement," accordingly, as partial assignments, the Insurers assert that the claims must be dismissed.

Despite the Insurers' arguments, it appears clear that Louisiana law presently does permit partial assignments without the consent of the obligor. The line of case law relied upon by the Insurers includes only four cases, and they all were decided no later than 1961. In the meantime, the legislature passed Article 2643, which states in relevant part, "If a partial assignment unreasonably increases the burden of the debtor he may recover from either the assignor or the assignee a reasonable amount for the increased burden." La. Civ. Code art. 2643. Insurers argue that their line of case law cannot be overridden by a codal article that does not explicitly authorize partial assignments but instead provides a rule for recovering the cost. It appears illogical, however, for the state legislature to set the ground rules for partial assignments and yet fail to mention that consent is required. The much more plausible conclusion is that Article 2643 permits partial assignments and overrules any prior law that was inconsistent, particularly considering that Article 2643 allows the debtor to seek recompense for any increased burden, thus curing the very reason that partial assignments were allegedly not permitted. As explained in the legislative comments to this article, it was a new article and was intended to change the law "insofar as it requires either actual knowledge by the debtor, or that notice be given to him, for the effectiveness even of a partial assignment."[7] La. Civ. Code art. 2643, comment (a). More to the point, the legislative notes further explain, "Under this Article, whether the debtor has knowledge of the assignment the assignment is effective against him, *regardless of whether*

_____

[7]As noted in comment (a), Article 2643 does require notice be given to the debtor, or that the debtor have "actual knowledge" of the assignment. While this issue has not been raised by either party, it would appear that the Insurers did have notice or actual knowledge because prior to providing Road Home funds, the State contacted each Insurer to confirm that the prospective Road Home funds recipient had a valid insurance policy. Opp. at 8. As this fact appears not to have been disputed by the Insurers, this Court presumes that the Insurers did receive notice or otherwise had actual knowledge of this assignment.

*or not he accepts the transfer in an authentic act.*"  La. Civ. Code art. 2643, comment (b) (emphasis added).  In eliminating any requirement of acceptance of the transfer by the debtor, it appears clear that the legislature was eliminating any possible requirement of consent.  Accordingly, the Insurers' argument that the claimants' partial assignments to the State are invalid without the debtors' consent is unfounded.

### 3.        Claims for Bad Faith and Breach of Fiduciary Duty

The Insurers argue that the State must be barred from asserting any claims outside of the contract.  The Insurers note that, in addition to seeking a refund for Road Home funds, the State also seeks attorneys fees and costs via allegations of bad faith and breach of fiduciary duty pursuant to La. Rev. Stats. § 22:658.2 and § 22:1220.[8]

It is clear that these claims must fail because they were not assigned to the State.  The subrogation agreement states:

> Notwithstanding anything to the contrary contained herein, this is a limited subrogation and assignment, and is limited to an amount not to exceed the amount of the grant received by the undersigned under the Program, to which the State has not been reimbursed from other sources.

Mot., App. C & D.  It would be contrary to the agreement for the State to sue for additional claims above and beyond the limited assignment/subrogation agreement.  This rule would seem to be a coordinate to Code Article 1822: "A person who, by agreement with the obligor, assumes the obligation of the latter is bound *only to the extent of his assumption*."  La. Civ. Code art. 1822 (emphasis added).  Indeed, state and federal courts in Louisiana agree that an assignee is

---

[8]As of January 1, 2009, § 22:658.2 was recodified at § 22:1893.

only bound by that which is assigned and can only assert that claims that have been assigned. *See Lewis v. Kubena*, 800 So.2d 68, 72 (La. Ct. App. 4th Cir. 2001) (dismissing assignee's claim, finding "because the language of these agreements does not clearly reflect an intent to transfer ownership of the claim or cause of action, there was no valid assignment under Civil Code article 2642."); *see also Joslyn Mfg. v. Koppers Co., Inc.*, 40 F.3d 750, 754-58 (5th Cir. 1994) (in action for contribution arising from federal and state environmental laws, applying Louisiana law to determine "scope of the assignment" in determining whether assignee was bound to indemnify assignor for environmental violations).[9]  Accordingly, all claims pursuant to La. Rev. Stats. § 22:658.2 and § 22:1220 are dismissed.

