## DECLARATION OF DR. ROBERT GLENN BEA

Robert G. Bea, under penalty of perjury, states as follows:

1.     This declaration is submitted to address: (a) failure of the East side levee and sheet pile supported reinforced concrete floodwall (FPS) intended to provide protection from flooding developed in the 17th Street Canal (SSC) during hurricane Katrina, (b) association of the failure with project site development (dredging to expand canal cross section) performed for the Orleans Sewerage and Water Board (OSWB) under permit required and approved by the U.S. Army Corps of Engineers (USACE).

2.     My declaration is divided into several sections. Section I provides an overview of my qualifications to serve as an expert on the issues associated with the failure of the FPS adjacent to the SSC during hurricane Katrina. Section II provides a summary of the results of engineering forensic studies into the causes of the failure of the east side FPS adjacent to the SSC during hurricane Katrina. This section also addresses the engineering forensic studies into the incipient failure of the immediately opposite west side FPS. Section III provides a summary of what I have been able to learn about how the work conducted in behalf of the OSWB under permit required and issued by USACE contributed to the failure of the East side FPS adjacent to the SSC during hurricane Katrina.

1

## I. QUALIFICATIONS

3.    I have devoted the past two decades of my professional career to research associated with the catastrophic failure of engineered systems (e.g. BP Texas City refinery, NASA Columbia shuttle, Exxon Valdez and Braer oil tankers, Occidental Petroleum Piper Alpha and Petrobras P36 oil and gas production platforms). This work has involved detailed studies and investigations of more than 600 major accidents, failures, and disasters associated with complex engineered systems. The research has focused primarily on interactions of engineering and organizational – institutional mechanics associated with catastrophic failures. A primary objective of this work has been development, validation, and application of advanced methods for Risk Assessment and Management (RAM) of complex engineered systems during their life-cycles (concept development through decommissioning). This work has been built on my more than five decades of experience with the design, construction, operation, maintenance, and decommissioning of major engineered systems around the world.

4.    Of particular importance to my testimony is the work I have performed since August 29, 2005 to investigate the failure of the flood protection system for the greater New Orleans area associated with hurricanes Katrina and Rita. During the past 24 months, I have spent more than 4,500 pro bono hours assisting in the forensic engineering studies of the breaches and gaps in the hurricane flood protection system that led to the catastrophic flooding of the greater New Orleans area. This work has involved multiple field studies (first started 20 September 2006) in the greater New Orleans area, interviews of people with extensive knowledge of the history of the New Orleans flood protection system (how it was designed, constructed, operated, and maintained), and review of the primary investigations

and studies that have documented this failure (USACE Interagency Performance Evaluation Task Force, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System*, 2007; D. Woolley and L. Shabman, *Decision-Making Chronology For the Lake Pontchartrain & Vicinity Hurricane Protection Project*, Report to Institute for Water Resources of the U.S. Army Corps of Engineers, June 2007; Team Louisiana, *The Failure of the New Orleans Levee System During Hurricane Katrina*, Report to Louisiana Department of Transportation and Development, 2007; American Society of Civil Engineers, *The New Orleans Hurricane Protection System: What Went Wrong and Why*, 2007; National Academy of Engineering and National Research Council, Committee on New Orleans Regional Hurricane Protection Projects, Third Report, 2006; Independent Levee Investigation Team, *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005*, 2006; National Institute of Standards and Technology, *Performance of Physical Structures in Hurricane Katrina and Hurricane Rita: A Reconnaissance Report*, 2006; Federal Emergency Management Agency, *Hurricane Katrina in the Gulf Coast*, 2006; Committee on Homeland Security and Governmental Affairs, *U.S. Senate, Hurricane Katrina A National Still Unprepared*, 2006; Committee to Investigation the Preparation for and Response to Hurricane Katrina, U.S. House of Representatives, *A Failure of Initiative*, Feb. 2006) .

