UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | * * * * * * | CIVIL ACTION NO. 05-4182 and consolidated cases |
| PERTAINS TO: BARGE | * * | SECTION "K" (2) |
| *Boutte v. Lafarge* 05-5531 | * |  |
| *Mumford v. Ingram* 05-5724 | * |  |
| *Lagarde v. Lafarge* 06-5342 | * | JUDGE |
| *Perry v. Ingram* 06-6299 | * | STANWOOD R. DUVAL, JR. |
| *Benoit v. Lafarge* 06-7516 | * |  |
| *Parfait Family v. USA* 07-3500 | * | MAGISTRATE |
| *Weber v. LNA* 08-4459 | * | JOSEPH C. WILKINSON, JR. |
|  | * |  |

**MEMORANDUM OF LAFARGE NORTH AMERICA INC. IN OPPOSITION
TO BARGE PLAINTIFFS' MOTION TO CONTINUE INDIVIDUAL TRIALS
AND FOR MODIFICATION OF CASE MANAGEMENT ORDER NO. 7**

Defendant Lafarge North America Inc. ("LNA") opposes the Barge plaintiffs' belated

motion to extend their deadline for submitting expert reports, and to extend the Court's long-

established July 2009 trial date by three months to permit the expert extension.  Doc. 18130.

Plaintiffs' motion does not even begin to establish the "good cause" required to support it.  As

we show below:

1.  The Barge plaintiffs present no excuse or explanation – ***none*** – for the supposed

inability of their expert, Gennaro Marino, to comply with the Court's now-lapsed expert report

deadline of March 16, 2009.  Nor could plaintiffs possibly do so, given that these lawsuits were

filed over three years ago, the data at issue has been available for years, and Mr. Marino has had

more than a year since his retention in March 2008 to consider and analyze the data.  Indeed,

specifically confirming the absence of diligence, Mr. Marino testified at his deposition that for at least three months, between June and September 2008, his team's analytical work amounted to nothing more than "casual conversations."

2.   The Barge plaintiffs also have not shown and cannot show the importance of the additional analyses that Mr. Marino says he has yet to perform.  Mr. Marino testified under oath in September 2008 that he had already concluded, "to a reasonable degree of engineering certainty," that the barge caused the floodwall breaches at issue in this case.  If Mr. Marino has any basis for these conclusions, it should have been possible for him to provide his expert report by the March 2009 deadline.  Conversely, if it really is true that requiring plaintiffs to comply with the expert deadline would leave them "naked as to the issue of causation," as they now argue, that only underscores their expert's lack of reliability and undermines their attempt to show "good cause" for the extension.

3.   As plaintiffs concede, the required expert extension will prejudice LNA and make it impossible for LNA to prepare its case for trial by the Court's July 2009 trial date.  Nor would plaintiffs' cavalier suggestion that the trial date be delayed by three months cure this irreparable harm.  Plaintiffs have known, for over a year, the Court considers the July 2009 trial date to be "as sacred as anything is in this case" because of the loss of crucial court resources after that date.  The loss of court personnel familiar with the record and issues in this case, which now encompasses many thousands of docket entries, would severely prejudice not only the Court, but would also prejudice LNA and every other litigant that has an interest in bringing the case to a conclusion.

## FACTUAL BACKGROUND

### A.  Relevant Litigation History

On November 18, 2005, plaintiffs' counsel filed their initial complaint alleging, under Rule 11 of the Federal Rules of Civil Procedure, that the barge had "crashed through the east side flood wall of the Industrial Canal … causing catastrophic damage, personal injury and mental anguish" to the plaintiff and putative class.[1]  By February 2006 at the latest, plaintiffs' counsel was telling the public that "[s]cientific investigations reveal that the Industrial Canal breach was caused by a barge adrift in the canal during Katrina, which slammed into the concrete floodwall, allowing the wall and levee to topple."[2]  Plaintiffs have represented that until the case was transferred to this Court in September 2007, their efforts had been "concentrating on the critical issue at hand," which was "wall failure and flooding causation."[3]

Following transfer of the case from Judge Berrigan, this Court established a case management order to govern further proceedings.  Case Management Order No. 5 ("CMO #5"), entered on September 18, 2007, provided that plaintiffs' merits expert reports would be due on March 31, 2008, with defendants' merits expert reports to follow.[4]  At no time did plaintiffs raise the possibility that they would be unable to supply their merits expert reports by March 2008, even though the deadline was only six months from the entry of CMO #5.

