# EXHIBIT 5

**DECLARATION OF ROBERT G. BEA, PH.D., P.E. IN RESPONSE TO BARGE PLAINTIFFS' FIRST MOTION TO CONTINUE INDIVIDUAL TRIALS AND FOR MODIFICATION OF CASE MANAGEMENT ORDER NO.7**

I, Robert G. Bea, PhD., P.E., declare as follows:

1. I am resident of Moraga, California. I make this Declaration in response to the Plaintiffs' First Motion to Continue Individual Trials and Modify Case Management Order No. 7. I have personal knowledge of the matters stated herein and if called as a witness I could and would testify truthfully and competently to the matters stated herein.

2. In preparing this declaration, I have reviewed the following materials: (a) Expert Report of Gennaro Marino entitled "Preliminary Failure Investigation of the North and South Breaches Along IHNC East, St. Bernard Parish, New Orleans, LA" dated June 30, 2008; (b) Deposition Transcript of Gennaro Marino dated September 12, 2008; and (c) Declaration of Gennaro Marino in Support of Barge Plaintiffs' First Motion to Continue Individual Trials and for Modification of Case Management Order No. 7, dated March 12, 2009.

3. I am a Professor of Civil and Environmental Engineering at the University of California Berkeley. I have been retained by counsel in the *In re. Katrina* litigation to perform comprehensive forensic engineering analyses of the breaches in the hurricane flood protection system structures that developed at the Lower 9th Ward adjacent to the Inner Harbor Navigation Canal (IHNC) East Bank Industrial Area (EBIA) during Hurricane Katrina on August 29, 2005. Since March 2007, I have offered a series of Expert Reports and expert opinion testimony as to the causes and failure modes associated with development of the breaches at the Lower 9th Ward. I have been retained by counsel for Lafarge North America ("LNA") to testify about the results of my work and the work of the Independent Levee Investigation Team ("ILIT").

4. To date, my investigations (September 30, 2005 to present) have been focused on forensic engineering analyses of the causes and failure modes that were responsible for development of the breaches at the Lower 9th Ward. This forensic engineering work has been developed during four phases:

a. **Phase 1** - August 2005 – November 2005 (Independent Levee Investigation Team – ILIT - initial field investigations and forensic engineering analyses),

b. **Phase 2** - November 2005 – May 2006 (ILIT additional field investigations and forensic engineering analyses),

c. **Phase 3** - May 2006 – March 2007 (University of California Berkeley Center for Catastrophic Risk Management field investigations and forensic engineering analyses), and

d. **Phase 4** - March 2007 – March 2009 (New Orleans Federal District Court Consolidated Katrina Litigation Expert field investigations and forensic engineering analyses).

5. My forensic engineering analyses have addressed both the engineering mechanics and organizational – institutional mechanics involved in development of the breaches at the Lower 9th Ward. This work has included multiple location – field studies (2005-2009), analyses of environmental conditions and effects associated with Hurricane Katrina, the history of development and performance of the flood protection structures at the Lower 9th Ward, and analyses of results from other major forensic engineering investigations of these breaches (Congressional Committee reports, U.S. Army Corps of Engineers reports, National Research Council – National Academy of Engineering reports, American Society of Civil Engineering reports, the Team Louisiana report, the Independent Levee Investigation Team report, and reports by the National Institute of Standards and Technology and the Federal Emergency

Management Agency). This work also has included extensive structural and geotechnical forensic engineering mechanics analyses of the multiple causes and modes of failure potentially involved in development of the breaches at the Lower 9th Ward.

6. My forensic engineering analyses have included multiple evaluations of soil conditions and characteristics at locations in the vicinity of the Lower 9th Ward breaches. Information on the soils has been progressively obtained and developed since October 3, 2005. The vast majority of the information and data that pertains to the soil conditions and characteristics has been available before June 1, 2006; This is the date that the draft final report was completed and made available to the public by the Interagency Performance Evaluation Taskforce. During a three month period (December 2005 – February 2006) we analyzed soil information from approximately 50 different locations and integrated this information into multiple soil – structure – water interaction analytical models. Our team performing these soil analyses consisted primarily of Professor Ray Seed and myself and three part-time graduate students. Results from this work including results from new soil borings, in situ testing, and laboratory testing were documented and made available to the public on May 14, 2006 in the form of the Independent Levee Investigation Team (ILIT) report to the National Science Foundation. To my knowledge, the last of the soil boring, in situ testing, and laboratory testing data became available by June 2007 in a release by the U.S. Government of the password protected IPET website data.

7. My forensic engineering analyses have included multiple analytical models which have addressed the structural and geotechnical mechanics involved in development of the breaches at the Lower 9th Ward. The geotechnical mechanics analyses have included multiple two dimensional and three dimensional seepage and hydraulic pressure analyses, and multiple

lateral stability analyses that have included the external and internal hydraulic effects and multiple potential effects of the interactions of the flood walls, sheet piling, and earthen flood protection structure components. This forensic engineering work has addressed explicitly the uncertainties involved in the analyses including both natural variabilities (e.g. soil characteristics) and uncertainties introduced by the multiple analytical models (e.g. due to analytical model limitations). All of this work has been carried out consistent with the Court's deadlines for the submission of expert reports.

8. During the time that I have been providing expert reports related to the *In re Katrina* litigation, I have been guided by the Court's multiple Case Management Orders. I have not requested one delay in the dates specified by the Court for delivery of my multiple Expert Reports or expert testimony. Even when there were substantial delays caused by other experts and lawyers involved in these developments, I have been able to meet the deadlines specified by the Case Management Orders, even when delays occasioned by others caused the loss of planned vacation time for myself and others helping me perform these analyses.

9. Given this background, I cannot understand why Dr. Marino has been unable to complete his expert analysis within the time frames provided by the Court's Case Management Order No. 7. Dr. Marino officially has been engaged in this work since April 2008. Dr. Marino submitted an Expert Report on June 30, 2008 that contained results from analyses of seepage and stability of the flood protection structures at the sites of the Lower 9th Ward breaches. Given that no significant new information or data on the soils at these sites has become available since late 2007, it should have required no more than modest professional diligence on the part of Dr. Marino and his staff to complete all of his soil boring analyses, and whatever additional analyses

he felt necessary, within the nine-month period from the completion of his preliminary report to the March 16, 2009 expert report deadline.

      10.     At his September 2008 deposition, Dr. Marino testified that he had already concluded that "the soil behind the wall should have held" (p. 175-76); that "with a reasonable degree of engineering certainty … the barge caused the north breach" (p. 186); and that "to a reasonable degree of engineering certainty … the [IHNC] east wall would not have failed at any time on August 29th if the barge had not broken away from its mooring" (p. 187). No responsible expert could have testified to such conclusions in the absence of sufficient data and analyses to back them up. Or, viewed another way, whatever additional analyses Dr. Marino wanted to perform after September 2008 cannot have been crucial to allowing him to form those opinions. It is difficult, therefore, to understand why a three-month extension of the expert deadline is necessary.

     I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. This declaration was executed by me on this 16th day of March 2009, at Moraga, California.

                                                          Robert G. Bea, PhD., P.E.