## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE KATRINA CANAL BREACHES                                           CIVIL ACTION
CONSOLIDATED LITIGATION

                                                                       NO. 05-4182

PERTAINS TO:                                                           SECTION "K"(2)
     *Robinson* C.A. No. 06-2268

## ORDER AND REASONS

Before the Court are Plaintiffs' Motion for Partial Summary Judgment (Doc. 16510) and

Defendant United States' Renewed Motion to Dismiss or, in the Alternative, for Summary

Judgment.  (Doc. 16511).  In this matter, as discussed in the Court's previous rulings[1], Plaintiffs[2]

have filed suit against the United States for damages caused by flooding allegedly caused by the

Mississippi River-Gulf Outlet ("MRGO").   The gravamen of these cross-motions focuses on

whether the due care exception and discretionary function exception, as delineated in 28 U.S.C.

§ 2680(a), shields the United States and warrants the dismissal of Plaintiffs' suit.

---

[1] *See In re Katrina Canal Breaches Consolidated Litigation (Robinson v. United States)*, 471 F. Supp.2d
684 (E.D.La. 2007) (statutory immunity as to flooding damages arising out of federal flood control projects did not
extend to flooding damages caused by negligent design, construction, maintenance, or operation of navigational
channel project); *In re Katrina Canal Breaches Consolidated Litigation (Robinson, C.A. No. 06-2268 and BARGE)*,
577 F. Supp.2d 802 (E.D.La. 2008) (questions of fact precluded determination as to whether relationship between
MRGO and Lake Pontchartrain and Vicinity Hurricane Protection Plan precluded determination as to whether
immunity found in Flood Control Act barred claims and questions of fact precluded determination as to applicability
of the "due care" and discretionary function" exceptions of FTCA). The factual background and legal analysis
contained therein are incorporated by reference and may, when relevant, be repeated herein.

[2] Norman Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr. and Lucille
Franz ("Plaintiffs") are the named Plaintiffs.

*Plaintiffs' Motion for Partial Summary Judgment*

Plaintiffs maintain that they are entitled to judgment on the United States' third[3] and fourth[4] affirmative defenses which are based on 28 U.S.C. § 2680(a) because:

(1)    the Government cannot carry its burden to establish that the Army Corps of Engineers ("the Corps") had discretion to ignore specific legal mandates prescribed in federal statues, regulations, and policy; and

(2)    the Government cannot carry its burden that those decisions were grounded in political social, or economic policy because they were not discretionary policy choices made in the implementation of the original decision to build the MRGO but were ordinary non-policy decisions concerning technical, engineering and professional judgments about safety.

However, the focus of their motion presented here is **solely** on the first argument–that is that because the Corps violated specific mandates, it is not entitled to invoke the discretionary function exception.  Plaintiffs contend that the United States violated federal law by:

(1)    violating the Fish and Wildlife Coordination Act ("FWCA")[5] by not consulting with federal and state environmental agencies and by not reporting their concerns to Congress;

(2)    violating the National Environmental Policy Act ("NEPA")[6] by dredging for decades without an adequate environmental impact statement; and

(3)    violating policies mandating wetlands protection.

---

[3] The United States' Third Defense states, "The claims are barred to the extent that they are based on the exercise or performance or the failure to exercise or perform a discretionary function or duty. 28 U.S.C. § 2680." (Doc. 3640).

[4] The United States' Fourth Defense states, "The claims are barred insofar as they challenge an act or omission of a Government employee exercising due care in the execution of a statute or regulation.  28 U.S.C. § 2680." (Doc. 3640).

[5] 16 U.S.C. § 662.

[6] 42 U.S.C. §§4321-4370f.

2

In addition, Plaintiffs contend that the United States has the burden of proof to demonstrate that it did not violate these federal laws.

### The United States' Renewed Motion to Dismiss or in the Alternative Motion for Summary Judgment

The United States contends in its motion that the discretionary function exception protects the Army Corps of Engineers' ("the Corps'")  design, construction, operation, repair and maintenance of the MRGO.  In essence, it maintains that the Corps built a channel that it was mandated to do.  The mandated design created the hydraulic funnel of which Plaintiffs' complain when the Corps joined Reach 2 (which is the southeastern reach of MRGO) to the Gulf Intercoastal Waterway ("GIWW") at a point near Michoud to Reach 1, which commingled the two channels continuing as one from that point westward to the Inner-Harbor Navigational Canal ("IHNC").  The Government further contends that it then maintained the channel in the mandated 36-foot depth and 500-foot width using due care.

In addition, the United States contends that the features that Plaintiffs maintain were necessary to eliminate the alleged harmful hydraulic effects–surge barriers and bank protection–were not part of the plans for the MRGO and were "positively excluded." (Doc. 16564 at 2).  Thus, it argues that "the *only* channel, in Plaintiffs' view, that would have comported with the exercise of 'due care'–was a different channel from the one that the Chief of Engineers recommended and that Congress directed the Corps to construct."  (Doc. 16564 at 3).

The Corps further contends that changing the project to add surge barriers and bank protection would not have promoted the purpose of the MRGO which was to provide an aid to navigation.  In addition, they maintain that "the addition of these features would have invalidated

the cost-benefit calculations that were an essential underpinning of the Chief's recommendation that construction be authorized." (Doc. 16564 at 3).  Also, the Corps argues that the discretionary function exception  bars Plaintiffs' claims that improper dredging contributed to the widening of the channel; it asserts that its decision to install bank protection only where doing so was considered to be more economical method of maintaining the channel's prescribed depth and width would be a policy decision protected by the discretionary function exception of § 2680.[7]

The Court  will address the legal framework that it will use to analyze these two motions. It will examine the due care exception and  the discretionary function exception in the context of the arguments made herein.  In so doing it will re-emphasize its previous analysis of this bar to Plaintiffs' claims as found in *In re Katrina Canal Breaches Consolidate Litigation (Robinson, C.A. No. 06-2268 and BARGE)*, 577 F. Supp.2d 802 (E.D.La. 2008).  However, considering the instant allegations, a further examination of these concepts is required, including a discussion concerning who bears the burden of proof on the immunity issues.

## LEGAL FRAMEWORK  AND ANALYSIS

### I.  Standard for Summary Judgment

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).  Thus, "'summary judgment is proper when the pleadings

---

[7]It is interesting to note that while the introduction to the United States' motion focuses on the "due care" exception found in the first part of §2680(a), the thrust of the motion relies on the discretionary function exception found in the second part of §2680(a).

and evidence demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.'" *Condrey v. Sun Trust Bank of Georgia,* 429 F.3d 556, 562 (5th Cir. 2005), *citing DIRECTV, Inc. v. Budden,* 420 F.3d 521, 529 (5th Cir. 2005).   Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986); *Condrey*, 429 F.3d at 562.  Once the movant meets this burden, the burden shifts to the non-movant "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.   "[M]ere allegations or denials" will not defeat a well-supported motion for summary judgment.  Fed. R. Civ. P. 56(e).  Rather, the non-movant must come forward with "specific facts" that establish an issue for trial.  *Id*.

The Fifth Circuit Court of Appeals has recognized that where the matter is to be tried to the Court rather than a jury, that there might be a "non-jury motion for summary judgment standard" that is more lenient.  "Under the suggested more lenient standard, the district judge could grant summary judgment based on inferences drawn from incontrovertibly proven facts, so long as there is no issue of witness credibility." *Illinois Central R.R. Co. v. Mayeux,* 301 F.3d 359, n. 1 (5th Cir. 2002).  However, the appellate court has noted that it has not actually been adopted, and the Court will not do so here.  *Id*.

Thus, when deciding a motion for summary judgment, the Court must avoid a "trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are tasks for the trier-of-fact. *Anderson*, 477 U.S. at 255. To that end, the Court must resolve disputes over material facts in the non-movant's favor. "The party opposing a motion for summary judgment, with evidence competent under Rule 56, is to be believed." *Leonard v. Dixie Well Service & Supply, Inc*., 828 F.2d 291, 294 (5th Cir. 1987).

## II. The Federal Tort Claims Act and the Relevant Exceptions

This Court has previously set out in detail the statutory provisions upon which this suit is based and the immunities sought to be applied in *In re Katrina Canal Breaches Consolidated Litigation,* 471 F. Supp.2d 684 (E.D.La. 2007). That opinion was from the perspective of a Rule 12 motion on the application of the same immunities which are at issue herein. The Court will reiterate and expand upon its analysis here.

As explained in *United States v. S.A. Empresa de Viacao Aera Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984):

> The Federal Tort Claims Act, 28 U.S.C. § 1346(b), authorizes suits against the United States for damages:
>
> > for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
>
> The Act further provides that the United States shall be liable with respect to tort claims "in the same manner and to the same extent as a private individual under like circumstances." [ 28 U.S.C. ] § 2674.

*Varig Airlines*, 467 U.S. at 807-08.   However, Congress did not waive the sovereign immunity

of the United States in all respects.  Section 2680 of Title 28 of the United States Code provides

two salient exceptions–the due care exception and the discretionary function exception.   The

statute provides:

> (a) Any claim based upon an act or omission of an employee of the
> Government, exercising due care, in the execution of a statute or regulation,
> whether or not such statute or regulation be valid, or based upon the exercise or
> performance or the failure to exercise or perform a discretionary function or duty
> on the part of a federal agency or an employee of the Government, whether or not
> the discretion involved be abused.

28 U.S.C. §2680(a).  The first part of this statute is known as the "due care exception" and the

second part of the statute is known as the "discretionary function exception."  Both operate to

shield the United States from liability based on the Federal Tort Claims Act (28 U.S.C. §

1346(a)) ("FTCA").

### Burden of Proof

As most recently stated by the United States Court of Appeals for the Fifth Circuit,

> "Plaintiff[s] bear[ ] the burden of showing Congress's unequivocal waiver of
> sovereign immunity." *St. Tammany Parish v. Fed. Emergency Mgmt. Agency,* No.
> 08-30070, 2009 WL 146582, at *6 (5th Cir. Jan. 22, 2009). "At the pleading
> stage, plaintiff[s] must invoke the court's jurisdiction by alleging a claim that is
> facially outside of the discretionary function exception." *Id.* at *6 & n. 3 (citing
> [*United States v. Gaubert ,* 499 U.S.315,  324-25, 111 S.Ct. 1267)].

*Freeman v. United States*, ____ F.3d ____,  2009 WL 146579, at *5 (5th Cir. 2009).  As the

litigants are well aware, the Court considered these issues at the pleading stage and denied them

as raising questions of fact.  *(See* n. 1 above).  While the motion is styled alternatively as  "re-

urging"  the Rule 12(b)(1) motion,  the Court has considered evidence presented, thus the motion

is in reality one for summary judgment.  As such, the Court must examine who should carry the burden of proof in this instance.

"As is generally the case with waivers of sovereign immunity, the plaintiff bears the burden of proving that the government's waiver is applicable.  On a related point, several federal courts have held that the burden of proving the applicability of an exception to a waiver of sovereign immunity falls on the United States."  Wright and Miller, 14 *Federal Practice and Procedure* § 3658 at n. 11 and n. 12.  *See Ashford v. United States,* 511 F.3d 501, 505 (5th Cir. 2007) (government could not show as a matter of law that it had discretion where prison policy required placing plaintiff in solitary where inmate raised safety concern)("Government needs to establish there was "room for choice" in making the allegedly negligent decision" for first DFE exception to apply);  *Merando v. United States*, 517 F.3d 160 (3[d] Cir. 2008) (plaintiff bears burden of demonstrating that his claims fall within the scope of FTCA but United States has the burden of proving the applicability of the discretionary function exception); *Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1213 (9th Cir. 2001) (burden of proof of the applicability of the discretionary function exception is on the United States)( citing *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992)); *Carlyle v. United States*, 674 F.2d 554 (6th Cir. 1982) (plaintiffs' allegations must fall facially outside the exceptions of §2680; however, government must prove applicability of a specific provision of § 2680; plaintiff need not disprove every exception under discretionary function exception); *Cazales v. Lecon, Inc*, 994 F.Supp. 765 (S.D. Tex. 1997) (plaintiff bears initial burden of proving that subject matter jurisdiction exists under the FTCA; however, the United States Bears ultimate burden of proving that discretionary function exception applies in particular case).  *But see Le Rose v. United*

*States,* 2008 WL 2704517 (4th Cir. 2008) ( plaintiffs bore burden of proof to show unequivocal waiver of sovereign immunity existed and to show that none of the FTCA waiver exceptions applied); *Welch v. United States*, 209 F.3d 646 (4th Cir. 2005) (burden is on plaintiff to show that unequivocal waiver of sovereign immunity exists and no exceptions under FTCA apply); *Hawes v. United States,* 409 F.3d 213 (4th Cir. 2005) (burden is on plaintiff to defeat assertion by United States of discretionary exception to Federal Tort Claims Act sovereign immunity waiver).

