**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

IN RE: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

FILED IN:   05-4181, 05-4182, 05-4191, 05-4568,
            05-5237, 05-6073, 05-6314, 05-6324,
            05-6327, 05-6359, 06-0020, 06-1885,
            06-0225, 06-0886, 06-11208, 06-2278,
            06-2287, 06-2346,  06-2545, 06-3529,
            06-4065, 06-4389, 06-4634, 06-4931,
            06-5032, 06-5042, 06-5159, 06-5163,
            06-5367, 06-5471,  06-5771, 06-5786,
            06-5937, 06-7682, 07-0206, 07-0647,
            07-0993, 07-1284, 07-1286, 07-1288,
            07-1289.

CIVIL ACTION

No.:  05-4182

PERTAINS TO: LEVEE AND MR-GO

**MEMORANDUM IN SUPPORT OF JOINT MOVANTS' REQUEST
FOR ENTRY OF FINAL ORDER AND JUDGMENT CERTIFYING
THE PROPOSED SETTLEMENT CLASS AND APPROVING THE
PROPOSED CLASS SETTLEMENT AGREEMENT**

The March 13, 2009 objection deadline established by the Court has passed.  The

proponents of the proposed class settlement respectfully submit this memorandum of points and

authorities in support of their requests for certification of the Settlement Class and thereafter

approval of the proposed Class Settlement Agreement.[1]

---

[1] Except as otherwise expressly provided below or as the context otherwise requires, all capitalized terms
used in this memorandum shall have the meanings and/or definitions given them in the Class Settlement
Agreement, the original of which, together with all exhibits, is attached to the Joint Motion as *in globo*
Exhibit "1".

1

By Order dated December 15, 2008, this Court directed that notices of appearance of counsel for any Class Member (other than Class Counsel) be filed with the Clerk of Court no later than the Objection Deadline, March 13, 2009.[2]  The detailed notice approved by this Court, at pp. 7-8 (Question No. 20), is also clear on this point.  The proponents are aware of three notices or entries of appearance filed with the Clerk of Court by counsel for Class Members (timely or otherwise):[3]

1.   Richard A. Nussbaum, II --   Louisiana Congregation of Holy Cross (Doc. No. 18000)

2.   James K. Irvin
     John J. Cummings III --      Plaintiffs in various lawsuits (Doc. No. 18134)

3.   Jennifer J. Rosenbaum
     Micheal T. Kirkpatrick --    Mary Brinkmeyer, Michelle LeBlanc and Thomas C.
                                  Stuart (Doc. No. 18179)

## FACTUAL & PROCEDURAL BACKGROUND

The Parties have entered into a Class Settlement Agreement in the captioned matter.  This case arises out of allegations of hurricane related flood damages resulting from alleged Levee Failures.  The suit, as amended, names as defendants, among others, the Orleans, East Jefferson and Lake Borgne Basin levee districts, the Board of Commissioners for each Levee District, and St. Paul Fire and Marine Insurance Company (in its capacity as the insurer for any and/or all of the Levee Defendants).  These parties are the Settling Defendants under the Class Settlement Agreement.  The Persons released under the Class Settlement Agreement are the Settling Defendants above, together with the Board of Commissioners of the Southeast Louisiana Flood Protection Authority - East, the Southeast Louisiana Flood Protection Authority - East, and related Persons.

---

[2] *See* Preliminary Order, p. 9 ¶ 11 (Doc. No. 16721).

[3] This excludes the notice of intent to appear and response of Ashton O'Dwyer, which was not filed with the Clerk of Court, but was sent to several of the counsel for the joint movants.

As set forth in the Class Settlement Agreement, the Parties have agreed to and do hereby propose the following Class for certification by the Court for settlement purposes only pursuant to the Class Settlement Agreement and Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure:

> [A]ll Persons (a) who at the time of Hurricane Katrina and/or Hurricane Rita (i) were located, present or residing in the Hurricane Affected Geographic Area, or (ii) owned, leased, possessed, used or otherwise had any interest in homes, places of business or other immovable or movable property on or in the Hurricane Affected Geographic Area, and (b) who incurred any losses, damages and/or injuries arising from, in any manner related to, or connected in any way with Hurricane Katrina and/or Hurricane Rita and any alleged Levee Failures and/or waters that originated from, over, under or through the Levees under the authority and/or control of all or any of the Levee Defendants.  The term "Class" or "Settlement Class" shall expressly include all Plaintiffs and putative class members of the Pending Actions.  The Settlement Class shall include and be divided into the following subclasses of Class Members whose alleged Claims are based in any way on, or result in any way from, the acts, omissions, or any sources of liability whatsoever of:  (a) *Subclass 1* - the Lake Borgne Basin Levee District, the Lake Borgne Basin Levee District Board of Commissioners, and St. Paul Fire and Marine Insurance Company, in its capacity as insurer of each of the foregoing; (b) *Subclass 2* - the East Jefferson Levee District, the East Jefferson Levee District Board of Commissioners, and St. Paul Fire and Marine Insurance Company, in its capacity as insurer of each of the foregoing; and (c) *Subclass 3* - the Orleans Levee District, the Orleans Levee District Board of Commissioners, and St. Paul Fire and Marine Insurance Company, in its capacity as insurer of each of the foregoing (collectively, the "Subclasses" and each a "Subclass").   A Class Member may be included in more than one Subclass.  Excluded from the Settlement Class are the judge and/or magistrate judge to whom the Litigation is assigned at the trial court or upon any appeal.

As used above in the definition of the proposed Settlement Class (and in the Class Settlement Agreement), the following terms are defined as follows:

> i.      The term "Hurricane Affected Geographic Area" shall mean the entire area located within the Parishes of Jefferson, Orleans, Plaquemine and St. Bernard, Louisiana, together with any body of water that is, in whole or in part, adjacent to or within any portion of these Parishes.

NO.99937258.1

ii.     The term "Hurricane Katrina" shall mean the tropical cyclone named "Hurricane Katrina" by the National Weather Service's National Hurricane Center which made landfall in Louisiana on or about August 29, 2005, including but not limited to, its classification as a tropical depression, storm, hurricane and/or other weather event and any and all effects due to, caused by, or relating to Hurricane Katrina regardless of whether same occurred prior to, concurrently with, or following Hurricane Katrina's landfall including but not limited to, storm surge, flooding, rainfall, lighting, wind, and/or tornados.

iii.    The term "Hurricane Rita" shall mean the tropical cyclone named "Hurricane Rita" by the National Weather Service's National Hurricane Center which made landfall in Louisiana on or about September 24, 2005, including but not limited to, its classification as a tropical depression, storm, hurricane and/or other weather event and any and all effects due to, caused by, or relating to Hurricane Rita regardless of whether same occurred prior to, concurrently with, or following Hurricane Rita's landfall including but not limited to, storm surge, flooding, rainfall, lighting, wind, and/or tornados.

iv.     The term "Levees" shall include any and all levees, embankments, seawalls, jetties, breakwaters, water-basins, floodwalls, floodgates, gates, outfall canals, drainage canals, berms, spoil banks, and other works in relation to such projects, and/or any other flood or water control structure(s), whether man-made or natural.

v.      The term "Levee Failures" shall mean the actual or alleged breaching, overtopping, seepage, collapse, undermining, weakening or any other alleged failure of Levees regardless of cause, whether caused in whole or in part by an alleged defect, error or neglect with respect to the design, construction, maintenance, inspection, and/or operation of the Levees, and all dredging operations necessary in connection therewith or incidental thereto, and/or whether caused in whole or in part by any wind, waves, tide, rainfall, storm surge or other force or effect caused by or resulting from Hurricane Katrina and/or Hurricane Rita.

vi.     The term "Pending Actions" shall mean any and all lawsuits, administrative claims or other actions, however asserted (including but not limited to any and all petitions, complaints, third-party demands, cross-claims and counter-claims), in which a Released Claim has been, or is, asserted (including but not limited to those lawsuits identified on

> Exhibit "A" to the Class Settlement Agreement, as same shall be amended from time to time prior to the entry of the Final Order and Judgment).

The purposes and intentions of the proponents of this proposed settlement are, *inter alia*, (a) to provide a fund for the benefit of the Settlement Class; (b) to provide a process by which the Claims of Class Members can be dealt with fairly; (c) to terminate and extinguish any liability of the Released Parties for all Released Claims of the Class Members; and (d) to dismiss on the merits and with prejudice all Claims against the Released Parties asserted in the Litigation.

