# EXHIBIT 1

**Page 1**

1  Tuesday, January 8, 2009, Thursday, January 8, 2009, Katrina
2                  Canal Breaches - Part 1.
3        THE COURT: Good morning.
4        DEPUTY CLERK: Civil Action 05-4182, in re
5  Katrina Canal Breaches consolidated litigation. Pertains
6  to Robinson case, 06-2268, and the motion for Document No.
7  16510, Plaintiff's Motion for Partial Summary Judgment and
8  Docket No. 16511, defendant, United States Motion to
9  Dismiss or in the alternative for Summary Judgment.
10       THE COURT: Make your appearances.
11       MR. O'DONNELL: Good morning, Your Honor, Pierce
12 O'Donnell for the plaintiffs.
13       THE COURT: Good moring, sir.
14       MR. SMITH: Good morning, Your Honor, Robin Smith
15 for the United States, and with me is Jeff Ehrlich.
16       THE COURT: Good morning.
17       MS. GILBERT: My name is Elisa Gilbert with the
18 Gilbert Firm in the New York, and representing the Amici
19 on the supporting motion for the plaintiff.
20       THE COURT: Thank you.
21       THE COURT: Okay, have you discussed between an
22 among yourselves who is going to go first?
23       MR. O'DONNELL: No, Your Honor.
24       THE COURT: We have cross motions.
25       MR. O'DONNELL: I would suggest perhaps the

**Page 2**

1  United States go first, but it's up to Mr. Smith.
2        MR. SMITH: I would be happy to go first, Judge.
3        THE COURT: All right, go ahead, sir. And let me tell
4  you how I'm going to do this. I know you've made elaborate
5  presentations and prepared for this is assiduously as you always
6  do, but the way I'm going to approach this, which is most
7  informative for me, is to go through a series of questions. I'm
8  going to ask different questions for each you. Some of them
9  somewhat redundant but permutations of the same theme, scripted
10 the questions. I may modify them as we go along. It is the
11 best way, sort of a dialogue, is the best way for me to
12 calibrate the issues here. Then I'm, of course, going to allow
13 you after that to make any point you want to make. This is
14 to -- although let me make it clear that I approach this as I do
15 any case, if one were one plaintiff and one and one defendant.
16       I understand it's a catastrophe. I understand
17 hundreds of thousands of people involved. I understand the
18 consequence to the Government, however, the way that my judicial
19 framework is, is that I look at it as one person suing the
20 Government.
21       The magnitude of it, I'm very conscious of it, but
22 it's not going to make any difference. The magnitude doesn't
23 make any difference as to whether there was a mandate, whether
24 there is due care or whether there was decisions grounded in
25 policy.

**Page 3**

1  With that, Mr. Smith, I know you have a prepared -- but let me
2  go through my questions. I've changed a few this morning as I
3  thought back over them and I -- let me go to yours.
4        Okay. One of the first issues is under the two prong
5  Berkovitz test prior to any -- bottom line is, was there a
6  mandate that the Corp did not observe there by losing the
7  immunity granted to it by the -- the exception, FWCA, I should
8  say. And I know it's your position that with the FWCA -- by
9  the way, if the court reporter has any problems, let me know
10 because we're all going to want this transcript -- that you
11 contend, you the Government, contend that you complied with the
12 FWCA and that there was no requirement to consult with the
13 various agencies denominated in the FWCA until after
14 authorizations. I am aware that in 1946 there was an amendment
15 of the 1936 Act. I'm aware in 1958 there was an amendment of
16 the 1946 Act, and in the '46 Act, among other things, the word
17 "proposed" or "authorized" was placed in the statute.
18       So, my question is this -- probably be a fairly long
19 answer. One, do you contend that you complied with the FWCA by
20 consuming a firm, or conferring with the federal agencies, and
21 tell me as precisely as you can how you did, both between '46
22 and '51, and between '51 and after authorizations based on the
23 '58 Act? I think it's your position you really had no duty
24 until after authorization, which was in 1956.
25       The plaintiffs claim that you had a duty under the '46

**Page 4**

1  Act, and they stated and you disputed the fact that you did not
2  confer with the appropriate agencies at this time.
3        So I guess you can give me a long as in essence of
4  presentation on your view of the FWCA based on the questions and
5  statements that I have set forth. Go ahead, sir.
6        MR. SMITH: Yes, Your Honor, Robin Smith for the
7  United States. It's our position that Fish and Wild Life
8  Coordination Act that was in affect prior to the
9  authorizations of MRGO, which occurred in 1956 did not
10 require consultation or reporting. The language of the act
11 says whenever waters are authorized to be controlled in any
12 way, constructing agencies shall consult. Prior to 1956,
13 the waters were not authorized to be controlled. Because
14 the waters were not authorized to be controlled, the
15 prefatory conditions clause requiring consultation was not
16 met. No waters were authorized to be controlled. So it's
17 our position that consultation was not required under the
18 '46 Act at any time prior to 1956.
19       THE COURT: So you filed a report with Congress
20 in 1951; is that correct?
21       MR. SMITH: Correct. The Chief's Report.
22       THE COURT: The Chief's Report was
23 pre-authorization?
24       MR. SMITH: It was, Your Honor. It was submitted
25 in '51, and five years later Congress authorized

