# Exhibit 1

BEA, ROBERT

1/30/2009

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

--oOo--

IN RE KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION,

                              No.  05-4182 "K" (2)

PERTAINS TO:   ROBINSON, NO.
06-2268
_____

DEPOSITION OF ROBERT GLENN BEA

Friday, January 30, 2009

Reported By:

KATHLEEN WILKINS, CSR #10068, RPR, CRR

BEA, ROBERT

1/30/2009

Page 48

1           That will be conditional on the third
2  step, acceptability of those -- of the authorized
3  conditions, contingent on things such as an
4  Environmental Protection Act that's approved, and
5  approval decision, again, by the Corps of
6  Engineers that the initially proposed design
7  conditions are appropriate for the present
8  conditions.
9      Q.   I may have stopped that sentence a
10 little early because the next part of it, you say,
11 "Without any structures to control excessive and
12 prolonged water flow into the confined IHNC during
13 hurricane storm siege conditions."
14          So that's a necessary part of that first
15 letter A opinion, isn't it?
16     A.   That is.
17     Q.   All right.  So what structures are you
18 talking about?
19     A.   Well, for example, a structure similar
20 to that being in the initial design phase for the
21 closure of the MRGO.
22     Q.   You're talking about a barrier?
23     A.   A barrier.  But it's not a barrier
24 without gates -- gates to facilitate the passage
25 of traffic both from the MRGO and on the Gulf

1    Intracoastal Waterway.
2         Q.   I want to stick with just the decision,
3    not the types of projects to -- like you're
4    distinguishing between different kinds of
5    barriers.  I just want to stick with the decision
6    right now --
7         A.   Understood.
8         Q.   -- because that's, quite frankly,
9    easier.
10             So first thing is the structures that
11   are going to be built.
12             Is there any coordination with state and
13   local authorities that the Corps would have to do
14   to determine whether barriers were going to be
15   built in this area?
16        A.   Certainly.
17        Q.   Would the Corps of Engineers have to
18   provide some sort of cost-benefit analysis to the
19   Congress in order to get funding to provide a
20   barrier if the Corps decided it was appropriate?
21        A.   Certainly.
22        Q.   Is there any kind of tradeoff between
23   putting barriers there and using the money
24   elsewhere within the system to either add
25   shoreline protection to the MRGO and otherwise

```
 1   provide repairs?
 2        A.   Certainly.
 3        Q.   Okay.  Is there any other kind of
 4   social, economic, or political needs that has to
 5   be satisfied for such barriers to be put in place?
 6        A.   Certainly.
 7             MR. BRUNO:  Objection.  Outside the area
 8   of the witness's expertise.
 9             MR. STONE:  Q.  Okay.  Let me --
10             MR. SMITH:  I think he already answered.
11             MR. STONE:  He did answer.
12             MR. BRUNO:  It's noted.
13             MR. STONE:  It's not a problem, but I
14   want to make sure I don't go outside his
15   expertise.  Expertise seems broad enough.
16             MR. BRUNO:  Not for political.  Not
17   social, no.  Come on, man.  You know you're going
18   out.  I know where you're doing, too, but he's not
19   that guy.  He's an engineer.
20             THE WITNESS:  Not too smart.
21             MR. BRUNO:  I didn't mean to belittle
22   you.  Don't start on me.
23             THE WITNESS:  Engineers have
24   limitations.
25             MR. BRUNO:  Not as many limitations as
```

 1   lawyers do.
 2             MR. STONE:  Q.  With that understanding,
 3   then, your opinions regarding decisions ought to
 4   be strictly based on science, correct?
 5        A.   Incorrect.
 6        Q.   Okay.  What would they -- what would
 7   your opinions about all these decisions be based
 8   on?
 9        A.   For example, economics.  Cost-benefit
10   is a -- is a necessary part of the engineering.
11   It's not decoupled from it.
12        Q.   Okay.
13        A.   Social acceptability is a part of the
14   engineering decisions.  You can't subject people
15   to risks that they haven't acknowledged or
16   approved.
17             Law becomes an instrument in
18   engineering, to assure that what we construct is
19   in the interest and benefit of the public.
20             You can't -- you can't decouple
21   engineering from reality.
22        Q.   Isn't it fair to say that before MRGO
23   was built, before the levees were put up, the
24   State of Louisiana had to communicate their need
25   to Congress?

