## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO (*Robinson, 06-2268*) | § | |
| | § | |
| _____ | § | |

## UNITED STATES OF AMERICA'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

**I. Authorization of the MRGO**

1. **In response to a request from Congress for a report as to the "advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce," the Chief of Engineers prepared a report and recommendation to Congress ("Chief's Report").[1]** H.R. Doc. No. 82-245 at 4 (1951); *see also id.* at 12, 17, 39-43.

2. **The Chief's Report was transmitted to Congress by the Secretary of the Army and included a statement of support by the Governor of Louisiana.** H.R. Doc. No. 82-245 at 4 (1951); *id.* at 12, 17, 39-43.

3. **The Chief's Report reflected that multiple routes were considered in determining where to construct the MRGO.** H.R. Doc. No. 82-245 at 2-3, 12, 33, 39.

4. **The Chief's Report recommended construction of a deep-draft channel on the east**

---

[1] Plaintiffs have stipulated to the numbered fact paragraphs written in bold text.

**side of the Mississippi River.**  H.R. Doc. No. 82-245 at 5 (1951).

5.     **The recommended route ran from the Inner Harbor Navigation Canal ("IHNC") eastward along the Intracoastal Waterway to a point near Micheaud before striking a southeasterly course "to and along the south shore of Lake Borgne and through the marshes to and across Chandeleur Sound" to the Gulf of Mexico.**  H.R. Doc. No. 82-245 at 5; *see also id.* at 38, 43.

6.     The recommended route through the marshes next to Lake Borgne was considered preferable to eight other routes that were considered.  H.R. Doc. No. 82-245 at 11, 31-33.

7.     The Chief's Report stated that the recommended channel would be dug "through the marshes."  The decision to make "maximum use of land cuts" was intended to minimize the return of dredged spoil into the channel, minimizing maintenance dredging costs. H.R. Doc. No. 82-245 at 5, 37 (1951).

8.     **The Chief's Report recommended construction "generally in accordance with the plans of the division engineer and with such modifications thereof as in the discretion of the Secretary of the Army and the Chief of Engineers may be desirable."**  H.R. Doc. No. 82-245 at 5 (1951). .

9.     This discretion included the ability to change the alignment of the channel after authorization based on more detailed studies that were to be performed during the design stage.  H.R. Doc. No. 82-245 at 5, 43 (1951).

10.    The recommendation was based on a cost/benefit ratio.  The favorable ratio was based on a decision to maintain the channel through dredging only.  The recommendation did not include additional features such as barriers or foreshore protection.  H.R. Doc. No. 82-245 at 33 (1951).

11.    **The recommendation was conditioned on the furnishing by "local interests . . . free of cost to the United States all lands, easements, rights-of-way, and spoil-disposal areas for the initial construction, and when as required for subsequent maintenance."**  H.R. Doc. No. 82-245 at 5 (1951).

12.    The recommendation called for the dimensions of the channel to be 36 feet deep and 500 feet wide, to increase to 38 feet deep and 600 feet wide in the Gulf of Mexico.  H.R. Doc. No. 82-245 at 5, 43.

13.    Neither the Chief's Report nor the authorization discussed the top width of the MRGO or the angle used to construct the side slopes and banks of the MRGO.  H.R. Doc. No. 82-245 at 5, 43.

14.    Neither the Chief's Report nor the authorization included barriers to impede the flow of

2

water through the channel.  H.R. Doc. No. 82-245 at 5, 43.

15.     **Public Law Number 84-455 authorized construction of the MRGO, and required that it be constructed "substantially in accordance with" the recommendation contained in the Chief's Report.**  70 Stat. 65 (1956).

## II.     Design of the MRGO

16.     **After authorization, the Corps prepared a series of designs for the MRGO.  Design and construction occurred in phases, with construction of certain segments occurring while the designs of other segments were still being developed.**  MRGO DM No. 1-A:  Channels Mile 63.77 - Mile 68.85 (Apr. 1957 (rev. Jul. 1957)); MRGO DM No. 1-B:  Channels Mile 39.01 - Mile 63.77 (Sept. 1958 (rev. May 1959)); MRGO DM No. 1-C: Channels Mile 0 to Mile 36.43 (Bayou La Loutre); Mile 0 to Mile -9.75 (38 ft. contour) (Nov. 1959); MRGO DM No. 2: Gen'l Design (June 1959); GMD No. 2, Supp. No. 4 (Foreshore Protection) (Apr. 1968).

17.     A series of design memoranda were prepared that provided details of the designs and explanations for why certain designs were chosen over others.  MRGO DM No. 1-A: Channels Mile 63.77 - Mile 68.85 (Apr. 1957 (rev. Jul. 1957)); MRGO DM No. 1-B: Channels Mile 39.01 - Mile 63.77 (Sept. 1958 (rev. May 1959)); MRGO DM No. 1-C: Channels Mile 0 to Mile 36.43 (Bayou La Loutre); Mile 0 to Mile -9.75 (38 ft. contour) (Nov. 1959); MRGO DM No. 2: Gen'l Design (June 1959); GMD No. 2, Supp. No. 4 (Foreshore Protection) (Apr. 1968).

18.     In preparing these design memoranda, the Corps coordinated with other federal and state agencies and considered the views of those agencies in finalizing the designs.

19.     Comments from other federal and state agencies and changes based on those comments were included in the design memoranda.

20.     The design memoranda did not specify the MRGO's top width; instead, the memoranda specified the bottom width and side slopes.  ER-1130-2-50 DM 1-B (Sep 1958).

21.     **The design memoranda show that erosion of the banks of the MRGO was expected.** Bea Dep. 70:11-24 (Jan. 30, 2009).

22.     The MRGO was designed to provide channel stability without the use of bank protection works, which were not recommended as a project feature nor included in the costs.  DM 2 ¶ 47, at 22.  See also Bea Dep. 2009 at 72:3-10.

23.     The design memoranda determined that channel side slopes of "one on two" would provide adequate channel stability.  GDM No. 2, ¶ 46-48, at 21-22.

24.   The design memoranda presumed that sufficient rights of way would be furnished by local interests if erosion caused the banks to widen beyond the existing rights of way.

25.   Consistent with the Chief's Report and authorization, the design memoranda included no barriers to impede the flow of water through the channel.   *See* DM 1-A, at 2-9 & Plate 2 (Ex. 4); DM 1-B, at 3 (Ex. 5) & Plates 2-9 (Ex. 26).

26.   **In April 1958, the U.S. Fish and Wildlife Service issued an Interim Report on Fish and Wildlife Resources as Related to the MRGO Project and an outline of proposed fish and wildlife studies.**  UDI-001-000000120-142

27.   In June 1958, the Corps funded a study by Texas A&M University through the U.S. Fish and Wildlife Service to review the MRGO project area and recommend a program of data collection to support future ecological studies.

28.   The U.S. Fish and Wildlife Service issued a Preliminary Report of Marsh Vegetation Study, which evaluated project impacts from initiation of the study in 1958 through August 1960.   Fish and Wildlife Report (UDI-001-000000164).

## III.   Construction of the MRGO

29.   **Construction on the MRGO began in 1958.**  MRGO Reconnaissance Report on Channel Bank Erosion at 14 (Feb. 1988) (Ex. 8) [hereinafter 1988 Recon. Rep.]. By mid-1961, the project was 20 percent complete.  H.R. Doc. No. 89-231 at 53 (1965) (Ex. 9).

30.   In 1942, prior to and independent of construction of the MRGO, the GIWW was dredged to a depth of 17 feet and a width of 165 feet as a war-time measure.  H.R. Doc. No. 82-245, at 23.

31.   Construction was performed in phases, with completion of an access channel in 1961, an interim channel in 1963, and the full project channel in 1968.  1988 Recon. Rep. at 14 (Ex. 8).

32.   At the suggestion of the U.S. Fish and Wildlife Service, retention dikes were constructed to contain the dredged material within the designated spoil area and to prevent it from entering the adjacent marshes.

33.   All of the initial construction of the MRGO, from its inception in 1958 until full project completion in 1968, was performed by independent contractors and no employees of the United States.

34.   The Corps used three techniques to dredge the MRGO and maintain its authorized dimensions: (1) box cut dredging, (2) allowable overdepth dredging, and (3) advance maintenance dredging.  Dep. Of Richard Broussard at 23:25-24:1-11; 54: 14-20; Apr. 22,

4

2008.

35.     Instead of requiring dredging contractors to cut at a precise "one on two" diagonal angle, the Corps permitted contractors to use a box cut when dredging the MRGO.   Dep. of O'Cain at 57:10-21; Mar. 31, 2008 Dep. of Richard Broussard at 54:21-55:16;  Apr. 22, 2008 Dep. of  O'Cain at 29:17-30:6; Mar. 31, 2008 Dep. of Broussard at 55:15-22, 57:17-58:6.

36.     Box cutting was approved because it was expected to yield a 1 on 2 slope specified in the design memoranda and would be less costly than other methods of attaining the specified slope.   *See* Apr. 22, 2008, O'Cain Dep. at 31:20-21; 57:10-15; 58:24 – 60:8 (Ex. 14); *cf.* USACE Engineer Reg. 1130-2-520 ch. 8-2a(10) (allowing box cutting on navigable waterways) [hereinafter ER] (Ex. 16); Ex. 17 (illustration of typical box cut design section).

37.     The design permitted dredgers to remove additional material from the bottom of the MRGO as a working tolerance—a process known as overdepth dredging.  Mar. 31, 2008 Dep. of Broussard at 23:25-24:11.

38.     As a matter of policy, the Corps authorized overdepth dredging to account for inaccuracies in dredging.  ER 1130-2-307 ¶ 9 [hereinafter ER] (Ex. 18);  *see also* DM 1-A ¶ 7, at 3-4 (Ex. 4); DM 1-B ¶ 7, at 2 (Ex. 5); DM 1-C ¶ 5(a), at 1 (Ex. 6); DM 2 ¶ 46-48, at 21-22 (Ex. 7); *cf.* ER-1130-2-520 ch. 8-2a(10) (allowing overdepth dredging on navigable waterways) (Ex. 16); ER-1130-2-307 ¶ 9a, at F-3 (1968); Mar. 31, 2008 Broussard Dep. at 23:25-24:11 (Ex. 15) (overdepth dredging provides a working tolerance); Apr. 22, 2008 O'Cain Dep. at 10:25 – 11:1 (Ex. 14) (allowable MRGO overdepth was two feet).

39.     The design memorandum also authorized advance maintenance dredging, which permits the contractor to remove additional material from a waterway to prevent frequent re-dredging.  April 22, 2008 Dep. of O'Cain at 10:8-11:8.

40.     Also as a matter of policy, the Corps authorized advance maintenance dredging in excess of the prescribed channel depth to reduce the need for maintenance dredging.  ER 1130-2-520 ch. 8-2a(7) (Ex. 16); ER 1130-2-307 ¶ 9(g) (Ex. 18); *see also* Apr. 22, 2008 O'Cain Dep. at 10:8–11:2 (Ex. 14); *cf.* DM No. 1-A, ¶ 7, at 4 (advance maintenance depth was initially two feet) (Ex. 4); DM 1-B, ¶ 7 (Ex. 5), at 2; DM 1-C, ¶ 5(a), at 1 (Ex. 6); Apr. 22, 2008 O'Cain Dep. at 10:17 – 11:2 (advance maintenance depth was increased to four feet).

41.     The Corps allows dredging contractors to use box cutting, allowable overdepth dredging, and advance maintenance dredging on all navigable waterways across the country.  ER-1130-2-520 ch. 8-2a(6), (7), (10)

**IV.    Maintenance of the MRGO**

42.    Erosion caused material to "shoal" to the bottom of the channel, thereby reducing the depth of the channel.  Nov. 14, 2007 30(b)(6) Dep. of Keith O'Cain at 498:8-499:17.

43.    This shoaling, if unaddressed, would prevent ships from using the channel.  Nov. 14, 2007 30(b)(6) Dep. Of Keith O'Cain at 86:24-87:8.

44.    Erosion occurred for a number of reasons, including: (1) natural subsidence and sea level rise; (2) wind-driven waves; (3) wave wash caused by vessel activity; and (4) dredging activities.  May 21, 2008 Dep. of Edmond Russo at 42:1-43:18; April 4, 2008 Dep. of Chris Accardo at 27:14-22.

45.    **Maintenance dredging was necessary to restore the channel to authorized depth so that ships could travel as intended.**  Dep. of Broussard at 183:17-22; 142:16-21 Apr. 22, 2008.

46.    The Corps has adopted an engineering regulation, entitled "Project Operations - Navigation and Dredging Operations and Maintenance Policies," which "establishes the policy for the operations and maintenance (O&M) of USACE navigation and dredging projects, as well as their related structures and equipment."   ER 1130-2-520 Ch. 1-1.

47.    It is the Corps's policy that dredging shall be accomplished in an efficient, cost-effective, and environmentally acceptable manner to improve and maintain the Nation's waterways to make them suitable for navigation and other purposes consistent with Federal laws and regulations.  ER 1130-2-520 Ch. 8-2a(1)-(2), (6)-(7), (10).

48.    It is the Corps's policy to maximize the practicable benefits of materials dredged from authorized Federal navigation projects, taking into consideration economics, engineering, and environmental requirements in accordance with applicable Federal laws and regulations (33 CFR Parts 335-338).  ER 1130-2-520 Ch. 8-2a(1)-(2), (6)-(7), (10).

49.    It is the Corps's policy to permit overdepth dredging (depth and/or width) outside the specified minimum dimensions to account for inaccuracies in the dredging process. District commanders may permit dredging of a maximum of two feet allowable overdepth in coastal regions and in inland navigation channels.  ER 1130-2-520 Ch. 8-2a(1)-(2), (6)-(7), (10).

50.    The Corps's policy permits advance maintenance dredging, to a specified depth and/or width, to be performed in critical and/or fast shoaling areas to avoid frequent redredging and ensure the least overall cost of maintaining the project.   ER 1130-2-520 Ch. 8-2a(1)-(2), (6)-(7), (10).

51.    The Corps's policy permits side slopes to be dredged by dredging along the slope of the

required dimension or by dredging an equivalent box cut at the base of the side slope for the required dimension.  ER 1130-2-520 Ch. 8-2a(1)-(2), (6)-(7), (10).

