UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO:  *Robinson* (No. 06-2268) | |

**PLAINTIFFS' PRETRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

PLAINTIFFS' NEGLIGENCE CLAIMS .............................................................................1

PRE-MR-GO TOPOGRAPHY ...........................................................................................3

   DESCRIPTION OF REGION ........................................................................................3
   CHARACTER OF LAND AND HABITAT .........................................................................4
   CONDITIONS NECESSARY FOR SUSTAINING HABITAT .................................................5
   DEPICTION OF STUDY AREA ....................................................................................7

ARMY CORPS DECISION-MAKING AND CHAIN OF COMMAND............................17

THE MR-GO'S PLANNING AND AUTHORIZATION....................................................20

THE MR-GO'S DESIGN...................................................................................................25

   VIOLATION OF CONGRESSIONAL MANDATE ............................................................25
   ROUTE SELECTION.................................................................................................28
   OPPOSITION TO SELECTED ROUTE .........................................................................29
   RECOGNITION OF STORM SURGE POTENTIAL ..........................................................30
   NO RECOGNITION OF OTHER ADVERSE EFFECTS .....................................................32

THE MR-GO'S CONSTRUCTION...................................................................................34

THE MR-GO'S OPERATION & MAINTENANCE .......................................................35

   MAINTENANCE DREDGING DEEPER THAN AUTHORIZED ..........................................38
   WAVE WASH EXACERBATED BY SHIPS LARGER THAN DESIGN ASSUMPTION ...........38
   ARMY CORPS' RECOGNITION OF POTENTIAL WAVE WASH DAMAGE TO LPV STRUCTURES .........39
   ARMY CORPS' FAILURE TO STUDY WAVE IMPACTS DURING HURRICANES ...............39

HURRICANE BETSY .......................................................................................................40

LAKE PONTCHARTRAIN AND VICINITY HURRICANE PROTECTION PROJECT ...............41

   1962 HYDROLOGIC STUDY .....................................................................................41
   1966 HYDROLOGIC STUDY .....................................................................................43
   AUTHORIZATION....................................................................................................44
   LEVEE SYSTEMS.....................................................................................................46
   DESIGN HEIGHTS AT TIME OF HURRICANE KATRINA ...............................................48
   IHNC .....................................................................................................................52
   MR-GO REACH 2 ...................................................................................................52
   REACH 1/GIWW .....................................................................................................54

DECLINING USAGE AND CLOSURE OF THE MR-GO................................................54

STORM PROTECTION AFFORDED BY WETLANDS ................................................57

ARMY CORPS' KNOWLEDGE OF THE MR-GO'S DEFECTS AND RISK OF CATASTROPHIC FLOODING ....................................................................................61

   HURRICANE SURGE................................................................................................61
   "FUNNEL EFFECT" .................................................................................................62
   WETLANDS DESTRUCTION......................................................................................67
   CHANNEL BANK EROSION ......................................................................................69
   SHIP WAVES CAUSED BANK EROSION AND JEOPARDIZED LPV STRUCTURES ...........73

NEPA .................................................................................................................................74

   ARMY CORPS'S KNOWLEDGE OF MR-GO'S ADVERSE EFFECTS AT THE TIME OF PREPARING ENVIRONMENTAL DISCLOSURE DOCUMENTS ...............................74

ARMY CORPS' AWARENESS OF FEASIBLE MITIGATION MEASURES ...............87

   SURGE PROTECTION ..............................................................................................88
   "FUNNEL EFFECT" .................................................................................................88

DESTRUCTION OF WETLANDS .................................................................................91
CHANNEL BANK EROSION ......................................................................................93
FORESHORE PROTECTION .......................................................................................94

ARMY CORPS NEVER SOUGHT FUNDING FROM CONGRESS TO REMEDIATE THE MR-GO'S
KNOWN DEFECTS ...................................................................................................99

HURRICANE KATRINA ..........................................................................................101
CLASSIFICATION (SAFFIR SIMPSON) AND TIMING ...............................................101
SURGE HEIGHT/DURATION ..................................................................................102
WAVES/DURATION ..............................................................................................103

RELATIONSHIP BETWEEN MR-GO AND CHANGES  IN TOPOGRAPHY AND HABITAT ...............104
RAPID STORM SURGE DELIVERY ..........................................................................104
LOSS OF TREES AND WETLANDS ..........................................................................107
CHANNEL WIDENING ...........................................................................................110
ACCELERATED AND INCREASED SUBSIDENCE AND COMPROMISING OF LPV STRUCTURES ...........111

RELATIONSHIP BETWEEN CHANGES IN TOPOGRAPHY AND HABITAT AND COMPROMISING
THE ABILITY OF LPV STRUCTURES TO  PROTECT GREATER NEW ORLEANS ...............................118
REACH 1 ...............................................................................................................119
REACH 2 ...............................................................................................................119
REDUCED LEVEE HEIGHTS ...................................................................................120
ENHANCED SURGE ...............................................................................................121
INTENSIFIED WAVE ENERGY .................................................................................123
EARLIER ONSET OF OVERTOPPING AND FAILURE OF LPV STRUCTURES AND LONGER DURATION OF
FLOODING ............................................................................................................127

