79.     The Corps selected a route generally from the IHNC near the Port of New Orleans proceeding easterly from the existing GIWW and turning at the Michoud facility and proceeding in a generally southeasterly direction as a landcut through 46 miles of marshland to the Gulf of Mexico near Chandeleur Sound.  Exh. 2, 1951 MR-GO Report at p. 43, ¶82.

80.     The Corps' stated reason for selecting this landcut route was that it was perceived at the time as the least expensive route for construction and ongoing operation and maintenance.  Exh. 2, 1951 MR-GO Report at pp. 35-37.

81.     The Corps constructed the MR-GO generally along the recommended route which was the most environmentally-destructive alignment in terms of loss of wetlands and allowing the introduction of saltwater into the marshland and destroying the largely freshwater aquatic habitat for the surrounding flora, fish, and wildlife.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 1-1, Nos. 4, 8.

**Opposition to Selected Route**

82.     Before the Army Corps commenced constructing Reach 2, the U.S. Fish and Wildlife Service and its Louisiana counterpart warned the Army Corps that the selected route for the MR-GO would destroy the wetlands along that route.  Exh. 142, 1958 Fish & Wildlife Report at pp. 1, 8, 16-19; Exh. 174, Statement of Louisiana Wildlife and Fisheries Commission.

83.     Both fish and wildlife protection agencies urged the Corps to consider alternative routes and delay construction until scientific studies could be completed.  The Corps refused these requests.  Exh. 142, 1958 Fish & Wildlife Report at pp. 19-20, ¶¶48-51; pp. 26-27, ¶69; Exh. 166, Fish & Wildlife Memorandum at p. 1; Exh. 174, Statement of Louisiana Wildlife and Fisheries Commission; Exh. 175, FWS Information Service Statement.

84.     These fish and wildlife agencies accurately predicted that one of the most significant adverse effects on the wetlands environment would be massive wetlands loss due to

the channel's destruction of the elevated land ridge at Bayou La Loutre that acted as a natural

barrier to saltwater intrusion from the Gulf of Mexico.  Exh. 95, Day/Shaffer Expert Report (July

2008) at p. 21.

**Recognition of Storm Surge Potential**

85.     From the inception of the MR-GO's design memoranda, the Corps was informed

by the Beach Erosion Board that "hurricane waves developed in Chandeleur Sound could be

transmitted up the channel to New Orleans. . . ."  Exh. 641, MR-GO Design Memo No. 2 (1959).

86.     The MR-GO is bordered on the northeast for approximately 16 miles by Lake

Borgne which has a surface area of approximately 350 square miles but a relatively shallow

depth of three feet to 25 feet maximum.  Lake Borgne is fed directly from the Gulf of Mexico via

the Mississippi Sound (through a six mile wide water course).  Exh. 1, Graci IV at 191, ¶7.

87.     The MR-GO, GIWW, and IHNC have a hydrologic connection:  if a hydrological

event occurs in one, it affects the other.  The MR-GO is open to tidal effects and water

movement because there is an opening to Lake Borgne.  Exh. 8, Deposition of Corps 30(b)(6)

witness, Al Naomi ("Naomi 30(b)(6) Depo.") at 324:17-325:6; Exh. 8, O'Cain 30(b)(6) Depo.

492:18-494:1.

88.     The waters of the IHNC enjoyed free exchange with Lake Pontchartrain through

the passage at Seabrook and with the GIWW at their intersection.  In addition, the waters of the

MR-GO enjoyed free exchange with Lake Borgne through the hundreds of tributaries connecting

the two.  The waters of the GIWW enjoyed free exchange with the Mississippi Sound and the

IHNC and were joined by the MR-GO southeast of Paris Road.  Exh. 1, Graci IV at 192, ¶¶12-

14.

89.    At the time of the LPV's enactment in 1965, Congress and the Army Corps were aware that: "The eastern portion of the area is also subject to flooding by surges and waves that move directly from Lake Borgne, overtopping the existing inadequately protected systems [40 Arpent Canal Levee] seaward of the developed land areas.  As a result, residences and industrial commercial establishments suffer damage.  Business activities are disrupted, lives endangered, and hazards to health created." Exh. 10, House Doc. No. 231 at p. 17; Exh. 8, Naomi 30(b)(6) Depo. at 156:1-11.

90.    In 1969, the Army Corps was aware of the "funnel" effect at the convergence of Reach 1 and Reach 2 of the MR-GO and was told that "[t]his will cause water to funnel up Intracoastal Canal into the Industrial Canal from the Gulf of Mexico."  Exh. 5, Letter to Manuel Pinto from Major Steven G. West, Acting District Engineer at AFW-467-000000030 (11/26/1969).

91.    At the same time, the Army Corps was advised to construct "a lock in the MR-GO, Mississippi River Gulf Outlet, west of Paris Road in order to prevent hurricane surges from entering the IHNC, Inner Harbor Navigation Canal."  Exh. 5, Letter to Manuel Pinto from Major Steven G. West, Acting District Engineer at AFW-467-000000030 (11/26/1969).

92.    The highest storm surges that have caused flooding in the Greater New Orleans since Hurricane Betsy in 1965 have always come from Lake Borgne rather than Lake Pontchartrain.  Exh. 4, Team Louisiana Report at p. xii; Exh. 8, Naomi 30(b)(6) Depo. at 178:23-179:16.

93.    Before Hurricane Katrina, the Army Corps knew that Lake Borgne was historically a pathway for hurricane storm surge to enter St. Bernard Parish and other areas of Greater New Orleans.  One example was the flooding that occurred during and after Hurricane

Betsy in 1965.  The "funnel effect" and its role in the flooding of Greater New Orleans have

been well documented.  Exh. 4, Team Louisiana Report at pp. 223-24, Fig. 158; 235-40; Exh. 26,

Decision Making Chronology at pp. ES-6-7; Exh. 2, ILIT Report at p. 8-6; Exh. 7, Kemp 702c

Expert Report at pp. 25-33.

## No Recognition of Other Adverse Effects

94.     In designing and constructing the MR-GO, the Army Corps ignored predictable

adverse effects of the MR-GO.

95.     The Corps was aware that the unarmored banks of the Reach 2 channel would be

unstable, erode, and significantly widen over time well beyond its design top width of 650 feet.

Exh. 71, Bea Expert Report (July 2008) at pp. 15-16, ¶¶14-15; Exh. 200, MR-GO General

Design Memo 1-A at p. 7; Exh. 201, MR-GO General Design Memo 1-B at p. 5; Exh. 202, MR-

GO General Design Memo No. 2, Supp. 4 at pp. 1-30; Exh. 183, Thomas Podany 30(b)(6) Depo.

(Oct. 9, 2008) at 74:8-77:16

96.     Despite recognizing inevitable bank erosion, the Army Corps' design for the MR-

GO failed to specify any erosion protection from wave wash (such as armoring or other

protective covering) for Reach 2's unstable banks.  Exh. 4, Team Louisiana Report at p. 234,

Exh. 8, O'Cain 30(b)(6) Depo. at 495:1-4; 496:23-498:7; 500:1-11; 516:20-24.

97.     Despite its recognition that Reach 2 would widen significantly in the future, the

Corps failed to take into account at any time (including in the design of the LPV structures) the

widened channel's effect on fetch and wave exacerbation during hurricanes and the resulting

impact on the LPV structures.  Exh. 71, Bea Expert Report (July 2008) at pp. 15-16, ¶¶14-15.

98.     At the time of designing the MR-GO, the Army Corps was well aware that the

ship channel's construction through the St. Bernard marshland would breach the natural

saltwater barrier at Bayou La Loutre and allow the flow of deadly saltwater from the Gulf of Mexico into the Central Wetlands Unit, Golden Triangle, and adjoining areas.  Exh. 144, 1957 Tidewater Channel Advisory Committee Report at p. 2; Exh. 1952, "Interim Survey Report on Hurricane Study of Morgan City, Louisiana, and Vicinity" (November 1962); Exh. 178, USACE Fact Sheet, Jan. 2005; Exh. 161, letter from United States Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957; Exh. 155, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Press Release, "Louisiana Canal's Effects on Fish and Wildlife Arouse Concern of Conservationists," September 26, 1957, at p. 1; Exh. 179, U.S. Fish and Wildlife Service, An Interim Report on Fish and Wildlife Resources as Related to Mississippi River Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies, April 1958; Exh. 9, 1988 Recon Report at p. 27; Exh. 4, Team Louisiana Report at p. 112; Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 16-20, 46.

99.    Despite this recognition, the Army Corps did not design any features that would have prevented saltwater intrusion into the Central Wetlands Unit, Golden Triangle, and adjoining areas.

100.    At the time of designing the MR-GO and LPV structures along Reach 2, the Army Corps was aware that the marshland consisted of a combination of deltaic fine grained and organic sediments which are spongy, porous materials.  Exh. 15, MR-GO Design Memo 1-B at pp. 4-5.

101.    In designing the LPV structures along Reach 2, the Corps was aware that there would be natural subsidence over time, necessitating periodic uplifts to restore the crowns to design elevation.  Exh. 3, ILIT at p. 12-16; Exh. 13, Theis 702c Expert Report (Sept. 2007) at ¶18; Exh. 27, Exh. 27, Deposition of Corps 30(b)(6) witness Richard Varuso in the Turner v.

