245.    The Army Corps understood in 1988 that the loss of land in front of the flood protection structures around Lake Borgne caused by erosion of the MR-GO was removing the last line of defense to reduce the impact of storm surge and waves.  Exh. 9, 1988 Recon Report at p. 24, Appendix E at pp. 6, 8; Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 128:13-129:17.

246.    In its 1988 bank erosion reconnaissance study, the Army Corps considered (but did not adopt) structural bank protection options, including rock dikes, alternative disposal areas, concrete block, timber pile, stone, and shell core dikes.  Exh. 9, 1988 Recon Report at pp. 34-35; Exh. 193, Podany 30(b)(6) Depo. at 33:9-34:24, 139:7-142:25.

247.    In its 1988 bank erosion reconnaissance study, the Army Corps considered alternatives to operation of the MR-GO that might mitigate the erosion of the banks of the MR-GO, including reduction of and alternatives to maintenance dredging.  Exh. 9, 1988 Recon Report at pp. 34-50; Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 33:9-34:24, 146:3-147:22.

248.    The Army Corps acknowledged by the time of its 1988 bank erosion reconnaissance investigation that the problems associated with erosion had an impact on the human environment which would be regulated by NEPA, but it never incorporated this information into its environmental disclosures—either in the EAs or a Supplemental Environmental Impact Statement.  Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 157:5-159:25.

**Ship Waves Caused Bank Erosion and Jeopardized LPV Structures**

249.    As early as 1983, the Corps recognized that drawdown and return flows were serious problems along the MR-GO.  Exh. 1934, MR-GO-Erosion Protection at Bayou Yscloskey (Jan. 24, 1983) at AIN-108-000001594.

250.    As early as 1983, the Corps also recognized that the width of the Reach 2 channel was a factor in generating waves during hurricanes. Exh. 1943, Foreshore Protection Test Sections MR-GO South Bank Station 475 to 501 (Jan. 1, 1983) at p. 4 (NED-192-000000432); Exh. 205, Memorandum re MR-GO, St. Bernard Parish, (Bank Erosion) Revised Reconnaissance Study (Dec. 9, 1992) at p. 1 (NED-167-000001832).

251.    Wave wash from vessel traffic caused continuous erosion of the marsh along the east bank of Reach 2.  Exh. 1946, letter to Robert Livingston, House of Representatives from Harold E. Manuel, Jr.; Major, U.S. Army; Acting District Engineer (undated) (enclosed "Fact Sheet", Subject: MR-GO – referenced in letter – is dated 07/24/1990) (NOP-007-000001451-1452).

252.    Ship waves in Reach 2 caused strong drawdown and return flows that caused erosion of the banks and sufficient energy to cause the failure of the Corps' foreshore protection test sections along Reach 2 near Bayou Yscloskey.  Exh. 1934, MR-GO-Erosion Protection at Bayou Yscloskey (Jan. 24, 1983) (AIN-108-000001594).

253.    As early as 1983, the Corps knew that ship waves in Reach 2 created wave conditions and drawdown and return flows—hydrodynamic forces—so severe that 1¼  inch steel anchor cables were ruptured and boats were capsized from an increase in water level of several feet.  Exh. 1943, Foreshore Protection Test Sections MR-GO South Bank Station 475 to 501 at p. 1 (Jan. 28, 1983) (NED-192-000000432).

254.     In 1984, the Corps concluded that the wave climate was more severe than the design parameters anticipated for the foreshore dike in the Citrus Bank Levee and that the frequently experienced higher water levels meant that waves could overtop the height of the dike.  Exh. 1478, Memo to Chatry from Chief Joe Dicharry, Navigation Section, Project Management Branch; Subject: Foreshore Protection Along Citrus Back Levee (July 27, 1984) (AIN-108-000000889).

255.     The Corps recognized that overtopping of LPV structures along Reach 2, caused by waves from passing ships, could scour the bank behind the LPV structures and cause failure from behind.  Exh. 1943, Foreshore Protection Test Sections MR-GO South Bank Sta 475 to 501 (Jan. 28, 1983) (NED-192-000000432).

## NEPA

## Army Corps's Knowledge of MR-GO's Adverse Effects at the Time of Preparing Environmental Disclosure Documents

256.     Pursuant to NEPA, the U.S. Army Engineer District, New Orleans, Louisiana completed in 1974 a "Review Draft" entitled "Composite Draft Statement for Operation and Maintenance Work on Three Navigation Channels in the Lake Borgne Vicinity Louisiana" ("1974 DEIS").  The document describes the "Administrative" action under review as the:

> operation and maintenance of the following projects in the vicinity of Lake Borgne Louisiana:  The Mississippi River Gulf Outlet….Operation and Maintenance …consist(ing) primarily of periodic dredging and subsequent material Depo. along the total of 111.3 miles.  Maintenance dredging is accomplished by a cutter head pipeline dredge.

Exh. 191 at p. i, ¶2 (1974 DEIS).

257. The 1974 DEIS removed references to studies regarding the MR-GO's effect on storm surge that had been part of the 1972 DEIS.  Exh. 190 at pp. 13, 14 (1972 DEIS); Exh. 191 (1974 DEIS); *see also* Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19;

131:11-132:3-142:25, 181:8-184:14; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 32:9-

35:9; 60:1-71:12; 79:11-81:22; 82:18-85:17; 90:15-93:20; 96:8-97:3; 98:23-99:7; 118:6-119:17.

258. By 1975, the Army Corps had acknowledged "[t]he marsh west of the MR-GO has

been significantly modified by, inter alia, the MR-GO channel." Exh. 186, Mississippi River

Gulf Outlet New Lock and Connecting Channels Quantities to Use for Real Estate for

Comparative Analysis of 14 Schemes, at AFW-180-000001008, ¶8.

259. The Corps' response to the EPA Comment Letter, as included in Section 9 of the

"Coordination Comment and Response" portion of the 1976 FEIS, merely dismissed the EPA's

concerns noting that the environmental impacts raised by the EPA were not relevant to O&M

and as such need not be addressed in this impact statement and, discussion of mitigative

measures were similarly deemed "inappropriate" for this statement. Exh. 192, 1976 FEIS at IX-

3, 13; *see also* Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19, 131:11-

132:3-142:25, 181:8-184:14; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 32:9-35:9,

60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17; Exh.

177, December 1972 Digest of Water Resources Policies and Activities, EP 1165-2-1, at p. A-

135.

260. The Department of the Interior ("DOI") likewise brought to the Corps' attention

certain perceived deficiencies in the DEIS. The DOI sharply disputed the Corps' unsubstantiated

conclusion that spoil disposal would "constrain the westward erosion of the MR-GO channel

bank" which was contributing to the widening of the surface of the MRGO. Exh. 192, 1976

FEIS at p. IX-20; *see also* Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19,

131:11-132:3-142:25, 181:8-184:14; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 32:9-

35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17.

261. In its response, the Corps merely rejected out of hand the DOI's comment without addressing the merits of its stated concern about bank erosion.  Exh. 192, 1976 FEIS at p. IX-7; *see also* Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17.

262. The United States Department of Commerce, Assistant Secretary for Science and Technology, commented that the DEIS failed to identify the land loss process of marsh deterioration resulting from saltwater intrusion and failed to address specific authoritative studies on the relevant environmental effects of saltwater intrusion on vegetative types in the vicinity as well as studies regarding conversion of marsh to open water in violation of 40 CFR Part 1500.8 (a) (1).  Exh. 192, 1976 FEIS at p. IX-14.

263. The Corps' 1976 FEIS did not act upon this comment in its Section IX "Coordination Comment and Response" portion of the 1976 FEIS and made no reference to the impact of saltwater intrusion as a cause of land loss, nor did it include the referenced studies anywhere in the body of the document. Exh. 192, 1976 FEIS at IX-1-10; *see also* Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17.

264. The State of Louisiana, Department of Public Works letter, commented that the 1974 DEIS did not adequately identify the role of the proposed locks at Seabrook and Rigolets to hurricane protection in the vicinity in violation of 40 CFR Part 1500.8 (a)(1).  Exh. 192, 1976 FEIS at IX-21.

265. The Corps failed to acknowledge that The State of Louisiana, Department of Public Works comment and made no alteration in its discussion of the impact that the proposed Seabrook and Rigolets Locks were expected to have on hurricane protection and the impact of salt water intrusion on the marshes, in violation of 40 C.F.R. Part 1500.8(a)(1).  Exh. 192, 1976 FEIS at II-116-117(g).

266. The Louisiana Wildlife and Fisheries Commission ("LWFC") commented that: implementation of the proposed O&M would enhance the MRGO's impact on saltwater intrusion and significant ecological changes in the marshlands and estuaries.  Problems the LWFC considered to be of "significant magnitude."  Exh. 192, 1976 FEIS at IX-8 to IX-9.

267. In lieu of responding to the LWFC's concerns, the Corps merely concluded  that it was "inappropriate" to present or analyze these impacts in this environmental document.  Exh. 192, 1976 FEIS at IX-9.

268. In March 1976, the U.S. Army Engineer District, New Orleans, Louisiana completed the Final Environmental Impact Statement ("1976 FEIS") for the MR-GO project pursuant to 40 CFR Part 1500.6 (d)(1).  Exh. 192, 1976 FEIS.

269. The 1976 FEIS fails to satisfy the requirements of NEPA in that it does not contain of the following:

      a.      a description of the wetlands environment in the MR-GO vicinity as it existed prior to the proposed maintenance dredging and operation of the MR-GO, in violation of 40 CFR Part 1500.8 (a)(1);

      b.      a description of the interrelationships and cumulative environmental impacts of the proposed maintenance dredging and operation of the MR-GO as it impacts the storm surge environment in the vicinity and other related Federal projects (for example specifically but not exclusively, the locks at Seabrook and Rigolets); the wetlands environment in the MR-GO vicinity, and channel erosion, as required by 40 CFR Part 1500.8 (a)(1), (a) (3);

c.      a description of the  probable adverse environmental effects of the Operation, Maintenance, and Dredging on the storm hazards in the environment which could not be avoided, as required by 40 CFR Part 1500.8 (a)(5).

d.      the interrelationships of the MR-GO on other related Federal projects, in particular, the relationship that the MR-GO has or may have on the Lake Pontchartrain Hurricane Protection Project, in violation of 40 CFR Part 1500.8 (a)(1).  Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 126:19-127:16; Exh. 192, 1976 FEIS at I-11-13.

e.      any detail regarding the probable impact of the proposed maintenance dredging and operation of the MR-GO on the wetlands environment in the MR-GO vicinity as they affect storm surge and channel erosion, as required by 40 CFR Part 1500.8 (a)(3);

f.      an analysis of the secondary, or indirect, as well as primary or direct, consequences of the maintenance dredging and operation of the MR-GO on the wetlands environment as it relates to storm surge and channel erosion in the MR-GO vicinity, as required by 40 CFR Part 1500.8 (a)(3)(ii);

g.      an evaluation of the cumulative environmental impacts of the MR-GO O&M as required by 40 CFR Part 1500.8 (a) (1); Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 126:13-18;

h.      an analysis of alternatives to the proposed maintenance dredging and operation of the MR-GO (and their benefits) relative to environmental changes presented to the storm surge environment and impacts on storm hazards, wetlands loss, and channel erosion, as required by 40 CFR Part 1500.8(a)(4);

i.      the required statement indicating the extent to which the stated countervailing benefits could be realized by following reasonable alternatives to the proposed action that would avoid some or all of the adverse environmental effects on the wetlands environment in the MR-GO vicinity, as required by 40 CFR Part 1500.8 (a)(8).

j.      an analysis in sufficient detail to reveal the Army Corps's comparative evaluation of the environmental benefits, costs, and risks of the Operation, Maintenance, and Dredging and each reasonable alternative as it impacted storm hazards, wetlands loss, and channel erosion in the vicinity of the MR-GO, as required by 40 CFR Part 1500.8 (a)(4).

k.      any descriptions of appropriate alternatives to resolve conflicts concerning methods of mitigating the effects of maintenance dredging and operation of the MR-GO on storm surge, wetlands loss, and channel erosion in the MR-GO vicinity, as required by 40 CFR Part 1500.8 (a)(4);

l.      a rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative mitigating measures that

might neutralize or avoid some or all of the adverse environmental effects of the existence of and continued maintenance dredging and operation of the MR-GO, as required by 40 CFR Part 1500.8 (a)(4);

      m.     an analysis of the operation and maintenance of the MR-GO's potential for reducing the environmental benefits of the wetlands environment in its vicinity or the alternative of taking "no action" to operate the MR-GO, or of postponing action pending further study of the effects of O&M, as required by 40 CFR Part 1500.8 (a)(4);

      n.     a required statement on the extent to which the Operation, Maintenance including dredging involved tradeoffs between short-term environmental gains at the expense of long-term losses, and a discussion of the extent to which the Operation, Maintenance, including dredging foreclose future options regarding the environment, as required by 40 CFR Part 1500.8 (a)(6); and

      o.     the required section indicating what other interests and considerations of Federal policy are thought to offset the adverse environmental effects of the proposed action on the wetlands environment in the MR-GO vicinity, as required by 40 CFR Part 1500.8 (a)(8).

270. The Corps concedes that the 1976 FEIS contains no analysis of the impacts of the MR-GO O&M on the health and safety of the human environment related to erosion of the banks along the MR-GO.  Exh. 181, Gregory Miller 30(b)(6) (Oct. 14, 2008) at 281:6-282:16.

271. At no time after 1976 did the Corps prepare any additional Final or Supplemental Environmental Impact Statement concerning the effects of the ongoing O&M activities or that discussed the impact of those activities on the human environment.  Nor did it ever address mitigation measures, alternatives or risks to human life and property, or any other disclosures required by NEPA and its implementing regulations.  Exh. 188, Appendix L, MR-GO De-Authorization Study); *see also* Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17.

272. Between 1963 and 2005, the Corps engaged in approximately 147 dredging events and removed approximately 492,422,925 million cubic yards of sediment which became spoil. Exh. 206, Compilation of Dredging Events Notice of Intent to Introduce Summary Evidence; Exhibit A-F (September 12, 2008) at p. 5.

273. The Corps never presented Congress with an objective analysis of the impacts of these dredging activities, including the Corps' own understanding that its conduct was causing the surface width of the MR-GO to expand at a rate averaging over 15 feet per year causing the channel to triple in width.  Exh. 203, *The Mississippi River Gulf Outlet: A Study of Bank Stabilization* at 1865; Exh. 145, New Orleans District Corps of Engineers for the Environmental Subcommittee of the Technical Committee Convened by EPA in Response to St. Bernard Parish Council Resolution 12-98. December 1999. Habitat Impacts of the construction of the MR-GO (March 16, 2000) at 1559.

274. The Corps never presented to Congress, the impact that continued dredging had on the stability and integrity of the adjacent hurricane protection system.

275. As of October 1, 1977, the effective date of Executive Order No. 11990, the MRGO was an ongoing project with wetlands implications that would require future Environmental Impact Statements.  One of the objectives of Executive Order No. 11990 was "to avoid to the extent possible the long and short term adverse impacts associated with the destruction or modification of wetlands.  This expressly included dredging activity.  Exh. 172, Executive Order No. 11990 at pp. 1-2, Sections 1(a) and 7(b).

276. Executive Order No.11990 required that the Corps "consider factors relevant to a proposal's effect on the survival and quality of the wetlands … such as flood and storm hazards." Exh. 172, Executive Order No.11990 at p. 2, Section 5.  Although the Corps drafted a FEIS in

1976, the activities associated with the O&M of the MR-GO that were ongoing necessitated Supplemental statements, the Corps' activities initiated after the 1976 FEIS, failed to comply with Executive Order 11990.

