**Table 8-1**
**Character of Breach Sites and General Repairs**

| Breach/Project ID | Breach Location Description | Damage Description | Repair Description |
|---|---|---|---|
| OEB02 | 17th St. Canal floodwall | Damage to this section consists of a 455-ft breach of the floodwall on the east side of the canal. | Repairs involved replacing 455 ft of reinforced concrete T-wall. The T-wall consists of a reinforced concrete base slab with a reinforced concrete wall extending up to elevation +14.0 ft. |
| OEB04 | London Ave. Canal floodwall at Mirabeau Blvd | Damage to this section consists of a 425-ft breach of the floodwall on the east side of the canal. | Repairs involved replacing 425 ft of reinforced concrete T-wall. |
| OEB06 | London Ave. Canal floodwall at Robert E. Lee | Damage to this section consists of a 720-ft breach of the floodwall on the west side of the canal. | Repairs involved replacing 720 ft of reinforced concrete T-wall. |
| STB04 | MRGO between Bayou Bienvenue and Bayou Dupre Control Structure | Damage to this section consists of a 6.2-mile reach of levee that lost approximately 12 ft of levee elevation. Additionally, a total of 4,300 ft of sheet-pile floodwall was badly damaged. | Repairs include restoring the entire levee reach to the design grade elevation, which requires the placement of an estimated 1,040,000 cubic yards of fill material. Replace sheet-pile walls with 30' sheets. |
| STB03 | MRGO East of Bayou Dupre | Approximately 12 ft of levee elevation was lost in an 8,000 ft section of levee immediately southeast of Bayou Dupre. Approximately 8 ft of levee elevation was lost in a 2,500-ft section of levee southeast of Bayou Dupre. Approximately 700 ft of sheet-pile floodwall was damaged. | The entire levee reach will be restored to the design grade elevation, requiring the placement of an estimated 1,120,000 cubic yards of fill material. The damaged sheet pile floodwall will be replaced. |
| STB05 | Paris Road floodgate | Damage to the closure structure included scour of the structural backfill resulting from overtopping of the closure panels and the impact from a loose barge. | Repair involves filling structural and structural backfill scour adjacent to floodwalls and four closure structures. |
| STB06 | Bayou Dupre Control Structure | Adjacent section of the floodwall failed and the fill around other sections of floodwalls was eroded away due to overtopping. Mechanical and electrical systems were also damaged. | Repair involves repair of floodwall and structural backfill of the control structure, including a significant scour hole to be filled with 17,500 cubic yards of granular backfill and protected with grouted riprap. |
| STB07 | Bayou Bienvenue Control Structure | Damage resulted from a loose barge hitting an adjacent floodwall and the fill around the floodwall eroding due to overtopping. Mechanical and electrical systems were also damaged. | Repair involves repair of floodwall and structural backfill of the control structure, including a significant scour hole to be filled with 28,600 cubic yards of granular backfill and protected with grouted riprap. |
| STB08 | MRGO to Caernarvon Levee | Damage included scour on the backside of the about 10.8 miles of levee. | Repair involves filling the scour areas. |
| P03 | NOV East Bank, Reach C | Damage consisted of approximately 2.6 miles of crown erosion and <500 ft of riverside and landside slope erosion was identified. The back levee sustained a complete breach with associated scour hole. A ground survey shows that the breach was 190 ft wide at the levee centerline and the sour hole extends to -21 NGVD. | Repair involves the entire 16-mile east bank back levees, including clearing and grubbing, excavation, placing semi-compacted fill and armor stone, fertilized, seeding and other incidental work. |

This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

**Table 8-1**
**Character of Breach Sites and General Repairs**

| Breach/Project ID | Breach Location Description | Damage Description | Repair Description |
|---|---|---|---|
| P07 | MRL Levee, City Price to Port Sulphur | Damage consisted of 0.6 mile of riverside paving block damage and 3.1 miles of minor landside slope erosion. | Repair involves hauling, placing and compacting fill and crushed limestone, fertilizing and seeding. |
| P08 | MRL Levee, Port Sulphur to Fort Jackson | Damage consisted of paving block damage, crown erosion, landside slope erosion, riverside slope erosion, and erosion at the ends of and behind sheet pile and concrete capped hurricane protection walls (2.8 miles). | Slope and crown scour will be repaired. |
| P15 | NOV Empire Flood Gate | The back levee sustained ruinous damage to sheetpile walls in the vicinity of the Empire lock and canal, and to the levee crown on either side of the sheet pile. The Empire flood gate was stuck in the open position during Hurricane Katrina. | Mechanical, electrical, and structural repairs will be made to the Empire Flood Gate. |
| P17 | NOV Enlarged Levees, Buras Area | Hurricane protection floodwalls were damaged | Damaged floodwalls will be replaced. |
| P18 | NOV Back Levee Repair, Reach B-1 | Damage consisted of crown and slope scour along an 11-mile reach from Empire to Fort Jackson. Severe damage occurred at places where hard points intersected - at wing walls for Sunrise and Hayes pumping stations, and at a pipeline crossing. | Slope and crown scour will be repaired. |
| P19 | NOV Levee, Above City Price and Reach A | Damage involved crown and slope scour as well as levee breaches at two locations near Naim. One breach occurred where a pipeline passed thru the embankment, while the other breach occurred where a deep canal lay just inside the levee toe. | Slope and crown scour will be repaired. |
| P20 | NOV West Bank Back Levee Floodwall | Damage involved a levee breach near Hayes Pump station and a breach at the Sunrise Pumping Station. The breach at the Sunrise pumping station destroyed about 200-ft of structural T-wall. The breach was 180 ft wide, 500 ft long and included a 25-30-ft deep scour hole. | T-walls will be replaced and additional sheet-pile wing walls will be constructed at the Hayes Pumping Station. |
| P21 | West Bank Back Levee Repairs | Floodwalls (sheet pile I-walls) were damaged at Freeport, Home Place Marina, Gainard Woods Pump Station, and Diamond Pump Station. The Diamond Pump Station sustained erosion at the ends of the concrete transition wall. | Floodwalls will be repaired |
| P22 | Woodland Emergency Repair | Damage involves a levee breach at Woodland on the west bank of the Miss. River. | The levee will be repaired. |
| P25 | West Pointe a la Hache Siphon Repair | Damage involves a levee breach. | The damaged levee section will be reconstructed, sheet pile cutoff walls will be extended upstream and downstream of the siphon, and the slope pavement on both sides of the crown of the levee will be replaced. |

Exh. 20, IPET at pp.. I-8-5 through I-8-7, Table 8-1.

148

**Overtopping and Breaching**

486.   A "breach" of a flood protection work refers to when the section of a flood protection work and/or the pre-storm crown elevation erodes away or is washed away and no longer exists.  By contrast, overtopping entails storm water crossing over the crown elevation of a flood protection work to the protected side.  Exh. 27, Varuso Depo. at 159:22-160:12.

487.   Overtopping can cause structure failure by the overflowing water eroding the soil on the protected side and destabilizing the structure.  Exh. 77, Bea Tech. Report No. III (July 2008) at p. 10.

488. As depicted in Figure 26 below, the east side of Greater New Orleans that faces Lake Borgne experienced a higher level of storm surge during Katrina than Orleans Metro south of Lake Pontchartrain.  The surge from Lake Borgne propagated as a high velocity bore through Reach 1/GIWW to the IHNC, causing maximum water levels in that canal to rise to 15.7 ft NAVD88 (2004.65), while surge along the lakefront to the west was 2 to 4 ft lower.  The highest surges predicted and observed for Greater New Orleans were in the throat of the "funnel" east of Paris Road.  Overtopping LPV structures in the Reach 1/GIWW connection to the IHNC west of Paris Road provided the majority of the water that flooded New Orleans East.  The Reach 1/GIWW LPV structures east of the junction are the only LPV structures that should have experienced extensive overtopping during Katrina.  Unfortunately for St. Bernard, the Reach 2 LPV structures did not wait for overtopping, but were largely destroyed before they could be overtopped, at an earlier stage in the storm sequence.  Exh. 4, Team Louisiana Report at pp. 46-47; Exh. 91, Kemp Expert Report (July 2008) at pp. 95-158; Exh. 71, Bea Expert Report (July 2008) at pp. 6-7, 12.



Figure 26.  LSU ADCIRC maximum surge elevation (ft) and current velocity (fps) in parentheses based on the LSU hindcast. The arrow indicates the point at which the surge and velocity is reported.   The final number is the surge elevation (ft) forecast 39 hours prior to landfall. (Mashriqui etal 2006)

Exh. 4, Team Louisiana Report at p. 46, Fig. 26.

489.   The overtopping waves created very high water velocities down the back sides of the LPV structures, reaching 10 to 15 ft/sec.  These velocities were two to three times those experienced on the water side of these LPV structures (4 to 6 ft/sec).  Since the potential for erosion is related to the cube of velocity, it is no wonder that the back sides of the levees—especially where they were comprised of erodible materials—were scoured away, leading in many cases to complete breaching.  There is a close correlation between the degree of breaching from overtopping and erosion and the types of materials.  For example, in New Orleans East, the correspondence of breaching and hydraulic fill constructed levees is obvious.  Exh. 20, IPET at p. I-42; Figure 19a, 19b (pp. I-44, I-45)

150

490.   Some overtopping of the LPV structures was expected due to the intensity of the storm, which would result in localized flooding.  However, the catastrophic flooding was caused by the massive and numerous failures (breaches) of levees and floodwalls resulting largely from the sustained overtopping and failures before overtopping due to wave attacks.  Exh. 3, ILIT at p. F-22; Exh. 72, Bea Decl. No. I (July 2008) at pp. 141-42; Exh. 94, Kemp Expert Report (Jan. 2009) at p. 29.

491.   As demonstrated above, a primary reason (and substantial factor) for the sustained overtopping was the amplified surge and intensified waves caused by the MR-GO's combined effects which in turn were caused by the ship channel's defects.  Exh. 81, Bea Expert Report (Jan. 2009) at pp. 3-16, ¶¶1-14.

492.   Similarly, a primary reason (and substantial factor) for the breaches of LPV structures was the overtopping and wave attacks on the unprotected (water) sides caused by the MR-GO's combined effects which in turn were caused by the MR-GO's defects.  Exh. 81, Bea Expert Report (Jan. 2009) at pp. 3-16, ¶¶1-14.

493.   Overtopping was most severe on the east side of the flood protection system as the waters of Lake Borgne were driven west towards New Orleans, and also farther to the south, along the lower reaches of the Mississippi River.  Overtopping of flood protection works along the IHNC and Reach 1 and Reach 2 of the MR-GO was a major source of flooding of populated areas in New Orleans East, St. Bernard Parish and the Lower Ninth Ward.  Significant overtopping and erosion—plus wave erosion before overtopping—produced numerous breaches in these areas.  Overtopping caused erosion of the soil on the protected (population) side of the flood protection works and then a failure of the structure and even more extensive flooding.  The magnitude of overtopping was less severe along the IHNC and along the western portion of the

MR-GO, but this overtopping again produced erosion and caused additional levee failures.  Exh. 91, Kemp Expert Report (July 2008) at pp. 2-3; Exh. 94, Kemp Expert Report (Jan. 2009) at p. 3, ¶6; Exh 71, Bea Expert Report (July 2008) at pp. 6-22, ¶¶1-22; Exh. 81, Bea Expert Report (Jan. 2009) at pp. 3-16, ¶¶1-13; pp. 27-34, ¶¶24-42; Exh. 29, Dalrymple Expert Report at pp. 6-7; Exh. 4, Team Louisiana Report at p. 133, Table 15.

494.   As Plaintiffs' experts have concluded, if the breaching of LPV structures or the overtopping of LPV structures along the MR-GO had not occurred, there would have been only minor inundation in New Orleans East, Lower 9th Ward, and St. Bernard Parish, but not catastrophic flooding. Exh. 91, Kemp Expert Report (July 2008) at pp. 2-3; Exh. 94, Kemp Expert Report (Jan. 2009) at p. 3, ¶6; Exh 71, Bea Expert Report (July 2008) at pp. 6-22, ¶¶1-22; Exh. 81, Bea Expert Report (Jan. 2009) at pp. 3-16, ¶¶1-13; pp. 27-34, ¶¶24-42.

495. If there had been no overtopping or breaching of flood protection works throughout the LPV system and there was only the 12 inches of recorded rainfall, there would have been some localized, but not catastrophic flooding.  Exh. 28, Dalrymple Depo. (Sept. 18, 2007) at 111:3-17; Exh. 91, Kemp Expert Report (July 2008) at p. 16.

## **Reach 1**

496.   The maximum surge at the IHNC during Katrina was approximately 16 feet.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at p. 17, Table 1.

497.   The Citrus Back Levee along the north side of Reach 1/GIWW) east of Paris Road—which was ranged from about 15.5 feet to 18 feet—was overtopped primarily by waves but was not breached and proved to be quite resilient.  The design level of protection of the Citrus Back Levee to the west of Paris Road was approximately 3 feet lower, and perhaps as low as 12.5 feet in places.  It experienced a surge of over 16 feet with some unanticipated waves.

The LPV structure here held up well under several feet of overtopping, but I-walls integrated into the levee failed as a result of back scour.  Exh. 4, Team Louisiana Report at p. 134; Exh. 74, Bea Expert Decl. III (July 2008) at pp. 12-25; 144-46, ¶¶134-38.

