**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO (*Robinson, 06-2268*) | § | |
| | § | |
| _____ | § | |

**UNITED STATES OF AMERICA'S TRIAL BRIEF**

Plaintiffs seek damages for the flooding of their properties that resulted when the storm surge generated by Hurricane Katrina overwhelmed the Lake Pontchartrain and Vicinity Hurricane Protection floodworks on August 29, 2005.  According to the Plaintiffs, the flooding of their properties was caused not by Hurricane Katrina but by the negligent design, construction, maintenance, and operation of the Mississippi River-Gulf Outlet ("MRGO").  The evidence will show, however, that the MRGO was not a substantial factor in the flooding of Greater New Orleans.  This catastrophe would have occurred regardless of the MRGO and regardless of the way the channel was maintained prior to the flood.  Hurricane Katrina generated surge that far exceeded the surge the capacity of the Lake Pontchartrain and Vicinity Hurricane Protection Project levees and floodwalls.  Those works had not been designed to withstand surge as powerful as that created by Katrina, and the works that were in place when the storm struck did not even measure up to the designs, because construction of the levees was not yet complete.

**STATEMENT OF MATERIAL FACTS**

Construction of the MRGO was authorized by Congress in 1956 and began in 1958.  The dredging of the channel to its full dimensions was completed a decade later, in 1968.

Simultaneously with the development of detailed designs for the MRGO channel and its construction, the Corps of Engineers also was studying a plan for constructing federal hurricane protection for the New Orleans area.  Congress authorized construction of the Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPV") in legislation passed on October 27, 1965. While the MRGO and LPV were independent projects, separately authorized and funded, their proximity gave rise to multiple connections between them, connections of which the Corps was well aware.  The evidence will show that the existence of the MRGO and its impacts on the LPV and surrounding area were evaluated by the Corps beginning with the initial planning documents and continuing throughout the life of the project.  The nexuses between the projects appear not only in the initial design documents but also in the documents that re-evaluated the project, continuing right up until Hurricane Katrina.

The initial design documents reveal numerous considerations reflecting the fundamental relationship between the two projects.  For example, the location of the levees intended to protect Chalmette was selected based in part on the existence of the MRGO and especially the MRGO spoilbanks, which provided a foundation for the LPV levees.  Included in the design of the LPV levees was a specification that the MRGO project be modified to include foreshore protection along the south bank, to prevent bank erosion from compromising the stability of the levees. The LPV project included hydraulic studies that evaluated both salinity increases resulting from the MRGO and the impact of the deep-draft channel on storm surge.  The Corps "killed two birds with one stone," by dredging the channel deeply to obtain materials for levee construction.

The first study to evaluate the impact of the MRGO on storm surge was commissioned shortly after Hurricane Betsy caused flooding of St. Bernard and Orleans Parishes in 1965.

2

Based on that study, the Corps upwardly revised the LPV levee grades because the surges generated by Betsy were greater than expected.  The study showed that the surge, though large, was only minimally affected by the MRGO.

The evidence will show that the Corps continued to consider the relationship between the two projects even after completion of the LPV design.  Multiple studies were performed to evaluate the hurricane protection system in light of changes in the project, advances in science and technology, and to respond to concerns raised regarding the impact of the MRGO on storm surge.  Both the state of Louisiana and local governments, including St. Bernard Parish, repeatedly passed resolutions that informed Congress of the alleged problems caused by the MRGO and requested its closure.  The Corps responded to inquiries from Congress regarding these resolutions and also informed Congress of problems such as bank erosion through its reconnaissance reports.  At the time of Hurricane Katrina, a re-evaluation of the MRGO was nearing completion, evaluating whether continued operation of the MRGO remained economically justified.  That re-evaluation included another study of the impact of the MRGO on storm surge and the LPV hurricane protection system using advanced modeling technology, which again found that the MRGO had a minimal impact on the surge generated by most storms. In addition, the Corps participated in numerous studies of the environmental impacts of the MRGO and efforts toward coastal restoration, both in the immediate vicinity of the MRGO and coast-wide.  Many such studies were joint efforts with the state of Louisiana.

The Corps correctly concluded, after thorough investigation, that the concerns expressed by local citizens who believed that the MRGO posed a threat of flooding were unfounded.  The Corps did recognize, however, that the LPV flood protection structures would not be able to

withstand surge generated by a powerful hurricane.  The Corps therefore repeatedly advised

Congress of the distinct possibility that the eastern areas of Greater New Orleans would be

devastated by flooding in the event of a major hurricane striking the region.  The Corps also

informed Congress of the problem of wetlands loss in southeastern Louisiana and of the loss of

wetlands resulting from the operation and maintenance of the MRGO.  The Corps was unable to

remedy the problem of MRGO-related erosion because no local entity was willing to shoulder a

portion of the cost of studying feasible solutions.  The failure to remedy that problem played no

role in the flooding caused by Hurricane Katrina.  Even if the wetlands had been in the very same

condition as before the MRGO came into existence, the surge generated, driven, and sustained by

Hurricane Katrina was so great that the destruction of the Reach 2 MRGO levee was inevitable.

In very earliest hours of August 29, 2005, storm surge driven by Hurricane Katrina began

piling up along the LPV levee facing Lake Borgne.  By 3:00 a.m., the water level exceeded 10

feet, and small waves of about 8 inches were lapping at the levee.  By 4:00 a.m., the water had

risen more than a foot, and the waves had doubled in size.  An hour later, at 5 o'clock, the water

level was nearly 13 feet, and two-foot waves were overtopping the levee in many places.

Overtopping began when the surge was about two feet below the crest of the levee, as waves

surged up and over the top.  In places where the levee crest was less than 15 feet—and there were

many such places—water accelerated by gravity was rushing down the backside of the levee by

5:00 a.m.

By 5:00 a.m., waves alone were carrying so much water over the top of the levee that the

flow rates on the backside were sufficient to cause erosion.  In places where the levee crest

4

elevation was 15 feet or less, the flow rates on the back of the levee remained sufficiently high to cause erosion for at least six hours.

At the Reach 2 levee, the surge was rising rapidly, at a rate of nearly two feet per hour between 4:00 a.m. and 7:00 a.m.  Between 5:00 a.m. and 5:30 a.m., the surge elevation increased from about 13 feet to nearly 14 feet.  By 6:00 a.m. the surge was at 15-and-a-half feet, and thirty minutes later it was more than a foot higher, 16.8 feet.  The surge peaked at more than 17 feet elevation all along the MRGO Reach 2 levee, between 7:00 a.m. and 7:30 a.m.  In many places between Bayou Bienvenue and Bayou Dupre, the surge exceeded 18 feet.

The levee was only designed to withstand a surge that was 13 feet or less above sea level, and the levee that stood beside the MRGO on August 29, 2005, was not even as tall or as strong as the design specified.  The design specified a levee crest elevation of 17.5 feet, so that waves running up from a 13-foot surge would not overtop the levee.  Because of budgetary restraints, the Corps of Engineers was prevented from enlarging and raising the Reach 2 levee before Katrina.  When the storm struck, more than half of the Reach 2 levee was less than 17 feet in crest elevation.  More than 20 percent of the levee crest was between 14 feet and 15.5 feet—more than two feet shy of the specified design elevation.

Because so much of the levee was not even as high as the surge and because the surge reached elevations equaling or exceeding the levee crest even where the levee met the design specification, the levee massively eroded between Bayou Bienvenue and Bayou Dupre.  The overtopping flow rate was more than 10 times the threshold rate at which damage to high quality grass-covered clay levees can begin.  According to published guidelines for use in designing levees, a flow rate of 0.011 cubic feet per second per foot (cfs/ft) is the threshold at which

damage to clay levees with a reasonably good grass cover can occur.  A rate of one cubic foot per second per foot (1 cfs/ft)—about 10 times the damage threshold—was met or exceeded at every point south of Bayou Bienvenue.  Indeed, where the levee was lowest and overtopping was therefore the greatest, overtopping rates were as much as 25 cfs/ft—250 times the rate at which erosion of the best grass-covered earthen levees can begin.

The duration of damaging overtopping flow on the backside of the Reach 2 levee ranged from more than six hours (at the lowest spots, where overtopping began earliest) to about three hours at levees that had a crest elevation of 19 feet.  Even where the levee crest met or exceeded the 17.5-foot LPV design specification, overtopping waves and surge met or exceeded the 0.011 cfs/ft damage threshold for between three and four hours.  Most of the Reach 2 levee experienced a backside flow rate that was double the threshold rate for more than three hours.

The massive breaching of the Reach 2 levee was not caused by the MRGO.  Reducing the MRGO to its initial design dimensions would have made almost no difference in the surge.  Studies performed by both Plaintiffs' experts and Defendant's experts demonstrate that every aspect of surge at the Reach 2 levee would have been unaffected by reducing the size of the channel.  Onset, rate of rise, peak elevation, duration, and rate of fall would have been about the same.

