# UNITED  STATES  DISTRICT  COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| _____ | § | |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE UNITED STATES' MOTION TO EXCLUDE
## THE OPINIONS OF PLAINTIFFS' EXPERT ROBERT BEA

Despite already having issued over 3,200 pages of expert opinions, declarations, technical reports, and revisions thereto, Plaintiffs' expert Robert Bea felt compelled last Saturday to issue still another 525 pages of expert reports and technical appendices.  Bea Decl. No. 1 ¶ 19 (July 11, 2008) (Ex. 1).  This newest report details the analysis underlying Dr. Bea's latest opinion – that the MRGO caused quantifiable subsidence in half of the Reach 2 levees, beyond the subsidence that was caused by natural processes.  Yet even now, Dr. Bea has not supplied the United States with a *final* report of the expert opinions that he intends to offer at trial.

The Court should not permit Plaintiffs to continue their bait-and-switch tactics a mere two weeks before trial.  Because the United States lacks sufficient time to study the material,

have its experts review the analyses, adequately depose Dr. Bea, and prepare for trial, this Court should either preclude Dr. Bea entirely from testifying at trial or, at least, strike Dr. Bea's newest report and preclude him from testifying about the opinions stated therein.  In the event that the court declines either to preclude Dr. Bea from testifying entirely or to strike his latest report, the Court should postpone trial to afford the United States an opportunity to respond to Dr. Bea's latest analysis.

**<u>BACKGROUND</u>**

The most recent Bea opinion is the third iteration of Plaintiffs' attempt to establish a causal link between the MRGO and the flooding caused by Hurricane Katrina.  Plaintiffs' original theory was that the MRGO caused three additional feet of storm surge.  *See* Statements by Pierce O'Donnell, Mar. 11, 2008, Hrg. Tr. at 43-48, 56, 73-75 (Doc. 15317-7) (Ex. 2).  After their Dutch hydrologic experts opined that the initial design and construction had a negligible effect on the storm surge in Reach 2, Plaintiffs shifted to a new theory:

> Now, the critical difference between them [i.e., the United States] and us is that the Corps of Engineers believed that the levees failed because of backside overtopping -- backside erosion, I'm sorry, caused by overtopping.
>
> The plaintiffs' argument is that the levees failed because of front-side erosion. In other words, the wave was so powerful that they [sic] destroyed the levees from the water side, not from the protected side.

Statement by Joseph Bruno, Dec. 18, 2008 Hrg. Tr. at 47 (Ex. 3).

Not until 2009 – more than three years after beginning their investigations – did Plaintiffs come to realize that waves and surge would have destroyed the levees even if the MRGO had not existed.  Indeed, consistent with the United States' experts, Dr. Bea now acknowledges that the majority of breaches in Hurricane Katrina resulted from "surge

2

overtopping initiated breaching (protected side to flood side)." Bea Decl. ¶ 134 (Jan. 29, 2009) (Ex. 4). Finally recognizing that neither of their first two theories could carry the day for them, Plaintiffs confected their third and latest theory of causation. Because the destruction of the MRGO levee was inevitable, given the powerful and massive surge that overwhelmed it, Plaintiffs had no choice but to argue that the MRGO was responsible for the low LPV crest elevations. Hence Dr. Bea's newest report, asserting that the proximity of the MRGO channel to the levees caused the levees to sink.

> Given the results from the analyses summarized in this Declaration and the conclusions reached by Resio, Ebersole, and Mosher (December 2008 Expert Reports), one would conclude there is a direct correlation between the overtopping breaching mechanism purportedly responsible for breaching the EBSBs and the proximity of the MR-GO channel.

Bea Expert Report ¶ 31 (April 3, 2009) (Ex. 5).[1]

Although Dr. Bea now touts this new "squeezing" theory as a cause of the subsidence of the levees, he had originally attributed the squeezing phenomenon to something other than the MRGO:

> Observed features on the borrow pit side of the levee (Figure 83) indicate lateral 'squeezing' – deformations – resulting from the recently placed and settling ESBS. The land manager for the area adjacent to this levee (Mr. John Esteves) opined that these lateral deformations had been taking place for years along both sides of the levee. His observations were that these lateral deformations resulted in partially filling the borrow pits that were in close proximity to the toes of the levees, thereby accelerating levee settlements.

