# EXHIBIT 2

```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3
   ****************************************************************
 4
   IN RE:  KATRINA CANAL
 5  BREACHES CONSOLIDATED
   LITIGATION
 6
                                 CIVIL ACTION 05-4182
 7                               SECTION "K"(2)
                                 NEW ORLEANS, LOUISIANA
 8                               TUESDAY, MARCH 11, 2008, 9:00 A.M.
   PERTAINS TO:
 9
   MRGO, ROBINSON (06-2268)
10

11  BARGE, IN THE MATTER OF THE
   COMPLAINT OF INGRAM BARGE
12  COMPANY, AS OWNER OF THE
   ING4727, PETITIONING FOR
13  EXONERATION FROM OR
   LIMITATION OF LIABILITY
14  (05-4237, 05-5531,
   05-5724, 06-5054,
15  06-5342, 06-6299,
   06-7516)
16
   ****************************************************************
17

18          TRANSCRIPT OF MOTIONS HEARING PROCEEDINGS
        HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
19                     UNITED STATES JUDGE

20

21  APPEARANCES:

22
   FOR THE PLAINTIFFS:           O'DONNELL & ASSOCIATES
23                               PIERCE O'DONNELL, ESQUIRE
                                 550 SOUTH HOPE STREET
24                               SUITE 1000
                                 LOS ANGELES CA   90071
25
```

 1  the loss of the wetlands, all known and foreseeable.
 2              It's an independent tort, it's an independent act
 3  of negligence outside of flood control conduct occurring before
 4  the LPV was enacted and the project was built.
 5              And what happened here is, I'm being very precise
 6  because my record is very, you want to pinpoint, I tried to
 7  pinpoint, there is three feet of excess floodwater we allege
 8  caused by the MRGO.
 9              THE COURT:  So now you're going to my last question but
10  I'll ask it now.  And I'm not sure how it relates to 702c
11  immunity necessarily, but it's something that vexes me.  In fact,
12  if you think a lot about this case, it will keep you up at night.
13  It seems to me that I'm going to have to hold that to the extent
14  that the flooding was caused by the failure of the LPV, there is
15  immunity for the government.
16              MR. O'DONNELL:  I respectfully disagree.  But I'll wait,
17  Your Honor.
18              THE COURT:  Well, you're going to lose on that one.  You
19  may disagree, because that would, because it would be reversed in
20  a heartbeat in my opinion.  But I want to hear what you say and I
21  think you're going to lose, you really have an uphill battle.
22  For me to say that it caused part of the damage, somehow they
23  don't have immunity.
24              MR. O'DONNELL:  No, no, no.  We agree, segregation,
25  *Central Green* opened the possibility of it.

1            THE COURT:  You.

2            MR. O'DONNELL:  I have a factual point on that.

3            THE COURT:  You may have a factual point on that but --

4            MR. O'DONNELL:  But I will wait on that.

5            THE COURT:  Okay.

6            MR. O'DONNELL:  I think failure is in the eye of the
7    beholder.

8            THE COURT:  If, without the surge from the MRGO, there
9    would have been six feet of water, hypothetically, in the homes
10   of your plaintiffs, of your six plaintiffs, and on the, and with
11   the surge there was nine feet, what the heck is the damage from
12   the MRGO?

13           MR. O'DONNELL:  Would you turn to Tab 6 for a moment
14   please, Your Honor.

15           THE COURT:  I'm jumping ahead of my question.  We'll get
16   back to my question.

17           MR. O'DONNELL:  This is great.  This is like dealing
18   with my three children, Your Honor, they all come at me from
19   different directions.  Let me answer that question very
20   specifically.  These three charts show what a difference three
21   feet makes and they're very simple --

22           THE COURT:  It's almost a song.

23           MR. O'DONNELL:  It does, Your Honor.  It's the IHNC
24   where the, there was overtopping and failure on both sides.  I
25   have Reach 1 and Reach 2.  And this is the essential point of the

1   negligence and the causation, Your Honor.

2            THE COURT:  Mr. Smith, do you have a copy?

3            MR. SMITH:  Yes, thank you.

4            MR. O'DONNELL:  Is this, because of the destruction of

5   the wetlands, and Dr. Robert Dalrymple, their expert in a related

6   case, Johns Hopkins, it doesn't get any better than that unless

7   it's Tulane, he says there was over a meter of excess surge

8   during Katrina because the wetlands were destroyed.  They have a

9   known buffering effect, about 2.7 miles of wetlands, cypress,

10  whatever, knocks down a foot of surge.

11           So he, himself said there was over three feet of

12  surge that attacked the Reach 1 levees, which is depicted in

13  Tab 3.  Actually, there is arrows from the ILIT report that show

14  you what they label as overtopping flow.  Liquid bulldozer.

15  Okay.  And if there had not been the MRGO in that area of

16  Lake Borgne and if there had not been a decimation of those

17  wetlands, tens of thousands of acres of wetlands that they knew

18  was going to happen, according to our allegations and our proof.

