# EXHIBIT 7

Page 541

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

--oOo--

IN RE KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION,

No.  05-4182 "K" (2)

PERTAINS TO:  ROBINSON, NO.
06-2268
_____

DEPOSITION OF ROBERT GLENN BEA

(VOLUME III, Pages 541 - 784)

Friday, February 27, 2009

Reported By:

KATHLEEN WILKINS, CSR #10068, RPR, CRR

ROBERT G. BEA (VOL III)  February 27, 2009

Page 545

```
 1   February 27, 2009                        8:39 A.M.
 2                    P R O C E E D I N G S
 3            THE VIDEOGRAPHER:  Good morning.  We are on
 4   the video record, ladies and gentlemen, at 9:18 a.m.
 5            My name is Ryan Triolo, from LegalPoint, LLC,
 6   in San Francisco, California.  The phone number is
 7   (415)692-3600.  This is a matter pending before the U.S.
 8   District Court, Eastern District of Louisiana, in In Re
 9   Katrina Canal Breaches, Civil Action No. 05-4182K and 2,
10   in parens.
11            This is the beginning of Tape No. 1,
12   Volume III, of the deposition of Dr. Robert Bea, on
13   February 27th, 2009.  We are located today at Three
14   Embarcadero Square [sic], San Francisco, California.
15            MR. STONE:  This deposition pertains to
16   Robinson, at 06-2268.
17            THE VIDEOGRAPHER:  Okay.  This is being taken
18   on behalf of the defendants.
19            Counsel, will you please identify yourselves,
20   beginning with the questioning attorney.
21            MR. STONE:  Richard Stone, United States
22   Department of Justice.
23            MR. LEVINE:  Paul Levine, for the United
24   States.
25            MR. BAEZA:  Dan Baeza, for the United States.
```

ROBERT G. BEA (VOL III)  February 27, 2009

Page 546

```
 1            MR. RAFFMAN:  Mark Raffman, for Lafarge North
 2   America, Inc.  I'm not appearing at the deposition.
 3   Just appearing.
 4            MR. STONE:  We also have Dawn Miller, from --
 5   a techi with us, for use in the TrialDirector.
 6            MR. BRUNO:  And Joseph Bruno, plaintiffs'
 7   liaison counsel.
 8            THE VIDEOGRAPHER:  Thank you.
 9            Will the court reporter please swear in the
10   witness.
11                    ROBERT GLENN BEA,
12          having been duly sworn,
13        was examined and testified as follows:
14                         --oOo--
15            MR. BRUNO:  Richard, before we begin, you've
16   requested, again, and we produced for the second time
17   the simulated wave-induced erosion of the Mississippi
18   River-Gulf Outlet Levees During Hurricane Katrina,
19   Journal of Waterway Port, Coastal and Ocean Engineering
20   ASCE 2008.
21            MR. STONE:  Thank you.
22            MR. BRUNO:  And also includes any documents
23   that Bob has reviewed since his last deposition, which
24   was, what, two weeks ago, or something like that.
25            MR. STONE:  We reserve our position on that
```

ROBERT G. BEA (VOL III)  February 27, 2009

Page 547

```
 1   until we've looked at them.
 2             RESUMED EXAMINATION BY MR. STONE
 3            MR. STONE:  Q.  Dr. Bea, I noticed in this
 4   latest report, Technical Report No. 4, you say that it's
 5   preliminary and that it's an ongoing process, it seems
 6   like.
 7            What does that mean?
 8       A.   Well, still conducting studies to develop more
 9   details.
10       Q.   What part of your opinions and conclusions,
11   then, at this time are final?
12       A.   Nothing.
13       Q.   None?
14       A.   Correct.
15       Q.   Okay.  Have you provided for us all
16   calculations that you've made, whether they're on a
17   spreadsheet and whether they have to do with EFA
18   testing, LS-DYNA runs, surge and wave calibrations, et
19   cetera?
20       A.   Yes.
21            MR. BRUNO:  Could you mark that part of the
22   deposition, please.
23            MR. STONE:  Q.  You've spoken of coefficients
24   of variation in your testimony.  And I can direct you to
25   page 57, Table 17, if you want to look at it, but I
```

