# EXHIBIT 9

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

--oOo--

IN RE KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION,

No.  05-4182 "K" (2)

PERTAINS TO:   ROBINSON, NO.
06-2268
_____

DEPOSITION OF ROBERT GLENN BEA

Friday, January 30, 2009

Reported By:

KATHLEEN WILKINS, CSR #10068, RPR, CRR

BEA, ROBERT
1/30/2009

Page 185

1  this because it's so important.
2      Q.   Right.  Now, the members of your ILIT
3  team really don't agree with your current -- or in
4  the ILIT report, they don't necessarily agree with
5  your current opinions because they didn't reach
6  those opinions?
7      A.   Correct.
8      Q.   Well, why didn't you reach those
9  opinions when you were doing the ILIT report?
10     A.   Didn't have the information at the time
11 or resources.
12     Q.   I see.
13     A.   We had $330,000 to bring 33 people into
14 the field to study this massive problem.  We
15 didn't have $33 million to conduct the study, as
16 did the IPET.  It was a David and Goliath
17 challenge.
18     Q.   I see.  How many dollars have you had to
19 study this with since ILIT?
20     A.   Approaching 2 million.  Plus 9,000 pro
21 bono hours, no pay.
22     Q.   9,000 pro bono hours over how many
23 years?
24     A.   Three.
25     Q.   Three?

BEA, ROBERT
1/30/2009

Page 186

1           How many hours have you investigated
2  this for Mr. Bruno and other plaintiffs' counsel?
3      A.   Probably approaching a couple of
4  thousand.
5      Q.   And how many hours do you teach?
6      A.   During what period of time?
7      Q.   During this three-year period.
8      A.   I've taken two sabbatical leaves, which
9  means I'm not teaching.
10     Q.   Not teaching at all?
11     A.   That means essentially devoted full-time
12 to this effort:  Weekends, nights, holidays
13 including Christmas.
14     Q.   Pretty much have to be to add up to
15 those numbers.
16     A.   Yes, sir.  Because I log those hours; I
17 don't guess at them.
18     Q.   There are white spaces going on right
19 here because I'm looking through these, because
20 quite a few of these we've discussed before, and I
21 don't want to go over them again.
22     A.   You're doing a marvelous job.
23     Q.   We don't need to do that.
24          Okay.  I'm on page 20, but I don't think
25 it matters.

BEA, ROBERT
1/30/2009

Page 187

1           Once again, you talk about the hurricane
2  neutral MRGO conditions.
3      A.   Very important.  It does matter.
4      Q.   Describe -- describe for me what is the
5  hurricane neutral MRGO condition?
6      A.   Essentially, I have identified the
7  deleterious effects brought to the system by the
8  life cycle cycle of the MRGO.
9           In construction of the neutral MRGO
10 conditions, we mitigated all negative impacts from
11 that life cycle cycle development.
12     Q.   Is it fair to say that the only way to
13 do that is completely take the MRGO out of the
14 picture?
15     A.   I'm sure there are other ways to do it,
16 but eventually we had to do that to get parts of
17 the neutrality characterized.
18     Q.   I don't understand that.
19     A.   For example, you couldn't leave the
20 channel itself in place and correctly determine
21 the wave action at the channel bank adjacent to
22 the flood protection structures because the
23 presence of the channel itself acts to increase
24 the wave action.
25          So in order to construct that resulting

BEA, ROBERT
1/30/2009

Page 188

1  picture, you have to erase the channel.
2           Now, other analysts would say, no, we
3  will understand the channel and we will subtract
4  the waves that are caused by the channel.
5           So there are different ways to
6  characterize a complex system.
7      Q.   I think my question is just more basic
8  than that.
9      A.   Okay.
10     Q.   It's very simple.
11          How do you keep the MRGO in the system
12 and establish a system that's completely MRGO
13 neutral?
14     A.   I'll attempt to answer your question.
15 You please stop me if I'm not being responsive to
16 what you would like to know.
17          For example, you could keep the channel
18 in place and, say, the thing I'm attempting to
19 mitigate would be the salinity influx.
20          That would then say, "The way I will
21 handle that is through the placement of a barrier
22 at the intersection of the MRGO with the Gulf of
23 Mexico to prevent the highly saline waters from
24 being sucked in, flushed through that entire
25 system to Lake Pontchartrain.

