UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES * | | CIVIL ACTION |
| CONSOLIDATED LITIGATION * | | |
| * | | NUMBER: 05-4182 "K"(2) |
| * | | |
| * | | JUDGE DUVAL |
| * | | |
| PERTAINS TO: MRGO, Robinson * | | MAG. WILKINSON |
| (No. 06-2268) * | | |

* * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF MOTION TO STRIKE SUPPLEMENTAL REPORT OF DEFENDANT UNITED STATES' EXPERT DONALD RESIO AND PRECLUDE DERIVATIVE TESTIMONY

**NOW INTO COURT,** through undersigned counsel, comes the Plaintiffs Norman Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr., and Lucielle Franz, who in support of their Motion to Strike the Supplemental Report of Defendant United States Expert Donald Resio and Preclude Derivative Testimony, do state:

**I.**

## THE DEFENDANT'S TARDY PRODUCTION OF RESIO'S EXPERT REPORT IS THE CULMINATION OF A SERIES OF TRANSGRESSIONS CAUSING SUBSTANTIAL PREJUDICE TO THE PLAINTIFFS

Despite receiving Plaintiffs' expert reports and reliance materials in July 2008, the government claimed at the hearing date of September 12, 2008 that it would need until December 22, 2008 to produce its' own expert reports.  Fully aware that the Plaintiffs' experts would be

saddled with an equally imposing scope of work in reviewing the defense expert reports, but under substantially shorter time constraints,[1] the Court "begrudgingly" granted a continuance of the January 2009 trial date but sought to minimize the burden on Plaintiffs by specifying in its October 9, 2008 Order that "Defendant's Expert Reports and Computer Generated Evidence shall be produced" on December 22, 2008. (Rec. Doc. 15841).

Instead of these reports being provided on December 22, the defendant filed a Notice of Production into the record, which accompanied their "snail-mailing" of encrypted, unreadable reports that were then followed the next day with "improper codes" that could not open the reports. These reports should not have been encrypted in the first place as they are not electronically stored information ("ESI"); they are actual, physical typewritten reports that could easily have been provided via a send space site as the Plaintiffs provided to the Defendant on July 14, 2008. This was the first of many transgressions that were to follow. This ploy prevented Plaintiffs from seeing the defense expert reports until December 29, a fact admitted by the defendant.

The defendant's bogus December 22, 2008 Notice of Production flaunted the Court's October 9, 2008 Amended *Robinson* Case Management Order by stating that the Plaintiffs would need to contact defendant's counsel to obtain the computer generated evidence that the experts relied upon in drafting their reports. (Rec. Doc. 16833). Almost as soon as the new year started, Plaintiffs undertook to do just that and resolve the discovery dispute amicably.

Beginning on January 6, 2009, the first request for the data of the defendant's experts was

---

[1] Expert reports were to be produced just prior to Christmas (12/22), and expert cutoff was just 46 days later.

presented. (See Exhibit A). The defendant neither produced said evidence nor responded to the request.

On January 15, 2009, the second request for the data of the defendant's experts was presented. (See Exhibit B). The defendant neither produced said evidence nor responded to the request.

On January 16, 2009, the third request for the data of the defendant's experts was presented. (See Exhibit C). The defendant neither produced said evidence nor responded to the request.

On January 19, 2009, a fourth request for the data of the defendant's experts was presented. (See Exhibit D). Also on January 19, 2009, a fifth, but separate, request for the data of the defendant's experts was presented. (See Exhibit E).

The defendant finally replied, somewhat, indicating that the information had been provided at some point previously in the over ten (10) terabytes of information produced to date.

On January 28, 2009, a sixth request for the data of the defendant's experts was presented. (See Exhibit F). The defendant neither produced said evidence nor responded to the request.

Without either the reliance materials produced or an indication of where said materials could be located (Plaintiffs dispute that there was any such production), Plaintiffs were forced to start noticing the depositions of the defense experts. To address the government's inert production, Plaintiffs included with the Notice of Deposition, as an exhibit, a list of materials, including reliance materials, regularly produced by experts in conjunction with their deposition. (See attached Exhibit 8, Notice of Deposition - Resio). At deposition, the defense experts

consistently appeared at their deposition without *ANY* of the specified information; and one defense expert, Brain Jarvinen, testified that he had not even read his deposition notice until placed in front of him after he was sworn in at the deposition.

