**Deponent:** Varuso, Richard

**Deposition Date:** 8/22/2006

**Witness Type:** USACE 30(b)(6) - *Muprhy Oil*

|  | Position | Time Period |
|---|---|---|
| **Position:** | USACE NOD Civil Engineer, Geotechnical Branch, Engineering Division | 1994 to present |



EXHIBIT 2

VARUSO, RICHARD                    Rule 30(b)(6)                    8/22/2006

Page 1 Line 11 to Page 1 Line 14
11      Deposition of U.S. ARMY CORPS OF ENGINEERS, through its designated
12   representative, RICHARD VARUSO, Post Office Box 60267, New Orleans, Louisiana
13   70160-0267, taken in the offices of Frilot Partridge, LLC, 1100 Poydras Street, Suite
14   3600, New Orleans, Louisiana, on Tuesday, the 22nd day of August, 2006.

Page 10 Line 19 to Page 11 Line 2
19   He has been
20   designated properly as a representative of
21   the Corps. He's informed to address not the
22   subjects that are in the notice of the
23   deposition, but only three subjects which
24   the Corps has allowed this deposition to go
25   forward on and on which the Corps of
11
1    Engineers has authorized Mr. Varuso to
2    address.

Page 11 Line 7 to Page 11 Line 16
7    And let me identify now which
8    those three subject -- which subject matters
9    we are talking about. Items 2, 3 and 8 of
10   the notice: Item 2 being the design of the
11   levees along the Mississippi River Gulf
12   Outlet (MRGO) in St. Bernard Parish; No. 3,
13   the construction of the levees along the
14   MRGO in St. Bernard Parish; and No. 8, the
15   performance of the levees along the MRGO in
16   St. Bernard Parish during Hurricane Katrina.

Page 24 Line 16 to Page 25 Line 15
Q.   What do you understand that that
17   design responsibility consists of?
18       A.   We are given a -- given storm of a

VARUSO, RICHARD                    Rule 30(b)(6)                    8/22/2006

    19   given frequency, we refer to that as a
    20   standard project hurricane. That standard
    21   project hurricane will have a given
    22   still-water level. That is, basically the
    23   elevation of the water that we are going to
    24   design the levees to withstand. Once that
    25   elevation is determined, the top of the
    25
    1    levee or the crown of the levee, if you
    2    will, is usually, give or take, two feet
    3    plus or minus a foot in addition to wave
    4    runup or settlement. We take these factors
    5    into consideration.
    6           And so the top of the levee crown
    7    is typically two feet give or take a foot
    8    higher than the still-water level. Once
    9    that elevation is determined, given the
    10   topography of the area and information that
    11   we obtain from mooring logs and laboratory
    12   tests, perform stability analyses to
    13   determine the required stability berms and
    14   required levee section to meet the global
    15   stability.


Page 26 Line 9 to Page 26 Line 17
    Q.  I'm trying to find out whether the
    10   Corps of Engineers was free to come up with
    11   the best design that it could conceive of to
    12   protect Lake Pontchartrain and vicinity?
    13       A.  It was free to determine a levee
    14   section based on the still-water level that
    15   was given that was based on the standard
    16   project hurricane for which we were
    17   authorized to design the levees to.


Page 28 Line 3 to Page 28 Line 11
    Q.  There is no limitation placed on
    4   the project manager as far -- insofar as the
    5   Corps' ability to exceed whatever standard?

VARUSO, RICHARD            Rule 30(b)(6)                    8/22/2006

```
 6    A.  His limitation is based on -- it's
 7  from Congress. We are authorized to design
 8  the levee from Congress. We are given funds
 9  and authorized to design a levee to sustain
10  that still-water elevation from a standard
11  project hurricane.
```

