DONALD RESIO                                              February 9, 2009

```
                                                          Page 169
 1   you.
 2              Well, but you assumed a shelf.
 3        A.    Um-hum.  (Affirmative)
 4        Q.    In fact, you called it a generic shelf
 5   200 feet long.  And at what evaluation?
 6        A.    It went up to about 9 feet.
 7        Q.    Okay.  A 9-foot high shelf 200 feet in width
 8   generic the entire length of the MRGO Reach 2.
 9   Correct?
10        A.    That is correct.
11        Q.    All right.  Now, certainly you know that
12   there are areas of the MRGO where there's considerably
13   less shelf, considerably more shelf --
14        A.    Yes.
15        Q.    -- or, for that matter, considerably
16   shallower water?
17        A.    Oh, yes, yes.
18        Q.    And certainly many areas where the shelf is
19   not totally flat as you assume where there's an
20   inclination?
21        A.    This is true.
22        Q.    Yet you made the call --
23        A.    Right.
24        Q.    -- to assume a 9-foot high shelf 200 feet
25   from the toe of the levee to the edge of the MRGO
```

```
                                                      Page 171
```

1    Q.   But is the ultimate answer to my question
2 that what you just told me in the sense that it cannot
3 run site specific, it's got to run with the generic?
4    A.   No, I did not say that.
5    Q.   All right.  Well, tell me what you said.  I
6 could tell you if I had the realtime, but go ahead.
7    A.   All right.  The -- what I was trying to say
8 is that if you run -- you can run one or two sites and
9 just run it site specific.  We did that.  We ran five
10 different sites for Katrina.  In this case we were
11 going to be running -- and that was very long and very
12 tedious.  And so that --
13   Q.   Now, bookmark that.  I'm going to let you
14 continue.
15   A.   Okay.
16   Q.   Just bookmark that in your report.
17        Do you report those five sites?
18   A.   Not in this report, no.
19   Q.   That's what I wanted to know.  Go on.
20   A.   So -- but they are reported in IPET.
21   Q.   I understand that.
22   A.   And if we then have to run six different --
23 well, we didn't know how many alternatives, but let's
24 just say at least six alternatives, and we had to run
25 21 points along there.  It was just going to become a

DONALD RESIO					February 9, 2009

Page 172

1  gigantic computer exercise, and we were not convinced
2  it would provide that much better accuracy. And that's
3  the issue that you were raising is one of accuracy --
4  is how accurate is it.
5       Q.   All right. Well, let's talk about what you
6  did.
7       A.   Okay.
8       Q.   I have taken the liberty of blowing up Figure
9  23 --
10      A.   All right.
11      Q.   -- from your report.
12           MR. ROY:  And I'm going to label it
13      Exhibit 17, and I'm going to hand it to you. And
14      I will hand your esteemed lawyer more paper, a
15      copy of it, and I'll keep a copy of it.
16                  (EXHIBIT 17 MARKED)
17      A.   Nice paper.
18  BY MR. ROY:
19      Q.   Now, in terms of the distance along the
20  profile feet --
21      A.   Um-hum. (Affirmative)
22      Q.   -- you've got an elevation scale on the left
23  in feet, one on the right in feet.
24      A.   That's correct.
25      Q.   So is it your intention to illustrate to