# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISAINA

| | | |
|---|---|---|
| IN RE:  KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NO. 05-4182 "K" (2), (3) |
| PERTAINS TO LEVEE AND MR-GO: | * | |
| | * | |
| NO. 06-5116 (SIMS) | * | |
| NO. 06-5118 (RICHARD) | * | JUDGE DUVAL |
| NO. 06-5127 (DEPASS) | * | |
| NO. 06-5128 (ADAMS) | * | MAG. J. KNOWLES |
| NO. 06-5134 (CHRISTOPHE) | * | |
| NO. 06-5137 (WILLIAMS) | * | |
| NO. 06-5131 (BOURGEOIS) | * | |
| NO. 06-5142 (AUGUSTINE) | * | |
| NO. 06-5132 (FERDINAND) | * | |
| NO. 06-5140 (PORTER) | * | |

**************************************

## POST-HEARING BRIEF OF CERTAIN OBJECTING PLAINTIFFS
## IN OPPOSITION TO CLASS CERTIFICATION AND SETTLEMENT

Plaintiffs in Case No. 06-5116 (*Sims*), Case No. 06-5118 (*Richard*), Case No. 06-5142 (*Augustine*), Case No. 06-5132 (*Ferdinand*), Case No. 06-5131 (*Bourgeois*), Case No. 06-5134 (*Christophe*), Case No. 06-5137 (*Williams*), Case No. 06-5127 (*DePass*), Case No. 06-5128 (*Adams*), and Case No. 06-5140 (*Porter*), who filed Complaints under F.R.C.P. 20 (the "Objecting Plaintiffs"), object to the proposed settlement (the "Settlement").  The Settlement has been proposed by the Board of Commissioners of the Orleans Levee District, the Orleans Levee District, the Board of Commissioners of the Lake Borgne Basin Levee District, the Lake Borgne Basin Levee District, the Board of Commissioners of the East Jefferson Levee District, the East

Jefferson Levee District, the Board of Commissioners of the Southeast Louisiana Flood Protection Authority-East, the Southeast Louisiana Flood Protection Authority-East (sic), and St. Paul Fire and Marine Insurance Company (the "Joint Applicants").  Following the April 2, 2990 certification and fairness hearing, the Objecting Plaintiffs continue to urge disapproval of the Settlement on the grounds that the Joint Applicants have failed to carry their burden to show that the Settlement can be certified as a limited fund class settlement authorized by Federal Rule of Civil Procedure 23(b)(1)(B), and they have failed to show that the Settlement is fair, reasonable and adequate.   The Objecting Plaintiffs also adopt by reference the arguments made in opposition to the settlement by class members Mary Brinkmeyer, Michelle LeBlanc, and Thomas C. Stuart.  The brief is submitted in accordance with the briefing schedule ordered by the Court at the recess of the hearing on April 2, 2009 and the seven-day extension granted by the Court on May 1, 2009.

## I.   Introduction

The Joint Applicants consist of:  (1) a handful of individuals seeking to represent a class of plaintiffs who incurred monetary losses in Louisiana or suffered personal injuries resulting from levee failures following Hurricanes Katrina and Rita in 2005; (2) the three separate defendant Levee Districts of Orleans, Lake Borgne Basin and East Jefferson, and each of their respective Boards of Commissioners; (3) their successor in some respects, the defendant Southeast Louisiana Flood Protection Authority-East and its Board of Commissioners; and (4) the levee districts' insurer, St. Paul Fire and Marine Insurance Company.  These Applicants are seeking certification of a mandatory, non-opt-out settlement class of all persons who were living in or owned property in the area of Louisiana affected by Hurricanes Katrina and Rita and who incurred monetary losses or personal injury damages as a result of any levee failures.  They are

2

asking the Court to grant final approval of a settlement that would provide in the aggregate less than $21 million (or $23 million depending on resolution of the recently-raised "premises" issue) to hundreds of thousands, perhaps more than a million, affected plaintiffs,[1] with no specified means or structure for distribution of the settlement proceeds.  The Joint Applicants have alleged the existence of a "limited fund," which they contend warrants class certification pursuant to Fed. R. Civ. P. 23(b)(1)(B).

On December 15, 2008, this Court preliminarily approved the proposed settlement, finding that the requisites of Fed. R. Civ. P. 23 (a), (b)(1)(B) and (e) were met and that this case

> present[s] a definable limited fund insufficient to satisfy the claims of Class Members such that prosecuting separate actions by or against individual Class Members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Dkt. No. 16,721, at 3, ¶¶ "J" & "M."  The Court, however, did not set forth any basis for this finding, nor did it specify the evidence upon which the Court's decision rested.  No factual basis to support the preliminary approval was established by the evidence adduced at the April 2, 2009 hearing.

