## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

IN RE KATRINA CANAL BREACHES          CIVIL ACTION
CONSOLIDATED LITIGATION

         NO. 05-4182

PERTAINS TO:                  SECTION "K"(2)
    MRGO

### ORDER AND REASONS

      Before the Court is a Motion for Summary Judgment filed by Washington Group

International, Inc. ("WGI") (Doc. No. 15861). WGI seeks dismissal of the claims brought

against it for the flooding caused during Hurricane Katrina as the result of the failure of the

floodwall at the east bank of the Inner Harbor Navigation Canal ("IHNC"), which is also referred

to as the Industrial Canal. The allegations are based on WGI's performance of a contract with

the United States Army Corps of Engineers ("the Corps") to remediate an area adjacent to the

Industrial Canal. Plaintiffs contend that the floodwall failures that occurred at two specific sites

were caused by WGI's failure to fulfill its state law duty of due care when it excavated and

backfilled these two locations. Nonetheless, WGI maintains that it is entitled to immunity from

suit under the federal government contractor defense. Based on an extensive review of the

pleadings, memoranda, exhibits, depositions and the relevant law, the Court finds that the motion

must be granted.

**Background**

      As this Court noted in its previous decision concerning the claims against WGI found in

*In re Katrina Canal Breaches Consolidated Litigation,* Civ. A. No. 05-4182, 2007 WL 4219351



EXHIBIT
2

(E.D.La. Nov. 27, 2007), the MRGO Master Consolidated Class Action Complaint (Doc. 3415)

incorporates in one document all the pending allegations against all of the defendants for harm

caused by the MRGO in these consolidated proceedings. In essence, plaintiffs contend that even

though Hurricane Katrina's winds barely reached 100 miles per hour and did not register as a

Category 3 hurricane on the Saffir-Simpson scale:

> through the fault and negligence of defendants, a tidal surge rushed from the Gulf
> through the MR-GO and collided at the nexus of the Gulf Intra-Coastal Waterway
> ("GIWW) and MR-GO with another storm surge from Lake Borgne which
> combined to flood New Orleans East, the Lower Ninth Ward and St. Bernard
> Parish by overwhelming levees/floodwalls and/or spoil banks that had been
> negligently designed, constructed, maintained, undermined, weakened and/or
> operated by the Defendants.

(Master Complaint, Introduction, p.2). Included as one of the numerous named defendants is

WGI.

Specifically, plaintiffs contend that the United States Army Corps of Engineers ("the

Corps") contracted with WGI to clear abandoned industrial facilities and debris from the East

Bank Industrial Area ("EBIA") in order for the Corps to replace a lock on the Industrial Canal.

The EBIA is a 32-acre site located between Florida Avenue and Claiborne Avenue extending

from the Industrial Canal to the floodwall at the Lower Ninth Ward. The EBIA was littered with

assorted structures, contaminants, and debris that the Corps needed to remove before dredging a

bypass channel.

Plaintiffs allege that the two levee/floodwall failures on the east side of the IHNC

occurred near the south end, Saucer Marine site, and at the north end, Boland Marine site. The

Saucer Marine site contained a sewer lift station, and the Boland site contained a concrete block

that is referred to as the "wedding cake" structure. Plaintiffs contend that depth of the floodwall

at the Industrial Canal extended only to -8 feet; however, the excavation required to remove the sewer lift was to the depth of -20 feet, and the excavation to remove the wedding cake structure was to the depth of -25 feet (Def. Ex. 17, Dep. of Guillory I at 160-161). Plaintiffs' theory is that because WGI failed to use its geotechnical expertise to evaluate the potential for under-seepage caused by the excavation and subsequent back filling of these holes, the integrity of the flood wall during high water conditions was compromised causing the two breaches at issue herein. Plaintiffs maintain that the deep excavation required to remove these two structures "altered the flow of sub-surface ground water, opened portals to sub-surface permeable layers, and allowed the unabated under-seepage through permeable soils below the flood wall during Hurricane Katrina when the EBIA was covered with high water." This under-seepage allegedly caused the failures of the floodwalls at these two locations. (Doc. 16216-2, MRGO PSLC's Statement of Disputed Facts, No.28). Plaintiffs maintain that because WGI and the Corps improperly backfilled these two excavations, the floodwall at the Lower Ninth Ward was compromised. Thus, these two sites are the focus of plaintiffs' claims against WGI.

### WGI, the TERC, and Task Order 26

In August 1994, WGI (formerly, Morrison Knudsen Corporation or "M-K") and the Corps' Tulsa District entered into an Indefinite Delivery-Indefinite Quantity Contract for the remediation of various Hazardous, Toxic, and Radioactive Waste ("HTRW") sites in the southwest region. (Def. Ex. 15, Total Envt'l Restoration Contract, Aug. 17, 1994, at 1-109; Def. Ex. 16, Excerpts from Deposition of Anne Veigel). This "umbrella" contract, also known as a Total Environmental Restoration Contract ("TERC"), provided the general requirements for all

of WGI's anticipated work on HTRW sites in the region with the understanding that the Corps would prepare a specific Statement of Work ("SOW") for each individual Task Order it later issued. The Corps utilized the WGI TERC contract that was based in the Corps' Tulsa District to accomplish the EBIA clean-up.

Under the general provisions of the relevant TERC, Section 4 pertaining to contractor personnel and qualifications, provides, "The requirements for on-site and off-site personnel will differ for each project and shall be specifically identified in individual Delivery [or Task] Orders." (Def. Ex. 15, TERC at 15). Thus, with respect to the overarching umbrella contract, it is clear that there was no specific requirement for geotechnical engineers to be provided by WGI.

John Grieshaber of the Corps testified concerning geotechnical support. He defined geotechnical engineering as "the study of soils and their response to loading, and it is an area of engineering that addresses how loads are transferred into soils, how they're carried by soils." (Plaintiffs' Ex. 7, Dep. of Grieshaber at 25). He further testified that in the context of a project like Task Order 26, a Corps employee from the construction division would oversee the contract. If that person would identify a geotechnical engineering concern, the concern would be addressed by the "geotech" branch of the engineering section of the Corps. (Plaintiffs' Ex. 7, Dep. of Grieshaber at 28-29).[1]

---

[1] An example under Task Order 26 where the Corps performed its own geotechnical review occurred in the context of the creation and expansion of the McDonough Marine Site "borrow pit." This pit provided most of the material used to backfill excavations undertaken at the EBIA. When it was found that the pit needed to be larger than first planned, the Corps undertook a review concerning the impact of the pit on the structural integrity of the adjacent levee/floodwall. The Corps' Mr. Guillory testified:

> We had two ways we could have gone with it we could have asked [WGI] to evaluate the structural stability of it and submit that to the Corps for final review and approval, or we could just do [the analysis] in-house. And for expediency, and being that Corps had the final say-so in the structural stability analysis, . . . myself and the HTRW team tasked [WGI] to provide us with accurate cross-

4

On July 12, 1999, the Corps formally tasked WGI with preparing to demolish the existing

structures in the EBIA, removing surface and subsurface obstructions, characterizing the

contaminants on the site and ultimately remediating the site in accordance with the Louisiana

Department of Environmental Quality's ("LDEQ") and the new Risk Evaluation and Corrective

Action Program ("RECAP") standards. (Def. Ex. 24, Technical Completion Rep., Aug. 2005, at

13-14). This task, considered part of the larger IHNC Lock Replacement Project, became known

as "Task Order 26" of the TERC.  WGI was to perform Task Order 26 in accordance with the

project's first SOW, dated June 1, 1999, which was drafted by the Corps' Construction Manager

and Contracting Officer Representative Lee A. Guillory, P.E.(Def. Ex. 25, SOW at 3-7;  Def. Ex.

6, Dep. of Guillory, Vol. II at 45-46).

