# EXHIBIT "B"

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 2005-11720          DIVISION "L"


TONI ORRILL, ET AL

VERSUS

LOUISIANA CITIZENS FAIR PLAN


PROCEEDINGS held in the above-captioned matter before
the HONORABLE KERN A. REESE, JUDGE, presiding on
Tuesday, December 16, 2008.


APPEARANCES:

          GREGORY P. DILEO

          MADRO M. BANDARIES

          JEFFREY P. BERNIARD

          Attorneys for The Orrill Class


          JOHN T. CULOTTA

          JOHN UNSWORTH

          DARREN PATIN

          RICK SIMMONS

          Attorneys for La. Citizens Property

          Insurance Company


          FRED L. HERMAN

          BOB ATES

          STEVEN HERMAN

          Attorneys for Beevers and Beevers

REPORTED BY:

          DENISE K. ETHERIDGE, CCR, OCR

```
1                    Judge, I asked her how they're going
2               to do this settlement on money that hadn't
3               been approved yet.
4    THE COURT:
5                    I sustained the objection.  Ask
6               another question.
7    BY MR. HERMAN:
8    Q    Ms. Dondeville, the settlement agreement has a
9    reversionary clause in it, were you a proponent of
10   the reversionary clause?
11   A    A proponent?
12   Q    Yes.  Did you ask for the reversionary clause,
13   or was that something that was offered by the
14   plaintiffs?
15   A    I believe that was the subject for arm's length
16   negotiations.
17   Q    I asked you a question, Ms. Dondeville, I would
18   like an answer.
19   A    I am answering you.
20   Q    Was that offered by the plaintiffs or by the
21   defendants, one or the other?
22   MR. DILEO:
23                    Objection, Your Honor, that's been
24               asked and answered and it's getting
25               argumentative.
26   THE COURT:
27                    She hasn't.  I'll allow it.
28   THE WITNESS:
29                    My understanding is that it wasn't
30               proponent, neither side was a proponent.
31               It was part of the negotiations.  I don't
32               know what the genesis of it was.  I
```

-44-

1              certainly wasn't a proponent of it in any

2              way.

3    BY MR. HERMAN:

4    Q     You don't know how it came about when say you

5    don't know the genesis of it?

6    A     I was not sitting in the room during the

7    negotiations.

8    Q     Ma'am, you haven't been sitting in the room

9    during the -- during any of the negotiations --

10   THE COURT:

11              Mr. Herman, you want to ask a

12              question.  You're making editorial

13              comments.

14   BY MR. HERMAN:

15   Q     Look ma'am, you said earlier that the

16   negotiations were arm's length, now if you weren't

17   there and you don't know the genesis of the terms how

18   do you know that?

19   A     That they were arm's length negotiations?

20   Q     Yes.

21   A     Because I know what went on in the negotiations

22   through my conversations with counsel.  I don't need

23   to be in the room to know the negotiations were arm's

24   length.  I know what went back and forth, I know what

25   questions I was asked.  I know what I was asked to

26   give authority to.  I know what the various terms

27   that were proposed to me, whether or not we wanted to

28   do "X", whether or not we wanted to do "Y".  I know

29   about those things through conversations with my

30   counsel.

31   Q     Are you telling this Court that you know what

32   offers were made back and forth, is that what you're

-45-

1  telling this court?

2  A  I know what my counsel had told me was proposed

3  to us at certain points during the negotiations.  I

4  can not recall specifically as to how the

5  reversionary clause was proposed, who proposed it,

6  how it came up.

7  Q  Do you know who proposed, or how it was

8  proposed that the fund be negotiated to be a fund of

9  30 million dollars?

10  A  I believe, again, that was part of the

11  negotiations.  I don't know how -- I know that there

12  was back and forth negotiations, who arrived at the

13  30 million dollars and how that finally got arrived

14  at I don't know exactly.  I know my counsel came to

15  me and gave me certain things, gave me, asked me for

16  authority, and we arrived at that number.

17  Q  What was the opening number that Louisiana

18  Citizens offered?

19  MR. DILEO:

20      Objection, Your Honor, it's not

21     relevant and it's attorney-client

22     privilege.  This is information she learned

23     from her attorney and it's not -- those

24     first numbers are not part of the

25     settlement.  So they are not relevant.  And

26     the only way she knows them is from counsel

27     with her attorney.

28  MR. HERMAN:

29      Your Honor, may it please the Court,

30     they put Ms. Dondeville up here as attorney

31     litigation manager, she has done nothing

32     but express her opinion based upon meetings

-46-

```
 1              with her counsel.  They opened that door,
 2              Your Honor.  They have had her testify.
 3              They have arm's length.  There is no
 4              collusion, there is no fraud.  And she's
 5              saying that based on her quote "own
 6              personal experience".  It has to be
 7              allowed, because Your Honor, she could have
 8              only learned it, she wasn't there, through
 9              her counsel.  That is not protected
10              information in this context.  If they
11              didn't want to expose that information they
12              had other means to get it in.
13   THE COURT:
14              You got authority for your position?
15   MR. HERMAN:
16              Your Honor, the authority for the
17              position is in the Reed case where it
18              says --
19   THE COURT:
20              Tell me where you can waive
21              attorney-client privilege on all the
22              negotiations.  Read it to me.  I don't want
23              to hear argument.  I want to hear juris
24              prudence or authority.
25   MR. HERMAN:
26              Your Honor, I must tell you, I don't
27              have juris prudence in front of me, but I
28              will tell you that I believe it to be an
29              accurate representation.
30   THE COURT:
31              Then have one of your co-counsel find
32              me authority, you can ask another line of
```

-47-

```
 1                    questions until you find it because I'll
 2                    sustain the objection until then.
 3     MR. HERMAN:
 4                         Judge --
 5     THE COURT:
 6                         Find me some authority.  I want the
 7                    law.
 8     MR. HERMAN:
 9                         Yes, sir. I'll get to that.  There is
10                    a second basis for my response, Your Honor,
11                    and it is you can't express personal
12                    knowledge based on hearsay.  If you're
13                    someone's counsel in a case, a general
14                    counsel, you can --
15     THE COURT:
16                         What are you going to put the
17                    attorneys on the stand next?
18     MR. HERMAN:
19                         Your Honor, that's exactly what Reed
20                    did.  That's exactly --
21     THE COURT:
22                         They haven't done it.  You didn't
23                    subpoena them.  We are not going to do that
24                    unless you got authority or provision, move
25                    onto something else.
26     MR. HERMAN:
27                         Judge, I don't have the burden of
28                    proving the fairness.
29     THE COURT:
30                         You asked the question, Mr. Herman.
31     MR. HERMAN:
32                         I believe I'm entitled to.
```

1    THE COURT:
2                Either give me some authority for your
3           position or move on to something else.
4    MR. HERMAN:
5                I will move on and look for the
6           authority.
7    THE COURT:
8                Good enough.
9    MR. HERMAN:
10               And note my objection for the record.
11          I assume you will not let me proffer that
12          testimony.
13   THE COURT:
14               No.  There may be a privilege
15          involved.
16   MR. HERMAN:
17               There may be, Judge, but she didn't
18          assert it and her lawyer didn't assert it.
19   THE COURT:
20               We have discussed this enough, Mr.
21          Herman, it is time to move on.
22   MR. HERMAN:
23               It is not plaintiff's counsel's
24          privilege --
25   THE COURT:
26               Mr. Herman, one more word.
27   MR. HERMAN:
28               Yes, sir.
29   MR. PATIN:
30               For the record, Your Honor, we object
31          to the line of questions on the ground of
32          attorney-client privilege.

