IN RE: KATRINA CANAL BREACHES                                      CIVIL ACTION
         CONSOLIDATED LITIGATION
                                                                    NO. 05-4182

PERTAINS TO: BARGE                                                 SECTION "K"(2)
         *Boutte v. Lafarge* **(05-5531)**
         *Mumford v. Ingram* **(05-5724)**
         *Lagarde v. Lafarge* **(06-5342)**
         *Perry v. Ingram* **(06-6299)**
         *Benoit v. Lafarge* **(06-7516)**
         *Parfait Family v. United States* **(07-3500)**


## ORDER AND REASONS

Before the Court is the Barge Plaintiffs' Amended Motion for Class Certification.  (Rec.

Doc. 15549) ("Mot.").  Defendant Lafarge North America, Inc. ("Lafarge") has filed an

opposition to the motion.  (Rec. Doc. 16405) ("Opp.").  Lafarge's opposition has been joined in

its entirety by defendants Zito Fleeting, LLC and Zito Fleeting, Inc. (Rec. Docs. 16412, 16464),

and it has been joined partially by third party defendants Orleans Levee District, Lake Borgne

Basin Levee District, and the Board of Commissioners of the Port of New Orleans (Rec. Doc.

16413).[1]

---

[1]The Orleans Levee District, Lake Borgne Basin Levee District, and the Board of
Commissioners of the Port of New Orleans join Lafarge North America's opposition in all
aspects except to the extent that the opposition "addresses whether the barge had anything to do
with the [Industrial Canal] breaches and/or that adjudicating plaintiffs' claims will necessarily
entail apportioning liability among Lafarge and various third-party defendants named in
Lafarge's third-party claims."  (Rec. Doc. 16413 at 1).  They also disagree with Lafarge's
statement that Plaintiffs have chosen to proceed under admiralty jurisdiction. *Id.*  Plaintiffs,
however, have disclaimed any intent to proceed under admiralty rules, and this Court's opinion

For the purpose of the present motion, the Court will refer to these parties that are opposing class certification collectively as "Defendants." Plaintiffs have filed a reply. (Rec. Doc. 16571) ("Reply"). Various supplemental briefs were also filed by the parties.[2] The Court heard oral argument on this motion on February 11, 2009. Having reviewed the briefs, expert reports, exhibits, and the relevant law, this Court finds that the Motion for Class Certification shall be denied.

## I. FACTS

The proposed class members are residents of New Orleans who live east of the Inner Harbor Navigational Canal ("IHNC" or "Industrial Canal"), a waterway that bisects New Orleans by connecting Lake Ponchartrain to the Mississippi River. The Plaintiffs allege that putative class members suffered a variety of injuries when the barge owned by Lafarge struck and breached the east wall of the Industrial Canal during Hurricane Katrina, causing flooding throughout the residential area. Plaintiffs estimate that a total of 14,831 properties were affected.[3] They assert that Lafarge's negligence in mooring the barge caused it to become free during the storm, resulting in the subsequent breach and flood.

Plaintiffs propose their class as the following:

All persons and/or entities who/which, on August 29, 2005, were residents of, or

---

issued December 1, 2008 regarding the application of maritime law to Lafarge's third party complaint should foreclose any dispute as to choice of law. (Rec. Doc. 16574).

[2]To include: Lafarge's Surreply (Rec. Doc. 16675), Plaintiffs' Sur-surreply (Rec. Doc. 17422), and Lafarge's Supplemental Surreply (Rec. Doc. (17654).

[3]Expert Report of Dr. John A. Kilpatrick, Mot., Ex. 21 ("Kilpatrick Rep.").

owned properties or businesses in, the following geographic area: the Industrial
Canal floodwall on the West, Paris Road on the East, the Mississippi River on the
South, and, on the North, the Public Belt or other Railway adjacent to and
immediately north of Florida Avenue and the East-west channel or canal (Florida
Walk Canal and Forty Arpent Canal) extending from the aforementioned railway
to Paris Road.

Mot. at 2. Plaintiffs further propose two subclasses: a personal/real property claim sub-class for

those who "sustained personal or real property loss and/or damages," and a business claim

subclass for "[a]ll business and/or the owners of such businesses" located within the class

boundaries who "sustained loss and/or damages relating to flooding" during Hurricane Katrina.

Mot. at 2. Barge Plaintiffs also "identify several Categories of persons that are members of the

Class having damages that will likely entail some level of individualized inquiry":

> **Zone of Danger Property Claim Category** (Category One), comprised of
> persons suffering consequential emotional harm that is defined as all persons who
> (1) are members of the Class, and (2) who sustained personal or real property loss
> and/or damages as a result of the flooding that began on Monday, August 29,
> 2005, and (3) at that time they sustained such personal or real property loss and/or
> damages were physically present in the defined class area.
>
> **Personal Injury Category** (Category Two), is comprised of persons who (1) are
> members of the Class, (2) were, at the time of flooding on August 29, 2005,
> present in the defined class area, and (3) sustained personal injuries as a result of
> flooding that began on Monday, August 29, 2005.
>
> **Wrongful Death Category** (Category Three), is comprised of persons who (1)
> are members of the Class, and (2) who have a claim for wrongful death related to
> the flooding that began on Monday, August 29, 2005.

Mot. at 3. Plaintiffs propose nine class representatives who would represent one or more of these

categories. Mot. at 3-8.

In order to administer this class action, Plaintiffs recommend a multi-phased trial. In

Phase One, Plaintiffs plan to try the common issue of liability, specifically "whether the

negligence of Defendants resulted in Barge ING 4727 breaking free of its moorings at Lafarge's France Road facility and breaching the Industrial Canal in two places." Mot., Ex. 3, at 3 ("Trial Plan"). If Phase One results in a finding of liability, Plaintiffs propose a Phase Two involving "the determination and calculation of those damages awardable to the Class or any sub-Class or category of Class member." Trial Plan at 6. This phase will require determinations of cause in fact, proximate cause, and damages. To assess damages, they propose mass appraisal techniques to calculate class-wide real property damages, business value damages, and personal property damages. Trial Plan at 9-12. Phase Three would involve individual and grouped trials for personal injury and emotional distress. Plaintiffs suggest that "it is possible to group class members by common injury 'type' and/or 'experience' for purposes of managing the adjudication of class members' individual physical and emotional injury claims." Trial Plan at 13. As to wrongful death claims, Plaintiffs believe that they will number at minimum 50, at maximum 500, and they would require more time to resolve in trials in comparison with other personal injury claims. Trial Plan at 14.

