1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5

6  IN RE:  KATRINA CANAL BREACHES   *    Docket 05-CV-4182-K
            CONSOLIDATED LITIGATION  *
7                                    *    New Orleans, Louisiana
   * * * * * * * * * * * * * * * *   *
8                                    *    April 2, 2009
   PERTAINS TO:  LEVEE and MRGO      *
9                 Document 16721     *    10:00 a.m.
   * * * * * * * * * * * * * * * *   *

10

11        TRANSCRIPT OF PROCEEDINGS BEFORE THE
            HONORABLE STANWOOD R. DUVAL JR.
12             UNITED STATES DISTRICT JUDGE

13

   APPEARANCES:
14

15  For Proposed Plaintiffs     Law Offices of Joseph M. Bruno, A PLC
    Settlement Class:           BY:   JOSEPH M. BRUNO, ESQ.
16                              855 Baronne Street
                                New Orleans, Louisiana 70113
17

18  For Proposed Plaintiffs     Gainsburgh Benjamin David
    Settlement Class:            Meunier & Warshauer
19                              BY:  GERALD E. MEUNIER, ESQ.
                                1100 Poydras Street, Suite 2800
20                              New Orleans, Louisiana 70163

21

22  For Proposed Plaintiffs     Domengeaux Wright Roy & Edwards, LLC
    Settlement Class:           BY:   JAMES P. ROY, ESQ.
23                              556 Jefferson Street, Suite 500
                                Post Office Box 3668
24                              Lafayette, Louisiana 70502

25

1  <u>APPEARANCES (Continued)</u>:

2

3  For Orleans Levee          McCranie Sistrunk
   District:                  BY:  THOMAS P. ANZELMO, ESQ.
                              3445 North Causeway Boulevard
4                             Suite 800
                              Metairie, Louisiana 70002
5

6  For Orleans Levee          Laborde & Neuner
   District:                  BY:  BEN L. MAYEAUX, ESQ.
                              Post Office Drawer 52828
7                             1001 West Pinhook Road, Suite 200
                              Lafayette, LA 70505
8

9
   For East Jefferson         Duplass Zwain Bourgeois
10 Levee District and           Morton Pfister & Weinstock
   Lake Borgne Basin          BY:  GARY M. ZWAIN, ESQ.
11 Levee District:            3838 N. Causeway Blvd., Suite 2900
                              Metairie, Louisiana 70002
12

13 For St. Paul Fire and      Lugenbuhl Wheaton Peck
   Marine Insurance Company:    Rankin & Hubbard
14                            BY:  RALPH S. HUBBARD III, ESQ.
                              601 Poydras Street, Suite 2775
15                            New Orleans, Louisiana 70130

16
   For St. Paul Fire and      Phelps Dunbar, LLP
17 Marine Insurance Company:  BY:  SESSIONS AULT HOOTSELL III
                              365 Canal Street, Suite 2000
18                            New Orleans, Louisiana 70130

19
   For Objectors:             Milling Benson Woodward, LLP
20                            BY:  JAMES K. IRVIN, ESQ.
                              909 Poydras Street, Suite 2300
21                            New Orleans, LA 70112-1010

22
   For Objectors:             Public Citizen Litigation Group
23                            BY:  MICHAEL T. KIRKPATRICK, ESQ.
                              1600 20th Street, N.W.
24                            Washington, DC 20009

25

1    Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                     500 Poydras Street, B-406
2                                    New Orleans, Louisiana 70130
                                     (504) 589-7778
3

4

5
     Proceedings recorded by mechanical stenography, transcript
6    produced by computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **I N D E X**

2  PAGE

3  Opening Statements
        Gerald E. Meunier, Esq.                    20
4       Thomas P. Anzelmo, Esq.                    41
        Ralph S. Hubbard III, Esq.                 56
5

6  Gregory C. Rigamer
        Voir Dire                                  65
7       Direct Examination                         81
        Cross-Examination                          98
8       Cross-Examination                          99

9

10 Timothy P. Doody
        Direct Examination                        108
        Cross-Examination                         112
11      Cross-Examination                         113

12

13 Pete Ligeros
        Voir Dire                                 115
        Direct Examination                        121
14      Cross-Examination                         137
        Cross-Examination                         141
15      Cross-Examination                         143
        Redirect Examination                      146
16

17 Joseph M. Bruno
        Direct Examination                        149
18      Cross-Examination                         181
        Cross-Examination                         182
19      Cross-Examination                         191
        Redirect Examination                      199
20

21 Edward F. Sherman
        Direct Examination                        203
22

23

24

25

1          **MORNING SESSION**

2          **(APRIL 2, 2009)**

3          **THE DEPUTY CLERK:**  All rise.

4              Please be seated.

5          **THE COURT:**  Good morning.

6              Announce the case, please, Sheena.

7          **THE DEPUTY CLERK:**  This is Civil Action 05-4182,

8    In Re: Katrina Canal Breaches Consolidated Litigation.  This

9    motion deals with levee, and it's an Order of Preliminary

10   Certification of a Settlement Class, Preliminary Approval of

11   Proposed Settlement and Stay of Certain Claims and Actions,

12   Document 16721.

13         **MR. BRUNO:**  It also applies to MRGO.

14         **THE COURT:**  Thank you.  Before we start, I'm going to

15   make some preliminary comments.

16              First, there's no way that I can understand the

17   devastation that was wreaked upon this area by Katrina because

18   I didn't suffer from it.  Hopefully, I'm empathetic enough to

19   at least partially understand it.  It's like I've told other

20   people:  I had a father and an uncle who were marine

21   lieutenants on Iwo Jima.  They told me some of what went on,

22   but there's no way I could ever understand that.  I wasn't

23   there.  I want you to know the Court understands the immensity

24   of the suffering that hundreds of thousands of people went

25   through.  I didn't suffer much at all.  That's a fact.

1          I've been over the letters of objection and all
2    the letters received.  I just want to read one as an example of
3    what I just tried to illustrate:

4          "I'm writing this letter in the case of Katrina
5    Canal Breaches Consolidated Litigation, Case 05-4182.  My name
6    is Shani Scott..." and she gives her address and telephone
7    number, which I won't read.

8          "I do wish to be a part of the settlement due to
9    my damages..." and she gives her address.  "Some of my personal
10    items are lost.  I also was in the Superdome for four nights
11    and five days, six months pregnant.  On the fourth day, I
12    fainted.  I was told no one from the National Guard....  Once
13    out of the Superdome, I was transported to Duncanville, Texas.

14          "Two months later, I gave birth to my son.  He
15    died two days later.  I didn't receive any help from FEMA for
16    the funeral.  I'm not asking for pity but justice for what I
17    went through.  I know I may not be the only person who went
18    through a lot of pain.  I just want my son and me to be
19    remembered, someone to at least act like they care."  She
20    attaches a picture of her child who died.  That's just one of
21    the many stories.

22          The Court understands how serious this is.  This
23    is a court of law, and I'm bound to uphold the law as best as I
24    see it.  Federal judges may be appointed for life, but none of
25    them are omniscient or infallible, by a long shot.

 1          One of the reasons we are here is that, although

 2    in my opinion I detail a lot of what I consider to be extreme

 3    negligence by the Corps of Engineers, I dismissed the Corps of

 4    Engineers because it was my view, under the law and under the

 5    oath that I took, that they were immune under the Flood Control

 6    Act of 1928.  It's not part of this fairness hearing,

 7    obviously, but that matter is on appeal.  The Court of Appeal

 8    may view it differently than I did, or the Supreme Court may.

 9    I did what I thought was right.

10          One of the reasons we are here is because the

11    largest defendant, perhaps the most culpable defendant, the

12    Corps of Engineers, was dismissed by yours truly.  The fund,

13    whatever it is -- and I'm going to hear all the evidence today

14    and perhaps tomorrow -- was certainly diminished when the Corps

15    was dismissed.

16          I might point out that the lawyers in this case

17    fought valiantly to keep the Corps in.  They made many

18    arguments to me to try to convince me and they made a valiant

19    fight.  They lost here.  They are going on to the Fifth Circuit

20    Court of Appeal and could conceivably have better luck there.

21    I just did what I thought was right even though it certainly

22    would not be a popular decision in New Orleans.

23          Therefore, there remain very few defendants who

24    might be liable to the people of this area for the levee

25    failures, at least assuming my decision is upheld.  Among them

1  are the Lake Borgne Basin Levee District, the East Jefferson

2  Levee District, and the Orleans Levee District.  These levee

3  districts were insured by St. Paul Fire and Marine Insurance

4  Company.  The insurance company has offered what they contend

5  are the policy limits to obtain the release of all claims

6  against the levee districts arising out of damages caused by

7  hurricanes Katrina and Rita.

8           If somebody can't hear me, just let me know.

9           The remaining defendants in the matter before me

10  who are not part of this ostensible settlement class are the

11  Sewerage and Water Board and the New Orleans Public Belt

12  Railroad, both of whom have filed motions to dismiss based on

13  their own immunity and other legal grounds.  One is submitted

14  and one I haven't heard yet.  It's my understanding that they

15  also claim they have no liability insurance that would cover

16  this event.  That's my understanding, but they are not part of

17  this.  In other words, right now they would still remain in

18  this suit unless I dismiss them, as well, which is a

19  possibility.

20           For the reasons that will be discussed at length

21  here today and possibly tomorrow, the plaintiff class

22  representatives and the settling defendants filed a pleading

23  and I found it appropriate to preliminarily approve a limited

24  fund settlement about which you received notice.  I entered an

25  Order of Preliminary Certification of a Settlement Class,

1    Preliminary Approval of Proposed Settlement and Stay of Certain

2    Claims and Actions on December 15, 2008.  That is preliminary,

3    subject to this hearing and subject to some other things, which

4    we will talk about.

5                     Notice was published, pursuant to my order, on

6    January 30, 2009, with objections required to be filed

7    March 13, 2009, which provided for 43 days for objections.

8    Under the notice provisions, in order to speak at this hearing,

9    it was required that a claimant "submit a valid objection" and

10   file a Notice of Intent to Appear in this matter, which was to

11   include the claimant's name, address, telephone number, and

12   signature addresses to the addresses provided therein.  I think

13   there were three, including counsel for defendants.

14                     As such, the Court is in receipt of a proper

15   Notice of Intent to Appear and will allow the following persons

16   to speak at the appropriate time during the hearing after all

17   evidence has been adduced:

18                     (1)   Frances S. Feigler;

19                     (2)   John J. Therence Jr.;

20                     (3)   Lawrence and Noella Thonn;

21                     (4)   Amy and Don Dowling;

22                     (5)   Charles R. Barber or his daughter SonTasha

23   Barber;

24                     (6)   James K. Irvin of Milling Benson Woodward

25   and those attorneys appearing on those pleadings;

1          (7)   Jennifer J. Rosenbaum and Michael T.

2   Kirkpatrick representing Mary Brinkmeyer, Michelle LeBlanc, and

3   Thomas C. Stuart;

4          (8)   Richard A. Nussbaum representing the

5   Louisiana Congregation of Holy Cross, also known as the

6   Congregation of Holy Cross, Southern Province, Inc.

7          Mr. Ashton O'Dwyer attempted to file his

8   "objections" on behalf of himself and what he termed as "his

9   clients."  However, the objections were not accepted by the

10  Clerk of Court pursuant to the En Banc Order of this Court

11  dated November 7, 2008, wherein Mr. O'Dwyer was suspended from

12  the practice of law for a period of two years.  Subsequently,

13  on March 4, 2009, Mr. O'Dwyer was disbarred by the En Banc

14  Court.

15          The En Banc Court, for those of you who don't

16  know, is a meeting of all of the members of the Eastern

17  District of Louisiana.  As a result of those actions, the

18  En Banc Court stated:

19          "It is further ordered that respondent Ashton R.

20  O'Dwyer Jr. shall file no pleadings or documents in any

21  proceeding before this Court, whether existing or sought to be

22  initiated, including as a *pro se* litigant, without first paying

23  all outstanding monetary sanctions issued against him and

24  without first obtaining an order of a member of this Court.

25  This order does not apply to the filing of a notice of appeal

1    or to a document required to be filed by this order."

2              So Mr. O'Dwyer will not be allowed to speak

3    since there is no filing.  Also, the filing purported to

4    represent clients, which he cannot represent clients in this

5    Court at this time.  He has complained about that and appealed.

6    Until the order of this Court is reversed, I must enforce the

7    order of the En Banc Court.

8              Further, if he is ultimately dissatisfied with

9    what I do in this, Mr. O'Dwyer may file an objection attached

10   to his Notice of Appeal.  That's in the spirit of the order

11   because he can file appeals.  He can attach the objection to

12   the appeal.  The Court of Appeal will then have an opportunity

13   to see it.  There will be no more offer of proof here.  That

14   would be against the spirit of the En Banc Order.  That's the

15   way we have to handle that.

16             That's my preliminary statement.  Understand,

17   this is a hearing.  I haven't ruled on this yet.  There is a

18   legitimate question raised.  I'm now going to ask the attorneys

19   to make their appearances.  Then the parties seeking

20   certification can put on their case.  If witnesses take the

21   stand, I'm going to allow -- because we can't have everybody

22   cross-examining -- the attorneys who filed objections, they can

23   ask questions, and those questions will serve as questions for

24   all objectors.  Even though you're not technically representing

25   them, it's an orderly way for the Court to proceed.

1      I might ask, Mr. Irvin, do you plan to call any

2 witnesses, as well, just to try to get a time estimate?

3      **MR. IRVIN:**  I plan to call Ms. Kiefer from the

4 Orleans Parish levee board.  Other than that, I think we are

5 just introducing some exhibits.

6      Your Honor, preliminarily, I mentioned yesterday

7 that I had discovered over the weekend that while the orders

8 and the notice scheduled this hearing to begin today, the class

9 action settlement agreement provides that the hearing shall

10 take place no sooner than 45 days following the objection

11 deadline, which was March 13.  I think that presents a problem

12 with going forward today and would be grounds for an objection.

13 I think it can also be solved if we just keep the record of

14 this proceeding open until at least the 45th day following

15 March 13.

16      **THE COURT:**  Okay.  I note your objection and we'll

17 consider it.

18      **MR. MEUNIER:**  We would have no objection on behalf of

19 plaintiffs, Your Honor.

20      **THE COURT:**  The Court will so do it.  We appreciate

21 you pointing that out to us.

22      Mr. Hubbard.

23      **MR. HUBBARD:**  The defendants have no objection to

24 that, as well, Judge.  I'm a little bit perplexed about exactly

25 where that is in the settlement agreement.  Do you have an

```
 1   idea?
 2          MR. IRVIN:  It's in paragraph 23 of the definitions
 3   section.
 4          THE COURT:  Do you want to look at that, Mr. Hubbard?
 5   I appreciate your suggestion, Mr. Irvin.  While we are looking
 6   at that, if the attorneys who are going to be making the
 7   presentation could make their appearances now.
 8          MR. MEUNIER:  Jerry Meunier appearing for the
 9   proposed plaintiffs settlement class, Your Honor.
10          THE COURT:  Thank you, sir.
11          MR. BRUNO:  Joseph Bruno for the proposed plaintiffs
12   settlement class.
13          MR. ROY:  Jim Roy appearing for the proposed
14   plaintiffs settlement class, Your Honor.
15          THE COURT:  Defendants.
16          MR. ANZELMO:  May it please the Court.  Tommy Anzelmo
17   representing the Orleans Levee District.
18          MR. MAYEAUX:  Ben Mayeaux representing the Orleans
19   Levee District.
20          MR. ZWAIN:  Gary Zwain, Your Honor, representing the
21   East Jefferson Levee District and the Lake Borgne Basin Levee
22   District.
23          MR. HUBBARD:  Ralph Hubbard, Your Honor, representing
24   St. Paul Fire and Marine Insurance Company.
25          MR. HOOTSELL:  Ault Hootsell, Your Honor,
```

1    representing St. Paul Fire and Marine Insurance Company.

2              **MR. KIRKPATRICK:**  May it please the Court.

3    Your Honor, I'm Mike Kirkpatrick.  I'm here to represent the

4    objectors Brinkmeyer, LeBlanc, and Stuart.

5              **MR. IRVIN:**  James Irvin representing the various

6    objectors.

7              **THE COURT:**  Thank you.  This is, indeed, a dilemma

8    since we have hundreds of thousands of claimants and the

9    limited fund is purported to be $20 million plus.  It's

10   egregiously inadequate to meet the claims.  There's no question

11   about that.  The Court is aware of that, but the fact is the

12   Court has to make an inquiry to determine whether, in fact,

13   this fund is limited, whatever it is.

14              I need to undertake an independent investigation

15   as to whether the valuation of the assets comprising the

16   proposed fund has been set at the upper limit.  I need to

17   determine on the record the value of future and present tort

18   claims against the limited fund; analyze any side agreements,

19   if any exist; compare the interests of different claimants,

20   including the class; and other factors.

21              I might point out that in that case, the

22   criteria was created -- that was the *Ortiz* case -- in the

23   context of a corporate defendant.  Here, we have political

24   subdivisions, which pose a different question; that is, in

25   reality, whether the only viable source of recovery is from the

1   insurer.

2              In addition, in Judge Vance's decision in *In re*

3   *Educational Testing Service Praxis Principles of Learning and*

4   *Teaching*:   *Grades 7-12 Litigation*, 447 F. Supp. 2d 612 (E.D.

5   La. 2006), the court identified six factors as specified by the

6   Fifth Circuit to determine whether settlement is "fair,

7   adequate, and reasonable."  Again, that is not a limited fund

8   settlement, as I read it.  The factors were:

9              (1)   The existence of fraud or collusion behind

10  the settlement;

11             (2)   The complexity, expense, and likely

12  duration of the litigation;

13             (3)   The stage of the proceedings and the amount

14  of discovery completed;

15             (4)   The factual and legal obstacles to

16  prevailing on the merits;

17             (5)   The range of possible recovery; and

18             (6)   The opinions of class counsel, class

19  representatives, and absent class members.

20             In discussing the complexity, expense, and

21  likely duration of the litigation, the court noted that the

22  case involved a scoring error on tests that occurred over a

23  16-month period, which inflicted damage on a discrete number of

24  individuals.  The resulting contract and tort claims were not

25  in and of themselves particularly complex nor was the

1   transaction between the parties document-intensive.  The court

2   considered in that case whether settling voids the risk and

3   burdens of potentially protracted litigation.  The nature of

4   the claims suggested that the amount of individual damages

5   would be relatively small, making the cost of litigating

6   individual claims potentially prohibitive.  Yet, the issues

7   involved in class certification threatened to delay the case at

8   great expense and/or to result in a denial of certification.

9            The point I'm making is that if this class is

10  not certified -- let's assume that we didn't have this limited

11  fund settlement; we had a straight-out class certification

12  hearing.  One of the Court's concerns -- and I'm interested to

13  hear your thoughts on this -- is:  What is the possibility of

14  this class being actually certified in a nonlimited fund

15  context under Fifth Circuit law?  That is a consideration I

16  will take into effect in determining this.  If you look at

17  Fifth Circuit law, it's pretty tough.

18           I'm going to briefly summarize the objections,

19  and excuse me if I don't characterize all of them

20  appropriately.  This is for the record, and you can elaborate

21  on that when you are speaking.

22           From Mr. Irvin (*Sims*, *Richard*, *DePass*, *Adams*,

23  *Christophe*, *Williams*, *Bourgeois*, *Augustine*, *Ferdinand*, and

24  *Porter* plaintiffs):

25                 (1)  There is no evidence of the inadequacy of

the limited fund to pay all of the claims.  They claim:

(a)  This is not a classic limited fund case under *Ortiz*, and Rule 23 was not designed to be used "to aggregate unliquidated tort claims on a limited fund rationale."

(b)  There needs to be further inquiry into the availability of the fund.  The joint applicants mistakenly assume the existence of limited insurance for the levee boards.

(c)  Louisiana law does not created a limited fund.  Instead, the Louisiana legislature appropriates many millions of dollars each year to satisfy or settle judgments against the state and its political subdivisions.

(d)  The proponents of the settlement have not shown through investigation or otherwise that the insurance proceeds being paid are the only insurance proceeds available for the purposes of settlement.

(e)  The defendants are making no contributions to the limited fund.

(2)  Class counsel will deplete part of the settlement fund, which is not appropriate under *Ortiz*.  *Ortiz* held that the "whole of the inadequate fund [must] be devoted to the overwhelming claims."

1          (3)   There's no showing that the potential

2    claimants will be treated fairly and equitably among

3    themselves.

4          (4)   The class notice was inadequate and

5    misleading:

6          (a)   The notice did not inform class

7    members that a mandatory non-opt-out class was

8    sought.

9          (b)   The notice did not provide any means

10   for class members to ascertain their recovery under

11   the settlement.

12         (c)   The notice was misleading because it

13   claims the Court will confirm in this settlement a

14   fund that represents all insurance money available

15   to the joint applicants.

16         (d)   The notice stated that the settlement

17   class can get no additional money or property in the

18   settlement because the joint applicants are

19   governmental bodies.

20         (e)   The notice was misleading in its

21   failure to disclose the breadth of the indemnity

22   obligations and releases in the proposed settlement

23   agreement.

24         (5)   The requirements of Rule 23(a) have not

25   been met:

1          (a)  The class representatives have not

2     shown that their claims are typical and that they

3     are adequate representatives.

4          (b)  The claims of all class members are

5     diverse, and the representatives may not be capable

6     of representing all of these clients.

7               Mr. Nussbaum only requested that all notices be

8     served on him.  That's the Congregation of the Holy Cross.

9               Attorney Jennifer Rosenbaum (*Brinkmeyer*,

10    *LeBlanc*, and *Stuart* plaintiffs) stated:

11         (1)  The notice was deficient because it did not

12    provide class members with a means to calculate their

13    individual recoveries.

14         (2)  The levee boards are not "limited funds."

15    While they cannot be forced to satisfy a monetary judgment

16    against them, they can choose to pay a judgment or to

17    contribute to a settlement fund.

18         (3)  A class settlement can be approved only if

19    it is fair, adequate, and reasonable.  The settling parties

20    have not provided enough information to allow the Court or the

21    class members to evaluate the settlement.  Specifically, they

22    have not provided an estimate of the size of the class and they

23    have not provided enough information to evaluate the limited

24    fund.

25         (4)  Further, that the notice and settlement

1    agreement both indicate that counsel may seek an enhancement of

2    their actual costs and expenses.  Lawyers should not make a

3    "profit on costs."  Such an arrangement is contrary to the

4    Louisiana Rules of Professional Conduct and is unsupported in

5    the case law.

6              I think that's a general background.  The way I

7    had this arranged is that those nonattorneys who did comply

8    with the rules and whose names I read off, I am going to have

9    you speak at the end of the movers' presentation.  You would

10   then be informed as to what they are representing and could

11   further augment your objections or -- unlikely but possibly --

12   say, "Oh, now I'm convinced."  That's the way we have it

13   arranged.

14             You are not being paid, you nonattorneys, the

15   ones who I read.  If for some reason you can't wait until that

16   point, I'm going to let you speak out of turn, so just let me

17   know.

18             Mr. Meunier, you're up.

19        MR. MEUNIER:  Thank you, Judge.  May it please the

20   Court.  Jerry Meunier, plaintiffs' liaison counsel for the

21   levee cases in these consolidated proceedings.

22             The law favors settlement.  This is one of the

23   most familiar and fundamental truisms in our system of civil

24   justice, and it is a principle of justice which applies with

25   particular force in cases where the total judgment value of

1    numerous claims being simultaneously pursued against a

2    defendant or group of defendants far exceeds the total amount

3    of available funds which the defendant or defendants legally

4    can be obliged to pay.

5                      That is the very situation presented to

6    Your Honor in the matter at hand and that is why your

7    court-appointed liaison counsel ask you, respectfully, to favor

8    and approve a limited fund class settlement of the claims

9    asserted in this litigation against the Orleans,

10   East Jefferson, and Lake Borgne levee districts, their

11   governing boards, and their liability insurer, St. Paul Fire

12   and Marine Insurance Company.

13                     So the record is clear, request for approval of

14   this settlement is made on behalf of the plaintiff class by me,

15   by Jim Roy as plaintiffs' liaison counsel in the MRGO cases,

16   and by Joseph Bruno, the principal negotiator of this

17   settlement agreement on plaintiffs' behalf and Your Honor's

18   appointed liaison counsel for all plaintiffs in the Katrina

19   litigation.  I'll also state for the record that this Court's

20   appointed litigation committees for plaintiffs in these

21   proceedings have met and voted and are in unanimous support of

22   this proposed limited fund settlement.

23                     Now, several questions are to be addressed in

24   this hearing and in this introductory overview of the

25   proceedings from plaintiffs' standpoint.  Let me discuss each

1   of them briefly in turn.

2                    Number one, what are the basic essential

3   elements of the settlement agreement?

4                    Number two, does this proposed settlement

5   satisfy the legal criteria for a mandatory limited fund

6   settlement of class claims?

7                    Number three, how do we respond to the chief

8   concerns and issues that have been raised by those objecting to

9   the approval of this settlement?

10                   First, as to the terms of the settlement, it is

11  important to note, as Your Honor has already mentioned, that

12  this is a partial settlement of plaintiffs' claims in this

13  litigation.  This settlement calls for the release of claims

14  against the settling levee districts only.  The claims being

15  pursued against other defendants in this litigation remain and

16  are fully preserved.  For example, as the Court notes and is

17  aware, the dismissal of the defendant U.S. Army Corps of

18  Engineers, based on Flood Control Act immunity, is yet to be

19  appealed to or reviewed by the Fifth Circuit.

20                   In addition, there is now pending in the

21  Fifth Circuit the levee plaintiffs' appeal of this Court's

22  dismissal of the defendants Boh Bros., Modjeski and Masters,

23  and Eustis Engineering based on the Louisiana law of

24  preemption.

25                   These prospective and pending appeals are not

1  impaired or affected in any way by this levee district

2  settlement, nor does the settlement impede in any way the right

3  of plaintiffs to pursue claims against other defendants, as

4  mentioned by the Court, including the Sewerage and Water Board,

5  in pending state court litigation.

6              Now, the funds paid in the settlement of

7  plaintiffs' claims are insurance proceeds; more specifically,

8  they are what we believe to be the full limits of all primary

9  and excess liability insurance policies issued to the levee

10 districts by their insurer, St. Paul.  The settling defendants

11 additionally have agreed to pay legal interest on these policy

12 limits calculated from the dates actions initially were filed

13 against each of the defendant levee districts.

14             Pending approval of the settlement, these policy

15 limits payments plus legal interest have been deposited into

16 escrow accounts at U.S. Bank, where the funds can continue to

17 earn interest -- though not as much as we'd like, obviously,

18 under the circumstances, but interest -- through the purchase

19 of U.S. Treasury bills.

20             The total amount of the settlement fund at this

21 time is in excess of $20.8 million.  It consists of the

22 following:

23             $2 million has been paid as the total limits

24 with legal interest as the aggregate limits of a policy issued

25 to the Lake Borgne Levee District.

 1                    $5 million of this total with interest was paid

 2     under a primary policy with limits of $1 million and an excess

 3     policy with limits of $4 million issued to the East Jefferson

 4     Levee District.

 5                    $10 million of this total plus interest was paid

 6     as a $1 million proposed limit under a primary policy and a

 7     $9 million limit under an excess policy issued to the Orleans

 8     Levee District.

 9                    This totals $17 million plus interest.  The

10     parties, by agreement, will submit to this Court in this

11     hearing an important issue regarding the limits of the Orleans

12     Levee District primary policy, the result of which could

13     determine that the limits of that primary policy are not

14     $1 million but $3 million, and here's why.

15                    That policy affords coverage of $1 million per

16     insured premises.  If Your Honor concludes that there is only

17     one insured premises at issue -- namely, a continuous levee

18     system which failed -- then the limits of the primary policy

19     issued to the Orleans Levee District would be $1 million, the

20     amount already paid by St. Paul with interest in escrow.

21                    If, on the other hand, the Court concludes that

22     there are as many as three insured premises since levee systems

23     separately protected the City of New Orleans, New Orleans East,

24     and the Lower Ninth Ward, all of which failed, giving rise to

25     the plaintiffs' claims, then the primary policy issued to the

1    Orleans Levee District would afford limits of $3 million, not
2    $1 million, for plaintiffs' claims.
3                      From plaintiffs' standpoint, we obviously urge
4    that this three-premises interpretation be the Court's ruling
5    and that the settling defendants hopefully then will agree to
6    increase the amount of the limited fund by $2 million
7    accordingly.
8                      Judge, the underlying facts for you to make this
9    determination will primarily consist of stipulations,
10   supplemented as needed by the testimony of Mr. Bruno and
11   perhaps references to the preexisting record in this case.
12                     Finally, Judge, it should be noted that, under
13   the agreement, we propose to divide the plaintiff settlement
14   class into three separate subclasses:  One consisting of damage
15   claims asserted against the Lake Borgne Levee District; the
16   second consisting of claims made against the East Jefferson
17   Levee District; and the third consisting of claims against the
18   Orleans Levee District.
19                     We submit that this subclass approach is fair
20   and reasonable based on an understanding, through our expert
21   analysis, of which geographic areas were impacted by which
22   sources of flooding or system failures, at times including
23   combinations of sources and failures.  By requiring the
24   separate allocation of available insurance funds from each
25   settling levee district to a specific subclass of claims as to

1    that levee district, we can assure that the funds available

2    under a given levee district's policy will not be available to

3    benefit a class member having no claim for damage against that

4    levee district.

5              At the same time, the settlement expressly

6    stipulates that membership in these subclasses can overlap in

7    any case where a claimant can show impact or damage from more

8    than one levee district.  Nothing prevents such a plaintiff, in

9    other words, from being a settlement participant in more than

10   one settlement subclass on the basis of having claims against

11   more than one of the defendant levee districts.

12             Coming now to the question whether this proposed

13   agreement satisfies the legal criteria for approval as a

14   limited fund settlement under Rule 23(b)(1) and the

15   Supreme Court's decision in *Ortiz*, the Court will find this

16   fully addressed in the joint written memorandum filed in

17   support of approval.

18             Suffice it to say, much of what is required by

19   Rule 23 for class certification in this case is satisfied

20   without serious dispute.  To the extent that concerns have been

21   raised, we submit that Your Honor will find them readily

22   satisfied not only in the record of this hearing, but by

23   reference to the record already made in these same proceedings

24   based on plaintiffs' efforts to certify a litigation class.

25             Thus, for example, the same class

1   representatives presented to Your Honor for consideration as

2   typical and adequate for purposes of the proposed settlement

3   class and subclasses -- namely, Kenneth and Jeannine Armstrong,

4   Thurman Kaiser, and Donna Augustine -- previously were included

5   among the plaintiffs' proposed litigation class

6   representatives.  The transcripts of their earlier deposition

7   testimony taken by the defendants will be submitted, in

8   addition to their affidavits, to support our position that they

9   fully meet the class representative requirements.

10          Looked at not just as a matter of law but as a

11  matter of underlying policy, it would appear that this case

12  fits precisely the stated objective of Rule 23(b)(1), which

13  requires certification of a mandatory limited fund class when

14  the separate adjudication of individual claims of class members

15  would substantially impair -- *substantially impair* -- the

16  ability of other class members to protect their interests as

17  claimants.

18          You will hear in this proceeding, Your Honor,

19  that the class claims herein realistically can be valued in the

20  billions, not just millions of dollars.  Whatever the reduction

21  of recovery based on levee district percentage of fault, these

22  claims dwarf the availability of insurance funds of either

23  $17 million or $19 million with interest.  Therefore, absent a

24  mandatory class settlement and relying on the litigation of

25  claims to conclusion, to judgment, it is clear that this would

1    become a case of a relative few receiving compensation to the

2    detriment of the many, which is the very problem addressed by

3    Rule 23(b)(1).

4                    As Your Honor knows, the *Ortiz* court did reject

5    a proposed limited fund class settlement because the district

6    judge had simply accepted the figure for maximum available

7    insurance proceeds recited by the parties in the settlement

8    agreement.  Such is not the case here.

9                    You will hear testimony from Mr. Bruno regarding

10   the due diligence efforts to secure all applicable policies,

11   the arms-length negotiations involved in reaching this

12   agreement, and the retention of a qualified and independent

13   expert to verify and confirm the limits of coverage available

14   under the applicable policies.  That expert, Pete Ligeros, also

15   will testify and present to the Court his analysis and his

16   conclusions which support the agreement as based on a truly

17   limited insurance fund relative to the amount of claims at

18   issue.

19                   There were two fundamental predicates for the

20   support of this settlement by your liaison counsel:

21                   Number one, the ability of a qualified expert,

22   an independent expert such as Mr. Ligeros, to verify that the

23   limits of the policies affording coverage to these three levee

24   districts for these plaintiffs' claims totaled either

25   $17 million or perhaps $19 million, thus constituting, clearly,

1    a limited fund of insurance proceeds given the claims; and

2                    Number two, verification through proper legal

3    research and analysis that once these insurance proceeds would

4    be exhausted by claims, the assets of the three levee districts

5    were not subject to seizure in order to satisfy the legal

6    claims of class members.

7                    The constitutional, statutory, and

8    jurisprudential authority of Louisiana prohibiting any such

9    seizure of levee district assets to satisfy judgments is

10   undeniable, without dispute, and all set forth in our joint

11   memorandum.  Nevertheless, we recognize there are objectors to

12   this settlement, including objectors represented by counsel we

13   know and respect.  We welcome a full, good-faith discussion in

14   these proceedings of their concerns.

15                   Let me close my remarks by briefly touching --

16           THE COURT:  Go ahead.  You may touch on what I was

17   going to ask you about.  If you're going to cover it later,

18   that's fine, but go ahead and --

19           MR. MEUNIER:  Just now to mention two that I think

20   are important:

21                   Number one, it's been suggested that the

22   equitable allocation of the settlement fund among claimants --

23           THE COURT:  Why don't you talk a little bit about

24   that in nonlegal terms.  We have a lot of people here who may

25   not be able to be here the whole two days, and I want them at

1    the outset to understand what might or might not be available

2    to them.

3              **MR. MEUNIER:**  The objectors' concern is that we have

4    this limited fund of currently $20.8 million.  Everybody seems

5    to agree there are billions of dollars in claims.  Let's assume

6    for the moment this is all the insurance.  You can't seize the

7    assets of the levee districts.  This is the total amount of

8    legally available money to pay these claims.  People will

9    wonder:  How is it that this could be fairly, equitably

10   divided?  How much will I get and how much are the lawyers

11   going to get?  All legitimate concerns.

12             Well, what the law requires today, at this

13   moment, at this stage is that this Court first decide is it a

14   limited fund, is it a fund that will be used for the benefit of

15   the class, the entire class, and is it a fund that is capable

16   of equitable allocation among the plaintiffs.

17             Now, I touched earlier on the fact that one of

18   the structures of the settlement will assure that subclass

19   members having claims against different levee districts will

20   only be able to benefit from the available policies of those

21   districts.

22             **THE COURT:**  Just to get into that mechanism a bit,

23   after this hearing and all the objections, if I were to find

24   it's a limited fund, then what would be the mechanism where

25   persons who fit into the categories could make a claim, and how

1   do you envision that would be handled?  They don't know all

2   that.

3             **MR. MEUNIER:**  I think if the settlement is approved

4   legally as a limited fund, what we envision is that this Court

5   will utilize its authority under the Federal Rules of Civil

6   Procedure to engage a special master.  These are, typically,

7   appointed members of the bar who have no relationship to any of

8   the parties, have no involvement with any of the arguments on

9   either side.

10            **THE COURT:**  I would have to get somebody from Canada.

11            **MR. MEUNIER:**  We would have to go outside of

12  Louisiana.  I stand here and make no pitch for any particular

13  appointment.  You certainly have the authority and it's

14  typically done in class actions, as you know, to engage the

15  services of a special master because this Court is not going to

16  be in a position to get into the specifics of which claims are

17  where and how they're categorized and etc., etc.  So a special

18  master would be used to create, in effect, a matrix that would

19  reflect the claims that are asserted:  Where they are, who they

20  are, what the claims consist of.

21                 You then have the ability with that matrix to

22  organize some distribution of the fund if -- and this is an

23  important *if* -- if the Court concludes that it is economically

24  feasible to do so because sometimes the cost of distribution of

25  funds exceeds the value of the individual payments.

1    **THE COURT:**  I'm glad you brought that out.  So that
2  could mean that the class would receive zero.
3    **MR. MEUNIER:**  Well, it means the class may not --
4    **THE COURT:**  It's conceivable, or is it?
5    **MR. MEUNIER:**  The class must receive benefit -- and
6  that is an absolute requirement of the settlement -- but the
7  individual members of the class may not receive checks in the
8  mail for a specific amount of money.  The benefit delivered to
9  class members in a limited fund settlement such as this may
10  come in other ways.
11    **THE COURT:**  I'm joking, but not a good time to joke:
12  Like 100 feet of a good levee, something like that?
13    **MR. MEUNIER:**  I would suggest that the claimants in
14  this case would love there to be a benefit of this settlement
15  from which they derive greater flood protection.
16    Now, the beauty of how the distribution or
17  allocation system works in a case like this is that it can be
18  flexible based on equity; not just based on sensible economic
19  factors, but based on what this Court ultimately feels is fair.
20  The good news for the objectors is they can have their day in
21  court ad infinitum on the issue of allocation and distribution.
22  There will come a time.
23    **THE COURT:**  We're going to have another hearing.
24    **MR. MEUNIER:**  There will have to be another hearing.
25  There will come a time when the fund having been approved --

1          **THE COURT:**  Assuming that I find the factors that

2    lead to the other hearing.

3          **MR. MEUNIER:**  Yes.  But we have to take it a step at

4    a time because we don't get there unless you first decide that

5    this is a limited fund settlement and that it must be approved

6    as a mandatory no-opt-out settlement class.  That's serious

7    business.  *No opt-out* means once the claimants are told they're

8    in the class, there's no way to get out of the class, and so

9    the law does impose restrictions on us, on the Court, on the

10   approval of such a matter.  That's what we're here to talk

11   about:  Do we meet the requirements?

12               As I say, we get back to the policy.  There's a

13   great evil here at play that that policy needs to protect

14   against and it's the very evil we face; which is that if this

15   is not done and if these claims are allowed to proceed in

16   litigation, a relative small percentage of people will ever

17   have any chance of receiving compensation because of the

18   insurance limits, because of the nonseizability of levee

19   district assets.  So the vast majority of people sitting out

20   there in litigation will be left with zero.

21               Whereas with a settlement class, every single

22   member of the class must receive benefit.  Whether it's a check

23   in the mail, whether it's a benefit that is derived from the

24   wise use of these funds to protect and serve the entire

25   plaintiff class, this Court gets to address that, usually with

1    the help of a special master, at a later time.

2              **THE COURT:**  Yes, sir.

3              **MR. MEUNIER:**  One of the issues I'm hearing from the

4    objectors is that the equitable allocation of the fund, the

5    capability of an equitable allocation, is precluded because the

6    settlement agreement recognizes that plaintiffs' counsel are

7    entitled to request -- *to request* -- the reimbursement from the

8    fund of costs, case costs, litigation costs.

9              **THE COURT:**  I understand clearly that the plaintiffs

10   have waived any attorneys fees.

11             **MR. MEUNIER:**  Yes, Your Honor.  I was going to get to

12   that.  It deserves emphasis.  Lawyers get a lot of knocks, but

13   let me tell you:  I have been in many class actions.  This is

14   the first class action settlement that I have ever been a

15   participant in in which the class counsel have made it clear

16   that they intend to waive all law fees.  There will be no

17   attorneys fees paid out of this settlement.

18             Again, if you look at the alternative of

19   litigation if this settlement is not approved, if these

20   claimants have to go try their case against the levee

21   district -- mad rush to get to the insurance proceeds, whoever

22   gets in first gets them, whoever doesn't is out of luck, that

23   kind of thing -- every one of those plaintiffs --

24             **THE COURT:**  The levee districts are defendants in

25   other suits other than here in federal court.

1        **MR. MEUNIER:**  Absolutely, but every one of those
2   plaintiffs will owe costs and attorneys fees.  Costs and fees.
3   So I'm proud of the fact that the attorneys have said no fees
4   will be requested.
5               Now, what the settlement agreement does say is
6   we'll give the plaintiff attorneys, who have been handling this
7   case for years, who have invested funds in the prosecution of
8   these claims, who have done everything they can to establish
9   the fault of these defendants who are coming to the table to
10  settle, who have hired experts, who have had their law firms'
11  money at risk for years in a contingent case, where no recovery
12  is assured, all of those things -- the settlement agreement
13  does what is traditional in every class settlement of which I'm
14  aware, and that is it gives plaintiffs' counsel the right to
15  request that Your Honor allow certain costs to be deducted from
16  the settlement.
17              I think the objectors imagine some nightmarish
18  scenario in which the entire settlement fund is going to be
19  wiped out by a bunch of lawyers coming in with cost bills.
20  Well, guess what, the good news for them is they will have
21  their opportunity when this Court -- if the day comes that this
22  Court is asked to reimburse expenses out of the fund, to have
23  those funds audited, to scrub every bill, to see if the
24  expenses are real, to see if they're too much, to see if none
25  of them can be taken out.  All of that is a decision made

1  later, not today.

2          **THE COURT:**  All of it would be subject to appeal as

3  well.  If this Court errs, which is certainly possible, it can

4  be appealed.  The whole thing can be appealed.

5          I emphasize again as you have emphasized -- just

6  because we are in the beginning of this -- that if this Court

7  was wrong on the Corps of Engineers, this doesn't affect the

8  Corps of Engineers or any other nonsettling entity in the case.

9  As I pointed out, I want everybody to understand that the

10 remaining nonsettling entities, one I've already dismissed and

11 two have motions to dismiss before me -- and I may grant them.

12 At this point I want everybody to understand that.  They're

13 there right now and they're not settled and they're not part of

14 this, but they may not be later on.  I don't know.  I just want

15 clarity from my standpoint.  Go ahead.

16         **MR. MEUNIER:**  So, Judge, just, I guess, to leave the

17 subject of costs --

18         **THE COURT:**  Yes.  Now, there was a word about

19 enhanced costs or something, and I think that grabbed the

20 attention of the objectors.  I certainly understand.

21         **MR. MEUNIER:**  Your Honor, in class action cases,

22 again, it is customary or it is traditional that at least the

23 opportunity to make a request for the reimbursement of costs

24 with some enhancement is extended and, again, it's for the

25 reason I mentioned.  Class counsel in these cases often have

1    large sums of their firms' money at risk, invested in the
2    prosecution of the case, the hiring of experts, etc.  The use
3    of that money is not available to them the whole time, and so
4    there are cases -- this may not be one, but there are cases
5    where courts entertain a request by class counsel that, when
6    they get reimbursed their costs, there be some enhancement.
7                    Again, the only thing we're talking about today
8    is whether this is a limited fund.  This issue of what costs
9    will come out is for a later day.  To suggest that there's no
10   way you'll ever equitably allocate this fund for the benefit of
11   the clients because attorneys may ask for costs is, frankly,
12   not logical.
13                    Every dollar that is in the settlement must be
14   used for the benefit of the class.  If this Court determines
15   that the expenditure of certain funds, in order to bring us to
16   this point and create this settlement fund, were indeed
17   expenses for the benefit of the class, then that's consistent
18   with how you use the funds in this settlement.
19                    The truth is -- and I mean this in the best
20   sense -- I believe perhaps the objectors are being distracted
21   by speculation and not fact and they're being distracted
22   prematurely.  The settlement agreement, again, guarantees
23   nothing in the way of cost reimbursement, promises nothing in
24   the way of cost reimbursement.  It simply recognizes the right
25   to make the request at a later time.

1          There are so many variables, so many unknowns,

2    so many unknowables with respect to this issue and to the right

3    to make the request and how it will look when it's made that I

4    believe any focus on the right before it's ever exercised

5    necessarily is premature, speculative, and unfortunately it is

6    counterproductive in these proceedings.

7          Now, the final issue raised by the objectors

8    which I would like to comment on is that despite the limits of

9    available levee district insurance and even despite the law,

10   which clearly prohibits the seizure of levee district assets to

11   pay claims once the insurance is exhausted, there's another

12   mechanism, they say, for the claimants to recover the payment

13   of judgments, and that is through some legislative act, some

14   legislative appropriation of funds to pay the claims.

15         Now, most plaintiffs' counsel in practice are

16   familiar with the legislative mechanism when it comes to

17   judgments against the state -- *the state* -- or an agency of the

18   state.

19         **THE COURT:**  When you say "the state," you mean -- and

20   it's a little difficult to describe -- any arm of the state

21   that would be protected by the Eleventh Amendment or involved

22   the Eleventh Amendment other than a political subdivision,

23   which under the law is not the state.

24         **MR. MEUNIER:**  Yes, Your Honor.  The law makes it

25   clear when and how the State of Louisiana has a legal

1    indebtedness based on a lawsuit or a judgment.  We're not

2    guessing about this.  The blueprint on this is very clear.  The

3    State of Louisiana, for example, would be indebted to pay a

4    judgment against the Department of Transportation and

5    Development because of an injury due to a defective highway.

6    That agency forms part of the state in a way that confers legal

7    indebtedness on the State of Louisiana.

8                      It's not true with respect to levee districts.

9    We wish it were true.  It is not true that the legal

10   indebtedness resulting from a judgment against the Orleans,

11   East Jefferson, or Lake Borgne Levee District could ever become

12   a debt of the State of Louisiana.  It is simply not the case.

13                     So when the objectors say, you know, you can go

14   to the legislature once the insurance funds are gone -- you may

15   not be able to seize assets.  You have a judgment.  Go up to

16   Baton Rouge.  Get a friendly legislator to put in a bill for

17   you.  It happens all the time.

18                     It only happens when the state is indebted on

19   the judgment.  No judgment here against these levee districts

20   can ever result in an indebtedness of the state.  Therefore, to

21   go to Baton Rouge and seek that kind of legislation is seeking

22   a donation, a gift, and the state is constitutionally and

23   statutorily prohibited from making gifts.

24                     So where are we?  The mechanism would be this:

25   Judgment against the levee district.  You would go to the

1    governing board of that levee district.  That levee district

2    has a budget.  The budget is there to protect citizens against

3    floods.  They use that budget for that purpose.  You would say,

4    "I've got this judgment against the levee district.  You guys

5    are out of insurance.  I can't seize your assets.  I can't go

6    to Baton Rouge to get help because the state's not on the hook

7    for this.  Would you guys please pay my judgment?  Please."

8    That's what you're left with.  You're left with a request that

9    the governing board of a levee district voluntarily --

10   *voluntarily* -- say, "We'll go ahead and do it."

11           Now, we get back to the big picture.  You're

12   going to hear evidence -- and I don't think there's any serious

13   dispute.  There are billions -- not millions -- billions of

14   dollars in claims in this case.  The prospect -- I would call

15   it a cruel hope, maybe more kindly put it's a hopeful guess --

16   that one day in the future the multitude of claimants who can't

17   collect insurance because that's gone, who can't seize assets

18   because the law says no, who can't go get help in the

19   legislature, that they'll line up with millions of dollars at

20   issue and convince governing bodies of these levee districts --

21   who are strapped for funds, trying to protect the citizens with

22   their budget -- to voluntarily deplete their budget in order to

23   pay those claims, Your Honor, it's just not real.  It's just

24   not real.  I suggest to the Court that we have to be real.

25           So I understand the angst.  Believe me, we all

do.  Mr. Bruno has lived this case every day of his life since
you appointed him, he more than anyone else.  We understand the
angst of this limited fund.  We understand the fact that there
are many people who are going to be disappointed.  We have, we
think, procured everything that we can, and there is no other
insurance and there is no way to get legislative help.  It
would be, I think, illogical -- let's put it that way -- to
suggest that you shouldn't approve this limited fund because
one day the levee board's governing body may voluntarily start
paying the series of claims that add up to millions of dollars.

          So we submit, Judge, that in the final analysis
we don't think, with all due respect, that the objectors
demonstrate a logical much less legal or practical basis for
you to deny the certification of this settlement class and the
approval of the limited fund settlement.  We will ask for that
certification and for that approval based on established law,
the record of these proceedings, and above all -- *above all* --
based on fairness to the people sitting out there, the members
of the plaintiff class.  Thank you very much.

          **THE COURT:**  Thank you, Mr. Meunier.

          Mr. Anzelmo.

          **MR. ANZELMO:**  Your Honor, we're going to change the
batting order.

          **THE COURT:**  That's certainly fine.

          **MR. ANZELMO:**  May it please the Court.  Your Honor,

1    Tommy Anzelmo appearing for these purposes on behalf of the

2    Orleans Levee District, the Lake Borgne Basin Levee District,

3    and the East Jefferson Levee District.

4                    Your Honor, we certainly, on behalf of our

5    clients, share the sentiments of the Court because our

6    employees, our families, our staff, they have suffered.  We all

7    have stories that are as heartbreaking as the one of the lady

8    that you read to us.  This discussion today is not about that

9    pain because we are presenting the discussions on behalf of our

10   clients and to the class and to Your Honor to understand the

11   nature of why this limited fund class should be approved by

12   Your Honor.

13                    There has been no ruling, of course, as to any

14   liability as to any of the public bodies.  Throughout the

15   course of the litigation, that certainly remains an open

16   question.  The liability of these districts has been hotly

17   contested through the course of the litigation.  Should the

18   matter proceed to trial, the districts are prepared to present

19   evidence that the cause of the problem was unknown to the

20   districts and that any of the claimed damages were due either

21   to the forces of nature or to the acts of others.

22                    These cases involve federally constructed

23   levees.  The levee districts' role as sponsors was informed by

24   the acts of assurance.  For the benefit of the public, acts of

25   assurance are contracts that are signed by the levee districts

1    with the United States Army Corps of Engineers, and those acts
2    of assurance set out what the responsibilities are.
3               Principally, the Corps was going to design and
4    construct the flood protection system that was going to protect
5    all of these areas.  Then the levee districts would come in as
6    local sponsors to ensure access to property, to have a small
7    cost sharing of the costs of the construction of these levees.
8    But, principally, after the completion of the projects, we were
9    there to operate and maintain the levee systems pursuant to the
10   regulations as specified by the Secretary of the Army.
11              The United States Army Corps of Engineers has
12   been under unprecedented scrutiny through both internal
13   analysis and the analysis of independent bodies as to what went
14   wrong and why.  The conclusion that was ultimately reached by
15   all is that the United States Army Corps of Engineers, through
16   its actions, was responsible for the failures of the levee
17   systems in the hurricane-affected areas.
18              This Court in its Order and Reasons filed on
19   January 30, 2008, that being Record Document 10984, discussed
20   the history of the construction of the Lake Pontchartrain and
21   Vicinity Hurricane Protection Project -- or as we've come to
22   know it as the LPV -- as part of its consideration of the
23   Corps' claim of immunity.  In reaching its decision, the Court
24   relied on various documents, including Exhibit D-8 of the
25   presentation, which was a report entitled "The Decision-Making

1    Chronology of Lake Pontchartrain and Vicinity Hurricane

2    Protection Project."  That, again, was a self-analysis, but

3    also an independent analysis of what went wrong.

4               This exhaustive report provided detailed

5    timelines and discussions concerning what proved to be, as the

6    Court observed, a 50-year exercise in ineptitude and gross

7    economic and technological mismanagement.  In the Court's

8    reasons for judgment, it noted how the Corps failed to include

9    critical information from elevation data and the definition of

10   a standard project hurricane into project redesign, all things

11   that they knew as time was proceeding.

12              Of particular import was the test referred to as

13   the E-99 Sheet Pile Wall Field Load Test, which became a basis

14   for the criteria used in 1989 for the rebuilding and

15   enhancement of floodwalls.  As the Court noted, this decision

16   was yet another in the monumental miscalculations of the Corps,

17   as there was strong evidence that the reduced penetration

18   requirements, or how deep the piles would go, was another cause

19   for the failure experienced along the outfall canals.  The

20   outfall canals -- 17th Street, London Avenue canals, and also

21   potentially the Inner Harbor Navigational Canal, the IHNC.

22              As the Court observed, the Flood Protection Act

23   of 1965 settled on a design to raise the level of protection

24   for these outfall canals years after Congress first mandated

25   safeguards.  The project entailed the construction of I-walls,

1    or walls that were set into the ground, for the most part along

2    all three canals, with specifications in line with that E-99

3    sheet pile test -- that is, depths that were proved to be

4    woefully inadequate -- in an effort to save money.

5              The engineering calculations upon which this

6    protection was premised was outdated and lacking, which was

7    known to the Corps but ignored because of funding concerns.

8    The stage, as Your Honor noted, was thus set for Hurricane

9    Katrina to damage or destroy 80 percent of the housing stock of

10   New Orleans not merely by wind and rain, but by virtue of the

11   effects of these outfall canals.

12             In reaching the Court's conclusion, Your Honor

13   noted:  "While the United States government is immune from

14   legal liability for the defalcations alleged herein, it is not

15   free, nor should it be, from posterity's judgment concerning

16   its failure to accomplish what was its task."

17             The respective levee districts, in their

18   defense, will be able to present the evidence of these same

19   defalcations of the Corps insofar as the design and

20   construction of the LPV, both plans as it affects the

21   floodwalls on three outfall canals, the floodwalls along the

22   Inner Harbor and Navigational Canals, and those levee and

23   floodwalls surrounding New Orleans East, the Lower Nine of

24   Orleans Parish, and the system protecting St. Bernard and

25   Plaquemines parishes.

1            The forces of nature which overwhelmed those

2    portions of the system which did not fail, coupled with design

3    and engineering errors by the Corps, provide defenses to these

4    respective levee districts as to the claims asserted by any

5    litigant for damages sustained in the hurricane geographic area

6    experienced during hurricanes Katrina and Rita.

7            The Decision-Making Chronology of Lake

8    Pontchartrain and Vicinity Hurricane Protection Project

9    confirmed with startling candor the following:

10            What the project record shows is that the

11    district knew, in at least general terms, of the lessening of

12    the degree of protection and the level of protection over time.

13    However, the Corps reporting requirements did not inform higher

14    authorities or local sponsors of that project -- meaning the

15    levee districts -- if completed with the estimated funds, it

16    would not provide the standard project hurricane protection.

17            That report concludes that Corps leaders have

18    accepted responsibility for the disaster, but it is not clear

19    what responsibility was or should be in the future.  It is also

20    important to note that, in appearing before Congress, one of

21    the generals of the United States Army Corps of Engineers was

22    asked to comment on what had occurred.  He made these

23    remarkable statements.  This was General Strock as he appeared

24    before the Senate committee on appropriations on Wednesday,

25    April 5, 2006.  This is what he stated in part:

1          "Specifically, in the 17th Street Canal area, we
2    have now concluded that we did have a problem with the design
3    of the structures there, something we had hoped would not be
4    the case but now must confront that as a reality."
5          He further stated:
6          "The most dramatic conclusion is that, yes, we
7    had a design problem and that there may be other elements in
8    the system design along that way that need to be addressed."
9          So we know, insofar as the defense of the levee
10   districts, where the primary responsibility is and how the
11   Corps has accepted that acknowledgment.
12         Also, insofar as contractors or engineers who
13   might have participated in the project at the behest and
14   direction of the Corps -- because, remember, the Corps is
15   telling the levee districts what it's going to build, assigning
16   where it's going to build it, telling us how it's going to be
17   built.  They watch it being built.  They inspect it during the
18   process.  They approve it at the end, and then they ultimately
19   turn it over for operation and maintenance.  Operation and
20   maintenance of levees, for the most part, is the cutting of the
21   grass and observing what's there.
22         The facts would ultimately show that the Orleans
23   Levee District, the Lake Borgne Basin, and the East Jefferson
24   Levee District had no notice of any impending problem relative
25   to a system that we all believed would protect us.

1           The Court will also note -- and so will the

2    audience note -- that insofar as those contractors or engineers

3    are concerned, because the work was completed so long ago, by

4    operation of law, that any claims against those contractors and

5    engineers had to be dismissed and were properly dismissed.

6           Now, let's discuss the public policy issues as

7    to what are faced by levee districts insofar as claims that may

8    be asserted against us that might result in a judgment and

9    whether this could result in recovery against these levee

10   districts.

11          As Your Honor knows by the briefing that has

12   been supplied to it, the Constitution of the State of Louisiana

13   has set up a system whereby both the state and its political

14   subdivisions, their assets are immune from seizure.  This is

15   not an immunity that we're claiming; this is a question of no

16   seizure of its assets.

17          The policy considerations I think that easily

18   are understood by everyone, and especially our audience, is the

19   fact that if a public body, such as the state or the levee

20   district, undertakes the operation and maintenance of a levee

21   system and presents flood protection, that if you could go in

22   and then seize all of the funds and the assets and the

23   equipment of the state or levee districts, here in particular,

24   then it's impossible for us to perform our primary functions of

25   flood protection, operation and maintenance that we are

1    contractually obligated to the Corps.

2         **THE COURT:**  I recall those debates quite well, as I

3    was a delegate to the constitutional convention where we got a

4    waiver -- we had a sovereign immunity waiver in there, but at

5    the same time we had the concomitant no-seizure provision, as

6    well, which Lee Hargrave, in his article, points out is a

7    dichotomy, but it had practical considerations.

8         **MR. ANZELMO:**  Yes, sir.  Those practical

9    considerations were those policy considerations.

10             Insofar as the Constitution, Article XII,

11   Section 10(C), this is what it says partially about the

12   legislature:

13             "It shall provide a procedure for suits against

14   the state, a state agency, or a political subdivision...."

15             Notice the dichotomy:  There is the state and

16   state agencies, but also separate and distinct political

17   entities, political subdivisions.

18             "...and provide for the effect of a judgment,

19   but no public property or public funds shall be subject to

20   seizure."

21             Then it concludes by saying:

22             "No judgment against the state, a state agency,

23   or political subdivision shall be exigible, payable, or paid

24   except from funds appropriated therefor by the legislature or

25   by the political subdivision against which the judgment is

1  rendered."

2           Now, the Constitution and the legislature didn't

3  stop because it had a mandate to go forward and present the

4  procedure by which this could be accomplished, and that was

5  done in La. R.S. 13:5109, subparagraph (B)(2).  This is the key

6  which helps to resolve some issues raised by some objectors,

7  and that is that somehow the state comes in to pay or that

8  somehow this is an obligation of the state.  Again, the

9  dichotomy:  State versus distinct political subdivisions.  This

10  is what the legislature provided:

11           "Any judgment rendered in any suit filed against

12  the state, a state agency, or political subdivision, or any

13  compromise reached in favor of the plaintiff or plaintiffs in

14  any such suit shall be exigible, payable, and paid only out of

15  funds appropriated for that purpose by the legislature, if the

16  suit was filed against the state or a state agency, or" -- and

17  now this is us -- "out of funds appropriated for that purpose

18  by the named political subdivision if the suit was filed

19  against a political subdivision."

20           That's the essence of what we have here.  We are

21  not the state.  We are not an arm of the state.  The

22  jurisprudence that we've supplied to Your Honor in a memo,

23  especially *Vogt v. The Board of Commissioners* -- there was one

24  in state court; there was one in federal court.  The state

25  court case explained the operation of the constitutional

1    provision in R.S. 13:5109 and how it worked together.  In the

2    federal case, it established clearly that the Orleans Levee

3    District -- and, clearly, any levee district -- is not an arm

4    of the state and, therefore, you cannot seize levee district

5    properties to any extent.

6                   As if the distinction was not clear enough, the

7    legislature in Title 13, starting at 5102, again in the

8    definitional section, defined what a state agency was and then

9    further defined what a political subdivision was, which is what

10   we are.

11                  Further, in dealing with levee districts

12   particularly, Title 38, Section 281 defined what things were.

13   This is the definition of a levee district.  This is

14   subparagraph (6):

15                  *"Levee district* means a political subdivision of

16   the state organized for the purpose and charged with the duty

17   of constructing and maintaining levees and all other things

18   incidental thereto within its territorial limits."

19                  Subparagraph (7) says:

20                  *"Levee and drainage district* means a political

21   subdivision of the state, organized for the purpose and charged

22   with the duty of constructing and maintaining levees, drainage,

23   and all other things incidental thereto within its territorial

24   limits."

25                  So we know we have three separate and distinct

1  political subdivisions, whether they're levee districts or
2  levee and drainage districts.
3          The legislature, in Title 38, then defined who
4  the levee districts and levee drainage districts were,
5  including the three defendants who stand before you now.
6          38:281 and following, for the most part,
7  describes the operations of levee boards, levee and drainage
8  districts, and then ultimately post-Katrina, which I'll get to,
9  the new authority that is governing the operations of these
10 districts.
11         Chapter 38 then described the powers and duties
12 of boards and in particular the Orleans Levee District, and
13 those powers and duties were almost exclusively designed for
14 the operation and maintenance and protection of the levee
15 systems, all for that public policy issue, were providing flood
16 protection, among other things.
17         A further distinctness of us is that each levee
18 district or levee and drainage district has the power to sue
19 and be sued, all factors noted in the federal *Vogt* decision.
20         There's been some discussion, I think, in the
21 objectors' -- relative to where we are now and what can be
22 done.  Subsequent to Hurricane Katrina -- again, changed in all
23 respects, nothing had been experienced like this ever before --
24 the legislature and the governor decided:  Let's change our
25 focus and be as focused as we can and approach it from a

1    regional basis.  As a result the Southeast Louisiana Flood
2    Protection Authority-East was created pursuant to
3    constitutional authorization in Article VI, Section 38.1.
4                    It described that this new authority, East --
5    which it's the governing authority for Orleans Levee District,
6    East Jefferson Levee District and Lake Borgne Basin Levee
7    District -- that it now is the governing authority for those
8    districts, although the three districts remain still in effect.
9    There is an Orleans, Lake Borgne, and East Jefferson.  Those
10   levee districts remain in effect, but now we have a governing
11   authority.
12                   That governing authority is dedicated to the
13   same mission of providing flood protection.  The statutes also
14   make it clear that there is no changeover or crossover; that
15   the liabilities of each levee district at the time that the
16   regional authority was created remain with each separate and
17   district levee district; that the authority itself nor any
18   other levee district has liability for any other levee
19   district; that the indebtedness of those districts -- bonding,
20   whatever -- still remains in place; and the notation that the
21   proceeds of any taxes that are being levied are going to remain
22   with those levee districts.  There's no cross-pollination of
23   those tax proceeds.
24                   What's important to note about the taxes is:
25   Where's our funding derived from?  It's derived from, for the

1  most part, the ad valorem taxes that are levied pursuant to law

2  by these levee districts.  That's the money that fuels the

3  engine that let's us work, operate and maintain, buy equipment,

4  pay employees, fulfill our primary functions.  To strip away

5  that funding, again, deprives us of our ability to do what we

6  are supposed to do.

7            The Constitution also mandated and proscribed

8  the limitations on taxation.  You can only tax, as a levee

9  district, to do what your function is as a levee district.

10  This is what the Constitution said, Article VI, Section 39,

11  taxation:

12            "For the purpose of constructing and maintaining

13  levee, levee drainage, flood protection, hurricane flood

14  protection, and for all other purposes incidental thereto, the

15  governing authority of a levee district created prior to

16  January 1, 2006..." and then it talks about the ability to tax.

17            There is no ability to tax to pay a judgment.

18  That is constitutionally impermissible under our law.  The same

19  thing for bonding.  There's no mythical way or some inventive

20  way to pull money in.  It just doesn't exist.  The money that

21  we're talking about is money that we raised from ad valorem

22  taxes.

23            As a matter of common knowledge but will also be

24  supported by the evidence, again, post-Katrina the housing

25  stock, the residents, the people have been diminished and so,

1   too, the ability for the levee districts to have money to

2   fulfill its constitutional and statutory purposes.  If there

3   would be a tax that would have to be levied, it all has to go,

4   of course, in front of the voters of the individual levee

5   districts to pass.

6               It has been suggested, I think, by some of the

7   objectors insofar as the appropriations are concerned --

8   because the funding to pay a judgment can only come by

9   appropriation of the authority because that's now the governing

10  authority of each -- that somehow if judgments would be

11  returned against the levee districts, that that would somehow

12  provide an impetus to the levee districts to pay to discharge

13  that.

14              It really is a counterintuitive argument to

15  suggest that, "Well, the more judgments that pile up, that

16  means that we have to pay."  Well, no.  No.  Because the more

17  judgments that pile up, the more you can't collect a judgment

18  against us.  For us to start paying judgments, it's impossible.

19  You wouldn't want to favor somebody in the beginning and not

20  favor someone in the end.

21              It all goes to the point that we cannot and we

22  will not be passing appropriations to pay for claims that arise

23  out of this litigation because it will destroy our ability to

24  function.  That's why the Constitution and the legislature

25  provided these protections to us.

1             It's also been suggested potentially that:

2    "Well, you have insurance.  Lawsuits go on."  Well, what

3    happens?  The first case could literally wipe out all of our

4    insurance coverage.  The levee districts would then be stripped

5    of the cost of defense, would be unable to fund those defenses,

6    again, because it strips away our ability to perform our

7    primary function.

8             This fund is truly a limited fund because there

9    is no way to get to the money of the levee districts.  It's

10   been tried over and over and over again.  Especially

11   considering what's in the future for us, all the projects that

12   are working to get the system back, the projects that are

13   coming in the future, that will impose upon each of these levee

14   districts an incredible amount of future funding obligations to

15   provide the protection that we need.

16            Your Honor, I think after the Court hears the

17   complete presentations and receives the testimony that the

18   Court will find that this truly is a limited fund and that the

19   assets of the levee district are best used and will be only

20   used for flood protection.  I'll be glad to answer any

21   questions Your Honor might have at this time.

22            **THE COURT:**  No questions at this time.  Thank you.

23            Mr. Hubbard.

24        **MR. HUBBARD:**  May it please the Court.  I'm Ralph

25   Hubbard appearing on behalf of St. Paul Fire and Marine

1    Insurance Company.

2              Mr. Meunier and Mr. Anzelmo have certainly

3    covered the waterfront with their statements and so I'm going

4    to be as brief as possible.  I do want to go back just for one

5    second, though, to the issue about just who is being released

6    here and emphasize again that we are only talking about the

7    release of the levee boards and their insurer, St. Paul.

8              **THE COURT:**  How many levee boards, just for the

9    record?

10             **MR. HUBBARD:**  Three.  The Lake Borgne Basin Levee

11   District, the East Jefferson Levee District, and the Orleans

12   Levee District.

13             **THE COURT:**  Thank you.

14             **MR. HUBBARD:**  There are defendants in other cases,

15   Your Honor.  For instance, in the remand motion that we were

16   arguing before you just yesterday afternoon, there are claims

17   pending there against the State of Louisiana through the

18   Department of Transportation and Development.  There are claims

19   against various Jefferson Parish entities.  And, of course, as

20   you explained, the Sewerage and Water Board and other

21   defendants in the cases before you are not home-free at this

22   particular point in time.  Additionally, some of these same

23   people that would be in this class have claims that are pending

24   against the Corps of Engineers in the MRGO matter, which is

25   going to trial before you on April 20.

1          Very briefly, you spoke with Mr. Meunier about

2     the appointment of a special master and so forth.

3          **THE COURT:**  Yes, sir.

4          **MR. HUBBARD:**  We contemplated that specifically and

5     the question of how you would distribute the funds when we were

6     negotiating this settlement agreement.  In fact, the settlement

7     agreement at page 27 provides that the parties will recommend

8     to the Court one or more special masters to be appointed at the

9     conclusion of this proceeding.

10         Of course, there are many cases which we cited

11    in our brief, the first of which was *In re Agent Orange*, which

12    go on to say that there is no requirement -- notwithstanding

13    the objection that was made on these grounds in this Court,

14    there's no requirement that a provision for how the fund is

15    going to be distributed be involved at this stage of the

16    proceeding.

17         It's just too speculative or too hard to know.

18    You don't know how many proofs of claim you're going to have

19    and the like.  The law seems to be very clear that that's not a

20    requirement.  I would suggest to you that it's even less

21    important where you have a limited fund class because in an

22    opt-out class people may be trying to decide how much money

23    they're going to get to make a decision as to whether they want

24    to opt out and go their own way.  In a limited fund class,

25    where there's no opt-outs, it's less relevant.

1          So we don't want to raise anybody's expectations

2    falsely, but I would like to say that we will have Professor

3    Sherman, who will be testifying with respect to how the

4    settlement agreement is structured and how Rule 23 applies in

5    this case.  I think that he's going to be able to offer to the

6    Court some notion about inexpensive ways to deal with large

7    classes like this through use of the Internet.  I think

8    Mr. Rigamer will have testimony that will show that there's a

9    great deal of information that's already been developed about

10   who this class is and where they are.

11          Additionally, I think that the Court should

12   consider, you know, what happens if this limited fund

13   settlement is rejected and what are the possibilities after

14   that, and they're fairly limited.  You could refuse to certify

15   a litigation class, certainly.  If you did, it's going to be

16   every man for himself because the refusal to accept this

17   settlement is not going to create more money.  It's not going

18   to change the facts that Mr. Anzelmo was talking about, about

19   the fact that the levee boards are immune.  It's not going to

20   increase the amount of insurance money that's available.  It's

21   the harsh reality that we are where we are.

22          So rejection of this is not going to improve the

23   situation of any of the members of this settlement class.  In

24   fact, it's going to make it far worse for them because what is

25   going to happen is there's going to be a race to judgment.  So

1    you're going to have a small number of plaintiffs -- assuming

2    that they're successful in prosecuting their claim -- that are

3    going to have -- that's first in time, first in rank, a

4    situation like that.  So they're going to dissipate the

5    insurance proceeds to the detriment of everybody else in the

6    class.  A handful may get paid 100 cents on the dollar in that

7    situation, Judge, while the rest will get absolutely nothing.

8    That's if you refuse to certify a class.

9              Suppose you do certify a litigation class.  In

10   that case there will be the option of opting out.  With a class

11   of hundreds of thousands of people, I don't think you would be

12   surprised to find that there were a lot of opt-outs.  Lawyers

13   who understand the limits on this fund would also be inclined

14   to opt their clients out and try to be the first one to get a

15   judgment.  So you have exactly the same situation where the

16   fund is going to go to a handful of people and everybody else

17   is going to get nothing.

18             Even if you didn't have opt-outs, if nobody

19   opted out, which is an extremely remote possibility, at the end

20   of the day, you're going to be right where we are here.  You're

21   going to have a class certified.  You're going to spend a great

22   deal of money litigating it in order to convert every single

23   member of that class into an actual claim by way of litigation.

24   We'll have immense costs.  Certainly, while there's no

25   attorneys fees being asked for in this situation, if a lawyer

1  has to litigate this thing to the end, which may take decades
2  to do, they're going to expect to be paid.  And they should be
3  paid, you know, for doing that if they are successful.

4              If you went that route, you're going to wind up
5  exactly where we are today.  You're going to have the same
6  amount of insurance proceeds plus interest and you're going to
7  be trying to decide how to parse that out except now, in
8  addition to everything else, you have a huge attorney fee
9  component to the claim.

10             What that brings you back to exactly is the
11 reason why Rule 23 allows you to certify a class like this one,
12 and that is because under 23(b)(1)(B) it talks about the fact
13 that if there's a possibility that adjudications with respect
14 to some members of the class would impair or impede the ability
15 of the other members of the class to protect themselves -- and
16 that is precisely what we're dealing with here, as I have laid
17 out.  Regardless of which path people might go, 23(b)(1)(B) is
18 all the more, obviously, the best choice.

19             Let's turn for a second now to the fund.
20 Mr. Meunier laid out exactly what is there:  $2 million for the
21 Lake Borgne policies from St. Paul; $5 million for East
22 Jefferson from St. Paul as well; and, of course, the Orleans
23 Levee District, $10 million.

24             Mr. Meunier correctly spelled out the fact that
25 there is a zero to $2 million differential in the Orleans Levee

 1   District policy.  We have stipulated as to the facts that are

 2   involved in that determination.

 3          THE COURT:  That determination would be part of the

 4   Court's task -- if I decide it's not a limited fund, I'm not

 5   sure if that issue is before me or not.  If I decide it is,

 6   certainly I have to decide the insurance issue.  Is it your

 7   contention I have to decide it regardless of how I rule?

 8          MR. HUBBARD:  Well, if you were to decide that this

 9   is not a limited fund, it would depend on why you were deciding

10   that.  I mean, if you were deciding that because of the

11   situation of the levee boards, I don't think there's any reason

12   for you to reach any other insurance coverage type questions.

13          THE COURT:  That answers my question.

14          MR. HUBBARD:  Well, I think you've called for us to

15   parse out the insurance coverage issues for you --

16          THE COURT:  Absolutely.

17          MR. HUBBARD:  -- so that you can make a

18   determination, and we will file post-hearing briefs as well.

19          THE COURT:  Yes.  We have a schedule for post-hearing

20   briefs for everyone on all issues, which at the end of this I

21   will get to.

22          MR. HUBBARD:  Your Honor, if you're ready to proceed

23   right now, I think that we're in a position to offer certain

24   evidence to move this hearing forward.

25          THE COURT:  Why don't we do that.

1          **MR. HUBBARD:**  I offer, introduce, and file into

2     evidence all of the policies of insurance that were in effect

3     in 2005 at the time of hurricanes Katrina and Rita and

4     thereafter for the three levee districts.

5               Exhibit 1 is a summary sheet which lists those

6     insurance policies.  Exhibits 2 through 58 are the insurance

7     policies, and let me comment on that briefly.

8               We decided to put in the record all of the

9     policies of insurance.  The vast majority of them have

10    absolutely nothing to do with liability type of coverage, but

11    we wanted the world to have the opportunity to look at them if

12    they wanted to.  There's flood insurance in there and

13    automobile insurance, etc.

14         **THE COURT:**  Some of which obviously would not provide

15    liability coverage in this instance.

16         **MR. HUBBARD:**  That's correct.  I would also like for

17    the record to note that Exhibits 47, 51, and 52 are three

18    insurance policies that we have been unable to obtain at this

19    point in time.  We have inserted subpoenas that have been

20    served on the insurance companies in question as a placeholder,

21    if you will, in the evidence of this Court.  We would move the

22    Court to hold the record open so that we can supplement the

23    record with those policies, which we expect to have in short

24    order and certainly before the briefing schedule in this case.

25         **THE COURT:**  I will certainly do that.

1          **MR. MEUNIER:**  We have no objection.  Your Honor,

2     Mr. Ligeros will be prepared, as our expert, to review those

3     policies once they are received.

4          **MR. HUBBARD:**  We also offer, introduce, and file into

5     evidence -- all of these are joint exhibits, of course --

6     Exhibit 59, all of the objections or responses to the notice,

7     which we've already given to the clerk.

8               As Exhibit 60 we offer, introduce, and file into

9     evidence the stipulation relating to the premises issue under

10    the Orleans Levee District.  Thank you, Your Honor.

11         **THE COURT:**  Thank you, sir.

12         **MR. MEUNIER:**  Those are all joint exhibits.

13    Obviously, no objection from plaintiffs.

14         **THE COURT:**  By the way, just for the attorneys here,

15    if you did have an objection, you certainly -- the attorneys

16    representing the objectors who filed, if you have any

17    objections, you can certainly urge them as well.

18         **MR. IRVIN:**  I have no objection, sir.

19         **THE COURT:**  Thank you.

20         **MR. KIRKPATRICK:**  No objection, Your Honor.

21         **THE COURT:**  What's next?  I know this is tedious for

22    some of you.  I know some of you may need a break.  I'd planned

23    to break at 12:00.  Sir, how long do you think this witness

24    will be?

25         **MR. ZWAIN:**  We intended to call as our first witness

1  Mr. Greg Rigamer, who has expertise, we believe, that goes to

2  the issue of commonality, typicality, numerosity, and most

3  importantly, perhaps, that the claims exceed the amount of the

4  limited fund.

5          **THE COURT:**  Well, why don't we start, with the

6  understanding we will probably break around noon.

7          (WHEREUPON **Gregory C. Rigamer**, having been duly

8  sworn, testified as follows.)

9          **THE DEPUTY CLERK:**  Please state your full name and

10  correct spelling for the record.

11          **THE WITNESS:**  I am Gregory C. Rigamer:

12  G-R-E-G-O-R-Y, R-I-G-A-M-E-R.

13                          **VOIR DIRE**

14  **BY MR. ZWAIN:**

15  **Q.**   Mr. Rigamer, would you please state your full name and

16  address for the Court, please.

17  **A.**   Yes.  Gregory Clayton Rigamer.  I live at 110 Bellaire

18  Drive in New Orleans, Louisiana 70124.

19  **Q.**   Mr. Rigamer, what is your profession?

20  **A.**   I am an urban planner by trade.

21  **Q.**   By whom are you employed?

22  **A.**   I am employed by Gregory C. Rigamer & Associates, Inc.

23  **Q.**   Can we call that GCR for short?

24  **A.**   Yes, I can.

25  **Q.**   What's your position with GCR?

1  **A.**   I am chief executive officer of GCR and the primary
2  stockholder.
3  **Q.**   Do you have your CV in front of you?
4  **A.**   I believe that I do.
5        **MR. ZWAIN:**  Your Honor, I have a hard copy both in
6  the benchbook and in a separate notebook.  I can give you a
7  separate binder if that's most convenient for you.
8        **THE COURT:**  I'm fine.
9  **BY MR. ZWAIN:**
10 **Q.**   I see in your CV that you state that you have a master's
11 degree in urban studies; is that correct?
12 **A.**   That is correct.
13 **Q.**   Would you please tell the Court what urban studies is.
14 **A.**   Urban studies is the forerunner of a master's in urban and
15 regional planning.  I received the MS degree in 1974.
16 **Q.**   Does expertise in urban studies include knowledge of
17 demographics?
18 **A.**   Yes, it does.
19 **Q.**   Would you please explain to the Court what the study of
20 demographics is.
21 **A.**   The study of demographics is a study of people and changes
22 to people particularly related to spatial and temporal
23 considerations.
24 **Q.**   Your résumé says that GCR is "a full service professional
25 firm with expertise in urban and transportation planning,

1    aviation and civil engineering, and managerial consulting."

2    Can you explain to the Court what you meant by that statement.

3    **A.**    Yes.  Our firm offers a broad array of services to help

4    people make better decisions relative to the urban environment

5    and the management of the infrastructure required to support an

6    urban environment.

7    **Q.**    I also see in your résumé that GCR employs over 100

8    professionals; is that correct?

9    **A.**    That is correct.

10   **Q.**    Would you please give the Court an understanding or idea

11   of the array of professional backgrounds of your employees.

12   **A.**    We have civil engineers, we have management consultants,

13   we have attorneys, we have CPAs who are on full-time staff.  We

14   have a number of geographic information specialists, database

15   administrators.  We use technology extensively in our firm as a

16   tool of the intellect, using technology to leverage the

17   information that is available to us to hopefully better

18   organize it and present a clearer picture of the task at hand.

19   **Q.**    Your résumé goes on to say that GCR has expertise in

20   demographic analysis and forecasting.  What is demographic

21   analysis and forecasting and for what purposes is it used?

22   **A.**    As I mentioned earlier, the study of demographics often

23   involves a study of a people or a population particularly

24   related to spatial (place) or temporal (time) considerations.

25   We do a significant amount of work studying the population of a

1    given area to determine what are the support requirements for

2    that.

3              In our role as urban planners, very often we study

4    communities to determine the types of facilities and services

5    that are needed or evaluate the facility and services available

6    to determine whether it's adequate to support the population.

7    From an economic perspective, we are often doing similar

8    studies to determine what is the economic or market capacity of

9    a given area to support the proposed facility or investment.

10   Q.   In performing demographic analysis and forecasting for the

11   clients that you represent, do you use geographic-driven data?

12   A.   That is at the heart of what we do.

13   Q.   Would you please explain to the Court what

14   geographic-driven data is.

15   A.   We generally believe that data is most relevant when

16   evaluated in the context of place.  So what we try to do is

17   associate a geographic coordinate as precise as we can get it

18   to any given dataset so that we can evaluate information

19   relative to jurisdictional definitions, whether it be a block,

20   a neighborhood, a zip code, or a community.

21   Q.   Give me an example as to how geographic-driven data is

22   utilized to analyze the characteristics of a particular

23   geographic location.

24   A.   Right.  Immediately after Katrina, like everyone else, our

25   office is located in the Gentilly area at the University of

1   New Orleans Research and Technology Park.  We were very much
2   involved in the community prior to the storm in our role as
3   urban planners and civil engineers.
4        Immediately after the storm, while in Baton Rouge in
5   temporary quarters, we assembled all of the geographic data
6   describing the floods, what happened.  While we were hearing
7   terms like 80 percent of the area was affected, we were able to
8   quantify very specifically the number of housing units and
9   people who were affected.
10       The way we did that is by grabbing all of the flood
11  data that was available and using terrain models to essentially
12  create a 5m x 5m grid for every 5m x 5m square throughout
13  southeast Louisiana and determine the extent of the flooding
14  that occurred at that location.
15       We then tied those geographic coordinates to a census
16  STFID block-level file and, thereby, we were able to say as a
17  matter of fact how many people, how many housing units received
18  what degree of flooding, was it 6 inches, was it 12 feet, and
19  everything in between.  We had this on a block level basis, so
20  we were able to raise our hand and help begin to quantify the
21  very specific number of people, housing units, and equivalent
22  value that was affected.
23  Q.   Has this geographic-driven data that you obtained and
24  utilized and organized and managed enabled you to make certain
25  assessments with respect to the effect that hurricanes Katrina

1   and Rita had on the New Orleans metropolitan area?

2   **A.**   Absolutely.

3   **Q.**   Explain to the Court how that's done.

4   **A.**   How that's done?

5   **Q.**   Yes.

6   **A.**   Well, first of all, as I said, what we are dealing with is

7   simply a matter of fact.  We have LIDAR photography, which

8   essentially allows you to create a terrain model.  We knew what

9   the depth of flood was throughout the area, so we were able to

10  calculate what --

11  **Q.**   What is LIDAR photography?

12  **A.**   Light identification and ranging.  It's essentially like a

13  sonar type or, you know, radar where you can measure distances,

14  so from the satellites you know what is the distance of that

15  ray.  At any rate, it's a technique that's used throughout for

16  these types of --

17  **Q.**   So if you know what the elevation of a certain point --

18  **A.**   Correct.

19  **Q.**   -- of land was before August 29, 2005 --

20  **A.**   Correct.

21  **Q.**   -- and then you shot another beam down --

22  **A.**   Yes.

23  **Q.**   -- while that area was flooded by, say, Hurricane

24  Katrina --

25  **A.**   Well, the --

1        **THE COURT:**  Please wait until he finishes his

2    question.

3    **BY MR. ZWAIN:**

4    **Q.**   By knowing the difference between the measurement prior to

5    the storm and the measurement taken after the storm, you could

6    calculate the high-water mark created by the floodwaters

7    emanating from Katrina; is that correct?

8    **A.**   Close.  We had the actual terrain model from the LIDAR,

9    and then there were measures of depth of flood throughout the

10   area.  Using geographic tools, we were able to assign all of

11   those values of the depth of water to the 5m x 5m LIDAR

12   squares.

13   **Q.**   I see that a large part of your résumé is devoted to

14   activities regarding the evaluation and assessment of the

15   impact of hurricanes Katrina and Rita on the New Orleans

16   metropolitan area.  Would you please tell the Court what GCR's

17   involvement has been with regard to the response and recovery

18   initiatives.

19   **A.**   Yes.  While our firm works throughout the United States

20   and actually has some international assignments, since the

21   storm my exclusive focus has been within the metropolitan

22   New Orleans area and throughout southeast Louisiana relative to

23   recovery initiatives.

24        One of the first and most significant assignments I

25   think that we had was to build the recovery model for how the

1   city would likely recover.  I did this for the Bring

2   New Orleans Back Commission, which began to establish the

3   framework as to how New Orleans would recover.

4           We also worked with Entergy of New Orleans, Inc., to

5   help develop a service restoration plan relative to what areas

6   would have to be powered on and what types of capacity would we

7   need over time for each of these areas.

8           We also worked with Louisiana Housing Finance Agency

9   prior to the storm, when we had completed the detailed housing

10  needs assessment throughout Louisiana actually submitted in

11  about June of 2005.  So we immediately began working to

12  quantify the impact of the storm on the state's housing stock.

13  We had a very good baseline from the work that we had just

14  completed in June 2005.

15          We worked with FEMA to help establish some of the

16  planning recovery requirements -- excuse me, community recovery

17  requirements and actually, based on the data that we had, began

18  to frame the amount of money that would be needed to support

19  The Road Home Program.  I'm very pleased to say that, from the

20  work that we did in the fall of 2005 and early 2006, as that

21  program winds down, our work has proven to be very accurate.

22          We also licensed our recovery model to the RAND

23  Corporation, who is a very well-known think tank, who was doing

24  models for how the city would recover.  They actually used the

25  models that we had developed with that.

1            We have worked with the Urban Land Institute to
2    quantify and evaluate the impact of housing and how the
3    community would likely recover.  I was the facilitator for a
4    very distinguished panel that they brought in, in terms of
5    quantifying the economic impact to the housing in the
6    community, as well as how to best address it going forward.
7            We were retained by Fannie Mae to develop a community
8    or neighborhood-level sustainability model, whereby we looked
9    at the economic impact within each neighborhood and how that
10   neighborhood would likely recover, how could investments be
11   supported within those neighborhoods.
12           We also represented the City of New Orleans --
13   Orleans Parish, excuse me, and Jefferson Parish in the recent
14   challenge to the U.S. Census Bureau estimates of population.  I
15   can go on if you like.
16   Q.   Why don't you explain to the Court the types of data, in
17   addition to the LIDAR data, that your firm collects, analyzes,
18   evaluates, organizes with regard to some of the studies and the
19   projects that you just described.
20   A.   First of all, we developed very effective systems to
21   manage census data at both block, block-group levels.  By
22   relating everything to geography, we are able to bring diverse
23   datasets together through geographic definitions.  For
24   instance, we work with the Postal Service saturation list for
25   every active address in the community, every active address

1    that is receiving mail.  We know whether it's residential or
2    commercial or institutional.
3           We work with the utility companies and we track
4    energy utilization by address.  We helped the Entergy companies
5    develop their service restoration and maintenance plans.  So on
6    a month-by-month basis, I have address-level data by account
7    that indicates to me whether it's a residential, a commercial,
8    an institutional, or an industrial account.  I have it for one
9    year prior to the storm.  I have it for one year -- I have it
10   on a monthly basis since the storm.
11          In Orleans Parish we have garbage cart registration.
12   We have a listing of every registered voter in the state tied
13   by address to these notes.  We know if those people have
14   participated in election events.
15          We have multiple datasets that we bring together at
16   the address level to establish what we call an activity index,
17   how active is that address today relative to the baseline of
18   information that we had from July 2005.
19   Q.   Now, did the impacts that you have studied with regard to
20   the effect that Hurricane Katrina had on this particular
21   geographic area include things related to economic impact?
22   A.   Absolutely.
23   Q.   Tell the Court how that is so.
24   A.   Well, everything is about investment.  When we really look
25   at whether or not the recovery is going to be successful, it

1    has to be measured in terms of investment.  Investment is
2    required to create an action.  Things just don't happen.
3    Whether it's an individual who's trying to recover their house,
4    a school that's being rebuilt, a commercial or employment
5    facility that needs to be rebuilt, it requires investment.  So
6    while we speak very specifically about activity indices, what
7    we're really talking about are people and assets, economic
8    assets.
9    **Q.**    So how have your studies or analysis of economic impacts
10   caused by hurricanes Katrina and Rita been utilized by some of
11   the clients you have been asked to consult with?
12   **A.**    Well, for instance, the Recovery School District, Orleans
13   Parish School District, Jefferson Parish Public School System,
14   St. Tammany Parish Public School System, we have made forecasts
15   for student enrollments.  It's a very complex methodology
16   because, for instance, with the Recovery School District, with
17   so much of the area decimated, it's not only a function of how
18   many students are likely to be returning, but how many students
19   by age group because of type of school that's required and also
20   geography served.
21            Our estimates for the school system have proven to be
22   very accurate.  A very interesting and high-profile assignment
23   we had, we were retained by the secretary of state in February
24   of 2006 to help with the municipal elections, which were
25   scheduled in Orleans Parish for 2006 but delayed because of the

 1     inability to actually stand up the polling places and the like.

 2           Our job was to help the state defend some of the

 3     allegations about that you could not have a fair election

 4     within the community because the demography had changed so much

 5     that the voting pattern would be different, from a cultural

 6     perspective, in 2006 than it was prior to Katrina, that it was

 7     too soon after the storm.  So we did the models for what would

 8     likely voter participation be, what would the turnout be, and

 9     also what would the racial composition of the vote be.

10           So in the April 20, I believe it was, 2006 election,

11     the question was should it be delayed until we had more of a

12     stabilized population in the community.  The argument that we

13     made on behalf of the state was that we felt that, in that

14     particular race, we would have somewhere around 106,000 votes

15     cast.  While less than prior elections, African-American votes

16     would still be a majority, within the 52 to 54 percent range.

17           In April, 107,000 votes were cast, and the

18     African-Americans cast 53 percent of the votes.  So there was

19     no question about the outcome for -- excuse me, whether or not

20     the runoff would go forward in May.

21           Just interestingly enough, because our projection was

22     very accurate, we received a call from The Times-Picayune

23     asking -- you know, on the morning of the runoff election,

24     saying:

25           "Okay.  What is your forecast for the number of votes

1    that are going to be cast?"

2          "Probably about 5,000 more.  I think we'll probably

3    see somewhere around 112,000, 113,000 votes."  There was

4    113,000 votes cast.

5          The data that we use is not speculative data.  We are

6    assembling data that is simply a matter of fact -- it can be

7    traced by anyone else -- and organizing it in a way, on a

8    geographic basis, to make intelligent decisions about what is

9    the status of that area.

10          So I think the data that we have provided to the

11    school systems, to certainly Orleans Parish, to FEMA, to the

12    Louisiana Recovery Agency, to the Louisiana Housing Finance

13    Agency, to Jefferson Parish, and now to St. Bernard Parish has

14    proven to be helpful in understanding where we are today.  The

15    communities have changed significantly as a result of this

16    event and we are in a recovery mode, which by definition is

17    transitional.  So understanding where you are is very

18    important.

19    Q.   Will that data inform us with regard to the approximate

20    number of properties damaged by the storm and the levee

21    breaches associated with the storm?

22    A.   I am fully confident that it will.

23    Q.   Will that data inform us with regard to the number of

24    people impacted by the storm?

25    A.   Yes, it will.

1  **Q.**   Will that data inform us with respect to the economic
2  losses incurred by those people and those properties within the
3  class area?
4  **A.**   I believe that it will.
5  **Q.**   You have provided that kind of data, that kind of
6  analysis, that kind of consulting work for clients you have
7  listed this morning in addition to many more?
8  **A.**   That's correct.
9        **MR. ZWAIN:**  Your Honor, we would tender Mr. Rigamer
10 as an expert in the fields of urban studies, demographic
11 analysis and forecasting, and the assessment of economic
12 impacts on communities caused by natural disasters.
13       **THE COURT:**  Any objection?
14       **MR. MEUNIER:**  Class plaintiffs have no objection.
15       **MR. KIRKPATRICK:**  Brinkmeyer objectors have no
16 objection.
17       **THE COURT:**  The Court accepts him as tendered.  We're
18 going to take a recess until 1:15.  I'm hoping you'll get into
19 eliciting his opinions in a rather incisive fashion.  Thank
20 you.
21                   **(LUNCHEON RECESS)**
22                   *  *  *  *  *
23
24
25

1 **<u>AFTERNOON SESSION</u>**

2 **(APRIL 2, 2009)**

3 (WHEREUPON the following proceedings were held

4 outside the presence of counsel.)

5 **THE DEPUTY CLERK:**  All rise.

6 Be seated, please.

7 **THE COURT:**  Yes, sir.  If you would, please, just

8 state your name and what you intend to do.  We are on the

9 record.

10 **MR. DUCHMANN:**  My name is Wayne Duchmann,

11 D-U-C-H-M-A-N-N, 2224 Jacob Drive in Chalmette.  We filed under

12 Subclass Category 1 with Lake Borgne Levee District.

13 The reason why I filed an objection in the first

14 place, Your Honor, is because I was kind of confused about the

15 settlement.  After coming here and listening to the testimony

16 and realizing that it's very limited funds with the insurance

17 company and you will do your best to try to find some more

18 funds, if possible, I wish to withdraw this objection.

19 **THE COURT:**  Yes, sir.  The Court acknowledges that

20 and appreciates you listening.

21 **MR. DUCHMANN:**  Well, I didn't understand before.

22 When I came here, I understand.

23 **THE COURT:**  That's the whole purpose of the hearing.

24 No one could understand.  I don't think anybody could.

25 **MR. DUCHMANN:**  No.  It was very clear the way you

1    spoke and the defense attorneys and along with Mr. Bruno, which

2    is -- Mr. Frank is a real good, close friend, and that's his

3    son Joe.  Me and Joe have a lot of disagreements about a lot of

4    things, but I wasn't able to talk to him in detail about this

5    particular case.  However, he is on another case, which has

6    jurisdiction in your court, so you probably might be seeing me

7    more.

8              **THE COURT:**  All right, sir.  I appreciate you coming.

9              **MR. DUCHMANN:**  This concludes -- like I said, I would

10   like to withdraw the objection.

11             **THE COURT:**  Thank you, sir.  It's so noted and it's a

12   part of the record.  Thank you very much.

13             (WHEREUPON the Court took a brief recess.)

14                            *  *  *

15

16

17

18

19

20

21

22

23

24

25

1          (WHEREUPON the following proceedings were held in

2     open court.)

3               THE DEPUTY CLERK:  All rise.

4                    Court is in session.  Please be seated.

5               MR. ZWAIN:  Your Honor, it's been pointed out to me

6     that Mr. Rigamer was tendered as an expert but not yet

7     officially accepted.

8               THE COURT:  First, let me ask if there are any

9     objections.

10              MR. MEUNIER:  No objections.  We went through the

11    objections.  I'm not sure you stated he was accepted.

12              THE COURT:  I will accept him as tendered.

13                    **DIRECT EXAMINATION**

14    BY MR. ZWAIN:

15    **Q.**   Mr. Rigamer, in connection with your testimony, did you

16    prepare a set of slides for use by yourself, the Court --

17    **A.**   Yes, I did.

18    **Q.**   -- and anyone who wants to ask you questions?

19              Those slides, the hard copies I understand contain

20    the information that you want the Court to consider, and each

21    hard copy of the slide contains the source material from which

22    that data was extracted; is that correct?

23    **A.**   That is correct.

24    **Q.**   Let's go to the slides, please.  The first slide notes

25    that the settlement class area is defined as all those -- the

1    settlement class definition is defined as all those present or

2    who owned property in four parishes -- Jefferson, Orleans,

3    St. Bernard, and Plaquemines -- at the time of hurricanes

4    Katrina and Rita.  Is that what you understand to be true?

5    A.    Yes, it is.

6    Q.    You have information with respect to how many people were

7    present or owned property in that defined class area as of

8    August 2005?

9    A.    According to the U.S. Census Bureau with their July 1,

10   2005 estimate, approximately 999,349, so right shy of a

11   million.

12   Q.    Let's talk about the housing assets in the class area.  Do

13   you have information with respect to how many housing units

14   were in the area, which I'll call the class area, as of

15   August 2005?

16   A.    Yes.  440,269 housing units with an approximate value of

17   $47 billion.  That value is based on the value of the

18   improvements, not the land, just simply the housing assets.

19   Q.    The structures themselves?

20   A.    The structures themselves.

21   Q.    When you say "housing assets," that does not include

22   commercial?

23   A.    That's correct.  This is residential property.

24   Q.    Nor does it include governmental property?

25   A.    It does not.

Q.    Let's talk about the class area economic indicators as
they existed in August of 2005.  Can you discuss what's on your
next slide.

A.    Yes.  We requested shortly after the storm that Dunn &
Bradstreet run a comprehensive listing of employers, employees,
and other related information as of record August 1, 2005.
Dunn & Bradstreet reported about 94,564 businesses within the
four parish area, and we used the Bureau of Labor Statistics
relative to the count of the number of people who were employed
and the average weekly wage earned by those employed.

        The Bureau of Labor Statistics reported that during
this period we had a residential base employment of around
495,689 people employed, earning an average weekly wage of
$627.  That is for the four parish class area.

Q.    The slide that you prepared breaks down the number of
businesses on a parish-by-parish basis?

A.    As reported by Dunn & Bradstreet, yes, it does.

Q.    Let's talk about the impact of the storms on the four
parish area, the class area.

A.    Yes.

Q.    Can you talk about how many people were displaced by the
storms.

A.    Well, one of the things that we obviously -- those of us
who are residents know that everyone was displaced immediately
after -- nearly everyone was displaced immediately after the

 1   storm, but as of July 1, 2006, the Census reported about
 2   251,000 residents still displaced.  That is from 999,000 that
 3   we spoke of previously.  About 25 percent.
 4           The housing units in the class area, approximately
 5   164,000 were reported as having major or severe damage; a
 6   colossal number, 37 percent of the entire housing stock.  The
 7   damage estimate to the housing stock in the area is in excess
 8   of $20 billion.
 9           Infrastructure, just a very small portion of
10   infrastructure; that which FEMA has addressed through the
11   public assistance program is about $4.6 billion.  Commercial
12   facilities and employment areas were shut down throughout the
13   area for a significant period of time.
14   Q.   That $20 billion included in your slide does not include
15   damages to commercial?
16   A.   It does not.  It's just related to the housing assets in
17   the four parish class area.
18   Q.   Can you talk about the impact that the storms had on the
19   population of the class area.
20   A.   The storm had a colossal impact within the class area.
21   While we are continuing to recover as a community, Orleans,
22   Plaquemines, and St. Bernard Parish have suffered major
23   population losses.
24           As of the 2008 population estimates, Orleans is still
25   about 31 percent down, Plaquemines about 25 percent down, and

1   St. Bernard Parish about 42 percent of its prestorm population.
2   As you can see on the slide, we have it broken down from
3   July 1, 2005, 2006, 2007, and 2008.
4   **Q.**   How, if at all, has the population loss within the class
5   area affected the levee districts' ability to collect
6   ad valorem taxes?
7   **A.**   Value is determined through supply and demand.  The fact
8   of the matter is with a diminishing population, with a
9   diminishing level of commercial activity through employment and
10  the like, it's difficult.  We have fewer people addressing the
11  requirements of the whole.
12          In other words, when we speak about the
13  infrastructure required to support the community and we speak
14  about public funding for that infrastructure, ad valorem taxes
15  would be paid by the people who are within the area or the
16  property owners within the area to meet the requirements of the
17  funding.  If we have fewer people, the value of the real estate
18  will reflect that because real estate, as all other
19  commodities, value is determined by supply and demand.
20          We have in Orleans Parish alone some 60,000-plus
21  properties that are either blighted or unoccupied.  So we, over
22  time, will see a diminished value of housing stock, housing
23  assets, and real estate values.
24  **Q.**   So although the cost to operate and maintain the flood
25  protection systems within the jurisdictions of each of the

1  levee districts has remained the same or perhaps even

2  increased, the capacity to collect ad valorem taxes by each of

3  the levee districts has --

4  A.   May be diminished over time if the values reflect the

5  smaller footprint of the community.

6  Q.   Let's talk about the impact that the storms had on the

7  housing in the class area.

8  A.   Yes.

9  Q.   I think we have done that, actually.

10  A.   A very significant impact, as I said.  When you have

11  164,000 out of 440,000 units classified as either major or

12  severe damage, with the vast majority being classified as

13  severe, that is very significant.

14         Damage to the housing stock is estimated to be in

15  excess of $20 billion, and that number comes -- if you look at

16  reported claims on homeowners insurance, payments through

17  The Road Home, which are theoretically uninsured losses, and

18  payments from the NFIP, those alone total $20 billion.

19  Q.   Is $5 billion of personal property --

20  A.   We had the opportunity to --

21  Q.   When you use the term *personal property*, what specifically

22  are you including?

23  A.   Contents, not automobiles, but things that -- we had the

24  opportunity to examine many thousands of flood insurance

25  claims, and through that I was surprised that the percentage of

1    the total payment was related to contents rather than

2    structure.

3            So just in looking at the sample that we viewed,

4    which was a very significant sample, it was running a little

5    bit over 25 percent for contents.  So I think it is a

6    conservative estimate to say personal property -- just physical

7    value, not emotional value or anything else -- is in excess of

8    $5 billion within the class area.

9    **Q.**   So if we wanted to get perhaps an even more accurate

10   assessment of what the impact to property has been since the

11   storms, we would also want to take into account damage to

12   commercial properties; correct?

13   **A.**   Obviously.

14   **Q.**   And damage to contents within those commercial properties;

15   correct?

16   **A.**   That's correct.

17   **Q.**   And also the automobiles, both personal and commercial?

18   **A.**   Correct.

19   **Q.**   What has the impact been on the economy with regards to

20   the class area as a whole?

21   **A.**   Well, it's a very significant impact.  While we are

22   delighted to see the signs of recovery that we have throughout

23   the community, we have suffered a major setback from an

24   economic perspective.

25           The Bureau of Labor Statistics reports that since

1   June 2005, if you look at the employment that we had in the

2   area at that time and you look at employment in January 2009,

3   that we are down about 9,806 jobs just in the four parish class

4   area.

5            Now, if you look at the wage that was earned in 2005

6   and throughout the entire class area -- when you average it all

7   out, comes out about $662 -- we have a loss of about

8   $11 billion in wages in the 42 months since the storm.  That's

9   a significant number that most people don't really think about.

10           But as a practical matter, when you look at the

11  number of people that we had employed in this four parish area

12  in 2005, while we have come back up from the immediate

13  poststorm months, we are still down some 97,000 jobs and these

14  are -- BLS is reporting employment, not people within the labor

15  force.

16  Q.   We discussed the idea of including damage to commercial

17  facilities within the assessment of damage to the class area

18  totally.  Do you have a figure with regard to what damage has

19  been done regarding commercial facilities?

20  A.   Yes.  The Louisiana Department of Insurance reports about

21  $7.8 billion of nonhomeowner claims, you know, related to the

22  storm.  I am just simply trying to identify quantifiable

23  damages from reputable sources.  At a minimum, we know it's

24  $7.8 billion of nonhomeowner claims, so at least it's that.

25  Q.   Now, within the class area itself, we know that water came

1  from levee breaches.  That's why we are here today.  Water also

2  came from rain, and damage was also caused by wind.  Have you

3  estimated for the Court --

4  A.   Yes.

5  Q.   Do you have any figures for the Court that assess or

6  estimate the impact of rain and wind on the class area?

7  A.   Yes.  There's been a significant amount of study by other

8  professional organizations relative to the impact of rain on

9  this event.  This was a major rain event.  While flooding was

10  primarily from breaches and overtopping, there was a

11  significant amount of flooding from rain because our pumping

12  stations were shut down.

13       Additionally, we obviously had wind damage throughout

14  the area.  We also had access to a FEMA inspection report that

15  detailed where wind damage was the most and where the profiles

16  indicated that -- demonstrated, excuse me -- where the profiles

17  demonstrated that in areas that flooded the wind damage was

18  minimal; but in areas that it didn't flood, wind accounted for

19  the majority of the damages.  So we built models on that basis,

20  which we will show you.

21  Q.   So for purposes of this specific hearing, did you or did

22  your firm prepare a rough assessment of what water sources

23  contributed to certain areas of flooding over the geographic

24  area comprised by the class area?

25  A.   Yes, we did.

1    Q.    Can you tell the Court about that, please.

2    A.    Yes.  What we did is we identified the sources of

3    flooding, and then we used the IPET report to determine the

4    amount of water entering the class area from rain and from

5    overtopping by drainage subbasin.  Then we built terrain models

6    that essentially quantified the capacity of the area to hold

7    water.  So when we applied the amount of water coming in from

8    the breaches and the overtopping and the amount of rain to the

9    terrain models, we then began to get a "depth of flood."

10          The next slide shows the amount of rain that occurred

11   in the area.  We had at least 8 inches of rain and some areas

12   within the class area reported 12 to 14 inches of rain.  We had

13   this quantification by the subbasins which are illustrated on

14   the next slide.

15          So on this slide -- excuse me.  As you can see, at

16   each breach we have the area that is -- where the breaches are

17   occurring with the drainage subbasins in the area.  We have the

18   number of acre-feet of water coming into the class area by rain

19   and by each of the breaches.  Then from the topographic model,

20   the terrain model that we saw earlier, we began to fill up the

21   basins, looking at any of the impediments to the flow of water.

22          Then from that we estimated what was the source of

23   flooding in each of the drainage subbasins, the elevation of

24   that flooding, and then tested that against the reported depth

25   of flood as a quality control check.

1        If you look at the next slide --

2            **THE COURT:**  Can we go back to that slide.

3            **THE WITNESS:**  Sure.

4            **THE COURT:**  Just one clarification.  As an example,

5    in -- I'll call them subdistrict 12 and 13.  You have

6    100 percent.  Just for the record, could you give what that

7    "100 percent" means.

8            **THE WITNESS:**  Sure.  In other words, if you look at

9    the volume of rain that fell in the Uptown area, the volume of

10   the rainwater exceeded any flooding -- the volume of any

11   floodwaters that were there in those particular areas.

12           **THE COURT:**  So that means 100 percent rainwater, in

13   essence?

14           **THE WITNESS:**  Yes, in this area.  If you think about

15   it, this is the highest area in the city, so the water is

16   draining away from that.  So any flooding that, you know, did

17   occur in, you know, the areas around -- as we can see the next

18   slide, was really primarily from the accumulation of rain that

19   is just running off and getting ponded there in those two

20   particular subbasins.

21           **THE COURT:**  I understand.

22           **THE WITNESS:**  So from this we looked at what was the

23   resulting depth of water by area from our calculations, and

24   then we checked it against what was the reported depth of

25   flooding that we had throughout.  There was a very good

1  correlation between the two, so we are reasonably confident

2  that our assumptions are correct and can be expanded.

3  BY MR. ZWAIN:

4  Q.   With regard to -- and I can't remember which subclass

5  aligns with the East Jefferson Levee District, but let's call

6  it --

7  A.   3.

8  Q.   3?  The East Jefferson Levee District is associated with

9  or alleged to be associated with the breach of the 17th Street

10 Canal.  Have you done a rough estimate of the impact area for

11 waters that emanated from the breach in the 17th Street Canal?

12 A.   Yes, we have.

13 Q.   Could you describe for the Court the areas involved, the

14 numbers of people who might have lived within that area, the

15 numbers of housing units within that area and so on.

16 A.   Yes.  If you look at this illustration, the dark red

17 indicates an area that was exclusively flooded by waters from

18 the breach, and the lighter red indicates that this was

19 contributing to the flooding that was in the area.  We had a

20 population in that area, the entire area that is colored red,

21 and once again we are doing -- since we have information by

22 subbasin, looking at all the blocks within that subbasin and

23 tabulating the number of people from 2005 -- 173,189 -- what is

24 the population today, what is the percent returned of that

25 area, how many housing units did we have in that area in 2005,

1    what was the approximate value of those housing units.

2              We calculated the damage to those housing units based

3    on factors related to wind from the FEMA reports, based on

4    depth of flood, as well as the amount of rain by subbasin, and

5    then looked at what the total damage estimate was; did an

6    allocation for wind, did an allocation for rain.  We had Road

7    Home grants at the block level; how many Road Home grants were

8    issued, what was the value of those and established that, what

9    was the average Road Home grant for that area.  Then we come up

10   with a net estimated flood damage value.

11   Q.   Just so I can understand, the estimated residential

12   damages for Subclass 3 is in the order of $6 billion?

13   A.   That is correct.

14   Q.   If you back out wind damage from that figure and you back

15   out rain damage from that figure and you back out Road Home

16   grants, in the event that they are not considered collateral

17   sources, then you get the net damage figure estimate of almost

18   $2.8 billion for Subclass 3; am I correct?

19   A.   That's correct.

20   Q.   Now, that does not include commercial properties?

21   A.   No.  We will get to that.

22   Q.   It does not include contents, does not include

23   automobiles, does not include infrastructure?

24   A.   That's correct.

25   Q.   You did the same analysis with respect to the canals with

1    which the Orleans Levee District is alleged to have been

2    associated; correct?

3    **A.**    Correct.

4    **Q.**    Those would have been the Orleans Avenue Canal, also the

5    17th Street Canal, the London Avenue Canal, and the Industrial

6    Canal; correct?

7    **A.**    We did one for each, yes, sir.

8    **Q.**    Let's run through each of those quickly.

9    **A.**    Okay.  Very quickly, this area had a population of about

10   22,000 in 2005.  The population at the beginning of 2009 is

11   about 13,000.  It's about 60 percent back.  We estimated the

12   damage to the residential units in that area at about

13   $980 million.  When you look at wind, flooding, Road Home

14   grants for the area, we net out about $465 million.

15   **Q.**    London Avenue.

16   **A.**    London Avenue had extensive flooding from that.  Now, the

17   area impacted is everything that you see in blue.  The London

18   area, unlike 17th Street Canal, did not have any area that was

19   exclusively flooded by London Avenue because there were other

20   collateral sources of water that quickly made it into that

21   area.

22          We had about 127,000 population in 2005.  We have

23   about 87,000 today.  We estimated the residential damage at

24   about $3.3 billion.  When we did the offsets for wind,

25   flooding, and Road Home, we wind up with about $1 billion

1    within that area that is blue.

2              IHNC, the flooding was quite extensive.  That

3    footprint had a population of about 231,000 in 2005.  It has

4    about 161,000 today.  Residential damages were estimated at

5    about $5.8 billion.  When you do the offsets in that area, we

6    come up to about $1.7 billion with that.

7    Q.    Let's talk about New Orleans East.

8    A.    New Orleans East, about 89,000 --

9    Q.    You did the same analysis for New Orleans East that you

10   did for the other areas?

11   A.    Correct.  The bottom line figure on that is we estimate

12   about $1.5 billion of losses when you go through -- close to

13   $3 billion in damage.  We looked at wind.  We looked at

14   flooding caused by rain.  We looked at The Road Home grants.

15   It nets out about $1.5 billion.

16   Q.    Then --

17   A.    With the St. Bernard MRGO impact area, about close to

18   65,000 population; today, about a 33,000 population.  We had in

19   excess of $2 billion of -- I'm sorry.  Housing units at a value

20   in excess of $2 billion.  We had damage in that area of about

21   $1.6 billion, really a very significant percentage of total

22   value.  When you net out flood, rain, Road Home grants, as you

23   can see, we have over $500 million of net damage.

24   Q.    Let's talk about the quantifiable damage --

25   A.    I apologize.

1  **Q.**    -- within the class area.

2  **A.**    Okay.  At a minimum, if you are talking about things that

3  you can readily quantify and go back to credible sources to

4  establish a value, you can see that it's very easy to get the

5  $44 billion of quantifiable damage:

6         At least $20 billion to residential properties, as we

7  said there; $7.8 billion of insurance claims reported by the

8  Louisiana Department of Insurance; we talked about personal

9  property previously; and we have lost wages of some

10  $11 billion; totaling a minimum of $44 billion.

11         We do not have public infrastructure in here.  We

12  have no consideration for nonquantifiable issues such as pain

13  and suffering or death or the like.

14  **Q.**    With regard to damages, did you make a rough calculation

15  of the quantifiable damages attributable to the subclass areas?

16  **A.**    Yes, we did.  What we did is, using the block level data

17  that we spoke about previously, we allocated all of the damages

18  for each of the facilities to their respective subclass area.

19  The flood impact area -- and I apologize.  I have it in red

20  because it's a credit.

21         But when we look, for instance, in the flood impact

22  area, we have about $26.7 billion of flood related -- of

23  damage, and then we credit wind, rain, and Road Home grants and

24  essentially come up with -- it's off the bottom of this slide,

25  and I apologize, because of the projection device -- but

1   there's about a $17.4 billion net damage estimate within the

2   flood-impacted area of the class area.  So those areas that did

3   not flood were not included in that.  So the --

4           THE COURT:  Does that amount show on your screen?

5           THE WITNESS:  It does.

6           THE COURT:  It just doesn't show on the big one?

7           THE WITNESS:  Yeah.  It's that projection device.

8           THE COURT:  Right, right.

9           THE WITNESS:  If we look at Subclass 1, which is the

10  St. Bernard area, we have about $2 billion by the time we

11  credited out.  If we look at Subclass 2, which would be the

12  Orleans Levee District, we have about $11.8 billion.  Then when

13  we look at Subclass 3, which would be the East Jefferson Levee

14  District and 17th Street Canal, we get about $7.1 billion.

15          The thing I do want to mention is that if you

16  add up Subclass 1, Subclass 2, and Subclass 3, they exceed the

17  $17 million, but this is because, as you said earlier, some

18  areas are within multiple classes.

19  BY MR. ZWAIN:

20  Q.   These damage estimates do not include automobiles?

21  A.   I believe they do include automobiles for the Louisiana

22  Department of Insurance nonhomeowner claims.

23  Q.   Doesn't include claims for personal injury?

24  A.   Does not.

25  Q.   Doesn't include claims for wrongful death?

1    A.    Does not.

2    Q.    Doesn't include claims for inconvenience caused by having

3    to evacuate the city for two months?

4    A.    Correct.  The extent of the damage is so great, for the

5    purposes of my presentation, I wanted to really rely on things

6    that could be specifically quantified.

7              **MR. ZWAIN:**  Your Honor, those are all the questions I

8    have.

9              **THE COURT:**  Thank you, sir.

10             Cross-examination.

11                          **CROSS-EXAMINATION**

12   BY MR. MEUNIER:

13   Q.    Mr. Rigamer, I know that you have been addressing the

14   values and estimates of damages in global, collective ways.  I

15   wonder if you are in a position to confirm the likelihood that

16   looked at individually in the parish area, there will be claims

17   for damages that may well exceed $1 million each standing

18   alone?

19   A.    I would agree with that, yes.

20   Q.    The $44 billion estimate you have for quantifiable damages

21   in the class area, as you say, does not even include the

22   recovery of a family member's loss of a loved one in the storm,

23   mental anguish, in some cases suicide, personal injury?  Those

24   types of things are not even included in the $44 billion; is

25   that true?

1   A.   That is correct.

2   Q.   Finally, on The Road Home issue, you have taken out, in an

3   effort to get a net recoverable damage figure, some amount that

4   might be paid back to The Road Home.  You're not suggesting

5   that in a limited fund allocation, where there may not be

6   actual monetary payments to class members, The Road Home would

7   have any way of diminishing this?

8   A.   No, I am not.

9        MR. MEUNIER:  Thank you, sir.  No further questions.

10        THE COURT:  Mr. Irvin.

11                    CROSS-EXAMINATION

12   BY MR. IRVIN:

13   Q.   Good afternoon, Mr. Rigamer.  Your estimates of property

14   damage claims were based on insurance claims?

15   A.   The $20 billion was on insurance claims.  That's what we

16   know was reported.  When we tried to tie it to geographic

17   areas, we looked at the values of the houses in those specific

18   areas down to the block group level; we looked at the extent of

19   the water that was received there; we looked at the FEMA damage

20   reports for that; and we made some calculations to get to the

21   numbers that we have reflected by subclass area.

22   Q.   What components of this damage testimony you have given us

23   were based on insurance claims?

24   A.   Only at the class area, the $20 billion of residential,

25   those are the only ones that were really -- just the overall

1    class area.

2            When we looked at the impact area, we made damage

3    calculations based on the specific geography of the block, the

4    depth of flooding, and the value of the properties that were

5    there.

6    **Q.**   Do you know how much your company has been paid for your

7    study and your testimony today?

8    **A.**   Well, we have been working with the defense panel from the

9    beginning with this, and we have done a significant amount of

10   work with them.  This is just a continuation of that

11   assignment.

12   **Q.**   Do you know what the total amount has been?

13   **A.**   I don't know the exact amount.  It's a significant amount.

14   I'm sure it's in the $400,000, $500,000 range.

15           **MR. IRVIN:**  Thank you.  That's all I have.

16           **THE COURT:**  Thank you, sir.

17               Anything else?

18           **MR. ZWAIN:**  Your Honor, if I may, may I file and

19   introduce into evidence in globo Exhibit 61, which are his CV

20   and slide.

21           **MR. MEUNIER:**  No objections.

22           **THE COURT:**  Any objections?  Let it be admitted.

23               You can step down, sir.  Thank you.

24               Next witness.  Mr. Anzelmo, are you taking the

25   next witness?

1      **MR. ANZELMO:**  Yes, Your Honor, I am, but my colleague

2  may be discussing some stipulations that would shorten it.

3      **THE COURT:**  Okay.

4      **MR. MAYEAUX:**  Your Honor, Ben Mayeaux for the Orleans

5  Levee District.  We have, I believe, reached an agreement that

6  will allow us to release a couple of witnesses.

7      **THE COURT:**  All right, sir.

8      **MR. MAYEAUX:**  Your Honor, we have and offer the

9  affidavit of Carol Kiefer.  Ms. Kiefer is an employee of the

10  Orleans Levee District in the risk management department.

11      She in her affidavit -- which we are marking as

12  Exhibit 62 -- authenticates the Orleans Levee District

13  insurance policies that have previously been introduced and

14  accepted into evidence.  Additionally, her affidavit

15  authenticates request proposals for insurance bids submitted by

16  the levee district to St. Paul.

17      **THE COURT:**  All right.

18      **MR. MAYEAUX:**  In connection with offering this,

19  Your Honor, Ms. Kiefer has been subpoenaed as a witness and she

20  is here today.  I think we have reached an agreement that the

21  levee district will stipulate as to the authenticity and

22  admissibility of the 2007 financial report issued for the

23  Orleans Levee District and, additionally, that we will

24  stipulate that the Orleans Levee District has formerly paid

25  certain settlements and judgments and will be introducing an

1    exhibit that summarizes those settlements and judgments paid,

2    along with the resolutions from the board appropriating funds

3    for those settlements and judgments.  We will offer that as

4    Exhibit 63.

5              **THE COURT:**  That information is contained in

6    Exhibit 63?

7              **MR. MAYEAUX:**  Yes, sir.  It's an exhibit that is not

8    in the benchbook because it came today.

9              **THE COURT:**  If anybody wants to look at it, I just

10   want them to know what exhibit number it is.

11             **MR. MAYEAUX:**  In exchange for those stipulations and

12   agreements, I think Ms. Kiefer is released from her subpoena.

13   I request confirmation.

14             **THE COURT:**  Let me make sure there's no objection

15   among the lawyers present.

16             **MR. MEUNIER:**  Just for the record, Judge, the class

17   plaintiffs join in the stipulation.

18             **THE COURT:**  All right.  Thank you.

19             **MR. ZWAIN:**  Your Honor, I believe I'm able to

20   announce another stipulation.

21             **THE COURT:**  Let me make sure I have no objection to

22   this one.

23             **MR. IRVIN:**  No.  We join in the stipulation.

24             **THE COURT:**  Thank you very much.  Then it is

25   admitted.  Anybody out there who wants to look at it in the

103

 1   record, it is Exhibit 62 and Exhibit 63.  The affidavit is 62

 2   and the information concerning payment of judgments, etc.,

 3   would be 63.

 4          **MR. ZWAIN:**  I will offer, file, and introduce into

 5   evidence what I will mark as Exhibit 64, which I believe there

 6   is no objection to.  That is the affidavit of T. Robert Lacour,

 7   who is the counsel for the Southeast Louisiana Flood Protection

 8   Authority and prior to that the attorney for the East Jefferson

 9   Levee District, which attests to information with regard to

10   identification of the various insurance policies --

11          **THE COURT:**  Can you speak up just a little bit.  I'm

12   sorry.  Make sure everybody can hear you.

13          **MR. ZWAIN:**  He identifies the insurance policies that

14   were in full force and effect with regard to the East Jefferson

15   Levee District at the time Katrina struck and the fact that

16   there was one contract in progress as of the time of Hurricane

17   Katrina at the 17th Street Canal, but that contract was with

18   the U.S. Army Corps of Engineers and did not require anyone to

19   add the East Jefferson Levee District as an additional insured.

20          **MR. MEUNIER:**  Class plaintiffs have no objection.

21          **MR. KIRKPATRICK:**  No objection, Your Honor.

22          **THE COURT:**  Thank you.  Let it be admitted.

23          **MR. HUBBARD:**  Ralph Hubbard for St. Paul.  At this

24   time we would like to offer, introduce, and file into evidence

25   the affidavit of Charlotte K. Lane.  She is an underwriter with

1  the ocean marine division of St. Paul.  Her affidavit has to do

2  with separate underwriting of the land-based and the

3  marina-based risks and calculation of premiums with respect to

4  the Orleans Marina, New Basin Canal, and the South Shore Harbor

5  Marina.

6          **THE COURT:**  Any objection to that stipulation?

7          **MR. MEUNIER:**  No objections by class plaintiffs,

8  Your Honor.

9          **MR. KIRKPATRICK:**  No objections, Your Honor.

10          **MR. IRVIN:**  No objections.

11          **THE COURT:**  Thank you.

12          **MR. HUBBARD:**  Let the record reflect that is going to

13  be Exhibit 65.

14          **THE COURT:**  65.  Thank you.

15          **MR. MAYEAUX:**  One more, Your Honor.  We offer the

16  affidavit of Mr. Gerard Gillen, assistant chief engineer for

17  the Orleans Levee District.  This affidavit, Your Honor, goes

18  to the issue of additional insured potential coverage and

19  simply confirms as fact that the engineer and contractor

20  defendants that have previously been dismissed on their

21  preemption motions, when those two had contracts with the levee

22  district, actually completed their contracts.

23          Then, secondly, Mr. Gillen discusses the

24  projects that were actually ongoing in 2005 in connection with

25  levee flood structure type work, identifies those four

1   projects, and then establishes that they were remote from the

2   breach sites.  Attached to his affidavit are the four contracts

3   associated with those projects.

4            Without objection, we would offer that testimony

5   and exhibits by affidavit.

6            THE COURT:  The number of that exhibit would be?

7            MR. MAYEAUX:  66.

8            MR. MEUNIER:  No objection by the plaintiffs.

9            MR. IRVIN:  No objection.

10            MR. KIRKPATRICK:  No objection.

11            THE COURT:  Thank you.  Let it be filed.

12            MR. ZWAIN:  Your Honor, we are up to 67?

13            THE COURT:  Yes, sir.

14            MR. ZWAIN:  I offer, file, and introduce into

15   evidence the affidavit of Robert A. Turner Jr.  He is the

16   regional director for the Southeast Louisiana Flood Protection

17   Authority-East.  Prior to that he was the executive director

18   for the Lake Borgne Basin Levee District.  He provides

19   information in his affidavit with respect to the insurance in

20   place for the Lake Borgne Levee District as of the date of the

21   storm and attaches a schedule of insurance to that effect.

22            MR. MEUNIER:  No objection by plaintiffs.

23            THE COURT:  Any objection?

24            MR. IRVIN:  No objection.

25            MR. KIRKPATRICK:  No objection.

1          **THE COURT:**  Let it be admitted.

2          **MR. ANZELMO:**  May it please the Court.  Your Honor,

3    Tommy Anzelmo.  I would like to ask the Court, in connection

4    with the motions and the dismissals of all the engineer and

5    contractor defendants, to take judicial notice for this record

6    of:

7                    Record Document 2148, which involved the

8    dismissals of Eustis, Burk-Kleinpeter, and Modjeski and

9    Masters; Record Document 463, which involved the dismissal of

10   GOTECH; Record Document 894, the remaining engineering

11   defendants; Record Document 2142 granting the motion to dismiss

12   of Boh Bros.; Record Document 560 and Record Document 624

13   involving dismissals of Boh and, I believe, B&K Construction;

14   Document 6175 granting the dismissals of T.L. James and

15   C.R. Pittman, and those also included Record Document 2954 and

16   Record Document 3403.

17                    I also ask the Court to take notice that there

18   were several "me too" motions for the peremptory exemptions

19   where the Court granted dismissals of Eustis, Modjeski and

20   Masters, Burk-Kleinpeter, GOTECH, Boh Bros., and B&K involving

21   the dredging of the 17th Street Canal.

22                    There were also dismissals in Record Document

23   9854, partial dismissal of the New Orleans Public Belt

24   Railroad; Record Document 11551 granting dismissal of CSX; and

25   there were several motions to dismiss voluntarily of several

1   defendants, including James Construction and the Gulf Group, in
2   Record Documents 580, 581, 582, and 8076.

3         **THE COURT:**  The Court will take judicial notice of
4   that.  As an aside, on the contractors and engineers -- I will
5   refer to them in globo -- I know that is on appeal.  Was that
6   argued before the Court of Appeal?

7         **MR. MEUNIER:**  It has been, Judge, and it's under
8   submission.

9         **THE COURT:**  What effect would that have on this
10  limited fund if the Court were to be reversed?

11        **MR. MEUNIER:**  We think it has absolutely no effect.

12        **THE COURT:**  Other than they would be back in the suit
13  and there would be more entities.

14        **MR. HUBBARD:**  That's correct, Your Honor.  These
15  record documents that have just been read into the record have
16  to do with the fact that most of those defendants were
17  dismissed on preemption grounds and the projects that they were
18  working on were completed and accepted more than five years --

19        **THE COURT:**  I understand.  What's next?

20        **MR. ANZELMO:**  Your Honor, at this time the levee
21  districts would call Mr. Tim Doody to the stand.

22        (WHEREUPON **Timothy P. Doody**, having been duly sworn,
23  testified as follows.)

24        **THE DEPUTY CLERK:**  Please state your full name and
25  correct spelling for the record.

1    **THE WITNESS:**  Timothy P. Doody:  T-I-M-O-T-H-Y,

2    D-O-O-D-Y.

3                    **DIRECT EXAMINATION**

4    **BY MR. ANZELMO:**

5    **Q.**   Mr. Doody, good afternoon, sir.  My name is Tommy Anzelmo.

6              Sir, would you please tell us what your current

7    employment is.

8    **A.**   I am the executive director of Chaffe, McCall, Phillips,

9    Toler & Sarpy; Chaffe McCall now.

10   **Q.**   Mr. Doody, do you hold any position with the Southeast

11   Louisiana Flood Protection Authority-East?

12   **A.**   I'm the president of the Authority.

13   **Q.**   When did you first become a member of the Authority?

14   **A.**   In January of 2007.

15   **Q.**   When you became a member of the Authority, what did you

16   understand your primary function to be as serving them?

17   **A.**   As Governor Blanco told us when she swore us in, we had

18   three duties:  Flood protection.  Flood protection.  Flood

19   protection.

20   **Q.**   Mr. Doody, in connection with your service as president of

21   the Authority, have you familiarized yourself with the powers,

22   duties, and functions of the Authority and the duties and

23   functions of the respective levee districts under the

24   Authority's control?

25   **A.**   Generally speaking, yes.

1  Q.    Are you familiar with the future projects that have been

2  proposed to bring the Lake Pontchartrain and Vicinity Hurricane

3  Protection Plan to 100-year protection and beyond?

4  A.    Yes.  In a general sense, yes, I have.

5  Q.    Could you describe or explain to the Court what are the

6  projects that are underway and the future projects that are

7  being contemplated that will be administered by the levee

8  districts and the board that you're the president of.

9  A.    It's really a complete -- rebuilding the entire system to

10 bring it to a 100-year level of protection as defined by the

11 Corps of Engineers, but I can tell you about some of the larger

12 projects that there will be.  There will be T-walls constructed

13 along the Mississippi River Gulf Outlet.  There's going to be a

14 surge barrier there, and there's going to be a raising of the

15 levees along the GIWW, on the north side of the GIWW.

16 Q.    Insofar as projected costs are concerned, what is the best

17 information that you have, for instance, as to what the cost of

18 the surge barrier project will be?

19 A.    The surge barrier itself is going to be -- estimated right

20 now to be $1.2 billion.

21 Q.    Now, will the Orleans Levee District, the East Jefferson

22 Levee District, and the Lake Borgne Basin Levee District as

23 local sponsors continue to be obligated to contribute to the

24 cost of future projects and also have operation and maintenance

25 responsibilities therefor?

1   A.    Absolutely.

2   Q.    Can you tell the Court what's the current cost share that

3   the Corps has been requiring of its local sponsors.

4   A.    Since the hurricane, actually it's increased.  Our local

5   cost share is 35 percent.

6   Q.    Insofar as operation and maintenance responsibilities are

7   concerned -- and let's take the surge barrier project.  Could

8   you tell the Court what's estimated to be the annual cost of

9   maintenance of that project once constructed.

10  A.    The Corps has told us that it's got a 50-year life, and

11  its annual estimated maintenance cost is scheduled to be

12  $800,000 per year for its 50-year life.

13  Q.    Insofar as the works that are going to be accomplished,

14  are there any land acquisition costs that you are aware of

15  globally for the entire region served by the levee districts

16  particularly that we are discussing today?

17  A.    Tremendous land acquisition costs.  Tremendous.

18  Q.    Any quantifiable number that you have heard so far?

19  A.    Yes.  $200 million, $300 million.

20  Q.    Now, do the levee districts that are under the Authority

21  currently have the assets necessary to meet their obligations

22  to pay both existing debt and their share of future obligations

23  for these federal projects?

24  A.    We do not.  We don't have the money.

25  Q.    The revenue stream that the districts were relying on is

1  principally composed of funds from where?

2  A.   It's principally composed of ad valorem taxes.  That's the

3  greatest majority.

4  Q.   Since Hurricane Katrina what has been the effect on the

5  ability of the respective levee districts to collect those?

6  A.   As was shown earlier, our tax base has been decimated by

7  the hurricane and the effects of the hurricane, so our ability

8  to collect taxes is restricted to the ability -- basically, the

9  population base that has returned.

10  Q.   Insofar as the Orleans Levee District is concerned

11  particularly, has it had to borrow money to pay for its current

12  bonded indebtedness?

13  A.   We have.

14  Q.   Could the levee districts pay for judgments that might be

15  returned in connection with this litigation and still maintain

16  the ability of each respective district to fulfill its

17  statutory obligations and maintenance and operation obligations

18  for the hurricane protection system?

19  A.   We could not and responsibly we would not.  We just

20  couldn't.

21  Q.   It's been suggested by some of the objectors that there

22  may be an impetus to the Authority to make appropriations on

23  behalf of the districts as more judgments are accumulated by

24  the district.  What would be your response to that?

25  A.   I don't really see how that could possibly make any sense,

1    the fact that we would have more judgments against us making it

2    easier for us to pay judgments or some kind of way cause us to

3    pay judgments.  We don't have the resources now to perform the

4    function nor to build a higher level of protection.  I don't

5    see how more judgments would help us.

6    **Q.**    Finally, Mr. Doody, will the Authority appropriate money

7    to pay for any judgments that result from these cases should

8    they be awarded?

9    **A.**    We can't and we won't.

10                **MR. ANZELMO:**  Thank you, sir.  That's all the

11   questions I have at this time.

12                **THE COURT:**  Cross-examination.

13                **MR. MEUNIER:**  No questions, Your Honor.

14                              **CROSS-EXAMINATION**

15   BY MR. IRVIN:

16   **Q.**    Good afternoon, Mr. Doody.  Are the levee boards or the

17   levee board of which you are in charge continuing to maintain a

18   restricted fund to pay judgments against the levee board?

19   **A.**    No, sir, we do not maintain restricted funds to pay

20   judgments.

21   **Q.**    Are you aware that the Orleans levee board has for years

22   maintained a restricted fund to pay judgments?

23   **A.**    No, sir, I'm not aware of that.

24                **MR. IRVIN:**  That's all I have.

25

1                          CROSS-EXAMINATION

2     BY MR. KIRKPATRICK:

3     Q.   Mr. Doody, do the levee districts and the board maintain

4     nonflood control assets, in other words, things like marinas or

5     airports or casinos or anything like that?

6     A.   We do not maintain them.  That has been transferred.  The

7     maintenance of those assets has been transferred to the

8     Division of Administration.

9     Q.   It has been transferred to the Division of Administration?

10    A.   The maintenance of the assets, yes.

11    Q.   Are some of those assets revenue-generating for the levee

12    board?

13    A.   They are intended to be, but they don't.

14    Q.   Was there a time that they were revenue-generating?

15    A.   Yes, there was.  Before the hurricane, yes.  The biggest

16    generator was the Belle Casino.  As I'm sure it's widely known,

17    that is no longer there.

18              MR. KIRKPATRICK:  Thank you.  I have nothing further.

19              THE COURT:  Anything else?  You may stand down.

20                   We will take a brief recess, five to ten

21    minutes.  I think the next witness may be a little longer;

22    would that be fair?

23              MR. HUBBARD:  We need to consult with the plaintiffs

24    as to who is next.

25              THE COURT:  While you are consulting, we will take a

1   break.

2           THE DEPUTY CLERK:  All rise.

3           (WHEREUPON the Court took a brief recess.)

4           THE DEPUTY CLERK:  All rise.

5               Court is in session.  Please be seated.

6           THE COURT:  Yes, sir.

7           MR. ZWAIN:  Your Honor, before the next witness is

8   called, I would like to offer, file, and introduce into

9   evidence in globo Exhibit 68, which is the affidavit and

10  various exhibits of the notice expert, Shannon Wheatman,

11  including specifically as Exhibit 68-4 the CD of the CAFA

12  notice sent to all the states' attorneys general as required by

13  the CAFA statute.

14          MR. MEUNIER:  Class plaintiffs have no objection.

15          MR. KIRKPATRICK:  No objection, Your Honor.

16          MR. IRVIN:  No objection.

17          THE COURT:  That's Exhibit 68.

18          MR. MEUNIER:  Your Honor, the plaintiffs call Pete

19  Ligeros.

20          (WHEREUPON **Pete Ligeros**, having been duly sworn,

21  testified as follows.)

22          THE DEPUTY CLERK:  Please state your full name and

23  correct spelling for the record.

24          THE WITNESS:  Pete Ligeros, L-I-G-E-R-O-S.

25

1                        **VOIR DIRE**

2  **BY MR. MEUNIER:**

3  **Q.**   Mr. Ligeros, please state your occupation.

4  **A.**   My occupation is insurance and risk management consultant.

5  **Q.**   How long have you been engaged in that occupation?

6  **A.**   Approximately 24 years.

7  **Q.**   What is your educational background?

8  **A.**   I have a Bachelor of Science from the University of Utah,

9  a law degree from Western State University, and a mediation

10 certificate in California.

11 **Q.**   Do you regularly attend and present at seminars in the

12 field of insurance and risk management?

13 **A.**   Yes, sir.

14 **Q.**   How many presentations have you given at such seminars?

15 **A.**   They are listed on my résumé.  I'm guessing around 50.

16 **Q.**   Have you published in the field of insurance and risk

17 management customs and practices?

18 **A.**   Yes.

19 **Q.**   Have you, in fact, co-authored course guides and textbooks

20 that are used in the field of insurance and risk management?

21 **A.**   Portions of the textbook and course guide, yes.

22 **Q.**   Do any of the articles or publications that you have

23 authored deal with the issues of insurance which you find to be

24 presented in this case?

25 **A.**   They do.

1    **Q.**    Give us some examples.

2    **A.**    *The Additional Insured Book*, which is published by the

3    International Risk Management Institute, deals primarily with

4    additional insured issues.  It deals with construction issues.

5    It deals with contract issues and provisions in contracts

6    requiring indemnity and additional insured status.

7          *The Umbrella Book*, which I wrote for about 10 years,

8    deals with listing each of the policy terms of commercial

9    general liability policies and comparing them word-by-word with

10   approximately 100 different umbrella policies issued by

11   insurers throughout the United States.  We publish a monthly

12   newsletter on these issues.

13         There are some CGL books that discuss the CGL terms.

14   **Q.**    Now, in your professional work, Mr. Ligeros, do you

15   regularly consult with insurance companies, risk managers,

16   underwriters, public and private entities, and even attorneys

17   on matters dealing with insurance limits and coverage?

18   **A.**    Yes.

19   **Q.**    Give us some example of the institutional clients that you

20   have served in that regard.

21   **A.**    Well, in the field of construction contracts and the

22   additional insured issues, we would be talking, for example, in

23   Las Vegas, the Las Vegas monorail, the Las Vegas Hilton Hotel;

24   in Washington -- Seattle -- with the bulk in enterprises, which

25   the owner of Microsoft has a development firm up there.

1          You're talking about private industries?

2  **Q.**   Private and public.

3  **A.**   American Nevada Corporation.   The Wise Companies.

4  Different construction entities.

5          In the public entity sector, I have worked with --

6  over the years, when I was with Warren, McVeigh & Griffin in

7  California, drafting the coverage document for the Southern

8  California Joint Power Insurance Services Authority, which

9  provides coverage for most of the public entities in southern

10  California, drafting their manual, which details how to

11  request, word, and then verify coverage for the different types

12  of contracts they enter into; various hospitals; drafted policy

13  language for the Consolidated Catholic Casualty Risk Retention

14  Group, which covers the coverage issues used by the Catholic

15  Church around the country.

16          I have drafted language for Andover Insurance

17  Company.   Associated Aviation Underwriters at one point had

18  asked my partner and I to review their language.   I have worked

19  with Andover Insurance and through *The Umbrella Book*.

20  **Q.**   So in your consulting activities with all these

21  companies -- large and small entities, public and private -- do

22  you regularly focus and give professional advice on matters

23  such as policy drafting, policy provisions and interpretation,

24  and the expectations of the parties as to coverage?

25  **A.**   Everything except interpretation.   We leave that to the

1   judges and the attorneys.  We do comment on industry practice,

2   how it relates to the evolution of the language, how it's

3   intended and expected to apply by carriers, by insureds, and

4   things of that nature.

5   **Q.**   Now, in your work have you reviewed and studied various

6   drafting documents of the Insurance Services Office or the ISO?

7   **A.**   Yes, sir.

8   **Q.**   Please tell the Court what the ISO is.

9   **A.**   ISO is the Insurance Services Office.  There are two basic

10  standard commercial general liability forms.  One is issued by

11  the Insurance Services Office or ISO; the other by the

12  Association of Insurance Services.  These are the standard

13  terms used throughout the country to provide commercial general

14  liability coverage, which are then modified by endorsement

15  depending on the requirements of a given state.

16  **Q.**   In the policies you reviewed in this case, do you find

17  some of the standardized language and words and phrases that

18  emanate from the ISO?

19  **A.**   I find similar terminology.  The St. Paul companies use

20  what they call their standard plain English version, but it is,

21  in essence, the same coverage.  They use sometimes different

22  language.  But, yes, it's pretty standardized in terms of the

23  coverage it's intended to provide.

24  **Q.**   Now, have you previously testified in legal proceedings as

25  an expert witness in the area of insurance and risk management

1  industry customs and practices?

2  **A.**    Yes.

3  **Q.**    How many depositions have you given as an expert witness?

4  **A.**    I would say approximately 40; probably more, but to be

5  safe, say 40 depositions.

6  **Q.**    Have you been accepted as an expert witness in that field

7  in both federal and state courts?

8  **A.**    Yes.

9  **Q.**    Have you previously served as an expert dealing with

10  insurance matters in connection with a Louisiana class action

11  case?

12  **A.**    Yes.

13  **Q.**    Have you ever been tendered and then rejected as an expert

14  by any court?

15  **A.**    Not rejected.  At times courts will say expert testimony

16  will not be used and they rule as a matter of law.

17  **Q.**    What is the total percentage of your professional time

18  dedicated to serving as an expert witness in legal cases?

19  **A.**    It's very minimal.  5 to 10 percent depending -- I mean,

20  I'm a sole practitioner, so if one case engulfs more time than

21  others -- but basically 5 or 10 percent.

22  **Q.**    Finally, Mr. Ligeros, is the methodology that you have

23  used to reach your opinions in this case as an expert commonly

24  used and generally accepted in the field of insurance and risk

25  management?

1    A.    Yes.

2    Q.    Is the methodology you have used in this case found in

3    peer-reviewed publications in your field?

4    A.    I'm sorry?

5    Q.    Is the methodology that you have used reflected in

6    peer-reviewed publications in the field?

7    A.    Yes.

8              MR. MEUNIER:  Your Honor, at this time I would tender

9    Pete Ligeros as an expert in the field of insurance and risk

10   management industry customs and practices.

11             THE COURT:  Any traverse by anyone?

12             MR. IRVIN:  Nothing from me, Your Honor.

13             MR. KIRKPATRICK:  No objection, Your Honor.

14             MR. HUBBARD:  No objection.

15             MR. ANZELMO:  No objection.

16             THE COURT:  Any objection to Mr. Ligeros as tendered?

17   No objection?  I will accept him as tendered, with the

18   understanding that any ultimate interpretation of any policy at

19   issue here must be made by the Court.  For the purpose of this

20   fairness hearing, my assumption is that he is testifying as to

21   due diligence by counsel, type of policies, and that kind of

22   thing.

23             MR. MEUNIER:  Correct, Your Honor.

24

25

1          **DIRECT EXAMINATION**

2    **BY MR. MEUNIER:**

3    **Q.**   Mr. Ligeros, by whom and when were you first contacted to

4    provide expert assistance in this case?

5    **A.**   It was early in -- late 2007, maybe early 2008.  My

6    partner, Don Malecki, I believe contacted me.  He had been

7    contacted by Mr. Bruno.  Don Malecki has semiretired.  I took

8    over and contacted Mr. Bruno, and I believe it was early in

9    2008 when I became actively involved.

10   **Q.**   Prior to that time, did you have any kind of involvement

11   whatsoever in this litigation?

12   **A.**   No.

13   **Q.**   Were you, in fact, retained by Mr. Bruno to serve as an

14   expert on behalf of plaintiffs in this case?

15   **A.**   Yes.

16   **Q.**   What were you asked to do?

17   **A.**   I was asked to explore the coverages available and to

18   determine, in a practical sense, any ways -- or to investigate

19   ways of expanding what the coverages were and to determine what

20   was necessary to ferret out the coverage issues.

21   **Q.**   So we're clear, is this with respect to coverages afforded

22   to the defendants Orleans, East Jefferson, and Lake Borgne

23   Basin Levee Districts?

24   **A.**   It was.  It was primarily limited to liability coverage,

25   which would be third-party liability coverage issues that would

1   respond to suits by those filing a claim against the levee

2   districts.

3   **Q.**    Pursuant to the request made of you and the work that you

4   have done, are you now in a position to state your opinion as

5   to the maximum amount of insurance proceeds potentially and

6   practically available to the plaintiffs based on their claims

7   in this case against those three levee districts?

8   **A.**    Yes.  I guess I should clarify that when we approached

9   this from the beginning, we broke it down into coverage for the

10  levee districts, which is at issue here, and secondary sources

11  that might be applicable from policies that applied to other

12  sources -- through other sources.  So when you say "limited

13  fund," I'm referring to what's available to the levee

14  districts.

15  **Q.**    So the focus here is on third-party liability insurance;

16  correct?

17  **A.**    Correct.

18  **Q.**    As distinguished from first-party coverage?

19          **THE COURT:**  You might for the record --

20          **MR. MEUNIER:**  We're going to explain what that is.

21          **THE COURT:**  -- elucidate a little bit on that.

22  BY MR. MEUNIER:

23  **Q.**    Explain to the Court the difference between third-party

24  liability policies and first-party coverage.

25  **A.**    In the first-party context, the levee district would

1    procure insurance to cover its own assets -- the buildings, the

2    contents, things of that nature -- as opposed to procuring

3    liability coverage that applies to protect the levee district

4    when it is sued by third-party claimants alleging bodily injury

5    or property injury or personal injury or advertising injury.

6    The first-party denotes coverage for the entity's own property

7    and the third-party denotes coverage for claims by third-party

8    claimants.

9    Q.    The third-party claimants here would be the members of the

10   proposed plaintiff class; correct?

11   A.    Correct.

12   Q.    You indicated that you looked at both policies that would

13   have been issued directly to afford coverage to the levee

14   districts as well as policies issued to other entities where

15   there might be coverage available to these levee districts;

16   true?

17   A.    True.

18   Q.    State for the record what steps you then took and what

19   action you engaged in and what process you used in order to do

20   what you were asked to do in this case.

21   A.    Initially, I requested information such that I could

22   identify the parameters of what the coverage would apply to.

23   Then I sought to determine who the parties were; what the

24   policies were; what the contracts were between the parties, the

25   levee district and other contractors and subcontractors; who

1    those contractors were.

2           I sought to get information on insurance agents and

3    brokers who procured this coverage early on to see -- the

4    method that I was approaching was, number one, to determine who

5    had an indemnity obligation; who had provided additional

6    insured status; who had an obligation to procure the coverage;

7    did they meet those obligations and standards; and to look at

8    the contracts, if they were available, to see what type of

9    coverage had been requested; and then the policies themselves

10   to see if it provided additional insured status to the levee

11   districts.  Also, my initial focus was to get as much coverage

12   on the table as we could find from these other entities.

13   **Q.**   Now, you have written a report in this case; true?

14   **A.**   Yes.

15   **Q.**   That report, dated March 30, 2009, has certain

16   attachments, including as Exhibit C a list of insurance

17   policies issued to the three levee districts in effect from

18   August 2004 to October 2005; correct?

19   **A.**   Correct.

20   **Q.**   A number of nonlevee policies, that is, policies issued to

21   others that may afford coverage to the levee districts;

22   correct?

23   **A.**   Correct.

24   **Q.**   Certain contracts which involved the levee districts and

25   some of these other insured entities; true?

1    A.    True.

2    Q.    Then you also reviewed the depositions and the pleadings

3    that you identified in that list of material?

4    A.    Yes.

5    Q.    Does that constitute the written material on which you are

6    relying in order to form your expert opinions?

7    A.    Yes.

8    Q.    For the record, are there some corrections in the policy

9    numbers you have given for the policies listed as being issued

10   to the East Jefferson Levee District in Exhibit C to your

11   report?

12   A.    There is.

13   Q.    For the record, what are those corrections that need to be

14   made?

15   A.    I have the wrong numbers down on two policies that I

16   noted.  On the public officials E&O policy for East Jefferson,

17   the number that I'm showing is incorrect.  630-1698 should be

18   replaced with 978 2727.  Just below that, for the law

19   enforcement liability policy, the same number should be

20   replaced with UGL 0000123-0.

21   Q.    That's UGL 0000123-0?

22   A.    Correct.

23   Q.    When you were analyzing the issue of coverage,

24   Mr. Ligeros, did you give any consideration to the possibility

25   of coverage for these plaintiffs' claims in this case under

1  policies issued to these levee districts after Hurricane

2  Katrina?

3  **A.**   I did.

4  **Q.**   What was the result of that consideration?

5  **A.**   In the report I noted that it would be expected for these

6  policies to exclude coverage for what had happened prior to

7  their inception date.  I had not reviewed them at the time I

8  wrote the report, but I reviewed them subsequently, and they

9  had exactly the type of language I expected.

10  **Q.**   So to be clear about this, the third-party liability

11  coverage under policies issued directly to the levee districts

12  which you list that you reviewed here for the period

13  August 2004 to October 2005, if we considered one such policy

14  as that to be issued starting in November of 2005, you're

15  satisfied that the language in any such policies could not

16  relate back to cover claims in this case?

17  **A.**   No.  Two of the insurers involved issued policies using

18  standardized language, which for many years now states that if

19  property damage began in a prior policy period, it will not be

20  picked up in that policy.  Two of the insureds did the same

21  thing in a different way, but the language is different.

22  **Q.**   Now, let's talk about the policies you've looked at that

23  were not issued directly to the levee districts but issued to

24  entities other than the levee districts with whom the levee

25  districts had contracts.  What was the result of your analysis

1  of those policies?

2  **A.**   I started focusing on Washington Group International (WGI)

3  and they eventually came out of the case.  That was the

4  greatest blow because that was where most of the coverage

5  appeared to be, if they were in.

6          We then looked at the policies that were issued in

7  2005 by some of the entities that were mentioned earlier,

8  Boh Bros., Modjeski -- I don't know how they say that name.

9  Those policies provided additional insured status to the levee

10 districts, but the problem was with WGI, for example, the

11 additional insured coverage was dependent upon the existence of

12 a written contract requiring the additional insured status, and

13 I was told there were no such contracts.

14 **Q.**   Just sticking with WGI, so we are clear about that, your

15 understanding is that there were no written contracts between

16 WGI and any of these three settling levee districts, which

17 written contracts would have been a necessary prerequisite to

18 there being any additional insured coverage through WGI?

19 **A.**   It's very standard language by insurers.  They absolutely

20 require that there be a written requirement.  Some provide

21 blanket additional insured coverage automatically.  But even

22 so, they are going to say in most cases that you have to have

23 that you are required to provide it under a contract.

24 **Q.**   We also directed your attention, didn't we, to the

25 possibility that these levee districts, one or more of them,

1    may have been additional insureds under contracts with

2    Boh Bros., Modjeski and Masters, and Eustis specifically in

3    connection with dredging work done in the 17th Street Canal

4    dating back to the '90s; correct?

5    **A.**    Correct.

6    **Q.**    What was the result of your analysis of that issue?

7    **A.**    I might have to show it on the board, but basically --

8              **MR. MEUNIER:**  Judge, may he step down?

9              **THE COURT:**  He certainly may.

10             **THE WITNESS:**  I'm using the year 1980 just

11   figuratively.  But, for example, in 1980, if the work was being

12   performed under a contract to do repair work on the 17th Street

13   project and additional insured status was provided, which it

14   was, then the additional insured status would apply to the

15   levee districts during the period that that policy in 1980 was

16   in effect.

17             The coverages are triggered by damage during the

18   policy period.  So to the extent there was damage in 1980, the

19   levee district would have had coverage under those policies for

20   any claimants.  But when you move over to 2005 and you have a

21   Boh Bros. project going on somewhere else under a different

22   contract 20 years later, the levee district is an additional

23   insured but under that new contract or that project.

24             It's not an industry practice to go back and

25   say:  "Okay.  You're listed as an additional insured in 2005

1    for these contracts.  We also are going to force you to go back
2    and provide coverage for what you did under a contract 20 years
3    ago."  It's not the way it works.  It's not the way it's
4    customarily done.
5                    So unless there was property damage in 2005 to
6    projects that caused the damages here, the additional insured
7    status would have no effect.  I was told that that earlier work
8    is where the damage took place that contributed to the failures
9    of the levees.
10   BY MR. MEUNIER:
11   Q.   So to be concrete about it, if a plaintiff sought to
12   complain that dredging work done -- I believe it was actually
13   in the '90s -- by Boh Bros., Modjeski and Masters, and Eustis
14   undermined the floodwalls, resulting in a later failure with
15   Hurricane Katrina in 2005, and if the levee district -- Orleans
16   Levee District, for example, were an additional insured under
17   policies issued to Boh Bros., Modjeski and Masters, and Eustis
18   back at the time of the dredging, could a claim in this case be
19   asserted by plaintiffs against the levee district securing any
20   additional insured coverage under those policies?
21   A.   It wouldn't apply to the levee here as additional
22   insureds.  I mean, to the extent that Boh Bros. is left in the
23   case, their coverage is continuous because it's not dependent
24   on a contract.  So if Boh Bros. is brought back into the case,
25   you could conceivably trigger coverage all the way down.  But

1   for the levee districts, the coverage under those additional

2   insured endorsements would apply in the policy years to which

3   the contracts applied.

4   Q.   So the only way a plaintiff could collect insurance

5   proceeds from the Orleans Levee District for something wrong

6   with the dredging back in '80 would be to argue that the damage

7   became manifest and was sustained back in the policy period?

8   A.   As an additional insured, based upon the contract for the

9   dredging, yes.

10  Q.   Let's look at the other end of it, which is a policy in

11  2005, in effect at the time of the hurricane, issued in

12  connection with a different contract, a different project under

13  work in play at that time with a levee district as an

14  additional insured.  Why couldn't a plaintiff sue the Orleans

15  Levee District under that policy seeking coverage in connection

16  with the damage resulting from dredging?

17  A.   Because the damage resulting from dredging took place in

18  1990 or 1980 and that's the policy to which the levee was an

19  additional insured for that dredging work.

20       The newer policy is only insuring the contract work

21  being done at that time, and I'm told that the newer work had

22  nothing to do with the levee failure.  So they wouldn't be able

23  to assign any liability to that contract.

24  Q.   So are you satisfied, Mr. Ligeros -- we asked you to look

25  into this additional insured issue, didn't we, as part of your

1    effort to try to, as you say, expand coverage?

2    **A.**    You did.  I started way before.  We were trying to find

3    coverage, and this was one of the avenues we went to, and it

4    just wasn't there.

5    **Q.**    Are you satisfied now, having done everything you have

6    done and looked at everything you have looked at, that there's

7    simply no coverage afforded to the plaintiffs' claims in this

8    case through an argument that the levee districts may have been

9    additional insureds under policies issued to other entities?

10   **A.**    Yes, in this context:  I think that, like I said, if you

11   can bring these named insureds back in, Boh Bros. and the

12   contractors, there could be coverage, but not for the levee.

13   **Q.**    There would be coverage for Boh Bros., etc., but not for

14   the levee district?

15   **A.**    Correct.

16   **Q.**    Now, let's look at the third-party liability.

17              **THE COURT:**  Just to explain that a little bit more,

18   you're saying it's conceivable that if this Court had not

19   dismissed the contractors and the engineers based on the

20   Louisiana preemption statute and if Boh Bros. was a defendant,

21   it's conceivable that the policy issued for the year 1980 -- we

22   are speaking hypothetically.

23              **THE WITNESS:**  Correct.

24              **THE COURT:**  -- could provide, the way the policy

25   language is couched, Boh Bros. with coverage if the occurrence

1  was in 2005?

2         THE WITNESS:  Yes.  And the reason for that is the

3  occurrence could be that work back then, but there was also

4  property damage back then.  So the policies provide coverage

5  for damages because of property damage.  So each year that that

6  property damage continued on, while initially the coverage

7  would run to the levee district, eventually it resulted in

8  this.  You could even argue the coverage all the way along the

9  way was triggered and then it would become an allocation.

10         THE COURT:  So that would be an argument, it's

11  conceivable that it would occur?

12         THE WITNESS:  Yes.

13         THE COURT:  You're saying it doesn't apply to the

14  levee district as an additional insured because?

15         THE WITNESS:  Because the additional insured status

16  of the levee district ends when the contract is completed or

17  when that policy period ends.  The only way that the levee

18  district has coverage is when it's added as an additional

19  insured --

20         THE COURT:  The additional insured status is tied

21  to -- inextricably intertwined with the contract?

22         THE WITNESS:  Yes, sir.

23  BY MR. MEUNIER:

24  Q.   So when the contract ends, the AI coverage in effect ends?

25  A.   And/or the policy.  With the policy, unless you have an

1  added continuous completed operations coverage or whatever,

2  it's over.

3          **MR. MEUNIER:**  If I may erase this, I would like to

4  use the board.

5          **THE COURT:**  You may.  Is there any objection to him

6  erasing the board?  Go ahead.

7  **BY MR. MEUNIER:**

8  **Q.**  I want to now look, Mr. Ligeros, at the third-party

9  liability policies that you have studied that were issued

10  directly to the three settling levee districts.  Let's begin

11  with the Lake Borgne Basin Levee District.  What do you find to

12  be the maximum available limits of coverage under the St. Paul

13  policy issued to that levee district?

14  **A.**  On this policy there's $1 million per occurrence, and so

15  with two occurrences you would get maximum limits $2 million.

16  The aggregate on the policy was $2 million.  With both

17  occurrences triggered, you would get the full amount.

18  **Q.**  So all of plaintiffs' claims collectively brought in this

19  case with respect to the Lake Borgne Levee District would meet

20  a maximum or cap in insurance coverage of $2 million and no

21  more; is that true?

22  **A.**  That's true, and that's very standard terminology, yes.

23  **Q.**  What do you find from a review of the policies issued to

24  the East Jefferson Levee District?

25  **A.**  The same type of coverage; however, there's no $2 million

1   aggregate.  It's $1 million per occurrence and in the
2   aggregate.  Therefore, regardless of the number of claimants,
3   your aggregate limit is $1 million under that policy.
4   **Q.**   $1 million on the primary policy?
5   **A.**   Yes, sir.
6         **THE COURT:**  Regardless of the number of occurrences,
7   in essence?
8         **THE WITNESS:**  Occurrences, right.
9         **THE COURT:**  It's a $1 million policy if you have ten
10  occurrences or one?
11        **THE WITNESS:**  That's it.
12  **BY MR. MEUNIER:**
13  **Q.**   Now, is there an umbrella policy or excess policy in the
14  case of the East Jefferson Levee District?
15  **A.**   There is.
16  **Q.**   What does your analysis of that policy reveal?
17  **A.**   A $4 million aggregate limit for all claims.  For all
18  coverages.
19  **Q.**   So again regardless of the number of occurrences, the
20  plaintiff class claims would be limited in regard to the East
21  Jefferson Levee District, in terms of insurance, to a total of
22  $5 million; true?
23  **A.**   Correct.
24  **Q.**   Now, let's talk about the Orleans Levee District.  Here
25  again is there both a primary and an excess or umbrella policy?

1  **A.**    There is.

2  **Q.**    By the way, all these policies that you have looked at

3  third-party liability policies issued directly to the levee

4  districts, are from the same insurer, St. Paul?

5  **A.**    That's correct.

6  **Q.**    What is the limit for the Orleans Levee District primary

7  policy?

8  **A.**    The limit is $1 million in the aggregate for all claims,

9  but they have added to this policy an endorsement that says

10  that that general limit will apply separately to each premises.

11  So depending on how the Court rules, if there's one premises,

12  it's going to be $1 million; if there are three premises, it

13  will be $3 million.

14          **THE COURT:**  I understand that's one of the bones of

15  contention here.  There are sure to be more, but that's one.

16  **BY MR. MEUNIER:**

17  **Q.**    So in the case of the Orleans Levee District's primary

18  policy from St. Paul, the limits of coverage are either

19  $1 million if the Court determines there's only one insured

20  premises or $3 million if the Court determines there were three

21  insured premises; is that correct?

22  **A.**    That's correct.

23  **Q.**    What about the excess policy issued to the Orleans Levee

24  District?

25  **A.**    The excess policy provided $9 million in the aggregate.

1  **Q.**    So the total coverage that would be available under the
2  combined primary and excess policies issued to the Orleans
3  Levee District would either be $10 million or $12 million
4  depending on the Court's finding as to the number of premises
5  for purposes of primary coverage; correct?
6  **A.**    Correct.
7  **Q.**    So looking at the combined limits of coverage from the
8  three settling levee districts in this case, have you concluded
9  that the total available insurance proceeds under these
10 policies is either $17 million or $19 million, again depending
11 on the number of premises for purposes of the Orleans Levee
12 District primary policy?
13 **A.**    Yes.  For the levee districts, yes.
14 **Q.**    Are you satisfied, Mr. Ligeros, that you have considered
15 all realistic and possible practical arguments that the
16 plaintiffs could make in order to try and exceed the amount of
17 coverage available under these policies?
18 **A.**    I have asked every question that I can imagine and I
19 looked at every possible way to go after additional coverage.
20 I really did.
21 **Q.**    So it's either $17 million, period, end of story?
22 **A.**    Or $19 million.
23 **Q.**    I'm sorry.  $17 million or $19 million; correct?
24 **A.**    Right.  Again, I'm separating the levee district policies
25 from all those other ones.

1     **MR. MEUNIER:**  Thank you, sir.  No further questions.

2     **THE COURT:**  Mr. Hubbard.

3                          **CROSS-EXAMINATION**

4  BY MR. HUBBARD:

5  **Q.**   Good afternoon, Mr. Ligeros.  I'm Ralph Hubbard for

6  St. Paul.

7  **A.**   Good afternoon.

8  **Q.**   I just want to clarify one point because Judge Duval asked

9  you some questions about the Boh Bros. and dredging scenario

10 that you had described.

11           Am I not correct, when you first started talking

12 about that example, you said that Boh Bros. may have had a

13 policy in -- you said 1980, but let's say 1990.  Mr. Meunier

14 said that's when the dredging took place.

15           **MR. HUBBARD:**  Right, Jerry?

16           **MR. MEUNIER:**  Yes, in the '90s.

17 BY MR. HUBBARD:

18 **Q.**   The policy that Boh Bros. would have had in place whereby

19 the Orleans Levee District might have been an additional

20 insured would have been an occurrence-based policy; right?

21 **A.**   Correct.

22 **Q.**   Those policies, certainly in the '80s and '90s, provide

23 that the property -- in order to be covered under the policy,

24 the bodily injury or property damage must take place during the

25 policy period; isn't that correct?

1   A.   Correct.

2   Q.   So that the policy that you are referring to in 1980 or

3   1990 would not be applicable to the claims today because here

4   the levee breaches occurred in 2005?

5   A.   If we are talking about Boh Bros. and not the levee

6   districts, there is an argument to be made that property damage

7   that took place in 1990 was ongoing, so all damages because of

8   that property damage are what are covered.  So those damages

9   that would have taken place in 1990 would be covered under that

10  policy, and then each policy down the road would be triggered,

11  but those coverages would apply only to the levee.

12          THE COURT:  So there would have to be proof there

13  was, according to your testimony, a continuum of damage

14  throughout until the ultimate major occurrence?

15          THE WITNESS:  Correct.  Correct.

16  BY MR. HUBBARD:

17  Q.   What you're saying is that those would only apply to

18  damages that were claimed by the levee districts to its own

19  property?

20  A.   Exactly.  Well, against Boh Bros.  However, to the extent

21  that you can show a continuum all the way down the line of

22  damages because of 1980 -- 1981 are damages because of 1980 and

23  so on, then it becomes you are definitely going to trigger the

24  2005 policy.  The question is one now of allocation:  How much

25  damage can you attribute to each of those other years that

1    caused the damage in 2005?  It would probably not be much,

2    quite honestly.

3              So it would be the levee's coverage would turn around

4    and be assigned to the claimants, but I think the bulk of the

5    coverage would come from the later policy, the 2005 policy.

6    **Q.**   The damages that you're talking about are claims that the

7    Orleans Levee District could make against Boh Bros. for having

8    damaged its levees; right?

9    **A.**   Right.

10   **Q.**   Let me just clarify this.  You're not talking about

11   coverage under the 1990 policy for a person who is a member of

12   this class whose house was flooded and who suffered either

13   bodily injury or property damage in 2005.  You're not

14   suggesting that a 1990 policy, which would say that a third

15   party had to incur bodily injury or property damage during the

16   policy period -- you're not saying that policy would apply, are

17   you?

18   **A.**   I think there are some arguments that are going to be made

19   because if -- the policies covered damages because of property

20   damage.  So if in 1990 you had damages, all damages because of

21   that damage are going to be arguably covered.

22             **THE COURT:**  I understand his testimony, Counsel, and

23   I think I appreciate what he is saying.  He is saying it's

24   conceivable there could be coverage, just as I asked, but he is

25   testifying -- and we have people who may question him and then

1    file briefs, but he is saying it doesn't provide coverage to
2    the levee district by virtue of the contract or additional
3    insured status.  So the only way this issue, according to his
4    testimony, would occur is if Boh Bros. is placed back into the
5    case.  That sounds like what he is saying.
6              **THE WITNESS:**  Yes.
7              **THE COURT:**  Whether he is right or not, for purposes
8    of this hearing right now, Boh Bros. isn't back, but I
9    understand.
10   **BY MR. HUBBARD:**
11   **Q.**   For the purposes of this record, you would agree that the
12   insurance policies that you're talking about would provide that
13   the bodily injury or property damage that is claimed by a third
14   party has to occur during the policy period; isn't that
15   correct?
16   **A.**   Correct.  I understand what you're saying, and I am
17   agreeing with you in part, but I'm just saying there's a legal
18   argument that could be made.  I don't know that it's practical,
19   but --
20             **THE COURT:**  I understand.  I don't think we are --
21             **MR. MEUNIER:**  Your Honor, we will stipulate that none
22   of this really will be sought to be invoked later if we get
23   into a dispute about Boh Bros.  The real question is:  There is
24   no additional insured --
25             **THE COURT:**  I realize we may be concerned if the

1   Fifth Circuit reverses my ruling, then -- well, we'll have this
2   argument.
3           **MR. HUBBARD:**  We'll have a discussion.
4           **THE COURT:**  Either before me -- or hopefully someone
5   else -- you'll have this argument again.
6           **MR. HUBBARD:**  No further questions.
7           **THE COURT:**  I understand his testimony.
8                         **CROSS-EXAMINATION**
9   BY MR. KIRKPATRICK:
10  **Q.**   Hello, Mr. Ligeros.  I'm Mike Kirkpatrick.
11  **A.**   Good afternoon.
12  **Q.**   Mr. Ligeros, these policies from St. Paul we have been
13  discussing here, if there's no settlement for the limits of
14  those policies, will St. Paul continue to incur costs of
15  defense on behalf of their insured levee districts?
16  **A.**   It should.
17  **Q.**   Is there any sort of cap on the amount of liability for
18  defense costs they could incur?
19  **A.**   No.
20  **Q.**   Can you estimate for us how much the cost of defense in a
21  case of this nature might be.
22  **A.**   Far in excess of the limits of the policy.
23          **THE COURT:**  The Court will take judicial notice of
24  that.  In this case, I'm sure that's true.
25

1    **BY MR. KIRKPATRICK:**

2    **Q.**   Mr. Ligeros, were there any policies that you had reason

3    to believe might exist but that you were unable to examine

4    because you just couldn't put your hands on the policy?

5    **A.**   No.  I mean, there was an umbrella policy that didn't

6    exist for -- I believe it was Lake Borgne.  Everybody had one

7    but them, but I asked about it.  Apparently there is not one.

8    **Q.**   Now, we talked about these third-party policies.  I'm

9    wondering:  Did you take a look at any of the first-party

10   policies?  In other words, did you look at whether the levee

11   districts were insured and could collect damages for the losses

12   they suffered to the marinas, the airport, the casino, those

13   sorts of things?

14   **A.**   I did not analyze the policies; but having looked at them,

15   I'm sure they could.  I'm sure they did.

16   **Q.**   Do you have any estimate of the amounts of recovery that

17   the levee districts may have enjoyed from those first-party

18   policies?

19   **A.**   I did not do a total, no.

20   **Q.**   Are those first-party policies included within the 59 or

21   so insurance policies that have been admitted in evidence here?

22   **A.**   Yes, sir.

23            **MR. KIRKPATRICK:**  Thank you, sir.

24            **THE COURT:**  Thank you, sir.

25                Mr. Irvin, anything?

1        **MR. IRVIN:**  Just a few.

2                    **CROSS-EXAMINATION**

3  **BY MR. IRVIN:**

4  **Q.**  Mr. Ligeros, I'm James Irvin representing some of the

5  objecting plaintiffs.

6        You were retained in early 2008, you say?

7  **A.**  Or late 2007.  I'm not 100 percent sure, but it was either

8  late 2007 or early 2008.

9  **Q.**  Did you have an engagement letter from anybody?

10  **A.**  I have my own engagement letter I sent to them, yes, sir.

11  **Q.**  Do you have a letter from anybody instructing you what to

12  do?

13  **A.**  No.  From the outset, most of the correspondence was from

14  me to Mr. Bruno's office asking questions and trying to get

15  information as to the policies, the contracts, things of that

16  nature, because that's basically what I was told my job was,

17  was to find out what was there, and I just asked what I thought

18  was relevant.

19  **Q.**  Whom did you ask?

20  **A.**  Mr. Bruno.  I worked with Rob Warren a lot and Joe Bruno

21  both.

22  **Q.**  Rob who?

23  **A.**  Warren.

24  **Q.**  Who is that?

25        **MR. MEUNIER:**  For the record, he is a member of

1    Mr. Bruno's staff.  He's with Joe Bruno's law office.

2              **THE COURT:**  W-A-R-N-E-R?

3              **THE WITNESS:**  W-A-R-R-E-N.

4              **THE COURT:**  Warren.  I'm sorry.

5    **BY MR. IRVIN:**

6    **Q.**   Did you interview anybody with any of the levee boards?

7    **A.**   No, sir.

8    **Q.**   When did you finish your work?

9    **A.**   Last week.

10   **Q.**   March 30?

11   **A.**   Yes.

12   **Q.**   Did you actually see the Boh Bros. CGL policies that named

13   the Orleans levee board as an additional insured?

14   **A.**   I saw the newer policies.  I didn't see the older ones.

15   **Q.**   What was the latest one you saw?

16   **A.**   I believe they were 2005 and 2006, during the period of

17   Katrina.

18   **Q.**   Did you ask for the earlier ones?

19   **A.**   All along I had asked for everything.  My understanding is

20   these things were being located.  That's all I was given.  I

21   was not given the older ones.  And, yes, I asked for

22   everything.

23   **Q.**   So your testimony today is not based on what's in those

24   policies, but what you would have expected to see in those

25   policies?

1  **A.**   Well, yeah.  I have looked at -- I can tell you pretty

2  much with certainty that's what these policies would say.

3  These are umbrella policies.  They are CGL policies.  What

4  you're going to find there is pretty standard stuff.  The only

5  thing you could find would be endorsements excluding coverage

6  and things of that nature.  I believe there would have been

7  additional insured status for each contract and things of that

8  nature.

9  **Q.**   Did you ask for any certificates of insurance for those

10  earlier years?

11  **A.**   I was provided with some certificates, but again not those

12  earlier years.  Again, the certificates probably wouldn't help

13  as much, at the end of the day, unless they specified that they

14  had been added as an additional insured.  It's the policies and

15  the contracts that are of relevance to us in the analysis.

16          **THE COURT:**  Can I ask a question to the levee

17  districts:  Do you have copies of those older policies?

18          **MR. ANZELMO:**  The older policies of Boh Bros.,

19  Your Honor?

20          **THE COURT:**  Yes.

21          **MR. ANZELMO:**  No, we didn't have those.

22          **THE COURT:**  Just checking.

23          **MR. ANZELMO:**  I believe Boh was asked during the

24  course of the proceedings to produce their policies.

25          **THE COURT:**  Okay.  I'm just curious.  Go ahead, sir.

1   **BY MR. IRVIN:**

2   **Q.**   On the Orleans Levee District policy, there's a

3   possibility that the $1 million primary coverage would be

4   tripled depending on the number of premises available?

5   **A.**   Yes, sir.

6   **Q.**   Does that possibility also exist for the umbrella?

7   **A.**   No.

8   **Q.**   Why not?

9   **A.**   Well, the umbrella has an aggregate limit on it and that's

10   as far as you are going to go.  It will not give you anything

11   beyond that limit.

12        **MR. IRVIN:**  Thank you very much.

13        **THE WITNESS:**  Thank you.

14        **THE COURT:**  Mr. Meunier.

15                    **REDIRECT EXAMINATION**

16   **BY MR. MEUNIER:**

17   **Q.**   Just to clarify, Mr. Ligeros, you're basing your opinion,

18   with a reasonable degree of certainty, that there is no

19   additional insured coverage for the levee districts under those

20   earlier Boh Bros. policies that were issued back in the '80s or

21   '90s based upon extensive knowledge of what policies of that

22   nature provide; true?

23   **A.**   I'm saying there probably were additional insureds; but

24   for the reasons we discussed, the coverage wouldn't apply.

25   **Q.**   You would expect them to be identified as additional

1   insureds and that's all the certificate of insurance would lead

2   us to, but the coverage would not be there; true?

3   A.   Correct.

4   Q.   For the reasons you have mentioned?

5   A.   Correct.

6   Q.   There's no need for you to go back and read policy

7   language that you're already familiar with through the

8   standardized policies in question?

9   A.   I don't think it would change anything.

10   Q.   Since we are really focusing here, for purposes of this

11   analysis, on occurrence language and on the meaning of

12   occurrence language, when did that occurrence language become

13   standardized in the insurance industry?

14   A.   Well, it's always been there.  The term *accident* was used

15   in the 1960 policies and earlier.  In 1973, it became the term

16   *occurrence*.

17          Coverage has always been based upon property damage

18   during the policy period.  That's the distinguishing

19   characteristic between occurrence and claims-made coverage.

20   You can have an occurrence anywhere.  The occurrence can take

21   place 10 years earlier.  That's not the trigger.  It's the

22   damage during the policy period that's going to trigger the

23   policy.

24   Q.   I understand.

25          MR. MEUNIER:  Judge, in connection with the testimony

 1    of Mr. Ligeros, I would offer as -- I think it's Joint

 2    Exhibit 69 -- his written report of March 30, 2009, with all

 3    attachments.

 4             **THE COURT:**  Any objections?

 5             **MR. HUBBARD:**  No objection.

 6             **MR. KIRKPATRICK:**  No objection, Your Honor.

 7             **THE COURT:**  Let it be admitted.

 8             **MR. MEUNIER:**  I think the witness may be excused.

 9             **THE COURT:**  Yes, you may.

10                  Who is up next?  Who is on deck?

11             **MR. MEUNIER:**  I think we are going to do Mr. Bruno.

12             **THE COURT:**  Mr. Roy.

13             **MR. ROY:**  Yes, Your Honor.  Jim Roy.  I will be

14    questioning Mr. Bruno.  We need our technical guy to come up.

15    We have three slides to use, Your Honor.  That is Mr. Rob

16    Warren, W-A-R-R-E-N.

17             (WHEREUPON **Joseph M. Bruno**, having been duly sworn,

18    testified as follows.)

19             **THE DEPUTY CLERK:**  Please state your full name for

20    the record.

21             **THE WITNESS:**  Joseph Michael Bruno.

22             **MR. ROY:**  Judge, we are not going to get to the

23    demonstratives until a little bit later, so we can go ahead and

24    start.

25             **THE COURT:**  All right.

1    **MR. ROY:**  If we still have a problem when we get to

2    them, I may need to ask you for a five-minute break.

3                    **DIRECT EXAMINATION**

4    BY MR. ROY:

5    **Q.**   Mr. Bruno, give us your full name, your occupation,

6    something about your experience and significant class action

7    work.

8    **A.**   My name is Joseph Michael Bruno.  I have been practicing

9    law for 30 and 1/2 years.  During my time as an attorney, I

10   have handled a great number of complex litigation, beginning

11   with civil rights class actions back in 1979, moving to toxic

12   torts, including silicosis claims, particularly with regard to

13   the insurance issues that relate to exposures to toxins over

14   time, moving to a variety of explosions and mass class actions.

15          The Norco explosion that occurred in 1988.  The *NOTX*

16   litigation that occurred in '87.  The *Shell* case settled for

17   $172 million.  The *NOTX* litigation resulted in a $3.5 billion

18   judgment.  We went from there to the *Gaylord* litigation, which

19   resulted in a $92 million judgment.  From there we went to the

20   *Scott* litigation, which resulted in a half-billion-dollar

21   judgment against the cigarette industry for the fraudulent sale

22   of cigarettes, which unfortunately is still on appeal.

23   **Q.**   You have been involved, actually, since immediately

24   following Katrina in the preparation, filing, and prosecution

25   of various class actions arising out of Katrina, including but

1   not limited to the levee master class action complaint, the

2   MRGO class action complaint, and the *Robinson* test case

3   complaint in MRGO; is that right?

4   **A.**   Yes, that's true.  Ever since September 2, 2005, when I

5   heard Colonel Strock tell the world via radio interview that

6   they knew the levees would fail if the water went over the top,

7   I felt compelled to do something, however little it may have

8   been, about this debacle.

9   **Q.**   You were appointed by this Court, in fact, Judge Duval, as

10   the overall plaintiff liaison counsel in the *In Re: Katrina*

11   umbrella; correct?

12   **A.**   Yes.  I have been privileged and honored to serve the

13   Court.

14   **Q.**   As such, you have served with Mr. Meunier, who was also

15   appointed by the Court as the levee PSLC plaintiff liaison.

16   You have served on his levee PSLC in the prosecution of the

17   levee master class; correct?

18   **A.**   That's correct.  Just for the record, if nothing else, all

19   of the cases that resulted or had something to do with levee

20   breach were sent to, unfortunately, Judge Duval for resolution.

21   As those cases came in, it became apparent that they needed to

22   be categorized by type.

23          So we had a category for levee, which I'll show you

24   on the map refers to a certain area of the city; cases that we

25   refer to as MRGO referring to another geographic area of the

1  city; cases that referred to the insurance issues; as well as

2  responder issues; barge issues; and I think dredging issues.

3  There may have been some more categories, but we have a variety

4  of categories of cases in order to assist the Court.

5          **THE COURT:**  You may have forgotten contractors and

6  engineers.

7          **THE WITNESS:**  Yeah, right.  There was an attempt to

8  categorize these things to assist the Court and its personnel

9  in knowing what we're talking about on any particular day as

10  relates to this *In Re: Katrina*.

11  **BY MR. ROY:**

12  **Q.**   To the point at hand, you also served on the MRGO PSLC

13  liaison committee, of which I was appointed by the Judge as

14  plaintiff liaison in the prosecution of that master class

15  complaint and *Robinson* test case; correct?

16  **A.**   That's correct.

17  **Q.**   It was these two master classes in particular in which the

18  discovery -- within the *In Re: Katrina* umbrella in which the

19  levee board, at least the ones present today, the settling

20  defendants, were involved in part; correct?

21  **A.**   That's correct.

22  **Q.**   There were, in fact, other defendants within this

23  litigation that we started with, and I would like for you to

24  tell the Court about the evolution of that briefly and who we

25  are left with now and why.

1  **A.**    Do we have the map yet by any chance?

2  **Q.**    It's coming.  If you can just refer to the map.

3  **A.**    Let me try it this way, Judge.

4         **THE COURT:**  Do we have a technical issue?  Can we

5  help you with it?

6         **MR. ROY:**  Do you want A, B, or C, Joe?

7         **THE WITNESS:**  A.

8         **THE COURT:**  We are not getting the big screen for

9  some reason, which I would like so everybody can see.  I'm

10  trying to get the big screen so everybody can see it.  Is the

11  plasma screen working?  It's not working.

12         **THE WITNESS:**  There you go.

13         **THE COURT:**  We have it.  Thank you, Sheena.

14         **THE WITNESS:**  I learned a new word, Judge, in

15  connection with this litigation, as we always do, and that word

16  is *polder*.

17         The Dutch call a bowl formed by geography as a

18  polder.  The New Orleans area had three large polders, and

19  within one of those polders there are three smaller polders.

20  If we start with New Orleans East, that is itself a polder and

21  that's because it is surrounded by a levee.  It becomes a bowl.

22         The second polder --

23         **THE COURT:**  If you want to mark on that for any

24  reason, I think it will show up there.  You can use the stylus

25  if you want to mark on that.

1          **THE WITNESS:**  This is great.  I have shown with the

2     stylus here New Orleans East as one of the polders.  As I said,

3     the reason why it's a polder is because it's completely

4     surrounded by a levee and all the land within the levee is

5     lower than the crest of the levee.

6               The second polder is here.  That is the

7     St. Bernard/Lower Ninth polder.  It is also surrounded

8     completely by a levee all along 40 Arpent Canal going to down

9     here to where the levees are all here.  That is the second

10    polder.

11              The third polder is the New Orleans central

12    unit, as you can see here, and it's divided into a polder here,

13    here, and there.

14              Now, in evaluating how to proceed with

15    litigation, obviously the first thing we had to consider was

16    whether we were going to file an individual lawsuit or a class

17    action.  Anybody that's dealt with mass disaster understands

18    that it is almost impossible to resolve litigation like this

19    without at least seeking the Court's approval to make it a

20    class action.

21              So that being the criteria, it became important

22    for us to understand what were the common elements within each

23    of these potential class actions.  It was obvious that if we

24    had an area that was affected by floodwater and the cause of

25    that floodwater was common to everybody, then we would then

1    make that one of the class actions.

2              So the first class action we filed was the class

3    action that regards the New Orleans polder.  That's this one

4    here.  We sued as defendants there, first of all, the

5    United States Army Corps of Engineers.

6              As all plaintiffs do, we attempted to identify

7    all of the potential defendants who may be responsible for the

8    waters that entered that polder.  That included the New Orleans

9    levee board, the East Jefferson levee board, the New Orleans

10   Sewerage and Water Board, a variety of architects and

11   engineers.  I may not recall all of them, but the principal

12   ones were Modjeski and Masters, Eustis Engineering.  There was

13   another engineering firm that worked on the London Avenue Canal

14   whose name I have forgotten.  There was a construction company

15   named Pittman or C.R. Pittman that did some work at the 17th

16   Street Canal.

17             At that time we didn't have a lot of information

18   about the facts, so the idea was to identify all possible

19   defendants so that we could understand the cause of the

20   flooding and make further determinations as to how to proceed.

21             On the levee side of the case, we were almost

22   immediately met with a prescription -- I'm sorry, preemption

23   issues by the engineers and the architects because, under

24   Louisiana law, if the damages occur, after seven years they

25   have the right to assert a preemption.  Motions were filed,

1    arguments were held, and Judge Duval determined that those

2    motions had merit.  He dismissed Boh Bros., Eustis, Modjeski,

3    and the other engineers.

4                   That left the levee boards in that central unit.

5    That'd be the East Jefferson Levee District and the Orleans

6    Levee District and the Sewerage and Water Board.  We understood

7    from the beginning that the Sewerage and Water Board had no

8    insurance, and we also understood that their assets were not

9    subject to seizure, but there were -- I hesitate to go further

10   because the litigation is still active in state court, but

11   there were some strategic and tactical reasons why I felt it

12   appropriate to make them a party defendant in the case.  I

13   thought that they could be a material help with regard to our

14   claims against the Corps.

15                  We have since met as a group and decided to

16   voluntarily dismiss the Sewerage and Water Board in favor of

17   the action pending against that entity in state court.  The

18   Sewerage and Water Board asked for an opportunity to file

19   dispositive motions, which I thought was only fair.  Those

20   motions have been heard and are presently pending before

21   Judge Duval.

22                  Now, other lawyers filed lawsuits close to or

23   after we filed our class action.  Those lawyers felt that there

24   may have been some liability with regard to the New Orleans

25   Public Belt Railroad.  I didn't, frankly, see it, but because

1    of my role as liaison counsel and because of the orders of the

2    Court which required us to file a supplemental amending master

3    class action, we subsumed all of the claims that were made in

4    the various different class actions and lawsuits.  So the

5    Public Belt Railroad became a defendant in the case as well as

6    the CSX Railroad.

7                     That regarded allegations resulting from a

8    railroad train that had run into a floodgate that was owned

9    by -- that was one of the flood protection gates.  It turned

10   out that CSX wasn't the railroad that ran into it, so they were

11   dismissed.  The Public Belt was the culprit, but the Public

12   Belt had paid all of the sums necessary to make the repairs.

13   So there is a motion pending by the Public Belt for dismissal

14   as well.

15                     Moving to the other side, which would be the

16   New Orleans East polder and the St. Bernard polder, there had

17   been a lawsuit filed back in the early '70s which suggested

18   that the MRGO was responsible for flooding in those areas.

19   Upon further examination and some initial discussions with our

20   experts, we felt like that was probably a pretty good claim, so

21   we filed a lawsuit against, again, the Army Corps of Engineers

22   alleging that the MRGO was the cause of flooding.

23                     But because it was our job to ferret out all of

24   the possible defendants, we also sued the Orleans Levee

25   District as the local sponsor of the levees around New Orleans

1   East and the Lower Ninth Ward and the Lake Borgne Levee

2   District, which was the local sponsor for the MRGO levees.

3             We also sued a variety of contractors who had

4   done some work in or around some of these breaks.  I neglected

5   to mention that on the levee side.  Those were dismissed

6   voluntarily because we felt like they didn't really have any

7   responsibility for the breaks.

8             On the MRGO side, the evidence seemed pretty,

9   pretty clear that Washington Group International was

10  responsible for some of the -- at least partially responsible

11  for the breaks at the Upper or Lower Ninth Ward, so we sued

12  them as well.  Judge Duval granted their motion to dismiss on

13  government contractor's immunity, so they are out of the case.

14            So the only defendants left on the MRGO side of

15  the case are currently the Lake Borgne Levee District, Orleans

16  Levee District, and the Corps of Engineers.  As you indicated,

17  we go to trial on our test case on April 20.

18  BY MR. ROY:

19  Q.   Thank you.  Now, in connection with various cases, would

20  you describe to the Court the nature and extent of discovery,

21  both formal and informal -- including representations that

22  negotiation has gotten the defendants here today to give

23  written representations concerning -- that in your mind

24  provided adequate due diligence and overview to recommend this

25  settlement to the Court.

1   **A.**   Of course.  Well, we did extensive discovery directly with

2   each of the levee boards.  Go on to the next slide.  We did

3   extensive discovery and received thousands of documents from

4   the New Orleans levee board.

5          **MR. ROY:**  Just for the record, Your Honor, since I

6   will be introducing these, the map we were just looking at I'm

7   going to mark as Exhibit 70 and offer and introduce it into

8   evidence.

9          **THE COURT:**  Any objection?  No objection.  Let it be

10  admitted.

11         **THE WITNESS:**  This is just another map showing the

12  same areas, but it has the neighborhoods broken down.  You can

13  see the 17th Street Canal, London Avenue, and Orleans Canal on

14  there as well.

15             Judge, we requested and received thousands and

16  thousands of documents from each of the three levee districts,

17  we received thousands of documents from the Sewerage and Water

18  Board, and we received a monumental number of documents from

19  the United States Army Corps of Engineers.

20             The reason why, of course, all of that is

21  relevant is because we attempted to understand, to the extent

22  that we could, what was the cause of each of the breaches and

23  how did that relate to our theories of recovery.

24         **THE COURT:**  I'm not sure why that keeps -- right now

25  it will be a distraction.

1        **THE WITNESS:**  If it's distracting, go to the next

2   slide.

3        **THE COURT:**  I interrupted your testimony.  You were

4   talking about the number of documents you had received.

5        **THE WITNESS:**  This is the final one.  This is a good

6   one for everybody to see exactly where the levee breaks are.

7   It gives us a sense of these polders.

8             Real quickly, you can see the light colors are

9   the boundaries of each of the polders within the larger polder,

10  together with the New Orleans East and St. Bernard polder.

11            The point is that we evaluated the documents.

12  We began our discovery.  We took many depositions.  We hired

13  experts.  We did just an incredible amount of work in order to

14  understand the causes of the breaks at the 17th Street Canal,

15  the London Avenue Canal, the Lower Ninth Ward breaks on both

16  the east and west side, and the breaks at Reach 2.  We came to

17  various conclusions as to the causes of each of those breaches

18  and as to who the culpable parties are.

19        **MR. ROY:**  We'll mark this as Exhibit 72, Your Honor,

20  and offer, introduce, and file it into evidence.

21        **THE COURT:**  Hearing no objection, let it be admitted.

22  Thank you.

23  **BY MR. ROY:**

24  **Q.**   Mr. Bruno, just so we are clear -- because I'm going to

25  ultimately ask you to talk about the three different geographic

1   areas of the subclasses -- this Exhibit 72, in fact, shows the
2   Jefferson Parish line at Orleans; correct?
3   A.   That's right.  I could mark it right here.
4            THE COURT:  Why don't you do that.
5            THE WITNESS:  Right.
6   BY MR. ROY:
7   Q.   So the area to the left of the Jefferson Parish line
8   that's marked with any of these, for lack of a better word,
9   flood colors representing water that rose in those areas --
10  A.   Right.
11  Q.   -- that would be at least part, on this map, of the
12  subclass that would have the ability -- should the Judge
13  approve this settlement and certify the settlement class, this
14  would be the East Jefferson subclass that would be able to
15  access -- either through benefit or actual distribution,
16  depending on the discretion of the Court and its order -- those
17  insurance policies attributable to that levee board?
18  A.   Well, to be very specific, the folks who would have a
19  claim against the East Jefferson Levee District would be the
20  folks who would have lived in this area here.  The reason for
21  that is our allegation against the East Jefferson Levee
22  District was, such as it is, that they didn't sufficiently
23  oppose the Corps in moving from the barrier plan to the
24  high-level plan and that they didn't sufficiently oppose the
25  Sewerage and Water Board's request for a dredging permit back

1   in 1979 to dredge the bottom of that 17th Street Canal.  So the

2   damages that flow from those allegations would be those damages

3   that were sustained as a result of the overflow of the 17th

4   Street Canal.

5   **Q.**   So a claimant who can establish damage caused by the

6   levees under the jurisdiction of the East Jefferson levee board

7   would be able to tap the benefit or whatever the Court does, if

8   it's a distribution, from that pool of money within the

9   settlement?

10  **A.**   That's correct.

11  **Q.**   The same analogy would be for the residents of

12  Orleans Parish who sustained damage as a result of the Orleans

13  levee board?

14  **A.**   The Orleans levee board is somewhat more difficult because

15  you remember I told you about two different class actions.

16  This is where the members of one class action overlap the

17  members of another class action.  That is not the one that we

18  are seeking to certify as a settlement class.

19          These folks here have a claim against the Orleans

20  Levee District.  You can see it would be the New Orleans East

21  residents, it would be center of New Orleans, and it would be

22  the Lower Ninth Ward.  It obviously would exclude St. Bernard

23  Parish because their claims are against the Lake Borgne Levee

24  District.

25  **Q.**   Then the third, that is, the Lake Borgne Levee District,

1    would be strictly St. Bernard Parish?

2    **A.**    Yes.  That would be because that levee board has

3    jurisdiction over the -- well, actually, it's not entirely

4    clear that they ever did receive jurisdiction over that levee.

5    But for our purposes here, the levee that it is suggested that

6    they may have had some control over is that levee as well as

7    the 40 Arpent Levee down there.

8    **Q.**    The ultimate point is that if the Court approves this

9    settlement, in making its determination at a later date as to

10   whether to actually distribute cash out of the settlement fund

11   to claimants in the class or to establish some other benefit,

12   whatever that may be in the Court's discretion, the Court will

13   be able to objectively quantify beneficiaries from a particular

14   pot of money?

15   **A.**    Absolutely.  And benefit.

16   **Q.**    So because that is objectively quantifiable by the Court,

17   is it your opinion that the various subclasses do not need

18   individual, separate class counsel?

19   **A.**    They do not, not in my opinion.

20   **Q.**    In addition to that, under the safeguards that have been

21   provided in this proposed settlement, no benefit or

22   distribution or anything else can be determined as to the

23   nature, much less actually distributed, without further

24   evaluation of the Court and, if the recommendation of the

25   movants today is followed, upon the advice of a special master

1   he appoints to determine that?

2   A.   That's correct.  That's, frankly, the way it's always

3   done.

4   Q.   So whatever the preconceived notions of anyone in this

5   courtroom -- regardless of whether they are involved as a

6   movant or as a spectator -- as to what the relief should or

7   should not be, each of the subclasses or any member of any

8   subclass -- that decision is to be a considered decision of the

9   Court, with the assistance of his special master, at a later

10  date, making the determination of how best to utilize the

11  settlement funds for each subclass after due deliberation?

12  A.   That's correct.  Let me just say this, if I may.

13  Sometimes in the case of an attempt to resolve a case in a

14  class action through a fairness hearing we try to do the

15  allocation at the same time that we do the overall fairness.

16  Because of the nature of this case and because of the complex

17  issues involved with regard to the Court's determination of

18  whether it is a limited fund, we felt it better for the class

19  to divide up into two different components; so that at this

20  trial we could focus on the fundamental issue of whether it was

21  a limited fund and how much the fund should be, and then at a

22  later time everybody would have an opportunity to talk to the

23  Judge, tell the Judge what they think should be done, how it

24  should be allocated.  It would be a full, complete hearing on

25  that issue.

1  **Q.**   Regardless, from the get-go you and Mr. Meunier and

2  myself, as class counsel for the plaintiffs moving in this

3  case, have recommended and, in fact, signed our names to the

4  settlement that there be no attorney fees paid in connection

5  with this out of the fund; is that right?

6  **A.**   That's correct.  Let me remind you that wasn't just my

7  decision or your decision or Mr. Meunier's decision.  The

8  Court-appointed committees for the levee group and the MRGO

9  group met.  We discussed it.  It wasn't easy, but we agreed,

10 after vote, that we would make no claim for attorneys fees for

11 the obvious reasons that everyone can see.  There is

12 insufficient funds.

13         It was hard work to get here.  Don't let me suggest

14 by saying that we make no claim that one hasn't been earned or

15 that there's no merit or that we have no entitlement.  It's

16 just that, based upon all the facts, we elect not to make a

17 claim.

18 **Q.**   In reaching your decision as *In Re: Katrina* liaison

19 counsel and class counsel here today to recommend this

20 settlement to the Court, did you consider the risk attendant

21 with continuing the litigation against the settling levee

22 boards?

23 **A.**   Absolutely.

24 **Q.**   In connection with that, let me run you through a series

25 of questions here.  Whether this Court would ever, under any

1    circumstance, approve a litigation class might in and of itself
2    be problematic if this settlement didn't occur and if we
3    continued in an effort to obtain a litigation class against
4    these settling levee boards; is that correct?
5    **A.**   Well, let's start with the proposition that the defendants
6    at the table in this courtroom vehemently opposed our request
7    for class certification, and it was not anything that they were
8    going to fall over on.  That's number one.

9           Number two, we have the Fifth Circuit, and we are
10   subject to the edicts of the Fifth Circuit.  We have evaluated
11   very carefully all of the decisions that have come out of that
12   circuit.  We are painfully aware of how that court has treated
13   class actions, which include wrongful death, personal injury,
14   etc.  So we understood that we have, as the Judge would say, a
15   very high bar to overcome in order to be certified.  So, yeah,
16   absolutely, we thought about that.
17   **Q.**   I don't want to put you in the position, with ongoing
18   litigation, of saying whether you think we would or wouldn't.
19   I'm not going to ask that question.  I think it's an improper
20   question.  I don't want you to answer it.

21          I want to ask you:  Even if this Court would certify
22   the class action against these settling levee boards as a
23   litigation class, in your professional opinion would the size
24   of the pot of money available to go to these hundreds of
25   thousands of potential class members get any bigger?

1  A.    No.   That's after quite a lot of evaluation of the

2  documents, the insurance policies, hiring an expert witness,

3  evaluating the law.

4          It's perhaps fortuitous, but we have a Fifth Circuit

5  opinion that discusses this very issue.   It's the *Bohemia*

6  litigation.   The Fifth Circuit specifically said that you could

7  not seize the assets of a levee board to pay even a settlement.

8  I believe that that's even after the state legislature ordered

9  the levee boards to pay the money.

10  Q.    But even if through brilliant legal work your committees

11  and your subcommittees persuaded Your Honor over vehement

12  opposition by these distinguished lawyers to my right

13  representing the defendants -- if the Judge were to certify a

14  litigation class, the bottom line is the amount of money

15  available for settlement, roughly $17 million to $19 million

16  plus interest, isn't going to grow by a dime other than

17  increased interest potential; right?

18  A.    Absolutely not.

19  Q.    But, in fact, the net available funds to distribute -- if

20  His Honor were to certify this class and if we won against the

21  levee boards on the liability issue, in fact, the net pot would

22  go down because, in all likelihood, there would be a claim for

23  common benefit attorney fees; is that correct?

24  A.    Absolutely.   Not only that, I would have to see if I could

25  find some people to be willing to put the time and money in in

1    order to proceed on that claim based upon all that they know

2    about the fact that there's a limited fund.

3    **Q.**    Now, in fact, as a lawyer who has successfully prosecuted

4    class actions at least to settlement and a couple otherwise

5    through trial, is it fair to say that it would not be unusual

6    to seek -- and certainly ultimately up to the discretion of the

7    Court and review of higher courts, but they're certainly

8    reported attorney fees out there of 25 and 30 and 33-plus

9    percent in class action cases?

10   **A.**    39.75 percent in the *CSX* litigation in Gentilly, which was

11   a $435 million settlement.

12   **Q.**    Let's take the opposite tact.  If Judge Duval refused

13   certification of a litigation class through this settlement,

14   said, "We are not going to do it," we all proceed, he wouldn't

15   let us have a class certification of a litigation class, even

16   then, it's more problematic, isn't it?

17   **A.**    Of course.  Then we have to try cases individually or in

18   flights.  We have had this issue come up since the

19   Fifth Circuit has taken this position, and it is an extremely

20   daunting task.

21   **Q.**    Mr. Bruno, isn't it even more problematic than that

22   because the big businesses, the wealthy individuals that have

23   large damage claims that can go out and get the best lawyers,

24   would be able to go and have a race to the courthouse to see

25   who can get their judgments first and exhaust the $17 million

1   or $19 million worth of policies, leaving hundreds of thousands

2   of claimants with nothing from these three defendants?  Isn't

3   that correct?

4   **A.**   Well, that's true.  It would be an extraordinary hardship

5   on the courts as to how to deal with this so-called race to the

6   courthouse, but there would definitely be a race because there

7   would be a limited pot and you would want to get your judgment

8   and have it paid first.

9   **Q.**   In terms of complexity and likely duration of litigation

10  against the settling defendant levee boards without a

11  settlement, the factors that you would consider and things that

12  make this whole thing even more problematic, you can't just

13  address the fault of the levee boards in a vacuum, can you?

14  **A.**   No.  I would fully expect -- and it's been advised to me

15  that if we were to go to trial against the levee board for,

16  let's say, pick somebody on Marconi Avenue.  It's highly likely

17  that one of the defenses would be that the United States Army

18  Corps of Engineers, even though they are immune, are

19  responsible for the damages.  So we have what we call an

20  enormous empty chair, meaning that there would be the potential

21  that the finder of fact may determine that the levee boards, if

22  they are found at fault in the first instance, would have a

23  very small percentage of fault.

24          So the motivation for lawyers to spend money and time

25  is extremely diminished, and that's a large part of the

1    problem.  You have people who are of modest means who would be
2    totally left out of the process.
3    **Q.**   Stated differently, if you viewed each of the defendants
4    left in the MRGO master class, in the levee master class as a
5    moving part, you have to work with all the moving parts
6    simultaneously, at least consider them, and you can't just
7    ignore all the rest; right?
8    **A.**   No, you cannot.  It all works together.  Even though this
9    is a limited fund, it's not anything new.  All of us have
10   experienced cases, even with one plaintiff, where the policy of
11   insurance is $10,000 and the person's a paraplegic or you have
12   two defendants, one with a large policy or maybe large
13   liability/small liability.  This happens all the time.  So we
14   are called upon to make these kinds of decision on a routine
15   basis.  So this is nothing new to us, and I'm quite comfortable
16   that we are doing the right thing.
17   **Q.**   So not to harp on the point, but in terms of complexity
18   and likely duration, if the Judge does not approve this limited
19   fund settlement and this settlement class, in terms of
20   complexity and likely duration, if these settling defendants
21   stay in this litigation and continue to be prosecuted through
22   the MRGO and the levee master action umbrellas or otherwise,
23   then what we'll have is collectively one of the largest, most
24   complex, longest duration, with the greatest number of moving
25   parts class actions in the history of this state if not the

1   country; correct?

2   **A.**   Well, to be technical, it would be the most ridiculous,

3   complicated mass joinder because the Court would be called

4   upon, if it decided not to certify the class, to try these

5   cases one at a time.  So this Court would be trying cases until

6   the next century.

7   **Q.**   If someone were to suggest to you, Mr. Bruno, that

8   settlement negotiations with these settling defendants have not

9   been in good faith or at arms-length, what would be your

10  response?

11  **A.**   I would take that personally because, first of all, the

12  defendants weren't immediately persuaded to turn over the

13  money.  The first thing that they had to know was that we were

14  going to stay in the game; we were going to pursue them.

15          The second thing we had to do was to make sure that

16  what they represented was true; that is, the assets weren't

17  subject to seizure, which admittedly was pretty obvious.  But

18  beyond that, we had to make certain that we had all their

19  insurance policies and that we had evaluated all the coverages

20  and didn't leave any stone overturned.

21          That's why, even though we have had discussions for

22  some time and even advised the Court we have had ongoing

23  discussions, this was not an easy thing to do.  It was

24  extremely, extremely difficult.

25          We know about the extraordinary damages to this

1   community.  We know that emotions are extremely frail.  We know

2   people are upset by this.  So we wanted to make sure we did it

3   correctly.

4   Q.   Once the settling defendants' attorneys were willing to

5   tender, for lack of better words, to the Court their policy

6   limits, whatever they may be -- $17 million, $19 million,

7   whatever the Court concludes they are, plus interest -- did you

8   feel it was your duty to pull your subcommittees together and

9   recommend to the Court, for the benefit of the class, that that

10  $20 million, approximately, be removed from the bank accounts

11  of the insurance companies and, figuratively speaking, put into

12  the bank account for the benefit of the class?

13  A.   There's no question about that.  It's also consistent with

14  the strategy that any lawyer would have for obtaining a result

15  that's for the good of the class.  The litigation is not yet

16  over and, again, it's routine in a litigation.

17       You may have defendants with limited coverages, etc.,

18  etc., and you may elect, because of an overall strategy or some

19  tactic, to do these kinds of things for the benefit of the

20  class, and that's exactly what we are doing here.  In fact, I

21  think it would be irresponsible not to do this.

22  Q.   In part, irresponsible because either, A, liability being

23  ultimately proven could be problematic; right?

24  A.   Of course.  This is not a lock-cinch.  Without divulging

25  details, as I said, one thing we do know is that the Corps

1    bears an extraordinary percentage of fault in this case.

2    Q.   But there's no benefit to the class with the sum zero

3    dollars?

4    A.   There's no benefit whatsoever.

5    Q.   The only benefit by continuing and not taking the money

6    would be, as someone pointed out with Mr. Ligeros, the defense

7    lawyers -- God bless them -- would continue to get paid until

8    the bitter end?

9    A.   I really like these guys and respect them, but my sole

10   purpose in life is not to enrich them or their families.

11   Q.   Let's talk about the insurance policies.  Are you

12   satisfied professionally and personally that the subject

13   policies described today as being the universe of available

14   insurance is, in fact, just that, all of the available

15   insurance?

16   A.   Yes.  I wanted to make -- that's why I made the point a

17   few moments ago.  I'm not an insurance expert by any pretense.

18   However, I do have an extraordinary amount of experience with

19   toxic tort.

20          It so happens that these occurrence policies were at

21   the heart of it back in the day when we were filing lawsuits

22   against Avondale Shipyards for African-American sandblasters.

23   We had the issue of trying to get as much coverage as we

24   possibly could put together.  They had $25,000 policies in the

25   day.  We were able to show we could get coverage from 1965 all

1   the way to 1976 because we could demonstrate that the exposure

2   to silica caused damage at the same time that the exposure

3   occurred.

4          So we understood back then, in the context of an

5   occurrence policy, that the language required that you

6   demonstrated actual physical damage at the time that the fault

7   or the alleged misconduct of the defendant occurred.  Because

8   of all that, the policy language was changed and kind of really

9   tightened up a whole lot and moved to what we referred to as

10  these occurrence policies, which make it absolutely mandatory

11  that you are able to show that the wrongful act and the damage

12  occurs in the same year -- I'm sorry, the policy coverage is

13  triggered when the damage occurs.

14  Q.   Now, you relied upon the discovery in the various lawsuits

15  as well as the written representations of defense counsel

16  either directly to you or to Mr. Ligeros; is that correct?

17  A.   Well, that and please know that we took the 30(b)(6)

18  depositions of representatives of each of these entities.  So,

19  no, I'm not relying only on the lawyers.  I'm relying on the

20  sworn testimony of individuals appointed by each of these

21  entities with regard to insurance policies that they purchased,

22  coverages, etc.

23  Q.   The mandate you gave Mr. Ligeros was find all the

24  insurance coverage that a good-faith allegation of coverage can

25  be made because we want all that can be gotten for the class?

1  **A.**   Right.  Absolutely.  And, also, ask any question that you

2  think could possibly be asked, as insane as it may be, and let

3  me pose the question to my opponents, see what their answers

4  are, let me evaluate the facts so that I can answer those

5  questions, if I could, and after all that I concluded that this

6  is all the coverage there is.  Now, with the exception of this

7  premises thing, which we haven't touched on.

8  **Q.**   You're satisfied that the subject policies, which is the

9  $17 million to $19 million plus interest, represents the sole

10 source of funds recoverable under law from the settling

11 defendants; is that correct?

12 **A.**   Yes.

13 **Q.**   Unless, like Santa Claus, their clients would decide to

14 find more?

15 **A.**   Or write a check for a billion dollars, which I don't

16 think they are likely to do.

17 **Q.**   In your opinion, considering the various distinct polders,

18 the various distinct geographic areas of coverage of insurance,

19 and the safety factors that have been put in for later

20 proceedings in the Court, either through a special master

21 and/or through its own direct intervention, are you satisfied

22 that there are no conflicts or inequities between the

23 subclasses?

24 **A.**   There are no conflicts at all between the subclasses.

25 **Q.**   If this settlement is approved and the class certified as

1   a settlement class, will class members with previously asserted
2   claims against the Army Corps as relates to MRGO or *Robinson*
3   have those claims preserved?
4   **A.**   I would suggest that even if the claim hasn't been
5   previously presented, it is preserved because this is a class
6   action.  We have interrupted prescription.  We included here
7   everybody.
8          **THE COURT:**  I think he meant people who filed in the
9   Form 95.
10         **MR. ROY:**  That's right, Your Honor.
11  **BY MR. ROY:**
12  **Q.**   In other words, we know basically, with the exception of
13  an area of the Upper Ninth Ward, generally, that areas west of
14  the Industrial Canal the Judge has dismissed the claims against
15  the Corps of Engineers.
16  **A.**   Correct.
17  **Q.**   But on the east side plus that Upper Ninth Ward,
18  generally, area where there are still claims relative to the
19  Corps' negligence in the design, construction, operation or
20  maintenance of the MRGO, to the extent those claims remain
21  alive without the Court throwing them out or a higher court
22  throwing them out, they're still there?  This settlement does
23  not stop somebody from pursuing those claims?
24  **A.**   I'm sorry.  I misunderstood your question.  No, of course
25  not.

1  **Q.**   If the Fifth Circuit Court of Appeal or the United States
2  Supreme Court reverses Judge Duval on the levee ruling, where
3  he threw out the claims against the Corps on Flood Act
4  immunity, and they come back down, those claims are still alive
5  if this settlement is perfected against the Corps?
6  **A.**   Yeah.  The claims against any other party -- any other
7  party:  Boh Bros., Modjeski and Masters, Eustis -- all of those
8  claims are not affected in any way by this settlement.
9  **Q.**   It's been suggested by one objector that you may have
10 stated somewhere that class members will probably get nothing.
11 Mr. Bruno, do you recall having said that?
12 **A.**   No, no, no.  What I said was and the intent of what I said
13 was to -- because you have to understand.  I represent about
14 50,000 people.  I have handled about 5,000 individual homeowner
15 claims.  I may be not the most knowledgeable person, but I am
16 at least as knowledgeable as anybody else out there.  I
17 understand what these people have been through.  They are
18 destroyed.  What I wanted to make sure that they understood is
19 that there is little likelihood they would receive an
20 individual check out of the proceeds of this settlement.
21 **Q.**   Let me stop you right there.  Under this settlement
22 agreement, if Judge Duval in the second phase of these
23 proceedings -- if he certifies the class today and he approves
24 the settlement today, if in the next phase Judge Duval, after
25 consideration of input from his special master, from anybody

1  else that wants to offer up advice that he permits, if he

2  decides and finds there's 400,000 claimants and there's

3  $20 million available net to be distributed, there's nothing in

4  this settlement that precludes Judge Duval from ordering $50

5  checks being mailed to 400,000 people if that's what he finds

6  is fair and right to do; right?

7  A.    That's right.  Where we are at this stage of the

8  proceedings, we do not speak to allocation.  And, by the way,

9  we have no right to speak to allocation.  We can make

10 recommendations, but we can't make that call.

11 Q.    My point is:  Under this settlement he can do it if he

12 wants to --

13 A.    Of course.

14 Q.    -- in the next stage?

15 A.    Absolutely.

16 Q.    Likewise, if he wants to in the next stage, he might apply

17 the money that's available to go to some other benefit --

18 A.    To the class.

19 Q.    -- for each of the subclasses as he determines is proper

20 and an appellate court approves or doesn't disapprove?

21 A.    Yes.  The Judge always has that right.  But more

22 importantly, everybody in this courtroom and every class member

23 has the right to come and speak to the Judge and share his or

24 her view on that issue.

25 Q.    If somebody says they heard you say or if you wrote -- if

1   you, in fact, wrote something to the effect you don't think

2   anybody will probably get any money, if that's there, was it

3   your intent simply to say, in fact, it's not going to be a big

4   payday because it's a limited fund?

5   A.   Again, my purpose was in making certain that my clients

6   had fair and reasonable expectations.  These people are

7   desperate, and I didn't want them to believe that they might

8   get a check.  I did not mean to suggest that there was no

9   common benefit.

10  Q.   It's possible that they wouldn't get a check if the Judge

11  decides there's a better way to apply that money down the road

12  in his discretion?

13  A.   I can't imagine how -- because every claim is not equal --

14  that everybody would get a check.  In my wildest imagination, I

15  can't see how that would occur.

16  Q.   Once again, Mr. Bruno --

17  A.   It's not my call; it's the Judge's call.

18  Q.   -- if the man in the black robe decides that's what's

19  going to happen, there's nothing in this settlement that

20  precludes it; correct?

21  A.   No.  We established that.

22          MR. ROY:  Your Honor, I know I offered and introduced

23  and you accepted Exhibit 70.  I can't remember if I did 71.  If

24  I didn't, I'm doing it now, and I'm giving them to your clerk.

25          THE COURT:  Thank you, sir.  No objection.

1        **MR. ROY:**  Judge, I am reminded that I should remind
2   Mr. Bruno that there is one other area of inquiry.
3   BY MR. ROY:
4   Q.   Mr. Bruno, would you please explain why it is your opinion
5   and the opinion of class counsel that there are only three
6   premises.
7   A.   Okay.  First of all, the policy language says that the
8   aggregate limit doesn't apply to premises.  So we had to look
9   at it with reason and some degree of intelligence to ascertain
10  what that meant, how it might be applied.  I had many
11  discussions with Ralph on this point.  What are the facts?
12  Well, here are the facts.  One, the --
13        **MR. HUBBARD:**  Your Honor, I object to the testimony
14  if, to any extent, it varies from the stipulation that we have
15  entered.
16        **THE COURT:**  All right.
17        **THE WITNESS:**  It's not my intent to vary from the
18  stipulation.  I'll defer to the stipulation.
19        **THE COURT:**  If it does vary from the stipulation,
20  please advise the Court.  Have you stipulated there are, in
21  fact, a maximum of three premises?
22        **THE WITNESS:**  Yes.
23        **THE COURT:**  Mr. Roy is asking --
24        **THE WITNESS:**  He wants to know how I got there.
25        **THE COURT:**  -- why did you make that stipulation?

1          **MR. ROY:**  Yes, sir.  Thank you.

2          **THE WITNESS:**  That's what I thought I was doing.

3          **MR. ROY:**  I know.

4          **THE WITNESS:**  Again, I have to start with -- I just

5     can't pull it out of the air.  The fact of the matter is in

6     1965 the Congress of the United States passed a statute called

7     the Lake Pontchartrain and Vicinity Hurricane Protection Act.

8     With that act it empowered the Corps of Engineers to design

9     hurricane protection for the city of New Orleans.  That is the

10    congressional act from which the money comes to build the

11    levees which are now under the auspices of the Orleans Levee

12    District.

13          Again, we have talked about the fact that

14    there's one ring around New Orleans, there's one around

15    New Orleans East, and there's a half ring around the Lower

16    Ninth Ward.  The language says that it's one premises.  The

17    only thing that separates these things is a canal or a

18    waterway.

19          So as an advocate, it's important for me to

20    understand what I can do to maximize the coverage.  We talked

21    about this.  I understand and find reasonable the defendants'

22    position there's one premises because, in fact, despite that

23    there are three rings, they are divided by water.  But as an

24    advocate, to maximize coverage to the extent I can to my

25    client, which is my duty, it seemed like the contiguous rings

1    the Court might embrace as three separate premises.  That's it.

2              **MR. ROY:**  Thank you.

3                   We tender the witness, Your Honor.

4              **THE COURT:**  Thank you, sir.

5                   Mr. Hubbard, any questions from your group?

6              **MR. HUBBARD:**  I have one.

7                        **CROSS-EXAMINATION**

8    BY MR. HUBBARD:

9    **Q.**   Mr. Bruno, I just have one issue I wanted to kind of clear

10   up.  You're familiar with Washington Group International; is

11   that right?

12   **A.**   Painfully so, yes.

13   **Q.**   They were included in the MRGO side of the case?

14   **A.**   Yes.

15   **Q.**   Y'all sued them there; is that correct?

16   **A.**   Yes.

17   **Q.**   That was for their acts on the Inner Harbor Navigational

18   Canal; isn't that correct?

19   **A.**   On the east, yes.

20   **Q.**   The Inner Harbor Navigational Canal where they were

21   working -- was there any other work that you're aware of that

22   Washington Group International was doing that had anything to

23   do with levee failures?

24   **A.**   No, no.

25   **Q.**   The location on the Inner Harbor Navigational Canal where

1   WGI was working is in Orleans Parish; is that right?

2   **A.**   Yes.  It's called the EBIA, the East Bank Industrial Area.

3   It is entirely in Orleans Parish, yes.

4   **Q.**   It's within the jurisdiction of the Orleans Levee

5   District; is that right?

6   **A.**   The jurisdiction of the levee district?

7   **Q.**   I mean the Orleans Levee District extends throughout the

8   parish of New Orleans?

9   **A.**   Oh, yeah.  I thought you were -- there was a lot of

10  discussion about whether they did the work on the levee or next

11  to the levee.  I thought you were asking me that question.  The

12  work was done in Orleans Parish on the batture, so it wasn't

13  part of the levee.

14          **MR. HUBBARD:**  Thank you.  I have no further

15  questions.

16          **THE COURT:**  Thank you, sir.

17              Yes, sir.

18                    **CROSS-EXAMINATION**

19  **BY MR. KIRKPATRICK:**

20  **Q.**   Good evening, Mr. Bruno.

21  **A.**   Good evening.

22  **Q.**   Mr. Bruno, this has been expensive litigation for the

23  plaintiffs' side so far; is that right?

24  **A.**   Sure.

25  **Q.**   You testified earlier that you conducted extensive

1  discovery?

2  **MR. ROY:**  May we have a sidebar?

3  **THE COURT:**  Yes.

4  (WHEREUPON the following proceedings were held at the

5  bench.)

6  **MR. ROY:**  Thank you for indulging us with a sidebar.

7  I did not want to interject repeated objections.

8  It's my understanding that the Court granted a

9  motion to quash a subpoena regarding expenses.  When I heard

10  the word *expenses* was raised, in the context, I didn't object

11  then because they didn't go any further.  Before it went

12  further, I wanted to find out before the Court whether or not

13  it was going to permit the exploration into expenses because we

14  obviously object to that.  I wanted to raise it privately at a

15  sidebar, with all counsel here present, rather than do it in

16  open court.

17  **MR. KIRKPATRICK:**  Your Honor, if I may, Mr. Irvin

18  told me about the motion to quash and the argument there.  I

19  understand that in one respect these questions could be

20  considered premature at this stage of the litigation.  However,

21  I think these questions go to fairness, which is part of what

22  we are talking about right now and the terms of this

23  certification hearing for this reason:  In order for a

24  settlement to be fair to the class, the class must receive

25  benefit.  I think we all agree on that.  Because costs will be

1   paid and it is a very limited amount --

2          **THE COURT:**  They not necessarily will be paid; they

3   may be sought.

4          **MR. KIRKPATRICK:**  They may be and, in fact, the

5   settlement agreement calls for that.

6          **THE COURT:**  It calls for the right to seek it.

7          **MR. KIRKPATRICK:**  Yes.  I think it's important, in

8   order for us to support our arguments about fairness and value

9   and benefit to the class, to explore a little bit of how much

10  is --

11         **THE COURT:**  I'm going to let you explore a little

12  bit.  I don't want to go into how many invoices.  I'm going to

13  let him touch on it in this hearing.

14         **MR. ROY:**  Subject to our objection, simply because we

15  believe it's irrelevant.  But as I understand it from the way

16  you're looking at me, if I object, you're going to overrule me.

17         **THE COURT:**  If you said it's to the benefit of the

18  class they get $20 million to the class, it would be hard for

19  me --

20         **MR. ROY:**  If his questions are directly as to what

21  are the costs involved in any of this litigation to date --

22         **THE COURT:**  He is not prepared --

23         **MR. ROY:**  -- it's irrelevant, prejudicial to the

24  ongoing litigation by telling our opponents what's at stake.

25         **THE COURT:**  I'm going to let you go into it to some

1   degree, and I hope you contour it if you can.

2           **MR. KIRKPATRICK:**  Yes, I will.

3           **MR. ROY:**  For the record, so I don't have to stand

4   up --

5           **THE COURT:**  The objection is noted and made general.

6           **MR. HUBBARD:**  We would like to join in that because

7   we believe it's irrelevant because it's the Court that's going

8   to decide.  It's only a right to ask for it; it's not a right

9   to demand it.

10          (WHEREUPON the following proceedings were held in

11  open court.)

12  **BY MR. KIRKPATRICK:**

13  **Q.**   Mr. Bruno, you were telling us this has been expensive

14  litigation.  You testified earlier that there had been

15  extensive discovery conducted; is that right?

16  **A.**   Yes.

17  **Q.**   And that you had received thousands of documents?

18  **A.**   Yes.

19  **Q.**   What kinds of costs are associated with receiving that

20  volume of documents in terms of document control, indexing,

21  scanning or copying?  Could you give us an idea of that.

22  **A.**   It's expensive.

23  **Q.**   Could you give us a ballpark figure.

24  **A.**   A number?  I have no idea.  I have no earthly idea.  With

25  respect, it's been three and a half years, and we are entirely

1   focused on preparations for the MRGO -- I should say *Robinson*

2   trial in the next three weeks, which we hope to win, by the

3   way.  There's no way in the world that I can possibly know what

4   that outcome may be, and so I don't know at this point in time

5   whether or not we will ever make a claim for costs.

6          I do believe, though, that our work in pursuing this

7   litigation is for the benefit of the people of this community.

8   I think even getting a judgment from Judge Duval dismissing the

9   Corps of Engineers has been of enormous value to the people of

10  this community because it sends the message to the Congress

11  that the Corps of Engineers broke our levees, and they have yet

12  to acknowledge that fact and they have yet to appropriately

13  compensate the people in this community for all they have been

14  through.  So it has extraordinary value.

15         At this stage of the litigation, it would be unfair

16  for me to say what claim we make, how much it is, or any of

17  that.  I have great affection and admire Judge Duval, but I

18  hope he is reversed on the levee case.  I hope he is reversed

19  on the *WGI* case.  It may not be ever necessary for us to make

20  any claim for costs.

21  **Q.**   Mr. Bruno, not to interrupt you --

22         **THE COURT:**  Let the Court make a point that there is

23  going to be a finite time -- under the agreement as proposed,

24  if I find that there is a limited fund, there is a right to ask

25  for costs.  They also used the word *enhancement*.  I don't have

1    to give it.

2             As a practical matter, if it's too much, it

3    would be a strain to convince the Court how it benefits the

4    class.  I don't know if the motion is going to be filed, but

5    I'm eventually going to set a deadline for a motion to be filed

6    if I get to step two.  So it will be a finite time, and then

7    everybody can fight over it and go to the Court of Appeal.

8             **THE WITNESS:**  We expect that.

9             **THE COURT:**  I'm hoping there won't be any wretched

10   excess involved, from my standpoint.  I'm the final arbiter of

11   that until the Court of Appeal.

12            **MR. KIRKPATRICK:**  I appreciate that, Your Honor.

13   When we get to legal argument later today or tomorrow, I intend

14   to urge you to make some of those decisions at the first stage,

15   but we'll talk about that later.

16   **BY MR. KIRKPATRICK:**

17   **Q.**   Mr. Bruno, how many depositions have been taken in this

18   matter?

19   **A.**   In this matter?  I presume you mean the class action?

20   **Q.**   Yes, involving the three settling defendants.

21   **A.**   There is no class action involving just the three.  As I

22   indicated to you before, the class action named all of the

23   defendants that we felt were responsible for the flooding of

24   the city.

25            Now, there are two different class actions and some

1    of those depositions crossed over, but it is inappropriate to

2    suggest there is a litigation against the levee board that

3    doesn't include the Corps of Engineers.  It would be even more

4    inappropriate to suggest that this somehow is easily divisible.

5    It is not in any way divisible.

6           Particularly, the Judge will recall the arguments

7    that we made with regard to the Corps and the levee were that

8    the Corps essentially blackmailed the levee district into

9    abandoning the barrier plan and going with the high-level plan.

10   The Corps told the levee boards that they were going to have

11   gates.  The levee boards said --

12          THE COURT:  We can go on forever on this, sir.  The

13   point is a lot of depositions were taken, a lot of costs were

14   incurred, and we don't know what the plaintiffs are going to

15   seek.  If that's your point, it's well made.

16          THE WITNESS:  We concede that point.

17   BY MR. KIRKPATRICK:

18   Q.   Mr. Bruno, if I could ask you:  Should the settlement be

19   approved and should application for costs be made, how will

20   plaintiffs' counsel divide out between the depositions that

21   went to multiple lawsuits, which ones should be reimbursed out

22   of this limited fund versus what should be carried with the

23   other ongoing litigation?

24   A.   We will not make an application for the payment of a fee

25   unless we lose all the other litigation.

1            **MR. MEUNIER:**  You mean costs?

2            **THE WITNESS:**  I'm sorry.  I meant costs, Judge.

3            **THE COURT:**  Costs.

4            **THE WITNESS:**  Judge, to be fair to you and everybody

5     in the room, if the appellate process hasn't exhausted ourself,

6     then the safe thing and logical thing for us to do would be to

7     seek a set-aside, a reserve, which is normally what's done.  I

8     have done this 20 times.  Which you could, again, accept or

9     reject.  It doesn't matter.  But what that is, I have no

10    earthly idea.

11            I respect the Judge in saying he doesn't want me

12    to delay any opinion about how to expend this money because I'm

13    waiting for an appeal.  That will not happen, absolutely not

14    happen, Your Honor.  If we don't know, then we will say there

15    should be some reserve set aside.  Monies were spent.  We have

16    given up our attorneys fees.  I think we have been fair and

17    reasonable, and we propose to continue to be fair and

18    reasonable as we conduct ourselves throughout the remainder of

19    this litigation, but I point out it ain't over.

20    **BY MR. KIRKPATRICK:**

21    **Q.**   Mr. Bruno, in your experience with class action

22    settlements, you have had occasion to work with special masters

23    and Court-appointed disbursing agents?

24    **A.**   Yes, I have.

25    **Q.**   Can you estimate for us what you think the costs of a

1   special master and Court-appointed disbursing agents for this
2   settlement, if it's approved, is likely to be.
3   **A.**   That's a tough one because, you know, I think -- you know,
4   if you go to the proof-of-claim process, which may or may not
5   be -- this is going to be more difficult than most because in
6   order to ascertain those who are in the class, you truly have
7   to go through a proof-of-claim process, which itself is very
8   expensive and, yes, it could eat up a large portion -- if
9   400,000 people divided into $20 million is $50, it could cost
10  $10 per claim just to do a proof of claim.  That's true.
11          But I will tell you in my opinion -- for what it's
12  worth, and it's just my opinion -- doing a proof of claim will
13  have tremendous and important and extraordinary value to the
14  class because every time I go to Washington, D.C., I am told,
15  "We have paid you guys off.  You have no claim.  There is no
16  damage to New Orleans that remains uncompensated."
17          So to me, merely having information that I can take
18  to the Congress to say, "You know what, here's a sworn proof of
19  claim by 400,000 people.  This is how much insurance they got.
20  This is how much Road Home money they got.  This is the gap.
21  This is the unpaid claim," I think, with humility, that that
22  would be of extraordinary value to this class, very, very
23  valuable.  Because for too long we have these people who were
24  making guesses about how much money has been spent as opposed
25  to how much money has actually gotten into the pockets of the

1    people of this community who have been inundated, flooded,

2    killed, hurt, maimed, and otherwise impacted by this hurricane.

3              So that's why we have suggested to you and others

4    that this is not the time for that discussion.  I want an

5    opportunity to be heard completely as to my feelings and

6    thoughts about what is in the common benefit of the class.  I

7    would like to have a chance to make that record.  I can't do

8    that now.  I haven't been given an appropriate chance to do so.

9    I would like to do that, and I would like to give you an

10   opportunity to cross-examine me.

11             **THE COURT:**  Okay.  Move on, Counsel.

12             **MR. KIRKPATRICK:**  I'll pass the witness, Your Honor.

13             **THE COURT:**  With the understanding that I have to

14   first find out if this is a limited fund.  If it's a limited

15   fund that I have found, subject to appeal, there's only so much

16   money.  It's a question of what we do with it.

17             **MR. KIRKPATRICK:**  Thank you, Your Honor.

18             **THE COURT:**  If it's not a limited fund, then they

19   lose; there will be no certification.  No question, one reason

20   there's not much money -- if this is all correct -- is because

21   the Court has dismissed a lot of solvent defendants.  The Court

22   doesn't enjoy doing that.  Go ahead.

23                        **CROSS-EXAMINATION**

24   BY MR. IRVIN:

25   **Q.**   Good afternoon, Mr. Bruno.

1  **A.**    Good afternoon.

2  **Q.**    I would like to show you a letter -- I only have one

3  copy -- which will eventually be Exhibit 73.

4             **MR. IRVIN:**  May I hand the letter to him?

5             **THE COURT:**  By the way, when the objectors file their

6  briefs, I'm going to want you to give out in some detail what's

7  a better alternative.  I'm going to ask for a briefing

8  schedule.  What's a better alternative than this limited fund?

9  I'll give you the briefing schedule after.

10 **BY MR. IRVIN:**

11 **Q.**    Did you write that letter?

12 **A.**    I did.  It says exactly what I said it says because I say

13 here, "It is unlikely that the Court will make any distribution

14 of these funds directly to claimants."  It does not say that

15 nobody gets a benefit.

16 **Q.**    It says it's highly unlikely?

17 **A.**    That's me.  That's my opinion.  Guess what, I'm writing to

18 my own clients.  So I have to be curious about how my letters

19 get to you, but that's another subject.  But I'm writing a

20 letter to my client expressing my opinion, as their lawyer,

21 about this settlement, which I hope I have the right to do.

22 **Q.**    How many of those letters did you write?

23 **A.**    Not many.  Whoever called and asked me the question, I

24 wrote the letter.  I guess it was -- I really don't know, but

25 it wasn't more than 100.  I think it would be less than 100.

1    Many of them were e-mails.

2    **Q.**   For your edification, I received this along with the

3    written objections that I had requested from Mr. Fayard's

4    office.

5    **A.**   Okay.  That's fair.  If my client wants to give you my

6    correspondence, that's their business, not mine.

7    **Q.**   You say you took the 30(b)(6) depositions of the levee

8    boards --

9    **A.**   Yes.

10   **Q.**   -- on the insurance issue?

11   **A.**   Yes.

12   **Q.**   Did you take any other depositions to inquire about the

13   existence of other insurance that covered the levee boards?

14   **A.**   No.

15   **Q.**   Was there anything else that you did by way of

16   investigation to determine if there was other insurance

17   covering the levee boards?

18   **A.**   Certainly.  I've been in constant communication with the

19   counsel for each of the levee boards.  They have a Rule 26

20   obligation to disclose documents, you'll have to remember.  It

21   shouldn't have been necessary for me to do a 30(b)(6) because

22   the Judge ordered, I think --

23          Judge, within three months of the litigation, you

24   ordered everybody to produce all insurance policies that they

25   had that could possibly cover this action, so I had that

1    information before I took the 30(b)(6).  I took the 30(b)(6) as

2    a precautionary measure to make certain that, you know, I had

3    somebody under oath that would be different from the attorneys

4    making their representation that they had given me the

5    policies.

6    **Q.**   My question is simply:  Did you do anything else?

7    **A.**   I just told you the answer.  That would be something else.

8    I looked at all of the Rule 26 disclosures, which included a

9    mountain of paper and was, by order of the Court, supposed to

10   contain the insurance policies that these various entities

11   believed covered this event.

12   **Q.**   What, if anything, did you do to determine whether the

13   levee boards themselves could make a contribution to the

14   settlement?

15   **A.**   Well, that they could?

16   **Q.**   Yes.

17   **A.**   I would have to believe they all have charitable hearts.

18   I'm sure that they can, but that's not relevant to me at all.

19   As an attorney I have to understand what my rights and

20   obligations are in connection with representing my clients.

21          So my analysis was not whether they could charitably

22   give me money.  My analysis was whether or not -- in the event

23   that I obtained a judgment in favor of my clients, what rights

24   did I have to get that judgment paid.

25          It doesn't take a lot of evaluation to know that I

1    couldn't seize any of their property.  The only thing that I

2    had available were the insurance policies.  So as a matter of

3    law, we reached the conclusion that we could not recover beyond

4    the amount of this insurance coverage any monies from these

5    levee boards to satisfy judgments.

6    **Q.**   In your negotiations with the levee boards, did you ever

7    discuss their making a contribution not from insurance

8    proceeds?

9    **A.**   Of course.  They said no.

10   **Q.**   That was the end of it?

11   **A.**   Well, given the fact that you have, let's see, about

12   $2.5 trillion in claims made, I couldn't imagine -- I must say

13   maybe I'm wrong and maybe I'm naive, but I didn't think it

14   unreasonable for them to say, "We don't choose to make a

15   contribution to this $2 trillion claim."  No, I don't find that

16   to be unreasonable at all because the moment they made an offer

17   of a dollar, they put themselves in jeopardy.  Why not $2?  Why

18   not $1 million?  Why not $10 million?  Why not $1 billion?

19   Forgive me, but it was perfectly logical to me that they would

20   make no offer, and that was the precise discussion that we had

21   on that.

22   **Q.**   Why not, so you could get to an amount that was truly the

23   maximum funds available under *Ortiz*?

24        **MR. ROY:**  Your Honor, we object.  This is to the

25   point now of badgering this witness and is irrelevant.

1        **THE COURT:**  Sustained.  Sustained.  Sustained.  Move

2    on.  He said he asked; they didn't give.  That's his answer.

3    There's nothing much else he can say.

4        **MR. IRVIN:**  I'll accept that.

5        **THE COURT:**  Why he didn't do it -- you can write me a

6    brief why he should have.  The entities have said here under

7    oath they are not paying.

8    **BY MR. IRVIN:**

9    **Q.**   Did you discuss with them the fact that the levee boards

10   often pay judgments?

11        **THE COURT:**  I'll let him ask that one.

12        **THE WITNESS:**  That's not true.  They don't often pay

13   judgments.  What they do is in the context of a particular

14   claim -- for example, civil rights, they have to pay those.

15   They also have a self-insured retention.  It was perfectly

16   logical and understandable why it would be the case that if

17   they killed somebody and they could persuade that person to

18   take $50,000, they might feel compelled to do so.  That's a

19   different situation than we have here with a $3 trillion claim.

20        It's not about charity; it's about what they

21   have the capacity to do or not do.  It's about the

22   practicalities involved.  The moment they say to us that they

23   are going to pay us a dollar over what they are obligated to

24   pay, they put themselves in difficulty.  So I mean, with

25   respect, I felt that their position was entirely reasonable.

1   BY MR. IRVIN:

2   Q.   Have you ever had a judgment against the state paid by the

3   legislature?

4   A.   I'm sure my firm has.

5            THE COURT:   Against the state.   This is not the

6   state.   I'm aware of it.   That does happen, and there are

7   judgments against the state that aren't even paid.   This is not

8   the state.   These are political subdivisions governed by a

9   different statute, at least that's the Court's understanding.

10  If there's something out there, you can certainly apprise me of

11  it.   It's not the state, at least that's my understanding.   If

12  you want to enlighten me in a brief, you may.

13           MR. IRVIN:   That was my next comment.   I assume you

14  wanted me to do that in a post-trial brief.

15           THE COURT:   Absolutely.   It's going to have to be

16  very persuasive because I haven't seen anything that says, for

17  instance, the levee districts are arms of the state subject to

18  the statute.   If you can show me, you can show me.

19           MR. IRVIN:   I will do that, Your Honor.

20  BY MR. IRVIN:

21  Q.   Can you tell us a little bit about what you mean by

22  *enhancement* as that word is used to modify costs in the

23  settlement agreement.

24  A.   Well, all I can do is point you to Judge Fallon.   The most

25  recent experience I had with enhancement was in connection with

1    the Murphy Oil spill, which itself was a Katrina catastrophe.

2    The judge awarded an enhancement to those lawyers who had

3    expended money to the resolution of the case.  It was his idea.

4    It was his determination as to how much.

5            Remember, all that I and my co-counsel have done is

6    said that we will make the request.  You'll have to understand

7    when I and Jim and Jerry suggested to this bunch of lawyers we

8    are not making a fee claim, we had a lot of resistance to that,

9    and many insisted on putting that provision in there.  I'm not

10   particularly fond of it, but it's there for that reason.

11   Lawyers want to reserve their rights.  Am I going to get it?

12   No, probably not.

13   **Q.**   What was the enhancement in the *Murphy Oil* case?

14   **A.**   100 percent.

15   **Q.**   So it was a multiple that doubled the costs?

16   **A.**   It was.  That's of record in the *Murphy Oil* litigation.

17   **Q.**   Why was National Union Fire Insurance Company excluded

18   from the settlement?

19   **A.**   I'll direct that question to His Honor because he

20   dismissed them.

21           **MR. IRVIN:**  Okay.

22           **THE WITNESS:**  We tried.  We lost.

23           **MR. IRVIN:**  That's all I have.  Thank you.

24           **THE COURT:**  Thank you, sir.

25              Anything else?

1        **MR. ROY:**  One question regarding a "yes" or "no" on
2   redirect, Your Honor.
3                     **REDIRECT EXAMINATION**
4   BY MR. ROY:
5   **Q.**   Mr. Bruno, this is a "yes" or "no" question.  In the
6   exhibit that is before you, Exhibit 73, just put up there by
7   Mr. Irvin, he read you the sentence where your client relations
8   assistant wrote "...unlikely that the Court will make any
9   distribution of these funds directly to claimants."  He did not
10  read the next sentence.  Can you see that far?
11  **A.**   I have it in front of me.
12  **Q.**   Read the next sentence from your letter to put it in
13  context, please.
14  **A.**   "The decision to distribute funds to claimants is a
15  decision which the Judge will not make until after he decides
16  whether or not this settlement is fair."
17  **Q.**   Thank you.
18       **MR. ROY:**  I'm sorry, Your Honor.  It wasn't a "yes"
19  or "no," but it was close.
20       **THE WITNESS:**  Well, I don't know how to say "yes" or
21  "no" to that.
22       **THE COURT:**  That's fine.  You may step down.
23            Let me make one thing clear before the next
24  witness.  Assuming I find this is a -- just as I think it's
25  going to be very difficult for Mr. Irvin to show me that all

1    the law that I have seen is incorrect and that the state is

2    obligated to pay the levee district's judgment -- it's going to

3    be very difficult because I don't think it's the law -- it's

4    just about or even more difficult for the plaintiffs to "razoo"

5    this fund, as hard as they worked, from my standpoint; such

6    limited fund as it is, again, resulting from my rulings on the

7    Corps and other large defendants.  I just want everybody to

8    know that up front, so be careful what you ask for.

9              MR. MEUNIER:  Judge, for the record, the class

10   plaintiffs do not intend in any way to ask for anything that

11   would constitute a raid on the fund.

12             THE COURT:  I don't mean to imply that you would, but

13   just trying to chill it right now in case you had that aberrant

14   thought.

15             MR. MEUNIER:  I wanted to hand up Exhibit 69, which

16   is the Ligeros report, and I did correct the policy numbers.

17             THE COURT:  How many more witnesses do you have?

18             MR. ZWAIN:  One.

19             THE COURT:  Let me ask a question.  Is Ms. Feigler

20   here?  We have probably worn out everybody.  Is Mr. Therence

21   here, John Therence?  Are Lawrence or Noella Thonn here,

22   T-H-O-N-N?  Are Amy and Don Dowling here?  Is Mr. Charles

23   Barber or his daughter SonTasha Barber here?  That's all I

24   wanted to know.

25                  Yes, sir.  You can call your next witness.

1    **MR. ZWAIN:**  Your Honor, we would call Dean Edward F.

2    Sherman.

3          **MR. MEUNIER:**  Your Honor, I have an offer of some

4    affidavits, and perhaps we can just get that out of the way

5    before this testimony.

6          **THE COURT:**  All right.  Has your worthy opposition

7    seen them?

8          **MR. MEUNIER:**  Yes.  These have been identified as

9    exhibits.  These are the declarations of the class

10   representatives Jeannine Armstrong, Kenneth Armstrong, Thurman

11   Kaiser, Donna Augustine, and then the declarations of class

12   counsel:  Myself, Gerald Meunier, Joseph Bruno, and Jim Roy.  I

13   would offer, then, this total of seven declarations of class

14   representatives and class counsel as Exhibits 74 through 81.

15          I now offer, Judge, in addition -- and this will

16   be beginning with Exhibit 82 -- the transcripts of the

17   depositions of the class representatives taken earlier in this

18   matter; the depositions, specifically, of Donna Augustine,

19   Jeannine Armstrong, Kenneth Armstrong, and Thurman Kaiser.

20   These four depositions will be marked as Exhibits 82 through

21   86.

22          **THE COURT:**  Any objection?

23          **MR. KIRKPATRICK:**  No objection, Your Honor.

24          **THE COURT:**  Let them be admitted.

25          **MR. MEUNIER:**  82 through 85.  Thank you, Judge.

1      **THE COURT:**  I see you have your next witness seated.

2      **MR. ZWAIN:**  Your Honor, at the outset it's my

3  intention to tender Dean Sherman as an expert in the field of

4  class action practice and procedure as well as complex

5  litigation.  I have shown Dean Sherman's curriculum vitae to

6  Mr. Irvin and Mr. Kirkpatrick.

7      **THE COURT:**  Do you want to introduce that curriculum

8  vitae into the record?

9      **MR. ZWAIN:**  Yes.  As Exhibit 86.

10     **THE COURT:**  Any objection?

11     **MR. KIRKPATRICK:**  No objection, Your Honor.

12     **MR. MEUNIER:**  None by plaintiffs.

13     **THE COURT:**  Let it be admitted.

14     **MR. ZWAIN:**  We would tender Dean Sherman as an expert

15  in the field of class action practice and procedure --

16     **THE COURT:**  The Court is well familiar -- did you

17  want to ask some questions?

18     **MR. IRVIN:**  I just stood to say no objection.

19     **THE COURT:**  I'm sorry.  The Court is well familiar

20  with Dean Sherman's expertise and accepts him as tendered.

21     (WHEREUPON **Edward F. Sherman,** having been duly sworn,

22  testified as follows.)

23     **THE DEPUTY CLERK:**  Please state your full name and

24  correct spelling for the record.

25     **THE WITNESS:**  Edward F. Sherman.

1              **DIRECT EXAMINATION**

2     **BY MR. ZWAIN:**

3     **Q.**   Dean Sherman, do you remember when I first contacted you

4     regarding this case?

5     **A.**   Yes.  It was about eight months ago.

6     **Q.**   What do you appreciate the role I asked you to play in

7     this case as being?

8     **A.**   Well, you asked me to look at the potential for settlement

9     and the appropriateness of such a settlement agreement and to

10    possibly serve as an expert witness on that.

11            My understanding was, of course, that I'm not here to

12    tell His Honor what the law is.  He can read the cases as well

13    or better than I can.  I have spent 25 years studying and

14    writing about class actions.  I have published a major case

15    book used in law schools around the country on complex

16    litigation.  In keeping that up, I have talked to a lot of

17    judges and law clerks and lawyers about the cases.

18            So I feel I have some knowledge about how courts have

19    dealt with some of the difficult issues we have talked about

20    today of manageability and feasibility of distribution and so

21    forth.  Really, I see my role as providing what information I

22    can, and the Judge may or may not find that to be useful.

23    **Q.**   In connection with your fulfilling your role in this case,

24    what materials have you reviewed?

25    **A.**   I've reviewed all of the major pleadings, the motions, the

1   memoranda in support of the motions, the depositions of the
2   class representatives, and the various exhibits that have gone
3   with these documents.
4   **Q.**   So if I'm understanding you correctly, you've reviewed all
5   of the motions and the memoranda in support of the joint motion
6   for preliminary approval of class settlement and for
7   preliminary certification; is that correct?
8   **A.**   That's right.
9   **Q.**   I believe you have reviewed the memoranda submitted
10  jointly by movants in support of the class we are trying to
11  certify and the settlement we are trying to get approved; is
12  that correct?
13  **A.**   I have.
14  **Q.**   As well as the settlement agreement itself?
15  **A.**   Yes.
16  **Q.**   As a result of your review of these materials and your
17  expertise in the field, did you reach certain conclusions?
18  **A.**   Yes, I have.
19  **Q.**   Are those conclusions set forth in an affidavit which you
20  signed on March 31, 2009?
21  **A.**   Yes.
22          **MR. ZWAIN:**  May I approach, Your Honor?
23          **THE COURT:**  Yes, you may.
24  BY MR. ZWAIN:
25  **Q.**   I'm going to show you what I have marked as Exhibit 87 and

1    ask if you can identify this as the affidavit you executed on

2    March 31, 2009.

3    **A.**   Yes, that's the affidavit.

4          **MR. ZWAIN:**   Your Honor, we would file, offer, and

5    introduce this into evidence --

6          **MR. IRVIN:**   Do you have any other copies?

7          **MR. ZWAIN:**   -- as Exhibit 87.

8          **THE COURT:**   Have you had an opportunity to look at

9    it, Counsel?

10         **MR. IRVIN:**   No.  It's kind of lengthy.

11         **THE COURT:**   Do you want a chance to review it?

12         **MR. IRVIN:**   Yes, Your Honor.

13         **THE COURT:**   How much time would you like?

14         **MR. IRVIN:**   Five minutes.

15         **THE COURT:**   We'll take a five-minute recess while you

16    review it.

17         **THE DEPUTY CLERK:**   All rise.

18         (WHEREUPON the Court took a brief recess.)

19         **THE DEPUTY CLERK:**   All rise.

20         **THE COURT:**   Please be seated.

21         **MR. MEUNIER:**   Your Honor, before we proceed, I'm

22    afraid, through my mistake, we have to make a correction for

23    the record in the numbering of certain exhibits, and I can do

24    it very quickly.

25         **THE COURT:**   Okay.

1        **MR. MEUNIER:**  The affidavits of class counsel and

2    class representatives are Exhibits 74 through 80.  The

3    depositions of the class representatives are Exhibits 81

4    through 84.  The CV of Dean Sherman is now Exhibit 85.

5            **THE COURT:**  Now, you were seeking to introduce --

6        **MR. ZWAIN:**  The affidavit, which is now remarked as

7    Exhibit 86.

8        **MR. IRVIN:**  All of the objecting plaintiffs object to

9    the admission of this affidavit and to Dean Sherman's

10   testimony, which is strictly on the law, which the Court does

11   not need.  It's also on the ultimate question of law.

12            I'll pull the rabbit out of Mr. Zwain's hat and

13   tell you that paragraph 30 says, "In my opinion this settlement

14   class meets the requirements of Rule 23(a) and Rule

15   23(b)(1)(B).  Given the restricted liability of the defendants

16   resulting in a limited fund, the settlement is fair, adequate,

17   and reasonable."  I think Dean Sherman can file an amicus brief

18   saying exactly what he said in here, but it shouldn't be

19   evidence.

20       **MR. ZWAIN:**  Your Honor, we think that Dean Sherman's

21   testimony will be helpful to the Court.  This is a settlement

22   which -- I'm not going to say is novel, but presents unusual

23   issues and issues of first impression.  I think Dean Sherman's

24   experience in the field and knowledge about the issues might be

25   helpful to the Court.

1          **THE COURT:**  It might be helpful if, before I rule, I

2     actually look at the affidavit.  Would the parties agree that

3     if I regard this as a supplemental brief or as an amici brief,

4     Dean Sherman would not have to testify, and I would just regard

5     it as such and you can respond to it?

6          **MR. IRVIN:**  That would be fine, Judge.

7          **MR. KIRKPATRICK:**  Yes, Your Honor.

8          **THE COURT:**  That's exactly what I'm going to do

9     unless there's some -- go ahead.

10          **MR. ZWAIN:**  I would like the opportunity for Dean

11     Sherman to speak to the issue of allocation of the settlement

12     fund --

13          **THE COURT:**  That's certainly fine.

14          **MR. ZWAIN:**  -- because I think he brings a little

15     different --

16          **THE COURT:**  Generally, I understand the objection.

17     As long as we don't get to the -- what he has here is a

18     wonderful brief, and I will read it and regard it as such.

19     There's also some opinions in here, to the extent they relate

20     to allocation, that would be helpful to the Court.  You may do

21     that.

22          **MR. ZWAIN:**  Thank you, Your Honor.

23          **THE COURT:**  I will regard this and make this part of

24     the record as a brief, which you can respond to.  Anyone who

25     wishes can respond.  Go ahead.

1  **BY MR. ZWAIN:**

2  **Q.**   Dean Sherman, you were present in the courtroom today when

3  Mr. Bruno testified and some other argument was made with

4  respect to how and whether the settlement fund, if approved,

5  ought to be allocated.

6  **A.**   Yes, I was.

7  **Q.**   Do you have certain views as to whether or not the fund

8  could be allocated in an equitable way for the benefit of the

9  class and in a fair and reasonable method among the class

10  members?

11  **A.**   Well, as Judge Duval has indicated, it's entirely the

12  Judge's decision to be made.  If the Judge does approve this

13  settlement at this point, there will be a future proceeding.

14  The Judge will have a special master with expert assistance to

15  determine exactly how the benefit to the class should be made

16  out of the fund.  There are a number of different approaches

17  which I could mention that I have seen in other pieces of

18  litigation.

19  **Q.**   Please.

20  **A.**   One, of course, is -- the most individualized method is

21  the use of grids or matrices to differentiate between the

22  various class members and to compensate those who have been

23  more heavily damaged than others.

24       The testimony I heard today from this terrific

25  database that's available indicates that an awful lot of the

1    work has already been done and, I assume, paid for.  So I have

2    a sense that a fairly small number of factors, such as the

3    particular kind of damage -- death, personal injury, property

4    damage; and within property damage, whether it was four feet of

5    water or three feet or two feet -- a relatively small number of

6    these factors could be put in a grid and you could

7    differentiate between the individuals.

8            The drawback to this is -- and this is what would be

9    done if it were not a limited fund.  The drawback to this is we

10   are talking about only $21 million, it looks like, something in

11   that range.  Therefore, to differentiate between someone who

12   has a claim for death versus someone who has a claim for a

13   small amount of flooding may cause some administrative expense.

14   Another method, of course, would be a pro rata share; all of

15   the class members share in it.

16           What was done in the CD antitrust case that's in my

17   memo, Judge, that was a nationwide class action brought on

18   behalf of all purchasers of CDs in the country alleging price

19   fixing, and there was a settlement.  The Judge had a fund to

20   distribute.  The Judge decided to set up a Web site in which

21   anyone could dial in with a Web site number, could swear under

22   oath that they had purchased a CD, and would be sent $13.

23           Then the other half of the fund was distributed to

24   all of the claimants who made a claim within the time period

25   for that amount of money, and the rest went through a kind of a

1    *cy pres* distribution.  They went to give CDs to schools and
2    charitable institutions and so forth.
3            The Judge there said that he thought that $13 is not
4    a lot of money.  He recognized that would not fully compensate
5    all of the class members, but there was a feeling that perhaps
6    there should be some individual recovery because of the
7    impression it makes on the quality of our legal system in doing
8    that.  So that hybrid approach would be one possibility.
9            **THE COURT:**  May I interrupt you, Dean?
10           **THE WITNESS:**  Yes.
11           **THE COURT:**  The *cy pres*, which is a form of trust,
12   you might want to explain what that is.
13           **THE WITNESS:**  Yes.  Well, *cy pres* would allow a Judge
14   where -- it is particularly used when there is a class action
15   and there are funds left over.
16           **THE COURT:**  C-Y, P-R-E-S; right?
17           **THE WITNESS:**  That's right, Judge.
18           It's particularly used when there is a judgment
19   and the claims period expires and all of the judgment is not
20   used up by the claims and what's the Judge to do with the extra
21   money.  He could return it to the defendant, but that would
22   reward the defendant for their wrongful conduct.  You could
23   give a premium to all of those who had made a claim, and that
24   is one possibility.  Or you could use a *cy pres* distribution,
25   and that is to take that extra money and give it for some

1   purpose that would benefit the class; for example, to build a

2   park with trees or some antipollution kind of device.

3                So a *cy pres* in a -- and a Court is free to

4   recognize that the cost of distribution might be so high that

5   it would eat up the fund and that, therefore, the class would

6   benefit more by finding an appropriate payment that would

7   benefit the class not individually but through a *cy pres*

8   distribution.  Here, I suppose it could have something to do

9   with the levees, the protection of the levees, beautification

10  of the levees, a variety of factors that the Judge might find

11  might have a different distribution for each of the three

12  subclasses.  So there are a range of factors that I assume the

13  Judge is going to consider if he approves this and a special

14  master can consider.

15               What I do think is that it could be done fairly

16  inexpensively because the data is out there already and it has

17  been paid for.  If one wanted to differentiate in some way and

18  pay people with more serious injuries and damages a higher

19  amount, you could set up a matrix with certain credits and you

20  could use the data that's in there so you could find out

21  exactly how much water each individual's house took and,

22  therefore, you could differentiate based on those factors.  Or

23  you could have a pro rata distribution or you could have a

24  mixture.  I think all of them are possible and feasible under

25  the conditions here.

1        **THE COURT:**  Let me ask you a question, Dean.  Do you

2   think that in the event that I were to find this settlement a

3   limited fund and it was upheld by the Court of Appeal, that the

4   first thing a special master should do is determine what the

5   various costs would be to have the claims process -- various

6   approaches in it, and if it would be prohibitively expensive,

7   then to think about some other alternative?  Would that be the

8   first step you would recommend?

9        **THE WITNESS:**  I think that would be a very good

10  approach, Judge.  One thing you have to keep in mind here,

11  also, is that the claims process is set up -- even if you use a

12  method like an Internet claim, which is relatively easy for

13  people to do, you certainly will not get 100 percent.

14        I think you recognize a large number of class

15  members here have been distributed around the country.  They

16  may not -- and you set a claims period, which the Court has to

17  do.  There has to be an expiration date.

18        In many consumer class actions, the percentage

19  of claims is around 10 percent.  It may be larger in this case

20  because there have been larger damages and injuries.  But you

21  have to recognize that we may not be talking about the full

22  400,000 people, if that's the number; we may be talking about

23  something a good deal less.  The advantage of that, I guess, is

24  that those who do make a claim will be able to be paid more.

25

1    BY MR. ZWAIN:

2    **Q.**   I suppose, too, that if the total number of claimants was

3    of such a number that if you did a matrix that it would be not

4    a substantial difference between what the highest paid member

5    of the class gets and what the lowest paid member of the class

6    gets, would a simple per capita, across-the-board distribution

7    scheme work in view of the fact that I would think it would be

8    a lot less expensive to allocate in that fashion?

9    **A.**   I think it would.  I think you could probably set up a

10   fairly simple matrix here with the data you have and, indeed,

11   the special master, in studying what Judge Duval said initially

12   what the cost could be, might well find that you could make

13   some differentiation.

14           Obviously, the sad thing about this case, of course,

15   is that terrible damages and injuries have been suffered and

16   people will not be anywhere near what they should be, but

17   that's a consequence of a limited fund.  Therefore, it now

18   seems to me the approach that the Judge has before him, if he

19   approves this, is to find the most feasible and economical way

20   to make some distribution and the best way to benefit the

21   class.

22           **MR. ZWAIN:**  Thank you, Dean Sherman.  That's all the

23   questions I have.

24           **THE COURT:**  Any questions?

25           **MR. KIRKPATRICK:**  None, Your Honor.

1          **THE COURT:**  Dean, it was very helpful.  Thank you

2    very much.

3          **THE WITNESS:**  Thank you, Judge.

4          **THE COURT:**  We'll file it as a brief into the record,

5    the Court will review it, and anybody can respond to it.

6               Undoubtedly, whatever we do here -- well, I

7    think it's a Hobson's choice no matter which way we go.  That's

8    what I'm here for, to make such choices.

9               Let me ask a question before we adjourn today.

10   One of my principal jobs is to get things to the Court of

11   Appeal.  Do we envision whichever way I rule -- because we are

12   going to have a briefing schedule, etc., but after I rule I

13   would guess there's going to be an appeal.  Is it all your

14   understanding it would be ripe for appeal at that time?

15         **MR. ZWAIN:**  Yes.

16         **MR. MEUNIER:**  Judge, I believe, so.

17         **THE COURT:**  We don't want to go off and do all of

18   this without the Court of Appeal saying, yes, Duval is right or

19   wrong.

20         **MR. MEUNIER:**  My notion was that the certification

21   and approval combined constitutes something appealable under

22   Rule 23.

23         **THE COURT:**  That's what I think it is.  I just want

24   to make sure we are all on the same page.  It doesn't make

25   sense to spend any more money, or at least get a special master

1   or anything like that -- assuming that I would find there was a

2   limited fund -- until the Court of Appeal addresses it.  Is

3   that everybody's --

4           **MR. MEUNIER:**  That's our view.

5           **THE COURT:**  Or if I reject it as a limited fund,

6   you're certainly going to appeal that to say that it is.  Any

7   points?

8           **MR. HUBBARD:**  The only thing I would suggest with

9   respect to that, Judge, is, as I see it, any ruling that you

10  make -- the settlement agreement provides for variations.

11  Number one, if the Court were to increase the amount in light

12  of the stipulation, I believe that the agreement provides that

13  St. Paul has the right to either withdraw from the agreement or

14  to continue.

15          In the event you ruled against us on that and in

16  the event we continued, we would have to modify the paperwork,

17  make contributions, and so forth.  By the same token, I think

18  it's also provided in the settlement agreement and I think the

19  preliminary order, if I'm not mistaken, that if the Court were

20  to rule against the creation of the limited fund class for

21  reasons that could be cured, that there would be an opportunity

22  for the parties to do that as well.

23          **THE COURT:**  I see what you're saying.

24          **MR. HUBBARD:**  The first judgment that you hand down

25  may not be the last word on this is my point.

1    **THE COURT:**  I see what you're saying.  It's

2  conceivable that I could rule on a basis that could be

3  rectified.

4    **MR. HUBBARD:**  Exactly.

5    **THE COURT:**  The general principle is if somebody

6  doesn't like my ruling -- which I'm assuming that's going to

7  happen -- that ultimately it will be appealed.  And before

8  anything is disbursed, any special master is appointed, we need

9  the blessing or the reversal of the Fifth Circuit.

10    **MR. MEUNIER:**  The plaintiffs would not contemplate

11  going forward with any sort of allocation, setup, or special

12  master appointment unless there's a final judgment.

13    **THE COURT:**  Right.

14    **MR. MEUNIER:**  Your Honor, on Mr. Hubbard's point

15  about the premises issue, it is true that the defendants have

16  an option.  If you find the extra $2 million is owed and, of

17  course, they choose not to pay, then that's the end of the

18  discussion.

19    **THE COURT:**  End of the deal.

20    **MR. MEUNIER:**  We would obviously then have a ruling

21  that not all of the insurance proceeds are being paid.  From

22  the plaintiffs' standpoint, that would no longer be a limited

23  fund.

24    **THE COURT:**  It would certainly not be a limited fund,

25  unquestionably true.

1       **MR. MEUNIER:**  We do need that ruling from you and
2   then the choice made.

3       **THE COURT:**  You're going to get a ruling.

4       **MR. MEUNIER:**  We need that at the beginning, it seems
5   to me, of this process.

6       **THE COURT:**  You need a briefing schedule on these
7   issues.  I had one tentatively scheduled, but I am open to
8   suggestion.  Just let me say in about three days I am going to
9   be completely occupied by reading 40 depositions, about 15
10  expert reports, and then having ostensibly a 30-day trial,
11  again trying to get that matter to the Court of Appeal in one
12  nice package, which is my job.

13       Therefore, this is the tentative schedule -- if
14  any of you squawk, I will work with you -- that I was going to
15  have.  You have already filed a brief.  I guess the first brief
16  I would need after the hearing would be the objectors' brief.

17       **MR. KIRKPATRICK:**  Yes, Your Honor.

18       **THE COURT:**  What would be a reasonable time for you
19  to file it?

20       **MR. KIRKPATRICK:**  30 days.

21       **THE COURT:**  Let's see where that puts us.  That would
22  be May 2.

23       How long would it take you to respond?  Now, we
24  have more complications.  As an example -- you know what I
25  need.  We have to have the brief on the insurance.

1          **MR. MEUNIER:**  We need a simultaneous schedule.

2          **THE COURT:**  You agree on the limited fund issue, but

3    you disagree on the coverage issue.

4          **MR. MEUNIER:**  That's right.

5          **THE COURT:**  That is, as to the premises issue.

6          **MR. MEUNIER:**  That's right.  So while the objectors

7    are being given time to file a brief opposing the limited fund,

8    I think we need a schedule to brief for you the question of

9    premises and have you rule on that hopefully in time for us to

10   know --

11         **THE COURT:**  I was thinking about that.  Is April 17

12   too early for the --

13         **MR. MEUNIER:**  Judge, we have stipulated facts.

14         **THE COURT:**  On the insurance issue.

15         **MR. HUBBARD:**  That would be fine, Judge.  We can do

16   that.

17         **THE COURT:**  Would a response of May 1 be reasonable?

18         **MR. MEUNIER:**  That would be fine.

19         **THE COURT:**  I'll give you a reply May 8.  I'm talking

20   about on the insurance issue.

21         **MR. HUBBARD:**  When you say "the insurance issue,"

22   you're referring to the premises issue?

23         **THE COURT:**  Premises issue.

24         **MR. BRUNO:**  Judge, I think briefs probably at the

25   same time of the response -- I don't think you have a mover and

1  a respondent.  You have two different views.

2          **THE COURT:**  I understand that.  Somebody is going to

3  have to file a brief on the 17th.  I'm assuming that's you,

4  Mr. Hubbard, and your interests reference the insurance issue,

5  the premises issue.

6          **MR. HUBBARD:**  Yes, sir.  We can do that.

7          **THE COURT:**  You will respond on the 1st --

8          **MR. BRUNO:**  That's fine.

9          **THE COURT:**  -- saying, "Oh, no, he's wrong."

10          **MR. MEUNIER:**  Or sooner.

11          **THE COURT:**  Or sooner.  Then Mr. Hubbard will have

12  until the 8th to file a reply, if he wishes.

13          Now, we have another issue, a much larger issue,

14  that is, the fairness hearing.  Basically, the questions are

15  going to whether it's a limited fund or not.  So you would like

16  30 days on that?

17          **MR. KIRKPATRICK:**  Yes, Your Honor.

18          **THE COURT:**  You're fine.  Your brief saying, "Judge,

19  this is not a limited fund," for the various factors and the

20  notice is wrong, that would be due -- I don't know what day

21  May 2 is.

22          **MR. ANZELMO:**  It's a Saturday, Your Honor.

23          **THE COURT:**  We'll give you a break.  May 4.

24          **MR. KIRKPATRICK:**  Okay.

25          **THE COURT:**  How long would you take to respond?

1       **MR. MEUNIER:**  We'll jointly oppose that.

2       **THE COURT:**  Jointly oppose that.  15 days since you

3  have already filed a brief?  I'm going to give you the 15 days.

4  If you do it quicker, that's great.  That's May 19.  Then I'll

5  give you -- May 18.  Sorry.  15 days would be the 19th.  How

6  many days would you like to reply, seven?

7       **MR. KIRKPATRICK:**  Seven days is fine, Your Honor.

8       **THE COURT:**  That would be the next Monday, the 26th.

9       **MR. ANZELMO:**  The 25th is the next Monday,

10  Your Honor.

11       **THE COURT:**  Technically, we are leaving this hearing

12  open until --

13       **MR. MEUNIER:**  Your Honor, we are leaving the record

14  open -- our belief is that the hearing is concluded, but the

15  record is kept open.

16       **MR. HUBBARD:**  Technically, do we need to close the

17  certification hearing and open the fairness hearing and adopt

18  all of the evidence and testimony.

19       **MR. MEUNIER:**  I thought we had been doing both

20  together.

21       **MR. IRVIN:**  Have the proponents of the settlement

22  rested?

23       **MR. HUBBARD:**  In the certification hearing?

24       **MR. IRVIN:**  Yes.

25       **MR. HUBBARD:**  Subject to the record being left open.

1            **THE COURT:**  Yes.  Do you have a witness?  I'm sorry.

2            **MR. IRVIN:**  We have some exhibits.

3            **MR. MEUNIER:**  I thought you put them in.  I'm sorry.

4            **THE COURT:**  We got our briefing schedule.  I jumped

5     the gun, I apologize.  What are your exhibits, sir?

6                  I take it, for the purposes of the certification

7     hearing, you have rested?

8            **MR. MEUNIER:**  Yes, we have, Judge.

9            **THE COURT:**  Do you have any exhibits, sir?

10           **MR. IRVIN:**  I do.  I believe all of these have been

11    stipulated to.  Exhibit 87 is a series of legislative

12    appropriations.

13           **THE COURT:**  Thank you.  Let that be filed and

14    admitted.

15           **MR. IRVIN:**  Exhibit 88 is the Orleans Levee District

16    financial statement dated June 30, 2007.

17           **THE COURT:**  Let that be filed and admitted.

18           **MR. IRVIN:**  Exhibit 89 is the Orleans Levee District

19    financial statement for October 21, 1998.

20           **THE COURT:**  Let that be filed and admitted as well.

21           **MR. IRVIN:**  Exhibit 90 is the financial statement

22    dated October 2, 1996.

23           **THE COURT:**  Let that be admitted as well.  Mr. Irvin,

24    anything else from you, sir?

25           **MR. IRVIN:**  The objecting plaintiffs rest.

1          **THE COURT:**  I understand.  Do we have any other
2    business to take up?  We had the certification hearing.  Do you
3    want to also, for the fairness hearing as well, adopt and
4    introduce all --
5          **MR. MEUNIER:**  We would, Judge.  On behalf of
6    plaintiffs, we would ask that the entire record of the
7    certification hearing just concluded be incorporated as the
8    fairness hearing before the Court on the limited fund
9    settlement.
10         **MR. ANZELMO:**  We join.
11         **MR. HUBBARD:**  We join in that, Judge.
12         **MR. MEUNIER:**  Including all exhibits, etc.
13         **THE COURT:**  Any objection?
14         **MR. KIRKPATRICK:**  No objection.
15         **MR. IRVIN:**  No objection.
16         **THE COURT:**  Let that be done.  I think I had already
17   called out the names of the individuals.  I will do it one more
18   time out of an abundance of caution.  I don't blame them for
19   not being here.  We wore them out.
20              Ms. Frances Feigler, John Therence, Lawrence and
21   Noella Thonn, Amy and Don Dowling, and Charles Barber or his
22   daughter SonTasha Barber.  They are not present.
23         **MR. MEUNIER:**  Judge, during the hearing there was
24   reference to needing to keep the record open.
25         **THE COURT:**  Yes.

1    **MR. MEUNIER:**  It had specifically to do with, I

2  think, two or three policies that had been issued to the levee

3  districts that were not yet available.  These were, as I

4  recall, first-party policies.

5    **MR. HUBBARD:**  That's correct.

6    **MR. MEUNIER:**  For completeness, we do want the record

7  to include those policies.  So we have asked the Court, for the

8  limited purpose of receiving those additional policies, that

9  the record of both hearings be kept open to allow them to be

10  furnished.

11    **THE COURT:**  For the record, both hearings are left

12  open for that limited purpose.  Any other --

13    **MR. KIRKPATRICK:**  No, Your Honor.

14    **MR. MEUNIER:**  Judge, in connection with that, if

15  necessary, a supplemental report from Pete Ligeros on his

16  review of those policies.  It may be necessary for him to say

17  just that he looked at them and that they don't change his

18  earlier opinion.  We would submit that, as well, by affidavit.

19    **MR. HUBBARD:**  No objection.

20    **THE COURT:**  If you get an agreement with counsel,

21  that would be great.

22    I thank all of you for being here.  Some of it

23  was very interesting.  I say again, it's unfortunate that what

24  I consider the primary culprit in this matter, the Corps of

25  Engineers, is not present, and that's a ruling that I made.

1    Believe me, if the Court of Appeal reverses me, it won't make

2    me cry.  Okay.  With that, we are adjourned.  Thank you.

3            **THE DEPUTY CLERK:**  All rise.

4            (WHEREUPON the Court was in recess.)

5                            * * *

6                        <u>CERTIFICATE</u>

7            I, Toni Doyle Tusa, CCR, FCRR, Official Court

8    Reporter for the United States District Court, Eastern District

9    of Louisiana, do hereby certify that the foregoing is a true

10   and correct transcript, to the best of my ability and

11   understanding, from the record of the proceedings in the

12   above-entitled and numbered matter.

13

14

15                            <u>s/ Toni Doyle Tusa</u>
                              Toni Doyle Tusa, CCR, FCRR
16                            Official Court Reporter

17

18

19

20

21

22

23

24

25

**$**

$1 [19]  24/2 24/6 24/14 24/15 24/19 25/2
94/25 98/17 133/14 134/1 134/3 134/4
134/9 135/8 135/12 135/19 146/3 195/18
195/18
$1 million [15]  24/2 24/6 24/14 24/15
24/19 25/2 133/14 134/1 134/3 134/4
134/9 135/8 135/12 135/19 146/3
$1.2 [1]  109/20
$1.2 billion [1]  109/20
$1.5 [2]  95/12 95/15
$1.5 billion [2]  95/12 95/15
$1.6 [1]  95/21
$1.6 billion [1]  95/21
$1.7 [1]  95/6
$1.7 billion [1]  95/6
$10 [5]  24/5 61/23 136/3 190/10 195/18
$10 million [4]  24/5 61/23 136/3 195/18
$10,000 [1]  169/11
$11 [2]  88/8 96/10
$11 billion [2]  88/8 96/10
$11.8 [1]  97/12
$11.8 billion [1]  97/12
$12 [1]  136/3
$12 million [1]  136/3
$13 [2]  209/22 210/3
$17 [11]  24/9 27/23 28/25 97/17 136/10
136/21 136/23 166/15 167/25 171/6
174/9
$17 million [7]  24/9 27/23 28/25 97/17
136/10 136/21 166/15
$17.4 [1]  97/1
$17.4 billion [1]  97/1
$172 [1]  149/17
$172 million [1]  149/17
$19 [9]  27/23 28/25 136/10 136/22
136/23 166/15 168/1 171/6 174/9
$19 million [8]  27/23 28/25 136/10
136/22 166/15 168/1 171/6 174/9
$2 [14]  23/23 25/6 61/20 61/25 95/19
95/20 97/10 133/15 133/16 133/20
133/25 195/15 195/17 216/16
$2 billion [3]  95/19 95/20 97/10
$2 million [9]  23/23 25/6 61/20 61/25
133/15 133/16 133/20 133/25 216/16
$2.5 [1]  195/12
$2.5 trillion [1]  195/12
$2.8 [1]  93/18
$20 [12]  14/9 84/8 84/14 86/15 86/18
96/6 99/15 99/24 171/10 177/3 184/18
190/9
$20 billion [7]  84/8 84/14 86/15 86/18
96/6 99/15 99/24
$20 million [5]  14/9 171/10 177/3 184/18
190/9
$20.8 [2]  23/21 30/4
$20.8 million [2]  23/21 30/4
$200 [1]  110/19
$21 [1]  209/10
$21 million [1]  209/10
$25,000 [1]  172/24
$26.7 [1]  96/22
$26.7 billion [1]  96/22
$3 [6]  24/14 25/1 95/13 135/13 135/20
196/19
$3 billion [1]  95/13
$3 million [4]  24/14 25/1 135/13 135/20
$3.3 [1]  94/24
$3.3 billion [1]  94/24
$3.5 [1]  149/17
$300 [1]  110/19
$300 million [1]  110/19

$4 [2]  24/3 134/17
$4 million [1]  134/17
$4.6 [1]  84/11
$400,000 [1]  100/14
$435 [1]  167/11
$435 million [1]  167/11
$44 [4]  96/5 96/10 98/20 98/24
$44 billion [4]  96/5 96/10 98/20 98/24
$465 [1]  94/14
$465 million [1]  94/14
$47 [1]  82/17
$47 billion [1]  82/17
$5 [5]  24/1 61/21 86/19 87/8 134/22
$5 billion [2]  86/19 87/8
$5 million [3]  24/1 61/21 134/22
$5.8 [1]  95/5
$50 [2]  177/4 190/9
$50,000 [1]  196/18
$500 [1]  95/23
$500 million [1]  95/23
$500,000 [1]  100/14
$6 [1]  93/12
$6 billion [1]  93/12
$627 [1]  83/14
$662 [1]  88/7
$7.1 [1]  97/14
$7.1 billion [1]  97/14
$7.8 [3]  88/21 88/24 96/7
$7.8 billion [3]  88/21 88/24 96/7
$800,000 [1]  110/12
$9 [2]  24/7 135/25
$9 million [2]  24/7 135/25
$92 [1]  149/19
$92 million [1]  149/19
$980 [1]  94/13
$980 million [1]  94/13

**'**

'70s [1]  156/17
'80 [1]  130/6
'80s [2]  137/22 146/20
'87 [1]  149/16
'90s [5]  128/4 129/13 137/16 137/22
146/21

**.**

...and [1]  49/18
...unlikely [1]  199/8

**0**

0000123-0 [2]  125/20 125/21
05-4182 [2]  5/7 6/5
05-CV-4182-K [1]  1/5

**1**

1/2 [1]  149/9
10 [3]  49/11 116/7 147/21
10 percent [3]  119/19 119/21 212/19
100 [6]  32/12 60/6 67/7 116/10 192/25
192/25
100 percent [6]  91/6 91/7 91/12 143/7
198/14 212/13
100-year [2]  109/3 109/10
1001 [1]  2/7
1010 [1]  2/21
106,000 [1]  76/14
107,000 [1]  76/17
10984 [1]  43/19
10:00 [1]  1/8
110 [1]  65/17
1100 [1]  1/19
112,000 [1]  77/3
113,000 [2]  77/3 77/4
11551 [1]  106/24

12 [3]  15/4 90/12 91/5
127,000 [1]  94/22
12:00 [1]  64/23
13 [5]  9/7 12/11 12/15 51/7 91/5
13,000 [1]  94/11
13:5109 [2]  50/5 51/1
14 inches [1]  90/12
15 [5]  9/2 217/9 220/2 220/3 220/5
16-month [1]  15/23
1600 [1]  2/23
161,000 [1]  95/4
164,000 [2]  84/5 86/11
16721 [2]  1/8 5/12
1698 [1]  125/17
17 [1]  218/11
173,189 [1]  92/23
17th [17]  44/20 47/1 92/9 92/11 94/5
94/18 97/14 103/17 106/21 128/3 128/12
154/15 158/13 159/14 161/1 161/3 219/3
18 [1]  220/5
19 [1]  220/4
1928 [1]  7/6
1960 [1]  147/15
1965 [3]  44/23 172/25 180/6
1973 [1]  147/15
1974 [1]  66/15
1976 [1]  173/1
1979 [2]  149/11 161/1
1980 [10]  128/10 128/11 128/15 128/18
130/18 131/21 137/13 138/2 138/22
138/22
1981 [1]  138/22
1988 [1]  149/15
1989 [1]  44/14
1990 [8]  130/18 137/13 138/3 138/7
138/9 139/11 139/14 139/20
1996 [1]  221/22
1998 [1]  221/19
19th [1]  220/5
1:15 [1]  78/18
1st [1]  219/7

**2**

20 [6]  57/25 76/10 128/22 129/2 157/17
189/8
200 [1]  2/7
2000 [1]  2/17
20009 [1]  2/24
2004 [2]  124/18 126/13
2005 [38]  63/3 70/19 72/11 72/14 72/20
74/18 82/8 82/10 82/15 83/2 83/6 85/3
88/1 88/5 88/12 92/23 92/25 94/9 94/22
95/3 104/24 124/18 126/13 126/14 127/7
128/20 128/25 129/5 129/15 130/11
132/1 138/4 138/24 139/1 139/5 139/13
144/16 150/4
2006 [11]  15/5 46/25 54/16 72/20 75/24
75/25 76/6 76/10 84/1 85/3 144/16
2007 [7]  85/3 101/22 108/14 121/5 143/7
143/8 221/16
2008 [9]  9/2 10/11 43/19 84/24 85/3
121/5 121/9 143/6 143/8
2009 [12]  1/7 5/2 9/6 9/7 10/13 79/2 88/2
94/10 124/15 148/2 204/20 205/2
20th [1]  2/23
21 [1]  221/19
2142 [1]  106/11
2148 [1]  106/7
22,000 [1]  94/10
2224 [1]  79/11
23 [14]  13/2 17/3 18/24 26/14 26/19
27/12 28/3 59/4 61/11 61/12 61/17

**2**

23... [3]  206/14 206/15 214/22
2300 [1]  2/20
231,000 [1]  95/3
24 [1]  115/6
25 [2]  167/8 203/13
25 percent [3]  84/3 84/25 87/5
251,000 [1]  84/2
25th [1]  220/9
26 [2]  193/19 194/8
26th [1]  220/8
27 [1]  58/7
2727 [1]  125/18
2775 [1]  2/14
2800 [1]  1/19
281 [1]  51/12
29 [1]  70/19
2900 [1]  2/19
2954 [1]  106/15
2d [1]  15/4

**3**

30 [16]  9/6 43/19 124/15 144/10 148/2
 149/9 167/8 173/17 193/7 193/21 194/1
 194/1 206/13 217/20 219/16 221/16
30-day [1]  217/10
31 [2]  204/20 205/2
31 percent [1]  84/25
33,000 [1]  95/18
33-plus [1]  167/8
3403 [1]  106/16
3445 [1]  2/3
35 percent [1]  110/5
365 [1]  2/17
3668 [1]  1/23
37 percent [1]  84/6
38 [3]  51/12 52/3 52/11
38.1 [1]  53/3
3838 [1]  2/11
38:281 [1]  52/6
39 [1]  54/10
39.75 percent [1]  167/10

**4**

40 [5]  119/4 119/5 153/8 162/7 217/9
400,000 [5]  177/2 177/5 190/9 190/19
 212/22
406 [1]  3/1
4182 [2]  5/7 6/5
42 [1]  88/8
42 percent [1]  85/1
43 [1]  9/7
440,000 [1]  86/11
440,269 [1]  82/16
447 [1]  15/4
45 [1]  12/10
45th [1]  12/14
463 [1]  106/9
47 [1]  63/17
495,689 [1]  83/13

**5**

5,000 [1]  176/14
5,000 more [1]  77/2
50 [1]  115/15
50,000 [1]  176/14
50-year [3]  44/6 110/10 110/12
500 [2]  1/22 3/1
504 [1]  3/2
51 [1]  63/17
5102 [1]  51/7
52 [2]  63/17 76/16
52828 [1]  2/7

**53 percent [1]  76/18**
54 percent [1]  76/18
556 [1]  1/22
560 [1]  106/12
58 [1]  63/6
580 [1]  107/2
581 [1]  107/2
582 [1]  107/2
589-7778 [1]  3/2
59 [2]  64/6 142/20
5m [6]  69/12 69/12 69/12 69/12 71/11
 71/11

**6**

6 inches [1]  69/18
60 [1]  64/8
60 percent [1]  94/11
60,000-plus [1]  85/20
601 [1]  2/4
61 [1]  100/19
612 [1]  15/4
6175 [1]  106/14
62 [3]  101/12 103/1 103/1
624 [1]  106/12
63 [4]  102/4 102/6 103/1 103/3
630-1698 [1]  125/17
64 [1]  103/5
65 [2]  104/13 104/14
65,000 [1]  95/18
66 [1]  105/7
67 [1]  105/12
68 [2]  114/9 114/17
69 [2]  148/2 200/15

**7**

7-12 [1]  15/4
70 [2]  158/7 178/23
70002 [2]  2/4 2/11
70112-1010 [1]  2/21
70113 [1]  1/16
70124 [1]  65/18
70130 [3]  2/15 2/18 3/2
70163 [1]  1/20
70502 [1]  1/23
70505 [1]  2/8
71 [1]  178/23
72 [2]  159/19 160/1
73 [2]  192/3 199/6
74 [2]  201/14 206/2
7778 [1]  3/2

**8**

80 [1]  206/2
80 percent [2]  45/9 69/7
800 [1]  2/4
8076 [1]  107/2
81 [2]  201/14 206/3
82 [3]  201/16 201/20 201/25
84 [1]  206/4
85 [2]  201/25 206/4
855 [1]  1/16
86 [3]  201/21 202/9 206/7
87 [3]  204/25 205/7 221/11
87,000 [1]  94/23
88 [1]  221/15
89 [1]  221/18
89,000 [1]  95/8
894 [1]  106/10
8th [1]  219/12

**9**

9,806 [1]  88/3
90 [1]  221/21
909 [1]  2/20

94,564 [1]  83/7
95,010 [1]  88/9
97,000 [1]  88/13
978 [1]  125/18
9854 [1]  106/23
99 [2]  44/13 45/2
999,000 [1]  84/2
999,349 [1]  82/10

**A**

a design [1]  44/23
a.m [1]  1/8
abandoning [1]  188/9
aberrant [1]  200/13
ability [17]  27/16 28/21 31/21 54/5 54/16
 54/17 55/1 55/23 56/6 61/14 85/5 111/5
 111/7 111/8 111/16 160/12 224/10
able [21]  29/25 30/20 39/15 45/18 59/5
 69/7 69/16 69/20 70/9 71/10 73/22 80/4
 102/19 130/22 160/14 161/7 162/13
 167/24 172/25 173/11 212/24
about [154]  8/24 9/4 11/5 12/24 14/11
 29/17 29/23 33/11 36/18 37/7 39/2 42/8
 49/11 53/24 54/16 54/21 57/5 57/6 58/1
 59/6 59/9 59/18 59/18 61/12 72/11 74/24
 75/6 75/7 76/3 76/19 77/2 77/8 79/14
 80/3 80/4 82/12 83/1 83/7 83/18 83/21
 84/1 84/3 84/11 84/18 84/25 84/25 85/1
 85/12 85/14 86/6 88/3 88/7 88/7 88/9
 88/20 90/1 91/14 94/9 94/11 94/11 94/12
 94/14 94/22 94/23 94/24 94/25 95/3 95/4
 95/5 95/6 95/7 95/8 95/12 95/19 95/17
 95/18 95/20 95/24 96/2 96/8 96/17 96/22
 97/1 97/10 97/12 97/14 109/11 116/7
 117/1 126/10 126/22 127/14 129/11
 134/24 135/23 137/9 137/12 138/5 139/6
 139/10 140/12 140/23 142/7 142/8 149/6
 150/8 151/9 151/24 154/18 159/4 159/25
 161/15 165/16 167/2 170/25 171/13
 172/11 176/13 176/14 180/13 180/21
 182/10 183/18 183/22 184/8 187/15
 189/12 190/24 191/6 192/18 192/21
 193/12 195/11 196/20 196/20 196/21
 197/21 200/4 203/5 203/14 203/17
 203/18 203/19 206/24 209/10 212/7
 212/21 212/22 213/14 216/15 217/8
 217/9 218/11 218/20
above [3]  41/17 41/17 224/12
above-entitled [1]  224/12
absent [2]  15/19 27/23
absolute [1]  32/6
absolutely [19]  35/1 60/7 62/16 63/10
 70/2 74/22 107/11 110/1 127/19 162/15
 164/23 165/16 166/18 166/24 173/10
 174/1 177/15 189/13 197/15
abundance [1]  222/18
accept [5]  59/16 81/12 120/17 189/8
 196/4
accepted [1]  10/9 28/6 46/18 47/11
 81/7 81/11 101/14 107/18 119/6 119/24
 178/23
accepts [2]  78/17 202/20
access [3]  43/6 89/14 160/15
accident [1]  147/14
accomplish [1]  45/16
accomplished [2]  50/4 110/13
according [3]  82/9 138/13 140/3
accordingly [1]  25/7
account [4]  74/6 74/8 87/11 171/12
accounted [1]  89/18
accounts [2]  23/16 171/10
accumulated [1]  111/23
accumulation [1]  91/18

**A**

accurate [4] 72/21 75/22 76/22 87/9
acknowledge [1] 186/12
acknowledges [1] 79/19
acknowledgment [1] 47/11
acquisition [2] 110/14 110/17
acre [1] 90/18
acre-feet [1] 90/18
across [1] 213/6
across-the-board [1] 213/6
act [10] 6/19 7/6 22/18 38/13 44/22
 173/11 176/3 180/7 180/8 180/10
action [33] 5/7 12/9 34/14 36/21 75/2
 119/10 123/19 149/6 150/1 150/2 153/17
 153/20 154/2 154/3 155/17 155/23 156/3
 161/16 161/17 163/14 165/22 167/9
 169/22 175/6 187/19 187/21 187/22
 189/21 193/25 202/4 202/15 209/17
 210/14
actions [20] 5/11 9/2 10/17 23/12 31/14
 34/13 43/16 149/11 149/14 149/25
 153/23 154/1 156/4 161/15 165/13 167/4
 169/25 187/25 203/14 212/18
active [4] 73/25 73/25 74/17 155/10
actively [1] 121/9
activities [2] 71/14 117/20
activity [3] 74/16 75/6 85/9
acts [5] 42/21 42/24 42/24 43/1 181/17
actual [6] 20/2 60/23 71/8 99/6 160/15
 173/6
actually [18] 16/14 71/20 72/10 72/17
 72/24 76/1 86/9 104/22 104/24 110/4
 129/12 144/12 149/23 162/3 162/10
 162/23 190/25 207/2
ad [7] 32/21 54/1 54/21 85/6 85/14 86/2
 111/2
ad valorem [2] 85/6 86/2
Adams [1] 16/22
add [3] 41/10 97/16 103/19
added [4] 132/18 133/1 135/9 145/14
addition [8] 15/2 22/20 27/8 61/8 73/17
 78/7 162/20 201/15
additional [44] 18/17 103/19 104/18
 116/2 116/4 116/6 116/22 124/5 124/10
 127/9 127/11 127/12 127/18 127/21
 128/1 128/13 128/14 128/22 128/25
 129/6 129/16 129/20 129/21 130/1 130/8
 130/14 130/19 130/25 131/9 132/14
 132/15 132/18 132/20 136/19 137/19
 140/2 140/24 144/13 145/7 145/14
 146/19 146/23 146/25 223/8
additionally [6] 23/11 57/22 59/11 89/13
 101/14 101/23
address [14] 6/6 6/9 9/11 33/25 65/16
 73/6 73/25 73/25 74/4 74/6 74/13 74/16
 74/17 168/13
address-level [1] 74/6
addressed [5] 21/23 26/16 28/2 47/8
 84/10
addresses [3] 9/12 9/12 215/2
addressing [2] 85/10 98/13
adduced [1] 9/17
adequate [7] 15/7 19/3 19/19 27/2 68/6
 157/24 206/16
adjourn [1] 214/9
adjourned [1] 224/2
adjudication [1] 27/14
adjudications [1] 61/13
administered [1] 109/7
Administration [2] 113/8 113/9
administrative [1] 209/13
administrators [1] 67/15

admire [1] 186/17
admissibility [1] 18/21
admission [1] 206/9
admitted [14] 100/22 102/25 103/22
 106/1 142/21 148/7 158/10 159/21
 201/24 202/13 221/14 221/17 221/20
 221/23
admittedly [1] 170/17
adopt [2] 220/17 222/3
advantage [1] 212/23
advertising [1] 123/5
advice [3] 119/17 122/2 162/25 177/1
advise [1] 179/20
advised [2] 168/14 170/22
advocate [2] 180/19 180/24
affect [1] 36/7
affected [8] 23/1 43/17 69/7 69/9 69/22
 85/5 153/24 176/8
affection [1] 186/17
affects [1] 45/20
affidavit [21] 101/9 101/11 101/14 103/1
 103/6 103/25 104/1 104/16 104/17 105/2
 105/5 105/15 105/19 114/9 204/19 205/1
 205/3 206/6 206/9 207/2 223/18
affidavits [2] 27/8 201/4 206/1
afford [3] 25/1 123/13 124/21
afforded [2] 121/21 131/7
affording [1] 86/25
affords [1] 24/15
afraid [1] 205/22
African [3] 76/15 76/18 172/22
African-American [2] 76/15 172/22
African-Americans [1] 76/18
after [28] 9/16 30/23 43/8 44/24 56/16
 59/13 68/24 69/4 71/5 76/7 79/15 83/4
 83/25 83/25 126/1 136/19 154/24 155/23
 163/11 164/10 166/1 166/8 174/5 176/24
 192/9 199/15 214/12 217/16
afternoon [10] 57/16 79/1 99/13 108/5
 112/16 137/5 137/7 141/11 191/25 192/1
again [34] 15/7 34/18 36/5 36/22 36/24
 37/7 37/22 44/2 50/8 51/7 52/22 54/5
 54/24 56/6 56/10 57/6 92/21 134/19
 134/25 136/10 136/24 141/5 145/11
 145/12 156/21 171/16 178/5 178/16
 180/4 180/13 189/8 200/6 217/11 223/23
against [76] 8/6 10/23 11/14 14/18 17/13
 19/16 21/1 21/9 22/14 22/15 23/3 23/13
 25/15 25/16 25/17 26/3 26/10 30/19
 33/14 34/20 38/17 39/4 39/10 39/19
 39/25 40/2 40/4 48/4 48/8 48/9 49/13
 49/22 49/25 50/11 50/16 50/19 55/11
 55/18 57/17 57/19 57/24 90/24 91/24
 112/1 112/18 122/1 122/7 129/19 138/20
 139/7 149/21 155/14 155/17 156/21
 160/19 160/21 161/19 161/23 164/21
 165/3 165/22 166/20 168/10 168/15
 172/22 175/2 175/14 176/3 176/5 176/6
 188/2 197/2 197/5 197/7 215/15 215/20
age [1] 75/19
agencies [1] 49/16
agency [10] 38/17 39/6 49/14 49/22
 50/12 50/16 51/8 72/8 77/12 77/13
Agent [1] 58/11
agents [3] 124/2 189/23 190/1
aggregate [11] 17/4 23/24 133/16 134/1
 134/2 134/3 134/17 135/8 135/25 146/9
 179/8
ago [4] 48/3 129/3 172/17 203/5
agree [7] 25/5 30/5 98/19 140/11 183/25
 207/2 218/2
agreed [2] 23/11 164/9
agreeing [1] 140/17

agreement [32] 12/9 12/25 18/23 20/1
 28/16 34/6 35/5 35/12 37/22 58/6 58/7
 59/4 101/5 101/20 176/22 184/5 186/23
 197/23 203/9 204/14 215/10 215/12
 215/15 215/18 223/20
agreements [2] 14/18 102/12
ahead [10] 29/16 29/18 36/15 40/10
 133/6 145/25 148/23 191/22 207/9
 207/25
AI [1] 132/24
ain't [1] 189/19
air [1] 180/5
airport [1] 142/12
airports [1] 113/5
aligns [1] 92/5
alive [2] 175/21 176/4
all [178] 5/3 5/25 6/1 7/13 8/5 9/16 10/16
 10/23 11/24 16/19 17/1 18/14 19/4 19/6
 19/7 21/18 23/8 24/24 28/10 29/10 30/6
 30/11 30/23 31/1 34/16 35/12 35/25 36/2
 39/17 40/25 41/12 41/17 41/17 42/6 43/5
 43/15 44/10 45/2 47/25 48/22 51/17
 51/23 52/15 52/19 52/22 54/14 55/3
 55/21 56/3 56/11 61/18 62/20 63/2 63/8
 64/5 64/6 64/12 69/5 69/10 70/6 71/10
 73/20 79/5 80/8 81/3 81/25 82/1 85/4
 85/18 88/6 92/22 96/17 98/7 100/15
 101/7 101/17 102/18 106/4 112/10
 112/24 114/2 114/4 114/12 117/20
 129/25 132/8 133/18 134/17 134/17
 135/2 135/8 136/15 136/25 138/7 138/21
 139/20 144/19 144/20 147/1 148/2
 148/25 150/18 153/4 153/8 153/9 154/4
 154/6 154/7 154/11 154/18 156/3 156/12
 156/23 158/20 164/16 165/11 166/22
 167/1 167/14 169/5 169/7 169/8 169/9
 169/13 170/11 170/18 170/19 172/14
 172/25 173/8 173/23 173/25 174/5 174/6
 174/24 176/7 179/7 179/16 183/15
 183/25 186/13 187/22 188/25 191/20
 193/24 194/8 194/17 194/18 195/16
 197/24 198/5 198/23 199/25 200/23
 201/6 203/25 204/4 205/17 205/19 206/8
 209/14 209/18 209/24 210/5 210/19
 210/23 211/24 213/22 214/13 214/17
 214/24 216/21 220/18 221/10 222/4
 222/12 223/22 224/3
allegation [2] 160/21 173/24
allegations [3] 76/3 156/7 161/2
alleged [4] 45/14 92/9 94/1 173/7
alleging [3] 123/4 156/22 209/18
allocate [2] 37/10 213/8
allocated [4] 96/17 163/24 208/5 208/8
allocation [18] 25/24 29/22 30/16 32/17
 32/21 34/4 34/5 93/6 93/6 99/5 132/9
 138/24 163/15 177/8 177/9 207/11
 207/20 216/11
allow [7] 9/15 11/21 19/20 35/15 101/6
 210/13 223/9
allowed [2] 11/2 33/15
allows [2] 61/11 70/8
almost [4] 52/13 93/17 153/18 154/21
alone [3] 85/20 86/18 98/18
along [12] 44/19 45/1 45/21 47/8 80/1
 102/2 109/13 109/15 132/8 144/19 153/8
 193/2
already [12] 22/11 24/20 26/23 36/10
 59/9 64/7 147/7 209/1 211/16 217/15
 220/3 222/16
also [59] 5/13 6/10 8/15 10/5 11/3 12/13
 21/19 28/14 44/3 44/20 46/19 47/12 48/1
 49/16 53/13 54/7 54/23 56/1 60/13 63/16

also... [39]  64/4 67/7 72/4 72/8 72/22
73/12 75/19 76/9 87/11 87/17 89/1 89/2
89/14 94/4 106/15 106/17 106/22 109/24
124/11 125/2 127/24 129/1 132/3 146/6
150/14 151/12 153/7 155/8 156/24 157/3
171/13 174/1 186/25 196/15 206/11
207/19 212/11 215/18 222/3
alternative [4]  34/18 192/7 192/8 212/7
although [3]  7/1 53/8 85/24
always [5]  147/14 147/17 152/15 163/2
177/21
am [19]  20/8 65/11 65/20 65/22 66/1
77/22 88/22 93/18 99/8 101/1 108/8
137/11 140/16 176/15 179/1 190/14
198/11 217/7 217/8
amending [1]  156/2
Amendment [2]  38/21 38/22
American [3]  76/15 117/3 172/22
Americans [1]  76/18
amici [1]  207/3
amicus [1]  206/17
among [8]  7/25 18/2 27/5 29/22 30/16
52/16 102/15 208/9
amount [42]  15/13 16/4 21/2 23/20 24/20
25/6 28/17 30/7 32/8 56/14 59/20 61/6
65/3 67/25 72/18 89/7 89/11 90/4 90/7
90/8 90/10 93/4 97/4 99/3 100/9 100/12
100/13 100/13 122/5 133/17 136/16
141/17 159/13 166/14 172/18 184/1
195/4 195/22 209/13 209/25 211/19
215/11
amounts [1]  142/16
Amy [3]  9/21 200/22 222/21
analogy [1]  161/11
analysis [23]  25/21 28/15 29/3 41/11
43/13 43/13 44/2 44/3 67/20 67/21 68/10
75/9 78/6 78/11 93/25 95/9 126/25 128/6
134/16 145/15 147/11 194/21 194/22
analyze [3]  14/18 68/22 142/14
analyzes [1]  73/17
analyzing [1]  125/23
and lacking [1]  45/6
and/or [3]  16/8 132/25 174/21
Andover [2]  117/16 117/19
angst [2]  40/25 41/3
anguish [1]  98/23
announce [2]  5/6 102/20
annual [2]  110/8 110/11
another [15]  32/23 32/24 38/11 44/16
44/18 70/21 80/5 102/20 150/25 154/13
158/11 161/17 192/19 209/14 219/13
answer [5]  56/20 165/20 174/4 194/7
196/2
answers [2]  62/13 174/3
antipollution [1]  211/2
antitrust [1]  209/16
any [129]  6/15 10/20 12/1 14/18 14/19
18/9 23/1 23/2 26/7 29/8 31/7 31/8 31/12
33/17 34/10 36/8 38/4 38/20 40/12 42/13
42/14 42/20 46/4 47/24 48/4 50/11 50/11
50/12 50/14 51/3 51/5 53/17 53/18 53/21
56/20 59/23 62/11 62/12 64/16 68/18
70/15 78/13 81/8 89/5 90/21 91/10 91/10
91/16 94/18 99/7 100/22 104/6 105/23
108/10 110/14 110/18 111/25 112/7
115/22 119/14 120/11 120/16 120/18
120/18 121/10 121/18 125/24 126/15
127/16 127/18 128/20 129/19 130/23
133/5 141/17 142/2 142/9 142/16 144/6
145/9 148/4 151/9 152/1 152/23 157/6
158/9 160/8 163/7 163/7 164/25 165/25

170/20 171/14 172/17 174/1 176/6 176/6
176/20 179/1 180/1 181/9 181/24 183/9
184/21 186/16 186/20 187/9 188/5
189/12 192/13 193/12 195/1 195/4 199/8
200/10 201/22 202/10 205/6 213/24
214/25 215/6 215/9 216/8 216/11 217/14
221/9 222/1 222/13 223/12
anybody [11]  79/24 102/9 102/25 143/9
143/11 144/6 153/17 176/16 176/25
178/2 214/5
anybody's [1]  59/1
anyone [8]  41/2 77/7 81/18 103/18
120/11 163/4 207/24 209/21
anything [20]  87/7 100/17 113/5 113/19
142/25 146/10 147/9 162/22 165/7 169/9
181/22 193/15 194/6 194/12 197/16
198/25 200/10 215/1 216/8 221/24
anywhere [2]  147/20 213/16
ANZELMO [9]  2/3 13/16 41/21 42/1 57/2
59/18 100/24 106/3 108/5
apologize [4]  95/25 96/19 96/25 221/5
apparent [1]  150/21
Apparently [1]  142/7
appeal [26]  7/7 7/7 7/20 10/25 11/10
11/12 11/12 22/21 36/2 107/5 107/6
149/22 176/1 187/7 187/11 189/13
191/15 212/3 214/11 214/13 214/14
214/18 215/2 215/6 217/11 224/1
appealable [1]  214/21
appealed [5]  11/5 22/19 36/4 36/4 216/7
appeals [2]  11/11 22/25
appear [3]  9/10 9/15 27/11
appearances [4]  1/13 2/1 11/19 13/7
appeared [2]  46/23 127/5
appearing [6]  9/25 13/8 13/13 42/1 46/20
56/25
appellate [2]  177/20 189/5
applicable [4]  28/10 28/14 122/11 138/3
applicants [3]  17/8 18/15 18/18
application [2]  188/19 188/24
applied [4]  90/7 122/11 130/3 179/10
applies [4]  5/13 20/24 59/4 123/3
apply [15]  10/25 118/3 123/22 128/14
129/21 130/2 132/13 135/10 138/11
138/17 139/16 146/24 177/16 178/11
179/8
appointed [15]  6/24 21/7 21/18 21/20
31/7 41/2 58/8 150/9 150/15 151/13
164/8 173/20 189/23 190/1 216/8
appointment [3]  31/13 58/2 216/12
appoints [1]  163/1
appreciate [6]  12/20 13/5 80/8 139/23
187/12 203/6
appreciates [1]  79/20
apprise [1]  197/10
approach [6]  25/19 52/25 204/22 210/8
212/10 213/18
approached [1]  122/8
approaches [2]  208/16 212/6
approaching [1]  124/4
appropriate [7]  8/23 9/16 17/23 112/6
155/12 191/8 211/6
appropriated [3]  49/24 50/15 50/17
appropriately [2]  16/20 186/12
appropriateness [1]  203/9
appropriates [1]  17/12
appropriating [1]  102/2
appropriation [2]  38/14 55/9
appropriations [5]  46/24 55/7 55/22
111/22 221/12
approval [13]  5/10 9/1 21/13 22/9 23/14
26/13 26/17 33/10 41/15 41/16 153/19
204/6 214/21

approve [8]  8/23 21/8 41/8 47/18 160/13
167/10
approved [11]  19/18 31/3 32/25 33/5
34/19 42/11 174/25 188/19 190/2 204/11
208/4
approves [5]  162/8 176/23 177/20
211/13 213/19
approximate [3]  77/19 82/16 93/1
approximately [6]  82/10 84/4 115/6
116/10 119/4 171/10
April [9]  1/7 5/2 46/25 57/25 76/10 76/17
79/2 157/17 218/11
April 17 [1]  218/11
April 20 [3]  57/25 76/10 157/17
April 5 [1]  46/25
arbiter [1]  187/10
architects [2]  154/10 154/23
are [297]
area [106]  5/17 7/24 46/5 47/1 68/1 68/9
68/25 69/7 70/1 70/9 70/23 71/10 71/16
71/22 74/21 75/17 77/9 78/3 81/25 82/7
82/12 82/14 82/14 83/1 83/8 83/14 83/19
83/19 84/4 84/7 84/13 84/17 84/19 84/20
85/5 85/15 85/16 86/7 87/8 87/20 88/2
88/4 88/6 88/11 88/17 88/25 89/6 89/14
89/24 89/24 90/4 90/6 90/11 90/12 90/16
90/17 90/18 91/9 91/14 91/15 91/23
92/10 92/14 92/17 92/19 92/19 92/20
92/20 92/25 92/25 93/9 94/9 94/12 94/14
94/17 94/18 94/18 94/21 95/1 95/5 95/17
95/20 96/1 96/18 96/19 96/22 97/2 97/2
97/10 98/16 98/21 99/21 99/24 100/1
100/2 118/25 150/24 150/25 152/18
153/24 160/7 160/20 175/13 175/18
179/2 182/2
areas [25]  25/21 43/5 43/17 72/5 72/7
84/12 89/17 89/18 89/23 90/11 91/11
91/17 92/13 95/10 96/15 97/2 97/18
99/17 99/18 156/18 158/12 160/1 160/9
174/18 175/13
aren't [1]  197/7
arguably [1]  139/21
argue [2]  130/6 132/8
argued [1]  107/6
arguing [1]  57/16
argument [11]  55/14 76/12 131/8 132/10
138/6 140/18 141/2 141/5 183/18 187/13
208/3
arguments [7]  7/18 31/8 136/15 139/18
155/1 184/8 188/6
arise [1]  55/22
arising [2]  8/6 149/25
arm [3]  38/20 50/21 51/3
arms [3]  28/11 170/9 197/17
arms-length [2]  28/11 170/9
Armstrong [5]  27/3 201/10 201/10
201/19 201/19
Army [12]  22/17 43/1 43/10 43/11 43/15
46/21 103/18 154/5 156/21 158/19
168/17 175/2
around [16]  65/6 76/14 77/3 83/12 91/17
115/15 117/15 139/3 156/25 157/4
180/14 180/14 180/15 203/15 212/15
212/19
Arpent [2]  153/8 162/7
arranged [2]  20/7 20/13
arrangement [1]  20/3
array [2]  67/3 67/11
article [4]  49/6 49/10 53/3 54/10
Article VI [1]  54/10
Article XII [1]  49/10
articles [1]  115/22
as [348]

**A**

ascertain [3]  18/10 179/9 190/6
Ashton [2]  10/7 10/19
aside [3]  107/4 189/7 189/15
ask [33]  11/18 11/23 12/1 21/7 29/17
37/11 41/15 81/8 81/18 106/3 106/17
143/19 144/18 145/9 145/16 149/2
159/25 165/19 165/21 174/1 185/8
186/24 188/18 192/7 196/11 200/8
200/10 200/19 202/17 205/1 212/1 214/9
222/6
asked [24]  35/22 46/22 60/25 75/11
117/18 121/16 121/17 123/20 130/24
136/18 137/8 139/24 142/7 143/17
144/19 144/21 145/23 155/18 174/2
192/23 196/2 203/6 203/8 223/7
asking [5]  6/16 76/23 143/14 179/23
182/11
assembled [1]  69/5
assembling [1]  77/6
assert [1]  154/25
asserted [7]  21/9 25/15 31/19 46/4 48/8
129/19 175/1
assess [1]  89/5
assessment [6]  71/14 72/10 78/11 87/10
88/17 89/22
assessments [1]  69/25
assets [29]  14/15 29/4 29/9 30/7 33/19
38/10 39/15 40/5 40/17 48/14 48/16
48/22 56/19 75/7 75/8 82/12 82/18 82/21
84/16 85/23 110/21 113/4 113/7 113/10
113/11 123/1 155/8 166/7 170/16
assign [2]  71/10 130/23
assigned [1]  139/4
assigning [1]  47/15
assignment [2]  75/22 100/11
assignments [2]  71/20 71/24
assist [2]  151/4 151/8
assistance [4]  84/11 121/4 163/9 208/14
assistant [2]  104/16 199/8
associate [1]  68/17
associated [7]  77/21 92/8 92/9 94/2
105/3 117/17 185/19
Associates [1]  65/22
Association [1]  118/12
assume [6]  16/10 17/8 30/5 197/13
209/1 211/12
assuming [7]  7/25 33/1 60/1 199/24
215/1 216/6 219/3
assumption [1]  120/20
assumptions [1]  92/2
assurance [3]  42/24 42/25 43/2
assure [2]  26/1 30/18
assured [1]  35/12
at [194]  5/19 5/25 6/19 7/25 8/20 9/8
9/16 11/5 12/14 13/4 13/6 14/16 16/7
16/16 20/9 21/6 23/16 23/20 24/17 25/22
26/5 27/10 28/17 29/25 30/12 30/13 33/3
33/13 34/1 34/18 35/11 36/12 36/22 37/1
37/25 40/19 46/11 47/13 47/18 49/4 51/7
53/15 56/21 56/22 57/21 58/7 58/8 58/15
60/19 62/20 63/3 63/11 63/18 64/23
65/17 67/18 68/12 68/25 69/14 70/15
73/9 73/21 74/15 74/25 82/3 85/4 86/15
87/3 88/1 88/2 88/2 88/5 88/10 88/23
88/24 90/11 90/15 90/21 91/1 91/8 91/22
92/16 92/22 93/5 93/7 94/10 94/12 94/13
94/23 95/4 95/13 95/13 95/14 95/19 96/2
96/6 97/9 97/11 97/13 98/16 99/17 99/18
99/19 99/24 100/2 102/9 102/25 103/15
103/17 103/23 107/20 112/11 115/11
115/14 117/17 119/15 120/8 120/18

122/10 123/12 123/17 126/7 126/22 127/6
129/3 129/16 130/20 130/25 131/2 131/4
131/6 131/6 131/16 133/8 135/2 136/7
136/19 142/9 142/10 142/14 145/1
145/13 151/12 151/19 153/19 154/15
154/17 157/10 157/11 158/6 159/14
159/16 160/2 160/11 162/9 163/9 163/15
163/19 163/21 165/6 167/4 168/22 169/6
170/5 170/9 172/20 173/2 173/6 174/24
176/16 177/7 179/9 183/4 183/14 183/20
184/16 184/24 186/4 186/15 187/14
194/8 194/18 195/16 197/9 197/11 202/2
203/8 205/8 207/2 208/13 214/14 214/25
217/4 218/24 223/17
attach [1]  11/11
attached [2]  11/9 105/2
attaches [2]  6/20 105/21
attachments [1]  124/16 148/3
attempt [2]  151/7 163/13
attempted [3]  10/7 154/6 158/21
attend [1]  115/11
attendant [1]  164/20
attention [2]  36/20 127/24
attests [1]  103/9
attorney [8]  19/9 61/8 103/8 149/9 164/4
166/23 167/8 194/19
attorneys [22]  9/25 11/18 11/22 13/6
34/10 34/17 35/2 35/3 35/6 37/11 60/25
64/14 64/15 67/13 80/1 114/12 116/16
118/1 164/10 171/4 189/16 194/3
attributable [2]  96/15 160/17
attribute [1]  138/25
audience [2]  48/2 48/18
audited [1]  35/23
augment [1]  70/19
August [7]  70/19 82/8 82/15 83/2 83/6
124/18 126/13
August 1 [1]  83/6
August 2004 [2]  124/18 126/13
August 2005 [2]  82/8 82/15
August 29 [1]  70/19
Augustine [4]  16/23 27/4 201/11 201/18
AULT [2]  2/17 13/25
auspices [1]  180/11
authenticates [2]  101/12 101/15
authenticity [1]  101/21
authored [2]  115/19 115/23
authorities [1]  46/14
authority [27]  29/8 31/5 31/13 52/9 53/2
53/4 53/5 53/7 53/11 53/12 53/16 53/17
54/15 55/9 55/10 103/8 105/17 108/11
108/12 108/13 108/15 108/21 108/22
110/20 111/22 112/6 117/8
Authority's [1]  108/24
Authority-East [3]  53/2 105/17 108/11
authorization [1]  53/3
automatically [1]  127/21
automobile [1]  63/13
automobiles [5]  86/23 87/17 93/23 97/20
97/21
availability [1]  17/7 27/22
available [38]  17/18 18/14 21/3 25/24
26/1 26/2 28/6 28/13 30/1 30/8 30/20
37/3 38/9 59/20 67/17 68/5 69/11 121/17
122/6 122/13 123/15 124/8 133/12 136/1
136/9 136/17 146/4 165/24 166/15
166/19 172/13 172/14 177/3 177/17
195/2 195/23 208/25 223/3
Avenue [10]  44/20 94/4 94/5 94/15 94/16
94/19 154/13 158/13 159/15 168/16
avenues [1]  131/3
average [4]  83/10 83/13 88/6 93/9
aviation [2]  67/1 117/17

Avondale [1]  172/22
Avondale's [1]  172/22
aware [9]  14/11 22/17 35/14 110/14
112/21 112/23 165/12 181/21 197/6
away [3]  54/4 56/6 91/16
awful [1]  208/25

**B**

B-406 [1]  3/1
Bachelor [1]  115/8
back [36]  33/12 40/11 56/12 57/4 61/10
72/2 88/12 91/2 93/14 93/14 93/15 94/11
96/3 99/4 107/12 126/16 128/4 128/24
129/1 129/18 129/24 130/6 130/7 131/11
132/3 132/4 140/4 140/8 146/20 147/6
149/11 156/17 160/25 172/21 173/4
176/4
background [2]  20/6 115/7
backgrounds [1]  67/11
badgering [1]  195/25
ballpark [1]  185/23
Banc [6]  10/10 10/13 10/15 10/18 11/7
11/14
bank [4]  23/16 171/10 171/12 182/2
bar [2]  31/7 165/15
Barber [6]  9/22 9/23 200/23 200/23
222/21 222/22
barge [1]  151/2
Baronne [1]  1/16
barrier [6]  109/14 109/18 109/19 110/7
160/23 188/9
base [3]  83/12 111/6 111/9
based [32]  8/12 22/18 22/23 25/20 26/24
27/21 28/16 32/18 32/18 32/19 39/1
41/16 41/18 72/17 82/17 93/2 93/3 99/14
99/23 100/3 104/2 104/3 122/6 130/8
131/19 137/20 144/23 146/21 147/17
164/16 167/1 211/22
baseline [2]  72/13 74/17
basic [2]  22/2 118/9
basically [6]  111/8 119/21 128/7 143/16
175/12 219/14
Basin [12]  2/10 8/1 13/21 42/2 47/23
53/6 57/10 104/4 105/18 109/22 121/23
133/11
basing [1]  146/17
basins [1]  90/21
basis [12]  26/10 41/13 44/13 53/1 69/19
74/6 74/10 77/8 83/16 89/19 169/15
216/2
Baton [4]  39/16 39/21 40/6 69/4
Baton Rouge [4]  39/16 39/21 40/6 69/4
batting [1]  41/23
batture [1]  182/12
be [422]
beam [1]  70/21
bears [1]  172/1
beautification [1]  211/9
beauty [1]  32/16
became [8]  44/13 108/15 121/9 130/7
147/15 150/21 153/21 156/5
because [123]  5/17 7/4 7/10 11/11 11/21
18/12 18/18 19/11 28/5 31/15 31/24 33/4
33/17 33/18 34/5 36/6 37/7 37/25 40/6
40/17 40/18 41/8 42/5 42/9 45/7 47/14
48/3 50/3 55/8 55/9 55/16 55/23 56/6
56/8 58/21 59/16 59/24 61/12 62/10
75/16 75/19 75/25 76/4 76/21 79/14
85/18 89/11 94/19 96/20 96/25 97/17
102/8 127/4 129/23 130/17 132/5 132/14
132/15 137/8 138/3 138/7 138/22 138/22
139/19 139/19 139/20 142/4 143/16
152/21 153/3 154/23 155/10 155/25

because... [50]  156/1 156/23 157/6
158/21 159/24 161/14 161/23 162/2
162/16 163/16 163/16 166/22 167/22
168/6 170/3 170/11 171/18 171/22 173/1
173/7 173/25 175/5 176/13 178/4 178/13
180/22 183/11 183/13 183/25 184/14
185/6 185/7 186/10 189/12 190/3 190/5
190/14 190/23 191/20 192/12 193/21
195/16 197/16 198/19 200/3 207/14
210/6 211/16 212/20 214/11
become [5]  28/1 39/11 108/13 132/9
147/12
becomes [2]  138/23 152/21
been [115]  6/1 9/17 14/16 18/25 22/8
23/15 23/23 26/20 29/21 32/25 34/13
34/14 35/6 42/13 42/16 43/12 48/12
52/20 52/23 54/25 55/6 56/1 56/10 59/9
63/18 63/19 65/7 71/17 71/21 75/10
75/11 81/5 87/10 87/19 88/19 89/7 94/1
94/4 98/13 100/6 100/8 100/12 101/13
101/19 104/20 107/7 107/15 107/22
109/1 110/3 111/4 111/6 111/21 113/6
113/7 113/9 114/20 115/5 119/6 119/13
121/6 123/13 124/9 127/17 128/1 131/8
137/19 137/20 141/12 142/21 145/6
145/14 147/14 147/17 148/17 149/8
149/23 150/8 150/12 151/3 155/20
155/24 156/17 162/20 164/14 168/14
170/9 174/19 174/4 176/9 176/17 182/22
185/13 185/14 185/25 186/9 186/13
187/17 189/16 190/24 191/1 191/8
193/18 193/21 201/8 202/21 208/22
209/1 211/17 212/15 212/20 213/15
220/19 221/10 223/2
before [36]  1/11 5/14 8/9 10/21 36/11
38/4 46/20 46/24 52/5 52/23 57/16 57/21
57/25 62/5 63/24 70/19 79/21 107/6
113/15 114/7 131/2 141/4 155/20 183/11
183/12 187/22 194/1 199/6 199/23 201/5
205/21 207/1 213/18 214/9 216/7 222/8
began [7]  72/2 72/11 72/17 90/9 90/20
126/19 159/12
begin [3]  12/8 69/20 133/10
beginning [9]  36/6 55/19 94/10 100/9
122/9 149/10 155/7 201/16 217/4
behalf [14]  10/8 12/18 21/14 21/17 42/1
42/4 42/9 56/25 76/13 111/23 121/14
141/15 209/18 222/5
behest [1]  47/13
behind [1]  15/9
being [31]  16/14 17/17 20/14 21/1 22/14
26/9 37/20 37/21 43/19 47/17 53/21 57/5
60/25 75/4 86/12 109/7 125/9 127/18
128/11 130/21 144/20 153/21 171/22
172/13 177/5 203/7 216/21 218/7 220/25
222/19 223/22
belief [1]  220/14
believe [33]  23/8 37/20 38/4 40/25 65/1
66/4 68/15 76/10 78/4 97/21 101/5
102/19 103/5 106/13 121/6 121/8 129/12
142/3 142/6 144/16 145/6 145/23 166/8
178/7 184/15 185/7 186/6 194/17 204/9
214/16 215/12 221/10 224/1
believed [2]  47/25 194/11
Bellaire [1]  65/17
Belle [1]  113/16
below [1]  125/18
Belt [7]  8/11 106/23 155/25 156/5 156/11
156/12 156/13
BEN [3]  2/6 13/18 101/4
bench [1]  183/5

benchbook [2]  66/6 102/8
vendor... [40]  96/8 98/9
benefit [38]  26/3 30/14 30/20 32/5 32/8
32/14 33/22 33/23 37/10 37/14 37/17
42/24 160/15 161/7 162/11 162/15
162/21 166/23 171/9 171/12 171/19
172/2 172/4 172/5 177/17 178/9 183/25
184/9 184/17 186/7 191/6 192/15 208/8
208/15 211/1 211/6 211/7 213/20
benefits [1]  187/3
Benjamin [1]  1/18
Benson [2]  2/19 9/24
Bernard [12]  45/24 77/13 82/3 84/22
85/1 95/17 97/10 153/7 156/16 159/10
162/12 162/1
best [11]  6/23 37/19 56/19 61/18 73/6
79/17 109/16 163/10 167/23 213/20
224/10
better [10]  7/20 67/4 67/17 160/8 163/18
171/5 178/11 192/7 192/8 203/13
between [15]  16/1 69/19 71/4 92/1
122/23 123/24 127/15 147/19 174/22
174/24 188/20 208/21 209/7 209/11
213/4
beyond [4]  109/3 146/11 170/18 195/3
bids [1]  101/15
big [6]  40/11 97/6 152/8 152/10 167/22
178/3
bigger [1]  165/25
biggest [1]  113/15
bill [2]  35/23 39/16
billion [42]  82/17 84/8 84/11 84/14 86/15
86/18 86/19 87/8 88/8 88/21 88/24 93/12
93/18 94/24 94/25 95/5 95/6 95/12 95/13
95/15 95/19 95/20 95/21 96/5 96/6 96/7
96/10 96/10 96/22 97/1 97/10 97/12
97/14 98/20 98/24 99/15 99/24 109/20
149/17 149/20 174/15 195/18
billions [4]  27/20 30/5 40/13 40/13
bills [2]  23/19 35/19
binder [1]  66/7
birth [1]  6/14
bit [11]  12/24 29/23 30/22 87/5 103/11
122/21 131/17 148/23 184/9 184/12
197/21
bitter [1]  172/8
black [1]  178/18
blackmailed [1]  188/8
blame [1]  222/18
Blanco [1]  108/17
blanket [1]  127/21
bless [1]  172/7
blessing [1]  216/9
blighted [1]  85/21
block [9]  68/19 69/16 69/19 73/21 73/21
93/7 96/16 99/18 100/3
block-group [1]  73/21
block-level [1]  69/16
blocks [1]  92/22
blow [1]  127/4
BLS [1]  88/14
blue [2]  91/17 95/1
blueprint [1]  39/2
Blvd [1]  2/11
board [37]  8/11 12/4 23/4 40/1 40/9
50/23 57/20 102/2 109/8 112/17 112/18
112/21 113/3 113/12 128/7 133/4 133/6
144/13 151/19 154/9 154/9 154/10 155/6
155/7 155/16 155/18 158/4 158/18
160/17 161/6 161/13 161/14 162/2 166/7
168/15 188/2 213/6
board's [2]  41/9 160/25
boards [31]  17/9 19/14 21/11 52/7 52/12

57/7 57/8 59/19 62/11 112/16 144/6
153/1 154/24 166/1 166/4 166/8 166/9
166/21 168/10 168/13 168/21 188/10
188/11 193/8 193/13 193/17 193/19
194/13 195/5 195/6 196/9
bodies [4]  18/19 40/20 42/14 43/13
bodily [5]  123/4 137/24 139/13 139/15
140/13
body [2]  41/9 48/19
Boh [30]  22/22 106/12 106/13 106/20
127/8 128/2 128/21 129/13 129/17
129/22 129/24 131/11 131/13 131/20
131/25 137/9 137/12 137/18 138/5
138/20 139/7 140/4 140/8 140/23 144/12
145/18 145/23 146/20 155/2 176/7
Boh Bros [19]  22/22 106/12 127/8 128/2
128/21 129/22 129/24 131/11 131/13
131/20 131/25 137/18 138/5 138/20
139/7 140/4 140/23 145/18 176/7
Bohemia [1]  166/5
bonded [1]  111/12
bonding [2]  53/19 54/19
bones [1]  135/14
book [4]  116/2 116/7 117/19 203/15
books [1]  116/13
Borgne [25]  2/10 8/1 13/21 21/10 23/25
25/15 39/11 42/2 47/23 53/6 53/9 57/10
61/21 79/12 105/18 105/20 109/22
121/22 133/11 133/19 142/6 157/1
157/15 161/23 161/25
borrow [1]  111/11
both [19]  8/12 20/1 43/12 45/20 48/13
66/5 73/21 87/17 110/22 119/7 123/12
133/16 134/25 143/21 157/21 159/15
220/19 223/9 223/11
bottom [4]  95/11 96/24 161/1 166/14
Boulevard [1]  2/3
bound [1]  6/23
boundaries [1]  159/9
Bourgeois [2]  2/9 16/23
bowl [2]  152/17 152/21
Box [1]  1/23
Bradstreet [3]  83/5 83/7 83/17
breach [6]  90/16 92/9 92/11 92/18 105/2
150/20
breaches [12]  1/5 5/8 6/5 77/21 89/1
89/10 90/8 90/16 90/19 138/4 158/22
159/17
breadth [1]  18/21
break [6]  64/22 64/23 65/6 114/1 149/2
219/23
breaks [8]  83/15 157/4 157/7 157/11
159/6 159/14 159/15 159/16
brief [24]  57/4 58/11 80/13 113/20 114/3
196/6 197/12 197/14 205/18 206/17
207/3 207/3 207/18 207/24 214/4 217/15
217/15 217/16 217/25 218/7 218/8 219/3
219/18 220/3
briefing [7]  48/11 63/24 192/7 192/9
214/12 217/6 221/4
briefly [6]  16/18 22/1 29/15 58/1 63/7
151/24
briefs [5]  62/18 62/20 140/1 192/6
218/24
brilliant [1]  166/10
bring [7]  37/15 72/1 73/22 74/15 109/2
109/10 131/11
brings [2]  61/10 207/14
broad [1]  67/3
broke [2]  122/9 186/11
broken [2]  85/2 158/12
brokers [1]  124/3

**B**

Bros [28] 22/22 106/12 106/20 127/8
128/2 128/21 129/13 129/17 129/22
129/24 131/11 131/13 131/20 131/25
137/9 137/12 137/18 138/5 138/20 139/7
140/4 140/8 140/23 144/12 145/18
146/20 155/2 176/7
brought [5] 32/1 73/4 129/24 133/18
209/17
Bruno [38] 1/15 1/15 13/11 21/16 25/10
28/9 41/1 80/1 121/7 121/8 121/13
143/20 143/20 148/11 148/14 148/17
148/21 149/5 149/8 159/24 167/21 170/7
176/11 178/16 179/2 179/4 181/9 182/20
182/22 185/13 186/21 187/17 188/18
189/21 191/25 199/5 201/12 208/3
Bruno's [3] 143/14 144/1 144/1
budget [5] 40/2 40/2 40/3 40/22 40/22
build [6] 47/15 47/16 71/25 112/4 180/10
211/1
buildings [1] 123/1
built [4] 47/17 47/17 89/19 90/5
bulk [2] 116/24 139/4
bunch [2] 35/19 198/7
burdens [1] 16/3
Bureau [5] 73/14 82/9 83/8 83/11 87/25
Burk [2] 106/8 106/20
Burk-Kleinpeter [2] 106/8 106/20
business [3] 33/7 193/6 222/2
businesses [3] 83/7 83/16 167/22
but [139] 5/22 6/16 6/24 7/7 8/16 14/11
20/11 23/18 24/14 26/22 27/10 29/18
32/6 32/11 32/19 33/3 34/12 35/1 36/14
37/4 43/8 44/2 45/7 45/10 46/18 47/4
49/4 49/7 49/16 49/19 53/10 54/23 59/2
63/10 75/18 75/25 80/4 81/6 84/1 86/23
88/10 89/18 92/5 96/21 96/25 97/17
101/1 103/17 109/11 113/13 118/20
118/22 119/4 119/21 126/8 126/21
126/23 127/10 127/21 128/7 128/11
128/20 128/23 129/25 131/12 131/13
132/3 135/9 135/15 137/13 138/11 139/4
139/24 140/1 140/4 140/17 140/19 142/3
142/7 142/7 142/14 143/7 144/24 145/11
146/23 147/2 149/25 151/3 154/11 155/9
155/10 155/25 156/11 156/23 158/12
162/5 164/9 166/4 166/10 166/19 167/7
168/6 169/17 170/17 172/2 172/9 175/17
176/15 177/10 177/21 180/23 184/15
186/17 187/4 187/15 188/1 189/9 189/19
190/11 192/19 192/19 192/24 194/18
195/13 195/19 198/10 199/19 200/12
206/18 206/22 210/5 210/21 211/7
212/20 213/16 214/12 217/7 218/2
220/14
buy [1] 54/3

**C**

C-Y [1] 210/16
C.R. [2] 106/15 154/15
C.R. Pittman [2] 106/15 154/15
CAFA [2] 114/11 114/13
calculate [3] 19/12 70/10 71/6
calculated [2] 23/12 93/2
calculation [2] 96/14 104/3
calculations [4] 45/5 91/23 99/20 100/3
California [4] 115/10 117/7 117/8 117/10
call [20] 12/1 12/3 40/14 64/25 65/23
74/16 76/22 82/14 91/5 92/5 107/21
114/18 118/20 152/17 168/19 177/10
178/17 178/17 200/25 201/1
called [9] 62/14 114/8 168/5 169/14

170/3 180/6 182/2 192/23 222/17
walls [2] 11/4 11/5 11/6
came [7] 79/22 88/25 89/2 102/8 127/3
150/21 159/16
can [121] 5/16 11/11 11/11 11/20 11/22
12/13 16/20 18/17 19/16 19/18 21/4
23/16 26/1 26/6 26/7 27/19 32/17 32/20
35/8 35/25 36/3 36/4 39/13 39/20 41/5
52/21 52/25 54/8 55/8 62/17 63/22 64/17
65/23 65/24 66/6 67/2 68/17 68/18 70/13
73/15 77/6 83/2 83/21 84/18 85/2 90/1
90/15 91/2 91/17 92/2 93/11 95/23 96/3
96/4 100/23 103/11 103/12 109/11 110/2
131/11 136/18 138/21 138/25 141/20
145/1 145/16 147/20 147/20 148/23
152/2 152/4 152/9 152/10 152/24 153/12
158/12 159/8 161/5 161/20 162/22
164/11 167/23 167/25 168/13 173/24
173/25 174/4 177/9 177/11 180/20
180/24 185/1 186/3 187/7 188/12 189/25
190/17 194/18 196/3 196/5 197/10
197/18 197/18 197/21 197/24 199/10
200/25 201/4 203/12 203/13 203/22
205/1 205/23 206/17 207/5 207/24
207/25 211/14 214/5 218/15 219/6
can't [20] 8/8 11/21 20/15 30/6 40/5 40/5
40/16 40/17 40/18 55/17 92/4 112/9
168/12 169/6 177/10 178/13 178/15
178/23 180/5 191/7
Canada [1] 31/10
canal [32] 1/5 2/17 5/8 6/5 44/21 47/1
92/10 92/11 94/4 94/5 94/5 94/6 94/18
97/14 103/17 104/4 106/21 128/3 153/8
154/13 154/16 158/13 158/13 159/14
159/15 161/1 161/4 175/14 180/17
181/18 181/20 181/25
canals [9] 44/19 44/20 44/20 44/24 45/2
45/11 45/21 45/22 93/25
candor [1] 46/9
cannot [5] 11/4 19/15 51/4 55/21 169/8
cap [2] 133/20 141/17
capability [1] 34/5
capable [2] 19/5 30/15
capacity [5] 68/8 72/6 86/2 90/6 196/21
capita [1] 213/6
care [1] 6/19
careful [1] 200/8
carefully [1] 165/11
Carol [1] 101/9
carried [1] 188/22
carriers [1] 118/3
cart [1] 74/11
case [91] 5/6 6/4 6/5 7/16 11/20 14/21
14/22 15/22 16/2 16/7 17/3 20/5 25/11
26/7 26/19 27/11 28/1 28/8 32/14 32/17
34/8 34/20 35/7 35/11 36/8 37/2 39/12
40/14 41/1 47/4 50/25 51/2 56/3 59/5
60/10 63/24 80/5 80/5 115/24 118/16
119/11 119/20 119/23 120/2 121/4
121/14 122/7 123/20 124/13 125/25
126/16 127/3 129/18 129/23 129/24
131/8 133/19 134/14 135/17 136/8 140/5
141/21 141/24 149/16 150/2 151/15
154/21 155/12 156/5 157/13 157/15
157/17 163/13 163/13 163/16 164/3
172/1 181/13 186/18 186/19 196/16
198/3 198/13 200/13 203/4 203/7 203/14
203/23 209/16 212/19 213/14
cases [28] 20/21 20/25 21/15 36/21
36/25 37/4 37/4 42/22 57/14 57/21 58/10
98/23 112/7 119/18 127/22 150/19
150/21 150/24 151/1 151/4 157/19 167/9
167/17 169/10 170/5 170/5 203/12

203/17
casino [2] 113/16 142/12
casinos [1] 113/5
cast [5] 76/15 76/17 76/18 77/1 77/4
Casualty [1] 117/13
catastrophe [1] 198/1
categories [3] 30/25 151/3 151/4
categorize [1] 151/8
categorized [2] 31/17 150/22
category [2] 79/12 150/23
Catholic [2] 117/13 117/14
cause [8] 42/19 44/18 112/2 153/24
154/19 156/22 158/22 209/13
caused [10] 8/6 75/10 78/12 89/2 95/14
98/2 129/6 139/1 161/5 173/2
causes [2] 159/14 159/17
Causeway [2] 2/3 2/11
caution [1] 222/18
CCR [3] 3/1 224/7 224/15
CD [3] 114/11 209/16 209/22
CDs [2] 209/18 210/1
census [5] 69/15 73/14 73/21 82/9 84/1
center [1] 161/21
central [2] 153/11 155/4
cents [1] 60/6
century [1] 170/6
certain [19] 5/11 9/1 35/15 37/15 62/23
69/24 70/17 89/23 101/25 124/15 124/24
150/24 170/18 178/5 194/2 204/17
205/23 208/7 211/19
certainly [27] 7/14 7/21 31/13 36/3 36/20
41/24 42/4 42/15 57/2 59/15 60/24 62/6
63/24 63/25 64/15 64/17 77/11 128/9
137/22 167/6 167/7 193/18 197/10
207/13 212/13 215/6 216/24
certainty [2] 145/2 146/18
certificate [3] 115/10 147/1 224/6
certificates [3] 145/9 145/11 145/12
certification [22] 5/10 8/25 11/20 16/7
16/8 16/11 26/19 27/13 41/14 41/16
165/7 167/13 167/15 183/23 191/19
204/7 214/20 220/17 220/23 221/6 222/2
222/7
certified [5] 16/10 16/14 60/21 165/15
174/25
certifies [1] 176/23
certify [13] 26/24 59/14 60/8 60/9 61/11
160/13 161/18 165/21 166/13 166/20
170/4 204/11 224/9
CGL [4] 116/13 116/13 144/12 145/3
Chaffe [2] 108/8 108/9
chair [1] 168/20
challenge [1] 73/14
Chalmette [1] 79/11
chance [5] 33/17 152/1 191/7 191/8
205/11
change [5] 41/22 52/24 59/18 147/9
223/17
changed [4] 52/22 76/4 77/15 173/8
changeover [1] 53/14
changes [1] 66/21
Chapter [1] 52/11
characteristic [1] 147/19
characteristics [1] 68/22
characterize [1] 16/19
charge [1] 112/17
charged [2] 51/16 51/21
charitable [2] 194/17 210/2
charitably [1] 194/21
charity [1] 196/20
Charles [3] 9/22 200/22 222/21
Charlotte [1] 103/25

C

check [7] 33/22 90/25 174/15 176/20 178/8 178/10 178/14
checked [1] 91/24
checking [1] 145/22
checks [2] 32/7 177/5
chief [3] 22/7 66/1 104/16
child [1] 6/20
chill [1] 200/13
choice [3] 61/18 214/7 217/2
choices [1] 214/8
choose [3] 19/16 195/14 216/17
Christophe [1] 16/23
Chronology [2] 44/1 46/7
Church [1] 117/15
cigarette [1] 149/21
cigarettes [1] 149/22
cinch [1] 171/24
circuit [15] 7/19 15/6 16/15 16/17 22/19 22/21 141/1 165/9 165/10 165/12 166/4 166/6 167/19 176/1 216/9
circumstance [1] 165/1
circumstances [1] 23/18
cited [1] 58/10
Citizen [1] 2/22
citizens [2] 40/2 40/21
city [10] 24/23 72/1 72/24 73/12 91/15 98/3 150/24 151/1 180/9 187/24
civil [8] 5/7 20/23 31/5 67/1 67/12 69/3 149/11 196/14
claim [42] 8/15 17/1 26/3 30/25 43/23 58/18 60/2 60/23 61/9 122/1 129/18 156/20 160/19 161/19 164/10 164/14 164/17 166/22 167/1 175/4 178/13 186/5 186/16 186/20 190/4 190/7 190/10 190/10 190/12 190/15 190/19 190/21 195/15 196/14 196/19 198/8 209/12 209/12 209/24 210/23 212/12 212/24
claimant [1] 9/9 26/7 161/5
claimant's [1] 9/11
claimants [24] 14/8 14/19 18/2 27/17 29/22 32/13 33/7 34/20 38/12 40/16 123/4 123/8 123/9 128/20 134/2 139/4 162/11 168/2 177/2 192/14 199/9 199/14 209/24 213/2
claimed [3] 42/20 138/18 140/13
claiming [1] 48/15
claims [108] 5/11 8/5 9/2 14/10 14/18 15/24 16/4 16/6 17/1 17/4 17/25 18/13 19/2 19/4 21/1 21/8 22/6 22/12 22/13 22/14 23/3 23/7 24/25 25/2 25/15 25/16 25/17 25/25 26/10 27/14 27/19 27/22 27/25 28/17 28/24 29/1 29/4 29/6 30/5 30/8 30/19 31/16 31/19 31/20 33/15 35/8 38/11 38/14 40/14 40/23 41/10 46/4 48/4 48/7 55/22 57/16 57/18 57/23 65/3 86/16 86/25 88/21 88/24 96/7 97/22 97/23 97/25 98/2 98/16 99/14 99/14 99/15 99/23 122/6 123/7 125/25 126/16 131/7 133/18 134/17 134/20 135/8 138/3 139/6 147/19 149/12 155/14 156/3 161/23 167/23 175/2 175/3 175/14 175/18 175/20 175/23 176/3 176/4 176/6 176/8 176/15 195/12 210/19 210/20 212/5 212/11 212/16 212/19
claims-made [1] 147/19
clarification [1] 91/4
clarify [4] 122/8 137/8 139/10 146/17
clarity [1] 36/15
class [243]
classes [3] 59/7 97/18 151/17
classic [1] 17/2

classified [2] 86/11 86/12
Claus [1] 171/11
Clayton [1] 65/17
clear [18] 21/13 27/25 34/15 38/25 39/2 46/18 51/6 53/14 58/19 79/25 121/21 126/10 127/14 157/9 159/24 162/4 181/9 199/23
clearer [1] 67/18
clearly [5] 28/25 34/9 38/10 51/2 51/3
clerk [3] 10/10 64/7 178/24
clerks [1] 203/17
client [4] 180/25 192/20 193/5 199/7
clients [17] 10/9 11/4 11/4 19/6 37/11 42/5 42/10 60/14 68/11 75/11 78/6 116/19 174/13 178/5 192/18 194/20 194/23
close [8] 29/15 71/8 80/2 95/12 95/17 155/22 199/19 220/16
co [2] 115/19 198/5
co-authored [1] 115/19
co-counsel [1] 198/5
code [1] 68/20
collateral [2] 93/16 94/20
colleague [1] 101/1
collect [8] 40/17 55/17 85/5 86/2 111/5 111/8 130/4 142/11
collective [1] 98/14
collectively [2] 133/18 169/23
collects [1] 73/17
collusion [1] 15/9
Colonel [1] 150/5
colored [1] 92/20
colors [2] 159/8 160/9
colossal [2] 84/6 84/20
combinations [1] 25/23
combined [3] 136/2 136/7 214/21
come [17] 32/10 32/22 32/25 37/9 43/5 43/21 55/8 88/12 93/9 95/6 96/24 139/5 148/14 165/11 167/18 176/4 177/23
comes [6] 35/21 38/16 50/7 86/15 88/7 180/10
comfortable [1] 169/15
coming [9] 26/12 35/9 35/19 56/13 79/15 80/8 90/7 90/18 152/2
comment [5] 38/8 46/22 63/7 118/1 197/13
comments [1] 5/15
commercial [16] 74/2 74/7 75/4 82/22 84/11 84/15 85/9 87/12 87/14 87/17 88/16 88/19 93/20 116/8 118/10 118/13
Commission [1] 72/2
Commissioners [1] 50/23
committee [2] 46/24 151/13
committees [1] 21/20 164/8 166/10
commodities [1] 85/19
common [6] 54/23 153/22 153/25 166/23 178/9 191/6
commonality [1] 65/2
commonly [1] 119/23
communication [1] 193/18
communities [3] 68/4 77/15 78/12
community [18] 68/20 69/2 72/16 73/3 73/6 73/7 73/25 76/4 76/12 84/21 85/13 86/5 87/23 171/1 186/7 186/10 186/13 191/1
companies [8] 63/20 74/3 74/4 116/15 117/3 117/21 118/19 171/11
company [13] 2/13 2/17 8/4 8/4 13/24 14/1 21/12 57/1 79/17 100/6 117/17 154/14 198/17
compare [1] 14/19
comparing [1] 116/9
compelled [2] 150/7 196/18

compensate [3] 186/13 208/22 210/4
compensation [2] 123/1 131/6
complain [1] 129/12
complained [1] 11/5
complaint [4] 150/1 150/2 150/3 151/15
complete [3] 56/17 109/9 163/24
completed [9] 15/14 46/15 48/3 72/9 72/14 104/22 107/18 132/16 133/1
completely [4] 153/3 153/8 191/5 217/9
completeness [1] 223/6
completion [1] 43/8
complex [7] 15/25 75/15 149/10 163/16 169/24 202/4 203/15
complexity [5] 15/11 15/20 168/9 169/17 169/20
complicated [1] 170/3
complications [1] 217/24
comply [1] 20/7
component [1] 61/9
components [2] 99/22 163/19
composed [2] 111/1 111/2
composition [1] 76/9
comprehensive [1] 83/5
comprised [1] 89/24
comprising [1] 14/15
compromise [1] 50/13
computer [1] 3/6
concede [1] 188/16
conceivable [6] 32/4 131/18 131/21 132/11 139/24 216/2
conceivably [2] 7/20 129/25
concern [1] 30/3
concerned [6] 48/3 55/7 109/16 110/7 111/10 140/25
concerning [4] 44/5 45/15 103/2 157/23
concerns [6] 16/12 22/8 26/20 29/14 30/11 45/7
concluded [5] 47/2 136/8 174/5 220/14 222/7
concludes [7] 24/16 24/21 31/23 46/17 49/21 80/9 171/7
conclusion [6] 27/25 43/14 45/12 47/6 58/9 195/3
conclusions [4] 28/16 159/17 204/17 204/19
concomitant [1] 179/12
concrete [1] 129/11
conditions [1] 211/25
conduct [3] 20/4 189/18 210/22
conducted [2] 182/25 185/15
confers [1] 39/6
confident [2] 77/22 92/1
confirm [3] 18/13 28/13 98/15
confirmation [1] 102/13
confirmed [1] 46/9
confirms [1] 104/19
conflicts [2] 174/22 174/24
confront [1] 47/4
confused [1] 79/14
Congregation [3] 10/5 10/6 19/8
Congress [5] 44/24 46/20 180/6 186/10 190/18
congressional [1] 180/10
connection [19] 81/15 101/18 104/24 106/3 108/20 111/15 119/10 128/3 130/12 130/15 147/25 152/15 157/19 164/4 164/24 194/20 197/25 203/23 223/14
consequence [1] 213/17
conservative [1] 87/6
consider [11] 7/2 12/17 59/12 81/20 153/15 164/20 168/11 169/6 211/13 211/14 223/24

Case 2:05-cv-04182-SRD-JCW   Document 20851-23   Filed 06/08/09   Page 233 of 262

consideration [7]  16/15 27/1 43/22 96/12
125/24 126/4 176/25
considerations [6]  48/17 49/7 49/9 49/9
66/23 67/24
considered [6]  16/2 93/16 126/13 136/14
163/8 183/20
considering [2]  56/11 174/17
consist [2]  25/9 31/20
consistent [2]  37/17 171/13
consisting [3]  25/14 25/16 25/17
consists [1]  23/21
consolidated [5]  1/6 5/8 6/5 20/21 117/13
constant [1]  193/18
constitute [2]  125/5 200/11
constitutes [1]  214/21
constituting [1]  28/25
Constitution [2]  48/12 49/10 50/2 54/7
54/10 55/24
constitutional [5]  29/7 49/3 50/25 53/3
55/2
constitutionally [2]  39/22 54/18
construct [1]  43/4
constructed [3]  42/22 109/12 110/9
constructing [3]  51/17 51/22 54/12
construction [11]  43/7 43/20 44/25 45/20
106/13 107/1 116/4 116/21 117/4 154/14
175/19
consult [3]  75/11 113/23 116/15
consultant [1]  115/4
consultants [1]  67/12
consulting [4]  67/1 78/6 113/25 117/20
consumer [1]  212/18
contacted [5]  121/3 121/6 121/7 121/8
203/3
contain [2]  81/19 194/10
contained [1]  102/5
contains [1]  81/21
contemplate [1]  216/10
contemplated [2]  58/4 109/7
contend [1]  8/4
contention [2]  62/7 135/15
contents [6]  86/23 87/1 87/5 87/14 93/22
123/2
contested [1]  42/17
context [9]  14/23 16/15 68/16 122/25
131/10 173/4 183/10 196/13 199/13
contiguous [1]  180/25
contingent [1]  35/11
continuation [1]  100/10
continue [7]  23/16 109/23 141/14 169/21
172/7 189/17 215/14
continued [4]  2/1 132/6 165/3 215/16
continuing [4]  84/21 112/17 164/21 172/5
continuous [3]  24/17 129/23 133/1
continuum [2]  138/13 138/21
contour [1]  185/1
contract [20]  15/24 103/16 103/17 116/5
127/12 127/23 128/12 128/22 128/23
129/2 129/24 130/8 130/12 130/20
130/23 132/16 132/21 132/24 140/2
145/7
contractor [2]  104/19 106/5
contractor's [1]  157/13
contractors [10]  49/12 48/2 48/4 107/4
123/25 124/1 131/12 131/19 151/5 157/3
contracts [19]  42/25 104/21 104/22
105/2 116/5 116/21 117/12 123/24 124/8
124/24 126/25 127/13 127/15 127/17
128/1 129/1 130/3 143/15 145/15
contractually [1]  49/1
contrary [1]  20/3

contribute [2]  19/17 109/23
contributed [2]  69/23 97/18
contributing [1]  92/19
contribution [3]  194/13 195/7 195/15
contributions [2]  17/21 215/17
control [7]  7/5 22/18 90/25 108/24 113/4
162/6 185/20
convenient [1]  66/7
convention [1]  49/3
convert [1]  60/22
convince [3]  7/18 40/20 187/3
convinced [1]  20/12
coordinate [1]  68/17
coordinates [1]  69/15
copies [5]  81/19 145/17 205/6
copy [3]  66/5 81/21 192/3
copying [1]  185/21
corporate [1]  14/23
Corporation [2]  72/23 117/3
Corps [50]  7/3 7/3 7/12 7/14 7/17 22/17
36/7 36/8 43/1 43/3 43/11 43/15 44/8
44/16 45/7 45/19 46/3 46/13 46/17 46/21
47/11 47/14 47/14 49/1 57/24 103/18
109/11 110/3 110/10 154/5 155/14
156/21 157/16 158/19 160/23 168/18
171/25 175/2 175/15 176/3 176/5 180/8
186/9 186/11 188/3 188/7 188/8 188/10
200/7 223/24
Corps failed [1]  44/8
Corps' [2]  43/23 175/19
correct [91]  63/16 65/10 66/11 66/12
67/8 67/9 70/18 70/20 71/7 78/8 81/22
81/23 82/23 87/12 87/15 87/16 87/18
92/2 93/13 93/18 93/19 93/24 94/2 94/3
94/6 95/11 98/4 99/1 107/14 107/25
114/23 120/23 122/16 122/17 123/10
123/11 124/18 124/19 124/22 124/23
125/22 128/4 128/5 131/15 131/23
134/23 135/5 135/21 135/22 136/5 136/6
136/23 137/11 137/21 137/25 138/1
138/15 138/15 140/15 140/16 147/3
147/5 150/11 150/17 150/18 151/15
151/16 151/20 151/21 160/2 161/10
163/2 163/12 164/6 165/4 166/23 168/3
170/1 173/16 174/11 175/16 178/20
181/15 181/18 191/20 200/16 202/24
204/7 204/12 223/5 224/10
correction [1]  205/22
corrections [2]  125/8 125/13
correctly [3]  61/24 171/3 204/4
correlation [1]  92/1
correspondence [2]  143/13 193/6
cost [18]  16/5 31/24 35/19 37/23 37/24
43/7 56/5 85/24 109/17 109/24 110/2
110/5 110/8 110/11 141/20 190/9 211/4
213/12
costs [36]  20/2 20/3 34/8 34/8 34/8 35/2
35/2 35/15 36/17 36/19 36/23 37/6 37/8
37/11 43/7 60/24 109/16 110/14 110/17
141/14 141/18 183/25 184/21 185/19
186/5 186/20 186/25 188/13 188/19
189/1 189/2 189/3 189/25 197/22 198/15
212/5
couched [1]  131/25
could [95]  5/22 7/20 13/7 20/10 24/12
30/9 30/25 32/2 39/11 48/9 48/21 50/4
56/3 59/14 71/5 73/10 76/3 79/24 79/24
91/6 92/13 98/6 109/5 110/7 111/14
111/19 111/25 123/21 124/12 126/15
129/18 129/25 130/4 131/12 131/24
132/3 132/8 136/16 139/7 139/24 140/18
141/18 142/11 142/15 145/5 154/19
155/13 158/22 160/3 163/20 166/6

166/24 171/23 172/24 172/25 173/1
173/17 174/5 183/23 185/23 185/23
188/18 189/8 190/8 190/9 193/25 194/13
194/15 194/21 195/3 195/22 196/17
208/8 208/17 209/6 209/6 209/21 209/21
210/21 210/22 210/24 211/8 211/15
211/19 211/20 211/20 211/22 211/23
211/23 213/9 213/12 213/12 215/21
216/2 216/2
couldn't [5]  111/20 130/14 142/4 195/1
195/12
counsel [38]  9/13 15/18 17/22 20/1 20/20
21/7 21/15 21/18 28/20 29/12 34/6 34/15
35/14 36/25 37/5 38/15 79/4 103/7
120/21 139/22 150/16 156/1 162/18
164/2 164/19 164/19 173/15 179/5
183/15 188/20 191/11 193/19 198/5
201/12 201/14 205/9 206/1 223/20
count [1]  83/9
counterintuitive [1]  55/14
counterproductive [1]  38/6
country [6]  117/15 118/13 170/1 203/15
209/18 212/15
couple [2]  101/6 167/4
coupled [1]  46/2
course [23]  42/13 42/15 42/17 55/4
57/19 58/10 61/22 64/5 115/19 115/21
145/24 158/1 158/20 167/17 171/24
175/24 177/13 195/9 203/11 208/20
209/14 213/14 216/17
court [197]  1/1 3/1 5/23 6/22 6/23 7/7 7/8
7/20 9/14 10/10 10/10 10/14 10/15 10/18
10/21 10/24 11/5 11/6 11/7 11/12 11/25
12/20 13/16 14/2 14/11 14/12 15/5 15/21
16/1 18/13 19/20 20/20 21/7 22/16 23/4
23/5 24/10 24/21 26/15 28/4 28/15 30/13
31/4 31/15 31/23 32/19 32/21 33/9 33/25
34/25 35/21 35/22 36/3 36/6 37/14 40/24
41/25 42/5 43/18 43/23 44/6 44/15 44/22
48/1 50/24 50/24 50/25 56/16 56/18
56/24 58/8 58/13 59/6 59/11 63/21 63/22
65/16 66/13 66/19 67/2 67/10 68/13 70/3
71/16 73/16 74/23 78/17 79/19 80/6
80/13 81/2 81/4 81/16 81/20 89/3 89/5
90/1 92/13 106/2 106/3 106/17 106/19
107/3 107/6 107/10 109/5 110/2 110/8
114/3 114/5 118/8 119/14 120/19 122/23
131/18 135/11 135/19 135/20 141/23
150/9 150/13 150/15 151/4 151/8 151/24
155/10 155/17 156/2 157/20 157/25
160/16 161/7 162/8 162/12 162/16
162/24 163/9 164/8 164/20 164/25
165/12 165/21 167/7 170/3 170/5 170/22
171/5 171/7 171/9 174/20 175/21 175/21
176/1 176/2 177/20 179/20 181/1 183/8
183/12 183/16 185/7 185/11 186/22
187/3 187/7 187/11 189/23 190/1 191/21
191/21 192/13 194/9 199/8 202/16
202/19 205/18 206/10 206/21 206/25
207/20 211/3 212/3 212/16 214/5 214/10
214/18 215/2 215/11 215/19 217/11
222/8 223/7 224/1 224/4 224/7 224/8
224/16
Court observed [1]  44/22
Court's [13]  16/12 21/19 22/21 25/4
26/15 44/7 45/12 62/4 136/4 153/19
162/12 163/17 197/9
court-appointed [4]  21/7 164/8 189/23
190/1
courthouse [2]  167/24 168/6
courtroom [4]  163/5 165/6 177/22 208/2
courts [6]  37/5 119/7 119/15 167/7 168/5
203/18

**C**

cover [5]  8/15 29/17 123/1 126/16
193/25
coverage [94]  24/15 28/13 28/23 56/4
62/12 62/15 63/10 63/15 104/18 116/17
117/7 117/9 117/11 117/14 117/24
118/14 118/21 118/23 121/20 121/24
121/25 122/9 122/18 122/24 123/3 123/6
123/7 123/13 123/15 123/22 124/3 124/6
124/9 124/11 124/21 125/23 125/25
126/6 126/11 127/4 127/11 127/18
127/21 128/19 129/2 129/20 129/23
129/25 130/1 130/15 131/1 131/3 131/7
131/12 131/13 131/25 132/4 132/6 132/8
132/18 132/24 133/1 133/12 133/20
133/25 135/18 136/1 136/5 136/7 136/17
136/19 139/3 139/5 139/11 139/24 140/1
145/5 146/3 146/19 146/24 147/2 147/17
147/19 172/23 172/25 173/12 173/24
173/24 174/6 174/18 180/20 180/24
195/4 218/3
coverages [9]  121/17 121/19 121/21
128/17 134/18 138/11 170/19 171/17
173/22
covered [8]  57/3 137/23 138/8 138/9
139/19 139/21 193/13 194/11
covering [1]  193/17
covers [1]  117/14
CPAs [1]  67/13
create [6]  31/18 37/16 59/17 69/12 70/8
75/2
created [6]  14/22 17/10 53/2 53/16 54/15
71/6
creation [1]  215/20
credible [1]  96/3
credit [2]  96/20 96/23
credited [1]  97/11
credits [1]  211/19
crest [1]  153/5
criteria [5]  14/22 22/5 26/13 44/14
153/21
critical [1]  44/9
cross [18]  10/5 10/6 11/22 19/8 53/22
98/10 98/11 99/11 112/12 112/14 113/1
137/3 141/8 143/2 181/7 182/18 191/10
191/23
Cross-examination [12]  98/10 98/11
99/11 112/12 112/14 113/1 137/3 141/8
143/2 181/7 182/18 191/23
cross-examine [1]  191/10
cross-examining -- the [1]  11/22
cross-pollination [1]  53/22
crossed [1]  188/1
crossover [1]  53/14
cruel [1]  40/15
cry [1]  224/2
CSX [4]  106/24 156/6 156/10 167/10
culpable [2]  7/11 159/18
culprit [2]  156/11 223/24
cultural [1]  76/5
cured [1]  215/21
curious [2]  145/25 192/18
current [3]  108/6 110/2 111/11
currently [3]  30/4 110/21 157/15
curriculum [2]  202/5 202/7
customarily [1]  129/4
customary [1]  36/22
customs [3]  115/17 119/1 120/10
cutting [1]  47/20
CV [5]  1/5 66/3 66/10 100/19 206/4
cy [6]  210/1 210/11 210/13 210/24 211/3
211/7

cy pres [5]  210/1 210/13 210/24 211/3
211/7

**D**

D-8 [1]  43/24
D-O-O-D-Y [1]  108/2
D-U-C-H-M-A-N-N [1]  79/11
D.C [1]  190/14
damage [75]  15/23 25/14 26/3 26/7 45/9
84/5 84/7 86/12 86/14 87/11 87/14 88/16
88/17 88/18 89/2 89/13 89/15 89/17 93/2
93/5 93/10 93/14 93/15 93/17 94/12
94/23 95/13 95/20 95/23 95/24 96/5
96/23 97/1 97/20 98/4 99/3 99/14 99/19
99/22 100/2 126/19 128/17 128/18 129/5
129/8 130/6 130/16 130/17 132/4 132/5
132/6 137/24 138/6 138/8 138/13 138/25
139/1 139/13 139/15 139/20 139/21
140/13 147/17 147/22 161/5 161/12
167/23 173/2 173/6 173/11 173/13
190/16 209/3 209/4 209/4
damaged [3]  77/20 139/8 208/23
damages [36]  6/9 8/6 16/4 42/20 46/5
84/15 88/23 89/19 93/12 95/4 96/14
96/15 96/17 98/14 98/17 98/20 129/6
132/5 138/7 138/8 138/18 138/22 138/22
139/6 139/19 139/20 139/20 142/11
154/24 161/2 161/2 168/19 170/25
211/18 212/20 213/15
dark [1]  92/16
data [26]  44/9 68/11 68/14 68/15 68/21
69/5 69/11 69/23 72/17 73/16 73/17
73/21 74/6 77/5 77/5 77/6 77/10 77/19
77/23 78/1 78/5 81/22 96/16 211/16
211/20 213/10
database [2]  67/14 208/25
dataset [1]  68/18
datasets [2]  73/23 74/15
date [6]  105/20 126/7 162/9 163/10
184/21 212/17
dated [4]  10/11 124/15 221/16 221/22
dates [1]  23/12
dating [1]  128/4
daughter [3]  9/22 200/23 222/22
daunting [1]  167/20
David [1]  1/18
day [15]  6/11 12/14 32/20 35/21 37/9
40/16 41/1 41/9 60/20 145/13 151/9
172/21 172/25 217/10 219/20
days [13]  6/11 6/15 9/7 12/10 29/25
217/8 217/20 219/16 220/2 220/3 220/5
220/6 220/7
DC [1]  2/24
deadline [2]  12/11 187/5
deal [7]  59/6 59/9 60/22 115/23 168/5
212/23 216/19
dealing [5]  51/11 61/16 70/6 116/17
119/9
deals [5]  5/9 116/3 116/4 116/5 116/8
dealt [2]  153/17 203/19
Dean [18]  201/1 202/3 202/5 202/14
202/20 203/3 206/4 206/9 206/17 206/20
206/23 207/4 207/10 208/2 210/9 212/1
213/22 214/1
death [5]  96/13 97/25 165/13 209/3
209/12
debacle [1]  150/8
debates [1]  49/2
debt [2]  39/12 110/22
decades [1]  61/1
December [1]  9/2
December 15 [1]  9/2
decide [11]  30/13 33/4 58/22 61/7 62/4

62/5 62/6 62/7 62/8 174/13 185/8
decides [4]  177/2 178/11 178/18 199/15
deciding [2]  62/9 62/10
decimated [2]  75/17 111/6
decision [21]  7/22 7/25 15/2 26/15 35/25
43/23 43/25 44/15 46/7 52/19 58/23
163/8 163/8 164/7 164/7 164/7 164/18
169/14 199/14 199/15 208/12
Decision-Making [2]  43/25 46/7
decisions [2]  67/4 77/8 165/11 187/14
deck [1]  148/10
declarations [3]  201/9 201/11 201/13
dedicated [2]  53/12 119/18
deducted [1]  35/15
deep [1]  44/18
defalcations [2]  45/14 45/19
defective [1]  39/5
defend [1]  76/2
defendant [15]  7/11 7/11 14/23 21/2 21/3
22/17 23/13 26/11 131/20 155/12 156/5
168/10 173/7 210/21 210/22
defendants [50]  7/23 8/9 82/2 9/13 12/23
13/15 17/20 21/2 21/3 22/15 22/22 23/3
23/10 25/5 27/7 34/24 35/9 52/5 57/14
57/21 104/20 106/5 106/11 107/1 107/16
121/22 151/20 151/22 154/4 154/7
154/19 156/24 157/14 157/22 165/5
166/13 168/2 169/3 169/12 169/20 170/8
170/12 171/17 174/11 187/20 187/23
191/21 200/7 206/15 216/15
defendants' [2]  171/4 180/21
defense [10]  45/18 47/9 56/5 80/1 100/8
141/15 141/18 141/20 172/6 173/15
defenses [3]  46/3 56/5 168/17
defer [1]  179/18
deficient [1]  19/11
defined [6]  51/8 51/9 51/12 52/3 81/25
82/1 82/7 109/10
definitely [2]  138/23 168/6
definition [4]  44/9 51/13 77/16 82/1
definitional [1]  51/8
definitions [3]  13/2 68/19 73/23
degree [8]  46/12 66/11 66/15 69/18
115/9 146/18 179/9 185/1
delay [2]  16/7 189/12
delayed [2]  75/25 76/11
delegate [1]  49/3
deliberation [1]  163/11
delighted [1]  87/22
delivered [1]  32/8
demand [3]  85/7 85/19 185/9
demographic [4]  67/20 67/20 68/10
78/10
demographics [4]  66/17 66/20 66/21
67/22
demography [1]  76/4
demonstrate [2]  41/13 173/1
demonstrated [3]  89/16 89/17 173/6
demonstratives [1]  148/23
denial [1]  16/8
denotes [2]  123/6 123/7
deny [1]  41/14
department [6]  39/4 57/18 88/20 96/8
97/22 101/10
DePass [1]  16/22
depend [1]  62/9
dependent [1]  127/11 129/23
depending [7]  118/15 119/19 135/11
136/4 136/10 146/4 160/16
deplete [2]  17/22 40/22
deposited [1]  23/15

D

deposition [1]  27/6
depositions [17]  119/3 119/5 125/2
159/12 173/18 187/17 188/1 188/13
188/20 193/7 193/12 201/17 201/18
201/20 204/1 206/3 217/9
deprives [1]  54/5
depth [9]  70/9 71/9 71/11 90/9 90/24
91/23 91/24 93/4 100/4
depths [1]  45/3
derive [1]  32/15
derived [3]  33/23 53/25 53/25
describe [4]  38/20 92/13 109/5 157/20
described [5]  52/11 53/4 73/19 137/10
172/13
describes [1]  52/7
describing [1]  69/6
deserves [1]  34/12
design [9]  43/3 44/23 45/19 46/2 47/2
47/7 47/8 175/19 180/8
designed [2]  17/3 52/13
desperate [1]  178/7
despite [3]  38/8 38/9 180/22
destroy [2]  45/9 55/23
destroyed [1]  176/18
detail [3]  7/2 80/4 192/6
detailed [3]  44/4 72/9 89/15
details [2]  117/10 171/25
determination [8]  25/9 62/2 62/3 62/18
162/9 163/10 163/17 198/4
determinations [1]  154/20
determine [20]  14/12 14/17 15/6 24/13
68/1 68/4 68/6 68/8 69/13 90/3 121/18
121/19 123/23 124/4 163/1 168/21
193/16 194/12 208/15 212/4
determined [4]  85/7 85/19 155/1 162/22
determines [4]  37/14 135/19 135/20
177/19
determining [1]  16/16
detriment [2]  28/2 60/5
devastation [1]  5/17
develop [3]  72/5 73/7 74/5
developed [3]  59/9 72/25 73/20
development [3]  39/5 57/18 116/25
device [3]  96/25 97/7 211/2
devoted [2]  17/24 71/13
dial [1]  209/21
dichotomy [3]  49/7 49/15 50/9
did [91]  7/8 7/9 7/21 18/6 18/9 19/11
20/7 28/4 46/2 46/13 47/2 59/15 64/15
69/10 72/1 72/20 74/19 76/7 81/15 81/17
89/21 89/21 89/25 90/2 91/16 92/25 93/5
93/6 93/25 94/7 94/18 94/24 95/9 95/10
96/14 96/16 96/16 97/2 103/18 108/13
108/15 121/10 124/7 125/24 126/3
126/20 129/2 131/2 136/20 142/9 142/10
142/14 142/15 142/19 143/9 143/19
144/6 144/8 144/12 144/18 145/9 147/12
154/15 158/1 158/2 158/23 159/13 162/4
164/20 171/2 171/7 178/8 178/23 179/25
182/10 183/7 192/11 192/12 192/22
193/12 193/15 194/6 194/12 194/24
195/6 196/9 199/9 200/16 202/16 204/17
213/3
didn't [27]  5/18 5/25 6/15 16/10 50/2
60/18 79/21 89/18 127/24 130/25 142/5
144/14 145/21 154/17 155/25 157/6
160/22 160/24 165/2 170/20 178/7
178/24 183/10 183/11 195/13 196/2
196/5
died [2]  6/15 6/20
difference [3]  71/4 122/23 213/4

different [25]  14/19 14/24 30/19 76/5
118/20 118/22 122/21 123/4 123/6
126/21 128/21 130/12 130/12 156/4
159/25 161/15 163/19 187/25 194/3
196/19 197/9 207/15 208/16 211/11
219/1
differential [1]  61/25
differentiate [5]  208/21 209/7 209/11
211/17 211/22
differentiation [1]  213/13
differently [2]  7/8 169/3
difficult [9]  38/20 85/10 161/14 170/24
190/5 199/25 200/3 200/4 203/19
difficulty [1]  196/24
dilemma [1]  14/7
diligence [3]  28/10 120/21 157/24
dime [1]  166/16
diminished [5]  7/14 54/25 85/22 86/4
168/25
diminishing [3]  85/8 85/9 99/7
DIRE [2]  65/13 115/1
direct [7]  81/13 108/3 121/1 149/3
174/21 198/19 203/1
directed [1]  127/24
direction [1]  47/14
directly [10]  123/13 126/11 126/23
133/10 135/3 158/1 173/16 184/20
192/14 199/9
director [3]  105/16 105/17 108/8
disagree [1]  218/3
disagreements [1]  80/3
disappointed [1]  41/4
disapprove [1]  177/20
disaster [2]  46/18 153/17
disasters [1]  78/12
disbarred [1]  10/13
disbursed [1]  216/8
disbursing [2]  189/23 190/1
discharge [1]  55/12
disclose [2]  18/21 193/20
disclosures [1]  194/8
discovered [1]  12/7
discovery [9]  15/14 151/18 157/20 158/1
158/3 159/12 173/14 183/1 185/15
discrete [1]  15/23
discretion [2]  160/16 162/12 167/6
178/12
discuss [6]  21/25 48/6 83/2 116/13 195/7
196/9
discussed [5]  8/20 43/19 88/16 146/24
164/9
discusses [2]  104/23 166/5
discussing [4]  15/20 101/2 110/16
141/13
discussion [8]  29/13 42/8 52/20 141/3
182/10 191/4 195/20 216/18
discussions [6]  42/9 44/5 156/19 170/21
170/23 179/11
dismiss [7]  8/12 8/18 36/11 106/11
106/25 155/16 157/12
dismissal [6]  22/17 22/22 106/9 106/23
106/24 156/13
dismissals [6]  104/4 106/8 106/13
106/14 106/19 106/22
dismissed [15]  7/3 7/12 7/15 36/10 48/5
48/5 104/20 107/17 131/19 155/2 156/11
157/5 175/14 191/21 198/20
dismissing [1]  186/8
displaced [4]  83/21 83/24 83/25 84/2
dispositive [1]  155/19
dispute [4]  26/20 29/10 40/13 140/23
dissatisfied [1]  11/8
dissipate [1]  60/4

distance [1]  70/14
distances [2]  69/20
distinct [5]  49/16 50/9 51/25 174/17
174/18
distinction [1]  51/6
distinctness [1]  52/17
distinguished [3]  73/4 122/18 166/12
distinguishing [1]  147/18
distracted [2]  37/20 37/21
distracting [1]  159/1
distraction [1]  158/25
distribute [5]  58/5 162/10 166/19 199/14
209/20
distributed [5]  58/15 162/23 177/3
209/23 212/15
distribution [18]  31/22 31/24 32/16 32/21
160/15 161/8 162/22 192/13 199/9
203/20 210/1 210/24 211/4 211/8 211/11
211/23 213/6 213/20
district [158]  1/1 1/2 1/12 2/3 2/6 2/10
2/11 8/1 8/2 8/2 10/17 13/17 13/19 13/21
13/22 23/1 23/25 24/4 24/8 24/12 24/19
25/1 25/15 25/17 25/18 25/25 26/1 26/4
26/8 27/21 28/5 29/9 33/19 34/21 38/9
38/10 39/11 39/25 40/1 40/1 40/4 40/9
42/2 42/2 42/3 46/11 47/23 47/24 48/20
51/3 51/3 51/4 51/13 51/15 51/20 52/12
52/18 52/18 53/5 53/6 53/7 53/15 53/17
53/17 53/18 53/19 54/9 54/9 54/15 56/19
57/11 57/11 57/12 61/23 62/1 64/10
75/12 75/13 75/16 79/12 92/5 92/8 94/1
97/12 97/14 101/5 101/10 101/12 101/16
101/21 101/23 101/24 103/9 103/15
103/19 104/17 104/22 105/18 105/20
109/21 109/22 109/22 111/10 111/16
111/24 122/25 123/3 123/25 125/10
128/19 128/22 129/15 129/16 129/19
130/5 130/13 130/15 131/14 132/7
132/14 132/16 132/18 133/11 133/13
133/19 133/24 134/14 134/21 134/24
135/6 135/24 136/3 136/12 136/24
137/19 139/7 140/2 146/2 155/5 155/6
156/25 157/2 157/15 157/16 160/19
160/22 161/20 161/24 161/25 180/12
182/5 182/6 182/7 188/8 221/15 221/18
224/8 224/8
district's [3]  26/2 135/17 200/2
districts [98]  8/3 8/6 21/10 22/14 23/10
23/13 26/11 28/24 29/4 30/7 30/19 30/21
34/24 39/8 39/19 40/20 42/16 42/18
42/20 42/25 43/5 45/17 46/4 46/15 47/10
47/15 48/7 48/10 48/23 51/11 52/1 52/2
52/4 52/4 52/8 52/10 53/8 53/8 53/10
53/19 53/22 54/2 55/1 55/5 55/11 55/12
56/4 56/9 56/14 63/4 86/1 86/3 107/21
108/23 109/8 110/15 110/20 110/25
111/5 111/14 111/23 113/3 121/23 122/2
122/7 122/10 122/14 123/14 123/15
124/11 124/17 124/21 124/24 126/1
126/11 126/23 126/24 126/25 127/10
127/16 127/25 128/15 130/1 131/8
133/10 135/4 136/8 136/13 138/6 138/18
141/15 142/11 142/17 145/17 146/19
158/16 197/17 223/3
districts' [2]  42/23 85/5
diverse [2]  19/5 73/22
divide [3]  25/13 163/19 188/20
divided [4]  30/10 153/12 180/23 190/9
divisible [2]  188/4 188/5
division [3]  104/1 113/8 113/9
divulging [1]  171/24
do [151]  6/8 11/9 12/1 12/20 12/25 13/4
22/7 31/1 31/24 33/11 40/10 41/1 54/5

**D**

do... [138]  54/6 54/9 57/4 60/9 61/2
62/25 63/10 63/25 64/23 66/3 66/4 67/25
68/11 68/12 68/16 79/8 79/17 82/12
88/18 89/5 95/5 96/11 97/15 97/20 97/21
100/6 100/12 104/1 107/16 108/10
110/20 110/24 112/19 113/3 113/6
115/11 115/22 115/25 116/14 117/21
118/1 118/16 121/16 123/19 123/20
128/12 130/22 133/11 133/23 142/16
142/19 143/11 143/12 145/17 148/11
150/7 150/19 152/1 152/4 152/6 152/15
154/6 160/4 162/17 162/19 163/14
163/15 167/14 170/15 170/23 171/19
171/21 171/25 172/18 174/16 176/11
177/6 177/8 177/11 180/20 181/23
183/15 186/6 189/6 190/10 191/7 191/8
191/9 191/16 192/21 193/21 194/6
194/12 196/5 196/13 196/18 196/21
196/21 197/14 197/19 197/24 200/10
200/17 202/7 203/3 203/6 205/6 205/11
205/23 207/8 207/20 208/7 210/20 211/8
211/15 212/1 212/4 212/13 212/17
212/24 214/6 214/11 214/17 215/22
217/1 218/15 219/6 220/4 220/16 221/1
221/9 221/10 222/1 222/2 222/17 223/1
223/6 224/9
Docket [1]  1/5
document [18]  1/8 5/12 11/1 16/1 43/19
106/7 106/9 106/10 106/11 106/12
106/12 106/14 106/15 106/16 106/22
106/24 117/7 185/20
Document 2142 [1]  106/11
document-intensive [1]  16/1
documents [16]  10/20 43/24 107/2
107/15 118/6 158/3 158/16 158/17
158/18 159/4 159/11 166/2 185/17
185/20 193/20 204/3
does [35]  10/25 17/10 22/4 23/2 33/9
35/5 35/13 66/16 66/18 82/21 82/24
82/25 83/17 84/14 84/16 93/20 93/22
93/22 93/23 97/4 97/5 97/24 98/1 98/21
125/5 134/16 146/6 161/7 169/18 175/22
179/19 192/14 197/6 206/10 208/12
doesn't [18]  34/22 36/7 54/20 97/6 97/23
97/25 98/2 132/13 140/1 177/20 179/8
188/3 189/9 189/11 191/22 194/25
214/24 216/6
doing [13]  61/3 68/7 72/23 92/21 169/16
171/20 178/24 180/2 181/22 190/12
191/22 210/7 220/19
dollar [5]  37/13 60/6 149/20 195/17
196/23
dollars [8]  17/12 27/20 30/5 40/14 40/19
41/10 172/3 174/15
Domengeaux [1]  1/21
Don [5]  9/21 121/6 121/7 200/22 222/21
don't [54]  10/15 16/19 29/23 31/1 33/4
36/14 40/12 41/12 58/18 59/1 60/11
62/11 62/25 65/5 73/16 75/2 79/24 88/9
100/13 110/24 111/25 112/3 112/4
113/13 127/8 140/18 140/20 147/9 160/4
164/13 165/17 165/20 174/15 178/1
184/12 185/3 186/4 186/25 187/4 188/14
189/14 192/24 195/14 195/15 196/12
199/20 200/3 200/12 207/17 214/17
218/25 219/20 222/18 223/17
donation [1]  39/22
done [30]  31/14 33/15 35/8 50/5 52/22
70/3 70/4 86/9 88/19 92/10 100/9 122/4
128/3 129/4 129/12 130/21 131/5 131/6
157/4 163/3 163/23 182/12 189/7 189/8

198/5 209/1 209/9 209/16 211/15 222/16
Dorr [1] 74/1
Doody [9]  107/21 107/22 108/1 108/5
108/10 108/20 112/6 112/16 113/3
doubled [1]  198/15
Dowling [3]  9/21 200/22 222/21
down [27]  70/21 72/21 83/15 84/12
84/25 84/25 85/2 88/3 88/13 89/12 99/18
100/23 113/19 122/9 125/15 128/8
129/25 138/10 138/21 153/8 158/12
162/7 166/22 176/4 178/11 199/22
215/24
Doyle [4]  3/1 224/7 224/15 224/15
drafted [2]  117/12 117/16
drafting [4]  117/7 117/10 117/23 118/6
drainage [10]  51/20 51/22 52/2 52/4 52/7
52/18 54/13 90/5 90/17 90/23
draining [1]  91/16
dramatic [1]  47/6
drawback [2]  209/8 209/9
Drawer [1]  2/7
dredge [1]  161/1
dredging [13]  106/21 128/3 129/12
129/18 130/6 130/9 130/16 130/17
130/19 137/9 137/14 151/2 160/25
Drive [2]  65/18 79/11
driven [4]  68/11 68/14 68/21 69/23
Duchmann [1]  79/10
due [9]  6/8 28/10 39/5 41/12 42/20
220/21 157/24 163/11 219/20
duly [5]  65/7 107/22 114/20 148/17
202/21
Dunbar [1]  2/16
Duncanville [1]  6/13
Dunn [3]  83/4 83/7 83/17
Duplass [1]  2/9
duration [6]  15/12 15/21 168/9 169/18
169/20 169/24
during [15]  9/16 46/6 47/17 83/11 128/15
128/17 137/24 139/15 140/14 144/16
145/23 147/18 147/22 149/9 222/23
Dutch [1]  152/17
duties [5]  52/11 52/13 108/18 108/22
180/22
duty [4]  51/16 51/22 171/8 180/25
DUVAL [17]  1/11 137/8 150/9 150/20
155/1 155/21 157/12 167/12 176/2
176/22 176/24 177/4 186/8 186/17
208/11 213/11 214/18
dwarf [1]  27/22

**E**

E-99 [2]  44/13 45/2
e-mails [1]  193/1
E.D [1]  15/4
each [43]  17/12 21/25 23/13 25/24 52/17
53/15 53/16 55/10 56/13 72/7 73/9 81/20
85/25 86/2 90/16 90/19 90/23 94/7 94/8
96/18 98/17 111/16 116/8 132/5 135/10
138/10 138/25 145/7 153/22 158/2
158/16 158/22 159/9 159/17 163/7
163/11 169/3 173/18 173/20 177/19
193/19 211/11 211/21
each levee [1]  52/17
earlier [18]  27/6 30/17 67/22 90/20 97/17
111/6 127/7 129/7 144/18 145/10 145/12
146/20 147/15 147/21 182/25 185/14
201/17 223/18
early [9]  72/20 121/5 121/5 121/8 124/3
143/6 143/8 156/17 218/12
earn [1]  23/17
earned [3]  83/10 88/5 164/14
earning [1]  83/13

earthly [2]  185/24 189/10
easily [2]  48/17 188/4
east [52]  2/9 8/1 13/21 21/10 24/3 24/23
25/16 39/11 42/3 45/23 47/23 53/2 53/4
53/6 53/9 57/11 61/21 92/5 92/8 95/7
95/8 95/9 97/13 103/8 103/14 103/19
105/17 108/11 109/21 121/22 125/10
125/16 133/24 134/14 134/20 152/20
153/2 154/9 155/5 156/16 157/1 159/10
159/16 160/14 160/19 160/21 161/6
161/20 175/17 180/15 181/19 182/2
East Jefferson [22]  13/21 21/10 24/3
25/16 39/11 42/3 47/23 92/5 92/8 97/13
103/8 103/14 103/19 109/21 125/10
125/16 133/24 155/5 160/14 160/19
161/20 161/6
EASTERN [3]  1/2 10/16 224/8
easy [4]  96/4 164/9 170/23 212/12
eat [2]  190/8 211/5
EBIA [1]  182/2
economic [13]  32/18 44/7 68/7 68/8 73/5
73/9 74/21 75/7 75/9 78/1 78/11 83/1
87/24
economical [1]  213/19
economically [1]  31/23
economy [1]  87/19
edicts [1]  165/10
edification [1]  193/2
educational [2]  15/3 115/7
Edward [3]  201/1 202/21 202/25
Edwards [1]  1/21
effect [19]  16/16 31/18 49/18 53/8 53/10
63/2 69/25 74/20 103/14 105/21 107/9
107/11 111/4 124/17 128/16 129/7
130/11 132/24 178/1
effective [1]  73/20
effects [2]  45/11 111/7
effort [2]  45/4 99/3 131/1 165/3
efforts [2]  26/24 28/10
egregiously [1]  14/10
eight [1]  203/5
either [18]  27/22 28/24 31/9 42/20 85/21
86/11 135/18 136/3 136/10 136/21
139/12 141/4 143/7 160/15 171/22
173/16 174/20 215/13
elaborate [1]  16/20
elect [2]  164/16 171/18
election [4]  74/14 76/3 76/10 76/23
elections [2]  75/24 76/15
elements [3]  22/3 47/7 153/22
elevation [3]  44/9 70/17 90/23
Eleventh [2]  38/21 38/22
eliciting [1]  78/19
else [21]  41/2 60/5 60/16 61/8 68/24
77/7 87/7 100/17 113/19 128/21 141/5
150/18 162/22 176/16 177/1 193/15
194/6 194/7 196/3 198/25 221/24
elucidate [1]  122/21
emanate [1]  118/18
emanated [1]  92/11
emanating [1]  71/7
embrace [1]  181/1
emotional [1]  87/7
emotions [1]  171/1
empathetic [1]  5/18
emphasis [1]  34/12
emphasize [2]  36/5 57/6
emphasized [1]  36/5
employed [6]  65/21 65/22 83/9 83/10
83/13 88/11
employee [1]  101/9
employees [4]  42/6 54/4 67/11 83/5

Case 2:05-cv-04182-SRD-JCW   Document 10937   Filed 06/08/08   Page 237 of 262

employers [1]  83/5
employment [8]  75/4 83/12 84/12 85/9
88/1 88/2 88/14 108/7
employs [1]  67/7
empowered [1]  180/8
empty [1]  168/20
En [6]  10/10 10/13 10/15 10/18 11/7
11/14
En Banc [5]  10/10 10/13 10/15 10/18
11/7
enabled [1]  69/24
end [13]  20/9 47/18 55/20 60/19 61/1
62/20 130/10 136/21 145/13 172/8
195/10 216/17 216/19
endorsement [2]  118/14 135/9
endorsements [2]  130/2 145/5
ends [4]  132/16 132/17 132/24 132/24
energy [1]  74/4
enforce [1]  11/6
enforcement [1]  125/19
engage [2]  31/6 31/14
engaged [2]  115/5 123/19
engagement [2]  143/9 143/10
engine [1]  54/3
engineer [3]  104/16 104/19 106/4
engineering [7]  22/23 45/5 46/3 67/1
106/10 154/12 154/13
engineers [35]  7/3 7/4 7/12 22/18 36/7
36/8 43/1 43/11 43/15 46/21 47/12 48/2
48/5 57/24 67/12 69/3 103/18 107/4
109/11 131/19 151/6 154/5 154/11
154/23 155/3 156/21 157/16 158/19
168/18 175/15 180/8 186/9 186/11 188/3
223/25
English [1]  118/20
engulfs [1]  119/20
enhanced [1]  36/19
enhancement [9]  20/1 36/24 37/6 44/15
186/25 197/22 197/25 198/2 198/13
enjoy [1]  191/22
enjoyed [1]  142/17
enlighten [1]  197/12
enormous [2]  168/20 186/9
enough [5]  5/18 19/20 19/23 51/6 76/21
enrich [1]  172/10
enrollments [1]  75/15
ensure [1]  43/6
entailed [1]  44/25
enter [1]  117/12
entered [3]  8/24 154/8 179/15
Entergy [2]  72/4 74/4
entering [1]  90/4
enterprises [1]  116/24
entertain [1]  37/5
entire [9]  30/15 33/24 35/18 84/6 88/6
92/20 109/9 110/15 222/6
entirely [5]  162/3 182/3 185/25 196/25
208/11
entities [18]  36/10 49/17 57/19 107/13
116/16 117/4 117/9 117/21 123/14
124/12 124/25 126/24 127/7 131/9
173/18 173/21 194/10 196/20
entitled [3]  34/7 43/25 224/12
entitlement [1]  164/15
entity [3]  36/8 117/5 155/17
entity's [1]  123/6
environment [2]  67/4 67/6
envision [3]  31/1 31/4 214/11
equal [1]  178/13
equipment [2]  48/23 54/3
equitable [5]  29/22 30/16 34/4 34/5

208/8
equitably [2]  30/17 30/22
equity [1]  32/18
equivalent [1]  69/21
erase [1]  133/3
erasing [1]  133/6
error [1]  15/22
errors [1]  46/3
errs [1]  36/3
escrow [2]  23/16 24/20
especially [3]  48/18 50/23 56/10
ESQ [7]  1/15 1/19 1/22 2/3 2/6 2/10 2/14
2/20 2/23
essence [4]  50/20 91/13 118/21 134/7
essential [1]  22/2
essentially [6]  69/11 70/8 70/12 90/6
96/24 188/8
establish [7]  35/8 72/2 72/15 74/16 96/4
161/5 162/11
established [4]  41/16 51/2 93/8 178/21
establishes [1]  105/1
estate [3]  85/17 85/18 85/23
estimate [15]  12/2 19/22 82/10 84/7 87/6
89/6 92/10 93/5 93/17 95/11 97/1 98/20
141/20 142/16 189/25
estimated [12]  46/15 86/14 89/3 90/22
93/10 93/11 94/11 94/23 95/4 109/19
110/8 110/11
estimates [6]  73/14 75/21 84/24 97/20
98/14 99/13
etc [12]  31/17 31/17 37/2 63/13 103/2
131/13 165/14 171/17 171/18 173/22
214/12 222/12
Eustis [9]  22/23 106/8 106/19 128/2
129/13 129/17 154/12 155/2 176/7
evacuate [1]  98/3
evaluate [3]  19/21 19/23 68/5 68/18 73/2
174/4
evaluated [4]  68/16 159/11 165/10
170/19
evaluates [1]  73/18
evaluating [2]  153/14 166/3
evaluation [4]  71/14 162/24 166/1 194/25
even [30]  7/21 11/24 38/9 58/20 60/18
86/1 87/9 98/21 98/24 116/16 127/21
132/8 165/21 166/7 166/8 166/10 167/15
167/21 168/12 168/18 169/8 169/10
170/21 170/22 175/4 186/8 188/3 197/7
200/4 212/11
evening [2]  182/20 182/21
event [10]  8/16 77/16 89/9 89/9 93/16
194/11 194/22 212/2 215/15 215/16
events [1]  174/14
eventually [4]  127/3 132/7 187/5 192/3
ever [16]  5/22 33/16 34/14 37/10 38/4
39/11 39/20 52/23 119/13 150/4 162/4
164/25 186/5 186/19 195/6 197/2
every [18]  33/21 34/23 35/1 35/13 35/23
37/13 41/1 59/16 60/22 69/12 73/25
73/25 74/12 136/18 136/19 177/22
178/13 190/14
everybody [21]  11/21 30/4 36/9 36/12
60/5 60/16 103/12 142/6 152/9 152/10
153/25 159/6 163/22 175/7 177/22
178/14 187/7 189/4 193/24 200/7 200/20
everybody's [1]  215/3
everyone [6]  48/18 62/20 68/24 83/24
83/25 164/11
everything [12]  35/8 41/5 61/8 69/19
73/22 74/24 94/17 117/25 131/5 131/6
144/19 144/22
evidence [26]  7/13 9/17 16/25 40/12
42/19 44/17 45/18 54/24 62/24 63/2

63/21 64/5 64/9 100/19 101/14 103/5
103/24 105/5 123/7 129/20
159/20 205/5 206/19 220/18
evil [2]  33/13 33/14
evolution [2]  118/2 151/24
exact [1]  100/13
exactly [15]  12/24 60/15 61/5 61/10
61/20 126/9 138/20 159/6 171/20 192/12
206/18 207/8 208/15 211/21 216/4
examination [20]  81/13 98/10 98/11
99/11 108/3 112/12 112/14 113/1 121/1
137/3 141/8 143/2 146/15 149/3 156/19
181/7 182/18 191/23 199/3 203/1
examine [3]  86/24 142/3 191/10
examining [1]  11/22
example [15]  6/2 22/16 26/25 39/3 68/21
91/4 116/19 116/22 127/10 128/11
129/16 137/12 196/14 211/1 217/24
examples [1]  116/1
exceed [4]  65/3 97/16 98/17 136/16
exceeded [1]  91/10
exceeds [2]  21/2 31/25
except [3]  49/24 61/7 117/25
exception [2]  174/6 175/12
excess [16]  23/9 23/21 24/2 24/7 84/7
86/15 87/7 95/19 95/20 134/13 134/25
135/23 135/25 136/2 141/22 187/10
exchange [1]  102/11
exclude [2]  126/6 161/22
excluded [1]  198/17
excluding [1]  145/5
exclusive [1]  71/21
exclusively [3]  52/13 92/17 94/19
excuse [6]  16/19 72/16 73/13 76/19
89/16 90/15
excused [1]  148/8
executed [1]  205/1
executive [3]  66/1 105/17 108/8
exemptions [1]  106/18
exercise [1]  44/6
exercised [1]  38/4
exhaust [1]  167/25
exhausted [3]  29/4 38/11 189/5
exhaustive [1]  44/4
exhibit [40]  43/24 63/5 64/6 64/8 100/19
101/12 102/1 102/4 102/6 102/7 102/10
103/1 103/1 103/5 104/13 105/6 114/9
114/11 114/17 124/16 125/10 148/2
158/7 159/19 160/1 178/23 192/3 199/6
199/6 200/15 201/16 202/9 204/25 205/7
206/4 206/7 221/11 221/15 221/18
221/21
Exhibit 1 [1]  63/5
Exhibit 59 [1]  64/6
Exhibit 60 [1]  64/8
Exhibit 62 [1]  103/1
Exhibit 63 [1]  102/6
Exhibit 64 [1]  103/5
Exhibit 65 [1]  104/13
Exhibit 68 [1]  114/17
Exhibit 68-4 [1]  114/11
Exhibit 69 [2]  148/2 200/15
Exhibit 70 [2]  158/7 178/23
Exhibit 72 [2]  159/19 160/1
Exhibit 73 [2]  192/3 199/6
Exhibit 82 [1]  201/16
Exhibit 85 [1]  206/4
Exhibit 86 [1]  206/7
Exhibit 87 [2]  204/25 221/11
Exhibit C [1]  125/10
exhibits [18]  12/5 63/6 63/17 64/5 64/12
105/5 114/10 201/9 201/14 201/20 204/2
205/23 206/2 206/3 221/2 221/5 221/9

**E**

exhibits... [1]  222/12
Exhibits 47 [1]  63/17
Exhibits 74 [1]  206/2
exigible [2]  49/23 50/14
exist [5]  14/19 54/20 142/3 142/6 146/6
existed [1]  83/2
existence [4]  15/9 17/8 127/11 193/13
existing [2]  10/21 110/22
expand [1]  131/1
expanded [1]  92/2
expanding [1]  121/19
expect [5]  61/2 63/23 146/25 168/14 187/8
expectations [3]  59/1 117/24 178/6
expected [4]  118/3 126/5 126/9 144/24
expend [1]  189/12
expended [1]  198/3
expenditure [1]  37/15
expense [4]  15/11 15/20 16/8 209/13
expenses [7]  20/2 35/22 35/24 37/17 183/9 183/10 183/13
expensive [6]  182/22 185/13 185/22 190/8 212/6 213/8
experience [5]  149/6 172/18 189/21 197/25 206/24
experienced [4]  44/19 46/6 52/23 169/10
expert [28]  25/20 28/13 28/14 28/21 28/22 64/2 78/10 81/6 114/10 118/25 119/3 119/6 119/9 119/13 119/15 119/18 119/23 120/9 121/4 121/14 125/6 166/2 172/17 202/3 202/14 203/10 208/14 217/10
expertise [6]  65/1 66/16 66/25 67/19 202/20 204/17
experts [4]  35/10 37/2 156/20 159/13
expiration [1]  212/17
expires [1]  210/19
explain [11]  66/19 67/2 68/13 70/3 73/16 109/5 122/20 122/23 131/17 179/4 210/12
explained [2]  50/25 57/20
exploration [1]  183/13
explore [3]  121/17 184/9 184/11
explosion [1]  149/15
explosions [1]  149/14
exposure [2]  173/1 173/2
exposures [1]  149/13
expressing [1]  192/20
expressly [1]  26/5
extended [1]  36/24
extends [1]  182/7
extensive [7]  94/16 95/2 146/21 158/1 158/3 182/25 185/15
extensively [1]  67/15
extent [14]  26/20 51/5 69/13 98/4 99/18 128/18 129/22 138/20 157/20 158/21 175/20 179/14 180/24 207/19
extra [3]  210/20 210/25 216/16
extracted [1]  81/22
extraordinary [7]  168/4 170/25 172/1 172/18 186/14 190/13 190/22
extreme [1]  7/2
extremely [6]  60/19 167/19 168/25 170/24 170/24 171/1

**F**

F. [1]  15/4
F. Supp [1]  15/4
face [1]  33/14
faced [1]  48/7
facilitator [1]  73/3

facilities [5]  68/4 84/12 88/17 88/19 96/13
facility [3]  68/5 68/9 75/5
fact [45]  5/25 14/11 14/12 30/17 35/3 37/21 41/3 48/19 58/6 59/19 59/24 61/12 61/24 69/17 70/7 77/6 85/7 103/15 104/19 107/16 112/1 115/19 121/13 150/9 151/22 160/1 164/3 166/19 166/21 167/2 167/3 168/21 171/20 172/14 178/1 178/3 179/21 180/5 180/13 180/22 184/4 186/12 195/11 196/9 213/7
factors [15]  14/20 15/5 15/8 32/19 33/1 52/19 93/3 168/11 174/19 209/2 209/6 211/10 211/12 211/22 219/19
facts [10]  25/8 47/22 59/18 62/1 154/18 164/16 174/4 179/11 179/12 218/13
factual [1]  15/15
fail [2]  46/2 150/6
failed [3]  24/18 24/24 44/8
failure [5]  18/21 44/19 45/16 129/14 130/22
failures [6]  7/25 25/22 25/23 43/16 129/8 181/23
fainted [1]  6/12
fair [18]  15/6 19/19 25/19 32/19 76/3 113/22 155/19 167/5 177/6 178/6 183/24 189/4 189/16 189/17 193/5 199/16 206/16 208/9
fairly [6]  18/2 30/9 59/14 209/2 211/15 213/10
fairness [11]  7/6 41/18 120/20 163/14 163/15 183/21 184/8 219/14 220/17 222/3 222/8
faith [3]  29/13 170/9 173/24
fall [2]  72/20 165/8
Fallon [1]  197/24
falsely [1]  59/2
familiar [7]  20/23 38/16 109/1 147/7 181/10 202/16 202/19
familiarized [1]  108/21
families [2]  42/6 172/10
family [1]  98/22
Fannie [1]  73/7
far [7]  21/2 59/24 110/18 141/22 146/10 182/23 199/10
fashion [2]  78/19 213/8
father [1]  5/20
fault [7]  27/21 35/9 168/13 168/22 168/23 172/1 173/6
favor [6]  21/7 50/13 55/19 55/20 155/16 194/23
favors [1]  20/22
Fayard's [1]  193/3
FCRR [3]  3/1 224/7 224/15
feasibility [1]  203/20
feasible [3]  31/24 211/24 213/19
February [1]  75/23
federal [8]  6/24 31/5 34/25 50/24 51/2 52/19 110/23 119/7
federally [1]  42/22
fee [3]  61/8 188/24 198/8
feel [3]  171/8 196/18 203/18
feeling [1]  210/5
feelings [1]  191/5
feels [1]  32/19
fees [12]  34/10 34/16 34/17 35/2 35/2 35/3 60/25 164/4 164/10 166/23 167/8 189/16
feet [6]  32/12 69/18 90/18 209/4 209/5 209/5
Feigler [3]  9/18 200/19 222/20
fell [1]  91/9
felt [9]  76/13 150/7 155/11 155/23

156/20 157/6 163/18 187/23 196/25 197/9 17/6 198/7 89/14 93/3 99/19
Ferdinand [1]  16/23
ferret [2]  121/20 156/23
few [4]  7/23 28/1 143/1 172/17
fewer [2]  85/10 85/17
field [14]  44/13 115/12 115/16 115/20 116/21 119/6 119/24 120/3 120/6 120/9 202/3 202/15 204/17 206/24
fields [1]  78/10
Fifth [14]  7/19 16/6 16/15 16/17 22/19 22/21 141/1 165/9 165/10 166/4 166/6 167/19 176/1 216/9
Fifth Circuit [13]  7/19 16/15 16/17 22/19 22/21 141/1 165/9 165/10 166/4 166/6 167/19 176/1 216/9
fight [2]  7/19 187/7
figuratively [2]  128/11 171/11
figure [8]  28/6 88/18 93/14 93/15 93/17 95/11 99/3 185/23
figures [1]  89/5
file [28]  9/10 10/7 10/20 11/9 11/11 62/18 63/1 64/4 64/8 69/16 100/18 103/4 103/24 105/14 114/8 140/1 153/16 155/18 156/2 159/20 192/5 205/4 206/17 214/4 217/19 218/7 219/3 219/12
filed [29]  8/12 8/22 9/6 11/1 11/22 23/12 26/16 43/18 50/11 50/16 50/18 64/16 79/11 79/13 105/11 154/2 154/25 155/22 155/23 156/17 156/21 175/8 187/4 187/5 217/15 220/3 221/13 221/17 221/20
filing [6]  10/25 11/3 11/3 122/1 149/24 172/21
fill [1]  90/20
final [5]  38/7 41/11 159/5 187/10 216/12
Finally [4]  25/12 99/2 112/6 119/22
Finance [2]  72/8 77/12
financial [4]  101/22 221/16 221/19 221/21
find [34]  26/15 26/21 30/23 33/1 56/18 60/12 79/17 115/23 118/16 118/19 124/12 131/2 133/11 133/23 143/17 145/4 145/5 166/25 173/23 174/14 180/21 183/12 186/24 191/14 195/15 199/24 203/22 211/10 211/20 212/2 213/12 213/19 215/1 216/16
finder [1]  168/21
finding [2]  136/4 211/6
finds [2]  177/2 177/5
fine [11]  29/18 41/24 66/8 199/22 207/6 207/13 218/15 218/18 219/8 219/18 220/7
finish [1]  144/8
finishes [1]  71/1
finite [2]  186/23 187/6
Fire [8]  2/13 2/16 8/3 13/24 14/1 21/11 56/25 198/17
firm [9]  66/25 67/3 67/15 71/19 73/17 89/22 116/25 154/13 197/4
firms' [2]  35/10 37/1
first [49]  5/16 10/22 10/24 22/10 30/13 33/4 34/14 34/22 44/24 56/3 58/11 60/3 60/3 60/14 64/25 70/6 71/24 73/20 79/13 81/8 81/24 108/13 121/3 122/18 122/24 122/25 123/6 137/11 142/9 142/17 142/20 153/15 154/2 154/4 167/25 168/8 168/22 170/11 170/13 179/7 187/14 191/14 203/3 206/23 212/4 212/8 215/24 217/15 223/4
first-party [8]  122/18 122/24 122/25 123/6 142/9 142/17 142/20 223/4
fit [1]  30/25

**F**

fits [1] 27/12
five [6] 6/11 107/18 113/20 149/2 205/14 205/15
five-minute [2] 149/2 205/15
fixing [1] 209/19
flexible [1] 32/18
flights [1] 167/18
flood [40] 7/5 22/18 32/15 43/4 44/22 48/21 48/25 52/15 53/1 53/13 54/13 54/13 56/20 63/12 69/10 70/9 71/9 85/24 86/24 89/18 90/9 90/25 93/4 93/10 95/22 96/19 96/21 96/22 97/2 97/3 103/7 104/25 105/16 108/11 108/18 108/18 108/18 156/9 160/9 176/3
flood-impacted [1] 97/2
flooded [6] 70/23 89/17 92/17 94/19 139/12 191/1
floodgate [1] 156/8
flooding [24] 25/22 69/13 69/18 89/9 89/11 89/23 90/3 90/23 90/24 91/10 91/16 91/25 92/19 94/13 94/16 94/25 95/2 95/14 100/4 154/20 156/18 156/22 187/23 209/13
floods [2] 40/3 69/6
floodwalls [5] 44/15 45/21 45/21 45/23 129/14
floodwater [2] 153/24 153/25
floodwaters [2] 71/6 91/11
flow [2] 90/21 161/2
focus [7] 38/4 52/25 71/21 117/22 122/15 124/11 163/20
focused [2] 52/25 186/1
focusing [2] 127/2 147/10
folks [3] 160/18 160/20 161/19
followed [1] 162/25
following [11] 9/15 12/10 12/14 23/22 46/9 52/6 79/3 81/1 149/24 183/4 185/10 202/22
follows [5] 65/8 107/23 114/21 148/18 202/22
fond [1] 198/10
footprint [2] 86/5 95/3
force [4] 20/25 88/15 103/14 129/1
forced [1] 19/15
forces [2] 42/21 46/1
forecast [1] 76/25
forecasting [4] 67/20 67/21 68/10 78/11
forecasts [1] 75/14
foregoing [1] 224/9
forerunner [1] 66/14
forever [1] 188/12
Forgive [1] 195/19
forgotten [2] 151/5 154/14
form [3] 125/6 175/9 210/11
Form 95 [1] 175/9
formal [1] 157/21
formed [1] 152/17
formerly [1] 101/24
forms [2] 39/6 118/10
forth [6] 29/10 58/2 203/21 204/19 210/2 215/17
fortuitous [1] 166/4
forward [6] 12/12 50/3 62/24 73/6 76/20 216/11
fought [1] 7/17
found [4] 8/23 120/2 168/22 191/15
four [12] 6/10 82/2 83/8 83/14 83/18 84/17 88/3 88/11 104/25 105/2 201/20 209/4
fourth [1] 6/11
frail [1] 171/1
frame [1] 72/18

framework [1] 72/3
frameworks [1] 29/1
Frank [1] 80/2
frankly [3] 37/11 155/25 163/2
fraud [1] 15/9
fraudulent [1] 149/21
free [3] 45/15 57/21 211/3
friend [1] 80/2
friendly [1] 39/16
front [4] 55/4 66/3 199/11 200/8
fuels [1] 54/2
fulfill [3] 54/4 55/2 111/16
fulfilling [1] 203/23
full [15] 23/8 29/13 65/9 65/15 66/24 67/13 103/14 107/24 114/22 133/17 148/19 149/5 163/24 202/23 212/21
full-time [1] 67/13
fully [6] 22/16 26/16 27/9 77/22 168/14 210/4
function [6] 54/9 55/24 56/7 75/17 108/16 112/4
functions [1] 48/24 54/4 108/22 108/23
fund [110] 7/12 8/24 14/9 14/13 14/16 14/18 15/7 16/11 16/14 17/1 17/2 17/5 17/7 17/11 17/21 17/23 17/24 18/14 19/17 19/24 21/8 21/22 22/5 23/20 25/6 26/14 27/13 28/5 28/17 29/1 29/22 30/4 30/14 30/14 30/15 30/24 31/4 31/22 32/9 32/25 33/5 34/4 34/8 35/18 35/22 37/8 37/10 37/16 41/3 41/8 41/15 42/11 56/5 56/8 56/8 56/18 58/14 58/21 58/24 59/12 60/13 60/16 61/19 62/4 62/9 65/4 99/5 107/10 112/18 112/22 122/13 162/10 163/18 163/21 163/21 164/5 167/2 169/9 169/19 178/4 186/24 188/22 191/14 191/15 191/18 192/8 200/5 200/6 200/11 206/16 207/12 208/4 208/7 208/16 209/9 209/19 209/23 211/5 212/3 213/17 215/2 215/5 215/20 216/23 216/24 218/2 218/7 219/15 219/19 222/8
fundamental [3] 20/23 28/19 163/20
funding [7] 45/7 53/25 54/5 55/8 56/14 85/14 85/17
funds [37] 19/14 21/3 23/6 23/16 25/24 26/1 27/22 31/25 33/24 35/7 35/23 37/15 37/18 38/14 39/14 40/21 46/15 48/22 49/19 49/24 50/15 50/17 58/5 79/16 79/18 102/2 111/1 112/19 163/11 164/12 166/19 174/10 192/14 195/23 199/9 199/14 210/15
funeral [1] 6/16
furnished [1] 223/10
further [20] 10/19 11/8 17/6 19/25 20/11 47/5 51/9 51/11 52/17 99/9 113/18 137/1 141/6 154/20 155/6 156/19 162/23 182/14 183/11 183/12
future [11] 14/17 40/16 46/19 56/11 56/13 56/14 109/1 109/6 109/24 110/22 208/13

**G**

G-R-E-G-O-R-Y [1] 65/12
Gainsburgh [1] 1/18
game [1] 170/14
gap [1] 190/20
garbage [1] 74/11
GARY [2] 2/10 13/20
gates [2] 156/9 188/11
gave [6] 6/14 173/23
Gaylord [1] 149/18
GCR [6] 65/23 65/25 66/1 66/24 67/7 67/19
GCR's [1] 71/16

general [11] 20/6 46/11 46/23 109/4 185/5 216/5
generally [6] 68/15 108/25 119/24 175/13 175/18 207/16
generals [1] 46/21
generating [2] 113/11 113/14
generator [1] 113/16
Gentilly [2] 68/25 167/10
geographic [20] 25/21 46/5 67/14 68/11 68/14 68/17 68/21 68/23 69/5 69/15 69/23 71/10 73/23 74/21 77/8 89/23 99/16 150/25 159/25 174/18
geographic-driven [4] 68/11 68/14 68/21 69/23
geography [4] 73/22 75/20 100/3 152/17
GERALD [2] 1/19 201/12
Gerard [1] 104/16
get [77] 12/2 18/17 30/10 30/11 30/22 31/10 31/16 33/4 33/8 33/12 34/11 34/12 34/21 37/6 39/16 40/6 40/11 40/18 41/6 52/8 56/9 56/12 58/23 60/6 60/7 60/14 60/17 62/21 68/17 78/18 87/9 90/9 93/17 93/21 96/4 97/14 99/3 99/20 124/2 124/11 133/15 133/17 140/22 143/14 148/22 149/1 152/10 164/1 164/13 165/25 167/23 167/25 168/7 172/7 172/23 172/25 176/10 177/8 178/2 178/8 178/10 178/14 184/18 187/6 187/13 192/19 194/24 195/22 198/11 201/4 204/11 207/17 212/13 214/10 214/25 217/3 217/11 223/20
get-go [1] 164/1
gets [6] 33/25 34/22 34/22 192/15 213/5 213/6
getting [3] 91/19 152/8 186/8
gift [1] 39/22
gifts [1] 39/23
Gillen [2] 104/16 104/23
give [28] 35/6 66/6 67/10 68/21 91/6 116/1 116/19 117/22 125/24 146/10 149/5 157/22 185/21 185/23 187/1 191/9 192/6 192/9 193/5 194/22 196/2 210/1 210/23 210/25 218/19 219/23 220/3 220/5
given [19] 26/2 29/1 64/7 68/1 68/9 68/18 99/22 115/14 118/15 119/3 125/9 144/20 144/21 189/16 191/8 194/4 195/11 206/15 218/7
gives [6] 6/6 6/9 35/14 159/7
giving [2] 24/24 178/24
GIWW [2] 109/15 109/15
glad [2] 32/1 56/20
global [1] 98/14
globally [1] 110/15
globo [3] 100/19 107/5 114/9
go [62] 29/16 29/18 31/11 34/20 36/15 39/13 39/15 39/21 39/25 40/5 40/10 40/18 44/18 48/21 50/3 55/3 56/2 57/4 58/12 58/24 60/16 61/17 73/15 76/20 81/24 91/2 95/12 96/3 128/24 129/1 133/6 136/19 145/25 146/10 147/6 148/23 152/12 155/9 157/17 158/2 159/1 164/1 165/24 166/22 167/23 167/24 168/15 177/17 183/11 183/21 184/12 185/24 187/7 188/12 190/4 190/7 190/14 191/22 207/9 207/25 214/7 214/17
God [1] 172/7
goes [4] 55/21 65/1 67/19 104/17
going [121] 5/14 7/13 7/19 11/18 11/21 12/12 13/6 16/18 20/8 20/16 29/17 29/17 30/11 31/15 32/23 34/11 35/18 40/12 41/4 41/22 43/3 43/4 47/15 47/16 47/16

**G**

going... [96] 53/21 57/3 57/25 58/15
58/18 58/23 59/5 59/15 59/17 59/17
59/19 59/22 59/24 59/25 59/25 60/1 60/3
60/4 60/16 60/17 60/20 60/21 60/21 61/2
61/4 61/5 61/6 73/6 74/25 77/1 78/18
104/12 109/13 109/14 109/19 110/13
122/20 127/22 128/21 129/1 135/12
138/23 139/18 139/21 145/4 146/10
147/22 148/11 148/22 153/8 153/16
158/7 159/24 165/8 165/19 166/16
167/14 170/14 170/14 178/3 178/19
183/13 184/11 184/12 184/16 184/25
185/7 186/23 187/4 187/5 188/9 188/10
188/14 190/5 192/6 192/7 196/23 197/15
198/11 199/25 200/2 204/25 206/22
207/8 211/13 214/12 214/13 215/6 216/6
216/11 217/3 217/8 217/14 219/2 219/15
220/3
gone [3] 39/14 40/17 204/2
good [26] 5/5 29/13 32/11 32/12 32/20
35/20 72/13 80/2 91/25 99/13 108/5
112/16 137/5 137/7 141/11 156/20 159/5
170/9 171/15 173/24 182/20 182/21
191/25 192/1 212/9 212/23
good-faith [1] 29/13 173/24
got [7] 40/4 49/3 110/10 179/24 190/19
190/20 221/4
GOTECH [2] 106/10 106/20
gotten [3] 157/22 173/25 190/25
governed [1] 197/8
governing [12] 21/11 40/1 40/9 40/20
41/9 52/9 53/5 53/7 53/10 53/12 54/15
55/9
government [2] 45/13 157/13
governmental [2] 18/19 82/24
governor [2] 52/24 108/17
grabbed [1] 36/19
grabbing [1] 69/10
Grades [1] 15/4
grant [2] 36/11 93/9
granted [3] 106/19 157/12 183/8
granting [3] 106/11 106/14 106/22
grants [7] 93/7 93/7 93/16 94/14 95/14
95/22 96/23
grass [1] 47/21
great [10] 16/8 33/13 59/9 60/21 98/4
149/10 153/1 186/17 220/4 223/21
greater [1] 32/15
greatest [3] 111/3 127/4 169/24
Greg [1] 65/1
Gregory [4] 65/7 65/11 65/17 65/22
grid [2] 69/12 209/6
grids [1] 208/21
Griffin [1] 117/6
gross [1] 44/6
ground [1] 45/1
grounds [4] 8/13 12/12 58/13 107/17
group [15] 2/22 21/2 73/21 75/19 99/18
107/1 117/14 127/2 155/15 157/9 164/8
164/9 181/5 181/10 181/22
grow [1] 166/16
guarantees [1] 37/22
Guard [6] 6/12
guess [5] 35/20 36/16 40/15 122/8
192/17 192/24 212/23 214/13 217/15
guesses [1] 190/24
guessing [2] 39/2 115/15
guide [1] 115/21
guides [1] 115/19
Gulf [2] 107/1 109/13
gun [1] 221/5

guy [1] 148/14
guys [14] 40/4 71/22/9 190/15

**H**

had [128] 5/20 12/7 16/11 20/7 28/6
35/10 46/22 47/3 47/7 47/24 48/5 49/4
49/5 49/7 50/3 52/23 69/19 70/1 71/8
71/25 72/9 72/13 72/13 72/17 72/25
74/18 74/20 75/23 76/4 76/11 83/12
84/18 84/20 86/6 86/20 86/23 88/1 88/11
89/13 89/14 90/11 90/12 91/25 92/19
93/6 94/9 94/16 94/22 95/3 95/18 95/20
104/21 108/17 111/11 117/17 121/6
124/5 124/5 124/6 124/9 126/6 126/7
126/9 126/25 128/19 130/21 131/18
137/10 137/12 137/18 139/15 139/20
142/2 142/6 144/19 145/14 150/19
150/23 152/18 153/15 153/24 155/2
155/7 156/8 156/12 156/16 157/3 159/4
162/6 167/18 170/13 170/15 170/18
170/18 170/19 170/21 170/22 172/23
172/24 178/6 179/8 179/10 181/22
185/14 185/17 189/22 193/3 193/25
193/25 194/2 194/5 195/2 195/20 197/2
197/25 198/2 198/8 200/13 205/8 209/19
209/22 210/23 217/7 220/19 222/2
222/16 223/1 223/2
half-billion-dollar [1] 149/20
hand [8] 21/6 24/21 67/18 69/20 151/12
192/4 200/15 215/24
handful [2] 60/6 60/16
handle [1] 11/15
handled [3] 31/1 149/10 176/14
handling [1] 35/6
hands [1] 142/4
happen [7] 59/25 75/2 178/19 189/13
189/14 197/6 216/7
happened [2] 69/6 126/6
happens [6] 39/17 39/18 56/3 59/12
169/13 172/20
Harbor [6] 44/21 45/22 104/4 181/17
181/20 181/25
hard [7] 58/17 66/5 81/19 81/21 164/13
184/18 200/5
hardship [1] 168/4
Hargrave [1] 49/6
harp [1] 169/17
harsh [1] 59/21
has [91] 8/4 9/17 11/5 14/12 14/16 22/11
23/23 38/25 40/2 41/1 42/13 42/16 43/11
47/11 48/11 48/13 52/18 53/18 55/3 55/6
61/1 65/1 67/19 69/23 71/17 71/20 71/21
72/21 75/1 77/13 80/5 84/10 85/4 86/1
86/3 87/10 87/19 88/18 95/3 100/6
100/12 101/19 101/24 104/1 107/7
107/11 110/3 110/10 111/4 111/6 111/9
111/11 112/21 113/6 113/7 113/9 116/25
121/7 124/15 132/18 140/14 146/9
147/17 157/22 158/12 162/2 165/12
167/3 167/19 175/14 177/21 177/23
182/22 185/13 186/9 186/14 190/24
190/25 191/21 197/4 201/6 207/17
208/11 209/1 209/12 209/12 211/16
212/16 212/17 213/18 215/13
hasn't [3] 164/14 175/4 189/5
hat [1] 206/12
have [462]
haven't [5] 8/14 11/17 174/7 191/8
197/16
having [17] 26/3 26/10 30/19 32/25 65/7
84/5 98/2 107/22 114/20 131/5 139/7
142/14 148/17 176/11 190/17 202/21

217/10
230/9
220/8 221/4
218/09 220/5 224/21 226/2/8 11/11
11/11 41/2 46/22 46/23 46/25 47/5 71/1
80/5 81/11 103/13 105/15 105/17 105/18
120/20 121/6 128/8 128/9 139/23 139/23
139/24 140/1 140/5 140/7 143/25 155/2
163/1 167/14 175/8 176/3 176/23 176/23
177/1 177/1 177/5 177/11 177/11 177/16
177/16 177/19 179/24 184/22 186/18
186/18 189/11 196/2 196/2 196/3 196/5
196/6 198/19 199/7 199/9 199/15 203/12
206/18 207/14 207/17 210/3 210/4
210/21 211/13 213/18 219/12 223/17
he's [3] 59/5 144/1 219/9
hear [7] 7/13 8/8 16/13 27/18 28/9 40/12
103/12
heard [8] 8/14 110/18 150/5 155/20
177/25 183/9 191/5 208/24
hearing [42] 7/6 9/3 9/8 9/16 11/17 12/8
12/9 16/12 21/24 24/11 26/22 30/23
32/23 32/24 33/2 34/5 62/18 62/19 62/24
69/6 79/23 89/21 120/20 140/8 159/21
163/14 163/24 183/23 184/13 217/16
219/14 220/11 220/14 220/17 220/17
220/23 221/7 222/2 222/3 222/7 222/8
222/23
hearings [2] 223/9 223/11
hears [1] 56/16
heart [2] 68/12 172/21
heartbreaking [1] 42/7
hearts [1] 194/17
heavily [1] 208/23
held [6] 17/24 79/3 81/1 155/1 183/4
185/10
Hello [1] 141/10
help [15] 6/15 34/1 40/6 40/18 41/6 67/3
69/20 72/5 72/15 75/24 76/2 112/5
145/12 152/5 155/13
helped [1] 74/4
helpful [6] 77/14 206/21 206/25 207/1
207/20 214/1
helps [1] 50/6
her [8] 6/6 6/9 6/20 101/11 101/14
102/12 104/1 177/24
here [80] 7/1 7/10 7/19 8/21 11/13 14/3
14/23 28/8 29/24 29/25 31/12 33/10
33/13 34/25 39/19 48/23 50/20 57/6
60/20 61/16 64/14 79/15 79/22 89/1
96/11 101/20 120/19 122/10 122/15
123/9 126/12 129/6 129/21 134/24
135/15 138/3 141/13 142/21 147/10
153/2 153/6 153/9 153/9 153/12 153/12
153/13 154/4 157/22 160/3 160/20
161/19 162/5 164/13 164/19 164/25
171/20 175/6 179/12 183/15 192/13
196/6 196/19 200/20 200/21 200/21
200/22 200/23 203/11 206/18 207/17
207/19 211/8 211/25 212/10 212/15
213/10 214/6 214/8 222/19 223/22
here's [2] 24/14 190/18
hereby [1] 224/9
herein [2] 27/19 45/14
hesitate [1] 155/9
high [6] 71/6 75/22 160/24 165/15 188/9
211/4
high-level [2] 160/24 188/9
high-profile [1] 75/22
high-water [1] 71/6
higher [5] 46/13 112/4 167/7 175/21
211/18
highest [2] 91/15 213/4
highly [2] 168/16 192/16
highway [1] 39/5

**H**

Hilton [1]  116/23
him [15]  10/23 19/8 41/2 78/17 80/4
81/12 120/17 133/5 139/25 184/13 192/4
196/11 202/20 213/18 223/16
himself [2]  10/8 59/16
hired [2]  35/10 159/12
hiring [2]  37/2 166/2
his [34]  9/22 10/7 10/8 11/10 28/15
28/15 41/1 49/6 71/1 78/19 80/2 100/19
105/2 105/19 139/22 140/3 141/7 148/2
150/16 163/9 166/20 176/25 177/23
178/12 184/20 196/2 198/3 198/4 198/19
200/23 203/12 222/21 223/15 223/17
His Honor [3]  166/20 198/19 203/12
history [2]  43/20 169/25
Hobson's [1]  214/7
hold [3]  63/22 90/6 108/10
Holy [3]  10/5 10/6 19/8
Holy Cross [3]  10/5 10/6 19/8
home [16]  57/21 72/19 86/17 93/7 93/7
93/9 93/15 94/13 94/25 95/14 95/22
96/23 99/2 99/4 99/6 190/20
home-free [1]  57/21
homeowner [1]  176/14
homeowners [1]  86/16
honestly [1]  139/2
Honor [109]  12/6 12/19 13/9 13/14 13/20
13/23 13/25 14/3 21/6 22/11 24/16 26/21
27/1 27/18 28/4 34/11 35/15 36/21 38/24
40/23 41/22 41/25 42/4 42/10 42/12 45/8
45/12 48/11 50/22 56/16 56/21 57/15
62/22 64/1 64/10 64/20 66/5 78/9 79/14
81/5 98/7 100/18 101/1 101/4 101/8
101/19 102/19 103/21 104/8 104/9
104/15 104/17 105/12 106/2 107/14
107/20 112/13 114/7 114/15 114/18
120/8 120/12 120/13 120/23 140/21
145/19 148/6 148/13 148/15 158/5
159/19 166/11 166/20 175/10 178/22
179/13 181/3 183/17 187/12 189/14
191/12 191/17 195/24 197/19 198/19
199/2 199/18 201/1 201/3 201/23 202/2
202/11 203/12 204/22 205/4 205/12
205/21 206/20 207/7 207/22 213/25
216/14 217/17 219/17 219/22 220/7
220/10 220/13 223/13
Honor's [1]  21/17
HONORABLE [1]  1/11
honored [1]  150/12
hook [1]  40/6
HOOTSELL [2]  2/17 13/25
hope [6]  40/15 185/1 186/2 186/18
186/18 192/21
hoped [1]  47/3
hopeful [1]  40/15
hopefully [5]  5/18 25/5 67/17 141/4 218/9
hoping [2]  78/18 187/9
hospitals [1]  117/12
Hotel [1]  116/23
hotly [1]  42/16
house [3]  75/3 139/12 211/21
houses [1]  99/17
housing [29]  45/9 54/24 69/8 69/17
69/21 72/8 72/9 73/12 73/2 73/5 77/12
82/12 82/13 82/16 82/18 82/21 84/4 84/6
84/7 84/16 85/22 85/22 86/7 86/14 92/15
92/25 93/1 93/2 95/19
how [98]  6/22 22/7 30/9 30/10 30/10
30/25 31/17 32/16 37/18 38/3 38/25 44/8
44/18 47/10 47/16 51/1 57/8 58/5 58/14
58/18 58/22 59/3 59/4 61/7 62/7 64/23

68/21 69/17 69/17 70/3 70/4 71/25 72/3
72/7 73/12 74/7 74/17 75/4 74/25 75/5
75/9 75/17 75/18 82/6 82/13 83/21 85/4
92/25 93/7 100/6 111/25 112/5 115/5
115/14 117/10 118/2 118/2 119/3 127/8
135/11 138/24 141/20 153/14 154/20
158/23 163/10 163/21 163/23 165/12
165/18 178/13 178/15 179/10 179/24
184/9 184/12 186/16 187/3 187/17
188/19 189/12 190/19 190/20 190/24
190/25 192/18 192/22 198/4 199/20
200/17 203/18 205/13 208/4 208/15
211/21 217/23 219/25 220/5
however [8]  10/9 46/13 80/5 133/25
138/20 150/7 172/18 183/20
Hubbard [13]  2/13 2/14 12/22 13/4 13/23
56/23 56/25 103/23 137/2 137/5 181/5
219/4 219/11
Hubbard's [1]  216/14
huge [1]  61/8
humility [1]  190/21
hundreds [5]  5/24 14/8 60/11 165/24
168/1
hurricane [26]  43/17 43/21 44/1 44/10
45/8 46/5 46/8 46/16 52/22 54/13 70/23
74/20 103/16 109/2 110/4 111/4 111/7
111/7 111/18 113/15 126/1 129/15
130/11 180/7 180/9 191/2
hurricane-affected [1]  43/17
hurricanes [7]  8/7 46/6 63/3 69/25 71/15
75/10 82/3
hurt [1]  191/2
hybrid [1]  210/8
hypothetically [1]  131/22

**I**

I'd [1]  64/22
I'll [15]  21/19 52/8 56/20 82/14 91/5
150/23 179/18 191/12 192/9 196/4
196/11 198/19 206/12 218/19 220/4
I'm [104]  5/14 5/18 6/4 6/16 6/23 7/13
11/18 11/21 12/24 14/3 14/3 16/9 16/12
16/18 20/12 20/16 32/1 32/11 34/3 35/3
35/13 56/24 57/3 62/4 66/8 72/19 78/18
81/11 95/19 100/14 102/19 103/11
108/12 112/23 113/16 115/15 119/20
120/4 122/13 125/17 128/10 130/21
136/23 136/24 137/5 140/17 141/10
141/24 142/8 142/15 142/15 143/4 143/7
144/4 145/25 146/23 152/9 154/22 158/6
158/24 159/24 165/19 169/15 172/17
173/12 173/19 173/19 175/24 178/24
178/24 184/11 184/12 184/25 187/5
187/9 187/10 189/2 189/12 192/6 192/7
192/17 192/19 194/18 195/13 195/13
197/4 197/6 198/9 199/18 202/19 203/11
204/4 204/25 205/21 206/22 207/8 214/8
215/19 216/6 218/19 219/3 220/3 221/1
221/3
I've [6]  5/19 6/1 36/10 40/4 193/18
203/25
I-walls [1]  44/25
idea [9]  13/1 67/10 88/16 154/18 185/21
185/24 185/24 189/10 198/3
identification [2]  70/12 103/10
identified [5]  15/5 90/2 125/3 146/25
201/8
identifies [2]  103/13 104/25
identify [5]  88/22 122/3 154/6 154/18
205/1
if [219]  8/8 11/8 11/20 12/13 13/6 14/19
16/9 16/16 16/19 19/18 20/15 24/16
24/21 29/17 30/23 31/3 31/22 31/23

31/23 33/14 33/15 34/18 34/19 34/19
34/19 35/16 35/19 35/20 36/6 37/14
46/15 48/19 48/21 50/15 50/18 51/6 55/2
55/10 59/12 59/15 60/8 60/18 60/18
60/25 61/3 61/4 61/13 62/4 62/5 62/5
62/8 62/10 62/22 63/11 63/21 64/15
64/16 66/7 70/17 73/15 74/13 79/7 79/18
81/8 85/4 85/17 86/4 86/15 87/9 88/1
88/5 91/1 91/8 91/14 92/16 93/14 96/2
97/9 97/11 97/15 98/15 100/18 102/9
107/10 119/20 124/8 124/10 126/13
126/18 127/5 128/11 129/11 129/15
129/24 131/10 131/18 131/20 131/25
133/3 134/9 135/11 135/12 135/19
130/22 135/19 139/20 139/20 140/4
140/22 140/25 141/13 149/1 150/6
150/18 152/2 152/20 152/23 152/25
153/23 154/24 159/1 161/7 162/8 162/24
163/12 165/2 165/21 166/10
166/13 166/19 166/20 166/24 167/12
168/15 168/21 169/3 169/18 169/20
169/25 170/4 170/7 174/5 174/25 175/4
176/1 176/5 176/22 176/23 176/24 177/1
177/5 177/11 177/16 177/25 177/25
177/25 178/2 178/10 178/18 178/23
178/23 179/14 179/19 183/17 184/16
184/17 184/20 185/1 186/24 187/2 187/4
187/6 188/15 188/18 189/5 189/14 190/2
190/4 190/8 191/14 191/14 191/18
191/20 193/5 193/16 194/12 196/16
197/10 197/11 197/18 204/4 205/1 207/1
207/3 208/4 208/12 209/9 211/13 211/17
212/6 212/11 212/22 213/2 213/3 213/18
215/5 215/11 215/19 215/19 216/5
216/16 217/13 219/12 220/4 223/14
223/20 224/1
ignore [1]  169/7
ignored [1]  45/7
IHNC [2]  44/21 95/2
III [2]  2/14 2/17
illogical [1]  41/7
illustrate [1]  6/3
illustrated [1]  90/13
illustration [1]  92/16
imagination [1]  178/14
imagine [4]  35/17 136/18 178/13 195/12
immediate [1]  88/12
immediately [8]  68/24 69/4 72/11 83/24
83/25 149/23 154/22 170/12
immense [1]  60/24
immensity [1]  5/23
immune [5]  7/5 45/13 48/14 59/19
168/18
immunity [7]  8/13 22/18 43/23 48/15 49/4
157/13 176/4
impact [22]  26/7 71/15 72/12 73/2 73/5
73/9 74/21 83/18 84/18 84/20 86/6 86/10
87/10 87/19 87/21 89/6 89/8 92/10 95/17
96/19 96/21 100/2
impacted [5]  25/21 77/24 94/17 97/2
191/2
impacts [3]  74/19 75/9 78/12
impair [3]  27/15 27/15 61/14
impaired [1]  23/1
impede [2]  23/2 61/14
impediments [1]  90/21
impending [1]  47/24
impermissible [1]  54/18
impetus [2]  55/12 111/22
imply [1]  200/12
import [1]  44/12
important [12]  22/11 24/11 29/20 31/23
46/20 53/24 58/21 77/18 153/21 180/19

I

important... [2]  184/7 190/13
importantly [2]  65/3 177/22
impose [2]  33/9 56/13
impossible [3]  48/24 55/18 153/18
impression [2]  206/23 210/7
improper [1]  165/19
improve [1]  59/22
improvements [1]  82/18
in [741]
in globo [1]  107/5
In Re [6]  5/8 58/11 150/10 151/10
  151/18 164/18
inability [1]  76/1
inadequacy [1]  16/25
inadequate [4]  14/10 17/24 18/4 45/4
inappropriate [2]  188/1 188/4
Inc [3]  10/6 65/22 72/4
inception [1]  126/7
inches [3]  69/18 90/11 90/12
incidental [3]  51/18 51/23 54/14
incisive [1]  78/19
inclined [1]  60/13
include [20]  9/11 44/8 66/16 74/21 82/21
  82/24 84/14 93/20 93/22 93/23 93/23
  97/20 97/21 97/23 97/25 98/2 98/21
  165/13 188/3 223/7
included [10]  27/4 84/14 97/3 98/24
  106/15 142/20 154/8 175/6 181/13 194/8
including [17]  9/13 10/22 14/20 23/4
  25/22 29/12 43/24 52/5 86/22 88/16
  107/1 114/11 124/16 149/12 149/25
  157/21 222/12
inconvenience [1]  98/2
incorporated [1]  222/7
incorrect [2]  125/17 200/1
increase [3]  25/6 59/20 215/11
increased [3]  86/2 110/4 166/17
incredible [2]  56/14 159/13
incur [3]  139/15 141/14 141/18
incurred [2]  78/2 188/14
indebted [2]  39/3 39/18
indebtedness [6]  39/1 39/7 39/10 39/20
  53/19 111/12
indeed [3]  14/7 37/16 213/10
indemnity [3]  18/21 116/6 124/5
independent [5]  14/14 28/12 28/22 43/13
  44/3
index [1]  74/16
indexing [1]  185/20
indicate [1]  20/1
indicated [5]  89/16 123/12 157/16 187/22
  208/11
indicates [4]  74/7 92/17 92/18 208/25
indicators [1]  83/1
indices [1]  75/6
individual [13]  16/4 16/6 19/13 27/14
  31/25 32/7 55/4 75/3 153/16 162/18
  176/14 176/20 210/6
individual's [1]  211/21
individualized [1]  208/20
individually [3]  98/16 167/17 211/7
individuals [5]  15/24 167/22 173/20
  209/7 222/17
indulging [1]  183/6
industrial [4]  74/8 94/5 175/14 182/2
industries [1]  117/1
industry [6]  118/1 119/1 120/10 128/24
  147/13 149/21
ineptitude [1]  44/6
inequities [1]  174/22
inexpensive [1]  59/6

inexpensively [1]  211/16
next occurrence 128/8
infallible [1]  6/25
infinitum [1]  32/21
inflicted [1]  15/23
inform [5]  18/6 46/13 77/19 77/23 78/1
informal [1]  157/21
information [25]  19/20 19/23 44/9 59/9
  67/14 67/17 68/18 74/18 81/20 82/6
  82/13 83/6 92/21 102/5 103/2 103/9
  105/19 109/17 123/21 124/2 143/15
  154/17 190/17 194/1 203/21
informed [2]  20/10 42/23
infrastructure [7]  67/5 84/9 84/10 85/13
  85/14 93/23 96/11
initial [2]  124/11 156/19
initially [4]  23/12 123/21 132/6 213/11
initiated [1]  10/22
initiatives [2]  71/18 71/23
injuries [3]  211/18 212/20 213/15
injury [13]  39/5 97/23 98/23 123/4 123/5
  123/5 123/5 137/24 139/13 139/15
  140/13 165/13 209/3
Inner [5]  44/21 45/22 181/17 181/20
  181/25
input [1]  176/25
inquire [1]  193/12
inquiry [3]  14/12 17/6 179/2
insane [1]  174/2
inserted [1]  63/19
insisted [1]  198/9
insofar [11]  45/19 47/9 47/12 48/2 48/7
  49/10 55/7 109/16 110/6 110/13 111/10
inspect [1]  47/17
inspection [1]  89/14
instance [9]  57/15 63/15 73/24 75/12
  75/16 96/21 109/17 168/22 197/17
Instead [1]  17/11
Institute [2]  73/1 116/3
institutional [3]  74/2 74/8 116/19
institutions [1]  210/2
instructing [1]  143/11
insufficient [1]  164/12
insurance [125]  2/13 2/17 8/3 8/4 8/15
  13/24 14/1 17/9 17/17 17/18 18/14 21/12
  23/7 23/9 25/24 27/22 28/7 28/17 29/1
  29/3 30/6 33/18 34/21 38/9 38/11 39/14
  40/5 40/17 41/6 56/2 56/4 57/1 59/20
  60/5 61/6 62/6 62/12 62/15 63/2 63/6
  63/6 63/9 63/12 63/13 63/18 63/20 79/16
  86/16 86/24 88/20 96/7 96/8 97/22 99/14
  99/15 99/23 101/13 101/15 103/10
  103/13 105/19 105/21 115/4 115/12
  115/16 115/20 115/23 116/15 116/17
  117/8 117/16 117/19 118/6 118/9 118/11
  118/12 118/25 119/10 119/24 120/9
  122/5 122/15 123/1 124/2 124/16 130/4
  133/20 134/21 136/9 140/12 142/21
  145/9 147/1 147/13 149/13 151/1 155/8
  160/17 166/2 169/11 170/19 171/11
  172/11 172/14 172/15 172/17 173/21
  173/24 174/18 190/19 193/10 193/13
  193/16 193/24 194/10 195/2 195/4 195/7
  198/17 216/21 217/25 218/14 218/20
  218/21 219/4
insured [46]  8/3 24/16 24/17 24/22
  103/19 104/18 116/2 116/4 116/6 116/22
  124/6 124/10 124/25 127/9 127/11
  127/12 127/18 127/21 128/13 128/14
  128/23 128/25 129/6 129/16 129/20
  130/2 130/8 130/14 130/19 130/25
  132/14 132/15 132/19 132/20 135/19
  135/21 137/20 140/3 140/24 141/15

142/11 144/13 145/7 145/14 146/19
insureds [8]  118/3 126/20 128/1 129/22
  131/9 131/11 146/23 147/1
insurer [5]  15/1 21/11 23/10 57/7 135/4
insurers [3]  116/11 126/17 127/19
insuring [1]  130/20
intellect [1]  67/16
intelligence [1]  179/9
intelligent [1]  77/8
intend [4]  34/16 79/8 187/13 200/10
intended [4]  64/25 113/13 118/3 118/23
intensive [1]  16/1
intent [5]  9/10 9/15 176/12 178/3 179/17
intention [1]  202/3
interest [15]  23/11 23/15 23/17 23/18
  23/24 24/1 24/5 24/9 24/20 27/23 61/6
  166/16 166/17 171/7 174/9
interested [1]  16/12
interesting [2]  75/22 223/23
interestingly [1]  76/21
interests [3]  14/19 27/16 219/4
interject [1]  183/7
internal [1]  43/12
international [6]  71/20 116/3 127/2 157/9
  181/10 181/22
Internet [2]  59/7 212/12
interpretation [4]  25/4 117/23 117/25
  120/18
interrupt [2]  186/21 210/9
interrupted [2]  159/3 175/6
intertwined [1]  132/21
intervention [1]  174/21
interview [2]  144/6 150/5
into [46]  16/16 17/7 23/15 25/14 30/22
  30/25 31/16 44/10 45/1 60/23 63/1 64/4
  64/8 78/18 87/11 90/18 94/20 100/19
  101/14 103/4 103/24 105/14 107/15
  114/8 117/12 122/9 129/24 130/25 140/4
  140/23 153/12 156/8 156/10 158/7
  159/20 163/19 171/11 183/13 184/12
  184/25 188/8 190/9 190/25 202/8 205/5
  214/4
introduce [14]  63/1 64/4 64/8 100/19
  103/4 103/24 105/14 114/8 158/7 159/20
  202/7 205/5 206/5 222/4
introduced [2]  101/13 178/22
introducing [2]  12/5 101/25 158/6
introductory [1]  21/24
inundated [1]  191/1
inventive [1]  54/19
invested [2]  35/7 37/1
investigate [1]  121/18
investigation [3]  14/14 17/16 193/16
investment [5]  68/9 74/24 75/1 75/1 75/5
investments [1]  73/10
invoices [1]  184/12
invoked [1]  140/22
involve [1]  42/22
involved [20]  15/22 16/7 28/11 38/21
  58/15 62/2 69/2 92/13 106/7 106/9 121/9
  124/24 126/17 149/23 151/20 163/5
  163/17 184/21 187/10 196/22
involvement [3]  31/8 71/17 121/10
involves [1]  67/23
involving [4]  106/13 106/20 187/20
  187/21
IPET [1]  90/3
irrelevant [4]  184/15 184/23 185/7
  195/25
irresponsible [2]  171/21 171/22
IRVIN [14]  2/20 9/24 12/1 13/5 14/5
  16/22 99/10 142/25 143/4 183/17 199/7

Case 2:05-cv-04182-SRD-JCW Document 11957-16 Filed 06/06/08 Page 243 of 262

## I

IRVIN... [3] 199/25 202/6 221/23
is [605]
isn't [8] 137/25 140/8 140/14 166/16
167/16 167/21 168/2 181/18
ISO [5] 118/6 118/8 118/9 118/11 118/18
issue [46] 24/11 24/17 28/18 32/21 37/8
38/2 38/7 40/20 52/15 57/5 62/5 62/6
64/9 65/2 99/2 104/18 120/19 122/10
125/23 128/6 130/25 140/3 152/4 163/20
163/25 166/5 166/21 167/18 172/23
177/24 181/9 193/10 207/11 216/15
218/2 218/3 218/5 218/14 218/20 218/21
218/22 218/23 219/4 219/5 219/13
219/13
issued [35] 10/23 23/9 23/24 24/3 24/7
24/19 24/25 93/8 101/22 116/10 118/10
123/13 123/14 124/17 124/20 125/9
126/1 126/11 126/14 126/17 126/23
126/23 127/6 129/17 130/11 131/9
131/21 133/9 133/13 133/23 135/3
135/23 136/2 146/20 223/2
issues [29] 16/6 22/8 34/3 48/6 50/6
62/15 62/20 96/12 115/23 116/4 116/4
116/5 116/12 116/22 117/14 121/20
121/25 149/13 151/1 151/2 151/2 151/2
154/23 163/17 203/19 206/23 206/23
206/24 217/7
it [407]
it's [169] 5/9 5/19 7/6 8/14 11/25 13/2
14/9 16/17 29/21 30/24 31/13 32/4 33/14
33/22 33/23 36/24 38/3 38/4 38/20 39/8
40/15 40/23 40/23 47/15 47/16 47/16
48/24 53/5 53/25 55/18 56/1 56/9 58/17
58/20 58/25 59/15 59/17 59/19 59/20
59/24 62/4 68/6 70/12 70/15 74/1 74/7
75/3 75/15 75/17 79/16 80/11 80/11 81/5
84/16 85/10 87/21 88/23 88/24 94/11
96/4 96/20 96/24 97/7 100/13 100/14
102/7 107/7 109/9 110/4 110/10 111/2
111/21 113/16 118/2 118/22 118/23
119/19 127/19 128/24 129/3 129/3 129/3
129/23 131/18 131/21 132/10 132/18
133/2 134/1 134/9 135/12 136/21 139/23
140/18 145/14 147/14 147/21 148/1
152/2 152/11 153/3 153/3 153/12 159/1
161/8 162/3 163/2 164/15 165/19 166/4
166/5 167/16 168/14 168/16 169/9
171/13 171/16 176/9 178/3 178/4 178/10
178/17 178/17 179/17 180/16 180/19
182/2 182/4 183/8 184/7 184/15 184/17
184/23 185/7 185/7 185/8 185/8 185/22
185/25 187/2 188/15 190/2 190/11
190/12 191/14 191/16 191/18 192/16
196/20 196/20 196/21 197/11 197/15
198/10 199/24 200/2 200/3 200/3 202/2
205/10 206/11 208/11 210/18 214/7
215/18 216/1 219/15 219/22 223/23
items [1] 6/10
its [27] 17/14 18/20 31/5 43/16 43/18
43/22 43/23 45/16 45/16 48/13 48/16
51/18 51/23 55/2 85/1 110/3 110/11
110/12 111/11 111/16 123/1 138/18
139/8 151/8 160/16 162/9 174/21
itself [8] 53/17 88/25 109/19 152/20
165/1 190/7 198/1 204/14
Iwo [1] 5/21
Iwo Jima [1] 5/21

## J

Jacob [1] 79/11
JAMES [7] 1/22 2/20 9/24 14/5 106/14
107/1 143/4
January [3] 1/19 57/16 88/2 180/3
January 2009 [1] 88/2
January 30 [2] 9/6 43/19
Jeannine [3] 27/3 201/10 201/19
Jefferson [40] 1/22 2/9 8/1 13/21 21/10
24/3 25/16 39/11 42/3 47/23 53/6 53/9
57/11 57/19 61/22 73/13 75/13 77/13
82/2 92/5 92/8 97/13 103/8 103/14
103/19 109/21 121/22 125/10 125/16
133/24 134/14 134/21 154/9 155/5 160/2
160/7 160/14 160/19 160/21 161/6
Jennifer [2] 10/1 19/9
jeopardy [1] 195/17
Jerry [4] 13/8 20/20 137/15 198/7
Jim [5] 13/13 21/15 148/13 198/7 201/12
Jima [1] 5/21
job [4] 76/2 143/16 156/23 217/12
jobs [3] 88/3 88/13 214/10
Joe [5] 80/3 80/3 143/20 144/1 152/6
John [3] 9/19 200/21 222/20
join [5] 102/17 102/23 185/6 222/10
222/11
joinder [1] 170/3
joint [10] 17/7 18/15 18/18 26/16 29/10
64/5 64/12 117/8 148/1 204/5
jointly [3] 204/10 220/1 220/2
joke [1] 32/11
joking [1] 32/11
Joseph [8] 1/5 1/15 13/11 21/16 148/17
148/21 149/8 201/12
JR [4] 1/11 9/19 10/20 105/15
judge [84] 1/12 12/24 15/2 20/19 25/8
25/12 28/6 36/16 41/11 60/7 102/16
107/7 128/8 137/8 147/25 148/22 150/9
150/20 151/13 152/3 152/14 155/1
155/21 157/12 158/15 160/12 163/23
163/23 165/14 166/13 167/12 169/18
175/14 176/2 176/22 176/24 177/4
177/21 177/23 178/10 179/1 186/8
186/17 188/6 189/2 189/4 189/11 193/22
193/23 197/24 198/2 199/15 200/9
201/15 201/25 203/22 207/6 208/11
208/12 208/14 209/17 209/19 209/20
210/3 210/13 210/17 210/20 211/10
211/13 212/10 213/11 213/18 214/3
214/16 215/9 218/13 218/15 218/24
219/18 221/8 222/5 222/11 222/23
223/14
Judge Duval [1] 155/21
Judge Fallon [1] 197/24
Judge Vance's [1] 15/2
Judge's [2] 178/17 208/12
judges [6] 6/24 118/1 203/17
judgment [38] 19/15 19/16 20/25 27/25
39/1 39/4 39/10 39/15 39/19 39/19 39/25
40/4 40/7 44/8 45/15 48/8 49/18 49/22
49/25 50/11 54/17 55/8 55/17 59/25
60/15 149/18 149/19 149/21 168/7 186/8
194/23 194/24 197/2 200/2 210/18
210/19 215/24 216/12
judgments [27] 17/13 29/9 38/13 38/17
55/10 55/15 55/17 55/18 101/25 102/1
102/3 103/2 111/14 111/23 112/1 112/2
112/3 112/5 112/7 112/18 112/20 112/22
167/25 195/5 196/10 196/13 197/7
judicial [3] 106/5 107/3 141/23
July [4] 74/18 82/9 84/1 85/3
July 1 [3] 82/9 84/1 85/3
July 2005 [1] 74/18
jumped [1] 221/4
June [4] 72/11 72/14 88/1 221/16
June 2005 [1] 72/14 88/1
June 30 [1] 221/16
jurisdiction [4] 82/1 136/6 162/3 162/4
182/4 182/6
jurisdictional [1] 68/19
jurisdictions [1] 85/25
jurisprudence [1] 50/22
jurisprudential [1] 29/8
just [97] 6/2 6/3 6/18 6/20 7/21 8/8 12/2
12/5 12/13 20/16 27/10 27/20 29/19
30/22 32/18 36/5 36/14 36/16 40/23
40/23 54/20 57/4 57/5 57/8 57/16 58/17
64/14 72/13 73/19 75/2 76/21 79/7 82/18
84/9 84/16 87/3 87/6 88/2 88/22 91/4
91/6 91/19 93/11 97/6 99/25 100/10
102/9 102/16 103/11 107/15 111/19
125/18 127/14 128/10 131/4 131/17
137/8 139/10 139/24 140/17 142/4 143/1
143/17 145/22 145/25 146/17 150/18
152/2 158/5 158/6 158/11 159/13 159/24
163/12 164/6 164/16 168/12 169/6
172/14 180/4 181/9 187/21 190/10
190/12 194/7 199/6 199/24 200/4 200/7
200/13 201/4 202/18 207/4 214/23 217/8
222/7 223/17
justice [3] 6/16 20/24 20/24

## K

Kaiser [3] 27/4 201/11 201/19
KATRINA [34] 1/5 5/8 5/17 6/4 8/7 21/18
45/9 46/6 52/8 52/22 54/24 63/3 68/24
69/25 70/24 71/7 71/15 74/20 75/10 76/6
82/4 103/15 103/17 111/4 126/2 129/15
144/17 149/24 149/25 150/10 151/10
151/18 164/18 198/1
keep [4] 7/17 12/13 212/10 222/24
keeping [1] 203/16
keeps [1] 158/24
Kenneth [3] 27/3 201/10 201/19
kept [2] 220/15 223/9
key [1] 50/5
Kiefer [5] 12/3 101/9 101/9 101/19
102/12
killed [2] 191/2 196/17
kind [15] 34/23 39/21 78/5 78/5 78/6
79/14 112/2 120/21 121/10 173/8 181/9
205/10 209/3 209/25 211/2
kindly [1] 40/15
kinds [3] 169/14 171/19 185/19
KIRKPATRICK [5] 2/23 10/2 14/3 141/10
202/6
Kleinpeter [2] 106/8 106/20
knew [4] 44/11 46/11 70/8 150/6
knocks [1] 34/12
know [68] 5/23 6/17 8/8 10/16 20/17
29/13 31/1 31/14 36/14 39/13 43/22 47/9
51/25 58/17 58/18 59/12 61/3 64/21
64/22 70/13 70/14 70/17 74/1 74/13
76/23 83/24 88/21 88/23 88/25 91/16
91/17 98/13 99/16 100/6 100/12 100/13
102/10 107/5 127/8 140/18 167/1 170/13
170/25 171/1 171/1 171/25 173/17
175/12 178/12 179/24 180/3 186/3 186/4
187/4 188/14 189/14 190/3 190/3 190/18
192/24 194/2 194/25 199/20 200/8
200/24 217/24 218/10 219/20
knowing [2] 71/4 151/9
knowledge [5] 54/23 66/16 146/21
203/18 206/24
knowledgeable [2] 176/15 176/16
known [4] 10/5 45/7 72/23 113/16
knows [2] 28/4 48/11

## L

L-I-G-E-R-O-S [1] 114/24

L

LA [4]  2/8 2/21 15/5 50/5
labor [4]  83/8 83/11 87/25 88/14
Laborde [1]  2/6
lack [2]  160/8 171/5
lacking [1]  45/6
Lacour [1]  103/6
lady [1]  42/7
Lafayette [2]  1/23 2/8
laid [2]  61/16 61/20
Lake [30]  2/10 8/1 13/21 21/10 23/25
 25/15 39/11 42/2 43/20 44/1 46/7 47/23
 53/6 53/9 57/10 61/21 79/12 105/18
 105/20 109/2 109/22 122/14 133/11
 133/19 142/6 157/1 157/15 161/23
 161/25 180/7
Lake Borgne [12]  8/1 79/12 105/18
 105/20 109/22 133/11 133/19 142/6
 157/1 157/15 161/23 161/25
Lake Pontchartrain [1]  43/20
land [7]  70/19 73/1 82/18 104/2 110/14
 110/17 153/4
land-based [1]  104/2
Lane [1]  103/25
language [20]  117/13 117/16 117/18
 118/2 118/17 118/22 126/9 126/15
 126/18 126/21 127/19 131/25 147/7
 147/11 147/12 147/12 173/5 173/8 179/7
 180/16
large [12]  37/1 59/6 71/13 117/21 152/18
 167/23 168/25 169/12 169/12 190/8
 200/7 212/14
larger [5]  109/11 159/9 212/19 212/20
 219/13
largest [2]  7/11 169/23
Las [3]  116/23 116/23 116/23
Las Vegas [3]  116/23 116/23 116/23
last [2]  144/9 215/25
late [3]  121/5 143/7 143/8
later [19]  6/14 6/15 29/17 34/1 36/1
 36/14 37/9 37/25 128/22 129/14 139/5
 140/22 148/23 162/9 163/9 163/22
 174/19 187/13 187/15
latest [1]  144/15
law [41]  1/15 6/23 6/23 7/4 10/12 16/15
 16/17 17/10 20/5 20/22 22/23 27/10
 30/12 33/9 34/16 35/10 38/9 38/23 38/24
 40/18 41/16 48/4 54/1 54/18 58/19 115/9
 119/16 125/18 144/1 149/9 154/24 166/3
 174/10 195/3 200/1 200/3 203/12 203/15
 203/17 206/10 206/11
Lawrence [3]  9/20 200/21 222/20
lawsuit [4]  39/1 153/16 156/17 156/21
lawsuits [6]  56/2 155/22 156/4 172/21
 173/14 188/21
lawyer [4]  60/25 167/3 171/14 192/20
lawyers [18]  7/16 20/2 30/10 34/12 35/19
 60/12 102/15 155/22 155/23 166/12
 167/23 168/24 172/7 173/19 198/2 198/7
 198/11 203/17
lead [2]  33/2 147/1
leaders [1]  46/17
learned [1]  152/14
Learning [1]  15/3
least [19]  5/19 6/19 7/25 12/14 36/22
 46/11 88/24 90/11 96/6 151/19 153/19
 157/10 160/11 167/4 169/6 176/16 197/9
 197/11 214/25
leave [3]  36/16 117/25 170/20
leaving [3]  168/1 220/11 220/13
LeBlanc [3]  10/2 14/4 19/10
Lee [1]  49/6

left [13]  33/20 40/8 40/8 129/22 151/25
 155/7 168/16 179/2 180/16 180/19 220/2
 220/25 223/11
legal [20]  8/13 15/15 22/5 23/11 23/15
 23/24 26/13 29/2 29/5 38/25 39/6 39/9
 41/13 45/14 118/24 119/18 140/17
 166/10 187/13 210/7
legally [3]  21/3 30/8 31/4
legislation [1]  39/21
legislative [5]  38/13 38/14 38/16 41/6
 221/11
legislator [1]  39/16
legislature [14]  17/11 39/14 40/19 49/12
 49/24 50/2 50/10 50/15 51/7 52/3 52/24
 55/24 166/8 197/3
legitimate [1]  11/18 30/11
length [3]  8/20 28/11 170/9
lengthy [1]  205/10
less [8]  41/13 58/20 58/25 76/15 162/23
 192/25 212/23 213/8
lessening [1]  46/11
let [45]  8/8 20/16 20/16 21/25 29/15
 34/13 63/7 81/8 100/22 102/14 102/21
 103/22 104/12 105/11 106/1 139/10
 148/7 152/3 158/9 159/21 163/12 164/6
 164/13 164/24 167/5 174/2 174/4
 176/21 184/11 184/13 184/25 186/22
 196/11 199/23 200/19 201/24 202/13
 212/1 214/9 217/8 221/13 221/17 221/20
 221/23 222/16
let's [29]  16/10 30/5 41/7 48/6 52/24 54/3
 61/19 81/24 82/12 83/1 83/18 86/6 92/5
 94/8 95/7 95/24 110/7 126/22 130/10
 131/16 133/10 134/24 137/13 165/5
 167/12 168/16 172/11 195/11 217/21
letter [10]  6/4 143/9 143/10 143/11 192/2
 192/4 192/11 192/20 192/24 199/12
letters [4]  6/1 6/2 192/18 192/22
levee [337]
levee's [1]  139/3
levees [18]  42/23 43/7 47/20 51/17 51/22
 109/15 129/9 139/8 150/6 153/9 156/25
 157/2 161/6 180/11 186/11 211/9 211/9
 211/10
level [15]  44/23 46/12 69/16 69/19 73/8
 74/6 74/16 85/9 93/7 96/7 99/18 109/10
 112/4 160/24 188/9
levels [1]  73/21
leverage [1]  67/16
levied [3]  53/21 54/1 55/3
liabilities [1]  53/15
liability [30]  8/15 21/11 23/9 42/14 42/16
 45/14 53/18 63/10 63/15 116/9 118/10
 118/14 121/24 121/25 122/15 122/24
 123/3 125/19 126/10 130/23 131/16
 133/9 135/3 141/17 155/24 166/21
 169/13 169/13 171/22 206/15
liability/small [1]  169/13
liable [1]  7/24
liaison [11]  20/20 21/7 21/15 21/18 28/20
 150/10 150/15 151/13 151/14 156/1
 164/18
licensed [1]  72/22
LIDAR [5]  70/7 70/11 71/8 71/11 73/17
lieutenants [1]  5/21
life [5]  6/24 41/1 110/10 110/12 172/10
Ligeros [28]  28/14 28/22 64/2 114/19
 114/20 114/24 115/3 116/14 119/22
 120/9 120/16 121/3 125/24 130/24 133/8
 136/14 137/5 141/10 141/12 142/2 143/4
 146/17 148/1 172/6 173/16 173/23
 200/16 223/15
light [3]  70/12 159/8 215/11

lighter [1]  92/18
likelihood [3]  98/15 166/22 176/19
likely [13]  15/11 15/21 72/1 73/3 73/10
 75/18 76/8 168/9 168/16 169/18 169/20
 174/16 190/2
Likewise [1]  177/16
limit [11]  14/16 24/6 24/7 134/3 134/17
 135/6 135/8 135/10 146/9 146/11 179/8
limitations [1]  54/8
limited [82]  8/23 14/9 14/13 14/18 15/7
 16/10 17/1 17/2 17/5 17/9 17/11 17/21
 19/14 19/23 21/8 21/22 22/5 25/6 26/14
 27/13 28/5 28/17 29/1 30/4 30/14 30/24
 31/4 32/9 33/5 37/8 41/3 41/8 41/15
 42/11 56/8 56/18 58/21 58/24 59/12
 59/14 62/4 62/9 65/4 79/16 99/5 107/10
 121/24 122/12 134/20 150/1 163/18
 163/21 167/2 168/7 169/9 169/18 171/17
 178/4 184/1 186/24 188/22 191/14
 191/14 191/18 192/8 200/6 206/16 209/9
 212/3 213/17 215/2 215/5 215/20 216/22
 216/24 218/2 218/7 219/15 219/19 222/8
 223/8 223/12
limits [27]  8/5 23/8 23/12 23/15 23/23
 23/24 24/2 24/3 24/11 24/13 24/18 25/1
 28/13 28/23 33/18 38/8 51/18 51/24
 60/13 116/17 133/12 133/15 135/18
 136/7 141/13 141/22 171/6
line [7]  40/19 45/2 95/11 138/21 160/2
 160/7 166/14
list [4]  73/24 124/16 125/3 126/12
listed [4]  78/7 115/15 125/9 128/25
listening [2]  79/15 79/20
listing [3]  74/12 83/5 116/8
lists [1]  63/5
literally [1]  56/3
litigant [2]  102/22 46/5
litigate [1]  61/1
litigating [2]  16/5 60/22
litigation [69]  1/6 2/22 5/8 6/5 15/4 15/12
 15/21 16/3 21/9 21/19 21/20 22/13 22/15
 23/5 26/24 27/5 27/24 33/16 33/20 34/8
 34/19 42/15 42/17 55/23 59/15 60/9
 60/23 111/15 121/11 149/10 149/16
 149/17 149/18 149/20 151/23 152/15
 153/15 153/18 155/10 164/21 165/1
 165/3 165/18 165/23 166/6 166/14
 167/10 167/13 167/15 168/9 169/21
 171/15 171/16 182/22 183/20 184/21
 184/24 185/14 186/7 186/15 188/2
 188/23 188/25 189/19 193/23 198/16
 202/5 203/16 208/18
little [15]  12/24 29/23 38/20 87/4 103/11
 113/21 122/21 131/17 148/23 150/7
 176/19 184/9 184/11 197/21 207/14
live [6]  65/17
lived [3]  41/1 92/14 160/20
LLC [1]  1/21
LLP [2]  2/16 2/19
Load [1]  44/13
local [7]  43/6 46/14 109/23 110/3 110/4
 156/25 157/2
located [2]  68/25 144/20
location [3]  68/23 69/14 181/25

**L**

lock [1]  171/24
lock-cinch [1]  171/24
logical [5]  37/12 41/13 189/6 195/19 196/16
London [9]  44/20 94/5 94/15 94/16 94/17 94/19 154/13 158/13 159/15
long [8]  6/25 48/3 64/23 115/5 190/23 207/17 217/23 219/25
longer [3]  113/17 113/21 216/22
longest [1]  169/24
look [32]  13/4 16/16 34/18 38/3 63/11 74/24 86/15 88/1 88/2 88/5 88/10 91/1 91/8 92/16 94/13 96/21 97/9 97/11 97/13 102/9 102/25 124/7 130/10 130/24 131/16 133/8 142/9 142/10 179/8 203/8 205/8 207/2
looked [23]  27/10 73/8 91/22 93/5 95/13 95/13 95/14 98/16 99/17 99/18 99/19 100/2 123/12 126/22 127/6 131/6 131/6 135/2 136/19 142/14 145/1 194/8 223/17
looking [7]  13/5 87/3 90/21 92/22 136/7 158/6 184/16
looks [1]  209/10
lose [2]  188/25 191/19
loss [3]  85/4 88/7 98/22
losses [5]  78/2 84/23 86/17 95/12 142/11
lost [4]  6/10 7/19 96/9 198/22
lot [21]  6/18 7/2 29/24 34/12 60/12 80/3 80/3 143/20 154/17 166/1 173/9 182/9 188/13 188/13 191/21 194/25 198/8 203/16 208/25 210/4 213/8
LOUISIANA [42]  1/2 1/6 1/16 1/20 1/23 2/4 2/11 2/15 2/18 3/2 10/5 10/17 17/10 17/11 20/4 22/23 29/8 31/12 38/25 39/3 39/7 39/12 48/12 53/1 57/17 65/18 69/13 71/22 72/8 72/10 77/12 77/12 88/20 96/8 97/21 103/7 105/16 108/11 119/10 131/20 154/24 224/9
love [1]  32/14
loved [1]  98/22
lower [9]  24/24 45/23 153/5 153/7 157/1 157/11 159/15 161/22 180/15
lowest [1]  213/5
LPV [2]  43/22 45/20
luck [2]  7/20 34/22
Lugenbuhl [1]  2/13
LUNCHEON [1]  78/21

**M**

mad [1]  34/21
made [38]  7/17 7/18 21/14 25/16 26/23 34/15 35/25 38/3 46/22 58/13 75/14 76/13 94/20 99/20 100/2 120/19 122/3 125/14 138/6 139/18 140/18 147/19 156/3 172/16 173/25 185/5 188/7 188/15 188/19 195/12 195/16 208/3 208/12 208/15 209/24 210/23 217/2 223/25
Mae [1]  73/7
mail [3]  32/8 33/23 74/1
mailed [1]  177/5
mails [1]  193/1
maimed [1]  191/2
maintain [8]  43/9 54/3 85/24 111/15 112/17 112/19 113/3 113/6
maintained [1]  112/22
maintaining [3]  51/17 51/22 54/12
maintenance [14]  47/19 47/20 48/20 48/25 52/14 74/5 109/24 110/6 110/9 110/11 111/17 113/7 113/10 175/20
major [8]  84/5 84/22 86/11 87/23 89/9 138/14 203/14 203/25

majority [6]  33/19 63/9 76/16 86/12 89/7 90/1
make [72]  5/15 11/19 13/7 14/12 20/2 25/8 30/25 31/12 36/23 37/25 38/3 53/14 58/23 59/24 62/17 67/4 69/24 77/8 96/14 102/14 102/21 103/12 111/22 111/25 136/16 139/7 153/19 154/1 154/20 155/12 156/12 164/10 164/14 164/16 168/12 169/14 170/15 170/18 171/2 172/16 173/10 176/18 177/9 177/10 179/25 186/5 186/16 186/19 186/22 187/14 188/24 191/7 192/13 194/2 194/13 195/14 195/20 198/6 199/8 199/15 199/23 205/22 207/23 212/24 213/12 213/20 214/8 214/24 214/24 215/10 215/17 224/1
makes [2]  38/24 210/7
making [15]  13/6 16/5 16/9 17/20 39/23 43/25 46/7 112/1 162/9 163/10 178/5 190/24 194/4 195/7 198/8
Malecki [2]  121/6 121/7
man [2]  59/16 178/18
manage [1]  73/21
manageability [1]  203/20
managed [1]  69/24
management [11]  67/5 67/12 101/10 115/4 115/12 115/17 115/20 116/3 118/25 119/25 120/10
managerial [1]  67/1
managers [1]  116/15
mandate [2]  50/3 173/23
mandated [2]  44/24 54/7
mandatory [6]  18/7 22/5 27/13 27/24 33/6 173/10
manifest [1]  130/7
manual [1]  117/10
many [38]  6/22 7/17 17/12 24/22 28/2 34/13 38/1 38/1 38/2 41/4 57/8 58/10 58/18 69/17 69/17 75/18 75/18 78/7 82/6 82/13 83/21 86/24 92/25 93/7 115/14 119/3 126/18 159/12 179/10 184/12 187/17 192/22 192/23 193/1 198/9 200/17 212/18 220/6
map [6]  150/24 152/1 152/2 158/6 158/11 160/11
March [9]  9/7 10/13 12/11 12/15 124/15 144/10 148/2 204/20 205/2
March 13 [3]  9/7 12/11 12/15
March 30 [3]  124/15 144/10 148/2
March 31 [2]  204/20 205/2
March 4 [1]  10/13
Marconi [1]  168/16
marina [3]  104/3 104/4 104/5
marina-based [1]  104/3
marinas [2]  113/4 142/12
marine [9]  2/13 2/17 5/20 8/3 13/24 14/1 21/12 56/25 104/1
mark [7]  71/6 103/5 152/23 152/25 158/7 159/19 160/3
marked [3]  160/8 201/20 204/25
market [1]  68/8
marking [1]  101/11
Mary [1]  10/2
mass [3]  149/14 153/17 170/3
master [25]  31/6 31/15 31/18 34/1 58/2 150/1 150/17 151/14 151/17 156/2 162/25 163/9 169/4 169/4 169/22 174/20 176/25 190/7 208/14 211/14 212/4 213/11 214/25 216/8 216/12
master's [2]  66/10 66/14
masters [10]  22/22 58/8 106/9 106/20 128/2 129/17 154/12 176/7 189/22

material [4]  81/21 125/3 125/5 155/13 209/19
materials [2]  203/22 204/12
matrices [1]  208/21
matrix [5]  31/18 31/21 211/19 213/3 213/10
matter [27]  7/7 8/9 9/10 21/6 27/10 27/11 33/10 42/18 54/23 57/24 69/17 70/7 77/6 85/8 88/10 119/16 180/5 187/2 187/18 187/19 189/9 195/2 201/18 214/7 217/11 223/24 224/12
matters [3]  116/17 117/22 119/10
maximize [2]  180/20 180/24
maximum [7]  28/6 122/5 133/12 133/15 133/20 179/21 195/23
may [101]  6/17 6/24 7/8 7/8 11/9 13/16 14/2 19/5 20/1 20/19 29/16 29/24 32/3 32/7 32/9 36/11 36/14 37/4 37/11 39/14 41/9 41/25 47/7 48/7 56/24 58/22 60/6 61/1 64/22 76/20 86/4 98/17 99/5 100/18 100/18 101/2 106/2 111/22 113/19 113/21 124/21 128/1 128/8 128/9 131/8 133/3 133/5 137/12 139/25 140/25 142/17 148/8 148/9 149/2 150/7 151/3 151/5 154/7 154/11 155/24 162/6 162/12 163/12 168/21 171/6 171/17 171/18 174/2 176/9 176/15 183/2 183/17 184/3 184/4 186/4 186/19 190/4 190/4 192/4 197/12 199/22 203/22 203/22 204/22 204/23 207/20 209/13 210/9 212/16 212/19 212/21 212/22 215/25 217/22 218/17 218/19 219/23 220/4 220/5 223/16
May 1 [1]  218/17
May 18 [1]  220/5
May 19 [1]  220/4
May 2 [2]  217/22 219/21
May 4 [1]  219/23
May 8 [1]  218/19
maybe [5]  40/15 121/5 169/12 195/13 195/13
MAYEAUX [3]  2/6 13/18 101/4
McCall [2]  108/8 108/9
McCranie [1]  2/2
McVeigh [1]  117/6
me [82]  5/21 6/18 7/18 7/18 8/8 8/8 8/9 16/19 20/16 21/14 21/25 29/15 34/13 36/11 40/25 62/5 63/7 68/21 72/16 73/13 74/7 76/19 80/3 80/6 81/5 81/8 89/16 90/15 102/14 102/21 106/18 120/12 121/6 139/18 141/14 143/14 152/3 163/12 164/6 164/13 164/24 168/14 174/3 174/4 176/21 180/19 182/11 183/18 184/16 184/16 184/19 186/16 189/1 190/17 191/10 192/17 192/23 193/21 194/4 194/18 194/22 195/19 195/19 196/5 197/10 197/12 197/14 197/18 197/18 199/11 199/23 199/25 200/19 203/8 212/1 213/18 214/9 217/5 217/8 224/1 224/1 224/2
mean [14]  32/2 37/19 38/19 62/10 119/19 129/22 142/5 178/8 182/7 187/19 189/1 196/24 197/21 200/12
meaning [3]  46/14 147/11 168/20
means [10]  18/9 19/12 32/3 33/7 51/15 51/20 55/16 91/7 91/12 169/1
meant [4]  67/2 175/8 179/10 189/2
measure [2]  70/13 194/2
measured [1]  195/1
measurement [2]  71/4 71/5
measures [1]  71/9
mechanical [1]  3/5
mechanism [5]  30/22 30/24 38/12 38/16 39/24

M

mediation [1] 115/9
meet [7] 14/10 27/9 33/11 85/16 110/21 124/7 133/19
meeting [1] 10/16
meets [1] 206/14
member [12] 10/24 26/3 33/22 60/23 108/13 108/15 139/11 143/25 163/7 177/22 213/4 213/5
member's [1] 98/22
members [30] 10/16 15/19 18/7 18/10 19/4 19/12 19/21 27/14 27/16 29/6 30/19 31/7 32/7 32/9 41/18 59/23 61/14 61/15 99/6 123/9 161/16 161/17 165/25 175/1 176/10 208/10 208/22 209/15 210/5 212/15
membership [1] 26/6
memo [2] 50/22 209/17
memoranda [3] 204/1 204/5 204/9
memorandum [2] 26/16 29/11
mental [1] 98/23
mention [4] 29/19 97/15 157/5 208/17
mentioned [7] 12/6 22/11 23/4 36/25 67/22 127/7 147/4
merely [2] 45/10 190/17
merit [2] 155/2 164/15
merits [1] 15/16
message [1] 186/10
met [5] 18/25 21/21 154/22 155/15 164/9
Metairie [2] 2/4 2/11
method [5] 124/4 208/9 208/20 209/14 212/12
methodology [4] 75/15 119/22 120/2 120/5
metropolitan [3] 70/1 71/16 71/21
Meunier [15] 1/18 1/19 13/8 20/18 20/20 41/20 57/2 58/1 61/20 61/24 137/13 146/14 150/14 164/1 201/12
Meunier's [1] 164/7
MICHAEL [4] 2/23 10/1 148/21 149/8
Michelle [1] 10/2
Microsoft [1] 116/25
might [34] 7/16 7/24 12/1 14/21 30/1 30/1 47/13 48/8 56/21 61/17 80/6 92/14 99/4 111/14 122/11 122/19 123/15 128/7 137/19 141/21 142/3 165/1 177/16 178/7 179/10 181/1 196/18 206/24 207/1 210/12 211/4 211/10 211/11 213/12
Mike [2] 14/3 141/10
Milling [2] 2/19 9/24
million [79] 14/9 23/21 23/23 24/1 24/2 24/3 24/5 24/6 24/7 24/9 24/14 24/14 24/15 24/19 25/1 25/2 25/6 27/23 27/23 28/25 28/25 30/4 61/20 61/21 61/23 61/25 82/11 94/13 94/14 95/23 97/17 98/17 110/19 110/19 133/14 133/15 133/16 133/20 133/25 134/1 134/3 134/4 134/9 134/17 134/22 135/8 135/12 135/13 135/19 135/20 135/25 136/3 136/3 136/10 136/10 136/21 136/22 136/23 136/23 146/3 149/17 149/19 166/15 166/15 167/11 167/25 168/1 171/6 171/6 171/10 174/9 174/9 177/3 184/18 190/9 195/18 195/18 209/10 216/16
millions [5] 17/12 27/20 40/13 40/19 41/10
mind [2] 157/23 212/10
mine [1] 193/6
minimal [2] 89/18 119/19
minimum [3] 88/23 96/2 96/10
minute [2] 149/2 205/15

minutes [2] 113/21 205/14
mis-calculations [1] 159/1
misconduct [1] 173/7
misleading [3] 18/5 18/12 18/20
mismanagement [1] 44/7
mission [1] 53/13
Mississippi [1] 109/13
mistake [1] 205/22
mistaken [1] 215/19
mistakenly [1] 17/8
misunderstood [1] 175/24
mixture [1] 211/24
mode [1] 77/16
model [7] 70/8 71/8 71/25 72/22 73/8 90/19 90/20
models [7] 69/11 72/24 72/25 76/7 89/19 90/5 90/9
modest [1] 169/1
modified [1] 118/14
modify [2] 197/22 215/16
Modjeski [10] 22/22 106/8 106/19 127/8 128/2 129/13 129/17 154/12 155/2 176/7
moment [4] 30/6 30/13 195/16 196/22
moments [1] 172/17
Monday [2] 220/8 220/9
monetary [3] 10/23 19/15 99/6
money [48] 18/14 18/17 30/8 32/8 35/11 37/1 37/3 45/4 54/2 54/20 54/20 54/21 55/1 56/9 58/22 59/17 59/20 60/22 72/18 110/24 111/11 112/6 161/8 162/14 165/24 166/9 166/14 166/25 168/24 170/13 172/5 177/17 178/2 178/11 180/10 189/12 190/20 190/24 190/25 191/16 191/20 194/22 198/3 209/25 210/4 210/21 210/25 214/25
monies [1] 189/15 195/4
monorail [1] 80/2
month [3] 15/23 74/6 74/6
month-by-month [1] 74/6
monthly [2] 74/10 116/11
months [7] 6/11 6/14 88/8 88/13 98/3 193/23 203/5
monumental [2] 44/16 158/18
more [50] 11/13 23/7 26/7 26/9 26/11 40/15 41/2 55/15 55/16 55/17 58/8 59/17 61/18 76/11 77/2 78/7 79/17 80/7 87/9 104/15 107/13 107/18 111/23 112/1 112/5 119/4 119/20 127/25 131/17 133/21 135/15 151/3 161/14 167/16 167/21 168/12 174/14 177/21 188/3 190/5 192/25 200/4 200/17 208/23 211/6 211/18 212/24 214/25 217/24 222/17
morning [4] 5/1 5/5 76/23 78/7
Morton [1] 2/10
most [26] 7/11 20/23 38/15 45/1 47/6 47/20 52/6 54/1 65/2 66/7 68/15 71/24 88/9 89/15 107/16 117/9 127/4 127/22 143/13 169/23 170/2 176/15 190/5 197/24 208/20 213/9
motion [10] 5/9 57/15 106/11 156/13 157/12 183/9 183/18 187/4 187/5 204/5
motions [13] 8/12 36/11 104/21 106/4 106/18 106/25 154/25 155/2 155/19 155/20 203/25 204/1 204/5
motivation [1] 168/24
mountain [1] 194/9
movant [1] 163/6
movants [2] 162/25 204/10
move [5] 62/24 63/21 128/20 191/11 196/1
moved [1] 173/9
mover [1] 218/25
movers' [1] 20/9

moving [8] 149/11 149/14 156/15 160/23 180/3 185/6 216/24 217/3
MPC [1] 196/25
Mr [5] 11/9 81/6 113/3 170/7 185/13
Mr. [113] 10/7 10/11 10/13 11/2 12/1 12/22 13/4 13/5 16/22 19/7 20/18 25/10 28/9 28/22 41/1 41/20 41/21 56/23 57/2 57/2 58/1 59/8 59/18 61/20 61/24 64/2 65/1 65/15 65/19 78/9 80/1 80/2 81/15 98/13 99/10 99/13 100/24 104/16 104/23 107/21 108/5 108/10 108/20 112/6 112/16 115/3 116/14 119/22 120/16 121/3 121/7 121/8 121/13 125/24 130/24 133/8 136/14 137/2 137/5 137/13 141/10 141/12 142/2 142/25 143/4 143/14 143/20 144/1 146/14 146/17 148/1 148/11 148/12 148/14 148/15 149/5 150/14 159/24 164/1 164/7 167/21 172/6 173/16 173/23 176/11 178/16 179/2 179/4 179/23 181/5 181/9 182/20 182/22 183/17 186/21 187/17 188/18 189/21 191/25 193/15 193/3 199/5 199/7 199/7 199/25 200/20 200/22 202/6 203/8 216/24 219/4 219/11 221/23
Mr. Anzelmo [4] 41/21 57/2 59/18 100/24
Mr. Ashton [1] 10/7
Mr. Bruno [27] 25/10 28/9 41/1 80/1 121/7 121/8 121/13 143/20 148/11 148/14 149/5 159/24 167/21 176/11 178/16 179/2 179/4 181/9 182/20 182/22 186/21 187/17 188/18 189/21 191/25 199/5 208/3
Mr. Bruno's [2] 143/14 144/1
Mr. Charles [1] 200/22
Mr. Doody [5] 108/5 108/10 108/20 112/6 112/16
Mr. Fayard's [1] 193/3
Mr. Frank [1] 80/2
Mr. Gerard [1] 104/16
Mr. Gillen [1] 104/23
Mr. Greg [1] 65/1
Mr. Hubbard [7] 12/22 13/4 56/23 137/2 181/5 219/4 219/11
Mr. Hubbard's [1] 216/14
Mr. Irvin [10] 12/1 13/5 16/22 99/10 142/25 183/17 199/7 199/25 202/6 221/23
Mr. Kirkpatrick [1] 202/6
Mr. Ligeros [21] 28/22 64/2 115/3 116/14 119/22 120/16 121/3 125/24 130/24 133/8 136/14 137/5 141/10 141/12 142/2 143/4 146/17 148/1 172/6 173/16 173/23
Mr. Meunier [10] 20/18 41/20 57/2 58/1 61/20 61/24 137/13 146/14 150/14 164/1
Mr. Meunier's [1] 164/7
Mr. Nussbaum [1] 10/7
Mr. O'Dwyer [3] 10/11 10/13 11/2
Mr. Rigamer [7] 59/8 65/15 65/19 78/9 81/15 98/13 99/13
Mr. Rob [1] 148/15
Mr. Roy [2] 148/12 179/23
Mr. Therence [1] 200/20
Mr. Tim [1] 107/21
Mr. Zwain's [1] 206/12
MRGO [21] 1/8 5/13 21/15 57/24 95/17 150/2 150/3 150/25 151/12 156/18 156/22 157/3 157/14 164/8 169/4 169/22 175/2 175/20 181/13 186/1
MS [1] 66/15
Ms. [6] 12/3 101/19 101/19 102/12 200/19 222/20
Ms. Feigler [1] 200/19
Ms. Frances [1] 222/20
Ms. Kiefer [4] 12/3 101/19 101/19 102/12

## M

much [40]  5/25 23/17 26/18 30/10 30/10
35/24 41/13 41/19 58/22 69/1 75/17 76/4
80/12 100/6 102/24 124/11 138/24 139/1
141/20 145/2 145/13 146/12 162/23
163/21 172/23 184/9 186/16 187/2
190/19 190/20 190/24 190/25 191/15
191/20 196/3 198/4 205/13 211/21 214/2
219/13
multiple [4]  74/15 97/18 188/21 198/15
multitude [1]  40/16
municipal [1]  75/24
Murphy [3]  198/1 198/13 198/16
must [11]  11/6 17/24 32/5 33/5 33/22
37/13 47/4 120/19 137/24 183/24 195/12
my [83]  6/5 6/9 6/9 6/14 6/18 7/2 7/4
7/25 8/14 8/16 9/5 11/16 29/15 36/15
40/7 62/13 71/21 79/10 98/5 101/1 108/5
115/4 115/15 117/18 120/20 121/5
124/11 141/1 143/10 143/16 144/19
149/8 149/9 156/1 162/19 164/6 166/12
172/9 174/3 177/11 178/5 178/5 178/14
178/17 179/17 180/24 180/25 183/8
187/10 190/11 190/12 191/5 192/17
192/18 192/18 192/20 192/20 193/5
193/5 194/6 194/19 194/20 194/21
194/22 194/23 197/4 197/11 197/13
198/5 200/5 200/6 202/2 203/11 203/21
205/22 206/13 209/16 214/10 214/20
215/25 216/6 217/12 224/10
myself [2]  164/2 201/12
mythical [1]  54/19

## N

N.W [1]  2/23
naive [1]  195/13
name [15]  6/5 9/11 65/9 65/15 79/8
79/10 107/24 108/5 114/22 127/8 148/19
149/5 149/8 154/14 202/23
named [5]  50/18 131/11 144/12 154/15
187/22
namely [1]  24/17 27/3
names [3]  20/8 164/3 222/17
National [2]  6/12 198/17
National Guard [1]  6/12
nationwide [1]  209/17
natural [1]  78/12
nature [14]  16/3 42/11 42/21 46/1 118/4
123/2 141/21 143/16 145/6 145/8 146/22
157/20 162/23 163/16
Navigational [5]  44/21 45/22 181/17
181/20 181/25
near [1]  213/16
nearly [1]  83/25
necessarily [2]  38/5 184/2
necessary [8]  110/21 121/20 127/17
156/12 186/19 193/21 223/15 223/16
need [22]  14/14 14/16 47/8 56/15 64/22
72/7 113/23 125/13 147/6 148/14 149/2
162/17 206/11 216/8 217/1 217/4 217/6
217/16 217/25 218/1 218/8 220/16
needed [4]  25/10 68/5 72/18 150/21
needing [1]  222/24
needs [4]  17/6 33/13 72/10 75/5
neglected [1]  157/4
negligence [2]  7/3 175/19
negotiating [1]  58/6
negotiation [1]  157/22
negotiations [3]  28/11 170/8 195/6
negotiator [1]  21/16
neighborhood [4]  68/20 73/8 73/9 73/10
neighborhood-level [1]  73/8

neighborhoods [2]  73/11 158/12
net [1]  91/2
never [3]  75/9 77/16 97/1
97/1 99/3 166/19 166/21 177/3
nets [1]  95/15
Neuner [1]  2/6
Nevada [1]  117/3
Nevertheless [1]  29/11
new [52]  1/6 1/16 1/20 2/15 2/18 2/21
3/2 7/22 8/11 24/23 24/23 45/10 45/23
52/9 53/4 65/18 69/1 70/1 71/15 71/22
72/2 72/3 72/4 73/12 95/7 95/8 95/9
104/4 106/23 128/23 152/14 152/18
152/20 153/2 153/11 154/3 154/8 154/9
155/24 156/16 156/25 158/4 159/10
161/20 161/21 169/9 169/15 180/9
180/14 180/15 182/8 190/16
New Orleans [36]  7/22 8/11 24/23 24/23
45/10 65/18 69/1 70/1 71/15 71/22 72/2
72/3 72/4 73/12 95/7 95/8 95/9 106/23
152/18 152/20 153/2 153/11 154/3 154/9
155/24 156/16 156/25 158/4 159/10
161/20 161/21 180/9 180/14 180/15
182/8 190/16
newer [3]  130/20 130/21 144/14
news [2]  32/20 35/20
newsletter [1]  116/12
next [29]  64/21 83/3 90/10 90/14 91/1
91/17 100/24 100/25 107/19 113/21
113/24 114/7 148/10 158/2 159/1 170/6
176/24 177/14 177/16 182/10 186/2
197/13 199/10 199/12 199/23 200/25
202/1 220/8 220/9
NFIP [1]  86/18
nice [1]  217/12
nightmarish [1]  35/17
nights [1]  6/10
Nine [1]  45/23
Ninth [9]  24/24 153/7 157/1 157/11
159/15 161/22 175/13 175/17 180/16
17/20 18/11 18/17 26/3 31/7 31/8 31/12
33/6 33/7 33/8 34/16 35/3 35/11 37/9
39/19 40/18 41/5 41/6 42/13 47/24 48/15
49/5 49/19 49/22 53/14 53/22 54/17
54/19 55/16 55/16 56/9 56/22 58/12
58/14 58/25 60/24 64/1 64/13 64/18
64/20 76/19 78/14 78/15 79/24 79/25
81/10 93/21 96/12 99/8 99/9 100/21
102/14 102/21 102/23 103/6 103/20
103/21 104/7 104/9 104/10 105/8 105/9
105/10 105/22 105/24 105/25 107/11
112/13 112/19 112/23 113/17 114/14
114/15 114/16 120/13 120/14 120/15
120/17 121/12 126/17 127/13 127/15
129/7 131/7 133/20 133/25 137/1 140/24
141/6 141/13 141/19 142/5 142/19
143/13 144/7 145/21 146/7 146/18 147/6
148/5 148/6 155/7 158/9 159/21 162/21
164/4 164/10 164/14 164/15 164/15
166/1 168/14 169/8 171/13 172/2 172/4
173/19 174/22 174/24 175/24 176/12
176/12 176/12 177/9 178/8 178/21
178/25 181/24 181/24 182/14 185/24
185/24 186/3 187/21 189/9 190/15
190/15 191/19 191/19 193/14 195/9
195/15 195/20 198/12 199/1 199/5
199/19 199/21 201/23 202/11 202/18
205/10 214/7 216/22 219/9 222/14
222/15 223/13 223/19
no-opt-out [1]  33/6
no-seizure [1]  49/5
nobody [2]  60/18 192/15

Noella [3]  9/20 200/21 222/21
non-opt-out [1]  18/7
nonattorneys [2]  20/7 20/14
none [5]  6/24 35/24 140/21 202/12
213/25
nonflood [1]  113/4
nonhomeowner [3]  88/21 88/24 97/22
nonlegal [1]  29/24
nonlevee [1]  124/20
nonlimited [1]  16/14
nonquantifiable [1]  96/12
nonseizability [1]  33/18
nonsettling [2]  36/8 36/10
noon [1]  6/15
nor [6]  15/25 23/2 45/15 53/17 82/24
112/4
Norco [1]  149/15
normally [1]  189/7
north [2]  2/3 109/15
not [281]
notation [1]  53/20
note [7]  12/16 22/11 46/20 48/1 48/2
53/24 63/17
notebook [1]  66/6
noted [11]  15/21 25/12 44/8 44/15 45/8
45/13 52/19 80/11 125/16 126/5 185/5
notes [3]  22/16 74/13 81/24
nothing [17]  26/8 37/23 37/23 52/23 60/7
60/17 63/10 113/18 120/12 130/22
150/18 168/2 169/15 176/10 177/3
178/19 196/3
notice [26]  8/24 9/5 9/8 9/10 9/15 10/25
11/10 12/8 18/4 18/6 18/9 18/12 18/16
18/20 19/11 19/25 47/24 49/15 64/6
106/5 106/17 107/3 114/10 114/12
141/23 219/20
notices [1]  19/7
notion [2]  59/6 214/20
notions [1]  163/4
notwithstanding [1]  58/12
NOTX [2]  149/15 149/17
novel [1]  206/22
November [2]  10/11 126/14
November 7 [1]  10/11
now [78]  8/17 11/18 13/7 20/12 21/23
22/20 23/6 26/12 29/19 30/17 32/16 35/5
36/13 36/18 38/7 38/15 40/11 47/2 47/4
48/6 50/2 50/17 52/5 52/21 53/7 53/10
55/9 61/7 61/19 62/23 74/19 77/13 88/5
88/25 93/20 94/16 108/9 109/20 109/21
110/20 112/3 116/14 118/5 118/24 122/4
124/13 126/18 126/22 131/5 131/16
133/8 134/13 134/24 138/24 140/8 142/8
151/25 153/14 155/22 157/19 158/24
167/3 173/14 174/6 178/24 180/11
183/22 187/25 191/8 195/25 200/13
201/15 206/4 206/5 206/6 213/17 217/23
219/13
number [53]  6/7 9/11 15/23 22/2 22/4
22/7 28/21 29/2 29/21 60/1 67/14 69/8
69/21 76/25 77/20 77/23 83/9 83/15 84/6
86/15 88/9 88/11 90/18 92/23 102/10
105/6 110/18 124/4 124/25 125/17
125/19 134/2 134/6 134/19 136/4 136/11
146/4 149/10 158/18 159/4 165/8 165/9
169/24 185/24 208/16 209/2 209/5
209/21 212/14 212/22 213/2 213/3
215/11
numbered [1]  224/12
numbering [1]  205/23
numbers [6]  92/14 92/15 99/21 125/9
125/15 200/16

Case 2:05-cv-04182-SRD-JCW    Document 18971    Filed 06/09/09    Page 248 of 262

numerosity [1]  65/2
numerous [1]  21/1
Nussbaum [2]  10/4 19/7

O

O'Dwyer [6]  10/7 10/11 10/13 10/20 11/2
 11/9
oath [4]  7/5 194/3 196/7 209/22
object [6]  179/13 183/10 183/14 184/16
 195/24 206/8
objecting [4]  22/8 143/5 206/8 221/25
objection [62]  6/1 9/9 11/9 11/11 12/10
 12/12 12/16 12/18 12/23 58/13 64/1
 64/13 64/15 64/18 64/20 78/13 78/14
 78/16 79/13 79/18 80/10 102/14 102/21
 103/6 103/20 103/21 104/6 105/4 105/8
 105/9 105/10 105/22 105/23 105/24
 105/25 114/14 114/15 114/16 120/13
 120/14 120/15 120/16 120/17 133/5
 148/5 148/6 158/9 158/9 159/21 178/25
 184/14 185/5 201/22 201/23 202/10
 202/11 202/18 207/16 222/13 222/14
 222/15 223/19
objections [21]  9/6 9/7 10/8 10/9 11/22
 16/18 20/11 30/23 64/6 64/17 81/9 81/10
 81/11 100/21 100/22 104/7 104/9 104/10
 148/4 183/7 193/3
objective [1]  27/12
objectively [2]  162/13 162/16
objector [1]  176/9
objectors [22]  2/19 2/22 11/24 14/4 14/6
 29/11 29/12 32/20 34/4 35/17 36/20
 37/20 38/7 39/13 41/12 50/6 55/7 64/16
 78/15 111/21 192/5 218/6
objectors' [3]  30/3 52/21 217/16
obligated [4]  49/1 109/23 196/23 200/2
obligation [4]  50/8 124/5 124/6 193/20
obligations [8]  18/22 56/14 110/21
 110/22 111/17 111/17 124/7 194/20
obliged [1]  21/4
observed [2]  44/6 44/22
observing [1]  47/21
obstacles [1]  15/15
obtain [3]  8/5 63/18 165/3
obtained [2]  69/23 194/23
obtaining [2]  10/24 171/14
obvious [3]  153/23 164/11 170/17
obviously [14]  7/7 23/17 25/3 61/18
 63/14 64/13 83/23 87/13 89/13 153/15
 161/22 183/14 213/14 216/20
occasion [1]  189/22
occupation [4]  115/3 115/4 115/5 149/5
occupied [1]  217/9
occur [7]  91/17 132/11 140/4 140/14
 154/24 165/2 178/15
occurred [9]  15/22 46/22 69/14 90/10
 138/4 149/15 149/16 173/3 173/7
occurrence [16]  131/25 132/3 133/14
 134/1 137/20 138/14 147/11 147/12
 147/12 147/16 147/19 147/20 147/20
 172/20 173/5 173/10
occurrence-based [1]  137/20
occurrences [6]  133/15 133/17 134/6
 134/8 134/10 134/19
occurring [1]  90/17
occurs [2]  173/12 173/13
ocean [1]  104/1
October [4]  124/18 126/13 221/19
 221/22
October 2 [1]  221/22
October 2005 [2]  124/18 126/13

October 21 [1]  221/19
of importance [1]
off [5]  20/8 91/19 96/24 190/15 214/17
offer [24]  11/13 59/5 62/23 63/1 64/4
 64/8 101/8 102/3 103/4 103/24 104/15
 105/4 105/14 114/8 148/1 158/7 159/20
 177/1 195/16 195/20 201/3 201/13
 201/15 205/4
offered [2]  8/4 178/22
offering [1]  101/18
offers [1]  67/3
office [9]  1/23 2/7 68/25 118/6 118/9
 118/11 143/14 144/1 193/4
officer [1]  66/1
Offices [1]  1/15
Official [3]  3/1 224/7 224/16
officially [1]  81/7
officials [1]  125/16
offsets [2]  94/24 95/5
often [6]  36/25 67/22 68/3 68/7 196/10
 196/12
Oh [3]  20/12 182/9 219/9
Oil [3]  198/1 198/13 198/16
Okay [14]  12/16 76/25 94/9 96/2 101/3
 128/25 145/25 179/7 191/11 193/5
 198/21 205/25 219/24 224/2
older [4]  144/14 144/21 145/17 145/18
omniscient [1]  6/25
on [256]
once [10]  6/12 29/3 33/7 38/11 39/14
 64/3 92/21 110/9 171/4 178/16
one [106]  6/2 6/12 6/20 7/1 7/10 8/13
 8/14 16/12 20/22 22/2 24/17 25/14 26/8
 26/10 26/11 28/21 29/21 30/17 34/3
 34/23 35/1 36/10 37/4 40/16 41/9 42/7
 46/20 50/23 50/24 57/4 58/8 60/14 61/11
 71/24 74/8 74/9 79/24 83/23 91/4 94/7
 97/6 98/22 102/22 103/16 104/15 117/17
 118/10 119/20 124/4 126/13 127/25
 131/3 134/10 135/11 135/14 135/15
 135/19 137/8 138/24 142/6 142/7 144/15
 152/19 153/2 154/1 154/3 156/9 159/5
 159/6 161/16 161/17 164/14 165/8
 168/17 169/10 169/12 169/23 170/5
 171/25 176/9 179/2 179/12 180/14
 180/14 180/16 180/22 181/6 181/9
 183/19 190/3 191/19 192/2 196/11 199/1
 199/23 200/18 208/20 210/8 210/24
 211/17 212/10 214/10 215/11 217/7
 217/11 222/17
ones [9]  20/15 99/25 136/25 144/14
 144/18 144/21 151/19 154/12 188/21
ongoing [6]  104/24 138/7 165/17 170/22
 184/24 188/23
only [40]  6/17 14/25 17/17 19/7 19/18
 22/14 24/16 26/22 30/20 37/7 39/18
 50/14 54/8 55/8 56/19 57/6 75/17 99/24
 99/25 130/4 130/20 132/17 135/19
 138/11 138/17 140/3 145/4 155/19
 157/14 166/24 172/5 173/19 179/5
 180/17 185/8 191/15 192/2 195/1 209/10
 215/8
open [15]  12/14 42/15 63/22 81/2 183/16
 185/11 217/7 220/12 220/14 220/15
 220/17 220/25 222/24 223/9 223/12
operate [3]  43/9 54/3 85/24
operation [11]  47/19 47/19 48/4 48/20
 48/25 50/25 52/14 109/24 110/6 111/17
 175/19
operations [3]  52/7 52/9 133/1
opinion [7]  2/12 4/4 146/17 162/17
 162/19 165/23 166/5 174/17 179/4 179/5
 189/12 190/11 190/12 192/17 192/20

206/13 223/18
opinions [5] 16/12 78/23 125/6
 207/19
opponents [2]  174/3 184/24
opportunity [13]  11/12 35/21 36/23 63/11
 86/20 86/24 155/18 163/22 191/5 191/10
 205/8 207/10 215/21
oppose [4]  160/23 160/24 220/1 220/2
opposed [3]  123/2 165/6 190/24
opposing [1]  218/7
opposite [1]  167/12
opposition [2]  166/12 201/6
opt [9]  18/7 33/6 33/7 58/22 58/24 58/25
 60/12 60/14 60/18
opt-out [2]  33/7 58/22
opt-outs [3]  58/25 60/12 60/18
opted [1]  60/19
opting [1]  60/10
option [2]  160/10 216/16
or [216]  6/25 7/8 9/22 10/20 10/21 11/1
 15/9 16/8 17/13 17/16 18/17 19/16 19/20
 20/11 21/2 21/3 22/19 23/1 25/22 26/7
 27/23 28/25 30/1 32/4 32/16 36/8 36/19
 36/22 38/17 38/21 39/1 39/11 41/13
 42/21 43/21 44/18 45/1 45/9 46/14 46/19
 47/12 48/2 48/19 48/23 49/14 49/19
 49/23 49/23 49/24 50/7 50/12 50/12
 50/13 50/16 50/16 52/1 52/18 53/14
 54/19 58/8 58/17 61/14 62/5 64/6 67/10
 67/23 67/24 68/5 68/8 68/9 68/20 70/13
 73/8 74/1 74/2 74/8 74/25 75/4 75/9
 76/19 82/1 82/7 84/5 85/15 85/21 86/1
 86/11 87/7 89/5 89/21 92/9 96/13 96/13
 109/5 112/2 112/16 113/4 113/5 113/5
 115/22 118/6 118/11 119/21 121/18
 123/5 123/5 123/5 127/25 128/23 130/18
 132/16 132/25 133/1 133/20 134/10
 134/13 134/25 135/20 136/3 136/10
 136/22 136/23 137/24 138/2 139/13
 139/15 140/2 140/7 140/13 141/4 142/20
 143/7 143/8 146/20 150/19 152/6 153/16
 154/15 155/22 157/4 157/11 160/15
 161/7 162/11 162/21 162/22 163/6 163/6
 163/7 164/7 164/7 164/14 164/15 165/18
 167/17 168/1 169/11 169/12 169/22
 170/9 171/18 172/10 173/7 173/16
 174/15 174/21 174/22 175/2 175/19
 175/21 176/1 177/20 177/23 177/25
 180/17 182/10 183/12 185/21 186/5
 186/16 187/13 189/8 190/4 194/22
 196/21 199/1 199/5 199/16 199/19
 199/20 200/4 200/21 200/23 203/13
 203/22 207/3 208/7 208/21 209/5 209/5
 210/24 211/2 211/22 211/23 214/18
 214/25 215/1 215/5 215/13 216/9 216/11
 219/10 219/11 219/15 222/21 223/2
Orange [1]  58/11
order [34]  5/9 8/25 9/5 9/8 10/10 10/24
 10/25 11/1 11/6 11/7 11/10 11/14 29/5
 37/15 40/22 41/23 43/18 60/22 63/24
 93/12 123/19 125/6 136/16 137/23 151/4
 159/13 160/16 165/15 167/1 183/23
 184/8 190/6 194/9 215/19
ordered [4]  10/19 166/8 193/22 193/24
ordering [1]  177/4
orderly [1]  11/25
orders [2]  12/7 156/1
organizations [1]  89/8
organize [2]  31/22 67/18
organized [3]  51/16 51/21 69/24
organizes [1]  73/18
organizing [1]  77/7
Orleans [122]  1/6 1/16 1/20 2/2 2/6 2/15

Q

Orleans... [116]  2/18 2/21 3/2 7/22 8/2
8/11 12/4 13/17 13/18 21/9 24/7 24/11
24/19 24/23 24/23 25/1 25/18 39/10 42/2
45/10 45/23 45/24 47/22 51/2 52/12 53/5
53/9 57/11 61/22 61/25 64/10 65/18 69/1
70/1 71/15 71/22 72/2 72/3 72/4 73/12
73/13 74/11 75/12 75/25 77/11 82/2
84/21 84/24 85/20 94/1 94/4 95/7 95/8
95/9 97/12 101/4 101/10 101/12 101/23
101/24 104/4 104/17 106/23 109/21
111/10 112/21 121/22 129/15 130/5
130/14 134/24 135/6 135/17 135/23
136/2 136/11 137/19 139/7 144/13 146/2
152/18 152/20 153/2 153/11 154/3 154/8
154/9 155/5 155/24 156/16 156/24
156/25 157/15 158/4 158/13 159/10
160/2 161/12 161/12 161/14 161/19
161/20 161/21 180/9 180/11 180/14
180/15 182/1 182/3 182/4 182/7 182/8
182/12 190/16 221/15 221/18
Orleans Parish [11]  12/4 45/24 73/13
74/11 75/25 77/11 85/20 161/12 182/1
182/3 182/12
Ortiz [7]  14/22 17/3 17/23 17/23 26/15
28/4 195/23
ostensible [1]  8/10
ostensibly [1]  217/10
other [76]  5/19 8/13 8/17 9/3 12/4 14/20
22/15 23/3 24/21 26/9 27/16 32/10 33/2
34/25 34/25 36/8 38/22 41/5 47/7 51/17
51/23 52/16 53/18 53/18 54/14 57/14
57/20 61/15 62/12 83/6 85/12 85/18 89/7
91/8 94/19 95/10 107/12 113/4 118/11
122/11 122/12 123/14 123/25 124/12
124/25 126/24 130/10 131/9 136/25
138/25 142/10 151/22 155/3 155/22
156/15 162/11 166/16 175/12 176/6
176/6 177/17 179/2 181/21 188/23
188/25 193/12 193/13 193/16 200/7
205/6 208/3 208/17 209/23 212/7 222/1
223/12
others [5]  42/21 119/21 124/21 191/3
208/23
otherwise [4]  17/16 167/4 169/22 191/2
ought [1]  208/5
our [63]  20/23 25/20 27/8 29/10 42/4
42/5 42/6 42/6 42/9 48/18 48/24 52/24
53/25 54/4 54/5 54/18 53/23 56/3 56/6
56/6 58/11 64/2 64/25 67/3 67/15 68/3
68/24 69/2 69/20 71/19 72/21 72/22
75/21 76/2 76/21 89/11 91/23 92/2 110/4
111/6 111/7 148/14 155/13 155/23
156/19 156/23 157/17 158/23 159/12
160/21 162/5 164/3 165/6 184/8 184/14
184/24 186/6 186/11 189/16 210/7 215/4
220/14 221/4
ourself [1]  189/5
ourselves [1]  189/18
out [87]  6/13 7/16 8/6 12/21 14/21 16/11
18/7 20/16 32/1 33/6 33/7 33/8 33/19
34/17 34/22 35/19 35/22 35/25 36/9 37/9
40/5 41/18 43/2 49/6 50/14 50/17 55/23
56/3 58/22 58/24 60/10 60/14 60/19 61/7
61/17 61/20 61/24 62/15 81/5 86/11 88/7
88/7 93/14 93/15 93/15 94/14 95/15
95/22 97/11 99/2 102/25 121/20 127/3
143/17 149/25 156/10 156/23 157/13
162/10 164/5 165/11 167/8 167/23 169/2
172/6 175/21 175/22 176/3 176/16
176/20 180/5 183/12 188/20 188/21
189/19 191/14 192/6 197/10 200/20

201/4 206/12 208/16 211/16 211/20
221/2 221/6 223/4
outcome [2]  76/19 186/4
outcome for [1]  76/19
outdated [1]  45/6
outfall [5]  44/19 44/20 44/24 45/11 45/21
Outlet [1]  109/13
outs [3]  58/25 60/12 60/18
outset [3]  30/1 143/13 202/2
outside [2]  31/11 79/4
outstanding [1]  10/23
over [33]  6/1 12/7 15/22 46/12 47/19
56/10 56/10 56/10 67/7 72/7 85/21 86/4
87/5 89/23 95/23 117/6 121/8 128/20
133/2 149/13 150/6 162/3 162/4 162/6
165/8 166/11 170/12 171/16 187/7 188/1
189/19 196/23 210/15
overall [4]  99/25 150/10 163/15 171/18
overcome [1]  165/15
overflow [1]  161/3
overlap [2]  26/6 161/16
overrule [1]  184/16
overtopping [3]  89/10 90/5 90/8
overturned [1]  170/20
overview [2]  21/24 157/24
overwhelmed [1]  46/1
overwhelming [1]  17/25
owe [1]  35/2
owed [1]  216/16
own [8]  8/13 58/24 123/1 123/6 138/18
143/10 174/21 192/18
owned [3]  82/2 82/7 156/8
owner [1]  116/25
owners [1]  85/16

P

P-R-E-S [1]  210/16
package [1]  217/12
page [3]  4/2 58/7 214/24
paid [34]  17/17 20/14 23/6 23/23 24/1
24/5 24/20 34/17 49/23 50/14 60/6 61/2
61/3 85/15 99/4 100/6 101/24 102/1
156/12 164/4 168/8 172/7 184/1 184/2
190/15 194/24 197/2 197/7 209/1 211/17
212/24 213/4 213/5 216/21
pain [3]  6/18 42/9 96/12
painfully [2]  165/12 181/12
panel [2]  73/4 100/8
paper [1]  194/9
paperwork [1]  215/16
paragraph [2]  13/2 206/13
parameters [1]  123/22
paraplegic [1]  169/11
parish [34]  12/4 45/24 57/19 73/13 73/13
74/11 75/13 75/13 75/14 75/25 77/11
77/13 77/13 83/8 83/14 83/16 83/16
83/19 84/17 84/22 85/1 85/20 88/3 88/11
98/16 160/2 160/7 161/12 161/23 162/1
182/1 182/3 182/8 182/12
parish-by-parish [1]  83/16
parishes [2]  45/25 82/2
park [2]  69/1 211/2
parse [1]  61/7 62/15
part [26]  6/8 7/6 8/10 8/16 17/22 36/13
39/6 43/22 45/1 46/25 47/20 52/6 54/1
62/3 71/13 80/12 130/25 140/17 151/20
160/11 168/25 169/5 171/22 182/13
183/21 207/23
partial [2]  22/12 106/23
partially [3]  5/19 49/11 157/10
participant [2]  26/9 34/15
participated [2]  47/13 74/14
participation [1]  76/8

particular [17]  20/25 31/12 44/12 48/23
58/3 57/23 66/24 74/9 80/21 80/24 80/5
91/11 91/20 151/9 151/17 162/13 196/13
209/3
particularly [11]  15/25 51/12 66/22 67/23
110/16 111/11 149/12 188/6 198/10
210/14 210/18
parties [13]  11/19 16/1 19/19 24/10 28/7
31/8 58/7 117/24 123/23 123/24 159/18
207/2 215/22
partner [2]  117/18 121/6
parts [2]  169/5 169/25
party [25]  121/25 122/15 122/18 122/23
122/24 122/25 123/4 123/6 123/7 123/7
123/9 126/10 131/16 133/8 135/3 139/15
140/14 142/8 142/9 142/17 142/20
155/12 176/6 176/7 223/4
pass [2]  55/5 191/12
passed [1]  180/6
passing [1]  55/22
path [1]  61/17
pattern [1]  76/5
Paul [23]  2/13 2/16 8/3 13/24 14/1 21/11
23/10 24/20 56/25 57/7 61/21 61/22
101/16 103/23 104/1 118/19 133/12
135/4 135/18 137/6 141/12 141/14
215/13
pay [36]  17/1 19/16 21/4 23/11 30/8
38/11 38/14 39/3 40/7 40/23 50/7 54/4
54/17 55/8 55/12 55/16 55/22 110/22
111/11 111/14 112/2 112/3 112/7 112/18
112/19 112/22 166/7 166/9 196/10
196/12 196/14 196/23 196/24 200/2
211/18 216/17
pay legal [1]  23/11
payable [2]  49/23 50/14
payday [1]  178/4
paying [4]  10/22 41/10 55/18 196/7
payment [5]  38/12 87/1 103/2 188/24
211/6
payments [5]  23/15 31/25 86/16 86/18
99/6
Peck [1]  2/13
peer [2]  120/3 120/6
peer-reviewed [2]  120/3 120/6
pending [9]  22/20 22/25 23/5 23/14
57/17 57/23 155/17 155/20 156/13
penetration [1]  44/17
people [58]  5/20 5/24 7/24 29/24 30/8
33/16 33/19 41/4 41/18 54/25 57/23
58/22 60/11 60/16 61/17 66/21 66/22
67/4 67/23 69/9 69/17 69/21 74/13 75/7
77/24 78/2 82/6 83/9 83/13 83/21 85/10
85/15 85/17 88/9 88/11 88/14 92/14
92/23 139/25 166/25 169/1 171/2 175/8
176/14 176/17 177/5 178/6 186/7 186/9
186/13 190/9 190/19 190/23 191/1
211/18 212/13 212/22 213/16
per [6]  24/15 110/12 133/14 134/1
190/10 213/6
percent [24]  45/9 69/7 76/16 76/18 84/3
84/6 84/25 84/25 85/1 87/5 91/6 91/7
91/12 92/24 94/11 110/5 119/19 119/21
143/7 167/9 167/10 198/14 212/13
212/19
percentage [8]  27/21 33/16 86/25 95/21
119/17 168/23 172/1 212/18
peremptory [1]  106/18
perfected [1]  176/5
perfectly [2]  195/19 196/15
perform [3]  48/24 56/6 112/3
performed [1]  128/12
performing [1]  68/10

perhaps [11] 7/11 7/14 25/11 28/25
37/20 65/3 86/1 87/9 166/4 201/4 210/5
period [20] 10/12 15/23 83/12 84/13
126/12 126/19 128/15 128/18 130/7
132/17 136/21 137/25 139/16 140/14
144/16 147/18 147/22 209/24 210/19
212/16
permit [2] 160/25 183/13
permits [1] 177/1
perplexed [1] 12/24
person [4] 6/17 139/11 176/15 196/17
person's [1] 169/11
personal [11] 6/9 86/19 86/21 87/6 87/17
96/8 97/23 98/23 123/5 165/13 209/3
personally [2] 170/11 172/12
personnel [1] 151/8
persons [2] 9/15 30/25
perspective [3] 68/7 76/6 87/24
persuade [1] 196/17
persuaded [2] 166/11 170/12
persuasive [1] 197/16
PERTAINS [1] 1/8
Pete [6] 28/14 114/18 114/20 114/24
120/9 223/15
Pfister [2] 2/10
phase [2] 176/22 176/24
Phelps [1] 2/16
Phillips [1] 108/8
photography [2] 70/7 70/11
phrases [1] 118/17
physical [2] 87/6 173/6
Picayune [1] 76/22
pick [1] 168/16
picked [1] 126/20
picture [3] 6/20 40/11 67/18
pieces [1] 208/17
pile [4] 44/13 45/3 55/15 55/17
piles [1] 44/18
Pinhook [1] 2/7
pitch [1] 31/12
Pittman [3] 106/15 154/15 154/15
pity [1] 6/16
place [14] 12/10 53/20 67/24 68/16
79/14 105/20 129/8 130/17 137/14
137/18 137/24 138/7 138/9 147/21
placed [1] 140/4
placeholder [1] 63/20
places [1] 76/1
plain [1] 118/20
plaintiff [17] 8/21 21/14 25/13 26/8 33/25
35/6 41/19 50/13 123/10 129/11 130/4
130/14 134/20 150/10 150/15 151/14
169/10
plaintiffs [43] 1/15 1/18 1/21 12/19 13/9
13/11 13/14 16/24 19/10 21/18 21/20
23/3 30/16 34/9 34/23 35/2 50/13 60/1
64/13 78/14 102/17 103/20 104/7 105/8
105/22 113/23 114/14 114/18 121/14
122/6 129/19 136/16 143/5 154/6 164/2
188/14 200/4 200/10 202/12 206/8
216/10 221/25 222/6
plaintiffs' [22] 20/20 21/15 21/17 21/25
22/12 22/21 23/7 24/25 25/2 25/3 26/24
27/5 28/24 34/6 35/14 38/15 125/25
131/7 133/18 182/23 188/20 216/22
plan [8] 12/1 12/23 72/5 109/3 160/23
160/24 188/9 188/9
planned [1] 64/22
planner [1] 65/20
planners [2] 68/3 69/3
planning [3] 66/15 66/25 72/16

plans [2] 45/20 74/5
plasma [1] 152/11
play [3] 33/13 130/13 203/6
PLC [1] 1/15
pleading [1] 8/22
pleadings [4] 9/25 10/20 125/2 203/25
please [38] 5/4 5/6 13/16 14/2 20/19
40/7 40/7 41/25 56/24 65/9 65/15 65/16
66/13 66/19 67/10 68/13 71/1 71/16 79/6
79/7 81/4 81/24 90/1 106/2 107/24 108/6
114/5 114/22 115/3 118/8 148/19 173/17
179/4 179/20 199/13 202/23 205/20
208/19
pleased [1] 72/19
plus [11] 14/9 23/15 24/5 24/9 61/6
85/20 166/16 167/8 171/7 174/9 175/17
pockets [1] 190/25
point [30] 7/16 14/21 16/9 20/16 36/12
37/16 55/21 57/22 63/19 70/17 117/17
137/8 151/12 159/11 162/8 169/17
172/16 177/11 179/11 186/4 186/22
188/13 188/15 188/16 189/19 195/25
197/24 208/13 215/25 216/14
pointed [3] 36/9 81/5 172/6
pointing [1] 12/21
points [2] 49/6 215/7
polder [16] 152/16 152/18 152/20 152/22
153/3 153/6 153/7 153/10 153/11 153/12
154/3 154/8 156/16 156/16 159/9 159/10
polders [7] 152/18 152/19 152/19 153/2
159/7 159/9 174/17
policies [11] 23/9 28/10 28/14 28/23
30/20 61/21 63/2 63/6 63/7 63/9 63/18
63/23 64/3 101/13 103/10 103/13 116/9
116/10 118/16 120/21 122/11 122/24
123/12 123/14 123/24 124/9 124/17
124/20 124/20 125/9 125/15 126/1 126/6
126/11 126/15 126/17 126/22 127/1
127/6 127/9 128/19 129/17 129/20 131/9
132/4 133/9 133/23 135/2 135/3 136/2
136/10 136/17 136/24 137/22 139/19
140/12 141/12 141/14 142/2 142/8
142/10 142/14 142/18 142/20 142/21
143/15 144/12 144/14 144/24 144/25
145/2 145/3 145/3 145/14 145/17 145/18
145/24 146/20 146/21 147/8 147/15
160/17 166/2 168/1 170/19 172/11
172/13 172/20 172/24 173/10 173/21
174/8 193/24 194/5 194/10 195/2 223/2
223/4 223/7 223/8 223/16
policy [94] 8/5 23/11 23/14 23/24 24/2
24/3 24/6 24/7 24/12 24/13 24/15 24/18
24/25 26/2 27/11 33/12 33/13 48/6 48/17
49/9 52/15 62/1 116/8 117/12 117/23
117/23 120/18 125/8 125/16 125/19
126/13 126/19 126/20 128/15 128/18
130/2 130/7 130/10 130/15 130/18
130/20 131/21 131/24 132/17 132/25
132/25 133/13 133/14 133/16 134/3
134/4 134/9 134/13 134/13 134/16
134/25 135/7 135/9 135/18 135/23
135/25 136/12 137/13 137/18 137/20
137/23 137/25 138/2 138/10 138/10
138/24 139/5 139/5 139/11 139/14
139/16 139/16 140/14 141/22 142/4
142/5 146/2 147/6 147/18 147/22 147/23
169/10 169/12 171/5 173/5 173/8 173/12
179/7 200/16
political [18] 14/23 17/14 38/22 48/13
49/14 49/16 49/17 49/23 49/25 50/9
50/12 50/18 50/19 51/9 51/15 51/20 52/1
197/8

pollination [1] 53/22
plasma [1] 152/11
ponded [1] 91/19
Pontchartrain [5] 43/20 44/1 46/8 109/2
180/7
pool [1] 161/8
popular [1] 7/22
population [20] 67/23 67/25 68/6 73/14
76/12 84/19 84/23 84/24 85/1 85/4 85/8
92/20 92/24 94/9 94/10 94/22 95/3 95/18
95/18 111/9
Porter [1] 16/24
portion [2] 84/9 190/8
portions [2] 46/2 115/21
pose [2] 14/24 174/3
position [11] 27/8 31/16 62/23 65/25
98/15 108/10 122/4 165/17 167/19
180/22 196/25
possibilities [1] 59/13
possibility [10] 8/19 16/13 60/19 61/13
125/24 127/25 146/3 146/6 210/8 210/24
possible [10] 15/17 36/3 57/4 79/18
136/15 136/19 154/18 156/24 178/10
211/24
possibly [8] 8/21 20/11 111/25 172/24
174/2 186/3 193/25 203/10
post [7] 1/23 2/7 52/8 54/24 62/18 62/19
197/14
post-hearing [2] 62/18 62/19
post-Katrina [2] 52/8 54/24
post-trial [1] 197/14
Postal [1] 73/24
posterity's [1] 45/15
poststorm [1] 88/13
pot [4] 162/14 165/24 166/21 168/7
potential [8] 18/1 104/18 153/23 154/7
165/25 166/17 168/20 203/8
potentially [5] 16/3 16/6 44/21 56/1 122/5
power [2] 52/18 117/8
powered [1] 72/6
powers [3] 52/11 52/13 108/21
Poydras [4] 1/19 2/14 2/20 3/1
practical [8] 41/13 49/7 49/8 88/10
121/18 136/15 140/18 187/2
practicalities [1] 196/22
practically [1] 122/6
practice [6] 10/12 38/15 118/1 128/24
202/4 202/15
practices [3] 115/17 119/1 120/10
practicing [1] 149/8
practitioner [1] 119/20
Praxis [1] 15/3
precautionary [1] 194/2
precise [2] 68/17 195/20
precisely [2] 27/12 61/16
precluded [1] 34/5
precludes [2] 177/4 178/20
preconceived [1] 163/4
predicates [1] 28/19
preemption [6] 22/24 104/21 107/17
131/20 154/22 154/25
preexisting [1] 25/11
pregnant [1] 6/11
prejudicial [1] 184/23
preliminarily [1] 8/23 12/6
preliminary [10] 5/9 5/10 5/15 8/25 9/1
9/2 11/16 204/6 204/7 215/19
premature [2] 38/5 183/20
prematurely [1] 37/22
premised [1] 45/6
premises [26] 24/16 24/17 24/22 25/4
64/9 135/10 135/11 135/12 135/20
135/21 136/4 136/11 146/4 174/7 179/6

**P**

premises... [11]  179/8 179/21 180/16
180/22 181/1 216/15 218/5 218/9 218/22
218/23 219/5
premium [1]  210/23
premiums [1]  104/3
preparation [1]  149/24
preparations [1]  186/1
prepare [2]  81/16 89/22
prepared [4]  42/18 64/2 83/15 184/22
prerequisite [1]  127/17
pres [6]  210/1 210/11 210/13 210/24
211/3 211/7
prescription [2]  154/22 175/6
presence [1]  79/4
present [15]  14/17 28/15 42/18 45/18
50/3 67/18 82/1 82/7 102/15 115/11
151/19 183/15 208/2 222/22 223/25
presentation [4]  13/7 20/9 43/25 98/5
presentations [2]  56/17 115/14
presented [4]  21/5 27/1 115/24 175/5
presenting [1]  42/9
presently [1]  155/20
presents [3]  12/11 48/21 206/22
preserved [3]  22/16 175/3 175/5
president [3]  108/12 108/20 109/8
prestorm [1]  85/1
presume [1]  187/19
pretense [1]  172/17
pretty [8]  16/17 118/22 145/1 145/4
156/20 157/8 157/9 170/17
prevailing [1]  15/16
prevents [1]  26/8
previously [10]  27/4 84/3 96/9 96/17
101/13 104/20 118/24 119/9 175/1 175/5
price [1]  209/18
primarily [2]  25/9 89/10 91/18 116/3
121/24
primary [22]  23/8 24/2 24/6 24/12 24/13
24/18 24/25 47/10 48/24 54/4 56/7 66/1
108/16 134/4 134/25 135/6 135/17 136/2
136/5 136/12 146/3 223/24
principal [3]  21/16 154/11 214/10
principally [4]  43/3 43/8 111/1 111/2
principle [2]  20/24 216/5
Principles [1]  15/3
prior [12]  54/15 69/2 71/4 72/9 74/9 76/6
76/15 103/8 105/17 121/10 126/6 126/19
private [4]  116/16 117/1 117/2 117/21
privately [1]  183/14
privileged [1]  150/12
pro [3]  10/22 209/14 211/23
pro rata [1]  211/23
pro se [1]  10/22
probably [15]  65/6 77/2 77/2 80/6 119/4
139/1 145/12 146/23 156/20 176/10
178/2 198/12 200/20 213/9 218/24
problem [9]  12/11 28/2 42/19 47/2 47/7
47/24 127/10 149/1 169/1
problematic [5]  165/2 167/16 167/21
168/12 171/23
procedure [5]  31/6 49/13 50/4 202/4
202/15
proceed [9]  11/25 33/15 42/18 62/22
153/14 154/20 167/1 167/14 205/21
proceeding [7]  10/21 12/14 27/18 44/11
58/9 58/16 208/13
proceedings [20]  1/11 3/5 15/13 20/21
21/21 21/25 26/23 29/14 38/6 41/17 79/3
81/1 118/24 145/24 174/20 176/23 177/8
183/4 185/10 224/11
proceeds [17]  17/17 17/18 23/7 28/7

29/1 29/3 34/21 53/21 53/23 60/5 61/6
125/3 131/4 133/21 195/13 204/9
process [9]  47/18 123/19 169/2 189/5
190/4 190/7 212/5 212/11 217/5
procure [2]  123/1 124/6
procured [2]  41/5 124/3
procuring [1]  123/2
produce [2]  145/24 193/24
produced [1]  3/6
profession [1]  65/19
professional [8]  20/4 66/24 67/11 89/8
116/14 117/22 119/17 165/23
professionally [1]  172/12
professionals [1]  67/8
Professor [1]  59/2
profile [1]  75/22
profiles [2]  89/15 89/16
profit [1]  20/3
program [3]  72/19 72/21 84/11
progress [1]  103/16
prohibited [1]  39/23
prohibiting [1]  29/8
prohibitive [1]  16/6
prohibitively [1]  212/6
prohibits [1]  38/10
project [17]  43/21 44/2 44/10 44/10
44/25 46/8 46/10 46/14 46/16 47/13
109/18 110/7 110/9 128/13 128/21
128/23 130/12
projected [1]  109/16
projection [3]  76/21 96/25 97/7
projects [15]  43/8 56/11 56/12 73/19
104/24 105/1 105/3 107/17 109/1 109/6
109/6 109/12 109/24 110/23 129/6
promises [1]  37/23
proof [7]  11/13 138/12 190/4 190/7
190/10 190/12 190/18
proof-of-claim [2]  190/4 190/7
proofs [1]  58/18
proper [3]  9/14 29/2 177/19
properly [1]  48/5
properties [9]  51/5 77/20 78/2 85/21
87/12 87/14 93/20 96/6 100/4
property [34]  18/17 43/6 49/19 82/2 82/7
82/23 82/24 85/16 86/19 86/21 87/6
87/10 96/9 99/13 123/5 123/6 126/19
129/5 132/4 132/5 132/6 137/23 137/24
138/6 138/8 138/19 139/13 139/15
139/19 140/13 147/17 195/1 209/3 209/4
proponents [2]  17/15 220/21
proposals [1]  101/15
propose [2]  25/13 189/17
proposed [22]  1/15 1/18 1/21 5/11 9/1
13/9 13/11 13/13 14/16 18/22 21/22 22/4
24/6 26/12 27/2 27/5 28/5 68/9 109/2
123/10 162/21 186/23
proposition [1]  165/5
proscribed [1]  54/7
prosecuted [2]  167/3 169/21
prosecuting [1]  60/2
prosecution [5]  35/7 37/2 149/24 150/16
151/14
prospect [1]  40/14
prospective [1]  22/25
protect [9]  27/16 33/13 33/24 40/2 40/21
43/4 47/25 61/15 123/3
protected [2]  24/23 38/21
protecting [1]  45/24
protection [37]  32/15 43/4 43/21 44/2
44/22 44/23 45/6 46/8 46/12 46/12 46/16
48/21 48/25 52/14 52/16 53/2 53/13
54/13 54/14 56/15 56/20 85/25 103/7
105/16 108/11 108/18 108/18 108/19

103/9 109/3 109/10 111/18 112/4 156/9
159/3 180/24 221/25
protections [1]  55/25
protracted [1]  16/3
proud [1]  35/3
proved [2]  44/5 45/3
proven [4]  72/21 75/21 77/14 171/23
provide [21]  18/9 19/12 46/3 46/16 49/13
49/18 55/12 56/15 63/14 118/13 118/23
121/4 127/20 127/23 129/2 131/24 132/4
137/22 140/1 140/12 146/22
provided [19]  9/7 9/12 19/20 19/22 19/23
44/4 50/10 55/25 77/10 78/5 124/5
124/10 127/9 128/13 135/25 145/11
157/24 162/21 215/18
provides [6]  12/9 58/7 105/18 117/9
215/10 215/12
providing [3]  52/15 53/13 203/21
Province [1]  10/6
provision [4]  49/5 51/1 58/14 198/9
provisions [3]  9/8 116/5 117/23
PSLC [3]  150/15 150/16 151/12
public [26]  2/22 8/11 42/14 42/24 48/6
48/19 49/19 49/19 52/15 75/13 75/14
84/11 85/14 96/11 106/23 116/16 117/2
117/5 117/9 117/21 125/16 155/25 156/5
156/11 156/11 156/13
publications [3]  115/22 120/3 120/6
publish [1]  116/11
published [4]  9/5 115/16 116/2 203/14
pull [4]  54/20 171/8 180/5 206/12
pumping [1]  89/11
purchase [1]  23/18
purchased [2]  173/21 209/22
purchasers [1]  209/18
purported [2]  11/3 14/9
purpose [12]  40/3 50/15 50/17 51/16
51/21 54/12 79/23 120/19 172/10 178/5
211/1 223/8 223/12
purposes [15]  17/18 27/2 42/1 54/14
55/2 67/21 89/21 98/5 136/5 136/11
140/7 140/11 147/10 162/5 221/6
pursuant [6]  9/5 10/10 43/9 53/2 54/1
122/3
pursue [2]  23/3 170/14
pursued [2]  21/1 22/15
pursuing [2]  175/23 186/6
put [17]  11/20 39/16 40/15 41/7 63/8
142/4 165/17 166/25 171/11 172/24
174/19 195/17 196/24 199/6 199/12
209/6 221/3
puts [1]  217/21
putting [1]  198/9

**Q**

qualified [2]  28/12 28/21
quality [2]  90/25 210/7
quantifiable [7]  88/22 95/24 96/5 96/15
98/20 110/18 162/16
quantification [1]  90/13
quantified [2]  90/6 98/6
quantify [6]  69/8 69/20 72/12 73/2 96/3
162/13
quantifying [1]  73/5
quarters [1]  69/5
quash [2]  183/9 183/18
question [37]  11/18 14/10 14/24 26/12
42/16 48/15 58/5 62/13 63/20 71/2 76/11
76/19 136/18 138/24 139/25 140/23
145/16 147/8 165/19 165/20 171/13
174/1 174/3 175/24 182/11 191/16
191/19 192/23 194/6 198/19 199/1 199/5
200/19 206/11 212/1 214/9 218/8

**Q**

questioning [1]  148/14
questions [27]  11/23 11/23 11/23 21/23
56/21 56/22 62/12 81/18 98/7 99/9
112/11 112/13 137/1 137/9 141/6 143/14
164/25 174/5 181/5 182/15 183/19
183/21 184/20 202/17 213/23 213/24
219/14
quicker [1]  220/4
quickly [5]  94/8 94/9 94/20 159/8 205/24
quite [5]  49/2 95/2 139/2 166/1 169/15

**R**

R-I-G-A-M-E-R [1]  65/12
R.S [2]  50/5 51/1
rabbit [1]  206/12
race [5]  59/25 76/14 167/24 168/5 168/6
racial [1]  76/9
radar [1]  70/13
radio [1]  10/5
raid [1]  200/11
railroad [7]  8/12 106/24 155/25 156/5
156/6 156/8 156/10
rain [20]  45/10 89/2 89/6 89/8 89/9 89/11
90/4 90/8 90/10 90/11 90/12 90/18 91/9
91/18 93/4 93/6 93/15 95/14 95/22 96/23
rainwater [2]  91/10 91/12
raise [4]  44/23 59/1 69/20 183/14
raised [7]  11/18 22/8 26/21 38/7 50/6
54/21 183/10
raising [1]  109/14
RALPH [6]  2/14 13/23 56/24 103/23
137/5 179/11
ran [1]  156/10
RAND [1]  72/22
range [5]  15/17 76/16 100/14 209/11
211/12
ranging [1]  70/12
rank [1]  60/3
Rankin [1]  2/13
rata [2]  209/14 211/23
rate [1]  70/15
rather [3]  78/19 87/1 183/15
rationale [1]  17/5
ray [1]  70/15
razoo [1]  200/4
re [8]  1/5 5/8 15/2 58/11 150/10 151/10
151/18 164/18
reach [4]  62/12 119/23 159/16 204/17
reached [5]  43/14 50/13 101/5 101/20
195/3
reaching [4]  28/11 43/23 45/12 164/18
read [13]  6/2 6/7 15/8 20/8 20/15 42/8
107/15 147/6 199/7 199/10 199/12
203/12 207/18
readily [2]  26/21 96/3
reading [1]  217/9
ready [1]  62/22
real [10]  35/24 40/23 40/24 40/24 80/2
85/17 85/18 85/23 140/23 159/8
realistic [1]  136/15
realistically [1]  27/19
reality [3]  14/25 47/4 59/21
realize [1]  140/25
realizing [1]  79/16
really [18]  55/14 74/24 75/7 88/9 91/18
95/21 98/5 99/25 109/9 111/25 136/20
140/22 147/10 157/6 172/9 173/8 192/24
203/21
reason [16]  20/15 36/25 61/11 62/11
79/13 132/2 142/2 152/9 152/24 153/3
158/20 160/20 179/9 183/23 191/19

198/10
reasonable [13]  39/11 25/14 40/6 89/9
178/6 180/21 189/17 189/18 196/25
206/17 208/9 217/18 218/17
reasonably [1]  92/1
reasons [10]  7/1 7/10 8/20 43/18 44/8
146/24 147/4 155/11 164/11 215/21
rebuilding [2]  44/14 109/9
rebuilt [2]  75/4 75/5
recall [5]  49/2 154/11 176/11 188/6
223/4
receipt [1]  9/14
receive [8]  6/15 32/2 32/5 32/7 33/22
162/4 176/19 183/24
received [14]  6/2 8/24 64/3 66/15 69/17
76/22 99/19 158/3 158/15 158/17 158/18
159/4 185/17 193/2
receives [1]  56/17
receiving [5]  28/1 33/17 74/1 185/19
223/8
recent [2]  73/13 197/25
recess [8]  78/18 78/21 80/13 113/20
114/3 205/15 205/18 224/4
recited [1]  28/7
recognize [4]  29/11 211/4 212/14 212/21
recognized [1]  210/4
recognizes [2]  34/6 37/24
recommend [5]  58/7 157/24 164/19
171/9 212/8
recommendation [1]  162/24
recommendations [1]  177/10
recommended [1]  164/3
record [67]  12/13 14/17 16/20 21/13
21/19 25/11 26/22 26/23 41/17 43/19
46/10 57/9 63/8 63/17 63/22 63/23 65/10
79/9 80/12 83/6 91/6 102/16 103/1
104/12 106/5 106/7 106/9 106/10 106/11
106/12 106/12 106/15 106/16 106/22
106/24 107/2 107/15 107/15 107/25
114/23 122/19 123/18 125/8 125/13
140/11 143/25 148/20 150/18 158/5
185/3 191/7 198/16 200/9 202/8 202/24
205/23 207/24 214/4 220/13 220/15
220/25 222/6 222/24 223/6 223/9 223/11
224/11
recorded [1]  3/5
recover [9]  38/12 72/1 72/3 72/24 73/3
73/10 75/3 84/21 151/4
recoverable [2]  99/3 174/10
recoveries [1]  19/13
recovery [22]  14/25 15/17 18/10 27/21
35/11 48/9 71/17 71/23 71/25 72/16
72/16 72/22 74/25 75/12 75/16 77/12
77/16 87/22 98/22 142/16 158/23 210/6
rectified [1]  216/3
red [4]  92/16 92/18 92/20 96/19
redesign [1]  44/10
redirect [3]  146/15 199/2 199/3
reduced [1]  44/17
reduction [1]  27/20
refer [3]  107/5 150/25 152/2
reference [3]  26/23 219/4 222/24
references [1]  25/11
referred [3]  44/12 151/1 173/9
referring [4]  122/13 138/2 150/25 218/22
refers [1]  150/24
reflect [4]  31/19 85/18 86/4 104/12
reflected [2]  91/21 120/5
refusal [1]  59/16
refuse [2]  59/14 60/8
refused [1]  167/12
regard [22]  71/17 73/18 74/19 77/19
77/23 88/18 92/4 96/14 103/9 103/14

116/20 134/20 149/12 155/13 155/24
157/1 172/6 205/7 205/7 207/4 207/18
207/23
regarded [1]  156/7
regarding [7]  24/11 28/9 71/14 88/19
183/9 199/1 203/4
regardless [7]  61/17 62/7 134/2 134/6
134/19 163/5 164/1
regards [2]  87/19 154/3
region [1]  110/15
regional [4]  53/1 53/16 66/15 105/16
registered [1]  74/7
registration [1]  74/11
regularly [3]  115/11 116/15 117/22
regulations [1]  43/10
reimburse [1]  35/22
reimbursed [2]  37/6 188/21
reimbursement [4]  34/7 36/23 37/23
37/24
reject [3]  28/4 189/9 215/5
rejected [3]  59/13 119/13 119/15
rejection [1]  59/22
relate [4]  126/16 149/13 158/23 207/19
related [9]  66/22 67/24 74/21 83/6 84/16
87/1 88/21 93/3 96/22
relates [3]  118/2 151/10 175/2
relating [2]  64/9 73/22
relations [1]  199/7
relationship [1]  31/7
relative [13]  28/1 28/17 33/16 47/24
52/21 67/4 68/19 71/22 72/5 74/17 83/9
89/8 175/18
relatively [3]  16/5 209/5 212/12
release [4]  8/5 22/13 57/7 101/6
released [2]  57/5 102/12
releases [1]  18/22
relevance [1]  145/15
relevant [5]  58/25 68/15 143/18 158/21
194/18
relied [2]  43/24 173/14
relief [1]  163/6
rely [1]  98/5
relying [5]  27/24 110/25 125/6 173/19
173/19
remain [8]  7/23 8/17 22/15 53/8 53/10
53/16 53/21 175/20
remainder [1]  189/18
remained [1]  86/1
remaining [3]  8/9 36/10 106/10
remains [3]  42/15 53/20 190/16
remand [1]  57/15
remarkable [1]  46/23
remarked [1]  206/6
remarks [1]  29/15
remember [7]  47/14 92/4 161/15 178/23
193/20 198/5 203/3
remembered [1]  6/19
remind [2]  164/6 179/1
reminded [1]  179/1
remote [2]  60/19 105/1
removed [1]  171/10
rendered [2]  50/1 50/11
repair [1]  128/12
repairs [1]  156/12
repeated [1]  183/7
replaced [2]  125/18 125/20
reply [3]  218/19 219/12 220/6
report [14]  43/25 44/4 46/17 89/14 90/3
101/22 124/13 124/15 125/11 126/5
126/8 148/2 200/16 223/15
reported [12]  83/7 83/11 83/17 84/1 84/5
86/16 90/12 90/24 91/24 96/7 99/16
167/8

**R**

Reporter [3]  3/1 224/8 224/16
reporting [2]  46/13 88/14
reports [5]  87/25 88/20 93/3 99/20
 217/10
represent [5]  11/4 11/4 14/3 68/11
 176/13
representation [1]  194/4
representations [3]  157/21 157/23
 173/15
representative [1]  27/9
representatives [14]  8/22 15/19 19/1
 19/3 19/5 27/1 27/6 173/18 201/10
 201/14 201/17 204/2 206/2 206/3
represented [3]  29/12 73/12 170/16
representing [16]  10/2 10/4 11/24 13/17
 13/18 13/20 13/23 14/1 14/5 19/6 20/10
 64/16 143/4 160/9 166/13 194/20
represents [2]  18/14 174/9
reputable [1]  88/23
request [16]  21/13 34/7 34/7 35/15 36/23
 37/5 37/25 38/3 40/8 101/15 102/13
 117/11 122/3 160/25 165/6 198/6
requested [7]  19/7 35/4 83/4 123/21
 124/9 158/15 193/3
require [2]  103/18 127/20
required [12]  9/6 9/9 11/1 26/18 67/5
 75/2 75/19 85/13 114/12 127/23 156/2
 173/5
requirement [5]  32/6 58/12 58/14 58/20
 127/20
requirements [12]  18/24 27/9 33/11
 44/18 46/13 68/1 72/16 72/17 85/11
 85/16 118/15 206/14
requires [3]  27/13 30/12 75/5
requiring [4]  25/23 110/3 116/6 127/12
research [2]  29/3 69/1
reserve [3]  189/7 189/15 198/11
residential [10]  74/1 74/7 82/23 83/12
 93/11 94/12 94/23 95/4 96/6 99/24
residents [5]  54/25 83/24 84/2 161/11
 161/21
resistance [1]  198/8
resolution [2]  150/20 198/3
resolutions [1]  102/2
resolve [3]  50/6 153/18 163/13
resources [1]  112/3
respect [22]  29/13 38/2 39/8 41/12 59/3
 61/13 69/25 78/1 82/6 82/13 93/25 104/3
 105/19 121/21 133/19 172/9 183/19
 185/25 189/11 196/25 208/4 215/9
respectfully [1]  21/7
respective [6]  45/17 46/4 96/18 108/23
 111/5 111/16
respects [1]  52/23
respond [9]  22/7 122/1 207/5 207/24
 207/25 214/5 217/23 219/7 219/25
respondent [2]  10/19 219/1
responder [1]  151/2
response [5]  71/17 111/24 170/10
 218/17 218/25
responses [1]  64/6
responsibilities [3]  43/2 109/25 110/6
responsibility [4]  46/18 46/19 47/10
 157/7
responsible [7]  43/16 154/7 156/18
 157/10 157/10 168/19 187/23
responsibly [1]  111/19
rest [4]  60/7 169/7 209/25 221/25
rested [2]  220/22 221/7
restoration [2]  72/5 74/5
restricted [5]  111/8 112/18 112/19
 112/22 206/15
vest [ ]  111/3
result [16]  10/17 16/8 24/12 39/20 48/8
 48/9 53/1 77/15 112/7 126/4 126/25
 128/6 161/3 161/12 171/14 204/16
resulted [5]  132/7 149/17 149/19 149/20
 150/19
resulting [9]  15/24 39/10 91/23 129/14
 130/16 130/17 156/7 200/6 206/16
retained [4]  73/7 75/23 121/13 143/6
retention [3]  28/12 117/13 196/15
return [1]  210/21
returned [4]  55/11 92/24 111/9 111/15
returning [1]  75/18
reveal [1]  134/16
revenue [3]  110/25 113/11 113/14
revenue-generating [2]  113/11 113/14
reversal [1]  216/9
reversed [4]  11/6 107/10 186/18 186/18
reverses [3]  141/1 176/2 224/1
review [9]  64/2 117/18 133/23 167/7
 204/16 205/11 205/16 214/5 223/16
reviewed [13]  22/19 118/5 118/16 120/3
 120/6 125/2 126/7 126/8 126/12 203/24
 203/25 204/4 204/9
reward [1]  210/22
Richard [2]  10/4 16/22
ridiculous [1]  133/17
Rigamer [13]  59/8 65/1 65/7 65/11 65/15
 65/17 65/19 65/22 78/9 81/6 81/15 98/13
 99/13
right [74]  7/9 7/21 8/17 23/2 35/14 36/13
 37/24 38/2 38/4 60/20 62/23 68/24 80/8
 82/10 97/8 97/8 101/7 101/17 102/18
 109/19 134/8 136/24 137/15 137/20
 139/8 139/9 140/7 140/8 148/25 150/3
 151/7 154/25 158/24 160/3 160/3 160/5
 160/10 164/5 166/12 166/17 169/7
 169/16 171/23 174/1 175/10 176/21
 177/6 177/6 177/7 177/9 177/21 177/23
 179/16 181/11 182/1 182/5 182/23
 183/22 184/6 185/8 185/15 186/24
 192/21 200/13 201/6 204/8 210/16
 210/17 214/18 215/13 216/13 218/4
 218/6
rights [5]  149/11 194/19 194/23 196/14
 198/11
ring [2]  180/14 180/15
rings [2]  180/23 180/25
ripe [1]  214/14
rise [9]  5/3 24/24 79/5 81/3 114/2 114/4
 205/17 205/19 224/3
risk [15]  16/2 35/11 37/1 101/10 115/4
 115/12 115/16 115/20 116/3 116/15
 117/13 118/25 119/24 120/9 164/20
risks [1]  104/3
Rita [7]  8/7 46/6 63/3 70/1 71/15 75/10
 82/4
River [1]  109/13
road [18]  2/7 72/19 86/17 93/6 93/7 93/9
 93/15 94/13 94/25 95/14 95/22 96/23
 99/2 99/4 99/6 138/10 178/11 190/20
Rob [3]  143/20 143/22 148/15
robe [1]  178/18
Robert [2]  103/6 105/15
Robinson [4]  150/2 151/15 175/2 186/1
role [7]  42/23 68/3 69/2 156/1 203/6
 203/21 203/23
room [1]  189/5
rose [1]  160/9
Rosenbaum [2]  10/1 19/9
Rouge [4]  39/16 39/21 40/6 69/4
rough [3]  89/22 92/10 96/14
roughly [1]  166/15
routine [2]  169/14 171/16
Roy [8]  1/21 1/22 13/13 21/15 148/12
 148/13 179/23 201/12
rule [21]  17/3 18/24 26/14 26/19 27/12
 28/3 59/4 61/11 62/7 119/16 193/19
 194/8 206/14 206/14 207/1 214/11
 214/12 214/22 215/20 216/2 218/9
Rule 23 [8]  26/14 26/19 27/12 28/3 59/4
 61/11 206/14 214/22
Rule 26 [2]  119/19 194/8
ruled [2]  11/17 215/15
rules [4]  20/4 20/8 31/5 135/11
ruling [10]  25/4 42/13 141/1 176/2 215/9
 216/6 216/20 217/1 217/3 223/25
rulings [1]  200/6
run [5]  83/5 94/8 132/7 156/8 164/24
running [2]  47/4 91/19
runoff [2]  76/20 76/23
rush [1]  34/21
résumé [5]  66/24 67/7 67/19 71/13
 115/15

**S**

sad [1]  213/14
safe [2]  119/5 189/6
safeguards [2]  44/25 162/20
safety [1]  174/19
said [28]  35/3 54/10 70/6 80/9 86/10
 96/7 97/17 131/10 137/12 137/13 137/14
 153/2 166/6 167/14 171/25 176/11
 176/12 176/12 184/17 188/11 192/12
 195/9 196/2 196/6 198/6 206/18 210/3
 213/11
sale [1]  149/21
same [26]  26/5 26/23 26/25 45/18 49/5
 53/13 54/18 57/22 60/15 61/5 86/1 93/25
 95/9 118/21 125/19 126/20 133/25 135/4
 158/12 161/11 163/15 173/2 173/12
 214/24 215/17 218/25
sample [2]  87/3 87/4
sanctions [1]  10/23
sandblasters [1]  172/22
Santa [1]  174/13
Sarpy [1]  108/9
satellites [1]  70/14
satisfied [9]  26/19 26/22 126/15 130/24
 131/5 136/14 172/12 174/8 174/21
satisfies [1]  26/13
satisfy [6]  17/13 19/15 22/5 29/5 29/9
 195/5
saturation [1]  73/24
Saturday [1]  219/22
save [1]  45/4
saw [3]  90/20 144/14 144/15
say [55]  20/12 26/18 33/12 35/5 38/12
 38/19 39/13 40/3 40/10 58/12 59/2 67/19
 69/16 70/23 72/19 82/21 87/6 98/21
 119/4 119/5 119/15 122/12 127/8 127/22
 128/25 131/1 137/13 139/14 143/6 145/2
 163/12 165/14 167/5 168/16 177/25
 178/3 186/1 186/16 189/14 190/18
 192/12 192/14 193/7 195/12 195/14
 196/3 196/22 199/20 202/18 206/22
 215/6 217/8 218/21 223/16 223/23
saying [22]  49/21 76/24 131/18 132/13
 138/17 139/16 139/23 139/23 140/1
 140/5 140/16 140/17 146/23 164/14
 165/18 189/11 206/18 214/18 215/23
 216/1 219/9 219/18
says [13]  40/18 49/11 51/19 66/24 135/9
 177/25 179/7 180/16 192/12 192/12

says... [3] 192/16 197/16 206/13
scanning [1] 185/21
scenario [2] 35/18 137/9
schedule [11] 62/19 63/24 105/21 192/8 192/9 214/12 217/6 217/13 218/1 218/8 221/4
scheduled [4] 12/8 75/25 110/11 217/7
scheme [1] 213/7
school [9] 75/4 75/12 75/13 75/13 75/14 75/16 75/19 75/21 77/11
schools [2] 203/15 210/1
Science [1] 115/8
scoring [1] 15/22
Scott [2] 6/6 149/20
screen [4] 97/4 152/8 152/10 152/11
scrub [1] 35/23
scrutiny [1] 43/12
se [1] 10/22
seated [6] 5/4 79/6 81/4 114/5 202/1 205/20
Seattle [1] 116/24
second [8] 25/16 57/5 61/19 152/22 153/6 153/9 170/15 176/22
secondary [1] 122/10
secondly [1] 104/23
secretary [2] 43/10 75/23
section [6] 13/3 49/11 51/8 51/12 53/3 54/10
Section 10 [1] 49/11
sector [1] 117/5
secure [1] 28/10
securing [1] 129/19
see [46] 6/24 11/13 35/23 35/24 35/24 66/10 67/7 71/13 77/3 85/2 85/22 87/22 90/15 91/17 94/17 95/23 96/4 111/25 112/5 124/3 124/8 124/10 144/12 144/14 144/24 152/9 152/10 153/12 155/25 158/13 159/6 159/8 161/20 164/11 166/24 167/24 174/3 178/15 195/11 199/10 202/1 203/21 215/9 215/23 216/1 217/21
seeing [1] 80/6
seek [6] 20/1 39/21 167/6 184/6 188/15 189/7
seeking [6] 11/19 39/21 130/15 153/19 161/18 206/5
seemed [2] 157/8 180/25
seems [4] 30/4 58/19 213/18 217/4
seen [4] 197/16 200/1 201/7 208/17
seize [8] 30/6 39/15 40/5 40/17 48/22 51/4 166/7 195/1
seizure [9] 29/5 29/9 38/10 48/14 48/16 49/5 49/20 155/9 170/17
self [4] 44/2 196/15
self-analysis [1] 44/2
self-insured [1] 196/15
seminars [2] 115/11 115/14
semiretired [1] 121/7
Senate [1] 46/24
sends [1] 186/10
sense [7] 37/20 109/4 111/25 121/18 159/7 209/2 214/25
sensible [1] 32/18
sent [4] 114/12 143/10 150/20 209/22
sentence [3] 199/7 199/10 199/12
sentiments [1] 42/5
separate [11] 25/14 25/24 27/14 49/16 51/25 53/16 66/6 66/7 104/2 162/18 181/1
separately [2] 24/23 135/10
separates [1] 180/17

separating [1] 136/24
September [1] 150/4
September 2 [1] 150/4
series [3] 41/10 164/24 221/11
serious [5] 6/22 26/20 33/6 40/12 211/18
serve [5] 11/23 33/24 121/13 150/12 203/10
served [9] 19/8 63/20 75/20 110/15 116/20 119/9 150/14 150/16 151/12
service [6] 15/3 66/24 72/5 73/24 74/5 108/20
services [9] 31/15 67/3 68/4 68/5 117/8 118/6 118/9 118/11 118/12
serving [2] 108/16 119/18
session [4] 5/1 79/1 81/4 114/5
SESSIONS [1] 2/17
set [16] 14/16 29/10 43/2 45/1 45/8 48/13 81/16 187/5 189/7 189/15 204/19 209/20 211/19 212/11 212/16 213/9
set-aside [1] 189/7
setback [1] 87/23
settle [2] 17/13 35/10
settled [3] 36/13 44/23 149/16
settlement [151] 1/15 1/18 1/22 5/10 5/11 6/8 8/10 8/24 8/25 9/1 12/9 12/25 13/9 13/12 13/14 15/6 15/8 15/10 16/11 17/15 17/19 17/23 18/11 18/13 18/16 18/18 18/22 19/17 19/18 19/21 19/25 20/22 21/8 21/14 21/17 21/22 22/3 22/4 22/6 22/9 22/10 22/12 22/13 23/2 23/6 23/14 23/20 25/13 26/5 26/9 26/10 26/14 27/2 27/24 28/5 28/7 28/20 29/12 29/22 30/18 31/3 32/6 32/9 32/14 33/5 33/6 33/21 34/6 34/14 34/17 34/19 35/5 35/12 35/13 35/16 35/18 37/13 37/16 37/18 37/22 41/14 41/15 58/6 58/6 59/4 59/13 59/17 59/23 79/15 81/25 82/1 141/13 157/25 160/13 160/13 161/9 161/18 162/9 162/10 162/21 163/11 164/4 164/20 165/2 166/7 166/15 167/4 167/11 167/13 168/11 169/19 169/19 170/8 174/25 175/1 175/22 176/5 176/8 176/20 176/21 176/24 177/4 177/11 178/19 183/24 184/5 188/18 190/2 192/21 194/14 197/23 198/18 199/16 203/8 203/9 204/6 204/11 204/14 206/13 206/16 206/21 207/11 208/4 208/13 209/19 212/2 215/10 215/18 220/21 222/9
settlements [4] 101/25 102/1 102/3 189/22
settling [20] 8/22 16/2 19/19 22/14 23/10 25/5 25/25 127/16 133/10 136/8 151/19 164/21 165/4 165/22 168/10 169/20 170/8 171/4 174/10 187/20
setup [1] 216/11
seven [4] 154/24 201/13 220/6 220/7
several [4] 21/23 106/18 106/25 106/25
severe [3] 84/5 86/12 86/13
Sewerage [10] 8/11 23/4 57/20 154/10 155/6 155/7 155/16 155/18 158/17 160/25
Sewerage and [1] 155/6
shall [6] 10/20 12/9 49/13 49/19 49/23 50/14
Shani [1] 6/6
Shannon [1] 114/10
share [7] 42/5 110/2 110/5 110/22 177/23 209/14 209/15
sharing [1] 43/7
she [7] 6/6 6/9 6/19 101/11 101/19 103/25 108/17
Sheena [2] 5/6 152/13

sheet [3] 44/13 45/3 63/5
Sherman [13] 59/3 201/2 202/3 202/14 202/21 202/25 203/3 206/4 206/17 207/4 207/11 208/2 213/22
Sherman's [5] 202/5 202/20 206/9 206/20 206/23
Shipyards [1] 172/22
Shore [1] 104/4
short [2] 63/23 65/23
shorten [1] 101/2
shortly [1] 83/4
shot [2] 6/25 70/21
should [32] 20/2 25/12 42/11 42/17 45/15 46/19 59/11 61/2 76/11 112/7 122/8 125/17 125/19 141/16 160/12 163/6 163/7 163/21 163/23 163/24 179/1 186/1 188/18 188/19 188/21 188/22 189/15 196/6 208/15 210/6 212/4 213/16
shouldn't [3] 41/8 193/21 206/18
show [17] 26/7 47/22 59/8 89/20 97/4 97/6 128/7 138/21 150/23 152/24 172/25 173/11 192/2 197/18 197/18 199/25 204/25
showing [3] 18/1 125/17 158/11
shown [5] 17/16 19/2 111/6 153/1 202/5
shows [3] 46/10 90/10 160/1
shut [2] 84/12 89/12
shy [1] 82/10
side [12] 14/18 31/9 109/15 154/21 156/15 157/5 157/8 157/14 159/16 175/17 181/13 182/23
sidebar [3] 183/2 183/6 183/15
signature [1] 9/12
signed [3] 42/25 164/3 204/20
significant [14] 67/25 71/24 84/13 86/10 86/13 87/4 87/21 88/9 89/7 89/11 95/21 100/9 100/13 149/6
significantly [1] 77/15
signs [1] 87/22
silica [1] 173/2
silicosis [1] 149/12
similar [2] 68/7 118/19
simple [2] 213/6 213/10
simply [12] 28/6 37/24 39/12 70/7 77/6 82/18 88/22 104/19 131/7 178/3 184/14 194/6
Sims [1] 16/22
simultaneous [1] 218/1
simultaneously [2] 21/1 169/6
since [19] 11/3 14/8 24/22 41/1 71/20 74/10 87/10 87/25 88/8 92/21 110/4 111/4 147/10 149/23 150/4 155/15 158/5 167/18 220/2
single [2] 33/21 60/22
sir [49] 13/10 34/2 49/8 58/3 64/11 64/18 64/23 79/7 79/19 80/8 80/11 94/7 98/9 99/9 100/16 100/23 101/7 102/7 105/13 108/5 108/6 112/10 112/19 112/23 114/6 115/13 118/7 132/22 134/5 137/1 142/22 142/23 142/24 143/10 144/7 145/25 146/5 178/25 180/1 181/4 182/16 182/17 188/12 198/24 200/25 219/6 221/5 221/9 221/24
Sistrunk [1] 2/2
site [2] 209/20 209/21
sites [1] 105/2
sitting [2] 33/19 41/18
situation [8] 21/5 59/23 60/4 60/7 60/15 60/25 62/11 196/19
six [2] 6/11 15/5
size [2] 19/22 165/23
slide [16] 81/21 81/24 83/3 83/15 84/14

slide... [11]  85/2 90/10 90/14 90/15 91/1
91/2 91/18 96/24 100/20 158/2 159/2
slides [4]  81/16 81/19 81/24 148/15
small [11]  16/5 33/16 43/6 60/1 84/9
117/21 168/23 169/13 209/2 209/5
209/13
smaller [2]  86/5 152/19
so [186]  11/2 12/20 20/16 21/13 31/17
31/24 32/1 33/8 33/19 35/3 36/16 37/3
38/1 38/1 38/2 39/13 39/24 40/25 41/11
47/9 48/1 48/3 51/25 54/25 57/3 58/2
59/1 59/22 59/25 60/4 60/15 62/17 63/22
68/16 68/18 69/19 70/9 70/14 70/17
72/11 74/5 74/23 75/5 75/9 75/17 76/4
76/7 76/10 76/18 77/10 77/17 80/6 80/11
82/10 85/21 85/24 87/3 87/5 87/9 88/24
89/19 89/21 90/7 90/15 91/12 91/15
91/16 91/22 92/1 92/15 93/11 97/2 97/3
98/4 110/18 111/7 117/20 119/20 121/21
122/12 122/15 126/10 127/14 127/22
128/18 129/5 129/11 129/24 130/4
130/22 130/24 132/4 132/5 132/10
132/24 133/14 133/18 134/19 135/11
135/17 136/1 136/7 136/21 138/2 138/7
138/8 138/12 138/23 139/3 139/20 140/3
142/21 144/23 148/23 150/23 152/9
152/10 153/21 154/2 154/18 154/19
156/4 156/10 156/13 156/20 157/11
157/13 157/14 159/24 160/7 161/1 161/5
162/16 163/4 163/19 165/14 165/15
168/5 168/19 168/24 169/13 169/15
169/17 170/5 171/2 172/20 173/4 173/18
174/4 179/8 180/19 181/12 182/12
182/23 185/3 186/4 186/14 187/6 190/17
191/3 191/8 191/15 192/18 193/25
194/21 195/2 195/22 196/18 196/24
198/15 200/8 203/18 203/20 204/4 209/1
210/2 210/8 211/3 211/4 211/12 211/20
214/16 215/17 218/6 219/15 223/7
so-called [1]  168/5
sole [3]  119/20 172/9 174/9
solved [1]  12/13
solvent [1]  191/21
some [92]  5/15 5/21 6/9 9/3 12/5 20/15
31/22 35/17 36/24 37/6 38/13 38/13 50/6
50/6 52/20 54/19 55/6 57/22 59/6 61/14
63/14 64/22 64/22 71/20 72/15 73/18
75/10 76/2 79/7 85/20 88/13 90/11 96/9
97/17 98/23 99/3 99/20 101/2 109/11
111/21 112/2 113/11 116/1 116/13
116/19 118/17 124/25 125/8 127/7
127/20 137/9 139/18 143/4 145/11 151/3
152/9 154/15 155/11 155/24 156/19
157/4 157/4 157/10 162/6 162/11 166/25
170/22 171/8 177/17 179/9 184/25
187/14 187/25 189/15 192/6 201/3
202/17 203/18 203/20 207/9 207/19
208/3 209/13 210/6 210/25 211/2 211/17
212/7 213/13 213/20 221/2 223/22
somebody [10]  8/8 31/10 55/19 168/16
175/23 177/25 194/3 196/17 216/5 219/2
somehow [5]  50/7 50/8 55/10 55/11
188/4
someone [7]  6/19 55/20 141/4 170/7
172/6 209/11 209/12
something [14]  32/12 36/19 47/3 130/5
149/6 150/7 150/19 178/1 194/7 197/10
209/10 211/8 212/23 214/21
sometimes [3]  31/24 118/21 163/13
somewhat [1]  161/14
somewhere [4]  76/14 77/3 128/21

176/10
sonar [1]  70/13
SonTasha [3]  9/22 200/23 222/22
soon [1]  76/7
sooner [3]  12/10 219/10 219/11
sorry [14]  95/19 103/12 120/4 136/23
144/4 154/22 173/12 175/24 189/2
199/18 202/19 220/5 221/1 221/3
sort [2]  141/17 216/11
sorts [1]  142/13
sought [7]  10/21 18/8 123/23 124/2
129/11 140/22 184/3
sounds [1]  140/5
source [4]  14/25 81/21 90/22 174/10
sources [11]  25/22 25/23 88/23 89/22
90/2 93/17 94/20 96/3 122/10 122/12
122/12
South [1]  104/4
southeast [6]  53/1 69/13 71/22 103/7
105/16 108/10
southern [3]  10/6 117/7 117/9
sovereign [1]  49/4
spatial [2]  66/22 67/24
speak [13]  9/8 9/16 11/2 20/9 20/16 75/6
85/12 85/13 103/11 177/8 177/9 177/23
207/11
speaking [4]  16/21 108/25 131/22 171/11
special [19]  31/6 31/15 31/17 34/1 58/2
58/8 162/25 163/9 174/20 176/25 189/22
190/1 208/14 211/13 212/4 213/11
214/25 216/8 216/11
specialists [1]  67/14
specific [7]  25/25 32/8 69/21 89/21 99/17
100/3 160/18
specifically [13]  19/21 23/7 47/1 58/4
69/8 75/6 86/21 98/6 114/11 128/2 166/6
201/18 223/1
specifications [1]  45/2
specifics [1]  31/16
specified [3]  15/5 43/10 145/13
spectator [1]  163/6
speculation [1]  37/21
speculative [3]  38/5 58/17 77/5
spelled [1]  61/24
spelling [4]  65/10 107/25 114/23 202/24
spend [2]  60/21 168/24 214/25
spent [3]  189/15 190/24 203/13
spill [1]  198/1
spirit [2]  11/10 11/14
spoke [4]  58/1 80/1 84/3 96/17
sponsor [2]  156/25 157/2
sponsors [5]  42/23 43/6 46/14 109/23
110/3
square [1]  69/12
squares [1]  71/12
squawk [1]  217/14
St [2]  2/13 2/16
St. [34]  8/3 13/24 14/1 21/11 23/10 24/20
45/24 56/25 57/7 61/21 61/22 75/14
77/13 82/3 84/22 85/1 95/17 97/10
101/16 103/23 104/1 118/19 133/12
135/4 135/18 137/6 141/12 141/14 153/7
156/16 159/10 161/22 162/1 215/13
St. Bernard [11]  45/24 77/13 82/3 84/22
85/1 95/17 97/10 156/16 159/10 161/22
162/1
St. Bernard/Lower [1]  153/7
St. Paul [21]  8/3 13/24 14/1 21/11 23/10
24/20 56/25 57/7 61/21 61/22 101/16
103/23 104/1 118/19 133/12 135/4
135/18 137/6 141/12 141/14 215/13
St. Tammany [1]  75/14

stabilized [1]  76/12
stabler [1]  76/16
stage [10]  15/13 30/13 45/8 58/15 177/7
177/14 177/16 183/20 186/15 187/14
stake [1]  184/24
stand [7]  11/21 31/12 52/5 76/1 107/21
113/19 185/3
standard [8]  44/10 46/16 118/10 118/12
118/20 127/19 133/22 145/4
standardized [5]  118/17 118/22 126/18
147/8 147/13
standards [1]  98/17
standing [1]  98/17
standpoint [6]  21/25 25/3 36/15 187/10
200/5 216/22
STANWOOD [1]  1/11
start [8]  5/14 41/9 55/18 65/5 148/24
152/20 165/5 180/4
started [4]  127/2 131/2 137/11 151/23
starting [2]  51/7 126/14
startling [1]  46/9
state [73]  17/13 21/19 23/5 38/17 38/17
38/18 38/19 38/20 38/23 38/25 39/3 39/6
39/7 39/12 39/18 39/20 39/22 48/12
48/13 48/19 48/23 49/14 49/14 49/15
49/16 49/22 49/22 50/7 50/8 50/9 50/12
50/12 50/16 50/16 50/21 50/21 50/24
50/24 51/4 51/8 51/16 51/21 57/17 65/9
65/15 66/10 74/12 75/23 76/2 76/13 79/8
107/24 114/22 115/3 115/9 118/15 119/7
122/4 123/18 148/19 155/10 155/17
166/8 169/25 197/2 197/5 197/6 197/7
197/8 197/11 197/17 200/1 202/23
state's [2]  40/6 72/12
stated [9]  10/18 18/16 19/10 27/12 46/25
47/5 81/11 169/3 176/10
statement [5]  11/16 67/2 221/16 221/19
221/21
statements [2]  46/23 57/3
states [16]  1/1 1/12 43/1 43/11 43/15
45/13 46/21 71/19 116/11 126/18 154/5
158/19 168/17 176/1 180/6 224/8
states' [1]  114/12
stations [1]  89/12
Statistics [3]  83/8 83/11 87/25
status [13]  77/9 116/6 124/6 124/10
127/9 127/12 128/13 128/14 129/7
132/15 132/20 140/3 145/7
statute [5]  114/13 131/20 180/6 197/9
197/18
statutes [1]  53/13
statutorily [1]  39/23
statutory [3]  29/7 55/2 111/17
stay [4]  5/11 9/1 169/21 170/14
stenography [1]  3/5
step [6]  33/3 100/23 128/8 187/6 199/22
212/8
steps [1]  123/18
STFID [1]  69/16
sticking [1]  127/14
still [14]  8/17 53/8 53/20 76/16 84/2
84/24 88/13 111/15 149/1 149/22 155/10
175/18 175/22 176/4
stipulate [3]  101/21 101/24 140/21
stipulated [4]  62/1 179/20 218/13 221/11
stipulates [1]  26/6
stipulation [11]  64/9 102/17 102/20
102/23 104/6 179/14 179/18 179/18
179/19 179/25 215/12
stipulations [3]  25/9 101/2 102/11
stock [7]  45/9 54/25 72/12 84/6 84/7
85/22 86/14
stockholder [1]  66/2

Case 2:05-cv-04182-SRD-JCW   Document 18971   Filed 06/09/09   Page 256 of 262

S

stone [1]  170/20
stood [1]  202/18
stop [3]  50/3 175/23 176/21
stories [2]  6/21 42/7
storm [20]  69/2 69/4 71/5 71/5 71/21
 72/9 72/12 74/9 74/10 76/7 77/20 77/21
 77/24 83/4 84/1 84/20 88/8 88/22 98/22
 105/21
storms [5]  83/18 83/22 84/18 86/6 87/11
story [1]  136/21
straight [1]  16/11
straight-out [1]  16/11
strain [1]  187/3
strapped [1]  40/21
strategic [1]  155/11
strategy [2]  171/14 171/18
stream [1]  110/25
Street [24]  1/16 1/19 1/22 2/14 2/17 2/20
 2/23 3/1 44/20 47/1 92/9 92/11 94/5
 94/18 97/14 103/17 106/21 128/3 128/12
 154/16 158/13 159/14 161/1 161/4
strictly [2]  162/1 206/10
strip [1]  54/4
stripped [1]  56/4
strips [1]  56/6
Strock [2]  46/23 150/5
strong [1]  44/17
struck [1]  103/15
structure [2]  87/2 104/25
structured [1]  59/4
structures [3]  30/18 47/3 82/19 82/20
Stuart [3]  10/3 14/4 19/10
student [1]  75/15
students [2]  75/18 75/18
studied [3]  74/19 118/5 133/9
studies [8]  66/11 66/13 66/14 66/16 68/8
 73/18 75/9 78/10
study [8]  66/19 66/21 66/21 67/22 67/23
 68/3 89/7 100/7
studying [3]  67/25 203/13 213/11
stuff [1]  145/4
stylus [2]  152/24 153/2
subbasin [4]  90/5 92/22 92/22 93/4
subbasins [4]  90/13 90/17 90/23 91/20
subclass [21]  25/19 25/25 26/10 30/18
 79/12 92/4 93/12 93/18 96/15 96/18 97/9
 97/11 97/13 97/16 97/16 97/16 99/21
 160/12 160/14 163/8 163/11
Subclass 1 [2]  97/9 97/16
Subclass 2 [1]  97/11
Subclass 3 [3]  93/12 93/18 97/13
subclasses [10]  25/14 26/6 27/3 160/1
 162/17 163/7 174/23 174/24 177/19
 211/12
subcommittees [2]  166/11 171/8
subcontractors [1]  123/25
subdistrict [1]  91/5
subdivision [10]  38/22 49/14 49/23 49/25
 50/12 50/18 50/19 51/9 51/15 51/21
subdivisions [7]  14/24 17/14 48/14 49/17
 50/9 52/1 197/8
subject [16]  9/3 9/3 29/5 36/2 36/17
 49/19 155/9 165/10 170/17 172/12 174/8
 184/14 191/15 192/19 197/17 220/25
submission [1]  107/8
submit [6]  9/9 24/10 25/19 26/21 41/11
 223/18
submitted [5]  8/13 27/7 72/10 101/15
 204/9
subparagraph [3]  50/5 51/14 51/19
subpoena [2]  102/12 183/9

subpoenaed [1]  101/19
subpoenas [1]  183/9
Subsequent [1]  52/22
subsequently [2]  10/12 126/8
substantial [1]  213/4
substantially [2]  27/15 27/15
subsumed [1]  156/3
successful [2]  60/2 61/3 74/25
successfully [1]  167/3
such [26]  9/14 20/3 26/8 28/8 28/22 29/8
 32/9 33/10 48/19 50/14 96/12 115/14
 117/23 123/21 126/13 126/15 127/13
 150/14 160/22 200/5 203/9 207/5 207/18
 209/2 213/3 214/8
sue [2]  52/18 130/14
sued [7]  52/19 123/4 154/4 156/24 157/3
 157/11 181/15
suffer [2]  5/18 5/25
suffered [6]  42/6 84/22 87/23 139/12
 142/12 213/15
suffering [2]  5/24 96/13
Suffice [1]  26/18
sufficiently [2]  160/22 160/24
suggest [13]  32/13 37/9 40/24 41/8
 55/15 58/20 164/13 170/7 175/4 178/8
 188/2 188/4 215/8
suggested [10]  16/4 29/21 55/6 56/1
 111/21 156/17 162/5 176/9 191/3 198/7
suggesting [2]  99/4 139/14
suggestion [2]  13/5 217/8
suicide [1]  98/23
suit [6]  8/18 50/11 50/14 50/16 50/18
 107/12
Suite [8]  1/19 1/22 2/4 2/7 2/11 2/14 2/17
 2/20
suits [3]  34/25 49/13 122/1
sum [1]  172/2
summarize [1]  16/18
summarizes [1]  102/1
summary [1]  63/5
sums [2]  37/1 156/12
Superdome [2]  6/10 6/13
Supp [1]  15/4
supplement [1]  63/22
supplemental [3]  156/2 207/3 223/15
supplemented [1]  25/10
supplied [2]  48/12 50/22
supply [2]  85/7 85/19
support [15]  21/21 26/17 27/8 28/16
 28/20 67/5 68/1 68/6 68/9 72/18 85/13
 184/8 204/1 204/5 204/10
supported [2]  54/24 73/11
suppose [3]  60/9 211/8 213/2
supposed [2]  54/6 194/9
Supreme [3]  7/8 26/15 176/2
Supreme Court [2]  7/8 176/2
Supreme Court's [1]  26/15
sure [22]  62/5 81/11 91/3 91/8 100/14
 102/14 102/21 103/12 113/16 135/15
 141/24 142/15 142/15 143/7 158/24
 170/15 171/2 176/18 182/24 194/18
 197/4 214/24
surge [4]  109/14 109/18 109/19 110/7
surprised [2]  60/12 86/25
surrounded [3]  152/21 153/4 153/7
surrounding [1]  45/23
suspended [1]  10/11
sustainability [1]  73/8
sustained [7]  46/5 130/7 161/3 161/12
 196/1 196/1 196/1
swear [1]  209/21
swore [1]  108/17
sworn [7]  65/8 107/22 114/20 148/17

173/20 190/18 202/21
sworn... [3]  108/15 148/22 148/25
system [6]  8/20 8/22 32/16 32/16 32/17
 43/4 45/24 46/2 47/8 47/25 48/13 48/21
 56/12 75/13 75/14 75/21 109/9 111/18
 210/7
systems [7]  24/22 43/9 43/17 52/15
 73/20 77/11 85/25

T

T-H-O-N-N [1]  200/22
T-I-M-O-T-H-Y [1]  108/1
T-walls [1]  109/12
T.L. [1]  106/14
T.L. James [1]  106/14
table [3]  35/9 124/12 165/6
tabulating [1]  92/23
tact [1]  167/12
tactic [1]  171/19
tactical [1]  155/11
take [29]  11/20 12/10 16/16 33/3 61/1
 78/18 87/11 106/5 106/17 107/3 110/7
 113/20 113/25 137/24 141/23 142/9
 147/20 167/12 170/11 190/17 193/12
 194/25 196/18 205/15 210/25 217/23
 219/25 221/6 222/2
taken [9]  27/7 35/25 71/5 99/2 138/9
 167/19 187/17 188/13 201/17
taking [2]  100/24 172/5
talk [18]  9/4 29/23 33/10 80/4 82/12 83/1
 83/18 83/21 84/18 86/6 95/7 95/24
 126/22 134/24 159/25 163/22 172/11
 187/15
talked [6]  96/8 142/8 180/13 180/20
 203/16 203/19
talking [20]  37/7 54/21 57/6 59/18 75/7
 96/2 116/22 117/1 137/11 138/5 139/6
 139/10 140/12 151/9 159/4 183/22
 209/10 212/21 212/22 218/19
talks [2]  54/16 61/12
Tammany [1]  75/14
tank [1]  72/23
tap [1]  161/7
task [4]  45/16 62/4 67/18 167/20
tax [5]  53/23 54/8 54/16 54/17 55/3
 111/6
taxation [2]  54/8 54/11
taxes [9]  53/21 53/24 54/1 54/22 85/6
 85/14 86/2 111/2 111/8
Teaching [1]  15/4
technical [3]  148/14 152/4 170/2
technically [3]  11/24 220/11 220/18
technique [1]  70/15
technological [1]  44/7
technology [3]  67/15 67/16 69/1
tedious [1]  64/21
telephone [2]  6/6 9/11
tell [34]  13/3 66/13 71/16 74/23 90/1
 108/6 109/11 110/2 110/8 118/8 145/1
 150/5 151/24 163/23 190/11 197/21
 203/12 206/13
telling [4]  47/15 47/16 184/24 185/13
temporal [2]  66/22 67/24
temporary [1]  69/5
ten [2]  113/20 134/9
tender [6]  78/9 120/8 171/5 181/3 202/3
 202/14
tendered [7]  78/17 81/6 81/12 119/13
 120/16 120/17 202/20
tentative [1]  217/13
tentatively [1]  217/7
term [3]  86/21 147/14 147/15
termed [1]  10/8
terminology [2]  118/19 133/22

terms [16]  22/10 29/24 46/11 69/7 73/4
75/1 116/8 116/13 118/13 118/22 134/21
168/9 169/17 169/19 183/22 185/20
terrain [6]  69/11 70/8 71/8 90/5 90/9
90/20
terrible [1]  213/15
terrific [1]  208/24
territorial [2]  51/18 51/23
test [6]  44/12 44/13 45/3 150/2 151/15
157/17
tested [1]  90/24
testified [9]  65/8 107/23 114/21 118/24
148/18 182/25 185/14 202/22 208/3
testify [2]  28/15 207/4
testifying [3]  59/3 120/20 139/25
testimony [25]  25/10 27/7 28/9 56/17
59/8 79/15 81/15 99/22 100/7 105/4
119/15 138/13 139/22 140/4 141/7
144/23 147/25 159/3 173/20 179/13
201/5 206/10 206/21 208/24 220/18
Testing [1]  15/3
tests [1]  15/22
Texas [1]  6/13
textbook [1]  115/21
textbooks [1]  115/19
than [27]  7/8 12/4 12/10 26/8 26/9 26/11
34/25 38/22 41/2 76/6 76/15 87/1 107/12
107/18 119/20 126/24 153/5 166/16
167/21 183/15 190/5 192/8 192/25
192/25 196/19 203/13 208/23
thank [54]  5/14 13/14 14/7 20/19 41/19
41/20 56/22 57/13 64/10 64/11 64/19
78/19 80/11 80/12 98/9 99/9 100/15
100/16 100/23 102/18 102/24 103/22
104/11 104/14 105/11 112/10 113/18
137/1 142/23 142/24 146/12 146/13
152/13 157/19 159/22 178/25 180/1
181/2 181/4 182/14 182/16 183/6 191/17
198/23 198/24 199/17 201/25 207/22
213/22 214/1 214/3 221/13 223/22 224/2
that [1182]
That'd [1]  155/5
that's [142]  5/25 6/20 8/16 11/10 11/14
11/16 19/8 20/6 20/12 29/18 33/6 33/10
37/17 40/8 40/17 41/24 50/20 54/2 55/9
55/24 58/19 59/9 59/20 60/3 60/8 63/16
66/7 70/3 70/4 70/15 75/4 75/19 78/8
79/23 80/2 82/23 87/16 88/8 89/1 93/19
93/24 99/15 100/15 107/14 111/2 112/10
112/24 114/17 125/21 130/18 133/22
133/22 134/11 135/5 135/14 135/15
135/22 137/14 141/24 143/16 144/20
145/2 146/9 147/1 147/18 147/21 147/22
150/4 150/18 151/16 151/21 152/21
153/17 154/3 160/3 160/8 161/10 163/2
163/2 163/12 164/6 165/8 166/1 166/8
168/4 168/25 170/21 171/15 171/20
172/16 175/10 177/5 177/7 177/17 178/2
178/18 180/2 181/1 185/7 188/15 190/3
190/10 191/3 192/17 192/17 192/19
193/5 193/6 194/18 196/2 196/12 196/18
197/9 197/11 198/16 198/23 199/22
200/23 204/8 205/3 207/8 207/13 208/25
209/16 210/17 211/20 212/22 213/17
213/22 214/7 214/23 215/4 216/6 216/17
218/4 218/6 219/3 219/8 220/4 220/4
223/5 223/25
the fact [1]  41/3
The Road [1]  86/17
their [65]  8/13 11/19 11/20 13/7 18/10
19/2 19/12 20/2 21/10 21/11 23/10 27/6

27/8 27/16 29/14 32/20 34/20 35/10
35/12 42/14 42/16 45/22 45/25 50/18
57/3 57/7 58/24 60/2 60/14 74/5 75/3
82/9 96/18 104/20 104/22 110/21 110/22
117/10 117/18 118/20 122/6 126/7
129/23 141/15 145/24 155/8 157/12
161/23 167/25 170/18 171/5 172/10
174/3 174/13 181/17 192/5 192/20 193/6
194/4 195/1 195/7 196/25 198/11 210/22
them [59]  6/25 7/25 8/18 11/25 16/19
19/16 22/1 26/21 29/25 30/2 34/22 35/20
35/25 36/11 37/3 59/24 63/9 63/11 64/17
91/5 100/10 102/10 107/5 108/16 113/6
116/9 126/7 126/8 127/25 142/7 142/14
143/10 146/25 149/22 154/11 155/12
157/12 169/6 170/14 172/7 172/9 172/10
175/21 175/22 178/7 178/24 181/15
193/1 195/14 196/9 198/20 201/7 201/24
211/24 221/3 222/18 222/19 223/9
223/17
themselves [9]  15/25 18/3 61/15 82/19
82/20 124/9 194/13 195/17 196/24
then [78]  11/12 11/19 20/10 24/18 24/25
25/5 30/24 31/21 37/17 43/5 47/18 48/22
48/24 49/21 51/8 52/3 52/8 52/11 54/16
56/4 69/15 70/21 71/9 90/3 90/5 90/9
90/19 90/22 90/24 91/24 93/5 93/9 93/17
95/16 96/23 97/12 102/24 104/23 105/1
117/11 118/14 119/13 123/18 123/23
124/9 125/2 127/6 128/14 132/3 132/4
132/9 138/10 138/23 139/25 141/1
153/25 153/25 161/25 163/21 167/16
167/17 169/23 173/4 183/11 187/6 189/6
189/14 191/18 201/11 201/13 209/23
212/7 216/17 216/20 217/2 217/10
219/11 220/4
theoretically [1]  86/17
theories [1]  158/23
there [210]  5/23 7/20 7/23 9/13 11/3
11/13 11/17 16/25 17/6 22/20 24/16
24/22 28/19 29/11 30/5 32/14 32/22
32/24 32/25 33/4 33/20 34/16 36/13
36/18 37/4 37/4 37/6 38/1 40/2 40/13
41/3 41/5 41/6 41/18 42/13 43/9 44/17
47/3 47/7 47/21 49/4 49/15 50/23 50/24
53/9 53/14 54/17 55/2 56/8 57/14 57/16
57/17 57/18 58/10 58/12 60/10 60/12
61/20 61/25 63/12 71/9 76/18 77/3 81/8
89/10 91/11 91/19 91/25 94/19 96/7
98/16 99/5 99/19 100/5 102/25 103/5
103/16 106/17 106/22 106/25 107/13
109/12 109/12 109/14 110/14 111/21
113/14 113/15 117/3 116/13 116/25
118/9 123/15 125/8 125/12 127/13
127/15 127/18 127/20 128/18 129/5
131/4 131/12 131/13 132/3 133/5 134/13
134/15 134/25 135/1 135/12 135/15
135/20 138/6 138/12 138/12 139/18
139/24 140/23 141/17 142/2 142/5 142/7
143/17 145/4 145/6 146/18 146/23 147/2
147/14 149/18 149/19 151/3 151/7
151/22 152/12 152/19 152/24 153/13
154/4 154/12 154/14 155/9 155/11
155/23 156/13 156/16 158/14 162/7
164/4 164/11 166/22 167/8 168/6 168/6
168/20 174/6 174/22 174/24 175/18
175/22 176/16 176/19 176/21 178/2
178/8 179/2 179/5 179/20 179/24 180/23
181/15 181/21 182/9 183/18 185/14
186/22 186/24 186/24 187/9 187/21
187/25 188/22 189/14 190/15 191/19
193/15 193/16 197/6 197/10 198/9
198/10 199/6 208/13 208/16 209/19

210/3 210/5 210/6 210/14 210/15 210/18
210/22 211/1 212/17 212/20 212/20
215/1 215/21 222/23
there's [57]  5/16 5/22 14/10 18/1 33/8
33/12 37/9 38/11 40/12 52/20 53/22
54/19 58/14 58/25 59/8 59/25 60/24
61/13 62/11 63/12 89/7 97/1 102/14
109/13 109/14 131/6 133/14 133/25
135/11 135/19 140/17 141/13 146/2
147/6 164/15 167/2 171/13 172/2 172/4
177/2 177/2 177/3 178/11 178/19 180/14
180/14 180/15 180/22 186/3 191/15
191/20 196/3 197/10 207/9 207/19
214/13 216/12
thereafter [1]  63/4
thereby [1]  69/16
therefor [2]  49/24 109/25
therefore [10]  7/23 27/23 39/20 51/4
134/2 209/11 211/5 211/22 213/17
217/13
therein [1]  9/12
Therence [4]  9/19 200/20 200/21 222/20
thereto [3]  51/18 51/23 54/14
these [117]  8/12 19/6 20/21 21/20 22/25
23/11 23/14 26/6 26/23 27/21 28/23
28/24 29/3 29/14 30/8 31/6 33/15 33/24
34/19 35/8 35/9 36/25 38/6 39/19 40/20
41/17 42/1 42/16 42/22 43/5 43/7 44/24
45/11 45/18 46/3 46/22 48/9 52/9 54/2
55/25 56/13 57/22 58/13 64/5 70/16 72/7
74/13 88/13 97/20 107/14 110/23 112/7
116/12 117/20 118/12 123/15 124/12
124/25 125/25 126/1 126/5 127/16
127/25 129/1 131/11 135/2 136/9 136/17
141/12 142/8 144/20 145/2 145/3 151/8
151/17 153/23 157/4 158/6 159/7 160/8
161/19 165/4 165/22 165/24 166/12
168/2 169/14 169/20 170/4 170/8 171/19
172/9 172/20 173/10 173/18 173/20
176/17 176/22 178/6 180/17 183/19
183/21 190/23 192/14 194/10 195/4
197/8 199/9 201/8 201/9 201/20 204/3
204/16 209/6 217/6 221/10 223/3
they [166]  5/21 6/19 7/5 7/17 7/18 7/19
7/19 8/4 8/14 8/15 8/16 8/17 11/22 17/1
19/2 19/15 19/16 19/21 19/22 20/10 23/8
27/8 31/1 31/19 31/19 32/15 32/20 34/16
35/8 35/20 36/14 37/6 38/12 40/3 42/6
44/11 47/17 47/17 47/18 47/18 58/23
59/10 61/2 61/3 63/12 64/3 72/24 73/4
83/2 93/16 97/16 97/21 105/1 107/12
107/17 112/8 113/13 113/13 113/14
115/15 115/25 117/12 118/20 118/21
119/16 124/7 124/8 126/8 127/3 127/5
127/8 127/19 127/22 130/22 135/9
141/18 142/12 142/15 142/15 144/16
145/3 145/13 145/13 150/6 150/21
154/24 155/13 156/10 157/6 157/13
160/22 160/24 162/4 162/6 162/19 163/5
163/23 165/7 167/1 168/18 168/22
170/13 170/16 171/6 171/7 172/24
173/21 174/16 176/4 176/17 176/18
176/19 177/25 178/7 178/10 180/23
181/13 181/20 182/10 183/11 184/2
184/2 184/4 184/18 186/11 186/12
186/13 186/25 188/10 190/19 190/20
191/18 193/19 193/24 194/4 194/15
195/17 194/18 194/21 195/9 195/16
195/17 195/19 196/2 196/7 196/12
196/18 196/20 196/22 196/23 196/23
196/24 200/5 207/19 209/22 210/1
212/15 213/16 216/17 222/22 223/17

they'll [1]  40/19
they're [15]  31/17 33/7 35/24 36/12
36/13 36/13 37/21 52/1 58/23 59/14 60/2
60/4 61/2 167/7 175/22
thing [26]  34/23 36/4 37/7 54/19 61/1
97/15 120/22 126/21 145/5 153/15
168/12 169/16 170/13 170/15 170/23
171/25 174/7 180/17 189/6 189/6 195/1
199/23 212/4 212/10 213/14 215/8
things [28]  9/3 35/12 44/10 51/12 51/17
51/23 52/16 74/21 75/2 80/4 83/23 86/23
96/2 98/5 98/24 113/4 118/4 123/2
142/13 143/15 144/20 145/6 145/7 151/8
168/11 171/19 180/17 214/10
think [92]  9/12 12/4 12/11 12/13 20/6
29/19 31/3 35/17 36/19 40/12 41/5 41/7
41/12 48/17 52/20 55/6 56/16 59/5 59/7
59/11 60/11 62/11 62/14 62/23 64/23
71/25 72/23 77/2 77/10 79/24 86/9 87/5
88/9 91/14 101/20 102/12 107/11 113/21
131/10 139/4 139/18 139/23 140/20
147/9 148/1 148/8 148/11 151/2 152/24
163/23 165/18 165/19 171/21 174/2
174/16 175/8 178/1 183/21 183/25 184/7
186/8 189/16 189/25 190/3 190/21
192/25 193/22 195/13 199/24 200/3
206/17 206/20 206/23 207/14 211/15
211/24 212/2 212/7 212/9 212/14 213/7
213/9 213/9 214/7 214/23 215/17 215/18
218/8 218/24 218/25 222/16 223/2
thinking [1]  218/11
third [17]  25/17 121/25 122/15 122/23
123/4 123/7 123/7 123/9 126/10 131/16
133/8 135/3 139/14 140/13 142/8 153/11
161/25
third-party [12]  121/25 122/15 122/23
123/4 123/7 123/7 123/9 126/10 131/16
133/8 135/3 142/8
this [411]
THOMAS [2]  2/3 10/3
Thonn [3]  9/20 200/21 222/21
those [127]  9/25 9/25 10/15 10/17 11/23
20/7 22/8 30/20 34/23 35/1 35/12 35/23
40/23 43/1 45/22 46/1 48/2 48/4 49/2
49/8 49/9 52/13 53/7 53/9 53/19 53/22
53/23 56/5 63/5 63/23 64/2 64/12 69/15
71/11 73/11 74/13 78/2 78/2 81/19 81/25
82/1 83/10 83/23 86/18 87/14 91/11
91/19 93/1 93/2 93/8 94/4 94/8 97/2 98/7
98/23 99/17 99/25 102/1 102/3 102/11
104/21 104/25 105/3 106/15 107/16
111/5 113/7 113/11 122/1 122/7 124/1
124/7 125/13 127/1 127/9 128/19 129/20
130/1 136/25 137/22 138/8 138/11
138/17 138/25 141/14 142/12 142/17
142/20 144/23 144/24 145/9 145/11
145/17 145/21 146/19 150/21 152/19
155/1 155/19 155/23 156/18 157/5
159/17 160/9 160/16 161/2 161/2 174/4
175/3 175/20 175/23 176/4 176/7 187/14
188/1 190/6 192/22 196/14 198/2 204/19
208/22 210/23 211/22 212/24 223/7
223/8 223/16
though [8]  7/21 11/24 23/17 57/5 168/18
169/8 170/21 186/6
thought [13]  7/9 7/21 143/17 155/13
155/19 165/16 180/2 182/9 182/11
200/14 210/3 220/19 221/3
thoughts [2]  16/13 191/6
thousands [11]  5/24 14/8 60/11 86/24
158/3 158/15 158/16 158/17 165/25

168/1 185/17
three-premises [1] 18/17
three [42]  9/13 22/7 24/22 25/4 25/14
28/23 29/4 45/2 45/21 51/25 52/5 53/8
57/10 63/4 63/17 108/18 122/7 124/17
127/16 133/10 135/12 135/20 136/8
148/15 152/18 152/19 158/16 159/25
168/2 179/5 179/21 180/23 181/1 185/25
186/2 187/20 187/21 193/23 209/5
211/11 217/8 223/2
three-premises [1]  25/4
threw [1]  176/3
through [48]  5/25 6/17 6/18 17/16 23/18
25/20 29/2 38/13 42/17 43/12 43/15
57/17 59/7 63/6 73/23 81/10 84/10 85/7
85/9 86/16 86/25 94/8 95/12 117/19
122/12 127/18 131/8 147/7 160/15
163/14 164/24 166/10 167/5 167/13
169/21 174/20 174/21 176/17 186/14
190/7 201/14 201/20 201/25 205/22
206/2 206/4 209/25 211/7
throughout [18]  42/14 69/12 70/9 70/15
71/9 71/19 71/22 72/10 84/12 87/22 88/6
89/13 91/25 116/11 118/13 138/14 182/7
189/18
throwing [2]  175/21 175/22
Thurman [3]  27/4 201/10 201/19
thus [3]  26/25 28/25 45/8
tie [1]  99/16
tied [3]  69/15 74/12 132/20
tightened [1]  173/9
Tim [1]  107/21
time [72]  9/16 11/5 12/2 23/21 26/5
32/11 32/22 32/25 33/4 34/1 37/3 37/25
39/17 44/11 46/12 49/5 53/15 56/21
56/22 57/22 60/3 63/3 63/19 67/13 67/24
72/7 82/3 84/13 85/22 86/4 88/2 97/10
103/15 103/16 103/24 107/20 112/11
113/14 119/17 119/20 120/8 121/10
126/7 129/18 130/11 130/13 130/21
149/9 149/14 154/17 163/15 163/22
166/25 168/24 169/13 170/5 170/22
173/2 173/6 186/4 186/23 187/6 190/14
191/4 205/13 209/24 214/14 217/18
218/7 218/9 218/25 222/18
timelines [1]  44/5
times [4]  25/22 76/22 119/15 189/8
Times-Picayune [1]  76/22
Timothy [2]  107/22 108/1
Title [3]  51/7 51/12 52/3
today [34]  7/13 8/21 12/8 12/12 30/12
36/1 37/7 42/8 61/5 74/17 77/14 89/1
92/24 94/23 95/4 95/18 100/7 101/20
102/8 110/16 138/3 144/23 151/19
157/22 162/25 164/19 172/13 176/23
176/24 187/13 203/20 208/2 208/24
214/9
together [8]  51/1 73/23 74/15 159/10
169/8 171/8 172/24 220/20
token [1]  215/17
told [15]  5/19 5/21 6/12 33/7 108/17
110/10 127/13 129/7 130/21 143/16
161/15 183/18 188/10 190/14 194/7
Toler [1]  108/9
Tommy [4]  13/16 42/1 106/3 108/5
tomorrow [3]  7/14 8/21 187/13
Toni [4]  3/1 224/7 224/15 224/15
too [10]  35/24 55/1 58/17 58/17 76/7
106/18 187/2 190/23 213/2 218/12
took [16]  7/5 80/13 114/3 121/7 123/18
129/8 130/17 137/14 138/7 159/12
173/17 193/7 194/1 194/1 205/18 211/21
tool [1]  67/16

tools [1]  71/10
topographic [1]  90/19
tort [4]  14/17 15/24 17/4 172/19
torts [1]  149/12
total [19]  20/25 21/2 23/20 23/23 24/1
24/5 30/7 86/18 87/1 93/5 95/21 100/12
119/17 134/21 136/1 136/9 142/19
201/13 213/2
totaled [1]  28/24
totaling [1]  96/10
totally [2]  88/18 169/2
totals [1]  24/9
touch [2]  29/16 184/13
touched [2]  30/17 174/7
touching [1]  29/15
tough [2]  16/17 190/3
toxic [2]  149/11 172/19
toxins [1]  149/13
traced [1]  77/7
track [1]  74/3
trade [1]  65/20
traditional [2]  35/13 36/22
train [1]  156/8
transaction [1]  16/1
transcript [3]  1/11 3/5 224/10
transcripts [2]  27/6 201/16
transferred [3]  113/6 113/7 113/9
transitional [1]  77/17
transportation [3]  39/4 57/18 66/25
transported [1]  6/13
traverse [1]  120/11
Treasury [1]  23/19
treated [2]  18/2 165/12
trees [1]  211/2
tremendous [3]  110/17 110/17 190/13
trial [9]  42/18 57/25 157/17 163/20 167/5
168/15 186/2 197/14 217/10
tried [4]  6/3 56/10 99/16 198/22
trigger [4]  129/25 138/23 147/21 147/22
triggered [5]  128/17 132/9 133/17 138/10
173/13
trillion [3]  195/12 195/15 196/19
tripled [1]  146/4
true [24]  39/8 39/9 39/9 82/4 98/25
123/16 123/17 124/13 124/25 125/1
133/21 133/22 134/22 141/24 146/22
147/2 150/4 168/4 170/16 190/10 196/12
216/15 216/25 224/9
truisms [1]  20/23
truly [6]  7/12 28/16 56/8 56/18 190/6
195/22
trust [1]  210/11
truth [1]  37/19
try [12]  7/18 12/2 34/20 60/14 68/16
79/17 131/1 136/16 152/3 163/14 167/17
170/4
trying [14]  40/21 58/22 61/7 75/3 88/22
131/2 143/14 152/10 170/5 172/23
200/13 204/10 204/11 217/11
turn [6]  20/16 22/1 47/19 61/19 139/3
170/12
turned [1]  156/9
Turner [1]  105/15
turnout [1]  76/8
Tusa [3]  3/1 224/7 224/15 224/15
two [28]  6/14 6/15 10/12 22/4 28/19 29/2
29/19 29/25 36/11 91/19 92/1 98/3
104/21 118/9 125/15 126/17 126/20
133/15 151/17 161/15 163/19 165/9
169/12 187/6 187/25 209/5 219/1 223/2
type [10]  62/12 63/10 70/13 75/19
104/25 120/21 124/8 126/9 133/25

# T

type... [1] 150/22
types [6] 68/4 70/16 72/6 73/16 98/24 117/11
typical [1] 19/2 27/2
typicality [1] 65/2
typically [2] 31/6 31/14

# U

U.S [6] 22/17 23/16 23/19 73/14 82/9 103/18
UGL [2] 125/20 125/21
ultimate [4] 120/18 138/14 162/8 206/11
ultimately [10] 11/8 32/19 43/14 47/18 47/22 52/8 159/25 167/6 171/23 216/7
umbrella [11] 116/7 116/10 117/19 134/13 134/25 142/5 145/3 146/6 146/9 150/11 151/18
umbrellas [1] 169/22
unable [3] 56/5 63/18 142/3
unanimous [1] 21/21
uncle [1] 5/20
uncompensated [1] 190/16
undeniable [1] 29/10
under [65] 7/4 7/4 7/9 9/8 16/15 17/3 17/23 18/10 23/18 24/2 24/6 24/7 25/12 26/2 26/14 28/14 31/5 38/23 43/12 54/18 61/12 64/9 79/11 107/7 108/23 110/20 125/25 126/11 127/23 128/1 128/12 128/19 128/21 128/23 129/2 129/16 129/20 130/1 130/12 130/15 131/9 133/12 134/3 136/1 136/9 136/17 137/23 138/9 139/11 146/19 154/23 161/6 162/20 164/25 174/10 176/21 177/11 180/11 186/23 194/3 195/23 196/6 209/21 211/24 214/21
underlying [2] 25/8 27/11
undermined [1] 129/14
understand [45] 5/16 5/19 5/22 11/16 30/1 34/9 36/9 36/12 36/20 40/25 41/2 41/3 42/10 60/13 79/21 79/22 79/24 81/19 82/4 91/21 93/11 107/19 108/16 135/14 139/22 140/9 140/16 140/20 141/7 147/24 153/22 154/19 158/21 159/14 176/13 176/17 180/20 180/21 183/19 184/15 194/19 198/6 207/16 219/2 222/1
understandable [1] 196/16
understanding [18] 8/14 8/16 25/20 65/6 67/10 77/14 77/17 120/18 127/15 144/19 183/8 191/13 197/9 197/11 203/11 204/4 214/14 224/11
understands [3] 5/23 6/22 153/17
understood [6] 48/18 155/6 155/8 165/14 173/4 176/18
undertake [1] 14/14
undertakes [1] 48/20
underway [1] 109/6
underwriter [1] 103/25
underwriters [2] 116/16 117/17
underwriting [1] 104/2
Undoubtedly [1] 214/6
unfair [1] 186/15
unfortunate [1] 223/23
unfortunately [3] 38/5 149/22 150/20
uninsured [1] 86/17
Union [1] 198/17
unit [2] 153/12 155/4
UNITED [15] 1/1 1/12 43/1 43/11 43/15 45/13 46/21 71/19 116/11 154/5 158/19 168/17 176/1 180/6 224/8
United States [12] 43/1 43/11 43/15

units [13] 69/8 69/17 69/21 82/13 82/16 84/4 86/11 92/15 92/25 93/1 93/2 94/12 95/19
universe [1] 172/13
University [3] 68/25 115/8 115/9
unknowables [1] 38/2
unknown [1] 42/19
unknowns [1] 38/1
unless [9] 8/18 33/4 129/5 132/25 145/13 174/13 188/25 207/9 216/12
unlike [1] 94/18
unlikely [3] 20/11 192/13 192/16
unliquidated [1] 17/4
unoccupied [1] 85/21
unpaid [1] 190/21
unprecedented [1] 43/12
unquestionably [1] 216/25
unreasonable [2] 195/14 195/16
unsupported [1] 20/4
until [15] 11/6 12/14 20/15 71/1 76/11 78/18 138/14 148/23 170/5 172/7 187/11 199/15 215/2 219/12 220/12
unusual [2] 167/5 206/22
up [43] 20/18 39/15 40/19 41/10 48/13 55/15 55/17 61/4 76/1 88/12 90/20 93/9 94/25 95/6 96/24 97/16 103/11 105/12 116/25 126/20 148/10 148/14 152/24 163/19 167/6 167/18 173/9 177/1 181/10 185/4 189/16 190/8 199/6 200/8 200/15 203/16 209/20 210/20 211/5 211/19 212/11 213/9 222/2
upheld [2] 7/25 212/3
uphold [1] 6/23
upon [14] 5/17 45/5 56/13 127/11 130/8 146/21 147/17 156/19 162/25 164/16 167/1 169/14 170/4 173/14
upper [4] 14/16 157/11 175/13 175/17
upset [1] 171/2
Uptown [1] 91/9
urban [13] 65/20 66/11 66/13 66/14 66/14 66/16 66/25 67/4 67/6 68/3 69/3 73/1 78/10
urge [3] 25/3 64/17 187/14
us [58] 12/21 33/9 37/15 42/8 47/16 47/25 48/8 48/24 50/17 52/17 54/3 54/5 55/18 55/18 55/25 56/11 62/14 67/17 77/19 77/23 78/1 83/23 99/22 101/6 108/6 108/17 108/17 110/10 112/1 112/2 112/2 112/5 116/1 116/19 141/20 145/15 147/2 149/5 153/22 156/2 159/7 167/15 169/9 169/15 183/6 184/8 185/13 185/21 185/23 186/19 189/6 189/25 196/22 196/23 197/21 215/15 217/21 218/9
use [19] 33/24 37/2 37/18 40/3 59/7 67/15 68/11 77/5 81/16 86/21 118/19 118/21 133/4 148/15 152/24 208/21 210/24 211/20 212/11
used [28] 17/4 30/14 31/18 37/14 44/14 56/19 56/20 67/21 70/15 72/24 83/8 90/3 115/20 117/14 118/13 119/16 119/23 119/24 120/2 120/5 123/19 147/14 186/25 197/22 203/15 210/14 210/18 210/20
useful [1] 203/22
using [6] 67/16 69/11 71/10 96/16 126/17 128/10
usually [1] 33/25
Utah [1] 115/8
utility [1] 74/3
utilization [1] 74/4
utilize [2] 31/5 163/10

utilized [3] 68/22 69/24 75/10

# V

vacuum [1] 168/13
valiant [1] 7/18
valiantly [1] 7/17
valid [1] 9/9
valorem [6] 54/1 54/21 85/6 85/14 86/2 111/2
valuable [1] 190/23
valuation [1] 14/15
value [25] 14/17 20/25 31/25 69/22 82/16 82/17 82/17 85/7 85/17 85/19 85/22 87/7 87/7 93/1 93/8 93/10 95/19 95/22 96/4 100/4 184/8 186/9 186/14 190/13 190/22
valued [1] 27/19
values [5] 71/11 85/23 86/4 98/14 99/17
Vance's [1] 15/2
variables [1] 38/1
variations [1] 215/10
varies [1] 179/14
variety [5] 149/14 151/3 154/10 157/3 211/10
various [21] 14/5 43/24 57/19 103/10 114/10 117/12 118/5 149/25 156/4 157/19 159/17 162/17 173/14 174/17 174/18 194/10 204/2 208/22 212/5 212/5 219/19
vary [2] 179/17 179/19
vast [3] 33/19 63/9 86/12
Vegas [3] 116/23 116/23 116/23
vehement [1] 166/11
vehemently [1] 165/6
verification [1] 29/2
verify [3] 28/13 28/22 117/11
version [1] 118/20
versus [3] 50/9 188/22 209/12
very [58] 7/23 21/5 28/2 33/14 39/2 41/19 58/1 58/19 68/3 69/1 69/8 69/21 72/13 72/19 72/21 72/23 73/4 73/20 75/6 75/15 75/22 75/22 76/22 77/17 79/16 79/25 80/12 84/9 86/10 86/13 87/4 87/21 91/25 94/9 95/21 96/4 102/24 119/19 127/19 133/22 146/12 160/18 165/11 165/15 166/5 168/23 184/1 190/7 190/22 190/22 197/16 199/25 200/3 205/24 221/9 214/1 214/2 223/23
VI [2] 53/3 54/10
via [1] 150/5
viable [1] 14/25
Vicinity [5] 43/21 44/1 46/8 109/2 180/7
view [5] 7/4 7/8 177/24 213/7 215/4
viewed [2] 87/3 169/3
views [2] 208/7 219/1
virtue [2] 45/10 140/2
vitae [2] 202/5 202/8
Vogt [2] 50/23 52/19
voids [1] 16/2
VOIR [2] 65/13 115/1
volume [4] 91/9 91/9 91/10 185/20
voluntarily [7] 40/9 40/10 40/22 41/9 106/25 155/16 157/6
vote [2] 76/9 164/10
voted [1] 21/21
voter [2] 74/12 76/8
voters [1] 55/4
votes [7] 76/14 76/15 76/17 76/18 76/25 77/3 77/4
voting [1] 76/5

# W

W-A-R-N-E-R [1] 144/2

W-A-R-R-E-N [2]  144/3 148/16
wage [3]  83/10 83/13 88/5
wages [2]  88/8 96/9
wait [2]  20/15 71/1
waiting [1]  189/13
waive [1]  34/16
waived [1]  34/10
waiver [2]  49/4 49/4
Wall [1]  44/13
walls [3]  44/25 45/1 109/12
want [43]  5/23 6/2 6/18 13/4 29/25 36/9
 36/12 36/14 55/19 57/4 58/23 59/1 81/20
 87/11 97/15 102/10 133/8 137/8 152/6
 152/23 152/25 165/17 165/20 165/21
 168/7 173/25 178/7 183/7 184/12 189/11
 191/4 192/6 197/12 198/11 200/7 202/7
 202/17 205/11 210/12 214/17 214/23
 222/3 223/6
wanted [14]  63/11 63/12 87/9 98/5 171/2
 172/16 176/18 181/9 183/12 183/14
 197/14 200/15 200/24 211/17
wants [8]  81/18 102/9 102/25 177/1
 177/12 177/16 179/24 193/5
Ward [8]  24/24 157/1 157/11 159/15
 161/22 175/13 175/17 180/16
Warren [5]  117/6 143/20 143/23 144/4
 148/16
Warshauer [1]  1/18
was [275]
Washington [7]  2/24 116/24 127/2 157/9
 181/10 181/22 190/14
wasn't [9]  5/22 80/4 131/4 156/10 164/6
 164/9 182/12 192/25 199/18
watch [1]  47/17
water [29]  8/11 23/4 57/20 71/6 71/11
 88/25 89/1 89/22 90/4 90/7 90/7 90/18
 90/21 91/15 91/23 94/20 99/19 150/6
 154/10 155/6 155/7 155/16 155/18
 158/17 160/9 160/25 180/23 209/5
 211/21
waterfront [1]  57/3
waters [3]  92/11 92/17 154/8
waterway [1]  180/18
way [61]  5/16 5/22 11/15 11/25 20/6
 20/12 23/1 23/2 33/8 37/10 37/23 37/24
 39/6 41/6 41/7 47/8 54/19 54/20 56/9
 58/24 60/23 64/14 69/10 77/7 79/25 99/7
 112/2 126/21 129/3 129/3 129/25 130/4
 131/2 131/24 132/8 132/9 132/17 135/2
 136/19 138/21 140/3 152/3 163/2 173/1
 176/8 177/8 178/11 184/15 186/3 186/3
 188/5 192/5 193/15 200/10 201/4 208/8
 211/17 213/19 213/20 214/7 214/11
Wayne [1]  79/10
ways [5]  32/10 59/6 98/14 121/18 121/19
we [581]
we'd [1]  23/17
we'll [14]  12/16 35/6 40/10 60/24 77/2
 141/1 141/3 159/19 169/23 187/15
 205/15 214/4 219/23 220/7
we're [14]  32/23 33/10 37/7 39/1 41/22
 48/15 54/21 61/16 62/23 75/7 78/17
 121/21 122/20 151/9
we've [3]  43/21 50/22 64/7
wealthy [1]  167/22
Web [2]  209/20 209/21
Wednesday [1]  46/24
week [1]  144/9
weekend [1]  12/7
weekly [2]  83/10 83/13
weeks [1]  186/2

Weinstock [1]  2/10
welcome [1]  118/9
well [73]  8/18 12/2 12/24 30/12 32/3
 35/20 36/3 49/2 49/6 55/15 55/16 56/2
 56/2 61/22 62/8 62/14 62/18 64/17 65/5
 70/6 70/25 72/23 73/6 74/24 75/12 79/21
 83/23 87/21 93/4 98/17 100/8 116/21
 123/14 138/20 141/1 145/1 146/9 147/14
 151/1 156/5 156/14 157/12 158/1 158/14
 160/18 162/3 162/6 165/5 168/4 170/2
 173/15 173/17 179/12 188/15 194/15
 195/11 197/24 199/20 202/4 202/16
 202/19 203/8 203/12 204/14 208/11
 210/13 213/12 214/6 215/22 221/20
 221/23 222/3 223/18
well-known [1]  72/23
went [16]  5/21 5/24 6/17 6/17 43/13 44/3
 61/4 81/10 131/3 149/18 149/19 150/6
 183/11 188/21 209/25 210/1
were [159]  5/20 7/5 8/3 9/13 10/9 15/8
 15/24 23/12 25/21 27/4 28/19 29/5 30/23
 37/16 39/9 42/20 43/8 45/1 45/3 48/5
 49/9 51/12 52/4 52/13 52/15 57/15 58/5
 60/12 62/8 62/9 62/10 63/2 69/1 69/6
 69/7 69/9 69/16 69/20 70/9 71/9 71/10
 73/7 75/23 75/24 76/17 79/13 81/1 82/6
 82/14 83/9 83/21 84/5 84/12 89/12 91/11
 93/7 94/19 95/4 97/3 99/14 99/23 99/25
 100/4 103/14 104/24 105/1 106/18
 106/22 106/25 107/10 107/16 107/17
 107/18 110/25 113/14 121/3 121/13
 121/16 121/19 123/20 123/23 123/24
 123/24 124/1 124/8 125/23 126/23 127/5
 127/6 127/7 127/13 127/15 129/16 131/2
 133/9 135/20 138/18 142/2 142/3 142/11
 143/6 144/16 144/20 146/20 146/23
 150/9 150/20 151/20 151/22 153/16
 153/22 154/12 154/21 154/25 155/1
 155/8 155/9 155/11 156/3 156/10 157/5
 158/6 159/3 161/3 165/7 166/13 166/20
 168/15 170/7 170/13 170/14 171/4
 172/20 172/21 172/25 181/13 181/20
 182/9 182/11 183/4 185/10 185/13
 187/23 188/7 188/10 188/13 188/13
 189/15 190/23 193/1 195/2 206/5 208/2
 209/9 212/2 215/11 215/19 223/3 223/3
weren't [2]  170/12 170/16
west [3]  2/17 159/16 175/13
Western [1]  115/9
WGI [7]  127/2 127/10 127/14 127/16
 127/18 182/1 186/19
what [230]
what's [17]  47/21 53/24 56/11 64/21
 65/25 83/2 107/19 110/2 110/8 122/13
 144/23 178/18 184/24 189/7 192/6 192/8
 210/20
whatever [11]  7/13 14/13 27/20 53/20
 133/1 161/7 162/12 163/4 171/6 171/7
 214/6
whatsoever [2]  121/11 172/4
Wheatman [1]  114/10
Wheaton [2]  2/13
when [66]  7/14 16/21 27/13 32/25 35/21
 37/5 38/3 38/16 38/19 38/25 39/13 39/18
 58/5 68/15 72/9 74/24 79/22 82/21 85/12
 86/10 86/21 88/6 88/10 90/7 94/13 94/24
 95/5 95/12 95/22 96/21 97/12 99/16
 100/2 104/21 108/13 108/15 108/17
 117/6 121/3 121/9 122/8 122/12 123/4
 125/23 128/20 132/16 132/17 132/18
 132/24 137/11 137/14 144/8 147/12
 149/1 150/4 172/21 173/13 183/9 187/13
 192/5 198/7 203/3 208/2 210/14 210/18

218/21
who [146]  222/25 223/9 226/7 30/24
 31/17 31/19 35/11 37/5 39/24 47/10
 47/16 49/3 52/21 58/21 58/25 59/10
 59/21 60/15 60/20 61/5 70/13 77/14
 77/17 89/15 89/15 89/16 90/16 99/5
 106/19 111/1 123/14 127/4 129/8 153/9
 159/6 161/16 169/10 175/18 176/2 177/7
 181/20 181/25 199/7 210/14 217/21
Where's [1]  53/25
Whereas [1]  33/21
whereby [3]  48/13 73/8 137/18
wherein [1]  10/11
WHEREUPON [13]  65/7 79/3 80/13 81/1
 107/22 114/3 114/20 148/17 183/4
 185/10 202/21 205/18 224/4
whether [40]  10/21 14/12 14/15 14/25
 15/6 16/2 26/12 33/22 33/23 37/8 48/9
 52/1 58/23 68/6 68/19 74/1 74/7 74/25
 75/3 76/19 140/7 142/10 153/16 162/10
 163/5 163/18 163/20 164/25 165/18
 182/10 183/12 186/5 194/12 194/21
 194/22 199/16 208/4 208/7 209/4 219/15
which [152]  6/7 8/18 8/24 9/3 9/7 9/10
 11/4 12/11 14/24 15/23 17/23 20/24 21/3
 24/12 24/18 24/24 25/21 25/21 27/12
 28/2 28/16 31/16 32/15 33/14 34/15
 35/13 35/18 36/3 38/8 38/10 38/23 43/25
 44/13 45/5 45/6 46/1 46/2 49/6 49/25
 50/4 50/6 51/9 52/8 53/5 57/24 58/10
 58/11 58/11 60/19 61/1 61/17 62/20 63/5
 63/14 63/23 64/7 70/7 72/2 75/24 77/16
 80/1 80/5 81/21 82/14 84/10 86/17 87/4
 89/20 90/13 92/4 94/1 97/9 97/11 97/13
 100/19 101/11 103/5 103/9 106/7 106/9
 112/17 114/9 115/23 116/2 116/7 116/24
 117/8 117/10 117/14 118/14 121/25
 122/10 124/24 125/5 126/12 126/18
 127/16 128/13 130/2 130/10 130/18
 139/14 149/18 149/20 149/22 150/23
 151/13 151/17 151/18 152/9 155/19
 156/2 156/15 156/17 157/2 165/13
 167/10 170/17 173/10 174/7 174/8
 174/15 180/10 180/11 180/25 183/21
 186/2 188/21 189/7 189/8 190/4 190/7
 192/3 192/21 194/8 198/1 199/15 200/15
 204/19 206/6 206/10 206/10 206/22
 207/24 208/17 209/20 210/11 212/12
 212/16 214/7 216/6 217/12
whichever [1]  214/11
while [20]  12/7 13/5 19/15 45/13 60/7
 60/24 69/4 69/6 70/23 71/19 75/6 76/15
 84/21 87/21 88/12 89/9 113/25 132/6
 205/15 218/6
who [85]  5/20 6/17 6/20 7/23 8/10 10/15
 11/22 13/6 20/7 20/15 29/24 30/25 31/7
 31/19 35/6 35/7 35/8 35/9 35/10 35/10
 40/16 40/17 40/18 40/21 41/4 47/12 52/3
 52/5 57/5 59/3 59/10 60/13 64/16 65/1
 67/13 69/9 72/23 72/23 81/18 82/2 83/9
 83/24 85/15 92/14 102/25 103/7 113/24
 123/23 123/25 124/4 124/5 124/6 124/6
 139/11 139/12 139/25 143/22 143/24
 148/10 148/10 150/14 151/24 154/7
 157/3 159/18 160/18 160/20 161/5
 161/12 167/3 167/25 169/1 169/1 175/8
 190/6 190/23 191/1 198/2 207/24 208/22
 209/11 209/12 209/24 210/23 212/24
who's [1]  75/3
whoever [1]  34/21 34/22 192/23
whole [9]  17/24 29/25 36/4 37/3 79/23
 85/11 87/20 168/12 173/9
whom [5]  8/12 65/21 121/3 126/24

**W**

whom... [1] 143/19
whose [3] 20/8 139/12 154/14
why [35] 21/6 24/14 29/23 42/11 43/14
55/24 61/11 62/9 62/25 65/5 73/16 79/13
89/1 130/14 146/8 151/25 153/3 155/11
158/20 158/24 160/4 170/21 172/16
179/4 179/25 191/3 195/17 195/17
195/18 195/18 195/22 196/5 196/6
196/16 198/17
widely [1] 113/16
wildest [1] 178/14
will [147] 8/20 9/4 9/15 11/2 11/12 11/13
11/23 12/20 16/16 17/22 18/2 18/13
24/10 25/5 25/9 26/2 26/15 26/21 27/7
27/18 28/9 28/15 30/8 30/10 30/14 30/18
30/19 31/5 32/22 32/24 32/25 33/16
33/20 34/16 35/2 35/4 35/20 37/9 38/3
41/15 45/18 48/1 48/1 54/23 55/22 55/23
56/13 56/18 56/19 58/7 59/2 59/3 59/8
59/8 60/7 60/10 62/18 62/21 63/21 63/25
64/2 64/24 65/6 77/19 77/22 77/23 77/25
78/1 78/4 79/17 81/12 85/18 85/22 89/20
93/21 98/16 101/6 101/21 101/23 101/25
102/3 103/4 103/5 107/3 107/4 109/7
109/12 109/12 109/18 109/21 112/6
113/20 113/25 119/15 119/16 120/17
126/19 135/10 135/13 140/21 140/22
141/14 141/23 146/10 148/13 152/24
158/6 158/25 162/12 175/1 176/10 178/2
183/25 184/2 185/2 186/5 187/6 188/6
188/19 188/24 189/13 189/14 190/11
190/12 191/19 192/3 192/13 197/19
198/6 199/8 199/15 201/15 201/20
206/21 207/18 207/23 208/13 208/14
212/13 212/24 213/16 214/5 216/7
217/14 219/7 219/11 222/17
Williams [1] 16/23
willing [2] 166/25 171/4
win [1] 186/2
wind [16] 45/10 61/4 89/2 89/6 89/13
89/15 89/17 89/18 93/3 93/6 93/14 94/13
94/24 94/25 95/13 96/23
winds [1] 72/21
wipe [1] 140/13
wiped [1] 35/19
wise [2] 33/24 117/3
wish [3] 6/8 39/9 79/18
wishes [2] 207/25 219/12
withdraw [3] 79/18 80/10 215/13
within [39] 51/18 51/23 71/21 73/9 73/11
76/4 76/16 78/2 83/7 84/20 85/4 85/15
85/16 85/25 87/8 87/14 88/14 88/17
88/25 90/12 92/14 92/15 92/22 95/1 96/1
97/1 97/18 142/20 151/18 151/22 152/19
153/4 153/22 159/9 161/8 182/4 193/23
209/4 209/24
without [11] 10/22 10/24 26/20 29/10
105/4 153/19 162/23 168/10 171/24
175/21 214/18
witness [21] 64/23 64/25 100/24 100/25
101/19 113/21 114/7 118/25 119/3 119/6
119/18 148/8 166/2 181/3 191/12 195/25
199/24 200/25 202/1 203/10 221/1
witnesses [4] 11/20 12/2 101/6 200/17
woefully [1] 45/4
won [1] 166/20
won't [4] 6/7 112/9 187/9 224/1
wonder [2] 30/9 98/15
wonderful [1] 207/18
wondering [1] 142/9
Woodward [2] 2/19 9/24

word [11] 36/18 116/9 116/9 117/11
152/10 166/16 169/1 189/11 190/9 197/3
197/22 215/25
word-by-word [1] 116/9
words [9] 8/17 26/9 85/12 91/8 113/4
118/17 142/10 171/5 175/12
wore [1] 222/19
work [40] 48/3 54/3 67/25 72/13 72/20
72/21 73/24 74/3 78/6 100/10 104/25
116/14 118/5 122/3 128/3 128/11 128/12
129/7 129/12 130/13 130/19 130/20
130/21 132/3 144/8 149/7 154/15 157/4
159/13 164/13 166/10 169/5 181/21
182/10 182/12 186/6 189/22 209/1 213/7
217/14
worked [10] 51/1 72/4 72/8 72/15 73/1
117/5 117/18 143/20 154/13 200/5
working [8] 56/12 72/11 100/8 107/18
152/11 152/11 181/21 182/1
works [5] 32/17 71/19 110/13 129/3
169/8
world [3] 63/11 150/5 186/3
worn [1] 200/20
worse [1] 59/24
worth [2] 168/1 190/12
worthy [1] 201/6
would [300]
wouldn't [8] 55/19 129/21 130/22 145/12
146/24 165/18 167/14 178/10
wreaked [1] 5/17
wretched [1] 187/9
Wright [1] 1/21
write [4] 174/15 192/11 192/22 196/5
writing [1] 6/4 192/17 192/19 203/14
written [11] 26/16 124/13 125/5 127/12
127/15 127/17 127/20 148/2 157/23
173/15 193/3
wrong [9] 36/7 43/14 44/3 125/15 130/5
195/13 214/19 219/9 219/20
wrongful [4] 97/25 165/13 173/11 210/22
wrote [6] 116/7 126/8 177/25 178/1
192/24 199/8

**X**

XII [1] 49/10

**Y**

Y'all [1] 181/15
yeah [6] 97/7 145/1 151/7 165/15 176/6
182/9
year [13] 17/12 44/6 74/9 74/9 109/3
109/10 110/10 110/12 110/12 128/10
131/21 132/5 173/12
years [21] 10/12 35/7 35/11 44/24
107/18 112/21 115/6 116/7 117/6 126/18
128/22 129/2 130/2 138/25 145/10
145/12 147/21 149/9 154/24 185/25
203/13
yes [136] 33/3 34/2 34/11 36/18 38/24
47/6 49/8 58/3 62/19 65/17 65/24 66/18
67/3 70/5 70/22 71/19 77/25 79/7 79/19
81/17 82/5 82/16 83/4 83/17 83/20 86/8
88/20 89/4 89/7 89/25 90/2 91/14 92/12
92/16 94/7 96/16 98/19 101/1 102/7
105/13 108/25 109/4 109/4 110/19
113/10 113/15 113/15 114/6 115/13
115/18 115/21 116/18 118/7 118/22
119/2 119/8 119/12 120/1 120/7 121/15
122/8 124/14 125/4 125/7 130/9 131/10
132/2 132/12 132/22 133/22 134/5
136/13 136/13 137/16 140/6 142/22
143/10 144/11 144/21 145/20 146/5
148/9 148/13 150/4 150/12 162/2 172/16

174/17 177/21 179/22 180/1 181/12
182/17 183/3 184/7 185/2 185/16 185/18
187/20 189/24 190/8 193/9 193/11
194/16 199/1 199/5 199/18 199/20
200/25 201/8 202/9 203/5 204/15 204/18
204/21 204/23 205/3 205/12 207/7 208/6
210/10 210/13 214/15 214/18 217/17
219/6 219/17 220/24 221/1 221/8 222/25
yesterday [2] 12/6 57/16
yet [11] 8/14 11/17 16/6 22/18 44/16
81/6 152/1 171/15 186/11 186/12 223/3
you [630]
you'll [5] 37/10 78/18 141/5 193/20 198/6
you're [43] 11/24 20/18 29/17 40/8 40/8
40/11 58/18 60/1 60/20 60/20 60/21 61/4
61/5 61/6 62/22 99/4 109/8 117/1 126/14
128/25 131/18 132/13 138/17 139/6
139/10 139/13 139/16 140/12 140/16
145/4 146/17 147/7 174/8 181/10 181/21
184/16 184/16 215/6 215/23 216/1 217/3
218/22 219/18
you've [3] 62/14 126/22 204/4
your [211] 12/6 12/16 12/19 13/5 13/9
13/14 13/20 13/23 13/25 14/3 16/13
20/11 21/6 21/6 21/17 22/11 24/16 26/21
27/1 27/18 28/4 28/20 34/11 35/15 36/21
38/24 40/5 40/23 41/22 41/25 42/4 42/10
42/12 45/8 45/12 48/11 50/22 54/9 56/16
56/21 57/15 62/6 62/22 64/1 64/10 64/20
65/9 65/15 65/19 65/25 66/3 66/5 66/10
66/24 67/7 67/11 67/19 71/13 73/17 75/9
76/25 78/9 79/8 79/14 79/17 80/6 81/5
81/15 83/2 84/14 89/22 97/4 98/7 99/13
100/6 100/6 100/7 100/18 101/1 101/4
101/8 101/19 102/19 103/21 104/8 104/9
104/15 104/17 105/12 106/2 107/14
107/20 107/24 108/6 108/16 108/20
111/24 112/13 114/7 114/15 114/18
114/22 115/3 115/7 116/14 117/20 118/5
119/17 119/23 120/3 120/8 120/12
120/13 120/23 122/4 125/6 125/10
126/25 127/14 127/24 128/6 130/25
134/3 134/16 138/13 140/21 142/4 144/8
144/23 145/19 146/17 148/6 148/13
148/15 148/19 149/5 149/5 149/6 157/23
158/5 159/3 159/19 162/17 164/7 164/18
165/23 166/10 166/11 166/11 168/7
170/9 171/8 171/8 174/17 175/10 175/24
178/3 178/22 178/24 179/4 179/13 181/3
181/5 183/17 187/12 188/15 189/14
189/21 191/12 191/17 193/2 195/6
195/24 197/19 199/2 199/7 199/12
199/18 200/25 201/1 201/3 201/6 201/23
202/1 202/2 202/11 202/23 203/23
203/23 204/16 204/16 204/22 205/4
205/12 205/21 206/20 207/7 207/22
213/25 214/13 216/14 217/17 219/4
219/17 219/18 219/22 220/7 220/10
220/13 221/5 223/13
Your Honor [89] 12/6 12/19 13/9 13/14
13/20 14/3 21/6 22/11 24/16 26/21 27/1
27/18 28/4 34/11 35/15 36/21 38/24
40/23 41/22 41/25 42/4 42/10 42/12 45/8
45/12 48/11 50/22 56/16 56/21 57/15
62/22 64/10 66/5 78/9 79/14 98/7 100/18
101/8 101/19 102/19 103/21 104/8 104/9
104/15 105/12 106/2 107/14 107/20
112/13 114/7 114/18 120/8 120/12
120/13 120/23 140/21 145/19 148/6
158/5 159/19 175/10 178/22 179/13
181/3 183/17 189/14 191/12 191/17
197/19 199/2 199/18 201/3 201/23 202/2

## Y

Your Honor... [15]  202/11 204/22 205/4
 205/12 205/21 206/20 207/22 213/25
 216/14 217/17 219/17 219/22 220/10
 220/13 223/13
Your Honor's [1]  21/17
yours [1]  7/12
yourself [2]  81/16 108/21

## Z

zero [4]  32/2 33/20 61/25 172/2
zip [1]  68/20
Zwain [3]  2/9 2/10 13/20
Zwain's [1]  206/12