UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| | § | |

### UNITED STATES' MEMORANDUM SEEKING
### ADMISSION OF DEFENSE PROFFERS

On repeated occasions throughout the trial, Plaintiffs objected to questions that sought to elicit opinions from the United States' experts which Plaintiffs contended were beyond the scope of the United States' expert reports, or which Plaintiffs argued was otherwise inadmissible. To preserve these issues, the Court allowed the United States to make proffers of the evidence to which Plaintiffs objected. The Court then established a briefing schedule to allow the United States to move for the admission of the proffered evidence. Doc. 18842. The proffers at issue are as follows:

| Proffer Number | Witness | General Topic | Trial Transcript Pages |
|---|---|---|---|
| Defense 1 | Tanya Smith | DX 73, DX 74, DX 75 | 502-503 |
| Defense 2 | Bruce Ebersole | Resio Supplemental | 2196-2198 |
| Defense 3 | Bruce Ebersole | Resio Supplemental | 2216-2224 |
| Defense 4 | Reed Mosher | Lateral Deformation | 2989-2991 |
| Defense 5 | Reed Mosher | Lateral Deformation | 3013-3055 |
| Defense 6 | Johannes Westerink | Flux | 3764-3773 |
| Defense 7 | Johannes Westerink | Flux | 3786-3794 |
| Defense 8 | Johannes Westerink | Flux | 3856-3857 |
| Defense 9 | Johannes Westerink | Flux | 3869-3870 |
| Defense 10 | Thomas Wolff | Kaufman and Weaver | 3992 |
| Defense 11[1] | Scott Taylor | DX 32 and 33 | 1655 |

For the reasons stated below, the evidence proffered by the United States should be admitted (or in the case of proffered demonstratives, considered and filed in the record).

ARGUMENT

I. <u>Evidence of Non-Collateral Source Payments Should Be Admitted.</u>

Prior to trial, the Court sustained Plaintiffs' objection challenging the relevance of exhibits DX 73, DX 74, and DX 75. Doc. 18617. These exhibits are authenticated excerpts from the FEMA files of Anthony Franz, Kent Lattimore, and Tanya Smith. The exhibits establish the disbursements that the United States made to these Plaintiffs.

---

[1] This proffer was not numbered during trial but was nonetheless an offer of a proof by the United States. For uniformity, this proffer is herein designated as Defense Proffer 11.

The Louisiana collateral source rule provides that "a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution." *Bozeman v. State*, 879 So. 2d 692, 698 (La. 2004). The FEMA grants received by these Plaintiffs were not "independent of the [United States'] procuration or contribution." *Id.* Like the TRICARE and CHAMPUS benefits received by members of the armed services, the FEMA payments were funded by the United States without contributions from Plaintiffs, and they therefore are not collateral source payments. *See Mays v. United States*, 806 F.2d 976, 977-78 (10th Cir. 1986); *Kennedy v. United States*, 750 F. Supp. 206, 213 (W.D. La. 1990).

As the only evidence quantifying the payments made by FEMA to these Plaintiffs, DX 73, DX 74, and DX 75 are necessary for the proper calculation of damages in the event liability is imposed. Therefore, the exhibits in Defense Proffer 1 are relevant and should be admitted into evidence. Plaintiffs' damages should be reduced in accordance with the FEMA payments if liability is imposed.

## II. Proffers 2 and 3 Come in with the Supplemental Resio Report.

Plaintiffs objected to testimony of Defendant's expert Bruce Ebersole relating to the supplemental report of Defendant's expert Donald T. Resio. Tr. 2044:3-18, 2187:5-2189:4. Because the Court had not yet determined the admissibility of the Resio report, it required this Ebersole's testimony to be proffered pending its ruling on the Resio report. Tr. 2188:23-25. The parties agreed to this approach. Tr. 2189:1-4.

The Court eventually deemed Dr. Resio's supplemental report admissible and allowed Dr. Resio to testify about it.  Tr. 2816:17-18.  Defense Proffers 2 and 3 should be therefore now be admitted and considered by the Court.

