# EXHIBIT B

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
                        --oOo--
IN RE KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION,
                              No.  05-4182 "K" (2)

PERTAINS TO:  ROBINSON, NO.
06-2268
_____

            DEPOSITION OF ROBERT GLENN BEA
                Friday, January 30, 2009








Reported By:
KATHLEEN WILKINS, CSR #10068, RPR, CRR
```

Page 1

```
1          DEPOSITION OF ROBERT GLENN BEA
2          BE IT REMEMBERED that on Friday, January
3    30, 2009, commencing at the hour of 8:39 a.m.
4    thereof, at GOODWIN PROCTER LLP, Three Embarcadero
5    Center, 24th Floor, San Francisco, California,
6    before me, Kathleen A. Wilkins, RPR, CRR, CRP, a
7    Certified Shorthand Reporter, in and for the State
8    of California, personally appeared ROBERT GLENN
9    BEA, a witness in the above-entitled court and
10   cause, who, being by me first duly sworn, was
11   thereupon examined as a witness in said action.
12            APPEARANCES OF COUNSEL
13   Plaintiffs Liason Counsel:
14       LAW OFFICES OF JOSEPH M. BRUNO
         BY: JOSEPH M. BRUNO, Attorney at Law
15           ROB WARREN, Attorney at Law
             (appearing phonetically)
16       855 Baronne Street
         New Orleans, Louisiana 70113
17       Telephone:  (504) 525-3780
         E-mail:  Jbruno@jbrunolaw.com
18
     For the Defendants:
19
         THE U.S. DEPARTMENT OF JUSTICE
20       TORTS BRANCH, CIVIL DIVISION
         BY:  RICHARD R. STONE, SR., Attorney at
21           Law
             ROBIN DOYLE SMITH, Attorney at Law
22           DAN BAEZA, Attorney at Law
         1331 Pennsylvania Ave., NW, Room 8002N
23       Washington, DC  20004
         Telephone:  (202) 616-4291.
24       E-mail:  Richard.stone@usdoj.gov
         Robin.doyle.smith@usdoj.gov
25
```

Page 3

```
1                    INDEX
2               INDEX OF EXAMINATIONS
3                               PAGE
4    EXAMINATION BY MR. STONE .......................7
5    AFTERNOON SESSION ............................96
6               INDEX OF EXHIBITS
7    Bea         Description             Page
8    Exhibit 1   Document entitled, "Amended .......7
                 Notice of Videotaped
9                Deposition"
10                   ---oOo---
```

Page 2

