# EXHIBIT D

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
                                 JUDGE DUVAL
PERTAINS TO:  MRGO AND ROBINSON
              (No. 06-2268)


                    (V O L U M E   I)
          Deposition of REED L. MOSHER, PH.D.,
given at the Law Offices of the Joseph M.
Bruno, 855 Baronne Street, New Orleans,
Louisiana 70113, on February 19th, 2009.




REPORTED BY:
     JOSEPH A. FAIRBANKS, JR., CCR, RPR
     CERTIFIED COURT REPORTER #75005
```

Page 1

```
 1   REPRESENTING THE PLAINTIFFS:
 2       LAW OFFICE OF JOSEPH M. BRUNO
 3       (BY: JOSEPH M. BRUNO, ESQUIRE)
 4       (BY: ROB WARREN, ESQUIRE)
 5       855 Baronne Street
 6       New Orleans, Louisiana 70113
 7       505-525-1335
 8   - AND -
 9       ELWOOD C. STEVENS, JR., APLC
10       (BY: ELWOOD C. STEVENS, JR., ESQUIRE)
11       1205 Victor II Boulevard
12       Morgan City, Louisiana 70380
13       985-384-8611
14   - AND -
15       DOMENGEAUX, WRIGHT, ROY & EDWARDS
16       (BY: ASHLEY E. PHILEN, ESQUIRE)
17       556 Jefferson Street, Suite 500
18       Lafayette, Louisiana 70501
19       337-233-3033
20
21
22
23
24
25
```

Page 2

```
 1   - AND -
 2       SHER, GARNER, CAHILL, RICHTER, KLEIN &
 3       HILBERT, L.L.C.
 4       (BY: MATTHEW CLARK, ESQUIRE)
 5       909 Poydras Street, 28th Floor
 6       New Orleans, Louisiana 70112
 7       504-299-2100
 8
 9   REPRESENTING THE UNITED STATES OF AMERICA:
10       UNITED STATES DEPARTMENT OF JUSTICE,
11       TORTS BRANCH, CIVIL DIVISION
12       (BY: PAUL LEVINE, ESQUIRE)
13       (BY: RUPERT MITSCH, ESQUIRE)
14       P.O. Box 888
15       Benjamin Franklin Station
16       Washington, D.C. 20044
17       202-616-4289
18
19   ALSO PRESENT:
20       DAVID DYER, ESQ.
21       ROBERT FISHER, ESQ.
22       TIANA CHRISTOPHER, ESQ.
23       RICHARD PAVLICK, ESQ.
24
25
```

Page 3

```
 1   PARTICIPATING VIA I-DEP:
 2       ELWOOD STEVENS, ESQ.
 3       NICK DIETZEN, ESQ.
 4       ERIC GOLDBERG, ESQ.
 5       ELISA GILBERT, ESQ.
 6       BRENDAN O'BRIEN, ESQ.
 7       BEN RODGERS, ESQ.
 8       CHRISTOPHER ALFIERI, ESQ.
 9       JAMES P. ROY, ESQ.
10       MARK RAFFMAN, ESQ.
11       SARAH SOJA, ESQ.
12       MARTIN COHEN, ESQ.
13
14   VIDEOGRAPHER:
15       LORRI FABRE (HART VIDEO)
16       KEN HART (HART VIDEO)
17
18
19
20
21
22
23
24
25
```

Page 4



JOINT EXHIBIT
JX-0115

1 (Pages 1 to 4)

REED MOSHER, Ph.D. (VOL I)                                February 19, 2009

Page 165

```
 1      Q.  Well, I think what we've heard is that
 2  it doesn't do very well with sheet pile because
 3  it can't pick up the width --
 4      A.  Right.
 5      Q.  -- below six inches.  But insofar as
 6  the height above whatever the measurement, it's
 7  not bad.  Is that true?
 8      A.  Um -- I think it would even be hard to
 9  pick up the sheet pile because it's so narrow.
10      Q.  That's what I mean, it can't pick
11  up --
12      A.  So it's hard to pick up its elevation,
13  the top of it.
14      Q.  Right.  My point is it cannot pick
15  up --
16      A.  Yeah.
17      Q.  -- things that are more narrow than
18  six inches, but for everything else it works
19  well.
20      A.  Yeah.
21      Q.  What's what I thought I had asked.
22      A.  Yeah, it's reasonable.  It has
23  inaccuracy.  But then if you walk out on the
24  levees, the fact that you have grass, you have
25  trees, you have all of those things, they have
```

Page 166

