Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ASHCROFT, FORMER ATTORNEY GENERAL, ET AL. *v.* IQBAL ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 07–1015.  Argued December 10, 2008—Decided May 18, 2009

Following the September 11, 2001, terrorist attacks, respondent Iqbal, a Pakistani Muslim, was arrested on criminal charges and detained by federal officials under restrictive conditions.  Iqbal filed a *Bivens* action against numerous federal officials, including petitioner Ashcroft, the former Attorney General, and petitioner Mueller, the Director of the Federal Bureau of Investigation (FBI).  See *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388.  The complaint alleged, *inter alia,* that petitioners designated Iqbal a person "of high interest" on account of his race, religion, or national origin, in contravention of the First and Fifth Amendments; that the FBI, under Mueller's direction, arrested and detained thousands of Arab Muslim men as part of its September-11th investigation; that petitioners knew of, condoned, and willfully and maliciously agreed to subject Iqbal to harsh conditions of confinement as a matter of policy, solely on account of the prohibited factors and for no legitimate penological interest; and that Ashcroft was the policy's "principal architect" and Mueller was "instrumental" in its adoption and execution.  After the District Court denied petitioners' motion to dismiss on qualified-immunity grounds, they invoked the collateral order doctrine to file an interlocutory appeal in the Second Circuit.  Affirming, that court assumed without discussion that it had jurisdiction and focused on the standard set forth in *Bell Atlantic Corp.* v. *Twombly*, 550 U. S. 544, for evaluating whether a complaint is sufficient to survive a motion to dismiss.  Concluding that *Twombly*'s "flexible plausibility standard" obliging a pleader to amplify a claim with factual allegations where necessary to render it plausible was inapplicable in the context of petitioners' appeal, the court held that Iqbal's complaint

Syllabus

was adequate to allege petitioners' personal involvement in discrimi-
natory decisions which, if true, violated clearly established constitu-
tional law.

*Held:*

1. The Second Circuit had subject-matter jurisdiction to affirm the
District Court's order denying petitioners' motion to dismiss.  Pp. 6–
10.

(a) Denial of a qualified-immunity claim can fall within the nar-
row class of prejudgment orders reviewable under the collateral-order
doctrine so long as the order "turns on an issue of law."  *Mitchell* v.
*Forsyth*, 472 U. S. 511, 530.  The doctrine's applicability in this con-
text is well established; an order rejecting qualified immunity at the
motion-to-dismiss stage is a "final decision" under 28 U. S. C. §1291,
which vests courts of appeals with "jurisdiction of appeals from all fi-
nal decisions of the district courts."  *Behrens* v. *Pelletier*, 516 U. S.
299, 307.  Pp. 7–8.

(b) Under these principles, the Court of Appeals had, and this
Court has, jurisdiction over the District Court's order.  Because the
order turned on an issue of law and rejected the qualified-immunity
defense, it was a final decision "subject to immediate appeal."
*Behrens, supra,* at 307.  Pp. 8–10.

2. Iqbal's complaint fails to plead sufficient facts to state a claim for
purposeful and unlawful discrimination.  Pp. 11–23.

(a) This Court assumes, without deciding, that Iqbal's First
Amendment claim is actionable in a *Bivens* action, see *Hartman* v.
*Moore,* 547 U. S. 250, 254, n. 2.  Because vicarious liability is inappli-
cable to *Bivens* and §1983 suits, see, *e.g., Monell* v. *New York City
Dept. of Social Servs.,* 436 U. S. 658, 691, the plaintiff in a suit such
as the present one must plead that each Government-official defen-
dant, through his own individual actions, has violated the Constitu-
tion.  Purposeful discrimination requires more than "intent as voli-
tion  or  intent  as  awareness  of  consequences";  it  involves  a
decisionmaker's undertaking a course of action " 'because of,' not
merely 'in spite of,' [the action's] adverse effects upon an identifiable
group."  *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256,
279.  Iqbal must plead sufficient factual matter to show that petition-
ers adopted and implemented the detention policies at issue not for a
neutral, investigative reason, but for the purpose of discriminating on
account of race, religion, or national origin.  Pp. 11–13.

(b) Under Federal Rule of Civil Procedure 8(a)(2), a complaint
must contain a "short and plain statement of the claim showing that
the pleader is entitled to relief."  "[D]etailed factual allegations" are
not required, *Twombly,* 550 U. S., at 555, but the Rule does call for
sufficient factual matter, accepted as true, to "state a claim to relief

Syllabus

that is plausible on its face," *id.*, at 570. A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556. Two working principles underlie *Twombly*. First, the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements. *Id.,* at 555. Second, determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense. *Id.,* at 556. A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Pp. 13–16.

(c) Iqbal's pleadings do not comply with Rule 8 under *Twombly*. Several of his allegations—that petitioners agreed to subject him to harsh conditions as a matter of policy, solely on account of discriminatory factors and for no legitimate penological interest; that Ashcroft was that policy's "principal architect"; and that Mueller was "instrumental" in its adoption and execution—are conclusory and not entitled to be assumed true. Moreover, the factual allegations that the FBI, under Mueller, arrested and detained thousands of Arab Muslim men, and that he and Ashcroft approved the detention policy, do not plausibly suggest that petitioners purposefully discriminated on prohibited grounds. Given that the September 11 attacks were perpetrated by Arab Muslims, it is not surprising that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the policy's purpose was to target neither Arabs nor Muslims. Even if the complaint's well-pleaded facts gave rise to a plausible inference that Iqbal's arrest was the result of unconstitutional discrimination, that inference alone would not entitle him to relief: His claims against petitioners rest solely on their ostensible policy of holding detainees categorized as "of high interest," but the complaint does not contain facts plausibly showing that their policy was based on discriminatory factors. Pp. 16–20.

(d) Three of Iqbal's arguments are rejected. Pp. 20–23.

(i) His claim that *Twombly* should be limited to its antitrust context is not supported by that case or the Federal Rules. Because *Twombly* interpreted and applied Rule 8, which in turn governs the

4                          ASHCROFT *v.* IQBAL

Syllabus

pleading standard "in all civil actions," Rule 1, the case applies to antitrust and discrimination suits alike, see 550 U. S., at 555–556, and n. 14.  P. 20.

(ii) Rule 8's pleading requirements need not be relaxed based on the Second Circuit's instruction that the District Court cabin discovery to preserve petitioners' qualified-immunity defense in anticipation of a summary judgment motion.  The question presented by a motion to dismiss for insufficient pleadings does not turn on the controls placed on the discovery process.  *Twombly*, *supra*, at 559.  And because Iqbal's complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise.  Pp. 20–22.

(iii) Rule 9(b)—which requires particularity when pleading "fraud or mistake" but allows "other conditions of a person's mind [to] be alleged generally"—does not require courts to credit a complaint's conclusory statements without reference to its factual context.  Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard.  It does not give him license to evade Rule 8's less rigid, though still operative, strictures.  Pp. 22–23.

(e) The Second Circuit should decide in the first instance whether to remand to the District Court to allow Iqbal to seek leave to amend his deficient complaint.  P. 23.

