**Causation**

1.       **Grass Lift Off: Why is Dr. Bea right and the defendants wrong?**

Dr. Bea's opinions and conclusions were based on available experimental data. None of the defendant's experts attack these conclusions; they only attack Dr. Bea for his use of the LSDYNA model. Dr. Bea factored wave height at the face of the levees, a sandy substrate, and quasi-steady flow stream velocities, supported by component science to reach his conclusions. [See Plaintiff's Post-Trial Brief, § 5].

Defense expert Bruce Ebersole, testified as to different lift-off times using the Seijffert and Verheij Model [TT Page 2253, Line 3-5], which was developed for grass covered clay levees, making Mr. Ebersole's times irrelevant as most of the levees were not in fact clay. [TT Page 2255, Lines 20-25]

Nonetheless, Defense expert Ebersole, despite having used the lowest possible value for the best possible grass cover [TT Page 2548, Lines 12-22], which resulted in longer times being required for lift-off [TT Page 2548, Lines 12-22] making faulty assumptions that all of the levees were made of clay, [TT page 2529 Lines 23-25 to Page 2530 Lines 1-5], and incorrectly using wave heights from deep-water locations that were 2 feet lower than the plaintiffs demonstrated occurred, admitted that waves significantly lower than were experienced during Hurricane Katrina would have lifted off the grass by 6:30 a.m. [See Plaintiff's Post-Trial Brief, § 5]. In addition to Mr. Ebersole, the Defendant's expert Thomas Wolff also testified that Dr. Bea's theory was plausible. [See Plaintiff's Post-Trial Brief, § 5].

2.      **Plaintiffs are to explain why the Ebersole pictures are not indicative of backside erosion:**

Mr. Ebersole has no training or experience with regard to the interpretation of pictures for the purposes of indicated front side versus back side erosion [See TT:2627:1-16]. Furthermore, no scientific or technical journal exists which would guide the court or any expert with regard to the interpretation of photographs in order to conclude front side or back side erosion.   The defendants themselves admit that there is photographic evidence of bench cutting which they agree is caused by front side of wave attack. [TT at p. 2628:22-2629:3].   Those photographs which evidence front side wave attack look very similar to locations where the erosion proceeded through the crown to the back side.   The mechanism of failure would likely be the removal of grass as indicated by Dr. Bea and admitted to by Ebersole, followed by the removal of chunks of clay, then followed by the removal of the sandy core.   One would expect some edging to be created in view of the different types of materials used to construct the levee. [*See* TT at p. 2518:15-20].

3.      **Subsidence-settlement-lateral displacement and Lateral Displacement: Why is Dr. Bea right and the Defendants wrong and is the lateral displacement issue tied to the front wave attack issue? If the Court does not agree with Plaintiffs on lateral displacement, does that in any way compromise the wave attack theory?**

Dr. Bea is right once again based upon the MRGO having lost much more elevation than expected. In several areas, the levee crests went from elevation 20.5 feet in 1985 to 14 feet in 1991.   As Dr. Wolf stated in his report, at least one of these areas had failed twice between 1985 and 1992, when the sheet pile repairs were made. As the Defendants admit, the Atchafalaya Basin Study demonstrated that the potential for lateral displacement is dependent upon the distance between the shoreline and the toe of the levee. The evidence clearly shows that at every

location where the shoreline is close to the levee those locations are the locations with the most serious subsidence. [See Plaintiff's Slide 35]. Lateral displacement is not tied to frontal wave attack, and should the court not agree with Plaintiff's theory of lateral displacement, in no way is the wave attack theory compromised.

4.      **Explain why some levees failed and others did not and how that supports Plaintiffs theory of front side erosion and lateral subsidence.**

The fact that all levees did not fail supports the Plaintiff's theory that the levees failed as a result of MR-GO exacerbated wave attack.

Whether a levee fails or not is dependent on two factors: its ability to withstand a load and the load brought to bear on it.  The Plaintiffs contend that the MRGO increased that load and diminished the ability of the levees to withstand the load brought to bear on it.

The MR-GO exposed the levees to greater wave attack as a result of the loss of protective wetlands to knock down hurricane waves, increase the fetch which regenerated those waves, and the eliminated trees and vegetation at the shore of the MR-GO which would have prevented those waves from damaging the levee.

At the same time, the MRGO threatened the ability of the levees to withstand the load through bank erosion which increased the rate of subsidence of the toe and the levee.

The variability in the ability of the levees along Reach 2 to withstand the load and the variability of the load along Reach 2 dictates which levees fail and which levees do not fail. It is an absolute fact that there is far more variability of the MR-GO related factors than any other factor that may impact the ability to withstand the load or the load brought to bear – waves are different, heights are different, distance to the shore are different, and the width of the channel is different.  As a result, the Plaintiffs' theory presumes that all levees would not fail.  On the other

3

hand, the Defendants' theory that all levees were overtopped by a deluge of water requires that all or most fail because there is very limited variability in the levees ability to withstand the load and limited variability in the deluge.

