# APPENDIX B

HL-91-2, TABS-MD Numerical Modeling Investigation of Shoaling in the Mississippi River Gulf Outlet by Hydraulics Laboratory at WES, p. 5 (ERD-019-000001041 to 1113) (01/1991).

331.   In 1993, the Corps created an initial cost estimate of $1,390,000 to address bank erosion issues along the MR-GO, however, this estimate had not been previously presented to Congress.  Exh. 2073, Supplemental Information Sheet, Mississippi River-Gulf Outlet, St. Bernard Parish, Louisiana (Bank Erosion) (dated 01/01/1993; prepared: 02/24/1993; revised 03/03/1993) at p. 4 (AIN-144-000000413 to 418).

332. The MR-GO project was modified under Chief of Engineer's discretionary authority to include as a mitigation measure, the cost of protecting a portion of the foreshore lying between the Lake Pontchartrain and Vicinity Hurricane Protection project levees and the MR-GO, including 6 miles along the reach of the MRGO, which is a part of the GIWW and 18 miles along south shore of the MRGO.

### ARMY CORPS NEVER SOUGHT FUNDING FROM CONGRESS TO REMEDIATE THE MR-GO'S KNOWN DEFECTS

333.   The Corps never informed Congress of the known dangers that the Corps perceived as a result of the risk of flooding caused by the MR-GO's defects, including but not limited to the loss of wetlands and bank erosion/channel widening.  MSJ DFE Order (Doc. No. 18212) at pp. 40, 45, 62.

334.   The Army Corps never asked Congress for authority to remediate the known adverse effects of the MR-GO.  Exh. 91, Kemp Expert Report (July 2008) at pp. 185-95.

335.   The Army Corps could have gone to Congress at any time to ask Congress for authority and money to remediate the known adverse effects of the MR-GO, but it did not.  Exh. 182 at 41:6-19; 43:11-45:10 (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).

336. In 2007, Congress, after becoming more informed about the environmental and safety problems created by the MR-GO, voted to deauthorize (close) the MR-GO to deep draft vessels. Public Law 109-234, Exh. 11, Mississippi River-Gulf Outlet Deep Draft De-authorization Study Integrated Final Report, http://MR-GO.usace.army.mil/default.aspx?p=MR-GOFinalReport.

337. There were always established procedures for the Corps to seek Congressional support for the MR-GO—for example, for funding increases for ongoing operation and maintenance or requesting funding to evaluate problems (reconnaissance reports) and to recommend funding for solutions (feasibility reports). Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 34:14-137:10; 139:10-140; 122:14-127:16.

338. The Corps could—and in fact did—request funding for a reevaluation study about closing the MR-GO—a long delayed and protracted process that lasted from 1999 to 2007. At the time of Hurricane Katrina, the Corps was still studying (reevaluating) the myriad chronic problems with the MR-GO. Exh. 91, Kemp Expert Report (July 2008) at pp. 187, 195; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 133:2-21.

339. Under the chain of command, the Chief Engineer is the Corp official vested with ultimate decision-making authority, and his approval would be required for any definitive agency deliberative process about remedial measures. Exh. 177, Army Corps's Digest of Water Resources Policies and Activities, EP 1165-2-1, Dec. 1972, at p. A-67.

340. At no time did the Chief of Engineers engage in a policy analysis or reach a decision—*i.e.*, exercise his discretion—about the impact of the MR-GO's ongoing operation and maintenance on the wetlands or extensive bank erosion as it pertained to the hazard of storm surge or about whether or how to address the MR-GO's known (and worsening) defects. Exh. 91, Kemp Expert Report (July 2008) at pp. 185-95; Exh. 92, Kemp Appendix B.

341. For decades the Corps studied the MR-GO's deficiencies, but the agency never reached a definitive conclusion about what to do and instead continued the same harmful conduct and exacerbated the dangerous conditions. Exh. 91, Kemp Expert Report (July 2008) at p. 187.

342. The Army Corps took no steps to minimize adverse effects or arrest the decimation of cypress forests, marshes, and swamps that its operation and maintenance activities were causing. Exh. 91, Kemp Expert Report (July 2008) at pp. 180-195; Exh. 182, 30(b)(6) Deposition of Zoltan Montvai, (Oct. 7, 2008) at 35:25-37:20.

343. Dr. Kemp correctly concluded that "[f]or a half century, the consistent course of action was no action—despite detailed institutional knowledge decades before Hurricane Katrina that the MR-GO, in the Corps's own words in 1988, posed a possible threat 'of catastrophic damage to urban areas by a hurricane surge coming up [MR-GO] . . . .'" Exh. 91, Kemp Expert Report (July 2008) at at p. 187.

## HURRICANE KATRINA

**Classification (Saffir Simpson) and Timing**

344. Hurricane intensity is measured on the Saffir-Simpson Scale as follows:

| Saffir-Simpson Hurricane Scale | | |
|---|---|---|
| Category | Knots | (MPH) |
| 1 | 64-82 | (74-95) |
| 2 | 83-95 | (96-110) |
| 3 | 96-113 | (111-130) |
| 4 | 114-135 | (131-155) |
| 5 | 136 and > | (156 and >) |

Figure 2. Saffir-Simpson Scale for Hurricane Intensity.

Exh. 1598, NOAA's Katrina Perspective Report (Aug. 2006) at p. 4.