# APPENDIX C

221. As early as 1966, the Army Corps understood that under certain hurricane conditions, the MR-GO would have "a marked effect" on storm surge and on wave action. Exh. 68, Bretschneider & Collins Study at p. 4; Exh. 185, memo "MR-GO, St Bernard Parish (Bank Erosion) rev Recon Study (December 9, 1992), at NED 192-000000684.

222. In 1964, both the New Orleans District and Lower Mississippi Valley Division Engineers acknowledged that the MR-GO—even without hurricanes—had increased velocities in the IHNC that were hazardous to navigation in the canal.  Exh. 1939, Report of the Chief of Engineers, Department of the Army, Headquarters Memo from Lieutenant W.K. Wilson, Jr. to The Secretary of the Army, Subject: Lake Pontchartrain and Vicinity, Louisiana dated 03/04/1964 at p. 2 (MVD-001-000000423).

223. The existence and severity of the "funnel effect" is further confirmed by significant, emergency post-Katrina corrective measures that the Army Corps has undertaken in order to remediate the "funnel effect."  As part of its 100 Year Level Protection Plan, the Army Corps is constructing the IHNC Surge Reduction Barrier across the mouth of the funnel and the Golden Triangle between the GIWW and Reach 2.  Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23; Exh. 131, Greater New Orleans Hurricane and Storm Damage Risk Reduction System (HSDRRS) Status June 2008; Exh. 132, New Orleans Hurricane and Storm Damage Risk Reduction System 2008 Facts and Figures by the U.S. Army Corp of Engineers dated August 28, 2008; Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers; Exh. 136, Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers, at pp. 52-53.

224. The purpose of the IHNC Surge Reduction Barrier—a new feature, authorized by Congress in 2006—is to reduce risk of storm damage to some of the region's areas most vulnerable to flooding—New Orleans East, metro New Orleans, the 9th Ward, and St. Bernard Parish. Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers at pp. 1-2; Exh. 136 Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers, at pp. 52-53; Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23.

225. The Army Corps has stated that "[t]he overall purpose of the project is to provide a comprehensive, integrated protection system that would reduce the imminent and continuing threat to life, health, and property posed by flooding from hurricanes and other tropical storm events." Exh. 20 at p. 4, ¶1.1 (Owen Depo. Exhibit 4).

226. This project aims to protect these areas from storm surge coming from the Gulf of Mexico and Lake Borgne. Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers at p. 1; Exh. 136, Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers at pp. 52-53; Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23.

227. The Army Corps's decision to recommend the IHNC Surge Reduction Barrier comes in the wake of the following IPET recommendation for this remedial measure: "To prevent storm surge in Lake Borgne from influencing water levels experienced in the IHNC or GIWW/MR-GO sections of waterway, flow through Reach 1 channel must be dramatically reduced or eliminated, either by a permanent closure or some type of structure that temporarily

66

serves to eliminate this hydraulic connectivity [between Lake Borgne and Lake Pontchartrain via GIWW/MR-GO and the IHNC]." Exh. 20, IPET Report at p. IV-135; Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 68:23-70:4.

228.    The Army Corps's planners took into account IPET data from Hurricane Katrina showing that as a result of storm surges from Lake Borgne propagating down the Reach 1/GIWW into the IHNC, the water elevation during Hurricane Katrina rose seven feet higher in the IHNC (water level of three feet plus waves up to four feet high).  Exh. 135, Decision Record, Individual Environmental Report #11, Improved Protection on the Inner Harbor Navigation Canal by the U.S. Army Corps of Engineers at p. 36; Ex. 130, Owen Depo. at 91:14-93:9.

