# APPENDIX H

314. In addition, wetlands preservation and restoration could have been readily accomplished by widespread fresh water introduction into the Central Wetlands Unit that would have buffered any saltwater intrusion and flushed out salt.  Sources of freshwater included the Violet diversion structure and variable operation of water control structures at Bayou Bienvenue and Bayou Dupre drainage pumps discharging surface runoff into the Central Wetlands Unit, and freshwater from treated, disinfected municipal effluent (waste water).  Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 35-36.

**Channel Bank Erosion**

315.   The massive widening of the Reach 2 channel through bank erosion was preventable at any time by armoring at its authorized or expanded width to protect the banks from predicted erosion from ship waves.  Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 34.

316.   Before the MR-GO was constructed, the Corps knew that bank protection can be accomplished by several means, including riprap, rock dikes, armor stone, shell core, and articulated concrete mattresses.  Exh. 208, MRGO, PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program (NOP-019-000000207) (4/11/05); Exh. 1990, Letter to Chief of Engineers, ENGCW-V from Major General Ellsworth I. Davis, USA, Division Engineer; Subject: Hurricane Protection – LPV – Chalmette Area (AFW-467-000003416) (3/21/66); Exh. 1991, MRGO Recon, Mile 23 to 27, Computation Sheet NED-167-000001330 (8/31/93).

317.   An additional benefit of armoring the Reach 2 bank lines is the fact that the approximately 250 meter area of drainage spoil between the channel bank and the toe of the LPV structures would have vegetated in salt-tolerant herbaceous plants, shrub-scrub and trees, similar

to the dredge spoil on the western side of the LPVs structures.  The presence of vegetation between the channel and the toe of the Reach 2 LPV structures would have provided vital protection against wave side attack during Hurricane Katrina.  Exh. 3, ILIT at p. 2-19, figure 2.6; Exh. 13, Theis 702c Expert Report (Sept. 2007) at ¶27.  Exh. 95, Day/Shaffer Expert Report (July 2008) at p. 35.

318.   The Corps knew that bank restoration would reduce saltwater intrusion, speed of tidal surges, and rate of marsh erosion attributable to tidal scour, which would in turn reduce wetland loss and greatly reduce maintenance dredging.  Moreover, this reduction in dredging and placement of material in the spoil disposal area would also have a beneficial result in greatly reducing the amount of dredge effluent into the spoil disposal area.  This would have benefited the spoil area by allowing more material drying to take place and also allow some of the marsh area to recuperate.  Exh. 13, Theis 702c Expert Report (Sept. 2007) at ¶10; Exh. 1940, Planning-Aid Report on MRGO, St. Bernard Parish, Louisiana (Bank Erosion) Reconnaissance Study; Prepared by: U.S. Fish and Wildlife Service (MVD-003-000000565 to 566) (08/1987).

319. Long before Katrina, the Corps recognized that another effective remedial measure for bank erosion would be reduction of the ships' speed in Reach 2.  Exh. 9, 1988 Recon Report at pp. 40-43.

**Foreshore Protection**

320.   The feasibility of effective bank stabilization was demonstrated by the Army Corps' limited installation of foreshore protection along the upper section of Reach 2 in the 1990(s).  Exh. 1989, Letter to John Breaux, U.S. Senate in response to letter dated 09/12/1994 concerning St. Bernard Parish Resolution SBPC #454-08-94 re: Closing the MRGO (NOP-018-

94

000002656) (10/12/1994); Exh. 1992, Map of Rock Dike Protection at upper lob of Lake Borgne (NOP-019-000001041) (01/1991).

321. In 1966, the Corps acknowledged that the foreshore distance between Reach 2 and the retaining dike was 500 feet, and the intervening area was covered with thick growth of marsh grass. The Corps nevertheless decided that no foreshore protection or slope paving was required to prevent silting in the channel due to wave action and therefore did not include this feature in the original MR-GO design. By the next year, however, the Corps realized that failure to protect the channel was a mistake. Exh. 1990, Letter to Chief of Engineers, Attn: ENGCW-V from Major General Ellsworth I. Davis, USA, Division Engineer; Subject: Hurricane Protection-LPV-Chalmette Area, p. 1 (AFW-467-000003416) (03/21/1966).

322. On July 1, 1967, the Chief of Engineers prepared a draft memorandum for the Special Assistant to the Secretary of the Army for Civil Functions concerning the MR-GO that acknowledged the need for foreshore protection along the MR-GO. The Chief stated:

> The navigation channel banks and the foreshore area between the channel bank and the levee are subject to severe erosive attack by waves generated by the marine traffic using the channel. Without protective works, this attack would erode the foreshore, undermine the levees, and ultimately result in their failure.

