# APPENDIX F

precipitate such overtopping when the surge is so low.  By the time the surge peak arrived at the Reach 2 EBSBs between 8 and 9 a.m., it is likely that the original levee crown, in many cases, had already experienced significant degradation.  Exh. 94, Kemp Expert Report (Jan. 2009) at p. 27.

**Defendant's Unfounded Focus on Scenario 3**

457.   To the extent that the Defendant seeks to argue that Plaintiffs' Scenario 3 is the "no negligence" condition, this argument is unfounded.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶11(b).

458.   Perfect maintenance of the MR-GO would not have eliminated the significant attendant negative hydrodynamic and hydrologic system impacts, including water flow from the Gulf of Mexico and Lake Borgne affecting surge elevations, wave generation, and the lack of appropriate defenses to effectively neutralize these negative effects.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶11(b).

459.   Plaintiffs' experts therefore pursued a more intellectually defensible analytical approach by evaluating a range of assumed conditions to test the sensitivity of relevant variables on the flooding outcome.  Exh. 103, Vrijling Expert Report, Wave Modeling New Orleans - Mississippi River Gulf Outlet, Final Report (July 2008); Exh. 104, Vrijling Expert Report, Flow Modeling New Orleans - Mississippi River Gulf Outlet, Final Report, Scenarios 1, 2A, 2B, 2C, 2D, 3 (June 2008); Exh. 105, Vrijling Expert Report, Polder Flood Simulations for Greater New Orleans: the neutral MRGO scenario (July 2008); Exh. 106, Vrijling Joint Declaration, Vrijling, Kok, de Wit, and Gautier concerning wave and flow modeling New Orleans -- MRGO for Hurricane Katrina, August 2005 (Jan. 2009); Exh. 107, Vrijling, Appendix 1 to Joint declaration, Vrijling, Kok, de Wit, and Gautier concerning wave and flow modeling New Orleans -- MRGO

for Hurricane Katrina, August 2005 (Jan. 2009); Exh. 108, Vrijling, Supplement on Wave Modeling New Orleans, memo from Gautier to van Heerden (Nov. 2008); and Exh. 109, Vrijling, Wave Modeling New Orleans - Mississippi River Gulf Outlet, Appendices (July 2008).

460.   The Court has concluded that Plaintiffs' experts' findings, based on their computer modeling, eye witness observations, available measurements of water levels, and analytical methods customarily used by such experts, presents a more plausible, credible explanation of the circumstances surrounding the catastrophic flooding during Hurricane Katrina than the explanation offered by the Defendant's experts.

461.   Plaintiffs' experts analyzed the cumulative impact of all four challenged activities (design, construction, operation, and maintenance) on the catastrophic flooding, without detaching the effects of operation and maintenance from the effects of design and construction. Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶¶3(a)(b), 4(a), 8(a), 10(b); Exh. 71, Bea Expert Report, (July 2008) at ¶3; Exh. 72, Bea Expert Decl. I (July 2008) at ¶37; Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶9; Exh. 91, Kemp Expert Report (July 2008) at p. 185; Exh. 104, de Wit et al 2008 Flow Modeling New Orleans -Mississippi River Gulf Outlet, Hurricane Katrina August 2005 - FINAL REPORT Scenario 1, 2A, 2B, 2C, 2D, 3.

462.   From a scientific standpoint, it is inappropriate to separate out only the effects of two challenged activities (MR-GO's operation and maintenance) from the complex and interdependent hydraulic system that was created by the project's design and construction.  By focusing on how the entirety of critical changes caused by the MR-GO that cumulatively contributed to the catastrophic flooding, Plaintiffs properly do not artificially detach operation and maintenance from design and construction.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶9(a)(b).

137

463. The performance of Reach 1, Reach 2, and the IHNC flood protection and navigation structures during Hurricane Katrina is an integrated effect of the entire life-cycle of activities over the MR-GO's history from the time of its inception through its design, construction, operation, and maintenance up to the time of Hurricane Katrina.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶¶3(a), 11(b); Exh. 71, Bea Expert Report (July 2008) at pp. 6-9, 17-19; Exh. 72, Bea Declaration I (July 2008) at pp. 141-42; Exh. 74, Bea Declaration III (July 2008) at pp. 50-52.

464. The performance of Reach 1, Reach 2, and the IHNC flood protection and navigation structures during Hurricane Katrina is also a function of the hydrologic "system" of which the MR-GO is a critical component, including the Gulf of Mexico, Lake Borgne, the GIWW, the IHNC and their connections to Lake Pontchartrain.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶3(b); Exh. 72, Bea Declaration I (July 2008) at pp. 47-58, 86-88; Exh. 74, Bea Declaration III (July 2008) at pp. 51-73; Exh. 91, Kemp Expert Report (July 2008) at pp. 96-147.

465. Any analysis of the MR-GO's contribution to the catastrophic flooding must address the multiple, interconnected, and interactive elements constituting the MR-GO and the associated hydrologic system from the time of its inception to the time that the Plaintiffs' properties were flooded.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4; Exh. 71, Bea Expert Report (July 2008) at pp. 17-20.

466. Given the MR-GO's multiple elements that interacted with a regional hydrologic system over a half century, analysis of its role in causing flooding during Hurricane Katrina must necessarily assess more than its negative impacts on the neighboring wetlands or widened channel.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4(a).

