# APPENDIX I

## ARMY CORPS' KNOWLEDGE OF THE MR-GO'S DEFECTS AND RISK OF CATASTROPHIC FLOODING

### Hurricane Surge

207.     Four decades before Hurricane Katrina, the Army Corps acknowledged the MR-GO was a direct, efficient route for hurricane surge into the heart of Greater New Orleans, created undesirable effects of excessive, high velocity, and erosive currents in the IHNC and significant salinity increases, and had the potential to deliver storm surges that would cause catastrophic property damage and loss of human life.  Exh. 10, House Doc. No. 231, at pp. 17, 25, 63; Exh. 140, Memo re: LPV to Chief of Engineers, Department of the Army from Major General R.G. MacDonnell (July 24, 1963) at NED-213-000000433; Exh. 152, Letter of Department of the Army, New Orleans District, Corps of Engineers from Colonel Thomas J. Bowen, District Engineer to Acting Division Engineer, Lower Mississippi Valley (October 19, 1966) at p. AFW-467-000001821; Exh. 4, Team Louisiana Report at pp. vii; 223; Exh. 20, IPET Report at p. IV-2, IV-135 to IV-136; Exh. 8, Naomi 30(b)(6) Depo. at 323:24-325:6.

208.     In 1969, the Corps was warned that unless it constructed floodgates on the MR-GO, the Corps was leaving "a big door open" for catastrophic flooding of New Orleans.  Exh. 1938, Letter to Representative Edward Herbert from John L. Crosby (General Contractors and Builders), Aug. 25, 1969, AFW-467-000000224-228.

209.     In 1988, the Lower Mississippi Valley Division of the Army Corps recommended that the alternative of completely closing the MR-GO should be evaluated in order to "reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up this waterway [the MR-GO]. . . ."  Exh. 9, 1988 Recon Report at Comment 2.

210.     After the MR-GO reached project-authorized dimensions, the Army Corps received notice on multiple occasions about the risk of serious flooding posed by the hazards to

life and property that it created in placing into Greater New Orleans a deep channel with direct access to the Gulf of Mexico.  Exh. 91, Kemp Expert Report (July 2008) at pp. 21-31, 170-92, 191-95.

211.    In 1966, the Army Corps acknowledged that during Hurricane Betsy large amounts of water flowed through the Reach 1/GIWW into the IHNC which then exited into Lake Pontchartrain.  Exh. 180, LPV Design Memo No. 2: Citrus Back Levee, Appendix E: Report on the Controlling Elevation of the Seabrook Lock, at p. 4..

**"Funnel Effect"**

212.    Before the MR-GO was dredged through the Breton Sound drainage system, there was well established science to understand how its construction would impact the magnitude of hurricane storm surge in the New Orleans region.  Thus, the Corps should have anticipated the potential increase in funneling of storm surge waters toward New Orleans.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-3.

213.    The coastal hazard conditions of Greater New Orleans—created in part by a series of northwest-southeast oriented, inter-connected nested funnels aligned between Lake Pontchartrain and the Gulf of Mexico—were well known to the Army Corps long before the MR-GO's construction in light of the region's well documented hurricane history.  However, this historic knowledge of storm flooding was not made an integral part of the decision-making when the MR-GO and other waterways and channels (such as the GIWW) were dredged through this flood prone area.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-1.

214.    Before the MR-GO's construction, the Corps' own research had established that the highest storm surge elevations coincided with the funnel-shaped shoreline alone Lake

Okeechobee during the August 26-27, 1949 Hurricane.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-3.

215.    Before and after the MR-GO's construction, the Corps published their own manuals that recognized the effect of funnel-shaped coastlines in causing significant water level elevations during storms (between 10 and 13 feet in two instances in 1949 and 1957).  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-1.

216.    In designing and constructing the MR-GO, the Army Corps ignored known hazards posed by the "funnel effect" enabling hurricane storm surge from Lake Borgne and the Gulf of Mexico (via Reach 2) to flow into the confined channel of the GIWW/Reach 1 separating New Orleans East and the Ninth Ward/St. Bernard Parish.  Exh. 4, Team Louisiana Report at pp. xii, pp. 223-24, Fig. 158; 230, 235-40; Exh. 5, USACE - New Orleans District Correspondence to Manuel Pinto (November 26, 1969) at pp. 1-2, 7-9; Exh. 1, Graci IV at 191, ¶7, 192, ¶12;; Exh. 8, Naomi 30(b)(6) Depo. at 156:1-11; 178:23-179:16; Exh. 10, House Doc. No. 231 at p. 17; Exh. 26, Decision Making Chronology at pp. ES-6-7; Exh. 2, ILIT at p. 8-6; Exh. 7, Kemp 702c Report at pp. 25-33.

