# APPENDIX N

## **ARMY CORPS' KNOWLEDGE OF THE MR-GO'S DEFECTS AND RISK OF CATASTROPHIC FLOODING**

**Hurricane Surge**

207.     Four decades before Hurricane Katrina, the Army Corps acknowledged the MR-GO was a direct, efficient route for hurricane surge into the heart of Greater New Orleans, created undesirable effects of excessive, high velocity, and erosive currents in the IHNC and significant salinity increases, and had the potential to deliver storm surges that would cause catastrophic property damage and loss of human life.  Exh. 10, House Doc. No. 231, at pp. 17, 25, 63; Exh. 140, Memo re: LPV to Chief of Engineers, Department of the Army from Major General R.G. MacDonnell (July 24, 1963) at NED-213-000000433; Exh. 152, Letter of Department of the Army, New Orleans District, Corps of Engineers from Colonel Thomas J. Bowen, District Engineer to Acting Division Engineer, Lower Mississippi Valley (October 19, 1966) at p. AFW-467-000001821; Exh. 4, Team Louisiana Report at pp. vii; 223; Exh. 20, IPET Report at p. IV-2, IV-135 to IV-136; Exh. 8, Naomi 30(b)(6) Depo. at 323:24-325:6.

208.     In 1969, the Corps was warned that unless it constructed floodgates on the MR-GO, the Corps was leaving "a big door open" for catastrophic flooding of New Orleans.  Exh. 1938, Letter to Representative Edward Herbert from John L. Crosby (General Contractors and Builders), Aug. 25, 1969, AFW-467-000000224-228.

209.     In 1988, the Lower Mississippi Valley Division of the Army Corps recommended that the alternative of completely closing the MR-GO should be evaluated in order to "reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up this waterway [the MR-GO]. . . ."  Exh. 9, 1988 Recon Report at Comment 2.

210.     After the MR-GO reached project-authorized dimensions, the Army Corps received notice on multiple occasions about the risk of serious flooding posed by the hazards to

61

life and property that it created in placing into Greater New Orleans a deep channel with direct access to the Gulf of Mexico.  Exh. 91, Kemp Expert Report (July 2008) at pp. 21-31, 170-92, 191-95.

211. In 1966, the Army Corps acknowledged that during Hurricane Betsy large amounts of water flowed through the Reach 1/GIWW into the IHNC which then exited into Lake Pontchartrain.  Exh. 180, LPV Design Memo No. 2: Citrus Back Levee, Appendix E: Report on the Controlling Elevation of the Seabrook Lock, at p. 4..

**"Funnel Effect"**

212. Before the MR-GO was dredged through the Breton Sound drainage system, there was well established science to understand how its construction would impact the magnitude of hurricane storm surge in the New Orleans region.  Thus, the Corps should have anticipated the potential increase in funneling of storm surge waters toward New Orleans.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-3.

213. The coastal hazard conditions of Greater New Orleans—created in part by a series of northwest-southeast oriented, inter-connected nested funnels aligned between Lake Pontchartrain and the Gulf of Mexico—were well known to the Army Corps long before the MR-GO's construction in light of the region's well documented hurricane history.  However, this historic knowledge of storm flooding was not made an integral part of the decision-making when the MR-GO and other waterways and channels (such as the GIWW) were dredged through this flood prone area.  Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-1.

214. Before the MR-GO's construction, the Corps' own research had established that the highest storm surge elevations coincided with the funnel-shaped shoreline alone Lake

Okeechobee during the August 26-27, 1949 Hurricane. Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-3.

215. Before and after the MR-GO's construction, the Corps published their own manuals that recognized the effect of funnel-shaped coastlines in causing significant water level elevations during storms (between 10 and 13 feet in two instances in 1949 and 1957). Exh. 96, Fitzgerald Expert Report (July 2008) at p. 7-1.

