# APPENDIX O

Bea Expert Report (July 2008) at pp.15-16; Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-178; Exh. 81, Bea Expert Report Summary (Jan. 2009) at p. 6.

407. Many of the Reach 2 LPV structures that were the lowest at the time of Katrina experienced the most breaching.  This is a direct link between the defective MR-GO channel and the catastrophic flooding of populated areas.  Exh 71, Bea Expert Report (July 2008) at pp.15-16; Exh. 72, Bea Expert Decl. No. 1 (July 2008) at pp. 162-178; Exh. 81, Bea Expert Report Summary (Jan. 2009) at p. 6.

**Enhanced Surge**

408. The loss of wetlands and channel widening foreseeably contributed to substantially increased vulnerabilities and degraded performance characteristics of the Reach 2 EBSBs, the navigation structures at Bayous Dupre and Bienvenue, and the Reach 1 flood protection structures during Katrina.  Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶4; Exh. 71, Bea Expert Report (July 2008) at pp. 17-20; Exh. 72, Bea Declaration I (July 2008) at pp. 41-44; Exh. 74, Bea Declaration III (July 2008) at pp. 50-52; Exh. 81, Bea Expert Report (Jan. 2009) at p.5, ¶3, p. 6, ¶6.

409. It is well known, and the Corps knew, that healthy wetlands have a positive effect in reducing the destructive impact of storms by reducing the height and intensity of storm surge and waves—anywhere from 1 foot per 2.75 miles (0.36 feet/mile) to 1 foot per 1.4 miles (0.71feet/mile) depending on the type of vegetation.  Exh. 91, Kemp Expert Report (July 2008) at pp. 184, Figure 9.5; see also Exh. 134, U.S. Army Corps of Engineers, Lake Pontchartrain and Vicinity, Louisiana, Design Memorandum No. 1 Hydrology and Hydraulic Analysis Part 4 – Chalmette Extension, at Plate No. 6 "Overland Surge Elevations, Coastal Louisiana" (October 1967)); Exh. 83, Bea Tech Report No. 1 (Jan. 2009) at p. 2.

410. If the cypress forests and marshlands had not been destroyed by the MR-GO, these natural defenses would have reduced surge caused by Hurricane Katrina by about three feet and spared Greater New Orleans from catastrophic flooding. Exh. 95, Day/Shaffer Expert Report (July 2008) at pp. 16-20; Exh. 28, Dalrymple Depo. at 143:6-145:1; *see also* Exh. 2091, Swenson, E.M., *Hurricane Andrew: the Inundation of the Louisiana Coastal Marshes,* Report Submitted to the Louisiana Department of Natural Resources, Baton Rouge, Louisiana, DNR Contract No. 256081-95-02 (1994); Exh. 1638, Coast 2050, Toward a Sustainable Coastal Louisiana (Dec. 1998) at p. 55; *see also* Exh. 2058, CRS Report for Congress, *Federal Liability for Hurricane Katrina-Related Flood Damage*, RL34131 (Aug. 17, 2007) at p. 2.

411. With healthy cypress forests and marshlands, surge across the Central Wetlands Unit between the Reach 2 and the 40 Arpent Canal Levee is reduced by a critical three feet, thereby averting catastrophic flooding. Exh. 91, Kemp Expert Report (July 2008) at pp.123, 182.

412. The Government's own expert, Dr. Robert Dalrymple, attributes over three feet of additional storm surge against Reach 2 EBSBs because of the destroyed adjacent wetlands. Exh. 28, Dalrymple Depo. at 143:6-145:1.

413. As discussed below, Plaintiffs' modeling scenarios establish that the cumulative impact of the MR-GO's four defects (no surge barriers, "funnel effect," loss of wetlands, and channel widening) in fact increased surge elevation along Reach 1/GIWW and the IHNC by at least three feet. Exh. 91, Kemp Expert Report (July 2008) at p. 125.

414. Defendant's expert attributes 3.5 feet of additional surge in Reach 1/GIWW due to the "funnel effect." Exh. 94, Kemp Expert Decl. (Jan. 2009) at p. 4 citing Westerink Expert Report at Figures 187-196.

415. Plaintiffs have presented evidence that an "as authorized" MR-GO—with pristine wetlands and "as authorized" channel width—is still a major conveyer of surge and a major source of devastating overtopping flows. Exh. 93, Kemp Supp. Decl. at ¶16.

416. The flood structures along Reach 2 were not armored, and they had no breakers or protective wetlands in front of them to serve as a buffer to storm surge and waves. Exh. 3, ILIT at p. 2-19, Figure 2.6.

417. In contrast, because it was constructed of cohesive soils on its slopes and the slopes were fertilized, seeded and sodded to form a section that generally prevented rain wash erosion and erosion from tidal wave action, the 40 Arpent Canal Levee, while overtopped, did not catastrophically fail during Hurricane Katrina. Exh. 13, Theis 702c Expert Report (Sept. 2007) at ¶27.

418. The widening of the Reach 1/GIWW channel from its design width of 650 feet to 1,000 feet increased the volume of water (conveyance) during Katrina and contributed to the overtopping of the LPV structures and the catastrophic flooding of New Orleans East. Exh. 91, Kemp Expert Report (July 2008) at pp. 11, 57, 80, 148-58; Exh. 81, Bea Expert Report (Jan. 2009) at p. 5, ¶4.

**Intensified Wave Energy**

419. Surge and wave height alone do not reflect the reality of the total universe of interactive hydrodynamics during a hurricane. Wave energy is also a critical factor in the destruction of LPV structures. Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶19, 27, 31-32.

