# APPENDIX S

254. In 1984, the Corps concluded that the wave climate was more severe than the design parameters anticipated for the foreshore dike in the Citrus Bank Levee and that the frequently experienced higher water levels meant that waves could overtop the height of the dike. Exh. 1478, Memo to Chatry from Chief Joe Dicharry, Navigation Section, Project Management Branch; Subject: Foreshore Protection Along Citrus Back Levee (July 27, 1984) (AIN-108-000000889).

255. The Corps recognized that overtopping of LPV structures along Reach 2, caused by waves from passing ships, could scour the bank behind the LPV structures and cause failure from behind. Exh. 1943, Foreshore Protection Test Sections MR-GO South Bank Sta 475 to 501 (Jan. 28, 1983) (NED-192-000000432).

## NEPA

### Army Corps's Knowledge of MR-GO's Adverse Effects at the Time of Preparing Environmental Disclosure Documents

256. Pursuant to NEPA, the U.S. Army Engineer District, New Orleans, Louisiana completed in 1974 a "Review Draft" entitled "Composite Draft Statement for Operation and Maintenance Work on Three Navigation Channels in the Lake Borgne Vicinity Louisiana" ("1974 DEIS"). The document describes the "Administrative" action under review as the:

> operation and maintenance of the following projects in the vicinity of Lake Borgne Louisiana: The Mississippi River Gulf Outlet….Operation and Maintenance …consist(ing) primarily of periodic dredging and subsequent material Depo. along the total of 111.3 miles. Maintenance dredging is accomplished by a cutter head pipeline dredge.

Exh. 191 at p. i, ¶2 (1974 DEIS).

257. The 1974 DEIS removed references to studies regarding the MR-GO's effect on storm surge that had been part of the 1972 DEIS. Exh. 190 at pp. 13, 14 (1972 DEIS); Exh. 191 (1974 DEIS); *see also* Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19;

131:11-132:3-142:25, 181:8-184:14; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 32:9-35:9; 60:1-71:12; 79:11-81:22; 82:18-85:17; 90:15-93:20; 96:8-97:3; 98:23-99:7; 118:6-119:17.

258. By 1975, the Army Corps had acknowledged "[t]he marsh west of the MR-GO has been significantly modified by, inter alia, the MR-GO channel." Exh. 186, Mississippi River Gulf Outlet New Lock and Connecting Channels Quantities to Use for Real Estate for Comparative Analysis of 14 Schemes, at AFW-180-000001008, ¶8.

259. The Corps' response to the EPA Comment Letter, as included in Section 9 of the "Coordination Comment and Response" portion of the 1976 FEIS, merely dismissed the EPA's concerns noting that the environmental impacts raised by the EPA were not relevant to O&M and as such need not be addressed in this impact statement and, discussion of mitigative measures were similarly deemed "inappropriate" for this statement. Exh. 192, 1976 FEIS at IX-3, 13; *see also* Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17; Exh. 177, December 1972 Digest of Water Resources Policies and Activities, EP 1165-2-1, at p. A-135.

260. The Department of the Interior ("DOI") likewise brought to the Corps' attention certain perceived deficiencies in the DEIS. The DOI sharply disputed the Corps' unsubstantiated conclusion that spoil disposal would "constrain the westward erosion of the MR-GO channel bank" which was contributing to the widening of the surface of the MRGO. Exh. 192, 1976 FEIS at p. IX-20; *see also* Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17.

261. In its response, the Corps merely rejected out of hand the DOI's comment without addressing the merits of its stated concern about bank erosion.  Exh. 192, 1976 FEIS at p. IX-7; *see also* Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17.

262. The United States Department of Commerce, Assistant Secretary for Science and Technology, commented that the DEIS failed to identify the land loss process of marsh deterioration resulting from saltwater intrusion and failed to address specific authoritative studies on the relevant environmental effects of saltwater intrusion on vegetative types in the vicinity as well as studies regarding conversion of marsh to open water in violation of 40 CFR Part 1500.8 (a) (1).  Exh. 192, 1976 FEIS at p. IX-14.

263. The Corps' 1976 FEIS did not act upon this comment in its Section IX "Coordination Comment and Response" portion of the 1976 FEIS and made no reference to the impact of saltwater intrusion as a cause of land loss, nor did it include the referenced studies anywhere in the body of the document. Exh. 192, 1976 FEIS at IX-1-10; *see also* Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17.

