## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NUMBER: 05-4182 "K"(2) |
| | * | |
| | * | JUDGE DUVAL |
| | * | |
| PERTAINS TO: MRGO, Robinson | * | MAG. WILKINSON |
| (No. 06-2268) | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

### PLAINTIFF'S OPPOSITION TO UNITED STATES' MEMORANDUM SEEKING

### ADMISSION OF DEFENSE PROFFERS (Rec. Doc. 18990)

### re: Proffers 1-3, 6-9, & 11

**NOW INTO COURT**, through undersigned counsel, come the Plaintiffs Norman

Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr., and

Lucielle Franz, who oppose the defendant's Memorandum seeking admission of defense proffers

1-3, 6-9, & 11, for the following reasons:

### I.

### Opposition to Defense Proffer 1

The exhibits offered by the defendants are not subject to the "collateral source rule"

interpretation presented by the defense proffer because the exhibits do not reveal an effort by the

Plaintiffs of seeking a double recovery.  The FEMA benefits on question were emergency funds

provided to displaced New Orleanians to prevent them from starving and dying in the streets any

more than they had in the days following the storm.  Minimal food and shelter were able to be

procured by the funds provided; however, these "benefits" were only stop-gap measures that in

no way are compensation for the losses claimed via the present lawsuit.  Not one of the named

Plaintiffs is presenting a claim to this court for uncompensated expenditures incurred that are

over and above their ordinary debt load.  As an example, mortgages were still paid and insurance

maintained for uninhabitable home, while the FEMA funds were utilized to pay for

comparatively paltry living conditions.  Clearly, no double benefit is sought in such a situation,

and the defendant should not benefit because the expenses incurred were over and above what

the Plaintiffs would have incurred during the months following the storm had their way of life

not been eradicated by the Corp's negligence.

        The collateral source rule provides that "a tortfeasor may not benefit, and an injured

plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from

sources independent of the tortfeasor's procuration or contribution.  Bozeman v. State, 879 So.2d

692, 698 (La.2004).  Further, the Louisiana Supreme Court has found the Bozeman rationale to

state that two primary considerations are guiding with respect to the collateral source rule:

        (1) whether application of the rule will further the major policy goal of tort deterrence;

and

        (2) whether the victim, by having a collateral source available as a source of recovery,

either paid for such benefit or suffered some diminution in his patrimony because of the

availability of the benefit such that no actual double recovery would result from application of

the rule. Cutsinger v. Redfern, --- So.3d ----, 2009 WL 1425619 (La., 5/22/2009).

        In the present situation, it is unlikely that the payment of FEMA benefits to the Plaintiffs

will instill in the Corps the motivation to better protect the New Orleans area from hurricanes.

Likewise, no double recovery is sought by the Plaintiffs.  As such, the Court should deny defendant's Proffer  1.

## II.

### Opposition to Defense Proffers 2-3

Plaintiffs understand the significance of the Court's ruling regarding the admissibility of Dr. Resio's supplemental report; and as such, withdraw their prior objections to the defendant's proffers 2 and 3.

## III.

### Opposition to Defense Proffers 6-9

### A.       *The failure to produce Dr. Westerinks' reliance materials*

Defendant's proffers 6-9, relative to Dr. Westerink's flux demonstratives, are veiled attempts to recharacterize demonstrative exhibits into evidence to circumvent their expert's report deficiencies.  At trial, Mr. Smith produced graphic images at 5:30 p.m. on the eve of Dr. Westerink's testimony the following day that were never produced in Dr. Westerink's expert report or subsequent **compelled** productions.  When confronted at trial about the tardy production of the flux charts, Mr. Smith informed the court that "Dr. Westerink's graphics today are not evidence, they are merely demonstratives, but they do reflect the data upon which his opinions were formed and the data that was provided to the plaintiffs." (Trial Transcript, 3677: 21-24). However, Dr. Westerink testified that the flux charts were not put together until "5, 6 days" before he testified at trial. (Trial Transcript, 3772:20 - 3773:3).  As the Court can surmise, the compilation of these flux charts was after defense expert Bruce Ebersole testified.

