UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO: *Robinson* (No. 06-2268) | |

**PLAINTIFFS' <span style="color:red">CORRECTED</span> POST TRIAL BRIEF**

I.      INTRODUCTION ...................................................................................... 1

II.     THE DISCRETIONARY FUNCTION EXCEPTION ............................... 3

    A.  Summary of Evidence ........................................................................ 4

        1.  The Source of Erosion ................................................................ 4

            a.  The 1950s ........................................................................... 4

            b.  The 1960s ........................................................................... 6

            c.  The 1970s ........................................................................... 7

            d.  The 1980s ......................................................................... 10

            e.  The 1990s ......................................................................... 16

            f.  The New Century .............................................................. 18

    B.  Government Has Not Proven Either Element of the
        Discretionary Function Exemption .................................................. 19

        1.  The Government Has the Burden To Establish Both Prongs of the DFE Test ...... 19

        2.  The First Prong Is Not Satisfied Because Defendant Admittedly Did Not Comply
            With NEPA's Mandatory Requirements ..................................... 20

            a.  NEPA's Statutory Framework ......................................... 20

            b.  The Evidence .................................................................... 22

            c.  An EIS or SEIS Was Required by 1980 and No Later Than 1988 ...... 25

            d.  No Disclosure to Congress ............................................... 27

            e.  Causal Connection Established ........................................ 29

        3.  The Second Prong Is Not Satisfied Because The Corps Decisions on Matters of
            Safety and Application of Professional Standards Are Not Protected Policy
            Decisions ................................................................................... 31

            a.  Governing Law .................................................................. 31

            b.  The Chief of Engineers Never Made A Decision ............ 33

            c.  Safety is Not a Discretionary Policy ............................... 34

            d.  Repair, Operations, and Maintenance Are Not Policy Decisions ...... 37

        4.  The Due Care Exception is Inapplicable ................................. 41

III.    THE ARMY CORPS BREACHED ITS DUTIES TO PLAINTIFFS .... 43

    A.  Legal Standards ............................................................................... 43

        1.  Duty/Risk Analysis ................................................................... 43

        2.  Duty ........................................................................................... 44

        3.  Breach of Duty .......................................................................... 47

i

**B.**   **The Record Contains Ample Evidence of Breach of Duty** ......................... 51

**1.**   **The Corps Had Knowledge of The MR-GO's Defects and Risk of Flooding**......... 51

**2.**   **The Corps Failed to Undertake Feasible Mitigation Measures** ............................... 57

**3.**   **The Corps Misrepresented and Concealed the MR-GO's Defects and Risks of Flooding** ............................................................................................................. 60

**IV.**   **THE CORPS' BREACH OF DUTY CAUSED PLAINTIFFS' DAMAGES** ......... 63

**A.**   **Legal Standards** ........................................................................................................ 63

**1.**   **Legal Cause** ................................................................................................................. 63

**2.**   **Cause-in-Fact** .............................................................................................................. 64

**B.**   **Plaintiffs' Causation Theory** .................................................................................. 66

**1.**   **The MR-GO's Adverse Effects on Habitat and Topography** ............................ 67

**a.**   **Destruction of Wetlands** .......................................................................................... 67

**b.**   **Channel Widening** ...................................................................................................... 69

**c.**   **Lowering of Crown Elevations by Lateral Displacement** ................................... 70

**d.**   **Unmitigated Funnel Effect and Reach 2 Surge Barrier** ..................................... 73

**2.**   **Effect of MR-GO's Defects on Critical Hydrodynamic Factors** ........................ 74

**a.**   **Enhanced Surge** ......................................................................................................... 74

**b.**   **Intensified Wave Energy** .......................................................................................... 76

**c.**   **Onset, Rate, and Duration of Flooding** ................................................................. 77

**3.**   **Damage to LPV Structures Caused by MR-GO** ................................................... 78

**V.**   **WHY THE LEVEES FAILED** ................................................................................ 80

**A.**   **What Happened** ........................................................................................................ 81

**1.**   **Plaintiffs' Flood Modeling Results** ......................................................................... 81

**a.**   **New Orleans East** ....................................................................................................... 82

**b.**   **Lower 9th Ward/St. Bernard Polder** ...................................................................... 84

**2.**   **Defendant's Flood Modeling Results** ..................................................................... 86

**a.**   **New Orleans East** ....................................................................................................... 86

**b.**   **Lower 9th Ward/St. Bernard Polder** ...................................................................... 86

**B.**   **Why Did It Happen?**................................................................................................. 88

**1.**   **For The Most Part, The Levees Performed As Designed and Were Not Defective** 89

**2.**   **Why Some Levees Failed**........................................................................................... 89

**C.**   **The MR-GO Was A Substantial Factor In Levee Failures** .................................. 94

Deleted: 83

Deleted: 89

ii

1.   A Tale of Two Polders ................................................................. 95

    a.  The Funnel and Surge ....................................................... 96

    b.  The Funnel and Conveyance ............................................. 99

    a.  Southern Border of the New Orleans East Polder East of
       the Funnel and Reach 2 ..................................................... 102

       i.   Surge ......................................................................... 102
       ii.  Conveyance .............................................................. 103
       iii.  Waves ....................................................................... 104

    b.  The MR-GO Enhanced Waves ......................................... 104

    c.  The MR-GO Destroyed a Natural Surge Buffer ............... 105

    d.  The Widened Channel ...................................................... 107

    e.  Frontal Attack on the Levees ........................................... 107

2.   Lowered Protective Levees ......................................................... 109

3.   Water Depth ................................................................................ 112

D.   Timing Is Everything ...................................................................... 113

E.   Defendant's Theory of Overtopping Is Flawed .............................. 116

VI.   PLAINTIFFS' DAMAGES ................................................................. 119

A.   Plaintiffs' Property and Inconvenience Damages ........................... 121

1.   Anthony and Lucille Franz's Property and Inconvenience Damages .................. 122

2.   Tonya Smith's Property and Inconvenience Damages .................. 123

3.   Kent Lattimore's Property and Inconvenience Damages ............. 123

4.   Norman and Monica Robinson's Property and Inconvenience Damages ............ 125

B.   Plaintiffs' Mental Anguish Damages .............................................. 125

1.   Anthony and Lucille Franz's Mental Anguish Damages .............. 127

2.   Tonya Smith's Mental Anguish Damages ................................... 130

3.   Kent Lattimore's Mental Anguish Damages ............................... 132

4.   Norman and Monica Robinson's Mental Anguish Damages ....... 133

C.   The Amount of Mental Anguish Damages Should be at Least $125,000 ............. 135

D.   The Damages in New Orleans East and the Lower 9th Ward Cannot be Allocated
    ..................................................................................................... 136

E.   Hydrographs .................................................................................. 136

F.   Witnesses on the Ground ............................................................... 140

Deleted: 105

Deleted: 108

Deleted: 117

Deleted: 122

Deleted: 124

Deleted: 126

Deleted: 137

iii

**Cases**

*Adams v. United States,*
　2006 WL 3314571 (D. Ida. 2006)............................................................................... 29, 31

*Alabama Elec. Co-op, Inc. v. United States,*
　769 F.2d 1523 (11th Cir. 1985) ............................................................... 24, 36, 39, 45

*Andrulonis v. United States,*
　952 F.2d 652 (2d Cir. 1991)............................................................................................ 36

*ARA Leisure Servs. v. United States,*
　831 F.2d 193 (9th Cir. 1987) ........................................................................................ 39

*Arizona Maint. Co. v. United States,*
　864 F.2d 1497 (9th Cir. 1989) ...................................................................................... 39

*Ashford v. United States,*
　511 F.3d 501 (5th Cir. 2007) ......................................................................................... 19

*Barrett v. T.L. James & Co.,*
　671 So.2d 1186 (La. App. 1996).......................................................................... 120, 121

*Begnaud v. Camel Contractors, Inc.*
　721 So.2d 550 (La. App. 1998)................................................................................... 121

*Berkovitz v. United States,*
　486 U.S. 531 (1988)........................................................................... 19, 20, 34, 35

*Bonin v. Ferrellgas, Inc.,*
　 877 So.2d 89 (La. 2004) ......................................................................................... 43, 64

*Boudreaux v. State Dept of Transportation and Development,*
　906 So.2d 695 (La. App. 2005).................................................................................. 120

*Branch v. City of Lafayette,*
　663 So.2d 216 (La. App. 1995)..................................................................................... 44

*Brandon v. State Through Dept. of Highways,*
　367 So.2d 137 (La. App. 1979) .................................................................................... 46

*Brantley v. Tremont & Gulf Ry. Co.,*
　75 So.2d 236 (La. 1954) ................................................................................................. 65

*Brazos River Auth. v. GE Ionics, Inc.,*
　469 F.3d 416 (5th Cir. 2006) ...................................................................................... 102

*Buchanan v. McMillan,*
　311 So.2d 469 (La. App. 1975)..................................................................................... 46

*Buchanan v. United States,*
　915 F.2d 969 (5th Cir. 1990) ....................................................................................... 42

*Bunge Corp. v GATX Corp.,*
　557 So.2d 1376 (La. 1990) ........................................................................................... 46

*Caplan v. United States,*
   877 F.2d 1314, (6th Cir. 1989) ................................................................... 38

*Carr v. City of Baton Rouge,*
   314 So.2d 527 (La. 1975) ........................................................................... 44

*Chaisson v. Avondale Indust., Inc.,*
   947 So.2d 171 (La. App. 2006)................................................................... 64

*Coleman v. Victor,*
   326 So.2d 344 (La. 1976) ......................................................................... 122

*Coliseum Square Ass'n, Inc.v. Jackson,*
   465 F.3d 215 (5th Cir. 2006) ..................................................................... 22

*Cook & Nichol v. Plimsoll Club,*
   451 F .2d 505 (5th Cir.1971) ..................................................................... 51

*Cope v. Scott,*
   45 F.3d 445 (D.C. Cir. 1995) ..................................................................... 39

*Crumpton v. Stone,*
   59 F.3d 1400 (D.C. Cir. 1995) ................................................................... 42

*Dalehite v. United States,*
   346 U.S. 15 (1953)..................................................................................... 42

*Department of Transportation v. Pub. Citizen,*
   541 U.S. 752 (2004)................................................................................... 22

*Dickerson v. Lexington Insurance,*
   556 F.3d 290 (5th Cir. 2009) ................................................................... 126

*E. Ritter & Co. v. Department of the Army, Corps of Engineers,*
   874 F.2d 1236 (8th Cir. 1989) ................................................................... 38

*Elston v. Valley Elec. Membership Corp.,*
   381 So.2d 554 (La. App. 1980).............................................. 119, 120, 126, 127

*Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army,*
   492 F.2d 1123 (5th Cir 1974) ................................................................... 22

*Faber v. United States,*
   56 F.3d 1122 (9th Cir. 1995) ..................................................................... 39

*Farr v. Johnson,*
   308 So.2d 884 (La. App. 1975 ................................................................. 119

*Faucheaux v. Terrebonne Consol. Gov't.,*
   615 So.2d 289 (La. 1993) .................................................... 44, 45, 46, 63

*Fire & Ins. Co. of Conn. v. Garick,*
   312 So.2d 103 (La. App. 1975)............................................................ 43, 47

*Gill v. United States,*
   429 F.2d 1072 (5th Cir. 1970) ................................................................... 45

v

*Graci v. United States*,
    435 F.Supp. 189 (E.D. La. 1977)................................................................................. passim

*Hennigan v. Cooper/T. Smith Stevedoring Co., Inc.*,
    837 So.2d 96 (La. App. 2002)........................................................................................ 64

*Hero Lands Co. v. Texaco, Inc.*,
    310 So.2d 93 (La. 1975) ............................................................................................... 121

*Holden v. Connex-Metalna*,
    2000 WL 1801845 (E.D. La. 2000) .............................................................................. 51

*In re Glacier Bay*,
    71 F.3d 1447 (9th Cir. 1995) ......................................................................................... 39

*In re Katrina Canal Breaches Consol. Litig.*,
    2009 WL 799976 (E.D. La. March 2009)................................................................. passim

*In Re Katrina Canal Breaches Consol. Litig.*,
    2007 WL 4573052 (E.D. La. 2007) ........................................................................... passim

*In Re Katrina Canal Breaches Consol. Litig.*,
    577 F.Supp. 2d 802 (E.D. La. 2008) ............................................................................ 60

*In re Katrina Canal Breaches Consolidated Litigation*,
    471 F.Supp.2d 684 (E.D. La. 2007) .......................................................................... passim

*In re Manguno*, 961 F.2d 533 (5th Cir. 1992) .................................................................. 65

*Indian Towing Co. v. United States*,
    350 U.S. 61, 76 (1955)................................................................................. 34, 38, 45, 46

*Johnson v. First Nat'l Bank of Shreveport*,
    792 So.2d 33 (La. App. 2001 ............................................................................. 120, 126

*Johnson v. Insurance Co. of N. America*,
    454 So.2d 1113 (La. 1984) ........................................................................................... 126

*Kennewick Irrig. Dist. v. United States*,
    880 F.2d 1018 (9th Cir. 1989) ................................................................................ 39, 45

*Khalminsky v. Liberty Mutual Fire Insurance Company*
    2009 WL 982641 (ED La. 2009) ................................................................................. 126

*LaCombe v. Carter*,
    975 So.2d 687 (La. App. 2008)..................................................................................... 126

*Learson v. Bussey*,
    691 So.2d 1301 (La. App. 1997)................................................................................... 46

*Lemann v. Essen Lane Daquiris, Inc.*,
    923 So.2d 627 (La. 2006) ....................................................................................... 43, 47

*Lively v. United States*,
    870 F.2d 296, 297 (5th Cir. 1989) ............................................................................... 42

*Lombard v. Sewerage & Water Bd.*,
   284 So.2d 905 (La. 1973) ........................................................................ 44

*Marlys Bear Medicine v. United States*,
   241 F.3d 1208 (9th Cir. 2001) ........................................................... passim

*McCall v. United States Dept. of Energy*,
   914 F.2d 191 (9th Cir. 1990.................................................................... 39

*McGarry v. United States*,
   549 F.2d 1018 (9th Cir. 1976) ............................................................... 35

*Medley v. United States*,
   480 F. Supp. 1005 (D.C. Ala. 1979) ...................................................... 39

*Migis v. Pearle Vision, Inc*.,
   135 F.3d 1041 (5th Cir 1998) ............................................................... 126

*Moresi v. State Dept. of Wildlife and Fisheries*,
   567 So.2d 1081 (La. 1990) ................................................................... 120

*O'Reilly v. United States Army Corps of Engineers*,
   477 F.3d 225 (5th Cir. 2007) ................................................................. 21

*O'Toole v. United States*,
   295 F.3d 1029 (9th Cir. 2002 ................................................................ 32

*Oberson v. USDA*,
    514 F3d 989 (9th Cir 2008) .................................................................. 39

*Ourso v. Grimm*,
   630 So.2d 963 (La. App. 1994) .............................................................. 65

*Perkins v. Entergy Corp.*,
   782 So.2d 606 (La. 2001) ................................................................. 64, 65

*Pitre v. Opelousas Gen. Hosp.*,
   530 So.2d 1151 (La. 1988) .................................................................... 44

*Rizzo v. Nichols*,
   867 So.2d 73 (La. App. 2004).............................................................. 121

*Roberts v. Benoit*,
   605 So.2d 1032 (La. 1991) .................................................................... 63

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989).............................................................................. 21

*Rodriguez v. Copeland*,
   475 So.2d 1071 (La. 1985) .................................................................. 121

*Roman Catholic Church v. Louisiana Gas Service Co.*,
   618 So.2d 874 (La.1993) ..................................................................... 122

*Rozier v. Ford Motor Co.*,
   573 F.2d 1332 (5th Cir. 1978) ............................................................. 102

*Seaboard Coast Line R.R. Co. v. United States,*
    473 F.2d 714 (5th Cir. 1973) ................................................................. 38, 45

*Socorro v. City of New Orleans,*
    579 So.2d 931 (La. 1991) ........................................................................ 45

*Spinks v. Chevron Oil Co.,*
    507 F.2d 216 (5th Cir. 1975) ................................................................. 64

*Standefer v. United States,*
    511 F.2d 101 (5th Cir. 1975) ................................................................. 43

*Summers v. United States,*
    905 F.2d 1212 (9th Cir. 1990) ............................................................... 39

*Thompson v. Simmons,*
    499 So.2d 517 (La. App. 1986) .............................................................. 120

*Todd v. Aetna Casualty & Surety Co.,*
    219 So.2d 538 (La. App. 1969) .............................................................. 120

*Trevino v. General Dynamics Corp.,*
    865 F.2d 1474 (5th Cir. 1989) ............................................................... 33

*United States v. Gaubert,*
    499 U.S. 315 (1991)........................................................................... 19, 32

*United States v. Muniz,*
    374 U.S. 150 (1963)............................................................................... 43

*United States v. Varig Airlines,*
    467 U.S. 797 (1984)............................................................................... 34

*W.C. & A.N. Miller Cos. V. United States,*
    963 F.Supp. 1231 (D. DC 1997) ............................................................ 36

*Weiland v. King,*
    281 So.2d 688 (La. 1973) ...................................................................... 43

*Welch v. United States,*
    409 F.3d 646 (4th Cir. 2005) ................................................................. 42

*Westfall v. Erwin,*
    484 U.S. 292 (1988)............................................................................... 20

*Whisnant v. United States,*
    400 F.3d 1177 (9th Cir. 2005) ................................................. 20, 34, 36, 38

**Statutes**

33 U.S.C. §701................................................................................................ 5

LSA C.C. Art. 2315(A)................................................................................... 3

LSA C.C. Art. 2316 ........................................................................................ 4

LSA C.C. Art. 2323(A).................................................................................. 27

LSA C.C. Art. 667 ................................................................................................................. 4

ix

I.      **INTRODUCTION**

> It was a great sorrow when I stood there and
> looked at the devastation [of my family home
> since 1921] and . . . I got mad, anger came.  Who?
> Why did this happen? How did it happen?  Was
> it because of incompetency?  Was it because of
> even worse, indifference?  Who's responsible for
> this?
>                    --Anthony Franz
>                    (TT at p. 571:21-25)

The answer to this anguished question is now clear.

The U.S. Army Corps of Engineers is responsible for the catastrophic flooding of the

home of Lucille and Anthony Franz and tens of thousands of other residents of the Lower 9th

Ward, St. Bernard Parish, and New Orleans East.  For a half century, the Corps turned a blind

eye to evidence in its own files that the Mississippi River-Gulf Outlet posed an escalating risk of

destroying Greater New Orleans.  The day of reckoning came on August 25, 2005 when the

destructive forces unleashed by the MR-GO—and not Hurricane Katrina—spelled the difference

between catastrophe and a survivable event.

By a preponderance of the evidence, Plaintiffs have proven all of the elements of their

negligence case.  By both incompetency and indifference to life and property, the Corps

breached its duty to avoid enhancing the risk of flooding, to warn the public about the risk, and

to remediate the ship channel's long-known defective conditions. That dereliction of duty was a

substantial factor in the overtopping and breaching of the levees and the resulting destruction of

Plaintiffs' property and their great sorrow and anger.

Most of the trial was an advanced course in engineering and related disciplines taught by

two competing scientific teams with divergent views of what happened on August 29th.  By any

objective standard, however, Plaintiffs' experts—renowned in their fields and independent of the

1

Corps—provided the more cogent substantiation of their opinions that the decimated wetlands,
destroyed fronting vegetation, enlarged channels, funnel geometry, and lowered protective levees
(all caused by the MR-GO) played a critical role in the levees' demise.  Among other things,
they presented a more plausible explanation—grounded in solid science, mostly incontrovertible
facts, and common sense—about how the MR-GO's defective conditions enhanced surge, waves,
and conveyance of water and how those powerful hydrodynamic forces assaulted the levees like
hydraulic cannonballs, crenellating the crowns lowered by the MR-GO's ever encroaching
channel, overtopping the structures, and causing front and back side erosion.  Plaintiffs'
sophisticated  modeling—performed by one of the leading flood modeling teams in the world
and largely unchallenged by the defense experts—established that the deteriorated, unmitigated
MR-GO contributed decisively to the earlier onset, accelerated rate, and extended duration of
flooding than would have otherwise occurred during Katrina.

        The defense experts—either current or former Corps employees and consultants—
presented a defense at war with itself.  Dr. Westerink did not accept his own $22 million worth
of IPET surge computations, and his newly-minted data about peak surge height and timing was
so unreliable that none of this teammates relied upon this output without "adjustments."  Mr.
Steven Fitzgerald testified that levee crest erosion (breaching) initiated at a surge height several

Deleted: FitzGerald

feet lower than Mr. Ebersole estimated.  Mr. Fitzgerald (accurately) placed peak surge along
Reach 2 at 8:30 a.m., while Dr. Westerink first calculated peak surge along Reach 2 at 6:30 a.m.
and Mr. Ebersole moved it to 7:30 a.m.—a facially implausible time since it takes two hours to
fill the Central Wetlands Unit which indisputably overtopped the 40 Arpent Canal Levee at 8:30
a.m.  The Corps' historic wave analysis— that the MR-GO would have no impact on waves—
was "silly" even according to Mr. Ebersole.

Worse yet, the Defendant's experts supported or ignored Plaintiffs' experts' opinions. Dr. Westerink agreed with Professor Vrijling that the "funnel" caused at least three feet of extra surge in the IHNC and several feet along Reach 1/GIWW.  Mr. Ebersole admitted that he found some evidence of front side erosion, thereby corroborating Dr. Bea's theory. None of the defense experts had any opinions on the cause of flooding in New Orleans East or a plausible reconciliation of their peak surge time and theory that the levees breached by overtopping alone.

In the end, the Court must choose one causation theory as most consistent with what happened and why it happened on that fateful day.  Plaintiffs respectfully submit that their theory is scientifically more plausible and offers the most coherent, consistent analysis of the facts. While no one will ever know with absolute certainty, the evidence overwhelmingly preponderates in favor of the conclusion that the MR-GO was a substantial factor in the levee overtopping and failures along Reach 1, Reach 2, and the IHNC and the resulting catastrophic flooding of Greater New Orleans.[1]

## II.     THE DISCRETIONARY FUNCTION EXCEPTION

The record, after trial, demonstrates that the discretionary function exception ("DFE") to the Federal Tort Claims Act is inapplicable in this case for two salient reasons.[2] First, the Corps violated a mandatory legal duty imposed by the National Environmental Policy Act ("NEPA") to prepare an adequate environmental impact statement (EIS) with regard to its ongoing operation and maintenance ("O&M") activities as they adversely affected the natural and human environment.  Second, the Corps' failure to undertake essential remedial measures were not

---

[1] For the Court's convenience, Plaintiffs have prepared a summary of their answers to the questions posed by the Court in its post trial orders.  *See* Appendix "A."

[2] The Government offered no evidence at trial that refuted Plaintiffs' evidence offered in connection with the motions for summary judgment on DFE.  For the Court's convenience, Plaintiffs attach as Appendix "S" their Proposed Findings of Fact and Conclusions of Law Nos. 256-96 regarding NEPA.

immunized policy decisions that Congress intended to protect from tort liability but are instead matters of safety and professional standards that are not grounded in policy.

**A.  Summary of Evidence**

From the MR-GO's inception and right up to Katrina, the Corps was on notice of the erosion of the MR-GO's channel banks and the destruction of the fresh forested wetlands—the last and best line of defense for hurricane protection.  For decades the Corps was aware of the risk to life and property that the land loss and bank erosion posed to increase the risk of catastrophic flooding.  Yet time and again and in flagrant violation of NEPA, the Corps failed to present an assessment of the detrimental effects of destructive dredging and O&M activities through mandatory EISs and/or Supplemental EISs after the issuance of its sole (and defective) EIS in 1976.

**1.   The Source of Erosion**

Channel erosion along the MR-GO was a consequence of O&M activities carried out on the channel without compensation for the known frailties of the composition of the MR-GO's foundation.  As Plaintiff's expert, Dr. FitzGerald, noted, the MR-GO's foundation consists of "distributaries"—layers of fine grain material ("fat clays") which contain a high percentage of water. TT at p. 349:3-25.  Fat clays have very little tolerance for weight.  Any load placed on them will escape and flow into the area of least resistance—in this case, the entire reach of the excavated MR-GO channel.  TT at p. 343:12-344:17.

**a.   The 1950s**

As early as 1958, the Corps acknowledged that the MR-GO's banks would erode and that foreshore protection would be necessary.  PX 699, MRGO DM 1-B at ¶ 19, p. 5.  Pre-construction, the Corps' geologists Kolb and Van Lopik studied core samples of the channel and

4

reported that "as much as 40 percent of the [MR-GO's] … sides consist of … Poorly

consolidated, high content interdistrubutary clays [that] will tend to flow laterally into the

excavation…" PX 59 at p. 10, ¶25; TT at pp. 350:23-25, 351:1-4; 359:6-24, 360:1-20 (Duncan

FitzGerald).  Moreover, as Drs. FitzGerald and Bob Bea confirmed, the process of erosion along

the banks of the MR-GO caused by the O&M of the MR-GO, exacerbated this 'lateral

displacement.' TT at p. 329:14-25; 350:23-25; 351:1-4; 359:6 - 360:20 (FitzGerald); TT at

pp.1146:15-1149:6 (Bea).

        Salinization further contributed to adverse effects of inherent structural flaws in the

vicinity of the MR-GO. The severing of the natural salt barrier at La Loutre Ridge[3] permitted

introduction of salt water, resulting in the destruction of the once plentiful storm buffering fresh

water wetland. TT at p. 699:5-25 (Day), TT at p. 331:19-25 (FitzGerald); TT at p. 1825:15-25

(Kemp).  Plaintiffs' experts, Drs. Day and Kemp explained that the loss of these wetlands

changed the characteristics of the habitat in the environment from one that provided acres of

natural wind and wave breaking capacity, to acres of unobstructed open and near open water. TT

at pp. 687:18-25, 688:1-9, 695:17-25, 707:6-25, 708:1-24 (Day); TT at p. 1825:9-15 (Kemp).

Further, the destruction of the wetlands caused by salinization degenerated root masses which, in

turn, decomposed, broke up and subsequently entered the channel. TT at p. 332:2-14

(FitzGerald).  This disintegration of the land along the banks contributed to the accelerated

widening of the channel and the additional need for maintenance dredging. TT at pp. 332:15-24,

338:1-3 (FitzGerald).

---

[3] The Department of the Interior and the Corps were both monitoring on a weekly basis, the
salinity changes and habitat changes in the vicinity.  The DOI first reported its results in August
1960 (PX574), other documented monitoring of rapid increase of saline intrusion is mapped at:
(PX0821)(PX2010).

**b. <u>The 1960s</u>**

By 1967, the Corps still had not implemented necessary foreshore bank protection measures.  Nonetheless, the Corps fully appreciated that the bank erosion along the MR-GO posed a threat to both the existing levee structures in New Orleans and the levee structures under construction adjacent to the channel.  Regarding the MR-GO, the Corps wrote "Construction of the navigation project exposed these levees to the foreshore between them and the channel to direct attack with resultant damage from waves generated by seagoing vessels…"  PX 202 at pdf pp. 81-83, November 27, 1967, Letter to Chairman of the Committee on appropriations (emphasis added).

In 1967, the General Design Memo 2 Supplement 4 for the MR-GO was modified to incorporate a full design for foreshore protection.  PX 202, MR-GO GDM No 2, Supp. No. 4; App. A pp.13, 15, ¶3.   In the fourth indorsement of GDM No. 2, Supp 4, dated November 1968, the Corps again acknowledged the frailties of the MR-GO's foundation and their associated engineering challenges.

In addition, in the fifth indorsement of MR-GO GDM No. 2, Supp. No. 4, dated December 1968, the Corps acknowledged that channel scour at the levee could even undermine the stability of the foreshore protection material. PX 202, MRGO GDM No. 2, Supp. No. 4, 5th Ind. dated 12/20/1968 at pdf p. 23.

Despite this knowledge and more significantly, without implementing any bank protection measures, the Corps, by the end of 1968, had entered into eight maintenance dredge contracts that excavated approximately 10 million cubic yards of spoil from between Bayous Dupre and Bienvenue and re-deposited this material along the west bank of upper Reach 2 of the MR-GO. PX 206.1, MR-GO Maintenance Dredging Charts.

6

As noted by Drs. FitzGerald and Bea, this practice of dredging and placement of dredge spoil on the soft bank of the west bank of Reach 2 channel exacerbated the rate of erosion and associated lateral displacement of the interdistributary layer because "not only are you placing a load on top of the interdistributary mud, but you're also removing confining pressure by removing the toe of that slope when you excavate the channel down to the required "40 foot depth." TT at p. 349:13-19 (FitzGerald); TT at p. 1119:1-25 (Bea); TT at p. 37:2-24 (Gagliano). The Corps' maintenance practice of constant dredging of the channel and cannibalization of the marsh also created over-steeping of the banks which further caused the banks of the channel to slump and retreat. TT at pp. 332:15-24, 333:1-3 (FitzGerald); TT at p. 1119:6-22 (Bea).  As explained by Dr. FitzGerald, prior to Katrina, the Corps' geological survey of core samples and other GIS data in evidence,  combined with Corps' dredging records, established that the Corps removed 17 million cubic yards of material from the channel and placed it on the sides of the levees along the MR-GO (PX 206, MR-GO Maintenance Dredging Charts), thus creating a "vicious" cycle of maintenance, deterioration, and lateral displacement.  TT at p. 359:17-19 (FitzGerald); TT at p. 1119:1120-23; 1574:1-1578:25 (Bea).

**c.  The 1970s**

It is undisputed that by 1970, Congress enacted NEPA which mandated that the Corps take specific action to identify and report the impacts of ongoing projects on the human environment and on other federal projects in their vicinity (1500.8 (a)(1) (1973)) as well as possible measures by which these impacts could be mitigated.

The Corps' only purported attempt at compliance with NEPA was its 1976 Final Environmental Impact Statement (FEIS) of the O&M of the MR-GO.  However, in his 1970, 1972 and 1973 reports to the Corps, Dr. Gagliano advised the Corps of the hazards of the MR-

7

GO and made a series of specific mitigation recommendations. PX 462, PX 583, PX 391, PX 1633. Dr. Gagliano repeatedly recommended surge barriers and a control structures at Bayou La Loutre to prevent surge and saltwater intrusion and to avert continued wetland loss and striation of the central wetlands unit. PX 462; TT at p. 92:21-25 (Gagliano); *see also* TT at p. 1826:5-10 (Kemp), TT at pp. 701:10-25, 702:1-25, 703:1-16, 710:17-25, 711:1-22 (Day); TT at pp. 1196:7-25,1197:1-25 (Bea).

Dr. Gagliano also testified to having recommended that the Corps vegetate the area between reach 2 and the toe of the levees (TT at p. 92:21-25; 93:10-13, *see also,* TT at p. 1826:20-25 (Kemp)); and that the Corps employ beneficial use of dredge spoil on the east bank of reach 2 to rebuild the land bridge between Lake Borgne and reach 2, as well as to restore and re-populate the fresh water wetlands in the Central Wetlands Unit. TT at p. 93:1-20 (Gagliano); TT at p. 702:17-25 (Day); TT at p. 1827:2-6 (Kemp).

Dr. Gagliano reported that, to halt erosion and conversion to open water, the Corps would need to armor *both* banks of Reach 2, as well as the Lake Borgne shoreline. TT at p. 93:4-5; TT at pp. 1762:9-23, 1763:11-13, 1826:11-19 (Kemp). This need for protection along the east bank of Reach 2 was also acknowledged by the Corps' Chief of Hydraulics, Cecil Soileau, in May 1988. PX 193, Memorandum from Cecil Soileau commenting on MR-GO, St. Bernard Parish (Bank Erosion) dated 05/24/1988; TT at pp. 701:10, 703:16 (Kemp).

Finally, Dr. Gagliano also advised that a surge barrier control structure across Reach 1 would be necessary to prevent the increased water velocity created by the funnel effect at the confluence of the GIWW and Reach 2. TT at p. 93:1-3. This funnel effect was a known hydrologic phenomenon that was brought to the Corps' attention by Bretschneider & Collins in 1966. TT at pp. 1752:8-12, 1753:3-9, 1753:18-21, 1779:2-7 (Kemp). As noted by Dr. Kemp, the

8

unmitigated erosion of the banks of Reach 2 and Reach 1 significantly worsened the impact of the funnel effect at the Citrus Back Levees.  TT at p. 1779:12-18.

The Court's Decision and Order of March 20, 2009 (Doc. 18212, "Katrina III")[4] indicated that the Corps' only attempt at NEPA compliance failed in its obligation to address the O&M-related impacts on bank erosion as a feature of channel widening or the considerable impact that related land loss had as a long term adverse impact on the human environment. *Id.* at p. 36.  This mandated obligation is acknowledged in the Corps own Engineering Manual on Planning, Preparation and Coordination of Environmental Statements  which noted that the "O&M activity will change the quality of the environment … or serve some purpose to the disadvantage of the environment … Typical examples [include] Disposal of dredged material into wetlands.." PX 346 at pdf 17-18.  Moreover, the Corps was pursuant to this Engineering Regulation, mandated to "Revise" or "Supplement" existing statements where previous statements failed to discuss alternatives or impacts of proposed actions or where major changes in circumstances because the certain environmental effects of the project were not originally discussed or where features of the project changed.  PX 346 at pdf 9-10.

Aware of the unanticipated high rate of bank erosion --on average, 15 feet per year, the Lower Mississippi Valley Division in November 1979 requested advanced construction funding for "emergency" work to control what was characterized as "excessive" erosion of the banks of the MR-GO. PX 2122, Series of Communication regarding foreshore protection, 5th Ind. at pdf p. 5.  The next month, the Corps also internally reported that erosion observed two years earlier

---

[4] Because of the preponderance of written opinions in this lawsuit, the following designations are used in this brief:  *In re Katrina Canal Breaches Consolidated Litigation*, 471 F.Supp.2d 684 (E.D. La. 2007) ("*Katrina I*"); *In re Katrina Canal Breaches Consolidated Litigation*, 2008 WL 2186400 (E.D. La. May 27, 2008) ("*Katrina II*"); *In re Katrina Canal Breaches Consolidated Litigation*, 2009 WL 799976  (E.D. La. March 20, 2009) ("*Katrina III*").

9

at the Bayou Dupre Control Structure had reached "critical levels."  PX 2122, 6th Ind. at pdf p. 6.

These observations were never reported to Congress in an EIS or SEIS.

**d.   The 1980s**

In February 1980, the St. Bernard Parish Planning Commission (on behalf of the Coastal Zone Advisory Committee) sought confirmation of the Corps' construction of bank protection and a corresponding schedule for installation of foreshore rip-rap along the south shore of the MR-GO. PX 794, Letter to Col. Sands from Jack Stephens, St. Bernard Parish Planning Commission dated 2/4/1980.

In March of 1980, the Corps was forced to admit that its delay in implementing the foreshore protection allowed the "extremely poor foundation conditions" of the MR-GO to render its 1967 foreshore protection design inadequate.  Accordingly, a new design for foreshore protection was required. PX 794, Letter to Jack Stephens, St. Bernard Planning Commission from Col. Sands dated 3/25/1980.

By 1980, the Director of Civil Works admitted that the Division Engineer's request for "repair" funds at Bayou Dupre Control Structure was not maintenance work, but was rather the result of unfinished original the MR-GO construction work. PX 2122 at pdf p. 9.  Compounding the obvious need to implement the MR-GO's delayed foreshore protection design, the erosion at the Bayou Dupre control structure by 1980 reached what was termed "catastrophic" levels and was confirmed as threatening the adjacent levees. (PX 2122 at pp. 18, 64, 74; PX 9 at pdf p. 10.)

On August 29, 1980, the Corps published a draft Letter Report that contained a telling admission that the delay in implementing the 1967 designed foreshore protection necessitated "emergency" bank repair work at the Bayou Dupre Control Structure "to arrest a serious problem…that would impact the hurricane protection levee, *which is the purpose of the*

10

*foreshore protection*." PX 2122 at pdf pp. 16-18, final letter report dated January 29, 1981 at ¶9 (emphasis added); *see also id.* at pdf p. 74.  The Corps also reported that an EIS for proposed foreshore protection of the MR-GO (per GDM No. 2, Supp. 4) would be prepared before construction in March 1981 (*Id.* at ¶8.)  This EIS was never prepared.

While designs for Reach 2 bank protection were underway, foreshore protection previously installed along the Reach 1/GIWW channel in 1978 was failing and by May of 1981, bank repair was needed along the Citrus Back levee.  PX 2122 at pdf pp. 33-35.

In October 1981, the Corps retained outside engineering contractors, Haliburton Associates ("HA"), to review and comment on the structural changes in the foreshore protection design made necessary by the delay in its implementation. PX 2122, at pdf pp. 38-39, Letter to Commander and Director of WES from Chief Chatry dated 11/20/1981.

