UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

CIVIL ACTION

No.:  05-4182

FILED IN:   05-4181, 05-4182, 05-4191, 05-4568,
05-5237, 05-6073, 05-6314, 05-6324,
05-6327, 05-6359, 06-0020, 06-1885,
06-0225, 06-0886, 06-11208, 06-2278,
06-2287, 06-2346,  06-2545, 06-3529,
06-4065, 06-4389, 06-4634, 06-4931,
06-5032, 06-5042, 06-5159, 06-5163,
06-5367, 06-5471,  06-5771, 06-5786,
06-5937, 06-7682, 07-0206, 07-0647,
07-0993, 07-1284, 07-1286, 07-1288,
07-1289.

PERTAINS TO: LEVEE AND MR-GO

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Upon considering the Joint Motion for Certification of a Settlement Class, for Approval

of Proposed Settlement and for the Stay of Certain Claims and Actions (the "Joint Motion"), the

Court entered an Order of Preliminary Certification of a Settlement Class, Preliminary Approval

of Proposed Settlement and Stay of Certain Claims and Actions on December 15, 2008 (the

"Preliminary Approval Order").[1]  Also pursuant to the Joint Motion, this matter came on for a

---

[1] Except as otherwise expressly provided herein or as the context otherwise requires, all capitalized terms used in these Findings of Fact and Conclusions of Law shall have the meaning given to them in the Class Settlement Agreement, as amended.  The Class Settlement Agreement, together with all exhibits thereto, was attached to the Joint Motion as *in globo* Exhibit "1."  A copy of the Class Settlement Agreement, as amended, is also attached as *in globo* Exhibit "1" to the Final Order and Judgment, which has been entered contemporaneously herewith.

**EXHIBIT
"A"**

Certification Hearing and a Fairness Hearing on April 2, 2009, to further consider the relief requested in the Joint Motion.

Upon consideration of the Joint Motion and the evidence submitted in support, including at the Certification Hearing and Fairness Hearing, the Court enters the following findings of fact and conclusions of law.

All findings of fact shall constitute conclusions of law to the extent applicable and all conclusions of law shall constitute findings of fact to the extent applicable.

## FINDINGS OF FACT

### Notice

1.  The notice provided to all Class Members of the preliminary certification of the Settlement Class, the proposed settlement, the Certification Hearing, and the Fairness Hearing complies with the Preliminary Approval Order.[2]  The Preliminary Approval Order expressly reserved in favor of all Class Members the right to raise for *de novo* consideration by this Court objections to certification of the proposed Settlement Class, to approval of the Class Settlement Agreement, and to all related issues at the Certification Hearing and/or the Fairness Hearing.

2.  The Notice Program, as implemented, reached approximately 86.5% of potential Class Members through mailed Notice.[3]  Not reflected in the calculable reach figure are the Louisiana newspapers and the nationwide public service announcements, press release, and website efforts utilized.[4]

---

[2] Exhibit 68, Affidavit of Shannon R. Wheatman, Ph.D. on CAFA Notice and Implementation and Adequacy of Settlement Notice Program ("Wheatman Affidavit"), ¶ 5(a), including the exhibits thereto.
[3] Exhibit 68, Wheatman Affidavit, ¶ 5(b).
[4] Exhibit 68, Wheatman Affidavit, ¶ 5(c).

3.     The Notices were clear, simple, substantive, and informative.  No significant or required information was missing.  The Notice Program and Notices were not misleading to Class Members.[5]

4.     The Court finds Dr. Shannon R. Wheatman, an expert in the areas of class notice form, content and distribution, is qualified to provide expert testimony with regard to the issues related to notice and the Notice Program.[6]

5.     On December 23, 2008, within the 10-day period required by the Class Action Fairness Act (CAFA), 28 U.S.C. 1715(b), notice containing materials appropriate in form and content were sent via certified mail to the 51 Attorneys General and the United States Attorney General.[7]

**The Levee Districts**

6.     The primary function of the Orleans Levee District, the East Jefferson Levee District, and the Lake Borgne Basin Levee District (collectively, the "Levee Districts") and the Southern Louisiana Flood Protection Authority – East  is flood protection for the Hurricane Affected Geographic Area.[8]

7.     Projects that are underway and future projects contemplated that will be administered by the Levee Districts include the rebuilding of the entire levee protection system surrounding the Greater New Orleans Metropolitan Area to bring it to a 100 year level of protection, as defined by the United States Army Corps of Engineers.  Future projects will

---

[5] Exhibit 68, Wheatman Affidavit, ¶ 5(d); Exhibits 6, 7, 9, 11 and 12 to Wheatman Affidavit.
[6] Exhibit 68, Wheatman Affidavit; Exhibit 1 (CV) to Wheatman Affidavit.
[7] Exhibit 68, Wheatman Affidavit, ¶ 7; Exhibits 2-4 to Wheatman Affidavit.
[8] Testimony of Timothy P. Doody, Transcript, page 108, lines 15-19.

include T-walls constructed along the Mississippi River Gulf Outlet, a surge barrier and the raising of levees along the north side of the Gulf Intercoastal Waterway.[9]

8. The projected cost of the surge barrier alone is estimated to be 1.2 billion dollars.[10] The estimated annual cost of maintenance of the surge barrier project alone is $800,000.00 per year for the 50 year life of the barrier.[11]

9. The Levee Districts, as local sponsors, will continue to be obligated by law to contribute to the cost of future projects and have the operation and maintenance responsibilities therefor.[12] The current cost share that the United States Army Corps of Engineers has been requiring of its local sponsors has increased since Hurricane Katrina and is currently 35%.[13]

10. The estimated land acquisition cost for the entire region served by the levee districts is $200 to $300 million dollars.[14]

11. The respective Levee Districts do not have sufficient assets to meet their obligations to pay either existing debt or their share of future obligations for proposed federal projects.[15]

12. The revenue stream that the Levee Districts rely on is principally composed of receipts from ad valorem taxes.[16]

13. The tax base of the respective Levee Districts has been decimated by the effects of Hurricanes Katrina and Rita.[17]

14. The non-flood assets of the Levee Districts do not generate revenue.[18]

---

[9] Transcript (Doody), page 109, lines 5-15.
[10] Transcript (Doody), page 109, lines 16-20.
[11] Transcript (Doody), page 110, lines 6-12.
[12] Transcript (Doody), page 109, line 21 through page 110, line 1.
[13] Transcript (Doody), page 110, lines 2-5.
[14] Transcript (Doody), page 110, lines 13-19.
[15] Transcript (Doody), page 110, lines 20-24.
[16] Transcript (Doody), page 110, line 25 through page 111, line 3.
[17] Transcript (Doody), page 111, lines 4-9.

NO.99959316.1

15.    The respective Levee Districts could not (and responsibly would not) pay for judgments that could be returned in connection with this Litigation and still maintain the ability of each respective Levee District to fulfill its statutory obligations and maintenance and operational obligations for the Lake Pontchartrain and Vicinity Hurricane Protection System.[19]

16.    The governing authority of the respective Levee Districts is the Southeast Louisiana Flood Protection Authority - East.  La. R.S. 38:330.1 - 38:330.3.

17.    The Court finds credible the testimony of Timothy P. Doody, President of the Southeast Louisiana Flood Protection Authority - East, that the Authority and the Levee Districts cannot pay for judgments in excess of its available insurance limits that result from this Litigation, and will not appropriate funds for that purpose even for a single claimant.[20]

18.    The Levee Districts are political subdivisions of the State of Louisiana. La. R.S. 13:5102(B)(1); La. R.S. 38:281(6).

