UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | ) | CIVIL ACTION |
| CONSOLIDATED LITIGATION | ) | NUMBER; 05-4182 "K"(2) |
| | ) | JUDGE DUVAL |
| | ) | MAGISTRATE WILKINSON |
| | ) | |
| PERTAINS TO: *Robinson* | ) | |
| (No. 06-2268) | ) | |
| | ) | |

**UNITED STATES' PROPOSED FINDINGS OF FACT**

## TABLE OF CONTENTS

A.    The Storm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

B.    The Surge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    1.    The Impact of MRGO On Surge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    2.    ADCIRC Circulation Model  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

C.    Waves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

D.    The Impact of Surge and Waves on the Reach 2 Levees . . . . . . . . . . . . . . . . . . . . . . 22

    1.    Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    2.    Determination of Water Levels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    3.    Determination of Elevations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    4.    Surf Zone Dynamics  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    5.    Modes of Levee Erosion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    6.    Soils Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    7.    Hydraulic Fill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    8.    Performed as Designed  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    9.    Soil borings analysis  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

    10.    Effect of the MRGO on Reach 2 Levee Breaches . . . . . . . . . . . . . . . . . . . . . . 54

    11.    Hypothetical Scenarios  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

E.    Results of interior flood modeling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

    1.    Breach geometries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    2.    Stage hydrograph results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

    3.    Water flow out of basin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

i

F.    Lateral Displacement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

    1.    The Reach 2 Levee Design  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

    2.    MRGO Design . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .93

G.    Plaintiffs' Misplaced Reliance on Robert Bea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .95

    1.    Causes of Breaching  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

    2.    Salinity, Grass, and Vegetation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

    3.    Soil Erosion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

    4.    Flood-Side Wave-Induced Erosion Model  . . . . . . . . . . . . . . . . . . . . . . . . . . 106

    5.    Scenario 3  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

    6.    Grass Liftoff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

    7.    Surge, Waves, Currents, Funneling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

    8.    Flood Control Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

    9.    Modeling Problems  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

    10.    Salinity from MRGO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

    11.    Scenario 2C  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

    12.    Causation and Timing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

    13.    Scenario 3 Variations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

    14.    Investigations Conducted By Other Bodies . . . . . . . . . . . . . . . . . . . . . . . . . 122

H.    Flood Control Act Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

I.    Authorization of the MRGO  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

J.    Design of the MRGO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

K.    Construction of the MRGO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

ii

L.      Maintenance of the MRGO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

M.      Disposal of Dredged Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

N.      Corps' Efforts to Address Bank Erosion Along the MRGO . . . . . . . . . . . . . . . . . . . . . 146

O.      The Corp Continued to Reevaluate the MRGO and the
        Hurricane Protection System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

P.      Authorization of the LPVHPP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

Q.      Compliance with Environmental Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

R.      Impact of the MRGO on Wetlands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

S.      Governmental Relations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

        1.      Congressional Oversight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

        2.      Congress's Inadequate Appropriations for the LPV . . . . . . . . . . . . . . . . . . . . 186

        3.      Awareness by Congress of "problems" Posed by the
                Existence of the MRGO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .197

        4.      Congressional Input Into Bank Stabilization Efforts . . . . . . . . . . . . . . . . . . . 213

        5.      The Necessity of a Local Sponsor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

T.      Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

The United States submits the following Proposed Findings of Fact in support of its Post

Trial Brief:

A.    *The Storm*

1.      Hurricane Katrina was one of the most catastrophic hurricanes that has ever hit

the United States.  It generated the largest storm surge elevations in our history.  Jarvinen

3632:14-16.[1]

2.      Hurricane Katrina's massive storm surge was due to six principal factors: its

intensity; its size, its angle of approach to the coast, its speed, and the bathymetry and coastal

shape of southeastern Louisiana.  Jarvinen 3632:20-3633:11.

3.      The Saffir Simpson Hurricane scale is used to measure the strength of a hurricane.

Ranging from Category 1 to 5, it is based solely upon the wind speed of a hurricane.  Jarvinen

3634:4-5.

4.      Hurricane Katrina formed from the remnants of a tropical depression over the

Bahamas, where it developed into a tropical storm.  Jarvinen 3635:7-12.

5.      Hurricane Katrina then tracked northward, entering a favorable environment for

hurricane development, and became a Category 1 Hurricane before it made landfall near Miami,

Florida.  Jarvinen 3635:13-17.

6.      As Hurricane Katrina tracked westward over the southern tip of Florida, it briefly

---

[1] Brian Jarvinen is an expert metereologist who testified on behalf of the United States. He worked for the National Hurricane Center for 35 years.  His career has focused on the study of storm surge.  He has a bachelors and masters degree in meterology from Florida State Universty.

weakened to a tropical storm and then returned to a Category 1 Hurricane on the western coast of

Florida. Jarvinen 3635:17-20.

      7.      On August 26, 2005, Hurricane Katrina entered very favorable conditions for

hurricane development and during the next two days exploded into a Category 5 Hurricane.

Jarvinen 3636:10-20.

      8.      On August 28, 2005, Hurricane Katrina reached its peak intensity. Jarvinen

3637:18-23.

      9.      At its most intense Hurricane Katrina had a maximum sustained surface wind

speed of 175 miles per hour, hurricane force winds extending 100 miles from its center, and

tropical force winds extending 225 miles from its center. Jarvinen 3636:24-3637:17.

      10.     Immediately prior to Hurricane Katrina making landfall on August 29, 2005, it

began a weakening process. Jarvinen 3637:18-3638:4.

      11.     At its landfall, Hurricane Katrina was a massive Category 3 Hurricane, with

winds about 125 miles per hour. Jarvinen 3638:10-13.

      12.     After its landfall in Southeastern Louisiana, Hurricane Katrina continued north

toward the Mississippi coast, where it continued to track to the northeast. Jarvinen 3638:14-22.

      13.     Generally, the more intense a hurricane is, the larger the storm surge will be. This

is because hurricane storm surge is a wind-driven process. Jarvinen 3638:23-3639:4.

      14.     During the period of Hurricane Katrina's traverse from its first landfall in Buras,

Louisiana, to its second landfall near the Pearl River on the Mississippi coast Hurricane Katrina

averaged a maximum sustained wind speed of 123 miles per hour, making it a strong Category 3

2

storm throughout its tracking through southeastern Louisiana.  Jarvinen 3639:5-12.

15.     The impact of a hurricane size on its storm surge was not well understood until the 1990's.  Jarvinen 3639:13-3640:10.

16.     When comparing two storms with the same central pressure, the storm with the larger radius of maximum winds—the distance between the center of the storm and its point of maximum wind—may have a lower maximum sustained wind speed, but will actually generate a higher storm surge along the coastline.  Jarvinen 3640:2-8.

17.     Hurricane Katrina was an extremely large storm with a radius of maximum winds of 34 nautical miles; the average radius of maximum winds for a Gulf of Mexico hurricane is about 20 to 25 nautical miles.  Jarvinen 3640:12-17.

18.     Hurricane Katrina generated the highest total kinetic energy of any storm that made landfall from 1995 to 2005.  Jarvinen 3642:9-12, 3644:2.

19.     The kinetic energy of a storm is directly related to the square of the wind speed, which generates storm surge, and is a useful tool to predict the potential of a hurricane to generate storm surge.  Jarvinen 3641:1-6.

20.     Possessing the largest total kinetic energy of landfalling hurricanes from 1995 to 2005, Hurricane Katrina is expected to have generated the greatest storm surge of hurricanes during that period.  Jarvinen 3642:13-17.

21.     Hurricane Katrina and Hurricane Camille had similar tracks moving north through southeastern Louisiana.  Jarvinen 3642:18-25.

22.     Hurricane Katrina was a Category 3 Hurricane at landfall, while Hurricane

3

Camille was a Category 5.  Jarvinen 3643:1-4.

23.    However, Hurricane Katrina was a much larger storm than Hurricane Camille. The aerial extent of Hurricane Katrina extended further than Camille and Hurricane Katrina's eye was 16 times the size of Camille's eye.  Jarvinen 3643:13-24.

24.    Hurricane Camille possessed only about half of the total energy of Hurricane Katrina  Jarvinen 3644:9-12.

25.    Hurricane Katrina's angle of approach was almost at the optimum angle for pushing up storm surge onto the large shallow area of the continental shelf in southeastern Louisisana.  Jarvinen 3644: 17-25; 3645:4-25.

26.    Generally, a hurricane with a higher forward speed will generate a higher storm surge than that of a slower moving storm.  Jarvinen 3646:1-23.

27.    The average speed for a Gulf of Mexico Hurricane is 10-15 miles per hour, while Hurricane Katrina moved northward at 18 miles per hour, this above average speed added to the storm surge Hurricane Katrina generated at landfall.  Jarvinen 3646:24-3647:3.

28.    The continental shelf surrounding southeastern Louisiana is very wide and shallow.  Jarvinen 3648: 15 - 3649: 4.

29.    The piling of water upon the continental shelf generates storm surge because the water on the shelf has no where to go but upwards.  Jarvinen 3649:12-21.

30.    As Hurricane Katrina approached southeastern Louisiana it drove a massive amount of water on to the shallow continental shelf, producing an abnormally large storm surge. Jarvinen 3649:12-21.

4

31.    A coast with a concave shape toward the water will tend to generate a higher storm surge than a straight coast.  Jarvinen 3649:22-3650:6.

32.    The United States has only three locations where the shape of the coast is so concave as to create a corner: the corner created by the Long Island Sound and the New Jersey coast, the corner created by the western coast of Florida and the panhandle of Florida, and the corner created by the southeastern Louisiana and the Mississippi coasts.  Jarvinen 3650:7-15.

33.    The right angle of southeastern Louisiana and Misssippi is formed by a combination of natural and man-made barriers.  The Mississippi coast itself, the CSX railroad which runs east-west along the Mississippi and Louisiana coasts, meet the flood control barriers of New Orleans which run north south at a 90 degree angle creating a corner.  The Mississippi River levees run north-south to Venice, Louisiana.  Jarvinen 3650:16 - 3651:11.

34.    The right angle created by these natural and man-made structures allows water to pile up during a hurricane, adding to hurricane storm surge.  Jarvinen 3651:12-19.

35.    The Standard Project Hurricane was a concept developed in the 1950s.  A tool used in designing protective structures, it represents the most severe combination of hurricane meteorological parameters reasonably characteristic of a specified geographic region.  Jarvinen 3652:5-9; JX 364 (National Hurricane Research Project, Report 3) at 2.

36.    The Probable Maximum Hurricane was a hypothetical hurricane intended to represent the worst combination of hurricane meteorological parameters that is reasonably characteristic of a specified region, and represents a worst-case scenario.  Jarvinen 3653:3-8: DX 1102 (NOAA Technical Report NWS 23) at 2, ¶ 1.2.2.

5

37.     The calculated storm tide values for both the Standard Project Hurricane and Probable Maximum Hurricane were exceeded by those observed during Hurricane Katrina in and around the Chalmette area and Reach 2 of the MRGO.  3657:23-3658:4.

B.     *The Surge*

38.     Hurricane Katrina created the highest surge ever recorded in the United States and pushed at least 8 feet of surge onto more than 4,000 square miles of the continental shelf near southeastern Louisiana before making landfall.  Westerink  3696:5-14, 3727:12-18, 3745:20 – 3746:8, 3830:15-20 (National Research Council review), 3887:17-22.[2]

39.     Much of the surge that piled up on the continental shelf was then driven across Lake Borgne, inundating the marshes and continuing west from the lake until being stopped by and piling up against the LPV levee system.  Westerink 3697:22-25, 3744:4 – 3745:19, 3753:2-18, 3780:20 – 3781:14, 3871:19 – 3872:3, 3887:23-24.

40.     By midnight 5 feet of surge had piled up along the Reach 2 levee.  Westerink 3796: 25 - 3797:3-4.

41.     By 1 a.m. more than 6 feet of surge had piled up along the Reach 2 levee.  Westerink 3797:21-23.

42.     By 2 a.m. more than 7 feet of surge had piled up along the Reach 2 levee.  Westerink  3798:1-13.

---

[2] Joannes Westerink is a Professor of Civil Engineering and Geological Sciences at the University of Notre Dame who testified on behalf of the United States.  He has a Ph.D. from the Massachusetts Institute of Technology.  He has been actively engaged in the study of storm surge model application in the Gulf of Mexico for the past 19 years.  He is the co-developer of the ADCIRC Finite Element Based Shallow Water Equation Model.  This model is used extensively worldwide to assess coastal currents and flooding.

43.    By 3 a.m. more than 8 feet of surge had piled up along the Reach 2 levee. Westerink   3798:17.

44.    By 4 a.m. more than 9 feet of surge had piled up along the Reach 2 levee. Westerink   3798:24 – 3799: 9.

45.    By 5 a.m. more than 10 feet of surge had piled up along the Reach 2 levee. Westerink   3799:2-3.

46.    By 6 a.m. about 13 feet of surge had piled up along the Reach 2 levee.  Westerink 3808:25 – 3809.

47.    By 7 a.m. more than 15 feet of surge had piled up along the Reach 2 levee. Westerink 3809:6-11.

48.    At 7 a.m. the hurricane was driving water directly toward the Chalmette levee. Westerink  3850:17-18.

49.    Shortly after 7:30 a.m. the surge peaked at 15.7 feet along the Reach 2 levee. Westerink 3809:17-19, 4133:2-6.

50.    The "marshes had minimal effects" because the "sustained winds pushed the surge up to and over the marsh and around the marsh."  Westerink 3698:3-7, 3745:20 – 3746:8, 3755:14 – 3756:17, 3887:24 – 3888:3.

51.    During the six hours immediately before the hurricane made landfall in Louisiana, easterly winds were blowing very intensely toward the Mississippi delta and the Chalmette Levee.  Westerink 3728:23 – 3729:13, 3734:14 – 3735:20, 3774:2-16, 3776:17 – 3777:21, 3780:20 – 3781:23, 3796:6-11.

7

52.    At 8 a.m. the peak surge had passed, the wind had shifted and was no longer blowing directly toward the Reach 2 levee.  Westerink 3850:22-24.

53.    By 9 a.m. winds had shifted and were blowing water north, away from the Reach 2 Chalmette levee and pushing water up from the south toward Mississippi.  Westerink 3736:2-20, 3777:22 – 3778:3, 3782:3 – 3784:4, 3796:10-11.

54.    The Golden Triangle is the area where the MRGO meets the ICWW.  Westerink 3736:17 - 3737:2.

55.    By 9 a.m. water levels were dropping along the Reach 2 levee because winds were no longer pushing water against it.  The water was beginning to move away from the Golden Triangle.  Westerink 3809:22 – 3810:13, 3852:6-13.

56.    By 10 a.m. westerly winds were blowing across the Golden Triangle, moving water away from the Chalmette Reach 2 levee and lowering surge elevations in the Golden Triangle as water moved into the Mississippi Sound.  Westerink 3736:22 – 3737:2, 3748:20 – 3749:7, 3778:7-19, 3810:19 – 3811:1.

57.    At 10 a.m. strong westerly winds were pushing water away from the Golden Triangle.  Westerink 3852:14-16.

58.    Between 7 a.m. and 10 a.m. the surface gradient in the IHNC between Seabrook and the IHNC lock decreased dramatically in the ADCIRC SL15 simulation, revealing that the surface elevation on the south shore of Lake Pontchartrain was controlling the water elevation in the IHNC at about 10'.  Westerink 3850:16-19, 3852:16 – 3853:15.

59.    After 10 a.m. winds continue to blow from the south and west as they attenuate,

8

and as the winds attenuate the velocity of the storm surge slows.  Westerink 3737:4-14, 3757:2-3, 3779:1-5.

60.     At 11 a.m. surge was withdrawing from the Mississippi coast, moving out from the Mississippi Sound between the Mississippi islands and the Chandeleur islands and moving back into the Golden Triangle.  Westerink 3757:15-19, 3784:5 – 3785:4, 3813:13 – 3814:3.

61.     As water rolled back into the Golden Triangle and pushed west through MRGO Reach 1 between 10 a.m. and 11 a.m., the water surface rose in the IHNC.  Westerink 3853:16 – 3854:12.

62.     At noon water elevations continued to rise in Chalmette and in the IHNC as diminishing winds no longer sustained the steep surface gradient that they had earlier created between those areas and the Bay St. Louis area.  Westerink 3750:7-16, 3784:12-23, 3814:4-8, 3854:14-20.

63.     At 1 p.m. and 2 p.m. water receded along the Reach 2 levee and across the region as water flowed back into the deep waters of the Gulf.  Westerink 3814:12-20.

    1.     *The Impact of MRGO On Surge*

64.     The hydraulic effects of MRGO Reach 2 "were only tiny in comparison to the overall hydraulic conductivity of the marshes," which had been massively inundated.  Westerink 3698:8-16, 3873:11 – 3874:3, 3879:4-7, 3880:7 – 3881:15, 3888:4-7.

65.     The widening of the surface of the MRGO only slightly increased its capacity for hydraulic conveyance because the deep part of the channel was essentially unchanged and the widened portions were fairly shallow.  Westerink 3877:2-10.

9

66.    If the MRGO had not been present and the wetlands had been in their 1956 configuration, the surge elevation east of the Chalmette levee would have been almost the same as during Hurricane Katrina, with no change in most of the area and less than 3 inches of change in a small part of it.  Westerink 3872:10-20, 4152:5-12.

67.    The hydraulic effects of MRGO Reach 1 were almost entirely limited to the reach itself and to the IHNC; "in the other areas in and around the study area, there was very minimal effect."  Westerink 3698:19-24, 3881:18 – 3883:1, 3886:1-3.

68.    Enlarging the GIWW to MRGO dimensions increased the hydraulic conveyance of that reach and allowed more water to surge through the channel during the hurricane, raising the water surface elevation to elevations that were as much as 3.5 feet higher than they would have been had the MRGO not been constructed.  Westerink 3883:2-13, 3888:8 -11, 4088:12 – 4089:1.

69.    Post-construction changes in the MRGO and changes in the surrounding wetlands had almost no effect on water surface elevations—3 inches at most outside of the IHNC and 6 inches at most in the IHNC.  Westerink 3886:6-17, 3888:12-14, 4151:2-14.

70.    Water levels in the IHNC and in Reach 1 were controlled by water levels at Seabrook and Paris Road.  Westerink 3813:1-7.

71.    The post-construction enlargement of the MRGO had "very minimal effects."  Westerink 3698:25 - 3699:5.

72.    The removal of the MRGO and restoration of the wetlands to pre-MRGO conditions would have affected water levels in only three areas: (1) English Turn and

10

Braithwaite, where eliminating the MRGO's dredged spoil mounds would have increased water surface elevations by about a foot; (2) the Central Wetlands east of the 40 Arpent Levee, where the removal of the MRGO's dredged spoil mounds would have increased water surface elevation by up to half a foot; and (3) the GIWW and the IHNC channels, where water levels would have been lowered by as much as 3.5 feet at the confluence of the IHNC and GIWW.   JX 196 (Westerink Expert Report) at 68-76.

73.     If the MRGO had not been present and the surrounding wetlands unchanged since 1958, the largest change in water surface elevations would have been about half a foot increase in the area east of St. Bernard Polder.  JX 196 (Westerink Expert Report) at 75-77.

74.     The degradation of the wetlands since the construction of the MRGO had minimal effect on maximum surge elevations.  JX 196 (Westerink Expert Report) at 78.

75.     Plaintiffs' own experts acknowledge that their results match very closely with those of Dr. Westerink.  DX 776 (Joint Declar., Vrijling, Kok, de Wit and Gautier January 21, 2009 ); Plts' Post Trial Brief at 98-99; Vrijling  903:10-23; 905: 16-22; 981:10-25.

2.     *ADCIRC Circulation Model*

76.     Dr. Westerink's opinions are supported by his use of the ADCIRC circulation model, which computes still water elevation and the currents that move the water and create increases or decreases in still water elevation.  Westerink 3699:11 – 3700:1; Ebersole 2084: 3-9.[3]

---

[3] Bruce Ebersole is a coastal enginer who testified on behalf of the United States.  He is Chief of the Flood and Storm Protection Division of the Coastal and Hydraulic Laboratory of the Corps of Engineers.  He supervises a staff of 115 people in a research program of $20 million per year .  He has a bachelors and masters degree in coastal engineering from the University of Delaware.

77.    The ADCIRC model has been validated by comparing computed values to measured values during routine and extreme conditions.  Westerink 3815:1 – 3828:8.

78.    The ADCIRC model has been extensively reviewed in  peer-reviewed publications.  Westerink 3832:6-16.

79.    The SL15 model is an improved version of the TF01 model that the IPET used and the National Research Council praised.  Westerink 3832:3-5, 3832:17 – 3833:22, 4087:24 – 4088:2;  Ebersole 2086: 11-24; Kemp 1967:22-1968:3.[4]

80.    The TF01 model was an upgrade of the S08 model.  Westerink 4087:14-23.

81.    Now that deficiencies in the S08 model have been quantified, many people in the scientific community no longer have confidence in it.  Westerink 4094:24 – 4095:17.

82.    The National Research Council, reviewing the work of the IPET, which employed the ADCIRC TF01 model,  described it as "an important advance of scientific understanding" that "did a good job of explaining the storm surge generated by Hurricane Katrina, how waters from the surge entered into the New Orleans metro region from the east and from the north, across Lake Borgne" and the "minor" role, "if any," played by the MRGO "in exacerbating storm surge" and "inundation depths across the city."  Westerink 3830:2-15.

83.    The ADCIRC model solves the equations that compute the movement of water.  Westerink 3700:6 – 3701:12.

84.    Still water elevation includes the effects of wind waves by averaging their height.  Westerink 3699:15-20.

---

[4] G. Paul Kemp is an expert who testified on behalf of the plaintiffs.

12

85.     The ADCIRC SL15 model used by Dr. Westerink as a basis of his opinions had roughly 2.5 million geographic points at which water elevation and velocity were computed every half second.  Westerink 3705:25 – 3706:4.

86.     The resolution of the ADCIRC SL15 model ranged from 20-24 kilometers in the Atlantic to 12-15 kilometers in the deep-water Gulf to around 100 meters at the barrier islands. Westerink 3706:9 – 3707:14.

87.     The ADCIRC SL15 model has eight times as much resolution as the SL08 model used by Plaintiffs, providing much better calculations of surge elevations and currents. Westerink 3719:18 – 3720:4; 3724:12-18; Ebersole 2086:11-24; Kemp 1967:15-21.

88.     Plaintiffs used the ADCIRC S08 model to drive the boundary conditions for their FINEL model, although they adjusted the S08 outputs in order to get the right water level outputs from FINEL.  Westerink 3887:4-9, 4096:3 – 4097:4, 4150:5-18; Kemp 1969: 4-22.

89.     The ADCIRC SL15 model, unlike the S08 model, accurately models the barrier islands and the Mississippi coast, the bathymetry of Chandeleur Sound, the Chef Menteur and Rigolets passes, and the Mississippi River and therefore more accurately captures the flow of surge into and out of the area of interest.  Westerink 3724:19 – 3725:13, 3725:19 – 3726:18; Kemp 1967:22-1968:3; 1969:8-22.

90.     The SL15 model shows that the barrier islands and the marsh provide a barrier that keeps the surge from moving back into the deep water in the early afternoon when the wind is trying to blow the water away from the land.  Westerink 3750:17 –3751:18.

91.     The ADCIRC SL15 model, unlike the S08 model, takes into account the varying

13

frictional effect of vegetation and therefore more accurately simulates the flow of surge through the marshes.  Westerink 3711:3-15, 3713:1 –3714:5, 3725:14-18.

92.    The ADCIRC SL15 model uses "a very sophisticated set of data-simulated winds . . . the best winds possible," unlike the S08 model, which uses "a somewhat dated version of the PBL model . . . to get its wind forcing."  Westerink 3726:25 – 3727:7, 3728:10-15.

93.    The ADCIRC SL15 model, unlike the S08 model, interacts with the STWAVE model to take into account the contribution of waves to the still water elevation.  Westerink 3716:25 – 3717:11.

94.    The lack of regional detail in the ADCIRC S08 model and the mistaken bathymetry in Chandeleur Sound explain the difference in the humps that appear in both Plaintiffs' and Defendant's surge elevation hydrographs.  Westerink 3841:8 – 14.

95.    As the ADCIRC SL15 accurately demonstrates, the shallow Chandeleur Sound and the barrier islands retarded flow out of the Bay St. Louis area and caused more water to flow back into the Lake Borgne area than the S08 model predicted in Plaintiffs' simulation. Westerink 3841:8 – 3843:13, 3866:8-21.

96.    Plaintiffs' and Defendant's hydrographs for locations along Reach 2 are very similar in shape although Plaintiffs' primary peak is somewhat higher and their secondary peak is somewhat lower.  Westerink 3861:8 – 3862:11, 3865:22 – 3866:7.

97.    At a midpoint along the Reach 2 levee, the ADCIRC SL15 model predicted a peak surge of about 15.5 feet around 8 a.m., a drop to about 11 feet by about 10 a.m., and then a rise back up to nearly 13 feet by about 11:30 a.m.  Westerink 3864:4 – 3865:16.

98.    The ADCIRC SL15 model predicted that surge of 10 feet or more was sustained at the Reach 2 levee midpoint for about 6 hours.  Westerink 3863:8-13.

99.    In Louisiana, waves contribute between one and three feet to the still water elevation, about 1.5 feet in the study area.  Westerink 3717:12-19, 3718:9-11.

100.    The ADCIRC SL15 model overestimated the size of the drop in water surface elevation between the two peaks that occurred in the IHNC because the model failed to capture wave radiation stresses along the south shore of Lake Pontchartrain and therefore underestimated the surge elevation at Seabrook, which was functioning as a control for water surface elevation in the IHNC as water receded from the Golden Triangle.  Westerink 3858:9 - 3860:14; 4114:2 - 4115:11; 4118:25 - 4119:7.

101.    According to the ADCIRC SL15 H1 model run, the second peak in surface water elevation in the IHNC occurred at 12:35 p.m.  Westerink 4139:24 - 4140:4.

102.    The ADCIRC SL15 model underpredicted surge elevations in the IHNC by about a foot.  Westerink 4120:5-8.

103.    The ADCIRC SL15 model predicted peak surge in the IHNC at 7:45 a.m. Westerink 4121:13.

104.    The gauge readings taken at the IHNC lock indicate that the surge peaked at 9 a.m., give or take half an hour.  Westerink 4125:2-5.

105.    Plaintiffs' FINEL model predicted a slightly earlier arrival of surge in the IHNC compared to the ADCIRC SL15 prediction.  Westerink 4146:7 – 4147:8.

106.    Plaintiffs' FINEL model predicted a slightly later peak in surge in the IHNC,

15

compared to the ADCIRC prediction, because it overpredicted the duration of the initial surge and the peak elevation.  Westerink 4147:13 – 4148:1.

107.    Plaintiffs' experts agree with Dr. Westerink's main findings about storm surge and the influence of the MRGO.  Westerink 4149:9-22, 4152:13-25.

108.    The ADCIRC SL15 model, which evolved from the S08 and TF01 grids, was developed for the LaCPR study.  It is being used by FEMA for the Digital Flood Insurance Rate Maps ("DFIRM") in Louisiana and Mississippi, and will be used to forecast incoming hurricanes in Louisiana during the 2009 hurricane season.  Westerink 3718:12 – 3719:9.

109.    The demonstrative exhibits that Dr. Westerink used to explain his opinions at trial were created from the SL15 H1 computer run that was produced to other Defendants' experts in November and to Plaintiffs at the beginning of March.  Westerink 4107:11-15, 4144:1-4, 4146:3-6.

110.    Mr. Ebersole and Dr. Resio were given the ADCIRC data file that referenced times to GMT, not local time, and Mr. Ebersole made the correct adjustment when he reported local times.  Westerink 4132:6-18, 4142:24 – 4143:2.

111.    The Westerink report had a number of small inaccuracies based upon the inclusion of plots from a prior report that were very, very similar to the plots that Dr. Westerink used to illustrate his opinions at trial.  Westerink 4102:4-9, 4104:11 – 4105:5, 4106:15 – 4107:3, 4112:3-5, 4113:19-20.

112.    The mistaken inclusion of figures from the FEMA report was pointed out in Dr. Westerink's January deposition, and he at that time differentiated the FEMA run from the DOJ

16

run.  Westerink 4145:18-25.

113.    The Westerink report incorrectly stated that surge along the MRGO Reach 2 levee

exceeded 16 feet, because it was relying on the SL15 V3 model that was used in a FEMA study,

not the SL15 H1 model that was used in the DOJ study.  Westerink 4137:3-23, 4144:17 –

4145:22.

114.    The modeled surge is about 6 or 7 inches lower in the H1 model runs because the

topography in the wetlands was changed to reflect the varying types of marsh in the area.

Westerink 4137:21 – 4138:4.

C.    *Waves*

115.    Waves increased in height by about one foot as they crossed the MRGO.  Resio

2822:20-21; 2840:17 – 2841:11; 2900:25 – 2901:2.[5]

116.    The use of the Westhuysen source terms by Plaintiffs' experts in their SWAN

modeling caused them to overestimate the growth of waves crossing the MRGO.  Resio 2830:19-

25.

117.    The Corps's Shore Protection Manual that may have been used by the Corps in

assessing the influence of the MRGO on waves included a chart showing that waves crossing the

channel could grow in height by about a foot.  Resio 2841:12 – 2846:2.  Professor Vrijling

supports the notion that the Shore Protection Manual may have been used without there being

---

[5] Donald Resio has been a Senior Scientist at the Corps of Engineers for the past 15 years.  He serves as the Technical Leader of the Coastal Engineering Program and directs research that spans a wide range of environmental and engineering areas within the Corps' civil works program.  He recently spearheaded the development of a new technical approach for hurricane risk assessment along the U.S. coastline and the rapid repair of levee breaches.  Dr. Resio received his Ph.D. from the University of Virginia.

any record made, since the analysis can be done "in five minutes and nobody sees you doing it." Vrijling 929:20-21.

118.    Waves rapidly decreased in height after crossing the MRGO because they became limited in height to about half of the water depth.  Resio 2822:22-24; 2901:3-6.  Dr. Bea agrees, testifying that: "As the water decreases as you approach the shoreline, the wave heights tend to decrease because of wave breaking.  That's essentially a relationship between the water depth and the wave height."  Bea 1163:5-8.

119.    Shallow-water waves are depth limited, which means that when their height becomes too great in relation to the water depth then they become unstable and break very rapidly—within a fraction of a wave length.  Resio 2846:16 – 2847:14.

120.    When waves break, energy from the waves goes into increased wave setup, raising the mean water level.  Resio 2847:20 – 2848:6.

121.    By the time waves reach a levee or other structure typically 15% of the wave height has been transformed into wave setup, pushing the water forward.  Resio 2848:17 – 2849:4.

122.    As waves left the channel and passed over the levee berm, they rapidly decreased in size because the depth of the water decreased.  Resio 2849:5 – 2852:5.

123.    Coulwave is a Boussinesq model that reliably models wave run-up and overtopping.  Resio 2852:15 – 2853:14.

124.    Dr. Bea's LS-DYNA modeling is unreliable because the model has not been validated for the use he made of it.  Resio 2853:21 – 2854:1; 2866:15 – 2867:2.

125. Dr. Bea's LS-DYNA modeling is unreliable because it calculated the effects of regular waves, not irregular waves, as occurred during Hurricane Katrina. Resio 2856:7 – 2860:21.126.`26. Dr. Bea's LS-DYNA modeling is unreliable because it trapped energy inside the model rather than letting it escape, as the Coulwave model does. Resio 2860:23 – 2861:25.

126. Dr. Bea's LS-DYNA modeling is unreliable because it did not accurately model shallow-wave dynamics. Resio 2862:1 – 2865:23.

127. Dr. Bea vastly overstated the buffering effect of vegetation principally because he neglected to take into account the effect of wind on water passing through vegetation. Resio 2867:5 – 2874:2.

128. Flow over the Reach 2 levee vastly exceeded—by a factor of 10—internationally recognized thresholds for major damage to grass-covered levees. Resio 2823:1-2; 2901:7-9, 15-17.

129. Overtopping rate for flow (as opposed to waves) is proportionate to the depth of flow and therefore sensitive to freeboard, so that flow rates were more greatly influenced by the variation in levee crest elevation for point to point along the Reach 2 levee because the crest elevation varied more than the surge elevation at any given time. Resio 2876:6 – 2877:17; 2901:12-14.

130. Surge, not waves, was the dominant contributor to overtopping flow. Resio 2901:18-20. Thirty-five percent of the Reach 2 levee had a crest elevation of 16 feet or less. Resio 2878:22-23.

131.    Varying the characteristics of the waves which impacted the levees along Reach 2 of the MRGO by decreasing wave height by 1 and 2 feet and increasing wave period from 5 seconds to 16 seconds, had a minimal affect on the levee overtopping rates.  Resio 2888:23-2889:9.

132.    These changes had a maximum affect of about 20% on overtopping rates.  Resio 2889:5-9.

133.    In addition to changing the characteristics of waves, the sensitivity of overtopping rates to changes in four other factors-- channel bank elevation, levee toe elevation, berm width, and levee slope– was determined.  Resio 2888:15-21.

134.    The channel bank elevation was varied from 0 feet to 5 feet.  Resio 2890:4-8.

135.    The levee toe elevation was varied from 5 feet to nine feet Resio 2890:10-13.

136.    The berm width was varied from 125 feet to 625 feet.  Resio 2890:14-17

137.    The levee slope was varied from 1:3 to 1:7.  Resio 2890:18-20.

138.    These sensitivity analyses validated the overtopping flow rates calculated using a generic levee profile.  Resio 2890:25-2891:7.

139.    At a 14 foot levee the international damage thresholds for overtopping were exceeded by 5:00 a.m. and persisted until 10:00 a.m.  Resio 2894:1-10.

140.    At a 16 foot levee the international damage thresholds for overtopping were exceeded by 5:15 a.m. and persisted until 9:15 a.m. Resio 2894:11:24, 2896:10-17.

141.    At a 17.5 foot levee, the international damage thresholds for overtopping were exceeded by 5:45 and persisted until 8:45 a.m.  Resio 2898:1-8.

142.    At an 18 foot levee the international damage thresholds for overtopping were

20

exceeded by 6:00 a.m. and persisted until 8:30 a.m.  Resio 2896:23.

143.     The very existence of the channel and degradation of the wetlands since the channel's construction had the effect of very slightly hastening the exceedance of the international damage thresholds.  Resio 2898:15-25.

144.     A 15 foot levee would have experienced just short of 5 hours of overtopping which exceeded the international damage thresholds.  Resio 2899:5-22.

145.     An 18 foot levee would have experienced a little more than 2.5 hours of overtopping which exceeded international damage thresholds.  Resio 2899:23-25.

146.     Plaintiffs' wave experts determined that, at the toe of the levee, using the maximum wind reduction to decrease the size of the waves, the degradation of the wetlands and expansion of the channel since the construction of the MRGO had the effect of increasing waves at six locations along the MRGO by the following values: 0.6ft, 0.4 feet, 2.4 feet, 0.7 feet, 1.2 feet, and 3.2 feet.  PX 2009 (Input and Results Swan Calculations, 23 March 2009) at 14.

147.     When an intermediate wind reduction was applied, the values at the same locations were reduced to: 0.6 feet, 0.4 feet, 1.6 feet, 0.5 feet, 0.9 feet, and 2.3 feet.  PX 2009 (Input and Results Swan Calculations, 23 March 2009) at 14.

148.     When no wind reduction was applied, the values at the same locations were reduced further still to: 0.6 feet, 0.4 feet 1.0 feet, 0.5 feet, 0.8 feet, and 1.8 feet.  PX 2009 (Input and Results Swan Calculations, 23 March 2009) at 14.

149.     Plaintiffs' expert disavowed any confidence in the numbers at the levee because "they become less and less reliable as the water depth becomes so really shallow."  Vrijling

986:3-5; 987:17-25.[6]

150.    For levee design, Plaintiffs' expert would rather have utilized values at the middle of the channel.  Vrijling 987:17-21.

151.    Dr. Resio, however, concluded that for the purposes of evaluating the wave conditions at the toe, both SWAN and STWAVE provide accurate results.  The wave conditions both immediately east and west of the channel being similar, there is no reason to believe that the results at one side of the channel would be inaccurate while the other side would be accurate. The levee toe slopes and water depth– about 18 feet at the time of peak surge– are within the applicability of the model.  Resio 2850:3-2851:8

152.    Dr. Resio confirmed that the results of Plaintiffs' SWAN modeling and the United States' STWAVE modeling of waves were "very similar in the results they produc[ed]" Resio 2825:23-2826:14.

153.    The results of  both models show that the height of the wave at the toe was a function of the water depth of the storm surge because waves are severely depth limited.  Resio 2846:16-2847:14; 2849:8-2850:10.

D.    *The Impact of Surge and Waves on the Reach 2 Levees*

1.    *Overview*

154.    Along the exposed eastern side of the hurricane protection system surrounding the St. Bernard polder (Reach 2), Hurricane Katrina produced maximum storm surge levels of 17.4 to 17.6'.  Ebersole 2098: 9-11.  These peak levels exceeded by nearly 5' those for which the levee system was designed (12.9 to 13.4'); Bea 1272: 9-11; 1333: 23 - 1334: 3.

_____

[6] Johannes Vrijling is an expert who testified on behalf of the plaintiffs.

155.     The highest three previous hurricane surge levels prior to Hurricane Katrina were maximum surge levels of 10'.  Bea 1292: 14 - 1293: 1

156.     These peak levels during Katrina overwhelmed the levees and walls along Reach 2.  Ebersole 2069: 3-7.

157.     The overwhelming surge led to extensive breaching of the levees along Reach 2.  Ebersole 2066:21-25.  That breaching was the main source of water that entered St. Benard Parish during Hurricane Katrina.  Kemp 1933:9-20.

158.     The maximum storm-induced water level is the single most important hydrodynamic parameter in determining levee erosion.  Ebersole 2066: 21 - 2067:1: JX 211 (Ebersole Expert Report) at 53.

159.     Mr. Ebersole illustrated the extent to which water levels were above the crest elevations of the levees during the storm.  Ebersole 2069: 3-7; JX 211 (Ebersole Expert Report) at 54, Figuire 40.  That figure also demonsrated the amount of variability in pre-storm elevations of the levees along the reach.  Levee heights in areas in proximity to each other varied as much as 2'.  Variations in levee height along the entire reach were as much as 7', but the very low ones were supplemented with sheet pile to increase their crests.   JX 211 (Ebersole Expert Report) at 54, Figure 40.

160.     Both Plaintiffs and the United States found that the MRGO had little effect on peak storm surge along Reach 2.  Both Plaintiffs and the United States found that restoring the wetlands to their 1958 condition had little effect on peak storm surge along Reach 2.  Kemp 1942:2-22; Mosher 2965: 14 - 2966: 6; Ebersole 2065.

161.     The breaching and erosion  which occurred along the levees adjacent to Reach 2

23

of the MRGO were primarily caused by overtopping.  The available data does not support the conclusion that front side erosion from waves caused the breaching along Reach 2.  Mosher 2964: 7-13; JX 212 (Mosher Expert Report) at 9-10.[7]

162.    The construction of the levees using hydraulic placement of the soil also led to erosion and breaching of the levees from overtopping along Reach 2.  Breaching and erosion of the levees in the New Orleans area from Hurricane Katrina primarily only occurred along sections where the soil for the levees was placed using hydraulic fill from the channels.  Where the levees were constructed by placing clay at a controlled water content and compacted, no breaching occurred.  Mosher 2964: 7-13; JX 212 (Mosher Expert Report) at 9-10.

163.    The erosion of the levees and the subsequent flooding that occurred along Reach 2 was more severe because the protective elevations of the levees were below the authorized elevations.  Sections of the levees between Bayou Bienvenue and Bayou Dupre control structures were 2 feet below the authorized protective elevations of the levees.  Mosher 2964: 7-13; JX 212 (Mosher Expert Report) at 9-10.

164.    The MRGO did not cause the breaching of the Reach 2 levees. Mosher 2966:7-12.

165.    Wave overtopping and steady overflow created a very corrosive hydrodynamic regime on the backside of the levee, beginning at the low spots and progressing along the entire reach. Incredibly devastating amounts of water overtopped the levee when water level was 1' above the levee crest.  Ebersole 2069.  Plaintiffs agreed that overtopping caused the majority of the breaching of levees along Reach 2.  Bea 1270: 1-10.

_____

[7] Reed Mosher is a geotechnical engineer.  He has a Ph.D. from Virginia Tech. Employed by the Corps of Engineers, he is the Chief of the Structural Mechanics Division and the technical Director for Military Engineering in the Geotechnical and Structures Laboratory.

166.    Overtopping led to severe back-side erosion and scour, and formation and deepening and widening of many breaches.  The number of areas subjected to damaging wave-overtopping and overflow grew as the water level and wave energy increased.  As levee crests were eroded and lowered in response to these forces, the magnitude of overtopping and overflow increased; this was a self-reinforcing and exacerbating process that led to widespread breaching and rapid levee destruction.  Ebersole 2208: 4-9.

167.    The water velocity regime on the backside was much higher than on the front-side of the levees.  There was no significant front-side erosion on the reach 2 levees and no breaching was caused by this process.  Ebersole 2225:25 - 2226:3

168.    In addition to erosion and breaching initiated by wave overtopping and overflow, breach widening was an important process.  Water levels were higher on the Lake Borgne side of the levee than water levels in the interior of the polder, creating a hydraulic gradient or slope in the water levels from front side to back side.  As breaches formed, flow was directed along adjacent higher levee sections toward breaches in response to this hydraulic gradient.  This flow of water toward the breach and the resulting acceleration of water caused breaches to widen and deepen.  The hydraulic gradient drove tremendous flows at high speed over degrading levees and walls through breaches as they formed, allowing a massive volume of water to enter and inundate the entire St. Bernard polder.  JX 211 (Ebersole Expert Report) at 54.

   2.    *Determination of Water Levels*

169.    Three primary means are available to measure high water levels in the region: high water marks, hydrographs and computer modeling.  Ebersole 2076:16-25

170.    Mr. Ebersole testified that a number of organizations, including the Corps of

25

Engineers (USACE), U.S. Geological Survey and Lousiana State University (LSU), recorded high water marks in the New Orleans area. Ebersole 2077: 1-14. Information about each mark was reviewed by an IPET interagency expert team. The marks are displayed in Figuire 2 of JX 211 (Ebersole Expert Report) at 12. The most accurate marks are those least affected by wind or wave action. Ebersole 2078: 9-25.

171.    Considering only the most reliable marks, the highest recorded storm surge level in the region was at Shell Beach (marks of 18.1' and 18.7'). Ebersole at 2079: 10-19. A trend in the region was evident, with high water marks increasing from west to east through the area. Ebersole 2079: 10-19.

172.    Along the GIWW, two excellent high water marks recorded along the Chef Menteur Pass indicated peak surge levels of 15.7 and 15.8'. Peak surge indicated by a mark along the north shore of the GIWW/MRGO reach 1 was 15.5'. JX 211 (Ebersole Expert Report) at 13; Ebersole 2090:11-24..

173.    In the IHNC, peak water levels exceeded the crest heights of most sections of the hurricane protection system. In light of the widespread flow over the walls and several breaches that formed, and the large area in polders available to receive the overflowing water volume, a considerable amount of water steadily flowed from the IHNC into adjacent populated area at the peak of the storm. A gradient in water levels was created, increasing from about 14.3' at the IHNC lock to 15.4' at the confluence of the IHNC with GIWW/MRGO Reach 1. JX 211 (Ebersole Expert Report) at 13.

174.    Hydrographs are variations of water level with time. The staff gauge at the IHNC lock, which was read each hour throughout the storm by the operator, was the only source for a

26

complete hydrograph for the entire region.  This hydrograph is the most accurate information available for characterizing the variation of storm surge within the IHNC in the vicinity of the lock.  Ebersole 2081: 19 - 2082: 17.   It reached a height of approximately 14.3' at about 9:00 AM.   JX 211 (Ebersole Expert Report) at 14.

175.    The third way to estimate surge levels is to complete surge and wave computer modeling.  Both IPET and the parties in this litigation have completed such models.  The regional surge and wave modeling done by the IPET team received high marks from both the ASCE and the NRC reviewers.  Ebersole 2073: 20 - 2074: 16.

176.    The IPET and other USACE studies that have been done since the work of IPET have continued to utilize numerical storm surge and wave models (the ADCIRC SL15 storm surge model application coupled to a STWAVE shallow water wave model application).  Mr. Ebersole 2084: 3-9. The models complement the measured data and provide information on how hurricane storm surge and waves evolve with time, throughout southeast Lousiana and Mississippi.  The models are used in conjunction to study the effects of storm surge on wave propogation and breaking (through changing water depth), and the momentum transfer from waves back to storm surge associated with wave breaking.  Ebersole 2084: 3-9; 2099: 11-19.

177.    Along the MRGO Reach 2 levee, the calculated peak water levels using ADCIRC SL-15 were fairly uniform; they ranged from 15 to 15.7', with the maximum located where the levee makes a slight bend south of Bayou Dupre.  Ebersole 2090: 16-20; JX 211 (Ebersole Expert Report) at 27.  However, the model results generated by ADCIRC SL-15  were consistently lower than the measured values.  After analyzing the data predicted, along with the measured high water marks, Mr. Ebersole determined that the predicted water levels would be

27

scaled up by 12%. Ebersole 2090: 16-20; JX 211 (Ebersole Expert Report) at 27.

178. Scaling is an accepted practice in coastal engineering. Ebersole 2091: 2-10. It was done during the IPET study and the practice was not criticized by the outside peer reviewers. Ebersole 2091: 24 - 2092: 4.

179. Plaintiffs have also scaled their storm surge model predictions. Ebersole 2091:11-23. The peak surge heights obtained by the ADCIRC 08 model were off by 19%. JX-194 (Kemp July 28, 2007 report) at 10. According to Dr. Kemp, he thought plaintiffs "did pretty well" by using this model. Kemp 1969:24-1970:25.

180. Because the ADCIRC 08 peak surge heights were too low, Plaintiffs needed to raise the ADCIRC surge levels to match the observed high water marks before this data was fed into their FINEL model. Kemp 1971:2-10. These values were plugged into the FINEL model at the boundaries of the FINEL model. Kemp 1971:4 - 1972:5.

181. Mr. Ebersole testified about the hydrographs generated by the ADCIRC SL 15 model. They described water levels at Bayous Bienvenue and Dupre and at the southeastern end of Reach 2. Ebersole 2067: 14 - 2068: 3.

182. The surge hydrograph at Bayou Bienvenue had two peaks. The first was associated with the arrival of the core hurricane winds, which built surge against the MRGO Reach 2 levee. Ebersole 2102: 23 - 2103: 16.

183. Once the core arrived, surge increased rapidly. The peak surge at Bayou Bienvenue was estimated to be between 16 and 17'. Ebersole 2100: 23 - 2101: 1; JX 211 (Ebersole Expert Report) at 39.

184. The time of peak surge was between 7:00 and 7:30 AM CDT. Ebersole 2123:13-

14. The surge level fell just as rapidly as it rose as the hurricane's center moved across Lake Borgne toward a second land fall in Mississippi. Ebersole 2100: 23 - 2101: 15.

185.    The second peak of lesser magnitude was created as the build-up of storm surge along the Mississippi coast, which was pushed against the coastline by high winds, propagated back away from the coast as the storm moved inland and wind speeds at the coast dropped quickly. Ebersole 2100: 23 - 2101: 16.

186.    The propagation of surge back toward the Gulf created the second peak, increasing water levels in Lake Borgne which had already fallen once the hurricane moved north of the region. Ebersole 2100: 23 - 2101: 16.

187.    The duration of the surge above 10' was approximately 12 hours. Ebersole 2101: 21-24.

188.    The surge at Bayou Dupre was quite similar, although the second peak was less pronounced than it was at Bayou Bienvenue. The peak surge was between 17 and 18'. Ebersole 2102: 5-13. The time of peak surge was at approximately 7:30 AM CDT. The duration above 10' at this location was also about 12 hours. Ebersole 2102: 5-13.

189.    At the southeastern end of the levee, the second surge was even less pronounced. The peak surge was similar to the value at Bayou Bienvenue. The time of peak surge was 7:30 AM CDT and the duration above 10' was again about 12 hours. Ebersole 2102:15 - 2103:16.

190.    The duration above 10' is significant because at that level water outside of Reach 2 continued to pump water into the St. Bernard polder over the 40 Arpent levee. Ebersole 2067: 6-12. The 40 Arpent levee was 10' high. Ebersole 2719: 11-16.

191.    Dr. Kemp also described four hydrographs for Shell Beach, MRGO Halfway

29

Point, Bayou Bienvenue, Bayou Dupre.  Kemp 1943:22-1944:9; JX   (Kemp Expert Report) at

117-118.  Significantly, the plaintiffs' hydrographs were very similar to those generated by the

United States.  Ebersole 2098: 7-15; 2104: 2-5.

192.    For instance, in scenarios 1 and 3, the duration, onset, and peak surge are

essentially equivalent.  Kemp 1945:25-1946:3; *accord*  Kemp 1995:12-18.

193.    The peak surge near Shell Beach in scenario 1 is 17.5 feet, and peak surge for

scenario 2c is 17 feet.  Both peak surges occur at approximately 8:30 am, the onset of surge is

approximately the same, the rate of surge is the same, and the rate of fall is the same.  Kemp

1946: 4 - 1947: 12; JX 194 (Kemp Expert Report) at 127.

194.    The peak surge at Bayou Bienvenue and Bayou Dupre and the MRGO Halfway

point, respectively, may differ by about .5 feet to 1 foot when comparing scenario 1 and scenario

2c.  However, the rate of rise, the rate of decline, and the time of peak surge was approximately

the same.  Kemp 1948:10-1949:8.

195.    Almost no change can be found in the surge hydrographs for locations along the

GIWW, Reach 1 of the MRGO, and in the IHNC when comparing Scenario 1 to Scenario 3.  JX

(Kemp Expert Report) at 119-122.  See also Dutch Storm Surge Report, 95-96, JX 197.

3.    *Determination of Elevations*

196.    Steve DeLoach was tendered as an expert in engineering surveying, LIDAR,

accuracy of LIDAR, and vertical datums.  DeLoach 3896:19-23.[8]  He testified about the

---

[8] Stephen DeLoach is an engineer and land surveyor with specialized experience in the use of LIDAR.  A gradaute of Virginia Tech, he is an expert in engineering surveying and the operational accuracy of LIDAR, including vertical datums.  He was a leader in the development of high altitude LIDAR mapping which was used in this case.

30

determination of elevations in the New Orleans area, with emphasis on levee heights.

197.    There are three LIDAR sets available for use in this case.  DeLoach 3897:14-3898:9:

        a.      The statewide mapping project, which was delivered in the form of a product with a 15-foot grid;

        b.      A 2000 survey of the LPVHPP system ("Pre-Katrina LIDAR"); and

        c.      A 2005 survey of the LPVHPP system after Hurricane Katrina ("Post-Katrina LIDAR").

198.    These three data sets produced five different products.  DeLoach 3897:14-3898:11:

        a.      The statewide mapping project in a 15-foot grid;

        b.      The Pre-Katrina LIDAR raw data;

        c.      The Pre-Katrina LIDAR gridded data, with a grid spacing of 1 foot;

        d.      The Post-Katrina LIDAR raw data; and

        e.      The Post-Katrina LIDAR gridded data, with a grid spacing of 2 feet.

199.    The difference between raw data (also known as "point cloud") and gridded data is that the raw data is what is collected, and the gridded data is the raw data mathematically adjusted, averaged, and smoothed into a grid that is easier for modeling.  DeLoach 3898:12-25.

200.    Smoothing is the mathematical shift from the raw data into the gridded data. DeLoach 3899:1-3.

201.    Feathering is done to mathematically smooth and fit together multiple data sets. DeLoach 3899:17-24.

202.    The American Society of Photogrammetry and Remote Sensing publishes

31

national standards for the collection and accuracy of LIDAR data. DeLoach 3900:6-10.

203.    The accuracy of the Pre-Hurricane Katrina LIDAR is plus or minus .45 feet to a 95-percent confidence level. DeLoach 3900:11-21.

204.    The accuracy of the Post-Hurricane Katrina LIDAR is plus or minus .45 feet to a 95-percent confidence level. DeLoach 3902:18-24.

205.    The statewide data is the only set that maps the St. Bernard Parish, New Orleans East, and Lower Ninth Ward polders. DeLoach 3902:25-3903:4.

206.    The accuracy of the statewide data is plus or minus 1.3 feet to a 95-percent confidence level. DeLoach 3903:5-10.

207.    There may be areas with structures or vegetation that reduce the accuracy of the LIDAR data. DeLoach 3903:11-20.

208.    Accuracy assessments are based on the guidelines developed by the American Society of Photogrammetry and Remote Sensing. It involves taking 20 checkpoints of high accuracy and comparing the LIDAR data to those checkpoints and then computing the statistical accuracy values. DeLoach 3903:21-3904:1.

209.    The best LIDAR data for determining elevations of sheet piles and floodwalls is the Pre-Hurricane Katrina LIDAR raw data. DeLoach 3904:5-8.

210.    The accuracy of the Pre-Hurricane Katrina LIDAR raw data for top of structure elevations is plus or minus 2.3 feet to a 95-percent confidence level. DeLoach 3904:9-18.

211.    The Pre-Hurricane Katrina LIDAR gridded data increases the uncertainty. Its accuracy for top of structure elevations is plus or minus 3.3 feet to a 95-percent confidence level. DeLoach 3904:20-5.

32

212.    The Plaintiffs' did not use all available LIDAR data, which reduced the accuracy of their modeling.  DeLoach 3905:6-14, 3933:4-9.

213.    The United States' experts took all the LIDAR data sets into account to have the most accurate flood control structure elevations at the time of Hurricane Katrina when formulating their opinions.  DeLoach 3905:15-17, 3933:10-19.

214.    All three LIDAR data sets met the accuracy standards and criteria within the scientific community for their intended purpose.  DeLoach 3905:18-23.

215.    Determining levee toe elevations is subject to inaccuracies due to how the data user defines the starting point for the levee toe.  DeLoach 3913:13-20.  For instance, a typical levee cross section could reasonably be considered to have either 7.5 foot or 6.5 foot levee toe elevation depending on the user's interpretation.  DeLoach 3913:21-3914:24; *see also* JX-0209, at 40 chart 17 (DeLoach Expert Report).

216.    An overlay is viewing multiple layers of data by placing one layer on top of the other layer.  Current practice is to use computers to overlay data rather than physically laying maps on top of one another.  DeLoach 3917:7-17.

217.    Accurate data sets, meeting all standards for their intended purpose, can exhibit horizontal shifts when overlayed on top of one another.  DeLoach 3917:19-3918:13; *see also* JX-0209, at 40 chart 17 (DeLoach Expert Report).

218.    In his experience, Dr.DeLoach has seen horizontal shifts of as much as 100 feet when old map products are overlayed with newer products.  DeLoach 3918:14-23.

219.    A vertical datum is a reference used to measure elevations.  DeLoach 3919:1-3.

220.    Multiple datums are used in Southeastern Louisiana.  DeLoach 3919:4-9.

33

221.    One of the purposes of using multiple datums is to address the problem of regional subsidence in southeastern Louisiana.  DeLoach 3919:8-14.

222.    The National Geodetic Survey of the U.S. Department of Commerce develops land-based datums.  The National Oceanic and Atmospheric Administration, also of the U.S. Department of Commerce, develops tidal datums.  DeLoach 3919:15-20.

223.    The design datum for the levees along Reach 2 of the MR-GO was mean sea level, which at the time was considered equivalent to the National Geodetic Vertical Datum of 1929 ("NGVD29").  DeLoach 3919:21-3920:7.  NGVD29 was used in the construction of levees along the MR-GO.  DeLoach 3920:6-10.

224.    The vertical datum used to measure elevations after Hurricane Katrina and also in the current case is the North American Vertical Datum of 1988, 2004.65 epoch ("NAVD88 (2004.65)").  DeLoach 3920:11-17.

225.    In terms of differences between the two datums, assuming NAVD88 (2004.65) is flat, NGVD29 would be about 1 foot below NAVD88 (2004.65) at the south end of Reach 2, and about 0.8 feet lower moving north towards Reach 2.  DeLoach 3920:18-23; *see also* DM-0040 (Diagram comparing levee design datum to datum used for purposes of this litigation).

226.    Based on this difference between the two datums, if a levee was 16.5 feet under the NAVD88 (2004.65) datum, it would be approximately at its design grade of 17.5 feet or within a couple of inches under the NGVD29 datum.  DeLoach 3922:21-3923:4.  If measuring levee elevations in NGVD29, the surge and wave heights would also have to be converted to NGVD29.  DeLoach 3923:5-13.

227.    Different LIDAR sets, despite being accurate for their intended purpose, will

34

exhibit differing elevations and slopes. These inaccuracies must be taken into account by looking at all the data, assessing potential errors, assessing accuracies and, if doing post-event modeling, sensitivity analyses. DeLoach 3931:3-17, 3932:8-21.

228.    A sensitivity analysis involves changing input data in a model to see their effects on the model's output. DeLoach 3931:15-17.

229.    A sensitivity analysis can include changing input parameters for vertical elevations of data. DeLoach 3931:18-21.

230.    Changing vertical elevations in a sensitivity study is an appropriate method. DeLoach 3931:22-24.

231.    United States expert Steven Fitzgerald's studies for polder flooding based on differing levee elevations were appropriate. DeLoach 3931:25-3932:3.

232.    United States expert Dr. Don Resio's sensitivity analyses for levee overtopping based on different levee crests and toe elevations were appropriate. DeLoach 3932:4-7.

233.    Plaintiffs' expert reports did not provide any accuracy assessments of the LIDAR data they used. DeLoach 3932:22-25.

234.    Mr. Chad Morris is not an expert in LIDAR, and would not address the details of accuracy assessments of the data. Morris 164:7-16.

*4.    Surf Zone Dynamics*

235.    Surf zone dynamics describe the interaction of surge and waves near the levees. Ebersole 2113: 16-21.

236.    The rapidly rising water level and increasing wave energy just seaward of the MRGO Reach 2 levee dictated the hydrodynamic regime and loadings experienced on the levee.

35

As winds built the storm surge, waves also increased in height and energy. During the rise in water level and wave conditions, wave energy was dissipated on the more gently sloping berm that fronted the steeper front face of the levee. JX 211 (Ebersole Expert Report) at 44.

237.    Wave breaking and dissipation on the berm limited the amount of wave energy that actually reached the levee; the degree of dissipation is strongly influence by the depth of water on the berm. Significant wave height is limited to a value that is approximately .4 to .6 times the local water depth, due to wave breaking, depending on slope. Ebersole 2114: 18 - 2115:18; Vrijling 994:7-11.

238.    Mr. Ebersole estimated water levels (excluding wave setup) and incident wave conditions, as a function of time, every 30 minutes, for a location between Bayou Bienvenue and Dupre, which was representative of conditions found along the MRGO Reach 2 levee. As the water level increased during the storm, the water depth increased on the berm and the wave energy that reached the toe and impacted the levee also increased. Wave energy at the levee toe was small until the water level rose high enough to allow significant wave energy to reach the levee. JX 211 (Ebersole Expert Report) at 44.

239.    Mr. Ebersole outlined the evolving water levels and velocities of approaching waves and overtopping rates. Assuming a 15.4' levee, at 4:30 AM, the incident significant wave heights were 2.4'. The water level was 12'. The storm surge water level was increasing at approximately 1.6' per hour. Small waves would have been breaking on the levee face near the toe and running up the levee front face. Their average velocity would have been about 1.6 ft/sec. No overtopping was occurring. This was a very low wave energy condition on the front face, from the standpoint of erosion potential and overtopping potential. Ebersole 2216: 23 - 2218: 4;

36

United States DM 15.

240.    By 5:00 AM, the storm surge level was increasing by 2 ft/hr.  The water level was 12.9' and significant wave heights had increased to 2.6'.  Negligible front side erosion was occurring and wave overtopping had begun.  The front side velocities were about 2.5 ft/sec and the mean overtopping rate was about .01 cfs/ft.  Ebersole 2218: 12 - 2219: 17; United States DM 15.

241.    Once overtopping begins the predominant effect on the levee is on the back of the levee.  Vrijling 1034:6-8; 1040: 10-11.  Plaintiffs agree that there would have been no failures of the levees without overtopping.  Bea 1092: 12-15; 1100: 19-22.

242.    Generally, neither party believes that any erosion occurs on the levee with storm surge below an elevation of 13'.  Bea 1377: 20 - 1378: 7; JX 207 (Bea Jan. 29 2009 Declaration) at 92, ¶ 139.

243.    Dr. Bea testified that overtopping began at 14'.  Bea 1386: 19-20.  He also stated that the water level rises from 13' to 14' in approximately 20 minutes.  Bea 1388: 19-24.  The 14' level is reached at approximately 6:20 AM.  Bea 1388: 8-10; 1388: 19-24.

244.    By 5:30 AM, the storm surge level was increasing by 2.5 ft/hr.  The water level was 15.6' and significant wave heights had increased to 2.9'.  Surficial front side erosion had begun and wave overtopping was occurring at damaging levels.  The front side velocities were about 3.1 ft/sec and the mean overtopping rate was about .35 cfs/ft.  The backside velocities were about 1.5 ft/sec and backside erosion and head-cut formation was beginning.  Ebersole 2219: 18 - 2220: 12; United States DM 15.

245.    By 6:00 AM, the storm surge level was increasing by 2.7 ft/hr.  The water level

was 13.9' and significant wave heights had increased to 3.0'. Surficial front side erosion was continuing and wave overtopping was occurring at very damaging levels. The front side velocities had decreased to about 2.8 ft/sec and the mean overtopping rate was greater than 2.1 cfs/ft. The backside velocities were greater than 4.7 ft/sec and backside erosion was dominant. Breaches were developing as head-cuts advanced through the levee crest. Ebersole 2220: 13 - 2222: 3; United States DM 15.

246.     By 6:30 AM, the storm surge level was increasing at a slower rate of 1.8 ft/hr. The water level was 16.8' and significant wave heights were 3.0'. Surficial front side erosion was continuing and wave overtopping was occurring at very damaging levels. The front side velocities had decreased to about 2.5 ft/sec and the mean overtopping rate was greater than 6.4 cfs/ft. The backside velocities were greater than 8.3 ft/sec and backside erosion was dominant. Waves were breaking on the crest and the backside. Breaches were widening and and deepening. Ebersole 2222: 6 - 21; United States DM 15.

247.     By 7:00 AM, the storm surge level was at its peak. The water level was 17.5' and significant wave heights had remained at about 3.0'. Surficial front side erosion was continuing and wave overtopping was occurring at extremely damaging levels. The mean overtopping rate was greater than 10.9 cfs/ft. The backside velocities were greater than 10.9 ft/sec and backside erosion was dominant. Breaches were widening and deepening and head-cuts were advancing into the front side surficial wave-induced erosion. Ebersole 2223: 21 - 2224: 11; United States DM 15.

248.     The data cited above were obtained using a state-of-the art Boussinesq-type wave model, COULWAVE. This was applied to compute hydrodynamic loadings on levee cross-

sections. This type of ultra-high resolution wave modeling, which has been extensively validated, provides reliable estimates of water velocities that are acting to erode the levee, as well as mean overtopping rates and other surf zone and current properties. JX 211 (Ebersole Expert Report) at 49.

249.    The data confirmed the conclusion of the IPET authors the average peak velocities on the frontside were 3 to 5 ft/sec. Results also showed that whenever overtopping occurred due to wave action alone. The mean velocities on the crest and back side were of greater magnitude than those on the front side, and the average peak velocities were also significantly greater on the crest and on the back side. This occurs because water in a wave that overtops the levee is accelerated down the back side by gravity, producing higher velocities as a result of the acceleration compared to velocities on the front. Ebersole 2266: 2-8; JX 211 (Ebersole Expert Report) at 51; United States DM 15.

     *5.*    *Modes of Levee Erosion*

250.    The parties displayed a large number of photos of the condition of the Reach 2 levees after after the hurricane. They showed evidence of devastating back side erosion along with surficial front side erosion.

251.    Earthen levees can be eroded by water having sufficiently high velocity. The rate at which an earthen levee will erode, and the degree to which it will erode, depends upon the hydodynamic forces acting on the levee surface as well as its resistence to erosion. The erosive force is determined by the nature and magnitude of the water velocities and by the duration of time for which erosion-producing velocities are present. Duration is a key parameter in any coastal erosion phenomenon. Ebersole 2122: 15 - 2123: 1; JX 211 (Ebersole Expert Report) at

78.

252.     The degree of erosion depends upon the flow situation and the location on the levee where these conditions occur.  Several flow regimes are possible: (1) front side erosion by currents; (2) front side erosion by wave action; and (3) backside erosion by wave overtopping and overflow.  Ebersole 2126: 21-24; 2179: 16 - 2180: 8.

253.     Neither party believes that front side erosion by MRGO's insignificant currents played a role in the degradation of the reach 2 levees.  Ebersole 2127: 3-12.  Bea 1326: 7-10.

254.     There are two signatures of wave-induced erosion on the front side of levees along the MRGO Reach 2: (1) a band of relatively minor surface erosion associated within the breaking wave zone, and (2) isolated bench cuts on the upper front face that are related to swash zone processes acting on pockets of more erodible non-cohesive sediments.  Ebersole 2127: 16 - 2128: 3.

255.     The evidence demonstrated that the band of minor surface erosion was prevalent along most of Reach 2.   The surface erosion band extended uninterrupted along the entire stretch of levee in many of the photos displayed at trial.  Ebersole 2128: 5-13; JX 211 (Ebersole Expert Report) at 188, 194 and 196.

256.     In contrast, bench cuts were isolated features, very limited in occurrence, and of relatively small extent along the levee.  Ebersole 2128: 11-13.

257.     The MRGO Reach 2 levee was comprised primarily of clay and covered with grass.  The observed position of the surface erosion band on the levee front face is very consistent with observations by Seijffert and Verheij (1998), two Dutch scientists who examined wave-induced erosion on the front side of grass-covered clay levees through large-scale testing.

40

Ebersole 2143: 3-8.  These scientists concluded that water must strike the levees for a very long duration in order to generate any significant amount of front side erosion.  Ebersole 2136:12 - 2137: 12.  The study also assumed that the waves were striking the levee at the same place.  Ebersole 2138: 5-11.

258.    Front side erosion is even less likely to become a significant cause of levee degradation in this case because the water level was rising so quickly along the front of the levee.  The waves rarely struck the levee in the same location more than once.  This limited the erosion potential on the front side.  Ebersole 2137: 22 - 2138: 5; 2164: 20 - 2165: 3.

259.    The surface erosion band represented minor vertical erosion, 0.5 to 1 ft, in the case examined using LIDAR data.  Ebersole 2130: 9-11.  This magnitude of erosion is consistent with the small values of erosion depth computed by Seijffert and Verheij (1998).  Ebersole 2135: 3 - 2137: 12.

260.    The surface erosion band was not evident at some locations.  Where it was not present, grass cover and sediment resistance to erosion prevented waves from stripping away the sediments and removing the grass cover.  Ebersole 2133: 8-22; 2148: 14-21; JX 211 (Ebersole Expert Report) at 167, 177, 196 and 205.

261.    There was no continuous zone of severe wave-induced bench cutting evident on the levee front side in any photo.  This was also the case with respect to photos that showed the levee crest intact and erosion on the back side.  Ebersole 2148: 22 - 2149: 4; 2155: 15-18.

262.    The telltale evidence of front side erosion is the presence of sediment along the front of the levee.  This sediment would have been removed from the front side of the levee during the erosion and then accumulated there. Ebersole 2156: 17 - 2157: 7.

41

263.    If front side wave-induced erosion was a dominant mode of erosion, one would expect to see deposits of sediment on the front side slope, at the levee toe, and seaward of the levee toe associated with sediment moved offshore due to wave breaking and undertow associated with breaking waves which would act to transport the sediment offshore. Ebersole 2156: 17 - 2157: 7.

264.    In the entire set of Appendix A photos, there were never significant sediment deposits evident on the front side of levees that did not appear to be features (erosion or depositional in origin) associated with return flow toward Lake Borgne, which exited the St. Bernard polder following passage of the storm. There was no evidence of significant sediment accumulation at and seaward of the levee toe on the front side.  Ebersole 2156: 17 - 2157: 15; 2159: 13-16.

265.    Dr. Bea indicated in his expert reports that this sediment accumulation would be evident if front side erosion occurred.  JX 207 (Bea Technical Report 2, Jan. 2009) at 51, Figuire 36c; Ebersole 2157: 24 - 2158: 15.

266.    Indeed, the evidence is just the opposite.  The primary evidence of sediment deposits were on the backside of the levees.  In the vast majority of photos, any significant sediment deposits was always observed on the backside, indicating that overtopping and transport of sediments landward was the dominant erosion and levee degradation process.  Each photo shows large fan-shaped sediment depositional features on the back side indicating the dominance of back side sediment erosion and transport, but no significant depositional features on the front side.  Ebersole 2159: 17 - 2162: 10; JX 211 (Ebersole Expert Report) at 166, 182, 185 and 202.

42

267.     Dr. Bea argued that a photo in Mr. Ebersole's expert report was evidence of sediment being deposited on the front side of the levee.  Ebersole 2167: 11 - 2168: 20; JX 211 (Ebersole Expert Report) at 162.  This photo, however, showed sediment that had flowed out with water which was exiting the polder.  Following the storm, the water level, as it began to get lower and lower, flowed through some of the breaches that were degraded to the greatest extent. Ebersole 2167: 16 - 2168: 20.  The water is concentrated as it flows through the breach and then expands as it comes out of the other side.  The pattern is known as the Venturi effect.  Ebersole 2168: 21 - 2170: 9; United States DM 12.

268.     The most severe wave-induced bench cuts formed later in the storm, at the highest levees, when the incident wave energy was greatest, had the longest duration to work on eroding sediments in the swash zone on the front side, and at locations where local patches of sediment were more erodible.  Ebersole 2150: 14 - 2151: 10.  These locations were typically south of Bayou Dupre and on levees that had a 19' crest.   Ebersole 2130: 22 - 2131: 7.

269.     Only rarely was an isolated wave-induced bench cut through the levee crest evident where extensive backside erosion also was evident.  This is consistent with a decrease in swash zone erosion as overtopping increases and with the occurrence of these features only at the highest levees.  Ebersole 2150: 1-16.

270.     The plaintiffs have claimed that the evidence of the front side erosion has been washed away after the failure of the levees. Bea 1384: 2-11; 1506: 17-20.  It is impossible, however, that there would be so much breaching and no evidence remaining at any location that showed  significant sediment accumulated on the seaward side of the levee.  Ebersole 2164: 8-19.     271.     If the wave-induced bench cutting mechanism was a predominant cause of levee

43

erosion and degradation along Reach 2, one would expect to see evidence of it much more often in the set of photos in Appendix A, in various stages of development, widespread and not isolated features. Their isolated occurrence suggests they are related to patches of highly non-cohesive sediments. Ebersole 2155: 15 - 2156: 3.

272.    Dr. Bea also extensively discussed levees with sheet piles. JX 207 (Bea Expert Report, Jan. 2009) at ¶ 133; Bea 1290: 10 - 1291: 5. He stated that these levees were generally closer to the MRGO, had the lowest levee elevation, and had the lowest toe elevation. Bea 1552: 7-11. These characteristics would allow waves to have a greater impact on the levee, thereby making it more likely that front side erosion would occur. Ebersole 2170: 10 - 2171: 15.

273.    Analysis of photos of levees with sheet piles did not show any significant evidence of frontside erosion. Ebersole 2171: 16 - 2179: 13; JX 211 (Ebersole Expert Report) at 159, 160, 163, 170, 171, 172, 174, 204. This further supports the conclusion that front side erosion did not play a significant role in the degradation of the Reach 2 levees.

274.    Lower levees would have been subjected to more damaging overtopping before cuts on the front side could have had time to form into deep erosion features. Incident wave energy was less, earlier in the storm. The swash zone advanced steadily up the levee front face as surge levels rose; so the swash zone was not located at one place on the levee face for very long. Ebersole 2155: 19 - 2156: 3; JX 211 (Ebersole Expert Report) at 91.

275.    As overtopping increased, the swash zone regime on the front side became less energetic; more waves were advancing over the levee crest, fewer were running back down the slope to interact with up rushing waves. The swash zone would have been most energetic for the longest period of time at the highest levees, for the highest water levels, and less energetic for

44

lower water levels and for shorter durations of time earlier in the storm. JX 211 (Ebersole Expert Report) at 91.

276.    The damage to the Reach 2 levees was caused by overtopping. Mosher 2964: 7-13; JX 212 (Mosher Expert Report) at 9-10; Ebersole 2098: 19-24.

277.    In current USACE and international engineering guidance, the threshold-for-damage criteria for earthen levees and sea dikes that are subjected to overtopping is based on the mean overtopping rate. This recognizes the dominant role of water passing over the levee and down the back side in determining damage. Ebersole 2201: 10-16.

278.    The mean overtopping rate is the average amount of water over a period of time that flows over a levee. Ebersole 2200: 21-24. It is related to velocity. Ebersole 2200: 25 - 2201: 9.

279.    Overtopping rates can be used to determine damage from overtopping flow. Vrijling 1053: 8-12.

280.    The USACE Coastal Engineering Manual has adopted guidance that relates mean overtopping rates to thresholds for damage to earthen dikes. This guidance was obtained from the Eurotop Manual, design guidance generated by Dutch and European regulatory bodies. Ebersole 2201: 17 - 2202: 4.

281.    These design guidelines are the best information currently available relating to the potential destruction caused by overtopping. Ebersole 2202: 20-24. They are illustrated in figuire 56 of JX 211 (Ebersole Expert Report) at 95 and United States DM 14.

282.    These guidelines show that damage starts on a grass covered clayey soil levee when the mean overtopping rate is .01 cfs/ft. Ebersole 2203: 7-10.

45

283.    For a levee made of the highest quality clay and grass, damage will occur at a mean overtopping rate of .1 cfs/ft.  Ebersole 2203: 19 -2204: 1.

284.    When the mean overtopping rate reaches 1 cfs/ft, the Eurotop Manual recommends the placement of asphalt or concrete armor on the back of the levee.  Ebersole 2204: 2-9.

285.    Mr. Ebersole calculated the mean overtopping rates for the levees along Reach 2. They are listed in his report. JX 211 (Ebersole Expert Report) at 97, Table 6.

286.    These mean overtopping rates were confirmed by plaintiffs' expert.  Vrijling.  JX 197 (Vriiling Expert Report June 2008) at 106-107.  He concluded that these extremely high mean overtopping rates were in place for up to two hours along Reach 2.  *Id.*; *see also* Vrijling 1035:6-1037:19; 1038:8-25; 1039:7-22.

287.    The vast majority of the mean overtopping rates listed in Table 6 of the Ebersole and Vrijling reports are at least 10 to 100 times greater than the .1 cfs/ft threshold for the start of damage.  Ebersole 2206: 4-24.

288.    Mr. Ebersole illustrated overtopping situations for various crest heights in his expert report.   JX 211 (Ebersole Expert Report) at 101-102, Figures 58a and 58b. The mean overtopping rates for crest heights of up to 19 ft, the highest along MRGO Reach 2, exceeded threshold-for-damage values that are currently in use by the USACE and international coastal engineering communities for earthen levees (0.001 to 0.1 cfs/ft.).

289.    Levees along MRGO Reach 2 that had crest heights of 18 ft or less were subjected to maximum mean overtopping rates that exceeded 2 cfs/ft, the threshold-for-damage for armored paved levees in current engineering guidance.  The lower the levee crest, the longer

46

the duration above 2 cfs/ft. For 17- 16-, 15-, 14-, and 11-ft crest heights, the mean overtopping

rate exceeded 2 cfs/ft for 1.5, 2, 2.5, 3.5 and 8 hours respectively. JX 211 (Ebersole Expert

Report) at 101-102, Figures 58a and 58b.

290.    The levees along MRGO Reach 2 which were subjected to averaged maximum

mean overtopping rates of 2 to 2.5 cfs/ft or higher were severely damaged. For about one third

of the locations along MRGO Reach 2, the mean overtopping rates exceeded 10 cfs/ft. Many of

those levees were obliterated. JX 211 (Ebersole Expert Report) at 103.

291.    The damage associated with these overtopping rates assume a static levee.

Overtopping begins a self-reinforcing erosion situation, in which overflow and levee degradation

feed upon each other, once the erosion process is initiated. As the levee erodes and degrades,

and the crest lowers in response to overflow, the mean overtopping rates skyrocket. This

necessarily increases the magnitude of overflow  which continues to degrade the levee at a faster

pace. Ebersole 2208: 19 - 2209: 11.

292.    Overtopping begins when the water level reaches 2 to 2.5' below the crest of the

levee. It is not necessary for the water level to reach the height of the crest of the levee for

overtopping to begin because waves can severely damage a levee when the mean water level is

below the levee crest. Ebersole 2208: 4-9.

293.    The photographic evidence also supported the conclusion that overtopping was

the predominant mode of levee erosion. This is apparent in the large number of photos that

showed evidence of significant erosion on the back side but with absolutely no evidence of

significant front-side wave-induced erosion other than a surface erosion band. The band is often

visible, but the surface erosion band does not reflect significant vertical or horizontal erosion.

Ebersole 2225: 25 - 2226: 13.

294.    Three photos cited by Mr. Ebersole in his testimony demonstrate the progression of backside erosion.  Ebersole 2225: 7- 2228: 25; JX 211 (Ebersole Expert Report) at 190, 194 and 186.   In JX 211 at 190, the early stages of damage due to overtopping begins, although there is evidence of a front side surface erosion band.  Ebersole 2225: 7-24.  In  JX 211 at 194, considerable backside degradation has occurred, with relatively little evidence of significant erosion on the front side.  There is considerable scour on the backside but there is no evidence that front side induced wave erosion has advanced into the crest of the levee.  Ebersole 2226: 18 - 2227: 2. In JX 211 (Ebersole Expert Report) at 186, the next step in the progression is shown.  Mature headcuts on the backside are advancing from the backside to the front.   Again there is no evidence of significant frontside erosion, while the erosion on the backside is considerable and prevalent.  Ebersole 2227: 11 - 2228: 6.

295.    These three figures, and many others in Appendix A, suggest that a minor surface erosion zone occurred on the front side.  Overtopping and head-cutting then occurred.  This dominated the process, often producing considerable back-side erosion like that shown in JX 211 (Ebersole Expert Report) at 186-187.  Head cutting eventually migrated to, and sometimes through, the zone of surface erosion on the front face.  Ebersole 2226: 5-13; 2228: 8-25.

*6.      Soils Review*

296.    Coarse grained materials, such as sand and gravel, are highly permeable and are the most erodible materials.  Mosher 2966:19-2967:5.  Fine grained materials are silts and clays.  Mosher 2967:6-14.

297.    Silts are more permeable than clays, but less permeable than sands.  They can be

48

quite erodible.  Mosher 2968:5-19; JX 212 (Mosher's Expert Report) at 29, Figuire 17.

298.     Clays are plastic material, which means the material feels sticky and has a higher water content.  Mosher  2967:25-2968:4, 2968:20-2969:3.  The higher the plasticity in a clay, the less erosion.  Clays are more resistant to erosion than other materials.  Mosher 2969:4-11.

299.     Lean clays is made of 50% clay, but still has the sands or silts in it.  They are more erodible than a fat clay.  Mosher 2969:12-19.

300.     Fat clay has less sand or silt in it than a lean clay.  Mosher 2969:20-2970:2.

301.     There are multiple levels of compaction for clay.  A soft clay will be like a peanut butter, a stiff clay will be like frozen ice cream, and a medium clay will be somewhere in the middle of those two.  Mosher  2970:3-8.  A soft clay is the most erodible, while a stiff clay is the best against erodibility, and a fat clay is somewhere in the middle of the two.  Mosher  2970: 9-13.

302.     While the levees along Reach 2 were mostly constructed of lean and fat clays, there were areas that were made of more erodible materials.  Ebersole 2110.  Those areas were primarily south of Bayou Dupree.  Those levees, while generally higher than the levees north of Bayou Dupree, most likely failed because they were comprised of more erodible materials.  Ebersole 2069: 17 - 2070: 10; 2111:17-23.

*7.     Hydraulic Fill*

303.     The Mosher expert report shows the location of the breaches along Reach 2.  JX 212 (Mosher Expert Report) at 11,  Figure 1.  Figure 4-1 on page 10 of Chad Morris' expert report, JX-191, is generally consistent with Figure 1 from Mosher's report.  In both figures, breaching occurs all along Reach 2.

49

304.    Dr. Mosher's expert report shows the construction method for the levees along St. Bernard Parish.    JX 212 (Mosher Expert Report) at 12,  Figure 2.   Hydraulic fill was used to construct the levees along Reach 2, while sand capped with clay taken from borrow pits was used to construct the extension levee protecting the southern part of St. Bernard parish.  Mosher 2971:11-2972:11.  Hydraulic fill was not used to construct the extension levee because of the lack of availability of material and the distance involved in pumping the fill.  Mosher 2972:18-22.

305.    These levees along the southern part of the St. Bernard Parish performed quite well during the hurricane.  Mosher 2972:23-2973:1.  In contrast, the levees constructed with hydraulic fill were the only levees to breach in all of the 220 miles of federal levees during the Hurricane.  Mosher 2973:2-9.

306.    Hydraulic fill is obtained through material dredged from a location and pumped to construct a levee.  Mosher 2970:17-2971:10.  These materials will create a hetrogenous levee, that is generally uncompacted.  An uncompacted levee will be more erodible than a compacted levee, particularly during overtopping conditions.  Mosher  2973:24-2974:7.

307.    Hydraulic fill was used because it was an economical material for constructing a levee.  Mosher 2974:8-12.  It is not used today, as current Corps practice (changed in 2001) is to use compacted fill material, thereby ensuring you have better control of the materials in the levee.  Mosher 2975:23-2976:7.

### 8.    *Performed as Designed*

308.    The levees were designed to protect against a surge of 13 feet high.  Bea 1272: 9-11.  Once the levees were overtopped, they were not designed to provide additional protection

50

and would be in danger of failure. The levees provided no armoring protection, other than grass. Mosher  2981:2-24.

309.    The levees were properly built and maintained. Bea 1094: 23 - 1095: 6. They performed as expected. Bea 1272: 6-8.

310.    The Reach 2 levees were competently designed and they did not fail within their design conditions. Bea 1272: 25 - 1273: 5; 1292: 7-10.

311.    The structures that were breached by Hurricane Katrina were subjected to greater hydraulic forces than for which they were designed. Bea 1333:16-19; 1337:11-13.

312.    The design hurricane for the New Orleans East Back levee was the Standard Project Hurricane. Bea 1333:20-22.

313.    The design water level of 13 feet was exceeded by Hurricane Katrina. Bea 1333:23-1334:3.

314.    Dr. Bea did not evaluate whether the levee design for Reach 2 would withstand the design surge water level. Bea 1336:9-17.

315.    Dr. Bea cannot say whether a Standard Project Hurricane would have breached the levees as Hurricane Katrina did. Bea 1337:4-6.

316.    Dr. Bea did not compare Hurricane Katrina breaches and conditions to Standard Project Hurricane or Probable Maximum Hurricane conditions. Bea 1337:7-10.

317.    The Standard Project Hurricane evolved to represent the most severe storm the Government should guard against when designing hurricane protection projects. Bea 1337:14-17.

318.    The Standard Project Hurricane tells the conditions to be expected on the

unprotected side of the levee.  Bea 1337:18-20.

319.     The Standard Project Hurricane determines the crown elevation of the LPV

levees.  Bea 1105:6-8.

320.     Even with hydraulic fill, the levees were designed to withstand erosion prior to

overtopping.   Mosher 2981:25-2982:6.

321.     In some instances, the levees were below their design grade because of settlement

of the material.  The materials below the levees are soft, and those materials will settle

signifigantly.  Part of that settlement is lateral deformation.  Mosher 2982:10-14.  The designers

understood that they would encounter some type of reduction because of the soft materials

underlying the levees.  That is why the levees were built in stages.  Mosher 2982:15-21.

322.     A lift between Bayou Bienvenue and Bayou Dupre was scheduled to occur at the

time of Hurricane Katrina, and the design for that lift was made in 2001.  Mosher 2982:22-

2983:21.  The Reach 2 levee design included stability berms to ensure the levees had factors of

safety in excess of 1.3.  Mosher 2985:6-12.

    9.     *Soil borings analysis*

323.     Levees which had medium fat clay soil (i.e., a low erodibility material) on the

surface best survived the hurricane.  Mosher 3105:19-24, 3106:25-3107:12; *see also* Mosher

3107:13-3108:10, JX 212 at 53, 54, Table 1 and Fig 52 (detailing soil borings, soil type at

surface of levee, scour depth, and amount of overtopping).  Once the erosion process began,

turbulence in the soil starts and the erosion process accelerates, regadless of soil type.

Therefore, the key for levee integrity is to cover the surface with a medium fat clay.  Mosher

3003:6-23.

324.    Dr. Kemp prepared a similar table analyzing the relationship between soil quality and erosion.  Mosher 3108:25-3109:8; DX 1601 (Kemp Jan. 14, 2009 Decl.) at 35.  His work showed the presence of medium fat clays at the levee surface resisted erosion, while other materials eroded during the storm.  *E.g.*, Mosher 3109:9-11, 3109:16-3112:9.

325.    Medium fat clays resist erosion because they have more cohesion to each other.  Other materials, like lean clays, have silt in them and do not get the same attraction between the particles.   Mosher 3108:11-24.

326.    The presence of medium fat clay soil had a greater impact on preventing erosion than the height of the levee.  *Compare* JX 212 (Mosher Report) at 11, figure 1 (detailing location of breaches) *with* JX 212 at 12, figure 2 (detailing constructed levee sources) *with* JX 191 (Morris Report) at 18, (detailing Reach 2 levee heights).  Mosher 3010:25-3011:10.  In many places where the levee was at or above design height, the levee still breached because the soil quality was not sufficient.  Mosher 3011:14-3012:8.

327.    Dr. Mosher reported the location of the soil borings in his expert report.   JX 212 (Mosher Expert Report) at 32; Mosher 2995:19-21.

328.    For example, at soil boring location 1, which is just south of Bayou Bienvenue, the pre-Hurricane Katrina levee elevation was 17 feet yet 5 feet of erosion occurred.  Mosher 2995:22-2996:6, 2998:25-2999:2; JX 212 at 41 fig. 31.  The soil forming this levee was medium-stiff lean clay, which is more erodible than medium fat clays.  Mosher 3002:15-3003:5; JX 212 at 41 fig. 30.

329.    Another levee with a higher elevation was at soil boring location 9, southeast of the Bayou Dupre Control Structure.  The pre-Hurricane Katrina Levee elevation was around 18

feet yet 8 feet of erosion occurred during the storm.  Mosher  3006:11-3007:1, JX 212 (Mosher Rep.) at 46 fig. 41.  The surface of the levee was comprised of a stiff lean clay.  Mosher 3007:9-17; JX 212 (Mosher Rep.) at 46 fig. 40.

330.    In contrast, soil boring location 5, two-thirds of the way between Bayous Bienvenue and Dupre, had a pre-Hurricane Katrina levee elevation of 15 feet yet suffered little erosion.   Mosher 3004:2-22; JX 212 (Mosher Report) at 44, fig 37.  This levee was comprised of medium fat clay on the surface of the levee, which is less erodible.  Mosher 3005:23-3006:9; JX 212 (Mosher Report) at 44 fig. 36.

     *10.    Effect of the MRGO on Reach 2 Levee Breaches*

331.    Hurricane Katrina produced unparalleled wave and storm surge conditions for the New Orleans area.  The large size of Hurricane Katrina throughout its history, combined with the extreme waves generated during its most intense phase, enabled this storm to produce the largest storm surges that have ever been observed in the Gulf of Mexico.  JX 211 (Ebersole Expert Report) at 130.

332.    Along the exposed eastern side of the hurricane protection system surrounding the St. Bernarrd polder, Hurricane Katrina produced surge levels of 17.5 to 18.3' which overwhelmed the levees and walls.  These peak surge levels exceeded by nearly 5' those for which the levees were designed.   JX 211 (Ebersole Expert Report) at 130.

333.    This overwhelming surge caused the severe levee erosion, degradation and subsequent widespread breaching that occurred between Bayou Bienvenue and Bayou Dupre, and south of Bayou Dupre.  JX 211 (Ebersole Expert Report) at 130.

334.    Levee degradation and breaching along the MRGO Reach 2 created a very large

source of water which propagated across the Central Wetlands region between the hurricane

protection system and interior 40-Arpent levee which surrounded the heavily populated areas.

This water eventually flowed over the the 40-Arpent levee and flooded the entire Chalmette area

including the Lower 9th Ward.  This was by far the greatest source of water that entered the

polder, greatly exceeding all other sources.  The majority of this water came through the

breaches in the levee system between Bayous Bienvenue and Dupre.  Ebersole 2066: 21 - 2067:

12; JX 211 (Ebersole Expert Report) at 131.

335.    The parties studied the role of the MRGO in terms of how it might have altered

water levels, wave conditions, velocities and overtopping rates along key areas of the periphery

of the St. Bernard polder, both along the MRGO Reach 2 levee and along the flood wall on the

eastern side of the IHNC adjacent to the Lower 9th Ward.  This analysis was done using

numerical storm surge and wave models, applied to various hypothetical cases, to make

assessments of changes to hydrodynamic loading conditions.  In light of these changes to

loadings, differences in damages to the levees and walls at the primary breach locations were

examined, and conclusions could be drawn regarding how the MRGO might have influenced

levee/wall responses at these critical locations.  Ebersole 2229: 6-13; JX 211 (Ebersole Expert

Report) at 132.

336.    Analysis of available evidence demonstrated that wave overtopping and overflow

were the most important processes in the destruction of the levees along Reach 2.  The

degradation process was driven by initiation of surface erosion on the levee backside due to

overtopping and then steady overflow, subsequent formation of severe backside head cuts,

migration of those head-cuts to and through the levee crest, forming breaches, and then

55

deepening and widening of the breaches as more water flowed through and over them in a self-reinforcing process. Flood walls along the levee also were damaged and breached due to severe overtopping and overflow, and by the very high velocities which eroded the levee surface on the backside. JX 211 (Ebersole Expert Report) at 133.

337.    In light of the prime importance of maximum mean water levels on levee degradation and breaching, one very important issue is how MRGO influenced the distribution of of maximum water level along Reach 2 for the various scenarios.  The computer models established that complete removal of the MRGO had a very small effect on peak water levels along the Reach 2 levee. Ebersole 2229: 14 - 2230: 15; JX 211 (Ebersole Expert Report) at 139, Figure 92.

338.    A second issue with regard to water level is how the MRGO influenced the variation of water level with time. Both magnitude and duration of high water level are important factors in the hydrodynamic loading experienced by the MRGO levee, and its subsequent erosion and degradation. The United States ran computer simulations that showed differences in hydrograph shapes for points that span this levee reach. They demonstrate that the MRGO had negligible influence on the storm surge hydrographs along the MRGO Reach 2 levee.  Ebersole 2230:16 - 2232: 1; JX 211 (Ebersole Expert Report) at 142-143, Figures 94-96.

339.    The models also show the variation of maximum significant wave height along Reach 2. There were some differences, generally in the range of 1 to 2'. However, these differences had negligible effect since wave height is limited by the depth of the water at the toe of the levee.  Once the waves reached the levees, wave heights were reduced because the water levels at the toe limited their effect. Ebersole 2232: 5 - 2237: 19; JX 211 (Ebersole Expert

Report) at 144, Figure 97.

340.    The most important issue is how the MRGO influenced overtopping/overflow and backside velocity conditions along the Reach 2 levee.  For each of the hypothetical cases examined, reductions in the maximum mean overtopping rates were generally less than 30%, and 5 to 20% less in the critical reach between Bayous Bienvenue and Dupre.  JX 211, Figuires 98-100.  More importantly, the rates exceeded 1 cfs/ft and approached 2 cfs/ft nearly everywhere along the reach.  Along the stretch between Bayous Bienvenue and Dupre, the mean rates exceeded 4 cfs/ft and the maximum rates exceeded 7 cfs/ft. For each of these cases, the small reductions would not have been great enough to prevent breaching.  Ebersole 2237: 20 - 2238: 16; JX 211 (Ebersole Expert Report) at 145-147.

341.    Neither the complete removal of the MRGO, nor changes to the wetlands that have ocurred since 1958, nor reduction of the MRGO to authorized dimensions, would have significantly altered the magnitude of overtopping and overflow.  Ebersole 2232: 2-4; 2238: 17 - 2239: 1.

    11.    *Hypothetical Scenarios*

342.    To a reasonable degree of scientific certainty, the erosion and breaching which occurred along levees adjacent to Reach 2 of the MRGO during Hurricane Katrina would have also occurred if the hypothetical alternative conditions had been in place during Hurricane Katrina.  With breaching of the levees adjacent to Reach 2 of the MRGO being essentially the same for all of the hypothetical alternative conditions as the actual conditions, their contribution to flooding along Reach 2 would be the same as the actual event.  Since both parties' experts agreed that the volume of water from breaching shows that the vast majority of the volume of

57

flooding is due to breaches along Reach 2, even under the hypothetical alternative conditions along Reach 2 alone, the flooding in St. Bernard Parish would have been severe. Mosher 2965: 14 - 2966: 6; JX 212 (Mosher Expert Report) at 106-07: PX 1487 (Fitzgerald, D Expert Report) at 20; Fitzgerald, D: 2744: 10 - 2746: 4; 2796: 15 - 2791: 1.

343.     The levees would have breached even if the MRGO did not exist or was at its idealized dimensions of a 650 foot top width, 500 foot bottom width, and a 36 foot depth.  Dr. Mosher 3110:10-20, 3114:20-23.  In either scenario, the surge would overwhelm the system, as each hypothetical situation shows almost no difference in the hydrograph created by Mr. Ebersole.  Mosher 3113:12-3113:22; JX 212 (Mosher Rep.) at 104-05, Figs. 87-89.  While the waves show more variation between scenarios, the overwhelming surge still would have led to breaching.  Mosher 3112:23-3114:19, JX 212 at 106, Fig. 90.

E.     *Results of interior flood modeling*

344.     Experts for both the Plaintiffs and the United States ran models to determine the maximum water surface elevations (*i.e.,* flooding depths) in the St. Bernard basin, with the marsh conditions that existed in August 2005.  The maximum water surface elevations for both parties were very close.  The United States' results, however, came closer to the actual observed data that was collected after Hurricane Katrina, such as high water marks, eyewitness accounts, photographs, and videos.  Fitzgerald, S. 2735:6-2735:16; 2736:15-2737:8; PX-1487 at 26, Table 6.[9]  The accuracy in the United States' flooding results are attributable to its precision in

---

[9] Steven Fitzgerald is a civil engineer who specializes in hydrology, hydraulics and interior flooding analysis.  He has spent nearly 30 years analyzing and modeling open channel detention basins and overland drainage.  These models are used to predict flood risk.  He participated in the IPET data collection effort for water levels and used that information to model flooding following Hurricane Katrina.  Mr. Fitzgerald has a bachelors degree in civil engineering

replicating the physical conditions that were in place at the time of the storm.  Fitzgerald, S. 2736:2-2736:14.

345.     The levels of flooding (*i.e.,* the maximum water surface elevations) in the St. Bernard basin were virtually identical under the Hurricane Katrina real run scenario and the scenario where MRGO was at as designed dimensions and the 1956 wetlands conditions. Fitzgerald, S. 2752:14-2753:4; PX-1487 at 25, Table 5.

346.     The plaintiffs' hydrology experts did not provide any interior flood modeling for the scenario where MRGO was at its designed dimensions with 1956 wetlands conditions. Fitzgerald, S. 2751:20-23; Bea 1432: 18 - 1433: 10.

347.     Both parties agree that the IHNC breaches did not impact the flooding of the St. Bernard basin.  HEC RAS modeling showed that the maximum water surface elevations without the north and south IHNC breaches (which were adjacent to the Lower Ninth Ward) were practically the same as the Hurricane Katrina real run scenario with those breaches.  Specifically, within the Lower Ninth Ward, the maximum water surface elevations were the same, and the water depths within the rest of the St. Bernard basin were only slightly lower.  Fitzgerald, S. 2750:13-2751:15; PX-1487 at 21, Table 4; see also Plaintiffs' Post Trial Brief at 66, 80.

_____

from stanford and a masters degree from the University of Illinois.

    *1.    Breach geometries:*

348.    For computational purposes in HEC RAS, Mr. Fitzgerald modeled the breaches as a series of weirs (*i.e.,* structure over which water flows) because the post-Hurricane Katrina crest elevations were very irregular.  Specifically, Mr. Fitzgerald divided Reach 2 into 15 weir segments using LIDAR data.  A weir segment is a line along the crest elevation prior to breaching.  Mr. Fitzgerald positioned the breaches in the center of each weir segment.  He aggregated the information both vertically and horizontally.  Fitzgerald, S. 2728:10-22; 2761:11-14; 2762:24-2763:7; 2766:8-11.

349.    There are elevations above and below the bottom elevations; however, for computational purposes the bottom elevations were aggregated.  Fitzgerald, S. 2730:8-19.

350.    When HEC RAS assumes breaching was triggered, no surge overtopping had yet to occur.  Mr. Fitzgerald explained, however, that there are locations along Reaches 1 and 2 where there was overtopping occurring that was lower than these surge elevations.  Hence, there was surge overtopping occurring at these elevation on Reaches 1 and 2.  Fitzgerald, S. 2767: 18-25.

351.    Mr. Fitzgerald calibrated the timing of the breaches (from one hour to one and a half hours) to the maximum water surface elevations.  He did not calibrate them to get the water crossing the 40 arpent levee at 8:30 am.  Fitzgerald, S. 2791:25-2792:3.

    *2.    Stage hydrograph results:*

352.    At the Franz location in the Lower Ninth Ward, the stage hydrograph shows that around 4:30 am, the IHNC north breach occurred and at about 7:00 to 7:30 am the IHNC south breach occurred.  Where the water level started to level off, the water that had come from the

Reach 2 breaches and overtopping had made it to the Lower Ninth Ward (this is water that had come across the central wetlands, over the 40 arpent). This water reached the Lower Ninth at approximately 10:00 to 11:00 am. The water continued to rise because water was still coming into the St. Bernard Basin until about 3:00 pm, when it reached the maximum water surface elevation of approximately 11 feet. Fitzgerald, S. 2738:13-2739:16; PX-1487 at 22, Figure 9b.

353.    The results of Mr. Fitzgerald's stage hydrograph (hence, the timing of the water flow) are confirmed by high quality observational data, notably the data from the Jackson Barracks. The data obtained at Jackson Barracks is particularly reliable because people remained at that location during the storm and photographed the water as it was rising. IPET team members subsequently took measurements at the locations in the photographs so that the actual water levels at a given time were documented. Fitzgerald, S. 2740:17-2740:24.

354.    Plaintiffs' stage hydrograph for this point starts out very similar on the rise, and the maximum water surface elevations are very similar. However, the shape of Plaintiffs' hydrograph curve differs. Plaintiffs' peak occurs about four to five hours earlier than the observed data and the computed data found by the United States' experts. Fitzgerald, S. 2739:18-2740:24; DM-25, 9B; JX-265 (IPET Report, Ch. 4, at 4-197, Figure 136.

355.    At the Smith location (just east of Paris Road, near the Channel 8 tower), Mr. Fitzgerald's stage hydrograph shows that at around 8:00, 8:30 am, the central wetlands is filled up and begins to spill over the 40 arpent, and then rises very rapidly, peaking at around 3:00 pm at roughly 11 feet. This matched very closely to the high quality observed data (Fox security camera video; another video taken by someone who stayed during the storm).

356.    Similarly, Plaintiffs' stage hydrograph starts out the same, at about 8:00 to 8:30

am, and their maximum water surface elevations are very similar (11 feet).  But again plaintiffs'

peak is about four hours earlier than what is known to have occurred.  Fitzgerald, S. 2741:16-

2743:1; PX-1487 at 23, Figure 9d.

357.    Plaintiffs' stage hydrograph peaks were earlier than the observed/known data

because of the shape of Plaintiffs' surge hydrographs.  Fitzgerald, S. 2743: 2-12.  Also, the

duration of the surge hydrograph from outside the levee differs.

358.    The biggest difference between the parties is the surge hydrograph input.  The

duration of Plaintiffs' surge hydrograph is about half of the United States' duration.  Fitzgerald,

S. 2746:5-22.

359.    Mr. Ebersole explained this difference as follows: duration of the time that the

water is outside of the levee in Lake Borgne is higher than inside.  As long as that water level is

higher, the water will flow through the Reach 2 breaches.  The United States' surge duration

above that level is around 12 hours.  Fitzgerald, S. 2743:2-12.

*3.    Water flow out of basin:*

360.    According to the HEC RAS data, water initially started flowing out through the

IHNC breaches some time between 12:30 and 1:30 pm, after the level in the IHNC began to

drop.  Then, water began to flow back out of the Reach 2 breaches around 3:00 pm, after the

peak level was reached inside the St. Bernard basin and the water level was essentially

equalized.  The water started flowing outside of the levees as the storm moved on.  The water

then started flowing back through those breaches (around 3:00 pm).  Fitzgerald, S. 2747:19-

2748:7.

361.    The HEC RAS model shows that shortly after the surge began to fall, the surge

62

droped relatively quicker than the central wetlands drained because there was limited flow out of the central wetlands through these breaches. Hence, there was a water surface differnetial over the next 24 hours after the peak of about 1 to 4 feet was reached. The flow velocity (about 5-6 ft/second) for an earthen structure with no grass cover would easily erode that levee on outflow and deposit material toward the MRGO. Fitzgerald, S. 2748:8-2749:21; JX-211 at 164, Figure A7 (photo south of Bayou Bienvenue about a third of the way toward Bayou Dupree).

F.    *Lateral Displacement*

362.    Flooding would not have occurred without overtopping, and the overtopping would not have occurred without the loss of the Reach 2 levee's protective elevation. Bea 1092:12-1093:3; 1132:2-1133:20; 1579:9-16.

363.    Dr. Bea testified before trial that only 15-20% of the Reach 2 levees were allegedly subjected to a lateral displacement process. JX 116 at 733:22-743:1,;736:23-737:17 (Bea Dep.); Tr. 1304:10-13 (Bea).

364.    But only the sections of the Reach 2 levees repaired with sheetpile were allegedly subject to the squeezing process, and these sections actually only constituted 14% of the Reach 2 levees. Bea 1287:5-1288:10; 1302:22-1306:1; JX 118 at 82:8-83:9 (Bea Dep.).

365.    Sheetpile repaired sections did not fail during the inflow of Hurricane Katrina. Bea 1288:10-19. The sheet piles along Reach 2 of the MR-GO raised the level of protection. Bea 1290:16-18. The Corps of Engineers acted affirmatively in adding sheet pile to increase the level of protection in the "squeezing" areas alleged by Dr. Bea. Bea 1290:21-25.

366.    An interdistributary layer ran underneath the upper Reach 2 levee. DX 1719,

63

Plate 29 (LPV DM-3); Wolff 4029:3-4030:25; Mosher 3043:25-3045:9.  This interdistributary layer was composed of a high plasticity fat clay, which holds a large amount of water.  Fitzgerald D. 338:19-340:1; Mosher 3018:20-3019:6.

367.    Because of its high water content, it takes a significant amount of time for the water to be forced out of the interdistributary layer.  Mosher 3018:20-3019:6 .  This layer is also highly compressible.  Wolff  4029:3-4030:25.[10]

368.    Once loaded with weight, the materials in the interdistributary layer will move – regardless of the presence of a channel.  Fitzgerald, D. 358:12-25; *see also* Fitzgerald, D. 340:17-24 (stating that when weight is applied to the interdistributary materials it responds by flowing); Doc. 19023-2 ¶ 6 (Bea May 15, 2009 Decl.) ("It is well known in the geotechnical engineering community that plastic clays are very strain rate sensitive . . . .").

369.    A different material, point bar, comprised the materials running underneath the lower Reach 2 levee.  DX 1719, Plate 29 (LPV DM-3); Wolff 4029:3-4030:25; Mosher 3043:25-3045:9, DX-1719 (GDM No. 3) at Plate 29.  The point bar materials are sandier and hold less water than the fat clays in the interdistributary layer.  Mosher 3043:25-3045:9.  Therefore, the point bar materials are "many times less compressible" than interdistributary materials.   Wolff 4029:3-4030:25;  Mosher 3043:25-3045:9.

370.    Similar to the upper Reach 2 levee, the Chalmette extension levee was underlain with the compressible fat clays in the interdistributary troft.  Bea 1313:11-1314:14; Wolff

---

[10] Dr. Wolff is a geotechnical engineer and an expert in probabalistics.  Currently the Associate Dean for Undergraduate Studies and Associate Professor of Civil Engineering at Michigan State University, he received his Ph.D. from Purdue University.  His specialties are reliability analysis in civil enginering, levee and hydraulic structures, seepage and dewatering foundations, and computer-aided design and numerical methods in geotechnical engineering.

4032:14-4033:15; JX 283, Plate Nos. 1 & 7 (DM No. 3, Supp. 1).  As expected, the Chalmette

extension levee also encountered significant elevation losses.  JX 191 at 18, Fig. 1 (Morris

Report).

371.    The elevation deficiencies seen in the upper Reach 2 levee are similar to the

elevation deficiencies seen in the Chalmette extension levee.  JX 191 at 18, Fig. 1 (Morris

Report); *accord Morris* 168:17-170:15; Bea 1313:11-1314:9; Wolff 4031:25-4032:13.

372.    The Chalmette extension levee lost elevation because of the "consolidation of the

underlying interdistributary clays and marsh materials."  Bea 1313:11-1314:14; *accord*

Fitzgerald, D. 358:12-25 ("When you load the area, I was mentioning earlier, as we load this

area with dredge spoil, we produce a weight or force on that sediment.  And if the MRGO were

not there, if this was just lateral area, it would tend to bulge in all different directions.").

373.    "[W]here the [levee] is low coincides with the region where the thickness of the

interdistributary bay deposits are the thickest. . . . [W]here the levee rather is highest also

coincides with a region where the interdistributary bay deposits are thickest."  Fitzgerald, D.

368:1-369:9; *accord* PX 2120; Fitzgerald, D. 398:19-399:9.

374.    Because of the soft soils present in the area, the Corps knew and understood that

settlement and lateral displacement would be an issue when designing the Reach 2 levees.  Wolff

3983:20-3985:10; Bea 1129:14-1130:21, 1146:5-1149:6; Fitzgerald, D. 350:14-351:11;  *see also*

PX 59 at 10, Plate 5 (1958 Geotechnical Investigation).

375.    In the 1960's, the Corps was aware that building levees on soft Louisiana soils

would be problematic.  Wolff 3983:18-3984:3.  The Corps conducted testing along the

Atchafalya Basin, adjacent to the Gulf Intracoastal Waterway, to understand how to construct

levees properly adjacent to a waterway under soft soils conditions.  Wolff 3987:7-8, 3992:4-17,

Mosher 3022:21-3023:6.  To do so, the Corps constructed three test sites and examined their

respective factors of safety.  *See* Wolff 4001:9-4003:13; Mosher 3022:21-3023:6.

376.    The results of this testing were published, and the authors who worked on this

testing were employed by the Corps.  Wolff 3984:23-3987:6; DX 003 (Kaufman and Weaver

Article).  These same authors reviewed the levee design for the Reach 2 levee.  *Id.*

377.    Dr. Kaufman, author of the study on stability of the Atchafalaya levees, was the

Chief of the Geology, Soils and Materials Branch of the Department of the Army when his study

was published.  Bea 1300:5-9.  Dr. Kaufman was one of the leaders in his field at the time this

study was published.  Bea 1300:5-11.  Dr. Kaufman's study on the stability of levees on soft soils

when adjacent to a waterway, in this case, the GIWW, has stood the test of time in that it is still

cited today for the building of levees in these conditions.  Bea 1300:12-17; Bea 1301:4-11.  In

the 1950s and 1960s, the Corps of Engineers' researchers at the Vicksburg Waterways

Experiment Station [now the Engineer Research and Development Center], were considered

among the best, brightest, and ablest people in their field.  Bea 1146:10-14.  In 1967, the Corps

of Engineers had more than 25 years of experience in analyzing the geology of Southeastern

Louisiana and were considered world leaders in their field.  Bea 1300:25-1301:3.

378.    A factor of safety compares two forces, the driving force and the resisting force.

Mosher 2989:2-2990:6; *see also* Wolff 4001:9-4003:13, Wolff 4023:8-15.  The driving force

wants to push the material outwards, while the resisting force wants to hold back the driving

forces.  Mosher 2989:2-2990:6; Wolff 4001:9-4005:1.  When the forces are equivalent, the factor

of safety is 1.0.  *Id.*  When the resisting force is stronger than the driving force, the factor of

safety will be in excess of 1.0; for example, a resisting force which is 30% stronger than a driving force has a factor of safety of 1.3.  *Id.*

379.    The type of soil is inconsequential when comparing the Atchafalya Basin testing to the Reach 2 levees, as the key for the slope stability analysis is the weight of the materials and the materials' shear strength.  Wolff 4005:18-23.

380.    At test section 1 at the Atchafalya Basin, there was no stability berm and the factor of safety was 1.11.  Mosher 3025:21-3026:7; Wolff 4001:9-4003:13.  At test section 2, there was a small stability berm but a zone of weak soil, so that the factor of safety was 1.07.  *Id.* At test section 3, a larger stability berm was constructed and the factor of safety was 1.26.  *Id.* At Atchafalaya the levee berms extended all the way to the waterway.  Wolff 4000:15-17. Both test sections 1 and 2, with low factors of safety moved laterally to the extent that cracks developed.  Mosher 3023: 7-3024:25, Wolff 4005:24-4006:12.  In contrast, test section 3, with a higher factor of safety, was stable and did not develop any cracks.  *Id.*

381.    Based on the Atchafalya Basin testing, the Corps elected to build the Reach 2 levees with stability berms, thereby ensuring a factor of safety in excess of 1.3.  Bea 1300:14-17 ; Wolff 3997:2-3998:4, 4020:8-4021:21; Mosher 2990:7-2991:3, 3029:22-24; DX 1719, Plate Nos. 41 & 42 (LPV DM No. 3).

382.    The soils in the Atchafalaya test are "generally similar [to MRGO levee foundation soils] in the fact that near the surface is a layer of peat and soft organic materials. In the middle of the profile from about elevation minus 30 to minus 80 is a thick layer of soft to medium clays, and then below minus 80 is a layer of somewhat stronger clays called medium clays.  Along many areas of reach 2 of the MRGO you also see peats, marsh or other organic

67

clays near the top, and then you see fairly thick layers of soft or very soft clays." Wolff 3999:4-13.

383.    The approach to levee building developed in the Atchafalaya test was appropriate for the foundation soil existing along the levees from Bayou Bienvenue to Bayou Dupre. Wolff 4000:18-21. The construction of a berm for the Reach 2 levees was directly in accordance with the studies of Dr. Kaufman regarding the stability of the Atchafalaya levees. Bea 1293:11-16.

384.    The analyses conducted by the Corps along Reach 2 checked the stability of the levee to an elevation 40 feet below the surface. Wolff 4020:8-4021:21; DX 1719, Plate Nos. 41 & 42 (LPV DM No. 3). These analyses also determined that the most likely location where the levee would fail would be 100 feet from the levee center line. Tr. 4021:23-4022:12, DX 1719, Plate No. 42 (LPV DM No. 3).

385.    To prevent against this failure, the levee designers ensured the factor of safety was in excess of 1.3 at this location as well. *Id.* In addition, the widening of the MRGO channel at the surface would not affect the factors of safety used in the Reach 2 levee design, and the banks of the MRGO did not encroach upon the Reach 2 stability berms. Mosher 3029:25-3030:4, 3032:6-21.

386.    After construction the factors of safety would increase during the life-span of a levee. Wolff 4006:13-25, 4009:10-18, Mosher 3026:20-3027:2; *see also* Bea 1295:20-1296:12 (explaining shear strength of soils stiffen with lifts). When the Corps conducted an analysis of the Upper Reach 2 levee in 2001, the factor of safety had increased to 1.74. Wolff 4034:13-4036:18; DX 562, Plate No. G21 (2001 Geotechnical Investigation Plan). Inconsistently, Dr.

Bea later said he reduced the shear strengths for the levees to obtain his lower factors of safety because the soil becomes weaker when dealing with a greater load. Tr. 1537:21-1538:5.

387.    Dr. Bea reduced the factors of safety for the Reach 2 levee to 1.16 and 0.9 – well below those found in the original Reach 2 design memoranda to obtain his flawed results. Mosher 3027:3-11; Wolff 4009:22-4015:19; DX 451 at 164, 174, 176 (Bea July 11, 2009 Decl. No. 1). To do so, he reduced the shear strengths of the soil by 40% and 30% to obtain his final factors of safety. Bea 1537:7-1538:16; *accord* Wolff 4012:24-4014:14; PX 72 at 177, Fig. 161 (Bea July 11, 2008 Decl. No. 1) (noting coefficients of 0.6 and 0.7 to compute Dr. Bea's calculations). Shear strength is the peak strength of a soil when one force exerts pressure on soil in one direction while another force exerts pressure on the soil in another direction. Mosher 3028:17-3029:1.

388.    To reduce the factors of safety, Dr. Bea improperly used a figure to reduce the strength of the soil. PX 72 at 175 (Bea July 11, 2008 Decl. No. 1); Wolff 4012:10-23, Mosher 3027:16-3029:21.

389.    Dr. Bea used this graphic as a *reduction* in the shear strength of the soil when computing his factors of safety. Mosher 3027:16-3029:21, Wolff 4012:10-4012:23. However, this figure represents the *actual* shear strength of the soil. *Id.* As the weight of the soil increases, the shear strength of the soil increases as well. Mosher 3027:16-3029:21; *see also* Wolff 4012:10-4012:23 ("It tells you how great the soil strength is as a fraction of the overlying stress of the soil."). If Dr. Bea would have used this figure properly, he would have found factors of safety in excess of 1.3. Mosher 3029:13-21.

69

390.    In addressing lateral displacement, Dr. Bea relied on the factor of safety relevant to Atchafalaya test site 2, not the 1.3 factor actually applied for the MRGO levees.  Wolff 4009:22-4011:3; DX-0451 (Bea July 2008 Report, Declaration No. 1) at 164, fig. 147.

391.    Atchafalaya test section 2 had a "factor of safety that the Corps did not use for further construction.  So it's not a test section that's relevant to Corps design."  Wolff 4010: 18-4011:3.

392.    At test site 2, actual movement was 2 feet, Dr. Bea uses the computed number of 3 feet rather than actual movement that had occurred.  Wolff 4011:4-18.

393.    Dr. Bea also states that according to theAtchafalaya tests movement of soils occurred 300 feet from the levee, but the farthest test equipment from the levee was 185 feet. Wolff 4011:21-25.

394.    Dr. Bea's computed factors of safety of approximately 1.16 and 0.9 are similar to the ones found at test section 2 for the Atchafalya Basin testing, where cracking was visible. Wolff 4009:22-4015:19.  However, along the Reach 2 levee, no cracking was visible.  Mosher 3021:9-3022:14; *see also* Wolff 4012:10-4014:14 (testifying that cracking would be visible if low factors of safety were used); Bea 1323:15-1324:9 (explaining that no tilting or other deformities were seen on the levee which could be attributable to lateral deformation).

395.    Dr.  Bea does not document properly his slope stability analysis. Wolff 4014:6-14.

396.    Dr. Bea's opinions that MRGO channel banks encroached on critical areas adjacent to the levees and that lateral squeezing led to decreases in levee crown elevations are not supported by evidence.  Wolff 4010:22-4015:19.

70

397.    Building levees in lifts, over the course of many years, ensures that settlement can be observed and corrected with the most recent information.  Wolff 4016:20-4018:25, 4023:16-4024:4; *see also* Bea 1295:20-1296:12 (explaining that raising levees in lifts is good practice in the geotechnical community because it increases the shear strength of soils that support the load).

398.    When initially constructing the Reach 2 levee, the Corps anticipated that a rapid, large amount of settlement would occur quickly after a lift.  Wolff 4024:17-4027:2; Tr. 3013:18-3014:12; DX 1719 at 25-27 (LPV DM-3); *see also* Bea 1293:11-1294:15 (stating that consolidation of levee after initial construction was expected to occur).  Thereafter, the levees would then slowly settle.  Wolff 4026:9-4027:2, DX 1719 at Plate 69 (LPV DM-3).  The Corps' design anticipated that a large amount of settlement would occur, even after all of the lifts.  Mosher 3030:24-3031:23.  All told, the settlement could take over 50 years because the high plasticity clays with a large percentage of water would take a long time to consolidate.  Wolff 4026:9-4027:2; DX 1719 at Plate 69 (LPV DM-3); Mosher 3017:11-3019:6.

399.    Before constructing a new lift, the Corps then conducted soil borings.  *See* Mosher 3000:15-3001:6.  These borings demonstrated that the soils underlying the levee were stiffening, thereby significantly reducing the amount of future settlement which would occur underneath a lift.  Wolff 4027:5-4028:7, 4034:13-4036:18; DX 1719 at 20, ¶ 38 (LPV DM-3); DX 562, Plate No. G21 (2001 Geotechnical Investigation Plan).

400.    Based on these borings, the Corps prepared a plan in 2001 to construct another lift of the Reach 2 levees between Bayou Bienvenue and Bayou Dupre.  DX 562 (2001 Geotechnical Investigation Plan).  This plan assumed completeerosion of the foreshore while also analyzing

the slope stability to a depth of 53 feet below the surface.  *Id.*  The lowest factor of safety

increased to 1.74, as the soil gained strength over the course of time. *Id; accord* Wolff 4034:13-

4036:18.

401.     Another portion of the 2001 plan checked the soil stability toward the

landward side of the levee, assuming removal of the borrow area 215 feet away from the levee.

Tr. 4040:3-4041:11, DX 562, Plate G24.  The minimum factor of safety for the landward side

was now 1.47 at an elevation 30 feet below the ground.  *Id.*

402.     Unfortunately, the Corps could not conduct this lift because Congress failed to

appropriate the necessary funding.  Naomi 3480:15-3483:18; Mosher 2982:22-2984:1; Bea

1302:5-21.

403.     Dr. Bea's analysis reflects that lateral displacement caused by the MRGO *stopped*

after 1980 (assuming that lateral deformation was even caused by the MRGO).  Tr. 1416:20-

1417:9; PX 2118 at 39 (Bea April 3, 2009 Decl.).  Soils *strengthen* over time when levee lifts are

conducted: "[t]here [sic] are slowly increasing the load and the purpose of that is to increase the

shear strength of the soils that have to support that load.  Essentially is [sic] they're attempting to

stiffen up the bed before you sit on it."  Bea 1295:20-1296:12; *accord*  Wolff 4009:10-18,

Mosher 3026:20-3027:2.

404.     Lateral displacement allegedly occurred prior to 1980 because while the soils

were weaker, the heavier, initial lifts of the Reach 2 levee exacerbated the lateral displacement.

Bea 1417:23-1418:4.  Later, as the soils stiffened, the levees were able to withstand the smaller,

later lifts of the Reach 2 levee.  Now, settlement occurred within the lifts.  Bea 1418:5-12

(emphasis added).

405.    The MRGO surface was continually widening.  *E.g.*, Fitzgerald, D. 322:12-323:23,  PX 96.29 (graphic comparing width of MRGO throughout time to pre-Katrina shoreline).

406.    Dr. Bea then testified that "[a]s the channel widens, the travel path through this lateral squeezing material is being shortened.  So it can escape faster and with more intensity." Bea 1120:9-13; *accord*  Bea 1428:3-23.

407.    If the MRGO widened over 300 feet between 1980 and 1990, then Dr. Bea's theory of encroachment-induced lateral displacement would lead one to expect more subsidence – particularly at a time when the MRGO was already wider than its original footprint. Fitzgerald, D. 323:9-17.

408.    Throughout the history of the Reach 2 levee, the Corps was regularly lifting the levees to ensure they would be at the design height.  PX 72 at 35 (Bea Decl. No. 1, July 11, 2008); *see also* PX 2118 at 20, 21 (Bea Apr. 3, 2009 Decl.).

409.    Inasmuch as subsidence occurred after 1980 (contrary to Dr. Bea's analysis purporting to show that settlement was not occurring after 1980), the Corps had planned and requested funding for an additional levee lift.  But that lift did not happen, because Congress failed to provide funds.  Naomi 3480:15-3483:18; Mosher 2982:22-2984:1; Bea 1302:5-21.

410.    This post-1980 subsidence, however, cannot be attributed to the MRGO, because the lateral displacement alleged by Dr. Bea stopped, he admitted, by 1980.  If there had been lateral subsidence purportedly attributable to the MRGO after 1992, when the levee crest was at the 17.5-foot target elevation, it would have been *de minimis* – a mere 4.5 inches (25% of total subsidence) over a 13 year period.  Bea 1297:4-20.

411.    Even using the final lift height of approximately 20 feet, (and assuming 25%

attributable to lateral displacement) subsidence attributable to the MRGO would only be

approximately one foot over the course of almost 20 years – less than one-half inch per year.  PX

72 at 35 (Bea July 11, 2008 Decl. No. 1).

412.    By raising the levee after 1980, the Corps corrected any pre-1980 induced

settlement.

413.    Dr. Bea corrects the purported lateral displacement in his Scenario 2c analysis by

changing the levees to their design height of 17.5 feet.  PX 2153; Bea 1315:25-1316:11.

414.    At other times, Dr. Bea stated the levee would have been in excess of the target

design height but for the purported squeezing caused by the MRGO.  *See* Bea 1569:13-17.

415.    Settlement not induced by the MRGO would have caused significant cumulative

settlement occurring over the life of a levee.  *See* Bea 1093:1-4.  For example, Dr. Bea testified

that at one levee section, the total settlement which occurred was 20 feet.  Bea 1315:6-14.  A

levee subsiding at this rate, even eliminating settlement that Dr. Bea attributes to the MRGO,

would have needed multiple levee lifts throughout its lifetime to ensure the levee was at its target

design elevation.  *See also*  Wolff 4026:9-4027:2; DX 1719 at Plate 69 (LPV DM-3); Mosher

3017:11-3019:6 (indicating that settlement would occur for approximately 50 years).

416.    Dr. Wolff defined for the Court the term cumulative settlement: "Imagine, sir, that

I raise the levee five feet and it settled two, and then I repeated that and raised it five and it

settled two.  And if I did that three times, the cumulative settlement would be six feet because it

has settled two feet three times, but the actual settlement of interest at the time there would only

be two feet because I would only be two feet above the most recent raise."  Wolff 3995:24-3996:13.

417.    Plaintiffs also neglect to consider datums, which are the reference points for any analysis involving levee heights.  DeLoach 3918:24-3919:20.  When constructing the Reach 2 levees, the Corps relied upon the Mean Sea Level datum, which was equivalent to the National Geodetic Vertical Datum of 1929 ("NGVD29").  Tr. 3919:21-3920:10; DX 299, EDP-017-095 (LPV DM-3); JX-284 at 1 (LPV DM No. 1 Part C); JX 286 at B (LPV DM No. 3 Supp. 1).  Instead of using this datum to measure the levees, Chad Morris and Professor Vrijling used NAVD88 (2004.65) for their data outputs.  *E.g.*, JX 191 at 4 (Morris Expert Report) ("Elevations are in feet and refer to the North American Vertical Datum of 1988 (NAVD88-2004.65."); JX 197 at 92-98 (Dutch Surge Report) (detailing surge hydrographs).

418.    Dr. Bea's expert report relies upon a graph depicting levee heights based in NGVD29.  Tr. 1114:20-1118:15; PX 72 at p. 35 (Bea Decl. No. 1, July 11, 2008).

419.    A 17.5 foot levee measured in NGVD29 is essentially equivalent to a 16.5 foot levee measured in NAVD88 (2004.65).  DeLoach 3891:10-3897:11, 3920:18-3921:8, 3922:14-3923:11; *see also* DM-0040 (DeLoach drawing).

*1.  The Reach 2 Levee Design*

420.    The design parameters for the levees along Reach 2 were for a 13 foot surge.  Bea 1272:9-11.

421.    The levees were competently built for the conditions they were designed to withstand.  Bea 1272:25-1273:2.

422.    The levees along Reach 2 did not fail within their design conditions.  Bea 1273:3-5, 1292:7-10.

75

423.    The three largest previous hurricane surge levels prior to Hurricane Katrina had a maximum elevation of 10 feet.  Bea 1292:14-1293:1.

424.    The construction of levees through a series of lifts was good practice in the geotechnical community.  Bea 1296:1-12.  The construction of levees through lifts allowed for a slow increase in the shear strength of the soils that supported the levee load.  Bea 1296:6-12. The materials used to construct the levees settled as expected.  Bea 1296:13-14.

425.    In an endorsement to the 1966 GDM 3 for the Chalmette Area Plan, Kaufman and Weaver's office concluded, "'it is likely that the first lift can be constructed without difficulty. After this construction, the levee should be divided into reaches, the added studies made for each reach, and the resulting recommended first shaping or next lift or subsequent lifts or shapings for each reach should be submitted to LMVD for approval.'"  Wolff 4016:10-4017:7.

426.    The Corps, thus, elected to use "the observational method in planning this lift construction. Rather than to even design the subsequent lifts, they're going to --they've designed the first lift and when they talk about additional studies submitted to LMVD for approval, the record will show that at a number [of] increments in time over the years that they've gone back out to the levee that's partially constructed, taken borings, did soil testing, did new stability analysis to evaluate the gain and strength due to consolidation in order to ensure that the next lift would be stable, and there are multiple examples of that.  That is termed the observational method because you observe the -- what is actually happening and compare it to your calculations.  Wolff 4017:8-21; DX-1719 (GDM No. 3) at 2, Indorsements.

427.    Under the observational method, "when it was time to place the next lift you would go out and do a survey, you would find the actual amount of settlement, and you would

take new borings, they did take new borings and do new tests, they can determine the soil strength and determine what the compressibility is now and then you would --they were always designing the next lift on the most recent information." Wolff 4023:16-4024:4.

428.    Because of Weaver's and Kaufman's role in both the Atchafalya testing and the MRGO levee design, the observational method was used to construct both levees. Wolff 4017:22-25; DX 1719 (GDM No. 3 – Indorsements) at 2.

429.    Corps personnel raised "issues about channel erosion in the upper part of the MRGO, at very shallow depths, and the designer's response is that they will perform stability analyses assuming that the channel is completely eroded away to minus three." Wolff 4018:24-4019:3. Weaver and Kaufman "check[ed] the final levee location for stability assuming erosion of the entire foreshore to elevation minus three. (the bottom of the foreshore protection)." Wolff 4018:12-17; DX 1719 (GDM No. 3 – 6th Endorsement) at 18. Critically, the Corps evaluated the Reach 2 levee design against failure into the MRGO, assuming the MRGO widened to the maximum width. Future designs will also deal with these considerations. Wolff 4018:18-23; DX-1719 (GDM No. 3 – 6th Endorsement) at 18.

430.    In DM-3, there "are documented slope-stability analyses similar to those that we looked at in the Atchafalaya document" for Reach 2, Bayou Bienvenue to Bayou Dupree. Wolff 4020:8-23; DX-1719 (GDM No. 3 – 6th Endorsement) at Plates 41, 42.

431.    The designers assumed a variety of failure surfaces with an active zone, a central block and a passive zone. They analyzed stability sliding both toward the MRGO, which is to the left, and the landside area, which is to the right, and checked those at a variety of elevations on both of these things." Wolff 4020:24-4021:3.

432.    These plates "show that there is a water level shown, there is a foreshore shown, but apparently, the channel of the MRGO is out some distance well beyond the influence of these critical sliding surfaces."  Wolff 4021:4-8; DX-1719 (GDM No. 3 – 6th Endorsement) at Plates 41, 42.

433.    The analysis of stability is "down to about minus 40 feet elevation."  Wolff 4021:11-13; DX-1719 (GDM No. 3 – 6th Endorsement) at Plates 41, 42.

434.    "The minimum factor of safety for that first reach [Bienvenue to Villere] appears to be 1.49, almost 1.5.  The minimum factor of safety for the second reach also appears to be 1.49. So these are significantly in excess of 1.3, and they show that the critical zone of influence just goes beyond the berm toe a bit."  Wolff 4021:14-21; DX-1719 (GDM No. 3 – 6th Endorsement) at Plate 41.

435.    "Plate 42 [analyzes] pipeline canal to Bayou Dupre, [and] actually show[s] static water level of 12 and a half feet or maybe that's surge water level.  And again, they found the zone of influence of the most critical locations to -- at this case, that looks to be 100 feet from the levee center line.  And actually, if we looked at -- well, let's go down to the table, and we would see the minimum factor of safety there as 1.41, and that's on failure surface b3."  Wolff 4021:24-4022:6; DX-1719 (GDM No. 3 – 6th Endorsement) at Plate 42.

436.    Regarding settlement expectations, Corps engineers "had divided the foundation into four strata and for each strata they have calculated what percent of the total settlement will have occurred at a particular point in time when they would be ready to do the next lift.  So that varies from 95 percent down to 28 percent.  If you add up the calculated settlements here . . . , I believe you get about seven feet total settlement at a particular point in time when they would

expect to place the next lift [for a fill height of 12 feet]." Wolff 4026:8; DX-1719 (GDM No. 3)
at 27.

437.    The Corps created "time rate of settlement calculations for stratum 1, 2, 3 and 4.
And they made a table where they've assumed 10 to 95 percent consolidation.  So, for example,
at 50 percent consolidation it means half of the settlement has occurred.  And if we looked at
stratum 3, for example, let me just take a minute to check it myself.  If we took 12 foot of fill,
this says "t" is time in months. 12 foot of fill, half of the total settlement would take I believe
152 months it looks like, I guess that number right there, which is over ten years.  And for 90
percent of the total settlement to occur would take looks like 661 months, that's like 50 years.  So
the settlement occurs at slower and slower rates and slower and slower amounts.  But you get
about 20 percent of it up here in 24 months or 2 years, you take something like ten years to get
half of it, and you take a lifetime to get all of it."  Wolff 4026:9-4027:2; DX-1719 (GDM No. 3)
at Plate 69.

438.    "The text that goes with the slope stability analysis drawings, . . . about the
                middle
of the page . . . says: 'it should be noted in levee construction from station seven plus 52.9 to 807
is over an area where the spoil from the dredging of the MRGO has been placed over five to
seven year period to an elevation from 5 to 12.  There's been considerable consolidation of the
underlying strata as evidenced by the general borings which . . . indicate that the original ground
has been depressed some 5 to 10 feet by the surcharge of the spoil.'" Wolff 4027:6-17; DX-1719
(GDM No. 3) at 20, ¶ 38;

439.     The Corps "took 30 borings and they did a statistical analysis of borings and testing that were under the spoil and not under the spoil, and they find that under the spoil the strength is 15 percent higher in areas with overburden, that would be the spoil, as compared to areas without overburden and the top 30 feet of the strata the strength increase was approximately 25 percent.  So the designers doing their stability analysis here are saying, ah, we see a good thing, although we have to do stage construction for stability analysis, this previous spoil has [al]ready helped us though." Wolff 4027:18-4028:3.

440.     "The design and construction of levees pursuant to the LPVHPP followed established USACE guidance and are consistent with engineering standards existing at the time these levees were designed and constructed".   JX-0210 (Wolff Report) at 11.

441.     "On October 27, 1965, Public Law 89-298 authorized the LPVHPP, which included the levees and floodwalls providing hurricane protection in St. Bernard Parish, New Orleans East, and the Lower Ninth Ward. The authorization provided for construction of a hurricane protection system substantially in accordance with the letter of the Secretary of the Army dated July 6, 1965." JX-0210 (Wolff Report) at 12.

442.     "On page 46 [of the authorization of the LPVHPP], the central pressure index is provided for the standard project (design) hurricane (SPH) at 27.6 inches of mercury (935 millibars), with maximum sustained winds of 100 mph at a 30 mile radius from hurricane center." JX-0210 (Wolff Report) at 12.

443.     It is well-documented that Katrina significantly exceeded the design hurricane. JX-0210 (Wolff Report) at 12.

444. "Page 65 (and also Plate 3) shows that the levee height in the MRGO area would be 16.0 ft east of Paris Rd. The Corps later changed this height to 17.5 ft." JX-0210 (Wolff Report) at 13.

445. "The same page notes that expected foundation settlement would require construction in one to six lifts, with an approximate period of two years between lifts to allow for settlement and consolidation of materials." JX-0210 (Wolff Report) at 13.

446. "The 1966 General Design Memorandum (GDM) No. 3, Lake Pontchartrain and Vicinity, Chalmette Area Plan provided the overall design of the flood protection works for St. Bernard Parish. Similar General Design Memoranda were developed for the Citrus Back and New Orleans East Back Levees protecting the southern frontage of New Orleans East." JX-0210 (Wolff Report) at 13.

447. "There was relatively little guidance available with respect to levee and floodwall design in 1966 at the time GDM No. 3 was prepared because the application of geotechnical engineering to levee design was still in its early development at that time." JX-0210 (Wolff Report) at 13.

448. The 1947 Code for Utilization of Soils Data for Levees provide the following significant points relevant to the LPV levee builders:

- "1.3 was a "target" factor of safety for slope stability...

- The Corps constructed levees of "uncompacted" materials, but attempted to achieve some degree of compaction of soils of natural (often high) water contents.

- The use of hydraulic fills was an established method used for levee construction.

- Levees could include up to two-thirds sands. Pure sand levees needed waterside protection only.

- Underseepage concerns were focused on foundations where thin, semipervious top blankets overlaid thick pervious substratum soils [which was not the foundation conditions for the LPV levees.]

- Construction in stages over weak, compressible soils was a well-established practice." JX-0210 (Wolff Report) at 13, 15.

449.    "GDM No. 3 documents the design of the levees along Reach 2 of the MRGO and is in accordance with available Corps guidelines and acceptable engineering practices regarding geotechnical considerations."  JX-0210 (Wolff Report) at 16.

450.    "The numerous letters of 'indorsement' (Army spelling) bound in the front of GDM No. 3 illustrates how the design of Corps projects in the relevant timeframe involved a series of multiple reviews."  JX-0210 (Wolff Report) at 16.

451.    "The result of the comments and replies in these indorsements is that the ultimate design represented a convergence of experience-based opinion and judgment from multiple engineers at multiple levels within the Corps and with coordination and input from local entities. These engineers agreed upon a safe and economical design based on available guidelines and general knowledge in the civil engineering community. The indorsements reflect the deliberations and judgments related to addressing the specific characteristics, challenges and practicalities of designing the specific project in the available area. This includes the hydrodynamic loading conditions that the project was designed to withstand."  JX-0210 (Wolff Report) at 16.

452.    "[T]he Division review provided for consistency across the Districts in the Mississippi River Valley in addressing site specific issues, while the Headquarters review often focused more on policy and project planning details. In most cases, reviewing engineers in the division office had significant experience in a district office prior to employment at the Division level."  JX-0210 (Wolff Report) at 16.

453.    "Regarding the 'short duration of hurricane floods,' the designers had experience with satisfactory performance of river levees on similar soil conditions, where water levels would be at flood stage for weeks or more. Thus, for the expected conditions of the LPVHPP, the soil conditions should have been adequate to resist short duration loadings expected from the design hurricane."  JX-0210 (Wolff Report) at 17.

454.    "[F]oundation conditions of a thin semipervious top stratum overlying a thick, pervious substratum - the Corps' soil profile of common concern for potential underseepage... are not the conditions along the MRGO.  JX-0210 (Wolff Report) at 17.

455.    "Post Katrina investigations and inspections do not provide any evidence that seepage or uplift occurred on any levee relevant in *Robinson*, including, but not limited to those levees that breached along the MRGO and the IHNC."  JX-0210 (Wolff Report) at 18.

456.    "Paragraph 36 of GDM No. 3 states: '[d]ue to the short duration of hurricane floods and the generally erosion resistant nature of the soil along this project, no erosion protection is considered necessary along the leveed portion of the project.'"  JX-0210 (Wolff Report) at 18 (citing DX-1719 (GDM No. 3) at ¶ 36).

457.    "No quantitative means of predicting erosion over time under wave forces were available in 1966. Indeed, no practical, reliable, widely-accepted means of such analysis and prediction is available even today." JX-0210 (Wolff Report) at 18.

458.    "Paragraph 38 of GDM No. 3 provides a detailed description of the stability analyses performed to design the phased construction sequence of the MRGO levees and their final configuration." JX-0210 (Wolff Report) at 18.

459.    "Notable details from GDM No. 3 include the following:

- Over a five to seven year period before levee construction, spoil from MRGO excavations had been placed to elevations varying from +5 to +12 ft. The spoil area was 2,000 to 4,000 ft. wide, paralleling the MRGO. Soil borings indicated that the weight of the spoil had depressed the original surface 5 to 10 ft. The levee designers properly concluded that significant foundation consolidation and strength gain had occurred.

- 'Lifts' involved bringing new materials to the site after earlier-placed materials had settled. 'Shapings' involved reworking previously placed material into a different (steeper) cross-sectional shape.

- Each lift or shaping was intended to be stable to a factor of safety of at least 1.3.

- A detailed analysis of consolidation and strength gain over time was performed for each lift or shaping and predicted strength values were obtained for slope stability analyses before placing the next lift or reshaping." JX-0210 (Wolff Report) at 18.

460.    "The designers had full knowledge of the difficulties of building on and with soft, compressible soils, and made detailed design analyses to develop a phased construction sequence that would be stable over the extended construction period." JX-0210 (Wolff Report) at 18-19.

84

461.    "[T]he levees were designed according to the best practices at the time and the breaches did not result from instability attributable to a negligent design."  JX-0210 (Wolff Report) at 19.

462.    "GDM No. 3, plates 23 through 25, show design sections for the levee along the MRGO. In general, the design called for the levees to have a 10 ft. wide crown (top of levee) at elevation 17.5 ft., with 1V on 5H side slopes down to elevation 9 ft., where a 1V on 30H stability berm is provided. Plate 23 shows that fill material will be obtained from selected areas of the MRGO channel."  JX-0210 (Wolff Report) at 20.

463.    "The Corps was familiar with the challenges of building on soft foundations with soft soils, and designed the MRGO levees with a well-established construction plan that required phased placements and reshapings over an extended period of time."  JX-0210 (Wolff Report) at 21.

464.    "[The] March 1967, First Lift, [at] Sta. 594+00 to 770+00... was between Bayous Bienvenue and Dupre. Included in the construction plans and specifications were soil boring logs for the area of the proposed work. These logs generally show the foundation materials to be thick deposits of soft to very soft fat clays (CH) with some organic clays (OH), silts (ML) and peat (Pt). The first lift construction involved building retaining dikes about 400 ft apart, and pumping hydraulic fill between them to elevations of +13 to +16.5 ft. with 1V on 30H slopes from the center to the retaining dikes." JX-0210 (Wolff Report) at 21.

465.    "[The] January 1968, First Lift, [at] Sta. 387+40 to Sta. 523+00... occurred southeast of Bayou Bienvenue. The relevant construction plans include logs of soil borings taken along the levee alignment in 1966. Similar to the reach above, the logs generally show the

85

foundation materials to be thick deposits of soft to very soft fat clays (CH) with some organic

clays (OH), silts (ML) and peat (Pt). Also similar to the above, the first lift construction involved

building retaining dikes about 400 ft apart, and pumping hydraulic fill between them. In this

reach, the top elevations of the first lift were to be elevation +12 ft. with 1V on 30H slopes from

the center to the retaining dikes."  JX-0210 (Wolff Report) at 21.

466.    "Borrow material [for the January 1968 lift] from the MRGO channel was shown

to be available from elevation -39 to -60 ft. This contract also involved providing a closure at

Bayou Villere which included shell fill flanked by hydraulic fill on either side. Subsequent fills

and reshaping would put the shell fill in a 'core' location not accessible by floodwaters."  JX-

0210 (Wolff Report) at 21.

467.    "[The] April 1970, First Lift, [at] Sta. 770+00 to Sta. 995+00... occurred southeast

of Bayou Dupre. The construction plans include logs of soil borings taken along the levee

alignment in 1967. The logs show the foundation materials to be primarily soft to stiff fat clays

(CH) with some silt strata, and in some cases, underlying silts (ML).  Similar to other reaches,

the first lift construction involved building retaining dikes (in this area, only about 265 ft. apart)

and pumping hydraulic fill between them. The top elevations of the first lift were to vary from

elevation +13 to +17 ft., with 1V on 30H slopes from the center to the retaining dikes.  Borrow

material from the MRGO channel was shown to be available from elevation -40 to -60 ft. These

drawings also include logs for soil borings taken in 1956 for the location that became the MRGO

channel. From elevation -40 to -55 ft., the soils were predominately soft fat clays (CH) with

some silt strata."  JX-0210 (Wolff Report) at 21.

468.    "The MRGO borrow area soil boring logs support that the levee materials were primarily fat clays (CH) of greater erosion resistance than sands and silts, and of lower permeability." JX-0210 (Wolff Report) at 22.

469.    "[The] April 1972, Second Lift, Sta. 370+00 to Sta. 682+00... construction project ran generally from Bayou Bienvenue to Bayou Dupre. The drawings include the 1966 soil borings used in the construction of the first lift in this area, plus additional soil borings taken in 1971. No significant differences are noted in the newer borings. The 1971 soil boring logs again show the foundation materials to be thick deposits of soft to very soft fat clays (CH) with some organic clays (OH), silts (ML) and peat (Pt). The construction involved raising the levee section using hydraulic fill from about elevation 10 ft. to elevation 18 ft. The borrow material from the MRGO channel came from as deep as elevation -70 ft." JX-0210 (Wolff Report) at 22.

470.    "[The] March 1978, Engineering Manual, EM 1110-2-1913, Design and Construction of Levees... provides basic principles and guidance for design and construction of levees... The transmittal letter to the district offices provides two important statements about its purpose and use:

- Purpose. The purpose of this manual is to present basic principles used in the design and construction of levees.

- General. This manual is intended as a guide for designing and constructing levees and not intended to replace the judgment of the design engineer on a particular project."

    JX-0210 (Wolff Report) at 22.

471.    "Corps' Engineer Manuals (EMs)... recognize that site and project-specific factors influence levee design and construction." JX-0210 (Wolff Report) at 22.

472.    "The factor of safety criteria for the end-of-construction condition used in the 1966 design memorandum... is consistent with the Corps-wide guidance published in the 1978 EM." JX-0210 (Wolff Report) at 23.

473.    "The 1978 EM, Section 7-6, pages 7-9 to 7-10, addresses protection of riverside slopes to withstand the erosional forces of waves and stream currents. Published twelve years after construction commenced on the LPVHPP, this EM continue[s] to consider grass protection on the water side slope of the levees to provide sufficient erosion protection (short duration water levels, flat slopes and presence of fat clays) – such as during a hurricane." JX-0210 (Wolff Report) at 23-24.

474.    "Nowhere in the 1978 EM guidelines is there a mandate for the Corps to incorporate specific erosion protection measures to a levee's landside slope to protect against failure in the event of overtopping... The Corps exercised the appropriate judgment necessary in following its guidelines and accepted engineering practices with respect to providing erosion protection to the LPVHPP levees." JX-0210 (Wolff Report) at 24.

475.    "[A]n engineer should take into account the availability and haul distance of soil for levees when considering a levee's design and construction." JX-0210 (Wolff Report) at 24 (citing DX-0210 (1978 EM) at § 4-2.a).

476.    "Section 6-1.a(1) clearly and unequivocally recognizes that hydraulic fill was in 1978 still an acceptable source of levee borrow material." JX-0210 (Wolff Report) at 24-25.

477.    "[The] April 1978, First Enlargement, B/L (Base Line) [at] Sta. 708+95 to B/L Sta. 945+85... contract provided for reshaping the first lift materials, placed eight years earlier, southeast of Bayou Dupre. These materials originally reached top elevations of +13 to +17 ft.

88

The 1976 profiles shown on these construction drawings provide top elevations primarily in the range +11 to +13 ft., indicating settlement on the order of 3 ft. since placement. Borrow was to be obtained from a very wide (315 ft.) landside borrow area, excavating a very shallow cut down to elevation +4 ft." JX-0210 (Wolff Report) at 25.

478.    "[T]he method of construction was appropriate for the specific conditions and purposes and was consistent with the then generally-accepted engineering practices for constructing a levee that would not be destabilized by through or underseepage during short-term loading such as would exist during hurricanes." JX-0210 (Wolff Report) at 25.

479.    "[The] July 1980, First Enlargement, [at] Sta. 360+70 to Sta. 699+00... contract provided for reshaping the first lift materials placed eight years earlier, generally from Bayou Bienvenue to Bayou Dupre. Levee centerline profiles showed top elevations typically between elevations +11 and +14 ft., indicating settlement on the order of 4 ft. since placement of the first lift. Borrow materials were to be obtained from both landside and waterside borrow areas, by land-based equipment, with the borrow excavations down to elevations -4 to -5 ft." JX-0210 (Wolff Report) at 25.

480.    "[The] November 1982, Bayou Bienvenue to Bayou Dupre Levee Closure... contract provided for closing of the natural channels of Bayous Bienvenue, Villere and Dupre, and closing a previous open area at the Southern Pipeline crossings. These closures were made with hydraulic fill obtained from a borrow area in the MRGO channel extending down to elevation -8 ft." JX-0210 (Wolff Report) at 26.

481.    "[The] March 1983, Second Enlargement, B/L [at] Sta. 708+68 to B/L Sta. 945+87... contract consisted of a second reshaping of materials southeast of Bayou Dupre. The

first enlargement (reshaping) had been done some five years earlier. Borrow was obtained waterside of the levee. August 1981 surveys showed the existing levee grade to be typically at elevation +16 to +18 ft., suggesting that settlement since the first enlargement had been approximately 1 ft. The contract provided for raising the levee to elevation 20 ft. with uncompacted fill except for small reaches of semicompacted fill near transitions to floodwall structures." JX-0210 (Wolff Report) at 26.

482. "A soils report dated November 1982 was available and apparently accompanied the plans and specifications [for the March 1983 lift]. This report recorded four deep soil borings and related testing, which were used for stability analyses to verify that the design section had a minimum factor of safety of 1.3. A settlement analysis that determined a gross grade of +20 ft. NGVD was needed to yield a net grade of +17.5 ft." JX-0210 (Wolff Report) at 26.

483. "[The] May 1985, Second Enlargement, MRGO B/L Sta. 380+50 to Sta. 692+50... contract provided for reshaping of the second lift materials placed five years earlier, generally from Bayou Bienvenue to Bayou Dupre. Levee centerline profiles showed top elevations typically between elevations +15 and +17 ft., indicating settlements of approximately 4 ft. since placement of the first lift. In this contract, the levee was to be raised to elevation +20.5 ft., with side slopes of 1V on 3.5H. Borrow materials were to be obtained from both landside and waterside borrow areas, by land-based equipment." JX-0210 (Wolff Report) at 27.

484. "[The] January 1987, Levee Closures, B/L Sta. 367+60 to 1005+49... contract involved the raising of Bayou closure sections constructed earlier in 1982. At Bayou Bienvenue, the closure section was raised from about elevation +12-13 to +15 ft. At Bayou

Vilere, the raise was to elevation +20.5 ft.; at the Southern pipeline, +15 ft.; and at Bayou

Dupre, +20.5 ft. Borrow was taken from both waterside and landside borrow areas adjacent to

the levees." JX-0210 (Wolff Report) at 28.

485.    "[The] May 1992, Levee Closures, Sta. 366+00 C/L to Sta. 1007+91 C/L...

contract provided for placement of semi-compacted fill and sheet piling to elevation +18.5 ft. at

a number of locations, generally adjacent to the closure structures and pipeline crossings

mentioned above." JX-0210 (Wolff Report) at 29.

486.    "The 1978 EM on design and construction of levees was revised in 2000." JX-

0210 (Wolff Report) at 29.

487.    "[The] 2000 revision of the EM for Design and Construction of Levees reaffirms

the Corps' continuing policy that EMs provide basic guidance, but specific design issues are

addressed on a project-by-project basis. That project-by-project review continues to be

performed through the multi-level design review." JX-0210 (Wolff Report) at 29.

488.    "[I]in the 22-year period between the two manuals, nothing "quantitative"

regarding design for erosion protection came about for which the Corps had enough confidence

in the methodology to include it in the revised EM." JX-0210 (Wolff Report) at 29.

489.    "[The] 2001 Geotechnical Investigation, Chalmette Area Plan, Bayou Bienvenue

to Bayou Dupre... design document summarizes geotechnical design studies performed in

connection with a proposed levee lift between the two bayou closure structures. The study

included four new soil borings and three older borings on the levee centerline, plus a number of

other borings. The proposed work was intended to raise the levee to elevation +20 ft., and the

report notes that the SPH grade was intended to be +17.5 ft." JX-0210 (Wolff Report) at 30.

91

490.    The purpose of the 2001 investigation study was to give the Corps additional parameters with which to evaluate the design of a heightened levee.  Bea 1298:13-22; DX-1715 (2001 Geotechnical Investigation – Chalmette Area Plan) at 1, 3.  In its 2001 geotechnical investigation, the Corps studied the stability and settlement of levees when next to a channel, as well as, soil stresses to a depth of 60 feet.  Bea 1298:23-1299:3; Bea 1301:22-1302:8; DX-1715 (2001 Geotechnical Investigation – Chalmette Area Plan) at 1, 3-5, Appendix B.  According to Dr. Bea, the redesigned levee that was the product of the 2001 geotechnical investigation was not scheduled to be completed until 2017.  Bea 1302:9-11.

491.    As established by the LPVHPP authorization, the Standard Project Hurricane determines the design elevations, including crown elevations, for the LPV system.  Bea 1105:6-8; Bea 1333:11-15.

492.    The design hurricane for the New Orleans East Back levee was the Standard Project Hurricane.  Bea 1333:20-23.

493.    The Standard Project Hurricane evolved to represent the most severe storm the Government should guard against when designing hurricane protection projects.  Bea 1337:14-17.

494.    The Standard Project Hurricane tells the conditions to be expected on the unprotected side of the levee.  Bea 1337:18-20.

495.    The Corps of Engineers evaluated the stability of the levees along Reach 2 of the MR-GO assuming that the entire foreshore to an elevation of -3 feet had been washed away.  Bea 1424:15-25.

496.    The levees were properly built and maintained.  Bea 1094:23-1095:6, 1100:14-18.

497.    Since the 1960s, the Corps of Engineers has studied the performance of levees built adjacent to waterways.  Bea 1144:15-24.

498.    The MRGO was a source for levee materials.  Bea 1499:16-24.  When engineers selected between types of materials for use in levee construction, they had to evaluate both economics and feasibility, in addition to other constraints such as environmental concerns.  Bea 1534:2-7.  For the Corps of Engineers to build a project, it obtains the input of state and local authorities.  Bea 1534:8-10.

499.    The levees along Reach 2 are highly heterogenous with respect to topography. Bea 1501:3-5.

500.    The Corps of Engineers requested appropriations from Congress for the levee redesign but these funds were not made available prior to Hurricane Katrina.  Bea 1302:12-21. The Corps of Engineers personnel participated in discussions with state and local authorities about the needs for the projects and the ways that these projects will be built.  Individuals such as Al Naomi and Walter Baumy interfaced with local interests on behalf of the Corps of Engineers to transfer good information to decision makers within the Government for the purpose of reaching wise decisions.  Bea 1534:20-1535:4.

2.  *The MRGO Design*

501.    The Design Memorandum for "the MRGO itself, not the levee … [points] out that 'erosion due to wave wash in open areas can be expected in the upper part of the channel slope where the peat and highly-organic clays are exposed.  Protection for this area can be

provided if and when the need for it becomes necessary. No channel protection is included in the overall cost estimate of the project. It is presumed that sufficient rights of way will be furnished by local interests that preclude the use of channel protection, or that additional rights of way will be furnished if the need arises.'" Wolff 4019: 4-23; JX-0356 (DM-1B, 1958) at 5, ¶ 19.

502.    "The design of the MRGO . . . anticipated shallow erosion near the water surface and did not appear to be concerned about it. A few years later, eight years later when they're designing the levee, because of that previously expressed concern, they do slope stability analyses to ensure that this erosion and the channel would not endanger the levee." Wolff 4019: 24-4020:4.

503.    "On May 5, 1948, House Document 245, 82nd Congress, second session included a report from the Chief of Engineers." JX-0210 (Wolff Report) at 11.

504.    "On March 29, 1956, by Public Law 84-455, the MRGO project design was approved and construction authorized substantially in accordance with the Chief of Engineers' report in House Document 82-245." JX-0210 (Wolff Report) at 11.

505.    "On April 30, 1957, the New Orleans District transmitted the first design memorandum, DM 1-A, Channels, to the Lower Mississippi Valley Division (LMVD)." JX-0210 (Wolff Report) at 11.

506.    "Design memorandum 1-B, Channels, was transmitted to the LMVD on September 15, 1958, and a revised DM 1-B was submitted on May 14, 1959. It included recommendations for 1V (vertical) on 2H (horizontal) channel slope and a berm width of 90 ft. In paragraph 18, the berm width refers to the distance between the top of the channel cut and the

toe of retaining dikes for dredge spoil. The DM notes that the soil conditions limit the height of retaining dikes to about 6 to 7 ft. and the height of dredge spoil to about 10 ft., with slopes of about 1V on 40H. It also states that construction is expected to occur in segments between 1959 and 1965." JX-0210 (Wolff Report) at 11-12.

507.    "Regarding erosion protection for the channel, DM 1-B states: 'No channel protection is recommended initially; however, erosion due to wave wash in open areas can be expected in the upper part of the channel slope where the peat and highly organic clays are exposed. Protection for this area can be provided if and when the need for it becomes necessary. No channel protection is included in the overall cost of the project. It is presumed that sufficient rights-of-way will be furnished by local interests to preclude the use of channel protection, or that additional rights of way will be furnished if the need arises.'" JX-0210 (Wolff Report) at 12 (citing JX-0356 (DM 1-B) at 5).

508.    The hydraulic connectivity of water through the GIWW into Reach 1 and the IHNC was a function of the design configuration for the MR-GO.  Bea 1327:14-1328:25.

509.    Dr. Bea does not take issue with the method of dredging with respect to the MR-GO.  Bea 1329:19-22.

G.    *Plaintiffs' Misplaced Reliance on Robert Bea*

510.    Plaintiffs' case in large part relies upon the expert testimony of Robert Bea.  The Court cannot find his testimony credible.  As demonstrated below, Dr. Bea's many concessions to the United States, his model assumptions, and his failure to consider all of the scenarios undermine his conclusions and make them inherently unreliable.[11]

---

[11] The record is replete with instances where Dr. Bea's testimony at trial was impeached:

511.    Though Dr. Bea holds himself out to be a forensic engineer, no state issues a license for that specialty.  Bea 1260:25-1261:8, 1269:8-14.

---

- While he has maintained that the Corps of Engineers did not build levees but rather "EBSBs" - a term made solely for purposes of litigation - Dr. Bea testified that he accepted the position that the levees were competently designed, even though he would occassionally refer to the levees as EBSBs during his testimony.  *See* Bea 1270:19-1271:25.

- At trial, Dr. Bea testified that 50% of the levees along Reach 2 were subjected to lateral displacement as a result of their proximity to the MR-GO.  *See* Bea 1304:14-17.  However, in his deposition, Dr. Bea testified that 15-20% of the levees along Reach 2 were subjected to this effect.  Bea 1302:22-24; *cf.* Bea 1304:10-13.

- At trial, Dr. Bea testified that his statement of no levee erosion occurring below a storm surge of +13 feet was dependent upon wave velocities.  *See* Bea 1445:18-20.  However, in his deposition he said there was no erosion below +13 feet, regardless of the grass covering and without any reference to wave velocities.  *See* Bea 1445:3-9, 1445:15-18.

- At trial, Dr. Bea testified that it was possible to have a neutral MR-GO, yet testified in his deposition that this was not possible.  *See* Bea 1480:13-17; *cf.* Bea 1481:21-23.

- At trial, Dr. Bea unequivocally stated that he did not perform his cumulative erosion analysis for Scenario 3.  *See* Bea 1483:21-25.  However, after being presented with reliance materials dated June 2008 documenting such work, Dr. Bea admitted that the analysis had been performed but rejected it as an invalid comparison.  *See* Bea 1492:3-8.  Subsequently, Dr. Bea decided to not correct what he believed was a flawed comparison with the "correct" inputs, even though he had the capability to do so.  *See* Bea 1492:9-13.

- At trial, Dr. Bea denied that scientists in the Netherlands rejected his request for the use of the DELFT3D model yet affirmed in his deposition that this occurred.  *See* Bea 1517:1-21.

- At trial, Dr. Bea denied that a levee with good grass cover would breach under Scenario 2c if the surge elevation exceeded the crest elevation for more than one hour, yet stated the exact opposite in his deposition.  *See* Bea 1532:11-14; *cf.* Bea 1533:4-15.

512.    Dr. Bea's opinions on the timing of breaching appear to be "contradictory."  Bea 1399:17-22.

   1.    *Causes of Breaching*

513.    It is not possible to have a neutral MR-GO.  Bea 1480:13-23, 1481:21-24.

514.    The levees would not have failed without overtopping.  Bea 1092:12-15, 1100:19-22.

515.    A parametric study is a study to determine what effects different parameters have on the performance of the structure at issue.  Bea 1204:9-15.

516.    The north and south breaches adjacent to the Lower Ninth Ward would have occurred regardless of whether Congress authorized the Corps of Engineers to construct the MR-GO.  Bea 1225:8-1226:11.

517.    The majority of levee breaching along Reach 2 was due to overtopping.  Bea 1270:1-10.

518.    The levees performed as expected.  Bea 1272:6-8.

519.    Hurricane Katrina had a storm surge along Reach 2 upwards of 18 feet.  Bea 1272:12-13.

520.    The structures that were breached by Hurricane Katrina were subjected to greater hydraulic forces than for which they were designed.  Bea 1333:16-19; Bea 1337:11-13.

521.    Hurricane Katrina exceeded the levee design water level of 13 feet.  Bea 1333:23-1334:3.

522.    Dr. Bea did not evaluate whether the levee design for Reach 2 would withstand the design surge water level.  Bea 1336:9-17.

523.    Dr. Bea cannot say whether a Standard Project Hurricane would have breached the levees as Hurricane Katrina did.  Bea 1337:4-6.

524.    Dr. Bea did not compare Hurricane Katrina breaches and conditions to Standard Project Hurricane or Probable Maximum Hurricane conditions.  Bea 1337:7-10.

525.    Members of ILIT do not agree with Dr. Bea's current opinions.  Bea 1351:4-10.

526.    All of Dr. Bea's parametric analyses confirm that levees constructed of good materials, cohesive, compacted, with low erodibility, would have performed significantly better than levees  constructed of high erodibility materials.  Bea 1369:4-20; DX-0451 (Bea July 2008 Report, Declaration No. 1) at 134 ¶ 114.  Moreover, subjected to the same front-side wave attacks, the levee with good materials would have experienced insignificant front-side erosion. Bea 1369:21-24; DX-0451 (Bea July 2008 Report, Declaration No. 1) at 134 ¶ 114.  This opinion applies to all the parametric scenarios analyzed in this case.  Bea 1369:10-15; DX-0451 (Bea July 2008 Report, Declaration No. 1) at 134 ¶ 114.

527.    Both Defense and Plaintiffs' experts agree that no erosion occurs with the storm surge below an elevation of +13 feet for the entire Reach 2 performance.  Bea 1377:20-1378:8; Bea 1378:18-22; JX-0207 (Bea January 2009 Report, Declaration) at 92 ¶ 139, 100 fig. 34.

528.    Dr. Bea states that for a levee with poor grass density and highly erodible materials, "the estimated time of failure through the wave-induced erosion method was... about one hour for erosion of the turf cover and then another 30 minutes for breach of the sand core." Bea 1380:11-18; JX-0207 (Bea January 2009 Report, Technical Report II) at 55.

529.    Dr. Bea states that once the surge climbs from 13 feet to 14 feet, it no longer causes wave erosion below 14 feet.  Bea 1385:24-1386:16.

98

530.    At Dr. Bea's test site, he concluded that wave overtopping began at 14 feet.  Bea 1386:19-20.

531.    Dr. Bea opined that at his test site, the surge level was at 13 feet at 6:00 AM. Bea 1388:8-10; DX-0451 (Bea July 2008 Report, Declaration No. 1)  at 50.  He concluded that at 7:00 AM, the surge level rose to approximately 16 feet.  Bea 1388:11-12; DX-0451 (Bea July 2008 Report, Declaration No. 1) at 50.  Under the Dutch hydrographs, the water level rose from 13 feet to 14 feet in 20 minutes.  Bea 1388:19-24.  According to Bea's timeline, the grass would have had to lift off between 6:00 AM and 7:00 AM before erosion would even begin.  Bea 1388:23-24.  However, by 6:20 AM, waves began to overtop the levee.  Bea 1388:19-24; 1386:19-20.

532.    In Scenario 2C, levees with good grass covering would have breached if the surge elevation had exceeded the crest elevation for more than one hour.  Bea 1407:19-23.

533.    There was no erosion below 13 feet at Dr. Bea's  test site, Station 497+00.  Bea 1445:3-14.

534.    At Dr. Bea's test site, there was no appreciable grass liftoff or erosion that could occur within the 13 foot design surge level of the levee.  Bea 1445:15-20.

535.    Dr. Bea did not perform a breaching analysis using the surge and wave conditions from Scenario 2C but the turf conditions of the levees in Scenario 1. Bea 1445:8-9.

536.    Dr. Bea's front side wave attack theory is based on speculation because he has no physical evidence of crenellation indicative of front-side wave erosion for areas where the crest of the levee had been washed away,.  Bea 1506:17-1507:1.

2.    *Salinity, Grass, and Vegetation*

99

537.    Before construction, the Corps of Engineers ran physical experiments and studied the MR-GO's effects on the introduction of salinity as a result of connecting the channel to the GIWW.  Bea 1328:22-1329:5.  Consequently, as part of the design, salinity was expected to be introduced into the area by the MRGO.

538.    Dr. Bea did not perform any analysis of how salinity from the MR-GO affects grass growth.  Bea 1276:21-23.

539.    Dense grass will grow next to a brackish marsh.  Bea 1275:3-1276:2.

540.    The New Orleans East Back levee, east of pump station 15, is adjacent to brackish marsh.  Bea 1276:10-12; see also JX-0195 (Duncan Fitzgerald Report) at 4-5 fig. 4.4.

541.    Grass growth is a function of the levee soil substrate.  A clay substrate allows more dense grass growth because it retains water well.  On the other hand, a sand substrate does not retain water well without constant rainfall.  Bea 1276:10-12, 1276:21-1277:5; JX-0195 (Duncan Fitzgerald Report).

542.    In the 1950s, the area west of pump station 15 and north of Bayou Bienvenue, at the confluence of Reach 1 and Reach 2, was composed of brackish marsh.  Bea 1281:1-10; DX-0451 (Bea July 2008 Report, Declaration No. 1) at 72.

543.    In the 2000s,  the area west of pump station 15 and north of Bayou Bienvenue, at the confluence of Reach 1 and Reach 2, was classified as salt marsh.  Bea 1278:11-1279:16; JX-0195 (Duncan Fitzgerald Report) at 4-5 fig. 4.4.

544.    The levees adjacent to the marshes classified as salt marsh at the confluence of Reach 1 and Reach 2 performed well during Hurricane Katrina.  Bea 1279:14-23.

545.    These levees had good grass cover because the levees were made with good soil. Bea 1279:21-1280:4.

546.    The MR-GO did not change the marshes in the area between Bayous Bienvenue and Dupre from brackish marsh to salt marsh. Bea 1281:24-1282:21; see also DX-0451 (Bea July 2008 Report, Declaration No. 1) at 72; cf. JX-0195 (Duncan Fitzgerald Report) at 4-5.

547.    Dr. Bea was unable to show that salt negatively affected the grass and vegetation along Reach 2 between MRGO and the the levees and on the levees. Bea 1285:14-1286:5. Any detrimental effect on grass and vegetation growth in this area cannot be attributed to the MR-GO. Id.; DX-0451 (Bea July 2008 Report, Declaration No. 1) at 72.

548.    The main breaches along Reach 1 and Reach 2 occurred in areas adjacent to brackish marshes. Bea 1286:6-22.

549.    The foreshore vegetation between the levees and the MRGO existed because the construction of the levee berm made ground available for the vegetation to grow. Bea 1319:1-21.

*3.    Soil Erosion*

550.    Dr. Bea collected a soil sample from his Sta. 497+00 test site that is identified as sample number S4. Bea 1353:23-25.

551.    Dr. Bea took the soil sample from his test site in January of 2006, after Hurricanes Katrina and Rita. Bea 1354:12-15.

552.    Dr. Bea collected his sample from this breached section with a shovel and placed the samples in two large milk cartons. Bea 1353:1-7.

553.    Dr. Bea transferred his two cartons of soil to Ms. Carmen Chung, a senior graduate student at Berkeley. Bea 1358:9-14. The transfer took place at Le Pavillon's parking lot. The two cartons were transported to the trunk of Ms. Chung's car and then taken to Texas A&M in College Station, Texas. Bea 1358:15-18.

554.    Dr. Jean-Louis Briaud performed the erosion analyses of Dr. Bea's soil samples and prepared a journal article based on these tests. He concluded that Dr. Bea's test site failed due to overtopping. Bea 1352:6-16; DX-0101 (Briaud 2008 Article on Erosion) at 624, Table 2.

555.    Rune Storesund, who is listed as a co-author on several of Dr. Bea's expert reports, was a co-author of Dr. Briaud's journal article. Bea 1352:17-22.

556.    The night before the transfer of shoveled soil samples, Dr. Bea had a "heated discussion" with Dr. Briaud discussing the evaluation of the erodibility of the soils he had collected. Bea 1358:19-1359:3.

557.    Included in this heated discussion was how Dr. Briaud's evaluations could be used in a determination of wave-induced breaching. Bea 1359:4-9.

558.    Later, Dr. Briaud expressly limited the results of his erosion analyses, stating: "The possible erosion of the levees by wave attack prior to overtopping sheet flow was not studied in this work." Bea. 1359:25-1360:5; DX-0101 (Briaud 2008 Article on Erosion) at 629.

559.    Clay sediments are readily carried by water and transported long distances by rushing, moving water. Bea 1501:20-24.

560.    Cohesive materials such as clay were advected and carried away from Dr. Bea's test site due to erosion. Bea 1354:23-1355:4; Bea 1356:23-25.

561.     Dr. Bea agrees with the Corps of Engineers' Coastal Engineering Manual definition of the sediment transport process in that, "Cohesive sediments are not transported as bed load except in the form of fluid mud.  They almost always are transported in suspension, advected, carried with the ambient water at the flow velocity, and dispersed, moved from areas of high sediment concentration to low by mixing, such as turbulence."  Bea 1355:14-25; DX-0412c (Coastal Engineering Manual – Part III) at III-5-38(a)(1).

562.     The Coastal Engineering Manual is a very good source for coastal engineers throughout the United States.  Dr. Bea used to teach from this manual at Berkeley.  Bea 1355:11-17.

563.     The areas where Dr. Bea collected his soil samples had been acted on by erosion. Bea 1356:20-22.

564.     Dr. Briaud focused his work on sheet-flow coming over the back side of a full levee.  Bea 1360:6-10.

565.     Dr. Briaud used a machine called the Erosion Function Apparatus ("EFA") that runs a flume of water through a soil sample, measuring the amount of soil that is removed as a function of time and velocity.  Bea 1360:11-19.

566.     Regarding the local impact on a levee from the collapsing crest of a wave, Dr. Bea agrees with the statement that, "The wave energy is dissipated over a short distance and within a short time, which results in relatively small surfaces exposed for a very short period of time, .01 to .1 seconds."  Bea 1365:25-1366:9.

567.     Soil erodibility characteristics are highly heterogenous along Reach 2.  Bea 1501:17-19.

568.    Before Hurricane Katrina, there was no uniform way to apply criteria from existing manuals to ascertain soil erosion rates.  Bea 1503:2-4.

569.    Even with a representative soil sample, there is a great deal of uncertainty in soil erosion analyses.  Bea 1503:2-6.

570.    Dr. Bea's erosion analyses have uncertainties of as much as 50 to 100 percent. Bea 1503:7-16.

571.    "I take substantial issue with the use of the [erosion function apparatus] test.  The erosion function apparatus test was developed by John-Louis Briaud at Texas A&M, research was largely funded, maybe all funded, by the Federal Highway Administration.  The question of interest in that research was scour around bridge peers in rivers and streams.  And so the tests, what the erosion function apparatus test does is take steady-state water flowing in one direction across the soil surface and measure how fast it erodes off particles of that soil.  In the front side wave attack model of Dr. Bea, you have rapidly changing velocities and rapidly changing directions as water hits the levee, goes up and comes down.  And, in fact, if the levee were eroding that would take us back to the issue of the changing geometry because the nature of the directions and velocities would change every time a bit of the soil is eroded.  But primarily, the EFA test is a steady state one directional flow model that is being used in a very complicated non-steady state three-dimensional flow regime."  Wolff 4046:4-21.

572.    Dr. Wolff takes issue with Dr. Bea's test site soil samples: "The soil samples, the best soil samples, including those that will be done in the EFA test and many soil samples in this project, would be taken as what's called an undisturbed sample taken with a Shelby tube.  A tube is pushed into the soil so that you can recover the intact soil in its original structure.  These

were shovel samples put into bags, taken to Texas for testing, and because they were loose

samples, they had to be reconstructed. And because of the erosion, some of the materials may

have been separated. So we do not know whether those bags have been separated. So we do not

know whether those bag samples are, in fact, representative of the soil that was eroded away."

Wolff 4047:3-19.

573.    Dr. Bea's models are too imprecise to provide certainty in their outcomes:

"Using his own estimates, which I can't confirm or deny, but he states that if the mean value or

the best estimate of the erosion distance at any time and location is 100 feet and in the type I

and type II uncertainties that he refers to, he has a total coefficient of variation of 64 percent,

then the 70th percentile and 30th percentile values would be approximately 160 and 30 feet

respectively. So let me explain what that means. There is a three in ten chance that the true

value is less than 30 feet of erosion; there is a four in ten chance that the true value is between

30 and 160, and there would be a 30 percent chance that it is greater than 160. So that's a very -

- the difference between 30 and 160 is a factor of over five. So it indicates that he's very

uncertain about what the real value from his model would be." Wolff 4049:5-19; JX-0207 (Bea

January 2009 Report, Declaration) at 36, ¶ 60.

574.    Dr. Wolff reviewed the soil borings available at the time of Katrina and "found

no indication of any locations where enough of the levee section was comprised of erodible

materials that would suggest it was capable of erosion-induced breaching before overtopping."

JX-0210 (Wolff Report) at 33.

575.    Without "any work prior to Dr. Bea's declaration where [the Erosion Function

Apparatus] results were used for analysis of erosion under rapidly changing velocities, or for

wave action in general, where the soil is alternately submerged and exposed to the air; [and without] any research done as to how properly to select erosion rates for such rapidly changing velocities, [t]he multiple variables concerned make suspect any results obtained from such exercises." JX-0210 (Wolff Report) at 43.

576.    "Following grass-lift off, Dr. Bea's work uses quantitative data from Briaud's EFA test to predict the time of lateral levee erosion. Briaud's test is based on constant velocity water flow parallel to the soil for an extended period of time. Dr. Bea's modeling uses numerical integration to accumulate soil erosion calculations for a series of very small time increments over which velocities rapidly change. Again, no calibration or verification of this approach has been made." JX-0210 (Wolff Report) at 46.

    4.    *Flood-Side Wave-Induced Erosion Model*

577.    Dr. Bea is unable to identify any industry standard in the United States that addresses flood side wave-induced erosion of earthen flood protection structures.  Bea 1525:7-1526:6.

578.    Dr. Bea has no knowledge of an accepted industry standard to perform flood side wave-induced erosion of earthen flood protection structures vis-a-vis recent Corps of Engineers guidelines.  Bea 1526:7-13.

579.    Dr. Bea's flood side wave-induced erosion method has not been accepted as a state of the practice either in the United States or in Europe.  Bea 1526:14-1527:14.

580.    The first step in Dr. Bea's flood-side wave-induced erosion model is to define the geometric configuration of the levee, the fronting berm, and the vegetation.  Bea 1373:11-22.

581.    The second part of this model is to define the hydrodynamics - that is, the significant wave height, wave period, wave direction, and storm surge during Hurricane Katrina.  Bea 1373:23-1374:1.

582.    The third part is to characterize highly variable grass cover.  Bea 1374:2-3.  This is a two-part inquiry that requires identifying the type, density and substrate of the grass on the levee, and then to calculate how long the grass will take to lift off during a hydrological attack on either the front or back of the levee.  Id. at 1374:4-10.

583.    Fourth, Dr. Bea must characterize the erodibility of the soils, which is contingent upon having a representative sample.  Bea 1374:11-14.

584.    Fifth, Dr. Bea analyzes the rush-up, rush-down, and wave-induced shear velocities on the flood side face using the LS-DYNA software program.  Bea 1374:15-17.

585.    The sixth and final step of Dr. Bea's model, known as the "cumulative damage step," combines the prior five steps to calculate lateral erosion.  Bea 1377:17-19.

586.    LS-DYNA is a program used to analyze damage.  A user needs to know the actual characteristics of the things being modeled.  Bea 1375:9-1376:1.

587.    When modeling accumulation of damage under LS-DYNA based on repeated impacts, the user has to model changes to the geometry of the structure with each impact.  Bea 1376:20-1377:5.

588.    Dr. Bea cannot model the changes to the geometry of a levee from repeated wave attacks because it is too complex.  Bea 1377:1-7.

589.     Dr. Bea's reference to the energy of a six foot wave at 8 A.M. is at the height of the surge, and thus not relevant to front side wave attack because this wave would have occurred when the surge was fully overtopping his test site.  See Bea 1471:24-1473:12.

590.     Dr. Bea does not have formal training in the use of LS-DYNA.  Bea 1487:2-5.

591.     Rune Storesund, a graduate student working with Dr. Bea on the preparation of his expert reports, performed the LS-DYNA computer runs.  Bea 1487:6-10.

592.     Dr. Bea provided input information to Mr. Storesund, who subsequently performed the analyses using LS-DYNA.  Bea 1487:11-16.

593.     With respect to modeling, Dr. Bea defines "validity" as "being supported by objective truth or generally accepted authority, based on flawless reasoning and solid ground, well grounded, sound, having a conclusion correctly derived from premises, cogent and convincing."  Bea 1509:8-17.

594.     Dr. Bea's models have not been validated or peer-reviewed sufficiently to be deemed reliable enough be to used as a foundation in the industry.  Bea 1527:20-1528:12.

595.     With respect to modeling, Dr. Bea defines "reliability" as "suitable or fit to be relied upon, trustworthy, worthy of full confidence, dependable.  A reliable method is one that yields valid and consistent results upon repeated use.  A reliable method is suitable for its intended purpose."  Bea 1509:22-1510:2.

596.     All steps in Dr. Bea's analyses have to be valid.  Bea 1510:7-12.

597.     Dr. Bea used monochromatic waves for his LS-DYNA modeling even though irregular waves are much more complex and were the type of waves that struck the levee face during Hurricane Katrina.  Bea 1514:1-8.

598.    Dr. Bea's LS-DYNA model is two-dimensional, unlike Dr. Resio's COULWAVE model that is three-dimensional.  Bea 1514:9-12.

599.    The COULWAVE model has been subjected to good validation.  Bea 1516:14-25.

600.    The Dutch have a model known as "DELFT3D" but the makers of that program did not allow Dr. Bea to use it because it could not be used for the purpose Dr. Bea wanted it. Bea 1517:1-16.  The makers of DELFT3D could only complete the fluid mechanics interaction part of the analysis.  Bea 1517:17-21.

601.    Dr. Bea's LS-DYNA model does not account for all the different vectors of water particles in the water column as it approaches the face of the levee.  Rather, he tracks the vectors that are parallel to the face of the structure.  Bea 1524:10-15.

602.    Dr. Bea's LS-DYNA model does not use any bottom shear stress calculations. Bea 1524:16-18.

603.    No detailed site-specific model calibration was performed for Dr. Bea's study due to the lack of actual data during Hurricane Katrina.  Bea 1528:17-1529:9.

604.    "For a model to be useful it must be validated."  Wolff 4042:15:17.

605.    "Validation essentially means that the numerical calculations done on a model need to be able to be related to physical observations that have been observed before and analytical solutions that have been done before." Wolff 4042:19-22

606.    "The same [is] true for calibration, that the model has to be capable of calibration."  Wolff 4042:23-24.

607.    "Calibration means that you can show that the numerical model results agree with things that were really observed to . . . have happened.  I'll give you two brief examples: one that the test sections at the Atchafalaya basin where they ran numeric slope stability analysis and then built test sections to see that their predicted factors of safety that the low ones actually resulted in levees that underwent distress and the other ones were better was an example of calibrating this whole stability model to a real embankment.  The many hydraulic studies around Hurricane Katrina, particularly the ones with high-water marks where they would check the model predictions against high-water marks to see that the water actually reached the levels that the model would say that they were is another example of calibrating a model."  Wolff 4043:2-15.

608.    "Before the model can be relied on, it should be accepted as a standard practice in the industry in which it's being used." Wolff 4043:16-19.

609.    "The front side wave induced erosion aggregation model applied by plaintiffs in this case has been [neither] validated [nor calibrated]."  Wolff 4043: 21-25.

610.    "To calibrate the model, you know, the model purports to predict the amount of erosion that would occur under time given attacking waves.  To calibrate such a model, to use an analogy to the slope stability or to water level models, it would seem one would have needed something like a video camera up on a pole that could actually record the levee being washed away so that one could calibrate or show that erosion takes place in the same time frame that the model would predict that erosion to take place."  Wolff 4044:1-9.

611.    "The LS/DYNA model as Dr. Bea used it [is not] used in the industry as a state of the practice to model cumulative erosion." Wolff 4044:21-25.

110

612.    Dr. Bea's use of LS/DYNA fails because he does not change the geometry of the levee as erosion allegedly occurs, and he does not change from sand to clay the soils being tested as alleged erosion moves into the levee face. Wolff 4045:5-25.

613.    "Numerical models are mathematical abstractions of real physical phenomena." JX-0210 (Wolff Report) at 45.

614.    To use a numerical model with confidence in engineering decision-making, it must be determined that the model and the parameter values do in fact predict the physical behavior of the prototype system. This determination can be thought of as verification, validation, calibration or confirmation." JX-0210 (Wolff Report) at 45.

615.    "To calibrate the numerical model, actual observed... tests are simulated in the numerical model, with parameter values and constitutive models (equations and relationships) iteratively adjusted until the predicted behavior of the numerical model matches the observed behavior of the prototype. Once calibrated, the numerical model can be used with some confidence to model other conditions for which additional prototype crash tests would increase costs and design time (e.g. differing speeds, loadings, geometry, etc.)." JX-0210 (Wolff Report) at 45-46.

616.    "[C]alibration is commonplace for all applications of LS-DYNA." JX-0210 (Wolff Report) at 46.

617.    "It is clearly commonplace to expect that one does not put faith in the results of numerical modeling until the model has been demonstrated to match prototypical behavior for at least a number of observed cases similar to the case at issue." JX-0210 (Wolff Report) at 46.

618.    "In Dr. Bea's numerical modeling of hypothesized levee breaching by water side wave attack, there is a significant number of instances where absolutely no calibration has been done, or could even be possible[.]" JX-0210 (Wolff Report) at 46.

619.    "LS-DYNA is used to model the wave action on the levee, including runup and rundown. However, there is no real record of actual wave behavior (magnitude, velocity, etc., as a function of time that can be used to verify or confirm that the underlying assumptions are correct)." JX-0210 (Wolff Report) at 46.

620.    "The certainty of pre-overtopping breaching is also clouded by Dr. Bea's statement on page 122 of his Declaration 1, where he states that "the 'evidence' for front side oriented erosion scarps was erased and replaced with backside erosion scarps." None of the post-Katrina investigations found conclusive evidence of pre-overtopping breaching due to water side wave attack. Finally, due to the remoteness of the MRGO Reach 2 and the weather conditions during Katrina, there was no eyewitness evidence of such events."  JX-0210 (Wolff Report) at 43.

621.    "The erosion modeling presented in the Dr. Bea declaration is a chain of a number of inferences, none of which have been "calibrated" to prototype behavior, as is the common standard when engineering decisions or designs are made using numerical models." JX-0210 (Wolff Report) at 46-47.

*5.    Scenario 3*

622.    For Scenario 3, Professor Vrijling's team ran the hydrodynamics to the center of the MR-GO channel.  The work Dr. Bea performed for the first time during the weekend before

112

his cross-examination was to bring these hydrodynamics to his study site, recognizing the local bathymetric and vegetation conditions. Bea 1474:25-1475:8.

623.    Dr. Bea did not perform any computer calculations for the Scenario 3 analysis he performed prior to his cross-examination because he claimed that he ccould take the Scenario 3 conditions with the existing information and draw conclusions. . Bea 1475:13-20.

624.    In Dr. Bea's declaration filed with the Court on October 22, 2008, he talked in length about Scenario 2C and distanced himself from Scenario 3. Bea 1477:13-19; see also JX-0069 (Bea October 2008 Causation Declaration) at 5-6

625.    From October 22, 2008 to his testimony at trial, Dr. Bea neither evaluated nor prepared a report addressing Scenario 3. Bea 1478:23-1479:15.

626.    Dr. Bea explicitly stated that he had never performed a cumulative erosion analysis for Scenario 3 nor a comparison of such analyses between Scenarios 1 and 3. Bea 1484:25-1485:4.

627.    Dr. Bea was presented with impeachment material from his reliance documents dated June 2008 showing a cumulative erosion analysis for Scenario 3 comparing lateral and cumulative erosion results for Scenarios 1 and 3. DX-1740 (Final MRGO Report, June 2008) at 111-112.

628.    At 4:30 AM, Dr. Bea's model predicted cumulative erosion for Scenario 1 to be 20 feet. Bea 1489:15-18; DX-1740 (Final MRGO Report, June 2008) at 111-12.

629.    Comparatively, Dr. Bea's model predicted cumulative erosion at the same time to be 29.3 feet for Scenario 3. Bea 1489:23-25; DX-1740 (Final MRGO Report, June 2008) at 111-12.

630.    Though the document compares cumulative erosion for Scenarios 1 and 3, Dr.

Bea insists that the comparison is not valid because he did not use the "appropriate Scenario 3

input hydrodynamics."  Bea 1490:1-18; DX-1740 (Final MRGO Report, June 2008) at 111-12.

631.    However, he had the capability to analyze erosion for Scenario 3 using what he

deemed proper inputs.  Bea 1490:19-1491:12; cf. DX-0451 (Bea July 2008 Report, Declaration

No. 3) at 73-74, 89-90 (describing the general differences in vegetative characteristics in the

Plaintiffs' surge modeling and graphing the reduction in significant wave height as a function of

distance).

632.    Dr. Bea was expecting less erosion in his Scenario 3 modeling.  He determined

that he did not have the correct data, but decided not to re-run Scenario 3 with the correct data.

Bea 1491:23-1492:13.

*6.    Grass Liftoff*

633.    There is disagreement in the coastal engineering community about grass lift-off

times.  Bea 1494:7-10.

634.    There is no international standard, nor unified state of the practice, for assessing

grass lift-off times.  Bea 1494:11-13; Bea 1495:25-1496:2.

635.    Dr. Bea is unaware of a standard for grass lift-off times in the United States.  Bea

1494:14-22.

636.    Design curves for grass cover incorporate factors of safety.  Bea 1495:5-16.

637.    Grass cover characteristics are highly heterogenous along Reach 2.  Bea

1501:11-16.

638.    Dr. Bea's grass lift-off model had not been calibrated or validated.  Wolff 4046:25-4047:2.

639.    "In Dr. Bea's declaration of July 2008, beginning on page 74, he notes that grass cover on levees provides some level of erosion protection. He then develops a model to predict a time of grass lift-off (removal of grass exposing underlying soil)."  JX-0210 (Wolff Report) at 44.

640.    Dr. Bea cites "sixteen references... related to grass lift-off under wave attack. However, all but two are dated 1994 or later, and at least four refer to post-Katrina forensic evaluations. The references cited would not have been of any benefit to the designers of the MRGO levees, who at [the] time of design could only assume that the combination of a grass cover and the short duration of hurricane loading would provide sufficient erosion resistance at least until overtopping."  JX-0210 (Wolff Report) at 44.

641.    "In one of the publications on grass lift-off most cited in the Dr. Bea declaration (Verheij, et. al., 1997), a manual published by the Technical Advisory Committee for Flood Defences in the Netherlands, the authors state in their Introduction: 'This report concerns the stability of grass coverings against the erosion caused by the loading put on them by waves. Until 1990, there was almost nothing known about this subject. Six years later, there is more to say about design, maintenance and testing of grass mats and the first attempt at a model has been made.'"  JX-0210 (Wolff Report) at 44.

642.    "The primary source of Bea's grass lift-off analysis is from a number of papers developed by Verheij and colleagues in the Netherlands between 1995 and 1998..."  JX-0210 (Wolff Report) at 44.

643.     Dr. Bea's grass lift-off model "is unsubstantiated by industry practice and has

not

been peer reviewed.  Verheij, et. al (1997)... exercise caution in the presentation of their model

(see Dr. Bea declaration figures 64, 66)." JX-0210 (Wolff Report) at 44-45.

644.     "Relationships developed by Verheij, et. al., are used to relate grass lift-off time

to significant wave height. As these relationships are based on direct observations, there may be

more credibility here than for some other elements (e.g., soil erosion). However, questions

remain regarding how the grasses and soils tested compare to the grasses and soils at the

MRGO. Further, Verheij, et. al. concede that their model includes remaining uncertainties and

may not be ready for practical use." JX-0210 (Wolff Report) at 46.

645.     "The work by Dr. Bea uses a fatigue-damage accumulation model to handle the

discrepancy between the Dutch grass lift-off (constant wave height) and the Katrina event

(time-varying wave height). No indication of validation or verification of this approach is

presented." JX-0210 (Wolff Report) at 46.

7.     *Surge, Waves, Currents, Funneling*

646.     The Corps of Engineers is an expert on the topic of wave erosion and mitigating

the effects of waves.  Bea 1153:4-9.

647.     As water depth decreases, the wave heights decrease because of wave breaking.

Bea 1162:20-1163:8, 1205:12-17.

648.     The levees and floodwalls along Reach 1 and Reach 2 form the physical walls of

the "funnel."  Bea 1325:7-25; 1329:6-14.

649.    The current of the MR-GO was insignificant as a factor in the breaching of the levees in this case.  Bea 1326:7-10.

650.    The surge for Plaintiffs' Scenarios 1 and 2C were approximately the same.  Bea 1407:19-1408:1, 1410:7-11

651.    Professor Vrijling's SWAN modeling of waves stops mid-channel at the MR-GO.  Bea 1421:18-23.

652.    Dr. Bea used the input from Professor Vrijling's SWAN modeling to run his own wave modeling for purposes of evaluating levee performance.  The results were then given to Professor Vrijling for subsequent flooding analyses.  Bea 1421:18-1422:4.

653.    Even though the MR-GO is being closed, the Corps of Engineers is still building a floodgate at the mouth of Reach 1.  Bea 1434:22-1435:3.  It's necessary to build this floodgate regardless of the MR-GO because of the confluence of water that would come in through Reach 1.  Bea 1435:4-9.

654.    There is a 20 to 30 percent uncertainty with respect to the peak significant wave height from Professor Vrijling's SWAN modeling.  Bea 1531:6-11.

*8.    Flood Control Act*

655.    Dr. Bea claims that without any purported lateral displacement caused by the MR-GO, a 15.5 foot levee would have been 19.5 feet, even though the design grade dictated by the Standard Project Hurricane is 17.5 feet.  Bea 1132:25-1133:20; 1105:6-8.

656.    In order to prevent levee breaching, Dr. Bea claims the levees had to be four feet higher and fronted with vegetation.  Bea 1134:7-13.

*9.    Modeling Problems*

117

657.    Professor Vrijling's modeling of Scenario 2C differs from Dr. Bea's in that the former could not capture foreshore vegetation or the local bathymetry fronting the levees.  Bea 1204:16-23.

658.    Instead of modeling the changes in geometry, Dr. Bea uses a fatigue damage accumulation model that aggregates the general progression of damage through the levee.  Bea 1377:8-16.

659.    Dr. Bea used wave heights from Professor Vrijling to calculate grass lift off at 4:00 A.M. Bea 1463:24-1464:4.

660.    These wave heights are from location "D," which is the significant wave height from the center of the MR-GO channel at a particular time.  Bea 1464:5-15.

661.    Dr. Bea then uses this "D" value and changes "that wave height as a function of water depth and vegetation conditions to the face of the levee."  Bea 1464:14-19.

662.    Dr. Bea does not rely on the wave heights from Professor Vrijling as the waves approach the levees because he concludes that the "model is too coarse to capture the local bathymetric vegetation conditions, so [he has] to very carefully step [the] levee into the appropriate point of impact on the levee.  So it is deadlier."  Bea 1464:23-1465:3.

663.    According to Dr. Bea, because Professor Vrijling's "T" number for the significant wave height at the toe of the levee were allegedly inaccurate, Dr. Bea used the "'D' wave height and extrapolated it based on certain factors to the levee and then up the levee."  Bea 1467:21-1468:9.

664.    According to Dr. Bea, he does not need to apply generally-accepted industry guidelines and standards in his analyses because he is performing forensic engineering analyses. Bea 1527:15-1528:12.

*10.    Salinity from MRGO*

665.    Dr. Bea opines that the breaches of the New Orleans Back Levee section east of pump station 15 were the result only of MRGO introduced increased salinity doing damage to the grass and vegetation fronting that levee.  Bea 1276:3-7.

*11.    Scenario 2C*

666.    In Scenario 2C, Dr. Bea raised the levee elevations along Reach 2 to their design grade of 17.5 feet, correcting it for both normal levee settlement conditions and also for the alleged "squeezing" conditions (that was allegedly 25% of total settlement) that he attributed to the MR-GO.  Bea 1317:15-18, 1318:7-10.

667.    Without proving the MR-GO's impact that led to deteriorated grass or vegetation, Dr. Bea improved the grass and foreshore vegetation for Scenario 2C.  Bea 1318:13-15.

668.    Dr. Bea states that the addition of denser vegetation to the foreshore reduces the energy, intensity, and amplitude of the waves in Scenario 2C by 50%.  Bea 1320:13-1321:1. Dr. Bea does not explain that the additional vegetation would not have been there in the 1950s except for the Corps having built a berm to support it.

*12.    Causation and Timing*

669.    Although Dr. Bea concluded that his levee test site at Station 497+00 failed due

to front side wave attack, the Independent Levee Investigation Team ("ILIT") of which he was a member concluded that that same section failed due to overtopping. Bea 1349:8-23; DX-0451 (Bea July 2008 Report, Declaration No. 1) at 18; cf. JX-0242 (IPET Report) at 4-45 fig. 4.32.

670.    Dr. Bea treats the waves running up and down the levee as sheet flow. Bea 1362:21-24. Other scientists may disagree with this method. Id. at 1362:25-1363:1. Indeed, he does not identify a single scientist or engineer who does agree with it.

671.    Dr. Bea initially had one study location at Station 497+00 along Reach 2. The results of the studies there were extrapolated to other locations along Reach 2. Bea 1515:5-10; cite to DX-0451 (Bea July 2008 Report, Declaration No. 1) at 36.

672.    In his January 29, 2009 report, Dr. Bea expanded his study location to seven areas. Bea 1515:14-18.

673.    For his January 2009 report, see generally JX-0207 (Bea January 2009 Report, Technical Report II), Dr. Bea attempted to validate his LS-DYNA model. However, these validation studies did not address all of the parameters that served as inputs for the model. Bea 1516:3-13. Moreover, these attempts to validate his modeling are unreliable because they were performed for purposes of litigation, rather than using generally-accepted practices in the scientific community.

674.    In Dr. Bea's opinion, his test site at Station 497+00 had poor grass cover based on looking at whatever grass was remaining after the storm. Bea 1384:2-24.

675.    Dr. Bea opines that for his test site, the grass is lifted off the front of the levee at 4:30 AM and a front-side breach through the crest occurs at 5:30 AM. Overtopping of the degraded crest began between 6:00 and 6:30 AM. Bea 1391:1-13.

676.    For the poor grass, sandy substrate that Dr. Bea attributes to his test site, he began lateral erosion of the soil between 4:15 and 5:00 AM.  Bea 1391:24-1393:20; DX-0451 (Bea July 2008 Report, Declaration No. 1) at 109 fig. 92.

677.    According to Dr. Bea, the significant wave height at 4:45 A.M. at the time the grass lifted off during Scenario 1 was 2.0 to 2.1 feet.  The surge elevation ranged from 10.1 to 11.0 feet between 4:30 and 5:00 A.M – well below the +13 feet minimum surge elevation for grass lift-off and erosion.  The water depth at the levee, assuming a 7-foot toe elevation, was 4 feet.  Bea 1535:8-1536:11; see also DX-0451 (Bea July 2008 Report, Technical Report I) at 59 fig. 48, 60 fig. 49.

678.    By 5:00 AM, Dr. Bea attributes 8 feet of erosion above the levee toe at his test site.  Bea 1394:16-18; DX-0451 (Bea July 2008 Report, Declaration No. 1) at 109 fig. 92.

679.    At 5:00 AM, the water level at Dr. Bea's test site is +10.5 feet.  Bea 1394:19-25; DX-0451 (Bea July 2008 Report, Declaration No. 1) at 50.

680.    By 5:00 AM, Dr. Bea has 13 feet of lateral erosion at his test site.  Bea 1397:12-15.  Yet, he has not seen a surge level of  +13 feet

681.    According to Dr. Bea, there was settlement of 2.6 feet at Test Site 1 with and without the MR-GO between 1980 and 1985.  Bea 1416:24-1417:2; DX-1742 (Bea April 2009 Report) at 39.  According to Dr. Bea, there was 4.21 feet of settlement at Test Site 1 with the MR-GO and 4.23 feet without the MR-GO, from 1985 to 1992.  Bea 1416:24-1417:2; DX-1742 (Bea April 2009 Report) at 39.

682.    According to Dr. Bea, there was 4.6 feet of settlement at Test Site 1 with and without the MR-GO from 1992 to 2001.  Bea 1416:24-1417:3; DX-1742 (Bea April 2009 Report) at 39.

683.    According to Dr. Bea, there was 4.8 feet of settlement at Test Site 1 with and without the MR-GO from 2001 to 2005.  Bea 1416:24-1417:3; DX-1742 (Bea April 2009 Report) at 39.

684.    During the course of his testimony, Dr. Bea changed his opinion that it takes one hour for grass lift-off at his test site to 30 minutes without citing any evidentiary support for this change.  Bea 1458:10-20; cf. Bea 1380:11-18; JX-0207 (Bea January 2009 Report, Technical Report II) at 55.

*13.    Scenario 3 Variations*

685.    For the Scenario 3 analysis that Dr. Bea performed the weekend before his cross-examination, he changed the grass, vegetation, foreshore protection, and salinity of the area.  Bea 1434:1-12.  He also added a floodgate at the mouth of Reach 1.  Bea 1434:13-21.

*14.    Investigations Conducted by Other Bodies*

686.    "A preliminary report was issued jointly by an early ASCE reconnaissance team and persons affiliated with the University of California at Berkeley (partially funded by NSF) that later led to the "Independent Levee Litigation Team" (ILIT). The report has over 20 co-authors including myself and plaintiffs' expert Dr. Robert Bea. As this team was formed after Katrina, our only ability to observe the condition of the levees was to view the remants. Section 4.5 of the report describes post Katrina observations of the MRGO levees and provides the following:

1.      Discussion is centered on overtopping, which occurred from +0.5 to +7.5 ft. There is no discussion and no evidence was found upon which to base a determination that breaching occurred before overtopping.

2.      There is a discussion of sandy materials in the levee soils at the eroded sites. But even this discussion is connected to the levees' inability to resist overtopping, rather than breaching before overtopping."  JX-0210 (Wolff Report) at 33.

687.    "The ASCE provided an external review of the IPET analyses and conclusions through a group titled the External Review Panel (ERP)."  JX-0210 (Wolff Report) at 34.

688.    "The IPET report considers the failures along MRGO to be the result of overtopping, and found no evidence supporting a conclusion that erosion-induced breaching occurred before overtopping."  JX-0210 (Wolff Report) at 34.

689.    The IPET concluded that "[n]o levee breaches occurred without overtopping." JX-0210 (Wolff Report) at 35.

690.    Dr. Wolff observed that "'[t]he IPET investigation has shown that even if the levees along MRGO were totally constructed of a clean sand, which they were not, the time that the water remained on the unprotected side of the levees due to the Hurricane Katrina surge before it overtopped the levees was not sufficient to establish through seepage and cause erosion of the levees.'"  JX-0210 (Wolff Report) at 36 (quoting JX-0277 (IPET Report) at Appendix 17).

691.    Dr. Wolff observed that "'[t]he IPET analysis and physical evidence at the sites show that the systemic issue for levee performance was overtopping, and the subsequent erosion from waves and ultimately surge. Where waves were incident perpendicular to the levees, the overtopping waves created velocities on the protected side of the levees up to three times those experienced on the front (water) exposed sides. This created a potential for erosion

123

27 times more severe on the crest and protected sides of the levees. In addition, claims of wave action increasing pore pressures within the relatively permeable materials of the interior of the levees leading to seepage-induced erosion do not stand the "test of time." The permeability of the materials was not sufficient to allow this process to take place in the time frame of exposure to high waves and surge."  JX-0210 (Wolff Report) at 36 (quoting JX-0277 (IPET Report) at Appendix V-18).

692.    "As noted in the IPET report, characterizing soil erodibility for a large earth structure such as the MRGO levees is nearly impossible, due to significant spatial variability. Soil composition, density, strength, cover, exposure and other variables can vary significantly from point to point, as can the characteristics of the attacking water."  JX-0210 (Wolff Report) at 36.

693.    The Independent Levee Investigation Team, of which Dr. Bea was a member, reported that "'[m]ethods and procedures for calculation of rates of likely erosion due to the various erosive mechanisms … are not well established, and there is little agreement within the profession as to how the erodibility of the various materials present…'"  JX-0210 (Wolff Report) at 37 (quoting JX-0242 (ILIT Report) at 6-5.

H.    *Flood Control Act Findings*

694.    Plaintiffs' expert Johannes Vrijling testified that the main point of entry of flood water into the New Orleans East polder was a breach in the New Orleans East Back Levee. Vrijling 835:6-10.

695.    Other floodwaters entered the polder by overtopping the Citrus Back Levee. Vrijling 837:11-20.

696.     Floodwaters entering the St. Bernard polder through breaches in the LPV levee along Reach 2 of the MRGO were the main source of the floodwaters in that polder, according to Plaintiffs' expert Paul Kemp.  Kemp 1933:9-20.

697.     Mr. Vrijling agreed, testifying that floodwater from the Reach 2 breaches flowed all the way to the Ninth Ward and would have caused flooding to about the same levels as occurred during the hurricane even if there had been no breaches in the floodwall on the east bank of the Inner Harbor Navigation Canal.  Vrijling 1063:4-13.

698.     To estimate floodwater elevations within the polders where the plaintiffs' properties were located, Mr. Vrijling calculated the volume of water that flowed over the levees and through the breaches.  Vrijling 907:15 – 909:23 (explaining calculation of overtopping flow that flooded polders), 835:6 – 836:10 (assumptions about breaching were basis for polder flood elevation estimates).

699.     Defendant's expert Steven Fitzgerald also computed the flood elevations in the St. Bernard polder based on estimates of the timing and extent of breaching along Reach 2 and in the IHNC.  S. Fitzgerald 2728:10-22; 2761:11-14, 2762:24 – 2763:7; 2766:8-11.

700.     Each of the plaintiffs' properties was flooded by floodwaters that flowed over the LPV levees and floodwalls and through breaches in the hurricane protection system. Vrijling 837:11-20 (Robinson property), 841:10 – 842:7 (Franz property), 846:3 – 847:17 (Lattimore properties), 848:8 – 849:4 (Smith property), 1055:14 – 1056:13 (Robinson property), 1058:25 – 1059:7 (Robinson property).

701.     The principal factor in determining where breaching occurred was the nature and quality of the LPV levees and floodwalls.

125

702.    The eastern flank of the LPV flood control system was massively breached by Hurricane Katrina.  The breaching is readily explicable.  The hydraulic forces imposed on the levees far exceeded the forces that the levees were designed to withstand.

703.    The Reach 2 levee was designed to withstand a hurricane surge reaching 13 feet above sea level.  The designed crown elevation of 17.5 feet took into account the breaking of waves on the levee and the resulting run-up of water above the "still-water" surge elevation. The levees were expected to withstand minimal overtopping as a result of this run-up.  They were not designed to withstand prolonged overtopping of massive quantities of water.

704.    About a third of the Reach 2 levee had a crown elevation of 16 feet or less. Because the "still-water" elevation exceeded this elevation for more than an hour and a half all along this levee, it was exposed to massive sheet flow in many places.  The waves extended the period of overtopping by several hours as they broke and ran up and over the levee. Defendant's wave expert, Dr. Donald T. Resio, calculated the rate of overflow and found that it vastly exceeded widely recognized thresholds used by levee designers in assessing when damage to a levee may be expected to result from overtopping flow.  Resio Supp. Report 1-10; Resio 2823:1-2; 2901:7-9, 15-17; *cf.* Vrijling 1049:7-21 ("EurOtop" reference used by levee designers).

705.    A comparison of levee reaches that failed with reaches that did not fail revealed that all of the breaches occurred in places where the levee was constructed of hydraulically extracted, hydraulically placed fill.

706    No levee that had been constructed of excavated, "trucked" fill was breached by Hurricane Katrina.

707.    The recognition of the relative weakness of hydraulic fill led the Corps to ban its use in 2001.

708.    Defendant's geotechnical experts Dr. Reed Mosher and Bruce Ebersole testified that the soil was more erodible in places where breaching occurred and less erodible where breaching did not occur.

709.    The nature and quality of the levee also was the principal determinant of the hydraulic load that the storm exerted on the levee.  Even though the surge and waves varied little along the Reach 2 levee, the hydraulic load varied greatly.

710.    The entirety of the Reach 2 levee was exposed to surge that reached about the same elevation (plus or minus six inches) and rose and fell at about the same rates and times. *See* Dutch Flow Report 32-33 (hyrdrographs for six locations).

711.    Waves varied somewhat more, with significant wave heights varying by about a foot (from about seven-and-a-half feet to eight-and-a-half feet) at the levee toe, according to the plaintiffs' experts.  PX-2009, at 8 (Table S1).

712.    The elevation of the levee toe and the stability berm was the principal factor in determining the size of the waves that reached the levee, because the height of these shallow-water waves was limited by the depth of the water.  Consequently, where the berm and toe were low the waves at the levee were higher, and where the berm and toe were high the waves at the levee were lower.

713.    Since surge elevation varied by only a foot or less and the toe elevation varied by as much as four feet, these variations in the levee were more influential in determining front-side hydraulic loading by waves.

714.    The greatest differences in hydraulic loading occurred on the backside of the levee.  Here again the levee geometry, specifically crown elevation, was the crucial factor.

715.    The overtopping flow varied dramatically as a result of varying crown elevations.  Flow over the top and down the back of the levee was greatest where the levee crown was lowest.  Overtopping occurred first and lasted longest at the lowest points in the levee crown.

716.    The Reach 2 crown elevation ranged from less than 14 feet to more than 18 feet. Morris Report 19; Ebersole Report 61 (Table 4); Resio Report 50 (Table 3).

717.    The paramount importance of levee crown elevation is seen in the wave height sensitivity study performed by Dr. Resio.  The duration of flow above the thresholds for initiation of erosion and major damage was influenced only slightly by varying significant wave heights by one or two feet.  Resio Supp. 6 (Fig. 1).  But raising the crest elevation from 14.5 feet to 18.5 feet reduced the duration of loading above these thresholds dramatically.  Duration above the threshold for major damage to an earthen levee exceeded five hours where the crown elevation was 14.5 feet.  By raising the crown elevation to 18.5 feet, that period was reduced by half, to less than two-and-a-half hours.  *Id.*  The threshold for initiation of erosion was exceeded for more than six hours where the crown elevation was 14.5 feet but was reduced by a third, to less than four hours where the crown elevation was 18.5 feet.  *Id.*  Levee crown elevation was the largest single factor in determining the volume of water that flowed over the levee at any given location.  Vrijling 1042:14 – 1046:19.

718.    More than two-thirds of the levee crown lay below the prescribed design elevation of 17.5 feet when the storm struck.  Morris Report 18-19; Resio Supp. Report 6 (Fig.

1).  Although crown elevation does not fully account for the difference between survival and

destruction of the levee, it was clearly a significant factor.  This is shown by the inverse

correlation that exists between pre-storm crown elevation and breaching.  Where the crown was

lower, breaching was more likely to have occurred.  Where the crown was higher, relatively

fewer breaches occurred.  Bea 1106:10-13; 1139:8-12.

719.    The quality of the turf (grass and substrate) also factored into the equation.

Dense grass rooted in erosion-resistant soil resisted the uprush and down flow of breaking

waves better than less dense grass growing in highly erodible soil.  Bea 1200:18-20; 2140:9 –

2141:15; 2144:8-10; 2281:2-19; Ebersole 2494:21 – 2496:18.  Dr. Bea found a definite

correlation between the quality of the turf on the levee and the performance of the levee during

the hurricane.  Bea 1201:16 – 1203:17; 1273:22 – 1274:13; 1276:18 – 1277:5; 1279:21 –

1280:8.  Indeed, he opined that dense grass cover, by lengthening the time before erosion

begins, "can be a border between survival and failure."  Bea 1201:5.

720.    That good turf can make the crucial difference in levee performance is illustrated

by Dr. Bea's reconfiguration of the levee in his "No MRGO, No Breaching" scenario.  Based on

the different rates of erosion that he applied in that scenario and in his "Katrina Real Run," Mr.

Ebersole concluded that Dr. Bea improved the turf covering the levee in Scenario 2c:  "[F]or

Scenario 1 he did not assume turf was of good quality, but he did for Scenario 2.  So that, in

essence, going from Scenario 1 to Scenario 2C to the neutral condition, he has made it much

more difficult to erode the back side of the levee under the Scenario 2C condition."  Ebersole

2278: 15-20.

721.    Dr. Bea also raised the crest of the levee to a uniform elevation of 17.5 feet along Reach 2 in his "No MRGO, No Breaching" scenario.  *See* PX-2153; Bea 1251-52 (affirming use of chart values in parametric studies); Mosher 3114:24 – 3115:2.  Changing the height of the levee was one of the "primary parameters" that Dr. Bea varied to understand the influence of crown elevation on "the ultimate outcome, flooding."  Bea 1253:7-8.

722.    In 1969, Col. Herbert R. Haar, Jr., who was then the New Orleans District Engineer, penned a letter in response to an inquiry from Congressman F. Edward Hebert concerning the LPVHPP.  The congressman had passed along a concern expressed by a constituent who was worried that the hurricane protection project "will not have all the answers because it excludes flood gates at the Gulf Outlet."  JX-0297 (Haar Letter) at 7.  In his response, Col. Haar explained that the Corps had considered putting surge barriers at the MRGO but had decided not to do so because such a structure "would result in a substantial increase in costs" with an "increase in benefits [that] was small by comparison."  *Id.* at 2.  Other reasons cited by the district commander included political opposition by state and local governments, delays associated with revising the LPV project to incorporate the new feature, and economic inefficiencies if the anticipated delays caused local governments "to proceed independently and at great cost with improvements to the existing levee systems for interim protections.  *Id.* at 3.

723.    Six years later, in a letter dated April 21, 1975, Col. Haar's successor penned a similar letter to G.J. Lannes, Jr., at the Regional Planning Commission.  Again the question of whether to place a surge barrier in the MRGO was discussed as an "alternative plan" for the LPVHPP. JX-0299 (Heiberg Letter) at 1.  Col. K.R. Heiberg III cited several of the same

reasons cited earlier by Col. Haar in explaining why the Corps would not support the alternative plan that included a barrier in the MRGO. *See id.* at 1-2.

724.    The third extant explanation of why the Corps decided not to place a surge barrier in the MRGO is found in a letter dated July 25, 1990, from the then Acting New Orleans District Engineer, Maj. Harold E. Manual, Jr., to Senator John Breaux. Major Manual explained that placing a surge barrier at the confluence of the MRGO and the GIWW "could not be economically justified" and would "represent a significant liability to the container industry and would doubtless cause the loss of cargoes, public investment, and jobs." DX-0844 (Manuel Letter) at 2. He reiterated the Corps's view that building a lock or closure across the MRGO "would not be a complete solution to either the erosion problem or maintenance demands of the channel." *Id.* He assured the senator that "[t]he channel represents no significant flood threat to the citizens of St. Bernard Parish," and pointed out that "[t]he virtually complete Chalmette Area Loop fo the Lake Pontchartrain and Vicinity hurricane protection project . . . provides standard project hurricane (SPH) storm protection to nearly all of the populated portions of the parish." *Id.*

725.    From the outset, the record also makes clear, the Corps considered the construction of foreshore protection, or "armored" banks, to be appurtenant to the LPV levees adjacent to the MRGO and the GIWW. *See* H.R. Doc. No. 89-231 (LPV Chief's Report) at 64-65.

726.    The levee designers recognized that armoring the south bank of the MRGO might become necessary to protect "the integrity of the levee": "erosion of the foreshore area between the levee and the channel bank by ship-generated waves will pose a threat to the

integrity of the levee.  Accordingly, foreshore protection will be provided *to protect the levee from such erosion.*"  LPV DM No. 3, Supp. No. 1, at 33; *see also* LPV DM No. 3, at 35.

727.    An understanding of foreshore protection as a feature of the flood control project comes into even sharper relief when it is remembered that the MRGO designers also anticipated erosion of the channel banks but chose the more economical remedy of allowing it to occur and then acquiring additional easements from adjacent landowners in the event that erosion began to encroach on private property:  "No channel protection is included in the overall cost of the project.  It is presumed that sufficient rights of way will be furnished by local interests to preclude use of channel protection or that additional rights of way will be furnished when the need arises."  DM 1-A ¶ 16, at 7; *accord* DM 1-B ¶ 19, at 5.

728.    Because "[b]ank protection works" were not part of the authorized plan and had not been included in the costs of the project, the designers dealt with "anticipated erosion" and "surface widening due to erosion" by conducting stability analyses and soil borings to determine how far away from the channel spoils would need to be deposited in order to provide an adequate factor of safety.  DM 2 ¶ 47, at 22.

729.    Surface widening was expected because "the upper part of the channel slope" consisted of "peat and highly organic clays."  DM 1-A ¶ 16, at 7 (Ex. 4); *accord* DM 1-B ¶ 19, at 5 (Ex. 5).

730.    To minimize maintenance requirements, the designs therefore called for "slopes of the channel cut not deeper than 1 on 2" because steeper cuts would result in excessive sloughing of the unstable, highly erodible banks.  DM 1-A, ¶ 15, at 7; *see also* DM 1-B ¶ 18, at 5 ("slopes on the channel cut not steeper than 1 on 2"); DM 2 ¶ 47, at 22 (Ex. 7) (same); *cf.* DM

1-B Endorsement of Div. Eng'r (Oct. 23, 1958) (commenting that box cutting the channel would "probably" result in "slopes of about 1 on 2" and recommending that "consideration . . . be given to excavating the final flatter slopes by a series of step cuts to reduce maintenance dredging," depending on the results of additional testing of soil strengths); DM 1-B Plate 12 (depicting the 1-on-2 channel side slope and labeling it "Theoretical Cut").

731.    Notwithstanding the plan's exclusion of bank protection and the absence of authorization for them, the designers noted that bank protection works were technically feasible if in the future such features were considered necessary.  *See* DM 1-A ¶ 16, at 7; DM 1-B ¶ 19.

732.    Based on a cost apportionment adopted by Congress in the 1958 Flood Control Act, the Chief of Engineers recommended that local entities assume 30 percent of the total cost of the LPV.  H.R. Doc. No. 89-231 (LPV Chief's Report) at 2.  Congress ratified this apportionment in the LPV authorizing legislation.  *See* Pub. L. No. 89-298, 79 Stat. 1073 (1965).

733.    In contrast, the federal government bore all of the cost of the MRGO.  "Local interests" therefore sought to have the cost of foreshore protection added to the MRGO and deducted from the LPV.  MRGO GDM No. 2, Gen. Supp. No. 4 ("Foreshore Protection") at 1; *Id.* App. B, at 1.  Judge Leander Perez telephoned the Chief of Engineers on March 3, 1966 to "express[] concern that the [LPV] project for the Chalmette area includes charges to local interests for bank protection work"  which the Boss of the Delta thought " was not a cost of hurricane protection, but a navigation cost to protect the levees against wave wash."

734.    The Corps's initial (internal) reaction was  one of understanding but disagreement:  "It is understandable that local interests would contend that the Outlet project

should bear some part of the cost of the riprap protection.  However, the benefits from the hurricane levee will include the prevention of flood damages and will allow considerable enhancement in the protected area. No benefits will accrue to the Gulf Outlet Channel because of the levee construction other than those that might stem from industrial development which could conceivably take place within the Chalmette area after it is afforded a higher degree of protection by the levee." *Id.* App. B, at 1-2.

735.    The Division Engineer for the Lower Mississippi Valley informed the Chief of his "belief that the levee slope protection along the Mississippi River-Gulf Outlet Channel is properly chargeable to the Lake Pontchartrain, La., and Vicinity hurricane protection project," but requested that the Chief himself decide the sensitive political controversy. *Id.* App. B., at 2. On April 15, 1966, the Chief issued his ruling:  "the portion of riprap costs that is required for [foreshore protection against erosion by wave wash from shipping] should be charged to the navigation project as a Federal cost for wave protection." *Id.* App. B, at 3.

736.    The Division Engineer interpreted this as a directive to apportion the cost of foreshore protection between the two projects.  He therefore directed the New Orleans District Engineer to "prepare and submit for approval by 27 May 1966 a breakdown of the riprap foreshore and levee slope protection costs, proportioned between the hurricane-flood protection project and the navigation project." *Id.* App. B, at 4.

737.    The District Engineer promptly complied with this directive.  When he delivered his cost estimate to the Division Engineer, however, the District Engineer used the occasion to voice his concerns about the Chief's decision:

 3.  The Mississippi River-Gulf Outlet was authorized long before
the Chalmette levee was even planned; hence, it seems strange that the

Outlet should be burdened with any construction which is subsequently
planned. The levee could have been planned at a more remote location
where no wavewash hazard would be involved; however, the optimum benefits
and costs are derived from a location close to the outlet channel.  At this
location, the maximum protected area is made available and the considerable
benefit of utilizing the spoil bank from the outlet channel is enjoyed, despite the
possible hazard of wavewash.

4.  The principle of having a project assume the financial burden, of a
subsequently authorized project may result in many of our marginal projects
being forced into a category of less than unity benefit-cost ratio by virtue of
factors that could not possibly have been evaluated when the project vas presented to the Congress.  The
making the Mississippi River navigation project bear the cost of levee slope paving in the
MR&T project, or of the Gulf Intracoastal Waterway bearing the cost of the locks which were
required in preViously authorized waterways in order to permit the levees to be extended to
protect additional land areas.

5.  This principle is in no wise comparable to that of taking action to correct an
unforeseen condition which has been brought on by the functioning of a project.
In the subject instance, no action would be required until the Chalmette levee is
constructed, hence the levee project should be complete within itself.

*Id.* App. B, at

738.    The Chief of Engineers took note of his subordinates' concerns, expressed his

appreciation of them, and informed them that his decision was "based on those facts pertaining

to the specific projects involved and it was not intended that it be considered a precedent . . .

applicable to other projects."  *Id.* App. B, at 7.

739.    He later decided that all of the cost of foreshore protection, not only on the south

bank of the MRGO but also on the north bank of the GIWW,  should be charged to the MRGO

project.  *Id.* App. B, at 4 (second pagination series).

740.    Despite this politically inspired decision on funding, engineering realities dictated

that the foreshore protection be designed as an integral part of the LPV.  The design for the

foreshore protection therefore continued to be developed in conjunction with the design of the flood control project.  LPV DM No. 3, Supp. No. 1; MRGO DM No. 2, Supp. No. 4, at 2-3, 15.

741.    When the Corps informed Congress of its plan to allocate these costs to the MRGO rather than the LPV, it explicitly noted that "this protection will be necessary to protect the new levees which will be constructed for sections for the Lake Pontchartrain and Vicinity Hurricane Protection project located adjacent to this ship channel."   MRGO DM No. 2, Supp. No. 4, App. B (separate pagination).

742.    As of August 29, 2005, all of the foreshore protection that had been described in the letter to Congress had been installed.  MRGO Bank Erosion Recon. Rpt. (Jan. 1994) at 9.

743.    The evidence clearly shows that the Corps did take into account the "changes that MRGO had wrought on the area" when it declined to put a surge barrier in the MRGO and when it decided to install foreshore protection to prevent erosion from destabilizing the LPV levee.

744.    The "funnel" effect of the MRGO was precisely the concern of the citizen who viewed the LPVHPP as "helpful" but inadequate "because it excludes flood gates at the Gulf Outlet . . . leaving a big door open."   Doc. 17703-3, at 7 (Crosby letter).

745.    Colonel Heiberg, the District Engineer in 1976, expressly acknowledged that the MRGO was functioning as a conduit for saline water, but he nevertheless rejected the notion that this "adverse effect[] of the MR-GO" required the construction of a surge barrier in the channel. Doc. 17703-4 (Heiberg letter).

746.    The Acting District Engineer in 1990 also acknowledged that "saltwater intrusion caused by the channel has also caused land loss and the conversion of fresh marsh and swamp to salt marsh."  DX-0844 (Manuel Letter) at 2.

I.      *Authorization of the MRGO*

747.    In response to a request from Congress for a report as to the "advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce," the Chief of Engineers prepared a report and recommendation to Congress ("Chief's Report").  DX-0573 (H.R. Doc. No. 82-245 (1951)) at 4, 12, 17, 39-43.

748.    The Chief's Report was transmitted to Congress by the Secretary of the Army and included a statement of support by the Governor of Louisiana.  DX-0573 (H.R. Doc. No. 82-245 (1951)) at 4, 12, 17, 39-43.

749.    The Chief's Report reflected that multiple routes were considered in determining where to construct the MRGO.  DX-0573 (H.R. Doc. No. 82-245 (1951)) at 2-3, 12, 33, 39.

750.    The Chief's Report recommended construction of a deep-draft channel on the east side of the Mississippi River.  DX-0573 (H.R. Doc. No. 82-245 (1951)) at 5.

751.    The recommended route ran from the Inner Harbor Navigation Canal ("IHNC") eastward along the Intracoastal Waterway to a point near Micheaud before striking a southeasterly course "to and along the south shore of Lake Borgne and through the marshes to and across Chandeleur Sound" to the Gulf of Mexico.  DX-0573 (H.R. Doc. No. 82-245 (1951)) at 5, 38, 43.

752.    The recommended route through the marshes next to Lake Borgne was considered preferable to eight other routes that were considered.  DX-0573 (H.R. Doc. No. 82-245 (1951)) at 11, 31-33.

753.    The Chief's Report stated that the recommended channel would be dug "through the marshes."  The decision to make "maximum use of land cuts" was intended to minimize the

return of dredged spoil into the channel, minimizing maintenance dredging costs.  DX-0573

(H.R. Doc. No. 82-245 (1951)) at 5, 37.

754.    The Chief's Report recommended construction "generally in accordance with the

plans of the division engineer and with such modifications thereof as in the discretion of the

Secretary of the Army and the Chief of Engineers may be desirable." DX-0573 (H.R. Doc. No.

82-245 (1951)) at 5.

755.    This discretion included the ability to change the alignment of the channel after

authorization based on more detailed studies that were to be performed during the design stage.

DX-0573 (H.R. Doc. No. 82-245 (1951)) at 5, 43.

756.    The recommendation was based on a cost/benefit ratio.  The favorable ratio was

based on a decision to maintain the channel through dredging only.  The recommendation did not

include additional features such as barriers or foreshore protection.  DX-0573 (H.R. Doc. No.

82-245 (1951)) at 33.

757.    The recommendation was conditioned on the furnishing by "local interests . . .

free of cost to the United States all lands, easements, rights-of-way, and spoil-disposal areas for

the initial construction, and when as required for subsequent maintenance."  DX-0573 (H.R.

Doc. No. 82-245 (1951)) at 5.

758.    The recommendation called for the dimensions of the channel to be 36 feet deep

and 500 feet wide at depth, to increase to 38 feet deep and 600 feet wide at depth in the Gulf of

Mexico.  DX-0573 (H.R. Doc. No. 82-245 (1951)) at 5, 43.

759.    Neither the Chief's Report nor the authorization discussed the top width of the MRGO or the angle used to construct the side slopes and banks of the MRGO.  DX-0573 (H.R. Doc. No. 82-245 (1951)) at 5, 43.

760.    Neither the Chief's Report nor the authorization included barriers to impede the flow of water through the channel.  DX-0573 (H.R. Doc. No. 82-245 (1951)) at 5, 43.

761.    Public Law Number 84-455 authorized construction of the MRGO, and required that it be constructed "substantially in accordance with" the recommendation contained in the Chief's Report.  DX-0051 (Pub. L. No. 84-455, 70 Stat. 65 (1956)).

J.    *Design of the MRGO*

762.    After authorization, the Corps prepared a series of designs for the MRGO. Design and construction occurred in phases, with construction of certain segments occurring while the designs of other segments were still being developed.  JX-0139 (DM No. 1-A: Channels Mile 63.77 - Mile 68.85 (Apr. 1957 (rev. Jul. 1957))); JX-0356 (DM No. 1-B: Channels Mile 39.01 - Mile 63.77 (Sept. 1958 (rev. May 1959))); JX-0140 (DM No. 1-C: Channels Mile 0 to Mile 36.43 (Bayou La Loutre); Mile 0 to Mile -9.75 (38 ft. contour) (Nov. 1959)); DX-1042 (DM No. 2: Gen'l Design (June 1959)); JX-0244 (GMD No. 2, Supp. No. 4 (Foreshore Protection) (Apr. 1968)).

763.    A series of design memoranda were prepared that provided details of the designs and explanations for why certain designs were chosen over others.  JX-0139 (DM No. 1-A: Channels Mile 63.77 - Mile 68.85 (Apr. 1957 (rev. Jul. 1957))); JX-0356 (DM No. 1-B: Channels Mile 39.01 - Mile 63.77 (Sept. 1958 (rev. May 1959))); JX-0140 (DM No. 1-C: Channels Mile 0 to Mile 36.43 (Bayou La Loutre); Mile 0 to Mile -9.75 (38 ft. contour) (Nov.

1959)); DX-1042 (DM No. 2: Gen'l Design (June 1959)); JX-0244 (GMD No. 2, Supp. No. 4

(Foreshore Protection) (Apr. 1968)).

764.    In preparing these design memoranda, the Corps coordinated with other federal

and state agencies and considered the views of those agencies in finalizing the designs.

765.    Comments from other federal and state agencies and changes based on those

comments were included in the design memoranda.

766.    This paragraph is intentionally left blank.

767.    The design memoranda did not specify the MRGO's top width; instead, the

memoranda specified the bottom width and side slopes.  JX-0356 (DM 1-B (Sept. 1958)).

768.    The design memoranda show that erosion of the banks of the MRGO was

expected.  The MRGO was designed to provide channel stability without the use of bank

protection works, which were not recommended as a project feature nor included in the costs.

DX-1042 (GDM No. 2) at 22, ¶ 47.

769.    The design memoranda determined that channel side slopes of "one on two"

would provide adequate channel stability.  DX-1042 (GDM No. 2) at 21-22, ¶ 46-48.

770.    The design memoranda stated that they assumed that sufficient rights of way

would be furnished by local interests if erosion caused the banks to widen beyond the existing

rights of way.

771.    Consistent with the Chief's Report and authorization, the design memoranda

included no barriers to impede the flow of water through the channel.  *See* JX-0139 (DM 1-A) at

2-9 & Plate 2; JX-0356 (DM 1-B) at 3& Plates 2-9.

772.    In April 1958, the U.S. Fish and Wildlife Service issued an Interim Report on Fish and Wildlife Resources as Related to the MRGO Project and an outline of proposed fish and wildlife studies.  JX-0018 (Fish and Wildlife Report).

773.    In June 1958, the Corps funded a study by Texas A&M University through the U.S. Fish and Wildlife Service to review the MRGO project area and recommend a program of data collection to support future ecological studies.  JX 356 (MRGO DM No. 1-B) at 8.

774.    The U.S. Fish and Wildlife Service issued a Preliminary Report of Marsh Vegetation Study, which evaluated project impacts from initiation of the study in 1958 through August 1960.  JX-0018 (Fish and Wildlife Report).

K.    *Construction of the MRGO*

775.    Construction on the MRGO began in 1958.  DX-1027 (MRGO Reconnaissance Report on Channel Bank Erosion, Feb. 1988) at 14 [hereinafter 1988 Recon. Rep.]. By mid-1961, the project was 20 percent complete.  DX-0610 (H.R. Doc. No. 89-231 (1965)) at 53.

776.    In 1942, prior to and independent of construction of the MRGO, the GIWW was dredged to a depth of 17 feet and a width of 165 feet as a war-time measure.  DX-0573 (H.R. Doc. No. 82-245) at 23.

777.    Construction was performed in phases, with completion of an access channel in 1961, an interim channel in 1963, and the full project channel in 1968.  DX-1027 (1988 Recon Report) at 14.

778.    At the suggestion of the U.S. Fish and Wildlife Service, retention dikes were constructed to contain the dredged material within the designated spoil area and to prevent it from entering the adjacent marshes.  JX 356 (MRGO DM No. 1-B) at 9-10.

141

L.    *Maintenance of the MRGO*

779.    Erosion caused material to "shoal" to the bottom of the channel, thereby reducing

the depth of the channel.  DX 788 (1976 EIS).

This shoaling, if unaddressed, would prevent ships from using the channel.  DX 788

(1976 EIS).

780.    Erosion occurred for a number of reasons, including: (1) natural subsidence and

sea level rise; (2) wind-driven waves; (3) wave wash caused by vessel activity; and (4) dredging

activities.  JX-0080 (Russo Dep., May 21, 2008) at 42:1-43:18; DX 788 (1976 EIS).

781.    Maintenance dredging was necessary to restore the channel to authorized depth so

that ships could travel as intended.  JX-0119 (Broussard Dep., Mar. 31, 2008) at 183:17-22;

142:16-21; DX 788 (1976 EIS).

782.    The Corps has adopted an engineering regulation, entitled "Project Operations -

Navigation and Dredging Operations and Maintenance Policies," which "establishes the policy

for the operations and maintenance (O&M) of USACE navigation and dredging projects, as well

as their related structures and equipment."   DX-1488 (ER 1130-2-520) at 1-1.

783.    It is the Corps' policy that dredging shall be accomplished in an efficient,

cost-effective, and environmentally acceptable manner to improve and maintain the Nation's

waterways to make them suitable for navigation and other purposes consistent with Federal laws

and regulations.  DX-1488 (ER 1130-2-520) at 8-2a(1)-(2), (6)-(7), (10).

784.    It is the Corps' policy to maximize the practicable benefits of materials dredged

from authorized Federal navigation projects, taking into consideration economics, engineering,

and environmental requirements in accordance with applicable Federal laws and regulations (33 CFR Parts 335-338). DX-1488 (ER 1130-2-520) at 8-2a(1)-(2), (6)-(7), (10).

785.    It is the Corps' policy to permit overdepth dredging (depth and/or width) outside the specified minimum dimensions to account for inaccuracies in the dredging process. District commanders may permit dredging of a maximum of two feet allowable overdepth in coastal regions and in inland navigation channels. DX-1488 (ER 1130-2-520) at 8-2a(1)-(2), (6)-(7), (10).

786.    The Corps' policy permits advance maintenance dredging, to a specified depth and/or width, to be performed in critical and/or fast shoaling areas to avoid frequent redredging and ensure the least overall cost of maintaining the project. DX-1488 (ER 1130-2-520) at 8-2a(1)-(2), (6)-(7), (10).

787.    The Corps' policy permits side slopes to be dredged by dredging along the slope of the required dimension or by dredging an equivalent box cut at the base of the side slope for the required dimension. DX-1488 (ER 1130-2-520) at 8-2a(1)-(2), (6)-(7), (10).

788.    It is the Corps' policy that dredging of any and all navigation projects shall be justified to reflect the current level of navigation activity at the project, to provide rationale for the channel dimensions to be dredged, the frequency of dredging, and, as a minimum, shall be in accordance with the current budgetary guidance. DX-1488 (ER 1130-2-520) at 8-2a(1)-(2), (6)-(7), (10).

789.    The operations manager for the MRGO had the responsibility to determine when maintenance dredging should be conducted. Russo 3515: 15 - 3516: 8; JX-0119 (Broussard Dep., Mar. 31, 2008) at 45:15-18.

790.    The operations manager determined which sections of the channel needed to be dredged based on surveys of the channel and available funds in the Operations and Maintenance budget.  Russo: 3515: 15 - 3516: 8;   JX-0119 (Broussard Dep., Mar. 31, 2008) at 45:15-18.

791.    There were several years that the MRGO Operations and Maintenance budget did not include enough money to dredge the channel to its  full dimensions.  Russo: 3516: 4-17.

792.    The operations manager had discretion to determine how to allocate the available Operations and Maintenance funds.  Russo: 3515: 15 - 3516: 8

793.    The channel was often dredged less than 500 feet wide because of a lack of funding.  Russo: 3516: 4-17.

*M.    Disposal of Dredged Materials*

794.    Each maintenance dredging event required identification of a disposal area for the dredged spoil.  Russo: 3530: 4-13.

795.    Disposal of dredged material is limited by the Federal Standard, which requires the Corps to use the least costly disposal alternative that is consistent with sound engineering practices and meets environmental requirements.  Russo 3531: 16 - 3531: 7.

796.    Sometimes, the Corps used designated "upland" disposal areas—areas on the shore—to dispose of dredged maintenance spoils.  JX-0257 (Final Environmental Impact Statement, 2007) at I-9, 10; Russo 3530: 14 - 3531: 7.

797.    Other times, the Corps disposed dredged maintenance spoils in open water.  JX-0257 (Final Environmental Impact Statement, 2007) at I-9, 10; Russo 3530: 14 - 3531: 11.

144

798.    The Corps also disposed of dredged materials in locations where the spoils can beneficially promote the growth of wetlands.  Russo 3531: 8-11; JX-0084 (Miller Dep., Apr. 16, 2008) at 224:22-25, 225:1-12.

799.    The Corps created new wetlands through disposal of dredged spoils when appropriate. Russo 3531: 8-11; JX-0084 (Miller Dep., Apr. 16, 2008) at 224: 22-25, 225: 1-12.

800.    Beneficial use of dredged spoils is considered appropriate when it will not result in environmental degredation and the cost is justified by environmental, economic, and social benefits.  DX-0018 (Water Resources Development Act, 33 U.S.C. § 2326); Russo 3531: 8 - 3532: 14.

801.    Where beneficial use can be accomplished within the Federal Standard, it may be done with Operation and Maintenance funds.  Russo 3531: 8 - 3533: 7.

802.    The Water Resources Development Act of 1992 permitted a cost-sharing partnership to cover the incremental cost of beneficial disposal where the cost required to accomplish the beneficial disposal exceeded the Federal Standard.  DX-0018 (Water Resources Development Act, 33 U.S.C. § 2326).

803.    The Louisiana Department of Natural Resources was the cost-sharing partner for the Corps beneficial disposal of material dredged from the MRGO, and their agreement was required for each beneficial disposal event if the cost exceeded the Federal Standard.  Russo 3533: 17 - 3534: 14.

804.    As of Hurricane Katrina, the beneficial use of material dredged from the MRGO had contributed to the creation of 1053 acres of land in the area between the MRGO and Lake

145

Borgne, 335 acres of land in the vicinity of the MRGO jetties, and 187 acres on Breton Island.

DX-0392 (Draft Project Management Plan, O&M MRGO, July 2005) at Table 8.

N.      *Corps' Efforts to Address Bank Erosion Along the MRGO*

805.     The Corps of Engineers was aware of shoreline erosion along the MRGO and

studied methods to reduce erosion.  *See generally,* DX-1027 (1988 Recon Report).

806.     Wave wash from ships traveling on the MRGO caused bank erosion, diminishing

the depth of the channel, widening the top, and eroding adjacent marsh.  *See* DX-1027 (1988

Recon. Rep. at 26 (Ex. 8)); DX-1028 (MRGO Reconnaissance Report on Channel Bank Erosion

at 1 (Jan. 1994) (Ex. 20) [hereinafter 1994 Recon. Rep.]).

807.     In September 1979, the Corps of Engineers received two requests, one from

Representative Livingston, the other from Senator Long, both asking the Corps to respond to

concerns about bank erosion on the MRGO, in particular the development of a north shore levee

using MRGO dredge spoil.  PX-1033, PX-1034 (Letters of Long, Livingston to Col. Sands).

808.     The Corps responded that, "Existing US Army Corps of Engineers authority

derived through Public Law 455 does not provide for expenditure of Federal funds for

acquisition of additional rights-of-way, easements, or for the construction of bank protection in

the unleveed reaches of the MR-GO channel.  As the local assuring agency, the Board of

Commissioners of the Port of New Orleans agreed to hold and save the United States free from

all claims for damages resulting from the construction, maintenance, and operation of the

project."  PX-1033, PX-1034 (Col. Sands response to letters from Long and Livingston, 1979).

809.     In the same letter response to Congress, Col. Sands wrote that, "While no Federal

authority presently exists through the Corps of Engineers for erosion protection in unleveed

reaches of the MR-GO, the progressive disposal of dredged material . . . along the north bank of the MR-GO in the problem areas does appear to have merit as a possible solution. However, before this alternate can be actively pursued by the Corps of Engineers, the Board of Commissioners of the Port of New Orleans would have to provide additional rights-of-ways for disposal sites, retaining dikes for the containment of the material, and all technical data necessary for revision of the environmental impact statement. Finally, this option for dredged material disposal can only be exercised by the Corps if the method of disposal does not result in higher total Federal costs for maintenance dredging, and the disposal plan is found to be environmentally acceptable." PX-1033, PX-1034 (Col. Sands response to letters from Long and Livingston, 1979).

810.    In 1982, Congressman Robert L. Livingston, Jr., of the Louisiana 1st Congressional District, passed a resolution directing the Corps to look into the feasibility of bank foreshore protection along the unleveed, a.k.a., north shore of the MRGO. DX-1027 (1988 Recon Rep. at 2).

811.    By 1984, the Corps had constructed test sections to evaluate the performance of erosion control measures along the MRGO. DX-1690 (Gagliano Tab 10: The Mississippi River Gulf Outlet: A Study of Bank Stabilization, December 1984, at 5-5).

812.    In February 1988, the Corps issued the 1988 Reconnaissance Report. DX-1027 (1988 Recon Rep.).

813.    The 1988 Report was 100% federally funded. DX-0023 (Deposition of Tom Podany).

814.    The purpose and scope of the report was as follows: 1) to define the extent of erosion and erosion-related problems occurring in the study area; 2) identify opportunities to implement solutions to the defined problems; 3) appraise the Federal interest in potential solutions to defined problems by evaluating the costs, benefits, and environmental impacts of the potential solutions; 4) determine, based on the appraisal of the Federal interest, whether planning should proceed beyond the reconnaissance phase into more detailed feasibility phase investigations; 5) estimate the time and cost required to complete feasibility phase studies, if Federal interest is indicated; and 6) assess the level of interest and support of non-Federal interests in the identified potential solutions to defined problems.  DX-1027 (1988 Recon Rep. at 2-3).

815.    The goal of the 1988 Report was to identify potentially economically justified and environmentally acceptable bank protection for the unleveed shores of the MRGO.  DX-0023 (Deposition of Tom Podany).

816.    The 1988 Report identified erosion along the north bank of the MRGO as a problem.  DX-1027 (1988 Recon. Rep.).

817.    Several potential solutions were considered, including no action, several possible foreshore protection measures, and a reduced speed limit for vessel traffic through several reaches of the MRGO.  DX-1027 (1988 Recon. Rep.).

818.    The 1988 Report included a recommendation that closure of the MRGO be considered as a potential solution.  DX-1027 (1988 Recon. Rep.).

819.    The 1988 Report concluded that continued bank erosion would pose problems in the future related maintenance dredging of the MRGO.  DX-1027 (1988 Recon. Rep.).

148

820.    Based on preliminary analysis of potential structure design effectiveness, reliability, and survivability; costs; benefits; and impacts; one structural option and four conceptual structure designs were recommended for detailed investigation.  DX-1027 (1988 Recon. Rep.).

821.    Public involvement was an important facet of the 1988 Report, and the Corps worked with several agencies, including the Louisiana Department of Natural Resources, to determine local interest and a potential local cost-sharing sponsor with respect to bank erosion protection.  DX-1027 (1988 Recon. Rep.).

822.    The 1988 report recommended that a supplement to the General Design Memorandum be completed, which would encompass further studies that would otherwise be contained in a feasibility study.  DX-1027 (1988 Recon Report); DX-0023 (Deposition of Tom Podany).

823.    The 1988 report was submitted to the Lower Mississippi Valley Division for comments upon the District Engineer's approval.  DX-1027 (1988 Recon Report).

824.    The 1988 report was also circulated to members of both the United States and Louisiana Congresses, as well as to several federal, state, and local agencies.  DX-1027 (1988 Recon Report, App. D).

825.    By the middle of 1989, new modeling revealed that the recommendations contained in the 1988 report were not valid.  DX-0023 (Deposition of Tom Podany).

826.    That modeling showed that attempts to justify north shore bank protection solely on maintenance savings tied to the navigation project did not result in an economically justifiable project.  DX-0023 (Deposition of Tom Podany).

827.    The Corps, at that point, realized that it did not have a process that would result in economically justifiable bank protection along the north shore of the MRGO.  DX-0023 (Deposition of Tom Podany).

828.    Over a period of time, the Corps determined that certain non-monetary valuation should be done with respect to environmental factors, such as wetlands loss.  These non-monetary benefits were to be incorporated into the benefit-cost ratios of potential solutions to determine if foreshore protection could be economically justified.  DX-0023 (Deposition of Tom Podany).

829.    This new methodology resulted in the 1994 Reconnaissance Report, published in January 1994.   DX-1028 (1994 Recon Report); DX-0023 (Deposition of Tom Podany).

830.    The authorization for the 1994 Recon Report was the same as the authorization for the 1988 report.  The purpose of the 1994 Recon Report was also the same as the 1988 report. DX-1028 (1994 Recon Report); DX-0023 (Deposition of Tom Podany).

831.    The 1994 Report identified potential cost-sharing partners as the Port of New Orleans, the Louisiana Department of Transportation, the Louisiana Department of Natural Resources, and St. Bernard Parish.  DX-0023 (Deposition of Tom Podany).

832.    Ultimately, the Port of New Orleans was seen as the most likely local sponsor for the project, which involved placement of 30 miles of rock dike protection along the north shore of the MRGO.  DX-1028 (1994 Recon Report).

833.    Environmental benefits were included in the 1994 report as a way to justify the project.  DX-0023 (Deposition of Tom Podany); DX-1028 (1994 Recon report).

834.    The 1994 report, like the 1988 report, identified bank erosion as a severe problem along the north shore of the MRGO.  DX-1028 (1994 Recon Report).

835.    The 1994 Report considered structural alternatives in the form of bank protection. It also considered non-structural options, including full closure of the MRGO and placing a speed limitation on ship traffic.  DX-1028 (1994 Recon Report).

836.    Based on an evaluation of both monetary savings and non-monetary environmental benefits of marshland creation, the report concluded that bank stabilization measures may be warranted.  DX-1028 (1994 Recon Report).

837.    The three objectives that stabilization would fulfill were 1) controlling bank erosion to minimize maintenance requirements; 2) reduction of rate of coastal wetlands adjacent to the MRGO; and 3) restoring, to the extent practicable, wetlands previously converted to open water as a result of bank erosion and saltwater intrusion.  DX-1028 (1994 Recon Report).

838.    The 1994 report recommended proceeding to a feasibility study, with cost sharing to be borne 70% Federal and 30% non-Federal.   DX-1028 (1994 Recon Report).

839.    Congress was informed of the existence of the 1994 Report.  DX-0866 (Oct. 12, 1994 Letter from District Engineer to Senator Breaux (NOP-018-000002656-58) at 2).

840.    In correspondence to Senator Breaux, the Corps informed the Senator of the 1994 Reconnaissance Report, stating that it "contained a recommendation to proceed with feasibility studies contingent upon the identification of a non-Federal sponsor and certification of the report by higher authority.  The purpose of the study will be to determine the advisability of constructing environmental restoration measures, which could include bank protection along the MR-GO.  To date, a non-Federal sponsor willing to cost share in the feasibility study has not

been identified." DX-0866 (Oct. 12, 1994 Letter from District Engineer to Senator Breaux (NOP-018-000002656-58) at 2).

841.    The feasibility study was never initiated due to a lack of a cost-sharing partner. DX-0023 (Deposition of Tom Podany).

842.    In 1995, the United States' House of Representatives Appropriations Committee issued House Report 104-149 in conjunction with the Energy and Water Appropriations Bill, 1996. DX-0440 (H. Rpt. 104-109); DX-1747 (1996 Evaluation Report).

843.    The House Report included the following statement regarding the MRGO: "The Committee is aware that the authorized 36-foot Mississippi River-Gulf Outlet channel is experiencing serious bank failures on its north bank due to land subsidence, which is significantly increasing dredging costs. The Committee is aware that the Corps of Engineers recently experienced serious dredging delays, which caused draft restrictions, while attempting to resolve environmental issues in the process of obtaining Coastal Zone Consistency to dredge the Mile 50-56 reach. To resolve this particular issue, the only available solution was to construct a rock dike that provided bank stabilization before dredging could be accomplished. The Committee is of the opinion that to minimize future dredging costs and preserve wetlands the north bank Mississippi River-Gulf Outlet should be stabilized with riprap or similar hardened protection, as necessary, using available operation and maintenance funds." DX-0440 (H. Rpt. 104-109); DX-1747 (1996 Evaluation Report).

844.    In response, the Corps compiled a report called the Mississippi River-Gulf Outlet, Louisiana North Bank Foreshore Protection Evaluation Report, dated October 1996. DX-0023 (Deposition of Tom Podany); DX-1747 (1996 Evaluation Report).

845.    The purpose of the 1996 Evaluation Report was to determine the advisability of constructing additional rock dikes along the unleveed reaches of the north bank of the MRGO. DX-1747 (1996 Evaluation Report); DX-0023 (Deposition of Tom Podany).

846.    The report assessed whether such measures would reduce the overall maintenance costs of the project, identified the reaches for which such protection would be economically justified, and provided a recommended implementation schedule based on economic and engineering considerations.  DX-1747 (1996 Evaluation Report).; DX-0023 (Deposition of Tom Podany).

847.    The report was funded by available operation and maintenance funds.  DX-1747 (1996 Evaluation Report); DX-0023 (Deposition of Tom Podany).

848.    Eleven different options were developed for one design alternative.   DX-1747 (1996 Evaluation Report); DX-0023 (Deposition of Tom Podany).

849.    The report, after evaluating the environmental effects and monetary benefits, concluded that bank stabilization measures be implemented along miles 54.1-56, miles 43-44.5, and miles 41-43.  Such measures revealed a benefit-cost ratio of 2.17.  DX-1747 (1996 Evaluation Report); DX-0023 (Deposition of Tom Podany).

850.    Analysis indicated that some of the other reaches not selected for construction were either slightly deficient in terms of economic justification or marginally feasible with a lower probability of success due to their proximity to the Gulf.  DX-1747 (1996 Evaluation Report); DX-0023 (Deposition of Tom Podany).

851.    It was proposed that one to two years after construction of protection on the first selected reach, a re-analysis be done to determine whether additional protection would be justified.  DX-1747 (1996 Evaluation Report); DX-0023 (Deposition of Tom Podany).

O.    *The Corps Continued to Reevaluate the MRGO and the Hurricane Protection System*

852.    The operation and maintenance of the MRGO flowed from the original design of the MRGO.  JX-0447 (Kemp Dep. at 272:15 to 273:6).

853.    Building a surge barrier in the MRGO would have required Congressional authorization and funding. JX-0447 (Kemp Dep. at 269:25 to 271:8).

854.    The Corps selected the route for the MRGO to reduce future maintenance costs and to allow for the development of potential industrial sites. JX-0447 (Kemp Dep. at 286:8 to 287:22; 291:3 to 291:24).

855.    The MRGO project and the LPV project were underfunded.  JX-0204 (Kemp Report at 32).

856.    The Corps, through a letter written by Colonel Haar, rejected construction of a surge barrier because the project: (1) was not economically justified; (2) would not include credits for the work already accomplished by local interests; (3) would require additional Congressional authorization; (4) would abandon work already accomplished on building levees; and (5) would interfere with shipping and navigation interests.  JX-0447 (Kemp Dep. at  280:23 to 281:17, 282:18 to 283:1); JX-0204 (Kemp Report at 23-24).

857.    On July 25, 1990, then-Acting District Engineer, Maj. Harold E. Manuel, Jr., wrote a letter to Louisiana Senator John Breaux indicating that the Corps had considered and

154

rejected placing a surge barrier at the confluence of the MRGO and the GIWW because it "could not be economically justified."   DX-0844 (Manuel Letter).

858.    The letter further stated that such a barrier would "represent a significant liability to the container industry and doubtless cause the loss of cargoes, public investment, and jobs." DX-0844 (Manuel Letter).

859.    The letter also responded to concerns about land loss and saltwater intrusion by noting that "[t]he salt marsh is . . . a valuable nursery area and habitat for fish and shellfish, including red drum, speckled trout, shrimp, oysters, and blue crabs."   DX-0844 (Manuel Letter).

860.    The letter noted that "a number of commercial and recreational fishing businesses and oil field service vendors are based near the channel . . . and make heavy use of the MR-GO." Closure was not considered economically justified because it would result in annual losses of about $13 million or more.  DX-0844 (Manuel Letter).

861.    On September 23, 1969, then New Orleans District Engineer, Col. Herbert R. Haar, Jr., wrote a letter to Congressman F. Edward Hebert.  The letter is in response to a constituent's concern that the Lake Pontchartrain and Vicinity Hurricane Protection Project "will not have all the answers because it excludes flood gates at the Gulf Outlet."   In it, Col. Haar explained that the Corps rejected a flood protection plan with surge barriers at the MRGO because it "would result in a substantial increase in costs" with an "increase in benefits [that] was small by comparison."   JX-0297 (Haar Letter at 1-2).

862.    The Corps also considered the political implications: adoption of the plan featuring surge barriers on the MRGO "would mean that none of the work already accomplished by local interests . . . would be incorporated into the Federal project and no credit for such work

155

could be allowed."  Delays associated with adopting the plan would "likely" cause local political

entities "to proceed independently and at great cost with improvements to the existing levee

systems for interim protections.  For these reasons, the Orleans Levee District, the agency

designated by the Governor to provide the local cooperation required for the project, and the

Louisiana Department of Public Works, local coordinator for the project, have expressed their

opposition to such a plan."  DX-0844 (Haar Letter).

863.    The Corps also considered public safety:  "[T]he modifications involved are so

broad in scope as to be beyond the discretionary authority of the Chief of Engineers to adopt, so

that project review and subsequent Congressional action wold be required. During the time that

this process was being accomplished, progress in planning and constructing some of the most

urgently needed project features would be discontinued."  DX-0844 (Haar Letter).

864.    Commercial interests were also considered: "operation of two features of the plan,

namely, the navigation gate in the Mississippi River-Gulf Outlet and the lock in the Gulf

Intracoastal Waterway, would significantly impede seagoing and inland navigation."  DX-0844

(Haar Letter).

865.    On April 21, 1975, then District Engineer, Col. K.R. Heiberg III, wrote a letter to

G.J. Lannes, Jr. The letter indicates that the Corps considered the economic, political,

commercial, and social implications, including public safety implications, in deciding not to

build a floodgate in the MRGO.  JX-0299 (Heiberg Letter).

866.    In 1979, the Corps received correspondence from Rep. Livingston requesting that

the Corps respond to the concerns one of his constituents had about the LPV project, in

particular the "danger of flooding from hurricane tides in the Mississippi River Gulf Outlet." Elmo C. Waltzer letter to Livingston; Livingston letter to Col. Sands.

867.    In response, then District Engineer, Col. Tom Sands, sent a letter, dated Jan. 10, 1979, to Mr. Waltzer and a copy of the same to Rep. Livingston.  In that letter, Col. Sands indicated that the District Court for the Eastern District of Louisiana had enjoined construction on the barrier portion of the LPV project.  He noted that the MRGO barrier plan would be reconsidered as part of the alternative plans study in conjunction with the preparation of environmental impact statements.  The Corps indicated that it was currently undertaking studies regarding the effects of barriers on biological organisms and water quality parameters.  Letter from Sands to Waltzer.

868.    In 1999, the Corps initiated a reevaluation study of  the MRGO based on three factors: (1) the possibility that the Port of New Orleans might move some of its facilities from the IHNC to the Mississippi River; (2) the environmental community and local interests characterized the MRGO as an environmental disaster; and (3) efforts to ameliorate some of the environmental effects of the MRGO using O&M funds were inadequate.  JX-0349 (Sept. 2005 Draft Report at 8).

869.    The reevaluation study considered whether continued operation of the MRGO was justified.  JX-0349 (Sept. 2005 Draft Report at 11).

870.    The study evaluated several alternatives for maintenance of the channel, including abandoning all maintenance as well as constructing a physical closure of the channel at the Bayou La Loutre ridge. JX-0349 (Sept. 2005 Draft Report at 45-49).

871.     In connection with the reevaluation, a hurricane storm surge model was used to examine the influence of the MRGO upon storm surge because of concerns that the MRGO poses a threat of flooding from hurricanes.  JX-0349 (Sept. 2005 Draft Report at 9).

872.     The storm surge model compared storms scenarios with the existing geomorphology of the channel and with a complete closure at the Bayou La Loutre ridge.  JX-0349 (Sept. 2005 Draft Report at 9).

873.     Also in connection with the reevaluation, a study titled, "Salinity Changes in Pontchartrain Basin Estuary, Louisiana, Resulting from Mississippi River-Gulf Outlet Partial Closure plans with Width Reduction" was conducted and a report on the study was issued in August 2002.  JX-0349 (Sept. 2005 Draft Report App. C).

874.     The reevaluation study was not completed as of Hurricane Katrina.

Prior to Hurricane Katrina, the Corps also had initiated a study to evaluate hurricane protection necessary for a Category 4 or 5 storm.

P.     *Authorization of the LPVHPP*

875.     In 1955, Congress authorized the Corps to conduct hurricane protection studies. JX-0466 (Decision-Making Chronology) at A-3.

876.     In 1962, the Secretary of the Army transmitted a report to Congress (the "Interim Survey Report") with interim findings and a recommendation of the District Engineer for what was later called the "Barrier Plan," which had higher net benefits and lower cost than the alternative "High Level Plan."  JX-0466 (Decision-Making Chronology) at A-5.

877.     The Interim Survey Report is the planning document that was used for project authorization in 1965.  JX-0466 (Decision-Making Chronology) at A-5.

158

878.    The Interim Survey Report recognized that hurricane damages result from surges, including those from the MRGO.  JX-0278 (Interim Survey Report) at i.

879.    The Interim Survey Report also recognized the related problem that the MRGO provides a deep, direct route for the inflow of saline currents from the Gulf of Mexico to the area along its channel and to Lake Pontchartrain.  JX-0278 (Interim Survey Report) at i.

880.    The Corps performed a hydraulic modeling study to evaluate the effects of proposed hurricane surge control structures and the MRGO on Lake Pontchartrain, which included an evaluation of the salinity impacts from construction of the MRGO.  JX-0174 (Technical Report 2-636, Nov. 1963).

881.    The hydraulic modeling study initially was authorized in 1958, and extension of the model to include evaluation of the MRGO was authorized in 1960.  Results of the model investigation were published in November 1963 and were incorporated into the recommendation by the Chief of Engineers to Congress for approval of the LPV.  JX-0174 (Technical Report 2-636, Nov. 1963); DX-0610 (House Doc. 231, 89th Congress, 1st Session (Chief's Report)) at 60.

882.    In 1965, the "Chief's Report" was transmitted to Congress.  It included the reports of the Board of Engineers for Rivers and Harbors, the District (the reporting office) and Division engineers, and the concurring reports of the Mississippi River Commission for those areas under its jurisdiction.  The report recommends the Barrier Plan and serves as the basis for project authorization.  DX-0610 (House Doc. 231, 89th Congress, 1st Session).

883.    A levee is "an embankment whose primary purpose is to furnish flood protection from seasonal high water and which is therefore subject to water loading for periods of only a

few days or weeks a year."   DX-0210 (Design & Construction of Levees, EM 1110-2-1913) at 1-5(a)(1).

884.    The Chief's Report noted that, "[b]ecause of the serious threat to human life and property involved, the design of the protective plan must be based on the standard project hurricane for the region." DX-0610 (Chief's Report) at 61.

885.    The planned improvements for protection of New Orleans East included a new levee along the shore of Lake Pontchartrain, improvement of existing protective works between the lake and the Gulf Intracoastal Waterway, and improvement of existing works along the GIWW and the IHNC.  DX-0610 (H.R. Doc. No. 89-231) at 82; Plate 3.

886.    The plan for protection of St. Bernard Parish and the Lower Ninth Ward (collectively referred to as "Chalmette") entailed constructing a levee along the MRGO from the IHNC to Bayou Dupre, then along the bayou to Violet, La.  The plan further called for the improvement of the existing levee along the IHNC and drainage structures in the levee alignment at Bayous Bienvenue and Dupre.  The plan also called for riprap foreshore protection to be constructed along the MRGO channel to protect against erosion caused by wave wash from shipping use of the channel.  DX-0610 (Chief's Report) at 9; (Report of District Engineer) at 65); JX-0257 (Final Environmental Impact Statement, 2007) at I-9.

887.    By terminating the planned improvements at the existing Mississippi River levee, developed areas of St. Bernard Parish and the Lower Ninth Ward would be completely encircled by protective works. DX-0610 (H.R. Doc. No. 89-231) at 7, Plate 3; JX-0259 (IPET Vol. III) at 208.

888.    This paragraph is intentionally left blank.

889.    Representatives of Orleans and St. Bernard Parishes requested that the levee be constructed along the south side of the GIWW and MRGO rather than supporting an alternative proposal to improve the Chalmette back levee because the protection of additional land would provide potential for residential, industrial, and commercial development of areas adjacent to the MRGO.  DX-0610 (Chief's Report) at 8, 238, App. C.

890.    It was contemplated, even as the Army was recommending to Congress that the planned works be authorized for construction, that the proposed alignment of the levee protecting St. Bernard Parish might be enlarged to protect additional lands. DX-0610 (H.R. Doc. No. 89-231) at 3, 10; *see also* JX-0002 (USACE Dep., Nov. 14/15, 2007) 146:15-147:7, 147:22-148:7.

891.    The Chief's Report noted that completion of the MRGO would result in increased salinity in Lake Pontchartrain and recommended construction of a multi-purpose lock at Seabrook, where the IHNC connects with Lake Pontchartrain, to provide hurricane flood protection, control for salinity exchange between the MRGO and Lake Pontchartrain, and control for increased flow velocities in the IHNC caused by construction of the MRGO.  DX-0610 (Chief's Report) at 8-9; (Report of District Engineer) at 17.

892.    In October of 1965, Congress enacted legislation authorizing the Lake Pontchartrain and Vicinity Hurricane Protection Project.    JX-0229 (Pub. L. No. 89-298, 79 Stat. 1073 (Oct. 27, 1965)).

893.    The law authorized the Corps to execute the project "substantially in accordance with the recommendations" in the Chief's Report.  JX-0229 (Pub. L. No. 89-298, 79 Stat. 1073 (Oct. 27, 1965)).

161

894.    After construction was authorized, detailed designs were developed.  See generally, *e.g.*, JX-0244 (GDM No. 2, Supp. 4); DX-1042 (GDM No. 2); DX-0254 (GDM No. 3).

895.    As explained in the Chief's Report, design of the flood protection was based on the Standard Project Hurricane.  DX-0610 (Chief's Report) at 46-47, 61.

896.    In connection with developing the detailed designs, the Corps initiated a study to evaluate the surge generated by Hurricane Betsy, which had flooded the project area in September 1965.  JX-0427 (Storm Surge Effects of the MR-GO, Sept., 9, 1966) at 1.

897.    The study of Hurricane Betsy evaluated the existence of the MRGO and its impact on storm surge. JX-0427 (Storm Surge Effects of the MR-GO, Sept., 9, 1966) at 1.

898.    The design memorandum for the Chalmette area noted that revisions to the design may be necessary depending on the results of the study of the effects of the MRGO on hurricane surge.  DX-0224 (GDM No. 1 – Part I) at 23.

899.    The net levee grades were revised upward in accordance with results of the tidal hydraulic studies utilizing the latest hurricane parameters developed after Hurricane Betsy.  DX-0254 (GDM No. 3) at 7.

900.    As had been anticipated, the plan for the Chalmette area was modified to enlarge the protected area. The revised plan, "Chalmette Extension," extended the levee past Bayou Dupre along the bank of the MRGO to Verret before turning the levee south and then west, to connect it with the Mississippi River levee at Caernarvon.  *See* JX-0283 (GDM No. 3, Supp. 1) at 1-2.

901.    The LPV levees along the GIWW and the MRGO were designed and constructed to protect against hurricane-induced storm surge coming from Lake Borgne and the larger bodies of water that lay beyond it, including any surge propagated or conveyed by the GIWW and the MRGO themselves.  DX-0610 (H.R. Doc. No. 89-231) at ix, 1-2, 18, 80-81, 82, 84.

902.    In developing the plan of protection, these levees were designed to protect against a maximum stillwater level of +13 feet.  DX-0254 (GDM No. 3) at 8.

903.    In developing the plan of protection for the Chalmette area, an effort was made to evaluate the relationship between surge height and distance inland from the coast.  DX-1280 (DM No. 1, Part IV) at 4-5, Plate 6.

904.    Using observed high water marks along the coast and inland, the Corps derived a simple relationship between maximum surge height and distance inland.  *See* DX-1280 (DM No. 1, Part IV) at Plate 6; JX-0259 (IPET Vol. III) at III-210.

905.    A reduction of 1 foot in surge for every 2.75 miles of wetlands was determined. *See* DX-1280 (DM No. 1, Part IV) at Plate 6; JX-0259 (IPET Vol. III) at III-210.

906.    This reduction factor of 1 foot for every 2.75 miles inland was only used for hurricane tracks where it was apparent that the surge at the coast, or surge reference line, did not accurately reflect the surge inland.  JX-0133 (Powell Dep., Oct. 03, 2008) at 70:23-35, 71:1-13.

907.    The reduction factor applied to the Verret and Toca reach of the Chalmette Extension.  DX-1280 (DM No. 1, Part IV) at 6; JX-0133 (Powell Dep., Oct. 03, 2008) at 72:5-16.

908.    The critical hurricane track used for design purposes for the Verret to Toca reach was Track C, a track similar to that of Hurricane Betsy, making landfall around Grand Isle and proceeding northward.  DX-1280 (DM No. 1, Part IV) at 6, Plate 3.

909.    The designers of the Chalmette Extension applied the surge reduction factor to this particular hurricane track– Track C, the critical track for the Verret and Toca reach of the Chalmette extension–  because of the extensive wetlands to the south and west of the levee.

910.    Track F was the critical track for the Chalmette levee from Bayou Bienvenue to Bayou Dupre. *See* DX-0803 (DM No. 1 – Part I, Aug. 1966) at 28 Table 15, Plate 9.

911.    The surge reduction factor was inapplicable to the Chalmette Extension levee along the MRGO based upon the critical track (Track F) of the design storm. DX-1280 (DM No. 1, Part IV) at 6; JX-0133 (Powell Dep., Oct. 03, 2008) at 72:5-16.

912.    The surge reference line determined applicable for the Chalmette Extension levee virtually abutted the MRGO—making the reduction factor, which was based in miles between the reference line and levee, inapplicable.

913.    The surge reference line determined applicable for the Chalmette Levee from Bayou Bienvenue to Bayou Dupree made the surge reduction factor inapplicable.

914.    The design also evaluated the consolidation of the MRGO spoil bank that had occurred since its construction.  DX-0254 (DM No. 3) at 20.

915.    The design for the Chalmette area took into account anticipated erosion of the banks of the MRGO and changes in the side slopes of the MRGO.  The design memorandum states:  "Ultimately, the banks of the MR-GO will stabilize generally at a slope not flatter than 1 on 3.  However, erosion of the foreshore area between the levee and the channel bank by

164

ship-generated waves will pose a threat to the integrity of the levee. Accordingly, foreshore

protection will be provided to protect the levee from such erosion." JX-0283 (DM No. 3, Supp.

1) at 32-33; *see also* DX-0254 (DM No. 3) at 35.

916.    Construction of foreshore protection along the south bank of the MRGO and

along the GIWW was included in the Chief's Report recommending the LPV plan to Congress,

and the cost of the foreshore protection was subject to the cost sharing ration of 70% federal and

30% local specified in the authorization of the LPV. JX-0244 (DM No. 2, Supp. 4) at 1.

917.    After authorization, local interests expressed concern about paying the cost of

foreshore protection because it was made necessary as a result of the proximity of the levees to

the MRGO and the wind and vessel-generated waves from the navigation project that impact the

levee. JX-0244 (DM No. 2, Supp. 4) at 1-2.

918.    The Chief of Engineers directed that the cost of the foreshore protection along the

south bank of the MRGO and the north bank of the MRGO where it parallels the GIWW be

charged to the navigation project rather than be subject to the cost-sharing requirements of the

LPV. JX-0244 (DM No. 2, Supp. 4) at 1-2.

919.    "Inasmuch as the foreshore protection is more or less integral to and must be

coordinated with the levee construction," the design for the foreshore protection was developed

in connection with the LPV design memoranda. JX-0283 (DM No. 3, Supp. 1); JX-0244 (DM

No. 2, Supp. 4) at 2-3, 15.

920.    Following the decision regarding allocation of costs for the foreshore protection,

the Director of Civil Works informed the U.S. House of Representatives and Senate Committees

on Appropriations of the decision and increase in Federal cost for the LPV and MRGO projects by letter dated November 27, 1967.  JX-0244 (DM No. 2, Supp. 4) at App. B.

921.    The letter explained that, "[c]onstruction of the navigation project exposed [the then existing levees along the GIWW] and the foreshore between them and the channel to direct attack with resultant damage from waves generated by seagoing vessels using the waterway. The navigation project should have included adequate provisions for protecting these levees and their foreshore from this damage.  In addition, this protection will be necessary to protect the new levees which will be constructed for sections for the Lake Pontchartrain and Vicinity Hurricane Protection project located adjacent to this ship channel.  In view of this, as a mitigating measure, the plan for the Mississippi River-Gulf Outlet project has been modified to provide wave wash protection for approximately 6 miles of levees and foreshore on the north bank of the channel and about 18 miles of levees and foreshore along the south bank."  JX-0244 (DM No. 2, Supp. 4) at App. B.

922.    The foreshore protection had been installed along the 6 miles of the north bank and 18 miles of the south bank of the MRGO as of August 29, 2005.

923.    The LPV flood works along the GIWW and the MRGO constructed prior to August 29, 2005, consisted primarily of levees paralleling the waterways, on the south side of the MRGO between the IHNC and Verret, and on the north side of the GIWW eastward from the IHNC for a distance of about 12 miles.  JX-0466 (Decision-Making Chronology) at 2-2; JX-0093 (Vrijling Dep., Jan. 8, 2008) at 31:10-23.

924.    The LPV flood works along the GIWW and the MRGO constructed prior to August 29, 2005, were composed, in part, of materials hydraulically dredged from the bottom of

166

the MRGO.   JX-0212 (Mosher Report) at 9; JX-0010 (Bea September 2007 Report) at A.11; JX-0075 (Bea Dep., Nov. 19, 2007) at 86:18-25.

925.    The LPV levees along the GIWW and the MRGO were built in stages because of poor foundation conditions.   JX-0010 (Bea September 2007 Report) at A.1-A.4; JX-0259 (IPET Vol. III) at 33-34; JX-0242 (ILIT Report) at 2-6; JX-0434 (Team Louisiana Report – Chapter 5) at 131.

926.    The decision to build levees through a series of lifts was within the standard of care for the design and construction of a hurricane protection structure.  JX-0075 (Bea Dep., Nov. 19, 2007) at 138:15-23.

927.    On August 29, 2005, New Orleans East was protected by levees and other LPV flood control structures that stood on the north bank of the GIWW and the MRGO.  JX-0259 (IPET Vol. III) at 154-155; JX-0242 (ILIT Report) at 2-1, 2-2, 2-17 fig. 2.4; JX-0430 (Team Louisiana Report – Chapter 1) at 14-15; JX-0075 (Bea Dep., Nov. 19, 2007) at 78:9-80:2, 119:10-19, 268:11-16.

928.    On August 29, 2005, the LPV flood control structures along the MRGO and the GIWW joined with flood control structures along the IHNC, Lake Pontchartrain, and the eastern edge of New Orleans East to form a polder that was encircled by these flood control structures. JX-0259 (IPET Vol. III) at 154-155; JX-0242 (ILIT Report) at 2-1, 2-2, 2-17 fig. 2.4 at; JX-0430 (Team Louisiana Report – Chapter 1) at 14-15; JX-0093 (Vrijling Dep., Jan. 8, 2008) at 31:4-32:7.

929.    Construction of the LPV flood control project was not complete as of August 29, 2005.  JX-0002 (USACE Dep., Nov. 14/15, 2007) at 209:21-210:5.

167

930.    The Corps had not received sufficient funding from Congress to complete the LPV flood control project prior to Hurricane Katrina.  JX-0002 (USACE Dep., Nov. 14/15, 2007) at 236:15-23.

Q.    *Compliance with Environmental Statutes*

931.    The Corps "competed a Final Environmental Impact Statement ('1976 EIS') for the MR-GO project" in March 1976.   DX 0788 (1976 EIS).

932.    In 1985, the Corps published a "Supplemental Information Report" designed to complement the 1976 EIS.   PX 0194 (SIR).

933.    Between 1980 and 2004, the Corps prepared a total of 26 Environmental Assessments ("EAs") concerning its MRGO-maintenance activities, each time concluding that the Corps' activities would have no significant impact on the environment.  Doc. 16510-4 (Plaintiffs' Statement of Uncontested Facts in Support of Motion for Partial Summary Judgement) at ¶ 95.

934.    The 1976 EIS evaluated the erosion of the banks of the channel.

935.    The EIS described that "[a]s waves generated by winds or vessel passage reach the shoreline, the shoreline material erodes and sloughs off to the channel bottom or is suspended and dropped further downstream.  Turbulent waters created by hurricanes, local thunderstorms, or strong winds remove sediment from the channel and redistribute it."  DX 0788 (1976 EIS) at I-6.

936.    The EIS also documented the expansion of the banks that had occurred by 1976:

Channel bank erosion.  In the MR-GO, another factor has contributed to the amount of sediment to be removed from the channel in maintenance operations. The channel was originally dredged with one vertical to two horizontal feet side slopes.  Slopes tend to erode near the top and fill near the bottom as they come to

the equilibrium angle of repose.  Since construction, the distance between the banks visible above the waterline has increased.  Channel bank erosion has been a significant source of sediment in the channel through the land area.

*Id.*

937.    The 1976 EIS also addressed other sources of sediment in the MRGO contributing to the need for maintenance dredging, including erosion of the land between the MRGO and Lake Borgne.  *Id.* ("Prior to construction, Lake Borgne had no major western inlet-outlet of the magnitude now provided by the MR-GO.  Channels between the MR-GO and Lake Borgne are eroding westward at a rate of about 4.5 feet per year . . . . Some of these sediments from Lake Borgne may be entering the MR-GO. . . . Another sediment source is the marsh material released by marsh deterioration.").

938.    The EIS listed several factors that precluded definitive projections of the volume of future operation and maintenance dredging that would be required to remove sediment from the channel.  Those factors included: "1)  use of the channel for material for hurricane protection levees; 2) the possibility that the channel side slopes are coming to an equilibrium angle of repose; and 3) the possibility of rip-rap foreshore protection on proposed hurricane protection levees from Mile 66 to about Mile 47 which would reduce shoreline erosion on the west bank of the MR-GO."  *Id.* at I-6.

939.    The 1976 EIS described that the land area through which the channel crossed consisted of "marshlands from its origin (Mile 66+) to about Mile 23 of the MR-GO," and that "[t]opographic relief of the marshlands crossed is very slight, ranging from one to two feet."  *Id.* at II-15-21.

169

940.    The EIS described the increase in salinity resulting from construction of the MRGO and the impact it had on the wetlands of the area, noting that "the majority of land adjacent to the MR-GO is brackish marsh," but that "[i]ntermediate marshes were formerly conspicuous in the project area." *Id.* at II-76-77; *see also id.* at II-77 ("Since the construction of the MR-GO, marshes in the area are undergoing rapid successional changes toward more saline types."); *id.* at II-7 ("Saltwater intrusion, resulting from a variety of factors including . . . construction of the MR-GO, and subsidence, causes marsh deterioration.  Where areas thickly underlain by organic sequences experience increased salinity, the marsh may break up and revert to open ponds and lakes.").

941.    The 1976 EIS described the magnitude of land loss in the vicinity of the MR-GO, citing a 1970 study co-authored by Sherwood Gagliano. *Id.* at II-23.

942.    The EIS further noted that "[t]he wetlands shield inland areas from wave action, erosion, and storm damage" and that "[t]he barrier islands and the marshlands adjacent to the MR-GO provide protection for the urbanized areas around New Orleans." *Id.* at II-68.

943.    Having noted the adverse impacts of the channel, the 1976 EIS also included a section on "Remedial, Protective, and Mitigation Measures," which described future research plans to include "opportunities for creative use of dredged material," investigation of "[p]otentials for revegetation of disposal areas through sprigging or seeding of desired species," and the possibility of "establishment of shrubs and trees useful for wind protection, esthetic interest, and reduction of erosion." *Id.* at IV-13.  Finally, the EIS emphasized that operation and maintenance of the channel "requires continual adjustment of practices to changing conditions." *Id.* at VI-1.

944.    The impacts on the environment from initial construction of the MRGO were underway and became part of the existing environmental setting evaluated in the EIS.  DX 0788 (1976 EIS) at II-1 ("The usual title for Section 2 is Existing Environmental Setting Without the Project, but in a study of project operation and maintenance (O&M) the project itself must be considered a part of Environmental Setting.").

945.    Responding to public comments, the Corps explained that it was beyond the scope of the 1976 EIS to address impacts on the environment from initial construction:

> Comment:  The draft statement should discuss the associated long-term project induced impacts resulting from the construction of the Mississippi River-Gulf Outlet system in more detail.  Secondary impacts include modified water regime in the system, alteration of the hydrology and water chemistry of adjacent estuarine and wetland areas, and salt water intrusion and increased salinity levels.

> Response:  Construction of the MR-GO resulted in certain recognized socio-economic and environmental changes.  Secondary impacts are still underway and will continue until a state of equilibrium on natural dynamics is obtained.  This environmental statement concerns only actions necessary to operation and maintenance of the MR-GO and associated bayous, and is not intended to address impacts of original construction.

*Id.* at IX-3.

R.    *Impact of the MRGO on Wetlands*

946.    The cut of the MRGO channel when completed in 1968 comprised approximately 3,368 acres.  JX 195 (FitzGerald, D. Rep.) at table 2.1.

947.    The spoil banks created during construction of the MRGO comprised approximately 14,977 acres, covering approximately 12,084 acres of marsh and approximately 2,893 acres of water.  JX 195 (FitzGerald, D. Rep.) at table 2.1.

948.    The acreage impacted by the cut of the channel and creation of the spoil bank are considered the "direct impacts" of channel construction.  This total is approximately 18,345 acres.  JX 195 (FitzGerald, D. Rep.) at table 2.1.

949.    Erosion of the banks of the channel may also be considered a direct impact of channel construction.  JX 195 (FitzGerald, D. Rep.) at table 2.1.

950.    Plaintiffs' expert Duncan FitzGerald used post-Katrina photography to measure what he considered the bankline of the MRGO to be in 2005.  FitzGerald, D. 424:23 – 425:1.

951.    Post-Katrina photography includes erosion of the channel banks caused by Hurricane Katrina, so measurements based on the 2005 photography over-estimate channel bank erosion that had occurred at the time the hurricane hit.  FitzGerald, D. 424:23 – 425:14.

952.    As the banks of the MRGO eroded, some ponds or other channel areas adjacent to the MRGO channel became joined with the MRGO.  FitzGerald, D. 314:24 – 315:1; 316:20-24. The banks of ponds and other channels also eroded over time as a result of wind generated waves.

953.    Dr. FitzGerald included the size of adjacent ponds in his measurements of "erosion" of the banks of the MRGO, both those ponds through which the MRGO's initial construction cut and those that adjoined the channel through erosion over time.  FitzGerald, D. 41:19-25.

954.    As a result, Dr. FitzGerald's measurements of "erosion" that he attributes to the MRGO over-state the amount of land actually lost over time, since the measurements include areas that were water both before and after construction of the MRGO.  FitzGerald, D. 420:16 – 422:1.

172

955.    Total land area lost to erosion of the banks of the MRGO along the entire channel after construction has been measured to be between 3,800 and 4,800 acres.  JX 202 (Britsch Report) at 9; JX 0195 (FitzGerald, D. Rep.) at table 2.1.

956.    Dr. FitzGerald calculated an average of 11 feet of erosion on the west bank of the MRGO and 22 feet of erosion on the east bank of the MRGO per year.  FitzGerald, D. 323:13-17.  Some of the ponds included in Dr. FitzGerald's measurements and averages were of considerable size, making his measurements unreliable.  JX 195 (FitzGerald Rep.) at Appendix F.

957.    Processes that contribute to erosion of the banks along the MRGO include boat wakes, local wind-generated waves, and organic decay of the root mass of freshwater marsh as a result of salt water intrusion, and dredging of the channel.  FitzGerald, D. 329:8 – 332:8.

958.    All four processes Dr. FitzGerald considered to contribute to erosion of the banks of the MRGO were anticipated by the Corps as a result of initial construction of the channel. FitzGerald, D. 432:5 – 434:15.

959.    The area through which the MRGO was constructed is part of the St. Bernard delta complex, which was created by distributaries of the Mississippi River and has been in a deteriorating phase of the deltaic cycle since the La Loutre distributary was abandoned approximately 2,300 years ago.  JX 202 (Britsch Rep.).

960.    Wetland loss is a natural process in abandoned delta lobes.  JX 199 (Day/Shaffer Rep.) at 11.

961.    Since the early 1900's, human activity has influenced many key elements of the deltaic cycle.  In general, human activity has caused a reduction in forces that lead to delta

growth and an enhancement of forces that lead to delta deterioration.  JX 199 (Day/Shaffer Rep.) at 14.

962.    Construction of the Mississippi River levees has been identified as the single most important cause of land loss for the delta as a whole because the levees prevented flooding of the wetlands with sediment filled fresh water that provided nutrients, reduced salinity impacts, and helped build land.  JX 199 (Day/Shaffer Rep.) at 14-15.

963.    The forested wetlands of the Pontchartrain Basin have been cut off from river input for over a century.  JX 199 (Day/Shaffer Rep.) at 14-15.

964.    Other factors contributing to wetland loss include closure of River distributaries; elimination of crevasses; improvement of the efficiency of the River mouth for navigation; and reduction in the sediment load carried by the River.  JX 199 (Day/Shaffer Rep.) at 14-15.

965.    Canals dredged for oil and gas access, logging, and navigation impact wetlands both by direct removal of land and resulting changes in hydrology; spoil banks from canals interrupt sheet flow, impound water, and cause deterioration of wetlands.  JX 199 (Day/Shaffer Rep.) at 14-15.

966.    The occurrence of hurricanes causes both land loss and salinity intrusion.  The U.S. Fish and Wildlife Service issued a Preliminary Report of Marsh Vegetation Study, which evaluated project impacts from initiation of the study in 1958 through August 1960, and documented vegetation changes attributable to nutria in the vicinity of the MRGO, noting that "the most obvious is their destruction of entire stands of common reed."  The report also noted other plant types killed by nutria.  Fish and Wildlife Report (UDI-001-000000164) at 29.

174

967.    The report also noticed that "[a] number of influences, other than those induced by the project, are active within the marsh area.  These include:  (1) natural factors such as plant succession, which may occur rapidly in localized areas, animal activity, and geological change, such as wave-induced erosion; and (2) human influences which would include burning, ditching, and creation of marsh buggy trails."  Fish and Wildlife Report (UDI-001-000000164) at 29.

968.    There is a broad consensus that wetland loss is a complex interaction of a number of factors acting at different spatial and temporal scales. JX 199 (Day/Shaffer Report) at 15.

969.    As a result of the complex interaction of the many factors that cause wetland loss, it is difficult to isolate one activity as the singular cause of a specific loss.  JX 202 (Britsch Report) at App. A; Penland, et al., Process Classification of Coastal Land Loss Between 1932 and 1990 in the Mississippi River Deltaic Plain, Southeastern Louisiana," USGS Open File Report 00-418 (2001).

970.    The area of wetlands on the south side of the MRGO, encircled by the LPV levees along the GIWW and MRGO and the levee connecting to the Mississippi River is part of the area termed the "Central Wetlands."  JX 123 (Coast 2050 Report).

971.    Some descriptions of the Central Wetlands also include the area on the south side of the MRGO, outside the LPV levees, and north of Bayou La Loutre.  JX 123 (Coast 2050 Report).

972.    The wetland area located north of the MRGO, south of the GIWW, and north of Bayou La Loutre is termed the "South Lake Borgne" unit.  JX 123 (Coast 2050 Report).

973.    The portion of the South Lake Borgne Unit in the shape of a triangle south of the GIWW, west of Lake Borgne, and north of the MRGO is called the "Golden Triangle."

175

974.    The MRGO channel divides the area considered the Central Wetlands from the South Lake Borgne unit.

975.    The South Lake Borgne unit includes the area on the unprotected side of the MRGO levees.

976.    The Central Wetlands and South Lake Borgne unit are the only areas for which a change in wetland habitat type was evaluated by plaintiffs' storm surge modelers.  JX 204 (Kemp Expert Report) at Fig. 5.5a, 5.5b; JX 197 (Vrijling Expert Report) at Fig. 2.5, 2.19, 2.30.

977.    Any changes that may have occurred in wetlands outside the Central Wetlands and South Lake Borgne unit after construction of the MRGO are not relevant to plaintiffs' storm surge modeling.  JX 204 (Kemp Expert Report) at Fig. 5.5a, 5.5b; JX 197 (Vrijling Expert Report) at Fig. 2.5, 2.19, 2.30.

978.    Prior to construction of the MRGO, the South Lake Borgne area was a brackish marsh.  JX 195 (FitzGerald, D. July 2008 Report) at Fig. 4.2,

979.    By 2005, the South Lake Borgne area had transitioned to a mixture of brackish and saline marsh.  JX 195 (FitzGerald, D. July 2008 Report) at Fig. 4.2,.

980.    Prior to construction of the MRGO, the Central Wetlands area included fresh and brackish marsh and some swamp.  JX 199 (Day/Shaffer July 2008 Report) at 39.

981.    The swamp that existed in the Central Wetlands prior to construction of the MRGO was located along the higher ground toward the 40-Arpent levee, along the GIWW, and on the La Loutre Bayou ridge.  JX 195 (FitzGerald, D. July 2008 Report) at Fig. 4.2,.

982.    In the 1950s, no swamp was located in the South Lake Borgne wetlands area northeast of where the Reach 2 levees later would be constructed.  JX 195 (FitzGerald, D. July 2008 Report) at Fig. 4.2,.

983.    By 2005, the swamp in the Central Wetlands area had declined to a small area near the discharge of a pumping station at the 40-Arpent levee.  JX 195 (FitzGerald, D. July 2008 Report) at Fig. 4.4.

984.    By 2005, the remaining swamp and the fresh and brackish marsh in the Central Wetlands had transitioned to intermediate and brackish marsh.  JX 195 (FitzGerald, D. July 2008 Report) at Fig. 4.4

985.    By 2005, a shrub/scrub and tree habitat had grown on the MRGO spoil bank. Shaffer Dep. at 239:15-25, 240:1-13.

986.    The changes to the landscape resulting from original construction of the MRGO were fully realized by the time of the 1976 EIS, and the continued operation and maintenance of the channel did not significantly alter the landscape further.  Plaintiffs' witnesses confirmed the statement in the 1976 EIS that "most of the changes in the marshlands were associated with original construction."  *Id.* at II-3.

987.    Plaintiffs' expert witnesses testified that the cutting of the La Loutre ridge in 1961 was the key event that resulted in the salinity increase north of the ridge.  Day 782:20-23; 699:7-11 ("[T]he dramatic time in the construction of the MRGO was when the Bayou La Loutre Ridge was cut, because up until that time, the ridge remained [an] intact barrier against saltwater intrusion. That was widely recognized prior to the construction of the MRGO."); D. FitzGerald 301:7 – 303:4 (testifying that prior to construction of the MRGO, the Bayou La Loutre ridge was

a "major obstruction to the daily rise and fall of the tides and for saline waters" moving north of the ridge; construction of the MRGO provided a direct pathway for tidal exchange and salinity north of the La Loutre ridge).

988.    Once the La Loutre ridge was severed, the damage from saline intrusion began immediately.  *See* Day 709:23 – 710:4; 784:4-7; 706:8-9.

989.    The evidence at trial also established that the habitat changes resulting from increased salinity were essentially complete by the time the EIS was prepared; by 1978, "essentially all of the[] fresh and low-salinity areas were gone."  Day 701:7-9; 685:4-12 ("[T]he 1956 map indicates very little change in [the] area up until the Mississippi River-Gulf Outlet. These kinds of habitats have almost completely disappeared from the Central Wetlands Unit, and they had disappeared by the next mapping interval that was done after that in 1978.").

990.    To reverse the change to the environmental landscape that resulted from original construction would have required affirmative remedial action, rather than simply a change in or cessation of maintenance dredging.  Day 709:23 – 710:4.

991.    The 1976 EIS acknowledged as much in its analysis of the "no-action alternative," defined as "discontinuation of all O&M work."  DX 0788 (1976 EIS) at VI-3.  The 1976 EIS concluded that "[t]he project area would not return to conditions which existed prior to construction of the MR-GO. . . . Channel bank erosion and subsidence of the disposal areas would continue."  *Id.*  at VI-7.

992.    Because habitat changes were complete by 1978, the only continuing impacts to the environment after preparation of the EIS were the continued erosion of the channel banks and the deposition of dredged spoil from continued maintenance dredging.  *See generally id.*

993.     The "environmental landscape" that resulted from the MRGO was anticipated even at the time of the channel's initial authorization and design, more than 50 years ago.  The Chief of Engineers' Report to Congress, approved by the original authorizing legislation, and the detailed design memoranda that followed, reflect that routine maintenance dredging would be necessary to remove sediments from the channel bottom, and it was known that channel construction would destroy the marsh through which the channel was cut as well as that impacted by the spoil banks.

994.     The Chief's Report stated that the recommended channel would be dug "through the marshes."  H.R. Doc. No. 82-245 at 5 (1951).

995.     Given the known fact that shoaling would occur in the channel, the location of the recommended channel cut was selected based in part on a decision to make "maximum use of land cuts" in order to minimize the return of dredged spoil into the channel, and thereby minimize maintenance dredging costs.  *Id.* at 37.

996.     That erosion of the channel's banks was a significant source of sediment in the channel was acknowledged in the 1976 EIS, and the EIS reflects that this consequence of construction of the MRGO would be addressed in connection with the design of the LPV through the installation of foreshore protection along the leveed sections of the MRGO.  DX 788 (1976 EIS) at I-6, I-9.

S.     *Governmental Relations*

        1.     *Congressional Oversight*

997.     The Office of Management and Budget ("OMB") makes the final determination regarding which civil works projects the President will recommend to Congress for funding.

179

Peter Luisa 3583:9-11.  Mr. Luisa has worked for the Corps of Engineers for 31 years.  Since

2003, he has served as Chief, Program Development for Civil Works, at the Corps'

Headquarters.

998.   Each year, OMB provides to the Corps a target amount that the Corps will be

permitted to spend on all of its activities.  Luisa 3583:12-15.

999.   The budget process begins with Corps personnel at the district level gathering

information to be placed into an electronic database, which is used to compare the Corps'

projects to determine which will be funded and to what extent.  Luisa 3584:7— 3485:4; DX

0515R (spreadsheet containing all of the flood damage projects in the Mississippi Valley

Division Fiscal Year 2006).

1000.   Next, the divisions gather this information from all of their districts and rank the

projects across districts to determine funding priorities.  Luisa 3585:18-25.

1001.   Once the information gets turned over to the headquarters, the Assistant Secretary

of the Army's staff becomes involved.  Luisa 3486: 11-21.

1002.   The Assistant Secretary typically issues to the Corps a letter which outlines his

budget priorities and desires.  Luisa 3587:1-4.

1003.   The Corps divides its various types of civil works projects into different program

categories called "business lines."  These include the flood damage reduction program,

navigation, environmental restoration, recreation, water supply, emergency management, and

hydropower.  Luisa 3586:1-10.

1004.   Early in the budget process, the managers of the various business lines meet to

discuss how they will go about meeting the target budget set by OMB.  Luisa 3588:6-10.

1005.   The Corps provides recommendations to the Assistant Secretary of the Army regarding specific allocations, projects, and activities that should be funded within the limits provided by OMB.  The Corps also provides additional projects and funding levels that should be recommended should OMB provide additional money.  The Assistant Secretary sends this information to OMB.  Luisa 3588:11-19.

1006.   When OMB gets the final package from the Corps, its staff reviews the submissions.  Meetings are held in October where submissions are discussed and defended. OMB then decides the allocations and returns its decision at the end of November in the form of what's called a "pass back," usually about a 25-page document where they detail all of their decisions and the reason for each.  Luisa 3588:20–3589:8.

1007.   After receiving the decision from OMB, the Corps will prepare an appeal letter, which is really an appeal of the allocation—the total number is the same, but the Corps will suggest a different allocation.  Then OMB usually responds with a final note, wherein it will say, "This is the final decision, start developing your budget justification material for the Congress." Luisa 3589:9-25.

1008.   Normally, the budget is sent to Congress in February and the hearing process would begin with testimony to committee membership detailing what was done and why, followed by a question and answer period before the House and then the Senate. Luisa 3590:1-24.

1009.   After the hearings, Congress has a markup period.  The Senate and the House Chairmen essentially get letters from each member of Congress with requests for their projects. Those letters are sent to the Corps informally and a fact sheet is generated by the Corps of

Engineers for each request that details exactly what the member asked for and what the Corps could do.  Luisa 3591:2-12.

1010.   The House and Senate each develops a budget bill, that might total very much the same, but in terms of the projects and the allocations of the projects would be very different, and so the two would then have a conference where they would iron that out.  There may be a situation where the House and Senate each pass a budget for the Corps of $5 million but they related to different projects.  Luisa 3591:17–3592:4.

1011.   Once a budget is passed by Congress, the President would either sign or veto it. A veto "would be sent back to either be overridden by the Congress or they would have to work at trying to get a bill that would be acceptable to the President and he would then pass it." Luisa 3592:13-19.

1012.   Congress could add projects to those proposed by the President, could add money to the projects that the President proposed, could eliminate projects or money.  As Mr. Luisa explained, "it's pretty much [Congress's] call." Luisa 3592:20-25.

1013.   "Policy compliant" projects are those projects that the administration feels are the correct thing for the federal government to pursue.  The administration determines, in the first instance, whether a particular project is acceptable, but Congress has the final say.  For example, for many years, beach nourishment projects were not "policy compliant," yet there existed beach nourishment projects in the Corps' budget.  As Mr. Luisa explained, "What happens is that while we don't budget for them to the Congress, the Congress naturally comes back and will add a whole series of beach erosion projects."  Luisa 3594:3-21.

1014.   "Scrubbing" is a budget process where the Corps would strip out all of the policy non-compliant projects from its budget.  Luisa 3594:3-15.

1015.   An "earmark" is anything added beyond the President's budget.  It could be an addition of money or scope.  Luisa 3595:6-12.

1016.   Congress can change the nature of a project itself.  Luisa 3595:16-17.

1017.   Once a budget is turned over to Congress, politics plays a role in deciding whether a particular project gets funded and to what extent. Luisa 3595:18-20.

1018.   For several years, the Corps has collected information related to projects for budgeting purposes through the use of a spreadsheet.  The spreadsheets, similar to the one for fiscal year 2006 that was admitted into evidence at trial (DX 0515-R), contain the name of each project, the benefit/cost ratio for the project, the amount the project will cost to complete, and other relevant information.  Luisa 3600:17-23.

1019.   DX 0515R contains data for the flood damage reduction projects from the Mississippi Valley Division for fiscal year 2006.  Luisa 3602: 1-4; DX 0515R (Spreadsheet containing all of the flood damage projects in the Mississippi Valley Division Fiscal Year 2006).

1020.   "DIS Rank" is where the district puts their ranking on a particular project using the Corps' guidance book.  Luisa 3602: 5-19.

1021.   In the "MSC Rank" column on exhibit DX 0515R, "the district ranks all of their projects within their district and then when the division or MSC, Major Subordinate Command, takes over, they are looking at combining all of their districts together and in forming a ranking process of all of the projects in all of the districts." The MSC rank is populated at the division level.  Luisa 3605:24–3606:10.

183

1022.   In the "HQ Rank" column on exhibit DX 0515R, projects are ranked from 1-3.  A ranking of 1 is the highest priority, 2 is second highest, and projects ranked "3" are not a priority for the Corps.

1023.   The "Fed Cost" column on exhibit DX 0515R, represents the money requested by the district in thousands of dollars.  Luisa 3608:4-12.

1024.   The "BCR" column on exhibit DX 0515R is the benefit/ cost ratio of the project. Luisa 3608:13-16.

1025.   The benefit/cost ratio is the driving factor in the decision-making process, and that been the case for the last several decades.  Luisa 3609:1-7.

1026.   The "RBRCR" column on exhibit DX 0515R refers to the project's remaining benefit/remaining cost ratio.  Luisa 3609:8-12.  For a time, OMB mandated the use of that figure rather than the original benefit/cost ratio, but it has since made the policy decision to use the original figure in weighing different projects for funding.  Luisa 3609:17-22.

1027.   "AAD" stands for Average Annual Damages of the project.  This is also taken into account when deciding which projects to fund.  It looks at the probability of flooding integrated for all probabilities of flooding, and the damages that would occur with each probability.  Those figures are used in determining an average annual number.  Luisa 3609:23 — 3610:8-10.

1028.   The "100 Year" and "500 Year" columns on exhibit DX 0515R is collected by the flood plane business line looking at the population within the hundred years flood plane, as well as the 500-year flood plane.  These figures are also taken into account.   Luisa 3610:11-16.

184

1029.   The "Annual Benefits" column on exhibit DX 0515R is also taken into account.  It calculates the economic benefits for a project that is proposed to be built in the context of flood damage reduction projects. Luisa 3610:19-25.

1030.   The "Annual Cost," "Net Benefits," and "Years to Complete" data is also collected and considered in determining which projects to recommend for funding.  If a project is not funded to its capability, the "Years to Complete" column would change from year to year.  Luisa 3612:3-19.

1031.   When headquarters gives a "1," "2," or "3" in deciding what to recommend to OMB and ultimately what the President will recommend to Congress, it considers all of the information gathered on spreadsheets like DX-0515R and similar spreadsheets in the years past. Luisa 3612:25 – 3613:6.

1032.   The "Consequences" and "Remarks" columns of DX 0515R provide an opportunity for a project manager to state his case—aside from numbers—as to why he feels that this project is important and needs to be funded.  Luisa 3613:7-15.

1033.   Notwithstanding the dire warnings contained in the "Consequences" and "Remarks" columns each year, the Corps's capability funding level was usually about $7 billion for all projects.  As stated by Mr. Luisa, the Corps had "to make choices. . . unfortunately we have a lot of flood projects throughout the nation where we would see similar remarks and consequences."  Luisa 3613:23–3614:3.

1034.   Even when the Corps could not recommend a project to be fully funded, there was always a chance of getting additional funding from Congress.  Luisa 3614:18-22.

1035.   Prior to Hurricane Katrina, the Lake Pontchartrain and Vicinity Hurricane Protection Project competed for funding with other projects like those listed on exhibit DX 0515R.  As Mr. Luisa explained:  "And not only against these projects which the business line manager's concerned about, but when we get to the table for all business lines and all accounts . . . they compete against all other projects in the navigation, the hydropower, the environment.  It's very competitive."  Luisa 3615:4-17.

1036.   The MRGO budget would have a line item spreadsheet from the Corps and within that line item there would be a breakout of the money that would be used for the New Orleans district.  Luisa 3618:7-12.

2.    <em>Congress's Inadequate Appropriations for the LPV</em>

1037.   From 1998 to 2007, Alfred Naomi was Senior Project Manager responsible for the Lake Pontchartrain Hurricane Protection Project.  Naomi 3463: 8-22.  He worked for the Corps of Engineers for 38 years in various positions.

1038.    In the years immediately prior to Hurricane Katrina, Alfred C. Naomi served as Senior Project Manager for the Lake Pontchartrain & Vicinity Hurricane Protection Project ("LPVHPP").  Naomi 3463:8-9, 22.

1039.   At the time Mr. Naomi took over as Senior Project Manager in 1998, there was much work that remained to be done with respect to the LPVHPP, including "multiple levee lifts" and the construction of "flood wall structures."  <em>Id.</em> at 3464:20 3465:1-2; 3478:6-19.

1040.   This work was repeatedly delayed because there were not sufficient funds to complete it.  <em>Id.</em> at 3465:11-16; 3467:8-10 ("There was always a need for additional funds.  We

186

never were funded to our full capability in the later years of the projects when I managed it.");
3478:6-19 (describing how work had to be delayed for years due to lack of funding by Congress).

1041.    In the years just before Katrina, there was a need to perform $17 million to $20
million worth of work *each year*. *Id.* at 3468:6-8.

1042.    Year after year, the Corps was denied the money it needed to complete its work on
the LPVHPP.  As Mr. Naomi explained, although the Corps's funding requirements ranged from
$17 million to $20 million, the Corps was "fortunate if [it] got $5 million."  *Id.* at 3468:8-9.

1043.    Congress's failure to appropriate sufficient funds "to protect the people and
property of Greater New Orleans" certainly was not attributable to ignorance.

1044.    Although Mr. Naomi was prohibited by law from lobbying Congress for additional
funds, *see id.* at 3479:14 – 3480:2, he did inform local officials regarding the predictable effects
of chronic underfunding of the LPVHPP by Congress.  *See, e.g.*, *id.* at 3480:6 – 3483:25
(describing presentations made to local officials regarding the lack of funding by Congress);
3484:1-7 (describing public appearances and press interviews regarding the lack of funding by
Congress); 3485:15 – 3488:4 (describing letters sent to local officials regarding the lack of
funding by Congress); DX 0874 (letter from Alfred C. Naomi to Joseph Gautreau, President of
the Pontchartrain Levee District); DX 0875 (letter from Alfred C. Naomi to James P. Huey,
President of the Orleans Levee District); DX 0876 (letter from Alfred C. Naomi to Robert Turner,
President of the Lake Borgne Basin Levee District); DX 0877 (letter from Alfred Naomi to
Ronald Zibilich, President of the East Jefferson Levee District).

1045.    These local officials, armed with information provided by Mr. Naomi, contacted
every member of the Louisiana Congressional delegation regarding the need for additional

funding.  Mr. Huey, for example, over the course of several years, wrote to Representative John

Cooksey (DX-0846), Representative William Jefferson (DX 0847), Representative Chris John

(DX 0840), Representative W.J. Jim McCrery (DX 0849), Representative W.J. "Billy" Tauzin

(DX 0850), Representative David Vitter (DX 0851), Representative M.J. "Mike" Foster (DX

0852), Representative Richard H. Baker (DX-0854), Senator John S. Breaux twice (DX 0855 &

DX 0857), and Senator Mary Landrieu three times (DX 0856, DX 0858, DX 0905) regarding to

need to provide additional appropriations so that construction of the hurricane protection system

could be completed.

     1046.   The City of New Orleans passed a resolution that described how the project

required additional funding by Congress, explained the dire consequences should the project not

be completed due to a lack of funding, and urged Congress to lend its financial support. *See* DX

1271.

     1047.   Several of Mr. Huey's letters began with this dire warning:

> Our hurricane protection project, under the partnership of the Orleans Levee
> District and the U.S. Army Corps of Engineers (USACE), is critical to the safety
> of the residents and property in Orleans Parish, as well as the other three parishes
> included in the project. The project is nearing completion, but funding for the
> remaining contracts has all but dried up. . . .  Ominously, the lack of funds will not
> allow the USACE to award new contracts for 2004.

DX 0846; DX 0847; DX 0848; DX 0849; DX 0850; DX 0851; DX 0852; DX 0853; DX 0854;

DX 0855; DX 0856.

     1048.   Another letter, to Senator Breaux in 2001, warned that in fiscal year 2002, the

Corps would require $17,600,000 to perform necessary work on the "vital hurricane protection

project," including levee enlargements.  *See* DX 0857.

1049.   Along with his letters, Mr. Huey often included a copy of the letter he had received from Mr. Naomi, which detailed the work that could not be completed due to Congress's failure to appropriate sufficient funds.  *See, e.g.*, DX 0846; DX 0847; DX 0848; DX 0849; DX 0850; DX 0851; DX 0852; DX 0853; DX 0854; DX 0855; DX 0856.

1050.   Members of Congress therefore received, albeit indirectly, Mr. Naomi's warnings regarding the consequences of underfunding the LPVHPP.

1051.   As Senior Project Manager, Mr. Naomi "prepared the necessary budget documents for the Corps to submit to the administration as part of the President's budget that would go to Congress. . . .  The documents from all the Project Managers would be assembled at the District level and forwarded to the Division office, and, from the Division office, go to our headquarters for accumulation with all the other projects around the country."   Naomi 3465: 17– 3466: 9.

1052.   "Ultimately, Congress appropriates the funds that the Corps uses" for projects performed by the Corps of Engineers. "The President recommends a budget to Congress. The Corps plays a role in preparing that budget for the President. The President, through OMB [Office of Management and Budget], then prepares the budget and submits it to Congress for their consideration." Naomi 3466: 10-20.

1053.   Congress may appropriate funds for a Corps project even if the Corps has not requested funds for that project and Congress may decide not to appropriate funds for a project where the Corps or the President has recommended funding. Naomi 3466:21 – 3467:4.

In the later years as Senior Project Manager, Mr. Naomi prepared the basic budget documents for the projects he handled "according to formats that were given to me..." Naomi 3468: 13-20; DX

0515R (Spreadsheet containing all of the flood damage projects in the Mississippi Valley Division Fiscal Year 2006).

1054.   DX 0515R contains various projects divided into increments. "....[T]he decision makers then determine which increments to fund.  They can fund the basic increments or add increments to it as they went down the priority list." [Naomi 3469: 5-18] How the increments are divided depends on the project. [Naomi 3469: 25]. "...Lake Pontchartrain was divided by four increments..."  Naomi 3470: 1; DX 0515R (Spreadsheet containing all of the flood damage projects in the Mississippi Valley Division Fiscal Year 2006).

1055.   The projects listed on DX 0515R are flood damage reduction projects only from the Mississippi Valley Division. "All the appropriations had similar types of documents, and all the Divisions throughout the Corps prepared similar types of documents, and they would all be assembled into a massive budget document in Washington."  Naomi 3471: 10-19;  DX 0515R (Spreadsheet containing all of the flood damage projects in the Mississippi Valley Division Fiscal Year 2006).

1056.   This spreadsheet (DX 515R) demonstrates "the process that the Corps is required to go through and it does go through in order to plan and fund various projects."  Naomi 3472 21-23.  DX 0517 "is strictly of the Lake Pontchartrain and Vicinity Project showing the four increments that were in the budget for the fiscal year 2006."  Naomi 3473: 23 – 3474: 2; DX 0517 (Spreadsheet containing the Lake Pontchartrain and Vicinity Project Fiscal Year 2006).

1057.   "DIS Rank"on DX 0517, was determined by "...decision makers in our own district. In this case the ranking is determined by our programs and senior management. [...] Based on "[criticality, the status of completion, if there are other major gaps or problems with that

190

project, various criteria..." [...] "Criticality could be that if a project has a major opening or gap, they may choose to push funds that way to help close gaps in projection projects that are critical to protection of lives and property." Naomi 3474: 12 – 3475: 3; DX 0517 (Spreadsheet containing the Lake Pontchartrain and Vicinity Project Fiscal Year 2006).

1058.   The information in "M.C. Rank" on DX 0517 comes from the division office in Vicksburg. [Naomi 3475: 8-16]. "HQ" contains ranking from headquarters in Washington DC. "Projects with a ranking of 1 would generally be funded. 2's might be. 3's, under those circumstances, probably wouldn't be funded." The first row on DX 0517 pertains only to that particular increment. [Naomi 3475: 17 – 3476: 5]. Data in the "BAR" was entered by Mr. Naomi and is "...the overall benefit/cost ratio for the project."[Naomi 3476: 6-10]; DX 0517 (Spreadsheet containing the Lake Pontchartrain and Vicinity Project Fiscal Year 2006).

1059.   The columns on DX 0517 labeled "Consequences" "...describes the consequences of not funding this particular increment and describing to headquarters, if that funding is not provided, what the possible consequences might be."  Naomi 3476: 11-17.

1060.   Mr. Naomi inserted into the "Consequences" column of Spreadsheet for the Lake Pontchartrain and Vicinity Project Fiscal Year 2006 reads as follows:

> "Settlement of existing levees has compromised level of protection. Catastrophic levee system failure due to hurricane poses threats to one million people and national economy." Naomi 3476: 18-24. (Spreadsheet containing the Lake Pontchartrain and Vicinity Project Fiscal Year 2006).

1061.   Mr. Naomi inserted into the "Remarks" column of Spreadsheet for the Lake Pontchartrain and Vicinity Project Fiscal Year 2006 reads as follows:

> "Over $11 billion in benefits due to flood damages prevented have been generated by this project through 2002.  Federal and local sponsors have expended over $600 million on construction thus far.  Failure to continue construction will

> jeopardize these investments.  The levees need to be raised and last major structures
> need to be completed to ensure protection from design hurricanes.  The project
> protects New Orleans metro area.  Project underfunded over last three budget cycles."

Naomi 3476: 25 – 3477: 10; (Spreadsheet containing the Lake Pontchartrain and Vicinity Project

Fiscal Year 2006).

1062.   Mr. Naomi provided similar information as contained in DX 0517 up the chain of

command to the division level and ultimately to headquarters for previous years.  Naomi 3477:

11-16.

1063.   Only the first two increments listed on DX 0517 were funded in fiscal year 2006.

"If we don't get funds to do increments, then those increments are delayed to the following fiscal

year until we request funding again."  Requests are made yearly "[until the funds are provided

and those contracts can be constructed.  If the funds are not provided, we have to keep delaying

them until the funds can be provided."  Naomi 3477: 17 – 3478: 5.

1064.   If the second two increments listed on DX 0517 had been funded in fiscal year

2006, there were a number of contracts and improvements that would have been performed.

Naomi 3478: 6-19.

1065.   Mr. Naomi would become aware of the projects that were to be funded after the

President sent his budget to Congress but before Congress acted on it. Naomi 3479: 3-10.

1066.   Since Corps employees work in the Executive Branch, they have to support the

President's budget and are not permitted to lobby Congress for funds. [Naomi 3479: 14 – 3480: 2]

However, "[p]art of my duties as Senior Project Manager, it's incumbent upon me to let the local

sponsors know [that the President was not recommending funding to a level Mr. Naomi

considered necessary]. [...] If they had concerns about it, they could then talk to their

Congressional Delegation to see if they could make changes." Naomi 3480 3-14.

1067.   Mr. Naomi prepared a PowerPoint slide that he would make to the levee districts

and to the public in describing funding issues for the Lake Pontchartrain and Vicinity Project.

Naomi 3480: 15-24; DX 1064R (PowerPoint slide presentation describing funding requirements

for the Lake Pontchartrain and Vicinity Project, fiscal year 2005).

1068.   Page 3 of DX 1064R "...[D]escribes the President's fiscal year 2005 budget of $3.9

million and described the needed funds for 2005 as $22 million.  In this case...$6 million of that

was going to be used in Jefferson Parish.... Then at the end it describes that the levees are sinking

at a rate of 3 to 4 inches a year and that the funding levels cannot keep up with that settlement."

Naomi 3480: 25 – 3481: 9; DX 1064R (PowerPoint slide presentation describing funding

requirements for the Lake Pontchartrain and Vicinity Project, fiscal year 2005).

1069.   Page 2 of DX 1064R shows the levees that were in need of improvement and levee

deficiencies in fiscal year 2005. These deficiencies existed in prior years; fiscal year 2005 funding

did not allow correction of those deficiencies.  3481: 10 – 3482 5; DX 1064R (PowerPoint slide

presentation describing funding requirements for the Lake Pontchartrain and Vicinity Project,

fiscal year 2005).

1070.   On Page 2 of DX 1064R, the green arrow for the control structure "...are structures

that are closed in the event of a high tide or storm to keep water out of the St. Bernard Parish or

Orleans Parish area." [...] The red and white-checkered marks indicate "about a 2-foot need for

raising that area [...] there was a 3-foot levee raising required" along the IWW. Naomi 3483: 2-

17; DX 1064R (PowerPoint slide presentation describing funding requirements for the Lake Pontchartrain and Vicinity Project, fiscal year 2005).

1071.  Mr. Naomi presented DX 1064R either in person or provided copies of the presentation to "...all the levee districts throughout the area, the four levee districts..." He was also interviewed by the press; on various radio programs, made presentations to various civic groups.  Naomi 3483: 20 – 3484: 7.

1072.  Mr. Naomi engaged in the same education process as outlined in DX 1064R in fiscal year 2004 beginning at the time the President's budget was released in early 2003.  Naomi 3484: 13 – 3485: 1.

1073.  Mr. Naomi personally entered information in the "Consequences" and "Remarks" cells of the spreadsheet containing many of the projects throughout the Mississippi Valley Division that are flood damage reduction projects.  The individual project managers for the other projects entered data in these columns. Naomi 3494: 2-16; DX 0515R (Spreadsheet containing all of the flood damage projects in the Mississippi Valley Division Fiscal Year 2006)

1074.  The "Consequences" for the Chain of Rocks Canal, Mississippi River, in Illinois, the first line of DX 0515R, reads as follows:

> "Increased risk of failure and flooding of major metro area of 85,000 acres and affecting 180,000 residents."

1075.  The "Remarks" for the Chain of Rocks Canal, Mississippi River, in Illinois,  the first line of DX 0515R, reads as follows:

> "Failure could affect 85,000 acres and a major inland port. Commercial tonnage, 77,470,000. System ton miles, 18,000,200,000."

Naomi: 3494:17 – 3495:3

1076.   The "Remarks" for the Comite River drainage project, Baton Rouge, the second

line of DX 0515R,  reads as follows:

"Politically sensitive.  Footnote for average annual damages: total damages
prevented."

Naomi 3495: 7-22

1077.   The "Remarks" for the East St. Louis, Illinois project, third project from the

bottom of page 3 of DX 0515R, reads as follows:

"Sponsor is ahead.  Project is near completion.  Failure at triple culverts would
cause a catastrophic loss of the levee."

1078.   This means that the local sponsors "were ahead in their contribution...they were

very active in funding the project.  Naomi 3496: 9-20

1079.   The "Consequences" column for the Davenport, Iowa project, second from the

bottom of page 6 of DX 0515R, reads as follows:

"Project construction delayed a year."

1080.   The "Remarks" for the Davenport, Iowa project, second from the bottom of page 6

pf DX 0515R, reads as follows:

Project provides protection of the water supply for 125,000 people.  High visibility
in 2001."

Naomi 3496: 24 – 3497: 4.

1081.   The "Consequences" column for the Des Moines and Raccoon Rivers, Iowa

project, bottom of page 6 of DX 0515R, reads as follows:

"Completion of the feasibility study would be delayed another year, and Des
Moines would continue to be at risk for serious flooding for another year."

1082.   The "Remarks" column for the Des Moines and Raccoon Rivers, Iowa project,

bottom of page 6 of DX 0515R, reads as follows:

"Strong local and congressional support."

Naomi 3497: 5-13

1083.    A project with strong local or congressional support, "...means that there's high interest in the congressional delegation and strong local support, and that might help the decision makers in Washington decide whether or not to fund this project." A project is more likely to get funded if it has strong congressional support going into the process.  Naomi 3497: 14-22

1084.    The "Remarks" column for the St. Louis Flood Protection Project, last line on page 8 of DX 0515R, reads as follows:

> "This is a design deficiency correction necessary to ensure the proper functioning of the existing project.  Many large industrial properties and significant transportation, power, and sewage treatment infrastructures are protected by this project."

Naomi 3497: 23– 3498: 4.

1085.    The "Remarks" column for the Hurricane Protection Project, a study for category 4 and 5 protection, last line of page 11 of DX 0515R, for which Mr. Naomi is the project manager, reads as follows:

> "The southeast Louisiana area is extremely vulnerable to damages caused by hurricane storm surge. Study will determine if protection from a Category 5 hurricane is feasible.  Major national economic impacts, flood damages, and loss of life would result if Cat 5 protection is not implemented."

Naomi 3498:5 - 25.

1086.    The "HQ Rank" column for the Hurricane Protection Project is ranked 3 in priority which means it was excluded from the President's recommended budget.  But Congress funded the project anyway at $100,000. Naomi 3499: 1-20; DX 0515R (Spreadsheet containing all of the flood damage projects in the Mississippi Valley Division Fiscal Year 2006).

196

1087.    The "Consequences" column for the project along the Mississippi River in

Missouri and Illinois, page 52, first line, reads as follows:

> "Safety compromised, structural failure, loss of service.  15:42 24 noncompliance
> will lead to ERGO violations and fines from EPA."

1088.    The "Remarks" column for the project along the Mississippi River in Missouri and

Illinois, page 52, first line, reads as follows:

1089.    "Failure could affect 180,000 people, 35,000 acres, and major inland port."

Naomi 3499: 17 - 3500: 2.

1090.    The Lake Pontchartrain and Vicinity Hurricane Protection Project was competing

for funding with other projects listed in DX 0515R during fiscal year 2006 and with similar

projects in prior years all over the country.  "Congress makes ultimate funding decisions for all

Federal appropriations" and which projects would be funded and which would not. Naomi 3500:

3-14; DX 0515R (Spreadsheet containing all of the flood damage projects in the Mississippi

Valley Division Fiscal Year 2006).

> 3.    *Awareness by Congress of "problems" posed by the existence of the*
>        *MRGO*

1091.    Over the course of many years, several governmental entities passed legislation

informing Congress of problems allegedly caused by the MRGO.  *See, e.g.*, JX 0024 (resolution

passed by the St. Bernard Port, Harbor & Terminal District in 1999); JX 0406 (resolution passed

by the Lake Borgne Levee District in 1999); DX 0601 (resolution passed by the Legislature of

Louisiana in 1992); DX 0603 (resolution passed by the Legislature of Louisiana in 1999); DX

0607 (resolution passed by the Legislature of Louisiana in 2004); DX 0781 (resolution passed by

the Lafourche Parish Council in 1994); DX 0783 (a resolution passed by the Louisiana Wildlife

Federation, Inc. in 1998). These resolutions, containing various statements describing the erosion, salinity intrusion, and destruction of wetlands caused by the MRGO, were sent to Congress upon their passage.

1092.   St. Bernard Parish also passed a number of resolutions over the years regarding the MRGO. One, from 1991, was sent to Senator Breaux, Senator Johnson, and Representative Tauzin, and noted that "scientific studies have documented extensive land loss, wetland deterioration and other direct and indirect damage in St. Bernard Parish that has resulted from the MRGO." DX 1316. That resolution also warned that "scientific studies have shown that the threat of hurricane generated storm surge to St. Bernard Parish was increased by the construction of the MRGO." *Id.* Another resolution, passed in 1994 and forwarded to "St. Bernard Parish's Congressional Delegation," warned that "the MRGO causes erosion along the south shore of the MRGO which threatens the stability of the hurricane levee." DX 1315.

1093.   In 1998, St. Bernard Parish passed another resolution, a certified copy of which was forwarded to "the Southeast Louisiana's Congressional Delegation," Representative Livingston, who at the time was Speaker of the House of Representatives, Representative Tauzin, Representative Jefferson, Senator Breaux, and Senator Landrieu. PX 1253. It informed its recipients that "the MRGO provides a superhighway for storm surges caused by hurricanes and winter cold fronts" and that "saltwater intrusion has virtually destroyed intermediate water marshes and freshwater swamps surrounding Lake Borgne, resulting from opening the MRGO."

1094.   Around the time this resolution was passed and sent to Congress, Dr. Sherwood Gagliano participated in a field trip to the MRGO with a number of elected officials, including Louisiana's Senator Landrieu and then-Representative Vitter. Gagliano 109:1-18  Dr. Gagliano

198

made the Senators aware of his studies regarding the MRGO, and he provided the Senators with a

memorandum "which laid out the problems and suggested approaches and solutions" regarding

the MRGO. *Id.*; PX 1253. The memorandum provided by Dr. Gagliano, which was also attached

to the St. Bernard resolution, explained those problems as follows:

> The Mississippi River Gulf Outlet (MRGO), since its construction
> in 1965 as an alternative route for ocean going vessels into the Port
> of New Orleans, has increased the storm surge vulnerability of
> developed areas of St. Bernard and Orleans Parishes and caused
> extensive environmental damage to a vast area of the region.
> Greatest impacts occur in St. Bernard, Orleans and Plaquemines
> Parishes, in that order. The channel is a serious threat to public
> safety and an environmental threat to the region.

> The storm surge threat increases each year as the cross-sectional
> area of the channel continues to enlarge and marshes that buffer the
> hurricane protection levees and coastal communities erode away.
> Erosion and estuarine deterioration is continuous and is cumulative
> along the MRGO, along the natural and man-made channels which
> it intersects, and within the hydrologic basins which it crosses.
> Alteration of hydrology and salinity regimes by the MRGO has
> effects as far as the western end of Lake Pontchartrain and
> Mississippi Sound, and even beyond. Commercial fishermen from
> Mississippi and Alabama fish the waters in the MRGO area; the
> environmental impacts from the channel have secondary impacts to
> the economies of these neighboring states.

PX 1253 at 5.

1095.   Another St. Bernard Parishresolution, passed in 2004, warned that the MRGO "is a

serious threat to life and property in St. Bernard, Orleans, Plaquemines and many other Lake

Pontchartrain Basin parishes [and] is a major factor in coastal erosion." DX 1272. It specifically

requested the "Congressional Delegation representing the said parishes" to take all steps

necessary to close the MRGO. *Id.*

1096.   In addition to these state and local resolutions, many Federal legislative documents also demonstrate Congress's awareness of the problems caused by the MRGO.

1097.   By 1989, Congress was already considering legislation to address the loss of wetlands in Louisiana.  *See, e.g.,* S. Hrg. 101-239 (Aug. 2, 1989); S. Hrg. 101-342 (Aug. 31, 1989).

1098.   Testimony at Congressional hearings documents that Congress was informed of problems associated with land loss and its causes:  "The biggest problem [] in Louisiana has to do with coastal wetlands.  It has been estimated at one time that we are losing as much as 40 square miles a year," S. Hrg. 101-342 at 2; "[T]he ecology of the marsh has changed.  As inevitable saltwater intrusion and other not so inevitable saltwater intrusion has occurred, the salinity levels of the marsh have changed . . . ." I*d.*

1099.   The record of hearings on bills that later became the Coastal Wetlands Planning, Protection, and Restoration Act ("CWPPRA") demonstrates that Congress was aware not only of the problem of wetland loss, but also of ongoing efforts by the Corps of Engineers toward restoration of the wetlands.

1100.   At an August 31, 1989, hearing, Col. Gorski, New Orleans District Engineer, presented testimony concerning existing efforts to preserve, restore, and enhance wetlands.  *Id.* at 58-61.   Col. Gorski described the planning of the Bonnet Carre freshwater diversion intended to preserve wetlands in the Lake Pontchartrian Basin, including the area around Lake Borgne.

1101.   He also described the use of dredged material to create wetlands and existing studies underway to address the loss of wetlands, including the Louisiana Comprehensive Coastal Wetlands Study and the Land Loss and Marsh Creation Study.  *Id.*

1102.    Finally, Col. Gorski described that "[u]nder the Mississippi River-Gulf Outlet Project, we're studying shoreline protection features that will preserve some 1,700 acres of marsh from erosion.' *Id.* at 59; *see also* DX 1763 at 7-8 (Sept. 12, 1990) (Representative Lindy Boggs acknowledging efforts underway by the Corps of Engineers to benefit marsh surrounding Lakes Pontchartrain and Borgne through a freshwater diversion at Bonnet Carre and supporting passage of CWPPRA as "the next logical step toward implementing plans that have been developed by the Corps of Engineers and other Federal agencies, and by the State of Louisiana, to slow and halt this tremendous loss to our wetlands").

1103.    The importance of a source of funding in the proposed legislation for coastal restoration projects was emphasized by Senator Johnston:

> It is [] important to point out that this legislation creates a new dedicated funding source for coastal wetlands projects.  It is not simply new budget authority, which really means that you have the authority to try and take the money from other projects, but it is a dedication.  This is the central point of my legislation.  That is, an authorization frankly means very little in the Congress.  It means that you can go and try to take money from drugs or from national defense or from childrens' programs or from education and the answer always is that no you can't take the money from these other projects.  That is why we need a new source of revenue dedicated and sufficient to deal with the problem of wetlands.  That is the key to this legislation.

S. Hr'g 101-342 at 4.

1104.    In 1990, CWPPRA became law.  Pub. L. 101-646 (1990).  That Act provided annual funding for projects to restore or protect the wetlands of coastal Louisiana.  In addition, the law required annual reporting to Congress of a priority list of projects to be funded, *id.* § 303(a)(1), a long-term restoration plan to be completed within three years of enactment of the

statute and submitted to Congress, § 303(b)(1), (6), and every three years thereafter, a report to

Congress on the effectiveness of projects carried out under the plan, § 303(b)(7). *See also* Miller

3210:2-17 (describing reporting requirements under CWPPRA).

1105.   The long-term Restoration Plan that was prepared by the Task Force formed

pursuant to CWPPRA, led by the Corps of Engineers, described the expansion of the banks of the

MRGO.  DX 1749 (CWPPRA Restoration Plan, Nov. 1993) at 27 ("The [MRGO], a channel

completed east of New Orleans in 1968, is now as much as 2,000 feet wide, nearly three times it

original width of 750 feet.").  The Restoration Plan also described that "[c]onstruction of the

MRGO, which breaches the natural barrier of the Bayou La Loutre ridge and the

Pontchartrain/Borgne land bridge, allowed saline waters to push farther into the basin."  *Id.* at 63.

1106.   The Restoration Plan provided the following recommendations related to the

MRGO:

> Restoration of riverine input into the basin via freshwater diversion
> from the Mississippi River through the Bonnet Carre Spillway
> solves the first critical problem, salinity.  This is preferred to the
> strategy of a navigable gate in the MRGO because the diversion has
> the added benefit of restoring fluvial input and is less costly overall
> and on a per-acre basis.  The project is already authorized and need
> not be funded under the CWPPRA. . . . Construction of a rock dike
> on the north bank of the MRGO and the beneficial use of all the
> material dredged for the MRGO would stop erosion, addressing the
> second critical rpoblem, and create large amounts of marsh.  The
> diversion at the Bonnet Carre Spillway and bank protection with
> marsh creation along the MRGO are critical projects.

*Id.* at 67.

1107.   A Programmatic Environmental Impact Statement was prepared in connection with

the Restoration Plan.  DX 1749; Miller 3197:15 – 3198:1.

1108.   Additional legislative materials further demonstrate the extent of Congress's knowledge, even without a SEIS from the Corps.

1109.   In arguing for relief of St. Bernard Parish's cost-share obligation for the LPV project, Representative Tauzin emphasized that for St. Bernard Parish, the LPV was necessary specifically because of the MRGO, and, therefore, the destruction to the Parish caused by the MRGO justified forgiveness of St. Bernard's payments.  DX 1612 at 2 ("When [the MRGO] was planned, the Parish could not have foreseen the devastation which has been wrought by the channel. . . . When the MRGO was about 75% completed, Hurricane Betsy severely damaged the area.  The Parish concluded that the MRGO enhanced the storm surge.  For this reason, the St. Bernard Parish and the Lake Borgne Basin Levee District entered into an agreement with the federal government to pay 30% of the cost of a new hurricane protection system.  They had no choice . . . . [T]he Parish and Levee District have already paid more than enough in money, suffering, and environmental degredation.").

1110.   Even shipping interests testifying before Congress in favor of the MRGO acknowledged to Congress the harm caused by the channel.  *See* DX 1594 at 2-3 (Feb. 27, 1996, Testimony before the House Energy and Water Development Subcommittee on Appropriations) ("The long range plans for the Mississippi River Gulf Outlet is questioned by environmental groups.  There is a salt water intrusion and erosion problem in MRGO, but any curtailment of shipping traffic in the channel without regards to the long term effect upon the Port of New Orleans would be a disaster. . . . I feel very strong about approving of funds for maintenance dredging and jetty repair projects.  Additionally, I support the erosion Rip-Rap Study for the MRGO.").

1111.    In a 1995 Report justifying appropriations, the House Committee on

Appropriations candidly admitted an awareness of the exact problem about which Plaintiffs

complain:

> The Committee is aware that the authorized 36-foot Mississippi
> River-Gulf Outlet channel is experiencing serious bank failures on
> its north bank due to land subsidence, which is significantly
> increasing dredging costs.  The Committee is aware that the Corps
> of Engineers recently experienced serious dredging delays, which
> caused draft restrictions, while attempting to resolve environmental
> issues in the process of obtaining Coastal Zone Consistency to
> dredge the Mile 50-56 reach.  To resolve this particular issue, the
> only available solution was to construct a rock dike that provided
> bank stabilization before dredging could be accomplished.  The
> Committee is of the opinion that to minimize future dredging costs
> and preserve wetlands the north bank Mississippi River-Gulf Outlet
> should be stabilized with riprap or similar hardened protection, as
> necessary, using available operation and maintenance funds.

H.R. 104-149 (1995) at 50 (emphasis added).

1112.    Similar testimony was presented to other House committees.  *See, e.g.,* DX 1593 at

2 (July 8, 2004, Testimony before the Committee on House Transportation and Infrastructure

Subcommittee on Water Resources and Environment) ("Dredging of channels and canals like the

70 mile long [MRGO] has destroyed wetlands, increased saltwater intrusion and expanded dead

zones.  Even as we speak, an acre of wetlands disappears every 36 hours along the MRGO.

Natural occurrences like hurricanes, shoreline erosion, and land subsidence compound these

problems.")

1113.    Identification of both short and long-term strategies for wetlands restoration

pursuant to the authority of CWPPRA led to an effort to develop a strategy for implementation of

204

the longer term projects that could not be accomplished through CWPPRA's annual priority lists.

Miller 3210:18 – 3211:5.

1114.    The resulting strategy for restoration of the coast over the longer term became

known as the Coast 2050 Plan, which was published as a report in 1998. *Id.*; DX 0123.

1115.    Like the CWPPRA Restoration Plan, the Coast 2050 Plan also specifically

addressed the MRGO:

> 1116.    The construction of the Mississippi River Gulf Outlet (MRGO) in
> the early 1960's caused loss of marsh from both its "footprint" (area
> of direct impact) and the saline water it allowed to enter the basin
> once the La Loutre Ridge was breached. These events led to high
> loss in the areas surrounding the MRGO and in areas more removed
> such as the Pontchartrain/ Maurepas Land Bridge.
>
> * * * *
>
> *Special Problems—Resolve the MRGO Problem*
>
> *14. Close MRGO to deep draft navigation when adequate container
> facilities exist on the river.* The MRGO is perceived as a major
> problem in the Pontchartrain Basin. Wave erosion causes a 15-foot
> per year loss along 37 miles of the north bank. When the MRGO
> was completed in the 1960's, salinity increased in the basin, causing
> massive environmental damage. Currently, the MRGO is the only
> access to container facilities on the Inner Harbor Navigation Canal.
> However, only 2-3 large ships per day use the waterway. Some
> container facilities have just been built on the Mississippi River in
> the New Orleans area, but they are generally fully booked.
>
> A large new Millennium Port, including container facilities, is
> proposed in Plaquemines Parish. Once there are adequate container
> facilities on the river, the MRGO would be closed to deep draft
> navigation. The closure could be achieved by a structure (gate or
> weir) at the La Loutre ridge that would allow the passage of
> shallow-draft navigation but reduce salinities coming up the
> MRGO. In addition, the possibility of restoring the ridges at
> Bayous Bienvenue, Dupre, and Yscloskey should be studied. The

> strategy of actually closing the channel to deep draft shipping is
> expected to preserve minor amounts of marsh.

DX 0123 at 47, 88.

1117.   After the passage of CWPPRA, additional legislation was proposed to provide funding for coastal restoration projects.  At a 1999 hearing on one of the proposed bills, Louisiana's Governor Foster addressed the House Committee on Resources, emphasizing that the importance of the legislation to funding Louisiana's Coast 2050 Plan: "The State has a plan called Coast 2050 that will prevent much of our projected land loss and will significantly enhance our current efforts to save and rebuild our coastline.  But the plan is expensive, almost $14 billion over the next 50 years. . . . The legislation will provide the money to help us implement the Coast 2050 program."  DX 0597R at 219.

1118.   At the same 1999 hearing, the Mayor of the City of New Orleans provided the following warning regarding hurricane impacts:

> Last fall, we had a pretty turbulent hurricane season and New
> Orleans was threatened with an almost direct hit, 50 miles out
> Hurricane Georges tilted slightly to the east and therefore the eye of
> the storm missed us and we were on the eastern side of the eye,
> which meant we got wind but very little rain.  I cannot tell you how
> much the protection of the coast line seems to be one of those
> natural barriers against this large population base in southeastern
> Louisiana from being devastated.  It does not completely protect
> you, but all of the experts tell us it is a very important thing . . . .
> After steering the City through hurricanes and listening to the
> experts talk, I can tell you I have become convinced that it is one of
> those very important components of protecting this entire coastal
> part of the country from the brunt of these very dangerous
> hurricanes.

*Id.* at 241.

1119.   The Assistant Secretary of the Army also spoke to the Congressional Committee. *Id.* at 242-45.  In both oral testimony and a written submission, the Assistant Secretary of the Army informed the Committee of the importance of wetlands, the extent of loss, benefits being achieved through CWPPRA projects, and the significance of the Coast 2050 Plan as the "basis for long term solutions."  *Id.* at 242-248.

1120.   Representative Tauzin, presiding over the 1999 hearing, showed his familiarity with the MRGO and the concerns of St. Bernard Parish President "Junior" Rodriguez relating to the channel in the following statement:

> [I]f Junior [Rodriguez] was here, he would applaud your call for relocating the MRGO.  The MRGO, members of the panel, is the Mississippi River Gulf Outlet, an artificially created channel for deepwater shipments into the Port of New Orleans, that instead of going up the river, long and tenuous 90 miles, ships were able to come up this very straight but artificial channel.  But guess what?  It introduced more saltwater into the marshes and even into Lake Borgne and Pontchartrain and caused great problems, and Junior would applaud your comments.

*Id.* at 266.

1121.   The bills proposed in 1999 did not pass, but the Coast 2050 Plan served as a reconnaissance study that led to authorization of a feasibility study referred to as the Louisiana Coastal Area Study, or "LCA" Plan.  Miller 3212:3-17.  *See also* DX 1613 (H. R. 106-253, House Committee on Appropriations Report, July 23, 1999) ("*Louisiana Coastal Area, Louisiana—*The Committee has provided $1,750,000 to initiate an ecosystem restoration feasibility study of the Louisiana coast.  This effort, known as Coast 2050, will comprehensively address critical loss of coastal landscape in Louisiana.").

1122.   Later Congressional hearings continued to evaluate funding for ecosystem restoration.

In July 2004, the House Committee on Transportation, Subcommittee on Water Resources and Environment held a hearing to examine the Corps of Engineers's draft recommendations in the Louisiana Coastal Area, Ecosystem Restoration Study.  DX 1750.

1123.   Representative Tauzin provided the following comments, showing his complete understanding, prior to Hurricane Katrina, of the threat faced by Greater New Orleans:

> You go to the west bank of the Mississippi River at the FEMA office there, and they have a computer system you can log onto. You can see a simulation of what a category four hurricane does coming up Lake [Borgne], or eastern New Orleans, coming up on the wet side of New Orleans.  they'll tell you that New Orleans will be inundated, 27 feet of water.  I said, my God, when I saw this. . . . [W]e'll be faced one day with horrific losses.

DX 1750 at 4.

1124.   It was politics that frustrated Representative Tauzin's plan to address the hurricane threat, as he described at the hearing:

> I want to thank you for all the efforts this Committee has made . . . to try to help us in the energy bill, by trying to make sure we get some money back from the offshore drilling. . . . [T]he Energy Bill has stalled on the other side, we're not allowed to talk about what happens on the other side, but it's stalled over there because they can't bring closure on a filibuster.  Fifty-eight members were ready to vote for it.  And it would have meant the first of billions of dollars for us to begin saving the coastline of Louisiana, saving the lives of the people . . . . There may be other cases before this Congress is over, before I leave after almost 25 years of service here, where we can put something in, a water bill, a Coast Guard bill or somewhere, something to begin the process of providing some relief, some help to begin stopping this incredible loss of wetlands, this incredible disaster, this incredible threat to the lives of men and women and children . . . .

*Id.* at 5.

1125.   Representative Vitter echoed the frustrations of his colleague:

> [Rep. Tauzin has] done the job on the House side, we passed CARA
> several years ago, which was going to be a major start to set this
> right and to save our coast.  Then when that didn't go anywhere in
> the Senate, then he came with an energy bill which had a billion
> dollars, a major start, a real Federal breakthrough plan B.
> Unfortunately, that met the same fate in the Senate.  So here we are
> again. . . .
>
> It is life or death for us.  There is impending disaster unless we do
> something.  It means, as he said, the loss right now of 35 square
> miles a year, literally a football field of land every few minutes, just
> land going away into the Gulf, evaporating into nothingness.  All of
> our coastal communities are on edge, wondering how much longer
> they can survive.

*Id.* at 6.

1126.   The Army Corps of Engineers' Director of Civil Works testified at the hearing,

describing the history of efforts to provide remedies for land loss and the evolution of strategies

from CWPPRA to Coast 2050 to LCA.  *Id.* at 13-14.  His written submission to the Subcommittee

provided more details of the LCA plan, including the fact that "Mississippi River Gulf Outlet

environmental restoration features" were proposed to be one of the five near-term features for

accelerated implementation.  *Id.* at 79.

1127.   At the same hearing, the Secretary of Louisiana's Department of Natural

Resources acknowledged that "our collective efforts to manage the major rivers and facilitate

navigation over the years have contributed significantly to the coastal land [loss]."  *Id.* at 16.

1128.   The Corps' Final Report on the LCA Ecosystem Restoration Study and

Programmatic Environmental Impact Statement were completed in November 2004, DX 0925 –

DX 0932, and the Chief of Engineers transmitted his Report to Congress recommending implementation of the LCA Ecosystem Restoration Program on January 31, 2005, DX 1752.

1129.   Congress was considering legislation to authorize the LCA plan, including prioritization of restoration projects related to the MRGO, at the time of Hurricane Katrina.  DX 1585.

1130.   Hearing testimony plainly illustrates Congress's close familiarity with the history of concerns relating to the MRGO as well as efforts to address the concerns.  *See, e.g.*, DX 1585 at 8 (Senator Vitter:  "Senator Boasso represents the southeast portion of the State, a good part of St. Bernard and Plaquemines Parishes.  This is the area where the Mississippi River Gulf Outlet is located.  Senator Boasso is extremely well-versed on this environmental disaster because he has lived in one of the centers of gravity for that very worrisome activity.");  *id.* at 14-15 (Senator Boasso:  "The MR-GO is a symbol of how poorly we have treated our wetland environment in favor of commerce.  It has never developed to its original purpose and, once again, we are left with a situation no one wants to make a decision about. . . . You have three options:  One is continue with the proposed plan of $108 million of rocks [foreshore protection] . . . . The second thing is to properly fund the relocation of these businesses and close the MR-GO. . . . Or Plan 3, stop dredging . . . Install a gate system . . . Install locks . . . . I'm asking, we have to make a decision.  There is no sense in sending the mixed signals to the maritime community and the people who have to live and deal with the saltwater intrusion with the MR-GO.");  *id.* at 20 (Senator Boasso:  "The Army Corps of Engineers provided a study that said whether the MR-GO was open or closed that there would only be a 6-inch rise in storm surge on top of—or a 6-inch difference.  There's some people who had disagreement about that and so what we have done,

we've got the Governor's office and Secretary Angelle, the Army Corps of Engineers and some citizens and we got together and there is a re-look at all the studies that have been done to confirm whether or not if you dammed off the MR-GO is it only a 6-inch difference.").

1131.    A great deal of written correspondence between Members of Congress and others reveals just how familiar Congress was with the issues surrounding the MRGO.

1132.    In a letter dated March 28, 1977, Representative Lindy (Mrs. Hale) Boggs wrote to Col. Rush, New Orleans District Engineer, regarding an upcoming public hearing on the MRGO. *See* DX 0869.  In this letter, Representative Boggs emphasized the thorough study and review of water resources projects by Congress prior to initial authorization of the MRGO, and acknowledged that they are further scrutinized each year during consideration of the budget.  *Id.* The letter further revealed Representative Boggs's view that Congress had to balance the need to preserve the environment with the need to promote economic growth.

1133.    On September 18, 1979, Senator Russell Long wrote to Col. Sands, who was then District Engineer, and enclosed a correspondence he had received from the St. Bernard Parish Planning Commission concerning erosion problems along the banks of the MRGO.  *See* DX 1610.  On April 17, 1980, Representative Livingston similarly acknowledged to Col. Sands that he had recieved correspondence from the St. Bernard Parish Planning Commission regarding erosion along the MRGO.  *See* DX 1607.

1134.    On June 17, 1985, Representative Tauzin wrote to Col. Witherspoon, New Orleans District Engineer.  *See* DX-0821.  This letter demonstrates Representative Tauzin's knowledge of the damage to wetlands in St. Bernard caused by the MRGO.

1135.   On June 1, 1993, Col. Diffley, District Engineer, wrote to Senator Breaux responding to an earlier letter from Senator Breaux on behalf of the Lake Pontchartrain Basin Foundation concerning environmental damages and possible storm damages from the MRGO. *See* DX 1639.  The letter explained to Senator Breaux that foreshore protection had been constructed on the south bank of the MRGO; provided statistics for deep draft traffic and jobs generated by the channel; and explained current measures being implemented to address bank erosion and salinity, which were described as the two major environmental impacts caused by the MRGO.  *See id.*  The letter further explained that a diversion at Bonne Carre had been authorized, which was expected to lower the salinity levels in the St. Bernard marshes, and it explained the alternatives analyzed in preparing the overall CWPPRA restoration plan for the Pontchartrain Basin, which included navigable gates in the MRGO as well as closure of the MRGO.  *Id.*

1136.   On October 12, 1994, Col. Clow, District Engineer, responded to an earlier letter from Senator Breaux regarding a St. Bernard Parish resolution that requested closure of the MRGO and interim measures to be taken until closure occurred.  *See* DX 0866.  Among other things, the letter described the MRGO Bank Erosion Reconnaissance Report of January 1994, its recommendation to proceed with feasibility studies to determine the advisability of constructing environmental restoration measures, including bank protection, along the MRGO, and the lack of a non-Federal sponsor to cost share the feasibility study.  *Id.* Similar letters, acknowledging the impact to St. Bernard Parish from salt water instrusion and bank erosion, were sent to Senator Breaux in early 1999.  *See* DX 0897; DX 0898.

1137.   Such correspondence between Members of Congress and the Corps were not unusual.  For example, it was "fairly common" for the Corps to correspond with Members of

Congress regarding the bank erosion reports compiled by the Corps in the late 1980s and early

1990s. *See* Podany 3390:3-12; *see also, e.g.*, DX-1758. These reports found, among other things,

that bank erosion was occuring along the MRGO, that such erosion was "severe," and that it was

impacting the environment, including allowing for saltwater intrusion to the marshes. *See*

*generally* Podany 3353:12 – 3356:4.

### 4.    *Congressional Input Into Bank Stabilization Efforts*

1138.   Thomas J. Podany has worked for the Corps of Engineers for 26 years. He is

currently employed as Chief of the Protection Restoration Office. During Hurricane Katrina, Mr.

Podany was Assistant Chief of Planning Programs and Project Management.

1139.   The Water Resource Development Act of 1990 established environmental

restoration as one of the primary missions of the Corps of Engineers. Podany 3334:16-24. See

also Pub. L. 101-640, Section 306 (Nov. 28, 1990); 104 Stat. 4604, 4635; 33 U.S.C. 2316 ("The

Secretary shall include environmental protection as one of the primary missions of the Corps of

Engineers in planning, designing, constructing, operating, and maintaining water resources

projects.").

1140.   A "primary mission" means that projects within that mission are more likely to get

priority in budgeting within the administration and also with Congress. That means that there is a

better chance to execute these types of projects, there is likely to be more of them, and the

processes for evaluating them will be clearer. Podany 3335:2-9.

1141.   The Corps studied whether or not the bank stabilization measures could be

constructed along the north shore or the unleveed reach of the MRGO. Podany 3336:20-23.

1142.   The reconnaissance report or reconnaissance study is the first phase of a two-phased study process for federal  water resource projects. The second phase of that process is the feasibility phase.  Podany 3337:4-15.

1143.   The purpose of a reconnaissance report is to identify whether a feasibility study should be conducted.  It considers things like problems, needs, and opportunities associated with potential solutions to the problems identified.  It could also include the identification of a non-federal sponsor, the study cost estimate, and the recommendation to proceed into the next phase.  Podany 3337: 4-15.

1144.   If there was a previous report to Congress, Congress could issue a study resolution.  At the same time, Congress would send a docket letter to the Corps asking for information on the problems, and potential solutions in the area.  The Corps would provide that information.  Podany 3337:16--3338:17.

1145.  If there was no existing report to Congress, a study resolution could be issued only if there was new legislation or an appropriation from existing legislation such as the Water Resources Development Act.  Podany 3337:16--3338:17.

1146.   Neither an operations manager at the district level nor a project manager for a specific project can authorize a reconnaissance report as a part of an existing project.  Podany, 3338:19-25.

1147.   Participants in a reconnaissance report preparation include "a project delivery team made up of interdisciplinary planning team members, archaeologists, engineers, scientists, biologists."  Podany 3339:16--3340:11.

1148.   Public notice would be sent out at the beginning of a reconnaissance study to notify the public about the study.  It would indicate that the Corps is doing the study, identify the authority for the study, describe the study process (the two-phase process, the reconnaissance and feasibility), and provide contact information.  The notice is sent to the Congressional delegation, state and local officials, many of the elected officials in Louisiana, post offices libraries, media, environmental groups, and to interested stakeholders.  Podany 3339:16--3340:11.

1149.   The reconnaissance report would have the outline of at least one potentially-feasible plan.  It would show at least a preliminary analysis of the problems, needs and opportunities and whether the potential alternatives that were identified were in the federal interest to pursue. It would make a determination as to whether additional studies are warranted. Podany 3340: 19–3341: 3.

1150.   The ultimate goal of a reconnaissance report is to determine whether the feasibility phase is warranted.  That includes identifying generally a sponsor.  After the report is completed, it is submitted to the Corps division office for review and approval.  Podany 3341: 5-11.

1151.   If a feasibility study is warranted, a potential non-federal sponsor is identified , and funding approved.  The feasibility phase would consider a more detailed analysis of the problem and alternatives.  This would lead to a recommendation for a project that would be sent to Congress.  Podany 3341: 24 – 3342: 7.

1152.   A feasability study cannot be conducted if it is not funded.  The Corps "can only prepare a report based on the funding and authorizations provided by Congress."  Podany 3342: 8-14.   Funding for a feasibility study has a number of sources, including either new or existing legislation.  Podany 3342:15-25.

1153.   Budgeting for feasibility studies is governed by the President's budget priorities.
Podany 3343:1-13.

1154.   Priority protocols exist within the Corps.  As explained by Mr. Podany:  "What we
have now is business lines, so within ecosystem restoration, navigation, flood control, the
administration has set certain targets and thresholds for funding. So, for example, in a flood
damage risk reduction project, if you have a benefit /cost ratio greater than three, you're going to
be in a higher priority and a higher category than if you're below three. So there are certain things
that they have done to identify those priorities nationwide."  Podany 3343:14–3344:19.

1155.   The authorization of a reconnaissance report does not include funding. The Corps
requires study authorization either in terms of the study resolution or specific legislation in a
Congressional act.  But until Congress actually appropriates funds through an annual
appropriations act, the Corps cannot begin the study.  Podany 3349:10–3350:10

1156.   The 1988 reconnaissance report was authorized in 1982. Funding was appropriated
and received to begin work on the project in 1987. The Corps could not have begun work before
1987.  Podany 3349: 10–3350:10.

1157.   The purpose of the 1988 report was to look at the potential for putting bank
stabilization along the north and south levee banks of the MRGO.  Podany 3350: 21-25.

1158.   The 1988 report concluded that bank erosion was severe, and that it had some
environmental and navigation impacts.  Podany 3353: 12-16.

1159.   The 1988 report indicated that severe erosion was occurring along the banks of the
MRGO, causing a potential six-fold increase in the required annual maintenance dredging cost
based on shoaling.  It also considered the potential impacts of saltwater intrusion to the marsh,

and identified a number of different reasons for land loss due to man-made and natural causes, subsidence, sea-level rise, vessel wave wash. Podany 3353: 22–3354: 12.

1160.    Congress appropriated money to the Corps and authorized foreshore protection measures in 1991. Podany 3361:6-24.

1161.    Another reconnaissance report on bank erosion wascompleted in 1994. Mr. Podany assisted the study manager in the report preparation through the development of the initial project management plan for the feasibility phase.   Podany 3364: 4–10.

1162.    This report was initiated because it was felt that there might be another way to address bank stabilization measures on the north bank. The 1994 report's authorization was the same authorization that was used for the 1988 report. Podany 3364:12-22.

1163.    The major difference between the 1988 report and the 1994 report was that the 1994 report did not use as high shoaling rate. Podany 3365:24–3366:15.

1164.    The 1994 report included as an alternative closure of the MRGO.  This was a result of comments in the 1988 report. Podany 3366: 16-21.

1165.    The 1994 report gave four alternatives: continue the channel maintenance, divert traffic to the Mississippi River, divert traffic to an alternative port, or construct a deep-draft lock.

1166.    The 1994 report with respect to bank erosion "concluded that based on monetary benefits that the bank erosion -- bank protection measures were economically feasible and that there's a potential for developing a feasible plan in the feasibility phase. So it recommended moving ahead to the feasibility phase and identify non-federal sponsor to cost share the project." Podany 3367:17-24.

1167.   The Corps was able to determine ways to accomplish foreshore protection that could be tied solely to the operation and maintenance of the MRGO as opposed to an environmental restoration. "Basically we were given guidance from Congress to look at available operation and maintenance funding and look at whether that could be used to do bank stabilization." Podany 3373: 14-25.

1168.   The reconnaissance report is specifically authorized by Congress and funded specifically as a reconnaissance effort. A reconnaissance report can only be done if funded specifically by Congress and authorized. Podany  3374: 23–3375: 1.

1169.   The difference between the 1996 report and its predecessors, the 1988 and 1994 reports, was that the Corps focused mainly on the savings in maintenance dredging and was able to demonstrate that money invested in bank protection would produce at least the same or more in savings on dredging. Podany 3375: 4-18.

1170.   Congress specifically authorized and funded a separate project to put in foreshore protection. Podany 3376: 8-10.

1171.   It was recommended that studies continue to evaluate the feasibility and justification for further foreshore protection measures. The report indicated that as more was built there would be more learning opportunities from what was built and that would show areas where work can be done in other reaches. It was also dependent on available operation and maintenance funds. Podany 3389 20–3390: 2.

1172.   It was fairly common during the course of performing these evaluations and studies to correspond with members of Congress and their staff regarding these issues. Podany 3390: 3-9.

218

1173.    Congress of the United States is the ultimate decision-maker about authorizing a water development project.  Podany 3392: 1-4.

1174.    Congress is the ultimate decision maker about de-authorizing a project.  Podany 3392:5-7.

1175.    Congress is the ultimate decision maker about amending the project's purpose, subject to some limited discretionary authority of the chief.   Podany 3392:8-10.

1176.    Congress is the ultimate arbitrator or decision maker when balancing economic development as opposed to protection of the human and natural environment.  Podany 3392: 14-18.

1177.    The Corps is not allowed to lobby but the Corps routinely sends official formal chief's requests to Congress. The chief's reports generally require study authorization and funding to prepare.  Podany 3395: 8-25.

5.      *The Necessity of a Local Sponsor*

1178.    The Corps never performed a  feasibility study with regard to foreshore protection because it was unable to obtain a local sponsor, as required by law.  Podany 3368: 9-12.

T.    *Damages*

1179.    Tanya Smith built a new house in 1997 at 3920 Despaux Drive in Chalmette (Smith 453: 7-19).  Ms. Smith's parents, Anthony and Lucille Franz, provided the initial financing for the $115,000 purchase price (Smith: 493: 18-25), but gave the house to Ms. Smith by an act of donation in 2001 (Smith 494: 1-5).  Ms. Smith refinanced the remaining debt on the house after the act of donation and made payments of just over $800.00 per month thereafter for the mortgage and escrowed insurance (Smith 494: 4-19).

1180.   Tanya Smith sent her sons to Baton Rouge on Saturday, August 27, 2005, then followed them there on the same day (Smith 462:13 - 465:6).  On Sunday, August 28, 2005, Tanya Smith drove her sons and her father to Spring, Texas (Smith 465:7 - 466:22).  On Tuesday, August 30, 2005, Tanya Smith, her sons, and her father drove back to Baton Rouge (Smith 466:23 - 467:12), where they stayed for five weeks (Smith 468: 11-12).  Tanya Smith understood that her house had flooded on Tuesday, August 30, 2005, when she received a telephone call from a cousin, who said "the whole parish had been flooded." Ms. Smith then found an internet website with photographs showing the flooded neighborhood (Smith 494:20 - 495:8).  After five weeks in Baton Rouge, Ms. Smith and her sons moved into an apartment in River Ridge (Smith 469:23 - 470:3).

1181.   Tanya Smith gutted her house at 3920 Despaux with the help of her friends (Smith 483: 13-16), then hired sub-contractors and rebuilt it (Smith 484:16-24), completing the work by October 31, 2007 only to see the house burn (Smith 485:23 - 486:9).  She retained all the receipts for the re-construction project and presented them to her attorneys (Smith 487:3-10).  As the receipts show, she did not strictly use "like-for-like" finishes and appliances, opting instead to upgrade to high-end appliances and finishes and thereby adding at least $14,000 to the cost of rebuilding the house (Smith 495:9 - 496:9).

1182.   Ms. Smith compiled a handwritten list of the contents of her house for her attorneys and appended values for everything she listed, but did not refer to any listing of actual prices of goods for sale and admitted that she really did not know the value of many of the items and the list was "off the top of her head"  (Smith 497:2 - 498:3).

1183.   Ms. Smith received $101,000 of the US Department of Housing and Urban Development's Community Development Block Grant (CDBG) money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 *et seq*. (Smith 496:24 - 497:1).

1184.   Anthony Franz's grandmother bought the house at 5924-26 St. Claude Avenue in 1922 and Anthony inherited it when his parents died in the 1960's (A Franz 564:14-20; 566:4-9). While the house was a duplex with an outbuilding and four apartments that were capable, in proper circumstances, of generating rental income, the Franz's never leased any of them out (L. Franz 549: 12-25; A. Franz 566: 18 - 567:6).

1185.   As Tanya Smith described, Anthony and Lucille Franz evacuated by car to Baton Rouge on Saturday, August 27, then on Sunday, August 28, 2005, Tanya Smith drove Anthony Franz and his grandsons to Spring, Texas and, on Tuesday, August 30, 2005, Anthony Franz, Tanya Smith, and Tanya's two sons drove back to Baton Rouge, where Anthony and Lucille Franz stayed for five weeks (L. Franz 550:21 - 551:9; A. Franz 567:24 - 568:6).  During their stay in Baton Rouge, Anthony and Lucille Franz came to realize that their house at 5024-26 St. Claude Avenue had been flooded and they "had lost everything"(A. Franz 572:15 -574:16).   After staying five weeks in Baton Rouge, Anthony and Lucille Franz moved into an apartment in Harahan in which they still reside (L. Franz 554:4-8).

1186.   Anthony and Lucille Franz's house at 5924-26 St. Claude Avenue has never been cleaned or repaired and, other than a few personal possessions removed by the Franz's, the house remains in the same condition today as in October of 2005.  The Franz's have no intention of renovating the house and returning to live in it (L. Franz 557:23 -558:3).

1187.   Ms. Franz handwrote a list of the contents of her house and appended values for everything she listed, but did not refer to any listing of actual prices of goods for sale and admitted that she did not know the value of many of the items she listed  (L. Franz 558:11-16).

1188.   Anthony and Lucille Franz received $80,000 of the US Department of Housing and Urban Development's Community Development Block Grant (CDBG) money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 *et seq*. (A. Franz 575:5-6).

1189.   Kent Lattimore bought a 20-year-old used house trailer on a leased pad in the trailer park at 2100 Marcelle Drive in 1991 or 1992 for $10,000 (Lattimore 606:15-21).  He acquired no immovable property, owning only the trailer and leasing the space in the trailer park (Lattimore 606:22-24).

1190.   Kent Lattimore bought the abandoned Post Office building at 9117 West St. Bernard Highway, adjacent to the trailer park where he lived, in 1996 or '97 for $50,000 (Lattimore 587:3-12).  He thoroughly renovated the building (Lattimore 587:13-21).  He paid for the renovations himself, but is unsure how much he paid, having quoted figures ranging from $100,000 to $200,000 (Lattimore 587:24 -588:1; 606:25 -607:15).

1191.   Kent Lattimore left New Orleans on a cruise ship on Saturday, August 27, 2005, headed for a seven-day vacation in the Caribbean (Lattimore 596:15 -597:7).  When Hurricane Katrina struck New Orleans, Mr. Lattimore was in Mexico and upon its return, the ship diverted to Galveston (Lattimore 597:2-22).  While on the cruise, Mr. Received updates on the storm (Lattimore 597:9-11) and was advised by a friend who was a St. Bernard Parish deputy "not to even go back" because the courthouse was "chest deep" with water "up the steps" (Lattimore 601:

8-13).  Mr. Lattimore returned to New Orleans on September 10, 2005, retrieved his pickup truck from a parking space on Burgundy Street, and drove to his house and business in Chalmette (Lattimore 599:21-23; 600:23 - 601:23-7).  He found the doors to his home, shed, and office broken down and all three structures seemingly robbed after they had been flooded (Lattimore 608:1-4).  His firearms, scuba gear, and many other possessions were stolen (Lattimore 607:16-25; 609:19 - 610:2; 610:13-21).

1192.   Kent Lattimore rebuilt the building at 9117 West St. Bernard Highway, acting as his own general contractor and using two subcontractors for electrical and sheetrock work (Lattimore 608: 5-22).   Since renovating the building, Kent Lattimore has leased it and it remains on the rental market (Lattimore 608:25 - 609:3).  He has made no attempt to replace the house trailer at 2100 Marcelle Drive (Lattimore 609:4-6).

1193.   Norman Robinson bought the house at 6965 Mayo Drive in 1991 for $154,000 (N. Robinson 620:1-9).  Monica Robinson moved into the house at 6965 Mayo Drive in 1995 when she married Norman Robinson (M. Robinson 641:3-6).

1194.   Norman Robinson evacuated New Orleans through an automobile trip to Jackson, Mississippi on Sunday, August 28, 2005 while Monica Robinson went to Mobile, Alabama, where she met her sister (N. Robinson 624:2 - 625:2; M. Robinson 641:9 - 642:5).  Norman Robinson worked broadcasting news in Jackson for two to three weeks, then returned to New Orleans (N. Robinson 625:3-17; 625:25 - 626:1).  Monica Robinson stayed in Mobile for two weeks, then went to Atlanta for two weeks before returning to New Orleans in late September (M. Robinson 642:10-19).  Within five days of his evacuation, Norman Robinson heard from his brother-in-law that the house on Mayo "had been obliterated" (N. Robinson 626:5-11).

223

1195.   Norman Robinson lived with his brother-in-law in Algiers, Louisiana for a week until Monica Robinson and he rented an apartment in River Ridge (N. Robinson 633:2-5).  They lived in the apartment for approximately two years (N. Robinson 633:18-19).

1196.   In the summer of 2006, after gutting the house at 6965 Mayo Drive, Norman Robinson sold it "as is" for $120,000 to a contractor (N. Robinson 637:18-21).

1197.   Monica Robinson prepared a handwritten list of the contents of the house, but did so without reference to any listings of the prices of goods for sale, but rather tried to recall what things had cost (M. Robinson 646:3-14).

1198.   Norman Robinson received a $2,000 payment from FEMA (N. Robinson 637:22-23).

1199.   As their expert on damages, Plaintiffs presented Mr. Scott Taylor, an insurance adjuster (Taylor 1588:17-20).  Mr. Taylor has never worked in real estate appraisal or sales (Taylor 1621:17-19), is not licensed to work in those areas (Taylor 1621:13-16), and made no attempt to assess the fair market value of any of the Plaintiffs' immovable property.

1200.   Mr. Taylor wrote his reports using a computer software called Xactimate in an effort to approximate the "replacement cost value," or "RCV," of each property, RCV being the "cost to

deconstruct the buildings and then put them back together as they looked on August 28, 2005" (Taylor 1623:25 - 1624:18).  This is not the fair market value of the houses, as Mr. Taylor admitted that, in most cases, such repairs are much more expensive than purchasing a comparable house (Taylor 1623:9-24).  Indeed, with regard to the Franz's home, Mr. Taylor testified at his

224

deposition that "we could get them in a nice home for a pretty good amount of money less than what eventually I had arrived at in my calculation" (Taylor 1647:6-9).

1201.   Tanya Smith completely renovated her home and saved her receipts (Exhibit PX-1713, Tanya Smith's Receipts).  Ms. Smith did not submit the receipts as evidence of the cost of her renovations, knowing that she had not replaced the appliances and fixtures in her home with comparable items.  In fact, as noted above, she installed at least $14,000 worth of upgraded appliances and accessories (Smith 495:9 - 496:9).  Even with these improvements, Ms. Smith's receipts show that she spent $152,721.11 on her renovations (Exhibit DX-1739, Summary of Tanya Smith's Receipts), while Mr. Taylor and Xactimate calculated that it would cost $188,510.39 (Exhibit PX-1709, Taylor's Report re Tanya Smith; Taylor 1628:4 -1629:4-11).

1202.   Where the Plaintiffs provided lists of the contents of their houses, Mr. Taylor did no investigation into the value of any item listed, but accepted the values listed by the Plaintiffs line-for-line (Taylor 1632:25 -1635:9; 1652:2-8).  Mr. Taylor did not obtain a list of the guns in a collection of firearms claimed to be worth $10,000, could not recall any description of a collection of jewelry valued at $6,000, and accepted a claim for "$50,000 worth of business machines" on no more evidence than those five words (Taylor 1652:25 -1654:3).   While Mr. Taylor testified that he checked whether the items that the Plaintiffs listed exceeded 50 percent of the RCV of their homes (Taylor 1652:9-12), in fact Ms. Smith's list of the contents of her house, as adopted by Mr. Taylor, valued the contents at 76% of the RCV Mr. Taylor calculated (from Exhibit PX-1709, Taylor's Report re Tanya Smith: $143,493.00/ $188,500.43 =.76123).

1203.   In assessing the alternative living expenses, Mr. Taylor admitted that his calculations were "not based on any receipts or actual dates," (Taylor 1644:20 -1646:8, 1649:6-

10, 1652:13-16, 1654:4-7), but rather that he would "find a nice round number" and "if it's in the realm of normalcy," then figure he was "in the actual realm of what insurers might expect to pay for such a claim," (Taylor 1646:3-8).

1204.  Mr. Taylor admitted that he has tried to substitute his judgment for the Courts, testifying in his deposition that he "used discretion" and wrote his report in a way that he believes, "if they recover those damages that I have put in there, they will be able to have something that they can be proud of again" (Taylor 1648:4-18).

Dated: July 20, 2009                          Respectfully submitted,

                                              s/ Robin D. Smith
                                              ROBIN D. SMITH
                                              Senior Trial Counsel
                                              Civil Division, Torts Branch
                                              U.S. Department of Justice
                                              Benjamin Franklin Station, P.O. Box 888
                                              Washington, D.C. 20044
                                              (202) 616-4400 / (202) 616-5200 (Fax)
                                              Attorneys for the United States of America