**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' POST-TRIAL**
**MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.    THE FLOOD CONTROL ACT BARS THIS ACTION BECAUSE THE
ALLEGED DAMAGE WAS CAUSED BY FLOODWATERS THAT
EMANATED FROM A FLOOD CONTROL PROJECT, ALLEGEDLY
AS A RESULT OF NEGLIGENT FAILURE TO TAKE NECESSARY
FLOOD PREVENTION MEASURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.    THE FLOODWATERS THAT FLOODED PLAINTIFFS'
PROPERTIES WERE FLOODWATERS THAT EMANATED
FROM A FLOOD CONTROL PROJECT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.    THE NATURE AND QUALITY OF THE LPV FLOOD CONTROL
STRUCTURES WAS THE PRINCIPAL
DETERMINANT OF BREACHING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.    THE MISSING STRUCTURES THAT PLAINTIFFS SAY WOULD
HAVE PREVENTED FLOODING—SURGE AND SALINE BARRIERS
AND ARMORED BANKS—ARE STRUCTURES RELATED TO FLOOD
CONTROL AND TO THE LPV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    II.    THE FTCA'S "DUE CARE" EXCEPTION BARS THIS ACTION . . . . . . . . . . . . . . . . . 20

        A.    CONGRESS AUTHORIZED CONSTRUCTION OF THE SPECIFIC
PLAN THAT WAS RECOMMENDED BY
THE CHIEF OF ENGINEERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        B.    THE CONDUCT THAT ALLEGEDLY CAUSED PLAINTIFFS'
DAMAGE WAS CONDUCT THAT CONFORMED TO THE
PLAN RATIFIED BY CONGRESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    III.  THE DISCRETIONARY FUNCTION EXCEPTION BARS THIS ACTION . . . . . . . . . . . . . . 27

        A.    DECIDING WHAT INFORMATION TO TRANSMIT TO CONGRESS
WAS A MATTER OF JUDGMENT AND CHOICE GROUNDED IN
CONSIDERATIONS OF POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

B.    DECIDING WHETHER TO PRODUCE AN SEIS WAS A MATTER
OF POLICY-BASED JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        1.    DECIDING WHETHER "NEW CIRCUMSTANCES OR
INFORMATION" WERE "SIGNIFICANT" REQUIRED AN
EXERCISE OF POLICY-BASED JUDGMENT . . . . . . . . . . . . . . . . . . 34

                a.    BANK EROSION AND LOSS OF MARSH
WERE NOT "SIGNIFICANT NEW CIRCUMSTANCES." . . . . . 35

                b.    CONSTRUCTION IMPACTS TO MARSH
DID NOT REQUIRE AN SEIS . . . . . . . . . . . . . . . . . . . . . . . . 38

        2.    NEPA'S REGULATIONS DID NOT PROVIDE A "FIXED
OR READILY ASCERTAINABLE STANDARD"
FOR DETERMINING WHETHER AN SEIS WAS REQUIRED . . . . . . . 41

        3.    THE LACK OF AN SEIS DID NOT CAUSE THE
PLAINTIFFS' DAMAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

        4.    EVEN IF PLAINTIFFS COULD SHOW THAT THE
CORPS CONCEALED OR ACTIVELY MISREPRESENTED
THE DANGERS POSED BY THE MRGO, THE
FTCA'S DECEIT AND MISREPRESENTATION
EXCEPTION WOULD BAR THEIR CLAIMS . . . . . . . . . . . . . . . . . . 65

IV.    LOUISIANA LAW DID NOT IMPOSE A DUTY TO INFORM CONGRESS OR
THE PUBLIC OF HAZARDS CREATED BY THE MRGO . . . . . . . . . . . . . . . . . . . . . . 67

    A.    A DUTY TO CORRECT OR WARN DID NOT ARISE BECAUSE THE MRGO DID
NOT CREATE A HAZARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

    B.    LOUISIANA LAW DOES NOT IMPOSE A DUTY TO WARN ONESELF . . . . . . . 67

    C.    IMPOSING A DUTY ON AN EXECUTIVE BRANCH AGENCY
TO WARN THE LEGISLATURE WOULD BE IMPROPER
UNDER THE FTCA BECAUSE NO COMPARABLE DUTY
IS IMPOSED ON PRIVATE PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

V.    PLAINTIFFS FAILED TO PROVE THAT THE MRGO CAUSED THEIR DAMAGE    . . . . . 69

    A.    THE LEVEES THAT WERE MASSIVELY BREACHED PERFORMED AS DESIGNED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

        1.    THE POST-STORM PHYSICAL EVIDENCE INDICATES THAT OVERTOPPING WAS THE PREDOMINANT MECHANISM OF LEVEE EROSION . . . . . . . . . . . 82

            a.    PHOTOGRAPHIC EVIDENCE CONFIRMS THAT OVERTOPPING, NOT FRONT-SIDE WAVE ATTACK, CAUSED ALMOST ALL OF THE BREACHING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

            b.    THE SOIL BORINGS TAKEN ALONG REACH 2 DEMONSTRATE THAT LEVEE SECTIONS CONSTRUCTED WITH MEDIUM FAT CLAYS DID NOT BREACH . . . . . . . . . . . . . . . . . . . . . . . . . 86

    B.    DR. BEA'S CONCLUSION THAT THE LEVEES WOULD HAVE WITHSTOOD THE STORM "BUT FOR" THE MRGO IS PATENTLY WRONG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

        1.    DR. BEA'S OPINION THAT THE REACH 2 LEVEE WOULD HAVE HAD A UNIFORM CREST OF 17.5 "BUT FOR" THE MRGO LACKS SUPPORT IN FACT AND IN SCIENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

            a.    FOUNDATION CONDITIONS CAUSED THE SETTLEMENT OF THE LEVEE . . . . . . . . . . . . . . . . . . . 93

            b.    LATERAL DISPLACEMENT WAS ADDRESSED BY THE LEVEE DESIGN . . . . . . . . . . . . . . . . . . . . . . . . . 98

                (1)    THE ATCHAFALYA BASIN TESTING PROVIDED AN UNDERSTANDING OF LATERAL DISPLACEMENT . . . . . . . . . . . . . . . . 98

                (2)    THE LEVEE DESIGN INCLUDED A FLOODSIDE BERM TO PREVENT LATERAL DISPLACEMENT INTO THE MRGO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

iv

c.   THE USE OF STAGED CONSTRUCTION
ALLOWED FOR REMEDIATION
OF ONGOING SUBSIDENCE . . . . . . . . . . . . . . . . . . . . . . . 102

d.   LATERAL DISPLACEMENT
ENDED IN 1980, BUT LEVEE
LIFTS CONTINUED . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

e.   THE WIDENING OF THE MRGO
DID NOT CAUSE LATERAL DISPLACEMENT . . . . . . . . 106

f.   DR. BEA USED INCORRECT
DATUMS IN HIS SETTLEMENT ANALYSES . . . . . . . . . . . 107

2.   DR. BEA'S OPINION THAT THE LEVEES WOULD
HAVE BEEN MORE DENSELY COVERED WITH
GRASS "BUT FOR" THE MRGO LACKS SUPPORT
IN FACT AND IN SCIENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

a.   BEA SCENARIOS 2C AND 3 ARE FATALLY
FLAWED BY "DENSE GRASS ON LEVEE
SURFACES" (PX-2153) . . . . . . . . . . . . . . . . . . . . . . . . . 111

b.   THE MRGO DID NOT CAUSE THE POOR
SUBSTRATE THAT DR. BEA BLAMES
FOR POOR GRASS COVER . . . . . . . . . . . . . . . . . . . . . . . 112

c.   THE MRGO DID NOT CAUSE THE
FLOODING OF NEW ORLEANS EAST . . . . . . . . . . . . . . 112

3.   DR. BEA'S OPINION THAT  THE LEVEES WOULD HAVE
SURVIVED "BUT FOR" THE MRGO DEPENDS ON
HIS IDIOSYNCRATIC, UNVERIFIED, UNVALIDATED
USE OF LS-DYNA TO MODEL NEAR-SHORE WAVES . . . . . . . . . 114

4.   DR. BEA MANIPULATED HIS "GRASS LIFT-OFF"
RATES TO PREVENT BACKSIDE EROSION . . . . . . . . . . . . . . . . . 116

5.   DR. BEA'S COLLECTION AND CHARACTERIZATION OF
SOIL SAMPLES AND THEIR ERODIBILITY WERE UNSCIENTIFIC . . 120

a.   DR. BEA'S METHOD OF COLLECTING SOIL
SAMPLES WAS UNSCIENTIFIC . . . . . . . . . . . . . . . . . . . 120

b.   THE TEST THAT DR. BEA RELIED ON FOR
ASCERTAINING ERODIBILITY WAS NOT SUITED
TO THE PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

VI.   DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

A.   PLAINTIFFS' MENTAL ANGUISH AND INCONVENIENCE ARE NOT
RECOVERABLE UNDER LOUISIANA LAW. . . . . . . . . . . . . . . . . . . . . . . 123

B.   PLAINTIFFS FAILED TO CARRY THEIR BURDEN OF PROVING DAMAGES. . 126

C.   PAYMENTS PLAINTIFFS RECEIVED FROM FEMA AND THE ROAD HOME
PROGRAM SHOULD BE OFFSET AGAINST ANY DAMAGES AWARDED TO
THEM.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Air Crash Disaster Near New Orleans*, 764 F.2d 1084 (5th Cir. 1985) . . . . . . . .  71

*Andrade v. Chojnacki*, 338 F.3d 448 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . .  29,31

*Association of America Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d
    898 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Audler v. CBC Innovis, Inc.*, 519 F.3d 239 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . .  69

*Autery v. United States*, 992 F.2d 1523 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . .  44

*Baroni v. United States*, 662 F.2d 287 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . .  66

*Bode v. Pan American World Airways, Inc.*, 786 F.2d 669 (5th Cir. 1986) . . . . . . . .  124

*Brown v. United States*, 790 F.2d 199 (1st Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . .  28

*Cato v. United States*, 70 F.3d 1103 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . .  28

*City of Garland v. Zurn Industrial, Inc.*, 870 F.2d 320 (5th Cir. 1989) . . . . . . . . . . . .  66

*Cleveland v. United States*, 457 F.3d 397 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . .  69

*Coker v. Skidmore*, 941 F.2d 1306 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

*Collins v. United States*, 564 F.3d 833 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . .  29

*Daigle v. Shell Oil Co.*, 972 F.2d 1527 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . .  44,45

*Dalehite v. United States*, 346 U.S. 15 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20,22

*Deloria v. Veterans Admin.*, 927 F.2d 1009 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . .  66

*Dubois v. U.S. Department of Agriculture*, 102 F.3d 1273 (1st Cir. 1996) . . . . . . . . .  38

*Fisher Brothers Sales, Inc. v. United States*, 46 F.3d 279 (3rd Cir. 1995) . . . . . . . . .  30

*Franklin Savings Corp. v. United States*, 180 F.3d 1124 (10th Cir. 1999) . . . . . . . .  30,46

*Galvin v. Occupational Safety & Health Administration*,
  860 F.2d 181 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997)  . . . . . . . . . . . . . . . . . . . . . . . . .   128

*General Public Utilities Corp. v. United States*, 745 F.2d 239 (3rd Cir. 1984)  . . . . . .   31

*Goodwill Industrial v. United States*, 218 F.2d 270 (5th Cir. 1954) . . . . . . . . . . . . .   22,27

*Guile v. United States*, 422 F.3d 221 (5th Cir. 2005)  . . . . . . . . . . . . . . . . . . . . . . . . .   111

*Hal, Inc. v. United States*, 122 F.3d 851 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . .   68

*Harper v. Illinois Central Gulf Railroad*, 808 F.2d 1139 (5th Cir. 1987) . . . . . . . . . .   124

*Harrell v. United States*, 443 F.3d 1231 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . .   29

*Hughes v. United States*, 110 F.3d 765 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . .   44

*Hydrogen Technology v. United States*, 831 F.2d 1155 (1st Cir. 1987) . . . . . . . . . . . .   21

*Jayvee  Brand, Inc. v. United States*, 721 F.2d 385 (D.C. Cir. 1983) . . . . . . . . .   30,42,43

*Johnson v. United States*, 949 F.2d 332 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . .   30

*In re Katrina Canal Breaches Consolidated Litigation*,
  533 F. Supp. 2d 615 (E.D. La. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,9

*In re Katrina Canal Breaches Consolidated Litigation*,
  577 F. Supp. 2d 802 (E.D. La. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,19,20

*In re Katrina Canal Breaches Consolidated Litigation*, Civil Action
  No. 05-4182 2008 WL 2186400 (E.D. La. May 27, 2008) . . . . . . . . . . . . . . . . . . . 42,43

*In re Katrina Canal Breaches Consolidated Litigation*, Civil Action
  No. 05-4182, 2009 WL 799976 (E.D. La. March 20, 2009) . . . . . . . . . . . . . . . passim

*In re Katrina Canal Breaches Consolidated Litigation*, Civil Action
  No. 05-4182, 2009 WL 1033783 (E.D. La. April 15, 2009) . . . . . . . . . . . . . . . . . .   69

*Kennedy v. United States*, 750 F. Supp. 206 (W.D. La. 1990)  . . . . . . . . . . . . . . . . . .   129

*Kennewick Irrigation District v. United States*, 880 F.2d 1018 (9th Cir. 1989) . . . . . .   29

*Kiehn v. United States*, 984 F.2d 1100 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . .   29

*La. Crawfish Products Association-West v. Rowan*, 463 F.3d 352
    (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

*Lawrence v. United States*, 340 F.3d 952 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . .   66

*Lopez v. United States*, 376 F.3d 1055 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . .   29

*Marsh v. Oregon  Natural Resource Council*, 490 U.S. 360 (1989) . . . . . . . . . . . . . .   34

*Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir.)*, cert. denied*,
    434 U.S. 861 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   129

*Metoyer v. Auto Club Family Ins. Co.*, 536 F. Supp. 2d 664 (E.D. La. 2008) . . . . . .   130

*Montijo-Reyes v. United States*, 436 F.3d 19 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . .   46

*Myslakowski v. United States*, 806 F.2d 94 (6th Cir. 1986) . . . . . . . . . . . . . . . . . . . 29,30

*National Manufacturing Co. v. United States*, 210 F.2d 263 (8th Cir. 1954) . . . . . . . .   66

*Ochran v. United States*, 117 F.3d 495 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 42,43

*In re Ohio River Disaster Litigation*, 862 F.2d 1237 (6th Cir. 1989) . . . . . . . . . . . . .   47

*In re Operation of Missouri Riv. System Litigation*, 516 F.3d 688
    (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

*Pizani v. M/V Cotton Blossom*, 669 F.2d 1084 (5th Cir. 1982) . . . . . . . . . . . . . . . . .   129

*Richardson v. United States*, 943 F.2d 1107 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . .   29

*Rivera v. U.S. Army Corps of Engineers*, 891 F.2d 567 (5th Cir. 1990) . . . . . . . . . . .   68

*Sanchez Tapia v. United States*, 338 F.2d 416 (2nd Cir. 1964) . . . . . . . . . . . . . . . . . .   66

*Searcy v. Phillips Electric North America Corp.*, 117 F.3d 154 (5th Cir. 1997) . . . . .   68

*Sickman v. United States*, 184 F.2d 616 (7th Cir. 1950) . . . . . . . . . . . . . . . . . . . . . . passim

*Sierra Club v. U.S. Army Corps of Engineers*, 701 F.2d 1011 (2nd Cir. 1983) . . . . 34,39

*Sloan v. United States Department of Housing and Urban Development*,
   236 F.3d 756 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

*In re: Texas City Disaster Litigation*, 197 F.2d 771 (5th Cir. 1952) . . . . . . . . . . . . .   22,27

*Town of Winthrop v. FAA*, 535 F.3d 1 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . .   35

*Tudela v. Pan American World Airways, Inc.*, 764 F.2d 1082 (5th Cir. 1985) . . . . . .   124

*Turgeau v.Pan American World Airways, Inc.*, 764 F.2d 1084 (5th Cir.1985) . . . . . .   124

*United States v. Gaubert*, 499 U.S. 315 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

*United States v. James*, 478 U.S. 597 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

*United States v. Neustadt*, 366 U.S. 696 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66

*United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189
   (1st Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

*United States v. Second National Bank of North Miami*, 502 F.2d 535
   (5th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21,27

*Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . .   128

*Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017 (9th Cir. 1980) . . . . . . . . .   45

*Welch v. United States*, 409 F.3d 646 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . .   21,23

*Westchester Fire Insurance Co. v. Haspel-Kansas Investment Partnership*,
   342 F.3d 416 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   69

*Williams v. United States*, 71 F.3d 502 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . .   68

*Wisconsin v. Weinberger*, 745 F.2d 412 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . .   passim

*Zumwalt v. United States*, 928 F.2d 951 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . .   44, 45

## STATE CASES

*Acadian Heritage Realty v. City of Lafayette*,
   434 So.2d 182 (La. App. 3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   125

*Arnold v. Town of Ball*, 651 So.2d 313 (La. App. 3d Cir. 1995) . . . . . . . . . . . . . . . . .   125

*Begnaud v. Camel Contractors, Inc.*, 721 So.2d 550 (La. App. 3d Cir. 1998) . . . . . .   125

*Bonin v. Ferrellgas, Inc.*, 877 So.2d 89 (La. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . .    69

*Boteler v. Rivera*, 700 So.2d 913 (La. Ct. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . .    72

*Boudreaux v. State, Department of Transportation and Development*,
    906 So.2d 695 (La. Ct. App. Cir 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   125

*Bozeman v.State*, 879 So.2d 692 (La. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   129

*Branch v. City of Lafayette*, 663 So.2d 216 (La. App. 3d Cir. 1995) . . . . . . . . . . . . .   125

*Burmaster v. Plaquemines Parish Government*, 982 So.2d 795 (La. 2008) . . . . . . . . .    69

*Cheatham v. City of New Orleans*, 368 So.2d 146 (La. Ct. App.) . . . . . . . . . . . . . . . .    72

*Craig v. Burch*, 228 So.2d 723 (La. Ct. App. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . .    72

*Dixie Drive It Yourself System v. American Beverage Co.*, 242 La. 471,
    137 So.2d 298 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   70,71,73

*Farr v. Johnson*, 308 So.2d 884 (La. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   124

*Fowler v. Roberts*, 556 So.2d 1 (La. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    69

*Gray v. Security Storage & Van Co.*, 26 So.2d 399 (La. Ct. App. 1946) . . . . . . . . . .   127

*Gugert v. New Orleans Independent Laundries*, 181 So. 653 (La. Ct. App. 1938) . . .   127

*Hornsby v. Bayou Jack Logging*, 902 So.2d 361, 368 (La. 2005) . . . . . . . . . . . . . . . .   127

*Johnson v. First National Bank of Shreveport*,
    792 So.2d 33 (La. Ct. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   126

*McDonald v. Illinois Central Gulf Railroad Co.*, 546 So.2d 1287 (La. Ct. App.) . . .   124

*Matthieu v. Imperial Toy Corp.*, 646 So.2d 318 (La. 1994) . . . . . . . . . . . . . . . . . . . . .    69

*Moresi v. State Through Dept of Wildlife & Fisheries*,
    567 So. 2d 1081 (La. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   126

*Muse v. East Texas Grocery Co.*, 11 So.2d 250 (La. Ct. App. 1942) . . . . . . . . . . . . . .  72

*Napolitano v. F.S.P., Inc.*, 797 So.2d 111 (La. Ct.App. 2001). . . . . . . . . . . . . . . . . .  125

*Oubre v. Eslaih*, 869 So. 2d 71 (La. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67

*Quick v. Murphy Oil Co.*, 643 So.2d 1291 (La. Ct. App. 1994) . . . . . . . . . . . . . . . . .  70

*Rando v. Anco Insulations Inc.*, —So.3d —, 2009 WL 1426272
      (La. May 22, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69,70,71

*Roberts v. Benoit*, 605 So.2d 1032 (La. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69

*Rodgers v. Missouri Pacific Railway Co.*, 405 So.2d 571 (La. Ct. App. 1981) . . . . . .  71

*Rodrigue v. Copeland*, 475 So.2d 1071 (La. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . .  125

*Roman Catholic Church v. Louisiana Gas Serv. Co.*,
      618 So.2d 874 (La. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  126

*State Dept. of Transp. and Development v. Lobel*, . . . . . . . . . . . . . . . . . . . . . . . . . .  127
      571 So.2d 742 (La. Ct. App.1990)

*Williams v. Fire Association of Philadelphia*, 193 So. 202
      (La. App. 2d Cir. 1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  127

*Yates v. Brown*, 344 So.2d 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  72

## FEDERAL STATUTES AND REGULATIONS

U.S. Const. art II, § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

Pub. L. 84-455 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23,24

Pub. L. 101-646 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

40 C.F.R. § 1502.9(c)(1)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34,43,45

40 C.F.R. § 1506.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

40 C.F.R. § 1506.9(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32,48

40 C.F.R. § 1502.9(c)(1)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

16 U.S.C. § 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

33 U.S.C. § 702c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7,20

45 Fed. Reg. 56761, 56763 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

28 U.S.C. § 1346(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68,69

28 U.S.C. § 1346(b), 2679(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

28 U.S.C. § 2671 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

28 U.S.C. § 2680 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

28 U.S.C. § 2680(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6,20,42

28 U.S.C. § 2680(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66

42 U.S.C. § 5301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   129

42 U.S.C. §§ 9601(23) & 9621(d)(1)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

## CONGRESSIONAL REPORTS

H.R. Doc. No. 106-253 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

H.R. Doc. No. 104-149 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57,58

H.R. Doc. No. 82-245 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23,24,41

H.R. Doc. No. 89-231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15,16,75

S. Hr'g 101-342 (Aug. 31, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| | § | |

## DEFENDANT UNITED STATES' CORRECTED AND AMENDED POST-TRIAL MEMORANDUM OF LAW

The Mississippi River-Gulf Outlet did not flood New Orleans, Hurricane Katrina did. The largest, most powerful storm to strike the North American continent, Hurricane Katrina created waves in the Gulf of Mexico as tall as a five-story building and pushed so much water up onto the continental shelf near Bay St. Louis, Mississippi, that the sea level rose to the highest level ever recorded in American history, 28 feet.  Hurricane Katrina packed twice as much energy as and created more surge than Hurricane Camille, the Category 5 storm that landed near Bay St. Louis in August of 1969 and devastated Mississippi.  Though the eye of Hurricane Katrina did not pass directly over New Orleans, the gigantic storm's angle of approach was optimal for pushing water onto the wide, shallow continental shelf in Southeastern Louisiana and Mississippi.  Consequently, the surge and waves rose to at least 21.7 feet along the Lake Pontchartrain and Vicinity Hurricane Protection Levee, as indicated by water marks surveyed after the storm.  Both Plaintiffs' and Defendant's experts agreed that the "still water" surge peaked at about 18 feet along this levee.  The levee was only intended to withstand 13 feet of surge.  In retrospect it should not be surprising that this ferociously battered and massively overtopped levee did not survive the storm intact.

Hurricane Katrina did not need a helper, big or small, to flood New Orleans, and the evidence conclusively shows that it did not have one.  The MRGO did not cause the breaching of the federal flood control structures that ringed Plaintiffs' properties and did not raise the floodwater elevations at those locations at all.  Neither the surge nor the waves nor the LPV levee itself was at all affected by the operation and maintenance of the MRGO.  The surge and waves that reached the levee were no different than they would have been if the channel had been maintained at its initial dimensions and the surrounding topography had remained in the same form as existed prior to the channel's construction.  Indeed, the entirety of the ecological and hydraulic changes that resulted from the design, construction, operation, and maintenance of the MRGO had only minimal effects on surge and none whatsoever on the waves that reached the levee.

The waves that broke upon the levee were limited by the depth of the water, and the depth of the water was not affected by the operation and maintenance of the MRGO.  The parties' experts agreed that the surge at the LPV levee along the MRGO was the same as it would have been if the alleged defects in the MRGO had been fully remedied prior to the storm.  As a result of the stability berm that extended out from the levee, the large waves that passed over the channel were rapidly reduced as the depth of the water gradually diminished as it approached the levee.  Consequently, all of the hydraulic changes that resulted from the MRGO over its lifetime had no effect on the hydraulic forces that eroded and washed away vast stretches of the federal hurricane protection system that was guarding the eastern flank of New Orleans.

The parties' experts also agreed that the presence of the MRGO had very little effect on storm surge—increasing it by a foot or less, from about 17 feet, the estimated maximum surge elevation without the channel, to about 18 feet, the estimated maximum elevation during the

hurricane.   There is no reason to conclude that the LPV levee would have survived if the surge

along the levee had been just slightly lower.  More than one-third of the levee crown stood at 16

feet or less.  And with destructive overtopping flow beginning when the surge was at 14 to 15

feet, massive overflow at rates likely to cause major damage would still have occurred for hours

all along Reach 2.  The evidence therefore shows that the surge and waves would have destroyed

the levee even if the surge had been a foot lower.

    This reality led Plaintiffs to change the levee in their "No MRGO–No Flood" scenarios.

Only by changing the levee could they concoct a scenario in which the devastating flood would

be staved off.  Plaintiffs' expert Robert G. Bea assumed that the entire levee along Reach 2 of the

MRGO would have had a uniform crown elevation of 17.5 feet—the design height—if the

MRGO had not been constructed or if all of the channel's supposed "flaws" had been fully

ameliorated.  He also assumed that the grass on this hypothetical levee would have been all but

impervious (more erosion resistant than concrete!) to the hurricane's overtopping waves and

flow.  These unfounded and, indeed, demonstrably incorrect counter-factual assumptions form

fatal flaws in Plaintiffs' case.  The subsidence of the LPV levee along the MRGO was a result of

numerous factors and would have occurred regardless of the MRGO's presence and condition.

The LPV project manager recognized that the levee needed to be raised and made plans to

enlarge the levee but was prevented from doing so by inadequate funding.  There is no basis for

concluding that additional lifts would not have been necessary or that funding for necessary lifts

would have been provided if the MRGO had not been built or had been operated and maintained

differently.  Further, the evidence does not establish that even a 17.5-foot levee meeting all of the

LPV design specifications would have survived the storm.  On the contrary, the evidence shows

only that a levee much stronger than the LPV design levee would have withstood the Katrina

onslaught.  Plaintiffs' expert Robert Bea analyzed the performance of a levee covered with super erosion-resistant grass—grass stronger than concrete—in order to devise a scenario in which levee breaching would not occur.  There is no basis for assuming that such conditions would have existed, regardless of the MRGO.  The opposite conclusion is inescapable:  Hurricane Katrina's exceptionally large surge and waves would more probably than not have destroyed the eastern flank of the LPV hurricane protection system regardless of the MRGO.

The changes that Plaintiffs made to the levees in their "No MRGO–No Flood" scenarios also underscore this Court's lack of jurisdiction over this case.  The flooding of New Orleans resulted from the destruction and failure of federal flood control structures and could only have been averted by the presence of larger, stronger, more resilient levees and floodwalls.  The failure of the LPV hurricane protection system is indisputably the signal event in this catastrophe, and only a stronger, more resilient hurricane protection system could have prevented the disaster.  Congress authorized the construction of a hurricane protection system to withstand a 13-foot surge, not a 17- or 18-foot surge.  Plaintiffs argue that the Army Corps of Engineers should have taken additional flood control measures, namely, construction of surge and saltwater barriers and armored banks.  These structures were assertedly needed to protect against flooding, not to further any navigation purpose.  Whether the structures had been constructed under the auspices of the LPV or the MRGO makes no difference with respect to the immunity afforded by the Flood Control Act, since their flood prevention purpose is clear.  As the Court has recognized, flood control activities, particularly activities related to a flood control project, cannot be a basis of liability for the United States.

The Federal Tort Claims Act also excludes the subject matter of this case from the jurisdiction that the Act provides.  Determining the level of protection to be provided against

4

hurricane-induced flooding and deciding where to locate hurricane protection levees were non-actionable discretionary functions.  Likewise, deciding where and how to construct the MRGO and how to maintain it were discretionary functions.  Plaintiffs argue that surge and saltwater barriers should have been constructed at two points along the channel.  They also argue that the shore of the channel should have been fortified to prevent its erosion.  These three omissions can be traced back to the initial conception of the MRGO and LPV projects and to the project plans that were recommended to and approved by Congress.  The MRGO project manager was not authorized to expend funds for purposes unrelated to navigation, and the Corps considered a variety of social, political, and economic factors in deciding not to build a surge barrier across the MRGO.

Two considerations militated against changing the project after authorization to add surge barriers and bank protection.  First, neither feature would have furthered the purpose of the project.  The project was authorized as an aid to navigation, on the view that an additional shipping channel between the Port and the Gulf would yield commercial benefits and facilitate the national defense.  Second, and more important, the addition of these features would have invalidated the cost-benefit calculations that were an essential underpinning of the Chief's recommendation that construction be authorized.[1]

By contending that "due care" required that the shipping channel be constructed and maintained with "armored" banks and surge barriers, and by asserting that the Chief's choice of

---

[1]The massive gated barrier that is about to be constructed (in the very location that Plaintiffs contend it ought to have been constructed to counteract the MRGO) is a component of the new and improved hurricane protection system that was authorized after Katrina, as a result of the failure of the previously authorized inadequate and underfunded Lake Pontchartrain and Vicinity Hurricane Protection Project [hereinafter LPV].  Remarkably, this single structure, with a present price tag exceeding $1,000,000,000 (far more than was spent on the entire LPV and the MRGO combined) is considered necessary even though the MRGO is now defunct.

the best route was one that entailed the creation of "defective conditions," Plaintiffs are effectively challenging the validity of Public Law 84-455, which required the Corps to implement the recommended plan.  Their claims are therefore barred by the first part of 28 U.S.C. § 2680(a), the due care exception of the Federal Tort Claims Act.

The latter part of § 2680(a), the discretionary function exception, bars Plaintiffs' claims that improper dredging contributed to the widening of the channel and that the Corps abused its discretion by choosing to install bank protection only where doing so was considered to be a more economical method of maintaining the channel's prescribed depth and width than dredging alone.  How to maintain the channel's depth and width to ensure that ships could continue to carry goods and materials to and from domestic and international markets was assuredly a matter of judgment and choice within the Corps's ken.

It is surely true that the maintenance of the MRGO, no less than its design and construction, was driven by the congressional conviction that a deep-draft shipping channel from the Port of New Orleans to the Gulf of Mexico would be a boon to commerce and a benefit to the national defense.  Decisions about how to create the deep-draft channel and keep it open furthered those ends.

For all of these reasons, this action should be dismissed for lack of subject-matter jurisdiction or, alternatively, a judgment should be entered in favor of the United States.

## ARGUMENT

I. **THE FLOOD CONTROL ACT BARS THIS ACTION BECAUSE THE ALLEGED DAMAGE WAS CAUSED BY FLOODWATERS THAT EMANATED FROM A FLOOD CONTROL PROJECT, ALLEGEDLY AS A RESULT OF NEGLIGENT FAILURE TO TAKE NECESSARY FLOOD PREVENTION MEASURES.**

In sweeping terms, the Flood Control Act of 1928 affords the United States immunity "for any damage from or by floods or flood waters at any place."  33 U.S.C. § 702c.  "It is difficult to imagine broader language."  *United States v. James,* 478 U.S. 597, 604 (1986) (footnote omitted).  The Court has construed this provision to provide immunity "where damage is caused by flood waters emanating from a flood control project."  *In re Katrina Canal Breaches Consol. Litig.,* 533 F. Supp. 2d 615, 637 (E.D. La. 2008).  The Court has also recognized that the Flood Control Act immunizes conduct related to flood control, particularly to a flood control project.  *In re Katrina,* 577 F. Supp.2d 802, 822-26 (E.D. La. 2008).  The record therefore now demonstrates that § 702c applies to the present case.  The floodwaters that flooded Plaintiffs' properties were waters that the LPV failed to control.  These floodwaters flowed over the LPV levees and through breaches carved by Hurricane Katrina's waves and surge.  Barriers and banks of the sort that Plaintiffs say would have prevented this flood are flood control structures that would have been related to the LPV if they had been built.  And if, as the Court has concluded, § 702c immunity protects acts and omissions that occur in connection with a flood control project, then § 702 immunity protects the failure to build the barriers and banks described by Plaintiffs.

