UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO:  *Robinson* (No. 06-2268) | |

**PLAINTIFFS' POST TRIAL REPLY BRIEF**

## TABLE OF CONTENTS

I.       INTRODUCTION ................................................................................................... 1

II.     THIS COURT GRANTED SUMMARY JUDGMENT AGAINST THE
        GOVERNMENT ON FLOOD CONTROL ACT IMMUNITY ................................. 1

    A.   The United States Is Not Immune Merely Because Floodwaters May Have Come
         In Contact With The LPV ................................................................................ 4

    B.   The Condition Of The Reach 2 Levees Is Not Germane ............................................. 5

    1.   The Government Is Estopped From Savaging Its Own Levees ................................ 5

    2.   Soil Conditions Are Not The Determinative Levee Failure Factor ......................... 7

    C.   The Missing Remediation Measures Do Not Implicate § 702c ................................ 11

III.    THE "DUE CARE" EXCEPTION TO THE FTCA IS STILL INAPPLICABLE TO
        THE ARMY CORPS' O&M ACTIVITIES ................................................................. 15

IV.    THE TRIAL CONFIRMED THAT THIS COURT CORRECTLY HELD THAT
        THE CORPS' NEGLIGENT MR-GO OPERATION AND MAINTENANCE IS
        NOT PROTECTED BY THE DISCRETIONARY FUNCTION EXCEPTION ...... 18

    A.   The Plaintiffs' Case Challenges the Corps' Conduct, *Not* Congress or the
         President's Conduct ........................................................................................ 21

    B.   The Corps Did Not Have Discretion to Violate NEPA ............................................ 29

    1.   The Corps Had a Mandatory Duty To Supplement Its 1976 FEIS ......................... 30

    2.   The Severity of Impacts Experienced in The Environment of The MR-GO
         Mandated An SEIS To Address The Deficiencies Of The Corps' Activities And To
         Propose Remedies For Those Impacts ................................................................ 35

    C.   The Second Prong of the Discretionary Function Defense Fails Because Massive
         Environmental Destruction and Unsafe Engineering Culminating in an
         Admittedly Foreseeable Catastrophe Are Not Protected Policy Decisions ........... 38

    D.   The Government's Self-Indicting DFE Causation Argument Is Founded On An
         Incorrect Premise ........................................................................................... 41

    E.   The Government's Purported "Causation" Evidence Is Unconvincing ................. 45

    F.   The "Deceit and Misrepresentation Exception" Does Not Bar the Plaintiffs'
         Claims ............................................................................................................ 48

V.     LOUISIANA LAW OBLIGATED THE ARMY CORPS TO PREVENT THE MR-
        GO FROM FLOODING PLAINTIFFS' PROPERTY, TO AVOID ENHANCING
        THE FLOODING  RISK,  TO CORRECT KNOWN DEFECTS, AND TO WARN
        ABOUT DANGEROUS CONDITIONS ....................................................................... 51

    A.   The Corps Had Multiple Duties Under Louisiana Law ............................................ 51

B.    The Army Corps Had A Reporting Duty To Congress ............................................. 53

C.    The Duty To Report To Congress Is Imposed by Federal Law .............................. 54

VI.   THE PLAINTIFFS HAVE PROVED THAT THE MR-GO CAUSED THEIR
      DAMAGES ............................................................................................................. 55

A.    Louisiana Law Prescribes The "Substantial Factor" Standard For Proving Cause-
      in-Fact In A Multi-Causation Situation .................................................................. 59

B.    The Levees Performed As Designed And Failed Because Of Overtopping and
      Wave Side Erosion Caused By The MR-GO ......................................................... 62

1.    The MR-GO Caused Both Types of Overtopping That Caused The Catastrophic
      Failure of Reach 2 Levees ..................................................................................... 63

2.    Neither The Defense Photographs  Nor Soil Borings Undermine Plaintiff's
      Causation Proof ...................................................................................................... 68

      a.  The Proof Is On The Ground .......................................................................... 68

      b.  Fat Clays Are Not A Significant Factor In Levee Survival ............................ 69

C.    Dr. Bea's Conclusion That The Levees Would Have Withstood The Storm "But
      For" MR-GO Is Absolutely Correct ...................................................................... 71

1.    Dr. Bea Never Opined That The Reach 2 Levees Would Have Had A Uniform
      Crest Of 17.5 Feet "But For" The MR-GO ........................................................... 73

      a.  Foundation Conditions Do Not Explain The Drastic Loss of Protective Levee
          Crest Elevations ............................................................................................ 75

      b.  But For Lateral Displacement Caused By Operation and Maintenance Dredging,
          The Reach 2 Levee Would Have Survived Katrina ........................................ 77

      c.  Dr. Bea Did Not Underestimate The Relevant Factors of Safety ................... 78

      d.  The Use of Staged Construction Would Have Allowed For Remediation Of
          Ongoing Subsidence Absent The MR-GO's Negative Impacts ....................... 79

      e.  Lateral Displacement Did Not End in 1980 ................................................... 80

      f.  Widening of the MR-GO Caused Lateral Displacement .................................. 81

      g.  Dr. Bea Did Not Use Incorrect Datums In His Settlement Analysis. ............. 84

2.    Dr. Bea's Is Correct That The Levees Would Have Been More Densely Covered
      With Grass "But For" The MR-GO ........................................................................ 85

3.    The MR-GO Caused The Flooding of New Orleans East ...................................... 87

4.    Dr. Bea's Opinion That The Levees Would Have Survived "But For" The MR-GO
      Depends On His Verified And Validated Use of LS-DYNA To Model Near-Shore
      Waves ..................................................................................................................... 91

5.    Dr. Bea Correctly Assessed "Grass Lift-Off" Rates ............................................. 95

**6.   Dr. Bea's Collection And Characterization Of Soil Samples And Their Erodability Were Scientific** ............................................................................ 97

   **a.   Dr. Bea's Soil Collection Method Was Scientific** ...................................... 98

   **b.   The Tests Upon Which Dr. Bea Relied For Ascertaining Erodibility Were Expressly Suited For Its Purpose** .......................................................... 100

**VII.   PLAINTIFFS ARE ENTITLED TO THE DAMAGES DESCRIBED IN THEIR POST-TRIAL MEMORANDUM** ............................................................... 104

**A.   Louisiana Law Authorizes Plaintiffs To Recover Mental Anguish Damages** ...... 104

**B.   Plaintiffs Adequately Proved Their Entitlement to Damages for Economic Loss** ................................................................... 108

# TABLE OF AUTHORITIES

## Cases

*Adams v. United States*,
2006 WL 3314571 (D. Idaho Nov. 14, 2006)........................................................................ 27

*Adams v. United States*,
No. CV-03-0049, 2009 WL 899728 at * 2 (D. Idaho April 1, 2009) ..................................... 27

*Barron v. United States*,
473 F.Supp. 1077 (D Hawaii 1979) ..................................................................................... 47

*Berkovitz v. United States*,
486 U.S. 531 (1988) ..................................................................................... 18, 36, 41

*Block v Neal*,
460 U.S. 289 (1983).......................................................................................................... 46

*Blue Mountains Biodiversity Project v. United States Forest Service*,
229 F.Supp.2d 1140 (D. Or.2002) .................................................................................. 29, 33

*Bonin v. Ferrellgas, Inc.*,
877 So.2d 89 (La. 2004) ...................................................................................................... 58

*Boudreaux v. State Dep't of Transp. & Development*,
906 So.2d 695 (La. Ct. App. 2005)...................................................................................... 103

*Branch v. City of Lafayette*,
663 So.2d 216 (La. Ct. App. 1995)................................................................................. 49, 105

*Brown v. United States*,
790 F.2d 199 (1st Cir. 1986)................................................................................................ 37

*Buchanan v. U.S.*,
915 F. 2d 969 (5th Cir. 1990) ............................................................................................. 16

*Castro v. United States*,
560 F.3d 381 (5th Cir. 2009) .............................................................................................. 53

*Central Green Co. v. United States*,
531 U.S. 425 (2001)............................................................................................................. 2

*Chaisson v. Avondale Indust., Inc.*,
947 So.2d 171 (La. App. 2006)............................................................................................ 58

*Coker v. Skidmore,*
    941 F.2d 1306 (5th Cir. 1991),

*Coleman v. Victor,*
    326 So.2d 344 (La. 1976) ...................................................................... 107

*Daigle v. Shell Oil Co.,*
    972 F.2d 1527 (10th Cir. 1992) ................................................................ 28

*Dubois v. U.S. Dept. of Agriculture,*
    102 F.3d 1273 (1st Cir. 1996) .................................................................. 28

*E. Ritter & Co. v. United States,*
    874 F.2d 1236 (8th Cir. 1989) .................................................................. 37

*Elston v. Valley Elec. Membership Corp.,*
    381 So.2d 554 (La. Ct. App. 1980) ......................................................... 102

*Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army,*
    492 F.2d 1123 ................................................................................ 25, 51

*Farr v. Johnson,*
    308 So.2d 884 (La. Ct. App. 1975) ......................................................... 102

*Faucheaux v. Terrebonne Consol. Gov't,*
    615 So.2d 289 (La. 1993) ........................................................................ 49

*Francis v. United States,*
    No. 2:08CV244DAK, 2009 WL 236691, *9 (D. Utah Jan. 30, 2009) .................... 36

*Frasure v. United States,*
    256 F. Supp. 2d 1180 (D. Nev. 2003) ............................................. 36, 40, 41

*Friends of Marolt Park v. U.S. Dep't of Transp.,*
    382 F.3d 1088 (10th Cir.2004) ................................................................ 30

*Friends of the Clearwater v. Dombeck,*
    222 F.3d 552 (9th Cir. 2000) ................................................................... 29

*Galvin v. Occupational Health & Safety Admin.,*
    860 F.2d 181 (5th Cir. 1988) ................................................................... 51

*Gill v. United States,*
    429 F.2d 1072 (5th Cir. 1970) ........................................................... 49, 53

*Graci v. United States,*
    435 F. Supp. 189 (E.D. La. 1977) ................................................................... 49, 57,105

*Graci v. United States,*
    456 F.2d 20 (5th Cir. 1971) .......................................................................................... 2

*Hal, Inc. v. United States,*
    122 F.3d 851 (9th Cir. 1997) ...................................................................................... 51

*Harper v. Illinois Cent. Gulf R.,*
    808 F.2d 1139 (5th Cir. 1987) .................................................................................. 103

*Hatahley v. United States,*
    351 US 173 (1956) ....................................................................................................... 16

*Headwaters v. BLM,*
    914 F.2d 1174 (9th Cir. 1990) .................................................................................... 33

*Henigan v. Cooper/T.Smith Stevedoring Co., Inc.,*
    837 So.2d 96 (La. App. 2002) .................................................................................... 59

*Hornsby v. Bayou Jack Logging,*
    902 So.2d 361 (La. 2005) ......................................................................................... 108

*In re Katrina Canal Breaches Consol. Litig.,*
    2007 WL 4573052, *5 (E.D. La. Dec. 27, 2007) ....................................................... 88

*In re Katrina Canal Breaches Consol. Litig.,*
    2008 WL 2186400 (E.D. La. May 27, 2008) ............................................................... 2

*In re Katrina Canal Breaches Consol. Litig.,*
    2009 WL 1033783 (E.D. La. April 15, 2009) ............................................................. 2

*In re Katrina Canal Breaches Consol. Litig.,*
    2009 WL 799976 (E.D. La. March 20, 2009) ............................................................. 2

*In re Katrina Canal Breaches Consol. Litig.,*
    471 F.Supp.2d 684 (E.D. La. 2007) ....................................................................... 2, 15

*In re Katrina Canal Breaches Consol. Litig.,*
    533 F.Supp.2d 615 (E.D. La. 2008) ............................................................................ 2

*In re Katrina Canal Breaches Consol. Litig.,*
    577 F.Supp.2d 802 (E.D. La. 2008) ....................................................................... 1, 2

*In re Operation of the Missouri River System Litig.*,
    516 F.3d 688 (8th Cir. 2008) .................................................. 30, 31

*Indian Towing Co. v. United States*,
    350 U.S. 61 (1955) .............................................. 37,46,  47, 49

*Jayvee Brand, Inc. v. United States*,
    721 F.2d 385 (D.C. Cir. 1983) ................................................... 28

*Johnson v. First Nat. Bank of Shreveport*,
    792 So.2d 33 (La. Ct. App. 2001) ............................................ 103

*Kemper v. Don Coleman, Jr., Builder, Inc.*,
    746 So.2d 11 (La. Ct. App. 1999) ............................................ 106

*Kennewick Irrigation Dist. v. United States*
    880 F.2d 1018 (9th Cir. 1989) ............................................ 23, 36

*Lombard v. Sewerage & Water Bd.*,
    284 So.2d 905 (La. 1973) ......................................................... 49

*Lopez v. United States*,
    376 F.3d 1055 (10th Cir. 2004) ............................................... 38

*Marlys Bear Medicine v. United States*,
    241 F.3d 1208 (9th Cir. 2001) ......................................... 20, 37, 40

*Marsh v. Oregon Natural Resources Council*,
    490 U.S. 360 (1989) .......................................................... 29, 31

*Moresi v. State Dep't of Wildlife & Fisheries*,
    567 So.2d 1081 (La. 1990) .................................................... 103

*Neal v. Bergland*,
    646 F.2d 1178 (6th Cir.1981) ................................................ 47

*O'Reilly v. United States Army*,
    477 F.3d 225 (5th Cir. 2007) .................................................. 30

*Parker Land and Cattle Co. v. United States*,
    796 F. Supp. 477 (D. Wyo. 1992) ........................................ 36, 53

*Perkins v. Entergy Corporation*,
    782 So.2d 606 (La. 2001) ....................................................... 57

*Rando v. Anco Insulations Inc.*,
___ So.3d ___, 2009 WL1426272 (La. May 22, 2009) ........................................................ 57

*Richardson v. United States*,
943 F.2d 1107 (9th Cir. 1991) ..................................................................................... 35

*Rivera v. U.S. Army Corps*,
891 F.2d 567 (5th Cir. 1990) ....................................................................................... 53

*Rizzo v. Nichols*,
867 So.2d 73 (La. Ct. App. 2004) ................................................................................ 105

*Roberts v. Benoit*,
605 So.2d 1032 (La. 1991) ........................................................................................... 57

*Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Serv. Co.*,
618 So.2d 874 (La. 1993) ............................................................................................. 106

*Saden v. Kirby*,
635 So.2d 277 (La. Ct. App. 1994) .............................................................................. 105

*Seaboard Coast Line Railroad Co. v. United States*,
473 F.2d 714 (5th Cir. 1973) ....................................................................................... 47

*Searcy v. Phillips Elec. N. Amer. Corp*,
117 F.3d 154 (5th Cir. 1997) ....................................................................................... 52

*Shelton v. Aetna Cas. & Sur. Co.*,
334 So.2d 406 (La. 1976) ............................................................................................. 52

*Sickman v. United States*,
184 F.2d 616 (7th Cir. 1950) ....................................................................................... 16

*Sierra Club v. U.S. Army Corps of Engineers*,
701 F.2d 1011 (2d Cir. 1983).......................................................................................  31

*Socorro v. City of New Orleans*,
579 So.2d 931 (La. 1991) ............................................................................................. 52

*Spiker v. City of Baton Rouge/Parish of East Baton Rouge*,
804 So.2d 659 (La. Ct. App. 2001)............................................................................... 105

*State of Louisiana  v. Lee* ................................................................................................ 30
758 F.2d 1081 (5th Cir. 1985)

*State of Wisconsin v. Weinberger*,
   745 F.2d 412 (7th Cir. 1984) ................................................................. 32

*Town of Winthrop v. FAA*,
   535 F.3d 1 (1st Cir. 2008) ..................................................................... 32

*Turgeau v. Pan American World Airways, Inc.*,
   764 F.2d 1084, *rehr'g denied*, 770 F.2d 164 (1985)............................. 102

*United States v. Dalehite*,
   346 U.S. 15 (1953) ................................................................................ 1

*United States v. Gaubert*,
   499 U.S. 315 (1991) .............................................................................. 18

*United States v. Neustadt*,
   366 U.S. 696 (1961) .............................................................................. 46

*United States v. Sandra & Dennis Fishing Corp.*,
   372 F.2d 189 (1st Cir. 1967)............................................................ 37, 46

*Vieux Carre Prop. Owner, Residents & Assoc., Inc. v. Pierce*,
   719 F.2d 1272 (5th Cir. 1983) .............................................................. 30

*Williams v. United States*,
   71 F.3d 502 (5th Cir. 1995) .................................................................. 51

*Zumwalt v. United States*,
   928 F.2d 951 (10th Cir. 1991) .............................................................. 28

**Statutes**

28 U.S.C. § 1346 (b) ................................................................................ 49

28 U.S.C. § 2680 ...................................................................................... 46

28 U.S.C. § 2680 (a) ................................................................................ 15

28 U.S.C. §2680 (h) ................................................................................. 46

33 C.F.R. § 230.11(b) ............................................................................... 31

33 U.S.C. § 702c ...................................................................................... 1

40 C.F.R. § 1502.9(c)(1)........................................................................... 31

40 C.F.R. § 1502.9(c)(1)(ii) ............................................................................... 29, 31

40 C.F.R. § 1506.9(a) ........................................................................................... 25

40 C.F.R. § 1508.7 ............................................................................................... 29

40 C.F.R. §1508.27 .............................................................................................. 27

40 C.F.R.§ 1502.9(c)(1)(ii) .................................................................................. 31

40 CFR § 1502.9 (c) ............................................................................................. 28

40 CFR § 1502.9 (c) (1) ....................................................................................... 30

40 CFR §1506.9 .................................................................................................... 25

42 U.S.C. § 4341 ................................................................................................... 26

7 CFR § 1804 ........................................................................................................ 47

La. Civ. Code art. 667 ......................................................................................... 105

## Other Authorities

Wex S. Malone, *Ruminations on Cause-in-Fact,* 9 Stanford L.Rev. 60, 89 (1956-57) ................ 59

## Treatises
D. Dobbs, *Handbook on the Law of Remedies* § 5.1 at 317 (1973) ............................................ 107

## I.    <u>INTRODUCTION</u>

With this Reply Brief, Plaintiffs complete an arduous journey begun over three years ago in the wake of the worst disaster in American history.  On behalf of all Katrina victims, we are grateful for the opportunity to have had our day in court.  No litigants could expect more in terms of due process and respectful judicial consideration of their claims.

At this point, the Court is faced with a choice, in the words of Justice Robert Jackson, "to hold the Government's liability to be nothing or to be very heavy, indeed. But the magnitude of the potential liability is due to the enormity of the disaster and the multitude of its victims.  The size of the catastrophe does not excuse liability but, on its face, eloquently pleads that it could not have resulted from any prudently operated Government project . . . ."  *United States v. Dalehite,* 346 U.S. 15, 54 (1953) (Jackson, J., dissenting)

## II.    <u>THIS COURT GRANTED SUMMARY JUDGMENT AGAINST THE GOVERNMENT ON FLOOD CONTROL ACT IMMUNITY</u>

For the third time, the Government asks this Court for dismissal based on the Flood Control Act of 1928 (33 U.S.C. § 702c), claiming that immunity attaches here because Plaintiffs' damages were caused by floodwaters emanating from a flood control project.  *See* U.S. Corrected Post Trial Memorandum of Law ("USPTM ") at p. 7.[1]  In the process, Defendant conveniently ignores this Court's two prior rulings in this lawsuit rejecting such an expansive

---

[1] Procedurally, this third bite of the judicial apple is not authorized.  Defendant has not invoked Federal Rule of Civil Procedure 59(e) to seek reconsideration of the § 702c summary judgment decision since it is based on settled authority, and no higher court has ruled otherwise in the interim.  *See Katrina VI*, 577 F.Supp.2d at 822.  Nor did the Court's questions for post-trial briefing invite argument on this point.  On this ground alone, the Court should disregard Section I of the Government's brief.

1

statutory interpretation.[2]  *See In re Katrina Canal Breaches Consol. Litig.*, 471 F. Supp.2d 684, 690 ("[T]his wholesale approach to immunity . . . is neither supported by the history of the Flood Control Act of 1928 nor in a fair reading of *Central Green Co. v. United States*, 531 U.S. 425 (2001)."); *Katrina VI,* 577 F. Supp.2d at 822 ("This Court has previously rejected the United States' contention that it is immune from damages from any floodwater regardless of its source . . . .").[3]  Indeed, this Court granted summary judgment in favor of Plaintiffs "insofar as the United States may be found liable for damages caused by its negligence that are extrinsic to the LPV . . . ." *Katrina VI*, 577 F.Supp.2d at 827.  Thus, it is the law of this case that the test for whether flood immunity attaches here is not whether there is some arguable relationship to a flood control project but whether Plaintiffs' damages "are for negligence that occurred extrinsic to the LPV, that is to say the LPV was not designed to prevent the storm surge that occurred.  The United States should not be immunized for a tort which occurred *from an activity unrelated to a flood control project*." *Id*. at 825. (emphasis added).

---

[2] The Court has issued numerous decisions in *Robinson* and other MR-GO litigation. For the Court's convenience, the following designations are used in this brief:  *In re Katrina Canal Breaches Consol. Litig.*, 471 F.Supp.2d 684 (E.D. La. 2007) ("*Katrina I*"); *In re Katrina Canal Breaches Consol. Litig.*, 2008 WL 2186400 (E.D. La. May 27, 2008) ("*Katrina II*"); *In re Katrina Canal Breaches Consol. Litig.*, 2009 WL 799976 (E.D. La. March 20, 2009) ("*Katrina III*"); *In re Katrina Canal Breaches Consol. Litig.*, 2009 WL 1033783 (E.D. La. April 15, 2009) ("*Katrina IV*"); *In re Katrina Canal Breaches Consol. Litig.*, 533 F.Supp.2d 615 (E.D. La. 2008) ("*Katrina V*"); *In re Katrina Canal Breaches Consol. Litig.*, 577 F.Supp.2d 802 (E.D. La. 2008) ("*Katrina VI*").

[3] The Court's rulings followed the controlling Fifth Circuit precedent of *Graci v. United States*, 456 F.2d 20, 27 (5th Cir. 1971) ("Thus when, as here, the plaintiffs allege that they have suffered floodwater damage as a result of negligence of the United States *unconnected with any flood control project*, [§ 702c] does not bar an action against the United States under the Federal Tort Claims Act."). (Emphasis added.)  This Court also rejected the Government's argument in denying the Defendant's motion for certification of an interlocutory appeal.  *See* Doc. 3842.

Ignoring this Court's prior rulings and the parties' stipulation that the LPV structures were competently designed and performed as expected during Katrina, the Government seeks to attribute the primary reason for LPV failures to their intrinsic "nature and quality" and more particularly, variations in levee crown and toe elevations, turf density, and being "constructed of hydraulically extracted, hydraulically placed fill [instead of] excavated, 'trucked' fill . . . ." USPTM at pp. 9-10. In other words, "only a stronger, more resilient hurricane protection system could have prevented this catastrophe. . . . [T]he conduct which the plaintiffs are challenging was not unrelated to flood control." *Id.* at p. 13.

In light of the governing legal standard, this "bad levees" argument is irrelevant because Plaintiffs' causation theory—and proof at trial—is that the levees were overtopped and failed primarily because of the intensified waves and surge and lowered protective crown elevations caused by the MR-GO, *i.e.,* "for negligence that occurred extrinsic to the LPV."  The evidence establishes that Plaintiffs' property would not have been destroyed if the MR-GO's long known hazards had been mitigated.

Finally, in a variation on the "related to flood control" theme, Defendant claims § 702c immunity because the MR-GO remediation measures that the Corps should have undertaken— surge and saltwater barriers and armored banks—are structures primarily related to flood control. *Id.* at pp. 13-20.  This argument is strange, indeed.  Defendant seeks to avoid liability for negligently omitting to undertake remedial measures because *if they had been implemented,* they would have been "integral to the LPV and served a flood control purpose rather than a navigation purpose."  USPTM at p. 20.

Not surprisingly, Defendant cites no authority for the radical proposition that the United States can evade state law negligence liability because feasible mitigation measures—that would have avoided the catastrophe—*might* serve a flood control purpose.  In other words, while every landowner in Louisiana has a legal duty to prevent flooding of adjoining property by undertaking prudent preventive measures, the federal government is exempt because it *might* actually install *flood prevention* facilities.  If the failure of LPV structures that were actually in place during Katrina does not in and of itself (without regard to cause) implicate § 702c immunity, then how can the negligent failure to install flood mitigation measures lead to a different conclusion?   The answer is that it does not.

### A.  The United States Is Not Immune Merely Because Floodwaters May Have Come In Contact With The LPV

Proceeding from the undisputed factual premise that Plaintiffs' homes were destroyed because the LPV failed to contain the Katrina floodwaters, the Government leaps to the conclusion that this fact alone triggers Flood Control Act immunity.  *See* USPTM at pp. 7-8. The fatal flaw in this syllogism is that it is predicated on a glaring misstatement that this Court has held that "§ 702c immunity arises where damage is caused by flood waters emanating from a flood control project."  USPTM a pp. 8-9.  This quotation from *Katrina VI* misrepresents what this Court in fact held in granting summary judgment in favor of Plaintiffs.  In the very next paragraph, the Court distinguished the LEVEE decision (*Katrina V*)—whose determinative fact was that the two outfall canal floodwalls were part of the LPV and *failed because of design defects*—from *Robinson*:

> Here, however, it is not so clear.  Plaintiffs here have presented sufficient
> evidence to create a substantial question of fact as to what precisely caused the
> damage to their property.  They maintain that even if the flood control project had

4

been built perfectly to specifications, . . . because of the surge created by the
mistakes made with respect to the MR-GO, these damages would not have
happened. . . . 'Thus, contrary to the Government's contention that *Central Green*
broadens immunity provided by § 702c, in reality *Central Green* requires the
Court to identify *the cause of the damage* rather than base a decision on the mere
fact that a flood control project was involved.'

*Katrina VI*, 577 F.Supp.2d at 824 (quoting *Katrina I*, 471 F.Supp.2d at 695).

The pertinent issue here is therefore not where the waters came from but why they

inundated Plaintiffs' property.[4]  If the Court concludes that the LPV overtopping and breaching

was caused in whole or in part by the MR-GO, § 702c immunity is not available here.

### B.  The Condition Of The Reach 2 Levees Is Not Germane

Faced with overwhelming evidence that the LPV was the "victim" of the MR-GO's

multiple defects (TT at p. 1094: 23-1095:15; 1565: 6-9 (Bea)), the Government attempts to

escape responsibility for Plaintiffs' property losses by disparaging its own levees as unfit for

duty because they were too porous, too low, and too sparsely vegetated.  *See* USPTM at pp. 9-13.

Oh that the levees were only "stronger, more resilient . . . [they] could have prevented this

catastrophe"!  *Id.* at p. 13.  This contention is procedurally barred and factually erroneous.

### 1.  The Government Is Estopped From Savaging Its Own Levees

The Government can never be accused of a "foolish consistency" on the Flood Control

Act immunity issue.  At the outset, this argument is foreclosed by virtue of a stipulation and

---

[4] In fact, the floodwaters "emanated" not from the LPV but from the MR-GO whose water levels
rose dramatically during Katrina due to surge pushed up Reach 2 from the Gulf of Mexico, water
conveyed from Reach 2 into Reach 1 and the IHNC, and waves traversing Reach 2 regenerating
to nine feet from three feet in Lake Borgne.  TT at pp. 1095:16-1096:1; 1189:5-1191:24 (Bea);
PX 91 at p. 135, 146; TT at pp. 1845:1-7; 1852:11-18 (Kemp); PX 93, Kemp Supp. Decl. (Oct.
2008) at p. 10; TT at pp. 1064:10-1070:3 (Vrijling); PX 2150, 2151, Handwritten Drawing of
Prof. Vrijling re: Surge, Waves and Conveyance.  The LPV itself did not generate any
floodwaters—it failed to contain the MR-GO's waters because the system was overwhelmed by
the augmented waves and surge attributable to the navigation channel's defective conditions.

ruling at the beginning of trial.  For years, Defendant stoutly defended the levees' performance

during Katrina, adopting IPET's findings that they were competently designed and constructed

based on then prevailing standards and that they performed as expected.[5]  Then in the wake of

losing summary judgment on § 702c immunity, the Government did an abrupt about-face.

In its Trial Brief, Defendant argued that its levees were primarily at fault.[6]   Plaintiffs

then filed Plaintiffs' Memorandum to Prevent Defendant from Seeking to Prove That the LPV

Structures Were Not Properly Designed and Constructed and Did Not Perform as Expected.  *See*

---

[5] In the IPET Report of August 22, 2007, the Government stressed that the levees performed as designed: "Ironically, the structures that ultimately breached [the levees] performed as designed, providing protection until overtopping occurred …." PX 20, IPET Report at p. I-3. "The majority of the structures in the HPS were generally built as designed, and design approaches were consistent with local practice."  *Id.* at p. I-62. "The levees largely performed as designed, withstanding the surge and waves until overtopping. . . ."  *Id.* at p. I-65.  "The system was generally built as designed . . . using design approaches that were consistent with industry and local practices at the time of the design."  *Id.* at III-7.

