**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: KATRINA CANAL BREACHES      **CIVIL ACTION**
   CONSOLIDATED LITIGATION

                  **NO. 05-4182**

PERTAINS TO: LEVEE & MRGO     **SECTION "K"(2)**
     05-4181, 05-4182, 05-4191, 05-4568,
     05-5237, 05-6073, 05-6314, 05-6324,
     05-6327, 05-6359, 06-0020, 06-1885,
     06-0225, 06-0886, 06-11208, 06-2278,
     06-2287, 06-2346, 06-2545, 06-3529,
     06-4065, 06-4389, 06-4634, 06-4931,
     06-5032, 06-5042, 06-5159, 06-5163,
     06-5367, 06-5471, 06-5771, 06-5786,
     06-5937, 06-7682, 07-0206, 07-0647,
     07-0993, 07-1284, 07-1286, 07-1288,
     07-1289

## ORDER AND REASONS

Before the Court is a Motion for Approval of a Proposed Class Action Settlement (Rec. Doc. 16647) ("Mot."). This proposed class settlement represents the first recovery against a government agency that has been charged with liability arising out of Hurricanes Katrina and Rita. While the prospect of a recovery more than four years after these storms is long due, any such hope must be tempered by the fact that this settlement, as a limited fund settlement, will bind all putative class members without the ability to opt-out, and it will substantially end the claims arising out of Hurricanes Katrina and Rita against three levee districts and their insurer.

## I. FACTUAL BACKGROUND

The present motion seeks the approval of a class action settlement for the residents of the greater New Orleans area and surrounding parishes who were harmed by the levee breaches that

occurred during Hurricanes Katrina and Rita.  Under the *In re Katrina Canal Breaches Consolidated Litigation* umbrella, two of the myriad categories of cases are denominated "LEVEE" and "MRGO."  The LEVEE litigation concerns breaches of floodwalls around the outfall canals in and around New Orleans.  The Plaintiffs filed class actions against the U.S. Army Corps of Engineers ("the Corps"), various levee districts and their respective boards of commissioners, the Sewerage and Water Board of New Orleans, the Port of New Orleans, the New Orleans Public Belt Railroad, CSX Transportation, and private contractors and engineers. The multitude of complaints was consolidated into one Master Class Action Complaint.  Rec. Doc. 3420.[1]  In the course of this litigation, this Court has issued orders dismissing the claims against all of these defendants except for the levee districts and the Sewerage and Water Board of New Orleans.[2]

The second category, likewise, is an amalgam of all of the suits filed against the United

------

[1]This Superseding Master Consolidated Class Action Complaint (Rec. Doc. 3420) was amended to correct various error concerning the inclusion and/or exclusion of certain cases within that master complaint as well as certain claims.  *See* Rec. Docs. 3817, 7350, and 7570 . Furthermore, in the Court's dismissal of the Corps from the LEVEE litigation based on the immunity granted to it by virtue of § 702c of the Flood Control Act of 1928, the Court ordered that all claims concerning the Industrial Canal or Inner Harbor Navigational Canal be lodged in the MRGO Master Complaint.

[2]The claims against the private contractors were dismissed for peremption under La. Rev. Stat. § 9:2772.  Rec. Doc. 2142.  The Court also dismissed the claims against the private engineering companies on peremptive grounds under La. Rev. Stat. § 9:5607.  Rec. Doc. 2148. All claims against the private contractors and engineers based on maritime claims arising from the breaches of the inner canals were dismissed for lack of maritime jurisdiction.  Rec. Doc. 6175.  The Court dismissed the Port of New Orleans.  Rec. Doc. 8389.  CSX Transportation and the New Orleans Public Belt Railroad were likewise dismissed.  Rec. Docs. 9856 & 18431.  All claims against the Corps for breaches of the inner canal levees were dismissed based upon sovereign immunity under the Flood Control Act of 1928.  Rec. Doc. 10984.  If the present settlement is approved, the only remaining defendants in this litigation will be the Corps and the Sewerage and Water Board of New Orleans.

States of America for the defalcations of the Corps, Washington Group International, Inc. ("WGI"), the Board of Commissioners of the Orleans Parish Levee District, the Board of Commissioners of the Lake Borgne Basin Levee District, and St. Paul Fire and Marine Insurance Company for damages allegedly caused by the MR-GO with the various failures and overtopping of the levees and floodwalls along the MRGO, the east bank of the Inner Harbor Navigational Canal ("IHNC") and the levees along the area bordering New Orleans East. Rec Doc. 3415, as amended by Rec Doc. 11471. The Court granted WGI's Motion for Summary Judgment concerning the IHNC breaches on December 15, 2008. Rec. Doc. 16723. If the present settlement dismissing the levee districts is approved, the only remaining defendants in the MRGO category will be the Corps.

The motion before the Court proposes a settlement between the Plaintiffs and the levee districts along with their insurer. The motion is made on behalf of the Putative Class Plaintiffs and the following Settling Defendants: Board of Commissioners of the Orleans Levee District, the Orleans Levee District, the Board of Commissioners of the Lake Borgne Basin Levee District, the Lake Borgne Basin Levee District, the Board of Commissioners of the East Jefferson Levee District, the East Jefferson Levee District, and St. Paul Fire and Marine Insurance Company.[3] Mot. at 17. The Plaintiffs and Settling Defendants shall be referred to collectively as "Movants" herein. The Court issued a Preliminary Order of Certification of a Settlement Class on December 15, 2008 (Rec. Doc. 16721). Counsel James Irvin on behalf of

---

[3]For the purposes of this motion, the Orleans Levee District and its board of commissioners may be referred to as "OLD", the East Jefferson Levee District and its board of commissioners may be referred to as "EJLD", and the Lake Borgne Basin Levee District and its board of commissioners may be referred to as "LBBLD."

3

one group of objecting plaintiffs[4] ("Sims Objectors") filed objections to the preliminary

certification. (Rec. Doc. 18134, 18138). Likewise, Counsel Jennifer Rosenbaum and Michael

Kirkpatrick filed objections on behalf of objecting plaintiffs Mary Brinkmeyer, Michelle

LeBlanc, and Thomas Stuart ("Brinkmeyer Objectors") (Rec. Doc. 18179). On March 31, 2009,

Plaintiffs and Settling Defendants filed a memorandum in support of their request for

certification of the settlement class (Rec. Doc. 18356).

The Movants propose a class area of four parishes: Orleans, Jefferson, Plaquemines, and

St. Bernard. Mot. at 9. The putative class includes "all Persons (a) who at the time of Hurricane

Katrina and/or Hurricane Rita (i) were located, present or residing in the [class area], or (ii)

owned, leased, possessed, used or otherwise had any interest in homes, places of business or

other immovable or movable property in the [class area], and (b) who incurred any losses,

damages and/or injuries arising from . . . Hurricane Katrina and/or Hurricane Rita and any

alleged Levee Failures and/or waters that originated from . . . the Levees under the authority

and/or control of all or any of the Levee Defendants." Mot. at 4. The Movants also propose

three subclasses grouped with regards to which levee defendant caused their damage. Subclass 1

corresponds to Lake Borgne Basin Levee District, Subclass 2 concerns East Jefferson Levee

District, and Subclass 3 applies to Orleans Levee District. A class plaintiff can be a member of

more than one subclass. Mot. at 4.

This Court held a class certification and settlement fairness hearing on April 2, 2009.

---

[4]The following cases, consolidated within *In re Katrina Canal Breaches*, are included within the Sims Objectors: No. 06-5116 (*Sims*), No. 06-5118 (*Richard*), No. 06-5127 (*DePass*), No. 06-5128 (*Adams*), No. 06-5134 (*Christophe*), No. 06-5137 (*Williams*), No. 06-5131 (*Bourgeois*), No. 06-5142 (*Augustine*), No. 06-5132 (*Ferdinand*), and No. 06-5140 (*Porter*).

The Court received approximately ninety exhibits and heard from five witnesses, three of which were admitted as experts. (Rec. Doc. 18495). Eight notices of intent to appear at the hearing were sent by parties at interest to the settlement; the Court provided all such parties an opportunity to be heard. (Rec. Doc. 18532). The Court further received 185 submissions for individual class members, expressing both support and disapproval of the proposed settlement. The Brinkmeyer Objectors filed a post-hearing brief in opposition to the class certification and settlement (Rec. Doc. 18745), as did the Sims Objectors (Rec. Doc. 18779). The Plaintiffs and Settling Defendants filed a joint supplemental memorandum in support of their settlement plan (Rec. Doc. 18910), and they submitted Proposed Findings of Fact and Conclusions of Law (Rec. Doc. 19072, 19133). The Sims Objectors filed objections to the Proposed Findings of Fact and Conclusions of Law (Rec. Doc. 19180), and the Brinkmeyer Objectors also filed objections (Rec. Doc. 19182). Plaintiffs' and Settling Defendants filed a brief reply (Rec. Doc. 19184).

## II. ANALYSIS

The Court has before it a proposed class settlement. Rule 23(e) provides that a class action may be "settled, voluntarily dismissed, or compromised" only with the court's approval and after notice of the settlement or compromise has be given to the proposed class. Fed. R. Civ. P. 23(e). The Supreme Court has explained that Rule 23(e) is "an additional requirement, not a superseding direction," thus a district court must also determine whether the class fulfills Rule 23(a) and (b). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621, 117 S.Ct. 2231, 2248, 138 L.Ed.2d 689 (1997). "[T]he party seeking certification that bears the burden of establishing that the requirements of Rule 23 have been met." *Gene & Gene LLC v. Biopay LLC*, 541 F.3d 318,

325 (5th Cir. 2008) (citation omitted).  This Court is mindful that it must conduct "a 'rigorous analysis of the Rule 23 prerequisites' before certifying a class."  *O'Sullivan v. Countrywide Home Loans*, 319 F.3d 732, 738 (5th Cir. 2003) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)).

