UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | | CIVIL ACTION |
| PERTAINS TO: BARGE | | NO.  05-4182 and consolidated cases |
| *Boutte v. Lafarge* | **05-5531** | SECTION "K" (2) |
| *Mumford v. Ingram* | **05-5724** | |
| Lagarde v. Lafarge | **06-5342** | JUDGE |
| *Perry v. Ingram* | **06-6299** | STANWOOD R. DUVAL, JR. |
| Benoit v. Lafarge | **06-7516** | |
| *Parfait Family v. USA* | **07-3500** | MAGISTRATE |
| *Lafarge v. USA* | **07-5178** | JOSEPH C. WILKINSON, JR. |
| Weber v. Lafarge | **08-4459** | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

There is no basis in law or fact for the plaintiffs' claims against Zito Fleeting, L.L.C. and Zito Fleeting, Inc. ("Zito") and the claims against Zito should be dismissed. Zito's sole involvement with Barge ING 4727 was that Zito delivered the barge to  Lafarge North America, Inc.'s France Road terminal on August 26, 2005. At that time, Hurricane Katrina was not expected to hit the New Orleans area. The act of delivering the barge to Lafarge on August 26 was in no way negligent, nor was it a proximate cause of the barge's subsequent breakaway.

1

Zito entered this litigation as a defendant in the underlying limitation action that was litigated before Judge Ginger Berrigan (Civil Action No. 05-4419). When Lafarge's Assistant Terminal Manager, Ed Busch, was deposed in connection with the limitation action filed by the barge's owner, Ingram Barge Company, Busch suggested that he had attempted to leave a message with Zito on the morning of August 27, 2005 advising that Lafarge had finished offloading the barge and had "released" the barge.[1] Notwithstanding the fact that Busch made it clear that he did not speak with anyone at Zito on August 27, and more importantly did not expect Zito or anyone else  to remove the barge from Lafarge's terminal before Hurricane Katrina struck the area, the plaintiffs filed a supplemental and amended complaint adding Zito as a defendant. (Doc. 449 in Civil Action No. 05-4419)[2]

The two theories of negligence that plaintiffs have asserted against Zito (a negligent delivery claim and a failure to remove claim) fail as a matter of both law and fact. In fact, before Judge Ginger Berrigan transferred the remaining portions of the barge litigation to the captioned consolidated litigation, **Judge Berrigan determined that neither the delivery of the barge on August 26 nor the failure to remove it on August 27 were proximate causes of the subsequent breakaway**. (See Judge Berrigan's March 31, 2008

---

[1]The term "release" is a industry term used to determine when demurrage on a barge stops.

[2] At that time, Ingram, Lafarge, Joseph C. Domino, Inc. and Unique Towing, Inc. were already parties to the barge limitation litigation. Domino and Unique had been added because, pursuant to Lafarge's instructions, they had repositioned and secured the barge at Lafarge's terminal on the afternoon of August 27, 2005.

Opinion, Exhibit "A") Judge Berrigan's determination on these issues are entitled to preclusive effect in this matter and the negligent delivery and failure to remove claims against Zito should be dismissed.

Furthermore, and while the Court need not determine whether Busch left a message with Zito (which is denied by Zito) in order to grant Zito's motion, there is no real or genuine dispute on this issue. The phone records from both Lafarge and Zito establish clearly and beyond any reasonable doubt that Busch did not call Zito on August 27. Plaintiffs' experts agree that if Zito was not called, Zito could not have been negligent or at fault for not removing the barge. Finally, the undisputed facts show that even if Zito was asked to remove the barge on August 27, Zito was not capable of doing same. Zito had closed its fleet to all unscheduled barges and had no boats to send to Lafarge because all available boats were in the process of blocking and securing Zito's fleet for the approaching storm.[3]

## BACKGROUND

The crucial facts necessary to decide Zito's Motion for Summary Judgment are undisputed. Ingram owned Barge ING 4727. Ingram and Lafarge were parties to a contract whereby Ingram contracted to transport cement by barge for Lafarge from Lafarge's cement terminal in Joppa, Illinois to Lafarge's cement terminal on the Inner Harbor Navigation Canal ("IHNC") in New Orleans. On Wednesday, August 24, 2005, the loaded Barge ING 4727 was en route to New Orleans and scheduled to be dropped off at Zito's

---

[3] Barry Boudreaux's deposition, pp. 115-116, excerpts of which are attached as Exhibit "B".

