```
                UNITED STATES DISTRICT COURT

                EASTERN DISTRICT OF LOUISIANA


IN THE MATTER OF THE        *   CIVIL ACTION
COMPLAINT OF INGRAM         *
BARGE COMPANY, AS OWNER     *   NO. 05-4419
OF THE ING4727,             *       C/W 05-4237
PETITIONING FOR             *       C/W 05-5531
EXONERATION FROM OR         *       C/W 05-5724
LIMITATION OF LIABILITY     *   SECTION "C" (2)
                            *
                            *   JUDGE HELEN G.
                            *      BERRIGAN
                            *
                            *   MAG. JUDGE, JOSEPH
                            *      WILKENSON, JR.
                            *
 *  *  *  *  *  *  *  *  *  *  *  *



        Deposition of Barry Boudreaux taken at

the law offices of Liskow & Lewis, located at 701

Poydras Street, 50th Floor, New Orleans, Louisiana

70139, beginning on the 23rd day of February,

2007.




Reported by:

     Peter Caruso, CCR-CVR
     Certified Court Reporter
```

PETER CARUSO & ASSOCIATES (504)432-3656
P.O. BOX 10741, JEFFERSON, LOUISIANA 70181

EXHIBIT B

1  Q. But if somebody calls in from a cell
2  phone at LaFarge it wouldn't show up?
3  A. Unless their cell phones are registered
4  under LaFarge. I don't know.
5  Q. Yeah. So you don't know -- the calls
6  that are not identified, you don't know who they
7  came from?
8  A. I don't know how the phone system picks
9  up these names. So, you know, if it's a caller
10  ID issue, I've no knowledge of that. But this
11  calls -- this is generally all the calls to
12  Extension 117, which is the dispatcher.
13      MR. WIEDEMANN:
14          I'm going to mark the phone records
15          that were given to us as Boudreaux No. 4
16          for purposes of identification.
17  BY MR. WIEDEMANN:
18  Q. Is there any voice mail recordation made
19  other than this printout that you have?
20  A. The dispatcher's phone does not have
21  voice mail.
22  Q. So there's nothing, no record that's kept
23  that you could look through to see what the
24  message is vocally?
25  A. You can't leave a vocal message. You

40

1   have to talk to a human being.
2       Q.   So that when somebody calls in, what
3   happens if the dispatcher is in the men's room?
4       A.   It's going to ring until he's finished.
5       Q.   It's going to ring until he answers it?
6       A.   Until he answers the phone or they hang
7   up.
8       Q.   So there is no incoming call that is not
9   answered?
10      A.   Not answered?
11      Q.   Uh-huh (affirmative response).
12      A.   You have to answer the phone or they hang
13  up.  They can hang up.
14      Q.   If they hang up, there would still be an
15  incoming call recorded?
16      A.   I'm not sure if this has to be answered.
17  I don't think this just -- I don't know how this
18  system works, so I can't answer that.  If you're
19  asking me if someone can call and just hang up
20  and be on this record, I do not know that.
21      Q.   Well, for instance, I'm looking at
22  8/31 --
23      A.   I know one thing, it all says lines on
24  it.  So a line is a point of pickup, because it's
25  a multiple-line phone.

1   message with a machine. He'd have to
2   talk to someone.
3   BY MR. WIEDEMANN:
4       Q. Okay. So if he says he left a message,
5   is that, according to your understanding, not
6   possible?
7       A. Not the way our phone system is --
8       Q. The way it was at that time?
9       A. The way it was at that time was, you had
10  to talk to a human being.
11      Q. Are there any lines at the Ingram --
12  excuse me, at the Zito dispatch office, or the
13  Zito office where messages can be left?
14      A. There's extensions within the office that
15  messages can be left.
16      Q. So if Mr. Busch called --
17      A. But --
18      Q. Wait. Let me finish my question.
19      A. Okay.
20      Q. If Mr. Busch called and asked for an
21  extension, how would he have to --
22      A. He'd have to ask for a person by name.
23  We don't have published extensions.
24      Q. So if -- he could call in and ask, who
25  would answer? The dispatcher?

