EDWARD BUSCH

MINIDEP by Kenson

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE          *   CIVIL ACTION
COMPLAINT OF INGRAM           *
BARGE COMPANY, AS OWNER       *   NO. 05-4419
OF THE ING4727,               *   C/W 05-4237
PETITIONING FOR               *   C/W 05-5531
EXONERATION FROM OR           *   C/W 05-5724
LIMITATION OF LIABILITY       *   SECTION "C" (2)
                              *
*  JUDGE HELEN G.
                              *       BERRIGAN
                              *
                              *   MAG. JUDGE, JOSEPH
                              *       WILKENSON, JR.
                              *

* * * * * * * * * * * * * *

Deposition of Edward Busch taken at the
law offices of Chaffe McCall, located at 1100
Poydras Street, Suite 2300, New Orleans,
Louisiana 70163, beginning on the 14th day of
November, 2006.

Reported by:
Peter Caruso, CCR-CVR
Certified Court Reporter

APPEARANCES:

Representing the Plaintiffs,
    Ethel Mumford, et al:

WIEDEMANN & WIEDEMANN
Attorneys at Law
By: Lawrence D. Wiedemann, Esq.
821 Baronne Street
New Orleans, Louisiana 70113

LAW OFFICE OF BRIAN A. GILBERT
Attorneys at Law
By: Brian A. Gilbert, Esq.
3232 Edenborn Avenue
Metairie, Louisiana 70002

MR. PATRICK J. SANDERS, ESQ.
Attorney at Law
3316 Ridgelake Drive
Metairie, Louisiana 70002

Representing the Plaintiffs,
    The Parfait Family, et al:

LAW OFFICES OF ASHTON R. O'DWYER, JR.
Attorneys at Law
By: Ashton R. O'Dwyer, Jr., Esq.
365 Canal Street
Suite 2670
New Orleans, Louisiana 70130

Representing the Plaintiffs:

Representing the Plaintiffs,
    Marie Benoit, et al:

MAPLES & KIRWAN, LLC
Attorneys at Law
By: Carlos Zelaya, II, Esq.
902 Julia Street
New Orleans, Louisiana 70113

Representing Joseph C. Domino, Inc.
    and Unique Towing, Inc.:

EMMETT, COBB, WAITS & HENNING
Attorneys at Law
By: John F. Emmett, Esq.
1515 Poydras Street
Suite 1950
New Orleans, Louisiana 70112

Representing Joseph C. Domino, Inc.:

HARRIS & RUFTY, L.L.C.
Attorneys at Law
By: Jill Willhoft, Esq.
650 Poydras Street
Suite 2710
New Orleans, Louisiana 70130

Representing Lafarge North America, Inc.:

CHAFFE, McCALL, L.L.P.
Attorneys at Law
By: Robert B. Fisher, Jr., Esq.
    Derek Walker, Esq.
    Thomas Forbes, Esq.

Representing New York Marine and
General Insurance Company:

SUTTERFIELD & WEBB, L.L.C.
Attorneys at Law
By: Daniel A. Webb, Esq.
650 Poydras Street
Suite 2715
New Orleans, Louisiana 70130

Representing American Owners Mutual
    Protection and Indemnity Association:

MONTGOMERY, BARNETT, BROWN & READ,
HAMMOND & MINTZ
Attorneys at Law
By: Philip S. Brooks, Jr., Esq.
1100 Poydras Street
New Orleans, Louisiana 70163

Representing Board of Commissioners,
    Port of New Orleans:

DAIGLE, FISSE & KESSENICH
Attorneys at Law
By: Jonathan H. Sandoz, Esq.
P. O. Box 5350
Covington, Louisiana 70434-5350

Representing Lafarge North America, Inc.:

