UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| IN RE: KATRINA CANAL | * | |
| BREACHES | | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| | * | and consolidated cases |
| PERTAINS TO: BARGE | * | |
| | * | SECTION "K" (2) |
| *Boutte v. Lafarge*   05-5531 | * | |
| *Mumford v. Ingram*   05-5724 | * | |
| *Lagarde v. Lafarge*   06-5342 | * | JUDGE |
| *Perry v. Ingram*   06-6299 | * | STANWOOD R. DUVAL, JR. |
| *Benoit v. Lafarge*   06-7516 | * | |
| *Parfait Family v. USA*   07-3500 | * | MAGISTRATE |
| | * | JOSEPH C. WILKINSON, JR. |

**LAFARGE NORTH AMERICA INC.'S MEMORANDUM OF LAW IN**

**SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

BACKGROUND ..................................................................................................2

MATERIAL FACTS NOT IN DISPUTE ...........................................................3

A.   The Hurricane and the Barge .................................................................3

    1.   Geography of the Inner Harbor Navigation Canal.............................3

    2.   Barge ING 4727 .................................................................................3

    3.   Hurricane Katrina – Wind Direction at the IHNC ............................4

    4.   Hurricane Katrina – Current and Waves at the IHNC ......................5

    5.   IHNC Floodwall Breach Times vis-á-vis Prevailing Wind Direction ................7

B.   The Floodwall Failure............................................................................7

    1.   Genesis of Floodwall Failure – Loss of Steel Sheet Pile and Soil Support .........7

    2.   Consequences of Barge Impact – No Effect on Sheet Pile and Soil Support ......8

C.   The MRGO Levee Breaches and Their Inevitable Flooding of Plaintiffs' Properties.........................................................................9

    1.   The MRGO Levee Breaches...............................................................9

    2.   Flooding in the Lower Ninth Ward and St. Bernard Parish from the MRGO Breaches .........................................................................9

D.   The Independent Levee/Floodwall Performance Studies.......................10

E.   "Eyewitness" and Expert Evidence from the Plaintiffs............................12

    1.   Fact Witnesses ..................................................................................13

    2.   Experts ..............................................................................................14

ARGUMENT ................................................................................................... 17

I.     **Summary Judgment Standard** .................................................................. 17

       A.    General Statement ............................................................................. 17

       B.    To Avoid Summary Judgment the Record Must Show a "Genuine Issue,"
             Not Just a Factual Dispute ............................................................... 18

       C.    Summary Judgment on Causation is Appropriate ............................ 21

       D.    Summary Judgment on Damages Is Appropriate ............................ 22

II.    **It is Scientifically Impossible For The Barge To Have Caused Either
       Breach Because The Barge Could Not Have Moved Across The Canal
       Until After Both Breaches Had Already Occurred** ................................ 24

       A.    The Barge Could Not Have Been Present at the North Breach ........ 24

             1.    Wind Did Not Move the Barge to the North Breach ............... 24

             2.    Current Did Not Move the Barge to the North Breach ........... 26

             3.    Waves Did Not Move the Barge to the North Breach ............ 27

             4.    Plaintiffs' Evidence Does Not Create A Genuine Dispute of Fact
                   Regarding the Presence of the Barge at the North Breach ........ 28

       B.    The Barge Could Not Have Been Present at the South Breach at the Time
             of the Breach .................................................................................... 31

             1.    Neither Wind Nor Current Nor Waves Could Have Carried
                   the Barge to the Site of the South Breach Before It Occurred ........ 31

             2.    Plaintiffs' Evidence Does Not Create A Genuine Dispute of Fact
                   Regarding the Presence of the Barge at the Site of the South Breach
                   at the Time of the Failure .................................................... 33

III.   **It Is Scientifically Impossible For A Barge Impact With The Concrete Cap
       To Have Caused The Floodwall To Fail** ................................................ 39

       A.    The Undisputed Scientific Evidence Establishes That Any Impact With
             the Concrete Cap Would Cause Only Localized Damage to the Cap, Not
             the Dislocation of the Sheet Pile Required to Cause the Floodwall to Fail ....... 39

       B.    Plaintiffs Have Not Shown the Barge Could Have Dislodged the Sheet Pile ... 41

III.    **Plaintiffs' Own Evidence Establishes That Plaintiffs Would Have Sustained The Same Damages Without The IHNC Breaches Because The MRGO Would Have Flooded Their Homes To The Same Level**......................................................45

**CONCLUSION**......................................................................................................48

LIBW/1708040.18

## TABLE OF AUTHORITIES

**CASES:**                                                                                        **Page**

*Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963 (7th Cir. 1983) ..................................23, 47

*American River Transp. Co. v. Kavo Kaliakra S.S.*, 148 F.3d 446
    (5th Cir. 1998)..................................................................................................................21

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...........................................................17, 21

*Bach v. Trident S.S. Co.*, 920 F.2d 322 (5th Cir. 1991), *vacated* 500 U.S. 949,
    *reinstated* 947 F.2d 1290 (5th Cir. 1991) ...........................................................................21, 22

*Barker v. Norman*, 651 F.2d 1107 (5th Cir. 1981) ..........................................................18, 19, 36

*Bright v. G B Bioscience Inc.*, 305 F. App'x 197 (5th Cir. 2008) ............................................19, 29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................17

*Chavez v. Noble Drilling Corp.*, 567 F.2d 287 (5th Cir. 1978) .......................................................22

*Dillon v. Twin State Gas & Electric Co.*, 163 A. 111 (N.H. 1932) ....................................23, 46, 47

*Dixon v. International Harvester Co.*, 754 F.2d 573 (5th Cir. 1985) ......................................23, 47

*Evans v. McKinney Marine, Inc.*, No. 96-0132, 1997 U.S. Dist. LEXIS 2148
    (E.D. La. Feb. 21, 1997), *aff'd*, 127 F.3d 34 (5th Cir. 1997)....................................................22

*First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)........................20, 30, 36, 38

*Florida Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n*, 274 F.3d 924
    (5th Cir. 2001)..................................................................................................................18

*Frakes v. Crete Carrier Corp.*, No. 08-10603, ---- F.3d ----, 2009 WL 2450694
    (5th Cir. Aug. 12, 2009) .....................................................................................................18

*Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528 (5th Cir. 1994).......................18, 22

*Harris v. Illinois Central R.R.*, 58 F.3d 1140 (6th Cir. 1995)..................................................23, 47

*In re Ingram Towing Co.*, No. 93-3311, 1995 U.S. Dist. LEXIS 15034
    (E.D. La. Oct. 11, 1995)................................................................................................22, 44

*Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079
    (5th Cir. 1979)..................................................................................................................41

iv

*Kampen v. American Isuzu Motors, Inc.*, 157 F.3d 306
(5th Cir. 1998)...................................................................................... *passim*

*Kesinger v. Herrington*, 381 F.3d 1243 (11th Cir. 2004) .......................................19, 36

*Lancaster v. Norfolk & Western Railway*, 773 F.2d 807 (7th Cir. 1985) ................23, 46

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) ...................................... *passim*

*Marshall v. East Carroll Parish Hospital Serv. Dist.*, 134 F.3d 319
(5th Cir. 1998) ................................................................................................20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)....................17

*Molden v. Georgia Gulf Corp.*, 465 F. Supp. 2d 606 (M.D. La. 2006) ............19, 22, 44

*Moser v. Texas Trailer Corp.*, 623 F.2d 1006 (5th Cir. 1980)......................................21

*Ralston Purina Co. v. Hobson*, 554 F.2d 725 (5th Cir. 1977) ................................ *passim*

*Seshadri v. Kasraian*, 130 F.3d 798 (7th Cir. 1997)................................................19, 36

*Sievers v. Beechcraft Mfg. Co.*, 497 F. Supp. 197 (E.D. La. 1980) ............20, 21, 22, 37

*Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254 (5th Cir. 2002)..................19, 28, 33, 38

*Steinhauser v. Hertz Corp.*, 421 F.2d 1169 (2d Cir. 1970)..........................................46

*Westchester Fire Ins. Co. v. Haspel-Kansas Inv. P'ship*, 342 F.3d 416
(5th Cir. 2003)................................................................................................21

*White v. Black & Decker (U.S.) Inc.*, No. Civ. A. 03-0874, 2004 WL 1373271
(E.D. La. June 16, 2004) ................................................................................20

*Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560 (11th Cir. 1991)............23, 47

**RULES:**

Fed. R. Civ. P. 56(c) .................................................................................... *passim*

**OTHER AUTHORITIES:**

1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5.3 (4th ed. 2004) ...........................21

H.L.A. Hart & Tony Honore, *Causation in the Law* (2d ed. 1985)...............................................46

W. Page Keeton et al., *Prosser & Keeton on The Law of Torts* § 52 (5th ed. 1984)....................46

Restatement (Second) of Torts (1965):

    § 431...................................................................................................................................21
    § 432...................................................................................................................................21
    § 432(1)..............................................................................................................................22
    § 432(2)..............................................................................................................................22

# INTRODUCTION

Defendant Lafarge North America Inc. ("LNA") submits this memorandum in support of its motion for summary judgment on all of the claims brought against it by the plaintiffs in the above-captioned cases.  LNA is entitled to summary judgment for three separate reasons, each of which demonstrates that there is no genuine dispute of material fact that LNA did not cause the injuries about which plaintiffs complain:

First, there is no genuine dispute that the Barge ING 4727 (the "barge" or "ING 4727") did not cause either of the two floodwall breaches on the Inner Harbor Navigation Canal ("IHNC") because it is scientifically impossible for the barge to have been present at the locations of those breaches when the breaches occurred.  This is so because the barge was moored on the west side of the IHNC, the prevailing winds were blowing to the west, and the laws of science and physics show that it was impossible for the barge to have crossed to the east side of the IHNC to the location of the floodwall breaches until after the breaches had already occurred.

Second, there is no genuine dispute that the ING 4727 did not cause either of the two IHNC floodwall breaches for the further reason that, even had the barge been present, it is scientifically impossible for the barge to have caused the failure of the deeply-anchored steel sheet pile by contacting the upper portion of the concrete wall as plaintiffs allege it did.

Finally, there is no genuine dispute that, even if the IHNC floodwall breaches had never occurred, the plaintiffs would have sustained the same flood-related damages because, as plaintiffs' expert expressly conceded, the breaches along Reach 2 of the Mississippi River Gulf Outlet ("MRGO") would, within a few hours' time, have caused the same level of flooding and hence the same damages even if the IHNC breaches had never occurred.

1

In short, the undisputed record evidence in these cases establishes that, for two separate reasons, it is scientifically impossible for the barge to have caused either of the floodwall breaches.  The undisputed record evidence further establishes that any flooding from the IHNC made no material difference to plaintiffs' alleged damages, given the inevitable MRGO flooding later that same day.  For each and all of these reasons, LNA is entitled to summary judgment on all of plaintiffs' claims.

## BACKGROUND

Hurricane Katrina struck New Orleans on August 29, 2005.  On that day, the floodwalls and levees that had been built to protect the city from the hurricane storm surge failed, breaching in numerous places and flooding large portions of New Orleans and its surrounding metropolitan area.  The flooding spawned numerous lawsuits blaming the United States and others for the catastrophe.[1]  Some of those lawsuits claimed that the Barge ING 4727 caused the flooding of the Lower Ninth Ward and St. Bernard Parish, alleging that the barge struck the floodwall and caused it to fail at both the "North Breach" and the "South Breach" on the east side of the IHNC.  Discovery has recently closed on the merits of the "Barge Track" plaintiffs' claims.[2]  The evidentiary record shows that there are no genuine disputes of material fact on key issues of causation of the breaching and flooding, and the cases are ripe for summary adjudication.

---

[1] *See, e.g.*, Doc. 3299 (Case Management Order No. 4).  CMO No. 4 describes the "Levee", "MRGO" and "Insurance" categories of cases.  The "MRGO" cases allege liability on the part of the United States (as the principal defendant) for flooding in the areas of the Upper and Lower Ninth Ward, New Orleans East, and St. Bernard Parish. *Id.* at 3.  The areas covered by the MRGO category of cases include all of the areas covered by the claims of the "Barge" plaintiffs.  One of those cases, *Robinson v. United States*, has already proceeded to trial against the United States on claims that include plaintiffs (Robert and Lucille Franz) who live in the Lower Ninth Ward. *See, e.g.*, Doc. 19020 at 122-23.

[2] Although the first "Barge Track" cases were filed in the fall of 2005, the Barge Plaintiffs did not produce their merits expert reports until July 1, 2009.

2

## MATERIAL FACTS NOT IN DISPUTE

### A. The Hurricane and the Barge

1. Geography of the Inner Harbor Navigation Canal

The Lafarge North America cement terminal ("LNA Terminal") is located on the west side of the Inner Harbor Navigation Canal, in a protected "inset" (old turning basin) away from the main channel of the canal. Statement of Undisputed Material Facts ("SMF") ¶ 1.[3]  On the morning of August 29, 2005, the floodwall on the east side of the IHNC breached in two places. SMF ¶ 2.  The "North Breach" occurred just south of the Florida Avenue Bridge, at a location on the opposite side of the canal and to the north of the LNA Terminal.  SMF ¶ 3.  The "South Breach" occurred closer to the Claiborne Avenue Bridge, at a location to the south and east of the LNA Terminal and on the opposite side of the IHNC from the terminal.  SMF ¶ 4.  The locations of the LNA Terminal and the North and South Breaches are shown in Exhibits 1 (Cushing Report Figs. 8, 52), 2 (Marino Report, Photo 4.4), and 3 (Bakeer Report Fig. 1).

2. Barge ING 4727

Prior to the arrival of Hurricane Katrina, the unloaded Barge ING 4727 was moored to another barge at the LNA Terminal on the west side of the IHNC.  SMF ¶ 5.  The ING 4727 was a hopper barge with no motor or other means of self-propulsion.  SMF ¶ 6.  Therefore, the barge could not move from the west side of the IHNC to the east side of the canal unless it was propelled by an external force.  *Id.*  The only forces that could potentially have moved the barge

---

[3] LNA has supplied a separate Statement of Undisputed Material Facts providing citations to testimony of witnesses for both sides, establishing the absence of a genuine dispute as to each fact included in the Statement.  For purposes of reference, the plaintiffs' experts cited in the Statement are Hector Pazos (naval architect), Gennaro Marino (geotechnical engineer), Melvin Spinks (hydrologist), Robert Bartlett (metallurgist); and Donald Green (maritime expert).  The LNA experts cited are Charles Cushing (naval architect), Austin Dooley (meteorologist), Robert Bea (forensic and geotechnical engineer), Reda Bakeer (geotechnical engineer), Joseph Suhayda (coastal scientist), and Wade Ragas (real estate expert).

away from the LNA Terminal and toward either of the breach sites during Hurricane Katrina were (a) wind, (b) waves and/or (c) current. *Id.*

The barge was 23 feet high from top to bottom (including hatch covers), and in its empty and light condition it had a draft of approximately one-and-a-half feet. SMF ¶¶ 7, 8. Thus, on the morning of August 29, the barge was riding high in the water, with over 20 feet of the barge sticking up out of the water and exposed to the wind. SMF ¶ 9. This large "sail area" made the barge particularly susceptible to being moved in the direction of the prevailing wind, and thus experts for both sides agreed that wind was the "predominant" force acting on the barge that morning. SMF ¶ 10.[4] Consequently, weather data – particularly involving winds – is important to determine the wind loads acting on the barge and potential barge movement in the IHNC during the relevant time period that morning. SMF ¶ 11.

