# EXHIBIT 1

Report of Charles Cushing

Part 1

# Analysis of the Transit of the Barge ING 4727 During Hurricane Katrina and Reasons Why It Did Not Cause the Failure of the Inner Harbor Navigation Canal Floodwall



**Project No. 2581**

**July 29, 2009**

**C. R. Cushing & Co., Inc.**
**30 Vesey Street**
**New York, NY 10007**

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

ii

C. R. CUSHING & CO., INC.                              7/29/2009

## INDEX

| SUBJECT | PAGE |
|---|---|
| **INTRODUCTION** | 1 |
| **REGION** | |
| The Lower Ninth Ward | 3 |
| St. Bernard Parrish | 7 |
| Lake Borgne | 9 |
| Mississippi River - Gulf Outlet | 11 |
| Inner Harbor Navigation Canal | 13 |
| Lafarge Terminal | 17 |
| **THE BARGE** | 23 |
| **THE LEVEE** | 29 |
| **THE HURRICANE** | |
| Hurricanes - General | 33 |
| Hurricane Katrina | 39 |
| Storm Surge | 47 |
| **THE LEVEE FAILURE** | 51 |
| **THE LOWER NINTH WARD POST-KATRINA** | 63 |
| **WIND DATA** | 77 |
| **THE BARGE GROUNDING** | 81 |
| **SEQUENCE OF EVENTS** | 103 |
| **WITNESS ACCOUNTS** | 123 |
| **COMMENTS ON PLAINTIFF'S EXPERTS** | 127 |
| **HYPOTHETICAL BARGE IMPACT ANALYSIS** | 159 |
| **CALCULATION OF PITCHING MOTION OF BARGE ING 4727** | 165 |
| **REASONS THE BARGE DID NOT BREACH THE FLOODWALL** | 167 |

iii

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**

## APPENDICES

| SUBJECT | Appendix |
|---|---|
| Sources of Information, References, Documents Used | A |
| Waterway Simulation Technology Report | B |
| Hurricane Katrina Timeline | C |
| Barge Wind Force Calculation | D |
| Barge Velocity Due to Wind | E |
| Barge - Levee Impact Calculations | F |
| Lower Ninth Ward Debris Survey | G |
| Barge Bottom Inspection | H |
| Witness Accounts | I |
| Glossary | J |
| Additional Photographs | K |
| CRC CV | L |
| CRC Testimony Last 4 Years | M |
| CRC Publications Last 10 Years | N |
| CRC Compensation | O |

iv

## INTRODUCTION

On the morning of 29 August 2005, at the height of Hurricane Katrina's assault on the City of New Orleans, the east floodwall of the Inner Harbor Navigation Canal (IHNC) failed in two locations bordering the Lower Ninth Ward.  The Lower Ninth Ward was flooded and an empty barge was drawn through the southernmost of the two breaches. The barge grounded among the houses in the neighborhood immediately inside the floodwall.  This report examines the facts and events leading up to the IHNC floodwall failures, the causes of those failures and how the barge came to its final resting spot. The report concludes that the barge did not cause or contribute to the IHNC floodwall failures.

This report relies on a multitude of reports, data, photographs and personal observations made on site.  These references are listed in the attached appendices. Each conclusion provided in this report is corroborated by multiple facts and the evidence presented in this report.

On 27 September 2005 and on numerous subsequent dates, Dr. Charles R. Cushing, his colleagues and other experts in civil engineering, hydrology, levee construction and hydrodynamics visited the site of the floodwall breaches and the barge.  These experts began collecting evidence and started to analyze the causes of the failure of the eastern levee/floodwall on the southern portion of the Inner Harbor Navigation Canal.  This work was performed at the request of counsel for Lafarge North America Inc.

At the same time, the U.S. Army Corps of Engineers (USACE) began an investigation to determine, among other things, why the levees failed.  They formed the USACE Interagency Performance Evaluation Task Force (IPET).  IPET requested that the American Society of Civil Engineers (ASCE) convene an external panel of experts to review and comment on IPET's work.  This review is published under the title: *Preliminary Report on the Performance of the New Orleans Levee Systems in Hurricane Katrina on August 29, 2005.*[1]

The National Research Council (NRC) of the National Academy of Science (NAS) and the National Academy of Engineering (NAE) performed a review of IPET and USACE's work in a report: *New Orleans Regional Hurricane Protection Projects.*[2]

An independent investigation was carried out by a group of experts from the University of California, Berkeley, and funded by the National Science Foundation.  This group, the Independent Levee Investigation Team (ILIT), released their findings in May 2006. These and other governmental and scientific reports have also been reviewed and considered in forming the opinions contained in this report.

---

[1] ASCE Report No. UCB/CITRIS-05/01.
[2] NRC/NAE Project DEPS-L-05-A.

1

**C. R. CUSHING & CO., INC.**                              **7/29/2009**

An investigation into the failure of the New Orleans hurricane protection system was undertaken by a group from Louisiana State University ("Team Louisiana").  This report, titled *The Failure of the New Orleans Levee System during Hurricane Katrina*[3] was released in December 2006 and included, among other things, useful modeling of Katrina's storm surge.

The findings of these independent groups are consistent with our own findings and conclusions as detailed below.

---

[3] Louisiana State Project No. 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, 20 dated 18 December 2006.

**C. R. CUSHING & CO., INC.**                          **7/29/2009**

## THE LOWER NINTH WARD

The Lower Ninth Ward is part of the City of New Orleans and Orleans Parish, lying immediately to the east and separated from the city by the IHNC.  It is also immediately to the south of New Orleans East, separated by the Gulf Intracoastal Waterway (GIWW) and the Mississippi River - Gulf Outlet (MRGO).



Figure 1: The City of New Orleans after flooding from Hurricane Katrina.  The Lower Ninth Ward is in the foreground and the Central Business District (downtown) is in the background.

Built on an old cypress swamp, the Lower Ninth Ward was subject to constant flooding during the early 1800s.

The three main accesses to the Lower Ninth Ward from the city are the Florida Ave. Bridge to the north, the N. Claiborne Ave. (State Highway 39) Bridge to the south and the St. Claude Ave. Bridge closest to the river, all spanning the IHNC.



Figure 2: The N. Claiborne Ave. Bridge.



Figure 3: The Florida Ave. Bridge.

The southern edge of the Lower Ninth Ward along the Mississippi River is on higher ground, formed by both the man-made and the natural Mississippi River Levee. Topographically, the center of the city in Orleans Parish is a polder (i.e., tract of low land) called the Inter-Levee Basin. This depression extends eastward into the center of the Lower Ninth Ward, one of the lowest parts of New Orleans. Also, as one proceeds

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

away from the natural Mississippi River levee and toward the Florida Ave. Bridge within the Lower Ninth Ward, the ground gets progressively lower.  The area nearest the Florida Ave. Bridge is one of the lowest points in the Lower Ninth Ward.



Figure 4: Street map of the Lower Ninth Ward.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

The Lower Ninth Ward is bounded on the west by the IHNC and its levee, on the south by the river, on the east by St. Bernard Parish and the north by MRGO.  Figure 4 is a map that represents the 100-square-block area nearest the IHNC between N. Claiborne Ave. and Florida Ave..

Historic Jackson Barracks lies in the southeast corner of the Lower Ninth Ward at 6400 St. Claude Ave., about 16 blocks east of the IHNC.

## ST. BERNARD PARISH

St. Bernard Parish lies southeast, adjacent and contiguous to the Lower Ninth Ward. The important communities moving southeast along the Mississippi River from the Lower Ninth Ward include Arabi, Chalmette, Meraux, Violet and River Bend, about 8 miles southeast of the Lower Ninth Ward.  Further south lies Plaquemines Parish.  The Mississippi River – Gulf Outlet (MRGO) forms the northern and northeastern border of St. Bernard Parish.



Figure 5: The Lower Ninth Ward and portions of St. Bernard Parish.  Black lines represent levees.

The inhabited portions of St. Bernard Parish and the Lower Ninth Ward are part of the same polder. In addition to the levees along the Inner Harbor Navigation Canal, they depended on levees along the MRGO to the north and northeast for flooding protection from Lake Borgne and the Gulf of Mexico.  However, during Hurricane Katrina considerable overtopping and levee failures occurred along the entire length of MRGO causing considerable early flooding in St. Bernard Parish.

**C. R. CUSHING & CO., INC.**                                     **7/29/2009**

Bisecting St. Bernard Parish is a secondary or smaller levee varying in height between 7.5 to 10.0 feet above mean sea level (MSL).[4]  This is the Forty Arpent Levee, which runs alongside the Florida Walk Canal.  This secondary levee separates the more populated areas of St. Bernard parish and the Lower Ninth Ward to the southwest from the more marsh like areas to the northeast.  These environmentally important wetlands include Bayou Bienvenue (closer to the Lower Ninth Ward) and Bayous Villere, Dupre, Busman and others further east.  This levee did little to protect the Lower Ninth Ward or St. Bernard Parish from Hurricane Katrina.

---

[4] ILIT Report, Chapter 6 Page 6.

## LAKE BORGNE

As the Mississippi River Delta extends southward into the Gulf of Mexico, it has created a corner with the Louisiana-Mississippi coastline on the north and the delta (St. Bernard and Plaquemines Parishes) on the west.  Northwest of St. Bernard Parish is a body of water named Lake Borgne.

Lake Borgne (which is actually a bay) played a key role in the catastrophic flooding of New Orleans and particularly the Lower Ninth Ward.  It is important to understand how the orientation of this body of water contributed to amplification of the storm surge.

Although Lake Borgne is nearly surrounded by wetlands, any rise in sea level, such as caused by a hurricane storm surge, causes the protection from the salt water marshes to disappear.  Lake Borgne then becomes a "sound" and is directly connected to Chandeleur Sound and is open to the Gulf of Mexico.

Any wind-driven and storm-driven seas coming from the east or southeast will be driven into and concentrated in the funnel-like northwest corner of Lake Borgne, -- that is, into the MRGO.  This is precisely what happened in the early hours of 29 August 2005.  As Katrina approached from the south, the winds north of the hurricane eye were blowing nearly from due east, with increasing intensity, directly into the MRGO "funnel," creating and amplifying the storm surge.



Figure 6: Lake Borgne and the role its "funnel" played in the surge.

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

This Page Intentionally Left Blank

**C. R. CUSHING & CO., INC.**                                              **7/29/2009**

## MISSISSIPPI RIVER – GULF OUTLET CANAL

The MRGO is a controversial waterway constructed by the U.S. Army Corps of Engineers connecting the Gulf of Mexico to the IHNC. It extends 66 miles from the city southeastward, providing a deep draft (approximately 33 feet fresh water draft) channel to the Gulf of Mexico. It shortens the inbound distance by ship to New Orleans by some 40 miles. The MRGO was opened in 1963, and forms a part of the Intra-coastal Waterway System (IWS). The channel is approximately 76 miles long and 36 feet deep. Since it was completed in 1965, erosion has reportedly increased its control width of 650 feet to more than 1,500 feet.

The hydraulic effects of the canal have been criticized by Assistant Professor of Coastal Engineering Hassan Mashriqui, Ph.D., P.E. of Louisiana State University's (LSU's) Hurricane Center, who concludes that MRGO amplified both the water's velocity and level during the storm surge caused by Katrina.[5] Dr. Mashriqui concludes from Advanced Circulation (ADCIRC) computer modeling that the in-rushing velocity increased from 0.9 meters per second to 2.4 meters per second, and increased the water level height by three feet. This increased the scouring along MRGO and IHNC levees. (The U.S. Army Corps of Engineers states, by contrast, that Hurricane Katrina would have overwhelmed the levees with or without MRGO).[6]

The role that the MRGO played in Hurricane Katrina was to deliver the surge directly to the IHNC and the center of New Orleans.

