# EXHIBIT 1

Report of Charles Cushing

Part 2

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 53: The IHNC basin, Lafarge Terminal and barges.  The Namasco gantry roof is the white square object at the southern end of the slip.

In Figure 53, the original location of barge ING 4727 during Hurricane Katrina is shown in red and the location of the loaded barges moored at the wharf is shown in green. Although the exact timing of the breakaway and movement across the canal is not known, it is clear that the barge was transported across the canal after both breaches had already occurred, and there is evidence that allows a reasonable deduction of the timing of these events.

The following photograph (Figure 54) was taken by a member of the IHNC lock staff and was time stamped by the digital camera at 1503 (3:03 PM) on the afternoon of 29 August.  This photo shows the south breach at a time when water was draining from the Lower Ninth Ward and back into the IHNC.  Shown on the right side of the photo is a portion of the floodwall that is still standing at the lower (southern) end of the breach. The end of the floodwall shows a notch where part of the concrete panel has been cracked off (An explanation of this damage is provided a few pages below).  The barge had already been washed through the breach by this time and is just out of view on the right side of this photograph.



Figure 54: Photo of IHNC south breach taken by IHNC Lock staff time stamped 1503 (3:03 PM) on 29 August 2005.  The arrow shows the south end of the south breach.

Another critical piece of evidence that has been considered when establishing the time of barge ING 4727's departure from the Lafarge Terminal is the barge unloading gantry that juts north into the basin from the warehouse on the basin's south side wharf.  This structure is part of the Namasco Corp. Wharf and can be seen as the object with the bright white roof in Figure 53.

The gantry, seen from ground level in Figure 55, is a steel truss structure built on pilings and cantilevered over the basin.  The structure is clad in corrugated steel sheets which would show signs of damage if the barge had been blown into the structure.  If the barge had broken free of its moorings before 0900 (9:00 AM) it would have been blown south, and the only way it could have entered the canal's main channel would have been to float under the gantry housing.  But Katrina's storm surge raised the water levels to a height such that the barge could not have floated beneath the gantry if the barge was blown to the south during Katrina without scraping and otherwise damaging the barge's fiberglass covers.  Additionally, the water level would have allowed the

**C. R. CUSHING & CO., INC.**                    **7/29/2009**

unloaded barge to float over any of the pilings at the south end of the basin, strike the Namasco warehouse and ground in that location.  The fact that there is no damage consistent with a barge strike on the right side of the photo or to the gantry itself shows the barge was not blown south from its initial position at the Lafarge Terminal Wharf.



Figure 55: The gantry at the Namasco Corp. facility.



Figure 56: An image of barge ING 4727 elevated and superimposed over a photo of the Namasco Facility Gantry at the water level at 0600 (6:00 AM) on 29 August.  Note that there is insufficient clearance for the barge to float under the structure.

The evidence showing the barge was not blown to the south end of the basin means that the wind had to have a strong west-to-east component at the time that the barge broke free.  As shown in Figure 52, the earliest that the wind had a feasible direction was after 0900 (9:00 AM).

In Appendix B, the report prepared by Waterway Simulation Technology, Inc. there are several scenarios of the barge moving across the IHNC from the Lafarge Terminal toward the south breach, moved by winds and currents existing after the occurrence of the breach.  The scenarios demonstrate that before 0900 (9:00 AM) the barge would not have been able to exit the IHNC Basin.[57]  Because both breaches were well developed before 0900 (9:00 AM), the barge did not exit the IHNC basin until after the breaches had occurred.

---

[57] <u>Water Flow and Wind Conditions Affecting Movement of ING 4727 Barge in the IHNC During Hurricane Katrina on August 29, 2005</u> by Waterway Simulation Technology, Inc (Appendix B).



Figure 57: The most probable path of barge ING 4727 across the IHNC.  The red arrow shows the wind direction at 0900 (9:00 AM) and the white arrows show the current direction.  Based on the barge's large sail area and shallow draft, wind forces would have predominated over current forces when influencing the movement of the barge.

**C. R. CUSHING & CO., INC.**                                  **7/29/2009**

**Damage to Barge ING 4727**

As described above, on 27 September 2005 and on numerous subsequent dates, Dr. Cushing and other expert colleagues visited the site of the levee breaches and the grounding site of the barge ING 4727 in the Lower Ninth Ward.  The team members photographed the barge in place and inspected the top and sides of the barge at that time.

Removal of barge ING 4727 from the Lower Ninth Ward took place during early March, 2006, ,when the upper portion of the barge was removed, while the bottom from the keel to approximately 50 inches in height was cut into 19 sections and transported to a warehouse for examination.  Once the bottom of the barge was salvaged, it was possible to inspect for damage that may show how it entered the Lower Ninth Ward.

Inspection of the bottom of barge ING 4727 shows numerous parallel scratch marks aligned approximately parallel with the barge's longitudinal axis.  The scratch marks are concentrated on the barge's port side and run from the bow for approximately one third of the barge's length.  Additionally, some scratch marks wrap around the turn of the bilge on the forward end of the barge.  Although the spacing of these scratch marks found on the barge's bottom is not uniform, most of the scratches are parallel and are spaced between approximately 7 and 11 inches on centers.  Appendix H shows photos that were taken of the bottom sections of the barge.  Several of these photos show examples of scratch marks.

There was some additional damage to the barge, most notably several indentations on the sides and on the bottom.  There were also two locations where the hull was punctured, one location just above the turn of the bilge and the other just below deck level, both on the starboard side.  Additionally, patches of light abrasion were found on the bottom, which were noticeably less severe than the other scratch marks described above.  These indentations and punctures are not characteristic of ones that would be made by a collision with an intact floodwall.  Other minor dents and scratches on the barge are typical of inland barges and the conditions under which they operate, and it is likely that this was pre-existing damage.

There was no damage on the barge that is consistent with the barge having caused the failure of the levee such as crushing damage, which could have been apparent if a major collision had occurred.  There was no evidence of a major impact between the barge and an intact floodwall.  Further, there was no damage to the bottom of the barge other than the parallel scratches which, as will be explained below, were created when the barge passed over the floodwall after it had already failed.

No damage was found on the fiberglass covers of the barge.  This is further proof that the barge did not come into contact with the Namasco gantry shed.



Figure 58: The fiberglass covers of barge ING 4727 (Note lack of damage).

**Examination of Impact Damage to Floodwall**

Early in this investigation, it was noted that the extreme southern end of the south breach displays damage that appears to be the result of an impact. In this location, the floodwall panels transition from an upright position away from the breach to an overturned position in the breach. This transition does not, by itself, suggest impact. However, these transitioning panels also show fracturing done to the concrete floodwall cap as well as steel reinforcing bars that are bent at a sharp angle. Figures 59 and 60 are photos of this damage.

At the transition at the upper (northern) end of the south breach, the panels incline at increasing angles the closer to the breach they lie, but do not show any fracturing of the concrete. At the north breach, the transition at the south end is also similar in that the panels are inclined but show no horizontal fracturing. This discounts the possibility that torsional or other stresses associated with the failing floodwall could have caused the pattern of fracturing at the south end of the southern breach, and it shows that damage from impact is visibly different from the damage created by the initial failure and the damage at every other location along the failed floodwall.

88



Figure 59: Damage at the lower (southern) end of the south breach, looking north.

The USACE as-built drawings of the floodwall show that the floodwall contained vertical pieces of rebar that were spaced at approximately nine inches on center. This rebar was ASTM No. 6 (3/4" diameter) on the flood side face of the wall and No. 4 (1/2") on the land side face. As with any concrete structure, there were small variations in the spacing of the rebar, but the spacing would have averaged 9 inches. An as-built drawing of the floodwall obtained from IPET is included in Appendix H and shows the position of the reinforcing bars.[58]

After the survey of the bottom of the barge was completed and all damage recorded, the striations were drawn on a scale drawing of the bottom of the barge according to their observed position and orientation. This drawing was compared with parallel lines spaced at 9 inches on center representing the average spacing of the reinforcement. It was found that the expected number of bars in a given length of wall based on a 9 inch spacing almost exactly matched the number of scratch marks found on a portion of

---

[58] IPET File DACW-29-70-B-0126 AB Drawing No. H-4-25157 Dated Nov. 1969.

barge of the same width.  Where there were fewer scratch marks than one would expect to see based on the construction of the wall, there was often a space where a piece of reinforcement may have existed but not made contact with the bottom of the barge. The drawing of scratch marks on the bottom of the barge is shown in Appendix H. Given this physical evidence, there is little doubt that the scratch marks on the barge were created when the bottom of the barge came into contact with the rebar as the barge passed over and across the top of the already failed floodwall.

Figure 60 shows a floodwall panel in the foreground lying in a nearly horizontal position while the panel in the background is inclined at a less severe angle.  This photo provides important evidence that the floodwall had already failed when the barge came into contact with the concrete cap and passed over the rebar.  The detail that explains in which direction the damage progressed is the sheetpiling that has separated from the concrete on the more upright panel.  Large pieces of concrete (D) have fallen into this gap (B) between the sheetpile (A) (on the left) and the concrete panel it had separated from.  This indicates that the gap between the sheetpile and the concrete panel had formed before the concrete on top of the more upright panel was cracked off and knocked into the gap.



Figure 60: Damage at south end of breach, looking west.

The angle of the concrete panel in the foreground of this figure, and the damage to that panel, shows that the wall had failed before contact was made by the barge.  This evidence indicates that the initial contact between the wall and barge was made at the panel in the foreground, which in the photo is lying in a nearly horizontal position (C).

Approximately 6 inches of concrete is missing from the uppermost part of this panel. The short rebar stubs protruding through the failure plane nearest the photographer are unbent, but the bars become more bent as they progress away from the photographer. The near end of the panel, however, does not manifest this type of damage. This indicates that this panel was in an inclined position before being struck, with the far end of the panel sitting at a higher elevation than the near end. In other words, the wall was already down before the barge first made contact.

Quite likely, this panel was pushed further back into its final position due to the scraping of the barge as it first contacted the panel at point E and then cracked the concrete off the top 6 inches and bending the rebar ends (F) at the far end of the failed wall panel. The separation of the concrete panel from the sheetpile in the adjacent panel may also have occurred at that time. Again, this is localized damage of a type not found anywhere else on the failed floodwall, and superimposed on pre-existing unrelated breaching and damage of a type similar to that found elsewhere in the breaches. (The separation shown in the Figure 60 was between concrete monoliths; the steel sheetpile remained continuous and intact).



Figure 61: Cross section of the concrete portion of the floodwall, showing the two different concrete pours separated by a construction joint (left) and the floodwall cracking at the construction joint as the result of being impacted (right).

The adjacent panel, which is inclined at approximately a 45 degree angle, experienced failure at the construction joint – that is, the place where the concrete for the tapered floodwall cap was poured against the already cured concrete of the lower, rectangular shaped portion of the floodwall.  This is a natural plane of weakness in concrete.  The rebar in this section is bent horizontally, making it consistent with the flat bottom of a barge moving over the rebar.  The angle of the bent rebar – virtually parallel to the ground -- shows that the water level in the Lower Ninth Ward must have been approximately equal with the water level in the canal when the barge passed over the rebar.  If the water level in the neighborhood had been significantly lower than the water level in the canal, then the rebar that made the scratch marks on the barge would have been bent downward at a sharp angle as the barge transited into a lower level of water instead of being bent almost perfectly horizontal as seen in Figures 59 and 60.

When the scratch marks on the bottom of the barge are superimposed over the damaged floodwall at the lower (southern) end of the breach, it is apparent that the barge could not have passed over the floodwall bow first, as the damage is concentrated on the other side of the barge.  The barge would have been traveling in a south-eastward direction while the bow was angled slightly toward the north.  While moving in this direction, the port side came into contact with the inclined wall panel on the already failed floodwall. The barge rode up on this floodwall panel, cracking off the topmost 6 inches of concrete.  This panel was pushed further back as the barge went over and became separated from the adjacent floodwall panel.  As the barge continued to move toward the south, it cracked the next concrete floodwall panel at the construction joint, causing debris to fall into the gap between the lower portion of the panel and the separated sheetpile.  Once the barge grounded on this panel to the point where it could no longer continue moving south, it appears to have rotated slightly and slid off the floodwall backwards into the Lower Ninth Ward, creating the longitudinal scratch marks.  As the bow cleared the floodwall, some of the rebar that had been bent horizontal by the weight of the barge above sprang back up slightly, creating scratch marks that wrapped around the turn of the bilge at the barge's bow.

Figures 62 and 63 show the barge damage superimposed over an aerial photo of the lower (southern) end of the breach.  The scratch marks support this scenario, as the scratches furthest to the stern are at a greater angle relative to the barge's longitudinal axis than the scratch marks closer to the bow.  This is evidence that the barge rotated as the scratch marks were being made.

Because the barge had to have grounded on the inclined floodwall panel, the floodwall had already failed before the barge arrived.  Indeed, in order for the scratch marks that are present to have occurred where they did, the barge must have had two-thirds of its length inside the Lower Ninth Ward (on the protected side of the floodwall) before coming into contact with the floodwall.  This evidence confirms the barge entered the Lower Ninth Ward after the floodwall had already failed.

92

Some of the water flowing into the Lower Ninth Ward through the breach would have been flowing southward along Jourdan Ave.  Current from this flow would have caused the barge to rotate.

After the barge slid off of the fractured floodwall, it rotated approximately 90 degrees in order to come to rest adjacent to the rubble of two ruined houses on either side of N. Roman St.  Several weeks later during Hurricane Rita, the Lower Ninth Ward was re-flooded when the temporary levee sealing the south breach was overtopped and eroded.  This flooding caused the barge to re-float and come to rest slightly to the west of its original position.

