# EXHIBIT 3

Report of Reda Bakeer (appendices excluded)

**Reda M. Bakeer, Ph.D., P.E.**
Consulting Engineer
4624 Pike Drive
Metairie, Louisiana 70003
Telephone: (504) 237-1062
Fax: (504) 888-4806
Email: rbakeer@hotmail.com

August 1, 2009

Chaffe McCall LLP
2300 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2300

Attention: Robert B. Fisher, Jr.

Re: LNA-Barge ING 4727 - Levee Failures during Hurricane Katrina, New Orleans

Dear Mr. Fisher:

This Report contains my findings, opinions and conclusions relative to the causes of the two breaches that occurred in the Hurricane Protection System (HPS) along the east bank of the Inner Harbor Navigation Canal (IHNC) during Hurricane Katrina on August 29, 2005. The report also addresses allegations concerning the Barge ING 4727 (Barge) which, I conclude, was not a cause of either of the two breaches. The report explains my conclusions about the causes of the breaches and why the Barge was not involved in causing either of them.

The report represents my views as a registered professional civil engineer in Louisiana specializing in geotechnical engineering (soil mechanics) and foundation design, including design of levees and floodwalls, and as a former university professor. The report does not in any way reflect those of my present employer, Ardaman and Associates, Inc. The findings, opinions and conclusions discussed in this Report are based on:

1. My 33 years of academic and professional experience in geotechnical engineering and foundation design.
2. My knowledge of geotechnical conditions in southeastern Louisiana.
3. My interaction with the U.S. Army Corps of Engineers (USACE) and other government agencies on the professional and academic levels.

1

4. My interaction with local, national and international professionals and academics.

5. My review of numerous documents pertaining to the subject area, the impact of Hurricane Katrina on the New Orleans HPS, and the USACE design documents. These documents include those listed in Appendix A.

6. My review of the results of the pre-Katrina and post-Katrina subsoil investigations (soil borings, CPT, etc.) performed by others (USACE, IPET, ILIT, etc.) at the subject site.

7. Results of the geotechnical analyses that I have personally performed on the subject IHNC floodwall. Details of these analyses are included in Appendix B. My analyses were based on available information obtained from the USACE as-built drawings and documents listed in Appendix A.

My personal qualifications, including a list of my publications and a listing of the cases in which I have testified as an expert at trial or deposition are listed in Appendix C. I am compensated at the rate of $175 per hour for my work on this project.

Four individual breaches occurred along the IHNC HPS during Hurricane Katrina at the locations shown in Figure 1. These included two breaches along the west bank of the IHNC and two breaches along the east bank. Three of these breaches occurred in earthen levees enlarged with I-walls (floodwalls) and the fourth breach occurred in an earthen levee located on the west bank of the IHNC. The focus of this report is on the two breaches that occurred along the east bank floodwall segment extending between the Florida Avenue Bridge and the North Claiborne Bridge. These two breaches will be referred to in this report as the East Bank North Breach (EBNB or "North Breach") and the East Bank South Breach (EBSB or "South Breach").

For organizational purposes, the report is divided into four individual sections:

1. A brief description of flood protection structures (specifically earthen levees and floodwalls).

2. A brief discussion of the concept of lateral earth pressure and the design and function of I-walls.

3. Causes of the IHNC east bank I-wall failures: (a) North Breach; and (b) South Breach.

   a. I conclude that the North Breach (EBNB) was caused by the lack of sufficient lateral soil support needed to resist the rising pressure from the hurricane storm water surge. The failure is attributed to: (i) a weak link at the northern end of the North Breach floodwall located at a transition joint between the original sheet pile I-wall and a newer, deeper penetrating sheet pile I-wall which was

2

constructed as part of the adjacent Florida Avenue complex; (ii) formation of a tension crack (gap or separation) along the IHNC side of the floodwall (I-wall face), allowing water to flow into the gap and increasing the water pressure on the I-wall face beyond the design value; and (iii) the lower ground surface on the landside of the I-wall, where the actual ground elevation at the time of the storm was lower than the original design; and (iv) localized scour that occurred on the landside of the floodwall due to the flow of water through a separation that occurred at the weak joint between the two adjoining I-walls.

b.  I conclude that the <u>South Breach (EBSB)</u> was caused by the lack of sufficient lateral soil support needed to resist the rising hurricane storm water surge. This is due to: (i) formation of a tension crack (gap or separation) along the IHNC side of the floodwall (I-wall face), which allowed water to flow into the gap and increased the water pressure on the I-wall face beyond the design value; (ii) storm surge water from the IHNC overtopping the wall and developing a wide and deep scour (erosion) trench along the landside of the I-wall which deprived the wall of its lateral soil support; (ii) deviations from the straight-line wall alignment that created weak points that coincide with the precise limits of the South Breach; and (iv) variations in subsoil conditions in the area of the breach that led to a lower wall top elevation.

4.  Why the Barge ING 4727 did not cause the IHNC east bank failures.

a.  I conclude that the Barge ING 4727 did not cause and could not have caused, the IHNC east bank breaches because: (i) the failure patterns at these locations are similar to the failures that occurred at other I-wall locations throughout the New Orleans HPS during Hurricane Katrina without any barge impact, including the one on the west bank of the IHNC; (ii) barge impacts occurred at several I-wall locations during Hurricane Katrina without causing them to fail; and (iii) both the EBNB and EBSB breaches have all the hallmarks of failures resulting from a uniform water pressure and none of the hallmarks of a point load impact.

b.  I further conclude that the Barge did not cause and could not have caused, the North Breach (EBNB) because: (i) the Barge could not have been present at the site of that EBNB when it occurred; (ii) there is no evidence of a Barge impact within the limits of the EBNB wall, and substantial evidence shows that the Barge did not impact the floodwall itself at that location.

c.  I further conclude that the Barge did not cause and could not have caused, the South Breach (EBSB) because (i) the damage pattern in the concrete cap at the extreme southern end of the EBSB, where the Barge made contact with the floodwall, is not consistent with the Barge having caused such a massive breach; (ii) the point of Barge contact with the I-wall is distant from the center of failure (apex) where the breach initiated and then progressed laterally under the increasing storm surge water pressure; (iii) impact between the Barge and the concrete cap and the resulting damage to the cap at its point of entry would not have caused the floodwall to fail because the breach developed in the steel sheet pile wall (curtain) interface with the embedding soils and not in the

concrete cap; (iv) in this area when the barge made its only contact with the floodwall, the I-wall was tilting (leaning) backwards at the southern end of the breach as a result of the failure occurring further north at the apex of the EBSB, indicating pre-existing failure condition at that segment of the EBSB before the arrival of the Barge; and (v) Barge impact at the extreme southern end of the breach could not have caused the loss of lateral support of the floodwall at the midpoint of the breach (apex), where the breach originated and progressed laterally into the Lower Ninth Ward.

**d.** My foregoing conclusions and the results of my analyses included in Appendix B are consistent with those of all of the other major investigations that have independently studied the causes of the IHNC breaches and have concluded that they occurred for reasons having nothing to do with the subject Barge.

## 1.0  New Orleans Flood Protection System (FPS)

This section of the report discusses the flood protection structures (more specifically earthen levees and floodwalls) and describes how they function.  A plan view of the New Orleans Flood Protection System (FPS) is shown in Figure 2.  It consists primarily of levees constructed of earthen materials (soils) for the purpose of protecting the landside (protected side) of the levee from the Mississippi River floods.  The New Orleans Hurricane Protection System (HPS) is comprised of the FPS segments designed to protect the landside against flooding by hurricane storm surge and waves from the surrounding water bodies.  Other structures used in the FPS/HPS include floodwalls (I-walls, T-walls and L-walls), floodgates, pump stations, locks, etc. As can be seen in Figure 2, the system includes federal structures designed and constructed by the U.S. Army Corps of Engineers (USACE) as well as other structures designed and constructed by local authorities (LA parishes).

Flood protection structures must be designed and built to withstand the water pressure pushing against the structure during a flood event.  An earthen levee works by using a wide, gently-sloping soil structure to achieve its necessary stability.  An "I-wall" works by using a deeply-driven steel sheet pile to develop sufficient resistance in the foundation soil below the levee/I-wall structure.  By using this foundation soil to provide resistance, the floodwall does not require the same wide footprint as an earthen levee of similar height.

## 1.1  Earthen Levees

A typical cross-section of an earthen levee is shown in Figure 3.  According to the USACE Engineering Manual (EM 1110-2-1913, Apr. 30, 2000) entitled *Engineering and Design - Design and Construction of Levees*, the term levee is commonly used to define an earthen embankment whose primary purpose is to furnish flood protection from seasonal high water and is therefore subject to water loading for periods of only a few days or weeks during the year.  It should be noted that this definition applies to levees constructed within river flood plains. However, hurricane protection levees used in the HPS experience occasional high water during hurricanes and are, therefore, subject to water loading for only a few hours throughout their design life.

Several critical elements must be considered in a levee design. While these elements may vary from project to project, it is possible to develop general, logical steps based on successful past experience that can be used as a base for assessing levee performance.  The typical levee design procedure includes the selection of a trial cross-section (crown width, side slopes and base width as well as stability berms and/or wave berms, if needed), such as that shown in Figure 3.  The next step is to check the trial cross-section for:

a. Slope stability (available resistance in the levee and its foundation soil against slide failure).  The levee side slopes should be stable and have adequate resistance against failure during construction, under normal operating water level conditions and during high water events (floods).

b. Underseepage and through seepage (water flow under and through the levee itself).  Water should not be able to flow under or through the levee at a rate that would undermine its stability.

c. Settlement (downward movement resulting in a loss of the design flood protection level).  Levee settlement with time should be minimized and/or accounted for in the design.

d. Trafficability of the levee surface.  The levee surface should resist erosion due to weathering, flooding, etc. even under extreme ambient conditions.

Analysis of levee stability considers a number of short-term and long-term conditions. Soil properties and behavior, particularly cohesive soils (clays), vary with time and drainage conditions.  Therefore, the selected trial cross-section including the underlying soils (subsoil) is checked for various short-term (undrained soil properties, Q-case) and long-term (drained soil

properties, S-case) loading conditions.  The flood case is considered a short-term loading condition since it develops over a relatively short period of time (hours to days).  In contrast, consolidation settlement of the subsoils under the levee's own weight is a long-term condition since it develops over a relatively long period of time (years or design life of the FPS/HPS structure).

In addition to external loads (traffic, floods, earthquakes, etc.), own weight of a levee is considered as a "driving" force or a potential cause of failure.  In the slope stability analysis of a given levee trial section, there is essentially an infinite number of "potential" failure surfaces that pass through the levee and the underlying foundation soils where sliding could occur.  All of these potential failure surfaces have to be examined to determine the most critical surface under all possible loading conditions.  Drained or undrained soil strength achieved through cohesion and/or friction provides the necessary "resistance" against failure along the potential failure surfaces.  The most critical surface under a given loading condition is searched for and identified in the slope stability analysis.  This critical surface should possess ample resistance against failure with a sufficient "Factor of Safety" under all possible loading and ambient conditions expected throughout the design life of the structure, including a flood event.

A "Factor of Safety" based analysis is used to evaluate whether a flood protection structure can be expected to withstand the forces exerted on it under all possible loading conditions.  There are many methods of analysis that may be employed, including (a) the Method of Planes (MOP), or the Wedge Method, used by the USACE New Orleans District (NOD), which considers a potential planar failure surface (Figure 4a); and (b) other limit equilibrium methods (Bishop, Morgenstern and Price, Spencer, Sarma, Taylor, Janbu's, etc.), which consider a potential arc, circular or noncircular failure surface (Figure 4b).  The present *Hurricane and Storm Damage Risk Reduction System Design Guideline*s developed by the USACE NOD (USACE HSDRRS-DG 2007/08) after Hurricane Katrina require that all flood protection structures be analyzed using the MOP as well as the Spencer's method.

Figure 4a shows a schematic illustration of the model considered in Method of Planes (MOP) which was used exclusively by the USACE NOD prior to Hurricane Katrina in the slope stability analyses of levees and floodwalls (I-wall, T-wall and L-wall).  The MOP method was

programmed by the USACE NOD in the computer program FS004 *Stability with Uplift* (1974), which was used as tool for the design of levees and floodwalls.  Several modifications were made to the program with the latest version V.03 introduced in October 2006.  I have personally used this program FS004 in my analyses of the IHNC breaches discussed in Appendix B.

As can be seen in Figure 4a, the planar (noncircular) failure surface in the MOP encompasses three individual soil masses,

(a) Active wedge (A-B-C),

(b) Center block (B-C-D-E) and

(c) Passive wedge (D-E-F).

The active wedge is assumed to slide downward along the inclined segment of the failure surface (A-B) and to push the center block.  The block in turn slides laterally along the horizontal segment of the failure surface (B-E) to push the passive wedge (D-E-F).  Consequently, the passive wedge slides upward along the remaining segment of the failure surface (E-F).  The horizontal "driving" force acting on the three unit system is equal to the summation of the components of the soil's own weight ($\Sigma D = D_a - D_p$) contained within the active and passive wedges. The available horizontal "resistance" is equal to the summation of the mobilized friction and cohesion ($\Sigma R = R_a + R_b + R_p$) along the length of the potential failure surface (A-B-E-F) under consideration.  Therefore, the factor of safety (F.S.) in the MOP analyses is calculated as:

F.S. $= \Sigma R / \Sigma D = (R_a + R_b + R_p) / (D_a - D_p)$

The other recognized limit equilibrium methods (Bishop, Morgenstern and Price, Spencer, Sarma, Taylor, Janbu's, etc.) consider arc, circular or noncircular potential failure surfaces.  In these methods the soil mass bounded by the potential failure surface is divided into a number of individual vertical segments or "slices", as shown in Figure 4b.  Therefore, these methods are sometimes referred to as the "methods of slices."  The "driving" forces and/or moments and the "resisting" forces and/or moments acting on each slice are calculated.  Then, the "driving" and "resisting" forces and/or moments acting on all of the slices are summed to examine the stability of the failure surface under consideration.  The Morgenstern and Price, Spencer, Sarma, Taylor and Janbu's methods for slope stability analyses involve a generalized procedure of slices that satisfies all conditions of equilibrium and involves reasonable

7

assumptions. Traditional methods, such as Bishop's modified method, do not satisfy all conditions of equilibrium, but are as accurate as methods that do, provided that they are used only for circular surfaces. Duncan (1996) has noted that all of these methods provide answers within 5 percent of each other. Computer programs such as XSTABL, UTEXAS4, Slide, Slope/W and others were developed based on these methods.

The methods of Morgenstern and Price, Spencer, Sarma and Janbu's generalized procedure of slices probably will yield reasonable estimates of the factor of safety for failure surfaces of any shape. However, because of the difficulty associated with selecting an appropriate force function for use with the Morgenstern and Price and Sarma methods, and the frequent numerical instability problems associated with Janbu's generalized procedure, those methods may not be suitable for general engineering practice. As a result, the ASCE/SCEC committee on California landslide hazard mitigation (2002) recommended the use of the Spencer method for the analyses of failure surfaces of any shape. Following Hurricane Katrina the Spencer's method was incorporated by the USACE NOD in the analyses and design of flood protection structures in the New Orleans area. Prior to Katrina, the USACE relied only on the MOP in their analyses of all flood protection structures, including the floodwall (I-wall) along the east bank of the IHNC. I have personally used this program Slope/W and the Spencer's method in my analyses of the IHNC breaches discussed in Appendix B.

In any slope stability method of analysis, the "driving" forces and/or moments are defined as those that would cause the levee or floodwall trial cross section to fail along the potential failure surface under consideration. The driving forces or moments are calculated based on the applied loads and own weight of the soils bounded by the potential circular, or noncircular, failure surface for the given loading condition and trial cross section. The "resisting" forces or moments are defined as those being mobilized in the soils along the potential failure surface. They are calculated as the summation of the soil cohesion and/or friction mobilized along the potential circular, or noncircular, failure surface. The ratio of the resisting forces or moments to the driving forces or moments is termed as the "Factor of Safety" against failure along the potential circular, or noncircular, failure surface under consideration under the given loading conditions. A factor of safety (F.S.) of about 1.0 implies incipient failure where the available resistance is about equal to the driving forces or moments. A higher factor of safety (F.S. > 1.0)

8

indicates adequate resistance or a stable potential failure surface.  Thus, in an engineering analysis of levee or floodwall stability, the factor of safety must exceed 1.0; and if the analysis yields a factor of safety lower than about 1.0, that indicates a failure condition.

Levee or floodwall designs must possess minimum acceptable safety factors for each reach (segment) of levee or floodwall for which the analysis is being made based on the applicable geotechnical data.  These analyses use soil strength, unit weight, stratification and continuity, etc. established for use in the short-term (Q-Case) and long-term (S-Case) conditions based on the results of a field and laboratory testing program for the subject reach.  Soil borings and in-situ tests are performed to determine the subsoil properties.  The design procedure determines if the levee or floodwall trial cross-section is stable and safe against failure.

The factors of safety recommended by the USACE for the MOP and Spencer slope stability analyses vary from one loading condition to another and range between 1.0 and 1.5.  The loading conditions to which a levee or floodwall and its foundation soil may be subjected and which should be considered in the analyses include:

1. End of construction (short-term)
2. Normal operating conditions (long-term)
3. Flood (short-term)
4. Sudden drawdown from full flood stage (short-term)
5. Steady seepage from full flood stage, fully developed phreatic surface (long-term)
6. Earthquake (short-term)

It should be noted that the different slope stability methods (MOP, Spencer, etc.) would yield different factors of safeties for the same problem and same potential failure surface due to the differences in their algorithms.  In addition, the different computer programs (Slope/W, UTexas4, etc.) could also yield different results for a given method or analyses (say Spencer) of the same problem due to the inherit differences in coding.  The results of the analysis are also highly dependent on how the floodwall or levee and the foundation soils are modeled in the analyses.  Therefore, it is not necessary that two independent slope stability analyses of a given problem and using the same software would necessarily yield the same factor of safety.  The IPET investigation (2006) concluded that the Spencer method yields safety factors on the order

of 7 to 15 percent higher than the MOP.  Therefore, the present USACE HSDRRS-DG (2007/08) requires that both methods be used in the analyses of flood protection structures, including I-walls.  However, it also requires that a higher factor of safety be achieved in the Spencer analysis for the same case analyzed by the MOP (say F.S. = 1.5 for Spencer and F.S. = 1.3 for MOP).

