# EXHIBIT 4

Deposition of Charles Cushing

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES

CONSOLIDATED LITIGATION

PERTAINS TO:  BARGE          : CIVIL ACTION

                             : No. 05-4182

                             : and consolidated

Boutte v Lafarge      05-5531 : Cases

Mumford v Ingram      05-5724 :

Lagarde v Lafarge     06-5342 : SECTION "K" (2)

Perry v Ingram        06-6299 :

Benoit v Lafarge      06-7516 : JUDGE STANWOOD R.

Parfait Family v USA 07-3500  : DUVAL, JR.

Lafarge v USA         07-5178 :

Weber v Lafarge       08-4459 : MAGISTRATE JOSEPH C.

                             : WILKINSON, JR.

-----------------------------X


Thursday, August 6, 2009

- - -

     Videotaped oral deposition of CHARLES R. CUSHING,

PH.D., taken at the offices of Goowin Procter,

901 New York Avenue, N.W. Washington, D.C., beginning

at 9:05 a.m., before Nancy J. Martin, a Registered

Professional Reporter, Certified Shorthand Reporter

License No. 9504.

APPEARANCES:                    2

REPRESENTING LAFARGE NORTH AMERICA, INC.:
    GOODWIN PROCTER
    901 New York Avenue, N.W.
    Washington, DC 20001
    (202) 346-4444
    mraffman@goodwinprocter.com
    krobbins@goodwinprocter.com
    BY: MARK S. RAFFMAN, ESQUIRE
        KIRSTEN V.K. ROBBINS, ATTORNEY AT LAW
        JOHN D. ALDOCK, ESQ.

        -and-

    SUTTERFIELD & WEBB, L.L.C.
    650 Poydras Street
    Suite 2715
    New Orleans, Louisiana   70130-6111
    (504) 598-2715
    dwebb@cwslaw.com
    BY: DANIEL A. WEBB, ESQ.

---

INDEX                  4

WITNESS: CHARLES R. CUSHING, PH.D.

QUESTIONED BY:                         PAGE:
    MR. SEYMOUR                           7
    MR. RAFFMAN                         267
                - - -

EXHIBITS

| NUMBER | DESCRIPTION | MARKED FOR ID |
|---|---|---|
| 1 | C.R. Cushing Expert Report, 430 pages | 19 |
| 2 | Dooley SeaWeather Analysis, Inc., Weather Analysis, 45 pages | 87 |
| 3 | National Weather Service Forcast Online, 5 pages | 90 |
| 4 | A New Metric for Hurricane Destructive Potential, 52 pages | 115 |
| 5 | Principles of Naval Architecture, Second Revision, 8 pages, 42 pages | 131 |
| 6 | Tropical Cyclone Report, Hurricane Katrina, 22-30, August 2005, 42 pages | 188 |
| 7 | Deposition of William Joseph Villavaso, Jr., 79 pages | 190 |
| 8 | Principles of Naval Architecture, Second Revision, 2 pages | 219 |

---

APPEARANCES: (CONTINUED)         3

REPRESENTING BARGE PLAINTIFFS:

    KHORRAMI PLLARD & ABIR LLP
    444 South Flower Street
    33rd Floor
    Los Angeles, California   90071
    (213) 596-6000
    dpollard@kpalawyers.com
    BY: DYLAN POLLARD, ESQ.

        -AND-

    LAW OFFICE OF RICHARD T. SEYMOUR, PLLC
    1150 Connecticut Avenue, N.W.
    Suite 900
    Washington DC 20036-4129
    (202) 862-4320
    rick@rickseymourlaw.net
    BY: RICHARD T. SEYMOUR, ESQUIRE

ALSO PRESENT:
    JOHN SHELONKO, LAFARGE NORTH AMERICA, INC.
    LARRY L. DAGGETT, WATERWAY SIMULATION TECHNOLOGY
    GENNARO MARINO, MARINO ENGINEERING ASSOCIATES
    MARK GUENTHER, LEGAL VIDEOGRAPHER

---

DEPOSITION SUPPORT INDEX          5

DIRECTION TO WITNESS NOT TO ANSWER
Page   Line


REQUEST FOR PRODUCTION OF DOCUMENTS
Page   Line

CHARLES R. CUSHING, PH.D.          6

- - -

(It is hereby stipulated and agreed by and among
counsel that sealing, certification, and filing are
waived; and that all objections, except as to the form
of the question, are reserved until the time of
trial.)

- - -

THE VIDEOGRAPHER:  Good morning.  This is the
video deposition of Charles Cushing taken on August 6,
2009, beginning at 9:05:35 in the case of Katrina
Canal Breaches Mumford vs. Lafarge North America, Case
No. 054182 in the United States District Court for the
Eastern District of Louisiana.

The deposition is being taken at the law office
of Goodwin & Procter in Washington, D.C.  The court
reporter today is Nancy Martin of Veritext Reporting
of New York.  I'm the videographer, Mark Guenther,
also with Veritext.  Would the attorneys present
please introduce themselves and who they represent.

MR. SEYMOUR:  My name is Richard Seymour.  I
represent the plaintiffs.

MR. POLLARD:  Dylan Pollard.  I also represent
the plaintiffs

CHARLES R. CUSHING, PH.D.          7

MR. RAFFMAN:  I'm Mark Raffman.  I represent
Lafarge North America.  I'm with the firm of Goodwin &
Procter.  With me today from my firm are Kirsten
Robbins and John Aldock.  Also present for Lafarge
North America is Dan Webb from the firm of Sutterfield
& Webb.  We have also in the room John Shelonko from
Lafarge and Larry Daggett, who is an expert.

MR. POLLARD:  And plaintiffs also have Gerry
Marino, who is one of the plaintiff's experts.

THE VIDEOGRAPHER:  The court reporter can swear
in the witness.

CHARLES R. CUSHING, PH.D.,
having been first duly sworn,
was examined and testified as follows:

EXAMINATION
BY MR. SEYMOUR:
Q.  Please state your name and business address.
A.  My name is Charles Robert Cushing, and my
business address is C.R. Cushing & Company, Inc.,
30 Vesey, V-e-s-e-y, Street, New York, New York,
10007.
Q.  Do you own C.R. Cushing & Company,

CHARLES R. CUSHING, PH.D.          8

Incorporated?
A.  Yes, sir, I do.
Q.  Are there any other owners of the company?
A.  No, sir.
Q.  You have previously testified numerous times
in depositions and at trials, have you not?
A.  I have, yes, sir.
MR. WEBB:  Excuse me.  I'm having difficulty
hearing both of you.
MR. SEYMOUR:  I'll try to keep my voice up, and
for the benefit of your colleague, would you keep your
voice up also.
MR. WEBB:  Thank you.
THE WITNESS:  I surely will, but I'm having a
problem with my voice a little bit.
MR. SEYMOUR:  I understand.
Q.  When I ask a question, if you do not
understand anything about the question or if I use a
term with which you are not familiar, or if the
question seems ambiguous to you, will you let me know
that there's a problem so that we can resolve it and
you can answer the question that I intend to ask?
A.  I will.
Q.  If you answer a question, is it fair for me

CHARLES R. CUSHING, PH.D.          9

to assume that you do not have a problem with the
wording?  You do not see any ambiguity?
A.  Unless I say so, yes, you can assume that.
Q.  In the course of the deposition, there will
be some questions that may be long, and there may be
some answers that may be long.  To make an accurate
record, it is important that I not try to talk over
the end of your answer and that you not try to talk
over the end of my question.  Will you cooperate with
me in waiting until I finish my question before you
start your answer?
A.  I'll do my very best to do that.
Q.  And I'll do the same with respect to not
trying to speak when you're still completing your
answer.  Do you have any physical condition that would
make it difficult for you to testify today and
remember facts so as to provide accurate testimony?
A.  The only problem I have this morning is with
my voice, but aside from that, I have no other
physical condition.
MR. SEYMOUR:  Is the court reporter able to hear
your voice clearly?
REPORTER MARTIN:  I have an audio feed.  I can
hear him.

CHARLES R. CUSHING, PH.D.          10

1
2   MR. SEYMOUR:  The court reporter has no problem,
3   and I have no problem.  So we'll proceed as best we
4   can.
5       Q.  Have you taken any medication or under the --
6   or are you under the influence of any drug or alcohol
7   that would make it difficult for you to answer
8   truthfully and accurately today?
9       A.  I have taken medication, but none of them
10  would inhibit my ability to answer the questions, and
11  I'm not under any influence of alcohol.
12      Q.  Thank you.  Have you done any work or study
13  related to any hurricanes other than Katrina?
14      A.  Not as such, no, sir.
15      Q.  When you say, "not as such," what
16  qualification do you intend?
17      A.  I'm not understanding your question.  Is
18  my -- are you asking what are my qualifications?
19      Q.  No.  I asked if you had done work on any
20  hurricanes other than Katrina, and you said, "not as
21  such."  Are you thinking of something that makes it
22  impossible for you to simply say no?
23      A.  Well, I've been in hurricanes and experienced
24  hurricanes.  That would be one -- one situation.  I
25  certainly have done work that has involved wind and

CHARLES R. CUSHING, PH.D.          11

1
2   heavy winds, but as a -- specifically as a hurricane,
3   no.
4       Q.  So would it be accurate to say that this case
5   is the first case in which you have attempted to
6   analyze the effects of a hurricane?
7       A.  Well, that's not completely correct because
8   what I'm analyzing here are the effects of wind --
9   wind and waves of hurricane strength, and I certainly
10  have done that considerably.
11      Q.  When is the most recent occasion, prior to
12  your work on this case, in which you've studied
13  hurricane winds or waves?
14      A.  Pardon me.  I would say -- I would say within
15  the last year -- pardon me again.  Within the last
16  year.  I've worked on cases involving high wind and
17  high waves in relation to losses of vessels at sea in
18  the Bay of Viscay, for example.
19      Q.  Did any of the work involving the losses of
20  vessels at sea involve hurricanes?
21      A.  Not hurricanes as such, but high winds, winds
22  of gail force or high -- high wind forces and waves
23  generated by the winds.
24      Q.  You said that you had been involved within
25  the last year in a study of hurricane.  What hurricane

CHARLES R. CUSHING, PH.D.          12

1   was that?
2       MR. RAFFMAN:  Objection.
3       THE WITNESS:  I don't think that's the way I
4   testified.  I said I have been involved in the study
5   of the effects of high winds and waves on ships and
6   other vessels, and in the last year, these involved
7   high winds on a particular vessel or vessels.
8   BY MR. SEYMOUR:
9       Q.  Did that involve a hurricane?
10      A.  It wasn't specifically a hurricane, no.
11      Q.  Prior to your work on this case, were you
12  involved in any study on the effect of high winds and
13  waves on land?
14      A.  Yes, sir.
15      Q.  And when is the most recent time that you
16  were involved in such a study?
17      A.  Several years ago.  I don't remember the
18  exact date.  It involved wind loadings on gantry
19  cranes -- these are large container gantry cranes in
20  ports -- to determine the stability of those cranes
21  and the wheel loadings on the pile supports under the
22  cranes.  It involved wind tunnel testing of the
23  structures at various wind speeds as well as differing
24  attitudes of those structures in a wind tunnel.

CHARLES R. CUSHING, PH.D.          13

1
2       Q.  Is that for a lawsuit or for construction?
3       A.  That was for design purposes.
4       Q.  Have you previously been involved in a
5   lawsuit involving the effect of high winds and high
6   waves on land?
7       A.  I don't recall any such case.
8       Q.  If there had been such a case, would you be
9   likely to recall it?
10      A.  Not necessarily because we have been in
11  business 41 years.  Prior to that, I have another 10
12  years in the field, and over the last 41 years, we've
13  carried out almost 4,000 projects, and I can't recall
14  every one.  So it's possible that those cases exist.
15  I just don't recall them sitting here.
16      Q.  Would it be fair to say that it was not
17  significant enough involvement to come to your mind
18  right now?
19      A.  Not necessarily.  There have been many
20  significant cases that I've been involved with, but I
21  just can't remember all 4,000.
22      Q.  How would you categorize your memory?
23      A.  My memory is pretty good.
24      Q.  Have you done any work related to Hurricane
25  katrina for anyone other than Lafarge or its law

CHARLES R. CUSHING, PH.D.                14

1  firms?
2      A.  No, sir.
3      Q.  When did you first become involved in this
4  case?
5      A.  A little over a week after the hurricane
6  occurred.
7      Q.  Tell me what happened.
8      A.  I received a call from a Mr. James Shirley,
9  an attorney at Holland & Knight, who asked me if I was
10 available to become -- to be of assistance in the
11 case.  I advised him I was, and he told me he'd get
12 back to me.
13     Q.  When did he get back to you?
14     A.  I think over the -- the following week after
15 that, we may have had some phone calls, but certainly
16 within a week afterwards, his first call.
17     Q.  Did there come a time when you went to
18 New Orleans to inspect the Inner Harbor Navigational
19 Canal and its surroundings?
20     A.  Yes, sir.
21     Q.  When was that?
22     A.  It's approximately September 22.  That was
23 approximately.  I just don't have the dates exactly in
24 mind.
25

CHARLES R. CUSHING, PH.D.                15

1      Q.  Was that before or after Hurricane Rita?
2      A.  It was before or during Hurricane Rita.
3      Q.  Were you in New Orleans at the time of Rita?
4      A.  Would you repeat the question.
5      Q.  Were you in New Orleans at the time of Rita?
6      A.  Yes, sir, I was.
7      Q.  Was your inspection of the Navigational Canal
8  before or during Rita?
9      A.  First, during Rita because Rita was actually
10 striking New Orleans at the time of my first visit.  I
11 could only get onto the North Claiborne Avenue bridge
12 and view the -- view the canal and the site from the
13 bridge during the hurricane, and then I had an
14 opportunity shortly thereafter to go into the Lower
15 Ninth Ward after the Lower Ninth Ward drained.
16     Q.  And when was that?
17     A.  I think several days later.  Five or six days
18 later.
19     Q.  Is it correct that the Lower Ninth Ward
20 flooded again during Hurricane Rita?
21     A.  It did.
22     Q.  Please describe the state of the Inner Harbor
23 Navigational Canal east floodwall at the time you
24 first saw it.
25

CHARLES R. CUSHING, PH.D.                16

1      MR. RAFFMAN:  East of which floodwall?
2      MR. SEYMOUR:  The east floodwall.
3      MR. RAFFMAN:  The canal east of the east --
4      MR. SEYMOUR:  If the witness does not understand
5  the question, the witness can raise a question, but I
6  object to coaching.
7      MR. RAFFMAN:  Trust me.  I'm not trying to coach
8  the witness.  I'm trying to understand the question.
9      THE WITNESS:  Could I hear the question again.
10     MR. SEYMOUR:  Please read it back.
11     (Record read.)
12     MR. SEYMOUR:  The east floodwall.
13     (Record read.)
14     THE WITNESS:  My visit to the Lower Ninth Ward
15 focused on the east floodwall extending from
16 approximately the North Florida Avenue -- or the
17 Florida Avenue bridge southward to the
18 Claiborne Avenue bridge.  I had an opportunity at that
19 time to walk the length of the floodwall and to
20 examine the standing portions as well as the sections
21 of the floodwall and berms that had been washed in --
22 inland.
23     I had an opportunity to photograph, take an
24 extensive number of photographs of what I saw.  I
25

CHARLES R. CUSHING, PH.D.                17

1  staked out locations at 50-foot intervals along the
2  south breach for purposes of photography and
3  identifying the photographs.  What I observed was at
4  the north breach, a sheet wall that was lying in
5  helical fashion, collapsed and obviously a washout.  I
6  observed at the -- generally at the south breach, the
7  sheet piling that had formed part of the floodwall
8  that was blown inward some approximately 180 feet, and
9  at the northern end of the southern breach,
10 approximately near North Johnson Street, and then in a
11 large bowing shape, the floodwall sheet piling then
12 extended back to the south end of the south breach,
13 closer to North Roman Street or south of Prieur
14 Street.
15     Q.  You mentioned that you had staked out 50-foot
16 intervals.  Did you actually have a 50-foot tape or
17 something like that that you measured the intervals
18 with?
19     A.  Yes, I did.
20     Q.  And did you take photographs at each 50-foot
21 intervals?
22     A.  Yes, sir.
23     Q.  Where are those photographs?
24     A.  I believe counsel supplied them to you all.
25

5 (Pages 14 to 17)

CHARLES R. CUSHING, PH.D.          18

1
2    Q.  Can you identify the Bates numbers of the
3    photographs from this particular trip?
4    A.  I'm not sure I can.  I have in my report
5    reference material that I relied on.
6    MR. RAFFMAN:  For the record, I'm not sure that
7    we supplied all of the photos of the 50-foot intervals
8    to plaintiffs, just as Mr. Pazos has not supplied us
9    with every photo that -- that he took.  We did supply
10   plaintiffs with all photos that Mr. Cushing -- or
11   Dr. Cushing relies upon, and there are Bates numbers
12   at the back of the report.
13   BY MR. SEYMOUR:
14   Q.  Will you turn to the appendix that has Bates
15   numbers of images?
16   A.  That's just what I'm doing, sir.
17   Q.  And which -- for the record, which appendix
18   number is that?
19   A.  I don't know.  I'm looking for it now.
20   Q.  Okay.  If you look at Appendix K, it says,
21   "Additional Photographs."  Is that what you're looking
22   for?
23   A.  No, sir.  I don't believe so.  Let me look at
24   this.
25   MR. SEYMOUR:  While you're looking, I asked the

CHARLES R. CUSHING, PH.D.          19

1
2    court reporter to mark as Exhibit 1 to the deposition
3    Dr. Cushing's report and Appendices A through O.
4          (The Reporter marked the documents
5           referred to as Deposition Exhibit 1
6           for identification.)
7    MR. SEYMOUR:  I've placed a tabbed copy of your
8    report and appendices in front of you to make it
9    easier for you to --
10         (The witness reviewed the document.)
11   THE WITNESS:  There.  I found it.
12   BY MR. SEYMOUR:
13   Q.  I think if you use the tabbed report, it will
14   be fast -- easier for you to find things, and we can
15   use some time in the deposition.
16   A.  I think -- I think my -- my copy -- I put
17   tabs on.  It will be helpful for me to use my report.
18   It's just that this one wasn't tabbed in my report.
19         At any rate, these were -- these are a list
20   of the additional photographs in addition to the
21   photographs that appear in my report that I believe
22   have been provided.
23   Q.  Do you know which of these, if any, are
24   photographs that you took at the 50-foot intervals
25   shortly after Hurricane Rita and the draining of the

CHARLES R. CUSHING, PH.D.          20

1    Ninth Ward the second time?
2    A.  I don't know exactly what -- which
3    photographs are in this -- this collection here.
4    Q.  Do you have any description of the date,
5    time, and object being viewed for the photographs that
6    are listed in Appendix K to your report?
7    A.  I believe the photographs are -- all of the
8    photographs relating to the fallen floodwall and the
9    debris around it were taken on the same date.  I think
10   the photographs have been marked both as to which
11   location, which of these 50-foot intervals where the
12   photographs were taken, and also the direction in
13   which the photograph was taken, north, south, east or
14   west.  The photographs are marked.
15   Q.  Okay.  Where are those markings?
16   A.  I marked the back of every one of those
17   photographs.
18   Q.  Without the information on the backs of the
19   photographs, would it be possible to tell what one is
20   looking at and where and when the photograph was
21   taken?
22   A.  Yes, sir, because the photographs start at
23   the southern end of the south breach, at the first
24   marker, and then progress one by one to each of the

CHARLES R. CUSHING, PH.D.          21

1
2    markers 50 -- at 50-foot intervals north of that, and
3    they were taken sequentially from north to east to
4    south to west.
5    Q.  Are the photographs that are mentioned by
6    Bates number in Appendix K to your report all here in
7    sequence so that one would see your first photograph
8    as No. 739, for example, and your second photograph
9    would be 740, or are they out of order?
10   A.  I can't tell because I haven't seen the Bates
11   numbers on the -- on the photographs.
12   Q.  So as we sit here today, it's not possible to
13   tell what any of these images relates to?
14   A.  Without looking at the picture.
15   Q.  And potentially the back of the picture?
16   A.  Yes, sir.
17   Q.  You stated that the north breach was
18   "obviously a washout."  What do you mean by "washout"?
19   A.  I mean that the inflow of water from the
20   canal to the -- into the Lower Ninth Ward was under
21   extreme -- extremely high pressure and velocity.  It
22   was a devastating flow of water.
23   Q.  Would it ordinarily be expected that when you
24   have a breach in a canal, the breach will widen
25   because of the pressure of the water?

CHARLES R. CUSHING, PH.D.                    22

A. It can, yes.

Q. Would that ordinarily be expected?

A. It depends.

Q. Under what circumstances would it not be expected?

A. If the structure that didn't fail initially was strong enough to resist the flow of water and didn't depend upon the support of the portion that got washed away, then it wouldn't widen.

Q. Have you seen many levee breaches in your career?

A. I've seen photographs of them.

Q. Apart from the Katrina case, in what other work have you seen photographs of other breaches?

A. These are in publications, various publications.

Q. Are you referring to articles that you would see in publications to which you subscribe?

A. Or into which I've referred to as reference works.

Q. Have you done any work on levee breaches before this case?

A. No, sir.

Q. Do you know whether it is common that when

CHARLES R. CUSHING, PH.D.                    23

there is a breach in a levee with a great deal of water on the water side of the levee, that the breach will widen?

A. Again, I think -- I say it depends on the structure adjacent to the failed portion of the levee, and I presume here we're talking -- are you asking about levees or floodwalls?

Q. I'm talking -- asking about levees.

A. Levees. Yeah. Then I think if the levee is not otherwise reinforced, if it's just an earthwork berm, then it will widen.

Q. And levees reinforced by floodwalls, would it be common that the breach would widen?

A. Then I'd have to refer to my previous comments that it depends upon the structure that exists adjacent to the -- to the breach. If the structure is strong enough, such as is at the north end of the north breach, where a portion of the floodwall that had been installed in the 1980's with deeper sheet pilings withstood the flood waters, that's an example of why it doesn't widen.

But on the other hand, if one looks at the south end of the north breach where the floodwall toppled, continued toppling or in the south breach

CHARLES R. CUSHING, PH.D.                    24

where the floodwall to the south of the point of initiation toppled after the initial flooding, then, yes, it does widen.

(Telephonic interruption.)

MR. SEYMOUR: Can we please turn off cell phones.

Q. I'm not asking you about the condition under which the breach would widen or the breach would not widen. I'm asking you about the frequency with which a breach is widened. Are you able to say anything as to the frequency?

A. I don't recall any question up to this point had to do with frequency. You asked me if it's -- if it's possible that it happens.

Q. I asked if it was common that it happens.

A. It's common, yes.

Q. Thank you. And that is true for -- just to make sure that we're clear on the record, that's true both for levees and for levees reinforced by floodwalls?

A. Yes. With the exception that I -- I gave you where the structure is strong enough to withstand that widening of the breach.

Q. And is it very common that the structure is strong enough that a breach does not widen?

CHARLES R. CUSHING, PH.D.                    25

A. No, it's not uncommon because usually a floodwall is consistent in strength along its length. It's usually built at one time to one design. In the case of the north breach, however, there were two different -- the floodwalls had different characteristics at the point at which the sheet piling failed.

Q. What is the source of your information on the common techniques of construction of floodwalls?

A. Well, I'm not sure I understand. It's such a general question. The U.S. Army Corps of Engineers manuals, for example, are replete with information as to the design of floodwalls and how floodwalls are designed. At the same time, in the case of Hurricane Katrina, there are numerous pictures of many different kinds of floodwalls showing the commonality of the floodwall design, and just common sense tells you when you build a floodwall, you build it as a continuous strip. You don't do pieces and parts and segment the floodwall.

Q. Did you study the Army Corps of Engineers manuals on the construction of floodwalls for purposes of this case?

A. I've read it -- read through it, yes.

CHARLES R. CUSHING, PH.D.                26

Portions of it.  You could say I've studied portions
of it, but I've read through the manual.

Q.  And which particular manual did you read?

A.  I don't recall the numbers of the manuals,
but it's -- it's called a design manual.

Q.  Is this a manual that was attached to the
IPET report?

A.  No, sir.  I have my own copies of the U.S.
Army Corps of Engineers manuals.

Q.  Do you know whether it's different from any
of the attachments to the IPET report?

A.  I don't know what the attachments to the IPET
report are.

Q.  Did you visit the Inner Harbor Navigational
Canal on any occasion after Hurricane Rita after this
one trip that you made just before and during
Hurricane Rita?

A.  Yes, sir.  I've made about -- I can't give
you the exact number -- approximately six visits to
the Inner Harbor Navigational Canal on this occasion.
I've made many trips there prior to the -- prior to
Hurricane Katrina, though.

Q.  Many trips to the Inner Harbor Navigational
Canal prior to Katrina?

CHARLES R. CUSHING, PH.D.                27

A.  Yes, sir.

Q.  What was the most recent trip you made prior
to Katrina?

A.  I would have to give you an approximate date,
but approximately five years before.

Q.  And what was the occasion of that trip?

A.  Visits to the container facilities on France
Road, to visit the large container gantry cranes that
were located at that facility, which I was a part
owner.

Q.  Prior to Hurricane Katrina, did you ever pay
any -- did you ever examine the east floodwall of the
Inner Harbor Navigational Canal between Florida Avenue
and Claiborne Avenue?

A.  Not closely.  As I could see it across --
from across the -- the canal, but I didn't study it.

Q.  How much were you and your firm paid for your
work on this case in 2005?

A.  I can't tell you because I actually don't
know.

Q.  Would your answer be the same for 2006?

A.  Yes, sir.

Q.  2007?

A.  Yes, sir.

CHARLES R. CUSHING, PH.D.                28

Q.  2008?

A.  Yes, sir.

Q.  2009, up to this point?

A.  Yes, sir.

Q.  Do you know what your total compensation has
been?

A.  No, sir, I don't.

Q.  Do you know whether it is under or over six
figures?

A.  I don't, but I believe it would be six
figures.

Q.  Do you know whether it would be under or over
$500,000?

A.  No, sir, I don't.

Q.  Do you know whether it would be over or under
$1 million?

A.  I believe it would be under $1 million.

Q.  Do you know whether it would be under or over
750,000?

A.  No, sir, I don't.

Q.  Have any persons outside your firm submit, to
you, invoices for work that they did in connection
with your work on Hurricane Katrina?

A.  Initially, yes.

CHARLES R. CUSHING, PH.D.                29

Q.  Who is that?

A.  Dr. Daggett's firm, WST.

Q.  What does WST stand for?

A.  Waterway Simulation Technology.

Q.  What was the period of time in which
Dr. Daggett's firm, Waterway Simulation Technology was
submitting invoices to you?

A.  The first few months of the project.

Q.  Do you recall the amounts of the invoices
that were submitted to you?

A.  I don't recall them, no, sir.

Q.  Do you know how much they invoiced to Lafarge
or to the firms representing it?

A.  I don't know.

Q.  Do you know the percentage of your firm's
income this year that came from work on this case?

A.  No, sir, I don't.

Q.  Would your answer be the same for 2008?

A.  Yes, sir.

Q.  2007?

A.  Yes, sir.

Q.  2006?

A.  Yes, sir.

Q.  2005?

CHARLES R. CUSHING, PH.D.                30

1
2    A.  Yes, sir.
3    Q.  Prior to this project, did you ever work
4    with -- I believe you said it's Dr. Larry Daggett?
5    A.  Not -- not on particular projects, but we
6    were -- we are both -- we have both been members of
7    the National Academy of Sciences transportation
8    research board, marine board.  Dr. Daggett is no
9    longer a member.  I continue to be a member, but we've
10   worked together on projects on the marine board.
11   Q.  What type of projects on the marine board --
12   what I want to do is, just to clarify the question and
13   make it easier to answer, I want to distinguish
14   between projects in which you're doing work for
15   litigation, for design, for construction on the
16   one hand versus projects that simply have to do with
17   organizational purposes for the marine board on the
18   other hand.
19   A.  The marine board is an advisory board to the
20   U.S. government and the various government agencies
21   and congress and the administration on marine matters.
22   So all of our work together would have been on these
23   kinds of issues and would not have re- -- none of it
24   would have related to matters in litigation.
25   Q.  Would it also be true that none of it would

CHARLES R. CUSHING, PH.D.                31

1    have related to any question of design or
2    construction?
3    A.  Not necessarily, and I'm trying to think of
4    the -- the various projects because we had a very full
5    agenda of different projects, but I don't recall which
6    of them had to do with construction.  They were all --
7    not all, but most of them were technical, and many of
8    them were engineering related issues, having to do
9    with water -- the inland waterways of the
10   United States, having to do with risk of collision,
11   having to do with invasive species into the Great
12   Lakes and many other kinds of issues.
13        Super tentative salvage for the U.S. Navy
14   is -- is their problems and projects related to them.
15   There were just a large number of engineering and
16   technical projects.
17   Q.  Are you referring to projects for the marine
18   board?
19   A.  Yes, sir.
20   Q.  Other than projects for the marine board, did
21   you ever previously work with Dr. Daggett on any
22   question involving design or construction?
23   A.  Not previously, but subsequently, I did.
24   Q.  And what is the subsequent involvement?

CHARLES R. CUSHING, PH.D.                32

1
2    A.  Having to do with current flow in the Gulf of
3    Mexico, outside of the Port of Galveston.
4    Q.  Prior to this project, did you ever
5    previously work with J. Christopher Hewlett on any
6    matter?
7    A.  No, sir.
8    Q.  And apart from what you've already described,
9    did you ever previously work with waterway simulation
10   technology on any matter?
11   A.  No, sir.
12   Q.  Who suggested their names to you?
13   A.  Who suggested whose name?
14   Q.  Dr. Daggett, Mr. or Dr. Hewlett, I don't know
15   which, or the company, Waterway Simulation Technology
16   for work on this project?
17   MR. RAFFMAN:  Objection to form.
18   THE WITNESS:  No one actually suggested his name
19   to me.  I have been associated with Dr. Daggett on the
20   marine board prior to Hurricane Katrina.  I knew of
21   his capabilities and experience and background, and I
22   felt that he was an appropriate person to recommend to
23   our clients as a person who could participate in the
24   project and shed light on the -- the question of why
25   the barge did not cause the breach in the levee.

CHARLES R. CUSHING, PH.D.                33

1    BY MR. SEYMOUR:
2    Q.  Prior to your involvement in this case, had
3    you ever previously worked with any other experts or
4    companies that conducted waterway simulations with
5    wind or water movement?
6    A.  I can't recall any such -- most of the work
7    we've done in that area, we've done ourselves.
8    Q.  What other work have you done in that area?
9    A.  We've been involved in a number of projects
10   that involved the motion of vessels in waterways under
11   the influence of wind and current and the influence of
12   bottom conditions, such as the Exxon Valdez grounding
13   in Alaska, an allision of a vessel with a U.S. Coast
14   Guard fixed platform in the James River in Virginia.
15   The grounding of vessels in the south of France near
16   the port of Marseille, similar grounding of a vessel
17   on a bar in a breach -- an underwater shoal in the --
18   in I think it's the Port of Ponce on the south coast
19   of Puerto Rico.  Similar things like that.
20   Q.  Were all of those projects involving either
21   open bodies of water or free flowing rivers?
22   A.  No.  Well, yeah.  I guess, yeah, they were
23   either open bodies of water or not open bodies of
24   water.

CHARLES R. CUSHING, PH.D.          34

1
2    Q.  Do you understand that Dr. Daggett has been
3    withdrawn as a witness in this case?
4    A.  I do.
5    Q.  You have Dr. Daggett's report as an appendix
6    to your report?
7    A.  Yes, sir.
8    Q.  Why is that?
9    A.  Because I've relied on Dr. Daggett's report.
10   Q.  Do you have an understanding as to whether
11   Appendix B to your report is being withdrawn?
12   A.  Is being withdrawn?
13   Q.  That's right.
14   A.  No, I don't believe so.  I think it's part of
15   my report.
16   Q.  Do you intend to testify to all of
17   Dr. Daggett's work?
18   A.  Yes, sir.
19   Q.  Let's turn for a moment to your statement of
20   qualification, Appendix L.
21       (The witness reviewed the document.)
22   BY MR. SEYMOUR:
23   Q.  Do you know the field of expertise in which
24   your testimony will be offered in this case?
25   A.  Well, I think my field of expertise extends

CHARLES R. CUSHING, PH.D.          35

1    to those -- that subject matter that's incorporated
2    into my report.
3    Q.  I'm sure you've heard yourself being offered
4    as an expert witness in trials, haven't you?
5    A.  Yes, sir.
6    Q.  Are you familiar with the fact that counsel
7    will generally tender you as an expert witness in a
8    specific field?
9    A.  I believe he would, but I haven't read the --
10   the fields that he's tendering me.  I don't recall
11   having read that.
12   Q.  On what parts of your training and experience
13   do you rely for your testimony in this case?
14   A.  I rely on my education first, with one year
15   of college at the City College of New York in a
16   preliminary pre-engineering course, four years of
17   education at the U.S. Merchant Marine Academy.
18   Q.  Rather than go through that, let me try to
19   cut to the chase here.  The second line of your resume
20   identifies you as a naval architect marine engineer --
21   or your company as naval architects, marine engineers
22   and transportation consultants.  Do you consider
23   yourself a naval architect?
24   A.  I do.

CHARLES R. CUSHING, PH.D.          36

1
2    Q.  Do you consider yourself a marine engineer?
3    A.  Yes, sir.
4    Q.  And do you consider yourself a transportation
5    consultant?
6    A.  Yes, sir.
7    Q.  Are those three fields in which you consider
8    yourself an expert?
9    A.  I do.
10   Q.  Are there any other fields in which you
11   consider yourself an expert?
12   A.  I'm a licensed professional engineer, and I
13   have expertise in that area.  Forming part of my
14   education, training and experience in naval
15   architecture, it includes meteorology and
16   oceanography.  It includes structural design and
17   structural engineering.  It includes metallurgy.  It
18   includes many, many aspects of engineering.
19   Q.  Have you ever had experience personally with
20   modeling wind and water conditions in an enclosed
21   canal with lock gates at one end and the bridge down
22   to block the movement of water at the other end?
23   A.  Not specifically.  In a canal with a bridge
24   and all those qualifications that you put on it, no, I
25   have not.

CHARLES R. CUSHING, PH.D.          37

1
2    Q.  Have you ever modeled the wind and water
3    movement in a canal the size of the Inner Harbor
4    Navigational Canal?
5    MR. RAFFMAN:  Objection to form.
6    THE WITNESS:  I believe I testified that I did in
7    the case of the James River, a portion of the James
8    River, where a barge -- barge movement resulted in the
9    allision to a fixed structure and the shore, and the
10   dimensions of the river at that portion were sim- --
11   very similar to the Inner Harbor Navigation Canal.
12   BY MR. SEYMOUR:
13   Q.  What was the length of the James River?
14   A.  The length of the river was several -- I
15   don't know.  Over 100 miles.  Approximately 100 miles.
16   Q.  And what was the width of the river?
17   A.  I could only go by memory here, but it was
18   approximately --
19   Q.  If you don't know, you can just tell me you
20   don't know.  I don't want you to speculate.
21   A.  If you want a precise number, I can't tell
22   you.  I can find out.  I can estimate, but I can't
23   give you the precise width of the James River at the
24   location.
25   Q.  If you can give me a reasonable

```
                CHARLES R. CUSHING, PH.D.          38
 1
 2   approximation --
 3       A.  It was approximately the same width as the
 4   Inner Harbor Navigation Canal.
 5       Q.  And were there any high wind conditions at
 6   the time of that allision?
 7       A.  There were not high wind conditions.  There
 8   were currents, though.
 9       Q.  All right.  What was the speed of the
10   current?
11       A.  Again, I'm going by memory, which I can't
12   quote the precise speed of the current, but it was on
13   the order of two knots, three knots.  In that order.
14   Low flow.
15       Q.  And was there any overtopping of the banks on
16   that occasion?
17       A.  No, sir, there weren't.
18       Q.  Was there any wash of water from one side to
19   the other in that James River situation?
20       A.  There's wash -- there was wash behind the
21   barge and toe -- between the tug and the toe, yes,
22   sir.
23       Q.  You mean the ordinary wake?
24       A.  Wake.
25       Q.  But not a sloshing of water from side to
```

```
                CHARLES R. CUSHING, PH.D.          39
 1
 2   side?
 3       A.  Well, the -- the wake washes up on the shore
 4   and then comes back down.  You'd have a -- a wash from
 5   the banks.
 6       Q.  Why didn't you do modeling of wind and water
 7   conditions in the Inner Harbor Navigational Canal
 8   yourself instead of suggesting Dr. Daggett and his
 9   company for doing that?
10       A.  Well, because I -- several reasons.  I hoped
11   that Dr. Daggett had extensive experience in modeling
12   using various computer programs.  He was formerly with
13   the U.S. Army Corps of Engineers.  He was from the
14   Louisiana/Mississippi area and possibly had local
15   knowledge, had more resources in the area.  There were
16   many reasons why Dr. Daggett, I thought, was very well
17   qualified to do this work, maybe even more qualified.
18       Q.  More qualified than you are?
19       A.  Yes, sir.
20       Q.  Did he have training you do not have?
21       A.  I believe his educational training is
22   different than mine.
23       Q.  Did he have training relevant to this project
24   that you did not have?
25       A.  I would have to refer to his -- I think the
```

```
                CHARLES R. CUSHING, PH.D.          40
 1
 2   better answer would be to refer to his CV, which he
 3   includes in the -- in his report.
 4       Q.  Please look at his CV.  I think that would be
 5   Appendix C to his report, which is piggybacked to
 6   Defendants' B to your report, and I think the CV
 7   starts at Page B-45.
 8           (Pause in proceedings.)
 9   BY MR. SEYMOUR:
10       Q.  Do you have Page B-45 in front of you?
11       A.  I do, yes.
12       Q.  And is that Larry Daggett's resume of
13   publications?
14       A.  It is, yes, sir.
15       Q.  Please identify the training and experience
16   that Dr. Daggett has relative to this project that you
17   do not have.
18       A.  Dr. Daggett has a bachelor's degree in civil
19   engineering.
20       Q.  I'm going to need to interject a few
21   questions here just to make sure that we have the
22   record clear and that we get the points that we need
23   to get.
24       A.  Yes.
25       Q.  So rather than having you mention 100 things
```

```
                CHARLES R. CUSHING, PH.D.          41
 1
 2   and then go back over 100 things, if I could just ask
 3   you a couple of questions as we go along.  You're a
 4   marine engineer, and he's a civil engineer.  What's
 5   the difference between the two?
 6       A.  I'm a naval architect and marine engineer.
 7       Q.  And a transportation consultant.  But he's a
 8   civil engineer, and what's the difference between your
 9   background and his for him being a civil engineer?
10       A.  The reason I qualified my answer to your
11   question is I'm more than a marine engineer.  You
12   identified me as a marine engineer, and I'm not just a
13   marine engineer.  And I think it's important because
14   they're companion degrees and professions, and they
15   bear very much on the comparison with civil
16   engineering.  Okay?
17       Q.  Well, what does a civil engineer have by way
18   of training or experience that you do not have?
19       A.  Civil engineer is a field of engineering that
20   deals with land structures, waterworks and other civil
21   works such as soil mechanics and -- and those kinds
22   of -- those kinds of things.  They also deal with
23   structures and hydrodynamics and water flow, which are
24   the areas that naval architects and marine engineers
25   deal with.  They deal with structures and water flow.
```

CHARLES R. CUSHING, PH.D.        42

So there's an overlap between the field of civil
engineering and naval architecture and marine
engineering as it relates to structures and as it
relates to water.

Q.  Okay.  I'm asking these questions because of
your statement that in some respects, Dr. Daggett had
education or experience that was superior to yours.
Can you just identify -- and I'm not sure whether his
being a civil engineer gives him some kind of
qualification for this project that you do not have.
Did it?

A.  Well, first, I'd like to correct what -- what
your characterization of my testimony is.  I didn't
identify his education and training as superior.  I
identified it as different.  And it's different in a
sense that he has areas of training and experience
that I don't have.

Q.  I believe you stated that on some respects he
was more qualified?

A.  In some respects.

Q.  What are those respects?  You've got his
resume here.

A.  That's correct.  And I did testify to that.

Q.  Please identify those respects in which his

CHARLES R. CUSHING, PH.D.        43

education and experience makes him more qualified for
this particular part of the project than you.

A.  Well, my answer also, by the way, had to do
not only with his education, training but also his
experience, and his experience -- first of all, his
education and training as a civil engineer has to do
with land structures and buildings and -- and
structures on land.  Also, his experience has to do
with his work as the chief of navigation of the
division of the waterways experiment station of the
U.S. Army Corps of Engineers.

So this was -- this was experience which I
felt was more focused on the flow of water and
simulation of vessels in bodies of water.

Q.  Is there anything else on the resume that
you'd like to point out that gives him a somewhat
better qualification than yours for this particular
part of the project?

A.  Well, I think what I just said was pretty
significant.

Q.  Is that it?

A.  Yes.

Q.  Did you review Dr. Daggett's report before it
assumed the shape that it's in Appendix B?

CHARLES R. CUSHING, PH.D.        44

A.  I saw an earlier draft, yes, sir.

Q.  Did you make any suggestions with respect to
revisions to the draft?

A.  I don't recall having made any -- any
suggestions.

Q.  When did you first decide or -- or when were
you first informed that the appendix of his report was
going to become part of your report?

A.  I don't recall the precise date.  It was
approximately several months ago.  But I don't know
the exact date.

Q.  Would it have been in 2008?

A.  I don't recall the exact date, but I think it
was sometime this year.

Q.  Do you remember whether it was before or
after --

A.  2009, rather.

Q.  Do you know whether it was before or after
March 1, 2009?

A.  I don't recall, no.

Q.  Do you know whether it was before or after
May 1, 2009?

A.  No, sir, I don't recall more than it was
sometime this year, several months ago.

CHARLES R. CUSHING, PH.D.        45

MR. SEYMOUR:  Why don't we take a short break
now.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  We're going off the record at
10:03:20.

(A recess was taken from 10:03 a.m.
to 10:17 a.m.)

THE VIDEOGRAPHER:  This is the beginning of
Tape 2 of Dr. Cushing at 10:17:30.

BY MR. SEYMOUR:

Q.  Dr. Cushing, we're still on Appendix B to
your report -- the report of Dr. Daggett.  Are there
any parts of this report that you wrote?

A.  No, sir.

Q.  Are there any parts of this report that you
co-authored?

A.  No, sir.

Q.  If you turn to the table of contents on
Page B1, do you see the various topics that are
covered by the report?

A.  Yes, sir.

Q.  Did you work with Dr. Daggett or his team in
examining any of those topics?

A.  Yes, sir.

CHARLES R. CUSHING, PH.D.                46

1
2   Q. Which ones?
3   A. Well, I met with Dr. Daggett -- rather than
4   to go specifically through each topic, I think it
5   would be more helpful to you if I explained what I did
6   with Dr. Daggett.
7   Q. Please do.
8   A. When I contacted Dr. Daggett early in the
9   project, I asked him to -- to meet with me and to --
10  to accompany me to the site inspection on the east --
11  east side of the industrial canal.  So Dr. Daggett was
12  with me when we were inspecting the wall, and we were
13  there when he was doing some of his work and I was
14  doing some of my work.  For example, he was taking
15  surveys.  He was looking for high water marks and
16  those kinds of things, which I wasn't, and at the same
17  time, he and I were inspecting the floodwall together.
18  So to that extent, we collaborated.
19  Q. Was your only collaboration the gathering of
20  factual observations at the scene?
21  A. Well, I think we shared -- we shared findings
22  with each other.
23  Q. When is the first time that Dr. Daggett
24  shared any findings with you?
25  A. Well, I think shortly after our -- our visit

CHARLES R. CUSHING, PH.D.                47

1   and our inspections.  For example, he gave me -- he
2   gave me photographs that he had taken.  I provided
3   photographs to him.  That kind of thing.  Also, data
4   that he had collected, for example, I don't recall
5   whether it's in the form of photograph or data on high
6   water marks, information that he had collected from
7   the lock master or the people at the locks on water --
8   water heights.  Those were some of the kinds of things
9   that he provided to me.
10  Q. Did you list in your Appendix K the
11  photographs that Dr. Daggett provided to you?
12  MR. RAFFMAN:  Objection.
13  THE WITNESS:  I don't know, and I think I've
14  testified that I don't know what photographs are in --
15  specifically what those photographs refer to in
16  Appendix K.
17  BY MR. SEYMOUR:
18  Q. Do you have any index to the photographs
19  in -- that are listed in Appendix K so that one could
20  see what they are?
21  A. No, sir, I don't.  You would have to refer to
22  the photograph to see what they are.
23  Q. And to the back sides of the photographs?
24  A. I think it would be obvious from the

CHARLES R. CUSHING, PH.D.                48

photograph what they are, but the back side would
confirm what you're looking at.
Q. And how would I be able to tell if this was a
photograph that was taken by you or your team as
opposed to a photograph taken by Dr. -- Dr. Daggett?
A. I think all of my photographs have the
initials "CRC" on them.
Q. Okay.  And Dr. Daggett's photographs?
A. I don't recall how they're marked.
Q. Did you share your preliminary findings with
Dr. Daggett?
A. I believe so, yes.
Q. When was that?
A. It would have been well into 2006 or 2007.
Q. And what was the form in which you shared
your preliminary findings?
A. I don't recall whether it was an early draft
of my report or whether it was various data that I was
going to use in my report.
Q. Did you have many communications by letter,
note, memorandum or E-mail with Dr. Daggett as he was
preparing his report?
A. I wouldn't say, "many."  We spoke
occasionally.

CHARLES R. CUSHING, PH.D.                49

Q. I'm referring to communications in the form
of memoranda, notes or E-mails, documentary?
A. Not a lot.  I wouldn't say, "a lot," no.
Q. Do you know whether there would be more or
fewer than 100?
A. Fewer than 100, yes.
Q. Do you know whether it would be more or fewer
than 50?
A. Yes, fewer than 50.
Q. Do you know if they would be more or fewer
than 25?
A. Most likely, less than 25.
Q. Okay.  Did you ever suggest to Dr. Daggett
that he modify any of his findings?
A. I don't recall having any such
recommendations.  I don't recall having made such
recommendations.
Q. And did Dr. Daggett ever suggest to you that
you modify any of your findings?
A. I don't recall he did either.
Q. Okay.  Did you check Dr. Daggett's
calculations?
A. I checked through his report.  Some of his
calculations were done by computer program, and that

CHARLES R. CUSHING, PH.D.          50

1   was not possible for me to check the computer
2   programs.
3       Q. Did he use computer programs you did not
4   have?
5       A. Yes, sir.
6       Q. Would it be possible for you to say whether
7   those programs are accurate or not?
8       A. I can only say that those computer programs
9   that he used are extensively used by the U.S. Army
10  Corps of Engineers.  He's used them extensively in the
11  past.
12      Q. Do you know what the margin of error is in
13  those computer programs and the results that are
14  obtained by those programs?
15      A. Only by experience in -- in using computer --
16  other computer programs.  It's not precision.  It's
17  not absolutely precise, but it's obviously very close.
18  So I can say just in all hydraulic computer programs
19  that because of many slight variations, your results
20  are going to be within 2, 3 -- depending on the
21  program, 2, 3 percent, something on that order.
22      Q. Are you familiar with the measurement of
23  error in terms of numbers of standard deviations?
24      A. Generally.
25

CHARLES R. CUSHING, PH.D.          51

1       Q. In terms of these hydraulic programs, is it
2   possible to say what the margin of error is in terms
3   of standard deviations?
4       A. No.  I haven't thought about it in terms of
5   standard deviations.
6       Q. In terms of the programs, what are the names
7   of the programs that you use yourself for modeling of
8   water flow and wind movements?
9       A. Well, the programs that we use have to do
10  with the motions of vessels in water so that we're not
11  using the same water flow kinds of programs that
12  Dr. Daggett uses.
13      Q. Okay.  And what is the source of your
14  information that the computer programs that
15  Dr. Daggett used in this case have a margin of error
16  of 2 to 3 percent?
17      A. Because these computer programs, simulation
18  programs that Dr. Daggett would have been using
19  would -- would require in many cases the same kind of
20  inputs that the computer programs and simulations we
21  do.  They would share the same kind of inputs.
22  Frictional resistance on surfaces, wakes and eddies,
23  those kinds of things, and it's common to most analog
24  computers and hydraulics that you have those kinds
25

CHARLES R. CUSHING, PH.D.          52

1   of -- those kinds of margins of error.
2       Q. Have you ever -- okay.  What are the names of
3   the computer programs that Dr. Daggett used?
4       A. It's given in his report, and I would like to
5   look in the report to state.  The mathematical
6   modeling system that he used is the TABS- -- T-A-B-S,
7   dash MD modeling system, which is a two-dimensional,
8   free flow, free surface flow for rivers and estuaries,
9   and it's described in detail in Appendix A of his
10  report.
11      Q. Have you ever used that program yourself?
12      A. No, sir, I haven't.
13      Q. Do you have any direct experience with its
14  level of accuracy?
15      A. Well, I think I just mentioned that all of
16  these hydraulic programs and simulations depend upon
17  the same basic set of inputs and requirements, and
18  that is frictional -- frictional resistance, wake
19  resistance, wake form -- formation, eddie formation
20  and so forth.  So it's -- it's universal.
21      Q. Is there any treatise or scholarly article
22  that you rely upon to say that a computer program that
23  uses the same inputs will have the same accuracy in
24  this field of water movement?
25

CHARLES R. CUSHING, PH.D.          53

1       A. I can't refer you to one, no.
2       Q. Do you know which, if any, of the computer
3   programs are used by the Corps of Engineers for
4   modeling wind and water movements?
5       A. I believe this is a program that Dr. Daggett
6   has used with the Corps of Engineers.  It's commonly
7   used by the Corps of Engineers.
8       Q. What is the source of your information that
9   the computer program is commonly used by the Corps of
10  Engineers?
11      A. Page B-18 of his report that says, "The
12  modeling system commonly used by the Corps of
13  Engineers" at the bottom of Page B-18.
14      Q. Do you have any personal knowledge of the
15  accuracy of that statement?
16      A. No, sir, I don't.
17      Q. Did you ever suggest any particular computer
18  programs to be used by Dr. Daggett in his work?
19      A. No, sir, I didn't.  I relied on his expertise
20  in the field.
21      Q. Dr. Daggett perform some type of leveling
22  survey for the report.  Are you familiar with that?
23      A. Yes, sir.
24      Q. Okay.  Do you know --
25

CHARLES R. CUSHING, PH.D.        54

A.  When you say, "leveling," do you mean surveying of the heights of floodwalls?

Q.  Leveling survey as he used the phrase.

A.  Excuse me?

Q.  He used the phrase "leveling survey."

A.  Yes.

Q.  Is there more than one type of leveling survey?

A.  No.  We -- we've jumped -- you made a big leap from -- from the computer programs that he used for simulation to this, and I didn't know whether you were still referring to or you were changing the subject.  So when you said, "leveling," I wanted to be sure we were talking about the same thing.

Q.  Leveling survey as he used the phrase.  Are you familiar -- is there more than one type of leveling survey?

MR. RAFFMAN:  Objection to form.

BY MR. SEYMOUR:

Q.  All right.  Do you know whether there's more than one type of leveling survey?

MR. RAFFMAN:  Same objection.

THE WITNESS:  I think surveying, basic surveying is determining leveling, amongst other -- amongst

CHARLES R. CUSHING, PH.D.        55

other things.  My father was a civil engineer, and he was the county surveyor for the Wayne County, the City of New York -- Detroit, and I used to accompany him on his surveys when he did surveying.  Amongst other -- the functions of a surveyor amongst -- land surveyor, amongst other things, are to determine levels.

BY MR. SEYMOUR:

Q.  I'll come up with the specifics.  Doctor, are you familiar with whether or not Dr. Daggett used a GPS survey or some surveying technique that's called "a GPS surveying technique"?

A.  My understanding is Dr. Daggett used level surveys.  A level for the surveying.

Q.  Please explain.

A.  My understanding is he used a level for the surveying.

Q.  He referred to a "GPS survey."

Q.  Can you refer me to where in the -- the report?

Q.  I'll look for it at the next break, and then --

A.  Okay.

Q.  -- rather than --

MR. RAFFMAN:  If you want it, I got it.

CHARLES R. CUSHING, PH.D.        56

MR. SEYMOUR:  Surely.  I'd appreciate that.

MR. RAFFMAN:  B-15.

MR. SEYMOUR:  Page what?

MR. RAFFMAN:  B-15.

(Pause in proceedings.)

BY MR. SEYMOUR:

Q.  On Page -- do you have B-15 in front of you?

A.  I do, sir, yes.

MR. SEYMOUR:  And thank you, Mr. Raffman.

Q.  On paragraph -- the second full paragraph begins, "A survey of the east floodwall was conducted on October 29, 2005 using normal level survey techniques."  What is a normal level survey technique?

A.  That is the use of a level, a device that's placed on a -- a tripod and is used to determine levels.

Q.  Okay.  Does the word "normal" modify "level" or does it modify "survey"?

A.  I'm looking where it states that.

Q.  It's the first line of the second full paragraph.

A.  I think the word "normal" refers to level survey techniques.  It's the whole -- it's the technique that the word is modifying.

CHARLES R. CUSHING, PH.D.        57

Q.  And then it refers later in the same paragraph to a "dual frequency GPS survey."  Do you see that?

A.  Yes, sir.

Q.  What is a dual frequency GPS survey?

A.  Well, I haven't used a GPS survey technique in conjunction with a level survey because I'm not a surveyor, but obviously the GPS is a technique for verifying your position, your location when you're taking the survey points.

Q.  What is the significance of this being a dual frequency GPS survey?

A.  I can't answer the question.  I don't know.

Q.  Do you know whether any of the results that Dr. Daggett obtained for floodwall heights differed from those obtained in the IPET report?

A.  Page B-18 of Dr. Daggett's report shows the elevations that he determined along the floodwall, and they also show the results of the IPET survey on a plot, and there are slight differences in some locations.

Q.  Which of these data points is a data point obtained by Dr. Daggett?

A.  These would be the -- the blue line and the

CHARLES R. CUSHING, PH.D.          58

1   blue marks.
2       Q.  The legend has a line that looks like blue
3   with a diamond in the middle, saying "East Floodwall
4   Elev."  Is it your testimony that that is
5   Dr. Daggett's reference point?
6       A.  Yes, sir.
7       Q.  Do you know why Dr. Daggett obtained results
8   that were different from those of the IPET survey?
9       A.  Well, I think there are a number of reasons.
10  One is that the problems with surveying the east wall,
11  as well as the problems with the benchmarks in the
12  area, and for that matter, any structure, or for that
13  matter, the whole city of New Orleans, is that it's
14  subsiding, and the accuracy of the heights of
15  structures, as well as benchmarks, is questionable.
16          And so there will be slight differences
17  depending on what -- what benchmarks you're using and
18  what structures you're -- you're measuring.
19      Q.  Do you know whether the IPET study used
20  different benchmarks than Dr. Daggett?
21      A.  I don't know which benchmarks they used, but
22  I know that benchmark 152, for example, was a
23  benchmark that over a short period of time, several
24  years, a number of years, subsided more than a foot.
25

CHARLES R. CUSHING, PH.D.          59

1   So it's hard to know which -- if people are using
2   different benchmarks, they're not going to get
3   precisely the same -- same readings.
4       Q.  Did you specify the methodology that
5   Dr. Daggett was to use in obtaining this information?
6       A.  No, sir.
7       Q.  As you sit here today, would you be able to
8   explain all of the methodologies used by Dr. Daggett
9   in compiling his report?
10      A.  In general terms, yes.
11      Q.  But not specifically?
12      A.  In some cases, no.
13      Q.  Are you able to state, as you sit here today,
14  whether Dr. Daggett's report conforms in all respects
15  to the commonly used standards in civil engineering?
16      A.  I don't think that I'm a person who should
17  judge civil engineers.  Let's call it the standards of
18  the profession of civil engineers, since I'm not a
19  civil engineer.  I think there are specific areas
20  where Dr. Daggett has worked, which are also areas
21  where naval architects work and marine engineers work,
22  and in those areas, I think I'm capable of judging
23  work done.
24          I would also further mention, with regard to
25

CHARLES R. CUSHING, PH.D.          60

1   the -- to the surveys that were done by Dr. Daggett
2   and his team, that I engaged a -- a firm in
3   Baton Rouge, a firm of aerial photography who
4   specialized in stereoscopic measurements of land
5   structures, who took aerial pictures of the floodwall
6   to examine subsidence, and they were generally
7   consistent with the -- the data shown by Dr. Daggett's
8   surveys.  So I think it was a -- let's say a check
9   against or a benchmark against the standards that
10  Dr. Daggett used.
11      Q.  Do you know the degree of accuracy of the
12  stereoscopic aerial survey compared, for example, to
13  LIDAR?
14      A.  The degree of accuracy of the aerials,
15  stereoscopic surveys that were performed by AeroData
16  was within a couple of inches.
17      Q.  Are you familiar with the fact that a LIDAR
18  survey has difficulty picking up something like sheet
19  pile that is six inches or less in thickness?
20      A.  But I didn't use LIDAR.
21      Q.  I just asked if you're familiar with that.
22      A.  Yeah.  I understand others used the LIDAR,
23  but we didn't use that.
24      Q.  Are you familiar with the fact that LIDAR --
25

CHARLES R. CUSHING, PH.D.          61

1   let me state it differently.  Do you know whether
2   LIDAR has difficulty picking up objects of less than
3   six inches in diameter?
4       A.  No, sir.
5       Q.  Do you know whether sheet pile is commonly
6   less than six inches in diameter?
7       A.  Well, sheet piling is -- by definition
8   doesn't have a diameter.  Sheet piling is --
9       Q.  Well, thickness.
10      A.  -- linear -- linear sheets in corrugated
11  form, usually.
12      Q.  I'm not an engineer.  So I apologize for
13  using the wrong term.
14      A.  Okay.
15      Q.  If my questions had referred to thickness as
16  opposed to diameter, would your answers have been the
17  same?
18      A.  The question was does LIDAR have difficulty
19  in picking up sheet piling that -- I just don't
20  understand your question when you refer to "diameter."
21      Q.  Is sheet piling commonly less than six inches
22  thick?
23      A.  Less than six inches thick?
24      Q.  Yes.
25

16  (Pages 58 to 61)

CHARLES R. CUSHING, PH.D.          62

A. I would say commonly, yes.

Q. Does LIDAR have difficulty picking up objects that are less than six inches thick, such as sheet piling, if you know?

A. I don't know specifically, no.

Q. Do you know whether the stereo --

A. Sheet piling -- let me just further add. Sheet piling -- the thickness of sheet piling is generally under an inch, under half an inch, oftentimes. And so it will be on edge a very thin -- very thin structure, and I would think that LIDAR would have difficulty in picking up something that's 3/8 of an inch thick or a half an inch thick.

Q. When the stereoscopic images were taken in this aerial survey that was commissioned, were they taken from any particular angle?

A. No. They were taken directly downward from -- from above.

Q. So the sheet --

A. The plane flew over, but the stereoscopic pictures were not looking at sheet piling. They were looking at the top of the floodwall. We were measuring the top of the floodwall, which is a concrete -- flat concrete surface six inches wide.

CHARLES R. CUSHING, PH.D.          63

Q. Is there any documentation in Appendix B of the results that were obtained from this stereoscopic aerial survey?

A. In Appendix B?

Q. Yes.

A. I'm looking now at the reference documents to see if Dr. Daggett referenced them. I don't -- I don't see them referenced in his -- in his work, no.

Q. Okay. Has the stereoscopic aerial survey been produced in this case?

A. If you give me a moment to check my references, which is Appendix -- I don't recall.

MR. RAFFMAN: A.

THE WITNESS: A. That's what I'm looking for.

(Pause in proceedings.)

MR. RAFFMAN: Counselor, I believe it has.

MR. SEYMOUR: Do you have a Bates number?

MR. RAFFMAN: I -- I believe it's among the reliance materials that were produced. I believe that it's referenced in the -- A. Again, I don't want to usurp your deposition. So if you want me to stop, I will, but I can point you to it. It's at Page A-7. There's a reference to AeroData Corp., aerial photos of New Orleans/Louisiana taken.

CHARLES R. CUSHING, PH.D.          64

MR. SEYMOUR: Thank you.

MR. RAFFMAN: Actually, we found it among the references in Mr. Daggett's report at Page B-43.

MR. SEYMOUR: It's listed there, but the question is whether it was -- well, if it's in the reference materials, it's in the reference materials.

Q. Dr. Cushing, we were looking before at Page B-45 in Appendix C to your report, Larry Daggett's resume and publications. It says there that -- there's a line for registration, and it says, "Mississippi 1969" and a number. What is that?

A. That means that he's a licensed professional engineer in the state of Mississippi. He obtained that in 1969, and 04570 is his license number.

Q. Is Dr. Daggett licensed in the state of Louisiana?

A. I don't see it listed in his resume. So I would presume he is not. Otherwise, he would have listed it.

Q. Okay. If we look at your resume, I don't see any states in which you're licensed. Could you -- if I missed it, could you direct me to it.

A. My resume is --

Q. Appendix L.

CHARLES R. CUSHING, PH.D.          65

(Pause in proceedings.)

THE WITNESS: If you look on the second page of my resume, under "Professional Associations." Halfway down the page is "Professional Engineer, State of Mississippi," license --

BY MR. SEYMOUR:

Q. Okay. I see that.

A. License number --

Q. "03537."

A. -- "03537."

Q. Is Mississippi the only state in which you are registered or licensed?

A. Yes, sir.

Q. So you're not licensed in Louisiana either?

A. No, sir.

Q. Could you please identify the parts of your report on which -- which were based upon the work that's set forth in Appendix B?

(Pause in proceedings.)

BY MR. SEYMOUR:

Q. If it would save time, we can look at the index in small Roman Numeral III.

(Pause in proceedings.)

MR. RAFFMAN: I'll object to the form of the

CHARLES R. CUSHING, PH.D.                66

1  question.  I think it's not -- it's not clear, and if
2  you want me to explain the basis for my objection, I
3  will.  Otherwise, I'll remain silent.
4  BY MR. SEYMOUR:
5     Q.  Do you understand the question?
6     A.  I do.
7     Q.  Please answer.
8     MR. RAFFMAN:  I still object to the question.
9        Go ahead.
10    THE WITNESS:  Mr. Daggett's report -- I'm sorry.
11 Dr. Daggett's report in Appendix B has provided a
12 considerable amount of -- and important information in
13 helping -- both helping me to determine and also to
14 verify why the barge did not cause the failure of the
15 levee, and the almost entire report that I've produced
16 addresses the question of why the barge did not cause
17 the failure of the levee on the east bank of the
18 industrial canal.
19       Dr. Daggett's report was useful in -- in many
20 cases, as I said.  But his report is very useful to me
21 in helping me assess why the barge remained at the
22 terminal.  It did not cross the industrial canal
23 during the time at the height of the hurricane and any
24 time prior to and then until after the floodwall on
25

CHARLES R. CUSHING, PH.D.                67

1  the east bank had already failed.
2        Dr. Daggett's report contains a considerable
3  amount of information concerning the currents in the
4  industrial canal, and the motion of the barge and the
5  path of the barge and the timing of the barge movement
6  across the canal are dependent not only on
7  Dr. Dooley's work that has to do with wind, but
8  Dr. Daggett's report that has to do with currents.
9  And so in many, many portions of this report, we have
10 used Dr. Daggett's determination of the water currents
11 to help us come to a conclusion as to when the -- the
12 barge could have crossed and why the barge didn't
13 cross the canal until any time after the failure of
14 the levees.  That's -- that's one area.
15    Q.  And that's an important area.
16    A.  Yes.  A second important area is
17 Dr. Daggett's work in surveying the levee, which is
18 consistent with the AeroData results, and which are
19 also consistent with IPET surveys and other
20 conclusions made by ILIT and others concerning the
21 subsidence of the east floodwall and the probable
22 levels of that east wall, which key to the flooding of
23 the canal through storm surge, and then which key to
24 overtopping are important to the conclusions we have

CHARLES R. CUSHING, PH.D.                68

1  drawn in our report.
2        So Dr. Daggett's re -- results are used
3  really throughout the report.
4     Q.  Would you have been able to come to your
5  conclusion that the barge did not cross the canal and
6  breach the floodwalls without Dr. Daggett's report?
7     A.  Yes, sir.
8     Q.  And on what would that be based?
9     A.  That would be based on my knowledge, training
10 and experience in the movement of vessels and the
11 effect of wind and current on floating vessels.
12    Q.  Have you ever, prior to this case, studied
13 the effect of wind and current on a vessel floating in
14 a canal closed at both ends in the way the Inner
15 Harbor Navigational Canal at the Florida Avenue bridge
16 and at the Claiborne Avenue bridge?
17    A.  I think you --
18    MR. RAFFMAN:  Objection.
19    THE WITNESS:  I think you misstated the
20 configuration of the Inner Harbor Navigation Canal.
21 It was certainly closed at the southern end where the
22 locks were, but at the northern end it was open, in
23 the sense that there was an opening under the Florida
24 Avenue bridge.  And the answer is -- to the question

CHARLES R. CUSHING, PH.D.                69

1  is we have studied the effect of wind on floating
2  vessels in closed or semi-closed canal shape
3  configurations, particularly as regard to wind loading
4  on vessels moored in large slips in the port of
5  New York, Port Elizabeth and Port Newark, where
6  vessels have been subjected to high gusts of wind and
7  have moved in that closed shape of canal, if you will,
8  that is very similar in dimensions to the industrial
9  canal.  Shorter in length, but about the same width
10 and about the same depth.
11 BY MR. SEYMOUR:
12    Q.  These slips are all open -- in New York are
13 all open to very large rivers, aren't they?
14    A.  This was in New Jersey, and it was open at
15 one end to a portion of Newark Bay but was closed at
16 the other end.
17    Q.  Is it your testimony that there was no
18 obstruction at all to water underneath the
19 Florida Avenue bridge?
20    A.  I don't think I've so testified.
21    Q.  Was there an obstruction to water underneath
22 the Florida Avenue bridge?
23    A.  There are pilings and supports under the --
24 under the bridge, obviously, on either side, but the

CHARLES R. CUSHING, PH.D.                70

1  space -- the span of the -- the bridge is open
2  underneath.
3     Q.  Okay.  Do I understand correctly that you
4  would be able to deliver your report and make your
5  testimony even if Exhibit B were removed from it?
6     MR. RAFFMAN:  Objection.  Asked and answered.
7        Go ahead.
8     THE WITNESS:  I -- I believe so, yes, sir.
9  BY MR. SEYMOUR:
10    Q.  Does the field of marine engineering involve
11 the study of hurricane winds over land?
12    A.  No, sir.
13    Q.  Okay.  Did your prior training in meteorology
14 involve study of the movement of hurricane wind over
15 land?
16    A.  Repeat the question, please.
17    Q.  You had mentioned earlier that you had been
18 trained in meteorology?
19    A.  Yes, sir.
20    Q.  Did your training in meteorology involve the
21 study of hurri- -- the movement of hurricane wind over
22 land?
23    A.  Amongst other things, I studied meteorology
24 at City College in New York.

CHARLES R. CUSHING, PH.D.                71

1     Q.  That's quite a few years ago.
2     A.  Well, yeah.  I'm kind of old.  So I guess all
3  of my academic training, except for my doctorate, has
4  been quite a long time ago.  But the field of
5  meteorology hasn't changed sufficient that the
6  basics -- the basics aren't in place.  But it did
7  involve the study of predominantly meteorology and
8  climatology over land masses.
9        My coursework at the U.S. Merchant Marine
10 Academy, obviously did include the movement of -- of
11 air and particularly storms over land masses, but
12 focused on hurricanes to a great extent since
13 hurricanes are usually found over water and they break
14 down when they move over land masses.
15    Q.  Why is that?
16    A.  Pardon?
17    Q.  Why is that?
18    A.  Because a hurricane depends upon the in-flow
19 of moist, warm air to feed the hurricane, and when it
20 moves over land masses, it's deprived of that in-flow
21 of -- of hot, moist air into the core of the
22 hurricane.  But to complete my answer, I studied
23 meteorology at MIT in graduate school there in
24 conjunction with Woods Hole OceanoGraphic Institute.

CHARLES R. CUSHING, PH.D.                72

1  The coursework there had to do with both meteorology
2  and oceanography, and it obviously dealt with the
3  movement of hurricanes, amongst other things, and the
4  effect on -- on water and storm surges.
5        In my period of time that I was in the naval
6  reserve, I took correspondence courses with the U.S.
7  Navy in the field of aerology.  When I served aboard
8  passenger ships in the early days, right after the
9  Merchant Marine Academy, I was the designated weather
10 officer on a number of passenger and cargo vessels,
11 where I did prepare tenoptic charts of the movement
12 of -- of air mass -- air masses over land and over sea
13 and made predictions on meteor -- meteorological
14 forecasts that included on a couple of occasions
15 hurricanes.
16    Q.  In all of these different types of training
17 that you've described, is it your testimony that each
18 of those items of training involved the movement of
19 hurricane winds over land?
20    A.  Yes, sir.
21    Q.  Okay.
22    A.  Sorry.  I take it back.  The -- the aerology
23 courses with the Navy mostly dealt with meteorological
24 conditions and climatological conditions over water.

CHARLES R. CUSHING, PH.D.                73

1     Q.  Do you know whether hurricane winds behave
2  differently over land than over water?
3     A.  "Hurricane winds"?
4     Q.  Yes.
5     A.  They do to the extent that they decrease
6  in -- in magnitude because the hurricane reduces
7  its -- its circulatory winds because it's not being
8  fed and it does not grow, but rather decreases.  But
9  the movement of air generally and the direction of air
10 movement over land is generally the same as over
11 water.
12    Q.  Is the movement of hurricane winds more
13 asymmetric over land than it is over water?
14    A.  Asymmetric?
15    Q.  (Nods head.)
16    MR. RAFFMAN:  Objection.
17    THE WITNESS:  Only to the extent that the leading
18 edge of the hurricane, as it's proceeding over land,
19 would be less subjected to the in-flow of moist air
20 than the trailing edge.
21 BY MR. SEYMOUR:
22    Q.  Apart from the feeding mechanism, which
23 you've mentioned several times, are you aware of any
24 difference in the symmetry of the movement of

CHARLES R. CUSHING, PH.D.          74

1
2   hurricane winds over water versus over land?
3       A.  Not to the extent that it would be
4   significant in a case such as this one.
5       Q.  Apart from -- my question was whether you
6   were aware of any difference, not whether you're
7   making a judgment about whether the difference would
8   be significant for this case.  Are you aware of any
9   difference?
10      MR. RAFFMAN:  Objection.  Form.
11      THE WITNESS:  Let me say this because it sounds
12  like you want a precise answer in -- in a generalized
13  question.  Every hurricane is different.  There are no
14  two hurricanes that are identical.  When hurricanes
15  come ashore, they come ashore over land masses that
16  differ in nature.  So every hurricane would be
17  different.  And therefore --
18  BY MR. SEYMOUR:
19      Q.  Let me ask the question more precisely.
20      A.  Okay.
21      Q.  Are you aware of any general difference in
22  the symmetry of hurricane winds when moving over land
23  as opposed to water?
24      MR. RAFFMAN:  Same objection.
25      THE WITNESS:  I think I've answered that

CHARLES R. CUSHING, PH.D.          75

1
2   question and --
3   BY MR. SEYMOUR:
4       Q.  If you don't have anything more to say, then
5   that's it.  Let me ask my next question.
6           Are you aware of any difference in the
7   convective movement of air current within hurricane
8   winds when they're over land as compared to water?
9       A.  Well, I think I've answered that question
10  too, because what I said was that the -- the winds
11  feeding a hurricane over water, warm, moist air move
12  to the center.  The center of the -- the eye of the
13  hurricane, if you will, where the pressure is low, and
14  it is in this funnel, if you will, that convective
15  flow takes place as the warm, moist -- warm, moist air
16  moves upward into the center of the hurricane.
17          When you're over land, obviously you're not
18  being fed the warm -- as much warm, moist air, and
19  you're going to have differences in convective flow at
20  the center of the hurricane.
21      Q.  Are you aware of any difference in the
22  turbulence of hurricane winds as the winds move over
23  land compared to water?
24      MR. RAFFMAN:  I'll make the same objection.
25      THE WITNESS:  Surface winds, when they move over

CHARLES R. CUSHING, PH.D.          76

1
2   water, are relatively unobstructed, whereas when winds
3   move over land, there is more turbulence close to the
4   water in general terms.
5   BY MR. SEYMOUR:
6       Q.  You said, "more turbulence" than if it was
7   over water?
8       A.  Yes.
9       Q.  I'm not sure -- I may be confusing terms.  If
10  you would re-put your last answer, I think we can
11  clear it up.
12      A.  Okay.  What I'm saying is that surface winds
13  moving over water have a certain amount of turbulence,
14  but it is less than when surface winds move over land.
15      Q.  When hurricane winds move over land and come
16  up against structures, they become more turbulent,
17  don't they?
18      A.  Locally, they do.  When they encounter
19  buildings or bridges or other forms of structures, the
20  winds have to flow either through or over and around
21  such structures.  Locally, right adjacent to the
22  structures, depending on the shape of the structures,
23  you can have turbulence and eddies and vortices at the
24  corners where separation of flow takes place.
25          But downstream, within the shadow of the

CHARLES R. CUSHING, PH.D.          77

1
2   structure, the winds rejoin the prevailing winds and
3   move in a free stream again.
4       Q.  When wind -- hurricane winds meet with an
5   obstruction, they have to divide, and then they -- on
6   the other side of it, they come together again; is
7   that correct?
8       A.  Unless they blow right through it.
9       Q.  Assume they don't blow through it just for a
10  moment.
11      A.  Okay.
12      Q.  They have to divide, and then they rejoin on
13  the other side?
14      A.  That's correct.
15      Q.  And when they divide, they cause turbulence
16  to the wind that is to the sides of the structure that
17  they're dividing around?
18      A.  No, sir, they don't.
19      Q.  Please explain.
20      A.  The -- the wind flow around the sides is
21  compressed, but it is not turbulent.  It's free stream
22  flow.  It's where there's an abrupt change in flow
23  direction where separation of flow takes place and
24  where you get turbulence.  For example, moving around
25  a square or rectangular warehouse, at the downstream

CHARLES R. CUSHING, PH.D.        78

corners of the warehouse locally you'll have vortices
or eddies, if you will, in the free stream around the
corner, but the flow around the sides away from the
building will re- -- resume and join into the flow of
the free stream and the prevailing winds.

This is -- this is a characteristic of all
fluid flow, and in naval architecture and ship --
ships, we face this question every day when we deal
with fluid flow around abrupt corners and eddie making
characteristics, and it applies to wind as it applies
to water flow.

Q. Looking at Appendix B, whether it's Page B-18
or anywhere else in Appendix B, can you determine the
height above the level of the land in the Lower Ninth
Ward next to the floodwall and the height of the
floodwall at the time of Katrina?

A. You're referring me to Page B-18?

Q. Or any other place in the appendix.

A. And the question is?

Q. The height of the floodwall above the land in
the Lower Ninth Ward right next to the floodwall.  I
understand it slopes downwards toward the Florida
Avenue --

A. It does.  I haven't included it in my record,

CHARLES R. CUSHING, PH.D.        79

and I don't believe it's in this report, but it does
appear in, I think, IPET's report, and the height of
the toe of the berm on the protected side is given in
a number of -- of those publications, both at the
north and the south breach.

Q. Do you remember any approximate values?

A. Not approximate values, but having -- having
been there and stood on it, I should be able to
estimate roughly that -- that height, but it would be
an estimate.

Q. Please do.

A. And I'm looking for a photograph now showing
that in my report.  The photograph on Page 29 doesn't
show it completely.  I'm looking for another
photograph.  The -- the schematics that I've shown are
not to scale.  Let's see.  I can't estimate from that.

(Pause in proceedings.)

THE WITNESS:  It would be a very rough estimate,
but I want to say approximately 20 feet.

MR. RAFFMAN:  20 feet is from the toe of the --

MR. SEYMOUR:  From the land level of the Lower
Ninth Ward right before where the levee starts to
raise up.

MR. RAFFMAN:  Thank you.

CHARLES R. CUSHING, PH.D.        80

BY MR. SEYMOUR:

Q. Now, you testified in your report a good
number of times that during the early morning hours on
August 29, the wind was blowing consistently from east
to west; is that correct?

A. From an easterly direction to a westerly
direction.

Q. Okay.  Not east to west.

A. It's not east to west, but east to west is a
precise direction, whereas easterly winds and westerly
winds have an easterly component or a westerly
component.

Q. And when high speed wind hits the levee slope
and then has to go up 20 feet, is that going to
cause -- what happens to that air?

A. Well, the air that's right at the boundary
layer or the surface will have to change direction,
and when it flows over the -- the floodwall and
there's no water, say the water level is low, then
separation will take place, as we've mentioned, and
you'll have an eddie or a vortex just beyond the
floodwall.

Q. The wind has to go straight up, doesn't it?

A. Only the wind that's within the boundary

CHARLES R. CUSHING, PH.D.        81

layer.  That is, the wind that's within a few inches
of the wall is going straight up, but as you're -- but
as you move a few inches away from the wall, the air
is not going straight up.  It's going up at an angle,
and as you move away from the wall, that angle becomes
shallower and shallower.

Q. The 20 foot depth of wind closest to the
ground of the Lower Ninth Ward has got to be moved by
the slope of the levee and the floodwall almost
vertically up until it reaches the wind that is above
the 20 foot level; is that right?

A. No, sir.  That's -- again, you're
mischaracterizing what I'm saying.  Only the air
that's within an inch or so following the surface of
the -- of the berm and following the surface of the
concrete is moving straight up.  Any air away from
that, a few inch -- even a few inches away will not be
going straight up.  It will be going up at some angle,
and as you move further away from that floodwall, that
angle becomes shallower and shallower.

So -- so the air that's, say, a few feet away
from the floodwall will be moving at a much shallower
angle and compressing as its joining the free stream
above it.  It's when the air passes over the floodwall

CHARLES R. CUSHING, PH.D.          82

and has to then go down, again, you have a few inches
that follow the floodwall directly downward, but most
of the rest of the air then will have shallower angles
in order to join the free stream.

Q. Did Dr. Daggett perform any calculations as
to the point at which the upward movement of the air
would stop?

A. At which the point of the upper movement --

Q. The air that cannot go in a straight
direction because of the floodwall and the levee.  The
bottom 20 feet of air as it's going --

A. I'm not understanding your question.  Your
question is not clear.

MR. RAFFMAN:  Objection.

THE WITNESS:  Could you rephrase the question?

BY MR. SEYMOUR:

Q. You've testified that the air that is closest
to the floodwall is going straight up.  The air that
is near that is going to be at an elevated angle but
not straight up, and the air farther back is still
going to be at an elevated angle, have an upward
motion but not straight up.  The angle decreases as
you get farther back.

A. That's -- that's what I said, yes.

CHARLES R. CUSHING, PH.D.          83

THE VIDEOGRAPHER:  We're going off the record at
the end of Tape 2 at 11:19:05.

(A recess was taken from 11:19 a.m.
to 11:31 a.m.)

THE VIDEOGRAPHER:  Back on record, Tape 3 at
11:31:03.

BY MR. SEYMOUR:

Q. Dr. Cushing, just before we broke, we were
talking about this mass of air that was moving at
different angles upwards.  Did you perform any
calculations, or do you know if Dr. Daggett performed
any calculations as to the volume of air involved,
what a speed would be and what the trajectory of that
displaced air would be after it hit the levee?

A. I think it's known what the velocity of the
air is, but the volume of air that's moving could be
calculated, but it's not significant.  I'm not sure
how one would use a calculation for the volume of air.
It would be an unnecessary calculation.  And what was
the third characteristic you asked about?  You asked
about the speed of the air, the volume of the air, but
one other thing.

Q. And what its effect would be on the air
currents above the Inner Harbor Navigational Canal.

CHARLES R. CUSHING, PH.D.          84

A. I think it's pretty well known.  Anybody who
works in the fluid flow field, whether it be water or
air, knows that a disturbance such as a floodwall or
such as a building will be -- is a local disturbance,
and the fluid flow will rejoin the free stream of the
prevailing direction of the wind once it passes the
obstruction.

Q. Air behaves pretty differently from fluids in
some respects, doesn't it?

A. Air behaves pretty differently than --

Q. Fluids.

A. Actually, the similarities are very great.
There are differences in characteristics between air
and water, obviously.  Density being one,
compressibility being another, and its other
properties, such as kinematic viscosity and so many
other characteristics, but the behavior of the two
fluids are very similar.

Q. Let's hone in on this compressibility.
Compressed air means high pressure; isn't that right?

A. Not necessarily.  If it compresses even a
small amount, it's compressed.

Q. Higher pressure?

A. Well, if it's higher pressure, then -- I'm

CHARLES R. CUSHING, PH.D.          85

not sure I understand.

Q. The air that is displaced by the levee, the
eastern floodwall and levee of the Inner Harbor
Navigational Canal would be at higher pressure when it
goes up over the canal because it's compressing with
other air?

A. Yeah.  Immediately adjacent to the floodwall,
the air would have higher pressure.

Q. As it carries forward, that means there's
going to be lower pressure over the canal, doesn't it?

A. Just at the immediate local inboard side of
the canal, but not at any significant elevation or not
for any significant distance beyond the floodwall.

Q. Did you perform any calculations to underlie
that conclusion?

A. No, sir, I didn't.

Q. Did Dr. Daggett perform any calculations --

A. No, sir, I don't believe -- well, I'm not
aware of him having performed such a calculation.  But
I would add to that answer that I'm familiar with air
flow and -- of the type you're referring to because
when we design ships, in addition to calculate --
calculating the fluid flow, that is, the water flow
around the shape in order to assume a hydrodynamic

22  (Pages 82 to 85)

CHARLES R. CUSHING, PH.D.          86

1  shape, we also conduct air flow studies over the ship
2  because there is air resistance to the ship's
3  movement, and, therefore, we're very concerned about
4  how air flows over structures.
5      Additionally, we're very concerned in the
6  design of ships about the exhaust from the funnels of
7  the ship.  The exhaust from the engines, especially on
8  passenger ships where you do have vortices, where air
9  does, as it passes over the super structure and around
10 the funnel, does cause air to form vortices and eddies
11 and sometimes draws that exhaust, if you will, down to
12 the deck of the ship.  So we perform wind tunnel
13 studies to look at this air flow and to also determine
14 pressures and resistance of the air.
15     In doing so, it gives us very great
16 familiarity with what I testified earlier to, the fact
17 that the air that flows over the structure rejoins the
18 prevailing direction of the air in the free stream
19 very close to the point at which the air passes the
20 obstruction.  Let's say within the shadow of the ship.
21     Q.  Are you finished?
22     A.  Yes, sir.
23     Q.  Okay.  Please turn to Appendix C of your
24 report.

CHARLES R. CUSHING, PH.D.          87

1      (Pause in proceedings.)
2  BY MR. SEYMOUR:
3      Q.  All of the pages in Appendix C have a line
4  for wind data at IHNC.  Do you see that?
5      A.  Yes, sir.
6      Q.  Okay.  Now, if you turn to Page C-14, which
7  is the first of these pages that I want to talk about.
8  From the early morning of Monday, August 29, 2005,
9  there is -- there are entries for the wind data at the
10 IHNC.  What is the source of that information?
11     A.  The source of this information is a report
12 prepared by Dr. Austin Dooley.
13     Q.  Okay.  And is the wind data at the IHNC based
14 upon the four reference points that he used?
15     A.  It's a projection from those four reference
16 points to the IHNC.
17     MR. SEYMOUR:  Okay.  I ask that a copy of
18 Dr. Dooley's report be marked as Exhibit 2 to the
19 deposition.
20     (The Reporter marked the document
21     referred to as Deposition Exhibit 2
22     for identification.)
23     MR. SEYMOUR:  If you'd -- could you pass the
24 exhibit to the witness.  Thank you.

CHARLES R. CUSHING, PH.D.          88

1      If you'd turn to Page 21, you see that the
2  reference points A, B, C, and D are mentioned, and
3  they're depicted graphically on Page 22.
4      (Pause in proceedings.)
5  THE WITNESS:  Yes, sir.
6  BY MR. SEYMOUR:
7      Q.  Do you know why Dr. Dooley did not use a
8  relatively nearby high wind speed indication in his
9  reference points?
10     A.  I'm not sure I understand what "high speed
11 indication" you're referring to.
12     Q.  Okay.  If you turn to Dr. Dooley's report on
13 Page 18 -- excuse me.  On Page 17.  Do you see the
14 data from the NASA Michoud Ably facility?  I'm not
15 sure I'm pronouncing that correctly.
16     MR. RAFFMAN:  I believe it's an abbreviation for
17 Assembly, if it matters.
18     MR. SEYMOUR:  Okay.  Michoud Assembly Facility.
19     Q.  Do you see a sustained wind speed of 84 knots
20 at 6:00 a.m.?
21     A.  Yes, sir.
22     Q.  Okay.  That's in East New Orleans; isn't it?
23     A.  Yes, sir.
24     Q.  84 knots is very close to 100 miles an hour,

CHARLES R. CUSHING, PH.D.          89

1  isn't it?
2      A.  It's close.
3      Q.  Do you know why that would not have been
4  included in Dr. Dooley's calculations of what the wind
5  speed would be around the Inner Harbor Navigational
6  Canal?
7      MR. RAFFMAN:  Objection.  Foundation.  That's a
8  course question that might well have been asked of Bob
9  Dooley himself.
10     MR. SEYMOUR:  The witness was asked if he knew.
11     Q.  Do you know?
12     (The witness reviewed the document.)
13     THE WITNESS:  I believe the methodology that
14 Dr. Dooley and Oceanweather, Inc. used are -- in order
15 to make a prediction of -- of wind, RTUs, equally
16 spaced grid points that surround a particular site
17 that they're making a hindcast for, and I think the
18 methodology that he used here was to select these four
19 grid points where he had information.
20     MR. SEYMOUR:  I'd ask the reporter to mark as
21 Exhibit 3 to the deposition a document from the
22 "National Weather Service Forecast Office" for
23 New Orleans/Baton Rouge entitled "Hurricane Katrina
24 Post-Tropical Cyclone Report."

CHARLES R. CUSHING, PH.D.          90

1
2      (The Reporter marked the document
3      referred to as Deposition Exhibit 3
4      for identification.)
5  BY MR. SEYMOUR:
6      Q. Do you see that?
7      A. I see it.
8      Q. Okay. If you'd turn to the second page, you
9  see in the end of the top third of the page under the
10 heading "OTHER UNOFFICIAL OBSERVATIONS," data for
11 "Eastern NEW ORLEANS, NASA MICHOUD FACILITY, WIND
12 EQUIPMENT" at "40 FEET."
13     A. I'm looking for your reference on the second
14 page.
15     Q. Third page.
16     A. "OTHER" official -- "UNOFFICIAL
17 OBSERVATIONS."
18     Q. "EASTERN NEW ORLEANS - NASA MICHOUD
19 FACILITY"?
20     A. Yes, sir.
21     Q. And you see that Gauge 1 shows the peak wind
22 of 84 knots at 10:59 universal time?
23     A. I see that.
24     Q. Okay. And that's what Dr. Dooley has in his
25 report for 6:00 a.m. Central Daylight time; is that

CHARLES R. CUSHING, PH.D.          91

1  correct?
2      A. Which -- you say that's what he has.
3      Q. In his report on Page 17 that we looked at
4  just a moment ago where we had the NASA Michoud
5  facility at -- actually, 6:04 Central Daylight time
6  with a wind -- sustained wind speed of 84 knots.
7      (The witness reviewed the document.)
8  BY MR. SEYMOUR:
9      Q. It's the fourth line from the bottom on
10 Page 17.
11     A. He has it for 6:00 o'clock rather than 6:04.
12     Q. Well, if you look right next to "NASA MICHOUD
13 FACILITY" --
14     A. Minimum pressures.
15     Q. Excuse me. Yes. You're correct. And one
16 sees on Exhibit 3 that there's a Gauge 2 at the NASA
17 Michoud facility that had a reading at 14:15 universal
18 time. And that would be 9:00 a.m., wouldn't it,
19 Central Daylight time?
20     A. Well, there would be eight hours difference.
21 So 8 from 14 would be --
22     Q. I'm suggesting it's a five-hour difference.
23     A. Between universal --
24     Q. And Central Daylight time.

CHARLES R. CUSHING, PH.D.          92

1      (The witness reviewed the document.)
2      THE WITNESS: Yeah. I guess approximately
3  9:00 o'clock.
4  BY MR. SEYMOUR:
5      Q. Okay. 9:00 o'clock Central Daylight time?
6      A. That's right.
7      Q. And the reading from Gauge 2 at that time was
8  107 knots. Do you see that?
9      A. I see that.
10     Q. 107 knots is about 122 miles an hour,
11 roughly?
12     MR. RAFFMAN: Object to the question. Well,
13 prior question.
14     THE WITNESS: I see that. I see that.
15 BY MR. SEYMOUR:
16     Q. Okay. And that was not factored into
17 Dr. Dooley's calculation of the wind speed at the
18 Inner Harbor Navigational Canal; is that correct?
19     A. Well, what I'm observing here on your
20 Exhibit 3 is first that these were unofficial
21 observations, and I believe that unofficial may or may
22 not meet the standards of the National Weather
23 Service.
24     And, secondly, what I'm looking at on the

CHARLES R. CUSHING, PH.D.          93

1  document that you've just handed me that I haven't
2  seen before is it refers to "peak winds," which could
3  be gusts and not necessarily sustained winds. So I'm
4  not sure of the significance of the Exhibit 3.
5      Q. Are you familiar with the terminology used by
6  the National Weather Service when it uses terms like
7  "peak winds"?
8      A. I'm familiar with the terms "gusts" and
9  "sustained winds."
10     Q. You're not familiar with the National Weather
11 Service term?
12     A. For peak winds. I'm not sure how it's
13 defined here, no. But I am familiar with "gusts" and
14 "sustained winds."
15     Q. Do you see that the peak wind for Gauge 1 was
16 included by Dr. Dooley on Page 17 of his report?
17     A. I see that the numbers -- the numbers are the
18 same. The times are approximately the same.
19     Q. Okay. Isn't it true that there is no
20 indication in Dr. Dooley's report that that NASA
21 Michoud information is less valuable than the other
22 information that he has in that table?
23     A. You'll have to ask Dr. Dooley. I'm sure
24 he -- he weighed all of the information in coming to

24  (Pages 90 to 93)

CHARLES R. CUSHING, PH.D.                94

1  his conclusions.
2      Q.  I'm asking you to take a look at Page 17 of
3  his report and table.
4      A.  I am.  I am looking at it.
5      Q.  Is there any indication on Page 17 and
6  Table 4 that the data for the NASA Michoud facility is
7  less valuable than the other information in that
8  table?
9      MR. RAFFMAN:  Objection.  Which data from the
10  NASA Michoud, the 84 or the 107?  Please clarify.
11      MR. SEYMOUR:  Exactly what it says, 84.  The one
12  is stated; the other is not stated.  That's what we're
13  talking about.
14      MR. RAFFMAN:  I want to make sure I understand
15  what your question refers to.
16      MR. SEYMOUR:  Counsel, this is not the place for
17  argument.
18      Q.  Please answer the question.
19      A.  Okay.  I'm sorry.  Could you repeat the
20  question.
21      Q.  Do you see any indication, on Page 17 of
22  Dr. Dooley's report or on Table 4, that the data for
23  the NASA Michoud facility at 6:00 o'clock a.m. with a
24  sustained speed of 84 knots is less valuable than the
25

CHARLES R. CUSHING, PH.D.                95

1  other information in that table?
2      MR. RAFFMAN:  Same objection.
3      THE WITNESS:  I think all of the information in
4  the table is valuable, and I think you'll find it in
5  Dr. Dooley's report.  He wouldn't have put it in the
6  report, I don't believe, if he didn't consider it
7  important.  So I'm sure that it's important, and I'm
8  sure he considered it.
9  BY MR. SEYMOUR:
10      Q.  And do you know of any reason why the data
11  for 9:00 a.m. Central Daylight Time showing a peak
12  wind from Gauge 2 of, roughly, 122 miles per hour
13  would be less valuable than the other information
14  that's in this report?
15      MR. RAFFMAN:  Objection.
16      THE WITNESS:  I think I answered that.  I think
17  that all of the information -- sorry.  This
18  information doesn't appear in his report.  So I would
19  consider all -- all data that can be relied upon to be
20  useful, but the question is can this be relied upon.
21  He obviously made that determination.  I can't.  I --
22  I don't know why they're calling it unofficial.  It
23  may be a private -- it may be a NASA anemometer that
24  they're using.  I don't know the height of that
25

CHARLES R. CUSHING, PH.D.                96

1  anemometer.  It says, "40 feet," but at 40 feet above
2  what?  Of sea level?  Above land?  Above what datum?
3  So I can't judge, from what you've given me in Exhibit
4  3, the significance of it or the relative importance
5  of it.
6  BY MR. SEYMOUR:
7      Q.  If you take a look at your Exhibit C, where
8  you're using all this wind data that was calculated
9  for the Inner Harbor Navigational Canal --
10      A.  Sorry.  Exhibit C?
11      Q.  Appendix C to your report.
12      A.  Appendix C.
13      Q.  We were on Page C-14.
14      A.  Yes, sir.
15      Q.  And going from -- these pages deal with
16  2:00 a.m. and 3:00 a.m., and Page C-17 goes up
17  until -- I think 9:00 o'clock a.m. is the last time
18  for which we have information.  But there's a line for
19  30 minute average speed at 10 meters expressed in
20  knots.  So if I understand correctly, what this chart
21  shows, if this shows the average speed of the wind
22  measured by an anemometer of a 10 meter height in
23  knots per hour; is that correct?
24      A.  No, sir.
25

CHARLES R. CUSHING, PH.D.                97

1      Q.  Please explain.
2      A.  Knots per hour is not a term I'm familiar
3  with.
4      Q.  Excuse me.  Knots.  I'll give you that one.
5  Measured in knots.
6      A.  It does say 57.34 as a 30 minute average wind
7  speed --
8      Q.  I'm sorry.
9      A.  -- 10 meters.
10      Q.  I've referred to a series of questions that
11  I'm going to be asking about Pages C-14 to C-17, but
12  we need to be on the -- talking about the same page.
13  What page are you on right now?
14      A.  C-17.
15      Q.  Could you turn back to C-14, the first part
16  of the series.  That was the figure of 39.46 that I
17  was reading.
18      A.  Yes, sir.
19      Q.  But I -- am I correct that the anemometer is
20  assumed to be at 10 meters?  There's none there, but
21  it's assumed to be?
22      A.  That's correct.
23      Q.  And the 39.46 knots --
24      A.  That's 10 meters above main sea level.
25

CHARLES R. CUSHING, PH.D.            98

1
2    Q.  And at that point, how much would it be above
3    the level of the -- I can't say the level of the
4    water.  The level of the Lafarge facility at the Inner
5    Harbor Navigational Canal?
6        A.  I would have to know the -- the height of the
7    Lafarge facility above either mean sea level or some
8    datum to answer that question.
9        Q.  Okay.  And am I correct that the figure of
10   39.46 knots is the result of an average taken over a
11   30-minute period of readings?
12       A.  That's my understanding too.
13       Q.  Now, you notice that the 10-minute average
14   has got a faster wind speed, about 10 percent faster,
15   about 9 percent faster.  Do you see that?
16       A.  Yes, sir.
17       Q.  And the 1-minute wind speed is 48.93, and the
18   three-second average speed is 60.37.  Do you see
19   those?
20       A.  Yes, sir.
21       Q.  Those are calculated values, aren't they?
22       A.  They are.
23       Q.  Okay.  So the three-second average speed is
24   assumed to be about --
25       A.  No.  I'd like to change that answer.

CHARLES R. CUSHING, PH.D.            99

1
2        Q.  Surely.
3        A.  I think they're observed values.  When you
4    take the observed values, because these anemometers
5    are recording anemometers, then you have to calculate
6    the average from the observation.  So they're partly
7    observed and partly calculated.
8        Q.  If you take a look at Dr. Dooley's report on
9    Pages -- on wind speeds, Table 6-B on Pages -- let me
10   just see if I can find the -- actually, I take that
11   back.  On Page 21 of Dr. Dooley's report before he has
12   his tables, there is an explanation.  It says that
13   the -- third full paragraph on the page reads, "The
14   OWI wind and pressure fields are defined every 15
15   minutes and the surface winds represent 30 minute
16   average wind speeds."
17       A.  Yes, sir.
18       Q.  And if you turn to Page 22, you see that
19   there again is a reference to -- where it says, "The
20   surface winds represent the effective over water" --
21       A.  What page again, please?
22       Q.  Page 22, the next page.
23       A.  Yes, sir.
24       Q.  "The surface winds represent the effective
25   over water 30 minute average winds at a height of 10

CHARLES R. CUSHING, PH.D.            100

1
2    meters above sea level."  And then it says, "OWI
3    recommends applying the following factors to the
4    30 minute average wind speed to get reasonable derived
5    speeds at shorter averaging intervals."  Do you see
6    that?
7        A.  Yes, sir.
8        Q.  And you see that the 30 minute average is
9    multiplied by 1.09 to get the 10 minute average?
10       A.  Yes, sir.
11       Q.  And that the 1 minute average is obtained by
12   multiplying the 30 minute average by 1.24?
13       A.  Yes, sir.
14       Q.  And that the three-second gust is obtained by
15   multiplying the 30 minute average by 1.53?
16       A.  Yes, sir.
17       Q.  Do you now accept that the three-second
18   average speed in knots in your Appendix C is a
19   calculated figure obtained from the 30 minute average
20   speed?
21       A.  Yes.  The underlying -- obviously, the
22   underlying data comes from observations, but it's
23   first calculated as a hindcast, and then secondly, by
24   applying these coefficients to obtain 10 minute and
25   1 minute and 3 second intervals.

CHARLES R. CUSHING, PH.D.            101

1
2        Q.  Looking at your own Appendix C, is it fair to
3    say that that shows a great deal of turbulence in the
4    wind in terms of speed?
5        A.  If you don't mind, could I have a sticky
6    because we're jumping back and forth in the report.
7        Q.  Still on Page C-14.
8        A.  Okay.  It shows variations in wind speed that
9    are gusts -- can be described as gusts.
10       Q.  And a 10 minute average wind speed under this
11   formula is always assumed to be faster than the
12   30 minute average?
13       A.  Yes, because within -- within the -- those
14   shorter intervals, the gust becomes significant --
15   more significant.
16       Q.  And the 1 minute average is even faster?
17       A.  Yes, sir.
18       Q.  Now, are you familiar with the concept of
19   rolling averages in stock prices, 30-day averages and
20   90-day averages?
21       A.  Generally.
22       Q.  That smoothes out the turbulence in stock
23   prices, doesn't it?  It shows you a much smoother
24   curve that looks more consistent and steady?
25       A.  I think that's basic statistics that whenever

CHARLES R. CUSHING, PH.D.          102

1  you take a longer period, it reduces the averages.  It
2  reduces the -- the average of the peaks, right.
3      Q.  So the one observation you could have at the
4  30-minute speed conceals a fair amount of movement,
5  fair amount of turbulence; isn't that correct?
6      MR. RAFFMAN:  Objection.
7      THE WITNESS:  You keep using the term
8  "turbulence."  I don't consider gusts turbulence.
9  Turbulence to me means changes in directional flow,
10  and I don't think this is referring to directions in
11  flow.
12  BY MR. SEYMOUR:
13      Q.  Is it your testimony that there is more
14  turbulence when hurricane winds move over land than
15  when they move over water?
16      MR. RAFFMAN:  Objection.  Asked and answered.
17      THE WITNESS:  I believe I had said that it's --
18  it's a localized effect close to the surface, yes.
19  BY MR. SEYMOUR:
20      Q.  Is this a commonly recognized phenomena?
21      MR. RAFFMAN:  Same objection.
22      THE WITNESS:  Well, when you say, "commonly
23  recognized," I think it's recognized that -- that
24  whatever obstructions may exist on land will create a

CHARLES R. CUSHING, PH.D.          104

1      A.  Again, Page 32, sir?
2      Q.  Page 22.
3      A.  Okay.  I'm looking on Page 22.  Could you
4  refer it to me?
5      Q.  It's the first paragraph of text where it
6  says, "The surface winds represent the effective
7  over-water 30 minute average winds."
8      A.  Yes, sir, I see it.  I see it.
9      Q.  I want to make sure that I understand your
10  testimony fairly.  As I understand it, there was no
11  need to take into account the disturbances that are
12  caused when wind moves over land -- hurricane winds
13  move over land and comes into contact with structures
14  because it would be -- have a negligible effect.  Is
15  that fair?
16      A.  It would have -- I didn't say, "negligible."
17  I said, "localized effect."
18      Q.  Did you calculate the extent of the localized
19  effect?
20      A.  No.  I believe I know it.  It's within the
21  shadow of the particular structures.
22      Q.  And the only effect it has is within the
23  immediate shadow of the structures?
24      A.  You're using the word "immediate."  I use the

CHARLES R. CUSHING, PH.D.          103

1  localized effect on flow more than over water.
2  BY MR. SEYMOUR:
3      Q.  Was that taken into account in any of your
4  calculations for wind speed over the Inner Harbor
5  Navigational Canal?
6      A.  I'm sorry.  Would you repeat the question.
7      Q.  Was what you described as local disturbances,
8  when the hurricane winds move over land and come into
9  collisions with structures and so forth, was that
10  taken into account in calculating wind speeds over the
11  Inner Harbor Navigational Canal?
12      MR. RAFFMAN:  Objection.
13      THE WITNESS:  Certainly, it was considered, but
14  it was not considered significant because of -- for
15  the reasons that I've previously described, that such
16  turbulence, as you refer to it, occurs as a local
17  phenomena and not over open, flat areas such as the
18  canal.
19  BY MR. SEYMOUR:
20      Q.  Do you see on Page 22 of Dr. Dooley's report
21  where his 30 minute average winds --
22      A.  Dr. Dooley's report, sorry.
23      Q.  -- are defined as the effective over-water
24  30 minute averages?

CHARLES R. CUSHING, PH.D.          105

1  word "localized," but it's -- the effect is within the
2  shadow of the structures.
3      Q.  Dr. Cushing, how big is the shadow of the
4  structure?
5      A.  It depends on a lot of things, the size of
6  the obstruction, the length, the width ratio, the
7  height of it above ground and so forth.  But it would
8  be within one to two dimensions of the lateral
9  dimension of the structure, and at that point, any
10  eddies or turbulence that would occur would diminish
11  exponentially to the point where further downstream,
12  there wouldn't be significant or measurable
13  turbulence.
14      Q.  Do you know the approximate length of the
15  Inner Harbor Navigational Canal between the
16  Claiborne Avenue and Florida Avenue bridges?
17      MR. RAFFMAN:  Objection.
18      THE WITNESS:  I don't recall it.
19  BY MR. SEYMOUR:
20      Q.  What would be the shadow of the Inner Harbor
21  Navigational Canal?  You estimated a 20-foot height
22  for the levee and the floodwall, but for -- in terms
23  of understanding the testimony you've just given, what
24  would the shadow be?

CHARLES R. CUSHING, PH.D.          106

1    A.  The shadow, if it's -- if the wind or the
2  fluid is flowing around an obstruction, but if the
3  wind in this particular case is flowing around the
4  sides of the building, then you're interested in the
5  lateral dimension, that is, the width of the building
6  that the wind is flowing around.  So if it's flowing
7  around a 30-foot building, 60, 80 feet down- --
8  downstream, the flow has joined the free stream.
9       If you're talking about flowing over
10  something, you're talking about, say, flowing over a
11  30 foot high building, then we're talking about the
12  air sweeping over the building and then rejoining the
13  free stream downstream 30 to 60 to 90 feet downstream.
14       So in the case of the Inner Harbor Canal,
15  it's not the length of the floodwall that's
16  significant.  It's the height of the floodwall.  In
17  your earlier questions about air flowing up over the
18  berm and then up over the floodwall, would, following
19  the same approach, indicate that the air, if it was
20  then flowing down to a very low level water, say
21  something that was 15 feet below the top of the
22  floodwall, assuming the floodwall was 15 feet above
23  the main sea level, which it wasn't, but let's assume
24  it is for a moment, then some 15 to 30 to 45 feet

CHARLES R. CUSHING, PH.D.          107

1  downstream of that air, that free stream air, that
2  deflected air would be joining the free stream.
3     Q.  So the air deflected upward would be
4  deflected upward 40 or 60 feet, and then it would go
5  down and join -- that would be the shadow of the levee
6  and floodwall, and then it would join, I think you
7  said, with the free flowing air?
8     A.  That's right.
9     MR. RAFFMAN:  Objection.
10  BY MR. SEYMOUR:
11     Q.  Is that correct?
12     A.  That's not my testimony.  My testimony was
13  that the air immediately adjacent to the surface,
14  whether it's the surface of the berm or the vertical
15  surface of the floodwall within a few inches is
16  flowing upward, but when it reaches the top, it curves
17  over the top and then flows down the outboard side of
18  the floodwall.  It's not flowing 30 feet up in the
19  air.  The free stream that is being deflected by the
20  floodwall flows in an upward direction at an ever
21  diminishing height.  So that when you're 30 feet above
22  the floodwall, the air is nearly flowing in the same
23  direction as the free stream.
24     Q.  So you're saying that, if I understand you

CHARLES R. CUSHING, PH.D.          108

rightly, that for the purpose of the Inner Harbor
Navigational Canal east floodwall, the upward shadow
of the floodwall structure of the levee and floodwall
is going to be about 30 feet?
    MR. RAFFMAN:  Objection.
    THE WITNESS:  No.  No.  I'm saying the shadow is
in the lateral or downstream direction.  In other
words, when the -- the wind flows up and close to the
floodwall, flows upward a few inches, a depth of air
flows up and over the sharp top of the floodwall, it
forms turbulence, eddies, if you will, vortices on the
down shore -- downwind side of the floodwall as -- as
the air tries to fill in the space below the floodwall
in the shadow, and those eddies and that disturbance
will diminish as it moves downwind, away from the
floodwall.
    And when you come to 20 to 40 feet, if the
floodwall is 20 feet -- we said 15 feet.  When you
move 15 feet to 30 feet to 45 feet, those eddies and
that disturbed flow then smooth out and join the free
stream.
BY MR. SEYMOUR:
    Q.  Do you also recall testifying earlier this
morning that it's not just the first inch or two

CHARLES R. CUSHING, PH.D.          109

that's closest to the floodwall, but the air behind
that is also going upward but not at so vertical a
slope, and the air behind that it is moving upward but
at a decreased slope?
    A.  Yes.  At an ever decreasing slope as you move
above the -- the floodwall.  And, again, as you pass
over the floodwall, that air then is flowing downward
and joining the free stream.
    Q.  Did you perform any calculations to see at
what height above the levee the air once again becomes
undisturbed by this movement of the air that has to be
forced to rise up?
    A.  I would say I know it by experience for all
the reasons that is described in our -- our wind
tunnel tests and observation of -- of flow of air over
structures.
    Q.  Are the wind directions in your report also
averaged?
    A.  There would be some averaging, yes, sir.
    Q.  What's the averaging period?
    A.  Well, again, it depends on -- on how it's
reported.  Can you tell me which wind directions
you're referring to in the report?  Do you have a
specific --

CHARLES R. CUSHING, PH.D.          110

Q. Are you familiar with the input information
on -- on the averaging from the various weather vanes
that are providing the information?

MR. RAFFMAN: Objection.

THE WITNESS: I believe what I just said was that
the values that are reported from weather vanes are --
are an average value because the weather vane is
moving back and forth a small amount and that -- that
movement back and forth at any given instant is
different, but obviously, they're reporting the
directions for -- for a period of time.

So I'm asking you if you could refer -- but
you're asking me as it's referred to in my report, and
I'm asking you if you could refer me to the location
in my report that you're talking about.

BY MR. SEYMOUR:

Q. I'm just asking you whether you know -- the
report will speak for itself as to what it says, but
do you know, do you know anything that's not in the
report with respect to the averaging period for the
wind directions?

A. I don't recall.

Q. Do you know --

A. I believe -- however, I believe in

CHARLES R. CUSHING, PH.D.          111

Dr. Dooley's report, if I could refer to it, that is
Exhibit -- I think Exhibit 2.

(The witness reviewed the document.)

THE WITNESS: I don't believe he provides that --
the answer to that question.

BY MR. SEYMOUR:

Q. High winds --

A. Sorry. Let me --

(The witness reviewed the document.)

THE WITNESS: Let me see if I can answer your
question from Page 30 of Dr. Dooley's report where the
OWI hindcast refers to "30 minute winds." So they
apparently are averaging 30 minute winds for direction
in their prediction at the IHNC, and they're
converting those 30 minute winds to 10 minute winds.
That's what appears to be the answer to your question.

BY MR. SEYMOUR:

Q. As with the averaging of wind speeds over a
period of time, is it true that averaging wind
directions smoothes out a lot of the moment-by-moment
changes in wind direction?

A. It does -- well, you use the word "a lot." I
have a problem with a subjective term like that, but
it does smooth it out.

CHARLES R. CUSHING, PH.D.          112

Q. Do high wind conditions sometimes destroy
anemometers?

A. They do.

Q. And a destroyed anemometer cannot record the
speed of winds that were higher than the point at
which it was destroyed; is that correct?

A. By definition, yes.

Q. Can weather vanes also be destroyed by high
winds or by rapid changes of direction?

A. That's been my experience, yes.

Q. Do you know whether there were a substantial
number of anemometers and/or wind vanes destroyed in
Katrina in the New Orleans area?

A. I'm not sure what you mean by "a substantial
number." I believe the Lakefront Airport anemometer
failed during the hurricane.

Q. Are you familiar with other failures of
anemometers during the hurricane?

A. I don't recall any others.

Q. Do anemometers have margins of error?

A. I think all test instruments do.

Q. Do you know what -- are there different types
of anemometers with different margins of error?

A. There are different types of anemometers, and

CHARLES R. CUSHING, PH.D.          113

they would have different margins of error, yes.

Q. Have you ever seen anything indicating the
types of anemometers that were used for Dr. Dooley's
calculations of wind speed over the Inner Harbor
Navigational Canal?

THE WITNESS: I don't --

MR. RAFFMAN: I'll make an objection to that
question. Foundation.

MR. SEYMOUR: I've asked him whether he's seen
it. That's a foundational question.

THE WITNESS: I don't know the specifics of the
anemometers that Dr. Dooley -- from which Dr. Dooley's
data comes.

BY MR. SEYMOUR:

Q. Okay. When you interpolate -- just as a
statistical matter, when you interpolate information
from four different sets of observations, each with
its own margin of error, do you come up with a margin
of error that is an aggregate margin of error that is
larger than any of the four individual margins of
error?

MR. RAFFMAN: Same objection. The predicate is
flawed.

Continue to answer

CHARLES R. CUSHING, PH.D.        114

1
2    THE WITNESS:  I think it depends.
3    BY MR. SEYMOUR:
4        Q.  On what does it depend?
5        A.  It depends what the margins of errors are and
6    what the spacing of the data points are.  It depends
7    on a number of -- number of things.  The variations
8    in -- in the data and so forth.  In other words, if
9    the four data points each indicate a value of 10, 10,
10   10, 10 and they have a margin of error of .1, the
11   averaging of all of those won't create a larger margin
12   of error.
13       Q.  And when they have different readings?
14       A.  Then the margin of error will be different.
15       Q.  Larger?
16       A.  Could be.
17       Q.  Do you know what the margin of error is for
18   the interpolated Inner Harbor Navigational Canal wind
19   speeds that were calculated by Dr. Dooley?
20       A.  I don't.
21       Q.  Would your answer be the same with respect to
22   the wind directions?
23       A.  Yes, sir.
24       Q.  In reporting scientific results, isn't it
25   usual to report the margins of error?

CHARLES R. CUSHING, PH.D.        115

1    A.  Sometimes it is.
2        Q.  Under what circumstances is it not?
3        A.  Many times engineering reports don't include
4    margins of error.
5        Q.  Do you know what the general range of margins
6    of error is for anemometers?
7        A.  I think you asked me that question, and I
8    said it depends upon the type of anemometer.  I don't
9    know.
10       MR. SEYMOUR:  I'll ask the court reporter to mark
11   as Exhibit 4 to the deposition a document entitled "A
12   New Metric for Hurricane Destructive Potential," from
13   Mark Powell of the National Oceanographic and
14   Atmospheric Administration, Hurricane Research
15   Division, and Tim Reinhold from the Institute for
16   Business and Home Safety.
17       (The Reporter marked the document
18       referred to as Deposition Exhibit 4
19       for identification.)
20   BY MR. SEYMOUR:
21       Q.  Do you have that in front of you now?
22       A.  Yes, sir, I do.
23       Q.  They did not number the pages in this
24   presentation, but if you turn to what I believe is

CHARLES R. CUSHING, PH.D.        116

1    Page 10 that says at the top, "Hurricane Intensity"
2    with a colon.
3        (Pause in proceedings.)
4    BY MR. SEYMOUR:
5        Q.  This is what the page looks like
6    (indicating).
7        A.  Yes, sir.
8        Q.  Do you see the line saying, "Estimates can
9    vary by 30%"?
10       A.  Yes, sir.
11       Q.  And do you see the statement that the
12   intensity of hurricane winds is "Difficult to
13   measure"?
14       A.  Yes, sir.
15       Q.  Have you previously seen any estimate that
16   variance in measurements could be as high as
17   30 percent?
18       A.  Well, I'm confused by the --
19       MR. RAFFMAN:  Objection.
20       THE WITNESS:  I'm confused by the document that
21   you've handed to me.  First of all, I haven't seen it
22   before.  I haven't read it, and I don't know what it
23   says.  So you're taking one page out of context.
24   BY MR. SEYMOUR:

CHARLES R. CUSHING, PH.D.        117

1        Q.  I've handed you the entire document, have I
2    not?
3        A.  I'll be happy to read the entire document, if
4    you want me to, but I'm just saying that it's a
5    limitation on -- on what you're asking me is to refer
6    to one -- one line out of this whole document, and
7    it -- it talks about measurement on one line and
8    estimates on another line.  So if you're referring --
9    up to now, we've been talking about measurement
10   with -- with instruments.
11       Now we're coming to something that says,
12   "Estimates."  And so I presume you've changed the
13   subject and were referring now to estimating rather
14   than measuring.
15       Q.  First, could you answer the question, have I
16   handed you the entire document?
17       A.  I believe it's the entire document.  It's a
18   thick document.
19       Q.  Okay.  And --
20       A.  It's not numbered.  So I don't know if it's
21   the entire document, but it's a thick document.
22       Q.  I'll represent to you it's the entire
23   document.
24       A.  Fine.

CHARLES R. CUSHING, PH.D.          118

1
2       Q.  And my question to you did not require
3  knowledge of this document.  My question to you was
4  whether you had previously seen any learned treatise
5  or scholarly article indicating that estimates of
6  1 minute average wind speeds in a hurricane could vary
7  by as much as 30 percent?
8       MR. RAFFMAN:  Objection.  Characterization.
9          You can answer the question.
10      THE WITNESS:  All right.  Just to be precise
11  here, my answer, which I previously gave, was
12  referring to a question that you put to me before this
13  past question.  Just to clarify that.  You asked me to
14  read the line -- or identify the line on the page, and
15  my answer referred to that.  Now, your -- your
16  question that you're asking me to answer now, it's
17  been lost, and I wonder if you could -- I could ask
18  you to repeat that question again.
19  BY MR. SEYMOUR:
20      Q.  Let me try coming at this from a different
21  direction.  In your training, studies and so forth on
22  hurricanes that you described and in your review of
23  scholarly literature, have you seen any discussion of
24  the degree of error in anemometer readings during
25  hurricane?

CHARLES R. CUSHING, PH.D.          119

1
2       A.  No, sir.
3       Q.  Okay.  Did you ever do any research to try to
4  find out the degree to which you could pinpoint the
5  numbers that are in your report, that is, what the
6  actual margin of error in those numbers to be?
7       A.  No, sir.
8       MR. SEYMOUR:  This may be a good point to take
9  the lunch break.
10      THE VIDEOGRAPHER:  We're going off the record at
11  the end of Tape 3 at 12:29:04.
12          (A recess was taken from 12:29 p.m.
13          to 1:30 p.m.)
14      THE VIDEOGRAPHER:  Back on record.  Tape 4 at
15  13:30:41.
16  BY MR. SEYMOUR:
17      Q.  Dr. Cushing, you've done a lot of
18  calculations on the effect of wind and waves on the
19  barge, the effect of the barge on the wall and so
20  forth.  Do those calculations assume that the barge is
21  in any particular posture?
22      A.  Yes, sir.
23      Q.  Please describe that posture.
24      A.  Well, we've assumed it's on an even keel, and
25  it depends on which calculations you're referring to.

CHARLES R. CUSHING, PH.D.          120

1  We've done calculations on the wind, on the barge, and
2  we've also done calculations on the wave effects on
3  the motions of the barge.  So which calculations are
4  you referring to?
5       Q.  The wind and the waves and the impact of the
6  barge on the wall.  Do your calculations -- does your
7  calculation on the barge impact on the wall, those
8  forces assume that the barge is on an even keel?
9       A.  They started by assuming that, but then we
10  added the wind effect on the barge itself to see if
11  the barge had list on it caused by the wind blowing on
12  one side of it.  And we calculated how much list that
13  would be, but it was so small that it had very little
14  effect on it.  But we've calculated the angle of list.
15      Q.  If your -- how would your results change if
16  the barge were listing, not caused by the wind but
17  caused by something else?
18      A.  It depends on the amount of list.
19      Q.  Please explain.
20      A.  Well, the forces of the wind on the barge are
21  dependent upon the surface area that the wind is
22  blowing on it, and if the barge were listed
23  considerably, then the surface area would be different
24  than if it was floating on a relatively even keel.

CHARLES R. CUSHING, PH.D.          121

1
2       Q.  There would be a larger sail area in effect?
3       A.  If it was listing -- greatly listed, but if
4  it was slightly listing a degree or two degrees, or in
5  our case the effect of the wind on list less than a
6  degree, then it would be a very, very small,
7  negligible effect.
8       Q.  Does a vessel that is listing behave
9  differently with respect to water currents than a
10  vessel that is not listing?
11      A.  With respect to water currents.  Again, if
12  you're talking about the motion of the listed vessel
13  through the water or the effect of the current on the
14  vessel, it would behave slightly different.  Slightly
15  but not significantly if the list is small.
16      Q.  If the list is not small, can you describe
17  the effects it would have?
18      A.  It would still be --
19      MR. RAFFMAN:  Objection.  "Not small."
20      THE WITNESS:  If you can help me with what your
21  definition of "not small" is.
22  BY MR. SEYMOUR:
23      Q.  Well, you used the word "considerably"
24  before, to which I took no objection, and you
25  described something that -- as being too small to have

CHARLES R. CUSHING, PH.D.            122

1
2  any effect.  So how about large enough to have some
3  kind of effect, and I want to know what kind of effect
4  it would have.
5      A.  What I would consider large would be, say, a
6  30 degree list.  It would have an effect, but, again,
7  it would have a very, very small effect because we're
8  talking about barge movements at very slow speed.  If
9  you're talking about a high speed vessel, then list
10 becomes more significant at very high speeds, and by
11 "very high speeds," I mean 20, 30 knots.
12     But here we're talking about very slow
13 speeds, and so we're not talking about significant
14 differences in motion of the barge.
15     Q.  In a current, does the listing vessel tend to
16 rotate on its axis?
17     A.  In a current.  It can if the current is
18 unsteady, but if the current is unidirectional and
19 there are no other effects, then a barge would move at
20 a reasonably or readily steady attitude.  But if it's
21 moving with wind and current, the strength and
22 direction of the wind, if it's large as compared to
23 the current, if the current was small, then the wind
24 would -- effects would be dominant, and the barge
25 would assume an angle of -- what we call "an angle of

CHARLES R. CUSHING, PH.D.            123

1
2  repose" or a constant angle depending on, as I've
3  said, the direction and speed of the wind and, of
4  course, on the shape of the vessel.
5      Q.  When you say, "an angle of repose," do you
6  mean that the barge would list over to a -- list
7  further to a certain degree and then stop, or do you
8  mean that the barge would move at an angle to what its
9  other motion would be?
10     A.  The angle -- the term "angle of repose" as --
11 as it refers to wind effects on vessels is the
12 attitude it takes, the directional attitude it takes
13 when acted upon the wind.  In other words, which way
14 it points.
15     Q.  So the barge would tend to rotate somewhat in
16 that situation?
17     A.  No.  It -- when you say, "angle of repose,"
18 it's like saying, "the angle of rest."  In other
19 words, it assumes a certain attitude in the wind and
20 then holds that attitude under wind.  In other words,
21 if I can explain further --
22     Q.  Please do.
23     A.  If you have a vessel with a focal head, a
24 forecastle, a high forecastle, this would tend to
25 catch the wind like the jib on a sailboat would, and

CHARLES R. CUSHING, PH.D.            124

1
2  the vessel would point more downwind.  If you had a
3  tanker with a flat floor deck, if you had a
4  superstructure at the stern, the vessel would assume
5  an attitude that would point up into the wind.
6      If you have a barge, however, that's
7  symmetrical fore and aft, the barge assumes an
8  attitude perpendicular to the wind, and that would be
9  the angle of repose of the barge.
10     Q.  Are there any circumstances in which a barge
11 would -- that was listing substantially, 30 degrees,
12 say, would, in combination with the wind and water
13 currents, tend to rotate?
14     A.  The rotational effect would be -- and we're
15 assuming barges at slow speed now, moving at slow
16 speed.  As I said earlier, if you had very strong
17 currents, cross currents or eddies, strong eddies, it
18 could change the direction of the natural angle of
19 repose of the barge, if the wind was light and the
20 eddies and the currents were strong.  But in this
21 particular case, what we found was that the winds were
22 strong and the currents were negligible.
23     Q.  And is your statement about the currents
24 being negligible part of the result of Dr. Daggett's
25 study?

CHARLES R. CUSHING, PH.D.            125

1
2      A.  Yes, sir.
3      Q.  Please turn to Appendix D in your report.
4      A.  Appendix?
5      Q.  D.  D as in David.
6      A.  Yes, sir.
7      Q.  On Page D-1, the fifth full paragraph
8  beginning with the language, the words "the value for
9  wind velocity"?
10     A.  Yes, sir.
11     Q.  What locations around New Orleans did
12 Oceanweather interpolate wind speed for?
13     A.  Well, Oceanweather interpolated wind speeds
14 from their -- their analysis of -- of the storm
15 through -- through pressure gradients that they
16 established wind at grid points.  They -- they were
17 the ones that established the wind at the grid points.
18 It was Dr. Dooley, I believe, that interpolated the
19 values from the grid points to arrive at values for
20 the Inner Harbor Navigation Canal.
21     Q.  Does this mean that Dr. Dooley was not
22 dealing with actual observations at his four grid
23 points A, B, C, and D?
24     A.  I think --
25     MR. RAFFMAN:  Objection.

CHARLES R. CUSHING, PH.D.          126

1    Go ahead.
2    THE WITNESS:  My understanding from Dr. Dooley's
3  report, and from portions of his testimony that I
4  heard, is that the observations were used to verify
5  the values in the OWI analysis.
6  BY MR. SEYMOUR:
7    Q.  Please turn to deposition Exhibit 2,
8  Dr. Dooley's report.  Page 23.
9    A.  Yes, sir.
10   Q.  Pages 23 and 24 are a pair, I believe,
11  dealing with wind directions.  Is it your
12  understanding that there was an actual wind vane at
13  Location A that provided wind directions or that that
14  was interpolated from other information?
15   A.  I don't believe that there was a wind vane at
16  A, B, C, and D.
17   Q.  At none of those?
18   A.  No.
19   Q.  Do you know where the closest actual
20  observation of wind direction was that was used for
21  any of these grid points?
22   A.  Well, the nearest observation point to the --
23   MR. RAFFMAN:  Objection.
24   THE WITNESS:  IHNC was, I believe, at the

CHARLES R. CUSHING, PH.D.          127

1  Lakefront Airport up until the time when the
2  anemometers failed there.
3  BY MR. SEYMOUR:
4    Q.  Which was 6:19 a.m.; right?
5    A.  That's my understanding.
6    MR. RAFFMAN:  No.  Objection.
7    MR. POLLARD:  I think it's 6:53.
8    MR. RAFFMAN:  I think so too.
9    THE WITNESS:  I stand corrected.  If you could
10  permit me to refer to the -- to the report, I think he
11  identifies the latest readings he has for that
12  location.
13  BY MR. SEYMOUR:
14   Q.  We can hunt for that elsewhere.
15   A.  But the nearest recording --
16   Q.  Between 6:00 and 7:00, we can agree?
17   A.  That's my understanding.  That's my
18  recollection.  But that was the nearest location where
19  there was a recording anemometer.
20   Q.  And what was the nearest location after the
21  failure of the anemometer at the New Orleans Lakefront
22  Airport?
23   A.  I'm not sure.  And I'm referring here to a
24  recording anemometer and not an anemometer where wind

CHARLES R. CUSHING, PH.D.          128

1  observations were being read by an observer.
2    Q.  By recording anemometer, do you mean one that
3  radios information?
4    A.  No.  That records it.  It might radio it, but
5  it also keeps a contemporaneous record.
6    Q.  In your calculations in Exhibit D to your
7  report, did you use Dr. Cooley's data, or did you use
8  the data from the New Orleans Lakefront Airport
9  location until the failure of that anemometer?
10   A.  First, I believe his name is Dooley.  That's
11  a small detail, but --
12   Q.  We should always call people by their proper
13  names.  Thank you.
14   A.  But what we did in Appendix D is we selected
15  a wind -- a wind speed for the purpose of attempting
16  to find out whether the barge could have knocked over
17  the floodwall, and, therefore, we selected a
18  hypothetical wind speed, and the velocity of wind that
19  we assumed was the sustained wind speed, not gusts,
20  because we were talking about a barge movement that
21  would take place over a longer period of time as it
22  moved, and, therefore, its movement would be averaged
23  along with the averaging of the wind speed if there
24  was any slight variation between gusts and otherwise.

CHARLES R. CUSHING, PH.D.          129

1    So we used a wind speed of 67.38 miles per
2  hour in doing the hypothetical calculation in order to
3  determine what the impact of the barge would be on a
4  levee -- on a floodwall.
5    Q.  And is that particular wind speed taken from
6  the New Orleans Regional Airport or taken from
7  Dr. Dooley's analysis?
8    A.  There was a -- a wind speed at the
9  New Orleans Regional Airport, and that is -- my
10  recollection is that is the speed that we used.
11   Q.  Okay.
12   A.  If you'll give me a second, I'll just refer
13  to the calculations.
14   Q.  Actually, if you look on the bottom -- at the
15  last sentence of Page D-1, does that answer the
16  question?
17   A.  Yes, sir.
18   Q.  Okay.
19   A.  And K- -- KNEW are the call letters for the
20  Lakefront Regional Airport.
21   Q.  The last page of D-1 says, "The velocity
22  interpolated from measurements taken at KNEW."  What
23  is the interpolation?
24   A.  The wind velocities reported at the Lakefront

CHARLES R. CUSHING, PH.D.          130

1
2  Airport are from a standard height above sea level.
3  In this case, the anemometer was at a height of about
4  33 feet above ground level, as I've described in the
5  two paragraphs ahead of what you've referred to.
6          And the total height of that anemometer
7  above sea level was about 41 feet.  What we wanted to
8  do was have the wind that was blowing on the barge
9  more realistically, according to the -- to the wind
10 speed that would be at a lower level.  Geostrophic
11 winds are always higher than winds close to the
12 surface, and they diminish vertically in a known
13 pattern, and that pattern is described in the last --
14 second to the last paragraph on Page D-1 where we have
15 recalculated what the wind speed would be at the
16 centroid of the barge, the middle of the barge, closer
17 to the water.
18     Q.  And you have a citation to that, Principles
19 of Naval Architecture, Volume II.  Is there a
20 particular statement in Volume II of those principles
21 that you're referring to?
22     A.  Yes, sir.
23     MR. SEYMOUR:  I'll ask the reporter to mark as
24 Exhibit 5 to the deposition a document entitled
25 "Principles of Naval Architecture, Second Revision,

CHARLES R. CUSHING, PH.D.          131

1
2  Volume II, Resistance, Propulsion and Vibration."
3  This is in the reliance materials that we received for
4  Dr. Cushing.
5          (The Reporter marked the document
6          referred to as Deposition Exhibit 5
7          for identification.)
8  BY MR. SEYMOUR:
9     Q.  Could you please point me to where in this
10 document you obtained the figures that are on
11 Page D-1;
12          (The witness reviewed Exhibit No. 5.)
13     THE WITNESS:  I don't find it in this particular
14 portion of the document that you handed to me but --
15 BY MR. SEYMOUR:
16     Q.  If you look -- I'm sorry.  Go ahead.
17     A.  No.  No.
18     Q.  If you look at Page 33, Figure 31?
19     A.  Yes, sir.
20     Q.  Was Figure 31 the source of the numbers on
21 Page D-1?
22     A.  I can't -- oh, there it is.
23          (The witness reviewed the document.)
24     THE WITNESS:  Yes, sir.  Yes, sir.
25 BY MR. SEYMOUR:

CHARLES R. CUSHING, PH.D.          132

1
2     Q.  If you turn to Page 32, right-hand column, do
3  you see the statement that this information is derived
4  from wind tunnel tests on models of modern
5  counterparts of three types of ship?
6     A.  I'm looking for the reference.
7     Q.  First full paragraph on the right-hand
8  column.
9          (The witness reviewed the document.)
10    THE WITNESS:  And, again, the question was?
11 BY MR. SEYMOUR:
12     Q.  Do you see the statement that the data was
13 obtained on wind tunnel tests of models of three
14 different kinds of ships?
15     A.  The data they're referring to is the loading
16 on particular vessels, not the basic curve that we
17 used in Figure 31.  Figure 31 doesn't derive from the
18 wind tunnel test done by British Marine Technology.
19     Q.  Where does the information in Figure 31 come
20 from?
21     A.  That comes from standard works on
22 meteorology.  I think I've seen that curve or those
23 values published in virtually -- virtually all basic
24 books on meteorology.
25     Q.  Do you see that Figure 31 refers to the wind

CHARLES R. CUSHING, PH.D.          133

1
2  gradient above sea surface?
3     A.  Yes, sir.
4     Q.  Do you see anything in this thing in your --
5  document from your reliance materials referring to the
6  ratio of wind speed over a land surface to free stream
7  wind?
8     A.  No, sir.
9     Q.  They will be different, wouldn't they?
10    A.  Slightly, depending on the surface.  I mean,
11 every surface would be different.  In the case of a
12 sea surface at high winds, it's not completely smooth.
13 You have waves.  You can have waves of 30 feet, 40,
14 even 50 feet or much higher.  So you do have a profile
15 of geostrophic-to-surface wind ratios that reflect
16 uneveness at the surface.  So it will depend -- it
17 will depend on what the surface conditions are for a
18 particular surface.
19     Q.  Does Figure 31 assume a calm sea surface?
20     A.  No, sir, it doesn't.
21     Q.  What kind of sea surface does it assume?
22     A.  I don't recall right now.
23     Q.  Do you see anything in your source which
24 provides the answer?
25     A.  No, sir.

CHARLES R. CUSHING, PH.D.          134

Q. You said the gradient over land would be
slightly different than the figures in Figure 31. How
much different would it be?

A. It depends on what's on the land. If it's
relatively flat, open areas, it would be very similar,
nearly identical, I would say.

Q. And in the Inner Harbor Navigational Canal,
is your testimony that the -- I withdraw that.

In the period of time between 4:00 and
5:00 a.m. on August 29, how would you describe the
water surface in the Inner Harbor Navigation Canal?
Calm, agitated, waves, no waves, what?

A. Small -- small surface waves.

Q. What would be your definition of "small"?

A. On the order of a couple of feet, two feet.

Q. Under your impression of the water surface in
the Inner Harbor Navigation Canal, at what time would
the waves have been high enough to be splashing over
on either side of the floodwall?

MR. RAFFMAN: Objection --

BY MR. SEYMOUR:

Q. Sloshing over either floodwall, the west or
the east?

A. I'm sorry. Repeat the question again,

CHARLES R. CUSHING, PH.D.          135

please.

Q. Under your impression of the state of the
water in the Inner Harbor Navigation Canal on the
morning of Monday, August 29, at what time of day
would the waves have been able to splash over either
the west floodwall or the east floodwall?

MR. RAFFMAN: Objection for lack of specificity.

But you can answer.

THE WITNESS: Okay. First of all, I'd like to
state that my view of the height of the waves is not
an impression but rather the result of a calculation.
So I've calculated what the wave heights would be.

Secondly, the answer to your question would
depend on which floodwall you're talking about. It
would depend upon how high the water was, and
therefore, to pick a time, one would have to key the
time to the water height. So if you could tell me
what time you're talking about, I can maybe deal with
that.

BY MR. SEYMOUR

Q. I specified the east floodwall, but my
question was at what time would waves have been able
to splash over the east floodwall?

MR. RAFFMAN: Again, same objection.

CHARLES R. CUSHING, PH.D.          136

THE WITNESS: What time are we talking about?

BY MR. SEYMOUR:

Q. The time of day at which the waves would have
been able to splash over the east floodwall. You've
calculated the height of the water. You calculated --
you've provided calculations on wind speed and you've
provided calculations about current. So when could we
expect to see waves splashing over the east floodwall?

MR. RAFFMAN: Objection.

Go ahead.

THE WITNESS: Since waves move -- since waves
move in the direction of the wind, the waves wouldn't
be splashing over the east floodwall until the waves
were moving in the direction of the east floodwall.
So one would have to refer to a -- a directional
diagram that I've provided in my report to show at
what point there was a component moving in the
direction of the east from the wind. So it wouldn't
be before that time.

BY MR. SEYMOUR:

Q. Do you remember where in your report that
diagram is located?

A. I'll give it to you in a second. Page 45 of
my report.

CHARLES R. CUSHING, PH.D.          137

Q. On Page 45 of the report, I've got a colored
diagram with a number of arrows converging on the
barge that did not break away at Lafarge. Is that the
same page you're looking at?

A. Yes. And also Page 44, which has similar but
more precise information, and the arrows that you
describe as converging, each one of those arrows is
the direction of the wind, and the direction of the
wind would be the same generally throughout the entire
IHNC. So, for example, at 6 -- 6:00 o'clock in the
morning the direction -- the arrow and the direction
of the wind for that arrow would be the same on the
east floodwall and in the middle of the Inner Harbor
Canal, as well as at the Lafarge terminal, and it
would be moving from east to west.

Q. From your chart on Page 45, would it be
accurate to say that you would not expect waves
splashing over the east floodwall until sometime
between 9:00 and 10:00 a.m.?

MR. RAFFMAN: Objection.

THE WITNESS: No, sir.

BY MR. SEYMOUR:

Q. At what time, then?

A. I would say when there was a westerly --

35 (Pages 134 to 137)

CHARLES R. CUSHING, PH.D.          138

sorry -- an easterly component to the wind, which
would mean at some time between 7:00 and 8:00 o'clock,
the wind would be moving parallel to the east
floodwall.  You would have waves moving from generally
north to south along the floodwall, and if you had
waves and if the water was at the -- was at the level
where it would have over topped, then a two-foot wave
moving along the floodwall would splash over the
floodwall.

    Q.  So the answer, after all that, is between
7:00 and 8:00 o'clock?

    MR. RAFFMAN:  Objection.  Mischaracterizes the
testimony.

    THE WITNESS:  No.  I said it depends on how high
the water was at -- at the floodwall at a given time.

BY MR. SEYMOUR:

    Q.  And how high was the water at the floodwall
between 7:00 and 8:00 a.m.?

    MR. RAFFMAN:  Same objection.  The location of
the floodwall has not defined either thus far.

    MR. SEYMOUR:  We're talking about the east
floodwall.

    MR. RAFFMAN:  I understand that.  The question
assumes a fact about the height of the east floodwall.

CHARLES R. CUSHING, PH.D.          139

    THE WITNESS:  So my answer would be that one
would have to refer to the water heights as they
relate to the floodwall heights.

BY MR. SEYMOUR:

    Q.  Page 47, Figure 29 in your report shows
hydrograph readings for water levels at different
times; is that correct?

    A.  What page are you referring to again, please?

    Q.  Page 47.

    A.  Yes, sir.  Page 32 refers to the crest
elevations of the east floodwall as best we can define
them, recognizing that there's a certain degree of
inaccuracy or question about what the actual, precise
height of the floodwalls were based on the problems in
subsidence of the benchmarks, of inaccuracies in
assumptions regarding datums, given the changes in
mean sea level heights and a whole series of different
problems associated with defining the floodwall
heights.

    The floodwall heights, as I understand it
from the ILIT study and from the IPET study, and I
believe also the Team Louisiana or LSU studies all
find -- also, by the way, the ASE, the American
Society of Civil Engineers study all find that the

CHARLES R. CUSHING, PH.D.          140

flood -- sorry, the levee -- floodwall crest heights
were substantially below the designed heights, some as
much as two or three feet.

    So given that level of inaccuracy and then
taking the data shown on Page 47, which shows several
different gauge readings, there's a certain amount of
inaccuracy in those hydrograph readings, but given the
values taken at the Inner Harbor Navigation Canal
locks as at certain heights, one could make an
estimate, rough estimate of what time one would expect
winds -- waves to be overtopping the floodwall height.

    Q.  Do you have such an estimate?

    A.  Sorry?

    Q.  Do you have such a height?

    A.  No, I don't have such an estimate, but it
wouldn't be before this time that I described to you a
minute ago.  It wouldn't -- it wouldn't be before --
would be before 7:00 o'clock.

    MR. RAFFMAN:  All right.  Go ahead.  Finish the
question.  I want to make sure the question is clear.

BY MR. SEYMOUR:

    Q.  Okay.  If you turn to Page 46 of your report.

    A.  Yes, sir.

    Q.  There was a photograph with the date

CHARLES R. CUSHING, PH.D.          141

8-29-2005 in the lower right-hand corner.

    A.  Yes, sir.

    Q.  Can you read the letters in white in the
left-hand side of the picture?

    A.  I'm not sure how I can open this.

    (The witness reviewed the document.)

    THE WITNESS:  I'm not sure of the first word.  It
looks like "cell with waves and blowing rain."

BY MR. SEYMOUR:

    Q.  Do you know the time at which the picture was
taken?

    A.  My understanding is it was at 7:47 a.m. in
the morning.

    Q.  And is it your understanding that the --
well, it states that in the caption.  How do you know
that?

    A.  I believe that came from an interview with
the lock staff.

    Q.  Do you know who took the picture?

    A.  One of the staff.

    Q.  You don't know the name of the person?

    A.  The name of the person I don't -- I don't
recall, no.

    Q.  Okay.  Did you do the interview yourself?

CHARLES R. CUSHING, PH.D.          142

1
2    A. No, sir, I didn't.
3    Q. Who did?
4    A. I believe Mr. Daggett -- sorry.  Dr. Daggett
5    did.
6    Q. In Appendix D, we talked about the difference
7    between land and water wind gradients and your use of
8    the calculation based upon sea surfaces.  Are you
9    aware of any peer reviewed scholarly work, article or
10   treatise that supports your use of that gradient
11   that's in Figure 31 in estimating wind forces in a
12   hurricane over an urban environment?
13   A. I'm not -- the answer is no except to say
14   that the relationship and the curve that we're
15   referring to from PNA Chapter 5 is a curve that is
16   very similar to curves showing geostrophic and surface
17   winds over urban environments.
18   Q. You mentioned that word "geostrophic" before.
19   Please define it.
20   A. These are winds higher in the atmosphere that
21   flow in the direction of the -- the differential
22   between high and low pressure before they assume the
23   characteristics of surface winds.
24   Q. What's the high of a geostrophic wind?
25   A. It's undefined.

CHARLES R. CUSHING, PH.D.          143

1    Q. Is it calculable?
2    A. Well, it's a general term that means winds
3    high above the surface.
4    Q. Does that mean more than 1,000 feet?
5    A. It could.
6    Q. Could it mean more than 5,000 feet?
7    A. It could.  It means high level winds above
8    the -- the area where they're affected by surface
9    conditions.
10   Q. And is it your testimony that gradients that
11   are drawn to convert winds at that level down to
12   surface conditions would also be applicable to
13   adjusting the observation by an anemometer 30 or 40
14   feet above ground level to ground level?
15   A. Yes.  One would -- one would make that
16   adjustment if you're concerned about being over
17   ground.  In this particular case, we're concerned
18   about being over water.
19   Q. Well, if the wind speed -- the wind has been
20   over ground, has it not?
21   A. It has been over ground, but in the case of
22   the barge in the middle of this canal, it's over
23   water.
24   Q. Over water for a very short distance?

CHARLES R. CUSHING, PH.D.          144

1    A. Well, I don't know what you mean by "short."
2    Q. The width of the canal.
3    A. Yeah.  It's over water over the width of the
4    canal.
5    Q. Are you aware of any scholarly treatise or
6    scholarly article that supports the use of this kind
7    of sea surface gradient when a hurricane wind is just
8    passing over a narrow body of water like the
9    industrial harbor navigation canal?
10   A. Well, I would suggest that the -- the -- the
11   wind, in addition to passing over the Inner Harbor
12   Navigation Canal before it had arrived there, was
13   passing over Bayou Beambenu, and that is an open,
14   flat -- flat area.  Those are wetlands.
15   Q. Are you aware of any scholarly treatise or
16   scholarly article that supports the use of this sea
17   surface gradient when winds are passing over a
18   wetland?
19   A. I believe you asked, and I've answered that
20   question when I said that the curve of adjustment of
21   upper atmosphere or upper -- higher wind -- not upper
22   atmosphere, but upper winds to surface winds, the
23   shape of that curve and that relationship is very
24   similar whether it's over open water or open

CHARLES R. CUSHING, PH.D.          145

1    flatlands.
2    Q. Did you review, Mr. Villavasso's deposition
3    in this case?
4    A. I did.
5    Q. Did you note that he described the early
6    morning of August 29, he opened one of the doors
7    facing the industrial canal -- it's a west facing
8    door -- and the wind was of such force that it ripped
9    the door out of his hand, smashed it against the wall
10   and broke two of the hinges to the door?
11   A. I read that.
12   Q. Now, which direction would the wind have to
13   have been blowing towards in order to grab the door
14   like that?
15   A. I don't have the orientation of that face
16   of -- of the building with regard to -- with regard to
17   the wind.
18   Secondly, I don't have the direction of which
19   way -- which way the door hinges, but if you could
20   tell me those two things and you can be precise as to
21   exactly when that happened, it would help me answer
22   the question.
23   Q. On Page 45 that we're looking at before,
24   there is a reference to the pump station.  I think you

CHARLES R. CUSHING, PH.D.          146

 1     got some other pictures showing the location of the
 2     pump station.  But -- but let me make it hypothetical
 3     and make it easy.  There's a double door there.  So
 4     there's a right half and there's a left half, and my
 5     recollection is that he testified it was the left half
 6     that he opened and it is a west facing door.
 7         Wouldn't the wind have to have been moving
 8     from north to south?
 9         MR. RAFFMAN:  Objection.
10         THE WITNESS:  You're asking me to assume that the
11     door is a west facing door.
12     BY MR. SEYMOUR:
13         Q.  That's right.  Facing the industrial canal,
14     which is north and south.
15         A.  First of all, the -- the canal and Florida
16     Avenue are not directly west, but they're north of
17     west, approximately 16 degrees north of west.  So it
18     wouldn't be west facing if it's the side door to that
19     building.
20         Secondly, you're asking me to assume that the
21     building is square to the canal?
22         Q.  Yes, sir.
23         A.  I'm not sure I know exactly what time you're
24     asking me to assume as -- as I have some questions

CHARLES R. CUSHING, PH.D.          147

 1     about Mr. Villavasso's estimate of times.  So what
 2     time would you want me to assume in this hypothetical?
 3         Q.  Well, why would your answer depend upon time?
 4         A.  Because the wind changes direction over time.
 5         Q.  At the moment when the door was ripped out of
 6     his hands and slammed back and broke two of the
 7     hinges, that's considerable force, isn't it?
 8         A.  I think to break a hinge takes some force,
 9     yes.
10         Q.  All right.  Whatever time that was, wouldn't
11     the wind have to have been going from north to south?
12         MR. RAFFMAN:  Objection.
13         THE WITNESS:  The wind you're referring to now is
14     not the free stream wind that I'm showing on Page 45,
15     but you're talking about the local wind adjacent to
16     the west facing wall of this building.  In other
17     words, the wind is blowing from the northeast.  It's,
18     as we said earlier, passing around the building.  It's
19     being split so it passes both to the north and the
20     south of the building and then rejoins the free stream
21     downstream from the -- from the building.
22         But the wind that's moving along the face of
23     the building would not be the same direction as the
24     wind shown on Page 45.  It would be wind that would be

CHARLES R. CUSHING, PH.D.          148

 1     blowing along the face of that building parallel to
 2     the face of the building.
 3     BY MR. SEYMOUR:
 4         Q.  So if I understand you correctly, the wind
 5     divides around the pump station, and then on the far
 6     side of the pump station, you've got a southbound set
 7     of wind and you got a northbound set of wind, and they
 8     meet?
 9         A.  They join up at some point, yes.
10         Q.  And if the door's in the middle, they join up
11     at the door?
12         A.  I can't say exactly because I don't know all
13     of the configurations of the building, but they join
14     somewhere along that face of the building.
15         Q.  And where the winds join, there's not going
16     to be a strong southward force, is there?
17         A.  I can't say because, as I said earlier, those
18     winds that are moving along that face are in an eddie
19     or a vortex, and they're swirling.  So the winds right
20     adjacent to the -- to the door would be swirling
21     winds, vortices and eddies around the building.
22         Q.  And is it your testimony that wind that is
23     simply divided around the building and then it joined
24     up after the building is still going to have such a

CHARLES R. CUSHING, PH.D.          149

 1     strong southward component that it's capable of doing
 2     what he described as to the door?
 3         MR. RAFFMAN:  Objection.
 4         THE WITNESS:  Generally speaking, yes, but
 5     there's one additional problem with -- with this
 6     hypothetical, and that is I don't know the condition
 7     of the door or the condition of the hinges.  So, I
 8     mean, it could be in disrepair to begin with.  It
 9     could be a wooden door.  It could be a metal door.  It
10     could be strong hinges or weak hinges.  Without
11     knowing the details of the door itself, why the door
12     blew off two hinges, I can't say.
13     BY MR. SEYMOUR:
14         Q.  When you did your first inspection of the
15     area and were walking along the levee, did you look at
16     the pump station?
17         A.  I saw it in the -- I didn't inspect the pump
18     station.  I didn't take a close look at the pump
19     station.
20         Q.  Is it fair to say that the pump station is
21     more than a football field away from the levee?
22         A.  Slightly.  If a football field is 100 yards,
23     I would say it's slightly more than that.  It's more
24     like 400 feet.

CHARLES R. CUSHING, PH.D.        150

Q. Did you notice the door?  Was it still there?

A. I didn't focus on the doors, no.

Q. Were you informed, when you performed your look at the Inner Harbor Navigation Canal, that changes had been made after Katrina before the time of your visit?

MR. RAFFMAN:  Objection.

THE WITNESS:  Changes to what?

BY MR. SEYMOUR:

Q. The floodwall.

A. If there were changes made after Katrina?

Q. Yes, but before Rita.

A. Nobody so informed me.

Q. Did you know, without somebody so informing you, that changeS had been made?

A. I could see there were temporary closures put in place.

Q. Did you ever calculate the speed of the wind that would be necessary to grab the door out of Mr. Villavasso's hands, as he described, smash it against the wall and break two of the hinges?

MR. RAFFMAN:  Same objection I've been making. Assumption.

THE WITNESS:  I think I just testified that I had

CHARLES R. CUSHING, PH.D.        151

no information about the type of door, the type of hinges, the condition of the door and so forth.  So I couldn't have -- I couldn't have made such a calculation.

BY MR. SEYMOUR:

Q. Dr. Cushing, wouldn't you have made a calculation for a new door and new hinges and for an old door with weak hinges and gotten some bounds?

A. I could have done a lot of things, but there would be so many variations in those assumptions that it wouldn't have been a meaningful exercise.  There's another problem I have because there's not more than one door in the pump station, and whether the other doors and windows that may have existed in there were intact or not intact.  So whether there was a wind blowing through the interior of the pump house that would have contributed to the flow of air through that door, I don't know.  So it would have made such an exercise, I think, unreliable.

Q. Did anyone ever tell you that other doors were open at the time?

A. There was -- there was testimony that people looked out of other doors.

Q. That was Mr. Villavasso looking out of other

CHARLES R. CUSHING, PH.D.        152

doors, wasn't it?

A. There was one person that said he looked out of the doors, but there are other people in the pump station, and I think it's not unlikely that other people looked out of the doors.

Q. Who else in the pump station do you have a basis for saying looked out of the doors?

A. I didn't say looked out of the doors.  I said it's likely that they looked out of the doors.

Q. Do you have any information that any individual other than Mr. -- Mr. Villavasso opened one of the doors of the pump station, to look out or whatever, before this door was ripped out of his hands?

A. I have no direct testimony that says -- I'm only saying that it's likely that people looked out of the doors.

Q. Do you have any information that any of the windows had broken prior to the time the door slipped out of his hands?

A. I don't recall.

MR. SEYMOUR:  Why don't we take a break now.

THE VIDEOGRAPHER:  Going off the record at 14:30:33. End of Tape 4.

CHARLES R. CUSHING, PH.D.        153

(A recess was taken from 2:30 p.m. to 2:44 p.m.)

THE VIDEOGRAPHER:  Back on record. Tape 5 at 14:44:15.

BY MR. SEYMOUR:

Q. Dr. Cushing, could you describe what you see as the role of an expert in a lawsuit?

A. First, forgive me because I'm chewing on a lozenge because I have this voice problem.  So if I appear like I'm eating, it's only because of my voice. An expert is a person who is able to bring his expertise into shedding light on truth of the facts before the tribunal.

Q. Is it important that the expert be independent?

A. It's important, yes.

Q. Is the value of the --

A. Except if I can qualify that.

Q. Certainly.

A. To the extent that they must be unbiased.

Q. If an expert becomes partisan, does that destroy the value of the expertise, in your view?

A. It does.

Q. Please turn to Appendix I of your report.

CHARLES R. CUSHING, PH.D.          154

1
2          (Pause in proceedings.)
3     THE WITNESS:  Yes, sir.
4     BY MR. SEYMOUR:
5          Q.  And I direct you to Page I-3, the description
6     of the testimony of Wilson Simmons.  Do you see in the
7     last sentence of the description of the testimony it
8     states "During the deposition, he opined that a
9     catalyst was necessary for a levee failure, and
10    speculated that the barge was that catalyst."  Do you
11    see that?
12         A.  Yes, sir.
13         Q.  And do you see in your analysis of the report
14    that you state that it is possible that the witness
15    could see up to 1,000 feet away, the distance that you
16    calculated to the barge, "during the storm, although
17    there's substantial proof and other accounts that the
18    barge did not move once it hit the houses at Jourdan
19    Avenue."  Do you see that?
20         A.  Yes, sir.
21         Q.  Mr. Simmons had testified that he heard a
22    booming sound around 5:00 o'clock to 5:30, and shortly
23    afterwards, his home became inundated with water and
24    sometime later, just at daybreak, he said that he saw
25    the barge.

CHARLES R. CUSHING, PH.D.          155

1
2          A.  I see that.
3          Q.  I understand that you did a lot of
4     calculations about what you think happened, as shown
5     by the calculations.  Is it correct that an eyewitness
6     who was there and accurately described what he or she
7     saw and accurately stated the time would have to be of
8     more value than your calculations of what you think
9     should have happened?
10         A.  I would say absolutely not.  I'd say, first
11    of all, it depends very much on many, many factors as
12    to whether a witness can accurately state or not what
13    happened.  Also, it depends very much on when the
14    witness is stating what he's stating, how long after
15    the event the statement takes place, due to memory and
16    other causes that might cause him to give testimony
17    different from what actually happened.
18         I think it depends on the state of the person
19    and his conditions.  For example, he's under extreme
20    stress.  His house is being destroyed, his house is
21    being washed away and so forth.  Conditions like that
22    would create extreme stress.  If a person is up in a
23    tree and the water is rising, those people are under
24    stress.  So that would affect the accuracy of a -- of
25    a person's statement.

CHARLES R. CUSHING, PH.D.          156

1
2          I personally prefer using hard evidence,
3     that is, facts rather than recollections from
4     witnesses, especially where the witness's testimony is
5     in conflict with other witnesses' testimony.  At that
6     point, one has to read all of the testimony and to
7     weigh the -- weigh the testimony to see if it
8     corroborates or agrees with the facts or differs from
9     the facts, and then to try to understand why it may
10    differ.  So I think all -- all evidence, including
11    eyewitness evidence, is important, but I think hard
12    evidence and science trumps recollections from
13    witnesses.
14         Q.  Is it your belief that your calculations are
15    hard evidence?
16         A.  I think they're based on hard evidence.
17         Q.  Okay.  Is it your belief that your
18    calculations reflect science?
19         A.  I'm sorry.  Say again.
20         Q.  Is it your belief that your calculations
21    reflect science?
22         A.  I do.
23         Q.  Okay.  Now, my question to you was whether a
24    witness who accurately recounted what he or she
25    actually observed and accurately stated the time --

CHARLES R. CUSHING, PH.D.          157

1
2          A.  Actually --
3          Q.  Accurately stated the time of the observation
4     would be more valuable evidence of what happened than
5     your calculations?
6          A.  If everything was accurate.
7          Q.  That's what my question was.
8          A.  Yeah.  If it's an accurate statement, then by
9     definition it's -- pardon me -- equally important to
10    hard evidence that's accurate.
11         Q.  If the witness accurately reports something
12    and accurately states the time of the observation and
13    if your calculations show that it would not have been
14    possible, doesn't that say that your calculations are
15    wrong?
16         A.  If we're talking about the identical, same
17    thing.  If the calculations refer to A and the witness
18    is, hypothetically, accurately stating the time and
19    the conditions for B, then they could both differ
20    because they're different -- they're not talking about
21    the identical, same thing.
22         Q.  Isn't it true that in your report and in
23    Appendix I to your report you dismissed the testimony
24    of numerous witnesses on the grounds that your
25    calculations show that this could not possibly be

CHARLES R. CUSHING, PH.D.        158

1  accurate?
2      A.  I think the evidence, the hard evidence shows
3  that it couldn't be accurate.
4      Q.  By "hard evidence," you mean your
5  calculations?
6      A.  Not necessarily.  I think I've stated facts
7  relating to -- to hard evidence that discounts some of
8  the testimony here.  I'll give you a good example.
9  If -- if the witness says that he saw the sun rise at
10  a particular time, and I report that the sun rises,
11  according to the National Observatory at a different
12  time, the evidence presented by the sunrise from the
13  National Observatory, I would say is not my opinion,
14  is not my calculation of what they saw, but is rather
15  hard evidence.
16      And if the witness is saying the sun rose at
17  a different time, then I would say the hard evidence
18  is more valid than the witness's statement as to when
19  he thought the sun rose.
20      Q.  Do you believe that your calculations, and
21  the assumptions on which they are based, are as solid
22  as an observatory's recording of sunrise?
23      A.  Well, again, I think you're mischaracterizing
24  what I said.  I said that I have stated in my report
25

CHARLES R. CUSHING, PH.D.        159

1  not only the results of calculations and observations,
2  but I've stated in my report facts.  Not my opinions
3  of what they are, my interpretation, but facts.  And
4  those facts, in some cases, are as accurate as -- as
5  the National Observatory's statement of when sunrise
6  occurs.
7      Q.  At the top of Page I-4, isn't it true that
8  you take issue with the statement of Mr. Simmons that
9  a catalyst was necessary and state that "the events at
10  other levee breaches," such as the London Ave. Canal
11  and 17th Street Canal make "it painfully clear that a
12  levee or floodwall does not need a catalyst" like "a
13  barge to fail"?
14      A.  Yeah.  I think that's a very strong opinion
15  that I have.
16      Q.  Is that science?
17      A.  I think that's a scientific fact.
18      Q.  You have a number of pictures in your report
19  of great devastation caused in the areas, particularly
20  the south breach; is that right?
21      A.  Yes, sir.
22      Q.  Have you seen any evidence of similar
23  devastation at the location of the 17th Street Canal
24  breach or the London Avenue Canal breach?
25

CHARLES R. CUSHING, PH.D.        160

1      A.  If you're talking about the extent of the
2  displacement of the floodwall, I haven't seen any of
3  the other floodwalls to be displaced as extremely as
4  this one.
5      Q.  And you didn't see houses knocked off their
6  foundation and knocked blocks away either, did you?
7      A.  I'm sorry?
8      Q.  You didn't see houses knocked off their
9  foundation and moved blocks away either, did you?
10      A.  I don't recall any.
11      Q.  Okay.  But that happened near the south
12  breach, didn't it?
13      A.  It did.  And the north breach also.
14      Q.  Okay.  There was no evidence of a 20 foot
15  wall of water at the other breaches, was there?
16      A.  I think there wasn't any evidence of a
17  20 foot wall of water in any of the other canals, as
18  well as in this canal.
19      Q.  Are you saying that you think there's no
20  evidence of a 20 foot wall of water resulting from the
21  south breach?
22      A.  There could have been a -- a wall of water.
23  I don't know if 20 foot is an accurate value for it.
24  It could have resulted from the flood of water once
25

CHARLES R. CUSHING, PH.D.        161

1  the levee failed and moved -- moved inland, but there
2  was not a 20 foot wall of water in the canal as
3  Mr. Villavasso has testified.
4      Q.  Do you recall evidence of there being any
5  substantial wall of water at the 17th Street Canal
6  breach?
7      A.  You mean in the canal?
8      Q.  A wall of water coming over on the protected
9  side.
10      A.  I haven't read any -- any witnesses that have
11  described the height of water.  I have read witness
12  statements saying water was -- substantial water had
13  moved along, but none of them had said 20 foot.
14      Q.  Is the same true for the London Avenue Canal?
15      A.  I would say, yes, the London Avenue Canal.
16      Q.  On Page I-5 you begin a description of
17  D'Antionette Johnson and her testimony, and on Page
18  I-6 she said there was a 15- or 20-foot wave of water
19  going towards -- coming towards her and going towards
20  Dr. Bernard Parish in Chalmette.  Do you see that?
21      A.  Yes, sir.
22      Q.  Now, if you look at the last full sentence on
23  Page I-6 of your report, it says, "Thus, possibly the
24  witness saw the south breach occur, without
25

CHARLES R. CUSHING, PH.D.        162

1  participation by the barge."  Do you see that?
2  A.  Yes, sir.  No.  I'm sorry -- the last line.
3  I see it.
4  Q.  Okay.  What is that based on?
5  A.  By her statement that at no time did she see
6  the barge.
7  Q.  Is that evidence that -- in your view, that
8  there was no barge involved?
9  A.  Well, the barge would have been sticking
10 quite high up in the water and would have been obvious
11 if she saw the -- the flood water from the breach, if
12 there had been a barge there.
13 Q.  And how far would she have been from the
14 south breach?
15 A.  Well, she was on Tonti and Rocheblave Streets
16 on Deslonde.  So one would have to look at the map,
17 and if you refer to the beginning of this section,
18 I've included a map on Page I-1 which shows where she
19 would have been -- where she would have been located.
20 Q.  She would be at least, what, five blocks away
21 from the barge?
22 A.  It would be about five blocks away from the
23 south breach.
24 Q.  Uh-huh.  Would you agree that the

CHARLES R. CUSHING, PH.D.        163

1  statement -- let me get the page right here back
2  again.  On Page I-6, would you agree that the
3  statement that I read to you, "Thus, possibly the
4  witness saw the south breach occur, without
5  participation by the barge" is speculation?
6  A.  It has to be to some extent.
7  Q.  Did you think it permissible to indulge in
8  speculation on behalf of your client?
9  MR. RAFFMAN:  Objection.
10 THE WITNESS:  Well, I don't know whether the word
11 "speculation" is the way I would really describe my
12 analysis, but I'm leaving room for other
13 possibilities, but I strongly believe that if she's
14 sitting on the roof and she says she can see the --
15 the floodwall and she doesn't see the -- and she sees
16 the wave coming from what is likely the deluge and she
17 doesn't see the barge, chances are -- the likelihood
18 is more likely than not is that the barge wasn't
19 there.  She didn't see it.  But I'm merely reporting
20 the facts here.
21 BY MR. SEYMOUR:
22 Q.  Isn't the fact that she was not on her roof,
23 that she was looking out the front of her house?
24 A.  Well, it's not clear exactly because she got

CHARLES R. CUSHING, PH.D.        164

1  on the roof, which she thinks it was 6:45 in the
2  morning.
3  Q.  Do you see that she saw the wave when she was
4  looking out the front of her house, and afterwards she
5  got on the roof?
6  A.  That's correct.  That's correct, yes.
7  Q.  And when she's on the roof, which is sometime
8  later, at 6:45 a.m., the barge is not going to be
9  riding high in the water at that point, is it?
10 A.  Well, the barge at 6:45 is over in the
11 terminal on the other side of the industrial canal at
12 6:45 in the morning.
13 Q.  According to your calculations?
14 A.  According to the wind.  According to which
15 way the wind is blowing.
16 Q.  Based upon your calculations?
17 A.  I didn't calculate the wind.  The wind is --
18 the wind is clearly stated as a fact.
19 Q.  Okay.  Terry Adams on Page I-4.  And he
20 says -- in your description of his testimony, it says
21 that "'The carpet on the floor was wet.'"  He woke at
22 5:00 a.m.  He "climbed onto the roof 20 to 30 minutes
23 after noticing the water."  So it's 5:20 or 5:30.  The
24 water is still only up to his -- "ankle deep on his

CHARLES R. CUSHING, PH.D.        165

1  first floor."  And between 5:30 and 6:00 o'clock he
2  could see the levee there, but water coming underneath
3  it, and then he saw the barge hit the floodwall at
4  6:00 a.m., and he's on the roof.  Do you see that?
5  A.  I see that.
6  Q.  Then "the waters rapidly rose."  He also
7  heard a loud bang at the time of the barge breaking
8  the floodwall from his account.  Do you see that?
9  A.  Yes.
10 Q.  And you've got an observation well taken that
11 there's other evidence that the north breach occurred
12 first.  And then on the top of Page I-5, isn't it true
13 that you reject his eyewitness testimony because of a
14 line of sight survey by someone named Gondalfo Kuhn?
15 Do you see that?
16 A.  Yes, sir.
17 Q.  Okay.  Who is Gondalfo Kuhn?
18 A.  I don't know him personally.
19 Q.  Do you know who he works for?
20 MR. RAFFMAN:  Objection.
21 THE WITNESS:  No, sir, I don't know.
22 BY MR. SEYMOUR:
23 Q.  I'm sorry?
24 A.  Pardon me.  I don't know who he works for.

CHARLES R. CUSHING, PH.D.          166

Q. Were you there when he did whatever he did?

A. No, sir, I wasn't.

Q. Did anyone ever describe to you what he did?

A. My understanding is that what he did was to go to the site of Mr. Adams' house and then attempt to look in the direction of the south breach to see whether it was possible to see in that direction due to trees, structures and other objects.

Q. Do you know when Mr. Kuhn went there?

A. I don't recall.

Q. Did you ever know when he went there?

A. I don't recall.

Q. Do you know what time of day Mr. Kuhn went there?

A. Again, I don't recall.

Q. Do you know the month or the year?

A. I just said, I don't recall.

Q. Well, you may not recall the date, but you may remember a month and a year.

A. No, sir, I don't.

Q. Do you have any idea how soon after Katrina he went there?

A. If I don't know the date, the month, the year, I don't -- can't answer that question. I think

CHARLES R. CUSHING, PH.D.          167

I've already answered it. I don't know.

Q. Okay. Do you know whether Mr. Kuhn did anything to -- was he standing on the street when he made the observation?

A. I believe he said he climbed into the attic and then he climbed onto the roof, and that was 20 minutes -- what he says was 20 to 30 minutes after noticing water on the first floor.

Q. You're speaking about Mr. Adams, not Mr. Kuhn?

A. Pardon?

Q. You're speaking about Mr. Adams, not Mr. Kuhn?

A. I'm sorry. Are we talking about Mr. Adams?

Q. We're talking about Mr. Kuhn.

A. Oh, no. I'm sorry. I thought you were talking about Mr. Adams. I don't know exactly what time or where he -- exactly where he was or how high he was.

Q. Did you see a copy of -- did you see any document reflecting his survey?

A. That's what I don't recall.

Q. In your role as an independent expert witness, do I understand correctly that you are

CHARLES R. CUSHING, PH.D.          168

rejecting the testimony of Terry Adams, who was on his roof, and says that from his roof, he had clear sight in favor of the testimony of a gentleman who may or may not have been standing on the street at a different time of year in an unknown year as to what could be seen?

MR. RAFFMAN: Objection.

THE WITNESS: I'm rejecting Mr. Terry Adams' claim of what he saw not because of the reported work of Mr. Kuhn but for several other reasons as regards visibility. I know and I've personally been in the neighborhood myself close to where Mr. Terry Adams was. I've walked in that neighborhood. I know there were many, many trees between Mr. Adams' house and the south breach. I know there were still remaining structures and houses in that area before the south breach.

I know also that at 5:00 o'clock in the morning or 20 minutes past 5:00 in the morning or even 6:00 o'clock in the morning it was dark because neither dawn, civil twilight nor -- nor sunrise had occurred. It was raining. The wind was blowing, and visibility conditions, as are obvious from photographs taken about that same time, show that you couldn't see

CHARLES R. CUSHING, PH.D.          169

the distance that Mr. Adams claims he -- he saw. He couldn't see to the south breach clearly, if at all. So for all of those reasons, I believe that Mr. Terry Adams is not correct in what he's saying.

BY MR. SEYMOUR:

Q. And what was the height of those trees when you walked the neighborhood?

A. The trees -- again, I would have to estimate that they were probably 20 feet high -- 20 to 25 feet high.

Q. And Mr. Adams' house was no longer there, was it?

A. No, sir.

Q. He had a raised first floor, and he had an attic. We know that from his deposition; right?

A. Yes, sir.

Q. And do you know how high he would have been? Would he have been above 20 feet on top of his attic, on the roof?

A. Well, he had a crawl space under his house. That would have been just a couple of feet, and then one can assume the height of his one story house, the height of the rooms in his house would be on the order of 8 feet.

CHARLES R. CUSHING, PH.D.          170

Q. 8 feet?

A. I said the height of a room -- more than 8 foot ceilings would be very high rooms. So, typically, 8 feet. So now we have a 10 feet plus structure, another couple of feet, 12 feet. Then we have his attic, which would be something less than full height typically.

Q. How do you know?

A. I'm sorry?

Q. How do you know?

A. You're asking me to estimate. If you could provide me with the plans of the house, I can tell you how high he was when he was sitting on the roof.

Q. I think it's important to understand, I'm asking you the basis for your rejection of the testimony. You said there's no clear line of sight. There were trees at least up to the 20 foot level.

A. Approximately, I said, 20 feet. Some of them could have been 25 feet. Some could have even been higher.

Q. But speculation?

A. Approx- -- no. I'm saying I'm estimating. I'm not speculating. I just told you I was in the neighborhood, and I've seen the trees. I'm giving you

CHARLES R. CUSHING, PH.D.          171

an approximation.

Q. On Page 46, we looked at that picture that was taken at 7:47 a.m.

A. Page 46 of the report?

Q. Of the report. And while the rain interferes with visibility, doesn't that look to you like a fair amount of light in the picture?

A. Page 46?

Q. Yes.

A. The picture was taken at 7:47.

Q. That's what I said.

A. Yes. And Mr. Adams is saying that -- he's talking about 5:36 in the morning.

Q. He's talking after 6:00 o'clock, isn't he?

A. He's talking -- he claims that at 6:00 a.m. he saw the barge hit the floodwall. So he's talking about 6:00 a.m., before sunrise, and the picture you're referring to me is 7:47, which is more than an hour after sunrise.

Q. By the way, is there ever any lightening in a hurricane?

A. Is there ever?

Q. Lightening in a hurricane?

A. Sometimes.

CHARLES R. CUSHING, PH.D.          172

Q. And when a lightening flash -- flashes, it illuminates the area, doesn't it?

A. For only a fraction of a second. I wouldn't say that a lightening flash would give a person enough time to -- to make a judgment as to what they're seeing. But if you look at the picture on Page 46, you can see the -- the Claiborne Avenue bridge in the background in that picture, which is about 1,000 feet away, which is about the same distance that Mr. Terry Adams was from the north breach. And I think the picture that you're looking at on Page 46 is evidence of the fact that he couldn't have seen the south breach because you can't tell whether there's a barge under that bridge or not under that bridge, and that's under conditions of daylight, and he was looking at nighttime, in the dark.

Q. Of course, a barge would get merged with a structure of the bridge at that distance in a way unlike a barge coming through a floodwall. That would stand out in contrast, wouldn't it?

A. I don't think you can see hardly anything in that picture, not a barge or a bridge.

Q. Okay. Would you agree with me that the various things that you've described as adversely

CHARLES R. CUSHING, PH.D.          173

affecting the probative value of the testimony of eyewitnesses, time of stress, concentration of personal survival, climbing into a tree, concern with saving their life, difficulty remembering events precisely some period of time afterward, those all go under a general category of the credibility of the witness; isn't that right?

MR. RAFFMAN: Objection.

THE WITNESS: No, sir, not at all.

BY MR. SEYMOUR:

Q. It doesn't affect credibility?

A. No. I think credibility is a term that is used to impugn a witness whereas I think the reasons that I have given for possible inability of the witnesses -- many of the witnesses to accurately describe the facts go to conditions not under their control such as, for example, the stress that they were under. I think some of them may not have had access to accurate time pieces that would help them know exactly when things were happening, or even roughly when things were happening.

I think in many cases -- and it's my experience in forensic accident analysis, that -- that the longer the witness -- the longer the time interval

CHARLES R. CUSHING, PH.D.        174

1  between when a witness observes something and when he
2  testifies, the accuracy of the information degrades
3  greatly.
4       Q.  On Page 5 of Appendix I, in your analysis of
5  Carolyn Berryhill, you said that she heard a grinding
6  noise, then water entered the first floor.  She went
7  into the attic, and she also heard an explosion, that
8  you rejected her testimony because it disagreed with
9  your calculations about where the barge could have
10 been and based upon your conclusions about wind
11 direction.  Is that fair?
12      A.  If you'll give me a moment to just quickly
13 review what she says here.
14      Q.  Surely.
15           (The witness reviewed the document.)
16      THE WITNESS:  I'm sorry.  Can you ask the
17 question again, please.
18      MR. SEYMOUR:  Please read it back.
19           (Record read.)
20      THE WITNESS:  No, sir.  I think you've
21 mischaracterized what I stated in here, and you're
22 presuming certain facts.
23 BY MR. SEYMOUR:
24      Q.  Please explain.

CHARLES R. CUSHING, PH.D.        175

1       A.  Okay.  First of all, she -- let's take
2  this -- the sounds that she heard.  She heard a
3  grinding sound initially that lasted for five
4  minutes -- about five minutes, she said.  The grinding
5  sound could very well have been many different things.
6  So it's not conclusive as to what she's referring to
7  when she's talking about a grinding sound.  Then she
8  said she went to the attic; right?  When she was in
9  the attic, the house collapsed and the roof floated
10 away.
11          She said she also heard an explosion.  It
12 doesn't say when she heard the explosion.  She thought
13 she heard an explosion, but she also opined that it
14 was a power box exploding.  By "power box," I presume
15 she meant a transformer.  Then she found herself --
16 well, floating, I believe, on the roof at a tree to
17 the south, and she climbed the tree.  But we don't
18 know exactly where she was, how far the roof floated,
19 but she climbed up in a tree.
20          Then she testified as to the wind -- the --
21 the wind and the rain picking up and not picking up.
22 So she is apparently talking about conditions -- she's
23 contradicting herself a little bit on the wind and
24 weather conditions.  And then finally she said it

CHARLES R. CUSHING, PH.D.        176

1  wasn't possible to see in the darkness, and she says,
2  "until the sun came out."  Now, that's not sunrise,
3  but what she is saying there is after they --
4  obviously, clouds parted and there was sun.
5           So there are a lot of different factors that
6  work in her -- in her testimony, but what she does say
7  is she didn't see the barge until late, and she
8  claimed that at 8:00 o'clock she could see the barge,
9  which was not moving, and when she's sitting in a
10 tree, I'm not so sure the time of -- the time that
11 she's estimating is an accurate one.  I think she's
12 under stress, No. 1.
13          No. 2, she must have been in the water, and
14 whatever time piece she was wearing, if in fact it was
15 one, could have been faulty, could have stopped.  I
16 don't know.  It doesn't say.  And then finally, she
17 gave this testimony some year or two years after the
18 fact.  So I think all of those things raise the
19 question exactly when she saw what she saw.
20      Q.  Does it raise the question of how much weight
21 her testimony should be given; is that right?
22      A.  I think that -- that applies to every person
23 in this -- in this section.
24      Q.  Now, she's one of a number of witnesses who

CHARLES R. CUSHING, PH.D.        177

1  testified to hearing a grinding sound before the south
2  breach; isn't that right?
3       MR. RAFFMAN:  Objection.
4       THE WITNESS:  I don't believe that a number of
5  witnesses testified to that.
6  BY MR. SEYMOUR:
7       Q.  She did, didn't she?
8       A.  She said she heard a grinding sound.
9       Q.  And you said there are a number of
10 explanations for the grinding sound.  What are they?
11      A.  Grinding sound could have been caused by a
12 house moving off its slab.  Many of these houses were
13 sitting on concrete slabs, and if the house is moving,
14 if the house is floating or being forced by water, it
15 would certainly be a grinding sound.  There were other
16 structures beside houses.  If they were sliding,
17 turning over, moving down the street, they would
18 create grinding sounds.
19          If they were automobiles that were floating
20 or overturning, there were boats on trailers, for
21 example, that were upset and moving down the street.
22 There were many, many objects that were floating and
23 dragging on -- on surfaces.  These would all create
24 grinding sounds.  Also, a structure that was failing

CHARLES R. CUSHING, PH.D.          178

1    would make a sound that could -- could be described as
2    a grinding sound.
3        Q.  She testified, in your own description, that
4    she heard the grinding sound that lasted about five
5    minutes and that sometime afterward the water came up
6    to the first floor.
7        A.  Yes, sir.
8        Q.  Do any of those other sources of grinding
9    sounds have any relationship to the arrival of a lot
10   more water?
11       A.  Well, I think when I said that you could have
12   floating objects, it doesn't require a lot more water.
13   I'm not sure what you mean by "a lot more water," but
14   we know that the north breach failed earlier than the
15   south breach, and water moved from the north breach
16   area southward, and very well possible that -- and
17   likely that there were structures or other objects
18   floating down the street that were creating grinding
19   sounds.  There were a lot of possible sources for
20   grinding sounds.
21       Q.  If the barge created the grinding sound that
22   she heard, then your calculations and the assumptions
23   underlying your report would be wrong, wouldn't they?
24       MR. RAFFMAN:  Objection.
25

CHARLES R. CUSHING, PH.D.          179

1        THE WITNESS:  It depends on what time you're
2    talking about the barge creating -- a barge creating a
3    grinding sound.  It's hypothetical.
4    BY MR. SEYMOUR:
5        Q.  The time that she says is 5:30 to 5:45 a.m.
6    You can increase that by some hours before -- well, I
7    withdraw that.
8            You state in your report the earliest time
9    that the barge could have crossed -- based on your
10   calculations and assumptions, the earliest time the
11   barge could have crossed from the west bank to the
12   east bank of the Inner Harbor Navigational Canal;
13   isn't that right?
14       A.  I'm saying that it couldn't have crossed over
15   before 9:00 o'clock.  It would have to be sometime
16   after 9:00 o'clock.
17       Q.  And if somebody heard grating sounds caused
18   by the barge before 9:00 o'clock, that would mean that
19   your assumptions and calculations are wrong, wouldn't
20   it?
21       MR. RAFFMAN:  Objection.
22       THE WITNESS:  No, sir.  It would mean that it
23   wasn't the barge creating the grinding sound.
24   BY MR. SEYMOUR:
25

CHARLES R. CUSHING, PH.D.          180

1        Q.  I said if someone heard the barge creating
2    the grinding sound or actually saw the barge, then
3    your calculations and assumptions would be wrong,
4    wouldn't they?
5        A.  Well, I -- I just can't accept the fact that
6    the barge could be creating the grinding sound.  So --
7    that early in the morning.
8        Q.  You believe your calculations?
9        A.  I believe my reliance on the facts, that is,
10   the wind direction, to be correct.
11       Q.  Now, if she saw the barge not moving at
12   8:00 o'clock in the morning, your calculations would
13   be wrong; right?
14       MR. RAFFMAN:  Same objection.
15       THE WITNESS:  She could have seen the barge not
16   moving if she looked over at the terminal and saw it
17   at the terminal.  It wouldn't have been -- likely, it
18   wouldn't have been moving.  It would have been sitting
19   on the west bank.
20   BY MR. SEYMOUR:
21       Q.  Is -- is it your recollection that she
22   testified in her deposition that she saw the barge
23   over at the Lafarge terminal, or did she testify that
24   she saw it in the Lower Ninth Ward?
25

CHARLES R. CUSHING, PH.D.          181

1        A.  That was not your previous question.  This is
2    a different question.
3        Q.  I just asked you a different question.
4    Please answer it.
5        A.  Yes.  I believe her testimony is that when
6    she saw the barge, which she claims was not moving, it
7    was in the Lower Ninth Ward.
8        Q.  And if she saw that at 8:00 o'clock from her
9    high vantage point in the tree, then your calculations
10   and assumptions would be wrong?
11       A.  It would be assuming that she -- she was
12   correct in her assumption it was 8:00 o'clock, and I
13   go back to the -- to the point I've been trying to get
14   across is that it's not a calculation that I'm saying,
15   but I'm saying that the general observation of the
16   wind, which is a fact, would be wrong.  It would mean
17   that the winds would have to be blowing from some
18   other directions than -- than they were blowing, which
19   I don't believe to be a fact.
20       Q.  In your statement on witnesses, you cite the
21   testimony of some witnesses that heard a loud sound, a
22   boom or some loud sound like that when another levee
23   wall in another part of the city collapsed; is that
24   correct?
25

CHARLES R. CUSHING, PH.D.          182

A.  Yes, sir.

Q.  Now, do you remember in Mr. Villavasso's deposition that he stated that he heard the loud sound?  Then he saw this item protruding from the wall.  The wall collapsed shortly thereafter, and when the wall collapsed, it did not make a sound?

A.  I don't recall him having said that when the wall collapsed, he didn't hear any further sounds.  I don't recall that part of your question.  I do recall him saying that he saw something which he called -- what he believed to be the tip of the barge and, of course, he heard sounds.  He not only heard what he called a -- a popping sound, which he ascribed to be a transformer, but I believe he -- I'm recollecting -- I don't have it in my report, but I recollect that he heard a sound when the floodwall toppled.

Q.  I'll show you his deposition in a moment, but I just want to wrap up on the witnesses other than Mr. Villavasso.  Is it fair to say that you argued against giving weight to any witness that disagreed with your calculations and conclusions?

A.  No.  I weighed every one of the witnesses' statements in order to understand what they were saying and to see what facts they could add to the

CHARLES R. CUSHING, PH.D.          183

case.

Q.  Did you change any part of your conclusions on the basis of the eyewitness testimony?

MR. RAFFMAN:  Objection.

THE WITNESS:  I think the -- the witnesss testimonies in some cases were useful when they described water in the Lower Ninth Ward.  Obviously, there were many different opinions as to when water entered the Lower Ninth Ward, but it was clear that, I think mostly from the witnesses, for example, that the north breach occurred before the south breach.  I think that that was an important point that came from -- from the witnesses.  So one can't say that one -- that I rejected the witness's statements.  There's an example where one can give weight to what they -- the witnesses indicated -- some of the witnesses indicated.

MR. SEYMOUR:  Did you give weight to the eyewitness testimony of any witness who stated that the wind direction was from west to east before your calculations showed that the wind direction would have moved from west to east?

MR. RAFFMAN:  Objection.

THE WITNESS:  I believe that I've testified

CHARLES R. CUSHING, PH.D.          184

that -- or if I haven't mentioned it this morning, I started to form my conclusions not immediately after the passing of Katrina, but I intentionally held off drawing conclusions until months later, but I don't believe I saw the witness's testimony and depositions until years later.  So I didn't form my opinions about the directions of the wind from the testimony of the witnesses, but rather, from the hard data that was available to me from weather sources.

BY MR. SEYMOUR:

Q.  What is the answer to my question?

A.  I believe that was the answer to the question.

Q.  My question was a very simple one.  Did you give weight to the testimony of any witness who said that the wind was blowing from west to east prior to the time that your calculation showed that the wind should have been blowing from west to east?

MR. RAFFMAN:  I make the same objection.  I think it assumes something that will not prove to be shown.

THE WITNESS:  I don't recall any witnesses that are saying that the wind was blowing from west to east prior to the time that the wind in fact did blow from west to east.

CHARLES R. CUSHING, PH.D.          185

BY MR. SEYMOUR:

Q.  Do you re- -- do you recall rejecting the testimony or arguing against giving weight to the testimony of witnesses because under your calculations and assumptions, you concluded that no object on the west side of the industrial canal could have been blown to the east side at that time?

A.  I'm sorry.  Again, could you repeat that question?

Q.  Let me try rephrasing to it.

Do you recall rejecting the testimony of a number of witnesses in Appendix I because the barge could not have moved from the -- out of your calculations and assumptions, could not have moved from the west side to the east side of the industrial canal at the time that they stated?

A.  First of all, I'm going to object to your characterization of my testimony because you've continued to say it and I've tried to clarify it many times over, that they're not calculations or assumptions about the wind, but rather, they're observations.  This is hard fact, and these are statements.  These are evidence, rather, hard evidence, and not the result of calculations.

CHARLES R. CUSHING, PH.D.          186

1
2     But the answer is -- the answer to the
3  question, which I have now forgotten.  Sorry.  The
4  answer to the question is did I reject the testimony
5  of witnesses who said that the barge could have moved
6  across the canal before in fact the wind would have
7  permitted it to move across?
8     Q.  Before you thought the wind would have
9  permitted it to move across.
10    A.  Well, when you say I thought it did or
11 whether it in fact did, I'm stating it as a fact that
12 the wind didn't move that barge across.  Of course, I
13 don't accept their testimony as to when -- when things
14 happened.
15    Q.  Did you argue, in Appendix I or in your
16 report, against the weight to be given evidence, of
17 anybody whose observations were in accordance with
18 your conclusions?
19    A.  I'm not sure I understand your question.
20    Q.  Did you draw any question as to the
21 reliability of the testimony of anyone discussed in
22 Appendix I whose testimony was in accordance with your
23 conclusions?
24    MR. RAFFMAN:  Objection.
25    THE WITNESS:  I don't believe I've argued with

CHARLES R. CUSHING, PH.D.          187

1  the -- with the testimony that I've cited or the
2  analysis of it.  These are merely observations on what
3  they say.  I'm not arguing a point here.  In many
4  cases, the witnesses have stated some facts which I
5  believe occurred, and they have stated facts which I
6  don't believe are in accordance with the hard
7  evidence.  So I haven't totally rejected the
8  statements of all of these witnesses, but I've
9  certainly weighed them in coming to my opinions and
10 conclusions.
11 BY MR. SEYMOUR:
12    Q.  But you did not change any of your opinions
13 or conclusions as a result of anything contrary that
14 you found in the eyewitness testimony; is that
15 correct?
16    A.  That's correct.
17    MR. SEYMOUR:  Okay.  We now have to take another
18 break.
19    THE VIDEOGRAPHER:  Going off the record at the
20 end of Tape 5 at 15:43:50.
21    (A recess was taken from 3:43 p.m.
22    to 3:58 p.m.)
23    THE VIDEOGRAPHER:  Back on record.  Tape 6 at
24 15:58:03.

CHARLES R. CUSHING, PH.D.          188

1     MR. SEYMOUR:  I asked the reporter to mark as
2  Deposition Exhibit 5 -- Deposition Exhibit 6 a
3  document entitled "Tropical Cyclone Report, Hurricane
4  Katrina, 23-30 August 2005," by Richard D. Knabb,
5  K-n-a-b-b, Jamie R. Rhome, R-h-o-m-e, and Daniel P.
6  Brown, dated December 20, 2005.
7     (The Reporter marked the document
8     referred to as Deposition Exhibit 6
9     for identification.)
10 BY MR. SEYMOUR:
11    Q.  Do you have that before you?
12    A.  Yes, sir, I do.
13    Q.  Have you previously seen that?
14    A.  It looks somewhat familiar.
15    (Pause in proceedings.)
16    MR. SEYMOUR:  Let's go off the record for just
17 one second.
18    THE VIDEOGRAPHER:  Going off the record at
19 15:59:57.
20    (A recess was taken from 3:59 p.m.
21    to 4:00 p.m.)
22    THE VIDEOGRAPHER:  Back on record at 16:00:31.
23    THE WITNESS:  I believe I've seen it, but I don't
24 recall it specifically.

CHARLES R. CUSHING, PH.D.          189

1  BY MR. SEYMOUR:
2     Q.  Please turn to Page 4.  The first paragraph
3  under Subheading B, "Meteorological Statistics and
4  Observations."  Do you see the statement in the last
5  sentence of that paragraph that "Data from many
6  Automated Surface Observing System (ASOS) sites, C-MAN
7  stations, and buoys are incomplete due to power
8  outages and other weather-induced failures prior to
9  when peak winds and minimum pressures occurred"?
10    A.  Yes, sir.
11    Q.  Have you seen that particular observation
12 either in this document or another document before?
13    A.  Well, I'm familiar with the fact that the
14 recording station at the Lakefront Airport failed on
15 the morning of the 29th.  I'm familiar with the fact
16 that hydrograph gauges, water gauges have failed in
17 some locations.  So I obviously gathered that
18 information from sources.  So I may have seen such
19 things.
20    Q.  Do you know whether the anemometer at the
21 New Orleans Lakefront Airport, with the call letters
22 KNEW, was one of these types of systems that I
23 mentioned, an automated observing system or a C-MAN
24 station?

CHARLES R. CUSHING, PH.D.          190

1
2   A.  It wasn't specifically -- I'm not sure
3   whether it could be referred to as an automated
4   surface observing system, but I believe that it was a
5   recording anemometer, but I don't believe it was
6   obviously a C-MAN or a buoy system.
7       MR. SEYMOUR:  I'd ask the reporter to mark as
8   Exhibit 7 to the deposition, the deposition of William
9   Villavasso, Junior taken on December 18, 2007.
10          (The Reporter marked the document
11          referred to as Deposition Exhibit 7
12          for identification.)
13          (The witness reviewed Exhibit No. 7.)
14      MR. SEYMOUR:  There's some questions that I want
15  to ask you about your description to Mr. Villavasso's
16  deposition in your report and in Appendix I to your
17  report.  Let me just grab that.
18          (Pause in proceedings.)
19  BY MR. SEYMOUR:
20      Q.  If you'd turn to Page 123 of your report, at
21  the bottom of the page there begins a discussion about
22  William Villavasso.  Do you see that?
23      A.  I'm turning to the page, sir.
24          (Pause in proceedings.)
25      THE WITNESS:  Yes, sir.

CHARLES R. CUSHING, PH.D.          191

1
2   BY MR. SEYMOUR:
3       Q.  Is it fair to say that on Pages 123 through
4   126 you reject the testimony of Mr. Villavasso as
5   impossible because he could not have seen the barge as
6   he described it?
7       MR. RAFFMAN:  Objection.
8       THE WITNESS:  First of all, he didn't -- I don't
9   believe he ever said that I saw the barge.  He said he
10  saw an object which he thought could have been the
11  barge.
12  BY MR. SEYMOUR:
13      Q.  Is it fair to say that you rejected that
14  testimony?
15      A.  I don't believe -- I rejected it in the sense
16  that I don't believe he could have seen the barge in
17  the location at the time he said.
18      Q.  If he did see the tip of the barge protruding
19  from some part of the floodwall at that time, then
20  your calculations and conclusions would have to be
21  incorrect; isn't that right?
22      MR. RAFFMAN:  Objection.
23      THE WITNESS:  First of all, I believe it was
24  impossible that he saw the barge, in answer to your
25  question, but it would mean that hard facts and

CHARLES R. CUSHING, PH.D.          192

1   science would be incorrect.
2   BY MR. SEYMOUR:
3       Q.  By "hard facts and science," you mean your
4   study?
5       A.  I mean the -- the direction of the wind,
6   amongst other things.
7       Q.  And we've already established that
8   Mr. Villavasso's point of view is about 400 feet away
9   from the floodwall; is that correct?
10      A.  That's correct.
11      Q.  Now, from 400 feet, is it possible that he
12  saw -- well, let me -- let me withdraw that.
13          Do you recall that his testimony was that he
14  saw something that was a foot and a half to two feet
15  high?
16      A.  Yes, sir.
17      Q.  Okay.  And he saw it sort of sticking out of
18  the inside, the protected side of the floodwall; is
19  that correct?
20      A.  "Sticking through," I think is what he said.
21  To get the exact wording, we'd have to go to his
22  deposition, but yes, generally he saw something
23  sticking -- what he believed to be the tip of the
24  barge sticking through.

CHARLES R. CUSHING, PH.D.          193

1
2       Q.  Okay.  And the -- is it possible, in your
3   mind, that he might have been off on the size of what
4   he saw based upon the fact he's making that estimate
5   of size from 400 feet away?
6       A.  No, sir.  I think he was off on what he
7   saw -- what he thought he saw, not on the size but on
8   what he thought he saw.  He could very well have been
9   seeing the metallic portions of the floodwall sheet
10  piling itself, which he mistook as what he thought was
11  the barge.  He could have been seeing something else
12  that was in the canal, but I don't believe he was
13  looking at the barge.
14      Q.  Do you have any scientific basis for
15  believing that there was something else in the canal?
16      A.  We know that there were small boats, for
17  example, at the extreme southern end of the -- the
18  canal.
19      Q.  What size small boats?
20      A.  These were Coast Guard craft.  We don't have
21  the exact size, but they were patrol craft, service
22  craft.
23      Q.  Were those Coast Guard craft accounted for at
24  the end of Katrina?
25      A.  They were.  I mean, I say they were, but I

49 (Pages 190 to 193)

CHARLES R. CUSHING, PH.D.        194
1
2  saw nothing indicating that those vessels were lost.
3      Q.  Okay.
4      A.  They were damaged.  They were up on the
5  shore, but they were there.
6      Q.  They were there and they didn't go -- you
7  know, you're a naval architect.  What were the hulls
8  of those craft made of?
9      A.  I don't recall.  It's likely that they were
10  plastic or metal, aluminum.
11      Q.  These are light craft, aren't they?
12      A.  Yes, sir.
13      Q.  Would you think that such a craft would be
14  able to punch a hole in the wall of the -- at the site
15  of the north breach?
16      A.  I don't believe either they or the barge
17  could -- well, punch a hole?  In what?  In the --
18      Q.  In the floodwall at the -- at the site of the
19  north breach.
20      A.  No, I don't think they could punch a hole in
21  the -- in the basic structure of the floodwall, no.
22      Q.  Do you know where those Coast Guard craft
23  were -- were physically just prior to Katrina?
24      A.  No, sir, I don't.
25      Q.  Do you know whether they were on the east

CHARLES R. CUSHING, PH.D.        195
1
2  side or the west side of the Inner Harbor Navigation
3  Canal?
4      A.  No, sir, I don't.
5      Q.  Do you know whether they were at anchor or
6  moored?
7      A.  I don't have hard evidence.  I believe likely
8  they were in the vicinity of the Coast Guard station,
9  which is adjacent to the locks at the south end.
10      Q.  Did you ever check to see whether they were
11  moored?
12      A.  No, sir.  You mean before Katrina?
13      Q.  That's right.
14      A.  No, I wasn't in -- I wasn't there before
15  Katrina.
16      Q.  Okay.  So if those Coast Guard craft were at
17  the extreme southern end of the Navigational Canal,
18  which side would that be?  The east side or the west
19  side?
20      A.  It would be on the west side.
21      Q.  Okay.  So to get from where they were to the
22  north breach would have required a much longer
23  distance than the barge would have required; is that
24  correct?
25      A.  If one assumes that the barge could even make

CHARLES R. CUSHING, PH.D.        196
1
2  that passage or the -- these craft could come from the
3  south end to the north end, it would be a longer
4  distance from the Coast Guard station to the breach
5  than it was from the terminal to the breach.
6      Q.  Where did these Coast Guard craft fetch up on
7  land?
8      A.  Pardon?
9      Q.  Where did these Cost Guard craft fetch up on
10  land?
11      A.  Adjacent to the -- to the Coast Guard
12  station.
13      Q.  On the west side at the extreme southern end
14  of the IHNC?
15      A.  Yes, sir.
16      Q.  At the Claiborne Avenue bridge?
17      A.  Below the Claiborne Avenue bridge.
18      Q.  On the other side of the lock?
19      A.  No.  Well, when you say, "the other side,"
20  I'm not sure which.  You mean on the west side?  Not
21  beyond the locks.
22      Q.  On the southern side of the lock.
23      A.  No.  They -- they were ahead of the locks.
24  They were in the cell that Dr. Daggett previously
25  mentioned.  They were adjacent to the entry into the

CHARLES R. CUSHING, PH.D.        197
1
2  lock on the west side of the canal.
3      Q.  Okay.  Do you know whether any of those
4  displayed any signs of having collided with a massive
5  stationary object?
6      A.  No, sir, I don't.
7      Q.  So it would be speculation to say that it
8  could have been one of the Coast Guard craft?
9      A.  I believe your question was -- it all began
10  with were there any other craft in the -- or vessels
11  in the industrial canal, and I indicated those were
12  vessels that were in the industrial canal, and when I
13  became aware of them, they were already in the south
14  end of the industrial canal, having grounded because
15  of the flood.
16      Q.  I'm not saying that you said that they could
17  have caused the north breach.  My question was just,
18  based upon what you know, would it be speculation to
19  say that they could have caused the north breach?
20      A.  I don't believe they could have caused the
21  north breach.  Not speculation.  I think that's a firm
22  opinion that I have.
23      Q.  Okay.  Do you know of any other object in the
24  canal besides the Coast Guard boats?
25      A.  There were other barges at the terminal.

CHARLES R. CUSHING, PH.D.          198

1
2    Q. But those barges did not break away?
3    A. That's my understanding.
4    Q. We had talked earlier about the sound of
5    the -- that was heard by Mr. Villavasso and the
6    absence of a sound when the -- the levee fell. I
7    think you recalled that testimony differently. But if
8    you take a look on the deposition -- and this would be
9    on Page 64. There are a couple of passages I'd like
10   to direct your attention to, starting at Page 64. In
11   Lines 4 to 24 on that page, do you see that
12   Mr. Villavasso is saying he's watching the water.
13   It's getting more intense, splashing over the wall.
14   A. Line what, please?
15   Q. Line 7 to 8.
16   A. If you'll just give me a second. I'm just
17   reading just a couple lines ahead to get the context.
18   Q. And, now, your question relates to Lines 7, 8
19   and so forth?
20   BY MR. SEYMOUR:
21   Q. Lines 7 and 8. Do you see the passage where
22   it says he's watching the water? It's getting more
23   intense. It's splashing above the wall?
24   A. Yes, sir.
25   Q. And right above that, at the bottom of Page

CHARLES R. CUSHING, PH.D.          199

1
2    63 and the top of Page 64, do you see him saying that
3    he's not sure on time. He thought it was about
4    3:00 o'clock or 4:00 o'clock, but he's not sure?
5    A. That's correct. Yes, sir.
6    Q. Do you see his description on Page 64 that he
7    heard an explosion, boom, and he's still looking in
8    that direction, and he saw the -- the levee wall, a
9    couple of sections tumbling over, and he saw what
10   appeared to be a metal structure, like a barge, only
11   the tip of it. Do you see those words?
12       (The witness reviewed the document.)
13   THE WITNESS: I saw those words, yes.
14   BY MR. SEYMOUR:
15   Q. Are you aware that other experts have placed
16   the time of the north breach earlier than 5:00 a.m.?
17   A. "Other experts"?
18   Q. Other experts.
19   A. I don't recall, but if you could refer me to
20   who you're talking about, maybe it will recollect --
21   refresh my memory.
22   Q. Do you remember Dr. Mozer and the IPET
23   report.
24   A. I recall Dr. Mozer, but I believe Dr. Mozer
25   in the IPET report said the north breach at 5- --

CHARLES R. CUSHING, PH.D.          200

1    5:00 a.m.?
2    Q. Before 5:00 a.m.
3    A. It's my recollection, because I've read
4    thousands of pages, but Dr. Mozer, I believe said
5    5:00 a.m. for the -- the north breach.
6    Q. Okay. Let's proceed on that basis because we
7    have to go on your recollection.
8    A. Okay.
9    Q. Mr. Villavasso, if it's 5:00 a.m., then
10   that's the time when Mr. Villavasso was seeing this
11   occur. Would that be logical?
12   MR. RAFFMAN: Objection.
13   THE WITNESS: Well, he's -- he's saying, and you
14   can say it -- I think you've even said it a few lines
15   ahead, he wasn't sure about the time.
16   BY MR. SEYMOUR:
17   Q. But if the north breach occurred at
18   5:00 o'clock or whatever time it was placed by other
19   experts, then that's the time of these events he's
20   describing?
21   A. That's correct.
22   Q. Okay. Did you see that he says that the
23   water was splashing -- intense splashing over the wall
24   at this time?
25

CHARLES R. CUSHING, PH.D.          201

1    A. Yes.
2    Q. And at that time, the water surge is nowhere
3    near the top of the wall; isn't that right?
4    MR. RAFFMAN: Objection.
5    THE WITNESS: First of all, "at that time." What
6    time do you want me to assume?
7    BY MR. SEYMOUR:
8    Q. 5:00 o'clock.
9    A. At 5:00 o'clock --
10   Q. At the time of the north breach.
11   A. The water would not have been at the top of
12   the wall at the north breach.
13   Q. What's the page again where you had that
14   chart of the water heights?
15   A. I think it's -- give me a second.
16   Q. 47 might be.
17       (Pause in proceedings.)
18   THE WITNESS: Yes, sir.
19   BY MR. SEYMOUR:
20   Q. And the gauge reading at that time was about
21   9 feet; is that correct?
22   A. "At that time," meaning 5:00 o'clock?
23   Q. Right.
24   A. I read it to be about 10 feet here at

CHARLES R. CUSHING, PH.D.       202

1
2    5:00 o'clock.
3        Q.  Okay.
4        A.  And that's approximate.  It could have been a
5    foot higher than that.
6        Q.  Okay.
7        A.  It could be 11 feet even.
8        Q.  Would intense splashing over the east
9    floodwall of the Inner Harbor Navigational Canal at
10   5:00 o'clock a.m. be consistent with your theory?
11       MR. RAFFMAN:  Objection.
12       THE WITNESS:  First of all, again you
13   characterize my opinions as theory.
14   BY MR. SEYMOUR:
15       Q.  Would it be -- would that be consistent with
16   your opinions, if that's the word you'd like to use?
17       A.  No, it wouldn't, assuming it's 5:00 o'clock.
18       Q.  Then on Page 71, there's more discussion.
19   Actually, the bottom of Page 70, beginning with
20   Line 20 when Mr. Gilbert said, "The object you
21   described earlier in your testimony, when did you see
22   that?"  And the answer on the first line of Page 71 is
23   "After the wall fell."  Then he's asked, "How long
24   after?"  And the answer is "Seconds, minutes, maybe a
25   minute.  I don't know.  When it fell down, it

CHARLES R. CUSHING, PH.D.       204

1    "No, I couldn't hear anything."  Do you see that?
2        A.  I see that.
3        Q.  Now, if that had been the barge hitting the
4    floodwall at the north breach and protruding through
5    and you've got the wall coming off in fragments, could
6    some of those fragments have come down on the barge
7    and barred the site of more of the barge?
8        A.  I don't believe that's plausible or possible.
9        Q.  Why is that?
10       A.  Well, first of all, because the barge
11   couldn't have been there.
12       Q.  If it was the barge, I'm asking.
13       A.  But if you give me a hypothetical that the
14   barge was there, and I presume your question is did
15   the -- could this -- in this hypothetical situation,
16   the barge have knocked the floodwall down, I don't
17   believe that could have happened.  It wouldn't have
18   had the energy to do so.  And then if you accept the
19   fact hypothetically that it did knock the barge down,
20   could the concrete falling have fallen on the barge
21   causing the sound.  I don't believe that could have
22   happened because --
23       Q.  Not causing the sound but obstructing the
24   view.
25

CHARLES R. CUSHING, PH.D.       203

1
2    splashed, and I seen massive amounts of water, and I
3    seen something that appeared to be a barge protruding,
4    the tip protruding through the wall."  Do you see
5    that?
6        A.  Yes, sir.
7        Q.  Then you mentioned before in your testimony
8    that he had heard sounds that he thought were
9    transformers blowing.  Do you see that farther down on
10   Page 71?
11       A.  Yes, sir.
12       Q.  Okay.  And he described that as happening
13   before the explosion?
14       A.  That was the question and answer.
15       MR. RAFFMAN:  Wait a second.  Objection.
16   BY MR. SEYMOUR:
17       Q.  Then on Page 72, do you see the question,
18   "Can you tell from what direction the explosion sound
19   came from?"  His answer is, "The direction where the
20   wall broke."
21       A.  I see that.
22       Q.  And do you see the question did it -- about
23   the wall hitting the ground?  Answer, "It tumbled
24   down."  Question on Line 10, "Did it make any sound
25   when it hit the ground?"  And his answer on Line 12,

CHARLES R. CUSHING, PH.D.       205

1
2        A.  That the barge would have obstructed the
3    view?
4        Q.  That the wall coming down could obstruct the
5    view of the upper parts of the barge because we've got
6    part of it poking through.
7        A.  Not at all.  I think if you refer back to
8    the -- to the diagrams on Page 125, the barge would
9    have been sitting 13 feet up in the air.  It would
10   have been high above the -- high above the floodwall.
11   It wouldn't have been obstructed at all.  It would
12   have been clearly in view.  A person wouldn't say, "I
13   think it could have been.  It's something metallic.
14   It could have been a barge."  It would have clearly
15   have been the barge if it was sticking 16 feet up in
16   the air.
17       Q.  It was dark at 5:00 a.m., wasn't it?
18       A.  I believe it was dark, yes.
19       Q.  You testified earlier with respect to a
20   witness at 6:00 a.m. that she would not have been able
21   to see something; isn't that correct?
22       A.  That's right.
23       Q.  So at 5:00 a.m., Mr. Villavasso would not
24   have been able to see things as it -- as he would have
25   been able to see if there was light.  Am I right?

CHARLES R. CUSHING, PH.D.          206

1    A.  That's why, in my mind, I rejected
2  Mr. Villavasso's testimony that he saw what he thought
3  was a barge.  He was 400 feet away.  He had a -- a
4  sight problem, as I understand it.  It was dark.  It
5  was raining heavily, and I don't believe he could have
6  seen clearly what he was seeing.  Certainly not to be
7  able to define it as -- as a barge.
8    Q.  There's a light above the door at that
9  pumping station, isn't there?
10    A.  I don't -- I don't recall whether it was a
11  light there or not.  It would make sense that there
12  would be a light over the door at the pump station.
13    Q.  And the light was strong enough that he could
14  see the condition of the water, the movement of the
15  water, the depth of the water outside the pumping
16  station?
17    A.  Immediately adjacent to it, yes.  Within --
18  within 10 or 20 feet, yes.
19    Q.  Do you know how far the light was able to
20  shine?
21    A.  If you could give me the details of the
22  light.  I don't know whether there's a flood light or
23  a single bulb incandescent light or what kind of light
24  it was.
25

CHARLES R. CUSHING, PH.D.          207

1    Q.  Did you do anything to find out?
2    A.  No, sir.
3    Q.  You just concluded he wouldn't be able to see
4  it without checking on the light?
5    A.  I don't believe there was a flood light that
6  could have seen 400 feet at -- in -- in a heavy
7  rainstorm.
8    Q.  On Page 125 you show an earthen berm on the
9  protected side of the floodwall at the site of the
10  north breach; isn't that right?
11    A.  There's a portion of the protected side, a
12  small portion of the protected side.  Is that what
13  you're referring to?
14    Q.  Yes.  Is that an accurate depiction of the
15  size of -- of how far the earth berm reached up the
16  wall at the time of Katrina?
17    A.  I don't -- I don't recall whether the -- the
18  berm on the inshore side or the protected side is
19  accurately portrayed.  It's more schematic on that
20  side, but the height of the berm on the protected side
21  and the shape of the berm on the protected side, I
22  would say is accurate.
23    Q.  Okay.
24    A.  Which is what it -- what this diagram is

CHARLES R. CUSHING, PH.D.          208

1  meant to show.
2    MR. RAFFMAN:  I'll object.
3    MR. SEYMOUR:  I'm sorry.
4    MR. RAFFMAN:  It is possible that both the
5  questioner and the witness are talking about different
6  sides of the wall based on where I saw people
7  pointing.  Maybe I'm wrong.
8    MR. SEYMOUR:  Okay.  Let's make sure it's right.
9    Q.  On Page 125, these two graphics that you
10  have, the protected side of the wall is the right-hand
11  of the wall as we look at the page; isn't that true
12  (indicating)?
13    A.  That's correct.
14    Q.  And we're looking north; is that right?
15    A.  We're looking north, yes.
16    Q.  And the canal side is the side that's got the
17  water on it?
18    A.  That's correct.  And the purpose of these two
19  diagrams is to show how close the barge could be to
20  the wall at various stages of the -- of the water
21  level on the canal side of the barge, and the purpose
22  of the two drawings are to show that if he in fact saw
23  1-1/2 or 2 feet of some odd -- what he thought was a
24  metal object, the closest that the barge could be

CHARLES R. CUSHING, PH.D.          209

1  because of the berm is 30 feet away and could not have
2  knocked over the floodwall.
3    In the lower picture, it shows what the
4  relationship would be of the barge to the floodwall if
5  the floodwall was adjacent to the -- was in contact
6  with the floodwall, in which case he would have been
7  able to see 13 feet of the barge clearly well above
8  the floodwall, not 1-1/2 to 2 feet.  So that is the
9  purpose and the function of these two diagrams, not to
10  portray the protected side in detail.
11    Q.  Now, Mr. Villavasso testified that he saw a
12  tip, didn't he?
13    A.  He said he saw a tip, right.
14    Q.  So in the schematic, the barge is right
15  alongside the floodwall as if it were tying up at a
16  dock; is that right?
17    A.  It's para- -- the side is parallel to the
18  floodwall, as in the diagram.
19    Q.  As Mr. Villavasso described it, the barge
20  would be at an angle to the floodwall with a forward
21  tip?
22    A.  If it was a tip, then the oblique barge would
23  assume the same distances that you see in these two
24  diagrams, except it would be portrayed at a -- an

CHARLES R. CUSHING, PH.D.          210

1   oblique angle rather than a parallel angle.
2       Q.  And everything but the tip of the barge would
3   be considerably further away from Mr. Villavasso at
4   the time that he saw what he saw; isn't that right?
5       A.  No.  I think you're saying, "considerably
6   farther."  I don't know what angle we're talking
7   about.  If it's a slight angle, you'd see the entire
8   length of the barge.  If it was -- and, by the way, he
9   could see the tip of the barge even if it was parallel
10  to the floodwall if he was looking at one corner if
11  he's referring to the corner as a tip.  It's more
12  likely that what he was thinking he saw, if he thinks
13  he saw the barge, would have been the corner.  As we
14  said a few minutes ago, it could have been portrayed
15  at an oblique angle, but what that angle is, nobody
16  knows.
17      Q.  Isn't it true that he testified that the
18  floodwall fell after he saw the tip?  So you've got
19  the tip -- I think you even corrected me on that
20  saying the tip was protruding through, and then the
21  floodwall fell?
22      A.  Well, again, his testimony is confusing
23  because if he saw the tip protruding through the wall,
24  the wall would have failed for the tip to protrude

CHARLES R. CUSHING, PH.D.          211

1   through it.  So he's seeing the tip protruding through
2   the wall after the floodwall fails.  That's what he
3   thinks -- that's what he's thinking he's seeing.
4       Q.  Didn't he say that he heard the explosive
5   sound, then he saw the tip and the wall started coming
6   down?
7       A.  He says on Page 171 of his deposition, "When
8   it fell down" --
9       Q.  I'm sorry.  171 or 71?
10      A.  Page 71.  Sorry.  I'm reading on Line 5
11  onward.  "When it fell down, it splashed.  I seen a
12  massive amounts of water and I seen something that
13  appeared to be a barge protruding, the tip protruding
14  through the wall."  And I read that to mean that he's
15  seeing the tip after the wall -- what he thinks is the
16  tip of the barge after the wall has failed.
17      Q.  And on Page 64, do you see that he said a
18  couple sections looked like they tumbled over and then
19  he noticed the tip?
20      A.  He's saying, "I saw it tumble only over.  A
21  couple of sections look like they tumbled over.  And
22  I'm looking real good.  I'm squinting my eyes because
23  it's raining too.  I imagine it was still dark but I
24  could see that because it looked like a mouth with a

CHARLES R. CUSHING, PH.D.          212

1   tooth out.  That's what went through my mind, and then
2   I seen what appeared to be a metal structure like a
3   barge, only the tip of it.  I couldn't tell you I seen
4   the whole barge because I didn't.  That's what I
5   seen."
6       Q.  Now, Mr. Villavasso is unlike the other
7   witnesses whose testimony you criticized in Appendix I
8   that we talked about.  Isn't he -- wasn't he at work
9   and on duty at the time of his observation?
10      A.  Well, first of all, you're characterizing my
11  commentary on the other witnesses as criticism of
12  them.  I wouldn't call it a criticism.  It's a review
13  of their -- their testimony and where they may be at
14  odds with other testimony or other facts in the case.
15  So it's not -- I'm not criticizing the witnesses.  I'm
16  commenting -- commenting on their observations.
17      Q.  Do you recall having testified that their
18  observations should be given less weight because they
19  were excited and feared their lives, having to climb
20  from the house breaking up underneath them, having to
21  climb into a tree?
22      A.  Giving testimony 2 -- 2 years, 2-1/2 years
23  after the fact, I've said all of these could be
24  factors in affecting the accuracy of their testimony.

CHARLES R. CUSHING, PH.D.          213

1       Q.  And unlike them, Mr. Villavasso was a
2   municipal employee at the time, on duty; is that
3   correct?
4       A.  That's correct.  That's my understanding,
5   yes.
6       Q.  And one of his job responsibilities was to
7   observe what was happening during the storm, wasn't
8   it?
9       A.  I think it could be assumed that that would
10  be certainly a duty of his, especially as it relates
11  to water.
12      Q.  And you also testified that in the course of
13  his employment at that location, he had seen many
14  barges going up and down the river?
15      A.  I don't recall the specifics -- specifics of
16  that statement.
17      Q.  Okay.  Now, isn't it true that the tip of a
18  barge looks very different from a piece of sheet pile?
19      A.  The -- I wouldn't use the word "very
20  different."  I think they're both metallic structures.
21  If he's looking at just a portion, it could be a
22  sliver of the corner of a barge.  It could be mistaken
23  for a piece of sheet pile.  They're both vertical.
24  They both are oriented vertically.

CHARLES R. CUSHING, PH.D.        214

1
2    Q. A tip of a barge is also going to be oriented
3    laterally, isn't it?  It's going to be the -- the hull
4    is going to go at right angles.  It may be a curved
5    corner, but the hull is at right angles.  There's
6    width to it, isn't there?
7    A. Not the tip.  There would be very little to
8    mention when you talk about a tip.  You could be
9    talking about a vertical sliver.
10   Q. Mr. Villavasso had seen sheet pile every day
11   that he worked there, hadn't he?
12   A. I'm not sure why you make that statement.
13   Q. Wasn't there sheet pile on top?
14   A. On top of what?
15   Q. On top of the floodwall at the Inner Harbor
16   Navigational Canal.
17   A. I think the sheet pile is embedded in the
18   concrete cap, and the berm goes up to the cap.  The
19   sheet pile is embedded in the -- in the berm.  So he
20   wouldn't have been looking at sheet pile every day.
21   If that's the sheet pile you're talking about.
22   Q. Even from a distance of 400 feet, don't you
23   think he could tell the difference between the tip of
24   something that looked like the tip of a barge and
25   sheet pile that is as thin as you've described it in

CHARLES R. CUSHING, PH.D.        215

1
2    your testimony today?
3    A. No.  I don't think he -- he could describe
4    very well anything.  I think the distance, 400 feet
5    under the heavy rain late in the dark of the night,
6    and considering he has sight problems, would seem to
7    me that he would have difficulty describing anything.
8    Q. You and I have sight problems, don't we?  We
9    wear glasses.
10   A. Well, I don't know about your -- your
11   condition, but I can tell you that I use glasses to
12   read things nearby, but my distance -- I don't have a
13   problem with distance.
14   Q. What part of his deposition do you rely upon
15   with respect to your statement that he has sight
16   problems?  And I state for the record that I included
17   a word index at the end to make it easy to find.
18   A. Thank you very much.  That's just exactly
19   where I'm going, and I'm looking under "glasses."
20   Maybe I should look under eyesight first.
21   MR. RAFFMAN:  For the record, it looks to me like
22   the index you've included doesn't have any page
23   numbers.
24   THE WITNESS:  They're all zeros.
25   MR. SEYMOUR:  That's what was produced from Jones

CHARLES R. CUSHING, PH.D.        216

1
2    Pendleton Court Reporters.
3    MR. RAFFMAN:  Would you like some help from --
4    MR. SEYMOUR:  I would appreciate it.
5    MR. RAFFMAN:  I think you might find what you're
6    looking for at Page 211.
7    MR. SEYMOUR:  Thank you for taking the time to
8    find that.
9    (The witness reviewed the document.)
10   BY MR. SEYMOUR:
11   Q. On Page 211, Line 8, did you see the
12   question -- beginning in Line 2.  He wears glasses for
13   driving.  He was not wearing glasses that night.  He
14   sees long distance fuzzy.  Is that what you're
15   referring to?
16   A. What I'm referring to is that he wears
17   glasses, "but I wasn't wearing glasses at all for
18   answering -- for like driving."  When he was asked "Do
19   you see long distance fuzzy or do you see reading
20   fuzzy?"  And he says, "I see long distance fuzzy."
21   "And did you not have your glasses on at the time that
22   you went out on the" -- and he answers "No, I did
23   not."
24   So that, together with all of the other
25   factors, would be indicative of the fact to me that he

CHARLES R. CUSHING, PH.D.        217

1
2    would have difficulty saying what he saw 400 feet away
3    in the rain, in the dark of the night.
4    Q. Now, nobody in the deposition ever even
5    suggested that what he saw was sheet pile; isn't that
6    right?
7    A. That's correct.  Nobody has suggested that.
8    Q. Except you?
9    A. Well, just now, I indicated that he could
10   have seen other things since he's not sure of what he
11   saw.  He saw -- he starts by saying he saw a metallic
12   object, and then he goes on to qualify that by saying
13   he's not sure, but he thinks it was the tip of the
14   barge.  So he's not sure what he saw.  And it's clear
15   why he's not sure because for all of the reasons we
16   have just said.  He can't see long distance.
17   Everything is fuzzy long distance.  He's saying that
18   it was the dark of the night.  He's saying that there
19   was a heavy rainstorm.  All of those factors would
20   indicate that he had trouble seeing.
21   Q. At what distance did long distance become
22   fuzzy to him?
23   A. He says, "long distance, like when you're
24   driving."
25   Q. Would that be more than 400 feet?

CHARLES R. CUSHING, PH.D.          218

1
2    A.  It could be less than 400 feet even.
3    Q.  Could it be longer than 400 feet?
4    A.  It could be longer.  It could be shorter.
5    Q.  We just don't know?
6    A.  We don't know what the condition of his
7    eyesight was except to say, "It was fuzzy."
8    Q.  Would you agree with me that it is
9    speculative to say that he would have found it
10   difficult to see this because of his eyesight?
11   A.  No.  I think that -- that contributes to his
12   difficulty in seeing for that and the other reasons
13   that I've just stated.  Taken -- taken as a group, I
14   think it's indicative of the fact that he had trouble
15   identifying what he was looking at.
16   MR. SEYMOUR:  Okay.  Why don't we take a break
17   right now.  I think this will probably be our last
18   break.
19   THE VIDEOGRAPHER:  Going off the record at
20   16:47:21.
21   (A recess was taken from 4:47 p.m.
22   to 4:59 p.m.)
23   THE VIDEOGRAPHER:  Back on the record at
24   16:59:58.
25   BY MR. SEYMOUR:

CHARLES R. CUSHING, PH.D.          219

1
2    Q.  Dr. Cushing, please turn to Page 134 of your
3    report.
4    A.  Yes, sir.
5    Q.  Okay.  And do you see a reference in
6    Footnote 72 to the Principles of Naval Architecture
7    Society of Naval Architects and Marine Engineers,
8    Volume III, Page 105?
9    A.  Yes, sir.
10   (The Reporter marked the document
11   referred to as Deposition Exhibit 8
12   for identification.)
13   MR. SEYMOUR:  I asked the court reporter to mark
14   as Exhibit 8 to this deposition a document from your
15   reliance materials entitled "Principles of Naval
16   Architecture Second Revision, Volume III, Motions in
17   Waves and Controllability," and Page 105 is attached
18   to that.
19   Q.  You'll notice that this is yellow
20   highlighter.  Is that your yellow highlighting?
21   A.  I don't know who highlighted the -- the
22   document.
23   MR. SEYMOUR:  I state for the record that that's
24   how it is on the reliance materials.
25   MR. RAFFMAN:  Very good.  Thank you, Counsel.

CHARLES R. CUSHING, PH.D.          220

1
2    BY MR. SEYMOUR:
3    Q.  Do I take it that the highlighted text is the
4    source of your citation on Page 134 of your report?
5    A.  Yes, sir, it's verbatim.
6    Q.  From the text on Page 105 and from Figure 79
7    on Page 105, is it correct that that observation
8    applies to ships moving into head seas?
9    A.  This particular comment refers to that, but
10   in general, it re- -- it applies to ships even moving
11   in oblique seas or waves that are not head on to the
12   ship.
13   Q.  Do you have any scientific treatise or
14   scholarly article that says that this comment, which
15   does refer specifically to motions and head seas and
16   the graphic that refers to motions that seem to be
17   perpendicular to the waves would also apply when a
18   ship is moving obliquely?
19   A.  I refer to the citation that immediately
20   precedes what you see on Page 134 from the Principles
21   of Naval Architecture, which is a quote from a book on
22   dynamics of marine vehicles by Mr. -- a
23   Mr. Bhattacharyya.
24   Q.  And is it your testimony that
25   Mr. Bhattacharyya states that the observation in --

CHARLES R. CUSHING, PH.D.          221

1
2    that is made in Deposition Exhibit 8 would also apply
3    when a ship is moving in oblique seas?
4    A.  Yes, I think it applies to that also.
5    Q.  Does it apply in situations when a vessel is
6    stationary?  That is, when it's simply adrift?
7    A.  Yes.
8    Q.  Please turn to Page 29 of your report.  Who
9    is the man in the picture?
10   A.  My memory is failing me just now.  I -- I do
11   know his name, but I --
12   Q.  Is he an employee of yours?
13   A.  No, sir.
14   Q.  Do you know by whom he's employed?
15   A.  I believe he has his own firm.
16   Q.  Do you know the name of the firm?
17   A.  It's his name.
18   Q.  Okay.
19   A.  I think in a few minutes it will come back to
20   me.
21   Q.  Was he also employed by Lafarge?
22   A.  No, he wasn't.  I engaged -- I engaged his
23   services, but Lafarge paid his wages and his fees.
24   Q.  What is being done with the augers in the
25   picture?

CHARLES R. CUSHING, PH.D.        222

1
2   A. What is being done with the --
3   Q. Augers.
4   A. -- augers.  He took some soil samples, but
5   I'm not sure those are the augers that he used or
6   whether they were somebody else's.
7   Q. It appears he has an auger stuck into the
8   floodwall.
9   A. No.  That's not an auger.  That's a timber, a
10  piece of timber that's horizontal perched --
11  cantilevered out from the bank.
12  Q. Is that something he placed there or
13  something that was there anyhow?
14  A. Yes, he placed it there to indicate that
15  there was a dropoff underneath -- underneath the board
16  and where the wall -- where the berm had been abutting
17  the floodwall.
18  Q. When you say, "a dropoff," do you mean that
19  there's a trench of some kind between the berm and the
20  floodwall?
21  A. Yes, sir.
22  Q. Is that the dark area that we see towards the
23  right of the picture?
24  A. Well, it's everything beyond the grass along
25  the length of the -- not just at the right, but along

CHARLES R. CUSHING, PH.D.        223

1
2   the whole grass.  They -- the scour trench exists
3   along the length of the wall.
4   Q. What testing can be done with an auger?
5   A. He -- he was taking some samples of the soil.
6   I'm not sure that these augers that you see lying here
7   were his -- was his equipment.  There was equipment
8   from other people lying around, and I can't attest to
9   what these augers are for.
10  Q. Did his work show up in your report?
11  A. No, sir.
12  Q. What conclusion did you draw from his work?
13  A. Well, he didn't -- he didn't produce a
14  report.  He assisted me in my -- my inspections.  For
15  example, I mentioned that I laid out markers along the
16  length of the -- the floodwall.  He assisted me in
17  those measurements.  He assisted me in placing the
18  markers there.  He generally assisted me in my
19  inspection.  I needed ladders, for example, to climb
20  up on the barge.  He was able to provide the ladders.
21  Generally, that kind of assistance.
22  Q. Did you obtain any samples from the barge
23  when you inspected it?
24  A. "Samples from the barge."  I took nothing
25  from the barge.

CHARLES R. CUSHING, PH.D.        224

1
2   Q. Did you employ anyone to take samples from
3   the barge?
4   A. No, sir.
5   Q. To your knowledge, did Lafarge employ anyone
6   to take samples from the barge?
7   A. Not to my knowledge.
8   Q. On Page 60 of your report you have a section
9   called "Other Floodwall Failures."  For purposes of
10  your report, what does the word "failure" mean?  How
11  would you define it?
12  A. That it is not in the as-built condition.
13  It's damaged.
14  Q. Okay.  Would a floodwall that was leaning out
15  of the vertical but still intact, in the sense of
16  being able to keep water out, be considered a failure
17  for purposes of your report?
18  A. I would -- I would call -- that would be a
19  failure.
20  Q. On Page 63 of your report there's a
21  discussion of the northern breach.  You have a
22  sentence "No evidence was found at the site of the
23  northern breach to indicate physical impact or contact
24  by a barge or other object with the floodwall."  Had
25  any of the rubble been cleared way at the time you

CHARLES R. CUSHING, PH.D.        225

1
2   inspected the northern breach?
3   A. I can't tell what had been taken away, if
4   anything had been taken away because if it wasn't
5   there, I wouldn't have known that it had been there.
6   But since I -- since I did that inspection reasonably
7   shortly after Hurricane Rita, I would not expect there
8   would have been massive cleanup.  The cleanup didn't
9   occur until somewhat later.  But what this statement
10  is is that in looking at the north breach, I found no
11  indication, no physical evidence of a barge impact,
12  and I am not aware of anyone else that has found any
13  evidence of the barge impact.
14  Q. What evidence would you expect to see if the
15  barge had impacted the wall?
16  A. I don't know what evidence there would be.
17  Q. What were you looking for?
18  A. Any possible thing that would indicate a
19  barge had been there.
20  Q. Please give some examples.
21  A. Portions of -- portions of concrete that
22  would have scrapings of the barge on it could be one.
23  Q. Did you examine all of the chunks of rubble?
24  A. I looked at all of the chunks of rubble that
25  were lying -- lying around on the ground.

CHARLES R. CUSHING, PH.D.          226

Q. Did you turn them over so that you could see all sides, tops and bottom of the pieces of rubble?

A. No, sir, I didn't.

Q. So if there were paint scrapings from the barge on the rubble but the paint scraping side was down, you would not have seen it?

A. If I didn't look on the underside, I wouldn't have seen it, no.

Q. And you did not look on the underside?

A. Some of this rubble was too big to move.

Q. Did you try to get any mechanical assistance in moving the rubble?

A. No. I didn't want to spoliate the evidence that was there.

Q. So instead, the evidence was just carted away?

A. At some time, it would be -- the area was cleaned up.

Q. Did you ever talk with Corps of Engineers to find out if they would have any problem with your examining the rubble?

A. No, sir.

Q. On Page 65 of your report, in the bottom paragraph it refers to a "wooden plank road" and "an

CHARLES R. CUSHING, PH.D.          227

old oyster shell road." Is any part of your analysis based upon that?

A. That observation has to do with the underlying support that the floodwall was built on and the generally poor conditions of the construction of the floodwall.

Q. I'd asked you earlier a general question about having pictures in your report of great devastation in the vicinity of the south breach and whether you had seen anything elsewhere comparable. Let me ask you specifically about Figure 44 on Page 67. Have you seen that type of devastation with respect to the 17th Street Canal or the London Avenue Canal?

A. No, sir.

Q. On Page 68, in the first full paragraph, you have observations about the movement of the barge. Do you know for certain what movement occurred prior to Rita and what movement occurred because of Rita?

MR. RAFFMAN: Objection.

THE WITNESS: Yes.

BY MR. SEYMOUR:

Q. Okay. Please explain.

A. Prior to Katrina --

CHARLES R. CUSHING, PH.D.          228

Q. Prior to Rita?

A. Oh. I'm sorry.

MR. RAFFMAN: You asked prior to Rita.

THE WITNESS: I'm sorry. I thought the question was prior to Katrina.

BY MR. SEYMOUR:

Q. No. After Hurricane Katrina, the barge landed where it landed, and there are lots of pictures to show where it landed in the Lower Ninth Ward.

A. Yes.

Q. But you have a description of the movement of the barge in this paragraph, movement during Katrina and further movement during Rita. I'm asking you if you have any hard evidence as to what parts of this movement actually occurred during Katrina and what parts actually occurred during Rita. Can you distinguish?

A. Okay. So I did interpret your question correctly. You're asking what -- about the movement of the barge during Katrina, and then you're asking about what movements of the barge had been caused by Rita.

Q. I'm asking how you can tell what movement occurred during Hurricane Katrina and what movement

CHARLES R. CUSHING, PH.D.          229

occurred during Hurricane Rita.

A. Okay. Again, we keep coming back to the question of movement during Katrina, and the question is how far back do you want to go because the -- almost the whole thrust of this report is about the movement of the barge during Hurricane Katrina.

Q. My question has to do with the movement within the Lower Ninth Ward, what this paragraph concerns.

A. Okay. I just want to be sure I'm answering your question because --

Q. That's the question.

A. Okay. But restricting it then, the movement -- now, let me see if I understand your question correctly. When you talk about the movement of the barge during Katrina in the Lower Ninth Ward, we have a diagram of the movement of the barge once it entered the Lower Ninth Ward to arrive at its final resting position. Is that what you want to discuss, the movement of the barge during Katrina in the Lower Ninth Ward?

Q. I want to discuss the statements that are in this paragraph on Page 68.

A. Okay.

CHARLES R. CUSHING, PH.D.        230

1
2  (The witness reviewed the document.)
3  THE WITNESS: All right. The statements
4  contained in -- on Page 68 in the first full paragraph
5  describe the fact that the barge grounded
6  approximately 150 feet from the floodwall, and the
7  position that it grounded in has been shown in
8  photographs, for example, aerial photographs. So it's
9  identifiable as to where the vessel grounded after
10 Hurricane Katrina.
11     When Hurricane Rita struck New Orleans, the
12 Lower Ninth Ward flooded again, and in doing so, it
13 floated the barge somewhat such that the barge moved
14 sideways a short distance and came to rest a second
15 time, and everyone uses the school bus, for example,
16 as the location where it grounded the second time. So
17 it moved to the east for a short distance. Is that an
18 answer to your question? I'm not sure what you're
19 driving at.
20 BY MR. SEYMOUR:
21     Q. You refer to the pattern of damage on some
22 houses on Jourdan Avenue indicating that the barge
23 approached them from the direction of the canal.
24 That's during Katrina in your report; right?
25     A. Yes, sir.

CHARLES R. CUSHING, PH.D.        231

1
2     Q. How do you know that that did not occur
3  during Rita?
4     A. Because we have pictures of the barge in the
5  grounded position after Katrina but before Rita.
6     Q. Do you have pictures of the damage on those
7  houses after Katrina but before Rita?
8     A. After Katrina. Well, you have the aerial
9  pictures that not only show the position of the barge
10 grounded after Katrina, but you have -- the pictures
11 are in -- the pictures of the houses are in those
12 pictures also.
13     Q. Is your answer "yes"?
14     A. We have pictures of the houses.
15     Q. Have you compared the pre-Rita pictures of
16 damage on the houses with the post-Rita pictures of
17 damage on the houses? That's what I'm trying to get
18 at.
19     A. Well, I've observed them, yes.
20     Q. Okay. And you saw no difference?
21     A. Yeah. The -- Rita caused the barge to -- to
22 float and move off of a portion of the damaged houses.
23     Q. Now, when the water was coming into the Lower
24 Ninth Ward after the south breach, you mentioned that
25 fluids like air circle around. If they don't smash

CHARLES R. CUSHING, PH.D.        232

1  through something, they would circle around something
2  and rejoin on the other side; is that right?
3     A. If the object is in the free stream.
4     Q. The barge, however, could not circle around
5  and rejoin on the other side. It simply had to smash
6  through anything that was in its path; isn't that
7  correct?
8     MR. RAFFMAN: Objection.
9     THE WITNESS: I'm not sure I understand what your
10 question is or what time you're referring to now.
11 BY MR. SEYMOUR:
12     Q. When the barge was coming into the Lower
13 Ninth Ward, there would have been obstacles, wouldn't
14 there?
15     A. The already flood -- fallen floodwall would
16 have been one obstacle, and then once it passed into
17 the Lower Ninth Ward, it would have been subjected to
18 the flow of water in the Lower -- Lower Ninth Ward and
19 would have drifted with that water -- with that water
20 until it finally came into contact with something
21 where it would have stopped.
22     Q. Anything that the barge struck would have
23 slowed its momentum; isn't that true?
24     A. Yes. Almost by definition, yes.

CHARLES R. CUSHING, PH.D.        233

1
2     Q. And you testified to the large number of
3  trees, 20, 25 foot heights of trees. Those would have
4  slowed the barge too, wouldn't they?
5     MR. RAFFMAN: Objection.
6     THE WITNESS: I -- I don't believe so because it
7  wasn't near those particular trees. There were trees
8  in the vicinity of the southern end of the south
9  breach, but the barge did not knock those trees down.
10 In fact, it appeared to have avoided those trees and
11 telephone poles also.
12 BY MR. SEYMOUR:
13     Q. Did you see any downed trees or telephone
14 poles between the south breach and the place where the
15 barge came to rest?
16     A. I would have to look at a photograph to
17 refresh my memory. Yeah. There were trees further
18 inland at the south breach, and these are the trees I
19 referred to as not having been knocked down by the
20 barge.
21     Q. And do you know which houses that were
22 knocked off their slabs were knocked off by water and
23 which were knocked off by the barge?
24     A. Well, I observed houses on Jourdan Avenue
25 adjacent to where the barge finally grounded, or near

CHARLES R. CUSHING, PH.D.        234

1  them, that appeared to have been crushed by the barge
2  and was not the same kind of damage that I observed to
3  houses and other structures elsewhere in the Lower
4  Ninth Ward.
5      Q.  Were there houses knocked off their slabs
6  between the south breach and the place where the barge
7  finally came to rest after Katrina?
8      A.  There were houses -- yes, where the barge
9  grounded after Katrina that were crushed.
10     Q.  I asked you a different question.  Did you
11 observe houses knocked off their slabs -- the slabs
12 remained.  The houses didn't necessarily remain, but
13 the slabs remained in the path between the south
14 breach and the place where the barge came to rest
15 after Katrina?
16     A.  I don't recall whether they were knocked
17 off the -- knocked off the slab or not.  I can say the
18 houses -- the houses adjacent to the barge where it
19 finally came to rest were crushed.
20     Q.  If you turn to Page 69 of your report, you
21 have a picture of a house displaced by rushing water,
22 and it seems to have a roof line, at least, that still
23 is intact, as is the house farther down.  Then in the
24 last two sentences you say, "the damage to these
25

CHARLES R. CUSHING, PH.D.        235

1  houses appears related to the weight of the barge
2  coming to rest on the roofs."  Does that refer to the
3  final resting place of the barge after Katrina?
4      MR. RAFFMAN:  Wait a minute.  Objection.
5      THE WITNESS:  I'm looking on Page 69.  I'm not
6  seeing the reference.
7  BY MR. SEYMOUR:
8      Q.  It's the second paragraph.
9      A.  Yes.
10     Q.  You say, "From the fact that the barge landed
11 on the roofs of these houses," and then you refer to
12 the damage to these houses.  My question is whether
13 "these houses" refers to the roofs of the houses where
14 the barge finally came to rest after Katrina?
15     MR. RAFFMAN:  Same objection.  I don't know what
16 it has to do with Figure 45.
17     THE WITNESS:  That is my question.  Is -- is your
18 question -- since you made the reference as the
19 preamble to the question, you made reference to the
20 pictures in Figure 45.
21 BY MR. SEYMOUR:
22     Q.  I'll ask you a question about Figure 45 after
23 I get an answer to the outstanding question, which did
24 not refer to Figure 45.
25

CHARLES R. CUSHING, PH.D.        236

1      A.  Okay.  Well, that's not clear.
2      Q.  That's why I asked the question two, three
3  times.  When you refer to "these houses" in the second
4  to the last sentence, are you referring to the houses
5  on which the barge finally came to rest after Katrina?
6      A.  I'm referring to the houses on -- along
7  Jourdan Avenue where the -- the barge grounded.
8  That's what "these houses" are referring to in that
9  statement.
10     Q.  Now, does Figure 45 have any relationship to
11 the track of the barge?
12     A.  No, sir.
13     Q.  Do you know if that's Jourdan Avenue?
14     A.  I believe it's not Jourdan Avenue.  I believe
15 it's well inland from Jourdan Avenue, at least one or
16 two blocks inland.
17     Q.  Please turn to Page 85.
18     A.  Yes, sir.
19     Q.  What do you believe is the time when the
20 barge went through the south breach, or can't you
21 tell?
22     A.  It's sometime after 9:00 o'clock.
23     Q.  What is the significance of Figure 56 to your
24 conclusions?
25

CHARLES R. CUSHING, PH.D.        237

1      A.  The barge at the terminal is in a location
2  where any wind from the north, if the barge was loose,
3  would carry it into the southern end of the -- what
4  we've been referring to as "the notch."  That is, the
5  indentation or the turning basin that exists
6  immediately adjacent to south of -- of the Lafarge
7  terminal.  If the barge had been subjected to wind,
8  northerly winds and it were loose, it would have ended
9  up in that -- that notch area.
10     It would not have been able to escape from
11 that notch area unless -- that is from a wind from the
12 west unless it came into contact with this gantry shed
13 that you see in Figures 55 and 56 at the Namasco
14 terminal.
15     If it had come into contact with this shed,
16 there would have been damage on the sides of the shed,
17 which is lightly constructed corrugations, and there
18 would have been damage to the hatch covers, the
19 plastic hatch covers on the barge.  My inspection of
20 both the shed, the gantry shed and the barge itself
21 indicated that there were no such damages.
22     So, therefore, the barge had to have left at
23 some time when the wind from the west would have
24 carried it clear of this structure, and the only time
25

CHARLES R. CUSHING, PH.D.                238

1  that that would have occurred when we would have had
2  a -- a wind that would have carried it clear of this
3  area would have been after 9:00 o'clock.
4      Q.  Is it your testimony that a drifting barge
5  can move only in the direction of the wind?
6      A.  It's my testimony that Barge ING4727 in the
7  winds experienced on the morning of the 29th of August
8  in the industrial canal, could have only moved in the
9  direction of the -- of the winds which were so
10  dominant and -- and would not have been significantly
11  influenced by any slight currents that existed in
12  the -- in the canal.
13     Q.  Are you assuming that the wind would have hit
14  the barge edge on, perpendicular to the barge?
15     A.  Not necessarily. I show in the diagram of --
16  of wind that we've previously referred to, that the
17  wind is striking the barge from many different angles
18  as the wind is veering from northeast around to
19  northwest and westerly.
20     Q.  If the wind is striking the barge in the
21  notch at an oblique angle, isn't it going to turn the
22  barge?
23     A.  I'm sorry?
24     Q.  Isn't it likely to turn the barge?

CHARLES R. CUSHING, PH.D.                239

1      A.  That depends.
2      Q.  It could turn the barge?
3      A.  Is -- you have to tell me is the barge
4  secured or not secured? Is the barge secured at one
5  end or not?
6      Q.  The barge is adrift.
7      A.  Completely adrift.
8      Q.  I grant you it may have been secured at one
9  end before that too broke away. Would that increase
10  the risk of the barge being turned?
11     A.  If the barge is secured at one end, the barge
12  would rotate, yes, unless the wind was directly in
13  line with the securing.
14     Q.  And the Lafarge terminal and the bank of five
15  tethered barges, what we call the bungy barges, would
16  have acted as a little bit of a wind break for one
17  part of the barge while the wind was free to act on
18  the other part of the barge; is that correct?
19     A.  Well, again, it depends on the direction of
20  the wind. If the wind is coming from the directions
21  that I show on Page 45, up until after 8:00 o'clock,
22  the Barge ING4727 would have partly been in the lee of
23  the five other barges. It was only when the wind
24  moved around to, say, the 9:00 o'clock position or

CHARLES R. CUSHING, PH.D.                240

1  later that the barge would have been more exposed to
2  the wind. It still would have been partly in the lee
3  of the inboard barge, the loaded barge at the lower
4  draft.
5      Q.  You mentioned several times that there was
6  little current to speak of in the Inner Harbor
7  Navigation Canal based upon Dr. Daggett's and his
8  teams' study. Did you take reflective waves into
9  account?
10     A.  We considered reflective waves, yes.
11     Q.  Please describe for the record what a
12  reflective wave is.
13     A.  When a wave strikes a vertical surface, a
14  hard, vertical surface, a portion of the striking wave
15  then reflects off that wave. If the wave strike is --
16  if the wave is striking the vertical surface
17  obliquely, then a reflective wave will bounce off at
18  a -- at a complimentary angle, and if the wave strikes
19  the vertical surface perpendicularly, then the
20  reflected wave in its diminished form will reflect off
21  in the direction that the oncoming wave is coming
22  from.
23     Q.  Does a reflected wave on the surface have any
24  relationship to an undertow?

CHARLES R. CUSHING, PH.D.                241

1      MR. RAFFMAN: Objection.
2      THE WITNESS: Well, I'm not sure what you're
3  referring to as an "undertow." Undertow is usually a
4  coastal phenomena that occurs when waves ride up on a
5  beach and then flow back out into -- into the open
6  water.
7  BY MR. SEYMOUR:
8      Q.  And the undertow occurs in a form of
9  submarine reflected wave; isn't that correct?
10     MR. RAFFMAN: Objection.
11     THE WITNESS: A form of a submarine?
12  BY MR. SEYMOUR:
13     Q.  It's below the surface of the water. You've
14  got a wave on top going towards the beach, and you've
15  got a wave underneath that layer moving away from the
16  beach, that's been reflected from the beach; isn't
17  that correct?
18     A.  I don't believe that's a proper definition of
19  undertow. I think undertow is a -- a term that's
20  widely used, but by lay people, that refers to water
21  that has -- that has been washed up on the beach and
22  then is flowing back out into open water. Many
23  swimmers feel that they're being drawn under in an
24  undertow, when in fact they're being subjected to the

CHARLES R. CUSHING, PH.D.          242

1    water that's moving away from the beach, strong
2    current away from a beach.
3        In our particular case here, we had no
4    beach. We had, basically, a vertical surface. So I
5    wouldn't expect to see an undertow in our particular
6    case here.
7        Q. In the Inner Harbor Navigational Canal when
8    the wind is moving from east to west, is it pressing
9    some of the water against the west?
10       A. Is it pressing water to the west. A slight
11   amount. Again, we're talking about waves on the order
12   of two feet high. So you're not talking about very
13   much buildup of water from east to west. A negligible
14   amount.
15       Q. And when the reflected wave hits the east
16   bank, does it then rebound again?
17       A. To a very lesser degree. Some energy is
18   absorbed when the wave hits the surface and rebounds
19   back, and then it quickly dissipates because it
20   doesn't have the energy source that is driving the
21   wave. Waves are formed by -- generally by wind, and
22   it's the friction of the wind on the surface of the
23   water that causes the wave. When the wave then
24   reflects, it has lost its driving force, and it

CHARLES R. CUSHING, PH.D.          243

1    diminishes. It quickly dissipates.
2        Q. Is it possible for a wave to reach residents?
3        A. Excuse me.
4        Q. Is it possible for a wave to reach residents?
5        A. Could you help me understand what you mean by
6    reaching residents?
7        Q. Your Exhibit 8 -- do you still have that
8    there before you? Now, there, I think it's referred
9    to as synchronism of the waves. "Synchronism with a
10   particular wave length can be avoided by change in
11   speed," over in the left-hand column.
12       A. That's what they refer to when they refer to
13   even at residence.
14       Q. And what is the effect of the synchronism of
15   waves or residence?
16       A. In this particular case?
17       Q. Yes.
18       A. In this particular case, very little.
19   Virtually none because the motion of the barge in --
20   in the waves that it would have experienced in the
21   Inner Harbor Navigation Canal on that morning would
22   have been so slight that even at residence, the motion
23   of the barge is hardly perceptible. The barge -- I
24   calculated what the barge roll, pitch and heave were

CHARLES R. CUSHING, PH.D.          244

1    in these waves, and we're talking a fraction of an
2    inch. Less than an inch.
3        Q. On Page 74 you state that the barge could not
4    have come into the Lower Ninth Ward without there
5    already being a sufficient depth of water in the
6    neighborhood because otherwise the barge would have
7    grounded on the sand?
8        A. Yes, sir.
9        Q. And it would have "toppled into the
10   neighborhood." Do you see that?
11       A. Yes, sir.
12       Q. If the barge caused the south breach, do we
13   know whether it moved as fast as the water past the
14   floodwall?
15       A. Which water movement are you talking about?
16   The in-rush of water?
17       Q. Yes.
18       A. If the barge had caused the breach, which I
19   don't believe it did, but hypothetically, if it had
20   caused the breach, based on the -- the catastrophic
21   flow of water that flowed into the Lower Ninth Ward as
22   shown by the photographs, the barge would surely have
23   been drawn in with the flooding water, and if it had
24   done so, the water in the Lower Ninth Ward would have

CHARLES R. CUSHING, PH.D.          245

1    been very low. The water in the canal would have been
2    very high, and, therefore, in its in-rush, it would
3    have surely grounded as it entered the Lower Ninth
4    Ward. There was no damage on the barge that indicated
5    that such grounding took place, and it would have been
6    also blown well inland if it had ridden in on that
7    deluge.
8        Q. Wasn't the barge delayed by having to scrape
9    over the rebar?
10       MR. RAFFMAN: Objection.
11       Go ahead.
12       THE WITNESS: First of all, it presumes -- if
13   it's in connection with your hypothetical that the
14   barge caused the floodwall failure, it presumes that
15   the floodwall failure originated at the south end of
16   the south breach, which it could not have. The -- the
17   initiation was obviously close to North Johnson
18   Street, further to the north end of the south breach.
19       If it had been at the south end of the south
20   breach, hypothetically, as you are asking me, the
21   rebar would not have restrained or held the barge
22   back. The barge would have moved in with the flood
23   water and just bent -- bent those rebars over. So
24   that is not a scenario that is in any way realistic.

CHARLES R. CUSHING, PH.D.                246

BY MR. SEYMOUR:

Q. Hypothetically, couldn't the barge have reached the south breach by making a hole large enough to cause the failure of a large section of wall but not have moved over until the large section of wall had failed?

MR. RAFFMAN: Objection.

THE WITNESS: I don't believe this is true, and I think the evidence on the -- both on the fallen floodwall and rebar, as well as the bottom damage and scratches on the bottom of the bar indicated the angle at which the barge entered the Lower Ninth Ward, and it wouldn't have, if it had originated the -- the damage at the southern end of the south wall and the end of the barge that had entered the Lower Ninth Ward first would have had the scratches on it.

I think, as Mr. Pazos theorizes, and I think he has it backwards, and I think the barge clearly shows that the scratches were on the trailing end of the barge as it entered, and only on the one-third end of it, the forward end had obviously entered the Lower Ninth Ward at higher water levels obliquely and grounded on the rebar and the floodwall cap on the already fallen floodwall after the water levels were

CHARLES R. CUSHING, PH.D.                247

already high.

BY MR. SEYMOUR:

Q. Are you saying that the barge struck the cap and that would have delayed the barge and the barge didn't finish moving into the Lower Ninth Ward until after a great deal of water had come in?

A. No, sir, not at all. I'm saying that after the water levels had risen in the Lower Ninth Ward sufficiently for the barge to float the forward end of it into the Lower Ninth Ward, it came obliquely in contact with the southern end of the southern cap -- southern end of the southern breach. It, at that point, struck a portion of a cap that was already on the partially failed wall, knocked it over and passed over the rebar in one motion, scratching the remaining, trailing one-third of the barge.

Q. Now, a number of witnesses say that they testified that they heard scraping sounds for several moments. Hypothetically, assume that is the barge. If the barge were scraping against the floodwall, that puts a lot of additional load on the floodwall, doesn't it?

MR. RAFFMAN: Objection.

THE WITNESS: Could you tell me what part of the

CHARLES R. CUSHING, PH.D.                248

floodwall you're referring to?

BY MR. SEYMOUR:

Q. Any part of the floodwall that the barge is scraping against has got a lot of load because of the barge scraping against it.

A. Okay. The only part of the floodwall that I know that the barge scraped against was the cap at the southern end of the southern breach where it scraped across the cap as it entered and causes the scratch marks on the bottom of the barge. That scraping would have been under water, and I don't think it would have been a sound that would have been audible from any distance, if at all.

Q. Referring to the eyewitness testimony that prior to the south breach, prior to the arrival of all that water in the Lower Ninth Ward, they heard scraping for five minutes or so.

A. Okay.

Q. So if the barge is scraping along the yet unbreached area of the south breach, wouldn't that produce a lot of additional load on the wall?

MR. RAFFMAN: Objection.

THE WITNESS: That's assuming that the scraping sound was in fact coming from the barge and not coming

CHARLES R. CUSHING, PH.D.                249

from many of the other sources that I earlier testified to.

BY MR. SEYMOUR:

Q. You testified to cars tumbling, to boats floating and things that don't have a connection with a large in-rush of water immediately following the scraping sound. Now, we've got eyewitnesses who said five minutes of scraping, and then the water comes in. I'm asking you hypothetically assume that they're testifying accurately and that it was the barge scraping against the floodwall, and it's a simple question. Would the barge scraping against the floodwall produce a large additional load on the floodwall?

A. Well, I first have to respond to your preamble where you mischaracterized my testimony -- previous testimony. What I said earlier, it wasn't -- the scraping sounds, the possible other scraping sounds, you just characterized them as boats tumbling over or cars floating by. That's not what I said.

Q. Boats floating.

A. Boats floating.

Q. Cars tumbling.

A. Yeah. The boats floating would have caused

63 (Pages 246 to 249)

CHARLES R. CUSHING, PH.D.        250

scraping sounds, and cars tumbling would sound like
cars tumbling.  What I said was there were structures
that were being floated off their slabs.  I said there
were structures that would be disintegrating.  I said
that there were sheds and other small structures that
were moving.  I said that there were boats on trailers
and cars that were moving along the streets that would
have all caused scraping sounds.

So as of the preamble to your question, I
just wanted to clarify that point.  That's what I
think I testified to earlier.

Q.  Would you please answer my question now?

A.  Okay.  Now, coming to the question you posed,
would a barge moving along -- hypothetically, would a
barge moving along the floodwall create a scraping
sound.

Q.  Scraping against the flood -- no.  My
question is would a barge scraping against the
floodwall create a large, additional load on the
floodwall?

A.  No, it wouldn't create a large, additional
load on the floodwall.  It depends, first of all, on
the height of the wall of water, No. 1.  It depends
upon the direction of the wind, and if the barge was

CHARLES R. CUSHING, PH.D.        251

scraping along the floodwall, it would presume that
the wind was moving in a line parallel to the
floodwall, in which case there would be no component
of the wind that would press the barge against the
floodwall.  So it wouldn't produce a large load on the
floodwall.

Q.  Let me make a tiny modification to the
question I've asked so many times.  Assume that the
wind did exert a little pressure on the barge to move
in the direction of the floodwall, scraping along the
floodwall.  It lasts for five minutes or more,
according to the eyewitness or ear witness testimony.
That's the barge, and it's in contact with the
floodwall, and it's scraping against the floodwall.
So there's got to be some force there, doesn't there?

A.  In order for it to scrape?

Q.  Yes.

A.  Yes.

Q.  Would that impose a large, additional load on
the floodwall?

A.  No, by your very definition.  You said let's
assume there's a small component of the wind that's
pressing against it.  Then it produces a very small
load, and also, the barge, in such an attitude,

CHARLES R. CUSHING, PH.D.        252

scrapes -- this hypothetical of the barge scraping
along the wall, by the way, of which there was no
evidence on the wall itself or on the barge of such --
such scraping, the load would have been distributed
over the entire length of the barge if the barge was
laying against the floodwall.

And so this slight load would be distributed
over 200 foot of the length of the floodwall.  The
floodwall is far stronger than any such load that
could have been imposed by the barge under those
conditions.

Q.  And if the barge was scraping obliquely so
that a point of it is scraping along the floodwall,
all the force of the barge, all the momentum of the
barge is going to be concentrated at particular spots
on the floodwall; isn't that true?

A.  No, because by the hypothetical that you've
set up here, the force of the wind that would have
positioned the barge along the wall that would have
imposed any load on the wall would have turned the
barge to a flat position against the wall.  That
component in the direction of the wind, which is
necessary for your hypothetical, would have caused the
barge to come parallel to the wall.

CHARLES R. CUSHING, PH.D.        253

Q.  Even a listing barge?

A.  Sorry?

Q.  Even a listing barge?

A.  Well, a listing barge, depending on which way
it's listing -- if the barge is listing towards the
wall, then -- well, it doesn't matter.  Either way,
it's 200 feet of load against the wall, which is very
slight.

Q.  And let's remove the part of the hypothetical
that gives you pause, where I said, "a slight wind
force."  Dr. Cushing, I'm not an engineer, and I have
to apologize if this seems very complicated to you
where it seems very simple in my mind, but was this
wall in a weakened condition?

A.  The wall?  I believe the wall was a weak
wall, yes.

Q.  And isn't it true that the wall falls when
the last necessary amount of pressure fails, when the
last necessary amount of pressure is put against the
wall?

A.  No.  I believe that the -- that the amount of
force that you're talking about in this hypothetical
is so slight that it's a little bit like a flea
landing on the end of a trapeze artists's bar.

CHARLES R. CUSHING, PH.D.          254

1
2    Q.  Is there any amount of force that you can see
3    toppling the wall or making the wall lean so that
4    water starts to come in or that weakens the wall so
5    that it then fails?
6        MR. RAFFMAN:  Objection.  That's a vague
7    question.
8        THE WITNESS:  I'm not sure what all of the
9    hypotheticals are in your question.
10   BY MR. SEYMOUR:
11       Q.  Do you believe that there is any amount of
12   force that the barge could have exerted against the
13   wall that could have contributed to the failure of the
14   wall, whether failure is defined as leaning, as you
15   said before, or toppling?
16       A.  Not to the wall itself.  I think it requires
17   more -- well, it's just not possible for a barge of
18   this size and -- and weight and mass under the wind
19   conditions, even under the worst possible wind
20   conditions, even under the worst possible attitude,
21   under the highest speed that that barge could have
22   been moving in this wind condition to have damaged or
23   toppled this floodwall.  It's just not possible.
24       MR. SEYMOUR:  Okay.  I believe we have to take a
25   break for the tape.

CHARLES R. CUSHING, PH.D.          255

1
2        THE VIDEOGRAPHER:  Going off the record at
3    17:59:15.
4        (A recess was taken from 5:59 p.m.
5        to 6:11 p.m.)
6        THE VIDEOGRAPHER:  Back on record at 18:11:02.
7    BY MR. SEYMOUR:
8        Q.  Please turn to Page 86 of your report,
9    Figure 57.
10       A.  Yes, sir.
11       Q.  How did you determine the placement of the
12   arrows to indicate current directions on this chart?
13       A.  These were taken from Dr. Daggett's report.
14       Q.  There is a graphical depiction of the barge
15   over on the upper left-hand corner.  Is it correct
16   that the first skewed image of the barge is on top of
17   the original moored image of the barge, and it looks
18   as if this has got one end free and one end still
19   moored?
20       A.  Yes.  We had to make an assumption there.  We
21   have no idea which -- in what manner that barge freed
22   itself from -- from the moored position, but we wanted
23   to take a conservative view to it.  So we selected
24   this configuration to be the latest possible time that
25   the barge could clear the Namasco gantry.

CHARLES R. CUSHING, PH.D.          256

1
2        Q.  It would be -- just to understand, you have
3    the gray structure with something jetting out over the
4    water.  That's the Namasco gantry?
5        A.  Yes, sir.
6        Q.  And is it 9:00 a.m. is the earliest time you
7    think the barge could have cleared the gantry?
8        A.  Yes, sir.
9        Q.  And then how much longer would it be before
10   it could get into the Lower Ninth Ward based upon the
11   analysis that led into this graphic?
12       A.  Well, one would have to estimate that.  We
13   had a rough estimate.  We had a calculation on the
14   speed of the barge, and I believe that was on the
15   order of seven feet per second earlier.  The distance
16   from the Namasco, the corner of that Galvis Street
17   wharf, which shows the barge clearing it to the Lower
18   Ninth Ward, I don't have that distance offhand.
19       Q.  Are these various images of the barge
20   separated by an equal number of minutes?
21       A.  No.  Not necessarily, no.
22       Q.  Is there any particular information given by
23   the number of images of the barge that there are here?
24       A.  No.  It was just a sufficient number of
25   images to show you the path of the barge and the

CHARLES R. CUSHING, PH.D.          257

1
2    attitude of the barge as it's moving.
3        Q.  And in this analysis, the barge is always
4    moving sideways; is that correct?
5        A.  Yes, sir.  Which is the natural -- as I
6    explained earlier, the natural angle of repose of a
7    symmetric floating unit.
8        Q.  Would this look any different if the barge
9    were listing substantially?  I think you mentioned a
10   30 degree list as being substantial, in your view?
11       A.  No, sir.
12       Q.  If you'd turn to Page 90 and 91, there's --
13   on Page 90 in Figure 60, there's damage at the south
14   end of the breach looking west.  There's an overturned
15   floodwall panel identified as "(C)."  Do you see that?
16       A.  Yes, sir.
17       Q.  And at the top of Page 91, the end of the
18   first full paragraph, there's a sentence that says,
19   "In other words, the wall was already down before the
20   barge first made contact."  Is that the same wall that
21   was identified as the number (C) or is it a different
22   wall?
23       A.  C is a portion of the wall, but the entire
24   wall from -- from (C) all the way along to the north
25   end of the north -- north end of the south breach.

CHARLES R. CUSHING, PH.D.        258

1
2    Q. In the graphic in Figure 61, is the
3  floodwall -- does it appear in this graphic, the
4  floodwall that's marked as (C)?
5    A. I'm sorry. Would you repeat?
6    Q. You got a floodwall marked as (C) on Page 90.
7    A. Yes, sir.
8    Q. And it's right next to what's described as
9  the "Point of Initial Barge Contact" at (E). On
10 Figure 61 on Page 91, do (C) or (E) appear?
11   A. The picture on the page -- the Figure 61 on
12 Page 91 is a schematic. It's a graphic. It's not
13 meant to be a representation of the fallen floodwall.
14 What you're looking at in Figure 61 is an explanation
15 of how impact on the cap could cause the cap to fail
16 and -- and tumble. The lower portion below the
17 construction joint, the more rectangular portion of
18 the concrete is what's referred to as the "Overturned
19 Floodwall Panel (C)."
20   Q. On Page 92 in the second full paragraph,
21 about six, seven lines down, there's a sentence that
22 begins, "The barge rode up on this floodwall panel
23 tracking off the top most six inches of concrete." In
24 which direction was the barge moving when it did that?
25   A. When the barge rode up on the floodwall

CHARLES R. CUSHING, PH.D.        259

1
2  panel, it was moving obliquely over the floodwall. In
3  other words, back on the earlier description of the
4  path of the barge on Page 86 in Figure 57, you can see
5  that the barge is approaching the floodwall at an
6  oblique angle. The -- the leading edge -- and I
7  hesitate to call it the stern, but it was going stern
8  first into the Lower Ninth Ward, what we call the
9  stern was entering the Lower Ninth Ward without
10 contacting the already fallen floodwall, and it wasn't
11 until about two-thirds of it had passed over the
12 floodwall and continued to move south, to the south
13 end of the south breach that it comes into contact
14 with the cap of the fallen -- well, adjacent to the
15 fallen floodwalls.
16   At that point, it knocks the cap off. It
17 knocks the concrete on the cap off, which tumbles into
18 a portion of the already fallen floodwall, and in
19 doing so then passes over the rebar, which is sticking
20 up and flattens the rebar and then creates the
21 scratches on the bottom of the barge along the
22 trailing one-third of the barge.
23   Q. Could you turn to Page 166. I have a -- a
24 set of questions relating to your conclusions, which
25 will lead us to our conclusion.

CHARLES R. CUSHING, PH.D.        260

1
2    A. So in conclusion -- yes, sir.
3    Q. I don't want to repeat things that we've
4  already covered before that you think are adequately
5  covered before, and this is a particular question, but
6  is there anything that we have not talked about today
7  that you think underlies your Conclusion 1?
8      (The witness reviewed the document.)
9    THE WITNESS: No. I think it's pretty clear
10 that -- and Conclusion 1 is very important to my --
11 it's not the only reason why the barge did not cause
12 the breach in the floodwall, but it's certainly one of
13 the most important reasons and the easiest reason to
14 understand, that the wind was dominant on the barge,
15 and the wind was blowing from an easterly to a
16 westerly side up until and before -- until after the
17 floodwall had failed. It was only after the failure
18 of the floodwall that the barge -- the wind shifted
19 and permitted the barge to cross and enter the Lower
20 Ninth Ward.
21 BY MR. SEYMOUR:
22   Q. Do you see at the end of Conclusion 1, "Winds
23 at the IHNC did not blow to the north until after the
24 storm had passed New Orleans." Do you mean after the
25 eye had passed north of New Orleans?

CHARLES R. CUSHING, PH.D.        261

1
2    A. Yes. Until well after the eye in the
3  hurricane had passed New Orleans, not just the eye but
4  the -- the whole disturbance.
5    Q. On Page 167, is there anything supporting
6  Conclusion 2 that we've not already talked about?
7    MR. RAFFMAN: Objection.
8      (The witness reviewed the document.)
9    THE WITNESS: I think we've discussed the issues
10 surrounding Conclusion 2.
11 BY MR. SEYMOUR:
12   Q. Is there anything supporting Conclusion 3
13 that we've not already talked about?
14   MR. RAFFMAN: Same objection.
15   THE WITNESS: I think we didn't get it -- in
16 Conclusion 3, we didn't get into the magnitude of
17 those currents, and the magnitude is shown on the
18 scale on the extreme left, which indicates how weak
19 those currents were and why the wind would have been
20 dominant and control the motion of the barge and why
21 they -- the currents would have had a negligible
22 effect.
23 BY MR. SEYMOUR:
24   Q. How do you interpret the scale on the left?
25   A. These are in, I believe, feet per second, and

CHARLES R. CUSHING, PH.D.          262

1 we're looking at -- the whole scale is green.  If you
2 look at a larger scale, it goes all the way from red
3 to yellow, red to orange to yellow and blue and so
4 forth down to the weak level, and what this is
5 indicating is that the -- the strength of the current
6 is negligible.  If you refer to Dr. Daggett's report
7 in -- in Appendix B, he shows what that scale looks
8 like when you have really high flow, such as after a
9 breach occurs and the water is flooding into the Lower
10 Ninth Ward, such as in Figures -- in Figures 25, 26,
11 27 and 28 and 29.
12        There you see the flow rates of 9 as much as
13 9, 13 or even 14, nearly 15 feet per second.
14    Q.  Okay.  We've talked about the next three
15 entries.  Is there anything that we have not talked
16 about that supports your Conclusions 4 through 6?
17    MR. RAFFMAN:  Same objection.
18    THE WITNESS:  Well, we didn't discuss -- under 4,
19 we didn't discuss what actions waves could have on
20 a -- on a barge or a vessel and in detail why the
21 waves would not have had an effect on the motion of
22 the barge and the movement of the barge as it crossed
23 the -- as -- as it crossed the slip later in the
24 morning.  I think all we said was it was -- as a

CHARLES R. CUSHING, PH.D.          263

1 statement, that wave action couldn't do it, but we
2 didn't get into the details of why.
3        Conclusion 5, about the gantry shed trapping
4 the barge and the fact that there was no damage
5 indicating -- indicated on either the barge or the
6 shed, which indicated there was no such collision,
7 which indicated that the barge couldn't have left
8 until after 9:00 o'clock, I think we discussed that in
9 detail.
10 BY MR. SEYMOUR:
11    Q.  We don't need to repeat.  If there's
12 something that's new, you can mention that.  We don't
13 need to repeat anything that's already been covered.
14 I just want to find out if there's anything that
15 supports these conclusions that we haven't already
16 talked about.
17    A.  I was walking my way through it just to make
18 sure that -- if there were any issues.
19        (The witness reviewed a document.)
20    THE WITNESS:  We did not discuss in general -- in
21 detail, rather, the fact that the barge would have
22 moved inland.  I think, again, it was just a simple
23 statement that was made, but it is clear by the -- by
24 the damage and the debris that the barge would have

CHARLES R. CUSHING, PH.D.          264

1 been carried well inland.  If it had been carried well
2 inland, it couldn't have ended up in the final resting
3 position where it was on Jourdan Avenue at the south
4 end of the south breach.
5 BY MR. SEYMOUR:
6    Q.  By the way, is there any scientific treatise
7 or scholarly article that supports your view that the
8 barge would have toppled and grounded if there had not
9 already been a great deal of water in the Lower Ninth
10 Ward when the barge went across the wall?
11    A.  That's my opinion.  Based on the attitude
12 that the barge would have had to have assumed when you
13 have a differential in height between the water level
14 high up and the land at the base of the toe of the --
15 the floodwall and berm.
16    Q.  I understand that's your opinion.  I want to
17 know if there's a scholarly article or treatise
18 supporting that.
19    A.  Well, it's embedded in -- in the art that I
20 practice that says if a barge -- a barge has to be --
21 or any vessel or floating object has to be supported
22 by the buoyant forces under it and if there are
23 buoyant forces at the end of the barge that's sitting
24 in the in-- -- Inner Harbor Navigation Canal, and there

CHARLES R. CUSHING, PH.D.          265

1 are no buoyant forces on the inshore side where the
2 water levels are not yet developed, then the barge
3 will tip, and it will tip over a very short distance.
4        So that's a scientific fact, that the barge
5 will tip into where it's supported, and just as a ship
6 goes off the end of a launching way, and it pivots and
7 tips when it loses the support at one end from the
8 launching way, just as the same thing would happen
9 here with the barge, except that the barge, with its
10 shallow draft, would have hit the -- hit the ground
11 very, very hard and there would have been evidence on
12 the barge that the barge had grounded at the edge that
13 it entered the Lower Ninth Ward.  There was no such
14 evidence when I inspected the barge.
15    Q.  On Page 171, Figure 116, "The barge in its
16 post-Katrina resting place," doesn't it appear to you
17 that there are a collection of houses and
18 structures -- or former houses and structures that
19 acted as a break on the barge at that point?
20    A.  I believe that's true, yes.  In fact, I think
21 it's indicative of the fact that the flood -- the
22 flood waters were moving at a very low current or rate
23 of flow because if it had been immediately after the
24 failure of the floodwall, this barge would have been

CHARLES R. CUSHING, PH.D.        266

1  moving at high speed and would have wiped these houses
2  out.  But if it's moving at a slow speed and low
3  speed, then the houses get crushed, but they don't get
4  completely pushed away and the barge comes to a halt.
5        Q.  On Figure 120, on Page 174, you have an image
6  of the barge moving across the floodwall.  In this
7  analysis, what was the position of the barge just
8  before it passed the floodwall?  Was it still pointed
9  in the same direction, or did it swivel?
10       A.  It swivels slightly.  As I said, it entered
11  obliquely with the leading edge, which is the stern,
12  crossing the already floodwall to the -- to the right
13  or the former position of the floodwall to the right
14  of where it is in this picture until it grounds itself
15  against the ends of the already fallen floodwall at
16  the south end of the south breach.
17       Q.  And in this picture -- which is the stern of
18  the barge?  Is it the left or the right end of the
19  actual barge in the photograph?
20       A.  The barge entered -- the upper position of
21  the whitish image shows the barge entering the Lower
22  Ninth Ward stern first.  The bowel is at the -- still
23  in the -- out in the canal.  Once the barge enters the
24  Lower Ninth Ward and crosses Jourdan Avenue, then the
25

CHARLES R. CUSHING, PH.D.        267

1  flood waters that were flowing into the Lower Ninth
2  Ward were not only moving inland, but they were
3  curving around the corner and heading south.
4        It was once the barge entered, it was caught
5  by those south moving waters that turned the barge to
6  its position nearly parallel to the flood water so
7  that the bow, which entered the Lower Ninth Ward last,
8  ended up at the south end or to the extreme left in
9  the photograph.
10       Q.  So the barge had to have swiveled once it got
11  inside the Lower Ninth Ward?
12       A.  It rotated due to the current.
13       MR. SEYMOUR:  No further questions.
14       THE WITNESS:  Thank you.
15       MR. RAFFMAN:  I have maybe three, four questions.
16
17             EXAMINATION
18  BY MR. RAFFMAN:
19       Q.  Dr. Cushing, earlier in the deposition, you
20  testified that -- you were asked questions about waves
21  and wave direction and wave splashing, and I believe
22  you testified that before 7:00 a.m., waves do not go
23  toward the east wall of the IHNC; correct?
24       A.  That's correct.
25

CHARLES R. CUSHING, PH.D.        268

1        Q.  And you said that waves, because they're not
2  moving -- well, you said that waves are not splashing
3  over the east wall until after 7:00 a.m. -- right? --
4  as a result of the waves not being directed to the
5  wall?
6        A.  Well, I believe I was answering a
7  hypothetical question --
8        Q.  All right.
9        A.  -- that waves would be moving more in a
10  southerly -- sorry, southerly direction after
11  7:00 a.m., but obviously, if they -- if the height of
12  the water in the canal was as high as the floodwall,
13  wherever that was, then it was overtopping the
14  floodwall at an earlier date than any waves that would
15  be present would be possibly overtopping the wall.
16       Q.  So just to be clear, your testimony earlier
17  today did not discuss -- it's late.
18       MR. SEYMOUR:  Objection.
19       MR. RAFFMAN:  Thank you.
20       Q.  To be clear, the testimony you gave about
21  waves and wave splash does not refer or relate to the
22  potential time of surge overtopping at any location of
23  the wall; is that correct?
24       A.  That's correct.
25

CHARLES R. CUSHING, PH.D.        269

1        MR. RAFFMAN:  All right.  That's my last
2  question.
3        MR. SEYMOUR:  You're a free man.
4        THE WITNESS:  Thank you very much.
5        THE VIDEOGRAPHER:  We're going off the record at
6  18:36:15.
7
8             (Witness excused.)
9                  - - -
10       (At 6:36 p.m., proceedings were concluded.)
11                  - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CHARLES R. CUSHING, PH.D.          270

CERTIFICATE

- - -

I hereby certify that the witness was duly sworn
and that the deposition is a true record, to the best
of my ability, of the testimony given by the witness.

_____

NANCY J. MARTIN, RPR, CSR

(The foregoing certification of this transcript
does not apply to any reproduction of the same by any
means, unless under the direct control and/or
supervision of the certifying reporter.)

- - -

---

CHARLES R. CUSHING, PH.D.          272

- - - - - - - -

E R R A T A

- - - - - - - -

| PAGE | LINE | CHANGE |
|------|------|--------|
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |

DATE:

---

CHARLES R. CUSHING, PH.D.          271

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully
and make any necessary corrections. You should state
the reason in the sheet for any corrections that are
made.

After doing so, please sign the errata sheet and
date it.

You are signing same subject to the changes you
have noted on the errata sheet, which will be attached
to your deposition.

It is imperative that you return the original
errata sheet to the deposing attorney within thirty
(30) days of receipt of the deposition transcript by
you.  If you fail to do so, the deposition transcript
may be deemed to be accurate and may be used in court.

---

CHARLES R. CUSHING, PH.D.          273

ACKNOWLEDGMENT OF DEPONENT

I, _ _ _ _ _ _ _ _ _ _ _ _, do hereby
certify that I have read the foregoing
pages _ _ _ to _ _ _and that the same is a
correct transcription of the answers given
by me to the questions therein propounded,
except for the corrections or changes in
form or substance, if any, noted in the
attached Errata Sheet.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

DATE                SIGNATURE

Subscribed and sworn to before me this
_ _ _ _ _ _ day of _ _ _ _ _ _ _ _ _ _,
200_.

My commission expires:_ _ _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _

Notary Public

**A**

**abbreviation** 88:17
**ability** 10:10 270:6
**ABIR** 3:3
**able** 9:22 24:10 48:4 59:8
  59:14 68:5 70:5 79:9
  135:6,23 136:5 153:12
  194:14 205:20,24,25
  206:8,20 207:4 209:8
  223:20 224:16 237:11
**Ably** 88:15
**aboard** 72:8
**abrupt** 77:22 78:10
**absence** 198:6
**absolutely** 50:18 155:10
**absorbed** 242:19
**abutting** 222:16
**academic** 71:4
**Academy** 30:7 35:18
  71:11 72:10
**accept** 100:17 180:6
  186:13 204:19
**access** 173:20
**accident** 173:24
**accompany** 46:10 55:4
**account** 103:4,11 104:12
  165:9 240:10
**accounted** 193:23
**accounts** 154:17
**accuracy** 52:15,24 53:16
  58:15 60:12,15 155:24
  174:3 212:25
**accurate** 9:7,18 11:4
  50:8 137:18 157:6,8,10
  158:2,4 159:5 160:24
  173:20 176:12 207:15
  207:23 271:16
**accurately** 10:8 155:6,7
  155:12 156:24,25 157:3
  157:11,12,18 173:16
  207:20 249:11
**ACKNOWLEDGME...**
  273:2
**act** 239:18
**acted** 123:13 239:17
  265:20
**action** 1:5 263:2

**actions** 262:20
**actual** 119:6 125:22
  126:13,20 139:14
  266:20
**Adams** 164:20 166:6
  167:10,13,15,18 168:2
  168:9,13,15 169:2,5,12
  171:13 172:11
**add** 62:8 85:21 182:25
**added** 120:11
**addition** 19:20 85:23
  144:12
**additional** 18:21 19:20
  149:6 247:22 248:22
  249:14 250:20,22
  251:20
**Additionally** 86:6
**address** 7:20,22
**addresses** 66:17
**adequately** 260:4
**adjacent** 23:6,17 76:21
  85:8 107:14 147:16
  148:21 195:9 196:11,25
  206:18 209:6 233:25
  234:19 237:7 259:14
**adjusting** 143:14
**adjustment** 143:17
  144:21
**administration** 30:21
  115:15
**adrift** 221:6 239:7,8
**adversely** 172:25
**advised** 14:12
**advisory** 30:19
**aerial** 60:4,6,13 62:16
  63:4,10,24 230:8 231:8
**aerials** 60:15
**AeroData** 60:16 63:24
  67:19
**aerology** 72:8,23
**affect** 155:24 173:12
**aft** 124:7
**afterward** 173:6 178:6
**agencies** 30:20
**agenda** 31:6
**aggregate** 113:20
**agitated** 134:13

**ago** 12:18 44:11,25 71:2
  71:5 91:5 140:18
  210:15
**agree** 127:17 162:25
  163:3 172:24 218:8
**agreed** 6:3
**agrees** 156:8
**ahead** 66:10 70:8 126:2
  130:5 131:16 136:11
  140:20 196:23 198:17
  200:16 245:12
**air** 71:12,20,22 72:13,13
  73:10,10,20 75:7,11,15
  75:18 80:16,17 81:4,14
  81:17,22,25 82:4,7,10
  82:12,18,19,21 83:10
  83:13,15,17,17,19,22
  83:22,24 84:4,9,11,14
  84:21 85:3,7,9,21 86:2
  86:3,5,9,11,14,15,18,19
  86:20 106:13,18,20
  107:2,2,3,4,8,14,20,23
  108:10,14 109:2,4,8,11
  109:12,16 151:18 205:9
  205:16 231:25
**Airport** 112:16 127:2,23
  128:9 129:7,10,21
  130:2 189:15,22
**Alaska** 33:14
**alcohol** 10:6,11
**Aldock** 2:7 7:5
**allision** 33:14 37:9 38:6
**alongside** 209:16
**aluminum** 194:10
**ambiguity** 9:3
**ambiguous** 8:21
**America** 2:2 3:15 6:13
  7:3,6
**American** 139:24
**amount** 66:13 67:4 76:13
  84:23 102:5,6 110:9
  120:19 140:7 171:8
  242:12,15 253:19,20,22
  254:2,11
**amounts** 29:10 203:2
  211:13
**analog** 51:24

**analysis** 4:12,13 125:14
  126:6 129:8 154:13
  163:13 173:24 174:5
  187:3 227:2 256:11
  257:3 266:8
**analyze** 11:6
**analyzing** 11:8
**anchor** 195:5
**and/or** 112:13 270:19
**anemometer** 95:24 96:2
  96:23 97:20 112:5,16
  115:9 118:24 127:20,22
  127:25,25 128:3,10
  130:3,6 143:14 189:21
  190:5
**anemometers** 99:4,5
  112:3,13,19,21,24,25
  113:4,13 115:7 127:3
**Angeles** 3:5
**angle** 62:17 81:5,6,19,21
  81:24 82:20,22,23
  120:15 122:25,25 123:2
  123:5,8,10,10,17,18
  124:9,18 209:21 210:2
  210:2,7,8,16,16 238:22
  240:19 246:12 257:6
  259:6
**angles** 82:4 83:11 214:4
  214:5 238:18
**ankle** 164:25
**answer** 5:2 8:23,25 9:9
  9:12,16 10:7,10 27:22
  29:19 30:13 40:2 41:10
  43:4 57:14 66:8 68:25
  71:23 74:12 76:10
  85:21 94:19 98:8,25
  111:6,11,17 113:25
  114:21 117:16 118:9,11
  118:15,16 129:16
  133:24 135:9,14 138:11
  139:2 142:13 145:22
  147:4 166:25 181:5
  184:12,13 186:2,2,4
  191:24 202:22,24
  203:14,19,23,25 230:18
  231:13 235:24 250:13
**answered** 70:7 74:25

75:9 95:17 102:17
144:20 167:2
**answering** 216:18
229:11 268:7
**answers** 9:7 61:17
216:22 273:7
**anybody** 84:2 186:17
**apart** 22:14 32:8 73:23
74:5
**apologize** 61:13 253:13
**apparently** 111:14
175:23
**appear** 19:21 79:3 95:19
153:11 258:3,10 265:17
**appeared** 199:10 203:3
211:14 212:3 233:10
234:2
**appears** 111:17 222:7
235:2
**appendices** 19:3,8
**appendix** 18:14,17,20
20:7 21:6 34:5,11,20
40:5 43:25 44:8 45:12
47:11,17,20 52:10 63:2
63:5,13 64:9,25 65:19
66:12 78:13,14,19
86:24 87:4 96:12,13
100:18 101:2 125:3,4
128:15 142:6 153:25
157:23 174:5 185:13
186:15,22 190:16 212:8
262:8
**applicable** 143:13
**applies** 78:11,11 176:23
220:8,10 221:4
**apply** 220:17 221:2,5
270:18
**applying** 100:3,24
**appreciate** 56:2 216:4
**approach** 106:20
**approached** 230:23
**approaching** 259:5
**appropriate** 32:22
**Approx** 170:23
**approximate** 27:5 79:7,8
105:15 202:4
**approximately** 14:23,24

16:17 17:9,11 26:20
27:6 37:15,18 38:3
44:11 79:20 92:3 93:19
146:18 170:19 230:6
**approximation** 38:2
171:2
**architect** 35:21,24 41:6
194:7
**architects** 35:22 41:24
59:22 219:7
**architecture** 4:18,24
36:15 42:3 78:8 130:19
130:25 219:6,16 220:21
**area** 33:8,9 36:13 39:14
39:15 58:13 67:15,16
67:17 112:14 120:22,24
121:2 143:9 144:15
149:16 168:17 172:3
178:17 222:22 226:18
237:10,12 238:4 248:21
**areas** 41:24 42:17 59:20
59:21,23 103:18 134:6
159:20
**argue** 186:15
**argued** 182:20 186:25
**arguing** 185:4 187:4
**argument** 94:18
**Army** 25:12,22 26:10
39:13 43:12 50:10
**arrival** 178:10 248:16
**arrive** 125:19 229:19
**arrived** 144:13
**arrow** 137:12,13
**arrows** 137:3,7,8 255:12
**art** 264:20
**article** 52:22 118:5 142:9
144:7,17 220:14 264:8
264:18
**articles** 22:18
**artists's** 253:25
**ascribed** 182:14
**ASE** 139:24
**ashore** 74:15,15
**aside** 9:20
**asked** 10:19 14:10 18:25
24:13,15 46:9 60:22
70:7 83:21,21 89:9,11

102:17 113:10 115:8
118:13 144:20 181:4
188:2 202:23 216:18
219:13 227:8 228:4
234:11 236:3 251:9
267:21
**asking** 10:18 23:7,9 24:7
24:9 42:6 94:3 97:12
110:13,14,15,18 117:6
118:16 146:11,21,25
170:12,16 204:13
228:14,20,21,24 245:21
249:10
**ASOS** 189:7
**aspects** 36:18
**Assembly** 88:18,19
**assess** 66:22
**assistance** 14:11 223:21
226:12
**assisted** 223:14,16,17,18
**associated** 32:19 139:19
**ASSOCIATES** 3:17
**Associations** 65:4
**assume** 9:2,4 77:9 85:25
106:24 119:20 120:9
122:25 124:4 133:19,21
142:22 146:11,21,25
147:3 169:23 201:7
209:24 247:20 249:10
251:9,23
**assumed** 43:25 97:21,22
98:24 101:11 119:24
128:20 213:10 264:13
**assumes** 123:19 124:7
138:25 184:21 195:25
**assuming** 106:23 120:10
124:15 181:12 202:17
238:14 248:24
**assumption** 150:24
181:13 255:20
**assumptions** 139:17
151:11 158:22 178:23
179:11,20 180:4 181:11
185:6,15,22
**asymmetric** 73:14,15
**as-built** 224:12
**atmosphere** 142:20

144:22,23
**Atmospheric** 115:15
**attached** 26:7 219:17
271:10 273:11
**attachments** 26:12,13
**attempt** 166:6
**attempted** 11:5
**attempting** 128:16
**attention** 198:10
**attest** 223:8
**attic** 167:6 169:16,19
170:7 174:8 175:9,10
**attitude** 122:20 123:12
123:12,19,20 124:5,8
251:25 254:20 257:2
264:12
**attitudes** 12:25
**attorney** 2:6 14:10
271:13
**attorneys** 6:20
**audible** 248:13
**audio** 9:24
**auger** 222:7,9 223:4
**augers** 221:24 222:3,4,5
223:6,9
**August** 1:13 4:21 6:11
80:5 87:9 134:11 135:5
145:7 188:5 238:8
**Austin** 87:13
**automated** 189:7,24
190:3
**automobiles** 177:20
**available** 14:11 184:10
**Ave** 159:11
**Avenue** 1:16 2:3 3:9
15:12 16:17,18,19
27:14,15 68:16,17,25
69:20,23 78:24 105:17
105:17 146:17 154:19
159:25 161:15,16 172:8
196:16,17 227:14
230:22 233:24 236:8,14
236:15,16 264:4 266:25
**average** 96:20,22 97:7
98:10,13,18,23 99:6,16
99:25 100:4,8,9,11,12
100:15,18,19 101:10,12

101:16 102:3 103:22
104:8 110:8 118:6
**averaged** 109:19 128:23
**averages** 101:19,19,20
102:2 103:25
**averaging** 100:5 109:20
109:21 110:3,21 111:14
111:19,20 114:11
128:24
**avoided** 233:10 243:11
**aware** 73:24 74:6,8,21
75:6,21 85:20 142:9
144:6,16 197:13 199:15
225:12
**axis** 122:16
**A-7** 63:23
**a.m** 1:16 45:7,8 83:4,5
88:21 90:25 91:19
94:24 95:12 96:17,17
96:18 127:5 134:11
137:20 138:19 141:13
164:9,23 165:5 171:4
171:16,18 179:6 199:16
200:2,3,6,10 202:10
205:17,20,23 256:6
267:23 268:4,12

**B**

**B** 4:8 34:11 40:6 43:25
45:12 63:2,5 65:19
66:12 70:6 78:13,14
88:3 125:23 126:17
157:19 189:4 262:8
**bachelor's** 40:18
**back** 14:13,14 16:11
17:13 18:12 20:17
21:15 39:4 41:2 47:24
48:2 72:23 82:21,24
83:6 97:16 99:11 101:6
110:9,10 119:14 147:7
153:4 163:2 174:19
181:14 187:24 188:23
205:7 218:23 221:19
229:3,5 241:6,23
242:20 245:23 255:6
259:3
**background** 32:21 41:9

172:9
**backs** 20:19
**backwards** 246:19
**bang** 165:8
**bank** 66:18 67:2 179:12
179:13 180:20 222:11
239:15 242:17
**banks** 38:15 39:5
**bar** 33:18 246:12 253:25
**barge** 1:5 3:2 32:25 37:8
37:8 38:21 66:15,17,22
67:5,6,6,13,13 68:6
119:19,20 120:2,4,7
120:8,9,11,12,17,21,23
122:8,14,19,24 123:6,8
123:15 124:6,7,9,10,19
128:17,21 129:4 130:8
130:16,16 137:4 143:23
154:10,16,18,25 159:14
162:2,7,9,10,13,22
163:6,18,19 164:9,11
165:4,8 171:17 172:14
172:18,20,23 174:10
176:8,9 178:22 179:3,3
179:10,12,19,24 180:2
180:3,7,12,16,23 181:7
182:12 185:13 186:5,12
191:5,9,11,16,18,24
192:25 193:11,13
194:16 195:23,25
199:10 203:3 204:4,7,8
204:11,13,15,17,20,21
205:2,5,8,14,15 206:4,8
208:20,22,25 209:5,8
209:15,20,23 210:3,9
210:10,14 211:14,17
212:4,5 213:19,23
214:2,24 217:14 223:20
223:22,24,25 224:3,6
224:24 225:11,13,15,19
225:22 226:6 227:18
228:8,13,21,22 229:7
229:17,18,21 230:5,13
230:13,22 231:4,9,21
232:5,13,23 233:4,9,15
233:20,23,25 234:2,7,9
234:15,19 235:2,4,11

235:15 236:6,8,12,21
237:2,3,8,20,21,23
238:5,7,15,15,18,21,23
238:25 239:3,4,5,7,11
239:12,12,18,19,23
240:2,4,4 243:20,24,24
243:25 244:4,7,13,19
244:23 245:5,9,15,22
245:23 246:3,13,16,19
246:21 247:4,5,5,10,17
247:21,21 248:4,6,8,11
248:20,25 249:11,13
250:15,16,19,25 251:5
251:10,14,25 252:2,4,6
252:6,11,13,15,16,20
252:22,25 253:2,4,5,6
254:12,17,21 255:14,16
255:17,21,25 256:7,14
256:17,19,23,25 257:2
257:3,8,20 258:9,22,24
258:25 259:4,5,21,22
260:11,14,18,19 261:20
262:21,23,23 263:5,6,8
263:22,25 264:9,11,13
264:21,21,24 265:3,5
265:10,10,13,13,15,16
265:20,25 266:5,7,8,19
266:20,21,22,24 267:5
267:6,11
**barges** 124:15 197:25
198:2 213:15 239:16,16
239:24
**barred** 204:8
**base** 264:15
**based** 65:18 68:9,10
87:14 139:15 142:8
156:16 158:22 162:5
164:17 174:11 179:10
193:4 197:18 208:7
227:3 240:8 244:21
256:10 264:12
**basic** 52:18 54:24 101:25
132:16,23 194:21
**basically** 242:5
**basics** 71:7,7
**basin** 237:6
**basis** 66:3 152:8 170:16

183:4 193:14 200:7
**Bates** 18:2,11,14 21:6,10
63:18
**Baton** 60:4
**Bay** 11:18 69:16
**Bayou** 144:14
**beach** 241:6,15,17,17,22
242:2,3,5
**Beambenu** 144:14
**bear** 41:15
**began** 197:9
**beginning** 1:16 6:12 45:9
125:8 162:18 202:19
216:12
**begins** 56:12 190:21
258:22
**behalf** 163:9
**behave** 73:2 121:8,14
**behaves** 84:9,11
**behavior** 84:18
**belief** 156:14,17,20
**believe** 17:25 18:23
19:21 20:8 28:11,18
30:4 34:14 35:10 37:6
39:21 42:19 48:13 53:6
63:17,19,20 70:9 79:2
85:19 88:17 89:14
92:22 95:7 102:18
104:21 110:6,25,25
111:5 112:16 115:25
117:18 125:18 126:11
126:16,25 128:11
139:23 141:18 142:4
144:20 158:21 163:14
167:6 169:4 175:17
177:5 180:9,10 181:6
181:20 182:15 183:25
184:6,13 186:25 187:6
187:7 188:24 190:4,5
191:9,15,16,23 193:12
194:16 195:7 197:9,20
199:24 200:5 204:9,18
204:22 205:18 206:6
207:6 221:15 233:6
236:15,15,20 241:19
244:20 246:9 253:16,22
254:11,24 256:14

261:25 265:21 267:22
268:7
**believed** 182:12 192:24
**believing** 193:15
**benchmark** 58:23,24
60:10
**benchmarks** 58:12,16,18
58:21,22 59:3 139:16
**benefit** 8:12
**Benoit** 1:8
**bent** 245:24,24
**berm** 23:12 79:4 81:16
106:19 107:15 207:9,16
207:19,21,22 209:2
214:18,19 222:16,19
264:16
**berms** 16:22
**Bernard** 161:21
**Berryhill** 174:6
**best** 9:13 10:3 139:12
270:5
**better** 40:2 43:18
**beyond** 80:22 85:14
196:21 222:24
**Bhattacharyya** 220:23
220:25
**big** 54:10 105:4 226:11
**bit** 8:16 175:24 239:17
253:24
**blew** 149:13
**block** 36:22
**blocks** 160:7,10 162:21
162:23 236:17
**blow** 77:8,9 184:24
260:23
**blowing** 80:5 120:12,23
130:8 141:9 145:14
147:18 148:2 151:17
164:16 168:23 181:18
181:19 184:17,19,23
203:9 260:15
**blown** 17:9 185:8 245:7
**blue** 57:25 58:2,3 262:4
**board** 30:8,8,10,11,17,19
30:19 31:19,21 32:20
222:15
**boats** 177:21 193:16,19

197:24 249:5,20,22,23
249:25 250:7
**Bob** 89:9
**bodies** 33:22,24,24 43:15
**body** 144:9
**book** 220:21
**books** 132:24
**boom** 181:23 199:7
**booming** 154:22
**bottom** 33:13 53:14
82:12 91:10 129:15
190:21 198:25 202:19
226:3,24 246:11,12
248:11 259:21
**bounce** 240:18
**boundary** 80:17,25
**bounds** 151:9
**Boutte** 1:6
**bow** 267:8
**bowel** 266:23
**bowing** 17:12
**box** 175:15,15
**breach** 17:3,5,7,10,13
20:24 21:17,24,24 23:2
23:3,14,17,19,24,25
24:8,8,10,23,25 25:5
32:25 33:18 68:7 79:6
159:21,25,25 160:13,14
160:22 161:7,25 162:12
162:15,24 163:5 165:12
166:7 168:16,18 169:3
172:11,14 177:3 178:15
178:16,16 183:12,12
194:15,19 195:22 196:4
196:5 197:17,19,21
199:16,25 200:6,18
201:11,13 204:5 207:11
224:21,23 225:2,10
227:10 231:24 233:9,14
233:18 234:7,15 236:21
244:13,19,21 245:17,19
245:21 246:4 247:13
248:9,16,21 257:14,25
259:13 260:12 262:10
264:5 266:17
**breaches** 1:3 6:13 22:11
22:15,22 159:11 160:16

**break** 45:2 55:21 71:14
119:9 137:4 147:9
150:22 152:23 187:19
198:2 218:16,18 239:17
254:25 265:20
**breaking** 165:8 212:21
**bridge** 15:12,14 16:18,19
36:21,23 68:16,17,25
69:20,23,25 70:2 172:8
172:15,15,19,23 196:16
196:17
**bridges** 76:19 105:17
**bring** 153:12
**British** 132:18
**broke** 83:9 145:11 147:7
203:20 239:10
**broken** 152:20
**Brown** 188:7
**build** 25:19,19
**building** 78:5 84:5 106:5
106:6,8,12,13 145:17
146:20,22 147:17,19,21
147:22,24 148:2,3,14
148:22,24,25
**buildings** 43:8 76:19
**buildup** 242:14
**built** 25:4 227:5
**bulb** 206:24
**bungy** 239:16
**buoy** 190:6
**buoyant** 264:23,24 265:2
**buoys** 189:8
**bus** 230:15
**business** 7:20,22 13:11
115:17
**B-15** 56:3,5,8
**B-18** 53:12,14 57:18
78:13,18
**B-43** 64:4
**B-45** 40:7,10 64:9
**B1** 45:20

—————
**C**
—————
**C** 1:10 2:1 3:1 40:5 64:9
86:24 87:4 88:3 96:8
96:11,12,13 100:18
101:2 125:23 126:17

257:15,21,23,24 258:4
258:6,10,19
**calculable** 143:2
**calculate** 85:23 99:5
104:19 150:19 164:18
**calculated** 83:18 96:9
98:21 99:7 100:19,23
114:19 120:13,15
135:13 136:6,6 154:16
243:25
**calculating** 85:24 103:11
**calculation** 83:19,20
85:20 92:18 120:8
129:3 135:12 142:8
151:5,8 158:15 181:15
184:18 256:13
**calculations** 49:23,25
82:6 83:12,13 85:15,18
89:5 103:5 109:10
113:5 119:18,20,25
120:2,3,4,7 128:7
129:14 136:7,8 155:4,5
155:8 156:14,18,20
157:5,13,14,17,25
158:6,21 159:2 164:14
164:17 174:10 178:23
179:11,20 180:4,9,13
181:10 182:22 183:22
185:5,15,21,25 191:20
**California** 3:5
**call** 14:9,17 59:18 122:25
128:13 129:20 189:22
212:13 224:18 239:16
259:7,8
**called** 26:6 55:11 182:11
182:14 224:9
**calling** 95:23
**calls** 14:16
**calm** 133:19 134:13
**canal** 1:3 6:13 14:20 15:8
15:13,24 16:4 21:20,24
26:16,21,25 27:14,17
36:21,23 37:3,4,11 38:4
39:7 46:11 66:19,23
67:5,7,14,24 68:6,15,16
68:21 69:3,8,10 83:25
85:5,6,11,13 89:7 92:19

96:10 98:5 103:6,12,19
105:16,22 106:15 108:3
113:6 114:18 125:20
134:8,12,18 135:4
137:15 140:9 143:23
144:3,5,10,13 145:8
146:14,16,22 150:5
159:11,12,24,25 160:19
161:3,6,8,15,16 164:12
179:13 185:7,17 186:6
193:12,15,18 195:3,17
197:2,11,12,14,24
202:9 208:17,22 214:16
227:14,15 230:23 238:9
238:13 240:8 242:8
243:22 245:2 264:25
266:24 268:13
**canals** 160:18
**cantilevered** 222:11
**cap** 214:18,18 246:24
247:4,12,14 248:8,10
258:15,15 259:14,16,17
**capabilities** 32:21
**capable** 59:23 149:2
**caption** 141:16
**career** 22:12
**carefully** 271:3
**cargo** 72:11
**Carolyn** 174:6
**carpet** 164:22
**carried** 13:13 237:25
238:3 264:2,2
**carries** 85:10
**carry** 237:4
**cars** 249:5,21,24 250:2,3
250:8
**carted** 226:16
**case** 6:12,13 11:4,5,12
12:12 13:7,8 14:5,12
22:14,23 25:5,15,24
27:19 29:17 33:3 34:3
34:24 35:14 37:7 51:16
63:11 68:13 74:4,8
106:4,15 121:5 124:21
130:3 133:11 143:18,22
145:4 183:2 209:7
212:15 242:4,7 243:17

243:19 251:4
**cases** 1:6 11:16 13:14,20
51:20 59:13 66:21
159:5 173:23 183:7
187:5
**catalyst** 154:9,10 159:10
159:13
**catastrophic** 244:21
**catch** 123:25
**categorize** 13:22
**category** 173:7
**caught** 267:5
**cause** 32:25 66:15,17
77:15 80:16 86:11
155:16 246:5 258:15
260:11
**caused** 104:13 120:12,17
120:18 159:20 177:12
179:18 197:17,19,20
228:22 231:21 244:13
244:19,21 245:15
249:25 250:9 252:24
**causes** 155:16 242:24
248:10
**causing** 204:22,24
**ceilings** 170:4
**cell** 24:6 141:9 196:24
**center** 75:12,12,16,20
**Central** 90:25 91:6,20,25
92:6 95:12
**centroid** 130:16
**certain** 76:13 123:7,19
139:13 140:7,10 174:23
227:19
**certainly** 10:25 11:9
14:16 68:22 103:14
153:20 177:16 187:10
206:7 213:11 260:12
**CERTIFICATE** 270:2
**certification** 6:4 270:17
**Certified** 1:17
**certify** 270:4 273:5
**certifying** 270:20
**Chalmette** 161:21
**chances** 163:18
**change** 77:22 80:18
98:25 120:16 124:18

183:3 187:13 243:11
272:5
**changed** 71:6 117:13
**changes** 102:10 111:22
112:10 139:17 147:5
150:6,9,12,16 271:9
273:9
**changing** 54:13
**Chapter** 142:15
**characteristic** 78:7 83:21
**characteristics** 25:7
78:11 84:14,18 142:23
**characterization** 42:14
118:8 185:19
**characterize** 202:13
**characterized** 249:20
**characterizing** 212:11
**Charles** 1:15 4:2 6:1,11
7:1,14,21 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1

118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1

259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
**chart** 96:21 137:17
201:15 255:12
**charts** 72:12
**chase** 35:20
**check** 49:22 50:2 60:9
63:12 195:10
**checked** 49:24
**checking** 207:5
**chewing** 153:9
**chief** 43:10
**Christopher** 32:5
**chunks** 225:23,24
**circle** 231:25 232:2,5
**circulatory** 73:8
**circumstances** 22:5
115:3 124:10
**citation** 130:18 220:4,19
**cite** 181:21
**cited** 187:2
**city** 35:16 55:3 58:14
70:25 181:24
**civil** 1:5 40:18 41:4,8,9
41:15,17,19,20 42:2,10
43:7 55:2 59:16,18,19
59:20 139:25 168:22
**Claiborne** 15:12 16:19
27:15 68:17 105:17
172:8 196:16,17
**claim** 168:10
**claimed** 176:9
**claims** 169:2 171:16
181:7
**clarify** 30:12 94:11
118:13 185:20 250:11
**cleaned** 226:19
**cleanup** 225:8,8
**clear** 24:18 40:22 66:2
76:11 82:14 140:21
159:12 163:25 168:3
170:17 183:10 217:14
236:2 237:25 238:3
255:25 260:9 263:24

268:17,21
**cleared** 224:25 256:7
**clearing** 256:17
**clearly** 9:23 164:19
169:3 205:12,14 206:7
209:8 246:19
**client** 163:9
**clients** 32:23
**climatological** 72:25
**climatology** 71:9
**climb** 212:20,22 223:19
**climbed** 164:23 167:6,7
175:18,20
**climbing** 173:4
**clock** 179:17
**close** 50:18 76:3 86:20
88:25 89:3 102:19
108:9 130:11 149:19
168:13 208:20 245:18
**closed** 68:15,22 69:3,8
69:16
**closely** 27:16
**closer** 17:14 130:16
**closest** 81:8 82:18 109:2
126:20 208:25
**closures** 150:17
**clouds** 176:5
**coach** 16:8
**coaching** 16:7
**coast** 33:14,19 193:20,23
194:22 195:8,16 196:4
196:6,11 197:8,24
**coastal** 241:5
**coefficients** 100:24
**collaborated** 46:18
**collaboration** 46:19
**collapsed** 17:6 175:10
181:24 182:6,7,9
**colleague** 8:12
**collected** 47:5,7
**collection** 20:4 265:18
**college** 35:16,16 70:25
**collided** 197:4
**collision** 31:11 263:7
**collisions** 103:10
**colon** 116:3
**colored** 137:2

**column** 132:2,8 243:12
**combination** 124:12
**come** 13:17 14:18 55:9
67:12 68:5 74:15,15
76:15 77:6 103:9
108:18 113:19 132:19
196:2 204:7 221:19
237:16 244:5 247:7
252:25 254:4
**comes** 39:4 100:22
104:14 113:14 132:21
249:9 259:13 266:5
**coming** 93:25 117:12
118:20 161:9,20 163:17
165:3 172:20 187:10
204:6 205:4 211:6
229:3 231:23 232:13
235:3 239:21 240:22
248:25,25 250:14
**comment** 220:9,14
**commentary** 212:12
**commenting** 212:17,17
**comments** 23:16
**commission** 273:22
**commissioned** 62:16
**common** 22:25 23:14
24:15,16,24 25:10,18
51:24
**commonality** 25:17
**commonly** 53:7,10,13
59:16 61:6,22 62:2
102:21,23
**communications** 48:21
49:2
**companies** 33:5
**companion** 41:14
**company** 7:22,25 8:4
32:15 35:22 39:9
**comparable** 227:11
**compared** 60:13 75:8,23
122:22 231:15
**comparison** 41:15
**compensation** 28:6
**compiling** 59:10
**complete** 71:23
**completely** 11:7 79:15
133:12 239:8 266:5

**completing** 9:15
**complicated** 253:13
**complimentary** 240:19
**component** 80:12,13
136:18 138:2 149:2
251:4,23 252:23
**compressed** 77:21 84:21
84:23
**compresses** 84:22
**compressibility** 84:16,20
**compressing** 81:24 85:6
**computer** 39:12 49:25
50:2,4,9,14,16,17,19
51:15,18,21 52:4,23
53:3,10,18 54:11
**computers** 51:25
**conceals** 102:5
**concentrated** 252:16
**concentration** 173:3
**concept** 101:18
**concern** 173:4
**concerned** 86:4,6 143:17
143:18
**concerning** 67:4,21
**concerns** 229:10
**concluded** 185:6 207:4
269:11
**conclusion** 67:12 68:6
85:16 223:12 259:25
260:2,7,10,22 261:6,10
261:12,16 263:4
**conclusions** 67:21,25
94:2 174:11 182:22
183:3 184:3,5 186:18
186:23 187:11,14
191:20 236:25 259:24
262:17 263:16
**conclusive** 175:7
**concrete** 62:25,25 81:17
177:14 204:21 214:18
225:21 258:18,23
259:17
**condition** 9:16,21 24:7
149:7,8 151:3 206:15
215:11 218:6 224:12
253:15 254:22
**conditions** 33:13 36:20

38:5,7 39:7 72:25,25
112:2 133:17 143:10,13
155:19,21 157:19
168:24 172:16 173:17
175:23,25 227:6 252:12
254:19,20
**conduct** 86:2
**conducted** 33:5 56:12
**configuration** 68:21
255:24
**configurations** 69:4
148:14
**confirm** 48:3
**conflict** 156:5
**conforms** 59:15
**confused** 116:19,21
**confusing** 76:9 210:23
**congress** 30:21
**conjunction** 57:8 71:25
**Connecticut** 3:9
**connection** 28:23 245:14
249:6
**conservative** 255:23
**consider** 35:23 36:2,4,7
36:11 95:7,20 102:9
122:5
**considerable** 66:13 67:3
147:8
**considerably** 11:10
120:24 121:23 210:4,6
**considered** 95:9 103:14
103:15 224:16 240:11
**considering** 215:6
**consistent** 25:3 60:8
67:19,20 101:24 202:10
202:15
**consistently** 80:5
**consolidated** 1:4,6
**constant** 123:2
**constructed** 237:18
**construction** 13:2 25:10
25:23 30:15 31:3,7,23
227:6 258:17
**consultant** 36:5 41:7
**consultants** 35:23
**contact** 104:14 209:6
224:23 232:21 237:13

237:16 247:12 251:14
257:20 258:9 259:13
**contacted** 46:8
**contacting** 259:10
**contained** 230:4
**container** 12:20 27:8,9
**contains** 67:3
**contemporaneous** 128:6
**contents** 45:19
**context** 116:24 198:17
**continue** 30:9 113:25
**continued** 3:1 23:25
185:20 259:12
**continuous** 25:19
**contradicting** 175:24
**contrary** 187:14
**contrast** 172:21
**contributed** 151:18
254:13
**contributes** 218:11
**control** 173:18 261:20
270:19
**Controllability** 219:17
**convective** 75:7,14,19
**converging** 137:3,8
**convert** 143:12
**converting** 111:16
**Cooley's** 128:8
**cooperate** 9:10
**copies** 26:9
**copy** 19:7,16 87:18
167:21
**core** 71:22
**corner** 78:4 141:2 210:11
210:12,14 213:23 214:5
255:15 256:16 267:4
**corners** 76:24 78:2,10
**Corp** 63:24
**Corps** 25:12,22 26:10
39:13 43:12 50:11 53:4
53:7,8,10,13 226:20
**correct** 11:7 15:20 42:13
42:24 77:7,14 80:6
91:2,16 92:19 96:24
97:20,23 98:9 102:6
107:12 112:7 139:8
155:5 164:7,7 169:5

180:11 181:13,25
187:16,17 192:10,11,20
195:24 199:5 200:22
201:22 205:21 208:14
208:19 213:4,5 217:7
220:7 232:8 239:19
241:10,18 255:15 257:4
267:24,25 268:24,25
273:7
**corrected** 127:10 210:20
**corrections** 271:4,5
273:9
**correctly** 70:4 88:16
96:21 148:5 167:25
228:20 229:16
**correspondence** 72:7
**corroborates** 156:8
**corrugated** 61:11
**corrugations** 237:18
**Cost** 196:9
**counsel** 6:4 17:25 35:7
94:17 219:25
**Counselor** 63:17
**counterparts** 132:5
**county** 55:3,3
**couple** 41:3 60:17 72:15
134:16 169:22 170:6
198:9,17 199:9 211:19
211:22
**course** 9:5 35:17 89:9
123:4 172:18 182:13
186:12 213:13
**courses** 72:7,24
**coursework** 71:10 72:2
**court** 1:1 6:14,17 7:11
9:22 10:2 19:2 115:11
216:2 219:13 271:16
**covered** 45:21 260:4,5
263:14
**covers** 237:19,20
**co-authored** 45:17
**craft** 193:20,21,22,23
194:8,11,13,22 195:16
196:2,6,9 197:8,10
**cranes** 12:20,20,21,23
27:9
**crawl** 169:21

**CRC** 48:8
**create** 102:25 114:11
155:22 177:19,24
250:16,20,22
**created** 178:22
**creates** 259:20
**creating** 178:19 179:3,3
179:24 180:2,7
**credibility** 173:7,12,13
**crest** 139:11 140:2
**criticism** 212:12,13
**criticized** 212:8
**criticizing** 212:16
**cross** 66:23 67:14 68:6
124:17 260:19
**crossed** 67:13 179:10,12
179:15 262:23,24
**crosses** 266:25
**crossing** 266:13
**crushed** 234:2,10,20
266:4
**CSR** 270:12
**current** 32:2 33:12 38:10
38:12 68:12,14 75:7
121:13 122:15,17,17,18
122:21,23,23 136:8
240:7 242:3 255:12
262:6 265:23 267:13
**currents** 38:8 67:4,9,11
83:25 121:9,11 124:13
124:17,17,20,22,23
238:12 261:17,19,21
**curve** 101:24 132:16,22
142:14,15 144:21,24
**curved** 214:4
**curves** 107:17 142:16
**curving** 267:4
**Cushing** 1:15 4:2,10 6:1
6:11 7:1,14,21,22,25
8:1 9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1,10,11 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1

40:1 41:1 42:1 43:1
44:1 45:1,10,12 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1,8 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1,9 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1 102:1
103:1 104:1 105:1,4
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1,17 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1,4 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1,7 152:1 153:1,7
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1

196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1,2
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1,12 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1,20
268:1 269:1 270:1
271:1 272:1 273:1
**Cushing's** 19:3
**cut** 35:20
**CV** 40:2,4,6
**Cyclone** 4:20 89:25
188:4
**C-MAN** 189:7,24 190:6
**C-14** 87:7 96:14 97:12,16
101:7
**C-17** 96:17 97:12,15
**C.R** 4:10 7:22,25

**D**

**D** 2:7 4:1 88:3 125:3,5,5
125:23 126:17 128:7,15
142:6 188:5
**Daggett** 3:16 7:8 30:4,8
31:22 32:14,19 34:2
39:8,11,16 40:16,18
42:7 45:13,23 46:3,6,8
46:11,23 47:12 48:6,12
48:22 49:14,19 51:13

51:16,19 52:4 53:6,19
53:22 55:10,13 57:16
57:24 58:8,21 59:6,9,21
60:2,11 63:8 64:16
82:6 83:12 85:18 142:4
142:4 196:24
**Daggett's** 29:3,7 34:5,9
34:17 40:12 43:24 48:9
49:22 57:18 58:6 59:15
60:8 64:4,10 66:11,12
66:20 67:3,9,11,18 68:3
68:7 124:24 240:8
255:13 262:7
**damage** 230:21 231:6,16
231:17 234:3,25 235:13
237:17,19 245:5 246:11
246:15 257:13 263:5,25
**damaged** 194:4 224:13
231:22 254:22
**damages** 237:22
**Dan** 7:6
**Daniel** 2:13 188:6
**dark** 168:21 172:17
205:17,18 206:5 211:24
215:5 217:3,18 222:22
**darkness** 176:2
**dash** 52:8
**data** 47:4,6 48:19 57:23
57:23 60:8 87:5,10,14
88:15 90:10 94:7,10,23
95:11,20 96:9 100:22
113:14 114:6,8,9 128:8
128:9 132:12,15 140:6
184:9 189:6
**date** 12:19 20:5,10 27:5
44:10,12,14 140:25
166:19,24 268:15 271:8
272:25 273:14
**dated** 188:7
**dates** 14:24
**datum** 96:3 98:8
**datums** 139:17
**David** 125:5
**dawn** 168:22
**day** 78:9 135:5 136:4
166:14 214:10,20
273:18

**daybreak** 154:24
**daylight** 90:25 91:6,20
91:25 92:6 95:12
172:16
**days** 15:18,18 72:9
271:14
**DC** 2:4 3:10
**deal** 23:2 41:22,25,25
78:9 96:16 101:3
135:19 247:7 264:10
**dealing** 125:22 126:12
**deals** 41:20
**dealt** 72:3,24
**debris** 20:10 263:25
**December** 188:7 190:9
**decide** 44:7
**deck** 86:13 124:3
**decrease** 73:6
**decreased** 109:5
**decreases** 73:9 82:23
**decreasing** 109:6
**deemed** 271:16
**deep** 164:25
**deeper** 23:20
**Defendants** 40:6
**define** 139:12 142:19
206:8 224:11
**defined** 93:14 99:14
103:24 138:21 254:14
**defining** 139:19
**definition** 61:8 112:8
121:21 134:15 157:9
232:25 241:19 251:22
**deflected** 107:3,4,5,20
**degrades** 174:3
**degree** 40:18 60:12,15
118:24 119:4 121:4,6
122:6 123:7 139:13
242:18 257:10
**degrees** 41:14 121:4
124:11 146:18
**delayed** 245:9 247:5
**deliver** 70:5
**deluge** 163:17 245:8
**Density** 84:15
**depend** 22:9 52:17 114:4
133:16,17 135:15,16

147:4
**dependent** 67:7 120:22
**depending** 50:21 58:18 76:22 123:2 133:10 253:5
**depends** 22:4 23:5,16 71:19 105:6 109:22 114:2,5,6 115:9 119:25 120:19 134:5 138:15 155:11,13,18 179:2 239:2,20 250:23,24
**depicted** 88:4
**depiction** 207:15 255:14
**DEPONENT** 273:2
**deposing** 271:13
**deposition** 1:15 4:22 5:1 6:11,16 9:5 19:2,5,15 63:22 87:20,22 89:22 90:3 115:12,19 126:8 130:24 131:6 145:3 154:8 169:16 180:23 182:4,18 188:3,3,9 190:8,8,11,16 192:23 198:8 211:8 215:14 217:4 219:11,14 221:2 267:20 270:5 271:3,11 271:14,15
**depositions** 8:7 184:6
**deprived** 71:21
**depth** 69:11 81:8 108:10 206:16 244:6
**derive** 132:17
**derived** 100:4 132:3
**describe** 15:23 119:23 121:16 134:11 137:8 153:7 163:12 166:4 173:17 215:3 230:5 240:12
**described** 32:8 52:10 72:18 101:9 103:8,16 109:15 118:22 121:25 130:4,13 140:17 145:6 149:3 150:21 155:6 161:12 172:25 178:2 183:8 191:6 202:21 203:12 209:20 214:25 258:8

**describing** 200:21 215:7
**description** 4:9 20:5 154:5,7 161:17 164:21 178:4 190:15 199:6 228:12 259:3
**design** 13:3 25:4,14,18 26:6 30:15 31:2,23 36:16 85:23 86:7
**designated** 72:10
**designed** 25:15 140:3
**Deslonde** 162:17
**destroy** 112:2 153:23
**destroyed** 112:5,7,9,13 155:20
**Destructive** 4:17 115:13
**detail** 52:10 128:12 209:11 262:21 263:10 263:22
**details** 149:12 206:22 263:3
**determination** 67:11 95:22
**determine** 12:21 55:7 56:16 66:14 78:14 86:14 129:4 255:11
**determined** 57:19
**determining** 54:25
**Detroit** 55:4
**devastating** 21:22
**devastation** 159:20,24 227:10,13
**developed** 265:3
**deviations** 50:24 51:4,6
**device** 56:15
**diagram** 136:17,23 137:3 207:25 209:19 229:18 238:16
**diagrams** 205:8 208:20 209:10,25
**diameter** 61:4,7,9,17,21
**diamond** 58:4
**differ** 74:16 156:10 157:19
**differed** 57:16
**difference** 41:5,8 73:25 74:6,7,9,21 75:6,21 91:21,23 142:6 214:23

231:20
**differences** 57:21 58:17 75:19 84:14 122:14
**different** 25:6,6,16 26:11 31:6 39:22 42:16,16 58:9,21 59:3 72:17 74:13,17 83:11 110:11 112:23,24,25 113:2,18 114:13,14 118:20 120:24 121:14 132:14 133:9,11 134:3,4 139:7 139:18 140:7 155:17 157:20 158:12,18 168:6 175:6 176:6 181:3,4 183:9 208:6 213:19,21 234:11 238:18 257:8,21
**differential** 142:21 264:14
**differently** 61:2 73:3 84:9,11 121:9 198:7
**differing** 12:24
**differs** 156:8
**difficult** 9:17 10:7 116:13 218:10
**difficulty** 8:9 60:19 61:3 61:19 62:3,13 173:5 215:7 217:2 218:12
**dimension** 105:10 106:6
**dimensions** 37:10 69:9 105:9
**diminish** 105:11 108:16 130:12
**diminished** 240:21
**diminishes** 243:2
**diminishing** 107:22
**direct** 52:14 64:23 152:16 154:5 198:10 270:19
**directed** 268:5
**direction** 5:2 20:13 73:10 77:23 80:7,8,11 80:18 82:11 84:7 86:19 107:21,24 108:8 111:14 111:22 112:10 118:21 122:22 123:3 124:18 126:21 136:13,15,19 137:9,9,12,12 142:21

145:13,19 147:5,24 166:7,8 174:12 180:11 183:21,22 192:6 199:8 203:18,19 230:23 238:6 238:10 239:20 240:22 250:25 251:11 252:23 258:24 266:10 267:22 268:11
**directional** 102:10 123:12 136:16
**directions** 102:11 109:18 109:23 110:12,22 111:21 114:22 126:12 126:14 181:19 184:8 239:21 255:12
**directly** 62:18 82:3 146:17 239:13
**disagreed** 174:9 182:21
**discounts** 158:8
**discuss** 229:20,23 262:19 262:20 263:21 268:18
**discussed** 186:21 261:9 263:9
**discussion** 118:23 190:21 202:18 224:21
**disintegrating** 250:5
**dismissed** 157:23
**displaced** 83:15 85:3 160:4 234:22
**displacement** 160:3
**displayed** 197:4
**disrepair** 149:9
**dissipates** 242:20 243:2
**distance** 85:14 143:25 154:15 169:2 172:10,19 195:23 196:4 214:22 215:4,12,13 216:14,19 216:20 217:16,17,21,21 217:23 230:14,17 248:14 256:15,18 265:4
**distances** 209:24
**distinguish** 30:13 228:18
**distributed** 252:5,8
**District** 1:1,2 6:14,15
**disturbance** 84:4,5 108:15 261:4
**disturbances** 103:8

104:12
**disturbed** 108:21
**divide** 77:5,12,15
**divided** 148:24
**divides** 148:6
**dividing** 77:17
**division** 43:11 115:16
**dock** 209:17
**Doctor** 55:9
**doctorate** 71:4
**document** 19:10 34:21
   87:21 89:13,22 90:2
   91:8 92:2 93:2 111:4
   111:10 115:12,18
   116:21 117:2,4,7,17,18
   117:19,22,22,24 118:3
   130:24 131:5,10,14,23
   132:9 133:5 141:7
   167:22 174:16 188:4,8
   189:13,13 190:10
   199:12 216:9 219:10,14
   219:22 230:2 260:8
   261:8 263:20
**documentary** 49:3
**documentation** 63:2
**documents** 5:7 19:4 63:7
**doing** 18:16 30:14 39:9
   46:13,14 86:16 129:3
   149:2 230:12 259:19
   271:7
**dominant** 122:24 238:11
   260:14 261:20
**Dooley** 4:12 87:13 88:8
   89:10,15 90:24 93:17
   93:24 113:13 114:19
   125:18,21 128:11
**Dooley's** 67:8 87:19
   88:13 89:5 92:18 93:21
   94:23 95:6 99:8,11
   103:21,23 111:2,12
   113:4,13 126:3,9 129:8
**door** 145:9,10,11,14,20
   146:4,7,12,12,19 147:6
   148:12,21 149:3,8,10
   149:10,12,12 150:2,20
   151:2,3,8,9,14,19
   152:14,20 206:9,13

**doors** 145:7 150:3
   151:15,21,24 152:2,4,6
   152:8,9,10,13,18
**door's** 148:11
**double** 146:4
**downed** 233:13
**downstream** 76:25 77:25
   105:12 106:9,14,14
   107:2 108:8 147:22
**downward** 62:18 82:3
   109:8
**downwards** 78:23
**downwind** 108:13,16
   124:2
**dpollard@kpalawyers...**
   3:6
**Dr** 18:11 19:3 29:3,7
   30:4,8 31:22 32:14,14
   32:19 34:2,5,9,17 39:8
   39:11,16 40:16,18 42:7
   43:24 45:10,12,13,23
   46:3,6,8,11,23 47:12
   48:6,6,9,12,22 49:14,19
   49:22 51:13,16,19 52:4
   53:6,19,22 55:10,13
   57:16,18,24 58:6,8,21
   59:6,9,15,21 60:2,8,11
   63:8 64:8,16 66:12,20
   67:3,8,9,11,18 68:3,7
   82:6 83:9,12 85:18
   87:13,19 88:8,13 89:5
   89:15 90:24 92:18
   93:17,21,24 94:23 95:6
   99:8,11 103:21,23
   105:4 111:2,12 113:4
   113:13,13 114:19
   119:17 124:24 125:18
   125:21 126:3,9 128:8
   129:8 131:4 142:4
   151:7 153:7 161:21
   196:24 199:22,24,24
   200:5 219:2 240:8
   253:12 255:13 262:7
   267:20
**draft** 44:2,4 48:18 240:5
   265:11
**dragging** 177:24

**drained** 15:16
**draining** 19:25
**draw** 186:20 223:12
**drawing** 184:5
**drawings** 208:23
**drawn** 68:2 143:12
   241:24 244:24
**draws** 86:12
**drifted** 232:20
**drifting** 238:5
**driving** 216:13,18
   217:24 230:19 242:21
   242:25
**dropoff** 222:15,18
**drug** 10:6
**dual** 57:3,6,12
**due** 155:15 166:8 189:8
   267:13
**duly** 7:15 270:4
**duty** 212:10 213:3,11
**DUVAL** 1:9
**dwebb@cwslaw.com**
   2:13
**Dylan** 3:6 6:24
**dynamics** 220:22
**D'Antionette** 161:18
**D-1** 125:7 129:16,22
   130:14 131:11,21
**D.C** 1:16 6:17

**E**

**E** 2:1,1 3:1,1 4:1,8 258:9
   258:10 272:3
**ear** 251:13
**earlier** 44:2 70:18 86:17
   106:18 108:24 124:16
   147:19 148:18 178:15
   198:4 199:16 202:21
   205:19 227:8 249:2,18
   250:12 256:15 257:6
   259:3 267:20 268:15,17
**earliest** 179:9,11 256:6
**early** 46:8 48:18 72:9
   80:4 87:9 145:6 180:8
**earth** 207:16
**earthen** 207:9
**earthwork** 23:11

**easier** 19:9,14 30:13
**easiest** 260:13
**east** 15:24 16:2,3,4,4,13
   16:16 20:14 21:3 27:13
   46:10,11 56:12 58:4,11
   66:18 67:2,22,23 80:5,9
   80:10,10 88:23 108:3
   134:24 135:7,22,24
   136:5,9,14,15,19
   137:14,16,19 138:4,22
   138:25 139:12 179:13
   183:21,23 184:17,19,23
   184:25 185:8,16 194:25
   195:18 202:8 230:17
   242:9,14,16 267:24
   268:4
**easterly** 80:7,11,12 138:2
   260:15
**eastern** 1:2 6:15 85:4
   90:11,18
**easy** 146:4 215:17
**eating** 153:11
**eddie** 52:20 78:10 80:22
   148:19
**eddies** 51:23 76:23 78:3
   86:11 105:11 108:12,15
   108:20 124:17,17,20
   148:22
**edge** 62:11 73:19,21
   238:15 259:6 265:13
   266:12
**education** 35:15,18
   36:14 42:8,15 43:2,5,7
**educational** 39:21
**effect** 12:13 13:5 68:12
   68:14 69:2 72:5 83:24
   102:19 103:2 104:15,18
   104:20,23 105:2 119:18
   119:19 120:11,15 121:2
   121:5,7,13 122:2,3,3,6
   122:7 124:14 243:15
   261:22 262:22
**effective** 99:20,24 103:24
   104:7
**effects** 11:6,8 12:6 120:3
   121:17 122:19,24
   123:11

**eight** 91:21
**either** 33:21,24 49:21
 65:15 69:25 76:20 98:7
 134:20,23 135:6 138:21
 160:7,10 189:13 194:16
 253:7 263:6
**Elev** 58:5
**elevated** 82:20,22
**elevation** 85:13
**elevations** 57:19 139:12
**Elizabeth** 69:6
**else's** 222:6
**embedded** 214:17,19
 264:20
**employ** 224:2,5
**employed** 221:14,21
**employee** 213:3 221:12
**employment** 213:14
**enclosed** 36:20
**encounter** 76:18
**ended** 237:9 264:3 267:9
**ends** 68:15 266:16
**energy** 204:19 242:18,21
**engaged** 60:3 221:22,22
**engineer** 35:21 36:2,12
 41:4,4,6,8,9,11,12,13
 41:17,19 42:10 43:7
 55:2 59:20 61:13 64:14
 65:5 253:12
**engineering** 3:17 31:9,16
 36:17,18 40:19 41:16
 41:19 42:3,4 59:16
 70:11 115:4
**engineers** 25:12,22 26:10
 35:22 39:13 41:24
 43:12 50:11 53:4,7,8,11
 53:14 59:18,19,22
 139:25 219:7 226:20
**engines** 86:8
**enter** 260:19
**entered** 174:7 183:10
 229:19 245:4 246:13,16
 246:21,22 248:10
 265:14 266:11,21 267:5
 267:8
**entering** 259:9 266:22
**enters** 266:24

**entire** 66:16 117:2,4,17
 117:18,22,23 137:10
 210:8 252:6 257:23
**entitled** 89:24 115:12
 130:24 188:4 219:15
**entries** 87:10 262:16
**entry** 196:25
**environment** 142:12
**environments** 142:17
**equal** 256:20
**equally** 89:16 157:9
**equipment** 90:12 223:7,7
**errata** 271:7,10,13
 273:11
**error** 50:13,24 51:3,16
 52:2 112:21,24 113:2
 113:19,20,20,22 114:10
 114:12,14,17,25 115:5
 115:7 118:24 119:6
**errors** 114:5
**escape** 237:11
**especially** 86:8 156:4
 213:11
**ESQ** 2:7,13 3:6
**ESQUIRE** 2:6 3:11
**established** 125:16,17
 192:8
**estimate** 37:22 79:10,11
 79:17,19 116:16 140:11
 140:11,13,16 147:2
 169:9 170:12 193:4
 256:12,13
**estimated** 105:22
**estimates** 116:9 117:9,13
 118:5
**estimating** 117:14
 142:11 170:23 176:12
**estuaries** 52:9
**event** 155:15
**events** 159:10 173:5
 200:20
**evidence** 156:2,10,11,12
 156:15,16 157:4,10
 158:3,3,5,8,13,16,18
 159:23 160:15,17,21
 161:5 162:8 165:12
 172:12 185:24,25

 186:16 187:8 195:7
 224:22 225:11,13,14,16
 226:14,16 228:15
 246:10 252:4 265:12,15
**exact** 12:19 26:20 44:12
 44:14 192:22 193:21
**exactly** 14:24 20:3 94:12
 145:22 146:24 148:13
 163:25 167:18,19
 173:21 175:19 176:20
 215:18
**EXAMINATION** 7:18
 267:18
**examine** 16:21 27:13
 60:7 225:23
**examined** 7:16
**examining** 45:24 226:22
**example** 11:18 21:8
 23:22 25:13 46:14 47:2
 47:5 58:23 60:13 77:24
 137:11 155:19 158:9
 173:18 177:22 183:11
 183:16 193:17 223:15
 223:19 230:8,15
**examples** 225:20
**exception** 24:21
**excited** 212:20
**excuse** 8:9 54:5 88:14
 91:16 97:5 243:4
**excused** 269:9
**exercise** 151:12,20
**exert** 251:10
**exerted** 254:12
**exhaust** 86:7,8,12
**exhibit** 19:2,5 70:6 87:19
 87:22,25 89:22 90:3
 91:17 92:21 93:5 96:4
 96:8,11 111:3,3 115:12
 115:19 126:8 128:7
 130:24 131:6,12 188:3
 188:3,9 190:8,11,13
 219:11,14 221:2 243:8
**exist** 13:14 102:25
**existed** 151:15 238:12
**exists** 23:17 223:2 237:6
**expect** 136:9 137:18
 140:11 225:7,14 242:6

**expected** 21:23 22:3,6
**experience** 32:21 35:13
 36:14,19 39:11 40:15
 41:18 42:8,17 43:2,6,6
 43:9,13 50:16 52:14
 68:11 109:14 112:11
 173:24
**experienced** 10:23 238:8
 243:21
**experiment** 43:11
**expert** 4:10 7:8 35:5,8
 36:8,11 153:8,12,15,22
 167:24
**expertise** 34:23,25 36:13
 53:20 153:13,23
**experts** 7:10 33:4 199:15
 199:17,18 200:20
**expires** 273:22
**explain** 55:15 59:9 66:3
 77:19 97:2 120:20
 123:21 174:25 227:24
**explained** 46:5 257:6
**explanation** 99:12
 258:14
**explanations** 177:11
**exploding** 175:15
**explosion** 174:8 175:12
 175:13,14 199:7 203:13
 203:18
**explosive** 211:5
**exponentially** 105:12
**exposed** 240:2
**expressed** 96:20
**extended** 17:13
**extending** 16:16
**extends** 34:25
**extensive** 16:25 39:11
**extensively** 50:10,11
**extent** 46:18 71:13 73:6
 73:18 74:3 104:19
 153:21 160:2 163:7
**extreme** 21:21 155:19,22
 193:17 195:17 196:13
 261:18 267:9
**extremely** 21:21 160:4
**Exxon** 33:13
**eye** 75:12 260:25 261:2,3

**eyes** 211:23
**eyesight** 215:20 218:7,10
**eyewitness** 155:5 156:11
  165:14 183:4,20 187:15
  248:15 251:13
**eyewitnesses** 173:3 249:8
**E-mail** 48:22
**E-mails** 49:3

**F**

**face** 78:9 145:16 147:23
  148:2,3,15,19
**facilities** 27:8
**facility** 27:10 88:15,19
  90:11,19 91:6,14,18
  94:7,24 98:4,7
**facing** 145:8,8 146:7,12
  146:14,19 147:17
**fact** 35:7 60:18,25 86:17
  138:25 159:18 163:23
  164:19 172:13 176:15
  176:19 180:6 181:17,20
  184:24 185:23 186:6,11
  186:11 189:14,16 193:4
  204:20 208:23 212:24
  216:25 218:14 230:5
  233:10 235:11 241:25
  248:25 263:5,22 265:5
  265:21,22
**factored** 92:17
**factors** 100:3 155:11
  176:6 212:25 216:25
  217:19
**facts** 9:18 153:13 156:3,8
  156:9 158:7 159:3,4,5
  163:21 173:17 174:23
  180:10 182:25 187:5,6
  191:25 192:4 212:15
**factual** 46:20
**fail** 22:7 159:14 258:15
  271:15
**failed** 23:6 25:8 67:2
  112:17 127:3 161:2
  178:15 189:15,17
  210:25 211:17 246:7
  247:15 260:17
**failing** 177:25 221:10

**fails** 211:3 253:19 254:5
**failure** 66:15,18 67:14
  127:22 128:10 154:9
  224:10,16,19 245:15,16
  246:5 254:13,14 260:17
  265:25
**failures** 112:18 189:9
  224:9
**fair** 8:25 13:16 101:2
  102:5,6 104:16 149:21
  171:7 174:12 182:20
  191:3,13
**fairly** 104:11
**fallen** 20:9 204:21
  232:16 246:10,25
  258:13 259:10,14,15,18
  266:16
**falling** 204:21
**falls** 253:18
**familiar** 8:20 35:7 50:23
  53:23 54:17 55:10
  60:18,22,25 85:21 93:6
  93:9,11,14 97:3 101:18
  110:2 112:18 188:15
  189:14,16
**familiarity** 86:17
**Family** 1:9
**far** 138:21 148:6 162:14
  175:19 206:20 207:16
  229:5 252:10
**farther** 82:21,24 203:9
  210:7 234:24
**fashion** 17:6
**fast** 19:14 244:14
**faster** 98:14,14,15
  101:11,16
**father** 55:2
**faulty** 176:16
**favor** 168:4
**feared** 212:20
**fed** 73:9 75:18
**feed** 9:24 71:20
**feeding** 73:23 75:11
**feel** 241:24
**fees** 221:23
**feet** 17:9 79:20,21 80:15
  81:22 82:12 90:12 96:2

96:2 106:8,14,22,23,25
  107:5,19,22 108:5,18
  108:19,19,20,20,20
  130:4,7 133:13,14
  134:16,16 140:4 143:5
  143:7,15 149:25 154:15
  169:10,10,19,22,25
  170:2,5,5,6,6,19,20
  172:9 192:9,12,15
  193:5 201:22,25 202:7
  205:9,15 206:4,19
  207:7 208:24 209:2,8,9
  214:22 215:4 217:2,25
  218:2,3 230:6 242:13
  253:8 256:15 261:25
  262:14
**fell** 198:6 202:23,25
  210:19,22 211:9,12
**felt** 32:22 43:14
**fetch** 196:6,9
**fewer** 49:6,7,8,10,11
**field** 13:12 34:23,25 35:9
  41:19 42:2 52:25 53:21
  70:11 71:5 72:8 84:3
  149:22,23
**fields** 35:11 36:7,10
  99:14
**fifth** 125:7
**figure** 97:17 98:9 100:19
  131:18,20 132:17,17,19
  132:25 133:19 134:3
  139:6 142:11 220:6
  227:12 235:17,21,23,25
  236:11,24 255:9 257:13
  258:2,10,11,14 259:4
  265:16 266:6
**figures** 28:10,12 131:10
  134:3 237:14 262:11,11
**filing** 6:4
**fill** 108:14
**final** 229:19 235:4 264:3
**finally** 175:25 176:17
  232:21 233:25 234:8,20
  235:15 236:6
**find** 19:14 37:22 95:5
  99:10 119:4 128:17
  131:13 139:24,25 207:2

215:17 216:5,8 226:21
  263:15
**findings** 46:21,24 48:11
  48:17 49:15,20
**Fine** 117:25
**finish** 9:11 140:20 247:6
**finished** 86:22
**firm** 7:3,4,6 27:18 28:22
  29:3,7 60:3,4 197:21
  221:15,16
**firms** 14:2 29:14
**firm's** 29:16
**first** 7:15 11:5 14:4,17
  15:10,11,25 20:24 21:7
  29:9 35:15 42:13 43:6
  44:7,8 46:23 56:21
  87:8 92:21 97:16
  100:23 104:6 108:25
  116:22 117:16 128:11
  132:7 135:10 141:8
  146:16 149:15 153:9
  155:10 165:2,13 167:9
  169:15 174:7 175:2
  178:7 185:18 189:3
  191:8,23 201:6 202:12
  202:22 204:11 212:11
  215:20 227:17 230:4
  245:13 246:17 249:16
  250:23 255:16 257:18
  257:20 259:8 266:23
**five** 15:18 27:6 162:21,23
  175:4,5 178:5 239:15
  239:24 248:18 249:9
  251:12
**five-hour** 91:23
**fixed** 33:15 37:9
**flash** 172:2,5
**flashes** 172:2
**flat** 62:25 103:18 124:3
  134:6 144:15,15 252:22
**flatlands** 145:2
**flattens** 259:20
**flawed** 113:24
**flea** 253:24
**flew** 62:21
**float** 231:22 247:10
**floated** 175:10,19 230:13

250:4
**floating** 68:12,14 69:2
120:25 175:17 177:15
177:20,23 178:13,19
249:6,21,22,23,25
257:7 264:22
**flood** 23:21 140:2 160:25
162:12 197:15 206:23
207:6 232:16 245:23
250:18 265:22,23 267:2
267:7
**flooded** 15:21 230:12
**flooding** 24:3 67:23
244:24 262:10
**floodwall** 15:24 16:2,3
16:13,16,20,22 17:8,12
20:9 23:19,24 24:2
25:3,18,19,21 27:13
46:17 56:12 57:16,19
58:4 60:6 62:23,24
66:25 67:22 78:16,17
78:21,22 80:19,23
81:10,20,23,25 82:3,11
82:19 84:4 85:4,8,14
105:23 106:16,17,19,23
106:23 107:7,16,19,21
107:23 108:3,4,4,10,11
108:13,14,17,19 109:2
109:7,8 128:18 129:5
134:20,23 135:7,7,15
135:22,24 136:5,9,14
136:15 137:14,19 138:5
138:6,9,10,16,18,21,23
138:25 139:4,12,19,21
140:2,12 150:11 159:13
160:3 163:16 165:4,9
171:17 172:20 182:17
191:19 192:10,19 193:9
194:18,21 202:9 204:5
204:17 205:10 207:10
209:3,5,6,7,9,16,19,21
210:11,19,22 211:3
214:15 222:8,17,20
223:16 224:9,14,24
227:5,7 230:6 232:16
244:15 245:15,16
246:11,24,25 247:22,23

248:2,4,7 249:12,14,15
250:16,20,21,23 251:2
251:4,6,7,11,12,15,15
251:21 252:7,9,10,14
252:17 254:23 257:15
258:3,4,6,13,19,22,25
259:2,5,10,12,18
260:12,17,18 264:16
265:25 266:7,9,13,14
266:16 268:13,15
**floodwalls** 23:8,13 24:20
25:6,10,14,14,17,23
54:3 68:7 139:15 160:4
259:15
**floor** 3:4 124:3 164:22
165:2 167:9 169:15
174:7 178:7
**Florida** 16:17,18 27:14
68:16,24 69:20,23
78:23 105:17 146:16
**flow** 21:22 22:8 32:2
38:14 41:23,25 43:14
51:9,12 52:9,9 75:15,19
76:20,24 77:20,22,22
77:23 78:4,5,8,10,12
84:3,6 85:22,24,24 86:2
86:14 102:10,12 103:2
106:9 108:21 109:16
142:21 151:18 232:19
241:6 244:22 262:9,13
265:24
**flowed** 244:22
**Flower** 3:4
**flowing** 33:22 106:3,4,7
106:7,10,11,18,21
107:8,17,19,23 109:8
241:23 267:2
**flows** 80:19 86:5,18
107:18,21 108:9,10,11
**fluid** 78:8,10 84:3,6
85:24 106:3
**fluids** 84:9,12,19 231:25
**focsal** 123:23
**focus** 150:3
**focused** 16:16 43:14
71:13
**follow** 82:3

**following** 14:15 81:15,16
100:3 106:19 249:7
**follows** 7:16
**foot** 58:25 81:8,12
106:12 160:15,18,21,24
161:3,14 170:4,18
192:15 202:5 233:3
252:9
**football** 149:22,23
**Footnote** 219:6
**Forcast** 4:14
**force** 11:22 145:9 147:8
147:9 148:17 242:25
251:16 252:15,19
253:12,23 254:2,12
**forced** 109:13 177:15
**forces** 11:22 120:9,21
142:11 264:23,24 265:2
**fore** 124:7
**Forecast** 89:23
**forecastle** 123:24,24
**forecasts** 72:15
**foregoing** 270:17 273:5
**forensic** 173:24
**forgive** 153:9
**forgotten** 186:3
**form** 6:5 32:17 37:5 47:6
48:16 49:2 52:20 54:19
61:12 65:25 74:10
86:11 184:3,7 240:21
241:9,12 273:10
**formation** 52:20,20
**formed** 17:8 242:22
**former** 265:19 266:14
**formerly** 39:12
**Forming** 36:13
**forms** 76:19 108:12
**formula** 101:11
**forth** 52:21 65:19 101:6
103:10 105:8 110:9,10
114:8 118:21 119:20
151:3 155:21 198:19
262:5
**forward** 85:10 209:21
246:22 247:10
**found** 19:11 64:3 71:14
124:21 175:16 187:15

218:9 224:22 225:10,12
**foundation** 89:8 113:9
160:7,10
**foundational** 113:11
**four** 35:17 87:15,16
89:19 113:18,21 114:9
125:22 267:16
**fourth** 91:10
**fraction** 172:4 244:2
**fragments** 204:6,7
**France** 27:8 33:16
**free** 33:22 52:9,9 77:3,21
78:3,6 81:24 82:5 84:6
86:19 106:9,14 107:2,3
107:8,20,24 108:21
109:9 133:6 147:15,21
232:4 239:18 255:18
269:4
**freed** 255:21
**frequency** 24:9,11,13
57:3,6,13
**friction** 242:23
**frictional** 51:23 52:19,19
**front** 19:8 40:10 56:8
115:22 163:24 164:5
**full** 31:5 56:11,21 99:13
125:7 132:7 161:23
170:8 227:17 230:4
257:18 258:20
**function** 209:10
**functions** 55:6
**funnel** 75:14 86:11
**funnels** 86:7
**further** 59:25 62:8 81:20
105:12 123:7,21 182:9
210:4 228:14 233:17
245:19 267:14
**fuzzy** 216:14,19,20,20
217:17,22 218:7

----

**G**

**gail** 11:22
**Galveston** 32:3
**Galvis** 256:16
**gantry** 12:19,20 27:9
237:13,21 255:25 256:4
256:7 263:4

**gates** 36:21
**gathered** 189:18
**gathering** 46:19
**gauge** 90:21 91:17 92:8
   93:16 95:13 140:7
   201:21
**gauges** 189:17,17
**general** 25:12 59:11
   74:21 76:4 115:6 143:3
   173:7 181:16 220:10
   227:8 263:21
**generalized** 74:12
**generally** 17:7 35:8
   50:25 60:7 62:10 73:10
   73:11 101:21 137:10
   138:5 149:5 192:23
   223:18,21 227:6 242:22
**generated** 11:23
**GENNARO** 3:17
**gentleman** 168:4
**geostrophic** 130:10
   142:16,18,24
**geostrophic-to-surface**
   133:15
**Gerry** 7:9
**getting** 198:13,22
**Gilbert** 202:20
**give** 26:19 27:5 37:23,25
   63:12 97:5 129:13
   136:24 155:16 158:9
   172:5 174:13 183:16,19
   184:16 198:16 201:16
   204:14 206:22 225:20
**given** 52:5 79:4 96:4
   105:24 110:10 138:16
   139:17 140:5,8 173:15
   176:22 186:16 212:19
   256:22 270:6 273:7
**gives** 42:10 43:17 86:16
   253:11
**giving** 170:25 182:21
   185:4 212:23
**glasses** 215:9,11,19
   216:12,13,17,17,21
**go** 15:15 35:19 37:17
   41:2,3 46:4 66:10 70:8
   80:15,24 82:2,10 107:5

126:2 131:16 136:11
   140:20 166:6 173:6,17
   181:14 188:17 192:22
   194:6 200:8 214:4
   229:5 245:12 267:23
**goes** 85:6 96:17 214:18
   217:12 262:3 265:7
**going** 38:11 40:20 44:9
   45:5 48:20 50:21 59:3
   75:19 80:15 81:3,5,5,19
   81:19 82:12,19,20,22
   83:2 85:11 96:16 97:12
   108:5 109:3 119:10
   147:12 148:16,25
   152:24 161:20,20 164:9
   185:18 187:20 188:19
   213:15 214:2,3,4
   215:19 218:19 238:22
   241:15 252:16 255:2
   259:7 269:6
**Gondalfo** 165:15,18
**good** 6:10 13:23 80:3
   119:8 158:9 211:23
   219:25
**Goodwin** 2:3 6:17 7:3
**Goowin** 1:15
**gotten** 151:9
**government** 30:20,20
**GPS** 55:11,12,18 57:3,6
   57:7,9,13
**grab** 145:14 150:20
   190:17
**gradient** 133:2 134:2
   142:10 144:8,18
**gradients** 125:15 142:7
   143:11
**graduate** 71:24
**grant** 239:9
**graphic** 220:16 256:11
   258:2,3,12
**graphical** 255:14
**graphically** 88:4
**graphics** 208:10
**grass** 222:24 223:2
**grating** 179:18
**gray** 256:3
**great** 23:2 31:12 71:13

84:13 86:16 101:3
   159:20 227:9 247:7
   264:10
**greatly** 121:3 174:4
**green** 262:2
**grid** 89:17,20 125:16,17
   125:19,22 126:22
**grinding** 174:6 175:4,5,8
   177:2,9,11,12,16,19,25
   178:3,5,9,19,21,22
   179:4,24 180:3,7
**ground** 89:15 108:8 130:4
   143:15,15,18,21,22
   203:23,25 225:25
   265:11
**grounded** 197:14 230:5
   230:7,9,16 231:5,10
   233:25 234:10 236:8
   244:8 245:4 246:24
   264:9 265:13
**grounding** 33:13,16,17
   245:6
**grounds** 157:24 266:15
**group** 218:13
**grow** 73:9
**Guard** 33:15 193:20,23
   194:22 195:8,16 196:4
   196:6,9,11 197:8,24
**Guenther** 3:18 6:19
**guess** 33:23 71:3 92:3
**Gulf** 32:2
**gust** 100:14 101:14
**gusts** 69:7 93:4,9,14
   101:9,9 102:9 128:20
   128:25

-----

### H

**H** 4:8
**half** 62:10,14 146:5,5,6
   192:15
**Halfway** 65:4
**halt** 266:5
**hand** 23:23 30:16,18
   145:10
**handed** 93:2 116:22
   117:2,17 131:14
**hands** 147:7 150:21

152:15,21
**happen** 265:9
**happened** 14:8 145:22
   155:4,9,13,17 157:4
   160:12 186:14 204:18
   204:23
**happening** 173:21,22
   203:12 213:8
**happens** 24:14,15 80:16
**happy** 117:4
**harbor** 14:19 15:23
   26:15,21,24 27:14 37:3
   37:11 38:4 39:7 68:16
   68:21 83:25 85:4 89:6
   92:19 96:10 98:5 103:5
   103:12 105:16,21
   106:15 108:2 113:5
   114:18 125:20 134:8,12
   134:18 135:4 137:14
   140:9 144:10,12 150:5
   179:13 195:2 202:9
   214:15 240:7 242:8
   243:22 264:25
**hard** 59:2 156:2,11,15,16
   157:10 158:3,5,8,16,18
   184:9 185:23,24 187:7
   191:25 192:4 195:7
   228:15 240:15 265:12
**hatch** 237:19,20
**head** 73:16 123:23 220:8
   220:11,15
**heading** 90:10 267:4
**hear** 9:22,25 16:10 182:9
   204:2
**heard** 35:4 126:5 154:21
   165:8 174:6,8 175:3,3
   175:12,13,14 177:9
   178:5,23 179:18 180:2
   181:22 182:4,13,13,17
   198:5 199:7 203:8
   211:5 247:19 248:17
**hearing** 8:10 177:2
**heave** 243:25
**heavily** 206:6
**heavy** 11:2 207:7 215:5
   217:19
**height** 66:24 78:15,16,21

79:3,10 95:25 96:23
98:6 99:25 105:8,22
106:17 107:22 109:11
130:2,3,6 135:11,18
136:6 138:25 139:15
140:12,15 161:12 169:7
169:23,24 170:3,8
207:21 250:24 264:14
268:12
**heights** 47:9 54:3 57:16
58:15 135:13 139:3,4
139:18,20,21 140:2,3
140:10 201:15 233:3
**held** 184:4 245:22
**helical** 17:6
**help** 67:12 121:20
145:22 173:20 216:3
243:6
**helpful** 19:17 46:5
**helping** 66:14,14,22
**hesitate** 259:7
**Hewlett** 32:5,14
**high** 11:16,17,21,22,22
12:6,8,13 13:5,5 21:21
38:5,7 46:15 47:6 69:7
80:14 84:21 88:9,11
106:12 111:8 112:2,9
116:17 122:9,10,11
123:24 133:12 134:19
135:16 138:15,18
142:22,24 143:4,8
162:11 164:10 167:19
169:10,11,18 170:4,14
181:10 192:16 205:10
205:10 242:13 245:3
247:2 262:9 264:15
266:2 268:13
**higher** 84:24,25 85:5,9
112:6 130:11 133:14
142:20 144:22 170:21
202:5 246:23
**highest** 254:21
**highlighted** 219:21 220:3
**highlighter** 219:20
**highlighting** 219:20
**hindcast** 89:18 100:23
111:13

**hinge** 147:9
**hinges** 145:11,20 147:8
149:8,11,11,13 150:22
151:3,8,9
**hit** 83:15 154:18 165:4
171:17 203:25 238:14
265:11,11
**hits** 80:14 242:16,19
**hitting** 203:23 204:4
**holds** 123:20
**hole** 71:25 194:14,17,20
246:4
**Holland** 14:10
**home** 115:17 154:23
**hone** 84:20
**hoped** 39:10
**horizontal** 222:10
**hot** 71:22
**hour** 88:25 92:11 95:13
96:24 97:3 129:3
171:20
**hours** 80:4 91:21 179:7
**house** 151:17 155:20,20
163:24 164:5 166:6
168:15 169:12,21,23,24
170:13 175:10 177:13
177:14,15 212:21
234:22,24
**houses** 154:18 160:6,9
168:17 177:13,17
230:22 231:7,11,14,16
231:17,22 233:21,24
234:4,6,9,12,13,19,19
235:2,12,13,14,14
236:4,5,7,9 265:18,19
266:2,4
**hull** 214:3,5
**hulls** 194:7
**hunt** 127:15
**hurri** 70:22
**hurricane** 4:16,20 11:2,6
11:9,13,25,25 12:10,11
13:24 14:6 15:2,3,14,21
19:25 25:15 26:16,18
26:23 27:12 28:24
32:20 66:24 70:12,15
70:22 71:19,20,23

72:20 73:2,4,7,13,19
74:2,13,16,22 75:7,11
75:13,16,20,22 76:15
77:4 89:24 102:15
103:9 104:13 112:17,19
115:13,15 116:2,13
118:6,25 142:12 144:8
171:22,24 188:4 225:7
228:8,25 229:2,7
230:10,11 261:3
**hurricanes** 10:13,20,23
10:24 11:20,21 71:13
71:14 72:4,16 74:14,14
118:22
**hydraulic** 50:19 51:2
52:17
**hydraulics** 51:25
**hydrodynamic** 85:25
**hydrodynamics** 41:23
**hydrograph** 139:7 140:8
189:17
**hypothetical** 128:19
129:3 146:3 147:3
149:7 179:4 204:14,16
245:14 252:2,18,24
253:10,23 268:8
**hypothetically** 157:18
204:20 244:20 245:21
246:3 247:20 249:10
250:15
**hypotheticals** 254:9

---

**I**

**ID** 4:9
**idea** 166:22 255:21
**identical** 74:14 134:7
157:16,21
**identifiable** 230:9
**identification** 19:6 87:23
90:4 115:20 131:7
188:10 190:12 219:12
**identified** 41:12 42:16
257:15,21
**identifies** 35:21 127:12
**identify** 18:2 40:15 42:9
42:15,25 65:17 118:14
**identifying** 17:4 218:15

**IHNC** 87:5,11,14,17
111:15 126:25 137:11
196:14 260:23 267:24
**II** 130:19,20 131:2
**III** 65:23 219:8,16
**ILIT** 67:21 139:22
**illuminates** 172:3
**image** 255:16,17 266:6
266:22
**images** 18:15 21:13
62:15 256:19,23,25
**imagine** 211:24
**immediate** 85:12 104:24
104:25
**immediately** 85:8 107:14
184:3 206:18 220:19
237:7 249:7 265:24
**impact** 120:6,8 129:4
224:23 225:11,13
258:15
**impacted** 225:15
**imperative** 271:12
**importance** 96:5
**important** 9:8 41:13
66:13 67:16,17,25 95:8
95:8 153:15,17 156:11
157:9 170:15 183:13
260:10,13
**impose** 251:20
**imposed** 252:11,21
**impossible** 10:22 191:5
191:24
**impression** 134:17 135:3
135:12
**impugn** 173:14
**inability** 173:15
**inaccuracies** 139:16
**inaccuracy** 139:14 140:5
140:8
**inboard** 85:12 240:4
**incandescent** 206:24
**inch** 62:10,10,14,14
81:15,18 108:25 244:3
244:3
**inches** 60:17,20 61:4,7
61:22,24 62:4,25 81:2,4
81:18 82:2 107:16

108:10 258:23
**include** 71:11 115:4
**included** 72:15 78:25
   89:5 93:17 162:19
   215:16,22
**includes** 36:15,16,17,18
   40:3
**including** 156:10
**income** 29:17
**incomplete** 189:8
**incorporated** 8:2 35:2
**incorrect** 191:21 192:2
**increase** 179:7 239:10
**indentation** 237:6
**independent** 153:16
   167:24
**index** 5:1 47:19 65:23
   215:17,22
**indicate** 106:20 114:9
   217:20 222:14 224:23
   225:18 255:12
**indicated** 183:17,18
   197:11 217:9 237:22
   245:5 246:12 263:6,7,8
**indicates** 261:18
**indicating** 113:3 116:7
   118:5 194:2 208:13
   230:22 262:6 263:6
**indication** 88:9,12 93:21
   94:6,22 225:11
**indicative** 216:25 218:14
   265:22
**individual** 113:21
   152:12
**indulge** 163:8
**industrial** 46:11 66:19
   66:23 67:5 69:9 144:10
   145:8 146:14 164:12
   185:7,16 197:11,12,14
   238:9
**inflow** 21:19
**influence** 10:6,11 33:12
   33:12
**influenced** 238:12
**information** 20:19 25:9
   25:13 47:7 51:15 53:9
   59:6 66:13 67:4 87:11

87:12 89:20 93:22,23
   93:25 94:8 95:2,4,14,18
   95:19 96:19 110:2,4
   113:17 126:15 128:4
   132:3,19 137:7 151:2
   152:11,19 174:3 189:19
   256:22
**informed** 44:8 150:4,14
**informing** 150:15
**Ingram** 1:7,8
**ING4727** 238:7 239:23
**inhibit** 10:10
**initial** 24:3 258:9
**initially** 22:7 28:25 175:4
**initials** 48:8
**initiation** 24:3 245:18
**inland** 16:23 31:10 161:2
   233:18 236:16,17 245:7
   263:23 264:2,3 267:3
**Inner** 14:19 15:23 26:15
   26:21,24 27:14 37:3,11
   38:4 39:7 68:15,21
   83:25 85:4 89:6 92:19
   96:10 98:4 103:5,12
   105:16,21 106:15 108:2
   113:5 114:18 125:20
   134:8,12,18 135:4
   137:14 140:9 144:12
   150:5 179:13 195:2
   202:9 214:15 240:7
   242:8 243:22 264:25
**input** 110:2
**inputs** 51:21,22 52:18,24
**inshore** 207:19 265:2
**inside** 192:19 267:12
**inspect** 14:19 149:18
**inspected** 223:23 225:2
   265:15
**inspecting** 46:12,17
**inspection** 15:8 46:10
   149:15 223:19 225:6
   237:20
**inspections** 47:2 223:14
**installed** 23:20
**instant** 110:10
**Institute** 71:25 115:16
**INSTRUCTIONS** 271:2

**instruments** 112:22
   117:11
**intact** 151:16,16 224:15
   234:24
**intend** 8:23 10:16 34:16
**intense** 198:13,23 200:24
   202:8
**intensity** 116:2,13
**intentionally** 184:4
**interested** 106:5
**interferes** 171:6
**interior** 151:17
**interject** 40:20
**interpolate** 113:16,17
   125:12
**interpolated** 114:18
   125:13,18 126:15
   129:23
**interpolation** 129:24
**interpret** 228:19 261:24
**interpretation** 159:4
**interruption** 24:5
**interval** 173:25
**intervals** 17:2,17,18,22
   18:7 19:24 20:12 21:2
   100:5,25 101:14
**interview** 141:18,25
**introduce** 6:21
**inundated** 154:23
**invasive** 31:12
**invoiced** 29:13
**invoices** 28:23 29:8,10
**involve** 11:20 12:10
   70:11,15,21 71:8
**involved** 10:25 11:24
   12:5,7,13,17,19,23 13:4
   13:20 14:4 33:10,11
   72:19 83:13 162:9
**involvement** 13:17 31:25
   33:3
**involving** 11:16,19 13:5
   31:23 33:21
**inward** 17:9
**in-flow** 71:19,21 73:20
**in-rush** 244:17 245:3
   249:7
**IPET** 26:8,12,13 57:17

57:20 58:9,20 67:20
   139:22 199:22,25
**IPET's** 79:3
**issue** 159:9
**issues** 30:23 31:9,13
   261:9 263:19
**item** 182:5
**items** 72:19
**I-1** 162:19
**I-3** 154:5
**I-4** 159:8 164:20
**I-5** 161:17 165:13
**I-6** 161:19,24 163:3

_____

### J

**J** 1:16 32:5 270:12
**James** 14:9 33:15 37:7,7
   37:13,23 38:19
**Jamie** 188:6
**Jersey** 69:15
**jetting** 256:3
**jib** 123:25
**job** 213:7
**John** 2:7 3:15 7:5,7
**Johnson** 17:11 161:18
   245:18
**join** 78:5 82:5 107:6,7
   108:21 148:10,11,14,16
**joined** 106:9 148:24
**joining** 81:24 107:3
   109:9
**joint** 258:17
**Jones** 215:25
**Joseph** 1:10 4:22
**Jourdan** 154:18 230:22
   233:24 236:8,14,15,16
   264:4 266:25
**Jr** 1:9,10 4:23
**judge** 1:8 59:18 96:4
**judging** 59:23
**judgment** 74:7 172:6
**jumped** 54:10
**jumping** 101:6
**Junior** 190:9

_____

### K

**K** 1:7 18:20 20:7 21:6

47:11,17,20 129:20
**katrina** 1:3 4:21 6:12
10:13,20 13:25 22:14
25:16 26:23,25 27:4,12
28:24 32:20 78:17
89:24 112:14 150:6,12
166:22 184:4 188:5
193:24 194:23 195:12
195:15 207:17 227:25
228:6,8,13,16,21,25
229:4,7,17,21 230:10
230:24 231:5,7,8,10
234:8,10,16 235:4,15
236:6
**keel** 119:24 120:9,25
**keep** 8:11,12 102:8
224:16 229:3
**keeps** 128:6
**key** 67:23,24 135:17
**KHORRAMI** 3:3
**kind** 42:10 47:4 51:20,22
71:3 122:3,3 133:21
144:7 206:24 222:19
223:21 234:3
**kinds** 25:17 30:23 31:13
41:21,22 46:16 47:9
51:12,24,25 52:2
132:14
**kinematic** 84:17
**Kirsten** 2:6 7:4
**Knabb** 188:5
**knew** 32:20 89:11 129:20
129:23 189:23
**Knight** 14:10
**knock** 204:20 233:9
**knocked** 128:17 160:6,7
160:9 204:17 209:3
233:19,22,22,23 234:6
234:12,17,18 247:15
**knocks** 259:16,17
**knots** 38:13,13 88:20,25
90:22 91:7 92:9,11
94:25 96:21,24 97:3,5,6
97:24 98:10 100:18
122:11
**know** 8:21 18:19 19:23
20:3 22:25 26:11,13

27:21 28:6,9,13,16,19
29:13,15,16 32:14
34:23 37:15,19,20
44:11,19,22 47:14,15
49:5,8,11 50:13 53:3,25
54:12,21 57:14,15 58:8
58:20,22,23 59:2 60:12
61:2,6 62:5,6,7 73:2
83:12 88:8 89:4,12
95:11,23,25 98:6
104:21 105:15 109:14
110:18,20,20,24 112:12
112:23 113:12 114:17
115:6,10 116:23 117:21
122:3 126:20 141:11,16
141:20,22 144:2 146:24
148:13 149:7 150:15
151:19 160:24 163:11
165:19,20,22,25 166:10
166:12,14,17,24 167:2
167:3,18 168:12,14,16
168:19 169:16,18 170:9
170:11 173:21 175:19
176:17 178:15 189:21
193:16 194:7,22,25
195:5 197:3,18,23
202:25 206:20,23 210:7
215:10 218:5,6 219:21
221:11,14,16 225:16
227:19 231:2 233:21
235:16 236:14 244:14
248:8 264:18
**knowing** 149:12
**knowledge** 39:15 53:15
68:10 118:3 224:5,7
**known** 83:16 84:2
130:12 225:5
**knows** 84:4 210:17
**krobbins@goodwinpr...**
2:5
**Kuhn** 165:15,18 166:10
166:14 167:3,11,14,16
168:11

**K-n-a-b-b** 188:6

_____

**L**

**L** 3:16 34:20 64:25

**lack** 135:8
**ladders** 223:19,20
**Lafarge** 1:6,7,8,9,10 2:2
3:15 6:13 7:3,5,8 13:25
29:13 98:4,7 137:4,15
180:24 221:21,23 224:5
237:7 239:15
**Lagarde** 1:7
**laid** 223:15
**Lakefront** 112:16 127:2
127:22 128:9 129:21,25
189:15,22
**Lakes** 31:13
**land** 12:14 13:6 41:20
43:8,9 55:6 60:5 70:12
70:16,23 71:9,12,15,21
72:13,20 73:3,11,14,19
74:2,15,22 75:8,17,23
76:3,14,15 78:15,21
79:22 96:3 102:15,25
103:9 104:13,14 133:6
134:2,5 142:7 196:7,10
264:15
**landed** 228:9,9,10
235:11
**landing** 253:25
**language** 125:8
**large** 12:20 17:12 27:9
31:16 69:5,14 122:2,5
122:22 233:2 246:4,5,6
249:7,14 250:20,22
251:6,20
**larger** 113:21 114:11,15
121:2 262:3
**Larry** 3:16 7:8 30:4
40:12 64:9
**lasted** 175:4 178:5
**lasts** 251:12
**late** 176:8 215:5 268:18
**lateral** 105:9 106:6 108:8
**laterally** 214:3
**latest** 127:12 255:24
**launching** 265:7,9
**law** 2:6 3:8 6:16 13:25
**lawsuit** 13:2,5 153:8
**lay** 241:21
**layer** 80:18 81:2 241:16

**laying** 252:7
**lead** 259:25
**leading** 73:18 259:6
266:12
**lean** 254:3
**leaning** 224:14 254:14
**leap** 54:11
**learned** 118:4
**leaving** 163:13
**led** 256:11
**lee** 239:23 240:3
**left** 146:5,6 237:23
261:18,24 263:8 266:19
267:9
**left-hand** 141:5 243:12
255:15
**LEGAL** 3:18
**legend** 58:3
**length** 16:20 25:3 37:13
37:14 69:10 105:7,15
106:16 210:9 222:25
223:3,16 243:11 252:6
252:9
**lesser** 242:18
**letter** 48:21
**letters** 129:20 141:4
189:22
**let's** 34:19 59:18 60:9
79:17 84:20 86:21
106:24 175:2 188:17
200:7 208:9 251:22
253:10
**levee** 22:11,22 23:2,3,6
23:10 32:25 66:16,18
67:18 79:23 80:14
81:10 82:11 83:15 85:3
85:4 105:23 107:6
108:4 109:11 129:5
140:2 149:16,22 154:9
159:11,13 161:2 165:3
181:23 198:6 199:8
**levees** 23:8,9,10,13 24:19
24:19 67:15
**level** 52:15 55:13,14,16
56:13,14,15,18,23 57:8
78:15 79:22 80:20
81:12 96:3 97:25 98:3

98:3,4,7 100:2 106:21
106:24 130:2,4,7,10
138:7 139:18 140:5
143:8,12,15,15 170:18
208:22 262:5 264:14
**leveling** 53:22 54:2,4,6,8
54:14,16,18,22,25
**levels** 55:7 56:17 67:23
139:7 246:23,25 247:9
265:3
**license** 1:17 64:15 65:6,9
**licensed** 36:12 64:13,16
64:22 65:13,15
**LIDAR** 60:14,18,21,23
60:25 61:3,19 62:3,12
**life** 173:5
**light** 32:24 124:19
153:13 171:8 194:11
205:25 206:9,12,13,14
206:20,23,23,24,24
207:5,6
**lightening** 171:21,24
172:2,5
**lightly** 237:18
**likelihood** 163:18
**limitation** 117:6
**line** 5:3,8 35:20 56:21
57:25 58:3 64:11 87:4
91:10 96:19 116:9
117:7,8,9 118:14,14
162:3 165:15 170:17
198:14,15 202:20,22
203:24,25 211:11
216:11,12 234:23
239:14 251:3 272:5
**linear** 61:11,11
**lines** 198:11,17,18,21
200:15 258:21
**list** 19:19 47:11 120:12
120:13,15,19 121:5,15
121:16 122:6,9 123:6,6
257:10
**listed** 20:7 47:20 64:5,18
64:20 120:23 121:3,12
**listing** 120:17 121:3,4,8
121:10 122:15 124:11
253:2,4,5,6,6 257:9

**literature** 118:23
**litigation** 1:4 30:15,24
**little** 8:16 14:6 120:14
175:24 214:7 239:17
240:7 243:19 251:10
253:24
**lives** 212:20
**LLP** 3:3
**load** 247:22 248:5,22
249:14 250:20,23 251:6
251:20,25 252:5,8,10
252:21 253:8
**loaded** 240:4
**loading** 69:4 132:15
**loadings** 12:19,22
**local** 39:14 84:5 85:12
103:8,17 147:16
**localized** 102:19 103:2
104:18,19 105:2
**locally** 76:18,21 78:2
**located** 27:10 136:23
162:20
**location** 20:12 37:24
57:10 110:15 126:14
127:13,19,21 128:10
138:20 146:2 159:24
191:17 213:14 230:16
237:2 268:23
**locations** 17:2 57:22
125:11 189:18
**lock** 36:21 47:8 141:19
196:18,22 197:2
**locks** 47:8 68:23 140:10
195:9 196:21,23
**logical** 200:12
**London** 159:11,25
161:15,16 227:14
**long** 9:6,7 71:5 155:14
202:23 216:14,19,20
217:16,17,21,23
**longer** 30:9 102:2 128:22
169:12 173:25,25
195:22 196:3 218:3,4
256:9
**look** 18:20,23 40:4 52:6
55:21 64:21 65:3,22
86:14 91:13 94:3 96:8

99:8 129:15 131:16,18
149:16,19 150:5 152:13
161:23 162:17 166:7
171:7 172:7 198:8
208:12 211:22 215:20
226:8,10 233:16 257:8
262:3
**looked** 91:4 151:24
152:3,6,8,9,10,17 171:3
180:17 211:19,25
214:24 225:24
**looking** 18:19,21,25
20:21 21:14 46:15 48:3
56:20 62:22,23 63:7,15
64:8 78:13 79:13,15
90:13 92:25 94:5 101:2
104:4 132:6 137:5
145:24 151:25 163:24
164:5 172:12,16 193:13
199:7 208:15,16 210:11
211:23 213:22 214:20
215:19 216:6 218:15
225:10,17 235:6 257:14
258:14 262:2
**looks** 23:23 58:3 101:24
116:6 141:9 188:15
213:19 215:21 255:17
262:8
**loose** 237:3,9
**Los** 3:5
**loses** 265:8
**losses** 11:17,19
**lost** 118:17 194:2 242:25
**lot** 49:4,4 105:6 111:21
111:23 119:17 151:10
155:3 176:6 178:10,13
178:14,20 247:22 248:5
248:22
**lots** 228:9
**loud** 165:8 181:22,23
182:4
**Louisiana** 1:2 2:12 6:15
64:17 65:15 139:23
**Louisiana/Mississippi**
39:14
**low** 38:14 75:13 80:20
106:21 142:22 245:2

265:23 266:3
**lower** 15:15,16,20 16:15
21:20 78:15,22 79:22
81:9 85:11 130:10
141:2 180:25 181:8
183:8,10 209:4 228:10
229:9,17,19,21 230:12
231:23 232:13,18,19,19
234:4 240:4 244:5,22
244:25 245:4 246:13,16
246:22 247:6,9,11
248:17 256:10,17
258:16 259:8,9 260:19
262:10 264:10 265:14
266:22,25 267:2,8,12
**lozenge** 153:10
**LSU** 139:23
**lunch** 119:9
**lying** 17:5 223:6,8
225:25,25
**L.L.C** 2:10

---

**M**

**MAGISTRATE** 1:10
**magnitude** 73:7 261:16
261:17
**main** 97:25 106:24
**making** 74:7 78:10 89:18
150:23 193:4 246:4
254:3
**man** 221:9 269:4
**manner** 255:21
**manual** 26:3,4,6,7
**manuals** 25:13,23 26:5
26:10
**map** 162:17,19
**March** 44:20
**margin** 50:13 51:3,16
113:19,19,20 114:10,11
114:14,17 119:6
**margins** 52:2 112:21,24
113:2,21 114:5,25
115:5,6
**marine** 30:8,10,11,17,19
30:21 31:18,21 32:20
35:18,21,22 36:2 41:4,6
41:11,12,13,24 42:3

59:22 70:11 71:10
72:10 132:18 219:7
220:22
**Marino** 3:17,17 7:10
**mark** 2:6 3:18 6:19 7:2
19:2 89:21 115:11,14
130:23 188:2 190:7
219:13
**marked** 4:9 19:4 20:11
20:15,17 48:10 87:19
87:21 90:2 115:18
131:5 188:8 190:10
219:10 258:4,6
**marker** 20:25
**markers** 21:2 223:15,18
**markings** 20:16
**marks** 46:15 47:7 58:2
248:11
**Marseille** 33:17
**Martin** 1:16 6:18 9:24
270:12
**mass** 72:13 83:10 254:18
**masses** 71:9,12,15,21
72:13 74:15
**massive** 197:4 203:2
211:13 225:8
**master** 47:8
**material** 18:5
**materials** 63:20 64:7,7
131:3 133:5 219:15,24
**mathematical** 52:6
**matter** 32:6,10 35:2
58:13,14 113:17 253:7
**matters** 30:21,24 88:18
**MD** 52:8
**mean** 21:18,19 38:23
54:2 98:7 112:15
122:11 123:6,8 125:21
128:3 133:10 138:3
139:18 143:5,7 144:2
149:9 158:5 161:8
178:14 179:19,23
181:17 191:25 192:4,6
193:25 195:12 196:20
211:15 222:18 224:10
243:6 260:24
**meaning** 201:23

**meaningful** 151:12
**means** 64:13 84:21 85:10
102:10 143:3,8 270:19
**meant** 175:16 208:2
258:13
**measurable** 105:13
**measure** 116:14
**measured** 17:18 96:23
97:6
**measurement** 50:23
117:8,10
**measurements** 60:5
116:17 129:23 223:17
**measuring** 58:19 62:24
117:15
**mechanical** 226:12
**mechanics** 41:21
**mechanism** 73:23
**medication** 10:5,9
**meet** 46:9 77:4 92:23
148:9
**member** 30:9,9
**members** 30:6
**memoranda** 49:3
**memorandum** 48:22
**memory** 13:22,23 37:17
38:11 155:15 199:21
221:10 233:17
**mention** 40:25 59:25
214:8 263:13
**mentioned** 17:16 21:5
52:16 70:18 73:24
80:21 88:3 142:18
184:2 189:24 196:25
203:7 223:15 231:24
240:6 257:9
**Merchant** 35:18 71:10
72:10
**merely** 163:20 187:3
**merged** 172:18
**met** 46:3
**metal** 149:10 194:10
199:10 208:25 212:3
**metallic** 193:9 205:13
213:21 217:11
**metallurgy** 36:17
**meteor** 72:14

**meteorological** 72:14,24
189:4
**meteorology** 36:15 70:14
70:19,21,24 71:6,8,24
72:2 132:22,24
**meter** 96:23
**meters** 96:20 97:10,21
97:25 100:2
**methodologies** 59:9
**methodology** 59:5 89:14
89:19
**Metric** 4:16 115:13
**Mexico** 32:3
**Michoud** 88:15,19 90:11
90:18 91:5,13,18 93:22
94:7,11,24
**middle** 58:4 130:16
137:14 143:23 148:11
**miles** 37:15,15 88:25
92:11 95:13 129:2
**million** 28:17,18
**mind** 13:17 14:25 101:5
193:3 206:2 212:2
253:14
**mine** 39:22
**minimum** 91:15 189:10
**minute** 96:20 97:7 99:15
99:25 100:4,8,9,11,12
100:15,19,24,25 101:10
101:12,16 103:22,25
104:8 111:13,14,16,16
118:6 140:18 202:25
235:5
**minutes** 99:15 164:23
167:8,8 168:20 175:5,5
178:6 202:24 210:15
221:19 248:18 249:9
251:12 256:20
**mischaracterized** 174:22
249:17
**Mischaracterizes** 138:13
**mischaracterizing** 81:14
158:24
**missed** 64:23
**Mississippi** 64:12,14
65:6,12
**misstated** 68:20

**mistaken** 213:23
**mistook** 193:10
**MIT** 71:24
**modeled** 37:2
**modeling** 36:20 39:6,11
51:8 52:7,8 53:5,13
**models** 132:4,13
**modern** 132:4
**modification** 251:8
**modify** 49:15,20 56:18
56:19
**modifying** 56:25
**moist** 71:20,22 73:20
75:11,15,15,18
**moment** 34:19 63:12
77:10 91:5 106:25
147:6 174:13 182:18
**moments** 247:20
**momentum** 232:24
252:15
**moment-by-moment**
111:21
**Monday** 87:9 135:5
**month** 166:17,20,24
**months** 29:9 44:11,25
184:5
**moored** 69:5 195:6,11
255:17,19,22
**morning** 6:10 9:19 80:4
87:9 108:25 135:5
137:12 141:14 145:7
164:3,13 168:20,20,21
171:14 180:8,13 184:2
189:16 238:8 243:22
262:25
**motion** 33:11 67:5 82:23
121:12 122:14 123:9
243:20,23 247:16
261:20 262:22
**motions** 51:11 120:4
219:16 220:15,16
**mouth** 211:25
**move** 71:15 75:11,22,25
76:3,14,15 77:3 81:4,6
81:20 102:15,16 103:9
104:14 108:20 109:6
122:19 123:8 136:12,13

154:18 186:7,9,12
226:11 231:22 238:6
251:10 259:12
**moved** 69:8 81:9 128:23
160:10 161:2,2,14
178:16 183:23 185:14
185:15 186:5 230:13,17
238:9 239:25 244:14
245:23 246:6 263:23
**movement** 33:6 36:22
37:3,8 52:25 67:6
68:11 70:15,22 71:11
72:4,12,19 73:10,11,13
73:25 75:7 82:7,9 86:4
102:5 109:12 110:10
128:21,23 206:15
227:18,19,20 228:12,13
228:14,16,20,24,25
229:4,7,8,15,16,18,21
244:16 262:23
**movements** 51:9 53:5
122:8 228:22
**moves** 71:21 75:16
104:13 108:16
**moving** 74:22 76:13
77:24 81:17,23 83:10
83:17 109:4 110:9
122:21 124:15 136:15
136:18 137:16 138:4,5
138:9 146:8 147:23
148:19 176:10 177:13
177:14,18,22 180:12,17
180:19 181:7 220:8,10
220:18 221:3 226:13
241:16 242:2,9 247:6
250:7,8,15,16 251:3
254:22 257:2,4 258:24
259:2 265:23 266:2,3,7
267:3,6 268:3,10
**Mozer** 199:22,24,24
200:5
**mraffman@goodwinp...**
2:5
**multiplied** 100:9
**multiplying** 100:12,15
**Mumford** 1:7 6:13
**municipal** 213:3

**N**

**N** 2:1 3:1 4:1
**Namasco** 237:14 255:25
256:4,16
**name** 6:22 7:20,21 32:13
32:18 128:11 141:22,23
221:11,16,17
**named** 165:15
**names** 32:12 51:7 52:3
128:14
**Nancy** 1:16 6:18 270:12
**narrow** 144:9
**NASA** 88:15 90:11,18
91:5,13,17 93:21 94:7
94:11,24 95:24
**National** 4:14 30:7 89:23
92:23 93:7,11 115:14
158:12,14 159:6
**natural** 124:18 257:5,6
**nature** 74:16
**naval** 4:18,24 35:21,22
35:24 36:14 41:6,24
42:3 59:22 72:6 78:8
130:19,25 194:7 219:6
219:7,15 220:21
**navigation** 37:11 38:4
43:10 68:21 125:20
134:12,18 135:4 140:9
144:10,13 150:5 195:2
240:8 243:22 264:25
**Navigational** 14:19 15:8
15:24 26:15,21,24
27:14 37:4 39:7 68:16
83:25 85:5 89:6 92:19
96:10 98:5 103:6,12
105:16,22 108:3 113:6
114:18 134:8 179:13
195:17 202:9 214:16
242:8
**Navy** 31:14 72:8,24
**near** 17:11 33:16 82:20
160:12 201:4 233:7,25
**nearby** 88:9 215:12
**nearest** 126:23 127:16,19
127:21
**nearly** 107:23 134:7
262:14 267:7

**necessarily** 13:10,19
31:4 84:22 93:4 158:7
234:13 238:16 256:21
**necessary** 150:20 154:9
159:10 252:24 253:19
253:20 271:4
**need** 40:20,22 97:13
104:12 159:13 263:12
263:14
**needed** 223:19
**negligible** 104:15,17
121:7 124:22,24 242:14
261:21 262:7
**neighborhood** 168:13,14
169:8 170:25 244:7,11
**neither** 168:22
**new** 1:16 2:3,12 4:16
6:19 7:23,23 14:19
15:4,6,11 35:16 55:4
58:14 63:25 69:6,13,15
70:25 88:23 89:24
90:11,18 112:14 115:13
125:11 127:22 128:9
129:7,10 151:8,8
189:22 230:11 260:24
260:25 261:3 263:13
**Newark** 69:6,16
**night** 215:5 216:13 217:3
217:18
**nighttime** 172:17
**Ninth** 15:16,20,20 16:15
20:2 21:20 78:15,22
79:23 81:9 180:25
181:8 183:8,10 228:10
229:9,17,19,22 230:12
231:24 232:14,18,19
234:5 244:5,22,25
245:4 246:13,16,23
247:6,9,11 248:17
256:10,18 259:8,9
260:20 262:11 264:10
265:14 266:23,25 267:2
267:8,12
**Nods** 73:16
**noise** 174:7
**normal** 56:13,14,18,23
**north** 2:2 3:15 6:13 7:3,6

15:12 16:17 17:5,11,14
20:14 21:2,3,17 23:18
23:19,24 25:5 79:6
138:6 146:9,15,17,18
147:12,20 160:14
165:12 172:11 178:15
178:16 183:12 194:15
194:19 195:22 196:3
197:17,19,21 199:16,25
200:6,18 201:11,13
204:5 207:11 208:15,16
225:10 237:3 245:18,19
257:24,25,25 260:23,25
**northbound** 148:8
**northeast** 147:18 238:19
**northerly** 237:9
**northern** 17:10 68:23
224:21,23 225:2
**northwest** 238:20
**Notary** 273:25
**notch** 237:5,10,12
238:22
**note** 48:22 145:6
**noted** 271:10 273:10
**notes** 49:3
**notice** 98:13 150:2
219:19
**noticed** 211:20
**noticing** 164:24 167:9
**number** 4:9 16:25 18:18
21:6 26:20 31:16 33:10
37:21 58:10,25 63:18
64:12,15 65:9 72:11
79:5 80:4 112:13,16
114:7,7 115:24 137:3
159:19 176:25 177:5,10
185:13 233:2 247:18
256:20,23,24 257:21
**numbered** 117:21
**numbers** 18:2,11,15
21:11 26:5 50:24 93:18
93:18 119:5,6 131:20
215:23
**Numeral** 65:23
**numerous** 8:6 25:16
157:24
**N.W** 1:16 2:3 3:9

## O

**O** 19:3
**object** 16:7 20:6 65:25
66:9 92:13 185:6,18
191:10 197:5,23 202:20
208:3,25 217:12 224:24
232:4 264:22
**objection** 12:3 32:17
37:5 47:13 54:19,23
66:3 68:19 70:7 73:17
74:10,24 75:24 82:15
89:8 94:10 95:3,16
102:7,17,22 103:13
105:18 107:10 108:6
110:5 113:8,23 116:20
118:8 121:19,24 125:25
126:24 127:7 134:21
135:8,25 136:10 137:21
138:13,20 146:10
147:13 149:4 150:8,23
163:10 165:21 168:8
173:9 177:4 178:25
179:22 180:15 183:5,24
184:20 186:24 191:7,22
200:13 201:5 202:11
203:15 227:21 232:9
233:5 235:5,16 241:2
241:11 245:11 246:8
247:24 248:23 254:6
261:7,14 262:18 268:19
**objections** 6:5
**objects** 61:3 62:3 166:9
177:23 178:13,18
**oblique** 209:23 210:2,16
220:11 221:3 238:22
259:6
**obliquely** 220:18 240:18
246:23 247:11 252:13
259:2 266:12
**observation** 99:6 102:4
109:16 126:21,23
143:14 157:3,12 165:11
167:5 181:16 189:12
212:10 220:7,25 227:4
**observations** 46:20
90:10,17 92:22 100:22
113:18 125:22 126:5

128:2 159:2 185:23
186:17 187:3 189:5
212:17,19 227:18
**Observatory** 158:12,14
**observatory's** 158:23
159:6
**observe** 213:8 234:12
**observed** 17:4,7 99:3,4,7
156:25 231:19 233:24
234:3
**observer** 128:2
**observes** 174:2
**observing** 92:20 189:7
189:24 190:4
**obstacle** 232:17
**obstacles** 232:14
**obstruct** 205:4
**obstructed** 205:2,11
**obstructing** 204:24
**obstruction** 69:19,22
77:5 84:8 86:21 105:7
106:3
**obstructions** 102:25
**obtain** 100:24 223:22
**obtained** 50:15 57:16,17
57:24 58:8 63:3 64:14
100:11,14,19 131:10
132:13
**obtaining** 59:6
**obvious** 47:25 162:11
168:24
**obviously** 17:6 21:18
50:18 57:9 69:25 71:11
72:3 75:17 84:15 95:22
100:21 110:11 176:5
183:8 189:18 190:6
245:18 246:22 268:12
**occasion** 11:11 26:16,21
27:7 38:16
**occasionally** 48:25
**occasions** 72:15
**occur** 105:11 161:25
163:5 200:12 225:9
231:2
**occurred** 14:7 165:12
168:23 183:12 187:6
189:10 200:18 227:19

227:20 228:16,17,25
229:2 238:2
**occurs** 103:17 159:7
241:5,9 262:10
**OceanoGraphic** 71:25
115:14
**oceanography** 36:16
72:3
**Oceanweather** 89:15
125:12,13
**October** 56:13
**odd** 208:24
**odds** 212:15
**offered** 34:24 35:4
**offhand** 256:18
**office** 3:8 6:16 89:23
**officer** 72:11
**offices** 1:15
**official** 90:16
**oftentimes** 62:11
**oh** 131:22 167:17 228:3
**okay** 18:20 20:16 41:16
42:6 48:9 49:14,22
51:14 52:3 53:25 55:23
56:18 61:15 63:10
64:21 65:8 70:4,14
72:22 74:20 76:12
77:11 80:9 86:24 87:7
87:14,18 88:13,19,23
90:8,24 92:6,17 93:20
94:20 98:9,23 101:8
104:4 113:16 117:20
119:3 129:12,19 135:10
140:23 141:25 156:17
156:23 160:12,15 162:5
164:20 165:18 167:3
172:24 175:2 187:18
192:18 193:2 194:3
195:16,21 197:3,23
200:7,9,23 202:3,6
203:12 207:24 208:9
213:18 218:16 219:5
221:18 224:14 227:24
228:19 229:3,11,14,25
231:20 236:2 248:7,19
250:14 254:24 262:15
**old** 71:3 151:9 227:2

**once** 84:7 109:11 154:18
160:25 229:18 232:17
266:24 267:5,11
**oncoming** 240:22
**ones** 46:2 125:17
**one-third** 246:21 247:17
259:22
**Online** 4:15
**onward** 211:12
**open** 33:22,24,24 68:23
69:13,14,15 70:2
103:18 134:6 141:6
144:14,25,25 151:22
241:6,23
**opened** 145:7 146:7
152:12
**opening** 68:24
**opined** 154:8 175:14
**opinion** 158:14 159:15
197:22 264:12,17
**opinions** 159:3 183:9
184:7 187:10,13 202:13
202:16
**opportunity** 15:15 16:19
16:24
**opposed** 48:6 61:17
74:23
**oral** 1:15
**orange** 262:4
**order** 21:9 38:13,13
50:22 82:5 85:25 89:15
129:3 134:16 145:14
169:24 182:24 242:12
251:17 256:15
**ordinarily** 21:23 22:3
**ordinary** 38:23
**organizational** 30:17
**orientation** 145:16
**oriented** 213:25 214:2
**original** 255:17 271:12
**originated** 245:16
246:14
**Orleans** 2:12 14:19 15:4
15:6,11 58:14 88:23
90:11,18 112:14 125:11
127:22 128:9 129:7,10
189:22 230:11 260:24

260:25 261:3
**Orleans/Baton** 89:24
**Orleans/Louisiana**
63:25
**outages** 189:9
**outboard** 107:18
**outside** 28:22 32:3
206:16
**outstanding** 235:24
**overlap** 42:2
**overtopping** 38:15 67:25
140:12 268:14,16,23
**overturned** 257:14
258:18
**overturning** 177:21
**over-water** 103:24 104:8
**OWI** 99:14 100:2 111:13
126:6
**owner** 27:11
**owners** 8:4
**oyster** 227:2
**o'clock** 91:12 92:4,6
94:24 96:18 137:11
138:3,12 140:19 154:22
165:2 168:19,21 171:15
176:9 179:16,19 180:13
181:9,13 199:4,4
200:19 201:9,10,23
202:2,10,17 236:23
238:4 239:22,25 263:9

**P**

**P** 2:1,1 3:1,1 188:6
**page** 4:3 5:3,8 40:7,10
45:20 53:12,14 56:4,8
57:18 63:23 64:4,9
65:3,5 78:13,18 79:14
87:7 88:2,4,14,14 90:8
90:9,14,15 91:4,11
93:17 94:3,6,22 96:14
96:17 97:13,14 99:11
99:13,18,21,22,22
101:7 103:21 104:2,3,4
111:12 116:2,6,24
118:14 125:7 126:9
129:16,22 130:14
131:11,18,21 132:2

136:24 137:2,5,6,17
139:6,9,10,11 140:6,23
145:24 147:15,25 154:5
159:8 161:17,18,24
162:19 163:2,3 164:20
165:13 171:3,5,9 172:7
172:12 174:5 189:3
190:20,21,23 198:9,10
198:11,25 199:2,6
201:14 202:18,19,22
203:10,17 205:8 207:9
208:10,12 211:8,11,18
215:22 216:6,11 219:2
219:8,17 220:4,6,7,20
221:8 224:8,20 226:24
227:13,17 229:24 230:4
234:21 235:6 236:18
239:22 244:4 255:8
257:12,13,17 258:6,10
258:11,12,20 259:4,23
261:5 265:16 266:6
272:5
**pages** 4:11,13,15,17,19
4:19,21,23,25 87:4,8
96:16 97:12 99:9,9
115:24 126:11 191:3
200:5 273:6
**paid** 27:18 221:23
**painfully** 159:12
**paint** 226:5,6
**pair** 126:11
**panel** 257:15 258:19,22
259:2
**para** 209:18
**paragraph** 56:11,11,22
57:3 99:13 104:6 125:7
130:14 132:7 189:3,6
226:25 227:17 228:13
229:9,24 230:4 235:9
257:18 258:20
**paragraphs** 130:5
**parallel** 138:4 148:2
209:18 210:2,10 251:3
252:25 267:7
**pardon** 11:14,15 71:17
157:9 165:25 167:12
196:8

**Parfait** 1:9
**Parish** 161:21
**part** 17:8 27:10 34:14
36:13 43:3,19 44:9
97:16 124:24 181:24
182:10 183:3 191:19
205:6 215:14 227:2
239:18,19 247:25 248:4
248:7 253:10
**parted** 176:5
**partially** 247:15
**participate** 32:23
**participation** 162:2
163:6
**particular** 12:8 18:3
26:4 30:5 43:3,18
53:18 62:17 89:17
104:22 106:4 119:21
124:21 129:6 130:20
131:13 132:16 133:18
143:18 158:11 189:12
220:9 233:7 242:4,6
243:11,17,19 252:16
256:22 260:5
**particularly** 69:4 71:12
159:20
**partisan** 153:22
**partly** 99:6,7 239:23
240:3
**parts** 25:20 35:13 45:14
45:16 65:17 205:5
228:15,17
**pass** 87:24 109:7
**passage** 196:2 198:21
**passages** 198:9
**passed** 232:17 247:15
259:11 260:24,25 261:3
266:9
**passenger** 72:9,11 86:9
**passes** 81:25 84:7 86:10
86:20 147:20 259:19
**passing** 144:9,12,14,18
147:19 184:4
**path** 67:6 232:7 234:14
256:25 259:4
**patrol** 193:21
**pattern** 130:13,13

230:21
**pause** 40:8 56:6 63:16
65:2,20,24 79:18 87:2
88:5 116:4 154:2
188:16 190:18,24
201:18 253:11
**pay** 27:12
**Pazos** 18:8 246:18
**peak** 90:21 93:3,8,13,16
95:12 189:10
**peaks** 102:3
**peer** 142:9
**Pendleton** 216:2
**people** 47:8 59:2 128:13
151:23 152:4,6,17
155:23 208:7 223:8
241:21
**percent** 50:22 51:17
98:14,15 116:18 118:7
**percentage** 29:16
**perceptible** 243:24
**perched** 222:10
**perform** 53:22 82:6
83:11 85:15,18 86:13
109:10
**performed** 60:16 83:12
85:20 150:4
**period** 29:6 58:24 72:6
98:11 102:2 109:21
110:12,21 111:20
128:22 134:10 173:6
**permissible** 163:8
**permit** 127:11
**permitted** 186:7,9
260:19
**perpendicular** 124:8
220:17 238:15
**perpendicularly** 240:20
**Perry** 1:8
**person** 32:22,23 59:17
141:22,23 152:3 153:12
155:18,22 172:5 176:23
205:12
**personal** 53:15 173:4
**personally** 36:19 156:2
165:19 168:12
**persons** 28:22

person's 155:25
PERTAINS 1:5
phenomena 102:21
 103:18 241:5
phone 14:16
phones 24:6
photo 18:9
photograph 16:24 20:14
 20:21 21:7,8 47:6,23
 48:2,5,6 79:13,14,16
 140:25 233:16 266:20
 267:10
photographs 16:25 17:4
 17:21,24 18:3,21 19:20
 19:21,24 20:4,6,8,9,11
 20:13,15,18,20,23 21:5
 21:11 22:13,15 47:3,4
 47:12,15,16,19,24 48:7
 48:9 168:24 230:8,8
 244:23
photography 17:3 60:4
photos 18:7,10 63:24
phrase 54:4,6,16
physical 9:16,21 224:23
 225:11
physically 194:23
PH.D 1:15 4:2 6:1 7:1,14
 8:1 9:1 10:1 11:1 12:1
 13:1 14:1 15:1 16:1
 17:1 18:1 19:1 20:1
 21:1 22:1 23:1 24:1
 25:1 26:1 27:1 28:1
 29:1 30:1 31:1 32:1
 33:1 34:1 35:1 36:1
 37:1 38:1 39:1 40:1
 41:1 42:1 43:1 44:1
 45:1 46:1 47:1 48:1
 49:1 50:1 51:1 52:1
 53:1 54:1 55:1 56:1
 57:1 58:1 59:1 60:1
 61:1 62:1 63:1 64:1
 65:1 66:1 67:1 68:1
 69:1 70:1 71:1 72:1
 73:1 74:1 75:1 76:1
 77:1 78:1 79:1 80:1
 81:1 82:1 83:1 84:1
 85:1 86:1 87:1 88:1

89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1

233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1
pick 135:17
picking 60:19 61:3,20
 62:3,13 175:22,22
picture 21:14,15 141:5
 141:11,20 171:3,8,11
 171:18 172:7,9,12,23
 209:4 221:9,25 222:23
 234:22 258:11 266:15
 266:18
pictures 25:16 60:6
 62:22 146:2 159:19
 227:9 228:9 231:4,6,9
 231:10,11,12,14,15,16
 235:21
piece 176:15 213:19,24
 222:10
pieces 25:20 173:20
 226:3
piggybacked 40:5
pile 12:22 60:20 61:6
 213:19,24 214:10,13,17
 214:19,20,21,25 217:5
piling 17:8,12 25:7 61:8
 61:9,20,22 62:5,8,9,9
 62:22 193:10
pilings 23:21 69:24
pinpoint 119:4
pitch 243:25
pivots 265:7
place 71:7 75:15 76:24
 77:23 78:19 80:21
 94:17 128:22 150:18
 155:15 233:14 234:7,15

235:4 245:6 265:17
placed 19:7 56:16 199:15
 200:19 222:12,14
placement 255:11
placing 223:17
plaintiffs 3:2 6:23,25 7:9
 18:8,10
plaintiff's 7:10
plane 62:21
plank 226:25
plans 170:13
plastic 194:10 237:20
platform 33:15
plausible 204:9
please 6:21 7:20 15:23
 16:11 24:6 40:4,15
 42:25 46:7 55:15 65:17
 66:8 70:17 77:19 79:12
 86:24 94:11,19 97:2
 99:21 119:23 120:20
 123:22 125:3 126:8
 131:9 135:2 139:9
 142:19 153:25 174:18
 174:19,25 181:5 189:3
 198:14 219:2 221:8
 225:20 227:24 236:18
 240:12 250:13 255:8
 271:3,7
PLLARD 3:3
PLLC 3:8
plot 57:21
plus 170:5
PNA 142:15
point 24:2,12 25:7 28:4
 43:17 57:23 58:6 63:23
 82:7,9 86:20 98:2
 105:10,12 112:6 119:8
 124:2,5 126:23 131:9
 136:18 148:10 156:6
 164:10 181:10,14
 183:13 187:4 192:9
 247:14 250:11 252:14
 258:9 259:16 265:20
pointed 266:9
pointing 208:8
points 40:22 57:11,23
 87:15,17 88:3,10 89:17

89:20 114:6,9 123:14 125:16,17,19,23 126:22
**poking** 205:6
**poles** 233:11,14
**Pollard** 3:6 6:24,24 7:9 127:8
**Ponce** 33:19
**poor** 227:6
**popping** 182:14
**port** 32:3 33:17,19 69:5 69:6,6
**portion** 22:9 23:6,19 37:7,10 69:16 131:14 207:12,13 213:22 231:22 240:15 247:14 257:23 258:16,17 259:18
**portions** 16:21 26:2,2 67:10 126:4 193:9 225:21,21
**portray** 209:11
**portrayed** 207:20 209:25 210:15
**ports** 12:21
**posed** 250:14
**position** 57:10 229:20 230:7 231:5,9 239:25 252:22 255:22 264:4 266:8,14,21 267:7
**positioned** 252:20
**possibilities** 163:14
**possible** 13:14 20:20 21:12 24:14 50:2,7 51:3 154:14 157:14 166:8 173:15 176:2 178:17,20 192:12 193:2 204:9 208:5 225:18 243:3,5 249:19 254:17 254:19,20,23 255:24
**possibly** 39:14 157:25 161:24 163:4 268:16
**posture** 119:21,23
**post-Katrina** 265:17
**post-Rita** 231:16
**Post-Tropical** 89:25
**potential** 4:17 115:13 268:23

**potentially** 21:15
**Powell** 115:14
**power** 175:15,15 189:8
**Poydras** 2:11
**practice** 264:21
**preamble** 235:20 249:17 250:10
**precedes** 220:20
**precise** 37:21,23 38:12 44:10 50:18 74:12 80:11 118:10 137:7 139:14 145:21
**precisely** 59:4 74:19 173:6
**precision** 50:17
**predicate** 113:23
**prediction** 89:16 111:15
**predictions** 72:14
**predominantly** 71:8
**prefer** 156:2
**preliminary** 35:17 48:11 48:17
**prepare** 72:12
**prepared** 87:13
**preparing** 48:23
**present** 3:14 6:20 7:5 268:16
**presentation** 115:25
**presented** 158:13
**press** 251:5
**pressing** 242:9,11 251:24
**pressure** 21:21,25 75:13 84:21,24,25 85:5,9,11 99:14 125:15 142:22 251:10 253:19,20
**pressures** 86:15 91:15 189:10
**presume** 23:7 64:19 117:13 175:15 204:15 251:2
**presumes** 245:13,15
**presuming** 174:23
**pretty** 13:23 43:20 84:2 84:9,11 260:9
**prevailing** 77:2 78:6 84:7 86:19
**previous** 23:15 181:2

249:18
**previously** 8:6 13:4 31:22,24 32:5,9 33:4 103:16 116:16 118:4,11 188:14 196:24 238:17
**pre-engineering** 35:17
**pre-Rita** 231:15
**prices** 101:19,23
**Prieur** 17:14
**principles** 4:18,24 130:18,20,25 219:6,15 220:20
**prior** 11:11 12:12 13:11 26:22,22,25 27:3,12 30:3 32:4,20 33:3 66:25 68:13 70:14 92:14 152:20 184:17,24 189:9 194:23 227:19,25 228:2,4,6 248:16,16
**private** 95:24
**probable** 67:22
**probably** 169:10 218:17
**probative** 173:2
**problem** 8:16,22 9:2,19 10:2,3 111:24 149:6 151:13 153:10 206:5 215:13 226:21
**problems** 31:15 58:11,12 139:15,19 215:6,8,16
**proceed** 10:3 200:7
**proceeding** 73:19
**proceedings** 40:8 56:6 63:16 65:2,20,24 79:18 87:2 88:5 116:4 154:2 188:16 190:18,24 201:18 269:11
**Procter** 1:15 2:3 6:17 7:4
**produce** 223:13 248:22 249:14 251:6
**produced** 63:11,20 66:16 215:25
**produces** 251:24
**PRODUCTION** 5:7
**profession** 59:19
**professional** 1:17 36:12 64:13 65:4,5
**professions** 41:14

**profile** 133:14
**program** 49:25 50:22 52:12,23 53:6,10
**programs** 39:12 50:3,4,8 50:9,14,15,17,19 51:2,7 51:8,10,12,15,18,19,21 52:4,17 53:4,19 54:11
**progress** 20:25
**project** 29:9 30:3 32:4,16 32:24 39:23 40:16 42:11 43:3,19 46:9
**projection** 87:16
**projects** 13:13 30:5,10 30:11,14,16 31:5,6,15 31:17,18,21 33:10,21
**pronouncing** 88:16
**proof** 154:17
**proper** 128:13 241:19
**properties** 84:17
**propounded** 273:8
**Propulsion** 131:2
**protected** 79:4 161:9 192:19 207:10,12,13,19 207:21,22 208:11 209:11
**protrude** 210:25
**protruding** 182:5 191:18 203:3,4 204:5 210:21 210:24 211:2,14,14
**prove** 184:21
**provide** 9:18 170:13 223:20
**provided** 19:22 47:3,10 47:12 66:12 126:14 136:7,8,17
**provides** 111:5 133:24
**providing** 110:4
**Public** 273:25
**publications** 22:16,17,19 40:13 64:10 79:5
**published** 132:23
**Puerto** 33:20
**pump** 145:25 146:3 148:6,7 149:17,18,19 149:21 151:14,17 152:4 152:7,13 206:13
**pumping** 206:10,16

**punch** 194:14,17,20
**purpose** 108:2 128:16 208:19,22 209:10
**purposes** 13:3 17:3 25:23 30:17 224:9,17
**pushed** 266:5
**put** 19:16 36:24 95:6 118:12 150:17 253:20
**puts** 247:22
**p.m** 119:12,13 153:2,3 187:22,23 188:21,22 218:21,22 255:4,5 269:11

**Q**

**qualification** 10:16 34:20 42:11 43:18
**qualifications** 10:18 36:24
**qualified** 39:17,17,18 41:10 42:20 43:2
**qualify** 153:19 217:12
**question** 6:6 8:18,19,21 8:23,25 9:10,11 10:17 15:5 16:6,6,9,10 24:12 25:12 30:12 31:2,23 32:24 41:11 57:14 61:19,21 64:6 66:2,6,9 66:17 68:25 70:17 74:5 74:13,19 75:2,5,9 78:9 78:20 82:13,14,16 89:9 92:13,14 94:16,19,21 95:21 98:8 103:7 111:6 111:12,17 113:9,11 115:8 117:16 118:2,3,9 118:12,13,16,18 129:17 132:10 134:25 135:14 135:23 138:24 139:14 140:21,21 144:21 145:23 156:23 157:7 166:25 174:18 176:20 176:21 181:2,3,4 182:10 184:12,14,15 185:10 186:3,4,19,20 191:25 197:9,17 198:18 203:14,17,22,24 204:15 216:12 227:8 228:5,19 229:4,4,8,12,13,16 230:18 232:11 234:11 235:13,18,19,20,23,24 236:3 249:13 250:10,13 250:14,19 251:9 254:7 254:9 260:5 268:8 269:3
**questionable** 58:16
**QUESTIONED** 4:3
**questioner** 208:6
**questions** 9:6 10:10 40:21 41:3 42:6 61:16 97:11 106:18 146:25 190:14 259:24 267:14 267:16,21 273:8
**quickly** 174:13 242:20 243:2
**quite** 71:2,5 162:11
**quote** 38:12 220:21

**R**

**R** 1:8,15 2:1 3:1 4:2 6:1 7:1,14 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1,6 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1,3,3 273:1
**radio** 128:5
**radios** 128:4
**Raffman** 2:6 4:5 7:2,2 12:3 16:2,4,8 18:6 32:17 37:5 47:13 54:19 54:23 55:25 56:3,5,10 63:14,17,19 64:3 65:25 66:9 68:19 70:7 73:17 74:10,24 75:24 79:21 79:25 82:15 88:17 89:8 92:13 94:10,15 95:3,16 102:7,17,22 103:13 105:18 107:10 108:6 110:5 113:8,23 116:20 118:8 121:19 125:25 126:24 127:7,9 134:21 135:8,25 136:10 137:21 138:13,20,24 140:20 146:10 147:13 149:4 150:8,23 163:10 165:21 168:8 173:9 177:4 178:25 179:22 180:15 183:5,24 184:20 186:24 191:7,22 200:13 201:5 202:11 203:15 208:3,5 215:21 216:3,5 219:25 227:21 228:4 232:9 233:5 235:5,16 241:2 241:11 245:11 246:8 247:24 248:23 254:6 261:7,14 262:18 267:16 267:19 268:20 269:2
**rain** 141:9 171:6 175:22 215:5 217:3
**raining** 168:23 206:6 211:24
**rainstorm** 207:8 217:19
**raise** 16:6 79:24 176:19

176:21
**raised** 169:15
**range** 115:6
**rapid** 112:10
**rapidly** 165:7
**rate** 19:19 265:23
**rates** 262:13
**ratio** 105:7 133:6
**ratios** 133:15
**reach** 243:3,5
**reached** 207:16 246:4
**reaches** 81:11 107:17
**reaching** 243:7
**read** 16:11,12,14 25:25
  25:25 26:3,4 35:10,12
  116:23 117:4 118:14
  128:2 141:4 145:12
  156:6 161:11,12 163:4
  174:19,20 200:4 201:25
  211:15 215:12 271:3
  273:5
**readily** 122:20
**reading** 91:18 92:8 97:18
  198:17 201:21 211:11
  216:19
**readings** 59:4 98:11
  114:13 118:24 127:12
  139:7 140:7,8
**reads** 99:13
**real** 211:23
**realistic** 245:25
**realistically** 130:9
**really** 68:4 163:12 262:9
**reason** 41:10 95:11
  260:11,13 271:5
**reasonable** 37:25 100:4
**reasonably** 122:20 225:6
**reasons** 39:10,16 58:10
  103:16 109:15 168:11
  169:4 173:14 217:15
  218:12 260:13
**rebar** 245:10,22 246:11
  246:24 247:16 259:19
  259:20
**rebars** 245:24
**rebound** 242:17
**rebounds** 242:19

**recalculated** 130:15
**recall** 13:7,9,13,15 24:12
  26:5 29:10,12 31:6
  33:7 35:11 44:5,10,14
  44:21,24 47:5 48:10,18
  49:16,17,21 63:13
  105:19 108:24 110:23
  112:20 133:22 141:24
  152:22 160:11 161:5
  166:11,13,16,18,19
  167:23 182:8,10,10
  184:22 185:3,12 188:25
  192:14 194:9 199:19,24
  206:11 207:18 212:18
  213:16 234:17
**recalled** 198:7
**receipt** 271:14
**received** 14:9 131:3
**recess** 45:7 83:4 119:12
  153:2 187:22 188:21
  218:21 255:4
**recognized** 102:21,24,24
**recognizing** 139:13
**recollect** 182:16 199:20
**recollecting** 182:15
**recollection** 127:19
  129:11 146:6 180:22
  200:4,8
**recollections** 156:3,12
**recommend** 32:22
**recommendations** 49:17
  49:18
**recommends** 100:3
**record** 9:8 16:12,14 18:6
  18:17 24:18 40:22 45:5
  78:25 83:2,6 112:5
  119:10,14 128:6 152:24
  153:4 174:20 187:20,24
  188:17,19,23 215:16,21
  218:19,23 219:23
  240:12 255:2,6 269:6
  270:5
**recording** 99:5 127:16
  127:20,25 128:3 158:23
  189:15 190:5
**records** 128:5
**recounted** 156:24

**rectangular** 77:25
  258:17
**red** 262:3,4
**reduces** 73:7 102:2,3
**refer** 23:15 39:25 40:2
  47:16,22 53:2 55:19
  61:21 103:17 104:5
  110:13,15 111:2 117:6
  127:11 129:13 136:16
  139:3 157:17 162:18
  199:19 205:7 220:15,19
  230:21 235:3,12,25
  236:4 243:13,13 262:7
  268:22
**reference** 18:5 22:20
  58:6 63:7,24 64:7,7
  87:15,16 88:3,10 90:13
  99:19 132:6 145:25
  219:5 235:7,19,20
**referenced** 63:8,9,21
**references** 63:13 64:4
**referred** 19:5 22:20
  55:18 61:16 87:22 90:3
  97:11 110:14 115:19
  118:15 130:5 131:6
  188:9 190:3,11 219:11
  233:19 238:17 243:9
  258:18
**referring** 22:18 31:18
  49:2 54:13 78:18 85:22
  88:12 102:11 109:24
  117:9,14 118:12 119:25
  120:5 127:24 130:21
  132:15 133:5 139:9
  142:15 147:14 171:19
  175:7 207:14 210:12
  216:15,16 232:11 236:5
  236:7,9 237:5 241:4
  248:2,15
**refers** 56:23 57:2 93:3
  94:16 111:13 123:11
  132:25 139:11 220:9,16
  226:25 235:14 241:21
**reflect** 133:15 156:18,21
  240:21
**reflected** 240:21,24
  241:10,17 242:16

**reflecting** 167:22
**reflective** 240:9,11,13,18
**reflects** 240:16 242:25
**refresh** 199:21 233:17
**regard** 59:25 69:4
  145:17,17
**regarding** 139:17
**regards** 168:11
**Regional** 129:7,10,21
**registered** 1:16 65:13
**registration** 64:11
**reinforced** 23:11,13
  24:19
**Reinhold** 115:16
**reject** 165:14 186:4
  191:4
**rejected** 174:9 183:15
  187:8 191:13,15 206:2
**rejecting** 168:2,9 185:3
  185:12
**rejection** 170:16
**rejoin** 77:2,12 84:6 232:3
  232:6
**rejoining** 106:13
**rejoins** 86:18 147:21
**relate** 139:4 268:22
**related** 10:13 13:24
  30:24 31:2,9,15 235:2
**relates** 21:13 42:4,5
  198:18 213:11
**relating** 20:9 158:8
  259:24
**relation** 11:17
**relationship** 142:14
  144:24 178:10 209:5
  236:11 240:25
**relative** 40:16 96:5
**relatively** 76:2 88:9
  120:25 134:6
**relevant** 39:23
**reliability** 186:21
**reliance** 63:20 131:3
  133:5 180:10 219:15,24
**relied** 18:5 34:9 53:20
  95:20,21
**relies** 18:11
**rely** 35:14,15 52:23

215:14
**remain** 66:4 234:13
**remained** 66:22 234:13
234:14
**remaining** 168:16
247:17
**remember** 9:18 12:18
13:21 44:16 79:7
136:22 166:20 182:3
199:22
**remembering** 173:5
**remove** 253:10
**removed** 70:6
**repeat** 15:5 70:17 94:20
103:7 118:18 134:25
185:9 258:5 260:3
263:12,14
**rephrase** 82:16
**rephrasing** 185:11
**replete** 25:13
**report** 4:10,20 18:4,12
19:3,8,13,17,18,21 20:7
21:6 26:8,12,14 34:5,6
34:9,11,15 35:3 40:3,5
40:6 43:24 44:8,9
45:13,13,14,16,21
48:19,20,23 49:24 52:5
52:6,11 53:12,23 55:20
57:17,18 59:10,15 64:4
64:9 65:18 66:11,12,16
66:20,21 67:3,9,10 68:2
68:4,7 70:5 79:2,3,14
80:3 86:25 87:12,19
88:13 89:25 90:25 91:4
93:17,21 94:4,23 95:6,7
95:15,19 96:12 99:8,11
101:6 103:21,23 109:18
109:24 110:14,16,19,21
111:2,12 114:25 119:5
125:3 126:4,9 127:11
128:8 136:17,22,25
137:2 139:6 140:23
153:25 154:13 157:22
157:23 158:11,25 159:3
159:19 161:24 171:5,6
178:24 179:9 182:16
186:16 188:4 190:16,17

190:20 199:23,25 219:3
220:4 221:8 223:10,14
224:8,10,17,20 226:24
227:9 229:6 230:24
234:21 255:8,13 262:7
**reported** 109:23 110:7
129:25 168:10
**reporter** 1:17,17 6:18
7:11 9:22,24 10:2 19:2
19:4 87:21 89:21 90:2
115:11,18 130:23 131:5
188:2,8 190:7,10
219:10,13 270:20
**Reporters** 216:2
**reporting** 6:18 110:11
114:24 163:20
**reports** 115:4 157:11
**repose** 123:2,5,10,17
124:9,19 257:6
**represent** 6:21,23,24 7:2
99:15,20,24 104:7
117:23
**representation** 258:13
**representing** 2:2 3:2
29:14
**reproduction** 270:18
**REQUEST** 5:7
**require** 51:20 118:2
178:13
**required** 195:22,23
**requirements** 52:18
**requires** 254:16
**research** 30:8 115:15
119:3
**reserve** 72:7
**reserved** 6:6
**residence** 243:14,16,23
**residents** 243:3,5,7
**resist** 22:8
**resistance** 51:23 52:19
52:20 86:3,15 131:2
**resolve** 8:22
**resources** 39:15
**respect** 9:14 44:3 110:21
114:21 121:9,11 205:19
215:15 227:14
**respects** 42:7,19,21,22

42:25 59:15 84:10
**respond** 249:16
**responsibilities** 213:7
**rest** 82:4 123:18 230:14
233:15 234:8,15,20
235:3,15 236:6
**resting** 229:20 235:4
264:3 265:17
**restrained** 245:22
**restricting** 229:14
**result** 98:10 124:24
135:12 185:25 187:14
268:5
**resulted** 37:8 160:25
**resulting** 160:21
**results** 50:14,20 57:15,20
58:8 63:3 67:19 68:3
114:24 120:16 159:2
**resume** 35:20 40:12
42:23 43:16 64:10,18
64:21,24 65:4 78:5
**return** 271:12
**review** 43:24 118:22
145:3 174:14 212:13
**reviewed** 19:10 34:21
89:13 91:8 92:2 111:4
111:10 131:12,23 132:9
141:7 142:9 174:16
190:13 199:12 216:9
230:2 260:8 261:8
263:20
**Revision** 4:19,25 130:25
219:16
**revisions** 44:4
**re-put** 76:10
**Rhome** 188:6
**Richard** 3:8,11 6:22
188:5
**rick@rickseymourlaw...**
3:11
**Rico** 33:20
**ridden** 245:7
**ride** 241:5
**riding** 164:10
**right** 13:18 34:13 38:9
54:21 72:9 76:21 77:8
78:22 79:23 80:17

81:12 84:21 91:13 92:7
97:14 102:3 107:9
118:10 127:5 133:22
140:20 146:5,14 147:11
148:20 159:21 163:2
169:16 173:8 175:9
176:22 177:3 179:14
180:14 191:21 195:13
198:25 201:4,24 205:22
205:25 207:11 208:9,15
209:14,15,17 210:5
214:4,5 217:6 218:17
222:23,25 230:3,24
232:3 258:8 266:13,14
266:19 268:4,9 269:2
**rightly** 108:2
**right-hand** 132:2,7
141:2 208:11
**ripped** 145:9 147:6
152:14
**rise** 109:13 158:10
**risen** 247:9
**rises** 158:11
**rising** 155:23
**risk** 31:11 239:11
**Rita** 15:2,3,4,6,9,10,10
15:21 19:25 26:16,18
150:13 225:7 227:20,20
228:2,4,14,17,23 229:2
230:11 231:3,5,7,21
**river** 33:15 37:7,8,10,13
37:14,16,23 38:19
213:15
**rivers** 33:22 52:9 69:14
**road** 27:9 226:25 227:2
**Robbins** 2:6 7:5
**Robert** 7:21
**Rocheblave** 162:16
**rode** 258:22,25
**role** 153:8 167:24
**roll** 243:25
**rolling** 101:19
**Roman** 17:14 65:23
**roof** 163:15,23 164:2,6,8
164:23 165:5 167:7
168:3,3 169:20 170:14
175:10,17,19 234:23

**roofs** 235:3,12,14
**room** 7:7 163:13 170:3
**rooms** 169:24 170:4
**rose** 158:17,20 165:7
**rotate** 122:16 123:15
   124:13 239:13
**rotated** 267:13
**rotational** 124:14
**Rouge** 60:4 89:24
**rough** 79:19 140:11
   256:13
**roughly** 79:10 92:12
   95:13 173:22
**RPR** 270:12
**RTUs** 89:16
**rubble** 224:25 225:23,24
   226:3,6,11,13,22
**rushing** 234:22
**R-h-o-m-e** 188:6

**S**

**S** 2:1,6 3:1 4:8
**Safety** 115:17
**sail** 121:2
**sailboat** 123:25
**salvage** 31:14
**samples** 222:4 223:5,22
   223:24 224:2,6
**sand** 244:8
**save** 65:22
**saving** 173:5
**saw** 15:25 16:25 44:2
   149:18 154:24 155:7
   158:10,15 161:25
   162:12 163:5 164:4
   165:4 168:10 169:2
   171:17 176:20,20 180:3
   180:12,17,23,25 181:7
   181:9 182:5,11 184:6
   191:9,10,24 192:13,15
   192:18,23 193:4,7,7,8
   194:2 199:8,9,13 206:3
   208:7,23 209:12,14
   210:5,5,13,14,19,24
   211:6,21 217:2,5,11,11
   217:11,14 231:20
**saying** 58:4 76:12 81:14

107:25 108:7 116:9
117:5 123:18 152:8,17
158:17 160:20 161:13
169:5 170:23 171:13
176:4 179:15 181:15,16
182:11,25 184:23
197:16 198:12 199:2
200:14 210:6,21 211:21
217:2,11,12,17,18
247:4,8
**says** 18:20 53:12 64:10
64:11 94:12 96:2 99:12
99:19 100:2 104:7
110:19 116:2,24 117:12
129:22 152:16 158:10
161:24 163:15 164:21
164:21 167:8 168:3
174:14 176:2 179:6
198:22 200:23 211:8
216:20 217:23 220:14
257:18 264:21
**scale** 79:17 261:18,24
262:2,3,8
**scenario** 245:25
**scene** 46:20
**schematic** 207:20 209:15
258:12
**schematics** 79:16
**scholarly** 52:22 118:5,23
142:9 144:6,7,16,17
220:14 264:8,18
**school** 71:24 230:15
**science** 156:12,18,21
159:17 192:2,4
**Sciences** 30:7
**scientific** 114:24 159:18
193:14 220:13 264:7
265:5
**scour** 223:2
**scrape** 245:9 251:17
**scraped** 248:8,9
**scrapes** 252:2
**scraping** 226:6 247:19
247:21 248:5,6,11,18
248:20,24 249:8,9,12
249:13,19,19 250:2,9
250:16,18,19 251:2,11

251:15 252:2,5,13,14
**scrapings** 225:22 226:5
**scratch** 248:10
**scratches** 246:12,17,20
259:21
**scratching** 247:16
**sea** 11:17,20 72:13 96:3
97:25 98:7 100:2
106:24 130:2,7 133:2
133:12,19,21 139:18
142:8 144:8,17
**sealing** 6:4
**seas** 220:8,11,15 221:3
**SeaWeather** 4:12
**second** 4:19,25 20:2 21:8
35:20 56:11,21 65:3
67:17 90:8,13 100:25
129:13 130:14,25
136:24 172:4 188:18
198:16 201:16 203:15
219:16 230:14,16 235:9
236:4 256:15 258:20
261:25 262:14
**secondly** 92:25 100:23
135:14 145:19 146:21
**Seconds** 202:24
**section** 1:7 162:18
176:24 224:8 246:5,6
**sections** 16:21 199:9
211:19,22
**secured** 239:5,5,5,9,12
**securing** 239:14
**see** 9:3 21:7 22:19 27:16
45:20 47:21,23 57:4
63:8,9 64:18,21 65:8
79:17 87:5 88:2,14,20
90:6,7,9,21,23 92:9,10
92:15,15 93:16,18
94:22 98:15,18 99:10
99:18 100:5,8 103:21
104:9,9 109:10 111:11
116:9,12 120:11 132:3
132:12,25 133:4,23
136:9 150:17 153:7
154:6,11,13,15,19
155:2 156:7 160:6,9
161:21 162:2,4,6

163:15,16,18,20 164:4
165:3,5,6,9,16 166:7,8
167:21,21 168:25 169:3
172:8,22 176:2,8,9
182:25 189:5 190:22
191:18 195:10 198:11
198:21 199:2,6,11
200:23 202:21 203:4,9
203:17,21,22 204:2,3
205:21,24,25 206:15
207:4 209:8,24 210:8
210:10 211:18,25
216:11,19,19,20 217:16
218:10 219:5 220:20
222:22 223:6 225:14
226:2 229:15 233:13
237:14 242:6 244:11
254:2 257:15 259:4
260:22 262:13
**seeing** 172:7 193:9,11
200:11 206:7 211:2,4
211:16 217:20 218:12
235:7
**seen** 21:10 22:11,13,15
93:3 113:3,10 116:16
116:22 118:4,23 132:22
159:23 160:3 168:7
170:25 172:13 180:16
188:14,24 189:12,19
191:5,16 203:2,3 206:7
207:7 211:12,13 212:3
212:4,6 213:14 214:10
217:10 226:7,9 227:11
227:13
**sees** 91:17 163:16 216:14
**segment** 25:20
**select** 89:19
**selected** 128:15,18
255:23
**semi-closed** 69:3
**sense** 25:18 42:17 68:24
191:15 206:12 224:15
**sentence** 129:16 154:7
161:23 189:6 224:22
236:5 257:18 258:21
**sentences** 234:25
**separated** 256:20

separation 76:24 77:23
80:21
September 14:23
sequence 21:7
sequentially 21:3
series 97:11,17 139:18
served 72:8
service 4:14 89:23 92:24
93:7,12 193:21
services 221:23
set 52:18 65:19 148:7,8
252:19 259:24
sets 113:18
seven 256:15 258:21
Seymour 3:8,11 4:4 6:22
6:22 7:19 8:11,17 9:22
10:2 12:9 16:3,5,11,13
18:13,25 19:7,12 24:6
33:2 34:22 37:12 40:9
45:2,11 47:18 54:20
55:8 56:2,4,7,10 63:18
64:2,5 65:7,21 66:5
69:12 70:10 73:22
74:18 75:3 76:5 79:22
80:2 82:17 83:8 87:3
87:18,24 88:7,19 89:11
89:21 90:5 91:9 92:5
92:16 94:12,17 95:10
96:7 102:13,20 103:3
103:20 105:20 107:11
108:23 110:17 111:7,18
113:10,15 114:3 115:11
115:21 116:5,25 118:19
119:8,16 121:22 126:7
127:4,14 130:23 131:8
131:15,25 132:11
134:22 135:21 136:3,21
137:23 138:17,22 139:5
140:22 141:10 146:13
148:4 149:14 150:10
151:6 152:23 153:6
154:4 163:22 165:23
169:6 173:11 174:19,24
177:7 179:5,25 180:21
183:19 184:11 185:2
187:12,18 188:2,11,17
189:2 190:7,14,19

191:2,12 192:3 198:20
199:14 200:17 201:8,20
202:14 203:16 208:4,9
215:25 216:4,7,10
218:16,25 219:13,23
220:2 227:23 228:7
230:20 232:12 233:12
235:8,22 241:8,13
246:2 247:3 248:3
249:4 254:10,24 255:7
260:21 261:11,23
263:11 264:6 267:14
268:19 269:4
shadow 76:25 86:21
104:22,24 105:3,4,21
105:25 106:2 107:6
108:3,7,15
shallow 265:11
shallower 81:7,7,21,21
81:23 82:4
shape 17:12 43:25 69:3,8
76:22 85:25 86:2 123:4
144:24 207:22
share 48:11 51:22
shared 46:21,21,24
48:16
sharp 108:11
shed 32:24 237:13,16,17
237:21,21 263:4,7
shedding 153:13
sheds 250:6
sheet 17:5,8,12 23:21
25:7 60:19 61:6,8,9,20
61:22 62:4,8,9,9,20,22
193:9 213:19,24 214:10
214:13,17,19,20,21,25
217:5 271:5,7,10,13
273:11
sheets 61:11
shell 227:2
Shelonko 3:15 7:7
shifted 260:18
shine 206:21
ship 78:8 86:2,8,13,21
132:5 220:12,18 221:3
265:6
ships 12:6 72:9 78:9

85:23 86:7,9 132:14
220:8,10
ship's 86:3
Shirley 14:9
shoal 33:18
shore 37:9 39:3 108:13
194:5
short 45:2 58:24 143:25
144:2 230:14,17 265:4
shorter 69:10 100:5
101:14 218:4
Shorthand 1:17
shortly 15:15 19:25
46:25 154:22 182:6
225:7
show 57:20 79:15 136:17
157:13,25 168:25
182:18 207:9 208:2,20
208:23 223:10 228:10
231:9 238:16 239:22
256:25
showed 183:22 184:18
showing 25:17 79:13
95:12 142:16 146:2
147:15
shown 60:8 79:16 140:6
147:25 155:4 184:21
230:7 244:23 261:17
shows 57:18 90:21 96:22
96:22 101:3,8,23 139:6
140:6 158:3 162:19
209:4 246:20 256:17
262:8 266:22
side 23:3 38:18,25 39:2
46:11 48:2 69:25 77:6
77:13 79:4 85:12
107:18 108:13 120:13
134:20 141:5 146:19
148:7 161:10 164:12
185:7,8,16,16 192:19
195:2,2,18,18,19,20
196:13,18,19,20,22
197:2 207:10,12,13,19
207:19,21,21,22 208:11
208:17,17,22 209:11,18
226:6 232:3,6 260:16
265:2

sides 47:24 77:16,20 78:4
106:5 208:7 226:3
237:17
sideways 230:14 257:4
sight 165:15 168:3
170:17 206:5 215:6,8
215:15
sign 271:7
SIGNATURE 273:14
significance 57:12 93:5
96:5 236:24
significant 13:17,20
43:21 74:4,8 83:18
85:13,14 101:14,15
103:15 105:13 106:17
122:10,13
significantly 121:15
238:11
signing 271:9
signs 197:4
silent 66:4
sim 37:10
similar 33:17,20 37:11
69:9 84:19 134:6 137:6
142:16 144:25 159:23
similarities 84:13
Simmons 154:6,21 159:9
simple 184:15 249:12
253:14 263:23
simply 10:22 30:16
148:24 221:6 232:6
simulation 3:16 29:5,7
32:9,15 43:15 51:18
54:12
simulations 33:5 51:21
52:17
single 206:24
sir 8:3,5,8 10:14 12:15
14:3,21 15:7 17:23
18:16,23 20:23 21:16
22:24 26:9,19 27:2,23
27:25 28:3,5,8,15,21
29:12,18,20,22,24 30:2
31:20 32:7,11 34:7,18
35:6 36:3,6 38:17,22
39:19 40:14 44:2,24
45:15,18,22,25 47:22

50:6 52:13 53:17,20,24
56:9 57:5 58:7 59:7
61:5 65:14,16 68:8
70:9,13,20 72:21 77:18
81:13 85:17,19 86:23
87:6 88:6,22,24 90:20
96:15,25 97:19 98:16
98:20 99:17,23 100:7
100:10,13,16 101:17
104:2,9 109:20 114:23
115:23 116:8,11,15
119:2,7,22 125:2,6,10
126:10 129:18 130:22
131:19,24,24 133:3,8
133:20,25 137:22
139:11 140:24 141:3
142:2 146:23 154:3,12
154:20 159:22 161:22
162:3 165:17,22 166:3
166:21 169:14,17
173:10 174:21 178:8
179:23 182:2 188:13
189:11 190:23,25
192:17 193:6 194:12,24
195:4,12 196:15 197:6
198:24 199:5 201:19
203:6,11 207:3 219:4,9
220:5 221:13 222:21
223:11 224:4 226:4,23
227:16 230:25 236:13
236:19 244:9,12 247:8
255:10 256:5,8 257:5
257:11,16 258:7 260:2
**sit** 21:12 59:8,14
**site** 15:13 46:10 89:17
166:6 194:14,18 204:8
207:10 224:22
**sites** 189:7
**sitting** 13:15 163:15
170:14 176:10 177:14
180:19 205:9 264:24
**situation** 10:24 38:19
123:16 204:16
**situations** 221:5
**six** 15:18 26:20 28:9,11
60:20 61:4,7,22,24 62:4
62:25 258:21,23

**size** 37:3 105:6 193:3,5,7
193:19,21 207:16
254:18
**skewed** 255:16
**slab** 177:13 234:18
**slabs** 177:14 233:22
234:6,12,12,14 250:4
**slammed** 147:7
**sliding** 177:17
**slight** 50:20 57:21 58:17
128:25 210:8 238:12
242:11 243:23 252:8
253:9,11,24
**slightly** 121:4,14,14
133:10 134:3 149:23,24
266:11
**slip** 262:24
**slipped** 152:20
**slips** 69:5,13
**sliver** 213:23 214:9
**slope** 80:14 81:10 109:4
109:5,6
**slopes** 78:23
**sloshing** 38:25 134:23
**slow** 122:8,12 124:15,15
266:3
**slowed** 232:24 233:4
**small** 65:23 84:23 110:9
120:14 121:6,15,16,19
121:21,25 122:7,23
128:12 134:14,14,15
193:16,19 207:13 250:6
251:23,24
**smash** 150:21 231:25
232:6
**smashed** 145:10
**smooth** 108:21 111:25
133:12
**smoother** 101:23
**smoothes** 101:22 111:21
**Society** 139:25 219:7
**soil** 41:21 222:4 223:5
**solid** 158:22
**somebody** 150:15 179:18
222:6
**somewhat** 43:17 123:15
188:15 225:9 230:13

**soon** 166:22
**sorry** 66:11 72:23 94:20
95:18 96:11 97:9 103:7
103:23 111:9 131:16
134:25 138:2 140:2,14
142:4 156:19 160:8
162:3 165:24 167:15,17
170:10 174:17 185:9
186:3 208:4 211:10,11
228:3,5 238:24 253:3
258:5 268:11
**sort** 192:18
**sound** 154:22 175:4,6,8
177:2,9,11,12,16 178:2
178:3,5,22 179:4,24
180:3,7 181:22,23
182:5,7,14,17 198:4,6
203:18,24 204:22,24
211:6 248:13,25 249:8
250:2,17
**sounds** 74:11 175:3
177:19,25 178:10,20,21
179:18 182:9,13 203:8
247:19 249:19,20 250:2
250:9
**source** 25:9 51:14 53:9
87:11,12 131:20 133:23
220:4 242:21
**sources** 178:9,20 184:10
189:19 249:2
**south** 3:4 17:3,7,13,13,14
20:14,24 21:4 23:24,25
24:2 33:16,19 79:6
138:6 146:9,15 147:12
147:21 159:21 160:12
160:22 161:25 162:15
162:24 163:5 166:7
168:16,17 169:3 172:13
175:18 177:2 178:16
183:12 195:9 196:3
197:13 227:10 231:24
233:8,14,18 234:7,14
236:21 237:7 244:13
245:16,17,19,20,20
246:4,15 248:16,21
257:13,25 259:12,12,13
264:4,5 266:17,17

267:4,6,9
**southbound** 148:7
**southerly** 268:11,11
**southern** 17:10 20:24
68:22 193:17 195:17
196:13,22 233:8 237:4
246:15 247:12,12,13,13
248:9,9
**southward** 16:18 148:17
149:2 178:17
**space** 70:2 108:14
169:21
**spaced** 89:17
**spacing** 114:6
**span** 70:2
**speak** 9:15 110:19 240:7
**speaking** 149:5 167:10
167:13
**specialized** 60:5
**species** 31:12
**specific** 35:9 59:20
109:25
**specifically** 11:2 12:11
36:23 46:4 47:16 59:12
62:6 188:25 190:2
220:15 227:12
**specificity** 135:8
**specifics** 55:9 113:12
213:16,16
**specified** 135:22
**specify** 59:5
**speculate** 37:20
**speculated** 154:10
**speculating** 170:24
**speculation** 163:6,9,12
170:22 197:7,18,21
**speculative** 218:9
**speed** 38:9,12 80:14
83:14,22 88:9,11,20
89:6 91:7 92:18 94:25
96:20,22 97:8 98:14,17
98:18,23 100:4,18,20
101:4,8,10 102:5 103:5
112:6 113:5 122:8,9
123:3 124:15,16 125:12
128:16,19,20,24 129:2
129:6,9,11 130:10,15

VERITEXT REPORTING COMPANY

133:6 136:7 143:20
  150:19 243:12 254:21
  256:14 266:2,3,4
**speeds** 12:24 99:9,16
  100:5 103:11 111:19
  114:19 118:6 122:10,11
  122:13 125:13
**splash** 135:6,24 136:5
  138:9 268:22
**splashed** 203:2 211:12
**splashing** 134:19 136:9
  136:14 137:19 198:13
  198:23 200:24,24 202:8
  267:22 268:3
**split** 147:20
**spoke** 48:24
**spoliate** 226:14
**spots** 252:16
**square** 77:25 146:22
**squinting** 211:23
**stability** 12:21
**staff** 141:19,21
**stages** 208:21
**staked** 17:2,16
**stand** 29:4 127:10
  172:21
**standard** 50:24 51:4,6
  130:2 132:21
**standards** 59:16,18
  60:10 92:23
**standing** 16:21 167:4
  168:5
**STANWOOD** 1:8
**start** 9:12 20:23
**started** 120:10 184:3
  211:6
**starting** 198:10
**starts** 40:7 79:23 217:11
  254:4
**state** 7:20 15:23 52:6
  59:14 61:2 64:14,16
  65:5,12 135:3,11
  154:14 155:12,18
  159:10 179:9 215:16
  219:23 244:4 271:4
**stated** 21:17 42:19 94:13
  94:13 155:7 156:25

157:3 158:7,25 159:3
  164:19 174:22 182:4
  183:20 185:17 187:5,6
  218:13
**statement** 34:19 42:7
  53:16 116:12 124:23
  130:20 132:3,12 155:15
  155:25 157:8 158:19
  159:6,9 162:6 163:2,4
  181:21 189:5 213:17
  214:12 215:15 225:9
  236:10 263:2,24
**statements** 161:13
  182:24 183:15 185:24
  187:9 229:23 230:3
**states** 1:1 6:14 31:11
  56:20 64:22 141:16
  154:8 157:12 220:25
**stating** 155:14,14 157:18
  186:11
**station** 43:11 145:25
  146:3 148:6,7 149:17
  149:19,20,21 151:14
  152:5,7,13 189:15,25
  195:8 196:4,12 206:10
  206:13,17
**stationary** 197:5 221:6
**stations** 189:8
**statistical** 113:17
**statistics** 101:25 189:4
**steady** 101:24 122:20
**stereo** 62:7
**stereoscopic** 60:5,13,16
  62:15,21 63:3,10
**stern** 124:4 259:7,7,9
  266:12,18,23
**sticking** 162:10 192:18
  192:21,24,25 205:15
  259:19
**sticky** 101:5
**stipulated** 6:3
**stock** 101:19,22
**stood** 79:9
**stop** 63:22 82:8 123:7
**stopped** 176:16 232:22
**storm** 67:24 72:5 125:14
  154:16 213:8 260:24

**storms** 71:12
**story** 169:23
**straight** 80:24 81:3,5,17
  81:19 82:10,19,21,23
**stream** 77:3,21 78:3,6
  81:24 82:5 84:6 86:19
  106:9,14 107:2,3,20,24
  108:22 109:9 133:6
  147:15,21 232:4
**street** 2:11 3:4 7:23
  17:11,14,15 159:12,24
  161:6 167:4 168:5
  177:18,22 178:19
  227:14 245:19 256:16
**streets** 162:16 250:8
**strength** 11:9 25:3
  122:21 262:6
**stress** 155:20,22,24
  173:3,18 176:13
**strike** 240:16
**strikes** 240:14,19
**striking** 15:11 238:18,21
  240:15,17
**strip** 25:20
**strong** 22:8 23:18 24:22
  24:25 124:16,17,20,22
  148:17 149:2,11 159:15
  206:14 242:2
**stronger** 252:10
**strongly** 163:14
**struck** 230:11 232:23
  247:4,14
**structural** 36:16,17
**structure** 22:7 23:6,16
  23:18 24:22,24 37:9
  58:13 62:12 77:2,16
  86:10,18 105:5,10
  108:4 170:6 172:19
  177:25 194:21 199:10
  212:3 237:25 256:3
**structures** 12:24,25
  41:20,23,25 42:4 43:8,9
  58:16,19 60:6 76:16,19
  76:21,22,22 86:5
  103:10 104:14,22,24
  105:3 109:17 166:9
  168:17 177:17 178:18

213:21 234:4 250:3,5,6
  265:19,19
**stuck** 222:7
**studied** 11:12 26:2 68:13
  69:2 70:24 71:23
**studies** 86:2,14 118:21
  139:23
**study** 10:12 11:25 12:5
  12:13,17 25:22 27:17
  58:20 70:12,15,22 71:8
  124:25 139:22,22,25
  192:5 240:9
**Subheading** 189:4
**subject** 35:2 54:14
  117:14 271:9
**subjected** 69:7 73:20
  232:18 237:8 241:25
**subjective** 111:24
**submarine** 241:10,12
**submit** 28:22
**submitted** 29:11
**submitting** 29:8
**subscribe** 22:19
**Subscribed** 273:17
**subsequent** 31:25
**subsequently** 31:24
**subsided** 58:25
**subsidence** 60:7 67:22
  139:16
**subsiding** 58:15
**substance** 273:10
**substantial** 112:12,15
  154:17 161:6,13 257:10
**substantially** 124:11
  140:3 257:9
**sufficient** 71:6 244:6
  256:24
**sufficiently** 247:10
**suggest** 49:14,19 53:18
  144:11
**suggested** 32:12,13,18
  217:5,7
**suggesting** 39:8 91:23
**suggestions** 44:3,6
**Suite** 2:11 3:9
**sun** 158:10,11,17,20
  176:3,5

**sunrise** 158:13,23 159:6
  168:22 171:18,20 176:3
**super** 31:14 86:10
**superior** 42:8,15
**superstructure** 124:4
**supervision** 270:20
**supplied** 17:25 18:7,8
**supply** 18:9
**support** 5:1 22:9 227:5
  265:8
**supported** 264:22 265:6
**supporting** 261:5,12
  264:19
**supports** 12:22 69:24
  142:10 144:7,17 262:17
  263:16 264:8
**sure** 18:4,6 24:18 25:11
  35:4 40:21 42:9 54:15
  76:9 83:18 85:2 88:11
  88:16 93:5,13,24 94:15
  95:8,9 104:10 112:15
  127:24 140:21 141:6,8
  146:24 176:11 178:14
  186:19 190:2 196:20
  199:3,4 200:16 208:9
  214:12 217:10,13,14,15
  222:5 223:6 229:11
  230:18 232:10 241:3
  254:8 263:19
**surely** 8:15 56:2 99:2
  174:15 244:23 245:4
**surface** 52:9 62:25 75:25
  76:12,14 80:18 81:15
  81:16 99:15,20,24
  102:19 104:7 107:14,15
  107:16 120:22,24
  130:12 133:2,6,10,11
  133:12,16,17,18,19,21
  134:12,14,17 142:16,23
  143:4,9,13 144:8,18,23
  189:7 190:4 240:14,15
  240:17,20,24 241:14
  242:5,19,23
**surfaces** 51:23 142:8
  177:24
**surge** 67:24 201:3
  268:23

**surges** 72:5
**surround** 89:17
**surrounding** 261:10
**surroundings** 14:20
**survey** 53:23 54:4,6,9,16
  54:18,22 55:11,18
  56:12,13,14,19,24 57:3
  57:6,7,8,11,13,20 58:9
  60:13,19 62:16 63:4,10
  165:15 167:22
**surveying** 54:3,24,24
  55:5,11,12,14,17 58:11
  67:18
**surveyor** 55:3,6,6 57:9
**surveys** 46:15 55:5,14
  60:2,9,16 67:20
**survival** 173:4
**sustained** 88:20 91:7
  93:4,10,15 94:25
  128:20
**Sutterfield** 2:10 7:6
**swear** 7:11
**sweeping** 106:13
**swimmers** 241:24
**swirling** 148:20,21
**swivel** 266:10
**swiveled** 267:11
**swivels** 266:11
**sworn** 7:15 270:4 273:17
**symmetric** 257:7
**symmetrical** 124:7
**symmetry** 73:25 74:22
**synchronism** 243:10,10
  243:15
**system** 52:7,8 53:13
  189:7,24 190:4,6
**systems** 189:23

---

**T**

**T** 3:8,11 4:8 272:3
**tabbed** 19:7,13,18
**table** 45:19 93:23 94:4,7
  94:9,23 95:2,5 99:9
**tables** 99:12
**tabs** 19:17 52:7
**take** 16:24 17:21 45:2
  72:23 80:21 94:3 96:8

99:4,8,10 102:2 104:12
  119:8 128:22 149:19
  152:23 159:9 175:2
  187:18 198:8 218:16
  220:3 224:2,6 240:9
  254:24 255:23
**taken** 1:15 6:11,16 10:5
  10:9 20:10,13,14,22
  21:3 45:7 47:3 48:5,6
  62:15,17,18 63:25 83:4
  98:10 103:4,11 119:12
  129:6,7,23 140:9
  141:12 153:2 165:11
  168:25 171:4,11 187:22
  188:21 190:9 218:13,13
  218:21 225:3,4 255:4
  255:13
**takes** 75:15 76:24 77:23
  123:12,12 147:9 155:15
**talk** 9:8,9 87:8 214:8
  226:20 229:16
**talked** 142:6 198:4 212:9
  260:6 261:6,13 262:15
  262:16 263:17
**talking** 23:7,9 54:15
  83:10 94:14 97:13
  106:10,11,12 110:16
  117:10 121:12 122:8,9
  122:12,13 128:21
  135:15,19 136:2 138:22
  147:16 157:16,20 160:2
  167:15,16,18 171:14,15
  171:16,17 175:8,23
  179:3 199:20 208:6
  210:7 214:9,21 242:12
  242:13 244:2,16 253:23
**talks** 117:8
**tanker** 124:3
**tape** 17:17 45:10 83:3,6
  119:11,14 152:25 153:4
  187:21,24 254:25
**team** 45:23 48:5 60:3
  139:23
**teams** 240:9
**technical** 31:8,17
**technique** 55:11,12
  56:14,25 57:7,9

**techniques** 25:10 56:14
  56:24
**technology** 3:16 29:5,7
  32:10,15 132:18
**telephone** 233:11,13
**Telephonic** 24:5
**tell** 14:8 20:20 21:10,13
  27:20 37:19,21 48:4
  109:23 135:18 145:21
  151:21 170:13 172:14
  203:18 212:4 214:23
  215:11 225:3 228:24
  236:22 239:4 247:25
**tells** 25:18
**temporary** 150:17
**tend** 122:15 123:15,24
  124:13
**tender** 35:8
**tendering** 35:11
**tenoptic** 72:12
**tentative** 31:14
**term** 8:20 61:14 93:12
  97:3 102:8 111:24
  123:10 143:3 173:13
  241:20
**terminal** 66:23 137:15
  164:12 180:17,18,24
  196:5 197:25 237:2,8
  237:15 239:15
**terminology** 93:6
**terms** 50:24 51:2,3,5,7
  59:11 76:4,9 93:7,9
  101:4 105:23
**Terry** 164:20 168:2,9,13
  169:4 172:10
**test** 112:22 132:18
**testified** 7:16 8:6 12:5
  37:6 47:15 69:21 80:3
  82:18 86:17 146:6
  150:25 154:21 161:4
  175:21 177:2,6 178:4
  180:23 183:25 205:19
  209:12 210:18 212:18
  213:13 233:2 247:19
  249:3,5 250:12 267:21
  267:23
**testifies** 174:3

**testify** 9:17 34:16 42:24
180:24
**testifying** 108:24 249:11
**testimonies** 183:7
**testimony** 9:18 34:24
35:14 42:14 58:5 69:18
70:6 72:18 102:14
104:11 105:24 107:13
107:13 126:4 134:9
138:14 143:11 148:23
151:23 152:16 154:6,7
155:16 156:4,5,6,7
157:23 158:9 161:18
164:21 165:14 168:2,4
170:17 173:2 174:9
176:7,18,22 181:6,22
183:4,20 184:6,8,16
185:4,5,12,19 186:4,13
186:21,22 187:2,15
191:4,14 192:14 198:7
202:21 203:7 206:3
210:23 212:8,14,15,23
212:25 215:2 220:24
238:5,7 248:15 249:17
249:18 251:13 268:17
268:21 270:6
**testing** 12:23 223:4
**tests** 109:16 132:4,13
**tethered** 239:16
**text** 104:6 220:3,6
**thank** 8:14 10:12 24:17
45:4 56:10 64:2 79:25
87:25 128:14 215:18
216:7 219:25 267:15
268:20 269:5
**theorizes** 246:18
**theory** 202:10,13
**thick** 61:23,24 62:4,14
62:14 117:19,22
**thickness** 60:20 61:10,16
62:9
**thin** 62:11,12 214:25
**thing** 47:4 54:15 83:23
133:4 157:17,21 225:18
265:9
**things** 19:14 33:20 40:25
41:2,22 46:16 47:9

51:24 55:2,7 70:24
72:4 105:6 114:7
145:21 151:10 172:25
173:21,22 175:6 176:19
186:13 189:20 192:7
205:24 215:12 217:10
249:6 260:3
**think** 12:4 14:15 15:18
19:13,16,16 20:10 23:5
23:10 31:4 33:19 34:14
34:25 39:25 40:4,6
41:13 43:20 44:14 46:4
46:21,25 47:14,25 48:7
52:16 54:24 56:23
58:10 59:17,20,23 60:9
62:12 66:2 68:18,20
69:21 74:25 75:9 76:10
79:3 83:16 84:2 89:18
95:4,5,17,17 96:18 99:3
101:25 102:11,24 107:7
111:3 112:22 114:2
115:8 125:24 127:8,9
127:11 132:22 145:25
147:9 150:25 151:20
152:5 155:4,8,18
156:10,11,16 158:3,7
158:24 159:15,18
160:17,20 163:8 166:25
170:15 172:11,22
173:13,14,19,23 174:21
176:12,19,23 178:12
192:21 193:6 194:13,20
197:21 198:7 200:15
201:16 205:7,13 210:6
210:20 213:10,21
214:17,23 215:3,4
216:5 218:11,14,17
221:4,19 241:20 243:9
246:10,18,18,19 248:12
250:12 254:16 256:7
257:9 260:4,7,9 261:9
261:15 262:25 263:9,23
265:21
**thinking** 10:21 210:13
211:4
**thinks** 164:2 210:13

211:4,16 217:13
**third** 83:21 90:9,15
99:13
**thirty** 271:13
**thought** 39:16 51:5
158:20 167:17 175:13
186:8,10 191:10 193:7
193:8,10 199:3 203:8
206:3 208:24 228:5
**thousands** 200:5
**three** 36:7 38:13 132:5
132:13 140:4 236:3
262:15 267:16
**three-second** 98:18,23
100:14,17
**thrust** 229:6
**Thursday** 1:13
**Tim** 115:16
**timber** 222:9,10
**time** 6:6 12:16 14:18
15:4,6,11,24 16:20
19:15 20:2,6 25:4,15
29:6 38:6 46:17,23
58:24 65:22 66:24,25
67:14 71:5 72:6 78:17
90:22,25 91:6,19,20,25
92:6,8 95:12 96:18
110:12 111:20 127:2
128:22 134:10,18 135:5
135:17,18,19,23 136:2
136:4,20 137:24 138:3
138:16 140:11,17
141:11 146:24 147:3,4
147:5,11 150:6 151:22
152:20 155:7 156:25
157:3,12,18 158:11,13
158:18 162:16 166:4
166:14 167:19 168:6,25
172:6 173:3,6,20,25
176:11,11,15 179:2,6,9
179:11 184:18,24 185:8
185:17 191:17,19 199:3
199:16 200:11,16,19,20
200:25 201:3,6,7,11,21
201:23 207:17 210:5
212:10 213:3 216:7,21
224:25 226:18 230:15

230:16 232:11 236:20
237:24,25 255:24 256:6
268:23
**times** 8:6 73:24 80:4
93:19 115:4 139:8
147:2 185:21 236:4
240:6 251:9
**timing** 67:6
**tiny** 251:8
**tip** 182:12 191:18 192:24
199:11 203:4 209:13,14
209:22,23 210:3,10,12
210:19,20,21,24,25
211:2,6,14,16,17,20
212:4 213:18 214:2,7,8
214:23,24 217:13 265:4
265:4,6
**tips** 265:8
**today** 6:18 7:4 9:17 10:8
21:12 59:8,14 215:2
260:6 268:18
**toe** 38:21,21 79:4,21
264:15
**told** 14:12 170:24
**Tonti** 162:16
**tooth** 212:2
**top** 62:23,24 90:9 106:22
107:17,18 108:11 116:2
159:8 165:13 169:19
199:2 201:4,12 214:13
214:14,15 241:15
255:16 257:17 258:23
**topic** 46:4
**topics** 45:20,24
**topped** 138:8
**toppled** 23:25 24:3
182:17 244:10 254:23
264:9
**toppling** 23:25 254:3,15
**tops** 226:3
**total** 28:6 130:6
**totally** 187:8
**track** 236:12
**tracking** 258:23
**trailers** 177:21 250:7
**trailing** 73:21 246:20
247:17 259:22

**trained** 70:19
**training** 35:13 36:14
 39:20,21,23 40:15
 41:18 42:15,17 43:5,7
 68:10 70:14,21 71:4
 72:17,19 118:21
**trajectory** 83:14
**transcript** 270:17 271:14
 271:15
**transcription** 273:7
**transformer** 175:16
 182:15
**transformers** 203:9
**transportation** 30:7
 35:23 36:4 41:7
**trapeze** 253:25
**trapping** 263:4
**treatise** 52:22 118:4
 142:10 144:6,16 220:13
 264:7,18
**tree** 155:23 173:4 175:17
 175:18,20 176:11
 181:10 212:22
**trees** 166:9 168:15 169:7
 169:9 170:18,25 233:3
 233:3,7,7,9,10,13,17,18
**trench** 222:19 223:2
**trial** 6:7
**trials** 8:7 35:5
**tribunal** 153:14
**tried** 185:20
**tries** 108:14
**trip** 18:3 26:17 27:3,7
**tripod** 56:16
**trips** 26:22,24
**Tropical** 4:20 188:4
**trouble** 217:20 218:14
**true** 24:17,18 30:25
 93:20 111:20 157:22
 159:8 161:15 165:13
 208:12 210:18 213:18
 232:24 246:9 252:17
 253:18 265:21 270:5
**trumps** 156:12
**Trust** 16:8
**truth** 153:13
**truthfully** 10:8

**try** 8:11 9:8,9 35:19
 118:20 119:3 156:9
 185:11 226:12
**trying** 9:15 16:8,9 31:4
 181:14 231:17
**tug** 38:21
**tumble** 211:21 258:16
**tumbled** 203:23 211:19
 211:22
**tumbles** 259:17
**tumbling** 199:9 249:5,20
 249:24 250:2,3
**tunnel** 12:23,25 86:13
 109:16 132:4,13,18
**turbulence** 75:22 76:3,6
 76:13,23 77:15,24
 101:3,22 102:6,9,9,10
 102:15 103:17 105:11
 105:14 108:12
**turbulent** 76:16 77:21
**turn** 18:14 24:6 34:19
 45:19 86:24 87:7 88:2
 88:13 90:8 97:16 99:18
 115:25 125:3 126:8
 132:2 140:23 153:25
 189:3 190:20 219:2
 221:8 226:2 234:21
 236:18 238:22,25 239:3
 255:8 257:12 259:23
**turned** 239:11 252:21
 267:6
**turning** 177:18 190:23
 237:6
**twilight** 168:22
**two** 25:5 38:13 41:5
 74:14 84:18 105:9
 108:25 121:4 130:5
 134:16 140:4 145:11,21
 147:7 149:13 150:22
 176:18 192:15 208:10
 208:19,23 209:10,24
 234:25 236:3,17 242:13
**two-dimensional** 52:8
**two-foot** 138:8
**two-thirds** 259:11
**tying** 209:16
**type** 30:11 53:22 54:8,17

 54:22 85:22 115:9
 151:2,2 227:13
**types** 72:17 112:23,25
 113:4 132:5 189:23
**typically** 170:5,8
**T-A-B-S** 52:7

_____
**U**
**Uh-huh** 162:25
**unbiased** 153:21
**unbreached** 248:21
**uncommon** 25:2
**undefined** 142:25
**underlie** 85:15
**underlies** 260:7
**underlying** 100:21,22
 178:24 227:5
**underneath** 69:19,22
 70:3 165:3 212:21
 222:15,15 241:16
**underside** 226:8,10
**understand** 8:17,19 16:5
 16:9 25:11 34:2 60:23
 61:21 66:6 70:4 78:23
 85:2 88:11 94:15 96:21
 104:10,11 107:25
 138:24 139:21 148:5
 155:3 156:9 167:25
 170:15 182:24 186:19
 206:5 229:15 232:10
 243:6 256:2 260:14
 264:17
**understanding** 10:17
 34:10 55:13,16 82:13
 98:12 105:24 126:3,13
 127:6,18 141:13,15
 166:5 198:3 213:5
**undertow** 240:25 241:4
 241:4,9,20,20,25 242:6
**underwater** 33:18
**undisturbed** 109:12
**uneveness** 133:16
**unidirectional** 122:18
**unit** 257:7
**United** 1:1 6:14 31:11
**universal** 52:21 90:22
 91:18,24

**unknown** 168:6
**unnecessary** 83:20
**unobstructed** 76:2
**unofficial** 90:10,16 92:21
 92:22 95:23
**unreliable** 151:20
**unsteady** 122:18
**upper** 82:9 144:22,22,22
 144:23 205:5 255:15
 266:21
**upset** 177:22
**upward** 75:16 82:7,22
 107:4,5,17,21 108:3,10
 109:3,4
**upwards** 83:11
**urban** 142:12,17
**USA** 1:9,9
**use** 8:19 19:13,15,17
 48:20 50:4 51:8,10
 56:15 59:6 60:21,24
 83:19 88:8 104:25
 111:23 128:8,8 142:7
 142:10 144:7,17 202:16
 213:20 215:11
**useful** 66:20,21 95:21
 183:7
**uses** 52:24 93:7 230:15
**usual** 114:25
**usually** 25:2,4 61:12
 71:14 241:4
**usurp** 63:22
**U.S** 25:12 26:9 30:20
 31:14 33:14 35:18
 39:13 43:12 50:10
 71:10 72:7

_____
**V**
**v** 1:6,7,7,8,8,9,9,10
**vague** 254:6
**Valdez** 33:13
**valid** 158:19
**valuable** 93:22 94:8,25
 95:5,14 157:4
**value** 110:8 114:9 125:8
 153:18,23 155:8 160:24
 173:2
**values** 79:7,8 98:21 99:3

99:4 110:7 125:19,19
126:6 132:23 140:9
**vane** 110:8 126:13,16
**vanes** 110:3,7 112:9,13
**vantage** 181:10
**variance** 116:17
**variation** 128:25
**variations** 50:20 101:8
114:7 151:11
**various** 12:24 22:16
30:20 31:5 39:12 45:20
48:19 110:3 172:25
208:21 256:19
**vary** 116:10 118:6
**veering** 238:19
**vehicles** 220:22
**velocities** 129:25
**velocity** 21:21 83:16
125:9 128:19 129:22
**verbatim** 220:5
**verify** 66:15 126:5
**verifying** 57:10
**Veritext** 6:18,20
**versus** 30:16 74:2
**vertical** 107:15 109:3
213:24 214:9 224:15
240:14,15,17,20 242:5
**vertically** 81:11 130:12
213:25
**Vesey** 7:23
**vessel** 12:8 33:14,17
68:14 121:8,10,12,14
122:9,15 123:4,23
124:2,4 221:5 230:9
262:21 264:22
**vessels** 11:17,20 12:7,8
33:11,16 43:15 51:11
68:11,12 69:3,5,7 72:11
123:11 132:16 194:2
197:10,12
**Vibration** 131:2
**vicinity** 195:8 227:10
233:8
**video** 6:11
**videographer** 3:18 6:10
6:19 7:11 45:5,9 83:2,6
119:10,14 152:24 153:4

187:20,24 188:19,23
218:19,23 255:2,6
269:6
**Videotaped** 1:15
**view** 15:13,13 135:11
153:23 162:8 192:9
204:25 205:3,5,12
255:23 257:10 264:8
**viewed** 20:6
**Villavaso** 4:23
**Villavasso** 151:25 152:12
161:4 182:20 190:9,22
191:4 198:5,12 200:10
200:11 205:23 209:12
209:20 210:4 212:7
213:2 214:10
**Villavasso's** 145:3 147:2
150:21 182:3 190:15
192:9 206:3
**Virginia** 33:15
**virtually** 132:23,23
243:20
**Viscay** 11:18
**viscosity** 84:17
**visibility** 168:12,24
171:7
**visit** 15:11 16:15 26:15
27:9 46:25 150:7
**visits** 26:20 27:8
**voice** 8:11,13,16 9:20,23
153:10,11
**volume** 83:13,17,19,22
130:19,20 131:2 219:8
219:16
**vortex** 80:22 148:20
**vortices** 76:23 78:2 86:9
86:11 108:12 148:22
**vs** 6:13
**V-e-s-e-y** 7:23
**V.K** 2:6

---

### W

**wages** 221:23
**Wait** 203:15 235:5
**waiting** 9:11
**waived** 6:5
**wake** 38:23,24 39:3

52:19,20
**wakes** 51:23
**walk** 16:20
**walked** 168:14 169:8
**walking** 149:16 263:18
**wall** 17:5 46:12 58:11
67:23 81:3,4,6 119:19
120:7,8 145:10 147:17
148:15 150:22 160:16
160:18,21,23 161:3,6,9
181:24 182:6,6,7,9
194:14 198:13,23 199:8
200:24 201:4,13 202:23
203:4,20,23 204:6
205:4 207:17 208:7,11
208:12,21 210:24,25
211:3,6,15,16,17
222:16 223:3 225:15
246:5,6,15 247:15
248:22 250:24 252:3,4
252:20,21,22,25 253:7
253:8,15,16,16,17,18
253:21 254:3,3,4,13,14
254:16 257:19,20,22,23
257:24 264:11 267:24
268:4,6,16,24
**want** 30:12,13 37:20,21
55:25 63:21,22 66:3
74:12 79:20 87:8 94:15
104:10 117:5 122:3
140:21 147:3 182:19
190:14 201:7 226:14
229:5,11,20,23 260:3
263:15 264:17
**wanted** 54:14 130:7
250:11 255:22
**Ward** 15:16,16,20 16:15
20:2 21:20 78:16,22
79:23 81:9 180:25
181:8 183:8,10 228:10
229:9,17,19,22 230:12
231:24 232:14,18,19
234:5 244:5,22,25
245:5 246:13,16,23
247:6,9,11 248:17
256:10,18 259:8,9
260:20 262:11 264:11

265:14 266:23,25 267:3
267:8,12
**warehouse** 77:25 78:2
**warm** 71:20 75:11,15,15
75:18,18
**wash** 38:18,20,20 39:4
**washed** 16:22 22:10
155:21 241:22
**washes** 39:3
**Washington** 1:16 2:4
3:10 6:17
**washout** 17:6 21:18,18
**wasn't** 12:11 19:18 46:16
106:24 152:2 160:17
163:19 166:3 176:2
179:24 190:2 195:14,14
200:16 205:17 212:9
213:8 214:13 216:17
221:22 225:4 233:7
236:2 245:9 249:18
259:10
**watching** 198:12,22
**water** 21:19,22,25 22:8
23:3,3 31:10 33:6,22,24
33:25 36:20,22 37:2
38:18,25 39:6 41:23,25
42:5 43:14,15 46:15
47:7,8,9 51:9,11,12
52:25 53:5 67:11 69:19
69:22 71:14 72:5,25
73:3,12,14 74:2,23 75:8
75:11,23 76:2,4,7,13
78:12 80:20,20 84:3,15
85:24 98:4 99:20,25
102:16 103:2 106:21
121:9,11,13 124:12
130:17 134:12,17 135:4
135:16,18 136:6 138:7
138:16,18 139:3,7
142:7 143:19,24,25
144:4,9,25 154:23
155:23 160:16,18,21,23
160:25 161:3,6,9,12,13
161:13,19 162:11,12
164:10,24,25 165:3
167:9 174:7 176:14
177:15 178:6,11,13,14

178:16 183:8,9 189:17
198:12,22 200:24 201:3
201:12,15 203:2 206:15
206:16,16 208:18,21
211:13 213:12 224:16
231:23 232:19,20,20
233:22 234:22 241:7,14
241:21,23 242:2,10,11
242:14,24 244:6,14,16
244:17,22,24,25 245:2
245:24 246:23,25 247:7
247:9 248:12,17 249:7
249:9 250:24 254:4
256:4 262:10 264:10,14
265:3 267:7 268:13
**waters** 23:21 165:7
265:23 267:2,6
**waterway** 3:16 29:5,7
32:9,15 33:5
**waterways** 31:10 33:11
43:11
**waterworks** 41:20
**wave** 120:3 135:13 138:8
161:19 163:17 164:4
240:13,14,15,16,16,17
240:18,19,21,22,24
241:10,15,16 242:16,19
242:22,24,24 243:3,5
243:11 263:2 267:22,22
268:22
**waves** 11:9,13,17,22 12:6
12:14 13:6 119:18
120:6 133:13,13 134:13
134:13,14,19 135:6,11
135:23 136:4,9,12,12
136:13,14 137:18 138:5
138:7 140:12 141:9
219:17 220:11,17 240:9
240:11 241:5 242:12,22
243:10,16,21 244:2
262:20,22 267:21,23
268:2,3,5,10,15,22
**way** 12:4 41:17 43:4
68:15 123:13 139:24
145:20,20 163:12
164:16 171:21 172:19
210:9 224:25 245:25

252:3 253:5,7 257:24
262:3 263:18 264:7
265:7,9
**Wayne** 55:3
**weak** 149:11 151:9
253:16 261:18 262:5
**weakened** 253:15
**weakens** 254:4
**wear** 215:9
**wearing** 176:15 216:13
216:17
**wears** 216:12,16
**weather** 4:13,14 72:10
89:23 92:23 93:7,11
110:3,7,8 112:9 175:25
184:10
**weather-induced** 189:9
**Webb** 2:10,13 7:6,7 8:9
8:14
**Weber** 1:10
**week** 14:6,15,17
**weigh** 156:7,7
**weighed** 93:25 182:23
187:10
**weight** 176:21 182:21
183:16,19 184:16 185:4
186:16 212:19 235:2
254:18
**went** 14:18 166:10,12,14
166:23 174:7 175:9
212:2 216:22 236:21
264:11
**weren't** 38:17
**west** 20:15 21:4 80:6,9
80:10,10 134:23 135:7
137:16 145:8 146:7,12
146:17,18,18,19 147:17
179:12 180:20 183:21
183:23 184:17,19,23,25
185:7,16 195:2,18,20
196:13,20 197:2 237:13
237:24 242:9,10,11,14
257:14
**westerly** 80:7,11,12
137:25 238:20 260:16
**wet** 164:22
**wetland** 144:19

**wetlands** 144:15
**we'll** 10:3
**we're** 23:7 24:18 45:5,12
51:11 83:2 86:4,6
94:13 101:6 106:12
117:12 119:10 122:7,12
122:13 124:14 138:22
142:14 143:18 145:24
157:16 167:16 208:15
208:16 210:7 242:12
244:2 262:2 269:6
**we've** 13:12 30:9 33:8,8
33:10 54:10 80:21
117:10 119:24 120:2,3
120:15 192:8 205:5
237:5 238:17 249:8
260:3 261:6,9,13
262:15
**wharf** 256:17
**wheel** 12:22
**white** 141:4
**whitish** 266:22
**wide** 62:25
**widely** 241:21
**widen** 21:24 22:10 23:4
23:12,14,22 24:4,8,9,25
**widened** 24:10
**widening** 24:23
**width** 37:16,23 38:3
69:10 105:7 106:6
144:3,4 214:6
**WILKINSON** 1:10
**William** 4:22 190:8,22
**Wilson** 154:6
**wind** 10:25 11:8,9,16,22
12:19,23,24,25 33:6,12
36:20 37:2 38:5,7 39:6
51:9 53:5 67:8 68:12
68:14 69:2,4,7 70:15,22
77:4,16,20 78:11 80:5
80:14,24,25 81:2,8,11
84:7 86:13 87:5,10,14
88:9,20 89:5,16 90:11
90:21 91:7,7 92:18
93:16 95:13 96:9,22
97:7 98:14,17 99:9,14
99:16 100:4 101:4,8,10

103:5,11 104:13 106:2
106:4,7 108:9 109:15
109:18,23 110:22
111:19,20,22 112:2,13
113:5 114:18,22 118:6
119:18 120:2,6,11,12
120:17,21,22 121:5
122:21,22,23 123:3,11
123:13,19,20,25 124:5
124:8,12,19 125:9,12
125:13,16,17 126:12,13
126:14,16,21 127:25
128:16,16,19,19,20,24
129:2,6,9,25 130:8,9,15
132:4,13,18,25 133:6,7
133:15 136:7,13,19
137:9,10,13 138:2,4
142:7,11,24 143:20,20
144:8,12,22 145:9,13
145:18 146:8 147:5,12
147:14,15,16,18,23,25
147:25 148:5,8,8,23
150:19 151:16 164:15
164:16,18,18,19 168:23
174:11 175:21,22,24
180:11 181:17 183:21
183:22 184:8,17,18,23
184:24 185:22 186:6,8
186:12 192:6 237:3,8
237:12,24 238:3,6,14
238:17,18,19,21 239:13
239:17,18,21,21,24
240:3 242:9,22,23
250:25 251:3,5,10,23
252:19,23 253:11
254:18,19,22 260:14,15
260:18 261:19
**windows** 151:15 152:20
**winds** 11:2,13,21,21,23
12:6,8,13 13:5 70:12
72:20 73:2,4,8,13 74:2
74:22 75:8,10,22,22,25
76:2,12,14,15,20 77:2,2
77:4 78:6 80:11,12
93:3,4,8,10,13,15 99:15
99:20,24,25 102:15
103:9,22 104:7,8,13

111:8,13,14,16,16
112:6,10 116:13 124:21
130:11,11 133:12
140:12 147:17,20,23
143:3,8,12 144:18,23
144:23 148:16,19,20,22
181:18 189:10 237:9
238:8,10 260:22
**wiped** 266:2
**withdraw** 134:9 179:8
192:13
**withdrawn** 34:3,11,12
**withstand** 24:22
**withstood** 23:21
**witness** 4:2 5:2 7:12 8:15
12:4 16:5,6,9,10,15
19:10,11 32:18 34:3,21
35:5,8 37:6 45:4 47:14
54:24 63:15 65:3 66:11
68:20 70:9 73:18 74:11
74:25 75:25 79:19
82:16 87:25 88:6 89:11
89:13,14 91:8 92:2,3,15
95:4,17 102:8,18,23
103:14 105:19 108:7
110:6 111:4,5,10,11
113:7,12 114:2 116:21
118:10 121:20 126:3,25
127:10 131:12,13,23,24
132:9,10 135:10 136:2
136:12 137:22 138:15
139:2 141:7,8 146:11
147:14 149:5 150:9,25
154:3,14 155:12,14
156:24 157:11,17
158:10,17 161:12,25
163:5,11 165:22 167:25
168:9 173:8,10,14,25
174:2,16,17,21 177:5
179:2,23 180:16 182:21
183:6,20,25 184:16,22
186:25 188:24 190:13
190:25 191:8,23 199:12
199:13 200:14 201:6,19
202:12 205:20 208:6
215:24 216:9 227:22
228:5 230:2,3 232:10

233:6 235:6,18 241:3
241:12 245:13 246:9
247:25 248:24 251:13
254:8 260:8,9 261:8,9
261:15 262:19 263:20
263:21 267:15 269:5,9
270:4,6 271:2
**witnesses** 156:4,5,13
157:24 161:11 173:16
173:16 176:25 177:6
181:21,22 182:19,23
183:11,14,17,18 184:9
184:22 185:5,13 186:5
187:5,9 212:8,12,16
247:18
**witness** 183:6
**witness's** 156:4 158:19
183:15 184:6
**woke** 164:22
**wonder** 118:17
**wooden** 149:10 226:25
**Woods** 71:25
**word** 56:18,23,25 104:25
105:2 111:23 121:23
141:8 142:18 163:11
202:16 213:20 215:17
224:10
**wording** 9:3 192:22
**words** 108:9 114:8
123:13,19,20 125:8
147:18 199:11,13
257:19 259:3
**work** 10:12,19,25 11:12
11:19 12:12 13:24
22:15,22 27:19 28:23
28:24 29:17 30:3,14,22
31:22 32:5,9,16 33:7,9
34:17 39:17 43:10
45:23 46:13,14 53:19
59:22,22,24 63:9 65:18
67:8,18 142:9 168:10
176:7 212:9 223:10,12
**worked** 11:16 30:10 33:4
59:21 214:11
**works** 22:21 41:21 84:3
132:21 165:20,25
**worst** 254:19,20

**wouldn't** 22:10 48:24
49:4 91:19 95:6 105:13
133:9 136:13,19 140:17
140:18,18 146:8,19
147:11 151:7,12 172:4
172:21 178:24 179:20
180:5,18,19 202:17
204:18 205:11,12 207:4
212:13 213:20 214:20
225:5 226:8 232:14
233:4 242:6 246:14
248:21 250:22 251:6
**wrap** 182:19
**wrong** 61:14 157:15
178:24 179:20 180:4,14
181:11,17 208:8
**wrote** 45:14
**WST** 29:3,4

---

**X**

**X** 1:11 4:1,8

---

**Y**

**yards** 149:23
**yeah** 23:10 33:23,23
60:23 71:3 85:8 92:3
144:4 157:8 159:15
231:21 233:17 249:25
**year** 11:15,16,25 12:7
29:17 35:15 44:15,25
166:17,20,25 168:6,6
176:18
**years** 12:18 13:11,12,12
27:6 35:17 58:25,25
71:2 176:18 184:7
212:23,23
**yellow** 219:19,20 262:4,4
**York** 1:16 2:3 6:19 7:23
7:23 35:16 55:4 69:6
69:13 70:25

---

**Z**

**zeros** 215:24

---

**$**

**$1** 28:17,18
**$500,000** 28:14

---

**0**

**03537** 65:10,11
**04570** 64:15
**05-4182** 1:5
**05-5531** 1:6
**05-5724** 1:7
**054182** 6:14
**06-5342** 1:7
**06-6299** 1:8
**06-7516** 1:8
**07-3500** 1:9
**07-5178** 1:9
**08-4459** 1:10

---

**1**

**1** 4:10 19:2,5 44:20,23
90:21 93:16 100:11,25
101:16 114:10 118:6
176:13 250:24 260:7,10
260:22
**1,000** 143:5 154:15 172:9
**1-minute** 98:17
**1-1/2** 208:24 209:9
**1.09** 100:9
**1.24** 100:12
**1.53** 100:15
**1:30** 119:13
**10** 10:1 13:11 96:20,23
97:10,21,25 98:14
99:25 100:9,24 101:10
111:16 114:9,9,10,10
116:2 170:5 201:25
203:24 206:19
**10-minute** 98:13
**10:00** 137:20
**10:03** 45:7
**10:03:20** 45:6
**10:17** 45:8
**10:17:30** 45:10
**10:59** 90:22
**100** 37:15,15 40:25 41:2
49:6,7 88:25 100:1
149:23
**10007** 7:24
**101** 101:1
**102** 102:1
**103** 103:1

**104** 104:1
**105** 105:1 219:8,17 220:6
  220:7
**106** 106:1
**107** 92:9,11 94:11 107:1
**108** 108:1
**109** 109:1
**11** 11:1 202:7
**11:19** 83:4
**11:19:05** 83:3
**11:31** 83:5
**11:31:03** 83:7
**110** 110:1
**111** 111:1
**112** 112:1
**113** 113:1
**114** 114:1
**115** 4:16 115:1
**1150** 3:9
**116** 116:1 265:16
**117** 117:1
**118** 118:1
**119** 119:1
**12** 12:1 170:6 203:25
**12:29** 119:12
**12:29:04** 119:11
**120** 120:1 266:6
**121** 121:1
**122** 92:11 95:13 122:1
**123** 123:1 190:20 191:3
**124** 124:1
**125** 125:1 205:8 207:9
  208:10
**126** 126:1 191:4
**127** 127:1
**128** 128:1
**129** 129:1
**13** 13:1 205:9 209:8
  262:14
**13:30:41** 119:15
**130** 130:1
**131** 4:18 131:1
**132** 132:1
**133** 133:1
**134** 134:1 219:2 220:4,20
**135** 135:1
**136** 136:1

**137** 137:1
**138** 138:1
**139** 139:1
**14** 14:1 91:22 262:14
**14:15** 91:18
**14:30:33** 152:25
**14:44:15** 153:5
**140** 140:1
**141** 141:1
**142** 142:1
**143** 143:1
**144** 144:1
**145** 145:1
**146** 146:1
**147** 147:1
**148** 148:1
**149** 149:1
**15** 15:1 99:14 106:22,23
  106:25 108:19,20
  161:19 262:14
**15:43:50** 187:21
**15:58:03** 187:25
**15:59:57** 188:20
**150** 150:1 230:6
**151** 151:1
**152** 58:23 152:1
**153** 153:1
**154** 154:1
**155** 155:1
**156** 156:1
**157** 157:1
**158** 158:1
**159** 159:1
**16** 16:1 146:18 205:15
**16:00:31** 188:23
**16:47:21** 218:20
**16:59:58** 218:24
**160** 160:1
**161** 161:1
**162** 162:1
**163** 163:1
**164** 164:1
**165** 165:1
**166** 166:1 259:23
**167** 167:1 261:5
**168** 168:1
**169** 169:1

**17** 17:1 88:14 91:4,11
  93:17 94:3,6,22
**17th** 159:12,24 161:6
  227:14
**17:59:15** 255:3
**170** 170:1
**171** 171:1 211:8,10
  265:16
**172** 172:1
**173** 173:1
**174** 174:1 266:6
**175** 175:1
**176** 176:1
**177** 177:1
**178** 178:1
**179** 179:1
**18** 18:1 88:14 190:9
**18:11:02** 255:6
**18:36:15** 269:7
**180** 17:9 180:1
**181** 181:1
**182** 182:1
**183** 183:1
**184** 184:1
**185** 185:1
**186** 186:1
**187** 187:1
**188** 4:20 188:1
**189** 189:1
**19** 4:10 19:1
**190** 4:22 190:1
**191** 191:1
**192** 192:1
**193** 193:1
**194** 194:1
**195** 195:1
**196** 196:1
**1969** 64:12,15
**197** 197:1
**198** 198:1
**1980's** 23:20
**199** 199:1

---
**2**

**2** 1:7 2:1 4:12,25 45:10
  50:21,22 51:17 83:3
  87:19,22 91:17 92:8

95:13 111:3 126:8
  176:14 208:24 209:9
  212:23,23 216:12 261:6
  261:10
**2-1/2** 212:23
**2:00** 96:17
**2:30** 153:2
**2:44** 153:3
**20** 20:1 79:20,21 80:15
  81:8,12 82:12 108:18
  108:19 122:11 160:15
  160:18,21,24 161:3,14
  164:23 167:7,8 168:20
  169:10,10,19 170:18,19
  188:7 202:20 206:19
  233:3
**20-foot** 105:22 161:19
**200** 200:1 252:9 253:8
  273:19
**20001** 2:4
**20036-4129** 3:10
**2005** 4:21 27:19 29:25
  56:13 87:9 188:5,7
**2006** 27:22 29:23 48:15
**2007** 27:24 29:21 48:15
  190:9
**2008** 28:2 29:19 44:13
**2009** 1:13 6:12 28:4
  44:18,20,23
**201** 201:1
**202** 2:4 3:10 202:1
**203** 203:1
**204** 204:1
**205** 205:1
**206** 206:1
**207** 207:1
**208** 208:1
**209** 209:1
**21** 21:1 88:2 99:11
**210** 210:1
**211** 211:1 216:6,11
**212** 212:1
**213** 3:5 213:1
**214** 214:1
**215** 215:1
**216** 216:1
**217** 217:1

218 218:1
219 4:24 219:1
22 14:23 22:1 88:4 99:18
  99:22 103:21 104:3,4
22-30 4:21
220 220:1
221 221:1
222 222:1
223 223:1
224 224:1
225 225:1
226 226:1
227 227:1
228 228:1
229 229:1
23 23:1 126:9,11
23-30 188:5
230 230:1
231 231:1
232 232:1
233 233:1
234 234:1
235 235:1
236 236:1
237 237:1
238 238:1
239 239:1
24 24:1 126:11 198:11
240 240:1
241 241:1
242 242:1
243 243:1
244 244:1
245 245:1
246 246:1
247 247:1
248 248:1
249 249:1
25 25:1 49:12,13 169:10
  170:20 233:3 262:11
250 250:1
251 251:1
252 252:1
253 253:1
254 254:1
255 255:1
256 256:1

257 257:1
258 258:1
259 259:1
26 26:1 262:11
260 260:1
261 261:1
262 262:1
263 263:1
264 264:1
265 265:1
266 266:1
267 4:5 267:1
268 268:1
269 269:1
27 27:1 262:12
270 270:1
271 271:1
2715 2:11
272 272:1
273 273:1
28 28:1 262:12
29 29:1 56:13 79:14 80:5
  87:9 134:11 135:5
  139:6 145:7 221:8
  262:12
29th 189:16 238:8

**3**

3 3:1 4:14 50:21,22 51:17
  83:6 89:22 90:3 91:17
  92:21 93:5 96:5 100:25
  119:11 261:12,16
3/8 62:14
3:00 96:17 199:4
3:43 187:22
3:58 187:23
3:59 188:21
30 7:23 30:1 96:20 97:7
  99:15,25 100:4,8,12,15
  100:19 101:12 103:22
  103:25 104:8 106:12,14
  106:25 107:19,22 108:5
  108:20 111:12,13,14,16
  116:18 118:7 122:6,11
  124:11 133:13 143:14
  164:23 167:8 209:2
  257:10 271:14

30% 116:10
30-day 101:19
30-foot 106:8
30-minute 98:11 102:5
31 31:1 131:18,20 132:17
  132:17,19,25 133:19
  134:3 142:11
32 32:1 104:2 132:2
  139:11
33 33:1 130:4 131:18
33rd 3:4
34 34:1
346-4444 2:4
35 35:1
36 36:1
37 37:1
38 38:1
39 39:1
39.46 97:17,24 98:10

**4**

4 4:1,16 94:7,23 115:12
  115:19 119:14 152:25
  189:3 198:11 262:17,19
4,000 13:13,21
4:00 134:10 188:22
  199:4
4:47 218:21
4:59 218:22
40 40:1 90:12 96:2,2
  107:5 108:18 133:13
  143:14
400 149:25 192:9,12
  193:5 206:4 207:7
  214:22 215:4 217:2,25
  218:2,3
41 13:11,12 41:1 130:7
42 4:19,21 42:1
43 43:1
430 4:11
44 44:1 137:6 227:12
444 3:4
45 4:13 45:1 106:25
  108:20 136:24 137:2,17
  145:24 147:15,25
  235:17,21,23,25 236:11
  239:22

46 46:1 140:23 171:3,5,9
  172:7,12
47 47:1 139:6,10 140:6
  201:17
48 48:1
48.93 98:17
49 49:1

**5**

5 4:15,18 5:1 130:24
  131:6,12 142:15 153:4
  174:5 187:21 188:3
  199:25 211:11 263:4
5,000 143:7
5:00 134:11 154:22
  164:23 168:19,20
  199:16 200:2,3,6,10,19
  201:9,10,23 202:2,10
  202:17 205:17,23
5:20 164:24
5:30 154:22 164:24
  165:2 179:6
5:36 171:14
5:45 179:6
5:59 255:4
50 21:2 49:9,10 50:1
  133:14
50-foot 17:2,16,17,21
  18:7 19:24 20:12 21:2
504 2:12
51 51:1
52 4:17 52:1
53 53:1
54 54:1
55 55:1 237:14
56 56:1 236:24 237:14
57 57:1 255:9 259:4
57.34 97:7
58 58:1
59 59:1
596-6000 3:5
598-2715 2:12

**6**

6 1:13 4:20 6:1,11 137:11
  187:24 188:3,9 262:17
6-B 99:9

**6:00** 88:21 90:25 91:12 94:24 127:17 137:11 165:2,5 168:21 171:15 171:16,18 205:20
**6:04** 91:6,12
**6:11** 255:5
**6:19** 127:5
**6:36** 269:11
**6:45** 164:2,9,11,13
**6:53** 127:8
**60** 60:1 106:8,14 107:5 224:8 257:13
**60.37** 98:18
**61** 61:1 258:2,10,11,14
**62** 62:1
**63** 63:1 199:2 224:20
**64** 64:1 198:9,10 199:2,6 211:18
**65** 65:1 226:24
**650** 2:11
**66** 66:1
**67** 67:1 227:13
**67.38** 129:2
**68** 68:1 227:17 229:24 230:4
**69** 69:1 234:21 235:6

---
**7**

**7** 4:4,22 7:1 190:8,11,13 198:15,18,21
**7:00** 127:17 138:3,12,19 140:19 267:23 268:4,12
**7:47** 141:13 171:4,11,19
**70** 70:1 202:19
**70130-6111** 2:12
**71** 71:1 202:18,22 203:10 211:10,11
**72** 72:1 203:17 219:6
**73** 73:1
**739** 21:8
**74** 74:1 244:4
**740** 21:9
**75** 75:1
**750,000** 28:20
**76** 76:1
**77** 77:1
**78** 78:1

**79** 4:23 79:1 220:6

---
**8**

**8** 4:19,24 8:1 91:22 169:25 170:2,3,5 198:15,18,21 216:11 219:11,14 221:2 243:8
**8-29-2005** 141:2
**8:00** 138:3,12,19 176:9 180:13 181:9,13 239:22
**80** 80:1 106:8
**81** 81:1
**82** 82:1
**83** 83:1
**84** 84:1 88:20,25 90:22 91:7 94:11,12,25
**85** 85:1 236:18
**86** 86:1 255:8 259:4
**862-4320** 3:10
**87** 4:12 87:1
**88** 88:1
**89** 89:1

---
**9**

**9** 9:1 98:15 201:22 262:13,14
**9:00** 91:19 92:4,6 95:12 96:18 137:20 179:16,17 179:19 236:23 238:4 239:25 256:6 263:9
**9:05** 1:16
**9:05.35** 6:12
**90** 4:14 90:1 106:14 257:12,13 258:6
**90-day** 101:20
**900** 3:9
**90071** 3:5
**901** 1:16 2:3
**91** 91:1 257:12,17 258:10 258:12
**92** 92:1 258:20
**93** 93:1
**94** 94:1
**95** 95:1
**9504** 1:17
**96** 96:1
**97** 97:1

**98** 98:1
**99** 99:1