### 4.     Claims for Recovery or Declaratory Judgment with Respect to Flood Claims

Defendant Insurers assert that any flood claims based on a homeowner's insurance policy with a flood exclusion clause must be dismissed.  The State's Amended Complaint includes allegations that the Insurers "improperly equated inundation which had as its efficient proximate cause windstorm and/or third party fault or negligence with 'flooding' in an effort calculated to improperly expand each subject policy's water damage exclusion and thus improperly deny benefits owed to the recipients."  Compl. ¶ 63-64.  Insurers argue that Louisiana case law

---

[9]A useful decision by the Superior Court of Pennsylvania has noted that "in the majority of American jurisdictions, an insured's claim against his or her insurer, in the nature of breach of contract, breach of fiduciary duty, and bad faith as well as claims [] for punitive damages, counsel fees and interest, are assignable." *Brown v. Candelora*, 708 A.2d 104, 112 (Pa. Super. 1998) (citing numerous other jurisdictions).  However, that same court later explained, "[A] third party may not maintain a bad faith action against a tortfeasor's insurer without first obtaining an assignment from the tortfeasor." *Marks v. Nationwide Ins. Co.*, 762 A.2d 1098, 1101 (Pa. Super. 2000) (discussing *Brown*).

precludes any such claim by the State based upon Louisiana case law.  Indeed, the Louisiana Supreme Court in *Sher v. Lafayette Insurance Co.*, 988 So. 2d 186, 194-195 (La. 2008) ruled that the inundations caused by the breaches of levees during Hurricane Katrina qualified as a "flood" under the ordinary and prevailing meaning of the word, and accordingly held that claims for such inundations are precluded by insurance policy flood exclusions.  *See Johnson v. State Farm Fire & Cas. Co.*, Civ. A. No. 07-1226, 2008 WL 2178058, at *2 (E.D. La. May 19, 2008) (Lemelle, J.) (following *Sher* in denying plaintiff recovery for flood damage due to water damage exclusion).  The State does not appear to seriously dispute this authority.  Based upon the commanding authority on state law in Louisiana, this Court finds that any claims for relief by the State against the Insurers for having failed to compensate claimants for flood damage where those claimants' policies include flood exclusions must be dismissed.

5.      **Valued Policy Law Claims**

The State also has made allegations under Louisiana's Valued Policy Law ("VPL"), previously codified at La. Rev. Stat. § 22:695 until recodified at § 22:1318 on January 1, 2009. The State explains that "Louisiana is a 'valued policy' state, requiring that if an [']insurer places a valuation upon the covered property and uses such valuation for purposes of determining the premium charge to be made under the policy, in case of total loss the insurer shall compute and indemnify or compensate any covered loss of, or damage to, such property which occurs during the term of the policy at such valuation without deduction or offset.'" Compl. ¶ 74 (quoting La. Rev. Stat. § 22:695).  The State further alleges that "[m]any recipients, especially those whose

residences were located in the City of New Orleans, have suffered total losses to their property which are covered under their respective All Risk policies," and in response "the Insurance Company Defendants have failed to pay anything to the recipients or paid an amount lower than the valuation assessed to the properties for purposes of determining premiums." Compl. ¶ 76, 78. The Insurers contest the State's allegation, primarily alleging that the VPL's terms only apply to fire insurance policies. Moreover, they contend that the State has not adequately alleged that "any specific insured's property was rendered a *total loss* from a *covered peril*." Mot. at 24-25 (emphasis in original). They assert that the State has focused on properties that were not total losses and not harmed by covered perils because the complaint mentions residences that are in New Orleans and would have been rendered a total loss by flood, an *excluded* peril. Mot. at 25.

"Valued Policy Laws were enacted in many states in the late 1800's and early 1900's 'in response to the perception that insurers were profiting by selling insurance policies with inflated face values, and then, after the building suffered a total loss, litigating the actual value of the insured structure, even though the insured had been charged premiums for the policy limits . . . .'" *Landry v. Louisiana Citizens Property Insurance Co.*, 983 So.2d 66, 76 (La. 2008) (citation omitted). Louisiana's VPL states as follows:

> A. Under any fire insurance policy insuring inanimate, immovable property in this state, if the insurer places a valuation upon the covered property and uses such valuation for purposes of determining the premium charge to be made under the policy, in the case of total loss the insurer shall compute and indemnify or compensate any covered loss of, or damage to, such property which occurs during the term of the policy at such valuation without deduction or offset, unless a different method is to be used in the computation of loss, in which latter case, the policy, and any application therefor, shall set forth in type of equal size, the actual

method of such loss computation by the insurer. Coverage may be voided under said contract in the event of criminal fault on the part of the insured or the assigns of the insured.