I was a co-leader of the Independent Levee Investigation Team (ILIT) that conducted a 10-month intensive forensic study of this failure. I co-authored the report titled *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005* (http://www.ce.berkeley.edu/~new_orleans/, November 2005 Preliminary Report, May 2006 Draft Final Report, July 2006 Final Report). I have authored

3

and co-authored twelve professional conference and journal papers that have documented this forensic work. I have provided testimony to several Congressional committees and staff members who have conducted investigations into the background for this failure.

5.      I am a professor in the Department of Civil and Environmental Engineering, and associate director of the Center for Catastrophic Risk Management, University of California, Berkeley. I have held this position since January of 1989. My current responsibilities include teaching at the graduate and undergraduate levels, research, and university, professional and public service. Prior to that, for seven years I held the position of Vice President and Senior International Consultant at PMB - Bechtel's Ocean Engineering Division located in San Francisco, California.

6.      My educational background includes an Associate of Arts degree from Jacksonville University, Bachelor of Civil Engineering and Master of Engineering from the University of Florida, and a Doctor of Philosophy from the University of Western Australia. I have done graduate and postgraduate work at Tulane University, Rice University, Texas A&M University, Bakersfield College, the University of Houston, the Technical University of Norway, and the University of Western Australia.

7.      Attached hereto as Exhibit 1 is my curriculum vita. This is attached to support my competency to attest to the matters stated herein. I began my career in 1954 as an engineer-in-training for the U.S. Army Corps of Engineers. I was assigned to the southern Florida Flood Control District and worked on engineering and construction of flood protection facilities in the areas around Lake Okeechobee and the Everglades. In 1960, I was employed by Shell Oil Company as a coastal - offshore civil engineer. During my career with Shell Oil Company, Shell Development Company and Royal Dutch Shell Company, I

4

worked in exploration, drilling, production, refining, transportation, engineering, construction, operations, and research.

In 1965, I was Chief Offshore Civil Engineer and Manager of the Central Engineering Division for Shell Oil Company located in New Orleans. It was during that year my family lost our home in New Orleans East (Pines Village). This loss included all of our belongings due to flooding from breaches in the levees along the IHNC and Inter-Coastal WaterWay (ICWW) that developed as a result of hurricane Betsy. At this time, I was leading engineering teams working on development of risk and reliability based criteria for design and requalification of offshore platforms and pipelines subjected to hurricanes in the vicinity of the Mississippi River Delta and elsewhere in the Gulf of Mexico.

In 1977, I was appointed vice president and chief engineer of an international consulting engineering and contracting company (Woodward-Clyde Ocean Services now URS Corporation) that provided coastal and offshore engineering services including hurricane forecasting, development of reliability based design criteria, and engineering flood protection facilities for refineries and chemical processing plants along the Gulf coast. In 1981, I founded the Ocean Engineering Services Division of PMB and became vice president and senior international consultant for PMB – Bechtel. I joined the faculty of the University of California Berkeley in 1989.

I have published more than 350 technical papers in refereed journals and conferences and a similar number of technical papers, reports, and book chapters in non-refereed publications. I have been recognized by the National Academy of Engineering, the International Energy Center, the Academy of Management, the American Society of Civil Engineers (ASCE) and American Society of Mechanical Engineers (ASME) for my pioneering contributions to

5

development of advanced methods for risk assessment and management including human, organizational, and institutional factors. In May 2007, I received the first University of California Berkeley Chancellor's award for research in the public's interests for my work in development of understanding of the causes of the failure of the flood protection system for the greater New Orleans area and for my proposals for preventing and mitigating such failures in the future. I am a registered professional civil, structural, and geotechnical engineer in seven states (Louisiana, Texas, Florida, California, Washington, Oregon, Alaska).