In March 2008, the Court convened a status conference to consider a new schedule. There, the Court made clear that the case must be tried during the summer of 2009, because the Court would lose the services of critical court staff after that time.  Thus, the Court stated, "I

---

[1]  Doc. 1 in No. 05-5724 at 3.

[2] See Letter from Brian Gilbert, Esq. (2/14/06) (Exh. 1 hereto).  From that time forward, plaintiffs' counsel have not been shy about trumpeting their experts' supposed opinions on causation.  See, *e.g.*, www.bargecase.com/faq.html ("We have retained expert witnesses whose opinions show … that [the barge] broke the floodwall.).

[3] Doc. 12251-2 at 2.

[4] Doc. 7724 at 15.

would like to get as much as possible done before that time," and the July 2009 trial date would be considered "as sacred as anything is in this case."[5]  The Court asked the parties to confer and submit a scheduling proposal, either jointly or separately, to govern further proceedings.

In early April 2008, the parties submitted their scheduling proposals, with LNA, the MRGO plaintiffs, and WGI joining in one proposal and the Barge plaintiffs alone in advocating a different proposal.  The Barge plaintiffs proposed that the Court first try "negligence and causation of the flooding," and submitted a schedule whereby their expert reports on "liability and causation of the flooding" would be due on ***August 1, 2008*** – just five months away.[6]  At the time the Barge plaintiffs submitted that proposal, they had already retained Mr. Marino to prepare an expert report on causation.[7]  Thus, plaintiffs' proposal amounted to a representation that Mr. Marino could be ready to opine within the space of four months.

On May 1, 2008, this Court entered Case Management Order No. 7 ("CMO #7"), largely adopting the proposal of LNA, WGI, and the MRGO plaintiffs.  CMO #7 provided that "a trial on the merits … shall commence on July 13, 2009."[8]  Internal deadlines were specifically geared toward "completion of all discovery and trial preparation for any individual trial(s) that might occur on July 13, 2009."[9]  Thus, the deadline for "[a]ll plaintiffs' expert reports pertaining to any trial on the merits shall be served … as soon as possible, but in no event later than March 16, 2009."[10]  Accordingly, under CMO #7, the plaintiffs were given a total of over ***ten months*** to

---

[5] Doc. 11672 at 7, 11, 42.

[6] Doc. 12251-2 at 3.

[7] Deposition of Gennaro Marino ("Marino Dep.") (September 12, 2008), at 15 (Exh. 2 hereto); Marino Invoice (Exh. 3 hereto).

[8] Doc. 12935 at 11.

[9] *Id.* at 7.

[10] *Id.* at 9.  Defendants' merits expert reports were to be served a month later, on April 13, 2009.  *Id.*

4

provide their merits expert reports – more than twice the amount of time they had told the Court they needed to produce such reports.[11]

### B.  Mr. Marino's Analysis and Opinions

In March or April 2008, plaintiffs retained Gennaro Marino "to opine on the cause(s) and mechanics" of the "eastern Industrial Canal floodwall breaches."[12]  According to plaintiffs' new motion, his testimony is the "lynchpin of the Plaintiffs' case on causation."[13]  And, according to plaintiffs, a part of Mr. Marino's analysis involves "analyzing soil boring data received from the Army Corps of Engineers."[14]

But it is indisputable that, by the early part of 2008, when the plaintiffs hired Mr. Marino, all relevant soil boring data had long been available to anyone who wanted to analyze it.  As set forth in the Declaration of Robert Bea that accompanies this opposition, the last of the relevant soil boring data was made available to the public no later than June 2007.[15]  The vast majority of the data had been available for much longer – indeed, by 2006, both the Army Corps of Engineers' "IPET" project and the independent "ILIT" project had concluded their analyses of the soil borings and reported their results.[16]

---

[11] Although CMO #7 instructed the plaintiffs to produce their merits expert reports "as soon as possible," plaintiffs waited until the final deadline of March 16, 2009 to produce reports that disclosed, on their face, that they had been completed as early as June 25, 2008.  See Report of Hector Pazos (Exh. 4 hereto).  Plaintiffs' failure to comply with the Court's instructions with respect to these reports constitutes an additional reason to deny them more time as to the Marino report.