Thus, at a minimum, it is clear that the Fifth Circuit in *Ashford* placed the burden of proof on the United States on the first prong of the discretionary function exception to demonstrate that the decisions which it claims are shielded by the discretionary function exception are indeed subject to the exercise of judgment assuming plaintiff has properly pleaded a mandate.  It is not so clear where this Circuit lies in terms of the burden of proof as to the second prong, that is whether the Government must demonstrate that the action falls into the realm of a policy decision or whether that burden rests with Plaintiffs to show that the decision at issue is in the nature of a technical, engineering, or professional judgment or other non-policy based actors rather than about policy.   However, given the issues presented in light of the facts and evidence, the burden of proof is not really determinative of the issues presented herein.

The Court will now turn to the substantive issues at hand.  Given the fact that Plaintiffs' motion focuses on the first prong of the discretionary function exception which is on of the bases of the Government's motion, the Court has determined that the analysis will not be done in terms of each motion.  Rather, it will rule on the issues seriatim.

### A. Due Care Exception and Its Application with Respect to the United States' Motion

The "due care" exception immunizes the Government from suit with respect to claims based on the execution of a statute or regulation and requires "for its application that the actors have exercised due care." *Lively v. United State*s, 870 F.2d 296, 297 (5th Cir. 1989); *Buchanan v. United States*, 915 F.2d 969 (5th Cir. 1990). This provision "bars tests by tort action of the legality of statutes and regulations." *Dalehite v. United States,* 346 U.S. 15, 32, 73 S. Ct. 956, 966 (1953). Thus, the test for the application of the "due care" exception is to determine (1) whether the statute or regulation in question specifically proscribes a course of action, and (2) if mandated, whether due care was exercised. *Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005); *Crumpton v. Stone*, 59 F.3d 1400, 1403 (D.C. Cir. 1995).

The Government contends that since the Corps' design, construction, operation, repair, and maintenance of the MRGO were done "substantially in accordance with the recommendation of the Chief of Engineers," its actions were in accordance with Public Law 84-455–the enabling legislation for the MRGO–and thus is immune from suit. However, Plaintiffs maintain that such a position is erroneous because:

(1)   This exception is aimed at shielding the United States from suit where the legality of the statute itself is at issue. As Plaintiffs do not challenge the validity of Pub. La. No. 84-455, this immunity is inapplicable.

(2)   Public Law No. 84-455 did not mandate the challenged conduct here. Congressional authorization was a mandate for the Corps, using its professional engineering judgment and expense, to build, operate, and maintain the MRGO in a safe competent professional manner.

(3)     Public law No. 84-455 did not exempt the Corps from all other existing laws as it relates to MRGO–in particular the FWCA and NEPA.[8]

(4)     It is sharply disputed whether due care was exercised, particularly with respect the maintenance and operation of MRGO.

The United States responds to these contentions by admitting that not every single action undertaken by the Corps in designing, constructing, operating and maintaining the MRGO is protected by the due care exception. (Doc. 16923 at 24). Rather it argues that it was not prevented from "exercising its engineering judgement in deciding what angle to prescribe for the sides of the MRGO or what type of dredging to employ or even exactly what route the channel should take." The United States argues that the due care exception should apply because:

(1)     it was not free **not** to create the "funnel effect" by virtue of the Congressional mandate;

(2)     it was not free **not** to create the "conduit" by virtue of the Congressional mandate; and

(3)     the mandate did not include authority to add channel protection, surge or saltwater barriers.

The final argument of the United States is that Plaintiffs' argument that:

they are not challenging the validity of the authorizing statute is refuted by their complaints about these supposed "defects" in the project that Congress authorized and which the Corps was not free to remedy under the authority conferred by statue. Plaintiffs are *implicitly* challenging the statute by saying that 'due care' required that the Corps not construct the MRGO as the law require.

Doc. 16923 at 25.

The United States' argument requires the Court in essence to ignore Plaintiffs' allegations and recast the complaint. Whether the Corps exercised due care lies at the heart of

---

[8] These allegations are at the heart of Plaintiffs' contention that the United States is not entitled to invoke the discretionary function exception and will be explained *infra*.

this case, and Plaintiffs have presented voluminous evidence attempting to demonstrate that in a myriad of ways due care was not exercised.  The Government's proposed broad use of the due care exception is not warranted in light of Plaintiffs' allegations.   It appears to the Court that once Plaintiffs allege and offer substantial evidence that due care was not used by the Corps, certainly in the context of maintenance and operation, the cloak of this immunity statute is unavailable, and the Corps must rely on the discretionary function exception for immunity.

However, if at trial, the Government can adduce sufficient proof that it followed the congressional mandate and Plaintiffs cannot or do not demonstrate any defalcation in the design and/or construction of the MRGO, this immunity may apply to those two actions.  There is a paucity of proof that the Corps did not follow the mandate in the actual **design** or **building** of the MRGO.  On the other hand, Plaintiffs have created substantial questions of fact as to whether due care was exercised in the **maintenance and operation** of the MRGO.  As such, this first exception is unavailable to the United States for the purposes of summary judgment.

### B.      Discretionary Function Exception

The discretionary function exception bars claims based on the performance of a discretionary function and has no requirement  to exercise due care.  In fact, the statute specifically dictates that the immunity attaches regardless of whether the discretion is abused. *Lively*, 915 F.2d at 297.  In *Ashford*, the United States Court of Appeals for the Fifth Circuit recently set forth a succinct and workable explanation of the two distinct prerequisites for the application of the discretionary function exception.   In discussing whether the exception applied as a matter of law, the court stated:

We begin with the basics. Generally, sovereign immunity bars suits against the Government; this notion "derives from the British legal fiction that 'the King can do no wrong,' and therefore can never appear as a defendant in 'his' own courts."[Santana-Rosa v. United States, 335 F.3d 39, 41-42 (1st Cir.2003) (internal citation omitted)].  Under the FTCA, however, the Government has waived sovereign immunity for personal injury claims caused by "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his [or her] office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  [28 U.S.C. § 1346(b)(1)].   While the FTCA takes two steps forward in allowing individuals to receive compensation for the negligent conduct of the Government, it takes one step back with the numerous statutory exceptions that limit the circumstances under which individuals may bring suit.  [28 U.S.C.§ 2680].   Perhaps the exception that is the most frequent retreat is the discretionary-function exception, which affords the United States protection against any FTCA claim "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." [28 U.S.C. §2680(a)]. The Supreme Court has added some flesh to that bare-boned statutory skeleton, setting up a two-part test to determine whether the discretionary-function exception has been triggered.  [*United States v. Gaubert,* 499 U.S. 315, 322-23, 111 S.Ct. 1267, 1273-74, 113 L.Ed.2d 335 (1991)].  First, for the exception to apply, the challenged act must involve an element of judgment.  [*Id.* at 322, 111 S.Ct. at 1273]. In other words, the Government needs to establish there was "room for choice" in making the allegedly negligent decision.  [*Id.* at 323, 111 S.Ct. at 1274]. If a "federal statute, regulation or policy" specifically prescribes a course of action for the federal employee to follow, the employee has no choice but to adhere to the directive.  [*Id.* at 322, 111 S.Ct. at 1273]. If the Government can establish that the challenged act involved an element of judgment, step two of the test is met and the discretionary-function exception will apply only if that judgment is of the kind that the exception was designed to shield.  [*Id.* at 322-23, 111 S.Ct. at 1273-74].

*Ashford,* 511 F.3d  at 505 (5th Cir. 2007).   Indeed, the Supreme Court case law interpreting the

discretionary function exception unequivocally denies the Government its protection where the

actions are unauthorized because they are unconstitutional, proscribed by statute or exceed the

scope of an official's authority.  *Castro v. United States,* C.A. No. 0740416, Feb. 27, 2009

(revised edition), *citing Thames Shipyard & Repair Co. v. United States,* 350 F.3d 247, 254 (1st

Cir. 2003).

Accordingly, the second inquiry focuses on whether that judgment or choice is based on considerations of public policy.  As stated in *Berkovitz v. United States*, 486 U.S. 531 (1988), "'The basis for the discretionary function exception was Congress' desire to 'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'  *United States v. Varig Airlines* [467 U.S.] at 814."  *Berkovitz* 486 U.S. at 537.  "The discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment."  *Id.*

However, the Fifth Circuit specifically rejected the Government's contention:

that if Government activity involves conduct that is rooted in policy, the discretionary function exception bars a cause of action based on that conduct unless the Government employee violated a mandatory regulation that restricts his discretion or judgment.  Under this interpretation two types of activity would fall within the exception: violations of specific, mandatory regulations or statutes and ordinary common law torts where the exercise of discretion is not based on policy considerations.

*Lively*, 870 F.2d at 299.  The exception is not so limited.  The appellate court found that such an interpretation:

would subsume the FTCA: virtually any decision to act or not to act could be characterized as a decision grounded in economic, social or public policy and, thus, exempt.  Although we construe the exception broadly, we have never construed it so that the exception swallows the rule.  We therefore reaffirm our holding that in determining whether the discretionary function exception applies,

14

we examine the nature and quality of the activity to determine if it is the type that Congress sought to protect.

*Id.*

1.    **First Issue–Whether a Federal Statute, Regulation or Policy Specifically Prescribes a Course of Action for the Corps such that It Had No Choice But To Comply with that Statute, Regulation or Policy**

As noted above, Plaintiffs have based their Motion for Partial Summary Judgment on the argument that the Corps violated a number of mandates which deprives the Corps of the immunity of the discretionary function exception in the first instance.  The Court will now examine each alleged defalcation.

a.    **Fish and Wildlife Coordination Act**

The Fish and Wildlife Coordination Act was enacted in 1934 and codified at 16 U.S.C. § 662.  In 1946, Congress amended the bill to provide:

> Whenever the waters of any stream or other body of water **are authorized** to be impounded, diverted, or otherwise controlled for any purpose whatever by any department or agency of the United States, . . such department or agency first shall consult with the Fish and Wildlife Service. . . .

1946 Amendment to the Fish and Wildlife Coordination Act of August 14, 1946, § 1, ch. 965, 60 Stat. 1080 (1946) ("FWCA") (emphasis added).  This language indicates the requirement to consult  was triggered by authorization.

The Corps issued its Chief's Report to Congress in 1951.  Congress acted on that report in 1956 when it authorized construction  of the MRGO.  *See* Pub. L. No. 84-455, 70 Stat. 65 (1956).  That  legislation provided in its entirety as follows:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the existing project for Mississippi River Baton Rouge to the Gulf of Mexico is hereby modified to provide for the Mississippi River-Gulf Outlet to be prosecuted under the direction of the Secretary of the Army and supervision of the Chief of Engineers, substantially in accordance with the recommendation of the Chief of Engineers contained in House Document Numbered 245, Eighty-second Congress, at an estimated cost of $88,000,000: *Provided*, That when economically justified by obsolescence of the existing industrial canal lock, or by increased traffic, replacement of the existing lock or an additional lock with suitable connections is hereby approved to be constructed in the vicinity of Meraux, Louisiana, with type, dimensions, and cost estimates to be approved by the Chief of Engineers: *Provided further,* That the conditions of local cooperation specified in House Document Numbered 245, Eighty-second Congress, shall likewise apply to the construction of said lock and connection channels.

Approved March 29, 1956.

*Id.* This authorization triggered the requirement to consult under the FWCA.

In 1958, the FWCA was further amended to provide:

(a) Except as hereafter stated in subsection (h) of this section, whenever, the waters of any stream or other body of water are **proposed or authorized** to be impounded, diverted, **the channel deepened or the stream or other body of water** otherwise controlled **or modified** for any purpose whatever, **including navigation and drainage,** by any department or agency of the United States, or by any public or private agency under Federal permit or license, such department or agency **first shall consult with the United States  Fish and Wildlife Service and such State agency for the purpose of determining means and measures that should be adopted to prevent the loss of or damage to such wildlife resources and improvement of such resources, shall be made an integral part of any report prepared or submitted by any agency of the Federal Government responsible for engineering surveys and construction. . . .**.

**In furtherance of such purposes, the reports and recommendations [of those authorities] . . . shall be made an integral part of any report prepared or submitted by any agency of the Federal Government responsible for engineering surveys and construction of such projects when such reports are presented to the Congress** or to any agency or person having the authority or power, by administrative action or otherwise, (1) to authorize th e construction of water-resource development projects or **(2) to approve a report on the modification or supplementation of plans for previously authorized projects, to which this Act applies**. . . . The reporting officers in the project reports of the Federal agencies shall give full consideration to the reports and recommendations

of the Secretary of the interior and to any report of the State agency of the wildlife aspects of such projects, and the project plan shall include such justifiable means and measures for wildlife purposes as the reporting agency finds should be adopted to obtain maximum overall project benefits.