## LAW AND ARGUMENT

### I.   The Number of Objections is Extremely Low.

Initially, the joint movants would highlight to the Court the very few number of objections filed or received.  Movants are aware of only 189 responses to the proposed settlement filed into the record of this case or received by the Clerk of Court or counsel for any party (whether or not filed).[4]  The majority of these responses -- 113 (or 60% of the total responses) -- are not objections at all, but are either neutral submissions or submissions in favor of the proposed settlement.  Specifically, 83 of the responses (or 44% of the total received) are statements in support of particular Claims (which certainly could be considered as support for the settlement), requests for information, etc., and 28 of the responses (or 16% of the total received) are express statements in *support* of the proposed settlement.  In fact, out of the entire Class, *only 76 objections were received (only 40% of the total responses).*  Given the size of the Class, this is remarkable.  This small number of objections also represents an <u>extremely</u> small percentage of the total Class Members.  These figures are particularly meaningful given the excellent notice

---

[4] This excludes the response of Ashton O'Dwyer, which was not filed with the Clerk of Court, but was sent to several of the counsel for the joint movants.

campaign employed.  *See* Sections IV and V below, pp. 22-28.  *Cf. Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55 (S.D.N.Y. 2003) ("In view of the extensive notice campaign waged by defendant, the extremely small number of class members objecting or requesting exclusion from the settlement is a clear sign of strong support for the settlement").

## II.      Certification of the Proposed Settlement Class Under Rule 23(b)(1)(B) is Proper.

The  proposed  Settlement  Class  satisfies  Rule  23(b)(1)(B)'s  requirements  that "prosecuting separate actions by or against individual class members would create a risk of:"

> (B)     adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

Fed. R. Civ. P. 23(b)(1)(B).  The proposed Settlement Class should properly be certified as a mandatory (non opt-out) limited fund settlement class pursuant to Rule 23(b)(1)(B).

The United States Supreme Court in *Ortiz v. Fibreboard Corp.*[5] discussed in depth the use of Rule 23(b)(1)(B) and, after a thorough discussion of the history of "limited fund" class actions and the drafting history of Rule 23,[6] articulated three characteristics which it described not as mandatory, but as presumptively necessary:

---

[5] 527 U.S. 815, 119 S.Ct. 2295 (1999).

[6]  The Court's earlier decision in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) addressed a proposed settlement class under Rule 23(b)(3), not a Rule 23(b)(1)(B) mandatory settlement class.  *Shutts* is also distinguished from the instant case by the fact that the *Shutts* Court did not have personal jurisdiction over putative Class Members.  *Id.  See also Grimes v. Vitalink Comm. Corp.*, 17 F.3d 1553, 1558 (3rd Cir. 1994) ("Although the class members in the present case were not provided with an opportunity to opt out, the state court had the requisite power to bind absent class members as long as they had minimum contacts with the forum and they were not otherwise denied due process"); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285,292 (2d Cir. 1992) ("Because there is no question that the court has jurisdiction over appellants, *Shutts* is inapposite.  Thus, the district court did not abuse its discretion in denying appellants the opportunity to opt out of the class"); *Doe I v. Karadzic*, 182 F.R.D. 424, 430 n.4 (S.D.N.Y. 1998) ("*Shutts* is concerned with the difficulties of "distant forum abuse"-where a court adjudicates the claims of a party lacking "minimum contacts", *see International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), with the forum. *See* Arthur R. Miller & David Crump, *Jurisdiction and Choice of Law in Multistate Class Actions After Phillips Petroleum Co. v. Shutts*, 96 Yale L.J. 1, 52-56 (1986); Henry Paul Monaghan, *Antisuit Injunctions and Preclusion Against Absent Nonresident Class Members*, 98 Colum. L.Rev. 1148, 1162-74 (1998). By filing their case here *Kadic* plaintiffs established such contacts with this Court. Accordingly, *Shutts* does not require that they be permitted to opt out"). *Cf. Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (C.A.N.Y. 1977) (Decided pre-*Shutts*, but rejecting the

(1)    "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all claims";

(2)    "the whole of the inadequate fund [is] to be devoted to the overwhelming claims"; and

(3)    "the claimants identified by a common theory of recovery [are] treated equitably among themselves."

*Ortiz*, 527 U.S. at 838-39.  Each of these points raised in *Ortiz* is satisfied in this case.

### A.    The Total Claims of Class Members Exceed the Total Insurance Proceeds.

#### 1.    The Insurance Proceeds Constitute a Demonstrably Limited Fund Which is Insufficient to Pay Class Members' Claims.

In this case, the Class Members must look to a limited fund of insurance proceeds, which is one of the classic examples of a limited fund class action.[7]   In *Ortiz*, the Supreme Court

---

requirement of opt out rights of a Rule 23(b)(1) class.  "[W]hen appropriate notice and opportunity [to participate and be heard] have been provided, preclusion of the opt-out right in a (b)(1) settlement does not violate due process").

[7] "[T]he Supreme Court in *Ortiz* has read the 'limited fund' case as being moored to the Rule's historical antecedents, describing the classic actions as involving, for instance, 'claimants to trust assets, a bank account, insurance proceeds, company assets in a liquidation sale, proceeds of a ship sale in a maritime accident suit, and others.'"  *In re Simon II Litig.*, 407 F.3d 125, 137 (2d Cir. 2005) (quoting *Ortiz*, 527 U.S. at 834) (emphasis added). Indeed, no less then three of the historical examples cited by the *Ortiz* Court dealt with a kind of insurance, either surety bonds or an insurance policy:

> Equity, of course, recognized the same necessity to bind absent claimants to a limited fund when no formal imposition of a constructive trust was entailed. In *Guffanti v. National Surety Co.,* 196 N.Y. 452, 458, 90 N.E. 174, 176 (1909), for example, the defendant received money to supply steamship tickets and had posted **a $15,000 bond** as required by state law. He converted to personal use funds collected from more than 150 ticket purchasers, was then adjudged bankrupt, and absconded. One of the defrauded ticket purchasers sued the surety in equity on behalf of himself and all others like him. **Over the defendant's objection, the New York Court of Appeals sustained the equitable class suit, citing among other considerations the fact that all recovery had to come from a "limited fund out of which the aggregate recoveries must be sought" that was inadequate to pay all claims, and subject to pro rata distribution.** *Id.,* at 458, 90 N.E. 174, 90 N.E., at 176.   See Hazard, Gedid, & Sowle 1915 ("[*Guffanti*] explained that **when a debtor's assets were less than the total of the creditors' claims, a binding class action was not only permitted but was required; otherwise some creditors (the parties) would be paid and others (the absentees) would not**"). See also *Morrison v. Warren* 174 Misc. 233, 234, 20 N.Y.S.2d 26, 27 (1940) (**suit on behalf of more than 400 beneficiaries of an insurance policy following a fire appropriate where "the amount of the claims ... greatly exceeds the amount of the insurance"**); *National Surety Co. v. Graves,* 211 Ala. 533, 534, 101 So. 190 (1924) (**suit against a surety company by stockholders "for the benefit of themselves and all others similarly situate who will join the suit" where it was alleged that individual suits were being filed on surety bonds that "would result in the exhaustion of the penalties of the bonds, leaving many stockholders without remedy"**).

NO.99937258.1

expressly recognized that insurance assets (like the insurance assets in this case) are both limited "in the traditional sense" and subject to demonstrable limit:

> The insurance assets would obviously be "limited" in the traditional sense . . . **if the policies provided aggregate limits falling short of that total; calculation might be difficult, but the way to demonstrate the limit would be clear.**

*Id.,* at 851 (highlight added).  The purpose of this type of limited fund class action is to prevent a feast that would later lead to a famine for class members.  As explained by one commentator: "The individual suits could exhaust the fund before all members of the class were able to protect their interests."  7A Wright, Miller & Kane, Federal Practice & Procedure § 1774, (3d ed. 2005) (quoting Comment, Rule 23: Categories of Subsection (b), in The Class Action—A Symposium, 10 B.C. Ind. & Com. L. Rev. 539, 541 (1969)).