1  undisputed that the Chief of Engineers never made a policy
2  decision one way or another about what to do about this looming
3  disaster called the MRGO.
4       THE COURT: That becomes a very important question
5  because -- and we'll get into that later.
6       MR. O'DONNELL: But, they didn't tell Congress
7  the way they were suppose to, to alert Congress.
8       THE COURT: I understand your argument.
9       MR. O'DONNELL: And if they had done it Congress
10 very well may have taken action and prevented this
11 calamity.
12      THE COURT: That's another question. While we're on
13 that, do you think you have to prove -- and tell me why we have
14 any case law at all -- this is something that's been troubling
15 me, because I have a lot of time and effort and money spent al
16 of this everyone, and it's been troubling me.
17      Do you think you have to prove that in fact, had this
18 been appropriately disseminated to Congress, that in fact
19 Congress would have actually done something, proved more likely
20 than not, because that's where --
21      MR. O'DONNELL: No, because ==nobody can prove==
22 ==that.== ==Too speculative.== The Fifth Circuit in Lee said the
23 reason why EAs don't work on this major dredging, why they
24 don't work for this major dredging is the speculative
25 nature of an EA, number one.

                                                              89

1  Congress was never informed. You know, I actually
2  have a piece of information that helps me on circumstantial,
3  whether it would be more likely than not. When Congress finally
4  found out in the de-authorization report what the MRGO was all
5  about, what it had morphed into, how much thousands of acres it
6  had killed, it shut that thing down, that is, i.e., it didn't
7  authorize any new dredging to take out the hurricane deposited
8  and sediment. And, two, it should shut it down.
9       You know, plaintiffs don't usually get that kind of a
10 fact in a case, but Congress acted responsibly when more fully
11 informed than they had been by the Corps. Adams says I don't
12 bear that burden of uncertainly because it's sort of like
13 contract law and damages. He would breaches, he creates the
14 uncertainty, bears the risk of uncertainty. I can't prove that.
15 Nobody can prove that. But, I can prove one thing, the purpose
16 of NEPA, like the FWDC, was to have a fully informed Congress
17 arbitrate these disputes. The Congress of the United States
18 never learned about the implications, the magnitude of what was
19 happening with the MRGO, despite the fact the Corps admits it
20 could have gone at any time to Congress to tell them.
21      THE COURT: We're going to come back to this
22 later, because I am going to take a break now. I've got a
23 good bit more to go through with you, and then we have --
24      MR. O'DONNELL: I'm happy, Your Honor.
25      THE COURT: But, I will take a little break. But one

                                                              90

1  of the things that's interesting -- and Mr. Smith needs to pay
2  attention to this -- I have it here. I may have
3  mischaracterized it. The Corps argued that "it informed
4  Congress of the dangers of potential catastrophic flooding in
5  New Orleans." So, that gets back to my question, well, what did
6  the Corps do about that knowledge? And that gets out of, not
7  necessarily NEPA and the FWCA, it gets into the policy decisions
8  I'm going to ask you about after the break.
9       MR. O'DONNELL: I was a lineman in football, and
10 occasionally I would miss my guy and he was going to kill
11 my quarterback. And I would whisper, "look out." I think
12 the best you can say is those snippets of information went
13 to Congress was a whispered "look out." It wasn't what was
14 required, and certainly didn't recommend any course of
15 action.
16      THE COURT: But, I think Mr. Smith told you they
17 weren't aware of the danger.
18      MR. O'DONNELL: But, now he says they told
19 Congress about it. Which is it?
20      THE COURT: That's what I want to talk about later on.
21      MR. O'DONNELL: But, maybe just reduces to a
22 disputed fact that allows us to go to trial.
23      THE COURT: We will see that, and I've got about 15
24 more questions for you, and we'll move on from there.
25      MR. O'DONNELL: Thank you, Your Honor.

                                                              91

1       THE COURT: We're going to take a recess for an
2  hour, approximately 1:30, but you can be a few minutes
3  late.
4       MR. O'DONNELL: May we leave our materials
5  here?
6       THE COURT: Absolutely.
7
8       (At which time the proceedings were recessed for
9  lunch.)

                                                              92

==Katrina Canal Breaches case, Part II - Afternoon Session==

DEPUTY Clerk: All rise. Court is in session. Please be seated.