1    A.   That's correct.
2    Q.   Is it also fair to say that there were
3  problems with environmentalists in the Louisiana
4  area during the time of construction of levees?
5  That's a bad -- question's withdrawn.
6         Were environmentalists active,
7  particularly in court, during this time to prevent
8  certain projects that the Corps and the state were
9  trying to put in place?
10   A.   Yes.  And they should be active.
11   Q.   Okay.  And all of that enters into the
12 decision-making of the Corps or Congress when they
13 decide whether they're going to put in barriers or
14 build any kind of projects like this; is that
15 correct?
16   A.   It should.
17   Q.   All right.  You're talking about the
18 Corps should have selected a different route.
19   A.   Could have.
20   Q.   Well, okay.  Could have.
21        Once again, please correct me if I'm
22 wrong because I do not want to put words in your
23 mouth.
24   A.   We're working.
25   Q.   This is -- the question about that is,

BEA, ROBERT

1/30/2009

Page 109

1   mean is the Corps' own standards and guidelines,
2   and that coastal manual is -- is actually
3   mentioned in your tech report?
4       A.   That's correct.
5       Q.   So any geotech standard that was
6   available out there to the Corps, if you think
7   that they violated it, you've mentioned it
8   somewhere in your report; is that fair?
9       A.   That's correct.
10      Q.   Now, paragraph H, a decision not to
11  "expeditiously complete the hurricane flood
12  protection system."
13          How did that cause the failure or the
14  breaches of the levees for the hurricane
15  protection system?
16      A.   The Army Corps of Engineers was still
17  constructing those structures at the time of
18  Hurricane Katrina.
19      Q.   Did they have an authorized completion
20  date from the Congress?
21      A.   At the time of Hurricane Katrina?
22      Q.   Yes, sir.
23      A.   I do not know.
24      Q.   I thought I saw in your deposition that
25  they were to be completed by the year 2017.

1              Do you know whether that's true or not?
2         A.   That's correct.
3         Q.   Okay.  And -- and also that the Corps
4    had asked for funding for those levees?
5         A.   And that's correct.
6         Q.   So Congress hadn't provided the funding,
7    so this is one of those Congressional decisions
8    that you're complaining about, right?
9         A.   That's correct.  Appropriation without
10   authorization.
11        Q.   Now, you've also said in the past that
12   building of these levees in lifts was an
13   appropriate method of construction, and that's
14   true because of settlement; is that correct?
15        A.   That's correct.
16        Q.   So there has to be a period of time for
17   the levees to settle and cure, essentially, before
18   you can come in with the next lift?
19        A.   That's correct.  The time period is
20   necessary to increase the strength of the soils
21   beneath the levee.
22             And so water is being squeezed out as
23   you impose the lifts, and time has to be provided
24   for that consolidation process to be accomplished.
25        Q.   That's part of the normal process of

```
 1   be employed in those processes, and the quality
 2   assurance and quality control processes that
 3   should be employed during that entire process.
 4              That's engineering a complex, engineered
 5   system.
 6        Q.    I probably should have interrupted you,
 7   but I try not to.
 8        A.    Thank you.
 9        Q.    Because I'm strictly talking -- I'm --
10        A.    Don't let me run on.
11        Q.    I'm strictly talking about the MRGO
12   itself.  I'm not -- when it came out originally,
13   what's wrong with the design on the MRGO that
14   you -- you think that matters here?
15        A.    Okay.  Focusing on the MRGO as an
16   engineered hydrologic system, one of the things
17   that I cited earlier today was a lack of
18   sufficient -- or protection to control water flows
19   during both normal and abnormal conditions.
20        Q.    In other words, the barriers?
21        A.    Barriers or gates.  There's different
22   ways to protect the system.
23        Q.    So we're kind of stuck with the design
24   as far as the route goes, right?
25        A.    Yes.
```

BEA, ROBERT

1/30/2009

Page 126

```
 1       Q.   Once you got a route like that, things
 2   happen, you're saying that you -- there's more to
 3   the design --
 4       A.   Oh, yes.
 5       Q.   What is it that's wrong with the design
 6   for the MRGO that matters here?
 7       A.   Well, for -- one of the things that's of
 8   particular importance would be the itroduction of
 9   salinity into otherwise brackish or fresh water
10   areas.
11       Q.   We're stuck with that also --
12       A.   No, we're not.
13       Q.   -- because that's part of the design,
14   isn't it?
15       A.   No.
16       Q.   How do you reduce the flow -- how do you
17   reduce salinity on the MRGO, then?
18       A.   For example, you could put barriers on
19   the Gulf of Mexico, where the highly saline dense
20   waters are, that would prevent the intrusion into
21   the fresh water areas.
22            The ducts, as well, have used bubble
23   curtains.  Air is being bubbled through, or it can
24   be conducted, so the dense waters can't come
25   through.
```

BEA, ROBERT

1/30/2009

Page 127

1  Q.  And so that's a modification of the
2  design that you would recommend to prevent
3  salinity coming up the Gulf?
4     A.  Correct.
5     Q.  I'm sorry.  Up the MRGO.
6     A.  Yes.
7     Q.  Anything else for design on MRGO?
8     A.  Sure.  The gates that you cited.
9     Q.  Okay.
10    A.  Water control structures.
11    Q.  Anything else?  You talked earlier about
12 the erosion too.  So we'll include that in your
13 problem with the design.
14    A.  Correct.
15    Q.  The erosion was allowed?
16    A.  Well, erosion -- yeah.
17       Erosion was anticipated, but not
18 defended.
19    Q.  It was allowed?
20    A.  Correct.
21    Q.  Okay.  And it was allowed under the
22 design, wasn't it, the original design?
23    A.  Correct.
24    Q.  Okay.  So let's drop to the next
25 category, from design to construction.