52.     It is the Corps's policy that dredging of any and all navigation projects shall be justified to reflect the current level of navigation activity at the project, to provide rationale for the channel dimensions to be dredged, the frequency of dredging, and, as a minimum, shall be in accordance with the current budgetary guidance.  ER 1130-2-520 Ch. 8-2a(1)-(2), (6)-(7), (10).

53.     The operations manager for the MRGO had the responsibility to determine when maintenance dredging should be conducted.  Dep. of Broussard at 45:15-18, Apr. 22, 2008.

54.     The operations manager determined which sections of the channel needed to be dredged based on surveys of the channel and available funds in the Operations and Maintenance budget.  Dep. of Broussard at 45:15-18, Apr. 22, 2008.

55.     There were several years that the MRGO Operations and Maintenance budget did not include enough money to dredge the channel to its  full dimensions.

56.     The operations manager had discretion to determine how to allocate the available Operations and Maintenance funds.

57.     The channel was often dredged less than 500 feet wide because of a lack of funding. Dep. of Russo at 88:9-22; 92:16-20; 194-6:13.

58.     **Maintenance dredging of the MRGO did not recommence after Hurricane Katrina.** Dep. of Gregory Miller at 169:4-12, Apr. 16, 2008.

59.     **Following Hurricane Katrina, Congress directed the Corps to evaluate the de-authorization of the MRGO, and the channel was de-authorized in 2008.**  Dep. of Gregory Miller at 109:4-25, 110:1-21, Apr. 16, 2008.

**V.     Disposal of Dredged Materials**

60.     **Each maintenance dredging event required identification of a disposal area for the dredged spoil.**

61.     Disposal of dredged material is limited by the Federal Standard, which requires the Corps to use the least costly disposal alternative that is consistent with sound engineering practices and meets environmental requirements.

62.     Sometimes, the Corps used designated "upland" disposal areas—areas on the shore—to dispose of dredged maintenance spoils.   Final Environmental Impact Statement, Ex. X,

at I-9, 10; Sample Contract, Ex. X, at Pages; May 21, 2008 Russo Dep. at 59:3-61:4; 143:20-144:21.

63.    Other times, the Corps disposed dredged maintenance spoils in open water.  Final Environmental Impact Statement, Ex. X, at I-9, 10.

64.    The Corps also disposed of dredged materials in locations where the spoils can beneficially promote the growth of wetlands.  May 21, 2008 Russo Dep. at 59:3-61:4; 143:20-144:21; Dep of Gregory Miller at 224:22-25, 225:1-12, Apr. 16, 2008.

65.    The Corps created new wetlands through disposal of dredged spoils when appropriate. May 21, 2008, Russo Dep. at 59:3-61:4; 143:20-144:21;143:20-144:21; Dep. of Gregory Miller at 224: 22-25, 225: 1-12, Apr. 16, 2008.

66.    Beneficial use of dredged spoils is considered appropriate when it will not result in environmental degradation and the cost is justified by environmental, economic, and social benefits.  Federal Standard; 33 U.S.C. § 2326.

67.    Where beneficial use can be accomplished within the Federal Standard, it may be done with Operation and Maintenance funds.

68.    The Water Resources Development Act of 1992 permitted a cost-sharing partnership to cover the incremental cost of beneficial disposal where the cost required to accomplish the beneficial disposal exceeded the Federal Standard.  33 U.S.C. § 2326.

69.    The Louisiana Department of Natural Resources was the cost-sharing partner for the Corps beneficial disposal of material dredged from the MRGO, and their agreement was required for each beneficial disposal event if the cost exceeded the Federal Standard.

70.    As of Hurricane Katrina, the beneficial use of material dredged from the MRGO had contributed to the creation of 1053 acres of land in the area between the MRGO and Lake Borgne, 335 acres of land in the vicinity of the MRGO jetties, and 187 acres on Breton Island.  Draft Project Management Plan, O&M MRGO, July 2005, table 8.

## VI.   Authorization of the LPVHPP

71.    In 1955, Congress authorized the Corps to conduct hurricane protection studies.  Pub. L. 84-71.

72.    In 1962, the Secretary of the Army transmitted a report to Congress (the "Interim Survey Report") with interim findings and a recommendation of the District Engineer for what was later called the "Barrier Plan," which had higher net benefits and lower cost than the alternative "High Level Plan."  Decision-Making Chronology at A-5.

73.     The Interim Survey Report is the planning document that was used for project authorization in 1965.  Decision-Making Chronology at A-5.

74.     The Interim Survey Report recognized that hurricane damages result from surges, including those from the MRGO.  Interim Survey Report at i.

75.     The Interim Survey Report also recognized the related problem that the MRGO provides a deep, direct route for the inflow of saline currents from the Gulf of Mexico to the area along its channel and to Lake Pontchartrain.   Interim Survey Report at i.

76.     The Corps performed a hydraulic modeling study to evaluate the effects of proposed hurricane surge control structures and the MRGO on Lake Pontchartrain, which included an evaluation of the salinity impacts from construction of the MRGO.  Technical Report 2-636, Nov. 1963.

77.     The hydraulic modeling study initially was authorized in 1958, and extension of the model to include evaluation of the MRGO was authorized in 1960.  Results of the model investigation were published in November 1963 and were incorporated into the recommendation by the Chief of Engineers to Congress for approval of the LPV. Technical Report 2-636, Nov. 1963; House Doc. 231, 89th Congress, 1st Session (Chief's Report) at 60.

78.     In 1965, the "Chief's Report" was transmitted to Congress.  It included the reports of the Board of Engineers for Rivers and Harbors, the District (the reporting office) and Division engineers, and the concurring reports of the Mississippi River Commission for those areas under its jurisdiction.  The report recommends the Barrier Plan and serves as the basis for project authorization.  House Doc. 231, 89th Congress, 1st Session.

79.     A levee is "an embankment whose primary purpose is to furnish flood protection from seasonal high water and which is therefore subject to water loading for periods of only a few days or weeks a year."   EM 1110-2-1913, ch. 1-5(a)(1).

80.     The Chief's Report noted that, "[b]ecause of the serious threat to human life and property involved, the design of the protective plan must be based on the standard project hurricane for the region."  Chief's Report at 61.

81.     The planned improvements for protection of New Orleans East included a new levee along the shore of Lake Pontchartrain, improvement of existing protective works between the lake and the Gulf Intracoastal Waterway, and improvement of existing works along the GIWW and the IHNC.  H.R. Doc. No. 89-231, at 82; *see also id.* Plate 3.

82.     The plan for protection of St. Bernard Parish and the Lower Ninth Ward (collectively referred to as "Chalmette") entailed constructing a levee along the MRGO from the IHNC to Bayou Dupre, then along the bayou to Violet, La.  The plan further called for

the improvement of the existing levee along the IHNC and drainage structures in the levee alignment at Bayous Bienvenue and Dupre.  The plan also called for riprap foreshore protection to be constructed along the MRGO channel to protect against erosion caused by wave wash from shipping use of the channel.  Chief's Report at 9; Report of District Engineer at 65.  LPV EIS at I-9.

83.    By terminating the planned improvements at the existing Mississippi River levee, developed areas of St. Bernard Parish and the Lower Ninth Ward would be completely encircled by protective works. H.R. Doc. No. 89-231, at 7, Plate 3; *see also* IPET Vol. III, at 208.

84.    Representatives of Orleans and St. Bernard Parishes requested that the levee be constructed along the south side of the GIWW and MRGO rather than supporting an alternative proposal to improve the Chalmette back levee because the protection of additional land would provide potential for residential, industrial, and commercial development of areas adjacent to the MRGO.  Chief's Report at 8 and App. C at 238.

85.    It was contemplated, even as the Army was recommending to Congress that the planned works be authorized for construction, that the proposed alignment of the levee protecting St. Bernard Parish might be enlarged to protect additional lands.  H.R. Doc. No. 89-231, at 3, 10; *see also* USACE 702c Dep. 146:15-147:7, 147:22-148:7.

86.    **The Chief's Report noted that completion of the MRGO would result in increased salinity in Lake Pontchartrain and recommended construction of a multi-purpose lock at Seabrook, where the IHNC connects with Lake Pontchartrain, to provide hurricane flood protection, control for salinity exchange between the MRGO and Lake Pontchartrain, and control for increased flow velocities in the IHNC caused by construction of the MRGO.**  Chief's Report at 8-9; also Report of District Engineer at 17.

87.    **In October of 1965, Congress enacted legislation authorizing the Lake Pontchartrain and Vicinity Hurricane Protection Project.**   Pub. L. No. 89-298, 79 Stat. 1073 (Oct. 27, 1965).

88.    **The law authorized the Corps to execute the project "substantially in accordance with the recommendations" in the Chief's Report.**  Pub. L. No. 89-298, 79 Stat. 1073 (Oct. 27, 1965).

89.    After construction was authorized, detailed designs were developed.  See generally, *e.g.*, USACE LPVHPP General Design Mem. No. 2, Supp. No. 4, "New Orleans East Back Levee" (Mar. 1971); USACE LPVHPP General Design Mem. No. 2, "Citrus Back Levee" (Aug. 1967); USACE LPVHPP General Design Mem. No. 3, "Chalmette Area Plan" (Nov. 1966).

90.    As explained in the Chief's Report, design of the flood protection was based on the Standard Project Hurricane.  H.R. Doc. No. 89-231, at 46-47, 61; Bea Dep. 22:4-10 (Jan. 30, 2009).

91.    In connection with developing the detailed designs, the Corps initiated a study to evaluate the surge generated by Hurricane Betsy, which had flooded the project area in September 1965.  Storm Surge Effects of the Mississippi River- Gulf Outlet, at 1 (Sept. 9, 1966).

92.    The study of Hurricane Betsy evaluated the existence of the MRGO and its impact on storm surge. Storm Surge Effects of the Mississippi River-Gulf Outlet, at 1 (Sept. 9, 1966).

93.    The design memorandum for the Chalmette area noted that revisions to the design may be necessary depending on the results of the study of the effects of the MRGO on hurricane surge.  USACE LPVHPP General Design Mem. No. 1, Part I, at 23.

94.    The net levee grades were revised upward in accordance with results of the tidal hydraulic studies utilizing the latest hurricane parameters developed after Hurricane Betsy.  USACE LPVHPP General Design Mem. No. 3, at 7; Bea 702c Dep. 134:21-135:12 (Nov. 19, 2007).

95.    **As had been anticipated, the plan for the Chalmette area was modified to enlarge the protected area. The revised plan, "Chalmette Extension," extended the levee past Bayou Dupre along the bank of the MRGO to Verret before turning the levee south and then west, to connect it with the Mississippi River levee at Caernarvon.** *See* USACE LPVHPP General Design Mem. No. 3, Supp. No. 1, at 1-2, Plate; Bea 702c Dep. 191:25-193:2.

96.    The LPV levees along the GIWW and the MRGO were designed and constructed to protect against hurricane-induced storm surge coming from Lake Borgne and the larger bodies of water that lay beyond it, including any surge propagated or conveyed by the GIWW and the MRGO themselves.  H.R. Doc. No. 89-231, at ix, 1-2, 18, 80-81, 82, 84; Bea 702c Dep. 74:11-16; Vrijling 702c Dep. 31:24-32:7 (Jan. 8, 2008).

97.    In developing the plan of protection, these levees were designed to protect against a maximum stillwater level of 13 feet.  USACE LPVHPP General Design Mem. No. 3, at 8.

98.    In developing the plan of protection for the Chalmette area, an effort was made to evaluate the relationship between surge height and distance inland from the coast.  LPV DM No. 1, Part IV, at 4-5 & Plate 6.

99.    Using observed high water marks along the coast and inland, the Corps derived a simple

relationship between maximum surge height and distance inland. *See* USACE LPV Design Memorandum 1 Part IV Chalmette Extension (Oct. 1967) at Plate 6; IPET at III-210.

100.   A reduction of 1 foot in surge for every 2.75 miles of wetlands was determined. *See* USACE LPV Design Memorandum 1 Part IV Chalmette Extension (Oct. 1967) at Plate 6; IPET at III-210.

101.   This reduction factor of 1 foot for every 2.75 miles inland was only used for hurricane tracks where it was apparent that the surge at the coast, or surge reference line, did not accurately reflect the surge inland.  Dep. of Nancy Powell Vo1. I, 70:23-35, 71:1-13.

102.   The reduction factor applied to the Verret and Toca reach of the Chalmette Extension. USACE LPV Design Memorandum 1 Part IV Chalmette Extension 6; Dep. of Nancy Powell Vol. I, 72:5-16.

103.   The critical hurricane track used for design purposes for the Verret to Toca reach was Track C, a track similar to that of Hurricane Betsy, making landfall around Grand Isle and proceeding northward.  USACE LPV Design Memorandum 1 Part IV Chalmette Extension 6, Plate 3.

104.   The designers of the Chalmette Extension applied the surge reduction factor to this particular hurricane track– Track C, the critical track for the Verret and Toca reach of the Chalmette extension–  because of the extensive wetlands to the south and west of the levee.

105.   Track F was the critical track for the Chalmette levee from Bayou Bienvenue to Bayou Dupre. *See* USACE LPV Design Memorandum 1 Part Hydrology and Hydraulic Analysis Part I Chalmette (Aug. 1966) 28 Table 15, Plate 9.

106.   The surge reduction factor was inapplicable the Chalmette Extension levee along the MRGO based upon the critical track (Track F) of the design storm. USACE LPV Design Memorandum 1 Part IV Chalmette Extension 6; Dep. of Nancy Powell Vol. I, 72:5-16.

107.   The surge reference line determined applicable for the Chalmette Extension levee virtually abutted the MRGO—making the reduction factor, which was based in miles between the reference line and levee, inapplicable.

108.   The surge reference line determined applicable for the Chalmette Levee from Bayou Bienvenue to Bayou Dupree made the surge reduction factor inapplicable.

109.   The design also evaluated the consolidation of the MRGO spoil bank that had occurred since its construction.  LPV DM No. 3 at 20.