COMPUTER MODELING ...........................................................................................128
PLAINTIFF'S MODELING APPROACH ......................................................................129
PLAINTIFFS' MODELING RESULTS .........................................................................133
DEFENDANT'S EXPERTS AGREE WITH SEVERAL CONCLUSIONS BY PLAINTIFFS' EXPERTS .................134
DEFENDANT'S UNFOUNDED FOCUS ON SCENARIO 3 ............................................136
DEFENDANT'S EXPERTS FLAWED ANALYSIS .........................................................141

DAMAGE TO LPV STRUCTURES CAUSED BY MR-GO'S EXACERBATION  OF STORM
PARAMETERS ........................................................................................................142
CATASTROPHIC FAILURES ....................................................................................142
OVERTOPPING AND BREACHING ..........................................................................149
REACH 1 ...............................................................................................................152
REACH 2 ...............................................................................................................153
IHNC ...................................................................................................................158
40 ARPENT CANAL LEVEE ...................................................................................160

SOURCES OF FLOODING ..........................................................................................162
UPPER ST. BERNARD PARISH ...............................................................................165
NEW ORLEANS EAST ...........................................................................................166
Lower 9th Ward ...............................................................................................167

CAUSATION ...........................................................................................................170

PLAINTIFFS' DAMAGES ..........................................................................................174
NORMAN ROBINSON ............................................................................................174
General Information ........................................................................................174
Property ..........................................................................................................175
Damages ..........................................................................................................175
Property ..........................................................................................................175

*Emotional Pain and Suffering* ........................................................... *177*
**KENT LATTIMORE** ............................................................................ 180
   *General Information* ..................................................................... *180*
   *Property* ........................................................................................ *180*
   *Damages* ....................................................................................... *180*
   *Property* ........................................................................................ *180*
   *Emotional Pain and Suffering* ...................................................... *181*
   *Other Damages* ............................................................................. *182*
**LATTIMORE & ASSOCIATES** .............................................................. 182
   *General Information* ..................................................................... *182*
   *Damages* ....................................................................................... *183*
   *Property* ........................................................................................ *183*
**TANYA SMITH** ................................................................................. 184
   *General Information* ..................................................................... *184*
   *Property* ........................................................................................ *184*
   *Damages* ....................................................................................... *185*
   *Property* ........................................................................................ *185*
   *Emotional Pain and Suffering* ...................................................... *186*
**ANTHONY & LUCILLE FRANZ** .......................................................... 189
   *General Information* ..................................................................... *189*
   *Property* ........................................................................................ *190*
   *Damages* ....................................................................................... *191*
   *Property* ........................................................................................ *191*
   *Emotional Pain and Suffering* ...................................................... *192*

**CONCLUSIONS OF LAW** ................................................................. **194**
   **THE GOVERNMENT'S JURISDICTIONAL CHALLENGES** ...................... 194
   **NEPA** ........................................................................................... 197
   **NON-POLICY DECISIONS** ............................................................... 201
   **LOUISIANA NEGLIGENCE LAW** ....................................................... 203
   **CAUSATION** ................................................................................... 207

Plaintiffs set forth below their Proposed Findings of Fact and Conclusions of Law based on the record existing before trial  Wherever appropriate, a proposed finding is supported by a pin citation to exhibits, depositions, expert reports, and/or judicially noticeable evidence. Plaintiffs will supplement their Proposed Findings of Fact and Conclusions of Law based on additional evidence adduced at trial.

## PLAINTIFFS' NEGLIGENCE CLAIMS

1.      Plaintiffs' negligence claims are predicated solely on the Corps' negligence involving the MR-GO's design, construction, operation, and maintenance.  702c MSJ Order (Doc No. 12946) at 1; First Amended Complaint For Damages Caused By The Negligent Design, Construction, Operation, and Maintenance Of The Mississippi River-Gulf Outlet ("FAC"), *Robinson v. United States*, Case No. 06-2268, ¶¶1, 2, 5, 9, 91, 95, 97, 99, 102.

2.      Plaintiffs are not predicating Defendant's liability on claims of levee breaches or failures or the defective design, construction, operation and/or maintenance of levees, flood protection works, or any other federal structures or facilities intended for hurricane flood control protection, and their claims against the United States do not relate to a federal flood control project or its design, construction, operation, or maintenance or its performance during Hurricane Katrina.  FAC at ¶¶ 1-4, 6, 29-30, 33-34, 47, 49-50, 52, 53-59, 70-75, 78-80, 82-84, 94, 102, 104; Exh. 50, Order and Reasons Denying Motion to Dismiss, Feb. 2, 2007 ("Document 2994") at pp. 15-16.

3.      Plaintiffs allege that the MR-GO's cumulative adverse defects—loss and repression of natural wetland buffer and vegetation buffers, magnification of the waves in the deep channel which had widened by 300-500%, the accelerated and increased subsidence of the crest elevations of LPV structures along Reach 2, and the unimpeded rapid storm surge delivery

(elevations, volumes and durations) from Lake Borgne and Gulf of Mexico—were substantial factors in enhancing and prolonging storm surge and wave energy and exacerbating flooding during Hurricane Katrina to such an extent that LPV structures were overtopped and/or failed earlier and more severely than otherwise would have occurred without this exacerbation.