Murphy Oil litigation, Case No. 05-4206, Aug. 22, 2006 ("Varuso 30(b)(6) Murphy Oil Depo.")
at 40:7-25.

102.    In designing and maintaining the MR-GO and LPV structures, the Army Corps,
despite its awareness that the Reach 2 channel would widen and encroach upon the LPV
structures over time, failed to take into account the accelerated subsidence (due to soil creep and
squeezing), the resulting loss of crest elevation, and instability of the LPV structures that would
occur as a result of the widened channel's proximity to the LPV structures along Reach 2.  Exh.
82, Bea Expert Report (Jan. 2009) at pp. 66-74, ¶¶110-120.

### THE MR-GO's CONSTRUCTION

103.    The United States is the grantee of rights of way for the MR-GO.

104.    The Army Corps dredged through pristine land for most of the ship channel's
construction.  The MR-GO dredging operation was a cutterhead hydraulic dredge that breaks up
the material and, through pumping as an effluent, disposes of the material in a diked retainage
area.  A cutterhead dredge has a suction pipeline that goes to the bottom with a head on it that
rotates and can cut soil, stumps, and tree roots like a Roto-Rooter.  Exh. 8, O'Cain 30(b)(6)
Depo. at 500:25-502:17, 505:16-25, 521:11-23; Exh. 13, Theis 702c Expert Report (Sept. 2007)
at ¶ 15.

105.    The MR-GO land cut produced large volumes of spoil material that required
disposal during its construction. The spoil material—the byproduct of the excavation of the
channel by a variety of dredges during its construction and ongoing maintenance cycles—and it
was placed primarily in spoil bank areas (about 6 to 8 feet high) on the south side of Reach 2 of
the navigation channel.  The Reach 2 spoil bank area has always been about 4,000 feet wide, and
the 2,000 feet closer to the MR-GO channel has been the deposit area for the periodic dredging

over the years.  The spoil material consisted of an amalgamation of deltaic fine grained and organic sediments.  Exh. 14, Penland 702 c Expert Report (Sept. 2007) at p. 14; Exh. 13, Theis 702c Expert Report (Sept. 2007) at ¶ 9; Exh. 8, Naomi 30(b)(6) Depo. at 337:2-8; Exh. 8, O'Cain 30(b)(6) Depo. at 492:18-494:1.

106.    The disposal of the dredged material destroyed cypress swamp along Reach 2. Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 46, Summary Table.

107.    Nearly 300 million cubic yards of earth were moved to construct – and maintain during construction – the MR-GO between 1958 and 1968.  This amount is 60 million more cubic yards than the construction of the Panama Canal.  Exh. 4, Team Louisiana Report at p. 225.

108.    By the time of Hurricane Katrina, the Corps reported that it had not yet completed the MR-GO's construction—almost 50 years after dredging commenced.  Exh. 231, Corps Annual Report 2005 at p. 186.

109.    The Army Corps also performed a significant amount of over dredging to obtain construction material for the LPV dredging as deep as -70 ft. MLG.  Exh. 9, 1988 Recon Report at p. 16; Exh. 216, Letter from Don T. Riley to Peter Savoy, June 17, 2004, at p. 3.

**THE MR-GO's OPERATION & MAINTENANCE**

110.    Bank erosion has been the primary reason for the need to dredge the MR-GO. The powerful waves generated by the larger ships can reach as high as three or four feet in the MR-GO, exerting an energy on the bankline.  The banklines are basically a marsh environment with silty clay soils easily broken up by a wave.  Those soils then go into suspension in the water, and moved around by waves and tides again, they ultimately settle to the bottom.  Exh. 8, O'Cain 30(b)(6) Depo. at 495:5-23.

111.     The MR-GO has required periodic dredging by the Army Corps to remove silt deposited at the bottom of the channel from a natural shoaling process from ships' waves on the bankline causing erosion of the bankline.  If this silt was left unremoved, it would reduce the canal's depth and render it unusable for deep-draft vessels.  Exh. 14, Expert Report of Dr. Shea Penland, ("Penland Expert Report") at p. 14; Exh. 13, Theis 702c Expert Report (Sept. 2007) at ¶ 9; Exh. 8, Naomi 30(b)(6) Depo. at 337:2-8; Exh. 8, O'Cain 30(b)(6) Depo. at 492:18-494:1.

112.     Over the history of the MR-GO, it has been a constant struggle to keep it at its authorized depth for deep draft barges and ships.  Exh. 8, O'Cain 30(b)(6) Depo. at 494:9-16.

113.     The soil along Reach 2 is largely silt and clay with an overlaying of peat.  When it is all mulched up by the cutterhead dredge and deposited in the spoil bank area, it is still loose material even with the water out of it.  Thus, the porous soil materials on the spoil bank area of Reach 2 are uncompacted hydraulic fill material from the bottom.  Exh. 8, O'Cain 30(b)(6) Depo. at 516:25-517:12; 518:3-11.

114.     Over time, the original spoil bank area was at one elevation and the newer 2,000 feet part grew higher because of the periodic dredge material deposited on it.  The LPV flood structures along Reach 2 were generally built on the same alignment as the newer 2,000 feet width of spoil material and were constructed of coarser-grained (sandier) materials dredged from the bed of the pre-existing MR-GO.  Exh. 8, O'Cain 30(b)(6) Depo. at 522:5-18; Exh. 9, 1988 Recon Report at p. 16.

115.     The MR-GO dredging operation, like the MR-GO's construction, consisted of primarily using a cutterhead hydraulic dredge that breaks up the material and, through suction pumping as an effluent in liquid suspension, disposes of the material in a diked spoil bank (retainage) area.  The depositing of dredged material resulted in the initial loss of at least 16,183

acres of marshland.  With each dredge operation, there are continued impacts on at least 10,611 acres of marshland.  Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 46, 56, 61; Exh. 8, O'Cain 30(b)(6) Depo. at 500:25-502:17.

116.    The Army Corps's primary method of dredging was box cutting which eliminates any 1:2 slope and promotes erosion of the channel banks.  Exh. 15, MR-GO General Design Memo 1-B at Endorsement of Div. Eng'r (Oct. 23, 1958) at ¶2(d).

117.    Dredging of the MR-GO contributed to the MR-GO widening beyond its initial 650 foot surface width, which in turn increased the volume of water in the channel and enhanced fetch and storm surge and created a wider surface for the propagation of waves during a hurricane.  Exh. 1940, Planning-Aid Report on the MR-GO, St. Bernard Parish, Louisiana (Bank Erosion) Reconnaissance Study (08/1987) at p. 6; Exh. 9, 1988 Recon Report at Syllabus:

118.    Between 1963 and 2005, the Army Corps sought and obtained appropriations for approximately 147 dredging events and removed approximately 492,422,925 million cubic yards of sediment which became spoil.  Exh. 206, Compilation of Dredging Events at p. 5.

119.    For the representative years 1970 to 1979, the Army Corps sought tens of millions of dollars for funding for new work and ongoing maintenance activities for the MR-GO. None of these appropriations requests were accompanied with an Environmental Impact Statement ("EIS") outlining the impact of the maintenance of the MR-GO on wetlands, channel widening, and storm hazards, or any of the other information required by NEPA and implementing regulations.  Exh. 211, Annual Reports of the Chief of Engineers on Civil Works Activities (1970-72-1974-79).

120.    The Army Corps never presented Congress with an objective analysis of the dredging consequences, including the Army Corps's own understanding that its conduct was

causing the surface width of the MR-GO to expand at a rate averaging at least 15 feet per year and the channel to triple in width.  Exh. 203, The Mississippi River Gulf Outlet: A Study of Bank Stabilization at 4-22; Exh. 145, Corp Report on MR-GO Habitat Impacts, March 16, 2000, at NED-188-000001559.

## Maintenance Dredging Deeper Than Authorized

121.    Congress authorized a 38 foot depth for the MR-GO.  Exh. 2, 1951 MR-GO Report at p. 11, ¶12.

122.    The Army Corps dredged various stretches of Reach 2 at depths in excess of 38 feet.  Exh. 216, Letter from Don T. Riley to Peter Savoy, June 17, 2004, at p. 3.

123.    One predictable effect of dredging beyond 38 feet  was to increase the volume of water in the Reach 2 channel and to contribute to the destabilization of LPV structures.  Exh. 91, Kemp Expert Report (July 2008) at p. 12.

## Wave Wash Exacerbated by Ships Larger Than Design Assumption

124.    At the time of designing the MR-GO, the Army Corps made certain assumptions about the size of vessels using the channel and the expected wave wash. Exh. 9, 1988 Recon Report at p. 26

125.    Over time, the size of the vessels using the channel became much larger than originally assumed.  Exh. 9, 1988 Recon Report at p. 26.

126.    With larger vessels, the waves generated in the channel were higher and exerted greater energy on the unprotected bank lines.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 6-14.

127.    Over time, the greater wave energy contributed to more bank erosion than would have occurred with smaller vessels.  Exh. 96, Fitzgerald Report at p. 6-14.