277. Between the years 1980 and 2004, the Corps performed a total of 26 Environmental Assessments ("EA's") of the MR-GO relating to Operation and Maintenance. Each of these EA's were limited to analysis of discrete segments of designated miles along the 76 mile channel, and are often further subdivided into two and three sub-EAs prepared separately, addressing even smaller designated areas for the proposed action. *See, e.g.*, Exh. 197, EA 162 (miles 23-2); miles 49.9-56.1; miles 0 to (-) 2.5); Exh. 188, Appendix L of the Mississippi River-Gulf Outlet Deep Draft De-authorization Study Integrated Final Report to Congress ("Appendix L, MR-GO De-Authorization Study").

278. Without exception, each of the 26 EA's prepared by the Corps found that the O&M activities had no significant impact on the environment ("FONSI") and thus, omitted any discussion of the relationship between the dredging and the continuing loss of wetlands, failure to engage in bank stabilization, or discuss the cumulative environmental impacts of the O&M, or mitigation measures, or alternatives to the O&M, such as closure. Exh. 188, Appendix L, MR-GO De-Authorization Study.

279. In 1984, the Corps was aware of the potential impacts of the MRGO on the environment and participated in a study entitled "The Mississippi River Gulf Outlet: A Study of Bank Stabilization" and published by Coastal Environments, Inc. Exh. 203, The Mississippi River Gulf Outlet: A Study of Bank Stabilization, Coastal Environments, Inc (Dec. 1984).

280. On July 11, 1985 the Corps published a "Supplemental Information Report" ("1985 SIR") "to evaluate the ongoing removal of allowable over depth and advanced maintenance

during routine maintenance dredging" which was "inadvertently omitted" from the 1976 FEIS nine years earlier. Exh. 194, 1985 SIR at NOP-002-000002283.

281. The 1985 SIR does not evaluate the effects of over depth dredging on subsidence or contributing to the increase of surface width (which had gone from 600 feet to 1500 feet), on wetlands loss, or its subsequent effect on storm hazard.  Nor does the SIR evaluate the effects of over depth dredging on the health and safety of the human environment.  Nonetheless, the Corps concludes that the over depth dredging would have no significant impact on the human environment.  Exh. 194, 1985 SIR at NOP-002-000002287.

282. The SIR's findings that the "Environments Impacts" are conclusory in nature and do not mention in any manner the bank erosion that in less than three years resulted in specific findings of eminent danger. The Corps concludes that the over depth dredging would have no significant impact on the human environment.  Exh. 194, 1985 SIR at NOP-002-000002287.

283. "In light of extensive erosion which [had] been occurring in St. Bernard Parish along the unleveed banks of the Gulf Outlet Channel," in 1987, the Corps considered the need to evaluate bank stabilization measures along the MR-GO to address its impact on hurricane protection.  Nonetheless, the Corps did not supplement its EIS to address the impacts on the human environment caused by the O&M of the MRGO. Exh. 9, 1988 Recon Report at p. 2; Exh. 204, Memorandum re MR-GO, Bank Erosion Reconnaissance Study Interdisciplinary Planning Team (IPT) Meeting to Select Alternative Bank Erosion Control Measures for Evaluation in MR-GO Reconnaissance Report (April 6, 1987) at NED-192-000001167-1169. 1988 Mississippi River Gulf Outlet, St. Bernard Parish, La., Bank Erosion, Reconnaissance Report.(1988 Bank Erosion Recon Report);

284. The Corps did not supplement its EIS to address the impacts on the human environment caused by the O&M of the MRGO despite acknowledging in 1988 that:

a.      marshes along the north bank were disappearing at an "alarming rate" and "development to the Southwest would be exposed to direct hurricane attacks from Lake Borgne" Exh. 9, 1988 Recon Report at p. 10-11.  And that, the Lower Mississippi Valley Division of the Army Corps recommended that complete closure of the MR-GO be evaluated in order to "reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up this waterway [the MR-GO]. . . ." Exh. 9, 1988 Recon Report at Comment 2.

b.      based on recent trends, the area would continue to experience drastic losses due to erosion and that the MRGO east bank along Lake Borgne was dangerously close to being breached." Exh. 9, 1988 Recon Report at p. 23;

c.      as the marsh area diminished significant losses to marsh dependant fish and wildlife species will also occur.  Increases in water levels resulting from the general rise in sea level and subsidence of the land would enlarge land/water interface and accelerate saltwater intrusion. Exh. 9, 1988 Recon Report at p. 23.

d.      the banks of the MR-GO's unleveed reaches were retreating at rates varying from five to over forty feet per year.  The average rate of retreat of the north bank in the 41-mile land cut portion of the waterway was about 15 feet per year.  Exh. 9, 1988 Recon Report at p. 30.

e.      salt water intrusion from the MR-GO's O&M was causing lessened hurricane protection associated with loss of marsh along the north bank from Lake Borgne.  Exh. 9, 1988 Recon Report at p. 10, LMVD Comment No. 2, pp. 16, 24-27, Appendix E at pp. 3-8; Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 113:10-116:1, 126:13-129:17.

f.      alternatives to operation of the MRGO that might mitigate the erosion of the banks of the MRGO, including reduction of, and alternatives to maintenance dredging.  Exh. 9, 1988 Recon Report at pp. 34-50; Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 33:9-34:24, 146:3-147:22.

g.      the reduction in protective wetlands (both in the Golden Triangle and Central Wetlands Unit and immediately in front of the LPV structures) and increase in channel width would likely have a demonstrable effect on flooding levels in the vicinity of the MR-GO during hurricanes.  Exh. 9, 1988 Recon Report at Comment 2; Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶ 19-27.

285. The Corps did not supplement its EIS relating to the impacts on the human environment caused by the O&M of the MRGO despite proceeding "directly with a preparation

of a supplement to the General Design Memorandum for the MRGO navigation project" for continued O&M, notwithstanding the observation that "subsidence is at its greatest in areas that are most often dredged."  Exh. 9, 1988 Recon Report at Letter attached thereto dated March 10, 1988 from Col. Lloyd Brown of the Corps to the Commander of the LMVD.

286. The Corps did not supplement its EIS relating to the impacts on the human environment caused by the O&M of the MRGO despite acknowledging that "between 1956 and 1978, the bird's foot delta experienced a net loss of approximately 67,000 acres of marsh -a loss of more than 100 square miles."  Or that it was causing an average loss of 211 acres of marsh per year during the 20-year period between 1968 and 1987 and a total of 4,200 acres of highly productive marsh adjacent to the MR-GO channel it did not Supplement its EIS relating to the impacts on the human environment caused by the MR-GO's O&M.   Exh. 9, 1988 Recon Report at p. 2, Comment 2; Exh. 145, Army Corps, Habitat Impact of the Construction of the MR-GO (December 1999) at NED-188-000001556 *et seq.*; Exh. 196, Army Corps and Louisiana Department of Natural Resources, "Land Loss and Marsh Creation, St. Bernard, Plaquemines and Jefferson Parishes—Feasibility Study" (April 1990) at pp. 18-19.

287. In response to the Bank Erosion studies, the Corps considered implementing shore protection along the MR-GO.  On or about October 6, 1993 the Corps determined that such efforts would require the Corps to alert Congress of the environmental concerns inherent in the MR-GO through a full EIS.  The Corps acknowledged internally that a full EIS to Congress would necessitate public comment that would both challenge the limited scale of the Corps proposed bank protection efforts in light of the public desire for more extensive remedy, and would likely raise for Congressional consideration the closing of the MR-GO. Exh. 189, Memorandum for file, *Mississippi River-Gulf Outlet, St. Bernard Parish, LA (Bank Erosion)*

*Revised Reconnaissance Study and Feasibility Study*, Oct. 6, 1993) at pp. NPM-036-000001505-1506.

288. The Corps did not Supplement its EIS relating to the impacts on the human environment caused by the O&M of the MRGO and did not propose the discussed shore protection measures despite again acknowledging in 1999, that erosion of the unarmored banks of Reach 2 of the MR-GO had widened the channel beyond its authorized 650' top width, caused large breaches in the rapidly dwindling marsh buffer between the navigation channel and the open waters of Lake Borgne and Breton Sound, exposing neighboring people and property to direct hurricane attacks from Lake Borgne.  Exh. 9, 1988 Recon Report at Comment 2); Exh. 145, Army Corps, Habitat Impact of the Construction of the MR-GO (December 1999) at NED-188-000001556 *et seq.*

289. Four months before Hurricane Katrina, a Corps environmental compliance official, Richard Boe, after reviewing the agency's MR-GO environmental disclosure history, concluded that the agency had been deficient in its reporting and short-sighted in its analysis of the significant adverse and cumulative impacts of the MR-GO.  Exh. 208, ("Draft Mississippi River-Gulf Outlet PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program" (April 11, 2005) ("Army Corps 2005 Memorandum"); Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 177:14-186:14.

290. The April 11, 2005 Corps Memorandum Corps environmental compliance official Boe acknowledged that the Corps had segmented its environmental review, issuing periodic Findings of No Significant Impact ("FONSI"), and not preparing a comprehensive evaluation of the significant and cumulative environmental impacts on the environment from O&M dredging

and bank erosion that had occurred since its 1976 Environmental Impact Statement ("EIS").

Exh. 208, Army Corps 2005 Memorandum at pp. 1-2:

> [T]he dredged material disposal sites and methods that have been used
> along the inland reach since the mid-1980s bear little resemblance to those
> described in the environmental impact statement (EIS) prepared in 1976
> for the O&M of the MR-GO.  All of the changes that have occurred in the
> dredging and disposal plan since preparation of the original EIS have been
> addressed in environmental assessments (EAs) and associated findings of
> no significant impact (FONSIs). . . . The cumulative impact of all the
> changes that have already occurred since preparation of the 1976 EIS
> alone constitutes a significant impact on the environment, compared to the
> O&M plan described in the EIS, although there has been no supplemental
> EIS (SEIS) prepared.  In summary, both the existing O&M of the channel
> and the proposed changes to the O&M of the channel require preparation
> of an SEIS.

*Ibid.*

291. The April 11, 2005 Corps Memorandum concedes that the Corps had not

implemented preferred bank stabilization measures for channel stabilization of the MRGO.  Exh.

208, Army Corps 2005 Memorandum at p. 2.

292. The Corps concedes that pursuant to NEPA, it was required to report that the banks

of the MRGO were eroding in an EIS.  Exh. 181, Gregory Miller 30(b)(6) (Oct. 14, 2008) at

280:12-24.

293. The Corps concedes that it never evaluated the impact that erosion of the banks of

the MRGO had on the health and safety of the human environment.  Exh. 181, Gregory Miller

30(b)(6) (Oct. 14, 2008) at 282:17-24.

294. The Corps concedes significant environment impacts result (a) from erosion, wave

wash, and drawdown effects produced by large vessel traffic causing highly productive marsh to

be converted to open water and (b) from saltwater intrusion in the marsh modifying the character

of much of the marsh area.  Exh. 181, Gregory Miller 30(b)(6) (Oct. 14, 2008) at 317:17-318:13.

295. The Corps acknowledges that the MRGO human environment included areas that were impacted by land changes due to the MRGO project and that the Corps did not analyze the cumulative effect of environmental changes brought about by the MR-GO.   Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 17:19-23 (30(b)(6) and 126:13-18, 144:1-145:7.

296. The Corps acknowledged by the time of its 1988 bank erosion reconnaissance study the erosion had an impact on the human environment which would be regulated by NEPA, but it never incorporated this information into its environmental disclosures—either in the EAs or a Supplemental Environmental Impact Statement.  Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 157:9-159:25.

## ARMY CORPS' AWARENESS OF FEASIBLE MITIGATION MEASURES

297. The MR-GO's deficiencies were never "ineradicable" because technically feasible mitigation measures for bank and wetlands protection and surge and saltwater barriers—which would not have impeded use of the navigation channel by deep-draft vessels—were always available to the Corps.  *See, e.g.*, Exh. 154, Appendix C, Report on Evaluation of Alternate Plans Involving Modifications in the Alignment of the Lake Pontchartrain Barrier at p. 2; Exh. 151, Memo concerning MR-GO Floodgates at IHNC from Jerome C. Baehr, at p. 1, AFW-467-000001698-1699; Exh. 146, Letter from U.S. Department of the Interior to District Engineer, NOD, October 22, 1962; Exh. 141, Letter from Colonel E.R. Heiberg III to Mr. G.J. Lannes, Jr. at p. 1 (NED-125-000000995-997); Exh. 71, Bea Expert Report (July 2008) at p. 19, ¶20; Defendant's DFE Motion for Summary Judgment (Doc. No. 16552-4) at p. 36, n. 8 (bank protection works were technically feasible).

**Surge Protection**

298.   Throughout the life of the MR-GO, there were feasible means (known to the Army Corps) to install a surge barrier along the lower portion of Reach 2 that would have allowed ship passage and prevented dangerous storm surge during hurricanes from entering the upper section of Reach 2.  Exh. 71, Bea Expert Report (July 2008) at p. 19, ¶20.

299. In 1962, the Army Corps considered construction of two "floodgates" to control hurricane surge at Bayou Bienvenue and Bayou Dupre along Reach 2 of the MR-GO.  Exh. 146, Letter from U.S. Department of the Interior to District Engineer, New Orleans District, October 22, 1962.

**"Funnel Effect"**

300. It was widely reported that a 1938 hurricane that made land fall along the southern coast of New England caused catastrophic damage ($4.5 billion in 2005 dollars) and loss of life (664 people killed) due to storm surge levels greater than 18 feet in downtown Providence, Rhode Island.  In response to the 1938 hurricane and other hurricanes in the 1950s, the Army Corps built floodgates in Providence, Rhode Island and Bedford, Massachusetts to protect these regions from dramatic heightening of storm waters due to their funnel-shaped coastlines.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-2.

301.   Before and after the MR-GO's design and construction, there were feasible means (known to the Army Corps) to prevent or reduce storm surge from entering Reach 1/GIWW and the IHNC.  Exh. 147, Letter from Kenneth J. LeSieur to Colonel Thomas J. Bowen, November 24, 1965; Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-2.; Exh. 71, Bea Expert Report (July 2008) at p. 19, ¶20.

302.   There were several alternative locations where a storm surge barrier could have been located, including but not limited to several points across the mouth of the funnel and the Golden Triangle between the GIWW and Reach 2.  Exh. 130, 30(b)(6) Deposition of Gib Owen (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23; Exh. 131, Greater New Orleans Hurricane and Storm Damage Risk Reduction System (HSDRRS) Status, June 2008; Exh. 132, New Orleans Hurricane and Storm Damage Risk Reduction System 2008 Facts and Figures by the U.S. Army Corp of Engineers, August 28, 2008; Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers; Exh. 136, Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers, at pp. 52-53.

303.   After Hurricane Betsy, the Army Corps considered in 1967—and again in 1969—the construction of a hurricane surge barrier from the GIWW to Reach 2 of the MR-GO in order to prevent hurricane surge from Lake Borgne entering the combined GIWW/MR-GO Reach 1 and the IHNC west of Paris Road.  Exh. 154, Lake Pontchartrain and Vicinity Design Memorandum No. 2: Citrus Back Levee, Appendix C, at p. 2; Exh. 151, Memo concerning MR-GO Floodgates at IHNC from Jerome C. Baehr, at AFW-467-000001698 and AFW-467-000001699 (Map of Authorized Plan of Protection dated 10/1969).