498.   The sections of the Citrus Back Levee along the north side of Reach 1 of the MR-GO—which were overtopped but not severely eroded—were also constructed from more cohesive, less erodible, and more compacted soils than the soils used for the Reach 2 and New Orleans Back Levee flood protection works.  Exh. 74, Bea Expert Decl. III (July 2008) at pp. 20-21.

## Reach 2

499.   The maximum surge along Reach 2 was 18 feet.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at p. 17, Table 1.

500.   Along Reach 2, failures of LPV structures were caused by either breaching by waves before overtopping or breaching by a combination of waves and surge.  Exh. 72, Bea Expert Decl. I (July 2008) at pp. 141-42; Exh. 94, Kemp Expert Decl. (Jan. 2009) at pp. 26-29.

501.   When overtopping occurred, there was associated breaching of the flood protection works, leading to massive erosion of the structures and water pouring into St. Bernard Parish.  Exh. 28, Dalrymple Depo. (Sept. 18, 2007) at 119:14-23.

502.   The surge water went over the flood protection works, eroded the bank materials, and then the structures failed.  There were 50 breaches along Reach 2 alone.  Some of the crowns along a 12-mile stretch of Reach 2 eroded 10 feet below the crowns existing before Hurricane Katrina.  Exh. 28, Dalrymple Depo. (Sept. 18, 2007) at 77:13-17; 155:24-156:13; Exh. 27, Varuso Depo. at  72:19-73:8; Exh. 91, Kemp Expert Report (July 2008) at p. 159-184.

503.   During Hurricane Katrina, the LPV structures along Reach 2 were overtopped anywhere between one and one half feet and five feet above the existing elevation, and this significant amount of overtopping caused the erosion and subsequent breaches.  Exh. 94, Kemp Expert Decl. (Jan. 2009) at pp. 33, 35.

504.  On the south side of the funnel along the MR-GO, IPET interprets the maximum surge as being more uniform, ranging from 17.5 to 19.5 ft MSL.  IPET adds between 1 and 3 feet for waves, giving a combined water level that ranges from 19.5 to 23.0 ft MSL. The design elevation for the levee crown in this area is 17.5 ft MSL, and the actual elevation ranged from 15 to 18 ft MSL, so the stage was set for general overtopping.  This overtopping, and the wave attack that preceded it, destroyed the Reach 2 LPV structures, causing complete loss in some places and significant degradation in most places as depicted below in Figure 23.



Figure 23.   MRGO levee degradation from near junction with GIWW to Verret (derived from IPET 2006b, IV-16-2 to IV-16-10).  Subtract 0.6 ft for MSL.

Exh. 4, Team Louisiana Report at pp. 39-40.

505.   South of the Reach 1/GIWW channel that forms the throat of the funnel, the Chalmette LPV structures west of Paris Road were up to 4 feet deficient in spots, but, like the

Citrus Back Levee on the north side of Reach 1, they held up well under 4 to 6 feet of overtopping. The extent of the overtopping was exacerbated by the MR-GO deficiencies, and hastened the filling of the St. Bernard wetland buffer to the south, but this 7 mile LPV system reach did not breach.  Exh. 4, Team Louisiana Report at p. 134

506.   The most severe EBSB degradation on Reach 2 occurred in segments adjacent to where the highest waves were predicted to be immediately east of Bayou Dupre west to Bayou Bienvenue.  Exh. 94, Kemp Expert Decl. (Jan. 2009) at p. 29.

507. Dr. Bea completed a study of pre and post-Hurricane Katrina LIDAR surveys of Reach 2 breach features that included model-supported erosion analyses for a number of representative segments.  Dr. Bea concluded that:

(a)      approximately 35 percent of the man-made flood defense structure along the Reach 2 alignment was breached by waves prior to surge overtopping;

(b)      another 47 percent of the LPV structure was breached by a combination of waves and surge; and

(c)      18 percent of the structure was overtopped but did not breach (sheet pile repair sections, Dupre and Bienvenue navigation structures, and some EBSB segments).

Exh. 72, Bea Expert Decl. I (July 2008) at pp. 141-42.

508.   Dr. Bea identified which parts of the Reach 2 flood defense alignment were damaged by waves or waves and surge.  Significantly, Dr. Bea could not identify any damages segment without some signature of wave-induced erosion, although he did find that 18 percent of the structure was overtopped by surge without damage.  When Dr. Bea investigated undamaged segments using LIDAR and field surveys, he often found wave dissipating vegetated marsh platforms backed by a band of woody vegetation at a slightly higher elevation between the

155

channel edge and the toe of the flood protection structure.  Exh. 72, Bea Expert Decl. I (July 2008) at pp. 141-42; Exh. 94, Kemp Expert Decl. (Jan. 2009) at p. 29.

509.    Plaintiffs' hydrodynamic experts have demonstrated the MR-GO's uncontrolled widening and deepening of the channels into the toe of the LPV structures on Reach 2 strongly influenced the severity of the wave climate experience at the structure's toe.  Exh. 94, Kemp Expert Decl. (Jan. 2009) at p. 27.

510.    The maximum surge elevation in part of Reach 2 EBSBs may have been fairly uniform, but the wave climate was variable.  Exh. 94, Kemp Expert Decl. (Jan. 2009) at p. 27.

511.    Along the Reach 2 LPV structures, numerous failures occurred before overtopping due to erosive wave action.  Exh. 71, Bea Expert Report (July 2008) at pp. 13-14, Exh. 72, Bea Expert Decl. I (July 2008) at pp. 51-58, 86-88, 118-123, 132-142, Exh. 74, Bea Expert Decl. (July 2008) at pp. 67-74, 105-109, 117-119, 123-128, 140-144; Exh. 91, Kemp Expert Report (July 2008) at pp. 159-179.

512.    The maximum surge at the Bayou Bienvenue structure was 17.8 feet.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at p. 17, Table 1.

513.    The south end of the Bayou Bienvenue navigation structure failed because of instability attributable to seepage.  Exh. 71, Bea Expert Report (July 2008) at pp. 20-21; Exh. 72, Bea Expert Decl. I (July 2008) at pp. 147-51, 156-61; Exh. 74, Bea Expert Decl. III (July 2008) at pp. 138-40.

514.    The maximum surge at the Bayou Dupre structure was 17.6 feet.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at p. 17, Table 1.

515.    The north end of the Bayou Dupre navigation structure failed because of surge and wave overtopping erosion of the interface.  Exh. 71, Bea Expert Report (July 2008) at pp. 20-21;

Exh. 72, Bea Expert Decl. I (July 2008) at pp. 147-51, 156-61; Exh. 74, Bea Expert Decl. III (July 2008) at pp. 138-40; Exh. 75, Bea Technical Report I (July 2008) at pp. 68-86, 87-95, and 95-96.

516. If Reach 2 EBSBs had been overtopped without major breaching, floodwaters would have filled the Central Wetlands Unit bowl but Chalmette and the Lower 9th Ward would not have been flooded by storm surge waters.  The volume of water from overtopping of the LPV structures would not have overtopped the Forty Arpent levee.  Peak storm surge heights, above the height of the Reach 2 LPV structures, existed only for a few hours.  If the Reach 2 system had withstood this brief peak water level, as did many other structures in the area which were not subjected to all the negative impacts of the MR-GO channel, much of the flooding of the populated areas would not have occurred.  Exh. 81, Bea Expert Report (Jan. 2009) at p. 15, ¶13.



**Figure 11** – Flooding of St Bernard Parish due to Hurricane Katrina and due to a Neutral MRGO ("do no harm") Hurricane Katrina.

Exh. 83, Bea Technical Report I (Jan. 2009) at p. 11, Fig. 11.

517.   Early failure of the LPV structures along Reach 2 allowed the 32,000 acre wetland buffer between the MR-GO and 40 Arpent Canal Back Levee (Central Wetlands Unit) to fill and overtop the 40 Arpent Canal Back Levee while the surge was still rising, resulting in catastrophic flooding in St. Bernard Parish to an elevation of at least 11 feet (NAVD88) as well as catastrophic flooding in the Lower 9th Ward.  Exh. 81, Bea Expert Report (Jan. 2009) at p. 15, ¶13; Exh. 83, Bea Technical Report I (Jan. 2009) at p. 11; Exh. 4, Team Louisiana Report at p. v.

518. Overtopping of resilient Reach 2 LPV structures at the design level (MSL) would have delivered only about half of the volume necessary to fill the 32,000 acre wetland (Central Wetlands Unit) behind, and initiate overtopping of, the local 40 Arpent Canal Back Levee.  Had these LPV structures failed at a later stage in the surge hydrograph, or failed less completely, the storage capacity of the Central Wetlands Unit would likely have absorbed the discharge across the LPV structure alignment for long enough to save Chalmette and the rest of St. Bernard Parish and Lower 9th Ward from the disastrous flooding that occurred across the local 40 Arpent Canal Back Levee.  Exh. 4, Team Louisiana Report at p. 135; Exh. 91 Kemp Expert Report (July 2008) at pp. 63, 66, 146.

## IHNC

519.   The maximum surge height in the IHNC was 17.5 feet  during Hurricane Katrina as shown in the "Katrina As Was" conditions (Scenario 1).  Exh. 90, Bea Supp. Decl. (Oct. 2008) at p. 17, Table 1.

520.   Under the "Neutral MR-GO" conditions (Scenario 2C), the maximum surge height in the IHNC would have been 14.5 feet—three feet lower than the actual maximum surge height during Hurricane Katrina.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at p. 17, Table 1.

521.   The design elevation of the LPV structures along the IHNC was 14.8 feet.  Exh. 73, Bea Expert Decl. II (July 2008) at p. 28.

522.   The actual elevation of the LPV structures along the IHNC was between 12-12.5 feet during Hurricane Katrina.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at p. 17, Table 1.

523.   All of the LPV structure reaches exposed to the Lake Borgne surge system, including those along the IHNC, experienced overtopping.  If the IHNC LPV structures had been at the design elevation, they should have experienced less than 1 foot of overtopping at peak surge, rather than the 1.5 to 3.0 feet that occurred. This would have prevented some of the breaches and transition failures.  Exh. 4, Team Louisiana Report at pp. 133-34.

524.   Overtopping of the LPV system by Katrina occurred along nearly all portions of the IHNC. There were four breaches in the protection system, two on the east side and two on the west side. The east side breaches are both located in the Lower 9th Ward neighborhood and the west side breaches are both in the vicinity of France Road and Benefit Street.  Exh. 20, IPET at p. III-439.

525.   Defendant's experts have concluded that the failure of the LPV floodwall at the southern end of the east side of the IHNC ("South Beach")—the larger of the two breaches—was caused (and preceded) by surge water pressure imposed on the LPV structure and overtopping and the resulting erosion of the soil on the protected side of the LPV floodwall.  Exh. 81, Bea Expert Report, Summary (Jan. 2009) at pp. 27-28.

526.   The South Breach developed at a water level of 12 to 14 feet.  Exh. 74, Bea Expert Decl. III (July 2008) at p. 148, ¶141.

527.   The overtopping of this LPV floodwall at the southern end of the east side was caused in part by the incremental three feet of surge caused by the "funnel effect," and was a

contributing cause of the South Breach.  Exh. 72, Bea Expert Decl. No. II (July 2008) at p. 15, ¶25; Exh. 81, Bea Expert Decl. (Jan. 2009) at p. 6, ¶7.

528.   The South Breach developed from a combination of causes, including seepage and hydraulic uplift effects caused by the EBIA site during excavation and backfilling work and amplified surge in the IHNC caused by the "funnel effect" which increased LPV structure overtopping intensities and devastation, thereby increasing the protected (back) side erosion.  Exh. 81, Bea Expert Report (Jan. 2009) at pp. 28, ¶29.

529.   Both parties' experts therefore agree that overtopping of the LPV structures was a contributing cause of the South Breach.  Exh. 82, Bea Expert Decl. (Jan. 2009) at p. 105, ¶147.

530.   Defendant's experts have concluded that the failure of the LPV floodwall at the northern end of the east side of the IHNC ("North Beach") developed very early during the morning of August 29th as a result of lateral instability due to surge water pressure imposed on the LPV structure and the reduced cross section of the LPV structure at this location before overtopping.  Exh. 82, Bea Expert Decl. (Jan. 2009) at p. 104, ¶146.

531.   The North Breach developed at a water level of approximately 9 feet.  Exh. 73, Bea Expert Decl. II (July 2008), at p. 99, ¶107.

532. Both Plaintiffs' and Defendant's experts agree that the North Breach developed before overtopping.  Exh. 82, Bea Expert Decl. (Jan. 2009) at p. 104, ¶146.

**40 Arpent Canal Levee**

533.   The storm surges produced by Hurricane Katrina passed over the Reach 2 LPV structure into the Central Wetlands Unit, then filled up the bowl, overtopped the 40 Arpent Canal Levee, and catastrophically flooded the St. Bernard/Lower 9th Ward polder.  Exh. 20, IPET at p. IV-258.

534.   The 40 Arpent Canal Levee—southwest of Reach 2 of the MR-GO—is the nonfederal flood protection work intended to protect the adjoining St. Bernard population.  This local levee—with a design crest elevation is between 7.5 and 10 feet (MSL)—was severely overtopped along much of its length during Katrina.  This structure suffered relatively little erosion damage even though its highest points were lower than the EBSBs along Reach 2.  This local flood protection work was composed of significantly more erosion resistant materials (primarily clay) than Reach 2 EBSBs.  Exh. 31, Bea 702c Expert Report (Sept. 2007) at p. 85, ¶ 112.