The same lack of change was demonstrated through analysis of the effects of restoring wetlands near the MRGO to their pre-MRGO condition.  No aspect of surge would have been much affected by reducing the size of the channel or restoring wetlands or doing both.  Not even eliminating the MRGO in its entirety and eliminating all possible hydrologic effects of the

channel would have prevented the massive overtopping that extensively breached the LPV levee between Bayou Bienvenue and Bayou Dupre.

As a result of the breaches that developed in the Reach 2 levee, water flowed into the wetlands to the south and west and then overtopped the 40 Arpent levee. Prolonged flow of surge over and through the MRGO levee eventually inundated the developed areas of St. Bernard and even the Lower Ninth Ward. Although surge also entered the Lower Ninth through breaches in the LPV floodwall on the east side of the IHNC, even in the Ninth Ward, water from the Reach 2 levee breaches eventually equaled and exceeded the flood elevations produced by the IHNC breaches. Ultimately, the breaches in the IHNC floodwall had a beneficial effect, allowing floodwaters to drain out of the Lower Ninth and St. Bernard more rapidly than they otherwise would have.

The operation and maintenance of the MRGO had very little effect on storm surge levels in the IHNC. If the MRGO had been kept at its initial design dimensions and the wetlands had been wholly unaffected by the channel, surge in the IHNC would have been only about six inches lower. It was the design and construction that had a sizeable impact on surge levels in the IHNC. By enlarging the GIWW to the deeper and wider MRGO dimensions, the channel was enabled to carry much more surge into the IHNC. But not even the design and construction of the Reach 1 MRGO was a cause of the breaches that occurred in the IHNC. The floodwall in the Lower Ninth Ward failed because of an inadequate foundation and because of overtopping that would have occurred even if the GIWW had not been enlarged to accommodate the MRGO in Reach 1. Any additional overtopping that occurred as a result of the MRGO was superfluous, as the breaches occurred before the surge rose above pre-MRGO levels in the IHNC.

7

The only way in which the catastrophic flooding of the Lower Ninth Ward, St. Bernard, and New Orleans East could have been avoided would have been through the construction of a better hurricane protection system. The devastating water that rushed into New Orleans East came mainly through a huge breach in the New Orleans East Back Levee, east of Michoud. With or without the MRGO, the breaching of this levee would have occurred. The MRGO did not cause the breaching of the New Orleans East Back Levee, and it did not cause the flooding of Plaintiffs' property in New Orleans East. This breach could have been prevented only by the construction and maintenance of a stronger, more resilient levee.

Bigger, stronger levees along the GIWW, the MRGO, and the IHNC could have prevented floodwaters from inundating Plaintiffs' properties. Better operation and maintenance of the MRGO could not have averted this tragedy and would not have prevented or lessened Plaintiffs' alleged damage.

The Corps of Engineers was warned many times prior to Hurricane Katrina that the MRGO could function as a conduit for hurricane-driven surge and posed a threat to Greater New Orleans. The Corps investigated in response to these expressions of concern. Studies were commissioned by the Corps, and distinguished scientists reported that the channel would not substantially increase surge during a powerful hurricane. The Corps reasonably relied on the reports provided by these experts. The Corps also could reasonably have relied on the finding by this Court after Hurricane Betsy that the MRGO had not been negligently designed or constructed and had not caused the flooding experienced in St. Bernard Parish, the Lower Ninth Ward, New Orleans East, and elsewhere.

The Corps of Engineers did not know nor should it have known that the MRGO could have a substantial effect on hurricane-generated waves.  The science that enables the experts in this case to opine about the MRGO's effect on waves was insufficiently developed prior to Hurricane Katrina to enable the Corps to determine whether the channel would substantially enlarge waves.  By commissioning studies and relying on them in analyzing the hydrologic risks, if any, posed by the MRGO, the Corps exercised reasonable care.

## **ARGUMENT**

## INTRODUCTION

This court previously has ruled that the United States is protected by the discretionary function exception for all decisions and actions related to the design and construction of the MRGO.  Accordingly, the only remaining actionable claim is whether the United States may be held liable for the Corps' operation and maintenance of the channel.

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress."  St. Tammany Parish ex rel. Davis v. FEMA, 556 F.3d 307, 316 (5th Cir. 2009); see also Williamson v. U.S. Dep't of Agric., 815 F.2d 368, 373 (5th Cir. 1987) ("The doctrine of sovereign immunity is inherent in our constitutional structure and . . . renders the United States [and] its departments ... immune from suit except as the United States has consented to be sued."). Because "[s]overeign immunity is jurisdictional in nature," F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994), Congress's "waiver of [it] must be unequivocally expressed in statutory text and will not be implied." Lane v. Pena, 518 U.S.

187, 192 (1996) (internal citation omitted); see also Petterway v. Veterans Admin. Hosp., 495 F.2d 1223, 1225 n. 3 (1974) ("It is well settled . . . that a waiver of sovereign immunity must be specific and explicit and cannot be implied by construction of an ambiguous statute.").

For the foregoing reasons, this Court lacks jurisdiction over Plaintiffs' claims because Congress has not waived the government's sovereign immunity for such claims. Even if it did have jurisdiction, Plaintiffs have failed to carry their burden of proof with respect to duty, negligence, and causation.

I.      The United States is immune from suit under the Flood Control Act, 33 U.S.C. § 702c

The text of § 702c is straightforward and unambiguous: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c. This "sweeping" assertion of sovereign immunity "'safeguard[s] the United States against liability of any kind for damage from or by floods or flood waters in the broadest and most emphatic language.'" United States v. James, 478 U.S. 597, 608 (1986) (citation omitted) abrogated on other grounds by Central Green Co. v. United States, 531 U.S. 425 (2001). On its face, the statute's plain language, which has been given full effect and has not been abrogated in any way by the Supreme Court, bars this case. Contrary to the express language of the statute, Plaintiffs seek to hold the United States liable for damage caused by "floodwaters from the MRGO."

Application of the Flood Control Act here to bar Plaintiffs' claims is also required by the core teachings of James and Central Green.  In James, the Court determined that the statutory word "damage" encompasses not just property damage, but also personal injuries and death.  See 478 U.S. at 605.  Subsequently, in Central Green, the Supreme Court emphasized that § 702c immunity turns on "the character of the waters that cause the relevant damage."  See 531 U.S. at 437.  These Supreme Court precedents make it clear that the United States cannot be held liable for "any damage," whether to property or to person, caused by or resulting from "floods or flood waters." The latter statutory phrase was expressly construed to include "those waters that a federal project is unable to control." Id. at 431; accord James, 478 U.S. at 605; cf. R.D. 6194 (order on motion for 28 U.S.C. § 1292(b) certification) (statutory phrase is limited to waters that "have a nexus to a flood control project").

This authoritative construction disposes of this case, for the "floodwaters from the MRGO" were undeniably "waters that a federal project [was] unable to control." It is undisputed that flood control structures were put in place along the MRGO to keep storm surge from Lake Borgne out of the developed areas adjacent to the lake. At the time Hurricane Katrina hit the MR-GO area, the crest elevation had settled approximately 1.5 feet below the target crest elevation.

Because storm surge during Hurricane Katrina exceeded the crown elevation of the MRGO levee, the stage was set for general overtopping. This overtopping, and the wave

attack that preceded it, destroyed the MRGO levee, causing complete loss in some places and significant degradation in most.

The breaching of the MRGO levee along Reach 2 was the significant occurrence in the chain of events that produced the flood. All of the waters that contributed to the inundation of St. Bernard Parish, the Lower Ninth Ward, and New Orleans East entered those polders either as water that flowed over or through the levees and floodwalls surrounding them or as rainfall. Had the levees and floodwalls withstood Katrina's onslaught intact, St. Bernard Parish, the Lower Ninth Ward, and New Orleans East would have been inundated to elevations much lower than those to which the floodwaters actually rose during the event.

Indeed, according to Plaintiffs' own expert, Dr. Bea, the principal cause of the flooding was imperfect levees. He opined that the levees were not constructed of the proper materials, were not constructed to the proper height, and did not have the proper grass cover. Dr. Bea believes that the poor grass cover was caused by salinity introduced by the MRGO and, in fact, by improper maintenance and grass type. All of Plaintiffs' experts agree that the massive build-up of floodwaters that eventually overtopped the levees—causing them to erode and fail, sending catastrophic levels of floodwaters into the polder of St. Bernard Parish and the Lower Ninth Ward—was the result of the existence of those levees in the first place. Simply put, the condition of the levees was not an issue until a massive hurricane generated a massive storm surge that overwhelmed the hurricane protection

system that was not designed to withstand such an onslaught.  Plaintiffs' damages resulted from floodwaters.