Decl. of Robert Bea ¶ 185 (Sept. 17, 2007) (Ex. 6). Even though Dr. Bea was apprised of the supposed "squeezing" phenomenon by September of 2007, he did not begin to fully develop

---

[1] Except for occasional lapses, Dr. Bea persists in using Plaintiff's preferred euphemism "EBSB" (which Dr. Bea coined himself for purposes of this litigation) when he refers to the MRGO levees.

his opinions attributing it to the MRGO until 2009, in reports produced to Defendant on January 30 and April 4 – the latter report being produced to Defendant a mere two weeks before trial.  *Id.* ¶ 184 (Ex. 6).  Although mentioned in Dr. Bea's 1,100 page July 11, 2008 expert report, he devoted only 20 pages to the purported squeezing effect.  Bea Decl. No. 1 ¶¶ 145-159 (July 11, 2008) (Ex. 1).  Nowhere in either this July 2008 report or his earlier September 2007 declaration did Dr. Bea attempt to quantify the subsidence supposedly attributable to the MRGO or identify the places where he thought it had occurred.  Not until after January 30, 2009, was Defendant ever on notice that Dr. Bea intended to identify MRGO encroachment as a substantial link in the chain of the events that led to the flooding of St Bernard Parish.

After the United States produced its experts reports, Dr. Bea began to develop his opinion that MRGO encroachment was responsible for Reach 2 levee subsidence.  At his February 27, 2009 deposition, Dr. Bea finally quantified the percentage of the levees where this MRGO-induced sinkage had supposedly occurred, stating his opinion that *only 20%* of the levees were too close to the channel and, therefore, subject to the purported squeezing effect.  Even at that late date, however, he failed to identify the places where, in his opinion, this supposedly had occurred.[2]  *See* Bea Dep. at 733:22-734:8, 736:23-737:17 (Ex. 7) ("It's where the bank of the MRGO, prior to Hurricane Katrina, had come to within 2- to 500 feet of the toes of adjacent earthen flood protection structures."), 756:2-9.  In February Dr. Bea

---

[2] One thing that has remained consistent in both Dr. Bea's original and new analyses:  he has still failed to provide a map showing which levees are subject to the supposed squeezing effect.  Bea Dep. 756:2-9 (Feb 27, 2009) (Ex. 7).  The United States was unable to find such a map in the short time it has had to review Dr. Bea's newest report.

testified that he "corrected" for MRGO-induced subsidence by raising the affected levees reaches to their design height of 17.5 feet in his hypothetical, no-MRGO scenario. *Id.* at 730:21-731:3 (Ex. 7). In doing so, Dr. Bea failed to account for the natural subsidence and levee settlement which affected these reaches as well as the remaining 80% of the Reach 2 levee. *See id.* at 732:17-733:12 (Ex. 7).

Five weeks later, on April 4, 2009, a full year-and-a-half after he first alluded to the issue and only two weeks before trial is scheduled to begin, Dr. Bea has changed his opinion yet again to say that *50%* (rather than the *20%* he said in February) of the Reach 2 levees were too close to the channel and, therefore, subject to this purported squeezing effect. Bea Expert Report ¶ 32 (April 3, 2009) (Ex. 5). In his latest declaration, moreover, Dr. Bea for the first time differentiates between levee subsidence attributable (in his opinion) to MRGO encroachment and subsidence attributable to other factors. *Id.* ¶ 27 (Ex. 5). This new opinion is based on technical analyses that require 450 pages to delineate.[3]

Thus, in addition to his new report, Dr. Bea has issued three new technical appendices which contain the bulk of the analysis required for his opinion. Appendix A is a report by, among others, Plaintiffs' experts Duncan Fitzgerald and Chad Morris, detailing the regional subsidence which was occurring everywhere in Southeastern Louisiana. Appendix B is a 339 page report by Dr. Robert Bea and Rune Storesund (who co-authored many of Dr. Bea's

---

[3] On its face, Dr. Bea's new opinion calls for a reconsideration of the application of 33 U.S.C. § 702c to Plaintiffs' claims. It is undisputed that the Corps of Engineers attempted to remedy levee subsidence by adding more soil to the levee in a procedure known as a levee "lift." If Bea is correct in attributing some of the subsidence to MRGO encroachment, then the Corps, through the LPV project, was attempting to remedy the very same deleterious effect which Plaintiffs now ascribe to MRGO.

prior reports) which examines locations along the MRGO to determine the expected loss of levee elevation purportedly caused by the MRGO.  Appendix C is a 127 page report authored by Xavier Vera-Grunauer, one of Dr. Bea's co-authors of the ILIT report.  Appendix C contains complex technical simulations used by Dr. Bea in an attempt to substantiate his new opinions.  None of these appendices, let alone the analysis contained therein, were provided in Dr. Bea's extensive prior declarations, depositions, reports, and appendices.