19           If you look at the first chart in Tab 6, the surge

20  would have been only 12 feet.  The surge was 15 feet.  And the

21  actual height was twelve-and-a-half.  You would have had no

22  overtopping.  That's the real culprit here is overtopping.  It

23  would not have occurred.

24           THE COURT:  That's where you disagreed with the premise

25  of my question about you don't need to segregate, you're telling

1  me.

2          MR. O'DONNELL:  In that regard.  I do, however, on
3  page 2, Reach 1, maybe.  There, the surge was 18.2 feet high, the
4  actual height was 15, and if it was only 15.2, there is 0.2 of a
5  surge --

6          THE COURT:  You're talking about overtopping, some of
7  these levees failed.

8          MR. O'DONNELL:  I'll get to that, Your Honor.  In
9  Reach 2, I show the same thing.  In much of Reach 2, the surge
10 without the MRGO three-foot addition would have been less than
11 the actual height.

12         THE COURT:  Again, I'm getting a little off of my major
13 focus, which is the nexus argument.  But go ahead, let's finish
14 this up.

15         MR. O'DONNELL:  I know this may actually lead into
16 nexus, Your Honor.  So the vast amount of damages here is
17 overtopping.  Okay.  And not the failure.  Reach, now, there was
18 failure.  Let's take the IHNC.  There is not much of a dispute
19 between my experts and the Corps' IPET report and ILIT.  And --

20         THE COURT:  I have an interesting conundrum because I
21 have lots of theories of liability before this Court under this
22 umbrella but your case, if it gets to trial, will be very
23 interesting, go ahead.

24         MR. O'DONNELL:  Your Honor, if you get to Tab 5, I have
25 actually summarized this for you.  All with record evidence, all

1    but one cite being the Corps' own expert, Dalrymple's report, his
2    depo, Varuso, their employee, or the IPET report.
3                And overtopping is what caused the catastrophic
4    flooding in every location.  Overtopping.  It's undisputed in
5    this record.  And it's overtopped because of the three feet of
6    excess surge caused by MRGO.  In 1947, an unknown hurricane, the
7    record shows, hit this vicinity and did not have catastrophic
8    flooding.  There was no MRGO.  There was still all that wonderful
9    cypress Tupelo swamp out there and there was no funnel from the
10   MRGO.
11               In '65, they had catastrophic flooding that was
12   much the same footprint as we had in 2005.  The only difference
13   was the MRGO.  That's science.  That's in the record.
14               But here, overtopping is critical.  Reach 2 is made
15   of earthen berms for the most part, and it overtopped first, and
16   the overtopping was catastrophic.
17               And then the liquid bulldozer, the water caused by
18   MRGO, it's a battering ram just like your Navy vessel hitting the
19   levees of the Mississippi River, knocked out substantial portions
20   of the MRGO Reach 2.  It also contributed to the overtopping and
21   the failure of the IHNC's east side, the two breaches on the
22   north and south of each side, flooding the Ninth Ward and part of
23   Chalmette.
24               The point I'm trying to make, Your Honor, is even
25   in the context of a failure, a breach, the three feet of excess

```
 1   surge is a causative contributing factor.  It's the same as if
 2   the Army Corps had gone out to Canarvon, I'm told, as they did in
 3   1927 to save the city, and ba-boom, they blow up the levee.  It's
 4   the same analysis.  It's an independent tort act of negligence.
 5   I'll assume that was an act of negligence, although it was
 6   authorized by the president of the United States, I've read.
 7              So they do that.  My point is, I get to trial, I
 8   get over this issue I believe merely because of overtopping.  If
 9   the Court says, Well, Mr. O'Donnell, I think the liquid
10   bulldozer, I may have to allocate that might be immune, but I
11   agree with you that what you're saying about is non-immune,
12   that's the only point I'm making.  I'm not conceding that the
13   erosion caused by overtopping because of the excess three feet
14   but three feet made the dispositive difference here, and that's
15   our proof.
16              THE COURT:  Believe me, I understand your argument.
17              Let me ask you this:  You rely on *Graci,* and
18   counsel pointed out *Graci* is in a vacuum in the sense there was
19   its waters, the floodwaters there did not come into contact with
20   a FCP; therefore, what does *Graci* really teach us if we don't
21   have the same factual scenario?
22              MR. O'DONNELL:  It teaches us that it's not limited to
23   its facts.  It was, its doctrine is good today.  In fact, that
24   case has stood the test of time.  Indeed, I've pointed this out
25   you on several occasions, *James*, in footnote 2 cites approvingly
```