ROBERT G. BEA (VOL III)  February 27, 2009

Page 548

```
 1   don't know whether you need to.
 2            Let me hand you a document and see if you can
 3   tell me what that document describes about coefficients
 4   of variation.
 5            MR. BRUNO:  Do you want to mark that?
 6            MR. STONE:  Q.  I know it is not your
 7   document.  I had that made up myself.
 8            MR. BRUNO:  Do you want to mark it?
 9            MR. STONE:  Let's mark it as the next exhibit
10   in line.  I don't know what it is at this time.
11            I think I only marked one exhibit last time.
12   I'm not sure.
13            THE REPORTER:  I can find out.
14            MR. STONE:  The deposition notice.
15            THE WITNESS:  Yes, sir.
16            MR. STONE:  Q.  You've developed tables like
17   that, and you've seen tables like that before, right?
18       A.   Correct.
19       Q.   Is the way this works, that if you have a
20   coefficient of variation and your variation is
21   between -- bear with me if I say something wrong, along
22   the lines are that are wrong.
23            Same instructions apply as the last time.  If
24   you don't understand me, we'll try to figure out how to
25   ask a better question.
```

ROBERT G. BEA (VOL III)                          February 27, 2009

Page 729

1  direct connection has not been made between Scenario 3
2  conditions and the breaching characteristics, the
3  analysis work essentially has been done.
4        Q.   I'm asking you if you have done the breaching
5  conditions based on those circumstances that I
6  described.
7        A.   I would --
8        Q.   I'd see them here if you had, I thought.
9        A.   The reason I find the question difficult to
10 answer is I would have to first determine precisely, for
11 example, at the study location 497 plus 00, what the
12 surge and wave characteristics were for Scenario 3 and
13 then compare those conditions for those we have studied
14 in Scenarios 1 and 2C.
15       Q.   And you haven't done that?
16       A.   That's correct.
17       Q.   Okay.  Where exactly did you raise the levees
18 to change the conditions for Scenario 2C to neutral?
19       A.   That was when we did the evaluations of the
20 potentials for breaching.  So that if we had evaluated
21 the loss and elevation was directly attributable to the
22 Mississippi River Gulf Outlet configuration just prior
23 to Hurricane Katrina, then as we assess the performance
24 of the structures within those areas, we accommodated
25 the increase that should be there for that loss of

JOHNS PENDLETON COURT REPORTERS              800  562-1285

ROBERT G. BEA (VOL III)                          February 27, 2009

Page 730

1  protective elevations.
2        Q.   Have you -- have you changed those
3  conditions -- well, the question's withdrawn.
4             You haven't analyzed Scenario 2C in Phase II,
5  so you haven't changed those conditions based on your
6  Phase II evaluations for Scenario 1, have you?
7        A.   Correct.
8        Q.   What were the locations that you raised the
9  levees?
10       A.   Locations were the channel of the MRGO had
11 migrated to distances of the order of 200 feet to
12 500 feet from the toes of the earthen flood protection
13 structures.
14            The characteristics of the channel relative to
15 those earthen protective structures are contained in the
16 expert report by Fitzgerald Penland, et al.
17       Q.   The levee crest characteristics are contained
18 in that report?
19       A.   No.  The channel characteristics relative to
20 the locations of the flood protection structures.
21       Q.   But to get MRGO neutral, you had to bring the
22 levees up to 17 and a half in certain places?
23       A.   Correct.
24       Q.   Where are those places that you brought them
25 up --