BEA, ROBERT
1/30/2009

Page 237

1  frontage along Reach 2 of the MRGO, so is that an
2  accurate assessment of the levee crests along
3  there?
4      A.   It would be representative of probably a
5  low spot.  The crest elevation of the EBSB are
6  well characterized in Dr. Resio's expert report.
7  So they're variable along the length of the Reach
8  2.
9           And that variability is an important
10 part of what discerns -- determines front-to-back
11 or back-to-front erosion.
12     Q.   Is it fair to say that a higher levee
13 crest, if evaluated for front side erosion, is
14 more likely to have front side erosion?
15     A.   That will depend on the soil
16 characteristics and the characteristics of the
17 incoming waves.
18     Q.   Okay.  Well, how does the levee crest
19 height enter into your analysis of front side
20 erosion, if at all?
21     A.   It does because it's a levee crest
22 height that's being used as the index for
23 crenellation, penetration of that front side.
24          And it's at that point the crest
25 elevation lowers locally.  And that's because of

Johns Pendleton Court Reporters                    800 562-1285

---

BEA, ROBERT
1/30/2009

Page 238

1  the trench being eroded by the incoming water.
2  And that's far before we think the peak of the
3  surge.
4           Wave action is rushing through, together
5  with the mean level of the water.  As erosion
6  goes, the elevation continues to drop, the process
7  reinforces, and you breach front to back.
8      Q.   How does the crest elevation affect your
9  analysis without crenellation?  You have a -- you
10 have a front side wave attack --
11     A.   Right.
12     Q.   -- but you don't have crenellation.
13     A.   Got you.
14     Q.   Is it more likely to be greater on a
15 lower levee of the same materials than it is on a
16 higher levee of the same materials?
17     A.   Yes.  And the work by Mr. Ebersole and
18 Dr. Resio show that.
19     Q.   I don't read it that way, so that's why
20 I'm asking the question.
21          I read it that the water's rising, and
22 as the front side wave attack continues, it
23 continues rising up --
24     A.   It does.
25     Q.   -- through what I think they call the

Johns Pendleton Court Reporters                    800 562-1285

---

BEA, ROBERT
1/30/2009

Page 239

1  surf zone.
2      A.   Right.
3      Q.   And so if the waves are -- if the water
4  is rising fast enough --
5      A.   Right.
6      Q.   -- it will overtop a short levee pretty
7  fast.
8      A.   Correct.
9      Q.   And then that short levee will
10 immediately start to fail from the back side, and
11 the front-to-back erosion will occur.  That's the
12 way I read it.
13     A.   I think you're exactly right.
14     Q.   Did I say back-to-front erosion?  Okay.
15 Back-to-front erosion.
16     A.   Thank you.
17     Q.   Is that correct?
18     A.   You're home.
19     Q.   Okay.  So -- so in this latest version
20 of your reports, have you taken that kind of crest
21 elevation activity, I'll say, into consideration?
22     A.   Yes, sir.
23     Q.   Okay.  Well, why don't you help me out
24 here.  It's five minutes to 5:00.
25          Why don't you tell me, if you can,

Johns Pendleton Court Reporters                    800 562-1285

---

BEA, ROBERT
1/30/2009

Page 240

1  what's the difference between what I got here that
2  I've been looking at for a period of time now and
3  what you gave me today, 600 pages' worth, that's
4  different.
5           I want to know what's practically and
6  appreciably and critically different.  I'm going
7  to deal with what you've got here until I find
8  something in there that I think is worth reading.
9      A.   Good for you.  I'll do the best job I
10 can to appropriately and properly outline your
11 homework for tonight.
12          On the Reach 2 EBSBs, we revisited our
13 evaluation of breaching of the earthen flood
14 protection structures.  We call this Phase II
15 analysis.  What you have in July was Phase I
16 analysis.
17          The second thing I would commend to your
18 study is a direct response to the defense experts'
19 concerns for validations of all parts of the wave
20 and overtopping breaching analyses.
21          We address both internal and external
22 validation processes used in engineering, and we
23 addressed all of the criteria in the {}Talberg
24 tests.
25          The second thing I would commend to your