On February 1, 2009, Plaintiffs' counsel sent correspondence to Robin Smith, requesting a Rule 37.1 conference to amicably resolve this discovery dispute. (See Exhibit G). At the Rule 37.1 telephone conference with Joseph Bruno, Mr. Smith indicated he couldn't understand what was being requested. The disingenuous nature of this comment is meted by the defendant's insistence in obtaining this same evidence from the Plaintiffs' experts, and then requesting six months to review the data and to continue the January 2009 trial date.

The defendant instigated that discovery dispute by cavalierly disregarding the Court's October 9, 2008 Order to produce certain evidence associated with the production of its expert reports, and then undertook both dilatory disregard for specific requests and feigned ignorance of the data requested. Plaintiffs were left with no recourse but to seek judicial intervention to enforce the Court's October 9, 2008 Order, and filed a Motion to Compel on February 4, 2009. (Rec. Doc. 17542).

Even without the reliance materials, Plaintiffs had no choice but to proceed with the deposition of Dr. Resio due to the short discovery window. Through cross examination, Plaintiffs were able to establish numerous inconsistencies in Dr. Resio's conclusions, primarily through an understanding of the limitations revealed in the IPET report (a report from which the Defendant United States has repeatedly distanced itself). Plaintiffs were then of the belief that these inconsistencies would be substantiated by the reliance materials that were expected to be secured through the magistrate's intervention.

Instead of producing its experts' reliance materials, the defendant opposed the Plaintiffs Motion to Compel, the defendant asserted for the first time that the inclusion of Exhibit A to the Notice of Deposition was improper! (See Response (Rec Doc. 17701), pg. 1).  Here, the government was either purposefully misleading the court, or was flat out wrong, as Case Management Order No. 4 ("CMO 4") Sec. (IV) (D)(3), footnote 7, only precluded the use of Rule 30(b)(5) requests for common liability issues fact witnesses (See Rec. Doc. 3299, pg. 35).  The provision of CMO 4 addressing expert common liability issues experts contained no such prohibition.  The Court will note that the Exhibit A requests were inclusive of those materials specified by FRCP, Rule 26 (a)(2)(B), CMO 4, Sec. (IV) (E)(2), and the Court's Order of October 9, 2008.

Further evidence of the defendant's scheme to stymie Plaintiff's understanding of the defense expert's opinions is revealed on page 4, ¶ (A)(3) of its Response by stating the "United States has requested this information from Mr. Ebersole and will be producing any responsive information in the near future."  In fact, Mr. Ebersole testified under oath at deposition that the "government took everything" on his hard drive regarding his expert report.  When pressed at the deposition by Mr. Bruno when this was produced, defense counsel Rupert Mitsch could only state that he "assumed it had been produced," but he "personally" didn't know if it had been. (See Exhibit H).

The magistrate acknowledged the obligation of the defendant to produce their experts reliance materials pursuant to Rule 26, as implemented by the court's previous orders, and found on February 20, 2009 that the government had been "dilatory in its compliance with its disclosure obligations" and ordered that the government produce "all materials upon which defendant's

5

experts relied... no later that February 27, 2009." (Rec. Doc. 17816).

On February 26, 2009, the defendant filed a Motion for Reconsideration (Rec. Doc. 17915) to further consume the time needed for Plaintiffs to review these materials, citing no legal argument or precedent entitling it to relief it sought, yet arrogantly disregarding the *Pre-Trial and Trial Procedures-Civil Case Section "K"* (Rec. Doc 3408-2) in which this Court recognized that motions for reconsideration were "generally a waste of the Court's time," and "such motions are not even recognized in the Federal Rules of Civil Procedure." As such, it was specified that such a Motion for Reconsideration could be filed only upon seeking leave of Court to file. The defendant United States again utterly disregarded one of the Court's standing orders, and simply filed their Motion for Reconsideration without leave.

Ultimately, the magistrate denied the defendant's Motion for Reconsideration. The full import of the Defendant United States' discovery filibuster was revealed on March 24, 2009 when an undated and unsigned "Supplemental Report on Waves and Overtopping Characteristics along the MRGO" was presented; a wholly new report that relied upon information contained on seven (7) 500 gigabyte hard drives.

## II.

### THE DEFENDANT WAS OBLIGATED TO PRODUCE ITS EXPERTS' RELIANCE MATERIALS PURSUANT TO F.R.C.P., RULE 26

Rule 26 of the Federal Rules of Civil Procedure holds on pertinent part:

**"Duty to Disclose; General Provisions Governing Discovery**

(2) Disclosure of Expert Testimony.