Page 30 Line 8 to Page 30 Line 20
```
    Q.  I was going to say, describe for
 9  us, so that we are all on the same page,
10  what the MRGO levee means to you, the Corps.
11    A.  There is a control structure at
12  Bayou Bienvenu near the GIWW, the Gulf
13  Intracoastal Waterway. What I refer to the
14  MRGO levee would be the structure of levee
15  that extends south from Bayou Bienvenu past
16  the control structure at Bayou Dupre, until
17  we get to what we refer to as the return
18  levee at Verret. It's about 12 -- 12 miles
19  give or take of levee south of Bayou
20  Bienvenu.
```

Page 31 Line 3 to Page 31 Line 21
```
    Q.  Now, in designing the levee system
 4  over that 12-mile stretch that we will refer
 5  to as the MRGO levee, were there any
 6  restrictions placed on the Corps in terms of
 7  the size, quality materials that it chose to
 8  use?
 9    A.  The size was restricted by the
10  still-water elevation that was relative to
11  the standard project hurricane that we were
12  authorized to build the levee to.
13    Q.  And the still-water elevation is a
14  product of assumptions that go into the
15  standard project hurricane, is it not?
16    A.  Yes.
17    Q.  And those assumptions are
18  assumptions made by the project manager of
```

VARUSO, RICHARD          Rule 30(b)(6)                    8/22/2006

```
19  the Corps of Engineers or folks at the Corps
20  of Engineers?
21      A.  That's correct.
```

Page 54 Line 7 to Page 55 Line 2
```
 7      A.  Hydraulic fill is essentially
 8  material that would be disposed of after
 9  dredging operations.  They refer to it as
10  hydraulic fill because you are using water
11  pressure to bring up material into a dredge
12  and then pumped into a given area as fill.
13          Again, that's why they refer to it
14  as hydraulic fill, because there is water in
15  addition to the material that's being
16  dredged for use.
17      Q.  Does the Corps of Engineers
18  utilize hydraulic fill in constructing
19  levees along the Lake Pontchartrain and
20  vicinity hurricane protection system?
21      MR. SMITH:
22          Again, are you restricting this
23  just to the MRGO levees?
24      MR. KOHNKE:
25          Yes.
55
 1      THE WITNESS:
 2          They did.  Yes, they did.
```

Page 63 Line 5 to Page 63 Line 13
```
 5      Q.  When you say "still water," do you
 6  mean water that is not producing waves?
 7  What do you mean by still water?
 8      A.  The still water is basically the
 9  hydraulic analysis for that standard project
10  hurricane.  That is the elevation of the
11  water in NGVD of that given standard project
12  hurricane, the elevation of the water that
13  water -- that storm would produce.
```

VARUSO, RICHARD                         Rule 30(b)(6)                        8/22/2006

Page 63 Line 18 to Page 63 Line 22
```
    Q.  What does still water mean?
19      A.  It's the storm surge that they
20  assume for that given standard project
21  hurricane, and there are waves assumed in
22  that standard -- in that still-water level.
```

Page 88 Line 10 to Page 88 Line 13
```
    Q.  Were there any design or
11  construction flaws in the hurricane
12  protection levee known as the MRGO levee?
13      A.  No.
```

Page 159 Line 22 to Page 160 Line 12
```
    Q.  Define overtopping.
23      A.  When the elevation of the water
24  from the storm surge exceeds the elevation
25  of the crown of the levee.
160
1       Q.  When overtopping occurs, some
2   amount of water -- assuming the levee
3   remains intact, some amount of water will
4   cross the levee to the protected side; is
5   that correct?
6       A.  That's correct.
7       Q.  Now, contrast that with a breach.
8       A.  A breach is when the section of
9   the levee erodes away or is washed away and
10  no longer exists or you no longer have the
11  levee crown elevation you had prior to the
12  storm surge.
```

Page 172 Line 2 to Page 172 Line 17
```
    MR. BRUNO:
3           May we have a definition of the
4   phrase "borrow borings"?
```

VARUSO, RICHARD                 Rule 30(b)(6)                 8/22/2006

```
 5        THE WITNESS:
 6           It's a soil sample taken typically
 7   15 to 20 feet deep in the area where the
 8   borrow material -- the borrow material is
 9   the material that's taken from one location
10   to be used to construct the levee section.
11   We refer to that material as borrow,
12   borrowing from one site to construct the
13   levee.  So the borings we take to determine
14   what the material is in that area we refer
15   to those as borrow borings.
16        MR. BRUNO:
17           Thank you.
```