The Court entered an order requiring that the hearing contemplated by the order would be held "not less than 45 days" from the date of the Notice. In spite of that order, and in direct conflict with it, the Court subsequently scheduled and held the Hearing on April 2, 2009, refusing to permit Objectors adequate time or opportunity to take discovery. The Joint

---

[1] *See* T. Hilsee, G. Intrepido & S. Wheatman, *Hurricanes, Mobility, and Due Process: the "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 TULANE L. REV. 1771, 1787 (2006) ("Hurricane Katrina displaced more than 1.36 million people from their former addresses" and "'more than a third of the region's 1.7 million residents lived in areas that suffered flooding or moderate to catastrophic storm damage, according to FEMA.'").

Applicants have failed to make the requisite showing of entitlement to class certification under Fed. R. Civ. P. 23(a), they have not met their burden of proving the existence of a limited fund, they have not provided for allocation of proposed settlement funds to Class Members in a way that would account for inherent conflicts of interest among Class Members, they have failed to demonstrate that the settlement is fair, adequate and reasonable and that they can provide adequate representation, and the class notice issued in this case was inadequate and misleading.  For these reasons, more fully set forth below, the application should be denied.

## II.      The Joint Applicants Have Not Proven the Existence of a Limited Fund

This proposed Settlement must be tested by the rigorous criteria applicable to limited fund class actions under Fed. R. Civ. P. 23(b)(1)(B) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834, 119 S.Ct. 2295, 2309 (1999).  In addition, the proposed Settlement must satisfy the more general concern -- the "undiluted, even heightened attention" -- that must be addressed in considering certification of a class for settlement purposes under *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620, 117 S.Ct. 2231, 2248 (1997).

The principal reason that the settlement cannot be approved is the Levee Board defendants' refusal to make **any** contribution to the Settlement.   In *Fibreboard* one of the features of the proposed settlement causing its disapproval by the Supreme Court was "…the ultimate provision for a fund smaller than the assets…available for payment of the mandatory class members' claims." 527 U.S. at 859, 119 S.Ct. at 2321. While *Fibreboard's* insurers contributed $2 billion dollars to the proposed settlement,

> Fibreboard listed its supposed entire net worth as a component of the total (and allegedly inadequate) assets available for claimants, but subsequently retained all but $500,000 of that equity for itself.  On the face of it, the arrangement seems irreconcilable with the justification of necessity in denying any opportunity for withdrawal of class members whose jury rights will be compromised, whose damages will be capped, and whose

> payments will be delayed. With Fibreboard retaining all of its net worth, it hardly appears that such a regime is the best that can be provided for class members.

527 U.S. 859-860, 119 S.Ct. 2321.  (Footnote omitted).

The proponents of this Settlement will be unable to cite to **any** case giving final approval to a Rule 23(b)(1)(B) limited fund settlement to which **an insured defendant contributed nothing**. Commenting on this aspect of *Fibreboard*, the Sixth Circuit in *In Re Telectronics Pacing Systems, Inc.*, 221 F. 3d 870 (6th Cir. 2000) observed,

> Class certification, whether mandatory or not, necessarily compromises various rights of absent class members.  Rule 23(b)(3), with its notice and opt-out provisions, strikes a balance between the value of aggregating similar claims and the right of an individual to have his or her day in court.  Certification under Subsection (b)(1)(B), which does not include these protections, must be carefully scrutinized and sparingly utilized.   The Supreme Court also stressed in a proper interpretation of Rule 23, **principles of sound judicial management and constitutional considerations of due process and the right to a jury trial all lead to the conclusion that in an action for money damages class members are entitled to personal notice and an opportunity to opt out.**

231 F. 3d at 881. (Emphasis added.)

### A.      This is not a "Classic Limited Fund Case"

Embedded in our jurisprudence is the "deep-rooted historic tradition that everyone should have his own day in court."  *Martin v. Wilks*, 490 U.S. 755, 762, 109 S.Ct. 2180, 2184 (1989), *quoting* 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §4449, p. 417 (1981).  Certification of a limited fund settlement class under Fed. R. Civ. P. 23(b)(1)(B), therefore, necessarily raises the constitutional concerns noted in *Fibreboard* and *Telectronics* about the mandatory resolution of individual legal claims.   Where plaintiffs' Seventh Amendment right to a jury trial is taken away and where plaintiffs are bound *in personam* by the court's judgment even though they are absent parties, courts must be mindful of "the tension

between the limited fund class action's pro rata distribution in equity and the rights of individual tort victims at law." *Fibreboard, supra*, 527 U.S. at 845, 119 S. Ct. at 2313-14 (reversing certification of mandatory settlement class of asbestos personal injury claimants); *Amchem Prods., Inc. v. Windsor*, *supra*, 521 U.S. at 613, 117 S. Ct. at 2245; *see also Klein v. O'Neal, Inc.*, 2006 WL 325766 (N.D. Tex.) (refusing to certify mandatory limited fund class in mass tort action for drug).

The Rules Enabling Act instructs that rules of procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). Thus, the Supreme Court in *Ortiz* cautioned against an expansive use of the limited fund class action, holding that "applicants for certification [of a mandatory non-opt-out settlement class] must show that the fund is limited by more than the agreement of the parties, and has been allocated to claimants belonging within the class by a process addressing any conflicting interests of class members." 527 U.S. at 821, 119 St. Ct at 2302.