As the starting point for the work WGI was to perform, the SOW provided:

1.    <u>General</u>.  The Contractor shall furnish all services, materials, supplies,
      labor, and travel , as required, in connection with the coordination and
      technical review of site documents for the remediation and demolition of
      the east bank of the Inner Harbor Navigation Canal (IHNC) between
      Claiborne and Florida Avenues, from the IHNC east to the floodwall.

(Doc. 25 SOW at 3.)  The SOW further supplied a short site history, project requirements,

provision for project changes, a six month project schedule for the technical review of site

documents and the recommendation report, and a list of the government-furnished information

concerning the site which documents were to be technically reviewed and used in the preparation

of the recommendation report.  In particular, with respect to the project requirements, it stated:

---

sections and surveys of the area, and from that I specifically requested, by
memo, to our geotechnical engineering branch in engineering division to
perform that analysis.

Def. Ex. 6, Guillory II at 153.

3.   <u>Project requirements</u>.  The Contractor shall furnish all engineering
services, materials, supplies, labor, as required in connection with the
technical review of site documents, attendance at site meetings and travel
necessary for the period of approximately 21 June 99 through 30 Sep 99
associated with the demolition and remediation of the east bank of the
Inner Harbor navigation Canal (IHNC).  **In addition to reviewing the site
documents the Contractor shall prepare a comprehensive report
recommending the scope and duration of the remediation and
demolition that will be required, including any data gaps that may
need to [be] filled by sampling or other investigations.**

(Doc. 25, SOW at 3-4) (emphasis added). Thus, it became WGI's task to create a plan for

remediation of the EBIA based on the technical review of site documents and site meetings.

However, the confection of such a plan, or the Final Recommendation Report (Def. Ex. 44), was

not a unilateral activity on the part of WGI; it required review and comments from the Corps by

certain individuals.

**People, Roles and Responsibility of Corps and WGI Personnel on Task 26**

**The Corps–Guillory and Montegut**

Two primary individuals have been identified as being responsible for the Corps' actions

on Task Order 26–Lee Guillory and James Montegut.  Lee Guillory, a professional engineer in

the Construction Division of the Corps in New Orleans and a Functional Team Leader ("FTL")

for the Lock Replacement Project, became the Contracting Officer Representative ("COR") for

Task Order 26 in August 1999.  He served as both COR and Construction Manager, and was

"instrumental in the planning, direction, coordination, execution and construction management"

of Task Order 26. ( Doc. 15861-3, WGI Statement of Undisputed Facts 35 and 36). [2]  As COR,

the Corps designated Mr. Guillory to perform the following functions on Task Order 26:

> (1)     verify that WGI performed the technical requirements of the project in accordance
>         with the contract terms and specifications;
>
> (2)     conduct inspections of the work site throughout the project to assess WGI's
>         performance;
>
> (3)     maintain liaison and direct communications with WGI; and
>
> (4)     where work deficiencies or other problems were observed, record and report the
>         incidents to the Contracting Officer, notify WGI of the deficiencies, and direct
>         appropriate action to effect correction.

(WGI Undisputed Fact 38).  Mr. Guillory testified that he visited the job site approximately one

to three times per week, met with his on-site Quality Assurance staff, met with WGI, and had

team meetings to discuss the progress and performance on the project, and discussed any

particular problems or issues that arose during that week.  He sought to ascertain what the

Government needed to do to help WGI resolve any issue that arose, take their recommendations

into consideration, and work them out to the best of the Government's ability.  (Def. Ex. 6,

Guillory II at 28-29).

    James Montegut, a Project Engineer in the Construction Division of the New Orleans

District, was first assigned to Task Order 26 when the site mobilization began in early 2001.

(WGI Undisputed Fact No. 39).   Mr. Guillory testified in his deposition that Mr. Montegut was

---

[2]  The Court would note that those Statements of Undisputed Fact filed by WGI, which the Court has
incorporated, are indeed such.  *See* Response of the MRGO PSLC to the Statement of Undisputed Material Facts.
(Doc. 16216-3). However, plaintiffs in some instances have responded that certain "facts" are "controverted" and
cited the Court generally to its Opposition to Motion for Summary Judgment.  In addition, plaintiffs filed MRGO
PSLC's Statement of Disputed Facts.  (Doc. 16216-2). These objections are broad-brushed and provide the Court
with little or direction as to specific testimony that would create a question of fact as to the testimony in question.
Nonetheless, where plaintiffs have contended that such a fact is "disputed", the Court has relied and cited to direct
deposition testimony of the appropriate individual for the "fact" so stated.

the on-site Contracting Officer Representative for Task Order 26, (Def. Ex. 6, Guillory II at 29),

and Mr. Montegut himself testified that he was the Project Engineer to whom quality assurance

inspectors reported. (Def. Ex. 23, Montegut at 42).  Thus, Montegut was responsible for

overseeing WGI's performance and ensuring WGI worked in an efficient and cost-effective

manner.   ( Def. Ex. 23, Montegut at 30).    In addition to reviewing and approving WGI's

proposed expenses on Task Order 26, (Def. Ex. 23, Montegut at 68), he managed the Corps' on-

site Quality Assurance Representatives ("QA Representatives" or "QA Inspectors"), met daily

with WGI's on site personnel, approved plans for various features of work, and monitored the

physical progress of work on a day-to-day basis. (Def. Ex. 23, Montegut at 42-45).  If Mr.

Montegut encountered a situation on-site that required additional assistance from the Corps, or if

he determined a work plan warranted further engineering review or input before he could

approve it, he consulted with Mr. Guillory. (Def. Ex. 23, Montegut at 32-33; 62-63).


### WGI Employees on Task Order 26–Roe and O'Conner

Steven Roe was WGI's Program Manager for the overall TERC from mid-1997 until

May 2001. (WGI Undisputed Fact 47).  He drafted and negotiated WGI's initial proposal on

Task Order 26 and was responsible for "provid[ing] overall program leadership and direction"

from WGI's Denver Office. (WGI Undisputed Fact 48).

Dennis O'Conner was WGI's Project Manager from Task Order 26's inception in 1999 to

June 7, 2004.   He had an undergraduate degree in geology and geography, but he was not an

engineer. (WGI Undisputed Fact 49).   Mr. O'Conner was responsible for all performance

aspects of the project and [was] the point of contact for the Corps on-site supervision.   He also

8

was accountable for project cost, schedule, safety and overall quality and technical management. (WGI Undisputed Fact 50).

Finally, Phillip Staggs was WGI's on-site Construction Manager from July 2000 to March 2005. (WGI Undisputed Fact 51). Mr. Staggs testified that he was an experienced construction worker but not an engineer. (Def. Ex. 36, Dep. of Staggs at 13-26). Under the terms of the Project Work Plan for the EBIA a Construction Manager was responsible for all demolition, remediation and site restoration activities. The duties also included reviewing daily subcontractor reports and coordinating field activities with the Corps. (Def. Ex. 4, Project Work Plan at 19).

With that brief overview of the major actors in the execution of Task Order 26, the Court will now explain the process by which Task Order 26 was accomplished focusing on the activities at issue at the Saucer and Boland Marine sites.

**Task Order 26**

**Progression of the Job**

As previously noted, the Corps sent a Statement of Work ("SOW") to WGI with a Request for Proposal ("RFP") asking WGI to provide an estimated cost for the work identified in the SOW. Mr. Guillory testified that as to the previously mentioned "project requirements" at Paragraph 3 of the SOW, the Corps did not request WGI to provide any engineering services relative to the levees and floodwalls in the EBIA. He stated that the engineering services required were for the 32 acres of the EBIA and not the levees and floodwall because the Jourdan

Avenue levee and floodwall served mainly as a perimeter of the 32-acre site. The project did not

include any physical work on those flood control works. (Def. Ex. 6, Guillory II at 46-47).