-49-

```
1      THE COURT:
2                      Very well, noted.
3      BY MR. HERMAN:
4      Q     Ms. Dondeville, can you tell me, please, based
5      on your own personal knowledge, do you know any of
6      the offers that went back and forth between
7      plaintiffs and defendants counsel?
8      MR. DILEO:
9                      Now, Your Honor --
10     THE COURT:
11                     Sustained.
12     BY MR. HERMAN:
13     Q     Ms. Dondeville --
14     THE COURT:
15                     You're in the same vain, Mr. Herman,
16             now you're testing my patience, don't do
17             that.
18     MR. HERMAN:
19                     Your Honor, with all respect to the
20             Court, I'm entitled to test this witness'
21             testimony.
22     THE COURT:
23                     You're also supposed to listen to the
24             orders of the Court, you're being
25             disrespectful, now ask another line of
26             questions.
27     MR. HERMAN:
28                     I beg to differ with Your Honor.
29             I'm simply asking --
30     THE COURT:
31                     We need to take a recess.
32                     (Whereupon, a short recess was taken.)
```

-50-

```
1        THE COURT:
2                       All right, Mr. Herman, I have been
3                given a copy of the case In Re: General
4                Motors Corporation, et al, apparently out
5                of what's that, the Seventh Circuit?
6        MR. HERMAN:
7                       Yes, Your Honor, 594 Federal Second,
8                1106, and the pertinent part, I believe, is
9                at Page 1124.  And it would -- according to
10               that case law, Your Honor, permit the
11               inquiry into how the settlement
12               negotiations proceeded by virtue of the
13               fact that this is a fairness hearing and
14               it's in -- a part of fairness.
15                       I might add, Your Honor, that the
16               Grinell factors, which have been adopted
17               universally and have been followed and are
18               picked up in Reed also speak directly to
19               that issue with respect to the six factors,
20               the respective opinions of the participants
21               including class counsel, class
22               representatives and the absent class
23               members.  And in this particular instance
24               Ms. Dondeville very clearly is a
25               representative of one of the parties.  She
26               says -- has said so on her direct
27               testimony.  And Your Honor, she has been
28               called to express her opinion as to the
29               several factors set forth in Reed.
30       THE COURT:
31                       Mr. Dileo, your response.
32       MR. DILEO:
```

-51-

1           Yes, Your Honor.  I think counsel is
2     reading the Reed case wrong.  When the
3     Court allowed the negotiation issues when
4     they were mentioned in Reed, they were
5     mentioned in connection with the final
6     concluded settlement.  And the only
7     pertinent for the Court as it says that the
8     trial Judge is dependent upon a match of
9     adversary talent, because he can not obtain
10    the ultimate answers without trying the
11    case, because the trial Judge must predict
12    the value of the assessment of able counsel
13    negotiating at arm's length can not be gain
14    said.  Lawyers know their strengths and
15    they know where the bones are buried.
16          So what it tells the Court, what it
17    says is that you don't go into these
18    details, it's for the Court to consider,
19    but not based upon what was the first
20    offer, what was the second, what was the
21    second counter-offer.
22          And Your Honor, you had asked if there
23    is any other authority for getting that
24    sort of information in.  And I would direct
25    the Court to Louisiana Code of Evidence
26    Article 408, compromise and offers to
27    compromise in civil cases, which says that
28    evidence which is sought by Mr. Herman is
29    not admissible to prove liability for or
30    quote, "invalidity of the claim or its
31    amount", unquote.  And so I think that
32    there is no positive law supporting my

-52-

1          opponent's position.  And in fact, all the
2          law is in support of excluding such
3          evidence.
4    MR. HERMAN:
5               Your Honor, may I reply to the cite in
6          the Code of Evidence provision that Your
7          Honor clearly a fairness hearing is clearly
8          an exception to that prevailing rule.
9          There is no basis upon which a Court would
10         have to examine why a settlement happened,
11         how it happened, because typically Your
12         Honor is not called in to examine the terms
13         of a settlement for the Reed factors.
14         Moreover, I don't quite follow the
15         resortation by counsel of what the Reed
16         case means, because it seems pretty clear
17         cut that the inquiry to be made includes an
18         inquiry that would require the vigorous
19         cross examination of counsel.  It says that
20         in Reed.  The article that Mr. Dileo cites
21         does not require the exclusion of any
22         evidence otherwise admissible merely
23         because it is presented in the course of
24         compromise and negotiations.  And that,
25         Your Honor, is the comment -- actually that
26         is read directly from the article that he
27         just quoted.
28   THE COURT:
29              Which article?
30   MR. HERMAN:
31              408.  So I would suggest to Your Honor
32         that reading only part of the article

```
1              doesn't dispose of the issue.
2    MR. PATIN:
3                   May I comment, Your Honor?
4    THE COURT:
5                   Mr. Patin.
6    MR. PATIN:
7                   Irrespective of Mr. Herman's argument,
8              there is nothing within Article 408, Code
9              of Evidence, even though we agree with Mr.
10             Dileo's position, or of the Seventh Circuit
11             case that is cited, that will allow Mr.
12             Herman to intrude upon the attorney/client
13             privilege in those communications that Ms.
14             Dondeville and her attorneys of record have
15             had.  So irrespective of how you rule on
16             this issue, Your Honor, he is still not
17             entitled to invade into the communications
18             she had between, shared between Ms.
19             Dondeville and her client.
20   MR. HERMAN:
21                  Your Honor, may I reply to that?  The
22             fact of the matter is that when the
23             plaintiff's counsel began to question Ms.
24             Dondeville on the very matters that are
25             before you, it was at that time that Mr.
26             Patin or one of his co-counsel would have
27             had the opportunity to stand up, object and
28             issue whatever objection, and seek whatever
29             protection from the Court they would be
30             entitled to.  I would submit to you that
31             after the door is open and the cart is out
32             of the barn it is not time now for defense
```

-54-

```
 1              counsel to rise and object using, in fact,

 2              allowing the plaintiff's counsel to use as

 3              a sword the opinions of counsel and how

 4              she's arrived at them, and talk about her

 5              cost benefits analysis and her discussions

 6              with counsel, how she arrived at these

 7              conclusions she's made, and then when she

 8              is asked and tested on cross-examination as

 9              to those matters, have plaintiff's counsel

10              rise, now joined by defense counsel, and

11              hold it up as a shield.  That is precisely

12              the kind of imbalance that the Court in the

13              General Motors case cited to Your Honor,

14              albeit from the Seventh Circuit, is dealing

15              with, precisely.

16    THE COURT:

17              Mr. Dileo.

18    MR. DILEO:

19              Your Honor, the only imbalance here,

20              and counsel for the objectors is well aware

21              of this, the reason why Louisiana Citizens

22              is, and this is another big elephant in the

23              room, the reason why Louisiana Citizens is

24              not participating more fully in this

25              fairness hearing is because of their fear

26              of retaliation by these same attorneys in

27              Jefferson Parish, who have already filed a

28              Motion for Contempt against them for the

29              actions taken in this case, taking the

30              position that it violates the preliminary

31              injunction issued by Judge Sullivan in the

32              Oubre case.  And so there comes a point
```

1    where you push a lawyer too far, and that

2    is what he has done.  And at this point

3    what you're seeing is Louisiana Citizens

4    taking the position of oh, well, if we are

5    going to get fined for contempt so be it,

6    but I can't let my attorney-client

7    privilege go violated like this any longer.

8    And that's what's happening.

9 THE COURT:

10    All right.

11 MR. HERMAN:

12    Your Honor --

13 THE COURT:

14    No, no, no.  I have heard enough.

15 MR. HERMAN:

16    I move to strike those remarks, Your

17    Honor.

18 THE COURT:

19    Denied.  You cited the General Motors

20    case and the opinion of the Court, and that

21    case was at Page 1124, "We think the

22    conduct of negotiations was relevant to the

23    fairness of the settlement that the Court's

24    refusal for any discovery or examination of

25    the disclosed negotiations constituted an

26    abuse of discretion.  In addition, we do

27    not think the record adequately supports

28    the Court's conclusion that seemingly

29    irregular conduct of negotiations did not

30    prejudice the interest of the class. We

31    must therefore reverse the trial court's

32    order approving the settlement."  That's

1            from the General Motors case.

2                 Counsel, you have not cited anything

3            to me within this jurisdiction, Fifth

4            Circuit, Louisiana Supreme Court, Fourth

5            Circuit, or even another circuit of this

6            state, that stands for this proposition.  I

7            have to weigh and balance the interest of

8            attorney-client privilege as well as

9            Article 408 of the Code of Evidence, which

10           states that negotiations, as long as I have

11           sat on this bench, negotiations involving

12           counsel, involving a settlement are not

13           admissible.  And that's the interests that

14           have to be balanced here.

15                 Now, how do I respond to this?  And I

16           try to be fair to all parties, although

17           some might disagree, I am not going to

18           trample on the attorney-client privilege.

19           What I will say is I think it would be

20           relevant to know the starting points for

21           both parties, the point of the highest

22           point of plaintiff's demand and the lowest

23           point of defendant's response, and we know

24           what we have, and that's as far as it goes.

25   MR. HERMAN:

26                 Thank you, Your Honor, I appreciate

27           the Court's ruling.  Note my objection.