Defendants assert that class certification is inappropriate in this case on several grounds. First, Plaintiffs' claims are not typical. Defendants argue that Hurricane Katrina was an "exceedingly complex series of *different* 'events'" that resulted in a variety of damage. Opp. at 12. Therefore, the named Plaintiffs' injuries cannot be "typical" of all of the injuries of the proposed class members. Defendants also allege that none of the representative Plaintiffs assert claims of personal physical injury or "zone of danger" emotional harm. *Id.*

Defendants further aver that the representative Plaintiffs will not "fairly and adequately protect the interests of the class." Opp. at 13. The Defendants cite "[f]undamental conflicts,"

particularly the fact that Plaintiffs are proceeding on the theory that the barge, not the

Government, is responsible for the breach. Opp. at 14. They assert that the Barge class overlaps

with the MRGO class and that the two class actions are advancing "diametrically opposing

factual and legal positions in a joint trial involving the MRGO and Barge defendants."[4]  *Id.*

Defendants also argue that any omission of physical injury claims would waive such claims as a

matter of law. Opp. at 15. They further allege that the proposed class is not ascertainable

because ownership of property in the Ninth Ward is hard to discern as "successions have not

been recorded and ownership records are inaccurate or incomplete." Opp. at 16.

 The most significant objection by Defendants here is regarding the predominance and

superiority requirements of Rule 23(b)(3). Indeed, Defendants devote forty-three pages of their

brief to Rule 23(b)(3). They assert that individual issues of the measure of damages, the

causation of each class member's damage, and the defenses to be raised against such claims

predominate over any common issues that exist. Defendants claim that Plaintiffs' mass appraisal

technique for assessing property damages is not "a valid formulaic or mathematical method" that

would be appropriate for a class action. Opp. at 33. They also argue that the individualized

claims for personal injury, emotional distress, and wrongful death deserve their own

particularized adjudications. Opp. at 28. Defendants assert that, despite Plaintiffs' proposed

bifurcation of the proceedings, a class action is not a superior vehicle for adjudication because

class members have a strong interest in controlling their own claims, which are significant and

---

[4] The MRGO is the Mississippi River-Gulf Outlet, a navigational canal that connects the IHNC with the Gulf of Mexico to the east. Another case within this consolidated litigation alleges that the Government's failure to maintain the MRGO allowed a tidal surge during Hurricane Katrina which inundated New Orleans. *Robinson v. United States*, Civ. A. No. 06-2268.

do not amount to a "negative value" lawsuit. Opp. at 55. Plaintiffs, for their part, concentrate their reply on refuting Defendants' predominance and superiority arguments. In light of this focus by the parties on these requirements of Rule 23(b)(3), this Court will likewise devote its attention to that rule..

## II.  ANALYSIS

In the present Amended Motion, Plaintiffs seek certification of a Rule 23(b)(3) class action. Mot. at 4. "To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007). Rule 23(a) sets forth the following prerequisites for class certification: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class;(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). A class action proposed under Rule 23(b)(3) may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In evaluating Rule 23(b)(3)'s predominance and superiority requirements, the Rule provides that "[t]he matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Federal courts "emphasize that it is the party seeking certification that bears the burden of establishing that the requirements of Rule 23 have been met." *Gene & Gene LLC v. Biopay LLC*, 541 F.3d 318, 325 (5th Cir. 2008) (citation omitted). It is within the district court's discretionary decision to certify a class, a decision that is reviewed only for abuse of that discretion. *Anderson v. U.S. Dep't of Housing & Urban Devel.*, 554 F.3d 525, 528 (5th Cir. 2008). Nonetheless, "[t]he district court must conduct a 'rigorous analysis of the Rule 23 prerequisites' before certifying a class." *O'Sullivan v. Countrywide Home Loans*, 319 F.3d 732, 738 (5th Cir. 2003) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)). "A district court certainly may look past the pleadings to determine whether the requirements of rule 23 have been met." *Castano*, 84 F.3d at 744. "Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id.*, *citing* Manual for Complex Litigation § 30.11 (3d ed. 1995); *accord Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 312 (5th Cir. 2005) (district court must "focus on the requirements of [Rule 23], and if findings made in connection with those requirements overlap findings that will have to be made on the merits, such overlap is only coincidental.").

**A.  Rule 23(b)(3) Inquiry:  Predominance**

"The predominance inquiry is 'more demanding than the commonality requirement of Rule 23(a)' and requires courts 'to consider how a trial on the merits would be conducted if a class were certified.'"  *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 525 (5th Cir. 2007) (quoting *Bell Atl.*, 339 F.3d at 301, 302).  "Whether common issues predominate and whether the class action is a superior method to resolve the controversy requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case."  *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 601 (5th Cir. 2006) (citation omitted).  "This requirement, although reminiscent of the commonality requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005) (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623-24, 117 S.Ct. 2231, 2249-50, 138 L.Ed.2d 689 (1997)).  In evaluating the predominance requirement, this Court finds that individual issues exist with regards to damages, affirmative defenses, and causation.  When considered together, this Court finds that these individual issues predominate over those common to the class, and therefore Plaintiffs fail to satisfy Rule 23(b)(3).

**1.  Damages**

A significant predominance issue concerns damages.  Plaintiffs rely primarily on the expert report of John A. Kilpatrick, Ph.D., MRICS, to establish predominance regarding property

damages.[5]  Dr. Kilpatrick is an expert in real estate appraisal, and his expert report describes the method by which he proposes to calculate damages for the estimated 14,831 properties located in the class area.  Kilpatrick Rep. at 3.  He recommends a mass appraisal technique because, due to a multitude of variables, this method would achieve "great economies of scale" in calculating property values "before and after the levee breaches."  *Id.* at 5.  This mass appraisal method would apply to claims for real property damage, business loss, and personal property damage. Kilpatrick points out that some methods would too broadly assess damages, such as the using the decrease in property assessments by parish tax assessors after Katrina.  *Id.* at 9.  However, Kilpatrick avers that individualized assessments would be much too burdensome.  Accordingly, he recommends "a mass appraisal approach involving use of existing data sources supplemented by limited data collection and verification of data from existing sources."  *Id.* at 10.