### III. Proffers 4 and 5 Should Be Admitted to Rebut Testimony Improperly Elicited.

On April 9, 2009, Plaintiffs voluntarily withdrew the untimely April 3, 2009, report of their expert Robert G. Bea to avoid the trial continuance that justice would otherwise have required in fairness to Defendant, who was surprised by the novel opinions set forth in the eleventh-hour report.  Doc. 18511.  The withdrawal was prompted by the United States' then-pending motion to exclude the report in which "Dr. Bea had significantly changed his theory of causation concerning MRGO-induced levee sinkage from 20% in his January report to 50% . . . .  The Government argued that such a significant change in his report which was late filed and the extensive appendix which allegedly provided the scientific support for this theory received in essence two weeks before trial would significantly prejudice the Government at trial."  *Id.*

Despite this withdrawal, and the implicit acknowledgment of extreme prejudice to Defendant by the late disclosure of newly formed expert opinions, Plaintiffs' counsel deliberately elicited the withdrawn prejudicial opinion during the direct examination of Dr. Bea:

4

>BY MR. O'DONNELL:
>
>Q. In that deposition in February 2009, were you also asked to estimate how much of the central section of Reach 2 between Bayou Bienvenue and Bayou Dupre you considered to be a victim or have had this phenomenon occur to its crowns at the time of Katrina?
>
>A. Yes.
>
>Q. And what did you estimate?
>
>A. Thirty percent.
>
>*Q. What did you later conclude it was?*
>
>*A. Fifty percent.*

Tr. 1112:15-24 (emphasis added).

Despite having just elicited an opinion set forth only in the withdrawn report, Plaintiffs' counsel made this response when counsel for the United States objected to Dr. Bea's testimony:

>MR. O'DONNELL: No. I will represent to the Court that we are acidulously [sic] not going into the April 3, 2009 report. Correct, Dr. BEA?
>
>The WITNESS: Correct.
>
>MR. O'DONNELL: Rather I am going to show you the state of his knowledge up to the time of his reports and deposition will answer one of the Court's questions how much about the lateral subsidence contributed to lowering of the crowns in this area. I am not relying on the April 3 research.
>
>. . . .

>MR. O'DONNELL: I'll represent to you that his conclusions pre-April report are not inconsistent and the April 3 report was a mere refinement. So I believe Mr. Bruno in discretioning [sic] the better part of valor withdrew that report because we were pretty confident we had prior information.

Tr. 1113:7-23.[2]

Contrary to the representation of Plaintiffs' counsel, the April 3 report was not "a mere refinement." And whatever "prior information" Plaintiffs were "confident" of having, it did *not* include either the 50% opinion or any details in support of that opinion. The opinion and supporting documentation were provided *only* in the withdrawn eleventh-hour report. Because Plaintiffs deliberately elicited the substance of that withdrawn opinion, justice and fairness require that Defendant's rebuttal evidence be admitted.

Dr. Bea's trial testimony drastically altered his prior opinions with regards to both the scope and effects of the lateral deformation allegedly caused by the MRGO. Instead of lateral deformation caused by the MRGO occurring at 15-20% of the Reach 2 levee, his trial testimony was that fully half of the Reach 2 levee had subsided because of the channel.[3] At

---

[2] Based on Plaintiffs' counsel's representation that "we are acidulously not going into the April 3, 2009 report," counsel for the United States withdrew the objection. Tr. 1113:16.

[3] In his July 2008 expert report, Dr. Bea opined that "in some cases the MR-GO channel banks . . . encroach[ed] into the 'critical areas' adjacent to the [Reach 2 levee] . . . result[ing] in significant decreases in the crown elevations of the [levee]." PX 72 at 177-78 (Ex. A). On January 30, 2009, at his deposition, Dr. Bea briefly elaborated on this nonspecific opinion, testifying that these decreases had only occurred in places where the levee had been repaired with sheetpiles. Tr. 1287:5-1288:10; 1302:22-1306:1; *see also* Bea Dep. at 82:8-83:12 (Ex. B). The repaired sections constituted only 14% of the Reach 2 levee, Tr. 1302:22-1306:1, and Dr. Bea testified that these sections did *not* fail during the hurricane, Tr. 1288:10-19. When deposed a month later, Dr. Bea estimated that 20% of the Reach 2 levee had subsided because of the widening of the MRGO. Bea Dep. at 733:22-734:8, 736:23-737:17 (Ex. B).