```
1         APPEARANCES OF COUNSEL (Continued)
2    For Lafarge North American, Inc.:
3        GOODWIN & PROCTER
         BY:  MARK S. RAFFMAN, Attorney at Law
4        901 New York Avenue, N.W.
         Washington, D.C.  20001
5        Telephone:  (202) 346-4000
         E-mail:  Mraffman@goodwinprocter.com
6
     For Universal Health Services, et al.:
7
         (Telephonically present)
8        SHER GARNER CAHILL RICHTER KLEIN &
         HILBERT, L.L.C.
9        BY:  MELLISSA M. ROME, Attorney at Law.
         909 Poydras Street, Suite 2800
10       New Orleans, LA 70112
         Phone: 504-299-2100
11       E-mail:  Mrome@shergarner.com
12   Telephone participants:  Tom Wolff, Ph.D.; Don
     Resio; Bruce Ebersole; Reed Mosher
13
     ALSO PRESENT:  Benjamin Gerald, Videographer; Dawn
14   Miller and Nina Cortiella
15             --oOo--
```

Page 4

1 (Pages 1 to 4)

BEA, ROBERT

1/30/2009

## Page 81

A. Because we're concerned with two aspects. One's stability and one's erosion and its implications on the structures.

(Discussion held off record.)

MR. STONE: Q. Is there something in the -- I won't belabor this much longer, but is there something in the design that would -- from which you could infer that the information obtained in the Atchafalaya tests weren't included in the Design Memorandum 3?

A. We couldn't find any evidence that there was included.

Q. I see.

Now, this whole discussion that we've just had, we've been talking about foreshore protection, right?

A. We've been talking about two things.

Q. Okay. What are they?

A. The integrity of the adjacent manmade flood protection structures. The other aspect is the integrity of the Mississippi River Gulf Outlet hydrologic structure.

Q. Okay. But all that has to do with is the fact that there was erosion along the MRGO, correct?

## Page 82

A. That is incorrect.

Q. Okay. First thing is the structures and their integrity.

A. Correct.

Q. What is your evidence that erosion caused failure of the structures -- question's withdrawn.

What is your evidence that erosion of the MRGO in and of itself caused failures of the levees without there being a hurricane involved?

A. Hurricane involved?

The decrease in elevation of the Reach 2 MRGO EBSBs as a function of time were symptomatic of this squeezing process I have referenced.

Q. You're talking about the materials are going to settle, and they have weight. So they compress the soil, and you think they squeeze out the bottom, correct?

A. They don't squeeze out the bottom. They squeeze to the sides, and they squeeze toward their direction where the confining stresses are the smallest.

Q. And what specific locations were -- was the squeezing effect occurring that has some effect on this litigation?

## Page 83

A. We could identify them as the areas that had been sheet pile repaired during the operation and maintenance of the MRGO.

Q. All right. Let me make sure I understand.

The areas that you're talking about that were affected by this compressing and squeezing out were the areas involving sheet pile?

A. Correct.

Q. And they're all south of Bayou Dupre?

A. No. They're between Dupre and the Bienvenue.

Q. Okay. And what happened was that you believed there was an erosion from the MRGO that occurred because the levees were built in such a way that they squeezed out and -- how does that work? Was it the levees and the materials used in the levees that caused the squeezing out that was then affected by the MRGO eroded areas?

A. It's an interactive process. When you allow the MRGO channel to encroach that close to the toes of the EBSBs, you're providing a shortening of the migration channel for the soils under the EBSBs to then intrude into the channel.

Q. So when the Corps was designing the

## Page 84

levees, they should have taken this condition into effect and made sure it didn't happen --

A. That's correct.

Q. -- that's what you're saying?

Okay. All right. Last thing you have in here -- let's go back to maintenance dredging just for a second.

Maintenance dredging is required to keep the channel open, isn't it?

A. Of course.

Q. Well, it was -- the channels closing now, but it was required to keep it open?

A. Correct.

Q. That was the purpose of the channel, was navigation?

A. That's correct.

Q. So what is it about maintenance dredging that you find to be problematic? I mean, I'm talking about the dredging itself. Is it box cutting? Small boxes? Big boxes? Whatever you're talking about.

I need to know what you mean by "maintenance dredging" that you say is required to keep the MRGO in operation, but that somehow is one of the maintenance and operation problems that

21 (Pages 81 to 84)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

--oOo--

IN RE KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION,

                          No.  05-4182 "K" (2)

PERTAINS TO:  ROBINSON, NO.
06-2268
_____

DEPOSITION OF ROBERT GLENN BEA

(VOLUME III, Pages 541 - 784)

Friday, February 27, 2009

Reported By:

KATHLEEN WILKINS, CSR #10068, RPR, CRR

**Page 729**

```
 1   direct connection has not been made between Scenario 3
 2   conditions and the breaching characteristics, the
 3   analysis work essentially has been done.
 4       Q.  I'm asking you if you have done the breaching
 5   conditions based on those circumstances that I
 6   described.
 7       A.  I would --
 8       Q.  I'd see them here if you had, I thought.
 9       A.  The reason I find the question difficult to
10   answer is I would have to first determine precisely, for
11   example, at the study location 497 plus 00, what the
12   surge and wave characteristics were for Scenario 3 and
13   then compare those conditions for those we have studied
14   in Scenarios 1 and 2C.
15       Q.  And you haven't done that?
16       A.  That's correct.
17       Q.  Okay.  Where exactly did you raise the levees
18   to change the conditions for Scenario 2C to neutral?
19       A.  That was when we did the evaluations of the
20   potentials for breaching.  So that if we had evaluated
21   the loss and elevation was directly attributable to the
22   Mississippi River Gulf Outlet configuration just prior
23   to Hurricane Katrina, then as we assess the performance
24   of the structures within those areas, we accommodated
25   the increase that should be there for that loss of
```

**Page 730**