```
 1  an effect on that reflected image back.  And so
 2  you have to make corrections for it, but
 3  they're not going to be perfect.
 4      Q.  Right.  Okay.  All right.  It says,
 5  these levees were built using a hydraulic
 6  filling construction method which contributed
 7  to their vulnerability to erosion.  It says,
 8  over the years since the construction of the
 9  levees along the MRGO, subsidence of the New
10  Orleans area and the consolidation of the soils
11  below the levees resulting in their settlement
12  have led to a reduction in the protection
13  elevation level below that of the original
14  design protection level for the MRGO which
15  increased the amounts of overtopping erosion
16  and subsequent flooding.
17          MR. LEVINE:
18             You're reading from Page 9, the
19          first paragraph there?
20          MR. BRUNO:
21             I'm reading from Page 9, the last
22          sentence of the first paragraph, yes.
23      A.  Yes, I wrote that.
24  EXAMINATION BY MR. BRUNO:
25      Q.  Okay.  Now, did you evaluate the role,
```

Page 167

```
 1  if any, of the MRGO in contributing to the
 2  sinking of the levees?
 3      A.  Um -- I -- no, I didn't.  I didn't do
 4  an analysis of that because in those types of
 5  soils the dominant consolidation of the
 6  material tends to be dominant as long as the,
 7  um -- slope stability factors of safety moving
 8  out into the -- for the levees to move out into
 9  the MRGO were in the range of 1.3, settlement
10  from that area is very -- is not likely to
11  occur.
12      Q.  All right.  Well, did you review the
13  design of the levee itself, of Reach 2?
14      A.  I did look at the levee designs of
15  those.
16      Q.  And did you read where the engineers
17  themselves recognized that the -- because; of
18  the interdistributary layers below the levee
19  and location of the channel, that the channel
20  might contribute to a sinking of the levees
21  because it provides a vehicle, if you will, or
22  a pipe, for the water or moisture to be
23  squeezed into --
24          MR. LEVINE:
25             Objection.  Misstates the
```

Page 168

```
 1          evidence.  Do you have a document here
 2          so he can see it?
 3  EXAMINATION BY MR. BRUNO:
 4      Q.  Well, obviously you didn't read it.
 5          Or did you?
 6      A.  I have read some about that, I just
 7  want to know whether it is -- which part is it?
 8  I thought it was -- and this is where we need
 9  to look at -- I thought it was dealing with the
10  MRGO design and not on the levees design.
11      Q.  It was -- maybe I'm wrong.  It was in
12  the design documents for the MRGO?
13      A.  That's what I thought.
14      Q.  Okay.  That may be true.  I don't have
15  a perfect memory, I can assure you.
16      A.  I don't either.
17      Q.  But the real point of the exercise is
18  did you do an evaluation of that at all?
19      A.  In terms of understanding what they
20  were talking about --
21      Q.  They being the Corps of Engineers?
22      A.  -- the Corps of Engineers at the
23  time -- they mentioned about the unconsolidated
24  material and the concern, and that concern is
25  more about sloughing of the materials, because
```

42 (Pages 165 to 168)

**Page 169**

1 unconsolidated soils have a very low strength,
2 and they're concerned about the actual failure
3 of that material out into the --
4    Q. The channel.
5    A. -- the channel.
6    Q. Which means the levee can go down.
7    A. And those clays there aren't subject
8 the piping or migration, they're subject to
9 consolidation and slope stability problems.
10    Q. Okay. This document which I will show
11 you certainly -- and this comes from our --
12 have you read the plaintiffs' expert reports?
13    A. I have read some of them.
14    Q. Okay. This document is -- what is
15 this? It's Page 6-2 of our Duncan FitzGerald
16 report. It is a table which comes from the,
17 um -- Corps. It's the geological
18 investigation, Mississippi River Gulf Outlet
19 channel physical characteristics of
20 depositional types from 1958. Have you seen
21 that before?
22    A. I'm not sure if I've actually seen
23 this one, but ones similar to that.
24    Q. Okay. Fair enough. And what I'm
25 asking you about, if I may direct you, it says

**Page 170**

1 here, um -- disposed in clay wedges between --
2 and this is the interdistributary trough that's
3 there on that line. It says, deposed in clay
4 wedges between major distributaries, clay
5 sequence interrupted by silty or sandy
6 materials association with myriad small
7 distributaries but otherwise soils homogeneous,
8 the material will probably displace laterally
9 under a fairly light load. Meaning that if you
10 put a load on top of it it's going to squish it
11 out. And if you have a channel there it's got
12 a place to go. I mean, ask that -- do you
13 understand at least what I'm talking about?
14 I'm not asking you to agree with me.
15    A. Right. I'm not agreeing with you. I
16 understand what you're talking about. Any of
17 the levees built on this type of material will
18 tend to have a lateral squeeze. When you put
19 that much weight on it, you you're pushing the
20 soil down and out. Okay?
21    Q. Okay.
22    A. And depending on, if you're very close
23 to an area, you may have some lateral squeeze
24 in that one.
25       My determination would be if you have

**Page 171**

1 a lot more going out into the channel you
2 should see a tilt to your levees. We didn't
3 see a tilt to the levees. Because more is
4 going to be moving out on that side of the
5 levee than on the land side. It just makes
6 sense.
7       And we see this. When levees are
8 built and you get some local failures at the
9 toe, he whole thing tilts -- failures at the
10 toe from lateral spread. It's just not
11 unusual. They built -- you know, this is a
12 similar thing that they saw when they built the
13 turnpikes in New Jersey. They put a lot of
14 soil above them to consolidate them and let
15 them spread and then go back and raise the
16 height.
17    Q. Right. Okay. So your testimony is
18 that -- and I'm a little confused. Did you
19 evaluate this, yes or no?
20    A. Evaluate it in terms of --
21    Q. As a forensic exercise. Okay? Here
22 we are, we're out there, we're asking ourselves
23 the question what caused the levee failure?
24 You've indicated that the height of the levees
25 was a cause, right?

**Page 172**

1    A. Uh-huh.
2    Q. You say that in black and white. So a
3 forensic engineer would ask himself, or
4 herself, the question what caused that levee to
5 sink? Right?
6    A. Uh-huh.
7    Q. And a good forensic engineer would
8 evaluate the various potential mechanisms by
9 which that could occur, right?
10    A. Uh-huh.
11    Q. Okay. And we have one mechanism right
12 there which is, got this material which is
13 going to displace under a light load. So that
14 becomes a potential mechanism of failure, isn't
15 that true?
16    A. It is a potential --
17    Q. Just a potential.
18    A. -- a potential mode that you --
19    Q. A potential mode. That's all I'm
20 after. So the question is, did the IPET team
21 evaluate from a forensic perspective the
22 potential of that interdistributary lateral
23 displacement to be a potential explanation for
24 the sinking of the levee? Did they do that
25 exercise, yes or no?