490 F. 3d 143, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, and ALITO, JJ., joined.  SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined.  BREYER, J., filed a dissenting opinion.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–1015

_____

## JOHN D. ASHCROFT, FORMER ATTORNEY GENERAL, ET AL., PETITIONERS *v.* JAVAID IQBAL ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[May 18, 2009]

JUSTICE KENNEDY delivered the opinion of the Court.

Respondent Javaid Iqbal is a citizen of Pakistan and a Muslim. In the wake of the September 11, 2001, terrorist attacks he was arrested in the United States on criminal charges and detained by federal officials. Respondent claims he was deprived of various constitutional protections while in federal custody. To redress the alleged deprivations, respondent filed a complaint against numerous federal officials, including John Ashcroft, the former Attorney General of the United States, and Robert Mueller, the Director of the Federal Bureau of Investigation (FBI). Ashcroft and Mueller are the petitioners in the case now before us. As to these two petitioners, the complaint alleges that they adopted an unconstitutional policy that subjected respondent to harsh conditions of confinement on account of his race, religion, or national origin.

In the District Court petitioners raised the defense of qualified immunity and moved to dismiss the suit, contending the complaint was not sufficient to state a claim against them. The District Court denied the motion to dismiss, concluding the complaint was sufficient to state a

Opinion of the Court

claim despite petitioners' official status at the times in question.  Petitioners brought an interlocutory appeal in the Court of Appeals for the Second Circuit.  The court, without discussion, assumed it had jurisdiction over the order denying the motion to dismiss; and it affirmed the District Court's decision.

Respondent's account of his prison ordeal could, if proved, demonstrate unconstitutional misconduct by some governmental actors.  But the allegations and pleadings with respect to these actors are not before us here.  This case instead turns on a narrower question: Did respondent, as the plaintiff in the District Court, plead factual matter that, if taken as true, states a claim that petitioners deprived him of his clearly established constitutional rights.  We hold respondent's pleadings are insufficient.

I

Following the 2001 attacks, the FBI and other entities within the Department of Justice began an investigation of vast reach to identify the assailants and prevent them from attacking anew.  The FBI dedicated more than 4,000 special agents and 3,000 support personnel to the endeavor.  By September 18 "the FBI had received more than 96,000 tips or potential leads from the public." Dept. of Justice, Office of Inspector General, The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks 1, 11–12 (Apr. 2003) (hereinafter    OIG    Report),    http://www.usdoj.gov/oig/special/ 0306/full.pdf?bcsi_scan_61073EC0F74759AD=0&bcsi_scan _filename=full.pdf (as visited May 14, 2009, and available in Clerk of Court's case file).

In the ensuing months the FBI questioned more than 1,000 people with suspected links to the attacks in particular or to terrorism in general.  *Id.*, at 1.  Of those individuals, some 762 were held on immigration charges; and

Opinion of the Court

a 184-member subset of that group was deemed to be "of 'high interest'" to the investigation. *Id.,* at 111. The high-interest detainees were held under restrictive conditions designed to prevent them from communicating with the general prison population or the outside world. *Id.,* at 112–113.

Respondent was one of the detainees. According to his complaint, in November 2001 agents of the FBI and Immigration and Naturalization Service arrested him on charges of fraud in relation to identification documents and conspiracy to defraud the United States. *Iqbal* v. *Hasty,* 490 F. 3d 143, 147–148 (CA2 2007). Pending trial for those crimes, respondent was housed at the Metropolitan Detention Center (MDC) in Brooklyn, New York. Respondent was designated a person "of high interest" to the September 11 investigation and in January 2002 was placed in a section of the MDC known as the Administrative Maximum Special Housing Unit (ADMAX SHU). *Id.,* at 148. As the facility's name indicates, the ADMAX SHU incorporates the maximum security conditions allowable under Federal Bureau of Prison regulations. *Ibid.* ADMAX SHU detainees were kept in lockdown 23 hours a day, spending the remaining hour outside their cells in handcuffs and leg irons accompanied by a four-officer escort. *Ibid.*

Respondent pleaded guilty to the criminal charges, served a term of imprisonment, and was removed to his native Pakistan. *Id.,* at 149. He then filed a *Bivens* action in the United States District Court for the Eastern District of New York against 34 current and former federal officials and 19 "John Doe" federal corrections officers. See *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971). The defendants range from the correctional officers who had day-to-day contact with respondent during the term of his confinement, to the wardens of the MDC facility, all the way to petitioners—officials who

were at the highest level of the federal law enforcement hierarchy. First Amended Complaint in No. 04–CV–1809 (JG)(JA), ¶¶10–11, App. to Pet. for Cert. 157a (hereinafter Complaint).

The 21-cause-of-action complaint does not challenge respondent's arrest or his confinement in the MDC's general prison population. Rather, it concentrates on his treatment while confined to the ADMAX SHU. The complaint sets forth various claims against defendants who are not before us. For instance, the complaint alleges that respondent's jailers "kicked him in the stomach, punched him in the face, and dragged him across" his cell without justification, *id.,* ¶113, App. to Pet. for Cert. 176a; subjected him to serial strip and body-cavity searches when he posed no safety risk to himself or others, *id.,* ¶¶143–145, App. to Pet. for Cert. 182a; and refused to let him and other Muslims pray because there would be "[n]o prayers for terrorists," *id.,* ¶154, App. to Pet. for Cert. 184a.

The allegations against petitioners are the only ones relevant here. The complaint contends that petitioners designated respondent a person of high interest on account of his race, religion, or national origin, in contravention of the First and Fifth Amendments to the Constitution. The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11." *Id.,* ¶47, at 164a. It further alleges that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." *Id.,* ¶69, at 168a. Lastly, the complaint posits that petitioners "each knew of, condoned, and willfully and maliciously agreed to subject" respondent to harsh conditions of confinement "as a matter of policy, solely on account of [his]

Opinion of the Court

religion, race, and/or national origin and for no legitimate penological interest." *Id.,* ¶96, at 172a–173a. The pleading names Ashcroft as the "principal architect" of the policy, *id.,* ¶10, at 157a, and identifies Mueller as "instrumental in [its] adoption, promulgation, and implementation." *Id.,* ¶11, at 157a.

Petitioners moved to dismiss the complaint for failure to state sufficient allegations to show their own involvement in clearly established unconstitutional conduct. The District Court denied their motion. Accepting all of the allegations in respondent's complaint as true, the court held that "it cannot be said that there [is] no set of facts on which [respondent] would be entitled to relief as against" petitioners. *Id.,* at 136a–137a (relying on *Conley* v. *Gibson,* 355 U. S. 41 (1957)). Invoking the collateral-order doctrine petitioners filed an interlocutory appeal in the United States Court of Appeals for the Second Circuit. While that appeal was pending, this Court decided *Bell Atlantic Corp.* v. *Twombly,* 550 U. S. 544 (2007), which discussed the standard for evaluating whether a complaint is sufficient to survive a motion to dismiss.

The Court of Appeals considered *Twombly*'s applicability to this case. Acknowledging that *Twombly* retired the *Conley* no-set-of-facts test relied upon by the District Court, the Court of Appeals' opinion discussed at length how to apply this Court's "standard for assessing the adequacy of pleadings." 490 F. 3d, at 155. It concluded that *Twombly* called for a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Id.,* at 157–158. The court found that petitioners' appeal did not present one of "those contexts" requiring amplification. As a consequence, it held respondent's pleading adequate to allege petitioners' personal involvement in discriminatory decisions which, if true, violated clearly established consti-

6                    ASHCROFT *v.* IQBAL

Opinion of the Court

tutional law.  *Id.,* at 174.