5.      **Brief the differences between the Plaintiff's theory of wave attack and the Defendant's theory and explain why one theory is better than the other.**

Both Plaintiffs and Defendant's theories relies upon wave attack as the primary cause of breaching.

Defendant's wave attack theory is premised on the assumption that the MRGO had limited effect on wave regeneration, and therefore waves were lower. Plaintiffs theory is that the widened MR-GO caused the waves to regenerate to heights as high as 9 feet.

The fundamental problem with the D's theory is that if they admit the peak surge occurred at 8:30. it does not work.  There is no question that the peak surge occurred at 8:30 a.m.

6.      **Explain what Plaintiff's theory is and if the Court agrees with the lateral displacement theory, but disagrees with its wave attack theory, what effect would that have?**

The Plaintiffs have produced evidence that the MR-GO caused wave attack and lateral displacement. Plaintiff's wave attack theory is not based on the loss of elevation due to lateral displacement.

The theory is that the Corps failure to maintain the MR-GO shore caused the distance between the shore and the levee toe to be reduced, substantially increasing the potential of the interdistributary layer to be disbursed into the channel causing the levee to subside.

7.     **Why is one set of elevations better than the other and what is the significance of elevations vis-à-vis the theories?**

There is little distinction between one set elevations and the other set of elevations. The Plaintiffs used pre-Katrina elevations as provided by the Corps, and used by the IPET team.

The Defendants made adjustments of approximately one half of a foot to both the pre- and post- Katrina LIDAR, which the Plaintiffs believe was done, along with increasing the surge height, in an effort to prove the faulty conclusion they had already reached, that the levees had failed due to wave overtopping.

8.     **What caused the disparity in levee subsidence when the soil was similar?**

As indicated in response to Question 4, the disparity in the levee subsidence is caused by the different distances between the widened MR-GO and the levee.

9.     **Is there a correlation between the widening of the MRGO, on both or either side, and the cause of breaching?**

See: Number 3; Number 4 paragraph 2, 3 *supra*

**Surge**

10.    **Discuss the importance of the duration of surge and whether there was a second surge; and discuss the significance if there was or was not a second surge and the significance of the duration to Plaintiff's theories of the case?**

The duration of the actual surge is extremely important in that it set a maximum time that surge overtopping could occur. During Katrina, that time was 1.5 hours for levees less than 15.5 feet, 1.25 to 1.5 hours for levees between 15.5 and 16 feet, 1.25 to 1 hour for levees between 16 to 16.5 feet, 1 hour to 45 minutes for levees between 16.6 to 17 feet, 30 to 45 for levees between

17 to 17.5 feet, and 30 minutes for levees above 17.5 feet. [See Plaintiff's Post-Trial Brief, § V; Plaintiff's Slide 37].

Defendant's Expert Ebersole acknowledged that this was not enough time for surge overtopping alone to have caused the levee failures. [See Plaintiff's Post-Trial Brief, § V].

**11.    Explain why the Plaintiff's time of surge estimate is accurate and what it's significance is?**

Plaintiffs' surge estimates are based upon the official hurricane data of the National Weather Service ("NWS") (including the correct track of the storm) and corroborated by independent observations of the IHNC lockmaster.

Defendant's storm surge specialist Brian Jarvinen utilized the same NWS data (data he helped compile) likewise testified that the peak surge at the MRGO Reach 2 levee was 8:30 a.m. CDT.

**12. Explain with precision what the difference is if the surge reached the 40 Arpent levee at 8:30 or 7:30.**

Neither party is disputing whether the surge reached the 40 Arpent levee at 7:30 or 8:30. The parties agree that the flood arrived at the 40 Arpent Canal Levee at 8:30 a.m.  This was corroborated by the video tape footage from the Fox 8 remote security camera introduced at trial.

The Central Wetlands Unit required approximately two hours to fill.  Thus, water was entering the Central Wetlands Unit by 6:30 a.m.

The Defendant's theory, as testified to by Mr. Ebersole, is that levee failure was triggered when surge reached one foot below the crest of the levee.

Mr. Ebersole admitted that if the peak surge was at 8:30 a.m., there was not enough time for the water to have reached the 40 Arpent Canal Levee at 8:30. [See Plaintiff's Post-Trial Brief, § 5; TT page 3663, Lines 2-16].

13.   **What is the significance of the duration of the water level being above 10 feet?**

This distinction is significant to only the Defendants.

Defendants failed to include in their model 3,118 feet of breached levee.

Instead of measuring all of the breaches and putting them into a model as the Plaintiffs did, the Defendants modeled all of the breaches as if they were 11 rectangular holes in the levee, the shallowest being 10 feet.