**Wetlands Destruction**

229.    Long before Hurricane Katrina, the Army Corps knew that the MR-GO was destroying tens of thousands of acres of cypress forests, grasses, marshes, swamps, trees, shrubs and other wetlands ("wetlands") that provided a natural barrier and sponge for storm surge and that the loss of these wetlands reduced storm surge protection for New Orleans and St. Bernard Parish.  Exh. 144, 1957 Tidewater Channel Advisory Committee Report at p. 2; Exh. 96, Fitzgerald Report at p. 4-20, Fig. 4.6; Exh. 178, USACE Fact Sheet; Exh. 161, letter from United States Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957; Exh. 155, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Press Release, September 26, 1957, at p. 1; Exh. 179, U.S. Fish and Wildlife Service, An Interim Report on Fish and Wildlife Resources as Related to Mississippi River Gulf Outlet Project, (April 1958) at pp. 9-11; Exh. 9, 1988 Recon Report at p. 27; Exh. 4, Team Louisiana Report at p. 112; Exh. 95, Day/Shaffer Expert Report (July 2008) (July 2008) at pp. 16-20, 46.

295. The Corps acknowledges that the MRGO human environment included areas that were impacted by land changes due to the MRGO project and that the Corps did not analyze the cumulative effect of environmental changes brought about by the MR-GO.  Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 17:19-23 (30(b)(6) and 126:13-18, 144:1-145:7.

296. The Corps acknowledged by the time of its 1988 bank erosion reconnaissance study the erosion had an impact on the human environment which would be regulated by NEPA, but it never incorporated this information into its environmental disclosures—either in the EAs or a Supplemental Environmental Impact Statement.  Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 157:9-159:25.

### ARMY CORPS' AWARENESS OF FEASIBLE MITIGATION MEASURES

297. The MR-GO's deficiencies were never "ineradicable" because technically feasible mitigation measures for bank and wetlands protection and surge and saltwater barriers—which would not have impeded use of the navigation channel by deep-draft vessels—were always available to the Corps.  *See, e.g.*, Exh. 154, Appendix C, Report on Evaluation of Alternate Plans Involving Modifications in the Alignment of the Lake Pontchartrain Barrier at p. 2; Exh. 151, Memo concerning MR-GO Floodgates at IHNC from Jerome C. Baehr, at p. 1, AFW-467-000001698-1699; Exh. 146, Letter from U.S. Department of the Interior to District Engineer, NOD, October 22, 1962; Exh. 141, Letter from Colonel E.R. Heiberg III to Mr. G.J. Lannes, Jr. at p. 1 (NED-125-000000995-997); Exh. 71, Bea Expert Report (July 2008) at p. 19, ¶20; Defendant's DFE Motion for Summary Judgment (Doc. No. 16552-4) at p. 36, n. 8 (bank protection works were technically feasible).

**Surge Protection**

298.   Throughout the life of the MR-GO, there were feasible means (known to the Army Corps) to install a surge barrier along the lower portion of Reach 2 that would have allowed ship passage and prevented dangerous storm surge during hurricanes from entering the upper section of Reach 2.  Exh. 71, Bea Expert Report (July 2008) at p. 19, ¶20.

299. In 1962, the Army Corps considered construction of two "floodgates" to control hurricane surge at Bayou Bienvenue and Bayou Dupre along Reach 2 of the MR-GO.  Exh. 146, Letter from U.S. Department of the Interior to District Engineer, New Orleans District, October 22, 1962.

**"Funnel Effect"**

300. It was widely reported that a 1938 hurricane that made land fall along the southern coast of New England caused catastrophic damage ($4.5 billion in 2005 dollars) and loss of life (664 people killed) due to storm surge levels greater than 18 feet in downtown Providence, Rhode Island.  In response to the 1938 hurricane and other hurricanes in the 1950s, the Army Corps built floodgates in Providence, Rhode Island and Bedford, Massachusetts to protect these regions from dramatic heightening of storm waters due to their funnel-shaped coastlines.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-2.

301.   Before and after the MR-GO's design and construction, there were feasible means (known to the Army Corps) to prevent or reduce storm surge from entering Reach 1/GIWW and the IHNC.  Exh. 147, Letter from Kenneth J. LeSieur to Colonel Thomas J. Bowen, November 24, 1965; Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-2.; Exh. 71, Bea Expert Report (July 2008) at p. 19, ¶20.