Exh. 1993, Draft letter (1) to The Special Assistant to the Secretary; Subject: MR-GO, La (A feature of the project "Mississippi River – Baton Rouge to the Gulf of Mexico"), pp. 2-3 (VRG-014-000000088 to 93).

323. The Chief also reported that the original MR-GO design was deficient for not armoring the channel's banks. The Chief stated:

> The construction of the Mississippi River Gulf-Outlet exposed the foreshore fronting this levee to direct attack by waves generated by oceangoing vessels. [I]t is evident that the navigation project should have made adequate provision for protecting the levee against the added threat which the existence of the outlet would create . . . . The Mississippi River Gulf Outlet project was deficient in

95

> original formulation in not providing for the preservation of lands along its banks which were of potential and reasonable prospective use.

Exh. 1994, Draft Letter (Incl. 13) to the Special Assistant to the Secretary; Subject: Mississippi River-Gulf Outlet, Louisiana Project, p. 2 (VRG-014-000000104).

324. In view of the above, the Chief found a need to modify the authorized MR-GO to provide for foreshore protection along 6 miles of the north bank and 18 miles of the south bank, at a total cost of $5,337,000. Exh. 1993, Draft letter (1) to The Special Assistant to the Secretary; Subject: MR-GO, La (A feature of the project "Mississippi River – Baton Rouge to the Gulf of Mexico"), p. 5 (VRG-014-000000088 to 93).

325. Foreshore protection along the south bank of the MR-GO was authorized by the Chief's approval on July 3, 1968 of the MR-GO General Design Memorandum ("GDM"), No. 2, Supplement No. 4, Foreshore Protection. The 1968 GDM served as a modification of the original MR-GO authorization. Despite the programs' approval, the 1968 GDM indicated that construction of foreshore protection was to be delayed until after completion of the ongoing study to enlarge the MR-GO to 50 feet by 750 feet. Exh. 360, 6th End to Division Engineer, LMVD from Chief Jerome C. Baehr; Subject; MRGO, GDM No. 2, Supp. 4 (02/13/1969); 5th End to LMVD from Chief, A.J. Davis, Division Engineer (12/20/1968); and 4th End to NOD from Chief Jerome C. Baehr (11/27/1968) (AFW-341-000001114); *see also* Exh. 202, MR-GO General Design Memorandum, No. 2, Supplement No. 4, Foreshore Protection (April 1968).

326. From 1968 to 1986, the Corps had the ability to implement foreshore protection along the MR-GO without first securing a local sponsor. The 1968 GDM illustrates that the Corps' plan to enlarge the MR-GO was the true cause for the delay in foreshore protection, rather than the lack of local sponsorship. Exh. 202, MR-GO General Design Memorandum, No. 2, Supplement No. 4, Foreshore Protection (April 1968).

96

327. Despite approval of foreshore protection in 1968, the work was not undertaken until the early 1990s.  During the Corps' two decades of inaction in the face of the known "threat" to the LPV structures posed by the unarmored Reach 2 banks, the channel widened from 650 to at least 1,500 feet, dangerously encroaching on the LPV structures, posing a threat to the integrity of the levee system, and endangering the safety of area residents.  Exh. 1995, Technical Report HL-91-2, TABS-MD Numerical Modeling Investigation of Shoaling in the Mississippi River Gulf Outlet by Hydraulics Laboratory at WES (ERD-019-000001041 to 1113) (01/1991); Exh. 1996, 6th Ind to HQDA (DAEN-CWB-C) Wash DC from Chief Eugene H. Nettles, Program Development Office; Subject: Transfer of Fiscal Year 1980 Construction, General – Mississippi River-Gulf Outlet (AIN-108-000001408) (12/28/1979); Exh. 1997, 3d Ind. to Division Engineer, LMVD from Chief Rodney E. Pittman, Program Development Office; Subject: Transfer of Fiscal Year 1980 Construction, General – Mississippi River-Gulf Outlet (AIN-108-000001405) (11/21/1979); 4th Ind to NOD from Chief Eugene H. Nettles, Program Development Office (AIN-108-000001406) (12/07/1979); 5th Ind to Division Engineer LMVD from Chief Rodney E. Pittman, Program Development Office (AIN-108-000001407) (12/22/1979); Exh. 216, Letter to Pete Savoy from Brigadier General Don T. Riley, U.S. Army President Designee, Mississippi River Commission, Executive Office; re: Concerns about MRGO and recommendation of a flood gate at Bayou La Loutre (NOP-019-000000811 to 814) (06/17/2004); Exh. 1880, Memorandum from Project Manager Gerald Dicharry, Jr., MRGO Project; Subject: Foreshore Protection on the North Bank of the MRGO along the Citrus Back Levee Between Paris Road Bridge and the Michoud Slip  (AIN-108-000000001 (09/16/1982).