467. Plaintiffs' experts analyzed the associated hydrodynamic impacts (surge, currents, and waves) on the adjacent Reach 1, Reach 2, and IHNC flood control structures, the MR-GO channel geometry, the Gulf of Mexico – Lake Borgne – MR-GO – GIWW – IHNC – Lake Pontchartrain hydrologic "system," and the geometry of the adjacent hurricane flood protection structures and navigation structures. Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4(a).

468. Plaintiffs' experts' investigations yielded a comprehensive understanding of how the MR-GO affected the performance of the hurricane flood protection and navigation structures. Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4(a).

469. Plaintiffs' modeling demonstrates that the negative impacts of the MR-GO channel went beyond maintenance of the channel at its design dimensions and/or loss of surge-buffering wetlands. Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶11(a); Exh. 91, Kemp Expert Report (July 2008) at pp. 196-97; Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶32; Exh. 103, Vrijling Expert Report, Wave Modeling New Orleans - Mississippi River Gulf Outlet, Final Report (July 2008); Exh. 104, Vrijling Expert Report, Flow Modeling New Orleans - Mississippi River Gulf Outlet, Final Report, Scenarios 1, 2A, 2B, 2C, 2D, 3 (June 2008); Exh. 105, Vrijling Expert Report, Polder Flood Simulations for Greater New Orleans: the neutral MRGO scenario (July 2008); Exh. 106, Vrijling Joint Declaration, Vrijling, Kok, de Wit, and Gautier concerning wave and flow modeling New Orleans -- MRGO for Hurricane Katrina, August 2005 (Jan. 2009); Exh. 107, Vrijling, Appendix 1 to Joint declaration, Vrijling, Kok, de Wit, and Gautier concerning wave and flow modeling New Orleans -- MRGO for Hurricane Katrina, August 2005 (Jan. 2009); Exh. 108, Vrijling, Supplement on Wave Modeling New Orleans, memo from Gautier to van Heerden (Nov. 2008); and Exh. 109, Vrijling, Wave Modeling New Orleans - Mississippi River Gulf Outlet, Appendices (July 2008).

470. Scenario 3 does not take into account the fact that Reach 2 of the MR-GO is a potential conduit of storm surge from the Gulf of Mexico and from Lake Borgne and that there is a potential for "funneling" of surge down Reach 1/GIWW and into the IHNC, thereby omitting any provision for surge barriers . Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶8(a).

471. Notwithstanding the inappropriateness of segregating the negative effects of operation and maintenance from other negative effects, the flood modeling results for Scenario 3 in fact demonstrate that the loss of wetlands and channel widening, by themselves, had a material impact on the amplitude of surge, wave generation, onset of flooding, duration of flooding, and rate of overtopping and thereby the extent of flooding in the three polders. Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶20; Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶2.

472. Contrary to the Government's contention, Scenario 3 is not Plaintiffs' "no negligence" scenario. Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶5-6; Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶¶3(c), (d), 5(a), 11(b).

(a) None of the Plaintiffs' expert reports used the term "no negligence." Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶8(a)

(b) Scenario 3 does not take into account the fact that Reach 2 of the MR-GO is a potential conduit of storm surge from the Gulf of Mexico and from Lake Borgne and that there is a potential for "funneling" of surge down Reach 1/GIWW and into the IHNC, thereby omitting any provision for surge barriers . Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶8(a).

473. The MR-GO's operation and maintenance cannot be decomposed because of their interactive and interdependent effects on what existed at the time of Hurricane Katrina and on what could and should have existed at the time of Hurricane Katrina as performed with the utmost care. Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶10(b).

474. The attempted decomposition of the life-cycle effects of the MR-GO by the Defendants is a classic mistake in development of accurate and realistic understandings of the behavior of real complex "systems." Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶10(b).

475. Synthesis—or understanding the behavior of the entire system (assembly of components)—must take place before there are attempts to decompose the system to develop additional insights into workings of components and their interactive and interdependent relationships with other components. Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶10(b) (emphasis in original).

**Defendant's Experts Flawed Analysis**

476. There are other flaws in the Defendant's criticism of Plaintiffs' modeling results. For example, Defendant focuses almost exclusively on only two measurements of the MR-GO's impact—maximum surge and wave height. Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶10, 12(a), 19-27, 29-32; Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4; Exh. 81, Bea Expert Report (Jan. 2009) at pp. 22-34.

477. Like IPET, Defendant's experts' modeling largely ignores waves and their adverse effects on the LPV system in the relevant area. Exh. 94, Kemp Expert Decl. (Jan. 2009) at pp. 10-14; Exh. 91, Kemp Expert Report (July 2008) at p. 83.

478. Defendant's expert's modeling—and conclusions about the MR-GO's impact on surge and significant wave height—are skewed by erroneous assumptions about the Reach 2 topography and relevant features (channel and land separating the channel from the LPV berm) and boundary conditions. Exh. 94, Kemp Expert Decl. (Jan. 2009) at pp. 12-14, 25.

479. Defendant's experts do not address the impact of progressive wetlands on the flooding consequences. Exh. 94, Kemp Expert Decl. (Jan. 2009) at p. 30.