217.    While the MR-GO was being constructed, and for many years right up to Hurricane Katrina, the Army Corps was warned that the funnel created a back door that would accelerate and intensify hurricane storm surges emerging from Lake Borgne and the Gulf into the Greater New Orleans area.  Exh. 10, H.R. Doc. No. 231 at p. 17; Exh. 5, USACE - New Orleans District Correspondence to Manuel Pinto (November 26, 1969) at pp. 1-2, 7-9.

218.    Long before Hurricane Katrina, the Army Corps knew or should have known about the role of the MR-GO "funnel" as a storm surge conduit that was likely to cause

catastrophic flooding.  *See e.g.,* Exh. 153, CRS Report for Congress, *Mississippi River Gulf Outlet (MR-GO):  Issues for Congress*, Nicole T. Carter, Charles V. Stern, Aug. 4, 2006, at p. 7.

219.    From the time the MR-GO was being constructed and thereafter, the Army Corps knew that the MR-GO created a funnel that could enhance surge, waves, and currents during hurricanes and create a serious flooding risk.  Exh. 147, Letter from Kenneth J. Le Sieur to Colonel Thomas J. Bowen, November 24, 1965; Exh. 148, October 1, 1969 draft memorandum regarding the proposed Mississippi River-Gulf Outlet New Ship Lock and reviewing the Dock Board Proposals for a St. Bernard Parish Site, at AFW-143-000001049; Exh. 8, Naomi 30(b)(6) Depo. at 357:15-360:12; Exh. 150, Disposition Form dated 06-21-1971; Subject: MR-GO—New Ship Lock; Return Levees; signed by Mask at AFW-440-000000938; Exh. 149, Memo re MR-GO—New Ship Lock; Return Levees (Aug. 16, 1971) at AFW-440-000000936; Exh. 143, Environmental Impact Study Ship Channel Project prepared by Coastal Environments, Inc., (October 1972) at p. 54; Exh. 139, Army Corps, Environmental Considerations of an Expanded Mississippi River-Gulf Outlet, Appendix I at NED-111-000001197; Exh. 20, IPET Report at p. IV-258.

220.    In 1966, after Hurricane Betsy but before completion of the MR-GO's construction, the Army Corps commissioned a report (Bretschneider and Collins, Storm Surge Effects of the Mississippi River Gulf Outlet (1966) ("Bretschneider and Collins Report") which concluded that in all cases (slow, moderate, and rapidly rising surge during hurricanes), the predicted effect of building the contemplated LPV levee system that now forms the throat of the funnel was to hasten the onset of peak surge and to lengthen the period of highest water.  Exh. 4, Team Louisiana Report at pp. 249-50.

221.    As early as 1966, the Army Corps understood that under certain hurricane conditions, the MR-GO would have "a marked effect" on storm surge and on wave action. Exh. 68, Bretschneider & Collins Study at p. 4; Exh. 185, memo "MR-GO, St Bernard Parish (Bank Erosion) rev Recon Study (December 9, 1992), at NED 192-000000684.

222.    In 1964, both the New Orleans District and Lower Mississippi Valley Division Engineers acknowledged that the MR-GO—even without hurricanes—had increased velocities in the IHNC that were hazardous to navigation in the canal.  Exh. 1939, Report of the Chief of Engineers, Department of the Army, Headquarters Memo from Lieutenant W.K. Wilson, Jr. to The Secretary of the Army, Subject: Lake Pontchartrain and Vicinity, Louisiana dated 03/04/1964 at p. 2 (MVD-001-000000423).

223.    The existence and severity of the "funnel effect" is further confirmed by significant, emergency post-Katrina corrective measures that the Army Corps has undertaken in order to remediate the "funnel effect."  As part of its 100 Year Level Protection Plan, the Army Corps is constructing the IHNC Surge Reduction Barrier across the mouth of the funnel and the Golden Triangle between the GIWW and Reach 2.  Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23; Exh. 131, Greater New Orleans Hurricane and Storm Damage Risk Reduction System (HSDRRS) Status June 2008; Exh. 132, New Orleans Hurricane and Storm Damage Risk Reduction System 2008 Facts and Figures by the U.S. Army Corp of Engineers dated August 28, 2008; Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers; Exh. 136, Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers, at pp. 52-53.

224.    The purpose of the IHNC Surge Reduction Barrier—a new feature, authorized by Congress in 2006—is to reduce risk of storm damage to some of the region's areas most vulnerable to flooding—New Orleans East, metro New Orleans, the 9th Ward, and St. Bernard Parish.  Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers at pp. 1-2; Exh. 136 Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers, at pp. 52-53; Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23.