216. In designing and constructing the MR-GO, the Army Corps ignored known hazards posed by the "funnel effect" enabling hurricane storm surge from Lake Borgne and the Gulf of Mexico (via Reach 2) to flow into the confined channel of the GIWW/Reach 1 separating New Orleans East and the Ninth Ward/St. Bernard Parish. Exh. 4, Team Louisiana Report at pp. xii, pp. 223-24, Fig. 158; 230, 235-40; Exh. 5, USACE - New Orleans District Correspondence to Manuel Pinto (November 26, 1969) at pp. 1-2, 7-9; Exh. 1, Graci IV at 191, ¶7, 192, ¶12;; Exh. 8, Naomi 30(b)(6) Depo. at 156:1-11; 178:23-179:16; Exh. 10, House Doc. No. 231 at p. 17; Exh. 26, Decision Making Chronology at pp. ES-6-7; Exh. 2, ILIT at p. 8-6; Exh. 7, Kemp 702c Report at pp. 25-33.

217. While the MR-GO was being constructed, and for many years right up to Hurricane Katrina, the Army Corps was warned that the funnel created a back door that would accelerate and intensify hurricane storm surges emerging from Lake Borgne and the Gulf into the Greater New Orleans area. Exh. 10, H.R. Doc. No. 231 at p. 17; Exh. 5, USACE - New Orleans District Correspondence to Manuel Pinto (November 26, 1969) at pp. 1-2, 7-9.

218. Long before Hurricane Katrina, the Army Corps knew or should have known about the role of the MR-GO "funnel" as a storm surge conduit that was likely to cause

catastrophic flooding. *See e.g.,* Exh. 153, CRS Report for Congress, *Mississippi River Gulf Outlet (MR-GO): Issues for Congress*, Nicole T. Carter, Charles V. Stern, Aug. 4, 2006, at p. 7.

219. From the time the MR-GO was being constructed and thereafter, the Army Corps knew that the MR-GO created a funnel that could enhance surge, waves, and currents during hurricanes and create a serious flooding risk. Exh. 147, Letter from Kenneth J. Le Sieur to Colonel Thomas J. Bowen, November 24, 1965; Exh. 148, October 1, 1969 draft memorandum regarding the proposed Mississippi River-Gulf Outlet New Ship Lock and reviewing the Dock Board Proposals for a St. Bernard Parish Site, at AFW-143-000001049; Exh. 8, Naomi 30(b)(6) Depo. at 357:15-360:12; Exh. 150, Disposition Form dated 06-21-1971; Subject: MR-GO—New Ship Lock; Return Levees; signed by Mask at AFW-440-000000938; Exh. 149, Memo re MR-GO—New Ship Lock; Return Levees (Aug. 16, 1971) at AFW-440-000000936; Exh. 143, Environmental Impact Study Ship Channel Project prepared by Coastal Environments, Inc., (October 1972) at p. 54; Exh. 139, Army Corps, Environmental Considerations of an Expanded Mississippi River-Gulf Outlet, Appendix I at NED-111-000001197; Exh. 20, IPET Report at p. IV-258.

220. In 1966, after Hurricane Betsy but before completion of the MR-GO's construction, the Army Corps commissioned a report (Bretschneider and Collins, Storm Surge Effects of the Mississippi River Gulf Outlet (1966) ("Bretschneider and Collins Report") which concluded that in all cases (slow, moderate, and rapidly rising surge during hurricanes), the predicted effect of building the contemplated LPV levee system that now forms the throat of the funnel was to hasten the onset of peak surge and to lengthen the period of highest water. Exh. 4, Team Louisiana Report at pp. 249-50.

221. As early as 1966, the Army Corps understood that under certain hurricane conditions, the MR-GO would have "a marked effect" on storm surge and on wave action. Exh. 68, Bretschneider & Collins Study at p. 4; Exh. 185, memo "MR-GO, St Bernard Parish (Bank Erosion) rev Recon Study (December 9, 1992), at NED 192-000000684.

222. In 1964, both the New Orleans District and Lower Mississippi Valley Division Engineers acknowledged that the MR-GO—even without hurricanes—had increased velocities in the IHNC that were hazardous to navigation in the canal. Exh. 1939, Report of the Chief of Engineers, Department of the Army, Headquarters Memo from Lieutenant W.K. Wilson, Jr. to The Secretary of the Army, Subject: Lake Pontchartrain and Vicinity, Louisiana dated 03/04/1964 at p. 2 (MVD-001-000000423).