420. Once the combined surge and waves reach the top of a flood control structure, they cannot and do not rise any higher. Instead, the water overflows the crown and continues to do so until the water level recedes below the crown. This is like a bathtub that overflows once the

123

446. Waves generated by Katrina winds in Lake Borgne would have traversed a much narrower channel and buffering wetlands and been greatly diminished before striking the Reach 2 embankments if the MR-GO had not eroded the channel banks and had not destroyed tens of thousands of acres of wetlands due to construction, bank erosion, and saltwater intrusion. Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶31.

447. Plaintiffs' experts' data shows that the wider channel materially increased storm surge intensity, time of breach/overtopping, overtopping rates, and duration of flooding. Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶19-27.

448. The geometry of the unmitigated "funnel" directly influenced surge discharge—both in quantity and velocity—in Reach 1/GIWW and IHNC. Exh. 81, Bea Expert Report (Jan. 2009) at p. 6, ¶7; p. 12, Fig. 7; Exh. 91, Kemp Expert Report (July 2008) at Chapter 2, "Funnel Geography, Terminology and Katrina Flood Damages."

449. The onset rate, and duration of overtopping—three critical storm parameters—are significantly delayed without the MR-GO's adverse effects, thereby dramatically reducing (and averting catastrophic) flooding of Plaintiffs' property. Exh. 74, Bea Expert Decl. No. 3 (July 2008) at pp. 150-52, ¶142; Exh. 91, Kemp Expert Report (July 2008) at pp. 125-33.

**Defendant's Experts Agree With Several Conclusions by Plaintiffs' Experts**

450. Defendant's expert's (Westerink) modeling for Reach 1 and the IHNC shows dramatic reductions of peak surge by up to 3.5 feet and duration by more than half associated with returning Reach 1 to pre-MR-GO dimensions. (This is actually half a foot more reduction than Plaintiffs' experts showed with FINEL.) Thus, experts for both parties are in agreement about the role the unmitigated "funnel effect" and enlarged GIWW in amplifying and prolonging storm surge in Reach 1 and the IHNC and contributing to the early failure of floodwalls and

134

levees adjacent to the IHNC.  Exh. 94, Kemp Supp. Decl. (Jan. 2009) at p. 4 citing Westerink Report (Defendant's Expert) at Figs. 187-196.

451.   None of Defendant's experts (Westerink, Ebersole, or Resio) challenge Plaintiffs' experts' conclusions about the adverse effects of channel expansion and loss and conversion of wetlands.  Exh. 94, Kemp Expert Report (Jan. 2009) at p. 4.

452.   Defendant's modeling expert (Westerink) does not challenge Plaintiffs' experts modeling methods.  Exh. 94, Kemp Expert Report (Jan. 2009) at p. 5.

453.   Defendant's experts do not challenge the methodology of Plaintiffs' experts' modeling discussed above.  Exh. 94, Kemp Expert Decl. (Jan. 2009) at p. 4.

454.   Consistent with Team Louisiana's conclusion that flooding across the 40 Arpent Canal Levee began between 8:00 and 8:30 a.m., all experts agree that the peak surge on Reach 2 occurs in the 8:00 to 9:00 a.m. period.  Exh. 94, Kemp Expert Report (Jan. 2009) at p. 26; Exh. 4, Team Louisiana Report at p. 80, 94.

455.   Defendant's expert Bruce Ebersole acknowledges the hydraulic chaos on the Reach 2 EBSB face during Katrina due to turbulent surge, wave breaking, and swash generation akin to a hydraulic cannonball or Roto-Router eroding the sides and crowns.  *See, e.g.*, Exh. 94, Kemp Expert Report (Jan. 2009) at pp. 26-27.

456. Defendant's expert Bruce Ebersole agrees with Dr. Kemp and Dr. Bea that (a) the breaching of Reach 2 EBSBs began early in the surge sequence (between 5 and 6 a.m.) when water levels were halfway up the structure's front face and (b) overtopping became the dominant erosion mechanism, continuing as water levels and wave heights increased and levee crowns were substantially reduced due to wave overflowing.  These waves—originally generated in Lake Borgne regenerated (and magnified) within the Reach 2 channel—were the only means to

135

470. Scenario 3 does not take into account the fact that Reach 2 of the MR-GO is a potential conduit of storm surge from the Gulf of Mexico and from Lake Borgne and that there is a potential for "funneling" of surge down Reach 1/GIWW and into the IHNC, thereby omitting any provision for surge barriers . Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶8(a).

471. Notwithstanding the inappropriateness of segregating the negative effects of operation and maintenance from other negative effects, the flood modeling results for Scenario 3 in fact demonstrate that the loss of wetlands and channel widening, by themselves, had a material impact on the amplitude of surge, wave generation, onset of flooding, duration of flooding, and rate of overtopping and thereby the extent of flooding in the three polders. Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶20; Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶2.

472. Contrary to the Government's contention, Scenario 3 is not Plaintiffs' "no negligence" scenario. Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶5-6; Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶¶3(c), (d), 5(a), 11(b).

(a) None of the Plaintiffs' expert reports used the term "no negligence." Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶8(a)

(b) Scenario 3 does not take into account the fact that Reach 2 of the MR-GO is a potential conduit of storm surge from the Gulf of Mexico and from Lake Borgne and that there is a potential for "funneling" of surge down Reach 1/GIWW and into the IHNC, thereby omitting any provision for surge barriers . Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶8(a).

473. The MR-GO's operation and maintenance cannot be decomposed because of their interactive and interdependent effects on what existed at the time of Hurricane Katrina and on what could and should have existed at the time of Hurricane Katrina as performed with the utmost care. Exh. 90, Bea Supp. Decl. (Oct. 2008) at ¶10(b).