264. The State of Louisiana, Department of Public Works letter, commented that the 1974 DEIS did not adequately identify the role of the proposed locks at Seabrook and Rigolets to hurricane protection in the vicinity in violation of 40 CFR Part 1500.8 (a)(1).  Exh. 192, 1976 FEIS at IX-21.

265. The Corps failed to acknowledge that The State of Louisiana, Department of Public Works comment and made no alteration in its discussion of the impact that the proposed Seabrook and Rigolets Locks were expected to have on hurricane protection and the impact of salt water intrusion on the marshes, in violation of 40 C.F.R. Part 1500.8(a)(1).  Exh. 192, 1976 FEIS at II-116-117(g).

266. The Louisiana Wildlife and Fisheries Commission ("LWFC") commented that: implementation of the proposed O&M would enhance the MRGO's impact on saltwater intrusion and significant ecological changes in the marshlands and estuaries.  Problems the LWFC considered to be of "significant magnitude."  Exh. 192, 1976 FEIS at IX-8 to IX-9.

267. In lieu of responding to the LWFC's concerns, the Corps merely concluded that it was "inappropriate" to present or analyze these impacts in this environmental document.  Exh. 192, 1976 FEIS at IX-9.

268. In March 1976, the U.S. Army Engineer District, New Orleans, Louisiana completed the Final Environmental Impact Statement ("1976 FEIS") for the MR-GO project pursuant to 40 CFR Part 1500.6 (d)(1).  Exh. 192, 1976 FEIS.

269. The 1976 FEIS fails to satisfy the requirements of NEPA in that it does not contain of the following:

    a.     a description of the wetlands environment in the MR-GO vicinity as it existed prior to the proposed maintenance dredging and operation of the MR-GO, in violation of 40 CFR Part 1500.8 (a)(1);

    b.     a description of the interrelationships and cumulative environmental impacts of the proposed maintenance dredging and operation of the MR-GO as it impacts the storm surge environment in the vicinity and other related Federal projects (for example specifically but not exclusively, the locks at Seabrook and Rigolets); the wetlands environment in the MR-GO vicinity, and channel erosion, as required by 40 CFR Part 1500.8 (a)(1), (a) (3);

77

      c.      a description of the probable adverse environmental effects of the Operation, Maintenance, and Dredging on the storm hazards in the environment which could not be avoided, as required by 40 CFR Part 1500.8 (a)(5).

      d.      the interrelationships of the MR-GO on other related Federal projects, in particular, the relationship that the MR-GO has or may have on the Lake Pontchartrain Hurricane Protection Project, in violation of 40 CFR Part 1500.8 (a)(1). Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 126:19-127:16; Exh. 192, 1976 FEIS at I-11-13.

      e.      any detail regarding the probable impact of the proposed maintenance dredging and operation of the MR-GO on the wetlands environment in the MR-GO vicinity as they affect storm surge and channel erosion, as required by 40 CFR Part 1500.8 (a)(3);

      f.      an analysis of the secondary, or indirect, as well as primary or direct, consequences of the maintenance dredging and operation of the MR-GO on the wetlands environment as it relates to storm surge and channel erosion in the MR-GO vicinity, as required by 40 CFR Part 1500.8 (a)(3)(ii);

      g.      an evaluation of the cumulative environmental impacts of the MR-GO O&M as required by 40 CFR Part 1500.8 (a) (1); Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 126:13-18;

      h.      an analysis of alternatives to the proposed maintenance dredging and operation of the MR-GO (and their benefits) relative to environmental changes presented to the storm surge environment and impacts on storm hazards, wetlands loss, and channel erosion, as required by 40 CFR Part 1500.8(a)(4);

      i.      the required statement indicating the extent to which the stated countervailing benefits could be realized by following reasonable alternatives to the proposed action that would avoid some or all of the adverse environmental effects on the wetlands environment in the MR-GO vicinity, as required by 40 CFR Part 1500.8 (a)(8).

      j.      an analysis in sufficient detail to reveal the Army Corps's comparative evaluation of the environmental benefits, costs, and risks of the Operation, Maintenance, and Dredging and each reasonable alternative as it impacted storm hazards, wetlands loss, and channel erosion in the vicinity of the MR-GO, as required by 40 CFR Part 1500.8 (a)(4).