The "data" Mr. Smith references certainly was not produced in a timely fashion, and the defendant failed to seasonably update their expert's reliance materials as it had assured Plaintiffs

when the deficiencies of Dr. Westerink's expert report were revealed to him at deposition.  The Court will recall that defendant steadfastly flaunted the Court's standing order for production, forcing Plaintiff's to file Motion to Compel its expert's reliance materials on February 4, 2009. (Rec. Doc. 17542).  Magistrate Wilkinson acknowledged that the government had been "dilatory in its compliance with its disclosure obligations" and ordered that the government produce "all materials upon which defendant's experts relied... no later that February 27, 2009." (Rec. Doc. 17816).  Because of the continued gamesmanship of the defendant, Plaintiffs were forced to notice the depositions of the defense experts without either the reliance materials produced or an indication of where said materials could be located (Plaintiffs still dispute that there was any such production).  To address the government's inert production, Plaintiffs included with the Notice of Deposition, as an exhibit, a list of materials, including reliance materials, regularly produced by experts in conjunction with their deposition.  However, defendants pompously ignored the request for production.

Considerable efforts were undertaken to ameliorate the prejudice that defendant was systematically scheming to inflict, and at deposition of Dr. Westerink, he was forced to admit that there were considerable errors in his final expert report.  After this revelation, defendnat began producing hard drives of information from various sources that had no "roadmap" for Plaintiffs to correllate the voluminous data dumped after the deposition was concluded with the conclusions rendered in the report.  Nonetheless, Plaintiffs continued to expend considerable resources to effectively prepare to confront Dr. Westerink, and the other defense experts that relied upon Dr. Westerinks' conclusions to formulate their own opinions, at trial.  These efforts essentially were for naught when Dr. Westerink's flux information was produced at the last hours of the trial.

The Court should note that through out the testimony of Mr. Smith **and** the Memorandum Seeking Admission of Defense Proffers does the defendant indicate where this "data" is located (no file directory, no hard drive number, no link to the data).  If for no other reason than to lend credibility to defendant's assertions of production (because Plaintiffs certainly were precluded from such inquiry at deposition), it should be expected that defendant prove to the Court how, when and where that "flux compilation" data was produced.

Because of the deficiencies on the Government's production, this Court is well within its discretion of precluding the introduction of Dr. Westerink's flux opinions.  The requirement to produce the data and the exhibits used by the witness in forming his opinion is supported by the jurisprudence.  When an expert serves as a testifying witness, Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires disclosure of materials considered, reviewed or generated by the expert in forming the opinion, irrespective of whether the materials were actually relied on by the expert.  Employees Committed for Justice v. Eastman Kodak Co., 251 F.R.D. 101 (W.D.N.Y.,2008).  A litigant is required to disclose to his opponent any information "considered" by the litigant's testifying expert. Fed.R.Civ.P. 26(a)(2)(B); NutraSweet Co. v. X-L Engineering Co., 227 F.3d 776, 785-86 (7th Cir.2000); Salgado ex rel. Salgado v. General Motors Corp., 150 F.3d 735, 741 n. 6 (7th Cir.1998); In re Pioneer Hi-Bred Int'l, Inc., 238 F.3d 1370, 1375-76 (Fed.Cir.2001).  Any ambiguity as to the role played by the expert when reviewing or generating documents "should be resolved in favor of the party seeking disclosure." B.C.F. Oil Ref., Inc. v. Consol. Edison Co. of N.Y., 171 F.R.D. 57, 62 (S.D.N.Y.1997).

In addition, a testifying expert must disclose and therefore retain whatever materials are given him to review in preparing his testimony, even if in the end he does not rely on them in formulating his expert opinion, because such materials often contain effective ammunition for

cross-examination. Committee Notes to 1993 Amendments to Fed.R.Civ.P. 26(a)(2); <u>Karn v. Ingersoll-Rand Co.</u>, 168 F.R.D. 633 (N.D.Ind.1996).

Finally, the Court should judge the failure of the defendat to produce its expert's reliance materials as ordered by the Court on the merits of that issue.  As shown below, the defendant's argument that their tardy production is analogous to the presentation of visual aids by Chad Morris is simply a ruse to obfuscate its own defalcations.


**B.      *The Chad Morris GIS Smoke Screen***

The defendant argues that its tardy production is analogous to the presentation of Chad Morris to visualized the expanded MRGO channel top width dimension.  However, theer can be no comparison because the simple explanation for the Morris demonstratives is that he simply quantified the GIS data produced by the defendant and overlayed the data points on a map to reveal their actual location and provide context of the material to the Court.  This exercise by Mr. Morris is the electronic version of sticking pins in a map and tying sting between the pins to show a vector; but in this instance (as shown below), the defendant told Mr. Morris where to place the pins.  For the defendant to argue that it could not discern where the string would be strung is simply a smoke screen.