In December 1981, HA submitted a letter recommendation to the Corps highlighting specific engineering concerns regarding Reach 2 foreshore protection design. PX 2122 at pdf pp. 40-46, Letter to Dr. Fowler, WES dated 12/18/1981. Central among these concerns was the instability of the MR-GO's foundation.  HA also noted that their engineering analysis indicated that failure of the foundation of the MR-GO would appear as general heaving and up-thrust in the bottom of cut (channel) sections with associated *lateral slumping* and *subsidence* of the site material adjacent to the cut (channel).  HA warned the Corps, however, that banks of this composition may be incorrectly classified as stable.  Proper geotechnical engineering analysis of expected performance must consider bearing failure of foundation from unbalanced loads produced in construction. HA reported that NOD's estimates of consolidation of the foundation were based on incorrect values for soft cohesive soils and that the actual field settlements observed were a combination of both vertical consolidation settlement and *lateral spreading*. PX

2122, at pdf pp. 40-46. HA recommended installation of fabrics for slope and foreshore stability in conjunction with foreshore protection. *Id* . at pp. 40-46. The Corps did not implement HA's design.

In 1982, the Corps was contacted by several local interests to address their repeated concerns that bank erosion on the east bank of Reach 2 was becoming excessive. Local interests noted that the Corps created the bank erosion problem by O&M of the MR-GO and was improperly monitoring the banks. PX 2122 at pdf pp. 48-64.  In response, on November 9, 1982, the Chief of Engineering Division acknowledged that "it is obvious that this erosion is due to damage caused by operation of this project." He further commented that the MR-GO would not provide requested foreshore protection for the east bank "since the hurricane protection works will not be affected by erosion in this area."  PX 2122 at pdf p. 66.   This response was immediately revised on November 12, 1982 to remove the admission of liability for the erosion and engineering analysis.  PX 2122 at pdf p. 69.  This flatly contradicted information in the Corps' own files.[5]

Only two months later an in a handwritten note dated January 19, 1983, contemporaneous with a request for a revised cost estimate for the "critical item of work" of foreshore protection, the Corps admitted that "[e]rosion along this reach caused by wave wash from ships using the MRGO has occurred at alarming rates… This erosion, if left unchecked … will begin to encroach into the stability of the levees… We already experienced an emergency situation at the Bayou Dupre Control Structure where the erosion caused serious bank failures…"  PX 2122 at pdf pp. 74-76, Memo dated January 19, 1983 and handwritten notes attached.

**Deleted:** , without

---

[5] The substance of this memo was also later conveyed in a letter to the Orleans Levee District on December 5, 1982.  PX 2122 at pdf pp. 72-73.

In February 1983, the Corps requested funding for the 1985 fiscal year budget to construct the full foreshore protection plan. The Corps incorporated its earlier note that the "erosion along the MRGO occurred at faster rates than originally anticipated and will encroach on the stability berms of the levees and in some areas had already eroded back to within 200 feet from the levee toe." PX 2122 at pdf pp. 81-82. The Corps admitted that the initial design for the foreshore protection was predicated on an incorrect wave climate which was less severe than experienced in practice. The Corps also admitted that poor foundational conditions caused subsidence of the dike. Accordingly, the Corps was required to initiate new designs for the GDM to accommodate these original deficiencies. PX 2122 at pdf p. 110. Nonetheless, no EIS of these significant erosion or changed circumstances was prepared.

In June 1983, the Engineering Division also wrote to the lower Mississippi Valley Division to acknowledge that the result of surveys conducted between 1974 and 1982 revealed extensive scour in the vicinity of the Bayou Bienvenue Control Structure. The Corps reported that soil stability analysis revealed that due to scour in the area, stability was approaching the Corps' projected minimum factor of safety of 1.3 and would be less than the minimum within a year. The continuation of such an adverse trajectory would cause ongoing damage that would affect the stability of both the Bienvenue Control Structure and the levees. PX 2122 at pdf pp. 86-88.

In 1983, the Corps admitted that the banks of the channel had eroded to within 200 feet of the toe of the levees. PX 2122 at pp. 81-82. However, the Corps still did not implement badly needed widespread bank protection from the O&M of the MR-GO. Rather, in the interim, (1972-1983) the Corps dredged another 3.6 million cubic yards of spoil from the upper portion of

13

Reach 2 and deposited that spoil onto the west bank of the channel. PX 206, MR-GO

Maintenance Dredging Charts; PX 206.1; TT at p.1574:1-1578:25 (Bea).

> **Deleted:** ,

Having *already* performed foreshore protection test sections along the Reach 2 south

bank, the Corps drafted an environmental assessment (EA)[6] that acknowledged that the test

foreshore protection sections were necessary "*in the interest of public safety*." PX 1976, EA #38

(emphasis added).

This statement should be contrasted with the Corps' observation that an EIS was

required. Yet this assessment—and the totality (and implications) of the erosion problem that

was critical "and reaching emergency levels" was in fact never be presented to Congress in an

EIS. PX 2122 at pdf p. 91; TT at p. 3249:11-17 (Miller).

> **Deleted:** Greg

In 1984, the Corps prepared an internal study about the MR-GO's adverse impacts on the

environment.  The Corps noted that "Construction of the MR-GO has accelerated the natural

changes in the St. Bernard Parish wetlands near Lake Borgne."  PX 1639 at p. 7.  The report

explicitly warned of the potential dire implications of this habitat destruction on the human

population due to unchecked erosion. *Id.*  Again, no EIS or SEIS was prepared.

> **Deleted:** . D
>
> **Deleted:** , the Reach 2¶

In 1985 the Corps prepared an EA considering the need to complete an EIS for an

additional area of test foreshore protection. PX 198.  This EA did not address the impacts of the

MR-GO; rather, it merely discussed the impact of small test sections of bank protection.  A

comprehensive EIS was not prepared.

The EAs addressing test sections of bank erosion fail entirely to reference the impact that

the underlying bank erosion problem had on the stability of the levee system or the repeated

---

[6] As the court is aware, an EA is *not* reported to Congress.

concerns expressed by local citizens that bank erosion at the MR-GO was greater than anticipated in the Corps' original design.  PX 2122 at pdf pp. 92-99;[7] *See also, id.* at pp. 111-112.

Rather than ever attempting to comply with NEPA's mandate or the Corps' own procedures for supplementing an EIS, or address the impacts of the MR-GO on the safety of the human population in its vicinity and the impacts that the erosion of the banks had on the neighboring levee system, the Corps initiated a series of internal bank erosion studies of the MR-GO.  The first Bank Erosion Reconnaissance Report was initiated in 1985 and published three years later in 1988. PX 9, 1988 Bank Reconnaissance Report.

The 1988 Bank Erosion Reconnaissance Report, not surprisingly, confirmed that severe bank erosion had been observed along the MR-GO navigation channel; that approximately 41 miles of the 66 mile long channel consisted of land "cut through unstable marsh and shallow water areas, and that the top width of the channel had increased from 650 feet to an average of 1,500 feet in 1987 and that approximately 4,200 acres of highly productive, buffering marsh had been lost to the channel.  *Id.* at pdf p. 46.

In these internal reports,[8] the Corps acknowledged the role the MR-GO played in the impact of Hurricane Juan in 1985.  *Id.* at 7. The Corps also admitted that although erosion was significant "no erosion protection measures exist along the MRGO north (east) bank." *Id.* at 24. (Lake Borgne side).  Further, the Corps admitted that the loss of buffering marsh along the unprotected north (east) bank "will allow the open waters of areas of Lake Borgne and Breton

---

[7] Interestingly, as of 1983, the Corps also documented a $6 million surplus in its Construction General Funds budget for the 1985 fiscal year, but indicated a reduction in funds available for the MRGO foreshore protection project. PX 2122 at pdf pp. 107-108.

[8] Neither the 1988 nor later bank reconnaissance studies were ever sent to Congress. TT at p. 3372:8-10 (Podany) (1994 Recon Report did not go to Congress.) TT at p. 3404:9-12 (Podany) (1988 Recon Report nor 1994 Recon Report were ever sent to Congress—"They were not sent to Congress nor should they be.")

15

Deleted: Thomas

Deleted: Thomas

Deleted: --

Deleted: congress

Sound and the MRGO to merge" and that "the majority of the marsh on the north (east) bank of the MRGO" will convert "to open water… during the 1990 to 2040 period." *Id*. Most significantly, the Corps internally acknowledged that closure of the MR-GO would both mitigate the bank erosion problem and *also reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up this waterway*. PX 9 at pdf p. 10. Once again, the Corps failed to prepare a NEPA-mandated EIS or SEIS.

### e.  The 1990s

In 1991 the Corps initiated limited bank stabilization of approximately three miles of the Reach 2 east bank. No EIS was prepared, and despite the continued and growing problem presented by the east bank, no full scale bank protection was proposed. JX 150, EA #152, MR-GO St. Bernard Parish, La., Bank Stabilization, Miles 50.5 to 55.0.

Aware of its now long standing obligation to prepare an EIS or SEIS about the ecodisaster—and catastrophic flooding risk—wrought by the MR-GO, in a telling commentary, on October 6, 1993, the Corps wrote that any necessary shore protection remedial activity would require *a full EIS* alerting Congress to the environmental concerns inherent in the MR-GO. PX 189. Once again a decision to prepare a supplemental EIS to the terribly outdated and incomplete EIS prepared in 1976 was acknowledged. This same internal communication warned however that a full EIS would invite public comment that would both challenge any limited scale protection proposal and would prompt Congressional consideration of the channel's closure:

> The locals don't want a small scale bank protection project—they want something more than a few miles that are being considered critical reaches. When environmental organizations (LPBF) see how much this project is going to cost, they will probably ask why we didn't evaluate the closure of the MR-GO.

> PX 189, Memorandum for File, MR-GO St. Bernard Parish, La. (Bank Erosion) Revised

Reconnaissance Study and Feasibility Study, at p. 1.

16

Not surprisingly, the Corps did not propose the full scale bank stabilization program and in fact no EIS was prepared.

In yet another internal reconnaissance report in 1994, the Corps repeated its observations regarding the eroding banks along the MR-GO. PX 306. The Corps noted that: "Most of the Mississippi River Gulf Outlet is experiencing severe erosion along its unleveed banks… the marshes along the north bank of the Mississippi River Gulf Outlet… are disappearing at an alarming rate…. The Channel's north (east) bank along Lake Borgne between channel miles 38 and 43 is dangerously close to being breached… once the bank is breached development to the southwest would be exposed to direct hurricane attacks from Lake Borgne." *Id.* at pp. 18-19. In this reconnaissance report however, the Corps bluntly linked wetlands destruction and increased risk of hurricane flooding.   PX 306 at p. 53.

Nonetheless, full-scale foreshore protection along the north bank of Reach 2 was never constructed.  Incredibly, Congress was kept in the dark about clear and present dangers that its engineering experts were openly discussing and cavalierly disregarding.

In 1996, another small scale bank stabilization effort was performed and an EA for the limited work was prepared on the test section. JX 154, EA #247, MR-GO St. Bernard Parish, La., Bank Stabilization Miles 55.0 to 56.1.  Another study of bank erosion was published in 1996 and among other facts, the Corps reported that changes in the increased size of the vessels traveling along the MR-GO had manifested unanticipated impacts on its surrounding environment, resulting in more severe bank erosion.  PX 1165, The MR-GO North Bank Foreshore Protection Evaluation Report at p. 29.  The 1996 North Bank Foreshore Protection Evaluation Report also repeated the observations contained in the 1988 and 1994 reports that the

**Deleted:** evaluation

**Deleted:** report

17

buffering marsh between the MR-GO and Lake Borgne was eroding at a rate of approximately

15 feet per year and recommended approval of north bank foreshore protection. *Id.* at pp. 26, 29.

### f.   The New Century

As the decades rolled by, dredging volumes greater than the Panama Canal excavation

continued unabated, and the risk of Biblical flooding mounted, while the Corps continued to

suppress the truth from Congress and the public.  The agency never supplemented its EIS on the

O&M of the MR-GO to report these multiple adverse impacts to Congress.  Rather between 1983

and 2004, the Corps dredged another 9 million cubic yards of spoil from the fragile leveed

section of upper Reach 2 of the channel; 4.3 million cubic  yards of which had been removed by

the time the Corps prepared the 1988 Bank Erosion Reconnaissance Report.  PX 206.1, MR-GO

Maintenance Dredging Chart, TT at pp. 1574:1-1578:25.

Four months before Hurricane Katrina, a Corps environmental compliance official,

Richard Boe, after reviewing the agency's MR-GO environmental disclosure history, concluded

that the agency had been deficient in its reporting and short-sighted in its analysis of the

significant adverse and cumulative impacts of the MR-GO. PX 208, Draft Mississippi River-Gulf

Outlet PM-R Proposal for Gaining National Environmental Policy Act Compliance for the

Operation and Maintenance Program (April 11, 2005) ("Army Corps 2005 Memorandum"); PX

195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at pp. 177:14-186:14.  Boe acknowledged that the

Corps had segmented its environmental review, issuing periodic Findings of No Significant

Impact ("FONSI"), and not preparing a comprehensive evaluation of the significant and

cumulative environmental impacts on the environment from O&M dredging and bank erosion

that had occurred since its 1976 EIS".  PX 208, Army Corps 2005 Memorandum at pp. 1-2.

18

As Dr. Bea testified, based on a reasonable degree of forensic engineering certainty, from completion of the MR-GO forward, any minimally competent engineer would have recognized (and in this case did recognize and document) that the MR-GO presented a danger to the City of New Orleans in the event of a Hurricane passing east of the city; yet no effective, timely corrective action was taken causing tragic and preventable catastrophic results. TT at pp. 1582:12-1583:1.

**B.** **Government Has Not Proven Either Element of the Discretionary Function Exemption**

    **1.** **The Government Has the Burden To Establish Both Prongs of the DFE Test**

Federal courts apply a two-part test to determine whether the DFE applies. *See generally Ashford v. United States*, 511 F.3d 501, 505 (5th Cir. 2007); *see also, Katrina I,* 471 F.Supp. 2d at 697 (citing *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  In a recent articulation, the Fifth Circuit has succinctly laid out the methodology:

> First, for the exception to apply, the challenged act must involve an element of judgment.  In other words, *the Government needs to establish* there was 'room for choice' in making the allegedly negligent decision.  If a 'federal statute, regulation or policy' specifically prescribes a course of action for the federal employee to follow, the employee has no choice but to adhere to the directive.  If the Government can establish that the challenged act involved an element of judgment, step two of the test is met and the discretionary-function exception will apply only if that judgment the kind that the exception is designed to shield.

*Ashford*, 511 F.3d at 505 (citing *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991)) (emphasis added).

The burden is on the Government to satisfy both prongs as to every challenged act.  See *Ashford*, 511 F.3d at 505; *Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1213 (9th Cir. 2001); *Katrina I,* 471 F.Supp.2d at 699 ("The Court cannot accept on the record before it that all actions done by the Corps were based on policy determinations".)

The Government fails both prongs of the test.

First, the Corps had no discretion because it was not legally permitted to make any decisions about the MR-GO without first complying with NEPA's mandatory requirements. As discussed below, the Corps violated these legal obligations for three decades, thereby depriving it of the DFE sanctuary because it had no rightful option but to adhere and thus no discretionary function to protect. *Westfall v. Erwin*, 484 U.S. 292, 296-287 (1988); *Berkovitz*, 486 U.S. at 536.

Second, even if the Corps could satisfy the first prong, the Corps still bears the burden to establish that its decisions regarding the MR-GO's repair, maintenance, and operation were the result of a deliberative process grounded in policy balancing that would qualify as the type of decision that the DFE was designed to protect. Indeed, the Corps at trial failed to make a showing that it engaged in any definitive policy determination about any aspect of its conduct regarding the repair, operation and maintenance of MR-GO or the advisability of incorporating remedial measures into the MR-GO. *See* Plaintiffs'' Proposed Findings of Fact and Conclusions of Law Nos.333-343 in Appendix "B." What the evidence does establish, however, is that the Corps' chronic inaction in the face of known danger to people and property cannot be justified on policy grounds because "removing an obvious . . . hazard is a matter of safety, not policy [and] cannot be protected under the discretionary function exception." *Whisnant v. United States,* 400 F.3d 1177, 1183-84 (9th Cir. 2005).

## 2. The First Prong Is Not Satisfied Because Defendant Admittedly Did Not Comply With NEPA's Mandatory Requirements

### a. NEPA's Statutory Framework

This Court denied summary judgment because triable issues of fact remained with respect to the Corps' NEPA violations. The Court gave the Corps an opportunity to furnish evidence of compliance at trial. However, the Corps failed to demonstrate any evidence of compliance with

20

NEPA or offer any new evidence not before the Court at the time of summary judgment.

As stated in this Court's decision in *Katrina III*, the focus of the Prong One analysis is whether:

> …the actions or non-actions of the Corps in the context of the MRGO were of a nature such that the first prong of the discretionary function exemption inquiry precludes its application –that is whether NEPA and its regulations cited above [40 C.F.R. §§ 1500-1518] prescribes a course of action for the Corps such that it had no choice but to produce a EIS or a SEIS with respect to the cumulative impacts of the annual dredging and other individual actions that it took. . . .

Doc. No. 18212 at p. 32; see also, *Katrina I*, 471 F. Supp. 2d at 697, 699 and 705.

Relying on *O'Reilly v. United States Army Corps of Engineers*, 477 F.3d 225 (5th Cir. 2007), the Court found that the intent of NEPA's framework, terminology, and objectives was:

> to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, (2004) (quoting 42 U.S.C. § 4321).  Instead of mandating particular environmental results, NEPA "imposes procedural requirements on federal agencies, requiring agencies to analyze the environmental impact of their proposal and actions." *Coliseum Square Ass'n, Inc., v. Jackson*, 465 F.3d 215, 224 (5th Cir 2006) quoting, *Pub Citizen* 541 U.S. at 756-57.

*Katrina III* at p. 22 quoting *O'Reilly,* 477 F.3d at 228.

This Court further acknowledged that the vehicle by which the mandate is carried out, is a "detailed report, known as an Environmental Impact Statement or "EIS" designed to:

> ensure[] that the agency, in reaching its decision will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision.

*Katrina III* at p. 23 citing, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

21

Moreover, "the purpose of the EIS is to "provide Congress (and others receiving such recommendation) with a sound basis for evaluating the environmental aspects of the particular project or program." *Katrina III* at pp. 22-23, quoting *Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army*, 492 F.2d 1123, 1140 (5th Cir 1974) (further *cit.om*).  Thus, NEPA requires that Congress be advised of a specific project's impacts in the context of evaluating actions related to that project.

To eliminate questions of both when to prepare an EIS and what constitutes a satisfactory EIS, "Federal Agencies receive guidance in their preparation of an EIS from the Council of Environmental Quality ("CEQ") "[e]stablished by NEPA with the authority to issue regulations interpreting that statute, the CEQ has promulgated regulations determining what actions are subject to that statutory requirement." *Coliseum Square Ass'n, Inc.v. Jackson,* 465 F.3d 215, 224 (5th Cir. 2006) *citing* 40 CFR § 1500.3; *see also, Department of Transportation v. Pub. Citizen,* 541 U.S. 752, 757 (2004).  The CFR clearly sets out the subjects to be included in the EIS.  In preparing an EIS, the Federal agency must evaluate its conduct in relation to the impacts it has on the health and safety of the human environment and on other Federal projects in the vicinity.  40 C.F.R. 1500.8 (1973).

### b.  The Evidence

The written record summarized above, in and of itself, conclusively demonstrates that the Corps knowingly failed to comply with NEPA for three decades by not preparing an EIS or SEIS about its O&M activities that were destroying the environment and posing a threat of catastrophic flooding. Time and time again, the Corps undertook major dredging and foreshore protection measures based on FONSIs when its knowledge of the implications demanded a more extensive environmental assessment.  No amount of *post hoc* rationalization can justify the Corps' conspicuous NEPA noncompliance.

22

The testimony at trial confirms that despite a series of bank erosion studies, feasibility studies, and generic coastal restoration studies[9] the Corps, from the inception of the MR-GO in 1958 to Katrina, *never* undertook to evaluate the waterway's impact on the health and safety of the human environment.  PX 181, Miller 30(b)(6) Depo at pp. 204, 205 (10/10/2008).  Yet, the testimony in evidence shows that the Corps appreciated that "taken as a whole …you can draw the conclusion that yes, the MR-GO has changed the environment."  *Id*. at pp. 204:5-206:12.  Further, despite extensive notice, the Corps failed to consider the cumulative impacts of their operation and maintenance activities on the environment.  PX 208, Draft Mississippi River-Gulf Outlet PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program (April 11, 2005); *Katrina I,* 471 F.Supp. 2d at 699.

Throughout the 1980s, the Corps was on notice that the O&M activities were causing significant impacts on the environment and other federal projects such that a supplement to its 1976 EIS was required.  In 1980, the Corps was made aware of defects in its foreshore protection design caused by the MR-GO's severe unanticipated foundational flaws (PX 794, Letter to Col. Sands from Jack Stephens, St. Bernard Parish Planning Commission dated 2/4/1980), and considerable erosion that was manifesting catastrophic impacts on both the Bayou Control Structures in the channel and the adjacent levees.  PX 9, 1988 Bank Erosion Reconnaissance Report at pdf p. 10; PX 2122, Series of Communications on Foreshore Protection at pdf pp. 16-18, 74.

In 1985, 1988, 1991, and 1993 the Corps engaged in extensive studies of bank erosion and the need for stabilization on both sides of the channel, and internally acknowledged the

---

[9] PX 203, The Mississippi River-Gulf Outlet: A Study of Bank Stabilization by CEI (Dec. 1984); PX 9, MRGO Bank Erosion Reconnaissance Report (Feb. 1988); PX 306, MRGO Bank Erosion Reconnaissance Report (Jan. 1994).

obligation to alert Congress of the impacts through a full EIS.  PX 203, The MRGO: A Study of

Bank Stabilization (12/1984); PX 1634, Notice of Study Findings, Louisiana Coastal Area, Shore

and Barrier Island Erosion, Initial Evaluation Study (7/1984); PX 9, 1988 Bank Erosion

Reconnaissance Report (initiated in 1985); PX 2082, USACE Internal Briefing Memo dated

5/30/1991 (series of justifications for inaction by Corps regarding bank stabilization); *See also*,

TT at pp. 1767:22-1772:5 (Dr. Kemp); PX 306, 1994 Bank Erosion Reconnaissance Report.

Despite the knowledge that its foreshore protection measures were intended to protect the

levees from the eroding Reach 2 banks—measures which were designed to minimize the ship

channel's negative impact the health and safety of the human environment (PX 181, Miller

30(b)(6) Depo p. 155:20-24 (10/10/2008)—the Corps never advised Congress of either the

environmental impacts of bank erosion or the increasing dangers from storm hazard resulting

from O&M activities as mandated under NEPA. The Corps enjoys no immunity for its actions

that violate mandatory environmental laws and regulations.[10]  Nor does the DFE immunize the

Corps as to torts arising from its post design decisions relating to the channel. *See, Alabama

Electric Cooperative, Inc. v. United States*, 769 F. 2d 1525 (11th Cir. 1985) (Finding that the

Corps is not shielded from liability for any and all engineering errors and citing case law finding

that negligence at the operational level is outside the confines of the discretionary function

exemption); *see also*, *Katrina III at* 60-62 (discussing and analyzing *Alabama Electric*).

The evidence also demonstrates that for decades the Corps itself knew, recognized and

even internally reported that its maintenance activities had caused or would cause significant

---

[10] Where the Government exceeds its authority, the discretionary function exception provides no
immunity.  *See Gaubert, supra*, 499 U.S. at 322 (noting that a "federal statute, regulation or
policy" can work to nullify the discretionary-function exception); *Ashford, supra*, 511 F.3d at
505 (reversing the grant of summary judgment in favor of the United States in an inmate case
because a specific policy constrained the decision-making ability of the prison officials) (fn. om).

> Deleted: officals

impact on the wetlands adjacent to Lake Borgne and the MR-GO. *See Katrina III* at pp. 33, 40;
PX 2122, Series of Communications regarding foreshore protection at pdf p. 66 (it is obvious
that this erosion is due to damage caused by operation of this project); PX 1634, Notice of Study
Findings, Louisiana Coastal Area, Shore and Barrier Island Erosion, Initial Evaluation Study at
p. 6 (7/1984).

### c.   An EIS or SEIS Was Required by 1980 and No Later Than 1988

On this record, the Court should find that the Corps' failure to supplement its EIS was a
violation of its mandate, rendering the DFE inapplicable to its decisions associated with dredging
and failure to protect the banks and wetlands in the vicinity of the channel. *See* PX 203, The
MRGO: A Study of Bank Stabilization (12/1984); PX 9, 1988 Bank Erosion Reconnaissance
Report. Certainly, an EIS or SEIS should have been prepared no later than 1988 when the Corps
acknowledged "the possibility of catastrophic damage to urban areas by a hurricane surge
coming up this waterway."  PX 9 at pdf p. 10 (emphasis added).  The Court itself has suggested
1988 as the outer boundary for a full EIS or SEIS:

> This decision [that the Corps litany of findings of the MR-GO's
> significant impact raise significant questions about NEPA compliance is
> underscored by the 1988 statement that as a result of the wetland loss
> development to the southwest would be exposed to direct hurricane attacks
> from Lake Borgne.  *Such a statement demonstrates a positive finding by
> the Corps that removes its 'discretion' and mandates the filing of a SEIS.*

*Katrina III* at p. 45 (emphasis added); *see also id.* at pp. 33, 40.

Nonetheless, the evidence dictates that full environmental documentation in the form of
an EIS should have been furnished by 1980 when the Corps was openly discussing that Reach 2
bank erosion was reaching "dangerous" levels and was threatening the adjacent levees.  PX
2122, Series of Communications regarding foreshore protection at pp. 16-18, 74-76; TT at p.
94:11-15 (Dr. Gagliano) (remedial measures should have been undertaken no later than 1981).

25

Deleted: .

In addition, by 1980, the Corps had been warned for at least eight years by Dr. Gagliano that the MR-GO presented bank erosion problems and wetlands destruction problems and created a "hurricane storm surge threat in the funnel" at the confluence of Reach and the GIWW.  PX 143, Environmental Impact Study: Ship Channel Project (Oct. 1972) at pp 13, 54.

The record makes clear that mitigation measures urged in 1972 and 1973 by Dr. Gagliano, had they been implemented *at any time well into 1990s*, would have restored the wetlands, halted bank erosion, reinforced the Lake Borgne shoreline and offset the impacts of Katrina in 2005.  TT at pp. 701:12-703:15 (Day).  For example, cypress and tupelo trees grow rapidly, and a swath of full grown trees could have been in place within 10 years of planting. TT at p. 702:21-25 (Day). Similarly, surge and saltwater barriers—at the mouth of the "funnel" and Bayou La Loutre could have been expeditiously installed—just as they are being constructed post-Katrina—but at a fraction of the cost today. All of these remedial measures were known to the Corps and feasible. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law Nos. 223-8 and 297-332 in Appendix "C."  Significantly, these safety precautions, if in place at the time of Katrina, would have prevented the catastrophic flooding of Plaintiffs' property. *See* PX 91, Kemp Expert Report at pp. 192, 194; TT at pp. 1231:19-1235:5, 1236:25-1237:7, 1582:25-1583:1 (Dr. Bea).

The Corps' own witness, Gregory Miller, testified that the 1976 Environmental Impact Statement did not evaluate whether the erosion of the banks of the MR-GO negatively impacted the health and safety of the human environment.  This is despite the Corps' knowledge as early as 1958 that bank erosion could pose a problem.  TT at pp. 97:17-98:6 (Gagliano); PX 0699 (1958 Design Memorandum No. 1-B).  Dr. Gagliano's testimony confirmed that the Corps likewise failed to implement any of the recommended mitigation measures proposed by him or

26

**Deleted:** Dr.

**Deleted:** Dr. John

referenced in the 1976 EIS reporting prior to Hurricane Katrina.  TT at p.101:13-21 (Gagliano).

Despite both the extensive comments made by the outside agencies regarding the need to consider mitigation options, and the numerous documents in evidence in which the Corps' internally observed the need to address foreshore protection, the record demonstrates a steadfast refusal to comply with NEPA.  PX 2122, Series of Communications regarding Foreshore Protection.  The Corps' decisions to both delay and not to construct measures that would address the environmental impacts of the channel, cumulatively triggered the Corps' obligation to report to Congress.  PX 189, Memorandum for File, MR-GO St. Bernard Parish, La. (Bank Erosion) Revised Reconnaissance Study and Feasibility Study (1993).  The Corps was mindful of its mandates under NEPA and repeatedly documented assurances that preparation of EISs for Corps conduct would be completed. Nonetheless, no supplementation of its outdated, inadequate 1976 EIS was ever prepared.

### d.  No Disclosure to Congress

At trial, the Corps confirmed that it never presented Congress with the CEQ- mandated EIS or SEIS analyzing the effects of the MRGO on the health and safety of the human environment.  TT at p. 3249:13-17 (Miller); *see also* PX 181, Miller 30(b)(6) Depo. at pp. 281:6-282:20.  Aware that it could not meet its burden, the Government at trial attempted to demonstrate—through a variety of alternative communications and activities, unconnected to its decisions to continue to dredge the unprotected channel and delay or retard foreshore protection that it indirectly disclosed the MR-GO's hazards to Congress.  TT at pp. 3209:24-3210:17, 3214:9-19, 3219:4-3220:4 (Miller).  However, none of the documents or projects referenced by

| Deleted: Greg |

| Deleted: Greg |

the Corps[11] were designed to focus—or did focus—Congress's attention on the Corps' actions and inactions directly relating to the impacts of the Corps' dredging decisions and failures to protect the bank of the channel on bank erosion and the LPV's safety.  These and other documents in the record, however, illustrate the Corps' appreciation of the role the MR-GO played in contributing to the degradation and destruction of the wetland environment and the Corps' understanding of the MRGO's impact on flood hazards  and survival of the levee system. As this Court has noted, "[t]he Corps cannot ignore the dictates of NEPA and then claim the protection of the DFE based on its own apparent self-deception."  *Katrina III* at p. 33.

Ultimately, the record demonstrates that the Corps assiduously avoided direct communication with Congress and deprived it of the opportunity at any time to evaluate the impact of the actions and inactions of the Corps in relation to the MR-GO and mandate and fund timely mitigation measures.  TT at pp. 3242:12:16, 3243:23-3244:3, 3245:4-16, 3246:14-24, 3249:13-17 (Greg Miller) (never informed Congress).  As this Court found after reviewing the history of the Corps' temporizing for decades:

> . . . Plaintiffs have created substantial questions of fact with respect to the actions and inactions that followed the creation of the channel, particularly in light of the documents that demonstrate the knowledge of the Corps concerning the dangers that the MRGO was creating.  In fact, the most glaring issue the Court sees is in the context of the state negligence claim itself.  *There are substantial questions of fact as to whether the Corps' failure to warn Congress of the allegedly life threatening harm which the MRGO created is the key.*

*Katrina III* at p. 49 (emphasis added); *see also id.* at p. 63 ("[W]ith respect to NEPA, Plaintiffs demonstrated that there are material questions of fact that the Corps itself had found that the

---

[11] *See, e.g.,* Miller exhibits at trial; PX 203, The Mississippi River-Gulf Outlet: A Study of Bank Stabilization by CEI (Dec. 1984); PX 9, MRGO Bank Erosion Reconnaissance Report (Feb. 1988); PX 306, MRGO Bank Erosion Reconnaissance Report (Jan. 1994).

environmental damage caused by maintenance and operation of the MRGO was significant, such
that it had no choice but to file the mandated reports.")

### e.   Causal Connection Established

The nexus between NEPA noncompliance and the harm caused to Plaintiffs is that a
legally adequate EIS or SEIS would have averted this environmental disaster and loss of life and
property.  First, as a matter of law, the Corps cannot argue that an adequate EIS would not have
made any difference—any uncertainty in this regard inures to the Corps' detriment.  *Adams v.
United States*, 2006 WL 3314571, *2 (D. Ida. 2006).  As the District Court correctly held when
the Bureau of Land Management ("BLM") made a similar argument after it was found to have
violated NEPA with regard to use of a pesticide:

> The BLM is essentially saying that the NEPA analysis would have made
> no difference . . . .But there is no way to know.  While a bad NEPA report
> does not automatically block a project, it could lead to that result, or to
> significant modifications.  It is impossible to say what the result would be.
> And that means that the BLM loses because it has the burden of proof. . . .
> The burden is on the BLM to show that the NEPA analysis would make no
> difference—*a showing it cannot make because the analysis might have
> made a difference.*

*Id.*

Second, the Corps' systematic refusal to present Congress with the complete, truthful
picture of the MR-GO's significant adverse impacts on the human and natural environment
caused the very harm that Congress sought to avoid with NEPA.  Congress was unable to fully
evaluate the MR-GO's impacts and to reach an informed decision about the project as a whole
and the necessity for remedial measures and alternatives to prevent or mitigate these significant
adverse impacts, including the very real and admitted risk of catastrophic flooding caused by the
MR-GO.  At each stage that the Corps deliberately neglected to furnish an EIS or SEIS,
Congress could have instructed the Corps to discontinue the channel's operation or could have

29

instructed the Corps to build surge and saltwater intrusion barriers, to revegetate the denuded wetlands, or to undertake comprehensive bank armoring to protect the health and safety of the human environment. Plaintiffs have proven that feasible mitigation measures (and certainly closure) would have prevented or largely mitigated this catastrophe. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law Nos. 444-49 in Appendix "D."

Third, a fully informed Congress—armed with a legally adequate EIS or SEIS that candidly disclosed the risks to the human and natural environment posed by an out-of-control MR-GO—would undoubtedly have demanded that the Corps devise and recommend remedial measures. Clearly, history demonstrates that Congress would have appropriated funding to protect the people and property of Greater New Orleans. We need look no further than the fact that an informed Congress, after Katrina, swiftly moved to close the MR-GO and authorize remedial measures such as the IHNC surge reduction barrier and the saltwater barrier at Bayou La Loutre. *See, e.g.,* PX 131, Army Corps, Greater New Orleans Hurricane and Storm Damage Risk Reduction System (HSDRRS), 100-Year Level of Protection (June 13, 2008). Indeed, the Corps' motivation for obfuscating to the truth about the MR-GO is transparent, as noted in its internal memos of October 1993 that a full EIS would have alerted Congress about the need to close the MR-GO. *See* PX 189, Memorandum for File, MR-GO, St. Bernard Parish, La. (Bank Erosion) Revised Reconnaissance Study and Feasibility Study at pp. 1505-1506. Instead of allowing Congress to perform its constitutional function, the Corps' failure to satisfy its obligations under NEPA permitted the agency to proceed unchallenged in its O&M to the unmitigated detriment of the LPV and the human population in the channel's vicinity.

The DFE does not immunize the Corps from immunity for torts arising from its post-design decisions relating to the channel. The Corps had no room for choice in following the

30

**Deleted:** not

mandates of NEPA.  *See Katrina III*  at p. 48 ("Obviously, if at trial, the Court were to find that the NEPA violations alleged concerned one or all of these activities, then the discretionary function would not apply as to those defalcations.")  It was legally obligated to follow prescribed courses of conduct in the MR-GO's operation, maintenance, and repair.[12]  As this Court has already ruled, "[a] review of the evidence presented leads the Court to believe that the Corps was obdurate and intentionally violated its NEPA mandate." *Katrina III* at p. 45.  The evidence furnished at trial shed no brighter light on the Corps' conduct and warrants no varying conclusion.

### 3.   The Second Prong Is Not Satisfied Because The Corps Decisions on Matters of Safety and Application of Professional Standards Are Not Protected Policy Decisions

#### a.  Governing Law

The Government has also failed to satisfy the second DFE prong.[13]  Regardless of who has the burden of proof, it has not been demonstrated that (1) every decision made by the Corps over a half century—about design, construction, operation, and maintenance—was a policy-based decision protected by the DFE,  (2)  the Corps ever made a conscious decision about whether or not to undertake remedial measures to address the MR-GO's safety problems and/or (3) the agency's actions (or more accurately, its inactions) with respect to remediating the MR-

---

[12] The duty to inform Congress is all the more compelling in light of the MR-GO's initial design criteria that incorporated foreshore protection to prevent the expected known erosion problem. For 30 years, the Corps knew that it needed to ameliorate runaway bank erosion with foreshore protection.  Its chronic delay in implementing this remedial measure was a material factor in the expansion of the channel up to 3,700 feet by the time of Katrina.

[13] Once the Court finds that the Corps violated mandatory NEPA requirements, that is the end of the analysis.  *Adams v. United States,* 2006 WL 3314571, *2 (D. Ida. 2006) (denying Government's motion to dismiss on DFE grounds: "The BLM's failure to comply with NEPA meant that the agency had no discretion—it could not proceed until it complied with NEPA.") Nevertheless, Plaintiffs request that the Court also rule on the second prong so that the Fifth Circuit has the benefit of this Court's fact-finding and legal analysis.