19.    The State of Louisiana is not responsible for the payment of judgments or other debts of its political subdivisions.  La. R.S. 13:5109.  *See also,* La. Const. Art. XII, Sect. 10 and Art. VII, Sect. 14.

20.    There is no evidence that the State of Louisiana has ever paid a money judgment or a debt for any of the Levee Districts.  Rather, the record merely contains evidence that the Louisiana Legislature has appropriated funds for the payment of judgments and settlements involving the State and/or State agencies.[21]

---

[18]  Transcript (Doody), page 113, lines 11-17.
[19]  Transcript (Doody), page 111, line 14 through page 112, line 9.
[20]  Transcript (Doody), page 111, line 14 through page 112, line 9.
[21]  *See,* general appropriation bills included in Exhibit 87, introduced by objectors.

NO.99959316.1

**The Class**

21.    The proponents of the Class Settlement Agreement propose a class that is essentially composed of all persons and entities who were present or who owned immovable or movable property in the Hurricane Affected Geographic Area on August 29, 2005 and September 24, 2005, respectively.[22]

22.    All Class Members purposefully directed activities at the forum state in that they were either domiciled in the Hurricane Affected Geographic Area, had an interest in property that was damaged within the Hurricane Affected Geographic Area, or otherwise claim to have been injured while present there.[23]  The entirety of the Hurricane Affected Geographic Area lies within the Federal Judicial District for the Eastern District of Louisiana.

23.    The Court finds Gregory C. Rigamer, an expert in the fields of urban studies, demographic analysis and forecasting, and the assessment of economic impacts on communities caused by natural disaster, is qualified to provide expert testimony with regard to the issues he addressed.[24]

24.    Census data indicate that the population of the Hurricane Affected Geographic Area was almost 1,000,000 people in the summer of 2005.[25]

25.    Census data also indicate approximately 440,000 housing units existed in the Hurricane Affected Geographic Area in the summer of 2005.[26]

26.    The estimated total value of the housing units located in the Hurricane Affected Geographic Area in the summer of 2005 was approximately $47.5 billion.[27]

---

[22] Testimony of Gregory C. Rigamer, Transcript, page 81, line 23 through page 82, line 5; Class Settlement Agreement, Section II(10).
[23] *See,* Class Settlement Agreement, Section II(10), defining the Class.
[24] Exhibit 61 (CV); Transcript (Rigamer), pages 65-81.
[25] Transcript (Rigamer), page 82, lines 6-11.
[26] Transcript (Rigamer), page 82, lines 12-23.

- 6 -

27.    Hurricane Katrina struck the Hurricane Affected Geographic Area on August 29, 2005.  As of July 1, 2006, over 250,000 persons who resided in the Hurricane Affected Geographic Area had still not returned.  Of the 440,000 housing units in the Hurricane Affected Geographic Area, about 165,000 were reported as having suffered major or severe damage. Total damage to housing stock has been estimated to be in excess of $20 billion.[28]

28.    Repair costs for damage to infrastructure in the Hurricane Affected Geographic Area is an estimated minimum $4.6 billion.[29]

29.    Losses to personal property in the Hurricane Affected Geographic Area caused by Hurricanes Katrina and Rita are estimated to exceed $5 billion.[30]

30.    The Bureau of Labor Statistics reports that since June 2005, the Hurricane Affected Geographic Area has lost in excess of 96,000 jobs at an average weekly wage of $662. This equates to an estimated loss in wages of more than $11 billion from September 2005 through March 2009.[31]

31.    The proponents of the Class Settlement Agreement proposed three sub-classes: (a) Subclass 1, those persons having claims for damage due to flooding caused by breaches or overtopping of flood control structures designed, constructed, operated or maintained by the Lake Borgne Basin Levee District; (b) Subclass 2, those persons having claims for damage due to flooding caused by breaches or overtopping of flood control structures designed, constructed, operated or maintained by the East Jefferson Levee District; and (c) Subclass 3, those persons

---

[27] Transcript (Rigamer), page 82, lines 12-25.  This does not include commercial, non-residential properties; nor does it include governmental property or infrastructure.
[28] Transcript (Rigamer), page 83, line 21 through page 84, line 8.
[29] Transcript (Rigamer), page 84, lines 9-13; Exhibit 61, Report of Gregory C. Rigamer ("Rigamer Report").  These calculations do not include economic losses caused by the damage to or destruction of commercial enterprises in the Hurricane Affected Geographic Area caused by Hurricanes Katrina and Rita, and the loss of employment and wages as a result thereof.
[30] Transcript (Rigamer), page 87, lines 3-8.
[31] Transcript (Rigamer), page 88, lines 5-9.

NO.99959316.1

having claims for damage due to flooding caused by breaches or overtopping of flood control structures designed, constructed, operated or maintained by the Orleans Levee District.[32]

32.    The area impacted by flooding due to breaches or overtopping of the Mississippi River Gulf Outlet and/or 40 Arpent Canal flood control structures allegedly controlled by the Lake Borgne Basin Levee District contained a population of approximately 65,000 in the summer of 2005.[33]

33.    There were approximately 26,000 housing units in the area impacted by flooding due to breaches or overtopping of the Mississippi River Gulf Outlet and/or 40 Arpent Canal flood control structures allegedly controlled by Lake Borgne Basin Levee District. The value of those units was estimated to exceed $2 billion. After subtracting for estimated damage produced by rain, wind, or compensated by Road Home grants, the estimated damage to residential structures in the area impacted by flooding due to breaches or overtopping of the Mississippi River Gulf Outlet and/or 40 Arpent Canal flood control structures is approximately $546 million.[34]

34.    The area impacted by flooding due to breaches or overtopping of the 17th Street Canal flood control structure allegedly controlled by the East Jefferson Levee District and the Orleans Levee District contained a population of approximately 173,189 in the summer of 2005.[35]

35.    There were approximately 87,000 housing units in the area impacted by flooding due to breaches or overtopping of the 17th Street Canal flood control structure. The value of those units was estimated to exceed $11 billion. After subtracting for estimated damage

---

[32]  Class Settlement Agreement, Section II(10).
[33]  Transcript (Rigamer), page 95, lines 17-23.
[34]  Exhibit 61, *in globo*, Rigamer Report, slides entitled "Housing Assets in the Class Area," "MRGO Impact Area"; Transcript (Rigamer), page 95, lines 17-23.
[35]  Transcript (Rigamer), page 92, lines 16-25.

- 8 -

produced by rain, wind, or compensated by Road Home grants, the estimated damage to residential structures in the area impacted by flooding due to breaches or overtopping of the 17th Street Canal flood control structure is approximately $2.8 billion.[36]

36.    The area impacted by flooding due to breaches or overtopping of the London Avenue Canal, Orleans Canal, and Inner Harbor Navigational Canal (IHNC) flood control structures allegedly controlled by Orleans Levee District contained a population of approximately 382,000 in the summer of 2005.[37]

37.    There were approximately 185,000 housing units in the area impacted by flooding due to breaches or overtopping of the London Avenue Canal, Orleans Canal, and IHNC flood control structures allegedly controlled by Orleans Levee District.  The value of those units was estimated to exceed $17.5 billion.  After subtracting for estimated damage produced by rain, wind, or compensated by Road Home grants, the estimated damage to residential structures in the area impacted by flooding due to breaches or overtopping of the London Avenue Canal, Orleans Canal, and IHNC flood control structures is approximately $3.27 billion.[38]

38.    In addition to damage to residential property, flooding due to breaches or overtoppings of flood control structures allegedly controlled by the Levee Districts included damage to automobiles, damage to personal property (contents), personal injury, death, loss of wages, loss of business opportunities, inconvenience, expenses due to evacuation, damage to

---

[36]  Exhibit 61, *in globo*, Rigamer Report, slide entitled "17th Street Canal - Impact Area"; Transcript, page 93, lines 14-19.
[37]  Exhibit 61, *in globo*, Rigamer Report, slides entitled "Orleans Canal - Impact Area," "London Canal - Impact Area," and "IHNC - Impact Area."
[38]  Transcript (Rigamer), page 93, line 25 through page 95, line 6; Exhibit 61, *in globo*, Rigamer Report, slides entitled, "Orleans Canal - Impact Area," London Canal - Impact Area," and "IHNC - Impact Area."  These figures necessarily include some duplication or overlap to the extent that an area may have been impacted by the overtopping of more than one flood control structure.