A. **THE FLOODWATERS THAT FLOODED PLAINTIFFS' PROPERTIES WERE FLOODWATERS THAT EMANATED FROM A FLOOD CONTROL PROJECT.**

Unquestionably, the floodwaters that flooded Plaintiffs' properties were floodwaters that emanated from a flood control project.  Plaintiffs' expert Johannes Vrijling testified that the main

point of entry of flood water into the New Orleans East polder was a breach in the New Orleans East Back Levee.  Vrijling 835:6-10.[2]  Other floodwaters entered the polder by overtopping the Citrus Back Levee.  Vrijling 837:11-20.  Floodwaters entering the St. Bernard polder through breaches in the LPV levee along Reach 2 of the MRGO were the main source of the floodwaters in that polder, according to Plaintiffs' expert Paul Kemp.  Kemp 1933:9-20. Mr. Vrijling agreed, testifying that floodwater from the Reach 2 breaches flowed all the way to the Ninth Ward and would have caused flooding to about the same levels as occurred during the hurricane even if there had been no breaches in the floodwall on the east bank of the Inner Harbor Navigation Canal.  Vrijling 1063:4-13.

To estimate floodwater elevations within the polders where Plaintiffs' properties were located, Mr. Vrijling calculated the volume of water that flowed over the levees and through the breaches.  Vrijling 907:15 – 909:23 (explaining calculation of overtopping flow that flooded polders); 835:6 – 836:10 (assumptions about breaching were basis for polder flood elevation estimates).  Defendant's expert Steven Fitzgerald also computed the flood elevations in the St. Bernard polder based on estimates of the timing and extent of breaching along Reach 2 and in the IHNC.  Fitzgerald 2728:10-22; 2761:11-14; 2762:24 – 2763:7; 2766:8-11.  Each of Plaintiffs' properties was flooded by floodwaters that flowed over the LPV levees and floodwalls and through breaches in the hurricane protection system.  Vrijling 837:11-20 (Robinson property); 841:10 – 842:7 (Franz property); 846:3 – 847:17 (Lattimore properties); 848:8 – 849:4 (Smith property); 1055:14 – 1056:13 (Robinson property); 1058:25 – 1059:7 (Robinson property). Consistent with the Court's "belief that § 702c immunity arises where damage is caused by flood

---

[2]Throughout the brief, as here, citations to the trial transcript are indicated by the name of the witness followed by the page and lines to which reference is made.

waters emanating from a flood control project," 533 F.Supp. 2d 615, at 635-637, this case must be dismissed for lack of subject matter jurisdiction.

### B. THE NATURE AND QUALITY OF THE LPV FLOOD CONTROL STRUCTURES WAS THE PRINCIPAL DETERMINANT OF BREACHING.

The Flood Control Act bars this action because the principal factor in determining where breaching occurred was the nature and quality of the LPV levees and floodwalls.  The eastern flank of the LPV flood control system was massively breached by Hurricane Katrina.  The breaching is readily explicable.  The hydraulic forces imposed on the levees far exceeded the forces that the levees were designed to withstand.  The Reach 2 levee was designed to withstand a hurricane surge reaching 13 feet above sea level.  The designed crown elevation of 17.5 feet took into account the breaking of waves on the levee and the resulting run-up of water above the "still-water" surge elevation.  The levees were expected to withstand minimal overtopping as a result of this run-up.  They were not designed to withstand prolonged overtopping of massive quantities of water.  About a third of the Reach 2 levee had a crown elevation of 16 feet or less.  Because the "still-water" elevation exceeded this elevation for more than an hour and a half all along this levee, it was exposed to massive sheet flow in many places.  The waves extended the period of overtopping by several hours as they broke and ran up and over the levee.  Defendant's wave expert, Dr. Donald T. Resio, calculated the rate of overflow and found that it vastly exceeded widely recognized thresholds used by levee designers in assessing when damage to a levee may be expected to result from overtopping flow.  DX-1748 (Resio Supp. Rpt.) 1-10; Reiso 2823:1-2; 2901:7-9, 15-17; *cf.* Vrijling 1049:7-21 ("EurOtop" reference used by levee designers).  The question then becomes not, Why did the levee fail? but, Why did any of it survive?  The answer lies in the variable quality of the levee.  Some reaches were more resistant to erosion than

others.  A comparison of levee reaches that failed with reaches that did not fail revealed that all of the breaches occurred in places where the levee was constructed of hydraulically extracted, hydraulically placed fill.  No levee that had been constructed of excavated, "trucked" fill was breached by Hurricane Katrina.  The recognition of the relative weakness of hydraulic fill led the Corps to ban its use in 2001.  Defendant's geotechnical and coastal engineering experts, Dr. Reed Mosher and Bruce Ebersole, testified that the soil was more erodible in places where breaching occurred and less erodible where breaching did not occur.

The nature and quality of the levee also was the principal determinant of the hydraulic load that the storm exerted on the levee.  Even though the surge and waves varied little along the Reach 2 levee, the hydraulic load varied greatly.  The entirety of the Reach 2 levee was exposed to surge that reached about the same elevation (plus or minus six inches) and rose and fell at about the same rates and times.  Vrijling 967:14 – 978:23; 980:19 – 981:2; JX-197 (Vrijling Flow Rpt.) 32-33 (hydrographs for six locations).  Waves varied somewhat more, with significant wave heights varying by about a foot (from about seven-and-a-half feet to eight-and-a-half feet) at the levee toe, according to Plaintiffs' experts.  Vrijling 982:24 – 983:3; PX-2009 (Vrijling Supp. Rpt.) 8 (Table S1).  The elevations of the levee toe and the stability berm were the principal factors in determining the size of the waves that reached the levee, because the height of these shallow-water waves was limited by the depth of the water.  Vrijling 985:25 – 986:5; 987:14 – 988:25; 994:4 – 996:4; 1030:5-16; Ebersole 2218:20-23; 2114:15 – 2115:18; 2116:23 – 2117:15; 2133:12-16; 2411:17 – 2416:7; Resio 2846:16 – 2847:14; 2901:3-6.  Consequently, where the berm and toe were low the waves at the levee were higher, and where the berm and toe were high the waves at the levee were lower.  Since surge elevation varied by only a foot or less and the toe elevation varied by as much as four feet, these variations in the

levee were more influential in determining front-side hydraulic loading by waves.  Morris 149:24 – 152:22; Ebersole 2116:25 – 2117:20; 2462:11-22.

The greatest differences in hydraulic loading occurred on the backside of the levee.  Here again the levee geometry, specifically crown elevation, was the crucial factor.  The overtopping flow varied dramatically as a result of varying crown elevations.  Flow over the top and down the back of the levee was greatest where the levee crown was lowest.  Overtopping occurred first and lasted longest at the lowest points in the levee crown.  The Reach 2 crown elevation ranged from less than 14 feet to more than 18 feet.  JX-191 (Morris Rpt.) 19; JX-211 (Ebersole Rpt.) 60-61 (Table 4); JX-193 (Resio Rpt.) 50 (Table 3).  The paramount importance of levee crown elevation is seen in the wave height sensitivity study performed by Dr. Resio.  The duration of flow above the thresholds for initiation of erosion and major damage was influenced only slightly by varying significant wave heights by one or two feet.  DX-1748 (Resio Supp. Rpt.) 6, Fig. 1.  But raising the crest elevation from 14.5 feet to 18.5 feet reduced the duration of loading above these thresholds dramatically. *Id*.  Duration above the threshold for major damage to an earthen levee exceeded five hours where the crown elevation was 14.5 feet. *Id*  By raising the crown elevation to 18.5 feet, that period was reduced by half, to less than two-and-a-half hours.  *Id.*  The threshold for initiation of erosion was exceeded for more than six hours where the crown elevation was 14.5 feet but was reduced by a third, to less than four hours where the crown elevation was 18.5 feet.  *Id.*  Levee crown elevation was the largest single factor in determining the volume of water that flowed over the levee at any given location.  Vrijling 1042:14 – 1046:19.

More than two-thirds of the levee crown lay below the prescribed design elevation of 17.5 feet when the storm struck.  JX-191 (Morris Rpt.) 18-19; DX-1748 (Resio Supp. Rpt.) 6 (Fig. 1).

Although crown elevation does not fully account for the difference between survival and destruction of the levee, it was clearly a significant factor. This is shown by the inverse correlation that exists between pre-storm crown elevation and breaching. Where the crown was lower, breaching was more likely to have occurred. Where the crown was higher, relatively fewer breaches occurred. Bea 1106:10-13; 1139:8-12.

The quality of the turf (grass and substrate) also factored into the equation. Dense grass rooted in erosion-resistant soil resisted the uprush and down flow of breaking waves better than less dense grass growing in highly erodible soil. Bea 1200:18-20; 2140:9 – 2141:15; 2144:8-10; 2281:2-19; 2494:21 – 2496:18. Dr. Bea found a definite correlation between the quality of the turf on the levee and the performance of the levee during the hurricane. Bea 1201:16 – 1203:17; 1273:22 – 1274:13; 1276:18 – 1277:5; 1279:21 – 1280:8. Indeed, he opined that dense grass cover, by lengthening the time before erosion begins, "can be a border between survival and failure." Bea 1201:5. That good turf can make the crucial difference in levee performance is illustrated by Dr. Bea's reconfiguration of the levee in his "No MRGO, No Breaching" scenario. Based on the different rates of erosion that he applied in that scenario and in his "Katrina Real Run," Mr. Ebersole concluded that Dr. Bea improved the turf covering the levee in Scenario 2c: "[F]or Scenario 1 he did not assume turf was of good quality, but he did for Scenario 2. So that, in essence, going from Scenario 1 to Scenario 2C to the neutral condition, he has made it much more difficult to erode the backside of the levee under the Scenario 2C condition." Ebersole 2278: 15-20.

Dr. Bea also raised the crest of the levee to a uniform elevation of 17.5 feet along Reach 2 in his "No MRGO, No Breaching" scenario. *See* PX-2153; Bea 1251-52 (affirming use of chart values in parametric studies); Mosher 3114:24 – 3115:2. Changing the height of the levee was

one of the "primary parameters" that Dr. Bea varied to understand the influence of crown elevation on "the ultimate outcome, flooding." Bea 1253:7-8. His assumption that the entire levee would have been at the design grade had it not been for the MRGO dramatically highlights the single most revealing undisputed fact relevant to Flood Control Act immunity: only a stronger, more resilient hurricane protection system could have prevented this catastrophe. His reconfiguration of the levee in the alternative scenarios in which he concluded flooding would not have occurred very clearly reveals that the conduct which Plaintiffs are challenging was not unrelated to flood control.

The characteristics of the LPV levee determined how the levee performed at every location along Reach 2 of the MRGO. Levee toe and crown elevations had the most effect in varying the hydraulic loading on the front and back, and the quality of the turf covering the levee was the principal determinant of how long the levee was able to resist the load without eroding. For these reasons, the Flood Control Act applies to this case and prevents the imposition of liability on the United States.

C.   **THE MISSING STRUCTURES THAT PLAINTIFFS SAY WOULD HAVE PREVENTED FLOODING—SURGE AND SALINE BARRIERS AND ARMORED BANKS—ARE STRUCTURES RELATED TO FLOOD CONTROL AND TO THE LPV.**

Plaintiffs assert that the failure to build a surge barrier at the confluence of the MRGO and the Gulf Intracoastal Waterway was a negligent omission that caused them harm. Pls.' Corr. Post-Trial Brief 52, 73-74. But, as they acknowledge, the Corps of Engineers considered and rejected adding this feature on three separate occasions spanning three decades. *Id.* at 73. In 1969 Col. Herbert R. Haar, Jr., who was then the New Orleans District Engineer, wrote a letter in response to an inquiry from Congressman F. Edward Hebert concerning the LPV. JX-297 (Haar correspondence) at AFW-000000467-219 to AFW-000000467-220. The congressman had

13

passed along a concern expressed by a constituent who was worried that the hurricane protection project "will not have all the answers because it excludes flood gates at the Gulf Outlet." *Id.* at AFW-467-000000224. In his response, Col. Haar explained that the Corps had considered putting surge barriers at the MRGO but had decided not to do so because such a structure "would result in a substantial increase in costs" with an "increase in benefits [that] was small by comparison." *Id.* at AFW-000000467-219. Other reasons cited by the district commander included political opposition by state and local governments, delays associated with revising the LPV project to incorporate the new feature, and economic inefficiencies if the anticipated delays caused local governments "to proceed independently and at great cost with improvements to the existing levee systems for interim protections. *Id.* at AFW-000000467-220.

Six years later, in a letter dated April 21, 1975, Col. Haar's successor wrote a similar letter to G.J. Lannes, Jr., at the Regional Planning Commission. Again the question of whether to place a surge barrier in the MRGO was discussed as an "alternative plan" for the LPV. JX-299 (Heiberg ltr.) at NED-125-000000994. Col. K.R. Heiberg III cited several of the same reasons cited earlier by Col. Haar in explaining why the Corps would not support the alternative plan that included a barrier in the MRGO. *See id.* at NED-125-000000994 to NED-125-000000995.

The third extant explanation of why the Corps decided not to seek authorization from Congress to place a surge barrier in the MRGO is found in a letter dated July 25, 1990, from the then Acting New Orleans District Engineer, Maj. Harold E. Manual, Jr., to Senator John Breaux. Major Manual explained that placing a surge barrier at the confluence of the MRGO and the GIWW "could not be economically justified" and would "represent a significant liability to the container industry and would doubtless cause the loss of cargoes, public investment, and jobs."

14

DX-844 (Manual correspondence) at MGP-008-000006347.  He reiterated the Corps's view that building a lock or closure across the MRGO "would not be a complete solution to either the erosion problem or maintenance demands of the channel." *Id.*  He assured the senator that "[t]he channel represents no significant flood threat to the citizens of St. Bernard Parish," and pointed out that "[t]he virtually complete Chalmette Area Loop of the Lake Pontchartrain and Vicinity hurricane protection project . . . provides standard project hurricane (SPH) storm protection to nearly all of the populated portions of the parish." *Id.*

These three letters demonstrate that the Corps viewed the construction of a surge barrier in the MRGO primarily as a flood control structure which had to be evaluated in connection with the LPV and the protection that the flood control project provided.

From the outset, the record also makes clear, the Corps considered the construction of foreshore protection, or "armored" banks, to be appurtenant to the LPV levees adjacent to the MRGO and the GIWW.  *See* H.R. Doc. No. 89-231 (LPV Chief's Rpt.) at 64-65.  The levee designers recognized that armoring the south bank of the MRGO  might become necessary to protect "the integrity of the levee":  "erosion of the foreshore area between the levee and the channel bank by ship-generated waves will pose a threat to the integrity of the levee.  Accordingly, a stabilization dike will be provided *to protect the levee* from such erosion."  DX-254 (LPV GDM No. 3, Chalmette Area Plan) at 35 (emphasis added); *see also* JX-283 (LPV GDM No. 3, Supp. No. 1, Chalmette Extension) at 32-33.  An understanding of foreshore protection as a feature of the flood control project comes into even sharper relief when it is recalled that the MRGO designers also anticipated erosion of the channel banks but chose the more economical remedy of allowing it to occur and then acquiring additional easements from adjacent landowners in the event that erosion began to encroach on private property:  "No

channel protection is included in the overall cost of the project.  It is presumed that sufficient rights of way will be furnished by local interests to preclude use of channel protection or that additional rights of way will be furnished when the need arises."  JX-139 (MRGO DM 1-A) at 7, ¶ 16; *accord* JX-356 (MRGO DM 1-B) at 5, ¶ 19.  Because "[b]ank protection works" were not part of the authorized MRGO plan and had not been included in the costs of the project, the designers dealt with "anticipated erosion" and "surface widening due to erosion" by conducting stability analyses and soil borings to determine how far away from the channel spoils would need to be deposited in order to provide an adequate factor of safety.[3]  DX-1042 (MRGO DM 2) at 22, ¶ 47.

Based on a cost apportionment adopted by Congress in the 1958 Flood Control Act, the Chief of Engineers recommended that local entities assume 30 percent of the total cost of the LPV.  H.R. Doc. No. 89-231 (LPV Chief's Rpt.) at 2.  Congress ratified this apportionment in the LPV authorizing legislation.  *See* Pub. L. No. 89-298, 79 Stat. 1073 (1965).  In contrast, the federal government bore all of the cost of the MRGO.  Local interests therefore sought to have the cost of foreshore protection added to the MRGO and deducted from the LPV.  DX-1483

---

[3]Surface widening was expected because "the upper part of the channel slope" consisted of "peat and highly organic clays." JX-139 (MRGO DM 1-A) at 7, ¶ 16; *accord*  JX-356 (MRGO DM 1-B) at 5, ¶ 19.  To minimize maintenance requirements, the designs therefore called for "slopes of the channel cut not deeper than 1 on 2" because steeper cuts would result in excessive sloughing of the unstable, highly erodible banks. JX-139 (MRGO DM 1-A) at 7, ¶ 15; *see also* JX-356 (MRGO DM 1-B) at 5, ¶ 18 ("slopes on the channel cut not steeper than 1 on 2"); DX-1042 (MRGO DM 2) at 22, ¶ 47 (same); *cf.* JX-356 (MRGO DM 1-B) Endorsement of Div. Eng'r (Oct. 23, 1958) (commenting that box cutting the channel would "probably" result in "slopes of about 1 on 2" and recommending that "consideration . . . be given to excavating the final flatter slopes by a series of step cuts to reduce maintenance dredging," depending on the results of additional testing of soil strengths); *id.* Plate 12 (depicting the 1-on-2 channel side slope and labeling it "Theoretical Cut").  Notwithstanding the plan's exclusion of bank protection and the absence of authorization for them, the designers noted that bank protection works were technically feasible if in the future such features were considered necessary.  *See* JX-139 (MRGO DM 1-A) at 7, ¶ 16; JX-356 (MRGO DM 1-B) at 5, ¶ 19.

(MRGO GDM No. 2, Gen. Supp. No. 4 ("Foreshore Protection")) at 1; *Id.* App. B, at 1.  Judge

Leander Perez telephoned the Chief of Engineers on March 3, 1966 to "express[] concern that the

[LPV] project for the Chalmette area includes charges to local interests for bank protection

work"  which Judge Perez thought "was not a cost of hurricane protection, but a navigation cost

to protect the levees against wave wash."  *Id.*

The Corps's initial (internal) reaction was one of understanding but disagreement:  "It is

understandable that local interests would contend that the Outlet project should bear some part of

the cost of the riprap protection.  However, the benefits from the hurricane levee will include the

prevention of flood damages and will allow considerable enhancement in the protected area. No

benefits will accrue to the Gulf Outlet Channel because of the levee construction other than those

that might stem from industrial development which could conceivably take place within the

Chalmette area after it is afforded a higher degree of protection by the levee."  *Id.* App. B, at 1-2.

The Division Engineer for the Lower Mississippi Valley informed the Chief of his "belief that

the levee slope protection along the Mississippi River-Gulf Outlet Channel is properly

chargeable to the Lake Pontchartrain, La., and Vicinity hurricane protection project," but

requested that the Chief himself decide the sensitive political controversy.  *Id.* App. B., at 2.  On

April 15, 1966, the Chief issued his ruling:  "the portion of riprap costs that is required for

[foreshore protection against erosion by wave wash from shipping] should be charged to the

navigation project as a Federal cost for wave protection."  *Id.* App. B, at 3.

The Division Engineer interpreted this as a directive to apportion the cost of foreshore

protection between the two projects.  He therefore directed the New Orleans District Engineer to

"prepare and submit for approval by 27 May 1966 a breakdown of the riprap foreshore and levee

slope protection costs, proportioned between the hurricane-flood protection project and the

navigation project." *Id.* App. B, at 4.  The District Engineer promptly complied with this

directive.  When he delivered his cost estimate to the Division Engineer, however, the District

Engineer used the occasion to voice his concerns about the Chief's decision:

> 3.  The Mississippi River-Gulf Outlet was authorized long before
> the Chalmette levee was even planned; hence, it seems strange that the
> Outlet should be burdened with any construction which is subsequently
> planned. The levee could have been planned at a more remote location
> where no wavewash hazard would be involved; however, the optimum benefits
> and costs are derived from a location close to the outlet channel.  At this location,
> the maximum protected area is made available and the considerable benefit of
> utilizing the spoil bank from the outlet channel is enjoyed, despite the possible
> hazard of wavewash.

> 4.  The principle of having a project assume the financial burden of a
> subsequently authorized project may result in many of our marginal projects being
> forced into a category of less than unity benefit-cost ratio by virtue of factors that
> could not possibly have been evaluated when the project vas presented to the
> Congress.  The application of the principle is equivalent to making the Mississippi
> River navigation project bear the cost of levee slope paving in the MR&T project,
> or of the Gulf Intracoastal Waterway bearing the cost of the locks which were
> required in previously authorized waterways in order to permit the levees to be
> extended to protect additional land areas.

> 5.  This principle is in no wise comparable to that of taking action to correct an
> unforeseen condition which has been brought on by the functioning of a project.
> In the subject instance, no action would be required until the Chalmette levee is
> constructed, hence the levee project should be complete within itself.

*Id.* App. B, at 5.

The Chief of Engineers took note of his subordinates' concerns, expressed his

appreciation of them, and informed them that his decision was "based on those facts pertaining to

the specific projects involved and it was not intended that it be considered a precedent . . .

applicable to other projects."  *Id.* App. B, at 7.  He later decided that all of the cost of foreshore

protection, not only on the south bank of the MRGO but also on the north bank of the GIWW,

should be charged to the MRGO project.  *Id.* App. B, at 4 (second pagination series).

Despite this politically inspired decision on funding, engineering realities dictated that the foreshore protection be designed as an integral part of the LPV.  The design for the foreshore protection therefore continued to be developed in conjunction with the design of the flood control project.  JX-283 (LPV DM No. 3, Supp. No. 1 (Sept. 1968)) at 32, ¶ 41, Plates 12, 13 & endorsement of Lower Mississippi Valley Division (Dec. 13, 1968) at 4 ("The foreshore protection chargeable to the MR-GO account should be shown as a subfeature under Levees and Floodwall and properly footnoted."); DX-1483 (MRGO DM No. 2, Supp. No. 4) at 2-3, 15.  And when the Corps informed Congress of its plan to allocate these costs to the MRGO rather than the LPV, it explicitly noted that "this protection will be necessary to protect the new levees which will be constructed for sections for the Lake Pontchartrain and Vicinity Hurricane Protection project located adjacent to this ship channel."  DX-1483 (MRGO DM No. 2, Supp. No. 4) App. B (separate pagination).  As of August 29, 2005, all of the foreshore protection that had been described in the letter to Congress had been installed.  DX-1028 (MRGO Bank Erosion Recon. Rpt. (Jan. 1994)) at 9.

Prior to trial it may not have been sufficiently clear whether the allegedly negligent acts and omissions alleged by Plaintiffs had a nexus to a flood control project.  Furthermore, at that time "[t]here [was] no proof or any evidence that the Corps in designing the LPV ever took into consideration any of these changes that MRGO had wrought on the area."  577 F. Supp. 2d at 825.  Consequently, the "Court [was] unable as a matter of law at [that] time [to] find that § 702c immunity should lie."  *Id.*  Now, however, the evidence clearly shows that the Corps did take into account the "changes that MRGO had wrought on the area" when it declined to put a surge barrier in the MRGO and when it decided to install foreshore protection to prevent erosion from destabilizing the LPV levee.  The "funnel" effect of the MRGO was precisely the concern of the

citizen who viewed the LPV as "helpful" but inadequate "because it excludes flood gates at the Gulf Outlet . . . leaving a big door open."   JX-297 (Crosby letter), at AFW-467-224.   Colonel Heiberg, the District Engineer in 1976, expressly acknowledged that the MRGO was functioning as a conduit for saline water, but he nevertheless rejected the notion that this "adverse effect[] of the MR-GO" required the construction of a surge barrier in the channel.  JX-299 (Heiberg letter).  The Acting District Engineer in 1990 also acknowledged that "saltwater intrusion caused by the channel has also caused land loss and the conversion of fresh marsh and swamp to salt marsh."  DX-844 (Manual letter) at MGP-008-000006348.

This evidence was not before the Court prior to trial.  These letters conclusively demonstrate that the barriers and foreshore protection that Plaintiffs cite as omissions in the MRGO were structures that were integral to the LPV and served a flood control purpose rather than a navigation purpose.  Only by indulging in a formalistic assessment of these acts and omissions could they be described as extrinsic to the flood control project.  In no wise could it be fairly said that they were "unrelated to a flood control project."  577 F. Supp. 2d  at 825.  Because these acts and omissions were integral to the LPV and to its goal of guarding against hurricane-induced flooding, the immunity afforded by 33 U.S.C. § 702c bars this action and requires a dismissal for lack of subject-matter jurisdiction.

## II. THE FTCA'S DUE CARE EXCEPTION BARS THIS ACTION.

The United States' waiver of sovereign immunity under the FTCA does not apply to "any claim based upon an act or omission of an employee of the Government exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid . . . ."  28 U.S.C. § 2680(a).  This first clause of section 2680(a) "bars tests by tort action of the legality of statutes and regulations."  *Dalehite v. United States*, 346 U.S. 15, 33 (1953).  Courts have

applied a two-part test to determine whether the due care exception bars a particular claim.  First, the court determines whether the statute or regulation prescribes a particular course of action a government agent must follow.  *Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005); *In re Katrina,* 2009  WL 799976, at *7.  Second, the court inquires into whether the agent followed the statute or regulation with due care.  *Id.*

State law does not govern whether an agent exercised due care.  *Hydrogen Tech. v. United States*, 831 F.2d 1155, 1161 (1st Cir. 1987) ("[T]he district court's decision to use state law in applying the section 2680(a) exception was mistaken because it misperceived the structure of the FTCA.").  The exceptions set out in § 2680 define the limits of the waiver under the FTCA, thus interpretation of the exceptions is a matter of federal, not state, law.  *Id.*  Indeed, "permitting state law to control the breadth of the exceptions to the FTCA would mean that federal subject matter jurisdiction might vary from case to case depending on particular state choice of law rules for torts; this would be unacceptable."  *Id.*  Instead, unless an agent violates the very statute which he is required to execute, there is no lack of due care.  *See United States v. Second Nat'l Bank of North Miami*, 502 F.2d 535, 549 & n.27 (5th Cir. 1974).

Numerous cases make it clear that to render the due care exception inapplicable, the negligence or wrong alleged must not emanate from the statute or regulation itself, but must be an act or omission that the very statute or regulation makes impermissible.  In *Sickman v. United States*, 184 F.2d 616 (7th Cir. 1950), landowners brought claims under the FTCA seeking to recover damages for the destruction of their crops due to migratory waterfowl.  *Id.* at 617.  The complaint alleged that, *inter alia*, the United States was liable for the migratory birds' depredations by failing to protect the plaintiffs' crops from the birds.  *Id.*  The plaintiffs contended that because the United States had assumed protection of the birds under the

21

Migratory Bird Treaty Act, 16 U.S.C. § 703, it was therefore responsible for the destruction caused by the protected birds. *Id.* The district court dismissed the complaints and the court of appeals affirmed, holding that the due care exception barred the plaintiffs' claims. *Id.* Noting that the complaint did not allege that government agents had not exercised due care, the court concluded the acts and omissions complained of were in the execution of statute and regulations, and fell into the due care exception. *Id.* The court stated that, in fact, the complaint alleged "negligence of the United States acting through Congress, rather than any lack of due care by an employee of the United States." *Id.* Thus, the complaint essentially alleged "that Congress, in prohibiting the hunting of migratory wild fowl, including geese, was negligent *in not also providing* for the protection of crops which such wild fowl might eat or destroy." *Id.* at 619 (emphasis added).

The Fifth Circuit has endorsed the teachings of *Sickman.* In *In re Texas City Disaster Litig.*, 197 F.2d 771, 772 (5th Cir. 1952) *aff'd sub nom. Dalehite v. United States*, 346 U.S. 15 (1953), a consolidated action brought under the FTCA, the plaintiffs alleged that the United States was negligent in manufacturing and transporting fertilizer which exploded, killing and injuring numerous persons. Congress, however, approved the program which manufactured the fertilizer and granted the Secretary of War discretionary authority, which he then delegated to subordinates, establishing the procedures which covered all phases of the manufacturing and transportation of the fertilizer. *Id.* at 779-80. The court held that "many if not all" of the actions of government employees involved in the manufacturing and transportation of the fertilizer fell within the due care exception. *Id.* at 779. The court stated that "the negligence or wrong cannot inhere in the statute or regulation itself but must be in some act or omission not expressly permitted thereby." *Id.; see also Goodwill Indus. v. United States,* 218 F.2d 270, 272 (5th Cir.

1954) (citing *Sickman* with approval for proposition that no recovery against United States is allowed "for acts or omission of governmental employees in carrying out statutes or regulations").

More recently, the Fourth Circuit in *Welch* held that INS agents exercised due care in detaining an alien as statutorily required. 409 F.3d at 652. The complaint did not allege that the officers in any way deviated from the governing statute's requirements. *Id.* Thus, the complaint was "regarding the statute itself" and, absent any alleged deviation from its mandate, it could not be determined that "the officers acted with anything other than due care." *Id.*

### A. CONGRESS AUTHORIZED CONSTRUCTION OF THE SPECIFIC PLAN THAT WAS RECOMMENDED BY THE CHIEF OF ENGINEERS.

Congress authorized the construction of the MRGO "substantially in accordance with recommendation of the Chief of Engineers." Pub. L. No. 84-455, 70 Stat. 65 (1956). The Chief of Engineers recommended that the MRGO be constructed "generally in accordance with the plans of the division engineer and with such modification thereof as in the discretion of the Secretary of the Army." H.R. Doc. No. 82-245 (Chief's Rpt.) at 5. The division engineer's plans included a cost-benefit ratio justifying construction. *Id.* at 39, 43. The cost-benefit ratio included dredging as the sole maintenance cost. *See id.* After Congressional authorization, the division engineer provided further details, in the form of a design memorandum, for the design and construction of the MRGO. *See generally* JX-139 (MRGO DM 1-A). As noted in the design memorandum, "[n]o channel protection is included in the overall costs of the project. It is presumed that sufficient rights of way will be furnished when the need arises." *Id.* at 7. Furthermore, neither the Chief's Report, nor the subsequent design memoranda included plans or allocated funds for the construction of any type of surge barrier, salinity gate, or restoration of the

inevitable wetland destruction.  *See* H.R. Doc. No. 82-245, JX-139 (MRGO DM 1-A); DX-1042

(MRGO DM-2).

###   B.   THE CONDUCT THAT ALLEGEDLY CAUSED PLAINTIFFS' DAMAGE WAS CONDUCT THAT CONFORMED TO THE PLAN RATIFIED BY CONGRESS.

The due care exception applies to Plaintiffs' claims concerning the design, construction,

operation, and maintenance of the MRGO because Plaintiffs have failed to present any evidence

that the Army Corps of Engineers deviated in any way from the statute authorizing the

construction of the MRGO, Pub . L. No. 84-455 70, 70 Stat. 65 (1956).  In response to the

Court's specific questions it wished to be addressed in post-trial briefing, Plaintiffs described

four preventative measures which they alleged the Corps was negligent in not installing: (1)

foreshore protection, (2) a gate at the confluence of the GIWW and the MRGO, (3) a salt barrier

at the Bayou La Loutre Ridge, and (4) "[w]etlands loss as a result of the MRGO's presence

should have been restored."  Pls.' Answers to the Court's Questions at 8-9.  None of the

"preventative measures" which Plaintiffs allege the Corps should have implemented can be even

remotely described as deviations or violations of the legislation authorizing constructing the

MRGO; the statute simply did not provide for such remedial measures.  Thus, Plaintiffs

essentially complain that the legislation passed by Congress *should have* included such measures

to prevent the alleged deleterious effects of the construction of the channel.  This is a plainly a

thinly-veiled challenge to the legislation authorizing the channel.