Citing the IPET Report, the Government, in response to Plaintiffs' §702c summary judgment motion, stated that:  "*The levees along the MR-GO were not 'water pervious' nor were they "highly vulnerable to severe erosion*." Defendant United States' Response to Plaintiffs' Revised Statement of Undisputed Facts (Feb. 1, 2008) (Doc. 11033-2) at p. 7, No. 13.  (Emphasis added).

If there was any doubt as to the respective positions of the parties, it was removed by their respective statement of the undisputed facts for the § 702c summary judgment motion:

> **Plaintiffs' Revised Fact No. 49**
>
> The Government contends that there were no defects in the design and construction of the flood control structures along Reach 1 and Reach 2 of the MR-GO that contributed to flooding of Greater New Orleans.
>
> **Response to Plaintiffs' Revised Fact No. 49**
>
> Uncontested. . . ." *Id.* at p. 29.

[6] "The only way in which the catastrophic flooding of the Lower Ninth Ward, St. Bernard, and New Orleans East could have been avoided would have been through the construction of *a better hurricane protection system*. . . . This breach [along the New Orleans East Back Levee could have been prevented only by the construction and maintenance of *a stronger, more resilient levee.  Bigger, stronger levees* along the GIWW, the MR-GO, and the IHNC could have prevented floodwaters from inundating Plaintiffs' properties." Doc. 18448 at p. 8 (emphasis added).

6

Doc. 18672. In a chambers conference, the Government backpedaled, claiming that it was not attacking its own levees. This led to the following order on April 23, 2009: In light of "the Government's averring that it was not its intention to contend that the LPV structures were improperly designed or did not perform as expected, Plaintiffs' counsel asked that the memorandum be withdrawn." Doc. 18683.

Nevertheless, the United States at trial undertook a concerted effort to derogate the LPV levee system, despite the Court's admonition to the contrary. TT at p. 2976:17-2877:12. Assurances by defense trial counsel that the Government was not attacking the quality of its levees (TT at p. 2977:13-18) are now shown to be empty since the United States now reasserts post-trial that "the nature and quality of the LPV flood control structures was the *principal* determinant of breaching." USPTM at p. 9 (emphasis added). As will be shown below, however, the LPV levees were not defective and that but for the Corps' negligence, the LPV structures would have prevented any serious flooding to the Plaintiffs' homes. *See* TT 1091:21-1092:15 (Bea).[7]

### 2. Soil Conditions Are Not The Determinative Levee Failure Factor

In the Government's misguided view, the levee soil conditions are at the root of the evil for levee failure. Defendant relies upon Dr. Mosher's testimony to establish soil content through soil borings. This factor alone is drawn as a conclusion for levee failure because the "soil was more erodible in places where breaching occurred and less erodible where breaching did not occur," *i.e.*, "[n]o levee that had been constructed of excavated, 'trucked' fill was breached by Hurricane Katrina." USPTM at p. 10. This conclusion—contradicted by the

---

[7] The Government's Flood Control Act discussion focuses solely on Reach 2 and ignores New Orleans East flooding as well as levee performance along the eastern side of the IHNC.

Government's prior position that the MR-GO levees were not "water-pervious" or "highly vulnerable to erosion" (*see* note 5, supra)—ignores a plethora of evidence that other areas of the levee that did not fail were either protected by longer, higher level distances from the channel with substantially more fronting vegetation or whose crown height had not been reduced by lateral squeezing.  TT at pp. 1098:15-24, 1110:24-1111:14, 1201:24-1202:22, 1242:9-19, 1351:4-1354:13, 1481:9-15, 1542:19-25, 1555:24-1556:7 (Bea); TT at pp. 3121:4-3124:5 (Mosher).  In short, soil conditions are not "the principal determinant of breaching."

Significantly, as Defendant admits, "where the berm and toe [of the levee] were low the waves were higher, and where the berm and toe were high the waves at the levee were lower." USPTM at p.10.  This correlation is consistent with the testimony of Dr. Bea.  *See* TT at p. 1162:20-1163:8, 1400:8-23, 1402:16-1403:23 (Bea).  Dr. Bea also proved that the "widening of the channel leads to loss in protective elevation," increased the area of the channel "in which the waves can regenerate as they approach the earthen flood protection structure," and "remove[d] the vegetation on the foreshore that's acting to reduce the effect of the incoming waves."  TT at p. 1157:9-22 (Bea).  These effects allowed the wind driven waves to regenerate in the MR-GO channel and slam the Reach 2 levees *with ten (10) times greater force* than would have been transmitted with the MR-GO maintained as designed.  TT at p. 1206:1-25 (Bea).

Defendant further attacks the quality of the levees by asserting that the duration of overtopping exceeded the threshold for initiation of erosion and major damage to the earthen levee.  *See* USPTM at pp. 11-12.  Once again, the Government fails to consider the full scope of the deleterious effects of the Corps' negligence, including the encroachment of the Reach 2 channel to relatively close distances of the LPV, the eradication of fronting vegetation, the poor

grass covering due to salt water environment that was unable to withstand the increased frontal wave attack, and the consistent lowering of the levee heights due to lateral squeezing.  As proven by Dr. Bea, none of the polders would have flooded had the MR-GO's multiple deleterious effects been mitigated.  TT at pp. 1481:9-15; 1542:19-25 (Bea).

In order to understand the impact of these negative effects, Plaintiffs engaged their experts to develop parametric studies (scenarios) allowing for the inclusion or exclusion of various factors to understand the contribution of that factor to the system's overall functioning. In order to fully understand the dynamics of flooding during Katrina, Plaintiffs undertook a systematic approach to evaluating the causes of the various hydrologic ingressions, making the MR-GO a variable, and then continued that analysis to include an evaluation of the ship channel's role.

First, of course, the modelers ran a scenario simulating the actual events that occurred during Katrina—Scenario 1. Next, Dr. Bea developed scenarios to understand the impact of a mitigated MR-GO.   The most straightforward scenario to understand the mitigated MR-GO was Scenario 2c, which is a model that makes the MR-GO" hurricane neutral" and includes the full complement of pre-Katrina LPV flood protection works and pristine wetlands. TT at p. 1209:12-25 (Bea).  Scenario 2c allowed Plaintiffs to analyze the MR-GO banks having high ground and no negative salinity effects, thus recognizing the natural growth of vegetation in front of the levee face (expressed in the model by coefficients of friction).  It was thus discovered that the effect of this fronting vegetation alone decreased the intensity, energy, and amplitude of the waves by more than 50 %.  *See* TT at p. 1319:22-1320:21 (Bea).

In the St. Bernard and Lower 9th Ward polder, the destruction of the Reach 2 levee resulted in the catastrophic flooding of those areas. By lowering the protective elevations of the levees caused by channel growth (dredging, loading, squeezing, dredging continued), killing the vegetation due to salt water intrusion, and allowing the channel to grow and promote major wave regeneration, the Corps' negligent operation and maintenance doomed the levees once a surge began assaulting their face at a 90 degree angle. Had the levees not been destroyed, there would have been no flooding in that polder because overtopping would have been contained by the Central Wetlands Unit and the 40 Arpent Canal Levee. *See* TT at p. 1257:9-1258:15 (Bea); TT at p.1823:3-1824:11, 1935:18-23 (Kemp). In the Lower 9th Ward, predominately all of the flooding came from Reach 2 since the polder would have filled up entirely within a few hours. *See* TT at p. 1063:4-14 (Vrijling); TT at pp. 1223:9 -1224:16 (Bea).

A similar analysis was performed by Plaintiffs' experts for the New Orleans East polder. Without refutation by Defendant, it was proven that the Robinsons' damages were initially sustained from breaches and overtopping of the Citrus Back Levee (located west of the Paris Road bridge) resulting from the widened Reach 1 channel and unmitigated "funnel effect" and overtopping of the New Orleans East Back Levee caused by a MR-GO induced increase in surge. *See* TT at p. 1542:22-1544:4; 1235:6-8 (Bea) and Plaintiffs' Post Trial Brief ("PPTB"), Appendix J at Slides 14, 15. The funnel effect substantially increased the duration of overtopping by allowing an increase of surge height of two feet or more commencing two to three hours earlier. *See* TT at p. 1219:12–21 (Bea). The ultimate, unrebutted conclusion in evaluating the various scenarios was that with a mitigated MR-GO, there would have been only "minor flooding for the New Orleans East polder, and only rainfall flooding if we realize a gate

10

at the funnel." TT at p. 1259:5–8 (Bea). As previously shown through the Rule 30(b)(6) deposition of the Sewerage & Water Board, the pumping capacity in Orleans Parish was such that Katrina, as a rain event, was insufficient to flood the city. *See* PX 2148.1, Huerkamp Depo, at p. 85:1-22.

In sum, not only is the Government estopped from blaming its levees' alleged inferiority as the "principal determinant of breaching," the evidence shows that the most critical variables in levee performance were the close proximity of the levee to the channel and absence of fronting vegetation (due to unarmored bank erosion and saltwater intrusion), lowered protective crowns (due to lateral displacement), and the 1,000 percent more destructive waves assaulting the Reach 2 levees (due to the 300 to 500% channel widening and loss of wetlands). The levees themselves may have played a part, but it was only a minor supporting role; the "Death Star" was the MR-GO.

## C.  The Missing Remediation Measures Do Not Implicate § 702c

In order to deflect attention from the Corps' defalcations in maintaining and operating the MR-GO over the life of the project, Defendant suggests that the feasible mitigation measures advocated by Plaintiffs to offset the deleterious effects of the MR-GO are "structures related to flood control and to the LPVHPP." USPTM at p. 13. The most obvious response to this non sequitur is "so what?" Not surprisingly, Defendant cites no authority for the proposition that the legal duty to make repairs to the MR-GO—to mitigate storm flooding hazards created by the federal government in operating and maintain a navigation project—somehow implicates (and is excused by) Flood Control Act immunity.

Not all the measures that the Corps should have undertaken can be considered pure flood control structures.  For example, as early as 1962, a surge barrier at the IHNC and Lake Pontchartrain was considered to be essential to "prevent velocities hazardous to navigation in the channel" created by the MR-GO and was to be funded out of MR-GO appropriations.  *Katrina VI,* 577 F. Supp. 2d at 812 n.13.  The same, of course, can be said of the necessity of a surge barrier at the confluence of the two MR-GO reaches.

Similarly, mitigation of saltwater intrusion is not *per se* a flood control project.  It is undisputed that the rapid conversion of fresh swamp and marsh to salt marsh destroyed the protective vegetation that the designers of the Reach 2 levees relied upon in evaluating SPH conditions.  PX 91, Kemp Expert Report (July 2008) at p. 184, Fig. 9.5.  Indeed, "[t]here is no proof or any evidence that the Corps in designing the LPV ever took into consideration any of these changes that the MRGO had wrought on the area." *Katrina VI,*  577 F. Supp. 2d at 825.

In addition, foreshore protection was a means of preventing bank erosion and reducing the need for continuous dredging of Reach 2.[8]  Likewise, the ever-widening of the Reach 2 channel allowed encroachment of the deeper open waters of the channel to jeopardize the levees' survivability by lowering their crest elevation and eradicating the frontal vegetation that limited wave energy against the Reach 2 levee's face.  Arresting this runaway erosion was essential not only to protecting the levees but assuring the cost effective and safer operation and maintenance of the waterway.  PX 009 (1988 Recon. Report) at pdf 10-12, 18-20, 26, 28 at ¶¶1-2, 46-47, 63-64, 68-69, 76-81, 83-84, 87, 90; PX 202 (General Design Mem. No. 2); PX 216 (ltr of Riley to

---

[8] The Reach 2 levee designers specified that foreshore protection would be required along the MR-GO to stem the ever encroaching channel (JX 0283, p. 32, ¶ g), yet the New Orleans District Corps myopically considered the MR-GO project to be exempt from this responsibility.

Savoy of 6/16/2004); PX 2122 at pdf 18, 40-64, 74.  In fact, the Chief of Engineers in 1966 admitted that foreshore protection should have been a key feature of the MR-GO when it was built, and he ordered that it be done.  PPTB at Appendix H (Proposed Findings of Fact Nos. 321-326).  It was done—over two decades later.  PPTB at Appendix H (Proposed Findings of Fact Nos. 327-331); *see also* PX 218.

Finally, once it became apparent *post-construction* that the negligently maintained channel would develop a funnel to convey increased surge into the disappearing surge buffering wetlands around the MR-GO and compromise the levee system,[9] a surge barrier became a last ditch, essential measure to limit the capacity and duration of storm surge to endanger the Plaintiffs.  PPTB at Appendix C (Proposed Findings of Fact Nos. 221-22); *id.* at Appendix I (Proposed Findings of Facts Nos. 208-10).  Over the years, the evidence mounted that the "funnel" posed a serious threat to life and property but no remedial action was taken until it was too late.  PPTB at Appendix I (Proposed Findings of Fact Nos. 209-10, 217-19).

In a vain attempt to reopen the resolved Flood Control Act immunity issue, Defendant cites three Corps letters between 1969 and 1990 that it claims have never been presented to the Court and demonstrate that the Corps considered and rejected a surge barrier at the confluence of the GIWW and Reach 2.  This argument is a day late and a dollar short.

First, when it decided summary judgment, the Court was well aware that the Corps had failed to install a surge barrier despite warnings for decades that it was needed.  This issue is

---

[9] "During construction of the MR-GO, the surge effects of its construction were not given much discussion, and a physical model was never used to determine the hydraulic surge effects of the MR-GO."  *Katrina VI,* 577 F.Supp.2d at 808.

discussed extensively in *Katrina VI*, 577 F.Supp.2d at 807-11.[10]  Indeed, counsel for the United

States admitted in oral argument that there were not "any documents that you can point to that

demonstrate that the Corps took into consideration in the continuing, ongoing project of the

building of the Chalmette[,] GIWW or the IHNC levees that there would be any increase in the

flow or force of the water as a result of the MRGO and the destruction of the levees." *Id.*  at p.

815; *see also ibid.* (Court rejects assertion that the LPV and MR-GO were "inextricably linked

together—the evidence of this interrelationship in the actual oversight of the two projects is

insignificant.")[11]

Second, Defendant fails to contradict Plaintiffs' proof that the MR-GO was evaluated in

the design phase of the MR-GO or thereafter to determine the impact, if any, the channel would

have on hydraulic conveyance, increased surge propagation, or increased wave energy.  TT at p.

2308:1-25 (Ebersole); TT at p. 193:12-15 (Soileau), *see also Katrina VI,* 577 F. Supp. 2d at 825

("[T]he Corps did not ever take into consideration the MRGO with respect to storm surge or its

effect on the LPV . . . .").[12]  Subsequent evaluations, used for designing the LPV structures,

---

[10] The three letters cited by the Government were *all Corps documents* that were produced
during discovery and could have been offered in connection with the summary judgment motion.

[11] The Government has, moreover, conceded that the MR-GO and the LPV were separate
projects and that no levees were constructed as part of the MRGO project.  PX 12, U.S. Rebuttal
of Pls. Sur-Reply at p. 3 ("The parties agree that the MR-GO was *not* a flood control project and
was not absorbed into the LPVHPP.  The parties agree that the MR-GO did *not* have a flood
control purpose or function.  The parties agree that no levees were constructed *as part of the MR-
GO project.*") (emph. in original); *ibid.*at p. 9 ("the United States does not contend that the MR-
GO has flood control features, nor does the United States contend that MR-GO ever became
anything other than what it always was: a navigation project").

[12] Any good faith consideration of the necessity of installing a surge barrier was doomed by the
Corps' dismissive attitude about its obligation to minimize the risk of flooding from the MR-GO.
Joseph Breerwood, who became the highest ranking civilian at the Corps' New Orleans District,
a position that included maintaining the MR-GO, TT 505:6 – 19 (Breerwood), testified that not

determined that the MR-GO would have be no impact on the design of the levees.  PX 1322, LPV DM No. 1, Hydrology and Hydraulics, Chalmette Area, 2nd Ind dated 8/18/1966 at p. 3; PX 68, Bretschneider and Collins Report.  Plaintiffs do not suggest that such reliance is a fault. Instead, the *subsequent* negligent conduct in operating and maintaining the MR-GO degraded the environmental conditions of the LPV levees in question such that it became necessary—at some point after construction but long before Katrina—to mitigate the MR-GO's hazards.

In sum, the Government has presented no reasons for the Court to revisit its sound decision—based on all the evidence that the parties wanted to bring to its consideration and controlling Supreme Court and Fifth Circuit precedent—that § 702 is inapplicable here.

III.    **THE "DUE CARE" EXCEPTION TO THE FTCA IS STILL INAPPLICABLE TO THE ARMY CORPS' O&M ACTIVITIES**

For the third time, the Government seeks to extricate itself from liability by invoking the "due care" exception to the FTCA (28 U.S.C. § 2680 (a)), claiming that its conduct over a half century was dictated by statute.[13]  *See* USPTM at pp. 20-27.  Twice this Court has definitively held that the "due care" exception does not apply to the Army Corps' operation and maintenance activities if it did not act with due care. The Government has offered no new reasons for a different outcome.

---

only did the New Orleans District consider the MR-GO's deleterious effects to be outside its obligation to address, but that he, as the highest ranking civilian, did not even contemplate addressing these deleterious effects.  TT 506:8 - 507:19 (Breedwood).  As a result, the Corps' staunch position became one that if the MR-GO was adversely affecting an adjacent landowner, that landowner must bear part of the expense to stop the harm before *any* efforts would be undertaken by the Corps.  *See* TT 511:11-512:17 (Breerwood).

[13] All in all, the Government has invoked four immunities to evade responsibility for this catastrophe: Flood Control Act of 1928, "due care," discretionary function, and the latest and most fantastic, the putative deceit and misrepresentation privilege.  *See* USPTM at pp. 65-66.

In late 2006, the Government moved to dismiss Plaintiffs' lawsuit, arguing that as a matter of law, it was immune from suit based on the "due care" exception. The Government lost. *See In Katrina*, 471 F.Supp.2d 684 at 706 (Denying motion to dismiss because discovery required due to disputed issue of fact with respect to the applicability of the "due care" and DFE exceptions to the FTCA). Two years later, Defendant reiterated the same "due care" argument in its Motion for Partial Summary Judgment and Renewed Motion to Dismiss. Once again, the Government argued that since the Army Corps activities were done substantially in accordance with the MR-GO authorization statute (Pub. Law No. 84-455), *all* its actions were shielded by the "due care" exception.[14] The Government lost again. This Court held:

> The United States' argument requires the Court in essence to ignore Plaintiffs' allegations and recast the complaint. Whether the Corps exercised due care lies at the heart of this case, and Plaintiffs have presented voluminous evidence attempting to demonstrate that in a myriad of ways due care was not exercised. The Government's proposed broad use of the due care exception is not warranted in light of Plaintiffs' allegations. It appears to the Court that *once Plaintiffs allege and offer substantial evidence that due care was not used by the Corps, certainly in the context of maintenance and operation, the cloak of this immunity statute is unavailable*, and the Corps must rely on the discretionary function exception for immunity.

*Katrina III*, 2009 WL 799976, at *6 (emphasis added).

Thus, the resolution of this issue turns on the Court's ruling on liability: if the Corps acted without due care in its operation and maintenance of the MR-GO, this defense simply does

---

[14] In its reply brief, the Government had to "admit[]that not every single action undertaken by the Corps in designing, constructing, operating and maintaining the MRGO is protected by the due care exception. (Doc. 16923 at 24)." *Katrina III,* 2009 WL 799976 at *6.

not apply.[15]  As demonstrated in Plaintiffs' Post Trial Brief and this Reply Brief, the evidence is compelling that the Army Corps breached its duty of due care.[16]

The Government's arguments are still lacking in merit.  *See* PPTB at pp. 41-43.  First, the Government once again raises the straw man argument that Plaintiffs cannot challenge the legality of the authorizing legislation.  *See* USPTM at p 20.  As this Court has determined, however, Plaintiffs have never explicitly or implicitly challenged Pub. Law No. 84-455.  *See Katrina III*, 2009 WL 799976, at *5.

Second, the Government reargues that the Corps merely acted according to a specific plan authorized by Congress.  *See* USPTM at pp. 23-26.  Once again, Defendant ignores the fact that Congress did not mandate or prescribe the challenged conduct here, particularly the post-authorization operation and maintenance activities in flagrant violation of NEPA.  *See* Section IV, A, *infra*.

Third, Pub. Law No.  84-455 did not abrogate all other existing laws—nor did it repeal NEPA.  The MR-GO authorization was not the only law that constrained the Army Corps, and NEPA contains no exception for the Corps or any of its activities.  In fact, NEPA requires "full compliance" by the Corps.  *See* 40 CFR 1500.6 (NEPA supplements a federal agency's existing

---

[15] The main case relied upon by the Government—*Sickman v. United States*, 184 F.2d 616 (7th Cir. 1950)—did not involve (as the Government concedes) an allegation that any federal employee acted negligently, let alone in violation of any express law.

[16] The concept of "['due care'] implies at least some minimal concern for the rights of others." *Hatahley v. United States*, 351 US 173 (1956).  In *Buchanan v. U.S.*, 915 F. 2d 969, 970-71 (5th Cir. 1990), the Fifth Circuit noted that "[t]he first clause, exempting actions mandated by statute or regulation, *applies only if the actor has exercised due care*."  (Emphasis added).  Does "due care" contemplate a situation where the Chief of Engineers would knowingly operate and maintain a dangerous and defective channel that creates and continues to perpetuate a hazard even after he is undeniably on notice of the defective and dangerous condition for decades? Hardly.

authority and is "a *mandate* to view traditional policies and missions in the light of the Act's national environmental objectives" and "to insure *full compliance* with [its] purposes and provisions," and every federal agency "*shall comply with that section unless existing law applicable to the agency's operations expressly prohibits* or makes compliance impossible.") (Emphasis added)

Finally, the underlying assumption in the Government's argument is that a single statute by Congress comprehensively dictated to the Army Corps how and where to build, operate, and maintain the MR-GO.  The assumption is implausible on its face because taken to its logical conclusion, there would be no need for the Army Corps' vaunted expertise.  Congress itself could simply draw up the technical plans for any ship channel and hire a contractor to build the waterway.  Instead, Congress expected (mandated) that the Corps use sound professional engineering expertise and judgment in executing its responsibilities.

## IV.   THE TRIAL CONFIRMED THAT THIS COURT CORRECTLY HELD THAT THE CORPS' NEGLIGENT MR-GO OPERATION AND MAINTENANCE IS NOT PROTECTED BY THE DISCRETIONARY FUNCTION EXCEPTION

In its opening salvo on the discretionary function exception ("DFE") to the FTCA, the Government reminds the Court that it ruled that the Corps has immunity for the MR-GO's *initial* design and construction.  *See* USPTM at p. 27.  The Government's brief then proceeds to otherwise ignore *Katrina III* by repeating the same arguments and case law that this Court carefully considered and rejected.[17]  The trial, however, reconfirmed that the Corps did not

---

[17] *Compare* Doc. 16564 at p. 17 (Def. Mem. of Law in Supp. of Mot. To Dismiss) *with* USPTM at p. 29 n.6 (footnote 5 repeats same case cites in earlier defense briefing); *compare* Doc. 16789 at pp. 16-17 (Def. Opp. brief) *with* USPTM at pp. 29-30 (same string cites).  The Government also previously raised the issue of its cost calculations (*Katrina III,* 2009 WL 799976 at *2).

comply with NEPA in the Corps' MR-GO operation and maintenance ("O&M"), and the Corps' chronic inaction is not an immunized policy choice.

As this Court well knows, the DFE involves a two prong analysis. The first test is whether the challenged act involves room for choice. If it does, the second question is whether the challenged decision is within the "permissible exercise of policy judgment" and involved judgment "'of the kind that the exception was designed to shield.'" *Katrina III,* 2009 WL 799976 at **7-8 (citing *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991) and *Berkovitz v. United States,* 486 U.S. 531, 537 (1988)). At trial, the Government passed neither test: (1) the Corps had no discretion (*i.e.*, choice) to violate federal environmental laws; and (2) unsafe engineering is not a "policy." Thus, there are two independent reasons to reject the application of the DFE.[18]

The Government's arguments ignore the Court's summary judgment without presenting any new reasons compelling a different result. The Government seeks to make a virtue out of a vice, emphasizing that the MR-GO project served *its customers*, which the Corps chose to define not as the public, the taxpayers, or the citizenry devastated by negligent O&M of a dysfunctional ship channel, but as river boat pilots and the container industry.[19] The Government's defense

---

[18] While Plaintiffs maintain that the Government has the burden of proof on both prongs (*see* PPTB at p. 19) and this Court has ruled that at a minimum this is true for the first prong (*see Katrina III,* 2009 WL 799976 *5), this case does not turn on burden of proof because the evidence is overwhelming that the Army Corps flagrantly violated NEPA for decades *and* operated and maintained the MR-GO in contravention of professional engineering and safety standards.

[19] *See* USPTM at p. 14 (quoting a letter from a Corps engineer to Senator John Breaux in which the Corps complains that a surge barrier would allegedly harm the "container industry," "cargoes, public investment, and jobs."); TT 3446:1-5 (Podany) (erstwhile MR-GO project manager admitting to defining "customers" as river pilots and shippers).

assumes that this was appropriate, but even accepting for the sake of argument that myopic institutional bias in favor of influential business interests is "public policy," the service of narrowly defined interests in abject disregard for the rights of others is *not immunized* if these actions violate federal environmental laws, egregiously ignore the authorized channel size, *and* amount to non-policy-based civil engineering malpractice.   The Corps does not have immunity for decades of malfeasance breaching environmental laws and engineering safety standards.   In short, this reckless disregard of laws and safety was neither within the Corps' discretion nor did it fall within the ambit of protected policy.

The Government continues to defend the strained theory that preventing the drowning of hundreds of people and destruction of billions of dollars of property was something that the Corps' engineers were not required to consider as it managed an uneconomical navigation program.   The Government's version of the FTCA is that engineering and safety defalcations can be labeled as a "policy" to not consider safety where that might cost more money.   According to *the Government's brief,* the Corps' actions were known *before* the storm to invite "massive environmental damage,"[20] "dire," "incredible threat to the lives of men and women and children,"[21] and "horrific losses."[22]   Yet the Corps continued steering the 35th largest city in the country into disaster because, according to the Government, the Corps had discretion to dredge on the cheap or, rather, employ an economic "policy."   Clearly, drowning victims got in the way of a Government bureaucracy.   That is a tragedy, not a defense.

---

[20] *See* USPTM, p. 58.

[21] *See* USPTM, pp. 50, 61.

[22] *See* USPTM at p. 60.

A.  **The Plaintiffs' Case Challenges the Corps' Conduct, *Not* Congress or the President's Conduct**

The Government's first DFE argument mischaracterizes Plaintiffs' case as a challenge to Congressional appropriations (or the lack of them).  USPTM, p. 28.[23]  Plaintiffs are not challenging Congress; rather, Plaintiffs have proven that the Corps was negligent in its O&M.  *The Government* is trying to blame Congress for the Corps' catastrophically deficient civil engineering and knowing failure to inform Congress and seek funding for remediation of the wayward waterway.

That Congress refused the Corps' request for MR-GO remediation was never proven at trial—and there is simply no such evidence in the record.  Rather than establishing that the Corps was without resources, the trial testimony and evidence proved that the Corps at times had millions in unspent carry-over money with which it could have requested emergency funding.[24]  The Government cites the testimony of its senior budget officer Peter Luisa, overlooking that his answers in cross examination disprove the defense claim that the Corps' hands were tied by a supposed lack of appropriations.  As Mr. Luisa explained, the MR-GO budget sheets—which the

---

[23] In the margin, the Government argues that a policy-based decision need not be made but only capable of being made (USPTM. at p. 29 n.6), an issue Plaintiffs previously briefed.  *See* PPTB at pp. 33-34. This Court has rejected reliance on such "'after-the-fact justifications'" or "'ex post rationalizations by the Government in an attempt to invoke the discretionary function shield.'" *In re Katrina III*, 2009 WL 799976 *29 (quoting *Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1216-17 (9th Cir. 2001)).  In fact, the Corps never made a policy-based decision about whether or how to address the MR-GO's known (and worsening) defects and the risk of catastrophic flooding.  *See* PPTB at pp. 33-34.

[24] TT 3602-3604 (imminent peril and emergency situations (as asked about by the Court) are not part of the guidance and ranking process in the budget but are handled through program execution where money is provided immediately and then they would back fill by either getting supplemental funds to pay back those who loaned the money from different accounts or work it out in the budget process) (Luisa); TT 3506 (unspent carry over funds) (Naomi).

Government curiously chose not to produce for trial— should have included a statement of the imminent peril, there was a process for exigent circumstances funding, and the Corps did not disclose the peril up the chain of command:

> Q. … [If] the District Commander for New Orleans District concluded that there were conditions with regard to the MRGO that posed an imminent peril to life and property[,] would that be noted in the budget justification sheet?

> A. It should have been, it should be.

> Q. Okay.  Now, it's a fact, is it not, that in the Army Corps with regard to safety issues, a District Operations Manager for a project like the MRGO has an obligation to report something wrong up the chain of command?

> A. Yes.