Here, the Proponents seek certification of a limited fund settlement class under Rule 23(b)(1)(B).  (*See* Rec. Doc. 18910).  Therefore, this Court will review the propriety of this proposed class settlement under Rule 23(a), (b)(1)(B), and (e).

## A.  Rule 23(a) Requirements

Rule 23(a) sets forth the prerequisites for all class actions.  It provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if":

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These "baseline" requirements for class certification are more familiarly referred to as "numerosity, commonality, typicality, and adequacy of representation."  *Anderson v. U.S. Dep't of Housing & Urban Dev.*, 554 F.3d 525, 528 (5th Cir. 2008).

To fulfill numerosity, the Movants must establish that joinder is impracticable through "some evidence or reasonable estimate of the number of purported class members."  *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000); *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 459 (E.D. La. 2006) (Fallon, J.).  Movants presented the testimony Gregory Rigamer, an

6

expert in demographics and urban planning. He testified that the U.S. Census Bureau estimated that the class area, defined as Jefferson, Orleans, St. Bernard, and Plaquemines parishes, included 999,349 residents and property owners in July 2005, nearly two months before Hurricane Katrina. Tr. at 82. The class area also included 440,269 residential properties. He further testified that Dunn & Bradstreet reported that the class area included 94,564 businesses as of August 1, 2005, and the Bureau of Labor Statistics estimated that 495,689 people were employed in the class area. Tr. at 83. The Movants have provided adequate evidence to prove that the class clearly fulfills the numerosity requirement. *See James v. City of Dallas, Tex.*, 254 F.3d 551, 570 (5th Cir. 2001) (finding district court did not abuse its discretion in certifying class of 580 homeowners).

The second Rule 23(a) requirement, commonality, necessitates that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[C]ommonality is not demanding and is met 'where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.'" *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (quoting *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 426 (5th Cir. 1997)). The members of this class were impacted by the failure of levees during Hurricane Katrina and/or Rita. Moreover, the class shares the common legal issues of whether the levee districts were negligent in maintenance and operation of the levees within their control, and whether this negligence caused the failure of the levees within each district's control. The Court finds these issues adequate to fulfill the commonality requirement. *See Mullen*, 186 F.3d at 625 (holding that common issues regarding negligence of employer and seaworthiness of vessel that allegedly caused class members' damage was adequate to establish commonality).

7

Rule 23(a) further requires typicality: the claims or defenses of the representative parties must be "typical of the claims or defenses of the class."  Rule 23(a)(3).  "Like commonality, the test for typicality is not demanding.  It focuses on the similarity between the named plaintiff's legal and remedial theories and the theories of those whom they purport to represent."  *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001) (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999)).  "[T]he critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James*, 254 F.3d at 571 (quoting 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.24[4] (3d ed. 2000)).

Movants here aver that their claims are typical because they were all harmed due to flooding during Hurricane Katrina or Rita.  In *In re Vioxx Products Liability Litigation*, 239 F.R.D. 450, 460 (E.D. La. 2006), Judge Fallon found that the putative class representatives' claims were not typical of the class.  *In re Vioxx* concerned a class action against Merck & Co., Inc. by persons allegedly harmed by taking the pain reliever and anti-inflammatory drug Vioxx. In finding typicality to be lacking, Judge Fallon reasoned, "In this case, both the proposed class representatives and the putative class members assert various products liability claims against Merck under theories of negligence, strict liability, failure to warn, and defective design."  *Id.* at 460.  Moreover, he noted that the proposed nationwide class would be governed by different substantive laws depending on the jurisdiction in which the plaintiffs' claims arose.  *Id.* at 460. Here, in contrast, the putative class representatives reside within four neighboring parishes in Louisiana, and they were all harmed by the flooding allegedly caused by the levee districts'

defalcations during Hurricane Katrina.  While the nature and quantum of damages may vary, the claims of the representatives do not deviate from those of the class members.  *See Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) ("But the test is whether [the representative's] *claims* are typical, not whether [the representative] is.") (emphasis in original).  All of them would be based upon a negligence theory, which would be established by the same facts for each subclass.  Because the representatives' claims share the same "essential characteristics" as those of the putative class, typicality is satisfied.

The fourth requirement of Rule 23(a) is adequacy of representation: whether the representative parties "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Rule 23(a)'s adequacy requirement encompasses class representatives, their counsel, and the relationship between the two."  *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002) (quoting *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001)).  The Fifth Circuit has explained that "[t]he adequacy requirement mandates an inquiry into [1] the zeal and competence of the representative[s'] counsel and ... [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees[.]"  *Berger*, 257 F.3d at 479 (citing *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982)).

Here, there appears no dispute as to the adequacy of the class counsel to represent the Plaintiff class in this case.[5]  As to the class representatives, they all aver that they were injured by flood during Hurricane Katrina and/or Rita, and they assert that they have received no

---

[5]The Court notes that the Objectors have raised a dispute as to whether the settlement should include a payment "enhancement" for the attorneys.  This issue appears to concern the fairness of the settlement, and it will be addressed in that section *infra*.

9

additional compensation from their attorneys or from any other party in prosecuting this case or confecting the settlement.[6]  The Sims Objectors assert that the named Plaintiffs are not adequate representatives because, while they may live in areas that were affected by Hurricane Katrina, they do not live in areas that were highly impacted by Hurricane Rita.  The Court finds this distinction, if true, is of little relevance.  The level of the impact is not important here as long as the named Plaintiffs suffered damage during these storms that would result in their "willingness and ability" to seek recompense from the Levee Districts.  Here, it seems clear that these named Plaintiffs all have suffered severe damage during the storms and as a result of the Levee Districts' alleged negligence that they would indeed have the incentive to litigate zealously on behalf of the class.  The Court notes that "[t]he adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members."  *In re Vioxx*, 239 F.R.D. at 460 (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996)).  The Court's conclusion that the named Plaintiffs are adequate representatives is bolstered by its finding that their claims are typical of the class.  *See id.* (finding plaintiffs to be inadequate representatives where they also did not have claims typical of the class).  Therefore, the adequacy of representation element is satisfied.

## B.  Rule 23(b)(1)(B) Requirements

In addition to fulfilling the requirements of Rule 23(a), a class action must also satisfy the

---

[6]The parties submitted declarations and depositions into the record by stipulation.  Exs. 74-77; 82-86.  The class representatives are Donna Augustine, Thurman R. Kaiser, Jeannine Armstrong, and Kenneth Armstrong.

prerequisites of Rule 23(b)(1), (b)(2), or (b)(3).  *Gene & Gene LLC v. Biopay LLC*, 541 F.3d

318, 325 (5th Cir. 2008).  Movants specifically seek to certify the class under Rule 23(b)(1)(B),

which permits a class action to be maintained if "prosecuting separate actions by or against

individual class members would create a risk of . . . adjudications with respect to individual class

members that, as a practical matter, would be dispositive of the interests of the other members

not parties to the individual adjudications or would substantially impair or impede their ability to

protect their interests."  Fed. R. Civ. P. 23(b)(1)(B).

        The Movants here seek to certify a "limited fund" class.  To do so, they must fulfill the

stringent standards for class certification of limited fund classes set forth in *Ortiz v. Fibreboard*

*Corp.*, 527 U.S. 815, 841, 119 S.Ct. 2295, 2312, 144 L.Ed.2d 715 (1999).  In *Ortiz*, the Supreme

Court set forth a "narrow view" defined limited fund classes as those involving "a 'fund' with a

definitely ascertained limit, all of which would be distributed to satisfy all those with liquidated

claims based on a common theory of liability, by an equitable, pro rata distribution."  *Id.* at 841,

119 S.Ct. at 2312; *Baker v. Wash. Mut. Fin. Group*, 193 Fed. Appx. 294 (5th Cir. 2006)

(unpublished opinion) (citing *Ortiz* and describing limited fund class as that where "non-class

members seeking damages would likely deplete the fund and deprive class members of any

recovery.").  The case concerned an agreement by a group of named plaintiffs in a class action

seeking compensation for injuries caused by asbestos products made by defendant Fibreboard.

The settlement was a limited fund settlement under Rule 23(b)(1), in which parties agreed upon a

fund of $1.535 billion to settle all past and future claims against Fibreboard.  Fibreboard would

contribute $500,000 to the fund, with the remainder being contributed by its insurers.  *Ortiz*, 527

U.S. at 824-25, 119 S.Ct.at 2304.