Algiers fleet. At 1435 hours on August 24, 2005, Lafarge's Assistant Terminal Manager, Ed Busch, called Zito to advise that Lafarge had an immediate need for the barge's cargo and asked for the barge to be delivered to Lafarge's France Road barge terminal as soon as possible after the barge's arrival at Zito's fleet.[4] The barge arrived at Zito's fleet on August 25 and Zito started to transport the barge to Lafarge's terminal at approximately 2300 hours that evening.[5] When Zito set out to deliver the ING 4727 to Lafarge on August 25, Hurricane Katrina's projected path remained over the Florida peninsula with an anticipated landfall near the Florida panhandle and the Alabama coast.[6] Zito delivered the ING 4727 to Lafarge's terminal on Friday, August 26, 2005 at approximately 1125 hours.[7] Again, this was at a time when the Hurricane's projected path was not forecast to strike New Orleans.[8]

From that point forward the barge was in Lafarge's exclusive care, custody and control and Zito had no further involvement with the barge. The plaintiffs' experts agree that Zito had no knowledge of or responsibility for any of the decisions to position or secure the

---

[4]  Boudreaux, Exhibit "B", p. 60, l. 11.

[5]  Boudreaux, Exhibit "B", pp. 63-64.

[6]  Daniel Mecklenborg's deposition, pp. 65-67, excerpts of which are attached as Exhibit "C". Several of the attached depositions were taken before Zito was a party and Zito was only able to obtain condensed copies of the transcripts.

[7]  Boudreaux, Exhibit "B", p. 64.

[8]  Ed Busch's deposition, p. 22, excerpts of which are attached as Exhibit "D".

4

barge at Lafarge's terminal for the approaching storm.[9] The experts likewise agree that there were no industry or governmental rules or regulations that Zito failed to comply with.[10]

When the ING 4727 arrived at Lafarge's terminal, Lafarge's employees moored the barge to the dock with mooring lines that belonged to Lafarge.[11] Lafarge began to unload the ING 4727 and finished unloading the barge at approximately 0900 hours on Saturday, August 27, 2005.[12] By that time, the weather forecasts had moved Hurricane Katrina's track to the west and Lafarge's employees were aware that the storm threatened the New Orleans area.[13]

Although Busch had suggested that he attempted to call Zito at approximately 0900 hours that morning to leave a message advising that the barge was empty and had been "released" by Lafarge, **it has since been established that there is no record of this call. It bears noting however that the other calls that he claims to have made and received that morning do appear on Lafarge's phone records.[14]**

---

[9] Donald Green's June 25, 2009 deposition, pp. 196-197, excerpts of which are attached as Exhibit "E"; Green's November 8, 2008 deposition, p. 136, excerpts which are attached as Exhibit "F"; and Hector Pazos' deposition, pp. 327-328, excerpts which are attached as Exhibit "G".

[10] Green's November 8, 2008 deposition, Exhibit "F", p. 137 and Pazos, Exhibit "G", p. 329.

[11] Deposition of Earl Smith, p. 81, excerpts of which are attached as Exhibit "H".

[12] Deposition of Edward VanderMeulen, p. 105, excerpts of which are attached as Exhibit "I".

[13] Smith, Exhibit "H", pp. 42-43; Busch, Exhibit "D", pp. 42-43, and pp. 53-54.

[14] See p. 21 of this memorandum.

Not only is there no record of this call, it was impossible for Busch to have left a message on the Zito's phone system without actually first speaking with someone at Zito. Zito's phone system was designed so that an incoming call would continue to ring until someone at Zito answered the call. Once the call was answered, the person that answered could then transfer the caller to a particular persons voice mail.[15] **Since it is uncontested that Busch did not speak with any Zito personnel on August 27,[16] it was not possible for Busch to have left a voicemail message with Zito on August 27**.

Furthermore, and irrespective of whether Busch did or did not leave a voice mail message with Zito that morning, **it is uncontested that Busch did not expect anyone at Zito to receive his message and more importantly, he did not expect Zito or anyone else to pick up the barge in advance of the storm's arrival.**[17]

## ARGUMENT

### Summary Judgment Standard

Summary Judgment is appropriate when there is no genuine issue as to any material facts, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The Court must be satisfied that no reasonable trier of fact could find for the non-moving party, or in other

---

[15] Boudreaux, Exhibit "B", p. 39, l. 18- p. 40, l. 13; p. 46, l. 4-10; and p. 47, l. 10-p. 40, l. 1.

[16] Busch, Exhibit "D", p. 36.

[17] Busch, Exhibit "D", p. 38-39.

words, "that the evidence favoring the non-moving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavesphere v. Niagra Machine Nach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990)(*citing Anderson v. Liberty Lobby, Inc.,*477 U.S. 242, 249 (1986). The moving party bears the burden of establishing that there are no genuine issues of material fact. A dispute over a material fact is genuine only if a reasonable jury could return a verdict for the non-movant. *Anderson,* 477 U.S. at 248.