1   A.   A dispatcher would answer.
2   Q.   And if he asked for an extension --
3   A.   He has to talk to a human being, though.
4   Q.   Okay. Well, let me finish. I understand
5   that you --
6   A.   No, I'm just saying --
7   Q.   Well, yes, but I'm just trying to get the
8   information. I know what you're --
9   A.   I understand.
10  Q.   If he calls in -- if Mr. Busch calls in
11  and asks to speak to some person other than the
12  dispatcher, it's your testimony that he could not
13  leave a message, for instance, at your extension
14  or the extension of anybody else?
15  A.   He could leave a message at my extension
16  if the dispatcher answers the phone and then puts
17  him to that extension.
18  Q.   Okay. So if Mr. Busch called in and said
19  "I want to speak to Mr. Boudreaux" and the
20  dispatcher transferred the call to your
21  extension, it would be he could not -- could he
22  then record a message?
23  A.   He could record a message.
24  Q.   So that's the only way that a message
25  could be recorded if Mr. Busch called in?

1    A.   Yes.
2    Q.   Because you can record on -- on how many
3    other extensions other than yours, if you can
4    tell me?
5    A.   I don't know off the top of my head.
6    Seven or eight.  But it has to be -- there's two
7    receptionists' extensions, there's a daytime and
8    a nighttime and a weekend, which
9    nighttime/weekend is dispatch, and those two
10   phones do not have voice mail.  So there has to
11   be a human being to initially pick up the phone
12   from the outside.
13   Q.   If he called in to the dispatcher's
14   number and said I want to speak to Mr. Boudreaux
15   or any of seven or eight other people, he could
16   be transferred to that extension -- any one of
17   those extensions and leave a message?
18   A.   Yes.
19   Q.   And not necessarily talk to a human being
20   on the extension?
21   A.   On the extension.
22   Q.   But if he called in, he would have to
23   call in -- he couldn't call in direct to the
24   extension?
25   A.   No, you cannot.

1  Bigelow, the product of cement.
2      Q.  Okay.  And this is being called in by Ed
3  from LaFarge?
4      A.  LaFarge.
5      Q.  Hm?
6      A.  LaFarge Cement.
7          **MR. HAYCRAFT:**
8              Time out.
9              (Discussion off the record.)
10 **BY MR. WIEDEMANN:**
11     Q.  What does that mean to you, that Ed
12 called from LaFarge at 1435, and what does the
13 rest of that mean about these two barges?
14     A.  Ed called in from LaFarge for the 4745
15 and 4727 loads of cement, they were due in from
16 Ingram, or from the FR Bigelow.  He put them on
17 order -- on arrival.  So that means as soon as
18 the barges get to the fleet, get them to him.
19     Q.  And what does "hot" mean?
20     A.  That means he wants them really bad.
21     Q.  Okay.  At that point in time, were you
22 aware -- and when I'm speaking about -- when I
23 say "you," I mean Zito Fleeting, LLC.  Were you
24 aware of the hurricane at that time?
25     A.  I don't think it was a hurricane at that

1   A.   Hot on arrival.
2   Q.   And you all delivered them on the -- they
3   were delivered to LaFarge on the 26th?
4   A.   Right.
5   Q.   And you got ticket numbers, they were
6   delivered, it looks like, at 2300?
7   A.   They left the fleet at 2300.
8   Q.   Okay.  And --
9   A.   They got on lock turn at 2300.  So the
10  tow was billed to depart and to get on turn at
11  2300.  The boat, the FR Bigelow, I believe, came
12  in on the 25th, that day.
13  Q.   So the Bigelow, which was an Ingram
14  vessel?
15  A.   Large Ingram boat.
16  Q.   Delivered the two barges -- that is, 2745
17  and 4727 Ingram -- on the 26th?
18  A.   With other barges.
19        **MR. HAYCRAFT:**
20            25th.
21        **THE WITNESS:**
22            25th, with other barges in tow.
23    **BY MR. WIEDEMANN:**
24  Q.   Well, this is -- it says "Date 8/26/05."
25  A.   Yeah.  But you might be looking at his