GOODWIN PROCTOR, LLP
Attorneys at Law
By: Mark Raffman, Esq.
901 New York Avenue

EXHIBIT D

**- 11 -**

1  Q. And for the four years you were there,
2  you were always the terminal manager or -- the
3  assistant terminal manager, or did you start off
4  with a different position?
5  A. I was hired as the assistant terminal
6  manager.
7  Q. Tell me, as the assistant terminal
8  manager what means of contact do you have with
9  the other Lafarge offices and facilities? Do you
10 have e-mail, faxes? How do you communicate back
11 and forth?
12 A. When it's necessary to communicate with
13 those folks, we communicate by phone, by e-mail
14 and by fax.
15 Q. So you have faxing and e-mailing
16 capacity?
17 A. We did before the storm.
18 Q. Up until Katrina you had that facility?
19 A. Yes.
20 Q. And you had telephone?
21 A. They were working on the telephones and
22 the computer lines, the IT lines in the plant
23 prior to the storm. So the computers were down
24 and telephone was sketchy, at best. It was in
25 and out.

**- 12 -**

1  Q. Before the hurricane?
2  A. Yes, sir. We were in the process of --
3  we built a new office building and we were in
4  the process of moving when the storm came.
5  Q. But how long before Hurricane Katrina
6  were you having problems with faxing, e-mailing
7  and telephone?
8      MR. WALKER:
9          Objection. That wasn't his
10         testimony.
11 BY MR. WIEDEMANN:
12 Q. You can answer. Well, let me go back,
13 because maybe I didn't hear you correctly.
14     Was the e-mail working before the
15 hurricane?
16 A. Just prior to the hurricane, no, sir.
17 Q. How long before the hurricane? How many
18 days?
19 A. It probably -- I couldn't give you a
20 specific time, but we were experiencing
21 communications problems for, for a long period of
22 time.
23 Q. Was the e-mail non-functional for some
24 period of time?
25 A. Yes, sir.

**- 13 -**

1  Q. And was it a week or two weeks, or give
2  me some parameters?
3  A. It was probably at least a week.
4  Q. So for at least a week before Hurricane
5  Katrina you didn't have e-mail service, or
6  reliable --
7  A. Reliable --
8  Q. -- service?
9  A. -- e-mail service.
10 Q. Was that true also for your faxing
11 capacity?
12 A. For the most part, yes, sir.
13 Q. Same period of time?
14 A. Yes.
15 Q. And what about your telephone service?
16 A. Well, that was in and out. That was
17 another one undependable.
18 Q. So for the same period of time basically
19 your telephone, faxing, e-mail service was
20 unreliable?
21 A. Yes, sir.
22 Q. And your telephone service, was that from
23 a land line, or did you have cell phone
24 capability?
25 A. We had land lines and cell phones.

**- 14 -**

1  Q. But the land line was not working
2  correctly?
3  A. Correct.
4  Q. The cell phones, did you have two-way
5  communication, I mean that you could talk back
6  and forth? I mean, two-way radio facility?
7  A. Yes, sir.
8  Q. And that two-way radio facility was
9  through what service?
10 A. Nextel, I believe it was.
11 Q. So could you have two-way radio service
12 with various Lafarge offices?
13 A. No, sir. Our use of the Nextel phones
14 was primarily for the in-house contacting the
15 employees and each other.
16 Q. So the Nextel service, although it was
17 operable, was only limited to in-house use?
18 A. It wasn't limited. It's just the way we
19 were using it.
20 Q. So you wouldn't use it to call, let's
21 say, Joppa?
22 A. Not necessarily, no.
23 Q. Hm?
24 A. Not necessarily, no.
25 Q. Could you call Joppa?

Page 15:

1    A. We could have, yes.
2    Q. Could you call Reserve?
3    A. You know --
4    Q. Well, there's a Lafarge facility in
5  Union, is there not?
6    A. Yes, sir.
7    Q. Could you call Union?
8    A. It was an operating telephone, you know.
9    Q. Okay.
10   A. We could have called anyone.
11   Q. And it wasn't just that it was restricted
12 to in-house, that's what you used it for; is that
13 right?
14   A. Yes, sir.
15   Q. But you could use it to reach other
16 facilities?
17   A. Yeah.
18   Q. Hm?
19   A. Yes, sir.
20   Q. When did you first learn that there was
21 some hurricane preparation to be instituted?
22       MR. WALKER:
23           Object to the form. By the way, Mr.
24       Busch, if there's a question that you
25       want Mr. Wiedemann to rephrase or repeat