### 3. Hurricane Katrina – Wind Direction at the IHNC

According to a law of nature known as Buys Ballot's Law, hurricane winds in the northern hemisphere blow in a counterclockwise direction around the center (or "eye") of the hurricane. SMF ¶ 12. Thus, the direction of the prevailing wind at a given time and location during a hurricane can be determined by comparing that location to the location of the eye of the storm at that same time. *Id.*

Hurricane Katrina followed a path to the east of New Orleans and the IHNC, moving along a nearly vertical axis from south to north as it passed by the city. SMF ¶ 13. The path of the storm is shown in Exhibit 1 (Cushing Report Figs. 24, 25). The eye of the storm was located to the east of New Orleans throughout its passage. *Id.* The eye of the hurricane did not pass

---

[4] *See* Exh. 4, Deposition of Charles Cushing 238 ("Cushing Dep.") (LNA expert: wind was "dominant" force acting on barge); Exh. 5, Deposition of Donald Green (2009) 211 ("Green 2009 Dep.") (plaintiff expert: due to sail area, wind had a greater impact on the barge); Exh. 6, Deposition of Hector Pazos 104 ("Pazos Dep.") (plaintiff expert: "wind is the predominant item" acting on the barge).

4

through the latitude of New Orleans until after 8:00 a.m. CDT on the morning of August 29;
before that time, the eye of the storm was to the south (and east) of the city.  SMF ¶¶ 14, 15.

As Hurricane Katrina approached on its northward course to the east of the city, the
prevailing counterclockwise winds in the IHNC blew first from the east, then from northeast-to-
southwest, and then from north-to-south until the storm eye arrived at the latitude of New
Orleans.  SMF ¶ 16.  It was not until after 7:30 a.m. that Hurricane Katrina's prevailing winds at
the IHNC had any component blowing across the IHNC from the LNA Terminal toward the east
bank of the canal.  SMF ¶ 17.  Based on scientific analysis of the meteorological data, LNA's
expert meteorologist Austin Dooley concluded that:

> "up until 7:42 am CDT, the wind direction would push the barge
> toward the [LNA] dock."

See id. (citing Exh. 7, Dooley Report at 35).  Plaintiffs provided **no** meteorological data,
analysis, or evidence to support any contrary position regarding wind direction or barge
movement.  SMF ¶ 18.  Indeed, to the extent that they considered the meteorological data at all,
plaintiffs' experts agreed with the conclusions drawn by LNA's experts concerning the direction
of the wind during the relevant time periods.  See id.[5]

4.  Hurricane Katrina – Current and Waves at the IHNC

The IHNC below the Florida Avenue Bridge was a "closed system" in the sense that the
lock at its southern end prevented the flow of water to or from the Mississippi River.  SMF ¶ 19.
Therefore, when Hurricane Katrina's storm surge reached this part of the IHNC, it filled up "like

---

[5] Exh. 2, Marino Report at 3-11 (winds were "essentially parallel" to the IHNC until around 9:00 a.m. CDT); id. Fig.
3.2 (showing wind vectors at the IHNC blowing from the northeast toward the southwest prior to 9:00 a.m. CDT);
Exh. 8, Deposition of Gennaro Marino (2009) 76 ("Marino 2009 Dep.") (admitting that at the time of the North
Breach, the barge would have had to be going in a direction "other than the direction of the wind" in order to reach
the North Breach); Exh. 9, Deposition of Gennaro Marino (2008) 147-48 ("Marino 2008 Dep.") (Q: "You didn't
consider wind in connection with the north breach because the wind wasn't blowing in the direction of the wall at
that time, right?"  A: "Right."); Exh. 10, Deposition of Donald Green (2008) 56 ("Green 2008 Dep.") (winds
between 4:00 and 6:00 a.m. blew "from either the northeast or due from the north").

a bathtub" without generating appreciable currents. *Id.* Scientific modeling by LNA's experts showed that currents in the IHNC would have been "negligible" and could not have moved the barge from the LNA Terminal to either breach site until after both breaches had already occurred. SMF ¶ 20. Plaintiffs' experts performed no such modeling and provided no evidence to the contrary. *Id.*

It is also possible, through scientific means, to determine wave heights during a storm event at a given location. SMF ¶ 21. The Interagency Performance Evaluation Task Force ("IPET") conducted such a study and concluded that wave heights in the IHNC during Hurricane Katrina reached approximately one foot before 5:30 a.m. CDT on August 29, 2005, and two to three feet after that. SMF ¶ 22. Plaintiffs' experts did not perform any calculations regarding wave heights in the IHNC. SMF ¶ 23. The prevailing direction of waves can be determined through scientific principles including, among others, that wind-activated waves tend to propagate in the direction of the prevailing wind (SMF ¶ 24), and that when waves are reflected off a surface, the reflected waves have less energy than "incoming" waves approaching that surface (SMF ¶ 25).

Based on these principles, it is possible to scientifically determine the effect of waves on a free-floating object such as a barge. SMF ¶ 26. LNA's experts have applied such principles, including performing calculations, to determine that waves could not have moved the barge from the LNA Terminal to the site of either of the IHNC floodwall breaches. *Id.* This is so because, among other things, waves could not possibly have moved the barge in a direction counter to the prevailing wind. *Id.* (quoting Exh. 1, Cushing Report at 79). Plaintiffs' experts performed *no* calculations showing the effect of waves on a free-floating barge or how such waves could have moved the barge in the direction of either of the breaches. SMF ¶ 27.

6

5. IHNC Floodwall Breach Times vis-à-vis Prevailing Wind Direction

The North Breach on the east side of the IHNC, approximately 215 feet in length, occurred no later than 6:00 a.m. CDT on the morning of August 29, 2005.  SMF ¶ 28.  The South Breach, exceeding 800 feet in length, occurred no later than 7:30 a.m. that same morning.  SMF ¶ 29.[6]  Accordingly, both the North Breach and the South Breach *had already occurred* before the prevailing winds came to include any directional component blowing from the LNA Terminal toward the east bank of the IHNC.  SMF ¶ 30.

## B.  The Floodwall Failure

1. Genesis of Floodwall Failure – Loss of Steel Sheet Pile and Soil Support

The floodwalls on the IHNC – often referred to as "I-walls" – were comprised of a twenty-foot-long steel sheet pile driven into the ground to a depth of approximately seventeen feet, topped by a concrete monolith (cap) sticking six feet out of the ground.  SMF ¶ 31.  The concrete cap encased the top three feet of the sheet pile sticking up out of the ground.  *Id.*  The concrete cap included an additional three feet of concrete and reinforcing bar ("rebar") extending above the sheet pile.  *Id.*  The floodwall had a horizontal construction joint between the two "pours" of concrete.  *Id.*[7]

The floodwall derived its strength from the sheet pile and the supporting soils into which the sheet pile was embedded and anchored.  SMF ¶ 32.  Accordingly the floodwall failures that occurred at the North Breach and South Breach required a failure in the soil, depriving the sheet pile of its support.  *Id.*  Although the precise mechanism of failure is a matter in dispute, all

---

[6] Although the precise timing of the breaches is a matter that would be disputed at trial, there is broad consensus that the breaches must have occurred no later than these times.  *See* SMF ¶¶ 28, 29.

[7] For a schematic of the concrete cap, including the construction joint between the two pours of concrete, see Exh. 37, Bartlett Report Appendix B, and Exh. 2, Marino Report Fig. 2.3.

parties agree that at both breaches, the floodwall failed when it lost the support of the soils on the protected side of the wall.  *Id.*

    2.  <u>Consequences of Barge Impact – No Effect on Sheet Pile and Soil Support</u>

It is possible to calculate the effect of an impact by an object such as a barge on an I-wall such as those at the IHNC under the conditions that existed in Hurricane Katrina.  SMF ¶ 33. LNA's experts performed calculations showing that a barge impact, if it occurred, would cause local damage to the concrete cap but would not affect the steel sheet pile or supporting soil. SMF ¶ 34.  In particular, the work of Charles Cushing showed that "[a] barge striking the concrete cap of the floodwall could not cause the sheetpile to fail;" rather, such an impact would create only localized damage ("cracking" or a "notch") in the concrete cap, with no effect in the sheet pile below.  Exh. 1, Cushing Report at 158-63.[8]

Plaintiffs' geotechnical expert, Gennaro Marino, agreed that the pressure of a corner of a barge hitting the top of the floodwall would "be exerted on a narrow part of the wall rather than translating all the way down to the bottom of the sheet pile."[9]  Plaintiffs' experts, however, did *not* perform *any* calculations of their own to demonstrate the effect that a barge impact might

---

[8] *See also id.* at 149 (barge will cause concrete to crack but not overturn or uproot sheet pile), 173 (barge impact would not affect sheet pile anchoring), 99 & Figs. 72, 73, 74 ("These photos show that a barge impact with the concrete cap of a floodwall does not cause the floodwall to fail.  Rather, the concrete cap gives way and the sheetpile remains intact."); Exh. 4, Cushing Dep. 254 ("It's just not possible" for barge to have toppled floodwall); Exh. 11, Deposition of Reed Mosher 91-92, 267 ("Mosher Dep.") (referring to "[o]ther places where we say barges hit walls" and noting that they "can cause damage to the walls, but it's usually very local damage to the walls"; "punching through rather than causing collapse").

[9] Exh. 8, Marino 2009 Dep. 104.  Not only did Dr. Marino agree that a barge impact at the top of the wall would not be felt to the bottom of the sheet pile, but he also admitted that such an effect would be necessary to produce a failure.  *See id.* at 254-55 (admitting that "[i]n order for the barge to move the bottom of the sheet pile enough to allow water to percolate, the barge impact on the upper part of the wall has to have its effect felt all the way to the bottom of the [sheet pile]").  Reed Mosher, one of the lead investigators for the IPET team, observed that barge impacts do not produce the kind of damage observed at the sites of the North and South Breaches.  *See* Exh. 11, Mosher Dep. 130-31, 144-45.

LIBW/1708040.18

have on the floodwall (*i.e.*, the sheet pile versus the concrete cap).  SMF ¶ 35.[10]  Nor did

plaintiffs' experts perform *any* calculations to determine whether hydrostatic pressure on the

wall alone could have created the "gap" condition that they claim contributed to the breaching.[11]

## C.  The MRGO Levee Breaches and Their Inevitable Flooding of Plaintiffs' Properties

### 1.  The MRGO Levee Breaches

Hurricane Katrina's storm surge caused massive breaches in the earthen levees along

Reach 2 of the Mississippi River Gulf Outlet (the "MRGO Breaches").  SMF ¶ 36; *see* Exh. 13,

Bea Report Fig. 2 (diagram showing location of MRGO breaches).  Those earthen levees protect

the same area ("polder") as the floodwalls along the east side of the IHNC.  SMF ¶ 37.  The

MRGO Breaches inundated St. Bernard Parish and the Lower Ninth Ward with massive flooding

on the morning of August 29, 2005.  SMF ¶ 38.

### 2.  Flooding in the Lower Ninth Ward and St. Bernard Parish from the MRGO Breaches

It is possible, through scientific flood modeling, to determine the level of flooding that

would have occurred in the Lower Ninth Ward and St. Bernard Parish even if the IHNC

floodwall breaches (the North Breach and South Breach) had not happened.  SMF ¶ 39.  Flood

modeling by plaintiffs' expert hydrologist shows that even if the IHNC floodwall breaches had

---

[10] *See, e.g.*, Exh. 8, Marino 2009 Dep. 35-36 (Q: "This report doesn't contain any other quantitative forensic engineering analysis to demonstrate that the ING 4727 was capable of causing either breach, does it?"  A: "No."); *id.* at 127 (Q: "You haven't done any calculations to determine whether an impact with the concrete cap would cause the cap to shear off rather than pulling the wall from the soil; correct?"  A:  "That's correct."); *see* SMF ¶ 35 (citing additional deposition testimony regarding lack of analysis by plaintiffs' experts).

[11] Plaintiffs' experts Pazos and Marino both acknowledged that formation of gaps between the canal-side soil and the steel sheet pile played a significant role in facilitating seepage of water under the sheet pile and adding to the water pressure on the wall.  *See* Exh. 12, Pazos Report at 43-44; Exh. 8, Marino 2009 Dep. 164 ("channels or openings for seepage").  Dr. Marino admitted, however, that hydrostatic pressure on the wall during Katrina was sufficient to deflect the wall and to induce "gap forming," even on unfailed sections of the floodwall.  Exh. 8, Marino 2009 Dep. 246; *see also* Exh. 9, Marino 2008 Dep. 66 (admitting that "as the water rises in the canal the wall will deflect").  Thus plaintiffs' own theories are internally inconsistent, and suggest ample grounds to conclude the breaches formed without the need for a barge, as every other investigation has concluded.  *See* below at 10-12; *see also* Exh. 13, Bea Report at 50-52; Exh. 3, Bakeer Report at 2-3.  For purposes of this motion, the precise mode of failure at each breach is not material; rather, it is the absence of evidence that a barge impact could have caused the failures that occurred at the IHNC, and the abundant evidence that a barge impact could not have done so.

not occurred, the MRGO levee breaches would have flooded the Lower Ninth Ward and St.

Bernard Parish to the same maximum level on August 29, 2005.  SMF ¶ 40.[12]  In other words,

plaintiffs would have suffered the same alleged damages even if the IHNC breaches had never

occurred.  The only difference, according to plaintiffs' expert, was that water from the IHNC

breaches arrived somewhat earlier (by no more than five hours) than if the IHNC breaches had

not occurred.  SMF ¶ 41.[13]  The value associated with five hours' use of property during

hurricane conditions, and in the face of a mandatory evacuation order, is zero.  SMF ¶ 42.