The ILIT report extensively discusses the erosion and failures along the 11 mile stretch of MRGO levees facing Lake Borgne and the Gulf of Mexico.[7] As discussed by the Independent Levee Investigation Team (ILIT) report, levees along the MRGO were little more than earthwork berms constructed from the dredge spoils from the MRGO, which consisted of sandy and silty soil poorly suited for use in such a structure. These levees were quickly washed out by wave action and overtopping flow acting on the loose soil comprising these berms during the early hours of Hurricane Katrina. IPET concluded that the gravity-driven downrush velocities of flood water on the back face of the levee at maximum overtopping were as high as 15 feet per second.[8] This was more than sufficient to wash away the supporting inshore berm.

Early in the arrival of Katrina this northeast frontage of levees was breached in multiple locations, first flooding northeast St. Bernard Parish, and then over-topping the Forty Arpent secondary levee. The initial appearance of water in St. Bernard Parish came from the failures of the levees along MRGO.

---

[5] Team Louisiana Report Chapter Seven.
[6] Expert Report Prepared for United States Department of Justice by Dr. Reed Mosher, USACE.
[7] ILIT Chapter 6.
[8] IPET page V-3.

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**

The timing and issues concerning the MRGO, breaches along the MRGO and the MRGO's role in the flooding of New Orleans is the subject of inquiry by others.  This section is provided for background and context.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

## INNER HARBOR NAVIGATION CANAL (IHNC)

The Inner Harbor Navigation Canal (IHNC), sometimes also referred to as the Industrial Canal, provides a connection between the Mississippi River at its southern end and Lake Pontchartrain, 5.8 miles to the north.  As its name implies, the IHNC is a navigation project to facilitate the movement of ship traffic.  The southern half of the IHNC separates the city to the west from the Lower Ninth Ward to the east.  The northern half of the IHNC separates the Gentilly District of the city to the west, from New Orleans East to the east.  The IHNC is bisected by the MRGO, which enters the IHNC at a point just above the Florida Ave. Bridge.

The southern half of the IHNC varies in depth from 27 to 33 feet mean lower low water (MLLW).[9]  Access to the southern most end of the IHNC and the Navigation Locks is however limited to 30 feet because of a submarine pipeline crossing.

At the southern end of the IHNC, a lock system lifts vessels from the IHNC to the Mississippi River.  The existing lock has a 675 foot long by 75 foot wide chamber with a floor elevation of minus 36 feet (National Geodetic Vertical Datum).  The existing lock has interior dimensions of 640 feet long by 75 feet wide by 31.5 feet deep over the sills at low water in the Mississippi River.  This lock is the busiest in the Intra-Coastal Waterway System, with an estimated average wait of ten hours.

The U.S. Army Corp of Engineers is planning to replace the existing lock with a new 1,270 foot long by 110 foot wide by 40 foot deep lock in order to reduce waiting delays. The new lock has the highest priority of the National Inland Waterway Users Board. The US Army Corps of Engineers concurs, reporting it is critical to the Nation's commerce. The project began in 2001 and is scheduled for completion in 2015.  It also involves the construction of new N. Claiborne Ave. and St. Claude Ave. bridges.[10]

The IHNC has a 900 foot wide turning basin immediately south of the Florida Ave. Bridge, and a second turning basin 1,600 feet in diameter north of the Florida Ave. Bridge, at the IHNC intersection with MRGO.

The Florida Ave. Bridge is a newly built lift bridge with a horizontal clearance of approximately 300 feet.  There is a submerged drainage line on the south side of the Florida Ave. Bridge which restricts the draft of vessels to 30 feet at mean sea level.

The northern portion of the IHNC extends from MRGO to Lake Ponchartrain, separating the city from New Orleans East.  It is spanned by several bridges, from north to south: the Senator Ted Hickey (State Highway 47), a bascule bridge; Chief Menteur Highway (State Highway 90), a lift bridge; and Interstate 10, a fixed bridge, as well as two railway

---

[9] NOAA Navigation Chart 11368.
[10] U.S. Army Corp of Engineers New Orleans District website:
http://www.mvn.usace.army.mil/pd/projectsList/home.asp?projectID=107&directoryFilePath=ProjectData\.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

bridges, L&N Railroad bascule bridge to the south and Southern Railroad bascule bridge to the north.



Figure 7: Portion of NOAA chart 11368, showing the southern portion of the IHNC.

14

**C. R. CUSHING & CO., INC.**                          **7/29/2009**



Figure 8: The southern portion of the IHNC and adjacent Lower Ninth Ward (2002).

15

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

This Page Intentionally Left Blank

**C. R. CUSHING & CO., INC.**                                **7/29/2009**

## LAFARGE TERMINAL

The Lafarge North America cement terminal is located on the west bank of the IHNC. The entrance into the terminal is on Poland Ave. at N. Dorgenois St.  It is at 29° 58' 40"N, 90° 01' 33"W.[11]   The facility is owned by the City of New Orleans under the control of the Board of Commissioners of the Port of New Orleans, and is operated by Lafarge North America Inc. (LNA).  The wharf has a 600 foot face with a wharf height of approximately 10 feet.  The dock is equipped with a traveling suction gantry, with pipelines extending to cement storage silos with 60,000 ton capacity.  The water depth alongside the wharf is reported to be 11 feet.



Figure 9: The Lafarge Terminal looking north.  The barges in the photo are not the same barges present during Hurricane Katrina.

The wharf includes a fendering system and outboard pilings spaced at intervals of nine to ten feet along the dock.  There are also ten mooring bollards spaced at various intervals along the dock.  Loaded barges awaiting unloading and empty barges awaiting removal are moored to the wharf's fixed bollards.

---

[11] U.S. Coast Pilot 5 – 33rd edition.

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



**Comment [m1]:** Recommend cutting the highlighted text as it does not connect to any of the conclusions regarding transit of the barge or cause of levee failure

Figure 10: A section of the Lafarge Wharf, showing a typical bollard, pilings, stringer and stop for the traveling suction unloader.

The bollards are of the type and shape generally found on the majority of the wharves in New Orleans.

From the south end of the dock to where the aforementioned vertical pilings begin, at 139 feet from the south end, the dock is fitted with a system of 12" x 12" timber fenders, extending downward in horizontal tiers from the edge of the dock to an undetermined distance below the water, each timber being approximately 10 feet in length.

In addition to the traveling suction cement unloader, the wharf is equipped with a pair of wire rope winches and sheaves for moving barges along the wharf face. The unloader travels on steel wheels set on steel rails on the wharf. There are two small buildings on the wharf; a storage shed and a control house. A water mark left by floodwaters of Hurricane Katrina was found on the inside wall of the storage shed, and was found to be at a height above the dock apron of 6' 03". Inshore of the wharf is an I-Wall floodwall which forms part of the New Orleans flood protection system.

18

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 11: The flood gate directly inland of the Lafarge Wharf.  The control house is to the left and the Florida Ave. Wharf is to the right.



Figure 12: The Lafarge Terminal, looking south showing the pilings, stringer, winch used to move barges along the wharf and the suction unloader.

19

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 13: The Namasco Corp. facility looking southeast from the Lafarge Terminal, with the covered gantry in the left background.

Immediately to the north and northwest of the Lafarge wharf is the Florida Ave. Warehouse, owned and operated by the Dock Board.  This 57,600 square foot warehouse is approximately 482 feet long by 120 feet deep and overlaps the Lafarge wharf.  As such, it forms a lee (shelter) for winds from the north and northwest.

Directly south of the Lafarge cement terminal wharf is a wharf owned by the Port and operated by Namasco Corp.  This facility has a large warehouse for handling steel products.  It has overhead electric hoists that extend over the water used to unload steel products from barges.  The east-west wharf, measuring approximately 180 feet in length, was used for mooring Namasco barges.  It is in disrepair, with numerous broken and exposed steel and wooden pilings and sharp cornered fendering structural components.



Figure 14: Deteriorated pilings and mooring components at the Namasco facility.

Further south from the Namasco Wharf on the west bank and directly across from the levee protecting the Lower Ninth Ward is the 2,250 foot long (approximately) Galvez Street Wharf.

Of particular importance in the southern portion of the IHNC is the turning basin just south of the Florida Ave. Bridge. It forms a "pocket" or indentation on the west side of the IHNC at the Lafarge North America Terminal. This rectangular pocket is approximately 1,200 feet long (north-south) on its western side formed by Lafarge and Florida Ave. wharves, and is 850 feet deep (east-west) on the south by the Namasco Wharf. The barges alongside the Lafarge Wharf are "nested" in this pocket and thus do not interfere with traffic in the navigation channel even if several barges are moored alongside of the wharf. The orientation and arrangement of this pocket are important to the track of barge ING 4727 on the morning of 29 August 2005.

21

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 15: The southern portion of the IHNC showing the Lafarge terminal and surrounding wharves.  The yellow portions of the Figure are land above sea level on the canal side of the levee.

## THE BARGE

The barge, numbered ING 4727, which grounded in the Lower Ninth Ward on 29 August 2005, was a standard steel Mississippi River covered hopper barge. Its principal characteristics are as follows[12]:

| | |
|---|---|
| Builder | Equitable Shipyard |
| Owner | Ingram Barge Co. |
| Year Built | 1990 |
| Length | 200' – 0" |
| Beam | 35' – 0" |
| Depth | 12' – 0" |
| Coaming height | 5' – 0" |
| Draft, loaded | 10' – 0" |
| Draft, light | 1' – 4 ½" |
| Cover type | Fiberglass |
| Cover weight | 11 tons |
| Cargo capacity | 84,659 cubic feet |
| Tons per Inch Immersion | 18.14 |
| Displacement at 1'-4 ½" draft | 250 tons, approx. |
| Displacement at 10' draft | 1,877 tons |

Constructed of steel in 1990, the barge was owned by the Ingram Barge Company.   It is a typical Mississippi River "box barge" without rake at either end.  It has a double skin with a forepeak and after peak tank and five pairs of side tanks.   The barge is symmetrical, fore-and-aft.  For descriptive purposes we have designated the end of the barge with the ID numbers on the transom to be the stern.  In the grounded position this would be at the northern end.  The bow would be at the opposite or southern end, the starboard side to the west, and port side to the east.

Between the hopper tank and outer hull, the barge was subdivided into void tanks spaced 40 inches apart at the sides and 15 ½ inches at the bottom.  The fore and after peak tanks were spaced 21 inches between the hopper tank ends and the transoms.

The outer shell including sides and bottom plating was 3/8 inch thick.  The hopper tank had 3/8 inch sides and ½ inch bottom (tank top).  The barge was longitudinally framed with longitudinals spaced approximately 24 inches on center.  The framing was flanged angles, 5" by 2 ½" by ¼" on the side shell and 14 ½" x 3" x ¼" on the bottom.  The barge was fitted with a 6" by 5/8" rubbing strake on the exterior of the side shell approximately 12 inches above the baseline and just above the turn of the bilge.  The bottom shell transverse butt seams were approximately 66 inches on centers.

---

[12] Ingram Barge Register, 28 July 2005.

The cargo hopper was covered with domed fiberglass, removable covers.



Figure 16: Looking along the side coaming of barge ING 4727.

The barge was outfitted with cleats and buttons that are standard and commonly found on barges of this type, for use in mooring or in making the barge fast to other barges or to tugs, namely:

24

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

At each of the four corners of the barge, one 15" "button" and one 48" cleat.

On each side, port and starboard, at intervals of approximately 47 feet from each other along the length of the barge, three 36" cleats.