The presence of upright telephone poles, trees and houses immediately to the east of the final grounding spot indicate that the barge could only have followed this path. Fallen telephone lines extended from an upright pole to the south of the barge in a northerly direction along Jourdan Ave. and under the barge.

The houses on which barge ING 4727 came to a rest provide additional proof that the barge must have arrived a considerable amount of time after the levee had failed. These houses are wood framed structures and have limited capability to resist the forces associated with being struck by a large, heavy object.  Research shows that a wood frame house with diagonal bracing is only able to resist approximately 280 pounds of lateral load per linear foot of exterior wall.[59]  This is nowhere near enough strength to stop a barge if it were being carried by strong currents.  The fact that the houses were able to stop the barge rather than being totally demolished by it indicates that the barge had very little velocity when it contacted the houses.  This limited velocity indicates that the water on the protected side of the floodwall was nearly equalized with the water on the canal side when the barge floated in; otherwise the barge would have had a much higher velocity when it struck the houses and the homes would have been completely demolished.  Thus the barge did not enter the Lower Ninth Ward at the time of or immediately after the breach occurred.

Figures 64 – 71 show the path barge ING 4727 had to have taken over the floodwall in order to produce the pattern of scratch marks on its bottom.

---

[59] Shear Resistance of Wood Frame Walls by A.T. Hansen, 1985.



Figure 62: Scratch marks from bottom of barge superimposed over aerial photo of south end of breach, position 1.  The red arrow indicates the direction the barge is traveling.



Figure 63: Scratch marks from bottom of barge superimposed over aerial photo of south end of breach, position 2. The red arrow indicates the direction the barge is traveling.

94

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 64.  Note that houses that are shaded are homes that were not washed away by the breaching.  Houses that are outlines had been destroyed by the time the barge arrived.  The red arrows indicate current.



Figure 65.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 66.



Figure 67.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 68.



Figure 69.

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 70.



Figure 71.

The examination of the floodwall for impact damage answers the question of whether impact with the top of the concrete floodwall panels would result in damage to the concrete cap, or failure of the underlying embedded sheetpiling.  As is shown in the above photos, both shearing of the top of the tapered cap and fracture at the construction joint did occur.  However, nowhere was the concrete panel cracked at the top of the sheetpiling, and nowhere did the sheetpiling fail in any other manner as a result of such impact.  This corroborates that shearing off of the top of tapered cap and fracture of the construction joint are what would occur if the concrete floodwall were struck.  In other words, impacting the concrete cap atop the floodwall does ***not*** cause the sheetpile below the cap to fail.

Interestingly, the south breach along Jourdan Ave. is not the only location where this fact can be verified.  During Hurricane Katrina, there were reports of barges striking other floodwalls of near identical design to the one in question.  One wall was located in New Orleans East in the vicinity of the Michoud Canal.  As can be seen from the photo below from IPET, the tapered cap of the wall was sheared off, leaving stubs of rebar exposed.  This is exactly what happened when barge ING 4727 came into contact with the first panel at the south end of the breach along Jourdan Ave.  As is apparent in the photo, the floodwall remained standing following the barge strike.  There was another barge impact of the floodwall near the Paris Road Bridge along the MRGO.  As can be seen from Figure 73, barge ING 5848 did not cause this floodwall to fail.

These photos show that a barge impact with the concrete cap of a floodwall does not cause the floodwall to fail.  Rather, the concrete cap gives way and the sheetpile remains intact.

By contrast, the IHNC floodwall breaches resulted from deep-seated sheetpile failure. This failure could not have been caused by a barge impact with the concrete cap of the wall.

99

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 72: Damage to a floodwall in New Orleans East due to a barge impact. [60]

---

[60] IPET Report Vol. V Chapter 12 Figure 12-53.

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 73: A barge strike along the MRGO under the Paris Road Bridge. [61]

---

[61] IPET website.

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 74: A barge that impacted and came to rest on a floodwall near the Bayou Bienvenue Control Structure.  The concrete cap was damaged, but the floodwall did not fail.[62]

---

[62] IPET website.

**C. R. CUSHING & CO., INC.**                                                    **7/29/2009**

## SEQUENCE OF EVENTS

The evidence presented in this report establishes the sequence of events related to the failure of the Lower Ninth Ward floodwall and subsequent barge transition from the Lafarge terminal across the IHNC and through the existing breach.

The first event required to start that chain of events that led to the flooding of the Lower Ninth Ward was the hurricane itself.  Hurricane Katrina approached slightly east of the city of New Orleans causing storm surge waters to pile up and inundate the marshlands surrounding Lake Borgne.  This storm surge allowed two things to happen with regard to the Lower Ninth Ward and St. Bernard Parish.  Initially the storm surge overtopped the levee fronting the MRGO causing breaching of this inadequately constructed levee to occur and flooding of the unpopulated marshlands in the north east portion of the polder.  These waters eventually rose to a level where they began to overtop the Forty Arpent Levee and spill into the populated regions to the south and west.

The second result of Katrina's storm surge building in Lake Borgne was that these waters were funneled between the MRGO and the GIWW levees and driven up the combined MRGO / GIWW canal into the Inner Harbor Navigation Canal.  This storm surge in the IHNC is what caused the rising water that was recorded by several gauges maintained in that canal.  This rising water caused hydrostatic pressure on the floodwalls to increase.  At some point the water level rose to a point where waves began to splash over the wall, which had an uneven crest height, and began the scouring process.

There is evidence in the IPET report and witness depositions that the north breach occurred as early as 0430 (4:30 AM),[63] and certainly by the 0530 to 0600 (5:30 to 6:00 AM) time frame.  This breach washed away homes in the Florida Ave. vicinity and began the flooding of the Lower Ninth Ward.  The breach occurred prior to overtopping, as a result of foundation instability, resulting from one or a combination of the following mechanisms: 1: Development of a tension crack between the canal side embankment and floodwall causing increased hydraulic pressure; 2: Lack of adequate soil support on land side toe; 3: Breaking of the transition between the old and new sheetpiling sections.

Of note at the north breach was the transition between the 1960s sheetpiling installed by the Corp of Engineers and the deeper 1980s sheetpiling installed as part of the Florida Ave. floodgate project.  A weakness at this joint is what caused the sheetpiling to detach and caused the manner of the failure.  However, it is the opinion of this investigation that the detachment of the sheetpiling was the result of the breach, and not vice-versa, meaning the loss of lateral resistance provided by the landside embankment is what caused tension to be put on the transition, which in turn caused the detachment. If the transition between the different lengths of sheetpiling had held, the north end of

---

[63] IPET Report, page IV-194.

103

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**

the north breach would have had a gradual transition between the failed floodwall to the south and the intact floodwall to the north, just as was seen at the periphery of other breaches.

As described above (see Figure 31), the formation of a "gap" between the canal side levee and the sheetpile caused added hydrostatic pressure on the wall that contributed to the formation of the breach at this location.

This water entering the north breach quickly spread to other areas of the Lower Ninth Ward, although the water flow of high enough energy to wash away houses was confined to a small area north of N. Rocheblave St.  The water entering through this breach is likely what first alerted residents of the Lower Ninth Ward to flooding in their neighborhood.

The IPET Report states:

> Eyewitness reports indicate that the water level in the 9th Ward near Florida Avenue was rising as early as 5:00 AM.[64]

ASCE's report states:

> At about 5 AM, a breach in the east bank I-wall contributed the first flow of flood waters to the Lower Ninth Ward in St. Bernard Parish.[65]

This breach, together with water flowing over the MRGO and Forty Arpent Levees, began inundating houses in the protected area.[66]

The north breach failed in a sudden and violent manner and would have produced a tremendous amount of noise, both from the breaking of concrete and twisting of steel and the rushing water and movement of houses and debris.  It is likely that the noises that witnesses reported as "booming" sounds were caused by breaking concrete, rushing waters, collapsing houses and other moving debris.  Witnesses of other breaches where concrete walls failed also reported boom sounds.

Figures 75 – 81 show the progression of the north breach.

During the early morning hours of August 29 (0400 to 0600), when the north breach occurred, the wind was blowing with a significant component from the east.  At the Lafarge Terminal, this wind would have been blowing barge ING 4727 toward the dock, and into the barge alongside.  This wind prevented the barge from moving to the north breach site.

---

[64] IPET report, Page V-11-1.
[65] ASCE report, Page 27.
[66] ILIT report, Chapter 6 Page 6.



Figure 75: Because of inadequate soil resistance, hydrostatic pressure (blue arrows) on the canal side of the floodwall causes the landside embankment to fail which allows the floodwall at the north breach site to lean in the landward direction.  This causes the crest height of the wall to become lowered and makes this area more prone to overtopping.  Note that the sheetpiling just to the north of where the breach will develop is substantially longer than the sheetpiling supporting the 1960's floodwall to the south. This additional length of sheetpiling makes the newer, 1980's wall much better able to resist lateral loading.



Figure 76: Once the land side of the levee embankment can no longer resist the increasing hydrostatic pressure from the canal side, the sheetpiling and concrete cap are pushed in the landward direction.  Because the deeper sheetpiling to the north is well embedded and holding strong, great tension is placed on the sheetpiling at the joints between the old and new floodwall segments.  It is only this tension that allows the floodwall behind the failed embankment to remain standing.



Figure 77: As more of the landside embankment fails, more tension is placed on the sheetpiling at the transition between the 1960s and the 1980s wall.  Ultimately this tension becomes too great and the shorter 1960s sheetpiling detaches from the longer 1980s sheetpiling that was keeping it upright.  After detaching, a massive torrent of water (red arrow) is released into the Lower Ninth Ward and the sheetpiling and floodwall is washed inland.

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 78: The loose end of the floodwall overturns 90 degrees in the landward direction.

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**



Figure 79: More floodwall overturns as water continues to rush through the north breach.



Figure 80: The strong current (red arrow) flowing into the Lower Ninth Ward gets under the overturned and detached sheetpiling and lifts the sheetpiling while leaving the heavy concrete panels on the ground.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 81: The detached end of the floodwall at the north breach is ultimately rotated 270 degrees from its initial upright position, leaving a helical twist in the sheetpiling.

Even as water entered the Lower Ninth Ward through the north breach, the storm surge continued to cause the waters in the IHNC to rise and the floodwalls began to be overtopped by a continuous flow of water. Overtopping would have first occurred at the portions of the wall that had subsided the most and then spread to higher portions of the wall as the canal water level rose. Continuous overtopping greatly increased the amount of scour occurring on the land side of the floodwall, removing soil from the base of the floodwall and creating a deep trench. At some point pressure from the rising waters caused the sheetpiling to lean a small distance toward the land side, creating a narrow crevasse which allowed water to infiltrate to the tip of the sheetpiling and placing a much larger hydrostatic load on the wall, and possibly facilitating more or quicker overtopping and scour. This gap also would have created a more direct path for water to seep under the sheetpiling, had permeable soil existed at the pile's tip. If water was able to permeate under the sheetpiling, it would have caused an uplift force on the overlying landside soil embankment and reduced the factor of safety with respect to sliding.

111

**C. R. CUSHING & CO., INC.**                                   **7/29/2009**

Ultimately, either through landside scour and possibly aided by sliding of the embankment due to pore water pressure increases, the floodwall at the south breach site failed in the vicinity of N. Johnson St. and released a destructive torrent of water into the Lower Ninth Ward.  The water entering through the south breach spread from the location of the sheetpiling's inward bulge and radiated out in all directions into the residential neighborhood.  The failed and blown in sheetpiling which absorbed the brunt of the deluge dragged down the other already unstable floodwall further south to N. Roman St.  The water entering from the south breach caused many objects to be overturned and oriented in the direction of the rushing flood waters, creating a record of the water's flow pattern.  The progression of the south breach is shown in Figures 82 – 84.



Figure 82: The sheetpile supported floodwall begins to move in the landward direction just south of N. Johnson St.

112



Figure 83: The sheetpiling overturns completely at the bulge near N. Johnson St, releasing a torrent of water into the Lower Ninth Ward.  Blue arrows represent vertical objects such as utility poles, trees, fence posts, etc, that were laid flat generally in the direction of the rushing water.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 84: The southern portion of the south breach fails, but the sheetpiling in this location is not displaced as far inland.  Objects directly inland of the southern portion of the breach had already been displaced by the waters that first came through the upper (northern) part of the breach and as such they are not affected by water flowing through the lower (southern) portion of the breach later on.

The south breach added to the waters already present in the Lower Ninth Ward from the north breach.  By 0800 (8:00 AM) water was observed to be several feet deep in the vicinity of Jackson Barracks.[67]   At this time, the wind was blowing from north to south. At 0814 (8:14 AM) the National Weather Service issued a report stating that there had been a breach in the IHNC Levee.  For these reasons, both IPET and ILIT conclude that the south breach occurred in the 0730 (7:30 AM) timeframe.[68]  While the exact timing of the south breach is not known, it is clear that the breach had to have occurred before the winds had a west-to-east component.

---

[67] IPET Report Volume IV.
[68] IPET Report Vol. IV and ILIT Report Chapter 6.

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

The storm surge peaked in the IHNC at 0900 (9:00 AM) and began to drop thereafter.  It was not until after this time that the winds began to back to a direction that could have carried the barge away from the Lafarge Terminal and into the canal's main channel without interference from the gantry at the Namasco facility.