While the thrust of levee or floodwall design focuses on its stability against slides (slope stability analyses by methods such as MOP and Spencer), the levee trial cross-section must also exhibit adequate resistance for all potential failure modes.  According to the USACE, the most common causes of failure in earthen levees are overtopping, surface erosion, internal erosion (piping), and slides within the levee and/or foundation soil.  Overtopping occurs when the storm surge and waves exceed the elevation (grade) of the levee crown.  Overtopping could result from under-prediction of flood level, long-term settlement of the levee, or design error.  Surface erosion may also occur along the protected side of the levee following overtopping, as shown in Figure 14a.  In addition, floodwater and waves may erode (scour) the levee material on the flood (water) side, as shown in Figure 14b.  Even if the levee does not fail by erosion, overtopping is considered a "functional" failure as it may result in flooding of the protected side (landside) of the levee where residential, commercial, and other properties are impacted.  It should be noted that achieving an adequate factor of safety against one, or even most, of the modes of failure does not necessarily assure satisfactory performance of a levee or floodwall as the structure could fail under a different mode of failure where the factor of safety is less than one.

Typically, levees are constructed of cohesive soils (clay) which exhibit higher resistance against surface erosion due to cohesion between the individual clay particles (internal electro-chemical attraction).  Resistance against surface erosion could be enhanced by vegetation, armor, riprap, slope pavement, or revetment.  Internal erosion (water piping under or through the levee) is addressed in the selection of the dimensions of the levee cross-section and by using a low permeable material (compacted clay) for the construction of the levee.

The reported incidents of earthen levee failures during Hurricane Katrina were primarily due to overtopping and surface erosion with only few failures caused by internal erosion (through seepage).  There were no documented cases of levee failures during Hurricane Katrina

due to slides within the levee mass (local slope failure) or through the underlying foundation soil (deep-seated failure).

### 1.2  Floodwall/Levee Enlargement – I-Walls and Similar Structures

Floodwall structures are occasionally used in lieu of or in addition to earthen levees particularly in urban areas where limited space is available for construction.  According to the USACE Engineering Manual (EM 1110-2-1913, Apr. 30, 2000) entitled *Engineering and Design, Design and Construction of Levees,* a floodwall-levee enlargement is used when additional right-of-way is not available or is too expensive or if the foundation soil conditions will not permit an increase in the levee section (additional height and base width).  In general, economic justification (cost-to-benefit-ratio) of the floodwall/levee enlargement cannot be attained except in urban areas, such as the case of the New Orleans FPS/HPS.  The two types of floodwalls commonly used to raise levee grades are the I-wall and inverted T-wall shown in Figures 5 and 6, respectively.

As per the USACE Engineering Manual (EM 1110-2-1913, Apr. 30, 2000), "For stability reasons I-walls rarely exceed 7 ft. above the ground surface.  I-walls are often used in connection with levee and T-wall junctions or for protection in narrow restricted areas where the wall height is not over 8 to 10 ft., depending on soil properties and geometry."  Following Hurricane Katrina, the USACE NOD limited the exposed (stick-up) height of I-walls to 6 ft. in their initial criterion established in 2006.  This criterion was amended in the more recent HSDRRS-DG (USACE, 2007/08) to limit the height of I-walls to 4 ft.  These height limitations were established to minimize the deflection of the I-wall into the landside during flooding.  The I-wall along the east bank of the IHNC, the subject of this litigation, was designed to have a 6 ft. stick-up height.  The exposed height of the wall in 2005 during Hurricane Katrina may have exceeded the USACE limitations due to long-term ground settlement and erosion due to overtopping during Hurricane Katrina, as will be discussed.

The I-wall (floodwall), also referred to as a cantilever sheet pile wall (curtain), is an interconnected vertical structure partially embedded into an earthen levee and/or the underlying foundation soil.  The remaining height of the floodwall extends above the ground surface (or

11

levee crown) to provide the additional flood protection (exposed height).  Stability of an I-wall depends on balancing the "active" and "passive" pressures on either side of the wall.  Therefore, the I-wall relies for its stability on the embedded length of the sheet piles into the levee and foundation soil.  An I-wall is considered stable only if sufficient passive soil resistance is mobilized along its length to offer an adequate factor of safety against overturning.  The sufficient passive earth resistance needed for stability is governed by the sheet pile tip penetration depth.  The penetration depth of the sheet piles should also be adequate to control underseepage beneath the wall (through the levee and/or underlying foundation soils).  Normally the penetration depth of an I-wall required for stability is sufficient to satisfy underseepage requirements, but this should also be confirmed by detailed seepage analyses.  The post-Katrina USACE NOD criterion includes additional requirements for selecting the embedment or tip penetration of the I-wall into the underlying levee and/or foundation soils.  As per the USACE HSDRRS-DG, the required I-wall sheet pile tip penetration to assure stability should be determined using the computer program CWALSHT (USACE 2006) while assuring an adequate safety factor. I have personally used this program CWALSHT in my analyses of the IHNC breaches discussed in Appendix B.

The I-wall configuration commonly used in the New Orleans FPS/HPS is shown in Figure 5.  The two breaches along the east bank of the IHNC during Hurricane Katrina occurred in this type of I-wall.  The FPS/HPS I-wall consists of a row of interconnected individual steel sheet piles (typically Z-shaped sections) driven into the existing levee and/or into the underlying foundation soil with the remaining segment of the steel sheet pile above the ground surface capped in concrete (cap or monolith).   The concrete cap is not a point of fixity (support) for an I-wall, and does not add any lateral resistance against the forces exerted on the wall.  While the concrete cap adds to the longitudinal I-wall stiffness along the length of the floodwall, it is primarily used for aesthetics and to protect the steel sheet piles against corrosion, etc.  It also forms an additional water barrier by sealing any vertical gaps between the individual steel sheet piles. In this case, the exposed height of the wall extends from the levee top to the top of the concrete cap.  Therefore, the I-wall resistance against lateral loads, such as floodwater pressure, is governed exclusively by the depth of penetration of the sheet pile wall.

The other type of floodwalls commonly used in the New Orleans FPS/HPS is the inverted T-wall shown in Figure 6.  As per the USACE Engineering Manual (EM 1110-2-1913, Apr. 30, 2000), "Inverted T-walls are used to make floodwall levee enlargements possible when walls higher than 7 ft. are required."  The typical FPS/HPS T-wall consists of a reinforced concrete wall whose members act as wide cantilever beams in resisting hydrostatic pressures acting against the floodwall.  The horizontal segment of the inverted T-wall serves as the wall base and the vertical segment (stem) serves as a water barrier.  A vertical base key is sometimes used to increase resistance to lateral loads. However, long prestressed concrete piles or steel H-piles are commonly used for support of the New Orleans FPS/HPS T-walls.  A steel sheet pile cutoff wall may be included at the base to control underseepage and to provide protection against scour of the underlying foundation soil.  The L-wall configuration is a special case of a T-wall where the wall base extends horizontally only on one side of the stem.  L-walls were used in the New Orleans FPS/HPS in extremely tight areas and in short height levee enlargement projects.

As in the case of an earthen levee, I-walls, T-walls and L-walls should possess adequate stability to resist all forces which may act upon the structure, including flood loads.  The dimensions of the wall should satisfy the stability and seepage control criteria as presented in USACE Engineering Manual (EM 1110-2250, Sep. 29, 1989) entitled *Engineering and Design, Retaining and Flood Walls*.  While the T-wall and I-wall are both cantilever structures, a T-wall is relatively more rigid.  In addition, its stability is governed by the foundation support at its base, which is typically supported on long piles, in contrast with a required tip penetration depth as in the case with an I-wall.   While no failure incidents were reported in T-walls or L-walls during Hurricane Katrina, the USACE NOD developed new design criteria for these structures in 2007/08.

Other structures used in the New Orleans FPS/HPS include flood gates, pump stations, locks, etc.  As previously noted, the focus of this report is on the two failures at the IHNC east bank I-wall breaches.   Therefore, the discussion of these other structures is beyond the scope of this document.

### 1.3   Relevance of Levees, I-Walls and T-Walls to the Performance of the New Orleans FPS/HPS

Prior to Hurricane Katrina, the 350 mile long New Orleans FPS/HPS consisted mostly of earthen levees, and segments of floodwalls (I-walls, T-walls and L-walls), flood gates, pump stations, locks, etc.  The extensive use of floodwalls and flood gates in the FPS/HPS was necessitated by the urban character of the New Orleans metropolitan area.  I-walls were frequently used since they are generally less expensive to construct in comparison with T-walls (lower cost-to-benefit-ratio). Very few L-walls existed in the pre-Katrina New Orleans FPS/HPS.

On August 29, 2005 the New Orleans FPS/HPS experienced over 50 breaches or failures during Hurricane Katrina, as shown in Figure 2.  More than 170 miles of levees, or about 49 percent of the FPS/HPS, were overtopped, destroyed or damaged, which resulted in flooding of many parts of the greater New Orleans area.  In particular, Hurricane Katrina overwhelmed the eastern side of the New Orleans FPS/HPS with storm surge and wave loading that exceeded the design levels.  While I did find evidence of barges which floated over floodwalls and/or rested atop floodwalls (see Figures 66 and 72), there were no documented cases and I found no evidence that a barge or any other floating vessel caused a floodwall to fail during Hurricane Katrina.  The same observation was demonstrated in 2008 when the FPS/HPS system along the IHNC was impacted by several stray barges and vessels during Hurricane Gustav without causing any significant damage or failure to these structures.

Breaches and failures in earthen levees during Katrina in 2005 were primarily due to overtopping and subsequent erosion along the backside (landside or protected side) of the levee, rather than from deep-seated stability failure (slides).  Overtopping and erosion and the subsequent flooding during Hurricane Katrina were more dramatic than anticipated due to:

- Lower or non-uniform protection design elevation (top of levee or floodwall), particularly in New Orleans East.
- Inadequate joints, transitions or connections between two different types of adjoining FPS/HPS structures (for example; a connection between an I-wall and an earthen levee).
- Encroachments on or near a flood protection structure (fences, trees, etc.).
- Use of erodable materials for levee construction and/or lack of armor protection.

The major reported foundation failures (breaches) during Hurricane Katrina occurred in I-wall structures, which were extensively used in the New Orleans FPS/HPS.  The most catastrophic I-wall failures occurred along the 17th Street Canal (one breach), London Avenue Canal (two breaches) and the IHNC (three breaches) because of their close proximity to densely populated areas.  In all of these six breaches, the FPS/HPS consisted of an earthen levee enlarged with a concrete capped I-wall.  In many other incidents overtopping of I-walls led to significant scour and erosion along the landside.  Therefore, the following section addresses the design and analysis of I-walls in more detail, with more emphasis given to the pre-Katrina I-wall along the IHNC east bank.  The present HSDRRS-DG (2007/08) criterion used by the USACE for the design of I-walls is discussed in more details in Appendix B along with the results of my analyses of the IHNC EBNB and EBSB.

T-walls did not experience severe scour or erosion on the protected side because the base of the inverted T-wall section extends out on the protected side, preventing scour from developing behind the T-wall stem (landside face) , as shown in Figure 6.  It should be noted that the T-wall shown in Figure 62 was built by the USACE to replace the failed I-wall along the east bank of the IHNC following Hurricane Katrina.  I do not discuss T-walls and L-walls any further since no failures were reported during Hurricane Katrina in any of these structures.


## 2.0  I-Wall Design and Performance

This section of the report contains a general discussion of the concepts of lateral earth pressure, earth retaining structures, and I-walls as well as the specific conditions at the locations of the IHNC east bank I-wall breaches.  As previously discussed, the FPS/HPS along the east bank of the IHNC experienced two breaches (EBNB and EBSB) during Hurricane Katrina. These two breaches are the focus of this report.  This particular segment of the IHNC FPS/HPS consisted of an earthen levee raised using a steel sheet pile wall (curtain) with a concrete cap (I-wall).  These concepts are necessary to understanding the scientific methodology that governs the analysis of why the floodwall failures occurred.

### 2.1  Vertical and Lateral Earth (Soil) Pressures

The soil supporting flood protective structures exerts both vertical and lateral pressures. The weight of the soil creates a vertical pressure that increases with depth.  The soil in front or behind the retaining structure exerts a lateral pressure which also increases with depth.  Lateral earth pressure is critical to the stability of a retaining structure and constitutes the basis used in the analyses performed using the computer program CWALSHT.

### (a)  Vertical Earth Pressure

The soil element A within a homogeneous (uniform) soil mass shown in Figure 7 is located at a depth z below the ground surface.  The soil element is an equal sided cube with a unit horizontal area ($A_h = 1$) and unit thickness (t).  If the soil mass has a unit weight ($\gamma$), then the weight of the soil column above element A is $W = \gamma \times z \times A_h$.  The total vertical earth (soil) pressure, or stress, on the element is $\sigma_v = W/A_h$, $= \gamma \times z$.  Then, the total vertical stress is equal to zero at the ground surface (z = 0) and it increases linearly with depth (triangular or hydrostatic distribution) within the homogeneous soil mass ($\gamma$ is constant).

Part of the total stress in the soil mass is supported by the groundwater entrapped within the voids between the individual soil particles, which is referred to as the pore water pressure. The neutral pore water pressure (u) is equal to the unit weight of water ($\gamma_w$) times the depth ($h_w$) below the groundwater table at which the water pressure is being calculated, or $u = \gamma_w \times h_w$. Accordingly, the effective vertical stress, or pressure, supported by the soil particles is equal to $\sigma_v' = \sigma_v - u$.  The distribution of the total vertical stress, effective vertical stress, and neutral pore water pressure within a uniform soil mass are generally triangular or hydrostatic (linear distribution).

Any external load applied at the ground surface, such as the own weight of an earthen levee, will add a vertical stress increment ($\Delta\sigma_v$) on the underlying soil mass which will decrease with depth and distance away from the applied load.  Similar to the stresses due to the soil's own weight, the additional stress increment ($\Delta\sigma_v$) due to the applied load is supported initially by an increase in the pore water pressure (pore pressure increment or $\Delta u$).  This soil condition results in the undrained strength parameters which are used in short-term analyses (Q-case).  This pore

water pressure increment dissipates gradually with time as the entrapped water flows out when the void space between the soil particles decreases under the applied pressure. Meanwhile, the applied stress increment is transferred gradually to the surrounding soil particles. Under the applied pressure, the volume of voids between the soil particles decreases with time and water is squeezed (drained) out of the soil. At the end of this process, which is known as consolidation, the pore pressure returns to its original neutral value (u) and the entire stress increment is transferred to the soil particles ($\Delta\sigma_v$'). The reduction of the void space with time increases the soil strength, but results in surface settlements. This condition is termed the S-case, where the drained soil parameters are used in long-term analyses.

It should be noted that soil strength increases with depth as the weight of the soil column on top of it increases. In laymen's terms, vertical pressure in a soil mass is like a totem pole where the top figure (ground surface) carries no load, whereas the bottom figure supports the weight of all of the figures above it.

**(b) Lateral Earth Pressure**

As shown in Figure 7, the soil element A is also subjected to an all around lateral pressure, which is referred to as the lateral earth (soil) pressure. The effective lateral pressure is calculated as $\sigma_h = k \times \sigma_v$' minus the water pressure $\gamma_w \times h_w$, where k is defined as the coefficient of lateral earth pressure of the soil (ratio of lateral pressure to vertical pressure). As can be seen in Figure 8, k depends on the type and amount of movement experienced in the soil mass where the lateral earth pressure could exist in one of the three following states:

- <u>At-Rest Earth Pressure:</u> The state of lateral stress ($\sigma_{ho}$') when no movement occurs within the soil mass and it is equal to $\sigma_{ho}$' = $k_o \times \sigma_v$' - $\gamma_w \times h_w$, where $k_o$ is the coefficient of the at-rest lateral earth pressure. This is the initial and typical condition in a soil mass (Figure 8a).

- <u>Active Earth Pressure:</u> The at-rest lateral pressure decreases when the retaining structure moves away from the soil mass until it reaches a full active value (lower bound). It is equal to $\sigma_{ha}$' = $k_a \times \sigma_v$' - $\gamma_w \times h_w$, where $k_a$ is the coefficient of active lateral earth pressure (Figure 8b). This is also the condition of stress in the active wedge previously discussed in the Method of Planes since the active wedge slides away from the soil mass behind it (Figure 4a). The active wedge forms the primary "driving" factor in this mechanism.

17

- <u>Passive Earth Pressure:</u> The at-rest lateral pressure increases when a retaining structure moves into the soil mass until it reaches a full passive value (upper bound). It is equal to $\sigma_{hp}' = k_p \times \sigma_v' - \gamma_w \times h_w$, where $k_p$ is the coefficient of passive lateral earth pressure (Figure 8c). This is also the condition of stress in the passive wedge previously discussed in the Method of Planes as the passive wedge slides into the soil mass in front of it (Figure 4a). The weight and resistance of this passive wedge are part of the soil "resistance" against failure.

It should be noted that only a relatively small movement is needed to achieve the full value of the active lateral earth pressure, whereas a relatively large movement is needed to develop the full value of the passive lateral earth pressure. The at-rest, active, and passive lateral earth pressure distributions (variation with depth) are generally nonlinear due to the variations in soil properties (heterogeneity) with depth and distance. However, most of the analytical methods, including those used by the USACE for the design of the New Orleans FPS/HPS, assume linear (hydrostatic) distributions. For slope stability analyses (MOP or Spencer), the active and passive earth pressure, wedges and coefficients discussed above are also used in the CWALSHT analyses of the I-walls to determine the required tip penetration bending moments, and deflection of the sheet pile walls.

In laymen's terms, lateral earth pressure is the soil and/or water pressure acting sideways on the face and/or back of a retaining wall. Lateral pressure can cause the wall to move, by water pushing on the I-wall face when the water level in the canal rises. The lateral soil pressure can also provide resistance against the wall movement, as is the case with the pressure exerted on the backside of the I-wall or by the foundation soil below the ground surface preventing the wall from being pushed backwards.

## 2.2  Earth Retaining Structures

Earth retaining structures are used to maintain a vertical earth slope face or support an underground excavation (cut). They are constructed above the ground surface or installed deep into the foundation soil and are used to support lateral pressures from soil and/or water. Floodwalls are a special type of retaining structures. As the name implies, the purpose of a floodwall is to retain water pressing on the face of the structure to keep it from flooding the backside (landside or protected side) of the structure without displacing or failing. The stability

of a retaining structure, including I-walls, relies on balancing active and passive lateral earth pressures on either side of the wall.  Retaining structures include, but are not limited to:

- Retaining walls (gravity, cantilever, T-walls & L-walls),
- Sheet pile walls (cofferdams, bulkheads, cantilever, tie-back, & I-walls),
- Tunnels,
- Basement walls, etc.