B.   Any clause, condition, or provision of a policy of fire insurance contrary to the provisions of this Section shall be null and void, and have no legal effect. Nothing contained herein shall be construed to prevent any insurer from cancelling or reducing, as provided by law, the insurance on any property prior to damage or destruction.

C.   The liability of the insurer of a policy of fire insurance, in the event of total or partial loss, shall not exceed the insurable interest of the insured in the property unless otherwise provided for by law. Nothing in this Section shall be construed as to preclude the insurer from questioning or contesting the insurable interest of the insured.

D.   This Section shall only apply to policies issued or renewed after January 1, 1992, and shall not apply to a loss covered by a blanket-form policy of insurance nor to a loss covered by a builders risk policy of insurance.

La. Rev. Stat. § 22:1318.

Upon its face, it would appear that the State's VPL claims should fail because they have alleged solely claims under homeowners' policies while the VPL states it applies to fire insurance policies.  La. Rev. Stat. § 22:1318(A) ("Under any fire insurance policy . . ."); § 22:1318(B) ("Any clause, condition, or provision of a *policy of fire insurance* contrary to the provisions of this Section shall be null and void . . .").  The Fifth Circuit has observed, however, that Louisiana's VPL is not the epitome of clarity.  In *Chauvin v. State Farm Fire & Casualty Co.*, 495 F.3d 232, 235 (5th Cir. 2007), the Fifth Circuit rejected a VPL claim by homeowners whose properties had allegedly been rendered total losses by wind and flood during Hurricanes Katrina and/or Rita.  In determining that the VPL does not apply to any loss partially caused by a non-covered peril, flood, the court first noted that the VPL was ambiguous and "susceptible of

two possible meanings: (1) in the event of a total loss, an insurer is required to pay the homeowner the agreed full value of a policy as long as a covered loss causes some damage to the property, even if a non-covered peril renders the property a total loss; or (2) an insurer is only required to pay the homeowner the agreed face value of a policy when the property is rendered a total loss by a covered loss." *Id.* at 238. Only after evaluating the legislative intent behind the VPL did the court find that the VPL did not apply to total losses that were partially caused by non-covered perils because the VPL was intended to "link insurance recoveries to premiums paid," and any alternative definition would absurdly require an insurer to pay for damage that it did not incorporate into its premium calculation. *Id.* at 239.

Any confusion regarding the VPL was substantially cleared by the Louisiana Supreme Court in *Landry v. Louisiana Citizens Property Insurance Co.*, 983 So.2d 66 (La. 2008). Plaintiffs were homeowners whose property was rendered a total loss due to Hurricane Rita. They had a homeowners insurance policy in effect at the time of the damage and subsequently sued their insurer, alleging that it did not properly pay them the entire value under their policy as required by the VPL. The insurer refused to compensate the plaintiffs based upon the flood exclusion provision, and the plaintiffs subsequently sought summary judgment "seeking a determination as to whether defendant is liable for the full value of a structure if the entirety of the damage results in a total loss caused in part by wind, a covered peril, and in part by flood, a non-covered peril." *Id.* at 70. The court eventually concluded that plaintiffs could not recover under the VPL because the insurance contract included "a different method of loss computation [that was] set forth in the policy and policy application," which is permitted under the VPL as

amended in 1991.[10]  However, prior to reaching this conclusion, the *Landry* court in a lengthy footnote analyzed the statutory language and legislative history of the VPL, much as the Fifth Circuit had in *Chauvin*.  The Louisiana Supreme Court concluded that, although answering this question was not necessary, it appeared that the VPL could only apply to fire insurance policies, not to homeowners policies:

> It appears to us that the legislative history of La. R.S. 22:695, combined with the definitions provided in La. R.S. 22:6(10) and (15), and the contrast of the language used in related statutes, reveals that the statute is intended to apply only to fire insurance policies, which may include coverage against other perils as allowed by La. R.S. 22:691 and is distinct from homeowners' policies. However, it seems the insurance industry has always assumed that the use of the term "fire insurance policy" includes homeowners' policies.