## II. SUMMARY: FAILURE OF THE FPS ADJACENT TO THE 17th STREET NAVIGATION CANAL

8. The purpose of my affidavit is to discuss the key issues associated with the failure (breaches) of the levee, flood wall, and supporting sheet piling (FPS) on the East side of the SSNC during hurricane Katrina. I first arrived at the site of the breaches on September 24, 2005. Since that time, I have participated in multiple field studies of these breach sites and other breaches in this immediate area. These studies have included review of the evaluations of analyses of the breaches performed by the U.S. Army Corps of Engineers Interagency Performance Task Force (IPET, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System*, Draft Final Report, 1 June 2006, and partial Final Report, 26 March 2007), Team Louisiana (*The Failure of the New Orleans Levee System during Hurricane Katrina*, February 2007), the National Institute of Standards and Technology (NIST, *Performance of Physical Structures in Hurricane Katrina and Hurricane Rita: A Reconnaissance Report*, June 2006), the American Society of Civil Engineers (ASCE, External Review Panel Review Reports 1 – 3, 2006, Final Report 2007 ),

and the National Academy of Engineers – National Research Council (NAE/NRC, Committee on New Orleans Regional Hurricane Protection Projects Reports 1 – 3, 2006).

    9.    I have performed studies of the history of activities, decisions and trade-offs that provided the background for this failure ("Reliability Assessment & Management Lessons from Hurricane Katrina," *Proceedings Offshore Mechanics and Arctic Engineering Conference*, June 2007; "Investigation of the Performance of the New Orleans Regional Flood Protection Systems during Hurricane Katrina: Lessons Learned," *Proceedings of Geo-Denver 2007*, ASCE, February 2007; "Reinventing Flood Control," *Tulane Law Review*, March 2007). I have help perform detailed engineering analyses of the development of the breach on the east side of the SSNC and the near-breach on the west side of the SSNC ("Failure of the New Orleans 17th Street Canal Levee & Floodwall During Hurricane Katrina," *Research to Practice in Geotechnical Engineering*, ASCE Geotechnical Special Publication Honoring John H. Schmertmann, 2007), and the sites of the other major breaches that developed in the New Orleans flood protection system during hurricane Katrina ("Investigation of Levee Performance in Hurricane Katrina: The New Orleans Drainage Canals," *Proceedings of Geo-Denver 2007*, ASCE, February 2007, "Validity and Reliability of Forensic Engineering Methods and Processes," *Proceedings of 4th Forensic Congress*, ASCE, 2006; "Investigation of Levee Performance in Hurricane Katrina: The Inner Harbor Navigation Channel," *Proceedings of Geo-Denver 2007*, ASCE, February 2007).

    I also have performed detailed engineering analyses of the performance of the FPS directly opposite the breach on the east side of the SSC. This side of the canal did not breach but exhibited signs of incipient failure. The contrasts provided by the forensic analyses of the

7

two sides of the SSC provide important clues that allowed identification and confirmation of critical elements that led to the east side breach of the FPS.

10.    In summary, it is my conclusion based on my experience and the forensic engineering studies of the SSC breach that resulted in the catastrophic flooding of the Lakeview, City Park and adjacent areas that failure of the FPS (levee, floodwall, supporting sheet piles, Fig. 1) was due primarily to multiple flaws and defects embedded in the FPS during its life-cycle. These flaws and defects included those developed during the concept development (e.g. failure to recognize I-wall soil tension gap), design (e.g. failure to properly evaluate soil conditions and characteristics), construction (e.g. failure to drive sheet piling to depths sufficient to prevent excessive water intrusion), operation (e.g. failure to provide adequate safe-guards to adjacent FPS during dredging activities), and maintenance (e.g. failure to respond to early warnings of potential for excessive seepage, to allow growth of large trees at or close to the toe of the levee, and to ignore important reductions in the elevations of the protective structure due to settlements and subsidence). All of these flaws and defects represent important compromises in established and existing USACE standards and guidelines. Hurricane Katrina provided a test of this FPS and it performed miserably.