[12] Doc. 18130-2 ("Pl. Mem.") at 2; Marino Dep. at 15.  Although plaintiffs refer to their expert as "Dr. Marino" in their moving papers, plaintiffs' counsel addressed him as "Mr. Marino" at his deposition, and the expert confirmed that as a proper way to address him in response to defendants' questioning.  Marino Dep. at 6-8.

[13] Pl. Mem. at 2.

[14] Pl. Mem. at 2.

[15] Declaration of Robert Bea (March 16, 2009) ¶ 6 (Exh. 5 hereto) ("Bea Decl.").

[16] *Id.* ¶ 6.

In June 2008, the plaintiffs submitted a report from Mr. Marino in connection with class certification.  In that report, Mr. Marino stated that "we are collecting and reducing relevant data and performing various stability and seepage analyses among other tasks."[17]  Mr. Marino reported detailed conclusions regarding the supposed barge impact with the floodwall and the results of his "failure analysis."[18]  He also reported on his analysis of data from "boreholes that were drilled by the Army Corps of Engineers"[19] -- the same data that supposedly necessitates the current motion.[20]  Mr. Marino's June 2008 report sets forth his conclusions that the barge was the cause of the failure of the floodwall at the north and south breach, and that IPET and ILIT soil failure analyses were "significantly flawed" and "much less likely to have played a critical role in the IHNC floodwall breaches than the ING 4727 barge."[21]

In September 2008, Mr. Marino gave a deposition concerning the matters set forth in his June 2008 report.  Mr. Marino confirmed that he had been retained by the plaintiffs "to evaluate the failure of the floodwalls, the north and south breach."  Marino Dep. at 16.  He acknowledged that, "in order to fail the floodwall, you have to have some failure of the soil."  *Id.* at 40. Accordingly, Mr. Marino reported that he and his team were "collecting and reducing the relevant data and performing various stability and seepage analyses."  *Id.* at 18.  But, Mr. Marino reported, other than the receipt, collection and reduction of data, his team had done very little in the three months from June to September 2008; in fact, he said, "***other than some casual***

---

[17] Gennaro Marino, "Preliminary Failure Investigation of the North and South Breaches Along IHNC (East), St. Bernard Parish, New Orleans, LA" (June 30, 2008) ¶ 1.1 (Exh. 6 hereto) ("Marino Report").  Plaintiffs submitted a copy of Mr. Marino's declaration to the Court in connection with their class certification motion.  Doc. 15549-26, Exhibit 16.

[18] Marino Report ¶¶ 3.0, 4.0.

[19] *Id.* ¶ 4.2.a.

[20] Pl. Mem. at 2 (need for extension is the result of "the incredible time intensiveness of analyzing soil boring data received from the Army Corps of Engineers").

[21] Marino Report ¶¶ 5.5, 5.6.

*conversations, we really haven't done anything."*  *Id.* at 23 (emphasis added).  He described

these analyses as "very similar to those that have been done by the Corps and by the ILIT

group," but added that "*we haven't gotten to do much of that since before this report here was*

*published, this one in June*."  *Id.* at 23 (emphasis added).  When asked whether his team was

working on calculations relating to the effect of overtopping on levee soil – a component of soil

stability analysis – Mr. Marino reported, "*Well, not currently, but we will be doing that."*  *Id.* at

161-62 (emphasis added).  Mr. Marino recognized, however, that he would have to complete this

work by March 2009, and that doing so would involve "models that need to be calibrated and set

up and then run."  *Id.* at 181-82.

      Notwithstanding any work that remained to be done, Mr. Marino stressed during his

deposition that he had already reached his conclusions regarding the issue of causation.  He

testified, point blank:  "My opinion is that the barge caused the failure."  *Id.* at 76.  He said that

"the soil behind the wall should have held."  *Id.* at 175-76.  When asked, "[h]ave you concluded

with a reasonable degree of engineering certainty that the barge caused the north breach?," he

answered:  *"Yes."*  *Id.* at 186 (emphasis added).  When asked, "[d]o you conclude to a reasonable

degree of engineering certainty that the Inner Harbor Navigational Canal east wall would not

have failed at any time on August 29 if the barge had not broken away from its mooring?," he

once again answered: "*Yes."*  *Id.* at 187 (emphasis added).[22]  Mr. Marino specifically opined

about the soil boring data as well, stating (for instance) that he had rejected ILIT's soil analysis

based on "descriptions of the material in the boring logs" and that he had looked at "all the

laboratory data of the strength of the soft [soil] layer" in rejecting IPET's analysis.[23]

---

[22] See also *id.* at 78 ("What caused the sheet pile to tear [at the north breach]?"  A:  "The impact of the barge."); *id.* at 139 (damage at floodwall was the "result of a very high impact barge being launched by the wind into the wall at high velocity"); *id.* at 184 (barge impact "caused the failure of the wall at the north and south breach locations").