FWCA, §2(a)-(b), 72 Stat. 563, 564 (1958) (codified at 16 U.S.C. § 662(a)-(b) (emphasis added).

The legislative history set forth in the Senate Report of July 28, 1958, demonstrates that

the purpose of the amendment was indeed to improve upon failures found in the 1946 law:

. . . Despite the considerable accomplishments under the 1946 Coordination Act, the results have fallen far short of the results anticipated by the conservationists who sponsored the 1946 law.  The limitations and deficiencies of the act will not permit the Fish and Wildlife Serve and the State Fish and Game Department to accomplish the objectives of fish and wildlife conservation and river basin development that are clearly essential if we are to preserve our fish and wildlife resources on a scale demanded by the people of the nation.

**Principally the 1947 Act does not provide clear, general authority for the federal agencies who contract water-resource projects to incorporate in project construction and operation plans the needed measures of for fish and wildlife conservation.**  The Act is mainly concerned with compensatory measures to mitigate the loss of or damage to fish and wildlife resources; **it contains no clear authority to permit the planning of installations of appropriate means and measures to take advantage of opportunities provided by water projects for enhancement or improvement for fish and wildlife resources.**

Existing law is of questionable application to many authorized projects, a very serious shortcoming.  The Corps of Engineers, for example has a backlog of 650 active authorized projects with an estimated cost of about $6 billion on which construction has not yet started.  Many of these cover vast areas, containing some of the most important fish and wildlife resources of the nation. . . . Most of these projects have never been investigated from the standpoint of their effects on Fish and wildlife Resources.  Many of them were authorize 15 or 20 years ago or more.

**It would make good sense to have the policies and procedures of the Coordination Act applicable to them in order that the wishes of the Congress in enacting the 1946 statute and the proposed amendments can be observed.**

. . .

**Existing law has questionable application to projects of the Corps of Engineers for the dredging of bays and estuaries for navigation and filling purposes. . .this is a particularly serious deficiency from the standpoint of**

**commercial fishing interest**.  The dredging of these bays and estuaries along the coastlines to aid navigation and also to provide land fills for real estate and similar developments, . . . has increased tremendously in the last 5 years. Obviously, dredging activity of this sort has a profound disturbing effect on aquatic life, including shrimp and other species of tremendous significance to the commercial fishing industry. . . .

 **The amendments proposed by this bill would remedy these deficiencies** and have several other important advantages.  The Amendments, would provide that wildlife conservation shall receive equal consideration with other features in the planning of federal water resource development programs. this would have the effect of putting fish and wildlife on the basis of equality with flood control, irrigation, navigation, and hydroelectric power in our water resource programs, which is highly desirable and proper, and represents an objective long sought by conservationists of the nation.

1958 U.S.C.C.A.N. 3446, 3449-3450, s. Rep. No. 85-1981 (1958) (emphasis added).

This language eviscerates Plaintiffs' argument  that the language of the 1946 version of FWCA mandated that the Corps consult with the Fish and Wildlife Service and the head of the agency exercising administration over the wildlife resources in Louisiana during the project's initial planning–that is prior to submission of its 1951 MR-GO Report to Congress and prior to the passage of the enabling legislation in 1956.  The clear language of the 1946 version mandates that consultation was not required prior to authorization.   Thus, there was no legal requirement to consult prior to authorization in 1956.

From the period of 1956 when the MRGO project was "authorized" through the passage of the 1958, the 1946 language indicates that consultation was necessary considering that the requirement to consult was triggered upon the authorization"to impound, divert, or otherwise control any for any purpose whatever by any department or agency of the United States any stream or other body of water."  Pretermitting whether the above-cited legislative history for the 1958 amendments raises a question as to whether this "mandate" applies to what was a dredging activity–the dredging of wetlands to recreate a navigational channel, Plaintiffs have not

18

presented sufficient evidence to call into question any alleged non-compliance during this period

of time.        The documents provided by Plaintiffs and the United States demonstrate that the

Corps indeed did consult with the U.S. Fish and Wildlife Service as provided for in 1946 Act in

the  post-authorization mode prior to the 1958 Amendment in the fall of that year.  Exhibit  8 of

Plaintiffs' Motion (Doc. 16510) is a letter from the Secretary of the United States Department of

the Interior to the Secretary of the Army dated September 23, 1957 stating that The United States

Fish and Wildlife Service was initiating its investigation.  Exhibit 7 of Plaintiffs' Motion

provides  a preliminary draft of *An Interim Report on Fish and Wildlife Resources as Related to*

*Mississippi River-Gulf Outlet Project, Louisiana and An Outline of Proposed Fish and Wildlife*

*Studies, An Interim report on Fish and Wildlife Resources as Related to Mississippi River-Gulf*

*Outlet Project, Louisiana and An Outline of Proposed Fish and Wildlife Studies,* prepared in

April of 1958.  In the report, the U.S. Fish and Wildlife Service noted that this work was in

accordance with the District Engineer's January 10 letter which "establishes the need and

presents . . . plans for further fish and wildlife studies upon which to base recommendations

designed to conserve the resource."   See Plaintiffs' Ex. 7 to Doc. 16510 at 2 (*An Interim Report*

*on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana*

*and An Outline of Proposed Fish and Wildlife Studies,* April 1958).

A review of these documents indicate that the process may have been skewed.  Indeed, in

a press release issued on September 26, 1957 by the United States Fish and Wildlife Service the

aforementioned letter is discussed as follows:

> Mr. Seaton [the Secretary] emphasized the project had never been
> investigated by fish and wildlife conservation agencies as contemplated by the
> wildlife Coordination Act of 1946.  However, as he stated, the United States Fish
> and Wildlife Service of the Department of the Interior is now initiating such

> investigations with funds transferred by the Corps of Engineers. Since these
> investigations are so far behind the stage reached in the engineering
> investigations, Secretary Seaton asked Secretary Brucker to take the necessary
> steps to have the Corps of Engineers bring the investigation of all phases of this
> project into balance.

(Plaintiffs' Exhibit 25, Press Release of September 26, 1957). While it is disquieting to see that

environmental concerns may have not had much sway, this decision was not contrary to a

mandate as required for the Corps to lose the discretionary function exception under the first test.

Likewise, there is ample evidence in the MRGO design documents that post-

authorization coordination occurred. In particular in the General Design Memorandum No. 2

("GDM 2") (Exhibit 12, p. 14 and 24), paragraph 33 and paragraph 61 detail on-going

discussions between the two agencies. In fact, in August of 1957, the U.S. Fish and Wildlife

Service and the Louisiana Wildlife and Fisheries Commission were fully appraised of the status

of planning by the Corps. Note is made there of the Service's preliminary report of April 1958.

Subsequently there were a number of conferences held between the two agencies–the

Corps and the Service. In fact, certain recommendations were made by letter dated 5 January

1959. The recommendations for mitigating losses in the area between Paris Road and Bayou

Dupre "were essentially complied with in the plan for construction." (Plaintiffs' Exhibit 12, ¶

61). More recommendations are noted and the Corps committed to incorporating plans to

mitigate losses in this document.

Nonetheless, the Corps did reject a proposal "to delay the construction of the canal from

Pais Road through the marsh and sound areas until the fish and wildlife studies were completed"

and that "a dike be constructed on the northeast side of the project rights of way when, or if,

future studies reveal that fish and wildlife habitat northeast of the channel alignment is

deteriorating as a result of project construction." (Exhibit 13, ¶¶ a and f). This latter rejection was noted as not being applicable at this time.

Plaintiffs also argue that the Corps failed in its reporting obligations because it failed to detail any of the Service's concerns in the Annual Reports of the Chief of Engineers on Civil Works Activities from 1958 through 2005. (Plaintiffs' Exhibit 121). Plaintiffs contend that "the Corps supplied Congress with progress reports of the MR-GO's construction, the costs incurred to date, and the percentage of completion" but did not include any mention of the Service's predictions and recommendations to mitigate the environmental devastation from the construction of MRGO. However, the Court does not read the 1958 amendments so broadly. It only requires inclusion of such information to Congress in the context of FWCA when any report is prepared by the Corps when such reports are presented to the Congress (1) to **authorize** the construction of water-resource development projects or (2) to **approve a report on the modification or supplementation of plans for previously authorized projects**, to which this Act applies. The interpretation offered by Plaintiffs is, simply put, unfounded. Plaintiffs have not presented any evidence that any report of this nature was actually filed by the Corps and that such a report did not contain the required materials.

Based on the foregoing, the Court finds that the first prong of the discretionary function exception is satisfied with respect to the FWCA. The Court will now turn to NEPA.

### b.      National Environmental Policy Act ("NEPA")

### I. The Regulatory Scheme

Plaintiffs allege the following violations of NEPA's mandate:

(a)   failing to prepare mandatory detailed EISs within 30 days of authorizing legislation in 1976, 1986, and 1996;

(b)   failing to prepare detailed EISs for requests for appropriations from 1970 through 1979;

(c)   violating Executive Order 11990 Relative to NEPA;

(d)   failing to prepare the 1976 EIS in compliance with NEPA; and

(e)   failing to file Supplemental EISs when necessary.

In order to provide context to these allegations, a general review of the regulatory scheme is required.

NEPA embodies "a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 347 (1989) *citing* 42 U.S.C. § 4331. In *O'Reilly v. United States Army*, 477 F.3d 225 (5th Cir. 2007), the appellate court succinctly reviewed NEPA's framework, terminology and objectives.

> "NEPA . . . was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 756, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) (quoting 42 U.S.C. § 4321). Instead of mandating particular environmental results, NEPA "imposes procedural requirements on federal agencies, requiring agencies to analyze the environmental impact of their proposals and actions." *Coliseum Square Ass'n, Inc. v. Jackson,* 465 F.3d 215, 224 (5th Cir.2006) (quoting *Pub. Citizen,* 541 U.S. at 756-57, 124 S.Ct. 2204).

*O'Reilly*, 477 F.3d at 228.

The lynchpin of the NEPA as set forth in  § 4332(C) requires all agencies of the Federal government to:

> (C) include in every recommendation or **report on proposals for legislation** and **other major Federal actions significantly affecting the quality of the human environment**, a detailed statement by the responsible official on–

>       (I) the environmental impact of the proposed action,
>       (ii) any adverse environmental effects which cannot be avoided
> should the proposal be implemented,
>       (iii) alternatives to the proposed action,
>       (iv) the relationship between local short-term uses of man's
> environment and the maintenance and enhancement of long term
> productivity, and
>       (v) any irreversible and irretrievable commitments of resources
> which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C); *see also  Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 224 (5th

Cir. 2006).  This mandated detailed report, known as an Environmental Impact Statement or

"EIS," serves a dual purpose:

> It ensures that the agency, in reaching its decision, will have available, and will
> carefully consider, detailed information concerning significant environmental
> impacts; it also guarantees that the relevant information will be made available to
> the larger audience that may also play a role in both the decision making process
> and the implementation of that decision.

*Robertson*, 490 U.S. at 349.   Thus, as stated early on in the case law concerning NEPA:

> Environmental impact statements are not confidential or internal documents for
> agency eyes alone. . . .,  'NEPA was intended not only to insure that the
> appropriate responsible official considered the environmental effects of the
> project, **but also to provide Congress (and others receiving such
> recommendation or proposal) with a sound basis for evaluating the
> environmental aspects of the particular project or program.'**  [ *Save Our Ten
> Acres v. Kreger*,] 472 F.2d at 466.

*Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army*,  492 F.2d 1123, 1140 (5th

Cir. 1974) (emphasis added).


### *EIS*

Federal agencies receive guidance in their preparation of an EIS from the Council of

Environmental Quality ("CEQ").   "Established by NEPA with the authority to issue regulations

interpreting that statute, the CEQ has promulgated regulations determining what actions are subject to that statutory requirement."  *Coliseum Square Ass'n*, 465 F.3d at 224 *citing* 40 C.F.R. § 1500.3; *see also Pub. Citizen,* 541 U.S. at 757, 124 S.Ct. 2204.

As noted, NEPA requires an agency to produce a full EIS only where the agency proposes to undertake a project that qualifies as a "major Federal action[ ]," and then only when that action "significantly affect[s] the quality of the human environment."  *O'Reilly*, 477 F.3d at 228 *citing* 42 U.S.C. § 4332(2)(C) and *Coliseum Square,* 465 F.3d at 228. The CEQ regulations provide definitions for a number of these determinative terms.

### Major Federal Action

 CEQ defines a "[m]ajor Federal action" as "actions with effects that may be major and which are potentially subject to Federal control and responsibility."  The relevant regulation continues:

> (a) **Actions include new and continuing activities, including projects** and programs entirely or partly **financed,** assisted, **conducted**, regulated or approved **by federal agencies**; **new or revised agency** rules, regulations, **plans**, policies, or procedures; and legislative proposals (§§1506.8, 1508.17). . .