In this case (as will be established at the certification hearing), the total of the Class Members' asserted claims far exceeds the total aggregate insurance proceeds.  Katrina was the worst natural disaster in our Nation's history, with flood damages alone in the tens of *billions* of dollars.  The Levee Districts deny any legal responsibility for any of the Class Members' claims. However, even were the Levee Districts ultimately found liable for as little as one (1%) percent of these asserted damages, the numbers are staggering.  Once the insurance proceeds are exhausted, any Class Member with a judgment against a Levee Defendant will be unable to judicially enforce it.  In the absence of a settlement, the potentially available insurance proceeds would necessarily be depleted by a very small percentage of claimants, to the direct prejudice of the vast majority of claimants to follow.  No objector argues to the contrary.  This is precisely the type of situation Rule 23(b)(1)(B) was designed to address.  *See* the citations above. *See also Baker v. Washington Mut. Fin. Group, LLC*, 193 Fed. Appx. 294 (5th Cir. 2006) (basing a

limited fund finding on a determination that it was the most the defendant would be able to pay as punitive damages, taking into account its dwindling net worth and the possibility of numerous individual suits if the class were not certified).  *Cf., In re Orthopedic Bone Screw Prod. Liab. Litig.*, 176 F.R.D. 158, 177 (E.D. Pa. 1997) (finding that the settlement was "crafted around a limited fund" and stating, "[a]n unwillingness to recognize this will lead to the unacceptable result of many deserving claimants being unable to recover by settlement or judgment").

In the instant case, St. Paul Fire and Marine Insurance Company provides insurance coverage for each of the Levee District Defendants.  Each levee district has a separate and distinct policy of insurance.  No policy insures more than one levee district.  Under the settlement, insurance proceeds of $17,000,000.00, plus legal interest on this amount from date of judicial demand through date of deposit, have been placed into the escrow account (the total is in excess of $20 million).[8]

Several objections ask whether other insurance policies exist that provide additional coverage.  Unlike *Ortiz*, where the record "failed to demonstrate that the fund was limited except by agreement between the parties,"[9] the Parties will present evidence at the certification hearing on the total amount of available insurance coverage available to the Class.

---

[8]  The parties have a remaining dispute that the Court will resolve pursuant to which up to an additional $2,000,000 (plus interest) may be placed into the settlement fund for the Orleans Levee District subclass.

[9] *Ortiz*, 527 U.S. at 848-49.

2.     __The Levee Districts' Assets are Exempt from Seizure.__

As shown below, the assets of the Levee Districts are exempt from seizure.  *See* La.

Const. Art. XII, §10(C); La. R.S. 13:5109(B)(2).  *See also* Fed. Rule Civ. Proc.  69(a).[10]  No

objector argues to the contrary.

The Orleans Levee District was created by the Louisiana legislature in 1890 in order to

protect New Orleans from floods.  The Lake Borgne Basin Levee District was created to protect

St. Bernard Parish from floods.  *See* La R.S. 38:291(G). The East Jefferson Levee District was

created by the Louisiana legislature and maintains and operates the flood protection system for

the East Bank portion of Jefferson Parish.  *See* La R.S. 38:291(D).  The recently created

Southeast Louisiana Flood Protection Authority – East[11] supervises the Orleans Levee District,

the Lake Borgne Basin Levee District and the East Jefferson Levee District.  *See* La. R.S.

38:330.1.

---

10 "[U]nless a federal statute applies by its own terms, federal judgments are to be enforced in conformity with the
law of the state in which the judgment was rendered." 13 *Moore's Federal Practice*, § 69.03[2](3d ed.).  Fed. Rule
Civ. Proc.  69(a) provides in pertinent part:

> A money judgment is enforced by writ of execution, unless the court directs otherwise.  The
> procedure on execution – and in proceedings supplementary to and in aid of judgment or
> execution – *must accord with the procedure of the state where the court is located*, but a federal
> statute governs to the extent it applies. (emphasis and highlight added)

No such federal statute applies in this case.  These are state law claims.  There is no suggestion that the claims
asserted by any objector or any Class Member against any Settling Defendant are civil rights claims under 42 U.S.C.
§ 1983.  *See Gary W. v. State of Louisiana,* 441 F.Supp. 1121 (E.D.La.1977), *aff'd*, 622 F.2d 804 (5th Cir.1980),
*cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 193 (1981) (Judge Alvin Rubin).  Maritime claims do not
pose the same issue.  And, in any event the only potential maritime claim is a single contribution claim by Lafarge
North America, Inc. which has not objected to the settlement, and which will be fully resolved through the
settlement.  *Hardy v. Gulf Oil Corporation*, 949 F.2d 826 (5th Cir. 1992); *Ondimar Transportes Maritimos v. Beatty
Street Properties, Inc.*, 555 F.3d 184 (5th Cir. 2009).

11   The Southeast Louisiana Flood Protection Authority – East was created post-Katrina in 2006.

As political subdivisions of the State of Louisiana,[12] the Levee Districts are entitled to the protections of Louisiana's anti-seizure provisions of La. Const. art. XII, § 10(C) and La. R.S. 13:5109(B)(2).

Section 10(C) of Article XII of the Louisiana Constitution makes clear that public property and public funds are not subject to seizure:

> [T]he legislature by law may limit or provide for the extent of liability of the state, a state agency, or a political subdivision in all cases, including the circumstances giving rise to liability and the kinds and amounts of recoverable damages. It shall provide a procedure for suits against the state, a state agency, or a political subdivision and provide for the effect of a judgment, but no public property or public funds shall be subject to seizure. The legislature may provide that such limitations, procedures, and effects of judgments shall be applicable to existing as well as future claims. No judgment against the state, a state agency, or a political subdivision shall be exigible, payable, or paid except from funds appropriated therefore by the legislature or by the political subdivision against which the judgment is rendered.

Louisiana Revised Statute 13:5109(B)(2) was enacted by the Louisiana legislature to effectuate this prohibition:

> Any judgment rendered in any suit filed against the state, a state agency, or a political subdivision, or any compromise reached in favor of the plaintiff or plaintiffs in any such suit shall be exigible, payable, and paid only out of funds appropriated for that purpose by the legislature, if the suit was filed against the state or a state agency, or out of funds appropriated for that purpose by the named political subdivision, if the suit was filed against a political subdivision.

La. R.S. 13:5109(B)(2).

The policy behind this established principle was described by Judge Vance in a case involving the City of New Orleans as follows:

> [T]he government has limited resources, and the legislature expressly found that judgments have exceeded the government's ability to pay them on a current basis. Absent an anti-seizure provision, the assets of state and local governments could

---

[12]  A "levee district" is a "political subdivision of this state organized for the purpose and charged with the duty of constructing and maintaining levees, and all other things incidental thereto within its territorial limits."  La. R.S. 38:281(6).  A "political subdivision" is defined as any parish, municipality, "special district", school board, sheriff, or "other public or governmental body of any kind which is not a state agency."  La. R.S. 13:5102(B); *see also Wynat Dev. Co. v. Board of Levee Comm'rs*, 710 So.2d 783, 789-90 (1998) (stating that the Orleans Levee District is a "special district" within the meaning of La. R.S. 13:5102(B)).

> be dissipated through seizure actions, which could impair the ability of governments to perform vital public functions.  Barring seizure and requiring an appropriation to pay judgments is a rational response to this predicament.

*Bennett v. City of New Orleans*, 2004 WL 60316 *7 (E.D. La.) (Vance, J.).

The United States Fifth Circuit as well as several Courts in this District have recognized and enforced the Louisiana anti-seizure provisions.  For example, in *Specialty Healthcare Management, Inc. v. St. Mary Parish Hospital*, the Fifth Circuit vacated a writ of execution against the Parish Hospital defendant.  220 F.3d 650 (5th Cir. 2000).  This diversity case involved enforcement of an arbitration award.  *Id.* at 652-53.  Specialty sued the hospital in federal district court seeking monetary damages as well as declaratory and injunctive relief in connection with a contractual dispute.  *Id.* at 652.  The hospital invoked a mandatory arbitration clause.  *Id.*  After Specialty obtained a $750,000.00 arbitration award, the court confirmed the award in a judgment requiring the hospital to pay within thirty (30) days, but the hospital refused.  *Id.*  Specialty then sought and obtained from the district court a writ of execution pursuant to Fed. R. Civ. P. 69, over the parish hospital's objection that Louisiana's anti-seizure provisions controlled.  *Id.* at 653.  <u>The United States Fifth Circuit reversed the district court and vacated the writ, holding that the Louisiana anti-seizure provisions applied and the district court could not issue a writ of execution.</u>  *Id.* at 653-56.

Similarly, *City of New Orleans v. Municipal Administrative Services, Inc.* was a diversity action before Judge Africk of the Eastern District of Louisiana based on a contract dispute between the Municipal Administrative Services ("MAS") and the City of New Orleans.  2004 WL 2496202 (E.D. La) (Africk, J.).  MAS moved for contempt sanctions for the City's non-payment of a judgment based on breach of contract.  *Id.* at *1 - *2.  Judge Africk found that there was no dispute that the judgment was in effect, that it directed the City to pay a certain sum, and that the City had failed to pay.  *Id.* at *2.  Despite this, <u>the Court found the City could not be</u>

compelled, by contempt order, to satisfy a judgment as such order would conflict with the State's anti-seizure provision and Louisiana jurisprudence. *Id.* at *4. As observed by the Court, MAS simply sought "to accomplish indirectly what it [could not] accomplish directly." *Id.* at *4.