MR. O'DONNELL: Good afternoon, Your Honor.

THE COURT: Good afternoon. I'm glad that I was able to help the local cafeteria.

MR. O'DONNELL: You did. We need to stimulate our economy.

THE COURT: Absolutely right. I agree. All right. Let me -- one second, here. And, O'Donnell, I'll let you come back to anything you --

MR. O'DONNELL: Sure, Your Honor.

THE COURT: You feel you have covered, just I will Mr. Smith. But right now I want to get into the policy aspects of this.

MR. O'DONNELL: If you could, as best you can, illustratively but not exclusively, tell me as precisely as you can what negligent act you argue that the Corp committed that would not be subject to discretionary function. What I would like you to do, if you could, is to go through each one and explain why the DFE wouldn't apply, and leaving out the First Prong This is prong two.

MR. O'DONNELL: Yes, Your Honor.

THE COURT: In other words -- and now I may ask you that one prong question, but as to prong two why were they not policy decisions as defined by Gaubert and other cases?

MR. O'DONNELL: Yes, Your Honor.

THE COURT: First, to give just the clarity, these are the acts that they committed were negligent, acts of omission or commission and not subject to the DFE.

MR. O'DONNELL: There is a continuum of time as you recognize in your prior decision.

THE COURT: Absolutely.

MR. O'DONNELL: And so I'd say ab initio we have the initial sort of up through construction what did they do wrong. And there is ton of after-acquired knowledge which Louisiana and federal law -- I'll get to the fact of federal laws they play on the DFE that they would also impose a duty to do something about it. The Louisiana landowner and proprietor of facility as massive as a waterway can't sit back and put it's head in the sand.

We say the design construction of the project was negligently done. And you know construction is sort of a word that keeps following -- it's sort of like operation and maintenance, but there is operation and there is maintenance. I'll get to that. But the design and constructions of the project, or as the case law sometimes says, the building of the project was negligent because the Corp -- or certainly should have known under negligence parlance -- that by direct -- and Dr. Kemp says this in his report -- that by introducing for the first time a direct conduit or waterway for water and storm surge that come from the Gulf of Mexico to the heart of Greater New Orleans was incumbent upon you under objective engineering standards and the duty to create a federal facility with due care. And certainly by the time you had the Bretschneider and Collins report, which you of course are familiar which of course is familiar with is in my PUFs. You knew there was a storm surge affect of the MR-GO and a marked defect occurred under some circumstances, and you had the Betsy experience which is what Bretschneider and Collins were modeling was incumbent upon you to do two things, to at least study -- and we say make provisions for a surge barrier somewhere, maybe near Bayou Lutetia or whatever, somewhere where it could interdict storm surge before you get to the urban environment. Secondly, because of the well known funnel affect, the geometry of the MR-GO, it was incumbent upon them to do something to create a surge barrier, something, as you know, they're going to spend $8000,000,000 now after the fact; building one we speak.

THE COURT: So you said at some point along the time continuum, first, obviously going to be an argument, and has been an argument that the initial design and construction was a quintessential act of discretion in that, one, Congress approved the basic location, although I know there was some argument about that, but that was a discretionary act. But certainly subsequently things occurred, and at some point along the time continuum, either from the very beginning to Katrina, at some time during the time continuum your contention was negligent not to create surge protection and not to armor the levees.

MR. O'DONNELL: And not to understand that you were going to destroy wetlands and to put some kind of a feasible -- there were feasible -- open an close salt water barrier down by the natural ridge, or anywhere down there. And also not to take into account the fact that the widening of the channel and depositing all this spoil was killing the wetland, something as you know they very carefully chronicled over the decade. One thing the Corp could do is tell us how much wetlands.

I would like to make a parenthetical. Mr. Smith said that the Corp really cared about the wetlands. I would like to see what would have happened if they hadn't cared about the wetlands. But, the point I'm making is that sometime when the Corp was -- after -- I'm going to concede only one thing for discretionary function, and I'm going to go to Indian Towing when we have a chance.

THE COURT: I'm going to ask you about that.