110.    The design for the Chalmette area took into account anticipated erosion of the banks of the MRGO and changes in the side slopes of the MRGO.  The design memorandum states:  "Ultimately, the banks of the MR-GO will stabilize generally at a slope not flatter than 1 on 3.  However, erosion of the foreshore area between the levee and the channel bank by ship-generated waves will pose a threat to the integrity of the levee.  Accordingly, foreshore protection will be provided to protect the levee from such erosion."  DM No. 3, Supp. No. 1, at 32-33.  See also DM No. 3 at 35.

111.    Construction of foreshore protection along the south bank of the MRGO and along the GIWW was included in the Chief's Report recommending the LPV plan to Congress, and the cost of the foreshore protection was subject to the cost sharing ration of 70% federal and 30% local specified in the authorization of the LPV.  MRGO DM No. 2, Supp. No 4, at 1.

112.    After authorization, local interests expressed concern about paying the cost of foreshore protection because it was made necessary as a result of the proximity of the levees to the MRGO and the wind and vessel-generated waves from the navigation project that impact the levee.  MRGO DM No. 2, Supp. No 4, at 1-2.

113.    The Chief of Engineers directed that the cost of the foreshore protection along the south bank of the MRGO and the north bank of the MRGO where it parallels the GIWW be charged to the navigation project rather than be subject to the cost-sharing requirements of the LPV.  MRGO DM No. 2, Supp. No 4, at 1-2.

114.    "Inasmuch as the foreshore protection is more or less integral to and must be coordinated with the levee construction," the design for the foreshore protection was developed in connection with the LPV design memoranda.  LPV DM No. 3, Supp. No. 1; MRGO DM No. 2, Supp. No. 4, at 2-3, 15.

115.    Following the decision regarding allocation of costs for the foreshore protection, the Director of Civil Works informed the U.S. House of Representatives and Senate Committees on Appropriates of the decision and increase in Federal cost for the LPV and MRGO projects by letter dated November 27, 1967.  MRGO DM No. 2, Supp. No. 4, App. B.

116.    The letter explained that, "[c]onstruction of the navigation project exposed [the then existing levees along the GIWW] and the foreshore between them and the channel to direct attack with resultant damage from waves generated by seagoing vessels using the waterway.  The navigation project should have included adequate provisions for protecting these levees and their foreshore from this damage.  In addition, this protection will be necessary to protect the new levees which will be constructed for sections for the Lake Pontchartrain and Vicinity Hurricane Protection project located adjacent to this ship channel.  In view of this, as a mitigating measure, the plan for the Mississippi River-Gulf Outlet project has been modified to provide wave wash protection for approximately 6

13

miles of levees and foreshore on the north bank of the channel and about 18 miles of levees and foreshore along the south bank." MRGO DM No. 2, Supp. No. 4, App. B.

117. **The foreshore protection had been installed along the 6 miles of the north bank and 18 miles of the south bank of the MRGO as of August 29, 2005.**

118. **The LPV flood works along the GIWW and the MRGO constructed prior to August 29, 2005, consisted primarily of levees paralleling the waterways, on the south side of the MRGO between the IHNC and Verret, and on the north side of the GIWW eastward from the IHNC for a distance of about 12 miles.** Decision-Making Chronology, at 2-2; Vrijling 702c Dep. 31:10-23.

119. **The LPV flood works along the GIWW and the MRGO constructed prior to August 29, 2005, were composed, in part, of materials hydraulically dredged from the bottom of the MRGO.** Mosher Report, at 9 (Dec. 18, 2008); Bea 702c Report, at A.11 (Sept. 17, 2007); Bea 702c Dep. 86:18-25.

120. The LPV levees along the GIWW and the MRGO were built in stages because of poor foundation conditions. Bea 702c Report, at A.1-A.4; IPET Report Vol. III, at 33-34; ILIT Report, at 2-6; Team Louisiana Report, at 131.

121. The decision to build levees through a series of lifts was within the standard of care for the design and construction of a hurricane protection structure. Bea 702c Dep. 138:15-23.

122. On August 29, 2005, New Orleans East was protected by levees and other LPV flood control structures that stood on the north bank of the GIWW and the MRGO. IPET Report Vol. III, at 154-155; ILIT Report, at 2-1 to 2-2, Fig. 2.4 at 2-17; Team Louisiana Report, at 14-15; Bea 702c Dep. 78:9-80:2, 119:10-19, 268:11-16.

123. On August 29, 2005, the LPV flood control structures along the MRGO and the GIWW joined with flood control structures along the IHNC, Lake Pontchartrain, and the eastern edge of New Orleans East to form a polder that was encircled by these flood control structures. IPET Report Vol. III, at 154-155; ILIT Report, at 2-1 to 2-2, Fig. 2.4 at 2-17; Team Louisiana Report, at 14-15; Vrijling 702c Dep. 31:4-32:7.

124. **Construction of the LPV flood control project was not complete as of August 29, 2005.** USACE 702c Dep. 209:21-210:5.

125. The Corps had not received sufficient funding from Congress to complete the LPV flood control project prior to Hurricane Katrina. USACE 702c Dep. 236:15-23.

## VII.    Compliance with Environmental Statutes

126.    Section 186 of the Water Resources Development Act of 1976, Pub. Law 94-587, 90 Stat. 2917, 2941-2942, simply modified the conditions for local cost sharing insofar as they pertained to bridges to be constructed over the MRGO.  Pub. Law 94-587, sec. 186.

127.    Section 186 of the Water Resources Development Act of 1976 did not significantly affect the quality of the human environment.

128.    The Corps did not submit to Congress a recommendation or report relating to the 1976 Water Resources Development Act.

129.    The Corps did not propose to Congress that it adopt Section 186 of the Water Resources Development Act of 1976.

130.    Section 844 of the Water Resources Development Act of 1986, Pub. Law 99-662, 100 Stat. 4082, 4177, did not pertain to the MRGO project as a whole, but instead pertained only to the lock replacement project on the IHNC.  Pub. Law 99-662, sec. 844.

131.    The Corps did not submit to Congress a recommendation or report relating to the 1986 Water Resources Development Act.

132.    The Corps did not propose to Congress that it adopt Section 844 of the Water Resources Development Act of 1986.

133.    Section 326 of the Water Resources Development Act of 1996, Pub. Law 104-303, 110 Stat. 3658, 3717, did not pertain to the MRGO project as a whole, but instead pertained only to the lock replacement project on the IHNC.  Pub. Law 104-303, sec. 326.

134.    The Corps did not submit to Congress a recommendation or report relating to the 1996 Water Resources Development Act.

135.    The Corps did not propose to Congress that it adopt Section 326 of the Water Resources Development Act of 1996.

136.    Section 8 of Executive Order 11990 provides that it does not apply to "projects and programs for which a draft or final environmental impact statement will be filed prior to October 1, 1997.

137.    The Corps "competed a Final Environmental Impact Statement ('1976 EIS') for the MR-GO project" in March 1976—approximately eighteen months prior to October 1, 1977.  Doc. 16510-4 ¶ 58.

138.    In 1985, the Corps published a "Supplemental Information Report" designed to complement the 1976 EIS.  Doc. 16510-4 ¶¶ 87-88.

139.   Between 1980 and 2004, the Corps prepared a total of 26 Environmental Assessments ("EAs") concerning its MRGO-maintenance activities, each time concluding that the Corps' activities would have no significant impact on the environment.  Doc. 16510-4 ¶ 95.

## VIII.   Impact of the MRGO on Wetlands

140.   The cut of the MRGO channel when completed in 1968 comprised approximately 3,250 to 3,368 acres.  FitzGerald table 2.1; Britsch Report at 7.

141.   The spoil banks created during construction of the MRGO comprised approximately 14,977 acres, covering approximately 12,084 acres of marsh and approximately 2,893 acres of water.  FitzGerald table 2.1.

142.   The acreage impacted by the cut of the channel and creation of the spoil bank are considered the "direct impacts" of channel construction.  This total is approximately 18,345 acres.  FitzGerald table 2.1.

143.   Erosion of the banks of the channel may also be considered a direct impact of channel construction.  FitzGerald table 2.1.

144.   Total land area lost to erosion of the banks of the MRGO along the entire channel after construction was between 3,800 and 4,800 acres.  Britsch and FitzGerald reports.

145.   Intrusion of higher salinity waters to the area through which the MRGO was cut is an indirect impact of construction.  Penland Depo.

146.   **Prior to construction of the MRGO, a natural ridge at Bayou La Loutre served as a barrier between higher salinity waters of the Gulf and areas north of the ridge.**  Day; Shaffer; FitzGerald; Penland; Britsch.

147.   **The route of the MRGO cut through the natural La Loutre ridge.**  Day; Shaffer; FitzGerald; Penland; Britsch.

148.   **Severance of that ridge during construction of the MRGO allowed the intrusion of more saline water north of the ridge.**  Day; Shaffer; FitzGerald; Penland; Britsch.

149.   Salinity intrusion resulted from the design of the MRGO channel.  Penland; Day/Shaffer; FitzGerald; Bea; Kemp.

150.   **Changes in salinity resulting from construction of the MRGO channel contributed to changes in wetland habitat types in some of the wetlands through which the MRGO was constructed.**  Day; Shaffer; FitzGerald; Penland; Britsch.

16

151.   Salinity intrusion is one of numerous factors that contributed to changes in the wetlands through which the MRGO was constructed.  Day; Shaffer; Penland; Britsch.

152.   The area through which the MRGO was constructed is part of the St. Bernard delta complex, which was created by distributaries of the Mississippi River and has been in a deteriorating phase of the deltaic cycle since the La Loutre distributary was abandoned approximately 2,300 years ago.  Britsch Report; Env. Atlas of Lake Pontchartrain.

153.   Wetland loss is a natural process in abandoned delta lobes.  Day/Shaffer Report at 11.

154.   Since the early 1900's, human activity has influenced many key elements of the deltaic cycle.  Britsch Report.

155.   In general, human activity has caused a reduction in forces that lead to delta growth and an enhancement of forces that lead to delta deterioration.  Day/Shaffer Report at 14.

156.   Construction of the Mississippi River levees has been identified as the single most important cause of land loss for the delta as a whole because the levees prevented flooding of the wetlands with sediment filled fresh water that provided nutrients, reduced salinity impacts, and helped build land.  Day/Shaffer Report at 14-15.

157.   The forested wetlands of the Pontchartrain Basin have been cut off from river input for over a century.  Day/Shaffer Report at 14-15.

158.   Other factors contributing to wetland loss include closure of River distributaries; elimination of crevasses; improvement of the efficiency of the River mouth for navigation; and reduction in the sediment load carried by the River.  Day/Shaffer Report at 14-15.

159.   Subsidence and sea level rise also contribute to wetland loss and change throughout coastal Louisiana and in the area through which the MRGO was constructed.  Dep. of Gregory Miller at 151:25, 152:1-6, Apr. 16, 2008.

160.   Canals dredged for oil and gas access, logging, and navigation impact wetlands both by direct removal of land and resulting changes in hydrology; spoil banks from canals interrupt sheet flow, impound water, and cause deterioration of wetlands.  Day/Shaffer Report at 14-15.

161.   The occurrence of hurricanes causes both land loss and salinity intrusion.  Dep. of John Day at 164:4-24, Jan. 28, 2009.

162.   Animal activity can cause a destruction of wetland plants and trees.  Shaffer Dep.

163.   Nutria, forest tent caterpillars, and leaf roller caterpillars all feed on wetland plants and

trees.  Shaffer Dep. at 28-29.

164.  Defoliation of trees by caterpillars interacts with salinity stress, subsidence, and sea level rise to contribute to the death of trees throughout the Pontchartrain Basin.  Shaffer Dep. at 28-30.

165.  The U.S. Fish and Wildlife Service issued a Preliminary Report of Marsh Vegetation Study, which evaluated project impacts from initiation of the study in 1958 through August 1960, and documented vegetation changes attributable to nutria in the vicinity of the MRGO, noting that "the most obvious is their destruction of entire stands of common reed."  The report also noted other plant types killed by nutria.  Fish and Wildlife Report (UDI-001-000000164) at 29.

166.  The report also noticed that "[a] number of influences, other than those induced by the project, are active within the marsh area.  These include:  (1) natural factors such as plant succession, which may occur rapidly in localized areas, animal activity, and geological change, such as wave-induced erosion; and (2) human influences which would include burning, ditching, and creation of marsh buggy trails."  Fish and Wildlife Report (UDI-001-000000164) at 29.

167.  There is a broad consensus that wetland loss is a complex interaction of a number of factors acting at different spatial and temporal scales.  Day/Shaffer Report at 15.

168.  As a result complex interaction of the many factors that cause wetland loss, it is difficult to isolate one activity as the singular cause of a specific loss.  Penland, et al., Process Classification of Coastal Land Loss Between 1932 and 1990 in the Mississippi River Deltaic Plain, Southeastern Louisiana," USGS Open File Report 00-418 (2001) (see Britsch Report App. A).

169.  The area of wetlands on the south side of the MRGO, encircled by the LPV levees along the GIWW and MRGO and the levee connecting to the Mississippi River is part of the area termed the "Central Wetlands."  Coast 2050 Report.

170.  Some descriptions of the Central Wetlands also include the area on the south side of the MRGO, outside the LPV levees, and north of Bayou La Loutre.  Coast 2050 Report.

171.  The wetland area located north of the MRGO, south of the GIWW, and north of Bayou La Loutre is termed the "South Lake Borgne" unit.  Coast 2050 Report.

172.  **The portion of the South Lake Borgne Unit in the shape of a triangle south of the GIWW, west of Lake Borgne, and north of the MRGO is called the "Golden Triangle."**

173.  **The MRGO channel divides the area considered the Central Wetlands from the**

**South Lake Borgne unit.**

174.  The South Lake Borgne unit includes the area on the unprotected side of the MRGO levees.

175.  The Central Wetlands and South Lake Borgne unit are the only areas for which a change in wetland habitat type was evaluated by plaintiffs' storm surge modelers. Kemp Fig. 5.5a, 5.5b; Vrijling Fig. 2.5, 2.19, 2.30.

176.  Any changes that may have occurred in wetlands outside the Central Wetlands and South Lake Borgne unit after construction of the MRGO are not relevant to plaintiffs' storm surge modeling. Kemp Fig. 5.5a, 5.5b; Vrijling Fig. 2.5, 2.19, 2.30.