4.     Plaintiffs further allege that the increased surge and intensified waves led to overtopping in locations which would not have overtopped but for the heightened surge and that the intensified waves attacked the Reach 2 LPV structures like a battering ram, causing failure in numerous locations that would not have otherwise occurred. Without the enhanced and prolonged storm surge and wave energy caused by the MR-GO's defects, the Plaintiffs maintain, their homes in New Orleans East, Lower 9th Ward, and St. Bernard Parish would not have been destroyed by catastrophic flooding.  FAC at ¶¶ 1, 3, 49, 50, 53, 57, 59, 72, 73, 75, 83-87; Exh 81, Bea Expert Report (Jan. 29, 2009) at pp. 3-4.

5.     For the reasons discussed below, the Court has concluded that the Plaintiffs have proven by a preponderance of the evidence that Hurricane Katrina's prolonged amplified storm surge and intensified waves caused massive overtopping of the LPV structures along Reach 1, Reach 2, and the IHNC and contributed to the failure of the LPV structures along Reach 2 and IHNC floodwalls in two locations along the east side—and the resulting catastrophic flooding of the Lower Ninth Ward, New Orleans East, and St. Bernard Parish, including Plaintiffs' property. Exh. 71, Bea Expert Report (July 2008) at pp. 6-22, ¶¶1-22; Exh. 81, Bea Expert Report (Jan. 2009) at pp. 3-34, ¶¶1-42; Exh. 94, Kemp Expert Decl. (Jan. 2009) at p. 3, ¶6; Exh. 4, Team Louisiana Report at pp. 28, 59.

## **PRE-MR-GO TOPOGRAPHY**

**Description of Region**

6.      The MR-GO is located within the Mississippi River delta plain, a geomorphic

feature created through deposition by the Mississippi River.  The entire surface of the delta plain

that extends southeasterly from the confluence of MR-GO and the Gulf Intercoastal Waterway

(GIWW) consisted predominantly of low-elevation, forested swamps and marshes.  Exh. 96,

Fitzgerald Expert Report (July 2008) at p. 6-1.

7.      The area's freshwater cypress swamps once dominated the landscape and the soils

of this area characteristically consisted of highly organic sediment deposited within this

freshwater environment.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 6-1.

8.      Toward the south, an increasingly greater influence of marine waters from the

Gulf of Mexico creates elevated salinities that have led to the development of brackish water

marshes and saltwater marsh in the extreme southern extent of the area involved in this case

("study area").  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 6-1.

9.      The widespread presence of swamps and marshes and their associated highly

productive vegetative platforms has resulted in soft, highly organic soils at the surface and within

the shallow subsurface of the study area.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 6-1.

10.      Of particular interest here are two areas of wetlands: the Golden Triangle to the

east of Lake Borgne between the Gulf Intracoastal Waterway ("GIWW") and the northern end of

Reach 2 of the MR-GO and the Central Wetlands Unit to the south of the GIWW and between

the northern end of Reach 2 of the MR-GO and the 40 Arpent Canal Levee.  Exh. 91, Kemp

Expert Report (July 2008) at p. 14, Fig. 2.5; p. 37, Fig. 3.6,

11.     Of the 1,095,073 acres of the total study area in the 1950s, prior to the MR-GO's construction, 17,477 acres were fresh marsh, 6,228 acres were intermediate marsh, 212,734 acres were brackish marsh, 169,570 acres were salt marsh, 15,327 acres were cypress swamp, 26,158 acres were trees, 40,139 acres were other land, and 607,168 acres were ponds and bayous.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 4-11; *see also* Table 4.1.

**Character of Land and Habitat**

12.     Before the MR-GO's construction, there were extensive baldcypress trees, water tupelo swamps, salt marsh, brackish marsh, intermediate marsh, freshwater marsh, and swamps in the area.  Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 28; Exh. 96, Fitzgerald Expert Report (July 2008) at pp. 4-6 to 4-9.

13.     The pre-MR-GO's environment was considered stable because of a general sheet flow of freshwater from rainfall, drainage pump stations, and other sources, which was slowed and stored by wetland vegetation.  Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 22-23.

14.     The Bayou La Loutre Ridge—an elevation of land located towards the southern end of the MR-GO's Reach 2—helped to retain freshwater and prevent saltwater intrusion from Breton Sound, causing water levels and salinity to change very gradually with rainfall and tidal conditions.  An effective natural barrier against saltwater intrusion, the Bayou LaLoutre Ridge supported extensive vegetation, including oak, cypress, juniper, and palmetto trees.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 2-13, Fig. 2.18; p. 6-5; *see also* Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 23, 26; Exh. 2100, Susan Hawes Depo (April 17, 2008) at 11:21-14:6.