**Army Corps' Recognition of Potential Wave Wash Damage to LPV Structures**

128.    Long before Hurricane Katrina, the Army Corps acknowledged that wave wash from the Reach 2 channel could have an adverse impact on the LPV structures along Reach 2. "The existence of the Mississippi River-Gulf Outlet dictates the location of that part of the Chalmette hurricane levee paralleling the Outlet and adds to the exposure of the levee." Exh. 1990, Letter to the Chief of Engineers from Major General Ellsworth I. Davis, Division Engineer; Subject: Hurricane Protection – LPV – Chalmette Area dated 03/21/1966.

129.    On a limited basis, the Army Corps in the early 1990s undertook remedial foreshore protection along the upper portion of Reach 2 near Lake Borgne.  The Army Corps assumed financial responsibility for this remediation and financed the work out of its annual operation and maintenance budget.   Other than this armoring for a limited section of Reach 2, the Army Corps never undertook any other remediation efforts to stabilize the rapidly eroding Reach 2 banklines.  Exh. 2047, Letter to John Breaux, U.S. Senate from USACE NOD, Colonel Michael Diffley, Operations and Readiness Division, Project Manager dated 06/01/1993 (NOP-018-000001713-1716).

130.    The Army Corps never alerted Congress about the rapidly widening Reach 2 channel or its implications for nearby population centers.

131.    Nor did the Army Corps ever request funding from Congress to undertake wide scale remediation to prevent further bank erosion along Reach 2.

**Army Corps' Failure to Study Wave Impacts During Hurricanes**

132.    During the MR-GO's operation, the Army Corps, despite knowledge about waves, failed to study the impact of waves on the MR-GO or LPV structures during hurricanes.

133.    In the wake of Hurricane Betsy, the Army Corps commissioned a study by Bretschneider and Collins.  This report failed to appreciate, much less analyze, the potentially destructive power of waves propagating across Reach 2 during a hurricane.  Exh. 60, Bretschneider & Collins Report (1966).

## HURRICANE BETSY

134.    Hurricane Betsy brought extensive destruction to New Orleans when it made landfall in Louisiana in September, 1965.  Many of the descriptions and photos from Hurricane Betsy sound and look familiar to the damage from Hurricane Katrina forty years later.  Exh. 22, *A Failure of Initiative* at pp. 87-88.

135.    There was catastrophic flooding of the Greater New Orleans region as a result of Hurricane Betsy.  And 40 years later, almost to the day, there was catastrophic flooding of the same general area in Orleans and St. Bernard Parishes as a result of Hurricane Katrina.  Exh. 8, Naomi 30(b)(6) Depo. at 252:14-24.

136.    Levee failures in the Industrial Canal area during Hurricane Betsy were caused by overtopping of the levees from storm-driven waters originating in Lake Borgne and carried to the Industrial Canal over the open marsh and through the GIWW.  Exh. 1, *Graci IV* at 195, ¶ 45.

137.    Many people contend that the MR-GO played a prominent role developing the flooding of St. Bernard Parish and East New Orleans during Hurricane Betsy.  Before, during, and after construction of the MR-GO for nearly a half century, many concerns were expressed  to the Corps regarding the effects of this man-made ship channel on the adjacent wetlands and on its potential "funneling" effect on storm surge propagation into the IHNC.  *See e.g.,* Exh. 3, ILIT at p. 12-9; Exh. 5, USACE - New Orleans District Correspondence to Manuel Pinto (November

26, 1969); Exh. 6, Correspondence from Citizens Committee for Hurricane Flood Control to

USACE (November 24, 1965) at pp. 1-3.

138.     Hurricane Betsy provided a "wake-up call" that should have alerted Army Corps

designers developing the LPV that the original plan developed in the 1950s—prior to MR-GO

construction—was too exclusively oriented toward a Lake Pontchartrain surge.  Exh. 4, Team

Louisiana Report at p. 253.

139.     Hurricane Camille in 1969 provided another demonstration of the way a Lake

Borgne surge would outflank this LPV protection system.  This warning again went unheeded by

the Army Corps, and no remedial measures were undertaken for the intervening years before

Hurricane Katrina.  Exh. 4, Team Louisiana Report at p. 253.

## LAKE PONTCHARTRAIN AND VICINITY HURRICANE PROTECTION PROJECT

140.     The greatest natural threat posed to the Greater New Orleans area is from

hurricane-induced storm surges, waves, and rainfalls.  Therefore, a series of control structures,

concrete floodwalls, and levees were proposed by the Army Corps for the area along Lake

Pontchartrain in the 1960s following a planning process begun as early as 1955.  Congress first

authorized the construction of the LPV in the Flood Control Act of 1965 to provide hurricane

protection to areas around Lake Pontchartrain in Orleans, Jefferson, St. Bernard, and St. Charles

Parishes.  The legislation was enacted a month after Hurricane Betsy.  Exh. 19, GAO LPV

Report at p. 3; Exh. 8, Naomi 30(b)(6) Depo. 170:19-24.

**1962 Hydrologic Study**

141.     In planning the LPV, the Corps prepared an Interim Survey Report, dated

November 1962 ("1962 Interim Report") Exh. 2088.

142.    The 1962 Interim Report made several findings about storm surge and the MR-GO which had been designed and was under construction at the time:

(a)    The eastern portion of the lowlands in the lake Pontchartrain tidal basin are subject to flooding by surges and waves that move directly from Lake Borne.  The hurricane surge which inundates low coastal lands is the most destructive of a hurricane's characteristics. Exh. 2088, 1962 Interim Report at pp. I; 23, ¶8d.

(b)    The MR-GO provides a deep, direct route for the inflow of saline currents from the Gulf of Mexico to the area along its channel and to Lake Pontchartrain, with resulting adverse effect on fishery resources in the area.  Exh. 2088, 1962 Interim Report at p. i.

(c)    The Corps made Standard Project Hurricane ("SPH") calculations (with a frequency of once in 100 years), determining that the occurrence of an SPH for any location in the study area would produce maximum surge heights for 11.9 feet in the Chalmette area and 12.5 feet at the Citrus and New Orleans East back levees.  Exh. 2088, 1962 Interim Report at p. 25, ¶9 a; 25, ¶9b; Appendix A, p. A-15, ¶A-3c(1)(a).

(d)    The elevations of protected structures were established by computing the most critical combination of wind, tide level and corresponding significant wave runup for the design hurricane for each reach section.  Levee grades were determined by adding an amount equal to wave runup for the significant wave to those maximum wind tide levels.  Runups range between 2 and 4.5 feet, the exact amount dependent upon the types of structures, slopes of structure, water depths and wave characteristics.  Exh. 2088, 1962 Interim Report at p. 39, ¶ 17c(2).

(e)    The Corps recommended that rip rap protection against wave wash erosion from ships be installed for the LPV structures along the Citrus Back Levee, Reach 1, and the

Chalmette Loop along Reach 2.  Exh. 2088, 1962 Interim Report at p. 42, ¶ 17d(2)(h), (i; 42-43, ¶ 17d(3).

        (f)      For the Chalmette LPV structure, the generally adverse foundation conditions and the methods of construction that must be utilized would require that the levees be built from one to as many as six stages of lifts, with a minimum interval of two years between lifts.  Exh. 2088, 1962 Interim Report at p. 43, ¶ 17e).

        (g)      By reason of its direct connection to the Gulf of Mexico, the MR-GO would greatly increase the salinity regimen of the area contiguous to the canal.  Exh. 2088, 1962 Interim Report at p. 58, ¶ 26a.

**1966 Hydrologic Study**

    143.    After Hurricane Betsy, the Corps did a follow up hydrologic study for the LPV design.  Exh. 2089, 1966 Hydrological Study.

    144.    This study made some findings relating to storm surge and the MR-GO:

        (a)      Without any evaluation at the time, the Corps assumed that "[t]he Gulf Outlet had no effect on hurricane surge elevation."  Exh. 2089, 1966 Hydrological Study at p. 23, ¶ 8d(7).

        (b)      Protective structures exposed to wave runup would  be constructed to an elevation that is sufficient to prevent all over-flow from the significant wave and waves smaller than significant wave accompanying the SPH.  Exh. 2089, 1966 Hydrological Study at p. 23, ¶ 8e(2).

        (c)      Waves larger than the significant wave would be allowed to over-top the protective structure; however, such overtopping would not endanger the security of the structures or cause material interior flooding. Exh. 2089, 1966 Hydrological Study at p. 23, ¶ 8e(2).

**Authorization**

145.     In Section 204 of the Flood Control Act of 1965 (Pub.L.No. 89-298, 79 Stat. 1073 (October 27, 1965)), Congress directed the Army Corps to build "works of improvement for . . . the control of destructive floodwaters" and a "project for hurricane-flood protection on Lake Pontchartrain, Louisiana."  Exh. 31, Bea 702c Expert Report (Sept. 2007) at ¶ 23; Exh. 10, House Doc. No. 231 at p. 46; *see also* Exh. 19, GAO LPV Report at p. 3; Exh. 8, Naomi 30(b)(6) Depo. at 170:19-24.