304.   In 1975, the Army Corps acknowledged that a storm surge barrier from the GIWW to Reach 2 of the MR-GO "would have provided hurricane protection for the industrial development along the IHNC outside the authorized protective works," and "[a] relatively safe harbor, during hurricane conditions, would be provided in the IHNC and the MR-GO/GIWW since the navigation structures would control the ingress of hurricane tides and reduce wave

action."  Exh. 141, correspondence between K.R. Heiberg III and G.J. Lannes dated April 11, 1975 and April 21, 1975, at NED-125-000000995-997.

305.   In 1964, both the New Orleans District and Lower Mississippi River Division Engineers concluded that "the most suitable plan" for protecting the people and property of New Orleans East would consist, among other things, for a levee and floodwall barrier along the south east side of this area to prevent entry of surges from Lake Borgne into this area and Lake Pontchartrain.  Exh. 1939, Report of the Chief of Engineers, Department of the Army to The Secretary of the Army; Subject: LPV, Louisiana (MVD-001-000000422 to 424) (03/04/1964).

306. As discussed above, the Army Corps is presently constructing the IHNC Surge Reduction Barrier across the mouth of the funnel and Golden Triangle between the GIWW and Reach 2 as depicted below:



Exh. 131, Army Corps, *Greater New Orleans Hurricane and Storm Damage Risk Reduction System* (HSDRRS) 100-Year Level of Protection, June 13, 2008.

307. The presence of this type of surge reduction barrier during Hurricane Katrina would have prevented the significantly magnified surge from overtopping the LPV structures along both sides of the Reach 1/GIWW channel and the overtopping of the LPV structures along both sides of the IHNC, thereby averting the resulting catastrophic flooding of New Orleans East, the Lower 9th Ward, and portions of upper St. Bernard Parish.  Exh. 133, IHNC Surge Reduction Project Fact Sheet at pp. 1-2; Exh. 136, Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne, at pp. 52-53; Exh. 130 (Owen 30(b)(6) Depo. (Oct. 16, 2008)) at 77:9-78:7; 119:18-121:23; Exh. 138, Louisiana Coastal Area (LCA) Ecosystem Restoration, LA (General Investigations): Comprehensive Coastwide Ecosystem Restoration Feasibility Study, at p. 4, ¶ 1.1; Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶21, Table 1; ¶¶22, 30, 30(b), 30(c).

## **Destruction of Wetlands**

308.   Before and after the MR-GO's design and construction, there were feasible means to prevent the intrusion of saltwater into the Reach 2 channel and the adjoining Central Wetlands Unit and Golden Triangle and environs while at the same time allowing ship passage.  For example, a man-made saltwater barrier at Bayou La Loutre—a retractable gate—would have effectively replaced the natural barrier that was severed by the MR-GO construction. Alternatively, a lock could have been constructed at Bayou La Loutre Ridge.  Other technology for salinity control included inflatable barriers for deployment when there was no ship traffic. Exh. 96, Fitzgerald Expert Report (July 2008) at p. 2-13, fig. 2.18; p. 6-5; *see also* Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 23, 33-34, 36.

309.   Both before and after the MR-GO's opening, there were a number of feasible measures that could have been undertaken to prevent salinity intrusion into the Central Wetlands Unite and adjacent areas.  These salinity control measures would have prevented much of the vegetation loss, including the massive die off of bald cypress—water tupelo swamps because saltwater intrusion would have been significantly reduced.  Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 33-34, 36.

310.   Many of these salinity control measures were suggested both before and after the MR-GO's construction, but the Corps never implemented them at any time over 50 years.  Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 33.

311.   In addition, saltwater intrusion into the Central Wetlands Unit could have been greatly reduced by placing water control structures (before cutting the Bayou La Loutre Ridge) in openings in the spoil banks between the MR-GO and the Central Wetlands Unit at Bayou Bienvenue and Bayou Dupre.  This was an easy and economical salinity prevention measure. Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 34.

312.   In addition to feasible salinity control measures, there were proven methods for wetlands restoration—to revegetate trees killed by saltwater intrusion—that were known to the Army Corps during the MR-GO's lifetime.  Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 33; Exh. 1989, Letter to John Breaux, U.S. Senate in response to letter dated 09/12/1994 concerning St. Bernard Parish Resolution SBPC #454-08-94 re: Closing the MRGO (NOP-018-000002658) (10/12/94).

313.   At the time of Katrina, the Corps was creating 300 acres of emergent wetlands near the MR-GO using dredged spoil materials.  Exh. 216, Letter from Don T. Riley to Peter Savoy, June 17, 2004.

314. In addition, wetlands preservation and restoration could have been readily accomplished by widespread fresh water introduction into the Central Wetlands Unit that would have buffered any saltwater intrusion and flushed out salt.  Sources of freshwater included the Violet diversion structure and variable operation of water control structures at Bayou Bienvenue and Bayou Dupre drainage pumps discharging surface runoff into the Central Wetlands Unit, and freshwater from treated, disinfected municipal effluent (waste water).  Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 35-36.

**Channel Bank Erosion**

315.   The massive widening of the Reach 2 channel through bank erosion was preventable at any time by armoring at its authorized or expanded width to protect the banks from predicted erosion from ship waves.  Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 34.

316.   Before the MR-GO was constructed, the Corps knew that bank protection can be accomplished by several means, including riprap, rock dikes, armor stone, shell core, and articulated concrete mattresses.  Exh. 208, MRGO, PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program (NOP-019-000000207) (4/11/05); Exh. 1990, Letter to Chief of Engineers, ENGCW-V from Major General Ellsworth I. Davis, USA, Division Engineer; Subject: Hurricane Protection – LPV – Chalmette Area (AFW-467-000003416) (3/21/66); Exh. 1991, MRGO Recon, Mile 23 to 27, Computation Sheet NED-167-000001330 (8/31/93).

317.   An additional benefit of armoring the Reach 2 bank lines is the fact that the approximately 250 meter area of drainage spoil between the channel bank and the toe of the LPV structures would have vegetated in salt-tolerant herbaceous plants, shrub-scrub and trees, similar

to the dredge spoil on the western side of the LPVs structures.  The presence of vegetation between the channel and the toe of the Reach 2 LPV structures would have provided vital protection against wave side attack during Hurricane Katrina.  Exh. 3, ILIT at p. 2-19, figure 2.6; Exh. 13, Theis 702c Expert Report (Sept. 2007) at ¶27.  Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 35.

318.   The Corps knew that bank restoration would reduce saltwater intrusion, speed of tidal surges, and rate of marsh erosion attributable to tidal scour, which would in turn reduce wetland loss and greatly reduce maintenance dredging.  Moreover, this reduction in dredging and placement of material in the spoil disposal area would also have a beneficial result in greatly reducing the amount of dredge effluent into the spoil disposal area.  This would have benefited the spoil area by allowing more material drying to take place and also allow some of the marsh area to recuperate.  Exh. 13, Theis 702c Expert Report (Sept. 2007) at ¶10; Exh. 1940, Planning-Aid Report on MRGO, St. Bernard Parish, Louisiana (Bank Erosion) Reconnaissance Study; Prepared by: U.S. Fish and Wildlife Service (MVD-003-000000565 to 566) (08/1987).

319. Long before Katrina, the Corps recognized that another effective remedial measure for bank erosion would be reduction of the ships' speed in Reach 2.  Exh. 9, 1988 Recon Report at pp. 40-43.

**Foreshore Protection**

320.   The feasibility of effective bank stabilization was demonstrated by the Army Corps' limited installation of foreshore protection along the upper section of Reach 2 in the 1990(s).  Exh. 1989, Letter to John Breaux, U.S. Senate in response to letter dated 09/12/1994 concerning St. Bernard Parish Resolution SBPC #454-08-94 re: Closing the MRGO (NOP-018-

000002656) (10/12/1994); Exh. 1992, Map of Rock Dike Protection at upper lob of Lake Borgne

(NOP-019-000001041) (01/1991).

321.   In 1966, the Corps acknowledged that the foreshore distance between Reach 2 and

the retaining dike was 500 feet, and the intervening area was covered with thick growth of marsh

grass.  The Corps nevertheless decided that no foreshore protection or slope paving was required

to prevent silting in the channel due to wave action and therefore did not include this feature in

the original MR-GO design.  By the next year, however, the Corps realized that failure to protect

the channel was a mistake.  Exh. 1990, Letter to Chief of Engineers, Attn: ENGCW-V from

Major General Ellsworth I. Davis, USA, Division Engineer; Subject: Hurricane Protection-LPV-

Chalmette Area, p. 1 (AFW-467-000003416) (03/21/1966).

322. On July 1, 1967, the Chief of Engineers prepared a draft memorandum for the

Special Assistant to the Secretary of the Army for Civil Functions concerning the MR-GO that

acknowledged the need for foreshore protection along the MR-GO.  The Chief stated:

> The navigation channel banks and the foreshore area between the channel bank
> and the levee are subject to severe erosive attack by waves generated by the
> marine traffic using the channel.  Without protective works, this attack would
> erode the foreshore, undermine the levees, and ultimately result in their failure.

Exh. 1993, Draft letter (1) to The Special Assistant to the Secretary; Subject: MR-GO, La (A

feature of the project "Mississippi River – Baton Rouge to the Gulf of Mexico"), pp. 2-3 (VRG-

014-000000088 to 93).

323. The Chief also reported that the original MR-GO design was deficient for not

armoring the channel's banks.  The Chief stated:

> The construction of the Mississippi River Gulf-Outlet exposed the foreshore
> fronting this levee to direct attack by waves generated by oceangoing vessels.  [I]t
> is evident that the navigation project should have made adequate provision for
> protecting the levee against the added threat which the existence of the outlet
> would create . . . .  The Mississippi River Gulf Outlet project was deficient in

original formulation in not providing for the preservation of lands along its banks which were of potential and reasonable prospective use.

Exh. 1994, Draft Letter (Incl. 13) to the Special Assistant to the Secretary; Subject: Mississippi River-Gulf Outlet, Louisiana Project, p. 2 (VRG-014-000000104).

324.   In view of the above, the Chief found a need to modify the authorized MR-GO to provide for foreshore protection along 6 miles of the north bank and 18 miles of the south bank, at a total cost of $5,337,000.  Exh. 1993, Draft letter (1) to The Special Assistant to the Secretary; Subject: MR-GO, La (A feature of the project "Mississippi River – Baton Rouge to the Gulf of Mexico"), p. 5 (VRG-014-000000088 to 93).

325.   Foreshore protection along the south bank of the MR-GO was authorized by the Chief's approval on July 3, 1968 of the MR-GO General Design Memorandum ("GDM"), No. 2, Supplement No. 4, Foreshore Protection.  The 1968 GDM served as a modification of the original MR-GO authorization.  Despite the programs' approval, the 1968 GDM indicated that construction of foreshore protection was to be delayed until after completion of the ongoing study to enlarge the MR-GO to 50 feet by 750 feet.  Exh. 360, 6th End to Division Engineer, LMVD from Chief Jerome C. Baehr; Subject; MRGO, GDM No. 2, Supp. 4 (02/13/1969); 5th End to LMVD from Chief, A.J. Davis, Division Engineer (12/20/1968); and 4th End to NOD from Chief Jerome C. Baehr (11/27/1968) (AFW-341-000001114); *see also* Exh. 202, MR-GO General Design Memorandum, No. 2, Supplement No. 4, Foreshore Protection (April 1968).

326.   From 1968 to 1986, the Corps had the ability to implement foreshore protection along the MR-GO without first securing a local sponsor.  The 1968 GDM illustrates that the Corps' plan to enlarge the MR-GO was the true cause for the delay in foreshore protection, rather than the lack of local sponsorship.  Exh. 202, MR-GO General Design Memorandum, No. 2, Supplement No. 4, Foreshore Protection (April 1968).

327.   Despite approval of foreshore protection in 1968, the work was not undertaken until the early 1990s.  During the Corps' two decades of inaction in the face of the known "threat" to the LPV structures posed by the unarmored Reach 2 banks, the channel widened from 650 to at least 1,500 feet, dangerously encroaching on the LPV structures, posing a threat to the integrity of the levee system, and endangering the safety of area residents.  Exh. 1995, Technical Report HL-91-2, TABS-MD Numerical Modeling Investigation of Shoaling in the Mississippi River Gulf Outlet by Hydraulics Laboratory at WES (ERD-019-000001041 to 1113) (01/1991); Exh. 1996, 6th Ind to HQDA (DAEN-CWB-C) Wash DC from Chief Eugene H. Nettles, Program Development Office; Subject: Transfer of Fiscal Year 1980 Construction, General – Mississippi River-Gulf Outlet (AIN-108-000001408) (12/28/1979); Exh. 1997, 3d Ind. to Division Engineer, LMVD from Chief Rodney E. Pittman, Program Development Office; Subject: Transfer of Fiscal Year 1980 Construction, General – Mississippi River-Gulf Outlet (AIN-108-000001405) (11/21/1979); 4th Ind to NOD from Chief Eugene H. Nettles, Program Development Office (AIN-108-000001406) (12/07/1979); 5th Ind to Division Engineer LMVD from Chief Rodney E. Pittman, Program Development Office (AIN-108-000001407) (12/22/1979); Exh. 216, Letter to Pete Savoy from Brigadier General Don T. Riley, U.S. Army President Designee, Mississippi River Commission, Executive Office; re: Concerns about MRGO and recommendation of a flood gate at Bayou La Loutre (NOP-019-000000811 to 814) (06/17/2004); Exh. 1880, Memorandum from Project Manager Gerald Dicharry, Jr., MRGO Project; Subject: Foreshore Protection on the North Bank of the MRGO along the Citrus Back Levee Between Paris Road Bridge and the Michoud Slip  (AIN-108-000000001 (09/16/1982).

328.   By 1983, the Corps reported that foreshore protection along the Reach 2 south bank was critical because the erosion (at the rate of 20 feet per year), if unchecked, would soon begin

to encroach into the stability berms of the LPV structures in light of the fact in some existing banks had eroded back to about 200 feet (from the original 500 feet) from the levee toe.  Exh. 1998, Letter to Commander, LMVD from Chief Frederick M. Chatry; Subject: Mississippi River-Gulf Outlet, Louisiana Foreshore Protection (AIN-108-000001264 to 1265) (02/11/1983); Exh. 1999, Memo to File from Larry E. DeMent, LMNED-HC; Subject: MRGO Foreshore Protection Test Sections South Bank Sta 475 to 501 (NED-192-000000432 to 437) (01/28/1983).

329.   Beginning in 1990, the Corps, using its annual O&M budget, constructed 8.3 miles of foreshore rock bank protection along the MR-GO that successfully abated bank erosion, reduced channel sedimentation and associated dredging cycles, and preserved valued wetlands, land features, and infrastructure along Reach 2.  By 1994, the Corps had constructed 12.4 miles of rock foreshore protection on the south bank of Reach 2.  Exh. 1989, Letter to John Breaux, U.S. Senate from Colonel Kenneth H. Clow, U.S. Army District Engineer, Operations and Readiness Division, Project Manager (NOP-018-000002656 to 2658) (10/12/1994); Exh. 216, Letter to Pete Savoy, Coastal Zone Management, St. Bernard Parish from Brigadier General Don T. Riley, U.S. Army President Designee, Mississippi River Commission, Executive Office (NOP-019-000000811 to 814) (06/17/2004).