535.   The 40 Arpent Canal Levee, while being overtopped in both Hurricanes Betsy and Katrina, survived largely intact because of the well constructed and grass sodded embankment and the limited protection afforded by the forested wetlands in a sizeable area seaward of the developed area.  MSJ Exh. 13, Theis Expert Report, ¶ 28

536.   The healthy wetlands in front of large portions of the earthen 40 Arpent Canal Levee had an anti-erosion or buffering effect in protecting this levee during Hurricane Katrina because the wetlands absorbed some of the energy of the surge and waves.  Exh. 28, Dalrymple Depo. (Sept. 18, 2007) at 108:1-16.

537. Similarly, the 11 miles of the Chalmette Extension—turning south from the MR-GO and to the west to rejoin the main east bank levee of the Mississippi River—was fronted by wetlands and did not experience the kind of wave attack that affected the Reach 2 EBSBs.  Those structures were also built more robustly with a river sand core covered by a substantial thickness of hauled clay. This levee experienced overtopping in places where it was up to 4.5 feet deficient in actual elevation relative to the design, but there was no breaching and very little damage overall. The volume of water contributed by overtopping of this reach was negligible compared

to what came across the failed Reach 2 alignment. The major difference in performance of the LPV structures was the better protection afforded by natural vegetation and no wave attack caused by the Reach 2 channel. Exh. 4, Team Louisiana Report at p. 135, Figure 44, 89a; Exh. 98, Morris Expert Report (July 2008) at p. 10.

## SOURCES OF FLOODING

538. The depth of floodwaters at Plaintiffs' property—what it was during Katrina and what it would have been without the MR-GO's impact on LPV structures (Scenario 2c)—is as follows:

|  | Actual | Scenario 2c |
|---|---|---|
| Norman and Monica Robinson | 13' | <2' |
| Lattimore and Lattimore & Assoc. | 8' | <1' |
| Lucille and Tony Franz | >8' | <0.5' |
| Tanya Smith | >8' | 1' |

Exh. 1771, Delft University, Comparison flood depth development between Katrina event and Scenario 2C (Jan. 2009).

539. Based on the foregoing data, the MR-GO was a substantial factor in the catastrophic flooding of Plaintiffs' property. Indeed, none of the Plaintiffs' property would have sustained catastrophic flooding but for the MR-GO's defective conditions.

540. Rainfall at Plaintiffs' property was negligible compared to the floodwaters and did not catastrophically flood their property. Exhs. 110-114, Crawford Expert Reports (April 2008).

541. Plaintiffs' property was not flooded due to pump failures or other reasons.

542. Hurricane Katrina was nominally a storm that fit most SPH criteria. Sustained winds over the Greater New Orleans metropolitan area were that of a Category 1 or Category 2 strength. Exh. 1600, Tropical Cyclone Report (Dec. 2005) at p. 8.

543.   Because the eye of the counterclockwise-moving hurricane passed to the east of New Orleans, the hurricane threw severe wind loads and storm surges west onto an edge of the LPV flood protection systems that protected the northern edge of the Ninth Ward and St. Bernard Parish, and excess surge easily slid over the flood control structures.  The surge overtopped large sections during the morning of August 29th east of New Orleans, in Orleans and St. Bernard Parish, and it also pushed water up Reach 1/GIWW and into the IHNC.  Exh. 22, *A Failure of Initiative*, p. 94; Exh. 26, Decision Making Chronology, p. 3-36.

544.   As the eye approached New Orleans, Katrina shoved a 14 to 17 foot storm surge up the "funnel" created by the convergence of the south bank of the MR-GO and the north bank of Reach 1/GIWW focusing a torrent of water on the IHNC.  This caused the first flooding.  Exh. 23, *A Nation Still Unprepared* at pp. 53-55, Exh. 7, Kemp §702c Expert Report (Sept. 2007) at pp. 25-32 at ¶¶ 32-42.

545.   Upon reaching Lake Pontchartrain, Katrina's winds produced a southward surge of lakewater along the northern edges of the Orleans East Bank and New Orleans East polders, with overtopping and a breach in New Orleans East, adjacent to the Lakefront Airport.  Exh. 23, *A Nation Still Unprepared* at pp. 53-55, Exh. 7, Kemp 702c Expert Report (Sept. 2007) at pp. 25-32 at ¶¶ 32-42.

546.   The surge from Lake Borgne—and later the surge from Lake Pontchartrain—streamed into the Industrial Canal and the MR-GO channel.  Here, too, the floodwaters overflowed the levees.  Exh. 23, *A Nation Still Unprepared* at pp. 53-55, Exh. 7, Kemp 702c Expert Report (Sept. 2007) at pp. 25-32 at ¶¶ 32-42.

547.   Some of the floodwaters into Greater New Orleans also emanated from the Gulf of Mexico via Reach 2 because there was no surge barrier.  The Bretschneider and Collins Report

in 1966 acknowledged that Reach 2 could be a surge conduit.  In 1988, the Corps recognized that

the Reach 2 channel itself could be a conduit for catastrophic flooding of Greater New Orleans.

Exh. 9, 1988 Recon Report at Comment 2, LMVD; Exh. 68, Bretschneider and Collins Report

(Sept. 1966) at p. 4.

548. The peak storm surge versus design elevation at the time of Hurricane Katrina was

as follows:

|  | Design Elevation | Peak Surge |
|---|---|---|
| Chalmette Loop | 13 to 18 ft | 15.5 to 18.7 ft |
| IHNC | 13.5 ft | 15 ft |
| Citrus Back Levee | 14 to 15 ft | 15 to 17 ft |

MSJ Exh. 20, IPET, pp. IV-2, IV-4, IV-27, IV-257, V-13-38.

549.   Over 50 years ago, the Corps recognized—and IPET confirmed more recently—

that from the perspective of storm surge propagation into the IHNC and New Orleans

Metropolitan area, the critical section of the MR-GO channel is the one where the GIWW and

Reach 1 occupy the same channel because it is through this connection that Lakes Pontchartrain

and Lake Borgne are hydraulically connected to one another via the IHNC. A water level

gradient is established within the IHNC and the GIWW/Reach 1; the gradient is determined by

the storm surge levels in both lakes. The presence of an open channel is the key factor. The

hydraulic connectivity existed prior to construction of the MR-GO due to the presence of the

GIWW channel.  Exh. 20, IPET at p. IV-258; Exh. 10, House Doc. No. 231 at p. 17.

550.   The Corps recognized in 1988 that "the storm surge that inundated St. Bernard

Parish in 1965 and again in 1969 because of the wind direction during the storm, most likely

came from the east across Lake Borgne and the Biloxi Marsh . . . ."  Exh. 193, Memorandum of

Cecil W. Soileau (Chief, Hydraulics and Hydrologic Branch, Commenting on Army Corps, Mississippi River-Gulf Outlet, St. Bernard Parish, Louisiana (Bank Erosion) at NED-256-57.

551.  The six-mile portion of the combined GIWW and Reach 1 is a 1,500 foot wide 40+ feet deep channel that connects the "funnel" with the IHNC.  The Team Louisiana Report called this stretch of the shipping channel "Hurricane Alley."  The highest surge observed in the Greater New Orleans was against the MR-GO levee in the funnel formed by the convergence of the levee systems built along the north bank of the Reach 1/GIWW and the south bank of the MR-GO.  The surge penetrated six miles into Greater New Orleans through the portion of the GIWW that was enlarged as part of the MR-GO project.  MSJ Exh. 4, Team Louisiana Report at pp. 28, 33, 59, Fig. 15; Exh. 91, Kemp Expert Report (July 2008) at pp. 95-148.

**Upper St. Bernard Parish**

552.   The flooding of upper St. Bernard Parish was caused by waters originating in Lake Borgne and Reach 2 overwhelming the MR-GO banks and flood protection works along Reach 2, passing to the west over the largely deteriorated wetlands (Central Wetlands Unit), overtopping the 40 Arpent Canal Levee and flowing into the population areas of Chalmette and the Lower 9th Ward.  Exh. 28, Dalrymple Depo. (Sept. 18, 2007) at 137:12-138:14; Exh. 53, Delft University Flood Report (July 2007) at pp. 38-41; Exh. 71, Bea Expert Report (July 2008) at p. 12.

553.   Eyewitnesses living in Chalmette on August 29, 2005 saw water flowing over the 40 Arpent Canal Levee at about 8:30 a.m.  Within a matter of minutes, over ten feet of water engulfed their homes.  Trial testimony of witnesses Glen Diaz and Donald Riley.

554.   This time of flooding Chalmette (about 8:30 a.m.) is the time estimated by Plaintiffs' experts.  Exh. 91, Kemp Expert Report (July 2008) at p. 63.

555. The waters that inundated St. Bernard Parish ponded to a high elevation of about 12 feet above mean sea level, destroying homes and businesses—including those of Plaintiffs Kent Lattimore, Tanya Smith, and Lattimore & Associates—at all elevations above sea level in the populated St. Bernard Parish.  Exh. 31, Bea 702c Expert Report (Sept. 2007) at p. 85, ¶ 111.

**New Orleans East**

556.   The New Orleans East polder is bounded on the south by Reach 1/GIWW, on the west by the IHNC, and on the north and east by Lake Pontchartrain and marshlands. Significant levee overtopping and breaches occurred along Reach 1/GIWW.  There were also a few breaches along the floodwall on the IHNC near I-10, as well as overtopping of the floodwall near the Lakefront Airport. Overtopping also occurred along the LPV structure at Lake Pontchartrain, but to a much lesser degree than on Reach 1/GIWW. Therefore, the New Orleans East area received floodwaters from all directions.  Exh. 20, IPET at p. IV-190; Exh. 53, Delft University Flood Report (July 2007) at pp. 26-36; Exh. 91, Kemp Expert Report (July 2008) at pp. 15, 38; Exh. 74, Bea Expert Decl. III (July 2008) at p. 14, ¶23; p. 152, Table 5.

557.   The flooding of the largely unpopulated area behind the New Orleans East Back Levee came from waters in the GIWW that overtopped and/or breached the earthen flood protection works on the north side.  Exh. 28, Dalrymple Depo. (Sept. 18, 2007) at 140:9-141:14; Exh. 91, Kemp Expert Report (July 2008) at pp. 15; Exh. 74, Bea Expert Decl. III (July 2008) at p. 14, ¶23; p. 152, Table 5.

558.   The catastrophic flooding of New Orleans East was caused by floodwaters from the Reach 1/GIWW funnel throat to the south.  In addition, some of the water that flooded this area likely came from breaches that occurred along the GIWW levee east of the Michoud Canal slip that filled the marshy area behind the federal levee and then overtopped the local levee.  Exh. 4,

Team Louisiana Report at pp. 71-72, Figure 19; Exh. 20, IPET, p. IV-190-93; Exh. 91, Kemp

Expert Report (July 2008) at pp. 15, 38; Exh. 74, Bea Expert Decl. III (July 2008) at p. 14, ¶23;

p. 152, Table 5.

559.   Breaches along Reach1/GIWW affecting the residential areas of New Orleans East

were much less extensive than those affecting the MR-GO LPV structures on the south side of

the funnel. As a result, most flooding was caused by overtopping that stopped once surge levels

dropped.  Exh. 4, Team Louisiana Report at pp. 71-72; Exh. 20, IPET at p. IV-190-93.

560.   The water level in New Orleans East initially got to +1.5 ft in some residential

areas close to sources of overtopping, and higher in the industrial land to the south, and in the

Bayou Sauvage marsh to the east.  Exh. 4, Team Louisiana Report at pp. 71-72; Exh. 20, IPET at

p. IV-190-93.

561.   The overtopping of Reach 1/GIWW began at about 6 a.m. and subsided around

midnight on August 30, 2005 when the peak surge receded.  Exh. 105, Vrijling Polder Flood

Simulations (July 2008) at pp. 17-19.

562. Once the surge abated on the Reach 1/GIWW and the IHNC, the surge water that

had entered New Orleans East then spread out, dropping in some areas and rising in others until

it reached equilibrium more than a foot below mean sea level.  Because Little Woods is so low,

however, with many homes between 8 and 12 feet below sea level, even flooding to this modest

elevation had catastrophic consequences.  Exh. 4, Team Louisiana Report at pp. 71-72; Exh. 20,

IPET at p. IV-190-93.

**Lower 9th Ward**

563. The floodwaters that catastrophically inundated the Lower 9th Ward—and the

property of Plaintiffs Anthony and Lucile Franz—came from three sources:

(a)      water in the Reach 2 channel that overtopped and breached the Reach 2 LPV structures, filled the Central Wetlands Unit, passed over the 40 Aprent Canal Levee, and poured into St. Bernard Parish and the Lower 9th Ward;

(b)      water in the IHNC that overtopped and breached the LPV structures at the North Breach and South Breaches on the eastern side; and

(c)      water from overtopping of the southern side of Reach 1/GIWW.

Exh. 105, Vrijling Polder Flood Simulations (July 2008) at pp. 25-28; Exh. 91, Kemp Expert Report (July 2008) at pp. 3, 15-16.