Plaintiffs indisputably suffered an indivisible harm in the form of floodwaters that built up as a result of the presence of flood control project levees.  The existence and failure of those levees are a necessary link in  the causal chain of events that led to the flooding of Plaintiffs' homes.  It cannot be removed from the picture and is a necessary antecedent to any of the damages in this case.  It is too speculative to proportion the harm caused by the several variables, all of which are inextricably intertwined, and each of which, if removed from the causal chain, would eliminate the chain of causation altogether.

No more germane or appropriate nexus between a flood control project and floodwaters is imaginable for purposes of § 702c analysis.  A flood occurred, inundating and damaging protected areas because flood control structures were overtopped and breached.  Flooding of Citrus, New Orleans East, the Lower Ninth Ward, and St. Bernard Parish was exactly what the LPV project was intended to prevent.   While regrettable, the inescapable conclusion is that Plaintiffs' damages were the result of floodwaters that the LPV flood control project failed to prevent.  As such, the United States is immune from this lawsuit and this Court lacks jurisdiction over the case.

II.     This Court lacks subject matter jurisdiction because Plaintiffs' claims are
        barred by the discretionary function exception.

The Federal Tort Claims Act does not apply to claims that challenge conduct that is

(1) discretionary and (2) "susceptible to policy analysis." United States v. Gaubert, 499 U.S.

315, 325 (1991) (construing 28 U.S.C. § 2680(a)); Andrade v. Chojnacki, 338 F.3d 448, 457

(5th Cir. 2003); Baldassaro v. United States, 64 F.3d 206, 208, 211 (5th Cir. 1995).[1] Conduct is

considered discretionary if it "involve[s] an element of judgment and choice." Gaubert, 499

U.S. at 322 (original alteration omitted) (quoting Berkovitz v. United States, 486 U.S. 531,

536 (1988), and citing Dalehite v. United States, 346 U.S. 15, 34 (1953)); accord Baldassaro,

64 F.3d at 208. A Government employee necessarily exercises discretion, uses judgment, and

makes choices when he acts pursuant to a federal statute, regulation, or policy that does not

direct a specific course of conduct.  Unless the statute, regulation or policy specifies a

---

[1] Section 2680 provides as follows:

The provisions of this chapter and section 1346(b) of this title shall not
apply to—
(a) Any claim based upon an act or omission of an employee of the
Government, exercising due care, in the execution of a statute or
regulation, whether or not such statute or regulation be valid, or
based upon the exercise or performance or the failure to exercise
or perform a discretionary function or duty on the part of a federal
agency or an employee of the Government, whether or not the
discretion involved be abused.

The Supreme Court's construction of this exception is principally set forth in four
cases: United States v. Gaubert, 499 U.S. 315 (1991); Berkovitz v. United States, 486 U.S. 531
(1988); United States v. Varig Airlines, 467 U.S. 797 (1984); and Dalehite v. United States,
346 U.S. 15 (1953).

"specific direction" for the employee to take, his conduct is discretionary.  See Guile v.

United States, 422 F.3d 221, 231 (5th Cir. 2005); see also Gaubert, 499 U.S. at 322; Rich v.

United States, 119 F.3d 447, 450 (6th Cir. 1997); ALX El Dorado, Inc., v. Southwest Sav. &

Loan Ass'n, 36 F.3d 409, 411-12 (5th Cir. 1994).  Discretion is removed only by "a 'federal

statute, regulation, or policy [that] specifically prescribes a course of action for an employee

to follow,'" because in that circumstance the employee must follow the prescribed course.

Gaubert, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at 536).

The second characteristic of protected conduct is that it is "susceptible to policy

analysis."  See Gaubert, 499 U.S. at 325; accord Baldassaro, 64 F.3d at 211.  This is implicit in

the text of § 2680(a) because the discretionary function exception was drafted "to prevent

judicial 'second-guessing' of legislative and administrative decisions grounded in social,

economic, and political policy through the medium of an action in tort."  See Gaubert, 499

U.S. at 323 (quoting Varig Airlines, 467 U.S. at 814). Conduct is susceptible to policy analysis

if it is "the kind of conduct that can be said to be grounded in the policy of the

regulatory regime."  See id. at 325. Decisions that "implicate social, economic, or

political policies" or that "were undertaken for policy reasons of primary concern" to a

Government agency are protected. See id. at 332. When agency policies, coupled with

relevant statutory provisions, establish governmental policy, that policy "is presumed to have

been furthered when" Government employees "exercised their discretion to choose from

various courses of action" in response to the policy. See id. "[W]hen established government

policy allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when he exercises that discretion." Baldassaro, 64 F.3d at 211 (citing Gaubert, 499 U.S. at 324).

Whether an act is susceptible to policy analysis is determined by the nature of the conduct, not the actor's motivation or intent. Gaubert, 499 U.S. at 325. Indeed, whether the actor actually considered any policies is irrelevant, because the challenged conduct is analyzed abstractly and its character is not affected by the considerations on which the actor based his conduct in any given instance. See id.; Macharia v. United States, 334 F.3d 61, 67 (D.C. Cir. 2003); Lesoeur v. United States, 21 F.3d 965, 968-69 (9th Cir. 1994); Smith v. Johns-Manville Corp., 795 F.2d 301, 308-09 (3d Cir. 1986).

There need not even be an actual decision to review. "The discretionary function exception may apply 'in the absence of a conscious decision.'" Richardson v. United States, 943 F.2d 1107, 1111 (9th Cir. 1991) (quoting Kennewick Irrig. Dist. v. United States, 880 F.2d 1018, 1028 (9th Cir. 1989); accord Harrell v. United States, 443 F.3d 1231, 1236 (10th Cir. 2006); see also Lopez v. United States, 376 F.3d 1055, 1057 (10th Cir. 2004); Kiehn v. United States, 984 F.2d 1100, 1105 (10th Cir. 1993). If the nature of the challenged conduct reveals that a decision, if one had been made, could have involved a consideration of policy, then the exception applies. See Andrade, 338 F.3d at 457 (district judge "had no need to examine the evidence supporting this claim, because the applicability of the discretionary function

exception does not turn on evidence of the actual decisions made by the defendants, but, rather, on whether the decision is or is not 'susceptible to policy analysis'").

The exception protects more than just "the initiation of programs and activities." Dalehite, 346 U.S. at 35. "It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations." Id. at 35-36 (footnote omitted).

> Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.

Id. at 36 (footnote omitted); cf. Fisher Bros. Sales, Inc. v. United States, 46 F.3d 279, 282 (3d Cir. 1995) (exception cannot be circumvented by "looking behind" protected decision to challenge antecedent conduct).

The Corps's alleged noncompliance with "professional standards of reasonableness and due care" does not preclude application of the discretionary function exception. Whether the Corps complied with "professional standards," acted reasonably or unreasonably, or acted with or without due care is irrelevant to the discretionary function inquiry. See Lively, 870 F.2d at 297-98. The relevant inquiry is whether the controlling statutes, regulations, and administrative policies eliminated the Corps's discretion with respect to the design, construction, operation, repair, and maintenance of the MRGO.  See

Rosebush v. United States, 119 F.3d 438, 442 (6th Cir. 1997). It is the governing statutes, regulations, and policies, not the Corps's knowledge of danger or harm, "that determines whether certain conduct is mandatory for purposes of the discretionary function exception." Id.

Decisions by the Corps as to the design and construction of the MRGO previously have been found to be protected by the discretionary function exception. The evidence presented also demonstrates that the operation, repair, and maintenance of the MRGO are protected by the discretionary function exception because no statute or regulation prescribed the manner, methods, times, places, or extent of these functions. The MRGO was constructed, repaired, and maintained by dredging, as designed. Decisions as to the dredging of the MRGO were matters of judgment and choice grounded in the policies that led to the authorization of the waterway and are therefore not actionable under the FTCA. See Boston Edison Co. v. Great Lakes Dredge & Dock Co., 423 F.2d 891, 896 (1st Cir. 1970); Northlight Harbor, LLC v. United States, 561 F. Supp. 2d 517, 526-27 (D.N.J. 2008); Bean Horizon Corp. v. Tenn. Gas Pipeline Co., 1998 WL 113935 (E.D. La. 1998) (Clement, J.); In re Lloyd's Leasing, Ltd., 764 F. Supp. 1114, 1137-38 (S.D. Tex. 1990); Eazor Express, Inc. v. United States, 611 F. Supp. 197, 202 (E.D.N.Y. 1985); F. & M. Schaefer Brewing Co. v. United States, 121 F. Supp. 322 (E.D.N.Y. 1954).

Plaintiffs contend that the manner and extent of dredging enlarged the MRGO beyond its authorized dimensions and that the dredging was therefore not protected by the

discretionary function because the Corps had no discretion to allow the MRGO to exceed its authorized dimensions.