Further, Dr. Bea's new report does not rectify his continued failure to provide the United States with his final opinions.  Dr. Bea provided, consistent with the Court's scheduling order, over 1,100 pages of reports on July 11, 2008.  The United States scheduled Dr. Bea's deposition for January 30-31, 2009, in San Francisco.  On the first day of the deposition, without any advance notice, Dr. Bea submitted an additional 487 pages of expert reports.  Having assumed until then that Dr. Bea's first expert reports were final and complete, counsel for the United States was all the more astonished to learn that Dr. Bea considered even the January 2009 wave of opinions to be "preliminary."  Bea Technical Report No. 4 at 1 (Jan. 28, 2009) (Ex. 8) ("This report contains the analytic results of a preliminary Phase II erosion evaluation of the MR-GO Reach 2 alignment. . .").  Prior to that time, the United States was not informed that Dr. Bea's original reports were either preliminary or constituted only the first phase of a multi-phase series of reports.

The January 29 reports contain many references to "Phase II analysis," which during his deposition Dr. Bea described as a "revisit[ing of] our evaluation of breaching of the earthen flood protection structures.  We call this Phase II analysis.  What you have in July was Phase I analysis."  Bea Dep. at 239:23-241:3 (Jan. 30, 2009) (Ex. 9).  When Dr. Bea was

6

deposed again, on February 27, 2009, he again testified that his opinions and conclusions were still not final:

> **Q.  What part of your opinions and conclusions, then, at this time are final?**
>
> **A.  Nothing.**
>
> **Q.  None?**
>
> **A.  Correct.**

Bea Dep. at 547:3-14 (Feb. 27, 2009) (Ex. 7) (emphasis added).  Even Dr. Bea's latest report fails to state that the new opinions stated therein, or the opinions stated in his earlier reports (which are expressly incorporated by reference in his latest report) represent a final statement of Dr. Bea's opinions.  Accordingly, Dr. Bea should be precluded entirely from testifying at trial.

In the event that the Court declines to preclude Dr. Bea's testimony in its entirety, Dr. Bea at least should be precluded from testifying to the opinions stated in his latest expert report.  In the short time the United States' experts had to review Dr. Bea's latest tome, they have identified new analyses made by Dr. Bea which were not contained in his prior reports.  For example, Dr. Bea now uses a computer modeling program to support his conclusions about squeezing.  According to the sworn declaration of United States' expert, Dr. Reed Mosher, it would take at least three months from the time he receives Dr. Bea's supporting materials[4] to analyze the information, properly collect the data needed for the model,

---

[4] Once again, Dr. Bea has conducted computer simulations in an attempt to support his opinions.  Once again, Plaintiffs have failed to provide the computer simulations to the United States.

construct the model, and compare the results to other locations. Decl. of Reed Mosher, PhD., at ¶ 7 (Ex. 10). Another expert for the United States, Dr. Thomas Wolff, states in his declaration that he would need at least two months from the time he receives Dr. Bea's supporting documents to develop an understanding of Dr. Bea's opinions and bases, review the soil parameters, conduct a literature review, and review Dr. Bea's calculations. Decl. of Thomas Wolff, PhD., at ¶ 7 (Ex. 11). With the trial currently scheduled to begin in less than two weeks, insufficient time remains to allow the United States to rebut Dr. Bea's new opinions.

Finally, in the event that the Court declines to preclude Dr. Bea from testifying as to the opinions stated in his latest report, the currently scheduled trial date should be continued to afford the United States the time to adequately rebut these new opinions.

## ARGUMENT

**A. This Court Should Preclude Dr. Bea from Testifying at Trial**

"Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly." *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). Completeness is a necessary element of expert reports submitted pursuant to Rule 26. *See* Fed. R. Civ. P. 26 advisory committee's note (requiring that reports be detailed and complete). The purpose of such a stringent requirement is to obviate "sketchy and vague" expert reports. *Id*. A court has the discretion to set schedules for the disclosure of expert testimony. Fed. R. Civ. P. 26(a)(2)(C). Incomplete expert reports in contravention of a court's scheduling order are subject to exclusion. *See Sierra Club v. Cedar Point Oil Co.*

8

*Inc.*, 73 F.3d 546, 571 (5th Cir. 1996) (district court's striking of expert testimony that did not provide a complete statement of all opinions to be expressed was not an abuse of discretion).

After billing over $2,000,000 (as of January 30, 2009), Bea Dep. at 185:8-11 (Jan. 30, 2009) (Ex. 9), Dr. Bea has admitted that his report cannot be final, because he lacks the data necessary to finalize his opinions:

> For example, Dr. Wolff states his opinion that the analyses do not directly provide that something DID happen, rather that the scenario was possible. <u>What Dr. Wolff does not highlight is that the required information by which to fully complete the analyses requires information not available to either the Plaintiffs or the Defense Experts.</u>

Bea Decl. at 199 (Jan. 29, 2009) (Ex. 4) (emphasis in original). By this statement, Dr. Bea candidly admits that he lacks the evidence to provide a complete analysis to support his opinions. As such, Plaintiffs cannot meet their burden of proof.