1  to accept the government's argument on the literal language.  So
2  I hope for a fifth time the Court will do that.  But lets move to
3  nexus.  I think that's the issue.
4         The legislative history, the construction of the
5  act to give it a nod so it doesn't have an absurd and draconian
6  effect, as Justice Stevens has been concerned about for a long
7  time, requires that we say there has to be some nexus.  The fact
8  that they are floodwaters, yes.  But why were they floodwaters?
9  The water out in Lake Borgne, that's a surge, okay, according to
10 our experts and a lot of the Court's own documents, which you
11 mentioned there would be a lot more to come if we get to a trial,
12 indicate that that three feet rises up, okay, and my chart very
13 simple, but with record cites on each of them, shows you that we
14 wouldn't have had an event in New Orleans.  We would have said,
15 Oh, my gosh, we had another one of those near misses, we had a
16 little flooding, a pump didn't work over here, 12 inches of
17 rainfall.  We would not have had catastrophic flooding.  And so
18 the nexus here is missing.  In other words, we're not saying, Oh,
19 my gosh, you didn't build the walls 22 feet high.  You would have
20 stopped any flooding.  We're not saying that you should have
21 built it out of something different.  We're not saying anything
22 about the project itself.
23        Number 2, you've mentioned in one of your opinions
24 about floodwaters emanating from the project.
25        THE COURT:  That was in the levee opinion because I was,

1  the levees first by overtopping them, then by eroding them and
2  washing them away.  And that but for the failure of those levees,
3  there would not have been a flood.  There would have been some
4  rainwater that would have accumulated to a foot or two, but apart
5  from the failure of those levees, which as Your Honor, I think,
6  has rightly concluded, surrounded these areas, whether we call
7  them levees or not, and I understand Your Honor understands that
8  argument, it was the MRGO effect, according to plaintiffs'
9  theory, that caused the failure of the LPV in this case, and that
10 led to this flood.
11             That, Your Honor, is the nexus that we believe
12 requires 702c to be brought to bear in this case.  And we would
13 ask that the government's motion to dismiss be granted.
14             THE COURT:  Thank you, Mr. Smith.
15             Mr. O'Donnell.
16             MR. O'DONNELL:  We learned in law school that the
17 plaintiff is the master of the complaint and the Court has
18 acknowledged previously *In re Katrina* ruling that our theory has
19 been articulated.  I'll say it again:  Our primary theory of
20 liability is, and it's an allegation right now, I think I've
21 offered evidence to create the factual issue here that there was
22 three feet of extra surge because of the funnel and because of
23 the loss to the wetlands, point one.
24             That surge made the difference.  It overtopped.
25 Our first theory here is it overtopped.  That's not a failure.

1  The government has, in their own facts, said it performed as
2  expected.  It overtopped.  It's a speed bump.  It's not there.
3  I'm not talking about the failure of the levees in that regard.
4  And a substantial amount, maybe all of my clients' damages can be
5  attributed to the overtopping of the levees.
6              Because of the three feet, Your Honor, the
7  testimony of the experts is, it was earlier, more prolonged, and
8  more intense than it would have been.  And that three feet of
9  flooding leads to 15 to 20 feet of water in my clients' homes.
10 It's not that we're going to say three feet of the water is the
11 MRGO.  It's the three feet is the catastrophic.  It's the
12 linchpin, it's the trigger that causes it.
13             Secondly, there may be a factual dispute on whether
14 the liquid bulldozer, that ferocious surge created by the MRGO,
15 blew out the earthen berms or was a contributing factor in the
16 IHNC to the contributing failures.  That's a second proposition.
17 And the Court has to decide whether my claim, which is that it is
18 the same as the battering ram of the Navy frigate or the
19 dynamiting of the levee.  I don't think you can distinguish those
20 points, but at a minimum I get by summary judgment on the
21 overtopping basis because that's not a failure.  We're ignoring
22 it; it might as well not be there, Your Honor.
23             We filed a cross motion for summary adjudication.
24 And I'm not going to belabor or waste the Court's time on my
25 second and third propositions, but I think on this record the

1  Court could, if it agrees, continues, I believe to adhere to the
2  basic legal principles you have articulated in four decisions
3  already on the issue of 702c, that we not only defeat their
4  motion but we win our motion, and I think the Court understands
5  my point on that, that is there a parity, we've met them on those
6  issues.
7           The Court could decide that maybe there is factual
8  disputes about some aspect of nexus, but we believe there is a
9  clear category here relating to the three feet and the
10 overtopping, that's segregable from anything else that may have
11 caused damage to our client's property.  At least on that basis,
12 I think, we prevail on this case.
13          So I urge the Court either to grant, deny theirs
14 and grant my cross motion or find that there is factual dispute
15 for their motion.
16          Thank you very much for the time, Your Honor.
17     THE COURT:  Thank you.
18          Mr. Aldock, anything else?
19     MR. ALDOCK:  Nothing further, Your Honor.
20     THE COURT:  Mr. Smith, any last words?
21     MR. SMITH:  No, Your Honor.
22     THE COURT:  First I want to compliment all of you for
23 what I feel has been, from the Court's standpoint, an exceptional
24 oral argument, extremely prepared.  All of your clients should be
25 proud and this is why oral argument could be a lot of fun with