JOHNS PENDLETON COURT REPORTERS              800  562-1285

ROBERT G. BEA (VOL III)                          February 27, 2009

Page 731

1        A.   As previously defined, where the channel of
2  the MRGO had come to within 200 to 500 feet of the toes
3  of the adjacent flood protection structures.
4        Q.   But you can't tell me, again, as you sit here,
5  where those locations are on the ground, without having
6  to look to the MRGO to determine where they are?
7        A.   Please repeat your question.
8        Q.   Today, you can't tell me the locations,
9  without having to refer to the MRGO?
10       A.   I would have to refer to the present locations
11 of the bank of the MRGO to identify specifically those
12 locations.
13            Several example locations have been provided
14 in my July 2008 expert report.
15       Q.   Did you change anything at Bayou Bienvenue to
16 make the system there hurricane neutral?
17       A.   Please repeat your question.
18       Q.   Did you change anything at Bayou Bienvenue in
19 order to create a hurricane neutral under Scenario 2C?
20       A.   Correct.  Yes, we did.
21       Q.   Okay.  What did you change there?
22       A.   I changed vegetation between the banks of the
23 neutralized MRGO.  I changed vegetation covering the
24 surface of the interface between the navigation flood --
25 or flood control structure at Bayou Bienvenue.

JOHNS PENDLETON COURT REPORTERS              800  562-1285

ROBERT G. BEA (VOL III)                          February 27, 2009

Page 732

1             We did not change any of the characteristics
2  of the earthen structure that abuts that location, nor
3  the hard concrete and steel structure that abuts that
4  location.
5        Q.   Why do you raise -- well, let -- let me ask
6  this a different way.
7             Is it that you raise the levees along the MRGO
8  to create a hurricane neutral situation because of the
9  squeezing effect that you've talked about in the past?
10       A.   That's correct.
11       Q.   But when you raise the levees to, what is it,
12 17, 17 and a half feet, when you raise it to that height
13 just at the places that were -- that were squeezed,
14 there are other places that were lower that didn't
15 squeeze?
16       A.   On what basis do you make that assertion?
17       Q.   Well, do you not -- do you not know whether
18 there were or not other places along there?  I mean, do
19 you believe that there were no other places along the
20 levee except where you claim the -- there was a squeeze
21 that were lower than 17 feet?
22       A.   Oh, no.  There were.  And that's because we're
23 grappling with three mechanisms that can lower the
24 protective elevations.
25            One is the natural consolidation of sediment

JOHNS PENDLETON COURT REPORTERS              800  562-1285

Page 733

```
 1   that follows a placement of the earthen fill used to
 2   construct the earthen flood protection structures,
 3   Component 1.
 4            Component No. 2, given that the banks of the
 5   MRGO have propagated to near the toes of those earthen
 6   protection structures, but we have a second contribution
 7   that I have identified as "squeezing."
 8            There is a third potential contributor
 9   identified commonly as "regional subsidence."
10            All three of those components must be
11   understood, evaluated, to determine what is causing loss
12   of the protective elevations.
13        Q.  Does that mean that you raise the levees at
14   places other than where the MRGO was, in your words, I
15   think, encroaching on the levee?
16        A.  No.
17        Q.  No.  You didn't raise the other places?
18        A.  We left them at zero.
19        Q.  Okay.  All right.
20            What's your basis -- well, let's -- let's go
21   back to that.
22            How much of Reach 2 -- by what percentage did
23   you raise those levees?  What percentage of Reach 2 did
24   you raise the levees on?
25        A.  My recollection is it's something of the order
```

Page 734

```
 1   of 20 percent, 15 percent.
 2        Q.  And how would we know where you raised those
 3   levees?
 4        A.  I'm trying to answer your question earlier.
 5            It's where the banks of MRGO, prior to
 6   Hurricane Katrina, had come to within 2- to 500 feet of
 7   the toes of the adjacent earthen flood protection
 8   structures.
 9        Q.  Have you marked these on any chart?
10        A.  Yes, in fact, we did.  And that was a series
11   of charts that I referenced that came from Fitzgerald
12   and Penland, et al.
13        Q.  They marked the places where the levees were
14   raised to 17 and a half feet to change to MRGO neutral?
15        A.  No.  They marked the location of the banks
16   relative to the toes or center lines of the adjacent
17   flood protection structures.
18            Once we went with that location, we can take
19   the next step and say what is the elevation within that
20   region?
21            By and large, the low elevations of the
22   adjacent flood protection -- earthen flood protection
23   structures along Reach 2 were synonymous with, one, the
24   location of the banks of the Mississippi River Gulf
25   Outlet to the adjacent earthen flood protection
```