Johns Pendleton Court Reporters                    800 562-1285

BEA, ROBERT
1/30/2009

Page 241

1  homework tonight would be to look at the updated
2  evaluations of the breaching developed at the
3  Lower Ninth Ward, period.
4      Q.   That seems like pretty much everything
5  that I've already been looking at.
6      A.   I hope not, because we also addressed
7  the breaching on the New Orleans East -- the New
8  Orleans East Back levee.  There is a very long
9  list and a table provided there for -- for these
10 other critical breaches.
11          That will keep you busy tonight.
12     Q.   Let me just ask you right now, without
13 looking at any of your documents, what do you
14 reference that says that LS-DYNA is validated,
15 verified, tested, approved and used in the
16 industry for the purposes you are using it for
17 here?
18     A.   Which industry?  And approved by whom?
19          We have validated each of the steps and
20 components involved in the analyses, both
21 theoretically, laboratory experiments and field
22 experiments, in comparison with other established
23 techniques, to make such evaluations, including
24 those developed by our esteemed Netherland
25 colleagues.

Johns Pendleton Court Reporters                    800 562-1285

BEA, ROBERT
1/30/2009

Page 242

1      Q.   Let me ask you, do you know that the
2  esteemed Netherland colleagues have a test that's
3  applicable to advection and dispersion?
4      A.   Yes.
5      Q.   You do?
6           Have you used it -- have you used it to
7  analyze the soil samples that you collected from
8  497?
9      A.   To respond diligently to your question,
10 I'd have to know the specific tests to which you
11 are referring.
12          We have obtained test data from them
13 that specifically addresses front side wave
14 erosion, both information gathered in the field
15 during previous storms, and information gathered
16 in the large scale flume test run in Delft.
17 D-E-L-F-T, like the china.
18     Q.   But you're not aware of a particular
19 model or test that the Dutch have available to
20 determine how soils are advected and dispersed?
21     A.   No, I didn't say that.
22          What I was responding to was I don't
23 know specifically the test you're referring to.
24          The test information that we have
25 accessed from them cover everything from front

Johns Pendleton Court Reporters                    800 562-1285

BEA, ROBERT
1/30/2009

Page 243

1  side to back side to advection to other mechanisms
2  for development of breaching in earthen flood
3  protection structures they commonly call dikes.
4           All of that information was provided to
5  you this morning on CDs.  All of the information
6  is cited by reference in my expert report of
7  January the 29th, 2009.
8      Q.   Let's go back for a second to my
9  original question.
10          The question was -- well, before we go,
11 it's fair to say that you haven't applied any test
12 by the Dutch that deals with advection and
13 dispersion?
14     A.   I find that question difficult to answer
15 because all of the tests involve those mechanics.
16     Q.   If the Dutch have a test that deals with
17 sediments and advection and -- have you -- have
18 you applied that test at all?
19     A.   I'll have to know which test you're
20 referring to, sir.
21     Q.   Well, if you've applied any kind of test
22 like that.
23     A.   Yes, we have.  And that's documented in
24 the reports.
25     Q.   Okay.  I'll find it in there.

Johns Pendleton Court Reporters                    800 562-1285

BEA, ROBERT
1/30/2009

Page 244

1      A.   Thank you.
2      Q.   All right.  Okay.  Let's go back to my
3  original question.
4      A.   Did I finish answering you for the Lower
5  Ninth Ward?
6      Q.   I don't know.  But we're fine for now.
7      A.   Be sure and read it, because we studied
8  two-dimensional and three-dimensional seepage.
9           Previously, we had studied solely
10 two-dimensional.  Three-dimensional surprised us.
11 The effects of the seepage hydraulic conductivity
12 increases by 30 to 50 percent.
13     Q.   You're talking about the IHNC east flood
14 wall?
15     A.   That's correct.  So be sure and --
16     Q.   But your opinion is still -- I thought
17 you said earlier that your opinion is still that
18 under either scenario, those flood walls would
19 have breached.
20     A.   That remains unchanged.
21     Q.   Okay.
22     A.   It's the mechanics.
23     Q.   All right.  Let's go back to validation
24 and verification --
25     A.   Very important.

Johns Pendleton Court Reporters                    800 562-1285