(A) In General. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of

6

any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

(B) Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report-- prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(I) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the data or other information considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

( C) Time to Disclose Expert Testimony. A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:

(I) at least 90 days before the date set for trial or for the case to be ready for trial; or

(ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B), within 30 days after the other party's disclosure."

When an expert serves as a testifying witness, Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires disclosure of materials considered, reviewed or generated by the expert in forming the opinion, irrespective of whether the materials were actually relied on by the

expert. Employees Committed for Justice v. Eastman Kodak Co., 251 F.R.D. 101 (W.D.N.Y.,2008). A litigant is required to disclose to his opponent any information "considered" by the litigant's testifying expert. Fed.R.Civ.P. 26(a)(2)(B); NutraSweet Co. v. X-L Engineering Co., 227 F.3d 776, 785-86 (7th Cir.2000); Salgado ex rel. Salgado v. General Motors Corp., 150 F.3d 735, 741 n. 6 (7th Cir.1998); In re Pioneer Hi-Bred Int'l, Inc., 238 F.3d 1370, 1375-76 (Fed.Cir.2001). Any ambiguity as to the role played by the expert when reviewing or generating documents "should be resolved in favor of the party seeking disclosure." B.C.F. Oil Ref., Inc. v. Consol. Edison Co. of N.Y., 171 F.R.D. 57, 62 (S.D.N.Y.1997).

The materials that Dr. Resio relied upon should have been produced more than a month prior to his deposition. The defendant fought production of these materials consistently...until Dr. Resio was educated at his deposition of the flaws in his analysis and a new approach created.

It is difficult to even quantify the prejudice the plaintiffs have suffered. Considerable resources were expended in preparing for Resio's deposition with out any of the reliance materials. A full evaluation of the idiosyncracies of the voluminous IPET report juxtaposed with the report generated by Resio in such short order was daunting. Now with Resio's newly produced report and multiple terabytes of information, Plaintiffs have yet to determine whether any testimony obtained at deposition, other than Dr. Resio's name, can be relied upon. Clearly then, the supplemental report should be struck and all derivative testimony precluded.

### III.

## THE COURT IS EMPOWERED TO GRANT PLAINTIFFS' RELIEF THAT THE DEFENDANT HAS EARNED FOR ITS GAMESMANSHIP

The only recourse the Plaintiffs have to combat the defendant's plot to eschew its discovery obligation is to seek this sanction of barring the expert from testifying for violating the Court's Order.  Fed.R.Civ.P. 37.  ( C)(1); Mems v. City of St. Paul, Department of Fire & Safety Services, 327 F.3d 771, 779-80 (8th Cir.2003); Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico, 248 F.3d 29, 34-36 (1st Cir.2001), Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins., 412 F.3d 745 (C.A.7 (Ill.),2005.)

In measuring sanctions for violating the rules of pretrial discovery, as in other areas of the law, the punishment should fit the crime. Rice v. City of Chicago, 333 F.3d 780, 784 (7th Cir.2003)  Melendez v. Illinois Bell Telephone Co., 79 F.3d 661, 672 (7th Cir.1996); Bonds v. District of Columbia, 93 F.3d 801, 807-09 (D.C.Cir.1996).  This is apparent from the breadth of the range of sanctions that the civil rules authorize for failure to disclose materials on which an expert's opinion is based. See Fed.R.Civ.P. 37 ( C)(1), incorporating by reference the list of sanctions in Fed.R.Civ.P. 37(b)(2)(A)- ( C).

A trial court's order striking an expert witness designation or precluding an expert witness testimony involves both the enforcement of a scheduling order and the enforcement of the Federal Rules of Civil Procedure.  The Fifth Circuit Court of Appeals reviews either type of order under the abuse of discretion standard. Sturgeon v. Airborne Freight Corp., 778 F.2d 1154, 1157-58 (5th Cir.1985).

Rule 16(b) of the Federal Rules of Civil Procedure authorizes the district court to control

and expedite pretrial discovery through a scheduling order.  Consistent with the authority vested in the trial court by rule 16, the Fifth Circuit gives the trial court "broad discretion to preserve the integrity and purpose of the pretrial order." Geiserman v. MacDonald, 893 F.2d 787 (5th Cir. 1990), *quoting* Hodges v. United States, 597 F.2d 1014, 1018 (5th Cir.1979).  Moreover, a trial court's decision to exclude evidence as a means of enforcing a pretrial order "must not be disturbed" absent a clear abuse of discretion. Davis v. Duplantis, 448 F.2d 918, 921 (5th Cir.1971); Fed.R.Civ.P. 16(f) (court may sanction party's failure to comply with scheduling order by excluding evidence).