Page 199 Line 14 to Page 200 Line 9

```
     Q.  Let me ask you.  When a Corps of
15   Engineers representative refers to wave
16   action, the Corps of Engineers compares wave
17   action to the alternative which I believe is
18   still water; is that right?
19           What does wave action mean?
20   Compare it, contrast it to still water or to
21   any other condition that you have to take
22   into account when designing a levee.
23      A.  I would assume the wave force that
24   we -- that we -- or the height of the wave,
25   or the wave -- there is a wave force diagram
200
 1   that we assume for a given wave for a given,
 2   in this case, standard project hurricane.
 3   And that wave, if there is a floodwall, that
 4   force will be considered in the design of
 5   that floodwall.
 6           The same wave for a design of a
 7   levee we will design a flood side wave berm
 8   to dissipate the energy of that wave before
 9   it reaches the crown of the levee.
```

Page 205 Line 14 to Page 206 Line 1

VARUSO, RICHARD          Rule 30(b)(6)                    8/22/2006

```
Q. When designing the MRGO levee
15 system, did the Corps of Engineers take into
16 account that that levee might be overtopped
17 at any point in time when a hurricane came
18 into our area?
19     A. No. We are not authorized to do
20 so.
21     Q. You are not authorized to assume
22 that the levee will be overtopped?
23     A. That assumes a greater amount of
24 water than what the still-water level would
25 be for that given standard project
206
1 hurricane.
```

Page 209 Line 25 to Page 210 Line 4
```
Q. From that standard project
210
1 hurricane you then design a levee height,
2 design a levee, and that includes the height
3 of the levee?
4     A. That's correct.
```

Page 210 Line 24 to Page 211 Line 15
```
Q. Based upon the anticipated
25 settlement or subsidence -- which are two
211
1 different things, are they not?
2     A. Yes.
3     Q. You are assuming that you will be
4 left with a levee height that will not be
5 overtopped by the still water that your
6 model --
7     A. For that given standard project
8 hurricane, yes.
9     Q. For that given standard project
10 hurricane. And if you have made all of your
11 assumptions, if all of your assumptions are
12 correct and if no hurricane exceeds the
```

VARUSO, RICHARD          Rule 30(b)(6)                    8/22/2006

```
13  standard project hurricane, then you expect
14  no topping?
15      A.  That's correct.
```

Page 229 Line 25 to Page 231 Line 7

```
   Q.  Okay. I want to know whether the
230
 1  Corps could have and should have anticipated
 2  overtopping. And we ended up getting into
 3  an area where you said: We built the levee
 4  to a height that would take into account
 5  still-water elevation.
 6      A.  That's correct.
 7      Q.  And the implication of your answer
 8  to me was, and if I'm wrongly assuming tell
 9  me now, that we couldn't go higher than that
10  without some specific authority from
11  Congress.
12      A.  Let me rephrase my answer to the
13  question and see if I can clarify it for
14  you.
15      Q.  Please.
16      A.  The first variable that comes into
17  play in determining what that design grade
18  is, which is 17 and a half, the MRGO, the
19  one variable is the still-water elevation,
20  which in this case is elevation 13. In
21  addition to that, we have to assume that the
22  storm, this standard project hurricane will
23  produce some wave. The difference between
24  the still-water level and the 17 and a half
25  is the elevation needed for that wave runup.
231
 1  It's an additional four and a half feet for
 2  wave runups. So from 13 to 17 and a half,
 3  that's four and a half feet for wave runup.
 4          So our design grade is 17 and a
 5  half for that given still-water level with
 6  the wave load for that given standard
 7  project hurricane.
```