At the hearing in this case, the proponents of the settlement failed to show "that the fund is limited by more than the agreement of the parties" and that the levee boards will contribute nothing to the settlement fund. A party's advance determination that it will contribute nothing beyond its insurance policy proceeds cannot be regarded as a valid "limitation" under *Ortiz*.

*Ortiz* held that in order to qualify for "mandatory class treatment through representative actions on a limited fund theory," there must be "a 'fund' with a definitely ascertained **limit**, all of which would be distributed to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, pro rata distribution." 527 U.S. at 841, 119 S. Ct. at 2312 (Emphasis added.); *In re Simon (II) Litig.*, 407 F.3d 125, 136-38 (2nd Cir. 2005). The Supreme Court went on to observe, "[I]t is clear that the [Rule 23] Advisory Committee did not

contemplate that the mandatory class action codified in subdivision (b)(1)(B) would be used to aggregate unliquidated tort claims on a limited fund rationale." *Ortiz*, 527 U.S. at 843, 119 S. Ct. at 2313.[2]   Unquestionably, "serious constitutional concerns [accompany] any attempt to aggregate individual tort claims on a limited fund rationale." *Id*., 527 U.S. at 842, 119 S. Ct. at 2313.

This case is unlike the traditional limited fund examples outlined in *Ortiz*, each of which involved claimants' entitlement to a single limited amount of money based on their common claims arising from the same incident.[3]   Under *Ortiz*, "[a]t the least, the burden of justification rests on the proponent of any departure from the traditional norm." *Id*.  The Joint Applicants mistakenly assume that the existence of limited insurance in and of itself creates a limited fund warranting mandatory class certification.  And, in this particular case, it is still far from clear that the insurance is so limited.

A substantial issue concerning the available insurance limits was raised for the first time at the Hearing on April 2, 2009, when the proponents of the "limited fund" of seventeen million dollars (and applicable legal interest) revealed for the first time that the dollar amount might actually exceed that number (Opening Statement of the Plaintiffs'' Committee at page 4, line 24 to page 5, line 4 of the Realtime rough draft Transcript):

> "This totals $17 million plus interest. But the parties, by agreement, will submit to this Court, in this hearing, an important issue regarding the limits of the Orleans

---

[2]  "It is simply implausible that the Advisory Committee, so concerned about the potential difficulties posed by dealing with mass tort cases under Rule 23(b)(3), with its provisions for notice and the right to opt out, see Rule 23(c)(2), would have uncritically assumed that mandatory versions of such class actions, lacking such protections, could be certified under Rule 23(b)(1)(B)." 527 U.S. at 843-44, 119 S. Ct. 2313-14.

[3]  *Cf*., *e.g.*, *Guffanti v. Nat'l Surety Co.*, 196 N.Y. 452, 458, 90 N.E. 174, 176 (1909) (limited fund appropriate to equitably distribute, pro rata, available bond money among defrauded steamship ticket purchasers where all claims "grow out of the same contract"); *Nat'l Surety Co. v. Graves*, 211 Ala. 533, 534, 101 So. 190 (1924) (limited fund appropriate to equitably apportion defrauded stockholders' interest in surety bonds); *Morrison v. Warren*, 174 Misc. 233, 234, 20 N.Y.S.2d 26, 27 (1940) (limited fund appropriate where plaintiffs' property was destroyed while in possession of bankrupt debtor and fire insurance proceeds were insufficient to satisfy all claims).

> Levee District primary policy, the result of which could determine that the limits
> Of that primary policy are not $1 million but $3 million….

The "parties" mentioned by Mr. Meunier did not include the Objecting Plaintiffs, whose counsel had no knowledge of the existence of this issue until they received the Peter Ligeros report three days before the hearing.

Because the Objecting Plaintiffs' discovery was limited by the Court and the hearing was scheduled sooner than permitted by the original order, the Objecting Plaintiffs had no opportunity to conduct any discovery on this issue, which had not been raised by a pleading or motion.  The Joint Applicants' own statements and their Stipulation (Exhibit 60) make clear that the actual limits of the available insurance have not been adequately investigated for the purpose of consideration of a limited fund settlement.

The Applicants have ignored the stringent requirements of Fed.R.Civ.P. 23(b)(1)(B) and governing Supreme Court law.  Not only have they failed to demonstrate the existence of a limited fund, but the settlement agreement does not provide for any equitable allocation of the settlement proceeds among Class Members.

The Joint Applicants have not even met the threshold requirement for achieving a limited fund class action because they have not set forth any "totals of the aggregated liquidated claims" in this case, much less evidence of valuation with respect to any single plaintiff's claim(s).  The proposed class definition includes claims for property damage, clean-up costs, restoration costs, diminution of property value, personal injuries, loss of income, loss of consortium, wrongful death, survival damages, medical monitoring, punitive damages, and the like.  These are unliquidated mass tort claims based on levee failures in three separate levee districts in Louisiana following two separate hurricanes.