In addition, in paragraph 3 of the SOW, the need to fill certain "data gaps" by sampling

or other investigations is mentioned. Mr. Guillory explained this requirement as follows:

> The Corps did an extensive amount of preliminary site investigations . . . and so
> we knew what we had at the beginning of the project, but we also knew that there
> were some gaps in the data, there were some unknowns that we did not know
> about the project that we needed Washington Group to do, and that would include
> an extensive grid sampling analysis of the project, geophysical surveys to find
> any unknown debris and gaps and holes and contaminated waste in drums
> underground. We also did a subsurface trenching program on a grid system to
> find any underground storage tanks, unknown pipelines, utilities, foundations,
> slabs, anything like that.

(Def. Ex. 6, Guillory II at 47-49). He also opined that the Corps and WGI met on a continual

basis to brainstorm together and identify all the different gaps as needed. Clearly, the focus of

Task Order 26 was to remediate an area replete with debris and toxic waste.

In response to the RFP, WGI drafted and submitted a proposal. (Def. Ex. 22, Roe at 86-

87). Mr. Guillory and his staff at the Corps then conducted an independent analysis of the

proposal, known as a "Technical Analysis," to determine whether WGI's proposal was

reasonable.(Def. Ex. 6, Guillory II at 45). The Corps negotiated or commented on WGI's

proposal, verbally or in writing, and WGI submitted a revised proposal. (Def. Ex. 22, Roe at

102-103). The Final Recommendation Report was accepted by Mr. Guillory on behalf of the

Corps on January 19, 2000. (Def. Ex. 44, Final Recommendation Report).

With respect to the "data gaps" mentioned, a review of the testimony makes clear that the

"gaps" contemplated had to do solely with what action was needed to remediate fully the site.

Indeed, Appendix D at page 91 of the Final Recommendation Report contains nine Data Gap

Tasks that outline activities to be undertaken to comply with Louisiana Department of

Environmental Quality ("LDEQ") concerns. (Def. Ex. 44, Final Recommendation Report at 91-

102). Also outlined in Appendix E of the Final Recommendation Report are the SOW Data

Gaps. These eight gaps concern physical removal of materials where the exact nature of the task

was not known, because the information could not be ascertained until the activity commences.

For instance, SOW Data Gap–2, concerned building/structure demolition (Def. Ex. 44, Final

Recommendation Report at 106). A general description of the work, requirements, and duration

is provided; however, the Task Data Gaps are noted as follows:

> The actual thickness of concrete foundations is not known.
>
> There is a potential for substructure material to be beyond "normal" depths. There is a possibility that the concrete filled salvage barges were used as fill and foundation. Barges used as foundation may be stacked one upon another. The methodology used to fill these barges is not know. Barge excavation may uncover contamination.
>
> The amount of structural support, the depth and condition of supports is not known.
>
> These data gaps can result in changing conditions (i.e. there may be fewer support pilings than estimated) that will be reflected in a need to adjust the level of effort and the associated scheduling.

(Def. Ex. 44, Final Recommendation Report at 106). The description of these "gaps" highlight

the nature of the "contract" between the Corps and WGI. This information demonstrates that

change orders or modifications to Task Order 26 would be required. Thus, there is no one

document which constitutes "the contract"; it was an ongoing process between the Corps and

WGI.

The next phase which continued through October 2000 was the development of eight

major work plans as set forth in the Final Recommendation Report of January 19, 2000 at 5.1.2.

11

(Def. Ex. 6, Guillory II at 49). These plans were prepared with significant give and take between the two parties (WGI Uncontested Fact No. 63) and set out the broad parameters as well as the details and "best practices" to occur in the performance of Task Order 26. As the project continued, modifications were made to Task Order 26. For example, Modification No. 2601 was made on November 23, 1999 to allow for an arsenic background investigation of the area, and Modification 2602 was made on May 15, 2000 modifying the quantity and depths of borings. (Def. Ex. 48, ¶ 2 at 1-2).

The most salient of the eight major work plans is the Project Work Plan which was finally approved on November 16, 2000. (Def. Ex. 47, Comments on Washington Group International, Inc.'s Transmittal #26-027 Final Project Work Plan (PWP) and Def. Ex. 4, Project Work Plan, October 2000, at 2). This document defines the overall scope of the project to remediate the EBIA which consisted of the demolition and removal of structures, surface and subsurface obstructions, characterization of contaminants present at the site and remediation of the site in accordance with LDEQ RECAP Standards.[3] The PWP also contains six site descriptions with each site being named for its previous occupant. With respect to the soil and subsurface issues, the PWP provides that "all soil remediation and associated excavations were confined to 'the area 15 feet west of the floodwall.'" (Def. Exh. 4, PWP, at 55). Thus, no moving equipment or heavy equipment was placed within 15 feet of the floodwall face, which coincided with the curb side of Surekote Road. Mr. Guillory testified that this work zone was

---

[3] Plaintiffs have alleged that in a RECAP Submittal Report WGI provided information that the floodwall to the east of the site reached a depth of at least -25 feet and that this crucially defective report mislead the Corps's EBIA project team about the depth of the sheet pile at the adjacent flood wall, inferring some causative connection. However, Guillory testified that the Corps did not base any of the Corps determinations or approvals of the excavations based on this statement. (Def. Ex. 6, Guillory II at 185). As such, this mistake is of no consequence since it did not form the basis for any action taken with respect to the two sites at issue.

established to avoid the possibility of the equipment impacting the floodwall. (Def. Ex. 17, Guillory I at 159-160; Def. Ex. 6, Guillory II at 82-82).

Another of the eight major work plans was the Contractor Quality Control Plan ("CQCP") which set forth the procedures to insure quality control of the work to be done with respect to Task Order 26. Under the CQCP, there was a 3 phase quality control procedure to insure these projects were completed properly. These procedures required both Corps and WGI participation in the preparatory phase, the initial phase and the follow-up phase. There were Corps Quality Assurance inspectors reporting their observations to Messrs. Guillory and Montegut in a daily report. (WGI Undisputed Fact No. 87).

Eighty to ninety percent of the project was sub-contracted out. Such work included pulling pilings and building cofferdams. Where subcontractors were involved, WGI prepared the plans by which a subcontractor would bid a job; the Corps would review those plans. (Def. Ex. 17, Guillory I at 144; Def. Ex. 36, Staggs at 38-39). In fact the two excavations for the sewer lift and the wedding cake structure required the building of cofferdams which projects were contracted out to Hamp's Construction, L.L.C ("Hamp's") and other sub-contractors. The Court will now examine those two projects.

**Saucer Marine--Sewer Lift Station**

Based on investigations conducted at the EBIA prior to Task Order 26, the Corps knew that subsurface structures, including an abandoned sewer lift station, would have to be excavated and removed. (WGI Undisputed Fact No. 110). The lift station was a large diameter pipe with pumps, valves and a ladder encased in a metal pipe. Because it had been exposed to the brackish

water in the Industrial Canal, it was substantially deteriorated. (WGI Undisputed Fact 111). It

was located at the corner of the Saucer Marine site approximated 30 to 100 feet from the

floodwall. (WGI Undisputed Fact 112). WGI's subcontractor, Hamp's, submitted its initial

proposal for removing the lift station as part of its February 2001 demolition and piling removal

plan. (WGI Undisputed Fact 113). Initially, it was anticipated that a non-vibratory slide rail

shoring system would be designed and installed around the lift station measuring 24 feet by 32

feet to a depth of approximately 24 feet. (Def. Ex. No. 63 at 25). By September 2001, before

work on the lift station commenced, this approach had to be changed based on the status of the

soil around the station. (WGI Undisputed Fact No. 114 and Def. Ex. 75, Lift Station Removal

Plan, September 28, 2001 at 4). The proposal penned by Hamp's encompasses a cofferdam.