28   THE COURT:

29                 It's noted.

30   BY MR. HERMAN:

31   Q    Ms. Dondeville, on what date did the

32   negotiations commence?

-57-

1    A    Roughly September 15th.

2    Q    And are you aware which lawyers were

3    participating in the negotiations on behalf of

4    Louisiana Citizens on or about September 15th?

5    A    I know for a fact Mr. Culotta, Mr. Patin, Mr.

6    Unsworth.  I'm not sure if Mr. Simmons was there.

7    Q    Do you know who was participating on behalf of

8    the Orrill plaintiffs group?

9    A    I believe it was Mr. Dileo, Mr. Bandaries, I'm

10   not sure if Mr. Berniard was there.  I believe Mr.

11   Orrill was also participating.

12   Q    And up through and including September 15th, up

13   to that point, I understand that the Hailey McNamara

14   Firm had not yet enrolled and made an appearance in

15   any of the three class actions, is that correct?

16   MR. DILEO:

17            Objection, Your Honor.  The dates in

18         which they enrolled is a matter of record.

19   BY MR. HERMAN:

20   Q    Do you know what dates they enrolled, Ms.

21   Dondeville?

22   THE COURT:

23            I'll allow that.

24   THE WITNESS:

25            I am not sure of the exact date they

26         enrolled.

27   BY MR. HERMAN:

28   Q    Do you know what week or month they enrolled?

29   A    Either late August or early to mid-September,

30   I'm not sure exactly the date.

31   Q    Ms. Dondeville, were you in court on September

32   26th in another one of the class action matters at

1    which time that was the first appearance by Hailey

2    McNamara in that particular case?

3        A    That may have been the first date that they

4    were actually in court, but I believe they had filed

5    papers before that and were involved and had made

6    counsel aware that they were coming in and would

7    be -- the case would be transferred to them.

8        Q    And the counsel who they advised that they

9    would be coming in would be Mr. Wiley Beevers,

10   correct?

11       A    I believe it was actually Mr. Mauterer.

12       Q    And Mr. Mauterer is with Mr. Beevers' firm, you

13   know that?

14       A    Yes.

15       Q    And on the 26th when you appeared before Judge

16   Sullivan, at that time that was a status conference

17   in one of these other matters, a class actions

18   matter?

19       A    Yes.

20       Q    And it's one of the class action matters that

21   is one of the three that you evaluated for purposes

22   of this settlement, correct?

23       A    That matter was not part of this settlement.

24       Q    So as you sit there today, that matter pending

25   before Judge Sullivan, by your opinion, is not part

26   of that settlement?

27   MR. DILEO:

28                Objection, Your Honor.  This goes to

29                issues that is for this Court only to

30                decide, or for the Appellate Court and the

31                Supreme Court.

32   THE COURT:

-59-

1                      Rephrase your question.

2       BY MR. HERMAN:

3       Q       Ms. Dondeville, didn't you just testify that

4       the settlement isn't part of the Oubre matter?

5       MR. DILEO:

6                      Objection.

7       THE WITNESS:

8                      No.

9       BY MR. HERMAN:

10      Q       What did you just testify --

11      THE COURT:

12                     Hold on, wait, there's an objection.

13             Sustained.

14      BY MR. HERMAN:

15      Q       Ms. Dondeville, is it the intention of this

16      particular settlement to settle claims that are

17      pending in three different -- at this time two of

18      which are pending here, and one of which is pending

19      in another jurisdiction?

20      MR. DILEO:

21                     Your Honor, it's the same question.

22      THE COURT:

23                     The only thing that is before this

24                     Court is Orrill and Chalona.

25      MR. HERMAN:

26                     I understand, Your Honor, this is

27                     cross.  And she said she evaluated three

28                     class actions, Judge.  Now if she's only

29                     evaluated two, I'm entitled to know that.

30      THE COURT:

31                     If there wasn't an injunction in place

32                     about discussing the case in another

                              -60-

1             jurisdiction, I wouldn't be so jealously

2             guarding that, Mr. Herman.  I'm going to

3             protect my turf as it were, just like Judge

4             Sullivan protects his jurisdiction.  So

5             that's not a subject for discussion.

6    BY MR. HERMAN:

7    Q     Ms. Dondeville, what do you understand is being

8    resolved by this settlement agreement, what causes of

9    action?

10   A     The only cause of action that is being settled

11   is the Orrill cause of action, according to the class

12   definition that was in the Stipulation of Settlement

13   dated October 1st of 2008.

14   Q     And that's the first time, October 1, 2008,

15   that the Orrill cause of action, as you put it,

16   included the claim specifically for failure to

17   initiate loss of adjustment, correct?

18   MR. DILEO:

19             Your Honor, now this is repetious.

20   THE COURT:

21             I'll allow it.  Overruled.

22   THE WITNESS:

23             I don't know that that was the first

24             time that it included that, but I know that

25             the definition in deed was changed, and the

26             definition was changed through the

27             Stipulation of Settlement.

28   BY MR. HERMAN:

29   Q     Didn't you testify, ma'am, on direct, that

30   there was -- that this particular proceeding in

31   Orrill had been stayed because it was pending appeal,

32   the class certification was pending appeal in the

1     Supreme Court?

2     A     Yes.

3     Q     And when to your knowledge -- when was the last

4     activity in the Orrill case before this matter went

5     up on appeal in class certification?

6     A     The last activity was the certification of the

7     class before it went up.

8     Q     When was that?

9     A     June of 2008, I believe.

10    Q     And in June of 2008, the definition that this

11    Court certified went up to the Fourth Circuit Court

12    of Appeal, is that correct?

13    A     Yes.

14    Q     And the definition in the Fourth Circuit Court

15    of Appeal was then appealed to the Supreme Court,

16    correct?

17    A     Yes.

18    Q     And as of the time prior to October 1, 2008,

19    the certification of this class did not include in

20    its definition the claim for untimely loss

21    adjustment, correct?

22    A     Truthfully, counsel, I can not remember.  I

23    know what the current definition says.  And I can not

24    remember at this moment.

25    Q     Isn't it a fact, Ms. Dondeville, that the claim

26    prior to October 1, 2008, pending before Judge Reese,

27    did not include any hurricane claims for Hurricane

28    Rita?

29    A     I believe that is correct.

30    Q     Isn't it a fact, Ms. Dondeville, that the

31    discovery that had been done in the Orrill case

32    before Judge Reese did not include the taking of any

1    deposition testimony?

2    A    I am not sure if there was depositions taken

3    related to the class certification in this matter, I

4    am not sure.

5    Q    I'm talking about on the merits of the case,

6    not as to the procedure by which it would be handled?

7    A    Then you are correct.

8    Q    I'm sorry?

9    A    Then you are correct, there were no depositions

10   taken to the merits of the matter.

11   Q    There were no corporate representatives of

12   Louisiana Citizens whose testimony had been taken in

13   relation to the merits of the claim in Orrill?

14   A    That's correct.

15   Q    And so at this point in time there has been no

16   deposition testimony taken from Louisiana Citizens on

17   the issue of untimely loss adjustment in the claims

18   pending before Judge Reese?

19   A    In Orrill, no, you're correct.

20   Q    Now, with respect to written discovery, was

21   there written discovery that had been propounded in

22   Orrill directed to Louisiana Citizens to obtain their

23   claims files?

24   A    No, there hadn't been.

25   Q    You would be the person who would have to go

26   through that discovery and respond to it, wouldn't

27   you?

28   A    In conjunction with my counsel, yes.

29   Q    And up to September 15th, any of the activities

30   in Orrill that had been performed on behalf of

31   Louisiana Citizens in any of the three class actions

32   had been performed by the Biennvenue Foster Firm,

1    correct on the record?

2    A    Yes.

3    Q    With respect to the Chalona claim, you

4    mentioned there had been some discovery done in

5    Chalona, and that it had been set for a trial date

6    that was beyond the -- that it had already gotten

7    through the Court of Appeal and it was set for trial?

8    Certification had gotten through the Court of Appeal

9    in Chalona and was set for trial?

10   A    What are you asking me?  Are you asking me if

11   it was set for trial or are you asking me if it had

12   been through the appeal process?

13   Q    Let me break it down, thank you.  I may have

14   mispoke, Ms. Dondeville.  I want to clarify the

15   record.  In Chalona, what was the stage of the

16   proceeding in Chalona when the settlement

17   negotiations began in September, that were September

18   2008?

19   A    We were doing discovery.

20   Q    I'm sorry?

21   A    We were doing discovery.

22   Q    So you were not stayed, the case was proceeding

23   to a trial date?