The varying types of property damage that Plaintiffs seek in this class action create numerous individual issues.  Kilpatrick's report first points out numerous variables for which researchers will have to account in performing the mass appraisal of real estate property.  Dr. Kilpatrick explains, "[I]t will be necessary to combine data on property characteristics from several sources in order to arrive at sufficiently complete information on the affected class of properties to determine values before and after the levee breaches."  *Id.* at 5.  The Plaintiffs analysts would need to take into consideration the "elevation of homes" in order to determine depths of flooding in order to "reveal[] the pattern of damages."  *Id.* at 5.  In addition, "[t]ypes of construction, size, age and condition of properties var[y] across the proposed class area."  *Id.* at

---

[5] Dr. Kilpatrick also testified in the Levee/MRGO portion of *In re Katrina* to provide his expert opinion on class certification in that case.  The Court notes that its decision here has no

6.  Kilpatrick suggests that "sales of a particular style, size and vintage home, can be extrapolated to infer prices of nearby properties of similar age, construction materials, and architectural design." *Id.* at 7.  Kilpatrick argues that certain "common factors" are present, such as "negative stigma," land use regulations, and the "temporary or permanent interruptions of key public services," such as water and sewer, public safety, power, trash removal, and public schools and churches.  *Id.* at 8.

Even if a broad mass appraisal technique were used here, Kilpatrick admits that some cases will deserve "individual attention."  *Id.* at 10.  He explains that "[a] few of the largest properties in the affected area such as Exxon Mobile Refinery and Domino Sugar's property" will require "individual conventional appraisal methods."  *Id.* at 10.  Likewise, "other unusual or unique properties (in terms of uses, physical structures, size, title issues, or unusual location)" will also require individual evaluation because "mass appraisal methods would prove unreliable."  *Id.* at 10.  While Kilpatrick asserts that these properties will comprise a "small minority" of the class, analysts would presumably have to evaluate properties first to determine whether they are "unique" enough, and then perform individualized assessments.

Second, as to business losses, Kilpatrick points out that "[i]n addition to the change in value of the business [after Katrina], businesses suffered additional damages due to business interruption, moving, clean-up and repairs costs, as well as loss of inventory."  *Id.* at 18.  To assess these damages directly, Kilpatrick offers one of three "generally accepted approaches: the asset approach; the market approach; and the income approach."  *Id.* at 18.  However, to apply

---

effect whatsoever on the propriety of class certification in any other portion of the *In re Katrina* litigation.

these methods, experts would have to analyze "documentation of any losses of inventory, moving costs, temporary increased rentals, clean up and repair costs properties may have suffered." *Id.* at 20. Historic tax returns and insurance records would need to be collected and assessed. *Id.* at 19. Additionally, "intangible assets" such as customer goodwill or other business enterprise values would need to be incorporated to such calculations. *Id.* at 18. As an alternative to direct assessments of damages, Kilpatrick offers several "indirect means," such as using estimates of corporate profits before taxes from the Department of Commerce, or applying appropriate ratios based on a sample Louisiana state tax income statements to estimate business values from reported gross sales. *Id.* at 20. Kilpatrick, however, does not provide any clear recommendations among these options.

Finally, as to personal property losses, Kilpatrick again suggests several methods to measure these damages. One would be a direct method by "obtain[ing] local verification from businesses, homeowners, and insurance agents of rental insurance payouts and other insurance payments." *Id.* at 21. Kilpatrick also suggests an indirect  method for homeowners: "conduct samples and determine that personal property can be reasonably estimated as a formulaic percentage of house values," much as done for homeowners' insurance policies. *Id*. at 21. Cars and trucks lost in the storm could be valued according to the Edmunds or Kelley Bluebook, "combined with state motor vehicle licensing records." *Id.* at 21. Kilpatrick suggests that most vehicles were damaged by salt water and had to be scrapped, an effect common across the class. *Id.* at 21. Most significantly, Kilpatrick points out that adjustments must be made for "depth of flooding at the site and for multistory homes whose upper stories may have sustained less damage to personal property." *Id.* at 22. Kilpatrick concludes his report thus:

The valuation task will be challenging and require considerable time and effort if performed on a class wide basis using mass appraisal methods. If these thousands of properties were valued individually, the valuation task would not only be subject to far greater risk of inconsistency and bias, it would also be far more expensive, time consuming and practically difficult to implement.

*Id.* at 28.

Despite Dr. Kilpatrick's very comprehensive mass appraisal plan, it fails to establish that common issues regarding damages will predominate over individual issues. His plan fails to propose any workable formula by which any of these types of damages can be assessed. The weight of the Fifth Circuit's case law holds that where damages cannot be calculated using a mechanical formula, but instead require individualized assessment, predominance generally does not exist. The Fifth Circuit has instructed that "the necessity of calculating damages on an individual basis will not necessarily preclude class certification." *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006). However, the court has also held that "[t]he necessity of calculating damages on an individual basis, by itself, *can* be grounds for not certifying a class." *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 Fed. Appx. 296, 297 (5th Cir. 2004) (unpublished opinion) (emphasis added). In *Steering Committee*, a plaintiff class brought suit against Exxon for injuries arising from three-day accidental oil fire at the company's Baton Rouge, Louisiana plant. *Steering Committee*, 461 F.3d at 600. The plaintiffs also alleged "both personal and property injuries, while others allege[d] only one or the other," and many plaintiffs sought compensation for "emotional and other intangible injuries." *Id.* at 602. The district court had denied certification, and the Fifth Circuit affirmed specifically on the grounds of predominance and superiority. It explained that while "where individual damages cannot be determined by reference to a mathematical or formulaic calculation, the

damages issue may predominate over any common issues shared by the class." *Id.* at 602.  The

court found that the damages claims were "not subject to any sort of formulaic calculation"

because "each individual plaintiff suffered different alleged periods and magnitudes of exposure

and suffered different alleged symptoms as a result." *Id.*  While the parties had agreed that

liability was a common issue that could be bifurcated from damages for trial, the Fifth Circuit

stressed that "[t]he predominance inquiry, however, is more rigorous than the commonality

requirement." *Id.* at 603.  The court concluded:

> Based on the evidence presented to the district court regarding the complexity of
> the medical causation and damages issues, and with little evidence that the
> liability issues are similarly complex, it was not an abuse of its discretion for the
> district court to conclude that Appellants had failed to demonstrate that the class
> issue of Appellee's negligence or strict liability predominates over the vastly more
> complex individual issues of medical causation and damages.