6

no time prior to his April 3 report did Dr. Bea estimate the proportion of subsidence that was attributable to the MRGO as opposed to other factors. As he candidly admitted, the opinions that he expressed at trial were based upon analyses conducted after his depositions—long after the deadline for producing his expert report:

> Q. You say at this point – I can show it to you if you like, Dr. Bea, but it says "My recollection is something on the order of 20 percent, 15 percent."
>
> A. Okay. Thank You.
>
> Q. That's not super important here. But then you though you said 30 percent. But Friday you said 50 percent, right?
>
> A. *That's correct. We continued to work since January as I said in my last deposition with you.*
>
> Q. *But now that's an expansion of the number of areas that you claim are subject to this squeezing effect?*
>
> A. *And that's correct.*

Tr. 1304:10-20 (emphasis added). By deliberately inviting Dr. Bea to present opinions based upon the withdrawn report, Plaintiffs opened the door to testimony from the United States rebutting those opinions. The admission of those opinions—which Plaintiffs voluntarily withdrew shortly before trial to avoid unfair prejudice to Defendant—requires the admission of rebuttal testimony by Defendant's experts. *See, e.g.*, *Adams v. Fuqua Indus., Inc.*, 820 F.2d 275-76 (8th Cir. 1987) (excluding rebuttal evidence concerning subject that plaintiffs opened door to was reversible error); *see also Markovich v. Bell Helicopter Textron, Inc.*, 805 F. Supp. 1231, 1240-41 (E.D. Pa. 1992) ("Having introduced this testimony during their

7

case-in-chief, the plaintiffs cannot preclude the defendants from offering testimony in their case-in-chief to rebut the statements made by [the plaintiff's expert].").

In his proffered testimony, Dr. Reed Mosher explained the major flaws underlying Dr. Bea's April opinions. Tr. 3041:10-3055:10. Because Dr. Mosher's proffered opinions were elicited by the eleventh-hour Bea report, it would be unreasonable and unfair to exclude them solely because the went beyond Dr. Mosher's timely expert report. The timely opinion of Dr. Bea concerning MRGO "encroachment," set forth in his July 2008 report, was too general to warrant a response. *See supra* n.3. And plainly, given Plaintiffs' voluntary withdrawal of the untimely Bea report, there was no reason for Dr. Mosher to have framed a supplemental report in the limited time prior to trial.

But even if that were not so, Dr. Mosher's proffered testimony should be admitted. In his expert report, Dr. Mosher explained that the MRGO levee lost elevation because of regional subsidence and consolidation of soils below the levee. JX 212 at 9 (Ex. C); *see also* Tr. 3096:11-19. Further, at his deposition Dr. Mosher explained that he did not evaluate the alleged role the MRGO had in causing the Reach 2 levee to sink because the factor of safety used to construct the levee were approximately 1.3. Mosher Dep. at 166:4-167:11 (Ex. D). He explained that if lateral deformation caused by the MRGO were occurring along Reach 2, tilting and cracking of the levee would be visible. *Id.* at 167:12-197:15 (Ex. D). Otherwise, lateral deformation would be expected to occur on both sides (protected and flood) of the levee, as it regularly does in other embankments. *Id.* Plaintiffs' had ample time to prepare and counter Dr. Mosher's testimony pertaining to lateral displacement. Because Dr.

8

Mosher's deposition testimony presaged his trial testimony, Tr. 3019:7-3037:1, Plaintiffs are not prejudiced by admission of the proffers. *See Davis v. Parker Drilling Co.*, 01-cv-2355, 2003 U.S. Dist. LEXIS 5822, at *2-4 (E.D. La. Apr. 7, 2003) (Berrigan, J.) (no prejudice results from allowing testimony beyond scope of expert report if testimony is elicited by party opponent after report is tendered because testimony is no longer unexpected); *see also S. Pac. Transp. Co. v. Builders Transp., Inc.*, 90-cv-3177, 1993 U.S. Dist. LEXIS 7380, at *48 (E.D. La. May 25, 1993) ("Where an expert obtains information between the time his formal expert report is submitted and the time of his deposition, and the expert is questioned on the recently obtained information at his deposition, the deposition functions much like a supplemental expert report, and may be said to 'expand' the scope of the formal expert report.").

     Finally, the proffered testimony should be admitted because any prejudice suffered by Plaintiffs was curable. Plaintiffs sponsored the introduction of eleventh-hour report in its entirety during Defendant's cross-examination of Dr. Bea. Tr. 1415:9-15 ("Judge, we can introduce the whole thing. That would be fine."). Plaintiffs then had an opportunity to fully develop the opinions in this report on redirect. *See, e.g.*, *Haney v. Mizell Mem'l Hosp.*, 744 F.2d 1467, 1477 (7th Cir. 1984) ("If [the plaintiff's] counsel was not satisfied with the answers elicited from his witness on cross-examination, he had ample reason and opportunity to remedy this situation on redirect examination."); *Hayes v. Cha*, 338 F. Supp. 2d 470, 506 (D.N.J. 2004) (explaining that exhibit introduced during cross-examination could have been

9

dealt with during redirect examination). Plaintiffs opened the door to this testimony. Proffers 4 and 5 should be admitted.