```
 1   protective elevations.
 2       Q.  Have you -- have you changed those
 3   conditions -- well, the question's withdrawn.
 4           You haven't analyzed Scenario 2C in Phase II,
 5   so you haven't changed those conditions based on your
 6   Phase II evaluations for Scenario 1, have you?
 7       A.  Correct.
 8       Q.  What were the locations that you raised the
 9   levees?
10       A.  Locations were the channel of the MRGO had
11   migrated to distances of the order of 200 feet to
12   500 feet from the toes of the earthen flood protection
13   structures.
14           The characteristics of the channel relative to
15   those earthen protective structures are contained in the
16   expert report by Fitzgerald Penland, et al.
17       Q.  The levee crest characteristics are contained
18   in that report?
19       A.  No.  The channel characteristics relative to
20   the locations of the flood protection structures.
21       Q.  But to get MRGO neutral, you had to bring the
22   levees up to 17 and a half in certain places?
23       A.  Correct.
24       Q.  Where are those places that you brought them
25   up --
```

**Page 731**

```
 1       A.  As previously defined, where the channel of
 2   the MRGO had come to within 200 to 500 feet of the toes
 3   of the adjacent flood protection structures.
 4       Q.  But you can't tell me, again, as you sit here,
 5   where those locations are on the ground, without having
 6   to look to the MRGO to determine where they are?
 7       A.  Please repeat your question.
 8       Q.  Today, you can't tell me the locations,
 9   without having to refer to the MRGO?
10       A.  I would have to refer to the present locations
11   of the bank of the MRGO to identify specifically those
12   locations.
13           Several example locations have been provided
14   in my July 2008 expert report.
15       Q.  Did you change anything at Bayou Bienvenue to
16   make the system there hurricane neutral?
17       A.  Please repeat your question.
18       Q.  Did you change anything at Bayou Bienvenue in
19   order to create a hurricane neutral under Scenario 2C?
20       A.  Correct.  Yes, we did.
21       Q.  Okay.  What did you change there?
22       A.  I changed vegetation between the banks of the
23   neutralized MRGO.  I changed vegetation covering the
24   surface of the interface between the navigation flood --
25   or flood control structure at Bayou Bienvenue.
```

**Page 732**