```
 1      A.  There were slope stability analyses
 2   done, but they were not significant to actually
 3   report because they weren't -- we did checks on
 4   them to see if there was a potential.  They
 5   were so high we moved on to looking at other
 6   things, particularly because the physical
 7   evidence didn't show that there was failures of
 8   large lateral movements in that direction.
 9   There was a lot of vertical movement and that's
10   from the settlement.
11      Q.  We're talking about vertical movement.
12   Doc, we're talking about vertical movement.
13   You're talking about slope stability, which you
14   and I both know is something else.  Okay?  The
15   slope stability is the degree to which the
16   slope will be maintained given the conditions
17   that you find it in.  It's a 1:5 slope, right?
18   And you saw no indication that that slope had
19   deteriorated from any other reason other than
20   erosion.
21      A.  No.  You're incorrect.  Because what
22   causes -- okay, what causes lateral movement?
23   It's stresses.  The stresses from the slope
24   cause the lateral movement.  Those stresses
25   also are involved in the slope stability.
                                         Page 173
```

```
 1      Q.  We're talking about something that's
 2   underneath the ground, are we not?
 3      A.  Yes.
 4      Q.  How far underground?
 5      A.  Here?  Um -- these may be down twenty,
 6   thirty feet.
 7      Q.  Twenty or thirty feet below.  Okay?
 8   So it's possible, is it not, that something
 9   twenty feet or thirty feet below wouldn't be
10   visible on the surface.  Right?
11      A.  If it's settling, it definitely would
12   by visible because the rest of it settles.
13      Q.  My point is --
14      A.  If it's --
15      Q.  -- it's not necessarily so --
16      A.  If it's significant enough to cause
17   movement of the soil at the Mississippi channel
18   some 200 feet plus away, it would be
19   significant to show up at the levee.
20      Q.  Well, did you all evaluate the
21   distance of the MRGO shoreline to these
22   locations where the levee was low, and did you
23   compare that to the location of the
24   interdistributary layer in order to be able to
25   make an intelligent determination about the
                                         Page 174
```

```
 1   potential impacts?  Not just guessing?
 2         MR. LEVINE:
 3            Objection.  You all is IPET?
 4         MR. BRUNO:
 5            No.
 6   EXAMINATION BY MR. BRUNO:
 7      Q.  You.
 8      A.  In this report.  Okay.  Those were
 9   looked at, they weren't significant, so they
10   weren't looked at as a reason for the failure.
11      Q.  When you say you looked at and not
12   looked at, I get confused.  Okay?  You can't
13   look at it and not look at it at the same time.
14   All right?
15         Let's use forensic evaluation
16   methodology for this exercise.  Okay?  Look at,
17   in a forensic evaluation, requires more than
18   just I'm going to decide not to look at it,
19   don't you agree?
20      A.  It does, yes.
21      Q.  Okay.
22      A.  So you go back and look at what was
23   the design and what was the actual locations
24   where what has taken place, you also look at
25   the settlement across it, across the area --
                                         Page 175
```