Judge Cabranes concurred.  He agreed that the major-
ity's "discussion of the relevant pleading standards re-
flect[ed] the uneasy compromise . . . between a qualified
immunity privilege rooted in the need to preserve the
effectiveness of government as contemplated by our consti-
tutional structure and the pleading requirements of Rule
8(a) of the Federal Rules of Civil Procedure."  *Id.,* at 178
(internal quotation marks and citations omitted).  Judge
Cabranes nonetheless expressed concern at the prospect of
subjecting high-ranking Government officials—entitled to
assert the defense of qualified immunity and charged with
responding to "a national and international security emer-
gency unprecedented in the history of the American Re-
public"—to the burdens of discovery on the basis of a
complaint as nonspecific as respondent's.  *Id.,* at 179.
Reluctant to vindicate that concern as a member of the
Court of Appeals, *ibid.,* Judge Cabranes urged this Court
to address the appropriate pleading standard "at the
earliest opportunity."  *Id.,* at 178.  We granted certiorari,
554 U. S. ___ (2008), and now reverse.

II

We first address whether the Court of Appeals had
subject-matter jurisdiction to affirm the District Court's
order denying petitioners' motion to dismiss.  Respondent
disputed subject-matter jurisdiction in the Court of Ap-
peals, but the court hardly discussed the issue.  We are
not free to pretermit the question.  Subject-matter juris-
diction cannot be forfeited or waived and should be consid-
ered when fairly in doubt.  *Arbaugh* v. *Y & H Corp.*, 546
U. S. 500, 514 (2006) (citing *United States* v. *Cotton*, 535
U. S. 625, 630 (2002)).  According to respondent, the Dis-
trict Court's order denying petitioners' motion to dismiss
is not appealable under the collateral-order doctrine.  We
disagree.

Opinion of the Court

### A

With exceptions inapplicable here, Congress has vested the courts of appeals with "jurisdiction of appeals from all final decisions of the district courts of the United States." 28 U. S. C. §1291. Though the statute's finality requirement ensures that "interlocutory appeals—appeals before the end of district court proceedings—are the exception, not the rule," *Johnson* v. *Jones*, 515 U. S. 304, 309 (1995), it does not prevent "review of all prejudgment orders." *Behrens* v. *Pelletier*, 516 U. S. 299, 305 (1996). Under the collateral-order doctrine a limited set of district-court orders are reviewable "though short of final judgment." *Ibid.* The orders within this narrow category "are immediately appealable because they 'finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.'" *Ibid.* (quoting *Cohen* v. *Beneficial Industrial Loan Corp.,* 337 U. S. 541, 546 (1949)).

A district-court decision denying a Government officer's claim of qualified immunity can fall within the narrow class of appealable orders despite "the absence of a final judgment." *Mitchell* v. *Forsyth*, 472 U. S. 511, 530 (1985). This is so because qualified immunity—which shields Government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights," *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982)—is both a defense to liability and a limited "entitlement not to stand trial or face the other burdens of litigation." *Mitchell*, *supra*, 472 U. S., at 526. Provided it "turns on an issue of law," *id.*, at 530, a district-court order denying qualified immunity "'conclusively determine[s]'" that the defendant must bear the burdens of discovery; is "conceptually distinct from the merits of the plaintiff's claim"; and would prove "effec-

tively unreviewable on appeal from a final judgment." *Id.*, at 527−528 (citing *Cohen, supra,* at 546). As a general matter, the collateral-order doctrine may have expanded beyond the limits dictated by its internal logic and the strict application of the criteria set out in *Cohen*. But the applicability of the doctrine in the context of qualified-immunity claims is well established; and this Court has been careful to say that a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a "final decision" within the meaning of §1291. *Behrens,* 516 U. S., at 307.

### B

Applying these principles, we conclude that the Court of Appeals had jurisdiction to hear petitioners' appeal. The District Court's order denying petitioners' motion to dismiss turned on an issue of law and rejected the defense of qualified immunity. It was therefore a final decision "subject to immediate appeal." *Ibid.* Respondent says that "a qualified immunity appeal based solely on the complaint's failure to state a claim, and not on the ultimate issues relevant to the qualified immunity defense itself, is not a proper subject of interlocutory jurisdiction." Brief for Respondent Iqbal 15 (hereinafter Iqbal Brief). In other words, respondent contends the Court of Appeals had jurisdiction to determine whether his complaint avers a clearly established constitutional violation but that it lacked jurisdiction to pass on the sufficiency of his pleadings. Our opinions, however, make clear that appellate jurisdiction is not so strictly confined.

In *Hartman* v. *Moore,* 547 U. S. 250 (2006), the Court reviewed an interlocutory decision denying qualified immunity. The legal issue decided in *Hartman* concerned the elements a plaintiff "must plead and prove in order to win" a First Amendment retaliation claim. *Id.,* at 257, n. 5. Similarly, two Terms ago in *Wilkie* v. *Robbins,* 551

Opinion of the Court

U. S. 537 (2007), the Court considered another interlocutory order denying qualified immunity.  The legal issue there was whether a *Bivens* action can be employed to challenge interference with property rights.  551 U. S., at 549, n. 4.  These cases cannot be squared with respondent's argument that the collateral-order doctrine restricts appellate jurisdiction to the "ultimate issu[e]" whether the legal wrong asserted was a violation of clearly established law while excluding the question whether the facts pleaded establish such a violation.  Iqbal Brief 15.  Indeed, the latter question is even more clearly within the category of appealable decisions than the questions presented in *Hartman* and *Wilkie*, since whether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded.  In that sense the sufficiency of respondent's pleadings is both "inextricably intertwined with," *Swint* v. *Chambers County Comm'n*, 514 U. S. 35, 51 (1995), and "directly implicated by," *Hartman, supra*, at 257, n. 5, the qualified immunity defense.

Respondent counters that our holding in *Johnson*, 515 U. S. 304, confirms the want of subject-matter jurisdiction here.  That is incorrect.  The allegation in *Johnson* was that five defendants, all of them police officers, unlawfully beat the plaintiff.  *Johnson* considered "the appealability of a portion of" the District Court's summary judgment order that, "though entered in a 'qualified immunity' case, determine[d] only" that there was a genuine issue of material fact that three of the defendants participated in the beating.  *Id.,* at 313.

In finding that order not a "final decision" for purposes of §1291, the *Johnson* Court cited *Mitchell* for the proposition that only decisions turning "'*on an issue of law*'" are subject to immediate appeal.  515 U. S., at 313.  Though determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal

question that sits near the law-fact divide.  Or as we said in *Johnson*, it is a "fact-related" legal inquiry.  *Id.,* at 314. To conduct it, a court of appeals may be required to consult a "vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials." *Id.,* at 316.  That process generally involves matters more within a district court's ken and may replicate inefficiently questions that will arise on appeal following final judgment.  *Ibid.*  Finding those concerns predominant, *Johnson* held that the collateral orders that are "final" under *Mitchell* turn on "abstract," rather than "fact-based," issues of law.  515 U. S., at 317.