This resulted narrow in cuts that were too small to deliver the water experienced in flooding St. Bernard.  As the hurricane moved, water levels dropped. In order to substantiate Defendant's theory, they require more water at a higher level and so they must assign significance to the duration that the water level remained above 10 feet.

14.   **Brief precisely what effect the second surge had, if any, and why would it have had as much effect since the wind had diminished substantially at the time of the second surge.**

The Court is correct that by the time of the "second surge" the wind had diminished substantially and so any "surge" effect would have been minimal.

And as noted above the lock-master charts shows that there was no "second surge". [See Number 10, paragraph 1 *supra*].

15.   **Explain the gauge at the IHNC and why that gauge either supports or does not support the Defendant's version of two (2) surges.**

The gauge at the IHNC does not support the Defendant's version of two surges.

**Foreshore Protection-Preventive Measures**

16.    **When and where should foreshore protection have been placed?  How would it have prevented the harm?  When should it have been installed?**

Foreshore should have been installed contemporaneous with the construction of the MRGO as the Corps noted to Congress was necessary.  In 1968 the Corp designed a plan for foreshore protection that was never installed.  The foreshore protection should have been installed at that time.  The foreshore protection would have prevented the shoreline from encroaching on the toe of the levee and may have prevented lateral displacement in these locations.  The foreshore protection would have prevented saltwater intrusion into the grasses, trees, and vegetation at the toe of the levee and the levees would have been further protected by this vegetation that was destroyed by the salt.  The foreshore protection would have minimized the widening of the channel at these locations and may have minimized the wave heights.

17.    **What other preventative measures do the Plaintiffs maintain should have been installed?  When should they have been put in place?**

The Plaintiffs maintain that a gate should have been installed at the confluence of the GIWW and the MRGO to prevent the effects of the funnel. Such a gate should have been in place at least as of 1965 when the Corp recognized any funnel existed.

A salt barrier should have been installed at the Bayou La Loutre Ridge to stop salt water intrusion. This would have had the dual effect of stopping the wetlands damage and would have prevented the conveyance of water up the MRGO

Wetlands lost as a result of the MRGO's presence should have been restored in order to mitigate the effects of storms on the levees. The 600 feet between the levee toe and the banks of

the MRGO channel should have been replanted with wave diminishing plants. Trees should have

been replanted in order to cut down wind which drove waves across the channel into the MRGO.

All of these measures were proposed to the Corps by Dr. Gagliano in 1973.

18.     **Explain, especially in reference to the New Orleans East polder, what the MRGO did to exacerbate the flooding in those areas. How would it have been prevented? How much water would have been in those polders, regardless of the existence of the MRGO as widened?**

The evidence clearly showed that had Plaintiff's Scenario 2c, the mitigated MRGO been

in place, the flooding at the Citrus Back levee would have been eliminated. [See PX 0104 page

103]

At the back levee, had the Corps taken appropriate steps to prevent salt water intrusion

and planted appropriate vegetation to protect those levees there would have been far less

overtopping due to waves. If the court is asking the question as to whether or not the MRGO as

designed would have put as much water into the New Orleans East area as a deteriorated MRGO,

the answer is that the amounts of water would have been different. The Corps made an

engineering error at the design phase concluding that the MRGO channel itself did not create a

funnel, a fact which they discovered after the design and construction of the MRGO.

19.     **Explain Plaintiff's theory as to what would have happened had there been just overtopping and not breaching in St. Bernard, the 9th Ward and New Orleans East.**

Plaintiffs theory is that if there was no breaching there would have been very little

flooding in New Orleans East and no flooding in the Lower 9th Ward and in St. Bernard. As

overtopping due to the funnel effect caused much of the flooding of New Orleans East, the

removal of the additional 3.5 feet of water in the IHNC would have had a marked difference in

reducing flooding. In the Lower 9th Ward and St. Bernard Parish, flood waters would have been

contained within the 46 square mile (8 billion cubic foot) central wetland basin, thereby preventing flooding of the populated areas of Chalmette and the Lower 9th Ward.


20.     **Dr. Westerink seems to agree that the water did get higher in the IHNC, what flooding does he attribute to the MRGO by virtue of that higher water.**

Both parties modeling show 3 to 3.5 feet of extra water were in the IHNC due to the funnel effect.

By agreeing that the water was higher in the IHNC, Dr. Westerink proves what Bretschneider and Collins showed in 1966, that there is a funnel, the solution to which is a gate.


**Levees**

21.     **The Court is interested in whether the parties agree as to the reasons some levees were left standing. Was it simply because of erosion, as testified to by the Defendants? Or, are there other factors?**

There is very little agreement between the parties as to the reasons that some levees were left standing.