302. There were several alternative locations where a storm surge barrier could have been located, including but not limited to several points across the mouth of the funnel and the Golden Triangle between the GIWW and Reach 2.  Exh. 130, 30(b)(6) Deposition of Gib Owen (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23; Exh. 131, Greater New Orleans Hurricane and Storm Damage Risk Reduction System (HSDRRS) Status, June 2008; Exh. 132, New Orleans Hurricane and Storm Damage Risk Reduction System 2008 Facts and Figures by the U.S. Army Corp of Engineers, August 28, 2008; Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers; Exh. 136, Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers, at pp. 52-53.

303. After Hurricane Betsy, the Army Corps considered in 1967—and again in 1969—the construction of a hurricane surge barrier from the GIWW to Reach 2 of the MR-GO in order to prevent hurricane surge from Lake Borgne entering the combined GIWW/MR-GO Reach 1 and the IHNC west of Paris Road.  Exh. 154, Lake Pontchartrain and Vicinity Design Memorandum No. 2: Citrus Back Levee, Appendix C, at p. 2; Exh. 151, Memo concerning MR-GO Floodgates at IHNC from Jerome C. Baehr, at AFW-467-000001698 and AFW-467-000001699 (Map of Authorized Plan of Protection dated 10/1969).

304. In 1975, the Army Corps acknowledged that a storm surge barrier from the GIWW to Reach 2 of the MR-GO "would have provided hurricane protection for the industrial development along the IHNC outside the authorized protective works," and "[a] relatively safe harbor, during hurricane conditions, would be provided in the IHNC and the MR-GO/GIWW since the navigation structures would control the ingress of hurricane tides and reduce wave

action." Exh. 141, correspondence between K.R. Heiberg III and G.J. Lannes dated April 11, 1975 and April 21, 1975, at NED-125-000000995-997.

    305. In 1964, both the New Orleans District and Lower Mississippi River Division Engineers concluded that "the most suitable plan" for protecting the people and property of New Orleans East would consist, among other things, for a levee and floodwall barrier along the south east side of this area to prevent entry of surges from Lake Borgne into this area and Lake Pontchartrain. Exh. 1939, Report of the Chief of Engineers, Department of the Army to The Secretary of the Army; Subject: LPV, Louisiana (MVD-001-000000422 to 424) (03/04/1964).

    306. As discussed above, the Army Corps is presently constructing the IHNC Surge Reduction Barrier across the mouth of the funnel and Golden Triangle between the GIWW and Reach 2 as depicted below:



90

Exh. 131, Army Corps, *Greater New Orleans Hurricane and Storm Damage Risk Reduction System* (HSDRRS) 100-Year Level of Protection, June 13, 2008.

307. The presence of this type of surge reduction barrier during Hurricane Katrina would have prevented the significantly magnified surge from overtopping the LPV structures along both sides of the Reach 1/GIWW channel and the overtopping of the LPV structures along both sides of the IHNC, thereby averting the resulting catastrophic flooding of New Orleans East, the Lower 9th Ward, and portions of upper St. Bernard Parish.  Exh. 133, IHNC Surge Reduction Project Fact Sheet at pp. 1-2; Exh. 136, Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne, at pp. 52-53; Exh. 130 (Owen 30(b)(6) Depo. (Oct. 16, 2008)) at 77:9-78:7; 119:18-121:23; Exh. 138, Louisiana Coastal Area (LCA) Ecosystem Restoration, LA (General Investigations): Comprehensive Coastwide Ecosystem Restoration Feasibility Study, at p. 4, ¶ 1.1; Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶21, Table 1; ¶¶22, 30, 30(b), 30(c).