328. By 1983, the Corps reported that foreshore protection along the Reach 2 south bank was critical because the erosion (at the rate of 20 feet per year), if unchecked, would soon begin

97

to encroach into the stability berms of the LPV structures in light of the fact in some existing banks had eroded back to about 200 feet (from the original 500 feet) from the levee toe. Exh. 1998, Letter to Commander, LMVD from Chief Frederick M. Chatry; Subject: Mississippi River-Gulf Outlet, Louisiana Foreshore Protection (AIN-108-000001264 to 1265) (02/11/1983); Exh. 1999, Memo to File from Larry E. DeMent, LMNED-HC; Subject: MRGO Foreshore Protection Test Sections South Bank Sta 475 to 501 (NED-192-000000432 to 437) (01/28/1983).

329. Beginning in 1990, the Corps, using its annual O&M budget, constructed 8.3 miles of foreshore rock bank protection along the MR-GO that successfully abated bank erosion, reduced channel sedimentation and associated dredging cycles, and preserved valued wetlands, land features, and infrastructure along Reach 2. By 1994, the Corps had constructed 12.4 miles of rock foreshore protection on the south bank of Reach 2. Exh. 1989, Letter to John Breaux, U.S. Senate from Colonel Kenneth H. Clow, U.S. Army District Engineer, Operations and Readiness Division, Project Manager (NOP-018-000002656 to 2658) (10/12/1994); Exh. 216, Letter to Pete Savoy, Coastal Zone Management, St. Bernard Parish from Brigadier General Don T. Riley, U.S. Army President Designee, Mississippi River Commission, Executive Office (NOP-019-000000811 to 814) (06/17/2004).

330. In 1991, the Corps, recognizing that there were widening gaps between Reach 2 and Lake Borgne, acknowledged that continuing bank erosion of the Reach 2 channel had caused several serious problems, including channel widening from the original 650 feet to at least 1,500 feet, destruction of 4,200 acres of highly productive marshlands over the past 20 years, and significant gaps between the channel and Lake Borgne at Shell Beach and Martello Castle. Most significantly, the Corps expressed concern that this unchecked erosion exposed developed areas to the southwest to "direct hurricane attacks from Lake Borgne." Exh. 1995, Technical Report

HL-91-2, TABS-MD Numerical Modeling Investigation of Shoaling in the Mississippi River Gulf Outlet by Hydraulics Laboratory at WES, p. 5 (ERD-019-000001041 to 1113) (01/1991).

331.  In 1993, the Corps created an initial cost estimate of $1,390,000 to address bank erosion issues along the MR-GO, however, this estimate had not been previously presented to Congress.  Exh. 2073, Supplemental Information Sheet, Mississippi River-Gulf Outlet, St. Bernard Parish, Louisiana (Bank Erosion) (dated 01/01/1993; prepared: 02/24/1993; revised 03/03/1993) at p. 4 (AIN-144-000000413 to 418).

332. The MR-GO project was modified under Chief of Engineer's discretionary authority to include as a mitigation measure, the cost of protecting a portion of the foreshore lying between the Lake Pontchartrain and Vicinity Hurricane Protection project levees and the MR-GO, including 6 miles along the reach of the MRGO, which is a part of the GIWW and 18 miles along south shore of the MRGO.

### ARMY CORPS NEVER SOUGHT FUNDING FROM CONGRESS TO REMEDIATE THE MR-GO'S KNOWN DEFECTS

333.  The Corps never informed Congress of the known dangers that the Corps perceived as a result of the risk of flooding caused by the MR-GO's defects, including but not limited to the loss of wetlands and bank erosion/channel widening.  MSJ DFE Order (Doc. No. 18212) at pp. 40, 45, 62.

334.  The Army Corps never asked Congress for authority to remediate the known adverse effects of the MR-GO.  Exh. 91, Kemp Expert Report (July 2008) at pp. 185-95.

335.  The Army Corps could have gone to Congress at any time to ask Congress for authority and money to remediate the known adverse effects of the MR-GO, but it did not.  Exh. 182 at 41:6-19; 43:11-45:10 (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).