225.    The Army Corps has stated that "[t]he overall purpose of the project is to provide a comprehensive, integrated protection system that would reduce the imminent and continuing threat to life, health, and property posed by flooding from hurricanes and other tropical storm events."  Exh. 20 at p. 4, ¶1.1 (Owen Depo. Exhibit 4).

226.    This project aims to protect these areas from storm surge coming from the Gulf of Mexico and Lake Borgne.  Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers at p. 1; Exh. 136, Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers at pp. 52-53; Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23.

227.    The Army Corps's decision to recommend the IHNC Surge Reduction Barrier comes in the wake of  the following IPET recommendation for this remedial measure: "To prevent storm surge in Lake Borgne from influencing water levels experienced in the IHNC or GIWW/MR-GO sections of waterway, flow through Reach 1 channel must be dramatically reduced or eliminated, either by a permanent closure or some type of structure that temporarily

serves to eliminate this hydraulic connectivity [between Lake Borgne and Lake Pontchartrain via GIWW/MR-GO and the IHNC]."  Exh. 20, IPET Report at p. IV-135; Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 68:23-70:4.

228.    The Army Corps's planners took into account IPET data from Hurricane Katrina showing that as a result of storm surges from Lake Borgne propagating down the Reach 1/GIWW into the IHNC, the water elevation during Hurricane Katrina rose seven feet higher in the IHNC (water level of three feet plus waves up to four feet high).  Exh. 135, Decision Record, Individual Environmental Report #11, Improved Protection on the Inner Harbor Navigation Canal by the U.S. Army Corps of Engineers at p. 36; Ex. 130, Owen Depo. at 91:14-93:9.

**Wetlands Destruction**

229.    Long before Hurricane Katrina, the Army Corps knew that the MR-GO was destroying tens of thousands of acres of cypress forests, grasses, marshes, swamps, trees, shrubs and other wetlands ("wetlands") that provided a natural barrier and sponge for storm surge and that the loss of these wetlands reduced storm surge protection for New Orleans and St. Bernard Parish.  Exh. 144, 1957 Tidewater Channel Advisory Committee Report at p. 2; Exh. 96, Fitzgerald Report at p. 4-20, Fig. 4.6; Exh. 178, USACE Fact Sheet; Exh. 161, letter from United States Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957; Exh. 155, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Press Release, September 26, 1957, at p. 1; Exh. 179, U.S. Fish and Wildlife Service, An Interim Report on Fish and Wildlife Resources as Related to Mississippi River Gulf Outlet Project, (April 1958) at pp. 9-11; Exh. 9, 1988 Recon Report at p. 27; Exh. 4, Team Louisiana Report at p. 112; Exh. 95, Day/Shaffer Expert Report (July 2008) (July 2008) at pp. 16-20, 46.

230.     Before the MR-GO's construction began in 1958, the Army Corps knew that the MR-GO would destroy the storm surge buffering wetlands by "increas[ing] tidal action in marsh pond areas; higher average salinities with wider salinity ranges; increase[ing] turbidity. . . [that] would eliminate 6,200 acres of shallow open water and 17,400 acres of marsh. .  Exh. 51, Letter from Carey Kerlin to Jack Stephens (St. Bernard Parish) (May 31, 1979) at p. 4; *see also* Exh. 144, 1958 Tidewater Advisory Report p. 2.

231.     In 1965 during the MR-GO's construction, the Army Corps told Congress that the MR-GO "provides a deep direct route for the in-flow of saline currents from the Gulf of Mexico to the area along this channel and to Lake Pontchartrain."  Exh. 10, H.R. Doc. No. 231 at p. 17.

232.     In studying bank erosion in 1987, the Corps reported that (a) the MR-GO had already destroyed 2,000 acres of marsh along the Reach 2 banks and (b) predicted that another 5,677 acres of marsh along Reach 2 would be lost to erosion and another undetermined amount of additional marsh would also be lost due to saltwater intrusion, subsidence, and erosion due to increased velocities of tidal and vessel-generated waves.  Exh. 1932, Planning Aid Report on MR-GO St. Bernard Parish, Louisiana (Bank Erosion) Reconnaissance Study (Aug. 1987) at pp.1-8.

233.     By 1990, the Corps reported that wetlands were disappearing at an "alarming rate" of 35 square miles per year.  Exh. 1933, Land Loss and Marsh Creation; Illustration A-2.1; New Start Preconstruction Engineering and Design; Louisiana Coastal Area, Land Loss and Marsh Creation, St. Bernard, Plaquemine and Jefferson Parishes (June 26, 1990) (AIN-173-000000185)

234.     The Army Corps ignored the potential for exacerbating hurricane-driven surge and increasing overtopping flows when no effort was made to counteract the ruinous effect of the

channel on buffering wetlands or, ultimately, on the more rapid propagation of surge leading to earlier and more catastrophic flooding of developed areas.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶10; Exh. 91, Kemp Expert Report (July 2008) at pp. 31, 186, 196.