223. The existence and severity of the "funnel effect" is further confirmed by significant, emergency post-Katrina corrective measures that the Army Corps has undertaken in order to remediate the "funnel effect." As part of its 100 Year Level Protection Plan, the Army Corps is constructing the IHNC Surge Reduction Barrier across the mouth of the funnel and the Golden Triangle between the GIWW and Reach 2. Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23; Exh. 131, Greater New Orleans Hurricane and Storm Damage Risk Reduction System (HSDRRS) Status June 2008; Exh. 132, New Orleans Hurricane and Storm Damage Risk Reduction System 2008 Facts and Figures by the U.S. Army Corp of Engineers dated August 28, 2008; Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers; Exh. 136, Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers, at pp. 52-53.

224.    The purpose of the IHNC Surge Reduction Barrier—a new feature, authorized by Congress in 2006—is to reduce risk of storm damage to some of the region's areas most vulnerable to flooding—New Orleans East, metro New Orleans, the 9th Ward, and St. Bernard Parish.  Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers at pp. 1-2; Exh. 136 Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers, at pp. 52-53; Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23.

225.    The Army Corps has stated that "[t]he overall purpose of the project is to provide a comprehensive, integrated protection system that would reduce the imminent and continuing threat to life, health, and property posed by flooding from hurricanes and other tropical storm events."  Exh. 20 at p. 4, ¶1.1 (Owen Depo. Exhibit 4).

226.    This project aims to protect these areas from storm surge coming from the Gulf of Mexico and Lake Borgne.  Exh. 133, IHNC Surge Reduction Project Fact Sheet by the U.S. Army Corp of Engineers at p. 1; Exh. 136, Draft Individual Environmental Report, Improved Protection on the Inner Harbor Navigation Canal, Orleans and St. Bernard Parishes, Louisiana, IER #11 Tier 2 Borgne by the U.S. Army Corps of Engineers at pp. 52-53; Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 77:9-78:7; 119:18-121:23.

227.    The Army Corps's decision to recommend the IHNC Surge Reduction Barrier comes in the wake of  the following IPET recommendation for this remedial measure: "To prevent storm surge in Lake Borgne from influencing water levels experienced in the IHNC or GIWW/MR-GO sections of waterway, flow through Reach 1 channel must be dramatically reduced or eliminated, either by a permanent closure or some type of structure that temporarily

66

serves to eliminate this hydraulic connectivity [between Lake Borgne and Lake Pontchartrain via GIWW/MR-GO and the IHNC]." Exh. 20, IPET Report at p. IV-135; Exh. 130, Gibb Owen 30(b)(6) Depo (Oct. 16, 2008) at 68:23-70:4.

228.    The Army Corps's planners took into account IPET data from Hurricane Katrina showing that as a result of storm surges from Lake Borgne propagating down the Reach 1/GIWW into the IHNC, the water elevation during Hurricane Katrina rose seven feet higher in the IHNC (water level of three feet plus waves up to four feet high). Exh. 135, Decision Record, Individual Environmental Report #11, Improved Protection on the Inner Harbor Navigation Canal by the U.S. Army Corps of Engineers at p. 36; Ex. 130, Owen Depo. at 91:14-93:9.

**Wetlands Destruction**

229.    Long before Hurricane Katrina, the Army Corps knew that the MR-GO was destroying tens of thousands of acres of cypress forests, grasses, marshes, swamps, trees, shrubs and other wetlands ("wetlands") that provided a natural barrier and sponge for storm surge and that the loss of these wetlands reduced storm surge protection for New Orleans and St. Bernard Parish. Exh. 144, 1957 Tidewater Channel Advisory Committee Report at p. 2; Exh. 96, Fitzgerald Report at p. 4-20, Fig. 4.6; Exh. 178, USACE Fact Sheet; Exh. 161, letter from United States Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957; Exh. 155, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Press Release, September 26, 1957, at p. 1; Exh. 179, U.S. Fish and Wildlife Service, An Interim Report on Fish and Wildlife Resources as Related to Mississippi River Gulf Outlet Project, (April 1958) at pp. 9-11; Exh. 9, 1988 Recon Report at p. 27; Exh. 4, Team Louisiana Report at p. 112; Exh. 95, Day/Shaffer Expert Report (July 2008) (July 2008) at pp. 16-20, 46.

to what came across the failed Reach 2 alignment. The major difference in performance of the LPV structures was the better protection afforded by natural vegetation and no wave attack caused by the Reach 2 channel. Exh. 4, Team Louisiana Report at p. 135, Figure 44, 89a; Exh. 98, Morris Expert Report (July 2008) at p. 10.