      k.      any descriptions of appropriate alternatives to resolve conflicts concerning methods of mitigating the effects of maintenance dredging and operation of the MR-GO on storm surge, wetlands loss, and channel erosion in the MR-GO vicinity, as required by 40 CFR Part 1500.8 (a)(4);

      l.      a rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative mitigating measures that

might neutralize or avoid some or all of the adverse environmental effects of the existence of and continued maintenance dredging and operation of the MR-GO, as required by 40 CFR Part 1500.8 (a)(4);

m. an analysis of the operation and maintenance of the MR-GO's potential for reducing the environmental benefits of the wetlands environment in its vicinity or the alternative of taking "no action" to operate the MR-GO, or of postponing action pending further study of the effects of O&M, as required by 40 CFR Part 1500.8 (a)(4);

n. a required statement on the extent to which the Operation, Maintenance including dredging involved tradeoffs between short-term environmental gains at the expense of long-term losses, and a discussion of the extent to which the Operation, Maintenance, including dredging foreclose future options regarding the environment, as required by 40 CFR Part 1500.8 (a)(6); and

o. the required section indicating what other interests and considerations of Federal policy are thought to offset the adverse environmental effects of the proposed action on the wetlands environment in the MR-GO vicinity, as required by 40 CFR Part 1500.8 (a)(8).

270. The Corps concedes that the 1976 FEIS contains no analysis of the impacts of the MR-GO O&M on the health and safety of the human environment related to erosion of the banks along the MR-GO. Exh. 181, Gregory Miller 30(b)(6) (Oct. 14, 2008) at 281:6-282:16.

271. At no time after 1976 did the Corps prepare any additional Final or Supplemental Environmental Impact Statement concerning the effects of the ongoing O&M activities or that discussed the impact of those activities on the human environment. Nor did it ever address mitigation measures, alternatives or risks to human life and property, or any other disclosures required by NEPA and its implementing regulations. Exh. 188, Appendix L, MR-GO De-Authorization Study); *see also* Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14; Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17.

79

272. Between 1963 and 2005, the Corps engaged in approximately 147 dredging events and removed approximately 492,422,925 million cubic yards of sediment which became spoil. Exh. 206, Compilation of Dredging Events Notice of Intent to Introduce Summary Evidence; Exhibit A-F (September 12, 2008) at p. 5.

273. The Corps never presented Congress with an objective analysis of the impacts of these dredging activities, including the Corps' own understanding that its conduct was causing the surface width of the MR-GO to expand at a rate averaging over 15 feet per year causing the channel to triple in width.  Exh. 203, *The Mississippi River Gulf Outlet: A Study of Bank Stabilization* at 1865; Exh. 145, New Orleans District Corps of Engineers for the Environmental Subcommittee of the Technical Committee Convened by EPA in Response to St. Bernard Parish Council Resolution 12-98. December 1999. Habitat Impacts of the construction of the MR-GO (March 16, 2000) at 1559.

274. The Corps never presented to Congress, the impact that continued dredging had on the stability and integrity of the adjacent hurricane protection system.

275. As of October 1, 1977, the effective date of Executive Order No. 11990, the MRGO was an ongoing project with wetlands implications that would require future Environmental Impact Statements.  One of the objectives of Executive Order No. 11990 was "to avoid to the extent possible the long and short term adverse impacts associated with the destruction or modification of wetlands.  This expressly included dredging activity.  Exh. 172, Executive Order No. 11990 at pp. 1-2, Sections 1(a) and 7(b).

276. Executive Order No.11990 required that the Corps "consider factors relevant to a proposal's effect on the survival and quality of the wetlands … such as flood and storm hazards." Exh. 172, Executive Order No.11990 at p. 2, Section 5.  Although the Corps drafted a FEIS in

80

1976, the activities associated with the O&M of the MR-GO that were ongoing necessitated Supplemental statements, the Corps' activities initiated after the 1976 FEIS, failed to comply with Executive Order 11990.