The government's "feigned" ignorance of the source of the information relied upon by Mr. Morris can only be considered a lack of candor to the Court, or a revelation that the materials were produced to the Plaintifsf in such a jumbled fashion that it could not then decipher what had been sent.  As revealed by the Motion to Compel filed by the plaintiffs to obtain the GIS data, the gamesmanship of the defendant was a pattern torchestrated for confusion.

In preparing for the class certification portion of the MRGO class action, and in

accordance with this Court's Case Management and Scheduling Order No. 4, on June 5, 2007, the Plaintiffs' Subgroup Litigation Committees (PSLC) noticed the Videotaped Federal 30(b)(6) Deposition of the Corps of Engineers.  Prior to this notice being served, a courtesy copy was provided to Robin Smith, trial counsel for the United States. The United States indicated that the government would not comply with the deposition.

Accordingly, on June 6, 2007, the PSLC provided to Magistrate Wilkinson a letter brief to resolve this issue pursuant to Minute Entry of May 24, 2007.  This letter brief format was dispensed with by the Magistrate prior to this issue being resolved.   In response to discovery propounded, the defendant produced a hard drive containing electronic data which it claimed was responsive to the inquires presented in the Notice of Deposition.  However, PSLC was unable to secure a date for the United States to produce a witness to testify about the completeness or accuracy of this information.  With a discovery deadline fast approaching, the PSLC moved the Court to compel the United States to appear at deposition and respond to the inquiries as presented in the above referenced Videotaped Federal 30(b)(6) Deposition. (Rec. Doc 5730).

The defendant consistently maintained that it would not provide specific responses to these areas of inquiries as the information sought was "publicly available and therefore, obtainable from some source that is more convenient, less burdensome, and less expensive. Fed.R.Civ.P.26(b)(2)( C)(1)."  The United States directed the PSLC to the website containing the IPET report and other documentation that *may* be relevant to this request.

The PSLC soon determined that the IPET website did not allow public access to a plethora of information upon which the IPET report is based.  The information was password protected, accessible only to members of the IPET team and/or the government.  After a number of telephone conferences to discuss these issues, the PSLC developed the Notice of Deposition

specifically setting forth the items of inquiry concerning the IPET report.  The two hard drives of

information were produced six (6) weeks late on June 15, 2007.  As revealed by the defendant's

own admission, "the United States produced to Plaintiffs' Liaison Counsel nearly all of the ESI

(electronically stored information) from the IPET's web-based data repositiory–more than 400

gigibytes of data, on two hard drive. (Rec. Doc 5844 p. 2 of 5). As shown in the PSLC's Motion

to Compel, and admitted to in the United States' Opposition, the format of the hard drive data

dump rendered the information nearly useless.

In its' Reply Memorandum (Rec. Doc 6289), the PSLC proved through the supporting

affidavit of Chad Morris that these materials were the GIS data necessary to evaluate the IPET

conclusions and render an opinion regarding locations of various elevations and distances.

However, these materials were produced in an unreadable format with the following deficiencies:

1.     There were 27,000 plus documents in Native Format (EDP) which
       lack objective coding, such as author, date, subject and can only be
       searched by file name or by manually opening each and every file.

2.     Without proper file extensions, these files cannot be opened and
       manually searched.

3.     Only partial, extension list was furnished on June 2, 2007 at
       3:51pm.

Only after considerably expenditures of resources were the Plaintiffs able to compile this

information into a useable format.  This usable format allowed Mr. Morris to electronically

overlay the data points on a map of the MRGO to show where the shoreline of the channel was in

a particular year; and more importantly to show the steady recession of the shoreline.

Interestingly, the materials produced by the government as a result of the above referenced

Motion to Compel, was presented by the Plaintiffs to the defendant as part of Mr. Morris's

production of reliance materials.

Clearly then, the defendant should not be taken by surprise with the information it not only produced originally, but was then returned to it with greater context than the manner it which it was originally produced.

**IV.**

**Opposition to Defense Proffer 11**

Plaintiffs maintain no objection to the admissibility of the defense proffer 11.

**WHEREFORE**, the Plaintiffs Norman Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr., and Lucielle Franz pray that this Court deny the introduction of defense proffers 1-3, 6-9, & 11.

**Respectfully Submitted,**

**PLAINTIFFS LIAISON COUNSEL**

____/s/ Joseph M. Bruno_____
JOSEPH M. BRUNO (La. Bar # 3604)
Law Offices of Joseph M. Bruno
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@jbrunolaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing Memo in Support of Motion to Compel upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 28th day of April, 2009.

_____/s/ Joseph M. Bruno_____

Joseph M. Bruno