GO's hazards were the result of a policy balancing deliberative process of the kind that Congress sought to immunize in Section 2680 (a).  Since this Court has become (perhaps reluctantly) a DFE scholar,[14] Plaintiffs will abbreviate their discussion of the governing standards.

The type of governmental act that will qualify as involving "an element of judgment" must be "susceptible to a policy analysis grounded in social, economic, or political concerns." *Gaubert*, 499 U.S. at 325. Government decisions fall along a spectrum. *See Katrina III*, 2009 WL 799976 *33.  At the other extreme are "those agency decisions totally divorced from the sphere of policy analysis" such driving a government vehicle (*O'Toole v. United States*, 295 F.3d 1029, 1035 (9th Cir. 2002) and snow and ice removal in a parking lot (*Bolt v. United States*, 509 F.3d 1028 (9th Cir. 2007)). *See Katrina III,* 2009 WL 799976 *33-34.

Ultimately, the challenged conduct must be "the kind of conduct for which Congress had waived sovereign immunity." *Katrina I*, 471 F.Supp.2d at 700. Not every decision by a government official, even those involving some element of judgment, is insulated by the DFE from a negligence suit.  In its denial of the Government's motion to dismiss, this Court, after carefully reviewing the most significant DFE decisions, reached a conclusion which the facts, after trial, now confirm:

> In the context of this litigation, the Government's position appears to be . . . overly broad—that is that *all decisions taken* implicated the Government's policy with respect to the construction and maintenance of the MR-GO. . . . *See Cope v. Scott*, 45 F.3d 445, 452 (D.C. Cir. 1995) (engineering judgment no more matter of policy than objective scientific

---

[14] *See, e.g., In re Katrina Canal Breaches Consolidated Litigation*, 471 F.Supp.2d 684 (E.D. La. 2007) ("*Katrina I*"); *In re Katrina Canal Breaches Consolidated Litigation*, 533 F.Supp.2d 615 (E.D. La. 2008) ("*Katrina II*"); *In re Katrina Canal Breaches Consolidated Litigation*, 2009 WL 799976  (E.D. La. March 20, 2009) ("*Katrina III*").

> principles found to be exempt exercise of policy judgment . . .in
> *Berkovitz*)."[15]

*Id.* at 701 (emphasis added).

As discussed below, several categories of decisions have been held not to be immunized, including determinations concerning implementation of a public works project, repair, operation and maintenance of the project, and correcting known safety hazards.  As a matter of law, these decisions do not implicate policy formulation. *Katrina III*, 2009 WL 799976 *28-30.  Thus, as we shall see, "[c]ourts have generally drawn a line between decisions at a planning level, or decisions at an operational level, or decisions that are merely incident to carrying out a government policy." *Katrina II,* 2008 WL 2186400 at *5 (citing *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1484 (5th Cir. 1989)).

### b.  The Chief of Engineers Never Made A Decision

The record is conspicuously silent about what "decisions" relating to the MR-GO the Corps contends are protected by the DFE.

> Considering the allegations concerning the failure to armor the banks of the MRGO, the failure to properly maintain the MRGO, and the ongoing nature of this project, [dismissal is inappropriate].  The MRGO is not a simple one-time, isolated project.  Its history spans more than 50 years and innumerable Congressional reports and authorization bills. The Court cannot accept on the record before it that all actions done by the Corps were based on policy determinations.

*Katrina I,* 471 F.Supp.2d at 699.

It is the Government's burden to isolate a particular exercise of discretion—and the decision-maker's analysis of competing considerations—a burden it has failed to satisfy. "The

---

[15] While this quote offers the correct analysis and is an accurate quote of the Cope decision, therein, the Cope decision contains a typo which renders ultimately mischaracterizes the holding *Berkovitz* .  The Berkovitz court held objective scientific principles to be NON-exempt exercises of policy judgment.

33

discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible *exercise* of policy judgment." *Berkovitz,* 486 U.S. at 537 (emphasis added). The doctrine is intended to avoid judicial second-guessing of "legislative and administrative *decisions* grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines,* 467 U.S. 797, 814 (1984).

The record here demonstrates that at no time did the Chief of Engineer reach a decision— *i.e.,* exercise his discretion or engage in a policy analysis—about whether or how to address the MR-GO's known (and worsening) defects and the risk of catastrophic flooding. *See* PX 91, Kemp Expert Report (July 2008) at pp. 185-95; PX 92, Kemp Appendix B. Rather, by its own admission, the Corps merely documented the problems that it was encountering with the operation and maintenance of the channel and the timely need to address those problems. The Corps however, never underwent a process of concluding that its inaction with regard to bank erosion encroaching on the toe of the levees, the benefits of wetlands and acknowledged need for bank protection and surge barriers at the funnel and saltwater barriers at La Loutre Ridge would frustrate or otherwise benefit the objectives of the channel or other governmental policies.[16] Accordingly, this essential prerequisite for the DFE has not been established.

<div style="border:1px solid red; display:inline-block; padding:2px;">**Deleted:** C</div>

### c.   <u>Safety is Not a Discretionary Policy</u>

The DFE does not apply when public safety and property are jeopardized by an agency's recurring negligent conduct. *See, e.g., Marlys Bear Medicine v. United States,* 241 F.3d 1208, 1214 (9th Cir. 2001); *Cope v. Scott,* 45 F.3d 445, 451-2 (D.C. Cir. 1995); *Whisnant v. United States,* 400 F.3d 1177, 1183-4 (9th Cir. 2005); *Katrina III,* 2009 WL 799976 *28-34. In *Indian Towing,* 350 U.S. at 69, the Supreme Court declared that a federal agency like the Corps loses

---

[16] The evidence at trial established that the Chief of Engineers never made a policy-based decision or communicated such a decision to Congress.

the benefit of any immunity when it undertakes an activity but fails to exercise due care "to make certain that [the project] was in good working order," "to discover [defects] and to repair [it] or give warning that it was not functioning."  As later explained in *Berkovitz*, "the failure to maintain the lighthouse in good condition . . . did not involve any permissible exercise of policy judgment."  486 U.S. at 537, 538 n. 3.

In its DFE decision, this Court definitively held that public safety is not within the DFE. In denying the Government's motion for summary judgment, this Court specifically noted that the execution of public safety measures is not within the DFE:

> However, Plaintiffs have created substantial questions of fact with respect to the actions and inactions that followed the creation of the [MR-GO] channel, particularly in light of the documents that demonstrate the knowledge of the Corps concerning *the dangers the MRGO was creating*. In fact, the most glaring issue the Court sees is in the context of the state negligence claim itself.  There are substantial questions of fact as to whether the Corp's failure to warn Congress of the allegedly *life threatening harm* which the MRGO had created is the key.  Regardless of policy issues, where "the Government has undertaken responsibility for the *safety of a project, the execution of that responsibility is not subject to the discretionary function exception.* …

*Katrina III,* at 49 *quoting Marlys Bear Medicine,* 241 F3d. at 1181 (emphasis added) *quoting McGarry v. United States,* 549 F.2d 1018 (9th Cir. 1976).

This Court also noted that a triable issue of fact remained as to whether the Corps should have notified Congress of the threat to "life and property":

> Considering the exhibits … there is a serious question of fact as to whether once the Corps exercised its discretion to create a navigation channel, it was obligated to use due care to make sure that the channel did *not destroy the environment surrounding it by creating a hazard*.  Indeed, by 1988, the Corps itself recognized that it had created one when it found that with continuing erosion, land southwest of the channel would be exposed to direct hurricane attacks from Lake Borgne.  At some point during the time continuum from the MRGO's construction, there is a general issue of material facts as to whether the Corps should have warned Congress about the *potential catastrophic loss of life and property*.

35

*Id.* at 30 (emphasis added).

This Court underscored the point that public safety is a paramount concern, and not a discretionary consideration, by citing numerous cases from around the country that confirmed this.  *See id.* At *27-37 *citing Marlys Bear Medicine,* 241 F.3d at 1217 ("… our long held doctrine that safety measures, once undertaken, cannot be shortchanged in the name of policy); *W.C. & A.N. Miller Cos. V. United States,* 963 F.Supp. 1231, 1241-42 (D. DC 1997) ("Here, the Army's decision not to warn that it had buried munitions on private land is not the type of decision that involves social, economic or policy considerations."); *Andrulonis v. United States,* 952 F.2d 652 (2d Cir. 1991) (CDC failed to warn of obvious dangerous conditions); *Whisnant,* 400 F.3d at 1181-82 ("As we have summarized: 'The decision to adopt safety precautions may be based on policy considerations, but the implementation of those precautions is not…"); *Alabama Electric Cooperative v. United States*, 769 F.2d 1523 (11th Cir. 1985) (concerning the necessity of bank protection for river dikes to protect property).

The evidence at trial demonstrated beyond dispute that the Corps willfully ignored the manifest danger to life and property posed by the deteriorating MR-GO. Safety was subordinated to keeping the channel open (literally) at any cost.  Professional standards of care for repair, operating, and maintaining a flood-prone waterway were cast aside.  Nothing about the Corps' half century stewardship of this federal project entailed anything worthy of being dignified as a policy decision—much less a protected exercise of judgment.  If anything, the Corps demonstrated an utter lack of judgment—particularly in failing "to inform Congress of the dangers which it apparently perceived in the context of the environmental damage to the wetlands caused by the operation and maintenance of the MRGO . . . ."  *Katrina III,* at 62.

### d.  Repair, Operations, and Maintenance Are Not Policy Decisions

Referring to Prong Two, this Court has ruled that "the central issue is whether the actions or inactions taken by the Corps with respect to design, construction, maintenance, operation and repair of the MRGO constitutes policy decisions that are protected by the discretionary function exception." *Id. at* 48.  In its DFE ruling, the Court held that actions with regard to "the *initial* design and construction of the MRGO . . . are shielded by the discretionary function exception." *Id.* (emphasis added). The Court quickly added, however, that immunity would not cover "the actions and inactions that followed the creation of the channel, particularly in light of the documents that demonstrate the knowledge of the Corps concerning the dangers that the MRGO was creating." *Id.*  "[T]he salient issues to consider as to the second prong of the discretionary function exemption is whether the Corps was (1) acting in contravention of its own regulations or standards, or (2) was exercising policy choice." *Id.*

At trial the Corps furnished no evidence to suggest (or infer) that any of its decisions with regard to: (1) maintenance dredging (2) placing of dredge spoil on the levied west bank of the MRGO or (3) delaying and failing to fully implement foreshore protection on both banks of the channel and/or (4) failing to install surge and salinity control barriers were the result of any policy analysis.  Accordingly, these decisions—relating to safety, repair, operations, and maintenance—are not immunized under the DFE.

At trial, the Corps failed to demonstrate that it had made any attempt to evaluate its dredging actions or its spoil placement actions in light of the vast cumulative effects its continued conduct had on the destruction of the wetlands in the vicinity of the MRGO and the risk of catastrophic flooding.   Nor did the Corps offer evidence that it evaluated any of the mitigation measures for restoration of the wetlands, bank erosion, or surge and salinity control

37

structures—all of which had been repeatedly urged by federal, state, and local officials and their experts throughout the MR-GO's history.

The DFE does not immunize the Corps' for its decisions regarding maintaining the banks of a navigation canal. In *E. Ritter & Co. v. Department of the Army, Corps of Engineers*, 874 F.2d 1236 (8th Cir. 1989), the District Court determined that the Corp's decision not to stabilize or maintain the banks of a navigation channel "was ministerial, not analytical, in nature" and thus concluded that the Corps' decisions were "clearly" operational. (*Id.* at 4-6) for which immunity did not apply. The Eighth Circuit agreed that the Government was not held liable for design of the channel, "but rather, for its decision to ignore "the corollary task of supporting and maintaining the banks of the ditch." 874 F.2d at 1241. Moreover, as *Ritter* makes clear, the Corps' initial design decisions may be immunized, the Corps' responsibilities did not end:

> Even though the Corps of Engineers knew that this construction of the [channel] would cause erosion of adjoining land, the Corps failed to maintain the banks of the [channel] in proper fashion. …These acts and omissions do not involve policy concerns of the type which Congress intended to protect. Rather, they involve the most basic form of operational, ministerial conduct. The Corps' decision not to maintain the banks of the [channel] was not of a discretionary nature and therefore does not come within the protection afforded by the discretionary function exception.

*Id.* at 1241.

Similarly, the implementation of scientific and or professional decisions related to safety, exercised in association with *maintenance and repair* of a condition created by the Government, is rarely considered susceptible to social, economic or political policy. *See*, e.g. *Whisnant,* 400 F.3d at 1181 (duty to maintain safe and healthy premises not discretionary). *Indian Towing*, 350 U.S. at 69 (lighthouse repair); *Seaboard Coastline RR,* 413 F.2d 714, 716 (5th Cir. 1973) (drainage ditch.); *Caplan v. United States*, 877 F.2d 1314, (6th Cir. 1989) (falling trees during

38

deforestation); *Oberson v. USDA* ; 514 F3d 989 (9th Cir 2008) (duty to warn of a hazardous

location); *Alabama Electric,* 769 F. 2d at 1537 (In the absence of an express policy decision, the

Corps' design decisions are subject to judicial review under the state law tort standards that

would normally govern an action for engineering malpractice).

       Likewise, "[a]ctions based on technical or scientific standards are not the kind of

judgments meant to be protected from liability by the discretionary function exception because

those actions do not involve a weighing of policy considerations." *Bear Medicine*, 241 F.3d at

1214; *see also Kennewick*, 880 F.2d at 1030.   Thus, in addition to maintenance dredging

illustrated by the 8th circuit, in *Ritter*, the exception does not protect a contracting officer's

| | Deleted: 9th |
|---|---|

decisions to permit the existence of unsuitable material during construction of an allegedly

negligently-constructed canal." *Kennewick*, 880 F.2d at 1031; *see also In re Glacier Bay*, 71 F.3d

1447, 1453 (9th Cir. 1995) (negligent preparation of water charts); *Arizona Maint. Co. v. United

States*, 864 F.2d 1497, 1504 (9th Cir. 1989) at 1504 (negligent quantity of dynamite used in

executing seismic refraction surveys); *Medley v. United States*, 480 F. Supp. 1005 (D.C. Ala.

1979), (negligent installation of a defective lever in the design of a dump truck.) *See, e.g.*,

*Oberson v. United States Dept. of Agric.*, 441 F.3d 703, 710-11 (9th Cir. 2006) (negligent failure

to warn of known hazards on a snowmobile trail); *ARA Leisure Servs. v. United States*, 831 F.2d

193 (9th Cir. 1987) (negligent maintenance of a park road); *Faber v. United States*, 56 F.3d

1122, 1125 (9th Cir. 1995) (dangers of diving from high rocks); *McCall v. United States Dept. of

Energy*, 914 F.2d 191, 196 (9th Cir. 1990) (safety conditions in a workplace during construction

of electric transmission line); *Summers v. United States*, 905 F.2d 1212, 1216 (9th Cir. 1990);

(failure to warn barefoot visitors of hot coals); *Cope v. Scott,* 45 F.3d 445 (D.C. Cir. 1995)

Deleted:

(failure to maintain adequate skid resistance of roads), all are not the kind of policy decision that the Congress intended to shield from liability as discretionary functions.

With regard to the MR-GO, the record demonstrates that the Corps knew since 1958 that the channel would cause erosion of the adjoining land.  PX 59, Geological Investigation of MR-GO, Misc. Paper 3-259; PX 699, MR-GO DM No. 1-B; PX 1884, A Survey of the MR-GO Project with Emphasis on Shoaling Problems and Factors Influencing Sediment Distribution, Misc. Paper.  Yet despite its documented observation of the extensively eroded banks and the Corps internal appreciation that the erosion had reached "critical" levels threatening not just the land in the vicinity but the adjacent levee protection system, the Corps decided not to maintain the banks of the channel for decades.  PX 2122, Series of Communications regarding Foreshore Protection; PX 9, 1988 Bank Erosion Reconnaissance Report; PX 306, 1994 Bank Erosion Reconnaissance Report.  This prolonged neglect rendered ineffective previous designs for bank stabilization and rendered negligible the effects of any of the Corps' *de minimis*, belated, foreshore protection efforts. Further, the Corps' continued channel dredging in the face of this known problem caused the continued erosion and widening of the channel which in turn resulted in detrimental loss of elevation and foundational support for the adjacent levee system.

As illustrated by Dr. Bea, the Corps permitted the banks of the channel to erode to within the critical 500 feet of the levee toe, a point that endangered the elevation of the levees.  TT at p. 1159:21-25.  Records further confirm that the dredging between Bayous Bienvenue and Dupre were to depths precisely within the area of soft clays that would cause lateral displacement of that layer. TT at p. 1018:15-23 (Vrijling).  The Corps engineering studies indicated that for every foot of length that you add, the latter surface gains 200 to 400 pounds of resistance so that "as you make the berm longer you move out this passive zone so you force any failure to occur over

a longer distance." TT at p. 4003:7-21 (Wolff).  Thus, the Corps' maintenance and repair

decisions to allow the banks of the MR-GO to erode to within 200 feet of the toe of the levees

was a negligent professional engineering judgment which effected the safety of the population in

the vicinity of the levee system not the result of policy analysis for which the DFE was designed

to protect.

Similarly, the Corps practice of dredging the MR-GO and placing the dredge spoil on the

leveed banks of the channel despite the knowledge that soft clays underlying the channel banks

would permit the sliding surface of the interdistributary clays to fail into the channel, TT at p.

4003:1-26 (Wolff), were negligent maintenance and engineering decisions that adversely affect

the levee, contributed to the wetland's loss and bank erosion and not the result of policies that

Congress intended to shield from liability.

In sum, all of the Corps actions and omissions that Plaintiffs challenge were matters of

objective scientific, safety, and professional judgment—not of social, economic, or political

policy. Thus, the Corps decisions to dredge and allow the continued erosion of the channel banks

and wetlands destruction—combined with its decisions to delay implementation of authorized

foreshore protection along the banks of the channel, to forego regeneration of the wetlands,

construction of surge and salinity prevention barriers—were violations professional engineering

standards for public safety. The Corps, having created the hazards, cannot claim immunity for its

negligent failure to protect the public.  This is simply malfeasance and not the kind of policy-

driven Government conduct that the DFE was intended to protect.

**4.   The Due Care Exception is Inapplicable**

The Government also asserts that the "due care" exception (28 U.S.C. § 2680(a))

immunizes it from suit with respect to claims based on the execution of a statute or regulation.

However, this immunity requires "for its application that the actors have exercised due care." *Lively v. United States*, 870 F.2d 296 (5th Cir. 1989); *Buchanan v. United States*, 915 F.2d 969, 970-71 (5th Cir. 1990). This provision "bars tests by tort action of the legality of statutes and regulations." *Dalehite v. United States*, 346 U.S. 15, 33 (1953). Thus, the test for the application of the "due care" exception is to determine (1) whether the statute or regulation in question specifically proscribes a course of action and (2) if mandated, whether due care was exercised. *Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005); *Crumpton v. Stone*, 59 F.3d 1400, 1403 (D.C. Cir. 1995).

      This Court has already ruled that if Plaintiffs prove their negligence case, the due care exception is inapplicable:

> Whether the Corps exercised due care lies at the heart of this case, and Plaintiffs have presented voluminous evidence attempting to demonstrate in a myriad of ways due care was not exercised. The Government's proposed broad use of the due care exception is not warranted in light of the Plaintiffs' allegations. It appears to the Court that once Plaintiffs allege and offer substantial evidence that due care was not used by the Corps certainly in the context of maintenance and operation, the cloak of this immunity statute is unavailable, and the Corps must rely on the discretionary function exception.

*Katrina III*, 2009 WL 799976 *6.

      As demonstrated below, Plaintiffs have proven that the Corps violated due care "in a myriad of ways."

      The cloak of immunity afforded Defendant by the "due care exception" is also not applicable here because (a) Congress did not prescribe or mandate the challenged conduct here, including the manner of operating and maintaining the MR-GO after its construction; (b) as concluded above, Congress instead mandated the Corps, using its sound professional engineering expertise and professional judgment, to build, operate, and maintain the MR-GO in a safe,

42

competent manner; (c) Plaintiffs are not explicitly or implicitly challenging the validity of the MR-GO authorizing statute (Pub. Law. No. 84-455); and (d) the MR-GO authorizing statute did not exempt the Corps from all other existing laws as it relates to the MR-GO, particularly state tort law and NEPA. *See Katrina III at* p. 12.

### III.    THE ARMY CORPS BREACHED ITS DUTIES TO PLAINTIFFS

#### A.  Legal Standards

##### 1.  Duty/Risk Analysis

This negligence action is largely governed by Louisiana tort law.  *Standefer v. United States,* 511 F.2d 101, 104 (5th Cir. 1975) (citing *United States v. Muniz,* 374 U.S. 150 (1963)). Under Louisiana law, every act of the United States that causes damage to another as a result of the fault of the United States obliges it to repair that damage.  LSA C.C. Art. 2315(A); *Graci v. United States*, 435 F.Supp. 189, 195 (E.D. La. 1977).  Generally, the elements of a negligence cause of action in Louisiana are fault (*i.e.*, conduct falling below an appropriate legal standard), causation, and damage.  *Weiland v. King,* 281 So.2d 688, 690 (La. 1973); *Graci,* 435 F.Supp. at 195.  The United States is liable not only for its affirmative conduct, but also for its negligence, imprudence, and want of skill.  *See* LSA C.C. Art. 2316; *Graci,* 435 F.Supp. at 195; *Fire & Ins. Co. of Conn. v. Garick*, 312 So.2d 103, 105 (La. App. 1975).

Imposing liability under Louisiana negligence law involves a five-prong duty/risk analysis.  *See* Causation MSJ Order (Doc. No. 18567) at p. 10 (citing *Bonin v. Ferrellgas Inc.*, 877 So.2d 89, 94 (La. 2004)); *see also Lemann v. Essen Lane Daquiris, Inc.*, 923 So.2d 627, 632-33 (La. 2006).  These five elements are: (1) the defendant had a duty to conform his conduct to a specific standard, (2) the defendant's conduct failed to conform to this standard, the defendant's conduct was (3) the cause-in-fact and (4) legal cause of (5) the plaintiff's actual

43

damages.  *Ibid*.  The evidence demonstrates that Plaintiffs have satisfied all five requirements.
The only seriously disputed element in this case is cause-in-fact.

## 2.  Duty

The specific standard defining the duty can arise from "any law—statutory,
jurisprudential, or arising from general principles of fault . . . ."  *Faucheaux v. Terrebonne
Consol. Gov't.*, 615 So.2d 289, 292 (La. 1993); *In Re Katrina Canal Breaches Consol. Litig.*,
2007 WL 4573052, *2 (E.D. La. 2007).  As grantee of a right-of-way who also built, maintained,
and operated the MR-GO, the United States assumed a high standard of care to its neighbors
pursuant to Louisiana statute.  LSA C.C. Art. 667 (imposing liability for conduct "which may
deprive his neighbor of the liberty of enjoying his own [property], or which may be the cause of
any damage to him"); *Carr v. City of Baton Rouge,* 314 So.2d 527, 529 (La. 1975); *Graci*, 435
F.Supp. at 195.

Under Louisiana law, this landowner's duty extends to conduct causing the flooding of a
neighbor's property.  *See, e.g., Lombard v. Sewerage & Water Bd.*, 284 So.2d 905, 913-14 (La.
1973) (home damage caused by drainage canal construction); *Branch v. City of Lafayette,* 663
So.2d 216, 219-20 (La. App. 1995) (water damage to home caused by defective drainage
condition).  Liability for flooding—where the landowner is uniquely capable of preventing the
damage—is predicated on a simple axiom: "The persons at whose disposal society has placed the
potential implements of technology owe a heavy moral obligation to use them carefully and to
avoid foreseeable harm to present and future generations."  *Pitre v. Opelousas Gen. Hosp.*, 530
So.2d 1151, 1157 (La. 1988).[17]

---

[17] This duty to prevent flooding is also imposed by federal law: "Congress has mandated that the
Secretary of the Army, acting through the Corps of Engineers, has the responsibility to provide
flood protection for the City of New Orleans."  *In re Katrina Canal Breaches Consol. Litig.*,

Similarly, a public authority is charged with the duty to design, construct, operate, and maintain its facilities to avoid presenting "an unreasonable risk of injury" to the public. *Faucheaux,* 615 So.2d at 293. The Corps had a duty to avoid causing flooding in building, operating, and maintaining federal projects such as the MR-GO. *See, e.g., Kennewick Irrig. Dist. v. United States,* 880 F.2d 1018 (9th Cir. 1989) (U.S. Bureau of Reclamation built defective irrigation canal whose breaks caused property damage and personal injuries); *see also Alabama Elec. Co-op, Inc. v. United States,* 769 F.2d 1523 (11th Cir. 1985) (Army Corps caused property damage due to defective construction of a dike); *Seaboard Coast Line R.R. Co. v. United States*, 473 F.2d 714 (5th Cir. 1973) (Army Corps-designed drainage system diverted water that damaged railroad right-of-way). This duty included an obligation to assure that the MR-GO did not enhance the risk of flooding during hurricanes. *Faucheaux*, 615 So.2d at 293; *Graci*, 435 F. Supp. at 195-96. As the Fifth Circuit has held, "[t]he United States may be liable under the Federal Tort Claims Act for negligent provision of services upon which the public has come to rely." *Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir. 1970) (citing *Indian Towing Co. v. United States*, 350 U.S. 61, 76 (1955)).

In addition to the duty not to create hazards, "a landowner owes a plaintiff a duty to discover any unreasonable dangerous condition and to either correct the condition or to warn of its existence." *Socorro v. City of New Orleans,* 579 So.2d 931, 939 (La. 1991); *Faucheaux*, 615

2007 WL 4573052, at *3 (citing 33 U.S.C. §701 *et seq.*). As the Court well knows, this tragedy might have been averted but for the paradox that the Army Corps built and operated a hurricane flood protection system while at the same time it built and operated a massive navigable waterway that exposed Greater New Orleans to direct hurricane attacks from the Gulf of Mexico. PX 4, Team Louisiana Report at p. 224. The effect of one project on the other was never systematically addressed, resulting in planning that largely ignored their relationship. *Id.*; 702c MSJ Order (Doc. No. 12946) at pp. 21, 35. Thus, the Corps did not "anticipate the insidious effects of the MR-GO upon the levee" along Reach 2. TT at p. 201 (the Court). For example, the Corps did not evaluate the MR-GO's effect on waves on the Reach 2 LPV structures. *Id.* at p. 207-22 (Soileau).

**Deleted:** Cecil

45

So.2d at 294.  As a government agency, the Corps in particular had a legal duty—a public responsibility—to repair defective conditions and warn of known defects.  Thus, in *Indian Towing Co.*, 350 U.S. at 69, the Coast Guard had the duty to maintain its lighthouse in good working condition, to warn users if it went out of service, and to repair the defect.  This is especially true where the government's own construction activities create the hazardous condition.  *See Brandon v. State Through Dept. of Highways,* 367 So.2d 137, 143 (La. App. 1979) ("It is a breach of that duty for the Department to undertake construction, partially complete the project, and then leave the project unfinished with hazardous conditions existing for an unreasonable period of time, particularly when it is within the capacity of the Department to complete the project and eliminate the hazard.").

    Turning a blind eye to known or reasonably discoverable hazards obviously contravenes this duty to discover, repair, and warn about dangerous conditions.  *See Faucheaux,* 615 So.2d at 293.  Likewise, concealment of—or actively misrepresenting that a project does not pose—a risk of catastrophic flooding is a manifest dereliction of duty.  *See, e.g., Bunge Corp. v GATX Corp.*, 557 So.2d 1376, 1385 (La. 1990); *Learson v. Bussey*, 691 So.2d 1301, 1303 (La. App. 1997); *Buchanan v. McMillan*, 311 So.2d 469 (La. App. 1975).  Accordingly, the Corps had a duty to assure that the MR-GO did not enhance the risk of flooding during hurricanes, and when the Corps learned of defective conditions causing serious damage to the environment and a posing a risk of catastrophic flooding, it had a dual duty to warn and remediate.

    Similarly, by federal law, the Corps' duty to warn extended to Congress and derivatively the public.  As discussed in Section II, *supra,* about NEPA, its implementing regulations, and interpretative case law imposed a mandatory duty on the Corps—certainly after 1976—to prepare an EIS or SEIS disclosing possible adverse effects on the human and natural

46

environment caused by the MR-GO's continuing operation and maintenance ("O&M"), alternatives (including closure), and feasible mitigation measures.  Compliance with this statutorily mandated action was not a discretionary duty.  *See In re Katrina Canal Breaches Consol. Litig.,* 2009 WL 799976,*19-20 (E.D. La. March 2009).

### 3.  **Breach of Duty**

Breach of duty occurs when the defendant fails to exercise that degree of care ordinarily expected of a reasonably prudent person under similar circumstances.  *Fire & Gas Ins. Co. of Conn.*, 312 So.2d at 105; *Graci*, 435 F.Supp. at 196; *see also Lemann*, 923 So.2d at 633.  In this case, the relevant circumstance is the standard of care for professionals with training, education, and expertise in civil engineering, hydrology, oceanography, geology, and coastal and environmental science.  It is undisputed that the Army Corps is a professional engineering/science organization with abundant expertise in these fields and vast experience in designing, building, operating, and maintaining waterways like the MR-GO.

For more than a century, the agency has held itself out as the preeminent water development engineers upon whom Congress relies heavily for guidance on technical, engineering, and safety issues regarding navigation projects.  TT at p. 3621:17-24 (Pete Luisa). In addition, the Corps has pioneered in setting the standards in these fields and publishing manuals, guidelines, and other technical guidance about how to design, construct, operate, and maintain ship channels.[18]  In fact, the Corps prepared detailed design memoranda for the MR-

---

[18] *See, e.g.,* PX 1809, Wind Set-up and Waves in Shallow Water: Technical Memorandum No. 27 (6/1/1952); PX 584, Trafficability and Navigability of Delta-Type Coasts; Trafficability and Navigability of Louisiana Coastal Marshes, Technical Report No. 4 (5/20/1954); PX 65, Technical Report No. 4, Shore Protection, Planning and Design (6/1966); PX 2119, EP 1165-2-1, Digest of Water Resources, Policies, and Activities (12/1972); PX 1332, Shore Protection Manual, Vol. I, 2d Ed. (1975); PX 1333, EM 1110-2-1607, Engineering and Design, Tidal Hydraulics (3/15/1991); PX 212, EP 1165-2-1: Digest of Water Resources and Policies and

47

GO, purporting to apply pertinent engineering standards. *See, e.g.,* PX 200, MR-GO Design

Memo 1-A; PX 201, MR-GO DM 1-B; PX 459, MR-GO DM 1-C; PX 641, MR-GO Design

Memo No. 2 (1959); and PX 202, MR-GO GDM No. 2, Supplement No. 4 (1969).

   Even if the Corps cannot be held liable for its *initial* design and construction due to the

DFE,[19] the Corps had a continuing duty thereafter—not only under Louisiana law but under

longstanding professional standards—to discover, to warn Congress and the public about, and to

seek funding to repair the MR-GO's obvious, defective/hazardous conditions that were

victimizing the adjacent earthen structures.  PX 673, Memorandum; Subject: MR-GO, St.

Bernard Parish, LA, Bank Erosion Reconnaissance Update dated (July 31, 1996).  By the very

nature of their profession, engineers are obliged to protect the public—by carefully managing

risk and imagining the unimaginable—when they are designing, building, operating, and

maintaining structures that could endanger life and property.  PX 3, ILIT Report at p. 13-5 ("The

engineering profession has long practiced social responsibility by the technique of overdesign, to

compensate for uncertainties . . . .").  Thus, Greg Breerwood, a 38-year NOD engineer, noted

that he would take steps to remediate any project "constituting a public threat" since the reason

for building public works like the MR-GO is "to benefit the public."  TT at p. 510 (Breerwood);

PX 198, EA #47 at p. 1 ("in the interest of public safety").

---

Activities; Ch: 19, Environmental Restoration and Protection (7/30/1999); PX 1098, EM 1110-1-1100, Engineering and Design, Coastal Engineering Manual (4/30/2002).

[19] In light of the Court's ruling on the cross motions for summary judgment that "the *initial* design and construction of the MRGO . . . are shielded by the discretionary function exception," Plaintiffs are not briefing (but are preserving) this issue. *See In re Katrina Canal Breaches Consol. Litig.,* 2009 WL 799976 at *28  (emphasis added).  In this post-trial briefing, Plaintiffs demonstrate the Government's liability based on "the actions and inactions that followed the creation of the channel . . . [and] the knowledge of the Corps concerning the dangers that the MRGO was creating."

Because they apply current scientific knowledge and experience through engineering, engineers are uniquely informed about a project's risks and the need for informed disclosure of those risks. The profession therefore recognizes that the public must be informed about the risks to which it is exposed *and* must agree to bear the burdens of such exposure. Dr. Robert Bea, "Reliability Assessment & Management: Lessons from Hurricane Katrina," Proceedings of OMAE 2007: 6th International Conference on Offshore Mechanics and Arctic Engineering, June 10-15, 2007, San Diego, California (OMAE 2007-29650) at p. 2. In a democratic society founded on the principle that those who govern should do so only with the consent of the governed, full disclosure of the risks posed by public works—by means of compliance with NEPA and accurate, timely reporting to the public—is essential to fulfill a "national policy that those put in harm's way have a voice in what otherwise would be involuntary exposure to risk." PX 3, ILIT Report at p. 13-4.

The record reveals a broad consensus among witnesses and experts for both sides about the Corps' specific duties as to the MR-GO. Fundamentally, engineers have long been trained in the "observational method"—a four-step interactive risk assessment and management approach to engineered structures like the MR-GO. TT at pp. 1263-65 (Dr. Robert Bea). For example, a reasonably competent engineer would be expected to understand the potentially catastrophic risks to life and property posed by the addition of a wide, deep shipping channel with an outlet to the Gulf of Mexico, the "funnel" geometry, Reach 2 channel widening, and the loss of wetlands. TT at pp. 1751-53, 1757-78, 1835 (Dr. Paul Kemp) (this is Oceanography 101). Any alert observer—but surely an engineer—would readily notice a shipping channel widening some 33 FitzGerald feet per year and a football field every ten years. TT at p. 323 (Dr. Duncan FitzGerald). Put another way, "prudent engineer[s] . . . overseeing the MRGO, operating the

49

MRGO . . . should have been continuously observing and reevaluating the growing threat or increasing risk of harm to the public over the past 40 years." TT at p.1266 (Bea).

In addition, as the Corps' senior budget official admitted, "with regard to safety issues . . . for a project like the MRGO," the MR-GO operations manager "has an obligation to report something wrong up the chain of command."  TT at p. 3619 (Luisa); *see also id.* at pp. 3569-70 (Russo).  Indeed, Pete Luisa, the Corps' Chief of Program Development, agrees that it is a "failure of duty for a District to fail to remediate safety problems with a Corps project." *Id.* at 3620 (Luisa).[20]  And you certainly "wouldn't spend years [merely] studying [the dangers posed by the MR-GO] if you thought it was a problem. . . ." *Id.* at p. 3620:23-25 (Pete Luisa).[21]

In the engineering profession, a cardinal principle is that "knowledge of a hazard triggers an obligation to take corrective action."  TT at pp. 1262; 1582:12-1583:1 (Bea).  Accordingly, the breach of duty is all the more evident where the facility operator is on notice of defects and

---

[20] General Thomas Sands (former NOD Chief Engineer and LMVD Commander (1978-89)) likewise admitted that with respect to threatened damage to adjacent property, the Corps "should look at the impacts of that particular project and make arrangements to mitigate for those impacts *within the authorities they have.*"  TT at pp. 272:16-18 (emphasis added).  The self-imposed, artificial limitation that the Corps was able to remedy MR-GO defects only if it could be justified on a navigation-related basis (*i.e.,* within its existing authority) is belied by the fact that Louisiana law imposed a duty to take remedial action (*see* Section III.A.2, *supra*) and the Corps' witnesses admitted that it never requested (but could have sought) amended or supplemental authority from Congress, never informed Congress of the known dangers posed by the MR-GO, and never sent a recommendation to Congress or an appropriations request to ameliorate the MR-GO's known hazards.  *See In re Katrina Canal Breaches Consol. Litig.,* 2009 WL 799976 at * 23, 26, 37; PX 182, at pp. 142:6-10; 143-45:10 30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008; PX 191, Kemp Expert Report (July 2008) at pp. 185-95; TT at pp. 3410, 3414 (Thomas Podany); TT at pp. 3624-25 (Pete Luisa); Plaintiffs' Proposed Findings of Fact and Conclusions of  Law Nos. 333-43 (in Appendix "B").  Peter Luisa acknowledged that Congress would not appropriate any money unless informed by the Corps of a problem, accompanied by a specific request.  TT at p. 3624:1.  Luisa himself, however, was never informed of erosion problems or the loss of wetlands during the time he was Chief of Program Development.  *Id.* at TT at p. 3624:19.