NO.99959316.1

commercial property (both immovable and movable), and damage to governmental property and infrastructure.[39]

39.     A reasonable estimate of quantifiable damage (*i.e.*, damage to residential properties, damage to commercial facilities, damage to personal property, and lost wages), for each subclass, subtracting for damage attributable to wind and rain and compensated by Road Home grants (which may or may not be considered a collateral source), is as follows: (Sub-Class 1) $2,125,539,401; (Sub-Class 2) $11,858,540,385; and (Sub-Class 3) $7,171,056,182.[40]

40.     The maximum insurance assets available to persons having claims against the Lake Borgne Basin Levee District are $2 million.[41]   Even if the Lake Borgne Basin Levee District was to be held liable for only 1% of the quantifiable damages sustained by persons in Subclass 1, its exposure to liability would exceed $21 million.[42]

41.     The maximum insurance assets available to persons having claims against the East Jefferson Levee District are $5 million.[43]   Even if East Jefferson Levee District was to be held liable for only 1% of the quantifiable damages sustained by persons in Subclass 2, its exposure to liability would exceed $118 million.[44]

42.     The maximum insurance assets available to persons having claims against the Orleans Levee District are $10 million.[45]   Even if the Orleans Levee District was to be held

---

[39]  Transcript (Rigamer), page 93, lines 20-24, page 97, line 23 through page 98, line 5.
[40]  Exhibit 61, *in globo*, Rigamer Report, slide entitled "Quantifiable Damage - Areas Affected by Breaches." These figures necessarily include some duplication or overlap to the extent that an area may have been impacted by the overtopping of more than one flood control structure, while the approximately $17.4 billion net damages figure for the entire flood impact area as reflected in the referenced slide contains no such duplication or overlap.
[41]  Exhibit 4 at Bates No. TRV-LB-00029.
[42]  Exhibit 61, *in globo*, Rigamer Report, slide entitled "Quantifiable Damage - Areas Affected by Breaches"; Transcript, page 97, line 25 through page 98, line 6.  Quantifiable damage does not include damages due to personal injury, death, inconvenience, pain and suffering, and mental anguish.
[43]  Exhibit 3 at Bates No. TRV-LDE-00069, 186.
[44]  Exhibit 61, *in globo*, Rigamer Report, slide entitled "Quantifiable Damage - Areas Affected by Breaches."
[45]  Exhibit 2 at Bates No. TRV-OLD-00034, 135.

liable for only 1% of the quantifiable damages sustained by persons in Subclass 3, its exposure to liability would exceed $71 million.[46]

43.     The Court finds credible the testimony of Class Counsel and the submissions of the Class Representatives.

**Insurance-Applicable Policies**

44.     St. Paul Fire and Marine Insurance Company ("St. Paul") issued a multiform package policy to the Orleans Levee District bearing the policy number GP06300925 and with a policy period of November 1, 2004 to November 1, 2005 (the "OLD Policy") that provided, *inter alia*, comprehensive general liability ("CGL") coverage.[47]

45.     St. Paul issued a multiform package policy to the East Jefferson Levee District bearing the policy number GP06301698 and with a policy period of January 1, 2005 to January 1, 2006 (the "EJLD Policy") that provided, *inter alia*, CGL coverage.[48]

46.     St. Paul issued a multiform package policy to the Lake Borgne Basin Levee District bearing the policy number GP09312536 and with a policy period of June 8, 2005 to June 8, 2006 (the "LBBLD Policy") that provided, *inter alia*, CGL coverage.[49]

47.     Forty-eight other policies of insurance exist that were issued by various insurance companies to the Orleans Levee District, the East Jefferson Levee District or the Lake Borgne Basin Levee District and were in effect on August 28, 2005 (the "Noncontributing Policies").[50]

48.     The Noncontributing Policies provided the respective Levee Districts with various types of coverages including, but not limited to, coverage for automobile liability, first-party property losses, flood losses, inland marine, contractor's equipment, underground storage tanks,

---

[46] Exhibit 61, *in globo*, Rigamer Report, slide entitled "Quantifiable Damage - Areas Affected by Breaches."
[47] Exhibit 2.
[48] Exhibit 3.
[49] Exhibit 4.
[50] *See,* Exhibits 1 and 5-52.

employers liability and workers compensation, boiler and machinery, law enforcement liability, employment practices, marine general liability, public entity management liability, and hull and machinery.[51]

49.     American Empire Surplus Lines ("American Empire") issued separate CGL policies to the East Jefferson Levee District and the Lake Borgne Basin Levee District for the 2006 - 2007 policy period.[52]

50.     The American Empire policies issued to the East Jefferson Levee District and the Lake Borgne Basin Levee District for the 2006 - 2007 policy period provide coverage only for "bodily injury" and "property damage" that occur during the policy period and preclude coverage for "bodily injury" and "property damage" known to the insured before the policies incepted.[53]

51.     Under the American Empire policies, any continuation, change, or resumption of "bodily injury" or "property damage" will be deemed to be known by the insured before the policies incepted if the insured knew that "bodily injury" or "property damage" had occurred in whole or in part before the policy period.[54]

52.     The East Jefferson Levee District and the Lake Borgne Basin Levee District concede that they were aware of and had knowledge of Claims for "bodily injury" and "property damage" arising out of or resulting from the Levee Failures at the time the American Empire policies incepted.

53.     Further, this Court takes judicial notice that the damages resulting from the flooding were so widespread and immediate that the entire populace of the Hurricane Affected

---

[51] *See,* Exhibits 1 and 5-52.
[52] *See,* Exhibits 53 and 58.
[53] Exhibits 53 and 58.
[54] Exhibits 53 and 58.

- 12 -

Geographic Area had knowledge of the damages arising out of or resulting from the Levee Failures.

54.     Illinois Union Insurance Company ("Illinois Union") issued separate CGL policies to the Orleans Levee District and the East Jefferson Levee District for the 2007 - 2008 and 2008 - 2009 policy periods.[55]

55.     The Illinois Union policies issued to the Orleans Levee District and the East Jefferson Levee District for the 2007 - 2008 and 2008 - 2009 policy periods provide coverage only if the "occurrence" and "bodily injury" or "property damage" take place during the relevant policy period.[56]

56.     The Illinois Union policies issued to the Orleans Levee District and the East Jefferson Levee District for the 2007 - 2008 and 2008 - 2009 policy periods exclude coverage for damages arising out of levee failures.[57]

57.     Only the OLD Policy, the EJLD Policy and the LBBLD Policy potentially respond to the Class Members' Claims against the Levee Districts.[58]

58.     The Court finds that Peter Ligeros, Plaintiffs' expert in the fields of insurance and risk management industry customs and practices, is qualified to provide expert testimony with regard to the issues he addressed.[59] The Court finds persuasive and uncontradicted Mr. Ligeros' expert testimony regarding potential coverage under the OLD policy, the EJLD policy, and the LBBLD policy.[60]

---

[55] *See,* Exhibits 1 and 54-57.
[56] *See,* Exhibits 54-57.
[57] Exhibits 54-57.
[58] *See,* Exhibit 69, Report of Peter Ligeros ("Ligeros Report"); Testimony of Peter Ligeros, Transcript, pages 133-136.
[59] Transcript (Ligeros), pages 115-120; CV of Peter Ligeros, Exhibit 69.
[60] *See,* Exhibit 69, Ligeros Report; Transcript (Ligeros), pages 121-136.