Knowing full well that the Court has determined that it does not have jurisdiction over

allegations of negligence concerning the design and construction of the MRGO,[4] Plaintiffs

--------

[4]The Court has ruled that "as concerns the initial design and construction of the MRGO, these actions are shielded by the discretionary function exception." 2009 WL 799976, at *28 The Court also hinted that the due care exception barred Plaintiffs claims, observing that  "[t]here

(continued...)

contend that the Corps should have implemented four preventative measures, if not concurrent with authorization, at some point thereafter.  Pls.' Corrected Post Trial Br. 57-59.  None of the preventative measures, however, were provided for, or even permissible, under the authorization legislation.  The legislation authorizing the MRGO and the original design memoranda did not provide for any surge barriers; did not provide for any salinity gates; did not provide for any foreshore protection; and did not provide for any restoration of the wetlands.  The cost benefit ratio upon which Congress authorized the MRGO project would have been altered if any of these large-scale projects were implemented.  It simply cannot be said that the Corps did not exercise due care in following the mandates of Congress when it did not implement what *it was not* authorized to do.  Indeed, if the Corps had implemented measures extraneous to and arguably in contravention of the authorization statute, then it would not have exercised due care in implementing the dictates of the statute.

Plaintiffs' allegations of negligence concerning the MRGO in effect allege that Congress, in authorizing the MRGO, was negligent in *not also authorizing* bank protection, surge barriers, and measures to restore the wetlands.  Plaintiffs' own expert witness makes clear that it is Congress's actions, not the Corps', that were "negligent."  As Dr. Day summarized, "[t]he nature of my testimony and my opinion is that these things were known. . . . That it would have been good professional judgment to include those things in whatever was done to get this canal dug so

---

[4](...continued)

is a paucity of proof that the Corps did not follow its mandate in the actual **design** or **building** of the MRGO." *Id.* at 6 (emphasis in original).  The record now reveals that there is no evidence whatsoever that the Corps did not follow its mandate in designing and constructing the MRGO. Plaintiffs have merely alleged that in operating and maintaining the MRGO, the Corps should have implemented remedial measures.  Without any evidence that the Corps did not exercise due care with respect to the initial design and construction of the MRGO, Plaintiffs' claims alleging any negligence in design and construction are barred by the due care exception.

that we would not have had all these impacts that are clearly related to the canal." Day 792:12-20. Dr. Day further elaborated, "[w]hat I said would have been reasonable and seemed to be appropriate *that when the MRGO was proposed*, these measures [structure at La Loutre ridge, structure at Seabrook, measures to control bank erosion, and introduction of freshwater into area] *should have been proposed*." Day 794:14-17 (emphasis added). Furthermore, in post-trial briefing, Plaintiffs answered the Court's specific question of when and where foreshore protection should have been placed by stating, "[f]oreshore should have been installed *contemporaneous* with the construction of the MRGO as the Corps noted to Congress was necessary." Pls.' Answer to Court's Questions at 8 (emphasis added). These statements specifically acknowledge the real thrust of Plaintiffs' allegations of negligence—that Congress was negligent in not providing for remedial measures when it authorized the channel.

By their own admission and in effect, Plaintiffs' allegations of negligence stem directly and solely from the statute authorizing the MRGO. As such, the court's reasoning in *Sickman* applies. In *Sickman*, the court determined that the plaintiffs' complaint in fact alleged that Congress was negligent in protecting migratory waterfowl, but not additionally protecting crops which may be damaged by the migratory birds. 184 F.2d at 619. Here, the additional measures Plaintiffs contend should have been implemented are exactly like the remedial measures in *Sickman*. They were not provided for by Congress and their purpose would be to remediate any potential harms created by the legislation authorizing the construction of the channel. The failure of Congress to provide additional measures to prevent that which might be injured by its enacted statutory mandate, as *Sickman* held, is merely an attack on the statute itself, and does not allege that the agents involved failed to exercise due care. Thus, the pronouncement of the Fifth Circuit, which has followed *Sickman,* is applicable here, "the negligence or wrong cannot inhere

in the statute or regulation itself but must be in some act or omission not expressly permitted thereby." *In re Texas City Disaster Litig.* 197 F.2d at 779; *see also Goodwill Indus.,* 218 F.2d at 272 (citing *Sickman* with approval).

Having failed to present any evidence that the Corps deviated from the legislation that authorized the construction of the MRGO, it necessarily follows that the Corps acted with due care in operating and maintaining the MRGO.  *See Second Nat'l Bank of North Miami*, 502 F.2d at 549 & n.27.

**III.  THE DISCRETIONARY FUNCTION EXCEPTION BARS THIS ACTION.**

This Court previously—and correctly—ruled that the discretionary function exception shields from liability any actions taken in the initial design and construction of the MRGO.  *See In re Katrina.*, 2009 WL 799976, at *28 (holding that "as concerns the initial design and construction of the MRGO, these actions are shielded by the discretionary function exception"). In so ruling, the Court noted that the trial in this case would focus on "the actions and inactions that followed the creation of the channel."  *See id.*

Consistent with this Court's prior ruling, Plaintiffs focused at trial on "feasible mitigation measures" which according to Plaintiffs, had they been implemented prior to Hurricane Katrina, "would have prevented or largely mitigated this catastrophe."  *See* Pls.' Corrected Post-Trial Br. 30, 57-59.  Specifically, Plaintiffs identified six such measures: (1) construction of surge barriers and a control structure at Bayou La Loutre; (2) construction of a surge barrier or control structure across the GIWW and Reach 2 of the MRGO; (3) placement of armoring along the banks of Reach 2 of the MRGO and the Lake Borgne shoreline; (4) depositing of dredged spoil on the east bank of Reach 2 to restore the land bridge between it and Lake Borgne; (5) planting of trees, shrubs, and grass between Reach 2 and the toe of the LPV levee; and (6) "revegetation" of the

Central Wetlands Unit.  *See* Gagliano 91:20 – 93:17.  Plaintiffs fault the Corps for failing to

adopt these measures and for failing to warn Congress concerning the dangers posed by the

MRGO.

**A.  DECIDING WHAT INFORMATION TO TRANSMIT TO CONGRESS WAS A MATTER OF JUDGMENT AND CHOICE GROUNDED IN CONSIDERATIONS OF POLICY.**

The challenged conduct in this case—the Corps's failure to implement so-called

"mitigation measures" and to warn Congress that such measures were necessary—is protected

from liability by the discretionary function exception.  There can be no liability for failing to

adopt the specific mitigation measures identified by Plaintiffs because those measures required

additional Congressional authorization and funding.  *See* Day 793:19–794:22 (testimony of

Plaintiffs' expert witness, John W. Day, Jr., that none of the suggested mitigation measures could

have been accomplished without Congressional funding); Naomi 3466:10–13 (testimony of

former Corps employee Alfred C. Naomi that Congress "makes the ultimate funding decisions

regarding projects performed by the Corps of Engineers"); Russo 3558:9–17 (testimony of Corps

employee Edmund Russo that additional foreshore protection along the banks of the MRGO

could not be installed due to a lack of Congressional funding).[5]

First and foremost, Congress's failure to appropriate funds for the functions identified by

Plaintiffs is protected by the discretionary function exception.  *See Cato v. United States*, 70 F.3d

1103, 1110 (9th Cir. 1995) ("Legislative conduct is discretionary for purposes of the

[discretionary function] exception."); *Brown v. United States*, 790 F.2d 199, 202 (1st Cir. 1986)

("How much equipment the [agency] is to possess, and how much money it is to spend,

measured, necessarily, by Congressional appropriations, must be for the government's

---

[5]Similarly, Congressional action would have been required to close the MRGO.  *See* Podany 3392:5-7.

uncontrolled discretion."); *United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189, 195

(1st Cir. 1967) (same); *cf. Collins v. United States*, 564 F.3d 833, 839 (7th Cir. 2009) ("The

prioritization of demands for government money is quintessentially a discretionary function.").[6]

Second, there can be no liability based on the Corps's alleged failure to adequately warn

Congress of the need to adopt specific mitigation measures. Inadequate or incomplete reporting

to an ultimate decisionmaker with discretionary authority has repeatedly been held to fall within

the bar of the discretionary function exception.[7] As the Tenth Circuit has explained, "[t]o allow

---

[6]Plaintiffs argue that discretionary function immunity does not apply because the Corps never made an actual "decision" regarding whether to implement any of these measures. *See* Pls.' Corrected Post-Trial Br. 33-34. The Court must reject this argument, as "[t]he discretionary function exception may apply 'in the absence of a conscious decision.'" *Richardson v. United States*, 943 F.2d 1107, 1111 (9th Cir. 1991) (quoting *Kennewick Irrig. Dist. v. United States*, 880 F.2d 1018, 1028 (9th Cir. 1989); *accord Harrell v. United States*, 443 F.3d 1231, 1236 (10th Cir. 2006); *see also Lopez v. United States*, 376 F.3d 1055, 1057 (10th Cir. 2004); *Kiehn v. United States*, 984 F.2d 1100, 1105 (10th Cir. 1993). If the nature of the challenged conduct reveals that a decision, had one been made, could have involved a consideration of policy, then the exception applies. *See Andrade v. Chojnacki*, 338 F.3d 448, 457 (5th Cir. 2003) (holding that "the applicability of the discretionary function exception does not turn on evidence of the actual decisions made by the defendants, but, rather, on whether the decision is or is not 'susceptible to policy analysis'"); *Myslakowski v. United States*, 806 F.2d 94, 97 (6th Cir. 1986) (rejecting district court holding that discretionary function immunity did not apply because the challenged conduct "was not a deliberate decision at all, but a mere omission, an act of default, attributable to department shortsightedness").

[7]Such a claim is also barred by the Recommendation Clause of the Constitution. The Recommendation Clause gives the President the power to recommend to Congress "such Measures as he shall judge necessary and expedient," *See* U.S. Const. art. II, § 3, and precludes judicial second-guessing of measures recommended, or not recommended. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 908 (D.C. Cir. 1993) ("The President has the undisputed authority to recommend legislation, but he need not exercise that authority with respect to any particular subject or, for that matter, any subject."); Vasan Kesavan & J. Gregory Sidak, *The Legislator-in-Chief*, 44 Wm. & Mary L. Rev. 1, 57 (2002) ("The verb 'judge' in the Recommendation Clause also signifies that the President is the indeed last and only word on what recommendations he shall make. The question of whether a particular recommendation is necessary and expedient is a quintessentially political question committed to the President. . . .'") (footnotes omitted); J. Gregory Sidak, *The Recommendation Clause*, 77 Geo. L.J. 2079, 2121 (1989) ("[T]he recommendation clause obviously contemplates that the President is the sole

(continued...)

plaintiffs to avoid the discretionary-function bar by alleging that [Government] employees breached a specific duty to report information, even though the harmful decisions based on the information were themselves discretionary, would be in tension with precedent." *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1132 n.11 (10th Cir. 1999); *see also, e.g.*, *Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 285-86 (3rd Cir. 1995) (en banc) (rejecting "plaintiffs['] attempt to avoid application of the discretionary function exception by looking behind the injury-causing decision and finding fault with an aspect of the data on which it may have been based"); *Johnson v. United States*, 949 F.2d 332, 339-40 (10th Cir. 1991) (applying discretionary function exception to bar claim challenging agency's "information gathering activity," which was mandatory, because it was "inextricably tied to" and "a component of the overall policy decision," which was discretionary); *Myslakowski*, 806 F.2d at 97-98 (rejecting argument that discretionary function immunity does not apply "if the decision [was] made without consideration of important, relevant factors, or was a decision negligently reached"); *Jayvee Brand, Inc. v. United States*, 721 F.2d 385, 390 (D.C. Cir. 1983) ("[W]e conclude that making a discretionary decision without following mandated procedures should be characterized, for the purposes of the FTCA, as an abuse of discretion.  It follows that the discretionary function exception applies and the district court was without jurisdiction to entertain this suit."). Inasmuch as Congress's decision whether to authorize the specified mitigation measures and to appropriate funds would have been wholly discretionary, the FTCA does not allow this Court to

---

[7](...continued)
judge of what measures he will submit to Congress."); *id.* at 2123 ("The President *alone* shall decide what measures are necessary and expedient to recommend to Congress.").  In short, the President may not be sued for failing to recommend a specific measure—or, in this case, a specific "feasible mitigation measure"—to Congress.

"look behind" those discretionary functions to see whether the information provided to Congress as a basis for those functions was complete or accurate.

Third, even if it were permissible to examine the adequacy of the information transmitted by the Corps, the Corps's selection of information to transmit would itself be a protected discretionary function. As this Court knows well, application of the discretionary function exception depends on whether the conduct in question is (1) discretionary and (2) "susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991); *Andrade v. Chojnacki*, 338 F.3d 448, 457 (5th Cir. 2003). Unquestionably, the Corps's decisions regarding whether to report certain facts to Congress were "discretionary" in the absence of a specific directive requiring that specific facts be reported. In the absence of a statute or regulation *requiring* that certain information be reported, the first prong of the DFE test is satisfied. *See, e.g.*, *Gen. Pub. Utils. Corp. v. United States*, 745 F.2d 239, 246 (3rd Cir. 1984) (holding that agency's decision not to make a report was protected by discretionary function exception, even if "in hindsight the Commission's judgment may have been ill-advised").

As demonstrated by the evidence at trial, the second prong is also satisfied. The Corps's decisions with respect to what information should be reported to Congress were "susceptible to policy analysis." In the context of making funding recommendations, for example, the Corps was forced to decide which among many worthy projects it should recommend to Congress. *See generally* Naomi 3494:17 – 3500:9 (describing various flood control projects that were competing for President's recommendation to Congress); Luisa 3581:10 – 3615:17 (describing generally process by which Corps and President would decide which projects to recommend to Congress for funding). Those decisions were based on a host of political, social, and economic factors, including a project's benefit-cost ratio, the extent to which it might prevent damage from

flooding, and the number of people who live in the area to be protected.  *See* Luisa 3608:13 –

3615:17 (discussing factors that are considered); *id.* 3613:25 – 3614:1 (admitting that Corps

lacked funding to complete all projects and acknowledging that "we have to make choices here").

As will be discussed in detail below, moreover, NEPA did not mandate the transmission

of specific information to Congress.  Plaintiffs' argument that an SEIS would have resulted in

mitigation of the MRGO's "flaws" is premised on the incorrect assumption that environmental

impact statements are sent to Congress.  *See, e.g.*, Pls.' Corrected Post-Trial Br. 22 ("NEPA

requires that Congress be advised of a specific project's impacts in the context of evaluating

actions related to that project."); *id.* at 23-24 (discussing the Corps's supposed "obligation to

alert Congress of the impacts [of the MRGO] through a full EIS"); *id.* at 24 (alleging that "the

Corps never advised Congress of either the environmental impacts of bank erosion or the

increasing dangers from storm hazard resulting from O&M activities as mandated under

NEPA").  This premise, however, is false.  According to the regulations governing the CEQ,

environmental impact statements are "filed with the Environmental Protection Agency."  *See* 40

C.F.R. § 1506.9(a).[8]  There is no requirement that they be transmitted to Congress.  Accordingly,

NEPA does not remove the Corps's discretion concerning what information to report to

Congress.

**B. DECIDING WHETHER TO PRODUCE AN SEIS WAS A MATTER OF POLICY-BASED
JUDGMENT.**

Plaintiffs argue that the discretionary function exception is "render[ed] . . . inapplicable to

[the challenged] decisions" in this case because the Corps violated a mandate under the National

---

[8]The CEQ's regulations do provide that "legislative environmental impact statements" are transmitted to Congress whenever a Federal agency proposes legislation.  *See* 40 C.F.R. § 1506.8.  Neither at trial nor in their Post-Trial Brief have Plaintiffs pointed to any legislation proposed by the Corps that would have triggered an obligation to prepare a legislative EIS.

Environmental Policy Act ("NEPA").  Plaintiffs' NEPA argument has evolved throughout this litigation.  At the summary judgment stage, Plaintiffs argued that the United States should be stripped of its discretionary function immunity because the Corps violated NEPA in five respects: (1) by failing to produce an EIS each time the MRGO authorizing legislation was amended (in 1976, 1986, and 1996); (2) by failing to produce an EIS for each appropriations request made between 1970 and 1979; (3) by violating Executive Order 11990; (4) by failing to address in its 1976 EIS certain topics that Plaintiffs feel should have been included; and (5) by failing to prepare a supplemental environmental impact statement ("SEIS") after its 1976 EIS. *See In re Katrina*, 2009 WL 799976, at *4.

In its summary judgment order, the Court rejected all of these arguments except for the last, *see id.* at *24-27, finding that "Plaintiffs have raised significant questions of fact with respect to the Corps' compliance with [the] mandate" to produce an SSEIS when "significant new circumstances" warrant one, *id.* at *26.  Accordingly, Plaintiffs have abandoned their other NEPA arguments, and now press only one:  the Corps violated NEPA by failing to produce an SEIS by 1988.  *See* Pls.' Corrected Post-Trial Br. 25 ("On this record, the Court should find that the Corps' failure to supplement its EIS was a violation of its mandate, rendering the DFE inapplicable to its decisions associated with dredging and failure to protect the banks and wetlands in the vicinity of the channel.").  Plaintiffs' NEPA argument fails for several reasons in addition to those set forth above.

First, the Corps did not violate NEPA because the circumstances that existed in the 1980s were not significantly different from those addressed in the 1976 EIS and an SEIS was therefore not required.  Second, the regulations, even if applicable under the circumstances, did not provide a "fixed or readily ascertainable" standard for determining whether an SSEIS was

required and therefore did not remove discretion.  Third, even if the Corps did violate a

mandatory duty under NEPA by failing to prepare an SSEIS, that failure was not the cause of

Plaintiffs' damages, as Congress was well aware of the alleged problems associated with the

MRGO, even without the benefit of another report by the Corps.

### 1. DECIDING WHETHER "NEW CIRCUMSTANCES OR INFORMATION" WERE "SIGNIFICANT" REQUIRED AN EXERCISE OF POLICY-BASED JUDGMENT.

An EIS must be supplemented if there are "significant new circumstances or information

relevant to environmental concerns and bearing on the proposed action or its impacts."  40

C.F.R. § 1502.9(c)(1)(ii); *see also La. Crawfish Prods. Ass'n-West v. Rowan*, 463 F.3d 352, 358

(5th Cir. 2006).  As this standard implies, "[a]n EIS need not be supplemented whenever new

information concerning a project comes to light."  *Coker v. Skidmore*, 941 F.2d 1306, 1310 (5th

Cir. 1991); *see also Marsh v. Ore. Natural Res. Council*, 490 U.S. 360, 373 (1989) (holding that

"an agency need not supplement an EIS every time new information comes to light after the EIS

is finalized").  "Nor need the Corps update an EIS when portions of it become out-of-date."

*Coker*, 941 F.2d at 1310; *cf. Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1036

(2nd Cir. 1983) (holding that "mere passage of time rarely warrants an order to update the

information to be considered by the agency").  Rather, "the principal factor an agency should

consider in exercising its discretion whether to supplement an existing EIS because of new

information is the extent to which the new information presents a picture of the likely

environmental consequences associated with the proposed action not envisioned by the original

EIS."  *Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984).  As this Court has already

recognized, an agency need not prepare an SEIS "unless the new information provides a *seriously*

different picture of the environmental landscape." *In re Katrina,* 2009 WL 799976, at *17 (quoting *Weinberger,* 745 F.2d at 418).

Courts must be mindful that "[t]he supplementation process is extensive," *Weinberger,* 745 F.2d at 418, and "determining what constitutes *significant* new information . . . is a factual question requiring technical expertise," *Town of Winthrop v. FAA*, 535 F.3d 1, 8 (1st Cir. 2008). For these reasons, an agency's decision not to prepare an SSEIS should be given considerable deference. *Id.* ("The agency's resolution of this question is thus one to which a reviewing court owes considerable deference."); *Weinberger,* 745 F.2d at 417 ("The determination as to whether an SSEIS is required is left to the discretion of the agency.").

### a. BANK EROSION AND LOSS OF MARSH WERE NOT "SIGNIFICANT NEW CIRCUMSTANCES."

Plaintiffs argue that "erosion of the MR-GO's channel banks and the destruction of the fresh forested wetlands" created "significant new circumstances" requiring a supplement to the 1976 EIS.  Pls.' Corrected Post-Trial Br. 4.  They also cite a need for more and better foreshore protection as a circumstance that warranted an SEIS.  *Id.* at 4, 23-25.  Their argument fails because all of these environmental consequences were identified and analyzed in the 1976 EIS. The Corps was not required to prepare an SEIS, because there was no "new information" that provided "a seriously different picture of the environmental landscape" from that anticipated in the 1976 EIS.

The 1976 EIS evaluated the erosion of the banks of the channel.  It described the process in detail:  "As waves generated by winds or vessel passage reach the shoreline, the shoreline material erodes and sloughs off to the channel bottom or is suspended and dropped further downstream.  Turbulent waters created by hurricanes, local thunderstorms, or strong winds

remove sediment from the channel and redistribute it."  DX-788 (1976 EIS) at I-6.  The EIS also documented the ongoing widening of the channel as a result of bank erosion:

> <u>Channel bank erosion</u>.  In the MR-GO, another factor has contributed to the amount of sediment to be removed from the channel in maintenance operations.  The channel was originally dredged with one vertical to two horizontal feet side slopes.  Slopes tend to erode near the top and fill near the bottom as they come to the equilibrium angle of repose.  *Since construction, the distance between the banks visible above the waterline has increased.  Channel bank erosion has been a significant source of sediment in the channel through the land area.*

*Id.* (emphasis added).

The 1976 EIS also addressed other sources of sediment in the MRGO contributing to the need for maintenance dredging, including erosion of the land between the MRGO and Lake Borgne.  *Id.* ("Prior to construction, Lake Borgne had no major western inlet-outlet of the magnitude now provided by the MR-GO.  Channels between the MR-GO and Lake Borgne are eroding westward at a rate of about 4.5 feet per year . . . .  Some of these sediments from Lake Borgne may be entering the MR-GO. . . . Another sediment source is the marsh material released by marsh deterioration.").  The EIS listed several factors that precluded definitive projections of the volume of future operation and maintenance dredging that would be required to remove sediment from the channel.  Those factors included: "1)  use of the channel for material for hurricane protection levees; 2) the possibility that the channel side slopes are coming to an equilibrium angle of repose; and 3) the possibility of rip-rap foreshore protection on proposed hurricane protection levees from Mile 66 to about Mile 47 which would reduce shoreline erosion on the west bank of the MR-GO."  *Id.* at I-6.

The EIS reported that the channel knifed through "marshlands from its origin (Mile 66+) to about Mile 23 of the MR-GO," and that elevation of the marshlands was "very slight, ranging from one to two feet."  *Id.* at II-15-21.  The EIS described the increase in salinity resulting from

construction of the MRGO and its impact on wetlands, noting that "the majority of land adjacent to the MR-GO is brackish marsh," even though "[i]ntermediate marshes were formerly conspicuous in the project area." *Id.* at II-76-77; *see also id.* at II-77 ("Since the construction of the MR-GO, marshes in the area are undergoing rapid successional changes toward more saline types."); *id.* at II-7 ("Saltwater intrusion, resulting from a variety of factors including . . . construction of the MR-GO, and subsidence, causes marsh deterioration.  Where areas thickly underlain by organic sequences experience increased salinity, the marsh may break up and revert to open ponds and lakes.").

The EIS described the magnitude of land loss in the vicinity of the MRGO, citing a 1970 study co-authored by Sherwood Gagliano.  *Id.* at II-23.  The document noted that "[t]he wetlands shield inland areas from wave action, erosion, and storm damage" and that "[t]he barrier islands and the marshlands adjacent to the MR-GO provide protection for the urbanized areas around New Orleans."  *Id.* at II-68.

Having described the numerous adverse impacts of the channel, the EIS addressed "Remedial, Protective, and Mitigation Measures," describing the Corps's plans, which included "opportunities for creative use of dredged material," investigation of "[p]otentials for revegetation of disposal areas through sprigging or seeding of desired species," and the possibility of "establishment of shrubs and trees useful for wind protection, esthetic interest, and reduction of erosion."  *Id.* at IV-13.  Finally, the EIS emphasized that operation and maintenance of the channel "requires continual adjustment of practices to changing conditions."  *Id.* at VI-1.

The environmental circumstances that existed a decade later were not "seriously different" from those portrayed and addressed by the 1976 EIS.  The impacts identified by Plaintiffs are the same as those described in 1976, and they have not painted a "seriously

different" picture of circumstances in 1980 or 1988. The impacts described in the EIS were continuing, but mere continuance of previously identified impacts does not warrant an SEIS. *See In re Operation of Missouri Riv. Sys. Litig.*, 516 F.3d 688, 693 (8th Cir. 2008) ("A substantial change that requires as SEIS under 40 C.F.R. § 1502.9(c)(1)(I) is one that is *not* 'qualitatively within the spectrum of alternatives that were discussed' in a prior FEIS.") (quoting *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1292 (1st Cir. 1996)).

### b. Construction impacts to marsh did not require an SEIS.

NEPA did not require the creation of an SEIS to address the environmental impacts of the construction of the channel. Construction was complete before NEPA became law, and the law therefore applied only to the future operation and maintenance of the channel. The environmental impacts of construction were continuing to unfold as the 1976 EIS concerning operation and maintenance was being drafted. DX-788 (1976 EIS) at II-1 ("The usual title for Section 2 is Existing Environmental Setting Without the Project, but in a study of project operation and maintenance (O&M) the project itself must be considered a part of Environmental Setting."). This approach was explained in response to comments received on a draft of the EIS:

> Comment: The draft statement should discuss the associated long-term project induced impacts resulting from the construction of the Mississippi River-Gulf Outlet system in more detail. Secondary impacts include modified water regime in the system, alteration of the hydrology and water chemistry of adjacent estuarine and wetland areas, and salt water intrusion and increased salinity levels.

> Response: Construction of the MR-GO resulted in certain recognized socio-economic and environmental changes. Secondary impacts are still underway and will continue until a state of equilibrium on natural dynamics is obtained. This environmental statement concerns only actions necessary to operation and maintenance of the MR-GO and associated bayous, and is not intended to address impacts of original construction.

*Id.* at IX-3.  Just as the original EIS was not required to evaluate the environmental changes resulting from original construction, those impacts were not properly a subject to be addressed in a later NEPA document.[9]

This point is especially relevant because "most of the changes in the marshlands were associated with original construction."  *Id.* at II-3. Whether environmental impacts of MRGO construction were fully realized by the time of the 1976 EIS does not matter, because there was no legal requirement to address those impacts in an SEIS any more than in the initial EIS.  The changes to the marshlands resulting from construction included the loss of marsh in cutting the channel, the marsh buried under the spoil banks, and the transitions of marsh from freshwater to brackish to saline as saltwater migrated into the area via the channel.  And as the EIS noted, even the loss of marsh resulting from bank erosion was a consequence of constructing the channel without any bank protection.

Plaintiffs' experts testified that the cutting of the La Loutre ridge in 1961 was the key event that resulted in the salinity increase north of the ridge.  *See* Day 782:20-23; *see also id.* 699:7-11 ("[T]he dramatic time in the construction of the MRGO was when the Bayou La Loutre Ridge was cut, because up until that time, the ridge remained [an] intact barrier against saltwater intrusion. That was widely recognized prior to the construction of the MRGO."); FitzGerald 301:7 – 303:4 (testifying that prior to construction of the MRGO, the Bayou La Loutre ridge was

---

[9]This Court has held that even if it were improper for the 1976 EIS to have pertained only to operation and maintenance of the MRGO, "that decision would be at the discretion of the Corps."  *In re Katrina,* 2009 WL 799976, at *26.  That same discretion governs a decision regarding whether later changes to the environmental landscape created so different a picture as to warrant a supplemental EIS.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1035 (2d Cir. 1983) ("[T]he determination as to whether [] later data warranted preparation of an SSEIS would be a matter committed to the discretion of the responsible agencies, not to the judgment of the court.") (citations omitted).

a "major obstruction to the daily rise and fall of the tides and for saline waters" moving north of the ridge; construction of the MRGO provided a direct pathway for tidal exchange and salinity north of the La Loutre ridge).  Once the La Loutre ridge was severed, the damage from saline intrusion began immediately.  *See* Day 709:23 – 710:4; 784:4-7; 706:8-9.

The evidence at trial also established that the habitat changes resulting from increased salinity were essentially complete by the time the EIS was prepared.  By 1978, "essentially all of the[] fresh and low-salinity areas were gone."  Day 701:7-9; *see also id* 685:4-12 ("[T]he 1956 map indicates very little change in [the] area up until the Mississippi River-Gulf Outlet.  These kinds of habitats have almost completely disappeared from the Central Wetlands Unit, and they had disappeared by the next mapping interval that was done after that in 1978.").  To reverse the change to the environmental landscape that resulted from original construction would have required affirmative remedial action, rather than simply a change in or cessation of maintenance dredging.  *See id*. 709:23 – 710:4.  The 1976 EIS acknowledged as much in its analysis of the "no-action alternative," defined as "discontinuation of all O&M work."  DX-788 (1976 EIS) at VI-3.  The 1976 EIS concluded that "[t]he project area would not return to conditions which existed prior to construction of the MR-GO. . . . Channel bank erosion and subsidence of the disposal areas would continue."  *Id.*  at VI-7.

Because habitat changes were complete by 1978, the only continuing impacts to the environment after preparation of the EIS were the continued erosion of the channel banks and the deposition of dredged spoil from continued maintenance dredging.  Both impacts were analyzed in the 1976 EIS, and no "new information" later created a qualitatively different picture of the environmental landscape.  As a result, Plaintiffs provide no evidence to support the argument that NEPA required preparation of an SEIS at any time prior to Hurricane Katrina.

Indeed, the "environmental landscape" that resulted from the MRGO was anticipated even at the time of the channel's initial authorization and design, more than 50 years ago. The Chief of Engineers' Report to Congress, approved by the original authorizing legislation, and the detailed design memoranda that followed, reflect that routine maintenance dredging would be necessary to remove sediments from the channel bottom, and it was known that channel construction would destroy the marsh through which the channel was cut as well as that impacted by the spoil banks. The Chief's Report stated that the recommended channel would be dug "through the marshes." DX-573 (H.R. Doc. No. 82-245 (1951)) at 5. Given the known fact that shoaling would occur in the channel, the location of the recommended channel cut was selected based in part on a decision to make "maximum use of land cuts" in order to minimize the return of dredged spoil into the channel, and thereby minimize maintenance dredging costs. *Id.* at 37. That erosion of the channel's banks was a significant source of sediment in the channel was acknowledged in the 1976 EIS, and the EIS reflects that this consequence of construction of the MRGO would be addressed in connection with the design of the LPV through the installation of foreshore protection along the leveed sections of the MRGO. *See* DX-788 (1976 EIS) at I-6, I-9.

As the evidence at trial thus demonstrated, the Corps was well within its discretion not to supplement its 1976 EIS, which had already considered all of the environmental issues that Plaintiffs contend should have been the subject of an SEIS.

### 2. NEPA REGULATIONS DID NOT PROVIDE A "FIXED OR READILY ASCERTAINABLE STANDARD" FOR DETERMINING WHETHER AN SEIS WAS REQUIRED.

Even if the Court were to find that the Corps abused its discretion by failing to prepare an SEIS, the failure to prepare an SEIS would not be actionable. As established above, agencies exercise discretion in deciding whether circumstances warrant the preparation of an SEIS.

*Weinberger*, 745 F.2d at 417 ("The determination as to whether an SSEIS is required is left to the

discretion of the agency.").[10]  Thus, when an agency "gets it wrong" by failing to prepare an SEIS

when one should have been prepared, the agency has abused its discretion.  The discretionary

function exception, by its express terms, covers such decisions.  *See* 28 U.S.C. § 2680(a)

(providing immunity for "the exercise or performance or the failure to exercise or perform a

discretionary function . . . *whether or not the discretion involved be abused*") (emphasis added);

*see, e.g., Ochran v. United States*, 117 F.3d 495, 502 n.2 (11th Cir. 1997) (recognizing that the

"discretionary function exception shields the United States from liability" from an abuse of

discretion); *Jayvee Brand*, 721 F.2d at 390 (applying discretionary function exception to bar suit

based on an agency's abuse of discretion); *In re Katrina*, 2008 WL 2186400, at *6 ("The

discretionary function exception . . . protects all policy choices, even those that are an abuse of

discretion.").