> Q. Districts are, in fact, encouraged to seek remediation of problems with their

>    projects, correct?

> A. Yes.

> Q. And if a District doesn't tell headquarters about problems with their projects, the money will not be requested from Congress, correct?

> A. Correct…..

> Q. And if the word got to headquarters that there was a serious problem, there is a process for reprogramming funds for exigent circumstances, correct?

> A. Yes….

> Q. Congress relies heavily on the Corps for guidance on technical, engineering and safety issues, you agree, right?

> A. Yes….

> Q. And you were never told there was a problem with the MRGO like channel erosion or loss of wetlands while you've been there, correct?

> A. I haven't, no….

> Q. … To your knowledge, at any time before Katrina, did you or anyone else in the Army Corps of Engineers, the Assistant Secretary of the Army for Civil Works, the Office of

22

Management and Budget ever tell any Congressional Committee words to this effect:
"We must have money to fix the MRGO or a serious catastrophe including flooding may
happen when a hurricane strikes Greater New Orleans."?

A. Well, I haven't.

TT at pp. 3619:5-21, 3621:1-4, 3621:22-24, 3625:4-7, 3525:12-19 (Luisa).

Nor is there any evidence that any other Corps official ever requested remedial funding,

much less that Congress ever refused to appropriate funds. *See* PPTB at Appendix B (Proposed

Findings of Fact Nos. 333-43).

The Government cites the testimony of Mr. Luisa and Mr. Naomi (USPTM at p.  31),

both of whom relied on appropriation tables related to the LPV project, not the MR-GO.  *See*

DX0517; DX0515R (a combined 67 pages of funding request spreadsheets regarding the LPV

omit any proof of MR-GO funding requests).[25]  The Government's argument and its selection of

the inapposite appropriations tables is part of a sustained effort to treat the Plaintiffs' case as if it

were a challenge to the LPV instead of the MR-GO's O&M activities for a navigation project.[26]

---

[25] Indeed, Mr. Luisa admitted that he had never been informed that Plaintiffs requested the MR-
GO appropriation documents, which existed and were on his computer.  TT 3616-3617 (Luisa).

[26] In an Army letter dated 10 March 1988 to which the Court has already drawn the parties'
attention (*Katrina III*, 2009 WL 799976 at *23), Col. Lloyd Brown of the Corps discusses the
"critical" bank erosion and bank protection measures and recommends that the issue be
addressed in the form of "a supplement to the General Design Memorandum for the MR-GO
navigation project."  1988 Recon. Rptr., PX0009 at pdf 26-27 (Letter from Brown to
Commander of 3/10/1988 at p. 2).  In defending this case, the Government seeks to draw
attention away from the MR-GO project and onto the separate LPVHPP project; however, the
documents clearly indicate the distinct separation of these projects and the Corps' own
understanding of this separation.  *See Katrina VI*, 577 F.Supp.2d at 822, 825 (Court rejects
Government's argument that MR-GO and LPV are "'inextricably intertwined,'" finding they
"were two projects, with two different funding methods and two different concerns driving
each.")

Even had the Government produced the relevant appropriation spreadsheets at trial, the

"we-didn't-have-the-money" argument at the heart of the Government's analysis is not an excuse

when public safety is put at risk:

> The government argues . . . that because removal of unsuitable materials . . .
> would have significantly raised the cost of construction, the contracting officer's
> decisions were grounded on economic considerations and therefore immune from
> suit. In *ARA Leisure [Services, Inc. v. United States*, 831 F.2d 193 (9th Cir.
> 1987)]*, we held that the mere fact that Park Service maintenance personnel were
> required to work within a budget did not bring their failure to maintain a park
> road within the discretionary function exception.  831 F.2d at 196.  Indeed,
> *virtually all government actions affect costs since action itself requires resources.*
> *ARA Leisure* governs this case. The contracting officer's on-site decisions were
> not "of the nature and quality that Congress intended to shield from tort liability."
> [*United States v. S.A. Empresa  de Viacao Aerea Rio Grandense (Varig Airlines)*,
> 467 U.S. 797, 813 (1984)]. They  were not based on public policy and they are not
> entitled to immunity from lawsuit based on negligence under the discretionary
> function exception.

*Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1031 (9th Cir. 1989) (emphasis

added).

This Court has already rejected this defense.  *See Katrina III*, 2009 WL 799976, at *34

("'Were we to view inadequate funding alone as sufficient to garner the protection of the

discretionary function exception, we would read the rule too narrowly and the exception too

broadly.'") (quoting *Whisnant v. United States¸*400 F.3d 1177, 1184 (9th Cir. 2005)).[27]

---

[27] The Government's case law only underscores the irrelevance of its limited funds argument.
*Cato v. United States,* 70 F.3d 1103 (9th Cir. 1995) (cited at USPTM at p. 28) addressed a
demand for reparations for slavery and stated in the course of a standing analysis that the
Plaintiffs cannot sue Senators or members of Congress for their legislative conduct, such as
"Congress's failure to pass the Racial Justice Act[.]" 70 F.3d at 1109 (citation omitted).
Plaintiffs are not blaming members of Congress for their votes on legislation; the issue here is
*the Corps*' negligent acts and environmental defalcations which the Corps hid from Congress in
violation of both environmental laws and its own policies.

The Government similarly attacks another straw man by complaining that it is unconstitutional
under the "Recommendation Clause" for the President to "be sued for failing to recommend a

The Government's appropriations argument, if a legitimate defense, would yield absurd results.  Under this theory, the Army, after receiving less money than requested, could send its drivers out on the highway without functioning brakes because Congress did not appropriate enough money for brake fluid.[28]  According to the defense theory, a Plaintiff's ensuing state tort action complaining that he was thus run over by a truck would be an impermissible challenge to Congress's legislative appropriations authority *and* an unconstitutional demand that the President recommend brake fluid funding from Congress.  *See* USPTM, at p. 29 n.7.

---

specific measure," citing as authority an inapposite case against the then-First Lady for her participation in a Task Force on healthcare reform. USPTM at p. 29-30 n.7 (citing *Assn of Am. Physicians & Surgeons, Inc. v. Clinton,* 997 F.2d 898 (D.C. Cir. 1993).  President Clinton appointed his wife as Chair of a Task Force on National Healthcare Reform and a physician association filed suit, complaining that the Task Force needed to file an advisory committee charter.  *Clinton* has nothing to do with the FTCA, the DFE, the Corps, or the MR-GO.  Indeed, the only statement in the case that applies is the court's explanation that the Recommendations Clause issue was, as here, raised by the Government as a red herring.  *Id.* at 908 ("The government's focus on the Recommendation Clause seems somewhat artificial.").

[28] Judge Boyce F. Martin conducted a thoughtful discussion on the cost issue in *Caplan v. United States,* 877 F.2d 1314, 1321-22 (6th Cir. 1989) (Martin, J., concurring).  He explained that the analysis suggested in *Varig Airlines*, of whether the Government is acting as a regulator or in some other role, is necessary to foreclose the possibility that "the government could intentionally engage in negligent conduct causing injury to individuals and yet remain immune from suit." 877 F.2d at 1321.  He then recounted the following unacceptable examples of conduct for which *no immunity* should lie:

> For example, under this approach the Coast Guard could have intentionally operated the lighthouse in *Indian Towing* in a hazardous fashion *if it had considered this type of operation to be cost-effective*.  Similarly, the FAA could have intentionally made faulty navigational charts, or the Postal Service could decide to sell, without warning, surplus vehicles known to be defective *if these actions involved government cost calculations.*

877 F.2d at 1321 (cit. om.; emphasis added).  *See also Routh v. United States,* 941 F.2d 853, 856 & n.3 (9th Cir. 1991) (following *Kennewick* and reasoning that "[t]he United States' argument in this regard raises some serious concerns. It would be difficult to approve of a contracting officer's engaging in a cost-benefit analysis quantifying, by a dollar amount, the cost of risk to human life or limb when deciding whether to issue stop-work orders.").

The MR-GO was maintained only because the Corps kept dredging it.  *See Katrina III,* 2009 WL 799976 at *23.  A federal agency cannot take decades of concerted actions risking massive destruction of life, limb, and property and then hide behind Congress's and the President's immunities.  Neither Congress nor the President maintained and operated the MR-GO.

The Government argues that Congress forced the Corps to operate and maintain the MR-GO (*see* USPTM, p. 28 n.5); however, the project authorized by Congress through legislation in the 1950s bears little resemblance to the MR-GO maintained (or not maintained) by the Corps as of August 2005.  Congress authorized something else entirely.  As absorbed as the Government is on discussing the LPV instead of the MR-GO, the trial evidence and the defense arguments fail to explain how Congressional authorization of a channel with a specified bottom width of 500' and initial surface width of 650' could justify allowing the channel to degrade into a quasi-lake that was 2,000' to 3,700' feet wide.[29]  Through the Corps' negligent O&M, the MR-GO grew like Topsy far beyond the limits of discretionary engineering decisions that allow dredging a couple of feet deeper to compensate for inaccuracies.[30]  While the Government now tries to

---

[29] DX 1042, MR-GO Design Memo No. 2 (1959) at p. 21 ¶ 46 ("Channel width (authorized) ... 500 feet"); *Katrina,* 2009 WL 799976 at *21 (referencing MR-GO as "a waterway that was to be 650 feet in width"); PX 7, Kemp Decl. September 16, 2008, p. 38 ¶ 50 ("When the MR-GO was complete enough to be used in 1963, the MR-GO was authorized to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet.  As it sat before Katrina in 2005, the MR-GO had grown nearly threefold to more than 2,000 feet across and wider in some places."); PX 91, Kemp Expert Report (July 2008) at p. 126 (the channel authorization dimension was a 650 foot top-width).

[30] The Government's attempt at trial to prove the Corps acted within its discretionary authorization fell woefully short on this point.  The Government's purported compliance with engineering standards about dredging does not justify the channel width or depth expansion and does not explain what happened during most of the operative 40-year time period.  The MR-GO project manager who testified, Edmund Russo, started as project manager in 1999-2000.  TT

pass the buck to Congress, the witnesses at trial discussing the federal budget process did not

explain why the Corps operated and maintained the MR-GO without concern as to what

Congress allowed in the initial project authorization.[31]  On this record, the Court is entitled to

find as a fact that the Corps was not authorized to maintain the MR-GO as a 2000-to-3700-foot-

wide body of water and that the Corps had no discretion to operate the project in such an unsafe

and expanded condition.[32]

      After a discussion of Congressional appropriations, the Government's brief concludes

Section III.A with the contention that NEPA does not mandate the transmission of information to

Congress (USPTM at p. 32) and cites a regulation identifying the EPA address in Washington

D.C. to which environmental impact statements are mailed.  *See* 40 C.F.R. § 1506.9(a).  As this

Court explained in its DFE summary judgment opinion, however, a primary purpose of NEPA is

---

3511:17.  At least by 1987, however, at which time Mr. Russo was a college student (TT 3510:5), the MR-GO already had expanded from its authorized surface width of 650' to 1500'. *See Katrina III,* 2009 WL 799976 at *21.  Mr. Russo claimed that the Corps over-depth and advanced maintenance dredged in accordance with policies dated November 29, 1996 (DX1488). Under those policies, the default maximum over-depth is "two feet" and anything over requires prior MSC commander approval.  DX1488 at 8-1 & (6).  Further, the purpose of over-depth dredging under both the 1996 policy and its 1968 precursor was to "account[] for the inaccuracies of the dredging process" (TT3525:10-11 (Russo testimony); *see also* DX0013 at F-3 & 9a ("compensate for dredging inaccuracies"))—not to convert a 650 foot wide channel into a 2,000 to 3,700 feet disaster.  Engineering discretion does not justify allowing expansion by 300% to 500% of the originally authorized channel size; this is engineering malpractice.  *See* PPTB at 47-51.

[31] The 1988 Reconnaissance Report, which the Court analyzed at length in its DFE opinion, states that the steadily widening MR-GO was dangerously close to causing a breach of the east bank of Lake Borgne.  *See Katrina III,* 2009 WL 799976 at *22 (quoting 1988 Recon. Rpt. (PX 0009) at pp. 10-11).  Clearly, the Congressional authorization of 1956 did not allow the Corps to destroy the banks of a body of water that large, but the Corps did not abstain from further dredging and neglect in not preventing rapid channel expansion.

[32] Nor is there any defense that the Corps' hands were tied because Congress had authorized the MR-GO only for navigational purposes and any expenditures to remediate its defects were beyond the legislative grant of authority.  *See* PPTB at p. 56, note 27.

to provide Congress with information.  *Katrina III,* 2009 WL 799976 at * 14 (quoting

*Environmental Defense Fund, Inc. v. Corps. Of Engineers of U.S. Army,* 492 F.2d 1123, 1140

(5th Cir. 1974)).  In the margin, the Government hypothesizes that Congress learns of NEPA

statements only when legislation is proposed.  USPTM, at p. 32 n.8.  This is not accurate.

All EISs are filed with the EPA.  The EPA delivers one copy to the CEQ, which satisfies

the requirement of availability to the President. *See* 40 CFR §1506.9.  The CEQ is the vehicle

through which the President transmits to Congress annual environmental quality reports which

set forth among other things: "(4) a review of the programs and activities (including regulatory

activities) of the Federal Government, the State and local governments, and nongovernmental

entities or individuals, with particular reference to their effect on the environment and on the

conservation, development and utilization of natural resources; and *(5) a program for remedying

the deficiencies of existing programs and activities, together with recommendations for

legislation.*"  42 U.S.C. § 4341 (emphasis added).  Indeed, the Army maintains a staff for the

specific purpose of advising Congress on matters of NEPA oversight, and notifying Congress of

an EIS would fall within the information that the Army gives Congress pursuant to its own

rules.[33]  Accordingly, environmental reporting goes to Congress who, if properly informed, can

consider remedial action for an unsafe program.

---

[33] A Department of Defense regulation specifically addresses the role of the Assistant Secretary
of the Army whose responsibilities over NEPA oversight include maintaining a liaison with
Congress.  *See* Army Reg. 200-2, 53 FR 46322, 1988 WL 275225 (effective 1988 through 2002).
As of 1988, the same year that the Reconnaissance Report (PX 9) was completed, the
Department of the Army's procedures required communication of environmental effects,
including a rule that "The Chief of Legislative Liaison will notify members of Congress of
impending EISs and EAs of national concern."  53 FR 46325 at Subpart A, at 651.4(i).

Consistent with the assumption that Congress would be apprised of any NEPA statements, the
"telling Congress" phraseology has been used by defense counsel in discussing this issue. *See,*

## B.  <u>The Corps Did Not Have Discretion to Violate NEPA</u>

The third argument in the Government's Section III.A (and the primary point of Section III.B) is an attempt to re-litigate the Court's prior DFE opinion without offering any new, relevant case law or showing any trial evidence that would change the Court's conclusion that the Corps did not have discretion to violate NEPA.  As this Court has ruled, the first prong of the discretionary function test is not satisfied because "failure to comply with NEPA meant that the agency had no discretion; it could not proceed until it complied with NEPA."  *Adams v. United States*, 2006 WL 3314571, at * 2 (D. Idaho Nov. 14, 2006) (cited at *Katrina III,* 2009 WL 799976 at * 20).[34]

The Government protests at some length that only *significant circumstances* trigger a duty to supplement.  USPTM, at pp. 34-38.  This Court previously rejected this argument.  In the Court's decision's section headed "Significantly," this Court defined the term as used in NEPA.  *See Katrina III,* 2009 WL 799976 at *15 (citing 40 C.F.R. §1508.27).  After analyzing the Corps' numerous internal documents and its "litany of findings of significant impact of the MRGO," this Court concluded:

> A review of the evidence presented leads this Court to believe that the Corps was obdurate and intentionally violated its NEPA mandate.  However, in order that a

---

*e.g., Katrina III,* 2009 WL 799976 at *29 n.17 ("'I can assure Your Honor if the Corps had been convinced that it was a threat to human life they would have gone to Congress and would have told congress that it was a threat to human lives.' (Transcript of Proceeding, p. 30, lines 17-23)." (Robin Smith)).

[34] As here, the Government in *Adams* continued to advance its DFE defense even after losing on this issue, and the *Adams* court recently rejected the argument a second time.  *See Adams v. United States,* No. CV-03-0049, 2009 WL 899728 at * 2 (D. Idaho April 1, 2009) (referencing earlier decision and stating that because the FEIS omitted language evaluating the impact of a herbicide, the BLM cannot rely on the FEIS to create the "discretion it needs for the exception.").

> full record be made, the Court will not grant the [Plaintiffs' partial summary
> judgment] motion at this time and will allow the Corps to adduce evidence to the
> contrary.

*Katrina III,* 2009 WL 799976 at *26.

The Government introduced no contrary evidence at trial, thereby paving the way for this

Court to conclude on the entire record that the Corps "obdurate[ly] and intentionally violated its

NEPA mandate."  Defendant's only response in its post-trial briefing is to complain that the

Court was wrong in concluding that the Corps lacks discretion to ignore NEPA.  This Court

explained that the evidence forecloses this argument:

> Squarely stated, where there is evidence that the Corps itself knew, recognized
> and even internally reported that there had been or would be significant impact on
> the wetlands adjacent to Lake Borgne and the MR-GO, the Court must find that
> the Corps failed to follow a mandate or a prescribed course of action rendering the
> discretionary function inapplicable to those actions.  *Stated another way, where
> there is evidence that the Corps itself had made findings which per se triggered
> the mandates of these regulations, the Corps' argument falls flat.*  To embrace the
> Corps' argument would make the exception swallow the rule.

*Id.* at *20 (emphasis added).

Given this undisputed evidence, there is no basis for a different ruling.

### 1. The Corps Had a Mandatory Duty To Supplement Its 1976 FEIS

In its DFE ruling, this Court extensively reviewed the pertinent statutes, regulations, and

cases establishing conclusively that the Corps had a mandatory legal duty to supplement its 1976

EIS due to significant subsequent adverse environmental impacts thereafter.  *See Katrina III*,

2009 WL 799976 at *17-20.  "Agencies shall prepare supplements to . . . final environmental

impact statements if . . . there are significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impacts."  40 CFR § 1502.9 (c)

(1).  "The use of the word 'shall' is mandatory, not precatory."  *Dubois v. U.S. Dept. of*

*Agriculture,* 102 F.3d 1273, 1292 (1st Cir. 1996).[35]

       In fulfilling NEPA's purpose, this Court highlighted that:

> *... an agency that has prepared an EIS cannot simply rest on the original
> document.* The agency must *be alert to new information* that may alter the results
> of its original environmental analysis, and continue to take a "hard look at the
> environmental effects of [its] planned action, even after a proposal has received
> initial approval." [*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360,
> 374 (1989).] (citations and quotations omitted).  It must "ma[ke] a reasoned
> decision based on . . . the significance–or lack of significance–of the new
> information." *Id.* at 378*,* and prepare a supplemental EIS when there are
> "significant new circumstances or information relevant to environmental concerns
> and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).
> "If there remains major Federal action to occur, and the new information is

---

[35] The United States argues that all of its violations of NEPA were inherently discretionary, and thus cloaked in immunity because they were not acting under "any fixed or readily ascertainable standard" for determining whether an SEIS was required.  *See* USPTM at pp. 41-46.  This is just another way of arguing that the Corps had total discretion to prepare an SEIS—a proposition resolutely rejected by this Court.  The three cases cited by the Government—*Jayvee Brand, Inc. v. United States*, 721 F.2d 385 (D.C. Cir. 1983), *Daigle v. Shell Oil Co.*, 972 F.2d 1527 (10th Cir. 1992), and *Zumwalt v. United States*, 928 F.2d 951 (10th Cir. 1991)—are totally inapposite because their facts are materially different from those presented here.  *See* Plaintiffs' Reply (Doc. 16886 at pp. 21-22 (responding to *Jayvee Brand*).)

For example, in *Daigle,* plaintiffs sued the Army and an oil company for the pollution caused in a joint clean-up.  Plaintiff merely alleged that the Army "rushed into the clean-up without proper planning…"  972 F.2d at 1542.  But that was not the issue for DFE immunity.  The Tenth Circuit held that the precise issue was whether the Army violated "specific, mandatory directives."  *Id.* At 1540.  The court found none.  *Id.*  This is a far cry from the multiple NEPA violations of the Corps in this lawsuit.

Likewise, *Zumwalt* is a case the rugged and hardy can appreciate.  A hiker sued the government after he fell while visiting a national monument, arguing that warning signs should have been posted.  This case is somewhat unique because it involved federal policies to maintain the "preservation of wilderness characteristics" and which warned that "the visitor must accept wilderness on its own terms . . . and the risks of . . . of  possible danger from accidents . . . ."  928 F.2d at 954, note 3.  Given these considerations, it was not difficult for the Tenth Circuit to find that "[i]n the instant case, the absence of warning signs was part of the overall policy decision to maintain the trail in its wilderness state."  *Id.* at 955.  It would be hard to imagine the United States justifying its actions here—which led to a catastrophic loss of life and property of the citizens of Greater New Orleans—based on remotely analogous concerns.

sufficient to show that *the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered,* a supplemental EIS must be prepare[d]." *Marsh*, 490 U.S. at 374. *Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 556-58 (9th Cir. 2000) (footnote omitted); *Blue Mountains Biodiversity Project v. United States Forest Service*, 229 F.Supp.2d 1140, 1147-48 (D. Or.2002).

*Katrina III*, 2009 WL 799976 at *18 (emphasis added).

A related consideration mandating supplementation is evidence of cumulative impacts of

a project over time.

. . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7. In applying this regulation, the Fifth Circuit instructs that " a consideration of cumulative impacts must also consider '[c]losely related and proposed or reasonably foreseeable actions that are related by timing or geography."  *O'Reilly v. United States Army,* 477 F.3d 225, 234-35 (5th Cir. 2007)] *citing Vieux Carre Prop. Owner, Residents & Assoc., Inc. v. Pierce*, 719 F.2d 1272, 1277 (5th Cir. 1983).

*Katrina III*, 2009 WL 799976 *16.

Dredging and wetlands destruction ordinarily mandate full environmental review and not

mere EAs based on formulaic FONSIs.  *Ibid.* (discussing *O'Reilly v. United States Army*, 477

F.3d 225 (5th Cir. 2007).[36]  "The *O'Reilly* case demonstrates that an EA can be insufficient if

indeed the circumstances clearly require the production of an EIS or a SEIS because of the

'incremental impact of the action when added to other past, present, and reasonably foreseeable

---

[36] In *State of Louisiana  v. Lee*, the Corps conceded that "unrestricted dredging would have a significant environmental effect." 758 F.2d 1081 (5th Cir. 1985) (citing district court opinion). Thus, the ongoing and cumulative effects required environmental reporting under NEPA.  In addition, the Corps own Engineering Manual on Planning, Preparation and Coordination of Environmental Statements noted that typical examples of O&M activity which change the quality of, or serve some purpose to the disadvantage of the environment, include disposal of dredged material into wetlands.  PX 346 at pdf 18-19.  In those instances, this Engineering Regulation mandated the Corps to "Revise" or "Supplement" existing statements.  PX 346 at pdf 10-11.

future actions' such as the continual dredging of the MRGO." *Katrina III,* 2009 WL 799976 at

*17.  Thus, the Corps had a "'a continuing obligation to update its environmental evaluation in

response to'" the progressive destruction of the wetlands, widening of the Reach 2 channel, and

ratcheting up of the potential for catastrophic flooding. *Id.* (quoting 40 CFR § 1502.9 (c) (1)

(1992)).[37]

The Government concedes that "[a]n EIS must be supplemented if there are 'significant

new circumstances or information relevant to environmental concerns and bearing on the

proposed action or its impacts.'  40 C.F.R.§ 1502.9(c)(1)(ii); *see also La. Crawfish Prods. Ass'n-

West v Rowan,* 463 F.3d 352, 358 (5th Cir. 2006)." USPTM at p. 34.  In a bizarre twist, however,

Defendant claims an implicit exception to the statute whereby "[a]n EIS need not be

supplemented whenever new information concerning a project comes to light."  *Id.*  This

exception is nonexistent, predicated on a misleading discussion of relevant case law.

In support of this radical position that it has no legal requirement to comply with NEPA's

supplementation mandates, Defendant cites a string of inapposite cases—many of which support

the Court's conclusion.  *See, e.g., Coker v. Skidmore*, 941 F.2d 1306 (5th Cir. 1991), *Marsh v*

*Ore. Natural Res. Council*, 490 U.S. 360 (1989), and *Sierra Club v. U.S. Army Corps of*

---

[37] The Government's attempted reliance on *In re Operation of the Missouri River System Litig.*,
516 F.3d 688 (8th Cir. 2008) is misplaced.  In *Missouri River*, the Corps had initially spent over
fourteen years preparing its original FEIS which included a comprehensive environmental
analysis of the project—something that never happened with the MR-GO.  Relying on *Friends of
Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1097 (10th Cir.2004), the Eighth Circuit
found that a SEIS was required only if "the changed plans or circumstances will affect the
quality of the human environment in a significant manner . . . not already considered by the
federal agency."  *Missouri River*, 516 F.3d at 694 (citing *Marsh*, 490 U.S. at 374, as applying 40
C.F.R. § 1502.9(c)(1)(ii)).  An agency's decision to select a previously analyzed and evaluated
alternative does not amount to a substantial change requiring an SEIS.  *Missouri River*, 516 F.3d
688, at 694.

*Engineers*, 701 F.2d 1011 (2d Cir. 1983).  Specifically, the Government cites *Coker* for the off

point proposition that "[a]n EIS need not be supplemented whenever new information comes to

light." USPTM at p. 34.  The out-of-context quote from *Coker* comes from the Fifth Circuit

addressing the issue of whether an EIS could generically become "outdated."  *Coker* 941 F.2d at

1310.  Citing both *Marsh* and *Sierra Club,* the Fifth Circuit recognized that *by itself* "mere

passage of time rarely warrants an order to update the information to be considered by the

agency." *Coker* 941 F.2d 1306, 1310.  The trigger of an SEIS occurs when there are "significant

new circumstances"… *See* 40 C.F.R. § 1502.9(c)(1); *cf.* 33 C.F.R. § 230.11(b) ("significant

impacts")."  *Id*.

Defendant reprises this argument by misapplying another "passage of time" case—*Town

of Winthrop v. FAA*, 535 F.3d 1 (1st Cir. 2008).  There the First Circuit noted that the FAA had a

CEQ compliance regulation requiring a written reevaluation of its FEIS' continued accuracy

every three years. "The mere passage of time," however, did "not require preparation of an SEIS,

only a written reevaluation." *Id*. at 8.  Applying *Marsh*, the First Circuit found that the decision

not to issue an SEIS was reviewable under the arbitrary and capricious standard (*id.* at 8), adding

that an SEIS would be required if new information "paint[ed] a dramatically different picture of

impacts compared to the description of impacts in the EIS."  *Id.* at 7 (quoting FAA Order

1050.1E.).

The Corps' reliance on *State of Wisconsin v. Weinberger*, 745 F.2d 412 (7th Cir. 1984) is

equally misplaced.  The *Weinberger* court held that agencies act "arbitrarily or capriciously"

when they do not file an SEIS where "an accumulation of new information" provides "a

*seriously* different picture of the environmental landscape such that another hard look is

necessary." *Id.* at 418 (emphasis added).  Thus, as this Court noted, an EIS must be supplemented when "new information presents a '*seriously* different picture of the environmental landscape' such that *another in-depth look* at the environment is necessary." *Katrina III,* 2009 WL 799979, at *17, *citing Weinberger,* 745 F.2d at 418 (emphasis added).

The bottom line is that this Court has already directly addressed the issue of the Corps' need to supplement its EIS given the "new information" gleaned over the history of the MR-GO after 1976, finding that "an agency is not free to ignore the possible significance of new information.  Rather, NEPA requires that the agency take a 'hard look' at the new information to determine whether an SEIS is necessary."  *Katrina III,* 2009 WL 799979 * 18, citing *Blue Mountains*, 299 F.Supp.2d at 1148, *citing Headwaters v. BLM,* 914 F.2d 1174, 1177 (9th Cir. 1990).

### 2.   The Severity of Impacts Experienced in The Environment of The MR-GO Mandated An SEIS To Address The Deficiencies Of The Corps' Activities And To Propose Remedies For Those Impacts

The Government argues that an SEIS was not required because "the circumstances that existed in the 1980s were not significantly different from those addressed in the 1976 EIS . . . ." USPTM at p. 33.  This is not true.  As this Court detailed in its DFE decision, the MR-GO's environmental landscape deteriorated radically after the FEIS with the destruction of tens of thousands of more acres of wetlands, more than doubling of the Reach 2 channel width, and the open recognition of the potential of catastrophic flooding caused by the MR-GO. Based on its

review of the evidence presented by Plaintiffs *from the Corps' own files,*[38] this Court correctly concluded:

*"The Corps in this [1985] SIR makes absolutely no mention of the subsidence that has occurred since the 'overdepth or advanced maintenance' had been undertaken. It does not even note that the top-width of the MR-GO had increased considerably which, considering that by 1987 it had gone from 600 feet to 1500, must have been the case.  In terms of the 'Affected Environments and Impacts,' the findings are utterly conclusory in nature and do not mention in any manner the bank erosion that in less than 3 years resulted in specific findings of eminent danger."  *Katrina III,* 2009 WL 799976 * 22.