In reversing the Fifth Circuit, the Supreme Court reviewed the "historical antecedents" of Rule 23 along with the Advisory Committee's commentary on the Rule, and it concluded that a limited construction of Rule 23(b)(1)(B) "minimizes potential conflict with the Rules Enabling Act, and avoids serious constitutional concerns . . . especially where a case seeks to resolve future liability in a settlement-only action." *Id.* at 842, 119 S.Ct. at 2313. The Court found that the district court had failed to make findings of fact regarding the limit of the available funds and the total claims that would be satisfied by the fund. It particularly criticized the district court for relying on "the figures agreed upon by the parties in defining the limits of the fund and demonstrating its inadequacy." *Id.* at 849, 119 S.Ct. at 2316. The *Ortiz* Court also faulted the district court for failing to devise a subclass of future claimants with separate counsel because the "potential for gigantic fees" created an incentive for attorneys for the present claimants to settle the action to the possible detriment of future claimants. *Id.* at 852, 119 S.Ct. at 2318. Based upon its historical analysis of Rule 23, the Court set forth three "characteristics" that are "presumptively necessary, and not merely sufficient" in order to certify a limited fund class under Rule 23(b)(1)(B). 527 U.S. at 841-42, 119 S.Ct. at 2312. These characteristics are (1) the inadequacy of the fund to satisfy all claims, (2) the dedication of the fund to the overwhelming claims, and (3) equitable treatment of the claimants. *Id.* at 838-40, 119 S.Ct. at 2311.

Prior to evaluating whether this proposed class satisfies the three *Ortiz* requirements, this Court notes that the Supreme Court in *Ortiz* cast significant speculation on the use of limited fund class settlements in the context of mass tort litigation, such as the asbestos litigation in *Ortiz*. The Court stated that "the Advisory Committee did not contemplate that the mandatory class action codified in subdivision (b)(1)(B) would be used to aggregate unliquidated tort claims

12

on a limited fund rationale," and that "the Rules Enabling Act and the general doctrine of

constitutional avoidance would jointly sound a warning of the serious constitutional concerns

that come with any attempt to aggregate individual tort claims on a limited fund rationale."

*Id.* at 844-45, 119 S.Ct. at 2313-14.  It further explained that "a mandatory-settlement only class

action with legal issues and future claimants compromises their Seventh Amendment rights

without their consent.""  *Id.* at 846, 119 S.Ct. at 2314.  The *Ortiz* Court, however, explicitly

refrained from deciding "the ultimate question whether Rule 23(b)(1)(B) may ever be used to

aggregate individual tort claims."  *Id.* at 844, 119 S.Ct. at 2314.  Instead, the Court explained that

such a class might be certified if the three *Ortiz* requirements are fulfilled:

> Assuming, *arguendo,* that a mandatory, limited fund rationale could under some
> circumstances be applied to a settlement class of tort claimants, it would be
> essential that the fund be shown to be limited independently of the agreement of
> the parties to the action, and equally essential under Rules 23(a) and (b)(1)(B)
> that the class include all those with claims unsatisfied at the time of the settlement
> negotiations, with intraclass conflicts addressed by recognizing independently
> represented subclasses.

*Id.* at 864, 119 S.Ct. at 2323.  This Court believes that the presently proposed limited fund

settlement satisfies these requirements.


### 1. Inadequacy of the Fund to Satisfy All Claims

First, *Ortiz* noted that the "most distinctive characteristic" of a limited fund class "is that

the totals of the aggregated liquidated claims and the fund available for satisfying them, set

definitely at their maximums, demonstrate the inadequacy of the fund to pay all of the claims."

*Id.* at 838, 119 S.Ct. at 2311.  The Court emphasized that the "concept driving this type of suit

was insufficiency, which alone justified the limit on an early feast to avoid a later famine."  *Id.*,

119 S.Ct. at 2311.  Where parties seek to certify a limited fund class for the purposes of

settlement, as here, the Supreme Court has cautioned that the parties "must present not only their

agreement, but evidence on which the district court may ascertain the limit and the insufficiency

of the fund, with support in findings of fact following a proceeding in which the evidence is

subject to challenge."  *Id.* at 849, 119 S.Ct. at 2316.  The *Ortiz* Court refrained from "articulating

the standard to evaluate whether, in fact, a fund is limited, in cases involving mass torts."  *Id.* at

850 n.26, 119 S.Ct. at 2316.  Federal courts of appeal have differed in this standard, ranging

from requiring a finding that "separate punitive damage claims necessarily will affect later

claims," to requiring only a "substantial probability – that is less than a preponderance but more

than a mere possibility" that the earlier claimants will deplete the fund.  *Compare In re Northern*

*Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 852 (9th Cir. 1982) (applying

"necessarily will affect" standard), *with In re "Agent Orange" Prod. Liab. Litig.*, 100 F.R.D.

718, 726 (E.D.N.Y. 1983), *aff'd* 818 F.2d 145 (2d Cir. 1987) (using "substantial probability"

standard).  This Court makes no decision as to the proper standard, but instead finds that even

using the highest standard, this case qualifies as a limited fund.

This Court held a class action settlement fairness hearing in which it received evidence

regarding the total aggregate value of claims against the Levee Districts and the availability of

funds to meet those claims.  As to the aggregate value of claims, the Movants presented the

testimony of Gregory Rigamer, an expert in the fields of urban studies, demographic analysis

and forecasting, and the assessment of economic damage to communities after natural disasters.

Tr. at 78.  He testified that, based upon U.S. Census Bureau data, a total of 999,349 people

resided in the class area of Jefferson, Orleans, St. Bernard, and Plaquemines parishes as of July

1, 2005. Tr. at 82. There were 440,269 residential structures in the class area, valued at a total of $47 billion, not including land value. Tr. at 82. Mr. Rigamer testified that 94,564 businesses operated in the class area according to Dunn & Bradstreet, and the U.S. Bureau of Labor Statistics reported that the residential base employment in the class area totaled 495,689 people. Tr. at 83.

After the storm, the U.S. Census reported that 251,000 residents were still displaced as of July 1, 2006, about 25% of the pre-storm population. Tr. at 84. Approximately 164,000 housing units in the class area reported "major or severe damage," equaling 37% of the entire housing stock and amounting to $20 billion in damage.[7] Tr. at 84. Based upon a review of NFIP claims data, Rigamer estimated that the class area suffered $5 billion in damage to personal property within housing units, excluding automobiles. Tr. at 87. The Louisiana Department of Insurance reported over $7.8 billion in commercial property-related claims in the class area. Tr. at 88. Finally, again using Bureau of Labor Statistics data, Rigamer estimated that the class area has lost 96,806 jobs, resulting in a loss of $11 billion in wages.[8]

Having established the total property and income loss in the class area (excluding

---

[7]This assessment was based upon data from the U.S. Department of Housing and Urban Development, Office of Policy and Development and Research, "Current Housing Unit Damage Estimates: Hurricanes Katrina, Rita, and Wilma," Feb. 12, 2006, *at* http://www.huduser.org/publications/pdf/GulfCoast_Hsngdmgest.pdf. Rigamer noted that reported claims filed for payment from the Road Home Program, "which are theoretically uninsured losses, and payments from [the National Flood Insurance Program], those alone total $20 billion." Tr. at 86.

[8]Rigamer used data estimating the average weekly wage in the class area to be approximately $662. The estimated loss occurred over the course of 42 months, commencing from June 2005, two months prior to the storm. Presuming this estimate must be discounted for including loss in two pre-storm months, this Court is satisfied that the vast majority of the loss is attributable to post-Katrina job losses. Bureau of Labor Statistics data is available *at* http://www.bls.gov/data/#employment.

personal injury and wrongful death claims), Mr. Rigamer narrowed his estimate to include only

damage caused by the breach of the levees under the control of the Levee District Defendants.

Using the report by the Interagency Performance Evaluation Task Force, published by the U.S.

Army Corps of Engineers (hereinafter "IPET Report"),[9] Rigamer estimated the level of flood

levels caused by levee breaches within the class area.  He utilized a model that accounted for

terrain to estimate the capacity of various areas to hold water.  Tr. at 90.  Rigamer's model then

incorporated the location of levee breaches, the amount of water from each breach, and

accounted for rainfall and wind damage.  Tr. at 90.  Rigamer compared his estimates against the

U.S. Army Corps of Engineers' and National Oceanic and Atmospheric Administration's

LIDAR (Light Detection and Ranging) imagery as a quality control check.  The Corps and

NOAA used LIDAR after Katrina in order to directly assess the depths of flooding in the New

Orleans area, with flooding levels measured by areas of five meters by five meters.[10]  Having

accounted for the levels of flooding across the class area, Rigamer then assessed the damage

caused by water source.  He then parceled out and combined the flooding damage caused within

each subclass by levee breaches and overtopping.  Rigamer's report provides the best

explanation of his analysis:

> Damages to residential properties have been calculated by block using depth of
> flood and damage factors.  Damages to commercial facilities, personal property,
> and lost wages have been calculated on a pro rata basis reflecting the population

---

[9]U.S. Army Corps of Engineers, Performance Evaluation of the New Orleans and
Southeast Louisiana Hurricane Protection System, Draft Final Report of the Interagency
Performance Evaluation Task Force, June 1, 2006, *at*
http://www.asce.org/files/pdf/executivesummary_v20i.pdf.

[10]Rigamer drew this data from the Louisiana State University GIS Clearinghouse
Cooperative, *available at* http://katrina.lsu.edu/products_reports_download.asp (last visited Aug.
27, 2009).

> impacted within the subject area as it relates to the population of the Class Area (Jefferson, Orleans, St. Bernard, and Plaquemines Parishes). The proration of damages was used only where block level information was not available. In that area impacted by flooding within the Class Area, there was an estimated $26,770,018,432 of quantifiable damages. From this, a deduction was made for that damage attributable to wind, that flooding caused by the accumulation of rain, and the value of Road Home grants received within the subject area. The "net result" is offered as the extent of liability directly related to the breaching and overtopping of the subject levees and flood control facilities.