If the dispositive issue is one on which the non-moving party will bear the burden proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the non-moving party's claim. *See Celotex,* 477 U.S. at 325; *Lavesphere,* 910 F.2d at 178. The burden then shifts to the non-moving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. See *Celotex,* 477 U.S. at 324. The non-movant may not rest upon the pleadings, but must identify specific acts to establish a genuine issue exists for trial. See *Id.* at 325 (*Little v. Liquid Air Corp.,* 37 F.3rd 1069, 1075 (5th Cir. 1996).

## Flooding Was Not a Foreseeable Consequence of Zito's Actions

Maritime torts are analyzed under general principals of negligence law. *Consolidated Aluminum Corp. v. C.F. Bean Corp.,* 833 F.2d 65, 67 (5th Cir. 1987). A tortfeasor is accountable only to those for whom a duty is owed. *Id; Watz v. Zuppata Offshore Co.,* 431 F.2d 100 (5th Cir. 1970) and 57 Am. Jur. 2d *Negligence § 33* (1971).

Courts are tasked with the function of determining not only whether a duty exists,

but the parameters of that duty. *Consolidated Aluminum Corp.*, at 67. As noted by the Fifth

Circuit:

> That determination involves a number of factors, including
> most notably the forseeability of the harm suffered by the
> complaining party. *Prosser and Keeton on torts, Duty* § 53 (5th
> Ed. 1984); Green, *The Legal Duty Problem in Negligence
> Cases,* 28 Col. L. Rev. 1014 (1928); 29 Col. L. Rev. 255
> (1929). ... "'[D]uty... is measured by the scope of the risk that
> negligent conduct forseeability entails.'" Harper, James & Gray,
> *The Law of Torts, Scope of Duty in Negligence Cases*, § 18.2
> at 655 (2d ed. 1986). The duty 'may be owed only with respect
> to the interest that is forseeably jeopardized by the negligent
> conduct, and not to other interests even of the same plaintiff
> which may in fact happen to be injured.

See, *Consolidated Aluminum Corp.*, at 67.

Forseeability marks the limits of a defendants duty. In *Republic of France v. United*

*States*, 290 F.2d, 395, 401 (5th Cir. 1961), the Fifth Circuit held that to be found liable, a

defendant must have "knowledge of a danger, not merely possible but probable..."

*(quoting Dalehite v. United States,* 346 U.S. 15, 42, 73 S. Ct. 956, 971, 97 L. Ed. 1427

(1953)). In conducting a similar forseeability analysis, the Court in *Consolidated Aluminum*

stated:

> We perceive a harm to be the foreseeable consequence of an
> act or omission if harm of a general sort to persons of a
> general class might have been anticipated by a reasonably
> thoughtful person, as a probable result of the act or omission,
> considering the interplay of natural forces and likely human
> intervention.

*Consolidated Aluminum,* at 68.

In *Consolidated Aluminum,* a dredge owner ruptured a gas pipeline. This caused the

gas company to close the nearest valve which in turn interrupted the supply of natural gas to the plaintiff's aluminum plant resulting in the plaintiff suffering physical and economic damages. The plaintiff's plant was located approximately six miles from the rupture site. In applying the above definition of forseeability, the court found that the dredge owner could not have reasonably anticipated that its failure to follow safe dredging practices would result in physical and economic damage at the plaintiff's plant. The court found that "the damage arising from the loss of natural gas supply, in turn causing the shut down of electric turbines, in turn causing a loss of electric power vital to the aluminum reduction process, with the ultimate result being substantial damage to equipment and product-in-process, goes beyond the pale of general harm which reasonably might have been anticipated by negligent dredgers." *Id.*

The same is likewise true with respect to the alleged negligence on the part of Zito. The likelihood that Zito's delivery and/or failure to pick up the barge would in turn cause Lafarge to allegedly negligently moor the barge, which in turn would cause Unique to allegedly improperly secure the barge, which in turn would cause the barge to break free from its moorings, which in turn would cause the barge to breach the flood wall, which in turn would lead to flooding in New Orleans, with the ultimate result being substantial damage to the plaintiffs, goes beyond the pale of general harm which reasonably might have been anticipated by the delivery and/or failure to remove the barge prior to the storm.