64

1  outbound tow.  It came in on the Bigelow.  He
2  logged into the fleet at 0750 on the 25th with
3  his tow.  He had seven barges.
4      Q.  And they went into the LaFarge facility
5  when?
6      A.  And then it left at 2300 on the 25th,
7  that evening, and they arrived LaFarge 1125 on
8  the 26th.
9      Q.  1125 a.m. or p.m.?
10     A.  A.m.
11     Q.  On the 26th?
12     A.  Yeah.
13     Q.  So they were delivered -- how many barges
14 were there besides the two Ingram barges?
15     A.  There was -- they were all Ingram.  There
16 was two to LaFarge and three to another location
17 in the back.
18     Q.  So they were delivered at 11 a.m. on the
19 26th?
20     A.  Roughly, yeah.
21     Q.  Is that 11 or 12?
22     A.  It may be 1225 on the 26th.  There's an
23 official log in there.
24     Q.  Where are you looking at on 1225?
25     A.  That top line.

                                                                 115

1              The numbers are 1290, 1287, 1336 and
2       1304.
3  BY MR. WIEDEMANN:
4       Q.   So the fact that you sent out a notice on
5  the 27th at 9:54 a.m. that you were closing the
6  fleet to incoming traffic, that you continued to
7  receive incoming traffic from Zito after that
8  time?
9       A.   Ingram?
10      Q.   Ingram, I'm sorry.
11      A.   We closed the fleet to all unannounced
12 traffic, and that's why the notice goes out.
13      Q.   Right.
14      A.   We know about the barges that's
15 transiting to us, en-route, and which ones we
16 have to clean up in the harbor.  Those are in our
17 figuring already.
18      Q.   But you knew --
19      A.   I knew the Connie Z was in transit to us.
20 That's why those barges were received.
21      Q.   But you knew that, even though you issued
22 that, that you would take in Ingram barges?
23      A.   We would take in the barges I knew that
24 was coming to me.  Could have also been other
25 customer's barges.

```
                                                    116
 1         Q.   And looking at Boudreaux 2, you knew that
 2    4727 and 4745 were at LaFarge, did you not?
 3         A.   Did I know they were at LaFarge?
 4         Q.   Yes.
 5         A.   Yes.
 6         Q.   And you knew that after they were
 7    unloaded that they would be released from LaFarge
 8    and somebody would have to pick them up?
 9         A.   We couldn't pick them up.  No one could
10    pick them up.
11         Q.   Well --
12         A.   We had barges -- boats transiting back
13    already.  By the time our boats came back, late
14    on the 28th, we were already in lock-down mode
15    and we were locking them down.
16         Q.   This is on the 27th?
17         A.   Right.  But the boats, you noted that the
18    boats came back after the fleet was closed, late
19    that evening.  We had other harbor stuff to clean
20    up and to lock the fleets down.
21         Q.   Are you saying that on the 31st you all
22    were not -- you were still receiving barges?
23         A.   Receiving barges on the 31st?
24         Q.   On the 28th?  On the 27th and 28th?
25         A.   We were bringing in the barges with our
```

126

1  Q. And if the number that was called -- and
2  I'm going to give you a number that's listed on a
3  LaFarge document, LNA-00106, for Zito Fleet of
4  835-8531, would that be a correct number for Zito
5  Algiers Fleet?
6  A. Yes.
7  Q. And if that number were called on
8  Saturday morning, August 27th, that call would go
9  to the dispatcher?
10  A. Yes.
11  Q. And the dispatcher on duty that morning
12  was Scott Wershbale?
13  A. Chad Wershbale.
14  Q. Chad Wershbale. And you've looked at
15  the job orders for August 27th, and do you see
16  any record of any such job order?
17  **MR. WIEDEMANN:**
18  There is no 27. Object to the form
19  of the question.
20  **BY MR. HAYCRAFT:**
21  Q. Do you see any job order of that nature
22  on August 27th?
23  **MR. WIEDEMANN:**
24  There is no job order. And if there
25  is, I'll call for production of it. We