Page 16:

1        or you don't understand, you can
2        certainly ask him to repeat it.
3    THE WITNESS:
4        Would you repeat the question,
5        please?
6  BY MR. WIEDEMANN:
7    Q. Yes. My question is: Did you receive
8  instructions from someone in the Lafarge
9  hierarchy to take some action regarding the
10 impending hurricane, or was that done locally?
11       MR. WALKER:
12           Same objection.
13       THE WITNESS:
14           I don't understand what you're
15       asking me.
16 BY MR. WIEDEMANN:
17   Q. Well, what I'm asking you is: If I'm at
18 home, I'm the one responsible for determining
19 what I do relative to my house. If I'm in the
20 service, somebody else determines what happens.
21 And usually in corporations there's a level of
22 superior people and inferior people. I want to
23 know what happened to bring about any type of
24 consideration for the impending hurricane.
25       MR. WALKER:

Page 17:

1        Same objection.
2    THE WITNESS:
3        I did not receive any phone calls
4        from any superiors that morning.
5  BY MR. WIEDEMANN:
6    Q. I'm not talking about that morning. What
7  morning are you talking about?
8    A. The Saturday morning.
9    Q. Which is the 27th?
10   A. If you say so, sir.
11   Q. Did you have any communications with
12 management prior to the 27th?
13       MR. WALKER:
14           Objection as to any specific subject
15       matter.
16       MR. WIEDEMANN:
17           Well, I've been asking him about
18       Hurricane Katrina for the last ten
19       minutes, and I'm not talking about the
20       1902 hurricane or the 1905 hurricane.
21       MR. WALKER:
22           Well, it's actually really hard to
23       tell from your questions unfortunately.
24       So if you ask a specific question --
25       MR. WIEDEMANN:

Page 18:

1            Well, if you want me to
2        complete, every time I'm talking about
3        Hurricane Katrina. Okay?
4    MR. WALKER:
5        Okay.
6    MR. WIEDEMANN:
7        Unless otherwise mentioned.
8    MR. WALKER:
9        Unless you understand the question,
10       don't answer it.
11 BY MR. WIEDEMANN:
12   Q. Before the 27th, did you receive any
13 communication from anyone at Lafarge concerning
14 hurricane preparations?
15   A. No, sir.
16   Q. So as far as you knew nobody in the
17 Lafarge North America made any effort to
18 communicate with you or your local facility to
19 advise you about any precautions to be taken?
20       MR. WALKER:
21           Objection as to the form. And you
22       can only answer as to what you know about
23       yourself.
24       THE WITNESS:
25           No one contacted me.

## Page 19

1  BY MR. WIEDEMANN:
2  Q. Okay. Well, did anyone contact the
3  terminal manager?
4  A. I don't know what conversations he had
5  with anyone.
6  Q. Well, is it your testimony that the
7  terminal manager, if he received communications
8  from Lafarge about doing something, he would not
9  tell you about it?
10  MR. WALKER:
11      Objection. That's not his
12      testimony.
13  THE WITNESS:
14      I didn't communicate with the
15      terminal manager concerning the hurricane
16      prior to the hurricane.
17  BY MR. WIEDEMANN:
18  Q. Okay. So you had no communication with
19  Lafarge prior to the hurricane?
20  A. No, sir.
21  Q. You had no communication with your
22  general manager -- your terminal manager
23  concerning the hurricane at any time?
24  A. No, sir.
25  Q. Did you have any communication with the

## Page 20

1  people working under you concerning the
2  hurricane?
3  A. Just discussions about the storm and the
4  general direction it was moving.
5  Q. With whom?
6  A. With the people at the plant, the people
7  that report to me.
8  Q. Discussions about what? Just about the
9  weather, as what was happening?
10  A. Just about the weather and what was
11  happening. Up until that time, the storm was
12  going to Florida.
13  Q. So prior to the 27th, no discussion was
14  made between you and the terminal manager,
15  between you and Lafarge, and any other, any other
16  facility and no discussion was made between you
17  and your workers concerning hurricane
18  preparation?
19  MR. WALKER:
20      Objection. That wasn't your prior
21  question, so    that's not his prior
22  testimony.
23  MR. WIEDEMANN:
24      I believe I can ask another
25      question.