## D.  The Independent Levee/Floodwall Performance Studies

In the wake of the catastrophic flooding occasioned by Hurricane Katrina, no fewer than

three independent investigation teams examined the causes of the levee and floodwall failures

that led to the flooding.  The Interagency Performance Evaluation Team ("IPET") was

established by the U.S. Army Corps of Engineers to study the performance of the hurricane

protection system, with funding in the range of $22-23 million and a team that came to include

over 350 people, overseen by two review panels from the American Society of Civil Engineers

and the National Research Council.[14]  The Independent Levee Investigation Team ("ILIT") was

established by an independent team of thirty-six researchers led by scientists from the University

of California at Berkeley, and supported by the National Science Foundation, to address the

performance of the hurricane protection system in New Orleans to determine what happened,

---

[12] *See, e.g.*, Exh. 14, Deposition of Melvin Spinks (2008) 214 ("Spinks 2008 Dep.") ("[D]uring the storm event, the maximum level reached with MRGO's water."); Exh. 15, Deposition of Melvin Spinks (2009) 206 ("Spinks 2009 Dep.") (water at Richardson home reaches the same maximum level "with or without the IHNC breaches").

[13] *See, e.g.*, Exh. 14, Spinks 2008 Dep. 203 (agreeing that "[w]ithout the IHNC breaches you would get to the same water level, but just a couple of hours later"); Exh. 15, Spinks 2009 Dep. 149-50 (Q: "Without the IHNC breaches you get to the same water level, but just a couple of hours or a few hours later?"  A: "At Location 1 about five hours later.  At Location 2 closer to Paris Road where we know the two waters mixed, then about an hour to two hours difference."); Exh. 16, Spinks Report at 34 Figs. 15-16; Exh. 17, Suhayda Report at 11 ¶ 39 (LNA expert reaching same conclusion regarding impact of MRGO flooding based on modeling results).

[14] Exh. 11, Mosher Dep. 34-39.

LIBW/1708040.18

why it happened, and how a recurrence can be prevented.[15]  The "Team Louisiana" investigation

was established by the State of Louisiana to study the performance of the New Orleans hurricane

protection system and to identify causes of failure.[16]  In the words of Melvin Spinks, the expert

hydrologist retained by the plaintiffs in this case, the IPET, Team Louisiana and ILIT

investigations were performed to "provide credible and objective scientific and engineering

answers to fundamental questions about the performance of the hurricane protection and flood

damage reduction system in the New Orleans metropolitan area during Hurricane Katrina."[17]

     The conclusions of IPET, ILIT and Team Louisiana confirm the material facts set forth

above regarding wind, waves and current.[18]  For instance, IPET reported that the direction of the

wind was from the northeast during the critical 6:00 a.m. to 7:00 a.m. time period, and confirmed

based on careful analysis that waves in the IHNC were no greater than the 2-3 foot range.[19]  ILIT

traced the path of the eye of the storm, showing that it passed east of New Orleans and remained

south of the city until after 8:00 a.m.; and that the wind direction had easterly bearings (*i.e.,* from

east to west) as of 7:30 that morning.[20]  Team Louisiana likewise traced the path of the storm,

showing landfall at 6:10 a.m. southeast of New Orleans, and passage to the east of the city.[21]

---

[15] Exh. 18, R.B. Seed et al., *Investigation of the Performance of the New Orleans Flood Protection System in Hurricane Katrina on August 29, 2005* ("ILIT Report") at xix, xxvi to xxix; Exh. 19, Deposition of Robert Bea 38-39 ("Bea Dep.").

[16] Exh. 20, van Heerden et al., *The Failure of the New Orleans Levee System during Hurricane Katrina* ("Team Louisiana Report") at 3-4.

[17] Exh. 16, Spinks Report 11.

[18] For the reasons set forth above, there is no genuine dispute as to those facts, and thus confirmation from the independent studies is not necessary.  Nevertheless, the independent studies provide a measure of comfort regarding the absence of a genuine fact dispute.

[19] Exh. 21, Interagency Performance Evaluation Task Force, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System* (March 2007 Final Report) ("IPET Report") at IV-50 Fig. 26 (wind); *id.* at IV-4, IV-14-1 to 9, IV-15-36 to 42 (waves).  Plaintiffs' expert Gennaro Marino relied upon IPET's presentation of wind data in his own report.  Exh. 2, Marino Report Fig. 3.2.

[20] Exh. 18, ILIT Report Figs. 2.2, 2.8.

[21] Exh. 20, Team Louisiana Report at 26-27.

In addition, all three independent investigation teams concluded that the barge did not cause the floodwall to fail, and all three teams ascribed the floodwall failures on the east bank of the IHNC – both the North Breach and the South Breach – to causes other than a barge. As Dr. Mosher testified, IPET considered and rejected the possibility that the barge had caused the floodwall to fail.[22] ILIT concluded that a barge impact "was not the cause of the breach and failure," and that the "likelihood is that the barge slipped its moorings and was eventually drawn in through a breach that was already well developed."[23] Team Louisiana concluded that "[t]he barge had clipped the end of the already formed breach as it was sucked through."[24] Thus the independent studies support the undisputed material facts set forth above which show that the barge did not cause the floodwall failures on the IHNC.[25]

### E. "Eyewitness" and Expert Evidence from the Plaintiffs

The Court is already aware, from previous submissions by the plaintiffs, that they purport to have "eyewitness" and expert evidence establishing that the barge was present at the site of the IHNC breaches and that it caused the failure of the floodwall at both locations.[26] We address plaintiffs' evidence in the argument sections below, and show why it does not preclude summary

---

[22] Exh. 11, Mosher Dep. 68 (Q: "Did IPET conclude that the conditions in the Inner Harbor Navigation Canal were sufficient to cause the wall to fail without involvement by a barge?" A: "Yes."); id. at 78 (IPET considered the barge as a potential cause of the South Breach and "rejected that conclusion"); id. at 117 ("[T]here were other causes to the failure of the wall other than the barge, and [we] didn't feel that was a potential cause for the failure of the walls. They would have failed otherwise."); see Doc. 18852 at 20 & n.7 (order denying class certification, noting that IPET attributed failure of floodwall to "foundation instability").

[23] Exh. 18, ILIT Report at 6-7; Exh. 19, Bea Dep. 72-74 (describing process of ILIT investigation ruling out barge involvement in the breach).

[24] Exh. 20, Team Louisiana Report at 67; see Doc. 18852 at 20 & n.8 (order denying class certification, noting conclusion of Team Louisiana that floodwall failed due to "under-seepage, and loss of levee stability or overtopping and removal of soil support"); Exh. 22, Report of Paul Kemp at 6-9 (explaining Team Louisiana conclusions).

[25] See Exh. 13, Bea Report ¶¶ 57, 58, 59 (noting multiple failure mechanisms identified by the independent investigation teams, and that even though there are differences among the independent investigation teams concerning why the North and South Breaches developed, all of them concluded the barge did not cause the breaches and did not cause any flooding).

[26] See, e.g., Doc. 15549 (plaintiffs' class certification memorandum and supporting documents).

judgment in LNA's favor.  To assist the Court's consideration, we here provide an overview of the evidence the plaintiffs have cited, or may be expected to rely upon.

### 1. Fact witnesses

Plaintiffs rely on a small number of "eyewitnesses" to supposed barge impacts with the floodwall, and a larger number of persons who heard "boom" or other noises that plaintiffs associate with a barge impact.  Of the supposed eyewitnesses, the most important are William Villavasso, who is alleged to have seen the barge at the site of the North Breach, and Terry Adams, who is alleged to have seen the barge make impact at the site of the South Breach.  As the Court has previously recognized, however, Mr. Villavasso "admitted his vision was obscured by rain and darkness and described what he saw as a 'silhouette' and '[n]ot a clear focused picture,' referring to his alleged sighting of the barge near the north breach."[27]  Mr. Adams, meanwhile, professes to have made his observations in predawn darkness and a driving rainstorm from a location nearly half a mile distant from the site of the South Breach,[28] even though photographic evidence demonstrates that it was impossible to see that far even after dawn had broken.[29]  Furthermore, according to both Mr. Villavasso and Mr. Adams, the object they allegedly saw was sticking up out of the water only one to four feet above the top of the floodwall,[30] whereas plaintiffs' own experts testified that ING 4727, riding high in the water,

---

[27] Doc. 18852 at 21 (quoting Deposition of William Villavasso).

[28] Exh. 23, Deposition of Terry Adams 48 ("raining"), 77 ("still dark"), 88 ("five blocks") ("Adams Dep.").

[29] Exh. 1, Cushing Report at 46 Fig. 28; Exh. 4, Cushing Dep. 172 (photograph shows severely limited visibility at 7:47 a.m.).

[30] Exh. 24, Deposition of William Villavasso 202 ("Villavasso Dep.") ("a foot, foot and a half, two feet at the most"); Exh. 23, Adams Dep. 82 ("four feet").

13

would have had to be sticking up no less than *fifteen feet* above the top of the floodwall based on the water level in the canal.[31]

Plaintiffs also rely on the testimony of persons who said they heard noises that sounded like "booms" around the time of the breaches. Plaintiffs attribute those noises to barge impacts, but plaintiffs supply no factual basis for that leap.[32] To the contrary, as plaintiffs' experts admitted, witnesses in the proximity of the London Avenue and 17th Street Canal breaches also heard "boom" noises in connection with the failure of the floodwalls at those locations.[33] It is undisputed, therefore, that existence of a "boom" noise in the vicinity of a floodwall breach provides no basis for inferring that a barge impact has occurred.[34]

2. Experts

Plaintiffs rely on two experts – Hector Pazos and Gennaro Marino – for their assertion that the barge caused the IHNC floodwall breaches. Three fundamental flaws in their opinions are determinative here.

First, neither expert witness provided any analysis or explanation rebutting LNA's undisputed expert testimony that it was scientifically impossible for the barge to have crossed the IHNC to the location of the floodwall breaches before the breaches occurred. Mr. Pazos, a naval architect, opined in conclusory fashion that the barge traveled from the LNA Terminal to the site of both the IHNC breaches, but he disavowed having relied upon *any* meteorological data in

---

[31] Exh. 6, Pazos Dep. 164 ("the top of the barge was above the top of the seawall probably fifteen, sixteen, seventeen feet"); *id.* at 183 (stating that "[a] barge is huge compared … with the wall" and agreeing it would have been "sticking up 16 feet above the wall"); Exh. 8, Marino 2009 Dep. 120-21 (admitting that barge was sticking up at least 15 feet above the wall).

[32] *See, e.g.*, Exh. 2, Marino Report at 4-16; Exh. 12, Pazos Report at 12-13.

[33] Exh. 8, Marino 2009 Dep. 41-47; Exh. 25 (excerpts from depositions of witnesses who heard "boom" sounds in connection with the 17th Street and London Avenue Canal Breaches); Exh. 21, IPET Report at IV-7-3, IV-7-27 (witness accounts of booms at other breaches).

[34] *See also* Exh. 26, Weiss Report at 4-5; Exh. 27, Deposition of Reda Bakeer 133("Bakeer Dep.").

14

forming this opinion and could not cite *any* data to support his opinion.[35]  Meanwhile, Dr. Marino, a geotechnical engineer, cited meteorological data in his report showing that the barge was *not* driven by the wind toward the other side of the IHNC during the early morning hours of August 29, 2005 (*see* above at 5 & n.5; SMF ¶ 17), and he testified that he could *not* explain how the barge moved across the canal from the terminal to the other side.[36]  As Dr. Marino admitted, he undertook "no studies or scientific calculations or even any literature review that could shed light on how an empty barge sticking up 20 feet out of the water could move in a direction counter to that of the prevailing wind in order to arrive from the [LNA] slip to the north breach."[37]

Second, neither Dr. Marino nor Mr. Pazos provided any analysis or explanation rebutting LNA's undisputed expert testimony that it was scientifically impossible for an impact by the barge, even if that had occurred, to have caused the floodwall failure.  Dr. Marino admitted that demonstrating an impact "all the way to the bottom of the [sheet pile]" is a necessary component to any theory of breach causation.[38]  But he did not undertake the calculations that would have

---

[35] *See, e.g.*, Exh. 6, Pazos Dep. 129 (Q: " [D]o you have any meteorologic data from any source?"  A: "I review some meteorlogic data, but I didn't either memorize it or cover it recent to analyze it."); *id.* at 131 ("Don't need any meteorologic data."); *id.* at 132 ("I have no reason" to consider weather data ; "I didn't concentrate in this activity").

[36] Exh. 8, Marino 2009 Dep. 105 (Q: "Do you know how the barge got to the north breach?"  A: "No."); *id* at 142 (Q: "So again, as with the north breach, you can't explain how or why the barge got from one place to the next [*i.e.*, the south breach]?"  A: "That's correct.").

[37] Exh. 8, Marino 2009 Dep. 106-07.

[38] Exh. 8, Marino 2009 Dep. 254-55 (admitting that "in order for the barge to move the bottom of the sheet pile enough to allow water to percolate, the barge impact on the upper part of the wall has to have its effect felt all the way to the bottom of the [sheet pile]").

15

been needed to make such a showing with respect to the barge.[39]  Nor did Mr. Pazos.  *See* above at 8-9 & n.10; SMF ¶ 35.

Finally, although both Mr. Pazos and Dr. Marino profess to rely on photographs of the damaged floodwall to draw inferences about causation, their testimony is in direct conflict on numerous points.  For instance, whereas Mr. Pazos asserts that the barge caused damage to the floodwall as shown in certain photographs, Dr. Marino, examining the same photographs, attributes the damage to torsion from breaching, not barge contact.[40]  As another example, Mr. Pazos opines that a rip in the sheet pile at the North Breach occurred only at the final stage of the breaching sequence, whereas Dr. Marino rejects that scenario, saying, "I don't see how that's possible."[41]  Similarly, whereas Mr. Pazos alleges that the sheet pile at the South Breach was "ripped apart" by the barge, Dr. Marino testified, based on photographic evidence, that "[t]here is no location at which the sheet pile became separated at any point in the south breach."[42]

As we show in the argument sections below, plaintiffs' evidence does not suffice to create a *genuine* dispute of material fact.

---

[39] Exh. 8, Marino 2009 Dep. 35-36 (Q: "This report doesn't contain any other quantitative forensic engineering analysis to demonstrate that the ING 4727 was capable of causing either breach, does it?"  A: "No."); *id.* at 127 (Q: "You haven't calculated the force that would be needed to exhume the sheet pile at either location; is that correct?  A: "That's correct."); *id.* at 157 (Q: "And you haven't calculated whether the momentum of the barge was sufficient to cause the wall to deflect and create this gap in the manner you've described?"  A: "Right.").

[40] *Compare* Exh. 6, Pazos Dep. 184 (attributing cracks in concrete to barge impact) *with* Exh. 8, Marino 2009 Dep. 138-40, 179, 181 (attributing cracks to torsion and twisting, including in same photograph reviewed by Pazos).