On centerline on each end of the barge, one 36" cleat.

| | |
|---|---|
| Button Details | |
| Diameter | 15" |
| Height above deck | 8" |
| Distance from bow or stern | 24" |
| Distance from port or starboard side | 17" |
| | |
| 36" Cleat Details | |
| Length, end to end | 36" |
| Width | 5" |
| Height above deck at midpoint | 6 ½" |
| Height above deck at ends | 8" |
| Length of base plate | 24" |
| Width of base plate | 12" |
| | |
| 48" Cleat Details | |
| Length, end to end | 48" |
| Width | 7" |
| Height above deck at midpoint | 9 ½" |
| Height above deck at ends | 10 ½" |
| Length of base plate | 36" |
| Width of base plate | 21" |

The centerline cleats at the forward and after ends of the barge were at a distance of 22" from their respective ends of the barge.

25





Figure 17: The mooring fittings of barge ING 4727: Button (top) and cleat (bottom).

Barge ING 4727, like nearly all inland hopper barges, was not classed or otherwise inspected by a classification society or by the U.S. Coast Guard.

Before Katrina, ING 4727 was empty and tied up to the wharf at the Lafarge terminal, with a loaded barge to its outboard side.  On 27 August 2005 a towboat crew from Joseph P. Domino Towing shifted barges at the Lafarge Terminal, leaving the loaded barge adjacent to the wharf and the empty ING 4727 outboard of the loaded barge to which it was tied.  Directly to the north of these two barges, five loaded barges were also tied up, one outboard of the other.

26

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**



Figure 18: Barge ING 4727 where it came to rest in the Lower Ninth Ward.

At some time on 29 August 2005, barge ING 4727 broke free of the loaded barge to which it was tied and ended up in the Lower Ninth Ward near Jourdan Ave. and N. Roman St. on the other side of the failed floodwall.  Shortly after it became possible to gain access to the Lower Ninth Ward, the barge was surveyed and photographed extensively.  The results of this examination are discussed later in this report.

In March of 2006, the barge was lifted using air bags so that its bottom could be examined.  Following this examination, the barge was cut into sections. The upper 8 foot portion was scrapped.  The lower 4 feet was cut into 19 sections and transported to a warehouse where they were inverted and examined more thoroughly.  At that time, the condition of the bottom was documented.

27

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 19: Barge ING 4727 lifted on airbags for inspection.

**C. R. CUSHING & CO., INC.**                                       **7/29/2009**

## THE LEVEE

The levee and floodwall structure protecting the Lower Ninth Ward, extends along the eastern shore of the southern section of the IHNC and is part of the 320 miles of levees protecting the City of New Orleans and surrounding parishes.   The IHNC levee and floodwall extends from the Florida Ave. Bridge in the north to the N. Claiborne Ave. Bridge and the lock system to the south.   It runs parallel to Jourdan Ave. in the Lower Ninth Ward.



Figure 20: An intact portion of the levee and floodwall along the IHNC, post Hurricane Rita.  Note the scour trench and the original height of the earthen berm on the floodwall.

The levee system along the IHNC consisted of an earth embankment with a crest elevation of approximately 7.5 feet according to the North American Vertical Datum of 1988 (NAVD88 2004.65).   The embankment has side slopes of 2.4:1 and 2.8:1 on the land and water side, respectively.   The elevation of the land side heel is approximately - 3.5 feet and the mean water elevation in the IHNC is 2.5 feet.   Elevations were

29

determined by means of surveys and photogrammetry performed after Hurricane Katrina. LIDAR data show a decreasing levee toe elevation toward Florida Ave.[13]

Additional flood protection was provided by means of a floodwall sunk into and rising above the earth embankment. This wall was of the "I" type. The reinforced concrete floodwall was supported by a steel sheetpile driven to a depth of -9.76 feet, or over 15 feet deep into the earthen levee. The top of the sheetpile is embedded 4'-2" into the concrete wall, which has an overall height of 8 feet and is 2'-0" thick at the base. The concrete panels of the floodwall top were reinforced by ½" and ¾" diameter vertical rebar spaced on 9 inch centers and a series of ½" diameter bars oriented longitudinally within the wall. The sheetpile itself was a hot rolled steel PZ-27 section, with each panel measuring 18" long by 12" wide, with the web and flanges being $^3/_8$" thick[14]. A diagram of the floodwall system cross section can be seen in Figure 21.



Figure 21: Cross section of IHNC levee and floodwall.

The design elevation for the floodwall in 1969 was 15.0 feet above MSL as shown on the construction plans. MSL was taken as NGVD 29, even though in 1969 MSL was not the same as NGVD29. Furthermore, LMSL (local mean sea level) was not the same as MSL. By 2005 LMSL had changed; subsidence had lowered the benchmarks and the levee. No one knew how much lower the levees were below their intended or constructed heights. Surveys taken by WST show the uneven and significant

---

[13] IPET Report Figure 11-14.
[14] USACE Drawing H-4-25157.

**C. R. CUSHING & CO., INC.**                                                      **7/29/2009**

subsidence along the floodwall.[15]  An even greater degree of subsidence was noted in the IPET Report with a wall top height as low as 11.1 ft.[16]

For a variety of reasons, the top of the IHNC floodwall was considerably below the design elevation.  It has been traditional to measure flood water levels against known landside bench marks.  Geodetic datums are used to define the height of land on the earth, as well as many other characteristics of the earth.  There are many different datums used by different agencies for different purposes.  Datums are revised periodically making earlier datums obsolete.  Using incorrect datums can lead to serious errors with fatal consequences.  Such incorrect usage played a role in the flooding of New Orleans.

Two datums are most important in the case of Hurricane Katrina and New Orleans, namely "mean sea level" and "NAVD 88."  Mean Sea Level refers to the arithmetic mean of hourly observations over the National Tidal Datum Epoch, a 19 year period that covers all variations in the path of the moon about the sun[17].  NAVD88 is the North American Vertical Datum of 1988.  It replaced the National Geodetic Vertical Datum of 1929 (NGVD 29).  The NGVD 29 was synonymous with Mean Sea Level Datum of 1929, and did not take into consideration changes in sea level over time.  Therefore NGVD and mean sea level are not the same.  Nevertheless, the USACE used NGVD29 (with adjustments) for the design and construction of its New Orleans flood control projects.  While there may have been convergence between MSL and NGVD in 1929, they were measurably different in 2005.  MSL is about one foot higher than NGVD in the IHNC[18]  Furthermore there was confusion in the terms local mean sea level (LMSL) and mean sea level (MSL).  LMSL should have been used rather than MSL.  The difference in the IHNC between LMSL and MSL was not known, even in March 2006, but was estimated to be about ¼ foot.[19]

Thus, the benchmark which was used to determine the floodwall top elevation, namely Benchmark M 152, had an elevation in 1951 of 22.090 NGVD29.  In 1969 it was 21.811 NGVD29 which was taken as being MSL.  By 1991 it was 20.96 NGVD29.  When measured by GPS in November 2005 it was 20.34 NAVD88 (2004.65).  (Also, the LMSL could be as much as 0.1 to 0.3 feet lower than from NAVD88).

The ASCE report points out that incorrect assumptions were made about the datums used for the design, construction and maintenance of the height of floodwalls, resulting

---

[15] Water Flow and Wind Conditions Affecting Movement of ING 4727 Barge in the IHNC During Hurricane Katrina on August 29, 2005 by Waterway Simulation Technology, 2009 (Appendix B).
[16] (IPET Report IV-9-8).
[17] http://seacoos.org/Data%20Access%20and%20Mapping/water_level_product_desc/.
[18] IPET – page III 18/19.
[19] IPET – page III – 17.

in floodwalls built lower than their design height.[20]  Similarly, the Team Louisiana Report notes the errors in the design height and states the wall was built "almost 2 feet low."[21]

C. R. Cushing & Co. engaged the services of Aero-Data Corp. to carry out a photogrammetric survey of the height of the levee.  The IHNC structures in some locations were more than 2 feet below their intended elevations, largely from subsidence over the 35-year life of the project.[22]  ASCE reported that "along the Industrial Canal (built more than 35 years ago) …, the impact of subsidence plus incorrect use of datum has resulted in the levees and floodwall being **up to 3 feet lower than the original design.**"[23]



Figure 22: IHNC floodwall crest elevations produced for WST report.

---

[20] ASCE Report – page 66/67.
[21] Team Louisiana Report pages 126, 213.
[22] ASCE Report page 22.
[23] ASCE Report page 67 (emphasis added).

## HURRICANES - GENERAL

Hurricanes are tropical cyclones with winds exceeding 64 knots (74 mi/hr).  In the Northern Hemisphere, these winds circulate in a counter-clockwise direction around their centers.  In the North Atlantic, tropical cyclones usually offer the greatest threat from June through November; August, September, and October are the months of highest incidence.

These storms usually move westward or west northwestward at speeds of less than 15 knots in the lower latitudes.  Once they move into the northern Caribbean or Greater Antilles region, they usually either travel toward the Gulf of Mexico or recurve and accelerate into the North Atlantic.  Some will recurve after reaching the Gulf of Mexico, while others will continue westward to landfall.[24]

A tropical cyclone is a meteorological term for a storm system originating in the tropics or subtropics.  It is characterized by a low pressure system center and thunderstorms that produce strong wind and flooding rain.  In successive stages of intensification, the tropical cyclone may be classified as a tropical disturbance, tropical depression, tropical storm, and hurricane or typhoon.

A tropical disturbance is a distinct system of apparently organized convection which ranges from 100 to 300 miles in diameter.  It has a non-frontal migratory character and maintains its identity for 24 hours or more. It has no strong winds and no closed isobaric pressure pattern.

A tropical depression has one or more closed isobars and some rotary circulation at the surface.  The highest sustained (1-minute mean) surface wind is 33 knots.  A tropical storm has closed isobars, a distinct rotary circulation, and  a sustained surface wind between 34-63 knots.  Winds near the center increase to gale force, central pressure falls below 990 millibars, and towering cumulonimbus clouds shield a developing eye.

It becomes a hurricane when it has closed isobars, a strong and very pronounced rotary circulation, and a sustained surface wind speed of 64 knots or higher.[25]

Each system begins as a thunderstorm or group of thunderstorms which can grow to hurricane strength with cooperation from both the ocean and the atmosphere.  The ocean water must be warmer than 26.5° C (81° F).  High relative humidities in the lower and middle troposphere are also required for hurricane development.

The source of energy for hurricanes is the heat and moisture from the warm water. The tropical cyclone feeds on the heat released when moist air rises and the water

---

[24] Van Heerden, Ivor and Bryan, Mike. The Storm.  Viking, Penguin Group, New York. 2006.
[25] Bowditch, Nathaniel. American Practical Navigator, Vol. 1.  Defense Mapping Agency Hydrographic Center. 1977 ed.

vapor it contains condenses.   As the warm air rises, it cools.  As the air cools it can hold less water vapor which therefore condenses into droplets of water.  These droplets then fall as rain.  The condensation releases latent energy in the form of heat, which reinforces the dynamics of the storm.

Condensation leads to higher wind speeds, as a tiny fraction of the released energy is converted into mechanical energy.  The faster winds and lower pressure bring about increased surface evaporation and even more condensation.  Some of the released energy drives updrafts which increases the height of the storm clouds and speeds-up condensation.