It is most likely that barge ING 4727 broke free at about 0900 (9:00 AM) or shortly after, as the wind backed around to blow the barge away from its mooring.  (In any case, the wind would not have blown the barge away from the dock before 9:00 AM.)  Once the wind had carried the barge into the main channel of the IHNC, the presence of the already formed south breach caused currents in the main channel of the canal, which in combination with the wind, carried the barge toward the south breach.

The barge was traveling in the athwartship (sideways) direction when its stern crossed over the location where the now-failed floodwall had stood a few hours previously.  The stern crossed over to the land side of the fallen floodwall first and the barge continued to enter the Lower Ninth Ward as it moved south.  At the point when about two-thirds of the barge had entered the land side of the levee through the existing breach, the port side grounded on the inclined floodwall panel at the southern periphery of the breach.  As the barge slid over this panel the top part of the concrete cap was cracked off, exposing stubs of vertical rebar.  Because the panel was inclined, with the southern end being higher than the north end, the last few pieces of rebar on the southern end of the panel were bent over by the bottom of the barge passing over them.

As the barge slid toward the south end of the panel, it broke off portions of the concrete cap atop the southern end of the panel, which were higher in the water than the rest of the failed panel.  The weight of the barge pushed downward on the already failed floodwall panel, causing it to overturn the rest of the way.

As the barge continued to move south, it came into contact with the concrete cap on top of the next concrete panel.  Because this panel was less inclined than the first panel the barge had struck, the barge contacted more of the cap than just the top few inches.  As a result the panel cracked at the construction joint (i.e., the location where wet concrete was poured against already hardened concrete), which was the weakest part.  This action is depicted in Figure 87.  When this portion of the concrete cap cracked off, the rubble from the cap fell into the gap between the sheetpiling and what remained of the lower portion of the concrete floodwall.  Once the concrete was broken off, the moving barge bent the canal-side rebar over into the horizontal position as it floated across.  The sequence of the concrete floodwall panels cracking can be seen in Figures 85-89.

115

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 85: Underwater illustration of the concrete cap cracking as a result of a barge strike.

The barge continued to move south over the next panel, knocking off pieces of the concrete cap and bending over pieces of rebar until the barge temporarily came to a halt on the wall.  Because water was still flowing through the south breach into the Lower Ninth Ward, the current produced by this flow acted on the two-thirds of the barge that was already on the land side of the floodwall and caused to barge to rotate slightly, pivoting about the point where it was grounded on the floodwall.  Once the barge had been rotated by the current, it became dislodged and slid backwards into the neighborhood.  It was at this point when the scratch marks on the bottom of the barge were made by the barge moving over the bent pieces of rebar that had originally been located on the canal side face of the floodwall.  Once the bow of the barge cleared the floodwall, some of the pieces of rebar that had been bent horizontal from the weight of the barge sprung back up slightly, creating the scratch marks that wrap around the turn of the bilge on the barge's bow.

116



Figure 86: The failed floodwall at the south end of the south breach as it would have appeared before barge ING 4727 entered the Lower Ninth Ward.  Note that the panel in the foreground is inclined at a severe angle, with the crest of the wall on the left side at a higher elevation than the wall crest on the right side.  With this diagram it can be visualized that a barge moving from right to left will ground on this inclined floodwall panel at the point denoted by the green arrow, which is what happened when barge ING 4727 entered the Lower Ninth Ward from the IHNC.

117



Figure 87: The barge grounds on the floodwall panel in the foreground.  The abrasion caused by the bottom of the barge moving up the crest of the wall causes the top 6 inches of concrete to crumble, exposing the tops of the vertical rebar.  The barge is able to pass over the exposed rebar stubs on the right side of this panel without contacting them.  The rebar stubs on the left side of this panel are higher because of the wall panel being inclined from the previous failure and are therefore bent by the bottom of the barge passing over them.  As the barge moved to the left, it placed more of its weight on the inclined panel in the foreground, forcing it to rotate further downward as shown by the curved green arrow until it lay at nearly a 90 degree angle with respect to its original position in the intact floodwall.  When overturning the rest of the way, it tugged on the sheetpiling, forcing the sheetpiling to be pulled out of the adjacent concrete panel, although the sheetpile remained connected to the sheetpile within that panel.  This figure shows the configuration of the floodwall after these events occurred.



Figure 88: The barge continues to move to the south (left in this figure) and strikes the floodwall panel in the background, causing pieces of concrete from that panel located above the construction joint to break off and fall into the gap created between the concrete panel and the sheetpiling (shown by the curved green arrow).  While this concrete is being fractured, the vertical rebar that had been encased in the concrete are bent horizontally, perpendicular to the floodwall panel.  The rebar is unable to be bent in the direction the barge is traveling because the intact concrete above the construction joint prevents fractured pieces of concrete encasing the rebar to be pushed or rotated in that direction.

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 89: After the barge grinds to a halt in the southward direction, it slides off into the Lower Ninth Ward, creating the scratch marks that were visible on its bottom.   This figure shows the configuration of the wall at the southern periphery of the south breach as it was after Hurricane Katrina.

Once the barge was free from the wall, the currents entering from the canal pushed the barge sideways toward the south.   As the barge moved gently south, the stern came into contact with a home on Jourdan Ave. that lay just north of N. Roman St.   This house stopped the stern of the barge, while the bow continued to move south, rotating the barge into a more north – south alignment.   Eventually, the barge swung around and the bow contacted the homes on the south side of N. Roman St., which brought the barge to a rest.   In the course of this process, the barge rode up and over overhead wires that were dangling from a utility pole to the south along Jourdan Ave.   The barge was held in this position by the wreckage of the houses until the water drained, which left barge ING 4727 sitting on the ground at the intersection of Jourdan Ave. and N. Roman St.   As the water drained, the barge was lowered onto wires that had been under the floating barge.

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 90: The bow of the barge in its pre-Rita position adjacent to the houses that stopped it from moving further in the landward direction.  Note the wires running under the barge indicating the direction of travel of the barge (southward toward the photographer) before it grounded and the water level as the barge floated into the neighborhood (high enough to be on top of these wires, which were raised at their normal height).

When Hurricane Rita re-flooded the Lower Ninth Ward, barge ING 4727 became buoyant and slid to the starboard in a westerly direction where it fetched up against the front of a school bus.

This Page Intentionally Left Blank

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

## WITNESS ACCOUNTS

C.R. Cushing & Co., Inc. has been provided with and has reviewed deposition testimony from a number of individuals who were in the Lower Ninth Ward during Hurricane Katrina.   Appendix I provides details regarding the deposition testimony of these individuals and analysis of it.

Many witnesses that lived in the vicinity of a floodwall failure described hearing a loud boom.  This included those living in the Lower Ninth Ward as well as those who lived near the 17th Street and London Ave. drainage canal failures.  It can be concluded that these loud booms were the result of the floodwalls failing and large quantities of water rushing into the respective neighborhoods, and not an object striking a floodwall as some persons have surmised.

Of the witnesses who lived in the Lower Ninth Ward near either of the breaches, very few claim to have seen the barge.  The only witnesses that made mention of seeing the barge before being rescued were Wilson Simmons, Terry Adams, Arthur Murph, William Villavasso and Sidney Williams.

Wilson Simmons claims to have seen the barge while standing on his roof.  Depending on the time, this may be possible because of Mr. Simmon's location.  He can not verify what time he saw the barge.  He says that he saw it just floating near the southern end of the south breach, where it came to rest.

Terry Adams claims to have seen the barge break the floodwall at the south breach site.  Mr. Adams states that he was standing on his roof near the north breach at this time.  At the time he claims to have seen the barge knock the floodwall down, it was dark (before dawn) under hurricane conditions (i.e. heavy rain and wind).   The distance from Mr. Adams' home to the south breach site was over one-half mile, with many trees between his house and the south breach.  A survey conducted after the storm in ideal conditions (daylight, clear weather) shows that an unobstructed line of sight did not exist due to trees, houses and other obstructions.  Thus Mr. Adams could not have seen what he claims to have seen at night during a hurricane.

Arthur Murph lived in one of the houses just to the south of the south breach that was actually struck by the barge.  Although the timing of the first sighting of the barge is not known, the fact that he was in the attic of the house when it was struck by the barge means that it is possible that he could have seen the barge.  According to Mr. Murph, well over an hour passed between the time of the flooding and the time he first saw the barge.

William Villavasso was operating pump station OP-5 near the Florida Ave. Bridge at the time of Hurricane Katrina.  Mr. Villavasso claims to have looked out of the pump station door toward the north breach.  While doing so, he saw something lodged in the breach

123

"one to one and one-half, not more than two feet" high, and says that it looked like the tip of a barge. It is impossible that Mr. Villavasso saw the barge ING 4727 at this location, because there was no way for the barge to ever have traveled to the north breach site during Katrina. Moreover, it is geometrically impossible because the size of the object does not match the size of the barge. The barge's hull is 12 feet deep, with a 5 foot high coaming atop the hull, and fiberglass covers about 4 feet above the coaming, for a total of 21 feet from top of the barge to the bottom. If it is assumed that the barge is adjacent to the floodwall at the north breach, with the hatch covers 2 feet above the top of the intact floodwall, then the barge must extend 19 feet below the top of the floodwall. This situation is impossible, because there is at most 8 feet of space available below the crest of the floodwall. In order for the barge to have 2 feet visible above the floodwall, 11 feet of the barge must be below ground level, as the following figures show. Thus if the object that Mr. Villavasso saw protruding 2 feet above the floodwall was indeed the barge ING 4727, the barge would not have been able to strike the floodwall because it would have grounded a great distance from the wall, as shown in Figure 92.



Figure 91: Barge dimensions.

But, if the barge had indeed been adjacent to the floodwall at the north breach site (which it could not ever have been), it would have been protruding at least 13 feet above the top of the floodwall, which is not consistent with Mr. Villavasso's statements. The object described by Mr. Villavasso cannot have been the barge ING 4727. Instead, it is most likely that what Mr. Villavasso saw was the inverted sheetpiling that was pointing upward at the north breach site (see Figure 41); in any case, it certainly was not barge ING 4727.

7/29/2009



Figure 92: The barge could not have come close to the floodwall if only 2 feet was exposed above the crest of the wall.



Figure 93: If the barge was next to the floodwall, it would have protruded a minimum of 13 feet above the floodwall and not "Two feet at most."

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

Other employees at Pump Station OP-5 during Katrina did not report ever seeing anything resembling a barge at the north breach site, and Mr. Villavasso apparently never mentioned to the other employees of the pump station like Wallace Rainey and Richard Riess that he had seen something that he thought looked like a barge.

Sidney Williams is the final witness that testified that he saw the barge before being rescued.  Mr. Williams claims that he was forced to his roof by rising water.  While on his roof, he testifies:

> I heard the first bang we got on the roof.  I looked around.  That's when I seen the barge hit the wall, bounced off – the water was real rough – and it hit the wall again.

Sidney Williams Deposition 1, Page 41 Line 12-15

While Mr. Williams testifies that he saw the barge strike the floodwall during his deposition, Mr. Williams had spoken with an investigator over the telephone on an earlier date.  During this conversation, which was recorded, Mr. Williams was asked whether or not he had seen the barge; he told the investigator that he had not.  Given this change of story, Mr. Williams' testimony that he saw the barge strike the floodwall cannot be credited.

 The deposition testimony, taken as a whole, does not undermine the conclusions set forth in this report or the scientific data on which those conclusions are based.

126

**C. R. CUSHING & CO., INC.**                                                   **7/29/2009**

## COMMENTS ON PLAINTIFF'S EXPERTS

Expert reports sponsored by the plaintiffs were forwarded by the defense counsel.  This section consists of comments on some of these reports.

### Report by Robert D. Bartlett

Robert D. Bartlett, a metallurgist, submitted a report that was largely focused on the scratch marks on the bottom of the barge and the damage to the floodwall cap at the south end of the south breach.  Comments on his report can best be accomplished by commenting on each of Mr. Bartlett's conclusions.

Bartlett's Conclusion 1:

> Hydrostatic pressure alone would be insufficient to cause the fracture features and rebar deformations observed at the south end of the south breach of the IHNC 4727 east floodwall.

This statement is worded confusingly, *ING* 4727 is the barge and the floodwall along the IHNC has no 4727 suffix.  It is agreed that hydrostatic pressure could not have created the localized damage at the south end of the south breach.  This is the only damage, however, that is associated with a barge impact or contact.

Bartlett's Conclusion 2:

> The locations of the scratches on the bottom of the ING 4727 are consistent with the spacing of the exposed, bent vertical rebars at the south end of the south breach of the IHNC east floodwall.

Since the beginning, it has been the view of this investigation that the scratch marks on the bottom of the barge were consistent with the orientation of rebar within the floodwall and occurred long after the south breach occurred.

Bartlett's Conclusion 3:

> The features of the damage at the south end of the south breach of the IHNC east floodwall are indicative of damage being caused by contact from the ING 4727.

This investigation does not completely disagree with this statement, but it should be recognized that the damage was caused after the floodwall had already failed, and the damage referred to applies only to the limited local damage, which occurred when the barge passed over the already failed floodwall.

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

Bartlett's Conclusion 4:

> The cited information is compelling evidence that the damage to the south
> end of the south breach of the IHNC east floodwall was due, more likely
> than not, to an impact by the ING 4727.

Again, our investigation doesn't disagree with Mr. Bartlett as long as it is clearly
understood that this damage which Mr. Bartlett refers to is damage to the already fallen
floodwall and this localized damage had to have been created well after the initial south
breach and floodwall failure had already taken place.