An earth retaining structure is designed per unit length of the structure (pressures, forces, moments, etc.) since it would typically extend over some distance (say a 1 mile long floodwall). Design of a retaining structure entails selecting a trial cross-section and checking it against sliding, overturning, bearing capacity at base, and global stability.  The factors affecting the stability and design of a retaining structure include:

1. Wall height or excavation depth (H)
2. Properties of the retained backfill and the underlying foundation soil (type, stratification, continuity, strength, unit weight, water flow and compressibility)
3. Pore water pressure
4. Effect of time on soil properties (short-term, long-term and compressibility)
5. External loads (surcharge, traffic, flood, earthquake, etc.)
6. Soil/structure interaction which depends on the soil type, wall configuration, wall material, construction conditions and operating conditions
7. Structural rigidity of the wall (rigid or flexible wall)


### 2.3  I-Wall Configuration, Design Criteria and Failure Mechanisms

a)  I-Wall Configuration

An earthen levee enlarged with a steel sheet pile I-wall capped above the ground within a concrete monolith is the type of floodwall structure that was used along the east bank of the IHNC, as shown in Figures 19, 29 and 76.  Sheet piles are relatively slender (thin) structural sections connected or semi-connected together during installation to form a continuous wall (curtain).  They are made of timber, precast concrete, plastic or steel sections which are driven or vibrated into the ground.  Sheet pile walls are used to support soil and/or water pressure as either a permanent structure (pump station walls, docks and floodwalls) or as a temporary structure

19

(excavation cofferdams and braced cuts). The IHNC east bank floodwall employed a standard Z-27 steel sheet pile section, 12 inches deep, 18 inches wide and 0.375 inch thick.

The steel sheet pile Z-section shown in Figure 9 is commonly used in the New Orleans FPS/HPS floodwalls. Z-sections are made of thin cold-rolled steel sheets that are folded into a Z shape to enhance their cross sectional stiffness. When several Z-sections are connected together at their edges (interlocks) to form a continuous wall or curtain, they become like a paper sheet being folded repeatedly into an "accordion". A single paper sheet could be easily bent or wrinkled, but it takes more effort to bend or wrinkle the folded accordion made of the same sheet of paper. In more scientific terms, folding the steel sheet, or the paper sheet, increases its cross sectional stiffness by increasing its moment of inertia (a measure of stiffness or rigidity). As shown in Figure 9b, the wider (19.69 inches) and thicker (0.4 inch) PS-27.5 straight section (single paper sheet) has only a moment of inertia of 5.3 in$^4$/ft. in comparison with the PZ-27 section (folded paper accordion) which has a moment of inertia of 184.2 in$^4$/ft. Notice that the sectional properties shown in Figure 9b are given per linear ft., forms the basis for design of sheet pile walls (ft. of wall).

The "folded" steel sheet piles are relatively light which makes them easier to lift and transport, as shown in Figure 9a. Also, they are capable of penetrating deeper into the soil with less energy (impact, pressure or vibration) without significantly disturbing the surrounding soils in contrast to a solid pile section. This is similar in concept to the ease of cutting a butter stick with the thin blade of a sharp knife versus pushing the butt of the knife into the same stick of butter. The standard properties and geometry of the various Z and S (straight) sheet pile sections are shown in Figure 9b.

A sheet pile I-wall is modeled structurally as a cantilever (refer to Figures 10, 11 and 12). A cantilever is a structural member with one end being free to move (the top of I-wall above the ground) and the other end driven into the ground being restrained (fixed) against movement and rotation in all directions by the surrounding soils, as shown in Figure 11b. Stability of an I-wall and its ability to sustain loads depend on its depth of penetration into the embedding soil. As shown in Figure 9a, the cantilever I-wall could be thought of as a nail (sheet pile) being driven into a wood board (embedding soil). The deeper the nail (I-wall) is driven into the wood

(embedding soil), the harder it becomes to pull it out or bend it.  In more scientific terms, the deeper penetration into the wood (soil) increases the "fixation or fixity" of the nail (I-wall). Accordingly, a nail driven deeper into wood is capable of supporting a higher load (say a heavier picture frame if the board is a vertical wall).  In the case of an I-wall, the deeper penetration of the steel sheet pile into the ground increases its ability to support lateral loads, such as soil pressure, water pressure and wave forces.  Conversely, inadequate penetration or loss of the supporting soil could lead to wall instability or even failure, as was the case in the IHNC east bank breaches.

The earth pressures exerted on a sheet pile wall are illustrated in Figures 10, 11 and 12. The design of a sheet pile wall assumes that the wall would yield sufficiently, without failing, under the exerted lateral earth and/or water pressure and that it would rotate about a point along its penetration depth.  As illustrated in Figures 10, 11 and 12, the applied loads (soil, water, surcharge, etc.) cause sufficient movement in the wall to develop active earth pressure along the length of the sheet pile wall.  The lateral pressure on the wall increases with the additional pressure from water as the water level in the canal rises during a storm, as shown in Figure 12. Under the active pressure, the wall rotates and displaces into the soil on the opposite side to develop a passive earth pressure in the subsoil along the wall length, as shown in Figure 10.

The net pressures on both sides of the I-wall should at least equate (balance) so that it remains stable against toppling over as the water level in the canal rises (factor of safety of at least greater than 1.0).  Meanwhile, sufficient factors of safety (F.S.) should be assured in the design (more mobilized resistance than the anticipated driving forces and/or moments under all possible loading conditions) to account for the uncertainties associated with the storm as well as the possible variations in the subsoil conditions along the entire length of the floodwall.  In other words, the factors of safety account for the possibility of a higher surge level and wave loading. They also account for the possibility of the presence of weaker subsoils or different ground elevations from those assumed in the floodwall design.

For convenience, the stability calculations combine the individual earth pressure distributions into "net" pressure distributions shown in Figures 10, 11 and 12 as follows:

*Net Active Pressure* = *retained side active soil pressure - dredge side passive soil pressure + net water pressure (+ pressure due to retained side surcharge) (- pressure due to dredge side surcharge)*

*Net Passive Pressure* = *retained side passive soil pressure - dredge side active soil pressure + net water pressure (+ pressure due to retained side surcharge) (- pressure due to dredge side surcharge)*

In these definitions of net earth pressure distributions, positive pressures tend to move the wall toward the dredge (water) side.  Typical net pressure diagrams on a cantilever sheet pile wall are illustrated in Figures 10 and 11a.  Design of the I-walls, including those along the east bank of the IHNC, followed the procedure outlined above for obtaining design net lateral pressure diagrams.  However, the ground surface behind a typical I-wall does not extend to the top of the wall as in the case of the typical cantilever wall shown in Figures 10 and 11. Therefore, while the earth pressure diagrams utilized in the I-wall design are developed using the same exact principles, they will vary slightly from those shown in Figures 10 and 11.  Typical net earth pressure diagrams taken for USACE design drawings of I-walls are shown in Figures 12 and 22.

Insufficient sheet pile wall tip penetration, soil loss (settlement, erosion or scour) on the landside, or higher grade on the flood side would all result in insufficient lateral resistance and possibly an unstable wall.  This was the case in the many I-walls that failed during Hurricane Katrina, as will be discussed.  Insufficient or loss of penetration depth due to lower ground surface was critical to the observed failures of both the IHNC east bank North Breach and IHNC east bank South Breach.

b)  USACE NOD I-Wall Design Criteria

Prior to Hurricane Katrina, sheet pile walls (I-walls throughout the New Orleans FPS/HPS) were frequently driven through the top of earthen levees to provide additional protection height in lieu of a levee enlargement.  For this case and as in the case of any new, replacement, or enlargement FPS/HPS project, a sufficient number of soil borings as well as field and laboratory testing are performed along the project alignment to determine the properties of the existing levee material and the underlying foundation soils.  For an existing earthen levee,

some improvement is expected to have occurred in the subsoils under the weight of the levee in the form of gain in strength with time (transition from an undrained to drained condition, as previously discussed).  This subsoil improvement does not extend beyond the levee toe where weaker subsoil conditions would typically exist on either side outside the levee toes.  Therefore, the soil investigation should include soil borings made along the centerline, landside toe and flood side toe of the existing levee.  In view of the length of a typical FPS/HPS structure, several borings are typically made at several locations (stations) established along its alignment.  As per the USACE NOD design guidelines (HSDRRS-DG 2007/08), centerline and toe borings should be spaced at no more than 500 ft. on centers.  Two types of borings are typically performed by the USACE.

Two types of borings are commonly specified by the USACE.  These are the 5 inch diameter undisturbed (U) soil borings and the 3 inch diameter general (G) borings.  The U borings provide higher quality soil samples with minimum disturbance and, therefore, more weight is given to their test results in the USACE designs.  Soils are continuously sampled in the U borings using a piston sampler to minimize disturbance in the recovered soil cores.  Meanwhile, the G borings are commonly used by the industry as they are more cost effective.  The results of the G borings are only used by the USACE for non critical structures (borrow pits, excavations, inspections, instrumentation installation, etc.).  They are also used to confirm the continuity of the soil strata between widely spaced U borings.  However, a smaller weight is given by the USACE in their designs to the laboratory test results obtained from the G borings due to their lesser quality and the small size of the recovered cores.

The post-Katrina USACE FPS/HPS projects incorporate the results of field (in-situ) tests in their designs.  The Cone Penetrometer Test (CPT) was selected as their present standard test.  It yields a continuous trace with depth of the subsoil stratification and the variations in the soil undrained shear strength and pore water pressure, but it does not produce soil samples for laboratory testing.  Other in-situ tests such as the Vane Shear Tests (VST) and Pressuremeter Test (PMT) could also be used to determine the variations in the undrained shear strength of the soils with depth.  However, they are not commonly used by the USACE in their FPS/HPS projects.  This is due to the wide variations in their results as well as their limited availability and the lack of experience with their use in Louisiana.  It should be noted that the CPT has been used

23

by the Louisiana Department of Transportation and Development (La DOTD), which oversees the La Levee Boards, since the 1980s and became a required standard test in all of their projects in the 1990s.  If the VST or PMT were to be used in any analyses, some adjustments and corrections will have to be applied to their results to be compatible with the laboratory test results.

The soil strength, unit weight (density), stratification and continuity, etc. of the subsoil under the levee and beyond its toes are then established for short-term and long-term analyses and water flow characteristics (seepage) based on the results of field exploration and laboratory testing.  For a typical FPS/HPS project, the laboratory testing would include natural moisture content ($W_c$), soil classification (grain size and Atterberg Limits), consolidation and shear strength tests.  The soil density is obtained from the shear tests.  The Atterberg Limits (AL) include the Liquid Limit (LL) and Plastic Limit (PL) which should correlate well with the natural moisture content and grain size data.  The shear strength tests include short-term (quick or Q tests) and long-term (slow or S tests).  The most common tests are unconsolidated undrained triaxial tests (UU) which are performed under varying lateral confining pressure and vertical load.  They are typically performed on samples obtained from undisturbed (U) borings. Unconfined compressions tests (UC or UCT) are performed on samples obtained from U or general (G) borings.  In the UC test, the samples are tested by applying an increasing vertical compression load but with no lateral confinement.  Therefore, less emphasis (weight) is given in the analyses to the UC test results.  Occasionally, direct simple shear (DSS) or consolidated undrained triaxial tests (R-tests) are performed. Results of the soil tests should be examined and cross-referenced to determine their consistency and validity.  In other words, the soil properties obtained from soil samples at a given depth should be consistent when cross-referenced together. For example, a soil with higher natural water content should be cohesive or organic with a high LL.  Similarly, a stiffer (stronger) soil should have higher density and lower water content than a weaker soil of the same composition.

Subsoil geological profiles are developed to indicate the soil stratification, types and properties, such as that shown in Figure 20.   These geological profiles are based on the results of the field and laboratory testing.  This data is also used to develop soil strength diagrams under the levee centerline and outside the levee toes, such as those shown in Figure 23, and the wet

density diagrams within each reach of the FPS/HPS project. It should be noted that these diagrams are not simply based on the mathematical average of the various tests results. A specific logic is typically followed in the process, which include some objective engineering judgment. For example, the selected strength profile should correlate well with the past stress history at that location. For the New Orleans area, the shear strength profile in normally consolidated soils (NCC) would typically plot around $0.23\sigma'_v$ line, where $\sigma'_v$ is the effective overburden pressure at that location. Objective judgment should be used to identify outlier lab or field data points from actual low strength data indicating a soft soil stratum. More emphasis (weight) is given to triaxial test (UU) results and to undisturbed boring (U) samples than unconfined compression test (UC) results and general boring (G) samples. Appropriate correction factors should be applied to the results of field tests (SPT, CPT, VST, etc.) if they are to be included in a comparison with the laboratory tests. Ignoring some low values will yield wrong strength diagrams and poor designs. It should be noted that failure of the I-wall along the 17th Street Canal was attributed to the presence of a weak soil stratum which was not considered in the shear strength diagram used in its design. In addition, no borings or field tests were performed outside the toes of the levee along the 17th Street Canal. As previously discussed, at any given location the undrained shear strength profile under the levee will typically indicate higher soil strength values than the undrained shear strength profile outside the levee toes.

This information is used to determine the sheet pile tip penetration needed to withstand the forces exerted on the structure under the various design loading conditions. The sheet pile wall tip penetration should also be sufficient to control water seepage beneath the structure, which could undermine its stability. If unsafe seepage forces, or inadequate embankment stability resulting from higher heads, exist, seepage control methods or methods of improving embankment stability may have to be used. Thus, the enlarged levee with an I-wall should be checked for through seepage, underseepage and for embankment and foundation stability under the additional hydrostatic forces acting on the higher floodwall. The designed structure should have sufficient safety factors against failure against all of these possible modes of failures.

The existing ground surface elevations on either side of the floodwall are also established through geodetic surveys performed at discrete locations (stations are typically spaced at 100 ft., unless specific conditions are encountered in between) along the length of the proposed

floodwall.  These elevations are used to develop a trial cross section of the levee enlargement (floodwall) project.  In addition, the necessary parameters needed for design of the wall (water levels, storm surge, wave loads, surcharge, etc.) are selected based on a "design" storm.  The 50, 100 or 500-year design storm and loads are determined from hydraulic studies and metrological information using numerical, statistical and probabilistic models.

It should be noted that the elevations established during the original floodwall design could possibly change with time due to ground settlement, erosion, scour, human activities, etc. In particular, a lower ground surface on the landside or a higher ground surface on the flood side could compromise the stability of a floodwall.  Consolidation settlements occur naturally with time in the clay and marsh soil strata under the weight of the existing levee and other nearby structures.  Regional areal consolidation settlements would also develop on the landside due to lowering of the groundwater level due to pumping of groundwater into the drainage canals.  This standard practice used throughout the New Orleans area was necessitated by the fact that the ground surface within most of the metropolitan area is essentially below sea level.  Other factors that cause additional localized areal settlements include decay of organic matter (marsh or peat soil strata), drought, construction activities (dewatering of excavations), fill placement, etc. These factors had a major impact on the performance of the IHNC east bank floodwall during Hurricane Katrina, as will be discussed.

A sheet pile wall, like any other structure, should be designed to withstand all of the forces expected to act on it throughout its design life without yielding or failing while assuring adequate factors of safety against all possible modes of failure.  The designs assume that a cantilever I-wall will rotate as a rigid body about some point along its embedded length without measurable deflection, as illustrated in Figures 11a, 12 and 22.  This assumption implies that the wall is subjected to the net active pressure distribution from the top of wall down to a "transition" point near the point of zero displacement.  The design pressure distribution is then assumed to vary linearly from net active pressure at the transition point to full net passive pressure at the bottom segment of the wall.  The design pressure distribution based on a factor of safety of 1.0 (assuming full soil strength values) is illustrated in Figures 11a and 12 and a factor of safety of 1.5 (soil resistance is divided by 1.5) in Figure 22. Equilibrium of the wall requires that the sum of horizontal forces and the sum of moments about any point along the wall length

must both be equal to zero (stable, non-moving wall).  The two equilibrium equations (horizontal forces and moments) are solved to determine the location of the transition point and the required depth of sheet pile penetration.  Because the simultaneous equations are nonlinear in z and d, a trial and error solution is required.  Therefore, computer programs, such as the USACE CWALSHT program, are commonly used to analyze I-walls and to develop the required design parameters for sheet piles.

The design procedure of I-walls determines if the trial cross-section is stable and safe against failure under all possible short-term (Q-case) and long-term (S-case) loading conditions. The USACE requires different minimum factors of safety under each of these conditions.  Figure 22 shows the diagram used by the USACE to size the sheet pile along the east bank of the IHNC. The flood case is considered a short-term loading condition since it occurs over a relatively short period of time, which does not allow for the resulting pore water pressure increment to dissipate, as previously discussed.  According to the original design requirements of the USACE New Orleans District (NOD) at the time of construction of the IHNC floodwall, the trial cross-section should be analyzed for the following conditions:

- I-wall/levee global stability (deep seated failure)
- I-wall sheet piling tip penetration which is selected as the maximum of:
    - Required length for short-term stability
    - Required length for long-term stability
    - Minimum tip penetration of either
        - Three times of the exposed wall height (H) on the protected side based on the lower ground elevation on either side,
        - 10 ft. below the lower ground surface elevation, or
        - Any additional depth determined by engineering judgment such as selecting appropriate loading cases, penetration to head ratios and stickup ratios and for extending sheet piling through very shallow sand or peat layers.
- Piping and seepage analysis requirements
- Heave analysis
- Allowable deflection
- Structural design considerations

Minimum safety factors are designated for the various design conditions. Theoretically, factors of safety greater than unity (F.S. > 1) should be assured for all potential modes of failure under all possible loading conditions.  As discussed above, the factor of safety is defined as the ratio of the available resisting forces or moments to the driving forces or moments.   The recommended minimum factors of safety by the USACE vary from one loading condition to another and would typically range from 1.0 to 1.5.  Table 1 shows the original factors of safety used by the USACE for the design of FPS/HPS structures prior to Hurricane Katrina, *including my own personal comments shown in italic.*  Pertinent excerpts are given in Appendix D which were taken from the USACE as-built drawings and General Design Memoranda (GDM) of the various I-walls built in the IHNC and vicinity prior to Hurricane Katrina.

| ITEM | DESIGN CONDITION | REQ'D SAFETY FACTOR |
|---|---|---|
| Slope Stability: *(MOP pre-Katrina & Spencer after Katrina)* | High Water Condition | 1.30 |
| | Low Water Condition | 1.30 |
| | Sudden Drawdown[1] | 1.20 |
| Pile Capacity: | With Pile Test (Q & S Cases) | 2.0 |
| | No Pile Test (Q & S Cases) | 3.0 |
| Cantilever Wall Stability: *(Hand calculations, CANT or CWALSHT)* | Water to Flowline[2] | Q-Case = 1.5 (Figure 22) |
| | Water to Flowline Plus Freeboard[3] | Q-Case = 1.25 |
| | Water to Flowline | S-Case = 1.20 |
| | Water to Flowline Plus Freeboard | S-Case = 1.00 |

[1] *Sudden drop of water level on the floodside*
[2] *Design flood water level (not top of wall)*
[3] *Height of wall above flowline water level*

Table 1: Pre-Katrina safety factors used by USACE for design of FPS/HPS structures

Figure 12 shows a design plate from the IHNC General Design Memorandum for the West Levee, Florida Avenue to IHNC Lock (GDM No. 2, 1967).  The plate illustrates the typical analysis used by the USACE NOD for the I-wall design.  In this case, the analysis considered a ground surface on both sides of the I-wall at Elev. +7.0 ft. MSL (Mean Sea Level) and a wall top

at Elev. +14.5 ft. MSL (Elev. +4.5 and +12 ft. NAVD88).  The plate shows the resulting net pressure diagram used in the I-wall design for the case of a hurricane Still Water Level (SWL) at Elev. +14.0 ft. MSL (Elev. +11.5 ft. NAVD88).  This net pressure diagram is used to determine the required I-wall tip penetration.  The resulting moment diagram shown in Figure 12 was used in the structural design of the sheet pile to select the required Z-section.