*Id.* at 76 n.10.  Again, the *Landry* court explicitly avoided resolving the issue because its result would be the same regardless of whether the statute applied, yet it importuned the legislature "to consider this issue and make changes to the language of La. R.S. 22:695 if needed."  *Id.*

The issue here presents this Court with an unusual quandary.  As stated at the outset of this opinion, when deciding issues of state law, this court must "look to the final decisions of the Louisiana Supreme Court."  *Moore v. State Farm Fire & Cas. Co.*, --- F.3d ----, 2009 WL 130204, at *4 (5th Cir. 2009).  However, *Landry*, by its own terms, is not controlling precedent. The Louisiana Supreme Court in that case clearly stated that it was assuming that the VPL applied to homeowners policies, and therefore explained "we need not resolve the question of the applicability of the statute in this particular case."  *Landry*, 983 So.2d at 76.  Yet, "[i]n the

---

[10]The VPL states that insurers must use their valuation to "compute and indemnify or compensate any covered loss of, or damage to, such property . . . without deduction or offset, *unless* a different method is to be used in the computation of loss, in which latter case, the policy, and any application therefor, shall set forth in type of equal size, the actual method of such loss computation by the insurer."  La. Rev. Stat. § 22:1318.

absence of a final decision by the Louisiana Supreme Court, we must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case." *Moore*, 2009 WL 130204, at *4; *Illinois Central R. Co. v. Mayeux*, 301 F.3d 359, 362 (5th Cir. 2002) (when sitting in diversity a federal court "must apply the state law in an attempt to rule as the Louisiana Supreme Court would if presented with the same issues."). While *Landry* may not be controlling on this issue, that opinion clearly is how the Louisiana Supreme Court would have ruled on it. Its reasoning is careful and thorough: noting the ambiguity in the statute, the court proceeded to examine the legislative history of the VPL, the text of coordinate statutes within the Code, and relevant commentary on insurance codes to reach its conclusion that Louisiana's VPL only applies to fire insurance policies. It would be anomalous for this Court to perform the same exercise yet reach a different conclusion. Accordingly, this Court will follow *Landry* and hold that the VPL only applies to claims brought under fire insurance policies. As the State has not pleaded this claim under any fire insurance policies, and indeed nowhere mentions fire insurance policies but instead appears to rely entirely upon homeowners' policies, this Court finds no plausible means by which the State can amend its complaint, and accordingly the State's VPL claims will be dismissed.

### 6.  Prescription/Peremption

The Insurers argue that a significant portion of the State's claims are barred by preemption or prescription. Essentially, they appear to argue that all claims are prescribed where the claimant either (a) did not file an individual lawsuit by the deadline, or (b) did not assign his

claim to the State by the deadline. Because the statutory prescription deadlines for all Katrina and Rita claims passed shortly after the lawsuit was filed, the Insurers argue that a vast number of the claims are prescribed or perempted.

Despite the Insurers' argument, it appears that *American Pipe* tolling should apply here. In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 552-553, 94 S.Ct. 756, 38 L.Ed.2d 756 (1974), the Supreme Court held that "at least where class action status has been denied solely because of failure to demonstrate that 'the class is so numerous that joinder of all members is impracticable,' the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." The Fifth Circuit has further developed *American Pipe*; its most recent interpretation slightly broadened the protection for class members. In *Taylor v. United Parcel Service, Inc.*, --- F.3d ----, 2008 WL 5401487, at *1 (5th Cir. 2008), the plaintiff, an African-American employee of UPS, filed a lawsuit in the U.S. District Court for the Western District of Louisiana against his employer in 2003. At the time of the filing, he was also a member of a class action filed in the Eastern District of Missouri in 1994, although he was not a class representative. The class action involved the same allegations of racial discrimination, but was dismissed by the district court prior to class certification in June 2000, and the Eighth Circuit affirmed in August 2004. *Id.* In Taylor's individual action pending in Louisiana, the district court subsequently granted summary judgment to UPS, partially on the basis that some of his claims were filed beyond the one-year statute of limitations. The district court reasoned that "tolling ceased on Taylor's claims in 2000, when the Eastern District of

Missouri dismissed the [] class claims, rather than in 2004, when the Eighth Circuit affirmed that dismissal." *Id.* at *2.