**FIG. 1: SSC FPC components (levee, floodwall, sheet piling, after USACE 2006).**

8

11.     The information made available by the USACE and reviewed by the author clearly indicates a high degree of correlation of the SSC dredging activities and the FPS failure at this site. The configuration of the cross-section of the dredged canal 'favored' the Orleans Parish side (off-centerline cross section) and resulted in lowering the elevation of the top of the earth levee below normal water level (normal vegetation not possible) and reduction in the total levee cross section. In addition, the bottom of the canal was dredged to a depth greater than the penetration of the sheet piling which should have prevented development of excessive and damaging underground water pressure and stresses from the canal to the protected side of the SSC during high water in the SSC. Lowering the elevation of the top of the levee allowed early water intrusion in a tension crack that opened up between the sheet piling and the supporting soils. This tension gap resulted in dramatic increases in the horizontal loadings and decreases in the capacity of the soils and levee to resist the imposed loadings. These dredging developments had important effects on the soils relied upon to provide stability for the FPS. As a result of the developments associated with the dredging permitted by the USACE, there were important compromises in public flood safety and reliability attributes.

These observations are corroborated by comparison with the west side (Jefferson Parish) levee and FPS immediately opposite the side that failed. Observations and analyses indicate that this side was on the verge of failure when the opposite side failed. The soil conditions were nearly identical on both sides of the canal. The levee on the west side had an elevation that kept the top of the soil above normal lake levels (vegetation visible) and a cross section that was more than three times as great as on the east side (Orleans Parish). Because of the higher elevation of the levee on this side of the SSC, a substantial tension

9

crack allowing water intrusion (resulting in greater horizontal forces and seepage effects) did

not develop before the failure on the east side of the SSC.

## III. FORENSIC ANALYSIS: FAILURE OF THE FPS ADJACENT TO THE SSC

During Hurricane Katrina, a large segment of the levee and floodwall lining the SSC

in New Orleans failed catastrophically before the design water elevations were realized (Fig.

2). Eyewitness reports indicate that the failure initiated about 6:00 AM on August 29, 2005

(USACE IPET 2007). Pumping Station 6 water level recordings (Fig. 3) corroborate the time

of failure initiation and subsequent development of the failure until final breaching (USACE

IPET 2007). These records indicate that the water level in the canal was approximately 7 feet

at the time of initiation of the breach. At approximately 8 AM, there was another drop in the

water level indicating further development of the breach.



**FIG. 2: Initiation of east side breach on 17th street canal (National Geographic Society).**

10

Case 2:05-cv-04182-SRD-JCW   Document 6804-2   Filed 08/02/2007   Page 11 of 23



**FIG. 3:** Hurricane surge hydrograph showing time history of water levels in the 17th Street Canal (USACE IPET 2007)

Prior to arrival of the storm surge, strong winds from the northwest had blown over large oak trees growing at the toe of the levee thereby opening paths for accelerated water seepage and pressure effects (Figs. 2 and 4).



**FIG. 4:** Overblown tree root ball (pushed back from toe of levee by floodwater)

Water was first seen coming through the 'water stops' (vertical rubber joints) that separated the concrete floodwall sections. Differential movements of the supporting soil levee were large enough to open these joints. About 9:00 AM an eyewitness reported that the water had reached the top of the levee on the west side and a "whirlpool" had developed on the east side at the south end of the developing breach.

Due to the off-centerline dredged profile of the canal, the top of the levee on the east canal side was approximately 6 feet lower than on the west side. The west side would support vegetation while the east side was normally underwater (Fig. 5).



**FIG. 5: Aerial photograph of breach site taken before hurricane Katrina.**

At this point, a deep breach opened with large horizontal displacements between two adjacent sections of the floodwall indicating that there had been a failure of the sheet pile interlocks at that section. In the end, the levee, floodwall, and supporting sheet pile were displaced laterally toward nearby homes by more than 50 feet (Figs. 6 and 7).



FIG. 6: East side breach looking North  (USACE IPET 2007).



FIG. 7: East side breach looking Southeast (Environmental Protection Agency 2005).

After the breach had been sealed and the area dewatered, the overturned oak tree that had been at the toe of the levee was clearly visible as were buried cypress tree stumps (Fig. 8) and the thick organic (peat, marsh) layers that were buried by landfill and underlie this entire area (Fig. 9).