[23] *Id.* at 163, 175.

When the time came to supply a merits expert report from Mr. Marino, however, plaintiffs did not comply.  Instead, on March 13, 2009 – the last business day before the merits expert reports were due – plaintiffs moved for a three-month extension on the deadline for their report.  On the due date, plaintiffs submitted Mr. Marino's June 2008 report as a "preliminary report … for the express purpose of compliance to the greatest extent presently possible."[24]  At the same time, plaintiffs submitted five other merits expert reports, none of which purports to be anything other than a final report.[25]

## ARGUMENT

"Adherence to reasonable deadlines is critical to restoring integrity in court proceedings." *Geiserman v. MacDonald*, 893 F.2d 787, 792 (5th Cir. 1990).  Therefore, Federal Rule of Civil Procedure 16(b) provides that scheduling order deadlines "shall not be modified except upon a showing of good cause and by leave of the district judge."  As plaintiffs admit (Pl. Mem. at 3), a showing of "good cause" to submit an untimely expert report from Mr. Marino involves four factors:  "(1) the explanation for the failure to [submit a complete report on time]; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice."  *Reliance Ins. Co. v. Louisiana Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir. 1997).  In *Reliance*, the Fifth Circuit upheld the district court's decision to refuse a ten-day extension of the plaintiff's expert report on causation because the plaintiff had not been diligent in preparing its expert evidence, and because the defendant would have to address the late evidence, potentially disrupting the trial date.  *Id.* at 257-58.  Measured by the applicable standards, plaintiffs' motion here fails miserably.

---

[24] Transmittal from B. Gilbert to D. Walker (March 16, 2009) (Exh. 7 hereto).

[25] In addition to the report of Mr. Marino, plaintiffs submitted reports from Don Green (maritime expert); Hector Pazos (naval architect); Robert Bartlett (metallurgist); Aurora Environmental (environmental); and Melvin Spinks (hydrology).

## I.   PLAINTIFFS HAVE PROVIDED NO EXPLANATION FOR THEIR FAILURE TO COMPLY WITH THE DEADLINE.

Plaintiffs' motion and supporting memorandum and declaration supply no explanation for why their expert was unable to prepare a timely expert report.  Plaintiffs assert, without support or foundation, that they and Mr. Marino "have been, and continue to be, diligent in their efforts to prepare this matter for trial." Pl. Mem. at 2 & n.2.  Although plaintiffs attempt a showing that counsel have been diligent,[26] their papers lack any explanation or information concerning *Mr. Marino's* diligence.  As to their expert, the best that they can proffer is that his evaluation "entails a detailed analysis of massive quantities of soil boring data" and that "Dr. Marino's firm has been diligently working on processing such information."  Pl. Mem. at 4.  This is meaningless fluff.  Plaintiffs supply no information about what Mr. Marino's firm has actually been doing, or when they started doing it, or how much time they have spent, or why they could not have started earlier or worked harder to comply with the March 2009 deadline.  Plaintiffs supply no record of communications between Mr. Marino's firm and plaintiffs' counsel concerning attempts to comply with the March 2009 deadline.  Plaintiffs do not even supply a statement from Mr. Marino concerning the level of analysis that has been completed to date.  As a showing of diligence, plaintiffs' explanation does not even approach the starting line.