> (b) **Federal actions tend to fall within one of the following categories:** . . .

> (3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

> (4) Approval of specific projects, such as construction or management activities located in a defined geographic area.  Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

24

40 C.F.R. § 1508.18 (emphasis added).  Thus, the need for an EIS may arise where a continuing activity causes significant effects with respect to a specific construction project in a defined geographic area.

### Significantly

The regulations also provide a definition for the term "significantly" which states in relevant part:

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) *Context*. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. **For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.**

(b) *Intensity*. This refers to the **severity of impact**. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. **A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.**

(2) The degree to which the proposed action **affects public** health or **safety.**

(3) **Unique characteristics of the geographic area such as** proximity to historic or cultural resources, park lands, prime farmlands, **wetlands,** wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) **The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.**

25

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) **Whether the action is related to other actions with individually insignificant but cumulatively significant impacts**. **Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.**

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27 (emphasis added).   Thus, parsing this regulation,  an action could be considered "significant" where the "context" is (a) localized and (b) has long-term effects and where the "intensity level"  is determined to be severe (c) by balancing  beneficial versus adverse effects noting that even if the balance of the effects are considered beneficial, if they are severe a report is mandated, (d) by determining whether it would effect a unique characteristic of the geographic area such as wetlands, (e) by ascertaining whether it  involves uncertainty or unknown risks to the human environment and (f) by determining whether one would reasonably anticipate a cumulatively significant impact on the environment.

*Cumulative Impact and Improper Segmentation*

"Cumulative impact" is also defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. In applying this regulation, the Fifth Circuit instructs that " a consideration of cumulative impacts must also consider '[c]losely related and proposed or reasonably foreseeable actions that are related by timing or geography." *O'Reilly*, 477 F.3d at 234-35, *citing Vieux Carre Prop. Owner, Residents & Assoc., Inc. v. Pierce*, 719 F.2d 1272, 1277 (5th Cir. 1983).

For instance in *O'Reilly*, the residents of a Louisiana parish affected by dredging and filling of wetlands by a private land developer sued the Corps challenging its issuance of a finding of no significant impact (FONSI) (*See* discussion *infra* re:  EAS) with the issuance of a permit to dredge.  In that case, the Court found that the Corps, prior to the request to dredge at issue therein, had already issued 72 permits within a three mile radius of the proposed development covering a total of 18,086.4 acres of which 400.9 were wetlands.  *Id*. at 235.  In the EA, the Corps stated how "fragmentation" of the wetlands can occur resulting in increased environmental pressures; that there could be a major cumulative impact as a result of all of the dredging if the local population did not become more "pro-active" and acknowledged that this was only the first phase of a project that might have as many as three phases.  The appellate court noted, "Such language would seem to warrant a finding of significance, but instead the Corps states, without any exposition, that 'mitigation for impact caused by the proposed project, possible future project phases, and all Corps permitted projects will remove or reduce e[x]pected

impacts.'" The court then found that this bare assertion without an explanation of the basis for it rendered a finding that the Corps had acted arbitrarily in the issuance of that EA.

A "separate-but-similar" concern is "improper segmentation" which occurs when "federal agencies may plan a number of related actions but may decide to prepare impact statements on each action individually rather than prepare an impact statement on the entire group. This decision creates a 'segmentation' or 'piecemealing' problem." *O'Reilly,* 477 F.3d at 236 n. 10. "An analysis of improper segmentation, however, requires that where 'proceeding with one project will, because of functional or economic dependence, foreclose options or irretrievably commit resources to future projects, the environmental consequences of the projects should be evaluated together." *Id.* at 236, *citing* Daniel R. Madnelker, *NEPA Law and Litigation* §9:11 (2006).

> The commentator noted that with respect to cumulative impacts:
>
> A common example is a highway planned to connect two cities which the highway agency divides into two segments. It then prepares an impact statement covering only the first segment, which does no create environmental problems. The second segment does create environmental problems because it goes through a wilderness area. An objection may be made that by preparing an impact statement only on the first segment the highway agency has committed itself to a continuation of the highway through the wilderness area. If the highway agency had considered both segments together, it could have considered the cumulative impact of the highway on the wilderness area. It could have also considered a location for the highway that would have avoided the wilderness area. The segmentation of the highway in this example has allowed the highway agency to subvert NEPA's purposes.

Daniel R. Madnelker, *NEPA Law and Litigation* §9:11.

*EAS*

28

The regulations further provide a vehicle for an agency to prepare a less vigorous report which is not sent to Congress known as an Environmental Assessment (EA) where the proposed action is neither "categorically excluded from the requirement to produce an EIS **nor would clearly require the production of an EIS.**  See §§ 1501.4(a)-(b)."  *Department of Transp. v. Public Citizen*, 541 U.S. 752, 757-58 (2004) (emphasis added).  The Supreme Court in *Public Citizen* continued:

> The EA is to be a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." § 1508.9(a). If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a "finding of no significant impact" (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment. See §§ 1501.4(e), 1508.13.

*Id.*  The *O'Reilly* case demonstrates that an EA can be insufficient if indeed the circumstances clearly require the production of an EIS or a SEIS because of the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions" such as the continual dredging of the MRGO.

### Supplemental Statements

> "[An] agency bears a continuing obligation to update its environmental evaluation in response to substantial changes to the proposed action or significant new circumstances. 40 C.F.R. § 1502.9(c)(1) (1992).  The results of this later evaluation are published in a supplemental environmental impact statements ("SEIS").  Based on the findings of the SEIS, the agency must consider anew whether to proceed with the proposed project.

*West Branch Valley Flood protection Association v. Stone*, 820 F. Supp 1, 5-6  (D.C. 1993); *Association Concerned About Tomorrow, Inc. v. Dole*, 610 F. Supp. 1101, 1112 (N.D. Tex. 1985).  That process is triggered when"new information presents a '*seriously* different picture of

the environmental landscape' such that another in-depth look at the environment is necessary."

*Id.*, *citing Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984).   Section § 1502.9 (c)(1)

of the regulations instructs agencies on the on the procedures supplemental statements.   It states:

> (c) Agencies:
> > (1) **Shall** prepare **supplements** to either draft or final environmental impact
> > statements if:
> > > (I) The agency makes **substantial changes in the proposed action** that
> > > are relevant to environmental concerns; or
> > > (ii) there are **significant new circumstances or information relevant to
> > > environmental concerns and bearing on the proposed action or its
> > > impacts.**

40 C.F.R. § 1502.9(c)(1) (emphasis added).

In *Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 557-58 (2000),the Ninth Circuit

noted that in view of NEPA's purpose:

> an agency that has prepared an EIS cannot simply rest on the original document.
> The agency must be alert to new information that may alter the results of its
> original environmental analysis, and continue to take a "hard look at the
> environmental effects of [its] planned action, even after a proposal has received
> initial approval." [*Marsh v. Oregon natural Resources Council*, 490 U.S. 360, 374
> (1989).](citations and quotations omitted).  It must "ma[ke] a reasoned decision
> based on . . . the significance–or lack of significance–of the new information,"*Id.*
> at 378*,* and prepare a supplemental EIS when there are "significant new
> circumstances or information relevant to environmental concerns and bearing on
> the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).  "If there
> remains major Federal action to occur, and the new information is sufficient to
> show that the remaining action will affect the quality of the human environment
> in a significant manner or to a significant extent not already considered, a
> supplemental EIS must be prepare." *Marsh*, 490 U.S. at 374.

*Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 556-58 (2000) (footnote omitted);  *Blue*

*Montains Biodiversity Project v. United States Forest Service*, 229 F.Supp.2d 1140, 1147-48 (D.

Or.2002).  Moreover, "an agency is not free to ignore the possible significance of new

information.  Rather, NEPA requires that the agency take a "hard look" at the new information to

determine whether a SEIS is necessary."  *Blue Mountains*, 299 F.Supp.2d at 1148,*citing*

*Headwaters v. BLM,* 914 F.2d 1174, 1177 (9th Cir. 1990).


### *Appropriations Not Included in NEPA Requirements*

As to the reporting requirements, clearly appropriation bills do not constitute

"legislation" under the NEPA rubric.   In *Andrus v. Sierra Club*, 422 U.S. 347 (1979), the

Supreme Court discussed the requirements concerning the filing of EISs in the context of

"proposals for legislation and other major Federal actions" as found in 42 U.S.C. § 4332(2)(C).

The issue presented in that case was whether appropriation requests are "proposals for

legislation" as contemplated under NEPA.  In reaching their conclusion that the relevant statute

does not require an EIS to accompany appropriation requests, the Court provided an insightful

history of the regulations.

In 1970, President Nixon ordered CEQ to issue guidelines concerning NEPA.  *Id.* at 357

n. 15.  The guidelines, were promulgated in 1970 and revised in 1971 and 1973,  included

"appropriations" in the terminology requiring an EIS, but these guidelines were advisory in

nature. *Id.*  However, in 1977 President Carter ordered the creation of a single set of uniform

mandatory regulations which are now codified at 40 C.F.R. §§ 1500-1518.  The new regulation

provides, specifically, *"Legislation* includes a bill or legislative proposal to Congress developed

by or with the significant cooperation and support of a Federal agency, but does not include

requests for appropriations."  40 C.F.R. § 1508.17.  In addition, this provision requires only the

agency which has primary responsibility for the subject matter has the responsibility to prepare

the EIS. *Id.*

31

**ii.  Context of Court's Inquiry**

In the case before us, the posture is not one where the Court is reviewing the appropriateness of the Corps' EISs, EAS and FONSIs under the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.*  Instead, the Court must determine whether the actions or non-actions of the Corps in the context of the MRGO were of a nature such that the first test in the discretionary function exception inquiry precludes its application–that is whether NEPA and the regulations cited above prescribes a course of action for the Corps such that it had no choice but to produce an EIS or SEIS with respect to a number of individual actions in took.

The Corps argues that the very nature of the decisions involved in this process demonstrates that the first prong of the discretionary function exception is met–that is that it has discretion to decide whether or not to issue and EIS or EA.  They argue:

> While an agency's determination regarding whether a proposal for legislation or other major Federal action significantly affects the quality of the human environment is subject to judicial review under the standards prescribed by the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), such a determination cannot be second-guessed in the context of a tort suit against the United States.  *See Baie v. Secretary of Defense*, 784 f.2d 1375, 1376 (9th Cir. 1986),

(United States of America's Response to the Supplemental Brief on NEPA Submitted by Plaintiffs and Their Amici, Doc. 17624 at 4).  However, the case on which the Government relies is clearly distinguishable.

In *Baie*, a retired serviceman sought to recover under the FTCA the cost of surgery for a penile implant that had been denied by CHAMPUS, a government agency.  The reimbursement request was denied because the agency found that the "the surgery was not medically necessary; that the penile implant procedure did not constitute treatment of a medical or surgical condition; that the penile prosthesis was a specifically excluded prosthetic device; and counseling for

32

sexual dysfunctions was also specifically excluded as a CHAMPUS program benefit." *Id.* at 1376. The court indeed found that seeking monetary redress under the FTCA for the alleged abuse of discretion by the Assistant Secretary of Defense (Health Affairs) in denying these claims was improper. The court stated:

> The legislative history of the FTCA makes it clear that Congress did not intend that "the constitutionality of legislation, or the legality of a rule or regulation should be tested through the medium of a damage suit for tort." . . . The Assistant Secretary's interpretation of the statute is a plainly discretionary administrative act the "nature and quality" of which Congress intended to shield from liability under the FTCA.

*Id.* (citations omitted). Reliance on this case is squarely misplaced. Plaintiffs here do not seek redress in tort for money damages for the failure to prepare allegedly required EISs or SEISs. Plaintiffs seek damages for the Corps' alleged defalcations concerning the design, construction, maintenance and operation of the MRGO.

Likewise, the case law cited for the proposition that decisions to file EISs, EAS and the like are committed to the judgment of the agency is clear and uncontroverted. *Kleppe v. Sierra Club*, 427 U.S 390 (1976); *Sabine River Auth. v. United States Dep't of Interior*, 951 F2d 669, 677-78 (5th Cir. 1992). However, that is not the inquiry before this Court. Plaintiffs have presented substantial evidence that the Corps itself internally recognized that the MRGO was causing significant changes in the environment–that is the disappearance of the adjacent wetlands to the MRGO. The Corps cannot ignore the dictates of NEPA and then claim the protection of the discretionary exception based on its own apparent self-deception.