In support of his decision, Judge Africk quoted with approval the recognition by the Louisiana Forth Circuit Court of Appeals in *Vogt v. Board of Commissioners of the Orleans Levee District*[13] that the judiciary has no legal authority to compel payment by political subdivisions:

> This court recognizes and sympathizes with plaintiff['s] plight in getting judgment against the State or political subdivision satisfied. Nonetheless, this court is without constitutional or statutory authority to compel [a political subdivision] to pay the judgment rendered against it.

*Id.* at *4, citing *Vogt*, 814 So.2d at 656.

In addition, the levee districts also cannot be subject to a writ of mandamus to require them to appropriate additional funds to satisfy the potential judgments in this case. *Hoag v. State*, 2004-0857 (La. 12/1/04), 889 So. 2d 1019. The Louisiana Supreme Court in *Hoag* reaffirmed the long standing decisional law in Louisiana that "judgment creditors cannot mandamus political subdivisions to appropriate funds for payment of a judgment rendered against the respective political subdivisions." *Id.* at 1023 (citing *Jones v. Traylor*, 94-2520 (La. App. 4 Cir. 8/23/95), 660 So. 2d 933; *Landry v. City of Erath*, 93-308 (La. App. 3 Cir. 12/8/93), 628 So. 2d 1178; *State, Dept. of Trans. & Dev. v. Sugarland Ventures, Inc.*, 476 So. 2d 970 (La. App. 1 Cir. 1985); *Fontenot v. State, Through Dept. of Highways*, 358 So. 2d 981 (La. App. 1 Cir. 1978), *rev'd on other grounds*, 355 So. 2d 1324 (La. 1978)).

In *Hoag,* a group of coroners filed suit against the State of Louisiana to collect past due and future compensation under then La. R.S. 33:1599, and obtained a judgment in their favor. *Id.* at 1021. The Louisiana legislature never appropriated funds to satisfy the judgment. The

plaintiffs thereafter filed suit seeking a writ of mandamus directing the state treasurer and legislature to appropriate funds to satisfy the judgment. *Id.* at 1022. The Louisiana Supreme Court held that "a writ of mandamus directing the legislature to appropriate funds is an impermissible usurpation of legislative power by the judiciary."[14] *Id.* at 1025 (emphasis added); *see also Newman Marchive Partnership, Inc. v. City of Shreveport*, 2007-1890 (La. 4/8/08); 979 So.2d 1262 ("[A]ny judicial order compelling the [political subdivision] to pay those funds would constitute an unconstitutional seizure of public funds under La. Const. art. XII, § 10(C)").

Finally, the reach of Louisiana's anti-seizure provisions precludes even recordation of a judgment from creating a judicial mortgage on the property of the governmental entity. *See Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, Inc.,* 2006-0582 (La. 11/29/06), 943 So. 2d 1037.

In short, the putative Class Members before this Court have no legal means by which they may enforce judicially any judgment they might obtain against the Levee Districts.

> **3.      The Levee District Defendants Quite Reasonably Do Not Intend to Pay the Damages Sought by the Class Members as a Result of this Natural Disaster, and Cannot Do So Given Their Responsibility To Protect the Citizens of New Orleans and the Surrounding Area from Future Flooding.**

The settling parties will offer evidence and testimony at the certification and fairness hearings that the Levee Districts will not, under any circumstances, pay the extraordinary damages claimed by the Class resulting from this natural disaster, as to do so would render them unable to continue to perform their public duties.[15] The objection filed on behalf of plaintiffs in

---

[13] 2001-0089 (La. App. 4 Cir. 3/27/02); 814 So.2d 648.

[14] The Court noted that mandamus can only lie when "the public official to whom the writ is directed may exercise no element of discretion when complying," and stated that "[t]he very act of appropriating funds is, by its nature, discretionary and specifically granted to the legislature by the constitution." *Id.*

[15] *See e.g.,* La. R. S. 38:281(6) ("'Levee district' means a political subdivision of this state organized for the purpose and charged with the duty of constructing and maintaining levees, and all other things incidental thereto

the *Sims* matter and certain other cases (the "Sims Objection or Objections") (Doc. No. 18134) nevertheless wrongly asserts that the State is liable for the debts of the Levee District, a political subdivision. This is flatly incorrect. "[N]o legal liability arises against the state in the event of a judgment against the levee district or its officers." *Vogt v. Orleans Levee Dist.*, 294 F.3d 684, 693 (5th Cir. 2002). As a matter of law, only funds appropriated by the political subdivision against which any judgment is entered (and not the state) may be used to pay such judgment:

> Any judgment rendered in any suit filed against the state, a state agency, or a political subdivision, or any compromise reached in favor of the plaintiff or plaintiffs in any such suit shall be exigible, payable, and paid **only** [1] out of funds appropriated for that purpose by the legislature, *if* the suit was filed against the state or a state agency, or [2] **out of funds appropriated for that purpose by the named political subdivision, *if* the suit was filed against a political subdivision**.

La. R.S. 13:5109(B)(2) (numbers, emphasis and highlight added).[16]  In *Newman Marchive Partnership, Inc. v. City of Shreveport, supra*, the Louisiana Supreme Court reviewed Article XII, section 10(C) and La. R.S. 13:5109, and confirmed that judgments against a political subdivision may only be paid from funds appropriated by that political subdivision:

> Admittedly, article XII creates a frustrating dichotomy for the state's judgment creditors. As one commentator remarked, "the apparent liberality of abolishing most immunity from suit was offset by the continuation of a severe limitation on a private citizen's ability to enforce a judgment against the state, a state agency, or a local governmental entity." Lee Hargrave, *"Statutory" and "Hortatory" Provisions of the Louisiana Constitution of 1974,* 43 La. L.Rev. 647, 653 (1983). **Still, the combined effect of article XII, section 10(C) and LSA-R.S. § 13:5109(B)(2) is clear. Judgments against a political subdivision of the State may only be paid "out of funds appropriated for that purpose by the named**

---

within its territorial limits") and La. R. S. 38:281(7) ("'Levee and drainage district' means a political subdivision of this state organized for the purpose and charged with the duty of constructing and maintaining levees, drainage, and all other things incidental thereto within its territorial limits") [Orleans and East Jefferson are levee districts; Lake Borgne Basin is a levee and drainage district]. *See also* La. R. S. 38:291 and 301 *et seq*.

[16]  The constitutional and statutory provisions concerning the formation of the Southeast Louisiana Flood Protection Authority-East ("SLFPAE") clearly provide for the continued existence of the Levee Districts after the formation of SLFPAE. By Acts 2006, 1st Ex.Sess., No. 43, § 1, ratified September 30, 2006, the Louisiana Constitution was amended to provide that: "Levee districts as organized and constituted on January 1, 1974 *shall continue to exist*, except that" the legislature may provide for their consolidation, division, or reorganization, or may establish regional flood protection authorities. La. Const. Art. 6, § 38(A) (emphasis added).

**political subdivision,"LSA-R.S. 13:5109(B)(2);** *Hoag,* **2004-0857, p. 5, 889 So.2d at 1023,** and under no circumstance shall "public property or public funds ... be subject to seizure,"La. Const. art. XII, § 10(C).

*Newman*, 979 So.2d at 1266.  *See also  Vogt v. Board of Commissioners of the Orleans Levee District*, 814 So.2d at 654 ("for a judgment to be exigible, payable, or paid, there must first be *an appropriation of funds by the governing body against whom the judgment was rendered"* (emphasis added)).  *Cf. Board of Dir. of Indus. Dev. Bd. of City of Gonzales v. All Taxpayers, Prop. Owners, Citizens of City of Gonzales*, 2005-2298 (La. 9/6/06); 938 So.2d 11, 20 ("[La. Const. art. VII, § 14(A)] is violated when public funds or property are gratuitously alienated").

The objection filed by class members Mary Brinkmeyer, Michelle LeBlanc, and Thomas C. Stuart (the "Brinkmeyer Objection or Objections") (Doc. No. 18179) asserts that there is no limited fund because "although [the Levee Districts] cannot be forced to satisfy a monetary judgment against them, they can choose to pay a judgment or to contribute to a settlement fund."[17]  This reflects a misunderstanding of the limited fund doctrine.