MR. O'DONNELL: The congressional decision to build a Gulf outlet was clearly a legislative act and we're not challenging it. And the concept that under due care that I'm challenging the statute of authorization, I am not. Nor do I seek an implied right either under FWCA and NEPA, okay? My tort case depends on Louisiana law which I

```
 1  never reach a conclusion or recommendation. And on this
 2  record for this motion it's s undisputed. In the face of
 3  the known safety hazards, they fail to act.
 4          THE COURT: Is there any -- I'm getting back to this
 5  question that's been bothering me. And I don't know if you
 6  found any -- if there is any case law that it haven't focused
 7  on. But, lets assume that I say you were right, that yes, the
 8  Corp should have informed Congress; the Corps should have made
 9  recommendations. This Corp can't on it's on go on the levee.
10  It can't do that without a congressional authorization, without
11  the money to do it.
12          MR. O'DONNELL: Actually they did. In the early
13  90s they did a little stretch in the Upper Reach 2 because
14  they could they could move it from O&M, Operation and
15  Maintenance to do this, but lets put that aside.
16          THE COURT: As a general rule.
17          MR. O'DONNELL: As a general rule.
18          THE COURT: They did an appropriations.
19          MR. O'DONNELL: It's a little nuisance fact for
20  the government, but lets deal that aside.
21          THE COURT: As a general rule they need an
22  appropriation. And, again, we're talking about --
23          MR. O'DONNELL: I agree, Your Honor.
24          THE COURT: We're talking about land base.
25          MR. O'DONNELL: And something of the scale we
                                                            17
```

```
 1  would need -- right.
 2          THE COURT: We're talking about -- when we say you
 3  were negligent -- and it wasn't policy -- but didn't your
 4  negligence -- and this is really not part of this, really
 5  robustly discussed in this motion and it bothers me. Did your
 6  negligence in fact cause the damage? How do we proof that --
 7  what is your burden, in essence, to prove what Congress more
 8  likely would have done or not done, or what would have occurred,
 9  I guess, or do you even need approval.
10          MR. O'DONNELL: Someone never informed of a
11  problem usually doesn't stumble upon a solution, number
12  one. Not having been informed, Congress couldn't act,
13  okay? Congress could have made a multitude of decisions.
14  We love the MR-GO. We love the ships, even though nobody
15  is using it even more. Keep it going. Keep it going.
16  He'res another 12 or 15 million a year. Congress could
17  have said, this is an economic fiasco. It joins a list of
18  other boondoggles done by government and we're going to
19  shut it down. Furthermore, we have this information that
20  you should have given us. You're given this hypothetical
21  that this thing really is morphed. It's killed the
22  wetlands. People saying it could -- you even say it could
23  destroy New Orleans. You know, maybe we need to keep it
24  open but we'll put some mitigation measures in. Lets put
25  in a IHNC surge barrier in the gold triangle. Lets o
                                                            18
```

```
 1  something about protecting the wetlands and bringing them
 2  back again. Oh, yeah, you have to have policy about
 3  maximizing protection of wetlands. Maybe we should do
 4  something about that, Army Corp. There is a range of
 5  things that could have been done, anyone of which except
 6  ignoring problem. I believe I have the benefit of saying,
 7  the fact that it's plausible and reasonable that these
 8  things could have happened establishes the causal
 9  connection.
10          As I said before lunch, I'm the first one to tell you
11  and to try to be intellectually honest that, who knows what
12  would have happened. But, the purpose of NEPA, and say the
13  FWCA at the creation is to avoid the need to have to speculate.
14  If Congress takes the issue, mediates the dispute and proceeds
15  with the project unaltered, that's a decision we must accept in
16  our democracy. But when Congress is deprived of that
17  opportunity, the Government can't come in here and say, Your
18  Honor, were immuned and we had move -- do anything we want.
19          THE COURT: Let me ask you this. There was a
20  statement made by the Corp that your reply memorandum -- and I'm
21  sure you're going to take exception to it.
22          MR. O'DONNELL: To the extent I've had time to
23  read it.
24          THE COURT: It says: "Plaintiffs effectively
25  concede that the Corp's decision to design, construct and
                                                            19
```

```
 1  operate and maintain the MR-GO without certain barriers and
 2  without armored banks are permissible discretionary acts
 3  under an unauthorized expansion to --"
 4          MR. O'DONNELL: I don't know what briefs Mr.
 5  Smith and his colleagues read. I saw that on the plain --
 6  I have no idea. I didn't see record cite, by they way, to
 7  my briefs or anywhere where I've conceded that. I've taken
 8  the position since 2006 -- foolish consistency perhaps --
 9  but I've taken the position -- the plaintiffs have taken
10  the position these were not permissible exercises of policy
11  choice, and I have no idea -- I did not make that
12  concession.
13          THE COURT: Well, Mr. Smith may be arguing. I'll let
14  him eloquently argue himself, but that the enabling legislation
15  did not provide for armoring surge protection, et cetera.
16  Therefore, the legislation was the legislation and the Corp was
17  bound to follow that mandate for the time.
18          MR. O'DONNELL: I understand the argument, but
19  personally, I don't know how that factor is true, which
20  ain't so, would ever lead to the conclusion that I've
21  conceded that all of these things were permissible policy
22  choices. Congress did very little. First of all, I've got
23  PUFs on this, which I think are largely undisputed. It's a
24  feasibility study, a lot of economics and whether a
25  waterway is justified and how much it's going to cost. And
                                                            20
```