177.  Prior to construction of the MRGO, the South Lake Borgne area was a brackish marsh. FitzGerald Fig. 4.2, July 2008.

178.  By 2005, the South Lake Borgne area had transitioned to a mixture of brackish and saline marsh. FitzGerald Fig. 4.4, July 2008.

179.  Prior to construction of the MRGO, the Central Wetlands area included fresh and brackish marsh and some swamp. Day/Shaffer Report p. 39, July 2008.

180.  The swamp that existed in the Central Wetlands prior to construction of the MRGO was located along the higher ground toward the 40-Arpent levee, along the GIWW, and on the La Loutre Bayou ridge. FitzGerald Fig. 4.2, July 2008.

181.  In the 1950s, no swamp was located in the South Lake Borgne wetlands area northeast of where the Reach 2 levees later would be constructed. FitzGerald Fig. 4.2, July 2008.

182.  By 2005, the swamp in the Central Wetlands area had declined to a small area near the discharge of a pumping station at the 40-Arpent levee. FitzGerald Fig. 4.4, July 2008.

183.  By 2005, the remaining swamp and the fresh and brackish marsh in the Central Wetlands had transitioned to intermediate and brackish marsh. FitzGerald Fig. 4.4, July 2008

184.  By 2005, a shrub/scrub and tree habitat had grown on the MRGO spoil bank. Shaffer Dep. at 239:15-25, 240:1-13.

## IX.   The Corps's Efforts to Address Bank Erosion Along the MRGO

185.  The Corps of Engineers was aware of shoreline erosion along the MRGO and studied methods to reduce erosion. *See generally,* 1988 Recon Report.

186.  Wave wash from ships traveling on the MRGO caused bank erosion, diminishing the

depth of the channel, widening the top, and eroding adjacent marsh.  *See* 1988 Recon. Rep. at 26 (Ex. 8); MRGO Reconnaissance Report on Channel Bank Erosion at 1 (Jan. 1994) (Ex. 20) [hereinafter 1994 Recon. Rep.].

187.   In September 1979, the Corps of Engineers received two requests, one from Representative Livingston, the other from Senator Long, both asking the Corps to respond to concerns about bank erosion on the MRGO, in particular the development of a north shore levee using MRGO dredge spoil.   Letters of Long, Livingston to Col. Sands.

188.   The Corps responded that, "Existing US Army Corps of Engineers authority derived through Public Law 455 does not provide for expenditure of Federal funds for acquisition of additional rights-of-way, easements, or for the construction of bank protection in the unleveed reaches of the MR-GO channel.  As the local assuring agency, the Board of Commissioners of the Port of New Orleans agreed to hold and save the United States free from all claims for damages resulting from the construction, maintenance, and operation of the project."  Col. Sands response.

189.   In the same letter response to Congress, Col. Sands wrote that, "While no Federal authority presently exists through the Corps of Engineers for erosion protection in unleveed reaches of the MR-GO, the progressive disposal of dredged material . . . along the north bank of the MR-GO in the problem areas does appear to have merit as a possible solution.  However, before this alternate can be actively pursued by the Corps of Engineers, the Board of Commissioners of the Port of New Orleans would have to provide additional rights-of-ways for disposal sites, retaining dikes for the containment of the material, and all technical data necessary for revision of the environmental impact statement.  Finally, this option for dredged material disposal can only be exercised by the Corps if the method of disposal does not result in higher total Federal costs for maintenance dredging, and the disposal plan is found to be environmentally acceptable."  Col. Sands Letter.

190.   In 1982, Congressman Robert L. Livingston, Jr., of the Louisiana 1st Congressional District, passed a resolution directing the Corps to look into the feasibility of bank foreshore protection along the unleveed, a.k.a., north shore of the MRGO.  1988 Recon Rep. at 2.

191.   By 1984, the Corps had constructed test sections to evaluate the performance of erosion control measures along the MRGO. Gagliano Tab 10:  The Mississippi River Gulf Outlet: A Study of Bank Stabilization, December 1984, at 5-5.

192.   **In February 1988, the Corps issued the 1988 Reconnaissance Report.**  1988 Recon Rep.

193.   **The 1988 Report was 100% federally funded.**  Tom Podany

20

194.    The purpose and scope of the report was as follows: 1) to define the extent of erosion and erosion-related problems occurring in the study area; 2) identify opportunities to implement solutions to the defined problems; 3) appraise the Federal interest in potential solutions to defined problems by evaluating the costs, benefits, and environmental impacts of the potential solutions; 4) determine, based on the appraisal of the Federal interest, whether planning should proceed beyond the reconnaissance phase into more detailed feasibility phase investigations; 5) estimate the time and cost required to complete feasibility phase studies, if Federal interest is indicated; and 6) assess the level of interest and support of non-Federal interests in the identified potential solutions to defined problems.  1988 Recon Rep. at 2-3.

195.    The goal of the 1988 Report was to identify potentially economically justified and environmentally acceptable bank protection for the unleveed shores of the MRGO.  Tom Podany.

196.    The 1988 Report identified erosion along the north bank of the MRGO as a problem. 1988 Recon. Rep.

197.    Several potential solutions were considered, including no action, several possible foreshore protection measures, and a reduced speed limit for vessel traffic through several reaches of the MRGO.  1988 Recon. Rep.

198.    The 1988 Report included a recommendation that closure of the MRGO be considered as a potential solution.  1988 Recon. Rep.

199.    The 1988 Report concluded that continued bank erosion would pose problems in the future related maintenance dredging of the MRGO.  1988 Recon. Rep.

200.    Based on preliminary analysis of potential structure design effectiveness, reliability, and survivability; costs; benefits; and impacts; one structural option and four conceptual structure designs were recommended for detailed investigation.  1988 Recon. Rep.

201.    Public involvement was an important facet of the 1988 Report, and the Corps worked with several agencies, including the Louisiana Department of Natural Resources, to determine local interest and a potential local cost-sharing sponsor with respect to bank erosion protection.  1988 Recon. Report.

202.    The 1988 report recommended that a supplement to the General Design Memorandum be completed, which would encompass further studies that would otherwise be contained in a feasibility study.  1988 Recon Report; Tom Podany.

203.    **The 1988 report was submitted to the Lower Mississippi Valley Division for comments upon the District Engineer's approval.**  1988 Recon Report.

204.  The 1988 report was also circulated to members of both the United States and Louisiana Congresses, as well as to several federal, state, and local agencies.  1988 Recon Report, App. D.

205.  By the middle of 1989, new modeling revealed that the recommendations contained in the 1988 report were not valid.  Tom Podany.

206.  That modeling showed that attempts to justify north shore bank protection solely on maintenance savings tied to the navigation project did not result in an economically justifiable project.  Tom Podany.

207.  The Corps, at that point, realized that it did not have a process that would result in economically justifiable bank protection along the north shore of the MRGO.  Tom Podany.

208.  Over a period of time, the Corps determined that certain non-monetary valuation should be done with respect to environmental factors, such as wetlands loss.  These non-monetary benefits were to be incorporated into the benefit-cost ratios of potential solutions to determine if foreshore protection could be economically justified.  Tom Podany.

209.  This new methodology resulted in the 1994 Reconnaissance Report, published in January 1994.    1994 Recon Report; Tom Podany.

210.  The authorization for the 1994 Recon Report was the same as the authorization for the 1988 report.  The purpose of the 1994 Recon Report was also the same as the 1988 report.  1994 Recon Report; Tom Podany.

211.  The 1994 Report identified potential cost-sharing partners as the Port of New Orleans, the Louisiana Department of Transportation, the Louisiana Department of Natural Resources, and St. Bernard Parish.  Tom Podany.

212.  Ultimately, the Port of New Orleans was seen as the most likely local sponsor for the project, which involved placement of 30 miles of rock dike protection along the north shore of the MRGO.  1994 Report.

213.  Environmental benefits were included in the 1994 report as a way to justify the project.  Tom Podany, 1994 report.

214.  The 1994 report, like the 1988 report, identified bank erosion as a severe problem along the north shore of the MRGO.  1994 Recon Report.

215.  **The 1994 Report considered structural alternatives in the form of bank protection. It also considered non-structural options, including full closure of the MRGO and**

**placing a speed limitation on ship traffic.**  1994 Report.

216.   Based on an evaluation of both monetary savings and non-monetary environmental benefits of marshland creation, the report concluded that bank stabilization measures may be warranted.  1994 Report.

217.   The three objectives that stabilization would fulfill were 1) controlling bank erosion to minimize maintenance requirements; 2) reduction of rate of coastal wetlands adjacent to the MRGO; and 3) restoring, to the extent practicable, wetlands previously converted to open water as a result of bank erosion and saltwater intrusion.  1994 Report.

218.   The 1994 report recommended proceeding to a feasibility study, with cost sharing to be borne 70% Federal and 30% non-Federal.   1994 Report.

219.   Congress was informed of the existence of the 1994 Report.  Oct. 12, 1994 Letter from District Engineer to Senator Breaux (NOP-018-000002656-58) at 2.

220.   In correspondence to Senator Breaux, the Corps informed the Senator of the 1994 Reconnaissance Report, stating that it "contained a recommendation to proceed with feasibility studies contingent upon the identification of a non-Federal sponsor and certification of the report by higher authority.  The purpose of the study will be to determine the advisability of constructing environmental restoration measures, which could include bank protection along the MR-GO.  To date, a non-Federal sponsor willing to cost share in the feasibility study has not been identified."  Oct. 12, 1994 Letter from District Engineer to Senator Breaux (NOP-018-000002656-58) at 2.

221.   The feasibility study was never initiated due to a lack of a cost-sharing partner.  Tom Podany.

222.   In 1995, the United States' House of Representatives Appropriations Committee issued House Report 104-149 in conjunction with the Energy and Water Appropriations Bill, 1996.  H. Rpt. 104-109; 1996 Evaluation Report.

223.   The House Report included the following statement regarding the MRGO:  "The Committee is aware that the authorized 36-foot Mississippi River-Gulf Outlet channel is experiencing serious bank failures on its north bank due to land subsidence, which is significantly increasing dredging costs.  The Committee is aware that the Corps of Engineers recently experienced serious dredging delays, which caused draft restrictions, while attempting to resolve environmental issues in the process of obtaining Coastal Zone Consistency to dredge the Mile 50-56 reach.  To resolve this particular issue, the only available solution was to construct a rock dike that provided bank stabilization before dredging could be accomplished.  The Committee is of the opinion that to minimize future dredging costs and preserve wetlands the north bank Mississippi River-Gulf Outlet should be stabilized with riprap or similar hardened protection, as

necessary, using available operation and maintenance funds." H. Rpt. 104-109; 1996 Evaluation Report.

224.   In response, the Corps compiled a report called the Mississippi River-Gulf Outlet, Louisiana North Bank Foreshore Protection Evaluation Report, dated October 1996. Tom Podany; Eval Rept.

225.   The purpose of the 1996 Evaluation Report was to determine the advisability of constructing additional rock dikes along the unleveed reaches of the north bank of the MRGO. Eval Rept; Podany.

226.   The report assessed whether such measures would reduce the overall maintenance costs of the project, identified the reaches for which such protection would be economically justified, and provided a recommended implementation schedule based on economic and engineering considerations. Eval Rpt.; Tom Podany.

227.   The report was funded by available operation and maintenance funds. Eval Rpt.; Podany.

228.   Eleven different options were developed for one design alternative.   Eval Rpt.; Podany.

229.   The report, after evaluating the environmental effects and monetary benefits, concluded that bank stabilization measures be implemented along miles 54.1-56, miles 43-44.5, and miles 41-43. Such measures revealed a benefit-cost ratio of 2.17. Eval Rpt.; Podany.

230.   Analysis indicated that some of the other reaches not selected for construction were either slightly deficient in terms of economic justification or marginally feasible with a lower probability of success due to their proximity to the Gulf. Eval Rpt.; Podany.

231.   It was proposed that one to two years after construction of protection on the first selected reach, a re-analysis be done to determine whether additional protection would be justified. Eval Rpt.; Podany.

**X.   Other Efforts to Address Coastal Wetlands Impacts**

232.   Congress was aware of coastal wetland loss in Louisiana.

233.   Congress was informed of salinity intrusion resulting from construction of the MRGO when the Chief's Report for the LPV hurricane protection project was submitted. H.R. Doc. No. 89-231, at 8.

234.   The Louisiana Coastal Area Study was authorized by resolutions of the Committees on Public Works of the United States Senate and House of Representatives in 1967.

235.   The purpose of the Louisiana Coastal Area Study was to determine possible

improvements in the coastal area of Louisiana in the interest of hurricane protection, prevention of saltwater intrusion, preservation of fish and wildlife, prevention of erosion, and related water resources purposes.

236.    Several studies were conducted and reports prepared pursuant to the Louisiana Coastal Area Study authority.

237.    **In November 1990, Congress passed the Coastal Wetlands Planning, Protection and Restoration Act (CWPPRA or the Breaux Act).**  Pub. L. 101-646 (1990).

238.    CWPPRA provides funding for projects that restore the coastal ecosystem.

239.    Coastal restoration projects involving shoreline protection and hydrologic restoration have been approved under CWPPRA and constructed in the vicinity of the MRGO.

240.    One such project, the MRGO Disposal Area Marsh Protection, was approved in 1993 to repair damage to the back dike of the MRGO disposal area to preserve approximately 755 acres of wetlands.

241.    Other CWPPRA projects involved shoreline protection along Lake Borgne and the north bank of the MRGO.

242.    A Federal Louisiana Coastal Wetlands Conservation and Restoration Task Force was established in accordance with CWPPRA.  Coast 2050 Report.

243.    The District Engineer, U.S. Army Corps of Engineers, New Orleans District, was Chairman of the Federal Louisiana Coastal Wetlands Conservation and Restoration Task Force.  Coast 2050 Report.

244.    In combination with Louisiana's State Wetlands Conservation and Restoration Authority, the Federal Louisiana Coastal Wetlands Conservation and Restoration Task Force prepared the report, Coast 2050: Toward a Sustainable Coastal Louisiana, in 1998.  Coast 2050 Report.