15.     Before the MR-GO's construction, there were over 10,000 acres of healthy baldcypress – water tupelo swamps and freshwater wetlands  in the Central Wetlands Unit and

approximately five miles of tidal wetlands in the Golden Triangle that were sustained by a combination of freshwater surpluses and extensive wetlands and ridges that slowed or prevented saltwater intrusion from the Gulf of Mexico.  Exh. 95, Day/Shaeffer Expert Report (July 2008) at pp. 24-25, Figure 4; Exh. 91, Kemp Expert Report (July 2008) at p. 14; Exh. 96, Fitzgerald Expert Report (July 2008) at p. 4-1.

16.     Functioning distributaries, overbank flooding, crevasse splays, and reworking of sands formed a skeletal framework for the pre-MR-GO's surrounding environs that incorporated the natural levee ridges and barrier islands within which the Delta plain has formed, which was critically important in protecting baldcypress – water tupelo swamps and other freshwater wetlands in the area from saltwater intrusion.  Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 11-12.

**Conditions Necessary for Sustaining Habitat**

17.     Until modified by human activity, many of the distributaries in the Greater New Orleans area continued functioning well, delivering freshwater, sediments, and nutrients to large areas of the Delta plain.  Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 12.

18.     Freshwater forms a buffer against salinity intrusion, and provides mineral sediments, nutrients, and other materials, such as iron, that sustain healthier, more productive wetlands.  Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 13.

19.     Rainfall in the area north of Bayou La Loutre (and inflow from the GIWW and from the uplands in St. Bernard Parish) provided a relatively constant source of freshwater that protected the baldcypress – water tupelo swamps from saltwater.  Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 26.

20.     Locally generated freshwater—in conjunction with an intact Bayou La Loutre Ridge—maintained the conditions in the Central Wetlands Unit and adjacent areas in a fresh to very low salinity regime, which allowed baldcypress – water tupelo and fresh marsh to survive there.  Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 26.

21.     In this area before the MR-GO's construction, low salinity to fresh conditions were maintained as a result of the net surplus of freshwater from precipitation, runoff from the natural levees, some input of freshwater from the Industrial Canal Lock, the intact Bayou La Loutre Ridge and a greater area of wetlands than at present.  Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 28.

22.     Combined with rain water, the inputs of freshwater were sufficient to sustain the healthy baldcypress – water tupelo swamps and fresh marshes of the Central Wetlands Unit and adjacent areas.  This delicate balance was destroyed when the Bayou La Loutre Ridge was cut by the dredged channel during the MR-GO's construction.  Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 18, 30.

23.     Saltwater intrusion from the MR-GO caused the nearly complete loss of baldcypress – water tupelo swamps.  Saltwater carried by the MR-GO overpowered freshwater inputs and the baldcypress – water tupelo swamps, and fresh marshes rapidly succumbed.  Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 26, 30

24.     Before the MR-GO's construction, the area was considered the densest and richest wild fauna area in the world from both a commercial and recreational value.  The area was also populated by oyster beds, shrimp, crabs, large assortments of commercial and recreational fish, turtles, and alligators.  Exh. 142, 1958 Fish & Wildlife Report at pp. 6, 8, ¶20.

**Depiction of Study Area**

25.     Before the MR-GO's construction, the Central Wetlands Unit and Golden

Triangle was comprised of healthy baldcypress – water tupelo swamps, and wetlands as seen in

the map and photo below:



Exh. 96, Fitzgerald Expert Report (July 2008) at p. 4-3, Fig. 4.2.



**Figure 4.** Example of a healthy baldcypress – water tupelo swamp in southwestern Lake Maurepas. The area experiences little salinity stress, much like the swamps of the Central Wetlands Unit prior to construction of the MRGO.

Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 25, showing examples of health baldcyrpress – water tupelo swamp in Lake Maurepas.

26.     The MR-GO's construction eliminated substantial and healthy bald cypress, water

tupelo swamps, and wetlands as depicted in the photographs below:



Exh. 1673, MRGO photo no. 9944-9; view northeast vicinity station 475+00. Dredging access channel.



MRGO-PHOTOS-0000057

Exh. 1807, MR-GO photos from New Orleans Army Corps public library.



MRGO-PHOTOS-0000248

Exh. 1807, MR-GO photos from New Orleans Army Corps public library, view of MR-GO's Reach 2, looking south, with Golden Triangle to the left and eastern portion of Lake Borgne in the upper right hand corner.



Exh. 1807, MR-GO photos from New Orleans Army Corps public library.  View looking east from what would eventually become Reach 1 at the southward turn into the IHNC.



MRGO-PHOTOS-0000071

MR-GO groundbreaking ceremony, February 3, 1957, in Reach 1 showing direct removal of cypress swamp.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 2-4; Exh. 1807.

27.     The following photographs depict examples of destroyed baldcypress – water tupelo swamps and wetlands, and the progressive widening of the MR-GO's shoreline after its construction:



View of downtown New Orleans near Chalmette prior to Hurricane Katrina.   Note the dead cypress trees in the foreground.

Exh. 96, Fitzgerald Expert Report (July 2008) at p. ii.