146.     House Document No. 231 recommended: "construction of a new levee extending from the Inner Harbor Canal along the south side of the Gulf Outlet Channel to Bayou Dupre; thence westward to the Mississippi River levee at Violet; together with riprap slope protection along the navigation channel and flood gates and strengthening of the existing floodwall at Mandeville on the north shore."  Exh. 10, House Doc. No. 231 at p. 9, ¶12.

147.     The Corps was responsible for project design and construction of the approximately 125 miles of levees, with the federal government paying 70 percent of the costs, and state and local interests paying 30 percent.  Exh. 19, GAO LPV Report at pp. 3-4.

148.     Accepting the Chief of Engineer's recommendation in House Document No. 231, Congress authorized the LPV to protect the areas around Lake Pontchartrain from flooding caused by storm surge or rainfall associated with a Standard Project Hurricane ("SPH").  Exh. 19, GAO LPV Report at p. 4; Exh. 26, Decision Making Chronology at pp. 2-3 to 2-17, 2-29 (Map 2-2); Exh. 8, Naomi 30(b)(6) Depo. at 144:3-9; Exh. 20, IPET at p. III-35; Exh. 4, Team Louisiana Report at p. 95; Exh. 10, House Doc. No. 231 at pp. 46-47; Exh. 27, Varuso 30(b)(6) Murphy Oil Depo. at 32:19-22.

149.    The SPH—selected because of the area's urban nature—represented "the most severe combination of meteorological conditions considered reasonably characteristic for the region."  Exh. 10, H.R. Doc. No. 89-231 at pp. 20, 46-47; Exh. 19, GAO LPV Report at p. 4; Exh. 26, Decision Making Chronology at pp. 2-3 to 2-17, 2-29 (Map 2-2); Exh. 8, Naomi 30(b)(6) Depo. at 144:3-9, 181:7-1; Exh. 20, IPET at p. III-35; Exh. 4, Team Louisiana Report at p. 95.

150.    Congress approved specific design heights for various stretches of the system. Exh. 10, House Doc. No. 231 at p. 46.

151.    The Government contends—and Plaintiffs accept as a fact—that there were no defects in the design or construction of the LPV flood control structures along Reach 1 and Reach 2 of the MR-GO that contributed to the catastrophic flooding of Greater New Orleans during Hurricane Katrina.  Exh. 2090, Mosher Depo. (Feb. 19, 2009) at 109:14-110:18; *see also* Defendant's Expert Thomas Wolff Report (Dec. 2008) at p. 38.

152.    The Corps expected some overtopping of the protective structures but they were not designed to fail during the standard project hurricane.  Exh. 8, Powell Deposition, Volume II, at 285:11-13, 306:5-6; Exh. 27, Varuso 30(b)(6) Murphy Oil Depo. at 103:22-25, 104:1.

153.    The Government maintains—and Plaintiffs accept as fact—that the hurricane protection structures built by the Corps along the MR-GO between Bayou Dupre and Bayou LaLoutre performed as designed.  Exh. 27, Varuso 30(b)(6) Murphy Oil Depo. at 101:1-25.

154.    The Government maintains—and Plaintiffs accept as fact—that there was no inherent design defect or defect in the way the hurricane structures along the Reach 2 between Bayou Dupre and Bayou LaLoutre were constructed. Exh. 27, Varuso 30(b)(6) Murphy Oil Depo. at 102:7-20).

155.    The Government maintains that all of the I-walls performed as designed except for the I-walls at the 17th Street Canal, the London Avenue Canal, and possibly the north break at the east side of the IHNC.  Exh. 27, Varuso 30(b)(6) Murphy Oil Depo. at 46:20-25, 147:1-2.

156.    The Government maintains that the mechanism of failure for the north breach on the east side of the IHNC was similar to that experienced at the 17th Street Canal: separation between the earth berm and the I-wall, water filling, and then some subsequent failure.  Exh. 27, Varuso 30(b)(6) Murphy Oil Depo. at 154:7-10.

157.    The design of the LPV hurricane protection structures did not take into consideration any deleterious effects from the MR-GO channel from the date of its construction until 2005.  Exh. 27, Varuso 30(b)(6) Murphy Oil Depo. at 73:17-74:7.

158.    After 1966, the Army Corps "took no steps to re-evaluate the LPV to take into account the effects that MR-GO had had on the surrounding wetlands and the effects on storm surge, in particular as it related to 'the funnel effect.'"  Exh. 1669, 702c MSJ Order (Rec. Doc. No. 12946) at 21, *see also* p. 35.

159.    The planning of the MR-GO and LPV (while inexplicably not coordinated) occurred at the same time and under the same management Corps team in the New Orleans District, Lower Mississippi Valley Division, and Headquarters in Washington, D.C.  Exh. 91, Kemp Expert Report (July 2008) at p. 149.

**Levee Systems**

160.    The LPV flood protection system for Greater New Orleans ("LPV") is comprised of various types of structures, including floodwalls, levees, and earthen berms and spoil banks ("EBSBs") (collectively, "LPV structures").

161.    For purposes of this case as depicted below, the three pertinent LPV segments are the Citrus Back Levee, Chalmette Loop, and New Orleans East Back Levee.



Exh. 3, ILIT at p. 7-15, Fig. 7.5.



Exh. 3, ILIT at p. 4-40, Fig. 4.13 (Chalmette Levee System).

**<u>Design Heights at Time of Hurricane Katrina</u>**

162.    The design elevation of the various LPV structures is a statement of the level of protection authorized by Congress.  At the time of Hurricane Katrina, the levee crowns were lower than specified for the SPH dimension due to settlement and sea level rise.  Exh. 4, Team Louisiana Report at p. 116.

163.    The design height of an LPV structure—also referred to as the crown elevation— was established by the Army Corps for various sections of the LPV hurricane protection system based on estimations of potential heights of surge (plus wave runup) during an SPH.  Exh. 4, Team Louisiana Report at p. v.

164.    Subsidence is the general decrease in the land elevation in a region, thereby lowering the hurricane flooding protection (crown) elevation of LPV structures over time.  This problem was well known in Greater New Orleans.  Exh. 13, Theis 702c Expert Report (Sept. 2007) at ¶ 23; Exh. 82, Bea Expert Report (Jan. 2009) at pp. 66-74, ¶¶110-120; Exh. 27, Varuso

30(b)(6) Murphy Oil Depo. at 36:5-25; MSJ Exh. 3, ILIT at p. 2-5; Exh. 26, Decision Making

Chronology at pp. 3-38 (Table 3-5), p. 3-39 (Map 3-1), p. 3-40 (Map 3-2).

165.    Independent study confirmed that for decades prior to Hurricane Katrina, the

average annual land subsidence rate in the greater New Orleans area including St. Bernard Parish

was approximately 5mm (about .2 inches) per year, whereas the subsidence rates along the MR-

GO were -17.60 to -28.60mm/yr. Dixon, etal (Fig. 1, p. 587).  Exh. 1594, Timothy H. Dixon, et

al., "Space geodesy: Subsidence and flooding in New Orleans," *Nature* 441, 587-588 (1 June

2006).

166.    Settlement occurs when soils and other foundation materials under a flood

protection structure become compressed by the weight of the structure, thereby lowering the

hurricane flooding protection (crown) elevation of LPV structures over time.  This problem was

also well known in Greater New Orleans.  Exh. 13, Theis 702c Expert Report (Sept. 2007) at ¶

23; Exh. 82, Bea Expert Report (Jan. 2009) at pp. 66-74, ¶¶110-120; Exh. 27, Varuso 30(b)(6)

Murphy Oil Depo. at 36:5-25; MSJ Exh. 3, ILIT at p. 2-5; Exh. 26, Decision Making Chronology

at pp. 3-38 (Table 3-5), p. 3-39 (Map 3-1), p. 3-40 (Map 3-2).

167.    There was constant subsidence and settlement of the flood protection works along

the IHNC and Reach 1 and Reach 2 of the MR-GO.  Exh. 27, Varuso 30(b)(6) Murphy Oil Depo.

at 36:5-25; MSJ Exh. 3, ILIT at p. 2-5; Exh. 26, Decision Making Chronology at pp. 3-38 (Table

3-5), p. 3-39 (Map 3-1), p. 3-40 (Map 3-2).

168.    Since at least 1988, the Corps knew that subsidence and settlement along the MR-

GO was at its greatest in the areas that were the most often dredged.  DFE Order (Doc. No.

18212) at p. 39, 1988 Recon Report.

169.    When Katrina struck, the crown height on most LPV structures was generally between 1 and 3 feet low relative to current mean sea level, the only datum that is relevant to the oceanography of hurricane waves and surge.  Exh. 4, Team Louisiana Report at pp. viii to ix; Exhs. 35 & 36, Katrina Structures Height Maps; Exh. 27, Varuso 30(b)(6) Murphy Oil Depo. at 36:5-25; Exh. 3, ILIT at p. 2-5; Exh. 26, Decision Making Chronology at pp. 3-38 (Table 3-5), p. 3-39 (Maps 3-1), p. 3-40 (Map 3-2).

170.    Figure 7-1 below depicts the LPV structure heights for 31 miles of the Chalmette system—over 70% of which were below design grade at the time of Katrina.



Exh. 97, Morris Expert Report (July 2008) at p. 18, Fig. 7-1.