330.   In 1991, the Corps, recognizing that there were widening gaps between Reach 2 and Lake Borgne, acknowledged that continuing bank erosion of the Reach 2 channel had caused several serious problems, including channel widening from the original 650 feet to at least 1,500 feet, destruction of 4,200 acres of highly productive marshlands over the past 20 years, and significant gaps between the channel and Lake Borgne at Shell Beach and Martello Castle. Most significantly, the Corps expressed concern that this unchecked erosion exposed developed areas to the southwest to "direct hurricane attacks from Lake Borgne."  Exh. 1995, Technical Report

HL-91-2, TABS-MD Numerical Modeling Investigation of Shoaling in the Mississippi River Gulf Outlet by Hydraulics Laboratory at WES, p. 5 (ERD-019-000001041 to 1113) (01/1991).

331.   In 1993, the Corps created an initial cost estimate of $1,390,000 to address bank erosion issues along the MR-GO, however, this estimate had not been previously presented to Congress.  Exh. 2073, Supplemental Information Sheet, Mississippi River-Gulf Outlet, St. Bernard Parish, Louisiana (Bank Erosion) (dated 01/01/1993; prepared: 02/24/1993; revised 03/03/1993) at p. 4 (AIN-144-000000413 to 418).

332. The MR-GO project was modified under Chief of Engineer's discretionary authority to include as a mitigation measure, the cost of protecting a portion of the foreshore lying between the Lake Pontchartrain and Vicinity Hurricane Protection project levees and the MR-GO, including 6 miles along the reach of the MRGO, which is a part of the GIWW and 18 miles along south shore of the MRGO.

## ARMY CORPS NEVER SOUGHT FUNDING FROM CONGRESS TO REMEDIATE THE MR-GO'S KNOWN DEFECTS

333.   The Corps never informed Congress of the known dangers that the Corps perceived as a result of the risk of flooding caused by the MR-GO's defects, including but not limited to the loss of wetlands and bank erosion/channel widening.  MSJ DFE Order (Doc. No. 18212) at pp. 40, 45, 62.

334.   The Army Corps never asked Congress for authority to remediate the known adverse effects of the MR-GO.  Exh. 91, Kemp Expert Report (July 2008) at pp. 185-95.

335.   The Army Corps could have gone to Congress at any time to ask Congress for authority and money to remediate the known adverse effects of the MR-GO, but it did not.  Exh. 182 at 41:6-19; 43:11-45:10 (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).

336.   In 2007, Congress, after becoming more informed about the environmental and safety problems created by the MR-GO, voted to deauthorize (close) the MR-GO to deep draft vessels. Public Law 109-234, Exh. 11, Mississippi River-Gulf Outlet Deep Draft De-authorization Study Integrated Final Report, http://MR-GO.usace.army.mil/default.aspx?p=MR-GOFinalReport.

337.   There were always established procedures for the Corps to seek Congressional support for the MR-GO—for example, for funding increases for ongoing operation and maintenance or requesting funding to evaluate problems (reconnaissance reports) and to recommend funding for solutions (feasibility reports).  Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 34:14-137:10; 139:10-140; 122:14-127:16.

338.   The Corps could—and in fact did—request funding for a reevaluation study about closing the MR-GO—a long delayed and protracted process that lasted from 1999 to 2007.  At the time of Hurricane Katrina, the Corps was still studying (reevaluating) the myriad chronic problems with the MR-GO.  Exh. 91, Kemp Expert Report (July 2008) at pp. 187, 195; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 133:2-21.

339.   Under the chain of command, the Chief Engineer is the Corp official vested with ultimate decision-making authority, and his approval would be required for any definitive agency deliberative process about remedial measures.  Exh. 177, Army Corps's Digest of Water Resources Policies and Activities, EP 1165-2-1, Dec. 1972, at p. A-67.

340.   At no time did the Chief of Engineers engage in a policy analysis or reach a decision—*i.e.*, exercise his discretion—about the impact of the MR-GO's ongoing operation and maintenance on the wetlands or extensive bank erosion as it pertained to the hazard of storm surge or about whether or how to address the MR-GO's known (and worsening) defects.  Exh. 91, Kemp Expert Report (July 2008) at pp. 185-95; Exh. 92, Kemp Appendix B.

341.   For decades the Corps studied the MR-GO's deficiencies, but the agency never reached a definitive conclusion about what to do and instead continued the same harmful conduct and exacerbated the dangerous conditions.  Exh. 91, Kemp Expert Report (July 2008) at p. 187.

342.   The Army Corps took no steps to minimize adverse effects or arrest the decimation of cypress forests, marshes, and swamps that its operation and maintenance activities were causing.  Exh. 91, Kemp Expert Report (July 2008) at pp. 180-195; Exh. 182, 30(b)(6) Deposition of Zoltan Montvai, (Oct. 7, 2008) at 35:25-37:20.

343. Dr. Kemp correctly concluded that "[f]or a half century, the consistent course of action was no action—despite detailed institutional knowledge decades before Hurricane Katrina that the MR-GO, in the Corps's own words in 1988, posed a possible threat 'of catastrophic damage to urban areas by a hurricane surge coming up [MR-GO] . . . .'"  Exh. 91, Kemp Expert Report (July 2008) at at p. 187.

## HURRICANE KATRINA

### Classification (Saffir Simpson) and Timing

344. Hurricane intensity is measured on the Saffir-Simpson Scale as follows:

| Saffir-Simpson Hurricane Scale | | |
|---|---|---|
| **Category** | **Knots** | **(MPH)** |
| 1 | 64-82 | (74-95) |
| 2 | 83-95 | (96-110) |
| 3 | 96-113 | (111-130) |
| 4 | 114-135 | (131-155) |
| 5 | 136 and > | (156 and >) |

**Figure 2.  Saffir-Simpson Scale for Hurricane Intensity.**

Exh. 1598, NOAA's Katrina Perspective Report (Aug. 2006) at p. 4.

345.   By 07:00 a.m. CDT on Sunday, August 28, Hurricane Katrina reached Category 5 status with wind speeds of 160 mph and a pressure of 908 millibars while out at sea.  Exh. 1598, NOAA's Katrina Perspective Report (Aug. 2006) at p. 2.

346.   Katrina advanced toward Louisiana during the night, and by approximately 04:00 a.m. CDT on Monday, August 29, the center was 90 miles south southeast of New Orleans, and the winds near the center had dropped to 150 mph.  Exh. 1598, NOAA's Katrina Perspective Report (Aug. 2006) at p. 2.

347.   At 06:10 a.m. CDT, Katrina made landfall in Plaquemines Parish just south of Buras (between Grand Isle and the mouth of the Mississippi River) as a strong Category 3 storm. Exh. 1598, NOAA's Katrina Perspective Report (Aug. 2006) at p. 2.

348.   By 08:00 a.m. CDT, Katrina was only 40 miles southeast of New Orleans with hurricane force winds extending outward up to 125 miles with sustained winds of 94 mph.  New Orleans Lakefront reported sustained winds of 69 mph with gusts to 86 mph.  Exh. 1598, NOAA's Katrina Perspective Report at (Aug. 2006) p. 2.

349. Greater New Orleans experienced sustained surface winds of Category 1 or Category 2 strength.  Exh. 1600, Tropical Cyclone Report (Dec. 2005) at p. 8.

**Surge Height/Duration**

350.   Just after 8:00 am CDT on August 29th, maximum surge of 18 feet NAVD occurs along the Reach 2 LPV structures, with maximum surge in the Reach 1 of approximately 16.5 feet+NAVD88, and 17.5 feet+NAVD in the IHNC without floodwall or levee failures.  Exh. 104, Vrijling Flow Modeling (June 2008) at p. 112.

351.   Overtopping velocities are up to about 10 feet per second at the crest of LPV structures.  Exh. 104, Vrijling Flow Modeling (June 2008) at p. 112.

352. The following is a chart reflecting maximum storm surge heights under Scenario 1 (Katrina As Was) and Scenario 2c (Neutral MR-GO):

Table 1: Results of analyses of New Orleans East Polder, IHNC West side, Reach 2 MR-GO and Lower 9th Ward breach development during Hurricane Katrina 'as was' conditions (Scenario 1) and during 'Neutral' MR-GO Hurricane Katrina conditions (Scenario 2C). Source Bea Declaration III p. 152.

| Location | Maximum Surge Scenario 1 (feet) | Maximum Surge Scenario 2C (feet) | Elevation range (+ feet NGVD88) | Primary failure modes Scenario 1 | Primary failure modes Scenario 2c |
|---|---|---|---|---|---|
| GIWWW NO East Back Levee | 17.0 | 16.0 | 15.5-18.0 | wave and surge breaching. main point of entry of floodwater into NOE polder | **no breaching** – limited surge overtopping. waves insufficient height to breach (vegetation effects–outboard protection & grass). |
| GIWW Paris Road Area | 16.2 | 15.5 | 14.5-16.5 | overtopping | **no breaching except at Air Products Plant** flood wall to levee sheet pile connection due to sheet pile interlock failure. |
| GIWW Bulk Terminal | 16.2 | 14.5 | 14.0-15.0 | overtopping | **no breaching** of floodwalls or levees |
| IHNC Junction Port of New Orleans | 17.0 | 14.0 | 14.0-15.4 | overtopping | **no breaching of floodwalls. through seepage breach of two roadway sections behind Port of New Orleans.** |
| IHNC I10 CSX Railroad | 14.0 | 13.0 | 13.0-14.0 | sand bags blew out at 9 ft surge elevation | **breaching** - sand bags would blow out again. no breach if CSX Railroad flood gate was in place. |
| IHNC Seabrook NOE Area | 12.0 | 12.0 | 13.0-14.0 | overtopping | **no breaching** |
| Lower 9th Ward | 17.5 | 14.5 | 12.0-12.5 | seepage, overtopping, lateral instability breaching | **breaching at North and South Breaches** due to seepage, limited overtopping, lateral instability breaching |
| MR-GO Dupre | 17.6 | 16.5 | 14.5 | overtopping breaching at wingwall | **no breaching** |
| MR-GO Reach 2 EBSBs | 18.0 | 17.0 | 15.0 – 20.0 | wave and surge breaching, overtopping, failure of some sheet pile repair inerlocks. | **no breaching** (good turf – ground cover conditions). where surge elevation exceeds crest elevation for more than 1 hour (good grass cover), breaching can develop. **breaching** at sheet pile repairs interlock failure locations |
| MR-GO Bievenue | 17.8 | 17.2 | 15.5 | seepage, lateral instability breaching | **breaching after overtopping (after peak surge when surge at 15.5 ft)** due to seepage and lateral stability at wing wall to EBSB interface. |
| 40 Arpent Levee | 8.5-5.0 | 3.8-2.0 | 6.5 | no breaching | **no breaching** |

Exh. 90, Bea Supplemental Decl. (Oct. 2008) at p. 17.

## **Waves/Duration**

353.   The complex wave field generated during Hurricane Katrina in Lake Borgne impacting the MR-GO consisted of two basic kinds of waves reflecting their source:  (a) the ocean swells generated offshore that would have long periods and could possibly have reached Reach 2, and (b) the waves generated locally in Lake Borgne as a result of the wind blowing across the lake.  Exh. 103, Vrijling Wave Modeling Report (July 2008) at p. 6.

354.   The ocean swells would have periods of up to 16 seconds between crests, while the wind-generated waves would have expected periods between 3 and 7 seconds. Exh. 103, Vrijling Wave Modeling Report (July 2008) at p. 6.

355.   The ocean swells would be somewhat reduced in height (and possibly totally assimilated) by the wind-generated waves as they crossed the wetlands between the coast and Lake Borgne, while the wind wave heights would be related to the fetch (distance over which the wind blows) and wind direction.  Exh. 103, Vrijling Wave Modeling Report (July 2008) at p. 6.

356.   Both wave types would have a limiting maximum height based on the depth of water that the waves are traversing (frictional drag of the bottom).  Exh. 103, Vrijling Wave Modeling Report (July 2008) at p. 6.

357. At 8:00 am CDT on August 29th, during the peak of Hurricane Katrina, the wave heights in the MR-GO channel varied from 8.7 to 9.6 ft.  Exh. 108, Vrijling Wave Modeling Supplement (Nov. 2008) at p. 3.

**RELATIONSHIP BETWEEN MR-GO AND CHANGES
IN TOPOGRAPHY AND HABITAT**

358. As demonstrated in the earlier discussions of "The Army Corps' Knowledge of the MR-GO's Defects and Risk of Catastrophic Flooding" and "The Army Corps' Awareness of Feasible Mitigation Measures," and as discussed further below, the evidence shows that the MR-GO's defective conditions (a) caused significant changes in the topography and habitat in the MR-GO's vicinity and (b) compromised the ability and effectiveness of the LPV structures to protect the people and property of New Orleans and St. Bernard Parish from hurricane flooding.

**Rapid Storm Surge Delivery**

359.   The MR-GO was a conduit for rapid hurricane surge delivery via Reach 2 from the Gulf of Mexico to the heart of Greater New Orleans.  Exh. 4, Team Louisiana Report at pp. 223-

24, Fig. 158; 235-40; Exh. 26, Decision Making Chronology at pp. ES-6-7; Exh. 2, ILIT Report

at p. 8-6; Exh. 7, Kemp 702c Expert Report at pp. 25-33.

360.   The MR-GO was also a conduit for rapid hurricane storm surge delivery—via

Reach 1/GIWW—from Lake Borgne to New Orleans East and the Lower 9th Ward.  Exh. 20,

IPET Report at p. IV-258.

361. As depicted below in Figure 9, the route selection of the MR-GO created an

artificial funnel shape and served as a direct deep water conduit to the open ocean.  The direct

connection and funnel geometry—without construction of a feasible storm surge barrier initially

or at anytime over a half century—caused increased storm surge.  The deep water channel served

as a conduit which carried the unimpeded storm surge water into the St. Bernard Parish, New

Orleans East, and the IHNC area more rapidly than the natural vegetation would have allowed.

Exh. 83, Bea Expert Report (Technical Report I) ("The Legacies of the MR-GO") (Jan. 2009) at

p. 9.



**Figure 9** – The MR-GO 'Funnel'.

Exh. 83, Bea Tech. Report No. I (Jan. 2009) at p. 9, Fig. 9.

362.   The Army Corps-commissioned IPET investigation of the causes of the

catastrophic flooding during Hurricane Katrina acknowledged the funneling of water in the

IHNC from Reach 1/GIWW during hurricanes.  Exh. 20, IPET Report at p. IV-258.

363.   All the investigations of Katrina flooding concluded that there was a demonstrable

"funnel effect" of surge waters along Reach 1/GIWW and IHNC during Katrina.  Exh. 20, IPET

at p. IV-135; Exh. 3, ILIT Report at p. 3; Exh. 4, Team Louisiana Report at Chp. 2; Chp. 3 at pp.

59-60; Exh. 153, CRS Report for Congress, *Mississippi River Gulf Outlet (MR-GO):  Issues for

Congress*, Nicole T. Carter, Charles V. Stern, Aug. 4, 2006 (Exh. 49) at p. 7.

364. The funneling of water down Reach1/GIWW without a surge barrier significantly enhanced surge levels in that channel and the IHNC by 3 to 3.5 feet during Katrina.   Exh. 91, Kemp Expert Report (July 2008) at p. 125; Exh. 94, Kemp Supp. Decl. (Jan. 2009) at p. 4 citing Westerink Report (Defendant's Expert) at Figures 187-196.