564.   The St. Bernard polder (bowl) is one single area—with a minor, very low divider at the railroad tracks—that includes upper St. Bernard Parish and the Lower 9th Ward.  By 8:30 a.m. on August 29th, water was overflowing the 40 Aprent Canal Levee and inundating areas both east and west of this divider.  Trial testimony of Glenn Diaz; Trial testimony of Donald Riley.

565.   Water entering the St. Bernard polder from the east—originating in Reach 2 and then filling up the Central Wetlands, and then overflowing the 40th Arpent Canal Levee—was distributed throughout upper St. Bernard Parish and the Lower 9th Ward.  Exh. 105, Vrijling Polder Flood Simulations (July 2008) at pp. 25-28; Exh. 91, Kemp Expert Report (July 2008) at pp. 3, 15-16.

566.   Some of the flooding of the Lower 9th Ward was also caused by the waters overflowing the flood protection works on the east side of the IHNC and two breaches of flood protection works on the east side and some overtopping of LPV structures.  The South Breach was the largest—nearly 900 feet in length.  Overtopping and scouring occurred at both ends of the breach.  Exh. 28, Dalrymple Depo. (Sept. 18, 2007) at 138:7-139:9; Exh. 105, Vrijling Polder

Flood Simulations (July 2008) at pp. 25-28; Exh. 20, IPET at p. IV-200; Exh. 73, Bea Expert

Decl. II (July 2008) at p. 15, ¶25.

567.   The North Breach occurred at about 7:30 am on August 29th and flooding lasted

until after August 30, 2005 when the surge receded.  Exh. 105, Vrijling Polder Flood Simulations

(July 2008) at pp. 25-28.

568.   The South Breach occurred at about 9:00 a.m. on August 29th and flooding lasted

until after August 30, 2005 when the surge receded.  Exh. 105, Vrijling Polder Flood Simulations

(July 2008) at pp. 25-28.

569.   While the North and South Breaches had a local effect on the time of onset of

flooding in Lower 9th Ward which was earlier than flooding from Reach 1 and Reach 2, the

maximum water levels in the St. Bernard Polder (including the Lower 9th Ward) was determined

exclusively by flooding from Reach 2.  In other words, the catastrophic flooding of the Lower

9th Ward was caused by floodwaters originating in Reach 2.  Steven Fitzgerald Expert Report

(Dec. 2008) (Defendant's Expert) at p. 20.

570.   With respect to sources of flooding of the Lower 9th Ward, only a relatively small

percentage of the total volume came from the North and South Breaches along the IHNC.  Most

of the remaining floodwaters came from Reach 2, with some minor contribution from Reach 1.

Exh. 4, Team Louisiana Report at p. 80; Steven Fitzgerald Expert Report (Dec. 2008)

(Defendant's Expert) at p. 20.

571. Without the IHNC breaches, almost the same volume of floodwater enters the

populated area of the St. Bernard bowl—upper St. Bernard Parish and Lower 9th Ward—

compared with the scenario of MR-GO breaches plus overtopping plus rain.  Without the IHNC

breaches, it takes a little longer in the western part of bowl to reach the peak water level, but the

peak itself is only marginally lower.  In the eastern part of the bowl, the influence of the IHNC

breaches on the development of the water level is even smaller.  Thus, even without the

floodwater originating in the IHNC, the Lower 9th Ward—and the property of Plaintiffs

Anthony and Lucille Franz—would have catastrophically flooded.  Exh. 53, Delft University

Flood Report (July 2007) at p. 45.

## CAUSATION

572.   Based on the foregoing findings, the Court has determined that the MR-GO's

defective conditions were a cause in fact of the catastrophic flooding of Plaintiffs' property.  If

there had been no enhanced surge and intensified waves caused by the MR-GO's defects, there

would have been no catastrophic flooding of New Orleans East, Lower 9th Ward, and Saint

Bernard Parish (and Plaintiffs' property).  Alternatively, the evidence also shows that but for the

enhanced surge and intensified waves caused by the MR-GO's defects as discussed above,

Plaintiffs' property would have experienced only minor flooding, if any, that would not have

resulted in their destruction.

573.   The MR-GO's five major adverse effects —creation of a direct, unmitigated surge

conduit from the Gulf of Mexico, the unmitigated "funnel effect," destroyed wetlands,

substantial channel widening, and accelerated and increased subsidence of LPV structures—were

substantial contributing factors to the catastrophic flooding of the Plaintiffs' homes and

communities.  Exh. 91, Kemp Expert Report (July 2008) at pp. 2-3, 7, 38, 196; Exh. 81, Bea

Expert Report (Jan. 2009) at pp. 2-7.

574.   These effects were not only more than trivial—they were significant contributors

to the catastrophic flooding of Plaintiffs' property.

575.    The absence of surge buffering wetlands and the three to five times expansion of the Reach 2 channel—even when evaluated in isolation—(1) materially affected performance of LPV structures along both Reach 1 and Reach 2 and the IHNC and (2) was a substantial factor in the overtopping and failures of LPV structures during Hurricane Katrina and the inundation of New Orleans East, Lower 9th Ward, and St. Bernard Parish (including Plaintiffs' property) with ten feet or more of water.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶¶2, 4(b), p. 7, Figure 1; Exh. 72, Bea Expert Decl. No. I (July 2008) at ¶¶69, 100; Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶18-27, 29-32.

576.    The MR-GO—considerably deeper and wider than authorized, denuded of adjacent surge buffering wetlands, without any surge inhibitors, and undermining the stability of LPV structures—was a substantial factor in overtopping, breaching before overtopping, and breaching LPV structures, thereby causing the destruction of Plaintiffs' properties.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶32; Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶¶4(b), 5(b), 6(c), 7(b)(c), 9(a), 10(a), 11(a), Tables 1, 12, 13.

577.    The cumulative impact of all five defects –no surge barriers, "funnel effect," loss of wetlands, channel widening, and accelerated and increased subsidence of LPV structures—is synergistic, *i.e.*, acting in combination, they not only significantly increased surge and waves but also materially influenced additional, more sensitive indicators of the MR-GO's impact such as time of onset, duration, and rate of overtopping by surge.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶6.

578.    The combined effects of the integrated combination of MR-GO life-cycle negative environmental impacts adversely affected the performance of the Reach 1, Reach 2, and IHNC LPV structures during Hurricane Katrina.  Exh .90, Bea Supp. Decl. (Oct. 2008) at ¶13.

579.    The combination of accelerated and increased subsidence of EBSB crown elevations, channel widening, and loss of wetlands substantially—and dangerously—lowered the margin of hurricane storm protection afforded the people and property of St. Bernard Parish and Lower 9th Ward.  Exh. 81, Bea Expert Decl (Jan. 2009) at p. 5, ¶3; p. 6, ¶6; Exh. 91, Kemp Expert Report (July 2008) at pp. 2-4; Exh. 81, Bea Expert Report (Jan. 2009) at pp. 3-7.

580.    Experts for both sides agree that if breaching had not occurred along the Reach 2 LPV system, the Central Wetlands Unit would have safely absorbed all overtopping flow and prevented disastrous flooding across the 40 Arpent Canal Levee into the St. Bernard/Lower 9th Ward polder.  Exh. 94, Kemp Expert Decl. (Jan. 2009) at p. 27.

581.    Evaluating the more predictive factors of time of onset, duration, and rate of structure overtopping by surge, the addition of the MR-GO channel -- whether at its authorized dimensions or at the swollen cross-section during Hurricane Katrina and without any surge barriers  -- significantly increased the rate of surge water introduction into Reach 1 and the IHNC and thereby caused more water to inundate Plaintiffs' neighborhoods when the flood control structures were overtopped or breached before overtopping.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at p. 11, Fig. 2; p. 13¶23, Table 1.

582.    Without regard to their contribution to the catastrophic flooding, the water that accumulated in New Orleans East, Lower 9th Ward, and St. Bernard Parish can be attributed to three sources:  (1) enhanced surge and intensified waves caused by the MR-GO; (2) surge and waves generated by Hurricane Katrina itself; and (3) rainfall.  To this extent, these three sources can be considered concurrent sources of the flooding (although their relative contributions, vary significantly).

583.   There is no dispute that the rainfall alone—about 12 inches—would not have caused anything other than minor, non-catastrophic flooding in certain localized areas (including Plaintiffs' property) and would not have caused significant damage to Plaintiffs' property.  Exh. 110-114, Crawford Expert Reports (April 2008); Exh. 28, Dalrymple Depo. (Sept. 18, 2007) at 111:3-17; Exh. 91, Kemp Expert Report (July 2008) at p. 16; Exh. 105, Vrijling Expert Report (July 2008) at p. 27.

584.   The surge and waves generated by Hurricane Katrina alone—without any enhancement/intensification by the MR-GO—would not have resulted in catastrophic flooding of Plaintiffs' property and were a minor (negligible) contributor to the flooding of Plaintiffs' property.  Exh. 91, Kemp Expert Report (July 2008) at pp. 141-42; Exh. 81, Bea Expert Report (Jan. 2009) at pp. 3-7, ¶¶1-9; pp. 14-16, ¶¶10-14.

585.   Rainfall and/or the surge and waves generated by Hurricane Katrina—without any enhancement/intensification by the MR-GO—have not been shown to be concurrent causes of the catastrophic flooding of Plaintiffs' property.  Assuming, however, that these two sources could be deemed concurrent causes, the enhanced surge and intensified waves caused by the MR-GO's defects was a substantial factor in the catastrophic flooding of Plaintiffs' property.

586. The Plaintiffs' flood modeling demonstrates that the maximum level of flood waters at each Plaintiffs' home or business office—in the neutral MR-GO scenario 2C—was less than 2 feet—a level which is not catastrophic in New Orleans and St. Bernard Parish during heavy rainfalls and storms.  Exh. 1771, Delft University, Comparison flood depth development between Katrina event and Scenario 2C (Jan. 2009).

**PLAINTIFFS' DAMAGES**

587. The Plaintiffs' property locations are shown in the following map:



Figure 1: Visual representation of the five locations

Exh. 1771, Vrijling Flood Depth Report (Jan. 2009) at p. 1, Fig. 1.

**Norman Robinson**

   **General Information**

588.   Norman Robinson received an honorary PhD and was awarded a Nieman

Fellowship at Harvard University.  He served in the United States Marine Corps for four years.

589.   He had two children, son Paul and a daughter Jacqueline. He also has a step-

daughter who is 35.

174

590.   He is a veteran news anchor at Channel 6 in New Orleans and has been a news anchor for 18 years and a professional journalist for 32 years.

591.   Norman and Monica Robinson have been married for thirteen years.

592. Monica Robinson attended Nazareth College in Rochester, New York and obtained a Bachelor of Science in art.  She was an avid artist and ballet dancer.

**Property**

593.   Mr. Robinson purchased his house at 6965 Mayo Street in New Orleans East for $154,000.00, and the title always remained in his name.

594. Mr. Robinson purchased the house 17 years ago and made numerous repairs to the house such as a major roof repair and the replacement of all of the flooring downstairs with Italian and ceramic tile.  His therapy was gardening and often spent his Saturdays gardening around his house as it helped him relax.  His house had never flooded prior to Hurricane Katrina, even in the worst flooding event in New Orleans.

**Damages**

**Property**

595.   The home is an upper middle class home with moderate to high grade appointments.  There were other structures on the property which included an un-attached garage, in-ground swimming pool, and wooden fence.  Exh. 125, Scott Taylor Final Loss Report (Feb. 2009) at pp. 1-2.

596.   As a result of the flooding of their property and their subsequent relocation, the Robinsons were forced to incur additional living expenses in the amount of $55,200.00.  Exh. 125, Scott Taylor Final Loss Report (Feb. 2009) at p. 1.

175

597.   The Robinsons lost numerous irreplaceable items such as photographs, her cookbook collection, his old record albums, Christmas ornaments and Norman's family bible.

598.   In all of these cases, there is a resting water mark which is where the water dropped and stayed for a period of time.  The water mark is where the water equalized and created a stain on the particular structure which can last for years. In almost all times, the water mark was higher than that at one point.  Exh. 2078, John Crawford Depo. (Feb. 3, 2009) at 28:5-24.

599.   The resting water mark on the fence next to the Robinson home and the nearby residences indicated that the water level in the Robinson home was five to six feet above the first floor elevation.  This was confirmed by the photographs taken by the Robinson's of the inside of the home which indicate a resting water line at approximately five feet and a high water line several feet higher.  Exh. 2078, John Crawford Depo. (Feb. 3, 2009) at 97-99; Exh. 125, Scott Taylor Final Loss Report (Feb. 2009) at pp. 1-2.

600.   The water remained in the Robinson residence for two to three weeks until New Orleans was dewatered.

601.   The Robinsons lost all of the contents of their house. The value of their contents was $93,543.00.  Exh. 125, Scott Taylor Final Loss Report (Feb. 2009) at pp. 1-2.

602.   As a result of the water inundation, the Robinson house sustained severe damage and had to be restored. This damaged the Robinson's in the amount of $249,494.20. Exh. 125, Scott Taylor Final Loss Report (Feb. 2009) at p. 2.

603.   Mr. Robinson ultimately sold his home on Mayo Street for $120,000, to a contractor who bought the house unrestored in "as is" condition. The Mayo house was very special to the Robinsons because they were married there, Norman had his 50th birthday there and there were numerous parties and birthdays at their home.