Plaintiffs' argument fails because (1) the Corps did have discretion to allow contractors to dredge beyond the prescribed dimensions of the waterway in order to maintain the waterway at its authorized dimensions and (2) this discretion was provided in furtherance of Corps policy:

> It is the policy with respect to authorized navigation projects to have full project dimensions maintained where feasible and justified. To avoid frequent redredging in order to maintain full project depths, "overdepth dredging" should be performed in critical, fast shoaling areas to the extent that it results in the least over-all cost. Such additional dredging is exclusive of and beyond the allowable overdepth to compensate for dredging inaccuracies.

Engineer Reg. 1130-2-307 ¶ 9(a) (1968) see also id. ¶ 6(c) ("The actual requirements of existing commerce and the economies which may be obtained by a reduction in the frequency of dredging operations will govern the extent of the maintenance work to be undertaken. (see para. 9)"); cf. id. ¶ 9(d) ("Division Engineers are hereby authorized to approve additional overdepth for new work and subsequent maintenance in conformance with the above stated policy."); see also Northlight Harbor, 561 F. Supp. 2d at 523 (holding that the Corps has wide discretion in decisions made regarding dredging activities).

Because the banks of the MRGO were composed of marsh, they sloughed off during and after dredging. Had the dredging not exceeded the authorized width of 500 feet, the waterway would not have been as wide at the bottom as authorized because the soils from

the sides would have reduced the bottom width as they sloughed off and settled to the bottom. It was the bottom width that mattered, as this was the usable width. See Engineer Reg. 1130-2-307 ¶ 4(d)("Where a width of channel is specified it will be understood to mean width of bottom at project depth."). To take this anticipated sloughing off into account and keep the channel at its authorized width and depth, the Corps allowed its contractors to make a "box cut"—that is, a vertical side cut at 90 degrees from the bottom cut—beyond the desired 500-foot width because doing so was, in the Corps's judgment, the most economical way to create and maintain the 500-foot width.

No statute, regulation, or policy proscribed them or prescribed a different method or methods of creating and maintaining the MRGO. As the case law uniformly recognizes, the Corps's choice of these methods was grounded in the policies that led Congress to authorize the construction and maintenance of the waterway. Plaintiffs' dredging claims are therefore beyond the purview of the FTCA and must be dismissed for lack of subject matter jurisdiction.

As to the exercise of policy-based judgment in addressing problems associated with the MRGO, the law that authorized the MRGO did not specify every detail but instead left considerable room for the Corps to weigh numerous considerations in deciding how to design, build, operate, repair, and maintain the channel. Deciding whether, how, and when to modify the MRGO to combat erosion and to remedy other conditions that the plaintiffs contend should have been abated before Hurricane Katrina were matters of judgment and

choice for the Corps. In addition, the challenged acts and omissions—failure to "armor" both

banks of the MRGO in their entirety, failure to design and construct surge barriers, and

failure to dredge more precisely or using a different method—are by nature readily

susceptible to policy analysis. These activities are innately connected to the purposes of the

project itself: the promotion of commerce and improvement of the national defense.

Making the changes that the plaintiffs say should have been made—building armored

levees extending for many miles on both banks of the channel, constructing a retractable

barrier across a 500-foot-wide deepwater channel—would have been major undertakings

that would have required the weighing of costs, benefits, and alternatives. Whether to

address erosion by dredging or by stabilizing banks was within the Corps's ken.  Inasmuch as

Congress left the weighing of these matters to the discretion of the Secretary of the Army

and the Army's Chief of Engineers, Plaintiffs' claims are barred by the discretionary function

exception and must be dismissed for lack of subject matter jurisdiction.

Furthermore, contrary to Plaintiffs' allegation, the Corps did not violate NEPA

because it had full discretion to decide whether or not an EA or an EIS needed to be done.

The CEQ's regulations provide that an agency must prepare a supplement to an EIS when "it

makes substantial changes in the proposed action" or there "are significant new

circumstances."  40 C.F.R. § 1502.9(c)(1).  These provisions are too general to deprive the

United States of discretionary function immunity because they do not mandate a specific

course of conduct.  "Only if a federal statute, regulation, or policy specifically prescribes a

course of action embodying a fixed or readily ascertainable standard, will a government employee's conduct not fall within the discretionary function exception." Hughes v. United States, 110 F.3d 765, 768 (11th Cir. 1997); accord Autery v. United States, 992 F.2d 1523, 1529 (11th Cir. 1993); see also Daigle v. Shell Oil Co., 972 F.2d 1527, 1540 (10th Cir. 1992); Zumwalt v. United States, 928 F.2d 951, 954 (10th Cir. 1991).

In any event, Plaintiffs cannot establish that if the Corps had somehow complied with NEPA and completed a proper EIS for Congress that Congress would then have closed or otherwise altered the MRGO. Plaintiffs have not identified an expert witness to testify that another EIS (in addition to the one performed in 1976) would have identified problems that, if corrected by an Act of Congress, would have prevented the Plaintiffs' damages. None of Plaintiffs' experts have analyzed what effect such a hypothetical "correction" would have had with respect to Hurricane Katrina's massive storm surge. Accordingly, Plaintiffs cannot prove that a violation of NEPA, assuming there was one, caused their damages. *See Montijo-Reyes v. United States*, 436 F.3d 19, 25 (1st Cir. 2006) (holding that Plaintiffs' alleged violation of the Clean Water Act did not even pass the but for test of causation and dismissing suit); *Rivera Acevedo v. United States*, 2005 WL 5610230 at *6 (D. P.R. 2005) ("Nevertheless, even if there was a violation of a specific and mandatory provision of the [Endangered Species Act], the plaintiffs have demonstrated no connection between such a violation and their claims of fear of injury or damage to their homes.")

Moreover, whether Congress decides to close the MRGO or to take other "corrective" action is plainly a matter of discretion that cannot be challenged in a lawsuit. *See Cato v. United*

*States*, 70 F.3d 1103, 1110 (9th Cir. 1995) ("Legislative conduct is discretionary for purposes of the [discretionary function] exception."); *Brown v. United States*, 790 F.2d 199, 202 (1st Cir. 1986) ("How much equipment the [agency] is to possess, and how much money it is to spend, measured, necessarily, by Congressional appropriations, must be for the government's uncontrolled discretion."); *United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189, 195 (1st Cir. 1967) (same).

When a plaintiff claims as the direct cause of his injury such a discretionary act, he may not avoid application of discretionary function immunity by attempting to rely on an antecedent, mandatory act that may have been performed negligently.  As the Third Circuit has explained:

> If plaintiffs injured by regulatory policy decisions were permitted to prosecute damage actions by challenging the manner in which the underlying data was collected, federal courts, of necessity, would be required to examine in detail the decisionmaking process of the policymaker to determine what role the challenged data played in the policymaking and what the policymaker's decision would have been if he or she had received the unchallenged data but not the challenged data (or had received other data in lieu of the challenged data).  Without such an examination and all of the discovery that would necessarily precede it, a plaintiff in the position of these plaintiffs would be unable to prove a causal link between the alleged negligence and the alleged injury.  Yet this is precisely the kind of inquiry that the Supreme Court sought to foreclose when it ruled out any inquiry into an official's "subjective intent in exercising the discretion conferred by statute or regulation."

*Fisher Bros.*, 46 F.3d at 286 (quoting *Gaubert*, 499 U.S. at 325; *see also Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1132 n.11 (10th Cir. 1999) ("To allow plaintiffs to avoid the discretionary-function bar by alleging that RTC employees breached a specific duty to report information, even though the harmful decisions based on the information were themselves discretionary, would be in tension with precedent."); *Johnson v. United States*, 949 F.2d 332, 339-40 (10th Cir. 1991) (applying discretionary function exception to bar claim challenging

agency's "information gathering activity," which was mandatory, because it was "inextricably tied to" and "a component of the overall policy decision," which was discretionary); *In re Ohio River Disaster Litigation*, 862 F.2d 1237, 1247-48 (6th Cir. 1989) ("[e]ven the negligent failure of a discretionary government policymaker to consider all relevant aspects of a subject matter under consideration does not vitiate the discretionary character of the decision that is made."); *see generally* Richard H. Seamon, *Causation and the Discretionary Function Exception to the Federal Tort Claims Act*, 30 U.C. Davis L. Rev. 691 (1997).  In other words, because Congress's decision, *vel non*, to take corrective action would itself have been discretionary, this court is not permitted to entertain a suit examining whether that decision was based on complete and accurate information submitted by the Corps.