Even Dr. Bea's latest report, which expressly incorporates all of his prior writings in this case, fails to state that the opinions which he will render at trial in less than two weeks, are final. Accordingly, this Court should exclude Dr. Bea and his "preliminary" opinions from being offered at trial.

## B.  In the Alternative, the Court Should at Least Strike Dr. Bea's Most Recent Report

If the Court is not inclined to preclude Dr. Bea from testifying entirely, it should at least strike his latest report and preclude him from testifying to the opinions stated therein. Plaintiffs and Dr. Bea had over 18 months to produce the analysis contained in the most recent report. Instead, they waited until just weeks before trial to provide Dr. Bea's latest

opinion.  Rather than reward such behavior, the Court should strike Dr. Bea's most recent

report.

Four factors are used to determine whether to admit an expert report produced on the

eve of trial: (1) the explanation for the failure to submit the report in a timely fashion; (2) the

importance of the report; (3) the potential prejudice in allowing the new report; and (4) the

availability of a continuance to cure the prejudice.  *E.g.*, *Reliance Ins.  Co. v. Louisiana Land*

*& Exploration Co.*, 110 F.3d 253, 257-58 (5th Cir. 1997) (citing *Geiserman v. MacDonald*,

893 F.2d 787, 791 (5th Cir. 1990).

Here, these factors weigh decisively against admitting Dr. Bea's opinion unless trial

is rescheduled.  Dr. Bea – who claims to have devoted more time studying the issues than

anyone else – had 18 months to reach an opinion regarding a phenomenon he believed

existed.  Instead of producing his final opinions in a timely fashion pursuant to the Court's

schedule, Dr. Bea waited until the eleventh hour to provide the United States an extensive set

of reports and analyses.

Most critically, this new opinion is extremely prejudicial because it contradicts Dr.

Bea's prior sworn testimony, contains new analyses, and materially changes Plaintiffs'

theory of causation.   For almost a year, the United States prepared to rebut Dr. Bea's faulty

analysis concerning front-side wave erosion.  On December 18, 2008, Plaintiffs counsel said

"[t]he plaintiffs' argument is that the levees failed because of front-side erosion."  At the last

minute, belatedly facing the overwhelming evidence that overtopping surge indisputably

destroyed the levees, Plaintiffs sandbagged the United States by changing their causation

10

theory.  The Court should not countenance this behavior and should, at a minimum, strike

Dr. Bea's most recent report.[5]

## C.  In the Event that the Court Permits Dr. Bea to Submit His New Report, the United States Needs Additional Time to Respond

The only way to cure the prejudice of allowing Dr. Bea's newest report is to

reschedule trial to provide the United States with sufficient time to rebut Dr. Bea's opinion.

As demonstrated in the declarations attached hereto, the United States' experts would need

to review Dr. Bea's new opinions and bases, collect new data, conduct new computer

simulations, examine the literature, and compare results to other locations.  At a minimum,

these experts would need three months to rebut Dr. Bea's opinions, analyses, and computer

simulations – once the experts receive Dr. Bea's reliance data.  Thereafter, the parties would

need to depose the experts and again prepare for trial.

Given the nature of these new opinions and analyses, the prejudice to the United

States cannot be rectified within the next two weeks.  In *any* case, much less one of this

magnitude, a party is entitled to obtain a final statement of its opponent's theories and expert

opinions sufficiently in advance of trial to allow the development of rebuttal evidence and

opinions.  Even if Dr. Bea's opinions were somehow final – and he disavows that they are –

the United States would not be able to rebut Dr. Bea's newest opinions at trial without

---

[5] When informed of Defendants' objection to Dr. Bea's latest reports, Plaintiffs indicated that they would retaliate by moving to strike the supplemental report of the United States' expert Dr. Donald T. Resio.  It should be noted, however, that these are not the only two expert reports provided after the deadlines had passed.  Almost every expert retained by Plaintiffs produced a late "supplemental" report.  Dr. Bea's latest, however, is in a category by itself, not only because it comes so close to trial, but especially because it represents an attempt to introduce a new theory of causation into the case.

additional time to prepare, consult with its experts, and respond with its own expert reports if necessary.

## <u>CONCLUSION</u>

For the reasons stated, the United States requests that this Court preclude Dr. Bea entirely from testifying at trial, or strike his latest report and preclude him from testifying as to the opinions stated therein, or postpone the trial.

Respectfully submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR
Assistant Director, Torts Branch

 s/ Dan Baeza
DAN BAEZA
PAUL LEVINE
Trial Attorneys
ROBIN SMITH
RUPERT MITSCH
Senior Trial Counsels
Civil Division, Torts Branch
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 353-2574 / (202) 616-5200 (Fax)

Attorneys for the United States of America