Page 735

```
 1   structure, and the thickness of the underlying marsh and
 2   interdistributary layers.
 3            The closer, thicker, more loss of protective
 4   elevation, we tracked the correlation down the length of
 5   Reach 2.
 6        Q.  But you haven't provided us in the litigation
 7   a chart that shows that the levees were raised at a
 8   particular point along the MRGO for the hurricane
 9   neutral condition?
10        A.  That's correct.
11        Q.  Okay.  What's the basis for changing the grass
12   cover?
13        A.  To define a vegetation characteristics, you
14   should pose that question to environmental experts.
15            My understanding of the information that they
16   gave me to assist in the evaluation was that it was
17   principally saline water effects that were resulting in
18   loss of density, loss of root structure, loss of stiff,
19   dense, high protective vegetation.
20            Dr. Professor Gary Shafer and Dr. Professor
21   Emeritus John Day also contributed supporting expert
22   opinions information regarding the vegetation effects
23   caused by the presence of a Mississippi River Gulf
24   Outlet.
25        Q.  Can you give geo-spatial references to where
```

Page 736

```
 1   those levees were increased -- the levee crests were
 2   increased for creating a MRGO neutral?
 3        A.  Would you define what you mean by
 4   "geo-spatial."
 5        Q.  Yeah.  In any way you can do it.  GPS system
 6   or otherwise.
 7        A.  Certainly in --
 8        Q.  What system?
 9        A.  The easiest way for you to determine that
10   would be to refer to the figures included in the
11   Fitzgerald-Penland expert report of July 2008.
12            In there, they have a series of aerial
13   photographs with identification of the location of the
14   banks of the MRGO relative to the toe of the adjacent
15   earthen flood protection structures.
16        Q.  Where can we see the levee profile that you
17   used in this new MRGO neutral scenario?
18        A.  Levee profile viewed from what direction?
19   Along the axis of the levee or in the cross-section to
20   the earthen flood protection structure?
21        Q.  Let's do cross-section first.
22        A.  Your -- please repeat your question.
23        Q.  Did you change the levee profile, either
24   cross-section or otherwise, to create MRGO neutral?
25        A.  We would increase the crest elevation.  That
```

ROBERT G. BEA (VOL III)                                February 27, 2009

Page 737

1   would naturally bring a change in the levee
2   cross-section associated with that increase in
3   protective elevation.
4           We kept the toe of the earthen flood
5   protection structures at their original constructed
6   locations.
7       Q.  Have you drawn that up, that new profile?
8       A.  Yes, I'm sure we have.
9       Q.  Have you provided it to us?
10      A.  It would be a series of profiles depending on
11  the particular location you were at, because different
12  amounts of crest elevation have to be brought in to make
13  that accommodation, and that changes a profile depending
14  on where you are on this 10 to 15 percent of the
15  locations along Reach 2.
16      Q.  Is it 10 to 15 percent or 20 percent?
17      A.  Let's say approximately 20 percent.
18      Q.  Okay.  Have you provided to the defense a copy
19  of the new profile that's drawn up for those levees that
20  you've increased the heights of?
21      A.  No.  And that's because we sat down with a
22  piece of paper, a straightedge and a ruler, and drew
23  them once we understood if the profile would have an
24  effect -- an important effect on the wave side breaching
25  or front-to-back breaching or back-to-front breaching,