In conjunction with Rule 16, Rule 37 provides the court with additional powers to regulate the conduct of discovery.

Federal Rules of Civil Procedure Rule 37, sets forth in pertinent detail:

> **(b) Failure to Comply with a Court Order.**
>
> **(2) Sanctions in the District Where the Action Is Pending.**
>
> **(A)** *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent--or a witness designated under Rule 30(b)(6) or 31(a)(4)--fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders.
>
>  They may include the following:
>
>> **(I)** directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>>
>> **(ii)** prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>>
>> **(iii)** striking pleadings in whole or in part;

10

> **(iv)** staying further proceedings until the order is obeyed;
>
> **(v)** dismissing the action or proceeding in whole or in part;
>
> **(vi)** rendering a default judgment against the disobedient party; or
>
> **(vii)** treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

The central requirement of Rule 37 is that "any sanction must be 'just,'" which requires in cases involving severe sanctions that the district court consider whether lesser sanctions would be more appropriate for the particular violation. Insurance Corp. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 707, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492 (1982). The choice of sanction should be guided by the "concept of proportionality" between offense and sanction. Lorenzen v. Employees Retirement Plan, 896 F.2d 228, 232 (7th Cir.1990). The choice of proper sanctions should be guided by the court's finding of wilfulness, bad faith, or fault on the part of the noncomplying litigant. Melendez v. Illinois Bell Telephone Co., 79 F.3d 661 (C.A.7 (Ill.),1996), *quoting* Marrocco v. General Motors Corp., 966 F.2d 220, 224 (7th Cir.1992).

The Fifth Circuit has specified that a trial court should consider the following four factors when determining whether to exclude expert testimony:

"(1) the explanation for the failure to identify the witness;

(2) the importance of the testimony;

(3) potential prejudice in allowing the testimony; and

(4) the availability of a continuance to cure such prejudice."

Barrett v. Atlantic Richfield Co., 93 F.3d 375, 380 (5th Cir.1996); Hamburger v. State Farm Mut. Auto. Ins. Co., 361 F.3d 875, 883 (5th Cir.2004).

IV.

**THE PREJUDICE THAT PLAINTIFFS' CANNOT AMELIORATE**

At deposition, Dr. Resio admitted that he utilized a wave model of limited application, used mostly to analyze long waves during tsunamis; COULWAVE. This model operates as a derivative program from STWAVE, a numerical model that simulates waves. It has been established that the COULWAVE application is not analogous to a model that simulates short wave dynamics generated at a coastline similar to those experienced along the levees of the MRGO during Katrina. Furthermore, Dr. Resio testified that the validation of the COULWAVE model for its application in this scenario was only performed on low slopes like beaches, which are not comparable to the slope experienced by a hurricane wave against a feature like a levee. (248:4-10)

Dr. Resio's original report explained that his conclusions were based on an analysis produced by a third party; he utilized spectral wave periods of 6, 8 and 12 seconds (p.47). Basing his conclusions on the STWAVE model data, Dr. Resio concluded that there were significant wave periods of between 4.2 to 5.8 seconds. (See fig 25 on page 52 of his reports.) This was confirmed during his examination (228:6). During his examination, however, it became evident that Resio had performed no independent modeling analysis to formulate his opinions. Rather, Dr. Resio acknowledged that his analysis was reached exclusively on the reliance data generated by others. (71:21). Ultimately after pursuing supporting data for these representations (particularly the data to support the significant wave periods of 5-6 seconds), the Corps acknowledged on March 13, 2009 that even after having failed to conduct any initial analysis, in his new report he produced no wave modeling of the alleged significant wave period of 6 sec. (See Exhibit J - Affidavit of Van Heerden, Exhibit A.)

A further concession that was obtained at deposition was that Dr. Resio could not testify, with certainty, whether the modelers who performed the wave modeling that he relied upon utilized any bottom friction coefficients. (165:4.)  The importance of coefficients of friction to the modeling will become abundantly clear at the trial of the merits.  More importantly, the Court will see that the defense theory relies upon the veracity of each successive level of input from the disciplines brought by the various defense experts.  When the conclusions of Dr. Resio (an output) are incorrect, the input of the next successive defense expert is flawed.  Therefore, an incorrect output propagates itself throughout the defense theory.