VARUSO, RICHARD                    Rule 30(b)(6)                    8/22/2006

Page 231 Line 14 to Page 231 Line 25
```
    Q.  Is the expectation of wave height
15  or wave runup also a part of the standard
16  project hurricane calculation?  In other
17  words, is it one of the numbers that is
18  produced when you come up with the standard
19  project hurricane?
20      A.  That's right.
21      Q.  Or is that a separate assumption?
22      A.  No.  It's based on the standard
23  project hurricane.  Hydraulic engineering
24  analyses determine those -- determine those
25  values.
```

Page 243 Line 16 to Page 245 Line 2
```
    Q.  Have you specifically heard from
17  any source or learned from any source by
18  conversation or written word or any other
19  way that Congress has actually gone on
20  record in some fashion as saying that these
21  are the criteria for you to use in
22  establishing a design for the hurricane
23  protection levee down in St. Bernard,
24  particularly the MRGO?  Has Congress gone so
25  far as to tell the Corps what the
244
 1  limitations of its design shall be?  Have
 2  you heard that, is what I'm asking?
 3      A.  Well, the limitations on the
 4  design, and I assume you are again referring
 5  to elevations of still water with respect to
 6  the standard project hurricane.
 7      Q.  Yes, that's fair enough.
 8      A.  That is based on, obviously
 9  Congress is not going to tell us:  You are
10  going to design it to elevation 13.  They
11  are going to say:  You need to take the data
12  you have, and they are going to rely on the
13  hydraulic engineers and their knowledge of
14  the science to determine what that elevation
15  is going to be.
```

VARUSO, RICHARD                Rule 30(b)(6)                          8/22/2006

16     Q.   Who is going to rely upon the
17  hydraulic engineers?
18     A.   Congress would.
19     Q.   Congress would.
20     A.   In other words, they are
21  instructing the Corps of Engineers, or they
22  are authorizing the Corps of Engineers to
23  build a levee protection system that would
24  protect the area for a standard project
25  hurricane.  And it's up to the Corps of
245
1  Engineers to determine what criteria goes
2  into the standard project hurricane.


Page 302 Line 15 to Page 303 Line 1
 Q.   Sir, both and you Mr. Kohnke have
16  during these past hours used the word
17  "levee."  Would you please define for me
18  what is a levee?
19     A.   Define that as an earthen
20  embankment constructed of a given
21  cross-section that would withstand a given
22  water elevation, possibly encompass or
23  entail a wave berm to reduce the energies of
24  wave runup as well as a protected side
25  stability berm to insure the stability of
303
1  the levee section.


Page 306 Line 21 to Page 307 Line 10
 Q.   Thank you.  Same question with
22  regard to a wave berm.  Did the
23  specifications after 1965 include the
24  requirement that there be a wave berm when
25  the Corps was building a levee?
307
1     A.   There was a wave berm attached to
2  that particular levee section, yes.
3     Q.   And similar to the question with

```
 4  regard to the stability berm, must one be
 5  included or are there circumstances where
 6  one may not be included?
 7     A.  If no significant waves are
 8  anticipated to impact the levee section for
 9  the given storm event, then no wave berm
10  would be necessary.
```

Page 319 Line 15 to Page 319 Line 23
```
    MR. BRUNO:
16         Robin, this is something called
17  Lake Pontchartrain, Louisiana and Vicinity
18  Design Memorandum No. 1, Hydrology and
19  Hydraulic Analysis, Part 1, Chalmette,
20  August '66.
21  EXAMINATION BY MR. BRUNO:
22     Q.  Does that allow you to confirm the
23  project hurricane still-water height?
```

Page 320 Line 18 to Page 321 Line 14
```
    EXAMINATION BY MR. BRUNO:
19     Q.  Again, for the record, can you
20  just state then -- well, first of all, do
21  you know what this piece of paper is that
22  you're looking at?
23     A.  This is an approval from the chief
24  of engineers in Washington, D.C. to the
25  chief of engineers in the Lower Mississippi
321
 1  Valley Division in 1966 approving the design
 2  of the hurricane protection levees in the
 3  Chalmette area to standard project hurricane
 4  surge of elevation 13.0 as it appears
 5  reasonable and is approved for subject to
 6  the future studies.
 7     Q.  All right, good.  So, in fact, the
 8  number is 13?
 9     A.  Yes.
10     Q.  And as you have already testified,
```

VARUSO, RICHARD             Rule 30(b)(6)                    8/22/2006

    11  that number comes from a review of past
    12  experience with hurricanes, right?
    13      A.  It's a hydraulic analysis that
    14  takes that into consideration, yes.