Unnoticed in the flurry of activity surrounding this proposed settlement was the fact that the plaintiffs' counsel group was originally appointed by the Court in the Katrina Canal Breaches Litigation.  Their supposed authority to act on behalf of the victims of Hurricane Rita, as well, is nebulous at best. After the hearing on April 2, 2009, it is still unclear that there is even a common theory of liability, and there is surely no way to predict or compute at this point the value of these various claims, which  are obviously not uniform in the first place.  The upshot of Gregory Riganer's testimony was simply that the hurricane's economic impact on the area was massive.

*Oritz* expressly observed that Rule 23(b)(1)(B) was not intended to apply to cases like this one. 527 U.S. at 843, 119 S. Ct. at 2313; see also, *Telectronic, supra;  In re Complaint of River City Towing Services, Inc.*, 204 F.R.D. 94, 96 (E.D. La. 2001) (Judge Barbier) (In denying class certification, the court noted: "[L]ike the class in *Ortiz,* the instant proposed class has not demonstrated how the distribution of funds can be accomplished on an equitable pro rata basis, *as the suit involves an unknown amount of unliquidated tort damages*.") (Emphasis added).

In *Carnegie v. Mut. Sav. Life  Ins. Co.*, 2002 WL 32989594, *26 (N.D. Ala. Nov. 1, 2002), plaintiff alleged race discrimination and brought claims for civil rights violations, fraudulent inducement, negligent misrepresentation, reformation and sought declaratory and injunctive relief.  The court held:

> There simply is no way for the court to determine, at least at this stage of proceedings, the value of class members' claims, or what the due process limits of a punitive damage award might be.  Accordingly, the court concludes that plaintiff has failed to satisfy the requirements for certification of a punitive damages class under Rule 23(b)(1)(B).

See also, *In re Diet Drugs Products,* 1999 WL 782560, *8 (E.D. Pa. 1999) (in denying limited fund settlement of diet drug claims, the court held "the absence of trial experience fails to

provide a basis to determine the amount of the claims to be measured against the fund to be tendered, which itself is, at this time, incapable of even general ascertainment.")

Here, the proponents of the settlement have taken the unprecedented position that they will try to "figure out" some means of equitable allocation (such as a "levee beautification" project) **after** the class has been certified! In any event, what is clear is that the plaintiffs' counsel do not expect that individual plaintiffs will ever receive a direct payment of any kind as a result of this settlement (Mr. Meunier at page 12, lines 21-25 of the Realtime rough draft transcript):

> …the individual members of the class may not receive checks in the mail
> for a specific amount of money. The benefit delivered to class members in
> a limited fund such as this may come in other ways.

The Joint Applicants have failed to satisfy the initial burden imposed by *Ortiz*. Moreover, at the hearing they demonstrated that there is no way they can do so.

### B.    Louisiana Law Does Not Create a Limited Fund

*Ortiz* further requires that the Joint Applicants compare the aggregate value of plaintiffs' claims, "set definitely at their maximums," to the value of the available fund, "set definitely at [its] maximum[ ]," in order to demonstrate the fund's inadequacy to satisfy all claims.  *Ortiz*, 527 U.S. at 838, 119 S. Ct. at 2311.  At a minimum, "the settling parties must present not only their agreement, but evidence on which the district court may ascertain the limit and the insufficiency of the fund."  *Id.*, 527 U.S. at 849, 119 S. Ct. at 2316.

The only evidence offered in support of the "inadequacy of the fund to pay all the claims" in this case, other than the existence of $21 million of St. Paul insurance and the Levee Board's representation that it intends to contribute nothing at all, was the fact that Louisiana's Constitution and statutes contain anti-seizure provisions.  See, La. Const. Art. 12, §10(C) and La.

10

R.S. 13:5109(B)(2).  Far from creating a limited fund, however, the statute simply provides that the legislature must appropriate funds necessary to satisfy judgments against the state, in order to protect the interests of the state, and that its political subdivisions must appropriate funds to satisfy or settle judgments against themselves. La. R.S. 13:5109(B).  The Levee Board routinely appropriates the money needed to pay such judgments.  See, Exhibits 88-90.

Moreover, the Louisiana Constitution provides that the legislature may appropriate funds to satisfy or settle judgments against both the state and its political subdivisions (La. Const. Art. 12 §10(C).  If the legislature chose to do so, it could simply amend §5109 so as to permit such action.

In *Vogt v. Board of Commissioners of the Orleans Levee District*, 294 F. 3d 684 (5th Cir. 2002), the Orleans Levee Board argued that it was protected from suit by sovereign immunity. The Fifth Circuit rejected the argument observing that, while the Louisiana legislature had no obligation to do so "…the legislature has the authority to appropriate funds to pay a judgment against a levee district…" 294 F. 3d at 693.  And, while the court found the Levee Board's argument "too speculative for Eleventh Amendment analysis," the Levee Board had judicially admitted "…that it could go to the legislature and request that state money be appropriated to pay the judgment." *Id.*

The Fifth Circuit in *Vogt* also noted that,

> "The levee district generates its own revenues from the lakefront airport, a casino, leases of property, fees from boat slips and marinas and taxes, the district also receives income from various investment accounts currently worth $57 million."