The proposal states:

> After reviewing the soil borings with our engineers and performing exploratory
> excavations around the lift station, we discovered that the sub grade and the soil
> conditions surrounding the lift station are weak and therefore not ideal for the
> slide rail type shoring system initially proposed. Furthermore, the sub grade is
> wet and consists primarily of sandy-silt type soils, which are not conducive when
> using the slide rail type shoring system. As a result of the aforementioned, we are
> proposing to install a shoring system suited for the sub grade conditions
> surrounding the lift station. We are proposing to install a cofferdam type shoring
> system that will be designed and stamped by a Professional Engineer licensed in
> the State of Louisiana. The cofferdam will consist of using a LS-418-110 ton
> crawler crane equipped with hydraulic vibratory pile driver to install 60-foot z-
> type interlocking steel sheets. In addition, 24" steel I-beam type walers(s) will be
> installed around the perimeter of the cofferdam.

(*Id.*). The proposal notes:

> The excavation created to remove the lift station, wet well, and associated support
> structures will be back filled with previously excavated material. Due to the
> depth of the excavation, Hamp's will tamp the back filled material with the
> bucket of the hydraulic excavator in an effort to compact the backfill material.
> During the course of the backfill operations, previously installed waler(s) will be

14

removed.  Additional fill material necessary to complete backfill operations will
be provided by WGI.  Once the excavation is backfilled to grade, the z-sheetpiles
will be extracted using the LS-418-11- ton crawler crane equipped with a
hydraulic vibratory extractor.

(Def. Ex. 75, LIFT Station Removal Plan, September 28, 2001 at 5).

In compliance with the aforementioned Contractor Quality Control Plan ("CQCP"),

Preparatory Meeting was held with the Corps on October 3, 2001.   (Def. Ex. 76, IHNC Project

Preparatory Phase Meeting Minutes).  The minutes note that the subcontractor[4] was to give WGI

a date when fill material would be needed for back fill,  and a WGI representative reminded the

contractor "that backfill should be completed in 2-3' lifts with bucket compaction.  If soil is dry

water may need to be used to obtain a firm compaction."  (Def. Ex. 76, IHNC Project

Preparatory Phase Meeting Minutes at 4).  The Corps "inquired about submittal of response to

comments from meeting held on Monday, October 1, 2001.  A bullet list was submitted at the

meeting and [the Contractor] stated that the drawings and calculations would be submitted by

Friday, October 4, 2001."  The Corps also noted that "measurements of the sheetpilings should

be re-evaluation (sic) to ensure they will cover entire area.  Sheetpile specs and cofferdam

drawings indicate that 46 or more pilings may be needed."  (Def. Ex. 76, IHNC Project

Preparatory Phase Meeting Minutes at 4). The Corps reviewed, critiqued and commented on the

plan at least two more times before finally approving it on October 19, 2001. (Def. Ex. 77,

Disapproval dated October 11, 2001 signed by Mr. Montegut and Def. Ex. 78, Disapproval dated

October 15, 2001 signed by Mr. Montegut).   For example, the Corps Transmittal Form, Revised

Lift Station Removal Plan, Oct. 10, 2001,  states:

---

[4]  A company called Envirocon subcontracted to perform the job.

The revised Lift Station Removal plan is returned with Code "E" Disapproved, re-submission required.  You must address the following comments, revise, resubmit and obtain approval prior to commencement of this activity.

1)      DRAWINGS: The revised drawings have been amended to include sheet pile tip elevations, however the vertical datum is not clear.  Indicate the vertical reference datum for the elevations and state that elevations/grades will be based on this point.

(WGI Demonstrative Evidence, Hearing on Motion for Summary Judgment on November 13,

2008, Def. Ex. 77 NCS-022-000000357-58, at 18).

On October 19, 2001, the Lift Station Removal Plan (Revised) October 19, 2001 was

approved. (Def. Ex. 64).   The plan states:

The excavation created to remove the lift station, wet well, and associated support structures will be back filled with previously excavated material.  Due to the depth of the excavation, Hamp's will tamp the back filled material with the bucket of the hydraulic excavator in an effort to compact the back fill material. During the course of backfill operations, previously installed waler(s) will be removed.  Additional fill material necessary to complete backfill operations will be provided by WGI.  Once the excavation is backfilled to grade, the z-sheet piles will be extracted using the LS-418-110 ton crawler crane equipped with a hydraulic vibratory extractor.

(Def. Ex. 64, Lift Station Removal Plan (Revised , October 19, 2001) at 4).  The plan includes

many details with respect to the sequence needed to complete the cofferdam, and the elevation of

the excavation (-19.75).

Indeed, the specific method of tamping down the backfill which was mentioned at the

preliminary meeting by a WGI representative, was included.  "Backfill excavation with

previously excavated soil in 2' lifts."   It further notes "the initial backfill operation will be to the

bottom of the walers inside the cofferdam" and "complete backfilling to top of sheet piles with

material to be provided by WGI after walers are removed." (Def. Ex. 64, Lift Station Removal

Plan (Revised , October 19, 2001) at 7).

16

In the course of Mr. Guillory's deposition, he testified that the Corps was not concerned the lift station excavation was going to damage the flood control structures because of the location, proximity, and the rigidity of the design, the depth of the design, and the bracing and the waler system. "I felt confident that that was not going to adversely affect any of the adjacent soil or site." (Def. Ex. 17, Guillory I at 170). In later testimony, he reaffirmed this position noting that a cofferdam system "does not allow soil movement to occur that would adversely affect a flood control structure. And this cofferdam . . . [was] designed by a professional licensed engineer in the state of Louisiana and installed by professional contractors with full quality control and quality assurance during the entire process." (Def. Ex. 6, Guillory II at 138).

Mr. Montegut of the Corps testified as well with respect to plaintiffs' concerns about under-seepage and the backfill material used. He stated:

> I tend to approach things from a practical nature. Thirty-five years of experience have kind of taught me that that's the best way to go most of the time.
> And if you stop to think about this for a minute, as far as the backfill I'm talking about, what my thought process was is that a Proctor[5] is good, you know, it proves something, it shows that compaction was achieved. But I didn't need a Proctor, I had other things in my favor here that didn't make it necessary to spend our taxpayers' money on a Proctor. Because chances are if I would have gotten a Proctor, you guys would be here asking me why I didn't take two Proctors or three Proctors. What I had in my—you know, I guess the luxury that I had was two things; I had the luxury of time on my side because this job was—I believe you said it was in '01 or '02 at this time. . . .
> We were still going to be on site for another two or three years. Washington wasn't going anywhere. I had them under contract, under a cost

---

[5] Plaintiffs have cited specific regulations employed in Kansas City by the Corps which apparently have no match in the New Orleans District for the proposition that WGI did not properly backfill the two excavation sites at issue herein. In the Guidance for Work document presented at oral argument, it states that for backfill which occurs within 300 feet of a floodwall, impervious materials were to be used and placed in lifts not to exceed 8 inches and compacted to a minimum 95 percent Standard Proctor Density. (Plaintiffs' Power Pt. , 11/13/08 at p 27). As these requirements are not Corps requirements in New Orleans, there is no imposition on WGI to comply with them.

reimbursable contract. And if we had a problem with any of these back fill operations it would have been nothing–that's a poor choice of words–it would have been quite simple for me to direct them, as contracting officer's representative, to correct deficient work and to go in and to do whatever it took, probably just add fill material. And it would have been very easy to notice if there was a problem because material, over time, it will achieve a certain amount of compaction on its own. Rain and just elements, natural vibrations, would cause the material to settle and compact on its own. Had it–if it were not compacted properly, the area that was excavated would have subsided and there would have been a depression or a hole in the ground at that site. It would have been very simple to notice that and to direct Washington to go back and fix it.

(Def. Ex. 23, Montegut at 73-74).

The Corps conducted phase inspections and quality assurance inspections. On October 30, 2001, the Initial Phase Inspection Form was prepared by WGI and shows that the Corps's Quality Assurance inspector Alvin Clouatre was present, again in line with the CQCP. It was noted that "All work is in compliance with the Revised Lift Station Removal plan submitted on 10/19/01." (Def. Ex. 79, IHNC Project Initial Phase Inspection Checklist Form, at 1; Def. Ex. 6, Guillory II at 136). Also presented is Inspectors Quality Assurance Reports (QAR) Daily Log of Construction–Civil prepared by Alvin Clouatre. In QAR # 220, he reported:

FOLLOW-UP–LIFT STATION REMOVAL: Observed sub's crane complete pulling 210LF wood pilings with vibratory hammer from inside sheet pile cofferdam, excavator backfilling cofferdam to bottom of walers. . . . . Visually assured all debris and pilings have been removed from inside cofferdam and excavator began backfilling with spoil in approx. 2' lifts and compacting to bottom of walers. . . No deficiencies observed.