24   A    Yes.

25   Q    And I think you said, correct me if I'm wrong,

26   the trial date was in June of 2009?

27   A    That is my recollection, yes.

28   Q    What discovery specifically had been done up to

29   that point in September 15th of 2008 in Chalona?

30   A    We had -- we were in the process of answering

31   written discovery.  I believe there was a date set

32   for Stephanie Jackson's deposition.  There was -- we

-64-

1    were still working out, I believe, a date for Chad

2    Brown and whether that was going to go forward.  And

3    there was the issue related to whether or not Mr.

4    Wartman was going to be produced for deposition.

5    Q     Now what was the written discovery to which you

6    were responding in Chalona?

7    A     Answers to interrogatories and request for

8    production.

9    Q     Was it directed specifically to the class

10   claims in Chalona that failure to timely pay?

11   A     I believe that was the claim, so the

12   discovery -- I mean are you asking me what the

13   discovery requested?

14   Q     Yes, I'm asking was it directed to that cause

15   of action or was it directed to identification of

16   witnesses, for instance?

17   A     It was directed towards everything.  It was

18   very broad discovery.

19   Q     Had there been any motion practice on the

20   discovery?

21   A     Not at that time.

22   Q     As of September 15th?

23   A     Not at that time, correct.

24   Q     Had there been any motion practice after

25   September 15th on the Chalona discovery?

26   A     On the discovery, no.

27   Q     Had there been any motion practice up through

28   and including October 8th when you last were

29   preparing your defenses in the case?

30   A     No.

31   Q     So as of October 8th, 2008, and that's

32   approximately a week, I think the settlement,

-65-

1    preliminary settlement was approved on October 1st,

2    there was no discovery which had been completed in

3    Chalona, correct?

4    A      I believe that the answer to our answer to

5    interrogatories and request for production had been

6    completed.  I don't know that they had been sent to

7    opposing counsel.  But I believe that it had been

8    completed.

9    Q      But are you saying you don't know if it had

10   been sent to opposing counsel, or you're telling me

11   that -- because I thought your earlier testimony, and

12   I'm not wanting to argue, I just want clarification,

13   was that you were preparing to respond and then the

14   settlement occurred and it was never necessary to

15   respond?

16   A      No.  I was preparing to respond, Gustav hit and

17   I was tied up with Gustav and Ike for the better part

18   of a month and a half.  And then when we started

19   focusing on that again I began finishing putting it

20   together and then the settlement occurred.  So all

21   these things were kind of occurring about the same

22   time.

23   Q      I understand.  So to your knowledge the

24   discovery in Chalona was never submitted to opposing

25   counsel?

26   A      I can not say that for sure.  I don't believe

27   it was, but I can not say that with certainty.

28   Q      Okay.  In any event, were there -- do you

29   recall whether or not it was going to be responsive

30   discovery or was part of it going to be objected to

31   or part of it was going to be responded to?  Do you

32   remember?

-66-

1    A    Yes, I do.  Part of it was going to be objected

2    to and part of it was going to be responded to.

3    Q    But in any event, there were no Motions to

4    Compel ever filed in connection with the discovery

5    that you were preparing in Chalona?

6    MR. DILEO:

7                    Objection, Your Honor. I'm sorry, Your

8                    Honor, I withdraw the objection.

9    THE COURT:

10                   Okay.

11   THE WITNESS:

12                   I believe there was a Motion to Compel

13                   filed in Chalona.

14   BY MR. HERMAN:

15   Q    But not in response to anything you produced to

16   the plaintiffs, is that right?

17   A    No.  But it was related to the scheduling of

18   depositions, and if I recall, it may have been not

19   specifically related to the discovery we answered,

20   just that it had not been answered yet.  So I believe

21   there was a motion pending at some point around

22   the -- around the end of September or early October

23   if my recollection serves.

24   Q    Now, as to the two matters that you have

25   discussed with us so far, was there any other

26   discovery conducted in any other class action cases

27   that would have been applicable to the two claims,

28   the Chalona claim and the Orrill claim, as they had

29   been certified by the different courts as of

30   September 15th?

31   MR. DILEO:

32                   Objection, Your Honor, I call for

-67-

1            specification.  If he's talking about
2            Oubre, I don't think that that is
3            appropriate to go into.  If he's talking
4            about Chalona, those are the only two class
5            actions --
6   THE COURT:
7            My assumption is that he is only
8            talking about Orrill or Chalona.
9   MR. HERMAN:
10            The question speaks for itself, Judge.
11   MR. DILEO:
12            Your Honor, I think the Court's ruling
13            speaks for itself.
14   THE COURT:
15            Ms. Etheridge, read the question back.
16       (Whereupon, the preceding question was read back
17   by the court reporter.)
18   THE COURT:
19            Okay.  Now I'm going to ask what
20            you're referring to, Mr. Herman?
21   MR. HERMAN:
22            I am referring to any discovery which
23            had been produced by Louisiana Citizens in
24            connection with the claims that are alleged
25            in Chalona and the claims that are alleged
26            in Orrill.
27   MR. DILEO:
28            That's a different question.
29   MR. HERMAN:
30            I'm asking about this one, Judge.
31            Thank you.
32   THE COURT:

-68-

```
1                          Only Orrill and Chalona, that's the
2                    only thing that's before this Court, that's
3                    the only thing that's relevant.
4                          Do you understand the question?
5    THE WITNESS:
6                          I do.  And I'm having a difficult time
7                    answering it because the way it's phrased,
8                    any other discovery in my mind takes into
9                    account --
10   THE COURT:
11                         Ma'am, the only thing you need tot
12                   answer --
13   THE WITNESS:
14                         Then there was no other discovery that
15                   was done related to Orrill and Chalona
16                   specifically.
17   BY MR. HERMAN:
18   Q     Now, you understand I'm referring to Orrill and
19   Chalona as the two causes of action, the one for
20   failure to timely pay and the one for failure to
21   timely initiate loss adjustment, correct?
22   A     I understand you are referring to Orrill and
23   Chalona.
24   Q     Do you understand the two claims that are
25   asserted in Orrill and Chalona?
26   A     I do.
27   Q     Now, when you did your analysis of this
28   settlement, did you consider any material from
29   Louisiana Citizens which had not yet been produced in
30   Orrill or Chalona or in any other proceeding?
31   THE COURT:
32                         We are only talking about Orrill and
```

-69-

1           Chalona.

2    MR. HERMAN:

3               Judge, you know --

4    THE COURT:

5               Mr. Herman, and there is an elephant

6               in the room, and I have spoken to Judge

7               Sullivan, and I'll say again on the record,

8               and we both mutually agree to handle the

9               cases in our respective courts.

10   MR. HERMAN:

11              I understand, Judge.

12   THE COURT:

13              If you have any belief or objection to

14              this settlement and the reasonableness and

15              fairness of it then you bring that forward.

16   MR. HERMAN:

17              Yes, sir, I'm doing that.

18   THE COURT:

19              But any issues related to Oubre are

20              not part of these proceedings, as I have

21              said repeatedly.

22   BY MR. HERMAN:

23   Q      Ms. Dondeville, in your testimony, if I

24   understood it correctly, the negotiations began on

25   September the 15th, what was the opening offer by the

26   plaintiffs?

27   A      First of all I said it was approximately

28   September 15th.

29   Q      Yes, ma'am.  On or about September 15th, ma'am.

30   A      I honestly do not recall.

31   Q      Do you recall what opening counter-offer was?

32   A      I honestly do not recall.

1    Q    Do you recall any of the offers and

2    counter-offers besides the 35 million dollars for

3    attorneys fees and the settlement trust?

4    MR. DILEO:

5                 Objection, Your Honor, pursuant to the

6                 Court's ruling I believe the question is

7                 limited to the high and the low.

8    THE COURT:

9                 That was the ruling of the Court.

10                Sustained.

11   BY MR. HERMAN:

12   Q    So the only number that you do recall today is

13   the 35 million dollar number?

14   A    No, that's not correct.

15   MR. HERMAN:

16                And Your Honor won't let me inquire as

17                to what the other numbers exchanged were?

18   THE COURT:

19                As I indicated to you, I balanced the

20                interest involved, that's the ruling I

21                think is reasonable.

22   BY MR. HERMAN:

23   Q    Now Ms. Dondeville, at what point in the

24   process was that number of 30 million dollars arrived

25   at, what date?