*Id.*

In *Corley v. Orangefield Independent School District*, 152 Fed. Appx. 350 (5th Cir.

2005), an unpublished opinion, the Fifth Circuit considered a class action brought by landowners

in Mississippi, Texas, and Louisiana against Entergy, an energy company, in which the plaintiffs

claimed that the company had exceeded the terms of easements by transmitting information as

well as electricity on lines crossing their properties.  The district court had declined certification

under Rule 23(b)(3), and the Fifth Circuit affirmed.  The appellate court based its affirmance on

the district court's findings regarding the predominance of individual issues over common ones.

While the diversity of state law and causation presented some predominance problems, the court

explained, "Here again, however, the most important factor is the necessity of individualized

damage calculations." *Id.* at 355.  The following paragraph is worth excerpting:

> Although "relatively few motions to certify a class fail because of disparities in the damages suffered by the class members", *Bell Atlantic Corp. v. AT & T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003), we have nonetheless noted that the lack of a suitable formula for calculation of damages may defeat predominance. That is to say, where the issue of damages "does not lend itself to ... mechanical calculation, but requires separate mini-trial[s] of an overwhelmingly large number of individual claims," class certification will not be appropriate. *Id.* (quoting *Windham v. American Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977)). Here, the failure of predominance might be stated in a different way, that is, the injury to the landowners varies in substantial ways, depending on the value, character and location of the property over which the easement prevails.

*Id.* at 355. The Fifth Circuit concluded that "geographic variations would render some parcels more valuable than others, thus precluding any mechanical calculation of damages in this case." *Id.* Any kind of proposed flat-rate formula "would necessarily yield a windfall to some landowners at the expense of others." *Id.*; *see Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 602-03 (E.D. La. 2002) (Duval, J.) (finding issues of damages suffered by each individual precluded certification of proposed class alleging employment contract breaches by Wal-Mart stores).

Here, Dr. Kilpatrick's assessment methods for the various types of property damage portend additional predominance problems. The difference in real property values in this case creates the same problem of valuation that defeated class certification in *Corley*. These "geographic variations" are more intricate, and more significant, than valuing intrusions onto land; these are measurements of water damage to residential structures that can vary significantly parcel to parcel, block to block. As noted by Dr. Kilpatrick, these residential structures have differing values based upon construction materials, architectural style, neighborhood location, size, age, and condition of property. Unique structures would also deserve their own individualized evaluation. He suggests that intangibles must be assessed, such as negative

14

stigma, but even the level of stigma could be different across this broad class area. Measuring business damages presents additional problems, including evaluating the loss of further intangible assets, such as customer goodwill. This Court would have to make individual assessments with regards to personal property, such as determining which story of certain property was alleged to be located. Dr. Kilpatrick admits that collecting the required data will be "challenging and require considerable time and effort," particularly as he cites a plethora of data sources, such as invoices, insurance claims, and tax documents.

The same problems in measuring property claims are magnified when applied to Plaintiffs' personal injury claims. As admitted by the Plaintiffs, this Court would have to conduct numerous individual trials to formulate damages, particularly those for personal injury, wrongful death, and emotional harm. These claims do not lend themselves to formulaic calculation where levels of flooding varied across the class area, subjecting class members to different dangers and different injuries. *See Steering Committee*, 461 F.3d at 602 (finding individual issues of calculating physical injury predominated over common issues where "each individual plaintiff suffered different alleged periods and magnitudes of exposure [to fumes] and suffered different alleged symptoms as a result."). This Court finds that individual issues predominate in this case because of variety of types of damage alleged (personal injury, real estate damage, business losses, and personal property damage), the extraordinary undertaking required to collect the data to perform these varied damage assessments, and the failure of Plaintiffs to supply a model showing that all of these types of damage are subject to a formulaic calculation.

### 2. Affirmative Defenses

Issues of comparative negligence and other possible defenses can also defeat predominance. In *Castano v. American Tobacco Co.*, 84 F.3d 734, 748-49 (5th Cir. 1996), the Fifth Circuit addressed the propriety of class certification for a putative class of "all nicotine dependent persons in the United States." The plaintiffs alleged nine causes of action: fraud and deceit, negligent misrepresentation, intentional infliction of emotional distress, negligence and negligent infliction of emotional distress, violation of state consumer protection statutes, breach of express warranty, breach of implied warranty, strict products liability, and redhibition under the Louisiana Civil Code. *Id.* at 737. The trial court planned "to divide core liability from other issues such as comparative negligence and reliance," and it approved certification, concluding that "after a class verdict, the common issues will not be a part of follow-up [individual] trials." *Id.* at 749. The Fifth Circuit, however, reversed the district court's certification of the class. The court explained that predominance was not satisfied because "comparative negligence will be raised in the individual trials, and the evidence presented at the class trial will have to be repeated." *Id.* The result "may be a waste, not savings, in judicial resources." *Id.* The *Castano* court concluded:

> [A]n accurate finding of predominance is necessary before the court can certify a class. It may turn out that the defendant's conduct, while common, is a minor part of each trial. Premature certification deprives the defendant of the opportunity to present that argument to any court and risks decertification after considerable resources have been expended.

*Id.* In a similar vein, the Fifth Circuit reversed a district court's certification of a class alleging violations of the Telephone Consumer Protection Act, a federal law prohibiting unsolicited advertisements. *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 321 (5th Cir. 2008). The

court in that case found the predominance requirement unfulfilled because the court would be required to determine whether the advertisements "were transmitted without the prior express invitation or permission of each recipient," and issue of "*individual* consent." *Id.* at 327 (emphasis in original).