## IV. Proffers 6-9, Derived Entirely from Expert Reliance Data, Should Be Admitted.

Defense Proffers 6 through 9 pertain to the flux plots that were generated from DX 1757. This exhibit is the ADCIRC output data file of storm surge simulations that formed the basis of the opinions set forth in the expert report of Johannes Westerink. This output file contains all of the data for the *only* set of ADCIRC storm surge simulations that Dr. Westerink conducted for this trial.[4] These data were used to produce the storm surge elevation plots and surge velocity plots that were used as demonstratives to illustrate Dr. Westerink's opinion testimony at trial. Tr. 3743:2 – 3758:6. The volume of surge at any location is a function of the surge elevation (and depth) and that volume is in flux because the water is moving. The velocity represents the rate of movement.

The flux plots should be entered into the record as demonstratives because they simply combine the data from the elevation plots and the velocity plots into a single plot showing how the volume of surge varies throughout the region during the storm. Tr. 3758:11-25; 3764:3-21. The flux plots "look at where that water came from and how it got to the region." Tr. 3764:15-16. They show changes in the volume of water across the region during Hurricane Katrina. Tr. 3764:3-21, 3767:14-25. The omission of these plots

---

[4] As Dr. Westerink testified at trial, a number of graphics included in his expert report erroneously came from a prior ADCIRC simulation conducted on behalf of FEMA. Tr. 4143:18-4146:6. However, Dr. Westerink only conducted one set of ADCIRC simulations for this litigation. *Id.* That data set was the *only* data provided to other experts for the United States by Dr. Westerink. *Id.*

from Dr. Westerink's report does not require their exclusion, because they depict the same data as are depicted in the velocity and elevation plots that have been included in the record. *E.g.*, DM 38 at 97-115, 173-191, 249-267, 326-329 (Ex. E). The flux plots, like the elevation and velocity plots, were generally used by Dr. Westerink to explain the movement of water during the hurricane and were specifically used as an aid to understanding why storm surge in and around the St. Bernard polder rose in the late morning hours of August 29 after it had begun to subside. This phenomenon was depicted by a second peak that appears in the hydrographs that were generated by both Plaintiffs' Dutch surge modelers and Dr. Westerink and were admitted into evidence.

Significantly, *all of the data* used to construct the flux diagrams were produced to Plaintiffs well before trial. The flux plots are therefore analogous to the Plaintiffs' geographic-information-system ("GIS") exhibits illustrating Reach 2. Like the flux plots, many of Plaintiffs' exhibits depicting the MRGO channel and the LPV levees were not included in any of Plaintiffs' expert reports. *See, e.g.,* Tr. 322:12-13. They were not produced to Defendant prior to trial, and Defendant's objection to them was overruled. Tr. 325:9 – 327:12. Plaintiffs' Reach 2 maps were generated by Plaintiffs for use at trial from a GIS data

set that Plaintiffs produced with other reliance materials.[5] Over Defendant's objection, Plaintiffs' expert Duncan FitzGerald was permitted to render opinions based on calculations that were not in his report and that he did not perform but that were extracted from the GIS data.  Tr. 322:12 – 327:12; 420:14 – 422:1.

Defendant's use of the ADCIRC data to create flux plots for use at trial was less prejudicial than Plaintiffs' use of the GIS data to create exhibits that were admitted into evidence. Plaintiffs manipulated the GIS data to create and modify exhibits *during the course of the trial.* Plaintiffs presented their ability to manipulate the GIS data as a boon to be exploited, informing the Court, "Judge, that's the point I want to make to you, really.  The GIS that you've received, anything that you want us or the Defendants to do, we can manipulate this data so that you can see whatever you want to see, it's your call." Tr. 2293:14-17.  And they did manipulate the data to modify an exhibit during their direct examination of Duncan FitzGerald.  Tr. 355:24 – 337:22.  But when counsel for the United States requested that information culled by Plaintiffs from the GIS data be provided to Defendant, she was rebuffed.  Tr. 326:18 – 327:12; 441:21 – 446:8.  Other graphics created by Plaintiffs to illustrate their experts' opinions were allowed to be used as demonstratives even though they were not included in the experts' reports.  Tr. 361:19 – 366:9.