```
 1           We did not change any of the characteristics
 2   of the earthen structure that abuts that location, nor
 3   the hard concrete and steel structure that abuts that
 4   location.
 5       Q.  Why do you raise -- well, let -- let me ask
 6   this a different way.
 7           Is it that you raise the levees along the MRGO
 8   to create a hurricane neutral situation because of the
 9   squeezing effect that you've talked about in the past?
10       A.  That's correct.
11       Q.  But when you raise the levees to, what is it,
12   17, 17 and a half feet, when you raise it to that height
13   just at the places that were -- that were squeezed,
14   there are other places that were lower that didn't
15   squeeze?
16       A.  On what basis do you make that assertion?
17       Q.  Well, do you not -- do you not know whether
18   there were or not other places along there?  I mean, do
19   you believe that there were no other places along the
20   levee except where you claim the -- there was a squeeze
21   that were lower than 17 feet?
22       A.  Oh, no.  There were.  And that's because we're
23   grappling with three mechanisms that can lower the
24   protective elevations.
25           One is the natural consolidation of sediment
```

## Page 733

 1  that follows a placement of the earthen fill used to
 2  construct the earthen flood protection structures,
 3  Component 1.
 4          Component No. 2, given that the banks of the
 5  MRGO have propagated to near the toes of those earthen
 6  protection structures, but we have a second contribution
 7  that I have identified as "squeezing."
 8          There is a third potential contributor
 9  identified commonly as "regional subsidence."
10          All three of those components must be
11  understood, evaluated, to determine what is causing loss
12  of the protective elevations.
13      Q.  Does that mean that you raise the levees at
14  places other than where the MRGO was, in your words, I
15  think, encroaching on the levee?
16      A.  No.
17      Q.  No.  You didn't raise the other places?
18      A.  We left them at zero.
19      Q.  Okay.  All right.
20          What's your basis -- well, let's -- let's go
21  back to that.
22          How much of Reach 2 -- by what percentage did
23  you raise those levees?  What percentage of Reach 2 did
24  you raise the levees on?
25      A.  My recollection is it's something of the order

## Page 734

 1  of 20 percent, 15 percent.
 2      Q.  And how would we know where you raised those
 3  levees?
 4      A.  I'm trying to answer your question earlier.
 5          It's where the banks of MRGO, prior to
 6  Hurricane Katrina, had come to within 2- to 500 feet of
 7  the toes of the adjacent earthen flood protection
 8  structures.
 9      Q.  Have you marked these on any chart?
10      A.  Yes, in fact, we did.  And that was a series
11  of charts that I referenced that came from Fitzgerald
12  and Penland, et al.
13      Q.  They marked the places where the levees were
14  raised to 17 and a half feet to change to MRGO neutral?
15      A.  No.  They marked the location of the banks
16  relative to the toes or center lines of the adjacent
17  flood protection structures.
18          Once we went with that location, we can take
19  the next step and say what is the elevation within that
20  region?
21          By and large, the low elevations of the
22  adjacent flood protection -- earthen flood protection
23  structures along Reach 2 were synonymous with, one, the
24  location of the banks of the Mississippi River Gulf
25  Outlet to the adjacent earthen flood protection

## Page 735

 1  structure, and the thickness of the underlying marsh and
 2  interdistributary layers.
 3          The closer, thicker, more loss of protective
 4  elevation, we tracked the correlation down the length of
 5  Reach 2.
 6      Q.  But you haven't provided us in the litigation
 7  a chart that shows that the levees were raised at a
 8  particular point along the MRGO for the hurricane
 9  neutral condition?
10      A.  That's correct.
11      Q.  Okay.  What's the basis for changing the grass
12  cover?
13      A.  To define a vegetation characteristics, you
14  should pose that question to environmental experts.
15          My understanding of the information that they
16  gave me to assist in the evaluation was that it was
17  principally saline water effects that were resulting in
18  loss of density, loss of root structure, loss of stiff,
19  dense, high protective vegetation.
20          Dr. Professor Gary Shafer and Dr. Professor
21  Emeritus John Day also contributed supporting expert
22  opinions information regarding the vegetation effects
23  caused by the presence of a Mississippi River Gulf
24  Outlet.
25      Q.  Can you give geo-spatial references to where

## Page 736

 1  those levees were increased -- the levee crests were
 2  increased for creating a MRGO neutral?
 3      A.  Would you define what you mean by
 4  "geo-spatial."
 5      Q.  Yeah.  In any way you can do it.  GPS system
 6  or otherwise.
 7      A.  Certainly in --
 8      Q.  What system?
 9      A.  The easiest way for you to determine that
10  would be to refer to the figures included in the
11  Fitzgerald-Penland expert report of July 2008.
12          In there, they have a series of aerial
13  photographs with identification of the location of the
14  banks of the MRGO relative to the toe of the adjacent
15  earthen flood protection structures.
16      Q.  Where can we see the levee profile that you
17  used in this new MRGO neutral scenario?
18      A.  Levee profile viewed from what direction?
19  Along the axis of the levee or in the cross-section to
20  the earthen flood protection structure?
21      Q.  Let's do cross-section first.
22      A.  Your -- please repeat your question.
23      Q.  Did you change the levee profile, either
24  cross-section or otherwise, to create MRGO neutral?
25      A.  We would increase the crest elevation.  That