```
 1      Q.  Right.
 2      A.  -- and you talk to also the folks that
 3   were involved in maintaining those levees
 4   during a period of time.
 5      Q.  Well, do you know, for example,
 6   whether or not the levee crest heights in any
 7   way conformed to this interdistributary trough?
 8   Did you look at that?
 9      A.  Because of the significance of all the
10   settlements along there, it's hard to
11   distinguish whether those troughs had an effect
12   or didn't have an effect.
13      Q.  You're not answering my question, Doc.
14   You're giving me the reasons why.  I want a yes
15   or no is the question.
16         Okay.  Did you or did you not do
17   something is going to be answered with a yes or
18   no question.  Now you can give me an
19   explanation as to why you did it.  I got no
20   problem with that.  What you're giving me now
21   is an explanation.  Because of.  Well, I got to
22   know what the answer is before I get the
23   because of.
24         MR. LEVINE:
25            Let him answer the question.
                                         Page 176
```

|  |  |
|---|---|
| 1  EXAMINATION BY MR. BRUNO: | 1   I want to know where the trough is, would you |
| 2   Q.  Now I want an answer to the question. | 2   tell me, no, Joe, I got to go out and do a |
| 3       Did you or did you not evaluate the | 3   bunch of borings?  Would you tell me that? |
| 4   levee crest heights as they related to this | 4       A.  I could tell you generally where it's |
| 5   interdistributary trough?  Yes or no? | 5   located. |
| 6       A.  We looked at the geology along there | 6       Q.  Exactly.  Okay.  So now that we know |
| 7   and the locations and we found no significant | 7   we know where it is, and we know that the data |
| 8   tie to the location of how far away they were | 8   has been around since 1958, the question on the |
| 9   from the trough. | 9   table is, did you relate the levee crest |
| 10      Q.  They're not far away from the trough, | 10  heights to that trough layer? |
| 11  they're on top of the trough. | 11      A.  Levee crest heights?  No, I didn't. |
| 12      A.  I'm talking about their distance from | 12      Q.  Did IPET? |
| 13  the, um -- okay.  Their distance from the, | 13      A.  No. |
| 14  um -- | 14      Q.  They didn't.  All right.  So that |
| 15      Q.  The water. | 15  there's no way for you to either dispute or |
| 16      A.  -- the water. | 16  even to agree with FitzGerald when he says the |
| 17      Q.  Water 's edge.  That's different.  I | 17  interdistributary trough mimmicks the levee |
| 18  didn't ask about the difference from the | 18  crest heights; in other words, where it's low, |
| 19  water 's edge.  I asked you about whether or | 19  the levee crests are low? |
| 20  not this trough in any way relates to the levee | 20      A.  Could be.  I don't dispute that. |
| 21  crest height.  Did you look at that?  Yes or | 21      Q.  All right.  But my point is, not |
| 22  no?  I find nothing in your report -- | 22  having looked at it, you're not in a position |
| 23      A.  No. | 23  to dispute it. |
| 24      Q.  You certainly didn't put anything in | 24      A.  Yeah.  But keep in mind, though, the |
| 25  your report about it. | 25  other materials that are along there also have |
|                                                     Page 177 |                                                     Page 179 |
| 1       A.  No.  We looked at individual borings | 1   significant amounts of sediment and subsidence |
| 2   along -- | 2   that takes place. |
| 3       Q.  Different subject.  We'll talk about | 3       Q.  Other materials. |
| 4   borings all day long.  I want to talk about the | 4       A.  Where the trough isn't located.  There |
| 5   trough, the interdistributary trough. | 5   are other materials, the clays and the, um -- |
| 6       A.  Hold it.  The location of the trough | 6   the marsh material and things like that. |
| 7   is determined by the borings, isn't it? | 7       Q.  Where is it located? |
| 8       Q.  Yeah. | 8       A.  What? |
| 9       A.  So those borings are the most | 9       Q.  Where is the trough located? |
| 10  significant detail of the levees. | 10      A.  Um -- I'd have to get out a map and |
| 11      Q.  Did you map the trough? | 11  look. |
| 12      A.  I didn't map the trough. | 12      Q.  Isn't it located along the length of |
| 13      Q.  Did somebody map the trough? | 13  the Reach 2, between Bayou Bienvenue and Bayou |
| 14      A.  Yes.  It had been on done by the | 14  Dupre? |
| 15  Corps. | 15      A.  There's part of it along there, yeah. |
| 16      Q.  Who mapped the trough? | 16  But it does vary somewhere along there.  And |
| 17      A.  Corps of Engineers. | 17  the thickness of it varies. |
| 18      Q.  Okay.  When? | 18      Q.  Sure.  And where it's thick, that's |
| 19      A.  Some of it dates back to the fifties, | 19  where the crest is lower, did you know that? |
| 20  some of it more recent than that. | 20      A.  Could be. |
| 21      Q.  Okay.  So we got a map.  Right? | 21      Q.  Could be.  All right.  And you |
| 22      A.  Uh-huh. | 22  wouldn't necessarily have to have a levee |
| 23      Q.  We know where that trough is.  Right? | 23  that's cockeyed in order for the levee to be |
| 24  Do we need borings to determine where the | 24  lower there. |
| 25  trough is today?  I mean, I've if I said, Doc, | 25      A.  Well, but if it's affected by the |
|                                                     Page 178 |                                                     Page 180 |