The concerns that animated the decision in *Johnson* are absent when an appellate court considers the disposition of a motion to dismiss a complaint for insufficient pleadings.  True, the categories of "fact-based" and "abstract" legal questions used to guide the Court's decision in *Johnson* are not well defined.  Here, however, the order denying petitioners' motion to dismiss falls well within the latter class.  Reviewing that order, the Court of Appeals considered only the allegations contained within the four corners of respondent's complaint; resort to a "vast pretrial record" on petitioners' motion to dismiss was unnecessary. *Id.,* at 316.  And determining whether respondent's complaint has the "heft" to state a claim is a task well within an appellate court's core competency.  *Twombly,* 550 U. S., at 557.  Evaluating the sufficiency of a complaint is not a "fact-based" question of law, so the problem the Court sought to avoid in *Johnson* is not implicated here.  The District Court's order denying petitioners' motion to dismiss is a final decision under the collateral-order doctrine over which the Court of Appeals had, and this Court has, jurisdiction.  We proceed to consider the merits of petitioners' appeal.

### III

In *Twombly, supra,* at 553–554, the Court found it necessary first to discuss the antitrust principles implicated by the complaint. Here too we begin by taking note of the elements a plaintiff must plead to state a claim of unconstitutional discrimination against officials entitled to assert the defense of qualified immunity.

In *Bivens*—proceeding on the theory that a right suggests a remedy—this Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 66 (2001). Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability "to any new context or new category of defendants." 534 U. S., at 68. See also *Wilkie*, 551 U. S., at 549–550. That reluctance might well have disposed of respondent's First Amendment claim of religious discrimination. For while we have allowed a *Bivens* action to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment, see *Davis* v. *Passman*, 442 U. S. 228 (1979), we have not found an implied damages remedy under the Free Exercise Clause. Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment. *Bush* v. *Lucas*, 462 U. S. 367 (1983). Petitioners do not press this argument, however, so we assume, without deciding, that respondent's First Amendment claim is actionable under *Bivens*.

In the limited settings where *Bivens* does apply, the implied cause of action is the "federal analog to suits brought against state officials under Rev. Stat. §1979, 42 U. S. C. §1983." *Hartman*, 547 U. S., at 254, n. 2. Cf. *Wilson* v. *Layne*, 526 U. S. 603, 609 (1999). Based on the rules our precedents establish, respondent correctly concedes that Government officials may not be held liable for

12          ASHCROFT *v.* IQBAL

Opinion of the Court

the unconstitutional conduct of their subordinates under a theory of *respondeat superior.* Iqbal Brief 46 ("[I]t is undisputed that supervisory *Bivens* liability cannot be established solely on a theory of *respondeat superior*"). See *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 691 (1978) (finding no vicarious liability for a municipal "person" under 42 U. S. C. §1983); see also *Dunlop* v. *Munroe*, 7 Cranch 242, 269 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); *Robertson* v. *Sichel*, 127 U. S. 507, 515–516 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to *Bivens* and §1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue. Where the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose. *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 540–541 (1993) (First Amendment); *Washington* v. *Davis*, 426 U. S. 229, 240 (1976) (Fifth Amendment). Under extant precedent purposeful discrimination requires more than "intent as volition or intent as awareness of consequences." *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 279 (1979). It instead involves a decisionmaker's undertaking a course of action "'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Ibid.* It follows that, to state a claim based on a violation of a

Opinion of the Court

clearly established right, respondent must plead sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin.

Respondent disagrees. He argues that, under a theory of "supervisory liability," petitioners can be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees." Iqbal Brief 45–46. That is to say, respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents. In a §1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

## IV

### A

We turn to respondent's complaint. Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly,* 550 U. S. 544, the pleading standard Rule 8 announces does

not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555 (citing *Papasan* v. *Allain,* 478 U. S. 265, 286 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U. S., at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly.* First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.,* at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a com-

Opinion of the Court

plaint that states a plausible claim for relief survives a motion to dismiss. *Id.,* at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F. 3d, at 157–158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Our decision in *Twombly* illustrates the two-pronged approach. There, we considered the sufficiency of a complaint alleging that incumbent telecommunications providers had entered an agreement not to compete and to forestall competitive entry, in violation of the Sherman Act, 15 U. S. C. §1. Recognizing that §1 enjoins only anticompetitive conduct "effected by a contract, combination, or conspiracy," *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U. S. 752, 775 (1984), the plaintiffs in *Twombly* flatly pleaded that the defendants "ha[d] entered into a contract, combination or conspiracy to prevent competitive entry . . . and ha[d] agreed not to compete with one another." 550 U. S., at 551 (internal quotation marks omitted). The complaint also alleged that the defendants' "parallel course of conduct . . . to prevent competition" and inflate prices was indicative of the unlawful agreement alleged. *Ibid.* (internal quotation marks omitted).

The Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a "'legal conclusion'" and, as such, was not entitled to the assumption of truth. *Id.,* at 555. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the "nub" of the plaintiffs' complaint—the well-pleaded, nonconclusory factual allegation of parallel behavior—to determine whether it gave rise to a "plausible suggestion of conspiracy." *Id.,* at 565–566. Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. *Id.,* at 567. Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed. *Id.,* at 570.

B

Under *Twombly*'s construction of Rule 8, we conclude that respondent's complaint has not "nudged [his] claims" of invidious discrimination "across the line from conceivable to plausible." *Ibid.*

We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth. Respondent pleads that petitioners "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." Complaint ¶96, App. to Pet. for Cert. 173a–174a. The complaint alleges that Ashcroft was the "principal architect" of this invidious policy, *id.,* ¶10, at 157a, and that

Mueller was "instrumental" in adopting and executing it, *id.*, ¶11, at 157a. These bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing more than a "formulaic recitation of the elements" of a constitutional discrimination claim, 550 U. S., at 555, namely, that petitioners adopted a policy "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U. S., at 279. As such, the allegations are conclusory and not entitled to be assumed true. *Twombly*, *supra,* 550 U. S., at 554–555. To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. We do not so characterize them any more than the Court in *Twombly* rejected the plaintiffs' express allegation of a "'contract, combination or conspiracy to prevent competitive entry,'" *id.*, at 551, because it thought that claim too chimerical to be maintained. It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.

We next consider the factual allegations in respondent's complaint to determine if they plausibly suggest an entitlement to relief. The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11." Complaint ¶47, App. to Pet. for Cert. 164a. It further claims that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." *Id.,* ¶69, at 168a. Taken as true, these allegations are consistent with petitioners' purposefully designating detainees "of high interest" because of their race, religion, or national origin. But given more likely explanations, they do not plausibly establish this purpose.

Opinion of the Court

The September 11 attacks were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda, an Islamic fundamentalist group.  Al Qaeda was headed by another Arab Muslim— Osama bin Laden—and composed in large part of his Arab Muslim disciples.  It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims.  On the facts respondent alleges the arrests Mueller oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts.  As between that "obvious alternative explanation" for the arrests, *Twombly, supra,* at 567, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion.