The Plaintiff's position is that a combination of factors caused levee failure; (1) Ferocity of wave attack as limited by channel width, width of berm in front of levee, and vegetation on berm in front of levee; (2) Height of levee; (3) Quality of grass (armoring) on levees; and (4) Quality of levee construction material. The importance of the combination of wave attack, berm width and berm vegetation can be most clearly seen by the evidence showing that for those levee that had dropped to elevation 16 – 16.5 feet (a foot higher than the lowest along the channel) where the *toe of the levee was lowest and least protected by vegetation and closest to the channel as a result of channel widening,* these levees failed at a significantly greater rate than all other levees in the area.  Slide 35.

The Defendant's position is that the levees left standing survived because they were made of clay as opposed to sand laden clay

**22.   Why weren't all the levees obliterated considering Ebersole's opinion as to the tremendous volumes of overtopping?**

According to Mr. Ebersole's theory, Katrina should have obliterated all of the levees.

**23.   Explain the significance of the chart shown that seemed to underestimate the height of the levees along Reach 2.**

The chart used in the Resio and Ebersole Expert Reports depicted large areas of levees as being lower than they were. As with the "second surge" [see Number 10 above] and the "duration of the water level being above 10 feet"[see Number 13 above], this chart allowed the Defendants to compute much larger overflow volumes than actually occurred, thereby giving the appearance of plausibility to their overtopping theory.

**Negligence/Discretionary Function**

**24.   The Plaintiffs should brief the alleged acts of negligence committed by the Corps and explain why the acts are not protected by the Discretionary Function Exception – in other words, why they are not policy.**

As discussed more fully in the accompanying brief analyzing prong two of the Discretionary Function Exemption, the acts of negligence committed by the Corps relate to both basic operation and maintenance of the channel and address implementation of remedial safety/mitigative measures.  This negligence also relates to the application of professional engineering standards in the face of engineering flaws and deteriorated conditions.  These actions

and inactions associated with repair, operation and maintenance of the MR-GO are not protected by the Discretionary Function Exemption as they implicate no policy.

Further, the Corps at trial failed to demonstrate any deliberative process associated with these decisions.

25.    **Discuss all preventative measures that should have been taken and explain why these measures are not grounded in policy.**

As more fully discussed in the accompanying brief, the preventative measures that should have been taken include:

•       Installation of salt and surge barriers at the confluence of the GIWW and Reach 2 of the MRGO (funnel) and at La Loutre Ridge.

•       Both of these features would address mitigating repairable harm inflected on the wetlands and counteract the increased conveyance of water volume toward the populated areas.

•       Vegetate the land between the toe of the levees and the banks of the MRGO

•       This feature replaces removed vegetation during construction and preserves the foreseeable bank erosion.

•       Implementation of designed foreshore protection along <u>both</u> banks of Reach two of the channel and along the bank of Lake Borgne.

•       Deposit dredge spoil on the eastern bank of the channel to rebuild eroded wetlands and to create additional buffer between Lake Borgne and the levees and avoid further damage to the wetlands.

•       Repopulate the central wetlands unit to recreate the buffer that was eliminated by the changed habitat.

These are actions are not grounded in policy because they address basic maintenance and repair and relate to restoration of safety conditions that were adversely affected by the conduct of the Corps

26.     **Explain why the surge protection device, reference the IHNC and the New Orleans East polder, would not be subject to the Discretionary Function Exception.**

The Surge protection devices at both the La Loutre Ridge and the confluence of the GIWW and Reach 1 are both non-discretionary because they restore safety conditions that are necessary for the construction of a properly designed channel at this design location.  The Corps' latitude to construct the Channel in the discretion of the Chief of Engineers required that the construction include sound professional engineer decisions.  This required at minimum, the preservation of the safety conditions that existed prior to the introduction of the channel. Without these barriers, the channel created hazards by creating a vehicle of water conveyance velocity that had not previously existed.

**Mandate**

27.     **The Plaintiff should brief at what point should an EIS have been filed and explain why that would have ultimately prevented the harm caused by the MRGO (assuming causation is proved)**

Again referring to the Plaintiffs' brief, based on the CEQ regulations and the Corps' own Engineering Guidelines, an EIS was necessary to advise Congress of both the mitigative measures that were necessitated by the channel and the channel conditions introduced by O&M. By 1980 the bank erosion aloes was admittedly so significant as to reach catastrophic proportions.  Congress could have directed mitigation or remediation measures had it been properly informed.

**Expert Testimony Issues**

**28.     What is prejudice caused by the failure to provide underlying runs of FEMA report when FEMA report has been made part of DOJ report?**

The failure to provide FEMA data prevented the Plaintiffs' demonstrating the manner in which the Corps manipulated surge information to depict varying results.

**29.     What is the effect if the lateral displacement was 20% - 30% as testified by Dr. Bea in his deposition, rather than the 50% contained in his report that was stricken?**

The change in percentages does not have a significant impact on the theory of the case. Lateral displacement was a known danger to the levees, which was being exacerbated by the Operation and Maintenance of the MRGO. Dr. Bea's number of 50% contained in his report was merely a manner of quantification and clarifying his earlier testimony, but the change in percentages does not lessen the impact on reduced levee crests and the responsibility of the Corps for causing the harm.