**Destruction of Wetlands**

308.   Before and after the MR-GO's design and construction, there were feasible means to prevent the intrusion of saltwater into the Reach 2 channel and the adjoining Central Wetlands Unit and Golden Triangle and environs while at the same time allowing ship passage.  For example, a man-made saltwater barrier at Bayou La Loutre—a retractable gate—would have effectively replaced the natural barrier that was severed by the MR-GO construction. Alternatively, a lock could have been constructed at Bayou La Loutre Ridge.  Other technology for salinity control included inflatable barriers for deployment when there was no ship traffic. Exh. 96, Fitzgerald Expert Report (July 2008) at p. 2-13, fig. 2.18; p. 6-5; *see also* Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 23, 33-34, 36.

309. Both before and after the MR-GO's opening, there were a number of feasible measures that could have been undertaken to prevent salinity intrusion into the Central Wetlands Unite and adjacent areas. These salinity control measures would have prevented much of the vegetation loss, including the massive die off of bald cypress—water tupelo swamps because saltwater intrusion would have been significantly reduced. Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 33-34, 36.

310. Many of these salinity control measures were suggested both before and after the MR-GO's construction, but the Corps never implemented them at any time over 50 years. Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 33.

311. In addition, saltwater intrusion into the Central Wetlands Unit could have been greatly reduced by placing water control structures (before cutting the Bayou La Loutre Ridge) in openings in the spoil banks between the MR-GO and the Central Wetlands Unit at Bayou Bienvenue and Bayou Dupre. This was an easy and economical salinity prevention measure. Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 34.

312. In addition to feasible salinity control measures, there were proven methods for wetlands restoration—to revegetate trees killed by saltwater intrusion—that were known to the Army Corps during the MR-GO's lifetime. Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 33; Exh. 1989, Letter to John Breaux, U.S. Senate in response to letter dated 09/12/1994 concerning St. Bernard Parish Resolution SBPC #454-08-94 re: Closing the MRGO (NOP-018-000002658) (10/12/94).

313. At the time of Katrina, the Corps was creating 300 acres of emergent wetlands near the MR-GO using dredged spoil materials. Exh. 216, Letter from Don T. Riley to Peter Savoy, June 17, 2004.

314. In addition, wetlands preservation and restoration could have been readily accomplished by widespread fresh water introduction into the Central Wetlands Unit that would have buffered any saltwater intrusion and flushed out salt. Sources of freshwater included the Violet diversion structure and variable operation of water control structures at Bayou Bienvenue and Bayou Dupre drainage pumps discharging surface runoff into the Central Wetlands Unit, and freshwater from treated, disinfected municipal effluent (waste water). Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 35-36.

**Channel Bank Erosion**

315. The massive widening of the Reach 2 channel through bank erosion was preventable at any time by armoring at its authorized or expanded width to protect the banks from predicted erosion from ship waves. Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 34.

316. Before the MR-GO was constructed, the Corps knew that bank protection can be accomplished by several means, including riprap, rock dikes, armor stone, shell core, and articulated concrete mattresses. Exh. 208, MRGO, PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program (NOP-019-000000207) (4/11/05); Exh. 1990, Letter to Chief of Engineers, ENGCW-V from Major General Ellsworth I. Davis, USA, Division Engineer; Subject: Hurricane Protection – LPV – Chalmette Area (AFW-467-000003416) (3/21/66); Exh. 1991, MRGO Recon, Mile 23 to 27, Computation Sheet NED-167-000001330 (8/31/93).

317. An additional benefit of armoring the Reach 2 bank lines is the fact that the approximately 250 meter area of drainage spoil between the channel bank and the toe of the LPV structures would have vegetated in salt-tolerant herbaceous plants, shrub-scrub and trees, similar

93

to the dredge spoil on the western side of the LPVs structures. The presence of vegetation between the channel and the toe of the Reach 2 LPV structures would have provided vital protection against wave side attack during Hurricane Katrina. Exh. 3, ILIT at p. 2-19, figure 2.6; Exh. 13, Theis 702c Expert Report (Sept. 2007) at ¶27. Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 35.