**Channel Bank Erosion**

235.    Long before Hurricane Katrina, the Army Corps knew that erosion of the unarmored banks of Reach 2 had widened the channel far beyond its original 650' top width, caused large breaches in the rapidly dwindling marsh buffer between the navigation channel and the open waters of Lake Borgne and Breton Sound, and exposed neighboring people and property to direct hurricane attacks from Lake Borgne.  Exh. 9, 1988 Recon Report at Comment 2; Exh. 145, Report of the Environmental Subcommittee to the MR-GO Technical Committee dated March 16, 2000 at NED-188-000001511 et seq (Table 1: Summary of Estimated Habitat Loss from the MR-GO, Construction and Erosion by Mapping Unit, p. 55; Table 2: Habitat Types in 1956, 1978, and 1990 for Central Wetlands, South Lake Borgne and Eloi Bay dated 12/03/1999).

236.    In designing the MR-GO, the Army Corps knew that there would be stability problems with the channel cut because of ship wake erosion of the unstable banks, comprised of an almost ubiquitous 10 feet of marsh/swamp peat at the surface and scattered deposits of sandy-silt and silty-sand at greater depths and that this bank erosion would accelerate the loss of protective marshland.  Exh. 4, Team Louisiana Report at p. 234; Exh. 8, O'Cain 30(b)(6) Depo. 515:1-18.

237.    The initial design memoranda for the MR-GO expressly foresaw the eventuality that the erosion of the MR-GO—because the banks were unarmored— would necessitate bank stabilization measures and foreshore protection measures, but the Army Corps proceeded without

protecting the channel banks.  Exh. 200, MR-GO General Design Memo 1-A at p. 7; Exh. 201,

MR-GO General Design Memo 1-B at p. 5; Exh. 202, MR-GO General Design Memo No. 2,

Supplement 4 (foreshore protection)) at pp. 1-30; Exh. 183, Thomas Podany 30(b)(6) Depo.

(Oct. 9, 2008) at 74:8-77:16.

238.    Notwithstanding this recognition of inevitable bank erosion, the Army Corps did

not prescribe erosion protection from wave wash (such as armoring or other protective covering)

for the MR-GO's unstable banks.  Exh. 8, O'Cain 30(b)(6) Depo. at 495:1-4; 496:23-498:7;

500:1-11; 516:20-24; Exh. 13, Theis 702c Expert Report (Sept. 2007), ¶8.

239.    For over five decades, the Army Corps ignored the MR-GO's known potential for

exacerbating hurricane-driven surge and waves and increasing overtopping flows when the MR-

GO bank lines were not stabilized.  Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶10; Exh. 91,

Kemp Expert Report (July 2008) at pp. 31, 186, 196; Exh. 203, "The Mississippi River Gulf

Outlet: A Study of Bank Stabilization", Coastal Environments, Inc.; Exh. 183, Thomas Podany

30(b)(6) Depo. (Oct. 9, 2008) at 144:3-146:2; Exh. 204, Memorandum re MR-GO, Bank Erosion

Reconnaissance Study Interdisciplinary Planning Team (IPT) Meeting to Select Alternative Bank

Erosion Control Measures for Evaluation in MR-GO Reconnaissance Report (April 6, 1987) at

NED-192-000001167-1169.

240.    The Army Corps associated erosion of the MR-GO with hurricane protection, yet

it performed 147 dredging events over the remainder of the MR-GO and never supplemented its

1976 EIS submitted to address the known impacts of the ongoing dredging on erosion and loss of

wetlands or on its effect on hurricane protection in the area of the MR-GO.  Exh. 188, Appendix

L, MR-GO De-Authorization Study.

241.    In its 1988 bank erosion reconnaissance study, the Army Corps acknowledged the problems of saltwater intrusion, environmental loss of marsh, and hurricane protection associated with loss of storm buffer along the north bank of the MR-GO from Lake Borgne.  Exh. 9, 1988 Recon Report at p. 10, LMVD Comment No. 2, pp. 16, 24-25, 26-27, Appendix E at pp. 3-8; Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 113:10-116:1, 126:13-129.