## SOURCES OF FLOODING

538. The depth of floodwaters at Plaintiffs' property—what it was during Katrina and what it would have been without the MR-GO's impact on LPV structures (Scenario 2c)—is as follows:

|  | Actual | Scenario 2c |
|---|---|---|
| Norman and Monica Robinson | 13' | <2' |
| Lattimore and Lattimore & Assoc. | 8' | <1' |
| Lucille and Tony Franz | >8' | <0.5' |
| Tanya Smith | >8' | 1' |

Exh. 1771, Delft University, Comparison flood depth development between Katrina event and Scenario 2C (Jan. 2009).

539. Based on the foregoing data, the MR-GO was a substantial factor in the catastrophic flooding of Plaintiffs' property. Indeed, none of the Plaintiffs' property would have sustained catastrophic flooding but for the MR-GO's defective conditions.

540. Rainfall at Plaintiffs' property was negligible compared to the floodwaters and did not catastrophically flood their property. Exhs. 110-114, Crawford Expert Reports (April 2008).

541. Plaintiffs' property was not flooded due to pump failures or other reasons.

542. Hurricane Katrina was nominally a storm that fit most SPH criteria. Sustained winds over the Greater New Orleans metropolitan area were that of a Category 1 or Category 2 strength. Exh. 1600, Tropical Cyclone Report (Dec. 2005) at p. 8.

162

543. Because the eye of the counterclockwise-moving hurricane passed to the east of New Orleans, the hurricane threw severe wind loads and storm surges west onto an edge of the LPV flood protection systems that protected the northern edge of the Ninth Ward and St. Bernard Parish, and excess surge easily slid over the flood control structures. The surge overtopped large sections during the morning of August 29th east of New Orleans, in Orleans and St. Bernard Parish, and it also pushed water up Reach 1/GIWW and into the IHNC. Exh. 22, *A Failure of Initiative*, p. 94; Exh. 26, Decision Making Chronology, p. 3-36.

544. As the eye approached New Orleans, Katrina shoved a 14 to 17 foot storm surge up the "funnel" created by the convergence of the south bank of the MR-GO and the north bank of Reach 1/GIWW focusing a torrent of water on the IHNC. This caused the first flooding. Exh. 23, *A Nation Still Unprepared* at pp. 53-55, Exh. 7, Kemp §702c Expert Report (Sept. 2007) at pp. 25-32 at ¶¶ 32-42.

545. Upon reaching Lake Pontchartrain, Katrina's winds produced a southward surge of lakewater along the northern edges of the Orleans East Bank and New Orleans East polders, with overtopping and a breach in New Orleans East, adjacent to the Lakefront Airport. Exh. 23, *A Nation Still Unprepared* at pp. 53-55, Exh. 7, Kemp 702c Expert Report (Sept. 2007) at pp. 25-32 at ¶¶ 32-42.

546. The surge from Lake Borgne—and later the surge from Lake Pontchartrain—streamed into the Industrial Canal and the MR-GO channel. Here, too, the floodwaters overflowed the levees. Exh. 23, *A Nation Still Unprepared* at pp. 53-55, Exh. 7, Kemp 702c Expert Report (Sept. 2007) at pp. 25-32 at ¶¶ 32-42.

547. Some of the floodwaters into Greater New Orleans also emanated from the Gulf of Mexico via Reach 2 because there was no surge barrier. The Bretschneider and Collins Report

in 1966 acknowledged that Reach 2 could be a surge conduit. In 1988, the Corps recognized that the Reach 2 channel itself could be a conduit for catastrophic flooding of Greater New Orleans. Exh. 9, 1988 Recon Report at Comment 2, LMVD; Exh. 68, Bretschneider and Collins Report (Sept. 1966) at p. 4.