277. Between the years 1980 and 2004, the Corps performed a total of 26 Environmental Assessments ("EA's") of the MR-GO relating to Operation and Maintenance. Each of these EA's were limited to analysis of discrete segments of designated miles along the 76 mile channel, and are often further subdivided into two and three sub-EAs prepared separately, addressing even smaller designated areas for the proposed action. *See, e.g.*, Exh. 197, EA 162 (miles 23-2); miles 49.9-56.1; miles 0 to (-) 2.5); Exh. 188, Appendix L of the Mississippi River-Gulf Outlet Deep Draft De-authorization Study Integrated Final Report to Congress ("Appendix L, MR-GO De-Authorization Study").

278. Without exception, each of the 26 EA's prepared by the Corps found that the O&M activities had no significant impact on the environment ("FONSI") and thus, omitted any discussion of the relationship between the dredging and the continuing loss of wetlands, failure to engage in bank stabilization, or discuss the cumulative environmental impacts of the O&M, or mitigation measures, or alternatives to the O&M, such as closure. Exh. 188, Appendix L, MR-GO De-Authorization Study.

279. In 1984, the Corps was aware of the potential impacts of the MRGO on the environment and participated in a study entitled "The Mississippi River Gulf Outlet: A Study of Bank Stabilization" and published by Coastal Environments, Inc. Exh. 203, The Mississippi River Gulf Outlet: A Study of Bank Stabilization, Coastal Environments, Inc (Dec. 1984).

280. On July 11, 1985 the Corps published a "Supplemental Information Report" ("1985 SIR") "to evaluate the ongoing removal of allowable over depth and advanced maintenance

81

during routine maintenance dredging" which was "inadvertently omitted" from the 1976 FEIS nine years earlier. Exh. 194, 1985 SIR at NOP-002-000002283.

281. The 1985 SIR does not evaluate the effects of over depth dredging on subsidence or contributing to the increase of surface width (which had gone from 600 feet to 1500 feet), on wetlands loss, or its subsequent effect on storm hazard.  Nor does the SIR evaluate the effects of over depth dredging on the health and safety of the human environment.  Nonetheless, the Corps concludes that the over depth dredging would have no significant impact on the human environment.  Exh. 194, 1985 SIR at NOP-002-000002287.

282. The SIR's findings that the "Environments Impacts" are conclusory in nature and do not mention in any manner the bank erosion that in less than three years resulted in specific findings of eminent danger. The Corps concludes that the over depth dredging would have no significant impact on the human environment.  Exh. 194, 1985 SIR at NOP-002-000002287.

283. "In light of extensive erosion which [had] been occurring in St. Bernard Parish along the unleveed banks of the Gulf Outlet Channel," in 1987, the Corps considered the need to evaluate bank stabilization measures along the MR-GO to address its impact on hurricane protection.  Nonetheless, the Corps did not supplement its EIS to address the impacts on the human environment caused by the O&M of the MRGO. Exh. 9, 1988 Recon Report at p. 2; Exh. 204, Memorandum re MR-GO, Bank Erosion Reconnaissance Study Interdisciplinary Planning Team (IPT) Meeting to Select Alternative Bank Erosion Control Measures for Evaluation in MR-GO Reconnaissance Report (April 6, 1987) at NED-192-000001167-1169. 1988 Mississippi River Gulf Outlet, St. Bernard Parish, La., Bank Erosion, Reconnaissance Report.(1988 Bank Erosion Recon Report);

284. The Corps did not supplement its EIS to address the impacts on the human environment caused by the O&M of the MRGO despite acknowledging in 1988 that:

   a. marshes along the north bank were disappearing at an "alarming rate" and "development to the Southwest would be exposed to direct hurricane attacks from Lake Borgne" Exh. 9, 1988 Recon Report at p. 10-11. And that, the Lower Mississippi Valley Division of the Army Corps recommended that complete closure of the MR-GO be evaluated in order to "reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up this waterway [the MR-GO]. . . ." Exh. 9, 1988 Recon Report at Comment 2.

   b. based on recent trends, the area would continue to experience drastic losses due to erosion and that the MRGO east bank along Lake Borgne was dangerously close to being breached." Exh. 9, 1988 Recon Report at p. 23;

   c. as the marsh area diminished significant losses to marsh dependant fish and wildlife species will also occur. Increases in water levels resulting from the general rise in sea level and subsidence of the land would enlarge land/water interface and accelerate saltwater intrusion. Exh. 9, 1988 Recon Report at p. 23.