[21] In addition to the annual appropriations process, the Corps had a budget mechanism for reprogramming funds for exigent circumstances. TT at p. 3621:1-4 (Pete Luisa).

feasible measures well known in the relevant engineering field are available to prevent or mitigate the dangerous conditions created by defendant's conduct.  *See Holden v. Connex-Metalna*, 2000 WL 1801845, *3 (E.D. La. 2000) (quoting *Cook & Nichol v. Plimsoll Club,* 451 F .2d 505, 510 n.16 (5th Cir.1971)).  In short, competent engineers would not remain silent about remedying known defects.  Failure to remedy known hazards falls below the professional standard of care.

      **B.   The Record Contains Ample Evidence of Breach of Duty**

Compelling evidence substantiates that the Corps breached its duty to keep the MR-GO safe, to remediate known hazards, to warn the public of the known risks of catastrophic flooding, and to inform Congress and the public of the waterway's dangerous conditions and feasible mitigation measures.  This evidence comes from numerous Corps documents, its own witnesses, and Plaintiffs' experts.

      **1.   The Corps Had Knowledge of The MR-GO's Defects and Risk of Flooding**

The record is teeming with evidence that the Corps knew that the MR-GO—both before and after it was constructed—posed a serious risk to life and property.  Even if Plaintiffs had offered no expert testimony, the Corps' own documents and witnesses establish that the agency knew for decades that the MR-GO had morphed into a dangerous ship channel that was destroying the environment, victimizing/compromising the protective levees, and increasing the risk of catastrophic flooding.  Plaintiffs' Proposed Findings of Fact and Conclusions of Law Nos. 207-55, 380-400 (Appendix "I") document the Corps' extensive knowledge before Katrina about the MR-GO's defects and risk of catastrophic flooding.  *See generally* PX 91, Kemp Expert Report (July 2008) at pp. 185-91.

The evidence shows that the Corps had detailed knowledge of the following:

51

*The MR-GO was a direct, efficient route for hurricane surge into the heart of Greater New Orleans;

*The geometry of the MR-GO—connecting Reach 2 with Reach 1/GIWW without a surge barrier—created a dangerous funnel effect" enabling hurricane storm surge from Lake Borgne and the Gulf of Mexico (via Reach 2) to flow into the confined Reach 1/GIWW channel, thereby increasing the velocity and height of the flow in the Reach 1/GIWW channel and IHNC and amplifying the threat of flooding;

*The saltwater from the Gulf of Mexico destroyed tens of thousands of acres of storm surge buffering cypress forests and wetlands, thereby reducing the natural flood protection for the New Orleans and St. Bernard Parish;

*The unarmored banks of the Reach 2 channel widened from the initial 650 feet to 3,700 feet in some places, causing further wetlands destruction and creating a vast expanse for hurricane-driven waves to attack the Reach 2 LPV structures; and

*The widening of Reach 2 by repetitive maintenance dredging in the channel increased and cumulative accelerated loss of protective elevation via lateral displacement, thereby destabilizing and compromising the ability of the LPV structures to perform their intended flood protection role during Katina. *See* PX 91, Kemp Expert Report (July 2008) at p. 196; PX 149, CMT 2, Subject: MR-GO New Ship Lock, Return Levees (Aug. 18, 1971); PX 150, CMT 1, MR-GO New Ship Lock, Return Levees (June 21, 1971); as well as, TT at pp. 1092:19-1093:12, 1108:6-10, 1111:9-14, 1132:10-1133:20, 1565:6-1566:10 (Bea).

Deleted: and

Deleted: Robert

Scores of highly damaging Corps' documents—some going back to the 1950s— establish the agency's detailed knowledge about the MR-GO's defective conditions and the risk of

catastrophic flooding.[22]  The record is clear that *after the MR-GO reached project-authorized dimensions in 1968*, the Corps received notice on multiple occasions about the risk of serious flooding posed by the hazards to life and property that the MR-GO created in placing into Greater New Orleans a deep channel with direct access to the Gulf of Mexico.  *See* Appendix "I," Nos. 207-11; PX 91, Kemp Expert Report (July 2008) at pp. 21-23, 170-92, 191-95; TT at p. 3231 (Miller) (Corps knew from MR-GO's inception about saltwater intrusion, changes in habitat type, and shoreline erosion).  Among scores of Corps' documents, two stand out.

> **Deleted:** Gregory

        *In 1984, the Corps prepared a study about the MR-GO's adverse impact on the environment. "Construction of the MR-GO has accelerated the natural changes in the St. Bernard Parish wetlands near Lake Borgne."  PX 1639 at p. 7.  The report warned that due to unchecked erosion:

> [E]ast bank [of Reach 2] along Lake Borgne is dangerously close to being breached. Once the bank is breached, *development to the southwest [St. Bernard Parish] would be exposed to direct hurricane attacks,* the rich habitat around the area would be converted to open water, and more marsh would be exposed to the higher salinity water.

*Id.* (emphasis added).[23]

        *Four years later, the Corps was still studying bank erosion along Reach 2.  In the now familiar 1988 Bank Erosion Reconnaissance Report, the Corps noted:

> The alternative to completely close the MRGO waterway should be evaluated . . . .  In addition to solving the aforementioned problems [bank

---

[22] The Corps' files contain reports of annual inspections and numerous studies conducted over 40 years.  *See* PX 91, Kemp Expert Report (July 2008), Appendix "B."

[23] Twenty seven years earlier, the St. Bernard Police Jury's Tidewater Advisory Committee, in a report furnished to the Corps, warned that saltwater from the Gulf of Mexico would destroy wetlands and "[d]uring times of hurricane conditions, the existence of the channel will be an enormous danger to the heavily populated areas of the Parish due to the rapidity of the rising waters reaching the protected areas in full force through the avenue of this proposed channel. This danger is one that cannot be discounted.  [Any flood] is a major catastrophe."  PX 144 at p. 3; TT at p. 34 (Gagliano).

> **Deleted:** Dr.

erosion, loss of wetlands, saltwater intrusion, and loss of recreation],
[closure] will also *reduce the possibility of catastrophic damage to urban
areas by a hurricane coming up this waterway* . . . .

PX 9 at Comment No. 2 (MRGOX0420) (emphasis added).

These "smoking guns" gain even greater significance in the context of the repeated

warnings that the Corps received from numerous sources about the risk of flooding posed by the

MR-GO. *See* PX 91, Kemp Expert Report (July 2008) at pp. 185-91.  The most vocal and well

informed admonition came from Dr. Sherwood Gagliano.  A respected geographer and coastal

scientist[24] and a long time Louisiana resident with an impressive institutional memory, Dr.

Gagliano testified without contradiction about the MR-GO's history, development, and

devolution into an environmental disaster.  TT at pp. 96, 101; PX 1636, (1973) at p. 57 (MR-GO

likely had the "greatest environmental impact" of any Louisiana ship channel); *see also* PX 722

(1999) (MR-GO was considered by many ecological organizations as "an environmental

disaster"); TT at p. 97 (major environmental organizations decried MR-GO as an environmental

disaster).[25]  Beginning in the early 1970s, he continually warned the Corps about the MR-GO's

wetland destruction, channel widening, and risk of catastrophic flooding.  PX 143 (1972) at p.

54; PX 462 (1972) at pp. 66, 90-91; PX 1633 (1973) at pp. 1, 9, 12-14; TT at pp. 101 (Dr.

Gagliano).

---

[24] *See* PX 1623 (Dr. Gagliano's Resume).  Dr. Gagliano is considered "one of the leading deltaic geologists in the country."  TT at p. 1753:18-21 (Kemp).

[25] A 1984 report authored by Dr. Gagliano's firm for local, state, and federal agencies noted that the MR-GO "brought on a litany of environmental problems, including habitat change, marsh loss, and severe shoreline erosion.  These problems evolved *immediately following construction, and are continuing largely unabated to this day.*  JX 31 at p. 13 (Introduction)(emphasis added). Of course, this is hardly surprising since as the MR-GO operations manager (Robert Gunn) wrote in 1999:  Infrastructure construction like the MR-GO "took place with very little concern for the environment.  Engineers designed with no regard for the environment.  The 'build anything' mentality was pervasive in the 1960's."  PX 722 at p.2.

Several generations of Corps officials were aware of these warnings but did nothing.  *See* PX 91, Kemp Expert Report at p. 192; TT at p. 101 (Gagliano).  Numerous Corps employees—spanning decades of MR-GO involvement—testified that they were aware of the MR-GO's defective conditions.

*For example, Col. Thomas Sands, the Corps NOD Engineer (1975-1981) and Lower Mississippi Valley Division Commander (1984-9), acknowledged the lack of foreshore protection on the east side of the MR-GO was a concern in the 1970s because it "was becoming a major issue."  TT at p. 265.

*David Van Stutts, a Corps hydraulic engineer from 1971 to 2007— acknowledged that the MR-GO had obviously enlarged—and was a known problem—between 1974 to 1992.  TT at p. 175.[26]

*Edmond Russo—the MR-GO Operations Manager from 2000 to 2005—was aware that erosion caused by the MR-GO was a "significant problem," bank erosion was the source of most of the shoaling, and foreshore protection would have prevented shoaling.  TT at pp. 3512, 3539, 3557, 3569.

*Greg Breerwood (Corps 1969-2007, Chief of Dredging Operations 1984-6) testified that the Corps knew from the MR-GO's inception about saltwater intrusion and bank erosion.   TT at p. 3231; *see also id.* at p. 3414 (Podany) (1988 Bank Reconnaissance Report "makes it perfectly clear . . . that the MRGO was having a major effect on the environment along the MRGO").

*Gregory Miller, a senior project manager for the Corps Protection and Restoration office and manager of the MR-GO Reevaluation Study, acknowledged that problems associated with

---

[26] At least one senior Corps official was still in denial 30 years later.  *See* TT at p. 253 (Gen. Early Rush, NOD Commander (1975-78) never learned that bank erosion was a major problem). His successor, however, testified that he knew that bank erosion caused marsh loss.  TT at p. 265 (Col.  Thomas Sands).

habitat types, shore erosion, and saltwater intrusion were known by the Corps early in the MR-GO's history.  TT at p. 3231:6.[27]

In short, the Corps for four decades ignored the clear and present danger posed by the MR-GO.  TT at p. 1548 (Bea) ("the breaches and the flooding of St. Bernard Parish were the result of 40 years of inaction by the Corps of Engineers").  This failure to remediate this ship channel—in light of the growing knowledge of the risks to life and property—was a violation of duty.  TT at pp. 1266, 1557 (Bea); p. 446 (FitzGerald) (the Corps' "repeated errors in professional judgment set into motion and perpetuated this entire series of negative effects on the environment and the human population in the area of MRGO"); PX 91, Kemp Expert Report at p. 194 ("This ostrich-like approach to its duty to warn and remediate was a critical factor in the tragedy of Hurricane Katrina.").

---

[27] Even when Corps officials recognized these problems, they insisted that they were powerless to act.  Witness after witness claimed that Congress authorized only a deep draft navigation channel and that the Corps' sole responsibility was to keep it open to ship traffic.  Thus, Gregory Miller admitted that the *Corps never did an analysis of whether or not bank erosion negatively impacted on the health and safety of the nearby community*.  TT at p. 3236.  Indeed, he maintained that as late as September 2005, the Corps had no obligation to advise Congress of an impact of the MR-GO O&M on the human environment.  *Id.* at p. 3246.  This tunnel vision about the scope of the Corps' responsibilities to protect people and property from flooding is belied by its own actions in building limited foreshore protection out of its O&M funds (*see* Appendix "H," No. 329) and, more importantly, its admitted ability to seek authorization from Congress to undertake remedial measures.  *See* Proposed Findings of Fact and Conclusions of Law, Nos. 333-43 set forth in Appendix "B."  This collective myopia also animated the Army Engineers' mistaken belief that it owed no duty to landowners adversely affected by the MR-GO.  "[T]he fact that [a] person's land might be eroding . . . was the landowner's problem and not the Corps of Engineers problem . . . ." TT at p. 3572 (Russo).  The reason for this conspicuous lack of concern about the MR-GO's neighbors was the Corps' "narrow view of its constituency.  The agency showed concern only for what it termed its 'customers'—the Port of New Orleans, shipping, dredging, and pilot boat interests. . . . Public safety was simply not a factor in the Corps' decision-making calculus."  PX 91, Kemp Expert Report at p. 192.

**Deleted:** Dr. Robert

**Deleted:** Dr. Robert

**Deleted:** Dr. Duncan

**Deleted:** Edmond

## 2.  The Corps Failed to Undertake Feasible Mitigation Measures

It is undisputed that the Corps could have implemented feasible mitigation measures

decades before Katrina that would have prevented the catastrophic flooding caused by the MR-

GO.  *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law Nos.  223-28, 297-332

(attached as Appendix "C").  Dr. Gagliano outlined a comprehensive list six feasible mitigation

measures that he had long urged the Corps to undertake, including (1) surge barriers and control

structures at Bayou La Loutre to prevent storm surge and saltwater intrusion, averting severe

wetland loss and initiating required striation of the Central Wetlands Unit; (2) a surge

barrier/control structure across the GIWW to Reach 2 at the throat of the funnel; (3) armoring both

banks of Reach 2 and the Lake Borgne shoreline; (4) beneficial depositing of dredged spoil on the

east bank of Reach 2 to restore the land bridge between Lake Borgne and Reach 2; (5) planting

trees, shrubs and grass between the Reach 2 channel and the toe of the LPV structure and planting

grass on both sides and crown of the LPV structure; and (6) revegetation of Central Wetlands Unit.

TT at pp. 91; 101(Slide 89).[28]

Dr. Gagliano further testified that by the mid-1970s and certainly no later than 1981, the

Corps was aware of the MR-GO's dangerous conditions that posed the risk of flooding and

warranted remedial action.  TT at p. 94.  Yet, although the Coast 2050 Report—a joint state and

federal task force (including the Corps)—recommended in 1998 the closure of the MR-GO, the

---

[28] Some or all of these mitigation measures were also endorsed by other Plaintiffs' experts. *See*
TT at pp. 701:10-703:16; 710:17-712:13; 713:16-714:15; 717:9-17; 730:11-15; 747:16-22;
752:2-753:1; 756:9-25; 790:10-17; 812:17-21(Day); pp. 1152-1156 (Bea); pp. 1753:24-1755:10;
1758:23-1759:18; 1763:5-1765:11; 1772:13-1773:1 (Kemp).

Corps stalled the closure study between 1999 and 2005.[29]  *See* TT at pp. 84, 90.  Not until over

two years after Katrina did the Corps finally recommend closure.  *See* PX 1634.[30]

While they selected different time periods, Dr. Gagliano and Plaintiffs' experts were

unanimous that the Corps should have undertaken corrective action decades before Katina.

Thus, for example, Dr. Gagliano concluded that by the mid-1970s—and no later than 1981—the

Corps knew that the MR-GO's conditions posed a risk of flooding warranting remedial action.

TT at p. 94.  Citing Hurricane Betsy data and Bretschneider and Collins report (PX 68), Dr.

Kemp testified that the Corps was aware in the 1966-67 time period that the MR-GO enhanced

catastrophic storm surge risk to New Orleans but never proposed well understood remedial

measures.  TT at pp. 1747:14-1748:16; 1835:8-20; 1855:24-1856:11; 1857:2-6 (Kemp); Slides

13, 14; PX 91 at p. 24, Citrus Back Levee Design Memorandum No. 2, Alternate Plan C

---

[29] The MR-GO's closure—which would have averted the catastrophic flooding—could have rapidly been accomplished within the seven years between 1998 and Katrina by constructing barriers at the funnel mouth and Bayou La Loutre Ridge.  The post-Katrina IHNC Surge Reduction Barrier will be completed by 2010 within four years from earliest planning starting in 2007. *See* PX 133, Army Corps, IHNC Surge Reduction Project Fact Sheet (2008); JX 130, Gibb Owen 30 (b) (6) Depo. (Oct. 16, 2008) at 17:5-22, 45:24-46:17; TT at p. 1754:3-12 (Kemp); Appendix "C," Nos. 223-28.  As discussed below, however, the Corps should have recommended closure or implemented a suite of remedial measures long before 1998 and certainly no later than 1988.   The Corps' chronic lack of any sense of urgency—much less impending disaster—doomed any comprehensive remediation program that would have saved Greater New Orleans.

[30] Thomas Podany testified that although the Corps studied problems associated with bank erosion and the wetlands, the Chief Engineer never sent anything to Congress reaching any conclusion.  TT at p. 3410:13; *see also id.* at p. 267 (Gen. Sands) (while the Corps certainly had "a conduit to go back to Congress and make recommendations," he was unaware of any requests being made and could not point to any correspondence he sent to Congress alerting them of erosion concerns.)  Likewise, although the Corps' 1988 Bank Reconnaissance Report (PX 9) made it perfectly clear that the MR-GO was having a major impact on the environment, no immediate remedial measures were undertaken.  TT at p. 3414 (Podany).  In the final analysis, the senior Corp officials at Headquarters claim to have been kept in the dark about the MR-GO. TT at p. 3624 (Luisa) (before Katrina the Corps never told "any Congressional Committee words to this effect:  'We must have money to fix the MRGO or a serious catastrophe including flooding may happen when a hurricane strikes Greater New Orleans.'").

58

("Crosby Plan") (proposing in 1967 a levee across the funnel and a floating closure gate across the MR-GO). Dr. Day concluded that the Corps could have taken these remedial measures at any time over the 40 years after the MR-GO's construction. TT at p. 709:25; *see also id.* at p. 717 (floodgate was feasible in 1965 and thereafter). Finally, Dr. Bea opined that a surge reduction barrier between the GIWW and Reach 2 across the Golden Triangle would have been effective at any time in preventing storm surge from entering Reach 1 and IHNC, thereby avoiding the flooding of New Orleans East and Lower 9th Ward. TT at pp. 1231:19-1235:5. *See* note 14, *supra.*

The bottom line is that the experts at the Corps had at their disposal multiple, practical measures that could have been implemented in ample time to prevent Plaintiffs' damages caused by the Corps' actionable negligence. *See* TT at pp. 48:22-51:2; 66:7-11; 72:14-75:6; 87:3-15; 91:10-94:15; 101:13-21 (Gagliano). "Certainly, by 1988, if not much earlier, the Corps knew that the destruction of the wetlands and channel widening posed a serious threat of catastrophic flooding." PX 91, Kemp Expert Report at p. 194; *see also* PX 378 (1966 Seabrook Lock Report) at p. 2, ¶4; PX 2010 (1967 Survey of MRGO Shoaling Problems) at pp. 1, 15-16. The Army Corps itself was one of the early researchers and founders of the wave and surge buffering effects of foreshore/fronting vegetation and had known for decades that dense vegetation would reduce wave intensity by 85-90% and that even light vegetation would reduce the destructive capacity of waves by 70-80%. TT at pp.1191:25-1196-19 (Bea). In the end, however, no one at the Corps took responsibility, and the chain of command was derelict in its duty.[31]

---

[31] "The roots of this catastrophe can also be directly traced to a monumental failure of leadership. . . .Tragically, the same Corps officials who egregiously mismanaged the LPV were also derelict in their duty to protect the public and property from the long-known defects of this waterway." PX 91, Kemp Expert Report at pp. 192, 194. Gregory Breerwood, the highest ranking civilian in charge of maintaining the MR-GO during the mid 1980s, admitted that he did not believe that the

### 3. The Corps Misrepresented and Concealed the MR-GO's Defects and Risks of Flooding

The Corps' failure to act in the face of known danger and failure to warn is compounded by its chronic misrepresentations to the community and Congress about the risks posed by the MR-GO. "[T]he people of this community heavily relied upon the opinions of the United States Army Corps of Engineers on issues like flooding." TT at p. 208:11-15 (Soileau).[32]  In fact, for decades the Corps understated and concealed the MR-GO's adverse effects and hazards. Thus, when Dr. Gagliano went public in 1972 with his concerns about "hurricane storm surge threat in the funnel formed by the MRGO and the GIWW and associated hurricane protection levees" (PX 143 at p. 154),[33] the Corps concocted a dismissive unitive statement (JX 325) relying upon a misreading of the earlier Bretschneider and Collins report (PX 68).[34]  TT at p. 207:16-209:15 (Soileau). In truth, this was a misleading "party line" that was intended to allay the public's concerns. PX 91, Kemp Expert Report at pp. 25-26, 188, 194.[35]

---

Corps had the responsibility for erosion control of the MR-GO. Thus, he did not request authority from any higher ranking authority to address this ongoing problem. TT at pp. 506:8-507:19. This outlook certainly explains his response to the Court's inquiry that if the MR-GO's erosion was causing damage to other people's land, the Corps does not have the authority to make any reparations as a result of the erosion. TT at pp. 511:11-512:13 (Breerwood).

[32] The Corps expects the public to rely upon its representations about their safety. TT at p. 208:11-15 (Soileau).

[33] Dr. Gagliano's warning about the "funnel effect" had been preceded by several similar warnings. *See* Appendix "I," Nos. 212-22.

[34] As this Court has recognized, the Bretschneider and Collins report in fact concluded that the MR-GO could have a "very marked effect" on storm surge under certain scenarios. *In Re Katrina Canal Breaches Consol. Litig.,* 577 F.Supp. 2d 802, 809 (E.D. La. 2008); *see also* PX 91, Kemp Expert Report at pp. 40-51.  In addition, the Corps knew at the time that this report did not "evaluate the effect of the MRGO on waves . . . . ." TT at p. 209:16-19 (Soileau).

[35] From the earliest days, the Corps had an "institutional blind spot" about the MR-GO's known risk to the public. PX 91, Kemp Expert Report at pp. 31, 186; PX 4, Team Louisiana Report at pp. 223, 287.

60

A year later, Dr. Gagliano further warned the Corps about flooding of St. Bernard Parish and adjacent Orleans Parish by "a hurricane surge traveling up the MRGO."  PX 1633 at p. 13; *see also id.* at p. 14 ("we may expect surges of twenty feet or more to accelerate up the channel").  Dr. Gagliano's warning had been preceded by similar alarms as early as 1963.  PX 140, Memo re: LPV to Chief of Engineers, Department of the Army from Major General R.G. MacDonnell (July 24, 1963) at NED-213-000000433) (MR-GO will cause "increased tidal exchange [which] will cause erosive velocities . . . in the Inner Harbor Navigation Canal"); PX 1938, Letter to Representative Edward Hebert from John L. Crosby (General Contractors and Builders) (Aug. 25, 1969) at AFW-467-000000224-228 (without floodgates on the MR-GO, the Corps was leaving "a big open door" for catastrophic flooding of New Orleans).

Once again, despite substantial evidence to the contrary, the Corps studiously misrepresented or ignored the MR-GO' potential flooding effect.  For example, in its 1974 DEIS on operation and maintenance, the Corps removed references to studies regarding the MR-GO's effect on storm surge that had been included in its 1972 DEIS.  PX 190 at pp. 13, 14; 1972 DEIS; PX 191, 1974 DEIS; *see also* PX 184, John Saia 30(b)(6) Depo. (Sept. 30, 2008) at 82:23-83:19; 131:11-132:3-142:25; 181:8-184:14; PX 195, John Saia 30(b)(6) Depo. (Oct. 1, 2008) at pp. 32:9-35:9; 60:1-71:12; 79:11-81:22; 82:18-85:17; 90:15-93:20; 96:8-97:3; 98:23-99:7; 1186:6-119:17.  And as discussed in Section II, *supra*, the Corps never prepared an EIS or SEIS after 1976 disclosing to Congress what the Corps well knew: the MR-GO's multiple defective conditions posed a serious risk of catastrophic flooding during hurricanes.

Suppression of critical risk assessment information was compounded by a long-time, concerted disinformation and stonewalling campaign right up to Katrina.  For example, the Corps in 1969 told a local resident—who pointedly expressed concern about the MR-GO

61

"funnel" causing flooding and recommended a surge barrier in Reach 1/GIWW—that its studies

had demonstrated that no such protection was necessary.  *See* PX 5, NOD Correspondence to

Manuel Pinto (Nov. 26, 1969) at pp. 1-2, 78-9; *see also* PX 371, Letter from Col. Herbert R.

Haar, Jr. to Congressman F. Edward Hebert, Sept. 23, 1969 (surge barrier was not necessary and

"would significantly impede seagoing and inland navigation").[36]   The best example may be the

repeated insistence in the 1988 Bank Reconnaissance Report—reiterating the "party line"—that

the MR-GO has no effect on flooding during hurricanes.

> [C]losing of the MR-GO navigation channel will have no impact on
> hurricane surge.  This is obvious because the crest of the hurricane surge
> can be up to 200 miles wide and the presence of a 500-foot wide channel
> will have no impact on storm surge. . . .  *[T]hat the MR-GO increases
> hurricane storm surge is ludicrous*. . . .  [T]he presence of the MR-GO has
> no impact on the hurricane storm surge produced flood stages.

PX 193 at NED-192-000000256 (emphasis added).[37]

The Corps also brooked no public dissent.  When one resident at a public meeting tried to

ask about the risk of flooding due to the "funneling action," he was peremptorily cut off by the

NOD Chief Engineer Colonel Thomas J. Bowen.  *See* PX 2187, Report on Benefits Study,

Appendix G (Dec. 15, 1965) at p. 276.  The Corps' decades-long campaign was so out of touch

with reality that the Corps told local citizens, St. Bernard Parish, and Members of Congress that

---

[36] The "party line" shifted over time.  While in the 1970s and 1980s, the Corps protested that the MR-GO conveyed no hurricane surge along Reach 2, the justification for no surge control structure shifted by 2004 to the alleged futility of a closure structure at Bayou La Loutre because it "would slightly slow *the storm surge*, but once *the surge* overtopped the structure and surrounding wetlands, the resulting *surge* elevations would be virtually the same as without the closure structure."  PX 216, Letter from Gen. Don T. Riley to Pete Savoy, June 17, 2004 (emphasis added).  Of course, Katrina's devastation forced the Corps to build this very closure at Bayou La Loutre.  *See* PX 132 at p. 9.

[37] This comment by Cecil Soileau, Chief of the NOD Hydraulics and Hyrodologic Branch, was apparently in response to the comment by his Vicksburg superiors that the study should discuss the MR-GO's closure in order to "reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up the waterway. . . ."  PX 9 at Comment 2.

the MR-GO was a benign waterway—indeed, an economic and fishing boon— posing no danger

to the people and property of New Orleans and St. Bernard Parish. *See, e.g.,* PX 2187, Report on

Benefits Study, Exhibit B (June 17, 1991) at pp. 113-14 (in response to citizens' concerns

expressed in letters to Members of Congress, Corps wrote back an unresponsive, form letter that

the MR-GO had brought blue crabs, redfish, speckled trout, flounders, and jobs to the area).[38]

In sum, the local residents, businesses, and others—misinformed by its putative

guardians—never consented to be exposed to the MR-GO's deadly risk and Congress was never

afforded an opportunity to intercede.

## IV.    THE CORPS' BREACH OF DUTY CAUSED PLAINTIFFS' DAMAGES

### A.  Legal Standards

#### 1.  Legal Cause

As previously noted, the duty-risk analysis requires that the negligence be both a cause-

in-fact of the plaintiff's injury and a legal cause of the injury. *See In re Katrina Canal Breaches

Consol. Lit.*, 2007 WL 4573052, at *4. The issue of "legal cause"—also expressed as "scope of

duty"—is a purely legal question for the Court. *Ibid.* Clearly, the risk of serious property

damage here is easily associated with a duty not create, operate and maintain a channel which

would cause damage to the adjacent structures and catastrophic injury, damage and loss to

"neighboring lands and individuals." *Graci,* 435 F. Supp. at 195-96; *see also Roberts v. Benoit*,

605 So.2d 1032, 1054 (La. 1991); *Faucheaux,* 615 So.2d at 294.

---

[38] At the same time, the Corps was misleading stakeholders about the degree and level of hurricane flood protection afforded by the LPV. *See* PX 26, Douglas Wooley and Leonard Shabman, "Decision-Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project: Final Report for the Headquarters, U.S. Army Corps of Engineers Submitted to the Institute for Water Resources of the U.S. Army Corps of Engineers "(March 2008) at pp. ES-19, 3-25, 3-34, 3-36; PX 91, Kemp Expert Report at pp. 192-94.

### 2. __Cause-in-Fact__

While Plaintiffs must prove that the MR-GO's negligent operation and maintenance was a substantial factor, "[a] substantial factor need not be the only causative factor; *it need only increase the risk of harm.*" *Hennigan v. Cooper/T. Smith Stevedoring Co., Inc.*, 837 So.2d 96, 102 (La. App. 2002) (citing *Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir. 1975)) (emphasis added). It is well settled that "[t]here can be more than one cause in fact, making multiple wrongdoers liable." *Hennigan*, 837 So.2d at 102. In this case, Plaintiffs have sued only one wrongdoer/tortfeasor—the Army Corps of Engineers. As this Court has already ruled, "the issue is whether the MRGO was a substantial factor in bringing about the catastrophic flooding at issue in this suit." Causation MSJ Order (Doc. No. 18567) at p. 11; *see also Chaisson v. Avondale Indust., Inc.*, 947 So.2d 171, 187-88 (La. App. 2006) (quoting *Perkins v. Entergy Corp.*, 782 So.2d 606, 611-12 (La. 2001)).

"Substantial factor" is not synonymous with "but-for" causation. The Louisiana Supreme Court in 2001 expressly rejected the "but-for" test in cases of multiple causation. *See Perkins,* 782 So.2d at 612 n.4 ("The plaintiffs argue that the court of appeal erroneously required the plaintiffs to satisfy both the 'but for' test and the 'substantial factor' test. . . . However, our case law is clear that the substantial factor test is the preferred test when there are multiple causes. . . .").

Any ambiguity after *Perkins* was clarified by the Louisiana Supreme Court three years later in *Bonin v. Ferrellgas, Inc.,* 877 So.2d 89 (La. 2004) where it specifically held:

> Cause-in-fact is generally a 'but for' inquiry … However, where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about this accident.

*Id.* at 94; *see also Chaisson*, 947 So.2d at 187-88 (Proper inquiry is whether "'[e]ach of the multiple causes played so important a role in producing the result that responsibility should be

imposed upon each item of conduct, even if it cannot be said definitively that the harm would not

have occurred 'but for' each individual cause.'") (quoting *Perkins,* 782 So.2d at 612); *In re*

*Manguno,* 961 F.2d 533, 535 (5th Cir. 1992).

Any question about the applicable causation standard was put to rest when this Court just

before trial definitively held that "but-for" causation was not applicable in multiple cause cases.

*See* Causation MSJ Order (Doc. No. 18567) at pp. 10-11.  The Government had argued that

cause-in-fact included both "substantial factor" causation and "but for" causation.  This Court

unequivocally rejected this argument, stating that "this conjunctive requirement does not appear

to be a correct statement of the law with respect to multiple-factor cases."  *Id.* at p. 4.

Finally, once this Court finds that the MR-GO's negligent operation and maintenance

was a substantial factor in bringing about the catastrophic flooding of Plaintiffs' property, the

Army Corps—in the absence of any other culpable entity—is liable for 100% of the damages.

The Louisiana comparative fault statute does not apply here because there is not more than one

"person"  "causing or contributing to the. . . loss. . . ."  LSA C.C. Art. 2323(A).  *See Ourso v.*

*Grimm*, 630 So.2d 963, 966 (La. App. 1994) (since comparative fault percentages must always

equal 100%, sole actor must be found 100% at fault); *see also Brantley v. Tremont & Gulf Ry.*

*Co.*, 75 So.2d 236, 238 (La. 1954) (rejecting defendant's challenge to award for harm caused

jointly by excessive rain and defendant's damage to a dam, reasoning that when "it is clear that a

plaintiff has sustained some damages as a result of the fault of the defendant, according to our

well settled jurisprudence, his demands will not be rejected merely because he cannot establish

exactly the amount suffered. Under such circumstances the court must fix the quantum as best it

can and, in this connection, the trial judge is vested with much discretion.").

<div align="center">65</div>

Alternatively, as for Lower 9th Ward, any allocation would be impossible because the experts agreed that the floodwaters from the IHNC were indistinguishable from those from Reach 2. *See* PX 53, Delft University Flood Report (July 2007) at p. 45; TT at p. 2754:9-22, 2755:1-9 (Steven Fitzgerald) (Once the floodwaters from Reach 2 and IHNC interacted in Lower 9th Ward, it would be very difficult to distinguish one from the other.)  Moreover, the ultimate water levels in Lower 9th Ward would have been the same with or without the North and South Breaches on the IHNC. *Id.* (Steven Fitzgerald) and TT at pp. 1223:22-1224:19, 1545:1-1546:3 (Bea) (Ultimately, the north and south breaches in the IHNC were irrelevant in terms of final water depths because the Lower 9th  (even without the north and south breaches of the IHNC) would have flooded to same 10-12 ft depth in a few hours anyway as a result of waters flowing through the primary breaches in the levees along Reach 2 of the MR-GO.  Likewise, the source of the flooding of the populated areas of New Orleans East was predominantly overtopping of the Citrus Back Levee from the Reach 1/GIWW from the south.  PX 4, Team Louisiana Report at pp. 71-72, Figure 19; PX 20, IPET at pp. IV-190 to 193; PX 91, Kemp Expert Report (July 2008) at pp. 15, 38; PX 74, Bea Expert Decl. III (July 2008) at p. 14, ¶ 152, Table 5; TT at p. 1779:12-25 (Kemp); TT at p. 1055:14-18 (Vrijling), , TT at p. 1235:5-6 (Bea).  Dr. Bea further opined that without the multiple adverse effects of the MRGO there would have been no catastrophic flooding of New Orleans East or the Lower 9th Ward and that 90% of the water in the Lower 9th came from breaches along Reach 2 of the MRGO.  TT at p. 1217:6-1219:1, 1546:16-1547:11.

**B.  Plaintiffs' Causation Theory**

In response to the Court's request that the parties articulate their causation theory, Plaintiffs submit the following summary.  For each aspect, we cite the supporting Proposed

66

> **Deleted:** Robert

> **Deleted:** Dr. Paul
> **Deleted:** Johannes
> **Deleted:** Dr. Robert

Findings of Fact and Conclusions of Law in the attached Appendices which are incorporated by reference. A more detailed causation analysis follows in Section V, *infra*. In the final analysis, the unmitigated MRGO caused the early onset and extended duration of overtopping/breaching and spelled the difference between localized survivable flooding (a few wet carpets) and catastrophic (total loss) flooding. TT at p. 1189:5-1191:24 (Bea). Without the MRGO, Hurricane Katrina itself was not severe enough to have caused the front side wave attack and erosion of Reach 2 or the incrementally enhanced surge developed in Reach 1 and/or the IHNC. ("Katrina had a very big helper, the MRGO.") TT at pp.1095:16-1096:1 (Bea).

**Deleted:** Dr. Robert

**Deleted:** Dr. Robert

## 1.   The MR-GO's Adverse Effects on Habitat and Topography

### a.   Destruction of Wetlands[39]

Healthy wetlands have long been known to buffer the destructive impact of storms by reducing the height and intensity of storm surge and waves—anywhere from one foot per 2.75 miles to one foot per 1.4 miles, depending on the type of vegetation. One thing that the MR-GO's operation and maintenance efficiently accomplished was the destruction of this last line of defense for Greater New Orleans. As established by the Corps in its own "Habitat Impacts of the Construction of the MRGO" study published in 1999 (PX 1978), the area influenced by the MR-GO lost over 10,200 acres of cypress forest *from 1956 to 1978 alone* as a result of hydrological modification and salinity intrusion associated with the ship channel.

Long before Katrina, the Corps knew that the MR-GO was destroying thousands of acres of cypress and tupelo trees, grasses, marshes, swamps, trees, shrubs and other wetlands providing a natural barrier and sponge for storm surge. The reason for such extensive loss of cypress trees and wetlands was largely due to dredging, spoil disposal, bank erosion, the widening of the

---

[39] *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law Nos. 308-15, 365-75 in Appendix "K."

Reach 2 channel, and saltwater intrusion—all stemming from *post-construction* activities.  The severity of the wave attack during Katrina was enhanced by decades of erosion of the Reach 2 channel banks into the protective wetland buffer south of Lake Borgne.

Reach 2 extends nearly 40 miles southeast through marsh past the end of the LPV system until it reaches the open, salty waters of Breton Sound.  Between Mile 50 and 55 (near Bayou Dupre), the MR-GO channel eroded into the eastern lobe of Lake Borgne through the lake rim marsh.  Further south, beyond the Chalmette LPV structures, MR-GO construction breached a natural ridge at Bayou La Loutre allowing saltwater to move into what were once relatively fresh swamps and marshes—with thriving cypress and tupelo trees and wetlands—closer to the populated areas of St. Bernard Parish.  For decades, the Corps was urged to install a saltwater barrier.  Instead the Corps allowed the MR-GO to grow wider and wider, exponentially increasing the amount of saltwater into the area.