NO.99959316.1

59.     Class Counsel exercised due diligence in searching for all applicable insurance.[61]

**Insurance – Limits/Premises**

60.     While the EJLD Policy contains multiple coverage parts, only the Public Entity General Liability Protection ("GL") form and the Umbrella Excess Liability Protection ("Excess") form provide coverage for liability cast upon the East Jefferson Levee District as a result of "bodily injury" or "property damage" that happens during the policy period and is caused by an "event".[62]

61.     The General Total Limit under the GL coverage form in the EJLD Policy is $1 Million.[63]

62.     The General Total Limit under the Excess coverage form in the EJLD Policy is $4 Million.[64]

63.     Pursuant to the Class Settlement Agreement, St. Paul has deposited $5 Million, representing the combined General Total Limits available under the GL coverage form and the Excess coverage form in the EJLD Policy, plus legal interest, into an escrow account established for purposes of the settlement.[65]

64.     While the LBBLD Policy contains multiple coverage parts, only the GL coverage form provides coverage for liability cast upon the Lake Borgne Basin Levee District as a result of "bodily injury" or "property damage" that happens during the policy period and is caused by an "event."[66]

---

[61]  Transcript (Ligeros), pages 115-136; Exhibit 69, Ligeros Report; Testimony of Joseph M. Bruno, Transcript, pages 170, lines 15-20, page 172, line 11 through page 174, line 12, and page 193, line 7 through page 194, line 11.
[62]  See, Exhibit 3 at Bates No. TRV-LDE-00072, 188.
[63]  See, Exhibit 3 at Bates No. TRV-LDE-00069.
[64]  See, Exhibit 3 at Bates No. TRV-LDE-184, 186.
[65]  See, Class Settlement Agreement, Section III(4); Opening Statement of Gerald E. Meunier, Transcript, page 24, lines 1-4; Opening Statement of Ralph S. Hubbard, III, Transcript, page 61, lines 19-23.
[66]  See, Exhibit 4 at Bates No. TRV-LB-0032.

- 14 -

65. The General Total Limit under the GL coverage form in the LBBLD Policy is $2 Million.[67]

66. Pursuant to the Class Settlement Agreement, St. Paul has deposited $2 Million, representing the General Total Limits available under the GL coverage form in the LBBLD Policy, plus legal interest, into an escrow account established for purposes of the settlement.[68]

67. While the OLD Policy contains multiple coverage parts, only the GL coverage form and the Excess coverage form provide coverage for liability cast upon the Orleans Levee District as a result of "bodily injury" or "property damage" that happens during the policy period and is caused by an "event".[69]

68. The General Total Limit under the GL coverage form in the OLD Policy is $1 Million.[70]

69. The General Total Limit under the Excess coverage form in the OLD Policy is $9 Million.[71]

70. The General Total Limit in the GL coverage form in the OLD Policy is amended by an endorsement, which provides in relevant part:

> **PUBLIC SECTOR SERVICES**
> **CHANGE OF LIMITS ENDORSEMENT —**
> **GENERAL TOTAL LIMIT APPLIES PER PREMISES**
>
> This endorsement changes your Public Entity General Liability Protection.
>
> _____
>
> **How Coverage Is Changed**
>
> The following is added to the General total limit section. This change broadens coverage.

---

[67] Exhibit 4 at Bates No. TRV-LB-00029.
[68] *See*, Class Settlement Agreement, Section III(4); Transcript (Meunier), page 23, lines 23-25; Transcript (Hubbard), page 61, lines 19-23.
[69] *See*, Exhibit 2 at Bates No. TRV-OLD-00036-37, 138.
[70] *See*, Exhibit 2 at Bates No. TRV-OLD-00034.
[71] *See*, Exhibit 2 at Bates No. TRV-OLD-00133.

*General total limit applies per premises.*  The General total limit applies separately to each premises you own, rent, or lease.  But only for covered bodily injury, property damage, or medical expenses that result from such premises.

*       *       *       *       *

We'll consider all premises which:

- share a common boundary; or
- are divided only by a street or roadway, waterway, or railroad right-of-way;

to be one premises when applying the coverage provided by this endorsement.

**Other Terms**

All other terms of your policy remain the same.[72]

71.    At all times pertinent hereto, the flood control system owned and controlled by the OLD was comprised of four component parts: the New Orleans Metro flood control structure, the Lower Ninth Ward flood control structure, the New Orleans East flood control structure, and the New Orleans Westbank flood control structure.[73]

72.    The New Orleans Westbank flood control structure did not fail and was not overtopped during the Hurricanes in 2005, and it is not at issue in this Litigation.[74]

73.    At all times pertinent hereto, the southeast corner of the New Orleans Metro flood control structure was separated from the western side of the Lower Ninth Ward flood control structure only by the Inner Harbor Navigation Canal.[75]

74.    At all times pertinent hereto, the northern side of the Lower Ninth Ward flood control structure was separated from the southern side of the New Orleans East flood control structure only by the Gulf Intracoastal Waterway.[76]

---

[72] Exhibit 2 at Bates No. TRV-OLD-00065.
[73] Exhibit 60, Joint Stipulation.
[74] *Id.*
[75] *Id.*
[76] *Id.*

75.    At all times pertinent hereto, each of the flood control structures at issue was a continuous earthen levee/fronting protection/flood wall structure that encircled the land that it protected, except that the Lower Ninth Ward flood control structure also had one additional levee that was connected to and extended from the encircling structure, extending along the southern bank of the Gulf Intracoastal Waterway.[77]

76.    At all times pertinent hereto, the Mississippi River, the Inner Harbor Navigation Canal, and the Gulf Intracoastal Waterway were all navigable waterways.[78]

77.    Pursuant to the Class Settlement Agreement, St. Paul has deposited $10 Million, representing the combined General Total Limits available under the OLD Policy, plus legal interest into an escrow account established for purposes of settlement.[79]

**Insurance – Additional Insured**

78.    On August 28, 2005 Hurricane Katrina struck the Hurricane Affected Geographic Area.[80]

79.    Plaintiffs have alleged that the Levees along the 17th Street Canal, London Avenue Canal, Orleans Avenue Canal, IHNC/Industrial Canal, 40 Arpent Canal and other flood control structures owned, operated, constructed, designed, and/or maintained by the Defendants experienced Levee Failures incident to Hurricane Katrina and/or Hurricane Rita in August and/or September of 2005.[81]

---

[77] *Id.*
[78] *Id.*
[79] *See,* Class Settlement Agreement, Section III(4); Transcript (Meunier), page 24, lines 5-8; Transcript (Hubbard), page 61, line 19 through page 62, line 2.
[80] Transcript (Rigamer), page 83, line 21 through page 84, line 8.
[81] *See,* Rec. Doc. No. 16647-7, p. 9.