   In its summary judgment order, the Court stated that there were "significant questions of

fact" as to whether the Corps's awareness of the changing environment was such that it "removes

---

   [10]And there can be no question that the Corps, under its own regulations, had significant
discretion in deciding whether to produce any type of environmental impact statement relating to
its operation and maintenance dredging of the MRGO.  In 1980, the Corps's regulations were
amended to provide that priority should be given "to the preparation of an EIS for remaining
O&M actions involving annually recurring dredging and disposal operations *for which a final
EIS has not been filed.*"  45 Fed. Reg. 56761, 56763 (1980) (emphasis added).  The regulations
provided further that a "lesser priority effort will be assigned to any remaining O&M action on
other completed projects."  *Id.*  Because the MRGO was a "completed project," and because it
had already been the subject of "a final EIS," it could hardly be said that these regulations
"mandated" the preparation of an SEIS; in fact, the regulations counseled against such action.
Indeed, a related section of the regulations confirmed that an environmental assessment ("EA")
was all that was required to assess the environmental impacts of the Corps's dredging activities.
In a new section entitled "Actions Normally Requiring an Environmental Assessment (EA) but
Not Necessarily an EIS," the regulations provided that an EA "may be prepared to analyze
changes in O&M activities including new disposal areas not discussed in the final EIS covering
the O&M activity and for certain infrequent or once-only minor O&M activities, such as
infrequent maintenance dredging and disposal operations."  *Id.*

its 'discretion' and mandates the filing of an SSEIS." 2009 WL 799976, at *26. But even if the record established that the Corps was aware of "significant new circumstances or information" concerning environmental impacts, the Corps's failure to act on that knowledge, though an abuse of discretion, would not be actionable under the FTCA. Only a mandatory and specific statute or regulation could have removed the agency's discretion insofar as FTCA liability is concerned. Here, the lack of such a directive bestowed discretion on the agency. Consequently, even if that discretion had been abused, 28 U.S.C. § 2680(a) excludes it from the purview of the FTCA. *See Ochran*, 117 F.3d at 502 n.2; *Jayvee Brand*, 721 F.2d at 390; *In re Katrina*, 2008 WL 2186400, at *6.

In *Jayvee Brand*, for example, the plaintiffs alleged that a federal agency had adopted a rule without following certain mandatory procedures. *See Jayvee Brand*, 721 F.2d at 389. The court of appeals, acknowledging that this allegation was "correct," still held that the discretionary function exception barred the plaintiffs' suit. The court reasoned that the exception applied because the ultimate decision reached by the agency, albeit "in the wrong way," was nevertheless discretionary. *Id.* Significantly, the court did *not* hold that because the agency had failed to follow the mandated procedures, its discretion had been removed. Instead, the court held that "making a discretionary decision without following mandated procedures should be characterized, for the purposes of the FTCA, as an abuse of discretion." *Id.* at 390.

The CEQ's regulations were not specific enough to deprive the United States of its discretionary function immunity.[11] "Only if a federal statute, regulation, or policy specifically

---

[11]Although the Court briefly addressed this argument in its summary judgment order, *see* 2009 WL 799976, at *20, the Court should revisit this issue now that Plaintiffs have revised their NEPA argument to cover only the Corps's failure to prepare an SSEIS. The pertinent regulation, 40 C.F.R. § 1502.9(c)(1)(ii), as demonstrated below, falls far short of what is required to deprive the United States of its discretionary function immunity.

prescribes a course of action embodying a *fixed or readily ascertainable standard*, will a government employee's conduct not fall within the discretionary function exception." *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997); *accord Autery v. United States*, 992 F.2d 1523, 1529 (11th Cir. 1993); *see also Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1540 (10th Cir. 1992); *Zumwalt v. United States*, 928 F.2d 951, 954 (10th Cir. 1991).

In *Daigle*, for example, the court addressed a statute defining environmental-remediation actions "necessary to prevent, minimize, or mitigate damage to the public health or welfare." The statute specified that the actions should "attain a degree of cleanup . . . [which,] at a minimum . . . [en]sures protection of human health and the environment." *See Daigle*, 972 F.2d at 1540 (analyzing 42 U.S.C. §§ 9601(23) & 9621(d)(1)). It thus specified minimum attainments without specifying a course of action to maintain them. The court therefore held that the statute did not contain "specific and mandatory directives," finding that "[h]arsh as it may be, whether the Army substantially endangered Plaintiffs' health and welfare is irrelevant to the discretionary function determination." *Id.*

Similarly, in *Zumwalt*, the plaintiff had wandered off a trail in a National Park and injured himself. He sued the United States, alleging that employees of the National Park Service had negligently marked the trail. In response to the assertion of discretionary function immunity by the United States, the plaintiff argued that the immunity did not apply because the Park Service had failed to follow its own mandatory policies, one of which required it to improve "those sections of the trail that have proven to be hazardous or difficult to follow." *Zumwalt*, 928 F.2d at 954 n.4. The Tenth Circuit rejected the plaintiff's argument:

> National Park Service personnel retain substantial discretion under the [policies]. To implement the Project Statement, Park Service personnel must first determine which sections of the Trail have proven to be hazardous or difficult to follow.

44

> The Project Statement does not provide any direction on how this determination
> should be made . . . . These factors demonstrate the need for individual judgment
> by Park Service employees . . . . Therefore, Zumwalt's argument that the conduct
> at issue did not involve the exercise of judgment or choice must fail.

*Id.* at 954.

The CEQ's regulations pertaining to when an agency must prepare an SEIS, like those in

*Daigle* and *Zumwalt*, fail to prescribe a course of action "embodying a fixed or readily

ascertainable standard." As discussed above, the CEQ's regulations provide that an agency must

prepare an SSEIS when warranted by "significant new circumstances." 40 C.F.R.

1502.9(c)(1)(ii). Yet, the regulations do "not provide any direction on how this determination

should be made." *Zumwalt*, 928 F.2d at 954.

Several courts have commented on this unmistakable characteristic of the regulations.

The Seventh Circuit, for example, complained that the regulations provide no standard for

determining when "significant new circumstances" exist, and thus when an SEIS is required. *See

Weinberger*, 745 F.2d at 417. Exasperated, that court marveled that "[a]pparently, the Council

on Environmental Quality was willing to rely on the good faith assessments of the various federal

agencies and allow them to determine what information would be sufficiently serious to require

the preparation of a full-scale supplement to the original EIS." *Id.*; *see also id.* at 429 (Cudahy,

J., dissenting) ("The regulations and statute offer little direct guidance concerning new

information and ongoing projects. . . ."). Similarly, the Ninth Circuit observed that the CEQ's

regulations "do not in themselves provide a suitable standard for reviewing an agency's decision

not to supplement an EIS." *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1024 (9th

Cir. 1980).

45

At most, therefore, the Corps's failure to prepare an SEIS amounted to an abuse of discretion. Because the CEQ's regulations fail to provide a fixed or readily ascertainable standard and therefore require an exercise of judgment by the agency to determine whether "significant" new environmental circumstances or information arose after the 1976 EIS, the Corps's failure to produce an SEIS concerning those new developments is not actionable.

### 3. THE LACK OF AN SEIS DID NOT CAUSE PLAINTIFFS' DAMAGE.

Even if it were to be held that the Corps violated a mandatory and specific NEPA regulation by failing to prepare an SEIS, Plaintiffs would still bear the burden of proving that this omission caused their damage.  *In re Katrina,* 2009 WL 799976, at *37; *see also id.* at *27. This is unquestionably true, for the immunity preserved by 28 U.S.C. § 2680 is not vitiated by a statutory or regulatory violation that did not cause the alleged harm.  *See, e.g.*, *Montijo-Reyes v. United States*, 436 F.3d 19, 26 (1st Cir. 2006) (holding that for the violation of prescribed conduct to negate discretionary function immunity, there must be a "causal connection between the violation and [the plaintiff's] asserted damages"); *id.* ("[W]e hold that the CWA and [Water Quality Standards Regulations ("WQSR")] do not overcome the discretionary function exemption where, as here, Plaintiffs fail to allege a causal connection between the Corps's failure to comply with the CWA and WQSR and the purported damages for which they seek recovery under the FTCA."); *Sloan v. United States Dep't of HUD*, 236 F.3d 756, 762 (D.C. Cir. 2001) (holding that immunity applied because "[t]he complaint does not allege any damages arising from the investigation itself, but only harm caused by the [discretionary] suspension to which it assertedly led"); *Franklin Sav. Corp.*, 180 F.3d at 1133 (holding that immunity applied because "[t]he complaint does not suggest that plaintiffs' multi-million-dollar injuries flow from a failure to perform the arguably nondiscretionary function of drafting memoranda listing alternatives, and

not from neglect of the discretionary function of comprehensively and objectively weigh[ing] the alternative actions available"); *cf. In re Ohio River Disaster Litig.*, 862 F.2d 1237, 1249 (6th Cir. 1989) (barring recovery in case involving both discretionary and non-discretionary acts because plaintiffs were unable to prove that non-discretionary acts, "standing alone," were "substantial factors in causing the disaster").

Plaintiffs failed to carry their burden of demonstrating that the lack of an SEIS caused the flooding of their properties.  Plaintiffs did not prove that an SEIS would have resulted in the mitigation of the MRGO's alleged flaws.  They did not demonstrate that Congress would have authorized and funded the specific remedial measures that, when implemented, would have prevented the catastrophe of Hurricane Katrina.  Cognizant of their burden, Plaintiffs now argue that "a fully informed Congress," had it only been provided a supplement to the 1976 EIS, "would undoubtedly have demanded that the Corps devise and recommend remedial measures." Pls.' Corrected Post-Trial Br. 30.  "Clearly," according to Plaintiffs, "history demonstrates that Congress would have appropriated funding to protect the people and property of Greater New Orleans." *Id.*[12]

---

[12]In a more candid moment, Plaintiffs previously conceded that they cannot carry their burden.  Their counsel told the Court, "I'm the first one to tell you and to try to be intellectually honest that, who knows what would have happened."  Oral Arg. 1/8/2009 p.m. rough transcript at 19.  Dr. Freud would therefore understand why Plaintiffs' original post-trial brief contained the same admission:  "Clearly, history demonstrates that Congress would not have appropriated funding to protect the people and property of Greater New Orleans."  Doc. 19012-3, at 30.

As previously noted, the notion that an SEIS would have resulted in mitigation of the MRGO's "flaws" is premised on the incorrect assumption that environmental impact statements are sent to Congress.  *See, e.g.*, *id.* at 22 ("NEPA requires that Congress be advised of a specific project's impacts in the context of evaluating actions related to that project."); *id.* at 23-24 (discussing the Corps's supposed "obligation to alert Congress of the impacts [of the MRGO] through a full EIS"); *id.* at 24 (alleging that "the Corps never advised Congress of either the environmental impacts of bank erosion or the increasing dangers from storm hazard resulting

(continued...)

Whatever version of "history" Plaintiffs perceive, it is not one supported by the evidence at trial.  There, the United States presented uncontroverted evidence that Congress, even when fully apprised of the need for additional "funding to protect the people and property of Greater New Orleans," declined to act.

There is no better example of how wrong Plaintiffs are than the testimony presented by Alfred C. Naomi, who in the years immediately prior to Hurricane Katrina, served as Senior Project Manager for the LPV.  Naomi 3463:8-9, 22.  As Mr. Naomi explained, at the time he took over as Senior Project Manager in 1998, there was much work that remained to be done with respect to the LPV, including "multiple levee lifts" and the construction of "flood wall structures."  *Id.* at 3464:20-25; 3465:1-2; 3478:6-19.  This work was repeatedly delayed because there were not sufficient funds to complete it.  *Id.* at 3465:11-16; 3467:8-10 ("There was always a need for additional funds.  We never were funded to our full capability in the later years of the projects [sic] when I managed it.");  3478:6-19 (describing how work had to be delayed for years due to lack of funding by Congress).  In the years just before Katrina, for example, there was a need to perform $17 million to $20 million worth of work *each year*.  *Id.* at 3468:6-8.  Year after year, however, the Corps was denied the money it needed to complete its work on the LPV.  As Mr. Naomi explained, although the funding requirements for the MRGO ranged from $17 million to $20 million, the Corps was "fortunate if [it] got $5 million."  *Id.* at 3468:8-9.

_____

[12](...continued)
from O&M activities as mandated under NEPA").  This premise, however, is entirely false.  According to the regulations governing the CEQ, once they are completed, environmental impact statements are simply "filed with the Environmental Protection Agency."  *See* 40 C.F.R. § 1506.9(a).  This is yet another reason to reject Plaintiffs' argument that Congress would have acted, had only the Corps prepared an SEIS.

If, as Plaintiffs contend, Congress did not appropriate sufficient funds "to protect the people and property of Greater New Orleans," its inaction cannot reasonably be attributed to ignorance.  Although Mr. Naomi was prohibited by law from lobbying Congress for additional funds, *see id.* at 3479:14 – 3480:2, he did inform local officials regarding the predictable effects of chronic underfunding of the LPV by Congress.  *See, e.g.*, *id.* at 3480:6 – 3483:25 (describing presentations made to local officials regarding the lack of funding by Congress); 3484:1-7 (describing public appearances and press interviews regarding the lack of funding by Congress); 3485:15 – 3488:4 (describing letters sent to local officials regarding the lack of funding by Congress); DX-874 (letter from Alfred C. Naomi to Joseph Gautreau, President of the Pontchartrain Levee District); DX-875 (letter from Alfred C. Naomi to James P. Huey, President of the Orleans Levee District); DX-876 (letter from Alfred C. Naomi to Robert Turner, President of the Lake Borgne Basin Levee District); DX-877 (letter from Alfred Naomi to Ronald Zibilich, President of the East Jefferson Levee District).

These local officials, armed with information provided by Mr. Naomi, contacted every member of the Louisiana Congressional delegation regarding the need for additional funding.  Mr. Huey, for example, over the course of several years, wrote to Representative John Cooksey (DX-846), Representative William Jefferson (DX-847), Representative Chris John (DX-848), Representative W.J. Jim McCrery (DX-849), Representative W.J. "Billy" Tauzin (DX-850), Representative David Vitter (DX-851), Representative M.J. "Mike" Foster (DX-852), Representative Richard H. Baker (DX-854), Senator John S. Breaux twice (DX-855 & DX-857), and Senator Mary Landrieu three times (DX-856, DX-858, DX-905) regarding the need to provide additional appropriations so that construction of the hurricane protection system could be completed.  The City of New Orleans passed a resolution that described how the project required

additional funding by Congress, explained the dire consequences should the project not be completed due to a lack of funding, and urged Congress to lend its financial support.  *See* DX-1271.

> Several of Mr. Huey's letters, began with this dire warning:

> Our hurricane protection project, under the partnership of the Orleans Levee District and the U.S. Army Corps of Engineers (USACE), is critical to the safety of the residents and property in Orleans Parish, as well as the other three parishes included in the project. The project is nearing completion, but funding for the remaining contracts has all but dried up. . . .  Ominously, the lack of funds will not allow the USACE to award new contracts for 2004.

*See, e.g.,* DX-846; DX-847; DX-848; DX-849; DX-850; DX-851; DX-852; DX-853; DX-854; DX-855; DX-856.  A letter to Senator Breaux in 2001 warned that in fiscal year 2002, the Corps would require $17,600,000 to perform necessary work on the "vital hurricane protection project," including levee enlargements.  *See* DX-857.

Along with his letters, Mr. Huey often included a copy of the letter he had received from Mr. Naomi, which detailed the work that could not be completed unless Congress appropriated sufficient funds.  *See, e.g.*, DX-846; DX-847; DX-848; DX-849; DX-850; DX-851; DX-852; DX-853; DX-854; DX-855; DX-856.  Members of Congress therefore received, albeit indirectly, Mr. Naomi's warnings regarding the consequences of not funding the LPV to its capability.

One exchange of letters between Mr. Huey and Senator Landrieu is particularly telling. On August 11, 2003, Mr. Huey wrote to Senator Landrieu, warning her that $17 million would be required for fiscal year 2004 to perform the necessary work on the LPV.  *See* DX-856.  Mr. Huey noted that the Senate had recommended that only $6 million be appropriated.  *Id.*  In response, Senator Landrieu, after thanking Mr. Huey for his letter, pointed out that, in fact, the Corps would require $20 million to complete its work in fiscal year 2004.  *See* DX-887.  The Senator

acknowledged "that the Senate and House have separately approved FY 2004 appropriations bills for the Corps," and that "the Senate bill provides $6 million and the House bill provides $5 million." Senator Landrieu concluded on a pessimistic note, stating that funding for the LPV would be "particularly limited because of the demands of the military and homeland security combined with the reduced revenues resulting from the recent tax cut and sluggish economy." *Id.* In other words, for fiscal year 2004, at least, Congress had higher funding priorities than protecting "the people and property of Greater New Orleans."[13]

Just as Congress was aware of the Corps's funding requirements to protect Greater New Orleans from flooding, it was also aware of the problems posed by the very existence of the MRGO. Over the course of many years, state and local governmental bodies adopted resolutions informing Congress of problems allegedly caused by the MRGO. *See, e.g.*, JX-24 (resolution passed by the St. Bernard Port, Harbor & Terminal District in 1999); JX-406 (resolution passed by the Lake Borgne Levee District in 1999); DX-601 (resolution passed by the Legislature of Louisiana in 1992); DX-603 (resolution passed by the Legislature of Louisiana in 1999); DX-607 (resolution passed by the Legislature of Louisiana in 2004); DX-781 (resolution passed by the Lafourche Parish Council in 1994); DX-783 (a resolution passed by the Louisiana Wildlife Federation, Inc. in 1998). These resolutions, containing various statements describing the erosion, salinity intrusion, and destruction of wetlands caused by the MRGO, were sent to Congress upon their passage.

In addition to the resolutions enumerated above, the St. Bernard Parish government passed a number of resolutions over the years regarding the MRGO. One, from 1991, was sent to

---

[13]At trial, it was proved that Congress appropriated far less than what was needed for fiscal year 2004. *See* Naomi 3485:2-14.

Senators Breaux and Johnson and to Representative Tauzin, and noted that "scientific studies have documented extensive land loss, wetland deterioration and other direct and indirect damage in St. Bernard Parish that has resulted from the MRGO." DX-1316. That resolution also warned that "scientific studies have shown that the threat of hurricane generated storm surge to St. Bernard Parish was increased by the construction of the MRGO." *Id.* Another resolution, passed in 1994 and forwarded to "St. Bernard Parish's Congressional Delegation," warned that "the MRGO causes erosion along the south shore of the MRGO which threatens the stability of the hurricane levee." DX-1315.

In 1998, St. Bernard Parish passed yet another resolution, a certified copy of which was forwarded to "the Southeast Louisiana's Congressional Delegation," Representative Livingston—who at the time was Speaker of the House of Representatives—Representative Tauzin, Representative Jefferson, and Senators Breaux and Landrieu. PX-1253. It informed its recipients that "the MRGO provides a superhighway for storm surges caused by hurricanes and winter cold fronts" and that "saltwater intrusion has virtually destroyed intermediate water marshes and freshwater swamps surrounding Lake Borgne, resulting from opening the MRGO." *Id.*

Around the time this resolution was passed and sent to Congress, Dr. Sherwood Gagliano participated in a field trip to the MRGO with a number of elected officials, including Senator Landrieu and then-Representative Vitter. *See* Gagliano 109:1–18. Dr. Gagliano made Senator Landrieu and Representative Vitter aware of his studies regarding the MRGO, and he provided them with a memorandum "which laid out the problems and suggested approaches and solutions" regarding the MRGO. *Id.*; PX-1253. The memorandum provided by Dr. Gagliano, which was also attached to the St. Bernard resolution, explained those problems as follows:

The Mississippi River Gulf Outlet (MRGO), since its construction in 1965 as an alternative route for ocean going vessels into the Port of New Orleans, has increased the storm surge vulnerability of developed areas of St. Bernard and Orleans Parishes and caused extensive environmental damage to a vast area of the region.  Greatest impacts occur in St. Bernard, Orleans and Plaquemines Parishes, in that order.  The channel is a serious threat to public safety and an environmental threat to the region.

The storm surge threat increases each year as the cross-sectional area of the channel continues to enlarge and marshes that buffer the hurricane protection levees and coastal communities erode away.  Erosion and estuarine deterioration is continuous and is cumulative along the MRGO, along the natural and man-made channels which it intersects, and within the hydrologic basins which it crosses.  Alteration of hydrology and salinity regimes by the MRGO has effects as far as the western end of Lake Pontchartrain and Mississippi Sound, and even beyond.  Commercial fishermen from Mississippi and Alabama fish the waters in the MRGO area; the environmental impacts from the channel have secondary impacts to the economies of these neighboring states.

PX-1253, at 6.

Another St. Bernard resolution, passed in 2004, warned that the MRGO "is a serious threat to life and property in St. Bernard, Orleans, Plaquemines and many other Lake Pontchartrain Basin parishes [and] is a major factor in coastal erosion."  DX-1272.  It specifically requested the "Congressional Delegation representing the said parishes" to take all steps necessary to close the MRGO.  *Id.*

In addition to these state and local resolutions, many Federal legislative documents also demonstrate Congress's awareness of the problems caused by the MRGO.  While Plaintiffs argue that a supplemental EIS should have been prepared by the Corps by 1988 in order to inform Congress of information necessary to mitigate for the loss of wetlands, by 1989, Congress was already considering legislation to address the loss of wetlands in Louisiana.  Testimony at Congressional hearings on such proposed legislation shows that Congress was informed of problems associated with land loss and its causes.  *See, e.g.*, S. Hr'g 101-342 (Aug. 31, 1989) at

2 ( "The biggest problem [] in Louisiana has to do with coastal wetlands.  It has been estimated at one time that we are losing as much as 40 square miles a year."); *id.* ("[T]he ecology of the marsh has changed.  As inevitable saltwater intrusion and other not so inevitable saltwater intrusion has occurred, the salinity levels of the marsh have changed . . . .").

The record of hearings on bills that later became the Coastal Wetlands Planning, Protection, and Restoration Act ("CWPPRA") further demonstrates that Congress was aware not only of the problem of wetland loss, but also of ongoing efforts by the Corps of Engineers toward restoration of the wetlands.

Col. Gorski, New Orleans District Engineer, presented testimony concerning existing efforts to preserve, restore, and enhance wetlands.  *Id.* at 58-61.  He described the planning of the Bonnet Carre freshwater diversion intended to preserve wetlands in the Lake Pontchartrain Basin, including the area around Lake Borgne.  *Id.*  He also described the use of dredged material to create wetlands and existing studies underway to address the loss of wetlands, including the Louisiana Comprehensive Coastal Wetlands Study and the Land Loss and Marsh Creation Study. *Id.*  Finally, Col. Gorski described that "[u]nder the Mississippi River-Gulf Outlet Project, we're studying shoreline protection features that will preserve some 1,700 acres of marsh from erosion."  *Id.* at 59; *see also* DX-1763, at 7-8 (Sept. 12, 1990) (Representative Lindy Boggs acknowledging efforts underway by the Corps of Engineers to benefit marsh surrounding Lakes Pontchartrain and Borgne through a freshwater diversion at Bonnet Carre and supporting passage of CWPPRA as "the next logical step toward implementing plans that have been developed by the Corps of Engineers and other Federal agencies, and by the State of Louisiana, to slow and halt this tremendous loss to our wetlands").

In 1990, CWPPRA became law. *See* Pub. L. 101-646 (1990). That Act provided annual funding for projects to restore or protect the wetlands of coastal Louisiana. In addition, the law required annual reporting to Congress of a priority list of projects to be funded, *id.* § 303(a)(1), a long-term restoration plan to be completed within three years of enactment of the statute and submitted to Congress, § 303(b)(1), (6), and every three years thereafter, a report to Congress on the effectiveness of projects carried out under the plan, § 303(b)(7). *See also* Miller 3210:2– 17 (describing reporting requirements under CWPPRA).

The long-term Restoration Plan that was prepared by the Task Force formed pursuant to CWPPRA, led by the Corps of Engineers, described in detail the expansion of the banks of the MRGO. *See* DX-1749 (CWPPRA Restoration Plan, Nov. 1993) at 27 ("The [MRGO], a channel completed east of New Orleans in 1968, is now as much as 2,000 feet wide, nearly three times it original width of 750 feet."). The Restoration Plan also described that "[c]onstruction of the MRGO, which breaches the natural barrier of the Bayou La Loutre ridge and the Pontchartrain/Borgne land bridge, allowed saline waters to push farther into the basin." *Id.* at 63. The Restoration Plan provided the following recommendations related to the MRGO:

> Restoration of riverine input into the basin via freshwater diversion from the Mississippi River through the Bonnet Carre Spillway solves the first critical problem, salinity. This is preferred to the strategy of a navigable gate in the MRGO because the diversion has the added benefit of restoring fluvial input and is less costly overall and on a per-acre basis. The project is already authorized and need not be funded under the CWPPRA. . . . Construction of a rock dike on the north bank of the MRGO and the beneficial use of all the material dredged for the MRGO would stop erosion, addressing the second critical problem, and create large amounts of marsh. The diversion at the Bonnet Carre Spillway and bank protection with marsh creation along the MRGO are critical projects.

*Id.* at 67.[14]  A Programmatic Environmental Impact Statement was prepared in connection with

the Restoration Plan.  DX-1749; Miller 3197:15 – 3198:1.

Additional legislative materials further demonstrate the extent of Congress's knowledge,

even without an SEIS from the Corps.  In arguing for relief of St. Bernard Parish's cost-share

obligation for the LPV, Representative Tauzin emphasized that for St. Bernard Parish, the LPV

was necessary specifically because of the MRGO, and, therefore, the destruction to the Parish

caused by the MRGO justified forgiveness of St. Bernard's payments.  DX-1612, at 2 ("When

[the MRGO] was planned, the Parish could not have foreseen the devastation which has been

wrought by the channel. . . . When the MRGO was about 75% completed, Hurricane Betsy

severely damaged the area.  The Parish concluded that the MRGO enhanced the storm surge.  For

this reason, the St. Bernard Parish and the Lake Borgne Basin Levee District entered into an

agreement with the federal government to pay 30% of the cost of a new hurricane protection

system.  They had no choice . . . . [T]he Parish and Levee District have already paid more than

enough in money, suffering, and environmental degredation.").

Even shipping interests testifying before Congress in favor of the MRGO acknowledged

to Congress the harm caused by the channel.  *See* DX-1594, at 2-3 (Feb. 27, 1996, Testimony

before the House Energy and Water Development Subcommittee on Appropriations) ("The long

range plans for the Mississippi River Gulf Outlet is questioned by environmental groups.  There

is a salt water intrusion and erosion problem in MRGO, but any curtailment of shipping traffic in

the channel without regards to the long term effect upon the Port of New Orleans would be a

---

[14]Although authorized by Congress, the freshwater diversion at Bonnet Carre ultimately
was not constructed; the State of Louisiana and the State of Mississippi were to be the local cost-
share sponsors for the project, but the State of Louisiana withdrew its support for the project after
authorization, preventing completion of the project.  Miller 3207:3 – 3208:16.

disaster. . . . I feel very strong about approving of funds for maintenance dredging and jetty repair

projects.  Additionally, I support the erosion Rip-Rap Study for the MRGO.").

In a 1995 Report justifying appropriations, the House Committee on Appropriations

candidly admitted an awareness of the exact problem about which Plaintiffs complain:

> *The Committee is aware that the authorized 36-foot Mississippi River-Gulf Outlet*
> *channel is experiencing serious bank failures on its north bank due to land*
> *subsidence*, which is significantly increasing dredging costs.  The Committee is
> aware that the Corps of Engineers recently experienced serious dredging delays,
> which caused draft restrictions, while attempting to resolve environmental issues
> in the process of obtaining Coastal Zone Consistency to dredge the Mile 50-56
> reach.  To resolve this particular issue, the only available solution was to construct
> a rock dike that provided bank stabilization before dredging could be
> accomplished.  The Committee is of the opinion that to minimize future dredging
> costs and preserve wetlands the north bank Mississippi River-Gulf Outlet should
> be stabilized with riprap or similar hardened protection, as necessary, using
> available operation and maintenance funds.

H.R. 104-149, at 50 (1995) (emphasis added).  Similar testimony was presented to other House

committees.  *See, e.g.,* DX-1593, at 2 (July 8, 2004, Testimony before the Committee on House

Transportation and Infrastructure Subcommittee on Water Resources and Environment)

("Dredging of channels and canals like the 70 mile long [MRGO] has destroyed wetlands,

increased saltwater intrusion and expanded dead zones.  Even as we speak, an acre of wetlands

disappears every 36 hours along the MRGO.  Natural occurrences like hurricanes, shoreline

erosion, and land subsidence compound these problems.").

Identification of both short and long-term strategies for wetlands restoration pursuant to

the authority of CWPPRA led to an effort to develop a strategy for implementation of the longer-

term projects that could not be accomplished through CWPPRA's annual priority lists.  *See*

Miller 3210:18–3211:5.  The resulting strategy for restoration of the coast over the longer term

became known as the Coast 2050 Plan, which was published as a report in 1998. *Id.*; DX-123.

Like the CWPPRA Restoration Plan, the Coast 2050 Plan also specifically addressed the MRGO:

> The construction of the Mississippi River Gulf Outlet (MRGO) in the early 1960's caused loss of marsh from both its "footprint" (area of direct impact) and the saline water it allowed to enter the basin once the La Loutre Ridge was breached. These events led to high loss in the areas surrounding the MRGO and in areas more removed such as the Pontchartrain/ Maurepas Land Bridge.
>
> * * * *
>
> *Special Problems—Resolve the MRGO Problem*
>
> *14. Close MRGO to deep draft navigation when adequate container facilities exist on the river.*  The MRGO is perceived as a major problem in the Pontchartrain Basin. Wave erosion causes a 15-foot per year loss along 37 miles of the north bank. When the MRGO was completed in the 1960's, salinity increased in the basin, causing massive environmental damage.  Currently, the MRGO is the only access to container facilities on the Inner Harbor Navigation Canal. However, only 2-3 large ships per day use the waterway.  Some container facilities have just been built on the Mississippi River in the New Orleans area, but they are generally fully booked.
>
> A large new Millennium Port, including container facilities, is proposed in Plaquemines Parish.  Once there are adequate container facilities on the river, the MRGO would be closed to deep draft navigation. The closure could be achieved by a structure (gate or weir) at the La Loutre ridge that would allow the passage of shallow-draft navigation but reduce salinities coming up the MRGO.  In addition, the possibility of restoring the ridges at Bayous Bienvenue, Dupre, and Yscloskey should be studied.  The strategy of actually closing the channel to deep draft shipping is expected to preserve minor amounts of marsh.

DX-123, at 47, 88.

After the passage of CWPPRA, additional legislation was proposed to provide funding for coastal restoration projects.  At a 1999 hearing on one of the proposed bills, Louisiana's Governor Foster addressed the House Committee on Resources, emphasizing the importance of the legislation to funding Louisiana's Coast 2050 Plan:  "The State has a plan called Coast 2050 that will prevent much of our projected land loss and will significantly enhance our current

efforts to save and rebuild our coastline.  But the plan is expensive, almost $14 billion over the

next 50 years. . . . The legislation will provide the money to help us implement the Coast 2050

program."  DX-597R, at 219.  At the same 1999 hearing, the Mayor of the City of New Orleans

provided the following warning regarding hurricane impacts:

> Last fall, we had a pretty turbulent hurricane season and New Orleans was
> threatened with an almost direct hit, 50 miles out Hurricane Georges tilted slightly
> to the east and therefore the eye of the storm missed us and we were on the eastern
> side of the eye, which meant we got wind but very little rain.  I cannot tell you
> how much the protection of the coast line seems to be one of those natural barriers
> against this large population base in southeastern Louisiana from being
> devastated.  It does not completely protect you, but all of the experts tell us it is a
> very important thing . . . . After steering the City through hurricanes and listening
> to the experts talk, I can tell you I have become convinced that it is one of those
> very important components of protecting this entire coastal part of the country
> from the brunt of these very dangerous hurricanes.