* "Plaintiffs have presented substantial evidence that the Corps itself internally recognized that the MRGO was causing significant changes in the environment—that is the disappearance of the adjacent wetlands to the MRGO." *Id.* at *20.

* "Squarely stated, . . . there is evidence that the Corps itself knew, recognized and even internally reported that there had been or would be significant impact on the wetlands adjacent to Lake Borgne and the MRGO . . . ." *Ibid.*

* "Plaintiffs have presented a number of documents apparently demonstrating the Corps' knowledge concerning the effects of dredging of the MRGO that rendered a waterway that was to be 650 feet in width into one that was 1500 feet by 1987 and had caused the decimation of the adjacent wetlands." *Id.* at *21.

* The 1988 Bank Reconnaissance Report (PX 9) documented that "[b]ecause erosion is steadily widening the MR-GO, the east bank along Lake Borgne is *dangerously close to being*

---

[38] This evidence was augmented at trial and summarized in Plaintiffs' Post-Trial Brief at pp. 4-19 and Appendix S (Plaintiffs' Proposed Findings of Fact Nos. 256-96).

*breached.* Once the bank is breached, the following will happen: . . . *development to the southwest would be exposed to direct hurricane attacks from Lake Borgne . . . .*" *Id.* at *22.[39]

* "Certainly, all of *these positive findings of significant changes in the environment by the Corps itself* may have triggered the NEPA mandated requirements.  Clearly, where an agency's own findings and reports demonstrate a positive belief and objective recognition that the environmental impact of a project requires on-going action, such as dredging for its maintenance, has created a new detrimental circumstance, such as the decimation of an extremely large swath of wetlands, a SEIS would be mandated." *Id.* at *23 (internal fn omitted; emphasis added).

* "Considering the litany of findings of significant impact of the MRGO as outlined above, the Court finds that Plaintiffs have raised  significant questions of fact with respect to the Corps' compliance with this mandate.  This decision is underscored by the 1988 statement that, as a result of the wetland loss, development to the southwest would be exposed to direct hurricane attacks from Lake Borgne.  *Such a statement demonstrates a positive finding by the Corps that removes its 'discretion' and mandates the filing of a SEIS."  Id.* at *26 (emphasis added).[40]

_____

[39] This report also famously warned that the MR-GO posed a possible risk "of catastrophic damage to urban areas by a hurricane surge coming up this waterway." PX 9 at pdf. p. 10.  The Court has also highlighted another 1988 internal Corps document (PX 70) concerning maintenance dredging that suggests that the Corps was "on notice of serious problems for hurricane surge that would be caused with the marsh that kept Lake Borgne in check . . . ." *Katrina III,*  2009 WL 799976 *38 note 14.

[40] The Court's findings mirror the Corps' own internal assessment of this 30 year history. A 2005 environmental compliance review concluded that the Corps should have prepared a comprehensive evaluation of the significant and cumulative environmental impacts from O&M dredging and bank erosion occurring since the 1976 FEIS.  *See* PX 208, Army Corps 2005 Memorandum at pp. 1-2.

**C.   The Second Prong of the Discretionary Function Defense Fails Because Massive Environmental Destruction and Unsafe Engineering Culminating in an Admittedly Foreseeable Catastrophe Are Not Protected Policy Decisions**

The Government's brief is silent in response to the Plaintiffs' case law demonstrating that the Government does not enjoy policy-based immunity for its many engineering defalcations or its negligent maintenance and operation of the channel.  In fact, the Government has admitted that there is no policy basis for "let[ing] this waterway get wider and threaten people[.]"  (*See Katrina III*, 2009 WL 799976, at *9 and n.17).  Further, the Government now admits that the hydrodynamic loading conditions that the MR-GO project could withstand was an *engineering* decision made by multiple engineers based on "general knowledge in the civil engineering community."  (Def. FOF at p. 82 ¶ 451 at Doc. 19139, p. 86 of 230).  Authorities invoked by the Government likewise recognize that all engineering decisions are not policy decisions.[41]  This case is not about a government policy with which the Plaintiffs disagree; it is about unsafe engineering mistakes—largely a chronic failure to take prompt, decisive corrective actions in the face of admitted perils—made in the course of violating environmental laws.

As this Court has noted, the Supreme Court has defined the second mandatory prong of the discretionary function defense as being met only if "the action challenged in the case involves the *permissible* exercise of policy judgment."  *Berkovitz v. United States,* 486 U.S. 531, 537 (1988) (quoted at *Katrina III*, 2009 WL 799976 at *8) (emphasis added).  The Government has repeatedly argued that the Corps made policy choices to run its navigation program on the

---

[41] *Richardson v. United States,* 943 F.2d 1107, 1111 (9th Cir. 1991) ("Engineering decisions which involve the application of objective scientific standards without the consideration of economic, political, and social factors, however, fall outside the discretionary function exception." (citing *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1030 (9th Cir. 1989)) (cited at USPTM, at p. 29 n.6).

cheap and that it was allowed to do so regardless of the consequences.  The Government's theory would excuse what can only be described—and what the Government is now in fact characterizing—as "horrific" losses by shrouding the culpable conduct under the purported auspices of shockingly cold-blooded policy.  Under no circumstances can federal projects— whether a coastal lighthouse, national park, or navigation channel—be managed under a so-called "policy" of disregard of the dangers those projects create.[42]

    The Government's authorities fail to undercut the Court's prior finding that a government project or action, once undertaken, cannot be operated and maintained in an unsafe manner. *Katrina III,* 2009 WL 799976, at \*29 (quoting *Marlys Bear Medicine v. United States,* 241 F.3d 1208 (9th Cir. 2001));[43] *see also Indian Towing Co. v. United States,* 350 U.S. 61 (1955).  The

---

[42] Federal courts routinely hold that an agency's failure to act is not a DFE-protected choice.  *See Frasure v. United States,* 256 F. Supp. 2d 1180, 1191 (D. Nev. 2003) (rejecting DFE defense where Government failed to issue environmental impact statement and stating in the context of the second prong that "there are serious questions regarding whether some of the Defendant's actions or omissions were of the nature and quality that Congress intended to be shielded from liability. . . .  [M]any of the Defendant's actions taken regarding the assessment of the Monite Site and providing the public with sufficient warning and protection do not appear to be the type of actions or omissions considered by Congress when it passed the statute."); *Parker Land and Cattle Co. v. United States,* 796 F. Supp. 477, 487-88 (D. Wyo. 1992) ("the evidence showed that the federal defendants didn't really consider the dangers they have posed to the domestic livestock industry. . . . .  The *federal government does not have the discretion to do nothing* in the fight against a disease which it is perpetuating by its wildlife management practices at the [National Elk Refuge, Grand Teton National Park, and Yellowstone National Park].") (emphasis added); *accord Francis v. United States,* No. 2:08CV244DAK, 2009 WL 236691, \*9 (D. Utah Jan. 30, 2009) (while siding with the Government regarding the first prong of the exception, the court in a case arising from a bear attack explained that the defense failed for lack of a protected policy decision:  "the evidence set forth thus far in this litigation demonstrates, tragically, that *no decision was ever actually made about how to handle this threat to public safety*. . . .  Plaintiffs contend, and the court agrees, that this *was a simple and tragic failure to act, which does not fall under the discretionary function exception to the FTCA*.") (emphasis added).

[43] The courts draw a sharp line between policy-based *initial* planning (design) decisions and all subsequent *implementation* activities which are not protected by the DFE.  *See, e.g.,* E. *Ritter & Co. v. United States,* 874 F.2d 1236, 1241 (8th Cir. 1989) ("Once construction was completed,

language the defense extracts from *Brown v. United States,* 790 F.2d 199, 202 (1st Cir. 1986)

(USPTB, at p. 28) is a quote from *United States v. Sandra & Dennis Fishing Corp.,* 372 F.2d

189, 195 (1st Cir. 1967), where the First Circuit in fact "held the government liable for negligent

performance by the Coast Guard of a rescue operation after it had undertaken it[.]" *Brown*, 790

F.2d at 202 (citing *Sandra & Dennis* at 195). *Brown*'s conclusion on the DFE's practical

application, if anything, supports the distinction between initial design and subsequent

management (implementation) such as maintenance and operations:

> In these cases [imposing liability,] the government created the danger after the critical discretionary decision had been made. In *Indian Towing*, the government created a danger by representing that an operating lighthouse was present.

*Brown,* 790 F.2d at 203 (quotes om.).[44]

---

policy decisions ended. The district court recognized that the Corps' responsibilities, however, did not end after construction of the ROD was complete. Even though the Corps of Engineers knew that this construction of the ROD would cause erosion of adjoining land, the Corps failed to maintain the banks of the ROD in proper fashion. In addition, the Corps failed to inform Ritter of its cost-sharing policy and repeatedly reassured Ritter that the problem would be rectified. These acts and omissions, which constitute maintenance and operation of the ROD after construction, do not involve policy concerns of the type which Congress intended to protect. Rather, they involve the most basic form of operational, ministerial conduct. *The Corps' decision not to maintain the banks of the ROD was not of a discretionary nature and therefore does not come within the protection afforded by the discretionary function exception*."). (Emphasis added).

[44] The Government also relies on *Lopez v. United States,* 376 F.3d 1055, 1057 (10th Cir. 2004). USPTM, at p. 29 n.6. The *Lopez* court, in its analysis of *Indian Towing*, acknowledged that, "While maintenance of that lighthouse in good condition may be necessary to the furtherance of the policy objectives behind the lighthouse's construction, the tasks involved in that maintenance (for example, keeping the light lit) do not involve any of those policy considerations." 376 F.3d at 1059. *Lopez* further states that there is no clean distinction between decisions susceptible to policy analysis and discussed a case distinguishing between an immune initial zoning decision, which did fall within the ambit of discretionary policy, and the decision not to warn swimmers about dangerous conditions, which was *not* an immunized policy choice. *Lopez,* 376 F.3d at 1060.

As this Court has found, the logic of *Indian Towing* compels the conclusion that the Corps had a non-immunized duty, after creating the MR-GO, to maintain and operate it in a good and safe condition.  The bottom line, as this Court recognized, is that public safety and professional standards *always* trump claims of lack of funding for remediation.  *See Katrina III,* 2009 WL *27-37.

In sum, all of the Corps' actions and omissions that Plaintiffs challenge were matters of objective scientific, safety, and professional judgment—not of discretionary social, economic, or political policy.  Thus, the Corps' continuous dredging and allowing the unrestrained and continued erosion of the channel banks and wetlands destruction—combined with its decisions to delay implementation of authorized foreshore protection along the banks of the channel and to forego regeneration of the wetlands and construction of surge and salinity prevention barriers— were violations of professional engineering standards for public safety. The Corps, having created the hazards, cannot claim immunity for its negligent failure to protect the public.  This is simply malfeasance and not the kind of policy-driven Government conduct that the DFE was intended to protect.[45]

### D.   The Government's Self-Indicting DFE Causation Argument Is Founded On An Incorrect Premise

The Government devotes nineteen pages (USPTM at pp. 46-65) to undermining the brief's *first sentence* that the MR-GO allegedly did not flood New Orleans (*Id.* at  p. 1).  The Government, in Section III.B.3 of its brief, argues that the Corps' failure to comply with environmental reporting laws was harmless because everyone allegedly knew about the MR-GO

---

[45] Without reiterating Plaintiffs' position in full, Plaintiffs incorporate their position with regard to Prong Two from the PPTB at pages 31-41.

threat without the Corps telling them.  (*Id.* at  pp. 46-65).  According to the Government's

Memorandum, everyone knew of the "massive environmental damage,"[46] "dire", "incredible

threat to the lives of men and women and children,"[47]  and "horrific losses"[48] caused by the MR-

GO and yet, at the same time, the Government also denies that the MR-GO caused any damage.

According to the self-contradictory arguments in the Government's briefing, the MR-GO

Cassandras were, unlike the mythic version, actually wrong because the mass catastrophe that

*did in fact occur* was a coincidence not caused by the MR-GO.  The trial has shown that the

Cassandras were right.  What is not right is the Government's assumption that this DFE

causation argument – made at the expense of the Government's tort causation argument – assists

the defense.

The Government is arguing "that the NEPA analysis would have made no difference" – a

theory of defense directly rejected by the *Adams* court.  2006 WL 3314571 at *2.  As that court

explained, "there is no way to know.  While a bad NEPA report does not automatically block a

project, it could lead to that result, or to significant modifications.  It is impossible to say what

the result would be.  And that means that the [federal agency] loses because it has the burden of

proof."  *Id*. (citing *Marlys Bear Medicine, supra,* 241 F.3d at 1210).[49]  Accordingly, a federal

---

[46] *See* USPTM, p. 58.

[47] *See* USPTM, pp. 50, 61.

[48] *See* USPTM, p. 60.

[49] *See also Frasure v. United States,* 256 F. Supp. 2d 1180 (D. Nev. 2003) (in a case arising from toxic exposures at a Superfund site the Plaintiffs argued that the Government failed to perform or negligently performed mandatory environmental assessments, environmental impact statements, and record searches; the court denied the Government's motion to dismiss based on the discretionary function exception, reasoning that, "What is clear … is that once the environmental assessment was completed, it might have triggered a mandatory impact statement.  The record indicates that documents in the Defendant's possession disclosed that a dynamite factory was

agency that flouts NEPA's requirements thereby loses its DFE immunity without Plaintiffs proving what Congress would or would not have done in an alternate universe in which the federal agency chose to follow the law.[50] The Government, having violated its own laws, cannot be heard to complain that following the law would have been irrelevant.

The Government cites no authority for the proposition that agency conduct enmeshed in decades of NEPA violations is immune from tort liability under the DFE. The "Congress-would-not-have-cared" argument overlooks that the Government must establish *both parts* of a two-part test to secure DFE immunity. Assuming only for argument's sake that it were determined that environmental reporting laws it chooses because Congress stopped caring about the NEPA legislation it enacted, the DFE defense still fails because disregard of environmental laws involves impermissible—rather than permissible—policy. *Berkovitz, supra,* 486 U.S. at 537 (second prong requires that the action challenged in the case *involves the permissible* exercise of policy judgment") (emphasis added); *see also Frasure, supra,* 256 F. Supp. 2d at 1191.

The Government's analysis depends on the misperception that Plaintiffs had a duty of proving a failure to warn Congress not in the context of a response to the Government's DFE affirmative defense but rather as an essential element of causation grafted onto their tort claim. By making this argument, the Government takes the NEPA issues out of the context that this Court framed:

---

operated on the premises for many years and that hazardous substances were stored on the premises for more than one year. If such substances were stored on the site for more than one year, the environmental impact statement would have been mandatory and Defendant would have no protection from the discretionary function doctrine.") (footnote om.).

[50] Neither *Adams* nor *Frasure* required that the Plaintiffs prove that Congress would have taken specific actions had the Government complied with NEPA.

In the case before us, the posture is not one where the Court is reviewing the appropriateness of the Corps' EISs, EAS and FONSIs under the Administrative Procedures Act, 5 U.S.C. ' 701, *et seq.* Instead, the Court must determine whether the actions or non-actions of the Corps in the context of the MRGO were of a nature such that the first test in the discretionary function exception inquiry precludes its application -- that is whether NEPA and the regulations cited above prescribes a course of action for the Corps such that it had no choice but to produce an EIS or SEIS with respect to a number of individual actions it took.

. . . Plaintiffs here do not seek redress in tort for money damages for the failure to prepare allegedly required EISs or SEISs. Plaintiffs seek damages for the Corps' alleged defalcations concerning the design, construction, maintenance and operation of the MR-GO.

. . . The Corps cannot ignore the dictates of NEPA and then claim the protection of the discretionary exception based on its own apparent self-deception.

*Katrina III,* 2009 WL 799976, at **19, 20.[51]

---

[51] The Government's authorities do not compel a contrary conclusion. The Government's invocation of *In re Ohio River Disaster Litig.,*862 F.2d 1237 (6th Cir. 1989) (USPTM at p. 47), exposes the circular nature of the Government's argument. The problem for the *Ohio River* plaintiffs was that the appellate court found that a key challenged decision was made at a high level and was policy protected. 862 F.2d at 1246-47. Other key components of the *Ohio River* plaintiffs' case were deemed discretionary and policy-protected as well, and what few decisions were deemed non-discretionary were simply not "substantial factors," 862 F.2d at 1249, meaning that once the actions that were protected by the discretionary function exception were removed, the plaintiffs had no viable case left. In sharp contrast here, however, Plaintiffs have proven that the MR-GO's O&M was not policy protected and was a substantial factor causing their harm, which is what *Ohio River* requires.

In *Montijo-Reyes v. United States,* 436 F.3d 19 (1st Cir. 2006) (cited at USPTM at p. 46), the plaintiffs did not even "attempt to make [a] showing" that the Corps' conduct was not at least susceptible to policy-related judgments. *Id.* at 25 n.7. On that basis alone, the case is inapposite. Further, the plaintiffs based their arguments on the allegation that "the Corps violated the CWA's prescription to comply with all *state* water quality requirements." 436 F.3d at 25 (emph. supp.). Thus, the theory of the *Montijo-Reyes* case-in-chief was that state law provided a mandatory duty such as to defeat the discretionary function exemption, which Plaintiffs here are not arguing. Further, the *Montijo-Reyes* court stated that the water quality permit rule at issue was not aimed at the site selection and maintenance of which the plaintiffs complained; as support, the court cited a decision in which the plaintiffs' claims of mandatory safety were based on a *general* government manual. 436 F.3d at 25. Here, however, NEPA was aimed at preventing the massive environmental destruction that the Corps perpetrated in violation of specific and mandatory federal laws.

Thus, the premise upon which dozens of pages of the Government's argument is based—that the Plaintiffs cannot prove causation as to the failure to warn Congress—does not advance the DFE defense because the NEPA violation is not grafted into the Plaintiffs' case-in-chief as a stand-alone causation element.

### E.  The Government's Purported "Causation" Evidence Is Unconvincing

As demonstrated through the testimony of trial witness Luisa and Miller quoted above and other evidence, the Corps never informed Congress of the true impacts of its O&M and failed to request emergency funding for the MR-GO in order to remedy the host of dangerous conditions documented for decades by the Corps itself.  Far from proving that the Corps' lawless environmental defalcations were harmless, the evidence demonstrates that Congress did respond to what extremely limited information that it had received regarding the MR-GO O&M dangers.  Thus, in 1995, when the House Committee on Appropriations was made aware that the Corps'

---

Nor does the HUD-audit case, *Sloan v. United States*, 236 F.3d 756 (D.C. Cir. 2001) (cited at USPTM at p. 46), remotely apply.  As the Government acknowledges parenthetically, the *Sloan* plaintiffs did not allege harmed caused by a government investigation, but rather only argued that a subsequent suspension from government contracts harmed them.  In analyzing the DFE, however, the *Sloan* plaintiffs conceded that the suspension was a discretionary function and focused on the harmless investigation.  236 F.3d at 760.  Therefore, the *Sloan* plaintiffs, like those in *Montijo-Reyes,* clearly failed to present a cogent DFE analysis to the court by failing to link the specific federal law violated and the harm to them.  The court found that the investigation and suspension could not be separated as plaintiffs claimed *and* that the investigation was discretionary in the first instance.  236 F.3d at 761.  The decisions made by the investigating auditors were undertaken for policy reasons, including the protection of tenants living in HUD-funded housing, and that finding doomed the *Sloan* plaintiffs.  236 F.3d at 764.  In our case, the Corps decisions (or no decisions) made in destroying the environment and maintaining a massively unsafe channel were not protected policy decisions.

dredging conduct conflicted with environmental issues necessary for compliance with Coastal Zone Consistency, appropriations were approved for bank stabilization. USPTM at p. 57.[52]

This example alone demonstrates that if the Corps had satisfied its mandate to appropriately address the environmental impacts of its conduct through its mandatory NEPA reporting with regard to the MR-GO, Congress would likely have been responsive and appropriated funds for remediation of a range of hazards created by the MR-GO. Indeed, we need not speculate about what an informed Congress would do.  When Congress finally learned about the horrific impacts of the MR-GO after Katrina, it promptly voted to shut it down and authorized billions of dollars for remediation, such as the IHNC surge reduction barrier and the Bayou La Loutre saltwater intrusion barrier.  *See* PPTB at pp. 30-31.

Ignoring this evidence, the Government marshals pleas by state and local governments imploring the Corps' compliance in fulfilling its mandatory "hard look" at the impacts of its actions and reporting to Congress.  It is hardly exculpatory that local interests asked that a recalcitrant Corps be forced to "evaluate the adverse environmental impacts resulting from the Mississippi River Gulf Outlet and to determine if there is a federal interest in continuing to operate and maintain the Mississippi River Gulf Outlet." DX 601.

Nowhere in the communications offered by the Government does the Corps demonstrate that it did what NEPA requires. The Corps never told Congress—in an SEIS or otherwise—that after having taken the mandated "hard look" at the cumulative effects of its O&M activities,

---

[52] The House Committee on Appropriations further reported that it was "of the opinion that to minimize future dredging costs and preserve wetlands the north bank Mississippi River-Gulf Outlet  should be stabilized … using available operation and maintenance funds."  USPTM, p. 57 (citing H.R. 104-149).

further evaluation was necessary.   In lieu of compliance with NEPA, the Government points to

its participation in Coastal Wetlands Planning Protection and Restoration Act (CWPPRA) Task

Forces and other programmatic escosystem restoration "Plans" to argue that "Congress was

aware of the wetlands loss" as well as the Corps' "efforts toward restoration of the wetlands."

USPTM at p. 53.   This is manifestly wrong.  These endless regional and generic studies—like

all the Corps' reconnaissance reports and other inconclusive investigations—did not drill down

to the MR-GO and its ravaging of the natural environment *and* the resulting risk of catastrophic

flooding.[53]

      The Government refers this Court to multiple copies of similar letters (DX 874-877),

drafted in August 2003 from the Corps' Al Naomi *discussing the LPV.*  The letters neither relate

to the MR-GO nor are they addressed to Congress.  Rather, the letters are addressed to several

local Levee Districts and bemoan lack of funding for the LPV.  The letters omit any mention of

the Corps' active role in continuing O&M activity for the MR-GO that contributed to the harms

inflicted on the LPV and potentially necessitating these requests.[54]  The Government similarly

---

[53] Defendant highlights letters from the record, specifically JX 297 (from Col. Haar to
Congressman Hebert),  JX 299 (from Col. Heiberg to Mr. Lannes of the Regional Planning
Commission) and DX 844 (from Maj. Manuel to Sen. Breaux), asserting that these were not
previously before the Court.  USPTM, p. 20.  Oddly, however, Defendant also furnishes the
location in the record where these letters had been submitted.  (See Docs "17703 -4; 17703 -3
and 17703 -2" respectively in support of Defendant's Motion to Dismiss, Doc 16511).  Clearly,
the Court considered and rejected these letters as well as the Government's argument that these
and other attempts at substituted compliance with NEPA should preserve the Corps' DFE
immunity.

[54] Similarly, DX 857 (from Mr. Huey, Bd of Comm'r of Orleans Levee Dist., to Sen. Breaux)
and 887 (from Sen. Landrieu to Mr. Huey) address LPV funding requests and make no mention
of the Corps' federally funded O&M activities that impact the LPV.

cites several letters *from* the Orleans Levee District,[55] where, again, no suggestion is made as to the Corps' destructive, ongoing MR-GO related dredging actions.

What the evidence shows is that the Corps steadfastly refused to satisfy its NEPA mandate and, before Katrina, never analyzed its conduct in relation to the adverse effects that it was causing and the potential methods of remediation available to remedy them. While the Corps points to multiple examples of highly selective and deceptive public discussion of the harm it created, it fails utterly to illustrate a moment in history before Katrina where in the appropriate forum— *i.e.*, a NEPA-related EIS for the O&M of the MR-GO—the Corps connected its ongoing O&M activities with the devastation that behavior was creating. If NEPA can be so easily evaded, it has no teeth.

### F.   The "Deceit and Misrepresentation Exception" Does Not Bar the Plaintiffs' Claims

For the first time, the Government invokes 28 U.S.C. §2680 (h) to claim that it is immune from liability for its deceits and misrepresentations. *See* USPTM at pp. 65-66. The Government's own cited case describes the "principle laid down in *Indiana Towing*" to be that "the government must not mislead." *United States v. Sandra & Dennis Fishing Corp.,* 372 F.2d 189, 195 (1st Cir. 1967) (case cited at USPTM, p. 29). Subsection (h) of 28 U.S.C. § 2680 is irrelevant here because it refers to intentional torts, not negligence actions.

The Government's cases miss the mark because they address the specific application of a claim by a private party for damages sustained as a result of detrimental reliance on either intentional or negligent misrepresentations by a federal agent. For example, *United States v. Neustadt*, 366 U.S. 696 (1961) held immune "claims arising out of negligent, as well as willful,

---

[55] DX 846-856 (letters from Naomi to various officials discussing the LPV Budget FY 2004).

misrepresentation" (366 U.S. at 702).  Specifically, the court examined the question of whether

the United States could be held liable, under the FTCA, to a purchaser of residential property

who relied on an inaccurate FHA inspection and appraisal in paying a purchase price in excess of

fair market value. The Supreme Court made clear that the exemption is applicable to torts of

negligent as well as deliberate misrepresentation, but acts of negligence *are not exempted*:

> Our conclusion neither conflicts with nor impairs the authority of *Indian Towing Co. v. United States*, 350 U.S. 61, which held cognizable a Torts Act claim for property damages suffered when a vessel ran aground as a result of the Coast Guard's allegedly negligent failure to maintain the beacon lamp in a lighthouse. Such a claim does not 'arise out of. . . misrepresentation,' any more than does one based upon a motor vehicle operator's negligence in giving a misleading turn signal.

*Neustadt*, 366 U.S. 696, 711 n.26.

The Supreme Court in *Block v Neal,* 460 U.S. 289 (1983) illustrated the distinction.

There the Plaintiff applied for a Rural Housing Loan from the FHA and contracted with Home

Marketing Associates, Inc. for the construction of a prefabricated house.  The contract with

Home Marketing Associates was subject to 7 CFR § 1804 *et seq.* (1977) requiring the work to

conform to plans approved by the FHA.

The FHA had become heavily involved in all phases of the construction.  Shortly after

Plaintiff moved in, she discovered defects in the construction of the house and sued the FHA.

Although the agency had no contractual obligation to provide the Plaintiff with technical

assistance or to inspect and supervise construction of her house, the complaint had stated a claim

for negligence under the principle "that one who undertakes to act, even though gratuitously, is

required to act carefully and with the exercise of due care and will be liable for injuries

proximately caused by failure to use such care." *Neal v. Bergland*, 646 F.2d 1178, 1181-1182,

(6th Cir.1981), citing Restatement (Second) of Torts § 323 (1965).[56]

The Government claimed that *Neustadt* controlled and that immunity attached. The

Supreme Court disagreed with the Government and distinguished *Neustadt*,:

> …the essence of an action for misrepresentation, whether negligent or intentional,
> is the communication of misinformation on which the recipient relies. . . .
> Neustadt alleged no injury that he would have suffered independently of his
> reliance on the erroneous appraisal. Because the alleged conduct that was the
> basis of his negligence claim was in essence a negligent misrepresentation,
> Neustadt's action was barred under the "misrepresentation" exception.

*Block*, 460 U.S. at 296-97.

Citing Restatement (Second) of Torts § 552(3) (1965), the Supreme Court then

specifically limited *Neustadt,* holding that "the statutory exception undoubtedly preserves

sovereign immunity with respect to a broad range of government actions.  But it *does not bar

negligence actions* which focus not on the Government's failure to use due care in

communicating information, but rather on the Government's breach of a different duty."  *Block*,

460 U.S. at 297 (footnote omitted, emphasis added).

Once again, the Government's immunity claim fails, leaving it defenseless against the

indisputable evidence that it failed to comply with NEPA. There is no immunity to lie to

Congress—instead, there was a mandatory duty to inform Congress fully and timely about the

MR-GO's dangerous defects, the risk of catastrophic flooding, and measures for remediation.

---

[56] The Sixth Circuit Court of Appeals also relied upon *Indian Towing Co. v. United States,* 350
U.S. 61 (1955) (Coast Guard's failure to maintain the beacon light in a lighthouse); *Seaboard
Coast Line Railroad Co. v. United States,* 473 F.2d 714 (5th Cir. 1973) (negligent design and
construction of a drainage ditch); and *Barron v. United States,* 473 F.Supp. 1077 (D Hawaii
1979) (failure to require a subcontractor to comply with a contract's safety requirements), *aff'd in
part and rev'd in part on other grounds*, 654 F.2d 644 (9th Cir. 1981).

Because Plaintiffs here do not allege a cause of action for the Corps' deceit and

misrepresentations to the Congress, this exemption to the FTCA is manifestly inapplicable.