Rigamer Report at 26 (Ex. 26). Rigamer concluded that Subclass 1 sustained $2,125,539,401 in total property damage; Subclass 2 received $11,858,540,385 in total property damage; and Subclass 3 sustained $7,171,056,182 in total property damage. Rigamer Report at 26; Tr. at 93. The Court finds Mr. Rigamer's testimony to be credible, and further finds that he has estimated the total property damage suffered by each subclass to highest level of accuracy possible prior to actual adjudication of the claims. The Court notes that Mr. Rigamer's estimate does not account for personal injury or wrongful death/survival claims. Tr. at 97-98.

The second step in determining whether this fund is limited is determining whether the Settling Defendants' available funds can satisfy the aggregated claims. The Movants assert that the only available funds for settlement are derived from insurance policies held by the Levee Districts with St. Paul's. The Movants presented affidavits of officials from the Levee Districts that verify the existence of insurance policies procured by each district.[11] Moreover, the Court received the expert testimony of Pete Ligeros, an insurance and risk management consultant, who concluded that a total of $17-19 million is available from the Levee Districts' insurance policies to satisfy any judgment, plus interest. Tr. at 136. Mr. Ligeros was originally contracted by the Plaintiffs Litigation Committee to determine what insurance policies would be available

---

[11]These affidavits were received as exhibits by the Court with no objection being lodged by any party present at the class certification hearing.

in order to satisfy judgments against the various public and private defendants in the *In re Katrina* litigation.  Tr. at 121.  As this Court dismissed the private defendants and Corps of Engineers, Ligeros focused on the policies of the remaining public defendants.[12]  He reviewed all policies obtained by the Levee Districts and determined that 51 policies applied during Hurricanes Katrina and Rita.[13]  He narrowed this group down to the third-party liability policies[14] that would be available to satisfy any tort claims.  Mr. Ligeros concluded that the East Jefferson Levee District's policy limit is $5 million,[15] and the Lake Borgne Basin Levee District's policy limit is $2 million.[16]  With regards to the Orleans Levee District's policy limit, Ligeros' review determined that the limit would be either $10 million or $12 million.  This $2 million difference arises from a dispute between the Movants regarding OLD's premises liability.  If OLD's levee

---

[12]Ligeros noted during his testimony that it was possible for policies held by private entities (such as contractors Boh Brothers or Washington Group International) to require them to include the Levee Districts as additional insureds.  He explained that it is "standard language by insurers" to require a contract between the parties if another party is to be added as an additional insured.  Ligeros stated that he sought any and all such contracts from the Defendants, but none existed.  Tr. at 127.  Mr. Ligeros, acting on behalf of the Plaintiffs, had a clear incentive to locate as many applicable contracts as possible, and therefore the Court credits his expert opinion that no other contracts exist providing for additional insured status to the Levee Districts.

[13]Ligeros concluded that those policies that expired prior to the hurricanes or that were issued after the hurricanes would not apply to these claims.

[14]This Court focused on third-party insurance policies, i.e., those policies designed to cover injuries or damage suffered by third parties and caused by the Levee Districts.  A first-party policy would cover damage suffered by the Levee Districts themselves.  Tr. at 123.

[15]Ligeros Report (Ex. 69) at 5; Travelers Policy #GP06301698.  The EJLD limit comprises of a maximum of $1 million from the Public Entity General Liability Protection policy (TRV-LDE-00069 - 103); and a maximum of $4 million from the Umbrella Excess Liability Protection Coverage policy (TRV-LDE-00184 - 224).

[16]Ligeros Report (Ex. 69) at 4; Travelers Policy #GP09312536.  The LBBLD limit comprises of a maximum of $2 million for the Public Entity General Liability Protection policy (TRV-LB-00029 - 063).

18

system were deemed to be three "premises", then the limit on premises liability would be $3 million for an overall liability limit of $12 million; if the levee system were deemed one "premises," then the premises limit would be $1 million for a total limit of $10 million.[17]

      This Court has made an independent review of the insurance policies, and it determines that Mr. Ligeros's determination is correct. "Under Louisiana law, '[a]n insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007). "Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." La. Rev. Stat. § 22:881 (2009). The Court finds that only third-party insurance contracts in effect during Hurricanes Katrina and Rita would apply to the damage caused to third parties during those storms. For all third-party policies that are applicable in this case, the settlement prescribes that the maximum amount recoverable for each occurrence and in the aggregate shall be used. As to the dispute among the parties, this Court resolved the issue in an order issued June 26, 2009, holding that OLD's levee system constitutes one "premises" under the terms of the policy. Rec. Doc. 19070. Therefore, OLD's premises liability is $1,000,000 instead of $3,000,000, and OLD's total liability limit is $10,000,000. The total settlement fund available to the Plaintiffs in this case is $17 million, plus interest.

      The Court further heard the testimony of Timothy P. Doody, president of the Southeast

---

[17]Ligeros Report (Ex. 69) at 6; Travelers Policy #GP06300925. The OLD limit includes a maximum of $1 million or $3 million from the Public Entity General Liability Protection Coverage policy (TRV-OLD-00034 - 059), and a maximum of $9 million for the Public Sector Services Umbrella Excess Liability Protection Coverage policy (TRV-OLD-00133 - 161).

Louisiana Flood Protection Authority-East ("SLFPA-East"), the umbrella governmental agency

that oversees the Levee Districts.  He testified concerning the available assets compared with the

liabilities and future financial commitments of the Levee Districts.  He explained that the Levee

Districts have been charged by the Corps with 35% of the cost of operation and maintenance of

levee structures.  These structures will cost at total of $800,000 per year to maintain for their

estimated 50-year lifespan.  Tr. at 110.  The Levee Districts also will be required to acquire land

for planned levee projects, and such acquisitions will cost approximately $200 million to $300

million.  Tr. at 110.  The Levee Districts principally rely upon ad valorem taxes for their

funding.  The amount of ad valorem taxes is directly dependent upon the available tax base,

which was "decimated" by the hurricanes.  Tr. at 111.  Accordingly, Mr. Doody estimates that

the Levee Districts under the SLFPA-East will not have the assets necessary to meet their

present and future obligations.  Tr. at 110.

The Sims Objectors and Brinkmeyer Objectors assert that this fund is not so limited

because the Levee Districts have substantial assets that also can be used to satisfy the judgment.

The Court finds that the Objectors are incorrect for two reasons.  First, the Sims Objectors assert

that the Levee Districts have extensive resources totaling over $132 million.  Rec. Doc. 18779 at

12.  However, the Orleans Levee District's reserves appear to include only $5.2 million as of

June 2007, and $5 million account was reserved for "Debt Service," not for payments of

judgments. Ex. 88; Tr. at 112.  Moreover, as explained by Mr. Doody of SLFPA-East, the Levee

Districts principally gain funding from ad valorem taxes, which have been significantly reduced

since the hurricanes.  Any land assets that may have previously produced revenue have been

transferred to the Division of Administration.  Tr. at 113.  Thus, the Levee Districts have limited

assets available, and these assets will likely be almost entirely spent in maintaining levees and other flood control projects.

Second, and more fundamental to this Court's conclusion, even if the Levee Districts had extensive assets, they could not be seized to satisfy this judgment.  The Objectors rely on *Ortiz*, where the Supreme Court criticized the limited fund settlement in that case because the settling defendant "was allowed to retain virtually its entire net worth," thus deviating from limited fund precedents.  *Ortiz*, 527 U.S. 859, 119 S.Ct. at 2321.  However, in contrast to *Ortiz*, the present case concerns a public entity that enjoys legal protections from seizure.  Under Louisiana law, the Levee Districts are "political subdivision[s]" of the state.  La. Rev. Stat. § 38:281(6).[18] While the Louisiana Constitution states that a political subdivisions shall not be immune from "suit and liability" for "injury to person or property," La. Const. art. XII, § 10(A), the same section further provides:

> Notwithstanding Paragraph (A) or (B) or any other provision of this constitution, the legislature by law may limit or provide for the extent of liability of the state, a state agency, or a political subdivision in all cases, including the circumstances giving rise to liability and the kinds and amounts of recoverable damages. It shall provide a procedure for suits against the state, a state agency, or a political subdivision and provide for the effect of a judgment, but no public property or public funds shall be subject to seizure. The legislature may provide that such limitations, procedures, and effects of judgments shall be applicable to existing as well as future claims. No judgment against the state, a state agency, or a political subdivision shall be exigible, payable, or paid except from funds appropriated therefor by the legislature or by the political subdivision against which the judgment is rendered.

La. Const. art. 12, § 10(C).  The Louisiana legislature promulgated the following to further

---

[18]The relevant Code provision gives the following definition: "'Levee district' means a political subdivision of this state organized for the purpose and charged with the duty of constructing and maintaining levees, and all other things incidental thereto within its territorial limits."  La. Rev. Stat. § 38:281(6).

Article XII's provisions: "Any judgment rendered in any suit filed against the state, a state agency, or a political subdivision . . . shall be exigible, payable, and paid only . . . out of funds appropriated for that purpose by the named political subdivision, if the suit was filed against a political subdivision." La. Rev. Stat. § 13:5109(2). Thus, while the Levee Districts are not immune from suit, the Louisiana Constitution clearly proscribes any judgment creditor from seizing a Levee District's assets to satisfy that judgment, unless the Levee District has specifically appropriated such funds.