**Zito's Actions Did Not Cause the Breakaway**

Hornbook law dictates that "proof that the wrongful act caused injury or damages

is an essential of a cause of action under the general maritime law." T. Shoenbaum, *Admiralty and Maritime Law* § 5-3 at 188 (4[th] ed. 2004). As the United States Supreme Court stated in its seminal opinion on causation in the maritime law, "a party whose fault did not proximately cause the injury is not liable at all". *Exxon Co. v. Sofec, Inc.,* 517 U.S. 830, 842, 116 S. Ct. 1813, 1820 (1996).

Not every cause in fact of an accident can be considered a proximate cause. "Somewhere a point will be reached when the courts will agree that the link has become too tenuous- that what is claimed to be a consequence is only fortuity." *Petition of Kinsman Transit Co.,* 338 F.2d 708, 725 (2nd Cir. 1964).

Proximate cause in the maritime law envisions that the tortfeasor's conduct must have played a substantial role in the injury or damage and that the harm directly resulted or was a reasonable probable outcome of the act or omission. See *Thomas v. Express Boat Co.,* 759 F.2d 444, 448 (5th Cir. 1985), *Fournier v. Petroleum Helicopters, Inc.,* 665 F. Supp. 483, 486 (E.D. La. 1987); T. Shoenbaum, *supra,* at 189. "The term 'substantial factor' means more than 'but for the negligence, the harm would not have resulted.'" *Donaghey v. Ocean Drilling & Exploration Co.,* 974 F. 2d 646, 649 (5th Cir. 1992), *quoting Spinks v. Chevron Oil Co.,* 507 F. 2d 216, 223 (5th Cir. 1975).

In *Exxon v. Sofec, supra,* an oil tanker broke loose from an allegedly defective mooring system and went aground. The Court accepted as true for purpose of the decision that the breakaway occurred because the mooring gear was defective in some manner. But the ship captain's actions taken in guiding the ship after this original negligence led to the

breakaway were held to break the chain of causation. The Supreme Court affirmed the lower courts' decision to place the sole proximate cause of the ship's grounding on the captain rather than on the defective mooring gear. The mooring's defects were caused by the defendant "whose actions or omissions are deemed to be causes in fact, but not legal causes of the damage." 517 U.S. at 836, 116 S. Ct. At 1817. Without the mooring gear breaking, the ship would not have been cast loose. But it was the captain's actions after the mooring failure that caused the ship to go aground.

Absent legal duty, the enumerated possibilities for fault should not be considered negligent. Putting that issue to the side, however, analysis of Zito's alleged fault (delivering the barge and not picking it up before the storm) demonstrates that none of these  acts or omissions proximately caused the breakaway.

Zito's actions did not cause the barge to breakaway. Lafarge and Unique made the mooring decisions. Lafarge and Unique were responsible for the mooring lines. Neither Lafarge nor Unique asked Zito for assistance or advice concerning how to moor the barge in the face of an approaching storm. Lafarge did not expect that Zito would pick up the barge prior to the storm. Lafarge knew full well that it had the sole mooring responsibility in the face of an approaching storm and Lafarge took all of the steps it believed were reasonable and necessary to secure the barge at its terminal. Zito had no knowledge of and played no role in the barge's mooring configuration or how the barge was secured at Lafarge's terminal.

While true that if the barge had not been there in the first place, it could not have

11

broken away, the same "but for" analysis could go all the way back to the company that built the barge. This type of analysis ignores the reality that it was Lafarge - not Zito - that moored this barge at Lafarge's dock. Plaintiffs do not allege, nor do the facts in any way support, that Zito had any knowledge or responsibility for how the barge was moored and secured at Lafarge's terminal. As a matter of judicial common sense, Zito's alleged fault (delivering and not removing the barge before the storm) cannot be said to have substantially and directly led to the breakaway. Did Zito cause Lafarge's employees to tie single-part ropes? Of course not. Nor did Zito cause the M/V REGINA H to leave the facility without adding any additional lines.[18] Could Zito have reasonably foreseen that Lafarge, an experienced corporate wharfinger who contracted to safely and responsibility moor barges, would choose to tie single rather than double-part lines in this particular instance? No, that would have required clairvoyance on Zito's part. While the plaintiffs may vainly argue that such clairvoyance is required, the court will recognize the actual legal standard.