## Page 21

1  MR. WALKER:
2      That's not what you did. What you
3  constantly do is you recite a prior
4  answer --
5  MR. WIEDEMANN:
6      Read the question.
7  MR. WALKER:
8      -- and change it --
9  MR. WIEDEMANN:
10      Read the question back, please.
11  MR. WALKER:
12      -- in your next question. You're
13  now asking about hurricane preparation.
14  MR. WIEDEMANN:
15      Your objection is to the form of the
16  question.
17      (There was a readback.)
18  BY MR. WIEDEMANN:
19  Q. Mr. Busch, as I understand your
20  testimony, you had no discussion with anyone at
21  any Lafarge facility, including your general
22  manager - terminal manager. You had no
23  discussion with your employees prior to the 27th
24  with regard to hurricane preparation.
25  A. No. I had a discussion with the

## Page 22

1  employees at the terminal. But no one else.
2  Q. What kind of discussion did you have
3  with the employees concerning hurricane
4  preparation prior to the 27th?
5  A. It wasn't a discussion about hurricane
6  preparation. It was a discussion about the
7  weather. Straight up. At that time the
8  hurricane was projected to go into the panhandle
9  of Florida like so many other ones have done. So
10  there wasn't a mad rush at that time to make any
11  preparations for a direct hit.
12  Q. When was your discussion with the
13  employees about the weather?
14  MR. WALKER:
15      Objection. Asked and answered.
16  BY MR. WIEDEMANN:
17  Q. You can answer it.
18  A. Days prior to the actual storm as we saw
19  the weather
20  reports and the bits and pieces that was coming
21  around about the storm. We had discussions. But
22  like I say, they were just that, discussions.
23  Q. Were there any discussions about
24  hurricane preparation at your facility?
25  A. No, sir.

**Page 35:**

1 Q. And your company, that is Lafarge, did
2 not have vessel facility to take barges in or out
3 of the facility, isn't that so?
4 A. I don't know what you're --
5 Q. You did not -- Lafarge at the Industrial
6 Canal did not own vessels that would take barges
7 in and out of the facility?
8 A. No, sir.
9 Q. You depended on the companies that were
10 bringing in cement to arrange to pick up their
11 barges when they were available?
12      MR. WALKER:
13           Object --
14      THE WITNESS:
15           Yes.
16      MR. WALKER:
17           -- to the form.
18 BY MR. WIEDEMANN:
19 Q. And you would -- would it be you that
20 would call all the time when a barge was ready?
21 A. No, sir.
22 Q. Because Mr. Smith testified earlier today
23 that he called sometimes?
24 A. Yes, sir.
25 Q. And that there was a list of numbers in a

**Page 36:**

1 cab of -- I forget the piece of equipment that
2 had who you were to call from the various
3 companies?
4 A. Yes, sir.
5 Q. And you would call Zito? Is that who you
6 called?
7 A. For that particular barge, yes, sir.
8 Q. Did you always call Zito, or did you
9 sometimes call Ingram directly?
10 A. No. If Zito brought the barges in, we
11 called Zito.
12 Q. And how did you know you were to call
13 Zito to pick up Ingram barges?
14 A. Because Zito brought the barge in.
15 Q. And when you called Zito at 9 a.m. on the
16 morning of the 27th, who did you speak to?
17 A. I didn't speak to anyone. I got an
18 answering machine.
19 Q. And was that something that was
20 frequently done, you got the answering machine?
21      MR. WALKER:
22           You can answer.
23      THE WITNESS:
24           Not frequently, but from time to
25      time we would get an answering machine