[41] *Compare* Exh. 6, Pazos Dep. 83-85 (alleging that barge-induced seepage of water causes sliding in soil, with no rip in sheet pile until end of process) *with* Exh. 8, Marino 2009 Dep. 124-25 (Q: "If an alternative scenario were to conclude that the sheet pile rip came at the end of the sequence, after gaps have formed and seepage has caused sliding to result, would that scenario be consistent with your opinion?"  A: "I don't see how that's possible when you have observations that the failure began on the north end by a tumbling of sheet pile.  I guess if you neglect what people observed, you can dream up anything.").

[42] *Compare* Exh. 6, Pazos Dep. 238-39 (sheet pile "ripped apart" at South Breach) *with* Exh. 8, Marino 2009 Dep. 181-82 (sheet pile "is and remains a continuous length").  As another example, Dr. Marino denied that the barge had anything to do with floodwall damage in the South Breach that Mr. Pazos, reviewing the same photograph, said was "absolutely" caused by the barge.  *Compare* Exh. 8, Marino 2009 Dep. 181 (concrete damage in photo "is not the consequence of the barge hitting the wall and knocking the concrete off") *with* Exh. 6, Pazos Dep. 193-94 & Exh. 12 (second photo) (referring to same photo and testifying that barge "scraped away the concrete along the monolith").

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

#### A.    General Standard.

Summary judgment is proper when there is "no genuine issue as to any material fact" and "the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations and internal quotations omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.") (citations omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

The moving party must initially demonstrate that no genuine issue of material fact exists and identify those portions of the record which it believes show the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). However, once the movant meets this burden, the burden shifts to the non-movant "to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. To satisfy this burden, the non-movant must proffer *sufficient* evidence to show that a reasonable jury could find in its favor – that is, that "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson*, 477 U.S. at

249-50, 252.[43]  The existence of "some evidence" favoring the nonmoving party will not prevent

summary judgment unless the evidence is "of such a character that it would warrant the jury a

verdict in finding in favor of that party."  *Id.* at 251 (quoting *Improvement Co. v. Munson,* 14

Wall. 442, 448 (1872)).

## B.    To Avoid Summary Judgment the Record Must Show a "Genuine Issue," Not Just a Factual Dispute.

A "genuine issue" may be lacking even when the non-moving party purports to "dispute"

facts in issue.  In particular, summary judgment is proper, even when a "dispute" exists, if the

evidence is not sufficient to allow a reasonable jury to find for the non-moving party.  *See*

*Anderson*, 477 U.S. at 248-49.  The Fifth Circuit, sitting en banc, has held that "summary

judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential

fact that it could not support a judgment in favor of the nonmovant."  *Little*, 37 F.3d at 1075

(citation and quotation omitted).  Furthermore, "[e]vidence purporting to create doubts as to the

facts that is too incredible to be accepted by reasonable minds will not prevent summary

judgment."  *Barker v. Norman*, 651 F.2d 1107, 1127 (5th Cir. 1981).  Several points of law

follow from these basic principles.

First, "[e]vidence manifestly at variance with the laws of nature and the physical facts is

of no probative value and may not support a jury verdict."  *Ralston Purina Co. v. Hobson*, 554

F.2d 725, 729 (5th Cir. 1977).  In *Ralston*, the Fifth Circuit held that a plaintiff could not avoid a

judgment notwithstanding the verdict where testimony regarding the cause of plaintiff's

---

[43] *See also Frakes v. Crete Carrier Corp.*, No. 08-10603, ---- F.3d ----, 2009 WL 2450694, at *3 (5th Cir. Aug. 12, 2009) ("[P]laintiff has the burden to put forth sufficient evidence to create a genuine dispute" as to a material fact); *Florida Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n*, 274 F.3d 924, 928 (5th Cir. 2001) ("After a defendant properly moves for summary judgment, the non-movant plaintiff must bring forward sufficient evidence to demonstrate that a genuine issue of material fact exists on every element of a claim."); *Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528, 531 (5th Cir. 1994) ("An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party.").

chickens' deaths was contradicted by poultry experts' testimony on chicken behavior and physical characteristics. *Id.* The Fifth Circuit explained that the trial court properly disregarded the plaintiff's testimony because "[w]hat Hobson says his chickens did, chickens do not do." *Id.* Similarly, in *Molden v. Georgia Gulf Corp.*, 465 F. Supp. 2d 606 (M.D. La. 2006), the court granted summary judgment despite the plaintiffs' testimony that they suffered physical injuries within a short time of a toxic chemical release because the scientific evidence showed that their level of exposure was not sufficiently high to give rise to their physical injuries. *Id.* at 613-14. For similar reasons, the Fifth Circuit and others have held that testimony that is incredible in the face of overwhelming contrary evidence will not prevent summary judgment.[44]

Second, equivocal or vague testimony cannot be relied on to overcome summary judgment. *Bright v. G B Bioscience Inc.*, 305 Fed. App'x 197, 203-04 (5th Cir. 2008); *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 271-72 (5th Cir. 2002). In *Bright*, the Fifth Circuit upheld summary judgment when the plaintiff's reliance on vague testimony failed to raise a genuine issue of material fact probative of pretext in an employment discrimination case. 305 Fed. App'x at 203-04. And in *Stahl*, the Fifth Circuit held that "equivocal and ill-supported [expert] testimony is simply insufficient to preclude summary judgment on this inadequate warning claim." 283 F.3d at 271-72.

Likewise, expert testimony is insufficient to create a genuine issue of material fact if that testimony consists of "conclusory, unsupported assertions." *Kampen v. American Isuzu Motors,*

---

[44] *Barker v. Norman*, 651 F.2d 1107, 1127 (5th Cir. 1981); *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997) ("Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. ... [T]estimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it."); *Kesinger v. Herrington*, 381 F.3d 1243 (11th Cir. 2004) (eyewitness testimony was insubstantial and disregarded when it was contradicted by physical evidence as well as other witness testimony).

LIBW/1708040.18

*Inc.*, 157 F.3d 306, 318 (5th Cir. 1998) (en banc).[45]  For example, the Fifth Circuit has held that expert testimony that goes beyond the bounds of the expert's expertise, contains internal inconsistencies, and provides no comment on key considerations is not sufficient to defeat summary judgment. *Kampen*, 157 F.3d at 318.  In *White v. Black & Decker (U.S.) Inc.*, No. Civ. A. 03-0874, 2004 WL 1373271 (E.D. La. June 16, 2004), Judge Engelhardt granted summary judgment to the defendant in a product defect case because the plaintiff's expert did not provide adequate factual support or explanation for his assertions, admitted he was unaware of studies that supported his statements, and conducted no tests himself to support his position. *Id.* at *9.

Finally, a party may not avoid summary judgment by relying on an unsubstantiated interpretation of its own evidence.  Thus, although the evidence is viewed in the light most favorable to the non-moving party, summary judgment is appropriate when the moving party shows that the evidence relied upon by the other party is simply not susceptible to the interpretation which the other party gives it. *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968); *Sievers v. Beechcraft Mfg. Co.*, 497 F. Supp. 197, 200 (E.D. La. 1980).  In *Little v. Liquid Air Corp.*, for instance, the Fifth Circuit rejected the plaintiff's inference that "nasal fatigue" was the cause of the decedent's failure to smell the combustible gas that caused a fatal explosion, finding that the reason for his failure to smell the gas could not be inferred from his failure to evacuate the area.  37 F.3d at 1077.  In *Sievers*, the court refused to infer a causal connection between an airplane crash and an alleged aircraft defect, and granted summary judgment on that basis, because there was no physical evidence of a causal relationship, an exhaustive investigation by a federal agency did not conclude the crash was caused by

---

[45] *See also Marshall v. East Carroll Parish Hospital Serv. Dist.*, 134 F.3d 319, 324 (5th Cir. 1998) (testimony, though considered in its entirety for summary judgment purposes, was insufficient to create a material fact issue when it involved conclusory statements unsupported by necessary detail).

LIBW/1708040.18

defendant's negligence, and there was a reasonable alternative explanation for the cause of the crash.  497 F. Supp. at 199-202.

As we demonstrate below, the unchallenged evidence establishes as a matter of scientific fact that the Barge ING 4727 could not have caused and did not cause either of the IHNC floodwall breaches.  The plaintiffs have not adduced, and cannot provide, evidence sufficient to allow a reasonable jury to find in their favor on this issue.  To the contrary, plaintiffs' "evidence" is contrary to the laws of science, is equivocal and vague at best, consists of conclusory and conflicting assertions, and derives from mischaracterized inferences.

### C.   Summary Judgment on Causation is Appropriate.

As noted above, substantive law determines the materiality of facts.  *Anderson*, 477 U.S. at 248.  The core principle of the substantive law of causation is that "[a] defendant's actions must be the cause in fact of a plaintiff's injuries in order for the plaintiff to be able to recover." *Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1013 (5th Cir. 1980).[46]

A factual dispute about causation can only survive summary judgment if the dispute is genuine.  In *Little v. Liquid Air Corp.*, the Fifth Circuit found that plaintiffs' evidence, including expert proof, did not establish a genuine issue of fact concerning their theory of causation in a gas leak explosion case.  37 F.3d at 1075.  Similarly in *Bach v. Trident S.S. Co.*, 920 F.2d 322, 327 (5th Cir. 1991), the Fifth Circuit held that the plaintiff could not avoid summary judgment on causation without introducing "evidence which affords a reasonable basis for the conclusion

---

[46] *See also, e.g.*, 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5.3, at 189-90 (4th ed. 2004) (A "defendant's act cannot be a 'substantial factor' if the plaintiff's harm would have occurred without it."); *American River Transp. Co. v. Kavo Kaliakra S.S.*, 148 F.3d 446, 450-51 (5th Cir. 1998) (barges moored abreast were not substantial causal factor because accident was dominated by other vessel's loss of power); *Westchester Fire Ins. Co. v. Haspel-Kansas Inv. P'ship*, 342 F.3d 416, 421 (5th Cir. 2003) ("while a party's conduct does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability") (citations and internal quotations omitted); Restatement (Second) of Torts §§ 431, 432 (1965) (requiring showing of "but for" causation or, in multiple causation setting, that each actor's conduct was "sufficient" to cause the harm).

21

that it is more likely than not that the conduct of the defendant was a cause in fact of the result." *Id.* (quoting W. Keeton, Prosser & Keeton on Torts § 41, at 269). Applying that standard, the *Bach* court upheld summary judgment in a negligence case under maritime law because the "[u]ndisputed medical testimony indicates that Bach had no more than a fifteen percent chance of surviving even if the crew had rendered CPR and defibrillation had been available," and "[f]rom this uncontradicted evidence, no rational factfinder could conclude that the crew's failure to administer CPR more likely than not caused Bach's death." 920 F.2d at 327. The Fifth Circuit and other courts, including this Court, have not hesitated to grant summary judgment on causation where the evidence did not raise a genuine issue of material fact.[47]

### D.   Summary Judgment on Damages Is Appropriate.

Whether the plaintiff has suffered any damages is an appropriate consideration for summary judgment. *See Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528, 537 (5th Cir. 1994) (affirming summary judgment on tort claim because plaintiff failed to establish damages). Here, plaintiffs concede that even if the IHNC breaches had not occurred, their homes would have been flooded to the same level, only somewhat later, by virtue of the water from the

---

[47] *See, e.g., Little,* 37 F.3d at 1077 (affirming summary judgment on causation of shipboard accident); *Ralston Purina Co. v. Hobson,* 554 F.2d 725, 729 (5th Cir. 1977) (setting aside jury verdict on causation of poultry mortality); *In re Ingram Towing Co.,* No. 93-3311, 1995 U.S. Dist. LEXIS 15034 (E.D. La. Oct. 11, 1995) (Duval, J.) (granting summary judgment on causation in toxic exposure case, finding that it was "impossible for any person to have become ill due to the oil spill from drinking tap water in the days following the accident"); *Evans v. McKinney Marine, Inc.,* No. 96-0132, 1997 U.S. Dist. LEXIS 2148 (E.D. La. Feb. 21, 1997) (granting summary judgment on causation of marine casualty), *aff'd,* 127 F.3d 34 (5th Cir. 1997); *Molden v. Georgia Gulf Corp.,* 465 F. Supp. 2d 606, 613-14 (M.D. La. 2006) (granting summary judgment on causation in chemical exposure case); *Sievers v. Beechcraft Mfg. Co.,* 497 F. Supp. 197, 203-04 (E.D. La. 1980) (granting summary judgment on causation of air crash).

Because the thrust of this motion is that the barge simply played no role in causing either of the two IHNC floodwall breaches, this motion involves none of the "multiple causation" issues that led this Court to deny the government's summary judgment motion in *Robinson.* Doc. 18567 at 10 (discussing Louisiana law regarding "multiple causes"). But even if it were necessary to consider the various formulations of the cause-in-fact test, LNA would satisfy any such formulation because the barge was not a "but for" cause of the floodwall breaches as required under the single-cause test of Restatement (Second) of Torts § 432(1) and was not "sufficient" to cause the floodwall breaches as required under the multiple-cause test of Restatement (Second) of Torts § 432(2). *See Chavez v. Noble Drilling Corp.,* 567 F.2d 287, 288 (5th Cir. 1978) (applying Restatement under maritime law).

LIBW/1708040.18

breaches of the MRGO levees.  *See* above at 9-10.  This concession raises the substantive

question of whether plaintiffs would have any claim for damages in this case, even if they could

somehow muster evidence sufficient to withstand a motion for summary judgment on causation

of the two IHNC breaches.

As a matter of substantive law, a plaintiff's damages are limited by the likelihood (here,

the certainty) that the plaintiff would suffer the same injury from a non-liable cause.  Thus, for

instance, in *Lancaster v. Norfolk & Western Railway*, 773 F.2d 807 (7th Cir. 1985), the Seventh

Circuit explained that "the damages of the 'eggshell skull' victim must be reduced to reflect the

likelihood that he would have been injured anyway, from a non-liable cause, even if the

defendant had not injured him."  *Id.* at 822.[48]  In *Lancaster*, the Seventh Circuit cited (*id.* at 822-

23) to the leading case of *Dillon v. Twin State Gas & Electric Co.*, 163 A. 111 (N.H. 1932), in

which the estate of a boy who fell off a bridge sued the electric company whose lines

electrocuted the child as he fell, and the court held that damages could only be awarded for the

short time that the child would have lived before reaching the bottom.  *Id.* at 114-15.[49]  Other

authorities, including under maritime law, are in accord.[50]

---

[48] Plaintiffs have invoked the "eggshell skull" analogy in this case.  *See* Exh. 11, Mosher Dep. 153-54.

[49] In considering the assumption the fall would have resulted in Dillon's death, the court explained that "the defendant deprived him, not of a life of normal expectancy, but one too short to be given pecuniary allowance." *Dillon v. Twin State Gas & Elec. Co.*, 163 A. 111, 114-15 (N.H. 1932).