The high altitude winds pump ascending air out of the cyclonic system into a high-altitude anti-cyclone, which transports the air away from the disturbance.   As a consequence, a large scale vertical circulation is set up in which low level air is spiraled up the cyclonic twisting of the disturbance, and after a trajectory over the sea, returned to lower altitudes some distance from the storm.   "This pumping action, and the heat released by the ascending air, may account for the sudden drop of atmospheric pressure at the surface, which produced the steep pressure gradient along which winds reach hurricane proportions."[26]

This provides the system with enough energy to be self-sustaining and causes a positive feedback loop that continues as long as the tropical cyclone can draw energy from its thermal reservoir, the warm water at the surface of the ocean.   A lack of equilibrium in air mass distribution also gives supporting energy to the cyclone.  The rotation of the earth causes the system to curve (the Coriolis effect), giving it a cyclonic characteristic and affecting the trajectory of the storm.

Many tropical cyclones develop when atmospheric conditions around a weak disturbance in the atmosphere are favorable.  Tropical systems are moved by steering winds in the troposphere.   If conditions remain favorable, the tropical disturbance intensifies, and can develop an eye which is unique to hurricanes.

The eye is an area of relative calm (and lowest atmospheric pressure) at the center of circulation.  The eye is normally circular in shape, and may range in size from 2-230 miles in diameter.  Surrounding the eye is the eye wall, an area 10-59 miles wide in which the strongest thunderstorms and winds circulate around the storm's center. Large bands of clouds and precipitation spiral from the eye wall and are called spiral rain bands -- also unique to hurricanes. The direction of the winds in the bands around the eye wall is directly related to the location of the center of the storm.

Rainbands are bands of showers and thunderstorms that spiral cyclonically toward the storm center.   High wind gusts and heavy downpours often occur in individual rainbands, with relatively calm weather between bands.

---

[26] Ibid.

**C. R. CUSHING & CO., INC.**                                   **7/29/2009**

These spiral bands ascend in decks of cumulus and cumulonimbus clouds to the convective limit of cloud formation, where condensing water vapor is dispersed to form cirrus clouds.

As the storm approaches, the wind increases in gustiness, and its speed becomes greater, reaching 22-40 knots.[27]  A dark wall of heavy cumulonimbus, known as the bar of the storm, will appear on the horizon.  Portions of this heavy cloud will detach from time to time and drift across the sky, accompanied by rainsqualls and winds of increasing speed.  With the arrival of the bar, the day becomes very dark, squalls are continuous, and the barometer drops precipitously along with a rapid increase in wind speed.  The center of the storm may still be over 100 miles away.  As the center approaches, rain falls in torrents, seas become mountainous, and the wind fury increases.  In the Northern Hemisphere, if the center of the approaching storm is to the south and headed northward, these winds on the north side would blow in a nearly east-to-west direction, characteristic of the counter-clockwise circulation around the center.

The size of a tropical cyclone is determined by measuring the distance from its center of circulation to its outermost closed isobar.  Tropical cyclones are considered large when the closed isobar radius is 6-8 degrees of latitude (360 to 480 nautical miles).  A very large tropical cyclone will have a radius of greater than 8°.

From the water, the presence of an exceptionally long swell is usually the first visible indication of the existence of a tropical cyclone.  In deep water it approaches from the general direction of origin.  However, in shoaling water this is a less reliable indication because the direction is changed by refraction.

From any given point in a tropical cyclone, winds may be the best guide to the direction toward the center of a tropical cyclone. Buys Ballot's law states that when an observer stands with his back to a geostrophic wind in the Northern Hemisphere, the center of low pressure will be to the left and the high pressure to the right.  If the wind followed circular isobars exactly, the center would be exactly 8 points (90°) on the right from dead ahead when facing the wind.  However, the track of the wind is usually inclined somewhat toward the center, so the angle from dead ahead varies between 8-12 points (90° - 135°).  The inclination varies in different parts of the same storm: least in the front and greatest in the rear.  Closer to the center, the wind blows more nearly along the isobars, the inclination being reduced by one or two points at the wall of the eye.  In lay terms, this means that the direction of the wind in a tropical cyclone is directly related to the location of the center of the storm.  This is why, as noted above, if it is known that the center of the storm is to the south, then the wind blows in a nearly east-to-west direction.  If the wind is blowing east-to-west, then the center of the storm must be to the south.

---

[27] Beaufort 6-8.

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**

In open spaces, winds at any given time tend to blow in one direction, with very little variability in direction.  This can also be viewed as a consequence of Buys Ballot's law. As this law explains, the low pressure center (i.e. the eye of the hurricane) is always to the left if one's back is to the wind.  Because the eye of the hurricane does not move around erratically, it follows that the direction of the wind would not be erratic either. Thus, provided there are no obstructions, the prevailing winds during a hurricane flow in a uniform direction and are not erratic.

When winds encounter obstructions such as buildings, the winds flow over and around them and then rejoin the prevailing wind stream.  The directional variations of wind in open space such as in the middle of the IHNC are slight.  Eddy effects from buildings, silos and other obstructions diminish rapidly in the shadow of the structure and will have little to no effect in a short distance downstream.

The wind flow in an open area such as in the IHNC would be uniform in direction and would not be erratic, confused or vary in direction.



Figure 23: Flow around an obstruction such as a building.  A free stream exists a short distance upstream and downstream, and more turbulent flow surrounds the obstruction. Turbulent flow does not affect the prevailing wind direction.

Tropical cyclones can produce extremely powerful winds and torrential rain.  They are also able to produce high waves and damaging storm surge.  They develop over large

36

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**

bodies of warm water and lose their strength as they move over land.  Hurricanes rapidly weaken when they travel over land or colder ocean waters; both lacking sufficient heat and/or moisture.

### Table 1: Saffir-Simpson Hurricane Damage-Potential Scale

| Scale Number Category | Central Pressure mb inches | Wind Speeds mi/hr knots | Storm Surge feet meters | Observed Damage |
|---|---|---|---|---|
| 1 | >=980 >=28.94 | 74-95 64-82 | 4-5 ~1.5 | some damage to trees, shrubbery, and unanchored mobile homes |
| 2 | 965-979 28.50-28.91 | 96-110 83-95 | 6-8 ~2.0-2.5 | major damage to mobile homes; damage buildings' roofs, and blow trees down |
| 3 | 945-964 27.91-28.47 | 111-130 96-113 | 9-12 ~2.5-4.0 | destroy mobile homes; blow down large trees; damage small buildings |
| 4 | 920-944 27.17-27.88 | 131-155 114-135 | 13-18 ~4.0-5.5 | completely destroy mobile homes; lower floors of structures near shore are susceptible to flooding |
| 5 | <"920" <"27.17" | >"155" >"135" | >"18" >"5.5" | extensive damage to homes and industrial buildings; blow away small buildings; lower floors of structures within 500 meters of shore and less than 4.5 m (15 ft) above sea level are damaged |

37

**C. R. CUSHING & CO., INC.**                          **7/29/2009**

This Page Intentionally Left Blank

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

### HURRICANE KATRINA

On 23 August 2005, a tropical depression (designated Tropical Depression Twelve) developed by 1800 hrs UTC over the southeastern Bahamas about 175 nautical miles southeast of Nassau.



Figure 24: The track of Hurricane Katrina.[28]

By 25 August, the tropical depression had strengthened into Tropical Storm Katrina. The storm moved slowly along a northwesterly then westerly track through the Bahamas, gaining strength.

Meanwhile, over the northern Gulf of Mexico and southern United States, the middle to upper tropospheric ridge was strengthening. This ridge turned Katrina westward on 25 August toward southern Florida. On the afternoon of the 25th, an eruption of deep convection over the system's low-level center in the northwestern Bahamas enabled Katrina to become the fifth hurricane of the 2005 season. Two hours later (2230 UTC), Hurricane Katrina made landfall between Hallandale Beach and Aventura, Florida as a Category 1 hurricane on the Saffir-Simpson Hurricane scale. Katrina hit the peninsula with 80 mile per hour winds, and a well defined eye.

---

[28] ASCE publication *The New Orleans Hurricane Protection System: What Went Wrong and Why.*

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

The eye became better defined as Katrina moved inland, remaining intact during its entire track across the peninsula.  Katrina continued west-southwestward overnight, spending around six hours over the water-laden Everglades.  Katrina then weakened to a tropical storm with maximum sustained winds of 60 knots (69 mph).  The center emerged in the southeastern Gulf of Mexico around 0500 UTC on 26 August north of Cape Sable.

Back over the water, Katrina gained strength and again became a hurricane at 0600 UTC on 26 August with maximum sustained winds of 65 knots (75 mph).  It underwent two periods of intensification on 26 and 28 August.

The first period of intensification exhibited an increase in maximum sustained winds from 65 knots to 95 knots in the 24 hour period ending 0100 (1:00 AM) CDT 27 August.  The eye was evident on infrared satellite imagery early on 27 August.  By 0100 (1:00 AM) CDT, Katrina was a Category 3 hurricane with 100 knot (115 mph) winds.  The storm was 365 nautical miles southeast of the Mississippi River.

Katrina's track, when it was first over the Gulf, was west-southwestward.  On 27 August its track took on a general westward direction and then the storm took a turn toward the northwest on 28 August.

The second period of intensification reached 145 knots (166 mph) at 1300 (1:00 PM) CDT 28 August about 170 n miles southeast of the mouth of the Mississippi River.  Katrina was upgraded to a Category 4 hurricane with maximum sustained winds of 126 knots (145 mph).[29]  Katrina quickly became a Category 5 storm, just twelve hours after the beginning of the second round of rapid intensification, reaching peak intensity at 7:00 AM CDT 28 August with maximum sustained winds of 152 knots (175 mph), gusts of 187 knots (215 mph) and a center pressure of 902 mbar.  The storm was about 170 nautical miles southeast of the mouth of the Mississippi River.

Katrina turned northward, toward the northern Gulf coast early on 29 August.  The storm weakened rapidly prior to landfall.  At 0610 (6:10 AM) CDT on 29 August, the hurricane made landfall as a Category 3 storm, with estimated maximum sustained winds of 110 knots (127 mph), near Buras, Louisiana.  Katrina continued northward making final landfall near the mouth of the Pearl River at the Louisiana/Mississippi border, as a Category 3 hurricane with an estimated intensity of 105 knots (121 mph).

The extraordinary amount of rainfall in the New Orleans area during Katrina added to the flooding of the low lying areas.  Based on radar rainfall data during a 24 hour period of Katrina, 13.6 inches of rain fell beating the estimated 100 year prediction of 12.58 inches. [30]

---

[29] Note: 1 knot = 1.15 mph.
[30] U.S. Weather Bureau Technical Paper 40 (1961).

The National Hurricane Center reported rainfall of approximately 8 to 10 inches, with 11.63 inches in Slidell.[31]

Hurricane Katrina's track is provided in Dr. Dooley's report as follows:



Figure 25: The track of Hurricane Katrina over the New Orleans area.[32]

Dr. Dooley points out that many wind recording and reporting instruments in New Orleans failed during the passage of Hurricane Katrina.  Nevertheless, the National Hurricane Center was able to identify the track, wind speed and barometric pressure of Hurricane Katrina as it approached and passed near New Orleans.  These are:[33]

---

[31] Tropical Cyclone Report – Hurricane Katrina, 20 December 2005.
[32] Hurricane Katrina Weather Analysis, Dooley Sea Weather Analysis, Inc., 2009.
[33] Hurricane Katrina Weather Analysis, Dooley Sea Weather Analysis, Inc., 2009.