Bartlett's Conclusion 5:

> The evidence demonstrating that the ING 4727 created a breach at the
> south end of the IHNC east floodwall confirms the plausibility of the
> testimony by Mr. Villavaso that he observed a barge create the initial
> damage to the north breach of the IHNC east floodwall.

In the previous conclusions, Mr. Bartlett opined that the ING 4727 caused the localized
damage at the south end of the south breach.  However, this conclusion expands that
conclusion, without any basis, to conclude that the barge caused the entire south
breach.  There is no information in Mr. Bartlett's report that can justify this conclusion.
Mr. Bartlett also takes the stance that if the barge could have been at the south breach
site, it could have been present at the north breach site.  Such a conclusion requires
one to ignore a vast amount of evidence and relies solely on the observations of Mr.
Villavasso that he saw the tip of a metallic structure.  As noted above, the object that
Mr. Villavasso reported seeing cannot have been the barge ING 4727.  Overall, nothing
in Conclusion 5 is supported in Mr. Bartlett's own report.  This investigation does not
agree with that conclusion.

128

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

## Report by Hector V. Pazos

Hector V. Pazos is a naval architect who produced a report that deals primarily with his claim that the barge ING 4727 was the cause of both the north and south breaches in the IHNC east floodwall.

### Wind Direction

Mr. Pazos has the opinion that barge ING 4727 broke free from its moorings, traveled first in a north-east direction to the site of the north breach, and then traveled south to the site of the south breach.  It is an indisputable fact that when a hurricane in the northern hemisphere travels northward and its center is east of a specific site, as Katrina did, the winds at that site would blow first from east-to-west as the storm approaches and not south-to-north as Mr. Pazos suggests. More relevant to Mr. Pazos' claim, the winds during Hurricane Katrina at the IHNC would never have had a south-to-north component given the passage of the storm to the east of the city.  This makes it *impossible* that barge ING 4727 could have been blown north from its slip before it was blown south as Mr. Pazos concluded.  Additionally, in order for the winds to blow from west-to-east (i.e. in the direction of the floodwall), the eye of the storm had to have been north of New Orleans.  At all times when the IHNC east breaches developed, the eye of Katrina was south of the city, thus the winds would have been blowing the barge toward the dock and away from the site of the breaches.



Figure 94: Diagram showing a typical hurricane wind field, with the position of the barge shown relative to the center of the storm.

Mr. Pazos even acknowledges on page 37 of his report that the eye of the hurricane passed to the east of New Orleans, and that the winds blow counter-clockwise.  Hence the winds could not have blown the barge to the north, and could not have blown it to the east until long after the eye of the hurricane passed by the city.

<u>Superpositioned and Reflected Waves</u>

Mr. Pazos theorizes that wave action would have had an effect on moving barge ING 4727.  Mr. Pazos incorrectly suggests that reflected waves would have superimposed on top of incoming waves to create exceptionally high and steep waves that could have acted on the barge.  In section O on page 40 of his report, Mr. Pazos attempts to use a reference in Hydrodynamics in Ship Design to support his theory, but selectively chooses the information he places in his report.  The actual quote[69] by Saunders reads as follows:

> A devastating combination of gale-size wind waves bucking a water current, shallow water, and reflection from man-made boundaries can produce waves of incredible steepness…

In the IHNC, there were no "gale-size wind waves" and there was no water current.  Mr. Pazos leaves this information out of his misquotation.  Production of waves of "incredible steepness" is a rare event that requires many different factors to coincide.  These factors simply were not present in the IHNC.

---

[69] Hydrodynamics in Ship Design, Vol. III Page 188 by Harold Saunders.

Mr. Pazos advances the implausible theory that westbound waves reflected off of structures on the west side of the IHNC, superimposing themselves on the westbound waves, and somehow "pushing" barge ING 4727 eastward and northward, against the wind and wind-driven waves.  The waves present in the IHNC during Katrina were caused by winds.  Wind-driven waves can achieve considerable height, but there are several requirements in order for this to happen.  The most significant requirement is that the wind must blow across a wide, open body of water.  Large waves in the ocean or the Gulf of Mexico, for example, developed because wind blew across hundreds or thousands of miles of open water.  This distance over which the waves build is called the fetch.  The longer the fetch, the more energy can be transferred by the wind to the waves, and the higher the waves will become.

The Inner Harbor Navigation Canal did not have a large fetch.  With the wind blowing from east to west, the fetch would have been approximately a quarter mile in the vicinity of the Lafarge Terminal.  This small fetch would lead to only small waves being created.

 The wind-driven waves on the morning of 29 August, 2005 followed the wind and together with the wind were pushing the barge ING 4727 against the wharf on the west side of the IHNC until the center of the storm passed the city, and long after the breaches had occurred.

While waves that superimpose on top of each other can increase the wave height if two crests meet (or conversely cancel each other out if a crest meets the trough of another wave), waves can not be amplified in this manner infinitely.  There is a limit of wave steepness beyond which a wave will collapse due to gravity's restoring force, creating a white capping effect.  The fact that white caps were seen in photos taken of the IHNC during Katrina indicates that those waves had reached their maximum possible height, and there would not be waves appreciably higher or steeper than the white capped waves captured in photographs.  (See, e.g., Figure 28).  These waves would have had insufficient energy associated with them to have any capability to propel a barge counter to the prevailing wind direction.

Further, superpositioned waves exist for only a very short period before dying out.  As the movement of the barge across the canal is something that would have required considerable time, a wave lasting a few seconds cannot have had an appreciable effect.  Also, if a reflected wave were to superposition on top of an incoming wave, the resultant wave would have very little or no forward velocity, as the opposing directions of the two component waves would cancel out each other's velocity.  This makes it impossible that superpositioned waves comprised of two component waves traveling in opposite directions could move a floating object.

Mr. Pazos' theory that reflected waves could have had an effect on the barge, and perhaps overpowered the wind and incoming waves is also fundamentally flawed.  A

131

**C. R. CUSHING & CO., INC.**                                          **7/29/2009**

reflected wave will *always* have *less* energy than an incoming wave, and thus will *never* be able to overpower an incoming wave, let alone the powerful force of the hurricane wind.  When a wave reflects off of a structure, less than 100% of the incoming wave's energy is transferred to the reflected wave, with the remainder of the energy being dissipated.  Mr. Pazos' scenario is scientifically impossible.

In a related matter, it has been mentioned before in this report that these wind-generated waves act in the same direction as the wind, thus any force that they impart to the barge would have been in the same direction as the wind, only adding to the force that prevents the barge from crossing the IHNC and reaching the east floodwall until the wind shifted later in the morning and long after the floodwall failure occurred.

Mr. Pazos further contradicts himself in the drawing he labels sketch #1, a cropping of which is shown below.  This drawing shows the waves moving southerly and the wind blowing from another direction, which is not possible.  If the wind and waves were acting in the direction Mr. Pazos shows in this drawing, the barge could not have moved from the Lafarge Terminal to the site of the north breach.



Figure 96:[70] Cropping of one of Mr. Pazos' drawings, showing waves acting in a different direction than the wind.  The wind would not be blowing in the direction shown by Mr. Pazos until approximately 1000 (10:00 AM).

The wave conditions in the IHNC were not a mystery during Hurricane Katrina.  There exist several photos that show an example of what the wave conditions were like.  These include photos taken by the IHNC Lock staff, one of which is included in this report as Figure 28.  In addition, there are photos that were taken during Hurricanes Rita and Gustav that show similar waves.

Figure 97 for instance, is a photo that was taken from the Lafarge Terminal during Hurricane Rita.  This photo shows wind driven waves moving across the IHNC under

---

[70] Note that there is no Figure 95.

wind conditions that were similar for Hurricane Katrina. Despite the waves moving toward the wharf face, there are no gigantic waves formed as reflected waves superimpose on incoming waves. This is a good indication of how the wave conditions would have been in the early morning of 29 August, 2005.



Figure 97: Looking toward the Lower Ninth Ward from the Lafarge Terminal during Hurricane Rita. This gives an idea of the wave conditions that would have been present in the IHNC during Hurricane Katrina.

<u>Barge Pitching and Heaving</u>

Another of Mr. Pazos' theories is that the steep, choppy waves in the canal caused the barge to pitch and heave, and led to the barge's bottom coming to rest on top of the wall at the south breach. While vessels certainly do pitch and heave in heavy seas, the very small wave conditions in the IHNC cannot have caused the barge ING 4727 to exhibit such behavior. Pitching and heaving is most pronounced in waves of long wavelength such as 0.75 to 1.0 times the length of the barge. The wind-generated waves would have been short and small, only a fraction of the length of the barge. The 200 foot long

133

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

barge would have ridden across many wave crests, meaning that pitching and heaving would have been minimal, unnoticeable and barely measurable, if at all.

Mr. Pazos' theory that the barge developed "a substantial heave and pitch" sufficient to lift the end of the barge and deposit it "on top of the floodwall" is erroneous in the extreme and defies the basic laws of naval architecture. Bhattacharyya[71] tells us that:

> When the effective wave length is less than half the ship's length, the pitching movement is small.

The Principles of Naval Architecture[72] similarly states that:

> Only the wave components of about ¾ ship length and above have appreciable effects on motions in head seas because the excitation in very short waves is very much reduced, even at resonance.

The pitching motion of the barge can be determined by performing tank testing or a computer seakeeping simulation. Barring these two rather elaborate methods, there are empirical methods to predict ship motions that are based on research and sound scientific principle. Bhattacharyya outlines one of these methods in his book. However, from analyzing figure 4.24 on page 70 of Bhattacharyya, coefficients for the pitching exciting moment are not even given for wave lengths less than half of the vessel length because pitching is not significant for such short wave lengths. As the waves created in the IHNC during Hurricane Katrina would have had a wave length very much less than half of barge ING 4727's 200 foot length, the pitching actions would have been miniscule, let alone sufficient to lift the barge onto the floodwall. Mr. Pazos provides no calculations or model basin tests to support his claim.

Scrape Marks on the Floodwall

On page 42 of his report, Mr. Pazos makes note of horizontal scrape marks on the flood side of the floodwall panels, and attributes those scrapes to the barge moving along the canal side of the floodwall. There are two problems with Mr. Pazos' theory. One is that those scrape marks appear at about the same elevation all along the floodwall. If the south breach happened about 90 minutes after the north breach, which Mr. Pazos theorizes, and the barge traveled from the north breach site to the south breach site in that time as the water was rising, then the scrape marks closer to the south breach should be a couple of feet higher on the wall than at the north breach. They are not, which means that Mr. Pazos' theory is wrong. The other problem with theorizing that the barge made these scrapes is that the scrapes existed prior to Hurricane Katrina. The scrape marks are visible in photos taken of the East Bank Industrial Area (EBIA) during the remediation work that was done there before Katrina. These photos show

---

[71] Bhattacharyya, R. Dynamics of Marine Vehicles, Page 71, Wiley International Publications, John Wiley & Sons, 1978.
[72] Principles of Naval Architecture, Society of Naval Architects and Marine Engineers, Vol III, Page 105, 1989.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

scratch marks, which were likely created by heavy equipment either before or during the remediation.

Further evidence that contradicts Mr. Pazos' theory about the barge scraping the canal side of the flood wall includes:

A. The height of the scratch marks at the north end of the north breach and the south breach are at the same level, whereas Mr. Pazos also believes that it took 90 minutes for the barge to go from the north breach (where it never could have been) to the south breach.  In this time, the water level would have risen significantly, but the scratch marks are level along the entire length of the floodwall.

B. Mr. Pazos proposes that the barge made scratches at the base of the floodwall at the south end of the south breach, which would require the water level to be very low, and then collide with the top of the floodwall in the same location.  This proposition is contrary to the laws of physics.



Figure 98: The EBIA remediation in progress prior to Hurricane Katrina, with scrape marks visible on the floodwall.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 99: Scrape marks on the lower portion of the floodwall at the south end of the south breach.  The object that made these marks could not have fractured the upper part of the wall.

<u>"Scraped Concrete Panels"</u>

Mr. Pazos theorizes that photos of "scraped concrete panels" included in his attachment 4 can only be explained by the abrasion of the barge scraping across the panel while the wall was still vertical like "a big machine tool (planer)" (See Pazos Report, page 43). I do not concur with Mr. Pazos' conclusion.  What these photos show is that the concrete is largely disintegrated in patterns that correspond with the corrugations in the sheetpiling.  The concrete is cracked and disintegrated where there is only thin cover on top of the sheetpiling, leaving only "fingers" of concrete within the deep corrugations intact.  This is analogous to flexing a frozen ice cube tray that has been filled to the brim.  The ice cracks where it is thin (over the tray's partitions) but the individual ice cubes remain intact.  Note that the portion of the concrete slabs that did not have the sheet piling imbedded within them did not experience this kind of damage.  Abrasion has nothing to do with this pattern of damage, and if the failed floodwall were flipped over, the same pattern would be observed on what had been the land side.



Figure 100: An aerial photo of the same concrete panels in the photo from Mr. Pazos' attachment, showing the floodwall panel with disintegrated concrete where the concrete cover was thin over the sheetpiling alternating with intact "fingers" of concrete.

Even Dr. Marino concludes that this damage was caused by flexure of the floodwall structure.  In fact, photo 4.31 in Dr. Marino's report shows the same section of floodwall that Mr. Pazos says exhibits abrasion.  Dr. Marino, correctly, attributes this damage to tensile stresses caused by flexure.