The foregoing methodology was used in the pre-Katina design of I-walls in the New Orleans FPS/HPS.  Some of the limiting design parameters, methodology and minimum factors of safety were revised or amended several times by the USACE (Interim 2006 and present HSDRRS-DG 2007/08) based on their experience with the performance of I-walls during Hurricane Katrina.  The present HSDRRS-DG is discussed in details in Appendix B.  However, the main aspects of the revised USACE methodology for the New Orleans FPS/HPS include:

- No new I-wall type floodwalls are being planned or constructed (allowed as transitions from a structure into an earthen levee).
- All of the failed I-walls were replaced with T-walls.
- More strict design criteria and limitations were developed for the evaluation of the remaining I-walls.  These include limiting the exposed wall height, higher required safety factors, consideration of a tension crack on the flood side of the wall, higher safety factors, revised seepage control provisions and tighter structural design limits (deflection).

Those I-walls that survived the storm were evaluated, inspected and retrofitted as needed to meet the new design methodology requirements.  Retrofitting measures included driving the sheet piles to a deeper tip penetration, raising the ground surface on the landside to reduce the exposed height, placement of erosion protection alongside the wall, etc.   It should be noted that the failed pre-Katrina I-wall along the east bank of the IHNC does not meet the present revised design criteria adopted by the USACE after Hurricane Katrina. A detailed discussion of the present USACE HSDRRS-DG (2007/08) along with the results of my analyses and assessment of the IHNC floodwall are given in Appendix B.

c)  FPS/HPO Failure Mechanisms

As previously discussed, the major breaches that occurred in the New Orleans FPS/HPS during Hurricane Katrina were experienced either in earthen levees or earthen levees enlarged with I-walls.  Examination of these breaches by the various investigating teams (IPET, ILIT,

ASCE, Team Louisiana and others) indicates that the failed FPS/HPS structures exhibited some common failure mechanisms. These observations were substantiated by further analytical, experimental and forensic studies performed by the investigating teams including the USACE's own Interagency Performance Evaluation Task Force (IPET 2007). I have personally performed my own analyses of the IHNC east bank I-wall and the results of my analyses are included in Appendix B and summarized in the following sections of this report. These failures resulted from a combination of high storm surge water pressure, waves and high floodwater head differential on either side of the FPS/HPS structure, together with a loss or lack of soil support needed to counteract the pressure of the rising water along the face (flood side) of the structure. These common failure mechanisms are:

- Deflection/overturning of the sheet pile I-walls into the landside under the lateral floodwater pressure causing the development of a tension crack (gap or separation from the soil) along the embedded length of the sheet pile I-wall facing the levee on the flood side, as illustrated in Figure 13

- Erosion or scour of earthen levees on their landside (protected side) due to overtopping, as shown in Figure 14a

- Erosion or scour of earthen levees on their flood side under storm surge flow and waves, as shown in Figure 14b

- Development of a scour "trench" along the landside of I-walls due to overtopping, as shown in Figure 15

- Squeezing of weak and soft foundation soil below a relatively shallow I-wall tip penetration and displacing the soft soil blocks onto the landside under a high water head differential, as shown in Figure 16

- Underseepage of water beneath a relatively shallow I-wall tip penetration under a high water head differential, as shown in Figure 17

Significantly for the purposes of this case, I-wall failures or partial failures occurred at various locations throughout the area where no barge was even arguably present, including the cases shown in Figures 13b (London Avenue Canal), 15 (Port of New Orleans) and 16 (17th Street Canal). That is, at a number of locations, I-wall structures similar to those on the IHNC east bank indisputably failed due to the above explained causes, without any involvement of a barge.

In all of the reported I-wall failures experienced throughout the New Orleans FPS/HPS during Hurricane Katrina, breaches or significant tilting resulted from inadequate tip penetration

of the sheet piles.  That is, the sheet pile wall was not driven deep enough into the ground to sustain the increasing hydrostatic pressure from the rising water level in the adjacent water body. The "driving" water pressure on the wall increased due to the formation of a tension crack on the flood side between the embedding soil and the I-wall face.  The water pressure caused I-walls with marginal or inadequate tip penetration at many locations to tilt backwards into the landside at different degrees causing visible lean, partial or full breach, as shown in Figures 15, 32 and 36. In addition, some specific conditions existed within the failed areas which caused the individual breaches which caused a reduction of the available "resisting" forces.  Following Hurricane Katrina, the USACE recognized the potential for developing a "tension crack" on the flood side of I-walls and required that this condition be considered in all future global stability, CWALSHT and seepage analyses.

Overtopping also played a role in certain floodwall failures because the tops of many of the I-walls used in the pre-Katrina New Orleans FPS/HPS were lower than their authorized level. Overtopping is also proceeded with "splashing" when water flows over the floodwall top at a lower water level due to waves and wind.  In addition to flooding, overtopping and splashing are important because water flow can erode the soil on the landside (back) of the floodwall, reducing the soil resistance needed for wall stability. The authorized protection level, water flowline, freeboard and Still Water Level (SWL) used to establish the I-wall height are based on selected design storm models and the established geodetic benchmarks and reference datum used for the project.  A lower I-wall top reduces storm surge protection level because it takes lower rise in the storm surge level to exceed the wall top and to subsequently flow over the wall into the protected side.  Similarly, a lower protection level would also result from using an incorrect geodetic elevation reference datum or due to long-term change in the ground surface elevations. Localized overtopping or splashing will also occur within the low segments of the floodwall at much lower surge water levels.  This would cause localized scour and loss of support and possible failure or tilting within the low segments of the floodwall.

A number of reasons exist for why some floodwall tops were constructed, or were below their authorized level at the time of Hurricane Katrina.  First, there appear to have been some deficiencies including using a different reference datum throughout the FPS/HPS designs that included Mean Seal Level (MSL), National Geodetic Vertical Datum (NGVD29) and North

American Vertical Datum (NAVD88 2004.65). The Mean Seal Level (MSL) reference datum assumes a global sea water level at Elev. 0.0 ft. MSL (Elev. -2.5 ft. NAVD88). Adjustments were made in 1965 to the MSL reference datum by developing the National Geodetic Vertical Datum (NGVD29) which is based on the Local Mean Sea Level (LMSL) within the design region. The North American Vertical Datum was subsequently established in 1988 (NAVD88) to account for global subsidence in the region. Further adjustments were made to the NAVD88 datum in 2004 which is known as NAVD88 (2004.65) presently used by the USACE as well as this report.

The USACE IPET study concluded that the model domain is the 1985 epoch of NGVD29. The conversion of NGVD29 1985 epoch to NAVD88 2004.65 varies across the New Orleans area. For the Lake Pontchartrain and Vicinity and West Bank and Vicinity project areas, the average conversion factor is about -0.5 ft. (NAVD88 2004.65 = NGVD29 1985 – about 0.5 ft.). Meanwhile, NGVD29 elevations are generally lower than MSL elevations by about 2 ft. (NGVD29 1985 = MSL – about 2 ft.). (It should be noted that the acronym NAVD88 will be used throughout this report to refer to NAVD88 2004.65.)

Some elevation differences could also be attributed to subsidence (settlements) over time of the geographical area of the flood protection structure and/or the benchmarks established in the area of the structure. Another factor that affects the storm protection level is the global rise in sea water level since the time of construction of the FPS/HPS structure. Areal and regional settlements have also developed within the geographical area of the FPS/HPS due to lowering of groundwater and pumping into the drainage canal system.

### 3.0  Causes of the IHNC East Bank I-wall Failures

During Hurricane Katrina on August 29, 2005 the storm surge pushed westward from Lake Borgne along the east/west trending channel of the GIWW/MRGO that separates the St. Bernard and New Orleans East protected basins. This additional flow significantly raised the water level in the Inner Harbor Navigation Canal (IHNC) which resulted in four individual breaches in its FPS/HPS at the locations shown in Figure 1. Two of these breaches occurred on the IHNC east bank adjacent to the Lower Ninth Ward area between the Florida Avenue Bridge and the North Claiborne Avenue Bridge. The other two breaches developed on the IHNC west

bank north of the intersection of France Road and Florida Avenue.  The two IHNC east bank breaches and one of the west bank breaches involved failures of levees enlarged with I-walls.

Based on eyewitness reports, the first breach on the IHNC east bank occurred near the Florida Avenue Bridge and is referred to in most of the published literature as the North Breach and also in this report as the EBNB.  The second breach in this floodwall segment occurred south of the EBNB and closer to the North Claiborne Avenue Bridge and is referred to in most of the published literature as the South Breach and also in this report as the EBSB.  The Barge ING 4727 entered into the Lower Ninth Ward neighborhood at the extreme southern end of the EBSB.

The hydrograph of measured variations in the water level in the IHNC over time during the period of August 28 through August 30, 2005 is shown in Figure 18.  It indicates that entire the IHNC east bank I-wall was fully overtopped no later than 7:00 to 7:30 a.m. on August 29, 2005 when the IHNC water level was at about Elev. +13 to +14 ft. NAVD88 (about Elev. +15.5 to +16.5 ft. MSL) based on a design wall top at Elev. +15.0 ft. MSL (Elev. 12.5 ft. NAVD88). For reasons I will discuss below, it appears the wall top within certain areas of the floodwall would have been overtopped even earlier than that, based on a lower wall top.  Earlier splashing due to wind and waves was also experienced along the floodwall. According to IPET, there was a major floodwall failure between 5:00 and 6:00 a.m. on August 29, 2005 just south of Florida Avenue (North Breach or EBNB) into the Lower Ninth Ward.  ILIT (2006) and Team Louisiana (2006) believe that this breach occurred no later than 7:00 a.m. on August 29, 2005, though both reports note the presence of water in the Lower Ninth Ward before that time, reportedly due to splashing and overtopping over low areas of the wall as well as due to the development of a tear (separation or gap) at the northern end of the EBNB.

### 3.1 IHNC East Bank I-Wall Configuration and Design

According to the USACE 1966-1968 General Design Memorandum (GDM) and as-built drawings, the existing earthen levee along the IHNC east bank was augmented using an I-wall topped with a concrete cap (monolith).  Figures 19 through 22 show some of the pertinent design plates of the IHNC east bank FPS/HPS (USACE GDM No. 3 1966-68).  The subject I-wall extended from station (Sta.) 16+08.85 near the North Claiborne Bridge to Sta. 58+12.00 near Florida Avenue.  Accordingly, this I-wall segment is about 4,200 linear ft. long (stations are

33

spaced at 100 ft.).   The Florida Avenue Complex just north of the EBNB was subsequently replaced in 1980 to include new I-walls and T-walls.  The EBSB and EBNB developed at about Sta. 30 and Sta. 50, respectively.

As shown in Figure 19, a steel sheet pile wall (curtain) was driven into the crown of the existing levee which was to be reestablished at Elev. +9.0 ft. MSL (Elev. +6.5 ft. NAVD88). The 20 ft. long, Z-27 (old acronym for PZ-27) steel sheet pile had its top at Elev. +12.0 ft. MSL (Elev. +9.5 ft. NAVD88) and its tip at about Elev. -8.0 ft. MSL (Elev. +5.5 ft. NAVD88).  The upper 5 ft. of the steel sheet piles were capped with a concrete cap which extended for another 3 ft. above the steel sheet pile top.  Therefore, the top of the concrete cap, or the maximum flood protection level, was designated to be at Elev. +15.0 ft. MSL (Elev. +12.5 ft. NAVD88) with an anticipated net elevation at Elev. +14.0 ft. MSL (Elev. +11.5 ft. NAVD88) after allowing for 1 ft. of long-term settlement.

As per Figure 22, the I-wall enlarged levee was designed for 2 ft. of free board or a Still Water Level (SWL or flowline) at Elev. +13.0 ft. MSL (Elev. +10.5 ft. NAVD88).  According to the USACE pre-Katrina I-wall design criterion (Table 1), the IHNC floodwall was designed to have a factor of safety of 1.25 with regard to global stability for the Q-Case with a SWL at Elev. +13.0 ft. MSL (Elev. +10.5 ft. NAVD88).  As per Figure 22, structural design of the sheet pile and its required tip penetration (possibly obtained by hand calculations or the computer program CANT) were based on a pressure under a maximum hurricane water level at Elev. +14.5 ft. MSL (Elev. +12 ft. NAVD88).  As previously discussed, for the Lake Pontchartrain and Vicinity and West Bank and Vicinity project areas, the average conversion factor is about -0.5 ft. (NAVD88 2004.65 = NGVD29 1985 - about 0.5 ft.).  Meanwhile, NGVD29 elevations are generally lower than MSL by about 2 ft. (NGVD29 1985 = MSL - about 2 ft.).

In fact, however, the IHNC east bank floodwall and vicinity were not at the designated design elevations at the time of Hurricane Katrina in 2005.  The design was based on the Mean Seal Level (MSL) reference datum which assumes a global sea water level at Elev. 0.0 ft. MSL (Elev. -2 ft. NGVD29 and -2.5 ft. NAVD88). As a result, the top of the I-wall along the east bank of the IHNC was actually at about Elev. +13.35 ft. NGVD29 (Elev. +15.35 ft. MSL), which is about 0.35 ft. lower than the original design at Elev. +15.0 ft. MSL (Elev. +13 ft. NGVD29).

34

This difference is attributed to global and regional subsidence of the geographical area as well as local settlement within the floodwall area. Based on the NAVD88 reference datum and the global rise of sea level, the top of the IHNC wall was actually about 0.5 ft. lower than the adjusted NGVD29 elevations. Accordingly, the top of the IHNC I-wall on August 2005 was no higher than about Elev. +12.5 to +13 ft. NAVD88 (Elev. +15 to +15.5 ft. MSL).

Parts of the IHNC east bank floodwall may have been even lower than Elev. +13 ft. NAVD88 (Elev. +15.5 ft. MSL) due to the differential settlements experienced over time between the limits of the 4,200 ft. long wall. According to Team Louisiana (2006), when the crest (top) of the undamaged segments of the I-wall adjacent to the South Breach on the east bank of the IHNC was surveyed after the storm, it had an average elevation of +12.5 ft. NAVD88 (Elev. +10 ft. MSL). Elevation of the top of the floodwall surveyed farther north on the IHNC by IPET varied from 1.5 ft. to more than 3 ft. below the authorized design elevation of Elev. +15.0 ft. MSL (Elev. +12.50 ft. NAVD88). Table 2 illustrates the geodetic and Mean Sea Level adjustments associated with the benchmark located on the east wall of the IHNC lock.

It should be noted that according to IPET Volume II *Geodetic Vertical and Water Level Datums* (Page II-105), the IHNC "*I-walls constructed to 15.0 ft. MSL-per As-Built plans-see typical plan at Figure 49*." Accordingly, the floodwall top at the time of construction would have been at Elev. +12.5 ft. NAVD88. Page II-105 in the IPET report also states that "*Subsequent subsidence since the late 1960s construction has resulted in pre-Katrina and current flood protection elevations approximately 2.5 ft. below original design*." Therefore, there are some inconsistencies in the IPET data, since the post-Katrina geodetic surveys show that the floodwall top varied between Elev. +12.5 and +13.0 ft. NAVD88, or Elev. +15 to +15.5 ft. MSL, which is equal to or higher that the as-built design elevation. It is possible that the difference in elevation of 2.5 ft. below original design discussed by IPET is the difference between MSL elevations and NAVD88 elevations. This means that only global settlements occurred within the floodwall area. However, the floodwall likely experienced some long-term differential settlements along its length due to other factors such as added fill, lowering of groundwater by pumping, etc. As previously discussed, the original floodwall design assumed that the long-term settlements of the floodwall to be about 1 ft.

| Geodetic and Mean Sea Level Adjustments on IHNC Benchmark located on east wall of the IHNC lock (from IPET 2006b, II-109) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Elevation (ft.) at BM M152 Referenced to Various Datums | | | | | | | |
| NGVD29 | NAVD88 | LMSL | EPOCH | LMSL05 | LMSL01 | LMSL78* | NAVD88 |
|  |  | 19.70 | 01-05 | 0.00 |  |  | 0.64 |
|  |  | 20.00 | 83-01 | -0.30 | 0.00 |  | 0.34 |
|  |  | 20.16* | 60-78 | -0.46 | -0.16 | 0.00 | 0.18 |
|  | 20.34 |  | 2004.65 | -0.64 | -0.34 | -0.18 | 0.00 |
|  | 20.81 |  | 1996 | -1.11 | -0.81 | -0.65 | -0.47 |
|  | 20.76 |  | 1994 | -1.06 | -0.76 | -0.60 | -0.42 |
| 20.96 |  |  | 1991 | -1.26 | -0.96 | -0.80 | -0.62 |
| 21.07 |  |  | 1986 | -1.37 | -1.07 | -0.91 | -0.73 |
| 21.15 |  |  | 1982 | -1.45 | -1.15 | -0.99 | -0.81 |
| 21.81 |  |  | 1965 | -2.11 | -1.81 | -1.65 | -1.47 |
| * Estimated values for 1960-78 LMSL, not in IPET data | | | | | | | |

**Table 2:**  Geodetic and MSL Adjustments for the IHNC Benchmark (Team LA, 2006)

Based on the IHNC hydrograph shown in Figure 18 and assuming a maximum wall top at about Elev. +13 ft. NAVD88 (Elev. +15.5 ft. MSL), then the entire east bank I-wall segment was overtopped by floodwater no later than 7:00 a.m. on August 29, 2005.  Furthermore, earlier

localized overtopping would have occurred over low areas of the I-wall and even earlier by splashing due to wind and waves.  Localized continuous splashing was observed over the FPS/HPS system along the IHNC during Hurricane Gustav in 2008.  This overtopping and splashing explains the failure and tilting of specific segments of the I-wall but not of the entire floodwall even though a scour trench had developed throughout most of its length.  In other words, the depth, extent and impact of scour due to overtopping varied throughout the length of the floodwall depending on the wall top elevation, with overtopping and splashing occurring earlier over lower portions of the floodwall.