The Fifth Circuit, however, reversed the district court's holding. The court noted that prior cases, including *American Pipe*, held that the statute of limitations began running once the district court denied class certification because such a decision "was tantamount to a declaration that only the named plaintiffs were parties to the suit." *Id.* at *8. "Thus," continued the Fifth Circuit, "the putative class members had no reason to assume that their rights were being protected." *Id.* However, in *Taylor*, the district court never denied class certification, instead granting conditional certification, and then subsequently dismissed the case on the merits. Accordingly, "Taylor remained a member of a certified class while [the class action] was on appeal," and therefore "he was entitled to assume that the class representatives continued to represent him and protect his interests in appealing the order dismissing the class claims on the merits." *Id.* at *9.

Likewise, in this case, there appears no dispute that the original class action by the State was filed prior to any deadline. Therefore, any individual claim is still live because the prescription and peremptive deadlines are tolled per *American Pipe* and the Fifth Circuit's exposition in *Taylor*. The Insurers attempt to distinguish the prevailing law by stating that the relevant laws, Acts 739 and 802, do not provide prescriptive periods but instead a date certain on which a claim is prescribed. Moreover, they assert that "piggyback[ing]" multiple class actions to toll a statute of limitations indefinitely was barred by the Fifth Circuit in *Salazar-Calderon v. Presidio Valley Farmers Association*, 765 F.2d 1334, 1351 (5th Cir. 1985). However, as

reinforced in *Taylor*, reliance by the putative class members is the motivating factor behind tolling, and there does not appear to be any logical difference between a period of limitations and a peremptive date; in both cases, the putative class members believe that they are still being represented in the class action and that they need not file an individual action. The Insurers also do not point to any similar class action that had already been dismissed prior to the present class action being filed, which presumably would be required if *Salazar-Calderon* were to apply.

The Insurers' best argument is that tolling cannot apply to any claim that was not yet assigned to the State prior to the prescriptive deadline. Such a holding allegedly would be contrary to the contractual deadlines, which would result in an impairment of contractual rights. However, the touchstone of *American Pipe* is reliance: the State included in the class those who had not yet assigned their claims, thus, those who had not yet assigned their claims could presume they were a member of the class and could rely on the representation of the State. Even if the State has attempted to represent persons that it is not permitted to represent, even those who were improperly included in the class enjoy the benefit of tolling until they are excluded from the class. Accordingly, this Court finds prescription and peremption to be interrupted, i.e., they are tolled per *American Pipe*.

7.    **Conditions Precedent to Suit in Policies and in the Assignment/Subrogation Agreements**

The Insurers' assert that the State has failed to adequately allege that the insured homeowners complied with their duties under the policies prior to suit. As they aver that such duties are not delegable to the State, and because the State has not alleged that such conditions

precedent have been fulfilled under the policies, the complaint must fail under *Twombly*. Additionally, Insurers allege that under *Twombly* the State must allege a breach of specific policy provisions. Insurers also claim that the subrogation/assignment agreements themselves only authorize the State to sue the Insurers if an insured has chosen to abandon, dismiss or release his claims, and again the State has failed to make adequate allegations on this point. Mot. at 20.

This Court is of the opinion that it would be premature to address these argument at this time. The Insurers have alleged that there are six categories of homeowners "whose insurance claims are potentially at issue in this lawsuit." Mot. at 21. They further claim that there are upwards of 200 different insurer defendants, each with their own policies that include prerequisites that must be fulfilled prior to suit. The Insurers allege that the ISO policy alone includes seven terms that must be complied with prior to suit. Mot. at 35-36. Presently, this action is styled as a class action, and it would appear impractical for the State to allege these facts for each and every potential class member. A significant number of these issues may be mooted if class certification is denied. Moreover, this Court notes that the State is actively participating in settlements with Insurers in order to recover Road Home funds. Accordingly, the Insurers may raise these arguments again post-class certification, but at this time the Court will refrain from addressing them.

### III. CONCLUSION

For the foregoing reasons, accordingly

**IT IS ORDERED** that the Motion to Sever and Remand by the State of Louisiana (Rec. Doc. 16480) is **DENIED**; and

**IT IS FURTHER ORDERED** that the Motion to Dismiss by Defendant Insurers (Rec. Doc. 16493) is **GRANTED IN PART AND DENIED IN PART.** All of the State's extra-contractual claims, including claims of bad faith and breach of fiduciary duty, all claims premised upon the denial of coverage for flood damage due to levee breaches under homeowner insurance policies, and all claims under Louisiana's Valued Policy Law are hereby **DISMISSED WITH PREJUDICE.**

New Orleans, Louisiana, this __5th__ day of March, 2009.

_____
**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT JUDGE**