**FIG. 8: Buried cypress tree stumps and overturned oak trees (USACE IPET 2007)**



**FIG. 9: Buried marsh – peat layers pushed to surface by slide  (USACE IPET 2007)**

Fig. 10 shows a cross-sections through the breach – at the completion of the failure (top of floodwall at elevation of approximately 12.5 feet above mean sea level (MSL), bottom of canal at approximately – 16 feet, bottom of sheet piling at approximately – 17.5 feet, top of levee inboard at approximately +6 feet, and land at inboard at approximately –5 feet, based on information provided by USACE 2005). The analyses performed by the Independent Levee Investigation Team (ILIT 2006) indicated a lateral translational failure with the inboard side of the levee being pushed laterally by the elevated canal water. These lateral pressures opened a gap at the outboard side of the sheet piles supporting the concrete floodwall, further increasing the lateral force acting against the section. This action effectively cut the levee in half resulting in dramatic increases in horizontal forces and decreases in the lateral soil resistance (USACE IPET 2007, ILIT 2006, Team Louisiana 2007).



**FIG. 10: Cross-sections through SSC breach at conclusion of failure (Rogers, 2006)**

The upper portion of the levee consisted of brown silty organic clays (Fig. 11). This was underlain by older sections comprised largely of locally available gray marsh and lacustrine (lake deposits) clays. The levee was underlain by marsh deposits varying from a few feet to as much as 8 feet in thickness. These were underlain by a transition zone of interbedded marsh and clay deposits with a similar thickness. The transition zone was underlain by a layer of soft gray clay. Sands were present at the base of the profile.



**FIG. 11: Stratigraphic cross-sections through 17th street canal breach. Underlying marsh (peat) thins northward as does the underlying Pine Island Beach sand. The lacustrine (lake) organic silty clays thicken southward (Rogers, 2006)**

There were and are major differences in the geometry of the east and west bank flood protection levee cross sections (Fig. 12). The differences in the levee cross sections developed when the off centerline dredging of the canal was permitted by the USACE (Fig. 13). It is important to note that the data summarized in Fig. 12 comes from documentation provided by the USACE that purports to be "As Built". Based on the author's experience in

helping perform hydrographic surveys of drainage canals for the USACE, this information does not appear to be credible. The "As Built" profile lacks the irregularities that normally are developed during dredging operations. In addition, the "As Built" drawings indicate a sheet pile penetrations of approximately 10 feet when the actual sheet pile penetrations at this location were approximately 17.5 feet (USACE 2005).



**Fig. 12: Comparison of cross-sections of east I-wall levee that failed with west I-wall levee that did not fail (Team Louisiana, 2007)**



**Fig. 13: "As Built" drawing of levee – canal cross sections in vicinity of SSC breach (The Board of Commissioners of the Orleans Levee District, Excavation and Flood Protection – 17th Street Canal, Phase IB Hammond Hwy. To Southern Railway, 1990).**

17

At this time, none of the studies nor the available documentation has been able to identify the actual dredged profile of the canal after the dredging operations were completed nor during the intervening years. The USACE has provided data on the profile of the canal and levees following hurricane Katrina (USACE IPET 2007). Unfortunately, this data contains the effects of Katrina, the breaching processes and in some cases of the subsequent breach repair operations.

The documentation also is incomplete regarding the actual sheet pile penetrations on both sides of the SSC. The available documentation indicates that modifications were made to the sheet pile penetrations during the construction that followed the 1990 "As Built" documentation (e.g. Pittman Construction Co., Inc, July 27, 1994). The available documentation provided by the USACE indicates that the sheet piling on the west side penetrated deeper than on the east side (penetration of approximately 19.5 feet on west side versus 17.5 feet on east side).

It is clear that additional important factual details remain to be developed and corroborated before there is a complete and comprehensive understanding of the breach failure on the east side and the non-breach incipient failure on the east side of the SSC.