Nor could plaintiffs possibly make the showing of diligence required for the extra-ordinary relief that they seek; to the contrary, the record demonstrates extensive delay.  These cases were filed in 2005 – three and a half years ago.  And although plaintiffs' counsel have been (mis)representing since early 2006 that "scientific investigations reveal that the Industrial Canal

---

[26] Pl. Mem. at 2 n.2.  Plaintiffs' assertions of diligence relate to work being done by counsel in depositions, finalizing *other* expert reports, revising exhibit lists, and developing a selection protocol for individual cases.  *Id.* Such assertions would only count for something if counsel, and not Mr. Marino, were performing the requisite soil analyses or writing the expert report.  In that case, however, additional evidence from Mr. Marino would hardly be helpful to the court.

breach was caused by a barge" (see above at 3), they did not retain Mr. Marino to conduct his

causation analysis until early 2008 – a full two years after both IPET and ILIT issued their final

reports analyzing soil stability causation issues and concluding the breaches were caused by

factors other than the barge.  See above at 5; Doc. 16405 at 3 & n.8.  Thus, plaintiffs waited over

two years to get started on the issue they now call the "lynchpin of [their] case on causation."  Pl.

Mem. at 1.  If a full year was not enough time for Mr. Marino to carry out the requisite analyses

of soil stability, plaintiffs' counsel have only themselves to blame for waiting until 2008 to retain

an expert on that topic.[27]

The record also establishes that Mr. Marino's firm did not diligently pursue its analyses

during 2008, after being retained by plaintiffs' counsel.  According to Professor Bea, who has

performed these soil studies, all of the relevant soil boring data was available to Mr. Marino

when he undertook his work on plaintiffs' behalf, and thus "it should have required no more than

modest professional diligence on the part of Dr. Marino and his staff to complete all of his soil

boring analyses" by the March 2009 deadline.[28]  But, as Mr. Marino testified in his deposition,

he did not diligently pursue those analyses.  Between June and September 2008 (the last date for

which any evidence of his activities exists), Mr. Marino reported that his firm was engaged only

in the receipt, collection, and reduction of data, but that "[o]ther than some casual conversations,

---

[27] Failure to meet court deadlines, and failure to supply plausible explanations for such failures, have been a consistent pattern with plaintiffs' counsel in this case.  See Doc. 14525 at 7 (denial of motion to withdraw deemed admissions; although burden "is not high, plaintiffs have presented no evidence to support their argument") (emphasis in original); Doc. 15902 at 2 (denial of first motion for Seventh Amended Complaint; "[p]laintiffs present no persuasive explanation for their failure to make these amendments" in a timely way); Doc. 16755 at 1 (denial of second motion for Seventh Amended Complaint; "this motion is grossly untimely in all respects").

[28] See Bea Decl. ¶ 6.  In April 2008, after they had already hired Mr. Marino, plaintiffs' counsel told the Court that they could prepare their final merits expert reports no later than *August 1, 2008* – a full six months before their expert reports were actually due.  See above at 4.  As suggested by Professor Bea's declaration, diligent work by Mr. Marino could have produced a report even by that earlier date.

we haven't really done anything" to analyze the data.[29]  Thus, from what appears in the record, Mr. Marino's firm spent the summer of 2008 gathering and reducing data but not analyzing any of it.  That represents a waste of three months, and that is only what is shown in the record – it is likely that disclosure of Mr. Marino's true activities would reveal even more wasted time.

"Courts have routinely rejected untimely 'supplemental' expert reports and testimony where the opinions are based upon information available prior to the deadline for service of initial expert reports."  *Simmons v. Johnson*, 2008 WL 474203, at *2 (M.D. La., Feb. 14, 2008) (citing and collecting cases).  Plaintiffs' proposed three-month delay in this case is based on their expert's failure to timely analyze data that has long been available, coupled with plaintiffs' two-year delay in retaining him.  In *Reliance,* the Fifth Circuit upheld the district court's rejection of a ten-day extension that was lacking in justification.  110 F.3d at 257.  Here, not only do plaintiffs proffer no justification, but the record affirmatively shows that justification is lacking.  In such circumstances, it is impossible for plaintiffs to establish that "deadlines cannot reasonably be met ***despite the diligence of the party needing the extension.***"  *Curol v. Energy Res. Tech., Inc.*, 2004 U.S. Dist. LEXIS 23279, at *7 (E.D. La. Nov. 16, 2004) (emphasis added) (cited in Pl. Mem. at 3), and thus impossible for them to show "good cause" under Rule 16(b).