This analysis is supported in *Adams v. United States*, 2006 WL 3314571 (D. Idaho Nov. 14, 2006) (Winmill, J.). In a suit concerning the use of Oust, a herbicide, over 70,000 acres of

land for a particular project which apparently caused damage to plaintiffs, the Bureau of Land

Management's (BLM) filed a motion to dismiss based on the discretionary function exception.

The Court noted:

> Applying an herbicide with its attendant risks [decreased reproductive success
> noticed in rats and slightly toxic to aquatic organisms] to over 70,000 acres of
> land has the potential to be a "major Federal action significantly affecting the
> quality of the human environment," *see* 42 U.S.C. § 1501.4, and perhaps a full
> EIS.  *See Ramsey v. Kantor*, 96 F.3d 434, 442-43 (9th Cir. 1996).  Indeed that is
> why the BLM prepared an EIS in 1991 that examined the use of herbicides other
> than Oust on rangeland covering a three state area. . . .
>      The BLM's failure to comply with NEPA meant that the agency had no
> discretion—it could not proceed until it complied with NEPA. . . .
>      Finally, the BLM argues that NEPA provides no private right of action.
> This misperceives plaintiffs' use of NEPA.  they use it not to recover any remedy
> but to argue that the BLM was under a mandatory duty.  That is not an improper
> use of NEPA.

*Id.* at *1-2.  Furthermore, as demonstrated above, the NEPA mandates are clear and

unambiguous.  There is no basis to argue that the mandate is a "general guideline" such that non-

compliance would bar the discretionary function exception.   *See Hughes v. United States*, 110

F.3d 765 (11th Cir. 1997) (general postal service guidelines concerning security of post office do

not constitute mandate);  *Autery v. United States,* 992 F.2d 1523 (11th Cir. 1993) ("saving and

safeguarding of human life takes precedence over all other park management activities"

guideline is too broad to be considered mandate); *Zumwalt v. United States*, 928 F.2d 951 (10th

Cir. 1991) (Management Policies and  Project Statements by National Park Service constituted

general guidelines with non- placement of warnings along "natural state" monument).

Squarely stated, where there is evidence that the Corps itself knew, recognized and even

internally reported that there had been or would be significant impact on the wetlands adjacent to

Lake Borgne and the MRGO, the Court must find that the Corps failed to follow a mandate or a

prescribed course of action rendering the discretionary function inapplicable to those actions. Stated another way, where there is evidence that the Corps itself had made findings which per se triggered the mandates of these regulations, the Corps' argument falls flat. To embrace the Corps' argument would make the exception swallow the rule.

### iii.   Documents Raising Issue of Fact Concerning Failure to Follow Mandate

Plaintiffs have presented a number of documents apparently demonstrating the Corps' knowledge concerning the effects of the dredging of the MRGO that rendered a waterway that was to be 650 feet in width into one that was 1500 by 1987 and had caused the decimation of the adjacent wetlands.

### *Digest of Water Resources Policies and Activities, December 1972*[9]

In Chapter 19 entitled "Wetlands Conservation" at ¶ 19-3, the Corps' own policy states:

19-3.   Evaluation of Proposed Alterations.   A single proposed alteration of wetlands may, in itself, constitute a minor change. However the cumulative effect of numerous small changes can eventually impair the wetland ecology of large areas. A specific proposal in or on a wetland should be evaluated in recognition of the complete and interrelated wetland area of which it is a part. Studies relevant to environment impacts apply. (ER 1105-2-507).

Oddly, it appears from the following documents that this mandate, as well as NEPA, was simply ignored in the context of the continued dredging that was undertaken in the channel.

### *1976 FEIS*[10]

---

[9] Plaintiffs' Motion, Exh. 26.

[10] Plaintiffs' Motion, Exh. 63

The "Final Composite Environmental Statement for Operation and Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity, Louisiana" Final Environmental Impact Statement ("FEIS") issued as an administrative action in March 1976 focused on the maintenance and operation of the MRGO which as the result of sediment, required substantial dredging. It noted that:

> (2) Channel bank erosion.  The channel was originally dredged with one vertical to two horizontal feet side slopes.  Slopes tend to erode near the top and fill near the bottom as they come to equilibrium angle of repose. **Since construction, the distance between the banks visible above the waterline has increased.  Channel bank erosion has been a significant source of sediment in the channel through the land area.**

> (3) Other sediment sources.  The proportion of sediment coming in from adjacent waters is not yet clearly defined.  Prior to construction, Lake Borgne had no major western inlet-outlet of the magnitude now provided by the MR-GO. **Channels between the MR-GO and  Lake Borgne are eroding westward at a rate of about 4.5 feet per year (Department of the Army, 1974 E.)** Some of these sediments from Lake Borgne may be entering the MR-GO. . . . another sediment source is the marsh material released by marsh deterioration.  this material may be transported to the MR-GO by tidal action, storms, and hurricanes.

(FEIS 1976, at I-6) (emphasis added).

In the comments received by the Corps to the Draft EIS, the Environmental Protection Agency noted  that the draft statement should discuss the associated long term project induced impacts resulting form the construction of the MRGO, specifically the loss of 23,000 acres of marsh. (FEIS 1976, at IX-12).  In response the Corps simply stated that this report was solely aimed at the operation and maintenance and was not intended to address impacts of original construction.  (FEIS 1976, at IX-3).  Such an approach seems contrary to the aims and mandates of NEPA as outlined above.

In addition, the Corps referenced the interrelationship of the MRGO and the Lake Pontchartrain and Vicinity Hurricane Protection Plan (LVP) and referenced various locks and barriers that were to be part of the plan that were to deal with the salinity issues–for instance the Seabrook and Rigolets Locks.  (FEIS 1976, at IX-8).   None of these were ever built.

### 1985 SIR[11]

In this filing which was to augment the FEIS which had been filed nine years earlier, the Corps noted that the FEIS had not discussed the need for and the impact associated with the use of over-depth or advanced maintenance.  The Corps in this SIR makes absolutely no mention of the subsidence that has occurred since the "overdepth or advanced maintenance" had been undertaken.  It does not even note that the top-width of the MRGO had increased considerably which, considering that by 1987 it had gone from 600 feet to 1500, must have been the case.  In terms of the "Affected Environments and Impacts," the findings are utterly conclusory in nature and do not mention in any manner the bank erosion that in less than 3 years resulted in specific findings of eminent danger.  This document likewise raises issues of non-compliance with its NEPA mandate in light of *O'Reilly*.

### 1988 Mississippi River-Gulf Outlet, St. Bernard Parish, La., Bank Erosion, Reconnaissance Report [12]

---

[11]Plaintiffs' Motion, Exh. 72.

[12]Plaintiffs' Motion Exh. 83,*1988 Mississippi River-Gulf Outlet, St. Bernard Parish, La., Bank Erosion, Reconnaissance Report* ("1988 Recon Rpt") .

The Corps addressed in this report the options for structural bank erosion abatement along three reaches of "critical" erosion on the north bank of the channel.  The study was authorized by the Committee on Public Works and Transportation of the United States House of Representatives at the request of Representative Robert L. Livingston  "in light of extensive erosion which has been occurring in St. Bernard Parish along the unleveed banks of the Gulf Outlet Channel."

In this document, the Corps notes, "Most of the Mississippi River-Gulf Outlet is experiencing severe erosion along its unleveed banks.  The erosion is a result of both man-induced and natural forces, including combinations of channelization, ship and wind generated waves, storm activity and subsidence." (1988 Recon. Rpt., at 10) . The report notes that the marshes along the north bank are disappearing "at an alarming rate" and continues:

> Because erosion is steadily widening the MR-GO, the east bank along Lake Borgne **is dangerously close to being breached.**  Once the bank is breached, the following **will happen**: sediment from Lake Borgne will flow into the channel resulting in large increases in dredging costs to maintain the channel; **<u>development to the southwest would be exposed to direct hurricane attacks from Lake Borgne</u>**; the rich habitat around the area would be converted to open water; and more marsh would be exposed to higher salinity water.

1988 Recon. Rpt. at 10-11 (emphasis added).

In a section entitled "Future Conditions" and "Land Resources" the Corps stated:

> Based on recent trends, the study area will continue **to experience drastic losses due to erosion.**  The MR-GO east bank along Lake Borgne is dangerously close to being breached. . . .
>
> As the marsh within the project area diminishes, **significant losses to marsh dependent fish and wildlife species will also occur**.  Increases in water levels, resulting from the general rise in sea level and subsidence of the land will enlarge land/water interface and accelerate saltwater intrusion.

1988 Recon. Rpt. at 23 (emphasis added).

38

Discussing "Problems, Needs, and Opportunities", albeit in the context of the effects on wildlife, the Corps wrote:

> Saltwater intrusion also contributes significantly to marsh loss in the study area. Subsidence and lack of sediment deposition affect marsh loss to a lesser degree. Erosion and disintegration of the banks of the MR-GO has created many additional routes for saltwater to intrude into formerly less aline interior marshes. **Consequently, salinity in the marshes has increased significantly in the last 20 years.**

1988 Recon Rpt. at 27 (emphasis added).

In discussing various plans that would be possible to address the bank erosion issue, the Corps stated:

> The unleved banks of the MR-GO will continue to erode in the absence of remedial action. **Currently, banks of the unleved reaches are retreating at rates varying from five to over 40 feet per year. The average rate of retreat of the north bank in the 41-mil land cut portion of the waterway is about 15 feet per year.**

1988 Recon. Rpt. at 30 (emphasis added).

Also, buried in the exhibit is a letter dated 10 March 1988 wherein Col. Lloyd Brown of the Corps suggests to the Commander of the Lower Mississippi Valley Division (LMVD) that they proceed directly with a preparation of a supplement to the General Design memorandum for the MR-GO navigation project. In addition, in the body of the report, it is mentioned that subsidence is at its greatest in the areas that are most often dredged.

> ***Land Loss and Marsh Creation, St. Bernard, Plaquemines, and Jefferson parishes, Louisiana, Feasibility Study, Volume 1, Draft Main Report and Draft Environmental Impact Statement April 1990***[13]

---

[13]Plaintiffs' Motion, Exh. 74.

In this draft report, the final status of which the Court is unaware, the Corps noted, "Between 1956 and 1978, the bird's foot delta experienced a net loss of approximately 67,000 acres of marsh–a loss of more than 100 square miles.  Over this 22-year period the average annual rate of loss in this area was 4.75 acres.

Certainly, all of these positive findings of significant changes in the environment by the Corps itself may have triggered the NEPA mandated requirements.[14]  Clearly, where an agency's own findings and reports demonstrate a positive belief and objective recognition that the environmental impact of a project that requires on-going action, such as dredging for its maintenance, has created a new detrimental circumstance, such as the decimation of an extremely large swath of wetlands,  a SEIS would be mandated.

### iv.  Specific Alleged Violations of NEPA Mandates

It is in the context of these regulations and documents that Plaintiffs maintain that it is entitled to summary judgment on the issue of the Corps' not being entitle to invoke the discretionary function exception based on the Corps failure to adhere to a prescribed a course of action about which the Corps had no choice. As the Court noted above, Plaintiffs contend that the Corps violated its mandatory legal obligations under NEPA by failing to:

(a)     failing to prepare mandatory detailed EISs within 30 days of authorizing legislation in 1976, 1986, and 1996;

---

[14]Another interesting document is a Mary 24, 1988 memo concerning maintenance dredging quantities (Plaintiffs' Motion, Exh. 70).  While this document mentions how the closing of the  MRGO has no effect on hurricane surge, in the same paragraph it discusses how "the storm surge that inundated St. Bernard Parish in 1965 and again in 1969 because of the wind direction during the storm, most likely came from the east across Lake Borgne and the Biloxi Marsh rather than up the MR-GO." (Exh. 70 at NED-192-256-57).  Again, with this statement, was not the Corps on notice of serious problems for hurricane storm surge that would be caused with the marsh that kept Lake Borgne in check?

(b)      failing to prepare detailed EISs for requests for appropriations from 1970 through 1979;

(c)      violating Executive Order 11990 Relative to NEPA;

(d)      failing to prepare the 1976 EIS in compliance with NEPA;

(e)      failing to file Supplemental EISs when necessary.

The Court will now address each of these contentions.


**(a)      Failing to Prepare Mandatory Detailed EISs Within 30 days of Authorizing Legislation in 1976, 1986, and 1996.**

While clearly, the initial authorization of the MRGO was in 1956, Plaintiffs  maintain that there were 3 amendments which would require a new EIS–one in 1976, another in 1986 and finally one in 1996.  The Court will review each of these.

The 1976 amendment contained in section 186 of the Water Resources Development Act of 1976, Pub. Law 94-587, 90 Stat. 2917, 2941-2942 (1976) modified the conditions for local cost sharing with respect to the building of certain bridges.  Clearly, there is nothing in the amendment that would significantly affect the quality of human life.