The fund is limited because the Levee Districts' assets are immune from seizure.  Beyond this, the Levee Districts will confirm that they will not pay these extraordinary damages.  The Levee Districts will also confirm that they cannot pay these extraordinary claims and fulfill their obligations to protect the citizens of New Orleans and the surrounding regions from future catastrophic flooding.  Even if relevant, the objectors ask this Court not to accept this evidence, but rather to ignore it.

The objectors request that this Court should ignore the Levee Districts' immunity from seizure and base its decision on *speculation* about a future possibility that will likely never occur and that is contradicted by the evidence.  This is wholly improper.  As the United States Fifth Circuit has repeatedly recognized, "[s]peculation has no evidentiary weight."  *Westchester Media*

---

[17] Brinkmeyer Objection, pp. 1-2.

*v. PRL USA Holdings, Inc.*, 214 F.3d 658 (5th Cir. 2000); *see also In re Cohen*, 507 F.3d 610 (7th Cir. 2007) ("speculation is not evidence"); *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625 (9th Cir. 2005) (same).  *See also Broyard v. Rainer*, 2003-0123 (La. App. 4 Cir. 2003), 850 So. 2d 793 (quoted in *Bacon v. Ace American Ins. Co.*, 2008 WL 5377998 (M.D. La. 2008) ("Lawsuits may not be decided on mere speculation . . .").

It is on this basis that courts routinely exclude speculative testimony of lay witnesses on the basis of speculation.  *See e.g.*, *Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993) (holding that district court properly excluded lay witness' speculative testimony).[18] Indeed, expert testimony, which is not constrained by the personal knowledge limitations of lay testimony, also cannot be grounded in "subjective belief or unsupported speculation."  *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)).[19]

Further, in *Vogt v. Orleans Levee District*, *supra*, the Fifth Circuit rejected for purposes of Eleventh Amendment analysis the very argument made here by the Sims Objectors that a person or party "could go to the [state] legislature and request that state money be appropriated to pay the judgment [against the levee district]":

---

[18] *See also Infusion Res., Inc. v. MiniMed, Inc.*, 2002 WL 922377, (E.D. La. 2002) (striking portion of lay witnesses' affidavit as speculative); *Kocher v. Loyola Univ.*, 1997 WL 79299 at *1 (E.D. La. 1997) (holding that "[t]estimony based on mere personal belief, conjecture or speculation . . . is excludable"); *Kloepfer v. Honda Motor Co., Ltd.*, 898 F.2d 1452, 1459 (10th Cir. 1990) (holding that that speculative lay testimony was properly excluded because it would not have been based on the witness's perception).

[19] The law's recognition that speculation cannot serve as a foundation for Court rulings or parties' claims is found in numerous contexts. *See e.g.*, *Holloway v. Gaylord Chem. Corp.* 1995 WL 638605 (E.D. La. 1995) (court refused to grant temporary restraining orders "on the basis of mere speculation"); *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007) (court refused to entertain ineffective assistance of counsel claims for failure to call certain witnesses because "allegations of what a witness would have testified are largely speculative"); *Chase v. Hilton Hotels Corp.*, 682 F.Supp. 316, 318 (E.D. La. 1988) ("Under Louisiana law, damages are not recoverable where they are based on conjecture or speculation."). *See also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level"); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (same); *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754 (5th Cir. 2002) ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial").

> This court has consistently dismissed such arguments as too speculative for Eleventh Amendment analysis: "[W]e do not consider 'a state's voluntary, after-the-fact payment' of a judgment to be a liability against the state's treasury."

*Vogt*, 294 F.3d at 693.  *See also Hudson v. City of New Orleans*, 174 F.3d 677 (5th Cir. 1999) (possibility that the state "will elect to pay a judgment against the Orleans Parish District Attorney's office" could not transform that office into the "alter ego" of the state to afford Eleventh Amendment immunity).

Whether discussing the state or the Levee Districts as political subdivisions, speculation regarding future voluntary payments on judgments yet to be entered for the damages sought by the Class Members is legally irrelevant to the limited fund rationale.  The Court should not accept the objectors' invitation to engage in such speculation.  It would be improper to do so. The fund is limited because the Levee Districts' assets are immune from seizure.

Finally, the Levee Districts are unique public bodies established for the protection of the people they represent,[20] and whose assets are primarily derived from taxing the people they represent.[21]  Although not expressly raised by the objectors, it is worth noting that as a matter of law, the Levee Districts could not levy a tax to pay for the damages alleged in this case.[22] Further, even were this possible, the tax would have to be voted on by essentially the same people who make up the Class,[23] thereby resulting in the preposterous proposition that the Class Members should be asked to tax themselves to pay for their own damages!

---

[20] *See* footnote 12, above.

[21] *See* La. Const. Art. 6 Sec. 39 and La. R. S. 38:404.

[22]  *See* La. Const. Art. 6 Sec. 39 (limiting the authority to tax to specific purposes).

[23]  *See* Art. 6 Sec. 39(B) (should a levee district intend to increase existing taxes, such increase "shall take effect only if approved by a majority of the electors voting thereon in an election held for that purpose"); Art. 6 Sec. 39(C) (same for regional authorities).

**B.     The Whole of the Limited Fund is Devoted to the Claims of Class Members**

This consideration is easily satisfied in this case.  For the reasons discussed fully elsewhere -- all available insurance proceeds are being tendered, and the Levee Districts' assets are immune from seizure.  *See* Sections II(A)(1) – (3) above, pp. 7–18.  As the *Ortiz* Court recognized, when dealing with insurance assets the fund is limited "in the traditional sense" and "the way to demonstrate the limit [is] clear."  *See Ortiz*, 527 U.S. at 851.

**C.     The Class Members are Treated Equitably Among Themselves**

Unlike in *Ortiz*, the conflict between present and future claims does not exist in this case. Indeed, the concern regarding that conflict permeates the *Ortiz* decision and analysis.  *See Ortiz*, 527 U.S. at 853-56.  Nor have Class Counsel in this case negotiated a deal on the side for select claimants to the detriment of the remaining members of the proposed class.  *See id*, 527 U.S. at 824 and 852.  Nor do there exist class members with greater rights to insurance proceeds that are being treated on the same basis as other class members with less valuable rights to insurance assets.  *See id*, 527 U.S. at 857-58.  It was this inequitable treatment of groups of class members whose interests conflicted that troubled the *Ortiz* Court, not that the exact amount each class member might receive need necessarily be determined at the certification/fairness hearings stage of the litigation.

Furthermore, the proposed Class Settlement Agreement contains structural protections to ensure that funds under each Levee District's policy will not be available to any Class Member that does not have a claim against that Levee District.  Finally, as discussed in Section V(A) below, pp. 23-27, there is no requirement for a distribution plan at this stage.

**III.     The Rule 23(a) Criteria Are Met.**

At least one objection raised the criteria set forth under Rule 23(a).  The Settling Defendants do not concede that the requirements of Rule 23(a) could be satisfied in a *litigation*

NO.99937258.1

class and expressly reserve all rights and defenses in that regard.  However, in a settlement context, evidence in support of each will be presented to the Court at the hearing:

(i) With respect to numerosity, the number of Persons in the Hurricane Affected Geographic Area satisfies the numerosity requirement.

(ii) The commonality requirement requires only a single common issue.  *See Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).  All plaintiffs allege damages that they assert were caused by the fault of the Levee Defendants.  Further, given the Parties' agreement to a settlement that resolves the bulk of the individual issues, the fairness of the proposed settlement presents an overarching common question of law and fact.  *See In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 177 (E.D. Pa. 1997) ("The fairness of the settlement is . . . a common question . . ." because "[a]ll class members share a common interest in the factual and legal questions that must be answered to determine whether the settlement is fair, reasonable, and adequate.  The fairness inquiry also arises from a common nucleus of operative facts and is therefore a common question").