245.    The Coast 2050 Report was created as a collective effort among Federal, State, and local governments, and it presented a plan to "sustain coastal resources and provide an integrated multiple use approach to ecosystem management."  Coast 2050 Report.

246.    The Coast 2050 Report addressed the problem of land loss across coastal Louisiana, including the particular problems of increases in salinity and erosion attributed to the MRGO.  Coast 2050 Report.

247.    The Coast 2050 Report recommended ecosystem management strategies designed to restore wetlands and prevent continued deterioration.  Coast 2050 Report.

248.   The Coast 2050 recommendations included: (1) closure of the MRGO once alternative container port facilities were available on the Mississippi River; (2) stabilization of the entire north bank of the MRGO using dredged material behind rock dikes; (3) constriction of breaches in the marshes between the MRGO and Lake Borgne; (4) constriction of a sill at Seabrook to improve salinity in Lake Pontchartrain; (5) further study of the freshwater diversion project at the Violet Canal; and (6) use of dredged material from the MRGO to create marshes in South Lake Borgne, the Biloxi Marshes, and Eloi Bay.   Coast 2050 Report.

249.   The Coast 2050 Report was sent to Congress.  Gagliano Dep. 174:15 to 175:2.

250.   The Coast 2050 Report evolved into the Louisiana Coastal Area (LCA) reconnaissance report and formed the basis for a broader-scale effort under the Louisiana Coastal Area Ecosystem Restoration Study (LCA Study).  LCA Report at i.

251.   The LCA Study team was composed of staff from the Corps, the State of Louisiana, the U.S. Fish and Wildlife Service, the National Marine Fisheries Service, the U.S. Environmental Protection Agency, the U.S. Geological Survey, and the National Resources Conservation Services.  LCA Report at v.

252.   The LCA Ecosystem Restoration Study Report and Programmatic Environmental Impact Statement were completed in November 2004.  LCA Report.

253.   The LCA Report's recommendations included MRGO environmental restoration features as one of five near-term critical restoration features recommended for specific Congressional authorization.  LCA Report at MR 6-2 to 6-3.

254.   The Chief of Engineers and the Assistant Secretary of the Army for Civil Works approved and transmitted the LCA Plan to Congress in January 2005.

255.   The State of Louisiana Legislature passed multiple Concurrent Resolutions requesting the U.S. Congress to authorize the Corps to evaluate whether continued operation of the MRGO was justified in light of wetland loss, costs of maintenance, and the number of ships using the channel, and requesting that a plan for the timely closure of the MRGO be developed.  1992; 1999; 2004 (requesting the U.S. Congress and Army Corps of Engineers adopt the Coast 2050 Plan for closure of the MRGO).

256.   Some of the Concurrent Resolutions passed by the State of Louisiana included language informing Congress that "because there are no longer natural levees formed by winding bayous, water from the Gulf of Mexico moves straight up 'Mr. Go' unimpeded as though it were a superhighway for storm surges caused by hurricanes and other less severe storms, and such influx of water results in increased flooding in St. Bernard Parish, Orleans Parish, and Plaquemines Parish."  1999 Resolution No. 266.

257.   St. Bernard Parish also passed Resolutions, which were forwarded to Congress, requesting closure of the MRGO.

258.   In 1994, St. Bernard Parish passed a Resolution seeking closure of the MRGO.   Oct. 12, 1994 Letter from District Engineer to Senator Breaux (NOP-018-000002656-58).

259.   The 1994 St. Bernard Parish Resolution was forwarded by Senator Breaux to the Corps, and by letter dated October 12, 1994, the Corps responded to Senator Breaux regarding St. Bernard's request for the government to close the MRGO and to take five interim measures until closure occurred.  Oct. 12, 1994 Letter from District Engineer to Senator Breaux (NOP-018-000002656-58).

260.   The Corps's letter to Senator Breaux noted that closure of the MRGO required Congressional authority.  Oct. 12, 1994 Letter from District Engineer to Senator Breaux (NOP-018-000002656-58) at 2.

261.   The Corps informed Senator Breaux that the Corps "maintains 12.4 miles of rock foreshore protection on the south bank of the channel adjacent to the Chalmette Hurricane levee system," that "[e]rosion along the south bank of the MR-GO has not caused any stability problems which have increased levee maintenance," that "[r]eduction of vessel speed would probably help reduce bank erosion, but the setting fo ship speed limits and the enforcement of speed limits is not a responsibility of the U.S. Army Corps of Engineers," that a bank erosion reconnaissance report was completed in January 1994 and a non-federal sponsor has not been identified for a feasibility study, and that in 1993, the Corps initiated the placement of dredged material on the north bank of the MRGO "to develop, restore and nourish wetlands."  Oct. 12, 1994 Letter from District Engineer to Senator Breaux (NOP-018-000002656-58).

262.   On December 15, 1998, the St. Bernard Parish government resolved to set up a task force whose purpose was to investigate and develop a plan for closing the MRGO.  This resolution was sent to, among others, Congressman Robert Livingston, then Speaker of the House, Congressman William Jefferson, U.S. Senator John Breaux, and U.S. Senator Mary Landrieu.  St. Bernard Parish resolution dated December 15, 1998, at 2-4. (No. 1336-12-98).

263.   The December 15, 1998, resolution noted MRGO-related concerns, such as increased salinity, land loss, and increased storm surge during tropical storms and hurricanes.  Parish resolution at 2-3.

264.   The U.S. Environmental Protection Agency initiated a "task force" to evaluate the closure of the MRGO.

265.   In 1999, the House Appropriations Committee provided language in the Energy and

Water Development Appropriations Bill of 2000 noting concern "with the efforts of the Environmental Protection Agency to insinuate itself in the future management of the Mississippi River–Gulf Outlet, Louisiana, project.  The Committee emphasizes that the responsibility for identifying and evaluating options for the mitigation of potentially adverse project impacts resides with the Corps.  The Secretary of the Army, acting through the Chief of Engineers, may at his discretion seek to utilize the expertise of other agencies as he deems necessary."   House Report 106-253.

266.   In a report dated March 16, 2000, the Environmental Sub-Committee of the commissioned task force indicated that St. Bernard Parish had long requested closure of the MRGO due to environmental damage and because the channel serves as a funnel for hurricane storm surges entering the Parish.  Report of the Environmental Sub-Committee to the MRGO Technical Committee, March 16, 2000 at 45.

267.   The report identified three basic impacts of the MRGO: 1) habitat loss due to channel excavation, spoil disposal, and erosion; 2) shifts in habitat type due to salinity brought in by the MRGO; and 3) increased land loss due to hydrological changes caused by the MRGO.  Sub Committee report at 45.

268.   The recommendations, based on all available data gathered by the Task Force, were summarized by Councilman Junior Rodriguez as follows: 1) a closure structure should be built at the Bayou la Loutre ridge incorporating a gated system to protect against storm surges; 2) bank stabilization and marsh creation is needed in Lake Borgne from Bayou Bienvenue to the Mississippi River; 3) implementation of a 10-year program to restore and manage resources, including a freshwater diversion structure into the Central Wetlands area; and 4) compensation by the federal government to those who lost land as a result of the construction and maintenance of the MRGO.  Sub-Committee report at 5-6.

269.   Junior Rodriguez testified that "all of our federal legislative delegation got a copy of that report," referring to the March 16, 2000, report by the Environmental Sub-Committee.  Rodriguez Dep., April 30, 2008, at 154:1-6.

270.   Rodriguez also testified that St. Bernard Parish always sent their resolutions and studies regarding dangers posed by the MRGO to the Louisiana Congressional Delegation.  Rodriguez Dep. at 245:5-8.

271.   Dan Arceneux, a member of the St. Bernard Parish Coastal Zone Advisory Committee, testified that he recalled St. Bernard Parish's government passed at least 15 to 20 resolutions detailing the dangers posed by the MRGO and seeking its closure.  Arceneaux Dep., April 24, 2008, at 34:1 to 35:12.

272.   In August 1999, then Governor of Louisiana Mike Foster, Jr, sent a letter to Congressman David Vitter to express his concerns about abruptly halting maintenance

dredging on the MRGO.   Aug. 4 letter from Foster to Vitter.

273.   In that letter, Gov. Foster noted that a number of federal agencies and local governments were expressing concerns about the continued reliance on the MRGO as a deep draft channel and that the EPA had commissioned a group to discuss the possibility of phasing out the project.  Foster letter at 1.

274.   Gov. Foster expressed concerns about abrupt closure of the MRGO and stated that the did not believe that the MRGO could be simply deauthorized without severely damaging Louisiana's economy.  Foster letter at 1.

275.   Gov. Foster thus urged Rep. Vitter to work with the Port of New Orleans and the state in formulating a careful plan to phase out maintenance of the MRGO in order to protect local interests and objectives.  Foster letter at 2.

276.   On August 26, 2002, then Senior Project Manager Alfred C. Naomi sent a letter to Louisiana state representative Nita R. Hutter. The letter stated that the Corps was continuing to improve the federal hurricane protection system and was in the process of developing storm surge models that would address the threat of flooding that existed with the MRGO in place.  Exh. 70.

277.   Every year, the Corps put together Budget Justification Sheets which demonstrate that the Corps annually calculated the benefits and costs of continuing to operate and maintain the MRGO.  Budget Justification Sheets.

278.   Congress was notified of the loss of wetlands along the coast of Louisiana, including loss in the vicinity of the MRGO.

279.   Congress was notified of concerns that the MRGO contributed to the loss of wetlands in its vicinity.  Budget Justification Sheets.

280.   Congress was notified of concerns regarding the impact of the MRGO on hurricane storm surge.

281.   Congress was notified that the LPV hurricane protection system was not complete and that, as a result, it may not provide the protection that was intended.  Budget Justification Sheets.

282.   Congress was notified that storms larger than the SPH may impact the area and that the LPV may not provide protection from a Category 4 or 5 storm.  Budget Justification Sheets.

283.   Congress held multiple hearings involving coastal land loss in Louisiana prior to Hurricane Katrina.  S. Hrg. 101-239 (Aug. 2, 1989); S. Hrg. 101-342 (Aug. 31, 1989);

House Hrg. 106-18 (May 3, 1999); S. Hrg. 106-284 (July 22, 1999); S. Hrg. 109-990 (Aug. 26, 2005).

284. Congress recognized that to take action to address the loss of wetlands "takes very serious resources from both the State and the Federal government." S. Hrg. 101-342, Aug. 31, 1989, at 2 (Statement of Louisiana Senator J. Bennett Johnston).

## XI.    The Corps Continued to Reevaluate the MRGO and the Hurricane Protection System

285. The operation and maintenance of the MRGO flowed from the original design of the MRGO. Kemp Dep at 272:15 to 273:6.

286. Building a surge barrier in the MRGO would have required Congressional authorization and funding. Kemp Dep at 269:25 to 271:8.

287. The Corps selected the route for the MRGO to reduce future maintenance costs and to allow for the development of potential industrial sites.   Kemp Dep. at 286:8 to 287:22; 291:3 to 291:24.

288. The MRGO project and the LPV project were underfunded. Kemp Report at 32.

289. The Corps, through a letter written by Colonel Haar, rejected construction of a surge barrier because the project: (1) was not economically justified; (2) would not include credits for the work already accomplished by local interests; (3) would require additional Congressional authorization; (4) would abandon work already accomplished on building levees; and (5) would interfere with shipping and navigation interests.  Kemp Dep. at 280:23 to 281:17, 282:18 to 283:1; Kemp Report at 23-24.

290. On July 25, 1990, then-Acting District Engineer, Maj. Harold E. Manuel, Jr., wrote a letter to Louisiana Senator John Breaux indicating that the Corps had considered and rejected placing a surge barrier at the confluence of the MRGO and the GIWW because it "could not be economically justified."   Manuel Letter, Exh. 58.

291. The letter further stated that such a barrier would "represent a significant liability to the container industry and doubtless cause the loss of cargoes, public investment, and jobs." Manuel Letter.

292. The letter also responded to concerns about land loss and saltwater intrusion by noting that "[t]he salt marsh is . . . a valuable nursery area and habitat for fish and shellfish, including red drum, speckled trout, shrimp, oysters, and blue crabs."   Manuel Letter.

293. The letter noted that "a number of commercial and recreational fishing businesses and oil field service vendors are based near the channel . . . and make heavy use of the MR-GO."

Closure was not considered economically justified because it would result in annual losses of about $13 million or more.  Manuel Letter.

294.   On September 23, 1969, then New Orleans District Engineer, Col. Herbert R. Haar, Jr., wrote a letter to Congressman F. Edward Hebert.  The letter is in response to a constituent's concern that the Lake Pontchartrain and Vicinity Hurricane Protection Project "will not have all the answers because it excludes flood gates at the Gulf Outlet." In it, Col. Haar explained that the Corps rejected a flood protection plan with surge barriers at the MRGO because it "would result in a substantial increase in costs" with an "increase in benefits [that] was small by comparison."   Exh. 59, Haar Letter at 1-2.

295.   The Corps also considered the political implications: adoption of the plan featuring surge barriers on the MRGO "would mean that none of the work already accomplished by local interests . . . would be incorporated into the Federal project and no credit for such work could be allowed."  Delays associated with adopting the plan would "likely" cause local political entities "to proceed independently and at great cost with improvements to the existing levee systems for interim protections.  For these reasons, the Orleans Levee District, the agency designated by the Governor to provide the local cooperation required for the project, and the Louisiana Department of Public Works, local coordinator for the project, have expressed their opposition to such a plan."  Haar Letter.

296.   The Corps also considered public safety:  "[T]he modifications involved are so broad in scope as to be beyond the discretionary authority of the Chief of Engineers to adopt, so that project review and subsequent Congressional action wold be required. During the time that this process was being accomplished, progress in planning and constructing some of the most urgently needed project features would be discontinued."  Haar Letter

297.   Commercial interests were also considered: "operation of two features of the plan, namely, the navigation gate in the Mississippi River-Gulf Outlet and the lock in the Gulf Intracoastal Waterway, would significantly impede seagoing and inland navigation." Haar Letter.