**Figure 8**. Examples of ghost cypress killed by logging (left) or by saltwater intrusion (right). Decomposition, decades after the trees are killed, occurs most extensively at the air-water interface, where the trunk is moist yet oxygenated (Photographs by Michaelyn Lombard).

Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 53.



Northern end of Reach 2, Exh. 96, Fitzgerald Expert Report (July 2008) at p. E-1.



Southern end of Reach 2, Bayou La Loutre, Exh. 96, Fitzgerald Expert Report (July 2008) at p. D16.

## ARMY CORPS DECISION-MAKING AND CHAIN OF COMMAND

28.      The U.S. Army Corps of Engineers ("Army Corps" or "Corps") is a component of the U.S. Department of the Army within the U.S. Department of Defense in the Executive Branch of the United States of America, and the acts or omissions of Army Corp employees are attributable to the United States.

29.      The Army Corps is organized according to a hierarchical chain of command in which the Chief of Engineers (usually a Lt. or Major General) is the senior officer at Headquarters in Washington, D.C. with ultimate decision-making authority for the Corps.

30.      The bulk of the Civil Works program assigned to the Chief of Engineers is accomplished through delegation to field officers under the staff supervision of Headquarters.

17

Exh. 212, Dept. of the Army Digest of Water Resources Policies and Authorities, EP 1165-2-1 (July 1999) at p. 4-5.

31.    The Army Corps is administratively organized by Division and Districts.  Of particular relevance here, the New Orleans District ("NOD") was responsible for, among other things, the initial planning, design, construction, operation and maintenance of the MR-GO and Lake Pontchartrain Vicinity Hurricane Protection Project ("LPV") system.  The District Engineer is the senior official in the NOD and responsible for oversight of all Corps programs in the NOD.

32.    The NOD reports to, and is overseen by, the Lower Mississippi Valley Division ("LMVD") whose senior official is the Commander who reports to Headquarters.

33.    Typically, within the Corps, a proposal for a new water development project (such as the MR-GO) is approved first by the NOD District Engineer, then the LMVD Commander, and finally by the Chief of Engineers.  The approval of the Secretary of the Army, on the recommendation of the Assistant Secretary of the Army (Civil Works), is required before a proposal can be sent to the appropriate Congressional committees.

34.    Typically, the Army Corps conducts an investigation to determine the feasibility of a proposed project.  The 1951 MR-GO Report was such an investigation.  Exh. 2, House Doc. No. 245.

35.    Once a project is authorized, the Corps prepares various design memoranda which includes among other things, alignment, engineering, decisions on such matters as soil materials, bank armoring, and method and depth of dredging, and budgeting.  *See, e.g.,* Exh. 200, MR-GO-Design Memo 1-A.

36.    Once a project has been constructed and is operational, the Corps can conduct certain studies, including reconnaissance (investigation on specific projects) and reevaluations

(modification or de-authorization).  *See, e.g.,* Exh. 9, 1988 Recon Report; Exh. 11, Integrated

Final Report to Congress and Legislative Environmental Impact Statement for MRGO Deep-

Draft De-authorization Study (Nov. 2007).

      37.    One outside consultant whom the Corps commissioned to study the MR-GO's

environmental impacts is Dr. Sherwood Gagliano, President of Coastal Environments, Inc., a

distinguished coastal scientist with extensive expertise in Louisiana coastal wetlands destruction

and preservation.  Over three decades before Katrina, Dr. Gagliano authored numerous reports

on behalf of St. Bernard Parish government about the MR-GO's escalating destruction of storm

surge buffering wetlands, bank erosion, "funnel effect," the urgent need for remedial measures,

and the risk of catastrophic flooding of Greater New Orleans.  Exh. 143, Environmental Impact

Study, Ship Channel Project by Coastal Environments, Inc. (October 1972); Exh. 203, The

Mississippi River Gulf Outlet: A Study of Bank Stabilization, Coastal Environments, Inc. (Dec.

1984); *See* Exh. 91, Kemp Expert Report (July 2008) at p. 25, 188, 192.

      38.    The New Orleans District contains the following Technical Divisions:

Construction, Engineering, Operations, Real Estate, and Planning, Programs and Project

Management.  Exh. 860, USACE, NOD, Organizational Chart (01/17/2006) at MVD-007-

000002669.

      39.    The Operations Division of the New Orleans District is comprised of several

smaller branches and specific projects, one of which is the Mississippi River Gulf Outlet.  Exh.

860, USACE, NOD, Organizational Chart (01/17/2006) at MVD-007-000002669.

      40.    The Mississippi River Gulf Outlet project is directly overseen by the Operations

Manager.  Exh. 860, USACE, NOD, Organizational Chart (01/17/2006) at MVD-007-

000002669.

## THE MR-GO's PLANNING AND AUTHORIZATION

41.     The concept of a New Orleans to Gulf of Mexico ship channel was suggested as early as 1930, but the Army Corps determined that the costs exceeded the benefits.  Exh. 243, House Comm. Doc No. 46, 71st Cong. 2d Sess. at p. 2, ¶¶5-6.

42.     The idea of an inland water channel was resurrected in early World War II as a national defense measure, and in 1946, the Army Corps' planning commenced.  Exh. 92, Kemp Appendix "B" at p. 3, "Request for Review of Reports on MR-GO."