171.    Figure 7-2 below depicts the LPV structure heights for 39 miles of the New

Orleans East system—over 65% of which were below design grade at the time of Katrina.



Figure 7-2

Exh. 97, Morris Expert Report (July 2008) at p. 19, Fig. 7-2.

172.     By the time of Hurricane Katrina, the actual crown elevations of the LPV structures versus their design elevation were generally as follows:

|  | Design | Actual |
|---|---|---|
| Citrus Back Levee (Reach 1/GIWW) | 18' | 15'-16' |
| Chalmette Section (Reach 2) | 17.5' | 12.5'-13.5' |
| IHNC | 14 to 15 ft | 15 to 17 ft |

MSJ Exh. 20, IPET, pp. IV-2, IV-4, IV-27, IV-257, V-13-38.

**IHNC**

173.     Before Hurricane Katrina, the IHNC structures were more than 2 feet below their intended design elevations, mostly from subsidence over the 35-year life of the project.  This resulted in a significant loss of protection.  Exh. 20, IPET at p. I-61.

174.     For the floodwall on the east bank between Florida Avenue and Claiborne Avenue, the deficiency below the design elevation was 2.5 feet as authorized and constructed around 1970.  Like the Lake Pontchartrain outfall canals, this equates to a loss of most, if not all, of the design freeboard allowance and a significant loss of protection capability.  Exh. 20, IPET at p. II-2, II-100 and Figure 53; Exh. 35 & 36, Katrina Structures Height Maps; Exh. 27, Varuso 30(b)(6) Murphy Oil Depo. at 36:5-25; Exh. 3, ILIT at p. 2-5; Exh. 26, Decision Making Chronology at pp. 3-38 (Table 3-5), p. 3-39 (Maps 3-1), p. 3-40 (Map 3-2).

**MR-GO Reach 2**

175.     The design grade level selected by the Corps for the Chalmette section was 17.5 feet along Reach 2.  Exh. 8, Naomi 30(b)(6) Depo. at 293:7-12; Exh. 41, LPV Design Memo No. 3, Supp. No. 1 at p. 9, ¶17.

176.    At the time of Hurricane Katrina, few flood protections works along Reach 2 were at design grade elevation.  A representative location is Station 497+00 where the crest elevation had settled approximately 1.5 feet below the target crest elevation of 17.5 NGVD (still water elevation of 13 feet plus 4.5 feet for wave run-up).  Only for a brief time (around 1985) was this location at the enlarged height of 21.5 feet, settlement began almost immediately, and after 1991-92 the crest elevation was below the design elevation of 17.5 NGVD.  The surge at this site during and after Hurricane Katrina exceeded the crest elevation of 16 feet.  Exh. 31, Bea 702c Expert Report (Sept. 2007) at Appendix A, pp. A-25-26, Figure A.25; Exhs. 35 & 36, Katrina Structure Height Maps; Exh. 31, Bea 702c Expert Report (Sept. 2007) at p. 22, ¶33; Exh. 4, Team Louisiana Report at p. 130; Exh. 3, ILIT at p. 10-20 to 10-21; Exh. 27, Varuso 30(b)(6) Murphy Oil Depo. at 48:12-50:23, 66:23-67:2.

177.    At the time of Hurricane Katrina, the actual crown elevation of the LPV structures along miles 43 to 60 of Reach 2 that remained intact varied considerably from approximately 14 feet to above the authorized design height (17.5 feet) according to LIDAR surveys conducted by the Army Corps.  LIDAR (LIght Detection And Ranging is a terrestrial 3D laser mapping tool for data collection that was used by the United States Geological Survey post-Katrina to survey the actual crown elevations.  Exhs. 35 & 36, Katrina Structure Height Maps.

178.    South of the MR-GO/GIWW channel that forms the throat of the funnel, the crown elevation of the Chalmette Levee west of Paris Road was up to 4 feet deficient in spots, but, like the Citrus Back Levee on the north side of the channel, it held up well under 4 to 6 feet of overtopping. The extent of the overtopping was exacerbated by the deficiencies and hastened the filling of the St. Bernard wetland buffer to the south (Central Wetlands Unit), but this 7 mile levee reach did not breach.  Exh. 4, Team Louisiana Report at p. 134; Figure 44.

**Reach 1/GIWW**

179.    The vast majority of the New Orleans East Loop of the LPV system was below design elevations at the time of Hurricane Katrina.  Exh. 26, Decision Making Chronology at pp. 3-38 (Table 3-5), p.3-39 (Map 3-1), 3-40 (Map 3-2); Exhs. 35 & 36, Katrina Structure Height Maps.

180.    At the time of Hurricane Katrina, the elevations along the Citrus Back Levee (along Reach 1/GIWW) were uneven and different even when side by side.  The Citrus Back Levee east of Paris Road was less than 2 ft below the 18 ft design level and was constructed of resistant clay materials. It was overtopped primarily by waves but was not breached, and proved to be quite resilient. Exh. 4, Team Louisiana Report at p. 134; Figures 39 & 41; Table 42a; Exh. 28, Dalrymple Depo. at 103:10-104:5.

181.    The design level of protection of the Citrus Back Levee to the west of Paris Road was 15 feet but was as low approximately 12.0 ft in places at the time of Katrina.  It experienced a surge up to 16.5 ft with some unanticipated waves. The levee here held up well under approximately 4 feet of overtopping, but I-walls integrated into the levee failed as a result of back scour.  Exh. 4, Team Louisiana Report at p. 134; Figures 39 & 41; Table 42a.

### DECLINING USAGE AND CLOSURE OF THE MR-GO

182.    Originally conceived as a way to get deep draft ships to the Port of New Orleans facilities in the IHNC from the Gulf of Mexico, the MR-GO failed to realize its commercial justification because of changes in ships (deeper drafts) and the need for almost continuous dredging to keep the channel open.  Exh. 3, ILIT at p. 12-9.

183.    The new channel failed to attract the vessel traffic predicted by boosters, averaging less than five inbound and outbound passages per day in a typical year (1998) and

54

carrying only about three percent of the New Orleans port freight tonnage. On the other hand, the MR-GO cost the nation between $10 and $30 million annually for dredging to maintain the authorized channel section at an estimated price of about $13,000 per ship passage.  Most of this dredging  was required for the 40 mile open-water reach between the marsh edge jetties into Breton Sound and the 38 foot contour on the continental shelf that IPET designated Reach 3. Exh. 4, Team Louisiana Report at p. 227; Exh. 11, ACE Integrated Final Report to Congress and Legislative Environmental Impact Statement, on MR-GO, Deep Draft De-Authorization Study at pp 73-77.

184.    Even before construction began, the MR-GO attracted fierce opposition.  In 1957, the St. Bernard Police Jury, acting upon the report of its Tidewater Channel Advisory Committee, passed a resolution opposing the ship channel as a menace to life and property.  Exh. 144, Tidewater Channel Advisory Committee Report.

185.    From 1957 to Hurricane Katrina, the St. Bernard Police Jury (and later Parish Council) consistently sought closure of the MR-GO.  The local government commissioned, and submitted to the Corps, numerous expert studies (including many by Dr. Sherwood Gagliano) documenting in detail the destruction of the surge buffering wetlands and the risk of catastrophic flooding during hurricanes due to the MR-GO.  In 1988 and 1994, the St. Bernard Parish Council unanimously adopted a resolution to close MR-GO because it constituted a threat to public health and safety from hurricane storm surge.  Tragically, these well informed pleas were ignored.  Exh. 144, Tidewater Channel Advisory Committee Report; Exh. 203, The Mississippi River Gulf Outlet: A Study of Bank Stabilization; Exh. 3, ILIT at p. 12-9.

186.    Over time, more and more governmental entities, public officials, environmental groups, experts, and local citizens raised serious concerns about the risk posed by the MR-GO of

causing catastrophic flooding in St. Bernard Parish and New Orleans.  These concerns—which

the Corps' own internal studies verified—were also ignored by the Army Corps.  Exh. 160 at p. 2

"A Special Report on Fish and Wildlife Resources in Relation to the Mississippi River - Gulf

Outlet Project Louisiana, Nov. 8, 1957; Exh. 142 at p. 4, ¶2 "An Interim Report on Fish and

Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline

of Proposed Fish and Wildlife Studies," (April 1958); Exh. 161 at p. 1, letter from United States

Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22,

1957; Exh. 641, MR-GO Design Memo No. 2 (1959); Exh. 166, Memorandum from F.C. Gillett,

Acting Regional Director for the United States Fish and Wildlife Service to the Director of the

Fish and Wildlife Service in Washington, D.C., September 24, 1959; Exh. 51 at p. 2, letter from

Cary W. Kerlin to Jack A. Stephens, May 31, 1979; Exh. 174 "Statement of Louisiana Wildlife

and Fisheries Commission relative to the New Orleans [sic] to the Gulf Tidewater Channel,"

May 29, 1957; Exh. 175, FWS Information Service Statement, "Louisiana Canal's Effects on

Fish and Wildlife Arouse Concern of Conservationists," (Sept. 26, 1957).

187.    In October 2004, the Louisiana Legislature passed a resolution urging closure of

the MR-GO and immediate implementation of remedial measures to address the hurricane flood

risk posed by the MR-GO.  Exh. 3, ILIT at p. 12-9.