**Loss of Trees and Wetlands**

365.   Over five decades, the pre-MR-GO habitat was dramatically changed by the MR-GO's construction, operation, and maintenance in the study area (Central Wetlands, Golden Triangle, and adjoining areas).  The MR-GO directly and indirectly destroyed tens of thousands of acres of wetlands and cypress forests.  PUF Nos. 40-49; Exh. 145, Army Corps, Habitat Impact of the Construction of the MR-GO, at Table 1, p. 1559 (NED-188-000001511 *et seq*.); Exh. 196, Army Corps and Louisiana Department of Natural Resources, "Land Loss and Marsh Creation, St. Bernard, Plaquemines and Jefferson Parishes—Feasibility Study" (April 1990) at pp. 18-19; Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 38-50; Exh. 96 Fitzgerald Expert Report (July 2008) at pp. 4-1 to 4-9.

366.   The MR-GO destroyed tens of thousands of thriving wetland acres and baldcypress – water tupelo swamps that had protected Greater New Orleans from hurricane surge and waves.  Exh. 15 at pp. 16-20, 46, Expert Report of John W. Day, Jr. and Gary P. Shaffer (July 11, 2008).

367.   The Army Corps itself estimated that nearly 3,400 acres of fresh/intermediate marsh, over 10,300 acres of brackish marsh and over 4,200 acres of saline marsh have been converted to open water or spoil in the study area due to the MR-GO's construction.  In addition, over 1,500 acres of cypress swamp and levee forest have become disposal area.  A total of nearly 20,000 acres of wetlands have been lost and nearly 4,800 acres of shallow open water have been converted into deep water or disposal area.  Habitat shifts caused by saline waters brought in by

the MR-GO have caused 3,350 acres of fresh/intermediate marsh and 8,000 acres of cypress swamp to shift to brackish marsh.  Approximately 7,500 acres of swamp have converted to intermediate marsh.  In addition, 19,170 acres of brackish marsh and swamp have shifted to saline marsh.  Moreover, if the roughly estimated amount of increased loss is considered, the area influenced by the MR-GO could have lost over 3,400 acres of wetlands due to increased tides and salinity.  Exh. 145, Army Corps, Habitat Impact of the Construction of the MR-GO at p. 45.

368.   The Army Corps itself estimated that between 1956 and 1999, there was a loss of 14,800 acres of wetlands in the Central Wetlands Unit due the MR-GO's construction, operation and maintenance.  Exh. 145, Report of the Environmental Sub-Committee to the MRGO Technical Committee (Table 1: Habitat Impact of the Construction of the MR-GO) at p. 49 (1999).

369.   Plaintiffs' experts estimate that, as of 1999, at least 62,220 acres of cypress trees and wetlands and other valuable marsh habitat were either destroyed or altered due to the MR-GO's construction, operation, and maintenance.  Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 46.

370.   Plaintiffs' experts estimate that, as of 2001, at least 24,263 acres of land along the Lake Borgne, New Orleans East, South Lake Borgne, Central Wetlands, and St. Bernard areas were lost as a result of the MR-GO's construction, operation, and maintenance.  Exh. 96, Fitzgerald Expert Report (July 2008) at pp. 5-1 through 5-6.

371.   Both the Army Corps and Plaintiffs' experts agree that the reason for such extensive loss of cypress trees and wetlands in the study area is largely due to saltwater intrusion, dredging, spoil disposal, bank erosion, and widening of Reach 2 channel.  Report of the

Environmental Sub-Committee to the MRGO Technical Committee (Table 1: Habitat Impact of the Construction of the MR-GO, *et seq.*) (1999); Exh. 9, 1988 Recon Report, *et seq.*; Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 40-42; Exh. 96, Fitzgerald Expert Report (July 2008) at pp. 2-4, 6-13, 4-17 to 4-18.

372.   Any loss of cypress trees and wetlands in the study area due to natural subsidence and other causes (estimated to be between 0.5 and 1.0 cm/yr.) is minimal compared to the loss attributable to the MR-GO's construction, operation, and maintenance.  Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 13, 46.

373.   Over time after construction, the Reach 2 banks widened several times beyond its design top width of 650 feet, creating an uneven shelf and encroaching upon and eating up marshland.  As the water moves laterally, it destroys marshland because of the shelves that are being.  Exh. 8, O'Cain 30(b)(6) Depo. at 496:23-498:7; 500:1-11.

374.   By 1975, the Army Corps had acknowledged that "[t]he marsh west of the MR-GO has been significantly modified by, inter alia, the MR-GO channel, existing levees, and by the hurricane levee now under construction."  Exh. 186, Mississippi River Gulf Outlet New Lock and Connecting Channels Quantities to Use for Real Estate for Comparative Analysis of 14 Schemes, at AFW-180-000001008, ¶8.

375. For decades, the Army Corps knew that the MR-GO, through channel widening, wave erosion, disposal of dredged material, and continuing saltwater intrusion continued to destroy wetlands at an average loss of 211 acres of marsh per year during the 20-year period between 1968 and 1987 and a total of 4,200 acres of highly productive marsh adjacent to the MR-GO channel.  Exh. 145, Report of the Environmental Sub Committee to the MRGO

Technical Committee (03/16/2000) (Table 1: Habitat Impact of the Construction of the MR-GO) (1999) NED-188-000001511 *et seq*. at 1559.

**<u>Channel Widening</u>**

376.   At the time of constructing the MR-GO, the Corps knew—and predicted—that the unstable Reach 2 banks—composed of loose, porous sandy soils that were susceptible to erosion, particularly from ship waves in the channel—would erode and the channel would widen over time.  Exh. 15, MR-GO Design Memo 1-B (May 1959), at p. 5.; Exh. 200, MR-GO General Design Memo 1-A at p. 7; Exh. 200, MR-GO General Design Memo No. 2, Supplement 4 (foreshore protection) at pp. 1-30; Exh. 183, Podany Depo. At 74:8-77:16.

377.   From at least 1976 to the time of Hurricane Katrina, the Army Corps knew that the MR-GO's unarmored channel—due to erosion caused by ship wakes as high as three or four feet—continued to widen at the rate of 42 feet per year, eventually expanding through unmitigated erosion from 650 feet to 2,000 feet and in some places 3,700 feet.  Exh. 91, Kemp Expert Report (July 2008) at pp. 91, 186; Exh. 193, Memorandum of Cecil W. Soileau (Chief, Hydraulics and Hydrologic Branch, Commenting on Army Corps, Mississippi River-Gulf Outlet, St. Bernard Parish, Louisiana (Bank Erosion), May 24, 1988); Exh. 98, Morris Expert Report (July 2008) at p. 23, Fig. 9-1.

378.   Not only did unarmored Reach 2 erode from 650' to 2,000 to 3,700' in some places, but the unarmored Reach 1/GIWW also widened beyond its authorized width from 650' to 1,000' due to wave wash and erosion from passing ships.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) (Oct. 2008) at ¶2; Exh. 98, Morris Expert Report (July 2008) at p. 23.

379. This increase in the unprotected channel's width and volume of water had several adverse effects, including (1) the breaching of the Lake Borgne shoreline adjacent to the MR-GO

which allowed storm surge within Lake Borgne to dump directly into the MR-GO; (2) the

enormous loss of marshland adjacent to the channel; (3) destabilizing the LPV structures by

encroachment and lateral displacement and subsidence; and (4) shoaling within the MR-GO,

requiring continual dredging and disposal of dredged spoil in the wetlands and accelerating their

demise.  Exh. 13, Theis 702c Expert Report at ¶10; Exh. 9, 1988 Recon Report at pp. 10-11;

Exh. 8, Naomi Depo. at 327:2-9; Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-66;

Exh. 81, Bea Expert Report Summary (Jan. 2008) at pp. 3-7.

**Accelerated and Increased Subsidence and Compromising of LPV Structures**

380. As illustrated below, the widening of the Reach 2 channel had another significant

adverse effect of increasing and accelerating LPV structure subsidence and thereby destabilizing

and compromising the LPV structures' ability to perform as intended during Katrina.  Exh. 72,

Bea Expert Decl. No. 1 (July 2008) at pp. 162-66; Exh. 81, Bea Expert Report Summary (Jan.

2008) at p. 6, ¶6.



Exh. 81, Bea Expert Report, Summary (Jan. 2009) at p. 11, Fig. 6.

381.    As early as 1958, the Army Corps was concerned about the possibility of soil "squeezing" into the adjacent MR-GO Reach 2 channel under the weight of the heavy spoil banks. "Geologic Investigation of the Mississippi River Gulf Outlet." Exh. 59, "Geologic Investigation of the Mississippi River Gulf Outlet," Prepared by WES for the Division Engineer (02/1958); Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-66; Exh. 81, Bea Expert Report Summary (Jan. 2008) at p. 6, ¶6.

382.    The shallow sedimentary layering, physical and geotechnical soil properties, and environment in which these sediments were deposited along the MR-GO right of way was analyzed by and known to the Corps in 1958 prior to the commencement of operation and maintenance of the MR-GO. Exh. 96, Fitzgerald Expert Report (July 2008) at p. 6-1.

383.    The Army Corps reported in 1958 that the material making up the "Interdistributary Trough" (or layer), which extends along the entirety of Reaches 1 & 2 of the MR-GO, "comprises as much as 40% of the sides and bottom of the channel. . . .. [I]t is possible that the poorly consolidated, high-water-content interdistributary clays will tend to flow laterally into an excavation particularly under the extra weight of a spoil bank." Later, in the same report, on Plate 5 titled "Physical Characteristics of Depositional Types,"the remarks associated with the Interdistributary Trough description states "material will probably displace laterally under fairly light load." Exh. 96, Fitzgerald Expert Report (July 2008) at p. 6-2, Table 6.1.; *see also* 6-11 to 6-12.

384.   This Corps concern again surfaced in 1981—this time with specific reference to the Reach 2 LPV structures: "(h) within 10 years the MR-GO bank will have eroded past the MR-GO R/W line (over 200 feet) and *will threaten the stability of the hurricane levee.*" Exh. 72, Bea Expert Decl. No. 1 (July 2008) at p. 163, ¶146 (emphasis added).

385.   In 1983, the Corps reported that it was concerned about the fact that the dredged spoil lies upon a thick layer of organic soils and fluid clays and the risk of subsurface bank failure and slumping in view of the MR-GO's periodic dredging to 38 feet MSL for channel maintenance. The Corps noted that the organic soils had poor cohesiveness due to their high moisture content, especially under loading from spoil disposal, levee construction, and bank protection structures. Exh. 2001, Letter to Greg Martinez, LMNPD-RE, USACE NOD from Stephen W. Price, St. Bernard Parish, Department of Safety and Permits (AIN-108-000001080-1081) (09/15/1983).

386.   In 1988, the Corps noted that subsidence rates along the MR-GO were greatest in the areas that were dredged the most often.  MSJ DFE Order (Doc. No. 18212) at p. 39, citing Exh. 9, 1988 Recon Report at pp. 31-32:

387.   In 1993, the Corps recognized significant settlement of LPV structures on the MR-GO of anywhere from 1 to 6 feet two years after their construction.  Exh. 2002, Memorandum for Chief, Design Branch from Chief Rodney Picciola, Foundations and Materials Branch, CELMN-ED-FS (NED-167-000001591) (02/17/1993).

388.   The Corps of Engineers was aware of these phenomena and knew that the levees had settled approximately 10 feet over time as demonstrated by their attempt to "repair" these areas using sheet piling to re-establish protective elevations instead of placing more sediment on top of the levee, which would have resulted in additional loading and more 'squeezing' of the interdistributary mud.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-66, ¶¶145-61; Exh. 306, 1994 Recon Report at p. 47.

389.   Thus, long before Hurricane Katrina, the Corps recognized that the proximity of the Reach 2 channel to the LPV structures created a risk of destabilizing them and compromising their ability to perform their flood protection role.  Exh. 1993, Draft letter (1) to The Special Assistant to the Secretary; Subject: MR-GO, La (A feature of the project "Mississippi River – Baton Rouge to the Gulf of Mexico"), pp. 2-3 (VRG-014-000000088 to 93); Exh. 1996, 6th Ind to HQDA (DAEN-CWB-C) Wash DC from Chief Eugene H. Nettles, Program Development Office; Subject: Transfer of Fiscal Year 1980 Construction, General – Mississippi River-Gulf Outlet (AIN-108-000001408) (12/28/1979); Exh. 2003, St. Bernard Parish Government, Resolution SBPC #454-08-94 – Closure of the MRGO (NED-195-000000650 to 651 (08/09/94); Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-78, ¶¶145-59.

390.    As a result of the MR-GO's excavation, along with the continual operations and maintenance dredging, the interdistributary deposits were laterally displaced (squeezed) beneath the MR-GO levees and into the MR-GO channel excavation. The high water-content of the deposits makes these sediments susceptible to lateral displacement into an excavation even under the weight of the natural overburden (marsh and other deltaic deposits).  Loading by depositing spoil material on top of these interdistributary deposits resulted in greater volumes of sediment being expelled into the channel.  This situation was exacerbated  by maintenance dredging—not only because it resulted in additional loading from dredge spoil material—but more importantly, it removed the toe of the slope at the base of the MR-GO channel that had served to confine the lateral flow.  Continuous dredging created new accommodation space leading to more interdistributary mud flowing into the channel.  This migration of sediments into the channel from the underlying interdistributary deposits resulted in accelerated rapid subsidence of the adjacent land surface and increased rates of land loss along the channel.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 6-14, Fig. 6.6; Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-78, ¶¶145-59.

391.    Pre-Katrina variations in levee crest elevations along Reach 2, measured by LIDAR, were on the order of several feet.  This variation creates large differences in the overtopping rates at different locations along Reach 2, and the principal causative factor in breach development was the character (especially the crest elevation) of the LPV structure. Exh. 1749, Resio Expert Report (Dec. 2008) at p. 7, ¶2.

392.    A strong correlation exists between the thickness of the interdistributary deposit layer prior to MR-GO construction/maintenance and pre-Katrina levee heights, demonstrating that those areas along Reach 2 where the interdistributary deposits are thickest coincide with the

lowest pre-Katrina levee crest elevations. Likewise, those areas along Reach 2 of the MR-GO where west bank erosion was the greatest (from 1965 to 2005) correlate with those areas where the interdistributary layer was thickest.  Exh. 96, Fitzgerald Expert Report (July 2008) at p.6-3 thru 6-7.

393.    As a general proposition, excavation (construction and/or maintenance dredging) initiates, and loading exacerbates, lateral flow of the sediment beneath the levees along Reach 2, resulting in significant variations in levee crest elevations which in turn was the principal causative factor in breach development.  In the final analysis, lateral squeezing of these deposits not only compromised levee crest elevation, but also the surface elevations along the channel bank, resulting in increased erosion rates where interdistributary deposits were thickest.  This process of channel widening increased wave fetch in the channel.  Thus, in sectors where levee heights were lowest, wave fetch was greatest because of the continual removal of squeezed interdistributary material from the channel by the Corps' repetitive maintenance dredging activities.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-78, ¶¶145-59; Exh. 306, 1994 Recon Report at p. 47.

394.    Between 1963 and the occurrence of Hurricane Katrina in 2005, 17 separate maintenance dredging projects were performed in upper Reach 2 (M.P. 66-47) during which time thirty million (30,000,000) cubic yards of sediment were removed and placed on the surface area adjacent to the MR-GO.  Both the placement of sediment on the levee and repeated removal of material from the channel caused a repetitive cycle of lateral displacement of the interdistributary sediment into the channel excavation necessitating additional maintenance dredging in the channel.  Exh. 206, Compilation of Dredging Events Notice of Intent to Introduce Summary Evidence; Exhibit A-F, (Sept. 12, 2008), at p. 5.