604. They purchased a house on Delaronde Street in old Algiers because it was a raised house that survived. They wound up paying nearly twice the mortgage payment they were paying and had a very difficult time finding insurance. Monica and Norman purchased the house in Algiers for $349,000 and financed $329,000. The insurance was very expensive and was raised $1000 recently for no reason.

**Emotional Pain and Suffering**

605.   Mr. Robinson first understood the seriousness of Hurricane Katrina from Mayor Nagin on Saturday, August 28, 2005.  That day he worked fourteen to sixteen hours and went home at approximately 3 a.m.

606.   Later that morning, Mr. Robinson was awakened by a call from his News Manager at 8 a.m. who informed him that he had to relocate to Jackson, Mississippi immediately because his station's tower in Chalmette was projected to be under water.

607.   Norman literally forced Monica to get in the car and evacuate.  She drove to Mobile which because of gridlock traffic and other difficulties took her seven hours.  She was in Mobile, Alabama for the storm at her sister's house. They lost power for four days.  She was then able to get a phone and was able to talk with Norman.

608.   Norman packed in a daze as he was separated from his wife and granddaughter and did not know why he was being ordered to Jackson.  He only brought clothes and personal items for a few days. He left his house at approximately 11 a.m. and arrived in Jackson about a little more than 10 hours later.

609.   Mr. Robinson was ordered to get on the air as soon as he arrived at the sister station in Jackson.  It was extremely difficult for him as he had just spent ten hours driving to Jackson, which would normally take about two and a half hours. His emotional condition was further

177

strained because he did not know anything about what was happening with his wife and granddaughter or even if they were alive.

610.   WDSU Channel 6 tower was under 20 to 25 feet of water so it was forced to broadcast from Jackson.  Mr. Robinson was the focal point of the broadcast as the anchor. Chanel 6 first broadcasted from a garage at WDSU's sister station in Jackson—first through the internet and then a religious station.

611.   Norman was finally able to contact his wife four days later. He did not know where his granddaughter wound up after the storm.  In the days following the storm, he worked until 2 to 3 a.m. and would stay up until 5 a.m. to locate his granddaughter who was with his ex-wife. Norman eventually found his granddaughter and spent several days doing stories in south Mississippi.  He brought his granddaughter back to Jackson with him.

612.   Monica came back to New Orleans in early October with her friend and stayed at her brother's house in Algiers.  When she got to their house, they had to go in a window because the front door was swollen from the floodwaters. When she first looked in the front door of her house, she was overwhelmed by horrible stench and by what appeared to be sewer flies. She was only able to salvage a computer, and some clothes and coats.

613.   Norman first returned to his house in New Orleans approximately a month after the storm. At the time, he had to be escorted by armed mercenaries who assisted in kicking the front door in because it was swollen from the water. As he looked through the doorway into what was his house, he was overcome by a smell that reminded him of his uncle's hog pigpen. His house and everything in was total ruination. For example, his granddaughter's piano was dissolved as if it had been dropped in a vat of acid.

614.   After the Hurricane, Mr. Robinson moved back to New Orleans and lived with his brother-in-law and sister-in-law.  After hearing them argue about him living with them, he called Monica and told her that he needed to get an apartment.

615.   Norman and Monica, through the aid of a friend were able to lease a 700 square foot apartment on the third floor in the Creeks apartment complex in Harahan. They leased the apartment for around $1,100 a month which caused extreme financial hardship as they were still paying the mortgage on the Mayo Street house.  They were very cramped in the apartment but were forced to live there for nearly two years.

616.   Mr. Robinson had not lived in an apartment since he was twenty-one. He and his wife were forced to live in 700 square feet. The situation was strained when Mr. Robinson's daughter Jenna came to live with them for several months.  It was further strained by the fact that he was forced to climb stairs all the time and constantly had new neighbors.

617.   Mr. Robinson was traumatized by the flooding and decided that he would never live in a slab house again. Since the Hurricane, he has trouble concentrating and does not enjoy life. There are numerous things about life that he enjoyed prior to the storm that are now gone such as the people in the neighborhood and swimming with his granddaughter. Mr. Robinson specifically stated that it is as if "the world as we know it has changed and I don't know how to get it back. He felt as if they were sleepwalking through life.  Forced to seek psychiatric treatment as a result of the storm, her has not had a restful night's sleep in almost three years.

618.   Mr. Robinson had suicidal thoughts.  Mr. Robinson testified that he had numerous conversations with his wife Monica and others and that after much reflection he decided to 'throw away the gun" as his granddaughter was worth living for.

619.   Mrs. Robinson experienced severe mental anguish as a result of the storm.  She specifically testified that she has lost her ability to focus and her desire.  She also lost most of her friends who have relocated to different places.

620. While they were living in the apartment in Harahan, Monica she was the victim of a stalker that constantly traumatized her.

**Kent Lattimore**

**General Information**

621.   Kent Lattimore received a Bachelor's Degree from Tulane University in May 1989. He played offensive guard on Tulane's football team.

622. On Saturday, August 27, 2005, Kent was signed up for a cruise in the Gulf of Mexico that left from the Port of New Orleans.  The cruise was underway when Hurricane Katrina hit.

**Property**

623. Kent purchased the trailer at 2100 Marcelle Drive in St Bernard Parish for $10,000. in 1992 and lived there up to Hurricane Katrina.

**Damages**

**Property**

624.   When he first came back to his trailer he saw that a tree had fallen on the back of the trailer.  He discovered that after Katrina, a few dogs were living in his trailer.  He attempted to salvage a few things but every time he came back to the trailer, something else was stolen.

625.   The resting water marks in and around the Lattimore properties was approximately 5 to 6 feet above the ground.  Exh. 2078, John Crawford Depo. (Feb. 3, 2009) at 28:5-24.

626.    The water remained in the Lattimore residence for two to three weeks until St. Bernard Parish was dewatered. The Lattimore residence was flooded a second time in conjunction of the passing of Hurricane Rita.

627.    Mr. Lattimore lost most all of the contents he had in his house trailer, including Tulane bowl ring, a collection of scuba diving equipment, a Rolex watch, and a gun collection. The approximate value of these items is $45,000.  Exh. 119, Scott Taylor Final Loss Report (Feb. 2009) at p. 3.

628.    The trailer was totally destroyed by the floodwaters from the MR-GO.  After the Hurricane, Mr. Lattimore's trailer was crushed up and hauled off. The total amount due Mr. Lattimore to obtain a house trailer of like kind and condition is $46,065.96.  Exh. 119, Scott Taylor Final Loss Report (Feb. 2009) at p. 2.

629. After the Hurricane, he was not able to live in his trailer.

### **Emotional Pain and Suffering**

630.    The cruise did not return to New Orleans but to Galveston, Texas.  He then set out on his trek back to New Orleans.  He got a ride to Opelousas, Louisiana where he stayed in a friend's garage for a few days and then hitched rides to Houma and eventually New Orleans.

631.    Once Mr. Lattimore arrived in New Orleans, he went to get his truck on Burgundy Street and drove to St. Bernard.  On his way, he noticed a substantial amount of devastation from downed trees to damaged buildings—looking like something out of World War II, like somebody had just bombed the 9th Ward.

632.    When he arrived at his building, he saw that the door was kicked open and that his office was broken into.  Everything inside was jumbled to the point that it was difficult to even

get inside. He subsequently discovered that somebody had busted the window and unlocked the front door.  It looked like his place had been robbed.

633.   As he was renovating, he was constantly depressed as he was reminded of the possessions that he had in the building that he lost.  For him, it was very disheartening.  "It was almost like a religious experience, to go through and lose everything. . .you read the book of Job and something you had, you had life really good and then . . . something like that comes along and . . . you know, that's all you can do is maybe look at it from a religious experience."

634.  "It's just like. . . you lived in a community where you see – where you saw people and you, had you know, your favorite restaurants and stuff, and you  leave one day and then, you know, the next day—the next time you come back, I mean—my neighbors on either side where I lived, I left that Saturday and I have never seen them again."

### Other Damages

635. As a result of the flooding of his property and his subsequent relocation, Mr. Lattimore was forced to incur additional living expenses in the amount of $40,000.00.  Exh. 119, Scott Taylor Final Loss Report (Feb. 2009) at p. 2.

## Lattimore & Associates

### General Information

636.   After graduation, Kent he worked for Miles and Associates.  Shortly thereafter, he opened his own real estate appraisal business at 9117 St. Bernard Highway in Chalmette, St. Bernard Parish.

637.   In 1997, Kent bought the building on St. Bernard Highway to operate his business for $52,000 and had to totally renovate it.  The building was 1800 square feet.  Prior to the storm, the St. Bernard Parish Assessor had the building assessed for $230,000.

638.   Kent had four SteelCase desks that cost about $3,500. each, a color laser copier, and a fax machine.

639.   Mr. Lattimore spent more than $100,000 on renovating his office building after the Hurricanes.

640.   Mr. Lattimore envisioned working in the real estate appraisal business until he was 85 years old.  He never thought that he would leave the building.

**Damages**

**Property**

641.   Kent decided to drop his business interruption claim because he developed an opportunity to earn more income than he did in the real estate appraisal business. He was unable to go back into the real estate appraisal business. He was prevented from going back into the appraisal business because he lost everything in his building and because all of his employees and his business contacts were gone.

642.   His office building flooded again after Hurricane Rita. After Hurricane Rita, he had to re-sheetrock and rewire the building for about a year.  He did all of the renovations himself.

643.   Kent subsequently leased it to a dance studio that closed, and the building is up for lease.  The cost to restore Mr. Lattimore's building to the condition it was in prior to Hurricane Katrina is $118,033.  Exh. 117, Scott Taylor Final Loss Report (Feb. 2009) at p. 2.

644.   Mr. Lattimore also lost all of the contents contained in his office to water and to looters.  The approximate value of these contents was $50,000.  Exh. 117, Scott Taylor Final Loss Report (Feb. 2009) at p. 2.

645.   Mr. Lattimore was ambitious after the storm and was able to begin and develop a convenience store business where he makes more income than he did in the real estate appraisal

business.  His quality of life, however, has substantially changed for the worst.  For example, when he was in the appraisal business, he could leave on a Thursday and go to Las Vegas or Miami and come back on a Monday, while in the convenience store business he can never leave.

646. As he was renovating, he was constantly depressed as he was reminded of his loss possessions.

**Tanya Smith**

### General Information

647.   Her current address is 2001 Cypress Creek Rd, Apartment A-308, River Ridge, Louisiana.

648.   Ms. Smith's parents are Plaintiffs Lucille and Anthony Franz.

649.   She has two Bachelor of Science Degrees. One from the University of New Orleans in science and biology and the other from LSU Health Sciences Center.  She also has a Master's of Nursing and Nurse Anesthesia which qualifies her to be a Certified Registered Nurse Anesthetist.

650.   Tanya was married twice.  She had a son in each of the two marriages.  Her son, Caleb Guillot, from her first marriage is fourteen and her second son, Jared Smith is nine. Both of her sons were living with her at the time of Katrina.

651. In 2002, Tanya started as a nurse technician at Memorial Medical Center.  She subsequently became an RN at Memorial and worked in the neonatal intensive care unit.  She was working as an RN in August, 2005.

### Property

652.   At the time of Hurricane Katrina, Ms. Smith and her two boys lived at 3920 Despaux Drive in Chalmette, in St. Bernard Parish.  Ms. Smith built her house in 1997.  Her

parents acquired the original mortgage on the property, and when she graduated, she obtained a mortgage and bought the property from her parents.  As part of a package deal, she picked out the lot, picked out a floor plan and consulted with her contractor on the design and construction of her house at 3920 Despaux.

653.   Tanya chose that subdivision because she always wanted to live in Chalmette.  She grew up there, her family was there, her church was there and her son's future school was about a half mile away.  The neighborhood was a new subdivision just being developed and had a lot of young families with kids.  Ms. Smith thought it was the perfect place to raise her two boys.

654.   She paid $115,000. for the house and the lot.  It was a very well built home with central heating and air conditioning. Once the house was built, she made several upgrades such as adding wood laminate flooring, marble flooring and berber carpet.  After construction, Ms. Smith added a built-in pool with a slide, a fountain and an above ground hot tub.

655.   Her house never flooded prior to August 29, 2005.

656. She rebuilt her house at 3920 Despaux after Katrina.  She was almost ready to move back into the house but it sustained severe damage as a result of an electrical fire. The fire took out the roof and everything was subsequently wet and damaged by the rain and the fire fighters.

**Damages**

**Property**

657.   As a result of the flooding of her property and subsequent relocation, Ms. Smith was forced to incur additional living expenses in the amount of $44,400.  Exh. 127, Scott Taylor Final Loss Report (Feb. 2009) at p. 2.

658.   Ms. Smith's house was a frame house with a stucco veneer on a slab foundation. The home was devastated by flood after the events of August 29, 2005. Damages were estimated

in such a way as to be consistent with costs associated with this class of home.  Exh. 127, Scott

Taylor Final Loss Report (Feb. 2009) at p. 1.

659.   Damages to her home were consistent with the flooded homes in the area.  Though

water lines were eradicated during the initial restoration, evidence of flooding still existed across

the street.  There were clear water lines were at 4.5 feet in and around Ms. Smith's home.  Exh.

127, Scott Taylor Final Loss Report (Feb. 2009) at p. 2.  Ms. Smith saw a waterline mark at

around eleven feet when she first returned to her house at 3920 Despaux.