In any event, there is more than ample evidence that Congress was well aware of the bank erosion taking place along the north shore of the MRGO.  Indeed, the Corps was authorized to study the problem and investigate whether there was a feasible and economically justified way to prevent this erosion from taking place.  Numerous letters to Congressmen and Senators, from both the Corps and from concerned residents exist and indicate the ongoing erosion and even suggesting the potential for amplified storm surge.[2]  Similarly, several local governments, including St. Bernard Parish, repeatedly passed resolutions that informed Congress of the alleged problems caused by the MRGO.  Even more, two Reconnaissance Reports, one in 1988 and one in 1994, identified the bank erosion

---

[2] It is worth noting that the Corps itself studied the impact of the MRGO on storm surge and found that its effect was negligible.  As the evidence demonstrates, the Corps was correct.

problem and suggested ways to solve the problem.  The first report was found to have inaccurate methodology.  The second, which tied the solution to both the MRGO project, but also environmental benefits not germane to the MRGO project, languished because the Corps could not find a cost-sharing partner, required by law, to help fund a feasibility study. Congressmen were aware of these reports.  It was not until 1996, at the suggestion of Congress, that the Corps undertook a reliable study of whether foreshore protection could be justified as part of the maintenance costs of dredging.  That study, the 1996 Evaluation Report, recommended five and a half miles of riprap protection that would reduce maintenance costs but provide no environmental benefit.  Based on its own policy analysis, the Corps built this protection.

In sum, Plaintiffs' claims against the United States are barred by the discretionary function exception, and this court must dismiss for lack of subject matter jurisdiction.

III.      The United States is immune under Section 2680's "due care" exception

Another exception to the Act's waiver of sovereign immunity is the due care exception, which bars any claim against the United States "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid."  28 U.S.C. § 2680(a); see also Dalehite, 346 U.S. at 33.  This exception applies unless the Government employees whose conduct is in question have acted without due care. Id.

"The duty of 'due care' is addressed to the proper implementation of the statutes and

regulations." Bub Davis Packing Co. v. United States, 443 F. Supp. 589, 593 (W.D. Tex. 1977),

aff'd 584 F.2d 116 (5th Cir 1978).  State law governing negligence is not the appropriate test

for whether due care has been exercised.  Hydrogen Tech. Corp. v. United States, 831 F.2d

1155, 1161 (1st Cir. 1987).  Instead, unless the government employee violates the very statute

or regulation being executed, there is no lack of "due care."  See United States v. Second Nat'l

Bank of North Miami, 502 F.2d 535, 549 & n.27 (5th Cir. 1974); see also Doe v. Stephens, 851

F.2d 1457, 1462 (D.C. Cir. 1988) (following invalid regulations that authorized release of

plaintiff's records did not constitute absence of due care).

The due care exception applies to this case because Plaintiffs have neither alleged nor

adduced evidence that the Corps deviated from the mandate that authorized the

construction of the Mississippi River-Gulf Outlet "substantially in accordance with the

recommendation of the Chief of Engineers," Pub. L. No. 84-455, 70 Stat. 65 (1956).

The Chief of Engineers recommended that the MRGO be constructed "generally in

accordance with the plans of the division engineer and with such modifications thereof as in

the discretion of the Secretary of the Army. H.R. Doc. No. 82-245 (Chief's Report) at 5

(emphasis added). The Division Engineer's plan included neither bank protection nor surge

barriers. The Division Engineer calculated the cost of the project and the benefit/cost ratio

based on his judgment that construction and maintenance of inland sections of the channel

would involve only routine dredging operations. See id. at 33. As the designers noted soon

after Congress authorized construction, "[n]o channel protection is included in the overall

cost of the project. It is presumed that sufficient rights of way will be furnished by local interests to preclude use of channel protection or that additional rights of way will be furnished when the need arises." DM 1-A ¶ 16, at 7; accord DM 1-B ¶ 19, at 5. Because "[b]ank protection works" were not part of the authorized plan and had not been included in the costs of the project, the designers dealt with "anticipated erosion" and "surface widening due to erosion" by conducting stability analyses and soil borings to determine how far away from the channel spoils would need to be deposited in order to provide an adequate factor of safety. DM 2 ¶ 47, at 22.

As the report of the Division Engineer and the design memoranda make clear, the Corps made a conscious decision at the outset (even before authorization) to keep federal costs low by designing the channel in such a way that it could be maintained without the construction of costly bank protection works. If the anticipated "surface widening due to erosion," eventually exceeded the initial rights of way furnished by local interests, then local interests could be required to furnish additional rights of way at no cost to the United States.

The Chief based his recommendation on the Division Engineer's report. That report calculated the benefits and costs of building the MRGO, and the benefit/cost ratio. That ratio reflected the Division Engineer's omission of bank protection and surge barriers. Consequently, the premising of the Chief's recommendation on the Division Engineer's report removed any discretion to add those improvements later, unless those improvements

could have been added without increasing costs. See H.R. Doc. No. 82-245, at 12

(division engineer took costs and benefits of alternate routes into account in preparing

recommendation), 39 (division engineer compared east-bank and west-bank costs); cf. id. at

2-3 (Bureau of Budget "no objection" letter, comparing costs and benefits), 33 (considering

necessity of protective works in comparing relative "advantage" of west-bank route).

Surge barriers could not be added to the project for one very fundamental reason:

they would not advance the policies that underlay the project's authorization and funding.

Congress authorized the project to serve commercial and national security ends. Funds were

appropriated to advance those purposes, and using those funds for some other purpose,

however worthy, would be a misuse of taxpayer dollars. Fundamentally, this limitation on

use of funds was the reason why bank protection could be constructed only insofar as it was

the best (i.e., the most economical) method of channel maintenance. Bank protection, like

surge barriers, could serve very worthy ends unrelated to those that underlay the MRGO

project. But however worthy other ends might be, federal funds appropriated for the

MRGO, to advance commerce and promote the national defense, could not be diverted to

serve them.

Plaintiffs' allegation of negligence is not sufficient to overcome the immunity

provided by the due care exception.  Plaintiffs have, in essence, alleged that the United

States was negligent in the execution of the Act of Congress authorizing construction of the

MRGO—there is no claim that the United States failed to use due care or did not act without

"at least some minimal concern for the rights of others."  Bub Davis, 443 F. Supp. at 593.

Under these circumstances, the FTCA's due care exception bars Plaintiffs' claims

> IV.   The United States is not liable for any maintenance dredging
>        performed by independent contractors.

Under the FTCA, the United States may be held liable only for the acts or omissions

of "officers or employees of any federal agency . . . . " See 28 U.S.C. § 2671.  It further defines

what is considered a federal agency:

> As used in this chapter and sections 1346(b) and 2401(b) of this title, the term
> "Federal agency" includes the executive departments, the judicial and
> legislative branches, the military departments, independent establishments of
> the United States, and corporations primarily acting as instrumentalities or
> agencies of the United States, but does not include any contractor with the
> United States.

28 U.S.C. § 2671 (emphasis supplied).

It is undisputed that the Corps routinely used contractors to perform maintenance

dredging of the MRGO.  It authorized such contractors to follow the regulations and policies

created by the Corps.  To the extent any contractor was negligent in the performance of

maintenance dredging, the Corps is not liable and this court lacks jurisdiction because these

contractors are not subject to the FTCA's waiver of sovereign immunity.  See Broussard v.

United States, 989 F.2d 171, 174 (5th Cir. 1993) ("The United States has statutorily consented

to suits pursuant to the terms of the Federal Tort Claims Act. This consent to be sued,

though, does not extend to the acts of independent contractors.")

> V.    The United States is not liable under Louisiana's negligence principles.

"Whether liability exists under the facts of this particular case is determined by conducting a duty-risk analysis. Under this analysis, plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty." *See Oubre v. Eslaih*, 869 So. 2d 71, 77 (La. 2004). *Accord Pitre v. Louisiana Tech Univ.*, 673 So. 2d 585, 589-90 n.7 (La. 1996). "[A]ll four inquiries must be affirmatively answered for plaintiff to recover. *Oubre*, 869 So. 2d at 77.

Before any analysis of duty and breach is done, the Court must first determine whether the alleged conduct was a cause-in-fact of the resulting harm. See, e.g., Faucheaux v. Terrebone Consol. Gov't, 615 So. 2d 289, 292 (La. 1993) (first addressing cause-in-fact before addressing duty and breach); cf. Becnel v. St. John the Baptist Parish Police Jury, 364 So. 2d 1074, 1076 (La. Ct. App. 1978) (noting that the duty-risk analysis begins with a cause-in-fact inquiry and holding that the duty question need not be reached because plaintiff had failed to establish a causal relationship between the alleged malfeasance and his injury). Proceeding first to a cause-in-fact analysis, the United States is not liable to Plaintiffs because the MRGO had a de minimis effect on the storm surge, and the levees would still have breached if the MRGO had been maintained to its authorized depth.

> A.   The United States is not liable because the MRGO in both its original footprint and the footprint as it existed when Hurricane Katrina made landfall was not a cause-in-fact of the storm surge or the flooding.