JOHNS PENDLETON COURT REPORTERS                      800  562-1285

ROBERT G. BEA (VOL III)                                February 27, 2009

Page 738

1   at that point we disposed of them.
2       Q.  So for us to evaluate your MRGO neutral model,
3   we would have to go somewhere to find out, and that
4   would be Fitzgerald's report, where you actually changed
5   levee profile and height?
6       A.  Correct.
7       Q.  And then how do we know what your new levee
8   profile is?
9       A.  Well, it would be back at the prescribed
10  elevation, and it would have the footprint distance
11  between the two toes identical to what it was prior to
12  Katrina.
13      Q.  Well, how would we know that if you didn't
14  provide that to us in the litigation?
15      A.  Please define "that" in your question.
16      Q.  How would we know what the profile is for the
17  new levees that you've raised to the 17.5 feet height?
18      A.  You could sit down and draw them yourself.
19      Q.  If you don't change the underlying foundation
20  for the levee, and you raise the levee to 17 and a half
21  feet in your scenario, don't you still get subsidence
22  again?
23      A.  In which scenario?
24      Q.  Scenario 2C.
25      A.  Scenario 2C says that I have to maintain the

JOHNS PENDLETON COURT REPORTERS                      800  562-1285

ROBERT G. BEA (VOL III)                                February 27, 2009

Page 739

1   system in a neutral condition to the time of Hurricane
2   Katrina.
3           Certainly after Hurricane Katrina, those
4   conditions will change.
5           However, if you contend that your charge is to
6   maintain it in that neutral condition, those protective
7   elevations have to be reincreased.
8       Q.  Did the other 80 percent of the levees
9   subside?
10      A.  Certainly.  The entire region is subsiding.
11      Q.  How do you quantify in any of your analyses
12  how much of levee subsidence occurred because of a
13  squeezing-out effect and how much occurred because of
14  something else?
15      A.  Well, here's where the three components that I
16  described for you have to be evaluated.
17          One would be original regional subsidence
18  during the time period of concern.  In this case,
19  between the construction of the earthen flood protection
20  structures and the time of occurrence of Hurricane
21  Katrina.  That might be measured in terms of inches to a
22  foot.
23          Then you have to step into the evaluation of
24  the consolidated -- consolidation-related settlements
25  associated with the construction of the earthen flood

JOHNS PENDLETON COURT REPORTERS                      800  562-1285

ROBERT G. BEA (VOL III)                                February 27, 2009

Page 740

1   protection structures as it was being raised.
2           And the third component is an evaluation of
3   the additional contributions made by the proximity of
4   the MRGO and the underlying mobile interdistributary
5   marsh materials.
6       Q.  Have you provided us that analysis of which
7   levees you believe subsided due to squeezing out and
8   which ones subsided for other reasons?
9       A.  We've provided you with the analyses completed
10  to date -- or to -- January 2009 relating to those three
11  components.  We currently are conducting additional
12  analyses to further evaluate these conditions and
13  characteristics at other locations along Reach 2.
14          MR. BRUNO:  He's asked you that question three
15  times already.
16          (Discussion held off record.)
17          MR. STONE:  Q.  Okay.  If you take into
18  account the squeezing effect that you're talking about,
19  where the MRGO is fairly close to the levees, how high
20  do you have to raise the levees to be sure that you can
21  have 17 and a half feet, let's say, a year from now?
22      A.  The difference between the current height and
23  the target height.  The current height is 14 feet and
24  the target height is 17 and a half feet.  You can take
25  the difference.

JOHNS PENDLETON COURT REPORTERS                      800  562-1285

ROBERT G. BEA (VOL III)                          February 27, 2009

Page 753

```
 1   degraded the marshes and protective vegetation, that
 2   effect can be attributed to the environmental conditions
 3   developed upstream of the MRGO.
 4       Q.   Is that the way that you would connect the
 5   MRGO to that failure of the New Orleans East back levee?
 6       A.   That would be one of the ways, yes.
 7       Q.   How else would you connect the MRGO to that
 8   failure?
 9       A.   Well, the MRGO flow connected with the flows
10   of waves coming across Lake Borgne and the channel of
11   GIWW, form a complex hydrologic system.  I find it
12   difficult to separate those components, period.
13       Q.   Where do you show how the MRGO, in your
14   reports, caused the failure of the New Orleans East back
15   levee?
16       A.   Reframe your -- or repeat the question,
17   please.
18       Q.   Do you show in any of these reports how the
19   MRGO caused the failure of the New Orleans East back
20   levee?
21       A.   I believe we do.
22       Q.   Where is that?
23       A.   Okay.  I address the performance of the
24   Reach 1 manmade hurricane flood protection structures
25   for the neutral MRGO Hurricane Katrina conditions
```