Having identified substantial inconsistencies in Dr. Resio's output, the Plaintiffs began in earnest to develop a trial plan to underscore the fallacies in the defense theory.

No doubt realizing the precarious position Dr. Resio's concessions now placed the defendant, the Corps supplemented Dr. Resio's report with a Supplemental Report and seven (7) separate, five hundred (500) Gigabyte hard drivers supposedly of COULWAVE data.  As attested to by Dr. Ivor Van Heerden in his attached affidavit (See Exhibit J - Affidavit of Van Heerden) after examining the contents of the hard drives, it appears that for Dr. Resio's supplemental report there are apparently 3456 *new* COULWAVE runs recorded on this data set, used to generate a digital lookup table. (This lookup table is where all the results would be stored in a format similar to an excel spread sheet to see variations in the numbers.)  **This look up table appears to reflect entirely different values from the material referenced in his initial expert report of December 2008.**

Dr. Resio's supplemental report also adds an entirely new analysis of front side wave velocities that was not presented in his original report to present the argument that frontside wave

attack did not affect the levees.  The supporting data reflects that approximately 20 new runs were done to support his new theories.

The Corps supplied no instructions with the 7 hard drives, and thus no explanation on how the hard drives were organized, the format of the data or any notes on the software needed to read the data, nor any instructions on reading the data.  By way of example, the printout of the directory for only one of the seven hard drives constitutes 1166 pages. (See Exhibit I).

After initially attempting to determine the correct programs to run this new data, on April 2nd 2009 Plaintiffs' experts noted that:

    a.    Resio now claims to have done 3456 new individual runs; but supplied data for about 65 new runs (figures), with very pertinent data missing from the figure captions, things like wave period in some, wave height in others, etc. This is all new material not part of the original report;

    b.    Resio has furnished no wave periods for these new theories of front side attack.  Plaintiffs are left to assume that there are 3465 runs with front side velocity calculated that should have been supplied;

    c.    the new 3465 runs each should have accompanying wave parameters and other profile characteristics clearly identified.  None of the new front side velocities are calculated and all are pertinent wave and profile data.

On April 7th 2009 the Corps again refused to furnish the basic information necessary to read the 3500 Gigabytes of raw data that accompanied this Supplemental Report.  Plaintiffs and their experts have been relegated to attempting to guess which program might be able to read this enormous volume of data, and then hopefully have time to analyze it in a meaningful way prior to the impending trial.

**V.**

**CONCLUSION**

The defendant's "catch me if you can" attitude regarding its discovery obligations is anathema to the professionalism espoused in Rule 26 of the Federal Rules of Civil Procedure.

Dr. Resio's conclusions are the basis for other defense experts to base their opinions; and when the inconsistencies in his opinions were pointed out to him at deposition, he re-evaluated his conclusions and produced a new report. Yet the seven hard drives of information are provided in such a fashion as to make them so overwhelmingly obtuse as to be nearly useless considering the short period until trial. Where this the first transgression, the defendant may be entitled to some latitude. But as indicated in the record, that is not the case.

Only by evaluating Dr. Resio's reliance materials can Plaintiffs get an accurate understanding of his errors. These errors, that are likely propagated through the other defense expert's analysis, provide additional insight into the lack of reliability of at least two other defense expert opinions.

That the defendant is dragging its feet on producing reliance materials should not go unnoticed by the Court. The contemptuous disregard of standing court orders by the defendant United States should be met with sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure. The only viable sanction that can ameliorate the prejudice the defendant is inflicting would be to strike Dr. Resio's "supplemental" expert report and preclude any testimony derived from that report.

**WHEREFORE**, the Plaintiffs Norman Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr., and Lucielle Franz pray that this Court grant the Plaintiffs' Motion to Strike the Supplemental Report of Defendant United States Expert Donald Resio and Preclude Derivative Testimony.

**Respectfully Submitted,**

**PLAINTIFFS LIAISON COUNSEL**

    /s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
Law Offices of Joseph M. Bruno
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@jbrunolaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above and foregoing Memo in Support of Motion to Compel upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 9th day of April, 2009.

    /s/ Joseph M. Bruno
Joseph M. Bruno