Page 321 Line 15 to Page 321 Line 19
     Q.  Now, one of the things that is
    16  taken into consideration is the degree to
    17  which the marsh, as it then existed, is able
    18  to reduce the storm surge; isn't that
    19  correct?


Page 323 Line 9 to Page 323 Line 16
    XAMINATION BY MR. BRUNO:
    10      Q.  Okay.  Fine.  In fact, in the
    11  design of the levees for the greater
    12  New Orleans hurricane protection system, the
    13  number 2.7 miles per foot value was used
    14  based upon the then existing wetlands?
    15      A.  That would have been taken into
    16  consideration, yes.


Page 324 Line 23 to Page 325 Line 4
     Q.  Fair enough.  But at least we can
    24  confirm that the existence of wetlands will
    25  impact the still-water height?
325
     1      A.  I believe it does, but again, this
     2  is more in the area of hydraulic analysis
     3  and a little bit out of my area of
     4  knowledge.


Page 331 Line 22 to Page 332 Line 9
    EXAMINATION BY MR. BRUNO:
    23      Q.  The long way is, again, having

  24  gone through this long question and answer
  25  about how you got to the still-water height,
332
  1  there is a height which the Corps decides on
  2  as the appropriate height based upon
  3  expected storm surge, right?
  4    A.  Yes.
  5    Q.  And that expected storm surge is
  6  based upon the amount of marshland that was
  7  then extant is when the calculations were
  8  made, right?
  9    A.  One factor.

Page 337 Line 21 to Page 337 Line 25
  Q.  Can you state with certainty that
  22  the work that the Corps of Engineers did in
  23  connection with the construction of the
  24  first lift was completed before 1979?
  25    A.  Yes.

Page 338 Line 10 to Page 340 Line 1
You are referring to maintenance?
  11  Is that what you're --
  12  EXAMINATION BY MR. BRUNO:
  13    Q.  Yes.
  14    A.  Well, I suppose there is two types
  15  of maintenance. One would be -- you know,
  16  keeping the grass cut is part of
  17  maintenance, which is -- we give that to the
  18  local levee districts. Over time, and while
  19  the levee is at grade, at or above grade,
  20  the levee districts are responsible for the
  21  maintenance and care of those levees. Were
  22  it to become deficient, then the Corps of
  23  Engineers requests additional funds from
  24  Congress to go back and raise the
  25  embankments to the authorized height or
339
  1  something greater than that to account for

VARUSO, RICHARD                Rule 30(b)(6)                    8/22/2006

```
 2   that settlement, subsidence.
 3      Q.  Had the Corps of Engineers
 4   received any indication or notice of any
 5   deficiency with regard to its construction
 6   of the initial lift resulting from the '65
 7   authorization?
 8      MR. SMITH:
 9         Just vague as to time.
10      MR. BRUNO:
11         At any time, I guess.
12      MR. SMITH:
13         At any time subsequent to --
14      MR. BRUNO:
15         Yeah, I mean --
16      MR. SMITH:
17         -- completion of the first lift,
18   did they ever receive notice that it was
19   deficient?
20      MR. BRUNO:
21         Right.
22      THE WITNESS:
23         Noticed by?
24   EXAMINATION BY MR. BRUNO:
25      Q.  From anybody.
340
 1      A.  No, not that I'm aware of.
```

Page 340 Line 8 to Page 340 Line 10
```
    Q.  Now, you have testified about a
 9   second lift, right?
10      A.  Yes.
```