294 F. 3d at 684.

As of June 30, 2007, the date of the last financial statement made available to the

Objecting Plaintiffs, the Orleans Levee District had $5,293,685.00 in its restricted fund allocable to the payment of judgments although, its witness, Timothy Doody, was unaware of the restricted fund's existence, but still listed over $24 million in unpaid Bohemia Spillway judgments. Nevertheless, the District's total assets, net of liabilities, were valued at $132,785,082.00. Based on this information, it can hardly be said that the maximum amount that the levee board could contribute to the proposed limited fund settlement is zero. Both Mr. Meunier (opening statement page 20) and Mr. Bruno admitted at the April 2, 2009 hearing that the Levee Boards can an do pay settlements and judgments out of their assets on a regular basis (Bruno testimony, page 177, lines 11-17 Realtime rough draft transcript):

> Q.   What, if anything, did you do to determine whether the Levee Boards themselves could make a contribution to the settlement?
>
> A.   Well, that they could?
>
> Q.   Yes.
>
> A.   I would have to believe they all have charitable hearts. I'm sure that they can…

The Supreme Court in *Ortiz* made clear that objecting class members "are entitled to have the issue [of a fund's sufficiency] settled by specific evidentiary findings independent of the agreement of defendants and conflicted class counsel." 527 U.S. at 853, 119 S.Ct. at 2318. Without an adequate demonstration of the "upper limit" of the fund, "no showing of insufficiency is possible." 527 U.S. at 850, 119 S. Ct. at 2317.

III.   **There is No Intention to Allocate All Available Funds to Compensate the Plaintiffs**

Under the proposed settlement, the escrowed St. Paul insurance proceeds will be used to pay for class notice, to compensate the Escrow Agent, the Court Appointed Disbursing Agent and the Special Master, and to pay tax liabilities. Class Settlement Agreement, section III, ¶¶

12(a)-15.  In addition, Class Counsel "shall have the right to seek an award from the Escrowed Funds for fees, costs and expenses (including any *enhancement* of costs and expenses as may be awarded by the Court)...."  *Id*. at section III, ¶ 16.  (Emphasis added.)  Thus, although Class Counsel have agreed not to ask for attorneys' fees, they have left open the possibility of "an enhancement of costs and expenses," which, according to Joseph Bruno means at least a doubling of the amount of the costs - - in effect, an attorney fee that was not disclosed in the class notice as such and that could be worth millions.

At a minimum, estimated costs could total between $2 and $3 million,[4] which would amount to more than ten (10%) percent of the settlement fund.  When that amount is doubled and then increased by the amounts needed to compensate the administrators identified above, there is likely to be nothing left for the plaintiffs. This is far from what the Supreme Court had in mind when it held in *Ortiz* that "the whole of the inadequate fund [must] be devoted to the overwhelming **claims**."  *Ortiz*, 527 U.S. at 839, 119 S.Ct. at 2311 (Emphasis added); See also*, In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 221 (D. Me. 2003) ("[A] settlement is not fair where all the cash goes to expenses and lawyers, and the members receive only discounts of dubious value.").

Here, the class members will not even receive "dubious value," but rather, pursuant to Section IV, paragraphs 4-6 of the Class Settlement Agreement, they will be obligated to indemnify St. Paul against virtually every eventuality, making the members of the class insurers of the protection provided to St. Paul by this agreement.  Moreover, in paragraph 7, the plaintiffs will release all Katrina-related claims they might have against St. Paul, **including claims arising from St. Paul's coverage of non-settling defendants who could be found liable for the**

---

[4] Objecting Plaintiffs were denied pre-hearing discovery of the amount of these costs.

**plaintiff's damages!**  Thus, by funding the settlement of its levee board insureds, St. Paul would eliminate its entire exposure resulting from the 2005 hurricanes.

It is obvious that the only beneficiaries of this proposed settlement are the proponents themselves.  If this settlement is approved, the plaintiff attorneys will obtain a return of their expenses, with some as yet unspecified "enhancement."  St. Paul will end its potential liability for monumental damages, and will extinguish its defense obligation, estimated by the proponents' expert, Mr. Ligeros, as "far in excess of the limits of the policy."  (Realtime rough draft transcript at page 124, line 1.)  The Court went so far as to take judicial notice of the fact that defense costs would certainly be expected to be far in excess of the actual policy limits. (*Id.,* Page 124, lines 2-3).  Individual claimants, then would likely receive nothing.

## IV.    The Proposed Class Settlement Does Not Treat Class Members Equitably

The proposed settlement creates three subclasses - - Lake Borgne, East Jefferson and Orleans - - based only upon the location of any loss as determined by the particular levee district at issue.  Plaintiffs may belong to more than one subclass.  Other than the distinction between levee districts, the agreement makes no attempt to differentiate the various types of claims involved, *i.e.*, property damage versus wrongful death, for example, or the particular hurricane that caused the damage, *i.e.*, Katrina versus Rita.  The Joint Applicants have not named any separate class representatives to prosecute these divergent claims, nor have they specified a structure for the valuation of claims.