(Def. Ex. 70, QAR # 220, November 6, 2001 at 2). On November 7, 2001, Mr. Clouatre observed "excavator excavating sand backfill material from around subsurface concrete at Boland Marine for removal of concrete." He also noted:

FOLLOW-UP–BORROW PIT: Observed sub's excavator excavating clay from borrow pit at McDonough Marine, and Dinvaut dump truck hauling to Boland Marine for ACM excavation backfill. Excavator loading dump truck with sand

pile at ITT and truck stockpiling outside lift station cofferdam for backfill. No deficiencies observed.[6]

(Def. Ex. 80, QAR # 221, November 7, 2001 at 2). On November 13, 2001, Mr. Clouatre reported: "Removed sheetpile shoring from lift station cofferdam at Saucer Marine, removed wood pilings from below concrete foundations at Boland Marine, and backfilled asbestos excavations at Boland Marine with borrow material. " ( Def. Ex. 81, QAR # 225, November 7, 2001 at 1). In another section, it states:

> FOLLOW-UP–LIFT STATION REMOVAL: Observed Linkbelt LS418 crane with vibratory hammer/extractor removing sheetpile from west and south wall of lift station cofferdam. Assured sheetpilings are removed and stack adjacent to excavation to be used for concrete demolition cofferdam at Boland Marine. No deficiencies observed.

> FOLLOW-UP - BORROW PIT: Observed sub's excavator clay from borrow pit at McDonough Marine, and Dinvaut dump trucks haul into Boland Marine for ACM excavation backfill. No deficiencies observed.

( Def. Ex. 81, QAR # 225, November 7, 2001 at 2). All of these reports also note that Mr. Montegut as well as the Project Engineer, Mr. Ariatti, were in attendance and that they were on-site nine hours each reporting day.

This work was finally accepted by the Corps as testified to by Mr. Guillory. (Def. Ex. 6, Guillory II at 146).

---

[6] Plaintiffs have made much of this reference to the use of sand. Whether or not sand was used, it is clear that the Corps did not object to and indeed approved its use in this regard considering the statement in the report finding no deficiencies. This fact is the salient one for purposes of the Government Contractor Defense.

Furthermore, Guillory also testified that river sand was used in the backfilling of the McDonough Marine borrow pit. He stated, "Riversand is just a colloquial term that we use here for the silty sand material that is hydraulically dredged out of the base of the Mississippi River, and commercial suppliers sell it as a traditional backfill for sub-base and foundation material throughout New Orleans." (Def. Ex. 6, Guillory II at 181).

Finally in the case where WGI were to furnish other backfill material, Guillory testified with respect to a June 18, 2001 e-mail, that in the event there were not enough backfill provided by the borrow pit, imported material could be employed; however, before any could be used, Mr. Montegut would be informed where the material would come from, what type of material it would be, the cost associated with purchasing and trucking the material on site, and most importantly, he would have to approve it. (Def. Ex. 6, Guillory II at 103-104).

**Boland Marine and the Wedding Cake Structure**

After demolition work began, WGI identified eight previously unknown subsurface concrete and steel foundations at the Boland Marine site, including a large concrete block commonly referred to as Concrete Block #004, "the southern block" or the "wedding cake structure." (WGI Undisputed Fact No. 126). This block was between 150 to 175 feet from the floodwall.[7] Because these concrete/steel structures were not included in the Statement of Work for Task Order 26 in August 2001, the Corps issued Modification 10 to it. (WGI Undisputed Fact No. 127); (Def. Ex. 20, Statement of Work, Modification 002610, 6 Aug 2001). In this SOW for the modification, a number of Project Requirements were delineated and No. 3.1 concerned the Boland Marine Subsurface Foundations which included the wedding cake structure. It required that all concrete, steel and pilings were to be removed in their entirety. Noted also was as follows:

> [D]ewatering is a potential task for the removal of the southern block. It is assumed a cofferdam will be built with whalers (sic) installed at -5', -18' and -28' (if necessary). The cofferdam and whalers (sic) shall have a design that is approved by a Louisiana State Registered P.E.
> An excavation plan will be required.
> A decision will be made to excavate further, when the excavation reaches a depth of -25' msl.
> All elevation measurements are from mean sea level.

(Def. Ex. 20, Statement of Work, Modification 002610, 6 Aug 2001 at 2).[8]

On August 28, 2001, WGI submitted a proposal. In a Memorandum for Record dated August 31, 2001, the Technical Analysis thereof is memorialized. (Def. Ex. 28, Memorandum

---

[7] This distance is estimated using the Site Map, Inner Harbor Navigation Channel East Bank Industrial Area, New Orleans, Louisiana, WGI Demonstrative Evidence, Hearing on Motion for Summary Judgment at 13.

[8] Other projects are discussed in this SOW as well. An Asbestos Containing Material (ACM) Excavation and Disposal project is mentioned as well the ITT Subsurface Concrete Waste Excavation and Disposal.

for Record, 31 Aug 01).  Noted there is that with respect to Section 2.1, Page 3, Technical

Assumption 7:

> WGI estimates that 900 cys of off-site imported backfill material will be
> necessary for backfilling the removed foundations.  WGI's proposal should
> address that the primary source of backfill material will be the on-site
> McDonough Marine Borrow Area.  WGI should estimate if any additional
> imported material will be needed. [The Corps'] and WGI's intent has been from
> the beginning to utilize an on-site borrow area to minimize the quantity (i.e., cost
> ) of importing backfill material, which would subsequently increase future
> dredging costs of the IHNC Bypass Channel.

(Def. Ex. 28, Memorandum for Record, 31 Aug 01, at 2 (b).)

The Revised - Final Proposal # 113, dated September 24, 2001 Proposal Number 4423-

113 issued and was apparently approved on September 25, 2001.  (Undisputed Statement of Fact

130).[9]   In this document, the wedding cake structure is referred to as the "Eighth Block."   With

respect to the Technical Assumptions at paragraph 3, it states:

> 3.      Dewatering is assumed to be required for the removal of the eighth block
>         (the large block).  A cofferdam will be built with whalers (sic) installed -
>         5', -18' and -28 msl (if necessary).  The cofferdam and whalers (sic) shall
>         have a design that is approved by a Louisiana Registered P.E.
>
> 6.      With regard to the eighth block (the large block); upon reaching the -25'
>         msl excavation depth, a decision by [WGI] and [the Corps] shall be made
>         to continue excavation or quit.  Should it be determined to continue an
>         optional second phase mobilization will be initiated that includes
>         mobilization of equipment capable of excavating to greater depth (-35'
>         msl).  The second phase shall also include installation of whalers (sic) to
>         remove concrete from a depth of -25' to -35' msl.
>
> 7.      The excavations resulting from concrete foundation removal will be
>         backfilled with borrow material obtained from either the on-site borrow
>         source or an off-site source as required.  An estimated 900 cy will be
>         needed. The material will be placed in lifts and compacted; however, no
>         compaction testing will be required.  Revegetation will not be required.

---

[9]  Plaintiffs have controverted this fact with the sole reference of "See Opposition to Motion for Summary
Judgment" in which no particular proof or fact is offered to controvert this date.

(Def. Ex. 29, Revised - Final Proposal # 113, September 24, 2001 Proposal Number 4423-113, at

5).

A Preparatory Phase Meeting occurred on November 14 2001. (Def. Ex. 83, Preparatory

Phase Meeting Minutes). Attending were the Corps's Jim Montegut and Alvin Clouatre, Mr.