26   MR. DILEO:

27                You mean the 35 million?

28   MR. HERMAN:

29                The 30 million dollars, as I

30                appreciate it.  I want to know about first

31                the 30 million, and then the five million.

32                Because Your Honor, you see the cardinal

-71-

1          rule is you first have to get to the number
2          for the claimants, you can not settle a
3          case for attorney's fees before you discuss
4          and resolve the issue for the plaintiff.
5          That's what I appreciate the law.
6    THE COURT:
7              You understand the question, ma'am?
8    THE WITNESS:
9              I do.
10   THE COURT:
11             Answer the best you can.
12   THE WITNESS:
13             I believe it was, and now thinking
14         about it back as to, I think it was around
15         the 18th of September, which would mean the
16         initial time that this settlement was
17         discussed had to have been before the 15th.
18         So it would have been the week before that
19         the initial time it was discussed, but the
20         first time I remember hearing about the 30
21         million dollars figure was about the 18th
22         of September.  I believe it was a Thursday.
23   BY MR. HERMAN:
24   Q    Was that at the same time you heard about the
25   five million dollar attorney fee figure?
26   A    If not the 18th then it would have been the
27   next day.
28   Q    Do you know what the opening number by the
29   plaintiffs counsel was for the attorneys fee
30   provision?
31   A    Seven and a half to ten million is my best
32   recollection.

1     Q    And do you know what the original counter-offer

2    was from Louisiana Citizens on the attorneys fees?

3    A    I do not recall.

4    Q    Do you recall any of the numbers on the

5    attorneys fees with respect to the back and forth

6    negotiations?

7    MR. DILEO:

8              Same objection.

9    THE COURT:

10             Sustained.

11    BY MR. HERMAN:

12    Q    Well, let me ask you this --

13    MR. HERMAN:

14             Your Honor, I'd like to ask if --

15         was -- do you know whose number the five

16         million dollars was? Did it come from the

17         plaintiffs or did it come from Citizens?

18         Who initiated that particular number?

19    THE COURT:

20         It's what the settlement is, Mr.

21         Herman.

22    MR. HERMAN:

23         I understand, Judge.

24    THE COURT:

25         Well, I mean obviously it was a

26         compromise that was agreed to.  That's what

27         we are talking about.

28    MR. HERMAN:

29         Well, Judge --

30    BY MR. HERMAN:

31    Q    Ms. Dondeville, can you tell me who made the

32    offer of five million dollars as settlement of the

```
 1      attorneys fees, which side?
 2      MR. DILEO:
 3                    Your Honor, this is the same objection
 4              as before, it's the same line.
 5      MR. HERMAN:
 6                    Well, we don't know if it came from
 7              the plaintiffs --
 8      THE COURT:
 9                    I'll allow that.  I'll allow that.
10              Who made the offer and who accepted it, if
11              she knows.
12      THE WITNESS:
13                    I really don't remember.
14      BY MR. HERMAN:
15      Q    Now, can we go to the settlement definition,
16      ma'am, do you have that before you?  I believe it's
17      P-4.
18      A    No, I don't have any exhibits before me.
19      MR. HERMAN:
20                    Let me see if we can get the
21              settlement.
22      THE COURT:
23                    The Stipulation of Settlement is P-3.
24      MR. HERMAN:
25                    Sorry, Your Honor.
26      BY MR. HERMAN:
27      Q    Ms. Dondeville, I'm going to show you the
28      document which plaintiffs counsel has offered as P-3,
29      are you familiar with the document?
30      A    Yes, I am.
31      Q    Were you a party to help draft the document?
32      Or was it presented to you as a completed document?
```

-74-

1    A    It was presented to me in draft form for me to

2    make comments as counsel would to any client.

3    Q    Let me ask you this, as of the date, when did

4    you first see this first draft?

5    A    September 26th.

6    Q    What had transpired between September 18th --

7    A    No.  And that date is wrong.  It was September

8    28th or 29th.

9    Q    Was there any correspondence exchanged between

10   counsel for Louisiana Citizens and counsel for the

11   plaintiffs to confirm a parameters of settlement that

12   predated the first draft?

13   A    Yes, I believe there was.

14   Q    And what was the -- is that correspondence here

15   with you today?

16   A    No, it's not.

17   Q    Did the -- did it provide essentially what is

18   in the Stipulation of Settlement?

19   A    It was the frame work, the stipulation is much

20   more detailed, but it has essentially the same frame

21   work.

22   Q    And does it -- do you remember -- I'm sorry,

23   did you say you don't remember when that

24   correspondence was first dated or initiated?

25   A    I believe it was around the 22nd or 23rd of

26   September.

27   Q    So you had a frame work for a settlement as of

28   September 26th, 2008, correct, as represented by that

29   letter?

30   A    We had a general frame work, yes.  We had not

31   discussed any -- we had not negotiated any of the

32   details of it.

-75-

1    Q    What had been negotiated?  What details had

2    been negotiated or included within that frame work?

3    MR. DILEO:

4              Your Honor, continuing objection.  I

5              know the Court's ruling was clear as to the

6              extent that Mr. Herman would be able to go

7              into as being the high and the low, which

8              the witness says she does not recall.  He

9              is going in to a lot of other details that

10             I don't think are applicable here and are

11             outside of the Court's ruling.

12    MR. PATIN:

13             Also, Your Honor, it's attorney-client

14             privilege, irrespective of Mr. Herman's

15             assertion, you can still not invade the

16             attorney-client privileged communications.

17    MR. HERMAN:

18             Your Honor, it can't be an

19             attorney-client privilege for two lawyers

20             to put together a frame work for

21             settlement, exchange correspondence on it,

22             it's not privileged by anything.  Now with

23             respect to the particulars, I was trying to

24             establish a date on the letter was

25             exchanged and what it included.

26    MR. DILEO:

27             It's also work product, Your Honor.

28    THE COURT:

29             Wait, hold on.  Go ahead Mr. Herman.

30    MR. HERMAN:

31             I'm trying to establish, Your Honor,

32             based upon the witness' answer, the details

1            had not been worked out.  I'm just asking

2            what details had not been worked out and

3            what details had been worked out as of the

4            time the letter was confected.

5       MR. DILEO:

6                In response to that, Your Honor, how

7            does that go to the issue of whether this

8            settlement is fair when we know what the

9            settlement ultimately reached was?  I don't

10           see how it does.  What the consideration of

11           the Court should be is the six Reed

12           factors.  And I don't see how this falls

13           within any of those.

14      MR. HERMAN:

15               Your Honor, there is an allegation, or

16           at least an item of the Reed analysis that

17           speaks to the six factors, the first factor

18           is collusion.

19      THE COURT:

20               I have already read it, Mr. Herman, I

21           don't need you to argue to me.  What's your

22           point?

23      MR. HERMAN:

24               My point is, Judge, I'm entitled to

25           get in to this to establish in fact whether

26           there was or not any collusion, whether

27           there was or not the other five factors.

28           And if the record is made and demonstrates

29           that there wasn't, what possible harm could

30           they be to these people?  I would think

31           they would want that information before

32           this Court.

```
 1    THE COURT:
 2               I tell you what, if either plaintiff
 3               or defendants have a copy of that
 4               correspondence, give it to the Court, I'll
 5               do an in camera inspection and decide
 6               whether or not there is anything you need
 7               to see.
 8    BY MR. HERMAN:
 9    Q    Ms. Dondeville, the stipulation --
10    THE COURT:
11               Hold on.  Do either of you have a copy
12               of that?
13    MR. CULOTTA:
14               We do not.
15    MR. DILEO:
16               I do not.
17    MR. HERMAN:
18               Your Honor, I ask for production of
19               the document.  Obviously it was the basis
20               of the Stipulation of Settlement.  I can't
21               think of a more germane document, Your
22               Honor, than that that was the genesis of
23               the settlement.
24    THE COURT:
25               I asked for an in camera review, if
26               you have it give it to me.
27    MR. DILEO:
28               Your Honor, we will try.  I just want
29               to -- I'm not clear as to, you're talking
30               about a letter from Hailey McNamara to Ms.
31               Dondeville?
32    THE COURT:
```

```
1                    No. Ms. Dondeville has testified that
2              apparently there was some correspondence
3              between counsel that made the basis
4              structure of the Stipulation of the
5              Settlement.  And what's contained in the
6              letter pretty much ended up in the
7              stipulation, as I understand the testimony.
8              What I'm saying to you is that I would like
9              to see the letter that was transmitted
10             either by defense to the plaintiffs or
11             vice-a-versa, and sometime in late
12             September of 2008.  That's what we are
13             talking about.
14   MR. DILEO:
15                    We'll see if we can get a hold of it.
16   BY MR. HERMAN:
17   Q     Ms. Dondeville, the Court decided that -- the
18   Court understood that the letter contained
19   essentially the terms of the settlement, I believe,
20   is that what your testimony is?
21   A     It included the basic frame work, which was the
22   dollars and the thousand dollars per person.
23   Q     Did it discuss the estoppel or res judicata
24   effect that Louisiana Citizens was seeking in the
25   course of the settlement?  Or was that something that
26   was added after ending the stipulation of the
27   settlement?
28   A     I don't believe there was such language in
29   there.  It's been a long time since I looked at that
30   letter.
31   Q     Did the letter include a definition of the two
32   classes that were going to be merged into the Orrill
```

1    proceeding in order to resolve the claims that are

2    set forth and alleged for the class proposed to be

3    certified by this there this settlement statement?