In the present case, similar issues of the conduct of Plaintiffs could arise. Defendants could raise defenses regarding the negligence of individual Plaintiffs in failing to remove certain valuables and evacuating prior to Hurricane Katrina. This Court may be called upon to probe individual issues regarding maintenance of property after the storm. The only possible means of doing so would be through individualized hearings. Plaintiffs argue that Defendants cannot confound certification by raising individualized defenses; however, the Fifth Circuit has stated that "[a]n affirmative defense is not *per se* irrelevant to the predominance inquiry," *Gene & Gene*, 541 F.3d at 327, and the "predominance of individual issues necessary to decide an affirmative defense may preclude class certification." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 420 (5th Cir. 2004). Accordingly, this Court finds it appropriate to consider affirmative defenses in this class certification analysis, and moreover finds that the real possibility of affirmative defenses being raised suggests that class certification is inappropriate.

### 3. Causation

Causation presents additional individual issues to the forefront. "Mass tort cases, especially those of a national or multistate character, often present highly individualized issues with regard to causation and damages." Charles Alan Wright, et al., 15 *Federal Practice and Procedure* § 3868 (2009). Plaintiffs assert that this localized lawsuit, confined within one part of

New Orleans, is appropriate for certification because causation is a common issue. Indeed, some mass tort cases have been approved for certification in this circuit. For example, in *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1017 (5th Cir. 1992), a proposed class of plaintiffs sued Shell Oil for injuries arising from a vapor explosion at its manufacturing facility that "ripped through the plant, causing extensive damage both on the plant site and in the surrounding communities." The class broadly included those "persons or entities who were physically present or owned property [in the surrounding parishes] and who sustained injuries or damages as a result of the explosion." *Id.* at 1017 n.3. The district court approved the class and a complex four-phase trial plan in which phase one would consider common issue of liability, while phases two through four would analyze sample cases and evaluate individual issues of causation and damages.[6] The Fifth Circuit affirmed the district court's certification, stating, "In the context of mass tort litigation, we have held that a class issue predominates if it constitutes a significant part of the individual cases." *Id.* at 1022 (citing *Jenkins v. Raymark Indus., Inc.* 782 F.2d 468, 472 (5th Cir. 1992)). The court reasoned that "[t]he class issues to be determined by the Phase 1 jury form integral elements of the claims asserted by each of the more than 18,000 plaintiffs," thus "[t]here can be no serious contention that the district court abused its discretion in determining that these issues predominate for the purpose of class certification." *Id.* at 1022-23. Superiority was also fulfilled

---

[6] Phase two would determine compensatory damages for "20 fully-tried sample plaintiff cases" and determine "the ratio of punitive damages to compensatory damages for each class member." *Watson*, 979 F.2d at 1018. Phase three would require a new jury to resolve issues "unique to each plaintiff's compensatory damage claims, *e.g.*, injury, causation, and quantum." *Id.* These trials would be completed in "waves of five" plaintiffs. Phase four would require "the district court to compute, review, and award punitive damages, if any are established in Phase 1, for the plaintiffs awarded compensatory damages." *Id.*

because, unlike other toxic tort cases "in which numerous plaintiffs suffer varying types of injury at different times and through different causal mechanisms . . . [t]he case at bar will present fewer and simpler issues to the Phase 1 jury." *Id.* at 1023.

In another mass tort case cited favorably by Plaintiffs, *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999), a class action was proposed on behalf of riverboat casino employees suffering from asthma and bronchitis that were allegedly caused by the casino's failure to maintain its ventilation system. The district court certified a Rule 23(b)(3) class, and the Fifth Circuit affirmed. In examining predominance, the appeals court noted that the common issues, "especially negligence and seaworthiness [of the riverboat casino], are not only significant but also pivotal . . . requir[ing] the parties to produce extensive evidence regarding the Casino's air ventilation system." *Id.* at 626. The *Mullen* court contrasted other health-related class actions where predominance was found lacking, such as asbestos and tobacco class actions, explaining that in the case at hand "the putative class members are all symptomatic by definition and claim injury from the same defective ventilation system over the same general period of time." *Id*. at 627.

Despite Plaintiffs' arguments to the contrary, *Watson* and *Mullen* do not control the outcome here. Those courts noted that a common issue critical to certification was the singular source of the plaintiffs' injury: a refinery explosion in *Watson* and defective air ventilators at a casino in *Mullen*. Causation therefore was a common issue in those cases. Here, however, Hurricane Katrina resulted in multiple levee breaches, producing numerous potential sources of water damage. Plaintiffs' expert civil engineer, Melvin G. Spinks, P.E., explains that the eastern floodwall of the Industrial Canal was breached in two locations, both likely causing flooding of

19

the class area.  Report Plaintiffs' Expert Melvin G. Spinks, P.E., at 16, Mot., Ex. 1 ("Spinks Rep.").  Floodwaters also overtopped that eastern floodwall, spilling over into the class area. Spinks Rep. at 16.  Multiple breaches and overtopping occurred along the levees of the MRGO to the east of the proposed class.  Spinks Rep. at 14-15.  The Plaintiffs' expert noted that the "floodwaters from the IHNC moved east, eventually merging with the waters from the Chalmette area."  Spinks Rep. at 16.  Rainfall added between ten to eleven inches to the floodwaters. Spinks Rep. at 14; Report of Defendants' Expert Joseph N. Suhayda, Ph.D., at 7, Opp., Ex. 4. ("Suhayda Rep.").