---

[5] The GIS database, PX 1810-1877, was produced to the United States on March 31, 2009, months after Chad Morris produced his July 13, 2008 expert report.  Doc. 18358. Neither the word "GIS" nor the word "database" appears in Mr. Morris's expert report, JX 191, and Defendant had absolutely no notice that Plaintiffs intended to use the GIS data to produce demonstratives.  Further, after trial began and Plaintiffs' manipulation of the GIS data became evident, Defendant's experts were unable to access the GIS data because the files produced by Plaintiff lacked the necessary index.

Defense Proffers 6 through 9 illustrate and pertain to opinions set forth in Dr. Westerink's report, opinions also supported by the surge elevation and velocity plots that are in the record as demonstratives.  Dr. Westerink's proffered testimony concerning fluxes provides additional detail concerning the movement of surge during the storm.  Like the elevation and velocity plots, the flux plots document the second storm surge peak.  The Court should admit the testimony and evidence contained in these proffers.  *See Shuck v. CNH Am., LLC*, 498 F.3d 868, 875-76 (8th Cir. 2007) (permitting expert to expand bases for his opinion at trial when ultimate conclusion of expert report was unchanged); *James v. McKenna*, 02-318, 2003 U.S. Dist. LEXIS 13982, at *13-15 (E.D. La. Aug. 4, 2003) (Duval, J.) (concluding expert opinion's regarding weight of patient were within scope of expert report that discussed patient's clinical condition and co-morbidity factors).

## V. Proffer 10 Is Undisputed and Should Therefore Be Admitted.

Defendant's expert Thomas Wolff proffered testimony about a published article that discusses the testing conducted on levees at the Atchafalya River, DX 3.  The proffered testimony only addresses whether the paper studied the stability of levees next to a waterway.  Similar evidence was adduced elsewhere during trial.  *E.g.*, Tr. 1300:5 – 1301:11.  Accordingly, the proffered testimony of Dr. Wolff is not in dispute and should be admitted.

## VI. Proffer 11, Hearsay Within an Exception, Should Be Admitted.

Prior to trial, Plaintiffs objected to DX 32 and DX 33 as hearsay.  Believing that these exhibits had been withdrawn, the Court did not rule on the objection.  Doc. 18617.  The

13

United States had not withdrawn these exhibits, however.[6]  Doc. 18617.   These internet advertisements of mobile homes for sale in southern Louisiana in early 2008 were produced by Plaintiffs' damages expert, Scott Taylor.  *See* Taylor Dep. at 173:25-175:22 (Ex. F).  Each of the advertised mobile homes was slightly larger and newer than the one owned by Plaintiff Kent Lattimore.  *Id.*  Therefore, DX 32 and DX 33 provide comparable values useful in calculating the value of the Lattimore mobile home that was damaged by Hurricane Katrina.

Federal Rule of Evidence 803(17) provides that "[m]arket quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations" are excluded from the hearsay rule.  This rule includes commercial publications obtained on the internet.  *Flitton v. Primary Residential Mortgage, Inc.*, 03-cv-481, 2008 WL 4911225, at *3 (D. Utah Nov. 13, 2008).  Accordingly, Defense Proffer 11 should be admitted and the Court should consider DX 32 and DX 33 as evidence of comparable real estate values for the property lost by Mr. Lattimore.

---

[6]DX 32 is a duplicate of DX 176A, and DX 33 is a duplicate of DX 176B.  All four exhibits are attached hereto.  DX 176 is the report of Plaintiffs' expert Scott Taylor.  DX 32 and DX 33 are listed on the United States' final exhibit list.  Doc. 18816.

## CONCLUSION

For these reasons, Defendant's proffered testimony and exhibits should be admitted into evidence and the proffered demonstratives should be included in the record and considered by the Court.

Respectfully submitted,

TONY WEST
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR
Assistant Director, Torts Branch

ROBIN DOYLE SMITH
Senior Trial Counsel, Torts Branch

 s/ Paul Levine
PAUL LEVINE
Trial Attorney, Torts Branch
Civil Division
U.S. Department of Justice
Benjamin Franklin Station P.O. Box 888
Washington, D.C.  20044
(202) 353-2574 / (202) 616-5200 (fax)
Dated: June 15, 2009                        Attorneys for the United States

## CERTIFICATE OF SERVICE

    I, Paul Levine, hereby certify that on June 15, 2009, I served a true copy of the foregoing upon all counsel of record by ECF.

                                      /s/ Paul Levine
                                      Paul Levine