```
 1   would naturally bring a change in the levee
 2   cross-section associated with that increase in
 3   protective elevation.
 4          We kept the toe of the earthen flood
 5   protection structures at their original constructed
 6   locations.
 7      Q.  Have you drawn that up, that new profile?
 8      A.  Yes, I'm sure we have.
 9      Q.  Have you provided it to us?
10      A.  It would be a series of profiles depending on
11   the particular location you were at, because different
12   amounts of crest elevation have to be brought in to make
13   that accommodation, and that changes a profile depending
14   on where you are on this 10 to 15 percent of the
15   locations along Reach 2.
16      Q.  Is it 10 to 15 percent or 20 percent?
17      A.  Let's say approximately 20 percent.
18      Q.  Okay.  Have you provided to the defense a copy
19   of the new profile that's drawn up for those levees that
20   you've increased the heights of?
21      A.  No.  And that's because we sat down with a
22   piece of paper, a straightedge and a ruler, and drew
23   them once we understood if the profile would have an
24   effect -- an important effect on the wave side breaching
25   or front-to-back breaching or back-to-front breaching,
                                                    Page 737
```

```
 1   at that point we disposed of them.
 2      Q.  So for us to evaluate your MRGO neutral model,
 3   we would have to go somewhere to find out, and that
 4   would be Fitzgerald's report, where you actually changed
 5   levee profile and height?
 6      A.  Correct.
 7      Q.  And then how do we know what your new levee
 8   profile is?
 9      A.  Well, it would be back at the prescribed
10   elevation, and it would have the footprint distance
11   between the two toes identical to what it was prior to
12   Katrina.
13      Q.  Well, how would we know that if you didn't
14   provide that to us in the litigation?
15      A.  Please define "that" in your question.
16      Q.  How would we know what the profile is for the
17   new levees that you've raised to the 17.5 feet height?
18      A.  You could sit down and draw them yourself.
19      Q.  If you don't change the underlying foundation
20   for the levee, and you raise the levee to 17 and a half
21   feet in your scenario, don't you still get subsidence
22   again?
23      A.  In which scenario?
24      Q.  Scenario 2C.
25      A.  Scenario 2C says that I have to maintain the
                                                    Page 738
```

```
 1   system in a neutral condition to the time of Hurricane
 2   Katrina.
 3          Certainly after Hurricane Katrina, those
 4   conditions will change.
 5          However, if you contend that your charge is to
 6   maintain it in that neutral condition, those protective
 7   elevations have to be reincreased.
 8      Q.  Did the other 80 percent of the levees
 9   subside?
10      A.  Certainly.  The entire region is subsiding.
11      Q.  How do you quantify in any of your analyses
12   how much of levee subsidence occurred because of a
13   squeezing-out effect and how much occurred because of
14   something else?
15      A.  Well, here's where the three components that I
16   described for you have to be evaluated.
17          One would be original regional subsidence
18   during the time period of concern.  In this case,
19   between the construction of the earthen flood protection
20   structures and the time of occurrence of Hurricane
21   Katrina.  That might be measured in terms of inches to a
22   foot.
23          Then you have to step into the evaluation of
24   the consolidated -- consolidation-related settlements
25   associated with the construction of the earthen flood
                                                    Page 739
```

```
 1   protection structures as it was being raised.
 2          And the third component is an evaluation of
 3   the additional contributions made by the proximity of
 4   the MRGO and the underlying mobile interdistributary
 5   marsh materials.
 6      Q.  Have you provided us that analysis of which
 7   levees you believe subsided due to squeezing out and
 8   which ones subsided for other reasons?
 9      A.  We've provided you with the analyses completed
10   to date -- or to -- January 2009 relating to those three
11   components.  We currently are conducting additional
12   analyses to further evaluate these conditions and
13   characteristics at other locations along Reach 2.
14          MR. BRUNO:  He's asked you that question three
15   times already.
16          (Discussion held off record.)
17          MR. STONE:  Q.  Okay.  If you take into
18   account the squeezing effect that you're talking about,
19   where the MRGO is fairly close to the levees, how high
20   do you have to raise the levees to be sure that you can
21   have 17 and a half feet, let's say, a year from now?
22      A.  The difference between the current height and
23   the target height.  The current height is 14 feet and
24   the target height is 17 and a half feet.  You can take
25   the difference.
                                                    Page 740
```