```
 1  channel, which you asked that question, it
 2  would be.  It would have an effect on it.
 3      Q.  So your testimony will be to the judge
 4  that if the channel plays a role, then the
 5  levee has to sink toward the channel, it has to
 6  be off center.  It has to be.  Absolutely
 7  mandatory.
 8      A.  It would -- it would have evidence
 9  of -- that it would be leaning that way.
10      Q.  It has to.  It's mandatory, though.
11  There's no other way -- no other way it could
12  happen been other than it's going to have to --
13  the toe of the levee closer to the channel has
14  got go sink lower than the toe on the protected
15  side in order for MRGO to play a role.  That's
16  your absolute bottom line, got to be the way
17  testimony, right?
18      A.  No.  Because what I'm saying is if --
19  you have migration in the movement of the
20  material because of the MRGO, it will be more
21  pronounced, you'll have more movement close to
22  the channel, and that part of the levee would
23  settle more.
24      Q.  Can you point to a scientific journal,
25  an article, a textbook, anything that supports
                                        Page 181
```

```
 1  that view?
 2      A.  That would support that view?
 3      Q.  Yeah.
 4      A.  Of movements and settlement?
 5      Q.  No, no, no.  Very specific.  You just
 6  said to me that if the channel plays a role,
 7  then you absolutely are going to see evidence
 8  of the fact that you have a higher -- a
 9  lower -- I'm sorry -- the toe on the levee is
10  going to be lower nearer to the channel than it
11  is on the protected side.  That's what you've
12  told me.  So there's got to be a book or a
13  scientific journal where it says that.  Right?
14      A.  Well, you're talking about a specific
15  situation.
16      Q.  I sure am.
17      A.  Right.  And a book will not tell you
18  the specific pieces.  It will tell you what
19  should be trending based on the conditions that
20  are there.
21      Q.  Uh-huh.
22      A.  And that's what I'm talking about is
23  the conditions that are there.
24      Q.  Well, let's see now.  You've got a
25  levee of how wide?
                                        Page 182
```

```
 1      A.  Um -- a hundred and fifty feet or
 2  something like that.
 3      Q.  150.  And how tall is it?
 4      A.  Seventeen and a half feet.
 5      Q.  Seventeen and a half feet.  So would
 6  you agree with me that most of the weight is at
 7  the crest?
 8      A.  Uh-huh.
 9      Q.  Okay.  And would you agree with me
10  that where the weight is the heaviest is where
11  it's going to sink the fastest?
12      A.  But if you have material moving --
13      Q.  Answer my question and you can do the
14  but all day long.  Yes or no?
15      A.  If the ground surface is level, yes.
16      Q.  Okay.  All right.  Now, so it's
17  possible for the levee to sink straight down.
18      A.  Uh-huh.
19      Q.  If the material below is being
20  squeezed out into the channel.  It's possible.
21      A.  You will get lateral movement even if
22  the ground surface is -- there will be lateral
23  movement in both directions.
24      Q.  So the answer is yes or no?  Is it
25  possible for the levee to sink straight down,
                                        Page 183
```

```
 1  given the fact that most of the bulk is in the
 2  center of the levee, with the channel being
 3  close to the levee?  Is it possible that it
 4  sinks straight down?
 5      A.  With movement going to the levee.  I
 6  would say no.
 7      Q.  Okay.  It's not. It's going to
 8  absolutely sink --
 9      A.  It's going to be tilted.
10      Q.  The levee crest is going to be tilted
11  toward the channel.
12      A.  The levee -- base of the section will
13  be tilted to the channel.
14      Q.  All right.  The base of the levee is
15  tilted toward the channel.
16      A.  You are not pointing to the base.
17      Q.  Where is the base?
18      A.  The horizontal.  That's the base of
19  the levee.
20      Q.  Well, I know, but this is lower than
21  that.  The toe -- this is the toe of the levee,
22  is it not?
23      A.  Toe towards the --
24      Q.  Water side.
25      A.  Yeah.
                                        Page 184
```

REED MOSHER, Ph.D. (VOL I)                                    February 19, 2009

### Page 185

```
 1      Q.   So the water side toe is lower than
 2   the land side toe.
 3      A.   Correct.
 4      Q.   So I'm pointing to the water side toe.
 5      A.   Uh-huh.
 6      Q.   And so the levee is going to be on a
 7   tilt.
 8      A.   Uh-huh.
 9      Q.   And it has to.  There's no other
10   explanation.
11      A.   If you have the movements that we're
12   talking about, it should tilt to the outside.
13      Q.   How much?
14      A.   I don't know exactly.
15      Q.   Did you measure it?
16      A.   No.
17      Q.   Well, how do you know, then, if you
18   didn't measure it, whether you had tilt or no
19   tilt?
20      A.   I said it should be seen and I don't
21   see tilting of the levee.
22      Q.   Well, how much can you see?
23      A.   Well, the levees moved from 17-1/2 to
24   about 13 to 14.  It would seem like if that
25   much settlement occurred overall that you would
```

### Page 186