But even if the complaint's well-pleaded facts give rise to a plausible inference that respondent's arrest was the result of unconstitutional discrimination, that inference alone would not entitle respondent to relief.  It is important to recall that respondent's complaint challenges neither the constitutionality of his arrest nor his initial detention in the MDC.  Respondent's constitutional claims against petitioners rest solely on their ostensible "policy of holding post-September-11th detainees" in the ADMAX SHU once they were categorized as "of high interest." Complaint ¶69, App. to Pet. for Cert. 168a.  To prevail on that theory, the complaint must contain facts plausibly showing that petitioners purposefully adopted a policy of classifying post-September-11 detainees as "of high interest" because of their race, religion, or national origin.

This the complaint fails to do.  Though respondent alleges that various other defendants, who are not before

Opinion of the Court

us, may have labeled him a person of "of high interest" for impermissible reasons, his only factual allegation against petitioners accuses them of adopting a policy approving "restrictive conditions of confinement" for post-September-11 detainees until they were "'cleared' by the FBI." *Ibid.* Accepting the truth of that allegation, the complaint does not show, or even intimate, that petitioners purposefully housed detainees in the ADMAX SHU due to their race, religion, or national origin.  All it plausibly suggests is that the Nation's top law enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity.  Respondent does not argue, nor can he, that such a motive would violate petitioners' constitutional obligations.  He would need to allege more by way of factual content to "nudg[e]" his claim of purposeful discrimination "across the line from conceivable to plausible." *Twombly*, 550 U. S., at 570.

To be sure, respondent can attempt to draw certain contrasts between the pleadings the Court considered in *Twombly* and the pleadings at issue here.  In *Twombly*, the complaint alleged general wrongdoing that extended over a period of years, *id.,* at 551, whereas here the complaint alleges discrete wrongs—for instance, beatings—by lower level Government actors.  The allegations here, if true, and if condoned by petitioners, could be the basis for some inference of wrongful intent on petitioners' part.  Despite these distinctions, respondent's pleadings do not suffice to state a claim.  Unlike in *Twombly*, where the doctrine of *respondeat superior* could bind the corporate defendant, here, as we have noted, petitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic.  Yet respondent's complaint does not contain any factual allegation sufficient to plausibly suggest petitioners' discriminatory state

Opinion of the Court

of mind.  His pleadings thus do not meet the standard
necessary to comply with Rule 8.

It is important to note, however, that we express no
opinion concerning the sufficiency of respondent's com-
plaint against the defendants who are not before us.
Respondent's account of his prison ordeal alleges serious
official misconduct that we need not address here.  Our
decision is limited to the determination that respondent's
complaint does not entitle him to relief from petitioners.

### C

Respondent offers three arguments that bear on our
disposition of his case, but none is persuasive.

### 1

Respondent first says that our decision in *Twombly*
should be limited to pleadings made in the context of an
antitrust dispute.  Iqbal Brief 37–38.  This argument is
not supported by *Twombly* and is incompatible with the
Federal Rules of Civil Procedure.  Though *Twombly* de-
termined the sufficiency of a complaint sounding in anti-
trust, the decision was based on our interpretation and
application of Rule 8.  550 U. S., at 554.  That Rule in turn
governs the pleading standard "in all civil actions and
proceedings in the United States district courts."  Fed.
Rule Civ. Proc. 1.  Our decision in *Twombly* expounded the
pleading standard for "all civil actions," *ibid.*, and it ap-
plies to antitrust and discrimination suits alike.  See 550
U. S., at 555–556, and n. 3.

### 2

Respondent next implies that our construction of Rule 8
should be tempered where, as here, the Court of Appeals
has "instructed the district court to cabin discovery in such
a way as to preserve" petitioners' defense of qualified
immunity "as much as possible in anticipation of a sum-
mary judgment motion."  Iqbal Brief 27.  We have held,

Opinion of the Court

however, that the question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls placed upon the discovery process. *Twombly*, *supra*, at 559 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side" (internal quotation marks and citation omitted)).

Our rejection of the careful-case-management approach is especially important in suits where Government-official defendants are entitled to assert the defense of qualified immunity.  The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including "avoidance of disruptive discovery."  *Siegert* v. *Gilley*, 500 U. S. 226, 236 (1991) (KENNEDY, J., concurring in judgment).  There are serious and legitimate reasons for this.  If a Government official is to devote time to his or her duties, and to the formulation of sound and responsible policies, it is counterproductive to require the substantial diversion that is attendant to participating in litigation and making informed decisions as to how it should proceed.  Litigation, though necessary to ensure that officials comply with the law, exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government.  The costs of diversion are only magnified when Government officials are charged with responding to, as Judge Cabranes aptly put it, "a national and international security emergency unprecedented in the history of the American Republic." 490 F. 3d, at 179.

It is no answer to these concerns to say that discovery for petitioners can be deferred while pretrial proceedings continue for other defendants.  It is quite likely that, when

discovery as to the other parties proceeds, it would prove necessary for petitioners and their counsel to participate in the process to ensure the case does not develop in a misleading or slanted way that causes prejudice to their position. Even if petitioners are not yet themselves subject to discovery orders, then, they would not be free from the burdens of discovery.

We decline respondent's invitation to relax the pleading requirements on the ground that the Court of Appeals promises petitioners minimally intrusive discovery. That promise provides especially cold comfort in this pleading context, where we are impelled to give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties. Because respondent's complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise.

### 3

Respondent finally maintains that the Federal Rules expressly allow him to allege petitioners' discriminatory intent "generally," which he equates with a conclusory allegation. Iqbal Brief 32 (citing Fed. Rule Civ. Proc. 9). It follows, respondent says, that his complaint is sufficiently well pleaded because it claims that petitioners discriminated against him "on account of [his] religion, race, and/or national origin and for no legitimate penological interest." Complaint ¶96, App. to Pet. for Cert. 172a–173a. Were we required to accept this allegation as true, respondent's complaint would survive petitioners' motion to dismiss. But the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context.

It is true that Rule 9(b) requires particularity when pleading "fraud or mistake," while allowing "[m]alice, intent, knowledge, and other conditions of a person's mind

Opinion of the Court

[to] be alleged generally." But "generally" is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8. See 5A C. Wright & A. Miller, Federal Practice and Procedure §1301, p. 291 (3d ed. 2004) ("[A] rigid rule requiring the detailed pleading of a condition of mind would be undesirable because, absent overriding considerations pressing for a specificity requirement, as in the case of averments of fraud or mistake, the general 'short and plain statement of the claim' mandate in Rule 8(a) . . . should control the second sentence of Rule 9(b)"). And Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss.

## V

We hold that respondent's complaint fails to plead sufficient facts to state a claim for purposeful and unlawful discrimination against petitioners. The Court of Appeals should decide in the first instance whether to remand to the District Court so that respondent can seek leave to amend his deficient complaint.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 556 U. S. ____ (2009)          1

SOUTER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

No. 07–1015

————————

## JOHN D. ASHCROFT, FORMER ATTORNEY GENERAL, ET AL., PETITIONERS *v.* JAVAID IQBAL ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[May 18, 2009]

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

This case is here on the uncontested assumption that *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), allows personal liability based on a federal officer's violation of an individual's rights under the First and Fifth Amendments, and it comes to us with the explicit concession of petitioners Ashcroft and Mueller that an officer may be subject to *Bivens* liability as a supervisor on grounds other than *respondeat superior*. The Court apparently rejects this concession and, although it has no bearing on the majority's resolution of this case, does away with supervisory liability under *Bivens*. The majority then misapplies the pleading standard under *Bell Atlantic Corp.* v. *Twombly*, 550 U. S. 544 (2007), to conclude that the complaint fails to state a claim. I respectfully dissent from both the rejection of supervisory liability as a cognizable claim in the face of petitioners' concession, and from the holding that the complaint fails to satisfy Rule 8(a)(2) of the Federal Rules of Civil Procedure.