**30.     Brief the scaling factor and its appropriateness.**

Defendants chose to scale the outputs of the ADCIRC model.  As a result when the connected the outputs to the STWAVE, the STWAVE needed to be scaled.  They were not.

The Plaintiffs scaled the inputs.  This allowed the Plaintiffs' ADCIRC to be connected to the FINEL so that the FINEL outputs were correct.

**31.     Why was the IPET surge data wrong?**

The Plaintiffs do not contend that the IPET surge data was wrong.

**Damages**

32.     **Brief how the Court is supposed to allocate damages in New Orleans East and the 9th Ward, since there would have been flooding regardless of the MRGO.**

Regarding this question, Plaintiffs are confused about the basis of the inquiry as there was no evidence adduced at trial by the Plaintiffs that there would have been flooding in New Orleans East and the Lower 9th Ward without the MRGO.  As such, Plaintiffs will attempt to address the question by focusing on the evidence believed to resolve the issue in two parts: first, the hydrographs; second, the testimony of witness "on the ground."

1.     Hydrographs

The most pertinent answer is shown by the January 27, 2009 Report entitled Comparison flood depth development between Katrina event and Scenario 2C.  (PX 1771).  This report detailed the simulated flooding in the polder for each Robinson plaintiff via the flood simulation program SOBEK, and was substantiated at trial by the uncontradicted testimony of Professor Johannes Vrijling.

The specific location for Norman & Monica Robinson's home was identified by latitude and longitude, and the specific hydrograph excised for the Court's evaluation.  The Court can see through Figure 2 of the January 2009 report that flooding from all causes was approximately 13 feet, while flooding under Scenario 2C was just under two feet. (PX 1771, p. 2).  Professor Vrjling explained the hydrograph results for the Robinson location at TT 837:8 - 839:20.

The specific location for Lucille and Anthony Franz's home was likewise identified by latitude and longitude, and the specific hydrograph excised for the Court's evaluation.  This hydrograph captured additional information to account for this location's proximity to the IHNC breach sites ("industrial breach").  As proven by Figure 5 of the January 2009 report, flooding from all causes reached just over 10 feet, flooding evaluated by Scenario 2C (with industrial

breaches) was just over 6 feet, and flooding evaluated by Scenario 2C without industrial canal breaches was negligible, to the magnitude of a few inches.  (PX 1771, p. 4).  Of course, it was proven at trial that the MRGO was a substantial factor in causing the IHNC flood walls to fail; therefore, the hydrographs categorically prove that the Franz's would have sustained no flooding with a properly maintained channel.  Professor Vrjling explained the hydrograph results for the Franz location at TT 840:2 - 842:11.

For simulations run for both polders, the effect of the Sewerage & Water Board's ("S&WB") pumping capacity was not evaluated.  As proven by the testimony of the S&WB through its 30(b)(6) designee Jack Heurkamp (PX 2148), Hurricane Katrina, as a rain event, produced amounts of rain that would have been effectively removed from the city in short order, based upon pumping logs and pumping capacity. (PX 2148, 17:1-22).  Therefore, the City of New Orleans would not have flooded as a result of rainfall produced by Hurricane Katrina. (PX 2148, 19:15-25).

These results are consistent with the Dutch report Polder Flood Simulations for Greater New Orleans: the neutral MRGO scenario dated July 2008, prepared with the concurrent MRGO class action in mind. (PX 105).  That report modeled the New Orleans East polder, incorporating exclusions to breaching simulations utilized in the July 2007 class certification report entitled Polder Simulations for Greater New Orleans Hurricane Katrina August 2005.  (PX 53).  These exclusions were designed to highlight the contribution of the deleterious effects of the MRGO on the flood control structures.

The Court will recall that the July 2007 class certification report modeled the New Orleans East and St. Bernard polders to assess the relative contribution of the main causes of flooding (breaches, overtopping, and rainfall) using hydrographs for selected locations, with no

consideration for reasons why the water levels outside the polders were so high.  The New

Orleans East polder simulation demonstrated internal flooding resulting from breaches

(identified by number), in combination with rainfall and outer water levels. (PX 53, p. 26).

Various "what if" scenarios were presented, and concurrent modeling was undertaken to assess

the contribution of breaches, overtopping, rainfall, rainfall pumping capacity, both individually

and in conjunction with each other.  The hydrograph for the location nearest the Robinson home

shows that the level of flood waters from all causes was approximately 13 feet, while the

flooding due to overtopping was 7 feet. (PX 53, p. 34).  A similar exercise was undertaken for

the St. Bernard polder, with additional "what if" scenarios for no breaches for the MRGO and the

IHNC. The hydrographs for locations nearest to the Franz's home (PX 53, p. 46), prove that if

the structures along the IHNC and MRGO had not breached, there would have been limited

flooding in the St. Bernard polder, even with an unmitigated MRGO.