318.  The Corps knew that bank restoration would reduce saltwater intrusion, speed of tidal surges, and rate of marsh erosion attributable to tidal scour, which would in turn reduce wetland loss and greatly reduce maintenance dredging. Moreover, this reduction in dredging and placement of material in the spoil disposal area would also have a beneficial result in greatly reducing the amount of dredge effluent into the spoil disposal area. This would have benefited the spoil area by allowing more material drying to take place and also allow some of the marsh area to recuperate. Exh. 13, Theis 702c Expert Report (Sept. 2007) at ¶10; Exh. 1940, Planning-Aid Report on MRGO, St. Bernard Parish, Louisiana (Bank Erosion) Reconnaissance Study; Prepared by: U.S. Fish and Wildlife Service (MVD-003-000000565 to 566) (08/1987).

319. Long before Katrina, the Corps recognized that another effective remedial measure for bank erosion would be reduction of the ships' speed in Reach 2. Exh. 9, 1988 Recon Report at pp. 40-43.

**Foreshore Protection**

320.  The feasibility of effective bank stabilization was demonstrated by the Army Corps' limited installation of foreshore protection along the upper section of Reach 2 in the 1990(s). Exh. 1989, Letter to John Breaux, U.S. Senate in response to letter dated 09/12/1994 concerning St. Bernard Parish Resolution SBPC #454-08-94 re: Closing the MRGO (NOP-018-

94

000002656) (10/12/1994); Exh. 1992, Map of Rock Dike Protection at upper lob of Lake Borgne (NOP-019-000001041) (01/1991).

321. In 1966, the Corps acknowledged that the foreshore distance between Reach 2 and the retaining dike was 500 feet, and the intervening area was covered with thick growth of marsh grass. The Corps nevertheless decided that no foreshore protection or slope paving was required to prevent silting in the channel due to wave action and therefore did not include this feature in the original MR-GO design. By the next year, however, the Corps realized that failure to protect the channel was a mistake. Exh. 1990, Letter to Chief of Engineers, Attn: ENGCW-V from Major General Ellsworth I. Davis, USA, Division Engineer; Subject: Hurricane Protection-LPV-Chalmette Area, p. 1 (AFW-467-000003416) (03/21/1966).

322. On July 1, 1967, the Chief of Engineers prepared a draft memorandum for the Special Assistant to the Secretary of the Army for Civil Functions concerning the MR-GO that acknowledged the need for foreshore protection along the MR-GO. The Chief stated:

> The navigation channel banks and the foreshore area between the channel bank and the levee are subject to severe erosive attack by waves generated by the marine traffic using the channel. Without protective works, this attack would erode the foreshore, undermine the levees, and ultimately result in their failure.

Exh. 1993, Draft letter (1) to The Special Assistant to the Secretary; Subject: MR-GO, La (A feature of the project "Mississippi River – Baton Rouge to the Gulf of Mexico"), pp. 2-3 (VRG-014-000000088 to 93).

323. The Chief also reported that the original MR-GO design was deficient for not armoring the channel's banks. The Chief stated:

> The construction of the Mississippi River Gulf-Outlet exposed the foreshore fronting this levee to direct attack by waves generated by oceangoing vessels. [I]t is evident that the navigation project should have made adequate provision for protecting the levee against the added threat which the existence of the outlet would create . . . . The Mississippi River Gulf Outlet project was deficient in

95

>   original formulation in not providing for the preservation of lands along its banks which were of potential and reasonable prospective use.

Exh. 1994, Draft Letter (Incl. 13) to the Special Assistant to the Secretary; Subject: Mississippi River-Gulf Outlet, Louisiana Project, p. 2 (VRG-014-000000104).