242.    In 1987, the Army Corps expressly considered the need to evaluate bank stabilization measures along the MR-GO for its hurricane protection impacts.  Exh. 204, Memorandum re MR-GO Bank Erosion Reconnaissance Study Interdisciplinary Planning Team (IPT) Meeting to Select Alternative Bank Erosion Control Measures for Evaluation in MR-GO Reconnaissance Report (April 6, 1987) at NED-192-000001167-1169.

243.    When the Army Corps considered shore protection of the MR-GO, an internal memorandum in 1993 expressly concluded that such efforts would require the Army Corps to alert Congress of the environmental concerns inherent in the MR-GO through a full EIS.  Exh. 189, Memorandum for file, Mississippi River-Gulf Outlet, St. Bernard Parish, LA (Bank Erosion) Revised Reconnaissance Study and Feasibility Study at pp. 1505-1506 (NPM-036-000001505).

244.    In the course of considering shore protection along Reach 2, the Army Corps noted that a full EIS to Congress would necessitate public comment that would both challenge the limited scale of the Army Corps proposed protection efforts in light of the public desire for more extensive remedy, and would likely raise for Congressional consideration the closing of the MR-GO.  Exh. 189, Memorandum for file, Mississippi River-Gulf Outlet, St. Bernard Parish, LA (Bank Erosion) Revised Reconnaissance Study and Feasibility Study at NPM-036-000001505-1506.

245.    The Army Corps understood in 1988 that the loss of land in front of the flood protection structures around Lake Borgne caused by erosion of the MR-GO was removing the last line of defense to reduce the impact of storm surge and waves.  Exh. 9, 1988 Recon Report at p. 24, Appendix E at pp. 6, 8; Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 128:13-129:17.

246.    In its 1988 bank erosion reconnaissance study, the Army Corps considered (but did not adopt) structural bank protection options, including rock dikes, alternative disposal areas, concrete block, timber pile, stone, and shell core dikes.  Exh. 9, 1988 Recon Report at pp. 34-35; Exh. 193, Podany 30(b)(6) Depo. at 33:9-34:24, 139:7-142:25.

247.    In its 1988 bank erosion reconnaissance study, the Army Corps considered alternatives to operation of the MR-GO that might mitigate the erosion of the banks of the MR-GO, including reduction of and alternatives to maintenance dredging.  Exh. 9, 1988 Recon Report at pp. 34-50; Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 33:9-34:24, 146:3-147:22.

248.    The Army Corps acknowledged by the time of its 1988 bank erosion reconnaissance investigation that the problems associated with erosion had an impact on the human environment which would be regulated by NEPA, but it never incorporated this information into its environmental disclosures—either in the EAs or a Supplemental Environmental Impact Statement.  Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 157:5-159:25.

**Ship Waves Caused Bank Erosion and Jeopardized LPV Structures**

249.    As early as 1983, the Corps recognized that drawdown and return flows were serious problems along the MR-GO.  Exh. 1934, MR-GO-Erosion Protection at Bayou Yscloskey (Jan. 24, 1983) at AIN-108-000001594.

250.    As early as 1983, the Corps also recognized that the width of the Reach 2 channel was a factor in generating waves during hurricanes. Exh. 1943, Foreshore Protection Test Sections MR-GO South Bank Station 475 to 501 (Jan. 1, 1983) at p. 4 (NED-192-000000432); Exh. 205, Memorandum re MR-GO, St. Bernard Parish, (Bank Erosion) Revised Reconnaissance Study (Dec. 9, 1992) at p. 1 (NED-167-000001832).

251.    Wave wash from vessel traffic caused continuous erosion of the marsh along the east bank of Reach 2.  Exh. 1946, letter to Robert Livingston, House of Representatives from Harold E. Manuel, Jr.; Major, U.S. Army; Acting District Engineer (undated) (enclosed "Fact Sheet", Subject: MR-GO – referenced in letter – is dated 07/24/1990) (NOP-007-000001451-1452).

252.    Ship waves in Reach 2 caused strong drawdown and return flows that caused erosion of the banks and sufficient energy to cause the failure of the Corps' foreshore protection test sections along Reach 2 near Bayou Yscloskey.  Exh. 1934, MR-GO-Erosion Protection at Bayou Yscloskey (Jan. 24, 1983) (AIN-108-000001594).

253.    As early as 1983, the Corps knew that ship waves in Reach 2 created wave conditions and drawdown and return flows—hydrodynamic forces—so severe that 1¼ inch steel anchor cables were ruptured and boats were capsized from an increase in water level of several feet.  Exh. 1943, Foreshore Protection Test Sections MR-GO South Bank Station 475 to 501 at p. 1 (Jan. 28, 1983) (NED-192-000000432).