548. The peak storm surge versus design elevation at the time of Hurricane Katrina was as follows:

|  | Design Elevation | Peak Surge |
|---|---|---|
| Chalmette Loop | 13 to 18 ft | 15.5 to 18.7 ft |
| IHNC | 13.5 ft | 15 ft |
| Citrus Back Levee | 14 to 15 ft | 15 to 17 ft |

MSJ Exh. 20, IPET, pp. IV-2, IV-4, IV-27, IV-257, V-13-38.

549. Over 50 years ago, the Corps recognized—and IPET confirmed more recently—that from the perspective of storm surge propagation into the IHNC and New Orleans Metropolitan area, the critical section of the MR-GO channel is the one where the GIWW and Reach 1 occupy the same channel because it is through this connection that Lakes Pontchartrain and Lake Borgne are hydraulically connected to one another via the IHNC. A water level gradient is established within the IHNC and the GIWW/Reach 1; the gradient is determined by the storm surge levels in both lakes. The presence of an open channel is the key factor. The hydraulic connectivity existed prior to construction of the MR-GO due to the presence of the GIWW channel. Exh. 20, IPET at p. IV-258; Exh. 10, House Doc. No. 231 at p. 17.

550. The Corps recognized in 1988 that "the storm surge that inundated St. Bernard Parish in 1965 and again in 1969 because of the wind direction during the storm, most likely came from the east across Lake Borgne and the Biloxi Marsh . . . ." Exh. 193, Memorandum of

164

Cecil W. Soileau (Chief, Hydraulics and Hydrologic Branch, Commenting on Army Corps, Mississippi River-Gulf Outlet, St. Bernard Parish, Louisiana (Bank Erosion) at NED-256-57.

551. The six-mile portion of the combined GIWW and Reach 1 is a 1,500 foot wide 40+ feet deep channel that connects the "funnel" with the IHNC. The Team Louisiana Report called this stretch of the shipping channel "Hurricane Alley." The highest surge observed in the Greater New Orleans was against the MR-GO levee in the funnel formed by the convergence of the levee systems built along the north bank of the Reach 1/GIWW and the south bank of the MR-GO. The surge penetrated six miles into Greater New Orleans through the portion of the GIWW that was enlarged as part of the MR-GO project. MSJ Exh. 4, Team Louisiana Report at pp. 28, 33, 59, Fig. 15; Exh. 91, Kemp Expert Report (July 2008) at pp. 95-148.

**Upper St. Bernard Parish**

552. The flooding of upper St. Bernard Parish was caused by waters originating in Lake Borgne and Reach 2 overwhelming the MR-GO banks and flood protection works along Reach 2, passing to the west over the largely deteriorated wetlands (Central Wetlands Unit), overtopping the 40 Arpent Canal Levee and flowing into the population areas of Chalmette and the Lower 9th Ward. Exh. 28, Dalrymple Depo. (Sept. 18, 2007) at 137:12-138:14; Exh. 53, Delft University Flood Report (July 2007) at pp. 38-41; Exh. 71, Bea Expert Report (July 2008) at p. 12.

553. Eyewitnesses living in Chalmette on August 29, 2005 saw water flowing over the 40 Arpent Canal Levee at about 8:30 a.m. Within a matter of minutes, over ten feet of water engulfed their homes. Trial testimony of witnesses Glen Diaz and Donald Riley.

554. This time of flooding Chalmette (about 8:30 a.m.) is the time estimated by Plaintiffs' experts. Exh. 91, Kemp Expert Report (July 2008) at p. 63.

555. The waters that inundated St. Bernard Parish ponded to a high elevation of about 12 feet above mean sea level, destroying homes and businesses—including those of Plaintiffs Kent Lattimore, Tanya Smith, and Lattimore & Associates—at all elevations above sea level in the populated St. Bernard Parish.  Exh. 31, Bea 702c Expert Report (Sept. 2007) at p. 85, ¶ 111.