   d. the banks of the MR-GO's unleveed reaches were retreating at rates varying from five to over forty feet per year. The average rate of retreat of the north bank in the 41-mile land cut portion of the waterway was about 15 feet per year. Exh. 9, 1988 Recon Report at p. 30.

   e. salt water intrusion from the MR-GO's O&M was causing lessened hurricane protection associated with loss of marsh along the north bank from Lake Borgne. Exh. 9, 1988 Recon Report at p. 10, LMVD Comment No. 2, pp. 16, 24-27, Appendix E at pp. 3-8; Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 113:10-116:1, 126:13-129:17.

   f. alternatives to operation of the MRGO that might mitigate the erosion of the banks of the MRGO, including reduction of, and alternatives to maintenance dredging. Exh. 9, 1988 Recon Report at pp. 34-50; Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 33:9-34:24, 146:3-147:22.

   g. the reduction in protective wetlands (both in the Golden Triangle and Central Wetlands Unit and immediately in front of the LPV structures) and increase in channel width would likely have a demonstrable effect on flooding levels in the vicinity of the MR-GO during hurricanes. Exh. 9, 1988 Recon Report at Comment 2; Exh. 93, Kemp Supp. Decl. (Oct. 2008) at ¶¶ 19-27.

285. The Corps did not supplement its EIS relating to the impacts on the human environment caused by the O&M of the MRGO despite proceeding "directly with a preparation

of a supplement to the General Design Memorandum for the MRGO navigation project" for continued O&M, notwithstanding the observation that "subsidence is at its greatest in areas that are most often dredged." Exh. 9, 1988 Recon Report at Letter attached thereto dated March 10, 1988 from Col. Lloyd Brown of the Corps to the Commander of the LMVD.

286. The Corps did not supplement its EIS relating to the impacts on the human environment caused by the O&M of the MRGO despite acknowledging that "between 1956 and 1978, the bird's foot delta experienced a net loss of approximately 67,000 acres of marsh -a loss of more than 100 square miles." Or that it was causing an average loss of 211 acres of marsh per year during the 20-year period between 1968 and 1987 and a total of 4,200 acres of highly productive marsh adjacent to the MR-GO channel it did not Supplement its EIS relating to the impacts on the human environment caused by the MR-GO's O&M. Exh. 9, 1988 Recon Report at p. 2, Comment 2; Exh. 145, Army Corps, Habitat Impact of the Construction of the MR-GO (December 1999) at NED-188-000001556 *et seq*.; Exh. 196, Army Corps and Louisiana Department of Natural Resources, "Land Loss and Marsh Creation, St. Bernard, Plaquemines and Jefferson Parishes—Feasibility Study" (April 1990) at pp. 18-19.

287. In response to the Bank Erosion studies, the Corps considered implementing shore protection along the MR-GO. On or about October 6, 1993 the Corps determined that such efforts would require the Corps to alert Congress of the environmental concerns inherent in the MR-GO through a full EIS. The Corps acknowledged internally that a full EIS to Congress would necessitate public comment that would both challenge the limited scale of the Corps proposed bank protection efforts in light of the public desire for more extensive remedy, and would likely raise for Congressional consideration the closing of the MR-GO. Exh. 189, Memorandum for file, *Mississippi River-Gulf Outlet, St. Bernard Parish, LA (Bank Erosion)*

84

*Revised Reconnaissance Study and Feasibility Study*, Oct. 6, 1993) at pp. NPM-036-000001505-1506.

288. The Corps did not Supplement its EIS relating to the impacts on the human environment caused by the O&M of the MRGO and did not propose the discussed shore protection measures despite again acknowledging in 1999, that erosion of the unarmored banks of Reach 2 of the MR-GO had widened the channel beyond its authorized 650' top width, caused large breaches in the rapidly dwindling marsh buffer between the navigation channel and the open waters of Lake Borgne and Breton Sound, exposing neighboring people and property to direct hurricane attacks from Lake Borgne. Exh. 9, 1988 Recon Report at Comment 2); Exh. 145, Army Corps, Habitat Impact of the Construction of the MR-GO (December 1999) at NED-188-000001556 *et seq.*

289. Four months before Hurricane Katrina, a Corps environmental compliance official, Richard Boe, after reviewing the agency's MR-GO environmental disclosure history, concluded that the agency had been deficient in its reporting and short-sighted in its analysis of the significant adverse and cumulative impacts of the MR-GO. Exh. 208, ("Draft Mississippi River-Gulf Outlet PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program" (April 11, 2005) ("Army Corps 2005 Memorandum"); Exh. 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at 177:14-186:14.