Plaintiffs' experts estimate that as of 1999, at least 62,200 acres of cypress trees and other valuable habitat were either destroyed or altered due to the MR-GO *operation and maintenance*. *See* PX 95, Day/Shaffer Expert Report (July 2008) at p. 46; *see also* PX 145, Army Corps, Habitat Impact of the Construction of the MR-GO at p. 45.  Dr. Bea found that the erosion of the Reach 2 south bank affected the wave attack on the LPV structures because the scrub vegetation that formerly protected the structures has been reduced to less than 100 feet between the channel and berm toes in some places.  Significantly, levee sections which had dense grass cover or other dense fronting vegetation, were the "unsung heroes" of the flood protection system.  Grass covered levees which were significantly overtopped survived without distress or breaching.  There was a very definite correlation between the presence of grass cover and the areas where no

68

breaching occurred; because grass alone can acts as an excellent armor for earthen structures.

TT at p. 1201:24-1203-17 (Bea).

Deleted: Dr. Robert

**b.  Channel Widening**[40]

The MR-GO's operation and maintenance also had the predicted effect of creating an

open channel for enhanced surge transmission or "conveyance."  As early as 1966, the Corps

knew:

> that a large channel cut through marsh areas will permit more water to
> arrive at a faster rate in the interior of the marshland, at least in the
> immediate vicinity of the channel.  In addition, the maximum elevation
> and the steady peak will be reached at an earlier time… Without the
> channel, the water will rise over the marshlands at a slower rate and it will
> take a longer duration to reach maximum elevation and steady state
> conditions.  Similarly, after the storm has passed it will take longer for the
> surge to recede since now there is no channel to act as a drain. . . .*The
> velocity of flow through the channel will be two to four times as great as
> that over the marshland...* It is this later factor which tends to cause an
> increase in surge because of the Mississippi River-Gulf Outlet.

PX 91 (Kemp Report) at p. 42 *quoting* PX 68, Bretschneider and Collins report (1966) (emphasis

added).

The MR-GO Reach 1 greatly enlarged the original GIWW connection between the throat

of the funnel and the IHNC.  The unarmored portions of Reach 1 widened from the authorized

650 feet to 1,000 feet due to wave wash and erosion from passing ships. This nearly 50%

increase in turn significantly increased surge transmission into the city earlier in the flood

sequence, adding to the height and duration of surge experienced in Reach1/GIWW and IHNC

during Katrina.

The Reach 2 banks were also unarmored.  As the Corps was well aware, due to erosion

caused by ship wakes as high as three or four feet and wind-generated waves, the channel

---

[40] *See* Proposed Findings of Fact and Conclusions of Law Nos. 376-79 in Appendix "L"; *see also*
Appendix "I," Nos. 235-55.

69

continued to widen at a rate of 30 feet per year, eventually expanding through unmitigated erosion from 650 feet to 2,000 feet and, in some places, 3,700 feet.  This channel expansion vastly enlarged the cross-section, surface width, and water volume.  *See* PX 91, Kemp Expert Report at p. 148.

This 300 to 500% expansion in width had several negative effects.  First, the breaching of the Lake Borgne shoreline adjacent to the MR-GO allowed storm surge within Lake Borgne to dump directly in the MR-GO.  Second, channel widening contributed to the enormous loss of protective marshland adjacent to the channel.  Third, LPV structures were destabilized by bank encroachment and lateral displacement and subsidence.  Fourth, waves had a vastly greater expanse over which to regenerate after leaving Lake Borgne.  Finally, the disposal of the dredged spoil in the wetlands accelerated their demise.  These negative effects of the MRGO channel's operation and maintenance were like multiple Coast Guard Cutters ramming or attacking the LPV structures. TT at p. 1099:13-21 (Bea).

### c.  Lowering of Crown Elevations by Lateral Displacement[41]

Another deleterious consequence of the MR-GO's operation and maintenance was the lowering of Reach 2 crown elevations (and level of protection) caused by lateral displacement likened to "squeezing" toothpaste from a tube without a cap.  *See* TT at pp. 1111:19-1112:24 (Bea); TT at pp. 339, 357 (Duncan FitzGerald).  This long known phenomenon was the product of interrelated aspects of the MR-GO's O&M that generated a relentless cycle of futility not unlike that plaguing mythic Sisyphus.  *See* TT at pp. 1119:8-1120:23, 1140-41 (Bea); PX 82, Declaration of Robert G. Bea (Jan. 29, 2009) at p. 69; PX 59, Geological Investigation of the Mississippi River-Gulf Outlet Channel (1958) at p. 10, Plate 5; PX 1114, Geotechnical

---

[41] *See* Proposed Findings of Fact and Conclusions of Law 380-400 in Appendix "I."

Investigation, Chalmette Area Plan, Bayou Bienvenue to Bayou Dupre  (2001) at p. 2; PX 72,

Bea, Declaration No. 1 (July 11, 2008) at pp. 164,167; PX 71, Bea Expert Report (July 14, 2008)

at pp. 7-8, 15-16 ¶15; PX 81, Bea Expert Report (Jan. 2009) at pp. 6 ¶6; 11, Fig. 6; 24.  As the

unarmored channel widens toward the LPV structures due to maintenance and borrow dredging

and wave erosion, the travel path for subsurface lateral squeezing is shortened, thereby allowing

interdistributary material beneath the structures to escape faster and with more intensity into the

Reach 2 channel.  TT at pp. 1119:8-1120:23 (Bea).

Deleted: Dr. Robert

        The infusion of more sediment necessitates more dredging which can influence lateral

displacement.  *See* TT at pp. 1155-57 (Bea) (dredging below authorized 38 feet to depths of 60

Deleted: Dr. Robert

and 70 feet contributes to squeezing).  The heavy spoil (due to high water content) is then placed

along the shoreline of the channel.  This added weight in turn increases the squeezing pressures,

causing more displacement of interdistributary soils from under the structures and accelerating

the natural subsidence process (caused by overburden of marsh and deltaic deposits) and

lowering of the crown elevations.  *See* TT at p. 1119 (Bea) ("you push it higher, it squeezes

Deleted: Dr. Robert

more") (Bea).  This endless sequence—bank erosion, lateral displacement, dredging, deposing of

Deleted: Dr. Robert

heavy hydraulic fill on the levees, more squeezing of  greater volumes of interdistributary

deposits into the channel, and lowered crown elevations—recurred throughout most of the MR-

GO's lifetime.  *See* PX 72, Bea, Declaration No. 1 (July 11, 2008) at p. 35; TT at p. 1117 (Bea)

Deleted: Dr. Robert

(Corps calculated 15.5 feet of aggregate settlement at one location.); pp. 1155-57 (25% of

settlement is attributable to lateral displacement from channel widening).

        In terms of causation, lateral displacement and bank encroachment were substantial

factors in bringing about significant variations in crest elevations below design elevation and

resulting levee breaching.  *See* TT at pp. 1105, 1111 (Bea); *id.* at p. 1138:2-12 (a direct

Deleted: Dr. Robert

71

relationship exists between bank encroachment on the levees and lowered crown elevations); *id.*
at pp. 1159-60 (As the receding bank gets 500 feet or closer to the levee, breaching is more
extreme due to lowered elevations caused in part by lateral displacement.); PX 72, Bea,
Declaration No. 1 (July 11, 2008) at ¶ 159, Figs. 7 & 9.  Research on this issue demonstrated that
the pre-Katrina LPE (loss of protective elevation) were 4-5 feet and directly attributable to lateral
displacement caused by the MR-GO. TT at pp. 1565:6-1566:10 (Bea).

> **Deleted:** Dr. Robert

Protective elevation loss and levee failures can be correlated.  *See* TT at pp. 1105:21-
1106:13, 1139:4-1140:20 (Bea) (Slide 19); *id.* at pp. 324:2-19, 327:24-328:13 (Duncan
FitzGerald);  These lowered protective structures were more vulnerable to overtopping and
breaching during hurricanes—precisely what happened during Katrina in dozens of locations.
Considerable catastrophic flooding of St. Bernard Parish and Lower 9th Ward is directly
attributable to Reach 2 crown elevations lowered by lateral displacement. *See* TT at p. 1132:10-
1133:20 (Bea) (At one Reach 2 location, but for the four feet of crown decrease due to lateral
displacement,  there would have been no overtopping or breaching); *see also id.* TT at pp. 1133-
34 (Bea) (same would be true for the six miles between Bayou Dupre and Bayou Bienvenue
depending on foreshore protection and nature of vegetative  covering on top of EBSBs).

> **Deleted:** Dr. Robert
> **Deleted:** Dr.
> **Deleted:** Dr. Robert
> **Deleted:** Dr. Robert

As so many had predicted for so long an 18 ft storm surge moving up the MRGO channel
from the Gulf of Mexico met perpendicular hurricane force winds coming across Lake Borgne.
What had been 3 ft significant waves in Lake Borgne quickly regenerated across the extremely
wide (3x) and deep (2x) section of MRGO navigational channel and became 9 foot waves with
90 times more destructive force aimed at the lowest and most vulnerable section of the MRGO
levee system which also had the closest proximity to the channels edge and very little, if any,
fronting vegetation.  TT at p. 1560:20-1561:24 (Bea).

> **Deleted:** Dr. Robert

### d.  Unmitigated Funnel Effect and Reach 2 Surge Barrier[42]

The junction of Reach 1 and the GIWW formed a V-shape that acted as a funnel, channeling storm surge directly into the IHNC.  This is a well known phenomenon to the Corps.  *See* PX 91, Kemp Expert Report at pp. 100-02 (Corps built floodgates in Providence, Rhode Island in response to 1938 hurricane.); pp. 186-88 (lessons from Hurricane Betsy about funneling); PX 5, Letter to Manuel Pinto from Major Steven G. West, Acting District Engineer at AFW-467-000000030 (11/26/1969).  Computer-generated time histories reveal that a surge will build in large water bodies like Lake Borgne and Lake Pontchartrain and be transmitted inland through channels as opposed to over land.  Surge will pile up on elevated features like levees, particularly if they are oriented close to perpendicular to the direction of the winds driving the surge.

The original design and construction, joining Reach 1 with the GIWW, may have created a funnel, but the subsequent negligent operation and maintenance had catastrophic effects a half century later in New Orleans.  *Post-construction*, the Corps was repeatedly warned that it needed to build a surge control structure across the funnel's mouth in the Reach 1/GIWW channel. *See* Appendix "A, "Nos. 212-33; Appendix "B," Nos. 300-07.  At these times, there were feasible measures to prevent storm surge with a barrier that would still allow ship passage.

In fact, the Corps considered (but did not implement) such a strategy in 1967 and 1969 in the wake of Hurricane Betsy and acknowledged the efficacy of such a structure in 1975.  *See* PX 141, Letter to G.J. Lannes, Jr., Regional Planning Commission from Colonel Heiberg dated 4/21/1975; Subject: Alternative to LPV that would combine Barrier Plan and Chalmette Area Plan.

---

[42] *See* Proposed Findings of Fact and Conclusions of Law Nos. 359-64 in Appendix "M;" *see also* Appendix "N," Nos. 207-28, 538-71; Appendix "C," Nos. 298-307.

This dangerous convergence of the man-made channels, later augmented by the LPV berms of New Orleans East, was a substantial factor in the overtopping of the LPV structures along the Reach1/GIWW channel and IHNC due to three to 3.5 feet of enhanced surge that exceeded the crown elevations of most LPV structures.  In New Orleans East, this was the major source of catastrophic flooding.  Without these floodwaters, the Robinsons would have had less than two feet of flooding—a survivable event. TT at p. 1861 (Kemp); PX 1771, Delft University, Comparison of Flood Depth Development Between Katrina Event and Scenario 2c (Jan. 2009); TT at pp. 1187:21-1188:4, 1231:3-1232:16 (Bea).

**2.  Effect of MR-GO's Defects on Critical Hydrodynamic Factors**

**a.  Enhanced Surge**[43]

The MR-GO's operation and maintenance enhanced surge transmission because of (1) the funnel effect, (2) the destruction of the wetlands, and (3) channel widening.  First, the MR-GO was a conduit for rapid hurricane surge delivery via Reach 2 from the Gulf of Mexico to the heart of Greater New Orleans and via Reach 1/GIWW from Lake Borgne to New Orleans East and the Lower 9th Ward.[44]  Second, as previously noted, the MR-GO created an artificial funnel shape that served as a direct water conduit to the open water because a storm surge barrier was never constructed.  The deep water channel conveyed the unimpeded water into St. Bernard Parish, New Orleans East, and the IHNC area more rapidly than the pre-1958 natural vegetation and original channel width would have allowed.  The funneling of water down Reach 1/GIWW (without a surge barrier) significantly enhanced surge levels in the channel and the IHNC by 3 to 3.5 feet during Katrina. *See* PX 1540, Westerink Expert Report, Fig. 192 at p.201; TT at pp. 4088:12-

---

[43] *See* Proposed Findings of Fact and Conclusions of Law Nos. 408-18, 450, 471 in Appendix "O;" TT at pp. 1778-1779 (Kemp); PX 91, Kemp Expert Report at pp. 186-187; 194.

[44] The vast majority of water discharged into Reach 1 emanated from Reach 2.  *See* PX 91 at p. 135; TT at pp. 1845:1-7, 1852:11-18 (Kemp).

74

4089:1 (Westerink); PX 2152, Kemp Expert Declaration (Jan. 2009) at p. 4.  With a mitigated

Neutral MR-GO (Scenario 2c), surge discharging into the IHNC via Reach 1/GIWW decreases by

about 63%. PX 93, Kemp Supp. Decl. (Oct. 2008) Table 1 at p. 9.  Likewise, had the Corps

neutralized the MRGO with a gate across the throat of the funnel, there would have been no extra

3-3.5 feet of water and no failure at either the north or south breach in the IHNC.  TT at pp.

1231:3-1232:16 (Bea).

**Deleted:** Dr. Robert

Second, the loss of wetlands and channel widening foreseeably contributed to

substantially increased vulnerabilities and degraded performance characteristics of the Reach 2

EBSBs, the navigation structures at Bayou Dupre and Bienvenue, and the Reach 1 flood

protection structures during Hurricane Katrina.  If the cypress-tupelo forests and marshlands had

not been destroyed by the MR-GO's operation and maintenance, these natural defenses would

have reduced surge caused by Hurricane Katrina.  Particularly, with healthy cypress-tupelo

forests and marshlands, surge across the Central Wetlands Unit (between Reach 2 and the 40

Arpent Canal Levee) is reduced by a critical three feet, thereby averting catastrophic flooding in

St. Bernard Parish and the Lower 9th Ward. *See* PX 91, Kemp Expert Report (July 2008) at p.

123.

Finally, the widening of Reach 1/GIWW channel from its design width of 650 feet to

1,000 feet increased the volume of water (conveyance) during Katrina and contributed to the

overtopping of LPV structures and the catastrophic flooding of New Orleans East.

b.  **Intensified Wave Energy**[45]

In terms of destructive forces in the flooding sequence, waves played an even greater role than peak surge elevation which is a poor or insensitive predictor of overtopping. PX 93, Kemp. Supp. Decl. (Oct. 2008) at p. 10. Wave energy is a critical hydrodynamic factor in the destruction of LPV structures. Wave action generally increases with surge height since both are forced by the same properties of the wind, *viz.,* speed and direction. Accordingly, surge and wave action built up at varying rates in different places during the passage of Katrina, but diminished rapidly as soon as the storm left the area.

Once the combined surge and waves reach the top of a flood control structure, they cannot and do not rise any higher. Instead, the water overflows the crown and continues to do so until the water level recedes below the crown. This phenomenon resembles a bathtub that overflows once the water reaches the top and continues to overflow until the water is turned off. While the water level remains constant, the volume of water—a function of time of onset, duration and rate of overflowing—is more indicative of the amount and extent of flooding. *Id.* at p. 10, quoting PX 91, Kemp Expert Report (July 2008) at p. 146; TT at p. 1778:12-25 (Kemp).

**Deleted:** Dr. Paul

The MR-GO channel exponentially increased the wave energy impacting the face of the Reach 2 LPV structures and led to significantly greater discharges in the funnel—particularly in Reach 1 and the IHNC—than would have occurred if the authorized dimensions had been maintained and the pre-channel wetlands and vegetation preserved. Reach 2's growth to 300 to 500% beyond its design width created a broader expanse and volume of water, causing the channel to serve as a wave regeneration basin during Katrina. *See,* PX 83, Bea Expert Report,

---

[45] *See* Proposed Findings of Fact and Conclusions of Law Nos. 419-29, 444 in Appendix "P;" *see also* TT at pp.1795:3-10, 1813:4-1815:16 (Kemp); PX 93, Kemp Supp. Decl. (Oct. 2008) at pp. 15-22.

**Deleted:** Dr. Paul

Fig. 5 at p. 4.  The larger and more intense regenerated waves directly attacked the EBSBs'

exposed surfaces and created wave attack scour and erosion of the EBSBs before overtopping.

Channel widening and the resultant destruction of protective vegetation on the water side also

promoted overtopping earlier, prolonged, and severe wave side attack on the Reach 2 EBSBs.

Along with overtopping, destruction of the LPV structures caused by waves was a direct cause of

flooding due to the Reach 2 channel.

Plaintiffs' modeling demonstrated that the Deteriorated MR-GO (Scenario 1) had a

dramatic impact on waves compared to a mitigated Neutral MR-GO (Scenario 2c).   The waves

along Reach 2 were nine times more energetic during Katrina than they would have been with a

mitigated Neutral MR-GO (Scenario 2c).  *See* PX 75, Bea, Technical Report No. 1 (July 11,

2008), at pp. 55, 57; TT at pp. 1164:1-17, 1181:19-1182:15, 1185:19-23 (Bea) (These more

[Deleted: Dr. Robert]

intense waves meant 90 times more erodibility to the face of the levees).  Significantly, when the

MR-GO is hurricane neutral, wave height is reduced by more than 50%; wave period plummets

about 60%; and wave energy eroding the Reach 2 EBSBs dissipates by 67%.  *See* PX 93, Kemp.

Supp. Decl. (Oct. 2008) at ¶¶ 30 (a), (b), (c).

### c.   Onset, Rate, and Duration of Flooding[46]

The onset, rate, and duration of overtopping—three critical storm parameters—are

significantly delayed without the MR-GO's adverse effects, thereby dramatically reducing (and

averting catastrophic) flooding of Plaintiffs' property.  PX 91, Kemp Expert Report (July 2008)

at pp. 125-33; PX 74, Bea Expert Decl. No. 3 (July 2008) at pp. 150-52, ¶ 142; TT at pp.

1852:12-1854:4 (Dr. Paul Kemp).  The severity of flooding in the populated areas was

significantly dependent on when the overtopping  and breaching of Reach 2 EBSBs began in the

---

[46] *See* Proposed Findings of Fact and Conclusions of Law Nos. 430-33, 444-49 in Appendix "Q."

storm sequence—more flooding if earlier (longer duration) and less flooding if later (shorter duration). Indeed, with a mitigated Neutral MR-GO, overtopping is reduced by a critical 80% for all three polders that experienced catastrophic flooding. PX 91, Kemp Expert Report (July 2008) at p. 146. This is the margin between minor flooding and a deluge.

The MR-GO's adverse effects (including channel widening and wetlands destruction) caused earlier breaching of the LPV structures and therefore greater flooding. Without these flaws, the LPV structures would have survived the brief peak surge, and any overtopping would have been abbreviated, allowing the Central Wetlands Unit to contain the floodwaters. No significant flooding of the protected areas would have occurred if the EBSBs along Reach 2 could have remained largely intact through the brief period of the highest surge.

### 3. Damage to LPV Structures Caused by MR-GO[47]

The MR-GO's exacerbation of Katrina's hydrodynamic factors—like the proverbial Coast Guard cutter—was a substantial factor in causing the overtopping and breaches that led to the catastrophic flooding of Plaintiffs' property. *See* TT at pp. 1059:15-1160:15, 1098:12-1099:21 (Dr. Bea).

Along Reach 1, the Citrus Back Levee on the north side and east of Paris Road—whose crown elevations ranged from about 15.5 to 18 feet—was overtopped but was resilient and was not breached. The surge was over 16 feet with some unanticipated waves. Without the additional 3 to 3.5 feet of surged caused by the MR-GO, there would have been no overtopping and catastrophic flooding in New Orleans East.

Along Reach 2, there were 50 breaches caused by overtopping or breaching by a combination of waves and surge. In some locations (35%), breaching occurred before

---

[47] *See* Proposed Findings of Fact and Conclusion of Law Nos. 484-537 in Appendix "R."

overtopping due to wave side attack; at other sites (47%), the mechanism of failure was overtopping that led to back to front erosion; and only 18% of the LPV structures were overtopped but did not breach.  With maximum surge of about 18 feet, Reach 2 LPV structures were overtopped anywhere between 1.5 to 5 feet above the existing crown elevations.

The critical variable in terms of levee breaching was the energized waves unimpeded by any trees and vegetation.  Indeed, waves—and the earlier overtopping caused by larger waves— are the only forces that can accomplish breaching before overtopping.  Thus, LPV structures were more susceptible of destruction if they were exposed to waves breaking after crossing the Reach 2 channel, but they survived oblique waves diminished by trees and wetlands.  Surge overtopping alone was not enough to destroy the LPV structures.

The breaching along Reach 2 was the *sine qua non* for disaster.  If the EBSBs had been only overtopped without major breaching, floodwaters would have filled the Central Wetlands Unit but not overtopped the 40 Arpent Canal Levee.  Peak storm surge levels above the height of the LPV structures lasted for only a few hours.  Early failures before maximum surge at 8:30 a.m. allowed the 32,000 acre wetland buffer to fill and overtop the local levee while the surge was still rising, resulting in catastrophic flooding in St. Bernard Parish (to an elevation of 11 feet) and then in the Lower 9th Ward.  If the LPV structures failed at a later stage, or failed less completely, the storage capacity of the Central Wetlands Unit would likely have absorbed the discharge long enough to spare Chalmette, the rest of St. Bernard Parish, and the Lower 9th Ward from this cataclysm.

The maximum surge along the IHNC was 17.5 feet—3 to 3.5 feet higher than it would have been without the MR-GO's defects. The actual levee elevations during Katrina were between 12-12.5 feet versus design heights of 14.8 feet.  The entire length of the levees was

79

overtopped, and two breaches occurred on the eastern side adjacent to the Lower 9th Ward.  The
South Breach—the larger of the two failures—was caused in part by surge water pressure on the
levee and overtopping and the resulting back side erosion of the floodwall.  The incremental 3 to
3.5 feet of surge was a contributing cause of the South Breach. The North Breach developed
before overtopping at a water level of about 9 feet. The flooding of the Lower 9th Ward would
have occurred even without these breaches due to the floodwaters emanating from Reach 2, and
the ultimate water levels would have been the same without or without these IHNC levee
breaches. *See* TT at pp. 2754:9-22, 2755:1-9 (Steven Fitzgerald),  TT at p. 1217:6-1219:1,
1223:22-1224:19, 1545:1-1546:3, 1546:16-1547:11 (Bea). But for the multiple adverse effects of
the MRGO there would have been no flooding of New Orleans East, the Lower 9th Ward or St.
Bernard Parish.

| Deleted: Dr. Robert |
| --- |

## V.   WHY THE LEVEES FAILED

Determining the causes of the destruction of the nation's 35th largest city requires
answering three questions:  (1) what happened, (2) why did it happen, and (3) was the MR-GO a
substantial factor or would the catastrophic flooding have occurred with or without the MR-GO?
The short answers are that (a) the LPV system was overwhelmed (b) because of excess surge,
enhanced waves, and extraordinary water discharge that (c) would have been dramatically
reduced without the MR-GO's defective conditions.  The substantial evidence supporting these
conclusions is discussed below.

As we evaluate the record, it is helpful to bear in mind the testimony of Professor
Johannes Vrijling, a world renowned expert in hydraulics and probalistic design, that the MR-
GO posed three main threats to the LPV system that was supposed to protect Greater New

Orleans during Katrina: surge, waves, and conveyance. TT at pp. 1064:10-1070:3 (Vrijling); PX

2150 & PX 2151, Handwritten Drawings of Professor Vrijling re: Surge, Wave & Conveyance.

   *As the two MR-GO reaches widen, the surge level increases.

   * As the waves enter Reach 2 from the east over Lake Borgne, they progress over the

marsh and reduce in size; but when the waves reach the MR-GO, they increase (regenerate) very

rapidly due to the hurricane winds and the wide channel expanse.

   *Conveyance—also called discharge—implicates the volume and velocity ($ft^3$/s/ ft) of

water flow.  Example: if there is marsh in front of the levee, the water flow is decreased, thereby

making it more difficult for the water to enter through the breach. On the other hand, if there is a

deep channel in front of the dike, the water has less difficulty reaching the levee.  Therefore,

more water flows through the breach causing more flooding.

   A.  **What Happened**

      1.  **Plaintiffs' Flood Modeling Results**

   Before they could assess the potential impact of the MR-GO on the flooding of the New

Orleans East polder and the Lower 9th Ward/St. Bernard polder, Plaintiffs needed a complete

understanding of how the flooding occurred and where the water went.  Unlike Defendants, who

did their flood modeling <u>after</u> they had reached their conclusions about the cause of the flooding,

Plaintiffs' first undertook a scientific exercise of constructing a flood model of the New Orleans

East and Lower 9th Ward/St. Bernard polders.  *See* PX 53, Polder Flood Simulations for Greater

New Orleans, Hurricane Katrina August 2005 (July 2007); TT at p. 832:17-25 (Vrijling).  The

disparity in the parties' modeling results is striking.

   Plaintiffs got it right the first time, one year before they had reached their final

conclusions about the cause of breaching. TT at p. 827:9-14 (Vrijling). Defendants, on the other

hand, had to reject the IPET ADCIRC modeling in favor of a new beta version ADCIRC run that yielded the preordained results.  TT at p. 2084:3-9 (Ebersole); TT at p.1776:17-25 (Kemp)**.** Then the defense modelers had to manipulate the time of peak surge (by shifting the Hurricane Katrina track some miles to the east of the actual track during the storm) and the time that it took for the levees to fail in order to match witness observations regarding flooding.  PX 106, Joint Declaration, Vrijling, Kok, de Wit, and Gautier concerning wave and flow modeling New Orleans -- MRGO for Hurricane Katrina, August 2005 at p. 4; TT at pp. 1784:17–1789:4 (Kemp); TT at pp. 2121:25-2122:4 (different peak surge time) (Ebersole); TT at p. 2417:9-15 (admitting adjustment) (Ebersole); TT at pp. 2790:19-2791:23 (S. Fitzgerald).

The Dutch used a reliable flood simulator called the SOBEK model. PX 53, Polder Flood Simulations for Greater New Orleans, Hurricane Katrina 2005 (July 2007) at p. 1; TT at p. 825:8-13 (Vrijling); TT at p. 1776:7-25 (Kemp).   In order for the SOBEK model to function, detailed information was required about topography, bathymetry and habitat as they existed at the time of the Hurricane Katrina.  Weather information and, most importantly, detailed information about the location, length and sill height[48] of each breach was also necessary.  PX 53, Polder Flood Simulations for Greater New Orleans, Hurricane Katrina 2005 (July 2007) at pp. 4-6; PX 2152, Kemp Supp. Declaration (Jan 2009) at p. 6. There was no testimony offered at trial or any expert opinions that suggest that the Professor Vrijling conclusions derived by his SOBEK model were inaccurate.

### a.  New Orleans East

In the New Orleans East polder, Plaintiffs modeled 9 breach locations.  As can be seen by a comparison to the IPET map of the New Orleans East breaches (PX 53, Polder Flood

---

[48] Sill height refers to the height of the remaining levee after breaching, also known as bottom elevation.  TT at p. 2316:19-22 (Ebersole); TT at p. 2781:6-8 (S. Fitzgerald).

Simulations for Greater New Orleans, Hurricane Katrina 2005 (July 2007) at p. 26; JX 258, IPET Vol.1 at pp. 1-49; Slide1[49]), the Dutch modeling is more complete because it includes points 3, 1 and 4 which are 33 feet of breaching at the airport, 61 feet of an opening in the flood wall to accommodate train traffic that was sand bagged during Hurricane Katrina, and 25 feet of breaching on the east bank of the IHNC South of the railroad.  *See* PX 53 Polder Flood Simulations for Greater New Orleans, Hurricane Katrina 2005 (July 2007) at p. 27.

The Dutch model shows that the first floodwaters entered the New Orleans East polder through a 600 foot breach at the southeast corner at about 6:30 a.m.  PX 53 Polder Flood Simulations for Greater New Orleans, Hurricane Katrina 2005 (July 2007) at p. 29 and p. 34.[50] The second major breach occurred near the bulk terminal starting at 7:30 a.m.   PX 53, Polder Flood Simulations for Greater New Orleans, Hurricane Katrina 2005 (July 2007) at p. 29**.** The more important finding was the relative contribution of breaching to the flooding in the New Orleans East polder.  The SOBEK model—at any point selected by the modeler—can indicate the relative contribution of water from overtopping versus water from breaching.  PX 53, Polder Flood Simulations for Greater New Orleans, Hurricane Katrina 2005 (July 2007) at p. 43.

Plaintiffs selected five points within the New Orleans East polder for the purpose of creating a hydrograph to understand this relative contribution.  A map of those points appears at PX 53, Polder Flood Simulations for Greater New Orleans, Hurricane Katrina 2005 (July 2007)

---

[49] Attached as Appendix "K" are collections of graphics, herein referred to as "Slides," that are either admitted exhibits or based on admitted exhibits.

[50] Although in the Vrijling report the entry of water is referred to as overtopping, 6000 feet of the levee at this location in fact breached due to overtopping erosion.  PX53, Polder Flood Stimulations for Greater New Orleans, Hurricane Katrina 2005 (July 2007) at p. 27.  For this reason, the statement in the report that overtopping was the major contributor to flooding in the New Orleans East polder is a mistake.  In fact, breaching of the levees at this location was the major contributor.  The hydrographs are therefore also inaccurate.  The mistake was corrected in the flood model done to asses the flooding that would have resulted without the MR-GO caused breaches.  PX 105, Vrijling Polder Flood Report (July 2008) at p. 18.

at p. 33.  Points 1, 2 and 3 in the model showed that water from breaching contributed
approximately 10 feet to the water depth.  PX 53, Polder Flood Simulations for Greater New
Orleans, Hurricane Katrina 2005 (July 2007) at pp. 34-35.[51]  At points 4 and 5, breaching
contributed approximately 10 feet to the water depth.  PX 53, Polder Flood Simulations for
Greater New Orleans, Hurricane Katrina 2005 (July 2007) at p. 36.  The conclusion is that but
for the breaching, there would not have been catastrophic flooding in the New Orleans East
polder (including the Robinsons' home).  PX 53, Polder Flood Simulations for Greater New
Orleans, Hurricane Katrina 2005 (July 2007) at p. 51[52]; PX 2152, Kemp Supp. Decl. (Jan. 14,
2009) at p. 3.

**Deleted:** Declaration

### b.  <u>Lower 9th Ward/St. Bernard Polder</u>

Performing the same exercise for the Lower 9th Ward/St. Bernard polder, the model
showed that the first and most significant breaching occurred along Reach 2 of the MR-GO
between 5:00 am and 8:30 am.  PX 53, Polder Flood Simulations for Greater New Orleans,
Hurricane Katrina 2005 (July 2007) at pp. 38-39; TT at pp. 1823:17-1824:8 (Kemp); Slide 2.
Two of the breaches occurred on the east bank of the IHNC at the Lower 9th Ward.  It is
believed that those breaches were fully developed by 7:30 a.m. PX 53, Polder Flood Simulations
for Greater New Orleans, Hurricane Katrina 2005 (July 2007) at pp. 38-40.  Like the New
Orleans East polder, 10 points were selected to evaluate the relative contribution of breaching
versus overtopping in the Lower 9th Ward/St. Bernard polder. PX 53, Polder Flood Simulations
for Greater New Orleans, Hurricane Katrina 2005 (July 2007) at p. 37.  In addition to evaluating
the contribution of breaching versus overtopping generally, it was essential to evaluate the

---

[51] Because the breaching at the southeast corner was incorrectly labeled as overtopping, it was
not modeled in the model and as such the "only overtopping line" is incorrect.

[52] The Vrijling report inaccurately refers to breaching as overtopping.  JX 258, IPET Vol. 1 at
pp. 1-49; PX1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at pp. 18:13-20:15.

relative contribution of the IHNC East breaches as compared to the Reach 2 breaches since at that time Plaintiffs were pursuing claims against Washington Group International and the Corps on a separate theory of negligence in connection with the failure of the IHNC East levees at the Lower 9th Ward.  PX 53, Polder Flood Simulations for Greater New Orleans, Hurricane Katrina 2005 (July 2007) at p. 43.

> *At all locations, overtopping contributed very little to flood water.*  Significantly, once again, but for the breaching of the levees at Reach 2 and in the IHNC East at the Lower 9th Ward, there would have been no flooding in the Lower 9th Ward/St. Bernard polder. PX 53, Polder Flood Simulations for Greater New Orleans, Hurricane Katrina 2005 (July 2007) at pp. 46-50; PX 2152, Kemp Supp. Decl. (Jan. 2009) at p. 3.  In addition, the two IHNC breaches contributed a much smaller amount of water to the flooding than did the breaches from Reach 2. PX 53, Polder Flood Simulations for Greater New Orleans, Hurricane Katrina 2005 (July 2007) at pp. 46-50; TT at pp. 2745:10-4, 2754:9-22, 2755:1-9 (S. Fitzgerald); TT at pp. 1546:16-1547:11, 1223:24-1224:18, 1545:1-1546:1, 1097:8-19 (Bea); PX 1487, S. Fitzgerald Expert Report (Dec. 2008) at p. 4.

Deleted: Declaration

> Plaintiffs have offered the most reliable data that debunks the Government's theory that Katrina's size (diameter) caused such high surge levels poring massive volumes of water over the top of the levees that there would have been catastrophic flooding in any case. TT at pp. 1746:19-1747:2 (Kemp).  The SOBEK model demonstrates that levee breaching (both before and after overtopping) was the critical cause of catastrophic flooding in the New Orleans East and Lower 9th Ward/St. Bernard polders.  PX 53, Polder Flood Simulations for Greater New

Orleans, Hurricane Katrina 2005 (July 2007) at p. 51;[53] PX 71, Bea Expert Report- Summary

(July 2008) at p. 17, ¶18; TT at p. 1827:23-1828:6 (Kemp); TT at pp. 1228:19-1229:12 (Bea);

JX 258, IPET Report at pp. I-49, V-116; V-105; PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25,

2008) at pp. 18:13-20:15.  Likewise, Dr. Bea concluded that without the MR-GO, Hurricane

Katrina itself was not severe enough to have caused the front side wave attack and erosion of

Reach 2, the incrementally enhanced surge developed in Reach 1 and/or the IHNC.  "Katrina had

a very biug helper, the MR-GO." TT at pp. 1095:16-1096:1 (Bea).

### 2.   Defendant's Flood Modeling Results

Defendant's modeling is flawed or incomplete for a variety of reasons. *See* Plaintiffs'

Proposed Findings of Fact and Conclusions of Law Nos. 476-83 in Appendix "E."  The most

glaring generic mistake is the critical (and erroneous) choices made regarding data input.  TT at

pp. 1792:7-1795:16 (Kemp); PX 2152, Kemp Supp. Declaration (Jan. 2009) at p. 6.

#### a.   New Orleans East

Defendants did no flood modeling for the New Orleans East polder. TT at p. 2753:15-24

(S. Fitzgerald). Therefore, they have no evidence to contradict Plaintiffs' conclusions regarding

flooding in that polder.  TT at p. 2316:8-11 (Ebersole).

#### b.   Lower 9th Ward/St. Bernard Polder

For the Lower 9th Ward/St. Bernard Polder, Defendants inexplicably chose not to use the

actual location, length, sill height for the breaches along Reach 2.  Instead, they arbitrarily

lumped together all of the breaches along Reach 2 into 11 rectangular boxes, none of which had

a sill height of more than 10 feet.  *See* PX 2138.3, Fitzgerald Chart: Reach 2 Levee Crest

Elevation vs. Breach map.  PX 2138, Graphs Produced by Steven Fitzgerald at pp. 3-4; DX 744

---

[53] Again, the reference to overtopping is an error.  It should be breaching. PX1363.1, Mosher
30(b)(6) (Nov. 25, 2008) at pp. 18:13-20:15.