80.     The Lake Borgne Basin Levee District and the East Jefferson Levee District had no contracts in effect with any third-parties for work to be performed on the levees at the time of Hurricane Katrina.[82]

81.     The entities under contract with the Orleans Levee District in connection with the dredging of the 17th Street Canal completed all operations by August of 1992.[83]

82.     The entities under contract with the Orleans Levee District in connection with the construction of the floodwalls on the 17th Street Canal completed all operations by August of 1992.[84]

83.     The contractual operations related to the construction of floodwalls at the London Avenue Canal were completed by July, 1997.[85]

84.     The Orleans Levee District did not have any contracts with Geotech, Inc., Burk-Kleinpeter, Inc., B&K Construction, Eustis Engineering, Inc., Modjeski and Masters, Inc.from 1992 through 2006.[86]

85.     Boh Bros. Construction Company, LLC, Gotech, Inc., Burk-Kleinpeter, Inc., B&K Construction Company, Inc., Eustis Engineering, Inc., Modjeski and Masters, Inc., and T.L. James, Co., have been dismissed from the litigation based upon this Court's finding that the Plaintiffs' claims against these entities were perempted by La R.S. 9:5607 because all of the work performed by the entities which Plaintiffs alleged caused and/or contributed to the levee breaks and/or breaches occurred more than five years prior to August and/or September of 2005. C.R. Pittman Construction Company, Inc. has been dismissed from the litigation based upon this Court's finding that its work was too remote from the breach sites.     James

---

[82] *See,* Affidavit of T. Robert LaCour, Exhibit 64,  ¶ 8; Affidavit of Robert A. Turner, Jr., Exhibit 67, ¶ 9.
[83] *See* Affidavit of Gerard J. Gillen, Exhibit 66, ¶ 15.
[84] *Id.* at ¶ 16.
[85] *Id.* at¶ 17.
[86] *Id.* at ¶¶ 9-16.

- 18 -

Construction and Gulf Group, Inc. of Florida have been voluntarily dismissed from the litigation.[87]

86.     Any additional insured status that may have been afforded to any Levee District in connection with earlier levee construction projects would have expired when the contract was completed or the policy period ended.[88]

87.     Any additional insured coverage that may have been provided to any Levee District under any of the contractors or engineers' insurance policies from the time of the dredging would potentially respond only to damages sustained during the policy period of those policies.[89] And the Court finds that none of the damages being claimed by Plaintiffs were sustained prior to August 29, 2005.

88.     The Orleans Levee District had contracted for only four flood control structure projects from 2004 through 2006.[90]

89.     Alpha Testing & Inspection, Inc. ("Alpha Testing") provided vibration and monitoring services during the demolition and reconstruction of the Hammond Highway Bridge on the 17th Street Canal pursuant to a contract with the United States Army Corps of Engineers. The Hammond Highway bridge on the 17th Street Canal did not fail during Hurricane Katrina.[91]

90.     Boh Bros. Construction Co., LLC ("Boh Bros.") installed two metal plates to the sill of Floodgate S-1, which work did not fail during Hurricane Katrina.[92]

---

[87] *Transcript*, pp. 106-107; *Rec. Doc. Nos.* 2148,463,894,2142, 560, 624, 6175, 3403 580, 581, 582, 8076.
[88] Transcript (Ligeros), page 132, lines 13-22.
[89] Transcript (Ligeros), page 129, line 11 through page 130, line 9.
[90] *See* Affidavit of Gerard J. Gillen, Exhibit 66, at ¶¶ 5-6.
[91] *Id.* at ¶ 6A.
[92] *Id.* at ¶ 6B.

91.     Centaur LLC ("Centaur") was repairing damage to Floodgate W-30 caused by a train derailment. At the time of Hurricane Katrina, the flood gate was off-site for fabrication and did not fail.[93]

92.     Meyers Engineering, Ltd. ("Meyers") provided engineering services in connection with the upgrade of the Mirabeau Avenue and Filmore Avenue bridges on the London Avenue Canal, neither of which failed during the hurricane.[94]

93.     There is no evidence that the Alpha Testing, Boh Bros., Centaur, or Meyers flood control structure projects (1) caused or contributed to any of the damages alleged in the Master Complaint, or (2) that the Orleans Levee District was named as an additional insured under any policies issued to those contractors.

94.     Plaintiffs' expert, Peter Ligeros, testified that he did not observe any policies affording any of the Levee Districts additional insured coverage at the time of Hurricane Katrina and Hurricane Rita. And the Court finds no such policies existed.[95]

## CONCLUSIONS OF LAW

### Jurisdiction and Venue are Proper

1.     The Court has and retains, jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. 1332(d), 28 U.S.C. 1331, and 28 U.S.C. 1367.

2.     The Court has specific and/or general personal jurisdiction over all absent Class Members.[96]

---

[93]  *Id.* at ¶ 6C.

[94]  *Id.* at ¶ 6D.

[95]  Transcript (Ligeros), pages 125-130.

[96]  *See,* Findings of Fact, ¶ 22. *See also, e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Milliken v. Meyer*, 311 U.S. 457, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940) (personal jurisdiction through domiciliary status); *Burnham v. Superior Court of California*, 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990) (personal jurisdiction through physical presence, and recognizing that property ownership is a sufficient minimum contact when related to the litigation). The Court in *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 176

- 20 -

3.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(a).

**Notice was Proper**

4.     The form and content of the Class Notice, and the manner such Class Notice was given to Class Members and all other interested parties throughout this proceeding with respect to the certification of the Settlement Class, the proposed settlement and all related procedures and hearings, were reasonable and reasonably calculated under all the circumstances and have been sufficient, both as to form and content, to apprise interested parties of the pendency of the Litigation, the preliminary certification of the Settlement Class, the Class Settlement Agreement and its contents, the Certification Hearing, the Fairness Hearing, and Class Members' right to hire counsel, to appear in Court to have their objections heard, and to afford Class Members an opportunity to object.  Such notice complied with all requirements of federal and state laws and constitutions, including the due process clause and Federal Rule of Civil Procedure 23.  Such notice constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all potential Class Members of the Settlement Class, as preliminarily certified and defined by the Preliminary Approval Order, and of the Certification Hearing and the Fairness Hearing.[97]

5.     The form, content and manner of service of the notice required by 28 U.S.C. 1715 on the Attorney General of the United States, which this Court finds to be the "appropriate Federal official," and the Attorney General of Louisiana, which this Court finds to be the "appropriate State official," comply with the Preliminary Approval Order and applicable law, including the requirements of 28 U.S.C. 1715.[98]

---

F.R.D. 158, 180 (E.D. Pa. 1997) concluded that minimum contacts are not necessary in a mandatory limited fund class action; however, since absent Class Members have such contacts here, this Court need not address that issue.
[97]  Fed. R. Civ. Proc. 23(c)(2) and 23(e); <u>Exhibit 68</u>, Wheatman Affidavit, including the exhibits thereto.
[98]  28 U.S.C. 1715; <u>Exhibit 68</u>, Wheatman Affidavit, including the exhibits thereto.

**The Class Action Criteria are Satisfied**

6.     For purposes of certifying a settlement class, the applicable criteria under Rule 23(a) of the Federal Rules of Civil Procedure are satisfied.

7.     The numerosity requirement of Rule 23(a) is satisfied based on the number of Persons in the Hurricane Affected Geographic Area.  The Class is so numerous that joinder of all members is impracticable.[99]

8.     The commonality requirement of Rule 23(a) is satisfied based on questions of law and fact common to the Class.[100]

9.     The common questions of law and fact include the following:

(a)     Were the Levee Districts negligent, or otherwise at fault, in connection with the design, construction, operation and/or maintenance of the flood control structures within the Hurricane Affected Geographic Area that breached or overtopped?