*Id.* at 241.  The Assistant Secretary of the Army also spoke to the Congressional Committee.  *Id.*

at 242-45.  In both oral testimony and a written submission, the Assistant Secretary of the Army

informed the Committee of the importance of wetlands, the extent of loss, benefits being

achieved through CWPPRA projects, and the significance of the Coast 2050 Plan as the "basis

for long term solutions."  *Id.* at 242-48.  Representative Tauzin, presiding over the hearing,

showed his familiarity with the MRGO and the concerns of St. Bernard Parish President "Junior"

Rodriguez relating to the channel in the following statement:

> [I]f Junior [Rodriguez] was here, he would applaud your call for relocating the
> MRGO.  The MRGO, members of the panel, is the Mississippi River Gulf Outlet,
> an artificially created channel for deepwater shipments into the Port of New
> Orleans, that instead of going up the river, long and tenuous 90 miles, ships were
> able to come up this very straight but artificial channel.  But guess what?  *It
> introduced more saltwater into the marshes and even into Lake Borgne and
> Pontchartrain and caused great problems*, and Junior would applaud your
> comments.

*Id.* at 266 (emphasis added).

59

The bills proposed in 1999 did not pass, but the Coast 2050 Plan served as a reconnaissance study that led to authorization of a feasibility study referred to as the Louisiana Coastal Area Study, or "LCA" Plan.  *See* Miller 3212:3-17; *see also* DX-1613 (H. R. 106-253, House Committee on Appropriations Rpt., July 23, 1999) ("*Louisiana Coastal Area, Louisiana—*The Committee has provided $1,750,000 to initiate an ecosystem restoration feasibility study of the Louisiana coast.  This effort, known as Coast 2050, will comprehensively address critical loss of coastal landscape in Louisiana.").  Later Congressional hearings continued to evaluate funding for ecosystem restoration.

In July 2004, the House Committee on Transportation, Subcommittee on Water Resources and Environment held a hearing to examine the Corps of Engineers' draft recommendations in the Louisiana Coastal Area, Ecosystem Restoration Study.  *See* DX-1750.  Representative Tauzin provided the following comments, showing his *complete* understanding, prior to Hurricane Katrina, of the threat faced by Greater New Orleans:

> You go to the west bank of the Mississippi River at the FEMA office there, and they have a computer system you can log onto.  You can see a simulation of what a category four hurricane does coming up Lake [Borgne], or eastern New Orleans, coming up on the wet side of New Orleans.  They'll tell you that New Orleans will be inundated, 27 feet of water.  I said, my God, when I saw this . . . . [W]e'll be faced one day with horrific losses.

DX-1750, at 4.  But Representative Tauzin's entreaties to address the hurricane threat were to no avail, evoking frustration on his part:

> I want to thank you for all the efforts this Committee has made . . . to try to help us in the energy bill, by trying to make sure we get some money back from the offshore drilling. . . . [T]he Energy Bill has stalled on the other side, we're not allowed to talk about what happens on the other side, but it's stalled over there because they can't bring closure on a filibuster.  Fifty-eight members were ready to vote for it.  And it would have meant the first of billions of dollars for us to begin saving the coastline of Louisiana, saving the lives of the people . . . . There may be other cases before this Congress is over, before I leave after almost 25

years of service here, where we can put something in, a water bill, a Coast Guard bill or somewhere, something to begin the process of providing some relief, some help to begin stopping *this incredible loss of wetlands, this incredible disaster, this incredible threat to the lives of men and women and children . . . .*

*Id.* at 5 (emphasis added).

Representative Vitter echoed the frustration of his colleague:

[Rep. Tauzin has] done the job on the House side, we passed CARA several years ago, which was going to be a major start to set this right and to save our coast. Then when that didn't go anywhere in the Senate, then he came with an energy bill which had a billion dollars, a major start, a real Federal breakthrough plan B. Unfortunately, that met the same fate in the Senate.  So here we are again. . . .

It is life or death for us.  There is impending disaster unless we do something.  It means, as he said, the loss right now of 35 square miles a year, literally a football field of land every few minutes, just land going away into the Gulf, evaporating into nothingness.  All of our coastal communities are on edge, wondering how much longer they can survive.

*Id.* at 6.

The Corps's Director of Civil Works testified at the hearing, describing the history of efforts to provide remedies for land loss and the evolution of strategies from CWPPRA to Coast 2050 to LCA.  *Id.* at 13-14.  His written submission to the Subcommittee provided more details of the LCA plan, including the fact that "Mississippi River Gulf Outlet environmental restoration features" were proposed to be one of the five near-term features for accelerated implementation. *Id.* at 79.  The Secretary of Louisiana's Department of Natural Resources acknowledged that "our collective efforts to manage the major rivers and facilitate navigation over the years have contributed significantly to the coastal land [loss]."  *Id.* at 16.

The Corps's Final Report on the LCA Ecosystem Restoration Study and the Programmatic Environmental Impact Statement were both completed in November 2004, *see* DX-925 – DX-932, and the Chief of Engineers transmitted his Report to Congress

61

recommending implementation of the LCA Ecosystem Restoration Program on January 31, 2005, *see* DX-1752. Congress was considering legislation to authorize the LCA plan, including prioritization of restoration projects related to the MRGO, at the time of Hurricane Katrina. Most significantly, hearing testimony plainly illustrates Congress's close familiarity with the history of concerns relating to the MRGO as well as efforts to address the concerns. *See, e.g.,* DX-1585, at 8 (Senator Vitter) ("Senator Boasso represents the southeast portion of the State, a good part of St. Bernard and Plaquemines Parishes. This is the area where the Mississippi River Gulf Outlet is located. Senator Boasso is extremely well-versed on this environmental disaster because he has lived in one of the centers of gravity for that very worrisome activity."); *id.* at 14-15 (Senator Boasso) ("The MR-GO is a symbol of how poorly we have treated our wetland environment in favor of commerce. It has never developed to its original purpose and, once again, we are left with a situation no one wants to make a decision about . . . . You have three options: One is continue with the proposed plan of $108 million of rocks [foreshore protection] . . . . The second thing is to properly fund the relocation of these businesses and close the MR-GO . . . . Or Plan 3, stop dredging . . . . Install a gate system . . . . Install locks . . . . I'm asking, we have to make a decision. There is no sense in sending the mixed signals to the maritime community and the people who have to live and deal with the saltwater intrusion with the MR-GO."); *id.* at 20 (Senator Boasso) ("The Army Corps of Engineers provided a study that said whether the MR-GO was open or closed that there would only be a 6-inch rise in storm surge on top of—or a 6-inch difference. There's some people who had disagreement about that and so what we have done, we've got the Governor's office and Secretary Angelle, the Army Corps of Engineers and some citizens and we got together and there is a re-look at all the studies that have

been done to confirm whether or not if you damned [sic] off the MR-GO is it only a 6-inch difference.").

Finally, in addition to all of these legislative materials, a great deal of written correspondence between members of Congress and others reveals just how familiar Congress was with the issues surrounding the MRGO.  In a letter dated March 28, 1977, Representative Lindy (Mrs. Hale) Boggs wrote to Col. Rush, New Orleans District Engineer, regarding an upcoming public hearing on the MRGO.  *See* DX-869.  In this letter, Representative Boggs emphasized the thorough study and review of water resources projects by Congress prior to initial authorization of the MRGO, and acknowledged that they are further scrutinized each year during consideration of the budget.  *Id.*  The letter further revealed Representative Boggs's view that Congress had to balance the need to preserve the environment with the need to promote economic growth.

On September 18, 1979, Senator Russell Long wrote to Col. Sands and enclosed a correspondence he had received from the St. Bernard Parish Planning Commission concerning erosion problems along the banks of the MRGO.  *See* DX-1610.  On April 17, 1980, Representative Livingston similarly acknowledged to Col. Sands that he had received correspondence from the St. Bernard Parish Planning Commission regarding erosion along the MRGO.  *See* DX-1607.

On June 17, 1985, Representative Tauzin wrote to Col. Witherspoon, New Orleans District Engineer.  *See* DX-821.  This letter demonstrates Representative Tauzin's awareness of the damage to wetlands in St. Bernard caused by the MRGO.

On June 1, 1993, Col. Diffley, District Engineer, wrote to Senator Breaux responding to an earlier letter from Senator Breaux on behalf of the Lake Pontchartrain Basin Foundation

concerning environmental damages and possible storm damages from the MRGO.  *See* DX-1639.

The letter explained to Senator Breaux that foreshore protection had been constructed on the

south bank of the MRGO; provided statistics for deep draft traffic and jobs generated by the

channel; and explained current measures being implemented to address bank erosion and salinity,

which were described as the two major environmental impacts caused by the MRGO.  *See id.*

The letter further explained that a diversion at Bonnet Carre had been authorized, which was

expected to lower the salinity levels in the St. Bernard marshes, and it explained the alternatives

analyzed in preparing the overall CWPPRA restoration plan for the Pontchartrain Basin, which

included navigable gates in the MRGO as well as closure of the MRGO.  *Id.*

On October 12, 1994, Col. Clow, District Engineer, responded to an earlier letter from

Senator Breaux regarding a St. Bernard Parish resolution that requested closure of the MRGO

and interim measures to be taken until closure occurred.  *See* DX-866.  Among other things, the

letter described the MRGO Bank Erosion Reconnaissance Report of January 1994, its

recommendation to proceed with feasibility studies to determine the advisability of constructing

environmental restoration measures, including bank protection, along the MRGO, and the lack of

a non-Federal sponsor to cost share the feasibility study.  *Id.*  Similar letters, acknowledging the

impact to St. Bernard Parish from salt water intrusion and bank erosion, were sent to Senator

Breaux in early 1999.  *See* DX-897; DX-898.[15]

---

[15]Such correspondence between Members of Congress and the Corps was not unusual.  For example, it was "fairly common" for the Corps to correspond with Members of Congress regarding the bank erosion reports compiled by the Corps in the late 1980s and early 1990s.  *See* Podany 3390:3-12; *see also, e.g.*, DX-1758 (email).  These reports found, among other things, that bank erosion was occurring along the MRGO, that such erosion was "severe," and that it was impacting the environment, including allowing saltwater intrusion to the marshes.  *See generally* Podany 3353:12 – 3356:4.

Simply put, given all of the evidence described above, it would be absurd to conclude that all that stood between Members of Congress and a true understanding of the issues caused by the MRGO was a never-produced supplement to the Corps's 1976 EIS.  It cannot fairly be said  that Congress would surely have authorized and funded mitigation measures if it had been provided with more information about the environmental impacts of the MRGO.

For years before Hurricane Katrina, local officials, prompted by Mr. Naomi, advised Members of Congress that additional funds were needed to complete the hurricane protection system, yet Congress did not appropriate sufficient funds to finish the work.  For years before Hurricane Katrina—literally decades—numerous Members of Congress demonstrated a thorough awareness of the environmental impacts of the MRGO.  Plaintiffs nevertheless ask this Court to accept the dubious proposition that "Congress would have appropriated funding to protect the people and property of Greater New Orleans"  if only a supplemental EIS had been prepared.  But as the facts established at trial demonstrate, any such finding would be clearly erroneous.

### 4. EVEN IF PLAINTIFFS COULD SHOW THAT THE CORPS CONCEALED OR ACTIVELY MISREPRESENTED THE DANGERS POSED BY THE MRGO, THE FTCA'S DECEIT AND MISREPRESENTATION EXCEPTION WOULD BAR THEIR CLAIMS.

Plaintiffs argue that the Corps should be held liable for "concealing" and "actively misrepresenting" the dangers posed by the MRGO.  See Pls.' Corrected Post-Trial Br. 46, 40-63.  As we have demonstrated, the evidence at trial—including reports, environmental assessments, correspondence, and testimony before Congress—proves that the Corps engaged in no such conduct.  Indeed, the opposite is true:  over the course of decades, the Corps fully apprised Congress and the public concerning the problems caused by the MRGO.

Even if Plaintiffs could show that the Corps misrepresented or hid the true facts from Congress or others, any such claim that the United States should be held liable for such conduct

would be barred by the misrepresentation exception to the Federal Tort Claims Act. *See* 28

U.S.C. § 2680(h) (providing that the waiver of sovereign immunity in the FTCA does not extend

to claims based on deceit or misrepresentation); *see also United States v. Neustadt*, 366 U.S. 696,

702 (1961) (applying misrepresentation exception to bar plaintiffs' claims and holding that

exception bars "claims arising out of negligent, as well as willful, misrepresentation"); *City of*

*Garland v. Zurn Indus., Inc.*, 870 F.2d 320, 326 (5th Cir. 1989) (applying misrepresentation

exception to bar third-party claim for contribution based on alleged misrepresentation by EPA);

*Baroni v. United States*, 662 F.2d 287 (5th Cir. 1981) (holding that misrepresentation exception

barred claim by purchasers of homes who argued that they were misled by government's

negligent representation to developer regarding elevation of 50-year flood line); *Lawrence v.*

*United States*, 340 F.3d 952, 958 (9th Cir. 2003) (holding that exception barred claim that federal

officers failed to inform state authorities of individual's criminal history during hearing, resulting

in his placement as counselor in foster child care program, where he sexually abused plaintiff);

*Deloria v. Veterans Admin.*, 927 F.2d 1009, 1012-13 (7th Cir. 1991) (holding that

misrepresentation exception barred claim that VA officials deliberately misrepresented plaintiff's

records, resulting in denial of disability benefits); *Sanchez Tapia v. United States*, 338 F.2d 416,

416-17 (2nd Cir. 1964) (applying misrepresentation exception to bar claim that prosecutors

fraudulently procured plaintiff's conviction in criminal case); *Nat'l Mfg. Co. v. United States*,

210 F.2d 263, 278 (8th Cir. 1954) (holding that misrepresentation exception barred claim based

on dissemination of erroneous weather and flood information by government).

**IV.  LOUISIANA LAW DID NOT IMPOSE A DUTY TO INFORM CONGRESS OR THE PUBLIC OF HAZARDS CREATED BY THE MRGO.**

Under Louisiana law, Plaintiffs bear the burden of establishing that the United States owed a duty of care to Plaintiffs.  *E.g.*, *Oubre v. Eslaih*, 869 So. 2d 71, 77 (La. 2004).  Plaintiffs posit that the United States had two main duties with respect to the MRGO:  (1) correct or warn the public about defects to eliminate an enhanced risk of flooding; and (2) warn Congress so that remedial actions, if necessary, could be taken.  Pls.' Corrected Post-Trial Br. 44-51.  However, the United States cannot be held liable for failure to follow either "duty" proposed by Plaintiffs.

**A.  A DUTY TO CORRECT OR WARN DID NOT ARISE BECAUSE THE MRGO DID NOT CREATE A HAZARD.**

The United States had no duty to correct or warn the public about the alleged defects with the MRGO because the MRGO *did not create an enhanced risk of flooding*.  As the United States has proven, the widening of the MRGO and the destruction of the wetlands did not cause higher storm surge along Reach 2, materially higher waves, the levees to sink, or any additional levee breaching.  No duty exists under Louisiana law requiring the United States to correct and warn about ephemeral, non-existent dangers.[16]

**B.  LOUISIANA LAW DOES NOT IMPOSE A DUTY TO WARN ONESELF.**

There is no duty under Louisiana law that required the United States to warn *itself* of any suspected dangers caused by the MRGO.  Although Plaintiffs would like the Army Corps of

---

[16]To the extent the United States owed a duty to correct the alleged defects along the MRGO, the discretionary function exception shields the United States from liability.  The only way the United States could have corrected these defects, other than following Plaintiffs' supposed duty to warn Congress, was to re-allocate funding for these corrective actions.  However, decisions regarding the expenditure of appropriated funding, consistent with limitations provided in authorizing statutes, are quintessential discretionary decisions protected from judicial review.

Engineers to be the entity sued in this action, the only proper party that can be sued under the

Federal Tort Claims Act is the United States of America.  28 U.S.C. § 1346(b), 2679(a); *Galvin*

*v. Occupational Safety & Health Admin.*, 860 F.2d 181, 183 (5th Cir. 1988) ("In view of this

explicit statutory language, the courts have consistently held that an agency or government

employee cannot be sued *eo nomine* under the Federal Tort Claims Act.").  The Federal Tort

Claims Act makes clear that Congress is part of the United States for purposes of tort liability.

28 U.S.C. § 2671; *see also Williams v. United States*, 71 F.3d 502, 504-05 (5th Cir. 1995).  In

analogous situations, the United States and its agencies are viewed as a single entity.  *Hal, Inc. v.*

*United States*, 122 F.3d 851, 853 (9th Cir. 1997) (viewing the United States and its agencies as a

single entity for purposes of the bankruptcy code); *Searcy v. Phillips Elec. N. Am. Corp.*, 117

F.3d 154, 157 (5th Cir. 1997) ("Litigation conducted *en masse* presents different problems and

calls for different rules than litigation conducted on behalf of a single entity such as the United

States government.").  The reasoning of these cases applies here—Louisiana law does not impose

duty on the United States, a single legal entity under the Federal Tort Claims Act, to warn itself

of suspected dangers.  See also Recommendation Clause discussion, *supra,* at 29 n. 7.

### C.   IMPOSING A DUTY ON AN EXECUTIVE BRANCH AGENCY TO WARN THE LEGISLATURE WOULD BE IMPROPER UNDER THE FTCA BECAUSE NO COMPARABLE DUTY IS IMPOSED ON PRIVATE PERSONS.

Imposing a legal duty on the Corps to warn Congress of any purported dangerous

conditions on the MRGO would impose a duty unlike any legal duty that Louisiana law imposes

on private persons.  Under the FTCA, the United States is liable only as a private person would

be liable in accordance with the law of the place where the act or omission occurred.  28 U.S.C.

§ 1346(b); *Rivera v. U.S. Army Corps of Eng'rs*, 891 F.2d 567, 568 (5th Cir. 1990).  The

relationship that Congress has to the Corps is completely dissimilar to the relationship a patient

has with his "expert doctor."  Roy 3960:21 – 3961:3.  Rather, as the testimony presented at trial demonstrated, Congress passes appropriations for a variety of reasons—political and otherwise —notwithstanding the opinions of the Corps.  *E.g.*, Naomi 3497:14-22; 3495:14 – 3496:7; Luisa 3592:20-25; 3595:6-20.

## V.  PLAINTIFFS FAILED TO PROVE THAT THE MRGO CAUSED THEIR DAMAGE.

Proving causation is Plaintiffs' burden, and Plaintiffs must therefore prove that negligent operation and maintenance of the MRGO caused the flooding of their properties.  *See Audler v. CBC Innovis, Inc.,* 519 F.3d 239, 249 (5th Cir. 2008); *Burmaster v. Plaquemines Parish Gov't,* 982 So. 2d 795, 808 (La. 2008); *Matthieu v. Imperial Toy Corp.,* 646 So. 2d 318, 322 (La. 1994); *cf.* 28 U.S.C. § 1346(b) ("law of the place where the act or omission occurred" determines FTCA liability); *Cleveland v. United States,* 457 F.3d 397, 403 (5th Cir. 2006) (law of state where claim arose determines liability).  To prove "causation in fact" Plaintiffs must demonstrate that (1) the flooding of their properties would not have occurred if the MRGO had been furnished with surge barriers and armored banks and (2) the omission of these appurtenances was a substantial factor in bringing about the flood damage.  *See Rando v. Anco Insulations Inc.,* — So. 3d — , 2009 WL 1426272 (La. May 22, 2009); *Westchester Fire Ins. Co. v. Haspel-Kansas Inv. P'ship,* 342 F.3d 416, 420-21 (5th Cir. 2003); *Bonin v. Ferrellgas, Inc.,* 877 So. 2d 89, 94 (La. 2004); *Roberts v. Benoit*, 605 So. 2d 1032, 1042 (La. 1992); *Fowler v. Roberts*, 556 So. 2d 1, 5 & n.6 (La. 1990).

In denying the United States' motion for summary judgment for lack of proof of causation, the Court rejected this coupling of "but for" and substantial factor causation and ruled that in a "multiple factor" case such as this one the plaintiff need not demonstrate the former.  2009 WL 1033783, at *6-7.  "The issue is whether the MRGO was a substantial factor in bringing about the catastrophic flooding . . . ."  *Id.* at *7.  Since that ruling, however, the

69

Louisiana Supreme Court has made it clear that the "but for" test applies even in multiple factor cases in which marshaling proof of causation is difficult.  In *Rando* the plaintiff pipe fitter was repeatedly exposed to asbestos while working for the defendants in the early 1970s.  Nearly 35 years later he was diagnosed with mesothelioma, a rare cancer caused by exposure to asbestos. *Rando,* 2009 WL 1426272, at *1.  After the trial court entered judgment for Mr. Rando and the intermediate appellate court affirmed, the supreme court addressed the question of whether the plaintiff had carried his burden of proving causation-in fact.

The Louisiana Supreme Court began its analysis by reiterating the legal standard:  "To prevail in an asbestos case a plaintiff must show, by a preponderance of the evidence, he was exposed to asbestos and he received an injury substantially caused by that exposure.  When multiple causes of injury are present, a defendant's conduct is a cause-in-fact if it is a substantial factor generating plaintiff's harm."  *Id.* at *16 (citing *Quick v. Murphy Oil Co.,* 643 So.2d 1291 (La. Ct. App. 1994), *writ denied,* 648 So. 2d 923 (La. 1995).  The court emphasized that even though "[t]here can be more than one cause-in-fact of an accident," a plaintiff still "must prove that the negligent act or defect complained of was a cause-in-fact of the injury."  *Id.* "[N]otwithstanding the difficulty of proof involved, a plaintiff's burden of proof against multiple defendants in a long-latency case, such as a tort claim for mesothelioma, is not relaxed or reduced because of the degree of difficulty that might ensue in proving the contribution of each defendant's product to the plaintiff's injury."  *Id.* at *19.

The court then explained that even when multiple causes of harm may be present, the requirement of showing "but for" causation is not relaxed:

> In *Dixie Drive It Yourself System v. American Beverage Co.,* 242 La. 471, 137 So. 2d 298 (1962), we stated that "conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm." *Id.* at 302. Elaborating on

> that pronouncement of law, we stated negligent conduct is a substantial factor if the harm would not have occurred without the conduct, *i.e.,* but for defendant's conduct, plaintiff would not have sustained injury. Thereby, we equated the two concepts of substantial factor and necessary antecedent.  Malone, Ruminations on Dixie Drive It Yourself Versus American Beverage Company, 30 La.L.Rev. 363, 373 (1970).

*Id.* at *17.  To carry his burden, Mr. Rando was required to show that the defendants' conduct caused an injury that he would not have sustained in the absence of that conduct.  He carried that burden, the court concluded, by describing his work experiences with particularity, to prove that he breathed dust containing asbestos while employed by the defendants.  *See id.* at *18.  His experts testified that any inhalation of asbestos particles carries a risk of causing mesothelioma and that Mr. Rando inhaled dust with concentrations of asbestos several times higher than an established workplace standard.  *Id.* at *19-20.  The court therefore found "no manifest error in the trial court's determination Rando proved by a preponderance of the evidence his exposure to asbestos was significant and this exposure caused his mesothelioma."  *Id.* at *20.

The *Rando* court's reaffirmation of *Dixie Drive It Yourself Systems* confirms that application of the substantial factor test does not eliminate Plaintiffs' burden of showing that they would have had only "a few wet carpets" if the MRGO had been more carefully operated and maintained.  Bea 1093:12; 1479:14.  The omission of surge barriers and of foreshore protection were not causes-in-fact unless they were "necessary antecedents" of Plaintiffs' damage.  If the alleged damage "would have occurred irrespective of the [alleged] negligence of the [United States], then [the alleged] negligence was not a substantial factor or cause-in-fact."  *Dixie Drive It Yourself Sys. v. Amer. Bev. Co.,* 137 So. 2d 298, 302 (La. 1962); *see also In re Air Crash Disaster Near New Orleans,* 764 F.2d 1084, 1092 (5th Cir. 1985); *Rodgers v. Missouri Pac. Ry.*

*Co.,* 405 So. 2d 571, 574 (La. Ct. App. 1981); *Yates v. Brown,* 344 So. 2d 37, 39 (La. Ct. App.

1977; *Muse v. East Texas Grocery Co.,* 11 So. 2d 250, 253 (La. Ct. App. 1942).

   The parametric studies conducted by the experts in this case lay the foundation for

determining whether Plaintiffs have carried their burden of proving causation:  "A

counter-factual hypothesis is recommended as a step in determining cause-in-fact.  That is,

assuming that the conduct of the tortfeasor was 'corrected,' is it probable that the plaintiff would

still have sustained the damages complained of.  If so, then defendant's substandard conduct was

not a cause-in-fact."  *Boteler v. Rivera,* 700 So. 2d 913, 916 (La. Ct. App. 1997) (internal citation

omitted); *see also Craig v. Burch,* 228 So. 2d 723, 729 (La. Ct. App. 1969).  "Every act leading

to an event which is the subject matter of litigation cannot be said to be a cause-in-fact.

However, where such antecedent act supports a conclusion that, more probably than not, it was a

*necessary ingredient* of the ultimate event, it then constitutes a cause in fact."  *Cheatham v. City

of New Orleans,* 368 So. 2d 146, 149 (La. Ct. App.) (emphasis added), *aff'd in part and rev'd in

part on other grounds,* 378 So. 2d 369 (La. 1979).

   Professor Wex Malone, the famed colossus of Louisiana tort law, amplified this teaching

in the article cited with approval by the Louisiana Supreme Court:

> The determination of cause-in-fact is launched by fixing as precisely as possible
> the piece of conduct—the exact act or omission—with which the defendant is
> charged.  This item of behavior must be regarded as a cause-in-fact of the harm
> suffered by the victim whenever the trier concludes that the same harm would
> probably not have occurred if the defendant had not engaged in the conduct with
> which he is charged.  A cause-in-fact can thus be defined as a *necessary*
> antecedent, and the process of determining the existence or non-existence of cause
> is essentially one in which the trier speculates as to what would have happened if
> the conduct in question had *not* taken place.  Since this assumed state of affairs
> represents a negation of the situation as it actually existed, we can only engage in
> surmise.  The permissible degrees of likelihood are many, and our conjecture may
> lead us to conclude that the same harmful consequence would have come into
> being as a certainty, a probability, or a possibility, even if defendant had behaved

> otherwise than as he actually did behave.  It is at this point that the usual and
> accepted requirement that facts be established by *probabilities* comes into play.  If
> the victim would *probably* not have encountered the harm but for the defendant's
> conduct, it can be concluded that such conduct was a cause in fact and that the
> victim has sustained the required burden of proof on that issue.

Malone, *Ruminations on Dixie Drive It Yourself Versus American Beverage Company*, 30

La.L.Rev. 363, 370 (1970) (emphasis in original).

Insofar as causation is concerned, the present case turns on the answer to this question:

Does the evidence show that the catastrophic flooding of Plaintiffs' properties would probably

not have occurred if surge barriers and more extensive foreshore protection had been constructed

in and along the MRGO?  The answer to that question is, No, not at all.

### A.   THE LEVEES THAT WERE MASSIVELY BREACHED PERFORMED AS DESIGNED.

The parties agree that the levees **"performed as designed, *viz.*, they failed when

overtopped."**  Pls.' Corrected Post-Trial Br. 94 (emphasis added).  Levees, like other engineered

structures, are designed to bear a certain load.  That they will fail if a load substantially greater

than the design load is imposed on them is a given.  Failure can be expected under such

conditions, and such conditions occurred during Hurricane Katrina.  The LPV hurricane

protection structures were subjected to hydraulic forces far greater than those that they were

designed to withstand.  That they failed during Hurricane Katrina should not be viewed as

something requiring elaborate explanation.  Knowing what is now known about the strength of

the storm and the dimensions of the surge that piled up against and flowed over the top of the

levees and floodwalls, it is unsurprising that they were massively breached and washed away.

Dr. Bea summed it up succinctly when asked whether he had accepted as a fact "that these LPV

structures during Katrina performed as expected?":  "Certainly.  They disappeared." Bea 1272:6-

8.

The levees probably would not have withstood Katrina's surge even if they had been at full design specification when the storm struck.  They were not designed to withstand prolonged overtopping, yet they would have been massively overtopped for hours even if they had been at the design grade of 17.5 feet.  It may therefore be inferred that the levees—specifically those pertinent here, the MRGO Reach 2 and New Orleans East Back—would have failed under Katrina's onslaught even if they had been at their full design specifications when the storm struck.[17]

The process of designing the LPV levee began with the development of the standard project hurricane, which was chosen as the "design hurricane" for the LPV.  JX-133 (Corps Dep.)

---

[17]On the eve of Dr. Bea's testimony, Plaintiffs moved to estop the United States from "altering its consistent position throughout this litigation that the LPV structures were not negligently designed, constructed, or maintained and that they performed as expected."  Doc. 18672, at 1.  This motion came in response to the United States' contention that only "bigger, stronger levees" could have prevented the flooding.  *See* Doc. 18448, at 8.  But as the evidence shows, Plaintiffs' motion was misdirected, and the United States' consistent position about what was necessary to prevent flooding received support from unlikely quarters at trial.  Dr. Bea's own trial testimony confirmed that only "bigger, stronger levees" could have withstood Katrina's vicious attack.  Regarding stronger levees, it was Dr. Bea's opinion that:

> All of the parametric analyses confirm that levees constructed of 'good' materials (cohesive, compacted) with low erodibility would have performed significantly better than one constructed of high erodibility materials.  Subjected to the same front side wave attacks, the levee with 'good' materials would have experienced insignificant front side erosion.

DX-451 ¶ 114 (Bea Decl. No. 1, July 11, 2008) ¶ 114.  The premise that bigger levees were necessary is consistent with Dr. Bea's raising the Reach 2 levee crest in his "No MRGO, No Breaching," "Mitigated MRGO" scenarios.  His testimony that a 19.5-foot levee would have provided sufficient freeboard above Katrina's 18-foot surge to prevent overtopping and breaching puts a fine point on his opinion.  *See* Bea 1132:25-1133:20.  The three largest previous hurricane surge levels prior to Hurricane Katrina did not surpass 10 feet in elevation.  Bea 1292:14-1293:1.  These LPV levees were designed to withstand a surge 30 percent larger than the surge from the largest prior storms, but the surge generated by Hurricane Katrina exceeded the highest previous storm surge by an astonishing 80 percent.

at 98:11 – 99:7; H.R. Doc. No. 89-231 (LPV Chief's Rpt.) at 7, 9, 20, 46, 57, 61.  Maximum

surge heights computed from the standard project hurricane determined the levee heights

specified in the project design documents.  JX-285 (LPV DM No. 1, Hydrology and Hydraulic

Analysis:  Part IV – Chalmette Extension) at 4, 6; Bea 1105:6-8.  The crown elevation was

designed to be sufficiently high to minimize overtopping by waves when the surge was at its

peak:

> The vertical height to which water from a breaking wave will run up on a given
> protective structure determines the top elevation to which the structure must be
> built to prevent wave overtopping and resultant flooding of the area to be
> protected.  Wave runup is considered to be the ultimate height to which water in a
> wave ascends on the proposed slope of a protective structure.  This condition
> usually occurs when the surge is at the maximum elevation.
>
> * * * *
>
> Protective structures exposed to wave runup will be constructed to an elevation
> that is sufficient to prevent all overflow from the significant wave and waves
> smaller than the significant wave accompanying the design hurricane.  Waves
> larger than the significant wave will be allowed to overtop the protective
> structures but such overtopping will not endanger the security of the structures or
> cause excessive interior flooding.

*Id.* at 6, 8, ¶ 9.

The maximum surge height used to determine the crown elevation of the Chalmette

Extension Levee along the MRGO was 12.5 feet, with a wave run-up of 4.6 feet, yielding a levee

design grade of 17.5 feet above mean sea level.  *Id.* at 6, 9.  The corresponding figures for the

Chalmette Levee along the MRGO were 12.5–13.0, 4.3–4.7, and 17.5.  DX-789 (LPV DM No. 1,

Hydrology and Hydraulic Analysis:  Part IV – Chalmette Extension) at 24, Table 13.  The

numbers for the New Orleans Back Levee were 13.0, 4.5, and 17.5.  *Id.*  As Dr. Bea confirmed,

the LPV "system was built to a target elevation and to a specific design water level and was

expected to hold within those" parameters.  Bea 1292:7-10.  Dr. Mosher elaborated:

Q. With respect to the water levels portion, the hydrology aspect, can you explain to the court what you meant by the statement "performed as designed."