**V.     LOUISIANA LAW OBLIGATED THE ARMY CORPS TO PREVENT THE MR-GO FROM FLOODING PLAINTIFFS' PROPERTY, TO AVOID ENHANCING THE FLOODING  RISK,  TO CORRECT KNOWN DEFECTS, AND TO WARN ABOUT DANGEROUS CONDITIONS**

For the first time in this three-year-old litigation, the Government asserts that Louisiana

law imposed no duty on the Army Corps to correct or warn the public or Congress about the

MR-GO's known hazards.  *See* USPTM at pp. 67-69.  Not surprisingly, this novel claim is

predicated on a tautology, non sequitur, and false premise.  Bereft of any supporting legal

authorities, this argument is reminiscent of The Queen in Lewis Carroll's *Through The Looking

Glass*:  "Sometimes I've believed as many as six impossible things before breakfast."

**A.   The Corps Had Multiple Duties Under Louisiana Law**

The Government does not dispute Plaintiffs' articulation of the duties imposed on the

Corps by Louisiana law.  *See* PPTB at pp. 43-51.  Indeed, Defendant does not discuss any

Louisiana negligence law.  Thus, it is undisputed that like any private individual,[57] the Army

Corps, as a landowner and facility operator, had a quartet of affirmative duties in operating and

maintaining the MR-GO:  to prevent flooding, to avoid enhancing the flooding risk, to remedy

known defects, and to warn about dangerous conditions.  *See, e.g.*, LSA CC. Art 667; *Faucheaux

v. Terrebonne Consol. Gov't,* 615 So.2d 289, 292 (La. 1993); *Lombard v. Sewerage & Water

Bd.*, 284 So.2d 905, 913-14 (La. 1973); *Branch v. City of Lafayette,* 663 So.2d 216, 219-20 (La.

App. 1995); *Graci v. United States,* 435 F. Supp. 189, 195 (E.D. La. 1977).  As the Fifth Circuit

---

[57] The FTCA makes the Army Corps liable for negligent acts to the same extent as a private individual would be liable under Louisiana law.  *See* 28 U.S.C. § 1346 (b).

has held, "[t]he United States may be liable under the Federal Tort Claims Act for negligent provision of services upon which the public has come to rely." *Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir. 1970) (citing *Indian Towing Co. v. United States*, 350 U.S. 61, 76 (1955)).

Nor does the Government dispute that under Louisiana law and longstanding professional norms, the standard of care for engineers and scientists under similar circumstances required the Army Corps "to discover, to warn Congress and the public about, and to seek funding to repair the MR-GO's obvious, defective/hazardous conditions that were victimizing the adjacent earthen structures." PPTB at p. 48. Consistent with Dr. Bea's testimony that an engineer's "knowledge of a hazard triggers an obligation to take corrective action,"[58] Corps employees conceded that it was imperative to remediate any project "constituting a public threat." TT at p. 510 (Breerwood); *see also* TT at p. 3620 (Luisa) (It is a "failure of duty for a District to fail to remediate safety problems with a Corps project."). Likewise, engineers are uniquely situated to communicate known safety risks to the public, thereby fulfilling "a national policy that those put in harm's way have a voice in what otherwise could be involuntary exposure to risk." PX 3, ILIT Report, at p. 13-4. In short, competent engineers indisputably would not remain silent about remedying known defects.

Forced to concede that the Corps had these duties, the Government resorts to circular reasoning: it "had no duty to correct or warn the public about the alleged defects with the MR-GO because the MRGO *did not create an enhanced risk of flooding*." USPTM at p. 67 (emphasis in original). Obviously, if the MR-GO did not exacerbate the risk of hurricane flooding, the Corps had no duty to correct or warn. Conversely, if (as the Corps admitted in the

---

[58] TT at pp. 1261:14-1262:23; 1582:12-1583:1 (Bea).

1980s) the MR-GO posed a risk of catastrophic flooding,[59] it had a legal duty to take timely corrective action and to warn those in harm's way.  Defendant does not claim otherwise.

## B.  The Army Corps Had A Reporting Duty To Congress

The Government's argument then turns "curiouser and curiouser."  Faced with trial testimony proving that the Army Corps did not inform Congress about the hazards created by the MR-GO,[60] the Government resorts to arguing that Louisiana law imposed no duty on "the United States to warn *itself* of any suspected dangers caused by the MRGO."  USPTM at p. 67 (emphasis in original).  The argument has the elegance of simplicity: Congress and the United States are one and the same for FTCA liability purposes; therefore, asserting that the United States (the nominal defendant) had a duty to report to Congress is akin to saying that it had a duty to report to itself—a duty nowhere imposed by law.  Once again, Alice's words are apropos: "Oh dear, what nonsense I'm talking."

This is not the law.  Otherwise, all the reporting obligations the Army Corps owes to the Congress under NEPA are meaningless.  *See Katrina III*, 2009 WL 799976, at *14 (the purpose of an EIS is "'to provide Congress (and others receiving such recommendation or proposal) with a sound basis for evaluating the environmental aspects of the particular project or program.'") (quoting *Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army*, 492 F.2d 1123,

---

[59] *See, e.g.,* PX 9 at pdf. 10 (closure of the MR-GO would mitigate the bank erosion problem and "*also reduce the possibility of catastrophic damage to urban areas by a hurricane coming up this waterway"*); PX 2122 at pdf. pp. 72-73 (Reach 2 east bank erosion occurring at "alarming rates" and if unremediated, "will begin to encroach into the stability of the levees" like the "emergency situation at the Bayou Dupre Control Structure"); PX 1976, EA # 38 (test foreshore protection sections were necessary "in the interest of public safety").

[60] *See Katrina III*, 2009 WL 799976, at * 28 ("the Corps' failure to warn Congress of the allegedly life threatening harm which the MR-GO created"); TT 3242:12-16; 3243:23-3244:3; 3245:4-16; 3246:14-24; 3249:13-17 (Greg Miller) (never informed Congress).

1140 (5th Cir. 1974) (further cit. om.)).  In short, the Corps is by law a federal agency subject to NEPA's mandatory reporting requirements.  *See* 42 CFR 1500.6 (all federal agencies must "insure full compliance" with NEPA); Army Reg. 200-2, 53 FR 46322, 1988 WL 275225 (effective 1988 through 2002) (the Department of the Army's policies and procedures for implementing NEPA).

      None of the cases cited by the Government remotely support this tortured logic.  *See* USPTM at p. 66.  *Galvin v. Occupational Health & Safety Admin.*, 860 F.2d 181 (5th Cir. 1988) has nothing to do with the duty to warn or report but instead concern who should be the proper plaintiff.  Likewise, *Williams v. United States,* 71 F.3d 502 (5th Cir. 1995) concerned whether a Congressman was immune for defamatory statements, and *Hal, Inc. v. United States*, 122 F.3d 851, 853 (9th Cir. 1997) dealt with bankruptcy matters.  Finally, *Searcy v. Phillips Elec. N. Amer. Corp,* 117 F.3d 154 (5th Cir. 1997) was a *qui tam* lawsuit where the issue was intervention.

### C.  <u>The Duty To Report To Congress Is Imposed by Federal Law</u>

      In a final flourish of whimsy, the Government argues that since its liability under the FTCA is co-extensive with that of a private person, and since a private person has no duty to report to Congress under Louisiana law, the Government likewise has no duty.  *See* USPTM at p. 68.  This argument proceeds from a false premise. The duty imposed by Louisiana law is to warn *the public* about unreasonably dangerous conditions.  *See, e.g., Socorro v. City of New Orleans*, 579 So.2d 931, 939 (La. 1991); *Shelton v. Aetna Cas. & Sur. Co.,* 334 So.2d 406, 410 (La. 1976); *Faucheaux*, 615 So.2d at 294 (duty of parish in maintaining an automatic canal gate and providing warnings of perilous conditions); *cf.  Indian Towing Co.*, 350 U.S. at 69 (common law

duty to maintain Coast Guard lighthouse in good working condition, to warn users if it went out of service, and to repair the defect).

The duty to inform Congress (and derivatively the public) is imposed by federal law—NEPA.  *See* PPTB at pp. 20-22.  Of course, since a private person is not a federal agency like the Army Corps operating and maintaining a project ravaging the environment, a private citizen does not have a duty to report on the environmental impact of the Corps' actions.   No authority supports the proposition that the Government's breach of a duty specific to the Government is irrelevant in the context of the FTCA.   Under this theory, the Government presumably could defend the FTCA prisoner and detainee cases with a one-liner that private citizens have no duties vis-à-vis the treatment of individuals in federal custody.  That there is no such get-out-of-jail-cases free card is demonstrated by the very existence of such litigation.  *Accord Castro v. United States,* 560 F.3d 381, 389 (5th Cir. 2009) (deportation case discussing Constitutional limits on the "discretion of federal officials").  So, too, would the body of national park litigation[61] and aviation cases[62] fall by the wayside.  The sole case cited by the Government—*Rivera v. U.S. Army Corps*, 891 F.2d 567 (5th Cir. 1990)—concerns whether a security guard employed by the Corps was subject to the statutory employer defense under Louisiana law.

## VI.    THE PLAINTIFFS HAVE PROVED THAT THE MR-GO CAUSED THEIR DAMAGES

Any reply to the Government's causation briefing must begin with recognizing its conspicuous failure to engage, much less refute, Plaintiffs' detailed causation presentation.

---

[61] *See, e.g., Parker Land and Cattle Co. v. United States*, 796 F. Supp. 477, 480 (D. Wyo. 1992) (discussing responsibility to manage federal lands in accordance with federal statutes).

[62] *See, e.g., Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir. 1970) (quoting Federal Aviation Agency Manual and Government personnel manuals, both of which impose duties specific to the federal Government).

Virtually all of Plaintiffs' discussion of the evidence and engineering/scientific principles is simply ignored.  Likewise, most of the Court's questions go unanswered, and Defendant is silent in the face of Plaintiffs' debunking of the defense experts' opinions.

In place of a point-by-point refutation or attempt to defend its experts, Defendant devotes 32 pages to attacking Dr. Robert Bea. This criticism, however, is a glancing blow focusing mostly on peripheral aspects of his extensive testimony and not on the primary bases of his opinion. Thus, we are treated to nitpicking about grass cover lift-off rates, datums, use of LS-DYNA model, and soil sampling techniques.

The Government's critique of Dr. Bea's opinion on lateral displacement is unfounded. Like its commentary on other aspects of his testimony, Defendant first erroneously portrays a supporting fact cited by Dr. Bea as a lynchpin of his opinion, then mischaracterizes what he said, and then tilts with this windmill.  In the process, the Government fails to discuss the most cogent bases for his opinion that the "squeezing" of the interdistributary layer caused by the MR-GO's widening and dredging resulted in lowering of the Reach 2 crowns by at least three feet.

The core elements of Plaintiffs' causation theory and corroborating evidence—correlating the MR-GO's post-construction adverse effects on the topography and the catastrophic flooding of Plaintiffs' property—are not refuted in the Government's brief.  Some examples include the following:

*The MR-GO caused the widening of the Reach 1/GIWW channel by 50% and Reach 2 by 300 to 500% and the volume (conveyance) of water during Katrina.

*The MR-GO's introduction of saltwater destroyed tens of thousands of acres of storm surge and wave buffering cypress-tupelo swamp and wetlands.

56

*The widening of the Reach 2 channel massively increased the conveyance of water and facilitated the regeneration of waves out of Lake Borgne and across Reach 2 that were  90 times greater in destructive force acting on the levee face than waves traversing the initial 650 foot wide channel.

*Peak surge along Reach 2 occurred at 8:30 a.m., and a significant amount of breaching caused by wave side erosion occurred well before overtopping.

*Only sections of the Reach 2 levee exposed to wave action—which would not have been so destructive but for the widened channel and loss of fronting vegetation— suffered significant breaching.

*Without the Reach 2 breaches, the volume of overtopping would have filled only 25% of the Central Wetlands Unit—a volume of floodwaters insufficient to overflow the 40 Arpent Canal Levee—and St. Bernard Parish and Lower 9th Ward would not have been flooded.

*The increased conveyance of water in the Reach 1/GIWW channel contributed to the demise of the north and south floodwalls on the eastern side of the IHNC.

*The Corps had decades of notice of the MR-GO's defective conditions and the potential for catastrophic flooding.

*Feasible post-construction mitigation measures—such as surge and saltwater intrusion barriers, wetlands restoration, planting vegetation between the Reach 2 channel and levees, bank armoring, and foreshore protection—could have been installed long before Katrina and would have mitigated the surge and waves to the extent that there would have been only minor, but not catastrophic, flooding in New Orleans East, St. Bernard Parish, and the Lower 9th Ward.

In the same vein, the Government's brief does not address the failure mechanism for the floodwalls on the eastern side of the IHNC; does not dispute that floodwaters from Reach 2 were the primary source of flooding of the Lower 9th Ward; and admits that the initial flooding of the Robinsons' home in New Orleans East came from overtopping of the Citrus Back Levee along the Reach 1/GIWW due to at least three feet of enhanced surge and a significant increase in water conveyance caused by the channel widening and unmitigated "funnel effect." The Defendant completely ignores the testimony and report of Professor Johannes Vrijling regarding the uncontradicted fact that the MR-GO enhanced surge at the New Orleans East Bank Levee by one foot such that there would have been no overtopping and no overtopping erosion at that location. *See* Slides 14 and 15.

Equally remarkable is the fact that Defendant does not even discuss the opinions and supporting evidence of Plaintiffs' experts Dr. Paul Kemp, Dr. John Day, and Dr. Duncan Fitzgerald. The compelling testimony of Dr. Sherwood Gagliano—chronicling five decades of the mounting "environmental disaster" wrought by the MR-GO and his repeated, unheeded warnings of impending flood disaster—is hardly mentioned much less rebutted. Similarly, Chad Morris' LIDAR analyses are uncritiqued.

The bottom line is that the parties' briefs are the proverbial two ships passing in the night. Unfortunately for the Government, however, the result is an utter failure to discredit Plaintiffs' causation theory and evidence and to rehabilitate its own experts whose conflicting opinions were mortally wounded in Plaintiffs' opening brief. As for the extremely limited areas where Defendant critiques Plaintiffs' proof, the criticism is either unfounded or irrelevant.

On this record, Plaintiffs have clearly established by a preponderance of the evidence that the MR-GO was a substantial factor in causing the catastrophic flooding of Plaintiffs' property. Indeed, while the substantial factor test is applicable here, the Court would be justified to conclude, in the alternative, that Plaintiffs have also demonstrated that "but for" the MR-GO— and the resulting increase in surge, waves, and water conveyance and earlier, faster, and longer flooding that spelled the difference between levees largely surviving Katrina and their annihilation—St. Bernard Parish, Lower 9th Ward, and New Orleans East would have been spared from inundation.  While we will never know precisely what happened on that horrible day, Plaintiffs have presented the more credible science and persuasive evidence, while the Government has largely defaulted in offering a coherent or comprehensive refutation.  In sum, Plaintiffs have proven that the MR-GO caused their damages.

> **A.** **Louisiana Law Prescribes The "Substantial Factor" Standard For Proving Cause-in-Fact In A Multi-Causation Situation**

The United States has consistently advocated that Plaintiffs must establish "but for" causation to prevail.  This is not Louisiana law.  Louisiana courts have consistently held that in multiple factor cases, "but for" causation has been replaced by the "substantial factor" test.  This Court has also already ruled that the "substantial factor" test is the proper test for this case. *Katrina IV*, 2009 WL 1033783, **6-7 (E.D. La. April 15, 2009).  Implicitly acknowledging this, the Government now argues (USPTM at pp. 69-71) that the Louisiana Supreme Court recently either has reversed itself or created new doctrine in *Rando v. Anco Insulations Inc.,* ___ So.3d ___, 2009 WL1426272 (La. May 22, 2009).  This simply is not true.[63]

---

[63] The Government does not dispute that Plaintiffs have established "legal cause."  Clearly, the risk of serious property damage here is easily associated with a duty not to cause flood damage

Twice in the past decade, the Louisiana Supreme Court has expressly held that the substantial factor test, and not "but for" causation, applies in multiple cause cases.  In 2001, the Supreme Court held:

> Generally, the initial determination in the duty/risk analysis is cause-in-fact. Cause-in-fact usually is a "but for" inquiry, which tests whether the accident would or would not have happened but for the defendant's substandard conduct. Where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident.

*Perkins v. Entergy Corporation,* 782 So.2d 606, 611 (La. 2001) (internal citations omitted)

In 2004, the Supreme Court again held:

> Cause-in-fact is generally a "but for" inquiry, which tests whether the accident would or would not have occurred but for the defendant's substandard conduct. However, where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident.

*Bonin v. Ferrellgas, Inc.,* 877 So.2d 89, 94 (La. 2004) (internal citations omitted); *see also*

*Chaisson v. Avondale Indust., Inc.,* 947 So.2d 171, 187-88 (La. App. 2006).

*Rando* changes nothing.  For a third time, the Louisiana Supreme Court reiterated the substantial factor test for multiple cause cases:

> To prevail in an asbestos case a plaintiff must show by a preponderance of the evidence, he was exposed to asbestos and he received an injury substantially caused by that exposure.  When multiple causes of injury are present, a defendant's conduct is a cause-in-fact if it is a substantial factor generating plaintiff's harm.

2009 WL1426272, *16.

The Government's representations notwithstanding (USPTM at p. 70), if the *Rando* court had wanted to overrule the entire body of substantial factor case law and replace it with a "but

---

to "neighboring lands and individuals."  *Graci*, 435 F. Supp. at 195; *see also Roberts v. Benoit*, 605 So.2d 1032, 1054 (La. 1991); *Faucheaux*, 615 So.2d at 294.

60

for" test, it would have said as much in its opinion.  It did not.  What the Government has done is to conflate the terms "cause-in-fact" with "but for" causation in multi-factor cases.  As the Louisiana Supreme Court noted in *Perkins,* however, "cause-in-fact" is usually a "but for" inquiry, but not for multiple cause cases. 782 So.2d at 612.  "Cause-in-fact" is merely a legal conclusion that causation exists under *either* a "but for" test or a substantial factor test— whichever is applicable. The applicable standard here is clearly substantial factor.  As this Court has ruled, "the issue is whether the MRGO was a substantial factor in bringing about the catastrophic flooding at issue in this suit."  *Katrina IV*, 2009 WL 1033783, at *7.[64]

In practice, "[a] substantial factor need only not be the only causative factor; *it need only increase the risk of harm.*"  *Henigan v. Cooper/T.Smith Stevedoring Co., Inc.*, 837 So.2d 96, 102 (La. App. 2002) (emphasis added).  Thus, the Corps' negligent conduct is a substantial factor in causing Plaintiffs' damages if the Court determines that some or all of the MR-GO's defects— widened channels, lost surge buffering wetlands, unmitigated "funnel" effect, and lowering of levees—enhanced the storm surge and waves, *i.e.*, increased the risk of harm, which led to earlier and more extensive overtopping and breaching of the levees than would have occurred merely from Katrina.  The MR-GO is still a substantial factor even if Katrina contributed a baseline of surge and waves (and some flooding) on which the increased, destructive surge and waves attributable to the MR-GO acted, exacerbating the degree of flooding.

---

[64] Defendant quotes extensively from Professor Wex Malone's 1970 law review article, suggesting that the distinguished LSU scholar endorsed the "but for" causation standard in a multiple cause situation.  USPTM at pp. 72-73.  In fact, Professor Malone long before recognized that "[i]n the combined forces cases . . .[t]here must be evidence that the force set in motion by defendant was a 'substantial factor' in bringing about the damage . . . ." Wex S. Malone, *Ruminations on Cause-in-Fact*, 9 Stanford L.Rev. 60, 89 (1956-57).  The "substantial factor" test "supplanted" the "but for" standard.  *Id.*  "If each cause contributed to the injury, that is enough to bind both.'"  *Id.* at p. 90 (citation omitted).

As demonstrated in Plaintiffs' Post Trial Brief and reiterated below, there would have been no *catastrophic* flooding (1) of New Orleans East but for the overtopping of the Citrus Back Levee due to the 50% widened Reach 1/GIWW channel and the unmitigated "funnel" (fire hose) and the enhanced surge at the New Orleans East Back Levee; (2) of St. Bernard Parish and the Lower 9th Ward but for the wave side erosion of the Reach 2 levees before overtopping, thereby causing earlier and more extensive water flow in the Central Wetlands Unit and eventual overtopping of the 40 Arpent Canal Levee; and (3) of the Lower 9th Ward but for the failure of the two east side floodwalls due in part to the increased and earlier volume of water attributable to the widened Reach 1/GIWW channel and absence of a surge barrier along Reach 1.  At a minimum, the floodwaters emanating from the MR-GO made substantial contributions to the catastrophic outcome in all three areas.  Indeed, this same proof satisfies the "but for" causation test.

**B.   The Levees Performed As Designed And Failed Because Of Overtopping and Wave Side Erosion Caused By The MR-GO**

Defendant devotes the first 17 pages of its causation rebuttal by stating the obvious:  the Reach 2 and New Orleans East Back Levees were designed to fail when overtopped and, indeed, did fail when massively overtopped during Katrina.  *See* USPTM at pp. 74-90.  What the Government fails to refute, however, is Plaintiffs' compelling evidence and expert testimony that the reason for the levee's failure was the intensified wave and surge and increased conveyance caused by the Corps' negligent operation and maintenance of the MR-GO.  In the discussion below, we respond point-by-point to Defendants' claim that levee failure was inevitable with or without the MR-GO.

In both their extensive (and largely unrebutted) expert reports and trial testimony, Plaintiffs experts established a myriad of the Corps' defalcations during the 50-year period that it operated and maintained the MR-GO. Specifically, they proved that the Corps destroyed the surge buffering environment, neglected to revegetate the areas fronting the levees, allowed the channels to widen far beyond their initial width, and failed to install critical surge and saltwater intrusion control structures. Thus, at the time of Katrina, the destabilized levees were totally exposed and rendered much more vulnerable due to the loss of protective elevation from lateral displacement, vastly reduced vegetation, and enhanced waves and surge. *See* PPTB at pp. 66-80. No polders would have flooded had the deleterious effects of the MR-GO been mitigated. TT 1481:9-15; TT 1542:19-25 (Bea).

1. <u>**The MR-GO Caused Both Types of Overtopping That Caused The Catastrophic Failure of Reach 2 Levees**</u>

Each of the polders where Plaintiffs resided was threatened in a different way, yet the Government tellingly ignores the New Orleans East polder. For the St. Bernard/Lower 9th Ward polder, the Reach 2 levees were destabilized in two important ways, both attributable to the MR-GO' negative effects. First, "approximately 55 percent of the breaching was due to back- to-front breaching. Second, the remaining 45 percent was front-to-back breaching, initiated with a frontal side wave attack." TT at p. 1270:1-10 (Bea). Defendant denies that there was any wave-induced front side breaching, but the Government's own expert (Mr. Ebersole), as discussed below, concedes this point. TT at pp. 2396:18-2397:11 (Ebersole).

The Government strains to argue that the Reach 2 levee failure is primarily attributable to poor soil conditions generated by hydraulic fill construction that were unable to withstand the overtopping during the storm. USPTM at pp. 89-93. Plaintiffs simply proved that this was

63

wrong.  TT at pp. 1820:14-1821:13 (Kemp); TT at p. 1270:1-10 (Bea).  Since all of the Reach 2

levees were constructed of the same erodible soil, all of them should have failed if the defense

theory is correct.  JX 274, IPET Report at p. V-108, V-18-30; JX 274, IPET Report, Appendix A

at pp. A-3, A-7, Slides 23-24.  But they did not. Why?  Because of enhanced wave heights and

energy caused by the MR-GO.

Nor does the explanation lie with the high volume of overtopping and lift off rates.  *See*

USPTM at pp. 77-82.  This claim is belied by that simple fact that if all of the levees were in fact

subjected to the high volume of overtopping water and if the Defendant is correct that the

volumes were sufficient to destroy the levees, then all of the levees should have catastrophically

failed. PX 1361.1, Mosher 30(b) (6) Depo. p. 60:1-15; TT at pp. 3135:20-3137:22 (Mosher); TT

at pp. 2200-2209 (Ebersole).  But they did not. TT at pp. 1240:23-1243:1 (Bea).

Levee height is also not a sufficient explanation of levee failure.  *See* USPTM at pp. 74-

77.  Given the broad spectrum of crown elevation heights and failure percentages, no pattern is

discernible.  *See* PPTB at p. 117; Slide 35. Indeed, the levees in the 16'-16.5' range had the

highest failure rate (73%). *Ibid.*

The MR-GO set the stage for overtopping by lowering the protective crown elevations

over time by several feet.  TT at pp. 1098:12-24; 1111:1-24 (Bea).  Dr. Bea explained how the

Corps allowed the channel to continuously expand way beyond its original footprint, leading to

reduction in the crown height over and above expected consolidation and settlement.  TT at pp.

1116:6-1118:11 (Bea).  This was caused by: (1) the encroachment of the MR-GO channel to

dangerously close proximity of the LPV, (2) the eradication of fronting vegetation, (3) the poor

grass covering due to a salt water environment that was unable to withstand the increased frontal

wave attack, and (4) the consistent lowering of the levee heights due to lateral squeezing.  TT 1481:9-15; TT 1542:19-25 (Bea)

With respect to the assertion that the levees failed because of prolonged overtopping (USPTM at pp. 74-82), they would not have breached without the high energy waves and wave-induced setup crashing into and over the Reach 2 LPVs.  TT at pp. 1099:1-6, 1168:15-1169:1, 1242:20-1243:1 (Bea).  High intensity, short period, seven to eight foot waves destroyed Reach 2 LPV structures and were a significant cause of flooding of St. Bernard and Lower 9th Ward.  *See* TT at p.1820:1-9 (Kemp).[65]

The higher, more destructive waves generated by the MR-GO were modeled by Plaintiffs' experts.  If the MR-GO had been properly mitigated, wave heights along Reach 2 would have been *reduced by 3.9 to 4.9 feet.*  Slide 26, PX 2009 at p. 15.  This substantial wave height reduction—and corresponding exponential decrease in wave energy—would have clearly averted a catastrophe.   TT at pp. 1163:18-1164:5 (Bea) TT at pp. 1821:20-1822:7 (Kemp).

The Reach 2 levees were the only levees subjected to direct wave attack (hydraulic cannon balls) during Katrina. All of the other relevant St. Bernard levees—Reach 1, Verrett , and Forty Arpent Canal levees—were overtopped for a substantial duration; yet neither the Verrett nor the Forty Arpent Canal levee sustained any breaches whatsoever, and the south side levees along Reach 1 sustained no significant breaches.  *See* TT 1820:10-25; 1821:1-17 (Kemp).   None of those other levees, despite overtopping, failed because they either had wetlands buffering

---

[65] While subsidence caused by lateral displacement is a factor in the rate of overtopping, it has nothing to do with wave-induced overtopping or front side wave attack.  There are two mechanisms of wave induced levee destruction:  overtopping caused by waves and front-side erosion caused by waves.  Both phenomena are different than surge. *See* at p. TT 1822:14-19 (Kemp).

65

them or were not subjected to direct wave attack.  *See* TT at p. 1820:10-25 (Kemp).

There were many breaches along Reach 2, and New Orleans East levees were overtopped, but *the decisive factor* is that only the Reach 2 levees were subjected to direct front side wave attack and wave-induced set-up and overtopping.   It is a lamentable tale of two levees.  *See* TT at p. 1820:14 (Kemp).  Plaintiffs proved that the difference between the performance of the levees can be traced to the waves and wave direction that the Reach 2 levees were subjected to but all the other overtopped levees were not.  *See* TT at pp. 1821:20-1822:7 (Kemp).

At trial, Plaintiffs never contended the levees were poorly built. This theory was only (and improperly) championed by the Government that designed and built them. *See* Section II.B. 1, *supra.*  This contention is belied by the fact that other levees in the same area survived.  These levees, however, were not subjected to the same ferocious onslaught of dramatically increased wave energy.  *See* TT at p. 1821:25 (Kemp).

Even the Corps' expert (Mr. Ebersole) opined that the initiation of overtopping along Reach 2 was caused by wave overtopping and then followed by surge overtopping.  TT at p. 2398:21-25 (Ebersole).  Mr. Ebersole used a 15 foot levee for his analysis.  TT at p. 2401:14-17 (Ebersole).  This is significant because he admitted that higher levees had the longest period of time for waves to break on the front side, and the features of front side attack are prevalent when the levee is high. TT at pp. 2639:4-11, 2700:15-22 (Ebersole).  Further, only five percent of the Reach 2 levees are 15 feet or lower.  TT at pp. 2401:3-2404:25 (Ebersole).

Plaintiffs proved at trial that without wave action on the Reach 2 levees, these levees would have prevented the catastrophic flooding of the St. Bernard and Lower 9th Ward polders.

TT at pp. 1821:20-1822:7, 1826:1-1827:6 (Kemp); TT at pp. 2719:9-2720:4 (Ebersole), PX 2009 at p. 15.  Had the Corps heeded the sage advice of Dr. Gagliano in the early Seventies (including the recommendation to plant trees and shrubs on both sides of the MR-GO and to re-vegetate the central wetlands), the Reach 2 levees would not have been breached, and Plaintiffs' homes would have been spared. TT at pp. 1825:9-1827:6 (Kemp).

In the final analysis, the fact that the entire stretch of upper Reach 2 did not catastrophically fail supports Plaintiffs' causation theory that the widened MR-GO and destroyed buffering wetlands caused higher waves and increased subsidence. By the same token, Defendant's theory is not tenable because if overtopping followed by back to front erosion were the primary failure mechanism, one would expect the entire upper Reach 2 levee stretch to breach. The fact that this did not happen conclusively disproves Defendant's theory.