This Court has no power to circumvent the state law requirements for seizing a political subdivision's assets under a state law cause of action. Federal Rule of Civil Procedure 69(a) prescribes the procedure for executing money judgments, stating specifically, "The procedure on execution . . . must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed. R. Civ. P. 69(a); *see Star Ins. v. Risk Marketing Group Inc*., 561 F.3d 656, 661 (7th Cir. 2009) ("Rule 69 conforms collection proceedings to state law.") (citation omitted). In following Rule 69, the Fifth Circuit has refused to execute a money judgment against a Louisiana political subdivision where the execution is done according to state law.[19] Here, the cause of action is in tort, and it does not implicate any federal causes of

---

[19]*Specialty Healthcare Mgmt., Inc. v. St. Mary Parish Hosp.*, 220 F.3d 650, 653 (5th Cir. 2000); *see City of New Orleans v. Mun. Admin. Servs., Inc.*, Civ. A. No. 02-0130, 2004 WL 2496202, at *3 (E.D. La. Nov. 5, 2004) (Africk, J.) (holding that, in diversity action, money judgment against city must be executed under state law according to Rule 69(a)); *Bruno v. City of New Orleans*, 724 F. Supp. 1222, 1224 (E.D. La. 1989) (Collins, J.) (holding that writ of execution against city property would not be permitted under Louisiana law, and therefore not permitted under Rule 69(a)).

In *Specialty Healthcare*, the Fifth Circuit explained that the arbitral award against the parish hospital was confirmed under the Federal Arbitration Act, 9 U.S.C. § 9 ("FAA"). While the FAA is certainly federal, it provides that a confirmed arbitral award "may be enforced as if it had been rendered in an action in the court in which it is entered." *Specialty Healthcare*, 220 F.3d at 653 (quoting 9 U.S.C. § 13). Therefore, the Fifth Circuit concluded that Rule 69(a) "and

action or superseding federal interests.[20]  Therefore, this Court must enforce any judgment against the Levee Districts according to state law, which prohibits the seizure of any political subdivision assets to satisfy a judgment unless funds have been specifically appropriated for such.[21]  *See Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 814 So.2d 648, 654 (La. Ct. App. 4th Cir. 2002) ("Louisiana courts have repeatedly held that judgment creditors cannot mandamus political subdivisions to appropriate funds for payment of a judgment rendered against the respective political subdivisions.").  Accordingly, consistent with Fifth Circuit precedent and Louisiana law, this Court does not have the authority to seize any assets of the Levee Districts to satisfy a judgment under state law.

Objectors assert that the Levee Districts could appropriate funds to pay for any judgment.

---

its incorporation of state procedure remains the governing rule."  *Id.*

[20]The Fifth Circuit in *Specialty Healthcare* noted that "federal interests sometimes trump the substances of a state's anti-seizure provisions by means other than Rule 69(a)." *Specialty Healthcare*, 220 F.3d at 653.  By way of example, the court explained that in civil rights cases "it is within the scope of federal power to command state officials to pay judgments out of state funds, such as judgments for attorney fees under 42 U.S.C. § 1983, despite the existence of state anti-seizure provisions, even though a writ of execution is not issued."  *Id.*  This superseding interest is the enforcement of the Fourteenth Amendment.  *Id.* at 653-54.  As stated in the text, there is no such allegation of superseding federal interests or statutory authority here.  *See Star Ins.*, 561 F.3d at 661 ("[B]ecause there appears to be no federal statute on this issue, the district court was correct in turning to state law in the post-judgment proceeding."); *Freeman Decorating Co. v. Encuentro Las Americas Trade Corp.*, Civ. A. No. 02-2103, 2008 WL 4922072, at *1-3 (E.D. La. Nov. 12, 2008) (Berrigan, J.) (applying "sufficient federal interest" test and refusing to execute judgment against City of New Orleans for state law breach of contract claim).

[21]Under Louisiana law, a court may issue a writ of mandamus to a Levee District to require them to levy a tax in order to raise funds to pay for expropriation or appropriation of land.  La. Const. art. VI, § 42(A).  However, this section applies only where a Levee District has "used or destroyed" land or improvements for the purposes of "levees or levee drainage."  *Id.*  A court may not issue a writ of mandamus to levy taxes for the purpose of raising funds to may a tort judgment.  *Kimble v. Giordano*, 667 So.2d 542, 543 (La. 1996).  Therefore, this Court may not order the Levee Districts to levy a tax to pay any prospective judgment in this case.

However, this Court finds this assertion to be based solely upon speculation. Mr. Doody of SLFPA-East testified that, in light of the sizeable financial burdens already placed upon the Levee Districts, it would be highly unlikely that they would appropriate additional funds for a judgment. Tr. at 112. The Objectors aver that the Levee Districts could rely on the Louisiana legislature to appropriate funds for a judgment. However, Fifth Circuit has held that Levee Districts are not "arm[s] of the state," and thus not entitled to Eleventh Amendment immunity. *Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 692 (5th Cir. 2002). The *Vogt* court's conclusion was based significantly on its finding that any judgments would not be paid from the state treasury; instead, they would be paid only from the Levee District's own funding. *Id.* at 693 (noting that this factor is given "greatest weight because one of the principal purposes of the Eleventh Amendment is to protect state treasuries") (citation omitted). The consequence of *Vogt* is clear: the Levee Districts certainly may be sued in federal court, but the Louisiana legislature has no duty to pay any judgments. *Id.* ("The levee board acknowledges that the state has no duty to pay a judgment against the levee district."). The Objectors therefore are relying on pure speculation regarding whether the legislature will satisfy any judgment, particularly a judgment that is potentially billions of dollars. As noted in *Vogt*, the Levee Districts could "go to the legislature and request that state money be appropriated to pay the judgment," but the Fifth Circuit "has consistently dismissed such arguments as too speculative for Eleventh Amendment analysis." *Id.* In these analogous circumstances, this Court likewise finds the ability of the Levee Districts or the Objectors to seek satisfaction of a judgment from the legislature to be too speculative. This Court finds it more appropriate to rely upon actually available funds instead of the mere possibility that the Levee Districts or the legislature would choose to pay a judgment.

The relevant case law suggests that the present settlement indeed represents a limited fund. In the Fifth Circuit's only consideration of *Ortiz*, the plaintiffs sought to certify a class action brought on behalf of Mississippi customers who took out loans and bought insurance from Washington Mutual. *Baker v. Washington Mutual Finance Group, LLC*, 193 Fed. Appx. 294 (5th Cir. 2006) (unpublished decision). They alleged that the company "used fraudulent and misleading disclosures" in selling insurance products, including failing to disclose charges and commissions, charging unauthorized fees, and engaging in "insurance packing" and "loan flipping." *Id.* at 296. The putative class representative filed the class action on March 24, 2004, and then moved for preliminary approval of a class settlement two days later. The settlement did not provide for injunctive or declaratory relief, but instead it sought to "resolve the claims by establishing a $7 million fund for class members who file claim forms." *Id.* Half the fund would be designated as compensatory damages, the other half as punitive damages. While the agreement permitted putative class members to opt out of the settlement for compensatory damages, it did not permit opting out of the punitive damages portion. After conducting a fairness hearing, the district court certified the mandatory punitive damages class under Rule 23(b)(1)(B).

In affirming the class certification, the Fifth Circuit specifically focused on the district court's determination that the $3.5 million punitive damages fund was the limited fund. The appellate court noted that Washington Mutual had already ceased operations in Mississippi, and thus would not increase in net worth in the near future. The defendant also had an outstanding $56 million award pending against it that had been upheld by the state intermediate appellate court. The Fifth Circuit emphasized the district court's finding that if the class was not certified,

"tens of thousands of individual lawsuits would ensue" that would cost a "breathtaking" amount to defend. *Id.* at 297-98. Noting that Washington Mutual's total net value was between $50 and $70 million, the Fifth Circuit found the $3.5 million settlement not to be an abuse of discretion in light of the claims potentially pending against it. *Id.* at 298.

In *In re Telectronics Pacing Sys., Inc.*, 221 F.3d 870 (6th Cir. 2000), the Sixth Circuit disapproved of a limited fund class settlement involving a plaintiff class suing the manufacturers of allegedly defective cardiac pacemaker leads. During the course of the proceedings, the district court held that the Australian parent companies were subject to personal jurisdiction due to their control over the American subsidiary. After a non-binding summary trial, the district court approved a mandatory limited fund settlement whereby the parent companies would pay part of the settlement and be released, while the American subsidiary would also fund the settlement but retain assets to continue its operations. The Sixth Circuit reversed, finding that the settlement did not fulfill the *Ortiz* factors. A "primary problem" with the settlement was the release of the parent companies that were solvent and possibly liable under an alter ego theory: "We can only conclude that in its desire to approve a settlement and conclude the case by providing some money to class members, the court ignored its earlier findings. We cannot approve a settlement that releases these parent companies from all liability and leaves class members with no recourse against them." *Id.* at 879. The appellate court likewise noted that a district court could not approve a limited fund simply because bankruptcy was a "possibility, . . . even [if] it believes such an avenue to be in the best interests of most of the plaintiffs." *Id.* at 880. Lastly, the settlement failed because it "appear[ed] not to be the result of arms-length negotiation among the parties," particularly in light of the $19 million attorney fee award after

the plaintiffs agreed to release the "deepest pockets," i.e., the parent companies, from all liability. *Id.* at 880.