**The Claims Against Zito are Controlled by the Doctrine of Collateral Estoppel**

The plaintiffs' claims against Zito were motivated in part by the plaintiffs' attempt to establish an agency/principal relationship between Zito and Ingram in order to impute Zito's actions on Ingram. The two negligence theories that plaintiffs have asserted against Zito (negligent delivery and failure to pick up the barge ) were also asserted by plaintiffs against Ingram in the limitation action. In fact, plaintiffs argued that Zito was acting as Ingram's

---

[18]   Zito had no knowledge that Lafarge called Domino/Unique or that the M/V REGINA H had gone out to reposition and secure the barge.

agent and that Zito's actions in delivering the barge on August 26 and not picking it up

before the storm should be imputed to Ingram. The plaintiffs' claim that Ingram negligently

delivered the barge prior to the storm and then failed to pick it up before the storm, were

based directly on Zito's actions. In other words, it was Zito's actions - not Ingram's - that

were the subject of the negligent delivery and failure to remove claims that were litigated

in the limitation action.

For purposes of the trial on the limitation actions, Judge Berrigan started by

assuming plaintiffs would be able to prove it was negligent to both deliver and not remove

the barge. Judge Berrigan then proceeded to determine if such putative acts of negligence

caused the barge to breakaway from its moorings. (See pp. 6 and 7 of Judge Berrigan's

March 31, 2008 Opinion, attached hereto as Exhibit "A".) With respect to the putative

negligence of delivering the barge to Lafarge's terminal, Judge Berrigan made the following

determination:

> While the court agrees that delivery of the barge to [Lafarge]
> was a "but for" cause of the barge breaking away from its
> mooring, **the court finds that mere delivery of the barge on
> Friday, August 26, 2005, was not a proximate cause of the
> injury to the Claimants**. As discussed by the Fifth Circuit in
> *Stolt Achievement Ltd. v. Dredge B.E. Lindholm*, proximate
> cause is related to superceding cause doctrine, which "applies
> where  the defendant's negligence in fact substantially
> contributed to the plaintiff's injury, but the injury was actually
> brought about by a later cause of independent origin that was
> not foreseeable." *Stolt Achievement*, 447 F.3d at 367. In this
> matter, it was not reasonably foreseeable that the ING 4727
> would break free from its moorings because it was not
> forecasted for Hurricane Katrina to strike New Orleans on
> August 26, 2005. At that time, the USCG had not issued any
> alerts or bulletins for New Orleans, and the harbor was open

> for commercial traffic. Thus, **the mere fact that the barge was delivered to [Lafarge] cannot be a proximate cause of the ING 4727 breaking free from its mooring**. Accordingly, it was not negligent for Ingram to deliver the barges to [Lafarge] on Friday, August 26, 2005. *(emphasis added)*.

See Exhibit "A", pp. 12 and 13.

Zito - not Ingram - delivered the barge on August 26, 2005. Plaintiffs attempted to impute Zito's actions on Ingram to support the negligent delivery claim against to Ingram. The same parties, facts, legal standards and arguments that were at issue for the negligent delivery claim against Ingram, are likewise the subject of plaintiffs' negligent delivery claim against Zito. The claims are for all intents and purposes identical.

This claim has already been litigated before Judge Berrigan. Judge Berrigan conclusively determined that the delivery of the barge to Lafarge's terminal on August 26, 2005 was not a proximate cause of the subsequent breakaway and further, that it was not negligent to deliver the barge to Lafarge on August 26, 2005.

The doctrine of collateral estoppel, as well as the companion issue preclusion doctrine, are intended to promote the interests of judicial economy by treating specific issues of fact or law that have already been validly and necessarily determined as final and conclusive. *United States v. Shanbaum,* 10 F.3d 305, 311 (5th Cir. 1994). "[A] right, question, or fact distinctly put in issue and directly determined as a ground of recovery by a court of competent jurisdiction collaterally estoppes a party... from re-litigating an issue in a subsequent action". *Universal American Barge Corp. v. J-Chem, Inc.,* 946 F.2d 1131, 1136 (5th Cir. 1991) and *Hardy v. Johns-Mandeville Sales Corp.,* 681 F.2d 334, 338 (5th

14

Cir. 1992). Preclusion of a previously litigated issue under the doctrine of collateral estoppel requires that the issue under consideration be identical to the issue previously litigated; that the issue was fully and vigorously litigated in the primary proceeding; that the previous determination of the issue was necessary for the judgment in that proceeding; and that no special circumstances exist that would render preclusion inappropriate or unfair. *Universal American Barge Corp.,* at 1136*; Parklane Hosery,* 439 U.S. 322, 326-32, 99 S. Ct. 645, 649-52, 58 L. Ed. 2d 552 (1979) and *In re Lewisville Properties, Inc.,* 849 F.2d 946,949 (5th Cir. 1988). All of these factors are present.