**Page 37:**

1 with all the fleets if they went out to
2 lunch or had to go to the bathroom or
3 whatever.
4 BY MR. WIEDEMANN:
5 Q. So it was not unusual for you to leave a
6 message on the answering machine?
7      MR. WALKER:
8           Objection. Mis-characterizes his
9      testimony.
10      MR. O'DWYER:
11           On behalf of my clients, I'm calling
12      for production of whatever written record
13      exists of the phone call having been made
14      reflecting the time of call, the duration
15      of the call, and the number to which the
16      call was placed.
17 BY MR. WIEDEMANN:
18 Q. It was -- I don't know whether you
19 answered my question or not, but is it -- was it
20 not -- it was not unusual that you would call a
21 company like Zito and leave a message for them to
22 pick up a barge?
23      MR. WALKER:
24           Objection. Mis-characterizes his
25      testimony.

**Page 38:**

1 BY MR. WIEDEMANN:
2 Q. You can answer it.
3 A. From time to time we did get the
4 answering machines, and it was just a fact of
5 life, and it wasn't surprising with what else was
6 going on with the weather.
7 Q. What message did you leave with Zito?
8 A. I gave him the time, the date, and the
9 number of the barge and told him it was -- had
10 finished, you know, this is the time the barge
11 finished, and it's released and ready to be
12 picked up.
13 Q. Did you expect them to pick it up after
14 you left a message?
15      MR. WALKER:
16           Objection.
17      THE WITNESS:
18           Yes.
19 BY MR. WIEDEMANN:
20 Q. Did you expect them to pick it up before
21 the storm arrived?
22      MR. WALKER:
23           Same objection.
24      THE WITNESS:
25           No.

**EDWARD BUSCH**   MINIDEP by Kenson

## Page 39

BY MR. WIEDEMANN:
1. Q. Why were you calling them on the 27th?
2. A. To release the barge as we do.
3. Q. Well, you just said you knew about the weather conditions. What did you expect to happen?
4. A. I expected to release the barge, and I didn't expect anyone to pick it up.
5. Q. You called them and you didn't expect them to pick it up?
6. A. No, sir.
7. Q. What did you expect to happen when you left the message?
8. A. I didn't expect them to pick it up right away. Our past practice with all the fleets, and Zito included, is that the barge has, they have a tendency to leave barges back there for long periods of time. And call -- just making that call does not necessarily get you prompt service on getting the barge removed.
9. Q. Did you attempt to reach them by your cell phone?
10. A. I don't know if it was a cell phone or if I was in one of the trailers and used the land line. I don't remember which line was used.

## Page 40

1. Q. Did you only make one telephone call?
2. A. To Zito?
3. Q. Yes.
4. A. Yes, sir.
5. Q. Did Zito ever call you back?
6. A. No, sir.
7. Q. Did you ever call Zito back on some other --
8. A. No, sir.
9. Q. -- by some other method?
10. A. No, sir.
11. Q. Prior to the time you had the problem with your communications, did you e-mail and fax companies like Zito?
12. A. Not to my knowledge, sir.
13. Q. You never sent e-mails or faxes to any company --
14. A. Me, personally? No, sir, I did not.
15. MR. WALKER:
16. Objection. Asked and answered.
17. BY MR. WIEDEMANN:
18. Q. Did somebody in your office send e-mails or faxes?
19. A. Prior to the storm, not to my knowledge.
20. Q. Now, after 9 a.m., what time did you meet

## Page 41

1. with your employees at the Industrial Canal facility?
2. MR. WALKER:
3. Objection. Facts not in evidence.
4. BY MR. WIEDEMANN:
5. Q. When he objects, you can answer the question. That has nothing to do with this deposition.
6. A. Okay. The employees and I met around eight o'clock. I was with the contractor for a short period of time and walked back to the dock to see the progress on the barge.
7. Q. What did you tell the employees about the barges, the two Ingram barges that were there?
8. A. Well, I didn't tell them anything about the Ingram barges per se. The barge that they were unloading, that they had finished unloading, they were pulling equipment out and putting tops on, just like normal.
9. Q. So as far as you were concerned, on the morning of the 27th everything was normal and you weren't making any preparations at all for a possible hurricane?
10. MR. WALKER:
11. Objection. You asked him about a