[50] *See, e.g., Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 973 (7th Cir. 1983) (a "ground for reducing [the] damage award" is that "the injury complained of would have occurred anyway, so that the accident merely accelerated it"); *see also Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1569 n.20 (11th Cir. 1991) (principle recognized under maritime law); *Harris v. Illinois Central R.R.*, 58 F.3d 1140, 1144-45 (6th Cir. 1995) (lost wages limited to account for heart condition); *see Dixon v. International Harvester Co.*, 754 F.2d 573, 588-90 (5th Cir. 1985) (wage loss damages cut off by plaintiff's death due to unrelated causes).

23

**II.    IT IS SCIENTIFICALLY IMPOSSIBLE FOR THE BARGE TO HAVE CAUSED EITHER BREACH BECAUSE THE BARGE COULD NOT HAVE MOVED ACROSS THE CANAL UNTIL AFTER BOTH BREACHES HAD ALREADY OCCURRED.**

As discussed above (at 3-4), the ING 4727 was a hopper barge with no motor or other mode of self-propulsion.  Therefore, it was impossible for the barge to reach the opposite side of the IHNC unless it was conveyed there by an external force such as wind, current or waves.  *See* SMF ¶ 6.  Based on the undisputed meteorological data and evidence regarding the wind, current and wave conditions in the IHNC on the morning of August 29, 2005, it is scientifically impossible for any of those forces to have moved the barge from the LNA Terminal across the canal to the site of either the North Breach or the South Breach until after the breaches had already occurred.  Plaintiffs' supposed evidence to the contrary is not sufficient to raise a genuine dispute of fact regarding this point.

**A.    The Barge Could Not Have Been Present at the North Breach.**

The North Breach occurred just south of Florida Avenue, to the north and east of the LNA Terminal where the ING 4727 was moored.  SMF ¶ 3.  This breach occurred no later than 6:00 a.m. on the morning of August 29.  SMF ¶ 28.  Therefore, the barge cannot have caused the North Breach unless it was forced by wind, current or waves to the site of the breach before 6:00 a.m. on the morning of August 29.  The undisputed meteorological evidence shows, however, that it was scientifically impossible for any of those forces to have moved the barge to the site of the North Breach at or before that time.

**1.    Wind did not move the barge to the North Breach.**

It is scientifically impossible for wind to have blown the ING 4727 to the location of the North Breach.  According to Buys Ballot's law, a well-established meteorological theorem, the winds of a hurricane in the Northern Hemisphere behave predictably, blowing counterclockwise

24

around the eye of the storm. SMF ¶ 12. It is undisputed that the eye of Hurricane Katrina moved

on a northerly track, passing to the east of New Orleans and the IHNC. SMF ¶ 13; *see* Exh. 16,

Spinks Report (2009) at Fig. 1 and Exh, 7, Dooley Report at Map 2 (showing track of storm).

Thus, New Orleans and the IHNC were on the ***western side of the storm*** at all times. SMF ¶ 13.

As the storm approached from the south, therefore, the prevailing winds in the IHNC blew first

from the east, then from northeast-to-southwest, and then from north-to-south until the storm

reached the same latitude as the IHNC. SMF ¶ 16. At no time during this process did the

prevailing winds in the IHNC have a component blowing from the south to the north, as would

have been required to move the barge to the North Breach.[51]

Moreover, as of 6:00 a.m., when the North Breach occurred, the eye of the storm had ***not***

***even made landfall*** at Buras, Louisiana, over sixty miles to the southeast of the IHNC. SMF ¶

14.[52] Accordingly, with the storm to the southeast of the IHNC at the time of the North Breach,

the hurricane winds at the IHNC necessarily had an east-to-west component at the time the North

Breach occurred and at all times before then – or, at least, the winds could not have had a

component from the west. SMF ¶ 17. Thus, when the North Breach occurred, the hurricane

winds were forcing the barge ***toward the LNA dock***, and not away from the dock toward the

eastern side of the canal.[53] For this reason as well, it is scientifically impossible for the ING

4727 to have been blown to the North Breach at any time before the breach occurred. Indeed,

plaintiffs' expert, Dr. Marino, admitted that "the wind wasn't blowing in the direction of the

---

[51] The data relied upon by plaintiffs' expert Dr. Marino, which is the only meteorological data cited in any of plaintiffs' expert reports, supports this conclusion. *See* Exh. 2, Marino Report at 3-11. According to that data, the winds were blowing "parallel" to the canal from north to south, opposite the direction that would have been needed to carry the barge to the North Breach.

[52] *See* Exh. 28, Plaintiffs' Response to Request for Admission No. 6; Exh. 29, Green Report at 4 (hurricane was "located about 70 miles south-southeast of New Orleans" at 6:00 a.m. on August 29); Exh. 16, Spinks Report (2009) at 8 (landfall at Buras, Louisiana at 6:10 a.m. CDT).

[53] *See, e.g.,* Exh. 1, Cushing Report at 43 and Figs. 26 & 27; Exh. 7, Dooley Report at 35.

wall" at the time of the North Breach. Exh. 9, Marino 2008 Dep. 147-48; Exh. 8, Marino 2009

Dep. 76 (barge would have had to be moving "in the direction other than the direction of the

wind" at North Breach).[54]

It is undisputed that the Barge ING 4727, because it was empty and had a shallow draft

and a large sail area, was subject principally to the forces of the wind during Hurricane Katrina.

SMF ¶ 10. Indeed, plaintiffs' maritime expert opined that the barge breakaway "allow[ed] the

ING 4727 to drift uncontrollably in hurricane winds toward the levee."[55]   However, those

hurricane force winds could not have propelled (and did not propel) the barge toward the site of

the North Breach at any time before the breach occurred. At all relevant times, the winds were

blowing in the wrong direction for that to have taken place.

2.    <u>Current did not move the barge to the North Breach.</u>

The evidence also shows that the ING 4727 was not conveyed from the LNA Terminal to

the North Breach by water currents in the IHNC. Plaintiffs' expert, Mr. Pazos, admitted that

"[c]urrent is very insignificant" because the locks were closed and the flow was thus "very

limited or local." Exh. 6, Pazos Dep. 104. LNA's experts undertook scientific modeling

analysis which showed that "currents were negligible" and the barge "would not have been

significantly influenced by [them]." Exh. 4, Cushing Dep. 124, 238.[56]  Plaintiffs' hydrology

expert, Mr. Spinks, reviewed LNA's modeling analysis of currents in the IHNC and did not find

---

[54] *See also* Exh. 9, Marino 2008 Dep. 114 (admitting "at the north breach the barge was going in a direction other than the direction of the wind"); *id.* at 144 (admitting "the north breach [happened] without the aid of wind velocity"). Similarly, plaintiffs' maritime expert Don Green testified that, at the time the North Breach took place, the wind was blowing "from either the northeast or due from the north," opposite the direction the barge would have had to travel to get to the North Breach site. Exh. 10, Green 2008 Dep. 56.

[55] Exh. 29, Green Report at 7 ¶ 5.1.

[56] That analysis, performed by hydrologist Larry Daggett under the direction of Dr. Charles Cushing, is set forth in Appendix B to the Cushing Report (Exh. 1).

26

it objectionable.[57]  It is, therefore, undisputed that water currents in the IHNC did not and could

not have delivered the ING 4727 to the site of the North Breach.

> 3.    Waves did not move the barge to the North Breach.

As is the case with wind and current, scientific principles govern the action of waves, and

can be applied to determine the wave conditions in the IHNC on the morning of August 29,

2005.  SMF ¶ 21.  The Army Corps of Engineers' IPET project conducted a scientific study of

waves in the IHNC and found that wave heights rose to the level of only one foot high prior to

5:30 a.m., and only two to three feet high thereafter.  SMF ¶ 22; Exh. 21, IPET Report at IV-4,

IV-14-1, IV-15-36.[58]  It is undisputed that waves one to three feet high would not significantly

affect a two-hundred-foot long barge, particularly a barge sticking up twenty feet out of the water

in the middle of a hurricane.  SMF ¶¶ 26-27.  Moreover, and in any event, because waves tend to

propagate with the prevailing wind, and lose strength when they reflect off a surface, the waves

in the IHNC would have affected the barge in the same direction as the prevailing wind, and it

would have been impossible (and was impossible) for "reflected" waves to have carried the

barge in a direction opposite from that of the prevailing wind.  See SMF ¶¶ 24, 25, 26.[59]

Plaintiffs' experts conducted *no* scientific study or analysis to contest *any* of these points.

SMF ¶ 27.  Although Mr. Pazos submitted a report opining generally about "gigantic waves" that

may have been present in the IHNC,[60] he admitted that his theory of barge transit across the

---

[57] Exh. 15, Spinks 2009 Dep. 14 (Q:  "Did you see anything in Dr. Daggett's appendix that you found particularly objectionable?"  A: "No, not in particular.").

[58] Plaintiffs' hydrology expert, Mr. Spinks, accepted and relied upon IPET's analysis, finding that "IPET went through a scientific process and analysis in order to determine those values and … [I] had no reason to discount [that information]."  Exh. 15, Spinks 2009 Dep. 20.

[59] *See also* Exh. 1, Cushing Report at 79 (wind-generated waves "travel in the same direction as the prevailing wind" and "[r]eflected waves lose energy when reflection takes place"); Exh. 15, Spinks 2009 Dep. 23-24 (agreeing with these points).

[60] Exh. 6, Pazos Report at 41.

canal was *"pure guessing"* in the absence of "very detailed analysis of the waves, the reflecting

waves, the location of the wind, [and] the direction of the wind." Exh. 6, Pazos Dep. 123-24

(emphasis added). And Mr. Pazos admitted he had not undertaken such an analysis.[61] Mr.

Pazos' "pure guessing" fails to create a genuine issue of material fact, particularly in the face of

scientific evidence to the contrary accepted by other experts on plaintiffs' side of the case. *Stahl*,

283 F.3d at 271-72 ("equivocal and ill-supported [expert] testimony is simply insufficient to

preclude summary judgment").

      4.    <u>Plaintiffs' evidence does not create a genuine dispute of fact regarding the presence of the barge at the North Breach.</u>

As discussed above, the meteorological and other scientific evidence regarding wind,

waves, and current shows that the barge could not have arrived at the site of the North Breach

before the breach occurred. To the extent plaintiffs' experts have considered the scientific

evidence regarding wind, waves and current, they have endorsed its validity.[62]

Plaintiffs' allegation that the barge was present at the site of the North Breach depends

almost entirely on the testimony of a single eyewitness, William Villavasso.[63] Mr. Villavasso

was one of the employees on duty at Pump Station No. 5, located just south of Florida Avenue

---

[61] Exh. 6, Pazos Dep. 151 (Q: "Do you have an opinion about the prevailing direction of the waves at the time the barge contacted the wall at the site of the north breach?" A: "Absolutely no."); *id.* at 130 (Q: "You haven't cited a single piece of data about turbulence at this location in your report, have you?" A: "Because I'm not interested.").

[62] For instance, Dr. Marino studied the meteorologic data and concluded that the wind blew from north-to-south, not the other way around. SMF ¶17; Exh. 2, Marino Report at 3-11. Likewise Mr. Spinks reviewed and endorsed IPET's analysis of waves, and did not disagree with Dr. Cushing's analysis of currents. SMF ¶ 22, Exh. 15, Spinks 2009 Dep. 14, 22.

[63] As plaintiffs' expert Dr. Marino testified in 2008, the testimony of Mr. Villavasso is "really the beginning and end" of his opinion as to how the barge arrived at the site of the North Breach. Exh. 9, Marino 2008 Dep. 148-49; *see also id.* at 53-54, 75 (Villavasso was the only witness who said he saw the barge at the site of the North Breach); Exh. 8, Marino 2009 Dep. 119 (admitting that Villavasso's testimony is "important to the conclusions [he has] reached in this case"); Exh. 6, Pazos Dep. 56-58 (discussing importance of Villavasso's testimony to his conclusions regarding the North Breach).

near the IHNC, at a distance of around two hundred to three hundred feet from the levee wall.[64]

During the dark of night and in the rain, Mr. Villavasso went onto the porch of the pump station, where he said he heard an explosion ("boom"), and saw "[a] couple of sections" of the wall "tumble [ ] over," at which point he professed to have seen "what appear[ed] to be [a] metal structure like a barge, only the tip of it.  Couldn't tell you I seen a whole barge, because I didn't."[65]  Mr. Villavasso was unable to identify the color of the object he said he saw, or whether it had any writing on it, or whether it had a cover, or how big it was, or how long, or how wide; in fact, he testified: "I couldn't tell what it was."[66]  And Mr. Villavasso admitted that he was not wearing his eyeglasses, and that his long-distance vision was "fuzzy" without them.[67]  From this testimony, no reasonable factfinder could conclude that Mr. Villavasso actually saw the ING 4727 at the site of the North Breach.  His testimony is pure equivocation, and summary judgment may not be avoided on the basis of equivocal and vague testimony.  *See Bright*, 305 Fed. App'x at 203-04.[68]  Moreover, even had Mr. Villavasso's testimony been less equivocal, it would still be "manifestly at variance with the laws of nature and the physical facts," *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729 (5th Cir. 1977), because the Barge ING 4727 simply had no means of traveling from the LNA Terminal to the site of the North Breach because the wind, current, and waves could not have driven it in that direction.

Furthermore, even accepting Mr. Villavasso's testimony at face value, his description makes clear that the object he thought he saw could not have been the ING 4727.  Mr. Villavasso

---

[64] Exh. 24, Villavasso Dep. 31, 53.

[65] Exh. 24, Villavasso Dep. 64.

[66] Exh. 24, Villavasso Dep. 203-04.

[67] Exh. 24, Villavasso Dep. 211; *see* Exh. 8, Marino 2009 Dep. 121 (admitting Villavasso's vision was "obscured by rain and darkness" and that "he said he did not have a clear, focused picture").

[68] This Court, in denying class certification, has already noted the "substantial causation issues" raised by plaintiffs' reliance on this weak and equivocal testimony.  Doc. 18852 at 21.

LIBW/1708040.18

said that this object was sticking up above the top of the floodwall by "maybe a foot, foot and a half, two feet at the most." [69] As plaintiffs' own experts admitted, however, the ING 4727 was sticking up more than twenty feet out of the water. SMF ¶ 9.[70] Accordingly, even accounting for the height of the six-foot concrete floodwall, the barge, had it been present, would have had to be sticking up ***more than fourteen feet*** above the top of the floodwall – again as admitted by plaintiffs' experts.[71] Therefore, the object that Mr. Villavasso described as protruding one to two feet above the top of the floodwall cannot have been the Barge ING 4727.[72] Whatever Mr. Villavasso saw (or thought he saw), the object that he described was not the Barge ING 4727. As already shown, it is proper to enter summary judgment when the evidence is not fairly susceptible to the interpretation which plaintiffs give it. *First Nat'l Bank of Arizona*, 391 U.S. at 289. Mr. Villavasso's testimony cannot support the interpretation that plaintiffs give it – *i.e.*, that the object he described as sticking up "two feet at the most" was the Barge ING 4727.