**C. R. CUSHING & CO., INC.**                                                    **7/29/2009**

### Table 2:  Position of Hurricane Katrina

| Date | Time CDT | Longitude Degrees | Latitude Degrees | Pressure MB | Wind Speed Knots (MPH) |
|------|----------|-------------------|------------------|-------------|------------------------|
| 28 Aug. | 1300 | 88.6W | 26.3N | 902 | 150 (173) |
| 29 Aug. | 1900 | 89.2W | 27.2N | 905 | 140 (162) |
| 29 Aug. | 0100 | 89.6W | 28.2N | 913 | 125 (144) |
| 29 Aug. | 0200 | 89.6W | 29.5N | 923 | 110 (127) |
| 29 Aug. | 1300 | 89.6W | 31.1N | 948 | 80 (92) |
| 29 Aug. | 1900 | 89.1W | 32.6N | 961 | 50 (58) |

Clearly, as Hurricane Katrina passed over New Orleans, it was moving due north.  Its longitude did not change as it moved inland.

By knowing the location of the eye of the hurricane, it is possible to determine the bearing of the eye from the site of interest on the IHNC, namely the moored position of the barge and the north and south breaches in the IHNC levee.  These are:

### Table 3:  Bearing and Distance of Katrina from IHNC

| Date | Time CDT | LAT | LONG | Wind Speed Knots (MPH) | Distance N. Miles | Bearing Degrees |
|------|----------|-----|------|------------------------|-------------------|-----------------|
| 28 Aug. | 1300 | 26.3 N | 88.6 W | 150 (173) | 234 | 341 |
| 28 Aug. | 1900 | 27.2 N | 89.2 W | 140 (162) | 173 | 345 |
| 29 Aug. | 0100 | 28.2 N | 89.6 W | 125 (144) | 109 | 348 |
| 29 Aug. | 0400 | 28.8 N | 89.6 W | -- | 74 | 343 |
| 29 Aug. | 0610 | 29.3 N | 89.6 W | 110 (127) | 46 | 332 |
| 29 Aug. | 0700 | 29.5 N | 89.6 W | 110 (127) | 36 | 322 |
| 29 Aug. | 0945 | 30.2 N | 89.6 W | 105 (121) | 26 | 238 |
| 29 Aug. | 1300 | 31.1 N | 89.6 W | 80 (92) | 71 | 198 |

This means that the center of the storm passed closest to the IHNC between 7:00 AM CDT and 9:45 AM CDT.

Nearby wind recordings were obtained from the Lake Front Airport and from NASA's Michoud Assembly, about 7.5 miles east of IHNC.  Lake Front Airport recorded the wind sustained at 60 knots (69 mph) gusting to 75 knots (86 mph) at 0500 (5:00 AM) CDT.  The Hurricane Research Division of NOAA confirms that the analysis of their data shows that maximum wind gusts in the IHNC region was 80 to 90 knots (92 to 104 mph).

42

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

Oceanweather, Inc. (OWI) carried out a hindcast of the wind field at the IHNC.[34]  In the OWI hindcast analysis, the nearest grid point to the IHNC site is at 30.0°N and 90.0°W. The 30 minute interval wind directions for this location on 29 August show that wind direction changed (backed) from 041.14° T at 0600 (6:00 AM) CDT to 273.26°T at 1100 (11:00 AM) CDT as the storm passed east of the city, moving from south to north. Figure 27 shows wind direction as a function of time at this location.  As shown in that figure, the wind direction blew from a northerly direction (000) at 0800 (8:00 AM) but not before then.    After 0800 (8:00 AM), it continued backing or moving in a counterclockwise direction so that it began to blow, for the first time, with a component from the west.   Before 0800 (8:00 AM), the wind had a component that was blowing only from east to west.

Because the IHNC and the wharf faces are oriented in a N by NNE – S by SSW direction (016°-196°), it is possible to compare the wind direction at this location with the orientation of the barge and the canal.  During the early morning hours of 29 August, the wind was blowing from a northeasterly direction – that is, from the northeast toward the southwest -- thus holding the barge against the dock.  Between 0500 (5:00 AM) and 0700 (7:00 AM), the wind was blowing the barge toward the LNA dock.

Between 0745 (7:45 AM) and 0800 (8:00 AM), the wind was blowing parallel to the wharf face and on the end of the barge, not the side.

---

[34] Hindcast Data on Wind, Waves and Currents in Northern Gulf of Mexico in Hurricane Katrina and Rita, Oceanweather Inc., Sep. 2006.



Figure 26: Wind direction vs. time at the IHNC during Hurricane Katrina on 29 August 2005.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

At 0730 (7:30 AM) the wind achieved its maximum velocity of 62.85 knots or 72.28 miles per hour.  With the wind continually backing, if the barge were loose at this time, it would have been forced southerly and into the "pocket" at the Namasco Wharf.  From this position the wind would have to blow from 0286°T to cause the barge to move parallel to the face of the Namasco Wharf.  The wind would not have come from 286°T until after 1015.  Alternatively if the barge had become loose and blown directly clear of the corner of the Namasco Wharf (in a 137° direction), this could not have occurred until after 0920 (9:20 AM).

The below figure illustrates wind direction as a function of time at the LNA dock.  It clearly shows that the wind did not blow the barge ING 4727 in the direction of the IHNC floodwall at either the north or south breach site at any time before the National Weather Service announcement of the failure at 0814 (8:14 AM). As discussed further below, the wind data is a very important element in the conclusion that the barge did not and could not have caused the levee breaches.



Figure 27: Wind vectors at the Lafarge Terminal on 29 August, 2005.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 28: Photo taken by the IHNC lock staff at 0747 (7:47 AM) during Hurricane Katrina showing the prevailing conditions and visibility during the storm.  Note that the direction of the waves and wind, from north-northeast, matches the data reflected in Figure 27 and that the wind is not blowing in the direction of the IHNC east levee.

## STORM SURGE

The ADCIRC surge model produced by LSU[35] showed maximum water elevations in the IHNC approximately 1 foot higher, at 15.0 feet (using MSL) than those computed by IPET,[36] at 14.0 feet (using NGVD29).  LSU computes the water elevation at the south end of IHNC at 15.5 feet.[37]  Waterway Simulation Technology reported that neither model includes water level changes due to wind-generated waves or the cyclonic effects of wind and local wind-generated waves which would have increased the height of the water.  Wind-generated waves travel in the direction of the prevailing wind.

High water mark (HWM) data was collected by this author, Dr. Larry Daggett, USGS, LSU, FEMA and USACE.  These indicate that the high water marks within the IHNC were as high as 14.3 feet (NAVD88-2004.65) at the locks and 15.2 feet (NAVD88-2004.65) at the north side of the Florida Ave. Bridge.[38]



Figure 29: Hydrographs showing water level v time in the IHNC.

---

[35] http://hurricane.lsu.edu/flood predictions.

[36] IPET Report, Vol. IV, page IV-112.

[37] Water Flow and Wind Conditions Affecting Movement of ING 4727 Barge in the IHNC During Hurricane Katrina on August 29, 2005 by Waterway Simulation Technology, 2009 (Appendix B).

[38] IPET 38,

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

According to the IPET report, the peak water levels in the IHNC exceeded the floodwall level by as much as 2 feet.[39]  These same water levels would have exceeded, by an even greater degree, portions of the IHNC floodwall that had settled to an even lower height than IPET reported.  Thus, according to Team Louisiana:  "Given the variation in floodwall crown elevations that IPET documented farther north, it is possible that the floodwall crest elevation at the point where overtopping initiated the south breach into the Lower Ninth Ward could have been a foot lower than the 12.5 ft found in surviving adjacent sections."

Whether one uses the LSU or ASCE storm surge models, or the WST analyses or the high water marks, it is incontrovertible that the floodwall along the eastern shore of the IHNC overtopped early on the morning of 29 August 2005.  The scour trenches caused by overtopping were clearly visible when the site was visited in September 2005.

Although the storm surge from Lake Borgne through the MRGO and into the IHNC acted to raise the level of the water in the IHNC to levels well above the height of the floodwalls, the storm surge did not create significant currents within the IHNC but rather largely acted to fill up the IHNC much as water fills a bathtub.  Waterway Simulation Technology modeled the currents that the storm surge would have caused in the IHNC. Multiple scenarios were considered that included the floodwall both being overtopped and not being overtopped as well as an intact floodwall and the presence of breaches. The result of this analysis showed that there were no currents in the vicinity of the Lafarge Terminal for any scenario analyzed that could have carried barge ING 4727 into the canal's main channel and propelled it into the intact floodwall at either the north or south breach site.[40]

---

[39] IPET Report, page V-1

[40] Water Flow and Wind Conditions Affecting Movement of ING 4727 Barge in the IHNC During Hurricane Katrina on August 29, 2005 by Waterway Simulation Technology, Inc., 2009 (Appendix B).

48

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 30: Storm surge in Eastern New Orleans, modeled by Louisiana State University.[41]

---

[41] Team Louisiana Report Chapter Two.

49

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

This Page Intentionally Left Blank

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

## THE LEVEE FAILURE

During Hurricane Katrina, levees and floodwalls failed in numerous locations which led to flooding in many separate areas of the City of New Orleans.  The reasons for failure discussed in this section focus on the IHNC east levees and floodwalls.

It has long been known what mechanisms can lead to a levee failure.  According to the U.S. Army Corp of Engineers publication on the design of levees, the principal causes of levee failures are:

1. Overtopping
2. Surface Erosion
3. Internal Erosion
4. Sliding within the levee embankment or foundation soils.[42]

At the IHNC, the steel sheetpile "I-wall" (floodwall) failed during Hurricane Katrina.  To understand why the sheetpile failed, it is necessary to understand how a sheetpile achieves its stability.  Sheetpilings call upon passive soil pressure to resist overturning forces caused by active soil pressure and hydrostatic pressure as well as other dynamic forces.  Passive pressure is the amount of pressure that can be applied to a vertical face of soil before a shearing failure occurs.  Once a shearing failure occurs, a wedge of soil becomes detached from the surrounding soil and is pushed upwards and away from the source of the pressure.  Active pressure is the pressure that a vertical face of soil exerts when "leaning" on an object such as a retaining wall.[43]   As a rule, passive pressure is greater than active pressure assuming that all factors affecting the two pressures (such as soil unit weight and cohesion) are equal.  The fact that the passive pressure is greater is what allows a sheetpile to remain standing even though there is more fill on one side than the other.  A third form of pressure, hydrostatic pressure, is the lateral force that a liquid will exert on a face.  Because liquids do not have internal friction (internal friction is what allows a hill to be made from soil; liquids have no internal friction therefore a hill can not be made from a liquid) the lateral pressure is equal to the vertical pressure, which is not the case for active or passive soil pressure.

IHNC North Breach

According to IPET, the North Breach occurred before the South Breach, perhaps as early as 0430 (4:30 AM) CDT.[44]   IPET reports that the breach occurred prior to overtopping as a result of the formation of a tension crack on the floodwall and diminished soil support at the levee toe.[45]

---

[42] USACE Engineering Manual EM 1110-2-1913 titled The Design of Levees, Page 1-3 dated 30 April 2000.
[43] Principles of Geotechnical Engineering, Chapter 12, pages 364 - 378.
[44] IPET Report, pages IV-194, IV-195.
[45] IPET Report, page V-11-17.

The phenomenon of "gapping" involves the floodwall deflecting a small distance in the landward direction due to hydrostatic pressure, which causes a narrow gap to open up between the sheet piling and the canal side embankment.[46]  This gap allows water to flow to the tip of the sheetpiling, replacing the active earth pressure on the canal side with water pressure.   Because water produces more lateral pressure than soil, particularly clay, the presence of a water filled gap on the canal side of the embankment would have a dramatic reduction on the factor of safety – that is, the hydrostatic pressure, after the gap forms, is exerted over a much larger area of the floodwall and makes it more prone to failure.

Additionally, a gap can provide a more direct route for water to seep under the wall and cause an increase in pore water pressure.  In this sense, the gap splits the embankment in half and allows water to enter porous soil layers under the embankment without first percolating through the canal side embankment.