<u>Underseepage and Gapping</u>

In section R on page 43 of his report, Mr. Pazos attributes gapping to the force of the barge against the wall.  This implies that gapping is a phenomenon that is unique to floodwalls that are impacted by an object.  This is absolutely not so.  Gapping has been observed not only at the IHNC, but also elsewhere in New Orleans such as at the drainage canals, the 1985 E-99 sheetpile tests conducted by the Corps of Engineers and centrifuge testing of floodwalls.  In short, gapping is something that one would expect to occur given the forces and soils present, and an impact is not required to initiate gapping.  Mr. Pazos offers no evidence that promotes his theory that the barge created the waterside gap, and does not even consider that water pressure alone could have caused the gap.

On page 44, Mr. Pazos cites a statement from the IPET report that has to do with why the IPET investigation dismissed the possibility of underseepage at the south breach site. Mr. Pazos then states that "The above statement is based primarily on the "short duration of the storm," but it did not consider the creation of the gaps by the action of the barge." Mr. Pazos is mistaken here. IPET did consider the gap (which was NOT created by the barge); the point that IPET made was that they understood that the tip of the sheetpiling was embedded in low-permeability clay, so the presence of the gap was moot because water would have a difficult time flowing through this clay layer to reach the opposite side of the floodwall. In short, IPET felt that gap or not, the clay that the sheetpile tip was embedded in would mitigate underseepage.

"Rubber Band" Theory

On page 45-46 of his report, Mr. Pazos states his "rubber band" theory that the barge striking the south end of the south breach caused the sheetpiling to disconnect, initiating the entire breach. To make this statement, one has to ignore the debris field inside of the south breach that clearly shows that the breach initiated at the bulge at the north end, and it also requires one to ignore the fact that the sheet piling interlocks did not fail *anywhere* at the south breach. Numerous photos (e.g., Figures 42, 99, 101) show the sheetpile interlocks remained connected. This makes Mr. Pazos' rubber band theory impossible.

Besides the two reasons stated above, which by themselves disprove Mr. Pazos' rubber band theory, one must also question how Mr. Pazos theorized that the barge impacting the floodwall initiated a breach approximately 800 feet to the north. Impacting a floodwall will contain all forces and reactions locally. In fact, due to the relative fragility of the concrete monoliths of the floodwall, there is a limited amount of force that can be transferred to the sheetpiling. This fact aside, there is simply no way that the floodwall structure could transmit a traumatic impact force a long distance to what Mr. Pazos theorizes is the weakest portion of the floodwall. This is another case where Mr. Pazos ignores the evidence at hand and all scientific principle, in devising his breach theory.

Portions of the Floodwall That Did Not Fail

Section V of Mr. Pazos' report on page 47 pertains to why some portions of the IHNC east floodwall remained standing while other portions failed. According to Mr. Pazos, the most reasonable explanation is that the portions that failed are where the barge struck the floodwall and weakened the soils. This erroneous conclusion requires one to ignore evidence such as that at the London Ave. Drainage Canal. This canal had approximately 5 miles of floodwalls, of which about 1200 feet failed in two full breaches and one partial breach. This means that more than 95% of the floodwall along the London Ave. Canal survived the same loading that caused the other 5% of the wall to fail. The point of this is that the entire 5 miles of floodwall along the London Ave. Canal did not fail, as Mr. Pazos surmises they should have due to hydrostatic pressure. In

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

short, failed sections of floodwall were not subjected to different forces than surviving sections of a floodwall.  A floodwall will fail at its weakest link, as occurred at the London Ave. Canal as well as the IHNC.



Figure 101: The south end of the south breach.  The sheetpile interlocks did not fail at this location, contradicting Mr. Pazos' "rubber band theory".

Cracked Concrete Panels

On page 49, Mr. Pazos states that the cracked concrete panels at the ends of the breaches along the IHNC are evidence that they were struck by a barge, his reasoning being that other concrete panels, in locations where a barge was not a factor, do not exhibit this vertical cracking.  Like Mr. Pazos' other theories, this theory is flawed.  One flaw is that the only way that a vertical crack could be created is if part of the panel had some degree of lateral support, while the other end was located where the landside embankment had failed.  In other words, vertical cracking is indicative of being created at the time of a breach, not at sometime before the breach as Mr. Pazos theorizes.  The other reason that disproves Mr. Pazos' theory is that there were indeed vertical cracks

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

found in concrete floodwall panels at other breaches where it is undisputed that no barge was present.



Figure 102: Floodwall breach on the west side of the IHNC.  Note that there are vertical cracks in this floodwall panel, which is located at the end of the breach.

Localized Damage at the South Breach

Mr. Pazos' explanation of how the barge created the localized damage at the south end of the south breach is completely implausible.  Mr. Pazos states that the barge was sliding along the wall, when wave reflection caused the barge to leave the wall, then slam into the wall, creating the damage.  The problems with this theory are many.  First, if Mr. Pazos' theory was correct, which it isn't, the barge would tend to slide along the wall with its 200 foot length alongside the wall.  In order to create the short length of localized damage at the south breach, the barge would have to turn nearly 90 degrees.  There is simply no way for the barge to have done this in such a short distance.  The second problem with this theory is the position of the scratch marks on the bottom of the barge.  The scratch marks are concentrated toward the port side, from the bow to about 1/3 of the barge's length aft of the bow.  To explain why this makes Mr. Pazos' theory impossible, the following series of figures was prepared along with the below narrative.

Mr. Pazos theorizes that the barge impacted the floodwall when it was intact at what would become the south end of the south breach.  Mr. Pazos' theory includes the barge impacting the wall after pitching and heaving, cracking the concrete off of the uppermost portion of the wall and then coming to rest on the fracture surface of the floodwall.  This is shown in position 1 of the following figure.

140

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

Mr. Pazos theorizes that the barge then moved inland, creating the scratch marks on the bottom of the barge from the rebar embedded in the concrete floodwall.  This is shown in positions 2 and 3.  Position 3 shows approximately one-third of the barge's length on the land side of the floodwall, which corresponds to the portion of the barge that was found to have scratch marks on them created by the rebar in the floodwall.  At this point, because no scratch marks were found on the remaining two-thirds of the barge, the barge would somehow have to continue its journey into the Lower Ninth Ward without further contacting the floodwall.

However, Mr. Pazos' theory requires the barge to continue moving into the Lower Ninth Ward, which will require that scratch marks be created on the portions of the barge that were found to be undamaged.  Position 4 shows the barge halfway on the land side of the floodwall.  At this point, the barge would tend to balance like a seesaw on the floodwall.  Once slightly more of the barge entered the Lower Ninth Ward, it would rotate with the bow coming to rest on the ground surface in the Lower Ninth Ward, which is shown in position 5.  Once in this position, the rest of the barge would still have to be dragged over the damaged floodwall's exposed rebar, which would lead to the creation of scratch marks all the way to the barge's stern.

Thus, if Mr. Pazos' theory of how the barge entered the Lower Ninth Ward was true, evenly distributed scratch marks would have been found over the entire length of the barge.  In reality, scratch marks were found only on the forward most third of the barge. The only possible way for this to have occurred, as explained above, is for the barge to have entered the Lower Ninth Ward stern first and riding with the wind sideways (see Figure 57) onto the already-failed floodwall.  The trailing forward end of the barge would have dragged over the southern end of the south breach floodwall once most of the barge had already entered the Lower Ninth Ward.

Mr. Pazos also indicated that the barge was moving in all six degrees of freedom while crossing over into the Lower Ninth Ward.  If there were significant movements in all degrees of freedom, the scratch marks on the bottom of the barge would indicate this. Because the scratch marks are straight, this theory of Mr. Pazos can be discounted.

141

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**



Figure 103: Mr. Pazos' theory of how the barge passed from the IHNC into the Lower Ninth Ward.  This theory is not possible because of the orientation and extent of scratch marks found on the bottom of the barge.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

Also, if the Lower Ninth Ward had not been flooded at the time the barge entered, it would have lodged on the flood wall before entering, and would not have been able to fully enter the Lower Ninth Ward until the neighborhood was completely flooded.  There are no damage marks on the bottom to indicate that the barge grounded on the floodwall.  Rather, the scratch marks show that the barge passed cleanly over the already fallen floodwall long after the flooding in the Lower Ninth Ward began.  Similarly, no other marks appear on the barge that suggest any other sort of significant impact during Katrina.  There was, moreover, no buckling damage as would have been expected if the barge had been suspended and then tipped over Mr. Pazos' "waterfall." Furthermore, the waves in the IHNC were too short to somehow propel the barge off the rebar once it had supposedly lodged there.

On page 53, Mr. Pazos states that his theory of the formation of the south breach is the only way that accounts for the scratch marks on the barge, his reasoning being that the water would have been too high for the scratch marks to be created at a later time.  This theory ignores that the water level peaked, and that there was ample opportunity for the scratch marks on the bottom of the barge to be created later when the water receded and the localized damage at the south end of the south breach occurred.


Impact Analysis

Mr. Pazos conducted an analysis of the impact loads that contains many errors.  The first error in his analysis, outlined in attachment 5 of his report, is that the weight of the barge is incorrect.

In his analysis on wind loads on the barge, Mr. Pazos gives a detailed explanation of the boundary layer effects in place and explains how this phenomenon will cause a lower wind speed to act on the barge than the wind gauges would indicate.  In the next paragraph, Mr. Pazos completely disregards this explanation and chooses 100 mph as an arbitrary value of wind speed on the barge, even though the data from the morning of 29 August show the wind speed at a level of 10m above the ground was less, even before correcting for the boundary layer effect.  Mr. Pazos' statement that the wind velocity exceeded 100 mph is not correct for the IHNC site.

In calculating the impact forces exerted by the barge, it is important to carefully analyze the deflections of the floodwall.  Mr. Pazos did not do this.  Instead he chose an arbitrary value of 10 feet based on his interpretation of William Villavasso's testimony. 10 feet is an extremely large deformation, and would require unrealistically soft and compressible soils.  Mr. Pazos' analysis of what he thinks happens to a floodwall under impact is completely unrealistic.

143

**C. R. CUSHING & CO., INC.**                                                        **7/29/2009**

Eyewitness Testimony

Mr. Pazos places considerable emphasis on the testimony of Lower Ninth Ward witnesses.  If a witness heard a boom, Mr. Pazos attributed the boom to the barge striking the floodwall, disregarding the fact that the boom was probably not a barge striking the floodwall, given that witnesses at other breaches also heard boom noises even though no barges were present.  In this sense, Mr. Pazos misstates the testimony of the witnesses.  Most of the witnesses, such as Andrew Sartin and Kendrick Pounds, heard a boom or heard from others that they heard a boom, but never said that they believed the booming sound was a barge striking the wall.  In his summary of the witness accounts in section P of his report, Mr. Pazos states that the witnesses heard the sounds of the barge colliding with the floodwall.  This statement is false.  It is merely Mr. Pazos' speculation that the booms reported by the witnesses was the barge striking the floodwall.  To make this attribution, Mr. Pazos also had to have ignored the accounts of other witnesses throughout New Orleans that also heard booms where there were no barges.  Also, Marenthia Lagarde reported hearing a boom during the levee failure during Hurricane Betsy.  These accounts suggest that a boom does not correlate with a barge impact.

Overall, Mr. Pazos has numerous omissions from his report.  In order to produce a complete analysis of the events and reach a reasonable conclusion, it is necessary to take certain items into consideration.  The most significant omissions of Mr. Pazos include:

-Mr. Pazos' report does not have any information on actual wind data.  Wind direction is of huge importance in this matter, and a report that does not make any mention of actual wind speeds or directions is at best incomplete.  Had Mr. Pazos taken wind direction into consideration, he would have concluded that the wind would have *prevented* the barge from creating the breaches.

-Mr. Pazos has the opinion that the wave conditions in the IHNC were completely random during Hurricane Katrina.  Had Mr. Pazos applied scientific principles to the formation and propagation of waves in the IHNC, he would have concluded that the waves would have been traveling in the direction of the prevailing wind and were not coming from all directions.

-Mr. Pazos does not give any explanation about how the barge was transported from the Lafarge Terminal to the north breach.  Had Mr. Pazos taken all information into account, he would have concluded that the barge could not have reached the site of the north breach.

-Mr. Pazos' report contains a description of the scratch marks.  His survey of the scratch marks is very similar to those in Appendix H of this report.  However, Mr. Pazos does not use this information to conclude that the floodwall had to have failed before the

144

scratch marks were made on the barge.  Instead, Mr. Pazos theorizes that the barge passed over the floodwall in a longitudinal motion, a process which would have created scratch marks on the entire length of the barge.  But the fact that the scratch marks only are present on 1/3 of the barge's length, which even Mr. Pazos admits, means that his scenario is impossible.

-Mr. Pazos does not provide any explanation of how he quantified the pitching motions of the barge, or how he actually put a value on this pitching motion.  Had Mr. Pazos analyzed the effect of very short choppy waves on a 200 foot long barge, he would have concluded that the pitching of the barge would have been insignificant.

-Mr. Pazos does not have an explanation of the relationship between wind and waves. Had Mr. Pazos explicitly stated that wind-generated waves move in the same direction as the wind, he would not have concluded that wave action had a significant effect on the barge movement against the wind.

-Mr. Pazos does not mention the orientation of any debris in the Lower Ninth Ward, which does not support his theory that the south breach originated at the south end. Had Mr. Pazos carefully and accurately surveyed the orientation of the debris field, he would have concluded that the south breach originated at the northern end of the break and not the southern end.