There was also substantially lower soil support on the landside of the IHNC east bank floodwall at the time of the storm than what was assumed in the original design of the floodwall. The USACE GDM No. 3 indicated that the existing ground surface in the area of the levee toe on the landside of the IHNC east bank varied from Elev. -2 to +2 ft. MSL (Elev. -4.5 to -0.5 ft. NAVD88) at the time of design/construction of the east bank I-wall.  The 2000 LiDAR data of the ground surface elevation along the levee toe on the protected side (landside) from the south end of the South Breach (EBSB) to the north end of the North Breach (EBNB) is shown in Figure 25.  Figure 26 depicts the differences between the design profile levee/I-wall and the actual existing profiles at the EBNB and EBSB at the time of Hurricane Katrina.  This data suggests an average ground surface along the levee toe in the EBSB and EBNB areas essentially at about Elev. -4.5 and -7.0 ft. NAVD88 (Elev. -2 and -4.5 ft. MSL), respectively.  It should be noted that LiDAR tends to overestimate elevations by up to 1 to 2 ft. as it is affected by near surface features (vegetation, trees, shrubs, sidewalks, etc.).

The original design grade landward of the floodwall at the time of construction was considered at about Elev. 0.0 ft. MSL (Elev. -2.5 ft. NAVD88).  Therefore, the ground surface on the protected side in the areas of the east bank breaches was actually much lower than the design grade by 2 to 4.5 ft. in the areas of the EBSB and EBNB, respectively.  The lower ground surface meant that there was less soil support on the protected side of the wall, diminishing its ability to withstand the increasing pressure from the rising water in the IHNC.  The worst conditions existed at the EBNB area where, according to IPET, the calculated safety factor for the flood case was less than unity -- meaning the wall was experiencing a failure condition -- even before the surge water had reached the wall top.

The subsoil conditions and strength parameters used in the GDM of the IHNC east bank I-wall are shown in Figures 20 and 23. The subsoil conditions along the east bank of the IHNC were based on two soil borings made by the USACE prior to the construction of the I-wall, one at the levee centerline (B-4) and the other at the landside toe (B-4T). These borings were made near the extreme southern end of the South Breach in the area where the Barge made its only contact with the floodwall. The USACE design documents do not indicate the type of borings made (4U or 4G). However, the plotted data does not include any unconsolidated undrained triaxial tests (UU) results which indicate that they were likely to be 3 inch diameter general (G) borings. Due to their locations, the two borings (B-4 and B-4T) are not representative of the subsoil conditions at the EBNB or at the apex (maximum movement) area of the EBSB. No borings were made on the flood side. As previously discussed, the current USACE HSDRRS-DG requires that borings be made at a spacing of no more than 500 ft. on centers. This means that at least 9 centerline borings, 9 flood side borings and 9 landside borings should have been made along the 4,200 ft. long floodwall. Supplemental CPT soundings would also be required. Therefore, the number of borings made does not meet the present requirement and some unforeseen subsoils conditions may not have been detected.

According to the USACE, the subsoils at the site consist generally of 10 ft. of very soft clay underlain by 5 ft. of highly organic stratum (marsh or peat). This is followed by about 25 ft. of soft clay and then by dense sand. Based on the foregoing subsoil conditions and a design ground surface at Elev. -2.0 to +2.0 ft. MSL (Elev. -4.5 to -0.5 ft. NAVD88), the tip of the sheet pile wall within the limits of the two breaches was predominantly located in the very soft clay stratum at Elev. -8.0 ft. MSL (Elev. -10.5 ft. NAVD88).

The subsoils underneath the earthen levee and floodwall along the east side of the IHNC were also problematic from the standpoint of strength and potential for underseepage. Following Hurricane Katrina, additional CPT soundings and soil borings were made by IPET (2007) and ILIT (2006) along the east bank of the IHNC within the breach areas. The supplemental data shown in Figure 24 was used in their analyses of the South Breach. I also used this information in my analyses of the IHNC floodwall included in Appendix B. The ILIT study indicated that the upper foundation soils in the EBNB area are dominated by thick deposits of high plasticity

clays (CH), punctuated by two layers of marsh deposits (peat), and that there is a relatively thin but continuous stratum of low plasticity silt (ML) underlying the lower marsh unit.

Based on the ILIT (2006) subsoil profile, the sheet pile wall tip penetration was insufficient as to cutoff lateral underseepage flow through the relatively pervious "marsh" deposits.  Soil data in the EBNB were sparse, and consisted of the single pre-Katrina general boring (B-4) located nearby but just off-site (and with higher embankment overburden loads than at the main breach area); two ILIT soil borings and one ILIT CPT soundings; and several additional IPET CPT probes.  At the EBNB, there is only one main marsh layer, but most of the other soil conditions are very similar to those encountered at the EBSB.

According to the USACE General Design Memorandum, the IHNC earthen levee was to be constructed of semi-compacted cohesive soil (clay).  No compaction testing (control) was performed in the filed during construction and the material was compacted using several passes of a bulldozer (D-6 or D-7), as per the USACE requirements at that time.  The GDM of the floodwall indicates that this was adequate to provide sufficient resistance against erosion and, therefore, there was no need for revetment or armor.  The ILIT report states that the upper embankment fill is moderately compacted imported clay (1966-68 fill placed to reshape the levee), which is underlain by older "fat clay" (CH) fill comprised of locally available lacustrine clays (original 1966 levee).  Based on this and considering the construction method, the levee fill material will exhibit variable undrained shear strength and density throughout its cross-section and length.  This is consistent with the CPT soundings performed in the levee fill after Katrina.  Based on this CPT data, the average strength of the levee material is about 500 lbs per square ft. and its density is about 110 lbs per cubic ft., which is consistent with the original design.

Following the completion of the floodwall, sand fill was placed along the flood side of the levee to raise the ground surface slightly above the IHNC mean water level.  Semi-compacted fill (sand or locally excavated materials) was used to backfill miscellaneous excavations made in 2004-05 along the flood side of the I-wall.  More fill was used to backfill the drainage ditch (Jourdan Canal) that paralleled the floodwall on the landside sometime after the construction of the floodwall.  The canal extended from the south (upstream) to the north (downstream) between the precise limits of the EBSB and EBNB.

The subsoil design profile shown in Figure 20 was developed by the USACE in 1966 prior to the I-wall construction.  It shows the subsoil stratification along with the corresponding elevations within the project limits between Sta. 0+00 at the south end near the Claiborne Bridge and Sta. 50+00 to the north near Florida Avenue.  Figure 25 shows the results of the 2000 LiDAR survey of the elevations along the landside levee toe.  Figure 26 shows the results of a geodetic survey of the existing cross sections of the floodwall in the areas of the EBSB and EBNB after Hurricane Katrina in 2005 as well as the design cross section.   Figure 63 shows the results of a survey of the wall top after Hurricane Katrina.  Examination of these figures yields some specific observations:

- In 1966, the crown of the existing levee within the project limits prior to the construction of the I-wall was generally at Elev. +9 ft. MSL (Elev. +6.5 ft. NAVD88), which met the required design grade of the I-wall enlarged levee.  The 1966 subsoil profile indicates that the levee crown within the limits of the EBSB (near Sta. 30) and the EBNB (near Sta. 50) was actually at Elev. +7 ft. MSL (Elev. +4.5 ft. NAVD88) which is lower by about 2 ft. than the design grade.  Therefore, fill had to be placed in these areas during the I-wall construction to reestablish the levee crown to the required design grade at Elev. +9.0 ft. MSL (Elev. +6.5 ft. NAVD88).  Consequently, some settlements have had to occur at Sta. 30 and Sta. 50 under the weight of the added fill resulting in the observed lower ground surface and lower I-wall top in the areas of the EBNB and EBSB as shown in Figures 25, 26 and 63.

- In 1966, the elevation of the existing levee toe varied from about Elev. +2 ft. MSL (Elev. -0.5 ft. NAVD88) at Sta. 0+00 near the Claiborne Bridge to about Elev. -2 ft. MSL (Elev. -4.5 ft. NAVD88) at Sta. 60+00 near Florida Avenue.  This 4 ft. difference in grade is consistent with the 2000 LiDAR data shown in Figure 25 which shows that the levee toe near the EBSB was at about Elev. -2 ft. MSL and at about Elev. -5 ft. MSL (Elev. -0.5 and -7.5 ft. NAVD88) in the area of the EBNB (NAVD88 elevations are about 2.5 ft. lower than MSL).  Furthermore, the LiDAR data indicates that settlements on the order of 2 to 4 ft. have occurred at the site during the period between 1966 and 2000.  The original design assumed that long-term settlements on the order of 1 ft. will develop in the IHNC floodwall after construction.  This implies that the top of the I-wall segment within which the breaches developed in 2005 was much lower than the original design grade at Elev. +15 ft. MSL (Elev. +12.5 ft. NAVD88) and the predicted final grade after settlement at Elev. +14 ft. MSL (Elev. +11.5 ft. NAVD88) assumed in the USACE design.  Again, this is consistent with the data shown in Figures 25, 26 and 63.

- According to the subsoil profile, the thickness of the existing fill prior to the construction of the I-wall within the breached segment (between about Sta. 30 and Sta. 50) is on the order of 21 ft., whereas the fill thickness in the remaining segment (between about Sta. 0 and Sta. 30) is only 14 ft.  Based on this

- In 1966, a drainage canal (Jourdan Canal) paralleled the existing levee along the landside as indicated in the design drawings.  The subsoil profile shown in Figure 20 shows that the L.S. (landside) canal started at about Sta. 30, where the EBSB developed, and ended near Sta. 50, where the EBNB developed.  This canal was subsequently filled.  Filling the canal caused additional settlements resulting in even lower grades within that segment of the floodwall.

- Pumping of water at the drainage pump station near Florida Avenue has probably lowered the water table within that area.  This resulted in additional areal settlements over the years and lower ground surface in the area of the EBNB.  The adjacent major structures including the pump station structure, the Florida Avenue Bridge and T-wall are not seriously impacted by these areal settlements since they are all supported on long pile.  However, these settlements could be visually detected by the gap, or space, that developed under the floor slabs of the adjacent pile-supported structures.

- The tip of the sheet pile within the breached segment north of Sta. 30+00 was located in a weak and highly compressible stratum of very soft clay and marsh (peat). Meanwhile, the tip of the sheet pile of the floodwall south of the EBSB (from Sta. 30+00 to Sta. 0+00) was driven into a natural levee deposit, which is stronger and less compressible.  The natural levee deposit offers higher resistance and, hence, resulted in a more stable sheet pile wall within that segment.  Greater settlements would also develop in the very soft clay and marsh stratum between Sta. 30+00 and 50+00.

These observations are consistent with the 2000 LiDAR ground elevation data and the cross sectional profiles at the EBNB and EBSB shown in Figures 25, 26 and 63.  In laymen's terms, the subsoil conditions at the locations of the North Breach and South Breach suggest that at those locations, the wall top and the landside ground surface would both have been lower than the remaining segments of the floodwall – meaning that there was lesser soil resistance on the landside of the wall at those locations, and also that the wall top at those locations was particularly lower and, therefore, subject to earlier splashing by waves, overtopping by storm surge water, and initiation of landside scour, than the remaining segments of the floodwall.

According to published articles in the Times Picayune and other news media in 2008, the USACE placed large sand bags along the landside segment of the IHNC west bank floodwall. According to these articles, a recent geodetic survey of the floodwall indicated that the landside ground surface within that segment of the floodwall was much lower than the assumed design

grade and USACE limits.  Consequently, the USACE took this action to assure the stability of the I-wall during the upcoming hurricane season until a permanent repair is made.  This area was closely monitored during Hurricane Gustav in 2008 and its survival was attributed to the supplemental stability provided by the sand bags.  This localized low grade area is similar to the conditions that existed in 2005 along some segments of the IHNC east bank floodwall causing the EBNB and EBSB to develop during Hurricane Katrina.

There was a transition joint between the original (1966-68) I-wall and a new segment of sheet pile I-wall that was constructed in 1980 during a project to renovate the Florida Avenue Complex near Sta. 60+00.  The conditions at that location are depicted in the 2002 aerial photograph of the north end of the floodwall near Florida Avenue shown in Figures 75 and 76. Whereas the original 1966-68 I-wall segment had a sheet pile tip penetration to Elev. -8 ft. MSL (Elev. -10.5 ft. NAVD88), the newer adjoining I-wall of the Florida Avenue complex had a sheet pile tip penetration at Elev. -25.0 ft. NGVD29 (Elev. -23 ft. MSL and Elev. -25.5 NAVD88) below the bottom of the marsh (peat) stratum.  The newer I-wall with a deeper tip penetration connected to an even more rigid T-wall to the north.  Thus the new sheet pile wall nearer to Florida Avenue was much deeper, and hence more stable, than the original 1966-68 I-wall.  The east bank North Breach (EBNB) occurred at this transition joint between the two adjoining I-wall segments and progressed to fail the weaker of the two adjoining walls.

The original 1966-68 design drawings of the floodwall indicate a curved segment of the east bank I-wall, which is also evident in the 2002 aerial photograph of the floodwall shown in Figure 74 and 76.  The limits of the deviated segment precisely match those of the EBSB.  The purpose of this deviation in the floodwall alignment is not known with certainty, but it appears to start near the upstream end of the Jourdan Canal.  The deviation in the floodwall alignment could have been necessitated by the many industrial facilities that existed along the flood side of the floodwall.  This area is known as the East Bank Industrial Area (EBIA).  Most of the structures and facilities in the EBIA were subsequently removed over the years, but some of them remained and could be seen in the 2002 aerial photographs shown in Figures 74 and 75.

Historical records and aerial photographs (Figure 76) indicate that dredging and excavations were also made in the EBIA along the flood side of the I-wall.  In 2004-05, the

Washington Group, Inc. (WGI) removed assorted structures, contaminants and debris from the EBIA under a contract with the USACE (U.S. District Court, 2008).  Their activities included a deep excavation, 24 ft. by 32 ft. in plan and extending down to at least Elev. -22 ft. MSL   (Elev. -24.5 ft. NAVD88), at the Saucier Marine site to remove a buried sewer lift station.  This excavation was located about 30 to 100 ft. away from the I-wall in the general vicinity of the EBSB.  Another deep excavation was made to remove a "wedding cake" concrete block at the Boland Marine site in the general vicinity of the EBNB.  This excavation extended down to at least Elev. -25 ft. MSL (Elev. -27.5 ft. NAVD88) and required dewatering.

Based on the available information, the EBIA excavations were subsequently backfilled with semi-compacted excavated material from the EBIA and/or imported sand, as per the USACE project specifications (not with select and controlled-compacted fill).  This fill material is relatively permeable, particularly if not well compacted.  It is possible that some of the demolition and construction activities such as deep excavations, construction vibration, and dewatering may have also had some detrimental impact on the stability of the floodwall.  The semi-compacted and permeable soils used to backfill the excavations offer a faster flow path for floodwater to seep underneath the relatively shallow tip of the I-wall.  No information is available relative to the type and placement conditions of the material used to backfill the Jourdan Canal on the landside of the floodwall.  In view of this, it is possible that the underseepage rate beneath the I-wall into the landside could have been facilitated by the fill material placed on either side of the floodwall, particularly in the relatively low EBNB area.

Moreover, a cyclone fence was installed about 18 inches away from the back of the I-wall on the landside.  Deep localized erosion and flow around the posts of the fence from splashing and overtopping water during Hurricane Katrina added to the excessive scour experienced landward of the IHNC east bank I-wall and contributed to the growth of the scour trench.  This process is illustrated in Figures 58 and 67.  Localized deep scour developed at the northern end of the EBNB after the two adjoining walls separated at the weak joint.  Concentrated flow through construction joints between the concrete cap segments where the rubber fillers were missing caused additional localized scour under the resulting water spouts.  The loss of soil support due to scour along the backside of the wall reduced the soil resistance needed for the

floodwall to withstand the rising storm surge water pressure and acted to compromise the stability of the I-wall.

### 3.2  IHNC I-Wall North Breach (EBNB)

a. Description of the North Breach

Figures 27, 28, 29, 30, and 31 show the post-Katrina conditions in the area of the IHNC east bank North Breach (EBNB).  The EBNB was about 215 ft. long (L) and it developed near Sta. 50 according to the 1966-68 GDM No. 3, or about 700 ft. south of the Florida Avenue Bridge Complex.  The steel sheet pile wall within the breached segment tilted backwards and its embedded tip was dislodged and appeared on the ground surface.  Under the storm surge water pressure, the steel sheet piles at the northern end of the breach tore and separated from the standing segment of the new I-wall to the north.  The separated segment of the I-wall was then pushed back by the force of water into the protected side (landside) a maximum distance of about 65 ft. (H) at its apex at the location of the sheet pile tear and separation (northern end).  This maximum displacement corresponds to about 30 percent of the breached length (H/L = 0.30).  Figure 31 shows the ILIT (2006) model of the EBNB failure mechanism.

In typical I-wall breaches such as those shown in Figures 32 through 36, the sheet pile wall tilted and/or spread back into the landside in a "bow" or "fan" shape with the individual sheet piles remaining mostly interlocked throughout the breached length (L).  In concrete capped walls, the cap (monolith on top of the wall) displaced landward and the sheet pile tips moved upward, or appeared on the ground surface on the landside.  Parts of the concrete cap were damaged or cracked in extension as the top of the sheet piles flattened (stretched) when the sheet piles "fanned" or spread laterally.