A large number of borings and cone penetration test probes were performed at this location by the U.S. Army Corps of Engineers (USACE) Interagency Performance Evaluation Taskforce (IPET 2007), ILIT (2006), and Team Louisiana (2007) investigation teams. In addition, many borings had been performed earlier as part of the initial design studies (USACE 1990). The soft gray clay stratum and the overlying marsh and intermixing zones exhibited three distinct over-consolidation profiles representing the effects of desiccation at three times during the history of these deposits (Fig. 14). These desiccation

profiles were less pronounced beneath the levee crest due to the increased overburden pressures.



**FIG. 14: Shear strengths of the marsh layer (ILIT 2006).**

The profile of shear strengths (Su, pounds per square foot, psf) within the marsh layer beneath the crest and inboard toe of the levee showed pronounced differences (Fig. 14). This layer is a complex and inter-layered zone of organic marsh depositions including peat, marsh clays, and organic silts. A critical layer proved to be a thin layer of dark organic clayey silt near the base of the marsh layer. This layer had the appearance, consistency and strength of black toothpaste (Fig. 15). Soil tests performed during the ILIT investigation indicated that this layer was extremely sensitive to shear strains. There were dramatic reductions in the shear strength of the layer as strains acted to collapse and reorient the colloidal soil particles.

Case 2:05-cv-04182-SRD-JCW      Document 6804-2      Filed 08/02/2007      Page 20 of 23



**FIG. 15: Sensitive soft clay layer embedded in marsh – intermixing layers (Fig. 11, ILIT 2006).**

It is interesting to note that the presence of the sensitive layer was not detected during the USACE IPET soil investigations (ILIT 2007). Discussions with personnel familiar with the details of how the IPET soil field investigations were performed indicates that the standard procedures used by the USACE could easily fail to detect the presence of such layers. In the case of the ILIT soil investigations, very experienced senior personnel with extensive background in the local geology and soil characteristics were present during the field work and continuous sampling and logging procedures were utilized. The insights and information developed during the field investigation period were carried forward directly into the laboratory testing and subsequent analytical work.

Geologic studies indicated this stratum was the result of a previous major hurricane that changed the local depositional regime (Rogers 2006, ILIT 2006). The storm churned up organics and silts and mixed them with the locally available clays. A layer was formed of heavily flocculated (highly sensitive) organic silty clay due to the increased salinity caused by the storm. This layer was then covered by settled detritus (sticks, leaves, twigs). The layer

20

was thickest in the vicinity of bayou sloughs shown on an 1872 map of the area (Fig. 16). The map showed that these sloughs crossed the location of the SSC in the immediate vicinity of the breach.



**FIG. 16: 1872 Map overlaid with 1936 street map showing intersections of bayou sloughs with SSC alignment in vicinity of SSC breach (Rogers, 2006).**

Soil-structure-water interaction analyses were performed for two sets of conditions – with and without the tension gap between the sheet piles and the outboard soils (Fig. 17). A water-filled tension crack begins to open at the outboard side the sheetpiles (elevation of +6 feet MSL), applying additional lateral water pressures against the sheetpiles and the inboard and outboard side of the levee. The factor of safety (FS) becomes less than unity (implying failure – lack of force equilibrium) at a water elevation of approximately +8 feet MSL (Fig. 18).

21



**FIG. 17: Relative shear strain at failure (ILIT 2006).**



**FIG 18: Factor of Safety (FS) for east breach site as function of water level (ILIT 2006).**

The ILIT investigation disclosed a section on the opposite (west) bank of the SSC that was displaced laterally several inches hurricane Katrina (Fig. 19). The soil characteristics and properties at the east and west sides were very similar – the geologic conditions were the same (ILIT 2006). The principal differences between the east and west sides were the soil levee cross sections and top elevations.



**FIG 19: FPS displacement on west side of SSC (ILIT 2006).**

Soil-structure-water interaction analyses showed that this very similar section also developed a very low factor of safety, but substantially larger than the east side. At the time that the east wall failed, the factor of safety for the west wall was approximately 1.6 (Fig. 20). Failure would not have developed until the water reached an elevation of approximately +11 feet MSL.