## II.   PLAINTIFFS HAVE NOT DEMONSTRATED THAT THE ADDED TESTIMONY IS ESSENTIAL.

Plaintiffs hyperbolically assert that without the extension, they will be left "naked" as to the issue of causation.  Pl. Mem. at 5.  This assertion is impossible to fathom, given their expert's unequivocal testimony that, as of September 2008, he had ***already*** reached the conclusion – "to a reasonable degree of engineering certainty" – that the barge caused the breaches, and that the

---

[29] Marino Dep. at 22-23; see *id.* at 23 (describing analyses as "very similar to those that have been done by the Corps and by the ILIT group," but adding that "we haven't gotten to do much of that since before this report here was published, this one in June"); *id.* at 161-62 (asked whether his team was working on calculations regarding overtopping, Mr. Marino said, "Well, not currently, but we will be doing that").

wall "would not have failed at any time on August 29th if the barge had not broken away from its moorings."  No responsible expert would proffer such testimony without having done the analysis to back it up.  See Bea Decl. ¶ 10.[30]

Furthermore, plaintiffs do not explain what it is that Mr. Marino has not yet done, or why it is important.  They say that the missing piece of Mr. Marino's work is a "soil density analysis" that "plays a significant role in his overall causal analysis," without ever telling the Court what role the soil density analysis is supposed to play, or why, lacking such analysis, Mr. Marino was prepared to render his opinions on causation in September 2008 with a reasonable degree of engineering certainty.  Certainly, vague words like "significant role" will not do the trick. See *Keys v. M/V Ming Longevity*, 2003 WL 25720981, at *2 (E.D. La. Jan. 21, 2003) (refusing supplemental expert report because expert would still be allowed to testify in accordance with her earlier, timely reports).

Plaintiffs argue that the proposed extension is needed in order to "further the objectives of underpinning the justifications of CMO No. 7."  Pl. Mem. at 6.  The thrust of plaintiffs' argument is that forcing them to proceed without Mr. Marino's soil density analysis is akin to requiring them to litigate at a handicap, undermining a "meaningful" outcome in the first set of trials.  *Id.*  To this, all LNA can say is that Mr. Marino has already testified as to his conclusions regarding causation, and if he cannot back them up ***now***, then such a result will be "meaningful" regardless of how the trial comes out.  In any event, having submitted six expert reports on the merits, including Mr. Marino's report, plaintiffs cannot plausibly contend that a trial would be meaningless if it does not include every last piece of the puzzle.

---

[30] See also, *e.g.*, Marino Dep. at 186-87; see *id.* at 76 ("My opinion is that the barge caused the failure"); *id.* at 78 ("What caused the sheet pile to tear [at the north breach]?"  A:  "The impact of the barge."); *id.* at 139 (damage at floodwall was the "result of a very high impact barge being launched by the wind into the wall at high velocity"); *id.* at 184 (barge impact "caused the failure of the wall at the north and south breach locations").

But even if plaintiffs' situation were as dire as they say, that would not justify acceding to the extension they belatedly demand.  As the Fifth Circuit stated in *Reliance*, "[d]istrict judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case."  110 F.3d at 258.  In *Hamburger v. State Farm Mut. Auto Ins. Co.*, 361 F.3d 875, 882-84 (5th Cir. 2004), the Fifth Circuit upheld the district court's exclusion of the plaintiff's ***only*** expert on causation, even though this resulted in the grant of summary judgment for the defendant, advising that "the importance of the testimony only underscores how critical it was" for the plaintiff to have complied with the rules in the first instance.[31]  This Court has already refused to allow plaintiffs to withdraw admissions that, according to plaintiffs would "gut the litigation" and "undermine lynchpin issues affecting every plaintiff in the case."  Doc. 14708-2 at 9, 13 (plaintiffs' memorandum); Doc. 16053 (order affirming denial of motion to withdraw deemed admissions).  Here, as in the case of the deemed admissions, plaintiffs cannot expect the Court to blindly give them a free pass if their own ineffectiveness as litigants rises to such a high level.

## III.   EXTENDING THE EXPERT CUTOFF IS PREJUDICIAL.

In arguing for a continuance of the trial date, plaintiffs recognize that LNA would be prejudiced by their requested extension.  An extension that will engender delay and expense, and that will disrupt the pretrial schedule, is prejudicial.  *Reliance*, 110 F.3d at 257; *Geiserman*, 893 F.2d at 791.  Indeed, the only question raised by plaintiffs' motion is whether a continuance is available to remedy the prejudice that granting their requested relief would cause.