The 1986 Amendment was contained in section 844 of the Water Resources Development Act of 1986, Pub. Law 99-662, 100 Stat. 4082, 4177 and concerned the lock replacement provision of the original 1956 authorization  and modified it as follows:

> to provide that the replacement and expansion of the existing industrial canal lock **and connecting channels or the construction of an additional lock and connecting channels shall be in the area of the existing lock or at the Violet site,** at a total cost of $714,300,000.  Before selecting the site under the preceding sentence, the Secretary [of the Army] shall consult with affected local communities.

100 Stat. at 4177.  The amendment then details the cost sharing provisions.  It then continues:

> (b) The Secretary is directed to make a maximum effort to assure the full participation of members of minority groups, living in the affected areas, in the construction of the replacement or additional lock and connecting channels authorized by subsection (a) of this section, including actions to encourage the use, wherever possible, of minority-owned firms.  **The Secretary is directed to report on July 1 of each year to the Congress on the implementation of this section, together with recommendations for any legislation that may be needed to assure the fuller and more equitable participation of members of minority groups in this project or others under the direction of the Secretary**.

*Id.*   While it is possible that an EIS might have been required in 1986, Plaintiffs have presented no evidence that would demonstrate that the Corps had recognized that any such change would significantly affect the quality of the human environment.  As such, the motion will be denied in this regard.

It appears that the Corps issued two FONSIs around this time.  In 1985, it issued a FONSI for EA #47[15] where the project is described as a project to control foreshore erosion on the south bank of the MR-GO and found that the impact of it would have negligible impacts on the human environment. In 1986 a FONSI for EA #54[16] which concerned the removal of 800,000 cubic yards of material from the south bank of the MRGO for use in the Lake Pontchartrain and Vicinity Hurricane Protection Plan.  This EA had to do with activity at Paris Road and is unclear what effect this might or might not have had on wetland protection for the adjacent area. Certainly, no discussion of this issue is contained therein.

---

[15]Plaintiffs' Motion Exh. 76.

[16]Plaintiffs' Motion, Exh. 127 (NEPA briefing, Doc. 17356)

The 1996 amendment, which like the 1986 amendment, concerned the IHNC was contained in section 326 of the Water Resource Act of 1996, Pub. Law 104-303, 110 Stat. 3658, 3717.  It provided:

> Section 844 of the Water Resources Development Act of 1986 (100 Stat. 4177) is amended by adding at the end the following:
> "(c)    COMMUNITY IMPACT MITIGATION PLAN–Using funds made available under subsection (a), the Secretary shall implement a comprehensive community impact mitigation plan, as described in the evaluation report of the new Orleans District Engineer dated August 1995, that, to the maximum extent practicable, provides for mitigation or compensation, or both for the direct and indirect social and cultural impacts that the project described in the subsection 9a) will have on the affected areas described in subsection (b)."

Again, while it is possible that an EIS might have been required in 1996, Plaintiffs have presented no evidence that would demonstrate that the Corps had recognized that any such change would significantly affect the quality of the human environment.  As such, the motion will be denied in this regard.

### (b) Failing to Prepare Detailed EISs for Requests for Appropriations from 1970 to 1979

As noted above, the regulations from 1970 to 1979 were advisory in nature and the failure to file an EIS with respect to any appropriation matter would not constitute a violation of a mandate.

### (c) Violating Executive Order 11990 Relative to NEPA

Plaintiffs contend that the Corps violated Executive Order No. 1190–*Protection of Wetlands*–which provides that in furtherance of NEPA and in order to avoid adverse impacts and

new construction in the wetlands, agencies are ordered through the CEQ to modify their

procedures to:

> avoid undertaking or providing assistance for **new construction** located in
> wetlands unless the head of the agency finds (1) that there is no practicable
> alternative to such construction, and (2) that the proposed action includes all
> practicable measures to minimize harm to wetlands which may result from such
> use. . . .

42 Fed. Reg. 29691 § 2 (1977) (emphasis added).  In furtherance of this policy, Section 3

provides that:

> Any requests for new authorizations of appropriations transmitted to the Office of
> Management and Budget shall indicate, if an action to be proposed will be located
> in wetlands, whether the proposed action is in accord with this Order.

*Id.*

However, Section 7(b) defines the term "new construction" as including dredging and

related activities **begun or authorized after the effective date of this Order.** And § 8

specifically states: "This Order does not apply to projects presently under construction or to

projects for which all of the funds have been appropriated through Fiscal Year 1977, or to

projects and programs for which a draft or final environmental impact statement will be filed

prior to October 1, 1977." *Id.*

From the clear language of the Executive Order, it appears that as MRGO's FEIS (which

pertained to Operation and Maintenance) was completed prior to these dates, this Executive

Order was not applicable.

        **d.**      **Failing to Prepare the 1976 EIS in Compliance
with NEPA**

Plaintiffs' maintain that the 1976 FEIS failed to satisfy the mandatory obligation to analyze the direct, indirect but foreseeable and cumulative "environmental impacts significantly affecting the human environment" in the FEIS.  However, it did not purport to do so as described in detail above.  Considering the foregoing, while the decision to segment the 1976 EIS so that it only pertained to maintenance and operation of the MRGO may have been improper, that decision would be at the discretion of the Corps.  No evidence was presented that would demonstrate that the Corps had recognized that this segmentation would significantly affect the quality of the human environment.  As such, the motion will be denied in this regard.

### e. Failing to Supplement its EIS When Necessary

Considering the litany of findings of significant impact of the MRGO as outlined above, the Court finds that Plaintiffs have raised significant questions of fact with respect to the Corps' compliance with this mandate.  This decision is underscored by the 1988 statement that as a result of the wetland loss development to the southwest would be exposed to direct hurricane attacks from Lake Borgne.  Such a statement demonstrates a positive finding by the Corps that removes its "discretion" and mandates the filing of a SEIS.  Moreover, it is clear the Corps knew for a substantial period of time that there were "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1).  A review of the evidence presented leads this Court to believe that the Corps was obdurate and intentionally violated its NEPA mandate.  However, in order that a full record

be made, the Court will not grant the motion at this time and will allow the Corps to adduce evidence to the contrary.

### f.  Improperly Segmenting EAS

Plaintiffs contend that the Corps improperly segmented its filing of EAS since it filed 26 EAS that can be categorized into four categories: eight EAS concerned proposed specific reaches of foreshore protection; four EAS addressed proposals for rebuilding and reconstructing wetlands, marsh and other land loss; the EAS addressed proposals for emergency alternative remedial dredging techniques; and eleven EAS addressed specific incremental mile reaches proposed for dumping dredged material excavated from the MRGO during dredging. Considering the Court's discussion of segmentation above, it does not appear that these kinds of actions are the type contemplated in an improper segmentation analysis.  They do raise questions of fact with respect to a failure to properly these being address in a cumulative environmental effects context.

### g.  Causal Connection to Plaintiffs' Harm

Considering the foregoing exposition of documents, the Court finds that there are considerable questions of fact with respect to the causal connection of the alleged Corps' failures to file the proper NEPA reports and the harm which Plaintiffs' incurred.  One of the main focuses of the case at trial will be whether the storm surge allegedly caused or exacerbated by the loss of the wetlands surrounding Lake Borgne and the widening of the channel caused damage to Plaintiffs that is not subject to §702(c) immunity of the Flood Control Act of 1928. As such, this issue remains for trial.

2.  **Second Issue: Whether the Alleged Defalcations of the Corps were Actions Taken in the Exercise of a Policy Decision and Thus Shielded by the Discretionary Function Exception or Whether the Alleged Defalcations were Ordinary Non-Policy Decisions Concerning Technical, Engineering and Professional Judgments About Safety**

The second inquiry in the application of the discretionary function exception is whether considering the defalcations alleged by Plaintiffs, were any of the alleged improper actions or failures to act based on considerations of public policy.  As previously noted the purpose of the exception it to prevent judicial second-guessing of "legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines* [467 U.S.] at 814."  *Berkovitz* 486 U.S. at 537.

Indeed, in *Berkovitz,* the Supreme Court specifically rejected the argument that "the exception precludes liability for any and all acts arising out of the regulatory programs of federal agencies."  It examined the regulatory scheme under which a polio vaccine was placed into commerce.  First, since the government agency had no discretion to issue a license without first receiving the required test data, and plaintiffs in that case alleged that it had not done so, the Supreme Court found that the discretionary function provided no bar.  *Berkovitz*, 486 U.S. at 543.  Furthermore, to the extent that plaintiffs averred that the agency licensed the vaccine without determining whether the vaccine complied with regulatory standards or after determining that the vaccine failed to comply, there was no basis for the imposition of the exception as the agency had no discretion to deviate from the  mandated procedure.  *Id* at 544. Finally,  the Supreme Court noted that if plaintiffs' claim was that the Government had made a determination in compliance with regulatory standards, but that determination was incorrect, the

"question of the applicability of the discretionary function exception requires a somewhat

different analysis."  *Id.*  The Supreme Court continued:

> In that event, the question turns on whether the manner and method of
> determining compliance with the safety standards at issue involve agency
> judgment of the kind protected by the discretionary function exception.
> **Petitioners contend that the determination involves the application of
> objective scientific standards, . . whereas the Government asserts that the
> determination incorporates considerable "policy judgment."**  In making these
> assertions, the parties have framed the issue appropriately; **application of the
> discretionary function  exception to the claim that the determination of
> compliance was incorrect hinges on whether the agency official making that
> determination permissibly exercised policy choice.**  The parties, however, have
> not addressed this question in detail, and they have given us no indiction of the
> way in which the DBS interprets and applies the regulations setting forth the
> criteria for compliance.  Given that these regulations are particularly abstruse, we
> hesitate to decide the question on the scanty record before us.

*Id..* at 546-47.  With respect to whether the release of the vaccine survived a motion to dismiss,

the Supreme Court noted that the discretionary function act **did prevent suit for the

formulation of policy as to the appropriate way in which to regulate the release of vaccine

lots**; however, "if the [Government's] policy leaves no room for an official to exercise policy

judgment in performing a given act, or if the act simply does not involve the exercise of such

judgment, the discretionary function exception does not bar a claim that the act was negligent or

wrongful."  *Id.*

   As this Court has noted before, the central issue is whether the actions or inactions taken

by the Corps with respect to the design, construction, maintenance, operation and repair of the

MRGO constitute policy decisions that are protected by the discretionary function exception.

Obviously, if at trial the Court were to find that the NEPA violations alleged concerned one or

all of these activities, then the discretionary function exception would not apply as to those

defalcations.  However, assuming that some of the alleged actions were not in contravention of a

specific mandate,  the salient issues to consider as to this second prong of the discretionary

function exception  is whether the Government actor was (1) acting in contravention of its own

regulations or standards or (2)  exercising a policy choice.

      To that end, the Court finds that as concerns the initial design and construction of the

MRGO, these actions are shielded by the discretionary function exception. Clearly, there was no

violation of any mandate and the decisions made were policy driven. However, Plaintiffs have

created substantial questions of fact with respect to  the actions and inactions that followed the

creation of the channel, particularly in light of the documents that demonstrate the knowledge of

the Corps concerning the dangers that the MRGO was creating.  In fact, the most glaring issue

the Court sees is in the context of the state negligence claim itself.  There are substantial

questions of fact as to whether the Corps' failure to warn Congress of the allegedly life

threatening harm which the MRGO had created is the key.  Regardless of the policy issues,

where:

> the Government has undertaken responsibility for the safety of a project, the
> execution of that responsibility is not subject to the discretionary function
> exception.  The decision to adopt safety precautions may be based in policy
> considerations, but the implementation of those precautions is not.  For example,
> in [*Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018 (9th Cir. 1989)],
> where a break in an irrigation canal was at issue, we held that the canal's design
> was protected from liability but that the actual construction was based not on
> policy, but rather on technical considerations, and therefore not subject to the
> discretionary function exception. . . .
>
>     The Government cannot claim that both the decision to take safety
> measures and the negligent implementation of those measures are protected
> policy decisions.  This argument would essentially allow the Government to
> "administratively immunize itself from tort liability under applicable state law as
> a matter of 'policy.'" *McGarry v. United States*, 549 F.2d 587, 591 (9th Cir. 1976)

*Marlys Bear Medicine v. United States*, 241 F.3d 1208 (9th Cir. 2001).  In fact, during oral

argument, the Government stated that if the Corps had been convinced that the MRGO were a

threat to human life, they would have gone to Congress and told them.[17]

Furthermore, the Court finds compelling the  *Marlys Bear Medicine* analysis of the

Government's contention that it does not need to prove it actually considered the policy it

invokes for discretionary function protection, rather it only must demonstrate that the decision is

susceptible to policy analysis.  In *Marlys Bear Medicine*, the Government argued that its

decision not to ensure that adequate safety measures were taken with respect to the training of

loggers was a policy decision due to limited funds.  The appellate court noted that the

Government's logic was based on its having misconstrued the Ninth Circuit's language in *Miller*

*v. United States*, 163 F.3d 591, 593 (9th Cir. 1998) which stated that a "'decision need not be

actually grounded in policy considerations, but must be, by its nature, susceptible to a policy

analysis,'" language that actually comes out of *Gaubert*.  *Marlys Bear Medicine*, 241 F.3d at

1216. The appellate court noted:

> The government misconstrues *Miller* in two fundamental ways.  First our
> inquiry into the nature of a decision is not meant to open the door to ex post
> rationalizations by the Government in an attempt to invoke the discretionary
> function shield.  We have held that the Government has the burden of proving the

---

[17]"I can assure Your Honor if the Corps had been convinced that it was a threat to human life they would have gone to Congress and would have told congress that it was a threat to human lives." (Transcript of Proceeding, p. 30, lines 17-23)Counsel then noted that the Corps did tell Congress that the eastern part of New Orleans was going to be destroyed if there was a major hurricane but that was transmitted in the context of the hurricane protection project.  He then stated:

> And so to say that, well, how can the Corps let this waterway get wider and threaten people?
> where is the policy basis for that?  I say, there is no policy basis for that.  If you want to look at it
> from that angle, there is no policy basis for creating a threat to human lives, but there is a policy
> basis for maintaining a waterway.  And that's what they were doing.  They didn't think they were
> threatening the City of New Orleans.  They realized they were destroying wetlands, but they
> studied wetlands loss and they concluded that that did not threaten the city.  So, the policy
> basis, Your Honor, is the policy basis for what they were engaged in doing.