(iii) Turning to typicality, the test focuses on the general similarity of the remedial theories behind the class members' claims.  *See Jenkins v. Raymark Indus. Inc.*, 782 F.2d 468, 472 (5th Cir. 1986); *see also In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 218 (E.D. La. 1998).  One of the purposes of the typicality requirement is to ensure that the representatives' interests are "aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members."  *In re American Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996).  Here, the Class Representatives have been deposed and the issues related to their adequacy and typicality have been fully

explored.   These deposition transcripts will be entered into the record at the certification hearing.[24]

(iv) With respect to adequacy of representation, among other things, this requirement ensures (a) that the named plaintiffs' interests are sufficiently representative of those of the class to render them appropriate class representatives; and (b) that the named plaintiffs and their lawyers are sufficiently qualified to represent the interests of absent class members.  *Baffa v. Donaldson, Lufkin, & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

The first of these two elements is designed to avoid certification where "the plaintiffs have interests antagonistic to those of other class members. . . ."  *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 165 (S.D.N.Y. 2000). There is no such antagonism of interests here.  The Class Representatives have the same interest as the other Class Members.  They are not receiving any extra-judicial premium for their services.  And they have no other interest in the outcome of the settlement that is at odds with the interests of the Settlement Class they seek to represent.[25]

Also, Class Counsel are intimately familiar with the factual and legal issues involved in this matter.  They are familiar with all aspects of the settlement.  And, there is no conflict of interest between the Class and Class Counsel.[26]

In this regard, under the Class Settlement Agreement, the Court has complete oversight in awarding any attorney's fees.[27]  Class Counsel have confirmed that they will not seek an award

---

[24] *See also* Declarations of the Class Representatives attached to the Joint Motion as in globo Exhibit "2" (Doc. No. 16647-9).

[25] *Id*.

[26] *See* Affidavits of Class Counsel attached to the Joint Motion as *in globo* Exhibit "3" (Doc. No. 16647-10).

[27] *See* Class Settlement Agreement, Section III(12 and 16) (Doc. No. 16647-2).

of attorney's fees.  And Class Counsel have even bound themselves to oppose any request for

fees that others might make.[28]

## IV.    The Court Approved Notice Campaign was Extensive.

The affidavit/testimony of Dr. Shannon Wheatman will establish that each element of the

notice program approved by the Court was implemented.  Below is a brief summary of the notice

program:

### *CAFA NOTICE*

- On December 23, 2008, within the 10 day period required by the Class Action Fairness
  Act of 2005, Hilsoft Notifications sent a complete notice packet by certified mail to the
  51 Attorneys General and the United States Attorney General.

### *MAILED NOTICE*

- Mailings were not simply sent to the Class member's last known address in Louisiana.
  An extensive address updating protocol was employed, that has been used successfully
  in numerous cases.  Hilsoft Notifications found every address that was located in the
  Hurricane Affected Geographic Area and used third party locator services to find a
  current address for anyone who had lived or had a business in the Hurricane
  Geographic Affected Area.

- Prior to mailing, all addresses were checked against the National Change of Address
  database maintained by the United States Postal Service.  In order to ensure the most
  accurate mailings possible, addresses were also certified via the Coding Accuracy
  Support System and verified through the Delivery Point Validation.  The addresses
  were further cross-checked with the list of all persons who had filed a Form 95 claim.

- On January 5, 2009, mailings were sent to 657,033 households and 8,662 businesses.
  On January 28, 2009, mailings were sent to an additional 80,046 Class Members who
  had filed a Form 95 claim.

- Mailings were sent out to Class members in the 50 states and even to 496 Class
  members who moved abroad.  Notices were re-mailed if returned to alternative
  addresses found through Lexis or United States Postal data.

- Overall, direct Notices reached approximately 86.5% of the Class.

- Dr. Wheatman will testify that, in her experience, this reach percentage far exceeds that
  achieved in many other court-approved notice programs, that the Class was adequately

---

[28] *See* Class Settlement Agreement, Section III(16) (Doc. No. 16647-2).

reached, and that with more than 45 days from the completion of the mailed Notice until the objection deadline and 65 days until the fairness hearing, Class members were allotted more than adequate time to act on their rights.

### Publication Notice

- To extend coverage to the majority of the Class who still reside in Louisiana, multiple quarter page notice placements appeared in 10 of Louisiana's daily metro newspapers.

### Press Release

- On January 5, 2009, a party-neutral, Court-approved informational release was issued to approximately 4,490 press outlets throughout the United States.

### Radio PSAs

- Court-approved nationwide radio public service announcements ("PSAs") were recorded and produced in 15, 30, and 60-second lengths, and distributed to more than 4,230 radio stations throughout the United States.

- As of March 15, 2009, 80 radio stations in the United States have reported airing the PSA a total of 8,040 times, for an average of 100 broadcasts per radio station. The total number of audience impressions from the broadcasts is 22,759,100.

### Internet Activities

- On January 5, 2009, the Court-approved website, www.LeveeBreachClass.com, went live. By logging on to this website, Class members could obtain additional information about the settlement, including: the Detailed Notice; preliminary approval order, Complaint, and the Settlement Agreement. Numerous class members went to the web site.

### Toll-free Number

- On January 5, 2009, the toll-free number became operational. Numerous class members called this number and were provided answers to frequently asked questions.

In preparing the Notice Program in this case, Hilsoft Notifications employed methods well established in this field. The Notice Program was successful.

**V.    The Content of the Court Approved Notice was Sufficient.**

    **A.    Neither the Notice nor the Class Settlement Agreement Must Include a Distribution Plan.**

Very few objections relate in any way to the content of the notice.

- 23 -

The Brinkmeyer Objection primarily asserts that the notice approved by this Court was deficient because it fails to allow Class Members to estimate their individual recoveries. The Sims Objection makes a similar argument.[29]  This is not a legal requirement for valid notice, particularly in a limited fund settlement. And there is no mandatory requirement that class settlements must include a framework for distribution and allocation prior to court approval.

In positing this argument, the Brinkmeyer Objection first notes that certain of the settlement notices in the cases listed in Dr. Wheatman's prior affidavit[30] "describe a range of recovery for individual class members."[31]  But the objectors fail to inform the Court that the notices in *other* cases mentioned in Dr. Wheatman's affidavit did <u>not</u> provide such a range of recovery, but involved unknown recoveries for class members,[32] which Dr. Wheatman will testify, in her experience, is common.

Moreover, the law does not require that a distribution plan be formulated prior to class notification. *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988), *citing, In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 223-224 (5th Cir. 1981),  *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982).   In rejecting the same argument, the *"Agent Orange"* Court explained:

> The prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case. This can be done

---

[29] *See* Sims Objection, p. 16.

[30] *See* Joint Motion, Exhibit "4" (Doc. No. 16647).

[31] *See* Brinkmeyer Objection, p. 5.

[32] *Id.*  (For example: PPO discount litigation in *Gunderson v. F.A. Richard & Associates, Inc., et al.* (No. 2004-2417-D, 14th Jud. Dist. Ct. Calcasieu Parish); the crawfish farming class action, *West v. G.H. Seed & Rhone-Poulenc* (No. 99-C-4984-A, 27th Jud. Dist. Ct. St. Landry Parish); the gas release cases, *Thibodeaux v. Conoco Phillips Inc.* (No. 2003-481, 14th Jud. Dist. Ct. Calcasieu Parish); *Morrow v. Conoco Inc.* (No. 2002-3860, 14th Jud. Dist. Ct. Calcasieu Parish and *In Re Educational Testing Serv. PLT7-12 Test Scoring Litig.* (MDL 1643, E.D. La.) (only one Sub-group knew their recovery)).

before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement. The formulation of the plan in a case such as this is a difficult, time-consuming process. To impose an absolute requirement that a hearing on the fairness of a settlement follow adoption of a distribution plan would immensely complicate settlement negotiations and might so overburden the parties and the district court as to prevent either task from being accomplished. Moreover, if a hearing on a settlement must follow formulation of a distribution plan, then reversal of any significant aspect of the plan on appeal, as has occurred in the instant case with regard to the establishment of a foundation, would require a remand for reconsideration of the settlement, followed by yet another appeal. There is no sound reason to impose such procedural straitjackets upon the settlements of class actions. Finally, we note that Chief Judge Weinstein's approval of the settlement was subject to formulation of and hearings on a plan for distribution.

*In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d at 170.

Objectors rely on selected language from the *Manual for Complex Litigation* suggesting that notice *should* include information allowing class members to estimate their individual recoveries.[33] But the Fifth Circuit in *Corrugated Container* declined to consider such a requirement as mandatory. *See Corrugated Container*, 643 F.2d at 224 ("The court may have decided that estimates of unit recovery were too unreliable to submit."). *See also In re Catfish Antitrust Litig.*, 939 F.Supp. 493, 499 (N.D. Miss. 1996) (addressing objectors' concern that they were not aware of how much each would ultimately receive, describing that as "unavoidable", and adding that "[i]t is impossible for anyone to determine how much each class member will receive from this settlement until the number of claimant class members eligible to obtain a portion of this settlement is known"). Indeed, the same section of the *Manual for Complex Litigation* cited in the Brinkmeyer Objection also concludes --

> often, however, the outcome of objections to or concerns over the
> settlement terms and the details of allocation and distribution are

---

[33] *See* Brinkmeyer Objection, p. 4 (*citing Manual for Complex Litigation* § 21.312, at 417-16 (4th ed. 2007)).