298.   On April 21, 1975, then District Engineer, Col. K.R. Heiberg III, wrote a letter to G.J. Lannes, Jr. The letter indicates that the Corps considered the economic, political, commercial, and social implications, including public safety implications, in deciding not to build a floodgate in the MRGO.  Exh. 60, Heiberg Letter.

299.   In 1979, the Corps received correspondence from Rep. Livingston requesting that the Corps respond to the concerns one of his constituents had about the LPV project, in particular the "danger of flooding from hurricane tides in the Mississippi River Gulf Outlet."   Elmo C. Waltzer letter to Livingston; Livingston letter to Col. Sands.

300.   In response, then District Engineer, Col. Tom Sands, sent a letter, dated Jan. 10, 1979, to Mr. Waltzer and a copy of the same to Rep. Livingston.  In that letter, Col. Sands

indicated that the District Court for the Eastern District of Louisiana had enjoined construction on the barrier portion of the LPV project.  He noted that the MRGO barrier plan would be reconsidered as part of the alternative plans study in conjunction with the preparation of environmental impact statements.  The Corps indicated that it was currently undertaking studies regarding the effects of barriers on biological organisms and water quality parameters.  Letter from Sands to Waltzer.

301.  In 1999, the Corps initiated a reevaluation study of  the MRGO based on three factors: (1) the possibility that the Port of New Orleans might move some of its facilities from the IHNC to the Mississippi River; (2) the environmental community and local interests characterized the MRGO as an environmental disaster; and (3) efforts to ameliorate some of the environmental effects of the MRGO using O&M funds were inadequate.  Sept. 2005 Draft Report at 8.

302.  The reevaluation study considered whether continued operation of the MRGO was justified.

303.  The study evaluated several alternatives for maintenance of the channel, including abandoning all maintenance as well as constructing a physical closure of the channel at the Bayou La Loutre ridge.

304.  In connection with the reevaluation, a hurricane storm surge model was used to examine the influence of the MRGO upon storm surge because of concerns that the MRGO poses a threat of flooding from hurricanes.  Sept. 2005 Draft Report at 9.

305.  The storm surge model compared storms scenarios with the existing geomorphology of the channel and with a complete closure at the Bayou La Loutre ridge.  Sept. 2005 Draft Report at 9.

306.  Also in connection with the reevaluation, a study titled, "Salinity Changes in Pontchartrain Basin Estuary, Louisiana, Resulting from Mississippi River-Gulf Outlet Partial Closure plans with Width Reduction" was conducted and a report on the study was issued in August 2002.   Sept. 2005 Draft Report App. C.

307.  The reevaluation study was not completed as of Hurricane Katrina.

308.  Prior to Hurricane Katrina, the Corps also had initiated a study to evaluate hurricane protection necessary for a Category 4 or 5 storm.

**XII.  Hurricane Katrina**

309.  Hurricane Katrina is estimated to have reached hurricane status on August 25, 2005, a few hours before its landfall on the southeast Florida coast.  Richard D. Knabb, et al., Tropical Cyclone Report Hurricane Katrina 23-30 August 2005 2 (2005).

310. **After passing over Florida, Hurricane Katrina entered the Gulf of Mexico and quickly returned to hurricane strength.** RICHARD D. KNABB, ET AL., TROPICAL CYCLONE REPORT HURRICANE KATRINA 23-30 AUGUST 2005 3 (2005).

311. Hurricane Katrina experienced two periods of rapid intensification between August 26 and August 28. RICHARD D. KNABB, ET AL., TROPICAL CYCLONE REPORT HURRICANE KATRINA 23-30 AUGUST 2005 3 (2005).

312. Hurricane Katrina nearly doubled in size on August 27, and by the end of that day tropical storm-force winds extended about 140 nautical miles from its center. RICHARD D. KNABB, ET AL., TROPICAL CYCLONE REPORT HURRICANE KATRINA 23-30 AUGUST 2005 3 (2005).

313. On August 28, Hurricane Katrina continued to expand: by the end of the day, tropical storm-force winds extended 200 nautical miles and hurricane-force winds extended 90 nautical miles from the center of the storm. RICHARD D. KNABB, ET AL., TROPICAL CYCLONE REPORT HURRICANE KATRINA 23-30 AUGUST 2005 3 (2005).

314. Hurricane Katrina strengthened from a low-end Category 3 hurricane to a Category 5 hurricane in less than twelve hours, reaching an intensity of 145 knots by 1200 UTC on August 28. RICHARD D. KNABB, ET AL., TROPICAL CYCLONE REPORT HURRICANE KATRINA 23-30 AUGUST 2005 3 (2005).

315. Hurricane Katrina remained very large as it weakened, and the extent of tropical storm-force and hurricane-force winds was nearly the same at its final landfall on August 29 as it was on August 28. RICHARD D. KNABB, ET AL., TROPICAL CYCLONE REPORT HURRICANE KATRINA 23-30 AUGUST 2005 3 (2005).

316. NOAA's National Climatic Data Center concluded that "[a]lthough Katrina weakened somewhat prior to landfall, the height and extent of the storm surge was not affected much by this trend, as the 'buildup' of the ocean surface not only relates to storm strength but storm duration and size, along with the shape of the coastline." RICHARD D. KNABB, ET AL., TROPICAL CYCLONE REPORT HURRICANE KATRINA 23-30 AUGUST 2005 15 (2005).

317. Hurricane Katrina had the largest kinetic energy of all U.S. landfalling hurricanes from 1995 to 2005. Jarvinen Rpt. at 6.

318. At 06:00 CDT on August 29, NOAA buoy 42040, located about 50 miles east of the mouth of the Mississippi River, recorded a peak significant wave height of 55 feet, equaling the highest ever recorded by a National Data Buoy Center buoy. AXEL GRAUMANN, ET AL., HURRICANE KATRINA: A CLIMATOLOGICAL PERSPECTIVE 2 (2005); RICHARD D. KNABB, ET AL., TROPICAL CYCLONE REPORT HURRICANE KATRINA 23-30

AUGUST 2005 9 (2005); IPET at IV-71.

319.   At 1110 August 29, Hurricane Katrina made landfall near Buras, Louisiana, at the upper end of Category 3 intensity with an estimated maximum sustained winds of 110 knots. RICHARD D. KNABB, ET AL., TROPICAL CYCLONE REPORT HURRICANE KATRINA 23-30 AUGUST 2005 3 (2005).

320.   Hurricane Katrina continued northward and made its final landfall near the mouth of the Pearl River at the Louisiana/Mississippi Border as a Category 3 hurricane with an estimated intensity of 105 knots.  Richard D. Knabb, et al., Tropical Cyclone Report Hurricane Katrina 23-30 August 2005 3 (2005).

321.   The Tropical Cyclone Report produced for the National Hurricane Center concluded that the massive storm surge produced by Hurricane Katrina was the result of the storm's size. Richard D. Knabb, et al., Tropical Cyclone Report Hurricane Katrina 23-30 August 2005 9 (2005).

322.   Factors contributing to Katrina's extreme storm surge included: (1) the massive size of the storm; (2) the strength of the system and its sustained winds (Category 5) just prior to landfall; (3) Katrina's near-perpendicular track as it approached the coastline focused its wind field over a large area at landfall; (4) the low central pressure (920 mb) at landfall; (5) the storm's speed, which resulted in additional wind energy being transferred to the water; (6) the wide and shallow continental shelf off the coastline areas in Katrina's path did not allow any room for the storm tide to move or dissipate, pushing it inland and upward at the same time.  RICHARD D. KNABB, ET AL., TROPICAL CYCLONE REPORT HURRICANE KATRINA 23-30 AUGUST 2005 4 (2005); Jarvinen Rpt. at 2.

323.   Hurricane Katrina's storm tide elevations exceeded both the Standard Project Hurricane and the Maximum Probable Hurricane storm tide elevations for locations along the east facing levees of St. Bernard and Orleans Parishes.  Jarvinen Rpt. at 2.

324.   Hurricane Katrina's central pressure at landfall (920 mb) was lower than the Standard Project Hurricane's central pressure (934.6 mb).  DM for LPV 1, pt. I (page 28).

325.   The Tropical Cyclone Report stated that although Hurricane Camille was more intense than Hurricane Katrina at landfall while following a similar track, Camille was far more compact and produced comparably high storm surge values along a much narrower swath.  Richard D. Knabb, et al., Tropical Cyclone Report Hurricane Katrina 23-30 August 2005 9 (2005).

326.   NOAA's National Climatic Data Center concluded that although Hurricane Katrina was comparable to Camille's intensity, it was a significantly larger storm.  AXEL GRAUMANN, ET AL., HURRICANE KATRINA: A CLIMATOLOGICAL PERSPECTIVE 2 (2005).

327. The Tropical Cyclone Report noted that Hurricane Katrina generated large northward-propagating swells in the 24 hours before it made landfall, producing substantial wave setup along the northern Gulf coast. RICHARD D. KNABB, ET AL., TROPICAL CYCLONE REPORT HURRICANE KATRINA 23-30 AUGUST 2005 9 (2005).

328. On the morning of August 29, 2005, Hurricane Katrina struck southeast Louisiana and triggered what would become one of the worst disasters ever to befall an American city.

329. Hurricane Katrina resulted in overtopped levees and floodwalls throughout southeast Louisiana.

330. Hurricane Katrina caused the levees and floodwalls in the New Orleans area to fail or breach in more than 50 locations.

331. Hurricane Katrina caused water to rush into New Orleans and flooded over 80 percent of the city—more than ten feet deep in some neighborhoods.

332. Flooding of the city of New Orleans was caused by the overtopping and breaching of levees and other flood control structures and by rainfall.

333. The New Orleans East Back Levee, which stood on the north side of the GIWW east of the MRGO junction, was overtopped and breached by storm surge in numerous places, flooding New Orleans East.

334. Storm surge from Hurricane Katrina overtopped the Citrus back levee, flooding Citrus and New Orleans East.

335. Levees and other flood control structures on the south side of the MRGO between the IHNC to Verret were massively overtopped and breached.

336. On August 29, 2005, the Lower Ninth Ward and St. Bernard Parish were encompassed by federal flood control structures that ran along the Mississippi River, the IHNC, the MRGO, and from the MRGO near Verret to the Mississippi River at Caernarvon.

337. On August 29, 2005, the federal flood control structures that encompassed the Lower Ninth Ward and St. Bernard Parish were overtopped and breached by storm surge driven by Hurricane Katrina.

338. The LPV floodwall on the east side of the IHNC at the western edge of the Lower Ninth Ward was overtopped by hurricane-induced storm surge, flooding the Lower Ninth Ward and St. Bernard Parish.

339. Portions of the LPV floodwall on the east side of the IHNC at the western edge of the Lower Ninth Ward collapsed.

340.   The floodwaters that inundated St. Bernard Parish and the Lower Ninth Ward on August 29, 2005, flowed over the top of and through breaches in the federal levees and other flood control structures that were designed and constructed to control them.

341.   High water marks were observed at Shell Beach, indicating that the hurricane-induced surge at that location exceeded 18 feet.   Ebersole Report at 11-12.

342.   Observers inside the protected areas of St. Bernard Parish during Hurricane Katrina reported that waters were still rising after 9 a.m.   Ebersole Report at 151.

343.   At Jackson Barracks the surge elevation was marked at 9 feet just after 9 a.m. and at 11 feet between 2 p.m. and 3 p.m.  Ebersole Report at 151.


## XIII.   The Effect of the MRGO during Hurricane Katrina

### A.   Introduction

344.   If the MRGO had not even existed or had been confined to its original footprint when Hurricane Katrina struck, it would have been massively breached as a result of erosion caused by massive and prolonged overtopping.

345.   Neither removing the MRGO in its entirety nor reducing the channel to its original dimensions would have resulted in any appreciable reduction in the storm surge, waves, overtopping rates, breaching, or flooding.

### B.   Results of Computer Modeling on the Impact of the MRGO on Storm Surge

346.   The physics that drive a major storm surge in Greater New Orleans are not significantly influenced by the presence of the MRGO or by the marshes.  Westerink Rpt. at 68.

347.   The conveyance of the MRGO is minimal compared to the conveyance of the surrounding marshes when they are covered with a minimum of fifteen feet of water as they were during Hurricane Katrina.  Westerink Rpt. at 68.

348.   The removal of the MRGO and the restoration of wetlands to pre-MRGO dimensions would have affected water levels in only three areas: (1) English Turn and Braithwaite, where eliminating the MRGO's dredged spoil mounds would increase water surface elevations by about a foot; (2) the Central Wetlands east of the 40 Arpent Levee, where the removal of MRGO's dredged spoil mounds would increase water surface elevation by up to half a foot; and (3) the GIWW and IHNC channels, where the complete removal of the MRGO would lower water levels at the confluence of the IHNC and Reach 1 by as

much as 3.5 feet.   Westerink Rpt. at 68-76.

349.   Reducing the MRGO to its original dimensions would reduce water surface elevation at the confluence of the GIWW and the IHNC by less than half a foot.   Westerink Rpt. at 75.

350.   The degradation of the wetlands since the MRGO's construction did not significantly affect the water levels in MRGO Reach 1 or the IHNC.   Westerink Rpt. at 75.

351.   MRGO Reach 2 had minimal impact on maximum Hurricane Katrina storm levels. Westerink Rpt. at 76.

352.   The two sides of the Golden Triangle formed by the New Orleans East Back Levee and the Chalmette Levee amplified water levels as water propelled by Hurricane Katrina was restrained by these levees and rose up against them in the concavity that they formed. Westerink Rpt. at 79.

353.   The construction of the New Orleans East Back Levee and the Chalmette Levee created a topographical geometry in the shape of a funnel in the Golden Triangle area.  FitzGerald.

354.   According to Plaintiffs' expert Paul Kemp, a funnel is formed by the convergence of the GIWW and Reach 2 of the MRGO.  Kemp. Dep. at 105:22-106:3.

355.   The levees and the banks of the channel are the boundaries of the funnel.  *Id.* at 106:4-10.

356.   The levees help create the surge because the levees are the structures that the water piles up upon during a hurricane.  *Id.* at 106:11-107:5.

357.   The MRGO channel and the degradation of adjacent wetlands after 1956 had minimal effect on waves and currents during Hurricane Katrina.  Resio Rpt. at 7.