43.     New Orleans port interests made an economic case for construction of navigation channels, and they were built before anyone thought about hurricanes or the environment.  The GIWW was dredged during World War II through the wetlands that separated Lake Pontchartrain from Lake Borgne to provide sheltered, submarine-free, inland waterway access for barges and shallow-draft vessels from the Mississippi Sound and points east to the Mississippi River via the IHNC lock (built in the early 1920s). It was a relatively small channel 125 ft wide by 12 ft deep, with a design cross-section of 1,400 square feet.  The Inner Harbor Navigation Cana ("IHNC" or "Industrial Canal"), which is about 5.8 miles long, was originally a local channel constructed by the Port of New Orleans to connect Lake Pontchartrain and the Mississippi River.  The IHNC later became a federal project.  Exh. 4, Team Louisiana Report at p. 225-26; Exh. 8, Naomi 30(b)(6) Depo. at 162:3-9; Exh. 10, House Doc. No. 231 at p. 63.

44.     Congress authorized the MR-GO in 1956 as a 76-mile deep water, navigation channel connecting the Gulf of Mexico to the Port of New Orleans IHNC via the GIWW.  Exh. 1, *Graci v. United States*, 435 F. Supp. 189, 192, ¶ 15 (E.D. La. 1977) ("*Graci IV*"); Exh. 2, House Doc. No. 245 at p. 2; Exh. 3, ILIT at p. 12-8 to 12-9.

45.     The channel includes a "landcut" of 46 miles and bisects the marshes of lower St. Bernard Parish and the shallow waters of Breton/Chandeleur Sound.  Exh. 1, *Graci* IV at 192, ¶16.

46.     The Army Corps designed, constructed, operated, and maintained the MR-GO. Exh. 1, *Graci* IV at 192, ¶19; Exh. 4, Team Louisiana Report at p. 224; Exh. 8, O'Cain 30(b)(6) Depo. at 516:20-24.

47.     The Army Corps commenced construction in 1958, the MR-GO was opened to ocean-going traffic in 1963 and it reached project authorized dimensions in 1968.  Exh. 231, Corps Annual Report 2005 at p. 186; Exh. 4, Team Louisiana Report at p. 226.

48.     Continuing operation and maintenance (including dredging) was the Army Corps' responsibility.  Exh. 8, Deposition of Corps 30(b)(6) witness, Keith O'Cain ("O'Cain 30(b)(6) Depo.") at 494:2-20.

49.     The MR-GO has been divided into three reaches:

(a)  The six-mile connection between the junction of the GIWW and the MR-GO terminus in the IHNC has been designated as Reach 1, and in IPET's words, Reach 1 is "the critical reach" playing the most significant role in transmission of hurricane surge;

(b)  Reach 2—the segment dredged through the marsh beginning at the convergence with the GIWW and extending to Veret—has caused the most environmental degradation;

(c)  Reach 3 further south to the Gulf of Mexico has required continual dredging to keep the channel open.

Exh. 4, Team Louisiana Report at p. 229

50.     In Public Law No. 84-455, Congress approved that the Corps construct the MR-GO "substantially in accordance with recommendation of the Chief of Engineers as contained in House Document Numbered 245, Eighty-second Congress" at an estimated initial cost of $88,000,000.  Exh. 1443, Public Law 455, Chapter 112; An Act To Authorize The Construction of the MR-GO.

51.     House Document No. 245 ("1951 MR-GO Report"), which had been submitted to Congress five years earlier in 1951, was an "investigation" and "a preliminary examination and survey" of the MR-GO.  Exh. 2, 1951 MR-GO Report at p. 1.

52.     The 1951 MR-GO Report included the Report of the Chief of Engineers who endorsed the accompanying Report of the Board of Engineers for Rivers and Harbors, which in turn approved the accompanying New Orleans Division Engineer's Report.  Exh. 2, 1951 MR-GO Report at pp. 4-17.

53.     The Division Engineer's Report explored "the advisability and cost" of a shipping outlet from the Mississippi River to the Gulf of Mexico.  Most of the Division Engineer's Report was a feasibility study.  Exh. 2, 1951 MR-GO Report at pp. 17-45.

54.     The Division Engineer's Report discussed in general terms the concept of "a deep-draft outlet and tidewater harbor" starting at the existing IHNC and proceeding "to a turning basis south of [Michoud], and a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves . . . to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of approximately 70 miles."  Exh. 2, 1951 MR-GO Report at p. 43, ¶ 82, p. 38, ¶60(b).

55.     The Division Engineer's Report was devoted almost entirely to a discussion of the region's characteristics and demographics (Exh. 2, 1951 MR-GO Report at pp. 19-22), existing navigation  projects (id. at pp. 22-23), the IHNC and Port of New Orleans (id. at pp. 23-25), local interests' desired improvements (id. at pp. 25-26, 39-40), existing and prospective ship traffic (id. at pp. 26-30), local navigation hazards and surveys of rivers and passes (id. at pp. 30-31), alternative routes to the Gulf (id. at pp. 31-35), cost-benefit analysis (id. at pp. 35-37), economic and national defense justification (id. at pp. 40-42), and conclusion and recommendation (id. at pp. 43-44).