188.    Despite rapidly declining usage of the increasingly outmoded ship channel and

mounting opposition to the MR-GO as a threat to the environment and public safety and

property, the Army Corps consistently opposed efforts to close the MR-GO.  As time passed and

the pressure to de-authorize the MR-GO intensified, the Corps nevertheless displayed no sense of

urgency, preferring to undertake protracted studies to evaluate the MR-GO's continuing

viability.  When Katrina hit, the Corps was still studying the issue; it took two more years for the

Corps to complete its closure study of a defunct ship channel.  Exh. 91, Kemp Expert Report (July 2008) at p. 187.

189.    In late 2007, over two years after Hurricane Katrina, the Army Corps finally recommended to Congress the de-authorization (closure) of the MR-GO.  Exh. 4, Team Louisiana Report at p. 227; Exh. 11, MR-GO Deep Draft De-Authorization Study at pp 73-77.

190.    In its Final De-Authorization Report to Congress, the Army Corps justified closure solely on economic grounds, reporting what had been known for decades:  the MR-GO had long ago become an obsolete ship channel due to larger vessels with greater than 36' drafts and rapidly declining usage.  Exh. 11, MR-GO Deep Draft De-Authorization Study at p. xi-xiii.

191.    By the time the Corps issued its final report, there was substantial data showing that the MR-GO played a critical role in causing flooding during Katrina.  Nevertheless, the Corps' closure report conspicuously omitted any discussion of the hurricane flooding risk posed by the MR-GO as a reason for closure. Exh. 91, Kemp Expert Report (July 2008) at p. 195; Exh. 11, MR-GO, Deep Draft De-Authorization Study.

## STORM PROTECTION AFFORDED BY WETLANDS

192.    It is well known (and the Army Corps knew) that healthy wetlands have a positive effect in reducing the height and intensity of storm surge—anywhere from 1 foot per 2.75 miles (0.36 feet/mile) to 1 foot per 1.4 miles (0.71feet/mile) depending on the type of vegetation.  Exh. 91, Kemp Expert Report (July 2008) at p. 184, Figure 9.5; see also Exh. 134 (Chalmette Extension Design Memorandum No. 1 Hydrology and Hydraulic Analysis Part 4 (October 1967) at Plate No. 6.

193.    In 1990, the Corps again recognized that coastal wetlands provide hurricane and storm surge "buffering capacity" to coastal and inland communities.  Exh. 398, "Land Loss and

Marsh Creation, St. Bernard, Plaquemines and St. Bernard Parishes, Louisiana" Feasibility Study
Vol. 2, App. A-F (April 1990).

194.    The Army Corps knew (or should have known) that the reduction in protective
wetlands (both in the Golden Triangle and Central Wetlands Unit and immediately in front of the
LPV structures) and increase in channel width would likely have a demonstrable adverse effect
on flooding levels in the vicinity of the MR-GO during hurricanes.  Exh. 9, 1988 Recon Report
at Comment 2; Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶19-27.

195.    It is widely agreed—and the Army Corps has acknowledged—that the presence of
the MR-GO destroyed wetlands that otherwise would have provided additional surge defenses
during Hurricane Katrina.  Exh. 9, 1988 Recon Report at p. 10; Exh. 8, Naomi 30(b)(6) Depo. at
281:20-202:6, 326:20-327:4; Exh. 17, Day Expert Report (Sept. 2007) at pp. 3-6, 11; Exh. 4,
Team Louisiana Report at pp. 112, 227-28; Exh. 3, ILIT at p. 12-8 to 12-9; Exh. 23, A Nation
Still Unprepared at p. 125; Exh. 28, Dalrymple Depo. at 35:19-36:6; Exh. 37, *An Unnatural
Disaster* at p. 4.

196.    A study by the Louisiana Department of Natural Resources found that in 1992,
Hurricane Andrew's 9.3 foot storm surge height dropped 3.1 inches for every mile of mash and
water landscape it crossed, dropping to 3.3 feet.  Exh. 2091, Swenson, E.M., *Hurricane Andrew:
the Inundation of the Louisiana Coastal Marshes,* Report Submitted to the Louisiana Department
of Natural Resources, Baton Rouge, Louisiana, DNR Contract No. 256081-95-02 (1994).Exh.
1638, Coast 2050, Toward a Sustainable Coastal Louisiana (Dec. 1998) at p. 55; *see also* Exh.
2058, CRS Report for Congress, *Federal Liability for Hurricane Katrina-Related Flood
Damage*, RL34131 (Aug. 17, 2007) at p. 2.

197.    During three decades of MR-GO dredging by the Army Corps, the Nation had a policy to maximize protection of wetlands.  This mandatory policy found expression in statutes, regulations, and policy statements issued by the President and federal agencies.  Exh. 169, Water Bank Act of 1980, Public Law 91-559 (84 Stat. 1468; 16 U.S.C. §§1301-1311) (December 19, 1970), as amended on January 2, 1980 by Public Law 96-182 (93 Stat. 1317)); Exh. 170 (Emergency Wetlands Resources Act of 1986, (16 U.S.C. §§ 3901-3932, November 10, 1986, as amended 1988 and 1992)); Exh. 171 (Clean Water Act, (33 U.S.C. §1251 et seq. (1972)); Exh. 172 (Executive Order No. 11990 (May 24, 1977)); Exh. 212, Army Corps, Water Resources Policies and Authorities, EP 1165-2-1 (July 1999) at 19-1 through 19-26.

198.    One of the primary purposes of this major federal initiative was preserving wetlands for flood control protection benefits.  *See, e.g.*, Exh. 169, Water Bank Act of 1980, 16 U.S.C §1301 (12/19/1970 as amended 01/02/1980); Exh. 170, Emergency Wetlands Resources Act of 1986, 16 U.S.C. §3901 (a)(1-9) (11/10/1986 as amended 1988 and 1992); Exh. 173, North American Wetlands Conservation Act of 1989, 16 U.S.C. §4401 (a)(4) (12/02/2002); Exh. 172, Executive Order No. 11990, Executive Order No. 11990.

199.    In the Emergency Wetlands Resources Act, it is stated: "Congress finds that wetlands provide a natural means of flood and erosion control by retaining water during periods of high runoff, thereby protecting against loss of life and property."  Exh. 170, Emergency Wetlands Resources Act, 16 U.S.C. §3901 (a)(6).

200.    The North American Wetlands Conservation Act of 1989 states that "wetland ecosystems provide substantial flood and storm control values and can obviate the need for expensive manmade control measures."  Exh. 173, North American Wetlands Conservation Act of 1989, 16 U.S.C. §4401 (a)(4).

201.    In 1977, President Jimmy Carter issued Executive Order No. 11990—"Protection of Wetlands."  Exh. 172, Executive Order No. 11990.

202.    In 2006, President George W. Bush announced "a new national policy on wetlands to achieve an overall increase of U.S. wetlands each year . . . ."  President Bush stressed that wetlands "provide a protective buffer for our towns and cities against floods and storm surges . . . ."  Exh. 176 at p. 3 "White House Council on Environmental Quality, Conserving America's Wetlands 2006: Two Years of Progress Implementing the President's Goal" (April 22, 2006)).

203.    Consistent with this federal policy to maximize wetlands preservation, the Army Corps issued a policy statement in 1972 detailing the agency's high priority commitment to preserve wetlands.  See Exh. 177, December 1972 Digest of Water Resources Policies and Activities, EP 1165-2-1, at p. A-135, Sections 19-1, 19-2, 19-3.

204.    The MR-GO's operation and maintenance is an ongoing project subject to the Digest of Water Resources Policies and Activities Civil Works, December 1972 EP 1165-2-1. Exh. 177, EP 1165-2-1; Exh. 182, 30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008 at 20:1-21:12.

205.    The Army Corps promulgated regulations recognizing wetlands as "[e]nvironmentally vital areas" whose "unnecessary alteration or destruction . . . should be discouraged as contrary to the public interest."  Exh. 192, 1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975, at p. IX-12.

206.    The Corps operation and maintenance activities were not consistent with the national policy to maximize wetlands protection and in fact magnified wetlands lost.

## ARMY CORPS' KNOWLEDGE OF THE MR-GO'S DEFECTS AND RISK OF CATASTROPHIC FLOODING

### Hurricane Surge

207.     Four decades before Hurricane Katrina, the Army Corps acknowledged the MR-GO was a direct, efficient route for hurricane surge into the heart of Greater New Orleans, created undesirable effects of excessive, high velocity, and erosive currents in the IHNC and significant salinity increases, and had the potential to deliver storm surges that would cause catastrophic property damage and loss of human life.  Exh. 10, House Doc. No. 231, at pp. 17, 25, 63; Exh. 140, Memo re: LPV to Chief of Engineers, Department of the Army from Major General R.G. MacDonnell (July 24, 1963) at NED-213-000000433; Exh. 152, Letter of Department of the Army, New Orleans District, Corps of Engineers from Colonel Thomas J. Bowen, District Engineer to Acting Division Engineer, Lower Mississippi Valley (October 19, 1966) at p. AFW-467-000001821; Exh. 4, Team Louisiana Report at pp. vii; 223; Exh. 20, IPET Report at p. IV-2, IV-135 to IV-136; Exh. 8, Naomi 30(b)(6) Depo. at 323:24-325:6.