395.    As predicted by Kolb and van Lopik, this cycle of lateral displacement and maintenance dredging accelerated the rate of subsidence of the Reach 2 EBSBs and significantly contributed to the levee crests being dangerously low along Reach 2 prior to Katrina.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-78, ¶¶145-59.

396.    The average rate of subsidence in the Greater New Orleans metropolitan area is about 5 mm (0.2 inches) per year.  However, the rate of subsidence along the levee system that parallels the MR-GO channel excavation is >20 mm (0.8 inches).  This anomalously high rate of subsidence along the MR-GO levee system (400% greater than the New Orleans area) correlates with breach locations along the Reach 2 EBSBs.  Exh. 1594, Timothy H. Dixon, et al., "Space Geodesy: Subsidence and Flooding in New Orleans," *Nature* 441, 587-588 (1 June 2006).

397.    The operation and repetitive dredging of the MR-GO in such close proximity to the Reach 2 LPV structures undermined the flood protection system such that crest elevations settled several feet in certain areas prior to Katrina, and in some cases they settled as much as 10 feet.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-78, ¶¶145-59.

398.    The zones with the thickest interdistributary deposits were most susceptible to wave attack and breach development because: (1) the fetch was greatest at these locations, thereby increasing potential storm wave height; (2) levee crest elevations were lowest; and (3) the distance between the toe of the levee and channel bank was shortest due to greater erosion. Such settling of the MR-GO Reach 2 levee and channel widening would not have occurred had it not been for the proximity of the deep water channel to the Reach 2 LPV structures and the aggressive, frequent, and deep dredging of the MR-GO by the Army Corps.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-78, ¶¶145-59; Exh. 81, Bea Expert Report (Jan. 2009) at p.6, ¶6.

399.   There is no evidence indicating that the Corps took proper corrective action to mitigate these known dangers to the LPV structures.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-178; Exh. 81, Bea Expert Report, Summary (Jan. 2009) at p. 6, ¶6; Exh. 82, Bea Expert Declaration (Jan. 2009) at p. 72, ¶116.

400. The encroachment of the Reach 2 channel on the LPV structures also caused the loss of surge and wave buffering protective vegetation between the channel and "toe" of the LPV structures, thereby reducing the natural protection from surge and waves during hurricanes.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-178; Exh. 81, Bea Expert Report (Jan. 2009) at p.6, ¶6.

## RELATIONSHIP BETWEEN CHANGES IN TOPOGRAPHY AND HABITAT AND COMPROMISING THE ABILITY OF LPV STRUCTURES TO PROTECT GREATER NEW ORLEANS

401.   The critical issue relating to causation is whether Plaintiffs have met their burden of proof that the adverse effects created by the MR-GO's defects were a substantial factor in the catastrophic flooding of their property.  Based upon all the evidence, Plaintiffs have carried their burden.

402.   The MR-GO's cumulative negative effects—the loss of natural wetland buffer, the magnification of the waves in the deep, widened channel, the accelerated and increased subsidence of the levee's crest elevation, and the rapid storm surge delivery—were primary causes of the overtopping and breaching of the LPV structures in the vicinity of the MR-GO.  Without this major breaching and overtopping, catastrophic flooding of the three populated areas—New Orleans East, Lower 9th Ward, and upper St. Bernard Parish (and Plaintiffs' property)—would not have occurred.

403. If the MR-GO had not been defective as outlined above, the following would have occurred during Katrina:

118

**Reach 1**

(a)     with one exception, there would not have been any significant breaching of the New Orleans East Back Levee and Citrus Back Levee LPV structures and therefore no catastrophic flooding of New Orleans East;

(b)     the levee-floodwall sheet pile interface breach at the Air Products plant would have developed at about 8 a.m.

Exh. 74, Bea Expert Decl. No. III (July 2008) at pp. 150-51, ¶142(b)

**Reach 2**

(c)     there would not have been any significant breaching of the EBSBs along Reach 2;

(d)     breaching of the Bayou Bienvenue (south) navigation structure wing-wall to EBSB interface would have developed following surge overtopping initiated between 8 and 9 a.m. and completing about one hour later;

(e)     breaching of the Bayou Dupre (north) navigation structure wing-wall to EBSB would not have developed at all;

(f)     there would have not been any overtopping of the 40 Arpent Canal Levee—and therefore no catastrophic flooding of upper St. Bernard Parish and the Lower 9th Ward

Exh. 74, Bea Expert Decl. No. III (July 2008) at p. 150, ¶142(b).

**IHNC**

(g)     with two exceptions, there would have been no significant breaching of floodwalls, levees, and man-made flood protection structures north of the intersection of the Reach1/GIWW and IHNC and therefore no catastrophic flooding;

(h)     the first exception would have been at the CSX railroad crossing where the temporary sandbag closure would have failed at about 7 a.m.;

(i)      the second exception would have been behind the southern end of the Port of New Orleans where two large breaches would have developed through an earthen levee-embankment fill (lightweight shell-sand) at the intersection of the earthen levee-embankment and a concrete floodwall section at about 9 a.m.;

(j)      neither of these two breaches along the IHNC north of the Reach 1/GIWW and IHNC intersection would have caused catastrophic flooding; and

(k)      in the section of the IHNC south of the Reach1/GIWW and IHNC intersection, two breaches would have developed on the eastern side at the locations of the North and South Breaches at the Lower 9th Ward.

Exh. 74, Bea Expert Decl. No. III (July 2008) at pp. 150-51, ¶142(b).

### Reduced Levee Heights

404.   The widening of the Reach 2 channel eventually encroached upon and foreseeably destabilized the LPV structures by means of accelerated and increased lateral settlement/subsidence of the mud beneath the LPV structures.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-178; Exh. 81, Bea Expert Report (Jan. 2009) at pp. 6, 15, ¶13.

405.   This lateral settlement/subsidence foreseeably lowered the design crown elevations of the Reach 2 LPV structures beyond what would have occurred as a result of natural subsidence, thereby decreasing the hurricane storm protection of the people and property in the vicinity.  Exh 71, Bea Expert Report (July 2008) at pp.15-16; Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-178; Exh. 81, Bea Expert Report Summary (Jan. 2009) at p. 6.

406.   The loss of crest elevation foreseeably resulted in increased exposure of the LPV structures along Reach 2 to both erosive wave action and overtopping during Katrina.  Exh 71,

Bea Expert Report (July 2008) at pp.15-16; Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp.

162-178; Exh. 81, Bea Expert Report Summary (Jan. 2009) at p. 6.

407. Many of the Reach 2 LPV structures that were the lowest at the time of Katrina

experienced the most breaching.  This is a direct link between the defective MR-GO channel and

the catastrophic flooding of populated areas.  Exh 71, Bea Expert Report (July 2008) at pp.15-16;

Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-178; Exh. 81, Bea Expert Report

Summary (Jan. 2009) at p. 6.

**Enhanced Surge**

408.   The loss of wetlands and channel widening foreseeably contributed to substantially

increased vulnerabilities and degraded performance characteristics of the Reach 2 EBSBs, the

navigation structures at Bayous Dupre and Bienvenue, and the Reach 1 flood protection

structures during Katrina.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4; Exh. 71, Bea Expert

Report (July 2008) at pp. 17-20; Exh. 72, Bea Declaration I (July 2008) at pp. 41-44; Exh. 74,

Bea Declaration III (July 2008) at pp. 50-52; Exh. 81, Bea Expert Report (Jan. 2009) at p.5, ¶3,

p. 6, ¶6.

409.   It is well known, and the Corps knew, that healthy wetlands have a positive effect

in reducing the destructive impact of storms by reducing the height and intensity of storm surge

and waves—anywhere from 1 foot per 2.75 miles (0.36 feet/mile) to 1 foot per 1.4 miles

(0.71feet/mile) depending on the type of vegetation.  Exh. 91, Kemp Expert Report (July 2008)

at pp. 184, Figure 9.5; see also Exh. 134, U.S. Army Corps of Engineers, Lake Pontchartrain and

Vicinity, Louisiana, Design Memorandum No. 1 Hydrology and Hydraulic Analysis Part 4 –

Chalmette Extension, at Plate No. 6 "Overland Surge Elevations, Coastal Louisiana" (October

1967)); Exh. 83, Bea Tech Report No. 1 (Jan. 2009) at p. 2.

410.   If the cypress forests and marshlands had not been destroyed by the MR-GO, these natural defenses would have reduced surge caused by Hurricane Katrina by about three feet and spared Greater New Orleans from catastrophic flooding.  Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 16-20; Exh. 28, Dalrymple Depo. at 143:6-145:1; *see also* Exh. 2091, Swenson, E.M., *Hurricane Andrew: the Inundation of the Louisiana Coastal Marshes,* Report Submitted to the Louisiana Department of Natural Resources, Baton Rouge, Louisiana, DNR Contract No. 256081-95-02 (1994); Exh. 1638, Coast 2050, Toward a Sustainable Coastal Louisiana (Dec. 1998) at p. 55; *see also* Exh. 2058, CRS Report for Congress, *Federal Liability for Hurricane Katrina-Related Flood Damage*, RL34131 (Aug. 17, 2007) at p. 2.

411.   With healthy cypress forests and marshlands, surge across the Central Wetlands Unit between the Reach 2 and the 40 Arpent Canal Levee is reduced by a critical three feet, thereby averting catastrophic flooding.  Exh. 91, Kemp Expert Report (July 2008) at pp.123, 182.

412.   The Government's own expert, Dr. Robert Dalrymple, attributes over three feet of additional storm surge against Reach 2 EBSBs because of the destroyed adjacent wetlands.  Exh. 28, Dalrymple Depo. at 143:6-145:1.

413.   As discussed below, Plaintiffs' modeling scenarios establish that the cumulative impact of the MR-GO's four defects (no surge barriers, "funnel effect," loss of wetlands, and channel widening) in fact increased surge elevation along Reach 1/GIWW and the IHNC by at least three feet.  Exh. 91, Kemp Expert Report (July 2008) at p. 125.

414.   Defendant's expert attributes 3.5 feet of additional surge in Reach 1/GIWW due to the "funnel effect."  Exh. 94, Kemp Expert Decl. (Jan. 2009) at p. 4 citing Westerink Expert Report at Figures 187-196.

415.   Plaintiffs have presented evidence that an "as authorized" MR-GO—with pristine wetlands and "as authorized" channel width—is still a major conveyer of surge and a major source of devastating overtopping flows.  Exh. 93, Kemp Supp. Decl. at ¶16.

416.   The flood structures along Reach 2 were not armored, and they had no breakers or protective wetlands in front of them to serve as a buffer to storm surge and waves.  Exh. 3, ILIT at p. 2-19, Figure 2.6.

417.   In contrast, because it was constructed of cohesive soils on its slopes and the slopes were fertilized, seeded and sodded to form a section that generally prevented rain wash erosion and erosion from tidal wave action, the 40 Arpent Canal Levee, while overtopped, did not catastrophically fail during Hurricane Katrina.  Exh. 13, Theis 702c Expert Report (Sept. 2007) at ¶27.

418. The widening of the Reach 1/GIWW channel from its design width of 650 feet to 1,000 feet increased the volume of water (conveyance) during Katrina and contributed to the overtopping of the LPV structures and the catastrophic flooding of New Orleans East.  Exh. 91, Kemp Expert Report (July 2008) at pp. 11, 57, 80, 148-58; Exh. 81, Bea Expert Report (Jan. 2009) at p. 5, ¶4.

**Intensified Wave Energy**

419.   Surge and wave height alone do not reflect the reality of the total universe of interactive hydrodynamics during a hurricane.  Wave energy is also a critical factor in the destruction of LPV structures.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶19, 27, 31-32.

420.   Once the combined surge and waves reach the top of a flood control structure, they cannot and do not rise any higher.  Instead, the water overflows the crown and continues to do so until the water level recedes below the crown.  This is like a bathtub that overflows once the

water reaches the top and continues to overflow until the water is turned off.  While the water level remains constant, the volume of water and rate of overflowing are more indicative of the amount and extent of flooding.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶19, 27.

421.   Catastrophic flooding is similarly a function of when the levee (bathtub) overflows, how long it overflows (time of onset and duration), and the intensity (rate) of water flow.  Thus, the water's elevation is not the most predictive or sensitive factor, but merely an indicator of the mean crown elevation of the flood protection works (assuming that they do not breach).  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶19, 27.

422.   The presence of the MR-GO channel as it existed on August 29, 2005 increased the wave energy impinging on the Reach 2 LPV structures and led to greater surge discharges in the "funnel," particularly in Reach 1 and the IHNC, than would have occurred if the authorized dimensions had been maintained.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶32.

423.   The MR-GO's channel size matters because the Corps' operation and maintenance program, consisting primarily of channel dredging, increased the total oceanographic stresses to which the LPV structures were exposed during Katrina, and significantly increased the likelihood of breaching and catastrophic flooding of Plaintiffs' properties.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶32.

424.   Channel widening and the resultant destruction of protective vegetation on the water side promoted earlier, prolonged, and severe wave side attack of the Reach 2 EBSBs.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶5(b); Exh. 81, Bea Expert Report (Jan. 2009) at pp. 14-16, ¶¶10-14.

425. The fact that the Reach 2 channel was allowed to grow to 300 to 500% beyond its initial width—and in some places up to 3,700 feet—created a broader expanse and volume of

water, causing the channel to serve as a wave regeneration basin during Katrina.  As shown by

Figure 5 below, the regenerated waves at the MR-GO LPV structures were significantly higher

and more powerful than they would have been had the pre-channel wetlands and vegetation been

present.  The larger and more intense waves directly attacked the EBSBs' exposed surfaces

(protected and unprotected sides) and created wave attack scour and erosion of the EBSBs before

overtopping.  The contribution to the destruction of the LPV structures caused by waves was a

direct cause of flooding due to the Reach 2 channel.



**Figure 5 –** This figure depicts the negative affects that the MRGO channel and degraded
wetlands had on the size of waves that attacked the MRGO levees.

Exh. 83, Bea Expert Report (Technical Report I) ("Legacies of the MR-GO") (Jan. 2009) at p. 4,
Fig. 5; Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶¶ 4(b), 5(b), 12(f).

426.   This wave side attack proved to be an important and pervasive—and primary—mechanism that led to early and catastrophic breaching of these Reach 2 LPV hurricane protection structures due to erosion, unprotected side scour, and subsequent breaching combined with overtopping by the Hurricane Katrina surge.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶¶4(b), 5(b); Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶30(c).

427.  As shown by Figure 9-1, there is a correlation between locations of significant channel widening (up to 3,700 feet) and the failure of EBSBs during Katrina.



**Figure 9-1**  MRGO Channel Erosion

Exh. 98, Morris Expert Report (July 2008) at p. 23, Fig. 9-1.

428.   Several of the breached levee locations also coincided with areas where there was dredging deeper than 38 feet.  Exh. 91, Kemp Expert Report (July 2008) at pp. 12, 98 at Fig. 6.4.

429. As discussed below, Plaintiffs' modeling data also establishes that the waves crossing the MR-GO grew significantly due to the depth of the channel and its fetch.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶31.