660.   The water remained in the Smith residence for two to three weeks until St. Bernard

Parish was dewatered. The Smith residence was flooded a second time in conjunction of the

passing of Hurricane Rita.

661.   Tanya Smith lost all of the contents of her house. The value of her contents was

$143,493.00.  Exh. 127, Scott Taylor Final Loss Report (Feb. 2009) at p. 2.

662. As a result of the inundation of the water from Katrina, Tanya Smith's house

sustained severe damage and had to be restored. The other structures were destroyed. The

damages to the main house were $165,784.04 and 22,716.39 for the other structures.  Exh. 127,

Scott Taylor Final Loss Report (Feb. 2009) at p. 2.

### Emotional Pain and Suffering

663.   Tanya started making plans to evacuate on Friday, August 27, 2005.  She made

arrangements to have her ex-husband in Baton Rouge pick up her boys the next day.  She had her

boys pack about five days worth of clothes. Her ex-husband picked up the boys on Saturday

around noon.

664.   At that time, she stayed because she did not know if Memorial Medical Center

Hospital was going to need her.  She packed a bag and received word on Saturday that she did

not have to stay at the hospital. She took her mother and her sister took her father, and they drove to Baton Rouge to her ex-husband's house.

665.   The family stayed at his house on Saturday night.  The next day she became increasingly worried about her father's health in the event there was a power outage in Baton Rouge. He has only one kidney and does not do well in the heat.

666.   She decided to take her father to her friend's house in Spring, Texas. She took her boys, her sister and her father.  They were stuck in traffic, and it took them thirteen hours to make what is normally a five hour drive.

667.    Once Tanya heard that the entire parish was flooded, she decided to try to drive back to Baton Rouge, where she remained in Baton Rouge for four to five weeks at her ex-husband's house with her parents, her boys and her sister.

668.   Tanya's uncle stayed in her house for the storm. He had to kick a hole in the ceiling in her bedroom and hung onto the ceiling fan support for two days until he was rescued.

669.   She was not able to return to her house for about eight weeks as St. Bernard Parish was completely locked down.  She was finally able to return to her house on Despaux in late October of 2005.

670.   After five weeks in Baton Rouge, she was able to obtain an apartment in Harahan for her and her two boys and another apartment for her parents.  At that time, she lived in a one bedroom apartment with her two boys.

671.   When she first returned to her house it was decimated, and there was nothing left but the structure.  Her house was filled with mud, water and snakes.  She wore waist high waders and still got her clothes wet.  There were boats and cars on top of houses.

672.   The top waterline in her bedroom was about a foot from top.  She had twelve foot ceilings so the water settled around eleven feet.

673.   On her first trip to her house, she was only allowed to go in and survey the damage. She was not able to start cleaning the house until about a month later.

674.   Tanya was horribly affected by the sight of her house and property.  It took her a few weeks to get her bearings and to try to reconcile her reality.  Everything she knew as gone— her home, her church, and her neighbors.

675.   Tanya decided that she should return to her property and that she should clean out her house.  It took about five months to get all of the mud and furniture out of the house. She could not afford to hire anyone to do the work. She was in school, had no income and was living on her savings.

676.   Once she had the house gutted and the walls down, she hired a sub contractor to begin rebuilding her house.

677.   Ms. Smith experienced severe mental anguish as a result of the flooding from the MR-GO.  To start out, there was an initial shock of seeing only the roof of her house on the internet and realizing that her house was completely under water. She did not know where her brother and uncle were, fearing that they had drowned.  Then she found out that her aunt drowned at the St. Rita's nursing home.

678.   When she first got to Baton Rouge after the Hurricane, she began to realize that she lost absolutely everything she owned.  She specifically testified that "I mean, I worked all my life, my pretty little dollhouse that I had designed was gone - - - So I was like, okay, I have no job, I have no house, I have no school at this point, because at this point in my brain I'm thinking

everything is gone." This situation was made worse when her boys kept asking her Mom where are we going and when are we going home.

679.   Tanya decided that she had to take over the situation. She and her sister became the captains of the ship. Her dad was depressed and all her mother did was cry. They began looking for her brother and her uncle. They finally found her brother and uncle, and she thought: I have two sons who have nothing but a Play Station, and we have no clothes at this point.

680.   She and her boys lived off of her savings. Very concerned that they would run out of money, she was reduced to waiting in line for food stamps.

681.   Once she enrolled her boys in school, she began commuting to Baton Rouge every day. Very often it would take two to two and half hours each way. Commuting five days a week, she went on the weekends to work on the gutting of her house. She was exhausted and felt like she was in the car non-stop.

682.   Tanya became desperate when she ran out of her savings and was forced to take out over one hundred thousand dollars in school loans. She lost everything she owned and her community. She built her house and loved her subdivision. She decided to rebuild because she was not going to lose her dream. So she rebuilt the house after Katrina and rebuilt it again after the fire.

683. The closure of many of the hospitals and clinics in the New Orleans area significantly reduced her ability to obtain gainful employment as a nurse anesthetist.

**Anthony & Lucille Franz**

### **General Information**

684.   Mr. Anthony Franz and his wife Lucille currently reside at 28397 Jefferson Highway, Apartment A, Harahan, Louisiana 70123.

685.   Mr. Franz went to work for the United States Government as a lab tech for the Department of Agriculture. He subsequently changed positions and became a lab director for the United States Customs.  Mr. Franz worked for the United States Government for approximately 38 years.

686.   Mr. Franz served in the Louisiana Air National Guard for 31 years and received an honorable discharge.

687.   Mr. Franz currently receives a pension for his years with US Customs and a retirement benefit for his service in the National Guard.  The Franz' lived well on these pensions prior to the Hurricane Katrina.

688.   Mrs. Franz graduated from high school in St. Bernard.  She did not work in the beginning of their marriage as she spent time raising the children.  She worked at numerous jobs over the years, for example she spent five years as a secretary with Brock Oil Company.

689. Mr. and Mrs. Franz have been married for fifty-five years and have three children together.

**<u>Property</u>**

690.   At the time of Hurricane Katrina, the Franz lived at 5924-26 St. Claude Avenue in the Lower 9th Ward.  Mr. Franz inherited this property upon the death of his parents.  The home is a shotgun duplex with two floors on each side.

691.   The house first came into his family in approximately 1921 when his grandmother purchased it. His parents lived in the house when he was born and while he was growing up.  All total, he spent about fifty years of his life living in the house at 5924 St. Claude Ave.

692. They owned their house outright and did not have a mortgage at the time of Hurricane Katrina.  The Franz did not rent out any part of their home on St. Claude.

### Damages

#### Property

693.   As a result of Hurricane Katrina, there was 18 to 22 feet of water in the street in front of the Franz's house which resulted in approximately 3 feet of water in the second floor of the house.

694.   It was a frame home with a brick walled first floor foundation with slab.  The skin is stucco and the interior walls are constructed of plaster over wood lathe strips.  The plaster work has an imprinted pattern sometimes construed as "venetian" style.

695.   As a result of the inundation of the water, the house sustained structural damage and needs to be torn down.  This damaged the Franz in the amount of $284,128.15.  This amount is based on a tear down and rebuild to the home's original construction as much as possible with current construction and craftsmanship considerations.  Exh. 115, Scott Taylor Final Loss Report (Feb. 2009) at p. 2.

696.   After the Katrina, they attempted to have the house cleaned out and to have the ruined contents hauled off.  Mrs. Franz made several phone calls to companies that hauled debris but she did not get a return call.  Eventually they gave up and the house remains in virtually the same condition today.  They have no intention of trying to renovate their house on St. Claude as they are too old and it is to much work to renovate it.

697.   As a result of the flooding of their property and their subsequent relocation, the Franzs were forced to incur additional living expenses in the amount of $56,000.  Exh. 115, Scott Taylor Final Loss Report (Feb. 2009) at p. 2.

698.   In the Franz home, the rising water associated with the passing of Hurricane Katrina inundated their home to approximately 1 foot above the second story floor elevation

causing extensive damages to interior and exterior finishes.  Exh. 111, John Crawford Expert Report (April 2008) at pp. 2, 4.

699.   The water remained in the Franz residence for two to three weeks until New Orleans was dewatered.

700. The Franz lost all of the contents of their house.  The value of the contents was 120,000.00.  Exh. 115, Scott Taylor Final Loss Report (Feb. 2009) at p. 2.

### Emotional Pain and Suffering

701.   The house at 5924 St. Claude Avenue had extreme sentimental value to Mr. Franz. He referred to it as the Family Mansion, and he was the only one left in his immediate family that was not going to be buried from the old Family Mansion.  Since the storm, he had to look for someplace else to die.

702.    The house also had extreme sentimental value because of all of the interior plaster work and gilding that was done by his grandmother in every room in the house.  Mr. Franz testified that there was a lot of love in the house.

703.   The Franz's evacuated to Baton Rouge and then to Spring Texas.  They returned to Baton Rouge when the electricity returned, and they stayed at their daughter's friend's house.

704.   They remained in Baton Rouge for approximately five weeks after the storm, returning to Harahan to move into the apartment where they currently reside. When they got back to Harahan, they replaced one of the two cars that they lost in the floodwaters.

705.   They learned that their house was flooded while they were in Baton Rouge from watching news reports about the Ninth Ward. They first returned to their house approximately two months after the Hurricane.

706.   Mr. Franz testified that he doesn't think that he will ever get over losing everything. He cannot afford a new house without wiping out his retirement, which is literally all he and Mrs. Franz have left.  Mr. Franz also testified that he now lives in constant fear that if something like Katrina happens again, he will not have his house to fall back on for extra money. Their situation is complicated as they are both in their late seventies, and they are not in the greatest health.

707.   Mrs. Franz found out after the storm that her sister drowned in the St. Rita's nursing home.

708.   The evacuation was emotionally difficult for her because her son, his girlfriend, their teenage daughter and her two brothers stayed behind, and she thought they all had drowned.

709.   Since the storm, Mrs. Franz does not sleep three or four nights a week as she constantly gets flashbacks of her sister drowning at St. Rita's nursing home.  Prior to Katrina, she called the nursing home and asked to take her sister.  The owners of St. Rita's assured her they were going to take care of her sister and evacuate her.  When she was in Baton Rouge, she saw the emergency responders removing her sister in a basket.

710.   The Franz lost all of the photographs of their children and grandchildren and numerous other irreplaceable possessions.

711. Prior to the Hurricane, Lucille Franz attended church at St. Marks in Chalmette where she had numerous friends that she saw nearly every Sunday.  All of these friends and neighbors are now scattered, and the Franzs do not see them anymore.

**CONCLUSIONS OF LAW**

712.   This Court has jurisdiction of the parties, and under 28 U.S.C. § 1346 (b)(1) and 28 U.S.C. § 2671, et seq., (Federal Tort Claims Act ("FTCA")) has subject matter jurisdiction over this suit by Plaintiffs against the United States for damages allegedly sustained as a result of Defendant's design, construction, operation, and maintenance of the MR-GO.

713.   In a suit brought under the FTCA, the United States is amenable to damages in the same manner and to the same extent as a private individual in like circumstances.  28 U.S.C. § 2674.

714.   In determining the liability of the United States for damages, the substantive laws of Louisiana (the state in which the incident occurred) are controlling.  *United States v. Muniz*, 374 U.S. 150 (1963); *Standefer v. United States*, 511 F.2d 101 (5th Cir. 1975).

715. The Congress of the United States authorized the design and construction of the deep water channel known as the MR-GO.  Public Law 455, 84th Congress, approved March 29, 1956.  In authorizing a major public works project like the MR-GO, Congress expected the Corps, using its professional engineering expertise and judgment, to build, operate, and maintain the MR-GO in a safe, competent manner.

**The Government's Jurisdictional Challenges**

716.   Defendant asserts that this Court lacks subject matter over the claims in this lawsuit for a variety of reasons, none of which this Court finds meritorious.  Only three of the contentions merit discussion.

717.   Defendant contends that the United States is immune from suit for the alleged damages pursuant to the Flood Control Act of 1928, 33 U.S.C. § 702c.  The Court has previously

concluded that this immunity is not applicable here.  *See In re Katrina Canal Breaches Consol. Litig.*, 471 F.Supp.3d 684 (E.D. La. 2008) which is incorporated here by reference.

718.   The MR-GO was built as an aid to navigation, not as or in connection with a flood control project.  Congressional directives provided no authorization for construction of flood control works in coordination with construction of the MR-GO.  *See Graci v. United States*, 456 F.2d 20 (5th Cir. 1971).  Plaintiffs do not allege, and the Court does not find, that Defendant's liability is related to the performance of a flood control project or flood control structures constructed for flood protection. In fact, Plaintiffs have scrupulously avoided attributing any fault for the overtopping and breaches of LPV structures to the design or construction of the LPV structures.

719.   Instead, the Court has found that the MR-GO acted as an independent cause of the catastrophic flooding of Plaintiffs' property unrelated to the design, construction, or performance of the LPV structures.  As such, the Flood Control Act immunity is not implicated here.