Proving causation is Plaintiffs' burden, and Plaintiffs must therefore prove that the alleged negligent dredging of the MRGO and the failure to prevent the waterway from

widening and diminishing nearby wetlands caused their alleged damage. See Audler v. CBC Innovis, Inc., 519 F.3d 239, 249 (5th Cir. 2008); Burmaster v. Plaquemines Parish Gov't, 982 So.2d 795, 808 (La. 2008); Matthieu v. Imperial Toy Corp., 646 So. 2d 318, 322 (La. 1994); cf. 28 U.S.C. § 1346(b) ("law of the place where the act or omission occurred" determines FTCA liability); Cleveland v. United States, 457 F.3d 397, 403 (5th Cir. 2006) (law of state where claim arose determines liability). To prove "causation in fact" Plaintiffs must demonstrate that the alleged negligent operation and maintenance were substantial factors in bringing about the alleged damage and that "but for" the widening of the waterway and the loss of wetlands the alleged damage would have been less or would not have occurred at all. See Westchester Fire Ins. Co. v. Haspel-Kansas Inv. P'ship, 342 F.3d 416, 420-21 (5th Cir. 2003); Bonin v. Ferrellgas, Inc., 877 So. 2d 89, 94 (La. 2004); Roberts v. Benoit, 605 So. 2d 1032, 1042 (La. 1992); Fowler v. Roberts, 556 So. 2d 1, 5 & n.6 (La. 1990).

Put differently, the widening of the waterway and the loss of wetlands were causes-in-fact if they were "necessary antecedents" of Plaintiffs' damage. If the alleged damage "would have occurred irrespective of the negligence of the [defendant], then his negligence was not a substantial factor or cause-in-fact." Dixie Drive It Yourself Sys. v. Amer. Bev. Co., 137 So. 2d 298, 302 (La. 1962); see also In re Air Crash Disaster Near New Orleans, 764 F.2d 1084, 1092 (5th Cir. 1985); Rodgers v. Missouri Pac. Ry. Co., 405 So. 2d 571, 574 (La. Ct. App. 1981); Yates v. Brown, 344 So. 2d 37, 39 (La. Ct. App. 1977; Muse v. East Texas Grocery Co., 11 So. 2d 250, 253 (La. Ct. App. 1942).  "A counter-factual

hypothesis is recommended as a step in determining cause-in-fact. That is, assuming that the

conduct of the tortfeasor was 'corrected,' is it probable that the plaintiff would still have

sustained the damages complained of. If so, then defendant's substandard conduct was not a

cause-in-fact." Boteler v. Rivera, 700 So. 2d 913, 916 (La. Ct. App. 1997) (internal citation

omitted); see also Craig v. Burch, 228 So. 2d 723, 729 (La. Ct. App. 1969).

The evidence more than adequately shows that the existence of the MRGO, even if it

had been confined to its original footprint, had negligible impact on the storm surge.  Simply

put, the storm surge generated by Hurricane Katrina would have sufficiently overtopped the

levees to the point of breaching with the MRGO at its authorized dimensions and at its 2005

dimensions.  The levees were not built to withstand such a tremendous—and

unparalleled—surge of water, and the MRGO's impact on the Katrina-generated surge was

not substantial.

Hurricane Katrina made landfall on August 29, 2005.  Just one day earlier, Katrina

had strengthened from a Category 3 storm to a Category 5 on the Saffir-Simpson scale, with

winds reaching an intensity of 145 knots extending 90 miles outward from the storm's

center.  Though it made landfall as a Category 3 storm, the height and the extent of the

storm surge was not affected by the weakening, as the buildup of the ocean surface not only

relates to strength, but also to storm duration and size, along with the shape of the coastline.

Katrina generated the highest significant wave height of a National Data Center buoy—55

feet high—about 50 miles east of the mouth of the Mississippi River.  In short, Katrina had

the largest kinetic force of any landfalling U.S. hurricane from 1995-2005.

The storm surge generated by Katrina was the largest ever recorded. Factors contributing to the extreme nature of the surge included: (1) the massive size of the storm; (2) the strength of the system and sustained winds (Category 5) just prior to landfall; (3) Katrina's near-perpendicular track as it approached the coastline, which focused its wind field over a large area at landfall; (4) the low central pressure (920 mb) at landfall; (5) the storm's speed, which resulted in additional wind energy to be transferred to the water; and (6) the wide and shallow continental shelf off the coastline areas in Katrina's path, which did not allow any room for the storm tide to move or dissipate, pushing it inland and upward at the same time.

The storm tide generated exceeded both the "Standard Project Hurricane" and "Maximum Probable Hurricane" used to model and develop the LPV Hurricane Protection System. The result was one of the worst disasters ever to befall an American city in the form of massive overtopping and breaching of levees, causing flooding of more than 80 percent of New Orleans. In some places the flooding was as deep as ten feet. In short, the federal flood control structures that encompassed the Lower Ninth Ward and St. Bernard Parish were overtopped and breached by Katrina's storm-driven surge, resulting in the massive flooding that occurred. Plaintiffs allege that but for the MRGO's existence or negligent maintenance, this flooding would not have occurred. Such an allegation is unfounded.

Computer modeling has demonstrated that the removal of the MRGO and the

restoration of wetlands to pre-MRGO dimensions would have affected water levels in only

three areas: (1) English Turn and Braithwaite, where eliminating the MRGO's dredged spoil

mounds would increase water surface levels by about a foot; (2) the Central Wetlands east of

the 40 Arpent Levee, where the removal of MRGO's dredged spoil mounds would increase

water surface elevation by up to half a foot; and (3) the GIWW and IHNC channels, where

the complete removal of the MRGO would lower water levels at the confluence of the IHNC

and Reach 1 by as much as 3.5 feet.  The Court has previously ruled, however, that the

design and construction of the MRGO were protected by the discretionary function

exception.  Thus, the only question left before the Court is whether the alleged negligent

maintenance and operation of the channel—which plaintiffs allege caused the degradation of

wetlands that would have reduced the storm surge—resulted in levee failures that caused the

flooding of St. Bernard Parish.

The Court need not reach the question of whether the Corps was negligent in its

maintenance of the MRGO, as the evidence adequately demonstrates that, even if the MRGO

had been maintained at its authorized width and depth, and no additional marshland had

been lost, the severity of the flooding would have been the same.  Computer modeling has

demonstrated that reducing the MRGO to its original dimensions would have reduced water

surface elevation at the confluence of the GIWW and the IHNC by less than half a foot, or

less than six inches.  Accordingly, any degradation of the wetlands post-dating the MRGO's

construction did not significantly affect the water levels in MRGO Reach 1 or the IHNC.

Moreover, the impact of the MRGO on Reach 2 was minimal as well.  In all modeled scenarios, the velocities and overtopping rates at every location on the Reach 2 levee were far in excess of the rates necessary and sufficient to cause substantial levee degradation, and the effect of the MRGO on wave-generated velocities and overtopping along Reach 2 were negligible as well.

Indeed, the evidence shows that the principal causative factor in breach development had nothing to do with the MRGO, but rather with the character of the LPV levee, not wind generated surge and waves.  The predominant mechanism in the breaching of the Reach 2 levees was backside erosion caused by overtopping from storm surge and waves, and because the surge elevations greatly exceeded the Reach 2 levee crests, or heights, for several hours, the overtopping-induced erosion was essentially inevitable in the areas where soil was hydraulically placed.  The varying height of the Reach 2 levee, which ranged from 15 to 19 feet, was also a factor in the breaching, with lower crest elevations more susceptible to breaching due to the earlier and, therefore, longer lasting overtopping event.

The evidence clearly demonstrated that the overtopping rates, both wave-induced and surge-induced, greatly exceeded the rates required for erosion to occur at the breached areas of the levees.  This is true whether or not the MRGO had been maintained at its authorized dimensions post-construction.  Ultimately, the breaches that occurred along Reach 2 due to overtopping were the predominant source in the flooding of St. Bernard Parish and the Lower Ninth Ward.

Lastly, any "funneling" effect generated by the MRGO into the confluence of the GIWW and IHNC along Reach 1 was also caused by the existence of the levees, not the MRGO, authorized dimensions or not.

> B.    The Corps was not negligent because it reasonably relied on studies demonstrating that the MRGO did not amplify storm surges.

The Corps reasonably relied on a number of different studies modeling the impact of marshland and the MRGO on storm surge.  In 1966, in the wake of Hurricane Betsy, Dr. Charles L. Bretschneider and Dr. J Ian Collins prepared a report that specifically studied the affect of the MRGO on hurricane storm surges for the New Orleans District of the Army Corps of Engineers.   Dr. Charles L. Bretschneider and Dr. J Ian Collins, Storm Surge Effects of the Mississippi River-Gulf Outlet, (Sept. 1966).  The report had two objectives: (1) to provide accurate surge predictions to support decisions required in the design of authorized levees and (2) to evaluate the effects of the MRGO on hurricane storm surge.  Id. at 1. Through studying the surges associated with Hurricane Betsy and six synthetic hurricanes the report reached conclusions as to the relative effect of the MRGO on hurricane storm surge.  Bretschneider and Collins concluded that the effect of the MRGO was "almost negligible for all large hurricanes accompanied by slow rising storm surges.  Id. at 4. Although the authors cautioned that "somewhat freakish" storm with a more rapidly rising storm surge may be more affected by the MRGO, that storm will not produce a storm surge as high as Betsy and the synthetic hurricanes with critical tracks.  Id.