JOHNS PENDLETON COURT REPORTERS                      800  562-1285

ROBERT G. BEA (VOL III)                          February 27, 2009

Page 754

```
 1   starting at paragraph 129, page 140, Part 3B,
 2   declaration edited July 15th, 2008.
 3       Q.   Okay.  The page number again?
 4       A.   Page 140, paragraph 129.
 5       Q.   Which expert report in that group?
 6       A.   Part 3B declaration, July 15th, 2008.
 7       Q.   Okay.  And I need the page again.  Sorry about
 8   that.
 9       A.   That's just fine.
10            Page 140, paragraph 129.
11       Q.   Okay.  I -- I don't see here -- and I'm sure
12   I'm missing it, but I don't see here, or anywhere
13   elsewhere, where you show that the MRGO itself caused
14   the failure of the New Orleans East back levee.
15       A.   Nothing in this entire process can be called
16   "the cause."  There are multiple causative elements.
17            I address explicitly our evaluation of this
18   condition that you have questioned in paragraph 133,
19   page 143.
20       Q.   In that paragraph, are you saying that you
21   changed the grass cover on the New Orleans East back
22   levee to be MRGO neutral?
23       A.   Correct.  Because that's conditions being
24   evaluated in this section of my work.
25       Q.   And based -- based on salinity?
```

JOHNS PENDLETON COURT REPORTERS                      800  562-1285

ROBERT G. BEA (VOL III)                          February 27, 2009

Page 755

```
 1       A.   Correct.
 2       Q.   Salinity caused damage to the levee grass?
 3       A.   And to the protective fronting vegetation.
 4       Q.   Okay.  So the way the MRGO caused damage to
 5   the New Orleans East back levee was through what -- the
 6   damage to the vegetation, in your opinion?
 7       A.   Yes.
 8       Q.   And that's the only way?
 9       A.   That's correct.
10       Q.   Okay.
11            (Discussion held off record.)
12            MR. STONE:  Q.  Dr. Bea, would you mind
13   Paul Levine asking you a question or two?
14       A.   It would be a pleasure.
15            MR. STONE:  Joe?
16            MR. BRUNO:  I'm easy.
17            MR. LEVINE:  I know.
18            THE VIDEOGRAPHER:  Would you mind taking the
19   microphone.
20            MR. BRUNO:  Objection.  Form.  Irrelevant.  I
21   can't even dream up at this stage late in the day, I
22   can't even do it.  I can't even do it.
23            MR. LEVINE:  I'll ask a couple questions.
24   Hopefully we can go.
25            (Discussion held off record.)
```

JOHNS PENDLETON COURT REPORTERS                      800  562-1285

ROBERT G. BEA (VOL III)                          February 27, 2009

Page 756

```
 1            EXAMINATION BY MR. LEVINE
 2            MR. LEVINE:  Q.  Is there a map anywhere in
 3   your report that showed the locations where the loss of
 4   protective elevation reductions would occur in
 5   Scenario 1?
 6       A.   No.
 7       Q.   Did you create such a map at all?
 8       A.   No.  We're in the process of creating that map
 9   right now.
10       Q.   But you didn't have it done for these reports?
11       A.   For Phase I, we examined two locations.
12       Q.   But other than those two locations, you don't
13   have such a map?
14       A.   In -- that's correct.
15       Q.   Okay.  What's the basis for the loss of grass
16   cover in Scenario 1 that's caused by salinity?  I think
17   you said -- you mentioned you -- the other experts that
18   worked on this case, Shafer, Day --
19       A.   Correct.
20       Q.   Okay.  Where is that located in your report?
21   Where is there reference to that?
22       A.   We document the conditions in Declaration 1,
23   July 2008 expert report, that evaluates the Reach 2 EBSB
24   breaching for Hurricane Katrina Scenario 1 conditions.
25            I also further developed that evaluation in
```

JOHNS PENDLETON COURT REPORTERS                      800  562-1285