Page 340 Line 24 to Page 341 Line 12
```
    A.  The fact that the levee -- I
25   believe there was two portions of this.  One
341
 1   is that the original hydraulically-filled
 2   levee was not part of the -- we were not
 3   able to actually bring it to elevation of 17
```

VARUSO, RICHARD                Rule 30(b)(6)                8/22/2006

```
 4  and a half by the means of the construction
 5  process of a hydraulic fill. As it was, it
 6  took two years, give or take, to get it to
 7  the original elevation, approximately 15.
 8          Soon thereafter we got
 9  authorization to build the first
10  enlargement, which would have been in the
11  early to mid '70s. That enlargement brought
12  it to elevation 17 and a half.
```

Page 341 Line 19 to Page 341 Line 23
```
    Q.  But the motivation for the Corps
20  to do this work was its own recognition that
21  you hadn't yet gotten to the height you
22  wanted to get it at?
23      A.  That's correct.
```

Page 343 Line 17 to Page 344 Line 1
```
    MR. KOHNKE:
18          Anything after the first lift
19  would be an augmentation.
20  EXAMINATION BY MR. BRUNO:
21      Q.  That's right. The second lift,
22  second enlargement occurred approximately
23  when?
24      A.  That would have been in the early
25  1980s.
344
```

Page 344 Line 5 to Page 345 Line 1
```
    A.  I do believe we are getting a
 6  little bit confused. Let me see if I can
 7  clarify. And if I'm paraphrasing too much,
 8  feel free to stop me. The MRGO first lift
 9  construction of levee on virgin soil was
10  done 1967, 1968 time frame. Mid -- early to
11  mid '70s the first enlargement was conducted
```

```
12  for a great portion of the MRGO levee. The
13  second enlargement was done early to mid
14  1980s for a great portion of the MRGO levee.
15          There was only one third
16  enlargement, or there was only one second
17  enlargement, which would have been -- no one
18  third enlargement, one third enlargement,
19  which was done on a small portion of the
20  MRGO levee and a section of what we call the
21  Verret to Caernarvon levee which extends
22  from the MRGO to Highway 46. That was the
23  third levee enlargement in the early 1990s.
24     Q.  The third enlargement would have
25  been completed before 1996?
345
 1     A.  Thereabouts.
```

Page 351 Line 15 to Page 351 Line 24
```
    Q.  Well, in fact, your own -- this
16  better and stronger business, the long-term
17  solution does talk about an intent for there
18  to be an integration with Coastal
19  restoration efforts. Would that not
20  indicate the Corps' understanding of the
21  need to improve the, or to restore the
22  wetlands in order to improve the ability of
23  the levees to perform? It wasn't that
24  funny.
```

Page 352 Line 7 to Page 352 Line 11
```
THE WITNESS:
 8          The Corps of Engineers is aware of
 9  the importance of levee -- of marshes with
10  respect to reducing storm surge. There is
11  no question about it.
```

Page 373 Line 19 to Page 374 Line 19
```
    Q.  Well, there were no rocks on the
```

VARUSO, RICHARD				Rule 30(b)(6)				8/22/2006

  20  water side of the MRGO levee, were there?
  21     A.  There are some rocks along the
  22  bank.  It's not continuous, but there is
  23  areas where the bank is faced with rock.
  24     Q.  Well, that's -- okay.  I need to
  25  ask you about that, then.  That's news to
374
  1  us.
  2       Along that 12-mile section, can
  3  you tell me whether or not the original
  4  construction -- can you tell me whether or
  5  not along the 12 miles of levees that were
  6  built pursuant to the '65 act the
  7  construction specifications called for
  8  aligning the water side of the levee with
  9  any kind of protective material, including,
  10  but not limited to, rock, broken concrete or
  11  other type -- any other type of armoring?
  12     A.  That's -- that's maintenance.
  13  That's a maintenance issue for the MRGO
  14  channel itself, not an issue for the levee
  15  design.  That was separate from the levee
  16  design and construction.  That's bank
  17  stabilization for the MRGO channel.  It's a
  18  separate funding, separate maintenance
  19  issue.