The only provision in the settlement addressing the treatment of claims states that:  "After the Effective Date of Class Settlement and subject to the terms of this Agreement, the Special Master shall provide to the Court a recommended disposition and protocol with regard to the remaining Escrowed Funds, and treatment of Claims of Class members."   Class Settlement

Agreement, section III, ¶ 12(a) ("Distribution of Escrowed Funds").  The treatment of claims under the settlement does not meet Rule 23's requirement that a limited fund class settlement agreement provide "an equitable, pro rata distribution" of all available proceeds to class plaintiffs.  *Ortiz*, 527 U.S. at 841, 119 S.Ct. at 2312.  At this juncture, we still have no idea how plaintiffs' claims will be treated, on what basis they will be evaluated, whether certain claims will be given priority over others, whether expert opinion will be used to make these determinations, or whether, in fact, the claims will be treated equitably.  The hearing shed no light on these questions.

Finally, in the section entitled "II. Definitions and Construction of Terms" (¶53), the proposed settlement lists the types of claims that would be released. This description of claims requires sixteen separate subsections, and encompasses virtually every claim cognizable under Louisiana or federal law - - hundreds of different kinds of claims in all. It is obvious from this definition alone that an "equitable allocation" of settlement proceeds would require a review-of-claims process that would exhaust a settlement fund many times larger than the one here proposed.  The Court need look no further than this itemization of the released claims to determine that this proposed settlement is not viable under the applicable law and cannot be made viable in any semblance of its currently proposed form. The settlement simply fails to meet the requirements of a limited fund under *Ortiz*.

## V.   **Certification for Partial Settlement Only**

Fed. R. Civ. P. Rule 23(e), reads in its entirety:

> A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

According to *Amchem*, "This prescription was designed to function as an additional requirement, not a superseding direction, because the "class action" to which Rule 23(e) refers is one qualified for certification under Rule 23(a) and (b)." 521 U.S. at 621, 117 S. Ct at 2248. "Federal courts, in any case, lack authority to substitute for Rule 23's certification criteria a standard never adopted - - that if a settlement is "fair," then certification is proper." 521 U.S. at 622, 117 S. Ct. at 2249. *Amchem* then made this observation in footnote 17, which is particularly appropriate here.

> We do not inspect and set aside for insufficient evidence District Court findings of fact. [Citation omitted]. Rather, we focus on the requirements of Rule 23, and endeavor to explain **why those requirements cannot be met for a class so enormously diverse and problematic as the one the District Court certified.**

*Id.* (Emphasis added.)

In addition, under *Amchem*, the inquiry appropriate under Rule 23(e) "protect[s] [unnamed] class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise…." 521 U.S. at 623, 117 S. Ct. at 2249. See 7B C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE & PROCEDURE § 1797, at 340-41. This is not to suggest that the class representatives and their counsel are fainthearted; but, in fact, many of these same class members are also asserting claims against the Louisiana Department of Transportation & Development, Jefferson Parish, the Jefferson Parish Drainage District and Aaron Broussard. These plaintiffs allege that, because of the defendants' conduct or *garde,* they were a proximate cause of the failure of the 17th Street Canal Levee.  These claims are being successfully prosecuted[5] in *Bennett, et al. v. East Jefferson Levee District, et al.*, NO. 635-594,

---

[5]  The Trial Court has denied Peremptory Dilatory and Declinatory Exception filed by Orleans Levee District La. Dept. of Transportation and Development, East Jefferson Levee District, Jefferson Parish, The Parish Drainage

24th Judicial District Court, c/w *de la Houssaye v. Parish of Jefferson, et al.*, No. 624-894**,** 24th Judicial District Court.[6]  Furthermore, similar claims are being prosecuted in *Rodriguez, et al. v. New Orleans Sewerage & Water Board*, 2006-9763, and *Diggs Reith v. New Orleans Sewerage & Water Board*, 06-9744, all pending in the Civil District Court for the Parish of Orleans.  These actions assert claims against the Louisiana Department of Transportation and Development ("LDTD"), Jefferson Parish, the City of New Orleans, and the Port of New Orleans, raising additional matters that are not addressed in the proposed Settlement, but are implicated by a Rule 23(e) partial settlement.

For instance, the proponents argue that claims against the state are not released.  But the financial statements of the South Eastern Levee District Authorities (East and West) define them "…as component units of the state."[7] The release of the Joint Applicant defendants, which include such "state component units," could conceivably be raised as a bar to the prosecution of claims against other state component units like LDTD and the Louisiana Department of Administration. The accountability for the fault of one component unit of the state may be inseparable from the fault of another, so that the release of claims against one releases claims against the others.  These issues have not thus far been addressed by the Settlement's proponents.

Similarly, the release of claims based upon the fault of Orleans Levee District in its involvement in the "non-centerline" east side dredging of the 17th Street Canal, two feet below sheet piling, and the failure to monitor the effect of an increase in volume and rate of drainage outflow, could result in the release of claims against LDTD for its complicity in the same cause.