Staggs and two other representative from WGI as well as two representatives from other

subcontractors. At this meeting, excavation permits were discussed. It was agreed that a Work

Plan would be submitted, and the design for the cofferdam would be submitted for review by

November 19 -20th. (Def. Ex. 83, Preparatory Phase Meeting Minutes at 1). Specifically the

minutes state:

> After approval of the design, the cofferdam will be installed. Concrete will be
> demolished with a hydraulic hammer and subsequently removed with the
> excavator. Upon completion of concrete demolition, the piles will be removed
> with a vibratory pile hammer. Backfill will commence when timber pile removal
> is complete. Walers will be removed and backfill will continue to grade. Backfill
> material will be provided by WGI from the on site borrow. Water from
> dewatering activities will be pumped to a diversion ditch with silt fence material.

(Def. Ex. 83, Preparatory Phase Meeting Minutes at 2).

An initial plan was submitted on November 27, 2001 but was resubmitted on December

11, 2001. ((Def. Ex. 24, Submittal Register of all documents transmitted to the Corps) Entries 85

and 88 at 63). On December 13, 2001, the December 6, 2001 Cofferdam Installation and

Concrete Foundation Removal Final Work Plan was approved. (Def. Ex. 63,Transmittal of Shop

Drawings, at 1). The plan encompasses detailed plans for installation of a sheet pile cofferdam

to remove the wedding cake structure. (Def. Ex. 63, Cofferdam Installation and Concrete

Foundation Removal Final Work Plan at 3). At page 5 of the plan, it states with respect to

Backfill Excavations, "Immediately following pile extraction operations, the excavations will be

22

backfilled with either import sand[10] or onsite borrow back to original grade." (*Id.* at 5). Then in

the Sequence of Operations for Concrete Foundation South Pad Cofferdam Installation and

Concrete Removal with respect to Cofferdam Backfilling:

> *Backfill excavation with previously excavated soil in 2' lifts.
> *Initial backfill operations will be to the bottom of the whalers (sic) inside the cofferdam.
> *Complete backfilling to top of sheet piles with material to be provided by WGI after
>   whalers are removed.

Backfilling was to be completed to grade after sheetpile removal occurred. Also included in

these plans was the Cofferdam for Demolition Design Calculation prepared by Huval &

Associates, Inc. licensed Civil Engineers for the State of Louisiana.  (Def. Ex. 63, Cofferdam

Installation and Concrete Foundation Removal Final Work Plan at 39).

When questioned as to why the Corps did not call in the engineering division of the

Corps with respect to the excavation of the wedding cake structure, Mr. Guillory stated:

> Two reasons: the location and proximity of those concrete foundations with
> respect to the floodwall and the levee were quite a bit far away as opposed to
> McDonough marine borrowing area.  Also, where those concrete block
> foundations were located were within the footprint of where the future bypass
> channels were to be dredged.  There were two bypass channels to be dredged in a
> stairstep fashion to -22 NGVD and -31 NGVD, and those concrete foundations
> and their cofferdams fit within those footprints.  So that--those braced structural
> excavations were designed by a professional engineer, professionally . . . hired by
> WGI and their subcontractors--professionally reviewed by all parties, and
> constructed and intense quality control and quality assurance inspection followed
> on how those were installed and removed.

(Def. Ex. 17, Guillory I at 210-211).

Daily inspections occurred.  For instance, an Inspector Quality Assurance Report (QAR)

Daily Log of Construction--Civil was filed by Mr. Clouatre on February 22, 2002.  He reported

---

[10] It must be noted that Guillory also testified that only borrow pit material was used in conjunction with
the backfilling of the wedding cake structure at the Boland Marine location.  (Def. Ex. 6, Guillory II at 120). See
ftnt. 4 above for further discussion of use of sand.

on the progress at the Boland site, with the removal of concrete and wood debris and steel pilings

for bottom of concrete foundation #4 cofferdam and also noted that backfilling thereof had

begun. (Def. Ex. 84, Inspector Quality Assurance Report (QAR) Daily Log of

Construction–Civil, February 22, 2002, at 1). He further observed "Visually assured all debris

and pilings above el. -23.0 are removed from cofferdam. Observed PC400 begin backfilling SE

quadrant of sheetpile cofferdam. Assured cofferdam is backfilled in 2' lifts and compacted with

bucket." (Id. at 2). WGI's Quality Control Report signed by Sarah Alvey noted the same

activity. (Def. Ex. 84, Inspector Quality Assurance Report (QAR) Daily Log of

Construction–Civil, February 22, 2002, § 4(c) at page 5).

     Another Inspectors Quality Assurance Report was filed for Sun-Mon, February 24-25,

2002 by Mr. Clouatre. The backfilling of the Boland site continued. In the follow-up section,

it stated:

> FOLLOW-UP–EXCAVATION AND DEMOLITION OF CONCRETE
> FOUNDATIONS: Observed WGI pumping water with 3" pump from degrade
> area, and keeping seepage water pumped from bottom of sheetpile excavation
> with 4" pump. Seepage was not pumped down inside cofferdam until 0900 hrs.
> due to WGI not scheduling personnel to perform dewatering on 24 Feb or early in
> AM this date. Observed SK220 Excavator relaying borrow material into degrade
> and PC400 excavator backfilling bottom of cofferdam to bottom of 2nd waler at
> approx. El. -16.0. Assured cofferdam is backfilled in 2' lifts and compacted with
> bucket. Observe PC and SK 220 dressing excavation are and segregating
> concrete and timber debris form spoil piles.

(Def. Ex. 85, Inspectors Quality Assurance Report was filed for Sun-Mon, February 24-25, 2002

at 2). In the attached WGI report, it is also noted that the backfill material being used was from

the borrow pit and spoil piles excavated from the cofferdam. Also noted therein was that the fill

material was Wet and the PC400 performed bucket compaction at every 2-3' lift. (Def. Ex. 85 at

Section 4(c) at page 5). These documents were verified by Mr. Guillory in his deposition. (Def. Ex. 17, Guillory I at 125-126).

In an Inspectors Quality Assurance Report, Daily Log of Construction –Civil, from Mr. Clouatre to Mr. Guillory dated March 19 2002, Mr. Clouatre noted that with respect to Hamp's work on the wedding cake area, it "backfilled #004 cofferdam degrade area with borrow material" and that Dinvaut "hauled borrow material from McDonough Marine to Boland Marine." (Def. Ex. 38, Inspectors Quality Assurance Report, Daily Log of Construction –Civil, March 19, 2002 at 1). In the follow-up section he stated:

> [o]bserved WGI's PC400 excavator excavating material from McDonough marine borrow pit, loading Dinvaut dump trucks, and trucks hauling to Boland Marine. Observed PC270 and PC400 backfilling cofferdam area with borrow material hauled from McDonough Marine. Assured material is placed in 2'-3' lifts. No deficiencies observed.

(Def. Ex. 38, Inspectors Quality Assurance Report, Daily Log of Construction –Civil, March 19, 2002 at 2). Mr. Guillory also testified that the first used material was that was used to fill the cofferdam at this site was that which had been removed from within the cofferdam excavation, and any additional makeup material came from the McDonough Marine borrow area. (Def. Ex. 6, Guillory II at 120). (See footnote 7 above).

The final Pre-Final Inspection occurred on March 21, 2002. It was noted at this time that the work was not complete because of the need to disconnect and demobilize the office trailer/tool shed and portable fuel tanks. Also, all equipment, tools and material needed to be washed and decontaminated prior to demobilizing off site. (Def. Ex. 86, Pre-Final Inspection Report, March 21, 2002 at 1). On March 27, 2002, the Final Acceptance Report was rendered finding all work completed, acceptable and in compliance with the contract. (Def. Ex. 86, Pre-

Final Inspection Report, March 21, 2002 at 2).    This acceptance would include the backfill and

compaction of the excavation at the Boland site.  (Def. Ex. 6, Guillory II at 129-30).