4    A    I honestly can not recall.  Like I said, it's

5    been a long time since I looked at that letter.

6    MR. DILEO:

7                      Excuse me, Mr. Herman.

8                      Your Honor, we are putting in a call

9               to my office trying to get a hold of the

10              letter and get it faxed over to the Court.

11              We hope to do that shortly.

12   THE COURT:

13                      Very well.

14   BY MR. HERMAN:

15   Q    As I appreciate the terms of the settlement,

16   Mrs. Dondeville, once it is concluded the only remedy

17   for any Louisiana Citizens policyholder who has a

18   penalty claim would be an individual lawsuit, is that

19   correct?

20   A    That's not once it's concluded, it's part of

21   the notice of the settlement that people were given

22   time to opt out if they wanted to and they had until

23   December 1st to do that.  Then they could have their

24   own individual remedy if they choose to take that

25   out.

26   Q    So no other -- from your point of view no other

27   class action would be viable after the December 1st

28   opt out?

29   MR. DILEO:

30                      Objection, Your Honor.  It's not

31              enough information for her to answer the

32              question.  So improper foundation.

1     MR. HERMAN:

2                     I object to counsel testifying, Your

3            Honor.

4     MR. DILEO:

5                     I'm sorry, Your Honor.

6     THE COURT:

7                     Wait, wait, gentlemen, make your

8            objection.

9     MR. DILEO:

10                    If I can finish my objection.

11    THE COURT:

12                    Go ahead.

13    MR. DILEO:

14                    Now, Your Honor, it assumes facts not

15           in evidence first of all.  But there's no

16           proper foundation laid.  I think you will

17           find that when a foundation is laid it --

18    MR. HERMAN:

19                    Objection to a speaking objection,

20           Your Honor.

21    MR. DILEO:

22                    Your Honor, I think we have been

23           giving Mr. Herman wide latitude to do that

24           throughout the proceedings, and I haven't

25           been trying to do that.

26    THE COURT:

27                    What's your objection, counsel?

28    MR. DILEO:

29                    My objection is that there is improper

30           foundation and that the only foundation

31           would be an Oubre foundation.

32    MR. HERMAN:

-81-

```
 1                    Objection.  Your Honor, if I might, I
 2               am simply asking Ms. Dondeville in the
 3               course of --
 4    BY MR. HERMAN:
 5    Q     Let me ask it this way, Ms. Dondeville, what
 6    was the bargain to Louisiana Citizens by doing this
 7    deal?  What's in it for Louisiana Citizens?
 8    A     Resolution of the Toni Orrill lawsuit, class
 9    action lawsuit, as it was, as stated in the
10    stipulation of settlement.
11    Q     And that would include, if I -- am I correct in
12    reading this stipulation, that would include any
13    claims for failure to initiate loss adjustment
14    timely?
15    A     It includes anything that is included in the
16    class definition in the Stipulation of Settlement
17    entered into in the Toni Orrill versus Louisiana
18    Citizens class action suit.
19    Q     Ma'am, I want you to turn to the definition.
20    A     I have it, counsel.
21    Q     Would you read it for the record, please,
22    ma'am?
23    MR. DILEO:
24                    Objection, Your Honor.
25    THE COURT:
26                    I'll allow it.  Go ahead and read it,
27               ma'am.
28    THE WITNESS:
29                    "All present or past insures of
30               Louisiana Citizens Property Insurance
31               Corporation, also known as Louisiana
32               Citizens Fair Plan, hereinafter referred to
```

```
 1              as LCPIC, who on or after August 29, 2005
 2              provided notification of loss resulted from
 3              Hurricane Katrina and/or Rita to LCPIC and
 4              whose loss adjustment was not initiated
 5              within 30 days after notification of loss,
 6              and/or whose claims were not followed by a
 7              written offer to settle within 30 days
 8              after receipt of satisfactory proof of
 9              loss".
10    BY MR. HERMAN:
11    Q      And in the preamble to this paragraph it says
12    that "It is intended to finally and forever resolve
13    and discharge all the released claims", correct?
14    A      All the released claims that are included in
15    the class definition that I just read in the Orrill
16    versus Citizens certified class action.
17    Q      As of September 26th, 2008, no Citizens'
18    counsel had approached Mr. Beevers to settle the
19    matters that are the subject of the 30 day failure to
20    initiate loss adjustment?
21    MR. DILEO:
22              Objection, Your Honor.
23    THE COURT:
24              Sustained.
25    BY MR. HERMAN:
26    Q      Ms. Dondeville, who is the person in this
27    plaintiffs group that is charged with the
28    responsibility to represent the interests prior to
29    October 1, 2008 of those persons that are defined in
30    this settlement as having provided notification as a
31    result of Hurricane Rita and Katrina to Louisiana
32    Citizens whose loss adjustment was not initiated
```

-83-

1     within 30 days, which of these plaintiffs' counsel as

2     of September 26th, 2008 had that responsibility?

3     A     Assuming that the definition of Orrill

4     included, and I believe it did, some reference to

5     initiation of loss adjustment, that would have been

6     Ray Orrill and Jeff Berniard who were counsel for

7     record for Toni Orrill and that class action.

8     Q     But Mr. Orrill -- Mr. Orrill didn't participate

9     in negotiations with your counsel, did he?

10    MR. DILEO:

11              Objection, asked and answered, she

12         said he did.

13    MR. HERMAN:

14              No, she didn't.

15    MR. DILEO:

16              Yes, she did.

17    THE COURT:

18              Wait, wait, wait, hold it.

19    MR. HERMAN:

20              I'm sorry.  Let me go back.  If I've

21         mispoken I'll get it straight, Judge.

22    THE COURT:

23              She did include Ray Orrill.

24    BY MR. HERMAN:

25    Q     Do you know, ma'am, if there were any other

26    attorneys representing persons with this cause of

27    action in a class action as of September 26th, 2008?

28    A     I don't believe so.

29    Q     And so the attorneys who were representing all

30    the past and present insureds of Louisiana Citizens,

31    who had, on or after August 29th, 2005, had a claim

32    for untimely loss adjustment in this definition, it's

-84-

```
 1    your testimony there were no other attorneys in a
 2    class action matter, is that right?
 3    MR. DILEO:
 4                    Objection, asked and answered.
 5    MR. HERMAN:
 6                    This is cross, Your Honor.  I just
 7              want to make the record clear.
 8    THE COURT:
 9                    Restate the question.
10    BY MR. HERMAN:
11    Q     Ms. Dondeville, is it your testimony that there
12    was no other attorneys who had an obligation to
13    represent plaintiffs in a class action for untimely
14    loss adjustment as of September 26th, 2008?
15    A     Mr. Herman, you asked me who was representing
16    essentially the Orrill class as of September 26th,
17    2008.
18    Q     No, ma'am.
19    A     That's how I understood your question.  So if I
20    misunderstood your question I apologize.
21    Q     You did, ma'am.
22    A     But as my understanding --
23    Q     You misunderstood it and let me ask the court
24    reporter to read it back to you so you can understand
25    it.
26          (Whereupon, the preceding questions were read
27    back by the court reporter.)
28    THE WITNESS:
29                    Counsel, I believe that calls for me
30              to make a legal conclusion that I'm not
31              comfortable to make as to who had an
32              obligation to represent a class.  I'm
```