Plaintiffs assert that the most significant flooding came from the two breaches of the Industrial Canal's floodwalls.  They aver that these breaches both were likely caused by the same barge, and therefore causation is a common issue.  However, Defendants cite several reports that credibly dispute the causation of the two breaches.  An Army Corps of Engineers report made post-Katrina attributes the failures of the floodwalls to "foundation instability," explaining that "the failure occurred in weak foundation clay."[7]  A report prepared for the Louisiana Secretary of Transportation concludes that north breach was due to "under-seepage, and loss of levee stability or overtopping and removal of soil support," while the southern portion was "already leaning having failed earlier" when the barge "clipped the end of the already formed breach as it was sucked through."[8]  Plaintiffs plausibly argue that the barge caused the south breach as the

_____

[7] U.S. Army Corps of Engineers, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System, Final Report of the Interagency Performance Evaluation Task Force (Vol. 5)*, at V-1 (Mar. 26, 2007), Opp., Ex. 1; *see id.* at V-75 (south breach due to "overtopping and erosion").

[8] Team Louisiana, *The Failure of the New Orleans Levee System during Hurricane Katrina, A Report Prepared for Secretary Johnny Bradberry, Louisiana Department of*

vessel ran aground in the adjacent neighborhood after the storm. However, in alleging that the barge caused the north breach as well, Plaintiffs rely on one eyewitness who heard a sound "like an explosion," and then saw "what appear[ed] to be a metal structure like a barge, only the tip of it" near that breach.[9] While this Court recognizes that the class certification decision should not reach the merits of the claims, but this Court has a duty to make factual determinations relevant to class certification. *Castano*, 84 F.3d at 744; *Bell*, 422 F.3d at 312. As it bears upon solely class certification, this Court finds that there are substantial causation issues relating to the north breach. Plaintiffs rely on one witness during the storm who admitted his vision was obscured by rain and darkness and described what he saw as a "silhouette," and "[n]ot a clear focused picture," referring to his alleged sighting of the barge near the north breach.[10] Class treatment thus becomes even more inappropriate because the significant flood damage from the northern breach must be parsed out from the damage caused by the southern breach, as well as the damage caused by flood water from the breaches along Reach 2 of the MRGO. The damage caused by each breach varies across the class area depending on location and elevation, among other factors. Causation, therefore, is plainly not a common issue here.

Moreover, *Watson*, decided in 1992, and *Mullen*, decided in 1999, appear to represent a more hospitable view towards mass tort class certification that is now in the past. Since those cases, the Fifth Circuit has decided *Corley* (2005) and *Steering Committee* (2006), in which the court demanded a stricter application of the predominance principles, particularly where

---

*Transportation and Development*, at 67 (Dec. 18, 2006), Opp., Ex. 3.

[9] Deposition of William Joseph Villavasso, Jr. 28:8-9, 21-22 ("Villavasso Depo.").

[10] Villavasso Depo. 28:17-19; 29:8-9.

plaintiffs propose bifurcated proceedings. While the *Watson* court focused on predominance and superiority within the first phase of a four-phase trial, the *Steering Committee* court held, "The cause of action *as a whole* must satisfy Rule 23(b)(3)'s predominance requirement." *Steering Committee*, 461 F.3d at 601 (emphasis added). This change in focus is revealed in recent district court decisions that deny class certification in mass tort suits. *See In the Matter of American Commercial Lines, LLC*, Civ. A. No. 00-0252, 2002 WL 1066743, at *12 (E.D. La. May 28, 2002) (Engelhardt, J.) (denying class certification based partially on lack of predominance where class composed of residents of St. Charles Parish who were harmed by an oil spill from barge on Mississippi River); *see also Norwood v. Raytheon Co.*, 237 F.R.D. 581, 589 (W.D. Tex. 2006) (refusing class certification due to lack of predominance where class composed of technicians and operators of defendants' radar devices who suffered injuries due to radiation).

Plaintiffs point the Court to another Katrina-related class action that was recently certified, *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006) (Fallon, J.). *Turner* concerned a suit on behalf of residents and business owners in St. Bernard Parish for damages suffered when 25,110 barrels of crude oil escaped from one of the defendant's oil tanks during Hurricane Katrina. In evaluating the propriety of certification, the district court explained that the plaintiffs proposed a "three-phase trial": phase one would "concern common issues of liability for compensatory damages and the amount of damages for trial plaintiffs," phase two "would address common issues regarding punitive damages," and phase three "would involve compensatory damages for remaining members of the Plaintiff class." *Id.* In evaluating predominance, Judge Fallon found that "[t]he central elements of the claim surround [defendant]'s conduct, and the only individualized inquiry would relate to the amount of

Plaintiffs' damages." *Id.* at 608. He explained that "personal injury and mental anguish damages will not form a significant portion of the Plaintiff's claims, which further supports a finding of predominance here." *Id.* at 607 n.6; *id.* at 606 ("it is safe to assume that few, if any, of the Plaintiffs were present at the time of the oil spill"). Instead, property damage was the main concern, and the plaintiffs "presented evidence that certain elements of their alleged damages may be assessed on a class-wide basis" through "mass appraisal." *Id.* at 607 n.5. Having found that the defendant's liability was a common issue "appropriate for class treatment," Judge Fallon noted that "[t]he presence or degree of injury or damage is an issue of quantum that may be dealt with individually in a bifurcated proceeding, if necessary." *Id.* at 607. Accordingly, certification was granted.

Judge Fallon's decision in *Turner*, however, can be contrasted with a similar class action before Judge Barbier of this Court in *Ancar v. Murphy Oil, U.S.A., Inc.*, Civ. A. No. 06-3246, 2008 WL 2951794, at *1 (E.D. La. July 25, 2008). *Ancar* concerned class allegations on behalf of residents of St. Bernard Parish alleging various property, business, and personal injury claims as a result of an explosion at the defendant's refining facility and fumes arising from that explosion. Plaintiffs proposed a *Turner*-like bifurcated proceeding, separating liability from causation and damage assessments. However, Judge Barbier denied class certification. First, he noted that personal injury and mental anguish claims did not defeat predominance in *Turner* because Judge Fallon explained that "any individualized inquiry would not be extensive due to the great factual similarities between the plaintiff's claims and because the personal injury and mental anguish damages would not form a significant portion of the claims" due to the fact that many plaintiffs from the class area were out of the area during the hurricane. *Id.* at *5 (footnote

omitted).  *Ancar*, however, involved almost entirely claims for personal injury and mental anguish.  Moreover, *Turner* did not have to deal with the wide range of means by which the plaintiffs alleged damages in *Ancar*, to include some being awoken by the explosion, some having soot deposited on their homes, and some having already arranged for cleanup by the defendant.  Accordingly, Judge Barbier found that individual issues predominated over issues common to the class.