```
 1   so some tilt in those areas and you would see
 2   some possible cracking occurring.
 3      Q.   Well, the whole reach didn't sink five
 4   feet, did it?
 5      A.   The whole --
 6      Q.   Whole reach, Reach 2, the whole thing
 7   didn't sink.
 8      A.   No, not the whole thing.
 9      Q.   Certain portions of it sank.
10      A.   Some of it sank more but some of it
11   was also built up at different stages, too.
12      Q.   It was all built up at the same
13   height, wasn't it?
14      A.   I thought there was several different
15   enlargements of the whole Reach 2.
16      Q.   There was several lifts, but the lift
17   was for the whole reach.
18      A.   I thought that it -- the lower reach
19   was built up more recently, the one below
20   Bienvenue.
21      Q.   Between the IW -- Intracoastal
22   Waterway and Bienvenue, you said that was built
23   up?
24      A.   No.  Dupre.  The one lower, down to
25   the corner.  Because it's at a higher
```

### Page 187

```
 1   elevation.
 2      Q.   The levee between Dupre and Violet --
 3      A.   Violet.
 4      Q.   -- that list occurred later?
 5      A.   I thought it did.  Yes.
 6      Q.   Okay.  All right.  Well, I'm talking
 7   about between Dupre and Bienvenue, the space in
 8   between.  That lift occurred at the same time.
 9   And so -- and you have great variability in
10   levee heights in that -- along that span, don't
11   you?
12      A.   There is significant differences along
13   there.
14      Q.   All right.  And where the significant
15   differences are, you don't see a beg crack in
16   the levee, do you?
17      A.   No, I don't.
18      Q.   It's more of -- it's more of a smooth
19   line.  In other words, if you walked along the
20   crested of the levee from Bayou Dupre to Bayou
21   Bienvenue, you would not encounter a crack.
22      A.   Um -- I don't know that for sure, but.
23      Q.   Well, somebody should have picked that
24   up, don't you think?
25      A.   Yes.
```

### Page 188

```
 1      Q.   I mean, come on.  But in fact, as you
 2   walked along that levee from Bayou Dupre to
 3   Bayou Bienvenue you would be moving you and
 4   down and you probably wouldn't even notice it,
 5   would you?
 6      A.   Right.  But the ground elevation --
 7      Q.   It's hard to see.
 8      A.   But the natural ground elevation
 9   varies along there, too.
10      Q.   Sure, it does.  But my point is, you
11   could be going up and down as much as five or
12   six feet and not even know if you were moving
13   up five or six feet.
14      A.   But okay.
15      Q.   Isn't that true?
16      A.   Possibly, yes.
17      Q.   I mean, I can tell you that --
18      A.   Yeah.
19      Q.   -- my mother's home is on a street
20   called Topaz, and it is no more than five
21   blocks away from General Haig, and the
22   difference between those two points for the
23   flooding was twelve feet.
24      A.   Uh-huh.
25      Q.   And when you drive from Robert E. Lee
```

47 (Pages 185 to 188)

REED MOSHER, Ph.D. (VOL I)					February 19, 2009

Page 189

1  Boulevard to Topaz Street, you don't feel
2  yourself going up ten feet. Right?
3      A.  Uh-huh.
4      Q.  That's normal. Because it's hard for
5  us humans to see that much change in elevation
6  even though it's there.
7      A.  Uh-huh.
8      Q.  And so my point is, as you're walking
9  along the crest of the levee you are not
10 walking along a straight line at the same
11 height above whatever the datum is, you could
12 be going up and down and up and down and up and
13 down and you wouldn't even know it.
14     A.  If there are long enough distances
15 between them, yeah, you would not notice.
16     Q.  Okay.
17     A.  But also, the soil -- the top of the
18 soil, natural ground surface varies also along
19 there. And had varying thicknesses of the
20 marsh. So you'll get different settlements
21 because of the different thicknesses of the
22 marsh, also.
23     Q.  Did you evaluate that?
24     A.  I didn't have the information
25 available to do that, the surveys of the actual

Page 190

1  ground elevation. But you do see differences
2  in the thickness in the borings of some of the
3  marsh material along there.
4      Q.  Well, is that something the levee
5  builder should have done? My goodness, if they
6  knew about all that differential settling,
7  shouldn't they have put that into their design?
8      A.  I believe they accounted for some of
9  that in their design by continually building up
10 the different elevations of the levee. I mean,
11 it's something that they -- you mentioned about
12 this lateral movement. And, you know, there
13 was some studies done in the Atchafalaya Basin
14 where they had built levees along that period,
15 and they knew over the time period that they
16 had to keep building those up because there was
17 so much settlement.
18     Q.  Right.
19     A.  And those places had lateral movement
20 like you're talking about, and that lateral
21 mere movement actually caused cracks in the
22 levee surface. And we don't see any of those
23 cracks due to that on the MRGO, so that also
24 leads to evidence of very unlikely that you had
25 that lateral movement to the channel.

Page 191

1      Q.  Well, you also didn't see any cracks
2  in the width, despite the fact that you've got
3  difference in heights of five feet. You've got
4  levees right next to each other. This one is
5  seventeen feet, this one is thirteen feet.
6      A.  What is the -- they weren't straight
7  vertical dropoffs were three?
8      Q.  Of course not.
9      A.  They were over a long distance.
10     Q.  Exactly my point.
11     A.  Okay. These are less of a distance,
12 and the slopes are at the same height. But
13 when you get that much movement moving away
14 from the center line, you get cracks forming
15 along the center line of the levee, towards --
16 that run parallel to it.
17     Q.  Fact of the matter is, Doctor, you --
18 neither you nor IPET did a thorough evaluation
19 of the potential impact of the MRGO regarding
20 its potential contribution to settlement, did
21 you?
22         MR. LEVINE:
23             Objection. Vague.
24 EXAMINATION BY MR. BRUNO:
25     Q.  There wasn't any thorough

Page 192

1  reevaluation.
2      A.  A thorough evaluation.
3      Q.  No.
4      A.  We did an assessment of it and felt
5  that it wasn't --
6      Q.  And discounted it.
7      A.  -- wasn't an important factor based on
8  the fact that the levees at the of the
9  hurricane at a certain elevation.
10     Q.  Well, did you put that in your report?
11     A.  Nope.
12     Q.  Why no?
13     A.  Because they were looking at what was
14 the conditions of what happened with the
15 levees.
16     Q.  Well, that's one of the things that we
17 allege happened. You did read our reports
18 didn't you?
19     A.  Uh-huh.
20     Q.  You read Bea 's report; right?
21     A.  Yes.
22     Q.  You read FitzGerald's report.
23     A.  Uh-huh. I looked at his report.
24     Q.  Well, you read Bea 's. You know Bea
25 makes that allegation; right? And you felt

48 (Pages 189 to 192)

**Page 193**