I

A

Respondent Iqbal was arrested in November 2001 on charges of conspiracy to defraud the United States and

2                          ASHCROFT *v.* IQBAL

fraud in relation to identification documents, and was placed in pretrial detention at the Metropolitan Detention Center in Brooklyn, New York. *Iqbal* v. *Hasty,* 490 F. 3d 143, 147–148 (CA2 2007). He alleges that FBI officials carried out a discriminatory policy by designating him as a person "'of high interest'" in the investigation of the September 11 attacks solely because of his race, religion, or national origin. Owing to this designation he was placed in the detention center's Administrative Maximum Special Housing Unit for over six months while awaiting the fraud trial. *Id.*, at 148. As I will mention more fully below, Iqbal contends that Ashcroft and Mueller were at the very least aware of the discriminatory detention policy and condoned it (and perhaps even took part in devising it), thereby violating his First and Fifth Amendment rights.[1]

Iqbal claims that on the day he was transferred to the special unit, prison guards, without provocation, "picked him up and threw him against the wall, kicked him in the stomach, punched him in the face, and dragged him across the room." First Amended Complaint in No. 04–CV–1809 (JG) (JA), ¶113, App. to Pet. for Cert. 176a (hereinafter Complaint). He says that after being attacked a second time he sought medical attention but was denied care for two weeks. *Id.*, ¶¶187–188, at 189a. According to Iqbal's complaint, prison staff in the special unit subjected him to unjustified strip and body cavity searches, *id.*, ¶¶136–140, at 181a, verbally berated him as a "'terrorist'" and "'Muslim killer,'" *id.*, ¶87, at 170a–171a, refused to give him adequate food, *id.*, ¶91, at 171a–172a, and intentionally turned on air conditioning during the winter and heating during the summer, *id.*, ¶84, at 170a. He claims that

---

[1] Iqbal makes no claim against Ashcroft and Mueller based simply on his right, as a pretrial detainee, to be free from punishment prior to an adjudication of guilt on the fraud charges. See *Bell* v. *Wolfish*, 441 U. S. 520, 535 (1979).

prison staff interfered with his attempts to pray and engage in religious study, *id.,* ¶¶153–154, at 183a–184a, and with his access to counsel, *id.,* ¶¶168, 171, at 186a–187a.

The District Court denied Ashcroft and Mueller's motion to dismiss Iqbal's discrimination claim, and the Court of Appeals affirmed.  Ashcroft and Mueller then asked this Court to grant certiorari on two questions:

> "1. Whether a conclusory allegation that a cabinet-level officer or other high-ranking official knew of, condoned, or agreed to subject a plaintiff to allegedly unconstitutional acts purportedly committed by subordinate officials is sufficient to state individual-capacity claims against those officials under *Bivens.*
> "2. Whether a cabinet-level officer or other high-ranking official may be held personally liable for the allegedly unconstitutional acts of subordinate officials on the ground that, as high-level supervisors, they had constructive notice of the discrimination allegedly carried out by such subordinate officials."  Pet. for Cert. I.

The Court granted certiorari on both questions.  The first is about pleading; the second goes to the liability standard.

In the first question, Ashcroft and Mueller did not ask whether "a cabinet-level officer or other high-ranking official" who "knew of, condoned, or agreed to subject a plaintiff to allegedly unconstitutional acts committed by subordinate officials" was subject to liability under *Bivens.* In fact, they conceded in their petition for certiorari that they would be liable if they had "actual knowledge" of discrimination by their subordinates and exhibited "'deliberate indifference'" to that discrimination.  Pet. for Cert. 29 (quoting *Farmer* v. *Brennan,* 511 U. S. 825, 837 (1994)).  Instead, they asked the Court to address whether Iqbal's allegations against them (which they call conclusory) were sufficient to satisfy Rule 8(a)(2), and in particu-

SOUTER, J., dissenting

lar whether the Court of Appeals misapplied our decision in *Twombly* construing that rule. Pet. for Cert. 11–24.

In the second question, Ashcroft and Mueller asked this Court to say whether they could be held personally liable for the actions of their subordinates based on the theory that they had constructive notice of their subordinates' unconstitutional conduct. *Id.*, at 25–33. This was an odd question to pose, since Iqbal has never claimed that Ashcroft and Mueller are liable on a constructive notice theory. Be that as it may, the second question challenged only one possible ground for imposing supervisory liability under *Bivens*. In sum, both questions assumed that a defendant could raise a *Bivens* claim on theories of supervisory liability other than constructive notice, and neither question asked the parties or the Court to address the elements of such liability.

The briefing at the merits stage was no different. Ashcroft and Mueller argued that the factual allegations in Iqbal's complaint were insufficient to overcome their claim of qualified immunity; they also contended that they could not be held liable on a theory of constructive notice. Again they conceded, however, that they would be subject to supervisory liability if they "had actual knowledge of the assertedly discriminatory nature of the classification of suspects as being 'of high interest' and they were deliberately indifferent to that discrimination." Brief for Petitioners 50; see also Reply Brief for Petitioners 21–22. Iqbal argued that the allegations in his complaint were sufficient under Rule 8(a)(2) and *Twombly*, and conceded that as a matter of law he could not recover under a theory of *respondeat superior*. See Brief for Respondent Iqbal 46. Thus, the parties agreed as to a proper standard of supervisory liability, and the disputed question was whether Iqbal's complaint satisfied Rule 8(a)(2).

Without acknowledging the parties' agreement as to the standard of supervisory liability, the Court asserts that it

SOUTER, J., dissenting

must *sua sponte* decide the scope of supervisory liability here. *Ante*, at 11–13. I agree that, absent Ashcroft and Mueller's concession, that determination would have to be made; without knowing the elements of a supervisory liability claim, there would be no way to determine whether a plaintiff had made factual allegations amounting to grounds for relief on that claim. See *Twombly*, 550 U. S., at 557–558. But deciding the scope of supervisory *Bivens* liability in this case is uncalled for. There are several reasons, starting with the position Ashcroft and Mueller have taken and following from it.

First, Ashcroft and Mueller have, as noted, made the critical concession that a supervisor's knowledge of a subordinate's unconstitutional conduct and deliberate indifference to that conduct are grounds for *Bivens* liability. Iqbal seeks to recover on a theory that Ashcroft and Mueller at least knowingly acquiesced (and maybe more than acquiesced) in the discriminatory acts of their subordinates; if he can show this, he will satisfy Ashcroft and Mueller's own test for supervisory liability. See *Farmer*, *supra*, at 842 (explaining that a prison official acts with "deliberate indifference" if "the official acted or failed to act despite his knowledge of a substantial risk of serious harm"). We do not normally override a party's concession, see, *e.g.*, *United States* v. *International Business Machines Corp.*, 517 U. S. 843, 855 (1996) (holding that "[i]t would be inappropriate for us to [e]xamine in this case, without the benefit of the parties' briefing," an issue the Government had conceded), and doing so is especially inappropriate when, as here, the issue is unnecessary to decide the case, see *infra*, at 8. I would therefore accept Ashcroft and Mueller's concession for purposes of this case and proceed to consider whether the complaint alleges at least knowledge and deliberate indifference.