Upon completion of the class certification phase, Plaintiffs undertook the exercise of

understanding the deleterious effects of 50 years of Corps conduct in maintaining and operating

the MRGO, as described in the July 2008 expert report. (PX 105). Once the contribution of the

increased conveyance of a negligently maintained channel was understood, the SOBEK model

could be adjusted to incorporate a properly maintained, neutral MRGO.  To properly model the

lessened conveyance of a properly maintained MRGO, the "neutral MRGO" flood simulation

excluded the 6,000 foot breach of the Back levee, as well as the breaches along the Citrus back

levee and along the industrial canal.  Both Dr. Bea and Dr. Kemps' trial testimony justify these

exclusions.

Again, the New Orleans East polder was modeled separately, and specified locations

were modeled using Scenario 1 and 2C, with locations 1 and 2 closest to the Robinson's home.

The hydrograph for Location 1 indicates that flooding at that location (with NO S&WB pumping considered) was approximately 2 feet under Scenario 2, while nearly 13 feet in the Katrina "real run." (PX 105, pg. 21). The hydrograph for Location 2 indicates that flooding at that location (with NO S&WB pumping considered) was less than 1 foot under Scenario 2, while nearly 12 feet in the Katrina "real run."(PX 105, pg. 21).

The July 2008 report also addressed the evaluation of flooding within the St. Bernard polder, incorporating Locations 1 and 2 in the Lower Ninth Ward near the Franz's home. The hydrograph for Location 1 indicates that flooding at that location (with NO S&WB pumping considered) was approximately 3 feet under Scenario 2C with no industrial breach (the contribution of overtopping was negligible), while nearly 11 feet in Scenario 2C with industrial breach, and approximately 15 feet in the Katrina "real run." (PX 105, pg. 29). The hydrograph for Location 2 likewise indicates that flooding at that location (with NO S&WB pumping considered) was nearly zero under Scenario 2C with no industrial breach (the contribution of overtopping was again negligible), while nearly 5 feet in Scenario 2C with industrial breach, and approximately 9 feet in the Katrina "real run." (PX 105, pg. 29).

2.      Witnesses on the Ground

Norman and Monica Robinson lived in a two story house on Mayo Boulevard in New Orleans East. As a result of flooding caused by the Defendant's negligence, the Robinsons had at least five to six feet of water in their home. See Scott Taylor's Final Report for Norman Robinson, PX1716. The post-flooding photographs of the Robinson residence revealed that the water sat inside of the house for a period of time and that it wicked up into the sheetrock and effectively destroyed their house. TT at p. 1603:9-21 (Scott Taylor). Wicking is a process

wherein water is carried up into the wall and up into the insulation.  Mr. Taylor, Plaintiffs'

expert, testified:

> "As a result, I would expect wicking to occur in the sheetrock because it was a newer home and sheetrock is very thirsty like a straw. It draws water straight up given the opportunity where it will rest for any amount of time. It will not just draw the water up, but once the water is drawn up, it infests with mold after a relatively short amount of days so you end up starting to see the mold creeping and reaching up the ceiling and even beyond. You'll find that wicking can occur clear up to the ceiling very easily."

TT at p. 1601:4-13 (Scott Taylor).

There was also evidence of wicking in the post flooding photographs of the Robinson residence.

TT at p. 1603 (Scott Taylor).

This situation is in stark contrast to a mitigated or neutral MRGO which would have

produced a very small amount, if any, of water in the Robinson house.  Specifically, as

confirmed by the Plaintiffs' Scenario 2C, there would have been less than two feet of water,

which may not have even resulted in standing water in the Robinson house had the S&WB

pumps remained operational.  Consequently, with a mitigated or neutral MR-GO there would

have been minimal damage, if any, to the Robinsons' house in New Orleans East, which is

completely distinguishable from the damage caused by the Katrina flooding event.  TT at p.

1861:1-3 (Paul Kemp).

This result would be very similar or a very similar result would have occurred even with

Plaintiffs' Scenario 3.  The results of that scenario indicate that there would have been

substantially less damage, as the water inside the Robinson house would have only been half as

high or approximately three feet.  TT at p. 1861:13-19 (Paul Kemp).  This lower water level is

distinctly allocable from the Katrina flooding as it would have been akin to a May street flood

wherein the residents can remove the bottom sheets of sheetrock which would prevent the water

from wicking into the upper floors of the house.  Mr. Taylor specifically stated:

"That would be the difference between this kind of damage and the kind you see in just street level flooding, like in the May-type street floods that we sometimes see here where it would go like, say, 3 feet or less and then just dissipate very quickly, the damage in those cases would be much less because it doesn't involve the wicking and drawing of the moisture up beyond the 4-foot level."

TT at p. 1602:9-16 (Scott Taylor).