324.   In view of the above, the Chief found a need to modify the authorized MR-GO to provide for foreshore protection along 6 miles of the north bank and 18 miles of the south bank, at a total cost of $5,337,000.  Exh. 1993, Draft letter (1) to The Special Assistant to the Secretary; Subject: MR-GO, La (A feature of the project "Mississippi River – Baton Rouge to the Gulf of Mexico"), p. 5 (VRG-014-000000088 to 93).

325.   Foreshore protection along the south bank of the MR-GO was authorized by the Chief's approval on July 3, 1968 of the MR-GO General Design Memorandum ("GDM"), No. 2, Supplement No. 4, Foreshore Protection.  The 1968 GDM served as a modification of the original MR-GO authorization.  Despite the programs' approval, the 1968 GDM indicated that construction of foreshore protection was to be delayed until after completion of the ongoing study to enlarge the MR-GO to 50 feet by 750 feet.  Exh. 360, 6th End to Division Engineer, LMVD from Chief Jerome C. Baehr; Subject; MRGO, GDM No. 2, Supp. 4 (02/13/1969); 5th End to LMVD from Chief, A.J. Davis, Division Engineer (12/20/1968); and 4th End to NOD from Chief Jerome C. Baehr (11/27/1968) (AFW-341-000001114); *see also* Exh. 202, MR-GO General Design Memorandum, No. 2, Supplement No. 4, Foreshore Protection (April 1968).

326.   From 1968 to 1986, the Corps had the ability to implement foreshore protection along the MR-GO without first securing a local sponsor.  The 1968 GDM illustrates that the Corps' plan to enlarge the MR-GO was the true cause for the delay in foreshore protection, rather than the lack of local sponsorship.  Exh. 202, MR-GO General Design Memorandum, No. 2, Supplement No. 4, Foreshore Protection (April 1968).

327. Despite approval of foreshore protection in 1968, the work was not undertaken until the early 1990s. During the Corps' two decades of inaction in the face of the known "threat" to the LPV structures posed by the unarmored Reach 2 banks, the channel widened from 650 to at least 1,500 feet, dangerously encroaching on the LPV structures, posing a threat to the integrity of the levee system, and endangering the safety of area residents. Exh. 1995, Technical Report HL-91-2, TABS-MD Numerical Modeling Investigation of Shoaling in the Mississippi River Gulf Outlet by Hydraulics Laboratory at WES (ERD-019-000001041 to 1113) (01/1991); Exh. 1996, 6th Ind to HQDA (DAEN-CWB-C) Wash DC from Chief Eugene H. Nettles, Program Development Office; Subject: Transfer of Fiscal Year 1980 Construction, General – Mississippi River-Gulf Outlet (AIN-108-000001408) (12/28/1979); Exh. 1997, 3d Ind. to Division Engineer, LMVD from Chief Rodney E. Pittman, Program Development Office; Subject: Transfer of Fiscal Year 1980 Construction, General – Mississippi River-Gulf Outlet (AIN-108-000001405) (11/21/1979); 4th Ind to NOD from Chief Eugene H. Nettles, Program Development Office (AIN-108-000001406) (12/07/1979); 5th Ind to Division Engineer LMVD from Chief Rodney E. Pittman, Program Development Office (AIN-108-000001407) (12/22/1979); Exh. 216, Letter to Pete Savoy from Brigadier General Don T. Riley, U.S. Army President Designee, Mississippi River Commission, Executive Office; re: Concerns about MRGO and recommendation of a flood gate at Bayou La Loutre (NOP-019-000000811 to 814) (06/17/2004); Exh. 1880, Memorandum from Project Manager Gerald Dicharry, Jr., MRGO Project; Subject: Foreshore Protection on the North Bank of the MRGO along the Citrus Back Levee Between Paris Road Bridge and the Michoud Slip (AIN-108-000000001 (09/16/1982).