254.   In 1984, the Corps concluded that the wave climate was more severe than the design parameters anticipated for the foreshore dike in the Citrus Bank Levee and that the frequently experienced higher water levels meant that waves could overtop the height of the dike.  Exh. 1478, Memo to Chatry from Chief Joe Dicharry, Navigation Section, Project Management Branch; Subject: Foreshore Protection Along Citrus Back Levee (July 27, 1984) (AIN-108-000000889).

255.   The Corps recognized that overtopping of LPV structures along Reach 2, caused by waves from passing ships, could scour the bank behind the LPV structures and cause failure from behind.  Exh. 1943, Foreshore Protection Test Sections MR-GO South Bank Sta 475 to 501 (Jan. 28, 1983) (NED-192-000000432).

## NEPA

### Army Corps's Knowledge of MR-GO's Adverse Effects at the Time of Preparing Environmental Disclosure Documents

256.   Pursuant to NEPA, the U.S. Army Engineer District, New Orleans, Louisiana completed in 1974 a "Review Draft" entitled "Composite Draft Statement for Operation and Maintenance Work on Three Navigation Channels in the Lake Borgne Vicinity Louisiana" ("1974 DEIS").  The document describes the "Administrative" action under review as the:

> operation and maintenance of the following projects in the vicinity of Lake Borgne Louisiana:  The Mississippi River Gulf Outlet….Operation and Maintenance …consist(ing) primarily of periodic dredging and subsequent material Depo. along the total of 111.3 miles.  Maintenance dredging is accomplished by a cutter head pipeline dredge.

Exh. 191 at p. i, ¶2 (1974 DEIS).

257. The 1974 DEIS removed references to studies regarding the MR-GO's effect on storm surge that had been part of the 1972 DEIS.  Exh. 190 at pp. 13, 14 (1972 DEIS); Exh. 191 (1974 DEIS); *see also* Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19;

which allowed storm surge within Lake Borgne to dump directly into the MR-GO; (2) the

enormous loss of marshland adjacent to the channel; (3) destabilizing the LPV structures by

encroachment and lateral displacement and subsidence; and (4) shoaling within the MR-GO,

requiring continual dredging and disposal of dredged spoil in the wetlands and accelerating their

demise.  Exh. 13, Theis 702c Expert Report at ¶10; Exh. 9, 1988 Recon Report at pp. 10-11;

Exh. 8, Naomi Depo. at 327:2-9; Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-66;

Exh. 81, Bea Expert Report Summary (Jan. 2008) at pp. 3-7.

**Accelerated and Increased Subsidence and Compromising of LPV Structures**

380. As illustrated below, the widening of the Reach 2 channel had another significant

adverse effect of increasing and accelerating LPV structure subsidence and thereby destabilizing

and compromising the LPV structures' ability to perform as intended during Katrina.  Exh. 72,

Bea Expert Decl. No. 1 (July 2008) at pp. 162-66; Exh. 81, Bea Expert Report Summary (Jan.

2008) at p. 6, ¶6.



Exh. 81, Bea Expert Report, Summary (Jan. 2009) at p. 11, Fig. 6.

381.    As early as 1958, the Army Corps was concerned about the possibility of soil

"squeezing" into the adjacent MR-GO Reach 2 channel under the weight of the heavy spoil

banks.  "Geologic Investigation of the Mississippi River Gulf Outlet."  Exh. 59, "Geologic

Investigation of the Mississippi River Gulf Outlet," Prepared by WES for the Division Engineer

(02/1958); Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-66; Exh. 81, Bea Expert

Report Summary (Jan. 2008) at p. 6, ¶6.

382.    The shallow sedimentary layering, physical and geotechnical soil properties, and

environment in which these sediments were deposited along the MR-GO right of way was

analyzed by and known to the Corps in 1958 prior to the commencement of operation and

maintenance of the MR-GO.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 6-1.

383.    The Army Corps reported in 1958 that the material making up the "Interdistributary Trough" (or layer), which extends along the entirety of Reaches 1 & 2 of the MR-GO, "comprises as much as 40% of the sides and bottom of the channel. . . ..  [I]t is possible that the poorly consolidated, high-water-content interdistributary clays will tend to flow laterally into an excavation particularly under the extra weight of a spoil bank."  Later, in the same report, on Plate 5 titled "Physical Characteristics of Depositional Types,"the remarks associated with the Interdistributary Trough description states "material will probably displace laterally under fairly light load."  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 6-2, Table 6.1.; *see also* 6-11 to 6-12.

384.   This Corps concern again surfaced in 1981—this time with specific reference to the Reach 2 LPV structures:  "(h) within 10 years the MR-GO bank will have eroded past the MR-GO R/W line (over 200 feet) and *will threaten the stability of the hurricane levee.*"  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at p. 163, ¶146 (emphasis added).