**New Orleans East**

556.   The New Orleans East polder is bounded on the south by Reach 1/GIWW, on the west by the IHNC, and on the north and east by Lake Pontchartrain and marshlands. Significant levee overtopping and breaches occurred along Reach 1/GIWW.  There were also a few breaches along the floodwall on the IHNC near I-10, as well as overtopping of the floodwall near the Lakefront Airport. Overtopping also occurred along the LPV structure at Lake Pontchartrain, but to a much lesser degree than on Reach 1/GIWW. Therefore, the New Orleans East area received floodwaters from all directions.  Exh. 20, IPET at p. IV-190; Exh. 53, Delft University Flood Report (July 2007) at pp. 26-36; Exh. 91, Kemp Expert Report (July 2008) at pp. 15, 38; Exh. 74, Bea Expert Decl. III (July 2008) at p. 14, ¶23; p. 152, Table 5.

557.   The flooding of the largely unpopulated area behind the New Orleans East Back Levee came from waters in the GIWW that overtopped and/or breached the earthen flood protection works on the north side.  Exh. 28, Dalrymple Depo. (Sept. 18, 2007) at 140:9-141:14; Exh. 91, Kemp Expert Report (July 2008) at pp. 15; Exh. 74, Bea Expert Decl. III (July 2008) at p. 14, ¶23; p. 152, Table 5.

558.   The catastrophic flooding of New Orleans East was caused by floodwaters from the Reach 1/GIWW funnel throat to the south.  In addition, some of the water that flooded this area likely came from breaches that occurred along the GIWW levee east of the Michoud Canal slip that filled the marshy area behind the federal levee and then overtopped the local levee.  Exh. 4,

Team Louisiana Report at pp. 71-72, Figure 19; Exh. 20, IPET, p. IV-190-93; Exh. 91, Kemp Expert Report (July 2008) at pp. 15, 38; Exh. 74, Bea Expert Decl. III (July 2008) at p. 14, ¶23; p. 152, Table 5.

559.    Breaches along Reach1/GIWW affecting the residential areas of New Orleans East were much less extensive than those affecting the MR-GO LPV structures on the south side of the funnel. As a result, most flooding was caused by overtopping that stopped once surge levels dropped.  Exh. 4, Team Louisiana Report at pp. 71-72; Exh. 20, IPET at p. IV-190-93.

560.    The water level in New Orleans East initially got to +1.5 ft in some residential areas close to sources of overtopping, and higher in the industrial land to the south, and in the Bayou Sauvage marsh to the east.  Exh. 4, Team Louisiana Report at pp. 71-72; Exh. 20, IPET at p. IV-190-93.

561.    The overtopping of Reach 1/GIWW began at about 6 a.m. and subsided around midnight on August 30, 2005 when the peak surge receded.  Exh. 105, Vrijling Polder Flood Simulations (July 2008) at pp. 17-19.

562. Once the surge abated on the Reach 1/GIWW and the IHNC, the surge water that had entered New Orleans East then spread out, dropping in some areas and rising in others until it reached equilibrium more than a foot below mean sea level.  Because Little Woods is so low, however, with many homes between 8 and 12 feet below sea level, even flooding to this modest elevation had catastrophic consequences.  Exh. 4, Team Louisiana Report at pp. 71-72; Exh. 20, IPET at p. IV-190-93.

**Lower 9th Ward**

563. The floodwaters that catastrophically inundated the Lower 9th Ward—and the property of Plaintiffs Anthony and Lucile Franz—came from three sources:

167

  (a) water in the Reach 2 channel that overtopped and breached the Reach 2 LPV structures, filled the Central Wetlands Unit, passed over the 40 Aprent Canal Levee, and poured into St. Bernard Parish and the Lower 9th Ward;

  (b) water in the IHNC that overtopped and breached the LPV structures at the North Breach and South Breaches on the eastern side; and

  (c) water from overtopping of the southern side of Reach 1/GIWW.

Exh. 105, Vrijling Polder Flood Simulations (July 2008) at pp. 25-28; Exh. 91, Kemp Expert Report (July 2008) at pp. 3, 15-16.

  564. The St. Bernard polder (bowl) is one single area—with a minor, very low divider at the railroad tracks—that includes upper St. Bernard Parish and the Lower 9th Ward. By 8:30 a.m. on August 29th, water was overflowing the 40 Arpent Canal Levee and inundating areas both east and west of this divider. Trial testimony of Glenn Diaz; Trial testimony of Donald Riley.