290. The April 11, 2005 Corps Memorandum Corps environmental compliance official Boe acknowledged that the Corps had segmented its environmental review, issuing periodic Findings of No Significant Impact ("FONSI"), and not preparing a comprehensive evaluation of the significant and cumulative environmental impacts on the environment from O&M dredging

and bank erosion that had occurred since its 1976 Environmental Impact Statement ("EIS").

Exh. 208, Army Corps 2005 Memorandum at pp. 1-2:

> [T]he dredged material disposal sites and methods that have been used along the inland reach since the mid-1980s bear little resemblance to those described in the environmental impact statement (EIS) prepared in 1976 for the O&M of the MR-GO. All of the changes that have occurred in the dredging and disposal plan since preparation of the original EIS have been addressed in environmental assessments (EAs) and associated findings of no significant impact (FONSIs). . . . The cumulative impact of all the changes that have already occurred since preparation of the 1976 EIS alone constitutes a significant impact on the environment, compared to the O&M plan described in the EIS, although there has been no supplemental EIS (SEIS) prepared. In summary, both the existing O&M of the channel and the proposed changes to the O&M of the channel require preparation of an SEIS.

*Ibid.*

291. The April 11, 2005 Corps Memorandum concedes that the Corps had not implemented preferred bank stabilization measures for channel stabilization of the MRGO. Exh. 208, Army Corps 2005 Memorandum at p. 2.

292. The Corps concedes that pursuant to NEPA, it was required to report that the banks of the MRGO were eroding in an EIS. Exh. 181, Gregory Miller 30(b)(6) (Oct. 14, 2008) at 280:12-24.

293. The Corps concedes that it never evaluated the impact that erosion of the banks of the MRGO had on the health and safety of the human environment. Exh. 181, Gregory Miller 30(b)(6) (Oct. 14, 2008) at 282:17-24.

294. The Corps concedes significant environment impacts result (a) from erosion, wave wash, and drawdown effects produced by large vessel traffic causing highly productive marsh to be converted to open water and (b) from saltwater intrusion in the marsh modifying the character of much of the marsh area. Exh. 181, Gregory Miller 30(b)(6) (Oct. 14, 2008) at 317:17-318:13.

86

295. The Corps acknowledges that the MRGO human environment included areas that were impacted by land changes due to the MRGO project and that the Corps did not analyze the cumulative effect of environmental changes brought about by the MR-GO.  Exh. 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 17:19-23 (30(b)(6) and 126:13-18, 144:1-145:7.

296. The Corps acknowledged by the time of its 1988 bank erosion reconnaissance study the erosion had an impact on the human environment which would be regulated by NEPA, but it never incorporated this information into its environmental disclosures—either in the EAs or a Supplemental Environmental Impact Statement.  Exh. 183, Thomas Podany 30(b)(6) Depo. (Oct. 9, 2008) at 157:9-159:25.

### ARMY CORPS' AWARENESS OF FEASIBLE MITIGATION MEASURES

297. The MR-GO's deficiencies were never "ineradicable" because technically feasible mitigation measures for bank and wetlands protection and surge and saltwater barriers—which would not have impeded use of the navigation channel by deep-draft vessels—were always available to the Corps.  *See, e.g.*, Exh. 154, Appendix C, Report on Evaluation of Alternate Plans Involving Modifications in the Alignment of the Lake Pontchartrain Barrier at p. 2; Exh. 151, Memo concerning MR-GO Floodgates at IHNC from Jerome C. Baehr, at p. 1, AFW-467-000001698-1699; Exh. 146, Letter from U.S. Department of the Interior to District Engineer, NOD, October 22, 1962; Exh. 141, Letter from Colonel E.R. Heiberg III to Mr. G.J. Lannes, Jr. at p. 1 (NED-125-000000995-997); Exh. 71, Bea Expert Report (July 2008) at p. 19, ¶20; Defendant's DFE Motion for Summary Judgment (Doc. No. 16552-4) at p. 36, n. 8 (bank protection works were technically feasible).