S. Fitzgerald Expert Report at pp. 13-14; TT at pp. 2785:25-2786:1 (S. Fitzgerald).  The critical significance here is that this choice inexplicably leaves out of Defendant's flood model 1,453 feet of breaching occurring between Bayou Bienvenue and Bayou Dupre and 3,118 feet of breaching between Bayou Dupre and the southeastern end of the Reach 2 levee.  *See* PX 1810.15, Breach Sill Heights (S. Fitzgerald Cross Demonstrative Slide 4).  Additionally, Defendant's flood modeling of the Lower 9th Ward/St. Bernard polder fails to account for the 64% of the length of the Reach 2 breaches that had sill elevations above 10 feet.  PX 1810.15, Breach Sill Heights (S. Fitzgerald Cross Demonstrative Slide 4).  Thus, it is little wonder that the defense experts dismiss breaching as a significant cause of flooding in order to rationalize their overtopping theory.

Perhaps the most material flaw is that Defendants modeled all of the breaches as if they all had a sill height of no more than 10 feet—when in fact, 17,583 feet of the breaches had sill heights above 10 feet.  PX 1810.15, Breach Sill Heights (S. Fitzgerald Cross Demonstrative Slide 4); PX 2138.3, Fitzgerald Chart: Reach 2 Levee Crest Elevation vs. Breach map. In Plaintiffs' model—a much closer approximation of the reality of Hurricane Katrina—more water passes through the breaches when the water is higher since there is much more length (a wider hole) of higher sill heights.  Thus, the polder floods quickly—a finding also consistent with all of the eyewitness testimony.  *See* TT at p. 1782:18-22 (Vrijling).

In Defendant's model, a shorter length (a narrower hole) prevents water from entering the polder while the water is high.  As a result, Defendant's failure to include all of the breaching in its model does not allow enough water into the polder to completely flood it. TT at p. 2067:7-12 (Ebersole); TT at pp. 2793:6-2797:3 (S. Fitzgerald).  The IPET ADCIRC data showed that the water went down rapidly as the storm moved through the area.  However, Defendant's use of the

87

IPET ADCIRC data yielded an inconvenient output—it did not demonstrate that the water was at 10 feet for a sufficiently long enough period of time to completely flood the polder.[54]

Defendant's "solution" was to create a new ADCIRC model which implausibly assumed that the surge bounced back off the Mississippi coast, causing the water to remain at 10 feet for enough time to fill the bowl.  TT at pp. 2099:14-19, 2104:9-13 (Ebersole); JX 196, Westerink Report at p. 27. The fundamental flaw with Defendant's theory is the anomalous result that the water levels in the IHNC drop by nearly four feet but rise again by over one foot five hours later. JX 196, Westerink Report at p. 204; PX 104, Vrijling Flow Modeling at p. 96; JX 211, Ebersole Expert Report at p. 43; TT at pp. 2104:24-2105:1 (Ebersole); TT at pp. 1854:7-15 (Kemp); Slide 3.  Not only is this theory refuted by real world data[55], but Defendant admits that there was no such dramatic drop and rise ("second hump") in water in the IHNC.  TT at p. 2105:3-4 (Ebersole).  Without sufficient evidence, they improbably argue that their ADCIRC hydrographs for Reach 2 are accurate but that their hydrographs for the IHNC are not reliable. TT at pp. 2105:12-18, 2107:14-19, 2107:24-2108:2, 2108:4-5, 2350:7-9 (Ebersole).[56]

**B.  Why Did It Happen?**

Since levee breaching was the predominate cause of catastrophic flooding, the next inquiry is what caused the levees to fail.

---

[54] Plaintiffs make the assertion based on pure logic.

[55] The actual water level readings by the IHNC Lockmaster show progressively lower water levels after peak surge and no second "bump". PX3, IPET Volume 1 at pp. 6-24 (graph with lockmaster readings); TT at p. 1854:7-15 (Kemp); TT at p. 2107:3-4 (Ebersole); TT at pp. 4118:25-4119:1 (Westerink); Slides 4-7.

[56] Interestingly, Defendant's expert Bruce Ebersole testified that this feature of the Defendant's hydrographs—the infamous second hump on the hydrograph—makes Defendant's hydrographs more realistic than Plaintiff's hydrographs. TT at pp. 2102:23-2103:1.  Plaintiffs submit this is but one of many examples of Defendants having to create data to support their conclusions.

## 1. For The Most Part, The Levees Performed As Designed and Were Not Defective

Plaintiffs have consistently contended that the design and construction of the levees and I-walls—built as part of the LPV system surrounding the New Orleans East and Lower 9th Ward /St Bernard polders—were not defective and performed as designed.[57]  The Government has also taken this position.[58]  Therefore, the Court can rule out subpar LPV structures as a cause of breaching.

Reed Mosher, a senior Corps levee expert and a 30(b)(6) witness, testified about the Corps' position as to how the levees performed during Hurricane Katrina.  *See* PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at p. 11:2-9.  The design intent was the performance standard that was utilized to gauge performance. PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at p. 11:10-21.  The levees were not designed to withstand wave overtopping or surge overflow but they were designed to handle a seven foot peak wave. PX 1322, LPV, DM No. 1, Hydrology and Hydraulic Analysis, Part I-Chalmette at p p.23-24.

## 2. Why Some Levees Failed

Mosher testified about the reasons for the several levee failures along Reach 1, the GIWW and IHNC and the massive breaches along much of Reach 2.  The parties are in agreement about the mechanisms of failure but not the cause.

---

[57] After spending over $22 million, IPET reached this conclusion: "Ironically the structures that ultimately breached performed as designed providing protection until overtopping occurred and then becoming vulnerable to catastrophic breaching." JX 258, Executive Summary, Volume 1 at pp. 1-2.

[58] Testimony regarding the Corps' position on this issue came from a 30(b)(6) designee, Reed Mosher. PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at pp. 6:1-15 & 9:21-15.  Mosher was also one of the co-leads for the performance of the levees and flood walls discussion in the IPET report. PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at p. 10:13-23.  *See also* TT at pp. 3123:8-12 (Mosher).

\*On the northern bank of Reach 1, the second major breach to occur in the New Orleans East polder was an overtopped I-wall.  (Number 1 is marked by Mosher in his deposition and marked as locations 7 and 8 on the Vrijling map. *See* Slide 1.)  Water flowed over the back of the I-wall and eroded the ground behind the wall, causing the wall to breach by essentially leaning over into that eroded area. PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at p. 44:11-21. The wall performed up to the design until the water flowed over the top. PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at p. 45:11-14. Most significantly, Mosher affirmed the Plaintiffs' position that if the water level had not reached the point where it overtopped, this floodwall would not have breached. PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at p. 47:8–12; *see also* PX 71, Bea Expert Report – Summary (July 2008) at p.17, ¶18; PX 82, Bea Declaration (Jan. 2009) at pp. 104-105, 141-143, 146; TT at p. 1232:3-16 (Bea); PX 105, Vrijling Polder Flood Report (July 2008) at p. 39.

\*Mosher also analyzed the two breaches on the north side of the GIWW east of Michoud. (Location 2 on the Mosher map which is locations 5 and 6 on the Dutch map. *See* Slide 1). Here the breach mechanism was high flow around a difference in height between a levee and a wall where they came together (a transition location).  PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at p. 49:10-19.  The transition locations did not perform as designed. PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at pp. 49:20-50:5.  Plaintiff experts agree that this was a design failure and included this breach in their final SOBEK flood models (PX 1771 and PX 105) which removed only breaching caused by the MR-GO.  PX 105, Vrijling Polder Flood Report (July 2008) at p. 39.

\*At the southeastern corner of the New Orleans East polder along the GIWW (Number 3 on Mosher's map and location 9 on the Dutch map (*see* Slide 1)), the mechanism of failure was

overtopping of the levees which caused erosion of the crest.[59]  PX 1363.1, Mosher 30(b)(6)

Depo. (Nov. 25, 2008) at p. 50:6-20; JX 258,  IPET Volume 1 at p. V-18-69, Figure 21.  Despite

the fact that those levees were low, if water would not have flowed over the top, they would have

performed as designed.  PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at p. 54:2-13. PX

105, Vrijling Polder Flood Report (July 2008) at p. 39.

  *With respect to the two breaches on the IHNC, Mosher testified that the larger South

Breach was attributable to a floodwall failure caused (and preceded) by surge water pressure

imposed on the LPV structure and overtopping and the resulting protected side erosion. PX

1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at p. 67:5-14 (referring to Location 5 on the

Mosher map which is location 2 on the Dutch map.  *See* Slide 2)**.**  Mosher and Plaintiffs' expert

concur that overtopping was a contributing cause of the South Breach. *See* PX 82, Bea Expert

Decl. (Jan 2009) at p. 105, ¶ 147; JX 212, Mosher Expert Report (Dec. 2008) at p. 100;  PX 105,

Vrijling Polder Flood Report (July 2008) at p. 39.

  Mosher further testified that the North Breach (Location 6 on the Mosher map and

Location 1 on the Dutch map (*see* Slide 2)) was attributable to a failed floodwall that developed

early in the morning of August 29th (and before overtopping at a water level of 9 feet) as a result

of lateral instability due to surge water pressure and the reduced cross section of the LPV

structure at this location. PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at p. 79:1-7; JX

212, Mosher Expert Report (Dec. 2008) at pp. 27, 60.  In some particulars, the parties disagree

about the multiple causes of the North Breach.

**Deleted:** *See*

---

[59] This is the breach that Vrijling mistakenly refers to as overtopping in his 2007 report.  PX 53,
Polder Flood Simulations for Greater New Orleans, Hurricane Katrina August 2005 (July 2007)
at p. 51.

While Defendant primarily assigns defective design and construction as the mechanism of failure, Plaintiffs stress under seepage of the floodwall from defective demolition, construction, and/or remediation methods as part of the East Bank Industrial Area Remediation Project ("EBIA"). Both parties, however, agree that high water was the precipitating factor in the floodwall's demise. PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at pp. 364:18-371:6; JX 212, Mosher Expert Report (Dec. 2008) at p. 100. "Each of these factors—enhanced surge, current, and waves caused by the MR-GO and the USACE EBIA excavation work—was a substantial factor in the failure of these structures [North and South breaches] and the ensuing catastrophic flooding." PX 71, Bea, Expert Report (July 2008) at p. 17, ¶ 18; *see also* PX 105, Vrijling Polder Flood Report (July 2008) at p. 39. According to Dr. Bea, even if we eliminate the EBIA (assume it never happened) then the other negative MR-GO impacts (higher water level, increased hydrodynamic pressure, earlier onset and extended duration) standing alone would have been substantial factors in causing the North and South breaches. TT at pp. 1226:12-1228:25 (Bea).

\*As for Reach 2, Mosher stuck to the Defendant's position dating back to IPET, testifying that the mechanics of breaching along that levee stretch was overtopping. PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at p. 40:1-6. He asserted that the levees along Reach 2 were about 15 feet in height and the surge rose to 20-22 feet. PX 1363.1, Mosher 30(b)(6) Depo. (Nov. 25, 2008) at p. 60:1-9. As will be shown below, however, only 10% of all the levees along Reach 2 were 15.5 feet or lower, and the surge never reached 18 feet. Unfortunately for the Government, the actual facts inconveniently undermine its causation theory for Reach 2. PX 105, Vrijling Polder Flood Report (July 2008) at p. 39; Slides 34, 14-18.

92

The Court has asked for an explanation why some levees failed and some levees did not fail. The short answer is that the failed levees along Reach 2 typically had such common characteristics as lower crest elevations, channel proximity to the levees, more sandy soils, greater channel depth at the levee toe, little of no fronting vegetation, and more energetic waves. TT at pp. 947:11-948:12. (Vrijling); TT at p. 1111:1-14 (Bea); PX 71, Bea Expert Report (July 2008) at pp. 7-8; PX 81, Bea Expert Report (Jan. 2009) at pp. 3-6; PX 98; Morris Expert Report at pp. 23-25. With the exception of the more porous soils, the other variables (as discussed above) were all caused by the MR-GO.

One key to unlocking the issue is the logic that whether or not a structure fails is dependent on two fundamental factors—a levee's ability to withstand a load brought to bear on it and the load to which it is subjected. As shown above, the levees on Reach 2 between Bayou Bienvenue and the southern most end of the levee were built with hydraulic dredge spoil. Slide 23; JX 274, IPET Vol. V, at p. V-108; Slide 24; JX 274 at p. V-18-30. While each and every location cannot be expected to contain the same precise mix of soils, they are generally homogenous. To the extent that this type of soil is more vulnerable to overtopping and wave erosion, it is the proverbial "thin skulled" victim of the MR-GO's negative effects.

Another variable is a levee's height—the higher the crown, the less likely to be breached. This is not a complete explanation, however, because at each height level, there were levees that failed and those that did not fail. *See* Slide 35. Each height range in turn had a variety of toe heights with different water depths at the toe.

In addition, each failed levee location had a different distance from the toe to the Reach 2 shoreline. *See* Slide 35. Moreover, there were a variety of increased wave height at different places. *See* Slide 26. It is clear that there is more homogeneity with regard to the ability of the

93

> Deleted: :

levee to withstand the load (they were all built with hydraulic fill) than there is with regard to the load brought to bear on those levees (loss of levee height due to squeezing, wave energy related to distance to shore, vegetation, wave height, habitat loss, and toe height reduction).

What is most telling is that the loading variability can all be attributed to damages caused directly by the MR-GO:

*The differences in levee height and toe height are the result of their location over the interdistributary layer and the potential of the soils in that layer to be squeezed into the channel and the distance of the deteriorated shoreline to the levee toe—all of which is directly related to increased subsidence – both of which cause higher water on the levee face which increase the potential of waves to do damage.

*Increased salinity destroyed surge and wave buffering trees, brush, and other vegetation along the shore of the Golden Triangle, but not in precisely the same way at each point along Reach 2.

*The MRGO's depth and width due to the Corps' failure to maintain the banks as designed necessarily affected the ability of the waves to regenerate.  The variability in the fetch—caused by the differing width of the channel—accounts for a range of variability in wave height.

### C.  The MR-GO Was A Substantial Factor In Levee Failures

As demonstrated above, Plaintiffs have established three fundamental propositions:

(1)      the design and construction of the LPV structures met contemporary standards and performed as designed, *viz.*, they failed when overtopped;

(2)      overtopping, while a factor (especially in New Orleans East), did not alone cause catastrophic flooding in the two polders; and

94

(3)    the primary source of floodwaters inundating the two polders was by means of breaches in the levees.

Since overtopping and breaching are the consensus reasons for catastrophic flooding, the question becomes what role did the MR-GO play in causing overtopping and breaching. Plaintiffs have long maintained that the MR-GO had a material effect on increasing surge, waves, and conveyance that in turn were a substantial factor in causing breaches before and after overtopping as well as overtopping without breaching.  TT at p. 831:13-18 (Vrijling).  The evidence preponderates in favor of Plaintiffs' position.

### 1.  A Tale of Two Polders

The relevant regional geography divides into two distinct areas.

*The first is that portion likely to be affected by the confluence of the GIWW and the MR-GO—the "funnel." *See* Slides 3-12.  The sectors affected by the funnel are the northern and southern banks of Reach 1 of the MR-GO and the east bank of the IHNC from Lake Pontchartrain on the North to the Mississippi River Locks at the southern end of the canal.  The evaluation of the MR-GO's impact on levee breaching in the New Orleans East polder will focus on surge and conveyance of water.

*The second portion is the southern border of the New Orleans East polder, east of the confluence of the GIWW and the MR-GO and Reach 2 of the MR-GO to the southern end of the Reach 2 hurricane protection levees.  The evaluation of the MR-GO's impact on levee breaching in the Lower 9th Ward/St. Bernard Paris polder will focus on surge, waves, and water conveyance. Slides 13-38.

### a.  **The Funnel and Surge**

In connection with the original design of the MR-GO, the Army Corps performed an engineering evaluation of the influence of the proposed channel on water surface elevations (surge), the potential of the channel to transmit increased salinity into the environs surrounding the channel (potential to destroy habitat), and the influence of possible hurricane wind waves propagated up the channel (conveyance). PX 699, MR-GO, LA Design Memorandum No. 1-B, Channels, Mile 39.01-Mile 63.77 (rev. May, 1959) at pp. 2-4.  The Corps had the knowledge, tools, experience to study whether hurricane-generated waves—breaking on the Lake Borgne shore and/or the Lake Borgne marsh—could potentially be regenerated by the MR-GO channel. TT at p. 207:9-13 (Soileau); PX 91, Kemp Expert Report at p. 3**.**

The LPV levees were designed as if the MR-GO channel did not exist. TT at p. 193:12-15 (Soileau).  This hydraulic assumption was apparently based upon the Corps' previous engineering evaluations that the MR-GO would not have any impact on surge or the conveyance of water.  *See* PX 699, MR-GO, LA Design Memorandum No. 1-B, Channels, Mile 39.01-Mile 63.77 (rev. 05/1959) at p.2-3. The evidence is therefore overwhelming that the Corps of Engineers made an engineering judgment that the MR-GO channel would not have any impact on hurricane surge, waves, or the conveyance of water—a position ("unitive statement")[60] to which it stubbornly clung for five decades and, indeed, still professes to believe to this very day. Any study of the potential impact of the MR-GO channel on surge, waves or the conveyance of water—that is, whether the Corps was tragically mistaken—must therefore be based on a comparison of topography, bathymetry, and habitat that existed before the MR-GO was built and

---

[60] TT at pp. 208:24-209:2 (Soileau); JX 325, Memorandum for Record, Subject: Apparent Funneling Effects at Paris Road from Convergence of Citrus and Chalmette Hurricane Protection Levees (Feb. 6, 1973).

without a MR-GO channel.[61]  It is only by removing the channel that one can ascertain the MR-GO's effect on surge, conveyance and waves.[62]

Professor Vrijling's team undertook this analysis by first replaying Hurricane Katrina (Katrina Real Run) as it occurred using the 2005 deteriorated topography, bathymetry, and habitat to see if they could produce what was observed and was experienced by the affected population (Scenario 1 or Deteriorated MR-GO).  PX 104, Vrijling Flow Modeling Report (June 2008) at p. 8 ; TT at pp 825:8-13, 832:17-25 (Vrijling).  Next, the Delft University team changed the topography, bathymetry, and habitat to pre-1958 conditions based upon advice from Plaintiffs' experts Duncan FitzGerald, John Day, Chad Morris and Paul Kemp. TT at pp. 826:18-19; 827:1-5 (Vrijling).  They then repeated the calculations to obtain as reliable a prediction as possible of what might have occurred if the MR-GO had no effect on hurricane surge, waves, and conveyance as was assumed by the Corps before building the ship channel and throughout its history (Scenario 2c or MR-GO Neutral). *See* TT at pp. 832:17–25, 1075:1-8 (Vrijling); PX 104, Vrijling Flow Modeling Report (June 2008) at pp. 4-5.[63]

| Deleted: Fitzgerald |
|---|

---

[61] Defendant attempts to portray Scenario 3, not Scenario 2c, as the "no negligence" condition. This argument is unfounded.  The Corps was legally obligated to operate and maintain a ship channel that did not enhance the risk of flooding, i.e. was hurricane neutral.  *See* Section III, *infra*.  That requires a channel not only at its initial width and protected by pre-1958 vegetation, but also a waterway that has been mitigated to eliminate enhance surge, waves, and conveyance. Otherwise, the MR-GO retains one of its most salient defects at the time of Katrina.  For more detailed proof that Scenario 3 is not the proper focus, *see* Plaintiffs' Proposed Findings of Fact and Conclusions of Law Nos. 457-75 in Appendix "F."

[62] The fact that the channel is removed in the model *does not* mean that Plaintiffs are arguing that the channel should not have been built as designed.  Rather, Plaintiffs contend that consistent with this Court's ruling on the DFE motion (Rec. Doc. 18212 at p. 49), the authorized channel (after construction, but long before Katrina) should have had safety features to make it storm surge neutral (protected by the mitigation measures discussed elsewhere in this brief).

[63] The Defendant's expert, Professor Johannes Westerink, did a similar comparison using the ADCIRC Model instead of the FINEL Model.  His Katrina Real Run is labeled H-1 in his report ("MR-GO Deteriorated") and his equivalent to Plaintiffs' Scenario 2c is labeled H-3 in his report ("MR-GO Neutral"). JX 196, Westerink's Expert Report (Dec. 2008) at pp. 3-8.  It is important

Vrijling and Westerink reached remarkably similar conclusions about the MR-GO's impact on surge levels when the funnel is neutralized. *See* Slides 4–10; TT at p. 2121:18-20.

\*Starting at the IHNC Lockmaster location (Slide 4), Vrijling shows that the surge level would have been reduced by 3 feet if the MR-GO had no effect on hurricane surge; Westerink identifies a 3.5 foot reduction. PX 104, Vrijling Flow Modeling Report (June 2008) at p. 96; JX 196, Westerink Expert Report (Dec. 2008) at p. 204.

\*At the junction of the IHNC and the Reach 1/GIWW (Slide 5),Vrijling finds a 3 foot reduction; Westerink projects a 3.5 foot reduction.  PX 104, Vrijling Flow Modeling Report (June 2008) at p. 95; JX 196, Westerink Expert Report (Dec. 2008) at p. 202.

\*At the IHNC and I-10 (Slide 6),Vrijling notes a 1 foot reduction, while Westerink records a 3 foot reduction. PX 104, Vrijling Flow Modeling Report (June 2008) at p. 96; JX 196, Westerink Expert Report (Dec. 2008), at p. 200.[64]

\*At the Seabrook Bridge (Slide 7), Vrijling shows no reduction but Westerink reports a reduction of about 1.25 feet. PX 104, Vrijling Flow Modeling Report (June 2008) at p. 97; JX 196, Westerink Expert Report (Dec. 2008) at p. 196.

---

to note that in both Vrijling's and Westerink's MR-GO Deteriorated and MR-GO Neutral scenarios, the levees along the GIWW and the levees along the southern bank of Reach 1 and Reach 2 are considered by the model.  To the extent that there is any difference in results as between MR-GO Deteriorated and MR-GO Neutral, the levees obviously can have no impact on that difference.  The only differential effects being measured are those between the MR-GO in its deteriorated condition with levees and the MR-GO as designed and intended to have no hurricane surge and no water conveyance, also with the levees.

[64] Although Vrijling did not produce a hydrograph for the point midway between I-10 and the Seabrook Bridge, Westerink shows a reduction of 2 feet.  *See* JX 196, Westerink Expert Report, (Dec. 2008) at p. 198.

\*At Lake Pontchartrain (Slide 8), Vrijling and Westerink show no change.  PX 104, Vrijling Flow Modeling Report (June 2008) at p. 97; JX 196, Westerink Expert Report (Dec. 2008) at p. 194.

\*Moving to Reach 1 near the Bulk Terminal breach (Slide 9), Vrijling finds a reduction of 2 feet, while Westerink shows about 1 or 2 foot of reduced surge.  PX 104, Vrijling Flow Modeling Report (June 2008) at p. 95; JX 196, Westerink Expert Report (Dec. 2008) at p. 208.

Deleted: 2

\*Finally, at the GIWW and Paris Road (Slide 10), Vrijling and Westerink project a 2 foot reduction.  PX 104, Vrijling Flow Modeling Report (June 2008) at p. 94; JX 196, Westerink Expert Report (Dec. 2008) at pp. 210, 212.

Deleted: 2

The most remarkable observation about this Vrijling-Westerink consensus is that it corroborates the findings that Bretschneider and Collins made in 1966 when they were tasked by the Corps to ascertain whether or not the MR-GO had any impact on surge in the IHNC. *See* TT at p. 219:8-13 (Soileau)[65]; PX 68, Storm Surge Effects of the MR-GO, Study A (Bretschneider & Collins Report) (Sept. 1966) at p. 4 [MR-GO's "marked effect"].  Forty years of denial by the Corps led to the unmitigated funnel creating a powerful surge that was a substantial factor in destroying New Orleans East and the Lower 9th Ward.  On this record, this is the only plausible conclusion.

### b.  The Funnel and Conveyance

In addition to surge, the conveyance of water can make an extreme difference in whether your house floods or does not flood even if there is a breach. *See* TT at p. 1069:14-25 (Vrijling); PX 91, Kemp Expert Report (July 2008) at p. 141.  The amount of water delivered to a particular location is the discharge rate.  Comparing the discharge rate in the MR-GO as deteriorated with

---

[65] JX 284, Lake Pontchartrain and Vicinity, Louisiana Design Memorandum No. 1 - Hydrology and Hydraulic Analysis: Part I – Chalmette (Aug. 1966) at p. 28.  The forward speed of the SPH was 11 knots.

the MR-GO neutral demonstrates how much less water—and therefore the degree to which flooding would have been reduced—if the MR-GO channel had safety features in place to prevent the unplanned exacerbation of hurricane surge and conveyance in the area affected by the funnel.

*In the Lower 9th Ward, the amount of water conveyed to the North and South Breaches would have been reduced by approximately 85 percent. *See* Slide 11; PX 104, Vrijling Flow Modeling Report (June 2008) at p. 104; PX 91, Kemp Expert Report (July 2008) at p. 141. In addition, overtopping would have been delayed by two hours and the duration of overtopping would have been reduced from 2 hours to 45 minutes. This would have significantly reduced floodwaters emanating from these two levee failures.

*In the New Orleans East polder affected by the funnel at a point midway between the Seabrook Bridge and the confluence of the IHNC and the GIWW/MR-GO, the amount of water conveyed to that point would have been reduced by 60 percent and the overtopping would have been delayed by 45 minutes. The duration would have been reduced from 1 hour and 15 minutes to 45 minutes. *See* Slide 12; PX 104, Vrijling Flow Modeling Report (June 2008) at p. 105.

*At the bulk terminal (Slide 9)—the second largest source of flood water introduced to the New Orleans East polder—the amount of water conveyed would have been reduced by at least 75 percent and overtopping would have been delayed 1 hour and 15 minutes. The duration of overtopping would have been reduced from 2 hours to 1 hour. PX 104, Vrijling Flow Modeling Report (June 2008) at p. 103; TT at pp. 903:24-904:6 (Vrijling).

These stunning reductions in the volume of conveyed water and overtopping duration— with a mitigated Reach/GIWW channel—conclusively demonstrate that the MR-GO in fact has a major effect on flooding. The Corps' initial engineering mistake in concluding in 1958 that the

100

MR-GO channel would pose an inconsequential influence risk of affecting hurricane flooding (PX 699, MRGO DM No. 1-B (9/1958) at p. 3) was compounded by its *post design/construction* engineering mistake in 1966 in "misinterpreting" the work of Bretschneider and Collins to justify its conclusion that operating a ship channel with a V-shaped confluence of the GIWW and the MR-GO does not produce a funnel effect.[66]  This "misinterpretation" became the party line for four decades as the Corps persistently misrepresented the Bretschneider and Collins report in telling the public without qualification (for example, in response to a specific allegation by Dr. Sherwood Gagliano in 1973) that there was no funnel effect. *See* TT at pp. 214:11-12, 215:23-216:1, 219:8–13 (Soileau).

The Corps' post-Katrina emergency surge reduction barrier across the mouth of the funnel—to block hurricane surge from entering Reach 1 and the IHNC—gives new meaning to protesting too much.  PX 133, Project Fact Sheet: IHNC Canal Surge Reduction (October 22, 2008).  This feasible mitigation measure—known to the Corps long before the MR-GO's construction—was in fact recommended by two defense experts (Westerink and Ebersole) who wrote the following in the IPET report:

> To prevent storm surge in Lake Borgne from reaching the IHNC or GIWW/MR-GO sections of waterway, flow through the Reach 1 channel must be dramatically reduced or eliminated, either by a permanent closure or some type of structure that temporarily serves to eliminate this hydraulic connectivity.  The presence of an open channel is a key factor.

PX 1460, Volume IV, Appendix 6, at p. IV-6-7; *see also* TT at p. 2377:15-19 (Ebersole).[67]

---

[66] Despite the representations by the Corps that the Bretschneider and Collins Report was the basis of their opinion.  TT at pp. 209:8-11, 209:12-15, 213:5-9 (Soileau).  Cecil Soileau testified that it was a "contrived"—*i.e.*, "made up"—report. *See* TT at p. 236:7-15 (Soileau).
[67] The fact that the Corps is building a surge barrier at the funnel is strong evidence of the fact that the absence of a barrier caused excess surge and water conveyance.  *See Brazos River Auth.*

A surge barrier at the funnel and at the Seabrook Lock, as the Corps is building today, would have kept all surge and conveyance out and the North and South breaches as such would not have occurred. TT at pp. 1862:11-23 (Kemp); TT at pp. 1231:24, 1232:16 (Bea); TT at p. 1260:5-10 (Bea) ("Q: And as you told us on Friday, but for the MRGO or if the MRGO had been mitigated, we would have a few shingles and carpet to replace as opposed to catastrophic flooding?  A: That's correct. Q: In all three polders? A: That's correct.")

In the end, it is conceded that the Army Engineers had the scientific knowledge and technology to mitigate the funnel effect and keep the surge out of the Reach 1/GIWW and IHNC channels. *See* TT at p. 2377:15–19 (Ebersole); JX 131.1, Owen 30(b)(6) Depo. (Oct. 16, 2008) at pp. 94:24-95:19, 31:9-33:3.

### a.  Southern Border of the New Orleans East Polder East of the Funnel and Reach 2

#### i.  Surge

Besides analyzing the areas impacted by the funnel, Vrijling and Defendant's Expert Westerink evaluated the impact of the MR-GO channel on surge.  *See* Slides 14, 16–19.  At the southern border of the New Orleans East Polder, Vrijling finds that the surge would have been reduced by 1 foot if the MR-GO had in fact had no effect on hurricane surge as the designers contemplated.  PX 104, Vrijling Flow Modeling Report (June 2008) at p. 94; Slide 14.  Westerink found a ½ foot reduction. JX 196, Westerink Expert Report (Dec. 2008) at p. 218; Slide 14.

Along Reach 2 at Bayou Bienvenue, Vrijling found a ½ foot reduction. PX 104, Vrijling Flow Modeling Report (June 2008) at p. 93; Slides 16 and 20.  Westerink did not provide a hydrograph for this location.

---

*v. GE Ionics, Inc.,* 469 F.3d 416, 429 (5th Cir. 2006); *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1343 (5th Cir. 1978) *reh'g denied,* 578 F.2d 871 (5th Cir. 1978).

At the MR-GO halfway point, Vrijling found about a 1/2 foot reduction in surge. Westerink did not provide a hydrograph for this location either. PX 104, Vrijling Flow Modeling Report (June 2008) at p. 93; Slides 16 and 20.

At Bayou Dupre, Vrijling found a 1 foot reduction while Westerink found a 1/2 foot reduction. *See* Slide 17; PX 104, Vrijling Flow Modeling Report (June 2008) at p. 92; JX 196, Westerink Expert Report (Dec. 2008) at p. 214. At Shell Beach, Vrijling found 1 foot reduction and Westerink found a 1/2 foot reduction. *See* Slide 18; PX 104, Vrijling Flow Modeling Report (June 2008) at p. 92; JX 196, Westerink Expert Report (Dec. 2008) at p. 216.

One of the more interesting findings was that at the 40 Arpent Canal Levee, the 1958 forested and vegetated Central Wetlands Unit are able to reduce the surge at the 40 Arpent Canal by a full 2 feet. *See* Slide 19; PX 104, Vrijling Flow Modeling Report (June 2008) at pp. 98–99.

### ii.  **Conveyance**

The findings by Vrijling and his team regarding the reduction in conveyance with a neutralized MRGO are startling. In New Orleans East, there is no overtopping and therefore flooding through that location is reduced by 100%. *See* PX 104, Vrijling Flow Modeling Report (June 2008) at p. 103; Slide 15.

Vrijling finds that at Bayou Bienvenue there would have been a 10% reduction in flood waters delivered to that point. *See* JX 104, Vrijling Flow Modeling Report (June 2008) at p. 106. At the MR-GO halfway point, there would have been a 100% reduction in flood water delivered to that point. At Bayou Dupre, there would have been a 45% reduction in floodwater through that point. *See* Slide 21; PX 104, Vrijling Flow Modeling Report (June 2008) at pp. 106–107. At the 40 Arpent Canal as predicted by the SOBEK model, there would be no overtopping if the Reach 2 levees did not fail. *See* Slide 22; PX 104, Vrijling Flow Modeling Report (June 2008) at pp. 108–109.

<div align="center">103</div>

For years the Corps had considered putting a barrier at Bayou La Loutre.  In view of the fact it is now doing just that, the Corps is confirming that such a safety device was a known and economically feasible measure to make the MR-GO neutral as to surge and conveyance.  *See Rozier*, *supra*;  JX 346, Mississippi River Gulf Outlet Re-evaluation Study, Storm Surge Modeling Assessment; MR-GO Impacts and Restoration Options (Oct. 16, 2003); TT at pp. 91:24-25, 75:6-9, 92:22-25 (Gagliano).[68]

### iii.  **Waves**

The parties have sharply conflicting views about the role of waves in the demise of the Reach 2 levees and, more particularly, whether any of the levees breached before overtopping due to wave side erosion. Defendant's experts opine that Reach 2 levees failed almost exclusively from overtopping waves (via back to front erosion), triggered when the surge reached one foot below the levee crest. TT at p. 2213:9-13 (Ebersole).  Plaintiffs accept that a sizeable number of levees failed by this mechanism, but unlike Defendant, they insist that it was the MR-GO's defects that caused wave heights exceeding the performance criteria. Contrary to Defendant's theory, Plaintiffs maintain that a large percentage of LPV structures failed due to waves eroding the levee's front side before any wave overtopping.  For reasons discussed below, the evidence clearly tips in favor of Plaintiffs' position that the levees failed because of both wave overtopping and front side wave erosion before overtopping and that the waves were so destructive because of the MR-GO.

### b.  **The MR-GO Enhanced Waves**

Beside surge and conveyance, the MR-GO also created a dangerous environment for the propagation of wind-driven waves during Katrina that were more energetic (and destructive) than

---

[68] Once again, the use of Scenario 2c data does not mean that Plaintiffs assert that there should be no authorized channel.  Rather, the authorized channel in Scenario 2c has a surge reduction gate at Bayou La Loutre.

otherwise would have been the case without the supersized channel.  The waves in Lake Borgne

reached a maximum of 10 feet, but after passing out of the lake and across the denuded wetlands,

they regenerated almost to 9 foot height in the Reach 2 channel, pounding the largely exposed

(no protective vegetation) and lowered (through the MR-GO's displacement of the

interdistributary layer) Reach 2 levees.  PX 91, Kemp Expert Report (July 2008) at p. 176; PX

103, Vrijling Wave Modeling Report (July 2008) at pp. 50, 76; TT at p. 937:9-19 (Vrijling).

Why did the waves regenerate?  The answer is that the natural surge and wave buffering

vegetation had been destroyed by the salt water introduced by the MR-GO, and the Reach 2

channel provided a wide, unmitigated expanse for wave propagation.  As a matter of common

sense as well as accepted science, a wind-blown wave—unimpeded by any buffer—can generate

a more powerful "head of steam" over a 2,000 or 3,700 foot channel than a 650 foot waterway.

PX91, Kemp Expert Report (July 2008) at pp. 71, 82; TT at p. 1164:1-17 (Bea) (A 9 times

greater wave ultimately results in a 90 times greater destructive force upon the face of the

levee.).

### c.  The MR-GO Destroyed a Natural Surge Buffer

The next question is what happened to the natural surge buffer?

Greater New Orleans best defense was destroyed by toxic saltwater introduced into the

Golden Triangle and Central Wetlands Unit by severance of the Bayou La Loutre Ridge and the

300 to 500% widening of Reach 2.  The Corps had knowledge of this impending disaster as early

as 1961.  In his 30(b)(6) witness deposition, Gregory Miller testified that the Corps had

knowledge and/or was aware of the potential increase in salinity in the MR-GO as early as 1961.

*See* JX 132, Miller II 30(b)(6) Depo.  (Oct. 10, 2008) at p. 84:3-7.

Even though the MR-GO designers expected water in the channel to have increased salt

levels because of direct access to the Gulf of Mexico, they erroneously assumed that the bank

105

line would be maintained to prevent that lethal salt from being transmitted into the surrounding area.  TT at p. 2306:7-14 (Ebersole); PX 699, MR-GO, LA Design Memorandum No. 1-B, Channels, Mile 39.01-Mile 63.77 (rev. 05/1959) at p. 3.[69]

Saltwater intrusion over the past forty years—conveyed up the Reach 2 channel and into the bayous—destroyed tens of thousands of acres of cypress-tupelo trees, roseau cane, brush and other vegetation that made up the pre-MR-GO habitat.  *See* Appendix "G," Nos. 308-14.  The calculations done by Cecil Soileau in order to compute the peak wave and wave run-up that the standard project hurricane would deliver—to enable him to  calculate the height of the proposed levee—were based upon the MR-GO not being there and the habitat therefore being undamaged.  *See* TT. at p.193:12-20 (Soileau).  The design contemplated that the levees between Lake Borgne and the levee toe would be armored by the habitat that existed at the time of the design.  The destruction of the ecosystem—in the environs of the Golden Triangle, between the shore of the GIWW and the toe of the levee berm along the southern border of New Orleans East, and between the shore of Reach 2 and the Chalmette levee along that shore—shattered that assumption by stripping the adjacent levees of an essential component of natural armor intended to protect the levee from waves.