(b)     Did the fault of the Levee Districts contribute to damages suffered by the Class Members?

10.     The typicality requirement of Rule 23(a) is satisfied.   The claims of the representative parties are typical of the claims of the Class as a whole in that all claims arise from damages due to flooding caused by breaches or overtoppings of flood control structures allegedly under the control of the Levee Districts.[101]

11.     The adequate representation requirement of Rule 23(a) is satisfied.   The Class Representatives' interests are sufficiently representative of members of the corresponding Subclasses represented and render them appropriate class representatives.   Class Counsel are

---

[99] Fed. R. Civ. Proc. 23(a)(1); Exhibit 61, Rigamer Report; Transcript (Rigamer), page 81, line 24 through page 82, line 23.
[100] Fed. R. Civ. Proc. 23(a)(2); Exhibit 61, Rigamer Report; Transcript (Rigamer), pages 81-97; Transcript (Bruno), pages 160-162.
[101] Fed. R. Civ. Proc. 23(a)(3); Exhibit 61, Rigamer Report; Transcript (Rigamer), pages 81-98; Exhibit 74, Declaration of Jeannine Armstrong; Exhibit 75, Declaration of Kenneth Armstrong; Exhibit 76, Declaration of Thurman R. Kaiser; Exhibit 77, Declaration of Donna Augustine.

sufficiently qualified to represent the interests of the Class Members.   There is no need for separate class counsel for each of the respective Subclasses nor are there conflicts among the Subclasses given that the benefits available to each Subclass are directly related to and defined by the applicable insurance policy limits that correspond with the particular Subclass.[102]

## There is a Limited Fund

12.     No judicial means exist to force the state, state agencies, or political subdivisions to satisfy money judgments rendered against them. *Vogt v. Board of Commissioners of the Orleans Levee District*, 2001-0089 (La.App. 4 Cir. 3/27/02), 814 So.2d 648, 654.

13.     Appropriation of funds is discretionary and not ministerial, and mandamus will not lie to compel payment of a judgment by a political subdivision.   *Vogt v. Board of Commissioners of the Orleans Levee District*, 2001-0089 (La.App. 4 Cir. 3/27/02), 814 So.2d 648, 654.

14.     This Court is without constitutional or statutory authority to compel the Levee Districts to pay judgments rendered against them.   *Vogt v. Board of Commissioners of the Orleans Levee District*, 2001-0089 (La.App. 4 Cir. 3/27/02), 814 So.2d 648, 654.

15.     The allegations asserted in the Second Supplemental Levee and MR-GO Master Consolidated Class Action Complaint, Record Document 16647-7 against the defendants, the Orleans Levee District, Board of Commissioners Orleans Levee District, the East Jefferson Levee District, Board of Commissioners East Jefferson Levee District, the Lake Borgne Basin Levee District, Board of Commissioners Lake Borgne Basin Levee District, assert claims or

---

[102] Fed. R. Civ. Proc. 23(a)(4); Exhibit 74, Declaration of Jeannine Armstrong; Exhibit 75, Declaration of Kenneth Armstrong; Exhibit 76, Declaration of Thurman R. Kaiser; Exhibit 77, Declaration of Donna Augustine; Exhibit 78, Declaration of Gerard Edward Meunier; Exhibit 79, Declaration of Joseph M. Bruno; Exhibit 80, Declaration of James Parkerson Roy; Transcript (Bruno), page 162, lines 16-19.

causes of action based on the law of the State of Louisiana only.[103]   There are no civil rights claims at issue under 42 U.S.C. 1983 as there were in *Gary W. v. State of Louisiana*, 441 F. Supp. 1121 (E.D.La. 1977), *aff'd.*, 622 F.2d 804 (5th Cir. 1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed. 2d 193 (1981).

16.   Louisiana law does not consider political subdivisions to be arms of the State. The Orleans Levee District, East Jefferson Levee District, and Lake Borgne Basin Levee District are political subdivisions of the State of Louisiana and not arms of the State of Louisiana.  La. R.S. 13:5102;  La. R.S. 38:281; and La. R.S. 38:291; *Anthony L. Vogt, et al. v. Board of Commissioners of the Orleans Levee District,* 294 F.3d 684 (5th Cir. 2002).

17.   The State of Louisiana has no obligation to and is precluded by law from paying judgments against political subdivisions such as the Orleans Levee District, the East Jefferson Levee District, and the Lake Borgne Basin Levee District. La. Const. Art. XII, Sect. 10 and Art. VII, Sect. 14; La. R.S. 13:5109(B)(2).

18.   The property and funds of the Southeast Louisiana Flood Protection Authority-East, the Orleans Levee District, the East Jefferson Levee District, and the Lake Borgne Basin Levee District are not subject to seizure.  La. Const. Art. XII, Sect. 10; La. R.S. 13:5109(B)(2).

19.   The Southeast Louisiana Flood Protection Authority-East, the Orleans Levee District, the East Jefferson Levee District, and the Lake Borgne Basin Levee District cannot be mandamused to fund or appropriate funds to pay judgments returned against these entities in this Litigation. *Vogt v. Board of Commissioners of the Orleans Levee District*, 814 So.2d 648, 654 (La.App. 4 Cir. 2002).

---

[103] See Second Supplemental Levee and MR-GO Master Consolidated Class Action Complaint, Paragraph 4, sub-paragraphs 11-24.

NO.99959316.1

20.     The Court finds the arguments of the objectors that the law might change, or that the State of Louisiana might misappropriate State funds to pay judgments against the Levee Defendants to be too speculative for limited fund analysis. *Cf. Anthony L. Vogt, et al. v. Board of Commissioners of the Orleans Levee District*, 294 F.3d 684, 693 (5th Cir. 2002) (in concluding that the Orleans Levee District is not an arm of the State under the Eleventh Amendment and addressing the proposition that the levee board could request the legislature to appropriate funds to pay a judgment, the Fifth Circuit stated that it "has consistently dismissed such arguments as too speculative for Eleventh Amendment analysis").

**The Class Settlement is Proper**

23.     The application of the factors set forth in *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) support approval of the Class Settlement Agreement.[104]

24.     Absent the settlement, prosecuting separate actions by individual Class Members would create a risk of adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other Class Members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Overcoming the risks attendant with this Litigation and successfully prosecuting the Class Members' Claims against the Settling Defendants would result in actual recovery on any money judgments that is no more than the amount already placed in escrow under the terms of the Class Settlement Agreement. Successful pursuit of individual claims against the Settling Defendants might at best result in a higher individual recovery from the available insurance

---

[104] Class Settlement Agreement; Exhibit 78, Declaration of Gerard Edward Meunier; Exhibit 79, Declaration of Joseph M. Bruno; Exhibit 80, Declaration of James Parkerson Roy; Transcript (Bruno), pages 157-176.