A. Yes. The levees were designed for a still water level of 13 feet with a freeboard of 4.5 feet, giving them 17.5 feet of elevation. So as designed is they would have, the levees, survived up to a still water level of 13 feet and it was over. Then during Hurricane Katrina, it was such a storm that it overwhelmed the system; but up until that point, they were performing without breaching to that level.

Q. Well, how do you know the levee was not designed to withstand overtopping?

A. Well, first of all, there's a freeboard level provided above that for the waves. It actually says in the document that they wanted to make sure no significant wave heights would break over the top of the levee.

Mosher 2981:2-17.

The surge generated by Hurricane Katrina exceeded the LPV design value by nearly 40 percent near Bayou Dupre, where it was highest, and exceeded the design values by more than 30 percent at every point along both the MRGO Reach 2 levee and the New Orleans East Back Levee.[18]  The surge peaked at approximately 18 feet along the MRGO Reach 2 levee and at 17 feet along the New Orleans East Back Levee.  Vrijling 834:7-22; PX-105, at 39; Ebersole 2098:9-15; JX-211  (Ebersole Rpt.) at 28, 39-40; JX-193 (Resio Rpt.) at 50, Table 3.  The failure of the LPV under Hurricane Katrina conditions was unremarkable, as this exchange between Dr. Bea and Mr. Stone demonstrates:

Q. Well, then, have you accepted as a fact, as you say on Friday, that these LPV structures during Katrina performed as expected?

A. Certainly. They disappeared.

Q. The design parameters for the levee was for a 13-foot surge, still water level, correct, sir?

---

[18]The New Orleans East Back Levee bounded the north side of the GIWW east of Michoud and is to be distinguished from the Citrus Back Levee, which bounds the GIWW/MRGO west of Michoud.

A.   Yes.

Q.   And didn't the area see an 18-foot surge?

A.   Yes.

Q.   So you have been unable in this litigation to provide us an analysis of whether these levees would have withstood a 13-foot surge.  You have not provided that to us at any time during this litigation.

A.   That's not true.

Q.   Where did you provide that to us?

A.   As we stepped through the analyses of the Reach 2 earthen flood protection structures, we progressively increased the water level together with the appropriate wave action.  As you go from sea level to 18 feet, you cross 13 feet.  The results are contained in my expert reports.

Q.   So your contention is that they were competently designed, first of all, correct?

A    For those conditions.

Q.   And they didn't fail within those conditions, they only failed under the Katrina conditions, correct?

A    That's correct.

Bea 1272:6 – 1273:5.

Most of the breaching that occurred along Reach 2 was triggered by overtopping.  This is undisputed.  *See* Bea 1270:4-8; Mosher 3161:9-18.  The entire levee was overtopped, and breaching occurred even at points where the levee crown was at or above the 17.5 design grade. Mosher 3081:15-16; JX-193 (Resio Rpt. 49, Fig. 24) (plot of pre- and post-Katrina levee crown elevations).  Overtopping from waves began when the surge was two feet or more below the crown of the levee.  Ebersole 2124:6–10.  *Compare* Ebersole 1386:19-20 (Bea assumed that wave overtopping at his test site began when the surge elevation was 14 feet) *with* DX-451 (Bea July 2008 Decl. No. 1) at 90 (crest elevation was 16 feet at test site).  Consequently, breaching

from erosion of the backside of the levee occurred even in places where the crown of the

elevation exceeded the maximum elevation of the surge (still-water elevation).  Ebersole 2142:1-

13; Mosher  3163:4 – 3164:7.[19]  As Mr. Vrijling affirmed, waves "can have a serious impact on

overtopping erosion when those waves plunge down the back side of the levee," and at the time

of peak surge waves were "plunging down the back of the levee" at most locations along Reach

2.  Vrijling 1032:1-4.  Given the extremely high surge during Katrina, Dr. Bea opined that a

levee crest elevation of 19.5 feet would have been required in order to prevent extensive wave

overtopping and breaching.  Bea 1132:25 – 133:20.

The United States' expert team found overtopping rates in excess of internationally

recognized design criteria thresholds.  Significantly, Plaintiffs' hydrologic expert, Professor

Vrijling, also found similar and destructive overtopping rates.  Dr. Bea did not provide any

physical evidence or sound scientific study that contradicts findings made by Plaintiffs; or the

United States' experts on this issue.  This undisputed evidence, which shows the vicious

overtopping flows that attacked the Reach 2 levee, creates an irreconcilable inconsistency

between Dr. Bea's front-side wave attack theory and the hydrologic data supporting that opinion.

An overtopping rate is the average amount of water over a period of time that flows over

a levee.  Ebersole 2200:21-24.  These overtopping rates can be used to determine damage from

overtopping flows.  Vrijling 1053:8-12.  Both the Corps and international counterparts have

developed threshold overtopping rates that define when levee damage begins to occur.  Ebersole

2201:17-2202:4, *see also* Resio 2893:1-12.  Currently, these design guidelines are the best

_____

[19]Dr. Bea was unable to calculate backside erosion from wave overtopping because the
FINEL model used by the Delft modelers did not take wave run-up into account, which led the
modelers to use a perfect weir formula to calculate overtopping based solely on the still-water
elevation.  Vrijling 907:12-15; 1041:9-20; 1042:17-22; 1044:12-16; Resio 2886:20-25; JX-197
(Delft Flow Rpt.) at  100.

information available concerning the destruction potential of overtopping. Ebersole 2202:20-24. According to these thresholds, a levee made of the highest quality clay and grass will start to experience damage at a mean overtopping rate of 0.1 cfs/ft, and lower quality levees will experience erosion at lower rates. Ebersole 2203:7 – 2204:1. The European standard recommends the placement of concrete armor or asphalt when the overtopping rate reaches 1 cfs/ft. Ebersole 2204:2-9.

During Hurricane Katrina, the United States' experts found overtopping rates far in excess of 0.1 cfs/ft across the Reach 2 levee. Resio 2823:1-2; 2901:7-17; JX-211, at 97-102 (Ebersole Rpt.); DX-1748 (Resio Supp. Rpt.) Fig. 1. These overtopping rates also included the contribution from waves that overtopped the levee. *See* DX-1748 (Resio Supp. Rpt.) at 1 (indicating that wave heights from STWAVE were taken to compute the rates). Depending on levee height, these excessively high overtopping rates would persist for 1 to 5 hours. *E.g.*, DX-1748 (Resio Supp. Rpt.) at XDR-010-006-010. These overtopping rates assume a static levee, but during the storm the levee eroded and the crest degraded. Ebersole 2209:19 – 2209:11. Consequently, the overtopping rates *increased* as the levee crest eroded during Hurricane Katrina. *Id.*

The comparison between Professor Vrijling's overtopping rates and the United States' overtopping rates is best illustrated by a graph presented during the testimony of Dr. Resio:



Resio 2885:13–2887:13; DM-27 (Resio demonstrative).  As seen in the above results, both the

United States' and Plaintiffs' experts found extremely similar overtopping rates occurring at

levees of equal height.  For example, both expert teams found overtopping rates of 3-4 cfs/ft for a

levee crest of 17 feet.  Similarly, both expert teams found overtopping rates of approximately 9

cfs/ft for a levee crest of 15.5 feet.

 Dr. Resio analyzed the rates of overtopping that occurred when the contribution of waves

was taken into account.  He found that with the levee crest at 17.5 feet overtopping flow, when

averaged over a thirty-minute period, reached a maximum ranging from 2.3 to 2.6 cubic feet per

second per foot. JX-193 (Resio Rpt.) at 50, Table 3.  He also measured the length of time that

overtopping flow exceeded internationally recognized thresholds for erosion of an earthen levee.

*See generally*  DX-1748 (Resio Supp. Rpt.).  The lower threshold, for erosion onset, was

exceeded for more than four hours where the levee crown stood at the LPV design grade of 17.5 feet.  The upper threshold, for major damage, was exceeded for about thee hours.  *Id.* at 6, Fig. 1. To discover how these periods would have been affected by smaller waves, simulating conditions comparable to those predicted by Plaintiffs under "No MRGO" or "Mitigated MRGO" conditions, he modeled overtopping with waves one and two feet smaller than those that were generated by Katrina.  He found that these periods would have been reduced only minimally if the significant wave height had been two feet lower.  In that scenario, the lower threshold would have been exceeded for slightly less than four hours and the upper threshold would have been exceeded for a little less than three hours.  *Id.*

Dr. Vrijling testified similarly.  For both Scenarios 1 and 3, Professor Vrijling found destructive overtopping rates *even without* the contribution from waves.  JX-211 (Vrijling Flow Rpt.) at 102-03, 106-07.  At Bayou Bienvenue, with a 15.5 foot levee, an overtopping rate in excess of 5 cfs/ft persisted for at least forty-five minutes for Scenarios 1, 2c, and 3.  Vrijling 1035:6 – 1037:19; 1045:10 – 1046:3.  At the MRGO Halfway point, with a 17 foot levee, the onset, maximum overtopping rate, and duration of overtopping were equivalent for Scenarios 1 and 3.  Vrijling 1038:8-25; 1045:10 – 1046:3.  At Bayou Dupre, with a 14.5 foot levee, the peak overtopping rate exceeded 15 cfs/ft in Scenario 3.  Vrijling 1039:7-22; 1045:10 – 1046:3. Similar to the United States' experts' overtopping rates, these rates assume an intact levee throughout the whole storm; however, overtopping rates increase as the crest is degraded. Vrijling 1041:21 – 1042:8.

As Professor Vrijling testified, regarding Bayou Dupre "[t]here was dominant overtopping long before eight o'clock [a.m.]."  Vrijling 1040:3-7.  These massive overtopping rates ensured that "the back side of the levee is the most heavily tested part if overflowing is

started." Vrijling 1040:8-11; *see also* Vrijling 1036:25 – 1037:3 ("It's threatening the back side

at the most, yeah."). This testimony is consistent with the IPET findings, all other scientists and

engineers that have addressed the issue, and is not contradicted by Dr. Bea.

Overtopping thresholds, while extremely useful, are still under research. Ebersole

2965:6-11. Therefore, the rates alone do not tell the whole story of what occurred to the Reach 2

levee during Hurricane Katrina. Physical evidence, such as photographs and a review of the

soils, must also be analyzed to determine why one section of levee survived and one section of

levee failed during the storm.

### 1. THE POST-STORM PHYSICAL EVIDENCE INDICATES THAT OVERTOPPING WAS THE PREDOMINANT MECHANISM OF LEVEE EROSION.

Physical evidence presented at trial confirmed that overtopping was the dominant mode

of erosion on the Reach 2 levee. First, the United States presented the only form of post-storm

physical evidence, an analysis of photographs. These photographs provide overwhelming

evidence of backside erosion occurring on the levee. Second, the United States also examined

actual logs of soil borings taken before Hurricane Katrina from the Reach 2 levee. These soil

borings, while showing great variation in the levee materials, also demonstrate that sections

constructed with higher quality materials did not fail during Hurricane Katrina—thus explaining

why one section of levee failed during the storm while another section survived.

#### a. PHOTOGRAPHIC EVIDENCE CONFIRMS THAT OVERTOPPING, NOT FRONT-SIDE WAVE ATTACK, CAUSED ALMOST ALL OF THE BREACHING.

Photographic evidence presented by Dr. Mosher and Mr. Ebersole was the *only*

competent post-storm physical evidence presented at trial. This evidence confirmed the

computational analyses detailing the overtopping rates, by illustrating large sections of the Reach

2 levee in various stages of overtopping. *E.g.*, Ebersole 2127:16 – 2134:15; 2143:14 – 2181:23;

Mosher 3071:16 – 3081:9.  In contrast, even slight front-side wave attack damage was rarely seen in the photographs.  *Id.*  The photographs also revealed the presence of large sediment on the *backside* of the levee, providing further evidence that overtopping caused the levee breaching. Ebersole 2159:17 – 2162:10; JX-211 (Ebersole Rpt.) at 166, 182, 185, 202.

At trial, Dr. Mosher explained the four stages of overtopping erosion, otherwise known as "headcutting."  Mosher 3072:15 – 3074:19; JX-212 (Mosher Rpt.) at 16, Fig. 6.  Stage A erosion shows an initial disturbance on the levee's protected side, Stage B erosion shows the damage progressing to the crown of the levee on the protected side, Stage C erosion shows a loss of the levee crown proceeding from the protected side, and Stage D erosion shows damage starting from the protected side and progressing all the way through the flood side of the levee.  *Id.*  In addition to these four stages of overtopping erosion, a small section of scoured grass on the front-side of the levees indicative of minor wave damage, sometimes referred to as a "mowed strip" of grass, was seen in some of the photographs.  Mosher 3075:10 – 3076:4; Ebersole 2127:16 – 2128:13; 2133:8 – 22; 2135:3 – 2138:11; 2148:14-21.  This mowed strip occurred at approximately 13 feet high on the levee, and it did not constitute breaching.  *Id.*  These four stages and the mowed strip were seen together on this photograph presented at trial:



Figure 7.  Four stages of progressive erosion along Reach 2 of Mississippi River Gulf Outlet.

DX-1754 (annotated photograph from page 17 of Mosher Rpt., JX-212); Mosher 3075:10 – 3077:1.

In contrast, all across the Reach 2 levee few locations had *any* evidence of front-side breaching.  *E.g.*, Ebersole 2127:16 – 2134:15; 2143:14 – 2181:23; Mosher 3071:16 – 3081:9.  If front-side breaching was the dominant mode of levee failures, photographic evidence would reveal far greater instances of front-side damage.  Ebersole 2155:15 – 2156:3; 2164:8-19; Mosher 3082:7-25.  The only evidence of front-side erosion causing actual crown crenelation

occurred on the very high levee segment below Bayou Dupre.  *E.g.*, Ebersole 2150:14 – 2151:10; 2130:22 –  2131:7.

In addition, levee locations which were repaired with sheet piles did not show signs of front-side breaching.  Ebersole 2171:16 – 2179:13; JX-211 (Ebersole Rpt.) at 159, 160, 163, 170, 171, 172, 174, 204.  Dr. Bea stated these locations were generally closer to the MRGO, had the lowest levee elevation, and had the lowest toe elevation.  Bea 1552:7-11.  These characteristics would allow waves to have a greater impact on the levee, thereby making these levees an excellent place to study front-side erosion.  Ebersole 2170:10 – 2171:15.  Therefore, the lack of observable front-side wave erosion below, at, or above 13 feet at these locations provides further evidence that overtopping was the more likely cause of breaching.

Another key piece of physical evidence is the sediment deposits seen near the levee after Hurricane Katrina.  Dr. Bea indicated in his expert reports that this sediment accumulation would be evident if front-side erosion occurred.[20]  JX-207 (Bea Jan. 2009 Technical Rpt. 2) at 51, Fig. 36c; Ebersole 2157:24 – 2158:15.  If front-side wave-induced erosion was a dominant mode of erosion, one would expect to see deposits of sediment on the front-side slope, at the levee toe, and seaward of the levee toe associated with sediment moved offshore due to wave breaking and undertow associated with breaking waves which would act to transport the sediment offshore, *i.e.*, away from the unprotected face of the levee.  Ebersole 2156:17 – 2157:7.

---

[20]Dr. Bea's analysis of photographs is highly suspect.  During his direct testimony, he indicated that Dr. Mosher incorrectly used photographs of breaching at the Bayou Dupre control structure to support his opinion.  Bea 1237:24 – 1240:22.  On cross examination, Dr. Bea continued to state that Dr. Mosher incorrectly used photographs.  Bea 1343:12 – 1348:18.  As shown during Dr. Mosher's testimony, the photographs of the control structure Dr. Bea used during his direct examination were taken from different angles.  Mosher 3062:25 – 3071:5; JX-207 (Bea Jan. 29, 2009, Decl.) at 61-66.  Consequently, Dr. Bea's interpretation and attack on Dr. Mosher were wrong.

However, the primary evidence of sediment deposits were the photographs.  They overwhelmingly show that the deposits occurred on the backside of the levees.  In the vast majority of photos, any significant sediment deposits were always observed on the backside, indicating that overtopping and transport of sediments landward was the dominant erosion and levee degradation process.  Each photo shows large fan-shaped sediment deposits on the backside indicating the dominance of backside sediment erosion and transport, but no significant deposits on the front side.  Ebersole 2159:17–2162:10; JX-211 (Ebersole Rpt.) at 166, 182, 185, 202.  Sediment deposits observable on the front-side of the levees were consistent with outflow from the storm concentrated through a breach and then expanding as the water escaped back to the MRGO, otherwise known as the "Venturi effect."  Ebersole 2168:21–2170:9; DM-12.

### b. THE SOIL BORINGS TAKEN ALONG REACH 2 DEMONSTRATE THAT LEVEE SECTIONS CONSTRUCTED WITH MEDIUM FAT CLAYS DID NOT BREACH.

Another important piece of physical evidence presented at trial was the soil boring logs conducted by the Corps along the Reach 2 levee.  The soil borings showed great variation among the fill materials used to construct the levee materials.  However, the Reach 2 levee was not, as Plaintiffs claim, "homogeneously heterogenous" – the levee was not consistently made of a random assortment of sands, silts, and clays.  Pls.' Corrected Post-Trial Br. 93.  Rather, as Dr. Mosher testified, the levee was often composed of fat clays.  In these locations, these better materials were sufficient to ensure that the levee survived the overtopping flows from Hurricane Katrina.

A clay is a plastic material which feels sticky and is more resistant to erosion than other materials, such as sands and silts.  Mosher 2699:66 – 2969:11.  A lean clay has a higher percentage of silt, while a fat clay has less silt and, therefore, is less erodible than a fat clay.  Mosher 2969:12 – 2070:2.  A soft clay will have the consistency of peanut butter and is more

erodible than a stiff clay, which has the consistency of hard ice cream.  Mosher 2970:3-13.  A medium clay has an intermediate consistency and will be more compact and less erodible than a soft clay.  *Id.*  Medium fat clays resist erosion because they have more cohesion to each other.  Other materials, like lean clays, have silt in them and do not get the same attraction between the particles.  Mosher 3108:11-24.

In accordance with Corps and industry construction practice during the levee construction process, hydraulic fill was used to construct the levee along Reach 2.  Mosher 2971:11 – 2972:11.  A levee constructed with hydraulic fill will have a great mix of materials and is generally uncompacted and more erodible.  Mosher 2973:24 – 2974:7.  Medium fat clays also can be found in a levee constructed of hydraulic fill.  Mosher 2973:21-23. Hydraulic fill was used because it was an economical and an authorized levee construction material at that time.  Mosher 2974:8-12.  However, the levees constructed with hydraulic fill were the only levees to breach in all of the 220 miles of federal levees of the Hurricane Protection System at and around New Orleans during Katrina.  Mosher 2973:2-9.

In contrast, the Chalmette extension levee protecting the southern part of St. Bernard Parish was constructed with sand and then covered with clay obtained from borrow pits.  Mosher 2971:11–2972:11.  Hydraulic fill was not used to construct the extension levee because of the lack of availability of material and the distance involved in pumping the fill.  Mosher 2972:18-22.  The extension levee performed quite well during the hurricane.  Mosher 2972:23–2973:1.

Levees that had medium fat clay soil ("med CH") on the surface best survived the hurricane.  Mosher 3105:19-24; 3106:25–3107:12; *see also* Mosher 3107:13–3108:10; JX-212, at 53, 54, Table 1 and Fig. 52 (detailing soil borings, soil type at surface of levee, scour depth,

and amount of overtopping).  Other materials, such as medium lean clays ("med CL"), soft fat

clays ("soft CH"), and stiff lean clays ("stiff CL") were more susceptible to erosion after the

onset of overtopping.

A figure prepared by Dr. Mosher best illustrates the import of different levee material

during the erosion process:



JX 212 at 54, figure 52.  Levees that had medium fat clay soil ("med CH") on the surface best

survived the hurricane. Mosher 3105:19-24, 3106:25-3107:12; see also Mosher 3107:13-

3108:10, JX 212 at 53, 54, Table 1 and Fig 52 (detailing soil borings, soil type at surface of

levee, scour depth, and amount of overtopping). In addition, once the erosion process began,

turbulence in the soil started and the erosion process accelerated, regardless of soil type.

Consequently, the key to levee integrity is a surface covered with medium fat clay.  Mosher

3003:6–23.

Plaintiffs' expert, Dr. Paul Kemp, prepared a table similar to the above figure that

analyzed the relationship between soil quality and erosion.  Mosher 3108:25–3109:8; DX-1601

(Kemp Jan. 14, 2009, Decl.) at 35.  His work showed that medium fat clays at the levee surface resisted and inhibited erosion, while other materials more easily eroded during the storm.  *E.g.*, Mosher 3109:9-11; 3109:16 – 3112:9.

The presence of medium fat clay soil also had a greater impact on preventing erosion than did the levee height.  *Compare* JX-212 (Mosher Rpt.) at 11, Fig.1 (detailing location of breaches) *with* JX-212 at 12, Fig. 2 (detailing constructed levee sources) *with* JX-191 (Morris Rpt.) at 18 (detailing Reach 2 levee elevations).  Mosher 3010:25 – 3011:10.  In many places where the levee was at or above design height, the levee still breached because of insufficient soil quality to resist erosion.  Mosher 3011:14 – 3012:8.

For example, at soil boring location 1, just south of Bayou Bienvenue, the pre-Hurricane Katrina levee elevation was 17 feet, yet 5 feet of erosion occurred.  Mosher 2995:22 – 2996:6; 2998:25 – 2999:2; JX-212, at 41, Fig. 31.  The soil forming this levee was medium-stiff lean clay, which is more erodible than medium fat clays.  Mosher 3002:15 – 3003:5; JX-212 at 41, Fig. 30.  However, at soil boring location 5, two-thirds of the way between Bayous Bienvenue and Dupre, the levee had a pre-Hurricane Katrina elevation of 15 feet yet suffered little erosion. Mosher 3004:2-22; JX-212 (Mosher Rpt.) at 44, Fig. 37.  The levee here had medium fat clay on the surface.  Mosher 3005:23 – 3006:9; JX-212 (Mosher Rpt.) at 44, Fig. 36.

The levee material made a tangible difference in the success or failure of any levee section.  The levees were not uniformly, as Plaintiffs suggest, the "'thin skulled' victim of the MRGO's negative effects."  Pls.' Corrected Post-Trial Br. 93.  Instead, both Plaintiffs' and the United States' experts agree that levee locations *survived* in locations where higher quality medium fat clays were used to construct the top portion of the levee.  The coupling of lower quality hydraulic fill materials with the massive overtopping that the levees were not designed to

resist caused the breaching along Reach 2.  No evidence, physical or analytical, supports the theory that front-side wave attack triggered the breaching of the levees.

There is therefore no sound basis for finding that the Reach 2 levee or the New Orleans East Back Levee would have survived the storm intact under any circumstances that could plausibly have existed, even if the MRGO had never been built.

B. **DR. BEA'S CONCLUSION THAT THE LEVEES WOULD HAVE WITHSTOOD THE STORM "BUT FOR" THE MRGO IS PATENTLY WRONG.**

The foundation of Dr. Bea's conclusion that there would have been no breaching in a "No MRGO" or "Mitigated MRGO" scenario lies in his reconfiguration of the LPV levees.  He concluded that the levees would have been higher (at full design grade of 17.5 feet msl) and stronger (covered with a more erosion-resistant turf) if the bad effects of the MRGO had been eliminated.  PX-2153 ("Alternate Parametric Studies" table).  He correctly recognized that these are the "primary parameters that influence the ultimate outcome, flooding."  Bea 1253:7-8.  To say that flooding would have been averted if New Orleans had been surrounded by flood control structures up to the task of holding back Katrina's surge and waves is merely to state the obvious. What is far from obvious is whether New Orleans would have been protected by such structures "but for" the MRGO.  Dr. Bea concluded that it would have been, but his reasoning to reach this conclusion is unsound.

The Reach 2 levee was below design grade because of the soil conditions in the area where it was built.  It is undisputed that the levee subsided for this reason, and it is undisputed that this cause of subsidence was unrelated to the MRGO.  The soft marshy soil throughout the area was poorly suited for levee building, and it was therefore recognized from the outset that subsidence would be an ongoing process that would require a special method of construction. The "staged" construction plan called for bringing the levee up to design grade by periodically

90

adding additional soil, which would have the effect of eventually "lifting" the levee crown up to the design grade. Over the decades the levee was built through staged lifts. Because the levee was below design grade in most places along Reach 2 of the MRGO in the years immediately preceding Hurricane Katrina, the Corps sought funding for an additional lift. No funding was provided. Dr. Bea's conclusion that the levees would have been at design grade "but for" the MRGO is patently erroneous.

His conclusion that the levees would have been protected by a more dense, erosion-resistant turf is just as plainly mistaken. Dr. Bea professed to be an expert in grass based on experience "mowing my lawn here for 15 years." Bea 1276:19–20. He therefore considered himself qualified to render an opinion concerning the quality of the grass growing on the LPV levees. He opined that a more erosion-resistant turf would have protected the levees if the MRGO had not facilitated the migration of salt water into the vicinity. Bea 1276:3–9; 13–17. He also opined that better substrate would have resulted in better grass cover, but he did not explain how eliminating the MRGO or remediating its "flaws" would have been likely to result in levees constructed of levee topsoil more suited to grass. Bea 1277:1–5. As explained below, there is no adequate foundation for Dr. Bea's conclusion that the levees would have been strong enough to withstand Katrina's onslaught "but for" the MRGO.

1. **DR. BEA'S OPINION THAT THE REACH 2 LEVEE WOULD HAVE HAD A UNIFORM CREST OF 17.5 "BUT FOR" THE MRGO LACKS SUPPORT IN FACT AND IN SCIENCE.**

Discovering belatedly that their theories concerning the impact of the MRGO on surge and waves lacked scientific support, Plaintiffs made their "lateral subsidence" theory the centerpiece of their causation theory at trial. In short, this theory is that the MRGO caused the levees to sink, resulting in the crown of the levee being below the design grade of 17.5 feet in places. Doc. 18501-2, at 2-3. Plaintiffs presented testimony that flooding resulted from

overtopping, overtopping resulted from the loss of levee crest elevation, and the loss of crest elevation resulted from the proximity of the eroded banks of the MRGO.  Bea 1092:12 – 1093:3; 1132:2 – 1133:20; 1579:9–16.

Like their prior theories, Plaintiffs' lateral displacement theory is seriously flawed.  First, it is undisputed that consolidation of the levee soils and the foundation soils beneath the levee contributed to ongoing levee subsidence.  The evidence demonstrates that levee subsidence was greatest where the foundation was most compressible.  The greatest subsidence occurred where the levee was underlain by a thick interdistributary clay layer.  This layer was more compressible because it had a higher moisture content than other foundation soils.   Settlement unrelated to the MRGO was occurring throughout the history of the Reach 2 levee, right up to the moment when the hurricane struck.  Consequently, settlement unrelated to the MRGO  required repeated lifts to keep raising the levee back to 17.5 feet.  In practice, the lifts raised it above design grade in anticipation of future subsidence.  Consequently, whether the crest elevation was at, above, or below grade at any moment depended on where the cycle of lifting and settling happened to be at that moment.  The LPV project manager testified that the levee would have been lifted back to design grade before Hurricane Katrina if funds had been available.  Naomi 3481:15 – 3482:5.

Second, Dr. Bea's opinion that the foundation was squeezed out from under the levee and into the MRGO channel (like toothpaste from a tube) is refuted by the evidence demonstrating that the stability berm placed in front of the levee was designed to and did prevent the channel from affecting the levee foundation.  The Corps knew about the interdistributary layer and properly accounted for it in the levee design.  Dr. Bea's opinion that the factor of safety approximated unity as a result of channel widening was shown by Dr. Wolff to be flawed.  In

expectation that subsidence would continue for at least 50 years, the Corps constructed the levee in lifts to enable the construction process to address settlement as it occurred.

Third, according to Dr. Bea's own analysis MRGO-induced subsidence ended in 1980. If so, the deleterious effect of the MRGO was remedied by the multiple lifts that occurred during and after the period of MRGO-related subsidence. The declining rate of subsidence reflected a strengthening of the levee as the soil desiccated and consolidated.

Finally, Dr. Bea's analysis of levee subsidence was flawed by his misuse of the different reference datums to assess crown elevation. This flaw biases his analysis, ensuring that the Reach 2 levee has (or falsely appears to have) a one-foot deficiency prior to any analysis of subsidence. The datum used in building the levee was NGVD29, but the datum used by Dr. Bea to analyze subsidence was NGVD88 (2004.65). Because the baseline for NGVD29 is approximately one foot lower than NGVD88, the elevations cited by Dr. Bea are described by him as being one foot lower than they would have been perceived to be as the levee was being lifted up to design grade.

### a. FOUNDATION CONDITIONS CAUSED THE SETTLEMENT OF THE LEVEE.

The soils underlying the levees were responsible for the settlement seen along the Reach 2 levees—not the MRGO. An analysis of the soil conditions underlying three distinct levees sections further confirms the import of the soil conditions: (1) the Reach 2 levee between Bayou Bienvenue and Bayou Dupre (the "upper Reach 2" levee); (2) the Reach 2 levee south of Bayou Dupre (the "lower Reach 2" levee); and (3) the levee running south of the St. Bernard polder from Verrett to Caernarvon (the east-west reach of the Chalmette Extension levee).

As illustrated in the levee design documents, an interdistributary layer ran underneath the upper Reach 2 levee. DX-1719, Plate 29 (LPV DM-3); Wolff 4029:3-4030:25; Mosher 3043:25

– 3045:9.  This interdistributary layer was composed of a high plasticity fat clay, which holds a large amount of water.  FitzGerald 338:19 – 340:1; Mosher 3018:20 – 3019:6.  Because of its high water content, it takes a significant amount of time for the water to be forced out of the interdistributary layer.  Mosher 3018:20 – 3019:6.  This layer is also highly compressible.  *See* Wolff 4029:3 – 4030:25.  Once loaded with weight, the materials in the interdistributary layer will move—regardless of the presence of a channel.  FitzGerald 358:12-25; *see also* FitzGerald 340:17-24 (stating that when weight is applied to the interdistributary materials it responds by flowing); Doc. 19023-2 ¶ 6 (Bea May 15, 2009, Decl.) ("It is well known in the geotechnical engineering community that plastic clays are very strain rate sensitive . . . .").

A different material, point bar, comprised the materials running underneath the lower Reach 2 levee.  DX-1719, Plate 29 (LPV DM-3); Wolff 4029:3 – 4030:25; Mosher 3043:25 – 3045:9.  The point bar materials are sandier and hold less water than the fat clays in the interdistributary layer.  Mosher 3043:25 – 3045:9.  Therefore, the point bar materials are "many times less compressible" than interdistributary materials.  Wolff 4029:3 – 4030:25; Mosher 3043:25 – 3045:9.

Similar to the upper Reach 2 levee, the east-west reach of the Chalmette extension levee was underlain with the compressible fat clays in the interdistributary layer.  Bea 1313:11 – 1314:14; Wolff 4032:14 – 4033:15; JX-283 (DM No. 3, Supp. 1) Plate Nos. 1, 7.  As expected, the Chalmette extension levee also encountered significant elevation losses.  JX-191 (Morris Rpt.) at 18, Fig. 7-1.  As shown in the figure, the elevation deficiencies seen in the upper Reach 2 levee are similar to the elevation deficiencies seen in the Chalmette extension levee.  Morris 168:17 – 170:15; Bea 1313:11 – 1314:9; Wolff 4031:25 – 4032:13.

Clearly, the presence of the MRGO cannot explain why the Chalmette extension levee had similar height deficiencies as the Upper Reach 2 levee. Indeed, Dr. Bea conceded that the deficiencies that occurred away from the MRGO resulted from the "consolidation of the underlying interdistributary clays and marsh materials." Bea 1313:11 – 1314:14. Dr. FitzGerald testified similarly: "When you load the area, I was mentioning earlier, as we load this area with dredge spoil, we produce a weight or force on that sediment. And if the MRGO were not there, if this was just lateral area, it would tend to bulge in all different directions." FitzGerald 358:12-25.