The Government admits that wave-induced setup and wave-induced overtopping were substantial factors in the Reach 2 levee destruction; yet nowhere do the Government's experts establish how much of the overtopping was surge-induced versus wave- induced.   TT at pp. 2944:22-24;2959:20-25;2960:1-9 (Resio).  It is not hard to imagine why.  But in either event, the cause-in-fact of both types of overtopping was the MR-GO.  Plaintiffs established that 55 percent of the Reach 2 breaching was from wave-induced backside erosion versus 45 percent breaching due to front side wave attack.  TT at p. 1270:1-10 (Bea).  Both are substantial causes of the Reach 2 levee failures.

### 2.   Neither The Defense Photographs  Nor Soil Borings Undermine Plaintiffs' Causation Proof

The Government next claims that selected photos and soil borings support the defense position that back side erosion from overtopping was the predominant failure mechanism and that wave-induced levee side erosion was not a substantial factor in Reach 2 levee failure.  This argument does not withstand even casual scrutiny.

### a.   The Proof Is On The Ground

Defendant ignores the trial testimony of Dr. Bea who described the studies he performed on the levee shoulders to evaluate their constitution and the cause of their failure at each test section.  TT at pp. 1351:4-1354:13 (Bea).  Using photographic evidence, test results, and *multiple on site inspections* of the entire levee stretch, Dr. Bea accurately testified that these field observations of the "shoulders tell a tale."  TT at pp. 1382:19-1383:4 (Bea).  In addition, videotapes taken on September 13th and 14th, 2005 (PX 1877.1) provide excellent "down looking high resolution and forward looking high resolution" evidence of the destruction sustained by the Reach 2 levees. TT at p. 1507:3-25 (Bea).

The photographic evidence captured by the Government was selectively edited frames of the relevant video that do not provide an accurate historical account of what happened to the Reach 2 levees during the storm.  As Dr. Bea proved, "to get an understanding of the continuity you have to view the entire video.  You can't look at one frame of a motion picture and conclude what the motion picture is about."  TT at p. 1507:14-19.

At trial, Plaintiffs presented the entire video, with selected photograph captures, for Mr. Ebersole to examine.  After admitting that his previous photo analysis did not take into account

68

the entire length of the levee, he admitted that where the "levee was completely removed," all that was shown in the photographs "is the end state of the process, and there is no evidence which would allow someone to ascertain whether the cause of failure was front-side wave attack or overtopping."  TT at p. 2621:1- 11.  This admission is telling.

In the end, this is a duel between Dr. Bea and Mr. Ebersole.  The Court should consider the fact that Mr. Ebersole never physically observed first-hand the levee system for any study that he did for the Corps after the storm—he did a helicopter flyover.  TT at p. 2485:19 - 2486:25.  Disturbingly, Mr. Ebersole, after touting the evidentiary value of the photographs referenced by the Government, admitted on cross examination that he had never reviewed the videotape and that someone else had selected the individual pictures for his evaluation.  TT at p. 2619:9- 2623:24.

Dr. Bea, on the other hand, visited the LPV levee system innumerable times, performing actual physical observations of the levees, taking soil field samples from the shoulders of the breach sites with shovels, analyzing the laboratory results of the field samples he collected—all before making any conclusions (published in peer reviewed journals) about the cause of the levee failures.  TT at p. 1351:16 - 1361:13.  The choice is clear.

### b.   Fat Clays Are Not A Significant Factor In Levee Survival

The Government makes much ado about the intermittent presence of medium fat clays in the Reach 2 levees, claiming that there is a material correlation between these soils and levees that survived overtopping.  USPTM at pp. 84-87. This argument turns out to be nothing of import.[66]

---

[66] The Government omits mentioning one material characteristic of fat clays—their instrumental role in lateral displacement. Fat clays contain a high percentage of water, do not tolerate well heavy loading,  and any load placed on them will escape and flow into the area of least

What the Government fails to tell the Court is that the IPET Team, while suggesting that the levee construction materials were important, reached a far different conclusion than the Defendant's experts who testified at trial and were part of the IPET Team:

> It can be seen that the greatest erosion of hydraulically filled levees occurs when the surge height plus the peak wave height had the greatest level above the crest of the levee. *Examination of this information has shown that the peak wave height is the most important component of surge. . . . Presence of clay [is] not necessarily the controlling factor. . . .* The degree of erosion and breaching of overtopped levees was directly related to the character of the in place levee materials and the severity of the surge and wave action.

JX 274, IPET Report, Volume V at pp. V-105, V-111, V-123; Slides 27-33 (emphasis added).[67]

Once again, Dr. Mosher, like the other defense experts, is forced to ignore the salient facts substantiating Plaintiffs' causation theory.  Dr. Mosher consistently overlooked convincing evidence that other areas of the levee that did not fail were either protected by longer, higher levee distances from the channel (with substantially more fronting vegetation) or levees whose crown height had not been reduced by lateral squeezing.  TT at p. 3121:4- 3124:5 (Mosher).  Dr. Mosher's myopia stands in stark contrast to the testimony of defense expert Steven Fitzgerald in discussing "breach triggers" at the breach sites.  TT at p. 2760:12-19 (Fitzgerald).  After admitting that he did not understand how the breaching data was used by the Governments, Dr. Mosher conceded that he could not defend his opinion that there cannot be breaching without overtopping.  TT at pp. 3166:25 - 3170:12.

When all is said and done, it is undisputed that the Reach 2 levees were constructed of hydraulic fill drawn from the MR-GO channel; yet some failed and some did not. Without the

---

resistance—in this case, the entire reach of the excavated MR-GO channel. TT at p. 343:12-344:17.

[67]Defendant's assertion that the Chalmette Extension Levee did not fail because it had clay on top of sand (no hydraulic fill) is inaccurate.  They key variables there were the absence of wave side attack from Reach 2 and the presence of surge buffering vegetation. TT at pp. 1242:9-1243:1 (Bea).

MR-GO's close encroachment to the LPV structures, the supercharged waves surging across the engorged Reach 2 channel, the eradication of fronting vegetation, the poor grass covering due to salt water environment intrusion, and the consistent lowering of the levee heights due to lateral squeezing, the Reach 2 levees would have performed admirably. The defense ignores this evidence because it cannot refute it.

### C. Dr. Bea's Conclusion That The Levees Would Have Withstood The Storm "But For" MR-GO Is Absolutely Correct

Dr. Bea's calculations establish that the Reach 2 levee adjacent to the MR-GO would have performed much like the other levee systems in the area had they not been subjected to the MR-GO's negative impacts. TT at pp.1095:16-1096:1, 1173:24-1175:1, 1555:17-1556:14 (Bea). Contrary to the Government's claim that overtopping was the determinative factor in Reach 2 levee failure, the intensified waves and loss of storm buffering wetlands were the most critical variables—and both were directly caused by the MR-GO. In fact, strong support for Plaintiffs' causation case comes from the Defendant's own experts.

The Government's brief points out that its experts' calculations show that velocities requiring the installation of concrete resulted from as little as 1 foot of overtopping. USPTM at p. 79. If this were true, one would expect all of the levees in the area, which were significantly overtopped, to be badly breached. Yet, as noted above, the 40 Arpent Canal Levee, the north and south banks of Reach 1, and the Verret to Caernarvon (Chalmette Extension) Levee all experienced significant overtopping with virtually no breaching. Significantly, the 40 Arpent Canal Levee was overtopped by 3 to up to 4 1/2 feet during Katrina but did not breach or fail. TT at pp.1240:23-1243:1 (Bea).

Clearly, whether or not a levee failed depended on more than just whether it was overtopped. Unlike any of the Corps' experts, Dr. Bea performed detailed calculations which

took into account the effects of wave action, ground cover, levee height, and wave dampening fronting vegetation.  Those areas exposed to direct wave attack coming across the massively widened Reach 2 channel "fared a lot worse."  PX 1812.4 (Slide 28); TT at p. 1176:6-24 (Bea). Dr. Bea's forensic work confirmed that the levees along Reach 2 would have survived with only minor breaching, as did all of the other levee sections mentioned above, had they not been subjected to the MR-GO's multiple negative impacts. TT at p.1095:16-1096:1 (Bea).

The wider, deeper MR-GO channel served as a direct conduit for high saline Gulf waters, raising disastrously the saline level in the entire area which caused the destruction of large areas of fresh and brackish vegetation.  Repeated deposition of salty sediment from O&M dredging onto the Reach 2 bank negatively impacted the wave-dampening vegetation which would have grown naturally on the raised berm in front of the levee if the saline level had been at pre-MR-GO levels.  PPTB at pp. 67-69.

The extreme weight of that same material also accelerated and increased the loss of protective elevation ("LPE") of the levee system through compaction and lateral displacement of soils under the levee, leaving them well below design height and substantially more vulnerable to both waves and surge.  The proximity of the channel excavation (a mini-Grand Canyon), the fact that it was dredged to -70 (double its authorized depth), and the fact that it was allowed to morph to several times its authorized width also affected the rate of LPE of the Reach 2 LPV structures through lateral displacement of underlying soils.  *Id.* at pp. 70-73.  This unauthorized channel growth in both depth and width also served as a wave fetch basin, causing larger and much more powerful waves to impact the levee.  *Id.* at pp. 76-77.

Dr. Bea's work concludes that these factors were the difference between the major breaching and catastrophic flooding of populated areas as opposed to minor overtopping and

72

minor breaching which would have been contained within the massive unpopulated Central Wetlands Unit ("CWU").  TT at p. 1260:5-12 (Bea).  *Of all the facts in this case relating to the inundation of St. Bernard Parish and Lower 9th Ward, one of the most material is the vast capacity of the CWU to contain flood waters from Reach 2*.  Defendant's expert Steven Fitzgerald agreed that it would take *7.7 billion cubic feet of water* to fill this natural basin, but the total amount of water from either wave or surge overtopping (*i.e.,* all overtopping) was *only 1.8 billion cubic feet*.  TT at pp. 2793:6-2795:24 (S. FitzGerald).  Thus, Defendant's own expert confirmed that *but for* the breaches along Reach 2, only 23.4% of the water necessary to fill the CWU would have come from overtopping, and there would be zero water in the populated areas.  TT at pp. 2796:15-2797:3 (S. FitzGerald).  "This was not a natural disaster.  This was a man-made disaster."  TT at p. 1092:1-4 (Bea).

## 1.   Dr. Bea Never Opined That The Reach 2 Levees Would Have Had A Uniform Crest Of 17.5 Feet "But For" The MR-GO

Defendant suggests that Dr. Bea erroneously concludes that all the levees would have been at full design grade 17.5 ft levee crests "but for" the negative impacts of the MR-GO.  USPTM at p. 90.   Even if Dr. Bea's evaluation were limited to an examination of LPE from the time of the final lift in 1985 through Katrina in 2005, the only comparative evidence introduced (and not refuted) at trial clearly demonstrated that the levee adjacent to Reach 2 experienced four feet *more* LPE than an otherwise identical levee section.  PX 98.20.  Dr. Bea's *assumption* in Scenario 2c that the levee crest elevations would have been at design grade (17.5 ft) is, if anything, conservative since the most he added to pre-Katrina levee elevations was two feet.  PPTM, App. J at p. 34.  Thus, the one parametric study (Scenario 2c)—which assumed levee crests along Reach 2 to be at design grade (17.5 ft) in order to determine wave characteristics—

was not only reasonable but actually understated the LPE directly attributable to the MR-GO's operation and maintenance.

In a single paragraph without any citation to the record, Defendant asserts that "[t]he levees probably would not have withstood Katrina's surge even if they had been at full design specifications [of 17.5 feet] when the storm struck." USPTM at p. 74. Plaintiffs' case—namely, that each of the MRGO's negative impacts were substantial contributing factors in the demise of the Reach 2 levees and thus the flooding of the Plaintiff's property—does not hinge on any one fact. Certainly, both sides agree that the lowering of the levee crest elevation was a contributing factor to how poorly the LPV performed when faced with the destructive forces of the storm, but it is myopic for anyone to make a blanket statement about the performance of the levee based on just this single factor.

The critical causation point is that while the levees failed, they did not fail solely due to overflow as is evidenced by the fact that the lowest levees experienced overflow for 1.5 hours, and they all did not fail. As the overwhelming weight of evidence at trial established, the proximity of the channel's eroded banks to the toe of the levee (the width of the berm), the height and amount of wave dampening vegetation on the berm between the levee and channel, the width and depth of the wave enhancing channel, and the quality of the grass cover were all contributing factors (along with pre-Katrina crest elevations). Each of these MR-GO negative impacts was a substantial contributing factor to the levee's poor performance during the storm and their synergistic/combined impact created by the MR-GO's operation and maintenance was the proverbial Coast Guard Cutter.

The evidence shows that at 15.5' levee elevations along Reach 2, the overtopping lasted only for about 1.5 hours—a duration insufficient to fill the Central Wetlands Unit. Overtopping

74

alone was therefore not enough to fill the Central Wetlands Unit; the added factor was wave side erosion and breaching triggered when the surge reached one foot below the levee crest. TT at p. 2213:9-13 (Ebersole); Slide 38.  TT at pp. 2793:16-2797:1 (S. Fitzgerald).  By adding two feet to the Reach 2 levee crests, it is clear that any overtopping by an 18 foot surge would have lasted for a very short period of time and far less than needed to cause catastrophic flooding.  TT 1093:9-12 (Bea).  Higher levees actually experienced shorter durations of overflow and did not fail. The point is that the levees were not overwhelmed and something else was the cause.  Even Defendant agrees that the failure occurred before overflow.[68]  In the final analysis, Dr. Bea's calculations show that taken as a whole, these combined factors made the difference between the catastrophic flooding of thousands of homes and a partially filled Central Wetlands Unit.

### a. Foundation Conditions Do Not Explain The Drastic Loss of Protective Levee Crest Elevations

In a nutshell, Defendant claims that the loss in elevation of the levees adjacent to the MR-GO was due to poor soil conditions underlying the levee and had nothing to do with the MR-GO channel. "Given that the soil underlying the levee was similar in both the Upper Reach 2 and Chalmette extension levees, it can be concluded that the foundation conditions created the levee height deficiencies in both locations."  USPTM at p.95.  This is not the case.

It is not disputed that the soil conditions underlying the Upper Reach 2 levees (Bienvenue to Dupre) are essentially identical to the soils underlying the Verret to Caernarvon (Chalmette Extension) levee, namely, thick interdistributary soft clays.  TT at p. 349:7-19 (D. FitzGerald); TT at p. 4033:1-17 (Wolff).  However, there is one significant difference between these two levees that would cause the rate of loss of levee height to vary so dramatically:  the Reach 2

---

[68] At the time breaching was triggered, no surge overtopping had yet to occur; thus, the only forces acting to trigger breaching of the levee crests at the breach sites had to have been wave action.  PX 2138.3, TT at p. 2768:1-9 (S. Fitzgerald).

levee is adjacent to the MR-GO channel.  TT at pp. 1120:9-23; 1574:1-1578:25 (Bea); TT at p. 349:7-19 (D. FitzGerald).

In quantifying and comparing the rate of LPE between these two otherwise identical sections of levee, Plaintiffs demonstrated at trial that the Upper Reach 2 levee was losing protective elevation at a rate 75% faster than the Chalmette Extension levee.  PX 98.20; TT at pp. 4059:12-25 (Wolff).  As a matter of fact, some areas of Upper Reach 2 lost seven feet of protective elevation after the "final" lift in 1985.  PX 98.20.  The evidence at trial was un-rebutted that there was four feet more LPE since the final lift along Reach 2 than there was along the Chalmette Extension levee.  PX 98.20; TT at pp. 4059:12-25 (Wolff).

Another distinguishing factor between the Upper Reach 2 levee and the Chalmette extension levee significantly contributing to the enhanced and accelerated loss of protective elevation was the repeated deposition of massive quantities of O&M dredge spoils along the Reach 2 banks.  TT at pp. 1574:1-1578:25 (Bea).  The Court will recall Dr. Bea's undisputed testimony that dredge spoil materials three (3) times greater than the volume of the New Orleans Superdome and seven (7) times greater than the volume of materials used to construct the entire Reach 2 levee were deposited on the south/west bank of Reach 2.  TT at pp. 1574:19-1575:15 (Bea).  As Plaintiffs' expert Dr. Duncan FitzGerald noted, the MR-GO foundation consists of "distributaries"—layers of fine grain material ("fat clays") containing a high percentage of water. TT at p. 339:3-340:1 (D. FitzGerald).  Fat clays have very little tolerance for weight.  Any load placed on them will escape and flow into the area of least resistance—in this case, the entire reach of the excavated MR-GO channel.  TT at pp. 348:11-349:19 (D. FitzGerald); PX 96, FitzGerald Expert Report (July 2008) at pp. 6-12 through 6-14, Fig. 6.6.

**b. But For Lateral Displacement Caused By Operation and Maintenance Dredging, The Reach 2 Levee Would Have Survived Katrina[69]**

While Defendant offered no admissible expert reports or testimony on lateral displacement and LPE loss caused by the MR-GO, it nevertheless attempts in its brief to refute the opinions of Drs. Bea and FitzGerald. The Government focuses on interdistributary layer thickness, slope stability analyses with factors of safety and levee protective measures, berms and staged construction. USPTM at pp. 92-107. None of these points is well taken.

Defendant loosely suggests that "the stability berm placed in front of the levee was *designed to and did prevent* the channel from affecting the levee foundation" and that "lateral displacement was addressed by levee design." USPTM at pp. 92, 98 (emphasis added). While conceptually correct that this was the purpose of the design of the stability berms, the overwhelming weight of evidence verified that a multitude of adverse impacts of the channel compromised the levee crests and victimized their protective elevations. TT at pp. 1099:13-21; 1157:9-1158:22; 1160:1-15 (Bea). This being the case, the fact that the Corps experienced levee lift failures and rapid protective elevation loss despite initially adequate factors of safety (which according to their experts increased over time) can only be the result of other external forces negatively impacting the protective stability berms—lateral displacement. TT at pp. 4009:9-18, 4054:12-21 (Wolff).

---

[69] The Court is reminded that the Government's only witnesses who might have addressed the issue of lateral displacement (Drs. Mosher and Wolff) made no calculations and offered no opinions prior to trial. In fact, Dr. Wolff conceded that in connection with his opinions in this case, he made no engineering calculations, conducted no testing and ran no computer models or programs. TT at p. 3973:5-16 (Wolff). Likewise, he was not asked nor did he calculate the amount of cumulative settlement—although it could have been done from the drawings and plans upon which he purportedly based his opinions. TT at p. 4022:13-25 (Wolff).

In another effort to support its unsubstantiated conclusion that the MR-GO had no effect on lateral displacement, Defendant states: "the elevation deficiencies seen in the Upper Reach 2 levee are similar to the elevation deficiencies seen in the Chalmette extension levee."  USPTM at p. 94.  This is a clear misstatement of the unrebutted evidence presented at trial.  As noted above, Plaintiffs demonstrated during the cross examination of Dr. Thomas Wolff that the levee in fact experienced significantly greater LPE along Reach 2 between Bayou Bienvenue and Dupre (on average seven feet) as compared with the LPE along the Chalmette extension levee (approximately three feet).  TT at p. 4059:12-25 (Wolff); PX 98.20.  Defendant offered no evidence to refute these facts.  Simply put, it is not accurate to state that the "elevation deficiencies along Reach 2 and the Chalmette extension levee are similar."

### c.   Dr. Bea Did Not Underestimate The Relevant Factors of Safety

As the Court cogently noted during the testimony of the Government's expert, Dr. Thomas Wolff, "slope stability" and "lateral displacement" are distinct concepts.[70]  The relevant factor of safety is "unity" (1.0) because failure will occur at or below that value.  This Government-created sideshow about calculating factors of safety can be reduced to a simple truth.  When built, the Reach 2 levees were designed to have an "end of construction" value of 1.3.  *See* TT at pp. 4005:21-4006:7 (Wolff).  Dr. Wolff further testified that based on the Atchafalaya Study from the 1960s, the appropriate factor of safety to prevent sliding failure was 1.26 (TT at pp. 4003:6-4004:3), but the Corps actually used 1.30 (TT at p. 4012:6-8) and more importantly here, that value would immediately begin to increase and gain strength. TT at p.

---

[70] Court: "We're talking about whether the . . . digging of the channel of the MRGO affected the height of the levees.  The height of the levees.  Not the stability, but the height."  TT at p. 3976:10-15.

4009:9-18 (Wolff).[71]  By the time of the Corps' Geotechnical Investigation, Chalmette Area Plan

in June 2001, the "lowest" measured value of the factor of safety along Reach 2 of the MR-GO

between Bayou Bienvenue and Bayou Dupre was 1.74; which according to Dr. Wolff, indicated

that the levee had gained lateral stability due to soil strength gain.  "So now the levee is very safe

by geotechnical engineer's measure."  TT at p. 4036:10-16 (Wolff).

Even Dr. Wolff, however, had to concede that in the context of this case, the relevant

factor of safety was something the Army Corps monitored over time, even after the levees were

designed and constructed, but in view of the sudden sinking and rapid loss of protective

elevations, something besides simple settlement/compaction was taking place.  TT at p. 4053:17-

4054:21 (Wolff).  Dr. Wolff admitted that, "It failed," and said so in his own words that, the

factor of safety at this localized location would, in fact, have been one."  TT at p. 4054:12-21

(Wolff).  Thus, Dr. Bea was correct when he concluded that the relevant factor of safety was

between .90 and 1.16.

### d.  The Use of Staged Construction Would Have Allowed For Remediation Of Ongoing Subsidence Absent The MR-GO's Negative Impacts

Defendant suggests that the LPE was not caused by factors associated with the MR-GO

but, instead "soil desiccation and consolidation. . . was the cause of the loss of protective

elevation."  USPTM at p. 107.  According to the Corps' data, slope stability analyses showed a

minimum factor of safety of 1.3 in their design work, which increased to 1.74 by June of 2001

due to consolidation of the material underlying the levees.  Interestingly, however, the Corps'

2001 Geotechnical Investigation (DX 562) concluded: "These borings demonstrated that the

---

[71] Noteworthy here is Dr. Wolff's concession that other than reliance on the Atchafalaya Study for information about the vertical settlement of soils (compression from its own weight) there was nothing else he found significant about that report or that he relied upon in support of his opinions.  TT at pp. 3993:22-3994:3 (Wolff).

soils underlying the levee were stiffening, thereby significantly reducing the amount of future settlement that would occur underneath a lift." USPTM at p. 102. Thus, the Corps was adamant that by 2001 the levees were even more stable than designed and well beyond the range where rapid LPE should occur. Contrary to this projection of increased stiffening, however, the Corps had observed that the Reach 2 levees experienced stability failures with rapid loss of protective elevation. JX 210 at p. 26; TT 4053:22-4054:9 (Wolff). This rapid, unanticipated LPE required the urgent need for installation of sheet piling in the area between Bayou Bienvenue and Bayou Dupre (aka: "the breach zone"). PX 2138.2.

### e.   Lateral Displacement Did Not End in 1980

Defendant continues to misinterpret a chart appearing on page 39 of Dr. Bea's April 3, 2009 Supplemental Report (PX 2118). USPTM at p. 103. Despite having been told point blank it would be "junk science" or "junk engineering" to draw such a conclusion from this table, the Government persists in asserting that lateral displacement ended in 1980. TT at pp.1570:24-1571:3 (Bea). Moreover, the Corps fails to (and indeed cannot) offer any evidentiary support for this "spin" of the actual facts.

Without contradiction, Dr. Bea opined that the MR-GO navigation project itself was responsible for causing a total of four to five feet loss of protective elevation in the levees along Reach 2. TT at p.1570:2-7 (Bea). Dr. Bea elucidated his answer for the Court as follows:

> What it's telling you is this process is time and rate dependent. So that in this case we are at a time period when it's still squeezing, but we're not seeing significant contribution to the loss in protective elevation. *If you do something to upset the system, load it more,* the rate of the lateral squeezing, squeezing of the toothpaste out of the tube, will be hastened and you will see more evidence of loss of protective elevation.

TT at p.1572:8-15 (Bea) (emphasis added).

80

Significantly, the table on which the Corps bases its position that lateral displacement ended in 1980—despite Dr. Bea's express admonition that drawing such a conclusion would be wrong—*did not include* a single cubic yard of the 17 million cubic yards of O&M dredge spoil material placed along the shoreline of the MR-GO from 1963 to 2004. PX 206-1; TT at pp.1572:19-1574:22 (Bea). Thus, over three times the volume of the New Orleans Superdome (5 million cubic yards weighing 2,700 lbs. per cubic yard) from O&M dredging was deposited (loaded) on the west bank along Reach 2. According to Dr. Bea this load would have been the "elephant on the bed" and significantly increased lateral displacement of the levee foundations into the MR-GO channel. TT at pp.1576:4-1578:19 (Bea). In the final analysis, Dr. Bea's calculation that the MR-GO's operation and maintenance caused four to five feet LPE is actually a conservative number since inclusion of these recurring dredge spoils would further demonstrate that lateral displacement absolutely did not end in 1980. TT at p. 1578:20-25 (Bea).

### f.   Widening of the MR-GO Caused Lateral Displacement

Despite being fully aware that there was substantial lateral displacement and dramatic LPE along Reach 2, the Government sets up the same Paper Tiger based on the same convoluted logic and the same misapplication of Dr. Bea's chart. Purportedly relying upon Dr. Bea's own admission (allegedly found at TT at p. 1418:5-12), the Defendant persists in misstatement: "Remarkably, Dr. Bea admits that lateral subsidence was least when the MR-GO was widest." USPTM at p. 106. In fact, no such testimony appears in the record. This purported admission is apparently based upon the same tortured but stubborn adherence to the same false assumption that no subsidence occurred after 1980.

Dr. Bea was steadfast on this point both before and after the chart from his Supplemental Report was specifically addressed within Proffer #10.

*Before:*  (Q by Mr. Stone): *"Dr. Bea, is it fair to say that the settlement with the MRGO and the settlement without the MRGO stabilized as of 1980? A: No, it is not."*

TT at p. 1415:9-11 (Bea).

*After:* (Q by Mr. Stevens): *"To make sure we've got this straight, it is a misapplication or misinterpretation of your data, your results to say that lateral displacement stopped in 1980? A: That's correct."*

TT at p. 1571:17-20 (Bea).

Perhaps even more probative here than any calculation or evaluation is what Dr. Bea personally observed during one of his many field trips to the "breach zone" locations (depicted in PX 96.1 and 2138.2).  TT 1556:22-1557:22 (Bea).  Even in the four places between Bayou Bienvenue and Bayou Dupre where sheet pile had been installed before Katrina, not a single one of those elevations was at full design height of 17.5 feet.  In fact, in one location just south of Bayou Dupre, even the sheet pile was four or five feet below design grade.  According to Dr. Bea, the fact that sheet pile elevations were lower than design grade at the time of Katrina by two to three—or even four to five—feet clearly indicated that there was additional settlement of the sheet piling after it was installed in the mid-1990's.  These observed facts constituted direct evidence of active, on-going lateral displacement and LPE (loss of protective elevation) in these widened areas with close proximity between the toe of the levee and the channel.  TT at pp.1551:4-1554-3 (Bea).

Likewise, as Defendants' expert Dr. Thomas Wolff noted in his report, there was a sudden sinking of the levee by three feet after the first lift between Bayou Bienvenue and Bayou Dupre in 1981.  Dr. Wolff further notes that this area was repaired and again failed shortly thereafter.  Thus, something else, besides simple settlement of the levee, was adversely impacting levee crest elevations.  JX 210 at p. 26; TT at pp. 4053:17-4054:21 (Wolff).

Even more telling here again is the documented loss of seven feet of protective elevation along Reach 2 between 1985 and 2005. Dr. Wolff specifically confirms that, as a matter of fact, the Reach 2 levee was raised to 20.5 feet in 1985 and that pre-Katrina LiDAR taken in 2005 showed a seven foot LPE. JX 210 at p. 27; TT at pp. 4056:4-4057:1 (Wolff).

These established facts further confirm Dr. Bea's opinion that there is a direct correlation between the widening of the channel, the proximity of the water to the toe of the levee, and pre-Katrina loss of protective elevation. Ultimately, those locations where the channel was significantly widened, the levee's proximity to the water's edge was closest and the pre-Katrina levee crest elevations were the lowest were also the locations where the primary breaches along Reach 2 occurred during Katrina. Remarkably, *between 30 and 50% of the levee crests between Bayou Bienvenue and Bayou Dupre were "victim" to lateral displacement which lowered their protective elevations between three and five feet.* TT at p. 1112:2-24 (Bea). In a nutshell, these physical characteristics created more intense waves, allowed waves to regenerate across the enhanced channel distance (fetch), exacerbated the damaging impact of the waves on removing any vegetation on the foreshore, and accelerated the erosion, breaching, overtopping and failure of the levees. TT at pp.1157:9-1158:22 (Bea).