The case at hand presents none of the limited fund problems encountered in *Telectronics*. Here, the Levee Districts are public entities, subject to state constitutional provisions that restrict the ability of any creditor to seize assets. Indeed, these provisions make clear that only insurance funds are available for the satisfaction of a judgment, and here the settlement provides for the maximum insurance settlement possible. Much more akin to *Baker*, this Court has determined that the pending claims are in the billions, indeed a "breathtaking" amount in comparison to the available insurance funds. As discussed *supra*, the Louisiana legislature has no duty to pay any judgment on behalf of the Levee Districts. *Vogt*, 294 F.3d at 692. Even if the state of Louisiana would be liable here, the state is not a party to this agreement and the agreement does not provide for its release, thus there is no danger as expressed by the Sixth Circuit of releasing any party that may be liable. Most importantly, the Plaintiffs' counsel here has refused all attorney fees, instead requesting permission only to seek costs with a possible "enhancement" for risk. While this Court recognizes that Plaintiffs' counsel certainly has an incentive settle in order to recover costs, it is clear that there is a lower danger of conflict of interest because there are no gigantic attorney fees. Moreover, the parties did not agree on the application of Orleans Levee District's premises policy in this case, instead leaving it to the Court to decide, suggesting further that this agreement was the result of arms-length negotiation.

Returning to the requirements of *Ortiz*, this Court recognizes that the Supreme Court dissuaded courts from adopting limited fund classes to aggregate tort claims. The *Ortiz* Court conditioned any approval of tort-based limited funds with the caveat that a district court must

make factual findings establishing that the fund is "limited independently of the agreement of the parties." *Ortiz*, 527 U.S. at 864, 119 S.Ct. at 2323. In that case, the Supreme Court reversed the limited fund class certification because the district court determined the limit of the fund "by treating the settlement agreement as dispositive." *Id.* This Court has endeavored to heed the Supreme Court's directive.

Here, the Court received expert testimony and documentary evidence establishing that the total tort claims for property damage reach $19 billion. This estimate does not include those claims for personal injury and wrongful death/survival. In a word, the tort claims are tremendous. As pointed out by the Movants, if each Levee District were found to be 1% liable for the property loss caused by the breach of the levees within their respective jurisdiction, the Lake Borgne Basin Levee District would be liable $2 million, East Jefferson Levee District would be responsible for $11 million, and Orleans Levee District would be liable for $7 million in damage. This $20 million total would still not be satisfied by the available $17 million insurance fund. The *Ortiz* Court explained that "insurance assets would obviously be 'limited' in the traditional sense if the total of demonstrable claims would render the insurers insolvent, or if the policies providing aggregate limits falling short of that total." *Id.* at 851, 119 S.Ct. at 2317. While the estimate provided here does not include personal injury and wrongful death/survival claims, it is clear that the property claims alone "necessarily will affect" and deplete the insurance funds available for later claims. *In re Northern Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 852 (9th Cir. 1982). Personal injury and death-related claims, which are certainly included in this proposed class, would only increase the Levee Districts potential liability further. The Court bases its conclusion on its independent verification of the

availability of insurance policies and the inability of the claimants to seize any other assets of the

Levee Districts.  This Court concludes that first prong of *Ortiz* is satisfied.


### 2.  Dedication of the Fund to the Overwhelming Claims

The second requirement of *Ortiz* mandates that "the whole of the inadequate fund [be]

devoted to the overwhelming claims."  *Ortiz*, 527 U.S. at 839, 119 S.Ct. at 2311.  The *Ortiz*

Court based its interpretation of Rule 23(b)(1)(B) on its historical analysis of limited fund

classes.  In examining the case law with respect to this second requirement, the Court explained:

> It went without saying that the defendant or estate or constructive trustee with the
> inadequate assets had no opportunity to benefit himself or claimants of lower
> priority by holding back on the amount distributed to the class. The limited fund
> cases thus ensured that the class as a whole was given the best deal; they did not
> give a defendant a better deal than *seriatim* litigation would have produced.

*Id.*

In the present case, the settlement does not produce a better result for the Settling

Defendants than ordinary litigation would.  The Supreme Court's concern in *Ortiz* is fairly

reflected in the context of tort litigation against a corporate entity because the limited fund may

not fully deplete the entity's assets, resulting in a "steal" for the corporation.  In *Ortiz* this

concern was magnified by the fact that some claimants had not yet developed asbestos-related

diseases, thus giving the defendant a clear incentive to enter a discounted global settlement of all

claims, present and future.  Here, however, these dangers do not exist.  As discussed earlier in

this opinion, the insurance funds are the only assets that are available for satisfaction of any

judgment.  While it is possible that a settlement now would allow the Levee Districts and/or St.

Paul from spending any further resources in defense, those resources would not available to the

Plaintiffs for seizure.  The class is also well-defined because there are no "future" claimants from the hurricane.  Instead, all members of the class were aware of their injury commencing from the date the hurricanes struck Louisiana, thus the Levee Districts do not have an incentive to reduce their future risk by entering into a quick settlement.

A critical point to this Court's approval of the settlement is the provision for attorneys' fees.  The Court also received testimony of the Plaintiffs' class counsel, Joseph Bruno, who explained that any further litigation would likely reduce any available fund because of common benefit attorney fee claims.  Tr. at 166; *see Meredith v. La. Fed'n of Teachers*, 209 F.3d 398, 406 (5th Cir. 2000) (under "common benefit" theory, "a court may award attorney's fees when the plaintiff's success in the litigation confers a benefit on members of an ascertainable class, and where the court's award of attorney's fees will make it possible to spread the cost of litigation over the class of beneficiaries of the suit.") (internal quotations and citation omitted).  Plaintiffs' counsel have requested refund of their costs, with possibly an "enhancement" on those costs for the risk they bore in prosecuting this suit.  The Court intends to engage a special master to recommend disposition of these claims, and it will permit Plaintiffs' counsel to continue its petition before such special master.  However, while Plaintiffs' counsel may request an enhancement, any such enhancement, if granted, shall be modest in order to preserve the vast majority of the settlement fund to the overwhelming majority of claims.  The Court finds, therefore, that the second *Ortiz* factor is met.

### 3.  Equitable Treatment of Claimants

The third *Ortiz* requirement is that "the claimants identified by a common theory of

recovery [are] treated equitably among themselves." *Ortiz*, 527 U.S. at 839, 119 S.Ct. at 2311.

The Court explained that the prior courts approving limited funds "assume that the class will

comprise everyone who might state a claim on a single or repeated set of facts, invoking a

common theory of recovery, to be satisfied from the limited fund as a source of payment." *Id.*

*Ortiz* mandates that a district court must delve into two issues: "the inclusiveness of the class and

the fairness of distribution within it." *Id.* at 854, 119 S.Ct. at 2318.

    In *Ortiz*, the Supreme Court reversed the district court's class certification because it

excluded those who had previously settled against defendant while reserving a right to sue again

upon development of asbestos-related disease, those plaintiffs with claims pending against the

defendant at the time of the global settlement agreement, and the plaintiffs in "inventory" claims

that were settled "as a supposed necessary step in reaching the global settlement." *Ortiz*, 527

U.S. at 854, 119 S.Ct. at 2318. The Court concluded that the exclusion of "as much as a third of

the claimants" was insufficient to preserve equitable treatment. *Id.*, 119 S.Ct. at 2319. The

fairness of distribution was also "deficient" because separate independent counsel was not

appointed to future claimants, who were susceptible to unfair treatment, or to claimants from

before 1959 who were covered by the bulk of insurance coverage and "accordingly had more

valuable claims than post-1959 claimants." *Id.* at 856-57, 119 S.Ct. at 2319-20.

    Here, this Court finds that equitable treatment of the claimants has been achieved by this

settlement. The class definition is properly inclusive; it encompasses: "all Persons (a) who at the

time of Hurricane Katrina and/or Hurricane Rita (i) were located, present or residing in the [class

area], or (ii) owned, leased, possessed, used or otherwise had any interest in homes, places of

business or other immovable or movable property in the [class area], and (b) who incurred any

losses, damages and/or injuries arising from . . . Hurricane Katrina and/or Hurricane Rita and any alleged Levee Failures and/or waters that originated from . . . the Levees under the authority and/or control of all or any of the Levee Defendants." Mot. at 4. As discussed above, the class does not present the same difficulties as that in *Ortiz* because there are no future claimants; the injuries sustained in Hurricanes Katrina and Rita were discoverable contemporaneously with the storms. It is an arguable point that the Movants have sought an over-inclusive class because they have included victims of both hurricanes, thus arising from different factual situations. However, the Court finds this inclusion appropriate because the hurricanes struck Louisiana within one month of each other, and it is highly likely that the victims of the two storms are the same. Dividing the class into two would therefore be repetitive. Morever, to the extent there are victims of only one storm and not the other, separating the class runs the risk of the Katrina class recovering the annual maximum from the insurance proceeds while the Rita class receives none.

The Court further finds that separate counsel need not be appointed here. The *Ortiz* Court found fault in the proposed limited fund settlement because separate counsel was not appointed to subclasses representing future claimants. This conflict was particularly dangerous due to "side settlements" reached prior to full class settlement, "the full payment of which was contingent on a successful Global Settlment Agreement or successful resolution of the insurance coverage dispute." *Ortiz*, 527 U.S. at 853, 119 S.Ct. at 2318. Here, there have not been any prior settlements by the Levee Districts with any claimant suffering damage during Hurricanes Katrina or Rita. There are no agreements between Plaintiffs' counsel and the Levee Districts that depend on the Court's approval of the present settlement agreement. Moreover, there appears no conflict among subclasses that would suggest separate counsel is needed. The

32

insurance policies for all of the Levee Districts will be used to their maximum, and recovery from one of the districts does not preclude or lessen any recovery from another.