The negligent delivery claim against Zito is identical to the negligent delivery claim that was previously litigated before Judge Berrigan. They involve the same parties, facts, records, witnesses, legal standards and arguments. The negligent delivery claim was fully and vigorously litigated in the limitation action. Plaintiffs relied upon the same documents, witnesses and arguments in that proceeding that they intend to rely upon to support their negligent delivery claim against Zito. It was absolutely necessary for Judge Berrigan to make a determination on the negligent delivery claim in order for the Judge to exonerate Ingram from liability.[19]

Finally, there are no special circumstances that would render collateral estoppel inappropriate or unfair. To the contrary, this is precisely the type of situation where collateral estoppel should apply. This issue was fully and vigorously litigated by the

---

[19] An ultimate determination on the negligent delivery claim was necessary to exonerate Ingram from liability.

plaintiffs and their counsel in the limitation action. The facts that Judge Berrigan relied upon in determining that the August 26, 2005 delivery of the barge was not a proximate cause of the subsequent breakaway are the same facts that apply to the claims against Zito. Judge Berrigan's determination that the August 26, 2005 delivery was not a proximate cause applies with equal force to the claims against Zito. This issue has been determined and the doctrine of collateral estoppel should apply to promote judicial economy and prevent needless litigation.

**The Plaintiffs Have Effectively Withdrawn the Negligent Delivery Claim as to Zito**

In the alternative, and should the Court find that Judge Berrigan's determination on the negligent delivery claim is not entitled to preclusive effect in this matter, the plaintiffs have effectively abandoned the negligent delivery claim against Zito. The expert that plaintiffs retained to address this allegation as to Zito, Hector Pazos, was recently deposed. During that deposition, counsel for plaintiffs stipulated on the record that plaintiffs will not offer any expert opinion testimony concerning the negligent delivery claim as to Zito. In this regard, counsel for plaintiff stated as follows:

> "Actually, I will go on the record. Brian Gilbert, counsel for plaintiffs. We are not going to offer any opinion testimony from Mr. Pazos that Zito was negligent or at fault connected with the delivery of the barge on the date that it was delivered."

See p. 344, l. 23- p. 345, l. 4, of the transcript of Mr. Pazos deposition, attached hereto as Exhibit "G".

Mr. Pazos was the only expert that suggested that Zito may have been negligent in delivering the barge to Lafarge on August 26, 2005. Given the above stipulation, it is now

clear that plaintiffs have effectively abandoned the negligent delivery claim against Zito. Accordingly, and irrespective of the preclusive effect that should be given to Judge Berrigan's previous determination on this issue, the claim against Zito has been abandoned and, therefore, should be dismissed.

**The Failure to Remove Claim Is Also Subject To Collateral Estoppel**

The remaining claim against Zito is plaintiffs' claim that Zito was negligent in failing to remove the barge from Lafarge's terminal before Hurricane Katrina struck New Orleans.[20] Like the negligent delivery claim, the issue of Zito's alleged failure to remove the barge was litigated in the limitation action. Plaintiffs attempted to impute Zito's alleged failure to remove the barge directly to Ingram in the limitation matter. Judge Berrigan correctly found that since Ingram was not aware of Busch's alleged call to Zito or Zito's alleged failure to act after allegedly receiving Busch's call, Ingram could not be liable for failing to remove the barge. Nonetheless, Judge Berrigan went on to analyze the claim based on the assumption that Ingram had a duty to remove the barge prior to the storm. In other words, and before Judge Berrigan exonerated Ingram on the failure to remove claim, Judge Berrigan assumed the plaintiffs could prove that Ingram was negligent in failing to remove the barge. The question then became whether the failure to remove the barge was a proximate cause of the barge's subsequent breakaway from the dock. The

---

[20] This claim is rooted solely in Busch's suggestion that he left a voicemail message with Zito on the morning of August 27, 2005. As discussed later in this memorandum, there is no real or genuine dispute as to whether he called Zito that morning, much less, that he left a voicemail message with Zito that morning. The uncontradicted telephone records from both Lafarge and Zito establish conclusively that Busch did not call Zito that morning.

same question applies to the plaintiffs' claim against Zito.

Judge Berrigan answered this question in the negative. Judge Berrigan specifically determined:

> **"[F]ailing to remove the barge was not a proximate cause of the injury.** The Court notes that there were other barges present at the [Lafarge] facility, including [Lafarge] barges. There was no evidence that these barges broke free from their moorings or caused injury simply because they were left under [Lafarge's] custody during the storm. Accordingly, the claimants have not proven by a preponderance of the evidence that Ingram was negligent for failing to remove the ING 4727 from [Lafarge's] wharf. (Emphasis added)

See Exhibit "A", p. 15.