## Page 42

1. meeting with employees at 8 a.m.
2. BY MR. WIEDEMANN:
3. Q. You can answer.
4. A. At 8 a.m., no, we didn't -- we weren't making preparation for any storms.
5. Q. Well, you said you met with the employees after 9 -- 9 a.m., did you --
6. A. No, sir.
7. Q. -- were you --
8. A. I said I met with the employees at 8 a.m.
9. Q. And at 8 a.m. on the morning of the 27th you did not discuss anything with them about hurricane preparations?
10. MR. WALKER:
11. Objection. Asked and answered.
12. BY MR. WIEDEMANN:
13. Q. Hm? Is that correct?
14. A. (no response.)
15. Q. Did you meet with them at any time after the eight o'clock meeting to discuss with them any possible need for hurricane protection?
16. A. Yes, sir.
17. Q. When was that?
18. A. That was approximately at nine o'clock.
19. Q. Was that before or after you called Zito?

**Page 43**

1  A. It was in the same time period. I don't
2  know if it was -- if I had talked to, or if I had
3  called Zito before then. It was at that time we
4  started getting phone calls from the relatives or
5  the families of the people that were at the plant
6  and we were informed that the storm had changed
7  directions, that the projected course was
8  directly towards us.
9  Q. So that at some time around 9 a.m. the
10 families of some of your workers were calling to
11 tell you that the hurricane was coming your way?
12 A. Yes, sir.
13 Q. That's the first notification you had?
14 A. That's the first notification I had that
15 morning.
16 Q. And that was prior to any notification
17 from anybody at Lafarge?
18 A. There was no notification from anybody at
19 Lafarge.
20 Q. What was said at the meeting at nine
21 o'clock?
22 A. That one of the gentleman who -- that was
23 at the dock, his wife called and said that she
24 was -- had watched -- was watching the weather
25 channel and the storm had changed directions. At

**Page 44**

1  that time, we turned the radio on, and I think it
2  was my pickup truck, and started listening to the
3  weather reports, and at that point we started
4  making preparations, because at that point, the -
5  - we didn't know where the storm was going.
6  Q. And that was after nine o'clock on the
7  27th?
8  A. Yes, sir.
9  Q. And what did you tell the employees to do
10 based upon what the relatives had told you and
11 what you heard on the radio?
12 A. We were to get all the loose equipment
13 and all the equipment off the dock. We had to
14 finish closing up a barge and getting the
15 equipment out of the barge. Normal operations,
16 while they were closing up the barge, I started
17 going through and closing up the buildings and
18 silos and making everything on the other side of
19 the wall safe.
20 Q. Now, who established the procedure for
21 releasing barges, Ingram barges, how did you
22 become aware of that?
23 A. When I came to work there and we unloaded
24 the first barge, the barges that were brought in,
25 whoever brought the barges in, that's who you

**Page 45**

1  called to release the barges back out.
2  Q. And that had been going on for a long
3  period of time?
4  A. It had been going on since before I got
5  there.
6  Q. Four years?
7  A. Yes, sir.
8  Q. And so for four years when a barge was
9  released, you would call Zito and they would pick
10 it up?
11 A. Whoever was handling the barges, it would
12 be Zito or Turn Services or whoever the barge
13 companies were, or the fleeting services were,
14 and they changed around quite often.
15 Q. But insofar as the four years that you
16 were there, insofar as an Ingram barge, you would
17 call Zito?
18 A. No, sir. Zito did not get the Ingram
19 barges that came to us. I can't tell you exactly
20 when it started, but they started picking up the
21 barges and bringing them to us from another fleet
22 further up the river.
23 Q. For how long a period of time?
24 A. Probably two years.
25 Q. Did anyone at Ingram ever tell you that