Apart from plaintiffs' unwarranted inferences from the testimony of Mr. Villavasso, plaintiffs have ***no*** evidence that the Barge ING 4727 was present at the site of the North Breach. Plaintiffs' experts observed no pattern of damage at the North Breach or on the barge that they could uniquely tie to a barge impact at that location.[73] To the contrary, plaintiffs' experts disagree about the cause of floodwall damage reflected in the same photographs of the North

---

[69] Exh. 24, Villavasso Dep. 202.

[70] *See* Exh. 6, Pazos Dep. 103-04 (admitting barge sticking up out of water "in excess of twenty feet"); Exh. 8, Marino 2009 Dep. 66 (barge was unloaded, and sticking up over 20 feet); Exh. 1, Cushing Report at 124-25.

[71] Exh. 6, Pazos Dep. 164 ("the top of the barge was above the top of the seawall probably fifteen, sixteen, seventeen feet"); Exh. 8, Marino 2009 Dep. 120-21 (admitting that barge was sticking up at least 15 feet above the wall, but Villavasso said he saw a stickup of no more than "a few feet").

[72] Exh. 1, Cushing Report at 124-25 & Fig. 98. Dr. Cushing explained that if the barge had in fact been visible only one or two feet above the floodwall at that time, then the water level would have been too low to permit the barge to come into contact with the floodwall. *See id.*

[73] Exh. 30, Deposition of Robert Bartlett 63 ("Bartlett Dep.) (Q: "You saw no damage at the north breach that would lead you to believe that a barge had anything to do with that damage; correct?" A: "We did not see -- that's correct."); Exh. 9, Marino 2008 Dep. 146 (no distinctive damage on barge that could be attributed to North Breach).

Breach.[74]  In these circumstances, all the scientific evidence points in a single direction – neither wind, nor water, nor waves could have moved the barge to the site of the North Breach.  Neither ILIT, nor IPET, nor Team Louisiana, nor anyone else other than plaintiffs' retained experts have even suggested the barge was present at the North Breach.  The plaintiffs' evidence is simply not sufficient to create a genuine dispute of material fact regarding whether the barge was present. No reasonable factfinder could conclude that the ING 4727 overcame the laws of nature and was present at the North Breach, and thus summary judgment is warranted on this issue.

**B.      The Barge Could Not Have Been Present at the South Breach at the Time of the Breach.**

In order to have caused the South Breach, the ING 4727 would have to have been present when the South Breach occurred.  As with the North Breach, the undisputed scientific facts demonstrate that neither the wind, nor current, nor waves could have carried the barge to the site of the South Breach until after the breach had already occurred.  Plaintiffs' evidence does not rebut those threshold scientific facts, nor does it raise a genuine dispute of fact.

1.      Neither wind nor current nor waves could have carried the barge to the site of the South Breach before it occurred.

As with the North Breach, the undisputed scientific proof of wind direction prohibits a finding that the ING 4727 was or could have been present at the location of the South Breach at the time of the failure.  It is undisputed that the South Breach occurred sometime before 7:30 a.m. on the morning of August 29.  SMF ¶ 29.[75]  As of that time, the center of the storm had not yet reached the latitude of New Orleans, and thus, consistent with Buys Ballot's Law, the

---

[74] *Compare* Exh. 6, Pazos Dep. 184 (attributing cracks in concrete to barge impact) *with* Exh. 8, Marino 2009 Dep. 138-40, 179, 181 (attributing cracks to torsion and twisting, including in same photograph reviewed by Pazos).

[75] *See also* Exh. 16, Spinks Report (2009) at 17, Tbl.1, 35 (South Breach occurred at 5:30 a.m.); Exh. 12, Pazos Report at 46 (South Breach occurred at approximately 6:00 A.M.); Exh. 1, Cushing Report at 79, 114 (South Breach occurred by 7:30 a.m.).

31

counterclockwise hurricane winds were still blowing from the northeast at the IHNC and/or parallel to its north-south axis. SMF ¶¶ 14, 15. Of critical importance, Hurricane Katrina's prevailing winds did not acquire a component blowing across the canal from west to east until after 7:30 a.m. SMF ¶ 17. At that time, and throughout the entire morning up until then, the prevailing winds were blowing the barge toward the dock at the LNA Terminal, not away from it. *Id.*[76] Even plaintiffs' expert, Dr. Marino, agreed that the wind throughout the early morning hours, through and including 7:30 a.m., was "essentially parallel" to the orientation of the IHNC, and not across the canal from west to east.[77] Thus, the prevailing winds during Hurricane Katrina simply could not have driven the barge out of the LNA Terminal Basin, into the IHNC, and across IHNC until after the South Breach had already occurred.

It is also impossible for water, in the form of waves or current, to have overcome the hurricane force winds and moved the ING 4727 across the IHNC to the South Breach site prior to the failure. As discussed above, the waves in the IHNC were no larger than two to three feet, and were necessarily traveling predominantly in the direction of the prevailing wind (*i.e.*, toward the LNA dock or, at worst, toward the south end of the protected terminal basin). *See* above at 6. Also, as described above, no significant current existed in the IHNC to draw the barge away from the LNA Terminal. *See* above at 5-6.[78]

---

[76] *See, e.g.*, Exh. 7, Dooley Report at 35 (wind blowing barge toward dock until 7:42 a.m.); Exh. 31, Deposition of Austin Dooley 36 ("Dooley Dep.") ("[T]he wind would not have allowed that barge to move from the western side to the eastern side that early in the morning") (referring to South Breach).

[77] *See* Exh. 2, Marino Report at 3-11. From an overview of the orientation of the LNA Terminal vis-à-vis the main channel of the IHNC, it is obvious that a "parallel" wind could not have taken the barge away from the terminal into the main channel, but rather would have trapped it in the "pocket" of the southern portion of the Terminal Basin near the LNA dock. *See* Exh. 1, Cushing Report at 78.

[78] Even after the North Breach occurred, any currents were localized and did not affect the LNA Terminal Basin. Exh. 1, Cushing Report App. B; Exh. 15, Spinks 2009 Dep. 14.

32

Thus, neither wind, nor waves, nor current could have served as the external force necessary to drive the barge to the site of the South Breach prior to 7:30 a.m., by which time all sides agree the breach had already occurred.  No reasonable factfinder could conclude otherwise, and no genuine issue of fact is raised as to the presence of the barge at the site of the South Breach at any time before its occurrence.

> 2.     Plaintiffs' evidence does not create a genuine dispute of fact regarding the presence of the barge at the site of the South Breach at the time of the failure.

As was the case with the North Breach, plaintiffs have no evidence to support or explain how the barge could have traveled to the site of the South Breach at any time before the breach had already occurred.  Neither Mr. Pazos nor Dr. Marino conducted any sort of analysis of the meteorological data to support their naked assertion that, defying the laws of science, the barge somehow moved out of the LNA Terminal area and across the IHNC contrary to the direction of the prevailing wind.  SMF ¶ 18.[79]  The Fifth Circuit has ruled that in these circumstances – where expert proof lacks analysis or support regarding critical issues such as the meteorology issues in this case – such "equivocal and ill-supported testimony is simply insufficient to preclude summary judgment."  *Stahl*, 283 F.3d at 271-72 (expert testimony regarding inadequate warning was insufficient); *Kampen*, 157 F.3d at 317 (expert testimony regarding use of tire jack lacked support and was internally inconsistent); *Little*, 37 F.3d at 1077 & n.21 (expert testimony regarding cause of accident did not supply or analyze key data needed to support conclusion).[80]

---

[79] *See also, e.g.*, Exh. 8, Marino 2009 Dep. 142 (Q:  "So again, as with the north breach, you can't explain how or why the barge got from one place to the next?"  A:  "That's correct.").

[80] *See also* Exh. 15, Spinks 2009 Dep. 169 (Q:  "Would you agree with me it's better in carrying out a scientific study of meteorology to rely on meteorologic data to the extent the data is available?"  A:  "Clearly you want to gather the data from where it's available at.").

33

As support for their assertion that the barge was present at the site of the South Breach, plaintiffs principally rely on the testimony of a handful of witnesses who purport to have seen or heard the barge strike the wall. Plaintiffs' key witness is Terry Adams, who is alleged to have seen the barge come through the wall at the time the breach occurred.[81] According to Mr. Adams' account, at some time between 5:30 a.m. and 6:00 a.m., he "looked toward the Claiborne [B]ridge" from his rooftop at Jourdan Avenue and Law Street, and "could see something coming toward the levee," then "heard something that sounded like a bang" and "seen the barge come floating through."[82] But, Mr. Adams conceded, his vantage point was many blocks away – nearly half a mile – from where the impact supposedly took place.[83] Moreover, "it was still dark" and it was "still raining hard" when he purported to make his observation.[84] Furthermore, Mr. Adams had difficulty identifying the object he saw as a barge,[85] and even then, he said that he saw "only about four feet of that barge sticking out … over the floodwall."[86]

Mr. Adams' testimony is insufficient to avoid summary judgment. First, it is simply impossible for him to have seen what he professes to have seen from a distance of half a mile away in the dark and amid hurricane wind and rain. The photographic and video evidence shows that even after dawn had broken, the visibility along the IHNC during Hurricane Katrina was severely restricted, such that the Claiborne Avenue Bridge was not visible from the IHNC locks,

---

[81] Doc. 15549-2 (plaintiffs' memorandum in support of class certification) at 2, 31.

[82] Exh. 23 Adams Dep. 24-25.

[83] Exh. 23, Adams Dep. 88.

[84] Exh. 23, Adams Dep. 88.

[85] Exh. 23, Adams Dep. 23-26 ("couldn't exactly see what it was"; "couldn't make out what it was"; inferred it was a barge because "this canal don't be having nothing on it like that").

[86] Exh. 23, Adams Dep. 82.

a much closer vantage point than Mr. Adams' rooftop.[87]  Mr. Adams simply could not have seen

anything at that distance.  Furthermore, the object that Mr. Adams described having seen was

sticking up only four feet out of the water – not fifteen or more feet, as the ING 4727 would have

been.  SMF ¶ 9; *see* above at 30 & n.71.  Mr. Adams' testimony is contrary to the laws of nature

and the physical evidence, and cannot be relied on to overcome summary judgment.  *See Ralston*

*Purina Co.*, 554 F.2d at 729-30 ("evidence manifestly at variance with the laws of nature and the

physical facts is of no probative value and may not support a jury verdict").[88]

Plaintiffs have also cited the accounts of two other purported eyewitnesses, Arthur Murph

and Sidney Williams.[89]  But Mr. Murph testified that he did not see the barge strike the flood

wall,[90] and in any event, his account describes the floodwall having breached on Sunday

evening, August 28, contrary to that of every other witness, prompting plaintiffs' own expert, Dr.

Marino, to reject it.[91]  And Mr. Williams, although professing at his deposition to have seen the

barge "hit the wall, bounce[] off, [and] hit the wall again,"[92] also admitted that he gave a tape-

---

[87] Exh. 1, Cushing Report at 46 Fig. 28 (lockmaster photo taken at 7:47 a.m. and showing Claiborne Avenue Bridge was not visible from IHNC lock); Exh. 4, Cushing Dep. 141-42, 171-72 (photograph indicates poor visibility even after dawn had broken).

[88] Plaintiffs' experts concurred that it is proper to reject witness accounts that are at odds with scientific observations.  *See* Exh. 8, Marino 2009 Dep. 26-27 (Q:  "And as an expert, it's proper to reject accounts that can't possibly be true?"  A: "Right."); *id.* at 24-25 (Q: "And as an expert, you need to evaluate the witness's report of time against the scientific observations that you consider more reliable.  Isn't that fair?"  A:  "Yeah.  Yes."); Exh. 15, Spinks 2009 Dep. 71 (Q: "And in those instances where discrepancies were noted [in witness accounts], as an expert you would go where science points you?"  A: "Yes."); *id.* at 84 (Q: "Do you agree under the stress of the moment and in mortal danger almost all witnesses will recollect different times?"  A: "I think I mentioned previously that it's not uncommon to have differences in the eye witness accounts during a storm event.").

[89] *See* Doc. 15549-2 at 31(referring to Arthur Murph as eyewitness); Exh. 2, Marino Report Table 3.1 (referring to Murph and Williams as eyewitnesses).

[90] Exh. 32, Deposition of Arthur Murph 196 ("Murph Dep.") ("Q:  Did you see the barge moving at any time?  A: No."); *id.* at 199 (Q:  "Did you see it [the barge] come out [of] the canal?"  A: "No."); *id.* at 253-54 (Q: "It was more than an hour between the time you heard the boom and the time you saw the barge?"  A: "Yes.").

[91] Exh. 8, Marino 2009 Dep. 26 (Q:  "Arthur Murph reported that all of the flooding events took place on Sunday night; correct?"  A: "Right."  Q: "And you've rejected that account from Arthur Murph because it can't possibly be true?"  A: "Right.").

[92] Exh. 33, Deposition of Sidney Williams (Feb. 2008) 41 ("Williams Dep. (Feb. 2008)").

recorded account shortly after the storm in which he *denied* having seen the barge strike the wall and avowed that he was certain the barge *had not caused* the floodwall failure.[93]  Such witness accounts likewise have no probative value and may not be used to avoid summary judgment.[94]

Plaintiffs also offer the testimony of several witnesses who heard "booms" shortly before the arrival of floodwaters in the Lower Ninth Ward.[95]  From these witnesses, plaintiffs infer that the barge must have caused the "boom" sounds when it struck the floodwall.[96]  Such an inference is utterly unwarranted, however.  Numerous witnesses present at or near the floodwall failures on the 17th Street Canal and the London Avenue Canal – where no barge was present – testified that they heard "boom" sounds when those floodwalls failed, shortly before the arrival of floodwaters.[97]  Indeed, plaintiff Marenthia Lagarde testified that she heard a "boom" when the earthen levee protecting the Lower Ninth Ward failed during Hurricane Betsy in 1965.[98]  Thus, testimony regarding "boom" sounds does not provide any basis to infer the presence of the barge, or to avoid summary judgment based on such an inference.  *See First Nat'l Bank of Arizona*, 391

---

[93] Exh. 34, Deposition of Sidney Williams (Oct. 2008) 32, 38 ("Williams Dep. (Oct. 2008)") (authenticating tape recording); Exh. 35, Transcript of Recorded Interview, Williams Dep. (Oct. 2008) Exhibit 3 at 23 ("[W]e heard a loud BOOM sound about three times … right after we got on the roof … And, uh, once we got on there, we was on there about an hour before we even noticed a barge."); *id.* at 24 ("It really didn't sound like a barge to me.  I work on barges on the river."); *id.* at 26 ("Uh, maybe it was a little longer than an hour, maybe about two hours" from the time of the flooding until he saw the barge); *id.* at 27 (did not see barge until after flooding had risen to rooftops); *id.* at 29 (when he saw the barge, the water was "high enough for it to float over that wall"); *id.* ("I truly honest believe, man, that barge did not break that wall."); *id* at 32 ("That barge didn't break that wall, man, they blowed that wall.").