Figure 31: Water percolating through permeable marsh layer, causing uplift on clay layer above.

ILIT found that soil failure played an important role in the IHNC North Breach due to water penetration that weakened the soil on the land side of the levee.  "Sliding" is one

---

[46] ILIT Report Page 6-10.

52

type of failure mentioned in the ILIT Report.  If water is conducted through a permeable layer in the soil, it can exert a buoyant force on the soil on the other side of the wall, reducing the shear strength and potentially allowing underseepage-induced sliding to occur.  The only way to adequately protect against underseepage induced sliding is to utilize a longer sheetpiling or other means of lateral support.  This is because a failure plane should only occur in the vicinity of the tip of the sheetpiling.  A longer sheetpiling would force the failure plane to be so deep that the overburden pressure would give the soil tremendous shear strength.  Additionally, a deep failure plane means a long failure plane.  The longer the failure plane, the more soil can be called upon to resist the shearing force produced by the water on the canal side.  Long sheetpiling is also more likely to cut off those soil layers that allow water to seep under the wall.

The North Breach also appears to have occurred when a section of sheetpile just south of the Florida Ave. Bridge ripped away from a section to the north.  Apparently the failure of the sheetpile at the North Breach occurred at the transition of the sheetpile closest to the Florida Ave. Bridge, which was at a depth of -25.0 MSL, and the original sheetpile which was only at a depth of -8.0 MSL.  The deeper sheetpile closer to the bridge was 34 feet long (vertical dimension) installed in 1980, whereas the 1966 original sheetpile was only 20 feet long.  Clearly the original design was inadequate to restrain the hydrostatic load of the rising storm surge waters, especially in light of the very poor soil conditions.

In this connection, the testimony of Mr. Christopher Weaver is relevant.  Mr. Weaver states that he woke between 0500 (5:00 AM) and 0530 (5:30 AM) on 29 August and noticed that water had entered his house.[47]  When he looked out of a front window, he saw water overtopping the floodwall.  Mr. Weaver then climbed out a window, after which he reported his house was inundated by a large rush of water.[48]  The rush of water, which eventually washed Mr. Weaver's and neighboring houses away, was the result of water flooding the Lower Ninth Ward rapidly through the north breach.  However, it is clear that there was water in the vicinity of Florida Ave. before the surge of water swept away Mr. Weaver's house.  This indicates that the north breach may have failed in stages rather than all at once.  Initially, the floodwall would not have overturned completely, but rather rotated enough to substantially lower the crest height and allow water to pour into the Lower Ninth Ward, potentially causing the landside berm to scour away more and leading to the complete failure of the floodwall at this site.  This is consistent with Mr. Weaver's description of overtopping at the north breach site.

---

[47] Weaver Deposition, Page 82 Line 12-18.
[48] Weaver Deposition, Page 89.



Figure 32: Clay embankment failure due to sliding induced by uplift.

In summary, based on review of the IPET, ILIT and Team Louisiana reports, together with other information, the three principal mechanisms for the IHNC North Breach were: (1) formation of a gap between the canal side levee and the sheet pile leading to added hydraulic pressure; (2) inadequate soil foundation at the levee toe; and (3) failure of the sheetpile at a transition point near the Florida Ave. Bridge.

IHNC South Breach

According to IPET, the principal mode of failure for the IHNC east floodwall failures was overtopping induced scour.  This mechanism involves the water level in the canal rising to the floodwall's crest height or higher.  When the water level in the canal exceeds the height of the wall, water pours over the floodwall and falls onto the landside embankment of the levee.  Water falling from the top of the floodwall exerts an impact on the soil, which in turn experiences erosion, i.e. scours away.

54

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 33: The failed floodwall in the south breach along Jourdan Ave. after Hurricane Katrina.  Note the concrete topped floodwall has toppled to the left, or inland, indicating landside weakness caused by scouring.

The embankment of the IHNC levee was comprised of a clay-based material that had a unit weight of approximately 104 pounds per cubic foot, and a cohesion that varied greatly, but a value of approximately 500 pounds per square foot is representative of a majority of the samples.[49]  As clays go, the type found at the IHNC was relatively soft and light. This clay proved to be a more suitable material for construction of a levee than that which was found at other sites.

Nevertheless, as was apparent from inspections of the IHNC floodwall after Katrina, the embankment did not provide sufficient resistance to scour.  All along the floodwall, a trench was observed that ran the entire length from N. Claiborne Ave. to Florida Ave.  In places this trench was up to six feet deep.  Pictures of the scour trench appear in Figures 35 and 36.  Calculations show that a four foot deep scour trench is about the maximum that the floodwall could experience and still retain stability with respect to overturning.  The following figure shows failure by overtopping induced scour occurring

---

[49] IPET Boring Log 1U.

to the IHNC floodwall at the south breach site.  The soil stratum is from ILIT's borings near the south breach site.



Figure 34: Floodwall overturning due to overtopping induced scour.

Scouring is devastating to the stability of the wall because the resistance afforded by the land side embankment diminishes by the square of the depth of scour.  This means that 2 feet of scour will decrease the factor of safety four times more than one foot of scour.  If too much soil is scoured away, the water pressure on the canal side of the levee can cause the sheetpiling and concrete wall atop it to overturn.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 35: The scour trench on the land side of the IHNC floodwall, looking north from the north end of the south breach.

Scouring becomes an even more critical issue if subsidence occurs. Subsidence usually occurs at an irregular rate, meaning some portions of the floodwall will be lower than others. A lower portion of a wall will allow a larger volume of water to pour over the wall and for a longer duration than a higher portion of the wall. All other factors being equal, this will cause a lower wall to experience more scour than a higher wall and thus be more likely the point of initial failure by this mechanism.

In the case of the IHNC levee, scour from water overtopping the wall was exacerbated by a cyclone fence located just in back of the wall on the land side of the levee. The

57

cyclone fence acted to channel the overtopping water in a lateral direction, parallel to the floodwall, further deepening the scour trench.



Figure 36: Looking down into the scour trench at the southern end of the south breach.

In order to mitigate the consequences of overtopping induced scour, there are two principal features that could have helped.   The first is an armored landside embankment.  Placing a concrete or asphalt paved apron or riprap (armor stones) on the landside could have protected the soil underneath from being washed away by the falling water.  This was recommended in the USACE Levee Design Manual, but was not done.[50]   The second feature is a deeper sheetpile.  By utilizing longer sheetpiling driven deeper into the ground, the wall would have been able to remain upright even with a

---

[50] USACE Engineering Manual EM 1110-2-1913 titled The Design of Levees dated 30 April 2000.

**C. R. CUSHING & CO., INC.**                                           **7/29/2009**

much greater amount of scour. Neither of these features was present, and thus the wall did not survive the overtopping-induced scour that deprived it of support on the land side.

ILIT concluded that soil failure due to water penetration under the sheetpile was a second failure mechanism at work in the South Breach. In the case of the IHNC south breach, there was a thin layer of marsh material located in the clay underneath the embankment. There has been discussion in the IPET and ILIT reports as to the significance of this layer. ILIT concluded that the south breach occurred because of sliding due to an increase in pore water pressure. IPET responded by claiming that ILIT used a permeability one would expect to find in sand for this marsh layer and that this layer in reality had a much lower permeability and therefore the south breach site would be less susceptible to failure by sliding.

These factors considered, the floodwall constructed to replace the one that failed during Hurricane Katrina represents an improved design. The new wall is of the inverted "T" design, which incorporates a wide footing that can reduce scour because the wide footing of the "T" wall will prevent water that is overtopping the wall from eroding the soil directly beneath the land side of the floodwall. Additionally, the new wall utilizes a deeper sheetpiling than the ones used in the 1960s built wall. Lateral stability is further enhanced by three rows of battered H-piles that support the footing.[51]

Comparing the new wall with the old wall, it becomes apparent how inadequate the old wall was. The old I-wall, like many other floodwalls in the New Orleans area, was completely unsuitable for protection of a populated area. It did not have an adequate factor of safety in the first place, it was designed without considering various failure criteria such as landside scour and underseepage induced sliding, it was designed using an insufficient number of soil borings, it was built to an incorrect datum and it was not maintained adequately, meaning that its subsidence had gone unnoticed. Concerning settlement, this issue was known by the USACE and even mentioned in the Levee Design Manual, with recommended fixes:

> Regarding settlement, the manual recommends overbuilding by as much as 10 to 15 percent for semi-compacted and uncompacted fill in the embankment.[52]

The conclusions regarding the inadequacies of the levee design were reached by every investigation into the failure of the New Orleans hurricane protection system during Katrina.
It must be noted that the two breaches along the IHNC were not the only causes of flooding of the Lower Ninth Ward and St. Bernard Parish. According to the various

---

[51] Inner Harbor Navigation Canal project fact sheet from U.S. Army Corp of Engineers New Orleans District
http://www.mvn.usace.army.mil/HPS/pdf/Media%20Graphics/IHNC_Dec_2006.pdf.
[52] USACE Engineering Manual EM 1110-2-1913 titled The Design of Levees dated 30 April 2000.

59

studies, the great majority of the breaching of the levees that surrounded this protected area occurred at the levee fronting the MRGO and Lake Borgne.  This levee was constructed of an embankment made of sand and oyster shells, which is a completely unsuitable material for construction of a levee because of its high permeability and highly erodeable nature.

These levees fronting the MRGO were below design height and overtopped during Hurricane Katrina.  This overtopping occurred very early in the morning of 29 August. The breaching in these inadequately designed levees was massive, with well over a dozen individual breaches.  The flow through these breaches flooded the marshlands in the unpopulated area of the polder and ultimately overtopped the secondary levee.

In summary, based on review of the IPET, ILIT and Team Louisiana reports, together with other information, the principal mechanisms of failure at the IHNC South Breach were:  (1) formation of a gap leading to increased hydrostatic pressure on the floodwall; (2) overtopping and severe scouring of the landside soils leading to loss of soil support for the floodwall; and (3) possibly, exacerbation due to hydraulic forces within the soil, suggested by ILIT.

<u>Other Floodwall Failures</u>

The two breaches along the east bank of the IHNC were by no means the only floodwalls to fail as a result of Hurricane Katrina.  There were numerous significant areas of the greater New Orleans area that were flooded as the result of floodwall failures.  These failures were indisputably unrelated to barges or barge impacts.  These locations include:

-Gentilly and the Upper Ninth Ward, which was flooded as the result of a floodwall failure on the west side of the IHNC as well as the failure of the floodwall on the east side of the London Ave. Canal.

-Lakeview, which was flooded because of floodwall failures on the London Ave. and 17th Street Canals.

-New Orleans East, which was flooded because of numerous floodwall failures.

Other investigations attribute these failures to either overtopping induced scour or underseepage induced sliding.

**C. R. CUSHING & CO., INC.**                                           **7/29/2009**



Figure 37: Failed floodwall at the 17th Street Canal.



Figure 38: Failed floodwall at the London Ave. Canal.

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 39: Failed floodwall on the west side of the IHNC.



Figure 40: Failed floodwall on the north shore of the GIWW/MRGO Channel, New Orleans East.

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**

## THE LOWER NINTH WARD POST-KATRINA

The Lower Ninth Ward of New Orleans was flooded catastrophically when breaches formed in various levees protecting the Lower Ninth Ward and St. Bernard Parish from hurricane induced storm surges.  Two of these breaches were in the IHNC floodwall along Jourdan Ave. and were located about 2300 feet from each other.

This section of the report describes the physical characteristics of the breaches and surrounding area.  This evidence forms the basis for conclusions set forth in later sections of the report that discuss why the physical evidence described here shows that the barge did not and could not have caused either of the breaches.