-Mr. Pazos makes several false statements to support his theories.  These statements include the separation of the sheet pile interlock at the south breach (which did not occur) and the lack of cracking of the concrete floodwall panels at other floodwall breaches (which in fact did occur).  Had Mr. Pazos checked his facts, he would have concluded that the "rubber band theory" was wrong, and that the IHNC breaches exhibit features typical to many other floodwall failures.

-Mr. Pazos incorrectly concludes that a boom that a witness heard was the barge striking the floodwall.  Had Mr. Pazos taken into account the testimony of witnesses that lived near the drainage canals, he would have concluded that booms are indicative of a failing floodwall and that a barge does not make these sounds.

-Mr. Pazos theorizes that the reflected waves contained more energy than the incoming wind driven waves.  Mr. Pazos' theory is scientifically impossible and contrary to various physical laws.

Consequently, most of Mr. Pazos' causation theories are impossible and the author of this report does not agree with Mr. Pazos' explanation concerning the causation of the IHNC breaches.

**C. R. CUSHING & CO., INC.**                                         **7/29/2009**

**Report by Gennaro G. Marino**

Gennaro G. Marino, a geotechnical engineer, produced a report for the plaintiffs that focuses on causation issues with the IHNC east breaches.

Initial Location of Barge ING 4727

Dr. Marino's report contains numerous inaccuracies. The first major inaccuracy is in figure 2.15, which is an aerial view of the Lafarge terminal taken immediately after Hurricane Katrina. The red box representing the location of barge ING 4727 prior to breakaway is incorrect. ING 4727 was not tied outboard of the five barges to the north, but rather was tied outboard of the single barge to the south. Barge ING 4727's actual position prior to Katina would have made it much more difficult for it to exit the "pocket" of the IHNC at the Lafarge Terminal.

Wind Data

Section 3.2 of Dr. Marino's report pertains to wind speed and direction. While this information is not exactly the same as the wind data provided by Dooley SeaWeather Analysis, Inc. that was used in this report (which shows that the wind between 0530 and 0630 (5:30 to 6:30 AM) was blowing from 040° to 032°, respectively), the wind data in Dr. Marino's report nonetheless shows that it was impossible for the wind to have propelled barge ING 4727 to the IHNC east floodwall when the breaches occurred. Interestingly, after the presentation of the wind data in Dr. Marino's report, there is no further mention of wind data. Despite the wind data showing that barge ING 4727 never reached the north breach site and did not reach the south breach site until hours after the failure, Dr. Marino's conclusions do not address the fact that wind could not have carried the barge to the south breach location until several hours after the failure occurred and the wind could not have carried the barge to the north breach.

The wind data in his own report shows that Dr. Marino made the same error as was made by Mr. Pazos, namely theorizing that the barge broke away from the Lafarge Terminal, traveled to the north breach site, then to the south breach. For the same reasons as listed in the analysis of the Pazos report, this scenario is impossible. Dr. Marino's own referenced wind shows that it is impossible for the barge to be transferred by wind to the north breach site.

Likewise, Dr. Marino's referenced wind data shows that the wind was blowing parallel to the canal at all times prior to 1000 (10:00 AM). This would make it impossible for the wind to impart any velocity on the barge in the direction of the Lower Ninth Ward floodwall, thus preventing any kinetic energy to be imparted on the barge and negating the possibly of a collision, let alone one with a substantial amount of energy.

146

<u>Wave Action</u>

Like Mr. Pazos, Dr. Marino also places emphasis on wave action as a possible contributor to the barge movement.  In his report, Dr. Marino gives various accounts of wave heights in the IHNC during Hurricane Katrina.  These wave heights range from 1.3 feet as shown in a photo taken by the IHNC Lock staff, to 20 plus feet, as reported by witnesses.

The witness accounts of wave heights are based on the testimony of three witnesses. One of these witnesses was D'Antionette Johnson.  Ms. Johnson's exact testimony about wave height was:

> Well, it's like a big old wave.  I know it was tall.  I would say at least, and I am not over-exaggerating, at least 15 or 20 feet.

> D'Antionette Johnson Deposition, Page 36, Line 2-5.

Ms. Johnson goes on to say that:

> It was coming towards me.  It was coming, going toward St. Bernard Parish, Chalmette.

> D'Antionette Johnson Deposition, Page 36, Line 12-14.

While Dr. Marino theorizes that this wave was in the IHNC, it appears this is a description of the massive surge of water flowing through one of the IHNC floodwall breaches.

Another witness who Dr. Marino says reported a 5 to 8 foot wave was located at the 17th Street Canal, not the IHNC.  It is not known the specifics of this wave, such as whether it was in fact a surge associated with a breach or the witness actually thought he saw the wave in the actual canal.  Either way, this account is not useful for establishing conditions at the IHNC.

Another Lower Ninth Ward witness that Dr. Marino cites is from the IPET report.  This witness reported that water was traveling from St. Bernard Parish west toward New Orleans.  If this testimony is correct, then this would not have been water from the IHNC, as the IHNC is to the east of this location.  The water reported by this witness likely was coming from the MRGO, and as such the accounts of this witness do not prove anything with regard to wave conditions in the IHNC.

This leaves William Villavasso as the only witness who gave testimony that he saw an actual wave in the IHNC.  However, Mr. Villavasso's testimony is that the wave was moving from north to south before the north breach occurred.  Even if this wave did

exist, and there is no way it could have, it was traveling the wrong direction to carry barge ING 4727 to the north breach site.

As was stated before in this report, the IHNC was sheltered from waves that were present in open waters.  Dr. Marino fails to apply any scientific principle or calculations to determine the wave heights and instead relies solely on eye witness accounts of people on the land side of the levee in the dark during driving rain and under terrible personal and physical stress to conclude that waves of up to 20 feet were in the IHNC.

As such, the only waves present in the southern portion of the IHNC were wind driven waves.  These waves would have been no higher than about two feet due to the limited fetch in the canal.  There is absolutely no way that a wave approaching 20 feet in height could have been present in the canal.  There is ample photographic evidence, including the one taken by the IHNC Lock staff that Dr. Marino references, that show that the waves were of limited height.

Dr. Marino had previously stated that exceptional wave action was responsible for carrying the barge to the north breach site.  His updated report omits this conclusion, possibly suggesting that Dr. Marino no longer concludes that exceptional wave action had a role in the transit of barge ING 4727.

Barge Impact

Dr. Marino takes a very different stance than Mr. Pazos when it comes to the actual failure of the floodwall.  Mr. Pazos states that his belief is that the barge contacted the wall, dislodging it just enough to create a gap on the flood side.  After this occurrence, Mr. Pazos theorizes that it took some time for the actual breach to develop by means of underseepage.

Dr. Marino takes a very different opinion on this matter.  He theorizes that the barge struck the floodwall and caused the wall to overturn on the spot.  This theory appears to be largely based on the permeability study performed by Dr. Marino.  This study helped Dr. Marino reach the conclusion that the soil conditions were such that permeation of water from the IHNC under the sheetpiling was not something that was significant enough to be considered as a potential cause of the failure.  This being the case, Dr. Marino then concluded that the barge striking the floodwall is what caused it to fail.

In his previous report, Dr. Marino had begun to outline a barge impact analysis based on the IPET method.  However, this analysis was far from being complete or accurate.  No barge impact analysis at all was included in Dr. Marino's most recent report.  Without an accurate barge impact analysis, it is not known how Dr. Marino reached his conclusion that the two breaches along the IHNC were caused by the barge.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

Mr. Pazos did perform a barge impact analysis.  The conclusions of this analysis are not explicitly stated in his report.  However, the fact that Mr. Pazos has the wall displaced a small distance in the landward direction following impact – just enough to create a narrow, water-filled gap – indicates that Mr. Pazos does not believe that a barge impact would cause the floodwall to overturn.  Thus, Mr. Pazos did perform a barge impact analysis, the results of which apparently showed that a barge impact would not overturn the sheetpiling.  This presumably led to Mr. Pazos' postulation that underseepage then caused the floodwall failure once the gap occurred, despite not being a geotechnical engineer and not performing a seepage analysis.  This contrasts with Dr. Marino, who did perform a seepage analysis, the results of which showed that water would not have flowed under the sheetpiling in a manner that would come close to causing a failure. Presumably, this led to Dr. Marino's postulation that the floodwall failure must have therefore been caused by a barge strike, despite not being an expert on barges and not having carried out a complete barge impact analysis.

By not performing any calculations of the expected loads created when a barge strikes a floodwall, Dr. Marino overlooks a significant fact; that a barge striking a floodwall will just crack the concrete cap and not pull down the sheetpile.  This has been confirmed both by calculations that were prepared by C.R. Cushing & Co., Inc. staff and by observing other floodwalls that were struck by barges.  Two figures contained in Dr. Marino's report, 4.1 and 4.3, show an "Impact Load" acting on the top of the concrete floodwall, which causes the floodwall to overturn.  The scenario shown in these figures is impossible.  As calculations show and evidence of other barge impacts prove, a barge or any other object impacting a concrete floodwall will cause the concrete that receives the impact load to crack before the load will cause the entire sheetpiling to overturn or be uprooted (exhumed).  This is analogous to a book placed on a table.  No matter how much force one exerts on the book, the table will not slide across the floor; the book will simply slide across the surface of the table.

149

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 104: Causing the IHNC floodwall to overturn by applying an impact load to the top of the concrete cap is like pushing a table across the floor by pushing on a book that is lying on the surface of the table.  Both of these scenarios are impossible.

Even though Dr. Marino did not perform any calculations that support his theory that the barge impact caused the floodwall to overturn, by acknowledging that the barge caused the top of the concrete floodwall at the south end of the south breach to be sheared off, Dr. Marino acknowledges that the concrete floodwall cap will not accept large impact loads and transmit them to the underlying sheetpile.  Clearly, even neglecting that the concrete cap will not transmit an impact load to the sheetpile, there is no way that a barge impact could have dislodged the sheetpiling as was observed.  Pushing this enormous mass of earth inland would require so much force and energy that there is no way that a barge could have caused the failure that was observed.  An object impacting the floodwall at the location of the bulge in the sheetpiling at the north end of the south breach would be like a bulldozer with a 400 foot wide blade attempting to push a mound of earth forward.  The resistance provided by the 400 linear feet of earthen embankment would be far too great for any bulldozer to overcome, just as a barge would be unable to overcome the resistance of such an embankment.  Also, the enormous force required to displace the landside embankment would have caused readily apparent damage to the barge; none was observed.



Figure 105: In reality, an impact load applied to the top of the IHNC floodwall will cause the concrete to crack and prevent the floodwall from overturning or being exhumed, just like the book sliding across the surface of a table will prevent the force applied to the book from causing the table to slide across the floor.

What is more, Dr. Marino's figures 4.1 and 4.3 show that the impact load exerted on the top of the floodwall causes the floodwall to rotate in the landward direction, then the floodwall becomes vertical again after traveling some distance inland.  There is no way that a force applied to the top of the floodwall would be able cause the floodwall to move in the manner shown by Dr. Marino.  There is no explanation of the forces that helped the floodwall re-acquire a vertical orientation after moving inland provided in Dr. Marino's report.



Figure 106: Figure 4.3 from Dr. Marino's report.  In this figure, the floodwall is shown first overturning as a result of being impacted, then the floodwall re-attains a vertical position once it travels a distance inland.  Dr. Marino does not explain how the floodwall manages to right itself.

151

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

Thus, it is without a doubt impossible that the barge could have caused the failure that was observed at the south breach as Dr. Marino theorizes it did.  Even if the barge had been present at the floodwall when the breach occurred, the strong inrush of water into the Lower Ninth Ward would have caused the barge to be "blasted" deep into the Lower Ninth Ward; there is no evidence that this happened.  Therefore, it can be concluded that the barge could not have caused the south breach, the barge could not have been present when the south breach occurred, and that Dr. Marino is incorrect in his theories regarding the causation of the south breach.

Creation of the South Breach

Section 4.2 of Dr. Marino's report contains photos of the south breach and attempts to use these photos to establish a chronology of the failure at this site.  Dr. Marino claims that photo 4.14 in his report is the earliest available photo of the south breach.  Dr. Marino's justification of why this is the earliest photo of the south breach is because the water was still flowing into the Lower Ninth Ward and it had not yet reached the top of the school bus.  However, a closer examination of this photo reveals the emergency levee repairs placed by the US Army Corp of Engineers after Katrina as well as the stone ramp running toward the canal that was used to unload the material for the breach closure from barges.  This emergency closure was placed over the breach in the weeks after Katrina and was breached during Hurricane Rita in late September, which is what the photo shows.  Despite the caption in the IPET report, photo 4.14 was taken during Hurricane Rita, not Katrina, and as such is of no use trying to establish a timeline for the breach.  (Note how photo 4.15 in Dr. Marino's report does not show the emergency repair berm.  This is because photo 4.15 was taken the day after Katrina, and the repairs had not yet been made.  Photos 4.21 and 4.22 do show the emergency repair, as those two photos were taken during Rita.)

152



Figure 14-23. During Katrina; View to East Side of IHNC South of GIWW. Breach began approximately
            300 ft north of Claiborne Ave.

Figure 107: Photo and caption taken from IPET report, Volume V, Appendix 14.  Dr. Marino places the same photo in his report as photo 4.14.  Despite what IPET's caption says, this photo was taken during Hurricane Rita.  Note the presence of the emergency breach repair, which has been breached itself at the northern end of the breach.  This repair was only placed in this location in the weeks following Katrina.