While the failure pattern of the EBNB is essentially similar to many other I-wall breaches experienced during Hurricane Katrina, the EBNB exhibited some distinctive differences.  As in the case of a typical I-wall failure, the sheet piles tilted and displaced landward under the water pressure and remained interlocked at the southern end of the EBNB.  However, the dislodged sheet piles separated from the standing segment of the wall at the northern end of the EBNB to prevent a full "bow" or "fan" from forming (only one-half of a bow developed).  In addition, the dislodged I-wall rotated or tumbled while displacing landward under the force of water flowing

through the initial narrow gap that developed at the torn (northern) end of the breach, as shown in Figure 31.  Consequently, the concrete cap near the northern end of the breach landed on the flood side while the sheet pile wall tip appeared on the landside, in contrast with the southern end of the EBNB and the other typical I-wall failures.

As discussed earlier, failure at the EBNB was initiated at a weak joint between two adjoining segments of I-walls with different tip penetrations.  The USACE redesigned the Florida Avenue Complex in 1980.  As shown in Figures 37, 38 and 39 (GDM No. 4 1980), the GDM plates show that the existing 1966-68 steel sheet pile I-wall with its top at Elev. +12.0 ft. MSL and tip at Elev. -8.0 ft. MSL (20 ft. long sheets from Elev. +9.5 to -10.5 ft. NAVD88) was discontinued at the southern limit of the Florida Avenue Complex project, which coincides with the northern limit of the EBNB.  A new I-wall adjoined the existing I-wall at that location consisting of 34 ft. long PZ-27 steel sheet piles with their top at Elev. +9.0 ft. NGVD29 (Elev. +11 ft. MSL and Elev. +8.5 ft. NAVD88) and their tip at Elev. -25.0 ft. NGVD29 (Elev. -23 ft. MSL).  The top of the concrete cap of the new I-wall was established at Elev. +16.0 ft. MSL (Elev. +14 ft. NGVD29).  A PMA-22 steel sheet pile wall with its tip at Elev. -25.0 ft. NGVD29 (Elev. -23 ft. MSL and Elev. -23.5 ft. NAVD88) was used for the segment extending beneath Surekote Road where its roadway surface is at Elev. +14.0 ft. NGVD29 (Elev. +16 ft. MSL and Elev. +13.5 ft. NAVD88).  The new 39 ft. long sheets PMA-22 I-wall was followed by a pile supported T-wall segment with its top at Elev. +14.0 ft. NGVD29 (Elev. +16 ft. MSL and Elev. +13.5 ft. NAVD88).  Accordingly, the sheet piles of the new floodwall just north of the EBNB were longer and had deeper tip penetration than the existing 1966-68 I-wall to the south.  They also connected farther to the north to a more rigid T-wall.  Since some settlements occurred in the existing I-wall after its construction, the top of the existing 1966-68 I-wall to the south where the two breaches developed was lower than the top of the new I-wall just north of the EBNB.

Figures 40, 41, 42, 43, 44 and 45 show photographs of eight sheet piles recovered from the EBNB area.  I personally examined these sheet piles on January 23, 2008 at the Kearney Warehouse located on 1930 Japonica Street in New Orleans, where they are stored.  The photographs show some interconnected steel sheet piles of different lengths.  The two longer sheet piles measure about 32 ft. in length and have a relatively intact Z-shape.  They appear to be relatively new as they exhibit little or no rust or corrosion.  Therefore, they are likely to be part

of the newer PZ-27 steel sheet piles that were installed in 1980 during the construction of the Florida Avenue Complex (the longer I-wall north of the EBNB). As per Figure 39, these sheet piles should have been 34 ft. long based on a design top at Elev. +9.0 ft. NGVD29 (Elev. +11 ft. MSL and Elev. +8.5 ft. NAVD88) and tip at Elev. -25.0 ft. NGVD29 (Elev. -23 ft. MSL and Elev. -25.5 ft. NAVD88). The remaining six steel sheet piles are only 20 ft. long and appear to be much older based on the significant rust and corrosion depicted in the photographs shown in Figures 43, 44 and 45. These sheet piles appear to be the original 1966-68 Z-27 steel sheet piles that were installed with their top at Elev. +12.0 ft. MSL (Elev. +10 ft. NGVD29 and Elev. +9.5 ft. NAVD88) and tip at Elev. -8.0 ft. MSL (Elev. -10 ft. NGVD29 and Elev. -10.5 ft. NAVD88). The upper 3 ft. of the sheet piles show traces of concrete adhering to the steel surface in the area where the concrete cap (monolith) used to exist prior to the development of the breach.

Three of the recovered sheet piles were welded to one of the longer and newer sheets, as shown in Figures 41 and 42. Based on this configuration, these sheets had to have been recovered from the transition joint between the two adjoining I-walls (the old 1966-68 wall and the newer 1980 wall). The photographs show that one of the 1966-68 sheet piles was torn and bent at that joint. Based on my visual inspection, the interlocks of the older sheet piles were significantly rusted and corroded and, therefore, their interlocking capability had been compromised. The extensive rusting and corrosion weakened the steel sheet piles and resulted in the tear and separation, or dislodging, initiated at the northern limit of the EBNB. The deeper tip penetration of the newer sheet piles enhanced their stability and ability to withstand the rising floodwater pressure. Additional resistance in the direction of the water pressure and flow was provided by the perpendicular PMA-22 sheet pile connected to the more stable T-wall shown in Figure 75.

The higher top of the newer I-wall forced floodwater to splash and cascade first over the lower adjoining 1966-68 I-wall. This would create a localized spout of water flow causing soil erosion on the landside in the area directly beneath the joint between the two adjoining I-walls of different heights. Due to the development of the tear and separation (structural failure under the increasing water pressure), water flow through the gap into the landside would occur before the I-wall was even overtopped. This should explain the eyewitness reports of some early flooding near the area of Florida Avenue before the development of the full breach and flooding. This

situation is similar, but more dramatic, than the observed localized splashing over the IHNC floodwall that was widely broadcast on television stations during Hurricane Gustav in 2008.

### b. Causes of the North Breach (EBNB)

The IHNC east bank I-wall, like many other failed I-walls including the I-wall failure on the west bank of the IHNC, was inadequate to withstand the Katrina storm surge water pressure. In fact, design of this I-wall does not meet the present requirements included in the USACE HSDRRS design guidelines (2006, 2007 & 2008). Water flow through the torn and separated segment of the sheet pile wall at the EBNB, and water cascading over the shorter 1966-68 I-wall where it adjoins the new and higher floodwall to the north, caused excessive localized erosion on the landside at a much lower water level in the IHNC than the floodwall top. This concentrated flow spout eroded the soils behind the wall back within that area. Soil erosion progressed farther and deeper as more splashing and overtopping occurred with the rising water in the IHNC. Some localized scour developed in the earthen levee along the posts of the construction cyclone fence installed on the landside of the I-wall.

Formation of a tension crack on the flood side of the I-wall played a major role in the development of both the EBNB and EBSB. Available data from IPET, ILIT and other sources show that a gap did form between the floodwall and the levee along the flood side. The increasing storm surge water pressure caused the I-walls throughout the FPS/HPS to lean (tilt) back into the landside at different degrees. This tilt formed a small gap (tension crack) between the I-wall and the embedding soils on the flood side. This gap allowed canal water to penetrate to a greater depth along the sheet pile to exert added lateral pressure against the wall face. The impact of this phenomenon was not considered in the USACE pre-Katrina designs.

According to ILIT, a gap formed on the flood side along the I-wall/levee interface when the water level in the IHNC was at about Elev. +11.5 to +13.0 ft. MSL (Elev. +9 to +10.5 ft. NAVD88), and progressed fairly rapidly downward toward the sheet pile wall tip at Elev. -8.0 ft. MSL (Elev. -10.5 ft. NAVD88) within the next 1 to 2 ft. of water level rise in the IHNC, such that the increasing lateral pressure due to the rising surge waters finally destabilizes the system (factor of safety ≤ 1.0) at a surge at about Elev. +12 to +13 ft. NAVD88 near the wall top (Elev. +14.5 to +15.5 ft. MSL). According to ILIT, this appears to agree closely with the observed

field timing and surge levels at failure.  My own calculations performed in accordance with the present USACE HSDRRS design guidelines (2007/08) indicate that a 6 to 12 ft. deep tension crack developed at the face of the IHNC I-wall.  This caused a 4 to 9 fold increase in the water force acting on the flood side face of the floodwall from 1,125 lbs/ft. of wall length based on an exposed design wall height of 6 ft. (Elev. +9.0 to +15.0 ft. MSL) to 4,500 and 10,125 lbs/ft. of wall length with 6 and 12 ft. deep tension cracks, respectively.  My calculations assumed surge water level at the top of the wall and even higher water force would develop when the wall is overtopped.

The North Breach also resulted from the lower soil support on the landside of the levee due to the causes previously discussed in Section 3.1 and illustrated in Figures 25 and 26.  As discussed in the IPET and Team Louisiana reports (2007 and 2006), the EBNB occurred first and at the lowest ground location on the landside of the floodwall along the east bank of the IHNC. This location represents a "weak link" along the continuous floodwall in terms of available soil resistance.  While the ground surface was also low in the EBSB area, it was much lower in the EBNB area to constitute the "weakest link" in the entire floodwall.

IPET and ILIT analyzed the global stability of the IHNC I-wall breaches using the Spencer's method with and without assuming a tension crack (gap or separation) between the IHNC east bank I-wall and the soil on the flood side.  Reference is made to the discussion of the MOP and Spencer analyses given in Section 1.1 and Figures 4a and 4b of this report.  The IPET soil strength profiles shown in Figures 23 and 24 used in their analyses agreed fairly closely with the design strength profile reported in the General Design Memorandum (GDM No. 3) under the centerline of the levee.  I also used these diagrams as well as my own adjustments in my analyses of the breaches discussed in details in Appendix B.  Both the GDM and the IPET strength models assign lower strengths at the levee toe and beyond than under the crown of the levee, but the GDM strengths are unconservative, as shown in Figure 24 (that is, the GDM assumptions are overly optimistic regarding the strength of the subsoil).[1]

---

[1] IPET's Method of Planes analysis is a more conservative method. For the IHNC water level at Elev. +10.5 ft. MSL (the design water level), the factor of safety computed using the Method of Planes was 1.25 for the EBNB. The minimum factor of safety calculated by IPET for the same conditions using Spencer's method was 1.45, indicating that the Method of Planes is conservative by about 14 percent in this case.

There are indications in some expert investigative reports that eyewitnesses reported some water ponding in the area of the EBNB prior to the actual flooding of the Lower Ninth Ward area.  Based on the calculations performed by the IPET investigators, the I-wall in the EBNB area would have failed without the water level in the IHNC reaching the wall top or overtopping the wall. The IPET report also concluded that foundation instability (insufficient tip penetration) was the cause of the failure and breach at this site.  The failure mechanism favored in those analyses, however, was based on a semi-rotational failure dominated by undrained shear failure through the soft clays underlying the marsh stratum.  IPET concluded that this failure occurred at a relatively early stage, at a canal water level of only Elev. +9.0 ft. MSL (+6.5 ft. NAVD88), and that this early failure accounted for the observations of ponding of water along this general levee frontage well in advance of the failure of the larger breach section to the south (EBSB).

Results of the IPET (2007) and ILIT (2006) analyses suggest that even without the formation of a gap between the wall face and the embedding levee, the structure was inadequate to withstand the storm surge.  The USACE IPET concluded that the factor of safety dropped to about 1.0 with a crack on the canal side of the floodwall at Elev. +11.2 ft. NAVD88 (Elev. +13.7 ft. MSL) before overtopping occurred (See IPET Report V-11-2).  My analyses using the USACE programs FS004, Slope/W and CWALSHT to check the global stability and adequacy of the sheet pile tip penetration and section confirmed this conclusion.  A factor of safety near 1.0 was computed at the North Breach (EBNB) using both the MOP and Spencer's methods without a tension crack prior to overtopping (water at Elev. +11.5 ft. MSL or Elev. +9 ft. NAVD88) due to the low ground surface elevation on the protected side at that location, as illustrated in Figures 25 and 26. The lower ground elevation coupled with localized scour in the area of the tear and separation on the landside resulted in a smaller passive wedge and lower soil resistance than what was needed for global stability of the I-wall.  The factor of safety against global stability failure drops to about 0.9 with flood water at Elev. +11.5 ft. MSL (Elev. +9 ft. NAVD88) when a tension crack is considered in the Spencer's analyses of the EBNB.  In all cases, the critical failure surface developed near the bottom of the marsh stratum at Elev. -17.0 ft. MSL (Elev. -19.5 ft. NAVD88), which is consistent with the original USACE GDM.  Similar results were obtained from the CWALSHT analyses which also indicated inadequate sheet pile section in terms of tip penetration, moment capacity and deflection.

An important cause of the North Breach was the structural failure at the weak transition link between two sheet pile wall segments of different lengths – a newer and deeper sheet pile wall beyond the northern limit of the EBNB, which remained in place, and an older and shorter sheet pile wall to the south which tore, bent, separated and dislodged under the increasing water pressure. The tear, bending, and separation of the sheet piles at the north limit of the EBNB are attributed to the higher stiffness of the floodwall segment on the Florida Avenue side due to the presence of several interconnected and newer floodwalls that added additional resistance at that location, as shown in Figures 38 and 75. In addition, the 1980 I-wall segment to the north, which is part of the Florida Avenue complex, had a deeper sheet pile tip penetration to Elev. -25 ft. NGVD29 (Elev. -23 ft. MSL and Elev. -25.5 ft. NAVD88) in contrast with the breached 1966-68 I-wall that had a sheet pile tip penetration only to Elev. -8.0 ft. MSL (Elev. -10 ft. NGVD29 and Elev. -10.5 ft. NAVD88), as shown in Figure 38. The 1980 I-wall is also connected to a stronger T-wall on the north side which adds more rigidity to the north segment of the floodwall. This evidence coupled with the fact that the ground surface in the EBNB area was the lowest throughout the floodwall limits further makes the EBNB area the "weakest link" within the entire floodwall including the west bank I-wall.

The North Breach was initiated when a rusted and shorter 1966-68 sheet pile connected to a new and longer 1980 sheet pile tore under the water pressure on the flood side. The torn sheet pile then bent back into the landside creating a gap or opening. This bent steel sheet pile perturbing into the landside likely accounts for what was described by an eyewitness as "*Imagine it was still dark, but I could see that. Because it looked like a mouth with a tooth out. That's what went through my mind. And then I seen what appear to be metal structure like a barge, only the tip of it. Couldn't tell you I seen a whole barge because I didn't*". The developed tear allowed floodwater to enter with higher flow and concentration (spout like) into the landside. As this flow continued, it eroded the soils deeper on the landside of the I-wall in the vicinity of the northern limit of the EBNB. The difference in wall heights at that location forced water to cascade over the shorter, bent and torn 1966-68 sheet piles which further aggravated and expanded the localized erosion at that location. Consequently, more soil resistance was being lost as more landside soils scoured away by water. Ultimately, the EBNB fully developed when the rusted and weakened interlocks adjoining 1966-68 two steel sheet piles separated in full and the water pressure rolled or tumbled the wall back into the landside, as illustrated in Figure 31.

50

This could be thought of like an object rolling over a gentle slope with one end being tied with a rope to the top of the slope (standing segment of the breach).

In addition to the tension crack formation on the flood side and the soil erosion on the inboard (landside) toe of the floodwall, the EBNB was possibly the result of one or more of the underseepage-induced mechanisms, possibly two or more acting in concert. Based on the geometry of the post-failure configuration, ILIT concluded that the narrow and deep failure at the EBNB was caused by either seepage erosion and piping, or a combination of hydraulic uplift "blowout" followed by piping. Their calculated high exit gradients, and the hydraulic uplift pressures at the inboard toe region, support their conclusion. The ILIT analyses showed that the flow travels through the continuous marsh layer that was left frustratingly open to flow by the shallow sheet piles that were an inadequate cut-off at this site, and that seepage exit gradients at and near the inboard toe are massively unsafe with regard to the initiation of seepage erosion and piping in these relatively lightweight soils. To the extent that these mechanisms were at work, they would have weakened the levee/wall structure and hastened its failure.

ILIT showed that the I-wall section at the EBNB was marginally unstable with regard to limit equilibrium (Spencer's method), as a result of underseepage-induced pore pressures and resultant loss of strength. The most critical failure surface for this case passes through (and largely within) the main marsh layer, though a secondary failure surface concentrated near the interface between this marsh layer and the overlying clay layer has a nearly similar (unstable) factor of safety. This breached section is analytically unstable by a number of potential mechanisms, all of them associated with underseepage flow passing beneath the sheet pile curtain. According to ILIT, these potential mechanisms are:

- Seepage erosion and piping due to excessive exit gradients at the inboard toe.
- Hydraulic uplift or "blowout" at the inboard toe.
- Translational stability failure, as a result of reduction in strength of the foundation soils at the inboard side due to underseepage-induced pore pressure increases.

I have personally performed my own analyses using the MOP and Spencer's methods to investigate the failure at the EBNB. I also performed additional analyses to examine the adequacy of the sheet pile tip penetration. The analyses were performed using computer

programs (FS004 *Stability with Uplift*, Slope/W and CWALSHT) used by the USACE NOD for the design of FPS/HPS structures. The analyses were based on the cross-section and soil properties available in the USACE GDM drawings and the IPET report.

Results of my global stability analyses indicate a critical failure surface at either Elev. -15 or -17 ft. MSL (Elev. -17.5 or -19.5 ft. NAVD88) depending on the water level on the flood side and the ground surface elevation on the landside. These surfaces pass through or just below the marsh (peat) stratum and are deeper than the sheet pile tip at Elev. -8 ft. MSL (Elev. -10.5 ft. NAVD88). Therefore, these surfaces will not be intercepted by the sheet pile wall. The calculated factor of safety was generally around 1.0 without a tension track on the flood side. The introduction of a tension crack, lowering the ground surface on the landside or raising the water level above the wall top all result in safety factors below 1.0, indicating failure. Results of the CWALSHT analyses show that the sheet pile penetration becomes inadequate when the top of the levee on the landside is reduced from Elev. +9.0 ft. MSL (Elev. +6.5 ft. NAVD88) to Elev. +5.5 to +6.0 ft. MSL (Elev. +3 to +3.5 ft. NAVD88). This represents the reported lower ground elevation of 3 to 3.5 ft., which is the range reported in the LiDAR 2000 survey. Even lower ground surface existed in the scour area. The analyses also show that the wall would experience measurable deflection on the order of about 0.5 to 2 inches at the levee crown. This deflection would result in the development of a tension crack which could get filled with floodwater to add more hydrostatic pressure on the I-wall. My calculations indicate the development of a tension crack at least 6 to 12 ft. deep.