---

[31]The Fifth Circuit's rulings in *Reliance* and *Hamburger* make short work of plaintiffs' "due process" argument in favor of an extension (Pl. Mem. at 2 n.1).  Obviously, there is no due process constraint on the Court's ability to control its own docket by insisting on adherence to deadlines, and there are plenty of due process reasons to uphold deadlines when confronted by serial offenders such as the plaintiffs' counsel in this case. See above at 10 n.27; see also *Geiserman v. MacDonald*, 893 F.2d 787, 791-92 (5th Cir. 1990) ("The claimed importance of expert testimony underscores the need for Geiserman to have timely designated his expert witness ….The importance of such proposed testimony cannot singularly override the enforcement of local rules and scheduling orders.").

**IV.   THE COURT, LNA, AND THE OTHER PARTIES WOULD BE PREJUDICED BY A CONTINUANCE OF THE TRIAL.**

Plaintiffs' brief argues in favor of a "minimal" three-month continuance (Pl. Mem. at 6-7), as if using the work "minimal" will obscure the magnitude of an order that would destroy the object of all of the Court's scheduling orders – a July 2009 trial.  As the Court has made clear, the July 2009 trial date is "as sacred as anything is in this case," because the Court will lose the services of critical staff members at the end of August 2009.  Doc. 11672 at 7, 11, 42; see above at 3-4.  Neither the parties nor the Court can afford to lose resources that are familiar with the case and the issues it raises.

Indeed, the need for an extension of the trial date is seen by courts, ***without more***, as a reason to deny an extension of expert deadlines.  In *Hamburger v. State Farm Mut. Auto Ins. Co.*, 361 F.3d 875, 883-84 (5th Cir. 2004), the court disallowed an expert's testimony on causation, finding that "[s]ince the first and third factors militate against permitting the testimony, the trial court was not obligated to continue the trial," for "[o]therwise, the failure to satisfy the rules would never result in exclusion, but only in a continuance."   Similarly, in *Geiserman v. MacDonald*, 893 F.2d 787, 792 (5th Cir. 1990), the Fifth Circuit held that "a continuance would not deter future dilatory behavior, nor serve to enforce local rules or court imposed scheduling orders."   For these and similar reasons, district courts have refused to permit extensions that would delay the adjudication of the claims before them.[32]

---

[32] See *Simmons v. Johnson*, 2008 WL 474203 at *3 & n.8 (M.D. La., Feb. 14, 2008) ("[The] court has inherent power to control its docket and to prevent undue delays in the disposition of pending cases"; finding that continuance would delay adjudication of the case and therefore be unjustified); *Yuspeh v. State Farm Fire & Cas. Co.*, 2008 WL 4758627 (E.D. La., Oct. 29, 2008) at *2 n.7 (denying extension of expert report deadline because extension would "plac[e] the trial date at risk for continuance"); *Keys v. M/V Ming Longevity*, 2003 WL 25720981 at *2 (E.D. La. Jan. 21, 2003) (refusing extension because court "has already continued this matter once, and Keys opposes an additional continuance").

Plaintiffs' reference to an extension that was granted in *Robinson* (Pl. Mem. at 6-7) is totally unavailing.  As the transcript reveals, that extension was reached ***by consent*** and did not interfere with the Court's overall plan for reaching a resolution by the end of August 2009.  See Doc. 14942 at 65 ("We hope the Court says this is the last continuance.  We are not saying Mr. Smith is not entitled to more time.").  In contrast to the extension granted in *Robinson*, this extension is vigorously opposed, and will interfere with important considerations that led the Court to require that the case be ready for trial no later than July 2009.

## <u>CONCLUSION</u>

Plaintiffs' motion to extend the deadline for expert reports, and to implement a corresponding extension in the trial date, should be denied.

Respectfully submitted,

Robert B. Fisher, Jr., T.A. (#5587)
Derek A. Walker (#13175)
**CHAFFE MCCALL, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2300
Telephone:  (504) 585-7000
Facsimile:  (504) 585-7075
Fisher@chaffe.com
Walker@chaffe.com

/s/ John D. Aldock
John D. Aldock
Richard M. Wyner
Mark S. Raffman
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4240

March 18, 2009

## **Certificate of Service**

I hereby certify that I have on this 18th day of March, 2009 served a copy of the foregoing pleading on counsel for all parties to this proceeding by electronic filing notification.


/s/ John D. Aldock_____