(Transcript at 81, lines 4-14).

discretionary function exception applies, see *Prescott*, 973 F.2d at 702, and this is not done by mere subjective statements.  There must be a reasonable support in the record for a court to find without imposing its own conjecture that a decision was policy-based or susceptible to a policy analysis.  The passage from *Miller* is a paraphrase of a section of the Supreme Court's opinion in *United States v. Gaubert*, 499 U.S. 315, 324-35, 111 S. Ct. 1267, 1113 L.Ed.2d 335 (1991), addressing cases where "established governmental policy [. . . ] allows a Government agent to exercise discretion."  There was no such established policy here.  Moreover, the quoted language was used illustratively to draw a distinction between protected discretionary activities (*e.g.,* selecting the method of supervising savings and loan associations) and unprotected discretionary activities (*e.g.,*driving a car), not to widen the scope of the discretionary rule.  It therefore should not be used to allow the Government to create after-the-fact justifications for the purpose of liability protections.

Second, none of our cases have suggested that this language from *Miller* is intended to change our long-held doctrine that safety measures, once undertaken, cannot be shortchanged in the name of policy.

*Id.* 241 F.3d at 1216-17.

Another instance, cited by the Supreme Court in *Berkovitz,* as illustrative of the scope of

the discretionary function exception, is that found in *Indian Towing Co. v. United States*, 350

U.S. 61 (1955).  It has been noted that the discretionary function exception was not at issue in

*Indian Towing*[18]; nonetheless, it has been used in the analysis of discretionary function exception

cases by the Supreme Court.  The Supreme Court characterized  *Indian Towing* as follows:

The plaintiff sued the Government for failing to maintain a lighthouse in good working order.  The Court stated that the initial decision to undertake and maintain lighthouse service was a discretionary judgment. . . . The Court held, however, that the failure to maintain the lighthouse in good condition subjected the Government to suit under the FTCA. . . . The latter course of conduct did not involve any permissible exercise of policy judgment.

---

[18]From an analytical standpoint, one could posit that *Indian Towing* constitutes a hybrid  "due care" application to deny immunity based on the failure of the Coast Guard to exercise due care in the maintenance of a lighthouse which duty it had taken up.  This line of cases has been named the "Good Samaritan" approach in which the Government is held to the same standard where it takes up a duty that is not required and is held to the same standard of any "Good Samaritan" in a normal tort case–that is there is no responsibility to provide aid, but once the decision is made to undertake such a duty, one must do so with due care.  Osborne M. Reynolds, Jr., *The Discretionary Function Exception of the Federal Tort Claims Act:  Time for Reconsideration*, 42 Okla. L. Rev. 459, 467-270 (Fall, 1989).

*Berkovitz*, 486 U.S. at 538 n. 3.  Indeed, the Supreme Court stated eloquently in the *Indian Towing* decision:

> [T]he Coast Guard need not undertake the lighthouse service.  But once it exercised its discretion to operate a light. . ., it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning.  If the Coast Guard failed in it duty and damage was thereby caused to petitioners, the United States is liable under the [Federal] Tort Claims Act."

*Indian Towing,* 350 U.S. at 69.

Considering the exhibits cited above, there is a serious question of fact as to whether once the Corps exercised its discretion to create a navigational channel, it was obligated to use due care to make sure that the channel did not destroy the environment surrounding it by creating a hazard.  Indeed, by 1988,  the Corps itself recognized that it had created one when it found that with continuing erosion, land southwest of the channel would be exposed to direct hurricane attacks from Lake Borgne.  At some point during the time continuum from the MRGO's construction, there is a general issue of material fact as to whether the Corps should have warned Congress about the potential catastrophic loss of life and property.  The Corps argues that they relied on studies that the widening of the channel and loss of wetlands would not have an effect on the people and property in the area.  However, such a decision is not one based on policy, and the question is whether the reliance on these studies was negligent or not.

This analysis is underscored by a number of cases. For example, in *W.C. & A.N. Miller Companies v. United States*, 963, F. Supp. 1231 (D.D.C. 1997), *aff'd* 1999 WL 414253 (C.A.D.C. 1999), landowners who were excavating on land that had been leased by the Government during World War I found munitions which had been buried during World War I.

Plaintiffs sued for damages and the Government invoked the protection of the discretionary

function exception.  While the Court found that the actions concerning the actual burial of the

munitions was indeed protected, it found that  the Government's failure to warn of buried

munitions was not so barred. The court stated:

> In *Cope v. Scott*, 45 F.3d 445 (D.C.Cir. 1995), the District of Columbia
> Circuit determined that, although the Park Service's failure to maintain an
> adequate skid resistance on a road surface fell within the discretionary function
> exception, its failure to post adequate warning signs about the nature of the
> surface did not.  *Cope*, 45 F.3d at 450-51.  *Cope* explained that the failure to warn
> of known dangers falls within the discretionary function exception only when it is
> part of an overall discretionary policy or program.  *Id.*
> . . .
> Here, the Army's decision not to warn that it had buried munitions on
> private land is not the type of decision that involves social, economic, or policy
> considerations.  *Accord Faber v. United States*, 56 F.3d 1122, 1125 (9th Cir. 1994)
> (Navy's decision not to warn of a known water hazard was not the kind of social,
> economic or policy decision the exception was intended to protect); [citations
> omitted] although the Army states that its failure to warn of buried munitions
> involved economic and social considerations, there is evidence that the Army did
> mark and fence off some hazards left on the formerly leased properties. . . Thus,
> the Army had already made a decision to warn.  Its failure to effectuate that
> decision properly was not itself the product of a policy decision.

*Id.* 963 F.Supp. at 1241-42.

Another instance where the Government was not shielded by the discretionary function

exception can be found in *Andrulonis v. United States*, 952 F.2d 652 (2[d] Cir. 1991).  There, a

bacteriologist was severely and permanently injured when a federal government scientist from

the Center for Disease Control ("CDC") failed to warn about the obvious dangerous conditions

he should have noticed in the laboratory when the rabies virus he had supplied was being used.

Suit was brought against the Government and the Second Circuit affirmed the court's finding of

liability against the Government.  The appellate court found that the CDC doctor's failure to

warn of the dangers presented were not the type of conduct for which Congress had waived

sovereign immunity, since the doctor's decision not to act did not implicate any policy consideration.

Another seminal discretionary function exception case, which has been alluded to herein, *United States v. Gaubert*, 299 U.S. 315 (1991) was decided by the Supreme Court when the *Andrulonis* suit was on appeal, and the Court summarily vacated the appellate court's opinion in *Andrulonis* and remanded it for further consideration in light of *Gaubert*. The Supreme Court in *Gaubert* emphasized that the discretionary conduct is not confined to the policy or planning level and the importance of the regulatory structure in which the government actors worked. *Andrulonis*, 952 F.2d at 654. This approach was warranted in the Court's opinion because the lower courts had been using that approach–that is looking at the level at which a decision was made–to determine whether a policy decision was implicated. Quoting *Gaubert*, it noted:

> For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. *The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis. Id. at 1274-75.*

*Id.* In its opinion, the Second Circuit focused on *Gaubert*'s clarification of *Indian Towing*. The Second Circuit noted:

> *Gaubert*'s import lies in its clarification of *Indian Towing* and its rejection of any simplistic reliance on the dichotomy between planning-level actions and operational-level actions. Policy considerations, however, remain the touchstone for determining whether the discretionary function exception applies. Indeed the Court carefully reiterated that the exception "'protects only governmental actions and decisions based on *considerations of public policy.*'" *Gaubert*, 111 S. Ct. at 1274 (emphasis added) (quoting *Berkovitz v. United States*, 486 U.S. 531, 537 , 108 S. Ct. 1954, 1959, 1000 L.Ed.2d 531 (1988)), and further stated that "the actions of Government agents involving the necessary element of choice *and* grounded in the social economic, or political goals of the statute and regulations are protected."

*Andrulonis*, 952 F.2d at 654.

The Government argued in that case that the doctor's decision to allow an experiment to proceed was necessary to fulfill the policy objectives of the CDC and thus should be protected. The appellate court rejected that approach noting that to do so would mean that the CDC would be insulated from liability for its employees actions except "only those where the agent had acted contrary to a clear regulation." This scope is too broad. Thus, the appellate court affirmed its previous decision stating, "The general policy of wanting to eradicate rabies and granting officials some discretion to achieve those ends is far too broad and indefinite to insulate Dr. Baer's negligent conduct in the circumstances of this case." Thus, Dr. Baer's action "cannot be said to be based on the purposes of the regulatory regime seeks to accomplish." *Id.* at 655.

In the context of this litigation, the Government's position appears to be likewise overly broad–that is that all actions taken implicated the Government's policy with respect to maintenance of the MRGO. Again, on this record, the Court is unwilling to make such a determination. *See Cope v. Scott*, 45 F.3d 445, 452 (D.C. Cir. 1995) (engineering judgment no more matter of policy than objective scientific principles found to be exempt exercise of policy judgment found in *Berkovitz*).

In *Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005), a commissary operated and maintained by a government agency over the course of three years became infested with mold which by October 2000 was found to be toxic and carcinogenic. Plaintiff delivered and oversaw employees of his employer who worked there. Whisnant contracted pneumonia, and experienced other ailments. He filed suit against the United States alleging that the Government ignored indications of the dangerous condition of the meat department and intentionally or

recklessly permitted employees and customers into it.  The district court granted a motion to

dismiss based on the discretionary function rule because the agency regulations did not prescribe

a specific course of actions with respect to either mold specifically or inspections generally, and

because the government's choice in selecting an independent contractor was a decision grounded

in policy considerations.

> As characterized by the Ninth Circuit Court of Appeals:
>
> The court rejected Whisnant's argument that the discretionary exception did not
> apply because he was suing on the basis of the government's negligence in
> inspecting the premises rather than the government's negligence in selecting
> Johnson Controls as its maintenance contractor:  according to the court,
> Whisnant's "allegations of negligence are irrelevant" to the jurisdictional
> question.  The Court also rejected Whisnant's claim that the government's conduct
> fell outside of the exception because it occurred at the "operational" rather than
> the "planning or policy-making" level:  the court found that the Supreme Court
> had abolished the operational-planning distinction.

*Whisnant*, 400 F.3d 1177, 1180 (9th Cir. 2005).  In extremely thorough treatment of the second-

prong of the discretionary function exception, the appellate court reversed the district court.