> not established until after the settlement is approved.   In that situation, claim forms are distributed after the approval.

*Manual for Complex Litigation*, § 21.312 (4th ed. 2007), citing as an example, *In re Holocaust Victim Assets Litig.*, No. CV 96-4849, 2000 U.S. Dist. LEXIS 20817, at 13 (E.D.N.Y. Nov. 22, 2000); *see also, In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d 139 (E.D.N.Y. Aug. 2, 2000).

"The weight of authority rejects the proposition that a specific formula must always be included in the notice." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) (rejecting objectors' contention that notice must contain a formula for calculating individual awards, *citing Grunnin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir. 1975) and *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987)).   *See also In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 480 (S.D.N.Y. 1998) (finding appropriate a two stage procedure which deferred the plan of allocation until after approval).

Further, the very nature of a limited fund settlement suggests strongly that such determination may, and perhaps should, be made after the fund is judicially established.  *See* e.g., *In re Drexel Burnham Lambert, Inc.*, 130 B.R. 910 (S.D.N.Y. 1991), *affirmed*, 960 F.2d 285 (2d Cir. 1992), *cert. dismissed*, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993) (approving a mandatory, limited fund settlement and finding that determination of individual recoveries through a post-approval allocation procedures within each subclass was not an impediment to approval).

Finally, the teachings of *Ortiz* do not suggest a different result.  For example, in one of the historical decisions cited in *Ortiz* with approval,[34] *Morrison v. Warren*, 174 Misc. 233, 20 N.Y.S.2d 26 (1940), the Court <u>after</u> judicially recognizing the limited fund directed that the

---

[34] *Ortiz*, 527 U.S. at 837.

referee be appointed and "take proof of and fix the amount of the claims and make distribution of the insurance fund." *Morrison*, 20 N.Y.S.2d at 28. The joint movants suggest a similar process is appropriate in this case.

**B.    Objectors' Additional Notice Arguments are Flawed.**

- The Brinkmeyer Objection complains that the notice did not state the size of the class.[35] It is quite rare to find a notice that provides this kind of information, as opposed for example to outlining geographic areas like those that comprise the three subclasses in this case. Further, given the nature of this case, most (if not all) of the Class Members are certainly aware generally of the population in the Hurricane Geographic Affected Area.

- The Sims Objection incorrectly states that the "notice in this case did not inform Class Members that a mandatory, non-opt-out class was sought."[36]   To the contrary, the detailed notice, under the heading "14. What am I giving up?", provides that "Settlement Class Members do not have the right to get out of or be excluded from the settlement", further explaining that they will be bound by the settlement if approved by the Court.

- The Sims Objection also takes issue with not referencing the scope of the indemnity obligations and releases.[37]   However, notice to the Class should summarize the settlement's primary terms, not attempt to recite all terms in detail. *See e.g. Gottlieb v. Wiles*, 11 F.3d 1004, 1013 (10th Cir. 1993), *abrogated on other grounds, Devlin v. Scardelletti*, 536 U.S. 1 (2002); *Dillard v. City of Foley*,

---

[35] *See* Brinkmeyer Objection, p. 6.

[36] *See* the Sims Objection, pp. 16-17.

[37] *Id*. at p. 16.

NO.99937258.1

926 F.Supp. 1053, 1059, 1063 (M.D. Ala. 1995). Moreover, the notice refers to a web site at which the entire Class Settlement Agreement, including of course any provisions (including those raised), can be reviewed.

- Lastly, the Sims Objectors are critical of language in the notice to the effect that the Settlement Class can get no additional recovery because the levee districts are governmental bodies.[38]  But, there is no argument -- none -- made in this objection or in any other that the Levee Districts' assets can be seized to satisfy a judgment.  Further, as Dr. Wheatman will testify, this issue in no way affects the adequacy of notice to the Class.

In short, the Court approved Notices and the Notice Plan comported with Federal Rule of Civil Procedure 23 and law.

## VI.   The Settlement is Fair, Reasonable, and Adequate.

In considering whether to approve class action settlements, the Fifth Circuit has focused on the following factors: "(1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members." *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).

- There is no fraud or collusion behind this settlement.  No objector asserts otherwise.

- It is clear that continued prosecution of the numerous litigations would be lengthy and costly.  Moreover, discovery has taken place over the years in the related litigation in which the Parties have been involved, including the MR-GO

---

[38]  *Id.*

Consolidated Class Action and the Levee Consolidated Class Action.  The Parties have thereby become more educated concerning the particular issues involved and have had ample opportunity to determine the fairness and adequacy of the settlement.

- The Settling Defendants, of course, contend that there are significant legal barriers to the Class Members' successful litigation of their Claims.  These barriers include proving liability as to the Levee Defendants.  And the Settling Defendants further believe there are strong arguments against certification of a litigation class.  The Class Representatives dispute these points.  Through the proposed settlement, the considerable costs and risks facing the Class Members in the pursuit of their Claims are averted, as is the contentious issue of whether a Class may be certified for litigation purposes.

- Of course, these concerns were weighed against the backdrop of a limited fund, whereby successful prosecution of Class Claims against the Settling Defendants would ultimately result in total recovery that is no more than the amount that has already been placed in escrow under the terms of the Class Settlement Agreement. Successful pursuit of individual claims against the Settling Defendants might at best result in a higher individual recovery for a few Class Members, but would leave nothing for the vast majority of Class Members' Claims after exhaustion of the limited fund.  *See In re Orthopedic Bone Screw Prod. Liab. Litig.*, 176 F.R.D. at 177, 186 (finding that a limited fund settlement "places all claimants on the same plane, at the same time, with respect to [the defendant's] financial capacity to respond to all of the claims, leaving each claimants share to be determined by traditional application of equitable distribution standards."; and noting that when

- 29 -

weighing whether the settlement fell within the range of reasonableness, it could not ignore its overlapping finding that a limited fund existed).

- Full litigation of the Class Members' Claims, if successful, would result in a likely diminution of the limited fund for the payment of attorney's fees of between 1/4 and 1/3 of the total $21,000,000 (app.) fund -- or a reduction of between $5,000,000 to $7,000,000 to the fund before payment to Class Members.  Again, the fees of Class Counsel are being waived as part of the proposed settlement.  *See Faircloth v. Certified Fin. Inc.*, 2001 WL 527489 at *9 (E.D. La. 2001) (The Eastern District has acknowledged that "the majority of attorneys' fees awarded pursuant to the percentage method range between twenty-five and thirty-three and one-third percent of the common fund").[39]  Indeed, the Eastern District has routinely awarded attorneys' fees within – or even in excess of – this range.  *See id*. at *9 (finding that "Class Counsel's request for attorneys' fees in the amount of 35% of the settlement value [was] fair, adequate, and reasonable"); *In re OCA*, 2009 WL 512081 at *25 (awarding attorneys' fees of 28.5% of settlement fund); *Longden v. Sunderman*, 979 F.2d 1095 (5th Cir. 1992) (affirming district court's fee award of 27.5% of the settlement fund); *In re Harrah's Entm't, Inc.*, 1998 WL 832574 (E.D. La 1998) (awarding attorneys' fees of 26% of settlement fund). Louisiana state courts similarly award attorney's fees within this range.  *See e.g. Vela v. Plaquemines Parish Gov't*, 2000-2221 (La. App. 4 Cir. 3/13/02); 811 So.2d 1263.  ("The Court believes that an award of fees in the amount of 30% of the judgment value in this matter is appropriate").

---

[39]  The Eastern District has also recognized that a fee of 25% of an award "represents a typical benchmark." *In re OCA*, 2009 WL 512081 at *19 (quoting MANUAL OF COMPLEX LITIGATION (4th) § 14.121).

- Further, were this matter to be litigated fully and successfully in favor of the Class Members, Class Counsel would likely also be entitled to an award of reasonable costs in addition to attorney's fees. *See Faircloth*, 2001 WL 527489 at *9 (awarding full reimbursement of costs in addition to attorneys' fees); *In re OCA*, 2009 WL 512081 at *25 (same); *In re Harrah's*, 1998 WL 832574 at *7 (same).