358.   The principal causative factor in breach development was the character of the LPV levee, not wind generated surge and waves.  Resio Rpt. at 7.

359.   In all modeled scenarios, the velocities and overtopping rates at every location on the Reach 2 levee are far in excess of the rates necessary and sufficient to cause substantial levee degradation.  Resio Rpt. at 8.

360.   The MRGO and the degradation of wetlands had a negligible effect on wave-generated velocities and overtopping rates along the Reach 2 levee during Hurricane Katrina.  Resio Rpt. at 8.

361.   There is no evidence that eliminating the MRGO in its entirety would have reduced maximum water surface elevations by more than 1.5 feet along Reach 2 of the MRGO, 2

feet in Reach 1 of the MRGO, and 3 feet in the south of the IHNC.  Delft Flow Rpt. at 112.

362.   There is no evidence that maintaining the MRGO at its initial depth and width would have reduced maximum water surface elevations in Reach 1 and in the IHNC by more than a few inches.  Delft Flow Rpt. at 112.

363.   If the MRGO had been maintained at its initial depth and width, the significant wave height on the Reach 2 levees would have been reduced by less than 1 foot.   Delft Wave Rpt. App. at 35.

364.   The peak surge of 16.6 feet at Bayou Bienvenue occurred between 7:00 a.m. and 7:30 a.m.   Ebersole Rpt. at 39-40; 142-43.

365.   The surge at Bayou Bienvenue exceeded 11 feet from approximately 4:30 a.m. until 3:00 p.m.  Ebersole Rpt. at 39-40; 142-43.

366.   Neither eliminating the MRGO in its entirety nor maintaining the channel at its initial dimensions would have appreciably reduced either the peak surge or the duration of surge at Bayou Bienvenue.  Ebersole Rpt. at 39-40; 142-43.

367.   At Bayou Dupre, the peak surge of 17.4 feet occurred at approximately 7:30 a.m.  Almost no change in these elevations would have been effected by eliminating the MRGO in its entirety or maintaining it at its initial dimensions.  Ebersole Rpt. at 40-41; 142-43.

368.   The surge at Bayou Dupre  exceeded 11 feet from approximately 4:00 a.m. until 3 p.m. on August 29, 2005.  Ebersole Rpt. at 40-41; 142-43.

369.   Neither eliminating the MRGO in its entirety nor maintaining the channel at its initial dimensions would have appreciably reduced either the peak surge or the duration of surge at Bayou Dupre.  Ebersole Rpt. at 40-41; 142-43.

370.   Eliminating the MRGO in its entirety would have reduced the maximum water level along Reach 2 of the MRGO by only three or four inches.   Ebersole Rpt. at 138-39.

### C.   Analysis of Levee Failure

371.   The predominant mechanism in the breaching of the Reach 2 levees was backside erosion caused by overtopping from surge and waves.

372.   The storm surge elevations greatly exceeded the Reach 2 levee crest elevations for several hours, resulting in massive overtopping and erosion.

373.   The quality of the soil in the Reach 2 levee was a factor in the breaching that occurred.

374. The soil placement method was a factor in the breaching that occurred.(*i.e.*, hydraulic placement of dredged material or soils mechanically placed after being dug from a pit in from another location and trucked or barged to the levee site) were factors in levee breaching.

375. Soils that were placed hydraulically were weaker (*i.e.*, less resistant to erosion) than soils that were trucked to the levee and bulldozed into place.

376. Much of the soil that composed the Reach 2 levee was placed hydraulically.

377. Soils placed hydraulically (*i.e.*, by dredging them from the MRGO and pumping them into place) are described as "hydraulic fill."   Mosher Report at 25-26.

378. Hydraulic fill refers to the placement method and does not specify the type of soil that is being pumped into place.   Mosher Report at 25-26, Ebersole at 77.

379. "Truck-hauled fill" refers to soils brought in by truck from another location, regardless of the nature of the soils being put in place by this method.

380. A levee constructed with hydraulic fill will initially consist of uncompacted soils.

381. Hydraulic fill usually comprises a greater variety of soils than truck-hauled fill.

382. A levee constructed with truck-hauled fill generally has more compaction and less variation in the types of soil than a levee composed of hydraulic fill.  Ebersole at 77-78, *see also* Mosher Report at 25-26.

383. The levees along Reach 2 only breached in places where they were constructed using hydraulic fill.  Mosher Report at 12, 25.

384. Levees constructed with truck-hauled fill did not breach during Hurricane Katrina. Mosher Report at 12, 25.

385. The type of soil placed in the Reach 2 levee was also a factor in the erosion and breaching of the levee.   Mosher Report at 27.

386. A clay soil is a plastic material which is cohesive and can be resistant to erosion.  Mosher Report at 27.

387. A clay soil is characterized as "fat" if it is predominantly clay and contains few other types of soils.  Mosher Report at 30, 53-54.

388. A fat clay of medium consistency is highly resistant to erosion.

389. A fat clay of softer consistency is less resistant to erosion than a fat clay of medium consistency.

390. A "lean" clay is a clay that contains other materials, such as sand and silt, within the soil. Mosher Report at 30, 53-54.

391. Lean clays are less resistant to erosion than fat clays.

392. During Hurricane Katrina, levees constructed with fat clays of medium consistency showed less erosion than other soil types, including lean clays and fat clays of softer consistency.   Mosher Report at 53-54.

393. Levees constructed with lean clays and fat clays of softer consistency breached when overtopped by significant amounts of storm surge.

394. The elevation of the crown of the Reach 2 levee varied from less than 15 feet (NAVD88) to more than 19 feet.

395. The varying height of the Reach 2 levee was a factor in breaching.  Ebersole Report at 53-54.

396. Places where the crown of the levee was relatively low were more likely to breach than places where the crown was relatively high.

397. Generally, the crown of the levee was lower between Bayous Bienvenue and Dupre than south of Bayou Dupre.

398. Because of the relatively low crown between Bayous Bienvenue and Dupre, overtopping began there earlier and had greater volume and duration than overtopping that occurred south of Bayou Dupre.  Ebersole Report at 53-54.

399. At some points south of Bayou Dupre the levee crown elevation exceeded the maximum surge elevation.  Ebersole Report at 53-54.

400. Both the Corps of Engineers and the Technical Advisory Committee on Flood Defence in the Netherlands ("TAW") have studied overtopping flow to determine the rate at which the flow of water over a levee will trigger erosion.   Ebersole Report at 94-96.

401. The Corps and the TAW agree that water flowing at a rate of approximately 0.1 cfs/ft (cubic feet per second per foot) will trigger erosion of a levee composed of high quality "fat" clay that is well-covered with high quality grass.  Ebersole Report at 94-96.

402. The Corps and the TAW agree that water flowing at a rate of approximately 0.01 cfs/ft

(cubic feet per second per foot) will trigger erosion of a levee composed of medium quality clay with a reasonably good grass cover.  Ebersole Report at 94-96.

403.   The Corps and the TAW agree that water flowing at a rate of approximately 0.001 cfs/ft (cubic feet per second per foot) will trigger erosion of a levee composed of poor quality soils (such as sand) with a poor grass cover.  Ebersole Report at 94-96.

404.   The overtopping rates along the MRGO Reach 2 levees south of Bayou Bienvenue ranged from 0.6 cfs/ft up to 25 cfs/ft.   Ebersole Report at 97.

405.   The overtopping rates along the MRGO Reach 2 levees south of Bayou Bienvenue were at least 6 times the Corps's and TAW's threshold for damage to high quality, clay levees with a high quality grass cover and as much as 250 times above that threshold.  Ebersole Report at 97-98.

406.   The overtopping rates along the MRGO Reach 2 levees south of Bayou Bienvenue were at least 60 times the Corps's and TAW's threshold for damage to medium quality clay levees with a reasonably good grass cover and as much as 2500 times greater than that threshold.  Ebersole Report at 97-98.

407.   The overtopping rates along the MRGO Reach 2 levees south of Bayou Bienvenue were at least 600 times the Corps's and TAW's threshold for damage to poor quality sandy levees with  poor grass cover and as much as 25,000 times greater than that threshold.  Ebersole Report at 97-98.

408.   At all points south of Bayou Bienvenue, the overtopping rate was at least 0.22 cfs/ft. (twice the rate at which erosion of a levee composed of high quality "fat" clay that is well-covered with high quality grass is recognized as beginning by U.S. and Dutch standards) for more than an hour and a half.  Resio Report at 50.

409.   Waves can overtop a levee.  Ebersole Report at 46-47, 53-54.

410.   When a wave overtops a levee, gravity accelerates the flow down the protected (back) side of the levee.

411.   Wave overtopping prior to surge overtopping can trigger erosion if the flow rates exceed the threshold for damage of the levee over which the water flows.

412.   At places on the Reach 2 levee where the levee crown elevation exceeded the the maximum surge elevation, waves sufficiently overtopped the levee to create flow rates as great as 1.0 cfs/ft and even greater.  Ebersole Report at 97-99.

413.   Because the overtopping flow rates created by waves prior to surge overtopping were ten times greater than the threshold at which erosion of the best grass-covered levees

41

typically occurs, erosion of the protected side of the Reach 2 levee began before the storm surge reached the top of the levee.  Ebersole Report at 97-99.

414.   When wave overtopping was augmented by surge overtopping, flow rates on the backside of the Reach 2 levee far exceeded the established Dutch and American threshold at which damage to even the best grass-covered levees begins.  Ebersole Report at 97-99.

415.   Where the Reach 2 levee crown elevation was between15 and 16 feet, overtopping rates exceeded 1.0 cfs/ft at approximately 6:00 a.m. CDT, more than an hour before the peak storm surge.  Ebersole Report at 101-102.

416.   Where the Reach 2 levee crown elevation was between 15 and 16 feet, overtopping rates exceeded 1.0 cfs/ft for more than two-and-a-half hours.  Ebersole Report at 101-102.

417.   Where the Reach 2 levee crown elevation was less than 15 feet, overtopping rates exceeded 1.0 cfs/ft before 6:00 a.m. CDT and persist above this rate for more than 5 hours.  Ebersole Report at 101-102.

418.   Eliminating the MRGO in its entirety would have had a negligible effect on overtopping flow rates on the backside of the Reach 2 levee.  Ebersole Report at 146-148.

419.   Even if the MRGO channel had not been present during the hurricane, the overtopping rates on the backside of the Reach 2 levee would have exceeded and persisted above the established Dutch and American threshold for damage to the best grass-covered levees for hours.  Ebersole Report at 146-148.

420.   Because the overtopping flow rates and durations would have been virtually unchanged by eliminating the MRGO, the breaching of the Reach 2 levee would have occurred at about the same time and proceeded at about the same rate as in fact occurred during the hurricane.  Ebersole Report at 146-148.

421.   The paucity of front-side wave-induced erosion on the face of the Reach 2 levees that withstood the hurricane supports a conclusion that front-side erosion was not a dominant breaching mechanism.  Ebersole Report at 104.

422.   In most locations where erosion was seen on the front side of the Reach 2 levee after Hurricane Katrina, the erosion consisted of a superficial loss of a thin band of missing grass.  Ebersole Report at 111-114.

423.   In a few locations, more than superficial frontside erosion was visible high on the levee after the hurricane.  Ebersole Report at 118-19.

424.   Evidence of backside erosion at every stage of development was visible at many locations after the hurricane.  Ebersole Report at 114-117.

425.     Numerous photographs show sediment deposits on the protected side of the levees. Ebersole Report at 119-122.

426.     Sheetpile and floodwalls on the Reach 2 levee were breached as the result of overtopping.  Mosher Report at 20-24; Ebersole Report at 124-29.

427.     Sheetpile and floodwalls on the Reach 2 levee would have been breached even if the MRGO had not been present when the storm struck.  *See* Mosher Report at 20-24; Ebersole Report at 124-29.

428.     The Bayou Bienvenue Control Structure would have been breached even if the MRGO had not been present when the hurricane struck.  Bea.

429.     The Bayou Dupre Control Structure failed as a result of overtopping.   Ebersole Report at 180-81; Bea.

430.     Even if the MRGO had not been present when the hurricane hit, the Bayou Dupre Control Structure would have been breached.   Ebersole Report.

### D.        Bea's Modifications

431.     Plaintiffs' experts have modeled a number of scenarios to determine the influence of the MRGO.  Two scenarios are pertinent to Plaintiffs' analysis, Scenarios 1 and 2c.  Scenario 1 models the physical environment immediately prior to Hurricane Katrina's landfall**.** Doc. 16361-1 at 5.

432.     In Scenario 2c, a number of changes are made to the physical environment: (1) the MRGO is removed; (2) the Gulf Intracoastal Waterway ("GIWW") is returned to its pre-MRGO dimensions; (3) and the wetlands are returned to their 1958 condition.  *Id.*

433.     According to Plaintiffs, the levees have otherwise remained the same in Scenario 2c.  *Id.*

434.     However, Plaintiffs' Expert Robert Bea has changed the levees in multiple ways in Scenario 2c.  First, Dr. Bea has improved the grass cover on the levees.   Bea. Dep. at 726:5-7 (Feb. 27, 2009).

435.      By changing the grass cover, Dr. Bea made the Reach 2 levees less erodible in his Scenario 2c analysis. *See* Bea Decl. No. 1 ¶¶ 60-67 (July 11, 2008).

436.     Second, Dr. Bea added vegetation in front of the Reach 2 levees in Scenario 2c.  Bea. Dep. at 745:4-21, 748:15-749:20.

437.     Based on this additional vegetation, Dr. Bea reduced the waves computed by Plaintiffs'

hydrodynamic modeling team in Scenario 2c by half.  *Id.*

438.   Third, Dr. Bea raised some of the Reach 2 levees from their pre-Katrina elevation to the design elevation of 17.5 feet in his Scenario 2c analysis.  *Id.* at 732:17-734:1.

439.   Dr. Bea opines there are three mechanisms which caused the Reach 2 levees to be at an elevation less than 17.5 feet. *Id.* at 732:17-733:12.