56.     The Division Engineer's report highlighted the tentative, conceptual nature of the proposed project. The recommendation was expressly "subject to such modifications of location, alinement [sic], and dimensions as may be approved by the Chief of Engineers . . . ."  Exh. 2, 1951 MR-GO Report at p. 43.

57.     For more than a century, the Corps has prided itself on being the engineers for Congress and the preeminent engineering organization with expertise in designing and constructing water development projects such as ship channels.  Exh. 217 at p. xiii (Harold Ickes, Foreword, Arthur Maas, *Muddy Waters: The Army Engineers and The Nation's Rivers* (Da Capo Press 1951)).

58.     In the case of the MR-GO, Congress expected the Corps to make the detailed engineering decisions about how to design and construct the MR-GO and, if necessary, to make substantial changes where necessary.  Exh. 2, 1951 MR-GO Report at p. 43, ¶82.

59.     The Congressional authorization was a mandate to design, construct, operate, and maintain the MR-GO in a safe and competent professional manner.

60.     The MR-GO had no flood control features when constructed, no flood control purpose or function, and no levees were constructed as part of the MR-GO project.  Exh. 8, O'Cain Depo at 516:20-24; Exh. 12, Defendant's Rebuttal, Mtn. to Certify, Doc. No. 6052 at p. 4; Exh. 8, Naomi 30(b)(6) Depo. at 332:23-333:1.

61.     The MR-GO was neither (1) related to the national flood control program, (2) a "constituent component" of the LPVHPP, nor (3) morphed into a hybrid flood control project/navigational aid project.  Exh. 12, Defendant's Rebuttal, Mtn. to Certify, Doc. No. 6052 at p. 8.

62.     The MR-GO and the LPV have not been at any time "inextricably intertwined." Exh. 1669 , 702c MSJ Order (Rec. Doc. No. 12946) at p. 21.

63.     The MR-GO and LPV were two separate and distinct projects with two different funding methods and two different concerns driving each: the LPV sought to prevent flooding while the MR-GO sought to promote deep draft shipping.  Exh. 1669, 702c MSJ Order (Rec. Doc. No. 12946) at p. 35.

64.     The landscape of Greater New Orleans east of the IHNC is a maze of contradictions. Levees built to stop storm surge sit incongruously next to ship channels that speed storm surge through a "funnel" into the heart of the city. Navigation channels like the GIWW and MR-GO facilitate trade, but are liabilities when storms threaten. Both are federally funded projects, designed and built by the Army Corps. The MR-GO and the LPV were planned by the Army Corps at the same time, and were projected to have similar construction costs— about $90 million each.  The effect of one project on the other, however, was not considered until after MR-GO construction began in 1958.  MSJ Exh. 4, Team Louisiana, p. 224.

24

65.     Reaches 1 and 2 of the MR-GO had an appreciable, negative effect on hurricane protection and repeated flooding through New Orleans' "back door" during Hurricanes Betsy (1965), Camille (1969), and Katrina (2005).  Exh. 4, Team Louisiana Report at p. 230.

## THE MR-GO's DESIGN

66.     The MR-GO's design was set forth in various design memoranda prepared by the Army Corps.  *See e.g.,* Exh. 200, MR-GO General Design Memo 1-A; Exh. 201, MR-GO General Design Memo 1-B; Exh. 641 MR-GO General Design Memo No. 2 (1959).

67.     The MR-GO's original design specified a bottom width of 500 feet, surface width of 650 feet, and a 1:2 slope for the Reach 2 channel.  Exh. 200, MR-GO Design Memo 1-A at p. 2, ¶7; Exh. 641, MR-GO Design Memo No. 2 (1959) at p. 21; Exh. 91, Kemp Expert Report (July 2008) at p. 126.

68.     In the planning for the MR-GO, little attention was devoted to any aspects other than the engineering of the channel itself, namely, the type of material to be dredged, the spoil areas in which it would be placed, the stability of the cut, and expected costs. Exh. 4, Team Louisiana Report at pp. 230-31.

69.     In the 1959 General Design Memorandum No. 1B for the MR-GO, the effects of this massive channel on the environment of the Lake Borgne estuary and Lake Pontchartrain were addressed in a single paragraph, unsupported by data.  Exh. 15, General Design Memorandum 1B for the MR-GO (1959) at p. 3, ¶ 11.