208.     In 1969, the Corps was warned that unless it constructed floodgates on the MR-GO, the Corps was leaving "a big door open" for catastrophic flooding of New Orleans.  Exh. 1938, Letter to Representative Edward Herbert from John L. Crosby (General Contractors and Builders), Aug. 25, 1969, AFW-467-000000224-228.

209.     In 1988, the Lower Mississippi Valley Division of the Army Corps recommended that the alternative of completely closing the MR-GO should be evaluated in order to "reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up this waterway [the MR-GO]. . . ."  Exh. 9, 1988 Recon Report at Comment 2.

210.     After the MR-GO reached project-authorized dimensions, the Army Corps received notice on multiple occasions about the risk of serious flooding posed by the hazards to

life and property that it created in placing into Greater New Orleans a deep channel with direct access to the Gulf of Mexico.  Exh. 91, Kemp Expert Report (July 2008) at pp. 21-31, 170-92, 191-95.

211.    In 1966, the Army Corps acknowledged that during Hurricane Betsy large amounts of water flowed through the Reach 1/GIWW into the IHNC which then exited into Lake Pontchartrain.  Exh. 180, LPV Design Memo No. 2: Citrus Back Levee, Appendix E: Report on the Controlling Elevation of the Seabrook Lock, at p. 4..

**"Funnel Effect"**

212.    Before the MR-GO was dredged through the Breton Sound drainage system, there was well established science to understand how its construction would impact the magnitude of hurricane storm surge in the New Orleans region.  Thus, the Corps should have anticipated the potential increase in funneling of storm surge waters toward New Orleans.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-3.

213.    The coastal hazard conditions of Greater New Orleans—created in part by a series of northwest-southeast oriented, inter-connected nested funnels aligned between Lake Pontchartrain and the Gulf of Mexico—were well known to the Army Corps long before the MR-GO's construction in light of the region's well documented hurricane history.  However, this historic knowledge of storm flooding was not made an integral part of the decision-making when the MR-GO and other waterways and channels (such as the GIWW) were dredged through this flood prone area.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-1.

214.    Before the MR-GO's construction, the Corps' own research had established that the highest storm surge elevations coincided with the funnel-shaped shoreline alone Lake

Okeechobee during the August 26-27, 1949 Hurricane.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-3.

215.    Before and after the MR-GO's construction, the Corps published their own manuals that recognized the effect of funnel-shaped coastlines in causing significant water level elevations during storms (between 10 and 13 feet in two instances in 1949 and 1957).  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-1.

216.    In designing and constructing the MR-GO, the Army Corps ignored known hazards posed by the "funnel effect" enabling hurricane storm surge from Lake Borgne and the Gulf of Mexico (via Reach 2) to flow into the confined channel of the GIWW/Reach 1 separating New Orleans East and the Ninth Ward/St. Bernard Parish.  Exh. 4, Team Louisiana Report at pp. xii, pp. 223-24, Fig. 158; 230, 235-40; Exh. 5, USACE - New Orleans District Correspondence to Manuel Pinto (November 26, 1969) at pp. 1-2, 7-9; Exh. 1, Graci IV at 191, ¶7, 192, ¶12;; Exh. 8, Naomi 30(b)(6) Depo. at 156:1-11; 178:23-179:16; Exh. 10, House Doc. No. 231 at p. 17; Exh. 26, Decision Making Chronology at pp. ES-6-7; Exh. 2, ILIT at p. 8-6; Exh. 7, Kemp 702c Report at pp. 25-33.

217.    While the MR-GO was being constructed, and for many years right up to Hurricane Katrina, the Army Corps was warned that the funnel created a back door that would accelerate and intensify hurricane storm surges emerging from Lake Borgne and the Gulf into the Greater New Orleans area.  Exh. 10, H.R. Doc. No. 231 at p. 17; Exh. 5, USACE - New Orleans District Correspondence to Manuel Pinto (November 26, 1969) at pp. 1-2, 7-9.

218.    Long before Hurricane Katrina, the Army Corps knew or should have known about the role of the MR-GO "funnel" as a storm surge conduit that was likely to cause

catastrophic flooding.  *See e.g.,* Exh. 153, CRS Report for Congress, *Mississippi River Gulf Outlet (MR-GO):  Issues for Congress*, Nicole T. Carter, Charles V. Stern, Aug. 4, 2006, at p. 7.

219.    From the time the MR-GO was being constructed and thereafter, the Army Corps knew that the MR-GO created a funnel that could enhance surge, waves, and currents during hurricanes and create a serious flooding risk.  Exh. 147, Letter from Kenneth J. Le Sieur to Colonel Thomas J. Bowen, November 24, 1965; Exh. 148, October 1, 1969 draft memorandum regarding the proposed Mississippi River-Gulf Outlet New Ship Lock and reviewing the Dock Board Proposals for a St. Bernard Parish Site, at AFW-143-000001049; Exh. 8, Naomi 30(b)(6) Depo. at 357:15-360:12; Exh. 150, Disposition Form dated 06-21-1971; Subject: MR-GO—New Ship Lock; Return Levees; signed by Mask at AFW-440-000000938; Exh. 149, Memo re MR-GO—New Ship Lock; Return Levees (Aug. 16, 1971) at AFW-440-000000936; Exh. 143, Environmental Impact Study Ship Channel Project prepared by Coastal Environments, Inc., (October 1972) at p. 54; Exh. 139, Army Corps, Environmental Considerations of an Expanded Mississippi River-Gulf Outlet, Appendix I at NED-111-000001197; Exh. 20, IPET Report at p. IV-258.

220.    In 1966, after Hurricane Betsy but before completion of the MR-GO's construction, the Army Corps commissioned a report (Bretschneider and Collins, Storm Surge Effects of the Mississippi River Gulf Outlet (1966) ("Bretschneider and Collins Report") which concluded that in all cases (slow, moderate, and rapidly rising surge during hurricanes), the predicted effect of building the contemplated LPV levee system that now forms the throat of the funnel was to hasten the onset of peak surge and to lengthen the period of highest water.  Exh. 4, Team Louisiana Report at pp. 249-50.

221.    As early as 1966, the Army Corps understood that under certain hurricane conditions, the MR-GO would have "a marked effect" on storm surge and on wave action. Exh. 68, Bretschneider & Collins Study at p. 4; Exh. 185, memo "MR-GO, St Bernard Parish (Bank Erosion) rev Recon Study (December 9, 1992), at NED 192-000000684.

222.    In 1964, both the New Orleans District and Lower Mississippi Valley Division Engineers acknowledged that the MR-GO—even without hurricanes—had increased velocities in the IHNC that were hazardous to navigation in the canal.  Exh. 1939, Report of the Chief of Engineers, Department of the Army, Headquarters Memo from Lieutenant W.K. Wilson, Jr. to The Secretary of the Army, Subject: Lake Pontchartrain and Vicinity, Louisiana dated 03/04/1964 at p. 2 (MVD-001-000000423).

223.    The existence and severity of the "funnel effect" is further confirmed by significant, emergency post-Katrina corrective measures that the Army Corps has undertaken in order to remediate the "funnel effect."  As part of its 100 Year Level Protection Plan, the Army Corps is constructing the IHNC Surge Reduction Barrier across the mouth of the funnel and the Golden Triangle between the GIWW and Reach 2.  Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23; Exh. 131, Greater New Orleans Hurricane and Storm Damage Risk Reduction System (HSDRRS) Status June 2008; Exh. 132, New Orleans Hurricane and Storm Damage Risk Reduction System 2008 Facts and Figures by the U.S. Army Corp of Engineers dated August 28, 2008; Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers; Exh. 136, Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers, at pp. 52-53.

224.    The purpose of the IHNC Surge Reduction Barrier—a new feature, authorized by Congress in 2006—is to reduce risk of storm damage to some of the region's areas most vulnerable to flooding—New Orleans East, metro New Orleans, the 9th Ward, and St. Bernard Parish.  Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers at pp. 1-2; Exh. 136 Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers, at pp. 52-53; Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23.

225.    The Army Corps has stated that "[t]he overall purpose of the project is to provide a comprehensive, integrated protection system that would reduce the imminent and continuing threat to life, health, and property posed by flooding from hurricanes and other tropical storm events."  Exh. 20 at p. 4, ¶1.1 (Owen Depo. Exhibit 4).

226.    This project aims to protect these areas from storm surge coming from the Gulf of Mexico and Lake Borgne.  Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers at p. 1; Exh. 136, Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers at pp. 52-53; Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23.

227.    The Army Corps's decision to recommend the IHNC Surge Reduction Barrier comes in the wake of  the following IPET recommendation for this remedial measure: "To prevent storm surge in Lake Borgne from influencing water levels experienced in the IHNC or GIWW/MR-GO sections of waterway, flow through Reach 1 channel must be dramatically reduced or eliminated, either by a permanent closure or some type of structure that temporarily

serves to eliminate this hydraulic connectivity [between Lake Borgne and Lake Pontchartrain via GIWW/MR-GO and the IHNC]."  Exh. 20, IPET Report at p. IV-135; Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 68:23-70:4.