## Earlier Onset of Overtopping and Failure of LPV Structures and Longer Duration of Flooding

430.   The severity of flooding in the populated areas was significantly dependent on when the breaching of Reach 2 EBSBs began in the storm sequence—more flooding if earlier (longer duration), less flooding if later (shorter duration).  The adverse effects of the MR-GO caused earlier breaching of the LPV structures and therefore earlier and greater flooding.  Exh. 94, Kemp Expert Report (Jan. 2009) at p. 27.

431.   In flood control, timing is everything.  Without the MR-GO's negative effects, the LPV structures would have survived the brief peak surge.  If the EBSBs along Reach 2 could have remained largely intact through the brief period of the highest surge, there would have been no significant flooding of the protected areas.  Exh. 74, Bea Expert Decl. No. 3 (July 2008) at pp. 150-52, ¶142; Exh. 91, Kemp Expert Report (July 2008) at pp. 125-33.

432. Many EBSBs along Reach 2 failed before the peak surge largely because of wave attacks and heightened surge caused by the MR-GO's negative effects.  As noted above:

(a)     The loss of wetlands and vegetative cover eliminated a natural storm surge/wave buffer.  Exh. 81, Bea Expert Report (Jan. 2009) at p. 5, ¶3.

(b)     The widened, deep channel enhanced wave heights and increased surge levels.

(c)     The widened, deep channel encroached on the LPV structures and accelerated and increased subsidence of LPV structures allowing subsurface soil under the LPV structures to move laterally, thereby causing greater settlement of the crown and increasing crown exposure to wave damage and overtopping and exacerbating flooding.

Exh. 74, Bea Expert Decl. No. 3 (July 2008) at pp. 150-52, ¶142; Exh. 91, Kemp Expert Report

(July 2008) at pp. 125-33.

433. The unmitigated channel geometry —along with the width and depth of Reach

1/GIWW—made for a highly efficient water delivery "funnel" which increased surge heights in

the areas of Reach 1/GIWW and the IHNC and caused earlier overtopping and failures of LPV

structures intended to protect New Orleans East, parts of St. Bernard Parish, and the Lower 9th

Ward.  Exh. 91, Kemp Expert Report (July 2008) at pp. 148-84; Exh. 81, Bea Expert Report

(Jan. 2009) at pp. 3-20.

## COMPUTER MODELING

434.   The parties performed computer modeling in an effort to determine as best as

possible various aspects of the flooding during Hurricane Katrina, including but not limited to

sources of flood waters; surge height; wave height, fetch, and energy; onset and duration of

flooding; and other related matters.

435.   Having carefully reviewed the parties' expert reports detailing their modeling

methods, data relied upon, assumptions, and findings as well as these experts' trial testimony, the

Court finds the Plaintiffs' experts' conclusions are more persuasive and support the findings set

forth above about the impact of the MR-GO's negative effects on the performance of the LPV

structures and cause of catastrophic floodoing during Katrina.

436. As noted below, Defendant has criticized Plaintiffs' flood modeling for several

reasons.  The Court has carefully considered these critiques but has concluded that these

criticisms are not well founded.

**Plaintiff's Modeling Approach**

437.   Plaintiffs' experts are accomplished scientists and engineers who tested their understanding of the contribution of the MR-GO on the flooding during Hurricane Katrina by conducting extensive, sophisticated modeling of different scenarios, each with an explicitly stated set of assumed conditions, using state-of-the art techniques and models similar to those used by other scientists in the field, including the Army Corps and its consultants and experts in this case. The results of this modeling are set forth in three expert reports (de Wit et al 2008. Flow Modeling New Orleans -Mississippi River Gulf Outlet, Hurricane Katrina August 2005 - FINAL REPORT Scenario 1, 2A, 2B, 2C, 2D, 3; Gautier et al 2008 a. Wave Modeling New Orleans - Mississippi River Gulf Outlet, Hurricane Katrina August 2005 - FINAL REPORT; Gautier et al 2008 b. Wave Modeling New Orleans - Mississippi River Gulf Outlet, Hurricane Katrina August 2005 – APPENDICES).  The results of this modeling added significant depth to their understanding of the causes of catastrophic flooding.  Exh.106, Vrijling Joint Decl. (Jan. 2009) at ¶3.

438.   In terms of computer modeling, Plaintiffs' experts performed multiple analytical simulations (parametric studies) to develop a fundamental understanding of how the various factors and parameters influenced the performance of the hurricane flood protection and navigation structures along Reach 2 and Reach 1.  The combined ADCIRC surge, FINEL flow dynamics, and SWAN wave modeling are very useful in explaining the complexities of the flooding of the St Bernard Polder.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4; Exh. 74, Bea Declaration III (July 2008) at pp. 150-52; Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶4; Exhs. 103-109 (Dutch Flood Modeling).

439. Plaintiffs created several scenarios of actual and assumed conditions to determine what influence the MR-GO as it existed at the time of Katrina had on several storm parameters and the extent of flooding.  As reported in de Wit *et al* 2008, the scenarios tested the following conditions:

(a)     Scenario 1: "Katrina Real Run" ("Katrina As Was")—surge that engulfed the land and coastal areas and man-made features as they actually existed on August 29, 2005, with no surge reduction/prevention safeguards, widened channel, and degraded wetlands;

(b)     Scenario 2a: No MR-GO channels or LPV flood protection works except at the 40 Arpent location; pristine wetlands;

(c)     Scenario 2b: No MR-GO channels or LPV flood protection works; pristine wetlands;

(d)     Scenario 2c: "Neutral MR-GO": No MR-GO channels, full pre-Katrina complement of LPV flood protection works; pristine wetlands;

(e)     Scenario 2d: No MR-GO channels or LPV flood protection works; pristine wetlands except MR-GO spoil piles; and

(f)     Scenario 3: MR-GO as designed with 650'top width and full pre-Katrina complement of LPV flood protection works; pristine wetlands but no surge reduction/prevention safeguards.

Exh. 104, Vrijling, Flow Modeling New Orleans - Mississippi River Gulf Outlet, Final Report, Scenarios 1, 2A, 2B, 2C, 2D, 3 (June 2008).

440.   The three most pertinent scenarios are Scenario 1 (what actually happened during Hurricane Katrina), Scenario 2c (pristine wetlands before 1958 and no MR-GO surge and "funnel effect" impact), and Scenario 3 (pristine wetlands before 1958 and channel at original

650' top width but no surge or "funnel effect" reduction/prevention safeguards). Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶4.

441.   In addition to Scenarios 1, 2c, and 3, Plaintiffs' experts performed other scenarios and parametric sensitivity studies to gain an understanding of how the various parts of this complex system interacted in the "Katrina As Was" MR-GO condition (Scenario 1) and in the Hurricane Katrina "Neutral MR-GO" condition (Scenario 2c). Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶10(c); Exh. 72, Bea Declaration I (July 2008) at pp. 41-44, Exh. 74, Bea Declaration III (July 2008) at pp. 50-52.

442. Scenario 2c is the set of conditions that Plaintiffs established for "no negligence"/"hurricane neutral" MR-GO in the sense that the waterway does no harm to adjacent flood protection structures, property, and population because the pre-1958 wetlands are intact (and not destroyed by salt water intrusion) and the MR-GO has no effect on surge either in terms of opening Greater New Orleans to surge from the Gulf of Mexico or funneling surge into Reach 1/GIWW and the IHNC. Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶5, 16; Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶¶3(c), 3(d), 8(a)(b).

(a)      Scenario 2c is also described as the "No MR-GO" scenario because it tests the effect of the absence of any channel and whether it introduced increased volumes of water and surge. Exh. 104, Dutch Flow Modeling (June 2008) at p. 37; Exh. 91, Kemp Expert Report (July 2008) at p. 92.

(b)      This "Neutral MR-GO" condition has no trace of the MR-GO project, or the wetlands destruction that it caused, but retains all of the levees, EBSBs, and other LPV flood prevention structures added over the years in the pre-Katrina condition, all of which are presumed beyond reproach in the condition in which they were tested by Hurricane Katrina.

Exh. 104, Dutch Flow Modeling (June 2008) at p. 37; Exh. 91, Kemp Expert Report (July 2008) at p. 92.

(c)     Scenario 2c represents the Plaintiffs' experts' assessment of a valid set of reference hydrodynamic characterizations for "perfect" life-cycle conception, design, operation, and maintenance characterizing the MR-GO in a do "no harm" configuration for assessment of the performance of the LPV hurricane flood protection structures along Reach 2 and Reach 1. Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶5(a); Exh. 71, Bea Expert Report (July 2008) at pp. 6-9, 17-20; Exh. 72, Bea Declaration I (July 2008) at pp. 41-44, and Exh. 74, Bea Declaration III (July 2008) at pp. 50-52.

(d)     The rationale for the "no harm" assumption is reasonable because the Corps had a Congressionally-directed responsibility to manage the MR-GO navigation project so that it caused no added, unmitigated impact on the ability of the LPV hurricane protection structure to fulfill the Corps' other Congressionally-mandated mission to protect the City of New Orleans and St. Bernard Parish from hurricane-induced flooding.  Exh. 91, Kemp Expert Report (July 2008) at p. 92.

443. Scenario 2c is Plaintiffs' "no negligence" scenario, to use Defendant's terminology, because it properly assumes the MR-GO is "hurricane neutral," *i.e*., the navigation channel has no effect, with surge buffering wetlands as they existed before 1958, and no surge conduit or funneling of water. Scenario 2c reflects the Plaintiffs' position that Defendant had a legal duty to design, construct, operate, and maintain the MR-GO so that it did not create any added risk of flooding the adjacent neighborhoods. As set forth in the three above-referenced expert modeling reports and Dr. Bea and Kemp's separate reports, Scenario 2c—the Hurricane Neutral MR-GO— did not result in catastrophic flooding of Plaintiffs' properties, thereby confirming Plaintiffs'

experts' conclusion that it was the MR-GO's (including Plaintiffs' property) in its defective and unmitigated condition that was the determinative factor in causing the catastrophic flooding of New Orleans East, Lower 9th Ward, and St. Bernard Parish.  Exh. 106, Vrijling Joint Decl. (Jan. 2009) at ¶4.

**Plaintiffs' Modeling Results**

444. Plaintiffs' modeling results demonstrate that the MR-GO had a dramatic impact on several critical storm parameters that caused catastrophic flooding, specifically when contrasting the modeling results of Scenario 2c (Neutral MR-GO) with Scenario 1 (MR-GO As Was) shows:

(a)      overtopping is reduced by 80% for all three polders that experienced catastrophic flooding.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶22;

(b)      surge discharge into the IHNC via Reach 1/GIWW decreased by 274%.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶21, Table 1;

(c)      surge velocity diminishes by 246%.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶21, Table 1;

(d)      wave height is reduced by more than 50%.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶30(a);

(e)      wave period plummets about 60%.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) ¶30(b); and

(f)      wave energy eroding the EBSBs along Reach 2 dissipates by 300%.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) ¶30(c).

445.   The reduction in protective wetlands (both in the Golden Triangle and Central Wetlands Unit and immediately in front of the LPV structures) and increase in channel width had demonstrable effects on flooding levels.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶19-27.

446.   Waves generated by Katrina winds in Lake Borgne would have traversed a much narrower channel and buffering wetlands and been greatly diminished before striking the Reach 2 embankments if the MR-GO had not eroded the channel banks and had not destroyed tens of thousands of acres of wetlands due to construction, bank erosion, and saltwater intrusion.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶31.

447.   Plaintiffs' experts' data shows that the wider channel materially increased storm surge intensity, time of breach/overtopping, overtopping rates, and duration of flooding.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶19-27.

448.   The geometry of the unmitigated "funnel" directly influenced surge discharge—both in quantity and velocity—in Reach 1/GIWW and IHNC.  Exh. 81, Bea Expert Report (Jan. 2009) at p. 6, ¶7; p. 12, Fig. 7; Exh. 91, Kemp Expert Report (July 2008) at Chapter 2, "Funnel Geography, Terminology and Katrina Flood Damages."

449. The onset rate, and duration of overtopping—three critical storm parameters—are significantly delayed without the MR-GO's adverse effects, thereby dramatically reducing (and averting catastrophic) flooding of Plaintiffs' property.  Exh. 74, Bea Expert Decl. No. 3 (July 2008) at pp. 150-52, ¶142; Exh. 91, Kemp Expert Report (July 2008) at pp. 125-33.

**Defendant's Experts Agree With Several Conclusions by Plaintiffs' Experts**

450.   Defendant's expert's (Westerink) modeling for Reach 1 and the IHNC shows dramatic reductions of peak surge by up to 3.5 feet and duration by more than half associated with returning Reach 1 to pre-MR-GO dimensions.  (This is actually half a foot more reduction than Plaintiffs' experts showed with FINEL.)  Thus, experts for both parties are in agreement about the role the unmitigated "funnel effect" and enlarged GIWW in amplifying and prolonging storm surge in Reach 1 and the IHNC and contributing to the early failure of floodwalls and

levees adjacent to the IHNC.  Exh. 94, Kemp Supp. Decl. (Jan. 2009) at p. 4 citing Westerink

Report (Defendant's Expert) at Figs. 187-196.

451.   None of Defendant's experts (Westerink, Ebersole, or Resio) challenge Plaintiffs'

experts' conclusions about the adverse effects of channel expansion and loss and conversion of

wetlands.  Exh. 94, Kemp Expert Report (Jan. 2009) at p. 4.

452.   Defendant's modeling expert (Westerink) does not challenge Plaintiffs' experts

modeling methods.  Exh. 94, Kemp Expert Report (Jan. 2009) at p. 5.

453.   Defendant's experts do not challenge the methodology of Plaintiffs' experts'

modeling discussed above.  Exh. 94, Kemp Expert Decl. (Jan. 2009) at p. 4.

454.   Consistent with Team Louisiana's conclusion that flooding across the 40 Arpent

Canal Levee began between 8:00 and 8:30 a.m., all experts agree that the peak surge on Reach 2

occurs in the 8:00 to 9:00 a.m. period.  Exh. 94, Kemp Expert Report (Jan. 2009) at p. 26; Exh.

4, Team Louisiana Report at p. 80, 94.

455.   Defendant's expert Bruce Ebersole acknowledges the hydraulic chaos on the Reach

2 EBSB face during Katrina due to turbulent surge, wave breaking, and swash generation akin to

a hydraulic cannonball or Roto-Router eroding the sides and crowns.  *See, e.g.*, Exh. 94, Kemp

Expert Report (Jan. 2009) at pp. 26-27.

456. Defendant's expert Bruce Ebersole agrees with Dr. Kemp and Dr. Bea that (a) the

breaching of Reach 2 EBSBs began early in the surge sequence (between 5 and 6 a.m.) when

water levels were halfway up the structure's front face and (b) overtopping became the dominant

erosion mechanism, continuing as water levels and wave heights increased and levee crowns

were substantially reduced due to wave overflowing.  These waves—originally generated in

Lake Borgne regenerated (and magnified) within the Reach 2 channel—were the only means to

precipitate such overtopping when the surge is so low.  By the time the surge peak arrived at the

Reach 2 EBSBs between 8 and 9 a.m., it is likely that the original levee crown, in many cases,

had already experienced significant degradation.  Exh. 94, Kemp Expert Report (Jan. 2009) at p.

27.

**Defendant's Unfounded Focus on Scenario 3**

457.   To the extent that the Defendant seeks to argue that Plaintiffs' Scenario 3 is the "no

negligence" condition, this argument is unfounded.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at

¶11(b).