720.   Defendant also asserts that the "due care" exception (28 U.S.C. § 2680(a)) immunizes it from suit with respect to claims based on the execution of a statute or regulation. However, this immunity requires "for its application that the actors have exercised due care." *Lively v. United State*s, 870 F.2d 296, 297 (5th Cir. 1989); *Buchanan v. United States*, 915 F.2d 969, 970-71 (5th Cir. 1990).  This provision "bars tests by tort action of the legality of statutes and regulations."  *Dalehite v. United States*, 346 U.S. 15, 33 (1953).  Thus, the test for the application of the "due care" exception is to determine (1) whether the statute or regulation in question specifically proscribes a course of action and (2) if mandated, whether due care was exercised.  *Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005); *Crumpton v. Stone*, 59 F.3d 1400, 1403 (D.C. Cir. 1995).

721.   Whether the Corps exercised due care lies at the heart of this case.  As the foregoing findings of fact and these conclusions of law demonstrate, there is voluminous evidence that in a myriad of ways due care was not exercised by the Corps in the MR-GO's design, construction, operation, and maintenance.

722.   The cloak of immunity afforded Defendant by the "due care exception" is also not applicable here because (a) Congress did not prescribe or mandate the challenged conduct here, including the manner of operating and maintaining the MR-GO after its construction; (b) as concluded above, Congress instead mandated the Corps, using its sound professional engineering expertise and professional judgment, to build, operate, and maintain the MR-GO in a safe, competent manner; (c) Plaintiffs are not explicitly or implicitly challenging the validity of the MR-GO authorizing statute (Pub. Law. No. 84-455); and (d) the MR-GO authorizing statute did not exempt the Corps from all other existing laws as it relates to the MR-GO, particularly state tort law and NEPA.  *See In re Katrina Canal Breaches Consolidated Litigation, Order and Reasons* (Doc. No. 18212) (E.D. La. March 20, 2009) at pp. 10-12.

723.   Defendant further asserts that its conduct is immunized by the discretionary function exception ("DFE") to the Government's waiver of sovereign immunity in the FTCA. See 28 U.S.C. § 2680 (a) (United States is protected against any FTCA claim "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government.")  For a thorough discussion of the relevant law governing a DFE claim, *see In re Katrina Canal Breaches Consolidated Litigation*, Order and Reasons (Doc. No. 18212) (E.D. La. March 20, 2009) at pp. 12-14, 47-62 and I*n re Katrina Canal Breaches Consolidated Litigation*, 577 F.Supp.2d 802 (E.D. La. 2008), both of which are incorporated here by reference.

196

724.   This immunity is grounded in Congress' desire to prevent judicial second-guessing of legislative and administrative determinations "grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aera Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).  "The discretionary function exception insulates the Government from liability if the action challenged in the case involves the *permissible* exercise of policy judgment." *Berkovitz v. United State*s, 486 U.S. 531, 537 (1988) (emphasis added).  Not every exercise of policy judgment will be insulated; instead, the Court must "examine the nature and quality of the activity to determine if it is the type that Congress sought to protect." *Lively v. United States*, *supra*, 870 F.2d at 299 (emphasis added).

725. Under the two-prong DFE test, (1) the Corps had no choice but to comply with, but nevertheless violated several, mandatory requirements of the National Environmental Policy Act ("NEPA") and Louisiana tort law in its stewardship over the MR-GO, thereby depriving it the DFE immunity; and (2) alternatively, the Corps' negligent acts and inaction with regard to the MR-GO's design, construction, operation, and maintenance were ordinary, non-policy decisions concerning technical, engineering, scientific, and professional judgments about safety and not the type of economic, political, or social decisions that Congress that Congress sought to protect

**NEPA**

726.   NEPA governed the Corps' ongoing MR-GO operation and maintenance after 1970.  In denying the parties' cross motions for summary judgment, the Court discussed in detail the NEPA regulatory scheme which is incorporated here by reference. *See In re Katrina Canal Breaches Consolidated Litigation*, Order and Reasons (Doc. No. 18212) (E.D. La. March 20, 2009) at pp. 22-35.  In particular, NEPA required the Corps—in light of the substantial information that it possessed about the MR-GO's mounting, significant environmental

destruction of wetlands and widening of the Reach 2 channel and resulting risk of catastrophic

flooding during a hurricane—to produce either an Environmental Impact Statement ("EIS") or

Supplemental Environmental Impact Statement ("SEIS") with respect to a number of actions that

it undertook for three decades leading up to Katrina.  *See* 42 U.S.C. §§ 4331, 4332 (C); *O'Reilly*

*v. United States Army*, 477 F.3d 225, 228 (5th Cir. 2007); *Robertson v. Methow Valley Citizen's*

*Council*, 490 U.S. 332, 347, 349 (1989); *Environmental Defense Fund, Inc. v. Corps of*

*Engineers of U.S. Army*, 492 F.2d 1123, 1140 (5th Cir. 1974).  The NEPA statutes that were

violated were not general guidelines but were in fact clear, specific, and unambiguous legal

mandates.

727.   The Corps' operation and maintenance activities constituted a "major Federal

action[ ]" that "significantly affect[ed] the quality of the human environment" in Greater New

Orleans that required the preparation of a full Environmental Impact Statement ("EIS").  42

U.S.C. § 4332(2) (C); 40 C.F.R. § 1508.18, 1508.27.  One of the cornerstones of NEPA is the

preparation of an EIS whose purpose is not only to insure that government officials fully

consider the environmental consequences of a major project like the MR-GO, "`but also to

provide Congress (and others receiving such recommendations or proposal) with a sound basis

for evaluating the environmental aspects of the particular project or program.'"  *Environmental*

*Defense Fund, Inc. v. Corps of Engineers of U.S. Army*, 492 F.2d 1123, 1139 (5th Cir. 1974)

(quoting *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 466 (5th Cir. 1973).

728.   The Corps was under a continuing obligation to update its environmental

evaluation in response to substantial changes to the proposed action or significant new

circumstances.  40 C.F.R. § 1502.9(c) (1).  The results of this later evaluation are supposed to be

published in a Supplemental Environmental Impact Statement ("SEIS").  Based on the findings

of the SEIS, the agency must consider anew whether to proceed with the proposed project."
*West Branch Valley Flood Protection Association v. Stone*, 820 F. Supp. 1, 5-6 (D.C. Cir. 1993).

729.   Among other things, the Corps was obligated to prepare either a full EIS or SEIS in light of its long known knowledge that the MR-GO's operation and maintenance activities were causing significant changes in the environment, particularly the disappearance of wetlands adjacent to the MR-GO and Reach 2 channel widening.  40 C.F.R. § 1502.9(c) (1).  There is abundant evidence that over decades the Corps itself had made findings about significant environmental changes about the massive decimation of wetlands and dramatic widening of the MR-GO—presenting a "`seriously different picture of the environmental landscape'"—which per se triggered the mandates of NEPA and the implementing regulations.  *Association Concerned About Tomorrow, Inc. v. Dole*, 610 F. Supp. 1101, 1113 (N.D. Tex. 1985) (citing *Wisconsin v. Weinberger*, 745 F.2d 412, 420 (7th Cir. 1984); *Adams v. United States*, 2006 WL 3314571 *2 (D. Idaho Nov. 14, 2006) (Winmill, J.).

730.   The Corps' failure to prepare a SEIS violated a mandatory legal duty imposed by NEPA and the implementing regulations, thereby rendering the DFE inapplicable to its actions and inaction in the management of the MR-GO from the mid-1970s to the time of Katrina.  The Corps' "failure to comply with NEPA meant that the agency had no discretion—it could not proceed [with dangerous continuing operation and maintenance] until it complied with NEPA." *Adams v. United States*, 2006 WL 3314571*1-2 (D. Idaho Nov. 14, 2006) (Winmill, J.).

731.   Where an agency's own findings and reports demonstrate a positive belief and objective recognition that the environmental impact of a project requiring on-going action (such as dredging for its maintenance) has created a new detrimental circumstance—particularly the decimation of an extremely large swath of wetlands—an SEIS is mandated.  40 C.F.R. § 1509.2

(c) (1).  This conclusion is especially warranted by the Corps' own 1988 study that concluded that as a result of wetland loss, development to the southwest would be exposed to direct hurricane attacks from Lake Borgne—precisely what happened during Katrina.

732.   The destruction of tens of thousands acres of pristine cypress swamp and wetlands was also inconsistent with the Corps' own policies mandating a full environmental analysis of cumulative effects of activities like continued dredging on wetlands.  Exh. 177, Digest of Water Resources Policies and Activities, December 1972, Chapter 19 (Wetlands Conservation) at ¶19-3.

733.   Similarly, the Corps' 1985 Supplemental Information Report ("SIR")—prepared nine years after the 1976 FEIS—makes no reference to the subsidence that had occurred since the overdepth or advanced maintenance had been undertaken by the Corps, much less the near tripling of the Reach 2 channel width which would soon be found to present eminent danger to the environment.  These omissions are further proof of the Corps' non-compliance with NEPA.

734.   Depriving the Corps of the DFE is arranted here because there is substantial evidence that the Corps was obdurate and intentionally violated its NEPA mandate.  If the waiver of sovereign immunity in the FTCA is to have any vitality, the DFE cannot be allowed to swallow the rule in such an notable case of statutory noncompliance as presented here.

735.   As discussed below, the Court has also concluded that the Corps' actions and inactions challenged here violated Louisiana tort law which required that the Corps build, operate, and maintain the MR-GO without creating an unreasonable risk of harm.  This breach of a mandatory legal duty imposed by state law is a second basis for denying the Corps the protection afforded by the DFE. *See Lively v. United States*, 870 F.2d at 299 ("[T]wo types of activity would fall within the exception : violations of specific, mandatory regulations or statutes

and ordinary common law torts where the exercise of discretion is not based on policy considerations.") (Emphasis added.)

736.   Based on this record, Plaintiffs, as a matter of law, have demonstrated a causal connection between the destruction of their property during Katrina and the Corps' breach of duty in violation of Louisiana tort law, as well as its recurring failures to file proper NEPA reports and inform Congress of the MR-GO's significant adverse effects on the environment. The Court has found that there is causal connection between the loss of wetlands and Reach 2 channel widening and the exacerbation of storm surge and waves that were a substantial causative factor in the overtopping and failure of LPV structures.  Moreover, if the Corps had alerted Congress to the seriousness of the problem and risk to life and property, Congress could have authorized and funded remedial measures that would have significantly minimized, if not obviated, the danger. Indeed, after Katrina, a more fully informed Congress voted to close (de-authorize) the MR-GO.

737. Similarly, one of the several grounds for finding the Corps failed to exercise due care under Louisiana law was its chronic failure to take remedial action to prevent or retard the loss of wetlands and channel widening which were substantial factors in causing the catastrophic flooding.

**Non-Policy Decisions**

738.   As discussed in detail above, the Court has determined that the Corps' actions and inaction with respect to the MR-GO for over nearly a half century was inconsistent in several ways with objective professional judgment or scientific standards and not the permissible exercise of policy judgment.

739.   The inapplicability of the DFE is especially justified when public safety and property are jeopardized by an agency's recurring negligent conduct.  *See, e.g., Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1214 (9th Cir. 2001); *Cope v. Scott*, 45 F.3d 445, 451-2 (D.C. Cir. 1995); *Whisnant v. United States*, 400 F.3d 1177, 1183-4 (9th Cir. 2005).

740.   In *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955) where the Supreme Court declared that a federal agency like the Corps loses the benefit of any immunity when it undertakes an activity but fails to exercise due care "to make certain that [the project] was in good working order," "to discover [defects] and to repair [it] or give warning that it was not functioning."  As later explained in *Berkovitz*, "the failure to maintain the lighthouse in good condition . . . did not involve any permissible exercise of policy judgment."  486 U.S. at 538 n. 3.

741.   The record contains considerable evidence that for decades before Katrina, the Corps knew about the mounting dangers that the MR-GO was creating, but failed to warn Congress of the life threatening risk of catastrophic flooding that the Corps itself created and recognized.  The Corps' substandard conduct is not policy-based decision-making—it is the very kind of actionable negligence that Congress intended to make amenable to damages under the FTCA.

742. The conduct here falls decidedly at the end of the spectrum where judgments about safety are not considered to be susceptible to social, economic, or political policy.  "[R]emoving an obvious . . . hazard is a matter of safety, not policy [and] cannot be protected under the discretionary function exception."  *Whisnant v. United States*, 400 F.3d at 1183.

**Louisiana Negligence Law**

743.   Under Louisiana law, every act of the United States that causes damage to another as a result of the fault of the United States obliges the United States to repair that damage.  LSA C.C. Art. 2315(A); *Graci v. United States*, 435 F.Supp. 189, 195 (E.D. La. 1977).

744.   The elements of a cause of action under Article 2315 are Fault (which embraces all conduct falling below a proper standard), Causation, and Damage.  *Weiland v. King*, 281 So.2d 688, 690 (La. 1973); *Graci v. United States*, 435 F. Supp., at 195.

745.   Under Louisiana law, the United States is responsible for the damage it occasions not only by its acts, but also by its negligence, imprudence, and want of skill.  LSA C.C. Art. 2316; *Graci v. United States*, 435 F.Supp. at 195.

746.   The United States as grantee of the right of way, builder and maintainer of the MR-GO assumed a high standard of care with relation to damages caused by the MR-GO to neighboring lands and individuals.  LSA C.C. Art. 667; *Carr v. City of Baton Rouge*, 314 So.2d 527 (La.App.1975); *Graci v. United States*, 435 F.Supp. at 195.