After authorization of the LPV, the plan for the Chalmette area was modified to enlarge the area protected by the Chalmette levee.  See USACE, LPV Chalmette Area Plan General Design Memorandum 3 Supplement No.1 Chalmette Extension (Sept. 1968) 7-8. The original "return levee" from the MRGO to Mississippi River at Violet was deleted, and instead the return levee was placed further south and ran approximately from Verret to Caernarvon.  Id.  In the design memorandum for the Chalmette Extension, the Corps determined storm surge levels based upon the Standard Project Hurricane for both sections of the levee—the section fronting the MRGO and the return section which ran west from the MRGO to Caernarvon.  See USACE LPV Design Memorandum 1 Part IV Chalmette Extension (Oct. 1967).

In determining surge elevations for the design of levees in Chalmette, the Corps considered the affect of wetlands on storm surge.  Using observed high water marks along the coast and inland, the Corps derived a simple relationship between maximum surge height and distance inland.  See id. at Plate 6; IPET at III-210.  The data indicated a reduction of 1 foot for every 2.75 miles of wetlands.  Id.  This relationship was only used for hurricane tracks where it was apparent that the surge at the coast, or surge reference line, did not accurately reflect the surge inland.  Dep. of Nancy Powell Vo1. I, 70:23-35, 71:1-13.

The reduction factor applied to the Verret and Toca reach of the Chalmette Extension.  USACE LPV Design Memorandum 1 Part IV Chalmette Extension 6; Dep. of Nancy Powell Vol. I, 72:5-16.  The critical hurricane track used for design purposes for the

Verret to Toca reach was Track C, a track similar to that of Hurricane Betsy, making landfall around Grand Isle and proceeding northward. The designers of the Chalmette Extension applied the surge reduction factor to this particular hurricane track– the critical track for the Verret and Toca reach of the Chalmette extension– because of the extensive wetlands to the south and west of the levee.

The surge reduction factor, however, was determined not to apply to the critical track for the Chalmette Extension levees fronting the MRGO, Track F. USACE LPV Design Memorandum 1 Part IV Chalmette Extension 6 Table 2, Plate F; Dep. of Nancy Powell Vo1. I, 72:1-16. Track F was also the critical track for the Chalmette levee from Bayou Bienvenue to Bayou Dupre. See USACE LPV Design Memorandum 1 Part Hydrology and Hydraulic Analysis Part I Chalmette (Aug. 1966) 28 Table 15, Plate 9. The surge reduction factor was inapplicable to Track F of the design storm. See USACE LPV Design Memorandum 1 Part IV Chalmette Extension 6; Dep. of Nancy Powell Vol. I, 72:5-16. The surge reference line determined applicable for the Chalmette Extension MRGO levees virtually abutted the MRGO necessarily making the reduction factor, which was based in miles between the reference line and levee, totally inapplicable.

Later, in 2003, Dr. Joannes Westerink and Dr. Rick Luettich evaluated the effect of constructing a closure dike across the MRGO near Bayou Laloutre on hurricane storm surge. Untied States Army Corps of Engineers, Numerical Modeling of Storm Surge Effect of

MRGO Closure (2003).[3]  Using the ADCIRC model, Westerink and Luettich modeled nine

synthetic hurricanes and Hurricane Betsy.  The report concluded that "the MRGO has

minimal influence on storm surge propagation."

This catastrophic flood would have occurred with or without the MRGO. Hurricane

Katrina generated surge that far exceeded the surge that LPV levees and floodwalls were

designed to withstand. The Corps correctly concluded, after thorough investigation, that the

concerns expressed by local citizens who believed that the MRGO posed a threat of flooding

were unfounded. The Corps did recognize, however, that the LPV flood protection

structures would not be able to withstand surge generated by a powerful hurricane. The

Corps therefore repeatedly advised Congress of the distinct possibility that the eastern areas

of Greater New Orleans would be devastated by flooding in the event of a major hurricane

striking the region. The Corps also informed Congress of the problem of wetlands loss in

southeastern Louisiana and of the loss of wetlands resulting from the operation and

maintenance of the MRGO. The Corps was unable to remedy the problem of MRGO-related

erosion because no local entity was willing to shoulder a portion of the cost of studying

feasible solutions. The failure to remedy that problem played no role in the flooding caused

by Hurricane Katrina. Even if the wetlands had been in the very same condition as before

the MRGO came into existence, the surge generated, driven, and sustained by Hurricane

Katrina was so great that the destruction of the Reach 2 MRGO levee was inevitable.

---

[3] Unfortunately, this document is not paginated.

The Corps also reasonably relied on past precedent that supported its belief that the MRGO did not amplify storm surge that caused increased flooding.  In Graci v. United States, 435 F. Supp. 189 (E.D. La. 1977), this court addressed the impact of the MRGO on flooding that eventually overtopped the 40 Arpent levee, causing it to fail and flooding the plaintiffs' homes.  The Graci plaintiffs alleged that the MRGO was responsible and sued for the negligent design, construction, and operation of the channel.  Id. at 191.  Factually, the court found that:

> The MRGO did not in any manner, degree, or way induce, cause, or occasion flooding in the Chalmette area.  All flooding was the result of natural causes working upon local waters which have before threatened and caused flooding in the area due to the inadequate non-federal local protective features.

Id. at 195.  Indeed, the court noted that flooding during hurricane events previously had occurred in this area in 1915, 1947, and 1956, all prior to the MRGO's construction.  Id. at 193.  Accordingly, the court concluded as a matter of law that the Corps was in no way at fault for the design, construction, or functioning of the MRGO.  Id. at 196.  Moreover, and most importantly, plaintiffs were unable to show "by a preponderancy of the evidence any causal connection between the MRGO and any damages which plaintiffs may have sustained."  Id.  It was reasonable for the Corps to rely on the holdings in Graci, particularly that the MRGO was not a cause of the plaintiffs' flooding during Hurricane Betsy.

Because the Corps reasonably relied on the information it had and acted appropriately, there was no negligent breach of any duty owed to Plaintiffs.

C.   There is no private party analog for the United States to be held liable
for failing to warn Congress that there was a threat of safety to an as-
yet to be named group of potential plaintiffs.

Under the FTCA, the United States is liable only as a private person would be liable in

accordance with the law of the place where the act or omission occurred.  28 U.S.C. §

1346(b); Rivera v. U.S. Army Corps of Engineers, 891 F.2d 567, 568 (5th Cir. 1990).

Plaintiffs have not identified any provision of law that would render a private party

liable for failing to warn Congress of possible harm that could befall an innocent third party.

While Louisiana law holds a defendant responsible for failure to warn the party who is

ultimately injured, failing to warn some third party of injuries that might befall a plaintiff

down the road is not a cognizable theory except in certain, limited circumstances not

applicable here—such as a psychotherapist failing to warn a third party of a credible threat

of harm by a patient.  See, e.g., Dunnington v. Silva, 916 So. 2d 1166, 1170-71 (La. Ct. App.

2005); see also LSA-R.S. 9:2800.2.  Because Plaintiffs have failed to identify a

source—common law, statutory, or other—that would hold the United States liable for

failing to warn Congress, as opposed to Plaintiffs directly, of any possible risk of future harm,

the United States may not be held liable as a matter of law.  See, e.g., Tindall v. United States,

901 F.2d 53, 56 (5th Cir. 1990) (holding that state law did not impose a duty to the plaintiff

and, therefore, United States could not be held liable under the FTCA); Rivera, 891 F.2d at

568-70; Goodwill Indus. of El Paso v. United States, 218 F.2d 270, 272 (5th Cir. 1954)

(holding that United States could not be held liable where there was no analogous liability

for private persons under state law).

Plaintiffs argument fails for the additional reason that Plaintiffs cannot prove

causation.  In a tort action, the plaintiff bears the burden of proving fault, causation, and

damages.  See Johnson v. E.I. Dupont Denemours & Co., Inc., 2009 WL 91481 at *4 (La. Ct.

App. 2009).  The plaintiff bears the burden of proving every element of his case, including

the cause-in-fact of damage, by a preponderance of the evidence, that is, whether it is more

likely than not that the harm was caused by the tortious conduct of one or more defendants.

Id.

Assuming, arguendo, that Plaintiffs could identify a legal basis for this theory of tort,

they have failed to adduce evidence on causation in this regard.  Namely, Plaintiffs have not

demonstrated how warning Congress of a threat of future harm to them would have

prevented or otherwise mitigated their damages.  Indeed, they have all but conceded that

they cannot.