---

District and Aaron Broussard and the City of New Orleans.  Writ Applications have been denied in each case except the one against the City.  The City's writ was not perfected.

[6]   In January 2009, St. Paul Fire removed *Bennett and de la Houssaye* for a second time, but the Court again remanded them on April 1, 2009.  St. Paul has filed a petition to appeal the remand order.
[7] http://app1.lla.state.la.us/PublicReports.nsf

Objecting Plaintiffs contend that these works proximately caused the failure of the 17th Street Canal Levee and that LDTD was so involved that it shares in this fault.  How can we release a component of the state and not release a department of the state like LDTD?  And, how will it be possible to deal with the division of obligations between the state and the levee districts, component units of the state?

What is the Joint Applicants' intention going forward if the Joint Applicant defendants are released?  Despite the posing of this question in the Objecting Plaintiffs' pre-hearing brief, no effort was made to answer it at the hearing.  As noted above, in this proceeding, no claims are asserted against the LDTD, Jefferson Parish, Aaron Broussard, or the Jefferson Drainage District, and none are asserted against the City of New Orleans. Is this because some of the plaintiffs' lawyers supporting this settlement also represent the state, creating a conflict of interest that is nowhere addressed?  If this Settlement is approved, it could conceivably leave as viable claims only the FTCA and Admiralty Act claims against the United States.

Finally, the Objecting Plaintiffs contend that the state delegated its duty of flood protection to the levee districts.  Judge Duval said in connection with two of these cases, *DePass* and *Sims:*

> …[I]t appears that maintenance of the levees involved would be the duty of either the Orleans Levee District and/or the East Jefferson Parish Levee District. …It is primarily the state's duty to protect citizens from damage by flood which is inherent within its police power.  Such power, however, belongs to the state; the police power may be exercised by agencies of the state only under a delegation of authority. …Thus, a levee board is a creature or agency of the state brought into existence for the purpose of discharging the state's duties of flood protection….

Dkt. No. 8,390, *Depass*, pp. 10-11; Dkt. No. 8,387, *Simms*, pp. 9-10.

Is this duty truly delegable?[8]  Does the release of the "creature…of the state brought into existence for the purpose of discharging the state's duties," release the state?  The settlement agreement releases all of the class members' claims against the levee boards and their "parents." (¶ 54, p.17.)  Who or what are the "parents" of the levee boards?  Can they be anything but the state?   And is there any basis for the state's not being responsible for their delicts under the doctrine of *respondeat superior*?  All of these questions, none of which were addressed at the hearing, would make the certification and approval sought by the Joint Applicants highly problematic, even in the absence of the obstacles presented by *Ortiz* and *Amchem*.

The proposed Settlement is functionally similar to the settlement class rejected in *Amchem:* "The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected." 521 U.S. at 627, 117 S. Ct. at 2251.

> [W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups.  The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class.  But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.

*In re Joint Eastern and Southern Dist. Asbestos Litig.*, 982 F.2d 721, 742-43 (2d Cir. 1992), *modified on reh'g sub nom. In re Findley*, 993 F.2d 7 (2d Cir. 1993).  Such consents have neither been achieved nor even proposed in this case.

---

[8] "There are no clearly defined criteria for identifying duties that are nondelegable.  Indeed, whether a particular duty is properly categorized as 'nondelegable' necessarily entails a sui generis inquiry, since the conclusion ultimately rests on policy considerations…. The most often cited formulation is that a duty will be deemed nondelegable when the responsibility is so important to the community that the employer should not be permitted to transfer it to another….This flexible formula recognizes that the privilege to farm out [work] has its limits and that

## VI.   __The Class Notice Was Inadequate and Deceptive__

The Supreme Court in *Ortiz* acknowledged that "traditional limited fund class actions typically provided notice to all claimants and the opportunity for those claimants to establish their claims before the actual distribution took place."  527 U.S. at 841, n.19, 119 S. Ct at 2312.  Moreover, the notice did not provide any means for Class Members to ascertain their possible recoveries under the settlement, because the agreement itself provides no structure or formula for the payment of claims, nor does it estimate the number of claims at issue.  Although the proposed Settlement is dwarfed by the massive amount of potential claims, the Joint Applicants' position, implied in the notice and confirmed at the hearing, was that they will try to come up with a plan later, after the class has been certified.  This omission is significant in that it deprived Class Members of due process notice of how their rights under the law will be protected.

The notice was misleading in representing that "the Court will confirm that this settlement fund represents all insurance money available to the Joint Applicants."  There is no independent evidence of record evaluating the amount of available insurance.  The Joint Applicants' insurance expert, Mr. Ligeros, did not conduct an independent investigation.  The only persons he interviewed or even sought to interview were plaintiffs' counsel, Mr. Bruno, who retained him, and a paralegal in Mr. Bruno's office.

The notice further misled plaintiffs by stating that "the Settlement Class can get no additional money or property in this settlement because the Joint Applicants are governmental bodies."  This is so only because, as noted above, the defendant levee districts have flatly declined to contribute to the settlement without offering any evidence of their inabilities to do so.