### Finalization of Task Order 26

Other programs that were of the EBIA remediation continued.  Indeed, in 2004, two years

after these two excavations had been completed, Hurricane Ivan flooded the EBIA work sited up

to the base of the concrete portion of the floodwall.  (Def. Ex. 6, Guillory II at 173-175).  After

the hurricane, the Corps and WGI inspected the protected side of the floodwall along the EBIA

and did not detect any visible signs of damage to the levees and floodwalls.  (Def. Ex. 6,

Guillory II at 173-175).

Finally, on May 26, 2005, Mr Montegut, Mr. Guillory and three other Corps

representatives conducted a final site visit and inspection of the EBIA; all field operations were

officially concluded and Task Order 26 was declared substantially complete.  (WGI Undisputed

Fact No. 207 and 208).  The Technical Completion Report was a final document to conclude

Task order 26. (WGI Undisputed Fact No. 212).  WGI submitted a draft of the report for the

Corps' review and comment in July of 2005, and the Corps approved it on August 23, 2005.

(WGI Undisputed Fact No. 213).

With the history of Task Order 26 fully explained, the Court will now take up the motion

at hand.

### Standard for Summary Judgment

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "'Summary judgment is proper when the pleadings and evidence demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.'" *Condrey v. Sun Trust Bank of Georgia,* 429 F.3d 556, 562 (5th Cir. 2005), *citing DIRECTV, inc. v. Budden,* 420 F.3d 521, 529 (5th Cir. 2005). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp v. Catrett,* 477 U.S. 317, 323 (1986); *Condrey,* 429 F.3d at 562. Once the movant meets this burden, the burden shifts to the non-movant "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "[M]ere allegations or denials" will not defeat a well-supported motion for summary judgment. Fed. R. Civ. P. 56(e). Rather, the non-movant must come forward with "specific facts" that establish an issue for trial. *Id.*

When deciding a motion for summary judgment, the Court must avoid a "trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are tasks for the trier-of-fact." *Anderson,* 477 U.S. at 255.

To that end, the Court must resolve disputes over material facts in the non-movant's favor. "The party opposing a motion for summary judgment, with evidence competent under Rule 56, is to be believed." *Leonard v. Dixie Well Service & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir. 1987).

### The Government Contractor Defense

In order for a contractor to claim the government contractor defense, "(1) the government must have approved 'reasonably precise' specifications; (2) the equipment must have conformed to those specifications; and (3) the supplier/contractor must have warned of those equipment dangers that were known to the supplier/contractor but not to the government." *Kerstetter v. Pacific Scientific Co.,* 210 F.3d 431, 435 (5th Cir. 2000), citing *Boyle v. United Tech. Corp.*, 487 U.S. 500, 512, 108 S. Ct. 2510 (1988). This shield is derived from the government's immunity from suit where the performance of a discretionary function is at issue. *Kertstetter*, 210 F.3d at 435. Based on this defense, WGI contends that it immune from suit based on its faithful performance of the Corps-approved plans and specifications concerning Task Order 26.

### Prerequisites

Plaintiffs respond that there are two prerequisites that WGI must meet prior to invoking this defense. They first contend without citation that "[i]f the government does not enjoy discretionary function exception immunity for a particular task or project, then the government contractor employed on that same project likewise should not enjoy a derivative of this immunity." As a second prerequisite, they argue that "[o]nly when the state -imposed duty of

28

care (that conduct that is the asserted basis of the contractor's liability) is precisely contrary to

the duty imposed by the government contract should the contractor defense displace state law."

Thus, as a threshold proposition, plaintiffs maintain that two prerequisites must be proved by

WGI prior to the applicability of the defense.

These identical arguments have been specifically rejected by the United States Court of

Appeals for Second Circuit.  In *Lewis v. Babcock Indus., Inc.*, 985 F.2d 83 (2nd Cir. 1993), the

court rejected the first argument–that first it must be proven that the government is entitled to

discretionary function immunity (or exercised its discretion in accepting a safety risk) for the

particular task at issue before the contractor is able to invoke the government contractor defense.

It noted in the context of the *Boyle* inquiry:

> The Supreme Court indicated that the first two parts of the *Boyle* test implement
> this limitation by "assur[ing] that the suit is within the area where the policy of
> the 'discretionary function' would be frustrated– *i.e.,* they assure that the design
> feature in question was considered by a Government officer, and not merely by
> the contractor itself." *Id.* at 512, 108 S.Ct. at 2518. Thus, in determining whether
> the Government approved reasonably precise specifications, a District Court
> necessarily inquires into whether the Government adequately exercised its
> discretion and "thereby limit [ed] the contractor's ability to accommodate safety
> in a different fashion." *Grispo*, 897 F.2d at 632. The purpose of this inquiry is to
> exclude from the defense those cases where the Government merely "rubber
> stamps" a design, *see Trevino v. General Dynamics Corp.,* 865 F.2d 1474, 1480,
> 1486 (5th Cir.), *cert. denied,* 493 U.S. 935, 110 S.Ct. 327, 107 L.Ed.2d 317
> (1989), or where the Government merely orders a product from stock without a
> "significant interest" in the alleged design defect, *see Boyle,* 487 U.S. at 509, 108
> S.Ct. at 2517.

*Lewis,* 985 F.2d at 87.  As to the issue of displacement of state law, the Second Circuit stated

that "the purpose of the first part of the [government contractor defense] test, approval of

reasonably precise specifications, is to determine whether a conflict with state law exists at all. . .

. Thus, answering the question whether the Government approved reasonably precise

specifications for the design feature in question necessarily answers the question whether the federal contract conflicts with state law." *Id.* at 86 -87.    Finally, the Fifth Circuit has never recognized any such preliminary inquiry.  The sole requirements for the imposition of the government contractor defense have been the three prongs first outlined in *Boyle* as noted above. As such, the Court will now examine these requirements in light of the WGI and the Corps activities in the confection and execution of Task Order 26.

### Approval of Reasonably Precise' Specifications

The Fifth Circuit discussed what constitutes "approval of reasonably precise specifications" in *Kerstatter v. Pacific Scientific Co. v. General Dynamics Corp.*, 865 F.2d 1471, 1479-1481 (5th Cir. 1989):

> The government need not prepare the specifications to be considered to have approved them. *See Trevino v. General Dynamics,* 865 F.2d 1474, 1480 (5th Cir.1989) (holding that "substantive review" is adequate). To determine whether "substantive review" occurred, a court must take into consideration a number of factors. The factors involve examining drawings, evaluation from time to time, criticism and extensive government testing–a "continuous back and forth" between the contractor and the government. *See In re Air Disaster at Ramstein Air Base, Germany,* 81 F.3d 570, 574 (5th Cir.1996). The specifications need not address the specific defect alleged; the government need only evaluate the design feature in question. *See Boyle,* 487 U.S. at 512, 108 S.Ct. 2510; *Trevino,* 865 F.2d at 1486 ("The government contractor defense as reformulated in *Boyle* protects government contractors from liability for defective designs if discretion over the feature in question was exercised by the government.").

*Id.* at 435. As outlined above in detail, no reasonable person could find that there was not substantial give and take in the confection of the plans used to accomplish the clean-up of the EBIA under the numerous SOWs and evaluations that comprise Task Order 26. It is clear that while WGI proposed the method by which the remediation would occur and the "gaps" to be addressed, the Corps did not "rubber-stamp" any element thereof. The plans were confected in tandem, with meetings at the site where all of the subcontractors were involved.

Furthermore, the plans were "reasonably precise." In *Stout v. Borg-Warner Corp*, 933 F.2d 331 (5th Cir. 1991), the court found that the government approved reasonably precise specifications because of the Government's:

> thorough review of the design. The review involved, inter alia, Fairchild's submission of detailed drawings at various progressive stages of the design, critical design reviews where Army engineers critiqued Fairchild's work, and,

31

finally the production of prototype models tested and evaluated for months by the Army for its actual performance. *See Kleemann v. McDonnell douglas corp.*, 890 F.2d 698, 701 (4ᵗʰ cir. 1989) (governmental participation in various stages of product's development establishes military contractor defense); *Hardevel v. General Dynamics Corp.*, 878 F.2d 1311, 1320 (11ᵗʰ Cir. 1989) (requirement that government approve reasonably precise specifications is met where contractor incorporated design that government subsequently reviewed and approved).