-85-

```
 1              sorry, I'm not comfortable giving that
 2              answer.
 3    BY MR. HERMAN:
 4    Q      You're not comfortable?
 5    A      No, because it's asking me for a legal
 6    conclusion.
 7    Q      You are on notice of other attorneys who had
 8    made and had certified a class that involved that
 9    class action?
10    A      I am aware that there was another class action
11    pending in another parish that had those allegations.
12    Q      And are you aware that there were no contacts
13    with that particular person, that would be Mr.
14    Beevers, correct?
15    MR. DILEO:
16              Objection, Your Honor.
17    THE COURT:
18              Sustained.
19    BY MR. HERMAN:
20    Q      You were present at multiple status conferences
21    in that other litigation you just mentioned, correct?
22    MR. DILEO:
23              Objection, Your Honor.
24    THE COURT:
25              Sustained.
26    MR. HERMAN:
27              What is the basis of the objection,
28              Judge?
29    THE COURT:
30              Well, candidly the Court will say ex
31              proprio motu, I told you Oubre is not part
32              of these proceedings, why she attended
```

```
1              status conferences, court appearances in
2              Oubre is of no moment.
3    MR. HERMAN:
4                   Your Honor, all I'm looking for is her
5              state of mind during these negotiations
6              while they were negotiating to settle the
7              claim where they knew other counsel were
8              involved, and I'm trying to demonstrate for
9              this Court and this record that Ms.
10             Dondeville knew there were other people
11             involved.  She has testified to that.
12             She's testified that she knew there was a
13             cause of action pending elsewhere in a
14             class action. She's testified to that.  And
15             I am entitled to get into it and Your Honor
16             has ruled and I respectfully disagree.
17   THE COURT:
18                  Well, your objection is noted for the
19             record.  Ask another question.
20   BY MR. HERMAN:
21   Q    Ms. Dondeville, are you aware of what the
22   demographics of your Louisiana Citizens policyholders
23   were as of Hurricanes Katrina and Rita?
24   THE COURT:
25                  Demographics in what regard, counsel?
26             I don't understand your question.
27   MR. HERMAN:
28                  In other words, did it include a cross
29             section of the community?  Did it include
30             those who, as I think she testified as to
31             some demographic information, those who
32             could not obtain policies.  She testified
```

-87-

```
1              that they're a company of last resort, that
2              for whatever reasons those properties are
3              not desirable for other insurers.  I think
4              I'm entitled to ask that.
5   THE COURT:
6                   Well, but the problem I'm having is
7              your definition of demographic.  I think
8              you need to clarify that, counsel.
9   BY MR. HERMAN:
10  Q     Ms. Dondeville, do you know if the
11  policyholders of Louisiana Citizens typify the
12  demographics of the State of Louisiana in that there
13  are so many percentage of those who are educated, so
14  many percentage of college educated, so many
15  percentage high school educated, anything, any
16  information like that?
17  A     No.
18  Q     Now insurers do typically analyze the
19  demographics of their policyholders, do they not?
20  A     I am not aware of what insurance typically do.
21  I can tell you that Louisiana Citizens does not.
22  Q     I guess what I'm asking you is, is the
23  Louisiana Citizens policyholders, if you know,
24  predominantly lower income policyholders or upper
25  income policyholders?
26  A     It's predominantly south of I-10, and so my
27  understanding is that there are people of all walks
28  of life that live south of I-10, so I can't tell you
29  that, particularly their, what somebody's education
30  or socio-economic status is, but they're
31  predominantly south of I-10 and south of I-12.
32  Q     So geographically you understand what the
```

-88-

1    population of your policyholders is?

2    A    That's the typical one, but we also have a few

3    thousand policies in Shreveport and the Monroe area

4    also.  And we have some in Baton Rouge, but typically

5    it's south of 10 and south of 12.

6    Q    Okay.  Now would you refer to the notice,

7    please.  I think it was introduced as part of the

8    settlement package, and identified separately as, I

9    think I got it right, P-4.

10    A    I don't have it in front of me, counsel.

11    Q    I believe it's P-4.  That would be the notice

12    in the --

13    A    Counsel, just so you know, there is nothing on

14    this exhibit, it's blank.

15    Q    Yes, but that's the notice, isn't it? This

16    is the proposed notice in the Orrill class action,

17    isn't it, ma'am?

18    A    Yes, it is.

19    Q    And I call your attention to the final

20    paragraph on Page 2.

21    A    The final full paragraph, the one that has the

22    title --

23    Q    Proposed final settlement, you see that?

24    A    Yes, I see it.

25    Q    You see where it says in return for this

26    payment Louisiana Citizens, the class members and

27    individual plaintiffs will release and dismiss

28    Louisiana Citizens from this class action litigation

29    and any litigation brought by similar class members

30    in actions pending in other jurisdictions, you see

31    that?

32    A    Yes.

1     Q     Do you know if that language was promoted by
2     Louisiana Citizens or was it promoted by the
3     plaintiffs?
4     A     Again, I believe it was the subject of
5     negotiations.  I wouldn't say that one side promoted
6     it or the other.  This is a compromise settlement.
7     Q     You are saying that both sides equally
8     sponsored this?
9     A     That's not what I said.  I said it was based
10    upon a compromise after negotiations, counsel.  And
11    no, I'm not saying --
12    Q     Who proposed that language, do you know which
13    side?
14    MR. DILEO:
15                    Objection, asked and answered.
16    THE COURT:
17                    Sustained.
18    BY MR. HERMAN:
19    Q     Do you know who proposed the language would be
20    broad enough to include similar class members in
21    actions pending in other jurisdictions?
22    MR. DILEO:
23                    Asked and answered.
24    THE COURT:
25                    Sustained.
26    BY MR. HERMAN:
27    Q     Do you know what effect of that language is?
28    What is the effect to Louisiana Citizens?  As a fact
29    matter what is the effect?
30    MR. DILEO:
31                    Is he asking her from a legal
32                    conclusion standpoint or?

-90-

```
 1      MR. HERMAN:
 2                  Does she know, Judge?  If she knows,
 3              she knows.  If she doesn't know she doesn't
 4              know.
 5      THE COURT:
 6                  If you know the effect, ma'am, state
 7              it.
 8      THE WITNESS:
 9                  I know based upon my understanding of
10              what res judicata is, and I know what this
11              language means and the effect.
12      BY MR. HERMAN:
13      Q       What is it?
14      A       That any other suits will be dismissed.
15      Q       So are you telling me that you don't know
16      whether that was a requirement of this settlement put
17      in by Louisiana Citizens or a requirement put in by
18      the plaintiffs?
19      A       I believe I answered that, it was a part of --
20      it was the subject for compromise and negotiations.
21      Q       Is that a yes or a no, ma'am?
22      MR. DILEO:
23                  Objection, Your Honor.
24      THE COURT:
25                  Hold on. Hold on.
26                  Ma'am, do you know or not?
27      THE WITNESS:
28                  I really don't know.
29      MR. HERMAN:
30                  Thank you.
31      THE COURT:
32                  She doesn't know, that's her response.
```

-91-

1      MR. DILEO:

2                     Your Honor, we have the settlement

3              confirmation letter.

4      THE COURT:

5                     Pass it forward.

6      BY MR. HERMAN:

7      Q      I want you to go now, ma'am, to the second to

8      last paragraph on Page 3 above consequences of class

9      membership, it's the second to last paragraph

10     beginning "If approved".

11     A      Okay.

12     Q      It says, "If approved the settlement will

13     discharge Louisiana Citizens from any further

14     liability to class members or individual plaintiffs

15     both in this matter and in any other matters which

16     arise pursuant to the class definition."  You see

17     that?

18     A      Yes, I do.

19     Q      And that would have the same res judicata

20     effect, correct?

21     A      Under my understanding of the law, yes.

22     Q      And did you or Mr. Culotta or any one on the

23     defense team have any conversation with anyone other

24     than, other than Mr. Dileo, Mr. Berniard, Mr.

25     Bandaries or Mr. Orrill, to resolve all other class

26     actions?

27     MR. DILEO:

28                     Objection, Your Honor.  This has been

29              asked, answered, sustained repeatedly.

30     THE COURT:

31                     How is that relevant, Mr. Herman?

32     MR. HERMAN:

-92-

1              Your Honor, it's relevant to

2         demonstrate that a previously certified

3         class in another jurisdiction, who has

4         class counsel appointed for it and to

5         represent their rights has been taken out

6         of this negotiation process, which clearly

7         is a fundamental flaw in this entire

8         process.

9    THE COURT:

10             It's not part of these proceedings.

11   MR. HERMAN:

12             It is in deed part of these

13        proceedings by virtue of the res judicata

14        effect sought, Judge.