In comparing the contemporaneous decisions in *Turner* and *Ancar*, it is clear that the present case shares much more in common with *Ancar*.  Plaintiffs advocate for a mass appraisal method for assessing property damage, much like the method suggested by Judge Fallon in *Turner*.  However, Judge Fallon noted that property damage was the main concern in that case: "[I]t is safe to assume that few, if any, of the Plaintiffs were present at the time of the oil spill," *Turner*, 234 F.R.D. at 606.  Here, however, the Plaintiffs have made a much broader scope of allegations, as personal injury, wrongful death, and emotional harm will make up a significant portion of the claims.  Plaintiffs admit that in assessing these claims, this Court will have to make some additional determinations, such as which persons were in the "zone of danger." Reply at 36-37.  Judge Fallon in *Turner* also explained that "[t]here will be some individualized inquiry regarding whether there is oil on a particular plaintiff's property, and whether that oil is crude oil from Murphy's refinery." *Turner*, 234 F.R.D. at 607.  He characterized these issues as minor ones, stating that they "do not require the type of extensive individualized proof that would preclude class treatment." *Id.*  The present case involves a much more complicated evaluation of causation, however, as there is no means by which to determine from what source the flood water came that damaged each home.

Indeed, the distinction that makes the difference here are the multiple sources of flooding that would have to be individually parsed out to determine what damages was caused by Lafarge's barge. Plaintiffs deny that causation should be an issue because their experts' formulas (heretofore unseen) will only account for flood damage, excluding any damage caused by wind or rain. However, it is undisputed that there were two breaches of the IHNC east floodwall, both of which likely caused significant flooding. Plaintiffs assert that the barge caused *both* of the breaches; however, this Court finds it difficult to rely on these allegations considering what little evidence exists regarding what caused the northern breach. Moreover, the Plaintiffs' expert admits that the IHNC floodwall was also overtopped, and breaching and overtopping also occurred along the MRGO. Spinks Rep. at 14-16. On top of the flooding from levee breaches and overtopping, nearly a foot of rain fell during Katrina. The prior cases where certification was approved involved only one clear source of damage. *Turner* involved one source of crude oil, and *Mullen* concerned injury caused by the "same defective ventilation system over the same general period of time." *Mullen*, 186 F.3d at 627. In contrast, the Court would have to divide the damage to each property or person among the various levee breaches. Plaintiffs attempt to nullify the individual issues regarding causation by asserting that the principles of admiralty law require that the Defendants be held liable jointly and severally for any injury caused to the Plaintiffs. Even if this is indeed the situation, damage would eventually have to be parsed among the Defendants at a later date. Judicial economy may demand that this apportionment be incorporated as a phase of this class action, and then this Court will be back from whence it started in considering individualized damages.

In conclusion, this class action as alleged by Plaintiffs simply cannot fulfill

predominance.  The proposed class suffers from individual issues of measuring various types of property damage (including real property, business loss, and personal property), measuring personal injury damage, determining causation, and assessing affirmative defenses.  To be clear, this Court makes no conclusion as to whether any of these issues, when considered alone, would present enough individualized questions to defeat predominance.  This Court finds instead that all of these aspects of this class action, when considered *in toto*, present enough individualized issues to predominate over those that are common to the class.  Therefore, class certification must be denied for failure to fulfill Rule 23(b)(3)'s predominance requirement.

### B.  Rule 23(b)(3) Inquiry:  Superiority

Rule 23(b)(3) also requires that the Court make a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The Fifth Circuit has observed the "interrelationship between predominance and superiority," *Steering Committee*, 461 F.3d at 604.  Consequently, for many of the same reasons that this class fails the predominance requirement does it also fail superiority.

The notes by the Advisory Committee regarding Rule 23(b)(3) can provide some guidance in superiority analysis.  First, they forewarn courts of the problems with mass tort class actions:

> A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

Fed. R. Civ. P. 23 advisory committee's note.  However, one of the concerns in refusing class

certification is the onslaught of claims that could result if individuals filed their own claims

against the Defendants.  Indeed, the Advisory Committee recommends that a district court

account for these facts as well:

> In this connection the court should inform itself of any litigation actually pending
> by or against the individuals. The interests of individuals in conducting separate
> lawsuits may be so strong as to call for denial of a class action. On the other hand,
> these interests may be theoretic rather than practical; the class may have a high
> degree of cohesion and prosecution of the action through representatives would be
> quite unobjectionable, or the amounts at stake for individuals may be so small that
> separate suits would be impracticable. The burden that separate suits would
> impose on the party opposing the class, or upon the court calendars, may also
> fairly be considered.

*Id.*

In *Steering Committee*, the mass-tort case discussed *supra*, the Fifth Circuit affirmed the

district court's denial of class certification on grounds of superiority as well as predominance.

The court noted that Advisory Committee's recommendation regarding "mass accident" suits,

and explained that "[a]ppellants have not demonstrated that this mass tort has any exceptional

features that warrant departing from the general rule and treating it as a class action."  *Steering

Committee*, 461 F.3d at 604.  The court further noted that "the predominance of individual issues

relating to the plaintiff's claims for compensatory and punitive damages detracts from the

superiority of the class action device in resolving these claims."  *Id.* at 605.