```
 1   like it wasn't -- didn't even deserve a
 2   sentence.
 3       A.  He doesn't do any analysis of it.
 4       Q.  Neither do you.  You didn't even talk
 5   about it.
 6       A.  Right.  Because I didn't think it was
 7   important.
 8       Q.  Well --
 9       A.  I didn't feel it was.
10       Q.  You didn't even put the sentence I
11   don't think this is important.
12           MR. LEVINE:
13               Let him finish.  Let him finish.
14       A.  No, I looked at what was the important
15   cause, what was -- what was the cause as
16   opposed to things that weren't.  And then
17   things that we actually had some evidence of,
18   as opposed to -- there was no physical evidence
19   showing that that was the case.
20   EXAMINATION BY MR. BRUNO:
21       Q.  Well, one would think that the
22   reasonable thing to do would be to indicate in
23   your report that I evaluated it, I didn't see
24   any evidence, therefore I made the conclusion
25   that I'm making.  But you don't choose to do
```

**Page 194**

```
 1   that at all, which makes a third-party person
 2   like the Judge possibly believe that you didn't
 3   evaluate it in the first place.
 4       A.  Well --
 5       Q.  Isn't that true?
 6       A.  No, that's not true.
 7       Q.  Okay.  All right.  Well, we can agree
 8   that there is not a single sentence in this
 9   report nor is there a single sentence in the
10   IPET report which discusses the potential of
11   the MRGO to have any causal relationship to
12   settlement.  Isn't that true?
13       A.  To the settlement and subsidence of
14   the levees.
15       Q.  Yes.
16       A.  I don't know.  I haven't mentioned
17   that.
18       Q.  Well, you say I don't know.
19       A.  No, I said I haven't --
20       Q.  It came up as I don't know.  I'm
21   sorry.  What is your actual answer to the
22   question?
23       A.  I said I haven't put anything in the
24   report --
25       Q.  That's fair enough.  I'm just trying
```

**Page 195**

```
 1   to get it on the piece of paper here.
 2           You do say that there's rapid
 3   subsidence in your report.
 4           MR. LEVINE:
 5               Where did you see that?
 6   EXAMINATION BY MR. BRUNO:
 7       Q.  Next paragraph.  The elevations of the
 8   pre-Katrina hurricane protection levees and
 9   flood walls are significantly below the
10   originally designed heights in part from errors
11   in initial construction elevations, in part
12   from rapid subsidence.  So there's this rapid
13   subsidence, right?
14       A.  Yeah.  I think it --
15       Q.  What is that?  What is rapid
16   subsidence as compared to regular old
17   subsidence.
18       A.  Choice of adjectives used there.  But
19   basically that the subsidence happened very
20   fast, probably faster than anticipated by the
21   designers, and based their calculations it
22   happened faster than they anticipated.
23       Q.  Okay.  Those gentlemen were well
24   educated engineers, were they not?
25           MR. LEVINE:
```

**Page 196**