Second, because of the concession, we have received no briefing or argument on the proper scope of supervisory

6                    ASHCROFT *v.* IQBAL

liability, much less the full-dress argument we normally require.  *Mapp* v. *Ohio*, 367 U. S. 643, 676–677 (1961) (Harlan, J., dissenting).  We consequently are in no position to decide the precise contours of supervisory liability here, this issue being a complicated one that has divided the Courts of Appeals.  See *infra*, at 7–8.  This Court recently remarked on the danger of "bad decisionmaking" when the briefing on a question is "woefully inadequate," *Pearson* v. *Callahan*, 555 U. S. ___, ___ (2009) (slip op., at 14), yet today the majority answers a question with no briefing at all.  The attendant risk of error is palpable.

Finally, the Court's approach is most unfair to Iqbal. He was entitled to rely on Ashcroft and Mueller's concession, both in their petition for certiorari and in their merits briefs, that they could be held liable on a theory of knowledge and deliberate indifference.  By overriding that concession, the Court denies Iqbal a fair chance to be heard on the question.

### B

The majority, however, does ignore the concession. According to the majority, because Iqbal concededly cannot recover on a theory of *respondeat superior*, it follows that he cannot recover under any theory of supervisory liability.  *Ante*, at 13.  The majority says that in a *Bivens* action, "where masters do not answer for the torts of their servants," "the term 'supervisory liability' is a misnomer," and that "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  *Ibid*.  Lest there be any mistake, in these words the majority is not narrowing the scope of supervisory liability; it is eliminating *Bivens* supervisory liability entirely.  The nature of a supervisory liability theory is that the supervisor may be liable, under certain conditions, for the wrongdoing of his subordinates, and it is this very principle that the majority rejects.

SOUTER, J., dissenting

*Ante*, at 19 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic").

The dangers of the majority's readiness to proceed without briefing and argument are apparent in its cursory analysis, which rests on the assumption that only two outcomes are possible here: *respondeat superior* liability, in which "an employer is subject to liability for torts committed by employees while acting within the scope of their employment," Restatement (Third) of Agency §2.04 (2005), or no supervisory liability at all. The dichotomy is false. Even if an employer is not liable for the actions of his employee solely because the employee was acting within the scope of employment, there still might be conditions to render a supervisor liable for the conduct of his subordinate. See, *e.g., Whitfield* v. *Meléndez-Rivera*, 431 F. 3d 1, 14 (CA1 2005) (distinguishing between *respondeat superior* liability and supervisory liability); *Bennett* v. *Eastpointe*, 410 F. 3d 810, 818 (CA6 2005) (same); *Richardson* v. *Goord*, 347 F. 3d 431, 435 (CA2 2003) (same); *Hall* v. *Lombardi*, 996 F. 2d 954, 961 (CA8 1993) (same).

In fact, there is quite a spectrum of possible tests for supervisory liability: it could be imposed where a supervisor has actual knowledge of a subordinate's constitutional violation and acquiesces, see, *e.g., Baker* v. *Monroe Twp.*, 50 F. 3d 1186, 1994 (CA3 1995); *Woodward* v. *Worland*, 977 F. 2d 1392, 1400 (CA10 1992); or where supervisors "'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see,'" *International Action Center* v. *United States*, 365 F. 3d 20, 28 (CADC 2004) (Roberts, J.) (quoting *Jones* v. *Chicago*, 856 F. 2d 985, 992 (CA7 1988) (Posner, J.)); or where the supervisor has no actual knowledge of the violation but was reckless in his supervision of the subordinate, see, *e.g., Hall, supra*, at 961; or where the supervisor was grossly negligent, see, *e.g., Lipsett* v. *University of*

SOUTER, J., dissenting

*Puerto Rico*, 864 F. 2d 881, 902 (CA1 1988).  I am unsure what the general test for supervisory liability should be, and in the absence of briefing and argument I am in no position to choose or devise one.

Neither is the majority, but what is most remarkable about its foray into supervisory liability is that its conclusion has no bearing on its resolution of the case.  The majority says that all of the allegations in the complaint that Ashcroft and Mueller authorized, condoned, or even were aware of their subordinates' discriminatory conduct are "conclusory" and therefore are "not entitled to be assumed true."  *Ante*, at 17.  As I explain below, this conclusion is unsound, but on the majority's understanding of Rule 8(a)(2) pleading standards, even if the majority accepted Ashcroft and Mueller's concession and asked whether the complaint sufficiently alleges knowledge and deliberate indifference, it presumably would still conclude that the complaint fails to plead sufficient facts and must be dismissed.[2]

## II

Given petitioners' concession, the complaint satisfies Rule 8(a)(2).  Ashcroft and Mueller admit they are liable for their subordinates' conduct if they "had actual knowledge of the assertedly discriminatory nature of the classification of suspects as being 'of high interest' and they were deliberately indifferent to that discrimination."  Brief for Petitioners 50.  Iqbal alleges that after the September 11 attacks the Federal Bureau of Investigation (FBI) "arrested and detained thousands of Arab Muslim men," Complaint ¶47, App. to Pet. for Cert. 164a, that many of

─────────────

[2] If I am mistaken, and the majority's rejection of the concession is somehow outcome determinative, then its approach is even more unfair to Iqbal than previously explained, see *supra*, at 6, for Iqbal had no reason to argue the (apparently dispositive) supervisory liability standard in light of the concession.

SOUTER, J., dissenting

these men were designated by high-ranking FBI officials as being "'of high interest,'" *id.*, ¶¶48, 50, at 164a, and that in many cases, including Iqbal's, this designation was made "because of the race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity," *id.*, ¶49. The complaint further alleges that Ashcroft was the "principal architect of the policies and practices challenged," *id.*, ¶10, at 157a, and that Mueller "was instrumental in the adoption, promulgation, and implementation of the policies and practices challenged," *id.*, ¶11. According to the complaint, Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject [Iqbal] to these conditions of confinement as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." *Id.*, ¶96, at 172a–173a. The complaint thus alleges, at a bare minimum, that Ashcroft and Mueller knew of and condoned the discriminatory policy their subordinates carried out. Actually, the complaint goes further in alleging that Ashcroft and Muller affirmatively acted to create the discriminatory detention policy. If these factual allegations are true, Ashcroft and Mueller were, at the very least, aware of the discriminatory policy being implemented and deliberately indifferent to it.

Ashcroft and Mueller argue that these allegations fail to satisfy the "plausibility standard" of *Twombly*. They contend that Iqbal's claims are implausible because such high-ranking officials "tend not to be personally involved in the specific actions of lower-level officers down the bureaucratic chain of command." Brief for Petitioners 28. But this response bespeaks a fundamental misunderstanding of the enquiry that *Twombly* demands. *Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. We made it clear, on the contrary, that a court must take

10                    ASHCROFT *v.* IQBAL

SOUTER, J., dissenting

the allegations as true, no matter how skeptical the court
may be.  See *Twombly*, 550 U. S., at 555 (a court must
proceed "on the assumption that all the allegations in the
complaint are true (even if doubtful in fact)"); *id.*, at 556
("[A] well-pleaded complaint may proceed even if it strikes
a savvy judge that actual proof of the facts alleged is
improbable"); see also *Neitzke* v. *Williams*, 490 U. S. 319,
327 (1989) ("Rule 12(b)(6) does not countenance . . . dis-
missals based on a judge's disbelief of a complaint's factual
allegations").  The sole exception to this rule lies with
allegations that are sufficiently fantastic to defy reality as
we know it: claims about little green men, or the plaintiff's
recent trip to Pluto, or experiences in time travel.  That is
not what we have here.