The damage is less in these situations because the water generally dissipates fairly quickly and the homeowner can just remove the effected sheetrock.  TT at p. 1604:1-4 (Scott Taylor).  Consequently, the facts dictate that while there may have been some water with a fully mitigated MRGO or a pristine MRGO, the damages would not have risen anywhere near the total devastation experienced by the Robinsons and the people in New Orleans East.

The same result is reached with regard to the allocation of damages in the Ninth Ward. The Franzes resided on the second story of a two-story duplex on St. Claude Ave.  Mrs. Franz's son stayed in their house for Hurricane Katrina and that they had approximately three feet of water on the second floor of their house.  TT at p. 555:22-25 (Lucille Franz).  This was confirmed by the testimony and reports of Plaintiffs' experts, John Crawford and Scott Taylor, who opined that there was a resting water line that was of approximately one foot on the second floor.  See Crawford Expert Report, PX 1500; Taylor Expert Report, PX 1714.  The Franzes testified that the water was high enough on the second floor that they lost everything. TT at p. 556:4-6 (Lucille Franz); TT at p. 574:21–575:4 (Anthony Franz). This water remained in the Franzes' house for approximately three weeks as it had to be pumped out of the entire area.  TT at p. 1912:1-12 (Junior Rodriguez).

The damages resulting from the Franzes' home sitting in eighteen to twenty-two feet of water is again in stark contrast to the damages that could possibly have occurred with a neutral MR-GO.  The Plaintiffs' expert, Paul Kemp, testified that a neutral MRGO with no breaching of

the floodwalls on the IHNC results in no flooding at the Franz property, so there is no damage. TT at p. 1861:l3-19 (Paul Kemp).  With the breaches in the IHNC and a neutral or mitigated MR-GO the Franzes only have five feet flooding.  TT at p. 1861:13-19 (Paul Kemp).  Five feet of flooding in the Ninth Ward only translates into approximately three feet of flooding in the Franzes' house as the ground elevation in the area is approximately one and a half feet.  The damages that possibly could have resulted from three feet of flooding compared to the damages that were caused by flooding up into their second story are antipodal.

The hydrograph for Location 1, exhibited on pg. 21, indicates that flooding at that location (*with NO S&WB pumping considered*) was approximately 2 feet under Scenario 2, while nearly 13 feet in the Katrina "real run."  The hydrograph for Location 2, likewise exhibited on pg. 21, indicates that flooding at that location (*with NO S&WB pumping considered*) was less than 1 foot under Scenario 2, while nearly 12 feet in the Katrina "real run."

The July 2008 report also addressed the evaluation of flooding within the St. Bernard polder, incorporating Locations 1 and 2 in the Lower Ninth Ward near the Franz's home.  The hydrograph for Location 1, exhibited on pg. 29, indicates that flooding at that location (*with NO S&WB pumping considered*) was approximately 3 feet under Scenario 2C with no industrial breach (the contribution of overtopping was negligible), while nearly 11 feet in Scenario 2C *with* industrial breach, and approximately 15 feet in the Katrina "real run."  The hydrograph for Location 2, likewise exhibited on pg. 29, indicates that flooding at that location (*with NO S&WB pumping considered*) was nearly zero under Scenario 2C with no industrial breach (the contribution of overtopping was negligible), while nearly 5 feet in Scenario 2C *with* industrial breach, and approximately 9 feet in the Katrina "real run."

**Vrijling Scenario 3 compared to Vrijling Scenario 1**

33.     **Did the widening of the MRGO and the erosion of the wetlands cause the Reach 2 levees to fail from front side wave attack or would the same result have occurred with the MRGO as authorized with no wetland erosion.**

The effect of widening of the MRGO and the erosion of the wetlands as it relates to the front side wave attack theory.

A.     Did the widening of the MRGO and the erosion of the Wetlands cause the Reach 2 levees to fail from front side wave attack or world the same result have occurred with the MRGO as authorized with no wetland erosion?

B.     Did the erosion of the wetlands and widening of the channel cause the lateral displacement?

A.     The record reflects that the wetlands erosion significantly contributed to the breach of the reach two levees.  The appropriate comparison however; is not between Vrijling Scenarios 1 and 3.

As the Court is aware, Plaintiffs' Scenario 1 is the plaintiffs' depiction of the Hurricane event.  Contrastingly scenario 3 was merely an exercise to examine the modeling paradigm.   It is mischaracterized by defendants as the mitigated MRGO confronted with the conditions of Hurricane Katrina.

In asking Plaintiffs to compare Vrijling's Scenario 3, plaintiffs are forced to confront a conundrum.  Scenario 3 was never designed by the Plaintiffs to represent a mitigated MRGO.  It was simply an exercise Professor Vrijling did to understand all of the variables of the MRGO. The problem is that Scenario 3 includes the wetlands as they existed in 1958 in the Golden Triangle and along the shore of Lake Borgne. The only way for these wetlands to have survived the MRGO as authorized, would have been through the installation of a barrier at the La Loutre

Ridge which would not only have prevented the salt from destroying the habitat, but would have prevented the MRGO from causing an increase in surge and an increase in the conveyance of water along Reach 2 and along the southern border of New Orleans East.