328. By 1983, the Corps reported that foreshore protection along the Reach 2 south bank was critical because the erosion (at the rate of 20 feet per year), if unchecked, would soon begin

97

to encroach into the stability berms of the LPV structures in light of the fact in some existing banks had eroded back to about 200 feet (from the original 500 feet) from the levee toe.  Exh. 1998, Letter to Commander, LMVD from Chief Frederick M. Chatry; Subject: Mississippi River-Gulf Outlet, Louisiana Foreshore Protection (AIN-108-000001264 to 1265) (02/11/1983); Exh. 1999, Memo to File from Larry E. DeMent, LMNED-HC; Subject: MRGO Foreshore Protection Test Sections South Bank Sta 475 to 501 (NED-192-000000432 to 437) (01/28/1983).

329.   Beginning in 1990, the Corps, using its annual O&M budget, constructed 8.3 miles of foreshore rock bank protection along the MR-GO that successfully abated bank erosion, reduced channel sedimentation and associated dredging cycles, and preserved valued wetlands, land features, and infrastructure along Reach 2.  By 1994, the Corps had constructed 12.4 miles of rock foreshore protection on the south bank of Reach 2.  Exh. 1989, Letter to John Breaux, U.S. Senate from Colonel Kenneth H. Clow, U.S. Army District Engineer, Operations and Readiness Division, Project Manager (NOP-018-000002656 to 2658) (10/12/1994); Exh. 216, Letter to Pete Savoy, Coastal Zone Management, St. Bernard Parish from Brigadier General Don T. Riley, U.S. Army President Designee, Mississippi River Commission, Executive Office (NOP-019-000000811 to 814) (06/17/2004).

330.   In 1991, the Corps, recognizing that there were widening gaps between Reach 2 and Lake Borgne, acknowledged that continuing bank erosion of the Reach 2 channel had caused several serious problems, including channel widening from the original 650 feet to at least 1,500 feet, destruction of 4,200 acres of highly productive marshlands over the past 20 years, and significant gaps between the channel and Lake Borgne at Shell Beach and Martello Castle. Most significantly, the Corps expressed concern that this unchecked erosion exposed developed areas to the southwest to "direct hurricane attacks from Lake Borgne."  Exh. 1995, Technical Report

HL-91-2, TABS-MD Numerical Modeling Investigation of Shoaling in the Mississippi River Gulf Outlet by Hydraulics Laboratory at WES, p. 5 (ERD-019-000001041 to 1113) (01/1991).

331.   In 1993, the Corps created an initial cost estimate of $1,390,000 to address bank erosion issues along the MR-GO, however, this estimate had not been previously presented to Congress.  Exh. 2073, Supplemental Information Sheet, Mississippi River-Gulf Outlet, St. Bernard Parish, Louisiana (Bank Erosion) (dated 01/01/1993; prepared: 02/24/1993; revised 03/03/1993) at p. 4 (AIN-144-000000413 to 418).

332. The MR-GO project was modified under Chief of Engineer's discretionary authority to include as a mitigation measure, the cost of protecting a portion of the foreshore lying between the Lake Pontchartrain and Vicinity Hurricane Protection project levees and the MR-GO, including 6 miles along the reach of the MRGO, which is a part of the GIWW and 18 miles along south shore of the MRGO.

### ARMY CORPS NEVER SOUGHT FUNDING FROM CONGRESS TO REMEDIATE THE MR-GO'S KNOWN DEFECTS

333.   The Corps never informed Congress of the known dangers that the Corps perceived as a result of the risk of flooding caused by the MR-GO's defects, including but not limited to the loss of wetlands and bank erosion/channel widening.  MSJ DFE Order (Doc. No. 18212) at pp. 40, 45, 62.

334.   The Army Corps never asked Congress for authority to remediate the known adverse effects of the MR-GO.  Exh. 91, Kemp Expert Report (July 2008) at pp. 185-95.

335.   The Army Corps could have gone to Congress at any time to ask Congress for authority and money to remediate the known adverse effects of the MR-GO, but it did not.  Exh. 182 at 41:6-19; 43:11-45:10 (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).