385.   In 1983, the Corps reported that it was concerned about the fact that the dredged spoil lies upon a thick layer of organic soils and fluid clays and the risk of subsurface bank failure and slumping in view of the MR-GO's periodic dredging to 38 feet MSL for channel maintenance.  The Corps noted that the organic soils had poor cohesiveness due to their high moisture content, especially under loading from spoil disposal, levee construction, and bank protection structures.  Exh. 2001, Letter to Greg Martinez, LMNPD-RE, USACE NOD from Stephen W. Price, St. Bernard Parish, Department of Safety and Permits (AIN-108-000001080-1081) (09/15/1983).

386.   In 1988, the Corps noted that subsidence rates along the MR-GO were greatest in the areas that were dredged the most often.  MSJ DFE Order (Doc. No. 18212) at p. 39, citing Exh. 9, 1988 Recon Report at pp. 31-32:

387.   In 1993, the Corps recognized significant settlement of LPV structures on the MR-GO of anywhere from 1 to 6 feet two years after their construction.  Exh. 2002, Memorandum for Chief, Design Branch from Chief Rodney Picciola, Foundations and Materials Branch, CELMN-ED-FS (NED-167-000001591) (02/17/1993).

388.   The Corps of Engineers was aware of these phenomena and knew that the levees had settled approximately 10 feet over time as demonstrated by their attempt to "repair" these areas using sheet piling to re-establish protective elevations instead of placing more sediment on top of the levee, which would have resulted in additional loading and more 'squeezing' of the interdistributary mud.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-66, ¶¶145-61; Exh. 306, 1994 Recon Report at p. 47.

389.   Thus, long before Hurricane Katrina, the Corps recognized that the proximity of the Reach 2 channel to the LPV structures created a risk of destabilizing them and compromising their ability to perform their flood protection role.  Exh. 1993, Draft letter (1) to The Special Assistant to the Secretary; Subject: MR-GO, La (A feature of the project "Mississippi River – Baton Rouge to the Gulf of Mexico"), pp. 2-3 (VRG-014-000000088 to 93); Exh. 1996, 6th Ind to HQDA (DAEN-CWB-C) Wash DC from Chief Eugene H. Nettles, Program Development Office; Subject: Transfer of Fiscal Year 1980 Construction, General – Mississippi River-Gulf Outlet (AIN-108-000001408) (12/28/1979); Exh. 2003, St. Bernard Parish Government, Resolution SBPC #454-08-94 – Closure of the MRGO (NED-195-000000650 to 651 (08/09/94); Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-78, ¶¶145-59.

390.    As a result of the MR-GO's excavation, along with the continual operations and maintenance dredging, the interdistributary deposits were laterally displaced (squeezed) beneath the MR-GO levees and into the MR-GO channel excavation. The high water-content of the deposits makes these sediments susceptible to lateral displacement into an excavation even under the weight of the natural overburden (marsh and other deltaic deposits).  Loading by depositing spoil material on top of these interdistributary deposits resulted in greater volumes of sediment being expelled into the channel.  This situation was exacerbated  by maintenance dredging—not only because it resulted in additional loading from dredge spoil material—but more importantly, it removed the toe of the slope at the base of the MR-GO channel that had served to confine the lateral flow.  Continuous dredging created new accommodation space leading to more interdistributary mud flowing into the channel.  This migration of sediments into the channel from the underlying interdistributary deposits resulted in accelerated rapid subsidence of the adjacent land surface and increased rates of land loss along the channel.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 6-14, Fig. 6.6; Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-78, ¶¶145-59.

391.    Pre-Katrina variations in levee crest elevations along Reach 2, measured by LIDAR, were on the order of several feet.  This variation creates large differences in the overtopping rates at different locations along Reach 2, and the principal causative factor in breach development was the character (especially the crest elevation) of the LPV structure. Exh. 1749, Resio Expert Report (Dec. 2008) at p. 7, ¶2.

392.    A strong correlation exists between the thickness of the interdistributary deposit layer prior to MR-GO construction/maintenance and pre-Katrina levee heights, demonstrating that those areas along Reach 2 where the interdistributary deposits are thickest coincide with the

lowest pre-Katrina levee crest elevations.  Likewise, those areas along Reach 2 of the MR-GO where west bank erosion was the greatest (from 1965 to 2005) correlate with those areas where the interdistributary layer was thickest.  Exh. 96, Fitzgerald Expert Report (July 2008) at p.6-3 thru 6-7.