  565. Water entering the St. Bernard polder from the east—originating in Reach 2 and then filling up the Central Wetlands, and then overflowing the 40th Arpent Canal Levee—was distributed throughout upper St. Bernard Parish and the Lower 9th Ward. Exh. 105, Vrijling Polder Flood Simulations (July 2008) at pp. 25-28; Exh. 91, Kemp Expert Report (July 2008) at pp. 3, 15-16.

  566. Some of the flooding of the Lower 9th Ward was also caused by the waters overflowing the flood protection works on the east side of the IHNC and two breaches of flood protection works on the east side and some overtopping of LPV structures. The South Breach was the largest—nearly 900 feet in length. Overtopping and scouring occurred at both ends of the breach. Exh. 28, Dalrymple Depo. (Sept. 18, 2007) at 138:7-139:9; Exh. 105, Vrijling Polder

Flood Simulations (July 2008) at pp. 25-28; Exh. 20, IPET at p. IV-200; Exh. 73, Bea Expert Decl. II (July 2008) at p. 15, ¶25.

567. The North Breach occurred at about 7:30 am on August 29th and flooding lasted until after August 30, 2005 when the surge receded. Exh. 105, Vrijling Polder Flood Simulations (July 2008) at pp. 25-28.

568. The South Breach occurred at about 9:00 a.m. on August 29th and flooding lasted until after August 30, 2005 when the surge receded. Exh. 105, Vrijling Polder Flood Simulations (July 2008) at pp. 25-28.

569. While the North and South Breaches had a local effect on the time of onset of flooding in Lower 9th Ward which was earlier than flooding from Reach 1 and Reach 2, the maximum water levels in the St. Bernard Polder (including the Lower 9th Ward) was determined exclusively by flooding from Reach 2. In other words, the catastrophic flooding of the Lower 9th Ward was caused by floodwaters originating in Reach 2. Steven Fitzgerald Expert Report (Dec. 2008) (Defendant's Expert) at p. 20.

570. With respect to sources of flooding of the Lower 9th Ward, only a relatively small percentage of the total volume came from the North and South Breaches along the IHNC. Most of the remaining floodwaters came from Reach 2, with some minor contribution from Reach 1. Exh. 4, Team Louisiana Report at p. 80; Steven Fitzgerald Expert Report (Dec. 2008) (Defendant's Expert) at p. 20.

571. Without the IHNC breaches, almost the same volume of floodwater enters the populated area of the St. Bernard bowl—upper St. Bernard Parish and Lower 9th Ward—compared with the scenario of MR-GO breaches plus overtopping plus rain. Without the IHNC breaches, it takes a little longer in the western part of bowl to reach the peak water level, but the

peak itself is only marginally lower. In the eastern part of the bowl, the influence of the IHNC breaches on the development of the water level is even smaller. Thus, even without the floodwater originating in the IHNC, the Lower 9th Ward—and the property of Plaintiffs Anthony and Lucille Franz—would have catastrophically flooded. Exh. 53, Delft University Flood Report (July 2007) at p. 45.

## CAUSATION

572. Based on the foregoing findings, the Court has determined that the MR-GO's defective conditions were a cause in fact of the catastrophic flooding of Plaintiffs' property. If there had been no enhanced surge and intensified waves caused by the MR-GO's defects, there would have been no catastrophic flooding of New Orleans East, Lower 9th Ward, and Saint Bernard Parish (and Plaintiffs' property). Alternatively, the evidence also shows that but for the enhanced surge and intensified waves caused by the MR-GO's defects as discussed above, Plaintiffs' property would have experienced only minor flooding, if any, that would not have resulted in their destruction.

573. The MR-GO's five major adverse effects —creation of a direct, unmitigated surge conduit from the Gulf of Mexico, the unmitigated "funnel effect," destroyed wetlands, substantial channel widening, and accelerated and increased subsidence of LPV structures—were substantial contributing factors to the catastrophic flooding of the Plaintiffs' homes and communities. Exh. 91, Kemp Expert Report (July 2008) at pp. 2-3, 7, 38, 196; Exh. 81, Bea Expert Report (Jan. 2009) at pp. 2-7.

574. These effects were not only more than trivial—they were significant contributors to the catastrophic flooding of Plaintiffs' property.