The loss of wetlands was material.  For example, the waves were one foot higher along the southern border of New Orleans East, east of the funnel, than they would have been with a mitigated MR-GO.  Slide 25; PX 103, Vrijling Wave Modeling Report (July 2008) at p. 44. The waves along Reach 2 were nine times more energetic during Katrina than they would have been with a mitigated Neutral MR-GO (Scenario 2c).  *See* Slide 26; PX 2009, Vrijling Input and

**Formatted:** Font: Not Bold

---

[69] The Corps also expected that rain would freshen those areas where the salt might intrude—an engineering conclusion that even Bruce Ebersole thought unrealistic.  *See* TT at p. 2305:10–19 (Ebersole).

Results SWAN Calculations, Scenario 1, 2c and 3, Versions J, K & L; 1474/BL/09088 (March

2009) at p. 15; PX75, Bea, Technical Report No. 1 (July 11, 2008), at pp. 55, 57; TT at pp.

1181:19-1182:15, 1185:19-23 (Bea).  Significantly, when the MR-GO is mitigated, at its

authorized width and protected by healthy pre-1958 wetlands, wave height is reduced by more

than 50%; wave period plummets about 60%; and wave energy eroding the Reach 2 EBSBs

dissipates by 67%.  *See* PX 93, Kemp. Supp. Decl. (Oct. 2008) at ¶¶ 30 (a), (b), (c).[70]

| Deleted: & |

### d.  The Widened Channel

The next question is why did Reach 2 expand so dramatically?

The undisputed answer is that the Corps—despite recognizing from the earliest MR-GO

planning that the banks would erode without any armoring—failed to properly maintain the

Reach 2 shoreline by installing foreshore protection.  PX 200, MR-GO Design Memorandum

No. 1-A, Channels, Mile 63.77-Mile 68.85 (rev. 07/1957) at p. 7.  Thanks to ship wake and wind

erosion, the unarmored banks widened inexorably year-after-year as the Corps dutifully recorded

the rampant erosion but took no remedial action.  *See* Appendix "H" Nos. 315-32.  The waves

assumed by the MR-GO designers were much higher—at least 2.7 feet but as much as 4.9 feet—

and more powerful than planned.  PX 2009, Input and Results SWAN Calculations, Scenario 1,

2c &3, Versions J, K & L; 1474/BL/09088 (March 2009).[71]

### e.  Frontal Attack on the Levees

The Katrina waves frontally assaulted the Reach 2 levees which lay exposed to a

perpendicular attack from Lake Borgne.  PX 91, Kemp Expert Report (July 2008) at p. 165; PX

---

[70] Once again Scenario 2c measures a neutral MR-GO.  It does not suggest the removal of the channel.

[71] PX2009 is a chart prepared by Vrijling that illustrates all of the different wave reductions as they originally determined and with the waves as determined based on the changes in inputs suggested by defendants' experts.  In all cases, the differences are extreme.  TT at pp. 931:17-20, 934:6-11, 939:23-25, 941:20-25, 943:1-6 (Vrijling).

72, Bea Expert Report (July 2008) at pp. 28-29, ¶25.  This apparently came as a total surprise to

the Army Corps.  Despite their unquestionable ability to study waves in depth, the agency's

cursory analysis concluded that there would be no wave impact.  PX 699, MR-GO, LA DM No.

1-B, Channels, Mile 39.01-Mile 63.77 (rev. 05/1959) at pp. 3-4.  Bruce Ebersole, the Corps'

point man on waves, testified that the agency's wave analysis of waves "silly."  *See* TT at pp.

2308:1–2309:1 (Ebersole).[72]

   Early breaching of the levees was caused by amplified wave energy which was the direct

result of increased wave heights.  As demonstrated by Dr. Kemp at trial, the wave heights were

magnified by the additional fetch length furnished, which itself was the result of the widened

banks of the MRGO channel.  TT at pp. 1817:4-1820:9 (Kemp).  The two tenets of

hydrodynamics relevant to the impact on the levees—(1) the exponential increase in wave

energy (as that energy relates to wave height); and (2) wave generation (and regeneration) as a

function of fetch length (and water depth over the channel)—were not challenged by the

defendants. TT at p. 1164:1-17 (Bea).

   As illustrated by Vrijling through the SWAN modeling, beginning early in the morning

of August 29th, waves, which had been between 2 and 3 feet in Lake Borgne (TT at p. 1162:4

(Bea)), began to break over the vegetation at the shore of the lake and regenerated and increased

where the vegetation ended on the Lake Borgne side of the channel.  These waves grew along the

fetch of the MR-GO, which had increased from 650 to, in some areas 3,700 feet where front side

breaching was most prevalent.  This resulted in increased wave heights in Reach 2 from 3 feet to

as high as 9 feet. TT at p. 1162:6 (Bea).  As Dr. Vrijling and Dr. Bea demonstrated, the front side

---

[72] Corps planners did not evaluate whether the presence of the Reach 2 channel could regenerate waves
that broke on the Lake Borgne shore and marsh even though they had the tools to do so. *See* TT at pp.
237:15-25; 238:10-25; 239:1, 207:1-13 (Soileau).

erosive effects of waves are a "function of the kinetic and potential energy contained in the sea state" (TT at p.1163:22-23 (Bea)), which is "the square of the wave height." TT at p. 1163:24 (Bea).  Thus, a wave of 9 feet will have a relative force of 81, whereas a wave of 3 feet will have a relative force of 9.

These waves were in turn being blown by the hurricane winds, which were no longer being diminished by taller vegetation. The wind driven waves were eroding the soils in a non-linear function relative to the wave velocity with a 10:1 ratio.  Therefore, if a velocity was changed by a factor of 10, erodibility was changed by a factor of 100. TT at p. 1164:13-14 (Bea).

As the waves from Lake Borgne over Reach 2 approached the shallow waters in front of the levees, they broke, transferring their increased wave energy to the levee surface and resulting in erosion and scour. Dr. Bea testified that front-side attack began at the onset of the storm, thus, the "erosive attack continue[d] to increase in intensity. The duration is longer and hence the erosion damage, fatigue damage if you will, is greater, hence penetration of the crest, crenellation, happens earlier."  TT at pp. 1168:23-1169:1 (Bea).

## 2.  Lowered Protective Levees

The mismatch between the unprotected Reach 2 levees and the powerful waves proved catastrophic during Katrina as these hydraulic cannonballs bombarded the levee's sides with an energetic force exponentially greater than a MR-GO Neutral would have generated. PX 91, Kemp Expert Report (7/1/2008) at pp. 159-162; PX 72, Bea Expert Report (July 2008), pp. 28-31; TT at pp. 1102:15-1103:4 (Bea).  Nevertheless, the Reach 2 levees might have had a fighting chance if were not for a third adverse effect of the MR-GO:  the significant lowering of the crown elevations and the designed level of protection due to lateral displacement.  *See* Section IV.B.1.c, *supra.*  If the Reach 2 levees had been just two one to two feet higher, depending on

location, the amount of wave overtopping and wave side erosion would have been materially diminished.  *See* TT at pp. 1108:6-10; 1111:1-8, 1132:10-1133:20, 1139:4-11 (Bea).

Plaintiffs offered compelling (and unopposed) evidence that lateral displacement—above and beyond natural subsidence—lowered the crown elevations by 3.5 to 5 feet for 30 to 50% of the critical section of upper Reach 2 between Bayou Bienvenue and Bayou Dupre. TT at p. 1112:2-24 (Bea); PX 72, Bea Expert Report (July 2008) at pp. 35, 164, 167, 169-71, 175; PX 82, Bea Declaration (Jan. 2009), at p. 69; PX 114, Army Corps Geotechnical Investigation: Chalmette Area Plan (June 2001) at p. 5.  Significantly, Dr. Bea concludes that there is a direct correlation between loss of protective elevation (LPE) and levee failure; because the lower the crown elevation of the levee: (1) the greater the wave damage; (2) greater the overtopping; (3) the greater the failure; and (4) the greater the flooding.  TT at p. 1139:4-11 (Bea).

This should have come as no surprise to the Corps because when the MR-GO was designed, its planners knew that beneath a portion of the channel between Bayou Bienvenue and Bayou Dupre, there was an interdistributary layer of soil that would be squeezed into the channel by the weight of the spoil banks.  PX 59, Army Corps, Geological Investigation of the Mississippi River-Gulf Outlet (1958) at p. 10, Plate 5. This fact was not only recognized by the Plaintiffs' experts, but was also acknowledged by the IPET team.  JX 258, IPET Report, Volume V, at pp. V-20, V-21.

Deleted: and

The lateral displacement was exacerbated by the decision to use the MR-GO channel bottom as a source of material for construction for all of the lifts of the Chalmette hurricane protection levee.  JX 258, IPET Report, Vol. 5, Appendix A at pp. A-3 – A-7.  Dredged spoil is well known to be heavier than clay soils (used in other stretches of the LPV system), thereby exerting more pressure to squeeze out more interdistributary material and moving the channel

110

dangerously closer to the LPV structures. *See* PX 81, Bea Expert Repot (Jan. 2009) at pp. 66-74; TT at pp. 1119:10-22, 1138:2-12, 1140:23-1141:12 (Bea).  One therefore has to wonder why no Corps employee—despite knowing that the Corps had dredged to 70 feet and yet the channel bottom filled back up to 40 feet—was curious to learn the source of the added 30 feet of sediment.

The widening of the Reach 2 channel also contributed to the increased rate of subsidence. TT at pp. 3038:2-3040:12 (Mosher).[73]   The Corps knew from its study in the Atchafalaya Basin that the distance between the channel and a levee was a factor in increased subsidence.  *See* PX 59, Army Corps, Geological Investigation of the Mississippi River-Gulf Outlet (1958) at p. 10, Plate 5.  Nevertheless, despite the obvious loss of habitat and the danger to the levee, the Corps chose not to install foreshore protection that would have prevented channel expansion and decreased crown elevations.

The result of this neglect was a key ingredient in the levees' demise: 10% of the levees along Reach 2 are 15.5 feet or lower and, not coincidentally, these are the levees where the MR-GO shoreline is the closest to the levees. *See* Slides 34, 39-42; TT at p. 1118:11-15 (Bea); PX 1812.2, GIS of Portion of Reach 2; PX 1812.3, GIS of Portion of Reach 2; PX 1818, PX 1819, PX 1820, PX 1823, PX 1825, PX 1849, PX 1851, PX 1863, and PX 2138.8 (S. Fitzgerald levee crest elevations). When the MR-GO was built the distance from the shore to the levee toe was approximately 720 feet. Slide 39-42, PX 1818, PX 1819, PX 1820, PX 1823, PX 1825, PX 1849, PX 1851, PX 1863, and PX 2138.8 (S. Fitzgerald levee crest elevations). At the time of Katrina, the lowest levees were 334 feet from the shore.  The attached chart, Slide 34, illustrates the relative distance between the shore and levee height.  The highest levees are 487 feet from

---

[73] This testimony was given within a Proffer.

the shore—a 153 foot difference.  Subsidence not only attacks the levee height but it also attacks the levee toe. This in turn causes deeper water at the face of the levee, allowing the waves to break closer (and more forcefully) at the levee face.

In short, the Reach 2 levees were the victims of a supercharged wave assault precipitated by a MR-GO trifecta—lost natural buffer protection, a swollen wave regeneration highway, and diminished man-made protection.

### 3.  <u>Water Depth</u>

Another important factor in levee failure is the water depth at the face of the levee since this will determine where these high waves break.  The Coastal Protection Manual suggests that waves will break when the height of the wave equals the depth of the water.  PX 1334, Coastal Engineering Manual, EM 1110-2-1100, at p. II-4-1.[74]  Indeed, the levees with the highest failure rate (16 to 16.5 foot levees) had the deepest water in front of them because of the excessive settlement of the toe caused by channel encroachment and lateral subsidence. Slide 36; PX 1818, PX 1819, PX 1820, PX 1823, PX 1825, PX 1849, PX 1851, PX 1863, PX 2138.3 (S. Fitzgerald levee crest elevations)

Plaintiffs have created a chart based on GIS data already in evidence that depicts  the average toe height for each levee height range less than 15.5 feet; 15.5 feet - 16 feet; 16.0 feet - 16.5 feet; 16.5 feet - 17 feet; 17 feet - 17.5 feet; and higher than 17 feet. *See* Slide 36.  We have added a column for the height of the water every hour from 4 to 9 a.m. based upon an average of surge elevations at each of the locations along the Reach 2 for which a calculation of surge height was made.  The height of the water at the face of the levee is merely a subtraction of the

---

[74]Ebersole's suggestion that waves in a hurricane will gradually diminish as they get closer to shore means that 9 foot waves in 100 mph winds once they hit the shore have about 300 feet to "dissipate".  That is like expecting someone who is driving 100 mph to slow down by 75% merely because they hit a speed bump. TT at pp. 2114:23-25 and 2461:4-8.

toe height from the surge elevation at a particular point in time.  The Court can readily see that

the great disparity in the water depth even though the levee heights are different.  When the

excessive waves caused by the MR-GO in its deteriorated condition approach the levee, the

deeper the water, the more likely the waves would break at the face of the levee.

It can be clearly seen that (1) if the levees and levee toe had not subsided due to the

Reach 2 channel, (2) if the waves had been reduced, (3) if the channel had not widened and (4) if

there were vegetation in front of the levees, the Reach 2 levees would have had a different

outcome.  Professor Bea's conclusion that these levees would not have failed merely from wave

overtopping is logical and supported by the Defendant's experts.  *See* PX 72, Bea Expert Report

(July 2008) at pp. 57, 86-87; PX 81, Bea Expert Report (Jan. 2009); TT at pp. 1138:2-1139:11

(Bea).

### D.  <u>Timing Is Everything</u>

As indicated above, wave overtopping cannot explain all of the breaching along Reach 2.

The reason is because there simply is not enough time for all of the levees to have breached

based upon the timing of the peak surge along Reach 2.  Plaintiffs have prepared another chart to

demonstrate the approximate time of overtopping and its duration.  *See* Slide 37.

Before we address the chart, the Court should review the chart depicting the height of the

water at the face of the levee and in particular the column showing the water level at 9 a.m.  *See*

Slide 36. It can plainly be seen that by 9 a.m. the water has receded below the levee crest at all of

the differing levee heights.  The significance here is that duration of the load on these levees is a

critical factor.  All experts agree that the duration of the loading can determine whether or not a

levee fails.  *See* PX 71, Bea Expert Report (July 2008) at pp. 12, 18, 84-85; PX 82, Bea Expert

Report (Jan. 2009).

113

With that in mind, a review of the overtopping/duration chart (Slide 37) shows that the 15.5 foot levees that did not fail were subjected to overtopping for about 1.2 hours. The 15.5 to 16 foot levees were subjected to overtopping for between 1.25 to 1.5 hours. The 16 to 16.5 foot levees were subjected to overtopping for about 1 to 1.25 hours (The Court will recall that these levees failed at a higher rate than any other levee heights. *See* Slide 35. The 16.5 to 17 foot levees were subjected to overtopping for 45 minutes to 1 hour. The 17 to 17.5 foot levees were subjected to overtopping from between 30 and 45 minutes. The levees higher than 17.5 feet were subjected to overtopping for about 30 minutes. This pattern clearly shows that simple surge overtopping alone is not sole determinate of failure. It had to be waves—a point made by Plaintiffs' experts and understood by the IPET Team (including Ebersole).

Another proof that waves are the critical variable—and not overtopping alone—is the fact that there is not enough time available for wave overtopping to cause breaching *and* for that breaching to permit enough water to fill up the Central Wetlands Unit (about two hours) *and* arrive at the 40 Arpent Canal Levee by 8:30 a.m. PX 53 at pp. 39-40; TT at pp. 828:10-19; PX 91, Kemp Expert Report (July 2008) at p. 63. Plaintiffs have created another chart demonstrating the time at which the surge would have reached a point 1 foot below the levee crest (Slide 38)—a point where the Ebersole testified that wave overtopping would have triggered breaching. TT at p. 2213:9-13 (Ebersole). The chart demonstrates that the 15.5 foot levees would have breached between 6:30 a.m. and 6:45 a.m. The 15.5 to 16 foot levees would have breached within the same time frame. The 16 to 16.5 foot levees would have breached between 6:45 a.m. and 7:15 a.m. The 16.5 to 17 foot levees would have breached between 7:00 a.m. and 7:30 a.m. The 17 to 17.5 foot levees would have breached between 7:15 a.m. and 7:30

114

a.m.  The levees over 17.5 foot would have breached between 7:30 a.m. and 7:45 a.m.  Once again, the flood water overtopped the 40 Arpent Canal Levee at about 8:30 a.m.

Clearly, with the overtopping of the 40 Arpent Canal Levee at 8:30 a.m., there was not sufficient time for the levees to have been breached by wave overtopping alone.  In fact, the way Defendant tries to solve the dilemma is to assert that the peak surge happened earlier—a fact refuted by its own hurricane generated storm surge expert Brian Jarvinen.  With 25 years experience as the storm surge leader for the National Hurricane Center, Mr. Jarvinen utilized the verified, official National Weather Service (NWS) report of Hurricane Katrina (data he in fact helped compile) and combined that data with the NWS's state of the science model known as SLOSH and verified the peak surge at the Reach 2 levees in Chalmette to be 8:30 a.m. CDT.  *See* TT at pp. 3658:24-3663:7; JX 188, Jarvinen Expert Report at p. 11.

Indeed, Bruce Ebersole admitted that if the peak surge was in fact at 8:30 a.m., there is simply not enough time for the water to have reached the 40 Arpent Canal Levee at 8:30 a.m. *See* TT at p. 2679:23-25.  This is telling because the Defendant omitted Brian Jarvinen's expert analysis via the NWS's SLOSH model in his report—an expert conclusion substantiating what Mr. Ebersole was forced to admit. *See* TT at p. 3663:2-16 (Ebersole).

Another piece in the jig saw puzzle is Dr. Bea's well documented expert reports and testimony about the various reasons that wave side erosion was a primary failure mechanism.[75] *See* PX 72, Bea Expert Report (July 2008) at pp. 28-29; PX 81, Bea Expert Report (Jan 2009) at pp. 14-16.  In addition to the other points discussed above, Dr. Bea through his own laboratory

---

[75] A world-renowned forensic engineer specializing in coastal structures, Dr. Bea has devoted 10,000 hours to studying the causes of the levee failures during Katrina and written sixteen (16) peer reviewed articles about his conclusions.  No other forensic engineer—and certainly no defense expert—has devoted anything close to the amount of research as Dr. Bea.  *See* TT at pp. 1088:14-1091:25 (Bea).

115

work demonstrated that the velocities produced by these excessive waves were sufficient to remove the grass cover and quickly erode the levees' sandy core.  *See* PX 72, Bea Expert Report (July 2008) at pp. 75-86; PX 81, Bea Expert Report (Jan. 2009) at p. 17; PX 82, Bea Expert Report (Jan. 2009) at pp. 38-50; TT at pp. 1163:18-1170:2 (Bea).  Defendant's expert, Dr. Thomas Wolff, testified that Dr. Bea's theory was plausible.  TT at pp. 4074:2-4075:20 (Wolff). Relying on design criteria instead of actual grass lift-off data, Bruce Ebersole found that waves smaller than were experienced during Hurricane Katrina would have lifted off the grass by 6:30 a.m.  TT at pp. 2528:21-25, 2538:10-14, 2570:25-2571:2 (Ebersole).

In the final analysis, the battle of overtopping vs. wave erosion before overtopping decidedly goes to the Plaintiffs.  Many of Dr. Bea's conclusions are either not addressed or supported by Defendant's experts.  Unlike any other defense expert, Dr. Bea has spent countless hours actually walking and analyzing on site the Reach 2 levees.  (Bruce Ebersole relied on a videotape from a fly over the disaster site).  Ebersole had to admit that he found some evidence of front side wave attack and that in the case of demolished levees, the tangible evidence of front side vs. back side erosion is lost.[76]  Neither Ebersole nor any other defense expert has a plausible explanation for reconciling their theory and the irrefutable fact of insufficient time to allow for wave overtopping to be the sole cause of flooding.  Ultimately, Plaintiffs have the more credible theory and supporting evidence.

### E.  Defendant's Theory of Overtopping Is Flawed

Defendant's overtopping theory fails for a variety of reasons.  The first and most obvious reason is that if all of the levees were in fact subjected to the high volume of overtopping water and if the Defendant is correct that the volumes were sufficient to destroy the levees, then all of

---

[76] The parties agree that there is no scientific peer reviewed method for the review of photographs in order to determine evidence of front side wave attack.

116

the levees should have catastrophically failed. PX 1361.1, Mosher 30(b)(6) Depo. p. 60:1-15; TT

Deleted: P

at pp. 3135:20-3137:22 (Mosher); TT at pp. 2200-2209 (Ebersole).  Ebersole tried to suggest to

the Court that the height of the levees and the materials of construction explain why some levees

failed and others did not. TT at p. 2214:10-14 (Ebersole).  This is erroneous.

A review of attached Slide 35 demonstrates that while levee height is a factor, it does not

alone explain the disparity in experience over the length of Reach 2.  The evidence shows that

52% of the levees less than 15.5 feet failed; 69% of the levees 15.5 feet - 16 feet failed; 73% of

the levees 16.0 feet - 15.5 feet failed.  41% of the levees 16.5 feet – 17 feet failed.  42% of the

levees 17 feet - 17.5 feet failed.  33% of the levees over 17.5 feet failed.  It is clear that the levees

in the 16 feet - 16.5 feet range had the highest rate of failure.

The IPET Team, while suggesting that the levee construction materials were important,

reached a far different conclusion than the Defendant's experts who testified at trial even though

those same experts were part of the IPET Team:

> It can be seen that the greatest erosion of hydraulically filled levees occurs
> when the surge height plus the peak wave height had the greatest level
> above the crest of the levee.  *Examination of this information has shown
> that the peak wave height is the most important component of surge.* . . .
> *Presence of clay [is] not necessarily the controlling factor.* . . . The degree
> of erosion and breaching of overtopped levees was directly related to the
> character of the in place levee materials and the severity of the surge and
> wave action.

JX 274, IPET Report, Volume V at pp. V-105, V-111, V-123; Slides 27-33 (emphasis

added).

As we have seen, the Defendant's experts are of the view that the levees failed before the

surge overtopped the levees.  TT at p. 2208:4-9 (Ebersole).  As such, it is not the surge that is

dominant factor, but the waves.  In addition, all of the levees along Reach 2 were constructed

117

with hydraulic fill.  JX 274 at p. V-108, V-18-30; JX 274, IPET Report, Appendix A, Page A-3 -

A-7; Slides 23-24.  The only variable that remains is wave height.

      Professor Vrijling and his team evaluated the influence of the MR-GO on wave heights,

comparing both the MR-GO Neutral (Scenario 1) and the *partially mitigated* MR-GO (Scenario

3).[77]  Based upon the original assumptions, the Dutch concluded that the wave heights along

Reach 2 would have been reduced by approximately 3.9 to 4.9 feet if the MR-GO had been

properly mitigated. Slide 26; PX 2009 at p. 15.  Even a comparison between Scenario 1 and

Scenario 3 (without vegetation) shows a wave reduction of between 2.3 feet and 5 feet. Slide 26;

PX 2009 at p. 15.  Either wave reduction difference—3.9 feet or 2.3 feet—proves that waves

were a critical variable in levee performance.

      Utilizing far more conservative assumptions suggested by Defendant's experts,  the

Dutch found that wave heights reduced from between 2.7 to 4.57 feet in Scenario 2 and between

1.5 to 3.57 feet in Scenario 3.  TT at p. 943:1-6 (Vrijling).  Again, this impressive wave

reduction occurs without further reduction to the waves in Scenario 3 that would have

undoubtedly resulted with the presence of vegetation between the shore and toe.  The MR-GO

was designed to have no impact on waves, but the data demonstrates that it in fact had a

substantial impact on waves.

      Finally, the fact that the entire stretch of upper Reach 2 did not catastrophically fail

supports Plaintiffs' causation theory that the widened MR-GO and destroyed buffering wetlands

caused higher waves and increased subsidence.  By the same token, Defendant's theory is not

---

[77] Scenario 3 is only a partially mitigated MR-GO because the SWAN model is not refined
enough to allow for the introduction into the model of trees, roseau cane, and other vegetation
that would have been located between the MR-GO shore and the toe of the berm of the LPV
structure, but for the increased salinity and channel widening.  The Scenario 3 results understate
wave reduction since the waves would have been substantially reduced by the presence of this
vegetation between the shore and the toe of the berm.  TT at pp. 2115:25-2116:1 (Ebersole).

**Deleted:** Structure

118

tenable because if overtopping followed by back to front erosion were the primary failure

mechanism, one would expect the entire upper Reach 2 levee stretch to breach.  The fact that this

did not happen disproves Defendant's theory.

## VI.    PLAINTIFFS' DAMAGES

The Plaintiffs' seek damages pursuant to Louisiana Civil Code Articles 2315, 2316, 2317

and 667.  Collectively, they authorize property damages, mental anguish damages and damages

for inconvenience.  Each Plaintiff entitled should recover all of these types of damages,

regardless of whether they experienced a "physical injury" as a result of Defendant's conduct.

Pursuant to Articles 2315, 2316, and 2317, an award for mental anguish resulting from

property damage is generally permissible in limited situations when property is damaged: (1) by

intentional or illegal acts; (2) by acts for which the tortfeasor will be strictly or absolutely liable;

(3) by acts constituting a continuing nuisance; or (4) when the owner is either present or nearby

and suffered a psychic trauma as a direct.  *Farr v. Johnson*, 308 So.2d 884, 885-86 (La. App.

1975).  Importantly, these criteria set forth in *Farr* are neither inflexible nor exclusive.  *Elston v.

Valley Elec. Membership Corp.*, 381 So.2d 554, 556 (La. App. 1980).  Due to the highly

subjective nature of mental anguish claims and their potential susceptibility to fabrication or

exaggeration, Louisiana courts developed these criteria to limit recovery to cases where both the

mental injury and the causal relation to the property damage are clearly established.  *Ibid*.; *see*

*also Todd v. Aetna Casualty & Surety Co.*, 219 So.2d 538, 541 (La. App. 1969).

Every incident of property damage is necessarily accompanied by some degree of worry

or consternation.  Consequently, recovery of mental anguish damages incident to property

damage is generally not allowed unless the plaintiff has suffered psychic trauma in the nature of

119

or similar to a physical injury as a direct result of the incident which caused the property damage. *Elston*, 381 So.2d at 556; *Thompson v. Simmons*, 499 So.2d 517, 520 (La. App. 1986).

Moreover, physical injury or manifestation of serious mental distress need not be proven in cases in which there is an "'especial likelihood of genuine and serious mental distress arising from special circumstances.'" *Johnson v. First Nat'l Bank of Shreveport,* 792 So.2d 33, 51 (La. App. 2001) (quoting *Moresi v. State Dept. of Wildlife and Fisheries*, 567 So.2d 1081, 1096 (La. 1990)). In addition, this standard, "serves as a guarantee that the claim is not spurious." *Moresi*, 567 So.2d at 1096. Thus, this rule has been applied to uphold an award of damages for mental anguish to flood victims. *Boudreaux v. State Dept of Transportation and Development*, 906 So.2d 695, 707-08 (La. App. 2005). Consequently, in this case, Louisiana law clearly provides that Plaintiffs can recover mental anguish damages.

This conclusion is strengthened by the fact that the law of vicinage applies to Plaintiffs' claims under Article 667.[78] In *Barrett v. T.L. James & Co.*, 671 So.2d 1186, 1190 (La. App. 1996), the court stated:

> The obligations of vicinage contained in [Articles 667-69] are legal servitudes imposed on the owner of property. These provisions embody a balancing of rights and obligations associated with the ownership of immovables. As a general rule, the landowner is free to exercise his rights of ownership in any manner he sees fit. He may even use his property in ways which occasion some inconvenience to his neighbor. *However, his extensive rights do not allow him to do real damage to his neighbor.*

*Id.* at 1190 (emphasis added); *see also Rodriguez v. Copeland*, 475 So.2d 1071, 1077 (La. 1985).

Louisiana courts sometimes use the word "nuisance" in describing the type of conduct which violates the pronouncements embodied in Articles 667 through 669. *Barret*, 671 So.2d at (La. App. 1996). Whether a "nuisance" exists under these Articles setting out the obligations of

---

[78] Plaintiffs need not expressly plead a violation of Section 667 because pleading "emotional damages suffices from a pleading perspective." *In re Katrina Canal Breaches Consol. Litig.*, 2009 WL 982104, *2 (E.D. La. 2009).

vicinage is a question of fact based on the nature of the intrusion into the neighbors' property, plus the extent or degree of the damage. *Hero Lands Co. v. Texaco, Inc.*, 310 So.2d 93, 98 (La. 1975) (*abrogated on other grounds by Everything on Wheels Subaru, Inc. v. Subaru South, Inc.*, 616 So.2d 1234 (La. 1993)); *Begnaud v. Camel Contractors, Inc.* 721 So.2d 550, 554 (La. App. 1998).

In *Graci v. United States,* 435 F.Supp. 189, 195 (E.D. La. 1977), Chief Judge Heebe specifically held that the United States as grantee of the right of way, builder, and maintainer of the MR-GO assumed a high standard of care with relation to damages caused by the works to neighboring lands and individuals.  In this case, this Court held that, "[i]n the event Plaintiffs were to prove that article 667 were applicable, 'a plaintiff in a vicinage cause of action may recover damages for mental anguish, discomfort, irritation, anxiety, and loss of use and/or enjoyment of his property.'" *In re Katrina Canal Breaches Consol. Litig.*, 2009 WL 982104, *2 (*E.D. La. 2009) (quoting *Rizzo v. Nichols,* 867 So.2d 73 (La. App. 2004).  Based upon the evidence and testimony adduced at trial, Plaintiffs have proven that Article 667 and the law of vicinage applies and that they can recover damages for mental anguish, discomfort, irritation, anxiety, and loss of use and/or enjoyment of their property.

**A.  Plaintiffs' Property and Inconvenience Damages**

Each of the Plaintiffs evacuated from the storm and each returned to find that their residences and contents were totally destroyed by the flooding caused by the Defendant's negligence.  "'When property is damaged through the legal fault of another, the primary objective is to restore the property as nearly as possible to the state it was in immediately preceding the damage.'" *Roman Catholic Church v. Louisiana Gas Service Co.,* 618 So.2d 874, 876 (La.1993) (*quoting Coleman v. Victor,* 326 So.2d 344, 346 (La. 1976)).  When damage to

121

property is assessed, "no mechanical rule can be applied with exactitude." *Ibid*. "Justice, reason, and the principle of full reparation of La.C.C. art. 2315 require that, where an individual's property is damaged unlawfully by a tortfeasor for no good reason, the owner be compensated at least as fully as when his property is damaged by the state for a public purpose." *Ibid*. As such, each Plaintiff is entitled to an award of damages for the damage to their respective properties. The value of these damages was provided to this Court through the Plaintiffs' testimony and the testimony and reports of Plaintiffs' expert appraiser, Scott Taylor.

### 1.  **Anthony and Lucille Franz's Property and Inconvenience Damages**

Plaintiffs Anthony and Lucille Franz owned their residence at 5924/26 St. Claude Avenue.  This property had been in Mr. Franz's family since 1921 and was free and clear from any mortgages.  TT at pp. 564:15, 566:7 (Anthony Franz).  The Franez returned to find that their family home was a total loss that could not be rebuilt.   TT at pp. 554:19-555:1, 556:4-6; 557:23-558:10 (Lucille Franz).

Mr. Taylor determined that "the loss was so severe as to require demolition.  Breaches of the foundation have caused the integrity of the structure to be at risk and should be considered irreparable."  *See* Scott Taylor Final Report for Anthony and Lucille Franz; PX 115; PX 1714.  Mr. Taylor also determined that the Franzes lost all of the contents in their house since it had at least a foot of water on the second floor.  *Ibid.*  This testimony was corroborated by the Lucille Franz who testified that her son stayed in their house during the storm and that the water level got to his waist on the second floor.  TT at pp. 552:19-21, 555:22-25 (Lucille Franz).  Mr. Taylor determined that the Franzes were entitled to $284,128.15 to tear down and rebuild their residence.  *See* Scott Taylor Final Report for Anthony and Lucille Franz; PX 115; PX 1714.  Mr. Taylor also calculated that the Franzes lost approximately $120,000 worth of contents and were also entitled to additional living expenses in the amount of $39,300.  *Ibid.*

In total, the Franzes should be awarded $443,428 for damage to their property and their forced displacement after the hurricane.

## 2. Tanya Smith's Property and Inconvenience Damages

Plaintiff Tanya Smith owned her residence at 3920 Despaux Drive in Chalmette at the time of Katrina.  TT at p. 75:16-17 (Smith).  She purchased the home in 1997 and made numerous upgrades to the house such as adding an in ground pool and a hot tub.  TT at p. 79:16-24 (Smith).  Ms. Smith returned to find her property in horrible condition and nearly destroyed.  She worked tirelessly to repair her home only to have it subsequently almost totally destroyed by an electrical fire.  TT at p. 111:2-5 (Smith).  Ms. Smith rebuilt her house again and has moved back into her home.  TT at p. 111:11-13 (Smith).

Mr. Taylor testified that it would cost approximately $165,784 to repair and restore Ms. Smith's residence and that it would cost $22,716 to rebuild the other structures on her property.  *See* Scott Taylor Supplement to Final Report for Tanya Smith; PX 1709**.**  Mr. Taylor also testified that Ms. Smith also lost $143,493 in contents.  *Ibid*.  Mr. Taylor also testified that Ms. Smith was forced to incur, and is entitled to, additional living expenses in the amount of $44,400.  *Ibid.*

Thus, Ms. Smith should be awarded $376,393 for damage to her property and her forced displacement after the hurricane.  *Ibid.*

## 3. Kent Lattimore's Property and Inconvenience Damages

Plaintiff Kent Lattimore brought a claim for the loss of his residence and the loss of his business, Lattimore and Associates.  TT at p. 585:12-18 (Lattimore).  At trial, Mr. Lattimore testified that he was waiving and not asserting any claim for lost revenue from his business.[79]

---

[79] It is important for this Court to find that while Mr. Lattimore is not entitled to lost revenues/profits on his business loss claim because he chose not pursue such damages, such

Nevertheless, he is asserting a claim for the building where he maintained his business as well as its contents contained therein.

In 2005, Mr. Lattimore owned and operated his business Lattimore and Associates, LLC which was a real estate appraisal business. Lattimore and Associates was located at 9117 West St. Bernard Highway. TT at p. 585:21-23 (Lattimore). After he purchased this location, he made extensive renovations and upgrades. TT at p. 585:15-21. Mr. Lattimore also purchased a vast amount of equipment such as high speed computers, faxes, and a telephone system. TT at p. 588:8-12 (Lattimore). Mr. Taylor testified that it would have cost approximately $118,033.25 to repair the damage to the structure where Mr. Lattimore maintained his business and that he lost approximately $50,000 in contents. *See* Scott Taylor Final Report for Lattimore & Associates, Inc. PX 117. Thus, Mr. Lattimore should be awarded $168,033.25, for damage to his business property.

Mr. Lattimore also lost his residence as a result of the Defendant's negligence. In 2005, he lived at 2100 Marcelle Drive in a house trailer located approximately seventy-five yards from his business. TT at pp. 585:14-586:1 (Lattimore). He returned to find that his trailer was a complete loss as were all of the contents therein. TT at p. 602:17 (Lattimore). Mr. Taylor testified that the damages to rebuild/restore Mr. Lattimore's residence was approximately $46,065 and that he lost approximately $45,000 in contents. *See* Scott Taylor Final Report for Kent Lattimore, PX 119; PX 1719. Mr. Taylor also testified that Mr. Lattimore was forced to spend approximately $ 38,600 in additional living expenses. *Ibid.*

> **Deleted:** Kent
>
> **Deleted:** Kent
>
> **Deleted:** Kent
>
> **Deleted:** Kent

---

damages are awardable under Louisiana law to compensate business owners who were damaged by the Defendant's tortious conduct and can prove that such damages are reasonable under the circumstances.

124

Thus, Mr. Lattimore should be awarded $129,665 for damage to his residential property and his forced displacement after the hurricane.

### 4. <u>Norman and Monica Robinson's Property and Inconvenience Damages</u>

Plaintiffs Norman and Monica Robinson lived at 6965 Mayo Boulevard in New Orleans East.  TT at p. 613:23 (Norman Robinson).  Mr. Robinson purchased this residence for approximately $154,000.  TT at p. 620:8 (Norman Robinson).  Mr. Robinson was the owner of the house and returned to find it devastated with extensive damage to both floors.  TT at p. 628:12-16 (Norman Robinson).

Mr. Taylor testified that it would cost approximately $234,251 to repair/rebuild Mr. Robinson's residence and that it would cost approximately $15,242 to repair/rebuild the other structures on Mr. Robinson's property.  *See* Scott Taylor's Final Report for Norman Robinson; PX 1716.  Mr. Robinson and his wife lost approximately $93,543 in contents.  *Ibid*.  The Robinson's were forced to spend approximately $55,200 in additional living expenses.  *Ibid.*

Thus, Mr. Robinson should be awarded $323,865 for the damage to his house, his lost contents and his forced displacement from his home while Mrs. Robinson should be awarded $74,371 for her lost contents and for her forced displacement after the hurricane.

### B.  <u>Plaintiffs' Mental Anguish Damages</u>

As discussed above, Louisiana law authorizes damages for mental anguish, loss of enjoyment and/or quality of life and for damages for inconvenience.  These damages do not require proof that medical or psychiatric care was required as a result of the incident, or expert testimony.  *Dickerson v. Lexington Insurance*, 556 F.3d 290, 305 (5th Cir. 2009); *LaCombe v. Carter*, 975 So.2d 687, 690 (La. App. 2008); *Johnson v. First Nat'l Bank of Shreveport*, 792 So.2d 33, 51 (La. App. 2001).  There is no clear legal standard for what constitutes sufficient

evidence of mental anguish in a case such as this.  It is therefore left to the trial court as fact

finder to determine whether the evidence presented was sufficient to prove that the Plaintiffs

suffered a compensable mental and/or emotional injury.  *Dickerson*, 556 F.3d at 305; *Johnson*,

792 So.2d at 51.

A claim for such damages may be supported solely by plaintiff's testimony, though such

testimony must be "sufficiently detailed" to allow a Court to discern the basis of the claim for

such damages.  *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir 1998).  Where

testimony is uncontradicted and there is no reason to doubt a witness' testimony, such testimony

should be accepted by the trier of fact.  *Johnson*, 792 So.2d at 51 (*citing Johnson v. Insurance

Co. of N. America*, 454 So.2d 1113, 1117 (La. 1984)).

In *Dickerson*, the 5th Circuit accepted as sufficient to support a mental anguish claim the

testimony of the plaintiffs' daughter that concerned "watching her father's mental state

deteriorate and his becoming short-tempered and anti-social."  *Dickerson*, 556 F.3d at 306; *see

also*, *Khalminsky v. Liberty Mutual Fire Insurance Company* 2009 WL 982641, *9 (E.D. La.

2009).  In *Elston v. Valley Electric Membership Corp.*, 381 So.2d 554 (La. App. 1980), the

plaintiffs suffered increased anxiety-induced nightmares as a result of an electricity surge that

destroyed all the electrical appliances, light fixtures, outlets, and caused some minor cosmetic

damage to the home's interior.  *Id*. at 555-56.  The court upheld an award of mental anguish

damages even though she was not present when electricity surge occurred because plaintiff's

"mental injury and the causal relationship to the property damage [were] clearly established."  *Id.*

at 556.  The court further stated that "the cases in which recovery was denied on the ground that

plaintiff was not physically present when the property damage occurred emphasized that absent

126

the circumstance of his presence, the plaintiff could not show that the anguish he suffered was directly caused by the accident." *Ibid.*

In this case, Plaintiffs testified about their specific experience when they were finally able to return to their respective properties. They all lost irreplaceable personal items from past pictures to jewelry from grandparents. They also testified about the level of emotional damage from seeing their respective properties destroyed and how losing everything manifested in their psychological trauma. Everyone experienced a strong sense of loss of security and loss of community.

Importantly, the United States did not and does not dispute the fact that each of the Plaintiffs actually experienced severe mental and emotional trauma. The United States contends only that such damages are not awardable under the facts of this case. Plaintiffs submit that the previously discussed jurisprudence dictates that the Plaintiffs are entitled to damages for their mental anguish, their loss of enjoyment, and/or for their substantially reduced quality of life.

### 1. <u>Anthony and Lucille Franz's Mental Anguish Damages</u>

Anthony and Lucille Franz are Tanya Smith's parents. TT at p. 553:22 (Anthony Franz). In August, 2005, this retired couple lived in the Lower 9th Ward on a fixed income. TT at pp. 548:13; 548:24 (Lucille Franz). Mr. Franz worked for the United States Department of Agriculture and the United States Customs Service for almost forty years. TT at p. 562:21-22 (Anthony Franz). He also served his country in the military in the Army and Air National Guard for approximately 31 years. TT at p. 563:16-18 (Anthony Franz). The couple received about $4,000 a month which more than made ends meet and was ample enough that the Franzes chose not to rent the four or five apartments located in and around their residence. TT at pp. 564:13; 566:20-24 (Anthony Franz). Mr. Franz referred to the apartments as his "ace in the hole" because if they ever needed money or somebody in the family got sick, they could always rent

127

**Deleted:** Tonya

**Deleted:** TT at p.

out the apartments.  TT at p. 566:10-14 (Anthony Franz).  They owned the residence outright

and were only burdened with paying the respective property tax on the property every year.  TT

at p. 566:9 (Anthony Franz).

Mr. Franz first moved into the house on St. Claude in February, 1929 shortly after he was

born.  TT at p. 564:18-20 (Anthony Franz).  He lived at the house his entire adult life with the

exception of a few years.  He is 80 years old and spent nearly his entire life within several miles

of his house on 5924 St. Claude.  TT at p. 560:2 (Anthony Franz).  Mr. Franz referred to the

house as the "Family Mansion" as it came into his family when his grandmother bought it in

1922.  TT at pp. 572:9; 564:15 (Anthony Franz).  He testified that she redid the inside of the

house and that she made circular designs in the plaster throughout the house.  TT at p. 565:11-17

(Anthony Franz).  Mr. Franz felt that this was the personal design of his grandmother throughout

the house.  TT at p. 565:11-17 (Anthony Franz).  When asked if the house had sentimental value

to him, Mr. Franz testified that the house was extremely valuable to him because it was a part of

his life -- something that was always there to remind him of the good times, the family that

passed through the house, and all of the people who passed through that loved him and he loved.

TT at p. 565:21-25 (Anthony Franz).

As a result of Defendant's negligence, the Franzes were forced to remain out of the city

and away from their house for nearly two months.  TT at p. 563:16 (Anthony Franz).  They spent

the first five weeks with their daughter, Tanya Smith, at her ex-husband's residence in Baton

Rouge.  TT at p. 551:8 (Lucille Franz).  They eventually moved back to the New Orleans and

rented an apartment in River Ridge in Harahan.  TT at p. 554:7-8 (Lucille Franz).  This

apartment costs the Franz approximately $675 in monthly rent. TT at p. 554:10 (Lucille Franz).

The Franzes were also forced to purchase a vehicle to replace the two cars that they lost in the

Deleted: TT at p.

128

storm.  TT at p. 568:20 (Anthony Franz).  This is a drastically diminished quality of life since

they have lost the security of their house and neighborhood.

       Mr. Franz emotional state after the flooding caused by the Defendant's conduct is best

evidenced by the following poignant testimony:

> Q:   I'VE HEARD YOU REFER TO YOUR HOUSE AS THE
>      FAMILY MANSION.  HOW DID IT AFFECT YOU
>      EMOTIONALLY TO LOSE THE HOUSE THAT HAD
>      BEEN IN YOUR FAMILY SINCE 1921?
>
> A:   **VERY DEEPLY.  THAT'S WHAT HAPPENED.  IT**
>      **WAS A GREAT SORROW WHEN I STOOD THERE**
>      **AND LOOKED AT THE DEVASTATION.  AND I**
>      **WAS JUST - THEN I GOT MAD, ANGER CAME.**
>      **WHO?  WHY DID THIS HAPPEN?  HOW DID IT**
>      **HAPPEN?  WAS IT BECAUSE OF**
>      **INCOMPETENCY?  WAS IT BECAUSE OF EVEN**
>      **WORSE, INDIFFERENCE?  WHO'S RESPONSIBLE**
>      **FOR THIS?**
>
>      **AND THEN I GUESS ONE OF THE WORST PARTS**
>      **ABOUT IT IS AT NIGHT WHEN THE -- THE**
>      **UNCERTAINTY AND THE FEAR SETS IN.**
>      **WHATCHA GONNA DO?  WHERE ARE WE GOING**
>      **TO GO?  HOW ARE WE GOING TO LIVE?  ARE**
>      **WE GOING TO BE ABLE TO LIVE?**
>      **YOU KNOW, I MEAN, ALL OF THEM THINGS**
>      **JUST CRUSH YOU.  AND I GUESS THAT'S THE**
>      **WAY IT IS.  I WAS JUST COMPLETELY CRUSHED**
>      **BY THE EVENTS AND -- MAYBE I'M GETTING**
>      **OVER A LITTLE BIT NOW, MAYBE, AFTER**
>      **ALL OF THESE YEARS.  BUT I GUESS**
>      **EVENTUALLY, TILL THE DAY I DIE,**
>      **I'LL CARRY THAT SCAR OF LOSING MY HOME,**
>      **THE OLD FAMILY MANSION.**

TT at pp. 571:21-572:9 (Anthony Franz) (emphasis added).

       The Franz's post-Katrina emotional condition was also detailed by their daughter Tanya

Smith.  She testified that Mrs. Franz was extremely nervous and that she would rarely sleep and

would pace all night long.  Her mother constantly chewed on the inside of her mouth.   TT at p.

489:7-8 (Smith).  Mrs. Franz was nervous because she did not know the whereabouts of her

sister, brother and son.  Mrs. Franz was distraught when she learned that her sister drowned at St.

Rita's Nursing Home.  TT at p. 552:2-16 (Lucille Franz).

As to Mr. Franz, Ms. Smith testified that even though Mr. Franz was an individual who

always overcame the hurdles of life, that after learning about the loss of his property he was

extremely depressed for a long time.  TT at p. 488:9-23 (Smith).  The Franz's testimony, as well

as the testimony of their daughter Tanya Smith, indicates that the Anthony and Lucille Franz

each clearly experienced severe mental injury and a severely reduced quality of life as a result of

the Defendant's negligence.  A corresponding award of general damages is warranted.

### 2.  Tanya Smith's Mental Anguish Damages

Tanya Smith was the primary parent for her two sons.  TT at p. 451:9-10 (Tanya Smith).

Before the storm, Ms. Smith had a very good quality of life as she loved her neighborhood and

her children's school and her work and her extended family were in the area.  TT at pp. 458:2-

460:16 (Tanya Smith).

Her home at 3920 Despaux was her "little pink dollhouse" and was perfect for her and

her sons.  TT at pp. 454:10-15 (Smith).  That is how she would have wanted to live the rest of

her life.  TT at pp. 460:14-16 (Smith).  She did not have plans on leaving the house or moving.

TT at pp. 460:14-16 (Smith).  It was enough for her.  Ms. Smith was very industrious and that

she worked herself through school and paid for the boys.  TT at p. 461:11-15 (Smith).  She had

approximately $10,000 in savings.  TT at pp. 460:23-461:7 (Smith).

The Defendant's negligence horribly changed her life.  Ms. Smith was forced to live in

Baton Rouge for approximately five weeks in a house shared by approximately 16 people.  TT at

p. 468:11-19 (Smith).  Finally able to relocate her and her two boys to a 550 square foot, one

bedroom apartment in Harahan, she remained in that apartment for several months before

130

**Deleted:** Tanya

**Deleted:** Tanya

**Deleted:** Tonya

**Deleted:** Tonya

**Deleted:** Tanya

**Deleted:** Tanya

**Deleted:** Tanya

**Deleted:** Tanya

**Deleted:** Tanya

**Deleted:** Tanya

securing a two bedroom apartment.  TT at p. 470:7-16 (Smith).  During this period she enrolled

her two boys in school and commuted to Baton Rouge on a daily basis.  TT at pp. 471:21-25,

472:1-11 (Smith).

Ms. Smith was finally able to return to her home in October, 2005.  TT at p. 473:24-25

(Smith).  This visit was limited to inspecting the condition of the property and leaving the parish

because St. Bernard was still under restricted access to civilians.  When she got to her home, she

found that her property almost totally destroyed.  She testified -- and the photographs confirm --

that she had several feet of mud and marsh grass inside her house and around her property.  TT at

p. 475:15-23 (Smith).  When she first drove up to her house, she remembers standing across the

street and saying, "I just kept looking at it and looking at it and saying, 'Oh, my god, this is

horrible. I hadn't even been in the house yet.  I could just see the -- I was like, 'Oh, no.'  You

know, pretty much, I knew at that point when I saw it that I had lost everything I had worked

for."  TT at p. 480:1-7 (Smith).

Over the next several months, Ms. Smith enlisted family and neighbors, cleaned and

gutted her house, and began the rebuilding process.  This proved to be very arduous as she was

only able to work on the weekends.  This was very difficult because she had to bring her children

to school in the morning, drive to Baton Rouge for her classes, then return to pick up her children

from after care, do homework, dinner and begin the process over the next day.  TT at pp. 471:21-

472:18.  Then she would spend the weekends gutting what remained of her "pink doll house" on

Despaux.

This situation was compounded by the fact that Ms. Smith was not able to work during

this time period, forcing her to live off her savings and to take out hundreds of thousands of

dollars in student loans.  TT at pp. 472:25, 461:7-25, 491:20-21 (Smith).  She did not go to

131

Deleted: Tanya

Deleted: Tanya

Deleted: Tanya

Deleted: Tanya

Deleted: Tanya

counseling or undergo psychological treatment because she did not have time.  TT at p. 490:20-25 (Smith).  Nonetheless, her life after her home flooded was very upsetting and there were quite a few nights where she was reduced to bawling from the stress and the pressure.  TT at p. 491:10-15 (Smith).  Ms. Smith experienced psychological trauma because "She lost everything. I didn't just lose matrial things, I lost my life as I knew it and to this day, I still have not recovered that."  TT at pp. 492:15-493:6 (Smith).  Undoubtedly, Ms. Smith experienced severe mental injury and a severely reduced quality of life as a result of the Defendant's negligence.  A corresponding award of general damages is warranted.

### 3.   Kent Lattimore's Mental Anguish Damages

In August, 2005, plaintiff Kent Lattimore owned and operated a successful real estate appraisal business.  Mr. Lattimore built the business from one employee to a business with approximately 100 residential appraisals a month.  TT at pp. 586:21-587:2, 590:1-2 (Lattimore). Mr. Lattimore lived his business every day, had a very good quality of life, and intended to be in the real estate appraisal business in his building at 9117 St. Bernard Highway for the rest of his life.  TT at pp. 592:24-593:2 (Lattimore).  In the real estate business, he could get away for the weekend, and leave on a Thursday and come back on a Monday morning while still getting his work done.  TT at p. 596:1-4 (Lattimore).

At that time of Katrina, he lived in a residential trailer approximately 75 yards behind his business.  He lived in a secure retirement community where you did not have to lock your car. He made friends with several of his neighbors.  He also became very close with a couple of the neighbors who were World War II veterans.  TT at p. 594:4-14 (Lattimore).

Although stoic, Mr. Lattimore sustained emotional issues as a result of losing his business and residence.  He experienced what he termed, "the Katrina washout," feeling like he lost his sense of security.  TT at p. 595:14-24 (Lattimore).  He also developed a drinking problem

132

following Katrina that he has struggled with on a daily basis.  TT at pp. 605:17-606:11

(Lattimore).  Plainly, Mr. Lattimore experienced a severe mental injury and a reduced quality of

life as a result of the Defendant's negligence.

**Deleted:** Kent

#### 4.   Norman and Monica Robinson's Mental Anguish Damages

In August, 2005, Norman and Monica Robinson lived in their home at 6965 Mayo

Boulevard in New Orleans East.  TT at p. 613:22-23 (Norman Robinson).  They were married in

the house approximately thirteen years ago, and it was the location of Mr. Robinson's 50th

birthday party.  TT at p. 621:7-9 (Norman Robinson).  He purchased the house in 1992 and

planned on spending the rest of his life there.  TT at p. 620:4-5, 18-20 (Norman Robinson).  His

garden was his weekend refuge and his house was a great place for entertainment.  TT at p.

620:24-25 (Norman Robinson).  It was just a place where people could come hang out.  TT at p.

621:9-10 (Norman Robinson).  He had the part in the back of the house where he would go out

and play his horn and listen to his records.  TT at p. 621:18-24 (Norman Robinson).

The Robinsons lived in a wonderfully eclectic neighborhood, with blacks, whites,

widows, widowers, police officers, lawyers, accountants, postal workers, and teachers.  TT at p.

622:19-21 (Norman Robinson).  They had a very good relationship with their neighbors and

were actively involved in their community.  TT at p. 622:11-13 (Norman Robinson).  It was an

ideal middle class American neighborhood.

Things changed drastically for the worse when they returned.  Mr. Robinson evacuated to

Jackson, Mississippi and that when he first returned he stayed with his brother-in-law.  TT at pp.

**Deleted:**  and sister-in-law

624:2-3, 632:1-3 (Norman Robinson).  Shortly thereafter, his wife Monica returned from Atlanta

and they rented a 700 square foot apartment in the Creeks in Harahan.  They shared the 700

square foot apartment with Mr. Robinson's daughter for nearly two years.  TT at p. 633:18-19

(Norman Robinson).  Mr. Robinson did not have a sober moment at the apartment as it was so

bad that he resorted to drinking as a coping mechanism.  TT at pp. 633:21-634:1 (Norman

Robinson).

When he first returned to his house, Mr. Robinson testified that he was crestfallen; like

his life was over. TT at p. 631:9-15 (Norman Robinson).  He said he had never seen anything

like it.  It looked like everything had been disintegrated in a big vat of acid.  His furniture was

unrecognizable.  The walls were covered with what looked like giant amoeba.  He said it smelled

like his uncle's hog farm where he used to slop hogs.  TT at p. 628:12-22 (Norman Robinson).

Even though his brother-in-law told him the house was obliterated, Mr. Robinson did not

believe him because New Orleans East had never gotten water.  TT at p. 626:7-14 (Norman

Robinson).  Then he saw it on the news reports.  After the storm, not knowing the condition of

his house, he said it was like he was in a dimension between life and death.  TT at p. 626:19-22

(Norman Robinson).  It was such a helpless feeling: "It's a little embarrassing and humiliating to

the extent that I didn't eat or sleep.  I kept going to the bathroom and I couldn't understand why I

was going to the bathroom because I hadn't eaten, but I was still going to the bathroom."  TT at

pp. 626:21-627:1 (Norman Robinson).  Mr. Robinson testified that he ended up going to a

psychologist because he had suicidal thoughts.  TT at p. 633:21-23 (Norman Robinson).

Mr. Robinson had the house appraised at $280,000 prior to the storm.  TT at p. 634:15-22

(Norman Robinson).  He says to this day, "I still don't remember everything I lost."  TT at p.

635:1-2 (Norman Robinson).  Like so many other Katrina victims, the Robinsons lost

irreplaceable items such as her cookbook collection, his extensive record collection, photos of

his Irish ancestors, and photos of his granddaughter growing up.  TT at p. 635:1-25 (Norman

Robinson).  Mr. Robinson articulated that it was "really hard for him to lose these things, the

stuff that you don't put a monetary value on. The stuff that makes you a human being, the stuff

134

that gives you humanity and a connection to other people." TT at p. 636:7-12 (Norman Robinson).

Mr. Robinson also testified that this was the first community where he ever felt at home. TT at p. 636:18-20 (Norman Robinson). The Robinsons felt that they lost their sense of security and that they experienced psychological trauma. TT at p. 637:1-4 (Norman Robinson). The Robinsons each clearly experienced a severe mental injury and a severely reduced quality of life as a result of the Defendant's negligence and that a corresponding award of general damages is warranted.

### C.   The Amount of Mental Anguish Damages Should be at Least $125,000

While it is exclusively within the province of this Court to set the amount of general damages for each of the Plaintiffs based on the evidence, Plaintiffs respectively submit that such awards should be at or above $125,000 per individual. The Plaintiffs suggest this amount based in part on a like amount recently awarded by the trial court and affirmed by the Louisiana Fourth Circuit Court of Appeal. *See Orellana v. Louisiana Citizens Property Insurance Corp.*, 972 So.2d 1252 (La. App. 2007). In *Orellana*, the plaintiff sued his insurance company for failure to pay his claim. The trial court awarded the plaintiff $125,000 because he had to watch his house undergo additional damage that he was unable to remedy because of the insurance company's failure to pay the claim. *Id.* at 1255-56. The Court of Appeal held that "we find nothing in the record to indicate that the award of $125,000.00 was beyond the 'great, even vast' discretion of a trier of fact in fixing such a damage award." *Id.* at 1256 (*quoting Youn v. Maritime Overseas Corp.,* 623 So.2d 1257, 1261 (La.1993)).

Plaintiffs were all credible and their unrebutted testimony detailed their heart-rendering emotional trauma as a result of their lives being turned upside down by the Defendant's

135

negligence.  Plaintiffs essentially lost everything, not the least of which was their emotional

stability, security, and comforting sense of community from their close connections to their

homes, property, and neighborhoods.  In addition, each of the Plaintiffs has ongoing emotional

damage that they continue to struggle and deal with on a daily basis.  Consequently, Plaintiffs

submit that an award of general damages is warranted and that such award should be at least

$125,000 for each Plaintiff.

      **D.**   **The Damages in New Orleans East and the Lower 9th Ward Cannot be Allocated**[80]

      The damages in New Orleans East and the Lower 9th Ward cannot be allocated because

the differing damage that might possibly have been caused by the flooding resulting from a fully

mitigated MR-GO and/or a pristine MR-GO is drastically less if at all.  This conclusion is

buttressed by the fact that the volume of floodwaters from Hurricane Katrina resulted in these

areas being flooded and the water remaining in the structures for several weeks.  The standing

waters prevented the Plaintiffs' return and exacerbated the damage to the respective properties.

Plaintiffs will attempt to address the question by focusing on the evidence believed to resolve the

issue in two parts: first, the hydrographs; second, the testimony of witness "on the ground."

      **E.**   **Hydrographs**

      The most pertinent answer is shown by the January 27, 2009 Report entitled *Comparison*

*flood depth development between Katrina event and Scenario 2C*.  PX 1771.  This report detailed

the simulated flooding in the polder for each *Robinson* plaintiff via the flood simulation program

SOBEK, and was substantiated at trial by the uncontradicted testimony of Professor Johannes

Vrijling.

---

[80] Regarding this question, Plaintiffs are confused about the basis of the inquiry as there was no
evidence adduced at trial by the Plaintiffs that there would have been flooding in New Orleans
East and the Lower 9th Ward without the MR-GO.

The specific location for Norman and Monica Robinson's home was identified by latitude and longitude, and the specific hydrograph excised for the Court's evaluation.  The Court can see through Figure 2 of the January 2009 report that flooding from all causes was approximately 13 feet, while flooding under Scenario 2C was just under two feet. PX 1771, at p. 2.  *See* Professor Vrijling's explanation of the hydrograph results for the Robinson location at TT at pp. 837:8-839:20.

The specific location for Lucille and Anthony Franz's home was also identified by latitude and longitude, and the specific hydrograph excised for the Court's evaluation.  This hydrograph captured additional information to account for this location's proximity to the IHNC breach sites ("industrial breach").  As proven by Figure 5 of the January 2009 report, flooding from all causes reached just over 10 feet, flooding evaluated by Scenario 2c (with industrial breaches) was just over 6 feet, and flooding evaluated by Scenario 2c without Industrial Canal breaches was negligible, to the magnitude of a few inches.  PX 1771 at p. 4.  Of course, it was proven at trial that the MR-GO was a substantial factor in causing the IHNC flood walls to fail; therefore, the hydrographs categorically prove that the Franzes would have sustained no flooding with a properly maintained channel.  *See* Professor Vrijling explanation of the hydrograph results for the Franz location. TT at pp. 840:2-842:11.

For simulations run for both polders, the effect of the Sewerage & Water Board's ("S&WB") pumping capacity was not evaluated.  As proven by the testimony of the S&WB through its 30(b)(6) designee Jack Heurkamp (PX 2148), Hurricane Katrina, as a rain event, produced amounts of rain that would have been effectively removed from the city in short order, based upon pumping logs and pumping capacity.  PX 2148 at p. 17:1-22.  Therefore, the City of

137

New Orleans would not have flooded as a result of rainfall produced by Hurricane Katrina.  PX 2148 at p. 19:15-25.

These results are consistent with the Dutch report *Polder Flood Simulations for Greater New Orleans: the neutral MRGO scenario* dated July 2008, prepared with the concurrent MRGO class action in mind.  PX 105.  That report modeled the New Orleans East polder, incorporating exclusions to breaching simulations utilized in the July 2007 class certification report entitled *Polder Simulations for Greater New Orleans Hurricane Katrina August 2005*.  PX 53.  These exclusions were designed to highlight the contribution of the MR-GO's deleterious effects on the flood control structures.

The Court will recall that the July 2007 class certification report modeled the New Orleans East and St. Bernard polders to assess the relative contribution of the main causes of flooding (breaches, overtopping, and rainfall) using hydrographs for selected locations, with no consideration for reasons why the water levels outside the polders were so high.  The New Orleans East polder simulation demonstrated internal flooding resulting from breaches (identified by number), in combination with rainfall and outer water levels.  PX 53 at p. 26.[81]

Various "what if" scenarios were presented, and concurrent modeling was undertaken to assess the contribution of breaches, overtopping, rainfall, rainfall pumping capacity, both individually and in conjunction with each other.  The hydrograph for the location nearest the Robinson home shows that the level of flood waters from all causes was approximately 13 feet, while the flooding due to overtopping was 7 feet.  PX 53 at p. 34.  A similar exercise was

---

[81] Although in the Vrijling report, the entry of water through Breach 9 is referred to as overtopping, in fact 6000 feet of the levee at this location breached due to overtopping erosion. PX53, *Polder Flood Stimulations for Greater New Orleans, Hurricane Katrina 2005 (July 2007)* at p. 27.  For this reason the statement in the report that overtopping was the major contributor to flooding in the New Orleans East polder is a mistake.  In fact, breaching of the levees was the major contributor.

undertaken for the St. Bernard polder, with additional "what if" scenarios for no breaches for the MR-GO and the IHNC.  The hydrographs for locations nearest to the Franz's home (PX 53 at p. 46), prove that if the structures along the IHNC and MR-GO had not breached, there would have been limited flooding in the St. Bernard polder, even with an unmitigated MR-GO.

Upon completion of the class certification phase, Plaintiffs studied the deleterious effects of 50 years of Corps conduct in maintaining and operating the MR-GO, as described in the Vrijling's Flood Simulation Report.  PX 105, July 2008.  Once the contribution of the increased conveyance of a negligently maintained channel was understood, the SOBEK model could be adjusted to incorporate a properly maintained, neutral MR-GO.  To properly model the lessened conveyance of a properly maintained MR-GO, the "neutral MR-GO" flood simulation excluded the 6,000 foot breach of the Back levee, as well as the breaches along the Citrus back levee and along the industrial canal.  Both Dr. Bea and Dr. Kemps' trial testimony justify these exclusions.

Again, the New Orleans East polder was modeled separately, and specified locations were modeled using Scenario 1 and 2c, with locations 1 and 2 closest to the Robinson's home. The hydrograph for Location 1 indicates that flooding at that location (*with NO S&WB pumping considered*) was approximately 2 feet under Scenario 2, while nearly 13 feet in the Katrina "real run."  PX 105 at p. 21.  The hydrograph for Location 2 indicates that flooding at that location (*with NO S&WB pumping considered*) was less than 1 foot under Scenario 2, while nearly 12 feet in the Katrina "real run."  PX 105 at p. 21.

The July 2008 report also addressed the evaluation of flooding within the St. Bernard polder, incorporating Locations 1 and 2 in the Lower 9th Ward near the Franz's home.  The hydrograph for Location 1 indicates that flooding at that location (*with NO S&WB pumping considered*) was approximately 3 feet under Scenario 2c with no industrial breach (the

**Deleted:** 2C

**Deleted:** 2C

139

contribution of overtopping was negligible), while nearly 11 feet in Scenario 2c *with* industrial breach, and approximately 15 feet in the Katrina "real run."  PX 105 at p. 29.  The hydrograph for Location 2 likewise indicates that flooding at that location (*with NO S&WB pumping considered*) was nearly zero under Scenario 2c with no industrial breach (the contribution of overtopping was again negligible), while nearly 5 feet in Scenario 2c *with* industrial breach, and approximately 9 feet in the Katrina "real run."  PX 105 at p. 29.

> **F.**   **Witnesses on the Ground**

Norman and Monica Robinson lived in a two story house on Mayo Boulevard in New Orleans East.  As a result of flooding caused by the Defendant's negligence, the Robinsons had at least five to six feet of water in their house.  *See* Scott Taylor's Final Report for Norman Robinson, PX1716.  The post-flooding photographs of the Robinson residence revealed that the water sat inside of the house for a period of time and that it wicked up into the sheetrock and effectively destroyed their house.  TT at p. 1603:9-21 (Scott Taylor).

Wicking is a process wherein water is carried up into the wall and up into the insulation.  Mr. Taylor, Plaintiffs' expert, testified:

> As a result, I would expect wicking to occur in the sheetrock because it was a newer home and sheetrock is very thirsty like a straw. It draws water straight up given the opportunity where it will rest for any amount of time.  It will not just draw the water up, but once the water is drawn up, it infests with mold after a relatively short amount of days so you end up starting to see the mold creeping and reaching up the ceiling and even beyond.  You'll find that wicking can occur clear up to the ceiling very easily.

TT at p. 1601:4-13 (Taylor).

This situation is in stark contrast to a mitigated or neutral MR-GO which would have produced a very small amount, if any, of water in the Robinson house.  Specifically, as confirmed by the Plaintiffs' Scenario 2C, there would have been less than two feet of water,

which may not have even resulted in standing water in the Robinson house. Consequently, with a mitigated or neutral MR-GO, there would have been minimal damage, if any, to the Robinsons' house in New Orleans East, which is completely distinguishable from the damage caused by the Katrina flooding event. TT at p. 1861:1-3 (Kemp).

**Deleted: Paul**

A very similar or a very similar result would have occurred even with Plaintiffs' Scenario 3. The results of that scenario indicate that there would have been substantially less damage because the water inside the Robinson house would have only been half as high or approximately three feet. TT at p. 1861:13-19 (Kemp). This lower water level is readily distinguishable from the Katrina flooding and more akin to a May street flood where the residents can remove the bottom sheets of sheetrock which would prevent the water from wicking into the upper floors of the house. Mr. Taylor specifically stated:

**Deleted: Paul**

> That would be the difference between this kind of damage and the kind you see in just street level flooding, like in the May-type street floods that we sometimes see here where it would go like, say, 3 feet or less and then just dissipate very quickly, the damage in those cases would be much less because it doesn't involve the wicking and drawing of the moisture up beyond the 4-foot level.

TT at p. 1602:9-16 (Taylor).

**Deleted: Scott**

The damage is less in these situations because the water generally dissipates fairly quickly and the homeowner can just remove the effected sheetrock. TT at p. 1604:1-4 (Scott Taylor). Consequently, the facts dictate while there may have been some water with a fully mitigated MR-GO or a pristine MR-GO, the damages would not have risen anywhere near the total devastation experienced by the Robinsons and the people in New Orleans East.

The same result is reached with regard to the allocation of damages in the 9th Ward. The Franzes resided on the second story of a two-story duplex on St. Claude Ave. Mrs. Franz's son stayed in their house for Hurricane Katrina, and approximately three feet of water reached the

second floor of their house.  TT at pp. 555:22-25 (Lucille Franz).  That translates into approximately eighteen to twenty-two feet of water in the street next to their house.  TT at p. 556:1-3 (Lucille Franz).  This was confirmed by the testimony and reports of Plaintiffs' experts, John Crawford and Scott Taylor, who opined that there was a resting water line that was approximately a foot on the second floor.  *See* Crawford Expert Report, PX 1500; Taylor Expert Report, PX 1714.  The Franzes testified that the water was high enough on the second floor that they lost everything. TT at p. 556:4-6 (Lucille Franz); TT at p. 574:21–575:4 (Anthony Franz).  This water remained in the Franzes' house for approximately three weeks.  TT at p. 1912:1-12 (Junior Rodriguez).

The damages resulting from the Franzes' home sitting in eighteen to twenty-two feet of water is again in stark contrast to the damages that could possibly have occurred with a neutral MR-GO.  The Plaintiffs' expert, Paul Kemp, testified that a neutral MR-GO, with no breaching of the floodwalls on the IHNC, results in no flooding at the Franz property -- no damage at all.  TT at p. 1861:l3-19 (Kemp).  Even with the breaches in the IHNC[82] and a neutral or mitigated MR-GO the Franzes only have five feet of flooding.  TT at p. 1861:13-19 (Kemp).  Five feet of flooding in the 9th Ward only translates into approximately three feet of flooding in the Franzes' house as the ground elevation in the area is approximately one and a half feet.  The damages that possibly could have resulted from three feet of flooding compared to the damages that were caused by approximately nine and half feet of flooding are antipodal.  Consequently, the damages in the Lower 9th Ward cannot and should not be allocated.

Deleted: Paul

Deleted: Paul

---

[82] The Plaintiffs contend that a substantial factor in the breaching of the IHNC floodwalls was the extreme hydraulic forces from the unmitigated MR-GO.

142

Finally, no issue of allocation arises with respect to Plaintiffs Tanya Smith, Kent

Lattimore and Lattimore and Associates, all of whose property was in St. Bernard Parish.  The

parties agree that the sole source of flooding in this area is from the Reach 2 channel.

Dated: June 18, 2009                                   Respectfully submitted,


**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell

Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298


**Law Offices of Joseph M. Bruno**
By: s/ Joseph M. Bruno
Joseph M. Bruno (LSBA No. 3604)
Plaintiffs' Liaison Counsel
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493


**The Andry Law Firm, LLC**
By: s/ Jonathan B. Andry
Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788

**Domengeaux Wright Roy & Edwards LLC**
By: s/ James P. Roy
Bob F. Wright (LSBA No. 13691)
James P. Roy (LSBA No. 11511)
MR-GO PSLC Liaison Counsel
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile:  (337) 233-2796


**Fayard & Honeycutt**
Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193

**Girardi & Keese**
Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile:  (213) 481-1554

143

Facsimile:  (225) 664-6925

**McKernan Law Firm**
Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Law Office of Elwood C. Stevens, Jr., a
Professional Law Corporation**
Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Michael C. Palmintier, A.P.L.C.**
Michael C. Palmintier
Joshua M. Palmintier
618 Main Street
Baton Rouge, LA  70801-1910
Telephone: (225) 344-3735
Telefax: (225) 336-1146

**Levin, Papantonio, Thomas, Mitchell
Echsner & Proctor, P.A.**
Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**Gainsburgh, Benjamin, David, Meunier &
Warshauer, LLC**
Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Cotchett, Pitre, Simon & McCarthy**
Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

144

**Law Office of Frank J. D'Amico, Jr. APLC**
Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Robinson, Calcagnie & Robinson, Inc.**
Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

**Barron & Budd, P.C.**
Russell W. Budd
Thomas M. Sims
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Telephone: (214) 521-3605
Fax: (214) 520-1181

**Andry & Andry**
Jay Andry
Gilbert V. Andry
Arthur Landry
710 Carondelet Street
New Orleans, LA 70130
Telephone: (504) 581-4334
Fax: (504) 586-0288

**Carlton Dunlap Olinde & Moore**
John B. Dunlap, III
Richard P. Ieyoub
One American Place, Suite 900
301 Main Street
Baton Rouge, LA 70825
Telephone: (225) 282-0600
Telefax: (225) 282-0650

**The Dudenhefer Law Firm, L.L.C.**
Frank C. Dudenhefer, Jr.
601 Poydras Street, Suite 2655
New Orleans, LA 70130
Telephone: (504) 616-5226

**Dumas & Associates Law Firm, LLC**
Walter C. Dumas
Lawyer's Complex
1261 Government Street
P. O. Box 1366
Baton Rouge, LA 70821-1366
Telephone: (225) 383-4701
Telefax: (225) 383-4719

**Glen J. Lerner & Associates**
Glen J. Lerner
4795 S. Durango Drive
Las Vegas, NV 89147
Telephone: (702) 877-1500
Telefax: (702) 968-7572

145

## CERTIFICATE OF SERVICE

I, Pierce O'Donnell, hereby certify that on June 25, 2009, I caused to be served

**PLAINTIFFS' CORRECTED POST TRIAL BRIEF**, upon Defendants' counsel, Robin D.

Smith, George Carter, Keith Liddle, and Richard Stone by ECF and email at

robin.doyle.smith@usdoj.gov; george.carter@usdoj.gov, keith.liddle@usdoj.gov, and

richard.stone@usdoj.gov.

/s/ Pierce O'Donnell

Deleted: 18

146