- 25 -

proceeds for a few Class Members, but would likely exhaust those proceeds and leave nothing for the vast majority of Class Members' Claims after exhaustion of the limited fund.[105]

25.     The Class Settlement Agreement is fair, reasonable, and adequate, and in the best interests of the Class Members and the Settlement Class in light of the complexity, expense and likely duration of this Litigation, the risk involved in seeking certification of a litigation class, and the risk involved in establishing liability and damages, as well as the limited funds available through the Settling Defendants.[106]

28.     All Class Members allege that each of the Levee Districts was negligent in connection with the design, construction, maintenance, and/or operation of the flood control structures under their control and located within the Hurricane Affected Geographic Area.[107]

29.     All Class Members allege that the Levee Districts' negligence is a cause in fact of their damages.[108]

30.     All Class Members' claims arise from damages due to flooding caused by breaches and/or overtoppings of the flood control structures allegedly under the control of the Levee Districts and located within the Hurricane Affected Geographic Area.[109]

31.     The Levee Districts' defenses will include that the flood control structures at issue were completely designed and constructed under the supervision of the United States Army Corps of Engineers, and that operation and maintenance of those flood control structures had

---

[105] *See, e.g., In Re: Orthopedic Bone Screw Products Liab. Litig.*, 176 F.R.D. 158, 177 (E.D. Pa. 1997) finding that a limited fund settlement "places all claimants on the same plane, at the same time, with respect to [a defendant's] financial capacity to respond to all the claims, leaving each claimant's share to be determined by traditional application of equitable distribution standards."

[106] *Reed v. General* Motors, 703 F.2d 170 (5th Cir. 1983). Class Settlement Agreement; Exhibit 74, Declaration of Jeannine Armstrong; Exhibit 75, Declaration of Kenneth Armstrong; Exhibit 76, Declaration of Thurman R. Kaiser; Exhibit 77, Declaration of Donna Augustine; Exhibit 78, Declaration of Gerard Edward Meunier; Exhibit 79, Declaration of Joseph M. Bruno; Exhibit 80, Declaration of James Parkerson Roy; Transcript (Bruno), pages 157-176.

[107] Amended Complaint.

[108] Amended Complaint.

[109] Amended Complaint.

- 26 -

little or nothing to do with their breaches or overtopping.[110]   Indeed, this Court has recognized in connection with rulings on previous motions that the Army Corps of Engineers bears a substantial degree of fault in connection with the design and construction of flood control structures that are at issue in this Litigation.[111]

32.    The Court finds that, absent settlement, there is a significant possibility that one or more Levee Districts may be found to have been free from fault in connection with the breaches or overtoppings of the flood control structures at issue in this Litigation.

33.    The Class Settlement Agreement is the result of extensive arms-length negotiations among highly experienced counsel, with sufficient discovery and full knowledge of the risks inherent in this Litigation.  It was entered into in good faith, at arms-length, and without collusion.[112]

34.    Approximately 189 responses to the proposed settlement were filed into the record.  Out of the entire Class of nearly 1,000,000 persons, only 76 objections were received prior to the Certification and Fairness Hearings; the remaining responses constituted neutral submissions or expressed support for the settlement.  The extremely low number of objectors is a factor the Court takes into account as supportive of the proposed settlement.[113]

35.    The Parties have made an informed decision as to the fairness and adequacy of the proposed Class Settlement Agreement.[114]

---

[110]  Opening Statement of Thomas E. Anzelmo, Transcript, pages 42-47.
[111]  Doc. No. 10984.
[112]  Exhibit 78, Declaration of Gerard Edward Meunier; Exhibit 79, Declaration of Joseph M. Bruno; Exhibit 80, Declaration of James Parkerson Roy; Transcript (Bruno), pages 157-176; Exhibit 74, Declaration of Jeanine Armstrong; Exhibit 75, Declaration of Kenneth Armstrong; Exhibit 76, Declaration of Thurman B. Kaiser; Exhibit 77, Declaration of Donna Augustine.
[113]  See, e.g., Thompson v. Metropolitan Life Ins., 216 F.R.D. 55 (S.D.N.Y 2003).
[114]  Exhibit 78, Declaration of Gerard Edward Meunier; Exhibit 79, Declaration of Joseph M. Bruno; Exhibit 80, Declaration of James Parkerson Roy;Transcript (Bruno), pages 157-176; Exhibit 74, Declaration of Jeanine Armstrong; Exhibit 75, Declaration of Kenneth Armstrong; Exhibit 76, Declaration of Thurman B. Kaiser; Exhibit 77, Declaration of Donna Augustine.

36.    The proposed settlement is not the result of collusion or inequitable treatment of any Class Members.[115]

37.    CADA are impartial, qualified and independent and their retention and approval are in the best interests of the Class.[116]

38.    The characteristics the United States Supreme Court described in *Ortiz v. Fibreboard*, 527 U.S. 815, 119 S.Ct. 2295 (1999) for a mandatory limited fund class pursuant to Rule 23(b)(1)(B) are satisfied.

39.    The whole of the Settlement Fund is devoted to the Claims, less only necessary fees and expenses.[117]

40.    The Settlement Fund is indeed a limited fund pursuant to Rule 23(b)(1)(B) and jurisprudence interpreting same.  Unlike the settlement at issue in *Ortiz v. Fibreboard*, the limits of all applicable insurance policies are devoted to the settlement fund (with interest).  Also unlike the settlement at issue in *Ortiz*, the assets of the settling Levee Defendants, who are unable to satisfy the Claims in any event, are immune from seizure.

41.    Any reasonable estimate of the total of aggregated liquidated claims, both as to each Subclass and as to the entire Class, far exceeds the sums available from the Settling Defendants.

42.    Class Members identified by common theories of recovery are treated equitably among themselves.  The Court retains the authority to weigh and approve an allocation plan to be recommended by a Court-appointed special master, and to consider any objections to it.

---

[115] Exhibit 78, Declaration of Gerard Edward Meunier; Exhibit 79, Declaration of Joseph M. Bruno; Exhibit 80, Declaration of James Parkerson Roy; Transcript (Bruno), pages 157-176; Exhibit 74, Declaration of Jeanine Armstrong; Exhibit 75, Declaration of Kenneth Armstrong; Exhibit 76, Declaration of Thurman B. Kaiser; Exhibit 77, Declaration of Donna Augustine.
[116] Preliminary Approval Order.
[117] Class Settlement Agreement.

However that allocation is accomplished, it is clear under the terms of the Class Settlement Agreement that the benefits available to a member of a particular Subclass is directly related to and limited by the applicable insurance policy limits that correspond with the particular Subclass.

43.     The Class as a whole will benefit from payment of the settlement funds.

**The Objections to the Class Settlement Lack Merit**

44.     All objections made to the certification of the Settlement Class and/or approval of the Class Settlement Agreement, due process, constitutionality, procedures and compliance with law (including, but not limited to, the adequacy of notice and the fairness of the proposed Class Settlement Agreement), lack merit.

45.     To the extent the Objection entered by Mary Brinkmeyer, Michelle LeBlanc and Thomas E. Stuart (Doc. No. 18179) ("the Brinkmeyer Objection") and any other Objections suggest that (a) notice was insufficient because it did not allow Class Members to estimate their individual recoveries, or (b) the absence of a specific allocation plan or formula prior to approval of the Class Settlement calls the adequacy of the settlement into question, the Court is not so persuaded. The law does not require that a distribution plan be formulated prior to class notification or class settlement approval, nor is there a compelling reason to do so under the circumstances.[118]

46.     The Court is similarly unpersuaded by other arguments raised and objections pertaining to the Class Notice, including but not limited to (a) that raised in the objection filed by Plaintiffs in Case No. 06-5116 (*Sims*), et al. (the "Sims Objection") to the effect that the Notice should recite the scope of indemnity obligations and releases, when in fact the Notice should

---

[118] *See, e.g., In Re: "Agent Orange" Prod. Liab. Litig.*, 818 F. 2d 145 (2d Cir. 1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988), *citing, In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 223-224 (5th Cir. 1981), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982); *Petrovic v. Amoco Oil Co.*, 200 F. 3d 1140 (8th Cir. 1999); *See also, In re Drexel Burnham Lambert, Inc.*, 130 B.R. 910 (S.D.N.Y. 1991), *affirmed*, 960 F.2d 285 (2d Cir. 1992), *cert. dismissed*, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993); Exhibit 68, Wheatman Affidavit, ¶ 29; Testimony of Edward F. Sherman, Transcript, pages 208-213.

summarize the settlement's primary terms, but not attempt to recite all terms in detail,[119] and in any event the settling parties have amended the Class Settlement Agreement to strike the objected-to indemnity provisions; (b) that the Notice did not state the size of the class, when it is not necessary to do so; (c) the argument raised in the Sims Objection that the Notice did not inform Class Members that a mandatory non-opt-out class was sought when in fact under the heading "14. What am I giving up?", the Notice provides "Settlement Class members do not have the right to get out of or be excluded from the Settlement", further explaining that they will be bound by the Settlement approved by the Court;[120] and (d) the Sims Objection's criticism of language in the Notice to the effect that a Class Member can get no additional recovery because the Levee Districts are governmental bodies, when in fact there has been no legitimate argument made that the Levee Districts are not immune from seizure.[121]

47.    To the extent the objectors suggest that the Court should require that the Class be converted to an opt-out class, this would frustrate the purpose behind the limited fund settlement pursuant to Rule 23(b)(1)(B).

48.    To the extent the objectors challenge the propriety of Class Counsel seeking any enhancement of costs and expenses, Section III(16) of the Class Settlement Agreement merely provides that Class Counsel and counsel of any other Class Member may seek same from the Court. No such application has been filed. Nor has the Court indicated how it will address such an application when and if filed.

49.    The Sims objectors' post-hearing memorandum (Doc. 18779) misconstrues the import of provisions in the Class Settlement Agreement (Section II(6) and (23)) to the effect that

---

[119] See, e.g., *Gottlieb v. Wiles*, 11 F. 3d 1004, 1013 (10th Cir. 1993), *abrogated on other grounds*, *Devlin v. Scardelletti*, 536 U.S. 1 (2002).
[120] Exhibit 68, Wheatman Affidavit, ¶ 29, and Exhibit 12 thereto; *see also*, Exhibit 6 to the Wheatman Affidavit, providing in the corresponding Notice that Class Members cannot exclude themselves.
[121] Exhibit 68, Wheatman Affidavit, ¶ 29.

- 30 -

the Certification and Fairness Hearings would be no less than forty-five calendar days after the Objection Deadline. This provision would have afforded proponents of the settlement more time to respond to objections before the Certification and Fairness Hearings, a benefit which they merely opted not to exercise. Further, this Court has the right to control its own docket and this Court set these hearings in the Preliminary Approval Order to which the settlement proponents agreed.

**Insurance**

49.    In Louisiana, insurance policies are interpreted in accordance with the ordinary rules of contract interpretation. *Peterson v. Schimek*, 98-1712 (La. 4/9/99) 729 So. 2d 1024, 1028.

50.    When the language of an insurance policy is clear, expressing with clarity the parties' intent, courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation. *Edwards v. Daugherty*, No. 2003-2104 (La. 10/1/04), 883 So. 2d 932, 940-941.

51.    An insurance contract is to be construed as a whole, and one portion thereof should not be construed separately at the expense of disregarding another. *Pareti v. Sentry Indem. Co.*, 536 So. 2d 417, 420 (La. 1988); La. Civil Code art. 2050.

52.    Effect must be given to each element of a sentence in an insuring agreement. *Orazio v. Henderson*, 01-0028 (la. App. 3 Cir. 7/11/01), 790 So. 2d 754, 757.

53.    The Louisiana Civil Code requires that words used in contracts "must be given their generally prevailing meaning." La. Civ. Code art. 2047.

54.    The general prevailing meaning of a word is the meaning used in "common parlance" by "a reasonable person, a person in the street or an average citizen…." *Schroeder v. Bd. Of Sup'rs of Louisiana State University*, 591 So. 2d 342, 346 (La. 1991); *Savoie v.*

- 31 -

*Fireman's Fund Ins. Co.*, 347 So. 2d 188, 191 (La. 1977). *See also, Graham Resources, Inc. v. Lexington Ins. Co.*, 625 So. 2d 716, 721 (La. App. 1 Cir. 1993) (words used in insurance policies "should be given their general popular interpretation and not that which is strained and unusual").

55.   Only the OLD Policy, the EJLD Policy, and the LBBLD Policy potentially respond to the Class Members' Claims against the Levee Districts.

56.   None of the Noncontributing Policies potentially respond to the Class Members' Claims against the Levee Districts.[122]

57.   The American Empire policies appearing as Exhibits 53 and 58 do not potentially respond to the Class Members' Claims against the Levee Districts because all "bodily injury" and "property damage" is deemed to be known to the respective insureds before the policy inception dates, and coverage is precluded.

58.   The Illinois Union policies appearing as Exhibits 54 through 57 do not potentially respond to the Class Members' Claims against the Levee Districts because (1) the "occurrence" giving rise to the alleged "bodily injury" or "property damage" did not occur during the relevant policy period, and (2) the policies explicitly exclude coverage for damages arising out of levee failures.

59.   As to the EJLD Policy, only the GL coverage form and the Excess coverage form potentially respond to the Class Members' Claims against the East Jefferson Levee District.

60.   Five million dollars ($5,000,000) is the total limit of coverage potentially available from the EJLD Policy to satisfy the Class Members' Claims against the East Jefferson Levee District.

---

[122] *See,* Exhibits 5-52.

61.    As to the LBBLD Policy, only the GL coverage form potentially responds to the Class Members' Claims against the Lake Borgne Basin Levee District

62.    Two million dollars ($2,000,000) is the total limit of coverage potentially available from the LBBLD Policy to satisfy the Class Members' Claims against the Lake Borgne Basin Levee District.

63.    As to the OLD Policy, only the GL coverage form and the Excess coverage form potentially respond to the Class Members' Claims against the Orleans Levee District. The New Orleans Metro flood control structure, the Lower Ninth Ward flood control structure, and the New Orleans East flood control structure constitute a single premise within the meaning of the Public Sector Services Change of Limits Endorsement in the OLD Policy.

64.    Ten million dollars ($10,000,000) is the total limit of coverage potentially available from the OLD Policy to satisfy the Class Members' Claims against the Orleans Levee District.

65.    No additional amounts are available to fund the settlement under the GL coverage pursuant to the Public Sector Services Change of Limits Endorsement in the OLD Policy.

66.    The four flood control structure projects contracted for by the Orleans Levee District from 2004 through 2006 were too remote from the breach sites and would not have had any bearing on the alleged levee failures.

67.    No additional insured coverage exists for the Orleans Levee District for any flood control project undertaken and completed before Hurricane Katrina.

68.    No additional insured coverage exists for the Orleans Levee District for any flood control project undertaken by any contractors from 2004 through 2006.

- 33 -

69.    No additional insured coverage exists for the East Jefferson Levee District or the Lake Borgne Basin Levee District.

70.    The $17,000,000 (plus interest) paid by St. Paul pursuant to the proposed Class Settlement Agreement represents the full amount of all insurance policy limits of all insurance available to the Orleans Levee District, the East Jefferson Levee District, and the Lake Borgne Basin Levee District that potentially responds to the Class Members' Claims against the Levee Districts.

Signed this _____ day of _____, 2009 in New Orleans, Louisiana.


_____
United States District Court Judge
Eastern District of Louisiana