Given that the soil underlying the levee was similar in both the Upper Reach 2 and Chalmette extension levees, it can be concluded that the foundation conditions created the levee height deficiencies in both locations. Indeed, Dr. FitzGerald testified about this obvious correlation: "[W]here the [levee] is low coincides with the region where the thickness of the interdistributary bay deposits are the thickest. . . . [W]here the levee rather is highest also coincides with a region where the interdistributary bay deposits are thickest." FitzGerald 368:1 – 369:9. A graph used by Dr. FitzGerald at trial, PX-2120, further illustrates this point:



The blue line represents the levee height and is scaled on the left axis, and the red line represents the interdistributary layer thickness and is scaled on the right axis.  FitzGerald 367:20 – 369:9. The correlation between the interdistributary layer thickness and levee height is apparent.  As Dr. FitzGerald succinctly testified, "I also see interrelationships between the height of the levee and the thickness of the deposits."[21]  FitzGerald 398:19 – 399:9.

---

[21]All Plaintiffs can attribute to the presence of the channel is the necessity for additional dredging caused by lateral displacement.  FitzGerald 358:12 – 361:15; Bea 1119:6-22.  But this purported additional dredging does not explain why the Chalmette extension levee had similar elevation deficiencies as the Upper Reach 2 levee—even if additional spoil was deposited on top of the interdistributary layer underlying the Upper Reach 2 levee.

Plaintiffs' theory of MRGO-induced lateral subsidence gives short shrift to the causes of subsidence that cannot be attributed to the MRGO. Dr. Bea's raising the Reach 2 levee crest to its design height of 17.5 feet demonstrates his failure to address other causes of subsidence. PX-2153;[22] Bea 1315:25 – 1316:11. Dr. Bea's assumption that the levee would have been that high at the time of Hurricane Katrina ignores all of the settlement that he concedes was ongoing until the storm struck. *See, e.g.*, Bea 1093:1-4; 1118:9-11.[23]

It is clear that settlement unrelated to the MRGO would have required substantial and repeated lifts. For example, Dr. Bea testified that at one levee section, the total settlement which occurred was 20 feet. Bea 1315:6-14. A levee subsiding at this rate would have needed multiple levee lifts throughout its lifetime to ensure the levee was at its target design elevation. *See also* Wolff 4026:9 – 4027:2; DX-1719 (LPV DM-3) at Plate 69; Mosher 3017:11 – 3019:6 (indicating that settlement would occur for approximately 50 years). Simply eliminating MRGO-induced subsidence would not, in itself, have resulted in design-grade levees.

Because it is undisputed that subsidence was an ongoing process regardless of the MRGO, the elevation of the levee crest when the storm struck under hypothetical "No MRGO" or "Mitigated MRGO" conditions cannot be ascertained. The Court repeatedly asked Dr. Bea to estimate the height of the levees at the time of the storm "but for" the subsidence attributable to

---

[22]PX-2153 is an exhibit Dr. Bea prepared over the weekend during his direct testimony in an effort to explain why he failed to conduct a Scenario 3 analysis. Bea 1251:24-1255:2.

[23]Dr. Bea also speculates that a levee, somehow, would have been in excess of the target design height but for the purported squeezing caused by the MRGO. *See* Bea 1569:13-17. This analysis requires the Corps to have built their lifts *higher* than the level needed to reach the target design height. To do so, Dr. Bea must assume the Corps would have spent money to build the levees excessively high. The testimony of Al Naomi contradicts this position, and the discretionary function exception and the Flood Control Act immunizes the Corps from any liability concerning the design of any levee lifts along Reach 2.

the MRGO, but Dr. Bea could not do so.  *E.g.*, Bea 1426:17 – 1432:16.  In his parametric studies Dr. Bea did not analyze the performance of levees at any heights other than the design elevation and the elevations that existed when the storm struck.  This is a fatal flaw, for Dr. Bea has no analysis of the performance of levees that were higher than those that existed in reality, yet lower than design grade as a result of subsidence unrelated to the MRGO. [24]

### b. LATERAL DISPLACEMENT WAS ADDRESSED BY THE LEVEE DESIGN.

Because of the soft soils present in the area, the Corps knew and understood that settlement and lateral displacement would be an issue when designing the Reach 2 levees.  Wolff 3983:20 – 3985:10; Bea 1129:14 – 1130:21; 1146:5 – 1149:6; FitzGerald 350:14 – 351:11; *see also* PX-59 (1958 Geotechnical Investigation) at 10, Plate 5.  The Corps then instituted two mechanisms to protect the levees:  Based on testing conducted at the Atchafalya Basin, stability berms were installed to ensure the levee's slope stability, and staged construction of the levee by the performance of periodic lifts was chosen as the construction method.

### (1)   THE ATCHAFALYA BASIN TESTING PROVIDED AN UNDERSTANDING OF LATERAL DISPLACEMENT.

In the 1960s, the Corps was aware that building levees on soft Louisiana soils would be problematic.  Wolff 3983:18 – 3984:3.  The Corps conducted testing along the Atchafalya Basin, adjacent to the Gulf Intracoastal Waterway, to understand how to properly construct levees adjacent to a waterway, with soft soils conditions.  *Id.*, Wolff 3987:7-8; 3992:4-17; Mosher 3022:21 – 3023:6.  To do so, the Corps constructed three test sites and examined their respective factors of safety.  *See* Wolff 4001:9 – 4003:13; Mosher 3022:21 – 3023:6.

---

[24]His opinion that breaching would not have occurred if the levees had been 5 feet higher does not depend on a comparative analysis of MRGO-related subsidence and subsidence related to other causes nor does it take into account the repeated lifting of the levee, which remediated any prior subsidence caused by the MRGO.  *See* Bea 1236:1-15.

A factor of safety compares two forces, the driving force and the resisting force.  Mosher 2989:2 – 2990:6; *see also* Wolff 4001:9 – 4003:13.  The driving force wants to push the material outwards, while the resisting force wants to hold back the driving forces.  Mosher 2989:2 – 2990:6; Wolff 4001:9 – 4003:13.  When the forces are equivalent, the factor of safety is 1.0.  *Id.* When the resisting force is stronger than the driving force, the factor of safety will be in excess of 1.0; for example, a resisting force which is 30 percent stronger than a driving force has a factor of safety of 1.3.  *Id.*

 At test section one at the Atchafalya Basin, there was no stability berm and the factor of safety was 1.11.  Mosher 3025:21 – 3026:7; Wolff 4001:9 – 4003:13.  At test section two, there was a small stability berm but a zone of weak soil, so that the factor of safety was 1.07.  *Id.*  At test section three, a larger stability berm was constructed and the factor of safety was 1.26.  *Id.*

These factors of safety yielded vastly different results.  Both test sections one and two, with low factors of safety moved laterally to the extent that cracks developed.[25]  Mosher 3023:7 – 3024:25; Wolff 4005:24 – 4006:12.  In contrast, test section three, with a higher factor of safety, was stable and did not develop any cracks.  *Id.*

### (2)  THE LEVEE DESIGN INCLUDED A FLOODSIDE BERM TO PREVENT LATERAL DISPLACEMENT INTO THE MRGO.

Based on the Atchafalya Basin testing, the Corps elected to build the Reach 2 levees with stability berms, thereby ensuring a factor of safety in excess of 1.3.  Bea 1300:14-17; Wolff

---

[25]Dr. Bea's latest declaration further evidences the biased analysis he used to obtain the mistaken lateral deformation results.  When evaluating the Atchafalya Basin testing, Dr. Bea states "[t]he maximum lateral displacements in the ICWW channel side of the test section levee are more than twice those on the landward side *(16 feet versus 7 feet)*."  Doc. 19023-2 ¶ 17 (emphasis added).  However, the scale presented in the chart clearly states that the deflection was in *inches*, not feet.  Inexplicably, Dr. Bea ignores the scale to vastly overestimate the purported "squeezing" effect.

4020:8 – 4021:21; Mosher 2990:7 – 2991:3, 3029:22-24; DX-1719, Plate Nos. 41 & 42 (LPV DM No. 3).  The analyses conducted by the Corps along Reach 2 checked the stability of the levee to an elevation 40 feet below the surface. Wolff 4020:8 – 4021:2; DX-1719, Plate Nos. 41 & 42 (LPV DM No. 3).  These analyses also determined that the most likely location where the levee would fail would be 100 feet from the levee center line.  Wolff 4021:23 – 4022:12; DX-1719 (LPV DM No. 3) Plate No. 42.  To prevent this failure, the levee designers ensured that the factor of safety was in excess of 1.3 at this location as well.  *Id.*  In addition, they ensured that the widening of the MRGO channel would not affect the factors of safety used in the Reach 2 levee design and that the banks of the MRGO did not encroach upon the Reach 2 stability berms. Mosher 3029:25 – 3030:4; 3032:6-2.

After construction the factors of safety would increase during the life-span of a levee. Wolff 4009:10-18; Mosher 3026:20 – 3027:2; *see also* Bea 1295:20 – 1296:12 (explaining that shear strength of soils increased with lifts).[26]  Indeed, when the Corps conducted an analysis of the Upper Reach 2 levee in 2001, the factor of safety had increased to 1.74.  Wolff 4034:13–4036:18; DX-562, Plate No. G21 (2001 Geotechnical Investigation Plan).  Dr. Bea, however, erroneously reduced the factors of safety for the Reach 2 levee to 1.16 and 0.9 —well below the factor set forth in the design memoranda.  Mosher 3027:3–11; Wolff 4009:22–4015:19; DX-451 (Bea July 11, 2008, Decl. No. 1) at 164, 174, 176.  He accomplished this erroneous reduction by misinterpreting a graph of shear-strength reductions brought about by prolonged stress.  He obtained lower factors of safety by reducing the shear strengths of the soil

---

[26]Inconsistently, Dr. Bea later said he reduced the shear strengths for the levees to obtain his lower factors of safety because the soil becomes *weaker* when dealing with a greater load. Bea 1537:21 – 1538:5.

by 40 percent and 30 percent.[27]  Bea 1537:7–1538:16; *accord* Wolff 4012:24–4014:14; PX-72

(Bea July 11, 2008, Decl. No. 1) at 177, Fig. 161 (noting coefficients of 0.6 and 0.7 to compute

Dr. Bea's calculations).  He incorrectly reduced the strength of the soil by misconstruing a graph

that portrayed reductions in shear strength effected by stresses of long duration.  PX-72 (Bea July

11, 2008 Decl. No. 1) at 175; Wolff 4012:10-23; Mosher 3027:16 – 3029:21.  But as the legend

created by Dr. Bea for Fig. 158 indicates, Dr. Bea mistook the values to set forth the *reduction* in

the shear strength of the soil.  Mosher 3027:16 – 3029:21; Wolff 4012:10 – 4012:23.  The figure,

however, sets forth not the reduction but the *actual* shear strength of the soil.  *Id.*  As the height

of the soil increases, the shear strength of the soil increases as well.  Mosher 3027:16 – 3029:21;

*see also* Wolff 4012:10 – 4012:23.

    If Dr. Bea had used the figure properly, he would have found factors of safety in excess of

1.3.  Mosher 3029:13-21.  But as a result of his mistaken understanding, he computed factors of

safety of approximately 1.16 and 0.9—far less than the true factors of safety established by the

design of the levee.  Mosher 3027:3-15; Wolff 4012:24 – 4014:21.  An indication that Dr. Bea's

factors of safety are wrong is the absence of visible cracking in the Reach 2 levee.  Dr. Bea's

factors of safety are similar to the ones found at test section two for the Atchafalya Basin testing,

where cracking was visible.  Wolff 4009:22 – 4015:19.  Cracking would have been visible along

the Reach 2 levee if Dr. Bea's factors were correct, but no cracking was visible.  Mosher 3021:9

– 3022:14; *see also* Wolff 4012:10 – 4014:14 (testifying that cracking would be visible if low

factors of safety were used); Bea 1323:15 – 1324:9 (explaining that no tilting or other deformities

that could be attributed to lateral deformation were seen on levee ).

---

    [27]Shear strength is the peak strength of a soil when one force exerts pressure on soil in one
direction while another force exerts pressure on the soil in another direction.  Mosher 3028:17 –
3029:1.

c.   THE USE OF STAGED CONSTRUCTION ALLOWED FOR REMEDIATION OF ONGOING
SUBSIDENCE.

Building levees in lifts, over the course of many years, ensured that settlement would be observed, measured, and corrected at appropriate intervals if funding was available.  Wolff 4016:20 – 4018:25, 4023:16 – 4024:4; see also Bea 1295:20 – 1296:12 (explaining that raising levees in lifts is in good practice with geotechnical community because it increases shear strength of soils that support load).  When initially constructing the Reach 2 levee, the Corps anticipated that a rapid, large amount of settlement would occur quickly after a lift.  Wolff 4024:17 – 4027:2; Mosher 3013:18 – 3014:12; DX-1719 (LPV DM-3) at 25-27; see also Bea 1293:11 – 1294:15 (stating that consolidation of levee after initial construction was expected to occur).  Thereafter, the levees would then slowly settle.  Wolff 4026:9 – 4027:2; DX-1719 (LPV DM-3) Plate 69. The Corps's design anticipated that a large amount of settlement would occur, even after all of the lifts.  Mosher 3030:24 – 3031:23.  All told, the settlement could take over 50 years because the high plasticity clays with a large percentage of water would take a long time to consolidate. Wolff 4026:9 – 4027:2; Mosher 3017:11 – 3019:6; DX-1719 (LPV DM-3) Plate 69.

Before constructing a new lift, the Corps then conducted soil borings.  See Mosher 3000:15 – 3001:6.  These borings demonstrated that the soils underlying the levee were stiffening, thereby significantly reducing the amount of future settlement that would occur underneath a lift.  Wolff 4027:5–4028:7; 4034:13–4036:18; DX-1719 (LPV DM-3) at 20, ¶ 38; DX-562 (2001 Geotechnical Investigation Plan), Plate G21.   Based on these borings, the Corps prepared a plan in 2001 to construct another lift of the Reach 2 levees between Bayou Bienvenue and Bayou Dupre.  DX-562 (2001 Geotechnical Investigation Plan).  This plan assumed erosion of the foreshore while also analyzing the slope stability to a depth 53 feet below the surface. Id.

The lowest factor of safety increased to 1.74, as the soil gained strength over time.[28]  *Id.* Unfortunately, the Corps could not conduct this lift because Congress failed to appropriate the necessary funding.  Naomi 3480:15 – 3483:18; Mosher 2982:22 – 2984:1; Bea 1302:5–21.

### d. Lateral Displacement ended in 1980, but levee lifts continued.

Given that the soils were gradually being consolidated by gravity as time passed, it is unsurprising that Dr. Bea did not compute any lateral displacement after 1980, as this figure reveals:

| YEAR | SETTLEMENT WITH MR-GO | SETTLEMENT WITH OUT MR-GO |
|---|---|---|
| 1965-1967 | 2,30 | 2,31 |
| 1967-1972 | 4,10 | 1,68 |
| 1972-1980 | 4,12 | 2,19 |
| 1980-1985 | 2,60 | 2,60 |
| 1985-1992 | 4,21 | 4,23 |
| 1992-2001 | 4,60 | 4,60 |
| 2001-2005 | 4,80 | 4,80 |

| YEAR | FILL INCREMENT |
|---|---|
| 1965 | 4,00 |
| 1968 | 10,50 |
| 1973 | 8,00 |
| 1981 | 5,50 |
| 1986 | 4,50 |



20-1417PX-2118 (Bea April 3, 2009, Decl.) at 39; Bea 1416:20 – 1417:9.  That the soils in the levee consolidated and strengthened over time is undisputed.  Wolff 4009:10-18; Mosher

---

[28]Another portion of the 2001 plan checked the slope stability towards the landward side of the levee, assuming removal of the borrow area 215 feet away from the levee.  Wolff 4040:3 – 4041:11, DX-562, Plate G24.  The minimum factor of safety for the landward side was now 1.47 at an elevation 30 feet below the ground.  *Id.*

3026:20 – 3027:2.  As Dr. Bea described it, the increasing strength of the consolidating soils can be compared to "attempting to stiffen up the bed before you sit on it."  Bea 1295:20 – 1296:12.

> If you take a light person and have them sit on the edge of the bed, it's very different than if you take a 300 pound person and set them on the edge of the same bed.  So the squeezing is being exacerbated or driven by the very high increment in weight.  As the increments in weight decrease, the squeezing has to decrease.

Bea 1417:23 – 1418:4.  Initially, when the soils were wetter and weaker, the heavy lifts caused the most lateral displacement.  As the water was squeezed out of the soil, the soil was able to bear the weight of the smaller later lifts with minimal if any displacement.

> The process is encapsulated in this exchange at trial:

> The Court:  Right.  My only problem was apparently there's been very little – from this chart, very little difference from 1980 on to the present date, yet the lifts occurred.  *So it would have to be within the lift itself, I guess.  Is that true?*

> *The Witness:  That's correct.*  Now you got it.  It's this intersection of these two primary players.  It took us a while to understand.

Bea  1418:5-12 (emphasis added).

Dr. Bea later attempted to distance himself from this conclusion by attributing the end of lateral subsidence in 1980 to a reduction in the number of lifts after that date. Bea 1571:9 – 1572:18.  But inasmuch as some lifts occurred after 1980, this explanation fails to account for the virtual absence of lateral subsidence after 1980.  Nor does it comport with the evidence that two lifts were performed at Dr. Bea's test site after 1980.  Moreover, even if it were to be accepted that a minimal amount of lateral subsidence was occurring after 1980, the Corps's method of staged construction was able to address subsidence regardless of cause.  The bottom line is that the absence of any quantifiable lateral displacement after 1980 leads to a conclusion that the low crown elevations that existed when Katrina struck were probably caused by consolidation of soils within the levee and not by lateral displacement.

Because the rate of subsidence was diminishing with the passage of time, it may be concluded that the regular lifting of the levee through the planned process of staged construction fully remedied whatever subsidence may have been attributable to MRGO-related lateral displacement.  Significantly, *every levee lift conducted by the Corps remedied any prior lateral displacement that might have been taking place*.  Regardless of cause, each lift served to eliminate all subsidence, whether attributable to consolidation of the levee and its foundation or to lateral displacement.

Once again, Dr. Bea's own work is instructive.  This graphic, used at trial, demonstrates the history of levee lifts at Dr. Bea's test site:



PX-72 (Bea Decl. No. 1, July 11, 2008) at 35; *see also* PX-2118  (Bea Apr. 3, 2009, Decl.) at 20-21.  As detailed in the graphic, the levee attained the design height twice after 1980.

Indeed, to remedy subsidence attributable to levee and foundation consolidation, the Corps had planned and requested funding for an additional levee lift.  According to Dr. Bea's own analysis, the portion of subsidence attributable to the MRGO was *de minimis*—a mere 4.5 inches over a 13 year period.  Bea 1297:4–20.[29]  The planned lift did not happen because Congress failed to appropriate funds.  Naomi 3480:15 – 3483:18; Mosher 2982:22 – 2984:1; Bea 1302:5-21.

### e.  THE WIDENING OF THE MRGO DID NOT CAUSE LATERAL DISPLACEMENT.

Remarkably, Dr. Bea admits that lateral subsidence was least when the MRGO was widest.  Bea 1418:5-12.  It is undisputed that the erosion of the unprotected banks of the MRGO and the widening of the channel at the surface was occurring continuously over the life of the project.  *E.g.*, FitzGerald 322:12 – 323:23; PX-96.29 (graphic comparing width of MRGO throughout time to pre-Katrina shoreline).  According to Dr. Bea's theory of  encroachment-induced lateral displacement, subsidence accelerated as the channel crept closer and closer to the levee:  "As the channel widens, the travel path through this lateral squeezing material is being shortened.  So it can escape faster and with more intensity."  Bea 1120:9-13; *accord*  Bea 1428:3-23.  But Dr. Bea's correlation of channel widening with lateral displacement is at odds with the evidence as well as with his hypothesis.  If the MRGO widened over 300 feet between 1980 and 1990, as Plaintiffs contend, then Dr. Bea's theory required an acceleration of subsidence over time, with the most rapid subsidence occurring in the years immediately preceding the storm

---

[29]Even using the final lift height of approximately 20 feet, subsidence attributable to the MRGO would only be approximately one foot over the course of almost 20 years – less than one-half inch per year.  PX-72  (Bea July 11, 2008 Decl. No. 1) at 35.

when the channel was widest.  FitzGerald 323:9-17.  The empirical evidence, which Dr. Bea does not dispute, shows that just the opposite was occurring.  As the channel banks eroded, allowing the channel to creep closer and closer to the levee, subsidence was becoming smaller and smaller.  This is further evidence that soil desiccation and consolidation, not any "squeezing" of foundation soils into the MRGO, was the cause of the loss of protective elevation.

### f. Dr. bea used incorrect datums in his settlement analyses.

Plaintiffs also neglect to consider datums, which are the reference points for any analysis involving levee heights.  DeLoach 3918:24 – 3919:20.  When constructing the Reach 2 levees, the Corps relied upon the Mean Sea Level datum, which was equivalent to the National Geodetic Vertical Datum of 1929 ("NGVD29").  DeLoach 3919:21 – 3920:10; DX-299 (LPV DM-3), EDP-017-095; JX-284 (LPV DM No. 1 Part C) at 1; JX-286 (LPV DM No. 3 Supp. 1) at B.  Instead of using this datum to measure the levees, Chad Morris and Professor Vrijling used NAVD88 (2004.65) for their data outputs.  *E.g.*, JX-191 (Morris Rpt.) at 4 ("Elevations are in feet and refer to the North American Vertical Datum of 1988 (NAVD88-2004.65)."); JX-197 (Vrijling Flow Rpt.) at 92-98 (detailing surge hydrographs).

Dr. Bea's failure to properly account for these datum differences significantly affects his results when analyzing the levee heights.  Dr. Bea's direct testimony prominently featured a graph taken from his expert report:

| All Levees | | |
|---|---|---|
| Elevation[1] | Total Levee Length(ft) | Percent of Total Length Per Elevation Range |
| <=15.5 | 6908 | 10% |
| 15.5<16.0 | 10915 | 16% |
| 16.0<16.5 | 5333 | 8% |
| 16.5<17.0 | 14277 | 21% |
| 17.0<17.5 | 12750 | 18% |
| >17.5 | 18845 | 27% |

Bea 1114:20-1118:15; PX-72 (Bea Decl. No. 1, July 11, 2008) at 35.  This graph, which uses

NGVD29 as its datum reference, measures the history of levee elevation as compared to a

"Target Design Elevation = 17.5 ft (NGVD29)."  Plt. Br., App J, at 34 (Doc. 19012-22).

According to Stephen DeLoach, the only expert in vertical datums presented in this case, a 17.5

foot levee measured in NGVD29 is essentially equivalent to a 16.5 foot levee measured in

NAVD88 (2004.65).  DeLoach 3891:10 – 3897:11; 3920:18 – 3921:8; 3922:14 – 3923:11; *see*

*also* DM-40 (DeLoach drawing).

Dr. Bea's apples-to-oranges comparison using different datums biases his results in favor

of finding excess settlement.   As Plaintiffs' own slides make clear, 66 percent of the Reach 2

levees were at least 16.5 feet NAVD88 2004.65 at the time of Hurricane Katrina —otherwise

equivalent to the design height of 17.5 NGVD29—and 90 percent  of the Reach 2 levees were at

least 15.5 feet NAVD88 2004.65 at the time of the storm, within one foot of the design height.[30]

Plt. Br., App J, at 34 (Doc. 19012-22).  By focusing on the "Percent of Total Length Per

Elevation Range" column, the totals can be added to determine the length of levee at, below, or

above a certain height.  For example, only 10 percent of the levee was below 15.5 feet NAVD88

2004.65, while 34 percent of the levee (10 percent + 16 percent + 8 percent ) was below 16.5

feet NAVD88 2004.65.

Therefore, when using the proper comparison, the amount of settlement is limited.  By

misusing the datums, Dr. Bea decreased the height of the Reach 2 levee by approximately one

foot before he conducted his lateral displacement analysis.  Given such a head start, it is little

wonder that Dr. Bea discovered the levees were sinking faster than expected.

### 2. DR. BEA'S OPINION THAT THE LEVEES WOULD HAVE BEEN MORE DENSELY COVERED WITH GRASS "BUT FOR" THE MRGO LACKS SUPPORT IN FACT AND IN SCIENCE.

Vital to Plaintiffs' claim that the MRGO was a substantial contributing factor in the

breaching of the Reach 2 levees is Dr. Bea's opinion that the migration of saltwater into the

vicinity of the channel prevented the growth of dense, erosion-resistant grass on the levees.[31] But

Dr. Bea did not perform any analysis in support of his opinion and there is no record evidence to

support this opinion other than Dr. Bea's own say-so.  Bea 1276:19-23.  Further, there is record

evidence refuting this opinion.  Dr. Bea himself testified that dense, erosion-resistant grass was

---

[30]This slide, provided by Plaintiffs in their brief to the Court, is based upon levee heights provided by the United States' expert, Steven Fitzgerald, in PX-2138.3.  Heights for PX-2138.3 are measured against NAVD88 (2004.65).

[31]Dr. Bea testified that the grass-cover characteristics of the levees varied along Reach 2. Bea 1501:11-16.  Dr. Kemp attempted to deflect a question about quality of grass cover, but was confronted with an article he had authored stating that the Reach 2 levee had very good grass cover prior to Katrina. Kemp 1980:13 – 1981:24; DX-1718 (Kemp Rpt.).

growing on the levees in places where the marsh adjacent to the levee had been affected by saline intrusion.  Bea 1275:3 – 1276:2; 1278:6 – 1280:4.  Dr. Bea's opinion was further undermined by evidence that the brackish marsh between Bayous Bienvenue and Dupre adjacent to the MRGO and New Orleans East Back Levee had been present before construction of the MRGO.  Bea 1280:22 – 1282:25.

The habitat classification maps prove that the MRGO did not change the character of the marshes where Dr. Bea says the grass was poor due to MRGO-introduced salinity.  The areas that Dr. Bea claims were negatively affected by salinity introduced by the MRGO actually experienced no change in the habitat as a result of the MRGO.  This was true for the section of the New Orleans East Back levee that breached, and the breached levee along Reach 2 between Bayous Bienvenue and Dupre.  Bea 1281:1-10; *see also* DX-451, at 72.  The MRGO did not change the marshes between Bayous Bienvenue and Dupre from brackish marsh to salt marsh.  Bea 1281:24  – 1282:21; *see also* DX-451, at 72; *cf.* JX-195 ( FitzGerald Rpt.), at 4-5.  The conclusion that salinity caused the failure of the Reach 2 levees cannot be drawn.  The habitat classification maps shown in Drs. Bea and FitzGerald's reports demonstrate that those areas were adjacent to brackish marsh in the 1950s and still are today.  Consequently, Plaintiffs' proof fails unless other evidence was introduced that supports salinity from the MRGO causing poor grass on the levee.  Bea 1282:22-25.  Plaintiffs presented no such evidence.  Any alleged poor grass and vegetation growth in these areas cannot be attributed to the MRGO.[32]  Bea 1285:14 – 1286:5; *see also* DX-451, at 72.

_____

[32]Contrariwise, and just as radically at odds with Dr. Bea's opinion that the MRGO prevented the growth of dense turf, is the evidence showing that salt marsh existed next to densely covered levees.  Indeed, some of the very places where Dr. Bea praised the quality of the grass cover were ones where the MRGO had changed the character of the marshes from brackish to salt marsh.  *See* Bea 1279:14-23; *cf.* JX-195 ( FitzGerald Rpt.), at 4-5.

### a. BEA SCENARIOS 2C AND 3 ARE FATALLY FLAWED BY "DENSE GRASS ON LEVEE SURFACES" (PX-2153).

The undisputed fact that the brackish and saline environment antedated the MRGO demonstrates that Dr. Bea's Scenarios 2c and 3 are fatally flawed.  Even if the Court were to find that poor soil caused poor grass cover, the lack of causal connection to the maintenance and operation of the MRGO confirms the inappropriateness of putting dense turf on the levees in Scenarios 2c and 3.  Dr. Bea concluded that breaching would not have occurred in a "No MRGO" or a "Mitigated MRGO" scenario based on the performance of "[d]ense grass on levee surfaces" in the models he concocted for his Scenarios 2c and 3.  PX-2153.  By putting "[d]ense grass on the levee surfaces," he strengthened the levees in those scenarios more than can be justified on this record.  His parametric studies therefore do not warrant a finding that "but for" the MRGO Plaintiffs' homes would have had "only a few wet carpets."  Bea 1093:12; 1479:14. His conclusion that the levees would not have breached "but for" the MRGO is based on the performance of  imaginary levees that there is no basis for believing would or could have existed, even in "a landscape in which the 1958 MRGO project never existed." JX-204 (Kemp Rpt.) at 69.  Even if Dr. Bea's opinion about the deleterious effect of the saline environment on the grass on the levees were to be credited despite his glaring lack of expertise on the subject, *but see Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) ("A claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness") (internal citation omitted), that opinion would not justify Dr. Bea's levee configuration in his "No MRGO, No Breaching" scenarios.

Dr. Bea's manipulation of the levees in his counterfactual scenarios may have been driven by the surge predictions provided by Plaintiffs' experts at Delft University.  Those experts found what the United States' experts later confirmed:  the presence or absence of the MRGO had no appreciable effect on surge and waves.  With no significant differences between the two

scenarios, the remaining "primary parameters that influence the ultimate outcome, flooding," Bea 1253:7-8, resided in the levees.  To obtain different outcomes in the various scenarios, Dr. Bea had to manipulate the levees' size and strength.  These alterations, now shown by the facts to be unjustified, became the basis for Plaintiffs' contention that a fully "mitigated" MRGO would have prevented "the ultimate outcome."  For both Scenarios 2c and 3, these changes to the levees lack a sound basis in the facts and have no scientific basis other than the expert's *ipse dixit* and idiosyncratic methodology.

> **b.   THE MRGO DID NOT CAUSE THE POOR SUBSTRATE THAT DR. BEA BLAMES FOR POOR GRASS COVER.**

Dr. Bea also testified that the quality of the grass cover, especially its ability to resist erosion, depended on the quality of the levee soil.  In his opinion, a clay substrate allows more dense grass growth because it retains water well.  On the other hand, a sand substrate does not retain water well.  Bea 1276:10-12; 1276:21 – 1277:5.  Dr. Bea concluded that the places where the levees had poor grass cover were places where the substrate was sandy.  Where the grass cover was good, the levee topsoil consisted of clay.  Bea 1279:21 – 1280:4.  The heterogeneous soils in the levees were a result of their having been constructed with hydraulically obtained, hydraulically placed fill.  Mosher 2973:16-20.  The use of hydraulic fill comported with the state of practice at the time of construction and was chosen as the most economical method.  Mosher 2974:8-12; Mosher Rpt. 25.  Dr. Bea did not opine that the levees would have been constructed with better soil for sustaining grass if the MRGO's alleged "flaws" had been remediated, and there is no adequate basis for such a finding.

> **c.   THE MRGO DID NOT CAUSE THE FLOODING OF NEW ORLEANS EAST.**

It is especially important to recognize that the  New Orleans East Back Levee did not breach as a result of  salinity, because salinity intrusion is the sole and entire basis on which

Plaintiffs attribute New Orleans East Back Levee breaching to the MRGO.   Dr. Bea opined that

the only connection between the MRGO and the massive New Orleans East Back levee breach

east of Pump Station 15 was increased salinity causing damage to the grass and vegetation

fronting the levee.   Bea 1276:3-7.   But the evidence demonstrates that the MRGO did not change

the nature of the marsh fronting that levee.   This levee was fronted by brackish marsh before the

MRGO was built and also at the time of Hurricane Katrina.   Bea 1276:10-12; *see also* JX-195 (

FitzGerald Rpt.), at 4-3.   The lack of any change to this area confirms the obvious:   the MRGO

had no input into the breaching of a levee that was constructed on the GIWW more than four

miles from the MRGO.   If as Dr. Bea assumes the grass on that levee was sparse, the poor grass

cover cannot be blamed on the MRGO.[33]

Plaintiffs' inability to tie the huge New Orleans East Back Levee breach to the MRGO

precludes them from establishing that the damage to the Robinson property was caused by the

MRGO.   Plaintiffs argue that the overtopping of the Citrus Back Levee resulted from the MRGO.

While it is true that the MRGO did raise the surge elevation within Reach 1 and thereby did

contribute substantially to the overtopping of the Citrus Back Levee and the initial flooding of

the Robinson property, several additional facts reveal why the operation and maintenance of the

MRGO was not a substantial causative factor.   First, the additional surge elevation in Reach 1

resulted from the initial construction of the deep-draft channel, not from any subsequent

maintenance or operation.   Second, the floodwaters from the overtopping of the Citrus Back

Levee peaked and had begun to recede from the Robinson property when the floodwaters from

---

[33]Here again it must be reiterated that the levee reach immediately west of Pump Station 15 had good grass cover and vegetation even though the marsh adjacent to that reach had changed from brackish to salt marsh since the construction of the MRGO.   *See* JX-195 ( FitzGerald Rpt.) at 4-5.

the New Orleans East Back Levee breach reached the property and raised the elevation of the floodwaters even higher than the prior peak.  In the final analysis, the arrival first of floodwaters from Reach 1 made no difference whatsoever.  Regardless of the MRGO, the Robinson property was going to be flooded to its maximum extent by floodwaters attributable solely to force majeur:  Hurricane Katrina.  The MRGO therefore cannot properly be regarded as a substantial factor.

### 3. Dr. bea's opinion that  the levees would have survived "but for" the MRGO depends on his idiosyncratic, unverified, unvalidated use of LS-DYNA to model near-shore waves.

Dr. Bea's conclusions about levee performance are unsound because they depend on incorrect characterization of the hydrodynamic forces that affected the levees.  He undertook to evaluate significant heights, periods, and directions of the waves that broke on and washed over the levees during Hurricane Katrina and in his hypothetical scenarios.  Bea 1373:23 – 1374:1. He took the SWAN wave characteristics as they were estimated to exist in the middle of the MRGO and then used a variety of the LS-DYNA model to evaluate the changes in those waves from the middle of the channel to the levees.  Bea 1421:18 – 1422:4; 1464:5-15.  He changed "that wave height as a function of water depth and vegetation conditions to the face of the levee." Bea 1464:14-19.  He did not rely on the wave height estimates generated by Plaintiffs' Delft experts for waves at the levee toe or at the levee face.  Bea 1464:23 – 1465:3.

Dr. Bea's fundamental mistake was to rely on a model that does not accurately depict waves as they exist in nature.  His model analyzed "monochromatic" waves, not the constantly changing irregular waves that were generated by Hurricane Katrina.  Bea 1514:1-8; Kemp 1976:25 – 1977:25; Resio 2856:7-12.  A monochromatic wave is the simplest representation of a wave.  It takes the form of a sine wave, repeatedly peaking and breaking uniformly, impacting the

structure similarly each time.  *See* Resio 2856:13–2857:6 (describing differences between monochromatic and irregular waves); *see also* Ebersole 2246:20 – 2248:2.  Dr. Bea's use of monochromatic waves to evaluate the impact of the waves yielded a skewed assessment of the erosive power of the waves.  Ebersole 2247:10-25.  The significant height of the irregular waves that exist in nature is defined as the average of the highest one-third of the waves.  The significant wave height is the height routinely used to evaluate waves in nature.  It is the parameter used in both the SWAN and the STWAVE modeling that the parties' wave experts relied on.  In contrast, the height of the monochromatic waves modeled by Dr. Bea was uniform, which resulted in his evaluating the effects of the largest waves in his model.  *See id.*  Because a wave's energy is directly related to its height, Dr. Bea's use of monochromatic waves in his analysis exaggerated the energy in the waves that broke upon the levees by 40 percent.  Ebersole 2247:14 – 2248:2.  Dr. Bea's model incorporated a solid boundary that trapped wave energy rather than allowing it to flow out of the system as should have occurred in order to accurately assess the impact of waves on the levees.  Resio 2860:2 – 2861:25.  The LS-DYNA model has been validated for modeling impacts of solids but has not been validated for evaluating the impacts of water waves in nature.  Indeed, Dr. Bea's use of the model for this purpose is unprecedented.  Resio 2853:1 – 2854:1.

The variability of naturally-occurring irregular waves results in non-uniform breaking, which means that the waves do not all strike the levee face in the same place repeatedly.  Resio 2832:8-23; 2856:16 – 2857:6; 2858:3 – 2860:16.  The pictures of the tallest levees south of Bayou Dupre that had experienced some front-side notching at the crest as a result of prolonged wave attack illustrate this point.  In those pictures, the notches on the levee's front side are not uniform, as might be expected as an effect of a wave hitting the same location repeatedly.  Out of

all the pictures of levee damage presented in this case, only one shows evidence of numerous

discrete bench cuts on the front face of the levee at and above the upper edge of the surface

erosion band.  *See* JX-211 (Ebersole Rpt.), at 86-87, Fig. 49.  The cuts in the levee are isolated

and do not form a continuous zone of erosion.  *Id*.  The visual evidence of the variability of

wave-induced erosion on the Reach 2 levee provides empirical evidence that Dr. Bea's wave

modeling was fatally flawed.

### 4.   Dr. bea manipulated his "grass lift-off" rates to prevent backside erosion.

The onset of erosion is triggered by the loss of grass cover, which Dr. Bea describes as

"grass lift-off."  As noted above, Dr. Bea inappropriately changed the grass cover in his "No

MRGO, No Breaching" scenarios.  But quite apart from that improper manipulation, his

estimates of the ability of turf to resist erosion, as measured by the time that elapses until grass

lift-off, reveal that his analysis diverges so greatly from current engineering guidance as to justify

an accusation of outcome-oriented manipulation.

The engineering community's nascent study of the phenomenon of hydraulically

generated grass lift-off prevented the parties' experts from providing definitive estimates of the

time required for this process to occur under the conditions created by Hurricane Katrina.  There

is substantial disagreement in the coastal engineering community about grass lift-off times.  Bea

1494:7-10.  There is currently no accepted standard for grass lift-off times.  Bea 1494:11-22; JX-

210 (Wolff Rpt.) at 44-45.  Two peer-reviewed publications regarding grass cover stand out as

the current state-of-the-art for calculating grass lift-off times, and Dr. Bea relied on both of them.

The first, from engineers Seiffert and Verheij in the Netherlands, focuses on the erodibility of

grass as a function of significant wave heights.  *See* DX-451, at 76-80 (describing

Seiffert/Verheij studies).  Seiffert and Verheij described the surface erosion signature of levee

grass as a result of wave attack on the front side, and developed a numerical model for calculating grass lift-off time.[34]  *Id*. at 79-80, Figs. 65, 66.

Dr. Bea also relied on an older set of studies, by H.W.M. Hewlett, published in 1987. Hewlett analyzed the erodibility of turf  as a function of the velocity of water flowing over the turf.  In those studies the tested materials ranged from grasses of differing densities to concrete mats.  Dr. Bea relied on Hewlett to analyze the grass lift-off during overtopping.

Dr. Bea's analyses incorporated two dubious assumptions.  He assumed that the grass cover would have been very good "but for" the MRGO, and he also assumed that vegetation fronting the levee would have reduced the height of wave to half of the height of the waves that he used in modeling the Hurricane Katrina conditions.  The first of these assumptions has been addressed above and requires no further comment.  Dr. Bea's estimate of the wave-diminishing effect of fronting vegetation does not withstand scrutiny either.  To estimate the effect of vegetation on waves, Dr. Bea relied on a study that evaluated the effect of vegetation in a windless environment.  *See* DX-451 (Bea July 2008 Rpt.), Bea Decl. No. 1, at ¶ 56, Figs. 54-55 (describing the Knutson study in the Chesapeake Bay and graphing the wave decaying effects observed in that study).  As Dr. Resio pointed out, there are three important distinctions between the Knutson study and the conditions being evaluated in this case: (1) there were no winds in the Knutson study; (2) the ship wake-generated waves on the Chesapeake Bay were relatively small compared to the vegetation; and (3) fronting vegetation did not diminish waves during Hurricane

---

[34]For the equation they developed, Seiffert and Verheij included a variable for a factor of safety.  *Id*. at 80 ("They used a factor of safety . . . of 2.0 to develop these results").  Both Dr. Bea and the United States' expert Bruce Ebersole agree that for a forensic analysis, the factor of safety coefficient is removed.  Bea Bea 1495:5-16 (describing that design curves for grass cover incorporate factors of safety); Ebersole 2542:24 – 2543:10 (stating that factors of safety variables are not used in forensic studies because the safety factor pertains to design).

Katrina because it was submerged beneath the surface of an 18-foot-high surge. Resio 2872:18 – 2873:10. The Knutson study is of probative value in evaluating conditions that did not exist during Hurricane Katrina. Resio 2873:15-20.

Although Dr. Bea cited the Seiffert/Verheij and Hewlett studies as validation of his own analyses, his claim of validation is dubious inasmuch as he does not replicate their analyses. Rather than applying the calculations set forth in these published studies, he treats them only as "guidelines" and then devises his own rates of grass lift-off. DX-451, at 83 ¶ 66. To assess grass lift-off on the front of the levee, Dr. Bea developed three curves based on the quality of the grass and the significant wave height at the impact zone. *Id*. at 84, Fig. 70. To assess backside erosion, he developed a second set of curves. *Id*. at 83, Fig. 69. Neither set of curves is consistent with the erosion rates set forth in the cited studies.

Applying the actual equation that Seiffert and Verheij developed for good, moderate, and poor grass cover would result in grass lift-off in *hours,* under Hurricane Katrina conditions, but Dr. Bea's curves compress the process so much that he predicts grass lift-off in minutes. *See* Ebersole 2253:9 – 2254:11; *see also* DM-17, at slide 62. Using the rates established by Seiffert and Verheij, a significant wave height of two feet would remove grass of moderate density in about twenty hours. *Id*. at 2254:7-22. For poor density, the time to lift-off would be about twelve hours. *Id*. at 2254:23-25. By "reduc[ing] the lift-off times for the grass by a factor of 15 or 20 compared to the values that are suggested by the Seijfert (sic) and Verheij Model unaltered," Dr. Bea made the grass unrealistically susceptible to lift-off.[35] Ebersole 2257:15-21.

---

[35]To rationalize his contrived grass lift-off theory, Dr. Bea stated that his curves were proper because he was addressing the erodibility of grass covering with a sandy substrate, whereas Seiffert/Verheij and Hewlett were concerned with grass covering on a clay substrate. Notwithstanding that the soil borings of the Reach 2 levees prior to Hurricane Katrina showed a predominance of clays at the levee surface. Dr. Bea cannot identify similar guidelines from the

Dr. Bea's idiosyncratic, unvalidated grass lift-off curves allowed him to conclude that waves would have removed grass from the front of the levee during Hurricane Katrina and initiated breaching but would not have removed grass if the MRGO's supposed flaws had been eliminated. His conclusion is unsound because it depends on three flawed assumptions: (1) dense grass would have covered the levee in "Mitigated MRGO" conditions, (2) waves would have been drastically reduced in size in "Mitigated MRGO" conditions, and (3) grass lift-off would have occurred in a matter of minutes, not hours. The lack of a sound scientific basis for even one of these three assumptions suggests that Dr. Bea manipulated his analyses so that the front-side grass would lift off in Scenario 1 but not in Scenario 2c or 3.

The record also demonstrates that Dr. Bea manipulated the data for backside erosion, skewing it in the opposite direction from his front-side analysis. Dr. Bea's curves for grass lift-off from overtopping flow cannot be reconciled with the values set forth in the Hewlett study. Hewlett determined that a concrete-covered levee would be eroded by water flowing at a velocity of 8 meters-per-second, which is approximately 26 feet-per-second. DX-451, at 82, Fig. 68. Dr. Bea calculated that water would have to exceed this rate in order to lift-off of a good grass cover. He predicted that grass lift-off would not occur until an hour after flow reached a speed of 33 feet-per-second. *Id.* at 83, Fig. 69; *cf. id.* at 82-83, Figs. 68-69 (velocities and periods required to remove concrete cover). Dr. Bea's analysis is suspect and should not be relied on because it "treat[s] [the grass] as though it's much more resistant to erosion than even a concrete armoring system." Ebersole 2279:22 – 2280:5. The lack of *any* scientific support for the changes made to the quality of the turf on the *backside* of the levee, coupled with the near-impervious quality that

---

Seiffert/Verheij or Hewlett studies for modeling grass lift-off times on a sandy substrate. The lack of empirical data on the matter does not give Dr. Bea license to create data that is unsupported by any evidence other than the expert's *ipse dixit*.

his lift-off curve implies, renders this step in Dr. Bea's comparative analysis of levee

performance unreliable, warrants an inference that the analyses in this step were contrived, and

demonstrates that his ultimate conclusions drawn from his parametric studies are unsound.

### 5. DR. BEA'S COLLECTION AND CHARACTERIZATION OF SOIL SAMPLES AND THEIR ERODIBILITY WERE UNSCIENTIFIC.

Dr. Bea's opinions about the performance of the levees during Hurricane Katrina and

under alternative hypothetical scenarios were formed on the basis of tests performed on soil

samples that he collected during field investigations along the MRGO.  The methods by which he

selected his samples, collected them, and tested them were unscientific.  Dr. Bea admits that his

erosion analyses have uncertainties as great as 100 percent.  Bea 1503:2-16.  Opinions formed on

the basis of improper methods and analyses with huge uncertainties render his ultimate

conclusions about levee performance unworthy of reliance.

### a. DR. BEA'S METHOD OF COLLECTING SOIL SAMPLES WAS UNSCIENTIFIC.

Dr. Bea collected soil samples in January 2006. Bea 1354:12-15.  By this time Hurricane

Rita's surge and waves had inundated the site.  Dr. Bea took shovel samples of breached areas,

placed them in milk cartons, and then transferred them to the trunk of a car for transport to

Texas, where they were later tested.  Bea 1353:1-7; 1358:15-18.  The samples had a "very high

sand, silt, and shell content."  DX-451 at 37.

By collecting soil from the shoulders of a levee breach, Dr. Bea probably gathered

samples that were unrepresentative of the composition of the levee prior to the hurricanes.  The

clays within the levee would have been transported away from the breach by storm surge and

would have been dispersed to other areas, leaving sand, silt, and shells behind. JX-30 (Coastal

Engineering Manual) at III-5-38(a)(1); Bea 1355:11-25.  The transport of the more cohesive

materials away from the levee is borne out by the photographs analyzed by Mr. Ebersole and Dr. Mosher.  JX-212 (Mosher Rpt.) at 27.

The correct method for collecting soil to test for erodibility is a method that does not disturb the composition of the soils *in situ* and that penetrates well below the surface.  Soil to be tested for erodibility and other characteristics is therefore typically collected by thrusting a "Shelby tube" into the ground.  This minimizes disturbance of the sample and "maximizes the preservation of *in situ* density structure because of its importance in determining erodibility." JX-211 (Ebersole Rpt.) at 69.  Disturbance of the soil sample through rough handling, storing it other than in a vertical position, and allowing unnatural drying "can compromise the natural properties of the sediment sample, in terms of its resistance to erosion, and lead to erroneous test results."  *Id.*  The soil samples collected by boring into the levee prior to Katrina were analyzed, and those borings revealed that clay particles predominated between Bayous Bienvenue and Dupre, though with varying degrees of erosion-resistance.  *See* JX-212 (Mosher Rpt.) at 36-37, 39-42; *see also* JX-211 (Ebersole Rpt.) at 60-61, table 4 (describing sediments as lean and fat clays along Reach 2, but having more silt and sand as the levee approaches Bayou Dupre).

Given the high dispersion of cohesive soils by the floodwaters that cut through the levee, Dr. Bea's soil sample with a "very high sand, silt, and shell content" was probably not representative of the composition of the levee prior to Katrina.  DX-451 at 37.  Further, the jumbling of the soil as it was shoveled out of the levee, placed in milk cartons, and then carried by car to a distant place virtually ensured that later testing would not be able to ascertain even the erodibility of the sample *in situ*.  JX-211 (Ebersole Rpt.), at 70; DX-451 (Bea Tech. Rpt. No. 1) at 59 ("the degree of compaction makes a LARGE difference in the performance of the 'levee' materials").

121

**b. THE TEST THAT DR. BEA RELIED ON FOR ASCERTAINING ERODIBILITY WAS NOT SUITED TO THE PURPOSE.**

The erosion tests that Dr. Bea relied on were ill-suited for an assessment of resistance to waves. Dr. Bea relied on the work of Dr. Jean-Louis Briaud of Texas A&M, a fellow member of the Independent Levee Investigation Team, for soil erosion analyses. Dr. Briaud invented a device called the Erosion Function Apparatus ("EFA") that runs a flume of water over the surface of a soil sample, measuring the amount of soil that is removed as a function of time and velocity. Bea 1360:11-19. Dr. Briaud subsequently published the results of his erosion studies in a journal article entitled "Levee Erosion by Overtopping in New Orleans during the Katrina Hurricane." DX-101 (Briaud Article). Rune Storesund, a co-author of several of Dr. Bea's expert reports, was also a co-author of Dr. Briaud's journal article. *See id.*; *see also* Bea 1352:17-22. Dr. Briaud's article makes unmistakably clear that his invention had not been validated for use in assessing erosion from waves. He concluded his article by warning that "[t]he possible erosion of the levees *by wave attack prior to overtopping sheet flow was not studied in this work*." DX-101, at 12 (journal p. 629) (emphasis added); *see also* Wolff 4046:4-21 (describing uncertainties in using Dr. Briaud's erosion test for front-side wave attack).[36]

Despite Dr. Briaud's explicit reservations about the suitability of using his invention to evaluate frontal wave-induced erosion, Dr. Bea relied on Dr. Briaud's testing of Dr. Bea's samples for that very purpose. Not only is this application unvalidated, but sound reasons exist for concluding that it is improper. First, this application does not take into account possible differences in erosion rates resulting from the oscillating flow of waves running up and down the

---

[36]The night before Dr. Bea turned over his shoveled soil samples to Texas A&M, he had a "heated discussion" with Dr. Briaud discussing the evaluation of the erodibility of the soils he had collected. Bea 1358:19-1359:3. The controversy arose over disagreement about using Dr. Briaud's methods to evaluate wave-induced breaching. Bea 1359:4-9.

surface of the levee, which is markedly different from the steady sheet flow that Dr. Briaud's invention applies.  Dr. Bea conceded that other scientists may find fault with his application for this reason.  Bea 1362:21 – 1363:1.  Second, this application does not account for possible differences in erosion rates resulting from the impact of waves falling onto the levee as they break.  Dr. Bea agreed that with respect to the local impact on the front side of a levee from the collapsing crest of a wave, the wave energy is dissipated in a short distance, resulting in relatively small surface impacts of .01 to 0.1 seconds.  Bea 1365:25 – 1366:9.  Conversely, sheet flow is continuous, more intense and energetic, and attacks a broader expanse of the levee's backside.  Bea 1363:22 – 1364:4; 1365:25 – 1366:9.  The misapplication of a testing method to soil samples that were improperly collected and were probably unrepresentative of the levee composition renders Dr. Bea's ultimate conclusions about levee performance unsound.

At virtually every step, Dr. Bea adopted unsupported facts, applied biased reasoning, and misused established protocols and procedures to reach conclusions not supported by the evidence, science, or logic.  Consequently, his modeling efforts simply are not trustworthy to predict or to describe any part of the occurrence of any event related to levee breaching during Hurricane Katrina.  Lacking proof that the flooding of St. Bernard Parish, New Orleans East, and the Lower Ninth Ward resulted from breaching caused by the MRGO, Plaintiffs have failed to carry their burden of proving causation-in-fact.

## VI. DAMAGES

### A. PLAINTIFFS' MENTAL ANGUISH AND INCONVENIENCE ARE NOT RECOVERABLE UNDER LOUISIANA LAW.

Louisiana law allows a recovery for "fright, fear, or mental anguish" if the plaintiff is traumatized while an "ordeal is in progress" or for mental anguish suffered as a result of damage to property "(1) when property is damaged by an intentional or illegal act; (2) when property is

damaged by acts for which the tortfeasor will be strictly or absolutely liable; (3) when property is damaged by acts constituting a continuing nuisance; or (4) when property is damaged when the owner is either present or nearby and suffered a psychic trauma as a direct result." *Turgeau v. Pan American World Airways, Inc.*, 764 F.2d 1084, 1087, *rehr'g denied*, 770 F.2d 164 (5th Cir. 1985)(citations omitted); *see also Tudela v. Pan American World Airways, Inc.*, 764 F.2d 1082 (5th Cir. 1985); *Bode v. Pan American World Airways, Inc.*, 786 F.2d 669, 672 (5th Cir. 1986). Louisiana law further allows recovery for mental anguish if property is damaged in the owner's presence and "the damage is sudden, the realization of damage on the part of the owner equally sudden, and the mental distress clearly caused by the property damage." *Harper v. Illinois Central Gulf Railroad*, 808 F.2d 1139, 1141-42 (5th Cir. 1987).

Damages for mental anguish and inconvenience are not recoverable if the plaintiff's mental anguish amounts to nothing more than "the normal worry and distress that a property owner is going to experience in some degree when his property is damaged—worry over possible financial loss, settlement of insurance claims, discomfort or inconvenience while repairs are made, having to attend to repairs and the like . . . .  Such minimal worry over the consequences of damage to one's property is not 'damage' which one whose fault caused damage to the property is obligated to repair under LSA-C.C. Arts. 2315 and 2316." *Farr v. Johnson*, 308 So.2d 884, 885 (La. 1975).

Likewise, damages for "inconvenience" under Louisiana law are awarded only upon a showing that the plaintiff was in a zone of danger or present to witness property damage. *McDonald v. Illinois Central Gulf Railroad Co.*, 546 So.2d 1287, 1292 (La. Ct. App.), *writ denied*, 551 So.2d 1340 (La. 1989).  Cleaning and repairs after the immediate danger has passed

do not merit inconvenience damages.  *Napolitano v. F.S.P., Inc*., 797 So.2d 111, 115 (La. Ct. App. 2001).

Plaintiffs premise their argument for mental anguish and inconvenience damages on a theory of "vicinage" damages under Articles 667 through 669 of the Louisiana Civil Code, but none of the cases they cite involves damage to the property of a landowner who was not present when the damage occurred.  Every case cited by Plaintiffs involves a continuing nuisance to a landowner who was present on the property when the inconvenience occurred.  As Plaintiffs show, Louisiana courts have awarded mental anguish and inconvenience damages for enduring such ongoing nuisances as the stench of a landfill, *Acadian Heritage Realty v. City of Lafayette*, 434 So.2d 182 (La. App. 3d Cir.), *writ denied*, 440 So.2d 733 (La. 1983), the dust and noise generated by a commercial dirt excavation company, *Begnaud v. Camel Contractors, Inc.*, 721 So.2d 550 (La. App. 3d Cir. 1998), *writ denied*, 738 So.2d 1 (La. 1999), the clear-cutting of trees next to a landfill, *Arnold v. Town of Ball*, 651 So.2d 313 (La. App. 3d Cir. 1995), standing water caused by a neighbor's construction project, *Rizzo v. Nichols*, 867 So.2d 73 (La App. 3d Cir. 2004), the drainage of rainwater through a below-ground study, *Branch v. City of Lafayette*, 663 So.2d 216 (La. App. 3d Cir. 1995), and even Al Copeland's Christmas lights, *Rodrigue v. Copeland*, 475 So.2d 1071 (La. 1985), *cert. denied*, 475 U.S. 1046 (1986).  But in each of these cases, the plaintiffs were present on their property to suffer the mental anguish and inconvenience for which the damages were awarded.  In fact, damages for mental anguish were specifically denied to non-resident landowners who joined the suit in *Arnold v. Town of Ball*, 651 So.2d 313, 321 (La. Ct. App. Cir. 1995).  And in *Boudreaux v. State, Department of Transportation and Development*, 906 So.2d 695 (La. Ct. App. 2005), the Court awarded mental

anguish damages only on a finding that the property damage on which they were based "did occur at a time when the owners of the property were present or situated nearby."  *Id.* at 707.

Plaintiffs' evocation of Professor Maraist's comment concerning an "especial likelihood of genuine and serious mental distress arising from special circumstances" is taken out of context.  In the *Johnson* case, the phrase is quoted, in *dicta*, as follows:

> Mental distress that accompanies prior or contemporaneous physical injury is compensable; it sometimes is called "parasitic," and as such is an element of damages caused by the physical injury.  Mental anguish occasioned by damage to property also is compensable if the mental anguish victim was present or nearby and suffered psychic trauma as a direct result of watching the destruction of his or her property . . . .  Although the plaintiff does not suffer contemporaneous personal injury or property damage, he or she nevertheless may recover for negligently inflicted emotional distress if the defendant's conduct placed the plaintiff in fear or concern for his or her safety . . . . [In] Louisiana . . . an award is proper when the conduct is directed at the mental anguish victim and the circumstances show an "especial likelihood of genuine and serious mental distress." Cases in which a plaintiff fears for his personal safety or in which he watches his property destroyed probably are the most common. Other situations where emotional distress may be recoverable were cataloged by the Louisiana Supreme Court in *Moresi v. State*: (1) a telegraph company negligently transmitting a message, especially one announcing death; (2) mishandling of corpses; (3) failure to install, maintain or repair consumer products and (4) failure to take photographs or develop film.

*Johnson v. First National Bank of Shreveport*, 792 So.2d 33, 50-51 (La. Ct. App. 2001), *writ denied*, 805 So. 2d 213 (La. 2002) (quoting Frank L. Maraist & Thomas C. Galligan, Jr., *Louisiana Tort Law*  §§ 5-8, at 124-25 (1996)).  The property damage cases in which Prof. Maraist recognizes the likelihood of mental distress to which he refers are those "in which a plaintiff fears for his personal safety or in which he watches his property [be] destroyed."  *Id.*

## B.  PLAINTIFFS FAILED TO CARRY THEIR BURDEN OF PROVING DAMAGES.

Louisiana law permits a plaintiff whose immovable property is tortiously damaged  "to recover damages including the cost of restoration that has been or may be reasonably incurred," *Roman Catholic Church v. Louisiana Gas Serv. Co.*, 618 So.2d 874, 879-80 (La. 1993), but such

"restoration damages" are allowed only if "there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs." *Id*.  Allegations of personal reasons to restore a property are judged on the objective evidence of the plaintiff's use of the property, and not a plaintiff's "self-serving testimony of their inchoate intent . . ." *Hornsby v. Bayou Jack Logging*, 902 So.2d 361, 368 (La. 2005).  If the plaintiff does not restore his property, and no unique factor affecting the property's value is proved, then the measure of damages is the diminution of the market value.  *State Dept. of Transp. and Development v. Lobel*, 571 So.2d 742 (La. Ct. App.1990).

Since "ordinary household effects . . . depreciate immediately upon becoming used and, because of ordinary wear and tear, are worth much less after several years than when originally purchased, and may be readily replaced, . . . the just method of determining the value of used articles, which are not subject to disposal on the open market and which become disintegrated by wear and the lapse of time, is to deduct from their original price a reasonable sum for depreciation." *Gray v. Security Storage & Van Co.*, 26 So.2d 399 (La. Ct. App. 1946) (quoting *Gugert v. New Orleans Independent Laundries*, 181 So. 653, 656 La. Ct. App. 1938).  As Louisiana's Second Circuit Court of Appeals pointed out:

> As to the value of the insured effects destroyed, and extent of damage to others, much difficulty arises. Plaintiff fairly well proved the cost to him of each article or set of articles involved, but, in the main, did not prove their value immediately prior to the fire. Some of these household effects had been in use for eleven years or more, while others were not nearly that old. Of course, the cost of such chattels may not be safely accepted as a criterion of value in determining the loss sued for.

*Williams v. Fire Association of Philadelphia*, 193 So. 202, 204 (La. App. 2d Cir. 1939).

Plaintiffs have not met their burden of proving damages under Louisiana law because they did not properly quantify the loss of fair market value of their immovable property, actual

reconstruction costs where appropriate, depreciated value of their movable property, or actual additional living expenses.  Mr. Taylor made no attempt to analyze the market value of any of the immovable property at issue, and a comparison of the reconstruction costs his Xactimate program calculated for Ms. Smith's home with the amount Ms. Smith actually spent—upgrades and all— shows that the Xactimate program did not accurately quantify her costs.  There is therefore no adequate basis for finding that the program used by Plaintiffs' expert accurately calculated the cost of repairing Plaintiffs' properties.

With regard to Plaintiffs' personal property damage and additional living expenses, Mr. Taylor performed no analysis of any sort, but merely accepted Plaintiffs' lists of household contents and Plaintiffs' own value estimates.  He attempted to justify his acceptance of Plaintiffs' estimates of their "additional living expenses" on the basis of his subjective impression that they "seemed reasonable."  Such cavalier guesswork is not proper expert testimony.  The Supreme Court held in *General Electric Co. v. Joiner*, 522 U.S. 136 (1997) that:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.*, 522 U.S. at 146.  Even before the Supreme Court provided the guidance of *Daubert*, the Fifth Circuit held that:

> Indeed [the expert's] testimony is no more than [the offering party's] testimony dressed up and sanctified as the opinion of an expert.  Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible.

*Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987).

Mr. Taylor admitted that he used his personal discretion in an effort to ensure that Plaintiffs "will be able to have something that they can be proud of again."  Taylor 1658:7–18.

128

This candid testimony taints Mr. Taylor's opinions about the value of Plaintiffs' damage.  "As Professor McCormick notes, such testimony 'amounts to no more than an expression of the [witness'] general belief as to how the case should be decided.' . . . The admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case."  *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir.), *cert. denied*, 434 U.S. 861 (1977) (quoting McCormick on Evidence § 12).

Mr. Taylor is not Plaintiffs' attorney and is therefore not entitled to argue on their behalf concerning the damages they should be awarded.  The application of the law is the exclusive responsibility of the Court, as assisted by the attorneys, and Mr. Taylor's opinion—which was not derived by the scientific method—on what damages would properly compensate Plaintiffs is not reliable evidence.  Even where as here certain damages would otherwise be recoverable, the failure to establish their quantum with proper evidence bars an award.  *See Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1089 (5th Cir. 1982).

## C. PAYMENTS PLAINTIFFS RECEIVED FROM FEMA AND THE ROAD HOME PROGRAM SHOULD BE OFFSET AGAINST ANY DAMAGES AWARDED TO THEM.

Louisiana law recognizes the collateral source rule that "a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution."  *Bozeman v. State*, 879 So.2d 692, 698 (La. 2004).  The grants awarded to Plaintiffs by the Federal Emergency Management Authority and the US Department of Housing and Urban Development's Community Development Block Grant (CDBG) money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 *et seq*., were not independent of the United States' procuration or contribution and must be deducted from any damages awarded to Plaintiffs.  *Kennedy v. United*

*States*, 750 F. Supp. 206, 213 (W.D. La. 1990).  As this Court has already recognized, LRA

payments are "provided free of cost to eligible homeowners and [are] funded by a grant through

the United States Department of Housing and Urban Development."  *Metoyer v. Auto Club*

*Family Ins. Co.*, 536 F. Supp. 2d 664, 670 (E.D. La. 2008).

## CONCLUSION

For these reasons the Court should dismiss this case with prejudice, for lack of

jurisdiction or, in the alternative, should enter judgment in favor of the United States.

Respectfully submitted,

TONY WEST
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR
Assistant Director, Torts Branch

/s Robin D. Smith
ROBIN DOYLE SMITH
RICHARD R. STONE, SR.
Senior Trial Counsel
PETER MYER
KARA K. MILLER
PAUL MARC LEVINE
JEFFREY PAUL EHRLICH
DANIEL M. BAEZA, JR.
JOHN A. WOODCOCK
Trial Attorneys
Civil Division, Torts Branch
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 616-4400 / (202) 616-5200 (Fax)

Dated: July 29, 2009                    Attorneys for the United States of America

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all counsel of record by ECF on July 29, 2009.


    ___s/ Robin D. Smith___