In the final analysis, allowing unarmored Reach 2 to widen to these gargantuan dimensions, while deepening the channel in the same vicinity, eliminated three safety factors (design grade levee crests, land area, and fronting vegetation) and created in the MR-GO an extremely dangerous force (multiple Coast Guard Cutters) foreseeably capable of destroying even the best earthen structures. TT at p1160:1-15 (Bea).

### g.  **Dr. Bea Did Not Use Incorrect Datums In His Settlement Analysis**

Defendant contends that "Dr. Bea used incorrect datums in his settlement analyses."

USPTM at p. 107.  It is true that the original levee design height is 17.5 ft mean sea level (MSL),

but MSL is not the same as or equal to the National Geodetic Vertical Datum of 1929 (NGVD

29).  Defendant's brief nevertheless misrepresents that the MSL and NGVD29 are the same.

USPTM at p. 107.  While those two datums (MSL and NGVD29) may have been relatively close

to each other in 1929, they were not even close to being the same during the construction of the

LPV's many lifts or surveys of its crest elevations.  Indeed, by the time of Katrina in 2005, the

original NGVD29 elevation of vertical control monuments in the area and Local Mean Sea Level

(LMSL) differed by as much as 2 feet.  JX 262, IPET, Vol. II at p. II-108.

In an effort to normalize reference point and datum issues, the IPET Task Force worked

with the National Geodetic Survey to establish the NAVD88 (2004.65) adjustment of the

NAVD88 datum for specific use in evaluating elevation issues in the vicinity of the MR-

GO/Hurricane Katrina flood disaster.

> The primary focus of this study was to identify a common vertical reference
> framework for the various IPET physical models and high-resolution
> hydrodynamic models developed on this project. The common vertical reference
> framework chosen was the North American Vertical Datum of 1988—actually the
> 2004.65 adjustment to this datum (NAVD88 (2004.65)). This framework was
> adopted in order to relate flood control and hurricane protection system elevations
> to the local water surface reference datum used in hydrologic, hydraulic, flood
> inundation, and risk assessment models, e.g., local mean sea level and river low
> water reference planes, etc.

JX 262, IPET, Vol. II at p. II-4.

Not only did Dr. Bea, the IPET task force, and virtually every expert who ever analyzed

any Katrina-related elevation use NAVD88 (2004.65) as the relevant datum for all analyses, but

Defendant's experts (including Dr. Donald Resio and Steven Fitzgerald) did the same.  DX 957,

Resio Supplemental Report, at p. 1; PX 1487, S. Fitzgerald Report, at p. 11.  In the final analysis,

the difference between MSL and NAVD 88 (2004.65) in the area of Reach 2 is approximately

0.15 ft (~2 inches).  JX 262, IPET, Vol. II at p. II-54.  Accordingly, Dr. Bea's use of NAVD 88

(2004.65) as his reference is consistent with the established common vertical datum and is

clearly not "incorrect".  To be kind, the Government's suggestion that Dr. Bea used "incorrect

datums" is disingenuous.[72]

### 2.  Dr. Bea's Is Correct That The Levees Would Have Been More Densely Covered With Grass "But For" The MR-GO

The Government claims that "[v]ital to Plaintiff's claim that the MRGO was a substantial

contributing factor in the breaching of the Reach 2 levees is Dr. Bea's opinion that the migration

of saltwater into the vicinity of the channel prevented the growth of dense, erosion-resistant grass

on the levees."  USPTM at p. 109 (footnote omitted). This assertion is plainly wrong for several

reasons.  First, levee grass cover is not a significant aspect of Dr. Bea's opinion about the failure

mechanism of the levees.  *See* PX 71, July 14, 2008 Bea Report (no mention of grass cover).

During the course of the trial, Plaintiffs provided the testimony of experts coupled with

evidentiary support to prove that it was not one single factor but a mosaic of factors that caused

the breaches in the levee that ultimately led to the astronomical loss of humanity and property.

The levee grass response to saltwater was a side effect that contributed to these major controlling

factors.  Furthermore, it was only one of various forms of bank armoring techniques that, if

---

[72] Likewise, the Government's brief depicts a portion of a graph contained in Appendix J, p. 34 of Plaintiffs' Post Trial brief and represents: "This graph, *which uses NGVD29 as its datum reference*, measures the history of levee elevation as compared to a Target Design Elevation = 17.5 ft (NGVD29)." USPTM at p. 108 (emphasis added).  As a matter of fact, no such reliance on NGVD29 exists and this graph, like all of the plaintiffs' elevation references, is based upon NAVD 88 (2004.65).  Nothing contained on the full graphic (PPTB) mentions or cites NGVD29 in any way.

implemented, could have halted the effects of wave erosion, lateral displacement, and the like.
TT at pp. 1156:22–1158:18.

Second, Defendant's critique is premised on its assertion that "[t]he habitat classification
maps prove that the MR-GO did not change character of the marshes where Dr. Bea says the
grass was poor due to MR-GO induced salinity." USPTM at p. 110. This claim is false. In
reality, not only do these three habitat classifications maps (PX 96.17, PX 96.18, PX 96.19)
show a clear change in habitat from 1950 to 2000, they also show a correlation between the
habitat change and major levee breaches (*i.e.*, the two major levee breaches which occurred just
south of Bayou Dupree).

When you compare these locations with the 2000 Habitat Map, the marsh has indeed
been transformed into a saltwater marsh from brackish marsh. Unquestionably, the sequential
habitat maps chronicle a substantial transformation to increasingly saline marshes. These
changes are particularly dramatic in the Central Wetlands Unit, but also obvious along the MR-
GO corridor as well.

This is not Plaintiffs' only proof of the deleterious effects of high salinity levels
introduced via the MR-GO on the grass and other vegetation in and around the area of the levees.
The record is replete with testimony and evidence, in many cases uncontroverted, establishing
this very fact. For example, Dr. Day testified that after the opening of the MR-GO, "the raised
salinity level would kill essentially all of those plants that existed in the central wetlands unit and
out to the edge – most of the plants that lived out to the edge of Lake Borgne;" and that these
high levels of salinity still exist today. TT at pp. 700:15-701:9 (Day). In addition, Dr.
FitzGerald testified that the effect of salt water intrusion on the grass and other vegetation in and
around the channel was "to cause a move from a freshwater environment that had trees and

vegetation in excess of six to ten feet in height to a saltwater environment where the grass was much shorter, and that this change prevented far less resistance to waves and to storm surges." TT at p. 311:3-19 (D. FitzGerald).

Furthermore, a strong indicator of a change in habitat is the destruction of that habitat as evidenced in the substantial channel widening from approximately 650 feet to 3,700 feet at its widest point in this part of Reach 2 south of Bayou Bienvenue."  TT 1157:1-22 (Bea).  This change in channel width, and how it was directly related to breach sites was shown at trial through a series of photographs, diagrams and maps of the channel.  PX 83, PX 1969, PX 2138, PX 96.28.9, PX 96.28.11, PX 96.28.13, PX 96.28.15, PX 96.31.

Ultimately, the Government has partitioned the ship channel's effects to a single attribute shown in the Habitat Maps and has relied completely on the fact that the colors do not change in certain places during the three time periods.  This ignores the fact that during the same time the channel widened at a rate of a football field every ten years (TT at p. 311:12-23) (Day) and that the salinities were changing as evidenced by the conversion to salt marsh at Proctor Point and the Golden Triangle.

Nor does Defendant acknowledge the lateral squeezing from sediment loading and excavation, thereby lowering the levees. The Government also fails to recognize that deep, open-water adjacent to the levees in place of wetlands exacerbated the wave and surge conditions during Katrina thereby compromising the effectiveness of the flood protection levee.  In other words, there is a lot more to this story than a story of grass. TT at p. 1280:14-21 (Bea).

### 3.   The MR-GO Caused The Flooding of New Orleans East

The Government attempts to defeat Plaintiffs' claim that the flooding of the Robinsons' home in New Orleans East was caused by floodwaters emanating from New Orleans Citrus Back Levee overtopping by diverting attention to floodwaters from the New Orleans East Back Levee

breaches.  *See* USPTM at pp. 112-113.  This defense is doomed at the outset because Defendant

fatally concedes that "the MRGO did raise the surge elevation within Reach 1 and thereby did

*contribute substantially* to the overtopping of the Citrus Back Levee and the *initial* flooding of

the Robinson property . . . ."  *Id.* at p. 113.  Under the substantial factor test, the Citrus Back

Levee overtopping is therefore the cause-in-fact of the Robinsons' damages.

The Government's admission is forced by Plaintiffs' undisputed evidence that the

unmitigated MR-GO raised the water level at least three feet in the Reach 1/GIWW channel,[73]

Dr. Westerink's similar conclusion,[74] and the absence of any defense expert testimony or

modeling to the contrary.  TT at p. 2316:8-11 (Ebersole); TT at p. 2753:15-24 (not asked by

Government to model New Orleans East) (S. Fitzgerald).  New Orleans East flooded so much

during Katrina due to overtopping of the north side of the Reach 1 Citrus Back Levee.  *See* PX

98.8, Breaches in Flood Protection System After Katrina.  The excess velocity and surge volume

(conveyance) shoved down Reach 1 at the Paris Bridge area by the enlarged, unmitigated MR-

GO Reach 2 was the primary source of water overtopping the Citrus Back Levee.  TT at pp.

1779:8-18; 1843:11-18; 1845:1-7 (Kemp); PX 91, Kemp Expert Report (July 2008), p. 135; PX

53, Polder Flood Simulations, at p. 40.[75]  Dr. Kemp and his colleagues conclusively proved what

---

[73] Exh. 91, Kemp Expert Report (July 2008) at p. 125; *see also* Vrijling TT 835:6-10; 837:8-838:25; JX 282 at p. 8.

[74] Defendant's modeling for Reach 1 and the IHNC shows dramatic reductions of peak surge by up to 3.5 feet and duration by more than half associated with returning Reach 1 to its original dimensions. (This is actually half a foot more reduction than Plaintiffs' experts showed with FINEL.) Thus, experts for both parties are in agreement about the role the unmitigated "funnel effect" and enlarged GIWW in amplifying and prolonging storm surge in Reach 1 and the IHNC and contributing to the early failure of floodwalls and levees adjacent to the IHNC.  *See* PX 94, Kemp Supp. Decl. (Jan. 2009) at p. 4 citing Westerink Report (JX 196) at Figs. 187-196; *see also* TT p. 4088:12 – 4089:1 (Westerink); JX 196, Westerink Expert Report at p. 79.

[75] The testimony of Plaintiffs' experts—undisputed by Defendant—proved that both reaches deteriorated through widening and deepening *after* original construction, and this drastic transformation had a significant effect on surge amplification, volume, and timing along Reach 1

Bretschneider & Collins alerted the Corps to (but the Corps ignored) decades earlier—that is, the convergence of just Reach 1 and Reach 2 channels *alone* (without any LPV structures) significantly amplifies surge timing and intensity along Reach 1.  TT at p. 1779:2-7 (Kemp); PX 91, Kemp Expert Report (July 2008), p. 135.[76]

If the mitigated MR-GO had been in place during Katrina, there would have been no catastrophic flooding from Citrus Back Levee overtopping, and the Robinsons' home would have sustained only minimal damage.  PX 104 at p. 103; TT at p. 1861:1-3 (Kemp).[77]  Indeed, Plaintiffs' flow analysis showed that with a fully-mitigated MR-GO (*i.e.,* with a surge barrier at the "funnel"), *overtopping into New Orleans East at peak surge is reduced by 82%.*  TT p. 1852:23-1853:1 (Kemp).[78]  Plaintiffs have therefore met their burden of proof that the populated area of New Orleans East was catastrophically flooded due to the Citrus Back Levee overtopping caused by the defective MR-GO.  PPTB at pp. 83-84.

The Government's argument that "the additional surge elevation in Reach 1 resulted from the initial construction of the deep-draft channel, not from subsequent maintenance or operation"

---

[76] and 2.  TT p. 1778:1-4 (Kemp); PX 91, Kemp Expert Report (July 2008) at p. 135. The water coming out of Reach 2 amplified like a fire hose into the narrower funnel of Reach 1, overtopped the north side of the levee, and inundated New Orleans East.  TT at p. 1778:5-11 (Kemp).

[76] Plaintiffs' Scenario 2c clearly demonstrated that if the Corps had remediated the Reach 1 channel to the initial design size with a *neutral hydrologic effect*, the flow in Reach 1 would have dropped by 150,000 cubic feet per second—to one-third of the discharge of Scenario 1.  *See* TT p. 1839:16-21 (Kemp).  Hydrologically, Scenario 2c is the equivalent of having a surge gate in front of Reach 1 to neutralize the MR-GO as if it had no effect.  TT at p. 1840:3-15 (Kemp).

[77] Professor Vrijling's team modeled comparative flooding between Katrina (Scenario 1) and mitigated MR-GO (Scenario 2c) and simulated flooding in each polder using the SOBEK program.  PX 1771, January 27, 2009 Delft report.  At the Robinsons' home, flooding from all sources was about 13 feet, while flooding under Scenario 2c was just under two feet.  *Id.* at p. 2 (Figure 2); TT at p. 837:8-839:20 (Vrijling).

[78] If the MR-GO Reach 1 and Reach 2 had not enlarged in depth and width after original construction *without any other remediation whatsoever,* there would have been 50% less flooding in the inhabited portion of New Orleans East.  TT p. 1852:19-22 (Kemp).

(USPTM at p. 113) is factually inaccurate.  In light of the Court's pre-trial DFE ruling on the *initial* design and construction,[79] Plaintiffs at trial focused on the overwhelming evidence of the Corps' *post-construction* negligent acts in operating and maintaining the MR-GO, particularly its failure to prevent Reach 1/GIWW channel widening and to erect a surge barrier at the mouth of the "funnel."  The undisputed evidence shows that the initial Reach1/GIWW channel widened 50% from 650' to 1,000', thereby substantially increasing the conveyance of water during Katrina and contributing to earlier and longer overtopping and flooding.  *See* PX 93, Kemp Supp. Decl. (Oct. 2008) at ¶2; PX 98, Morris Expert Report (July 2008) at p. 23.  In addition, both side's experts agree that if the surge had been mitigated by a gate (Scenario 2c), there would have been no overtopping.  TT at p. 1840:3-15 (Kemp) (Scenario 2c is equivalent to placing a surge gate in front of Reach 1); PX 91, Kemp Expert Report (July 2008) at p. 125; Exh. 94, Kemp Expert Decl. (Jan. 2009) at p. 4 (*citing* Westerink Expert Report (JX 196) at Figures 187-196).

The Government's next contention— that "the floodwaters from the overtopping of the Citrus Back Levee peaked and had begun to recede from the Robinson property when the floodwaters from the New Orleans East Back Levee breach reached the property and raised the elevation of the floodwaters even higher than the prior peak" and that the destruction of their property was inevitable due to the "force majeur" [*sic*] of Katrina (USPTM at pp. 113-14)—is irrelevant and inaccurate.  Once the Robinsons' home was catastrophically (and initially) flooded by the Citrus Back Levee overtopping (as the Government admits), cause-in-fact has been established.  The addition of insult to injury by even more floodwaters from another source does

---

[79] Plaintiffs maintain (and have offered substantial evidence) that the MR-GO was negligently designed and constructed.  The Court has ruled that the MR-GO' *initial* design and construction (but not subsequent conduct) was protected by the DFE.  *See* PPTB at p. 48 note 19.

not extricate the Corps from liability for its negligence that caused the initial flooding.  *See In re Katrina Canal Breaches Consol. Litig.*, 2007 WL 4573052, *5 (E.D. La. Dec. 27, 2007) ("a subsequent act of negligence that is a cause-in-fact and a legal cause of a plaintiff's damages does not as a matter of law exonerate from liability a party responsible for an earlier act of negligence that is a cause-in-fact and legal cause of plaintiff's damages . . .")

Moreover, the evidence shows that floodwaters overtopping the Citrus Back Levee caused the overwhelming majority of flooding in New Orleans East where the Robinsons lived. *See* TT at p. 1779:19-25 (Kemp). Indeed, Citrus Back Levee overtopping was the source of 70% of the water entering New Orleans East inhabited areas; the other 30% came from breaches way out on the east end.  *See* TT at p. 1850 (Kemp).

Finally, Defendant alleges that "the New Orleans East Back Levee did not breach as a result of salinity, because salinity intrusion is the sole and entire basis on which Plaintiffs attribute New Orleans East Back Levee breaching to the MRGO."  USPTM at p. 113.  This does not accurately reflect Plaintiffs' position.  Dr. Johannes Vrijling testified that the MR-GO contributed an additional one foot to the surge at the New Orleans East Back Levee and as such there would have been no overtopping if the MR-GO had been properly mitigated with a salt/surge barrier at Bayou LaLoutre.  *See* Slides 14 and 15.

### 4.   Dr. Bea's Opinion That The Levees Would Have Survived "But For" The MR-GO Depends On His Verified And Validated Use of LS-DYNA To Model Near-Shore Waves

Dr. Bea's analyses and conclusions about wave impact on levee performance are based upon reliable procedures and methods that have been verified by other analytical models.  In fact, Dr. Bea has been published internationally on modeling and wave and erosion impacts, including LS-DYNA.  TT at p. 1581:8-20 (Bea).  In addition, the methods and practices—along

with information and data—upon which Dr. Bea relied are ordinarily and customarily relied upon by experts in the field of forensic engineering.  TT at pp. 1581:21-1582:9 (Bea).

Initially, Defendant employs a technical "fog" of inaccurate descriptions and misunderstandings by claiming that Dr. Bea's "fundamental mistake was to rely on a model that does not accurately depict waves as they exist in nature" and that his use of "monochromatic" waves yielded unreliable results.  USPTM at pp. 114-15.  Once again, Defendant's critique of Dr. Bea hinges on incomplete record citations and a blind eye to facts that are harmful to its case.[80]

The first fundamental misunderstanding is the Defendant's assertion that LS-DYNA was used to evaluate the hydrodynamic characteristics between the center of the MR-GO channel and the EBSB's faces.  LS-DYNA was one of the components in the analytical model that Dr. Bea utilized at the Reach 2 study site.  JX 118, Bea Depo. Jan. 30, 2009, at pp. 177:12-178:7.  LS-DYNA was used to get the velocity-time characteristics at various elevations on the flood side face of the EBSBs, while other models were employed to determine soil erosion characteristics.  JX 118, Bea Depo. Jan. 30, 2009, at pp. 177:12-178:7; *see also* PX 82, Bea Expert Report (Jan. 2009) at p. 45, Table 4.  Dr. Bea's wave analysis used *both* regular and irregular sea wave states.  JX 118, Bea Depo. Jan. 31, 2009, at pp. 266:10-268:21; PX 82, Bea Expert Report (Jan. 2009) at pp. 53-55, ¶¶87-89.  Specifically, Dr. Bea initially used regular waves during the LS-DYNA fluid velocity modeling.  *Ibid*.  Then, he incorporated Rainflow Corrections to recognize the differences between damage done by regular wave sea states *and* those due to irregular wave sea states.  *Ibid*.

---

[80] To the extent that the Government's post-trial attack on Dr. Bea's use of LS-DYNA is a *Daubert* challenge, it has been waived.

In addition, Dr. Bea incorporated and integrated other analyses with his LS-DYNA testing in order to achieve accurate and reliable results of wave impact on levee performance. Specifically, Dr. Bea calculated resistance to wave-induced erosion as a result of grass cover (turf) on the flood face of the EBSB based on the durations and magnitudes of the waves. He also estimated soil erodibility characteristics, in combination with the estimated wave-induced flood face velocities, to estimate the magnitude of lateral erosion.[81]   PX 82, Bea Expert Report (Jan. 2009) at p. 39, ¶65; *see also id*. at p. 40, ¶67.

Furthermore, Defendant's baseless claim that Dr. Bea's use of LS-DYNA has not been validated and is "unprecedented" is incorrect and ignores a basic tenet of engineering, specifically:  your modeling is only as reliable as the data you use.[82]  Thus, whether Dr. Bea used LS-DYNA or Coulwave, if "you handle the physics right, what you call the physics, be it LS-DYNA or Coulwave, doesn't make it any difference [*sic*], as the Judge pointed out."  TT at pp. 1581:21-1582:4 (Bea); *see also* PX 82, Bea Expert Report (Jan. 2009) at p. 193 ("it is equally if not more important that the data and information input to the computer program is realistic and that the output from the computer program is realistic and that the output from the computer

---

[81] Moreover, contrary to Defendant's additional incorrect assertions, Dr. Bea *did* use significant wave heights and did *not* "trap" wave energy when performing his analyses using LS-DYNA and other associated methodologies.  USPTM at p. 115; *see* JX 118 at pp. 266:10-268:21; 274:23-275:9; 280:1-8 (Bea Depo. Jan. 31, 2009) (discussing significant wave height); PX 72, Bea Expert Decl. (July 2008) at pp. 88-89, ¶70, Fig. 72 (detailing wave absorbing, non-reflective boundary used during LS-DYNA); PX 75, Bea Tech. Report I (July 2008) at p. 64.  If, as Defendant contends, Dr. Bea's tests "trapped" wave energy, then it would not have been possible to validate LS- DYNA with the experimental results.  PX 72, Bea Expert Decl. (July 2008) at p. 105, Fig. 88 (evidencing no "reflections" taking place on protected side of EBSB).

[82] To the extent Defendant implies that Coulwave is a better model for analyzing wave-induced erosion during Hurricane Katrina, Coulwave has not been validated with extreme oceanographic conditions experienced during Hurricane Katrina.  TT at p. 1516:14-25 (Bea).  Nevertheless, Dr. Bea addressed Defendant's use of Coulwave and found that the flow velocities generated by LS-DYNA and Coulwave were in substantial agreement.  PX 82, Bea Expert Report (Jan. 2009) at pp. 190-92, ¶¶2-3.

program is properly analyzed and interpreted; 'garbage in – garbage out.'").  Dr. Bea

painstakingly used proper data with his LS-DYNA analysis (along with all his other analyses)

and "validated each of the steps and components involved in the analyses, both theoretically,

laboratory experiments and field experiments, in comparison with other established techniques. .

. ."  JX 118 (Bea Depo. Jan. 30, 2009) at 241:12-25; *see also* PX 82, Bea Expert Report (Jan.

2009) at p. 40, ¶67; p. 45, Table 4; pp. 55-58, ¶¶90-96; PX 84, Bea Tech. Report II (Jan. 2009) at

pp. 4-5.

       In particular, Dr. Bea verified that LS-DYNA was one of the appropriate analyses for this

case by using, as part of its data sets, analytical formulations used in the Corps' own coastal

engineering manual providing computations of uprush and downrush velocities.  JX 118 (Bea

Depo. Jan. 30, 2009) at pp. 245:23-246:6 (Bea).  Dr. Bea also validated and verified his erosion

characteristic results by comparing his techniques with other established industry techniques

from Europe and Japan.  *Id*. at pp. 245:23-246:18 (Bea).  In addition, Dr. Bea's comparisons of

the velocity profiles generated by the LS-DYNA with the Corps' own laboratory studies were in

substantial agreement.  PX 82, Bea Expert Report (Jan. 2009) at pp. 190-191, ¶¶2-3.  Lastly, Dr.

Bea published his wave-induced erosion method and results in peer-reviewed journals—a step

that, as of the conclusion of trial, *none* of Defendant's experts had managed to do.  JX 118, Bea

Depo. Jan. 30, 2009, at pp. 245:23-246:19; TT at pp. 1527:20-1528:16 (Bea).

       All of Dr. Bea's validations established that LS-DYNA was able to replicate the

theoretical and experimental results without significant 'bias' (difference between true values

and analytical values) and with acceptable 'error rates' (uncertainties due to natural and

analytical sources).  Moreover, while Plaintiffs and Defendant may have chosen different routes,

*both* Dr. Bea and Mr. Ebersole confirm the critical conclusion that the MR-GO's enhanced

waves were sufficiently strong enough to remove the grass and expose the erodible hydraulic fill before 6:30 a.m.  *See* TT at pp. 1102:15-1103:4; 1380:11-24; 1562:6-1564:22 (Bea); TT at pp. 2567:5-2571:16 (Ebersole); PX2133.1: Ebersole Reliance: S1H6T10_Rollup-LowRes.avi.

Accordingly, Dr. Bea's use of LS-DYNA along with the results he obtained have been validated and verified and led to the proper conclusion that the MR-GO levees would have survived "but for" the MR-GO.

### 5.  Dr. Bea Correctly Assessed "Grass Lift-Off" Rates

The Government's next volley is to claim that Dr. Bea manipulated "grass lift-off" rates to support his theory, asserting that he used the wrong Reach 2 grass cover assumptions and misestimated the ability of turf to resist erosion.  USPTM at pp. 116-120.  Defendant is wrong on both counts.

As discussed in Section VI.C.2, *supra,* the Government erroneously criticizes Dr. Bea for his assumptions about the vegetation, claiming that "the habitat classification maps prove that the MRGO did not change the character of the marshes" in the area of the MRGO.  USPTM at p. 110.  Significantly, Defendant elected not to call its own habitat expert John Barras at trial to rebut the testimony of Dr. John Day and Dr. Sherwood Gagliano about the devastating effects of saltwater in the Upper Reach 2 region.[83]  The reason is obvious:  Mr. Barras refutes the Government's claim.

In his expert report, Mr. Barras concluded that the total swamp habitat area decline between 1956 and 1978 was *11,640 acres*.  JX 198, p. 2, ¶ 2.  By examining the 1956 Habitat Data 2 with 1932 T-Sheet, it is clear that the area bordering Lake Borne was predominately non-fresh marsh, interspersed with substantial flora such as roseau cane.  JX 198, p. 29.  When

---

[83] Dr. Bea relied upon Dr. Day's unimpeached testimony and report in formulating his opinions. TT at pp. 1196:20-1198:15 (Bea).

examining the same color plate of the area along Reach 1, the area comprising the Citrus Back

Levee in 1956 was swamp and fresh marsh.  *Ibid.*  The deterioration in twenty-two years is

striking. *Ibid.*

As for grass "lift off," Dr. Bea established two significant points regarding grass cover.

First, dense grass was found in those areas "where the levee had a high clay content so it could

retain water" such that the soil was "able to support the root growth."  TT at pp. 1276:21-1277:5

(Bea).  Second, the presence of grass cover, however, is not the final factor; the "substrate that

the grass is rooted in is important" as well.  TT at p. 1374:4-10 (Bea).

The grass "lift-off" rate plays an important factor in the evaluation of levee failure.  Poor

grass density that exposes a sandy, erodible substrate will allow for faster intrusion of wave

energy into the face of the levee than dense grass in erosion resistant clay.  TT at p. 1380:11-24

(Bea).  Through his own laboratory work, Dr. Bea demonstrated that the velocities produced by

the excessive waves caused by the MR-GO were sufficient to remove the grass cover and

quickly erode the levees' sandy core.  *See* PX 72, Bea Expert Report (July 2008) at pp. 75-86;

PX 81, Bea Expert Report (Jan. 2009) at p. 17; PX 82, Bea Expert Report (Jan. 2009) at pp. 38-

50; TT at pp. 1163:18-1170:2 (Bea)**.**

Dr. Bea's opinion is confirmed by the cross examination testimony of Mr. Ebersole that

the grass cover on the levees' face was of such a quality that the MR-GO's enhanced waves were

sufficiently strong to remove the grass and expose the erodible hydraulic fill before 6:30 in the

morning.  TT at pp. 2567:5-2571:16 (Ebersole).  Relying on design criteria instead of actual

grass lift-off data, Bruce Ebersole found that waves smaller than were actually experienced

during Katrina would have lifted off the grass by 6:30 a.m.  TT at pp. 2528:21-25, 2538:10-14,

2570:25-2571:2 (Ebersole).

**6.  Dr. Bea's Collection And Characterization Of Soil Samples And Their Erodability Were Scientific**

Finally, the Government focuses on Dr. Bea's soil sampling and conclusions about the erodability of the materials used to construct Reach 2.  Defendant disparages as "unscientific" Dr. Bea's soil collection and erosion analysis methodology.  USPTM at pp. 120-23.  This criticism is unfounded. Dr. Bea's testimony, as well as his expert reports, clearly establish that his collection and characterization of soil samples were sound and scientific and that the tests that Dr. Bea relied on for ascertaining erodability were precisely suited for that express purpose.

Initially, Defendant misconstrues completely Dr. Bea's statement about a 50 to 100% coefficient of variation for his erosion analysis when it states that Dr. Bea "admits that his erosion analyses have uncertainties as great as 100 percent."  *Id.* at p. 120.  As Dr. Bea explained, all modern engineered systems encounter large coefficients of variation—some as great as 200%.[84]  JX 118, Bea Depo. Jan 30, 2009, at pp. 484:14-485:15.  Such uncertainties are not unusual in either ocean/coastal engineering or engineering in general such as public buildings and commercial aircraft airframes.  *Ibid.*  These uncertainties do not mean that "something is wrong" with the analytical methods.  *Ibid.*  Rather, they mean that the natural variabilities (*e.g.*, wave heights, grass lift off times, soil erosion rates) and the uncertainties contributed by the analytical models (*e.g.*, LS-DYNA erosion velocities, linear erosion distance accumulation, Rainflow corrections to results based on regular significant wave height based analyses) are large in comparison with 'highly controlled' processes such as manufacturing steel and concrete (coefficient variation in the range of 8 % to 12%).  TT at pp. 1503:2-1505:7 (Bea).

_____

[84] Dr. Bea explained that the very building in which his January 2009 deposition occurred in San Francisco had a coefficient variation of 200%.  JX 118 at 484:14-485:15 (Bea Depo. Jan 30, 2009).  Defendant's counsel, Robin Smith, confirmed that he still felt safe in a building that had a 200% coefficient variation.  *Id.* at 484:14-485:5.

Accordingly, Defendant's attempt to conflate a naturally occurring coefficient variation as somehow leading to an unreliable result is false.  Dr. Bea's soil collection and testing procedures yielded reliable, scientific results about levee performance during Katrina.

### a.   Dr. Bea's Soil Collection Method Was Scientific

Initially, Defendant states incorrectly that Dr. Bea collected soil samples from sites that were purportedly inundated by Hurricane Rita's surge and waves.  USPTM at p. 120.  In fact, when Dr. Bea collected soil samples in January 2006, he sampled materials from the earthen embankments at elevations that *exceeded* those reached by Hurricane Rita's waves and surge.  TT at p. 1354:12-19 (Bea).

Not to be outdone, Defendant then ruminates (without a single citation to any evidence) that Dr. Bea's collection of soil from levee shoulders "*probably* gathered samples that were unrepresentative of the composition of the levee prior to the hurricanes."  USPTM at p. 120 (emphasis added).  Why speculate about probabilities when the plain answer can be found in the trial testimony?  What Dr. Bea *did* do was gather soil samples from levee shoulders that *were not* affected by Katrina or Rita.  TT at p. 1356:1-19 (Bea); *see also* JX 118, Bea Depo. Jan. 30, 2009, at p. 149:8-17 ("That's the reason we took the samples at the shoulders of the breaches.  It had not been advected/conveyed away.  It was there.").  Specifically, Dr. Bea extracted the soil samples from these levees shoulders by shovel, placed them in plastic bags, which were then placed in milk carton containers, and later delivered to Dr. Briaud at Texas A&M for testing.  TT at pp. 1353:1-7, 1357:7-14 (Bea); JX 118, Bea Depo. Jan 30, 2009, at p. 146:12-24.

In addition, Dr. Bea made certain that these samples were representative of the soil used to construct the MR-GO levees.  Specifically, Dr. Bea "gathered samples from several comparable sites, tested them under comparable conditions, [which] performed in the sense of erodability in comparable ways."  TT at pp. 1353:12-22 (Bea).  Dr. Bea also corroborated this

soil characterization with "the available soil boring information that the Corps of Engineers had gathered and had provided to corroborate [Dr. Bea's] observations."  TT at p. 1354:1-11 (Bea). These Corps's soil borings analyzed by Dr. Bea were *in situ*.  PX 72 at p. 29, ¶26; JX 118, (Bea Depo. Jan. 31, 2009, at p. 284:1-20.  When asked at trial about whether the soil samples taken were representative of the area, Dr. Bea testified that his job as a forensic engineer was to "assure" representative samples.  TT at pp. 1357:156-1358:8 (Bea).  Otherwise, his modeling process, which included "laboratory performance, field performance, and the performance predicted by other established models that do the same thing," would not have produced the results it did.  *Ibid*.

Lastly, Defendant attempts to discredit Dr. Bea's soil gathering process because it was conducted, in part, with a shovel.[85]  Once again, Defendant fails to cite Dr. Bea's explanation for how he addressed and adjusted his testing process and procedure to account for this soil gathering method.  Specifically, Dr. Bea testified that to account for using a shovel to gather soil, he "var[ied] the analytical work across ranges, including compaction, including clay content. . . . [B]ecause of the lack of definitive knowledge, we have to study the problem parametrically, looking at plausible realistic combinations to evaluate how we think breaching developed."  JX 118, Bea Depo. Jan. 30, 2009, at pp. 151:14-152:11.

Put another way, Dr. Bea provided the soil samples to Dr. Jean-Louis Briaud, Dr. Briaud then provided undercompacting and overcompacting data based on the shovel dug sample to Dr. Bea, and then Dr. Bea derived the testing parameters based on Dr. Briaud's data.  JX 118, Bea Depo. Jan. 30, 2009, at pp. 170:14-172:6.  Thus, Dr. Bea addressed any possible variations

---

[85] The reason Dr. Bea used a shovel for soil collection is that the Corps denied him access to a drill to collect samples at these sites.  JX 118, Bea Depo. Jan. 30, 2009, at p. 153:8-13.

resulting from the use of a shovel to collect soil samples by adjusting his testing procedures.

Accordingly, Dr. Bea's method for collecting soils samples was scientific.

### b.  The Tests Upon Which Dr. Bea Relied For Ascertaining Erodibility Were Expressly Suited For Its Purpose

Defendant then turns its unfounded attack on Dr. Bea's reliance on the soil testing

procedure used by Dr. Briaud of Texas A&M.[86]  In analyzing the soil samples provided by Dr.

Bea, Dr. Briaud used the Erosion Function Apparatus ("EFA") that runs a flume of water on the

surface of a soil sample, measuring the amount of soil that is removed as a function of time and

velocity.[87]  TT at p. 1360:11-19 (Bea).  Dr. Briaud's EFA and testing procedure has been peer

reviewed.  JX 118, Bea Depo. Jan. 30, 2009, at pp. 169:7-170:13 .  Dr. Briaud's EFA determines

erosion through sheet flow across a level surface but did not address the possible erosion of

levees by wave attack prior to overtopping.  *Id*. at pp. 281:10-282:18.  The reason for this is

because the EFA flume procedure cannot perform such a test.  *Id*. at 283:3-284:7.

What Defendant fails to disclose to the Court, however, is the undisputed fact that the Dr.

Briaud's EFA test was not the only test or procedure relied upon by Dr. Bea in reaching his soil

erosion conclusions.[88]  To the contrary, Dr. Bea also analyzed and studied, among other things,

---

[86] Defendant also mischaracterizes Dr. Bea's discussion with Dr. Briaud the night Dr. Bea transferred the soil samples over to Texas A&M.  USPTM at p. 122, n.36.  While Dr. Bea did describe the conversation as "heated," it most assuredly was not because of any purported "disagreement" about using Dr. Briaud's method to evaluate wave-induced breaching.  To the contrary, the disagreement concerned how best to perform erosion analyses.  TT at p. 1359:1-9; JX 116, Bea Depo. Feb. 27, 2009, at 613:6-614:4.

[87] To be sure, Dr. Briaud provided only the soil compacting testing results.  He did not, as the Defendant suggests, provide Dr. Bea with any independent analysis about the cause of soil erosion along the MR-GO.

[88] Dr. Bea explained this fact directly to Defendant's counsel when he testified that "I don't rely on any single paper.  We have his laboratory reports.  We've got multiple papers.  We use it all. . . . Additional results are reported in the ILIT report. . . .  It's a far wider range of information than is documented in [Dr. Briaud's] journal paper."  JX 116, Bea Depo. Feb. 27, 2009, at pp. 693:15-694:13.

the Defendant's own IPET team's soil erosion studies.  Aware of the EFA's limitations, Dr. Bea considered IPET's *in situ* tests along the MR-GO banks that used impinging flow conditions on the soils.  JX 118, Bea Depo. Jan. 31, 2009, at pp. 284:8-20.  These IPET tests studied the erodability function along the MR-GO.  *Id*.  Dr. Bea used *both* the EFA procedure and the IPET's *in situ* test results to help arrive at his conclusions about the erodability of soils along the MR-GO.  *Id*.  Indeed, the Defendant's own IPET studies were "a very valuable dataset [that gave Dr. Bea] insight into the normal direction of flow erosion effects" that Dr. Bea "actually use[d] to help [him] compute/analyze the development of erosion trenches behind the flood walls after overtopping."  *Id*. at pp. 284:21-285:9.

As Dr. Bea explained, the soil testing performed by Dr. Briaud "formed the second analytical component in the evaluation of the breaching of the study location."  JX 116, Bea Depo. Feb. 27, 2009, at p. 616:1-6.  The results of the EFA's flume test "formed the basis for the definition of the soil erodibility function used in the second component of our wave-induced breaching analyses."  *Id*. at p. 616:1-11.  The first analytical component used by Dr. Bea to account for other vectors of wave attack on the levees included, among other things:

- a consideration of potential grass cover conditions per potential differences in compaction conditions;

- a consideration of potential differences in water salinity conditions;

- a consideration of various soil compaction rates and their effects on erodibility;

- a consideration of the effect of changes in the sediment being transported by water during erosion conditions, changing from dirty water conditions with large amounts of sediments suspended in the water column, to clear water conditions; and

- validating his wave erosion breaching model with other validated analytical
  models.

*Id*. at pp. 617:5-618:9; JX 118, Bea Depo. Jan. 31, 2009, at pp. 407:20-408:20; *see also* PX 82,

Bea Expert Report (Jan. 2009), at p. 45, Table 4 (describing Dr. Bea's Flood-side Wave-Induced

Erosion Method and its Validity Assessment Factors); PX 84, Bea Technical Report II,

Validations of EBSB Wave Induced Erosion and Breaching Analyses (Jan. 2009).

   In addition, as evidenced in Dr. Bea's January 2009 Expert Report, the results achieved

by Dr. Bea's erosion analysis do in fact reliably replicate the results from other validated

laboratory experiments, field observations, and analytical models.  PX 82, Bea Expert Report

(Jan. 2009), at pp. 55-58, ¶¶90-96.  Instead of acknowledging Dr. Bea's sound reliance on test

methods in addition to Dr. Briaud's EFA, Defendant prefers to fixate on a single sentence from

Dr. Briaud's journal article concerning the statement that Dr. Briaud did not study wave attack

prior to overtopping.  USPTM at p. 122.  The reason Dr. Briaud did not perform this study is

because it was simply easier to compute back side flow wave and surge conditions and apply

those to his EFA than studying front side wave attack.  JX 116, Bea Depo. Feb. 27, 2009, at pp.

619:18-620:11.  Moreover, the Defendant's critique is borne out of its own experts' inexplicable

failure to account for the timing of the early and rapid flooding in St. Bernard that occurred

*before* the peak surge arrived.  PX 82, Bea Expert Report (Jan. 2009) at pp. 49-51, ¶¶ 80-81.  Dr.

Bea, on the other hand, set out to determine the cause of this early and rapid flooding and

concluded that based on his multi-faceted flood side wave induced erosion analysis, portions of

the Reach 2 levees failed before they were overtopped.  *Ibid.*  Lastly, as discussed above, Dr. Bea

accounted for the EFA's limitation by studying and applying other test results, variables and

methodologies to evaluate frontal wave-induced erosion along the MR-GO's Reach 2.

At bottom, Defendant's attack on Dr. Bea's soil collection, soil testing and soil analysis is completely baseless.  In an attempt to discredit Dr. Bea's soil erosion findings, Defendant relies on gross mischaracterizations and misleading snippets of his testimony as well as unsupportable statements of what Dr. Bea "*probably*" did.  A complete examination of Dr. Bea's testimony and his detailed expert reports, however, explains to the Court exactly what Dr. Bea *did* do.  Dr. Bea carefully and methodically collected and analyzed the soil along the MR-GO using sound, validated, and scientific methods and procedures and properly concluded that the MR-GO caused the flooding that destroyed Greater New Orleans.

* * *

As the Court can now see, the Government's attack on Dr. Bea is—like so much of its brief—a desperate tactic.  The Court had ample opportunity to evaluate Dr. Bea's reports and hear his testimony. Plaintiffs are confident that the Court will not be misled by Defendant's chronic mischaracterization of the record.

Dr. Bea is a distinguished forensic engineer who has devoted over 10,000 hours to investigating and writing peer reviewed articles about the causes of the catastrophic levee breaching.  No one—and certainly no defense expert—has devoted as much time and passion to this task.  Much of his expert testimony is unrebutted.  In the final analysis, no intellectually honest observer can conclude that he "adopted unsupported facts, applied biased reasoning, and misused established protocols and procedures to reach conclusions not supported by the evidence, science, or logic."  USPTM at p. 123.  These are just unsubstantiated epithets unworthy of our Government.

**VII.    PLAINTIFFS ARE ENTITLED TO THE DAMAGES DESCRIBED IN THEIR POST-TRIAL MEMORANDUM**

As an apparent afterthought, the Government's "corrected" brief argues that the mental anguish damages claimed by Plaintiffs are not recoverable under Louisiana law and that Plaintiffs did not adequately prove their claims for economic losses (damage to real property, damage to personal property, and additional living expenses) through the testimony of their expert, Scott Taylor.  These arguments are untenable.

**A.    Louisiana Law Authorizes Plaintiffs To Recover Mental Anguish Damages**

The Government asserts that Louisiana follows an absolute rule that a property owner may not recover damages for mental anguish caused by the loss of his or her property unless, in the absence of other exceptions not applicable here, the owner was "either present or nearby and suffered a psychic trauma as a direct result."  USPTM at p. 124, quoting *Turgeau v. Pan American World Airways, Inc.*, 764 F.2d 1084, 1087, *rehr'g denied*, 770 F.2d 164 (1985).  Once again, Defendant misstates the law.  In truth, Louisiana simply does not recognize any such absolute exclusion.

In *Elston v. Valley Elec. Membership Corp.*, 381 So.2d 554 (La. Ct. App. 1980), the Louisiana Second Circuit Court of Appeals allowed a homeowner to recover damages for mental anguish associated with the destruction of electrical appliances and "minor cosmetic damage to the interior of the home" caused by the defendant's negligence in installing the wrong electrical transformer.  381 So.2d at 555.  The court recognized that its opinion in *Farr v. Johnson*, 308 So.2d 884 (La. Ct. App. 1975)—a case quoted by the Government in its corrected brief (USPTM at p. 124)—identified four circumstances under which property owners could collect damages for mental anguish arising from harm to property,[89] and that none of those circumstances existed

---

[89] The four categories, recited by Plaintiffs and the Government in their post-trial briefs, are

in *Elston*.   Nevertheless, the court added that "[t]he criteria set forth in *Farr*, under which recovery for mental anguish may be allowed, are not inflexible or exclusive."  381 So.2d at 556. The court explained that the criteria were developed "to limit recovery to cases where both the mental injury and the causal relation to the property damage are clearly established," and that Mrs. Elston had otherwise shown that she had experienced "psychic trauma" directly related to the damage to her home.  *Id*.  The court concluded that the award of mental anguish damages to Mrs. Elston "was proper, notwithstanding that she was not physically present the moment the incident occurred."  *Id*.

More recently, in *Boudreaux v. State Dep't of Transp. & Development*, 906 So.2d 695 (La. Ct. App. 2005), the First Circuit Court of Appeals allowed all class members who had filed claim forms to recover damages for mental anguish resulting from harm to their homes caused by a flood whose effects were exacerbated by the negligence of the state.  Although the court noted that the damage caused by the flood occurred "when the owners of the property were present or situated nearby," the court also acknowledged that "not all of the class plaintiffs who submitted claim forms experienced 'psychic trauma' as a result of the flood damage to their property."  906 So.2d at 707.  Despite the class plaintiffs' failure to satisfy all of the four *Farr* criteria, the court nonetheless approved the award of mental anguish damages to all property owners.  The court reasoned that proof of such trauma is not required in cases in which there is "an especial likelihood of genuine and serious mental distress arising from special

---

(1) when the property was damaged by an intentional or illegal act; (2) when the property was damaged by acts giving rise to strict or absolute liability; (3) when the property was damaged by activities constituting a continuous nuisance; and (4) when the owner was present or nearby at the time the damage occurred and suffered a psychic trauma as a direct result.  *Farr*, 308 So.2d at 885-86.

circumstances."  *Id.*, quoting *Johnson v. First Nat. Bank of Shreveport*, 792 So.2d 33, 51 (La. Ct.

App. 2001) and *Moresi v. State Dep't of Wildlife & Fisheries*, 567 So.2d 1081, 1096 (La. 1990).

The Government's promotion of the imaginary rule that an absent homeowner cannot

recover damages for mental anguish caused by his/her home destruction is particularly galling in

light of the reason for Plaintiffs' absence.  This is not a case in which the property owners were

absent because they had rented their properties to others, or were on vacation, or were out

shopping.  Plaintiffs were absent (and unable to witness their homes being destroyed) because

*they were frantically fleeing the very danger created by the Government that was threatening*

*their lives and destroyed their homes.*  Indeed, The Government itself concedes that Louisiana

permits recovery for mental anguish from an "ordeal in progress."  USPTM at p. 123; *see also*

*Harper v. Illinois Cent. Gulf R.*, 808 F.2d 1139, 1141 (5th Cir. 1987) ("There is no question that

Louisiana permits a plaintiff in certain circumstances to recover for fear and mental anguish

while a traumatic ordeal is in progress regardless of whether the plaintiff sustained physical

injury.").[90]  It is black humor for the Government to suggest that under these unprecedented

circumstances, Plaintiffs' claims of mental anguish are too speculative and subjective to permit

recovery under Louisiana law.

It defies the evidence as well as common sense for the Government to suggest that the

proof of mental anguish presented by Plaintiffs is not as reliable and trustworthy as the evidence

of mental anguish caused by destruction of electrical appliances in *Elston* or that Plaintiffs did

not prove "psychic trauma" comparable or greater to that sustained by the class plaintiffs in

---

[90] The court in *Harper* denied recovery of mental anguish damages under the "ordeal in progress" theory because the plaintiffs did not show that they were within the zone of danger and that their fear of harm was reasonable.  Although the plaintiffs' home was included in the evacuation zone as a precautionary matter, the evidence showed "beyond question" that the plaintiffs were in no immediate danger.  *Harper*, 808 F.2d at 1141.  In stark contrast, Plaintiffs were on the epicenter of the zone of danger caused by the Government's negligence.

*Boudreaux*.  Plaintiffs experienced the worst disaster in American history—the loss of their loved ones, homes, and communities as well as traumatizing evacuations and displacement. Their emotional distress is all too real, extreme, and indelible.

Nor can the mental anguish of Plaintiffs be dismissed as mere "minimal worry and inconvenience over the consequences of the damages" as the mental anguish was characterized in *Farr*. 308 So.2d at 885.  In their opening post-trial brief, Plaintiffs described in detail each homeowner's emotional reaction to violent destruction of their homes.  *See* PPTB at pp. 126-36. As the Louisiana Supreme Court stated in *Moresi*, mental anguish damages are recoverable when there is an "especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious."  567 So.2d at 1096. Surely, the heart-rending circumstances described by the evidence in this case guarantee that Plaintiffs' claims of mental anguish are not "spurious."  Louisiana law allows them to recover damages based on this evidence. [91]

Moreover, as Plaintiffs pointed out in their initial post-trial brief, plaintiffs can recover damages for their mental anguish under the law of vicinage as codified in La. Civ. Code art. 667. *See* PPTB at pp. 120-21.  In *Graci v. United States*, 435 F. Supp. 189 (E.D. La. 1977), the court specifically recognized that article 667 applied and conferred on the United States "as grantee of the right of way, builder and maintainer of the MRGO . . . a high standard of care with relations to damages caused by the works to neighboring lands and individuals."  *Id*. at 195.  Other courts in Louisiana have applied the law of vicinage to claims based on flooding caused by mismanagement of nearby property by a private or government owner.  *Rizzo v. Nichols*, 867 So.2d 73, 76 (La. Ct. App. 2004); *Spiker v. City of Baton Rouge/Parish of East Baton Rouge*,

---

[91] The Government does not quarrel with the proposed amount of $125,000 in emotional distress damages for each plaintiff.

804 So.2d 659, 663 (La. Ct. App. 2001); *Branch v. City of Lafayette*, 663 So.2d 216, 219 (La. Ct. App. 1995); *see also Saden v. Kirby*, 635 So.2d 277, 281 (La. Ct. App. 1994), *aff'd in part and rev'd in part on other grounds*, 660 So.2d 423 (La. 1995).

The Government contends that the law of vicinage silently incorporates a requirement that the plaintiff must be present on the property at the time that the damage occurred.  *See* USPTM at p. 125.  This supposed requirement, however, finds no expression in Louisiana case law.  On the contrary, Louisiana courts have simply stated that the Code allows property owners to recover "general damages for the loss of use of enjoyment of their property, mental anguish, irritation, anxiety, and discomfort," without any reference to the need for plaintiffs to be present on the property to claim such damages.  *Rizzo*, 867 So.2d at 77, citing *Branch*, 663 So.2d at 222.  Consequently, the court in *Rizzo* upheld an award of damages for mental anguish despite the plaintiff's absence from the property during the flood.  867 So.2d at 77.

Alternatively, as this Court has recognized, Plaintiffs may recover general damages for the inconvenience they experienced as a result of the flood.  Order and Reasons of April 13, 2009 (Doc. 18539), at 3-4, citing *Kemper v. Don Coleman, Jr., Builder, Inc.*, 746 So.2d 11, 21 (La. Ct. App. 1999).  Whether labeled as "mental anguish" or "inconvenience," the cataclysmic disruption of Plaintiffs' lives caused by the Government's negligence is compensable under the law of Louisiana and should be redressed as requested in Plaintiffs' initial post-trial brief.

## B.  **Plaintiffs Adequately Proved Their Entitlement to Damages for Economic Loss**

The Government also challenges Plaintiffs' right to collect the economic damages claimed in the Plaintiffs.  The Government cannot and does not claim that the Plaintiffs did not in fact suffer substantial economic losses, but it contends that Plaintiffs presented flawed evidence of the amount of their economic damages and have thus effectively waived the right to

collect any such damages at all.  *See* USPTM at pp. 126-128.  Despite its concern that Plaintiffs'
economic damages claim is inflated (more specifically, is not appropriately discounted), the
Government offered no proof of its own to establish the amount of Plaintiffs' losses.  Contrary to
the Government's contention, Plaintiffs fully satisfied their burden on the issue of economic
damages.

In *Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Serv.
Co.*, 618 So.2d 874 (La. 1993), the Louisiana Supreme Court attempted to define the measure of
damages to be assessed against a defendant that tortiously harmed property.  The court first noted
that the "primary objective" in such cases is "to restore the property as nearly as possible to the
state it was in immediately preceding the damage." . . . ."  *Id*. at 876, quoting *Coleman v. Victor*,
326 So.2d 344, 346 (La. 1976).  The court reiterated the *Coleman* court's observation that "no
mechanical rule can be applied with exactitude to formulate tests in the assessment of property
damage under article 2315."  618 So.2d at 876, quoting *Coleman*, 326 So.2d at 347.  The
Supreme Court then noted commentary recognizing that damage assessments must be flexible to
fully compensate the plaintiff.  For example, "to limit repair costs to diminution in value is to
either force a landowner to sell the property he wishes to keep or to make repairs partly out of his
own pocket."  618 So.2d at 877, quoting D. Dobbs, *Handbook on the Law of Remedies* § 5.1 at
317 (1973).

In recognition of this need for flexibility, the Supreme Court adopted "as a general rule of
thumb" the rule that a property damage plaintiff may recover, at his election, "the cost of
restoration that has been or may be reasonably incurred" or "the difference between the value of
the property before and after the harm."  618 So.2d at 879.  If, however, the cost of restoration is
"disproportionate to the value of the property or economically wasteful," the measure of

damages is the difference in value before and after the harm, "unless there is a reason personal to the owner for restoring the original condition *or* there is a reason to believe that the plaintiff will, in fact, make the repairs." *Id*. (emphasis added).

Through the testimony of their damages expert Scott Taylor, each plaintiff presented reliable evidence of the replacement costs that they had incurred. If the Government believed that the cost of restoration is "disproportionate to the value of the property or economically wasteful," it—not Plaintiffs—should have adduced proof to that effect. Only at that point would Plaintiffs have been obligated to show the "reason personal to the owner for restoring the original condition" or the intent of Plaintiffs to make the repairs.[92]

Quoting Mr. Taylor's testimony that he used his personal discretion to ensure that Plaintiffs "will be able to have something that they can be proud of again," the Government criticizes his opinions regarding replacement costs as "cavalier guesswork." USPTM at 128. But the statement is taken out of context, as Mr. Taylor's next sentence explains: "Yes, I said that in the deposition. Does that necessarily mean that I was giving them further latitude than they should have based on the damages I saw? No." TT at p. 1648:18-20 (Taylor).

Similarly, the Government's criticism of Mr. Taylor's use of the Xactimate program is unpersuasive. As Mr. Taylor explained, the program is "used not only by the insurance industry

---

[92] Citing *Hornsby v. Bayou Jack Logging*, 902 So.2d 361 (La. 2005), the Government suggests that "self-serving testimony" of Plaintiffs' desire or intent to restore their property is insufficient to establish entitlement to restoration costs. *See* USPTM at p. 134. In that case, however, none of the plaintiffs had yet built any improvements on the property; one had not visited the property in 15 years. *Id*. at 368. Under those facts, the court found the evidence of a personal reason for restoration "so internally inconsistent [and] implausible on its face" that it was manifestly wrong for the trial court to credit the plaintiff's testimony. *Id*. In contrast, Plaintiffs here presented compelling, plausible testimony that they had legitimate, personal, emotional reasons for desiring restoration of their properties. Thus, *Hornsby* is inapposite.

but by construction people and remodelers as well." Taylor 1607: 19-21. If the insurance industry relies on it, Plaintiffs should be able to rely on it as well.

The Government presented no evidence of its own to indicate that Plaintiffs' calculation of their economic losses is inflated or inaccurate.[93] To accept the Government's defense is to embrace the fantastic fiction that Plaintiffs' suffered no economic loss at all as a consequence of the Government's tortious conduct precipitating a deluge of Biblical proportions. The Court need not indulge that fiction. Plaintiffs more than adequately proved the existence and amount of their economic loss under Louisiana law.

Dated: August 6, 2009                                     Respectfully submitted,


**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell

Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298


**Law Offices of Joseph M. Bruno**
By: s/ Joseph M. Bruno
Joseph M. Bruno (LSBA No. 3604)
Plaintiffs' Liaison Counsel
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335

---

[93] The Government suggests that the basis for Scott Taylor's opinions was unreliable. *See* USPTM at pp. 135-37. This objection fails for at least two reasons. First, Mr. Taylor testified in detail about the reasons for his valuation opinions. *See* PPTB at pp. 122-25. Second, the Government never objected on *Daubert* grounds to the admissibility of his testimony. *See* TT at pp. 1594: 15-23; 1619: 15-24.

Facsimile:  (504) 581-1493

**The Andry Law Firm, LLC**
By: s/ Jonathan B. Andry
Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788

**Domengeaux Wright Roy & Edwards LLC**
By: s/ James P. Roy
Bob F. Wright (LSBA No. 13691)
James P. Roy (LSBA No. 11511)
MR-GO PSLC Liaison Counsel
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile:  (337) 233-2796

**Fayard & Honeycutt**
Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile:  (225) 664-6925

**Girardi & Keese**
Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile:  (213) 481-1554

**McKernan Law Firm**
Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Levin, Papantonio, Thomas, Mitchell Echsner & Proctor, P.A.**
Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**
Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**
Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

112

**Michael C. Palmintier, A.P.L.C.**
Michael C. Palmintier
Joshua M. Palmintier
618 Main Street
Baton Rouge, LA  70801-1910
Telephone: (225) 344-3735
Telefax: (225) 336-1146

**Cotchett, Pitre, Simon & McCarthy**
Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**
Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Robinson, Calcagnie & Robinson, Inc.**
Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

**Baron & Budd, P.C.**
Russell W. Budd
Ann Saucer
Thomas M. Sims
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Telephone: (214) 521-3605
Fax: (214) 520-1181

**Andry & Andry**
Jay Andry
Gilbert V. Andry
Arthur Landry
710 Carondelet Street
New Orleans, LA  70130
Telephone: (504) 581-4334
Fax: (504) 586-0288

**Carlton Dunlap Olinde & Moore**
John B. Dunlap, III
Richard P. Ieyoub
One American Place, Suite 900
301 Main Street
Baton Rouge, LA  70825
Telephone: (225) 282-0600
Telefax: (225) 282-0650

**The Dudenhefer Law Firm, L.L.C.**
Frank C. Dudenhefer, Jr.
601 Poydras Street, Suite 2655
New Orleans, LA  70130
Telephone: (504) 616-5226

**Dumas & Associates Law Firm, LLC**
Walter C. Dumas
Lawyer's Complex
1261 Government Street
P. O. Box 1366
Baton Rouge, LA  70821-1366
Telephone: (225) 383-4701

**Glen J. Lerner & Associates**
Glen J. Lerner
4795 S. Durango Drive
Las Vegas, NV  89147
Telephone: (702) 877-1500
Telefax: (702) 968-7572

Telefax:  (225) 383-4719

## <u>CERTIFICATE OF SERVICE</u>

I, Pierce O'Donnell, hereby certify that on August 6, 2009, I caused to be served

**PLAINTIFFS' POST TRIAL REPLY BRIEF**, upon Defendants' counsel, Robin D. Smith,

Charles Marvray, Keith Liddle, and Richard Stone by ECF and email at

robin.doyle.smith@usdoj.gov; charles.marvray@usdoj.gov, keith.liddle@usdoj.gov, and

richard.stone@usdoj.gov.

/s/ Pierce O'Donnell