A significant concern in this settlement is the fairness of distribution. This Court has every interest in providing the class members with compensation distributed equitably. However, the level and variation of injuries creates complications in such a distribution. Moreover, it appears from the data estimates that the level of property damage dwarfs the funds available for this settlement, and again this damage estimate does include personal injury or wrongful death/survival claims, all of which are included in the class. It is a reasonable fear that the mere cost of adjudicating individual claims may swallow the entire settlement. The Supreme Court in *Ortiz* was mindful of these issues, explaining that while "[f]air treatment in the older cases was characteristically assured by straightforward pro rata distribution of the limited fund," such equity may be "unattainable in settlement covering present claims not specifically proven and claims not even due to arise." *Ortiz*, 527 U.S. at 855, 119 S.Ct. at 2319. In these instances, "such a settlement must seek equity by providing for procedures to resolve the difficult issues of treating such differently situated claimants with fairness amongst themselves." *Id.* at 855-56, 119 S.Ct. at 2319. In the present case, the Court shall appoint a special master to receive evidence and recommend a plan for distribution. The Court will direct the special master to report on the cost of any individualized distributions of funds in comparison to the likely recovery to each victim. Should the cost of distribution significantly lessen any recovery by class members, the special master should evaluate any *cy pres* distribution methods.[22] The

---

[22]As explained by Judge Eldon Fallon of this Court, the *cy pres* doctrine has its origin in Roman law and translates loosely to "as near as possible." *Turner v. Murphy Oil USA, Inc.*, Civ. A. No. 05-4206, 2009 WL 1507414, at *3 (E.D. La. May 27, 2009). The doctrine embraces the central concept that "where distribution to the class who should ideally receive a fund is

special master shall endeavor to ensure that any benefit accrues equitably among the subclasses according to the damage suffered and the insurance funds received from each subclass's respective Levee District.

The Court is mindful that the Supreme Court has advised caution in certifying a limited fund class of aggregated tort claims. The class will be a non-opt-out, mandatory class. The *Ortiz* Court warned that certification of a mandatory tort class "obviously implicates the Seventh Amendment jury trial rights of absent class members," as well as "the due process principle of general application of Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Ortiz*, 527 U.S. at 845-46, 119 S.Ct. at 2314-15. "This entitlement can be overcome only when individual suits would confound the interests of other plaintiffs, such as with a limited fund that must be distributed ratably or an injunction that affects all plaintiffs similarly." *Telectronics*, 221 F.3d at 881. Indeed, the instances where a tort suit may be settled for a mandatory, non-opt-out, limited fund class may be few; however, the case at hand appears to fit into this narrow exception. Here, the tort claims are clearly overwhelming, easily reaching the billions before personal injury or wrongful death/survival claims are included. Moreover, the fund is extremely limited because the Levee Districts, as political

---

impracticable or inappropriate, the distribution should be made in the 'next best' fashion in order as closely as possible to approximate the intended disposition." *In re Folding Carton Antitrust Litig.*, 557 F. Supp. 1091, 1108 (N.D. Ill.1983). The *cy pres* doctrine has been used in the class action setting where an unclaimed residual of a class action settlement fund is expended for the benefit of the class. *See Murphy Oil*, 2009 WL 1507414, at *1 (approving *cy pres* distribution of unclaimed settlement funds). Moreover, "[f]ederal courts have frequently approved [use of *cy pres* distribution] in the settlement of class actions where proof of individual claims would be burdensome or distribution of damages costly." *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990) (citing *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179, 184-85 (2d Cir. 1987)).

subdivisions of the State of Louisiana, are immune from seizure under state law. Therefore, this is the unique situation where the Levee Districts are settling for the maximum that Plaintiffs would be able to seek through litigation. It is therefore clear that ordinary litigation would allow very few to recover to the detriment of the vast majority of the class. This problem is precisely what limited fund settlements are intended to solve. Considering that the requirements of Rule 23(a) and Rule 23(b)(1)(B) have been satisfied, this Court will certify this class as a mandatory, non-opt-out, limited fund class.

## C.  Rule 23(e) Requirements

Having certified the class as a limited fund class, this Court must determine whether the proposed settlement is acceptable. Any class settlement must fulfill the requirements of Rule 23(e). The rule is designed to "ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (quoting *Pettway v. Am. Cast Iron Pipe Co.,* 576 F.2d 1157, 1214 (5th Cir. 1978)). The text of the rule states:

> The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
>
> > (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
> >
> > (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
> >
> > (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Fed. R. Civ. P. 23(e).  As required under Rule 23(e)(3), the Movants filed all relevant settlement agreements in the record.  Therefore, this Court must determine whether this settlement fulfills the requirements of Rule 23(e)(1) and (e)(2).

### 1.  Rule 23(e)(1): Notice

Rule 23(e)(1) requires that the Movants must "direct notice in a reasonable manner" to all possible class members.  "The fairness hearing notice should alert the class that the hearing will provide class members with an opportunity to present their views on the proposed settlement and to hear arguments and evidence for and against the terms."  Manual for Complex Litigation, Fourth § 21.635 (2004).  This notice "should tell objectors to file written statements of their objections with the clerk of court my a specified date in advance of the hearing and to give notice if they intend to appear."  *Id.*  "[T]he substantive claims must be adequately described" and the notice "must also contain information reasonably necessary" for the class members to make any relevant decisions.  *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977).  The notice should be so detailed or complex so as to "confuse class members and impermissibly encumber their rights to benefit from the action." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 224 (5th Cir. 1981) (quoting *In re Nissan*, 552 F.2d at 1104).

The notice here was crafted by Shannon Wheatman, Ph.D., whose affidavit was received

as evidence.  Ex. 68 (Wheatman Aff.).  The notice described the parties, specifically the Levee

Districts, and provided a description of the class and subclasses.  Wheatman Aff., Ex. 7.  The

notice explained the relevant claims arising out of Hurricanes Katrina and Rita.  It set forth the

terms of the settlement and the fact that the fund would be limited because the defendants were

"governmental bodies."  *Id.*  It stated that the fund would also cover costs and expenses.  It

provided both the website and toll-free number where any class member could seek addition

information.  It notified the class members of the date of the fairness hearing and the procedure

by which they could object.  The notice explained that, if such a settlement were approved, a

special master would likely be appointed by the Court to apportion the fund, and a second notice

may be provided to class members if ordered by the Court.  The entire notice was drafted in

plain, comprehensible language using the second-person tense for clarity.  Finally, the notice

stated in bold lettering that, if the class is approved, "you cannot exclude yourself from the

settlement."  *Id.*  While the notice did not provide each class member what he/she would receive,

it was appropriate to exclude this information where such estimates would be speculative.  *See In

re Corrugated Container*, 643 F.2d at 224 (failure to include specific recovery in class notice

was not abuse of discretion).  The Third Circuit specifically approved of a class action fairness

hearing notice that contained the following:

> The individual notice provided a description of the litigation, the settlement class,
> and the terms of the proposed settlement, including the relief available. It set out
> the information regarding the fairness hearing, including the date of the hearing,
> the opportunity for class members to appear at the hearing, and the procedure for
> filing objections with the court. The notice also explained the consequences for
> class members who remain in the class and provided the full text of the release.
> Finally, the notice provided class members with the toll-free 800 number
> established by [the defendant] to address class member concerns.

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 327 n.86 (3d

Cir. 1998). The Court finds that the notice here, similar to that approved by in *Prudential*, contained all necessary information for any class member to become fully apprised and make any relevant decisions.

The Court further finds that the Movants were successful in reaching class members with the notice. The Movants compiled a comprehensive list of individuals who were likely members of the class. They used third party locator services, such as LexisNexis and Form 95 filings, to determine the present address of members of the class instead of relying on pre-hurricane addresses. On January 5, 2009, mailings were sent to 657,033 households and 8,662 businesses. On January 28, 2009, mailings were sent to an additional 80,046 class members who had filed a Form 95 claim with the U.S. government. Wheatman Aff. at 4-5. Ms. Wheatman estimates that the notice reached 86.5% of potential class members individually. Public notice was placed in each of Louisiana's ten metro daily newspapers, appearing in each newspaper in a weekday edition and a Sunday edition.[23] To reach the broader public outside Louisiana, the Plaintiffs committee issued radio public service announcements in 4,230 radio stations throughout the United States, established a website at www.leveebreachclass.com, and set up a toll free number that handled a total of 66,290 calls by March 2009. Wheatman Aff. at 8-9. As required under the Class Action Fairness Act, on December 23, 2008, notice containing materials appropriate in form were also sent to all state attorneys general and the U.S. Attorney General via certified mail. 28 U.S.C. § 1715(b); Wheatman Aff. at 3. The Court finds this notice adequately reached the potential class. *See United States v. Alabama*, 271 Fed. Appx. 896, 901 (11th Cir. 2008)

---

[23]These newspapers were the Alexandria Town Talk, the Baton Rouge Advocate, the Houma Courier, the Lafayette Daily Advertiser, the Lake Charles American Press, the Monroe News-Star, the New Orleans Times-Picayune, the Opelousas Daily World, the Shreveport Times, and the Thibodaux Daily Comet. Wheatman Aff. at 6-7; *id.*, Ex. 7.

(unpublished decision) (finding notice adequate where notice appeared twice in each of ten regional newspapers and required objections to be filed within two weeks).

Two main objections were lodged against the notice. First, the Objectors assert that the notice was "inadequate and deceptive." Rec. Doc. 18779 at 20. This assertion is based on the allegation that "there is no independent evidence of record evaluating the amount of available insurance," and because the notice did not state that the attorneys would be seeking fees. *Id.* This objection is essentially a reiteration of the objection to the settlement itself. In light of the fact that the Court received documentary evidence as well as expert testimony and determined that the insurance funds indeed are the limit of available funds, this Court likewise finds that this objection is without merit. Moreover, the agreement states that the Court shall have oversight over any fees, and Plaintiffs' counsel have disclaimed any fees, but instead will only seek costs with a possible enhancement. The notice stated that the lawyers would seek "reimbursement for their costs and expenses." Wheatman Aff., Ex. 7. The Court finds, therefore, that the notice is not misleading regarding fees. The Sims Objectors assert that the Court violated its own ruling when it held the fairness hearing less than 45 days after the preliminary notice of certification. However, the notice itself stated only that the hearing would be held on April 2, 2009, and thus it was not misleading to class members. Wheatman Aff., Ex. 7. Moreover, during the fairness hearing the Court noted this error and held that the record shall remain open for any further objections to be lodged. Counsel for the Sims Objectors consented to this ruling. Tr. at 12. Therefore, this argument carries no merit.

As a final note regarding notice, the Court is aware that generally no notice of certification is required for a class certified under Rule 23(b). *Langbecker v. Elec. Data Sys.*

*Corp.*, 476 F.3d 299, 306 (5th Cir. 2007) ("Neither a Rule 23(b)(1) or (2) class action requires notice to class members or the option to opt-out.").  The Supreme Court in *Ortiz*, discussed at length *supra*, suggested some notice would be necessary to class members when certifying a limited fund class.  The Third Circuit sums it up succinctly: "Thus, *Ortiz* seems to imply (although it specifically declined to rule) that the level of notice required for a settlement . . . is the same as is required in a Rule 23(b)(3) action: the best notice practicable, 'including individual notice to all members who can be identified through reasonable effort.'"  *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 328 (3d Cir. 2001).  Here, however, the Court finds that the present notice was thorough and designed to reach as many of the individual class members as possible.  The fact that it reached approximately 86% of the class is proof of the success of the notice.  This Court makes no speculation regarding whether *Ortiz* would require any such notice, but even if such a higher level of notice would be needed, it would be satisfied here.

### 2. Rule 23(e)(2): Settlement Must Be Fair, Adequate, and Reasonable

Rule 23(e)(2) requires that if the proposed settlement "would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  This Court held a hearing on April 2, 2009 for this purpose.  The Fifth Circuit prescribes an assessment of the following six factors when evaluating whether a class settlement should be approved under Rule 23(e)(2):

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class

counsel, class representatives, and absent class members.

*Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) (citing *Reed*, 703 F.2d at 172, and *Parker v. Anderson*, 668 F.2d 1204, 1209 (5th Cir. 1982)).

As to the first factor, this Court finds no evidence of "fraud or collusion" behind the settlement. As discussed previously, there have been no prior agreements or side deals that have been struck. The present settlement encompasses the entirety of the funds available to any litigant if they were to be successful. Counsel for both Plaintiffs and Settling Defendants, while courteous, have proven themselves to be zealous advocates for their clients. Indeed, the settlement agreement itself was not entirely agreed upon as the parties disputed the interpretation of Orleans Levee District's premises liability policy. In *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004), the Fifth Circuit rejected any assertion of collusion based upon an alleged agreement regarding attorneys fees because the objectors failed to point to any record evidence of collusion. Here, Plaintiffs' counsel have disclaimed any attorneys fees, instead only requesting costs with a possibility of an "enhancement" based upon the risk of the case. There appears to have been no collusion between the settling parties regarding this request prior to offering the settlement, and the Objectors can point to no evidence showing any collusion.

The second, third, and fourth elements weigh in favor of approval. This Court has a wealth of experience in hurricane litigation. The Plaintiffs case would require proof that the Levee Districts were negligent in maintaining their respective levee systems, and further proof that this negligence caused the levee breaches. Multiple parties could have been at fault, and some of which are immune from liability, resulting difficulties with proof and a trial with "empty chairs" for some immune defendants. Moreover, as exemplified by the trial against the U.S.

41

Army Corps of Engineers for breaches along the Mississippi River-Gulf Outlet, proving fault and causation will require extensive expert evaluations and reports. These factors showing the complexity of the litigation further suggest that success on the merits may be difficult. This class likely would be certified under Rule 23(b)(3), which would require proof that common issues predominate over individual issues. This Court has already denied certification to another Hurricane Katrina-related class action alleging flooding due to levee breach based upon a failure of the predominance inquiry. *In re Katrina Canal Breaches Consol. Litig.*, 258 F.R.D. 128, 132-40 (E.D. La. 2009). In that decision, certification was denied under Rule 23(b)(3) because of the "varying types of property damage," different possible affirmative defenses, and numerous levee breaches the resulted in flooding. *Id.* This class action, as presently framed, could raise some of the same issues of predominance that prevented certification previously. In the meantime, the present litigation has been proceeding for nearly four years. The Plaintiffs' counsel have conducted depositions, propounded interrogatories, and produced expert reports. This Court concludes that the parties have thoroughly evaluated the merits of the case and it is at a stage that is ripe for settlement.

    As to the fifth factor, the range of possible recovery, this Court has found that the Plaintiffs are settling for the highest amount available. Due to the unique nature of this suit, the Plaintiffs are settling with Levee Districts that, as political subdivisions, are immune from having any assets seized to satisfy a judgment. Moreover, this Court cannot make any assumption that the Levee Districts would appropriate funds to pay a judgment, particularly as such an appropriation would be a discretionary decision. Therefore, if the Plaintiffs went to trial, the only available funds for a judgment would be from the insurance policies. Because this

settlement is for the maximum amount available from the policies, the Plaintiffs have clearly settled for a recovery very close to what any judgment would bring.

The final factor concerns the opinions of the class counsel, class representatives, and absent class members. Class counsel for Plaintiffs, Joe Bruno, testified during the hearing that the Plaintiffs' committee had reviewed the relevant class action law and determined that successful class certification under Rule 23(b)(3), and approval by the Fifth Circuit, would be doubtful. Tr. at 165. Moreover, the Plaintiffs' committee had engaged experts to evaluate available Levee District funds for settlement, and these experts concluded that a judgment after trial would not render any greater settlement. Tr. at 166. Accordingly, he concluded that the settlement was fair for the class members. The class representatives all have agreed to the settlement and have deemed it to be fair and reasonable.[24]

As to the opinions of unnamed class members, the Court received a total of 185 submissions from absent class members in addition to those objections filed by counsel. By this Court's count, 81 were neutral, 76 objected to the settlement, and 28 approved of the settlement. The Court also permitted any class members to make a presentation during the hearing. The Objectors would have this Court reject this settlement in light of the amount of objections. However, the Fifth Circuit has pointed out that "a settlement can be approved despite opposition from class members, including named plaintiffs," and case law shows that a settlement may be approved despite the objections of a large portion of the class. *Ayers*, 358 F.3d at 373 (citing cases); *see Reed*, 703 F.2d at 174 (approving settlement "over the objections of twenty-three of twenty-seven named plaintiffs and nearly forty percent of the 1,517 member class"). Here, the

---

[24]The Court received by stipulation the affidavits of the class representatives in which they express their approval of the settlement. Exs. 74-77.

76 submissions opposing the agreement are a small fraction compared to the many thousands of

potential claimants.[25]  The objections that were lodged understandably object to the size of the

settlement in relation to the level of damage suffered in the class area.  As discussed above,

however, insurance funds are the only funds that may be seized for a judgment, and the $17

million settlement represents the maximum level of insurance recovery.  The Court is also aware

that some objectors, such as the Sims Objectors, have class actions pending in state court that

would be enjoined by this settlement, and accordingly they have an incentive to object to this

settlement.  It is notable that one individual class member who filed an objection appeared before

the Court during the hearing to withdraw his objection.  He explained that, having heard the

presentations, he had been persuaded that the Plaintiffs' counsel had sought all available funds

available, and he was convinced that the insurance proceeds were the only funds available.[26]  Tr.

at 79-80.

Clearly, it is lamentable that such a parsimonious sum is the "limited" fund in these

proceedings.  The Court is acutely aware that this settlement is certainly hollow to the hundreds

of thousands of potential claimants.  It is this Court's opinion that the agency primarily

responsible for the failure of the levees affecting this class was the Corps of Engineers.

However, in a rather lengthy opinion the Court dismissed the Corps, finding them immune from

liability based upon the Flood Control Act of 1928.  Rec. Doc. 10984.  The present settlement

represents the maximum recovery that would be possible against the Levee Districts and their

---

[25]Based upon the pre-Katrina population estimate of nearly a million residents and/or
property owners, the proportion of objectors is not significant.

[26]Pursuant to Rule 23(e)(5), the Court permitted this objector to withdraw his objection.
Tr. at 80.

insurer.  As notice was adequate and the settlement is fair, adequate, and reasonable in light of all the factors presented, this Court determines that the settlement shall be approved.


### III.  CONCLUSION

For the reasons stated herein,

**IT IS ORDERED** that the Joint Motion for Approval of a Proposed Class Action Settlement (Rec. Doc. 16647) is **GRANTED.**  The Court further finds that it is appropriate to enjoin all other pending suits against the Levee Districts arising out of the same facts.  An order will issue in accordance with this opinion.


New Orleans, Louisiana this _____8th_____ day of September, 2009.


_____
        **STANWOOD R. DUVAL, JR.**
     **UNITED STATES DISTRICT JUDGE**