For purposes of Zito's motion, and even if this Honorable Court proceeds with the assumption that Zito had knowledge that the barge was ready to be picked up or that Zito was negligent in failing to remove the barge prior to the storm (both of which are vehemently denied by Zito), the failure to remove the barge was not a proximate cause of the barge's subsequent breakaway. This exact issue has already been fully and vigorously litigated by plaintiffs and their counsel before Judge Berrigan. Judge Berrigan conclusively determined that the failure to remove the barge was not a proximate cause. Judge Berrigan's determination on this issue is entitled to preclusive effect in this matter. Accordingly, and even if Zito knew or should have known that the barge was empty and had been released by Lafarge, the failure to remove the barge (whether the failure was attributed to Zito or Ingram) was not proximate cause of the subsequent breakaway.

18

**The Only Reasonable Conclusion Is That Busch Did Not Call Zito**

Although a resolution of this question is not necessary for this Honorable Court to grant Zito's Motion for Summary Judgment[21], out of an abundance of caution, Zito takes this opportunity to demonstrate the lack of a real or genuine dispute concerning Busch's alleged call to Zito on August 27, 2005.

Due to construction that was taking place at Lafarge's terminal, Lafarge's office telephone lines were experiencing systemwide problems and were not reliable.[22] Accordingly, Busch relied on his Nextel telephone service that morning.[23] Busch called Domino at approximately 1000 hours to have the M/V REGINA H reposition the barge.[24] He also spoke with Lafarge's Safety Director, Jennifer Arnold, several times that morning to discuss the status of the efforts to secure the terminal for the approaching storm.[25]

Domino's telephone number was 504-341-1122.[26] Busch used a Nextel telephone with the assigned telephone number 985-397-3254.[27]

---

[21] The failure to remove the barge was not a proximate cause of a matter of law.

[22] Busch, Exhibit "D", pp. 12-13.

[23] Busch, Exhibit "D", pp. 13-15.

[24] Deposition of Domino's dispatcher, David Castaing, Exhibit "J", p. 21.

[25] Busch, Exhibit "D", pp. 55-56; and Jennifer Arnold's deposition, pp. 31-32, excerpts of which are attached as Exhibit "K".

[26] Raymond Grabert's deposition, p.23, excerpts of which are attached as Exhibit "L".

[27] See Lafarge's Answer to Interrogatory No. 2, attached as Exhibit "M".

In response to a discovery request seeking the telephone records of the calls that Busch made or received on August 27, 2005, Lafarge produced the Nextel billing records, which include a detailed report concerning the calls Busch made or received on August 27 from his Nextel telephone. (See the Nextel billing records, in particular the Subscriber Activity Detail report on page A10, which was also labeled as Bates No. LNA001052, attached as Exhibit "N".) The Nextel records confirm that Busch called Domino (504-341-1122) at 0953 hours that morning. (See Exhibit "N".)

Busch also had several telephone conversations with Ms. Arnold that morning to discuss the status of the efforts to secure the terminal for the approaching storm. Ms. Arnold was at home in Kentucky on August 27, 2005. She was using both her cellular telephone (270-493-6004) and her home telephone (270-247-3961) to communicate with Busch that morning.[28] The Nextel records for Busch's telephone show that he received a call from Ms. Arnold's home telephone at 1031 hours, that he placed calls to her home telephone at 1032 hours, 1035 hours and 1036 hours, that he received a call from her cellular telephone at 1050 hours and that he called her cellular telephone at 1208 hours. (See Exhibit "N").

According to the Nextel records, the only other calls that Busch made or received that morning were a call to check his voicemail at 1044 hours, a call to another Lafarge telephone number (504-253-1016) at 1048 hours, an incoming call from that same Lafarge telephone number at 1107 hours and a follow up call to the same telephone number at

---

[28] Arnold, Exhibit "K", p. 52.

1108 hours.[29]

Zito's telephone number was 504-835-8531.[30] Except for the purported call to Zito that morning, **every other telephone call that Busch claims to have either made or received that morning is documented and confirmed in the Nextel records. There is no record of a telephone call to Zito (504-835-8531) that morning.**

The evidence is not limited to the Nextel records. Zito's telephone system generates an electronic log that identifies incoming and outgoing telephone calls. **The log from August 27, 2005 does not show a telephone call from Busch's telephone (985-397-3254) or for that matter, any of the other telephone numbers that were potentially available to Busch that morning.** (See Zito's August 27, 2005 telephone log, Exhibit "O"; and Lafarge's Answer to Interrogatory No. 2, Exhibit "M").

The fact of the matter is that every piece of documentary evidence that could corroborate the call to Zito shows just the opposite - **there was no call to Zito that morning!** All of the calls that Busch made or received that morning are documented and fully corroborated by the telephone records. There is however absolutely no record (either from Lafarge's side of the equation or Zito's side) of Busch's alleged call to Zito that morning.

The plaintiffs' expert agrees that in the absence of Busch's alleged voicemail

_____

[29] The Nextel records show that the 504-253-1016 telephone number is a Lafarge telephone number. See Exhibit "N", p. 3, Bates No. LNA 001022 and p. 7, Bates No. LNA 001026.

[30] Boudreaux, Exhibit "B", p. 126.

message, Zito would not have known that the barge was empty and therefore, could not

be negligent for failing to remove the barge.

> Q.    On page four of your report you talk about Busch testifying that the - it's about half way down - that there was limited communication, and that the communications - that they were limited to Nextel cell phone service. **I want you to assume that the records from Lafarge show that their Nextel phones, there is no evidence of a call on a Nextel - or a Lafarge Nextel phone being made to Zito that morning. Based on that assumption, you would agree that Zito would not have known that the barge was empty?**
>
> A.    **If that is true, then well that is true.**

See p. 50, l. 12, of Donald Green's November 8, 2008, deposition, Exhibit "F".

> Q.    In Section 5.14 in your March 11, 2009, expert report, there is a statement, the concluding sentence that says, "I'm of the opinion that the failure of Zito, had it received the call to retrieve the barge, knowing that it was empty, released and ready for pickup, constituted negligence."
>
> A.    Yes.
>
> Q.    **Would you agree that if Zito had not received the call that your opinion regarding its negligence would be reversed?**
>
> A.    **Yes.**

See p. 195, l. 6, of Mr. Green's June 25, 2009 deposition, Exhibit "E".

This is precisely what the telephone records show. There was no call to Zito that

morning. Zito did not know that the barge was empty. Zito did not know that the barge had

been "released" by Lafarge. Zito did not know that the barge was ready to be picked up.

There is absolutely no basis to claim, much less find, that Zito was negligent for not removing the barge. Accordingly, this claim must be dismissed.

Furthermore, the uncontraverted testimony from Zito's Vice President, Barry Boudreaux, establishes that Zito's telephone system was not capable of accepting a voicemail message as claimed by Busch. (See  p. 6 of this memorandum).

The suggestion that Busch attempted to leave a voicemail message with Zito that morning is the only factual thread that even arguably explains Zito's involvement in this litigation. Given the fact that the documentary evidence establishes clearly and unequivocally that Busch did not call Zito on August 27, there can be only one reasonable conclusion - he did not call Zito that morning.

**Lafarge Did Not Expect Zito to Remove the Barge Before the Storm**

Finally, it is undisputed that even if Busch did leave a message with Zito that morning, Lafarge did not anticipate or expect Zito or anyone else to remove the barge before the storm. It is for that reason that Lafarge took specific actions to secure the barge to ride out the approaching storm at Lafarge's terminal. These actions included, but were not limited to, hiring the Unique boat (the M/V REGINA H), to reposition and secure the barge to ride out the storm at Lafarge's terminal. It is undisputed that Zito had no involvement with or knowledge of this.

## **CONCLUSION**

Zito's involvement with the barge stopped when Zito delivered the barge to Lafarge on August 26, 2005. The delivery of the barge to Lafarge was not a proximate cause of the subsequent breakaway nor was the flooding to portions of New Orleans a reasonably forseeable consequence of delivering the barge to Lafarge.

It is axiomatic that since Zito did not know that the barge was empty and had been released by Lafarge, Zito could not have been negligent for failing to remove the barge. Irrespective of whether Zito did or did not know that the barge was empty, the failure to remove the barge was not a proximate cause of the breakaway nor was the flooding a reasonably forseeable consequence of the failure to remove the barge.

Accordingly, and for the reasons more fully set forth above, Zito respectfully submits that this summary judgment should be granted and all claims against Zito should be dismissed, with prejudice.

Respectfully submitted,

**s/C. William Emory**
ANDRÉ J. MOULEDOUX (LA Bar #9778)
C. WILLIAM EMORY (LA Bar #20179)
MOULEDOUX, BLAND, LEGRAND &
BRACKETT, L.L.C.
701 Poydras Street, Suite 4250
New Orleans, LA 70139
Telephone: (504) 595-3000
Email:  bemory@mblb.com
Attorneys for Zito Fleeting, L.L.C. and Zito
Fleeting, Inc.

## **CERTIFICATE OF SERVICE**

I do hereby certify that I have on this 2nd day of October, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record. I also certify that I have mailed the foregoing by United States Postal Service, First Class, to all non-CM/ECF participants.

**s/C. William Emory**

25