**Page 46**

1  you shouldn't call Zito to pick up their barges?
2  A. No, sir. They actually told us not to
3  call them, to call Zito to pick up their barges.
4  Q. When was that?
5  A. Right after Zito started handling their
6  barges.
7  Q. And who called Ingram -- who called from
8  Ingram and told Lafarge not to call them but to
9  call Zito?
10 A. No one from Ingram called us. We called
11 Ingram to release a barge and they told us, "Call
12 Zito and release it back to Zito because they
13 brought the barge to you. We don't handle the
14 barges any longer."
15 Q. So that was two -- approximately two
16 years before?
17 A. Yes, sir.
18 Q. So you had been instructed by Ingram
19 approximately two years before not to call them
20 but to call Zito to get their barges picked up?
21 A. Yes, sir.
22 Q. So on the 27th when you called at 9 a.m.,
23 you were following the instructions from Ingram
24 to call Zito; is that correct?
25 A. Yes, sir.

```
 1        You understand the question?
 2   MR. WALKER:
 3        Do you understand what "do something
 4   at the facility" means?
 5   MR. WIEDEMANN:
 6        That's not the question.
 7   MR. WALKER:
 8        That is the question. You want to
 9   have it read back?
10   MR. WIEDEMANN:
11        If you want to stay here till
12   midnight.
13   MR. WALKER:
14        You'd be surprised what your
15   question sounds like when you listen to
16   them.
17   BY MR. WIEDEMANN:
18   Q. Tell us every towing company that you use
19   to come in and top around barges or move barges
20   at your request.
21   A. Pearl River, Taco (phonetic), Turn
22   Services. The tugs that -- and I'm drawing a
23   blank, one of the other fleets that we used.
24   Q. Alario?
25   A. Alario is one of them.
                    - 51 -
```

```
 1   Q. ABC?
 2   A. Yes, sir.
 3   Q. Did you all have a contract with Joe
 4   Domino?
 5   A. No, sir.
 6   Q. So you can call anybody of these
 7   companies to pick -- to come and turn around
 8   barges?
 9   A. Yes, sir.
10   Q. Did you call Zito from time to time?
11   MR. WALKER:
12        I assume you mean to turn around
13   barges?
14   MR. WIEDEMANN:
15        No. I means something else.
16   MR. WALKER:
17        Well, then, we have to guess what
18   you mean once again. And I'm asking the
19   witness not to guess, as I'm sure you
20   would want him not to speculate.
21   MR. SANDERS:
22        The objections are objections as to
23   form. Said.
24   MR. WALKER:
25        If the question is unintelligible,
                    - 52 -
```

```
 1        I'm going to object and have it
 2   clarified.
 3   MR. SANDERS:
 4        It only matters whether the witness
 5   understands the question.
 6   MR. WALKER:
 7        If it's unintelligible, I'll object.
 8   MR. EMMETT:
 9        You want to take a break?
10   MR. WIEDEMANN:
11        Yeah, sure.
12        (At this time, a break was taken.)
13   BY MR. WIEDEMANN:
14   Q. When you had the meeting with the
15   employees at the Lafarge plant, the first one was
16   at eight o'clock; is that correct?
17   A. Yes, sir.
18   Q. And then you had another meeting at
19   around nine o'clock; is that correct?
20   A. It wasn't a meeting. I never left the
21   dock. It was a discussion that was going on. We
22   were doing different things. When I say "I never
23   left the dock," I never -- I didn't leave them
24   alone very long. I had gone out into the --
25   around the wall to close up some of the outlying
                    - 53 -
```

```
 1   buildings and left instructions for them to do
 2   things while in my absence. And I came back a
 3   few minutes later and they were doing it.
 4   Q. So when did you hear about the surge, at
 5   what time?
 6   A. It was during the course of the morning.
 7   Like I said, we had -- it was either my truck or
 8   someone else's truck, we had the door open and we
 9   were listening to the weather report.
10   Q. And so what did you -- after you heard
11   this surge, this problem with a surge, what did
12   you tell the employees at that point in time?
13   A. At that point in time I told them we
14   needed to secure the area for a storm.
15   Q. And you mentioned picking up loose items
16   and --
17   A. Yes, sir.
18   Q. -- things like that; is that right?
19   A. Yes, sir.
20   Q. Now, you called at some point in time
21   after meeting with the employees at -- about nine
22   o'clock is when you called Zito; is that correct?
23   Or was it before your meeting with the employees?
24   A. No. It was during the same period of
25   time. And I need to clarify something. You
                    - 54 -
```

**Page 55**

1 asked a question earlier that -- when you asked
2 me if I had talked with any of my superiors or
3 someone from Lafarge and I told you no, that
4 wasn't so. I talked to one of our safety
5 directors, had a phone conversation with her --
6 or several phone conversations, as a matter of
7 fact.
8  Q. When did you learn that?
9  A. When did I learn that? It was --
10  Q. Yeah, we just took a break. Did somebody
11 tell you about that?
12  A. Somebody actually jumped on me for
13 overlooking it, and it wasn't intentional. I
14 was -- I didn't think of her as a superior
15 because I don't report to the Safety Department.
16 And I would not have -- I would not have called
17 her, she called me.
18  Q. Who reminded you of that?
19  A. The gentleman that was sitting in that
20 chair (indicating).
21    MR. O'DWYER:
22       Mr. Webb.
23    THE WITNESS:
24       Yes.
25 BY MR. WIEDEMANN:

**Page 56**

1  Q. And who was the safety director that
2 called you?
3  A. Jennifer Arnold.
4  Q. And where is she located?
5  A. I think she's in Paducah, Kentucky.
6  Q. And what did she call you about?
7  A. The storm.
8  Q. So she was calling you from Paducah,
9 Kentucky, at what time?
10  A. Around the same time, about nine, ten
11 o'clock, something like that.
12  Q. And she was calling to tell you what
13 about the storm?
14  A. She was more not telling me about the
15 storm, she was calling to ask if our employees,
16 how many employees we had at the plant, what we
17 were doing, how long we were going to be there,
18 and basically said do what you got to do to get
19 that plant tied up, locked up, and get the hell
20 out of there.
21  Q. Did you tell Ms. Arnold that you had
22 called Zito in accordance with your usual policy
23 to pick up the Ingram barge?
24  A. I believe my discussion with her was that
25 I had released the barge. We finished the barge,

**Page 57**

1 I'd released it, and that we were in the process
2 of tying barges off and tying covers down.
3  Q. Did you tell her that you had called Zito
4 in accordance with your usual policy concerning
5 Ingram barges?
6  A. I believe I answered that, sir. I told
7 her that I had released the barge that we had
8 unloaded.
9  Q. Did you tell her that you had released
10 the barge to Ingram?
11  A. I don't know if I mentioned Ingram's name
12 directly, but --
13  Q. Did she ask you what was going on with
14 the barge?
15  A. No, sir.
16  Q. Did she ask you when they were going to
17 pick it up?
18  A. No, sir.
19  Q. Did she suggest anything for you to do to
20 further the process of getting the barge picked
21 up?
22  A. No, sir.
23  Q. Were you not concerned that you had an
24 empty barge and a full barge at your dock?
25  A. This person has no -- as far as I know,

**Page 58**

1 has no experience with barges. She's the safety
2 director.
3  Q. That wasn't my question. I'm asking you,
4 were you not concerned with the fact that you had
5 an empty barge, Ingram barge, and a full Ingram
6 barge at your dock?
7  A. Oh, I'm sorry. I thought you were asking
8 if she was concerned.
9  Q. Ask your counsel. Maybe he understands.
10
11    MR. WALKER:
12       I did, but I can't answer. I would
13    have otherwise.
14    THE WITNESS:
15       The concern was having it against
16    the dock knowing the possibilities of the
17    storm surge.
18 BY MR. WIEDEMANN:
19  Q. So you then -- when was it that you
20 called Joe Domino? Was it before or after you
21 talked to Jennifer Arnold?
22  A. I really don't remember which
23 conversation happened first.
24  Q. Did she suggest that you get someone to
25 turn the barges around?