[94] *See, e.g., Barker*, 651 F.2d at 1127 ("Evidence purporting to create doubts as to the facts that is too incredible to be accepted by reasonable minds will not prevent summary judgment."); *Kesinger*, 381 F.3d at 1249 (witness account that was inconsistent with initial statement and contrary to physical facts could not be accepted); *Seshadri*, 130 F.3d at 802 ("[T]estimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it," including where it is contradicted by "[d]ocuments or objective evidence" or is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it").

[95] *See* Exh. 12, Pazos Report at 11-12, 22-28 (extracts of witness testimony regarding "boom" sounds they heard).

[96] *Id.* at 41-42 (opining that these sounds represented "the sounds of the barge colliding with the floodwall").

[97] *See* Exh. 26, Weiss Report at 4 (listing witnesses who testified to having heard "boom" sounds at 17th Street and London Avenue Canals); Exh. 21, IPET Report at IV-7-3, IV-7-27, (witness accounts of "boom" sounds at other canals); Exh. 25 (deposition excerpts of witnesses who heard "boom" sounds at other canals).

[98] Exh. 36, Deposition of Marenthia Lagarde 71-72 ("Lagarde Dep.").

U.S. at 289 (summary judgment warranted where facts were "not susceptible to the interpretation which [plaintiff] sought to give them"); *Sievers*, 497 F. Supp. at 202 (citing existence of "reasonable and plausible alternative explanation" as grounds for refusing to infer causation).

Plaintiffs can point to no physical evidence demonstrating that the barge was present at the site of the South Breach prior to the formation of the breach. To be sure, there is abundant physical evidence that the barge passed through the extreme southern end of the breach, causing localized damage to the concrete cap and embedded rebar as it passed over.[99] This physical evidence is limited to a small area, however, and shows only that the barge sheared off a portion of the concrete cap and bent the rebar in a horizontal position as it passed over the wall, creating scratches in the bottom of the barge that line up precisely with the bent horizontal rebar.[100] Indeed, this localized barge-related damage at the far southern end of the breach is evidence that the barge was *not* present when the breach occurred.[101] Plaintiffs' experts provided no evidence that the barge was present when the South Breach occurred. Moreover, they provided inconsistent and contradictory testimony concerning the damage to the floodwall. Thus, Mr. Pazos alleged that the barge impact at the southern end caused the sheet pile to be "ripped apart,"

---

[99] *See* Exh. 37, Bartlett Report at 4-5 (describing barge impact damage at "the southern end of the south breach"); Exh. 1, Cushing Report at 88-93 (same); Exh. 20, Team Louisiana Report at 67 (same); Exh. 18, ILIT Report at 6-7 (describing damage at "the extreme southern end of the very long breach").

[100] *See, e.g.*, Exh. 37, Bartlett Report at 8 ("The locations of the scratches on bottom of the ING 4727 are consistent with the spacing of the exposed, bent rebars at the south end of the south breach of the IHNC east floodwall"); Exh. 1, Cushing Report at 90 ("[T]he scratch marks on the barge were created when the bottom of the barge came into contact with the rebar as the barge passed over and across the top of the already failed floodwall")' Exh. 6, Pazos Dep. 224 (Q: "All right. And the angle of the bending of the rebar, does that reflect … the attitude of the barge as it went into the neighborhood?" A: "Absolutely. Some was horizontal.").

[101] *See* Exh. 20, Team Louisiana Report at 67 ("[T]he angle of the steel reinforcing bars in the concrete cap exposed by the collision suggested that the section of the wall struck was already leaning having failed earlier. The barge had clipped the end of the already formed breach as it was sucked through."); Exh. 18, ILIT Report at 6-7 ("As this was the extreme southern end of the very long breach; this impact was not the cause of the breach and failure. Instead, the barge was apparently traveling southwards along the IHNC (driven by the prevailing storm winds at that time) and was drawn into the breach by the inflowing waters. The barge did not enter cleanly into the breach, but struck at the south end before passing in."); Exh. 1, Cushing Report at 90-91 (describing physical evidence of south end of South Breach showing that "the wall had failed before contact was made by the barge"); Exh. 8, Marino 2009 Dep. 186 (admitting "the wall was tilted before the barge passed over the rebar").

even though Dr. Marino's photographic evidence showed the sheet pile did *not* become separated.[102]  Likewise, Mr. Pazos opined that the barge caused concrete damage in the middle portion of the South Breach, whereas Dr. Marino, reviewing the same photograph, ruled out any contribution by the barge.[103]

The law is clear that when expert testimony amounts only to conclusory assertions unsupported by scientific analysis and support, such testimony is insufficient to create a genuine issue of material fact that would preclude summary judgment. *Kampen*, 157 F.3d at 318.  Here, the Barge ING 4727 simply had no means of traveling from the LNA Terminal to the site of the South Breach because the wind, current, and waves could not have driven it in that direction at that time, and plaintiffs have not undertaken any analysis or provided any expert evidence to show that it could have done so, or that it did.  Moreover, all investigations into the cause of the breaches other than those financed by plaintiffs attribute the South Breach to causes other than the ING 4727.  Plaintiffs present an "unsubstantiated interpretation of evidence" that cannot be adopted by a reasonable person. *First Nat'l Bank of Arizona*, 391 U.S. at 289.  Plaintiffs' "equivocal and ill-supported" expert testimony is insufficient to establish an issue of material fact, as are the "bald assertions" by their experts. *Stahl*, 283 F.3d at 271-72; *see also Kampen*, 157 F.3d at 318.  As plaintiffs are unable to introduce any issues of material fact regarding the causation of the South Breach, summary judgment is appropriate here for the South Breach as it is for the North Breach.

---

[102] *Compare* Exh. 6, Pazos Dep. 238-39 (sheet pile "ripped apart" at South Breach) *with* Exh. 8, Marino 2009 Dep. 181-82 (sheet pile "is and remains a continuous length").

[103] *Compare* Exh. 6, Pazos Dep. 193-94 (referring to photo of damage in middle portion of South Breach and testifying that barge "scrape[d] away the concrete along the monolith") *with* Exh. 8, Marino 2009 Dep. 181 (referring to same photograph and opining that concrete damage in photo "is not the consequence of the barge hitting the wall and knocking concrete off").

38

III.   **IT IS SCIENTIFICALLY IMPOSSIBLE FOR A BARGE IMPACT WITH THE CONCRETE CAP TO HAVE CAUSED THE FLOODWALL TO FAIL.**

Even if the plaintiffs could raise a genuine dispute about the presence of the barge at the floodwall before either breach occurred – which they cannot – that would still not suffice to avoid summary judgment because the evidence also establishes without genuine dispute that the barge could not have caused the floodwall to fail in the manner that the floodwall did.  Rather, the undisputed evidence shows that the barge's impact could only have resulted in localized damage to the concrete cap on the IHNC floodwall and could not have caused the buried sheet pile to be dislodged from the soil, which would have been required to produce a floodwall failure.

A.   **The Undisputed Scientific Evidence Established That Any Impact With the Concrete Cap Would Cause Only Localized Damage to the Cap, Not the Dislocation of the Sheet Pile Required To Cause the Floodwall to Fail.**

The floodwalls along the IHNC were "I-wall" structures consisting of twenty-foot-long steel sheet pile driven into the ground to a depth of approximately seventeen feet.  SMF ¶ 31.  The portion remaining above ground was covered in concrete and topped with a second pour of concrete supported by reinforcing bar ("rebar"), which together created a visible six-foot concrete monolith (cap).  SMF ¶ 31.  The two sections of the exposed concrete wall – *i.e.*, the concrete covering the sheet pile and the upper cap supported by the rebar  –  were joined by a horizontal construction joint.  *Id.*  For support to hold back rising water in the canal, the floodwall derived its strength from the soil on the protected side of the floodwall in which the sheet pile was embedded.  SMF ¶ 32.

At both the North Breach and South Breach, the floodwall failed when the underground sheet pile dislodged from the soil in which it was anchored.  Experts for both plaintiffs and LNA agreed that in order for such a failure to occur, the floodwall had to have lost the support of the

soils on the protected side of the levee. SMF ¶ 32. The loss of soil support, in turn, would have required an impact in the buried sheet pile wall, not just the concrete cap – as plaintiffs' expert Gennaro Marino admitted, a barge impact on the upper part of the wall cannot have caused the wall to fail unless its effect was felt "all the way to the bottom of the [sheet pile] wall."[104] Experts on both sides further agreed that it is possible to undertake scientific calculations to analyze the effect of an impact by an object, like a barge, on the I-wall structures in the IHNC under hurricane conditions. SMF ¶ 33. Such analysis could determine whether a barge impact, if it occurred, could dislodge the sheet pile from the soil. SMF ¶ 34.

LNA's experts carried out such calculations and showed that a barge impact with the concrete cap of the floodwall could have only created localized damage to the concrete cap but could not have dislodged the sheet pile. SMF ¶ 34. Dr. Cushing's calculations and analysis demonstrate that the amount of force that could have been applied by the barge in the conditions present during Hurricane Katrina would result only in "cracking" or a "notch" in the concrete cap, with no effect in the sheet pile below.[105] The reason is that the concrete cap would shear at the construction joint before the sheet pile would be dislodged.[106] Photographic evidence of other barges that impacted levees and floodwalls during Hurricane Katrina underscores this

---

[104] Exh. 8, Marino 2009 Dep. 254-55 (Q: "… In order for the barge to move the bottom of the sheet pile enough to allow water to percolate, the barge impact on the upper part of the wall has to have its effect felt all the way to the bottom of the wall; right?" A: "Yes.").

[105] See Exh. 1, Cushing Report at 158-63 (carrying out analysis showing that "[a] barge striking the concrete cap of the floodwall could not cause the sheetpile to fail" but would only create localized damage ("cracking" or a "notch") in the concrete cap); id. at 173 ("The barge could not strike the sheetpiling with sufficient energy to cause overturning. In any event, the concrete cap on top of the wall would have cracked before the barge could have affected the anchoring of the sheetpile.); Exh. 27, Bakeer Dep. 119-21 ("[Y]ou can take the cap [away] and the wall will be standing by itself.").

[106] See Exh. 1, Cushing Report at 150-51, Figs. 104, 105 (analogizing concrete cap to a book on top of a table, noting that pushing on the book will move the book but not the table).

reality as the photographs show multiple instances of barges causing localized damage at the point of impact but not undermining the entire floodwall structure.[107]

Plaintiffs' experts offer *no* analysis contrary to these findings. Indeed, Dr. Marino conceded that the pressure of a barge hitting the top of a wall would *not* be translated all the way to the bottom of the sheet pile.[108]  Dr. Marino further admitted that in his impact scenario, "a corner of the barge hit the wall" at a level corresponding to 11.8 feet – a level just below the top of the concrete cap.[109]  At that elevation, the barge would have necessarily struck the floodwall above the construction joint and, as Dr. Marino admits, such an impact would merely shear the cap at its weakest point, the construction joint.[110]  As Dr. Cushing's calculations show, that scenario would prevent the barge's impact from affecting the buried sheet pile and leading to the wall's failure.  SMF ¶ 34.

### B.   Plaintiffs Have Not Shown the Barge Could Have Dislodged the Sheet Pile.

Plaintiffs could have analyzed the question of whether a barge impact can affect the sheet pile as opposed to the concrete cap.  SMF ¶ 33.  But *they did not*.  SMF ¶ 35.  Dr. Marino admitted that he did not perform calculations to determine whether the impact of a barge hitting the concrete cap would merely shear off the cap rather than dislodging the sheet pile embedded

---

[107] Exh. 1, Cushing Report at 99, 149, & Figs. 72, 73, 74; Exh. 11, Mosher Dep. 91-92, 267 (describing other barge impacts without floodwall breaching); Exh. 19, Bea Dep. 94 (same); Exh. 8, Marino 2009 Dep. 129-30 (admitting barge struck Florida Avenue Bridge during Hurricane Katrina without knocking over bridge or causing it to fall); *cf. Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1083 (5th Cir. 1979) (noting, in finding that absence of buoy did not cause accident, that other vessels had safely transited passage despite buoy's absence).

[108] Exh. 8, Marino 2009 Dep. 104 (Q: "All right. So if a pressure on a wall is narrow in scope, you would not expect that pressure to be felt at deep depths?"  A: "Right."  Q: "So, for instance, the pressure of a corner of a barge hitting the top of a wall, you'd expect that pressure to be exerted on a narrow part of the wall rather than translating all the way down to the bottom of the sheet pile?"  A:  Well, obviously.  I mean, it's where there is contact.  I mean, that's a simple answer.").

[109] Exh. 8, Marino 2009 Dep. 112, 166.

[110] Exh. 8, Marino 2009 Dep. 59-60 (Q: "All right.  If the point of impact is at or above the construction joint, you would expect the wall to shear at the construction joint if the impact is sufficient to shear the joint?"  A: "Right. And it would vary depending upon – the amount of resistance would vary depending upon the location of that force.").

41

in the ground, or even what force would be needed for a barge to undermine the sheet pile and cause the breach.[111] Mr. Pazos' conclusions are similarly deficient because his calculations fail to distinguish between the force transferred by the barge to floodwall's concrete cap versus the deep-buried sheet pile.[112] In these circumstances, plaintiffs have simply failed to proffer sufficient evidence to negate the showing of LNA's experts that it is impossible for a barge impact with the concrete cap of the floodwall to cause the sheet pile wall to dislodge from its supporting soil. *See Kampen,* 157 F.3d at 318 (expert testimony can be considered insufficient for summary judgment purposes when experts fail to test their assertions).

Beyond that, plaintiffs' experts could not even agree among themselves about basic questions regarding the floodwall failures. *See id.* (expert testimony can be insufficient when it contains internal inconsistencies). For instance, Mr. Pazos claims that a "faulty weld" was involved in the failure at the North Breach, making it possible for a "hinge" to develop at the site of the North Breach.[113] Dr. Marino, however – while purportedly using a "process of elimination" to conclude the barge was involved[114] – did not analyze whether the faulty weld could have resulted in breaching due to hydrostatic pressure alone, and apparently did not even

---

[111] *See* Exh. 8, Marino 2009 Dep. 127 (Q: "You haven't done any calculations to determine whether an impact with the concrete cap would cause the cap to shear off rather than pulling the wall from the soil; correct?" A: "That's correct.").

[112] Exh. 6, Pazos Dep. 357 (describing "calculations … regarding forces developed by the wind on the barge that can be transmitted to the seawall," but not calculations of impact on the floodwall cap versus sheet pile); Exh. 12, Pazos Report Attachment No. 5 (estimate of forces, containing no analysis of effect of impact on concrete cap as opposed to sheet pile); *id.* at 14 (assuming wind blowing "predominant from West to East" – a direction that existed only after the breaches had already occurred).

[113] Exh. 6, Pazos Dep. 151-53 (agreeing that a "field weld of poor quality" in the area of the North Breach made this location "one of the weakest points" in the floodwall, and that the poor quality weld made it possible for the wall to "develop a hinge between the monolith and the sheet piles").

[114] Exh. 8, Marino 2009 Dep. 34-35, 166.

know the faulty weld was present.[115]   Similarly, Mr. Pazos claims that the North Breach occurred when "waters stops broke, and the water pushed through the wall through those water stops."[116] Dr. Marino, however, did not even consider whether hydrostatic pressure due to rising water might have caused the water stops to dislodge.[117]

Similar contradictions between the plaintiffs' experts exist in their consideration of the South Breach.  For instance, Dr. Marino insists the South Breach failed from north to south with a "primary" barge impact occurring in the northern section of the breach,[118] while Mr. Pazos says the wall failed from south to north with the only true barge "impact" occurring at the extreme southern end of the South Breach.[119]   Neither expert's opinion is even consistent with the account of Terry Adams, the supposed eyewitness on whom plaintiffs chiefly rely,[120] and neither expert's account is consistent with the physical evidence, which fails to demonstrate any crushing damage on the barge as would have been evident from a major collision between the barge and the floodwall.[121]   Finally, Mr. Pazos posits that the wall failed due to "gaps" or "tension cracks" between the floodwall and the canal side soils which allowed water to percolate

---

[115] Exh. 8, Marino 2009 Dep. 116 (Q: "Have you done any calculations to rule out the possibility that a faulty weld failed under a hydrostatic load?" A: "I haven't done those calculations, no."); id. at 218 ("I'm wondering where the hell the weld is coming from"; admitting "I haven't seen anything about it").

[116] Exh. 6, Pazos Dep. 148.

[117] Exh. 8, Marino 2009 Dep. 117-18 (admitting he has not calculated the amount of pressure it would take water stops to fail, and has "not looked at" the possibility that hydrostatic pressure caused water stops to dislodge).

[118] Exh. 6, Marino 2009 Dep. 141 ("[There was a primary collision in the northern part which caused the wall to bow …")

[119] Exh. 6, Pazos Dep. 202-03 (Q: "Only place where you can use the word impact is at the southern end of the south breach." A: "Yeah.  The other locations are differing level of contact.").

[120] Exh. 23, Adams Dep. 25 (barge approached and floated through floodwall without multiple contacts or impacts).

[121] Exh. 1, Cushing Report at 87 ("There was no damage on the barge that is consistent with the barge having caused the failure of the levee such as crushing damage, which could have been apparent if a major collision had occurred"); Exh. 9, Marino 2008 Dep. 131-32 (Q: "So there was no significant barge damage [crushing damage] on this barge, right?" A: "Yes."); Exh. 27, Bakeer Dep. 118-19 (noting absence of barge damage).

43

under the floodwall, but neither he nor Dr. Marino supplied any calculations showing that such gaps or cracks could not have formed in the absence of a barge impact.[122]

In these circumstances, plaintiffs have failed to sustain their burden of creating a genuine issue regarding whether the barge could have caused the floodwall breaches that occurred in the eastern IHNC floodwall. Plaintiffs' experts have failed to provide a scientific basis for concluding that a barge impact could have caused the type of harm observed at the two floodwall breaches, and LNA's experts have provided scientific analysis and calculations showing that it could not have done so. This case is similar to chemical exposure cases in which courts have granted summary judgment when the plaintiff failed to show he was exposed to harmful levels of a toxic agent.[123] Here, even assuming the concrete cap of the floodwall was "exposed" to impact from a barge at some point, plaintiffs have failed to show that this "exposure" could have caused their injuries (i.e., the failure of the embedded sheet pile and its supporting soil). Instead, plaintiffs have presented nothing more than unsupported, inconsistent, and conclusory assertions that are insufficient to prevent summary judgment. E.g. Kampen, 157 F.3d at 317-18 (rejecting conclusory and internally inconsistent expert testimony); Little, 37 F.3d at 1077 (rejecting expert testimony that was "only one speculative theory, neither more nor less supportable in this record

---

[122] Exh. 6, Pazos Dep. 90 (explaining importance of seepage through tension cracks at the South Breach and noting that seepage occurs "[i]rregardless of the barge"); id. at 95-96 (admitting that test data showing "solid proof that seepage occurred … through gaps" involved gaps created by "hydrostatic pressure and the characteristics of the local soil" – not a barge); Exh. 8, Marino 2009 Dep. 127 (Q: "I asked specifically whether you performed any calculations of flood levels at which tension cracks or hydrostatic gaps would form between the flood side soil and the sheet pile at the IHNC." A: "Not calculations per se."); Exh. 9, Marino 2008 Dep. 66 (Q: "And, in fact, as the water rises in the canal the wall will deflect, won't it?" A: "Yeah. Yeah."); see also Exh. 11, Mosher Dep. 14-15 ("[T]he walls would have failed even if the barge hadn't hit the walls."); id. at 59-64 (gaps between the sheet pile and canal side soil formed, splitting the levee in half and depriving it of canal-side soil resistance, without the need for any loading from a barge); Exh. 19, Bea Dep. 89 ("You do not need a barge" to open a tension crack); Exh. 27, Bakeer Dep. 122 ("The tension crack would develop[ ] immediately after the water starts rising.").

[123] See, e.g., In re Ingram Towing Co., 1995 U.S. Dist. LEXIS 15034, at *2 (granting summary judgment on causation based on evidence that it was "impossible for any person to have become ill due to the oil spill from drinking tap water in the days following the accident"); Molden, 465 F. Supp. 2d at 613 (summary judgment proper where "the level of exposure was not sufficiently high to give rise to the physical injuries complained of by Plaintiffs").

44

than any of the other speculative theories"); *Ralston Purina Co.,* 554 F.2d at 729 ("What Hobson

says chickens did, chickens do not do.").

**III.     PLAINTIFFS' OWN EVIDENCE ESTABLISHES THAT PLAINTIFFS WOULD
HAVE SUSTAINED THE SAME DAMAGES WITHOUT THE IHNC BREACHES
BECAUSE THE MRGO WOULD HAVE FLOODED THEIR HOMES TO THE
SAME LEVEL.**

Even if plaintiffs could establish a genuine dispute as to whether the Barge ING 4727

caused either of the two IHNC breaches – which they cannot – plaintiffs cannot demonstrate that

the IHNC breaches or the ING 4727 in fact caused them to sustain any damages.  To the

contrary, plaintiffs' expert hydrologist has conceded that plaintiffs' properties would have

flooded to the very same levels on the very same day from the MRGO levee breaches, even if the

IHNC floodwall breaches had not occurred.

In his expert report, plaintiffs' hydrology expert, Melvin Spinks, acknowledged that there

were many sources of flooding in the Lower Ninth Ward.[124]  Indeed, it is undisputed that

floodwaters from MRGO inundated the Lower Ninth Ward and St. Bernard Parish on August 29,

2005, and that the MRGO floodwaters accounted for the maximum water levels experienced

throughout the entire area.[125]  Most significantly for present purposes, scientific modeling

performed by Mr. Spinks (again, plaintiffs' own hydrology expert) shows that the flood levels in

the Lower Ninth Ward and St. Bernard Parish would have reached the same height even if the

IHNC breaches had never occurred.  SMF ¶ 39.[126]  As Mr. Spinks explained in presenting these

results, "[t]he model simulations show that the levee breaches along MRGO would have

completely inundated the Lower Ninth Ward and St. Bernard Parish approximately 3 to 4 hours

---

[124] Exh. 16, Spinks Report (2009) at 7 ("Flooding of the Lower Ninth Ward and the St. Bernard Parish was caused
by several sources including rainfall, levee/floodwall failures (breaches), and overtopping of the levees/ floodwalls
due to storm surge.").

[125] Exh. 14, Spinks 2008 Dep. 214 ("[D]uring the storm event, the maximum level reached with MRGO's water.").

[126] *See* Exh. 15, Spinks 2008 Dep. 195-200; Exh. 16, Spinks Report (2009) at 32-34, Figs. 14-18.

later than what actually happened during Hurricane Katrina."[127]  At his deposition, Mr. Spinks

confirmed that "without the IHNC breaches, you get to the same water level," with a difference

of about "five hours" at locations closer to the IHNC and "about an hour to two hours

difference" at locations in Chalmette.[128]  LNA's expert, Joseph Suhayda, concurs in that

finding.[129]

As stated by the court in *Lancaster v. Norfolk & Western. Railway Co.*, a plaintiff's

damages "must be reduced to reflect the likelihood that he would have been injured anyway,

from a non-liable cause, even if the defendant had not injured him." 773 F.2d at 822.  In

explaining its ruling, the Seventh Circuit applied the venerable case of *Dillon v. Twin State Gas*

*& Electric Co.*, 163 A. 111 (N.H. 1932), in which "the estate of Dillon, who was electrocuted by

the defendant's negligence on his way down from the bridge he had just jumped off, was allowed

to get damages only for the short time Dillon would have lived if it had not been for the

defendant's negligence." *Lancaster*, 773 F.2d at 822.[130]  The Fifth Circuit has recognized this

principle in holding that a plaintiff's damages are limited by the occurrence of subsequent events

---

[127] Exh. 38, Spinks Report (2008) at 26; *see also* Exh. 16, Spinks Report (2009) at 33 (presenting same results, but changing the word "would" to "could").

[128] Exh. 15, Spinks 2009 Dep. 149-50 (Q:  "Without the IHNC breaches you get to the same water level, but just a couple of hours or a few hours later?"  A: "At location 1 about five hours later.  At location 2 closer to Paris Road where we know the two waters mixed, then about an hour to two hours difference."); Exh. 14, Spinks 2008 Dep. 203 ("The levee breaches along MRGO would have completely inundated the Lower Ninth Ward and St. Bernard Parish sometime later than what actually happened during Hurricane Katrina.").

[129] Exh. 17, Suhayda Report at 11 ¶ 39.

[130] *Dillon* has been recognized as a "famous case" by courts and treatises over the decades.  *See, e.g.*, *Steinhauser v. Hertz Corp.*, 421 F.2d 1169, 1173 (2d Cir. 1970) (citing *Dillon* as a "famous case"); W. Page Keeton et al., *Prosser & Keeton on The Law of Torts* § 52 at 353 (5th ed. 1984) (discussing *Dillon* and opining that "a person who is standing in the path of an avalanche when the defendant shoots to kill" would not have a valid claim to damages); H.L.A. Hart & Tony Honore, *Causation in the Law* 176, 180 (2d ed. 1985) (citing *Dillon* and opining that "[t]he susceptibility or precarious situation of the plaintiff or his property is ... rightly taken into account when damages are assessed," and that "when defendant has caused the victim's death but the victim would in any case have died shortly afterwards the damages may be nominal or even nil").

that operate to cut off the claim.[131]  Other courts have applied it as well, including under maritime law.[132]

*Dillon* provides a perfect analogy for this case.  Instead of electrocution followed by impact with the ground as in *Dillon*, plaintiffs' own evidence hypothesizes breaches in the IHNC followed by flooding to the same level from the MRGO.  Under *Dillon*, thus, any damages attributable to the IHNC breaches would necessarily be limited to the value of the few short hours that plaintiffs' homes would have remained in their unflooded condition, during the middle of a major hurricane, before the inevitable arrival of the floodwaters from the MRGO breaches. For purposes of assessing damages, it is undisputed that the value of those extra few hours is zero.  SMF ¶ 42.[133]

Therefore, even if plaintiffs could show a genuinely triable dispute as to whether the barge caused either of the IHNC breaches – which they cannot – summary judgment would still be appropriate based on the undisputed record evidence, adduced through plaintiffs' own expert, that they suffered no resulting damages because their homes were inevitably going to be inundated to the very same degree almost immediately thereafter with waters from the MRGO levee breaches.

---

[131] *Dixon*, 754 F.2d at 588-90 (damages due to future lost wages could not be awarded where plaintiff had died due to unrelated causes).

[132] *See also, e.g., Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 973 (7th Cir. 1983) (a "ground for reducing [the] damage award" is that "the injury complained of would have occurred anyway, so that the accident merely accelerated it"); *Wilkinson, Inc.*, 920 F.2d at 1569 n.20 (principle recognized under maritime law); *Harris*, 58 F.3d at 1144-45 (plaintiff's lost wages due to industrial accident did not extend to normal retirement age, to the extent that his unrelated heart condition would have prevented him from working that long).

[133] Exh. 39, Deposition of Wade Ragas 115 ("Ragas Dep.") (damage caused by the IHNC breaches was only that of a loss of use of property for a few hours, which would be valued at "zero or an immeasurably small number").

## CONCLUSION

LNA's motion for summary judgment should be granted as to the entirety of plaintiffs'

claims.  In the alternative, the Court should enter partial summary judgment on any issue as to

which it finds there is no genuine dispute of material fact.


Dated: October 2, 2009                        Respectfully submitted,

                                              Robert B. Fisher, Jr., T.A. (#5587)
                                              Derek A. Walker (#13175)
                                              **CHAFFE MCCALL, L.L.P.**
                                              2300 Energy Centre
                                              1100 Poydras Street
                                              New Orleans, LA  70163-2300
                                              Telephone:  (504) 585-7000
                                              Facsimile:  (504) 585-7075
                                              Fisher@chaffe.com
                                              Walker@chaffe.com

                                               /s/ John D. Aldock
                                              John D. Aldock
                                              Richard M. Wyner
                                              Mark S. Raffman
                                              **GOODWIN PROCTER LLP**
                                              901 New York Avenue, N.W.
                                              Washington, DC  20001
                                              Telephone:  (202) 346-4240
                                              jaldock@goodwinprocter.com
                                              rwyner@goodwinprocter.com
                                              mraffman@goodwinprocter.com


                                              Daniel A. Webb (#13294)
                                              **SUTTERFIELD & WEBB, LLC**
                                              Poydras Center
                                              650 Poydras Street, Suite 2715
                                              New Orleans, LA  70130
                                              Telephone:  (504) 598-2715

                                              ***Attorneys for Lafarge North America Inc.***


48

LIBW/1708040.18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 2, 2009.

<u>/s/ John D. Aldock</u>

49