Northern Breach

The northern breach occurred first.  This breach was approximately 215 feet in length. The northern breach was located immediately south of a sharp bend in the floodwall at a transition between a newer, deeper section of sheetpile and the original, shallower sheetpile.  At this transition point, between Florida Ave. and Law St., the sheetpiling disconnected as it failed and rolled or rotated due to the force of the water flowing through the breach.  After the storm, the concrete panels of this section lay nearest to the canal and the tip of the sheet piling pointed in the inland direction.  Between the northern and the southern edges of the north breach, the sheetpiling is twisted in a helical fashion.  In this helix, the sheetpiling is pointed straight upwards, which indicates that the northern part of this breach has rotated 270 degrees with respect to its initial position.  The floodwall remained tethered at the southern end of the breach, and washed inland slightly.  Thus, at the southern end of the north breach, the floodwall had overturned in the landward direction similar to what was observed at other breaches including the south breach.

No evidence was found at the site of the northern breach to indicate physical impact or contact by a barge or other object with the floodwall.

Inland of the northern breach, all houses were completely washed away for as far as 5 blocks from Jourdan Ave. in a straight swath approximately one block wide.  This contrasts with the southern breach, where the area of completely missing homes spread from the breach in a fan-like pattern.



Figure 41: Twisted sheetpiling at the north breach site.[53]

<u>Southern Breach</u>

The southern breach was more than 800 feet in length.  For about half its length (the northern or upper portion), the sheetpile which supported the concrete floodwall was displaced in a prominent bulge, up to 180 feet away from its original location.  At the southern or lower portion of the breach, the sheetpile was pushed inland by a significantly shorter distance and was oriented approximately parallel to the floodwall's initial position.  Along the breach, the floodwall overturned in the landward direction, having rotated approximately 90 degrees with the concrete panels pointing inland and the tip of the sheetpiling pointing toward the canal.  More than half of the concrete floodwall panels had cracked off of the part of the sheetpile that made up the bulge. The steel sheetpiling was visibly stretched but remained interlocked.  The concrete panels on the sheetpiling that was displaced a shorter distance were generally intact. The sheetpiling at this portion of the floodwall did not experience the same degree stretching.  Figure 42 is an aerial photograph of the south breach taken before Hurricane Rita and shows the principal features of this site.

---

[53] IPET website.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 42: Aerial photo of the south breach.  The barge lies astride N. Roman St, N. Prieur St. is in the center of the photo, and N. Johnson St. is to the right. Note the fan-like inward bulge of the failed sheetpiling on the northern or upper end of the south breach, to the right in this figure.

At both the northern and southern ends of the south breach, the earthen embankment was completely washed away.  Toward the middle of the breach, much of the canal side embankment remained, as well as a very small, severely eroded portion of the land side embankment.  Visible within the remains of the canal side embankment are an old wooden plank road and an old oyster shell road that had been buried when the levee was constructed.

65

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**



Figure 43: Remains of the original canal side embankment at the south breach site.

Inland of the south breach, for a distance of approximately 3 ½ blocks, nearly all homes were completely disintegrated.  In contrast to much of the rest of the Lower Ninth Ward where homes were moved from their foundations but remained nearby, nothing was left of the homes located directly in front of the breach except for foundations.  Large trees and utility poles were also toppled directly in front of this breach.



Figure 44: The remains of houses immediately inside of the south breach.

In the weeks after the failure, the ground was covered by a layer of mud that had settled out of the floodwaters.  No evidence of sand boils was found near the southern breach site.  All along the inland side of the floodwall that remained standing there was a trench that was caused by water overtopping the floodwall.  In some places, this trench was six feet deep and, as a general trend, it was deeper closer to the point of initiation of the breach – that is, the trench grew deeper in the area closest to where the breach occurred, at the point of maximum displacement toward N. Johnson St.

No evidence was found of impact or contact by a barge or other object within the main section of the southern breach, in the area of the bulge where the wall stretched and was pushed into the neighborhood by the force of the water in the initial breach development.

This is in contrast to the evidence located at the very lower (southern) end of the south breach, far from the main section of the breach itself, where a portion of the concrete cap was broken off and the rebar bent in a manner not found at any other location in the

67

north or south breaches.  Figures 59 and 60 show this section of the wall and the conditions found there.  As this report discusses, in the section titled *The Barge Grounding* below, this location is the only place where the barge appears to have come into contact with the floodwall, and it is where the barge passed from the canal into the neighborhood, **after** the southern breach had already occurred and was well developed.

After Hurricane Katrina, the barge ING 4727 was located just inside the IHNC south breach on the land side of the floodwall.  After the floodwaters from Katrina receded, the barge grounded approximately 150 feet from the floodwall just south of the southern breach.  The relatively short distance the barge was carried into the Lower Ninth Ward indicates that it was not propelled by the initial explosive surge of water from the breach.  The barge had come to rest alongside and on top of homes at the intersection of Jourdan Ave. and N. Roman St.   Before Hurricane Rita, the barge was lying immediately to the west of several houses on Jourdan Ave.  The pattern of damage on these few houses indicates that the barge approached them from the direction of the canal.  This means that when the barge came into contact with these houses, it was moving to the east and could not have been moving back toward the canal.  Thus these homes just inside the floodwall mark the deepest point of penetration by the barge into the neighborhood.  When Hurricane Rita caused the Lower Ninth Ward to flood again in late September 2005, the barge re-floated and drifted a short distance toward the floodwall, coming to rest in the middle of Jourdan Ave. atop a small school bus.

**Interpreting Water Direction and Strength**

Our team surveyed debris in the vicinity of the breaches to identify objects that appeared to have toppled or moved in the direction of the deluge of water that came in through the breaches or would have been displaced by the flow of water.  Considering the orientation of the vectors spread over a large area, the pattern of water flow in the Lower Ninth Ward becomes apparent.  The most obvious method of determining the strength of incoming waters is from the condition of houses.  Many homes in the Lower Ninth Ward are wood frame structures built on either a slab-on-grade foundation or elevated a few feet above the ground by short columns of concrete block.  In areas immediately inside the breaches and subject to the most catastrophic inflow of water, structures built on either type of foundation were completely disintegrated, with the debris washed over a vast area so that the only remaining evidence of the homes are their foundations.



Figure 45: Houses displaced by rushing water in the Lower Ninth Ward.

Houses built on either type of foundation located in areas that were subject to only low velocity water tended to remain standing in their original location or float a short distance if they were built on a crawlspace.  There were a few homes in the Lower Ninth Ward which were constructed of concrete block.  These homes tended to resist damage very well.  The most notable example of this are two structures, each two stories with the first story built of concrete block, located on N. Roman St. between Jourdan Ave. and Deslonde St.  Despite being exposed to extremely high energy waters, these two structures showed no movement or serious structural damage.

The houses in the location where the barge grounded show damage that is of interest.  These houses, while exhibiting some structural damage from being struck by the barge, are still partially standing.  From the fact that the barge landed on the roofs of these houses, it may be inferred that the water in the neighborhood was already very high when the barge made impact.  Further, the damage to these houses appears related to the weight of the barge coming to rest on the roofs as the water drained after the storm, and not to migration impact.  This indicates that the barge was moving very slowly when it landed on these houses.

69

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**

**Water Flow through the North Breach**

The attached diagram in Appendix G shows that water flow originated at two breaches in the levee along the Inner Harbor Navigation Canal. While the water flow through each of the two breaches was very strong, the flow patterns surrounding each breach differ considerably.

The water flow through the northern break appeared to have been very strong, but much confined and concentrated as compared to the southern break. This is supported by a swath of houses that have been completely razed extending over five blocks inland from Jourdan Ave, but only one block wide. In the narrow swath that exists between Law St. and Florida Ave. the devastation from rushing water is similar to that seen at the south breach location. The Forty Arpent Levee, which runs parallel to Florida Ave, is part of the reason for the confined nature of the damage in this area. The presence of this levee created an obstruction to the northward propagation of the incoming waters, which reduced the possible directions the water could flow to either directly inland or to the south.



Figure 46: The north breach and immediately adjacent area. Note the swath of destruction left after the breach.

70

**C. R. CUSHING & CO., INC.**                              **7/29/2009**

The study of objects moved by the incoming waters indicated that forceful flow from the northern breach was primarily in the west to east direction.

The study of house displacements also concurs with the confined nature of the flow from the north breach. Homes that were moved by water that would have originated from the north breach are located almost exclusively north of N. Rocheblave St.



Figure 47: Aerial photo of the north breach site.

Apart from the previously mentioned levee parallel to Florida Ave., elevation is one of the factors that could have had an effect on the direction of water flow through the north breach. The aerial photo taken by Hydro Consultants, Inc. on 20 September 2005 shows water standing on Florida Ave. and the portion of Law St. nearest the Industrial Canal. This shows that the northern most block of the Lower Ninth Ward lies at a somewhat lower elevation than the remainder of the neighborhood, which would serve to channel incoming water in an easterly direction.

The flow of water through the northern break was very powerful.  If objects were floating in the water in the immediate vicinity of the break, they would be expected to have been drawn through the break with the current and carried deep into the neighborhood.  This is confirmed by evidence of houses that were swept off their foundations and carried several blocks deep into the neighborhood.

**Water Flow through the South Breach**

The damage caused to homes in the immediate vicinity of the south breach shows that the flow of water through the breach was very strong, and was strongest in the center of the breach as represented by the apex of the "bow" in the northern part of the breach. The evidence shows that this breach originated slightly south of N. Johnson St.  At this location, the sheetpile floodwall was displaced a considerable distance (approximately 180 feet) from its original location.  Additionally, vectors located slightly south of the point of the greatest displacement of the sheetpile were oriented in the south-easterly direction as opposed to being perpendicular to the levee.  This means that the flow of water that would have caused their movement would have originated at the point directly behind the portion of sheetpile that was displaced the furthest inland.  The evidence demonstrates, therefore, that the south breach originated just south of N. Johnson St., at the point where the sheetpiling was pushed the furthest distance inland. The part of the breach where the floodwall was displaced a shorter distance happened after the initial failure at the bulge.

The debris orientation around the south breach shows that most vectors radiate out from the point of initiation of the breach in an arc, with vectors located immediately inland of the bulge pointing straight inland.  As can be seen in the diagram of vectors in Appendix G, the water flowing through the breach in the location of the bulge varied in direction from southeast to northeast.  Notably, water flowing along these vectors could not have carried an object from the origin of the breach to the location where the barge finally grounded, meaning that the barge did not enter the Lower Ninth Ward where the breach originated in the vicinity of N. Johnson St.

Inland of this breach there is an area that extends 3 ½ blocks east of Jourdan Ave. in which all structures were completely demolished by inflowing waters.  This fact, combined with the distance that the floodwall was displaced, attests to the strength of the flood waters immediately following the levee failure.  The waters that poured through the initial breach location at its point of inception were directed inland, away from the canal.  If the barge had been present at this location when this breach occurred, it would have been carried deep into the neighborhood by this powerful initial rush of water.

South of N. Prieur St., similar devastation exists, but only extends 2 ½ blocks from Jourdan Ave.  Additionally, the sheetpile floodwall in the lower portion of the breach was displaced only a fraction of the distance that it was displaced in the "bow" immediately to the north.  This indicates that the initial surge of water in this lower portion of the

breach, to the south of where the initial breach occurred, was not as strong as that which occurred between N. Prieur St. and N. Johnson St.   This somewhat smaller amount of force can be attributed to a lower head of water at the breach location, indicating that the water level in the canal had fallen or the water level in the Lower Ninth Ward had risen between the time that the floodwall failed near N. Johnson St. and the rest of the south breach had formed.   This means that the south breach could not have initiated at the far southern end and progressed northward.



Figure 48: Trees and other debris displaced by water flowing through the south breach, Deslonde St. looking east.

From the house displacement analysis, the general trend is that water flowing through the south breach was responsible for moving homes off of their foundations in the region south of N. Rocheblave St.  Neglecting the homes that were obviously moved by water draining from the Lower Ninth Ward, most of the homes seem to have been moved by a current originating from the end of N. Johnson St., at the approximate location of the bulge in the failed sheetpiling.

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 49: Aerial view of the south breach, looking north.

Although there were many accounts of water in the Lower Ninth Ward very early, the amount of damage at the south breach indicates that the water level on the land side of the floodwall had not risen to the level in the canal when the floodwall at the south breach location failed.  If the water level in the neighborhood was close to being equalized with the canal water level at the time of the occurrence of the south breach, the damage due to water entering through the south breach would have been considerably less than what actually occurred.  This is important because, as this report will discuss, the damage to the concrete cap and rebar that occurred when the barge floated over the wall, as well as the water level on the homes with which the barge made impact, demonstrates that the water level in the neighborhood was already very high when the barge made its appearance, and shows the barge did not arrive until well after the breach had occurred.  (Furthermore, the barge could not have floated over the damaged wall without there having been a sufficient depth of water already in the neighborhood.  Otherwise, the barge would have toppled into the neighborhood and grounded on its end.  This means that the barge must have entered the Lower Ninth Ward well after the breach had occurred).

74

**C. R. CUSHING & CO., INC.**                                   **7/29/2009**

**Effects of Drainage and Re-Flooding**

After a period of time, the water level in the Lower Ninth Ward equalized with that in the IHNC, and when the storm surge receded, water began to flow out of the Lower Ninth Ward and back into the Inner Harbor Navigation Canal.  This backflow of water is thought to explain why some of the house displacement vectors are oriented in an East to West direction.  Houses were more susceptible to being moved by the reverse flow of water than other toppled objects.  This is because the houses floated and therefore could be moved by a minimal current, while objects such as fence posts bent in the opposite direction would require very high velocity water current, absent during the outflow from the Lower Ninth Ward.

On 23 September 2005, the Lower Ninth Ward was again flooded as a result of a storm surge from Hurricane Rita washing away the temporary levee placed at the south breach location.  This event is not believed to have caused a significant interference to the objects toppled by the Katrina flood as the waters from the Rita flood were considerably weaker than that from Katrina.  Also, most of the objects that fell as a result of Katrina would have offered very little resistance to incoming floodwaters, making the possibility of being further affected by the second event small.  Additionally, the breach during Rita occurred at almost the exact same location as it did during Katrina, near N. Johnson St., which would generate a nearly identical pattern of water flow and hence would not alter the orientation of objects to a large degree.

75

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 50: The school bus before Hurricane Rita.



Figure 51: The school bus after being crushed when the barge shifted westward during Hurricane Rita.

**C. R. CUSHING & CO., INC.**                                          **7/29/2009**

## WIND DATA

Wind data during Hurricane Katrina is a critical source of information to determine the timing and direction of the movements of the barge ING 4727 during Hurricane Katrina. Because the barge was empty and therefore riding high in the water, its movements would have been predominantly governed by the wind. Therefore, Dooley SeaWeather Analysis, Inc. was commissioned to determine the wind velocity and direction at the Inner Harbor Navigation Canal site during Hurricane Katrina.

To accomplish this, Dooley SeaWeather Analysis, Inc. obtained hindcast data from Ocean Weather, Inc. for various points in the New Orleans area. Dooley SeaWether Analysis, Inc. then used the data from these points as boundary conditions and calculated the wind speed and direction at the IHNC during the Hurricane Katrina event. More information about Dooley SeaWeather Analysis' work in this area can be found in the report submitted by Dr. Austin Dooley.[54]

The results of Dr. Dooley's work are presented, in summary form, at pages 41-45 above. A more detailed treatment of the wind speeds and directions throughout the morning of August 29 can be found in the timeline in the appendices of this report.

Hurricanes are defined by their prevailing wind patterns. In a hurricane, the prevailing winds closely follow isobar lines around the eye of the storm in a counterclockwise direction. The winds at a specific location do not deviate very far from the prevailing wind direction. Hurricane winds are not erratic and they do not rapidly or frequently change direction. Instead, they gradually change direction as the hurricane's eye changes position with respect to the location in question.

As described above, Hurricane Katrina approached New Orleans from the south and passed to the east of the city. As the storm approached, the winds blew with an east-to-west component at the IHNC. As the storm passed, the winds shifted around and passed through a north-to-south vector and began to blow with a west-to-east component. These west-to-east winds occurred only after the center of Katrina was north of the city.

To visualize how these winds are oriented relative to the Inner Harbor Navigation Canal and the Lower Ninth Ward, Figure 52 superimposes the wind vectors on the original position of barge ING 4727 at the Lafarge Terminal. The wind early in the morning was acting on barge ING 4727 from an east and then north-east direction, tending to push the barge toward the wharf and later to the south. The winds at this time, combined with the presence of the Namasco gantry that projected into the south end of the basin, would have prevented barge ING 4727 from entering the canal proper if it had broken free early in the morning.

---

[54] Dooley SeaWeather Analysis Report, 2009.

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

In the 0200 – 0700 (2:00 to 7:00 AM) timeframe, barge ING 4727 would have been subject to the wind free stream, meaning there were no close obstructions upstream of the barge. The nearest upstream obstructions in the 0200 – 0700 timeframe were the Florida Ave lift bridge and other smaller structures in its vicinity. These obstructions were approximately 1500 feet away from the barge at the Lafarge Terminal, a large distance compared with the size of the obstructions. Research shows that free stream flow re-establishes itself a distance downstream from an obstruction that is approximately equal to the size of the object. [55] Given that the barge was located much further from the obstructions than a distance approximately equal to the size of the obstructions, the winds acting on the barge at the Lafarge Terminal would have had the same direction as indicated in the hindcast data and would have been unencumbered by obstructions.

It was not until approximately 0730 (7:30 AM) on the morning of the 29th of August that Katrina's winds were acting almost completely parallel with the orientation of the canal. If the barge had broken free at this time, it would have been blown to the south end of the terminal basin and would have been confined in the "pocket" at the Namasco unloading gantry shed. (As noted, before this time the winds were holding the barge against the dock).

As the morning progressed, the wind direction came from a more north-northwesterly direction. After 0800 (8:00 AM), the winds began to have a component blowing from the west toward the east (though still predominantly from north to south). Taking note of the orientation of the wind vector on the canal, the earliest the barge could have been pushed into the canal by the wind, without interference from the Namasco gantry, would have been in the 0900 (9:00 AM) to 1000 (10:00 AM) timeframe. It is also worthwhile to note that this is the time when the wind would have had the first chance to act on the barge without the barge being sheltered in the lee of the silos and warehouses on the wharf. Of course, the breaches had already occurred by this time.

The strong winds present during Hurricane Katrina had an effect on the waters in the IHNC – specifically, waves were created. The height of waves is determined by well-known relationships relating to the distance over which the wind blows over water (fetch) and the length of time that the wind blows from a single direction (duration). Wave building is also a function of the character of the surface over which the wind blows, such that waves build more readily over open water and less so over irregular urban land structures such as houses, floodwalls, warehouses, silos, etc. The height of waves in the IHNC would have been very limited because of the short fetch of the wind. In the canal, the maximum uninterrupted fetch length would be about 1,400 feet when the wind is blowing approximately west to east.

---

[55] Ozgoren, Muammer. Flow Structure in the Downstream of Square and Circular Cylinders, Selcuk University, 2005.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

There are methods for calculating the properties of waves given a specific wind speed and fetch length.   Among the most widely used is the SMB (Sverdrup, Munk and Brentschneider) method.[56]   With a 1,400 foot fetch and a 68 mph wind speed, this method calculates a maximum wave height of about 2 feet.   These waves would be of short wavelength, steep and choppy, as seen in Figure 28.

Another important property of wind-generated waves is that they travel in the same direction as the prevailing wind.   This means that if the wind is blowing a barge one way, wind-generated waves would only add to the load exerted on the barge, and could not possibly move any floating object in a direction counter to the wind.   In no way would the wind driven waves have a direction that varied by more than a few degrees from the prevailing wind direction, especially in a waterway of limited fetch such as the Inner Harbor Navigation Canal.

Wind-generated waves were the only waves present in the IHNC during Hurricane Katrina.   Waves from the open Gulf of Mexico were damped out by the confined channels leading to the IHNC.

There has been some speculation that reflected waves could have had an effect on the barge movement.   Reflected waves lose energy when reflection takes place.   Also, the waves quickly decay and give up more energy because they are not being driven by the wind.   A reflected wave can never have as much energy as the primary wave, and reflected waves can never force a floating object in the direction from which the primary wave is coming.

In summary:

(1) Barge ING 4727 could not have been present at the north breach.   At no time during Hurricane Katrina would the wind would have carried it in that direction.

(2) The direction of the winds in the 0730 to 0900 (7:30 to 9:00 AM) time frame, coupled with the presence of the Namasco gantry, would not have permitted the barge to exit the Lafarge terminal basin in time for it to have been present at the time the south breach occurred, which must have been before 0814 (8:14 AM) when the National Weather Service reported its occurrence.   Indeed, the latest that any report has placed the timing of the southern breach was around 0730 (7:30 AM), when the wind still had an east-to-west component.

(3) Waves in the IHNC were created by the wind, were relatively small and acted in the same direction as the wind.   Thus, any waves in the IHNC would not have been able to propel the barge in any direction other than the direction in which the wind was blowing.

---

[56] The Rock Manual, Chapter 4 Page 369.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

(4) Reflected waves could not have carried the barge to the north breach site, and they would not have been able to overcome the wind and incoming waves to carry it to the south breach site.



Figure 52: Wind Directions acting on barge ING 4727 during Hurricane Katrina from 0200 to 1000 (2:00 to 10:00 AM) on August 29.

## THE BARGE GROUNDING

After the waters from Hurricane Katrina subsided, barge ING 4727 grounded in New Orleans' Lower Ninth Ward at the intersection of Jourdan Ave. and N. Roman St.  This location is approximately 150 feet inland of the IHNC floodwall as well as slightly south of the very southern end of the south breach.  Before the hurricane, the barge had been moored at the Lafarge Terminal located across the IHNC from the Lower Ninth Ward.  On the morning of 29 August 2005, the barge was empty and was tied up outboard of the loaded barge ING 4745 that was, in turn, tied up to the wharf.  Immediately to the north of barge ING 4727 there were five loaded barges tied up to the wharf.  Of the seven barges at the terminal, ING 4727 was the only one to break from its moorings.

In order to determine how the barge might have ended up at its resting location inside the Lower Ninth Ward, the surrounding area and the barge itself were searched for any evidence relating to the passage of the barge.  Our team inspected the failed floodwall as well as the area near the Lafarge Terminal where the barge was originally moored.  The purpose of the inspection was to collect evidence regarding how barge ING 4727 left the Lafarge Terminal and arrived in the Lower Ninth Ward.

**Barge ING 4727's Exit from the Lafarge Wharf Area**

The following figure shows the position of barge ING 4727 moored at the Lafarge Terminal along with several loaded barges at the time of Hurricane Katrina.  This wharf is situated off of the canal's main channel in a basin that measures approximately 1200 by 700 feet.  The Lafarge cement terminal is located on a wharf that occupies the southern half of the west side of this basin.

81