On page 4-55, Dr. Marino attempts to explain how the barge collided with the floodwall at the south breach site.  Dr. Marino states "with sufficient southward wind and/or eastward wave action, the barge made its "second" primary collision against the wall in the southern part of the breach…"  However, as Dr. Marino's own wind direction graphics show, there was no wind that could have propelled the barge in the direction of the breach at the time that the breach occurred.  And as has been stated before, wave action was a non-issue, as the waves were generated by the wind and hence moved in the same direction as the wind.

From reading Dr. Marino's report, it appears he has formulated the theory that the south breach occurred in the following manner:

1. Barge ING 4727 strikes the floodwall near N. Johnson St. (north end of breach) with its corner.
2. The floodwall overturns, bulges and fails as a result of this concentrated impact.
3. The wall near N. Prieur St. remains standing.
4. The barge rotates and applies its side (distributed load) against the wall at the vicinity of N. Prieur St.
5. The barge then rotates 90 degrees and impacts the floodwall at the south end of the south breach, shearing off the top of the wall and creating the scratch marks on the bottom of the barge.

The problems with this scenario are many. First, there was no mechanism to carry the barge to the south breach during the 0600 to 0700 (6:00 to 7:00 AM) timeframe when the south breach allegedly occurred. Secondly, the barge would not have been able to remain in the canal in the presence of the water rushing into the Lower Ninth Ward through the initial break near N. Johnson St; it would have been driven by the floodwater far to the east. Third, the barge could not have possibly have acquired enough energy in such a short distance to be able to knock the wall down near N. Prieur St. by striking it broadside. Fourth, there is no way that the barge could have executed a 90 degree turn in such a short distance in order to shear off the top of the floodwall at the south end of the breach. Lastly, there is no damage to the barge that suggests that more than one impact could have occurred (the one impact that did occur being the scratch marks created as the barge grounded on the floodwall while entering the Lower Ninth Ward in the post 0900 (9:00 AM) timeframe).

Like Mr. Pazos, Dr. Marino places considerable reliance on witnesses. Dr. Marino does not take into account the testimony of witnesses located near the drainage canal floodwall failures that heard booms similar to those heard by Lower Ninth Ward witnesses. The testimony of these witnesses shows that what the Lower Ninth Ward witnesses heard were sounds associated with a floodwall failing and that they had nothing to do with a barge or barge impact.

<u>The Barge's Arrival In the Lower Ninth Ward</u>

When it comes to how the barge exited the IHNC and entered the Lower Ninth Ward, Dr. Marino's theory has several flaws. In paragraph 4.52, page 4-65, Dr. Marino states that the scratch marks were on the southern two-thirds of the barge as it lay in the Lower Ninth Ward, when in actuality they existed on only about one-third of the barge. Dr. Marino theorizes that the end with the scrapes had to have passed over the failed floodwall first, creating the scrape marks on the bottom. However, if this was the case, the scrape marks should have been continuous over the entire barge's length. Also, the scratch marks are concentrated on the port side of the barge. If the barge had passed

over the floodwall bow first, the scratch marks would have been concentrated on the starboard side.  As explained in this report, the end of the barge that received the scratch marks from the floodwall rebar is the last part of the barge that passed into the Lower Ninth Ward; two-thirds of the barge having crossed over to the land side of the floodwall before contacting the failed floodwall.

<u>Other Floodwall Failures</u>

Dr. Marino also examines other floodwall failure, with the apparent goal of showing how different they are from the IHNC east breaches.  One of the differences between the IHNC breaches and other breaches that Dr. Marino points out is a feature that he calls a "slough".  Dr. Marino's "slough" is nothing more than a trench created when the tip of the sheetpiling was forced in the landward direction by the water pressure while failure was occurring.  This caused soil that was in front of the sheetpile tip to be pushed in the landward direction, which in turn created a trench behind the sheetpiling.  Several other floodwall failures show this trench, such as those shown photos 4.58 and 4.59 in Dr. Marino's report.  This confirms that this feature is just a result of the void left as a deeply embedded sheetpile is pushed landward, and has nothing to do with the presence of a barge.

In summary, Dr. Marino's report contains several flaws and omissions.  The most significant of these are:

-Dr. Marino does not use the wind data he obtained in any of his conclusions.  At the very least, his report should have mentioned that the wind direction at the times he theorizes the breaches occurred on the morning of August 29, 2005 would have prevented barge ING 4727 from being carried to the site of either breech, and consequently it would have been impossible that the barge played a role in the breaches based on this fact alone.

-Dr. Marino never actually explains how the barge could have reached either of the breaches, especially after explicitly showing that the wind could not have transported the barge.

-Dr. Marino never explains how the barge could have been prevented from being washed deep into the Lower Ninth Ward if it had been present when the breaches occurred.

-Dr. Marino concludes that a barge impact could have caused the floodwall to overturn, but he provides no calculations to support this claim.  All available evidence shows that a barge impact is incapable of "exhuming" a sheetpile supported floodwall.

-Dr. Marino makes no mention of other floodwalls that were impacted by barges during Hurricane Katrina.  There were several barge strikes that occurred, none of which

155

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

resulted in a failed or "exhumed" floodwall.  However, all floodwalls that were struck by barges displayed only very localized damage to the top of the concrete with respect to impact loading.

-Dr. Marino never considers that a witness might be mistaken.  As shown in the witness accounts section above, Mr. Villavasso, on whom Dr. Marino relied heavily, could not have possibly have seen the barge at the location of the north breach.

-Dr. Marino incorrectly states that the Lower Ninth Ward breaches exhibited traits that were not seen in any other breaches.  This is not so.  Many other breaches exhibit features such as trenches ("sloughs") where the sheetpiling had been forced in the landward direction and cracked or otherwise damaged concrete floodwall monoliths.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

This Page Intentionally Left Blank

## ANALYSIS OF A HYPOTHETICAL BARGE IMPACT

Because the plaintiffs in this case have alleged that the barge caused the IHNC floodwall failure, it is fair to ask whether impact from a barge could have knocked the wall down even if an impact were to have occurred prior to failure.

In order to carry out this analysis, it is necessary to carry out the following steps:

1.  Calculate the wind load exerted on the barge ING 4727.
2.  Calculate the velocity that the barge would attain if subjected to the previously determined wind load.
3.  Calculate the amount of energy that the moving barge would transfer to the floodwall.
4.  Calculate the effects that this amount of energy will have on the floodwall under different scenarios.
5.  Determine, for each of the scenarios considered, whether the wall would be expected to overturn as a result of the impact or something else will occur.

Step 1:

In order to determine wind loads on the barge, a time had to have been selected as wind direction and velocity changed with the passage of time that morning.  For the purposes of this hypothetical analysis, the wind at 0800 (8:00 AM) was selected to be analyzed because at this time the wind had some west-to-east component acting in the direction of the floodwall and because the time needs to be before the levee failure was reported by the National Weather Service at 0814 (8:14 AM) on 29 August.  Even though there is much evidence that supports the floodwall failed earlier when the wind was blowing from the east toward the Lafarge dock, this analysis is intended to provide a worst case scenario concerning the barge impacting the floodwall.

The wind velocity at 0800 was adjusted to account for altitude.  This is necessary because all wind speeds reported by anemometers or predicted by models are located at an elevation of 10 meters (32.8 feet) above ground level.  These values have to be adjusted to the elevation of the barge's centroid.  Making this adjustment reduces the wind velocity that is used in this hypothetical analysis.

The steps used to calculate the wind load on the barge are outlined in the appendices. Three principal methods for calculating wind load were used.  It is felt that that Hughes' method, a method for calculating wind loads on vessels for a variety of different angles of incidence, produces the most reliable results.  A free floating barge acted on by wind will tend to be rotated to an angle perpendicular to the wind direction.  This is because wind acting on the barge at an angle other than 90 degrees will produce a moment that will turn the barge perpendicular to the wind, much the same way that a moment is

158

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

induced on an airfoil with an angle of attack.  The wind acting on the barge at a 90 degree angle also exerts the maximum amount of force on the barge.

The results of these calculations show that for a sustained wind speed of 58.51 knots (67.37 mph), the maximum wind load on the barge would have been 35,932 pounds when the wind acts directly on the side of the barge.

Step 2:

Appendix E uses the wind load determined for 0800 (8:00 AM) and calculates the velocity of the barge under these wind conditions.  These calculations take into account all phenomena that would affect drag on the barge and concludes that the winds at 0800 (8:00 AM) on 29 August 2005 on the Inner Harbor Navigation Canal would have imparted a velocity of 7.73 feet per second or 4.57 knots (5.27 mph) on the barge, moving sideways.

Importantly for this analysis, this calculated velocity is the maximum that the barge could have achieved in the direction of the IHNC floodwall at any time up to and including 0800 (8:00 AM) on 29 August 2005.  Therefore, a barge strike at 0800 represents the worst possible scenario with respect to the potential for damage to the floodwall.  Any time appreciably earlier will not have a wind direction that is capable of carrying the barge toward the Lower Ninth Ward floodwall on the east side of the IHNC.

Based on this calculated speed, it is possible to theoretically analyze the impact of a barge with an intact floodwall.

Step 3:

To analyze a theoretical barge strike on the floodwall along the IHNC, several assumptions have to be made.  One assumption is that the barge's corner will contact the floodwall.  This is a worst case scenario because of the concentrated loading.[73]  A special case was analyzed that assumed a line drawn perpendicular to the floodwall at the point where the barge's corner made contact with the wall will pass directly through the barge's center of gravity.  Under this assumption, 100% of the barge's energy will be transferred to the floodwall in a single impact, rather than one corner glancing off the floodwall followed by the other corner, which will distribute the barge's energy between the two impact locations.  This assumption of 100% of energy being transferred in a single impact is extremely improbable and was chosen to analyze the maximum possible energy impact and test the maximum effect that a hypothetical impact could have had.  In all likelihood, about half of the barge's total kinetic energy will be

---

[73] The IPET Report (Volume V, Appendix 17) analyzed a hypothetical barge impact using different assumptions. IPET acknowledged, however, that the assumptions used in the report did not reflect conditions as they existed in Hurricane Katrina and the report did not analyze whether the barge could have or did cause the breaches under the conditions present during the storm.

**C. R. CUSHING & CO., INC.**                              **7/29/2009**

transferred to the floodwall in a single impact, and as such this more realistic scenario will have a substantially less severe consequence to the floodwall.



Figure 108: Single, more severe but highly unrealistic impact (left) compared with a more probable but less severe case where the energy of the moving barge is transmitted to the floodwall in two impacts.

Acting under the influence of the winds occurring at 0800 (8:00 AM), the barge will attain the previously mentioned velocity of 7.73 feet per second.  If the barge traveled the same direction as the wind at this time, it would have a course of 355°.  Because the Inner Harbor Navigation Canal is oriented 15° east of north, this means the barge will be traveling on a path 10° oblique to the wall.  As such, it will only be traveling at a relative velocity of 1.342 feet per second in the direction of the wall.  The remaining velocity is directed parallel to the wall, given the wind direction at this time.  This produces an energy of 15,660 lb-ft that the floodwall will have to absorb in order to stop the barge.

Step 4:

For the purposes of this analysis, it is assumed that all deflection of the floodwall in the landward direction due to the strike will be due to the elasticity of the soil and that the floodwall itself will remain perfectly rigid.  A further assumption is that the top of the concrete floodwall panel will not crack as a result of the impact loading – that is, it assumes the entire panel would remain rigid rather than cracking at the joint between the sheetpile and the cap.  (The validity of this last assumption is discussed below; as it turns out, the concrete cap will crack off before the sheetpile fails).

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**

The calculations of the floodwall impact are outlined in Appendix F.  In summary, a barge striking the top of the concrete panel, as it would have to have done considering the water level in the canal, would tend to cause the floodwall to rotate in the landward direction about a point somewhere below the surface of the ground.  Thus the top of the wall would move in the landward direction and the bottom of the sheetpiling that would move in the direction of the canal.  The energy contained in the moving barge would have to be compared with the work required to compress the soil of the levee embankment.

As explained in Appendix F, the amount of energy absorbed by the wall depends on where the barge strikes in relation to the concrete panels comprising the floodwall.  The floodwall consists of individually poured 30 foot long concrete panels poured on top of the sheetpiling.  There is no rebar continuous between these panels and a small gap of around one inch exists between the panels.  This gap contained a rubber water stop embedded in the two adjacent panels which contributed negligible strength to the floodwall system.

For the purposes of this analysis, three different scenarios were considered for impact.  The first assumes that the corner of the barge strikes directly in the center of a concrete panel, causing the panel to be pushed backwards, which in turn drags the two adjacent panels along with it.  The second scenario is that the corner of the barge strikes the joint between two floodwall panels, causing the ends of those two floodwall panels to be pushed inland.  The third scenario is that the barge corner strikes the center of a floodwall panel and cracks the panel in half, producing a pattern of deformation similar to the second scenario except the impact is distributed over half of the distance.

The following two tables list the expected floodwall deformations and impact forces associated with the three scenarios.  Passive failure (i.e. soil shearing) would occur only after a deflection of 15.201 inches is experienced.  Refer to Appendix F to review how these figures were obtained.

| Collision Scenario: | Expected Deflection, in |
|---|---|
| 1 | 3.64 |
| 2 | 5.76 |
| 3 | 8.15 |

Table 4: Expected deflections of floodwall for different hypothetical collision scenarios.

Step 5:

The values shown in table 4 are the net distances that the crest of the floodwall will deflect inland as the result of a hypothetical pre-failure barge impact.  These values do not include any displacement that would have been present from hydrostatic pressure acting on the wall.  As explained in Appendix F, hydrostatic pressure could have

161

imparted a deflection of 8.4 inches on the floodwall. When combined with the loading due to hydrostatic pressure, collision scenario 3 could cause a portion of the levee embankment to exceed the displacement associated with passive failure, if the force acted on a part of the wall that was strong enough to resist the loads generated by the impact. While a passive failure is a necessary step in order for an impacting projectile to overturn a floodwall because the soil mass behind the floodwall must be broken up before the sheetpiling can be pulled out of the ground by a lateral force, a passive failure does not by any means indicate that an overturning failure will take place. On the contrary, in the case of collision scenario 3, the soil embankment is pushed about 1.3 inches beyond the passive failure point. In order to initiate overturning, it would be necessary to push the wall much further beyond the passive failure point. Something on the order of 10 feet beyond the passive failure point would be necessary for overturning to become a possibility. What this would mean is that if collision scenario 3 had occurred, a small portion of the embankment would be pushed permanently in the landward direction and the wall would take on a permanent lean of about an inch at this location.

Another way to test the hypothesis as to whether the barge could have caused the floodwall failure is to ask whether impact from a barge would cause the concrete cap to crack at the top rather than pulling the sheetpile out of the ground as occurred.

| Collision Scenario: | Maximum Expected Force (lb) | Maximum Expected Moment (k-ft) |
| --- | --- | --- |
| 1 | 103,290 | 542.3 |
| 2 | 65,240 | 188.3 |
| 3 | 46,100 | 66.6 |

Note: k = kilopound (kip) = 1000 lb.

Table 5: Expected force and floodwall moments created by impact loading.

With the maximum expected moments known, it can be determined whether or not a panel might crack. This is done by comparing the maximum expected moments for each scenario with the flexural strength of the reinforced concrete wall panels.

The purpose of evaluating the floodwall panel for longitudinal bending strength is to evaluate whether Scenario 1 or Scenario 3 is more realistic, that is, would the concrete panel be expected to crack in a vertical plane if impacted. Summarizing the calculations in Appendix F, it is shown that the floodwall panel has a bending strength of about 205 k-ft. This shows that Scenario 1 is not realistic because it requires the panel accept a bending moment about three times greater than its calculated capacity. Therefore, if the barge struck the floodwall and the rest of the assumptions held true, the deformation would be expected to be between 6 and 8.5 inches in the landward direction and the impact force 46,000 to 65,000 pounds.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

With these forces known, it is necessary to test the assumption that the top of the floodwall above the sheetpiling will not crack off.  This is accomplished in the bending analysis in Appendix F.  This analysis calculates the bending strength in the vertical direction of a 9-inch long segment of wall containing one piece of rebar on each face.  The result of this analysis shows that in order for the floodwall panel not to crack off above the sheetpiling, the impact would have to spread evenly over a 6'-5" long segment of wall.  This distribution of loading would not be possible if the corner of the barge struck the wall as that scenario would concentrate the impact force in a very small area, on the order of a few inches.

Therefore if a barge were to strike the concrete cap, it would fracture the concrete in one of a number of ways – e.g., by cracking the cap at the construction joint, or by punching a notch in the cap – but would not cause (and could not cause) the sheetpile to dislodge in the manner that occurred.  This manner of damage is seen at the south end of the south breach as well as at locations where other barges struck floodwalls.

A barge striking the concrete cap of the floodwall could not cause the sheetpile to fail.  The concrete panel would crack or notch, leaving the sheetpile intact.  This is analogous to trying to push a table across the floor by applying a force to a book that is laying on the table.  No matter how much force is applied to the book, the table will not move; the book will simply slide across the surface of the table.  No projectile, regardless of the amount of energy it contained, could cause the sheetpiling to be removed from the earthen embankment, just as no force could slide the table across the floor by pushing on the book.

A hypothetical barge impact would not, therefore, have caused the IHNC floodwall failure during Hurricane Katrina, even if such an impact had occurred prior to the failure.  For independent reasons discussed above, such an impact did not occur prior to the failure.   Nevertheless, the calculations presented in this section provide separate confirmation that impact from a barge, in the conditions of Hurricane Katrina, could not have caused the IHNC floodwall failures.

163

## CALCULATION OF PITCHING MOTION OF BARGE ING 4727

Mr. Pazos makes the claim that the barge in the IHNC was pitching to the extent that the barge's bow was lifted out of the water and landed on top of the floodwall. He further claims that the waves were 8 to 10 feet high, and that the draft of the barge was 2 feet 4 inches. He is wrong on three counts. First, the draft of the empty barge was 1 foot 4 inches. Second, it was impossible for the waves to be 8 to 10 feet high. This is a gross exaggeration. Third, the following calculation shows that the pitching motion of the barge would not be anywhere near enough to achieve Mr. Pazos' unbelievable assertion.

The pitching motions have been calculated for two conditions. First, for the barge in its correct draft of 1"-4" (1.33 feet) and in 2'-0" high waves. Second, the pitching motion was calculated for Mr. Pazos' allegations, i.e. a draft of 2'-4" (2.33 feet) and 10 foot waves.

The method used is R. Bhattacharyya. The results are:

| Wave Height | Pitch Angle | Vertical Bow Motion | |
|---|---|---|---|
| ft | degree | ft | in |
| 2 | -0.087 | 0.152 | 1.822 |
| 4 | -0.174 | 0.304 | 3.644 |
| 6 | -0.261 | 0.455 | 5.465 |
| 8 | -0.348 | 0.607 | 7.287 |
| 10 | -0.435 | 0.759 | 9.109 |

Table 6: Pitching motions of ING 4727 at a 1.33 foot draft.

| Wave Height | Pitch Angle | Vertical Bow Motion | |
|---|---|---|---|
| ft | degree | ft | in |
| 2 | -0.153 | 0.266 | 3.196 |
| 4 | -0.305 | 0.533 | 6.391 |
| 6 | -0.458 | 0.799 | 9.587 |
| 8 | -0.611 | 1.065 | 12.783 |
| 10 | -0.763 | 1.332 | 15.979 |

Table 7: Pitching motions of ING 4727 at a 2.33 foot draft.

The maximum vertical motion is slightly more than one foot. Under the most favorable assumptions to Mr. Pazos' theory, the actual pitching motion would be insufficient to lift the barge and place it on top of the floodwall. .

164

**C. R. CUSHING & CO., INC.**                                   *7/29/2009*

This Page Intentionally Left Blank

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

## REASONS THE BARGE DID NOT BREACH THE FLOODWALL

Certain plaintiffs have alleged that the barge ING 4727 caused one or both of the breaches in the IHNC floodwall.  Our analysis concludes that it is simply not possible that barge ING 4727 caused either breach.

This report has explained in detail the various reasons why the barge could not have and did not cause the breaches.  These conclusions are supported by the data in this report and appendices, and are corroborated by the works of others including Dooley SeaWeather Analysis, Waterway Simulation Technology, IPET, ILIT, LSU, ASCE and others.

For purposes of summary, the reasons the barge did not breach the IHNC levee are:

1.  Neither the wind nor the current flowed towards the north breach on the morning of 29 August 2005.  At all times prior to the north breach, the wind was blowing from east to west and could not have moved the barge away from the Lafarge Terminal across the canal and to the north to the site of the breach.  The same is true of the water current – it could not have brought the barge to the site of the breach.  It is impossible for the winds in Hurricane Katrina to have moved the barge north before moving it south.  Winds at the IHNC did not blow to the north until after the storm had passed New Orleans.



Figure 109: The wind direction on the morning of 29 August, 2005.  The wind could not have carried the barge to the North Breach at any time shown here.

166

2. The barge could not have moved from the Lafarge Terminal to cause the south breach because the wind was blowing from the east or had an easterly component until after the wall was already down at that location.



Figure 110: The wind direction on the morning of 29 August, 2005.  The wind could not have carried the barge to the South Breach until 0900 (9:00 AM) or later.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

3.  The water currents in the IHNC were not flowing in the direction of the south breach prior to its occurrence.



Figure 111: Currents in the IHNC before breaching occurs.  Note that the currents are very nearly zero (turquoise).

4.  There was no wave action in the IHNC that could have moved the barge across the canal from its slip at the Lafarge Terminal before the floodwall failed.



Figure 112: The small amplitude waves present in the IHNC during Katrina.  They are moving in the same direction as the wind.

168

5. The Namasco Terminal gantry shed would have trapped the barge at the southern wharf area if the barge had been loose and moved by the prevailing winds before 0900 (9:00 AM).  Also the fiberglass hatch covers of the barge, the barge itself or the gantry shed would have shown damage if the barge had transited prior to that time.  No such damage was observed, further confirming the barge did not exit the slip prior to 0900 (9:00 AM) under the prevailing wind and water conditions.



Figure 113: The wind directions at given times superimposed over an aerial photo showing the Lafarge Terminal and Namasco Gantry.

6. The south breach was sudden and catastrophic, carrying the sheetpiling hundreds of feet inland.  The deluge obliterated houses in the North Johnson St. area of the Lower Ninth Ward.  If the barge had caused the breach, it would have immediately been drawn into and propelled in an easterly direction, deep into the Lower Ninth Ward.  There is no evidence on the barge nor in the debris field that this happened.  If it had happened, the results would have been readily apparent.

169

**C. R. CUSHING & CO., INC.**                                           **7/29/2009**



Figure 114: The barge was located immediately adjacent to the floodwall after Katrina, not far inland.

7. If the barge had entered the Lower Ninth Ward toward the northern end of the southern breach, or within the center of the breached area, it would have lodged itself several blocks due east of Jourdan Ave. in the vicinity of N. Johnson St. which it did not.



Figure 115: The direction that the barge would have taken had it been present at the time the breach occurred.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

8. The position and orientation of the barge as it came to rest near N. Roman St., nestled against two homes to the east of the barge, demonstrates that it must have approached from the direction of the canal.  Thus, the barge cannot have entered the neighborhood at N. Johnson St., and then drifted back toward the canal when the Lower Ninth Ward drained.  The arrival of the barge in its final position could only have happened late in the flooding phase and not during the draining phase.



Figure 116: The barge in its post-Katrina resting place.  The homes and trees would have prevented the barge from floating from the right side of this photo to its position on the left side of the photo, which is nearer to the canal.

9. The presence, location and condition of trees, telephone pole and wires indicates the barge reached its grounding spot during the flood and not during the draining of the water from the Lower Ninth Ward.

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 117: Obstructions such as houses and trees existed on the landward side (left side in this photo) of the barge, which would have prevented the barge from reaching its position by floating toward the canal when water was draining from the 9th Ward.

10. The barge impact on the house at 1739 Jourdan Ave. indicates that it did so during very low flow into the protected side of the floodwall, meaning that the barge entered the Lower Ninth Ward late in the flooding period and not when the levee first breached.



Figure 118: The barge adjacent to a semi-standing house (1739 Jourdan Ave.), which indicated the barge did not impact the house very hard.

11. The velocity and direction of the wind at 0800 (8:00 AM), and at any time before 0800 (8:00 AM), was not sufficient to impart enough energy to the barge to cause the floodwall to fail.

12. The barge could not strike the sheetpiling with sufficient energy to cause overturning. In any event, the concrete cap on top of the wall would have cracked before the barge could have affected the anchoring of the sheetpile.

13. The damage to the concrete cap and exposed reinforcing bar provide evidence that the barge entered the Lower Ninth Ward at the south end of the south breach, well away from the location where the breach initiated.



Figure 119: The localized damage to the floodwall, proving that the concrete will crack before the sheetpiling is torn from the embankment.

14. The scratch marks on the bottom of the barge match the exposed rebar at the lower (southern) end of the south breach, proving that the barge did not enter the Lower Ninth Ward at the upper (northern) end of the south breach, where the initial failure occurred.

15. The scratch marks on the barge indicate that the barge floated into the Lower Ninth Ward when it was already flooded, well after the initial failure of the south breach.

173



Figure 120: The scratch marks on the barge indicate that 2/3 of the barge must have floated across the failed floodwall before the barge contacted the floodwall at the south end of the breach.

16. The concrete cap and rebar at the lower (southern) end of the south breach in the already failed levee had to be sitting at an angle (i.e. already failed) before the passing barge came into contact with them.



Figure 121: The position of the floodwall at the south end of the south breach compared with its orientation before being struck, showing the end closer to the photographer was originally at a lower elevation.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

17. There is no damage to the barge or the floodwall consistent with the barge causing the failure of the floodwall.

18. The fact that barge impacts do not equate with levee failures is demonstrated by the many other locations where barges came into contact with floodwalls and did not cause them to fail.   The damage seen at those locations is similar to the concrete cap damage found at the localized area near the very end of the southern breach, which had nothing to do with the failure of the wall.



Figure 122: Damage resulting from the impact of a barge with a floodwall near the Bayou Bienvenue Control Structure.  Despite the cracked concrete (similar to the local damage at the IHNC south breach), the floodwall did not fail.

19. The floodwalls failed at the IHNC, as they failed at other locations, for reasons having nothing to do with a barge.  The floodwall along the east bank of the IHNC was poorly designed and improperly maintained.  No barge impact was needed for the floodwall to fail.   For these reasons and not because of the barge, the floodwall failed.

175

20. After exhaustive analysis, neither IPET, ILIT, ASCE nor the LSU studies concluded that the barge played a role in the failure of the levee.  No experts, apart from paid experts hired by the plaintiffs in this case, have concluded that the barge played a causative role in the IHNC floodwall failure.

**C. R. CUSHING & CO., INC.**                                   **7/29/2009**

The undersigned reserves the right to amend this report in the event that new information is made available.

_____

29 July, 2009
_____

Date

_____

Charles R. Cushing, Ph.D., P.E.