The EBNB area represents the weakest link in the floodwall and, therefore, the analyses indicate that it had to fail first. For a continuous system, failure should occur at its weakest link or the point of least resistance. In layman's terms, this is similar to pulling a chain link (I-wall) from both ends. It is obvious that the chain will break or separate at its weakest "link" (EBNB). On the other hand, if a strong chain made of thick links (1980 I-wall) is connected with a wire to a small "rusty" chain with thinner links (1966-68 wall), then when the chains are pulled from both ends it is likely that a "tear" will develop at the weakest location of a rusty thin link or at the wire connecting the two chains. This evidence confirms eyewitness reports that the EBNB, which represents the weakest link in the floodwall, occurred before the EBSB. However, since the water level in the IHNC continued to rise with time adding more pressure on the floodwall

(chain) it proceeded to break at the next weakest link, which is the EBSB.  This is fully substantiated with the evidence and analyses included in Section 3.3 and Appendix B.

In summary, the development of the North Breach (EBNB) can be explained by several factors – including a structural failure at the weak transition joint between the two adjoining sheet pile walls, lower ground surface on the landside, formation of a tension crack (gap) on the flood side, loss of soil support on the landside, and potential seepage through a weak subsoil – that would cause the wall to fail at this precise location of the North Breach without any involvement from a barge.  It is, therefore, my opinion that these factors did, in fact, cause the wall to fail first at the "weakest link" in the floodwall

### 3.3  IHNC I-Wall South Breach (EBSB)

a. Description of the South Breach

Figures 46 through 59 show the post-Katrina conditions in the area of the IHNC east bank South Breach (EBSB).  The EBSB developed at about Sta. 30+00 of the USACE 1966 GDM, north of the North Claiborne Avenue Bridge.  It is about 812 ft. long (L) which is much bigger than the EBNB.  The steel sheet pile wall within the EBSB tilted back and its tip (bottom) was dislodged to appear on the ground surface.  Under the floodwater pressure, the I-wall displaced back into the protected side (Lower Ninth Ward) a maximum distance (H) of about 190 ft. at its apex. This maximum displacement corresponds to about 23 percent of the breached length (H/L = 0.234), which is smaller than the corresponding ratio at the EBNB (H/L = 0.30) and many other I-wall breaches.

The EBSB failure pattern is generally similar in shape to the other breaches observed in I-walls during Hurricane Katrina.  The sheet pile wall at the EBSB tilted back and spread landward in a "bow" or "fan" like pattern with the steel sheet piles remaining interlocked throughout the limits of the breach.  The concrete cap (monolith on top of wall) displaced landward and the sheet pile tip moved upward and appeared on the ground surface on the landside.  Parts of the concrete cap broke when the tops of the steel sheet piles spread laterally (flattened) to accommodate the extension associated with the "fanning" pattern.  The flattened sheet pile sections by spreading are very different in appearance than the nearly intact Z-shaped sheet piles recovered from the EBNB and shown in Figures 40, 41 and 42.

The EBSB failure pattern was that observed in typical failures that developed throughout the FPS/HPS I-walls during Hurricane Katrina (Figures 32 through 36). However, it exhibited a "fanning" or "bow" pattern with two distinctive, but interconnected, segments as shown in Figure 46. The north segment (main bow) is located on the Florida Avenue Bridge side and it is about 585 ft. long ($L_1$) with a maximum landward displacement ($H_1$) of 190 ft. at its peak or apex. The south segment (small bow) is located on the Claiborne Bridge side and it is about 227 ft. long ($L_2$) with a maximum landward displacement ($H_2$) of 75 ft. at its peak or apex. The peak displacements of the two segments of the EBSB correspond to about 33 percent of their individual lengths ($H_1/L_1 = 0.325$ and $H_2/L_2 = 0.330$), respectively. These maximum ratios are consistent with the corresponding ratio at the EBNB of about 0.30 and many other typical I-wall failures indicating a consistent failure pattern and cause (increase in water pressure, development of a tension crack, formation of scour trenches due to overtopping and insufficient tip penetration). However, failure at each location was associated with some unique conditions (failure along a soft peat stratum at the 17th Street Canal, underseepage through the underlying sands at the London Avenue Canal and structural failure in a low grade area at the EBNB) as discussed in this report and by other investigating teams (IPET, ILIT, Team Louisiana and others).

b. Causes of the South Breach

The I-wall design section used in the area of the EBSB does not meet the present USACE HSDRRS design guidelines (2006, 2007 & 2008). It also represents the second "weakest link" in the IHNC floodwall. Overtopping and scour constitute a primary cause of the South Breach. Figure 63 shows the results of a geodetic survey performed along the subject floodwall following Hurricane Katrina. The results clearly illustrate that the wall top was much lower than the design grade, particularly in the areas of the EBNB and EBSB. This condition allowed for earlier splashing and overtopping within the limits of both of the east bank breaches.

Early splashing due to wind and waves and overtopping occurred over the wall top particularly over low areas of the floodwall. This initiated erosion and scour of the surface soils immediately behind the floodwall on the landside. Under the storm surge water pressure, a tension crack (separation or gap) developed between the I-wall face and the embedding soil along the flood side. As water filled the gap, the hydrostatic pressure on the I-wall face

increased beyond the value considered in the design.  Under the higher water pressure, the I-wall started to tilt or lean back into the landside.  As the water level continued to rise in the IHNC and continuous overtopping started, a contiguous scour trench developed along the landside of the floodwall starting at the low areas (EBNB and EBSB).  The scour trench widened as overtopping continued and the wall leaned further allowing the falling water to reach farther back into the landside.

Figures 51, 55, 58 and 59 show the scour trench eroded by flowing water overtopping the concrete cap at the EBSB.  Overtopping and scour extended beyond the limits of the EBSB, and the scour trench became 5 to 5.5 ft. deep.  In addition to the EBNB and EBSB, the next weaker segments of the east bank I-wall had also tilted but did not fail, as shown in Figures 29, 59, 60 and 61.  As previously discussed, the floodwall top within the limits of the EBSB was generally lower than the remainder of its length.  This allowed for earlier splashing and overtopping at these low areas. Therefore, it is likely that a deeper and/or wider scouring trench developed at the breached locations resulting in the two adjacent but separate failures.  The levee and foundation soils at the center (apex) of the EBSB were deeply scoured by overtopping as well as the dislodging of the sheet piles and the massive water flow through the breach, as shown in Figure 51.  Therefore, it was not possible to measure the exact depth and width of the scour trench within the limits of the EBSB.  The scour was aggravated further around the posts of the cyclone fence installed along the landside of the I-wall, as shown in Figure 58.  As the scour trench grew wider and deeper along the protected side, the I-wall moved backward and leaned, causing the scour trench to widen landward as the water cascaded farther down the levee slope until sufficient soil resistance was lost and the wall failed, as shown in Figures 49 through 52.

As previously discussed in Section 3.1, several observations were made by examining the 1966 USACE soil profile shown in Figure 20 and the results of the 2000 and 2005 surveys of the site elevations shown in Figures 25 and 26.  These observations indicate that higher settlements have developed within the limits of EBSB since the construction of the I-wall.  The 2000 LiDAR ground surface on the landside of the I-wall within the limits of the EBSB was lower by up to 3 ft. than the original design elevation.  The lower ground and excessive scour on the landside reduced the soil resistance and resulted in the I-wall failure.

In addition, the 2002 aerial photograph shown in Figures 74 and 76 clearly illustrates that the South Breach (EBSB) also occurred at a weak segment of the I-wall.  The USACE GDM and as-built drawings show that the I-wall deviated from its normal straight line alignment at location A in Figure 74 then it returned back to its original alignment at location B in Figure 74.  The limits of the deviated segment match precisely those of the EBSB shown in the post-Katrina aerial photograph (Figure 47 versus Figure 76).  The cause of this deviation in the wall alignment is not known at this time, but it could have been necessitated by an existing feature (industrial facility, underground pipe, building, retention pond, road, etc.) on either side of the floodwall at the time of construction which forced the designers to deviate from the straight line alignment.  The curved I-wall created weak links at the ends of the EBSB with the adjoining sheet piles.

As previously discussed, industrial facilities existed along the flood side (EBIA) at the time of construction of the I-wall.  In addition, Jourdan Canal that paralleled the floodwall at the time of its construction was subsequently filled.  The U.S. District Court, Eastern District of Louisiana, In Re: Katrina Canal Breaches Consolidated Litigation, Civil Action No. 05-4182, Section "K"(2), Case 2:05-cv-04182-SRD-JCW, Document 16723, Filed Dec 15, 2008 provides some detailed discussions in this regard.  Underground structures (drainage pipes, tanks, utilities, etc.) may have possibly extended underneath the floodwall between the EBIA and the Lower Ninth Ward.  The presence of an underground feature creates a weak point and a possible path for floodwater to flow into the protected side.  Miscellaneous dredging, construction and demolition activities occurred in the EBIA over the years.  This included some recent deep excavations made in the vicinity of the EBNB and EBSB in 2004-05.  These excavations were subsequently filled with backfill material excavated from the site or with sand.  This fill was placed in a semi-compacted condition and, therefore, it is more permeable than the naturally occurring soils at the subject site.  Construction activities performed in EBIA such as vibrations, excavation, dewatering, etc. may have also affected the integrity of the floodwall.  Loss of soil support due to dredging or excavation on either side of the wall and possible flow of water underneath the floodwall would cause global instability particularly under high water heads during floods.  These are conditions that could further compromise the wall stability beyond the lower structural capacity resulting from the wall curvature, which corresponds to the precise limits of the South Breach.

The South Breach (EBSB) appears to comprise of two interconnected scour-induced failure segments that have either occurred simultaneously or in-phase, as indicated by the two "bow" segments shown in Figures 46, 47, 48 and 50.  The north main segment progressed faster and yielded first and was the source of the major inrush of water reported in that area of the Lower Ninth Ward.  The smaller southern segment of the EBSB followed when the tension crack developed and the wall started to lean back into the landside.  Lesser splashing and overtopping occurred over this segment because of the higher wall top at the southern limit of the EBSB.  Therefore, a smaller scour trench developed on the landside of the wall and the wall only leaned back, but it did not fully spread back or dislodge.  It appears that this south segment was at the state of incipient failure that became partially dislodged, but did not fail until it was pulled out from the ground when the north segment (main bow) failed first.  This scenario explains the wide spread (apex = 190 ft.) of the main north segment of the EBSB and the relatively smaller spread (apex = 75 ft.) of the smaller south segment.  Figures 29, 59, 60 and 61 indicate that the IHNC east bank floodwall has tilted at several locations which supports the theory of multiple "bows" or incipient potential breach locations at the weaker "links" of wall.  As will be discussed below, the Barge was carried along with the inrushing floodwater after the two segments of the EBSB had occurred and entered into the neighborhood at the very southern end of the south segment (small bow), after the wall at that location had already tilted or failed completely under water pressure and flow through the north segment of the EBSB.

In addition to overtopping and scour erosion and the weakness in the I-wall alignment discussed above, it appears that soil weakness and permeability may have played some role in the South Breach as well.  ILIT reported that lateral permeability was very high within at least some of the substrata of the variable marsh deposits at the two east bank IHNC breach sites near the Lower Ninth Ward.  As shown by their analyses, as the canal water level rose above about Elev. + 13 to +14 ft. MSL (Elev. +10.5 to +11.5 ft. NAVD88), this section became analytically unstable by the three potential underseepage mechanisms discussed earlier for the EBNB, all of them associated with flow passing beneath the sheet pile curtain.  Based on the length of the EBSB of approximately 812 ft., ILIT concluded that failure at this site was due to translational instability due to underseepage-induced pore pressure increases, and resulting strength reduction within the landside foundation soils. It is certainly possible, however, that all three mechanisms contributed at least in part.

While overtopping and trenching were in fact occurring, ILIT concluded that it was underseepage-induced instability that actually developed the more critical mechanism that led to the EBSB.  However, many scientists contend that the permeability value assumed in the ILIT analyses for the marsh (peat) stratum is much higher than the typical values available in published literature.   In either case, underseepage could have contributed to the floodwall instability due to the shallow penetration of the sheet piles.  This is particularly possible if semi-compacted and more permeable fill was used to backfill the excavations on either side of the floodwall.  It is also likely that the formation of a tension crack on the flood side increased the lateral pressure exerted against the wall face by the water in the canal and possibly led to shorter path for water to permeate into the soil below the shallow sheet pile tip.

Results of my global stability analyses of the EBSB indicate a critical failure surface at either Elev. -15 or -17 ft. MSL (Elev. -17.5 or -19.5 ft. NAVD88) depending on the water level on the flood side and the ground surface elevation on the landside. These failure surfaces pass through or below the marsh stratum and below the sheet pile tip at Elev. -8 ft. MSL (Elev. -10.5 ft. NAVD88).   Therefore, the failure surface will not be intercepted by the sheet pile wall. The calculated factor of safety was generally around 1.0 without a tension track on the flood side. The introduction of only a 3 to 5 ft. deep tension crack yields safety factors below 1.0, indicating failure.  Results of the CWALSHT analyses show that the sheet pile wall becomes unsafe when the top of the levee on the landside is eroded by overtopping down from Elev. +9.0 ft. MSL (Elev. +6.5 ft. NAVD88) to Elev. +5.5 to +6.0 ft. MSL (Elev. +3 to +3.5 ft. NAVD88).   This represents a difference in elevation of 3 to 3.5 ft., which is less than the reported depth of the scour trench that developed along the landside of the wall.

The analyses also show that the IHNC floodwall would experience measurable deflection of about 0.5 to 2 inches at the elevation of the levee crown.  This deflection would result in the development of a tension crack which could get filled with floodwater to increase the hydrostatic pressure on the I-wall.  Based on the results of my analyses, a 6 to 12 ft. deep tension crack has developed along the flood side face of the I-wall.  This shortens the flow path around the sheet pile.  This also causes an increase in the water load acting on the wall by 4 to 9 folds from 1,125 lbs/ft. based on the design wall height of 6 ft. to 4,500 and 10,125 lbs/ft. based on 6 and 12 ft. deep tension cracks, respectively.  These calculations assume surge water at the top of the wall

and even higher water load would develop when the wall is overtopped.   Based on the hydrograph shown in Figure 18, the water level in the IHNC overtopped the floodwall by as much as 2.5 ft. of water.   Consequently, the pressure on the wall may have increased by 11 folds to about 12,500 lbs/ft. of wall.

As was the case with the North Breach, the location of the South Breach is explained and pinpointed by the configuration of the wall and its supporting levee, together with the effects of the storm.   Overtopping scoured away the soil on the landside of the levee based partly on a lower wall top in this area, reducing the lateral support on the protected side of the floodwall and allowing the water pressure to topple the wall.   The wall failed at a weak point created by a curvature in the wall alignment, the limits of which corresponded perfectly with the limits of the South Breach.   Weakness in the underlying soils and construction activities on either side of the wall may have hastened the demise of the wall.   Again, these factors explain why the wall failed where it did at its "weakest links" without any involvement of a barge.

### 3.4  IHNC Wall Failures Resulted from Variations from Design Assumptions

Design of the I-wall that existed along the east bank of the IHNC at the time of Hurricane Katrina does not meet the present requirements included in the USACE HSDRRS design guidelines (2006, 2007 & 2008).   Based on the above discussion, the foundation failure at the North Breach and South Breach along the east bank of the IHNC (EBNB and EBSB) was due to the following variations between the design assumptions and the actual site conditions during Hurricane Katrina:

1. The actual ground surface in the breach areas beyond the toe of the levee on the landside was much lower than the original design elevation.   This is caused by the different soil conditions in the areas of the EBNB and EBSB as well as the amount of fill added to raise the site grade in these areas during the construction of the original I-wall and the new Florida Avenue complex in 1980.   Additional areal settlement has occurred with time in the area of the EBNB due to pumping of groundwater at the pumping station near Florida Avenue.

2. The top of the I-wall within the limits of the breach settled due to the weight of fill added during the construction of the I-wall to reshape the levee at both breach locations and due

to the variations in the subsoil conditions.  This resulted in earlier splashing and overtopping of the I-wall at these locations.

3. The original I-wall design did not consider the development of a tension crack (gap or separation) along the flood side face of the wall resulting in an additional water pressure on the wall and a shorter path for water flow and underseepage.

4. The original I-wall design did not consider the development of a scour trench along the protected side due to splashing and overtopping.  More soil beyond the levee toe on the landside was scoured away by water that resulted in wall instability.

5. A cyclone fence installed along the landside of the I-wall, not part of the original floodwall design, aggravated the scour from water splashing and overtopping.  The localized scour area expanded around the posts of the cyclone fence which essentially propagated to create a continuous deep scour trench.

6. Concentrated flow due to flow through the torn and separated sheet piles at the northern limit of the EBNB where two I-walls with different tops and tips adjoined caused more concentrated scour on the landside at that location.  Similar concentrated but lesser flow may have also occurred at the construction joints between the individual segments of the concrete cap above the sheet pile top where rubber fillers were missing.

7. The EBNB and EBSB occurred at the most weakest links in the IHNC east bank floodwall with the EBNB occurring first.  The failed 1966-68 I-wall was connected just north of the EBNB to a 1980 I-wall with a longer sheet pile which in turn was connected to a perpendicular I-wall followed by a stronger T-wall.  Deterioration of the 1966-68 sheet piles and their interlocks over time caused the tear and dislodging at the northern end of the EBNB.  This structural failure represented the weakest link in the entire floodwall and, therefore, it failed first.  The EBSB occurred next within the precise limits of a curved segment of the I-wall which was likely the result of an existing structure(s) or feature(s) in that area at the time of construction.

8.  Some dredging, excavation, demolition and other activities also occurred along the flood side of the I-wall with time.  These activities may have also impacted the integrity of the floodwall or caused unfavorable soil conditions with regard to seepage and/or wall stability.

9. Sheet pile tip penetration was insufficient to assure global stability, local stability and/or seepage control of the I-wall under the high storm surge water pressure.

## 4.0  Why the Barge ING 4727 Did Not Cause the IHNC East Bank I-Wall Failures

Figures 48, 49, 50, 53, 54 and 58 show the Barge ING 4727 at its final landing position atop a small school bus near its point of entry at the southern end of the EBSB.  Following Hurricane Katrina the Barge had originally come to rest farther to the east, as shown in Figures 46 and 47.  After Hurricane Rita, the Barge came to rest at its final position over the small school bus which was also abandoned at that location after Hurricane Katrina.

The main thrust of my report is that the floodwall at the IHNC failed for reasons that had nothing to do with a barge.  I have also specifically analyzed the question of the Barge's supposed involvement and concluded that it did not cause either breach.  Instead, it is my opinion, and that of all of the main investigating teams including IPET (2007), ILIT (2006) and Team Louisiana (2006), that the Barge ING 4727 entered the Lower Ninth Ward through the already-developed IHNC East Bank South Breach (EBSB).

My conclusion is based on a review of the available documents, site visits, observations and analyses presented in the previous sections of this report and in Appendix B.  More specifically, it is based on the following items:

1. No investigative panel found any involvement by the Barge ING 4727 with the IHNC east bank breaches.  All of the investigating teams, including ILIT, ASCE, IPET and Team Louisiana, examined and modeled the two IHNC east bank breaches (EBNB and EBSB) and did not attribute either failure to a Barge impact.  They all agreed that the Barge entered into the Lower Ninth Ward area after the development of both breaches, or at a minimum, that the breaches occurred for reasons having nothing to do with the Barge.  Their investigations included forensic work, closed-form analytical solutions, computer modeling, finite element analyses and centrifuge modeling.  For example, ILIT concluded that other modes of failure would have been expected to fail the IHNC east bank I-wall without the impact of the Barge. The EBNB and EBSB developed for the reasons discussed earlier in Sections 3.2, 3.3, and 3.4, not the Barge.  The conditions at these breach sites were sufficient to cause the failures of the walls at those sites without any involvement by the Barge.

2. <u>The IHNC breaches are similar in pattern to other breaches that occurred in many other</u> <u>I-walls throughout the region without a barge.</u>  The failure pattern (bow or fanning like pattern) at the IHNC east bank floodwall breaches is similar to other I-wall failures, including the IHNC west bank I-wall failure observed during Katrina, which clearly occurred without any involvement from a barge.  Water overtopping the floodwalls throughout the FPS/HPS led to extensive scour and erosion at many locations, which ultimately resulted in breaches or wall tilting.  Water flowing over the floodwall scoured and eroded the levee on the protected side of the I-wall, exposing the supporting sheet piles and reducing the soil resistance needed for global stability.  The U-shaped scour trenches of various widths and depths could be seen along breached and unbreached segments of the I-walls shown in Figures 15, 29, 51, 55, 58, 59, 65, 71 and 73.  As the scour trench on the protected side grew wider and deeper, the I-wall moved or tilted back, causing the scour trench to widen even more as water cascaded farther down the slope until sufficient soil resistance was lost and the wall failed.  I-walls and levees along the Mississippi River Gulf Outlet (MRGO) and the Mississippi River in Plaquemines Parish suffered similar damage due to overtopping where the greater the scour, the greater the lateral translation and tilting of walls (*IPET Report* at V-103, 104).  Although there are some differences in the degree of translation, the pattern of the failures at the IHNC east bank (North Breach and South Breach) is similar in appearance and configuration to floodwall failures that occurred at other locations without barge involvement, thus indicating that the Barge ING 4727 was not involved in the IHNC failures.

3. <u>Soil conditions at the IHNC were similar to other breach sites where no barge was</u> <u>present.</u>  ILIT similarly reported that soil conditions near the IHNC breaches were similar to those found at other breaches where no barge was even arguably present.  ILIT stated that lateral permeability was very high within at least some of the sub-strata of the variable marsh deposits, both at the two east bank IHNC breach sites at the edge of the Lower Ninth Ward, as well as at sites along the drainage canals at the north end of the main (downtown) New Orleans protected basin.  Hydraulic response at nearby boreholes was very rapid, and evidence of the occurrence of high water pressures and underseepage was noted at several locations.  IPET investigators were surprised by the difficulties in dewatering a very shallow excavation to recover large block samples of peaty "marsh" deposits at the 17th Street Canal breach site for subsequent centrifuge testing.  In addition, persistent reports of underseepage and ponding of waters along this IHNC

frontage at the west edge of the Lower Ninth Ward, and a contractor's significant problems with dewatering of excavations along this same frontage, all suggest high lateral permeability within these strata.  There is evidence of excavations on the flood side by a contractor that appear to have weakened the soil there.  Backfilled excavations and ditches on either side of the floodwall may have also facilitated a path for underseepage.  Again, similarity of conditions at the site of the IHNC breaches to the sites of other breaches that indisputably occurred without any barge involvement suggests that the IHNC breaches likewise occurred without any involvement from a barge.

  4. <u>The sheet piles at the IHNC east bank I-wall and other breaches were too short.</u> Inadequate sheet pile tip penetration, which exacerbated the subsurface vulnerability, was also a common factor in the multiple floodwall failures.  According to ILIT, the New Orleans regional flood protection system needs to be thoroughly re-assessed, and re-analyzed with regard to the potential for additional underseepage-related vulnerabilities.  The USACE at a number of breach repair sites is replacing pre-Katrina sheet piles with lengths of 18 to 24 ft. with far longer (deeper penetrating) sheet piles with lengths of 60 ft. or greater.  The potential mechanisms associated with water seepage include seepage erosion and piping due to excessive exit gradients at the inboard (landside) toe, hydraulic uplift or "blowout" at the inboard toe and translational stability failure, as a result of reduction in strength of the foundation soils at the inboard side due to underseepage-induced pore pressure increases.  These vulnerabilities, which ILIT concludes were in play at the IHNC and at other breaches, have nothing to do with barge impact.  Indeed, the failure mechanism occurs deep in the foundation soils.  Flow of water "softens" weaker soils forming a surface for the stiffer block of soils to slide under water pressure on the I-wall.  This is similar to sliding that would occur when pushing on the back of a layered cake.  The wetter or softer layer in the cake will constitute the "failure" surface along which the top layer of the cake (floodwall and soil block) would slide laterally.  Regardless of the soil characteristics, however, a deeper sheet pile tip penetration increases the lateral stability of the floodwall to resist the increasing water pressure.  As can be seen, cutting the cake in half reduces the lateral resistance to sliding.  This is similar to losing the soil on the landside of the wall due to scour or ground settlement (low grade).  A barge impact does not have such an effect on the soil on the other side of the wall.

5.   <u>Barges impacted many floodwalls and levees without causing breaches.</u>   During Hurricane Katrina, there were over 300 incidents of barges or vessels impacting flood protection structures under similar conditions or even worse than those experienced in the IHNC without any reported catastrophic failures.  These structures include several concrete capped I-walls, as shown in Figures 66 and 72.  These impacts caused only minimal or cosmetic damage to the concrete caps of the I-walls.  Figure 66 shows a comparable size barge leaning on a similar floodwall in New Orleans East as well as the minor damage in the concrete cap resulting from multiple barge impacts.   As can be seen, the floodwall at that particular site did not translate, tilt or fail.  It should be noted that this wall was not overtopped by the surge water since the barge landed aground on the flood side.  Therefore, no scour trench was present on the landside of this floodwall.  Another comparable size barge that made contact with an I-wall without causing it to fail is shown in Figure 72.  This barge impacted and went over the I-wall northwest of the Bayou Bienvenue gate on the MRGO.  Despite the combined effects of scour, impact damage and weight of the barge, the Bayou Bienvenue floodwall suffered only minor damage to the concrete cap.  The barge impact clearly did not cause this floodwall to fail.  Indeed, the gate structure failed at a different location – separate and distant from where the barge made impact – due to scour at the transition between the floodwall and earthen levee on the opposite bank of the gate structure (reasons having nothing to do with a barge).  See *ILIT Report*, at 6-2.  A similar experience was documented by the media during Hurricane Gustav in 2008 where several barges and navy ships impacted the IHNC floodwalls without causing any damage or failure.

6. <u>The IHNC failures were not caused by impact from an object.</u>  Typical I-wall failures during Hurricane Katrina occurred in a "bow" or "fan" shaped pattern with the apex or peak translation developing near the center of the breach which is also the initial point of sheet pile dislodging (failure), as shown in Figures 32 through 36.  Water pressure is equal to zero at the water surface and it increases linearly with depth in all directions (triangular or hydrostatic distribution with depth).  Accordingly, the vertical and lateral water pressure at any given point is equal to the unit weight of water ($\gamma_w$) multiplied by the depth of that point from the water surface (z).  A breach (failure) initiates at the weakest location of an I-wall and progresses or spreads in both directions along the structure under the uniform water pressure.  In laymen's terms, the sheet piles within the limits of the breach would begin to tilt back then dislodge from the ground at the apex (initial point of failure).  The tilting and spreading would then advance in

both directions of the floodwall.  This is like opening a "zipper" by disconnecting some of its center teeth then pulling apart the two parts of the zipper at that location.  The "bow" or "fan" shaped failure results from a uniform (hydrostatic) pressure and not from a direct impact by a floating object, such as a barge, which would cause a localized or "pronounced" indentation at the point of impact.  Furthermore, a barge contact with an I-wall should also damage its concrete cap at the point of impact, as observed at other I-walls where barges made impact, as shown in Figures 66 and 72 (and, as discussed below, at the very southern end of the EBSB where the Barge passed into the neighborhood, but nowhere else).  There is no evidence of a non-uniform or "pronounced" indentation at the main apexes of the IHNC North Breach and South Breach.  There is also no evidence of impact damage to the concrete cap at the main apexes of either of those two breaches, thus indicating there was no direct barge impact at either of those locations.

7.  <u>The Barge entered after the EBSB failure had occurred.</u>  Evidence based on examining the Barge and the failed floodwall shows that the Barge entered the Lower Ninth Ward at a point that is distant from the initial point of failure (apex of the north segment of the EBSB) and after failure in the south segment of the EBSB had already developed and adjoined with the north segment to form the full EBSB.  Figure 64 shows a schematic of the dents, rubbing and scratch marks detected along the bottom of the Barge (Cushing, 2009).  Figure 65 shows the entry point of the Barge into the Lower Ninth Ward area (Cushing, 2009).  As in all other I-wall failures experienced during Hurricane Katrina, the concrete cap of the floodwall along the EBNB and EBSB failed in extension or flexure with the reinforcing steel (rebar) remaining fairly in place.  This resulted from the "fanning" or spreading of the steel sheet piles which caused stretching and compression at the top and bottom of the concrete cap, respectively.  Only one section of the concrete cap at the extreme southern end of the EBSB on the North Claiborne Bridge side showed the effects of an impact, as shown in Figures 55, 56 and 57.  These figures show close-up views of the floodwall at that location which exhibited a crushed concrete cap and compressed and bent rebar pointing landward.  They also show concrete blocks hanging down from the rebar on the landside.  This pattern shows that the bow of the Barge had scraped the top of the tilted I-wall at that location breaking the concrete and flattening the rebar into the landside.  Cushing showed that the scratch pattern along the bottom of the Barge matches closely the spacing and arrangement of the bent rebar at the southern end of the EBSB.  Therefore, this evidence shows that the Barge entered into the Lower Ninth Ward through the southern end of

the EBSB shown in Figure 65, after the wall had already toppled over and tilted throughout the entire breach area including its southern end.

8.  <u>The only Barge impact was localized and away from the initial I-wall failure point (apex).</u>  The evidence shows that the floodwater surface in the IHNC was just below the top of the tilted concrete cap at the time of the Barge contact.  The Barge did not enter cleanly into the EBSB, but struck the concrete cap at the south end of the existing breach after the wall had already tilted landward, before entering into the Lower Ninth Ward along with the inrushing water.  This damage pattern at the extreme southern end of the South Breach, including the localized damage to a section of the concrete cap and the rebar that has been bent toward the neighborhood, strongly resembles other places where barges came into contact with floodwalls without causing the floodwalls to fail. The fact that the Barge made incidental contact with the failed floodwall as it passed through in no way suggests that the Barge had anything to do with the breach.  This Barge impact force on the EBSB could not cause the I-wall failure since the point of entry of the Barge is at the extreme end of the EBSB (location A in Figure 46) where the floodwall had already tilted.  The Barge impact area is confined to the panels nearest the southern end of the EBSB, and is far from the location (main bow in Figure 46) where the wall had initially failed in the fanning pattern characteristic of breaches that occurred without the presence of any barge, as shown in Figures 34 through 36.

9.  <u>Barge impact with the concrete cap could not have caused the I-wall failure.</u>  The impact of the Barge with the concrete cap portion of the floodwall near the EBSB southern end – which is the only portion that the Barge made contact with – could not have caused the floodwall to fail.  The concrete cap of the I-wall does not constitute a point of fixity.  The cap is intended only for esthetics, sealing the sheet pile joints and corrosion protection.  It enhances the longitudinal rigidity of the I-wall, but does not provide additional lateral resistance in the direction of the water pressure or obstruct the Barge contact.  Therefore, the damage caused by the Barge impact to the concrete cap does not reduce the lateral resistance, affect the stability or cause failure of the I-wall.  The EBSB clearly resulted from inadequate or reduced lateral resistance in the sheet pile I-wall, not the concrete cap.  The Barge could not have caused that loss of soil resistance and stability.  The Barge floated with the inrushing water under the prevailing wind into the already tilted southern end of the small bow of the EBSB (location A in

Figure 46).  As the Barge made contact with the concrete cap (Figure 65), it caused localized damage at the site of one or more already dislodged and severely leaning sheet piles.

10.  <u>Water pressure caused the wall to lean then fail.</u>  Figures 29, 59, 60 and 61 indicate that the I-wall along the east bank of the IHNC between the Florida Avenue Bridge and the North Claiborne Bridge experienced tilting throughout its remaining standing segments outside the limits of the EBNB and EBSB.  In the remaining standing segments, the I-wall rotated and translated due to the development of a tension crack on the flood side and a scour trench on the protected side.  This observation gives rise to several conclusions:

(a) The IHNC east bank I-wall experienced significant movement within its entire length between the Florida Avenue Bridge and the North Claiborne Bridge under the water pressure during Hurricane Katrina.  This evidence shows that design of the I-wall along the east bank of the IHNC including at the failed segments along the EBNB and EBSB was inadequate to resist floodwater pressure.  The east bank I-wall experienced variable levels of distress throughout its length, but it failed only at its two weakest locations.  Failure at the weakest locations also occurred at other breach sites in the New Orleans area – for instance, although the I-wall along the west bank of the 17th Street Canal sustained some damage, it did not fail; rather, local failure occurred only at one specific segment on the east bank I-wall which was constructed over weaker soils.  This is also true, but under different failure mechanisms, in the cases of the I-wall failures experienced along the London Avenue Canal (two breaches) and the IHNC west bank.

(b) The IHNC east bank I-wall experienced significant tilting south of the point of entry of the Barge at the southern end of the EBSB, as shown in Figures 59, 60 and 61.  Figure 63 shows the results of a geodetic survey of the top of the IHNC east bank I-wall.   The lower elevation of the I-wall top could be attributed to differential settlements as well as tilting of the wall at those locations.  This tilt indicates that partial failure has developed throughout the I-wall even beyond the southern limit of the EBSB.  This partial failure cannot be attributed to the Barge, which the evidence shows that it entered into the Lower Ninth Ward through the southern end of the EBSB where it remained.  Based on the prevailing southeast wind and water flow in the IHNC, it is impossible for the Barge to have impacted and tilted any other I-wall segments south of its point of entry.   Again, this evidence shows that design of the I-wall along the east bank of the IHNC was inadequate to resist floodwater pressure including the failed segments

along the EBSB and EBSB as well as the tilted segments outside the beached areas. Again, the I-wall failed only at the two weakest locations along its alignment. Furthermore, the rapid rise of the water level on the landside of the I-wall following the occurrence of these two relatively large breaches would have caused water pressure on both sides of the floodwall to equalize faster preventing any further breaches from developing within the other tilting segments.

(c) Figures 46 and 50 indicate that two individual bow segments comprise the EBSB. The longer northern segment of the EBSB propagated first, as indicated by its size, and resulted in the inrush of water through the EBSB. Later, the Barge floated with the inrushing water under the prevailing wind toward the already developed small bow of the EBSB with dislodged sheet piles in the apex and northern end which adjoined the major bow leaving only some tilted sheet piles at the southern end of the smaller segment. From an engineering viewpoint, the large breach or failure could initiate a secondary or smaller breach as it develops or spread laterally along its boundaries like a "zipper". However, the smaller segment (bow) where the Barge had entered could not have generated a larger fanning segment or bow as the one observed in the northern segment of the EBSB.

11. One of the IHNC west bank breaches occurred in an I-wall enlarged earthen levee of similar design and age as the IHNC east bank breaches. Because the Barge ING 4727 had been moored at a location to the south of that west bank I-wall breach site, weather documents received from other experts indicate there was never any wind or water force to drive it to the location of this breach at any time before it had occurred. Furthermore, there are no allegations that the Barge was present in that area or was the cause of that breach. Published articles indicate that the USACE shored another segment of the west bank I-wall in 2008 to assure its stability during the hurricane season.

12. The Barge was never present in the area of the North Breach. Based on information from other experts, there does not appear to have been any time during Hurricane Katrina on August 29, 2005 when the prevailing wind and water flow in the IHNC had a bearing toward the north. Because the Barge ING 4727 had been moored at a location to the south of the EBNB site, there was never any wind or water force to drive it northward to the location of the North Breach. Furthermore, the EBNB failed structurally and initiated at its most northern end, which is located farther north of the mooring dock. Therefore, in order for the Barge to have reached

and impacted the point of the sheet pile separation, it would have had to travel against the water flow and prevailing wind on August 29, 2005.  The laws of physics do not allow for that possibility.   Further, my examination of the failed floodwall and sheet pile sections showed no evidence of a barge impact, which is not surprising given the absence of any reason to believe the barge was even present.

**Summary**

For the reasons stated above in my Report, I conclude that the breaches in the floodwall along the east bank of the Inner Harbor Navigation Canal – both the North Breach and the South Breach – occurred for reasons having nothing to do with the Barge ING 4727.  I also conclude that the Barge ING 4727 did not cause or contribute to either breach.  The results of my analyses of the IHNC breaches are included in Appendix B.

Please feel free to contact me if you have any questions or if need any further information.

Sincerely yours;

Reda M. Bakeer, Ph.D., P.E.