The court began by noting that government action "can be classified along a spectrum,

ranging form those 'totally divorced from the sphere of policy analysis,' such as driving a car, to

those 'fully grounded in regulatory policy,' such as the regulation and oversight of a bank." *Id.* at

1181, *citing Gaubert,* 499 U.S. at 325 n. 7.  The determination of where on that spectrum a set of

the facts rests is the challenge the court faces.  Reviewing Ninth Circuit jurisprudence, the court

then posited that there were two "trends" in the case law.  One dominant theme being the need to

distinguish between design and implementation–design being shielded; implementation not. The

second trend is where professional judgment–particularly judgments concerning safety–are

rarely considered to be susceptible to social, economic or political policy.  *Id.*  The court then

reviewed the case law as follows:

> Thus, for example, in a suit alleging government negligence in the design and maintenance of a national park road, we held that designing the road without guardrails was a choice grounded in policy considerations and was therefore shielded under the discretionary function exception, but maintaining the road was a safety responsibility not susceptible to policy analysis. *See ARA Leisure Servs. v. United States,* 831 F.2d 193, 195 (9th Cir.1987). Similarly, in a suit alleging government negligence in the design and construction of an irrigation canal, we held that the decision not to line the canal with concrete was susceptible to policy analysis, but the failure to remove unsuitable materials during construction was not. *See Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1027-28, 1031 (9th Cir.1989). In three cases concerning injuries resulting from the government's failure to post warnings concerning hazards present in national parks, we held that the government's decision not to post signs warning of obvious dangers such as venturing off marked trails to walk next to the face of a waterfall, and the government's decision to use brochures rather than posted signs to warn hikers of the dangers of unmaintained trails, involved the exercise of policy judgment of the type Congress meant to shield from liability, *Valdez v. United States,* 56 F.3d 1177, 1178, 1180 (9th Cir.1995); *Childers v. United States,* 40 F.3d 973, 976 (9th Cir.1994), but that such policy judgment was absent when the government simply failed to warn of the danger to barefoot visitors of hot coals on a park beach, *Summers v. United States,* 905 F.2d 1212, 1215 (9th Cir.1990). And in an action for the death of a prospective logger "trying out" for a job with a government contractor at a logging site under the management of a government agency, we held that while the government's authorization of the contract was protected under the discretionary function exception, the government's failure to monitor and ensure safety at the work site was not. *Bear Medicine,* 241 F.3d at 1212, 1214, 1217.

*Whisnant,* 400 F.3d at 1181-82.  The Court then noted that these cases comport with the Supreme

Court's pronouncement in *Indian Towing*.  The Court reiterated its previous statement, "As we

have summarized: 'The decision to adopt safety precautions may be based in policy

considerations, but the implementation of those precautions is not . . .  [S]afety measures, once

undertaken, cannot be shortchanged in the name of policy.'"   *Id., citing Bear Medicine,* 241

F.3d  1208, 1215, 1216-17 (9th Cir. 2001).

Based on that analysis, the appellate court then found that Whisnant's suit was not barred by the discretionary function exception. It noted that plaintiff had not alleged the government was negligent in designing its safety inspection procedures; instead, plaintiff contended that it was negligent in following through on those procedures by ignoring reports and complaints describing the unsafe condition of the meat department. The court continued:

> Like the government's duties to maintain its roads in safe condition, to ensure the use of suitable materials in its building projects, and to monitor the safety of its logging sites, the government's duty to maintain its grocery store as a safe and healthy environment for employees and customers is not a policy choice of the type the discretionary function exception shields. Cleaning up mold involves professional and scientific judgment, not decisions of social, economic, or political policy. "Indeed, the crux of our holdings on this issue is that a failure to adhere to accepted professional standards is not susceptible to a policy analysis." *Bear Medicine,* 241 F.3d at 1217 (internal quotation marks omitted); *see also In re Glacier Bay,* 71 F.3d 1447, 1453 (9th Cir.1995) ("Decisions involving the application of objective scientific standards are not insulated by the discretionary function exception because they do not involve the weighing of economic, political and social policy." (quoting *Kennewick,* 880 F.2d at 1030) (alterations omitted)). Because removing an obvious health hazard is a matter of safety and not policy, the government's alleged failure to control the accumulation of toxic mold in the Bangor commissary cannot be protected under the discretionary function exception.

*Id.* at 1183.

The court subsequently noted that the danger with the discretionary function exception is more pronounced where the government takes on the role of a private landowner. It noted:

> Every slip and fall, every failure to warn, *every inspection and maintenance decision* can be couched in terms of policy choices based on allocation of limited resources. As we have noted before in the discretionary function exception context, "[b]udgetary constraints underlie virtually all governmental activity." Were we to view inadequate funding alone as sufficient to garner the protection of the discretionary function exception, we would read the rule too narrowly and the exception too broadly. Instead, in order to effectuate Congress's intent to compensate individuals harmed by government negligence, the FTCA, as a remedial statute, should be construed liberally, and its exceptions should be read narrowly.

> *Id.* (quoting *ARA Leisure,* 831 F.2d at 196) (additional citations omitted) (emphasis added).

*Id.* at 1183-84.

Thus, there are questions of fact as to the whether the decisions made with respect to the maintenance of the MRGO were actually policy based, or whether they were within the purview of *Indian Towing's* dictates as non-policy based actions or omissions. *See Ayala v. United States*, 980 F.2d 1342 (10th Cir. 1992) (where mining inspector offers technical assistance, technical judgments are not protected by the discretionary function exception where choice was governed by objective principles of electrical engineering); *Aslakson v. United States*, 790 F.2d 688 (8th Cir. 1986) (decision of governmental agency not to elevate certain power lines running over lake did not involve evaluation of relevant policy factors and thus not subject to the discretionary function exception).

Further support for this position can be found in *Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*, 1998 WL 113935 (E.D. La. Mar. 10, 1998), where Judge Edith Clement while a district court judge  found that there were material questions of fact preventing summary judgment  on the discretionary function exception.  Suit had been brought against the Army Corps for damages allegedly caused when a dredge dropped a spud on a pipeline that had been improperly marked by the Corps in the contract under which the dredge was operating and where a Quality Insurance inspector was assigned to the dredge.  "Once the Corps takes an action, it must act reasonably with respect to those who are likely to rely upon it.  For this very reason, the Corps has a 'continuing duty' to use due care to make certain that its charts accurately depict the location of pipelines 'once it [takes] it upon itself to indicate the position of one of the pipeline on

the chars.' " *Southern Natural Gas Co. v. Pontchartrain Mat.*, 711 F.2d 1251, 1257, n.8 (5th Cir.

1983).

   In *Alabama Electric Cooperative, Inc. v. United States,* 769 F.2d 1523 (11th Cir. 1985), an

electric cooperative brought suit against the Corps for costs of stabilizing its tower which had

been undermined by erosion allegedly caused by the Corps.   The cause of the erosion was

described as follows:

> During 1970 and 1971, the Corps prepared plans and specifications for a series
> of eleven dikes or jetties along the Alabama River, the purpose of which was to
> reduce dredging costs by narrowing the channel and accelerating the current,
> which would theoretically wash away more silt. One of these dikes was located
> about one-half mile upstream from AEC's tower, extending out from the opposite
> bank. The alleged effect of this dike was to deflect the current toward the east bank
> and AEC's tower. Erosion increased substantially and in August of 1981, AEC
> determined that its tower was in danger of being undermined. Accordingly, AEC
> stabilized the tower by driving pilings around its base at a cost of $576,114.09.
> AEC subsequently brought this action under the FTCA to recover for the cost of
> stabilizing the tower

*Id.* at 1525.  During discovery, the Corps admitted that it had not intended to affect the banks of

the river and that there was no intention to widen the river at the dike location involved in the

suit.  A technical report was also produced by Corps which had been published by it prior to the

design and construction of the dikes.  In that report, factors were noted as relevant in the design

and construction of dikes including, among a myriad of things,  the necessity of bank protection

to preserve property; the necessity that all engineering factors and variable which affect river

channel geometry be considered and understood; and the requirement that the river engineer

determine the effects of a design in advance.

   The Corps took the position that even though this work was "a recognized authority on

dike design", the responsible engineer did not recall consulting the publication.  Furthermore, it

maintained that its engineers were not required by regulation to consider this technical report and that the cooperative had not alleged a specific violation of any specific regulations.  In reality, the engineers testimony indicated that the techniques used for purposes of construction of the dike at issue fell woefully short of the technical elements indicated as necessary by the Corps' own report.

The district court had dismissed the suit finding that the acts of design and construction were discretionary functions exempted from liability.   The Eleventh Circuit reversed, finding that the discretionary function exception did not shield the Corps from liability for caused by engineering errors.  The appellate court began by examining the "nature of the conduct" as required under *Varig* and *Berkovitz* and  found that it is clear that there is "nothing to suggest that all *design* decisions are inherently 'grounded in social, economy, and political policy.'" *Id*. at 1531.   The court then reviewed various cases where design decisions were found to be nondiscretionary decision and others where the design decisions were found to be discretionary. It started with *Seaboard Coast Line RR Co. v. United States,* , 473 F.2d 714 (5th Cir. 1973).  In that case plaintiff contended that a drainage system negligently designed by the Army Corps diverted water undermining its railroad right-of -way.  The Fifth Circuit found that the government made a policy decision when it made the *initial decision* to build the drainage system. However, once that decision was made, it was required to perform  the building of the drainage

ditch in a non-negligent manner.  *Id., citing Seaboard Coast*, 473 F.2d at 716.[19] After a

painstaking examination of cases,  the court concluded:

> where the Corps makes a social, economic or political policy decision concerning
> the design of a particular project, that decision is excepted from judicial review
> under § 2680(a).  ***In the absence of such a policy decision, the Corps' design
> decisions are subject to judicial review under the state law tort standards that
> would normally govern an action for engineering malpractice.***

*Alabama Electric*, 769 F.2d at 1536-37.

Based on the foregoing, there are material questions of fact as to whether the second prong

of the discretionary function is met and the motion must be denied as such.  Clearly, the alleged

failure of the Corps to inform Congress of the dangers which it apparently perceived in the

context of the environmental damage to the wetlands caused by the operation and maintenance of

the MRGO presents an issue for trial.

---

[19]The 11th Circuit properly noted that as *Alabama Electric* was pre-*Varig*, the finding that the *only* policy decision was in the initial decision to build the drainage system, the approach might have to be reexamined. However, the key is to determine whether whatever decision and construction decisions are alleged to have been negligent were policy driven.  As the facts of the fifty year evolution of the MRGO are simply not ascertainable on the record before the Court, this motion must be denied.

### III. Conclusion

The parties to this litigation have presented legal arguments concerning two important legal bars to the case before the Court–the due care exception and the discretionary function exception.  Plaintiffs sought to preclude the Government from raising the discretionary function exception based on the first inquiry required for its application–that certain federal statutes, regulations and policies specifically prescribed a course of action for the Corps to follow and that the Corps had no choice to but to adhere to those directives.  The Court has found that the FWCA does not provide such a bar; however, with respect to NEPA, Plaintiffs demonstrated that there are material questions of fact that the Corps itself had found that the environmental damage caused by the maintenance and operation of the MRGO was significant, such that it had no choice but to file the appropriate mandated reports.  As such, if the Court is convinced at trial the Corps indeed violated a mandate and is precluded from its protection, then Plaintiffs will still bear the burden to prove that this failure caused the damages sought.

As to the Government's motion, the Court has found as a matter of law that the due care exception is unavailable to it for the claims presented with respect to maintenance and operation of the MRGO, and it has found that there are material questions of fact with respect to the original design and construction thereof.  Furthermore, to the extent that the Corps can prove that it did not violate a mandate with respect to NEPA, there are material questions of fact with respect to whether the actions complained of were grounded in political, social, or economic policy rather than ordinary non-policy decisions concerning technical, engineering and professional judgments, or other non policy based factors, and/or whether the safety of the people and property in the area override any ostensible purported "policy" considerations.

Based on the foregoing and for the reasons assigned herein,

**IT IS ORDERED** that  Plaintiffs' Motion for Partial Summary Judgment (Doc. 16510) is **DENIED**  with regard to the FWCA because the Court finds, that under the undisputed facts of this case, it does not provide a mandate which would prevent the application of the discretionary function for the Corps.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Doc. 16510) is **DENIED** with respect to the alleged NEPA violations as the Court finds that there are material questions of fact as to whether the actions of the Corps with respect to the mandates of  NEPA were violated such that the discretionary function would not be unavailable to the Corps.

**IT IS FURTHER ORDERED** that the Defendant United States' Renewed Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. 16511) is **DENIED** with respect to the due care exception for the maintenance and operation of the MRGO as a matter of law  and **DENIED** with respect to the initial design and construction as there are material questions of fact with respect to these issues.

**IT IS FURTHER ORDERED** that the Defendant United States' Renewed Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. 16511) is **DENIED** with respect to the applicability of the discretionary function exception as there are material questions of fact concerning (1) whether the Corps violated a mandate under NEPA to warn Congress of the dangers presented by the MRGO, and (2) whether the Corps' actions complained of were

grounded in political social, or economic policy rather than ordinary non-policy decisions concerning technical, engineering and professional judgments or other non policy-based factors.

     New Orleans, Louisiana, this <u>20th</u> day of March, 2009.

 

 

                                        _____

                                             **STANWOOD R. DUVAL, JR.**
                            **UNITED STATES DISTRICT COURT JUDGE**