- Moreover, the Settlement Agreement does not <u>grant</u> costs to plaintiffs' counsel. Rather, plaintiffs' counsel merely have the right to <u>request</u> an award of costs from the Court upon notice. Further, as will be re-confirmed at the certification/fairness hearings, such request, if ever made, will be considered by the Court only in conjunction with its decision as to the disposition of the Settlement Funds. At that time, the Court's review would presumably include analyzing any issues that may arise regarding which expenses are properly allotted to claims pursued against and settled with the Levee Districts, as opposed to hurricane-related claims against the Corps or other defendants. In short, should there be any dispute as to the nature or amount of any request for costs, it remains within the Court's power to resolve it, with the benefit of taking into account the full range and nature of Class Claims submitted and the disposition of the Settlement Fund.

- Class Counsel and the Class Representatives support the settlement. And as previously discussed, the number of objectors is extremely low.

The objectors nevertheless suggest that the settlement may not provide value to the class, based in large measure on a flawed analogy to cases that are easily distinguishable because none of the cases involved a limited fund. Further, those cases all involved either: (i) primarily non-monetary recovery (ranging from coupons to visors) when assets were subject to seizure by the

Class but not made available, (ii) recovery which struck the courts as akin to a marketing program that, through discounts provided to the class for future purchases from the defendants, compelled class members to buy more of the defendants' products to gain any value, or (iii) significant awards of attorneys' fee to class counsel (unlike this case).[40]

In contrast to those cases, when a limited fund is involved the prevailing consideration is that reduced class member awards to the many is preferable to full awards to the few, as the former leaves nothing for the lion's share of class members.  Cases like *Clement v. American Honda Finance Corp.*, 176 F.R.D. 15, 23 (D. Conn. 1997), cited in the Brinkmeyer Objection, deal with a scenario where "each class member would unquestionably fare better by bringing an individual action . . ."  That is not the case here, where all but the first individual actions would see no recovery due to the limited fund.

Moreover, this settlement does <u>not</u> involve payment of Class Counsels' fees.  Further, the primary rationale behind estimating attorney's fees is to help determine the possibility of an adverse influence on class counsel as they negotiated the settlement.[41]  That rationale has little relevance here given that (i) Class Counsel have waived their attorney's fees, and (ii) this is a limited fund case.  As the evidence will establish, the entirety of the available insurance proceeds are included in the settlement fund -- in other words, Class Counsel could get no more.

---

[40]  The cases relied upon in the Brinkmeyer Objection (pp. 6-7 and 10-11) are: *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 1995 WL 222177 (E.D. La.) (Sear, J.) (a proposed settlement involving items ranging from atlases to visors in lieu of monetary recovery and attorneys' fees and expenses of some $4 million); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Maine 2003) (a proposed settlement involving a 50% discount for music club members who purchase CDs from defendants, with $940,000 in attorneys' fees and $105,000 in expenses); *Clement v. American Honda Finance Corp.*, 176 F.R.D. 15 (D. Conn. 1997) (a proposed settlement with a maximum recovery for class members other than the class representatives of a $150 coupon towards a Honda car purchase to go along with $140,000 in attorneys' fees); *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106 (7th Cir. 1979) (proposed settlement payment of $200 plus a 36-month extended warranty, with the court expressing concern over class members not being able to determine the possible influence of attorneys' fees on the settlement); and *General Motors v. Bloyed*, 916 S.W.2d 949 (Tex. 1996) (a proposed settlement involving certificates for up to $1,000 towards the purchase of a GM truck, finding that class members should have been notified of the size of the attorneys' fee award sought).

[41]  *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1130 (7th Cir. 1979) (cited by the Brinkmeyer objectors).

With no fee payment, a couple of the objectors wrongly target merely the *potential* for reimbursement of actual costs, a common feature of virtually any class settlement.  As noted above, this component is neutral to the Settlement Class as these same costs would also be paid from the fund if the Class' Claims were fully litigated to final judgments.

And in all events, the Class Settlement Agreement is structured to allow the Court and the parties to have the benefit of seeing the range of claims asserted before evaluating any motion for reimbursement of Class Counsels' costs.  In other words, contrary to the objectors' argument that expenses should be itemized in a vacuum on the front end, the Court will be able on the back end to weigh any reimbursement request with the benefit of taking into account the nature and amount of claims and the disposition of the Settlement Fund.

As to the fees and expenses to be incurred by the special master and CADA, they must, under the terms of the Class Settlement Agreement, be based on a budget approved by the Court and counsel in advance, giving the Court considerable oversight and control over same.[42]  And there is no basis suggested by any objector upon which to argue that these fees will be more than the fees that would be earned by counsel for all Class Members (and deducted from any actual recovery) if their Claims were all fully litigated to final judgment.  Indeed, they will surely be far less.

It also bears mention that this settlement does not purport to resolve all Class Members' Claims against all parties.  What is limited - because of limited funds - is Class Members recovery against the Levee Districts and their insurer, not their potential recovery against other parties alleged to be culpable.

---

[42] *See* the Class Settlement Agreement, §§ III(13) and (14) (Doc. No. 16647-2)**.**

## CONCLUSION

The Parties submit that the requests set forth in the Joint Motion for final certification of the proposed Settlement Class and thereafter approval of the Class Settlement Agreement, are well grounded in fact and law and should be granted.

Respectfully submitted,

LAW OFFICES OF JOSEPH M. BRUNO

BY:   /s/ Joseph M. Bruno
          Joseph M. Bruno (# 3604)
          855 Baronne Street
          New Orleans, Louisiana  70113
          Telephone:  (504) 525-1335
          Telecopier:  (504) 561-6775
          E-mail:  jbruno@jbrunolaw.com

ON BEHALF OF CLASS COUNSEL, AND AS LIAISON COUNSEL FOR LEVEE AND MR-GO-PLAINTIFF SUBGROUP LITIGATION COMMITTEES

Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.

By:    /s/ Gerald E. Meunier
          Gerald E. Meunier (# 9471)
          2800 Energy Centre
          1100 Poydras Street
          New Orleans, Louisiana 70163-2800
          Telephone:  (504) 522-2304
          Facsimile:  (504) 528-9973

LIAISON COUNSEL FOR LEVEE-PLAINTIFF SUBGROUP LITIGATION COMMITTEE

Domengeaux Wright Roy & Edwards

By:    /s/ James P. Roy
        James P. Roy (# 11511)
        556 Jefferson Street
        Lafayette, LA 70502
        Telephone:  (337) 593-4190
        Facsimile:  (337) 233-2796

LIAISON COUNSEL FOR MR-GO-PLAINTIFF
SUBGROUP LITIGATION COMMITTEE

MCCRANIE, SISTRUNK, ANZELMO, HARDY,
MAXWELL & MCDANIEL

BY:    /s/ Thomas P. Anzelmo
        Thomas P. Anzelmo (#2533)
        3445 N. Causeway Boulevard, Suite 800
        Metairie, Louisiana  70002
        Telephone:  (504) 831-0946
        Facsimile:  (504) 831-2492

ATTORNEYS FOR THE BOARD OF
COMMISSIONERS FOR THE ORLEANS LEVEE
DISTRICT AND THE ORLEANS LEVEE
DISTRICT

DUPLASS, ZWAIN, BOURGEOIS, PFISTER &
WEINSTOCK

BY:    /s/ Gary M. Zwain
        Gary M. Zwain (# 13809)
        Three Lakeway Center, Suite 2900
        3838 North Causeway Boulevard
        Metairie, Louisiana 70002
        Telephone No.:  (504) 832-3700
        Facsimile No.:  (504) 837-3119

ATTORNEYS FOR THE BOARD OF
COMMISSIONERS FOR THE EAST
JEFFERSON LEVEE DISTRICT, THE EAST
JEFFERSON LEVEE DISTRICT, THE BOARD
OF COMMISSIONERS FOR THE LAKE
BORGNE BASIN LEVEE DISTRICT, AND THE
LAKE BORGNE BASIN LEVEE DISTRICT

NO.99937258.1

LUGENBUHL, WHEATON, PECK, RANKIN &
HUBBARD


BY:    /s/ Ralph S. Hubbard III_____
       Ralph S. Hubbard III (# 7040)
       601 Poydras Street, Suite 2775
       New Orleans, LA  70130
       Telephone:  (504) 568-1990
       Telecopier:  (504) 310-9195


and


PHELPS DUNBAR LLP

BY:    /s/ S. Ault Hootsell III_____
       S. Ault Hootsell III (# 17630)
       Canal Place
       365 Canal Street, Suite 2000
       New Orleans, LA  70130-6534
       Telephone:  (504) 566-1311
       Telecopier:  (504) 568-9130

ATTORNEYS FOR ST. PAUL FIRE AND
MARINE INSURANCE COMPANY


## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2009, I electronically filed the foregoing with the Clerk of Court by using the CMECF system which will send a notice of electronic filing to all counsel of record.


/s/ S. Ault Hootsell III_____