440.   One way is the natural consolidation of sediment that follows a placement of the earthen fill used to construct levees.  *Id.*

441.   Another way is regional subsidence – general subsidence taking place throughout Southeast Louisiana.  *See id.*

442.   Dr. Bea also attributes a loss of levee elevation to material "squeezing" out into the banks of the MRGO.[2]  *Id.*

443.   Based on the squeezing effect, Dr. Bea raised 20% of the levees along Reach 2 of the MRGO to their design height of 17.5 feet.  *Id.* at 733:22-734:1.

444.   The remaining 80% of the levees along Reach 2 were not raised even though they otherwise subsided.  *Id.* at 733:13-18, 739:8-10.

445.   By raising levees to the original design height, Dr. Bea made no adjustment to account for regional subsidence and levee settlement which were taking place all along Reach 2 of the MRGO.  *See id.* at 732:17:733-18.

### E.   Interior Flooding Analysis– St. Bernard Polder

446.   The vast majority of flooding in St. Bernard emanated from breaches in the LPV levees and floodwalls.  Fitzgerald Rpt. at 20.

447.   The vast majority of floodwaters that entered the St. Bernard polder through breaches entered through the breaches that occurred between Bayous Bienvenue and Dupre. Fitzgerald Rpt. at 25.

448.   The expansion of the MRGO and the degradation of the wetlands since 1958 made virtually no difference in flood elevations within the St. Bernard Polder.   Fitzgerald Rpt. at 25.

---

[2] The United States does not concede that this squeezing process actually took place along Reach 2 of the MRGO.

449.  **The breaches in the IHNC made virtually no difference in ultimate water elevations within the St. Bernard Polder.**  Fitzgerald Rpt. at 21; Delft Flood Rpt. at 45.

450.  The IHNC breaches hastened the outflow of flood waters from the St. Bernard Polder. Fitzgerald Rpt. at 21; Delft Flood Rpt. at 45.

**XIV.   Damages**

451.  **Anthony and Lucille Franz inherited the house at 5924-26 St. Claude Avenue when Anthony's parents died in the 1960's.**  (A. Franz, p. 13, ll. 5-13; p. 16, ll. 2-6).

452.  While the house was a duplex with an outbuilding that was capable, in proper circumstances, of generating rental income, the Franz's used that portion of the property as a "storage area" and never leased it out.  (A. Franz, pp. 17-18, ll. 22-19; p. 19, ll. 16-22).

453.  By the summer of 2005, the Franz's children had reached adulthood.  Their two daughters had moved into their own homes and their son lived in the other half of the duplex at 5924-26 St. Claude Avenue for free.  (A. Franz, p. 18, ll. 4-7).

454.  **Anthony and Lucille Franz followed the news coverage's tracking of Hurricane Katrina from the "middle of the week" of August 22, 2005 and evacuated by car to Baton Rouge on Saturday, August 27.**  (A. Franz, pp. 35-36, ll. 5-14; p. 37, ll. 16-23; p. 38, ll. 3-5).

455.  On Sunday, August 28, 2005, Tanya Smith drove Anthony Franz and his grandsons to Spring, Texas.  (Smith, pp. 31-32, ll.14-22; A. Franz, p. 39, ll. 10-19).

456.  On Tuesday, August 30, 2005, Anthony Franz, Tanya Smith, and Tanya's two sons drove back to Baton Rouge, where Anthony and Lucille Franz stayed for four to five weeks. (Smith, p. 33, ll. 4-19; p. 33, ll. 20-23; A. Franz, p. 41, ll. 2-6).

457.  **In October of 2005, Anthony and Lucille Franz moved into an apartment in Harahan that Tanya Smith found for them and in which they still reside.**  (A. Franz, pp. 41-42, ll. 7-3).

458.  **During their stay in Baton Rouge, Anthony and Lucille Franz came to realize that their house at 5024-26 St. Claude Avenue had been flooded.**  (A. Franz, pp. 42-43, ll. 17-2).

459.  **Anthony and Lucille Franz's house at 5924-26 St. Claude Avenue has never been cleaned or repaired and, other than a few personal possessions removed by the Franz's, the house remains in the same condition today as in October of 2005.**  (A. Franz, pp. 50-51, ll. 8-1).

45

460.   Anthony and Lucille Franz expect the State of Louisiana to buy and demolish their house at 5924-26 St. Claude Avenue.   (A. Franz, p. 51, ll. 13-19; p. 52, ll. 14-20).

461.   Anthony and Lucille Franz have no intention of renovating the house and returning to live in it.  (L. Franz, p. 16, ii. 22-24).

462.   Anthony and Lucille Franz received a $21,842.00 grant from FEMA on November 22, 2005  and $80,000 of the US Department of Housing and Urban Development's Community Development Block Grant (CDBG) money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq.  (FEMA Records, A. Franz, p. 54, ll. 3-9); (A. Franz, p. 53, ll. 8-10).

463.   **Norman Robinson bought the house at 6965 Mayo Drive in 1991 for $154,000.**  (N. Robinson, pp. 11-12, ll. 22-5; p. 14, ll. 2-5).

464.   **Monica Robinson moved into the house at 6965 Mayo Drive in 1995 when she married Norman Robinson, but they never put her name on the title to the house.** (M. Robinson, pp. 32-33, ll. 12-8).

465.   Norman Robinson evacuated New Orleans through an arduous automobile trip to Jackson, Mississippi on Sunday, August 28, 2005.  He worked broadcasting news in Jackson for four weeks, then returned to New Orleans.  (N. Robinson, pp. 27-43, ll. 14-1).

466.   Monica Robinson evacuated New Orleans through an arduous automobile trip to Mobile, Alabama, where she met her sister.  (M. Robinson, pp. 22-25, ll. 2-11).

467.   Norman Robinson heard from his brother-in-law that the neighborhood of Mayo Boulevard had flooded, but did not understand the extent of the damage to the house until he and his wife, Monica, each returned to New Orleans in October and visited the house.  (N Robinson, pp. 45-51, ll. 12-10).

468.   **Norman Robinson lived with his brother-in-law in Algiers, Louisiana for several weeks until Monica Robinson and he rented an apartment in Harahan.  They lived in the apartment until March, 2007, when they bought a house in Algiers.**  (M. Robinson, pp. 30-31, ll. 20-15).

469.   **In the summer of 2006, after gutting the house at 6965 Mayo Drive, Norman Robinson sold it "as is" for $120,000 to a contractor.**  (N. Robinson, pp. 73-74, ll. 2-13).

470.   **Norman Robinson received a $2,000 payment from FEMA**.  (N. Robinson, p. 58, ll.

15-21).

471.     **Kent Lattimore bought a 20-year-old used house trailer on a leased pad in the trailer park at 2100 Marcelle Drive in 1991 or 1992 for $10,000.** (Lattimore, pp. 14-15, ll. 23-20; pp. 16-17, ll. 13-3; p. 18, ll. 4-6; p. 18, ll. 19-20).

472.     Kent Lattimore acquired no immovable property, owning only the trailer and leasing the space in the trailer park. (Lattimore, pp. 14-15, ll. 23-20; pp. 16-17, ll. 13-3; p. 18, ll. 4-6; p. 18, ll. 19-20).

473.     **Kent Lattimore built a storage shed next to the trailer and replaced the trailer's roof, but made no other significant improvements to the property.** (Lattimore, pp. 18-19, ll. 7-20).

474.     **Kent Lattimore bought the abandoned Post Office building at 9117 West St. Bernard Highway, adjacent to the trailer park where he lived, in 1996 or '97 for $52,000.** (Lattimore, p. 13, ll. 6-25; p.21, ll. 16-21).

475.     **Kent Lattimore thoroughly renovated the building and used it as an office for his real estate appraisal business for several years.** (Lattimore, p. 13, ll. 6-25; p.21, ll. 16-21).

476.     **Kent Lattimore left New Orleans on a cruise ship on Saturday, August 27, 2005, headed for a seven-day vacation in the Caribbean.** (Lattimore, pp. 27-28, ll. 20; pp. 30-31, ll. 25-2).

477.     **When Hurricane Katrina blocked the ship's intended track, it diverted to Galveston.** (Lattimore, p. 31, ll. 2-8).

478.     Kent Lattimore watched CNN on the cruise ship where he found himself on August 29 and 30, 2005 and heard conflicting reports about flooding in St. Bernard Parish. (Lattimore, p. 30, ll. 11-23).

479.     **Kent Lattimore returned to New Orleans on September 10, 2005, retrieved his pickup truck from a parking space on Burgundy Street, and drove to his house and business in Chalmette.** (Lattimore, pp. 32-33, ll. 21-19; p. 34, ll. 9-24).

480.     **Kent Lattimore found the doors to both buildings broken down and both structures seemingly robbed after they had been flooded.** (Lattimore, pp. 34- 36, ll. 16-18).

481.     **Kent Lattimore's firearms were stolen, probably by looters.** (Lattimore, pp. 42-43, ll. 19-18).

482.     **Kent Lattimore received a $1,734 grant on October 10, 2005 and a $17,487.29 grant**

**on March 17, 2006 from the Federal Emergency Management Agency ("FEMA") in the aftermath of the storm.** (FEMA Records).

483. **Kent Lattimore rebuilt the building at 9117 West St. Bernard Highway, acting as his own general contractor and using two subcontractors for electrical and sheetrock work.**   (Lattimore, pp. 51-52, ll. 1-24; pp. 54-55, ll. 6-5).

484. **After renovating the building at 9117 West St. Bernard Highway, Kent Lattimore leased it on a month-to-month basis for eight months.** (Lattimore, pp. 55-56, ll. 6-1).

485. Kent Lattimore has made no attempt to rebuild or replace the house trailer at 2100 Marcelle Drive and, to date, "lives like a nomad . . . here and there"  (Lattimore, p. 9, ll. 15-23).

486. **Tanya Smith decided to build a new house in 1997 and chose the lot at 3920 Despaux Drive in Chalmette for its site.**  (Smith, pp. 12-13, ll.  19-12; pp. 16-17, ll. 6-3; p. 20, ll. 6-18).

487. Working from standardized plans, while using the materials and finishes Ms. Smith chose, her contractor completed house in 1997.  (Smith, pp. 12-13, ll.  19-12; pp. 16-17, ll. 6-3; p. 20, ll. 6-18).

488. **Ms. Smith's parents, Anthony and Lucille Franz, provided the initial financing for the $115,000 purchase price, but gave the house to Ms. Smith by an act of donation in 2001.**  (Smith, p. 12, ll. 17-23; pp. 15-16, ll. 24-5; p. 18, ll. 2-17).

489. Tanya Smith sent her sons to Baton Rouge on Saturday, August 27, 2005, then followed them there on the same day.  (Smith, p.29, ll. 3-25; pp. 30-31, ll. 1-13).

490. On Sunday, August 28, 2005, Tanya Smith drove her sons and her father to Spring, Texas.  (Smith, pp. 31-32, ll.  14-22).

491. On Tuesday, August 30, 2005, Tanya Smith, her sons, and her father drove back to Baton Rouge, where they stayed for four to five weeks.  (Smith, p. 33, ll. 4-19;  p. 33, ll. 20-23).

492. **Tanya Smith understood that her house had flooded on Tuesday, August 30, 2005, when she received a telephone call from a cousin, who said "the whole parish had been flooded." Ms. Smith then found an internet website with photographs showing the flooded neighborhood.**   (Smith, pp. 38-39, ll. 1-3).

493. **At some point in October, 2005, Ms. Smith and her sons moved into a friend's vacant apartment in Harahan, Louisiana.**  (Smith pp. 39-41, ll. 22-1).

494. **In March, 2006, Ms. Smith and her sons moved to an apartment in River Ridge,**

**where they have lived ever since and plan to stay until the reconstruction of the house on Despaux is complete.** (Smith, p. 42, ll. 2-17).

495. **Tanya Smith hired contractors and rebuilt her house at 3920 Despaux, completing the work by October 31, 2007 only to see the house burn two weeks later.** (Smith, p. 26, ll. 8-20; p. 27, ll.2-12).

496. She retained all the receipts for the re-construction project and presented them to her attorneys.

497. **Ms. Smith received a $2,000 payment from FEMA.** (Smith, p. 54, ll. 21-25).

498. Ms. Smith received grants totaling $4,358.00 from the Federal Emergency Management Agency ("FEMA"). After FEMA notified Ms. Smith that $1,818.00 of the grant had been mistakenly awarded to her and should be repaid, Ms. Smith paid $50.00 back to FEMA. (FEMA Records).


## CONCLUSIONS OF LAW

1. The Court concludes that it has no subject matter jurisdiction over this action.

2. Pursuant to the Flood Control Act of 1928, 33 U.S.C. § 702c, the United States is immune from liability under the facts here presented.

3. The United States is immune from liability pursuant to the discretionary function exception to the Federal Tort Claims Act. 28 U.S.C. § 2680(a).

4. The United States is immune from liability pursuant to the due care exception to the Federal Tort Claims Act. 28 U.S.C. § 2680(a).

5. The United States is immune from liability for acts or omissions of any contractor with the United States. 28 U.S.C. § 2671.

6. The United States is not liable because of the absence of analogous liability on the part of a private individual in like circumstances. 28 U.S.C. § 1346(b).

7. Plaintiffs have failed to show by a preponderance of the evidence any negligence by the United States in the operation or maintenance of the MRGO.

8. Plaintiffs have failed to show by a preponderance of the evidence that the United States owed Plaintiffs a duty to warn Congress of any alleged danger posed by the MRGO.

9. Plaintiffs have failed to show by a preponderance of the evidence any causal connection

between any negligence on the part of the United States in the operation and maintenance of the MRGO and any damages alleged by the Plaintiffs.

10.    The Court therefore finds no liability by the United States for the damages alleged by the Plaintiffs.

11.    Even if Plaintiffs had established the liability of the United States, they have failed as a matter of proof to establish their entitlement to the damages they seek.

Respectfully submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR
Assistant Director, Torts Branch

 s/ Robin D. Smith
ROBIN D. SMITH
Senior Trial Counsel
Civil Division, Torts Branch
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 353-2574 / (202) 616-5200 (Fax)

Attorneys for the United States of America

## <u>CERTIFICATE OF SERVICE</u>

I, Robin D. Smith, hereby certify that on April 3, 2009, I served a true copy of the foregoing upon all Parties by ECF.

<u>s/ Robin D. Smith</u>
ROBIN D. SMITH