## Violation of Congressional Mandate

70.     Congress authorized and approved the MR-GO to be built according to a depth of 38 feet and dimensions of a bottom width of 500 feet, a side slope of 1:2 and therefore a top width of 650 feet because mathematically a top width of 500 feet with a 1:2 slide slope yields

about a 650 foot top width.  The Corps designed the MR-GO consistent with these specifically addressed and authorized project depth and dimensions, namely, a depth of 38, bottom width of 500 feet, surface width of 650 feet, and a 1:2 side slope for the Reach 2 channel.  Exh. 2, House Doc. No. 245 at p. 43, ¶82, p. 38, ¶ 60(b); Exh. 1, *Graci IV*, at 192 ¶17; Exh. 91, Kemp Expert Report (July 2008) at p. 126; Exh. 200, MR-GO Design Memo 1-A at p. 2, ¶17; Exh. 641, MR-GO Design Memo No. 2 (1959) at p. 21, and p. NED-111-000002077, where it states that "[i]nterested members of Congress . . . were notified of the approval in the second indorsement by letters dated 18 September 1959." (referring to approval of Route B and Design Memorandum No. 2, which expressly called for a 1:2 slope).

71.     Following the MR-GO's authorization, Congress never authorized or approved a depth greater than 38 feet or a bottom width greater than 500 feet or a surface width greater than 650 feet.  *See* Exh. 641, MR-GO Design Memo No. 2 (1959) at p. 21, and p. NED-111-000002077, where it states that "[i]nterested members of Congress . . . were notified of the approval in the second indorsement by letters dated 18 September 1959." (referring to approval of Route B and Design Memorandum No. 2, which expressly called for a 1:2 slope).

72.     The Corps did not design and construct the MR-GO in a manner that would assure compliance with the foregoing Congressional mandate for depth and dimensions of the Reach 2 channel.  For example, the Corps—neither as part of the initial design or at any time thereafter— failed to armor the channel banks in order to prevent predicted bank erosion and channel widening (top and bottom width) and thereby maintain the Congressionally-authorized dimensions.  When the Corps made this decision, it knew that due to ship wave wash erosion, the channel would widen significantly beyond the Congressionally authorized dimension.  Exh. 4, Team Louisiana Report at p. 234; Exh. 8, O'Cain 30(b)(6) Depo. 495:1-4; 496: 23-498:7; 500:1-

11; 515:1-18; 516:20-24; Exh. 13, Theis 702c Expert Report (Sept. 2007), ¶8; Exh. 200, MR-GO General Design Memo 1-B at p. 5; Exh. 202, MR-GO General Design Memo No. 2, Supplement 4 (foreshore protection) at pp. 1-30; Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 74:8-77:16

73.     Before the MR-GO's construction was completed, the Chief of Engineers determined that the "project was deficient in original formulation in not providing for preservation of lands along its banks" because it did not protect the channel banks from inevitable ship wake erosion and "expos[ing] the foreshore fronting this [LPV] levee to direct attack by wavers generated by oceangoing vessels. [I]t is evident that the navigation project should have made adequate provision for protecting the levee against the added threat which the existence of the outlet would create." Exh. 844, Draft Memo Re: MR-GO, La., a Feature Of The Project "Mississippi River-Baton Rouge To The Gulf Of Mexico" (1965) at VRG-014-00000091.

74.     At the time of Katrina, the Reach 2 channel had widened to a surface width of 300 to 500% (2,000 to 3,700 feet) greater than the design width of 650 feet. Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶¶4(b), 5(b), 12(f).

75.     At the time of Katrina, the Corps had allowed the Reach 2 channel depth exceed the authorized/design depth of 38 feet at some locations. Exh. 216, Letter from Don T. Riley to Peter Savoy, June 17, 2004, at p. 3.

76.     At the time of Katrina, the Corps had allowed the MR-GO to exceed two critical dimensions—depth and top width—to such an extraordinary degree in so many locations that the deeper and wider than authorized MR-GO had a material adverse effect on the performance of the Reach 2 LPV structures during Katrina by, among other things, creating an exponentially

greater volume of water and a vast expanse for high energy waves to traverse and attack the sides of LPV structures, contributing to sluffing of banks, channel widening, and destabilizing and lowering the protective crown elevations of the LPV structures due to accelerated and increased lateral subsidence. *See infra* "Relationship Between MR-GO and Changes in Topography and Habitat," "Relationship Between Changes in Topography and Habitat and Compromising The Ability of LPV Structures to Protect Greater New Orleans," and "Damage to LPV Structures Caused by MR-GO's Exacerbation of Storm Parameters."

77.     The modification of the MR-GO's dimensions by the widening and deepening of the Reach 2 channel beyond the Congressionally-authorized limitations violated federal law. Indeed, the Corps' legal counsel concluded that under governing statutes, the Chief of Engineers lacked discretionary authority to undertake post-completion project modifications.  In particular, his authority "does not apply to modifying specifically authorized channel depths. . . . [I]f Congress has previously considered all factors of a project's depth or dimensions [including "breadth"], that determination will prevail.  Such cases present an irrebuttable presumption that Congress intended the project to be constructed with whatever limitation it may contain."  Under controlling law, the Corps' lawyers concluded, only Congress can authorize modification of prior authorizing legislation that "specifically addressed and authorized project depth or dimensions."  Exh. 851, Memorandum re Applicability of Section 5, River and Harbor Act of 1915 to Navigation Project Channel Deepening (March 20, 1978), VRG-032-000001287-1289.

**Route Selection**

78.     The Corps considered nine possible routes for the MR-GO.  Exh. 243, House Comm. Doc No. 46 at p. 5, ¶6.