228.    The Army Corps's planners took into account IPET data from Hurricane Katrina showing that as a result of storm surges from Lake Borgne propagating down the Reach 1/GIWW into the IHNC, the water elevation during Hurricane Katrina rose seven feet higher in the IHNC (water level of three feet plus waves up to four feet high).  Exh. 135, Decision Record, Individual Environmental Report #11, Improved Protection on the Inner Harbor Navigation Canal by the U.S. Army Corps of Engineers at p. 36; Ex. 130, Owen Depo. at 91:14-93:9.

**Wetlands Destruction**

229.    Long before Hurricane Katrina, the Army Corps knew that the MR-GO was destroying tens of thousands of acres of cypress forests, grasses, marshes, swamps, trees, shrubs and other wetlands ("wetlands") that provided a natural barrier and sponge for storm surge and that the loss of these wetlands reduced storm surge protection for New Orleans and St. Bernard Parish.  Exh. 144, 1957 Tidewater Channel Advisory Committee Report at p. 2; Exh. 96, Fitzgerald Report at p. 4-20, Fig. 4.6; Exh. 178, USACE Fact Sheet; Exh. 161, letter from United States Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957; Exh. 155, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Press Release, September 26, 1957, at p. 1; Exh. 179, U.S. Fish and Wildlife Service, An Interim Report on Fish and Wildlife Resources as Related to Mississippi River Gulf Outlet Project, (April 1958) at pp. 9-11; Exh. 9, 1988 Recon Report at p. 27; Exh. 4, Team Louisiana Report at p. 112; Exh. 95, Day/Shaffer Expert Report (July 2008) (July 2008) at pp. 16-20, 46.

230.     Before the MR-GO's construction began in 1958, the Army Corps knew that the MR-GO would destroy the storm surge buffering wetlands by "increas[ing] tidal action in marsh pond areas; higher average salinities with wider salinity ranges; increase[ing] turbidity. . . [that] would eliminate 6,200 acres of shallow open water and 17,400 acres of marsh. .  Exh. 51, Letter from Carey Kerlin to Jack Stephens (St. Bernard Parish) (May 31, 1979) at p. 4; *see also* Exh. 144, 1958 Tidewater Advisory Report p. 2.

231.     In 1965 during the MR-GO's construction, the Army Corps told Congress that the MR-GO "provides a deep direct route for the in-flow of saline currents from the Gulf of Mexico to the area along this channel and to Lake Pontchartrain."  Exh. 10, H.R. Doc. No. 231 at p. 17.

232.     In studying bank erosion in 1987, the Corps reported that (a) the MR-GO had already destroyed 2,000 acres of marsh along the Reach 2 banks and (b) predicted that another 5,677 acres of marsh along Reach 2 would be lost to erosion and another undetermined amount of additional marsh would also be lost due to saltwater intrusion, subsidence, and erosion due to increased velocities of tidal and vessel-generated waves.  Exh. 1932, Planning Aid Report on MR-GO St. Bernard Parish, Louisiana (Bank Erosion) Reconnaissance Study (Aug. 1987) at pp.1-8.

233.     By 1990, the Corps reported that wetlands were disappearing at an "alarming rate" of 35 square miles per year.  Exh. 1933, Land Loss and Marsh Creation; Illustration A-2.1; New Start Preconstruction Engineering and Design; Louisiana Coastal Area, Land Loss and Marsh Creation, St. Bernard, Plaquemine and Jefferson Parishes (June 26, 1990) (AIN-173-000000185)

234.     The Army Corps ignored the potential for exacerbating hurricane-driven surge and increasing overtopping flows when no effort was made to counteract the ruinous effect of the

channel on buffering wetlands or, ultimately, on the more rapid propagation of surge leading to earlier and more catastrophic flooding of developed areas.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶10; Exh. 91, Kemp Expert Report (July 2008) at pp. 31, 186, 196.

**Channel Bank Erosion**

235.    Long before Hurricane Katrina, the Army Corps knew that erosion of the unarmored banks of Reach 2 had widened the channel far beyond its original 650' top width, caused large breaches in the rapidly dwindling marsh buffer between the navigation channel and the open waters of Lake Borgne and Breton Sound, and exposed neighboring people and property to direct hurricane attacks from Lake Borgne.  Exh. 9, 1988 Recon Report at Comment 2; Exh. 145, Report of the Environmental Subcommittee to the MR-GO Technical Committee dated March 16, 2000 at NED-188-000001511 et seq (Table 1: Summary of Estimated Habitat Loss from the MR-GO, Construction and Erosion by Mapping Unit, p. 55; Table 2: Habitat Types in 1956, 1978, and 1990 for Central Wetlands, South Lake Borgne and Eloi Bay dated 12/03/1999).

236.    In designing the MR-GO, the Army Corps knew that there would be stability problems with the channel cut because of ship wake erosion of the unstable banks, comprised of an almost ubiquitous 10 feet of marsh/swamp peat at the surface and scattered deposits of sandy-silt and silty-sand at greater depths and that this bank erosion would accelerate the loss of protective marshland.  Exh. 4, Team Louisiana Report at p. 234; Exh. 8, O'Cain 30(b)(6) Depo. 515:1-18.

237.    The initial design memoranda for the MR-GO expressly foresaw the eventuality that the erosion of the MR-GO—because the banks were unarmored— would necessitate bank stabilization measures and foreshore protection measures, but the Army Corps proceeded without

protecting the channel banks.  Exh. 200, MR-GO General Design Memo 1-A at p. 7; Exh. 201,

MR-GO General Design Memo 1-B at p. 5; Exh. 202, MR-GO General Design Memo No. 2,

Supplement 4 (foreshore protection)) at pp. 1-30; Exh. 183, Thomas Podany 30(b)(6) Depo.

(Oct. 9, 2008) at 74:8-77:16.

238.     Notwithstanding this recognition of inevitable bank erosion, the Army Corps did

not prescribe erosion protection from wave wash (such as armoring or other protective covering)

for the MR-GO's unstable banks.  Exh. 8, O'Cain 30(b)(6) Depo. at 495:1-4; 496:23-498:7;

500:1-11; 516:20-24; Exh. 13, Theis 702c Expert Report (Sept. 2007), ¶8.

239.     For over five decades, the Army Corps ignored the MR-GO's known potential for

exacerbating hurricane-driven surge and waves and increasing overtopping flows when the MR-

GO bank lines were not stabilized.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶10; Exh. 91,

Kemp Expert Report (July 2008) at pp. 31, 186, 196; Exh. 203, "The Mississippi River Gulf

Outlet: A Study of Bank Stabilization", Coastal Environments, Inc.; Exh. 183, Thomas Podany

30(b)(6) Depo. (Oct. 9, 2008) at 144:3-146:2; Exh. 204, Memorandum re MR-GO, Bank Erosion

Reconnaissance Study Interdisciplinary Planning Team (IPT) Meeting to Select Alternative Bank

Erosion Control Measures for Evaluation in MR-GO Reconnaissance Report (April 6, 1987) at

NED-192-000001167-1169.

240.     The Army Corps associated erosion of the MR-GO with hurricane protection, yet

it performed 147 dredging events over the remainder of the MR-GO and never supplemented its

1976 EIS submitted to address the known impacts of the ongoing dredging on erosion and loss of

wetlands or on its effect on hurricane protection in the area of the MR-GO.  Exh. 188, Appendix

L, MR-GO De-Authorization Study.

241.    In its 1988 bank erosion reconnaissance study, the Army Corps acknowledged the problems of saltwater intrusion, environmental loss of marsh, and hurricane protection associated with loss of storm buffer along the north bank of the MR-GO from Lake Borgne.  Exh. 9, 1988 Recon Report at p. 10, LMVD Comment No. 2, pp. 16, 24-25, 26-27, Appendix E at pp. 3-8; Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 113:10-116:1, 126:13-129.

242.    In 1987, the Army Corps expressly considered the need to evaluate bank stabilization measures along the MR-GO for its hurricane protection impacts.  Exh. 204, Memorandum re MR-GO Bank Erosion Reconnaissance Study Interdisciplinary Planning Team (IPT) Meeting to Select Alternative Bank Erosion Control Measures for Evaluation in MR-GO Reconnaissance Report (April 6, 1987) at NED-192-000001167-1169.

243.    When the Army Corps considered shore protection of the MR-GO, an internal memorandum in 1993 expressly concluded that such efforts would require the Army Corps to alert Congress of the environmental concerns inherent in the MR-GO through a full EIS.  Exh. 189, Memorandum for file, Mississippi River-Gulf Outlet, St. Bernard Parish, LA (Bank Erosion) Revised Reconnaissance Study and Feasibility Study at pp. 1505-1506 (NPM-036-000001505).

244.    In the course of considering shore protection along Reach 2, the Army Corps noted that a full EIS to Congress would necessitate public comment that would both challenge the limited scale of the Army Corps proposed protection efforts in light of the public desire for more extensive remedy, and would likely raise for Congressional consideration the closing of the MR-GO.  Exh. 189, Memorandum for file, Mississippi River-Gulf Outlet, St. Bernard Parish, LA (Bank Erosion) Revised Reconnaissance Study and Feasibility Study at NPM-036-000001505-1506.