458.   Perfect maintenance of the MR-GO would not have eliminated the significant

attendant negative hydrodynamic and hydrologic system impacts, including water flow from the

Gulf of Mexico and Lake Borgne affecting surge elevations, wave generation, and the lack of

appropriate defenses to effectively neutralize these negative effects.  Exh. 90, Bea Supp. Decl.

(Oct. 2008) at ¶11(b).

459.   Plaintiffs' experts therefore pursued a more intellectually defensible analytical

approach by evaluating a range of assumed conditions to test the sensitivity of relevant variables

on the flooding outcome.  Exh. 103, Vrijling Expert Report, Wave Modeling New Orleans -

Mississippi River Gulf Outlet, Final Report (July 2008); Exh. 104, Vrijling Expert Report, Flow

Modeling New Orleans - Mississippi River Gulf Outlet, Final Report, Scenarios 1, 2A, 2B, 2C,

2D, 3 (June 2008); Exh. 105, Vrijling Expert Report, Polder Flood Simulations for Greater New

Orleans: the neutral MRGO scenario (July 2008); Exh. 106, Vrijling Joint Declaration, Vrijling,

Kok, de Wit, and Gautier concerning wave and flow modeling New Orleans -- MRGO for

Hurricane Katrina, August 2005 (Jan. 2009); Exh. 107, Vrijling, Appendix 1 to Joint declaration,

Vrijling, Kok, de Wit, and Gautier concerning wave and flow modeling New Orleans -- MRGO

for Hurricane Katrina, August 2005 (Jan. 2009); Exh. 108, Vrijling, Supplement on Wave

Modeling New Orleans, memo from Gautier to van Heerden (Nov. 2008); and Exh. 109,

Vrijling, Wave Modeling New Orleans - Mississippi River Gulf Outlet, Appendices (July 2008).

460.   The Court has concluded that Plaintiffs' experts' findings, based on their computer

modeling, eye witness observations, available measurements of water levels, and analytical

methods customarily used by such experts, presents a more plausible, credible explanation of the

circumstances surrounding the catastrophic flooding during Hurricane Katrina than the

explanation offered by the Defendant's experts.

461.   Plaintiffs' experts analyzed the cumulative impact of all four challenged activities

(design, construction, operation, and maintenance) on the catastrophic flooding, without

detaching the effects of operation and maintenance from the effects of design and construction.

Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶¶3(a)(b), 4(a), 8(a), 10(b); Exh. 71, Bea Expert Report,

(July 2008) at ¶3; Exh. 72, Bea Expert Decl. I (July 2008) at ¶37; Exh. 93, Kemp Supp. Decl.

(Oct. 2008) at ¶9; Exh. 91, Kemp Expert Report (July 2008) at p. 185; Exh. 104, de Wit et al

2008 Flow Modeling New Orleans -Mississippi River Gulf Outlet, Hurricane Katrina August

2005 - FINAL REPORT Scenario 1, 2A, 2B, 2C, 2D, 3.

462.   From a scientific standpoint, it is inappropriate to separate out only the effects of

two challenged activities (MR-GO's operation and maintenance) from the complex and

interdependent hydraulic system that was created by the project's design and construction.  By

focusing on how the entirety of critical changes caused by the MR-GO that cumulatively

contributed to the catastrophic flooding, Plaintiffs properly do not artificially detach operation

and maintenance from design and construction.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at

¶9(a)(b).

463.   The performance of Reach 1, Reach 2, and the IHNC flood protection and navigation structures during Hurricane Katrina is an integrated effect of the entire life-cycle of activities over the MR-GO's history from the time of its inception through its design, construction, operation, and maintenance up to the time of Hurricane Katrina.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶¶3(a), 11(b); Exh. 71, Bea Expert Report (July 2008) at pp. 6-9, 17-19; Exh. 72, Bea Declaration I (July 2008) at pp. 141-42; Exh. 74, Bea Declaration III (July 2008) at pp. 50-52.

464.   The performance of Reach 1, Reach 2, and the IHNC flood protection and navigation structures during Hurricane Katrina is also a function of the hydrologic "system" of which the MR-GO is a critical component, including the Gulf of Mexico, Lake Borgne, the GIWW, the IHNC and their connections to Lake Pontchartrain.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶3(b); Exh. 72, Bea Declaration I (July 2008) at pp. 47-58, 86-88; Exh. 74, Bea Declaration III (July 2008) at pp. 51-73; Exh. 91, Kemp Expert Report (July 2008) at pp. 96-147.

465.   Any analysis of the MR-GO's contribution to the catastrophic flooding must address the multiple, interconnected, and interactive elements constituting the MR-GO and the associated hydrologic system from the time of its inception to the time that the Plaintiffs' properties were flooded.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4; Exh. 71, Bea Expert Report (July 2008) at pp. 17-20.

466.   Given the MR-GO's multiple elements that interacted with a regional hydrologic system over a half century, analysis of its role in causing flooding during Hurricane Katrina must necessarily assess more than its negative impacts on the neighboring wetlands or widened channel.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4(a).

467.   Plaintiffs' experts analyzed the associated hydrodynamic impacts (surge, currents, and waves) on the adjacent Reach 1, Reach 2, and IHNC flood control structures, the MR-GO channel geometry, the Gulf of Mexico – Lake Borgne – MR-GO – GIWW – IHNC – Lake Pontchartrain hydrologic "system," and the geometry of the adjacent hurricane flood protection structures and navigation structures.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4(a).

468.   Plaintiffs' experts' investigations yielded a comprehensive understanding of how the MR-GO affected the performance of the hurricane flood protection and navigation structures. Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4(a).

469.   Plaintiffs' modeling demonstrates that the negative impacts of the MR-GO channel went beyond maintenance of the channel at its design dimensions and/or loss of surge-buffering wetlands.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶11(a); Exh. 91, Kemp Expert Report (July 2008) at pp. 196-97; Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶32; Exh. 103, Vrijling Expert Report, Wave Modeling New Orleans - Mississippi River Gulf Outlet, Final Report (July 2008); Exh. 104, Vrijling Expert Report, Flow Modeling New Orleans - Mississippi River Gulf Outlet, Final Report, Scenarios 1, 2A, 2B, 2C, 2D, 3 (June 2008); Exh. 105, Vrijling Expert Report, Polder Flood Simulations for Greater New Orleans: the neutral MRGO scenario (July 2008); Exh. 106, Vrijling Joint Declaration, Vrijling, Kok, de Wit, and Gautier concerning wave and flow modeling New Orleans -- MRGO for Hurricane Katrina, August 2005 (Jan. 2009); Exh. 107, Vrijling, Appendix 1 to Joint declaration, Vrijling, Kok, de Wit, and Gautier concerning wave and flow modeling New Orleans -- MRGO for Hurricane Katrina, August 2005 (Jan. 2009); Exh. 108, Vrijling, Supplement on Wave Modeling New Orleans, memo from Gautier to van Heerden (Nov. 2008); and Exh. 109, Vrijling, Wave Modeling New Orleans - Mississippi River Gulf Outlet, Appendices (July 2008).

470.   Scenario 3 does not take into account the fact that Reach 2 of the MR-GO is a potential conduit of storm surge from the Gulf of Mexico and from Lake Borgne and that there is a potential for "funneling" of surge down Reach 1/GIWW and into the IHNC, thereby omitting any provision for surge barriers .  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶8(a).

471.   Notwithstanding the inappropriateness of segregating the negative effects of operation and maintenance from other negative effects, the flood modeling results for Scenario 3 in fact demonstrate that the loss of wetlands and channel widening, by themselves, had a material impact on the amplitude of surge, wave generation, onset of flooding, duration of flooding, and rate of overtopping and thereby the extent of flooding in the three polders.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶20; Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶2.

472. Contrary to the Government's contention, Scenario 3 is not Plaintiffs' "no negligence" scenario.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶5-6; Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶¶3(c), (d), 5(a), 11(b).

(a)      None of the Plaintiffs' expert reports used the term "no negligence."  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶8(a)

(b)      Scenario 3 does not take into account the fact that Reach 2 of the MR-GO is a potential conduit of storm surge from the Gulf of Mexico and from Lake Borgne and that there is a potential for "funneling" of surge down Reach 1/GIWW and into the IHNC, thereby omitting any provision for surge barriers .  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶8(a).

473.   The MR-GO's operation and maintenance cannot be decomposed because of their interactive and interdependent effects on what existed at the time of Hurricane Katrina and on what could and should have existed at the time of Hurricane Katrina as performed with the utmost care.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶10(b).

474.   The attempted decomposition of the life-cycle effects of the MR-GO by the Defendants is a classic mistake in development of accurate and realistic understandings of the behavior of real complex "systems."  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶10(b).

475. Synthesis—or understanding the behavior of the entire system (assembly of components)—must take place before there are attempts to decompose the system to develop additional insights into workings of components and their interactive and interdependent relationships with other components.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶10(b) (emphasis in original).

**<u>Defendant's Experts Flawed Analysis</u>**

476.   There are other flaws in the Defendant's criticism of Plaintiffs' modeling results. For example, Defendant focuses almost exclusively on only two measurements of the MR-GO's impact—maximum surge and wave height.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶10, 12(a), 19-27, 29-32; Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4; Exh. 81, Bea Expert Report (Jan. 2009) at pp. 22-34.

477.   Like IPET, Defendant's experts' modeling largely ignores waves and their adverse effects on the LPV system in the relevant area.  Exh. 94, Kemp Expert Decl. (Jan. 2009) at pp. 10-14; Exh. 91, Kemp Expert Report (July 2008) at p. 83.

478.   Defendant's expert's modeling—and conclusions about the MR-GO's impact on surge and significant wave height—are skewed by erroneous assumptions about the Reach 2 topography and relevant features (channel and land separating the channel from the LPV berm) and boundary conditions.  Exh. 94, Kemp Expert Decl. (Jan. 2009) at pp. 12-14, 25.

479.   Defendant's experts do not address the impact of progressive wetlands on the flooding consequences.  Exh. 94, Kemp Expert Decl. (Jan. 2009) at p. 30.

480.   Defendant ignores three more reliable measurements—time of onset, duration, and rate of structure overtopping by surge.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶10, 12(a), 19-27, 29-32; Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4.

481.   Defendant also mischaracterizes Plaintiffs' modeling data demonstrating that the MR-GO had a direct effect on substantially increasing oceanographic stresses on the LPV flood control structures due to earlier onset and more prolonged duration of surge above a critical elevation.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶10, 12(a), 19-27, 29-32; Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4.

482.   Defendant further ignores the destructive role of wave side attack—before overtopping—in the failure of the EBSBs along Reach 2.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶5(b).

483. There are numerous flaws in the computer modeling by Defendant's three experts—Westerink, Ebersole, and Resio—including use of a Beta version of ADCIRC (SL-15), random results, inaccurate input data, and others.  Exh. 93, Kemp Supp. Decl. (Jan. 2009) at pp. 4-6, 13-14; Exh. 94, Kemp Expert Decl. (Jan. 2009) at pp. 25-30; Exh. 82, Bea Expert Report. (Jan. 2009) at pp. 167-199; Exh. 106, Vrijling, Joint declaration, Vrijling, Kok, de Wit, and Gautier concerning wave and flow modeling New Orleans -- MRGO for Hurricane Katrina, August 2005 (Jan. 2009) at p. 12.

## DAMAGE TO LPV STRUCTURES CAUSED BY MR-GO'S EXACERBATION OF STORM PARAMETERS

### Catastrophic Failures

484.   The LPV flood protection system failed catastrophically, producing the single most massive failure of an engineered system in United States history.  Over 170 of the 350 miles of the LPV system were either destroyed or damaged at 50 different locations, primarily as a result

of overtopping..  Exh. 3, ILIT at p. 12-10; Exh. 26, Decision Making Chronology at p. 2-17 Exh. 4, Team Louisiana Report at p. 3.

485. As set forth below, the major breach sites in New Orleans and St. Bernard Parish from Hurricane Katrina are depicted below.  Exh. 20, IPET at I-8-1 to I-8-7; Figures 8-1, 8-2, 8-3, Table 8-1.



Figure 8-1. Distribution of breaches, Orleans East Bank.

Exh. 20, IPET at p. I-8-1, Fig. 8-1.



Figure 8-2. Distribution of breaches, New Orleans East.

Exh. 20, IPET at p. I-8-2, Fig. 8-2.



Figure 8-3. Distribution of breaches, St. Bernard.

Exh. 20, IPET at p. I-8-3, Fig. 8-3.

**Table 8-1**
**Character of Breach Sites and General Repairs**

| Breach/Project ID | Breach Location Description | Damage Description | Repair Description |
|---|---|---|---|
| IHNC01 | East Side N. Claiborne Ave to Florida Ave | There are approximately 4,000 lineal ft of concrete I-wall flood barrier. Damages consisted of a breach of the floodwall immediately south of Florida Ave (250') and a breach approximately 100 yds north of Claiborne Ave (850') with the remaining portions of the floodwall having areas of severe scour and tilting of the I-wall. | Repair work includes replacement of the concrete I-wall with a concrete T-wall, supported on H-piles and sheet piling. |
| IHNC02 | West Side France Rd ramp to Benefit St | This section consists of concrete I-wall. The damage in this area consisted of a breach of the floodwall at the container terminal along France Rd. There was also heavy scour of the floodwall. | Repair work consists of removing approximately 1,300 lineal ft of the damaged concrete I-wall and replacing it with new concrete L-wall, supported by steel H-piles and longer steel sheet piles. |
| IHNC05 | West Side Vicinity France Rd ramp to IHNC | This section consists of approximately 1,600 ft of existing levee and concrete floodwall that was breached and experienced severe scour. | Repair work consists of replacement with a new concrete T-wall. |
| IHNC07 | East Side, Lock to Claiborne | Approximately 1,400 lineal ft of concrete I-wall flood barrier was damaged by scour. | Repair work consists of scour repair. |
| NOE01 | Back Levee, Michoud Levee to CSX RR | Approximately 4.3 miles of levee experienced severe scour. | Repair consists of rebuilding the existing levee back to its constructed grade with 680,000 cu yd of earthen material, seeding and fertilizing |
| NOE02 | Pump Station No. 15 | The existing steel sheet-pile wall was severely damaged and the levee experienced severe scour. | Repair work consists of removing the damaged steel sheet pile wall, installing a new concrete T-wall, filling in sour holes and bringing the damaged levee back up to pre-Katrina elevation. |
| NOE03 | Air Products Site | The existing concrete I-wall and steel sheet-pile wall were severely damaged and the levee experienced severe scour. | Repair work consists of removing the damaged concrete I-wall and steel sheet-pile wall, filling in scour holes, installing a new concrete I-wall, and raising the damaged levee to pre-Katrina elevations, seeding and fertilizing. |
| NOE04 | Citrus Back Levee Floodwall | The existing concrete I-wall was severely damaged and the levee experienced severe scour. | Repair work consists of removing the damaged concrete I-wall sections, filling in the scour holes, regrading the damaged levees, constructing a new concrete wall, and putting in an earthen stability berm on the landside of the wall, seeding and fertilizing. |
| NOE05 | Floodgate at CSX Tracks | The existing concrete wall and railroad closure gate were severely damaged and the levee experienced severe scour. | Repair work consists of removing the existing concrete wall and railroad closure gate, filling the scoured areas, constructing a new closure gate and new concrete T-walls and I-walls, placement of rip rap, concrete slope paving and concrete roadway. |

Volume I  Executive Summary and Overview – Technical Appendix
This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

I-8-5