747.   The failure to exercise that degree of care ordinarily expected of a reasonably prudent person under similar circumstances constitutes negligence. *Fire & Gas Ins. Co. of Conn. v. Garick*, La. App. 312 So.2d 103,writs denied, 313 So.2d 845 (La. 1975); *Graci v. United States*, 435 F.Supp. at 196.

748.   Plaintiffs have shown by a preponderance of the evidence fault and negligence by the Defendant in the MR-GO's design, construction, operation, and maintenance.

749.   Plaintiffs have shown by a preponderance of the evidence a causal connection between the MR-GO defective conditions and negative effects and the damages sustained by Plaintiffs.

750.   The duty-risk analysis is the governing negligence standard for determining whether to impose tort liability under Louisiana Civil Code Article 2315. *See In re Katrina Canal Breaches Consol. Litig.*, 2007 WL 4573052, at \*2 (E.D. La. 2007) (citing *Lemann v. Essen Lane Daiquiris,Inc.*, 923 So. 2d 627, 632-33 (La. 2006)). To prevail on a claim of negligence, the plaintiff must satisfy the five elements of the duty-risk analysis: (1) the defendant had a duty to conform his conduct to a specific standard; (2) the defendant's conduct failed to conform to the appropriate standard; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) the actual damages.

751.   In terms of the first requirement, the pertinent inquiry on the scope of duty is "whether the plaintiff has any law—statutory, jurisprudential, or arising from general principles of fault—to support his claim." *Faucheaux v. Terrebonne Consol. Govt.*, 615 So. 2d 289, 292 (La. 1993); *In re Katrina Canal Breaches Consol. Litig.*, 2007 WL 4573052, at \*2 (E.D. La. 2007).  There are numerous sources of Louisiana law establishing a legal duty on the Corps to design, construct, operate, and maintain the MR-GO in a safe manner that did not enhance the risk of flooding during hurricanes, *i.e.*, the MR-GO had to be "hurricane neutral."

752.   Under long-established Louisiana law, the United States is responsible for any loss or injuries caused by defects in the MR-GO.  Louisiana Civil Code Article 2315 establishes that the United States—as owner and operator of the MR-GO—has a duty to avoid "every act whatever . . . that causes damages to another" and must compensate those "by whose fault it happened . . . ."  La. Civ. Code Art. 2315.

753.   Moreover, as a landowner/proprietor, the United States is liable for any of the MR-GO's defects "which may deprive [its] neighbor[s] of the liberty of enjoying [their] own [properties], or which may be the cause of any damage to [them]."  La. Civ. Code Art. 667.

754.   Louisiana courts have historically held landowners and proprietors liable for flooding a neighbor's property. *See, e.g., Lombard v. Sewerage & Water Bd.*, 284 So. 2d 905, 914 (La. 1973) (damage to homes resulting from construction of drainage canal); *Branch v. City of Lafayette*, 663 So. 2d 216, 220 (La. App. 1995) (water damages to home after heavy rainfall caused by defective drainage system). Liability for causing flooding—which the landowner/proprietor is uniquely capable of preventing—implements a salutary public policy: "The persons at whose disposal society has placed the potent implements of technology owe a heavy moral obligation to use them carefully and to avoid foreseeable harm to present or future generations."  *Pitre v. Opelousas Gen. Hosp.*, 530 So. 2d 1151, 1157 (La. 1988).

755.   Louisiana law also imposes a duty on a landowner/proprietor to warn the public of the risk of damage to the nearby property posed by the known defects of, and hazards created by, its facility or property. Thus, in addition to the duty not to create a hazard in the first instance, "a landowner owes a plaintiff a duty to discover any unreasonably dangerous conditions and to either correct the condition or warn of its existence."  *Socorro v. City of New Orleans*, 579 So. 2d 931, 939 (La. 1991); *see also Shelton v. Aetna Cas. & Sur. Co.*, 334 So. 2d 406, 410 (La. 1976) (citations omitted.); *Faucheaux, supra*, 615 So. 2d at 294 (duty of parish in maintaining an automatic canal gate and providing warnings of perilous conditions).

756.   Government agencies like the Army Corps therefore have a legal duty to repair defective conditions and warn of known defects.  *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955) (in operating a coastal lighthouse, Coast Guard had the duty to maintain the facility

in good working condition and to warn users if it went out of service).  This is particularly true where the agency's own construction activities have created the dangerous situation.  *See Brandon v. State, Through Dept. of Highways*, 367 So. 2d 137, 143 (La. App. 1979) ("It is a breach of that duty for the Department to undertake construction, partially complete the project, and then leave the project unfinished with hazardous conditions existing for an unreasonable period of time, particularly when it is within the capacity of the Department to complete the project and eliminate the hazard.")

757.   Applying these norms to our case, the Army Corps had a duty to assure that the MR-GO did not enhance the risk of flooding during hurricanes.  A public authority is charged with a duty to design, construct, operate, and maintain its facilities to avoid "presenting an unreasonable risk of injury" to the public.  *Faucheaux, supra*, 615 So. 2d at 293.

758. Defendant's legal duty to prevent the MR-GO from causing flood damages has already been determined. In *Graci v. United States*, *supra,* 435 F. Supp. at 195-96, Chief Judge Heebe concluded that as a matter of law:

(a)      Under Louisiana law, the United States is responsible for the damage it occasions not only by its acts, but also by its negligence, imprudence and want of skill. LSA C.C. Art. 2316.

(b)      The United States as grantee of the right of way, builder and maintainer of the MRGO assumed a high standard of care with relation to damages caused by the works to neighboring lands and individuals. LSA C.C. Art. 667; *Carr v. City of Baton Rouge*, 314 So. 2d 527 (La. App. 1975).

(c)   The failure to exercise that degree of care ordinarily expected of a reasonably prudent person under similar circumstances constitutes negligence.  *Fire & Gas Ins. Co. of Conn. v. Garick*, La. App., 312 So. 2d 103, writs denied, 313 So. 2d 845 (La. 1975).

759.   This duty to prevent flooding is also imposed by federal law. "Congress has mandated that the Secretary of the Army, acting through the Corps of Engineers, has the responsibility to provide flood protection for the City of New Orleans.  *See* 33 U.S.C. §701 *et seq.*"  *In re Katrina Canal Breaches Consol. Litig.*, 2007 WL 4573052, at *3 (E.D. La. 2007).

760. Similarly, the Government has a duty to avoid causing flooding in building, operating, and maintaining federal projects such as the MR-GO. *See, e.g., Kennewick Irrig. Dist. v. United States,* 880 F.2d 1018 (9th Cir. 1989) (U.S. Bureau of Reclamation built defective irrigation canal whose breaks caused property damage and personal injuries); *see also Alabama Elec. Co-op, Inc. v. United States,* 769 F.2d 1523 (11th Cir. 1985) (Army Corps caused property damage due to defective construction of a dike); *Seaboard Coast Line R.R. Co. v. United States*, 473 F.2d 714 (5th Cir. 1973) (Army Corps-designed drainage system diverted water that damaged railroad right-of-way).  As the Fifth Circuit has held, "[t]he United States may be liable under the Federal Tort Claims Act for negligent provision of services upon which the public has come to rely."  *Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir. 1970) (citing *Indian Towing Co.*, *supra*, 350 U.S. at 76).

## **Causation**

761.   The duty-risk analysis requires that the negligence be both a cause-in-fact of the plaintiff's injury and a legal cause of the injury.  *See In re Katrina Canal Breaches Consol. Litig.,* 2007 WL 4573052, at *4 (E.D. La. 2007).

762.     The issue of "legal cause"—also expressed as "scope of duty"—is a purely legal question for the Court.  *Ibid.*  Clearly, the risk of serious property damage here is easily associated with a duty not to cause flood damage to "neighboring lands and individuals."  *Graci, supra,* 435 F. Supp. at 195-96; *see also Roberts v. Benoit*, 605 So. 2d 1032, 1054 (La. 1991); *Faucheaux, supra,* 615 So. 2d at 294.

763.     Cause-in-fact is a factual determination that may be proven by direct or circumstantial evidence. Typically, expert testimony can supply the necessary proof.  *Torregano v. Cross*, 2008 WL 4059573, at *2-3 (E.D. La. 2008) (citing *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992) (plaintiff's summary judgment motion denied because defendant's expert offered competent evidence as to the cause of the accident to rebut plaintiff's claim)).

764.     It is well settled that "[t]here can be more than one cause in fact, making multiple wrongdoers liable."  *Hennigan v. Cooper/T. Smith Stevedoring Co., Inc.*, 837 So. 2d 96, 102 (La. App. 2002). Here there is only one alleged wrongdoer/tortfeasor, the Army Corps of Engineers.

765.     While Plaintiffs must prove that the MR-GO was a substantial factor, "[a] substantial factor need not be the only causative factor; *it need only increase the risk of harm.*"  *Hennigan, supra*, 837 So. 2d at 102 (citing *Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir. 1975)) (emphasis added).  In cases involving concurrent causes of damages, "'the proper inquiry is whether the conduct in question was a substantial factor in bringing about'" plaintiff's damages.  *Chaisson v. Avondale Indust., Inc.*, 947 So. 2d 171, 187-88, (La. App. 2006) (quoting *Perkins v. Entergy Corp.*, 782 So. 2d 606, 611-12 (La. 2001)).

766.     In determining whether a defendant's course of conduct was a substantial factor in causing plaintiff's harm, "[t]he Louisiana Supreme Court has analyzed whether 'each of the

multiple causes played so important a role in producing the result that responsibility should be imposed upon each item of conduct, *even if it cannot be said definitively that the harm would not have occurred 'but for' each individual cause.'"  Chaisson, supra* 947 So. 2d at 187 (emphasis added) *quoting Graves v. Page,* 703 So.2d 566, 570 (La. 1997).

767.    Defendant's articulation of Louisiana law on cause-in-fact is flawed. While Plaintiffs must demonstrate that the Army Corps's negligent management of the MR-GO was a substantial factor in causing their damages, it is not true that they must also demonstrate that but for the widening of the waterway and the loss of the wetlands the alleged damages would have been less or would not have occurred at all.  Defendant's attempt to impose a "but for" requirement is contrary to controlling Louisiana law as expressed in *Chaisson*.

768.    For example, in *In re Manguno,* 961 F.2d 533 (5th Cir. 1992), plaintiffs contracted lung cancer and sued the manufacturer of the asbestos to which they were exposed. The plaintiffs all were smokers, but they did not sue the tobacco manufacturers.  The expert testimony at trial indicated that asbestos was a "substantial contributing factor" to contracting cancer, although tobacco could not be ruled out as a cause.  The theory of the case was that asbestos and cigarettes were concurrent causes of the cancer.  The question was whether the asbestos manufacturer could be liable for the plaintiffs' damages.  The trial court instructed the jury that asbestos had to be a "but-for" cause of the cancer.  The jury found for the manufacturer. The Fifth Circuit reversed, finding the "but-for" instruction to be in error.  The court noted that *Chaisson* "made manifest that a 'but for' definition of causation is inappropriate for a concurrent cause Louisiana tort action" and that "[t]here can be more than one cause in fact…"  *Id*. at 535 (internal cites omitted).  The court concluded that the plaintiff did not have to prove "that the defendant alone would have caused the harm."  *Id.*

769.    Moreover, since this Court has found that the Army Corps caused (*i.e.*, was a substantial contributing factor) damage to the Plaintiffs, in the absence of any other culpable entity, the Army Corps is liable for 100% of the damages.

770.    Louisiana's comparative fault statute does not apply to this case.  Article 2323 of the Louisiana Civil Code concerns comparative fault and the allocation of liability. It does not apply to this case because there are no entities, other than the Corps, who are even arguably at fault for the damage suffered by the Plaintiffs in this lawsuit.  Comparative fault concerns allocation among people, not causes.

771. Article 2323(A) provides as follows:

> In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of *all persons causing or contributing to the injury, death, or loss* shall be determined, regardless of whether *the person* is a party to the action or a nonparty… If *a person* suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault *of another person or persons*, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to *the person* suffering the injury, death, or loss.

La. Civ. Code Art. 2323(A) (emphasis added).

772.    Article 2324 B of the Louisiana Civil Code provides that liability for damages caused by *two or more persons* shall be a joint and divisible obligation; however, where only one person/entity causes the damage, art. 2324 has no application.  Where a single actor through multiple acts of negligence causes damage, that defendant is liable for the whole.

773.    There has been no evidence, indeed no allegation, in this lawsuit that any other person or entity exacerbated the effects of Hurricane Katrina by their conduct.  There certainly is no allegation that Norman Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr. or Lucille Franz—the Plaintiffs—are at fault for this catastrophe.

774. The court therefore finds that, as a matter of law, the Army Corps is liable for 100% of the harm suffered by the Plaintiffs.

<u>**CERTIFICATE OF SERVICE**</u>

I, Pierce O'Donnell, hereby certify that on April 3, 2009, I caused to be served

**PLAINTIFFS' PRETRIAL PROPOSED FINDINGS OF FACT AND**

**CONCLUSIONS OF LAW**, upon Defendants' counsel, Robin D. Smith, George Carter,

Keith Liddle, and Richard Stone by ECF and email at robin.doyle.smith@usdoj.gov;

george.carter@usdoj.gov, keith.liddle@usdoj.gov, and richard.stone@usdoj.gov.

<u>/s/ Pierce O'Donnell</u>