Plaintiffs carry the burden of proof, and assuming Congress had been warned, as the

Plaintiffs contend the Corps should have done, but failed to do, the Court can only speculate

about what Congress might have done.  Indeed, since Congress had knowledge of the many

problems caused by the MRGO for over 20 years, Plaintiffs can do nothing more than

speculate about Congress would do, and they cannot establish that their injuries would not

have occurred.  The record reflects evidence indicating that Congress was aware of the

complained-of problems with the MRGO for many years, from the Corps and concerned

constituents, and chose not to do anything.  The United States simply cannot be liable for

failing to warn Congress.

      VI.    Damages

      Louisiana law permits a plaintiff whose immovable property is damaged by a tort "to

recover damages including the cost of restoration that has been or may be reasonably

incurred," Roman Catholic Church v. Louisiana Gas Serv. Co., 618 So. 2d 874, 879-80 (La.

1993), but these "restoration damages" are allowed only if "there is a reason personal to the

owner for restoring the original condition or there is a reason to believe that the plaintiff

will, in fact, make the repairs."  Id.  Allegations of personal reasons to restore a property are

judged on the objective evidence of the plaintiff's use of the property, and not a plaintiff's

"self-serving testimony of their inchoate intent . . ."  Hornsby v. Bayou Jack Logging, 902 So.

2d 361, 368 (La. 2005).

      The proper measure of damages in Louisiana is the diminution of the market value of

the property when (1) immovable property is damaged; (2) a plaintiff does not elect to

restore his property; and (3) no unique factor affecting the property's value is proven.  State

Dep't of Transp. and Dev. v. Lobel, 571 So. 2d 742 (La. Ct. App. 1990).  Since "ordinary

household effects . . . depreciate immediately upon becoming used and, because of ordinary

wear and tear, are worth much less after several years than when originally purchased, and

may be readily replaced, . . . the just method of determining the value of used articles, which

are not subject to disposal on the open market and which become disintegrated by wear and

the lapse of time, is to deduct from their original price a reasonable sum for depreciation."
Gray v. Sec. Storage & Van Co., 26 So. 2d 399 (La. Ct. App. 1946) (quoting Gugert v. New
Orleans Indep. Laundries, 181 So. 653, 656 (La. Ct. App. 1938).

    Louisiana law allows a recovery for "fright, fear, or mental anguish" only if the
plaintiff is traumatized while an "ordeal is in progress," or, for mental anguish suffered as a
result of damage to property: "(1) when property is damaged by an intentional or illegal act;
(2) when property is damaged by acts for which the tortfeasor will be strictly or absolutely
liable; (3) when property is damaged by acts constituting a continuing nuisance; or (4) when
property is damaged when the owner is either present or nearby and suffered a psychic
trauma as a direct result." Turgeau v. Pan Am. World Airways, Inc., 764 F.2d 1084, 1087
(1985). See also, Tudela v. Pan Am. World Airways, Inc., 764 F.2d 1082 (5th Cir. 1985);
Bode v. Pan American World Airways, Inc., 786 F.2d 669, 672 (5th Cir. 1986).

    Louisiana law further allows recovery for mental anguish only when property is
damaged in the owner's presence and "the damage is sudden, the realization of damage on
the part of the owner equally sudden, and the mental distress clearly caused by the property
damage." Harper v. Illinois Cent. Gulf R.R., 808 F.2d 1139, 1141-42 (5th Cir. 1987). No
damages for "mental anguish and inconvenience" is allowed where the "mental anguish"
which plaintiff experienced was the normal worry and distress that any owner is going to
experience in some degree when his property is damaged—worry over possible financial
loss, settlement of insurance claims, discomfort or inconvenience while repairs are made,

having to attend to repairs and the like.  Such minimal worry over the consequences of damage to one's property is not "damage" which one whose fault caused damage to the property is obligated to repair under LSA-C.C. Arts. 2315 and 2316.  Farr v. Johnson, 308 So. 2d 884, 885 (La. 1975).

The same criteria are applied to damages for "inconvenience" under Louisiana law. They are awarded only upon a showing that the plaintiff was in a zone of danger or present to witness property damage.  McDonald v. Illinois Central Gulf R.R. Co., 546 So. 2d 1287, 1292 (La. Ct. App. 1989).  Cleaning and repairs after the immediate danger to persons and property has passed do not merit inconvenience damages.  Napolitano v. F.S.P., Inc., 797 So. 2d 111, 115 (La. Ct. App. 2001).

Louisiana law recognizes the collateral source rule that "a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution." Bozeman v. State, 879 So. 2d 692, 698 (La. 2004).  The grants awarded to the Plaintiffs from the Federal Emergency Management Authority and the US Department of Housing and Urban Development's Community Development Block Grant (CDBG) money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq., were not independent of the United States' procuration or contribution and must be deducted from any damages awarded to Plaintiffs.  Kennedy v. United States, 750 F. Supp. 206, 213 (W.D. La. 1990).  In

fact, the LRA payments have been recognized as "provided free of cost to eligible homeowners and is funded by a grant through the United States Department of Housing and Urban Development." Metoyer v. Auto Club Family Ins. Co., 536 F. Supp. 2d 664, 670 (E.D. La. 2008).

Plaintiffs cannot meet their burden of proving damages under Louisiana law because they do not properly quantify: (1) the loss of fair market value of their immovable property; (2) actual reconstructions costs where appropriate; (3) depreciated value of their movable; or (4) actual expenses. Moreover, they are not entitled to personal injury damages in the form of mental anguish or inconvenience because they were not present or in the zone of danger at the time the damage occurred.

If the court awards damages, the award is limited to the sum certain found in the property damage section of Plaintiffs' administrative claims (SF-95). Property claims are severable from personal injury claims. See Kokaras v. United States, 980 F.2d 20, 23 (1st Cir. 1992) (holding that property damage is severable from personal injury and that failure to put a sum certain on administrative claim for personal injury does not prevent plaintiffs from seeking property damage where sum certain requirement was satisfied for such damage); Allen v. United States, 517 F.2d 1328, 1330 (6th Cir. 1975) (holding that, where plaintiffs filed an administrative claim for property but not personal injury or loss of consortium, but filed a complaint alleging only personal injury and loss of consortium, case was properly dismissed); Schwartzman v. Carmen, 995 F. Supp. 574, 576 (E.D. Pa. 1998) (holding that

where sum certain was listed as to property but not personal injury, plaintiff could pursue property damages but not personal injury claims in district court).

Furthermore, to the extent other actors, even non-parties, are responsible for any portion of the damages incurred by Plaintiffs, damages must be apportioned accordingly among the various causes.

In 1996, Louisiana amended its Civil Code to expressly guarantee that "[a] joint tortfeasor shall not be held liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person." La. Civ. Code Ann. art. 2324(B) (2008). The legislature also clarified that "the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, *regardless of whether the person is a party to the action or a nonparty*." La. Civ. Code art. 2323(A) (2008). (emphasis added).

*Dumas v. State*, 828 So. 2d 530 (La. 2002), a recent case from the Supreme Court of Louisiana, is instructive on this point. In that case, a wrongful death suit brought against the state, the decedent sustained a fatal head injury when the bicycle he was riding struck a large pothole on a state road. *Id.* at 531. As an affirmative defense, the state alleged that the death resulted from the negligent medical care provided to the decedent at the hospital following his accident. *Id.* at 531-32. The plaintiffs, in turn, argued that even if the hospital was also partly responsible for the death, the state should be held solidarily liable for 100 percent of their damages. *Id.* at 532. The court, however, soundly rejected this argument:

> Pursuant to Article 2323, the fault of both the State and the allegedly negligent
> health care providers should be determined notwithstanding the fact that the

health care providers are non parties. Under Article 2324(B), if a jury determines that both the State and the health care providers negligently injured Mr. Dumas and plaintiffs, then the liability between them will be a joint and divisible obligation, they will not be solidarily liable, and each joint tortfeasor will be liable only for his portion of fault.

*Id.* at 537. From this statement, it is evident that binding case law, in addition to well-established statutory provisions, forecloses the possibility of a negligent joint tortfeasor being held liable for the entire amount of a plaintiff's damages.

## CONCLUSION

This court lacks subject matter jurisdiction because the United States is immune under the Flood Control Act, as well as under the discretionary function and due care exceptions. Nevertheless, Plaintiffs have failed to prove that the MRGO caused the flooding during Hurricane Katrina. Even if they had, they failed to adequately prove any damages.

Respectfully submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General
PHYLLIS J. PYLES
Director, Torts Branch
JAMES G. TOUHEY, JR
Assistant Director, Torts Branch

 s/ Robin D. Smith
ROBIN D. SMITH
Senior Trial Counsel
Civil Division, Torts Branch
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C. 20044
(202) 616-4400 / (202) 616-5200 (Fax)
Attorneys for the United States of America

CERTIFICATE OF SERVICE

I certify that the foregoing was served on all counsel of record by ECF on

April 3, 2009.

<u>/s Robin Doyle Smith</u>
ROBIN DOYLE SMITH