---

those limits are best defined by reference to the gravity of the public policies that are implicated." *Faughnan v. Big Apple Car Service*, 828 F. Supp. 155, 165 (E.D.N.Y. 1993) (internal quotation marks omitted).

20

Before such a settlement could be approved, the defendants would be required to establish through their financials the maximum amount they **could** contribute, but, again, they have made no effort to do so.  On the contrary, Messrs. Meunier and Bruno admitted that more money **could** be obtained from the levee boards.

Moreover, as also noted above, the Louisiana Legislature may appropriate funds to satisfy or settle plaintiffs' judgments against these bodies.  Further, the notice was misleading in its failure to disclose the breadth of the indemnity obligations and releases imposed by paragraphs 4 through 7 of Section IV of the proposed Settlement Agreement, discussed above.

Finally, the class notice was misleading in representing that no attorney fees would be paid from the Settlement fund.  Mr. Bruno has clearly maintained that such fees could be paid in the form of "enhancements" of the costs being sought by counsel.

## VII.   The Requirements of Rule 23(a) Have Not Been Met

In order to achieve certification of a limited fund class, the Joint Applicants must also meet the requirements of Fed.R.Civ.P. 23(a).  In this case, they have simply asserted without any evidence that each element of the Rule is satisfied and, using circular reasoning, that the fairness of the settlement is "an overarching common question of law and fact."  *See* J.A. Memo in Support of Certification at 6.  This presentation is insufficient to warrant class certification.  *See Amchem*, 521 U.S. at 622, 117 S.Ct. at 2249  ("Federal courts...lack authority to substitute for Rule 23's certification criteria a standard never adopted - - that if a settlement is "fair," then certification is proper.").

The Supreme Court pointed out in *Amchem* that "[t]he standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind - - class certifications dependent upon the court's gestalt judgment or overarching impression of the

settlement's fairness." 521 U.S. at 621, 117 S.Ct. at 2248. For instance, the Applicants here provide no explanation as to how each Class Representative is typical of other Class Members.

Moreover, they have not shown, and they cannot in these circumstances show, that the named representatives are adequate to pursue the myriad of claims in this case.  The claims here are not uniform: they range from property damage claims to wrongful death, medical monitoring, punitive damages, loss of income, loss of consortium, restoration and the like.  No single person in Orleans Parish, for example, can adequately represent all of the plaintiffs in that levee district having claims arising from Hurricanes Katrina and Rita. And none of the representatives is from the geographical area most heavily impacted by Hurricane Rita.

In sum, the Joint Applicants "ignore[ ] the fact that Rule 23 requires protections under subdivisions (a) and (b) against inequity and potential inequity at the precertification stage, quite independently of the required determination at post-certification fairness review under subdivision (e) that any settlement is fair in an overriding sense." *Ortiz*, 527 U.S. at 858, 119 S. Ct. at 2320.

## VIII.   Conclusion

This proposed settlement presents the exact situation prohibited by the United States Supreme Court in *Ortiz* and *Amchem*:  a settlement that benefits plaintiffs' counsel and the settling defendants alone. If this settlement is approved, the Plaintiffs' Committee will receive reimbursement for expenses advanced with some, as yet unspecified, multiple or "enhancement." The defendant insurer, St. Paul will enjoy a release from the payment of defense costs that would otherwise reach many multiples of the policy limits, and it will be released from all claims against all of its insureds arising from both hurricanes, even if a class member has sued such an insured.  As a final insult, the plaintiffs' committee and St. Paul would require that the class

members, who receive nothing, indemnify St. Paul; the victims would become the insurer's insurer.

The levee boards will receive a dismissal without expenditure of a single penny of their own considerable assets.  But individual plaintiffs, according to testimony, could receive nothing at all, as acknowledged by the Court.

For all of the foregoing reasons, the Joint Motion to certify a mandatory, non-opt-out limited fund class action and to grant final approval of the proposed class settlement must be denied.

<div style="margin-left: 40%">

Respectfully submitted,

/s/ James K. Irvin
James K. Irvin (#7166)
MILLING BENSON WOODWARD L.L.P
909 Poydras Street, Suite 2300
New Orleans, LA  70112-1010
Telephone:  (504) 569-7000
Facsimile:    (504) 569-7001
jirvin@millinglaw.com

</div>

Of Counsel
John J. Cummings, III (#4652)
Cummings & Cummings
416 Gravier Street
New Orleans, LA  70130
Telephone: (504) 586-0000
Facsimile:  (504) 522-8423

## Certificate of Service

I hereby certify that on the 11th day of May, 2009, I electronically filed a Post-Hearing Brief of Certain Objecting Plaintiffs in Opposition to Class Certification and Settlement with the Clerk of Court by using CM/ECF system which will send a notice of electronic filing to all known counsel of record in this matter and caused copies to be hand-delivered to the Clerk of Court and counsel as directed by the Court's notice.

<div style="margin-left: 50%">

/s/ James K. Irvin

</div>

MBW/JCC 382907