*Id.* at 336. In this instance, the defense is not raised in the context of a product made for the

United States Army to cool the Hawk Missile System Mobile Repair Unit like the air conditioner

in *Stout*. Instead the "product" was the remediation under the Oklahoma TERC of an area

adjacent to a floodwall. The process by which such a project is accomplished is by its very

nature one in which the Corps is intimately involved at all stages of the planning.

With respect to the excavation and back-filling of the sewer lift and the wedding cake

structure, it is clear from the Corps' own testimony that by virtue of the use of cofferdams in the

removal process, it believed that the floodwall/levee would not be compromised. In addition, the

material used for backfill was approved and discussed in the planning stage. The Corps testified

that it intended for the backfill from the McDonough borrow pit to be used in all instances

possible to reduce the cost that was to be incurred. Moreover, the specifications for the

excavation of the sewer lift and wedding cake structures were certainly reasonably precise

considering the give and take discussed, *supra* at 13-27. Thus, WGI has fulfilled this

requirement for immunity to attach.

**Conformance with the Specifications**

This requirement is met where the alleged defect exists independently of the design itself, and must result from a deviation from the required military specifications. *Kerstetter*, 210 F.3d at 435-36 *citing Bailey v. McDonnell Douglas Corp*, 989 F.2d 794, 800 n.13 (5th Cir.1991) ("For the reasons explained *infra*, we interpret *Boyle's* statement that the defense bars'[l]iability for design defects' to mean liability for defects in the government specifications.") (citation omitted). "Extensive government involvement in the design, review, development and testing of a product, as well as extensive acceptance and use of the product following production, is evidence that the product line generally conformed with the government-approved specifications." *Kerstetter*, 210 F.3d at 436 *citing See In re Air Disaster*, 31 F.3d at 575.

Plaintiffs have made absolutely no showing that WGI did not perform its task in conformance with the specifications. Because of the very nature of Task Order 26, there were daily reviews and daily reports of Mr. Montegut and those who reported to him. At every stage, as noted in the discussion above, the Corps found no deficiencies in the performance of the contract and ultimately accepted the project in its entirety.

Furthermore, as the Corps testified, WGI was on site for two years after the completion of the excavation and back-fill of the two sites. No evidence was adduced of any subsidence in the areas. In addition, there is no evidence adduced that the Corps found any damage after Hurricane Ivan. WGI was not asked to revisit the sight or re-tamp or backfill the areas.

**Contractor Must Warn of Dangers Known To It, But Not to the Government**

As stated by the *Kerstetter* court:

> The third part of the *Boyle* test requires the contractor to warn the government
> about those equipment dangers that were known to the contractor, but not to the
> government. The purpose of this element is *not* to create an incentive to discover
> latent defects in a product designed for the government. *See Boyle*, 487 U.S. at
> 512, 108 S.Ct. 2510 ("The third condition is necessary because, in its absence, the
> displacement of state tort law would create some incentive for the manufacturer to
> withhold knowledge of risks, since conveying that knowledge might disrupt the
> contract but withholding it would produce no liability."). The government
> contractor defense does not require a contractor to warn the government of
> defects about which it only should have known. "After *Boyle*, a government
> contractor is only responsible for warning the government of dangers about which
> it has actual knowledge." *Trevino*, 865 F.2d at 1487.

*Kerstetter* , 210 F.3d at 436. Thus, the test is *not* should WGI have known of the alleged problem

created by the excavation and backfilling of the sewer lift and wedding cake structure, WGI is

**only responsible for warning the government of dangers about which it had actual**

**knowledge.** Simply put, there is absolutely no evidence which would demonstrate such

knowledge.

While plaintiffs have tried to make much of the idea that WGI had a responsibility to

perform greater geotechnical investigations whereby they presumably would have learned that

the actions they were taking would have an adverse effect on the floodwall, that is irrelevant to

this inquiry. By so stating, the Court does not seek to infer that this third prong could be fulfilled

by simply ignoring a potentially hazardous situation. Rather, in this instance, WGI was

performing a **remediation** contract which did not involve any flood control structure. The Corps

had the responsibility and duty to insure the integrity of the levee system. It is squarely within

its domain to monitor the effect of the work on the levee. Indeed, it did so in the context of the

McDonough borrow pit, as evidenced by the geotechnical review undertaken for that project.

34

(See Footnote 1). Furthermore, Mr. Guillory unequivocally testified that with the use of cofferdams, any concerns it might have as to the effect on the floodwalls was quelled. As such, WGI has met this prong as well and thus is entitled to immunity from these claims by plaintiff.

Finally, as to any argument that WGI's failure to obtain properly a permit from contributed to the floodwall's failures, this contention is baseless as the Orleans Levee District ("OLD") relies wholly on the Corps and its engineering department to determine whether certain acts impact a flood control project. This conclusion is confirmed in the declaration of Mr. Stevan Spencer, the Chief Engineer of OLD at the time of Task Order 26. He stated in a declaration the "OLD does not perform independent engineering investigations of any kind in connection with an entity's/person's request to perform subsurface work on or near a flood control structure." (Doc. 16296-3, Reply Memorandum of WGI, Exh. 12, Spencer Declaration, ¶ 4). Since WGI received letters of no objection to its proposed excavation work from the engineers at the Corps and the DOTD, it would appear then that whatever engineering reviews were to occur did so prior to the work commencing.

**Conclusion**

Looking at the evidence in the light most favorable to the non-moving party, this Court finds that the Corps was intimately and constantly involved in the planning and execution of Task Order 26. As to any claim that WGI had some duty to consider underseepage, Guillory testified:

> A.   If there was a specific requirement that the government wanted to task Washington Group with or a specific discipline that the government wanted of Washington Group, we would have addressed it in a modification to Task Order 26. . . .

> Q.    Was there ever a modification to Task Order 26 relating to–or
>        requiring Washington Group to undertake an underseepage
>        analysis of the levees and floodwalls in the East Bank Industrial
>        Area?
>
> A.    No.

(Def. Ex. 6, Guillory II at 254-55).

Plaintiffs' contention that the plans herein were only "general" in nature and were broad

enough to permit the use of anything from sand to clay to be used, as long as the fill was not

contaminated finds no support in this record.  It is clear that the Corps insisted on the use of

materials from the "borrow pit" and the spoils from the excavation at the McDonough Marine

site for the purpose of economy.  Furthermore, the use of any other materials from offsite had to

be approved by the Corps.  In addition, in deposition testimony of Grieshaber and Guillory it is

clear that any reference made to sand being used would be to the use of river sand which was

acceptable to the Corps.

Plaintiffs state that "[h]aving undertaken no independent geotechnical investigations of

the EBIA, and providing the Corps with a crucially defective report misleading the Corps's

EBIA project team about the depth of the sheet pile at the adjacent flood wall, WGI mobilized on

the site in January, 2001 to commence the physical aspects of the EBIA project." (Opposition at

16).  However, the job of the Corps of Engineers is to oversee the integrity of the floodwalls and

levees.  To argue that WGI had a greater duty or more knowledge in that area, where it is clear

that these issues were contemplated by the Corps–ergo the use of cofferdams–is a chimera.   The

fact that the Corps did do an independent examination of the McDonough site where a cofferdam

designed by a Louisiana civil engineer was not used demonstrates this fact.

Accordingly,

**IT IS ORDERED** that Motion for Summary Judgment filed by Washington Group International, Inc. ("WGI") (Doc. No. 15861) is **GRANTED**.

New Orleans, Louisiana, this 15th  day of December, 2008.

_____
        **STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**