15   THE COURT:

16             Well, whether -- if she is

17        testifying -- she already testified as to

18        who participated in these negotiations, who

19        arrived at this settlement, that's all I'm

20        concerned with.

21   MR. HERMAN:

22             I understand, and that's what I asked

23        her.  She did not discuss it with any other

24        lawyers.

25   THE COURT:

26             Okay.  Then she's already testified as

27        to who participated in it.

28   MR. HERMAN:

29             Your Honor, I don't think that's clear

30        from the record, I really don't, because

31        this is a different question.  And I

32        understand that is your understanding,

-93-

1              Judge, but this is a different question.
2              In fact, the other way I tried to ask it --
3    THE COURT:
4              Mr. Herman, I don't think it could be
5              more clear in that she's already testified
6              as to who participated in the discussion.
7              And you're asking a question that's already
8              been asked.
9    MR. HERMAN:
10             Judge --
11   THE COURT:
12             So I sustain the objection.  Ask
13             another question.
14   BY MR. HERMAN:
15   Q    Ms. Dondeville, by virtue of this settlement
16   document your Louisiana Citizens and the plaintiffs
17   are asking this Court to approve a settlement for
18   folks who are unrepresented in their settlement,
19   correct?
20   A    No, I don't believe that's correct.
21   Q    And tell me why it's not correct when you have
22   a class that's already been certified in another
23   court who had no involvement in these negotiations,
24   why is that not correct?
25   MR. DILEO:
26             Objection, Your Honor.
27   THE COURT:
28             Sustained.
29   MR. DILEO:
30             Your Honor, could I make a continuing
31             objection so I don't have to keep doing
32             this?  I have been not objecting to the

-94-

```
 1              fact that Mr. Herman's objections have been
 2              in the way of long, long, tedious
 3              sometimes, arguments to the Court.  And I
 4              have been trying not to do that to maintain
 5              the decorum of the courtroom so that we get
 6              out of here before next month.
 7    THE COURT:
 8              Oh, we will.
 9    MR. DILEO:
10              I would just ask that the Court,
11              rather than stand up every time he objects
12              and argues his objections --
13    THE COURT:
14              You know, I have the benefit of being
15              a practitioner and a litigator, and I
16              understand that a record needs to be made.
17              I allow attorneys a little bit of latitude
18              to make their case.  By the same token, I'm
19              not going to try the same case, and I am
20              not going to have the same questions asked
21              3 or 4 times.
22    MR. HERMAN:
23              I appreciate that, Your Honor.
24    THE COURT:
25              But I will cut it off.
26    MR. HERMAN:
27              Yes, sir.  I am trying to wrap it up.
28              I might add, Your Honor, I think it's an
29              unwarranted observation by Mr. Dileo.  But
30              in any event.
31    THE COURT:
32              Well, everybody gets to pontificate
```

```
1              just a little bit, Mr. Herman, don't you
2              think?
3    MR. HERMAN:
4              Your Honor, obviously I don't think.
5    THE COURT:
6              Well, I'm not commenting on that
7              either, but anyway let's go.
8    BY MR. HERMAN:
9    Q    Ms. Dondeville, with respect to the sentence
10   that was just read to you, the "if approved"
11   language --
12   A    Yes.
13   Q    -- wouldn't a reasonable person seeing this
14   language understand that all class actions are being
15   resolved by this notice?
16   MR. DILEO:
17             Objection, Your Honor, to the extent
18             the document speaks for itself.  And he is
19             asking her to comment on what is in the
20             purview of the class reps.
21   THE COURT:
22             I think she's already answered the
23             question, counsel.  She gave testimony
24             regarding res judicata.
25   MR. HERMAN:
26             Judge, I'm asking her with respect to
27             the particular language in the notice.
28   THE COURT:
29             Already answered that.  She already
30             gave her opinion as to it, that's what I
31             heard.
32   MR. HERMAN:
```

1                    Judge --

2       THE COURT:

3                    She did.

4       MR. HERMAN:

5                    I heard you, Judge.

6       THE COURT:

7                    If we need to find it in the record,

8            I'll show you.

9       MR. HERMAN:

10                   No.  What I'm asking -- that is from

11           her perspective, Your Honor, I understood

12           her direct testimony and she is siting up

13           here --

14      THE COURT:

15                   This is pursuant to your question, it

16           happened about 10 minutes ago, Mr. Herman.

17      MR. HERMAN:

18                   That's not what I'm referencing,

19           Judge.

20      THE COURT:

21                   State your question again.

22      BY MR. HERMAN:

23      Q    Ms. Dondeville, this notice purports to

24      communicate to the class members that if they accept

25      this settlement, and if it's approved, it will end

26      all class actions against Louisiana Citizens, is that

27      correct?

28      MR. DILEO:

29                   Objection, asked and answered.

30      THE COURT:

31                   Well, no, that's a different question

32           than what you're asking her to do is give

-97-

```
 1                the opinion of all the class members.  I
 2                don't think she is capable of doing that,
 3                counsel.
 4      MR. HERMAN:
 5                I didn't ask --
 6      THE COURT:
 7                Hold on one second, listen to your
 8                question.
 9                Read it back, please.
10      MR. HERMAN:
11                I'll try to rephrase it, Judge.
12      THE COURT:
13                All right.
14      BY MR. HERMAN:
15      Q    Ms. Dondeville, isn't the notice in this
16      case -- you understand what a class action notice
17      purports to do?
18      A    Yes.  Thank you.
19      Q    What does it purport to do?
20      A    It gives notice to the class members about the
21      settlement and tells them what their options are.
22      Q    Does it tell them what their obligations are?
23      A    Yes, it tells them what their options are and
24      their obligations in order if they want to be a part
25      of the settlement, or if they choose not to be part
26      of the settlement.
27      Q    Isn't it your position that this notice very
28      clearly and accurately depicts four class members,
29      that they will lose all of their rights in class
30      action, litigation, involving the penalties defined
31      in this notice if this settlement is approved and
32      they sent it?
```

-98-

1    A    Yes.  And I'm just making sure I followed your

2    question because it was a little long, I'm sorry, Mr.

3    Herman.

4    MR. HERMAN:

5              That's quite all right.  I thank you,

6              Ms. Dondeville.

7              Your Honor, we just simply note for

8              the record we are reserving our objections

9              on all of the sustained rulings of the

10             Court with respect to matters the Court did

11             not let me inquire into and to preserve the

12             record on appeal.

13             Thank you very much, Ms. Dondeville.

14   THE COURT:

15             Hold on one second before you do your

16             redirect.  Let me read this letter.  I tell

17             you what, let's break for lunch and we will

18             come back.  Let's come back at one o'clock.

19        (Whereupon, a lunch recess was taken.)

20   THE COURT:

21             All right, counsel, I have reviewed

22             the letter of -- what's the date of the

23             letter, Mr. Dileo?

24   MR. SIMMONS:

25             September 23rd.

26   THE COURT:

27             September 23rd, which was the

28             confirmation of the settlement between

29             class counsel and the counsel for Louisiana

30             Citizens.  And I believe that issues have

31             raised in the letter that would warrant

32             disclosure.  I have disclosed in chambers

-99-

```
 1              to counsel my thoughts on the matter.  The
 2              Court is of a mind that if there is an
 3              objection to the disclosure of the letter
 4              either by plaintiffs class counsel or by
 5              Louisiana Citizens, I will allow you to
 6              take a writ to the Fourth Circuit before
 7              the disclosure is made.  And another issue
 8              has arisen in that Louisiana Citizens wants
 9              to discuss the matter with Ms. Dondeville
10              who is their client, who is presently on
11              the witness stand.  So what we are going to
12              do is we're going to complete the redirect
13              by Mr. Dileo, at which time we are going to
14              recess so that she might discuss the matter
15              with counsel.  Okay.
16                   Mr. Dileo.
17     MR. HERMAN:
18                   One second, Your Honor.  I would like
19              to be sure, because I am not sure that --
20     THE COURT:
21                   One other thing, obviously if the
22              disclosure is made you would have the
23              opportunity to call Ms. Dondeville back to
24              the witness stand to cross on the contents
25              of the letter.
26     MR. HERMAN:
27                   Yes, sir.  So as I appreciate Your
28              Honor's ruling, Judge, the re-direct is
29              limited only to the cross I have given thus
30              far?
31     THE COURT:
32                   Correct.
```

-100-