In *Robertson v. Monsanto Co.*, 287 Fed. Appx. 354 (5th Cir. 2008) (per curiam), the Fifth

Circuit explicitly reversed a class certification decision by the district court on the lack of

superiority.  In that case, a group of nearly 8,000 individuals sued a chemical manufacturer for

the accidental release of ammonia fumes from a nearby factory.  The suit was originally filed in

27

state court, but the plaintiffs subsequently amended it to include a class action allegation, leading the defendant to remove to federal court.  The district court, prior to certifying the class, held a hearing in which it determined that plaintiffs were entitled to partial summary judgment as to defendant's liability, but not as to causation and damages.  *Id.* at 357.  The plaintiffs subsequently moved for class certification of the area where the noxious plume had carried, and the district court certified the class.  Upon review, the Fifth Circuit reversed the district court's certification, finding that superiority had not been established under Rule 23(b)(3).  The court focused on two relevant facts.  First, the district court had already granted summary judgment in favor of plaintiffs on the issue of liability before the class was certified.  The Fifth Circuit explained, "In effect, then, the issue of Monsanto's liability has already been resolved on a class-wide basis . . . [t]herefore, as far as the issue of liability is concerned, there simply is no gain to be had from using the class action form."  *Id*. at 362.  Second, the court noted that "the remaining issues of causation and damages are highly individualized, and thus would not be well-served by a class action."  *Id.*  "Although the alleged cause of the plaintiffs' injuries is a single incident, the gas leak at Monsanto's plant, each plaintiff still must show that Monsanto's negligence in causing the leak was proximately connected to the specific injuries complained of."  *Id.*

In contrast, the Fifth Circuit did find the class action to be a superior vehicle in *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999), discussed *supra*.  In considering the riverboat casino employees' class claims for negligent maintenance of casino ventilation systems, the Fifth Circuit found that the class action was superior because the class was a manageable size, unlike other cases involving "million-person class membership."  *Id.* at 628.  The class action also did not propose any novel legal theories, and instead was "akin to other

bifurcated class actions [that the Fifth Circuit] has approved." *Id.*

In weighing this proposed class action as a whole, this Court concludes that the class action device is not the superior method to adjudicate these claims. A class action could be desirable here because the legal theories are not necessarily novel, but proving liability in a hurricane could require complex proof, suggesting that it may be beneficial for the Plaintiffs to join together as a class to prosecute their claim. However, as in *Steering Committee* and *Monsanto*, the Plaintiffs must individually prove causation and damages after negligence has been established. The varying kinds and amounts of damages and the difficulty in determining the loss sustained by any property make a class action an inappropriate vehicle for this litigation.

Superiority also considers each claimant's interest in controlling their own litigation, Fed. R. Civ. P. 23(b)(3), and courts have observed that such interests are high for personal injury claims because they "have a significant impact on the lives of plaintiffs," and thus plaintiffs "have a substantial stake in making individual decisions on whether and when to settle." *Georgine v. Amchem Prods. Inc.*, 83 F.3d 610, 633 (3d Cir. 1996), *aff'd sub nom. Amchem Prods. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 510 (S.D. Tex. 2004) ("[T]he interest of class members to control litigation individually [] matters most when absent class members have personal injury claims."). Most importantly, the Fifth Circuit has noted that class actions are superior particularly for "negative value" suits, *i.e.*, suits where the possible recovery is less than the cost of bringing the suit. *See Castano*, 84 F.3d at 748 (the "most compelling rationale for finding superiority in a class action" is "the existence of a negative value suit"). The personal injury claims and particularly the wrongful death claims here are significant as plaintiffs estimate that wrongful

29

death claims alone will number 50-250 at a minimum, 500 at a maximum.  Trial Plan at 14.  The

value of these claims is potentially high, making a class action undesirable.  *See Norwood*, 237

F.R.D. 581 at 604-05 (finding no superiority because class claims alleging personal injury due to

radiation from defendants' radar devices were not negative value suits).

Plaintiffs' argue that their multi-phased class action trial plan is a superior vehicle that

sufficiently manages individualized issues.  They assert that, while Phase Two will involve some

individual issues of causation and damages, such issues will be "limited and manageable because

(1) liability will have been established for all individual claimants [during Phase One], (2)

groupings of similar claims will accelerate proceedings, (3) resolutions of the first rounds of

individual claims will foster settlement of those that follow, and (4) the total number of likely

individual claimants will be at least an order of magnitude smaller than the number of individual

claimants that the Court would encounter if the class certification device is not used."  Trial Plan

at 7.  However, despite Plaintiffs' best efforts, these assurances are speculative.  Even if claims

like property damage could be placed into "groupings," fairness dictates numerous groupings so

that plaintiffs can properly be accorded the value of their property.  This arrangement would

require subgroupings for different types of business property damage, residential property

damage, and damage to contents, vehicles, and other personal property.  Moreover, Plaintiffs can

only propose a mass appraisal technique for assessing these property claims, but have not

provided any semblance of a reliable means to collect data on all of these damage claims,

making class certification inappropriate.  *See Piggly Wiggly*, 100 Fed. Appx. at 300 (affirming

denial of class certification where "plaintiffs and their expert did not persuade the district court,

and do not persuade us, that a reliable formula for damages can be devised which will yield

statistically significant results, that the data that would have to be plugged into such a formula can be assembled.").  Groupings of claims also would be unworkable for the more intangible measures of personal and emotional injury.  Perhaps the most speculative aspect of Plaintiffs' plan is that personal injury claims grouped together during Phase Three would simply require "mini-trials" that "in almost every instance, take less than two hours per claimant."  Trial Plan at 14.  Plaintiffs' optimism is admirable, but such a brief trial on damages would be virtually unheard of in federal system and at best would give class members rough justice for significant personal injury claims.

Because Plaintiffs cannot satisfy the predominance or superiority requirements of Rule 23(b)(3), this Court finds it unnecessary to address Defendants' other grounds of opposition.  *See Steering Committee*, 461 F.3d at 601 (declining to address other Rule 23 requirements where plaintiffs failed to fulfill predominance or superiority prerequisites); *Nguyen v. St. Paul Travelers Ins. Co.*, 2008 WL 4691685, at *3 (E.D. La. Oct. 22, 2008) (Vance, J.) ("Because the Court finds that plaintiff has not met his burden of showing that common questions predominate, which dooms class certification under Rule 23(b)(3), the Court does not address the other threshold requirements of Rule 23(a), or the superiority requirement of Rule 23(b)(3).").

### III. CONCLUSION

For the foregoing reasons, accordingly,

**IT IS ORDERED** that Plaintiffs' Amended Motion for Class Certification (Rec. Doc. 15549) is **DENIED.**

New Orleans, Louisiana, this ___21st___ day of May, 2009.

_____
        **STANWOOD R. DUVAL, JR.**
    **UNITED STATES DISTRICT JUDGE**