```
 1               Objection.
 2   EXAMINATION BY MR. BRUNO:
 3       Q.  They worked for the Corps.  I hope
 4   they were.
 5       A.  I don't know exactly.
 6       Q.  You don't know.
 7       A.  Yeah.  How can I offer an opinion?
 8       Q.  How about this?  Did the Corps of
 9   Engineers have -- was the state of the art
10   advanced enough in 1962 for the geologists who
11   were working for the Corps back then to
12   evaluate the soils in order to make an
13   assessment of the likely rate of subsidence in
14   that area?  Did that -- was science --
15       A.  I believe the state of the art at that
16   time wasn't available to determine the
17   subsidence.  Not until more recently have we
18   actually been able to gather significant
19   information about the rates of subsidence.
20       Q.  So obviously you've not done a
21   detailed analysis of the documents that were
22   extant back in that time frame to learn whether
23   or not the engineers did those evaluations or
24   didn't do those evaluations.
25           MR. LEVINE:
```

```
 1           Objection. Vague.
 2    EXAMINATION BY MR. BRUNO:
 3        Q.  You didn't do that.
 4        A.  I read through the documents. Okay.
 5    They do talk about subsidence. But whether the
 6    accuracy of that subsidence has been something
 7    that's been more -- that's been worked on more
 8    recently that it gives a better picture. And
 9    what I understand from when we did the IPET
10    study, that the subsidence is actually greater
11    than what they thought at that period of time.
12        Q.  What did they think the subsidence
13    would be?
14        A.  I'd have to go look and see. I can't
15    remember all of that data.
16        Q.  Okay. No problem. All right. You
17    say Figure 4 -- all right. You say pre and --
18    Figure 4 shows the pre- and post-elevations of
19    the levee along the MRGO. The figure is taken
20    from the IPET, so we know where it comes from.
21        A.  Uh-huh.
22        Q.  It shows pre- and post-Katrina
23    conditions that would be similar to the base
24    conditions used in this litigation.
25            When you say base conditions, you're
                                            Page 197

 1    referring to the conditions that were plugged
 2    into the modeling that was done by Westerink
 3    and Resio, right? Is that what you mean by
 4    base condition?
 5        A.  Right. I'm looking at the pre-Katrina
 6    elevations.
 7        Q.  Yeah. I know. I'm trying to figure
 8    out what base conditions refers to.
 9        A.  Yeah.
10        Q.  Right?
11        A.  Uh-huh.
12        Q.  All right. So this was plugged into
13    or should have being plugged into those models.
14        A.  In other words, it would be similar to
15    what they put into their --
16        Q.  Similar. Well, how much can you fudge
17    it and not have unaccurate data? How
18    dissimilar can it be without ruining the
19    outcome?
20        A.  I would say in general terms that, you
21    know, these are close to the elevations that
22    they have, probably within -- they may vary a
23    little bit if they've made some corrections on
24    other data, but in general terms they're
25    probably were within six inches or so of the
                                            Page 198

 1    data that they have.
 2        Q.  Well, as I said, Ebersole testified
 3    that he reduced the levee crest height by one
 4    half a foot in the locations where there was no
 5    levee between the 2000 LIDAR and the 2005
 6    LIDAR, and in the case where there was a levee
 7    he split the difference. That's what he did.
 8        A.  Okay.
 9        Q.  So he -- where there was no levee he
10    reduced the levee heights by a half a foot, six
11    inches.
12            MR. LEVINE:
13               No levee when?
14            MR. BRUNO:
15               After the hurricane.
16            MR. LEVINE:
17               I get that. I don't know if he
18            gets that.
19    EXAMINATION BY MR. BRUNO:
20        Q.  Do you understand?
21        A.  Go again.
22        Q.  All right. What Ebersole testified is
23    that where the levee was still in intact he
24    compared the 2000 LIDAR to the 2005 LIDAR.
25    Even though it was intact, even though it was
                                            Page 199

 1    there, he split the difference between those
 2    two numbers. Okay?
 3        A.  Okay.
 4        Q.  It doesn't make a lot of sense because
 5    it's still there, so you should use, it seems
 6    to me, the height of the levee that your LIDAR
 7    tells you it is in 2005.
 8            Would that make sense?
 9        A.  I don't know what the other
10    information that he had or why he did it.
11        Q.  Well, he says what he did was he took
12    the 2000 LIDAR and the 2005 LIDAR. Where the
13    levee was still intact, instead of using the
14    levee height that he got in 2005, when it's
15    still there, he says I split the difference
16    between the two numbers. Does that make sense?
17        A.  Um -- I'd have to know why he did it.
18    I would stick with the elevations that I have
19    here.
20        Q.  Okay. And in those locations where
21    there was no levee -- Okay? So he didn't have
22    a levee to compare to -- he took the 2005 data
23    and reduced it by half a foot.
24        A.  That's six inches.
25        Q.  Right. Six inches. And you would
                                            Page 200
```