Under *Twombly*, the relevant question is whether,
assuming the factual allegations are true, the plaintiff has
stated a ground for relief that is plausible.  That is, in
*Twombly*'s words, a plaintiff must "allege facts" that,
taken as true, are "suggestive of illegal conduct."  550
U. S., at 564, n. 8.  In *Twombly*, we were faced with allega-
tions of a conspiracy to violate §1 of the Sherman Act
through parallel conduct.  The difficulty was that the
conduct alleged was "consistent with conspiracy, but just
as much in line with a wide swath of rational and competi-
tive business strategy unilaterally prompted by common
perceptions of the market."  *Id.*, at 554.  We held that in
that sort of circumstance, "[a]n allegation of parallel con-
duct is . . . much like a naked assertion of conspiracy in a
§1 complaint: it gets the complaint close to stating a claim,
but without some further factual enhancement it stops
short of the line between possibility and plausibility of
'entitlement to relief.'"  *Id.,* at 557 (brackets omitted).
Here, by contrast, the allegations in the complaint are
neither confined to naked legal conclusions nor consistent
with legal conduct.  The complaint alleges that FBI offi-
cials discriminated against Iqbal solely on account of his

SOUTER, J., dissenting

race, religion, and national origin, and it alleges the knowledge and deliberate indifference that, by Ashcroft and Mueller's own admission, are sufficient to make them liable for the illegal action.  Iqbal's complaint therefore contains "enough facts to state a claim to relief that is plausible on its face." *Id.*, at 570.

I do not understand the majority to disagree with this understanding of "plausibility" under *Twombly*.  Rather, the majority discards the allegations discussed above with regard to Ashcroft and Mueller as conclusory, and is left considering only two statements in the complaint: that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11," Complaint ¶47, App. to Pet. for Cert. 164a, and that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001," *id.*, ¶69, at 168a.  See *ante*, at 17.  I think the majority is right in saying that these allegations suggest only that Ashcroft and Mueller "sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity," *ante*, at 19, and that this produced "a disparate, incidental impact on Arab Muslims," *ante*, at 18.  And I agree that the two allegations selected by the majority, standing alone, do not state a plausible entitlement to relief for unconstitutional discrimination.

But these allegations do not stand alone as the only significant, nonconclusory statements in the complaint, for the complaint contains many allegations linking Ashcroft and Mueller to the discriminatory practices of their subordinates.  See Complaint ¶10, App. to Pet. for Cert. 157a (Ashcroft was the "principal architect" of the discriminatory policy); *id.*, ¶11 (Mueller was "instrumental" in adopt-

ing and executing the discriminatory policy); *id.*, ¶96, at 172a–173a (Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject" Iqbal to harsh conditions "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest").

   The majority says that these are "bare assertions" that, "much like the pleading of conspiracy in *Twombly*, amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim" and therefore are "not entitled to be assumed true." *Ante*, at 17 (quoting *Twombly*, *supra*, at 555). The fallacy of the majority's position, however, lies in looking at the relevant assertions in isolation. The complaint contains specific allegations that, in the aftermath of the September 11 attacks, the Chief of the FBI's International Terrorism Operations Section and the Assistant Special Agent in Charge for the FBI's New York Field Office implemented a policy that discriminated against Arab Muslim men, including Iqbal, solely on account of their race, religion, or national origin. See Complaint ¶¶47–53, App. to Pet. for Cert. 164a–165a. Viewed in light of these subsidiary allegations, the allegations singled out by the majority as "conclusory" are no such thing. Iqbal's claim is not that Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject" him to a discriminatory practice that is left undefined; his allegation is that "they knew of, condoned, and willfully and maliciously agreed to subject" him to a particular, discrete, discriminatory policy detailed in the complaint. Iqbal does not say merely that Ashcroft was the architect of some amorphous discrimination, or that Mueller was instrumental in an ill-defined constitutional violation; he alleges that they helped to create the discriminatory policy he has described. Taking the complaint as a whole, it gives Ashcroft and Mueller "'fair notice of what the . . . claim is and the grounds upon

which it rests.'" *Twombly*, 550 U. S., at 555 (quoting *Conley* v. *Gibson*, 355 U. S. 41, 47 (1957) (omission in original)).

That aside, the majority's holding that the statements it selects are conclusory cannot be squared with its treatment of certain other allegations in the complaint as non-conclusory. For example, the majority takes as true the statement that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." Complaint ¶69, App. to Pet. for Cert. 168a; see *ante*, at 17. This statement makes two points: (1) after September 11, the FBI held certain detainees in highly restrictive conditions, and (2) Ashcroft and Mueller discussed and approved these conditions. If, as the majority says, these allegations are not conclusory, then I cannot see why the majority deems it merely conclusory when Iqbal alleges that (1) after September 11, the FBI designated Arab Muslim detainees as being of "'high interest'" "because of the race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity," Complaint ¶¶48–50, App. to Pet. for Cert. 164a, and (2) Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed" to that discrimination, *id.*, ¶96, at 172a. By my lights, there is no principled basis for the majority's disregard of the allegations linking Ashcroft and Mueller to their subordinates' discrimination.

I respectfully dissent.

Cite as:  556 U. S. ____ (2009)          1

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–1015

_____

## JOHN D. ASHCROFT, FORMER ATTORNEY GENERAL, ET AL., PETITIONERS *v.* JAVAID IQBAL ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[May 18, 2009]

JUSTICE BREYER, dissenting.

I agree with JUSTICE SOUTER and join his dissent.  I write separately to point out that, like the Court, I believe it important to prevent unwarranted litigation from interfering with "the proper execution of the work of the Government." *Ante*, at 21.  But I cannot find in that need adequate justification for the Court's interpretation of *Bell Atlantic Corp.* v. *Twombly*, 550 U. S. 544 (2007), and Federal Rule of Civil Procedure 8.  The law, after all, provides trial courts with other legal weapons designed to prevent unwarranted interference.  As the Second Circuit explained, where a Government defendant asserts a qualified immunity defense, a trial court, responsible for managing a case and "mindful of the need to vindicate the purpose of the qualified immunity defense," can structure discovery in ways that diminish the risk of imposing unwarranted burdens upon public officials.  See *Iqbal* v. *Hasty*, 490 F.3d 143, 158 (2007).  A district court, for example, can begin discovery with lower level government defendants before determining whether a case can be made to allow discovery related to higher level government officials.  See *ibid.*  Neither the briefs nor the Court's opinion provides convincing grounds for finding these alternative case-management tools inadequate, either in general or in the case before us.  For this reason, as well

2                          ASHCROFT *v.* IQBAL

                          BREYER, J., dissenting

as for the independently sufficient reasons set forth in
JUSTICE SOUTER's opinion, I would affirm the Second
Circuit.