Plaintiffs' Scenario 3 does not have the La Loutre Ridge salt and surge barrier (that was a component of Scenario 2C because it is the truly neutral scenario. Scenario 3 also does not have habitat between the MRGO shore and the toe of the levee which would have armored the levees from wave attack.

The conundrum is that we are asked to compare Scenario 3 which does not have built into it the devices necessary to create the conditions partially measured by it, nor does it have a fully mitigated habitat.  With respect, very little then can be ascertained by such a comparison.

The only thing that can be gleaned from this comparison is that the waves are lower in Scenario 3 because the channel is narrower.  Because the protective habitat could not be put into that model and because waves are measured from the middle of the MRGO we do not possess the actual data that would show the extent of this reduction.


**Did the widening of the channel and the erosion of the wetlands cause lateral displacement?**

Plaintiff's expert, Duncan Fitzgerald Ph.D , described that the foundation of the MRGO consisted of "distributaries" which are defined as layers of fine grain material called "fat clays." These contain a high percentage of water. (p 349 lines 3-25) Dr. Fitzgerald explained that such a layer of sediment has very little resistance and can take no load so that when weight is placed upon it the layer will flow into the area of least resistance, in this case, the entire reach of the excavated MRGO channel.  (p 343 – 344 lines 12-17).

As early as 1958, the Corps acknowledged that the banks of the MRGO would erode and that foreshore protection would be necessary. (PX 699 - MRGO DM 1 (B) ¶ 19 p. 5). (and see; PX0722).  The Corps' geologists Kolb and Van Lopik studied core samples of the channel and reported: "as much as 40 percent of the bottom and sides of the channel will consist of these interdistributary clays. Poorly consolidated, high water content interdistributary clays will tend to flow laterally into the evacuation particularly under weight of a spoil bank." (p. 350 lines 23-25; 351 lines 1-4) (PX 059) (359 lines 6-24; 360 lines 1-20).  Drs. Duncan Fitzgerald and Robert Bea demonstrated that the erosion along the banks of the MRGO caused by the construction, operation and maintenance of the MRGO exacerbated the phenomena of lateral displacement. (p. 329 lines 14-25).

Further contributing to the structural flaws in the vicinity of the channel in the act of severing the natural salt barrier at La Loutre Ridge which permitted an introduction of salinity and consequent process of osmotic balance that caused the near immediate death of the once plentiful storm buffering fresh water wetlands including roseau cane, cypress and tupelo forest that previously existed in the Central Wetlands Unit. (699 lines 5-25); (p. 331 lines 19-25); (1825 lines 15-25).  Plaintiffs' experts, Drs. John Day and Paul Kemp explained that the loss of these wetlands changed the characteristics of the habitat in the environment from one that provided acres of natural wind and wave breaking capacity to acres of unobstructed open and near open water. (687 lines 18-25) (688 lines 1-9) (695 lines 17-25) (707 lines `6-25) (708 lines 1-24) (1825 lines 9-15)   Further, the death of the vegetation along the banks of the channel caused by salinity created degeneration of root masses which in turn decomposed, broke-up and subsequently entered the channel (p. 332 lines 2-14). This contributed to the accelerated

widening of the channel and additional need for maintenance dredging. (332 lines 15-24) (338 lines 1-3).

As explained by Drs. Duncan Fitzgerald, Robert Bea and Paul Kemp this practice of dredging and placement of dredge spoil on the soft bank of the channel exacerbated the rate of erosion and associated lateral displacement of the interdistributary layer because, "not only are you placing a load on top of the interdistributary mud, but you're also removing confining pressure by removing the toe of that slope when you excavate the channel down to the required "40 foot depth." (p. 349 lines 13-19). (Bea 1119)

The record also reflects that the Corps maintenance practice of constant excavation dredging of the channel and cannibalization of the marsh created oversteeping of the banks and further caused the banks of the channel to slump and retreat. (p. 332 lines 15-24; 333 lines 1-3). (Bea transcript p. 1119).

Dr. Duncan Fitzgerald further explained that the Corps' geological survey of core samples and other GIS data in evidence (PX0206)  combined with Corps' dredging records (PX0206) reflected that in total before Katrina, the Corps removed 17 million cubic yards of material from the channel and placed it on the sides of the levees along the MRGO.  This caused lateral displacement of the interdistributary fat clays into the MRGO which in turn resulted in the need for more maintenance dredging and the placement of that material back on the west bank of Reach 2. (p 37 lines 2-24).   Dr. Bea described this as a "vicious" cycle of maintenance, deterioration and lateral displacement. (Bea 1119).