393.    As a general proposition, excavation (construction and/or maintenance dredging) initiates, and loading exacerbates, lateral flow of the sediment beneath the levees along Reach 2, resulting in significant variations in levee crest elevations which in turn was the principal causative factor in breach development.  In the final analysis, lateral squeezing of these deposits not only compromised levee crest elevation, but also the surface elevations along the channel bank, resulting in increased erosion rates where interdistributary deposits were thickest.  This process of channel widening increased wave fetch in the channel.  Thus, in sectors where levee heights were lowest, wave fetch was greatest because of the continual removal of squeezed interdistributary material from the channel by the Corps' repetitive maintenance dredging activities.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-78, ¶¶145-59; Exh. 306, 1994 Recon Report at p. 47.

394.    Between 1963 and the occurrence of Hurricane Katrina in 2005, 17 separate maintenance dredging projects were performed in upper Reach 2 (M.P. 66-47) during which time thirty million (30,000,000) cubic yards of sediment were removed and placed on the surface area adjacent to the MR-GO.  Both the placement of sediment on the levee and repeated removal of material from the channel caused a repetitive cycle of lateral displacement of the interdistributary sediment into the channel excavation necessitating additional maintenance dredging in the channel.  Exh. 206, Compilation of Dredging Events Notice of Intent to Introduce Summary Evidence; Exhibit A-F, (Sept. 12, 2008), at p. 5.

395.     As predicted by Kolb and van Lopik, this cycle of lateral displacement and maintenance dredging accelerated the rate of subsidence of the Reach 2 EBSBs and significantly contributed to the levee crests being dangerously low along Reach 2 prior to Katrina.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-78, ¶¶145-59.

396.     The average rate of subsidence in the Greater New Orleans metropolitan area is about 5 mm (0.2 inches) per year.  However, the rate of subsidence along the levee system that parallels the MR-GO channel excavation is >20 mm (0.8 inches).  This anomalously high rate of subsidence along the MR-GO levee system (400% greater than the New Orleans area) correlates with breach locations along the Reach 2 EBSBs.  Exh. 1594, Timothy H. Dixon, et al., "Space Geodesy: Subsidence and Flooding in New Orleans," *Nature* 441, 587-588 (1 June 2006).

397.     The operation and repetitive dredging of the MR-GO in such close proximity to the Reach 2 LPV structures undermined the flood protection system such that crest elevations settled several feet in certain areas prior to Katrina, and in some cases they settled as much as 10 feet.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-78, ¶¶145-59.

398.   The zones with the thickest interdistributary deposits were most susceptible to wave attack and breach development because: (1) the fetch was greatest at these locations, thereby increasing potential storm wave height; (2) levee crest elevations were lowest; and (3) the distance between the toe of the levee and channel bank was shortest due to greater erosion. Such settling of the MR-GO Reach 2 levee and channel widening would not have occurred had it not been for the proximity of the deep water channel to the Reach 2 LPV structures and the aggressive, frequent, and deep dredging of the MR-GO by the Army Corps.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-78, ¶¶145-59; Exh. 81, Bea Expert Report (Jan. 2009) at p.6, ¶6.

399.   There is no evidence indicating that the Corps took proper corrective action to mitigate these known dangers to the LPV structures.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-178; Exh. 81, Bea Expert Report, Summary (Jan. 2009) at p. 6, ¶6; Exh. 82, Bea Expert Declaration (Jan. 2009) at p. 72, ¶116.

400. The encroachment of the Reach 2 channel on the LPV structures also caused the loss of surge and wave buffering protective vegetation between the channel and "toe" of the LPV structures, thereby reducing the natural protection from surge and waves during hurricanes.  Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-178; Exh. 81, Bea Expert Report (Jan. 2009) at p.6, ¶6.

## RELATIONSHIP BETWEEN CHANGES IN TOPOGRAPHY AND HABITAT AND COMPROMISING THE ABILITY OF LPV STRUCTURES TO PROTECT GREATER NEW ORLEANS

401.   The critical issue relating to causation is whether Plaintiffs have met their burden of proof that the adverse effects created by the MR-GO's defects were a substantial factor in the catastrophic flooding of their property.  Based upon all the evidence, Plaintiffs have carried their burden.

402.   The MR-GO's cumulative negative effects—the loss of natural wetland buffer, the magnification of the waves in the deep, widened channel, the accelerated and increased subsidence of the levee's crest elevation, and the rapid storm surge delivery—were primary causes of the overtopping and breaching of the LPV structures in the vicinity of the MR-GO. Without this major breaching and overtopping, catastrophic flooding of the three populated areas—New Orleans East, Lower 9th Ward, and upper St. Bernard Parish (and Plaintiffs' property)—would not have occurred.

403. If the MR-GO had not been defective as outlined above, the following would have occurred during Katrina: