# EXHIBIT 8

Deposition of Gennaro Marino (2009)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION
PERTAINS TO:  BARGE          : CIVIL ACTION
                             : No. 05-4182
                             : and consolidated
Boutte v Lafarge      05-5531 : Cases
Mumford v Ingram      05-5724 :
Lagarde v Lafarge     06-5342 : SECTION "K" (2)
Perry v Ingram        06-6299 :
Benoit v Lafarge      06-7516 : JUDGE STANWOOD R.
Parfait Family v USA  07-3500 : DUVAL, JR.
Lafarge v USA         07-5178 :
Weber v Lafarge       08-4459 : MAGISTRATE JOSEPH C.
                             : WILKINSON, JR.
-----------------------------X

Friday, August 7, 2009
- - -

     Videotaped oral deposition of GENNARO G. MARINO,
PH.D., P.E., taken at the offices of Goowin Procter,
901 New York Avenue, N.W. Washington, D.C., beginning
at 9:15 a.m., before Nancy J. Martin, a Registered
Professional Reporter, Certified Shorthand Reporter
License No. 9504.

A P P E A R A N C E S:                    2

REPRESENTING LAFARGE NORTH AMERICA, INC.:

GOODWIN PROCTER
901 New York Avenue, N.W.
Washington, DC 20001
(202) 346-4444
mraffman@goodwinprocter.com
krobbins@goodwinprocter.com
BY: MARK S. RAFFMAN, ESQUIRE
    KIRSTEN V.K. ROBBINS, ATTORNEY AT LAW
    JOHN D. ALDOCK, ESQ.

          -and-
CHAFEE MCCALL
2300 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2300
(504) 585-7000
walker@chaffe.com
BY: DEREK WALKER, ESQ.
          -and-
SUTTERFIELD & WEBB, L.L.C.
650 Poydras Street
Suite 2715
New Orleans, Louisiana   70130-6111
(504) 598-2715
dwebb@cwslaw.com
BY: DANIEL A. WEBB, ESQ.

---

I N D E X                    4

WITNESS: GENNARO G. MARINO, PH.D., P.E.
QUESTIONED BY:                      PAGE:
    MR. RAFFMAN                       8

                - - -

E X H I B I T S

| NUMBER | DESCRIPTION | MARKED FOR ID |
|---|---|---|
| 1 | Expert Report prepared by Gennaro G. Marino, Ph.D., P.E., 336 pages | 11 |
| 2 | Figure 9-5 Floodwall elevations at the IHNC, 1 page | 14 |
| 3 | Deposition Transcript of Ernest Edwards, 42 pages | 18 |
| 4 | Preliminary Failure Investigation of the North and South Beaches along IHNC (East), St. Bernard Parish, New Orleans, LA, 32 pages | 30 |
| 5 | Document entitled "782,700 3,323,600," IV-7-27, IV-7-23 through IV-7-25, 4 pages | 42 |

---

A P P E A R A N C E S: (CONTINUED)     3
REPRESENTING BARGE PLAINTIFFS:

KHORRAMI PLLARD & ABIR LLP
444 South Flower Street
33rd Floor
Los Angeles, California   90071
(213) 596-6000
dpollard@kpalawyers.com
BY: DYLAN POLLARD, ESQ.

     -AND-

LAW OFFICE OF RICHARD T. SEYMOUR, PLLC
1150 Connecticut Avenue, N.W.
Suite 900
Washington DC 20036-4129
(202) 862-4320
rick@rickseymourlaw.net
BY: RICHARD T. SEYMOUR, ESQUIRE

ALSO PRESENT:
    JOHN SHELONKO
    PETER KEELEY
    CHARLES CUSHING
    DANIEL WEBB
    MARK GUENTHER, LEGAL VIDEOGRAPHER

---

I N D E X                    5
E X H I B I T S

| NUMBER | DESCRIPTION | MARKED FOR ID |
|---|---|---|
| 6 | Document IV-34, 1 page | 80 |
| 7 | Document IV-4, 1 page | 81 |
| 8 | Resume of Genaro Gerald Marino, Ph.D., P.E., 9 pages | 84 |
| 9 | Deposition Transcript of William Villavaso, Jr., 68 pages | 122 |
| 10 | Figure 11-8 IHNC - East Bank, 1 page | 202 |
| 11 | Figures 11-18 and 11-19, V-11-31, 1 page | 204 |
| 12 | US Army Corps of Engineers, E-99 Sheet Pile Wall Field Load Test Report, 83 pages | 243 |
| 13 | Figures 14-103, 14-108, 14-109, 14-110, V-14-102, 4 pages | 274 |
| 14 | Photos, 2 pages | 276 |
| 15 | Marino Engineering, Expert Engineering Services for the Inner Harbor Navation Canal Failure, Statement Includes All Activity through June 30, 2009, 1 page | 285 |

DEPOSITION SUPPORT INDEX 6
DIRECTION TO WITNESS NOT TO ANSWER
Page   Line


REQUEST FOR PRODUCTION OF DOCUMENTS
Page   Line

---

GENNARO G. MARINO, PH.D., P.E. 7
- - -
(It is hereby stipulated and agreed by and among
counsel that sealing, certification, and filing are
waived; and that all objections, except as to the form
of the question, are reserved until the time of
trial.)
- - -

THE VIDEOGRAPHER:  Good morning.  This is the
video deposition of Gennaro Marino, taken on August 7,
2009 beginning at 9:15:36 in the case of Katrina Canal
Breaches, Mumford vs. Lafarge, North America.  Case
No. 05-4182, United States District Court, Eastern
District of Louisiana.  This deposition is being taken
at the law firm of Goodwin & Procter in Washington,
D.C.  The court reporter today is Nancy Martin of
Veritext Court Reporting of New York.  I'm the
videographer, Mark Guenther, also with Veritext.
Would the attorneys present please introduce
themselves and who they represent.
MR. POLLARD:  Dylan Pollard, on behalf of the
plaintiffs.
MR. SEYMOUR:  Richard Seymour for plaintiffs.
MR. RAFFMAN:  Mark Raffman for Lafarge

---

GENNARO G. MARINO, PH.D., P.E. 8
North America.  With me today from Goodwin & Procter,
my firm, are John Aldock and Kirsten Robbins.  Also
with me are Peter Keeley and John Shelonka from
Lafarge North America, Dan Webb from Sutterfield &
Webb representing Lafarge, and I expect to see Derek
Walker from Chaffe McCall this morning as well.
THE VIDEOGRAPHER:  The court reporter can swear
the witness.
GENNARO G. MARINO, PH.D., P.E.
having been first duly sworn,
was examined and testified as follows:

EXAMINATION
BY MR. RAFFMAN:
Q.  Mr. Marino, my name is Mark Raffman.  We've
met before.  Have you reviewed the transcript of your
deposition from September of 2008 in preparation for
this deposition?
A.  I really didn't get enough time to do that.
I -- I kind of this morning glanced over it for about
a half an hour.
Q.  When you glanced over it for half an hour,
did you see anything that struck you as being wrong?
A.  There was one that I noticed was that you

---

GENNARO G. MARINO, PH.D., P.E. 9
asked me who pulled a reference -- who pulled a
reference that was given in the back of our
preliminary report, and I said I did and it was
actually Dr. Gramall.
Q.  Dr. Gramall was your colleague at Marino
Engineering Associates?
A.  Yes.
Q.  All right.  Anything else you saw when you
glanced over your deposition that struck you as wrong?
A.  Not that I can think of.
Q.  Dr. Marino, since you've done this before in
this case, I'll give you a very short refresher on --
on deposition procedure.  First, you need to let me
finish my question before you start your answer.  Do
you understand that?
A.  Yes.
Q.  And I'll try to do the same for you.  If you
don't understand my question, please ask me to
clarify.  Will you do that?
A.  Sure.
Q.  If you don't ask me to clarify, is it fair to
assume you understand the question?
A.  Yes.
Q.  You need to speak, not gesture.  The court

GENNARO G. MARINO, PH.D., P.E.          10

1  reporter needs to take down your words.  Do you
2  understand that?
3      A.  Yes.
4      Q.  Have you taken any medication, alcohol, drugs
5  or anything else that impairs your ability to testify
6  truthfully and accurately today?
7      A.  No.
8      Q.  Dr. Marino, what time on August 29, 2005 did
9  the east wall of the Inner Harbor Navigation Canal
10 begin to overtop?
11     A.  Around 7:30.
12     Q.  What's your basis for saying that?
13     A.  Based on surge elevations.
14     Q.  Where did you take the surge elevations?
15     A.  From the hydrograph that's provided in our
16 report.
17     Q.  Hydrograph was taken from the Inner Harbor
18 Navigation Canal lockmaster?
19     A.  It was taken from a series -- yes.  I believe
20 so, yes.
21     Q.  What was the elevation of the surge at
22 7:30 a.m. on the morning of August 29 at the east wall
23 of the Inner Harbor Navigation Canal?
24     A.  May I look at -- is this my report?

GENNARO G. MARINO, PH.D., P.E.          11

1      Q.  Yes.  I've marked -- let's identify your
2  report.  It's been marked as Exhibit 1 to your
3  deposition.  Do you recognize that as your expert
4  report?
5          (The Reporter marked the document
6          referred to as Deposition Exhibit 1
7          for identification.)
8      THE WITNESS:  Yes.
9  BY MR. RAFFMAN:
10     Q.  And if you turn to Section 3.3 of your
11 report -- 3.4.  Is that the hydrograph?
12     A.  Yes.
13     Q.  What was the height of the wall -- what was
14 the height of the surge at 7:30 a.m., according to
15 your hydrograph?
16     A.  13 feet.
17     Q.  What was the height of the wall on the east
18 side of Inner Harbor Navigation Canal, wall top?
19     A.  12-5.  So it was 7:00 o'clock.
20     Q.  So now you say the time for overtopping on
21 the east wall was 7:00 o'clock?
22     A.  Based on this hydrograph.  I may have been
23 looking at a different one at the time.  I noticed
24 that there are several that have a little variation in

GENNARO G. MARINO, PH.D., P.E.          12

1  them.  This one I -- I took because it had in it also
2  the -- the gauge points for I-10 which were removed
3  afterwards, after it reached about elevation 11 or so.
4      Q.  The lockmaster's hydrograph was taken at the
5  lock at the very south part of the Inner Harbor
6  Navigation Canal.  Do you understand that?
7      A.  Yes.
8      Q.  What are the uncertainty surrounding the
9  numbers supported in that lockmaster's hydrograph?
10     A.  My understanding is that he was viewing the
11 staff gauge, and he would look at the variations in
12 water level, and this was his best determination of
13 where that water level is.
14     Q.  How far away was he standing from the staff
15 gauge when he made those visual observations?
16     A.  I don't know.
17     Q.  Would you agree with me that if he was
18 standing at a considerable distance from the staff
19 gauge when he made the observations, that that would
20 introduce some uncertainty into the observations that
21 he made?
22     A.  Yes, either way.
23     Q.  What is your basis for concluding that the
24 wall top was at 12.5 feet on the east side of the

GENNARO G. MARINO, PH.D., P.E.          13

1  canal?
2      A.  That's -- that's -- the basis of that was
3  from the IPET report and what was used in their
4  analyses.
5      Q.  Did IPET report any variation in the wall-top
6  levels along the east side of the Inner Harbor
7  Navigation Canal?
8      A.  I had looked for information on that, and
9  based on what I know, there were some variations
10 between close to 12.5, but could be several -- a
11 couple tenths greater.  But no one knows what exactly
12 existed right at the breaches because the breaches are
13 gone.
14     Q.  Did IPET not in fact report variations at the
15 wall-top level significantly more than a couple of
16 inches on the east side of the navigation canal?
17     A.  You know, we struggled to get survey
18 information, and it's possible that they are higher.
19 I noticed when I looked at -- briefly looked at
20 Dr. Cushing's report, that he showed some elevations
21 that were higher.  So if they were higher, the
22 elevation, the time of overtopping would actually be
23 further -- later.
24     Q.  Have you never seen, in IPET, any reports of

4  (Pages 10 to 13)

GENNARO G. MARINO, PH.D., P.E.          14

1  wall-top elevations in the east side of the Inner
2  Harbor Navigation Canal that are lower than 12.5 feet?
3  A. I don't believe so.
4  MR. RAFFMAN: I'm going to hand you what's been
5  marked as Exhibit 2 to your deposition. I will
6  represent that it comes from Page 4-9-8 from the IPET
7  report that is Appendix 4. I'm sorry. Volume IV,
8  Appendix 9, Page 8. I'll ask you to review that.
9  (The Reporter marked the document
10  referred to as Deposition Exhibit 2
11  for identification.)
12  THE WITNESS: Did you say this came from my
13  report?
14  BY MR. RAFFMAN:
15  Q. IPET. IPET. IPET stands for -- I believe it
16  stands for Inneragency Performance Evaluation Task
17  Force or team. Do you recognize this page from IPET
18  as representing wall-top heights along the Inner
19  Harbor Navigation Canal that are lower than 12.5 feet?
20  A. Floodwall elevations. That doesn't say top
21  of the floodwall.
22  Q. Okay. Have you ever seen this figure before?
23  A. No.
24  Q. So you didn't factor it into your report when
25

GENNARO G. MARINO, PH.D., P.E.          15

1  you concluded that the wall-top elevation at all
2  places along the Inner Harbor Navigation Canal was
3  12.5 feet?
4  A. No.
5  Q. And does this page from IPET, assuming the
6  truth of what it reports, would that change your
7  conclusion that the wall top was 12.5 feet along the
8  entire east side of the Inner Harbor Navigation Canal?
9  A. Well, I wouldn't say that I thought it was
10  12.5 across the entire east side. I -- I would say
11  that I took that value because that was a value that
12  IPET felt was representative of -- of the areas of
13  breach at the time of failure. Yes.
14  Q. So do you now accept that there are
15  variations in the level of the wall top along the east
16  side of the Inner Harbor Navigation Canal?
17  A. I would have to review this a little further,
18  but if these are what you claim they are, then that's
19  what they are.
20  Q. Have you ever seen any eyewitness testimony
21  that overtopping along the east side of the IHNC began
22  to take place well before 7:00 o'clock a.m.?
23  MR. POLLARD: Objection. Vague.
24  THE WITNESS: I think what I remember reading was
25

GENNARO G. MARINO, PH.D., P.E.          16

1  basically splashing. I didn't get the idea there was
2  continuous overtopping.
3  BY MR. RAFFMAN:
4  Q. Let me ask you to turn to Page -- Table 3.1
5  of your deposition. It's "Reported Events and
6  Observations."
7  MR. POLLARD: Your referring to his report?
8  MR. RAFFMAN: Yes.
9  MR. POLLARD: You said, "deposition," but I think
10  I understood what you meant.
11  MR. RAFFMAN: I'm sorry.
12  Q. Your report. Table 3.1. Table 3.1 has
13  "Reported Events and Observations." Do you see that?
14  A. Yes.
15  Q. And there are names of witnesses included in
16  Table 3.1. Do you see that?
17  A. Yes.
18  Q. Did you review personally each of the
19  accounts of the witnesses?
20  A. Yes.
21  Q. Do you know whether you reviewed all the
22  accounts of all the witnesses who were present in the
23  Lower Ninth Ward during the storm?
24  A. Only those depositions that were supplied to
25

GENNARO G. MARINO, PH.D., P.E.          17

1  me.
2  Q. And who decided which depositions would be
3  supplied to you?
4  A. I don't know.
5  Q. Did you get a list of names and then pick the
6  ones you wanted to see?
7  A. No.
8  Q. You just read what was sent to you?
9  A. I assumed that they sent me any depositions
10  that were relevant.
11  Q. All right. When you say, "they," you're
12  referring to the lawyers for the plaintiffs in this
13  case?
14  A. Yes.
15  Q. Have you -- I'll ask you to peruse at your --
16  at your leisure the list of names down there, and see
17  whether Ernest Edwards appears on that list of names.
18  A. I don't think I -- I don't need to peruse it.
19  I don't think I've heard that guy's name before.
20  MR. RAFFMAN: Well, since you don't believe
21  you've seen the deposition before, I'm going to ask
22  that Ernest Edwards' deposition be marked as
23  Exhibit 3.
24  ///
25

5 (Pages 14 to 17)

GENNARO G. MARINO, PH.D., P.E.        18

1  (The Reporter marked the document
2  referred to as Deposition Exhibit 3
3  for identification.)
4  BY MR. RAFFMAN:
5      Q.  And I'm going to ask you to turn to Page 76
6  of Mr. Edwards' deposition.  Actually, 75.
7      A.  Okay.
8      Q.  Mr. Edwards says that he was on the
9  Claiborne Avenue bridge.  Do you see that?
10     MR. POLLARD:  What line are you referring to?
11 BY MR. RAFFMAN:
12     Q.  Page 75 and into 76.  75, Mr. Edwards is
13 asked, "Do you see the Claiborne Avenue bridge?"  And
14 he responds, "Uh-huh."
15     A.  He's on the bridge or he's seeing the bridge?
16     Q.  Well, let's go back to 76, Line 4.  "What I'd
17 like you to do is show me where you parked on the
18 bridge first, second and the third time as you inched
19 up."  Do you see that on Page 76?  Lines 4 through 8.
20     (The witness reviewed the document.)
21     THE WITNESS:  Okay.
22 BY MR. RAFFMAN:
23     Q.  So he's parked on the Claiborne Avenue
24 bridge.  You see that now?

GENNARO G. MARINO, PH.D., P.E.        19

1      A.  Yes.
2      Q.  This is the first time you're reading this
3  deposition?
4      A.  Yes.
5      Q.  If you continue down the page, you'll see
6  that at a certain point, he parked and then got out of
7  the truck.  Do you see that at the bottom of the page?
8      A.  Okay.
9      Q.  All right.  Now, turn the page.  Page 77 at
10 the top.  You see he got out of the truck, and they
11 were looking at the water.  Do you see that?  Page 77.
12     A.  Yes.
13     Q.  All right.  Then he says, "The lights were
14 cut off in the Lower Ninth Ward."  He says he got to
15 the bridge about quarter to 2:00, 2:00 o'clock in the
16 morning.  Do you see that?
17     A.  Okay.
18     Q.  And further down the page, Page 77, Line 16
19 to 20, he's asked what he saw when he got out of the
20 truck, and he says he saw the water rising.
21     A.  Do you see that?
22     A.  Yes.
23     Q.  He's asked at Page 77, Lines 21 through 23,

GENNARO G. MARINO, PH.D., P.E.        20

1  "Okay.  You could see the water overtopping the levee
2  at that point?"  And he says, "Not yet.  It hadn't
3  started topping it yet."  You see that?
4      A.  Yes.
5      Q.  And continuing down the page, the questioner
6  says, "I know that you saw it overtopping at some
7  point."  He says, "Yes."  Questioner continues, "Soon
8  after.  About how long after you got to the bridge did
9  you see it overtopping?"  He says, "About an hour
10 later."  Do you see that?
11     (The witness reviewed the document.)
12     THE WITNESS:  Okay.
13 BY MR. RAFFMAN:
14     Q.  The questioner continues, "So maybe around a
15 quarter to 3:00?"  And the witness answered, "Yeah, it
16 started overtopping."  The witness says, "It started
17 topping."  Do you see that the witness has now said it
18 started topping at around a quarter to 3:00?  Page 78,
19 Line 8.
20     (The witness reviewed the document.)
21     THE WITNESS:  Okay.
22 BY MR. RAFFMAN:
23     Q.  The questioner continues, "You can see the
24 length of the wall?"  And the witness answers,

GENNARO G. MARINO, PH.D., P.E.        21

1  "Right."  The questioner says, "And it was standing?"
2  And the witness answers, "Right."  Do you see that?
3      (The witness reviewed the document.)
4      THE WITNESS:  Mark, where are you at?
5  BY MR. RAFFMAN:
6      Q.  Page 78, Lines 8 through 12.
7      A.  Yes.
8      Q.  All right.  The questioner continues, "And as
9  it overtopped, what did you see?"  The witness
10 answers, "After a while, you couldn't see anything."
11 The witness says, "Okay."  The questioner says,
12 "Okay."  The witness says, "Because it was raining.
13 It turned snow white.  You couldn't see the truck
14 anymore."  Do you see that?
15     A.  Yes.
16     Q.  And the questioner says, "Before it started
17 turning snow white, you saw what the water was doing
18 as it was coming over the wall; right?"  And the
19 witness says, "Right."  And the questioner continues
20 at the bottom of 78, "Tell us, describe to us what it
21 was doing to the ground."  And the witness says, "It
22 was topping.  It was topping over the side."  Do you
23 see that at the top of Page 79?
24     A.  Yes.

GENNARO G. MARINO, PH.D., P.E.        22

Q. And the questioner continues, "Describe to me the trench that it was creating from falling over." The witness says, "I don't know how much trenches, but it was coming over the wall pretty fast. Pretty heavy too." Do you see that at the page at the top of 79?

A. Yes.

Q. And you understand the witness is talking about an event that's occurring at 3:00 o'clock in the morning on August 29, 2005 from his vantage point on the Claiborne Avenue bridge?

A. Okay.

Q. The questioner continues, "Sort of like spilling over a bucket; right?" And the witness answers, "Right." Do you see that at the top of Page 79?

A. Yes.

Q. And the witness says -- the questioner says, "Those are your words, right?" And the witness says, "Yes." The questioner says, "You've used those words before 'spilling over a bucket'; right?" And the witness says, "Yes." Do you see that on 79?

(The witness reviewed the document.)

THE WITNESS: Yes.

BY MR. RAFFMAN:

---

GENNARO G. MARINO, PH.D., P.E.        23

Q. And the questioner says, "And you've used the word 'trench'?" And the witness says -- answers "Right." And the questioner says, "I was using your words?" And the witness says, "Right. It cut a trench in there." Do you see that? 79, Line 19.

(The witness reviewed the document.)

THE WITNESS: Yes.

BY MR. RAFFMAN:

Q. Do you understand the witness to be saying that the water pouring over the wall is cutting a trench in the soil?

A. I assume that -- you know, I haven't read this entire deposition. This is the first time I'm looking at it. So if that's what you say it is, that he's saying, that's what he's saying.

Q. All right. Having read this and assuming that in fact the witness is saying he is seeing the wall -- the water pour over the wall and cut a trench in the soil on the protected side of the Inner Harbor Navigation Canal east wall at around 3:00 o'clock in the morning on August 29, assuming that's what the witness is saying, do you nevertheless maintain that overtopping of that wall started at 7:00 o'clock in the morning on August 29?

---

GENNARO G. MARINO, PH.D., P.E.        24

A. Well, I don't know -- you know, as other witnesses have said about times, some of their times are off. They're obviously off. So you have to take that into consideration.

Q. Do you think it's possible that this witness, when he said 3:00 o'clock, that the actual time of the events he was observing was in fact 7:00 o'clock in the morning?

A. I don't know.

Q. He could be off by four hours?

A. I don't know. I mean, there's witnesses that were off by one day. So, I mean, if you ask me when I had breakfast two, three years ago, I wouldn't be able to tell you the exact time.

Q. So generally speaking, would you agree with me that when eyewitnesses in a hurricane report that something happens at a given time, it wouldn't really be a good idea, as an expert, to accept those times as gospel and go with them?

A. Not as gospel. I mean, you can look at a general -- as a general frame of mind.

Q. And as an expert, you need to evaluate the witness's report of time against the scientific observations that you consider more reliable. Isn't

---

GENNARO G. MARINO, PH.D., P.E.        25

that fair?

A. Yeah. Yes.

Q. If this witness is correct that the wall is overtopping at 3:00 o'clock in the morning, then your entire opinion about the time of overtopping has got to be wrong; isn't that right?

MR. POLLARD: Objection. Argumentative.

THE WITNESS: If he's correct that it happened at 3:00 o'clock in the morning, then my -- then obviously overtopping occurred at 3:00 o'clock in the morning.

BY MR. RAFFMAN:

Q. Right. And in fact, this witness you've never seen before. So you had no occasion to weigh and evaluate whether you could accept the testimony; right?

A. That's correct.

Q. There are other witnesses whose testimony you looked at and whose testimony you concluded could not be true based on the data that you reviewed or some other objective facts that you -- you thought about; right?

A. You'd have to give me an instance of that.

Q. All right. Take a look at Table 3.1, and I'm referring now specifically to Entry number -- well,

---

7 (Pages 22 to 25)

GENNARO G. MARINO, PH.D., P.E.          26

look at the first page of 3.1, and you'll see for date and timing a series of entries marked TNV.  Do you see that on the first page?

A.  Yes.  That's exactly the guy I was just talking about in reference to the time for -- what's this guy's name, Ernest something.  Ernest Edwards.  I mean, that was the example I was giving in terms of time that this guy was -- even he was saying was on Sunday.

Q.  Let's, for the record, be clear.

A.  And he was saying it was at night, not in the morning.

Q.  The witness that you just reviewed for the very first time is Ernest Edwards; correct?

A.  Yes.

Q.  The witness you're referring to in this entry is a man by the name of Arthur Murph.

A.  Yes.

Q.  Arthur Murph reported that all of the flooding events took place on Sunday night; correct?

A.  Right.

Q.  And you've rejected that account from Arthur Murph because it can't possibly be true?

A.  Right.

GENNARO G. MARINO, PH.D., P.E.          27

Q.  And as an expert, it's proper to reject accounts that can't possibly be true?

A.  Right.

Q.  All right.  Let me go back, and I'm going to ask you to take your report, which is Exhibit 1, and I want to ask you a few questions about your report.

A.  Just a few?

Q.  Maybe a couple.  Maybe a couple.  Exhibit 1 is your report; right?

A.  Unless you plagiarized it, it is, yes.

Q.  I promise you, I didn't plagiarize it.  I couldn't begin to.  All right.  Did you write the report?

A.  Yes.

Q.  And you signed it?

A.  Yes.

Q.  And the report contains all the opinions you expect to offer --

A.  Can I -- can I clarify that?

Q.  Yes, please.

A.  There were a few sections here that a draft was written by an engineer in our firm that we -- I had him summarize the analysis, and then I went through it and basically re-wrote it.  Okay.  So when

GENNARO G. MARINO, PH.D., P.E.          28

you said did I write the report, I wrote the report, but there was input from other engineers.

Q.  And there's no part of the report that you have not reviewed carefully and blessed and approved?

A.  Let me -- I want to apologize.  When we put this report together, I asked for a few additional days because we were putting together at the last minute.  If you -- you realize -- if you were waiting for this report, you know it came after 5:00 that day.  So as I reviewed it for the first time, the last few days, I realized there's a number of editorial things, glitches that exist in the report.  So with that said, that's my kind of preface to whatever question you're going to ask.

Q.  Well --

MR. POLLARD:  You can point those out when and if he gets to them.

MR. RAFFMAN:  I may do that.

Q.  If there's any part of this report that you don't feel able to testify confidently about, tell me now and I'll refrain from asking questions.

A.  No.  I mean, I went through the majority of the report in the last few days and, you know, what I read, I mean, there's typos and stuff, but I don't see

GENNARO G. MARINO, PH.D., P.E.          29

anything that I read that would make me say, "Okay. Well, that conclusion is not valid."

Q.  All right.  Does the report contain any opinions you expect to offer at the trial of this case?

A.  Yes.

Q.  Does the report contain all the bases and reasons for those opinions?

A.  Yes.

Q.  Does the report identify the information and the data considered by you in forming the opinion or opinions?

A.  The data that we relied on, yes.

Q.  Is there anything that you relied on that is not specified in your report or in your list of references in Section 8.1?

A.  Not intentionally.

Q.  Dr. Marino, you produced a preliminary report in this case in June of 2008.  Do you remember that?

A.  Yes.

Q.  Have you reviewed your preliminary report in preparation for this deposition?

A.  I went through it once about a week ago.

MR. RAFFMAN:  All right.  Why don't we go ahead

GENNARO G. MARINO, PH.D., P.E.          30

1    and mark it as Exhibit 3 --
2        REPORTER MARTIN:  4.
3        MR. RAFFMAN:  4.  I usually don't get off track
4    until later.
5            (The Reporter marked the document
6            referred to as Deposition Exhibit 4
7            for identification.)
8        THE WITNESS:  Well, wait until I start speaking
9    Italian then.
10        MR. RAFFMAN:  Well, I won't understand your
11    Italian.  All right.  Exhibit 4, which was Exhibit 1
12    to your earlier deposition.  I'm going to draw an "X"
13    through the Exhibit 1 so that we can just keep it as
14    Exhibit 4.
15        Q.  Do you -- do you recognize Exhibit 4 as the
16    preliminary report that you submitted in this case?
17        A.  Yes.
18        Q.  You testified about the conclusions you made
19    in the preliminary report in your September of 2008
20    deposition.  You remember that?
21        A.  Yes.
22        Q.  All right.  And the testimony you gave at
23    that deposition was your best testimony at that time;
24    right?
25

GENNARO G. MARINO, PH.D., P.E.          31

1        A.  Yes.
2        Q.  As of the time that you issued your
3    preliminary report, you identified some of the work
4    that you had done as of September 2008.  Do you
5    remember that?
6        A.  Yes.
7        Q.  And -- and among the work you had done was to
8    review public reports, eyewitness depositions,
9    technical publications and photographs.  Do you see
10    that you had done that in the first paragraph of the
11    first page of the preliminary report?
12        A.  Yes.
13        Q.  And you also said that you were performing
14    certain engineering calculations.  Do you also see
15    that in that same segment?
16        A.  Yes.
17        Q.  The engineering calculations that you were
18    performing at that time related to a barge impact on a
19    floodwall.  Do you remember that?
20        A.  Yes.
21        Q.  Would you agree with me that there are no
22    such engineering calculations in the report that you
23    issued in 2009?
24
25        A.  Yes.

GENNARO G. MARINO, PH.D., P.E.          32

1        Q.  What happened to the engineering
2    calculations?
3        A.  That analysis never got finished.
4        Q.  Why not?
5        A.  We're still working on it.  It's basically
6    taking longer than we expected.
7        Q.  What work have you done on the engineering
8    calculations of barge impact since 2008?
9        A.  Basically, we have set up three distinct
10    models, 3D models, and we're working on getting them
11    to run appropriately.
12        Q.  Would engineering calculations of barge
13    impact be helpful to an analysis of whether this barge
14    could have caused the failures of the IHNC floodwalls?
15        A.  Well, I mean, obviously, that's why we're
16    doing that analysis.  What -- when we first started on
17    this project, at the time when we talked last, we had
18    started working on it and felt it would -- would be a
19    good thing to do.  During that time afterwards, we did
20    additional work on seepage, on slope stability,
21    deformation patterns, and I became more and more
22    confident in our conclusions, and the 3D modeling
23    has -- is going to be helpful, but I feel much
24    stronger about the opinions that I've rendered because

GENNARO G. MARINO, PH.D., P.E.          33

1    of the additional work we've done in other areas.
2        Q.  When you refer to "the additional work"
3    you've "done in other areas," you're referring
4    specifically to the stability studies you've done on
5    the soil on the east side of the Inner Harbor
6    Navigation Canal, and the seepage studies as well?
7        A.  And the damage investigations.
8        Q.  The "damage investigations" you're referring
9    to are examinations of floodwall damage; right?
10        A.  Yes.
11        Q.  Your report -- your 2009 report takes the
12    seepage and stability studies and the examination of
13    floodwall damage as the touchstone, if you will, for
14    why you conclude that the barge must have caused the
15    two breaches.  Is that fair?
16        A.  "Touch stone."  I -- can you define what you
17    mean by that?
18        Q.  Well, essentially, your analysis arrives at
19    the conclusion that the barge caused the failures by
20    ruling out stability and ruling out seepage as
21    potential causes; right?
22        A.  And -- and general witness accounts.  The
23    damage is sort of a process of elimination and also
24    looking at, like I said, the damage patterns.
25

GENNARO G. MARINO, PH.D., P.E.          34

1
2  Q.  And the process of elimination that you've
3  conducted is based on ruling out seepage, ruling out
4  stability and then taking witness accounts and review
5  of damage at the wall to eliminate other causes than
6  the barge?
7  A.  Well, I mean, that wouldn't be part of
8  process of elimination.  The process of elimination
9  would be the -- the seepage analysis and the limit
10  equilibrium analysis.
11  Q.  All right.  So if I missed the stability --
12  stability and limit equilibrium are the same analysis;
13  right?
14  A.  That's correct.
15  Q.  So by using seepage and stability and then
16  adding witness accounts and floodwall damage, you
17  arrive at the conclusion that the barge caused the
18  failures by a process of elimination?
19  A.  Using process of elimination.
20  Q.  All right.  And because there are no other
21  likely causes -- I'm using your words on Page 5-91 if
22  you want to look.  No other likely causes.  You
23  conclude that the breaches are essentially caused by
24  the barge?
25  A.  Now, this failure analysis that you're

GENNARO G. MARINO, PH.D., P.E.          35

1
2  talking about is for the south breach, not for north
3  breach; right?
4  Q.  That appears -- that long, "no other likely
5  causes," you see that it appears in the third line of
6  the last paragraph?
7  A.  Right.  I want to qualify that what you're
8  talking about is the south breach.
9  Q.  All right.  But the answer to my question as
10  qualified is "yes"; right?
11  A.  Yes.
12  Q.  And more or less the same process is true for
13  the north breach; isn't that right?
14  A.  Yes.
15  Q.  You did not do any quantitative forensic
16  engineering analysis in this report that demonstrates
17  that the ING4727 was capable of causing either breach;
18  correct?
19  A.  In terms of a load mechanics analysis, you're
20  talking about?
21  Q.  Load mechanics analysis or any other
22  quantitative forensic engineering analysis.
23  A.  Well, other than what I've got in this
24  report, that's what we've -- that's -- that's what I'm
25  relying on.

GENNARO G. MARINO, PH.D., P.E.          36

1
2  Q.  Right.  And this report doesn't contain any
3  load impact analysis; right?
4  A.  No.
5  Q.  This report doesn't contain any other
6  quantitative forensic engineering analysis to
7  demonstrate that the ING4727 was capable of causing
8  either breach, does it?
9  A.  No.
10  Q.  Since you've issued your preliminary report,
11  you've done work to look at more information regarding
12  loading conditions; right?
13  A.  Yes.
14  Q.  And in -- those loading conditions and that
15  information is reflected in Chapter 3 of your report;
16  right?
17  A.  Some of it, yes.
18  Q.  Anything you're relying on for loading
19  conditions is in Chapter 3; right?
20  A.  No.
21  Q.  Explain your answer.
22  A.  Well, I mean, you have groundwater
23  conditions.  You have soil conditions.  You have, you
24  know, sheet piled deflection conditions.  I mean...
25  Q.  And I don't want to get caught up.  I'm just

GENNARO G. MARINO, PH.D., P.E.          37

1
2  trying to understand how you've organized your report.
3  Chapter 3 provides some basic information about
4  loading conditions based on work you've done since
5  September of 2008 and possibly before?
6  A.  Right.  Some basic data.
7  Q.  Chapter 4 of your report provides your
8  analysis of -- of photographs of the breaches and
9  damage of -- at those breaches and some other
10  breaches; right?
11  A.  That's correct.
12  Q.  Chapter 5 of your report is the place where
13  you report on the soil stability analysis and the
14  seepage analysis that you've done for the north and
15  south breach; right?
16  A.  Among other things.
17  Q.  What else is reported in Chapter 5 that I
18  haven't captured?
19  A.  It includes determining the physical model
20  used to perform those analyses.
21  Q.  You have to set up a physical model to
22  perform those analyses because the analyses won't run
23  unless you have a physical model?
24  A.  Very good.
25  Q.  We're going to ask some questions about the

GENNARO G. MARINO, PH.D., P.E.        38

physical model later, but let me just get a little preview.  In setting up your physical model, what data did you rely on?

A.  I mean, we can go through the report.  I mean, I put in all of the data that we relied on in this chapter.

Q.  All right.  We'll go through it later.  Did your physical model agree with the physical model created by the IPET team?

A.  In a general sense.

Q.  Did your physical model agree with the physical model -- let me -- did your physical model differ in any material way from the IPET model in a way that it affects results?

A.  Well, I would assume so.  We got -- we obtained different safety factors.

Q.  You did.  And did the different safety factors that you obtained from IPET relate to conditions in the physical model that you've used?

A.  Of course.

Q.  What were the physical model conditions that you used that drove the differences between your report and IPET?

A.  Well, I think they used, basically, a

GENNARO G. MARINO, PH.D., P.E.        39

birthday cake approach.  I mean, they just have, you know, very generic layers which are average -- average elevations, and those were used to determine their stability analysis.  Now, the elevation of a layers play a distinct role in determining, like you said, Mark, the stability.

Q.  So when you said earlier that your physical model agreed with IPET generally, in fact, your physical model departed from the IPET physical model in material ways that affected the results of the analysis?

A.  Yes.

Q.  And the same is true for the ILIT physical model; correct?

A.  Yes.

Q.  Chapter 6 of your report, you evaluated the ILIT seepage analysis; correct?

A.  Yes.

Q.  In Chapter 7 -- in Chapter 6 you also evaluate the IPET limit equilibrium analysis; right?

A.  Yes.

Q.  You summarize your conclusions in Chapter 7?

A.  Yes.

Q.  Your team reviewed IPET; correct?

GENNARO G. MARINO, PH.D., P.E.        40

A.  Yes.

Q.  Did you review IPET?

A.  Relevant sections, yes.

Q.  Which sections did you review?

A.  The sections that I reviewed were related to the performance evaluation, which would include sections on seepage and limit equilibrium and development of their analysis.  Now, see --

Q.  Someone -- are you finished with your answer?

A.  Yes.

Q.  Did someone on your team look at the witness accounts reported in IPET Section Volume IV?

A.  Yes.  I believe I did and as well as other staff.

Q.  Did someone on your team look at the weather analysis provided in the IPET report?

A.  If you're referring to the graph that I have in here in Section 3, I'm the one that looked at those.

Q.  Okay.  Did you or someone on your team look at the wave and water analysis that IPET provided?

A.  I -- I did in a general way.  Dr. Gramall might have also looked at it.

Q.  And, of course, someone on your team and you

GENNARO G. MARINO, PH.D., P.E.        41

looked at the IPET soil and failure analysis; right?

A.  Yes.

Q.  And if I ask those same questions for the ILIT report, did you or someone on your team look at those aspects of the ILIT report, would your answer also be "yes"?

A.  Yes.

Q.  And if I asked you those same questions about the team Louisiana report, did you or someone on your team look at the -- those aspects of the ILIT report -- I'm sorry, team Louisiana report, would your answer also be "yes"?

A.  That has been some time ago.  I remember reviewing that.

Q.  All right.  What significance do you ascribe to reports of boom sounds by people in the area of the Inner Harbor Navigation Canal?

A.  An indication of an impact.

Q.  An impact.  And you take the boom sound as an indication of a barge impact.  Am I right?

A.  Yes.

Q.  Are you familiar with the accounts of witnesses at the London Avenue or 17th Street canal breaches, witnesses who also heard boom sounds in

GENNARO G. MARINO, PH.D., P.E.        42

connection with those breaches?

A. Yes.

Q. And I take it that you do not ascribe those boom sounds to a barge impact. Am I right?

A. I don't know if they heard some of the -- the -- the impact sound from the IHNC. I mean, I don't know, you know -- there's not enough information given about those descriptions.

(The Reporter marked the document referred to as Deposition Exhibit 5 for identification.)

MR. RAFFMAN: I've handed you what's been marked as Exhibit 5. The exhibit comes from Volume IV, Appendix 7, Page 27 to the IPET report, and I'm going to ask you to take a look at the witness account at the top of the page on Monday morning, August 29.

Q. Do you see that account?

A. Yes.

Q. Do you recognize this account as pertaining to the breach on the East London Avenue canal breach?

MR. POLLARD: Hang on a second. Do you want him to just scan the document first? There's no title on the document. Why don't you give him a chance to read it.

---

GENNARO G. MARINO, PH.D., P.E.        43

MR. RAFFMAN: That's fine.

MR. POLLARD: Don't answer any questions. Read -- read the document first, and when you're done skimming it, let him know and then he'll ask you a question.

MR. RAFFMAN: Take your time. I'm going to make it easier for all of you. I'm going to give you the preceding three pages of the IPET report. We'll put that in back of it.

MR. POLLARD: Read the document he gave you first. This is Exhibit 5.

(The witness reviewed the document.)

MR. RAFFMAN: I'll ask that the three preceding pages be attached as Exhibit 5.

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. RAFFMAN:

Q. Have you read the witness account that's at Page 27 of Appendix 7?

A. Yes.

Q. And referring you to the preceding three pages, do you see that, on Page 23 of Appendix 7, there's a notation that says, "East London canal"?

A. Yes.

---

GENNARO G. MARINO, PH.D., P.E.        44

Q. And then the appendix continues with no other headings until Page 27. Do you see that?

A. Yes.

Q. And is it a reasonable inference, then, that the witness account on Page 27 refers to the East London canal?

A. Sure.

Q. All right. Do you see in the witness account, the witness is reporting that he's moving -- he reports water about a foot below the top. He could touch the water with his hand, and then he says as they moved south, they heard a loud cracking boom-type sound, and at the same instant, the wall burst open in front of him. Do you see that account?

A. Yes.

Q. You're not inferring from that account that what this witness is hearing as a boom is occurring on the Inner Harbor Navigation Canal, are you?

A. No.

Q. This boom is happening at the East London Avenue canal, isn't it?

A. That's correct.

Q. And so a boom sound can occur in connection with a floodwall breach and without an impact from a

---

GENNARO G. MARINO, PH.D., P.E.        45

barge; isn't that right?

A. Well, he's describing it as a large cracking, boom sound, and I don't remember those types of words being used by any of the witnesses in the Lower Ninth Ward.

Q. So when a witness says, "a cracking boom sound," that's a wall failing, whereas if a witness uses the word "boom" without the word "cracking," that's a barge impact in your inference?

A. I would -- I would tend to think that there can be a number of different kinds of boom sounds. You know, what -- what does this person mean by "loud"? You know, I don't know.

Q. Do you know what the witnesses mean when they report things at the IHNC?

A. Well, I mean, these witnesses appear, from this description, were much further away from the location of where the sound originated.

Q. So if a witness is further away from a sound and there is a boom --

A. And it sounds loud, that means it was -- it had higher decibel level than one where a person is close by.

Q. And if it's a higher decibel level sound,

GENNARO G. MARINO, PH.D., P.E.          46

then you infer it's got to be a barge?

A. No, it's an indication. Okay. Is it -- is
it 100 percent, I wouldn't say it's 100 percent, but
it's consistent with other phenomena that are observed
or happened in -- in the area of the Lower Ninth Ward.

Q. All right. The inference that a boom equals
a barge is consistent with what other phenomena?

A. Well, you have where the -- the barge
actually sheared off the wall. Okay? If you're
telling me that that's not a boom sound, okay, I --
that to me is 100 percent.

Q. When you say, "the barge sheared off the
wall," you're referring to the southern end of the
south breach where the rebar is bent; correct?

A. Yes.

Q. And so the boom sound that you attribute to a
barge impact could well be the sound of the barge
shearing off that rebar?

A. It didn't actually shear off the rebar.

Q. Well, shear off the wall and bend the rebar
at the southern end of the south breach.

A. Yes.

Q. Pardon my imprecision. But the boom sound
that you infer could be the sound of the barge

GENNARO G. MARINO, PH.D., P.E.          47

impacting and shearing the south end of the south
breach?

A. No. I think one of the booms was definitely
that -- that collision.

Q. Well, all right. When I asked you what are
the other circumstances that permit you an inference
that the boom equals the barge, you immediately
referred to the shearing off of the rebar -- the
shearing off of the cap and the bending of the rebar
at the southern end of the south breach; right?
You're nodding your head?

A. Yes.

MR. RAFFMAN: Okay. I'm -- I'm told that the
tape is running out. So this would be a good time for
our first break.

THE VIDEOGRAPHER: Going off the record at the
end of Tape 1 at 10:14:35.

(A recess was taken from 10:14 a.m.
to 10:33 a.m.)

THE VIDEOGRAPHER: Back on record, Tape 2 at
10:33:17.

BY MR. RAFFMAN:

Q. Dr. Marino, am I correct that all of the work
you've done in connection with the breaches at the

GENNARO G. MARINO, PH.D., P.E.          48

Inner Harbor Navigation Canal is for the plaintiffs'
lawyers in this case?

A. Yes.

Q. Your work has been performed purely for the
purpose of providing expert evidence or testimony in
litigation; right?

A. Yes.

Q. You've never published your failure analysis
of the Inner Harbor Navigation Canal for any purpose
other than litigation?

A. I wouldn't have any opportunity to do that,
no.

Q. Your -- your work has not been published in a
peer reviewed journal; correct?

A. No.

Q. Your work on the Inner Harbor Navigation
Canal has not been published in a refereed journal;
correct?

A. No.

Q. All right. Now, because our transcript is
going to read the way it reads, I need to ask the
question again.

MR. POLLARD: You need to ask it "is that
correct"?

GENNARO G. MARINO, PH.D., P.E.          49

MR. RAFFMAN: I did ask "is that correct," and he
said "no," which is why I need to ask it again.

Q. Am I correct, Dr. Marino, that your work on
this case has not been published in a peer reviewed or
a refereed journal?

A. That's correct.

Q. Your work on this case has not been subject
to any sort of independent oversight; is that correct?

A. That's correct.

Q. The only persons who have provided comments
on your report before it was completed were the
lawyers for the plaintiffs and people working either
for the plaintiffs' lawyers or for you; correct?

A. That's correct.

Q. I'm going to ask you to turn to Chapter 2 of
your report. I have a few questions. I'm going to
start on Page 2-1. Toward the bottom of the page, you
write that "The aerial photograph taken on April 13,
2005 indicates a significant amount of excavation
between the two breach areas to where the shoreline is
as close as 60 feet to the floodwall." Do you see
where you wrote that on Page 2-1?

A. Yes.

Q. You refer to Photo 2.6. Do you see that?

GENNARO G. MARINO, PH.D., P.E.          50

1
2   A. Yes.
3   Q. So you would agree that there are, as of
4   April 13, 2005, excavations that caused the shoreline
5   to be as close as 60 feet to the floodwall?
6   A. Yes.
7   Q. Now, is it your conclusion that those
8   excavations had been filled between April and August
9   of 2005?
10  A. I want to be clear on what excavation we're
11  talking about.  We're talking about this large
12  embayment here (indicating)?
13  Q. I actually would be pleased for you to tell
14  me what excavations you're referring to that caused
15  the shoreline to be as close as 60 feet to the
16  floodwall.
17  A. I'm talking about the shoreline that runs
18  parallel to the floodwall.
19  Q. Why don't we do this.  I'm going to send a
20  pen across, and I'm going to ask you to draw a circle
21  around the excavations that brought the shoreline
22  60 feet to the floodwall, and then sort of draw an
23  arrow to it in the white page of the report so it
24  shows.  If that doesn't work, I'll give you a
25  highlighter.

GENNARO G. MARINO, PH.D., P.E.          51

1
2   A. (Witness complies.)
3   Q. All right.  So you've drawn an arrow around
4   some very small excavations in the white strip of land
5   just inside this embayment that you indicated.  A
6   large embayment with a little finger sticking in.  Do
7   you see that?
8   A. Yes.
9   Q. All right.  And is it your contention that
10  those excavations were filled in?
11  A. Yes.
12  Q. Do you know what was --
13  A. I -- I think that the -- I don't think that
14  those two are related.  These excavations, I think
15  that you're talking about, these small ponded areas
16  are not the areas that are being referred to in the
17  report.
18  Q. All right.  Photo 2.8 of your report, you
19  wrote that "Low areas adjacent to the floodwall have
20  been filled prior to flooding."  Do you see that you
21  wrote that?
22  A. Yes.
23  Q. What was used to fill those low areas and how
24  do you know?
25  A. Well, you can see that there's ponded areas

GENNARO G. MARINO, PH.D., P.E.          52

1   adjacent to the floodwall on the left side, and you
2   don't see those on the right side.
3   Q. Do you know what was used to fill excavations
4   on the canal side of the floodwall in the months
5   before Hurricane Katrina?
6   A. I am not sure, no.  I would assume that it's
7   a fine grain material.
8   Q. You assume that, but you don't know?
9   A. That's correct.
10  Q. Have you ever seen any documentation that
11  shows that excavations on the canal side of the
12  floodwall were filled with sand?
13  A. No.
14  Q. You don't have any work logs from the Army
15  Corps of Engineers contractor to substantiate what
16  that contractor used to fill excavations on the canal
17  side of the floodwall; correct?
18  A. That's correct.  But, I mean, if these were
19  filled with sand, it would also demonstrate the point
20  that, you know, if there was underground seepage in
21  this area, this -- this is an area that would be more
22  likely to fail because now you have a closer hydraulic
23  connection to materials that are adjacent to the sheet
24  pile and below.

GENNARO G. MARINO, PH.D., P.E.          53

1   Q. All right.  Explain that to me.  If -- if you
2   used sand to fill an excavation on the canal side of
3   the floodwall, why does the use of sand make the wall
4   more likely to fail?
5   A. Well, what I'm saying is that if you have
6   sand in -- in those small excavation areas, you are
7   able to saturate the materials quicker.
8   Q. And if you're able to saturate the materials
9   quicker, what effect does that have on seepage?
10  A. Then the seepage pressures are greater.
11  Q. Do you know whether sand was used to fill
12  excavations in the areas adjacent to either the north
13  breach or the south breach on the canal side of the
14  floodwall by the United States Army Corps of Engineers
15  contractor?
16  A. No.
17  Q. You've never seen any documentation or work
18  logs by the contractor indicating what material they
19  used to fill excavations in the vicinity of either the
20  north breach or the south breach; is that correct?
21  A. That's correct.
22  Q. If sand had been used to fill excavations in
23  the vicinity of the north breach or the vicinity of
24  the south breach, would that affect the seepage

GENNARO G. MARINO, PH.D., P.E.          54

1   analysis for those breaches?
2       A.  I don't believe it would affect it
3   substantially because we're talking about materials
4   that are -- are so low permeability, that over the
5   period of time that we're considering, there's not
6   sufficient amount of time for those pressures to be
7   transferred from the flood side to the protection
8   side.
9       Q.  Your conclusion would be the same regardless
10  of whether sand had been used to fill excavations in
11  the vicinity of the north breach or the south breach.
12  Is that what you're saying?
13      A.  Yes.
14      Q.  But the analysis that you would use to arrive
15  at that conclusion would have to differ, wouldn't it,
16  because the sand would play a part of the soil profile
17  that you would then use to perform the analysis?
18      A.  Yes.
19      Q.  You have not analyzed a soil profile that
20  includes sand filled excavations on either -- on the
21  flood side at either the north breach or the south
22  breach; right?
23      A.  That's correct.
24      Q.  Let's turn to Figure 2.3 and 2.4 of your

GENNARO G. MARINO, PH.D., P.E.          55

1   report.  What do these figures represent?
2       A.  Just, basically, pictures over time of the
3   waterfront area and the H- -- the IHNC.
4       Q.  Explain to me what is the purpose of the
5   sheet pile in the function of a floodwall.
6       A.  It has -- it can have two purposes.  One is
7   to prevent seepage, and another to maintain stability
8   of the protection side when the floodwall is retaining
9   water.
10      Q.  And in order to maintain the stability --
11      A.  For this case.
12      Q.  All right.  Fair enough.  Fair enough.  In
13  order to maintain stability in a -- in a flood stage,
14  you need to have the sheet pile provide resistance in
15  the soil and then below the levee; isn't that right?
16      A.  Yes.
17      Q.  And if you're going to fail the sheet pile,
18  you've got to fail the soil; isn't that right?
19      A.  I haven't thought of all instances of whether
20  that's true or not, but I would say in general, it's
21  true.
22      Q.  And in this particular case, the failure of
23  the sheet pile along the Inner Harbor Navigation Canal
24  requires some failure of the soil behind the sheet

GENNARO G. MARINO, PH.D., P.E.          56

1   pile?
2       A.  I guess you have to define "failure."  What
3   does "failure" mean?
4       Q.  I'm going to refer you to your prior
5   deposition and will represent to you that I asked the
6   following question and you gave the following answer,
7   and then you can amplify if you need to.
8       A.  Okay.
9       Q.  I said, "Am I right that the reason
10  geotechnical science has" -- well, the court reporter
11  took it down wrong.  So I'll stop reading the
12  question.  What I said was, "In order to fail the
13  floodwall, you have to have some failure of the soil."
14  And you said, "Yes."  Do you remember that testimony?
15      A.  No.
16      Q.  All right.  Will you accept that I'm reading
17  your testimony correctly, or do you want me to show it
18  to you?
19      A.  No, sure.  That's fine.
20      Q.  So a failure --
21      A.  So since you were asking the question, I
22  wasn't sure what you were thinking about failure.
23  Okay.  In my mind, what failure means is that there --
24  there is a significant amount of yielding that results

GENNARO G. MARINO, PH.D., P.E.          57

1   in a non-optimum performance.
2       Q.  The soil behind the wall must give way?
3       A.  To some level.
4       Q.  Do you see on -- on Figure 2.3, I'm going to
5   refer you now -- you need to go to Figure 2.3, which
6   is one of your drawings of the flow.
7       MR. POLLARD:  Figure, not photo.
8   BY MR. RAFFMAN:
9       Q.  All right.  Now, I'm going to ask you some
10  questions about the top row, second drawing.
11      A.  Right.
12      Q.  All right.  It's small type, but I hope you
13  can read it.  Do you see that there is a notation that
14  says, "Elevation 15.0"?
15      A.  Yes.
16      Q.  All right.  And you see, then, that this
17  says, "Levee Crown Elevation 9.0."  Do you see that,
18  on the right-hand side of the same figure?
19      A.  It says, "Elevation."
20      MR. POLLARD:  "Levee Crown," he's referring to
21  right there (indicating).
22      THE WITNESS:  Okay.  Yes.
23  BY MR. RAFFMAN:
24      Q.  You now see that.  So according to this

GENNARO G. MARINO, PH.D., P.E.        58

1
2  design elevation of the floodwall -- well, you take
3  this as the design elevation of the floodwall
4  as-built -- let me strike that.
5          This figure represents the details of the
6  as-built floodwall along the north and south breaches;
7  correct?
8      A.  Yes.
9      Q.  So as the floodwall was built, there is
10 6 feet of floodwall sticking up above the levee crown;
11 right?
12     A.  Yes.
13     Q.  Now, at approximately -- all right.  Before I
14 go there, if you know the elevation of the levee crown
15 at a given time, then the elevation of the floodwall
16 above that crown should be 6 feet?
17     A.  Yes.
18     Q.  In the middle of the floodwall sticking up
19 above the levee crown, do you see a construction
20 joint?
21     A.  Yes.
22     Q.  And that construction joint is marked "CJ";
23 right?
24     A.  Yes.
25     Q.  The construction joint appears about three

GENNARO G. MARINO, PH.D., P.E.        59

1
2  feet below the top of the floodwall; right?
3      A.  Yes.  I believe that's an optional
4  construction joint.
5      Q.  Do you know whether such a construction joint
6  was present in the floodwall at the site of the
7  breaches along the Inner Harbor Navigation Canal?
8      A.  Yes.
9      Q.  And -- there was such a joint?
10     A.  Yes.
11     Q.  Would you agree with me that a construction
12 joint constitutes a point of weakness on the wall in
13 the event of an impact on the wall?
14     A.  Well, it all depends on -- on where the point
15 of the impact is.
16     Q.  All right.  If the point of impact is at or
17 above the construction joint, you would expect the
18 wall to shear at the construction joint if the impact
19 is sufficient to shear the joint?
20     A.  Right.  And it would vary depending upon --
21 the amount of resistance would vary depending upon the
22 location of that force.
23     Q.  So if the force is above the construction
24 joint, then the force would be directed in such a way
25 the construction joint would constitute a point of

GENNARO G. MARINO, PH.D., P.E.        60

1
2  weakness?
3      A.  Well, right.
4      Q.  Let me ask you to turn then to Figure 2.8.
5  All right?  We're going to look at 2.8, and we're also
6  going to look at Figure 2.14.
7          (The witness reviewed the document.)
8  BY MR. RAFFMAN:
9      Q.  Can you explain what was represented by these
10 two figures?
11     A.  These figures were taken off the as-built
12 plans -- or based on the as-built plans of as-built
13 contours and existing contours.
14     Q.  All right.  So the existing contours are
15 noted in -- in black; is that correct?
16     A.  Pre-existing.
17     Q.  Pre-existing.  So this is before the
18 construction of the levee wall, the black line
19 represents the contours.
20     A.  The improvement of the levee wall.  There was
21 a levee wall prior to the -- the construction that was
22 done in the late '60's.
23     Q.  Right.  And I don't want to get hung up on
24 terminology.  So let's understand.  Before the
25 floodwall was built, there was a -- some levee

GENNARO G. MARINO, PH.D., P.E.        61

1
2  present; correct?
3      A.  Yes.
4      Q.  The black lines represent the contours of the
5  pre-existing levee; correct?
6      A.  Yes.
7      Q.  The red lines represent the contours of the
8  levee that was added in the 1960's?
9      A.  That's correct.
10     Q.  Can you point me to the -- well, in Figure
11 2.14, can you point me to those stations that
12 represent the area where the south breach failed?
13     A.  I believe from Station 31 to about
14 Station 23.
15     Q.  All right.  At Station 31, Dr. Marino, would
16 you agree with me that there is a significant
17 difference between the black line and the red line?
18     A.  Yes.
19     Q.  And does that significant difference reflect
20 that a substantial amount of soil was added to the
21 pre-existing levee during the construction of the
22 floodwall and levee system?
23     A.  Yes.
24     Q.  Would the same thing be true at Stations 30,
25 29, 28 and 27?

GENNARO G. MARINO, PH.D., P.E.          62

A. There's additional fill there. I don't know, you know, what is meant by "substantial," but there is fill put on the protection side.

Q. Well, let's look at 2367 for a moment. Station 2367, the pre-existing levee soil, according to your black line, is somewhere between zero and five feet; correct?

A. Yes.

Q. And the levee soil that's been added appears to be at least five feet and maybe more soil at the crown of the levee; correct?

A. That's correct.

Q. Am I right, Dr. Marino, that when you add soil -- five feet or more of soil to a given location, that that added five feet of soil will cause a certain amount of settlement or subsidence over time?

A. You know, it depends. Obviously, the more load that you have, there's going to be settlement. Now, how much settlement is another question.

Q. That's a question that geotechnical scientists can either calculate or estimate; right?

A. I would like to say, "estimate," yes.

Q. All right. As a geotechnical scientist, you have not done such a calculation or estimation in this

GENNARO G. MARINO, PH.D., P.E.          63

case. Am I right about that?

A. I think we did somewhat of an analysis based on by looking at the topographic profiles.

Q. Did you do an estimate or an analysis with specific references to those areas along the Inner Harbor Navigation Canal to which a particularly large amount of soil or a greater amount of soil had been added during the construction of the levee or floodwall?

A. I believe our -- our topographic information was limited to certain sections. At those sections, we estimated that the settlements were on the order of -- over 40 years, on the order of a foot and a half.

Q. Can you point me to the place in your report where you carried out that topographic analysis resulting in that conclusion?

(The witness reviewed the document.)

THE WITNESS: Page 5-6.

BY MR. RAFFMAN:

Q. All right.

A. It says, fourth paragraph down, "Considering the 2005 post Katrina elevation at the top of the floodwall at 12.5 NAVD 88 the wall height from Jordan

GENNARO G. MARINO, PH.D., P.E.          64

Avenue is about 1.5 feet shorter than the as-built plans at both the north and south breach areas."

Q. Did you find any different -- well, let me stop you there for a second. The north and south breach wall height could not be measured after the storm; correct?

A. That's correct.

Q. Did you measure -- or did you estimate the top of the wall height at the north and south breach areas to be the same as the height of the wall along the other portions of the wall that did not fail?

A. Like I said earlier, I did not measure any top of the wall, floodwall elevations.

Q. For your purposes and for your analysis, the top of the floodwall was taken as a consistent 12.5 feet across the entire length of the floodwall from the north breach at Florida Avenue to the south breach and then toward Claiborne Avenue bridge; correct?

A. That's correct. And this is -- you know, this is the reason why you use the word "about." This is an approximate. It's a general trend.

Q. Did you use LIDAR data in the topographic profile?

A. Yes.

GENNARO G. MARINO, PH.D., P.E.          65

Q. Have you ever heard that LIDAR is imprecise or somehow less than accurate in estimating the top of a -- a floodwall that is of limited thickness?

A. I didn't rely on that, but that's correct.

Q. What did you rely on in addition to LIDAR? You relied on the Army Corps, you said earlier -- right? -- IPET?

A. I relied on -- you got me all confused.

Q. I apologize. I'm remembering prior testimony. I had asked you about what you used to take the floodwall top at 12-1/2, and I think you said IPET. And you're nodding your head.

A. That's correct.

Q. Okay. All right. Let me ask you a couple of details about the barge. Page 233 and -34 and -35 of your report.

(The witness reviewed the document.)

THE WITNESS: You mean page 234?

BY MR. RAFFMAN:

Q. Yes, I do. Page 234. You've marked it as barge height is 23 feet; right?

A. Yes.

Q. And you've marked the unloaded draft of the barge as 1.5 feet; correct?

GENNARO G. MARINO, PH.D., P.E.        66

1
2    A.  Yes.
3    Q.  And this barge was unloaded at the time of
4    the storm?
5    A.  Yes.
6    Q.  So this barge has a stick-up out of the water
7    of 21-1/2 feet; right?
8    A.  Well, this -- this is the information that
9    was provided as the general information for this kind
10   of barge.  My understanding, from talking to
11   Mr. Pazos, was that it actually had a list in it --
12   list in it where the actual variation was from 1-1/2
13   foot draft to 2-1/2 foot draft.
14   Q.  Well, all right.  Taking Pazos as your point
15   of departure, and I will say we don't necessarily
16   agree with Mr. Pazos, but if you take Pazos as your
17   point of departure, would you agree with me that the
18   stick-up of this barge out of the water is still going
19   to be over 20 feet?
20   A.  Yes.  Hold on.  With these numbers, that's
21   correct.
22   Q.  Take a look at Figure 2.15.  Did you draw
23   that figure?
24   A.  Yes.
25   Q.  Would you like now to correct any errors in

GENNARO G. MARINO, PH.D., P.E.        67

1
2    that figure?
3    A.  I really haven't had an opportunity to find
4    out what reference there is to it being adjacent to
5    the other barge, but I -- and I can't remember where I
6    got this reference as to where -- as to why I thought
7    it was next to the stack of five barges, but
8    apparently that's not the correct location.
9    Q.  Who wrote the number "12" in the lower left
10   corner of the photo?
11   A.  No clue.
12   Q.  You don't know?
13   A.  No clue.  Do you know?
14   Q.  If I knew, I might not ask.  To be clear, the
15   location of the barge prior to the breakaway that's
16   reported in Figure 2.15 is incorrect; right?
17   A.  That's -- when I kind of page through
18   Dr. Cushing's report, he has it in another location
19   and points out that my location is wrong.  Now, I
20   haven't had a chance to see what his basis for his
21   reference is.
22   Q.  All right.  You don't know one way or the
23   other where the barge was moored prior to the
24   breakaway?
25   A.  Not for sure, no.

GENNARO G. MARINO, PH.D., P.E.        68

1
2    Q.  I'm going to ask you questions now about
3    Section 3 of your report.  You wrote that "Section 3
4    provides a summary of available information concerning
5    conditions related to the storm and to the subject
6    breaches."  Do you see that?
7    A.  Yes.
8    Q.  "This includes wind conditions, surge levels,
9    wave conditions and the timing of the floodwall
10   failure."  Do you see that?
11   A.  Yes.
12   Q.  And in reporting these conditions, did you
13   evaluate the plausibility or not of the conditions
14   that you were reporting?
15   MR. POLLARD:  Objection.  Vague.
16   THE WITNESS:  I would say to some level.
17   BY MR. RAFFMAN:
18   Q.  All right.  So let's take wind conditions for
19   a moment.  What is the relevance of wind conditions to
20   this case?
21   MR. POLLARD:  Objection.  Overbroad.
22   BY MR. RAFFMAN:
23   Q.  As you understand it.
24   A.  Wind -- wind conditions can relate to force
25   imparted on the barge.

GENNARO G. MARINO, PH.D., P.E.        69

1
2    Q.  And --
3    A.  And also indirectly to wave -- wave
4    conditions.
5    Q.  All right.  What's the relationship between
6    the wind and the wave conditions?
7    A.  Well, like I said, I mean, the two can be
8    related.  Obviously, the more wind you have, the more
9    wave energy there will be.
10   Q.  And am I right that wind acts to create waves
11   that will move generally in the prevailing direction
12   of the wind?
13   A.  I -- I guess in a general way, but it's
14   really not my area of expertise in terms of the wave
15   mechanics and the interaction of the wind and wave.
16   Q.  You said earlier that wind imparts a force on
17   the barge; right?
18   A.  Yes.
19   Q.  The force on the barge that's imparted by the
20   wind will impose its force in the direction of the
21   prevailing wind; right?
22   A.  I'm hesitating because it's really starting
23   to get outside -- I mean, in general, yes, but if you
24   have a barge with a list in it, I mean, that can have
25   an effect.  But, again, I would leave that barge

GENNARO G. MARINO, PH.D., P.E.        70

1  impact induced loads as something that is -- for a
2  final report, wouldn't be something that I would have
3  used or evaluate.
4      Q. I didn't understand your last answer.
5      A. Assessing the barge loads really is not --
6  the magnitude of those loads is not in the area of my
7  expertise. So when you start asking me questions
8  about how much load and what kind of load would be
9  coming from wind and wave action, I -- I feel
10  uncomfortable answering those kinds of questions.
11      Q. In the analysis that you began to do about a
12  hypothetical barge load and then stopped doing and
13  that you may return to, won't you be required to
14  perform calculations to determine the wind load on the
15  barge?
16      A. Are you talking about the work that we have
17  ongoing?
18      Q. There was work that was done and then
19  stopped, and then it, as I heard you say, it's being
20  continued but not for the purpose of this report?
21      A. That's correct.
22      Q. That work is going to require you, as an
23  expert, to have an understanding of the wind load on
24  the barge, won't it?
25

GENNARO G. MARINO, PH.D., P.E.        71

1      A. I am actually not -- not doing the impact
2  load study.
3      Q. All right. Let me -- who is doing the impact
4  load study?
5      A. It's being done by a professor. Issam Harik.
6      Q. Could you spell that for the court reporter,
7  please?
8      A. I-s-s-a-m, Harik is H-a-r-e-k.
9      MR. POLLARD: I think it's -i-k, for the record.
10  BY MR. RAFFMAN:
11      Q. In your report, you have taken data about
12  wind speed and direction and included it in
13  Section 3.2; is that right?
14      A. Yes.
15      Q. Why is meteorologic data germane to wind
16  conditions in the IHNC?
17      A. It helps assess what the barge impact loads
18  could -- could be potentially.
19      Q. The weather data helps you to assess what in
20  fact the wind loads were on the barge in the IHNC at
21  the time of the failure; correct?
22      A. Yes.
23      Q. So let's look at the -- the data that you
24  report here. According to airport records reported on

GENNARO G. MARINO, PH.D., P.E.        72

1  3-1 between 3:00 and 4:00 a.m. -- I want to make sure
2  you're at the right page. It's Page 3-1.
3      A. Yes.
4      Q. According to airport records between 3:00 and
5  4:00 a.m., winds are generally coming out of the north
6  northeast at speeds of about 45 to 50 degrees. Do you
7  see that?
8      A. Yes.
9      Q. And a wind that's coming out of the north,
10  northeast in the Inner Harbor Navigation Canal will be
11  blowing across the canal away from the east floodwall
12  and toward the -- the west floodwall with the north
13  northeast component; right?
14      A. It's close. It's close to parallel.
15      Q. All right. In any event, it's not blowing
16  from the west toward the east at the canal; correct?
17      A. No.
18      Q. All right. Again, because of the way I asked
19  the question, I need to re-ask it. Am I correct that
20  it is not blowing from the west side of the canal
21  toward the east canal? Am I correct in that?
22      A. Based on the information that I've reported
23  here, okay, I noticed last night that these direction
24  vectors that are reported in here are fairly

GENNARO G. MARINO, PH.D., P.E.        73

1  significantly different than what Dr. Cushing
2  reported. So it seems like the arrows can depend
3  on -- you know, like anything else, the direction of
4  the arrows can depend on the analysis that's being
5  performed. It seems to me there was a significant
6  difference between these arrows and those arrows
7  reported by Dr. Cushing (indicating).
8      Q. Well, the arrows you've reported in
9  Figure 3.2, do you know from what model those arrows
10  were generated? Do you know?
11      A. Well, it says here -- I -- I wouldn't say
12  that that would be within my expertise to tell you
13  exactly the name of the model. I would assume that
14  it's a finite element or finite difference method
15  where boundary conditions are taken in -- into
16  consideration.
17      Q. In fact, in evaluating meteorologic conditions
18  in the Inner Harbor Navigation Canal, you would defer
19  to a meteorologist to determine what the conditions
20  really were; isn't that right?
21      A. Yeah. Or rely on a report like this.
22      Q. "A report like this," you're referring to
23  Figure 3.2?
24      A. Yes.

19  (Pages 70 to 73)

GENNARO G. MARINO, PH.D., P.E.          74

1         GENNARO G. MARINO, PH.D., P.E.          74
2  Q. You don't even know what generated that
3  report?  What model?
4  A. No.  This is -- this is figures that were
5  included in an IPET appendix.
6  Q. Right.  And do you know whether IPET, in its
7  appendix, included other weather data from a program
8  called H*Wind?
9  A. I -- I wouldn't be surprised if there were
10 other -- in the vast amount of work that IPET has
11 shown, that there isn't other studies that I'm not
12 aware of.
13 Q. Do you accept IPET's conclusion that, during
14 this storm, winds came first from the east, then the
15 northeast, then the north, then the northwest and
16 finally from the west?
17 A. I guess in general, yes.
18 Q. You reported weather data from Lakefront
19 Airport; correct?
20 A. Yes.
21 Q. This is at Page 3-11.
22 A. Okay.
23 Q. I wanted to make sure you're at the right
24 page.  Page 3-11.  There's a table.  Now we're at the
25 right table.  Do you see this table you reported

GENNARO G. MARINO, PH.D., P.E.          75

1         GENNARO G. MARINO, PH.D., P.E.          75
2  (indicating)?
3  A. Yes.
4  Q. And when you included this weather data from
5  the Lakefront Airport, you see that you reported the
6  time, the wind speed and the relative direction of the
7  IHNC.  Do you see that in your table?
8  A. Yes.
9  Q. And when you reported that the relative
10 direction to the IHNC was parallel at all times from
11 3:00 o'clock to 9:00 a.m., that's -- that's your --
12 your interpretation of the Lakefront data; right?
13 A. The Lakefront data, as well as these wind
14 vectors that are given in Figure 3-2.
15 Q. All right.  So that -- that's your
16 interpretation of all of the weather data; right?
17 A. My interpretation of all the weather data
18 that's provided in this report.
19 Q. All right.  On Page 3-11, you've interpreted
20 the weather data to show that at all times, from
21 3:00 o'clock a.m. until 9:00 o'clock a.m., the wind
22 direction relative to the IHNC was parallel; right?
23 A. That's correct.
24 Q. When you say, "parallel," you mean blowing in
25 a north to south orientation; right?

GENNARO G. MARINO, PH.D., P.E.          76

1         GENNARO G. MARINO, PH.D., P.E.          76
2  A. Yes.
3  Q. And so, assuming with me that wind is the
4  predominant force acting on the barge, am I right that
5  the wind would not have taken the barge from its
6  location at the terminal to the site of the north
7  breach between 3:00 o'clock and 9:00 o'clock in the
8  morning?
9  A. I -- I would have to defer to someone else
10 to -- to assess the transient flow of the barge.  What
11 I relied upon was basically witness reports that --
12 where there -- there are observations of actually
13 seeing the barge, okay, and looking at, as I said
14 before, limit equilibrium and seepage analysis and
15 damage deformation patterns.
16 Q. Am I right that at the north breach, as
17 you've concluded, at the north breach the barge was
18 going in the direction other than the direction of the
19 wind?
20 A. I -- I would assume that, yes.
21 Q. Now, if the wind is blowing strictly parallel
22 to the direction of the IHNC, would you agree with me
23 that the wind will not blow the barge to the site of
24 the south breach?
25 A. I -- I don't know that.

GENNARO G. MARINO, PH.D., P.E.          77

1         GENNARO G. MARINO, PH.D., P.E.          77
2  Q. Let me ask you some questions about waves.
3  I'm going to turn you to Page 3-17.  It's the last
4  part of your Chapter 3.  You wrote at the top of the
5  page, "Wave heights during this time were at least
6  4 foot and up to about 20 foot."  Do you see that?
7  A. Yes.
8  Q. That's your interpretation of the data that
9  you considered; right?
10 A. Yes.
11 Q. So you have concluded that the wave heights
12 were at least 4 feet and up to 20 feet; right?
13 A. Yes.
14 Q. All right.  Now, let me go back to some of
15 your reference data for waves.  You have cited IPET at
16 Page 3-14.  Let's make sure we're on the right page.
17 A. These aren't -- these don't have page
18 numbers.
19 Q. You want to turn forward in your report
20 several pages.
21 A. Okay.
22 Q. Now we're at the right place.  So in the
23 first paragraph under "Wave Conditions," you have
24 cited IPET Volume IV for the proposition that
25 "Simulations across Lake Pontchatrain found that,

GENNARO G. MARINO, PH.D., P.E.        78

1  during Hurricane Katrina, wave heights reached 8 to 9
2  feet with a period of 7 seconds before entering the
3  IHNC."  Do you see that?
4      A.  Yes.
5      Q.  Now, in order to reach the southern part of
6  the IHNC, are there any obstructions that would dampen
7  waves coming from Lake Pontchartrain?
8      A.  I think you're asking questions now that are
9  out of my area of expertise in knowing whether they
10  would be accentuated or dampened.  So I can't really
11  answer that question.
12      Q.  Are you telling me that you lack the
13  expertise necessary to conclude that waves were in
14  fact at least 4 feet and up to 20 feet in the
15  Inner Harbor Navigation Canal?
16      A.  Well, these are based on observations.  So, I
17  mean, if someone -- I don't think you have to have
18  expertise if someone is in front of you and sees a
19  wave that's 8 feet high.  You know, that's a physical
20  observation.
21      Q.  All right.
22      A.  The other is more scientific analysis,
23  numerical analysis with a number of assumptions.
24      Q.  Are you telling me that your conclusion that

GENNARO G. MARINO, PH.D., P.E.        79

1  wave heights were at least 4 feet and up to about
2  20 feet is based on something other than scientific
3  analysis of the data that you reviewed?
4      A.  That is based on observation -- looking at
5  what information was available related to observations
6  of wave heights, not mea- -- not scientific numerical
7  analysis.
8      Q.  And the same thing is true with respect to
9  any inferences you draw from witness observations.
10  Isn't that fair?
11      A.  I don't know what else you could -- I mean,
12  that's a simple answer because it's obvious.  I mean,
13  you can only -- they're not doing any calculations.
14      Q.  And the obvious answer to my question is yes;
15  right?
16      A.  Yes.  Yeah.
17      Q.  So let's -- my questions about wave heights
18  is simply to -- to probe the inferences you drew from
19  the observations.  And my question was do you know
20  whether there are any obstructions that would mean
21  eight to nine foot waves in Lake Pontchartrain are not
22  going to reach the IHNC?
23      A.  I really didn't look at it.
24      Q.  Did you review anything in IPET, the same

GENNARO G. MARINO, PH.D., P.E.        80

1  report that you relied on, IPET Volume IV, which said
2  that the bridge cord elevation of the Florida Avenue
3  bridge in the down position was 4.1 feet?  Did you see
4  any of that?
5      A.  No.  I knew it was on the down position, but
6  I didn't know the elevation of it.
7      Q.  Would it surprise you to learn that IPET
8  reported that the bridge cord elevation of the Florida
9  Avenue bridge was 4.1 feet?
10      A.  Can you repeat that, Mark.
11      MR. RAFFMAN:  Actually, let me see if I can find
12  the -- the paper I'm working with here.  I got it.
13  Let's mark that as the next exhibit.
14          (The Reporter marked the document
15          referred to as Deposition Exhibit 6
16          for identification.)
17  BY MR. RAFFMAN:
18      Q.  Do you now see that IPET has reported at
19  Page 34 of Volume 4 that the low cord elevation for
20  the Florida Avenue bridge was 4.1 feet?
21      A.  Yes.
22      Q.  Doesn't that mean that waves coming down the
23  Inner Harbor Navigation Canal, if they're in fact
24  eight or nine feet, are going to break somewhere at

GENNARO G. MARINO, PH.D., P.E.        81

1  the bridge cord elevation?
2      A.  There -- there's an obstruction there.
3      Q.  Sorry.  Did IPET report anything about the
4  strength of reflected waves?
5      A.  I'm not sure if they did or not.
6      Q.  Did IPET report anything to the effect that
7  waves in the lower part of the Inner Harbor Navigation
8  Canal were only in the range of two to three feet
9  high?
10      A.  Not a reference that I found.
11      MR. RAFFMAN:  All right.  I'm going to mark the
12  next exhibit.
13          (The Reporter marked the document
14          referred to as Deposition Exhibit 7
15          for identification.)
16      MR. RAFFMAN:  Dylan, I'm sorry.  I'm having
17  trouble locating my other copy of that.
18      MR. POLLARD:  All right.  Let me take a quick
19  look at it.
20      MR. RAFFMAN:  Take a look.
21      MR. POLLARD:  Just describe generally what this
22  is.
23      MR. RAFFMAN:  3-4, I'm going to ask you to look
24  at the middle of the page --

21  (Pages 78 to 81)

GENNARO G. MARINO, PH.D., P.E.          82

MR. POLLARD:  4-4.

MR. RAFFMAN:  4-4, middle of the page.  Here's another copy.

MR. POLLARD:  Use the official copy.

BY MR. RAFFMAN:

Q. Do you see in the middle of the page, 4-4, second full paragraph, "IPET reports estimated wave heights are in the two- to three-foot range for the area along the Lower Ninth Ward."

A. Yes.

Q. And is that two- to three-foot conclusion, do you take that as a plausible range of waves in the Inner Harbor Navigation Canal area?

(The witness reviewed the document.)

THE WITNESS:  I don't -- I mean, that's what they're saying.  I'm not sure what the basis of this range is and if it includes spurious waves or not.  I don't know.

BY MR. RAFFMAN:

Q. Do you take a report of a 20-foot wave in the Inner Harbor Navigation Canal as credible?

A. I think so, yes.

Q. Based on what?

A. Based on the observation.

GENNARO G. MARINO, PH.D., P.E.          83

Q. Anything -- any science other than the observation?

A. I don't think you need to have science if someone sees it.

Q. If someone reports seeing something that a scientist concludes could not possibly exist, do you agree that you don't need science for that?

A. It could not possibly exist.  I guess not.

Q. If a trained hydrologist concluded that a 20-foot wave in the Inner Harbor Navigation Canal is a scientific impossibility, would you credit the witness who purports to have seen the 20-foot wave, or would you credit the hydrologist that says its impossible?

A. Well, it would depend on the hydrologist and -- and their assumptions.  I mean, I wouldn't be able to tell, if a hydrologist says that, what assumptions he's making or whether those are valid assumptions.

Q. So all you can do is take the 20-foot wave that's reported by the witness and conclude that the report is plausible; right?

A. Yeah.  It's in that range.

Q. And you've put that in your report?

A. Exactly.

GENNARO G. MARINO, PH.D., P.E.          84

MR. RAFFMAN:  All right.  Let's go off the record.

THE VIDEOGRAPHER:  Going off the record at the end of Tape 2 at 11:32:30.

(A recess was taken from 11:32 a.m. to 11:47 a.m.)

THE VIDEOGRAPHER:  Back on record at 11:47:43.

MR. RAFFMAN:  Dr. Marino, I've handed you what has been marked as Exhibit 8 to your deposition.

(The Reporter marked the document referred to as Deposition Exhibit 8 for identification.)

BY MR. RAFFMAN:

Q. Do you recognize Exhibit 8 as a copy of your curriculum vitae as of June 2008?

A. That's correct.

Q. And do I understand correctly that that is a current copy of your curriculum vitae?

A. I know I said earlier that it was, but I remembered that I now have a license in Maine.

Q. All right.

A. And I just want to see if the publications are -- the publications seem fine.

Q. Do you have a license in Louisiana?

GENNARO G. MARINO, PH.D., P.E.          85

A. Yes.

Q. What do you have to do to get a license in Louisiana?

A. If you have a license from another state, you can use reciprocity.  I have a national certification.  So it makes it a lot easier to get a -- a license in various states.

Q. Basically, if you have a license in another state, you can apply to the state of Louisiana and get a reciprocal license there too?

A. Normally.  Some -- some states have extra requirements.

Q. Do you know whether Louisiana has extra requirements?

A. I think you have to pass an -- an ethics test.

Q. Anything else?

A. Not that I'm aware of.

Q. All right.  Referring to your -- your resume now.  I want to ask you about your publications.

A. Okay.

Q. I've gone down the list of your publications, and is it fair to say that the predominant area in which you have published is in the area of mines?

GENNARO G. MARINO, PH.D., P.E.          86

A. I -- I would say that since it's a unique subject, that there's a number of publications related to various aspects of ground movement from mining, but the ground movement can be from a number of different circumstances where you would get change patterns, and from this ground movement, I did a lot of work related to mapping damage, not only from mine subsidence, from earthquakes, from other sources.

I've done so much mapping of damage that I could almost tell you with a size of a crack down to a thousandths of a foot. I mean, yeah. Because a lot of times when you're doing forensic types of analysis, that evaluating damage patterns are very important.

Q. I will ask you questions about evaluating damage patterns, and I will ask you questions about forensics. My question now is is it fair to say that the predominant topic on which you have published is geotechnical issues relating to mines?

A. I would say that in general that is the case, but there are other aspects. Like, for example, the repairing -- I've done a number of tests at the University of Illinois where we simulated deep concrete beams, okay, and then broke the beams, and then we repaired them and reinforced those beams.

GENNARO G. MARINO, PH.D., P.E.          87

Okay. So that kind of information, although it was funded by a subsidence, mine subsidence organization, is applicable to a lot of different things.

In fact, I did publish in the Masonry Construction Manual and in a structural engineering conference, this information because it wasn't only applicable to my subsidence but other areas as well. That -- that information, in addition to modeling concrete -- concrete block walls about failure conditions to various other areas of looking at failure conditions and then looking at how you could then retrofit those failure conditions.

Q. Are you finished with your answer?

A. Not really, but I can -- I can talk more about damage mapping if you'd like.

Q. No. Because the question I asked was about your publications.

A. Right. I think I understand where you were going. You were trying to say that all my publications are mining related, but I wanted you to get an appreciation of the fact that mine subsidence has so many different aspects to it, and there are so many -- I think it's -- I think it's an area of expertise that takes a lot more education and training

GENNARO G. MARINO, PH.D., P.E.          88

than -- than others because it involves so many different aspects of engineering.

Q. Let -- let me see if I can be fair to you because I want to do that.

A. Okay.

Q. If I understand you correctly, what you're saying is that you published predominantly in the area of mine subsidence, but that within that area, many of the issues you've published about have general applicability. Is that fair?

A. I would say the majority of the publications are rooted in subsidence in some fashion and that there is areas related to soil structure interaction that applied to basically any type of condition that you would have.

Q. All right. Now, embedded within your long answer to an earlier question was some experience you discussed about failure tests on concrete.

A. Yes.

Q. Do you remember that part of your answer?

A. Yes.

Q. Were you present when those failure tests were being conducted?

A. Absolutely.

GENNARO G. MARINO, PH.D., P.E.          89

Q. What -- describe the sound that's created when concrete fails.

A. The sound was -- I mean, you could hear a sound. I don't know if I can describe it to you, what it was. I mean, it was an audible sound. It wasn't like a bang or a -- a boom that I understand witnesses were describing. Maybe that helps you.

Q. Can you describe it in different terms?

A. "Different terms."

Q. Right. Just use a word to describe a sound.

A. Like a thump. Thump.

Q. Was the thump that you heard something that could be heard at a long distance or outside the room you were in?

A. I don't think so.

Q. Have you ever designed a hurricane levee or protection floodwall for the United States Army Corp of Engineers?

A. No.

Q. Have you ever designed a levee or a floodwall in Louisiana?

A. I've done some stability analysis related to canals, but not -- not a levee in Louisiana, no.

Q. Have you ever been asked by the United States

GENNARO G. MARINO, PH.D., P.E.          90

1   Army Corp of Engineers to evaluate the safety of a
2   hurricane protection levee or floodwall at any
3   location?
4       A.  No.
5       Q.  Have you ever evaluated the safety of a
6   hurricane levee or floodwall in Louisiana before this
7   case?
8       A.  No.
9       Q.  Before this case, have you ever evaluated the
10  failure of a hurricane protection structure in
11  hurricane conditions?
12      A.  No.
13      Q.  Have you ever published any articles on the
14  failure of a hurricane protection floodwall or levee?
15      A.  No.
16      Q.  So am I correct, then -- have you ever been
17  asked to opine in any previous case or any previous
18  forensic investigation you've done on the
19  interpretation of sounds heard by people in the area
20  around a -- a casualty?
21      A.  No.
22      Q.  Have you ever conducted a seepage study of a
23  hurricane protection system that failed before this
24  case?

GENNARO G. MARINO, PH.D., P.E.          91

1       A.  No.
2       Q.  Have you ever conducted a stability analysis
3   or a limit equilibrium analysis of a hurricane
4   protection system that failed other than this case?
5       A.  No.
6       Q.  Who do you consider the authoritative agency
7   regarding how levees and floodwalls should be
8   constructed?
9       A.  I'm not sure.
10      Q.  Is there any particular agency that you can
11  think of that has a particularly large role in the
12  design and construction of hurricane protection levees
13  and floodwalls?
14      A.  Yes.
15      Q.  What agency is that?
16      A.  Corps of Engineers.
17      Q.  That's the United States Army Corps of
18  Engineers.  Do you accept the Army Corps of Engineers
19  work entitled "Design and Construction of Levees" to
20  be an authoritative work regarding levee and floodwall
21  design?
22      A.  I didn't use it.  Obviously, I didn't feel
23  like it was the thing to use.  I have found, from my
24  work with the Corps of Engineers in the past, looking

GENNARO G. MARINO, PH.D., P.E.          92

1   at other cases, where they made mistakes.  And,
2   obviously, they made mistakes in this one.  So I used
3   my background and my understanding and training to
4   evaluate this project.
5       Q.  What mistakes did the Army Corps of Engineers
6   make that you just referred to?
7       A.  In reference to what?
8       Q.  Well, you just referred to "obviously, they
9   made mistakes in this one."  So I just want to know
10  what you were thinking of.
11      A.  Obviously, there's failure, you know.
12  There's failure.  There's -- there's walls that
13  failed.  There's breaches in the levees.  Estimation
14  of conditions prior to a hurricane of this nature were
15  not correct.
16      Q.  Does your comment apply to the breaches along
17  the Inner Harbor Navigation Canal as well as other
18  breaches?
19      A.  Well, I mean, I -- I believe that the barge
20  caused the failure of those -- of those two
21  floodwalls.  So however you want to relate that to the
22  Corps, you can.
23      Q.  So your comment about the mistakes that the
24  Corps made just a moment ago, you would exclude the

GENNARO G. MARINO, PH.D., P.E.          93

1   floodwall at the Inner Harbor Navigation Canal from
2   those comments; right?
3       A.  Well, I guess, you know -- I don't know.  I
4   mean, a barge hit the wall.  So, I mean, is that -- is
5   that something that the Corps should have designed
6   for, I don't know.  I don't know the answer to that.
7       Q.  What mistakes did the Corps make in
8   connection with the other breaches?
9       A.  You know, one of the things that I point out
10  in my report was that there's a structural connection
11  between the sheet pile wall and the monolith panels,
12  and that connection doesn't have sufficient moment or
13  shear capacity which causes a yield surface or yield
14  line along the point of the sheet pile and -- and the
15  panel.  So what happens is that wall tilts excessively
16  as a result of this weak connection and allows water
17  to seep in through the failures in the water stops.
18      Q.  Were there water stops in the floodwall along
19  the Inner Harbor Navigation Canal?
20      A.  Yes.
21      Q.  So the failure to design a wall at which
22  water stops could fail is a defect that would apply
23  equally to the Inner Harbor Navigation Canal as well
24  as other walls you've observed?

24  (Pages 90 to 93)

GENNARO G. MARINO, PH.D., P.E.          94

1      A.  If you had the same connection.

2      Q.  Have you ruled out the existence of the same

3 connection at the Inner Harbor Navigation Canal?

4      A.  Yes.

5      Q.  What was the connection between the wall and

6 the water stops at the Inner Harbor Navigation Canal?

7      A.  There was 4.75 feet of embedment of the sheet

8 pile compared to 2.75 at these other places where

9 there was a problem with the moment -- moment and

10 shear generated at -- at this connection.  Also,

11 the -- the height of the walls above -- above the

12 connection was greater at London and -- and 17th

13 Street, which would create greater shear force --

14 potential shear forces and moment forces.

15      Q.  Have you ever heard of these water stops

16 referred to as elastomeric joints?

17      A.  I've heard that term before used.

18      Q.  So if -- if someone else were to conclude --

19 say another expert in this case were to conclude that

20 you had gaps or breakages at elastomeric joints in the

21 Inner Harbor Navigation Canal, would you agree with

22 that expert?

23      A.  No, I know that that happened.  It happened

24 at -- happened where the breach ends occurred and --

GENNARO G. MARINO, PH.D., P.E.          95

1 and within the breach.

2      Q.  If another expert were to conclude that

3 hydrostatic pressure was instrumental in creating

4 deflections at elastomeric joints, would you disagree

5 with that?

6      A.  Can you repeat the question, please.

7      Q.  If another expert were to conclude that you

8 had deflections or gaps formed at elastomeric joints

9 due to hydrostatic pressure, would you agree with that

10 expert?

11      MR. POLLARD:  Objection.  Incomplete

12 hypothetical.

13      You can answer.

14      THE WITNESS:  I guess that's a possibility, but I

15 think, to expound on my point, is that at these

16 particular locations, we're talking about a structural

17 failure as well, and we're also talking about these

18 gaps, these floodwalls being supported by a protective

19 embankment that's much higher than where this

20 connection is so that you -- you would get water

21 seepage that would flow from these breached areas

22 between the joints, in the joint and cause piping into

23 the embankment.

24      BY MR. RAFFMAN:

GENNARO G. MARINO, PH.D., P.E.          96

1      Q.  If you had a break in an elastomeric joint at

2 the Inner Harbor Navigation Canal, you would have

3 water flowing into the protected side; right?

4      A.  The joint is higher.  The joint in -- in the

5 rubber stop is higher than the levee.  In this other

6 case, it's not.

7      Q.  All right.  So the water rises to a certain

8 level where it's high enough on the wall that it can

9 affect the elastomeric joints; right?

10      A.  Where a breach in elastomeric joint can then

11 have a hydraulic connection to materials on the other

12 side.

13      Q.  All right.  I think I understand what you're

14 saying, and I'm going to move on.  We'll come back to

15 that later.

16      Is this the first time you've ever evaluated

17 in any respect the impact of a marine vessel on a

18 fixed structure?

19      A.  That's correct.

20      Q.  You don't hold yourself out as an expert in

21 the reconstruction of marine vessel casualties, do

22 you?

23      A.  That's correct.

24      Q.  You have no experience with the effect of

GENNARO G. MARINO, PH.D., P.E.          97

1 wind and waves on the failure of a floodwall, do you,

2 or storm surge for that matter?

3      A.  Well, storm surge is basically just a water

4 level.  So I wouldn't say that that would be the case.

5      Q.  Before this case, have you evaluated the

6 failure of a floodwall due to storm surge?

7      A.  Specifically, no.

8      Q.  And before this case, you've never evaluated

9 the transit of a marine vessel from one place to

10 another?

11      A.  No.

12      Q.  You've talked about Mr. Pazos.  You've had

13 some communications with Mr. Pazos?

14      A.  That's correct.

15      Q.  You're aware he's a naval architect; right?

16      A.  Yes.

17      Q.  You would defer to Mr. Pazos about details

18 regarding barge movement?

19      A.  I don't know if that's his -- his area of

20 expertise or not.

21      Q.  All right.  You would defer to Mr. Pazos

22 regarding conclusions about the nature of a barge

23 contact or a barge impact on the wall?

24      A.  I think now you're getting into an area where

GENNARO G. MARINO, PH.D., P.E.          98

1  you're basically looking at the damage patterns, okay,
2  and I've done a lot of damage surveys from various
3  causes, and I believe that I have a lot of experience
4  in evaluating damage as it relates to concrete or
5  steel.
6      Q.  So you would not defer to Mr. Pazos regarding
7  the nature of a barge contact or a barge impact on the
8  wall.  That's an area where you consider yourself an
9  expert in --
10     A.  In terms of the damage.  Damage effects.
11     Q.  Well, the damage effects -- just to be clear,
12 the damage effects is an interpretation of photographs
13 of a failed floodwall; right?
14     A.  Yes.
15     Q.  And with regard to the conclusions about
16 whether a barge came into contact or impact on the
17 wall, that's an area where you consider yourself the
18 equal of Mr. Pazos?
19     A.  I really don't know Dr. Pazos' qualifications
20 that well.
21     Q.  What -- what time did the north breach occur?
22     A.  My estimate is -- is at approximately
23 6:00 o'clock.
24     Q.  And that estimate is based on your

GENNARO G. MARINO, PH.D., P.E.          99

1  interpretation of -- of depositions, stop clocks, 911
2  calls and other data that you've received from the
3  plaintiffs' lawyers; right?
4      A.  That's right.
5      Q.  Does your 6:00 o'clock a.m. breach time agree
6  with what other plaintiffs' experts have found?  Do
7  you know?
8      A.  I've seen various times ranging from 4:30.  I
9  don't know if I've seen any as late as 6:00 a.m. prior
10 to -- prior to us establishing that.  I didn't
11 continue to -- what I'm trying to say is I didn't
12 continue to research that.
13     Q.  So if another expert concludes that the north
14 breach happens at 4:00 o'clock a.m., your conclusion
15 doesn't match that other expert, does it?
16     A.  Obviously not.
17     Q.  Surge level in the Inner Harbor Navigation
18 Canal --
19     A.  But, you know, I'd like to see -- you know, a
20 lot of times I see these -- I'm sorry.  Is it okay
21 if I --
22     Q.  You can expand on your answer.  Sure.
23     A.  I like to see what it's based on.  A lot of
24 times, you know, I've seen the Corps say, "Well, it

GENNARO G. MARINO, PH.D., P.E.          100

1  clearly occurred at 3:30 in the morning."
2  Okay.  Clearly it occurred.  Where is the data that
3  tells you that.  You know, I think 911 calls and a
4  log, in my mind, and Villavasso's description of when
5  he saw the failure are more valid than just someone
6  stating a time and not giving me any basis for it.
7      Q.  Based on your reading of Mr. Villavasso's
8  testimony, you've drawn the 6:00 a.m. time frame?
9      A.  That's correct.
10     Q.  The surge level in the Inner Harbor
11 Navigation Canal at 6:00 a.m., according to your
12 analysis, would be or was about 11.2 feet at
13 6:00 a.m.; right?
14     A.  That's correct.
15     Q.  That surge level is taken as the still water
16 level at the Inner Harbor Navigation Canal lock
17 pursuant to the lockmaster's hydrograph; right?
18     A.  That's correct.
19     Q.  South breach, you've concluded the start of
20 the flooding at about 6:30 in the morning; right?
21     A.  That's correct.
22     Q.  And that conclusion is based on the same
23 witness accounts, depositions, 911 calls that you
24 relied on for the north -- that's not right.  I'll

GENNARO G. MARINO, PH.D., P.E.          101

1  take it back.  Start over.
2      A.  Sounds good to me.
3      Q.  All right.  Your conclusion about breach
4  timing at 6:30 is based on witness accounts,
5  depositions, 911 calls and other data; right?
6      A.  Yes.
7      Q.  Surge water level in the Inner Harbor
8  Navigation Canal at 6:30 a.m. is taken as 11.8 feet in
9  your analysis; correct?
10     A.  Yes.
11     Q.  Based on the still water level at the
12 lockmaster's hydrograph?
13     A.  Yes.
14     Q.  If there were, in fact, four-foot waves, that
15 would add to the water level?
16     A.  No, because the wave would just go over the
17 top.  So it's not water that's retained.
18     Q.  During the time the wave is breaking, a
19 four-foot wave would push water over the wall; right?
20     A.  Yes.
21     Q.  Does a wave exert hydrostatic pressure on a
22 wall during the time that the wave is at the wall in
23 addition to the pressure on the wall before the wave
24 hits?

GENNARO G. MARINO, PH.D., P.E.        102

1  A.  It -- it would, but if you only have a wall
2  up to 12.5 feet, I mean, there's a limited amount of
3  pressure.  Now, if you have a barge that is 23 feet
4  high or 22 feet high, that gives you a larger area
5  where there could be a wave pressure.
6  Q.  I actually did not ask about hydrodynamic
7  pressure.  I asked about hydrostatic pressure.  Do you
8  understand the difference between the two?
9  A.  Yes.  I thought that you were talking about
10  the hydrodynamic pressures.
11  Q.  No.  The pressure of a barge or a breaking
12  wave breaking against the wall is a dynamic pressure;
13  right?
14  A.  Well, I mean, in my mind a wave -- if you're
15  talking about a wave and you're talking about forces
16  on the wall, that's -- that's not hydrostatic
17  pressure --
18  Q.  Well, let's test that.
19  A.  -- because it varies.
20  Q.  Let's test it for a minute.  I want you to
21  think about it.
22  A.  Okay.
23  Q.  All right?
24  A.  Yeah.

GENNARO G. MARINO, PH.D., P.E.        103

1  Q.  A wave will exert dynamic pressure if it
2  breaks against a subject with a horizontal vector
3  towards that subject; right?
4  A.  Say that again.
5  Q.  A dynamic pressure is a vector of energy that
6  is pushed toward a -- toward a target and that
7  releases energy toward the target; right?
8  A.  I'm having a problem with "dynamic vector."
9  Q.  All right.  Let me try and come at it a
10  different way.  If it doesn't work, we'll move on.
11  Hydrostatic pressure is the pressure that a still
12  water level exerts on the wall; right?
13  A.  Yes.
14  Q.  When a wave comes along a wall, either
15  parallel to or oblique to or even against the wall,
16  there is a moment at which the water level along the
17  wall rises; isn't that right?
18  A.  Yes.  But you have to -- go ahead.
19  Q.  In that moment, for as long as the water is
20  as high as it is, that extra water level exerts
21  hydrostatic pressure on the wall; correct?
22  A.  Where?  Where on the wall are you talking
23  about?
24  Q.  On the wall at whatever location you have

GENNARO G. MARINO, PH.D., P.E.        104

1  that extra water.
2  A.  I don't think so.
3  Q.  Now, why not?
4  A.  Because you have a distribution of pressure
5  at depth.  So I guess -- I guess the simple analogy
6  would be, for you to understand this, is if you had --
7  if you had a flat surface, and then you had, say, an
8  ice cube on top -- right? -- that pressure from that
9  ice cube would distribute with depth.  So if that --
10  if it is not wide enough, as you go down, you're not
11  feeling anything.  So the depth has -- has -- has an
12  important scope, if you will.
13  Q.  All right.  So if a pressure on a wall is
14  narrow in scope, you would not expect that pressure to
15  be felt at deep depths?
16  A.  Right.
17  Q.  So, for instance, the pressure of a corner of
18  a barge hitting the top of a wall, you'd expect that
19  pressure to be exerted on a narrow part of the wall
20  rather than translating all the way down to the bottom
21  of the sheet pile?
22  A.  Well, obviously.  I mean, it's where there is
23  contact.  I mean, that's a simple answer.
24  Q.  Let me ask you some questions about how the

GENNARO G. MARINO, PH.D., P.E.        105

1  barge got to the north breach.  Do you know how the
2  barge got to the north breach?
3  A.  No.
4  Q.  In your prior deposition, you testified that
5  you had concluded the barge arrived at the north
6  breach by exceptional wave action.  Do you remember
7  that testimony?
8  A.  I'd have to see that.
9  Q.  All right.  I'm going to hand you -- I'll
10  read it to you, and then if you don't remember it,
11  I'll hand it to you.  I asked you the question at
12  Page 115, "Do you have an opinion as to how the barge
13  arrived at the north breach in a manner other
14  than wave" -- I'm sorry.  Strike that.  I'll start
15  again.
16       I asked you a question, "Do you have an
17  opinion as to how the barge arrived at the north
18  breach in a manner other than wind aided?"  And your
19  answer was, "Yes.  Wave action."  Do you remember
20  that?
21  A.  Okay.  Yes.
22  Q.  In your deposition later, at Page 143, you --
23  I asked you the question, "Well, now, the north breach
24  wave action analysis, if you look here at Page 7, it

GENNARO G. MARINO, PH.D., P.E.      106

says from the pump station manager's description of
the incident, it appears that the impact force
generated by ING4727 barge was caused by exceptional
wave action."  And you said, "Right."  Do you remember
that testimony?

    A. I think that's from our report, actually.

    Q. All right.  So your report said, "exceptional
wave action"?

    A. Right.

    Q. And you -- you now, as I understand it, are
no longer opining that exceptional wave action brought
the barge to the site of the north breach?

    A. Well, I -- I guess I meant that as a general
comment.  I don't feel like that is an area of
expertise for me to opine on, how the barge got to the
wall.

    Q. And you've done no studies or calculations to
provide any scientific evidence or analysis of how the
barge transited from the slip to the north breach;
correct?

    A. That's correct.

    Q. You've done no studies or scientific
calculations or even any literature review that could
shed light on how an empty barge sticking up 20 foot

GENNARO G. MARINO, PH.D., P.E.      107

out of the water could move in a direction counter to
that of the prevailing wind in order to arrive from
the slip to the north breach; is that correct?

    A. That's correct.

    Q. And you've done no literature review or
studies or scientific calculations to support a -- a
conclusion that waves in the Inner Harbor Navigation
Canal operated with a predominant force or direction
counter to the prevailing wind; is that correct?

    A. That's correct.

    Q. Am I right that the beginning and end of your
opinion as to how the barge got to the north breach
wall is the testimony of the pump station operator
about what he saw that morning?

    A. I think there's another eyewitness that also
refers to seeing the barge in that area.

    Q. What -- take as much time as you'd like to
look at Table 3.1 of your report, and tell me what
other witness reports to have seen the barge at the
north breach area.

    (The witness reviewed the document.)

    THE WITNESS: Okay.  If you look at Page 3 of
Table 3.1, it states from Terry Mark Adams'
deposition, "The break in the wall towards Florida,"

GENNARO G. MARINO, PH.D., P.E.      108

related to that, he says, "'I wouldn't consider that
to be a break.  After the wall -- after the barge came
through the wall by me gave.'"  I slowly just -- "'it
slowly just collapsed, and the water was flowing down
that way from the break in the wall."

BY MR. RAFFMAN:

    Q. So your testimony, as you sit here today, is
that Terry Adams purports to have seen the barge go
through the north breach?

    A. That's my understanding from reading his
transcript.

    Q. When is the last time you read Terry Adams'
deposition?

    A. Probably a year ago.

    Q. So you have not read Terry Adams' deposition
since you testified at your deposition that I
conducted last September.  Am I right?

    A. That's correct.

    Q. Now, at the last deposition, I'm going to
read you some testimony you gave.  Pages 148 and 149
of your testimony I asked this question, "The pump
station manager's description of the wave action is
really the beginning and the end of your opinion on
the subject -- right? -- as to how the barge got to

GENNARO G. MARINO, PH.D., P.E.      109

the wall?"  And I'll represent to you I'm talking
about north breach.  And you answered -- after an
objection by Mr. Weedman you answered, "At this time,
yes"; right?

    A. Right.

    Q. So in the intervening time between your last
deposition and this deposition, you now remember,
based on a reading of Terry Adams' deposition that you
did before the last one, that Adams was testifying
about the north breach?

    MR. POLLARD: Objection.  Misstates his
testimony.

    THE WITNESS: Okay.

    MR. POLLARD: He stated he reviewed his chart.
That's different than -- than reading his deposition.

    MR. RAFFMAN: I understand.  Somebody --

    Q. Did you distill the entries in the chart from
the deposition testimony, or did someone else do that?

    A. What I did was, from the deposition
testimony, I prepared summaries.  And so I didn't go
back directly to the transcript and read it.

    Q. So is it fair to say today, as we sit here
today, that the pump station manager's testimony and
the testimony of Terry Adams is the beginning and end

GENNARO G. MARINO, PH.D., P.E.        110

1  of your opinion regarding how the barge got to the
2  north breach?
3      A.  Well, I don't think either one of them say
4  how the barge got to the north breach.  Okay.  They
5  say they saw it at the north breach.
6      Q.  You cannot explain the presence of the barge
7  at the north breach on any basis other than Villavasso
8  and Adams purport to have seen it there; right?
9      A.  That's not true.  That distorts my testimony.
10     Q.  What other explanation is there for how the
11 barge got to the north breach?
12     A.  Well, like I said, it's a process of
13 elimination.  We did a seepage analysis.  We did a
14 stability analysis.  We looked at the damage -- or I
15 looked at the damage and determined that the damage
16 and -- and the combination of the stability analysis,
17 seepage analysis and witness testimony indicates to me
18 that we have a barge impact at the north breach.
19     Q.  You've told me -- to be clear, you've told
20 us -- you've concluded it was there, but you have no
21 idea how it got there, do you?
22     A.  That's -- that's not my area of expertise.
23 That's correct.
24     Q.  This barge doesn't have a motor; right?

GENNARO G. MARINO, PH.D., P.E.        111

1      A.  I haven't seen one.
2  ==Q.  In order for the barge to move from one place==
3  ==to the other, something has to move it; right?==
4      ==A.  That makes sense to me, Mark.==
5      ==Q.  And that something has to be wind or water;==
6  ==right?==
7      ==A.  I would assume that yes, that's correct.==
8      Q.  As a scientist, you want an explanation of
9  how that barge got from one place to the other in
10 order to understand what happened; isn't that right?
11     A.  You know, there -- you're never going to have
12 everything you want.  Okay?  From the information that
13 I have, I feel like there's enough information there
14 for me to conclude what I've concluded.
15     Q.  But to be clear, the information you have
16 does not include any explanation of how the barge got
17 from one place to the other; right?
18     A.  I don't know how many times I have to say it,
19 Mark.  That's true.  You've said it maybe four, five
20 times already.
21     Q.  Well, I'll stop saying it, then.
22     A.  I think everybody in this room knows what
23 you're saying.
24     Q.  Describe for me what happened when the barge

GENNARO G. MARINO, PH.D., P.E.        112

1  arrived at the north breach, as you see it and as you
2  reconstruct it.
3      A.  That the -- that the barge impacted probably
4  the first panel, possibly the second panel just south
5  of the north end of the north breach.
6      ==Q.  When you say, "impact," what do you mean by==
7  ==that?==
8      ==A.  That a corner of the barge hit the wall.==
9      Q.  All right.  Let's get a -- let's look at
10 Figure 4.1.  Turn to Figure 4.1.  I'm asking you about
11 the figure, not the photo (indicating).
12         (The witness reviewed the document.)
13     THE WITNESS:  By the way, I don't know if your's
14 has a -- there's a drafting illustration problem here.
15 I asked my draftsman what happened, and he said it
16 must have been when we copied it on the website.
17 There's an extra sheet pile in the drawing.  I -- I
18 had him upload another copy of this figure.
19 BY MR. RAFFMAN:
20     Q.  Would you indicate on Figure 4.1 which is the
21 extra sheet pile that does not belong?
22     A.  You want me to do it on here, Mark
23 (indicating)?
24     Q.  Yes, please.

GENNARO G. MARINO, PH.D., P.E.        113

1      A.  This one (indicating).
2      Q.  So this second vertical sheet pile on the
3  drawing is -- is something that you say now does not
4  belong on that drawing?
5      A.  It never did.  I don't know how it got there.
6      Q.  And that drawing with that extra sheet pile
7  in the vertical position translated back from the
8  original position.  That doesn't make any sense at
9  all, does it?
10     A.  No.
11     Q.  All right.  So you've described an impact
12 failure that begins close to the north end of the
13 breach; right?
14     A.  Yes.
15     Q.  And is it your testimony that that impact
16 failure is what caused the sheet pile to tear?
17     A.  That "impact failure" did you say?
18     Q.  The impact of the barge caused the sheet pile
19 to tear?
20     A.  Yes.
21     Q.  You had what you called "a very abrupt
22 failure" of the construction joint at the north end of
23 the north breach; is that right?
24     A.  That's correct.

GENNARO G. MARINO, PH.D., P.E.    114

1  
2  Q. Have you calculated how fast the barge was
3  traveling when it caused the sheet pile to tear?
4  A. No.
5  Q. You wrote, "The tearing would have required a
6  significant force on the floodwall to displace it
7  sufficiently to cause the sheet pile to tear with
8  depth"; right?
9  A. Yes.
10  Q. What do you mean by "a significant force"?
11  A. Like I said, we haven't completed our impact
12  analysis. So I wouldn't be able to tell you what that
13  level of force was, but it was enough to cause it to
14  tear.
15  Q. The barge has to be traveling in the
16  direction of the floodwall with sufficient velocity to
17  impart that energy to the wall to cause the thing to
18  tear; right?
19  A. Yes.
20  Q. How fast did the breach progress once the
21  barge caused the tear?
22  A. I don't know exactly what the answer to that
23  is.
24  Q. Have you previously testified that if we go
25  by Villavasso's description, it was a progression that

GENNARO G. MARINO, PH.D., P.E.    115

1  
2  occurred fairly rapidly?
3  A. I don't remember what was said at that time.
4  Although, I remember Villavasso saying that it tumbled
5  panel by panel, and he was there watching it. So that
6  gives you an idea that it was on the order of less
7  than a half an hour for sure.
8  Q. And you said, "When the barge hit the wall,
9  tumbled and teared, and as it teared, the rush of
10  water caused the sheet pile to get pulled under the
11  water and twist."
12  A. Yes.
13  Q. You wrote that "The tearing occurred from the
14  top down, indicating an upper force"; right?
15  A. Yes.
16  Q. And what does "upper force" mean?
17  A. It means the -- the barge force.
18  Q. The barge force on the top or in the upper
19  part of what?
20  A. On the upper part of the sheet pile panel
21  system.
22  Q. Have you ever heard that the sheet pile tore
23  at the location of a faulty weld between two different
24  sections of sheet pile?
25  A. No.

GENNARO G. MARINO, PH.D., P.E.    116

1  
2  Q. Have you ever heard that there was a faulty
3  weld between the two sections of sheet pile that tore?
4  A. No.
5  Q. Would it matter to your opinion if in fact
6  the location of the tear was the location of a faulty
7  weld between two sections of sheet pile?
8  A. I wouldn't think so.
9  Q. Because you've concluded that the barge hit
10  the wall at that location?
11  A. Yes.
12  Q. Have you done any calculations to rule out
13  the possibility that a faulty weld failed under a
14  hydrostatic load?
15  A. I haven't done those calculations, no.
16  Q. We talked earlier about water stops.
17  Describe the water stops in a floodwall.
18  A. Basically, they're rubber sheets that have a
19  bulged area in the middle and then -- this is based on
20  the -- we can just go to the drawing, actually. It's
21  probably easier.
22  (The witness reviewed the document.)
23  THE WITNESS: Okay. If we went to Figure 2.3,
24  there's a picture of the rubber stop.
25  BY MR. RAFFMAN:

GENNARO G. MARINO, PH.D., P.E.    117

1  
2  Q. The water -- the rubber water stop is
3  contained within the concrete monolith? I'm sorry.
4  2.3.
5  A. Yes.
6  Q. The water stop --
7  A. You can see it on the right side, Mark.
8  Q. Right. And the water stop is included within
9  construction joints separating concrete monoliths;
10  right?
11  A. Yes.
12  Q. Have you calculated the amount of hydrostatic
13  pressure it would take to cause the rubber water stop
14  to dislodge as the water climbs the wall?
15  A. No. I mean, there's a lot of calculations
16  you can make. You know, what -- what I did is I did,
17  in my mind, a sufficient amount of analysis to make me
18  feel comfortable and confident in my conclusions.
19  Q. Have you ruled out the possibility that
20  hydrostatic pressure caused water stops in the
21  concrete or between the concrete monolith to dislodge
22  as the water rose up the floodwall on the morning of
23  August 29?
24  A. Are you saying that -- are you saying that --
25  that these water stops failed because of -- of the

water against them?  Is that what you're saying?

Q.  I'm asking the question whether you've ruled out that possibility by any work you've done in this case?

A.  I've not looked at that.

Q.  If the water stop fails under hydrostatic pressure and allows water to go through the gap between the two monoliths, can that allow water on the back side of the wall before the wall overtops?

A.  Yes.

Q.  You've testified about the barge velocity -- or the barge impact on the wall.  Do you know what -- do you know what gave the barge its momentum as it traveled towards the wall and impacted at the wall at the north breach?

A.  As I said, that's an area out of my expertise.

Q.  Would your answer be the same thing for the force exerted by the barge on the wall at the north breach?

A.  Yes.  The source -- as I mentioned to you before, the source of the impact of the -- of the load onto the wall from the barge is outside my area of expertise.

Q.  You've testified that you've relied, to some degree, on the testimony of the pump station manager, Mr. Villavasso; right?

A.  That's correct.

Q.  And at Page 4-16 of your report, you cite his testimony; right?

MR. POLLARD:  What page was that?

MR. RAFFMAN:  4-16 of your report.

(The witness reviewed the document.)

THE WITNESS:  Okay.

BY MR. RAFFMAN:

Q.  All right.  Is Mr. Villavasso's testimony important to your conclusions you've reached in this case?

A.  Yes.

Q.  Did you see anything in Mr. Villavasso's account that would cause you to question whether what he saw was in fact the ING4727?

A.  I think that the barge is large enough, and his experience at seeing barges for 20 years on -- on the canal is -- is pretty significant in my mind.

Q.  When you say, "the barge was large enough," you're referring in part to the fact that it's sticking up 20 feet out of the water; right?

A.  I mean, it would be sticking up 15 or 20 feet, that's correct.

Q.  And it's sticking up 15 or 20 feet because, as you've testified earlier, the floodwall itself, from the bottom of the levee embankment to the top of the wall, is only 6 feet; right?

A.  That's correct.

Q.  So if the barge is going to hit the wall, there's only 6 feet of the barge that's below the top of the wall; right?  At most --

A.  Okay.

Q.  -- right?  That's just arithmetic.

A.  I would -- I would say it's less than that.

Q.  Less than that.

A.  Yes.

Q.  It's less than that because you need the barge to hit higher on the wall than the very bottom; right?

A.  That's correct.

Q.  So what we're talking about, when the barge hits the wall, you're talking about a stick-up that's going to be at least 15 feet and probably more; right?

A.  Something on that order, yeah.

Q.  Do you recall any testimony from

Mr. Villavasso about how high above the wall the object that he saw was?

A.  I don't remember the specific number, but I remember there were something about a few feet.

Q.  Now, do you accept that Mr. Villavasso's vision was obscured by rain and darkness?

A.  Yes, to some degree.

Q.  Do you accept that he said he did not have a clear, focused picture?

A.  Yes.

Q.  And do you accept that the stick-up which he said he saw, which you characterized as a few feet, is less than the actual stick-up the barge would have to have if it had hit the wall at that location?

A.  That's correct.

Q.  You testified that Mr. Villavasso heard a significant boom sound.  I'm sorry.  You wrote in your report that Mr. Villavasso said that he heard a significant boom sound; right?

A.  Yes.

Q.  Do you equate that boom sound with the impact of the barge?

A.  Yes.

Q.  Are you aware Mr. Villavasso testified --

GENNARO G. MARINO, PH.D., P.E.        122

1  I'll ask you to turn to Page 120 of the deposition
2  that's been put in front of you, Exhibit 9.
3        (The Reporter marked the document
4        referred to as Deposition Exhibit 9
5        for identification.)
6  BY MR. RAFFMAN:
7      Q.  It's at 119 over to 120.  It's the bottom of
8  119.  The question is asked of Mr. Villavasso, the
9  questioner asks, "Well, the reason -- and that's
10  precisely why I'm asking this question.  I'm trying to
11  determine if you, having heard this, are able to
12  distinguish between the possibility that the sound
13  came from the wall breaking, from whatever reason, as
14  opposed to something striking the wall."  And
15  Mr. Villavasso says, "Well, no.  I couldn't tell you
16  that, but I don't know."  Do you see that part of his
17  testimony?
18      A.  I see that.
19      Q.  So will you accept that Mr. Villavasso
20  himself could not distinguish whether the sound that
21  he heard was the impact of the barge versus the wall
22  breaking?
23      A.  Well, it makes sense to me that if -- if
24  there's a boom sound and then you see a barge, that

GENNARO G. MARINO, PH.D., P.E.        123

1  it's connected together.  Those -- those two incidents
2  are connected together.
3      Q.  Well, let's be clear.  That's an inference
4  you made; right?
5      A.  Yes.
6      Q.  Villavasso himself, when asked the question,
7  would not make that inference, as you've just read;
8  right?
9      A.  I would have to read the rest of his
10  deposition because I know that there's a lot of
11  back-and-forth and stuff in here.  So I don't remember
12  the specifics of it.  I'm sure you've read it
13  recently.  I haven't.
14      Q.  All right.  Let me -- if I understood your --
15  your report, the tear of the sheet pile at the north
16  breach leads to water pouring into the lower Ninth
17  Ward; right?
18      A.  Yes.
19      Q.  And there's a progressive washout and a
20  failure of the north breach moving to the south;
21  right?
22      A.  Yes.
23      Q.  And the result is a loss of soil support and
24  a washout of the wall; right?

GENNARO G. MARINO, PH.D., P.E.        124

1      A.  Yes.
2      Q.  Your stability analysis, when you concluded
3  that the wall was stable enough to withstand the storm
4  surge, you didn't factor in a sheet pile tear and a
5  progressive washout into that analysis; right?
6      A.  That's correct.
7      Q.  Now, under your conclusion, the sheet pile
8  rip is the first part of progressive failure of the
9  wall; right?
10      A.  Yes.
11      Q.  And this is the connection between the
12  20 foot sheet pile and 35 foot sheet pile immediately
13  adjacent; right?
14      A.  Yes.
15      Q.  And in order to start this, the barge has to
16  hit that precise monolith, the first 20 foot monolith,
17  below the 35 foot neighbor; right?
18      A.  It would -- it would have to be, like I said,
19  within the first or second panel.
20      Q.  If an alternative scenario were to conclude
21  that the sheet pile rip came at the end of the
22  sequence, after gaps have formed and seepage has
23  caused sliding to result, would that scenario be
24  consistent with your opinion?

GENNARO G. MARINO, PH.D., P.E.        125

1      A.  I don't see how that's possible when you have
2  observations that the failure began on the north end
3  by a tumbling of sheet pile.  I guess if you neglect
4  what people observed, you can dream up anything.
5      MR. RAFFMAN:  It's a good time to take a break.
6      THE VIDEOGRAPHER:  Going off the record at 12:49
7  even.
8        (A recess was taken from 12:49 p.m.
9        to 1:38 p.m.)
10      THE VIDEOGRAPHER:  Back on record.  Tape 4.
11  13:38:37.
12  BY MR. RAFFMAN:
13      Q.  I'm going to ask you some questions about the
14  photos that you looked at and the inferences you draw
15  from the photos, but before I do that, am I right that
16  you have not visited the failed flood wall at the
17  IHNC?
18      A.  At the time when I -- I visited the site
19  after my deposition in New Orleans.
20      Q.  So you didn't visit the site until September
21  of 2008; right?
22      A.  That's correct.
23      Q.  By that time, there was no evidence for you
24  to gather?

GENNARO G. MARINO, PH.D., P.E.        126

1
2   A. That's correct.
3   Q. So your visit to the site was merely for
4   information purposes and not forensic purposes.  Is
5   that fair?
6   A. That's correct.
7   Q. You didn't inspect the failed sheet pile that
8   was removed from the north breach; correct?
9   A. That's correct.
10  Q. You haven't inspected the barge?
11  A. That's correct.
12  Q. You didn't visit the other locations where
13  flood walls failed; correct?
14  A. That's correct.
15  Q. You didn't perform any stability or seepage
16  analyses regarding the failures at those other flood
17  wall locations; correct?
18  A. That's correct.
19  Q. And you've already testified, you haven't
20  calculated the barge speed on impact at either of the
21  flood wall breaches; right?
22  A. That's correct.
23  Q. You haven't calculated the barge impact force
24  at either of the breaches; correct?
25  A. That's correct.

GENNARO G. MARINO, PH.D., P.E.        128

Page 4-2 of your report.  You write that "This is a
still of the earliest available video of the north
breach after Hurricane Katrina"; is that right?
A. That we had, yes.  That we could find.
Q. All right.  Now, you write that "This photo
is copied from a hard drive borrowed from the law
office of Brian Gilbert."  Do you see that?
A. Yes.
Q. What was on that hard drive?
A. To tell you the truth, I didn't actually
capture this from the hard drive.  So I -- I wouldn't
know exactly the contents of the hard drive as --
as -- as related to specific files.  I know generally
what's -- what's on the hard drive.
Q. What generally is on the hard drive?
A. Information related to the failures and the
conditions during Katrina and afterwards.
Q. What sorts of information?
A. Videos and photographs, reports.
Q. What kind of reports?
A. For example, some of the reports that I
reference in -- in my report related to the Washington
Group work.
Q. Was the hard drive among the information that

GENNARO G. MARINO, PH.D., P.E.        127

1
2   Q. You haven't calculated the force that would
3   be needed to exhume the sheet pile at either
4   locations; is that correct?
5   A. That's correct.
6   Q. You haven't done any calculations to
7   determine whether an impact with the concrete cap
8   would cause the cap to shear off rather than pulling
9   the wall from the soil; correct?
10  A. That's correct.
11  Q. You haven't performed calculations to
12  determine the flood levels at which a hydrostatic gap
13  or a tension crack would form at the IHNC versus other
14  breaches?
15  A. Repeat that question, please.
16  Q. I asked specifically whether you performed
17  any calculations of flood levels at which tension
18  cracks or hydrostatic gaps would form between the
19  flood side soil and the sheet pile at the IHNC.
20  A. Not calculations per se.
21  Q. I understand you've reached some opinions on
22  that subject, but those opinions are not supported by
23  any calculations you've derived.  Is that fair?
24  A. That's correct.
25  Q. Take a look at Photo No. 4.1.  It's at

GENNARO G. MARINO, PH.D., P.E.        129

you considered in forming your opinions?
A. Yes.
Q. Do you see in Photo 4.1, in the lower
right-hand corner near the Florida Avenue bridge,
there's a red -- a red structure there.  A red object.
Do you see the red object in the lower right-hand
corner?
A. Yes.
Q. What is that object?
A. It looks like a barge to me, but I'm not --
Q. I'm sorry?
A. I said to me, it looks like a barge.
Q. Right.  Does it look like that barge has come
into contact with the Florida Avenue bridge, around
that location?
A. Yes.
Q. And would you agree with me that the barge
that's come into contact with the Florida Avenue
bridge has not knocked the bridge over?
A. It hasn't knocked the bridge over, no.
Q. So whatever hurricane winds may have driven
that barge into the Florida Avenue bridge did not
drive it with sufficient force to cause the bridge to
fall; correct?

GENNARO G. MARINO, PH.D., P.E.      130

A. That's correct.

Q. Let me ask you to turn, then, to Page -- I'm going to start you on the previous page. Page 4-1. I'm going to read you -- you say, "There is also photographic evidence that this sheet pile" -- and we're going to have to turn to Page 4-15 to continue the sentence -- "that this sheet pile peeled off the still standing concrete flood wall. See Photo 4.7." Do you see that sentence?

A. Yes.

Q. Now, I'm going to ask you to turn to Photo 4.7.

A. Okay.

Q. Actually, before -- you also wrote at 4-15, "Similarly, the southern portion of the eastward displaced sheet pile delaminated from the adjoining southern concrete panel." All right. You wrote that too?

A. Yes.

Q. My question for you in Photo 4-7 is what is the sheet pile that peeled off the still standing concrete flood wall?

A. It's the one that's located in the photograph.

GENNARO G. MARINO, PH.D., P.E.      131

Q. To the right or to the left of the -- of the panel, the concrete panel as you -- as you look at the picture?

A. There's a -- the sheet pile that looks bent over.

Q. All right. I'm going to ask you to take the pen that's right in front of you and circle on your copy the sheet pile that peeled off the still standing concrete flood wall.

A. (Witness complies.)

Q. May I see what it is you've circled.

A. (Indicating.)

Q. All right. I see. So the sheet pile that's peeled is the sheet pile toward the left of the -- of the monolith?

A. Yes.

Q. All right. What do you infer from this picture, 4.7 and 4.-- -- and Photo 4.8?

A. It shows a basic tearing mechanism where -- where the sheet pile was torn, a segment of the sheet pile has been torn off the northern portion of the still intact panel.

Q. Why did that panel remain intact?

A. It -- it's a -- it's a shorter panel that has

GENNARO G. MARINO, PH.D., P.E.      132

almost like a fixed condition to the north, and it also has a sheet pile with a significantly deeper embedment.

Q. The deeper embedment is what gives that sheet pile added strength against pressure; correct?

A. Yes.

Q. The junction between the failed sheet pile and the deeper embedded sheet pile is a weak point on the wall. Would you agree with me?

A. Yes. Well, I mean, it's a weak point in the sense that the -- the segment to the north is -- has higher integrity, structural integrity than the segment to the south.

Q. And when you put pressure on the wall, and specifically pressure on the segment to the south, that junction between the deeper sheet pile and the shallower sheet pile will be a point of tension along the wall; right?

A. Torsional induced tension.

Q. The torsion will occur because the shorter sheet pile will have torque in it that can't be translated to the deeper sheet pile to the north?

A. That's prefaced with the fact if you're concentrating the displacements close enough to this

GENNARO G. MARINO, PH.D., P.E.      133

joint so there is no give in the connection, that is correct. But if -- if you're talking about induced displacements that are a panel -- or several panels beyond this, then there's sufficient amount of flexibility in the panels themselves to accommodate some displacement.

Q. Sure. So if you're talking about a point load occurring several panels away, you don't expect the torque at that location; right?

A. That's correct.

Q. If you're talking --

A. Well, I wouldn't say you wouldn't expect any torque.

Q. You wouldn't -- you wouldn't expect any significant torque that could fail the wall if you had a point load several panels away; right?

A. Yes.

Q. But if you have a load that's occurring along the entire wall, then that load will exert torsion or torque at this point on the wall where you have a deeper sheet pile?

A. Well, here's the problem with that, Mark. Is that we know, from observation of the mechanism, of the failure and how it tumbled. Okay? So if it's

GENNARO G. MARINO, PH.D., P.E.        134

tumbling, it's not yielding at the other end. Also,
you have the way the sheet pile twisted out of the
ground, also showing that it was progression from
north to south. So if you're talking about a central
loading area, that's not consistent with the observed
failure phenomena.

Q. What I'm asking is -- is whether or not, if
you have water rising on the wall and exerting
pressure all along the wall, whether that pressure can
exert a force that will create torque at the
connection between the deeper and the shallower sheet
pile?

A. Of course.

Q. In order for a point load to exert torque at
that location, that point load really needs to be
within a panel or two; right?

A. Well, I mean, it still could exert some
torque if it wasn't within the panel or two.

Q. You testified you believe the barge hit
within a panel or two because that's --

A. Yes.

Q. -- because that's what it would take for the
barge to exert the kind of torque that you believe
existed on this wall; right?

GENNARO G. MARINO, PH.D., P.E.        135

A. Yes, in order to initiate failure.

Q. In order to initiate failure. Now, without
knowing the mechanism that drove the barge to the
wall, would you agree with me that if the barge
motion -- well, let me ask it this way. How many
flood wall panels are there on the wall between the
Florida Avenue bridge and the Claiborne Avenue bridge?

A. I would say about --

MR. POLLARD: You're talking about prior to
Katrina hitting?

BY MR. RAFFMAN:

Q. Prior to Katrina hitting, yes, please.

A. About 300. I'm sorry. Yeah. About 300.
100. Let's see. 1,000. Sorry. About 1,000.

Q. About 1,000 30-foot panels between Florida
Avenue and Claiborne Avenue; right?

A. Wait. Hold on. Around 1,300 from the north
end of the breach to the corner, where it turns the
corner at the bottom.

Q. All right.

A. I don't know about -- I don't have in my mind
what the other remaining length is.

Q. I'm asking how many panels there are, and
you've said --

GENNARO G. MARINO, PH.D., P.E.        136

A. Around 1,300.

Q. 1,300. And so if you assume that the panel
that the barge strikes, if it strikes a panel on that
side, is a random phenomena, would you agree with me
that the chances of the barge hitting that particular
panel on the flood wall are about 1 or 2 in 1,300?

A. I wouldn't make any kind of probability
statement like that.

Q. Well, because --

A. Why are you including just that section? Why
don't you include the west part or the northern part
above Florida Avenue? I mean -- I mean, I don't know
what that statistic proves. We have an observation --
observations of where the barge was. So that's what
I'm relying on. It's not a statistical thing.

Q. Well, I guess --

A. If you want to call it a statistic of 1 in
1,300, that's -- that's fine.

Q. There's no reason that you can think of why
the barge would be drawn to that particular panel;
right?

A. As I said, I'm not a person to be able to
determine the route that the barge took to get to that
location.

GENNARO G. MARINO, PH.D., P.E.        137

Q. All right. Would you agree with me that if,
in fact, the barge struck the one or two panels that
are right at a point where you had a 23-foot sheet
pile next to a 35-foot sheet pile, that would be
pretty unlucky?

A. If it struck any of the panels, it would be
pretty unlucky.

Q. Well --

A. I mean, you know, any of -- any of the panels
that hit anywhere could have did similar damage.

Q. Is it your testimony that this barge would
have caused the sheet pile to be pulled out of the
ground and failed if it struck any panel along the
entire length of the eastern floodwall?

A. Well, it depends on the magnitude of the
force of the impact, and also, you know, the
conditions that surround that -- that area.

Q. Do you know whether any other panels along
the east length of the Inner Harbor Navigation Canal
contained connections between 23-foot lengths of sheet
pile and 35-foot lengths of sheet pile?

A. I'm not sure if that exists to the south or
not.

Q. All right. Let's turn to Photo 4.12. All

GENNARO G. MARINO, PH.D., P.E.     138

1    right.  You -- you wrote there, "Photo 4.12 depicts
2    the more gradual twisting of the wall at the south end
3    of the north breach."  Do you see that?
4        A.  Yes.
5        Q.  You wrote, "Torsion or twisting strains
6    greatest at the joints."  Do you see that?
7        A.  Yes.
8        Q.  What does that mean?
9        A.  Well, if you look at where the joint is, you
10   can see that there's a displacement, a twisting like
11   rotational displacement at the joint.
12       Q.  And what's happening here is that the -- the
13   force of water rushing into the neighborhood is moving
14   the wall back and creating torsion on the wall that's
15   still connected to the soil; isn't that right?
16       A.  Yes, in this instance.
17       Q.  And if you look with me, then, at the -- the
18   cracks in the concrete that you see, the vertical
19   cracks in the concrete, do you see the vertical cracks
20   in the concrete in the portion of the wall that's just
21   leaning a bit?
22       A.  I'm not sure which one you're talking about.
23       Q.  Why don't you let me circle for you the
24   cracks that I'm talking about.

GENNARO G. MARINO, PH.D., P.E.     139

1        MR. POLLARD:  Why don't you take the page out of
2    there rather than slide that whole thing across.
3    BY MR. RAFFMAN:
4        Q.  Am I right that as -- as water creates
5    torsion on the wall and the wall twists back, that
6    this twisting can create cracks in the concrete?
7        A.  Yes.
8        Q.  And the twist -- the crack that I've just
9    circled on this page is one of those cracks that you
10   attribute to the twisting motion of the wall under
11   force of the rushing water?
12       A.  Yes.  Or -- or it could also be from any
13   hydrostatic head that's up against the wall.
14       Q.  "Hydrostatic head," meaning water on the
15   wall?
16       A.  Yes.
17       Q.  Whatever it is, you're not telling us that
18   the crack that I've circled was created or evidences
19   impact by the barge?
20       A.  No.
21       Q.  All right.  Let's go back to Figure 4- -- 4.1
22   briefly.  This is the figure you told me earlier had
23   an extra panel in it that might not belong.
24       A.  Not panel, but sheet pile cross-section.

GENNARO G. MARINO, PH.D., P.E.     140

1        Q.  Right.  Which -- when this panel -- when this
2    tumbles out of the wall and twists, where does the
3    soil in front of it go?
4        A.  It gets washed out.  I think I discussed that
5    there was evidence of scour -- of scour on the north
6    end.
7        Q.  Let's turn, then, to the south breach.
8        A.  Where?
9        Q.  Well, I was using it metaphorically.  Do you
10   have an opinion about what the barge did or where it
11   went after it left the north breach site?
12       MR. POLLARD:  Objection.  Compound.
13       MR. RAFFMAN:  Well, that's a fair objection.  Let
14   me go back and ask a better question.
15       Q.  What did the barge do after it left the north
16   breach site?
17       A.  It went into the lower Ninth Ward.
18       Q.  Did the barge go directly from the north
19   breach site into the lower Ninth Ward?
20       A.  No.
21       Q.  What happened between the time the barge left
22   the north breach site and the time the barge went into
23   the lower Ninth Ward?
24       A.  It struck the south end of the south breach.

GENNARO G. MARINO, PH.D., P.E.     141

1        Q.  Is that the only place along the south breach
2    that the barge struck?
3        A.  No.
4        Q.  So before the barge struck the south end of
5    the south breach, what happened?
6        A.  As I explained in my report, there was a --
7    there was a primary collision in a northern part which
8    caused the wall to bow, and then there was a secondary
9    collision, which was a broadside collision, that
10   caused uniform displacement of the sheet pile to the
11   south, and then as the barge was essentially against
12   the wall in that location, it moves in a southerly
13   direction and sheared off the south end of the wall.
14       Q.  All right.  So we've got a three-stage
15   process, if you will, at the south breach.  You've got
16   a primary collision at the north where there's the
17   bow?
18       A.  Yes.
19       Q.  A secondary collision broadside in the area
20   south of that --
21       A.  I wouldn't say, "secondary."  I would say
22   it's a second primary collision.
23       Q.  Second primary collision.
24       A.  Yes.

GENNARO G. MARINO, PH.D., P.E.      142

1
2   Q. All right. And then third, you have the
3   barge moving to the southern part and shearing off the
4   concrete and bending rebar; right?
5   A. Yes.
6   Q. All right. Now, before your primary
7   collision at the northern bow, do you have an opinion
8   about where the barge went or how it got there?
9   A. No.
10  Q. So again, as with the north breach, you can't
11  explain how or why the barge got from one place to the
12  next?
13  A. That's correct.
14  Q. In order for the barge to do the kind of
15  damage it did, as you put it, the barge will need to
16  have some momentum to transfer to the wall; right?
17  A. Yes. Sufficient to initiate a failure.
18  Q. And what kind of momentum does the barge need
19  that would be sufficient to initiate a failure? It's
20  not a love tap, is it?
21  A. If you look at Figure 4-3, the type of impact
22  that we're talking about is where there's actually
23  sort of like a kickback displacement at the bottom of
24  the sheet pile which allows seepage forces to get onto
25  the backside and erode the materials on the back side.

GENNARO G. MARINO, PH.D., P.E.      143

1
2   Q. When you say, "seepage forces," you're not
3   talking now about seepage underneath the soil; right?
4   You're talking about water pushing directly on the
5   wall; right?
6   A. An impact induced gap which results in a
7   hydraulic connection because of this kickback below
8   the sheet pile, thus eroding the material on the back
9   side.
10  Q. All right. Let me ask, have you changed your
11  opinion of the barge impact at the south breach from
12  the time you gave your deposition last September?
13  A. Not that I can think of.
14  Q. All right. In your deposition last
15  September, you said, "The dramatic movement of that
16  bow, 180 feet into the neighborhood, is a result of a
17  very high impact barge being launched by the wind into
18  the wall at high velocity." Do you remember saying
19  that, or something like that?
20  A. No, I don't remember.
21  Q. All right. I'll show you Page 139 of your
22  deposition. I'll read it to you first.
23  "Q. And the movement of the
24  180 feet is a result, if I
25  understand your testimony right,

GENNARO G. MARINO, PH.D., P.E.      144

1
2   that dramatic movement of that bow
3   180 feet into the neighborhood
4   is a result of a very high
5   impact barge being launched by
6   the wind into the wall at high
7   velocity.
8   "A. Right. That's yes."
9   MR. RAFFMAN: You can read it if you'd like.
10  (The witness reviewed the document.)
11  THE WITNESS: Okay. When I say in here -- you
12  asked me about the velocity in the wind and the high
13  impact of the barge, I would say at the time of my
14  preliminary analysis that I hadn't thought out the
15  entire sequence as much as I have now. What I believe
16  occurred is that there is some impact force here which
17  allowed a gap to form, erosion below the back, and
18  then this wall moved outward.
19  BY MR. RAFFMAN:
20  Q. What kind of calculations have you done, if
21  any, regarding the amount of time that it would take
22  for erosion below the wall to create instability on
23  the land side upon impact by a barge?
24  A. I haven't done any calculations on that.
25  Q. Necessarily, however, necessarily --

GENNARO G. MARINO, PH.D., P.E.      145

1
2   A. Necessarily?
3   Q. Let me ask my question. You've concluded
4   that the barge caused the north breach at 6:00 a.m.;
5   correct?
6   A. Approximately.
7   Q. You've concluded that the barge -- I'm sorry.
8   You've concluded that the south breach actually
9   occurred and water rushed into the neighborhood at
10  6:30 a.m.; isn't that correct?
11  A. Approximately.
12  Q. The barge took how long to get from the north
13  breach to the south breach?
14  A. Approximately, half an hour or so.
15  Q. Half an hour or so. So what you're saying
16  is, if I understand you correctly, that when the barge
17  hits the wall at the south breach, translates the wall
18  back and allows seepage under the toe of the wall --
19  am I right that the seepage is going under the toe of
20  the wall?
21  A. Yes.
22  Q. And that seepage under the toe of the wall
23  almost instantaneously causes the wall to trans
24  back -- translate back into the neighborhood
25  unleashing the water at 6:30. Is that your testimony?

GENNARO G. MARINO, PH.D., P.E.        146

A. Well, let me -- let me -- the way you
rephrased -- you phrased the question, I got a little
confused. Okay? I believe at 6:30 is when the
flooding actually -- the massive flooding occurred.
So prior to 6:30, there was other phenomena going on
from the barge impact on the wall.

Q. Well, this is why I asked you how long it
took for the barge to get from one place to the other,
and you told me half an hour. Do you want to take
that back and give a shorter time?

A. I said, "approximately." I said "about this"
and "about that," and to tell you the truth, I didn't
consider that time period as being so rigid as you
did.

Q. Well --

A. I mean, it sounds like a trick question to
me. So --

Q. Believe me -- finish your answer. Go ahead.

A. I'm telling you what I -- what I believe.
Okay? And what I believe is that the flooding at the
south breach occurred at 6:30. Okay? Not the
failure. The flooding. Okay? So there's -- there's
several instances of yielding that are occurring or
localized failure prior to that.

GENNARO G. MARINO, PH.D., P.E.        147

Q. So we're going to take 6:30 as the absolute
back-end time for flooding?

A. No absolute back end.

Q. No?

A. No. You tell me anybody that has an absolute
back-end time.

Q. So the flooding could have happened later
than 6:30; right?

A. Yes.

Q. It could have happened as late as 7:00;
right?

A. I wouldn't think it would be that late, no.

Q. Sometime after 6:30?

A. Or a little bit before.

Q. What I'm trying to ascertain from you is what
time the barge made its primary collision at the north
breach as you say.

A. About 6:00 o'clock is when the flooding
started based on what Villavaso says.

Q. Now I'm trying to ask you what time the barge
made its primary collision at the south breach?

A. I don't know.

Q. It has to be between 6:00 and 6:30, doesn't
it?

GENNARO G. MARINO, PH.D., P.E.        148

A. Somewhere in there, yes.

Q. Would you agree with me that the barge isn't
going to travel more than six, seven feet per second?
Have you ever seen any calculations like that before?

A. There may have been some calculations in
the -- the IPET report on speed, but I don't remember
what those times were.

Q. How far is it from the site of the north
breach to the site at the northern bow at the south
breach. About half a mile?

A. You're asking me questions about finite
details that I did not really analyze because I didn't
think they were as relevant as the information that I
have in this report.

Q. Well --

A. I didn't go -- you know, if I had the time --
I didn't go minute frame-by-frame analysis of the
entire sequence.

Q. So you don't know how far it is from the one
location or another?

A. No, I wouldn't say that.

Q. How far is it?

A. It's around 2,400 feet.

Q. 2,400 feet. So between 6:00 o'clock and 6:30

GENNARO G. MARINO, PH.D., P.E.        149

a.m., the following events need to occur; right? The
barge needs to travel 2,400 feet from one location to
the next. It needs to create a primary impact, which
then activates seepage under the sheet pile. The
seepage under the sheet pile needs to progress to the
point where it undermines the soil on the back side of
the wall, and the wall needs to fail and flooding
starts; is that right?

A. Again, you're getting back into those time
frames, and again, there is some flexibility in that.
But in terms of the general sequence, what I'm saying
is that there's a primary collision at the north --
northern portion of the south breach, okay, that
caused the wall to deflect sufficiently to cause a
kickback in some displacement to the south, which
resulted in the back scour, which is observed in front
of the -- in front of the breach in this area, and
also erosion of the back side of the sheet pile.
(Indicating)
   To me this is the only way you can get a
vertical -- somewhat vertical bow of the sheet pile
and have it translate the extraordinary amount that it
did.

Q. I'm going to come back to those, I promise

GENNARO G. MARINO, PH.D., P.E.      150

you.

A. Okay.

Q. The question I asked, which I think you can answer "yes" or "no" is the following sequence of events is necessary between the north breach and the flooding from the south breach. No. 1, the barge travels approximately 2,400 feet to the south.

No. 2, a primary collision between the barge and the wall activates seepage underneath the wall.

No. 3, a secondary collision or second primary collision broadside activates more seepage under the wall.

No. 4, the barge strikes the wall and shears off the cap; correct?

A. That's correct.

Q. The second step, the primary collision can only occur after the barge travels that 2,400 feet; correct?

A. "The second step" meaning --

Q. In this four-step process that I've just described.

A. Yes. Yeah. It has to go that distance, obviously.

Q. The seepage that undermines the soil on the

GENNARO G. MARINO, PH.D., P.E.      151

back of the wall, in your -- your opinion, cannot occur until the barge makes its primary collision; correct?

A. That's correct.

Q. Such seepage is complete to the point of failing the wall within a matter of minutes of the primary collision; right? 15 minutes, 20 minutes?

A. I don't know. I mean, I would say it's less than a half an hour. I don't know.

Q. Now, you have not calculated the amount of seepage that occurs during that less than a half an hour; right?

A. That's correct.

Q. And you haven't calculated the effect of that seepage on the soil at the back of the wall in your seepage or stability analysis that you presented in your report; isn't that right?

A. That's correct.

Q. You could have done that; right?

A. I'd have to think about that one. That's not an easy calcu- -- I mean, I could -- sure, I could have fabricated something, you know. I mean, I could have put something in there, but I -- I don't know if I would believe what I put in there, and that's why I

GENNARO G. MARINO, PH.D., P.E.      152

didn't put it in there.

Q. Having not created that analysis, your result is that in the seepage instability analysis you did, your conclusion about the barge causing the failure of the wall is largely a process of elimination you've described earlier?

A. Yes.

Q. You testified earlier that you thought the barge hit so hard on the wall that it caused the homes to shake in the neighborhood when it hit, like an earthquake. Do you remember that testimony?

A. Yes.

Q. And is that another piece of test- -- do you still believe that to be true today?

A. Well, I think that that could be true with regards to the southern -- most southern collision, and as far as the most northern collision, I think it's still a viable possibility. And, in fact, there were three bangs heard. So there's also the -- the second primary collision.

Q. Once you activate this barge, would you agree with me that the barge is going to acquire momentum in the direction it's moving?

A. Yes.

GENNARO G. MARINO, PH.D., P.E.      153

Q. Would you agree with me that unlike, say, a canoe or a paper boat, once this barge acquires momentum in a given direction, it's going to take quite a force to redirect it in a different direction?

A. It depends on the -- it depends on the amount of momentum, and it depends on your stiffness -- I'm going to call it stiffness of the wall. Lateral stiffness of the wall. Obviously, if you've got a rigid wall -- right? -- and you're hitting it with a certain amount of momentum, you're going to get a larger force than if you have a wall that gives, and you have that same amount of momentum.

Q. And leaving aside the characteristics of the wall, would you agree with me that once this barge acquires momentum in a given direction, it's going to take a considerable force, whether from wall or from wind or from waves or from something else, a considerable force to redirect it in a different direction?

A. I'm not sure why you're saying that. I mean, it -- it hits at the primary location and then rotates around and hits at the secondary location. I don't understand why you're saying that.

Q. Does the barge transfer all of its momentum

GENNARO G. MARINO, PH.D., P.E.        154

1  to the wall at the primary location?
2      A.  I don't know if it does.
3      Q.  You haven't done that calculation?
4      A.  No.
5      Q.  If the barge -- let me ask it this way.  What
6  momentum will the barge impart to the wall that will
7  cause it to displace in the way that you've suggested?
8      A.  I don't have -- as I said before, from the
9  beginning, I don't have -- the methodology used in
10  developing this report and coming to my conclusions
11  did not include a barge impact response analysis.
12      Q.  Regardless of what you did in this report or
13  didn't do in this report --
14      A.  Well, you're asking me to speculate about
15  things that I don't think they're very easy to
16  speculate about -- I mean, easy to make conclusions
17  about.
18      Q.  Am I right, Dr. Marino, that in order to
19  transfer momentum to the wall, the barge must be --
20  the energy that's transferred to the wall is the
21  energy exerted perpendicular to the direction of the
22  wall?
23      A.  Yes.
24      Q.  Because the only direction of energy that's

GENNARO G. MARINO, PH.D., P.E.        155

1  going to cause the wall to deflect backward is that
2  energy which is exerted along that vector; right?
3      A.  Yes.
4      Q.  And for that reason -- for that reason,
5  you've got to have a broadside action of the barge on
6  the wall, not -- not necessarily the orientation of
7  the barge, but the barge has to be acting
8  perpendicular to the wall to move it in that -- to
9  deflect it in that manner?
10      A.  Well, that's different than what you said.
11      Q.  Let me -- well, let me ask it this way.  In
12  order for the barge to make the flood wall fail,
13  you've got to have some force that's driving the barge
14  into the flood wall; right?
15      A.  Yes.
16      Q.  And the barge has to strike the wall in a way
17  that causes the wall to impact and transfer its energy
18  into the wall instead of some sort of a glancing blow;
19  right?
20      A.  Well, there's -- there has to be enough force
21  to cause it to deflect.
22      Q.  The force we're talking about is force
23  exerted not in a glancing way oblique to the wall, but
24  it's the force that moves the wall back; right?

GENNARO G. MARINO, PH.D., P.E.        156

1      A.  I don't know what you mean by "glancing way."
2      Q.  Well, let's put it this way.  A glancing -- a
3  glancing blow, if the barge is traveling oblique to
4  the wall but primarily parallel to the wall --
5      A.  It depends on how much momentum that -- that
6  vector has relative to the inclination of the wall.  I
7  mean --
8      Q.  Right.  If the barge is traveling directly
9  parallel to the wall, it's never going to exert any
10  force to the wall?
11      A.  Right.  Exactly.
12      Q.  If the barge is traveling almost parallel to
13  the wall, let's say a 1 degree angle when it comes
14  into contact with the wall, only a small portion of
15  its energy is going to be transferred to the wall in
16  the direction of the wall falling backward; right?
17      A.  That's correct.
18      Q.  So the angle of approach is germane; right?
19      A.  Yes.
20      Q.  You don't know what angle the barge
21  approached the wall from, do you?
22      A.  No.
23      Q.  What you do know is that the barge was at the
24  north breach, which is on the wall; right?

GENNARO G. MARINO, PH.D., P.E.        157

1      A.  Yes.
2      Q.  And it traveled south to the south breach;
3  right?
4      A.  Yes.
5      Q.  You don't know how far back into the canal it
6  went when it again approached the wall at the south
7  breach?
8      A.  Right.
9      Q.  And you don't know the momentum of the barge
10  when it approached the south breach?
11      A.  Right.
12      Q.  And you haven't calculated whether the
13  momentum of the barge was sufficient to cause the wall
14  to deflect and create this gap in the manner you've
15  described?
16      A.  Right.
17      Q.  Look at Photo 4.19.  This is the photo you
18  were referring to earlier -- right? -- as a trench?
19      A.  4.19?
20      Q.  Photo 4.19.  Page 4-24.
21      A.  And your question was?
22      Q.  What inferences do you draw from this
23  photograph?
24      A.  Well, we can read what it says, "Photo of the

GENNARO G. MARINO, PH.D., P.E.      158

1
2  south part of the south breach.  The photo appears to
3  have been taken prior to Hurricane Rita as the ING4727
4  barge is to the east of the school bus but after
5  temporary levee material has been placed to the west.
6  The final resting place of the barge was on the bus."
7      Q. I'll tell you what -- and I'm sorry to
8  interrupt, but I didn't ask you to read it.
9      A. Well, I didn't know what inferences you were
10 talking about.
11     MR. POLLARD:  Hang on a second.  Why don't you
12 read it to yourself first, and when you're done, let
13 him know you're done, and then you can proceed with
14 your questions.
15     MR. RAFFMAN:  I'm going to even short circuit
16 that.
17     MR. POLLARD:  All right.
18     MR. RAFFMAN:  We're going to try to keep this on
19 an even pace.
20     Q. You wrote here that there's a trench and that
21 the trench could have resulted from displacement of
22 sheet pile from the lateral impact force of the barge.
23 Do you see that you wrote that in the middle of that
24 paragraph?
25     A. Yes.

GENNARO G. MARINO, PH.D., P.E.      159

1
2      Q. What do you mean by that sentence?
3      A. That seems simple to me.  I mean, I don't
4  understand why you're --
5      MR. POLLARD:  Just explain it to him.
6      THE WITNESS:  Okay.  The -- the movement of -- of
7  the sheet pile was to the south, okay, creating a gap
8  in front, not from scour but from this gap that
9  formed, and I also note in my report that there are
10 other instances of that that have similar -- similar
11 physical manifestations in some of these other flood
12 walls that are later on in the report.
13 BY MR. RAFFMAN:
14     Q. So you had other floodwalls that had a gap in
15 front of the wall from hydrostatic pressure; right?
16     A. That's correct.
17     Q. What you're saying is that a similar gap
18 formed here, but not from hydrostatic pressure?
19     A. That's correct.
20     Q. You're saying that instead of hydrostatic
21 pressure at this wall, you had a barge creating a gap?
22     A. That's correct.
23     Q. How long before the failure of those walls
24 did a hydrostatic gap form, if you know?
25     A. There seems to be, on those particular

GENNARO G. MARINO, PH.D., P.E.      160

1
2  instances, there was a large washout of material on
3  the back side, which caused the inclination.  My
4  opinion is that this failure occurred prior to
5  overtopping so that there wasn't -- and if there was,
6  the scoured trench on the other side wouldn't be
7  significant compared to what existed at these other
8  floodwalls, which allowed the wall to become more
9  inclined, significantly more inclined and cause a gap.
10     A salient difference between those
11 floodwalls gap and this one is that the sheet pile was
12 exhumed from it.
13     Q. The sheet pile was "exhumed," as you put it,
14 within no less than a half hour of the time of the
15 barge impact according to your calculation --
16 according to your report; right?
17     A. Approximately.
18     Q. Now, do I take it, then, that you are not
19 saying that the barge simply pulled the sheet pile out
20 of the soil?
21     A. I think this latter portion of the sheet
22 pile, that when the barge swung back over, it had
23 some -- it had some force into knocking the sheet pile
24 out of the ground.  I think it's a contribution of
25 that and the seepage forces underneath the tip.

GENNARO G. MARINO, PH.D., P.E.      161

1
2      Q. At the northern bow of the south breach, the
3  barge did not pull the sheet pile out of the ground;
4  correct?
5      A. That's correct.
6      Q. The water pulled the sheet pile out of the
7  ground; right?
8      A. Well, after -- after -- water caused the
9  sheet pile to come out of the ground after there was a
10 creation of the seepage around the tip of the sheet
11 pile.
12     Q. Well, suppose for a minute that there was
13 seepage around the tip of the sheet pile without a
14 barge.  I want you to assume that there was seepage
15 around the tip of the sheet pile without a barge.  I
16 want you to make that assumption.
17     A. All right.
18     Q. If that assumption is true, this failure
19 could occur without a barge; correct?
20     A. I guess if that assumption is true.  However,
21 if you look at all the other failures, there are none
22 which have this condition.  This is an exemplary
23 condition.
24     Look at Figure 4.2.  Photo -- I'm sorry.

41 (Pages 158 to 161)

GENNARO G. MARINO, PH.D., P.E.      162

MR. RAFFMAN:  Let's go off the record.  We've got a very short amount of time left on the tape.

THE VIDEOGRAPHER:  Going off the record at the end of Tape 4 at 14:37:24.

(A recess was taken from 2:37 p.m. to 2:50 p.m.)

THE VIDEOGRAPHER:  Back on record at 14:50:10.

BY MR. RAFFMAN:

Q.  Dr. Marino, please turn to Figure 4.2.  Do you have that in front of you?

A.  It's Page 4-55.

(The witness reviewed the document.)

THE WITNESS:  Okay.

BY MR. RAFFMAN:

Q.  You see this depicts wall movement in stages; is that right?

A.  That's correct.

Q.  All right.  Take a pen and put an "X" next to the place where the barge made its primary collision with the wall.  Just write "P" there.  Now, take the same pen and make an -- write an "S" next to the second collision with the wall, the place where you say the barge made its second collision.

A.  Second primary collision.

---

GENNARO G. MARINO, PH.D., P.E.      163

Q.  Second primary collision.  Fine.

A.  (Witness complies.)

Q.  Now, place a "T" next to the place where the barge sheared the top of the wall.

A.  (Witness complies.)  For "tertiary"?

Q.  Sure.  Now, you see in this photo that there is a hole that's protected by sandbags immediately outside of the place where you've marked a "P."  Do you see that hole protected by sandbags?

A.  Yes.

Q.  Do you know the origin of this hole?

A.  Yes.  I believe that this hole was the result of back scour from erosion below the sheet pile.

Q.  Explain what you mean by that.

A.  Basically -- let's go back to this other figure.  Let's see.  Figure 4.3, and what I'm showing in this dash line in front of the -- in front of the sheet pile wall is short of a conceptual illustration of this back scour.

Q.  So what you're saying is that as the sheet pile was driven backward by the barge, the bottom of the sheet pile rotated, and as it rotated, it scooped the soil up in the place where that hole is -- is created?

---

GENNARO G. MARINO, PH.D., P.E.      164

A.  No.  I'm saying that there's a -- there's a kickback and that there's now openings, channel openings for water to make its way underneath the sheet pile onto the other side.

<mark>Q.  All right.  So this hole reflects a place at which there were channels or openings for seepage to make its way to the other side?</mark>

<mark>A.  For a severe case.</mark>

Q.  Are you aware of any evidence that the location of that hole is at or near a place where there were excavations that were filled with sand?

A.  I'm not privy to that information.

Q.  If it turned out that that hole is at or near a place there were excavations that were filled with sand before Hurricane Katrina, would that affect your analysis?

A.  As I mentioned before, I didn't think it would effect play an analysis.  It may exacerbate the back scouring.

Q.  If in fact that hole were at a place that had been filled with sand prior to Katrina, wouldn't that hole create a place at which you could have seepage underneath the wall?

A.  As I said before, I felt that -- I feel that

---

GENNARO G. MARINO, PH.D., P.E.      165

there's not enough time for seepage as a result of, you know, what's been called "under seepage" to occur during the period of time of this flooding.

Q.  When you say, "under seepage," you're referring to seepage through the marsh layer; right?

A.  Any of the materials.  Any of the materials that are associated with under seepage.

Q.  And that could include under seepage through a tension crack in the wall; right?

A.  That's correct.

Q.  You've actually analyzed how long it would take water to penetrate through a tension crack in the wall; right?

A.  Tension crack in the wall?

Q.  A tension crack between the canal side soil and the floodwall.

A.  That's correct.

Q.  And you did that in connection with ILIT?

A.  That's correct.

Q.  And when you did that, you concluded that there wasn't sufficient time -- time for water to penetrate beneath a -- in a crack between the canal side soil and the wall; right?

A.  That's correct.

GENNARO G. MARINO, PH.D., P.E.        166

Q. But you haven't done the same calculation to
determine whether there was sufficient time for water
to penetrate sufficiently between the gap in the wall
created by the barge impact?

A. Exactly. You just look at the phenomena.
You don't need to do a calculation. I mean, you have
washout on the other side. You have a barge hitting
the wall. You know, the statement -- the facts are
the facts. I don't need to predict anything.

Q. Well, the fact of the barge hitting a wall is
something you back into after you eliminated all the
other causes; isn't that right?

A. That's correct.

Q. Now, how high was the level of the water on
the wall when you say the barge hit?

A. I think I say in the report it's about
11.8 feet elevation.

Q. Right. And that water level is the -- is the
same water level for each of the three collisions you
described; right?

A. That's right.

Q. Is there something different about the
collision that causes the bow at the north breach and
the one that causes the displacement in the middle and

GENNARO G. MARINO, PH.D., P.E.        167

the one that causes the shearing in the rebar bending
that can explain why three collisions between the
barge and the wall occurring at the same water level
would have three different results? I misspoke.

All right. What I meant to say is the
northern part of the bow at the northern part of the
breach.

A. That's pretty complex, but I think I
understand what you're saying. You have different
loading conditions. The northern part, you have the
corner of the barge hitting the wall. The southern
part, you have a broadsiding action, and you also have
witnesses saying that they heard grinding and banging,
which would be present -- would be consistent with
being in that second location.

And then the third, you have an entirely
different loading condition, which is essentially
parallel to the wall, and, in fact, shows a sign of
soil bending of that wall, indicating a southern
deflection or southern impact. So you have three
different forces, locations and orientations.

Q. Those are the inferences that you draw;
right?

A. Obviously.

GENNARO G. MARINO, PH.D., P.E.        168

Q. Nobody saw the barge hit the wall in these
three places is the way you suggest?

A. I don't think that -- that the detailed
accounts that we have from the eyewitnesses get into
the specifics on up.

Q. Did the barge shear off the top three feet at
the southern end of the breach before the flooding
began, in your opinion?

MR. POLLARD: Objection. Vague.

BY MR. RAFFMAN:

Q. At the south breach.

MR. POLLARD: Thank you.

THE WITNESS: When you say, "flooding," I don't
know what you mean by that.

BY MR. RAFFMAN:

Q. You've said that the time of flooding at the
south breach is 6:30; right?

A. Okay. As the north portion is moving to the
east, obviously there's some water getting over the
top, and there's also water getting from underneath.
So if you consider that in terms of your flooding
definition, then yes. My flooding definition is when
the massive amounts of water came over the breach
area.

GENNARO G. MARINO, PH.D., P.E.        169

Q. All right. Did the massive amounts of water
come over the breach area before the barge sheared the
cap at the southern end of the breach?

A. I don't believe so, no.

Q. The barge sheared the cap before the massive
amounts of water came over?

A. Yes.

Q. Have you done any calculations about what
would happen to a barge that's present when a massive
in-rush of water occurs into the neighborhood not more
than a few hundred feet away?

A. I haven't done any calculations, no.

Q. Can you say one way or the other whether you
would expect the barge in that location and in that
situation, with a massive amount of water a few
hundred feet away, to be drawn with that amount of
water in that situation?

A. Be what?

Q. To be drawn along with this massive in-rush
of water.

A. Yes. I believe that -- that the barge, once
the floodwalls failed, got carried into the -- the
Ninth Ward.

Q. Looking at Figure 4.2, can you say where the

GENNARO G. MARINO, PH.D., P.E.          170

area of the most violent flow of water was?

A. I would suspect it to be to the north of where the barge is.

Q. The barge was not carried along with that violent flow of water to the north, was it?

A. No.

Q. In fact, the barge came to rest a very short distance inside the lower Ninth Ward, didn't it?

A. Well, that's your terminology, "very short distance."

Q. Well, it's no more than a block away from the wall, is it?

A. Well, it's 100, 150 feet.

Q. Well, this water carried into the neighborhood and blew houses off for blocks, didn't it?

A. Yes.

Q. So compared with the many blocks of houses --

A. I mean, this -- that's another good example. I mean, this is a violent failure.  This is another difference that we have with the other floodwall failures that we don't have this violent failure mechanism.

Q. This is a violent failure mechanism in which

GENNARO G. MARINO, PH.D., P.E.          171

houses are blown off their foundations for blocks; right?

A. Yes.

Q. And in the middle of this violent failure mechanism in which houses are blown off their foundations for blocks, this barge travels 150 feet and nestles up against a couple houses without being drawn in with this violent water; right?

A. Yes, because it's on the south edge, where -- where the violent flooding is toward the north.  And I'm not sure -- here you're saying it just nestled up against.  To me, it looks like there's some houses crushed and other damage.  If you listen to some Arthur Murph's testimony, the way he describes it coming in is not floating in like you're talking about.

Q. Well, let's be clear about what Arthur Murph described.  Arthur Murph's testimony in his deposition said nothing about seeing a barge come in that way, did it?

A. Well, I -- I put more credence into his transcript.  We -- we can look back at the table and see what he says.

Q. Well, let's not.

GENNARO G. MARINO, PH.D., P.E.          172

MR. POLLARD:  Just answer his questions, Jerry.  Don't spontaneously go into other areas.

BY MR. RAFFMAN:

Q. Let me ask you a question about putting credence in a witness.  As an expert, you had to put credence in witnesses; right?

A. Yes.

Q. You had to decide which accounts were credible given the facts that you know to exist; right?

A. Yes.

Q. And so, for instance, you gave credence to Arthur Murph's transcript instead of his sworn deposition testimony; right?

A. Yes.  I mean, I would think that a guy who comes to his deposition with his own lawyer is a little bit paranoid.  Why is he paranoid?  You know, I would tend to believe the most impromptu discussion that he would have would have been the discussion prior to his deposition.

Q. And the same thing is true for another witness, Sidney Williams; right?

A. I don't know if I read his transcript or not.

Q. Well --

GENNARO G. MARINO, PH.D., P.E.          173

A. I think I did read his transcript, but it's been a while.  So I don't remember his.

Q. And Mr. Williams came to his deposition with his own lawyer too, didn't he?

A. I don't know.

Q. Let's just see if I can refresh your recollection here.  I asked you, "So in forming the opinions that led to the preparation of this report, you tended to credit the transcript of the interview with Sidney Williams more than you credited the deposition testimony?"  And you said, "Right."

A. Okay.

Q. Do you want me to show you that?

A. No.  Like I said, I hadn't read my deposition transcript.  I didn't have the opportunity.  I didn't have enough time to do that.

Q. But that helps you now to recall that, in fact, you credited Williams' transcript more than you credited his testimony?

A. Right.  I'd have to go back and figure out why that is.

Q. Why did the barge enter the neighborhood at the southern end of the south breach instead of the other places at which it collided at the same height

GENNARO G. MARINO, PH.D., P.E.        174

1  from the top of the wall?
2      A.  Because the forces -- the impact forces
3  weren't sufficient enough to cause it to enter.
4      Q.  What caused the barge to have a greater
5  impact force at the southern end of the south breach
6  than it had at the other two places that it touched
7  the wall?  Do you know?
8      A.  I would think it would be the -- the
9  direction of the wind.
10     Q.  Do you know what the direction of the wind
11  was at 6:30 in the morning on August 29?
12     A.  In a southerly direction.
13     Q.  Did you see any substantial damage sustained
14  by the barge?
15     A.  What do you mean by "substantial"?
16     Q.  Well, look at Page 4-58 of your report.
17     A.  Where are you referring to?
18     Q.  Bottom of the page.  Bottom of the last full
19  paragraph.  "Also these photos show that there was no
20  substantial damage sustained by the barge."
21     A.  Okay.  So what I mean by, "no substantial
22  damage" is that there wasn't a major indent of a
23  corner of a barge.
24     Q.  In fact, other than the scratches on the

GENNARO G. MARINO, PH.D., P.E.        175

1  bottom of the barge that match the rebar, you observed
2  no physical evidence on the barge that you can tie
3  with any specific impact on any part of the wall?
4      A.  My information on the damage wasn't as
5  detailed as what Dr. Cushing has or what you guys
6  have.  I worked off photographs that were provided to
7  me and what -- my conversations with Hector Pazos.
8      Q.  So if Dr. Cushing says that, apart from the
9  scratches on the rebar, the barge had no evidence of
10  impact with the wall at any other location, you have
11  no reason to disagree with him?
12     A.  I wouldn't say that.  I would have to see --
13  you know, if someone had produced their photographs
14  and their video and their notes of where these photos
15  were taken, I'd -- I'd say that I could be more
16  comfortable answering whether I agree or not.
17     Q.  As you sit here today, having reviewed
18  Dr. Cushing's analysis --
19     A.  I haven't.
20     Q.  You haven't reviewed his analysis?
21     A.  No.  I got it -- I got it Monday afternoon.
22     Q.  All right.
23     A.  I was in Kentucky giving a talk on Wednesday
24  at Kentucky University.  I didn't have time to do

GENNARO G. MARINO, PH.D., P.E.        176

1  that.
2      Q.  Let me ask you to look at Photo 4.14.
3      A.  Oh, yeah.  The infamous photo.
4      Q.  Why do you say it's "infamous"?
5      A.  Well, I mean, I did see that in Dr. Cushing's
6  report.  I did review, you know, some of what he said,
7  and I could save you a lot of questions, if you want,
8  or you could ask me and --
9      Q.  Why don't you save me some questions.
10     A.  Okay.  Good.  I don't know if I will.
11     Q.  All right.  I'll ask the questions.  We'll do
12  it the old-fashioned way.
13     A.  Okay.
14     Q.  Mr. Marino, do you have reason now to believe
15  that this photo was not taken during Hurricane
16  Katrina?
17     A.  Yes.
18     Q.  Would you agree with me this photo was taken
19  during Hurricane Rita?
20     A.  Yes.
21     Q.  Does the time that this photo was taken,
22  whether it's Hurricane Rita or Hurricane Katrina, is
23  that germane to the analysis in your report?
24     A.  Not really.

GENNARO G. MARINO, PH.D., P.E.        177

1      Q.  It merely represents an inference that you
2  drew that turned out not to be correct?
3      A.  Yeah.  And I'd like to explain that for the
4  record.  The photograph that I had -- I don't do a lot
5  of -- for this project in particular and others, I
6  don't do a lot of surfing the net to find the data.
7  And I had a photograph printed out, and, obviously, if
8  I would have seen this at that time, I would have
9  realized that -- in fact, I knew that the picture said
10  on it that it was during Hurricane Rita, and I looked
11  at it and I go, "I don't see anything in there that
12  indicates that to me," and it was just a bad
13  photograph I had.
14     Q.  So this was a photo that --
15     A.  Was printed off, and it was given to me and I
16  looked at it and I didn't see these details.
17     Q.  Let me ask you to turn, then, to Page 4. --
18  Photo 4.28 at the north end of the south breach.
19         MR. POLLARD:  What page is that on?
20         MR. RAFFMAN:  I'm sorry.  It's 4-33.
21         THE WITNESS:  The guy with the cell phone?
22  BY MR. RAFFMAN:
23     Q.  I believe that's a guy with a cell phone,
24  yeah.  And what you wrote there is "predominant

GENNARO G. MARINO, PH.D., P.E.        178

1  twisting and bending strains resulting in debonding in
2  bottom and spalling in upper portion of the wall." Do
3  you see that?
4      A. Yes.
5      Q. And is this another example of twisting and
6  bending that's created by the force of water pushing
7  the wall into the neighborhood and twisting those
8  portions of the wall as -- as it bends?
9      A. As it is induced by the barge.
10     Q. Well --
11     A. You know, the barge having an effect on the
12  wall in addition to the water effects that occurred
13  later on.
14     Q. I guess that's my -- that's my question,
15  Dr. Marino. I understand that you say that the barge
16  caused deflection of the wall at the site of the north
17  breach. Now, this photo was taken at the very edge of
18  that bow where it joins back up with the unfailed
19  floodwall. Do you see that? It's the north end of
20  the south breach.
21     A. Well, there might be some deflection on the
22  panel to the north, but that's approximately correct.
23     Q. Are you saying that the debonding and the
24  spalling in the upper portion of the wall is a direct

GENNARO G. MARINO, PH.D., P.E.        179

1  consequence of a barge impact on that precise portion
2  of the wall?
3      A. Indirect.
4      Q. Indirect consequence?
5      A. (Nods head.)
6      Q. So this photo does not reflect the barge
7  knocking concrete off the wall; right?
8      A. No. This would be too far north.
9      Q. Too far north?
10     A. Yes.
11     Q. So -- and if another expert were to opine
12  that this photo reflects an actual impact of the wall
13  with this precise section of the wall, you would
14  disagree with that?
15     A. That -- that the actual damage -- this
16  damage -- I mean, that the impact was at this location
17  right here (indicating)?
18     Q. Yes, sir.
19     A. I would think that would be the case.
20     Q. Now, you've got some horizontal scrapes
21  evident in this picture as well. Do you see those
22  horizontal scrapes on the wall?
23     A. Yes.
24     Q. Do you attribute those horizontal scrapes to

GENNARO G. MARINO, PH.D., P.E.        180

1  the barge scraping along the wall?
2      A. I don't have that in my report anywhere.
3  It's not -- not something that I concluded.
4      Q. All right. Different people can look at a
5  picture and reach different conclusions?
6      A. Like you and me.
7      Q. The answer to my question is "yes"?
8      A. Yes.
9      Q. All right. Let's look at Figure 4.31 --
10  Photo 4.31. Page 4-36. Now, we're looking in the
11  middle of the south breach where the greatest
12  horizontal curvature is present. You said, "Note
13  tensile debonding on the bottom parts of the panels
14  and compressive spalling on the upper segments." Do
15  you see that?
16     A. Yes.
17     Q. Now, again, "tensile debonding" suggests to
18  me that the wall is in tension and that the tension of
19  the wall as the water is pushing on it causes the
20  water to debond. Is that a fair interpretation of
21  what you wrote?
22     A. No. I think this is more of the final
23  deformation condition.
24     Q. All right. Do you attribute the final

GENNARO G. MARINO, PH.D., P.E.        181

1  deformation condition, and specifically the status of
2  the concrete on this portion, to be attributable to a
3  direct barge impact on that wall?
4      A. I think this is the curvature section. So as
5  I've discussed before, the primary collisions that I
6  believe are more north of this and south of this area.
7      Q. And so the answer to my question is "no."
8  The concrete damage you observed in this panel is not
9  the consequence of the barge hitting the wall and
10  knocking concrete off; correct?
11     A. That's correct.
12     Q. Let's look at 4.35. 4.35, it says, "The
13  south end of the south breach where the top of the
14  concrete wall has been sheared off"; right?
15     A. Yes.
16     Q. You wrote again, "Note tensile debonding due
17  to twisting and bending"?
18     A. Yes.
19     Q. The "twisting and bending" we're talking
20  about is twisting and bending under the pressure of
21  water; right?
22     A. I don't know about that. I mean, this --
23     Q. All right.
24     A. I don't know about that.

46 (Pages 178 to 181)

GENNARO G. MARINO, PH.D., P.E.      182

Q.  Would you agree with me that the sheet pile at this location is and remains a continuous length of sheet pile?

A.  Yes.

Q.  There is no location at which the sheet pile became separated at any point in the south breach; right?

A.  Yes, that's correct.

Q.  The sheet pile did not snap like a rubber band at any location in the south breach; correct?

A.  No.

Q.  That's incorrect?

A.  Yes, that's right.

MR. POLLARD:  What's correct?  The premise of his question is correct or incorrect?

THE WITNESS:  I seem to be answering your question wrong when you say, "correct" afterwards.

MR. RAFFMAN:  So far you've done very well, but let's make sure the record is clear.

Q.  Dr. Marino, do you conclude that the sheet pile snapped like a rubber band at any place in the south breach?

MR. POLLARD:  Objection.  Vague.

THE WITNESS:  Are you saying has it separated and

GENNARO G. MARINO, PH.D., P.E.      183

torn apart?

BY MR. RAFFMAN:

Q.  Yes.

A.  No.

Q.  The sheet pile did not cease to function as a continuous unit along the south breach; is that correct?

A.  Say that again.

Q.  Did the sheet pile cease to function as a continuous unit along the south breach?

A.  When you say, "function," what do you mean by "function"?

Q.  I mean -- well, if you don't understand my question, I'll -- I'll withdraw it.  Photo 4.43.  You wrote, "The south end of the south breach showing rebar bent landward, perpendicular and across construction joint."  Do you see you wrote that?

A.  Yes.

Q.  When you wrote, "perpendicular," what did you mean?

A.  Perpendicular to the alignment of the -- of the wall in its deformed shape.  If you were to look back, Mark, there's another picture that I actually added to the report later on because I thought it actually showed it better.  If you look at Photo 4.39.

GENNARO G. MARINO, PH.D., P.E.      184

Q.  All right.

A.  And you can see the rebar is basically perpendicular to the alignment of the wall.  For example, if you start at the north end, you'll see the inclination is different than towards the south end of the panel that's completely sheared off.

Q.  So would you agree with me, then, that if the rebar is bent perpendicular to the alignment of the wall and that the alignment of the wall reflects a greater tilt on one side of the photograph than the other, then it must be the case that the wall was tilted when the barge passed over?

A.  I don't know.  I mean, the -- the wall could have been -- I think that there was some tilt of the wall based on the banging that occurred as it was in its second collision location.  Another interesting thing about this photo and the other photo you pointed out is you can see at the south end where you have this concrete that's displaced in the southern direction, which is another indication of the -- of the barge entering the breach in a southerly direction.

Q.  All right.  So you conclude the barge entered the breach in a southerly direction; right?

GENNARO G. MARINO, PH.D., P.E.      185

A.  Yes.

Q.  All right.  And regardless of what caused the wall to tilt before the barge hit the rebar, would you agree with me that the orientation you've described suggests that the wall was tilted when the barge passed over it?

A.  I mean, to me, it's obvious that there was -- if you look -- I guess you're not understanding this.  Where are we?  Okay.  Look at Figure 2 -- or Figure 4.2.  If you notice the orange line, that's -- that's where the barge was.  Okay?  And you can see that line represents a deflected condition.  So there is deflection of the south end prior to that barge making its way southward and shearing that wall.  Another indication of that is this has a sinusoidal bowing or coiling of the wall.  You can see it in this photograph, but you could see it better in some previous photographs where I outlined.  I can show those to you if you want to see those.  (Indicating)

Q.  I actually -- I think you answered my question --

A.  Okay.

Q.  -- you know, and I will say, Dr. Marino --

A.  I get excited about this sometimes.

GENNARO G. MARINO, PH.D., P.E.        186

1
2   Q. No, I understand that, and I understand you
3   want to teach me things, but let's try to keep the
4   transcript crisp and clear.
5   A. Okay.
6   Q. I think you said it was obvious --
7   A. Yes.
8   Q. -- for whatever reason, the wall was tilted
9   before the barge passed over the rebar.  Is that fair?
10  A. Yes.
11  Q. All right.  Let me ask you about Photo 4.66.
12  This is --
13  MR. POLLARD:  What page are you on?
14  MR. RAFFMAN:  I'm sorry.  4-84.
15  MR. POLLARD:  Thank you.
16  THE WITNESS:  Okay.
17  BY MR. RAFFMAN:
18  Q. Am I right that this photo depicts a
19  floodwall breach on the west side of the Inner Harbor
20  Navigation Canal?
21  A. Yes.
22  Q. Would you agree that the barge did not have
23  anything to do with this floodwall failure condition?
24  A. There's no evidence of -- of that that I
25  could see, no.

GENNARO G. MARINO, PH.D., P.E.        187

1
2   Q. All right.  This photograph reflects a
3   floodwall with a lateral deflection of 15 feet at the
4   widest point and 160 feet long; correct?
5   A. But keep in mind that that 15 feet is at the
6   top of the wall.
7   Q. Now, the deflection of the wall will be
8   greater at the top of the wall than it will at the
9   base; right?
10  A. Yes.
11  Q. And what you see here is a lateral deflection
12  in a bow-like formation; right?
13  A. Yes.
14  Q. What caused the lateral deflection in a
15  bow-like formation at this location?
16  A. I didn't do a -- if you look at my report,
17  you'll notice in the beginning, I didn't really --
18  when I discovered -- described the floodwall damage, I
19  made reference to the fact that I did not do an
20  analysis of each one of these to find -- to give an
21  opinion about what caused the failure of each.  That
22  would have taken a lot more time to do --
23  Q. Well --
24  A. -- but I can show you where it says that.
25  Q. Do you have any reason to conclude that

GENNARO G. MARINO, PH.D., P.E.        188

1   something other than hydrostatic pressure caused the
2   lateral deflection of this bow at the west side of the
3   Inner Harbor Navigation Canal?
4   A. I -- I don't really want to get into what
5   caused the failure because, like I said, I didn't have
6   an opportunity to -- to research that.
7   Q. Well, you've concluded that this failure is
8   nothing like the failures you've observed on the east
9   side of the -- the Inner Harbor Navigation Canal;
10  right?
11  A. Right.  Deformation patterns and displacement
12  patterns, yes.
13  Q. But without knowing what forces are at work
14  in those other failures, isn't that a little harder
15  for you to conclude that the barge must have caused
16  the failure at the Inner Harbor Navigation Canal?
17  A. Well, the point is is we're looking at
18  deformation patterns and we're looking at displacement
19  patterns, and we're noticing that, you know, we've got
20  extreme conditions compared to these other -- other
21  floodwall failures.
22  Q. When you say, "extreme conditions," you're
23  talking about fact that at the Inner Harbor Navigation
24  Canal, you've got a much bigger bow and a much greater

GENNARO G. MARINO, PH.D., P.E.        189

1   displacement; right?
2   A. Well, I mean, and you have a deformation
3   pattern that's not the same.  You know, it's -- you
4   show me one that has a bow and then has a uniform
5   section.  Show me one.
6   Q. Well, it's got --
7   A. Show me one.
8   Q. So when you --
9   A. And show it to me being exhumed from the --
10  the levee.
11  Q. The different condition you're talking about,
12  then, to be clear is a bow with an extra uniform
13  displacement and the exhumed sheet pile from the
14  levee.  Those are the two things that to you
15  distinguish these --
16  A. Well, I think there's more.  I mean, I'm
17  sure -- I know you've read the report, and there are
18  other things that were pointed out that are distinctly
19  different.
20  Q. Well, let's go to -- apart from the shape and
21  the exhumed sheet pile, what is distinctly different
22  from the IHNC east and the IHNC west failures?
23  A. Okay.  Let's look at the --
24  Q. I direct your attention to 4. -- 4-80 and

GENNARO G. MARINO, PH.D., P.E.   190

4-89.

A. Thank you, Mark.

(The witness reviewed the document.)

THE WITNESS: I guess the other thing would be related to the signif- -- there's no significant debonding or shattering of concrete.

BY MR. RAFFMAN:

Q. And as we've talked about -- well, go ahead.

A. And also, you have bending at the ends that's less -- at least about twice as less than we have at the south breach.

Q. It's smaller?

A. Yeah. That's another point. I mean, that is another point.

Q. Can a breach in one location be smaller than a breach in another location and yet still result from the same forces?

A. Yes.

Q. I want to ask you about the London Avenue and 17th Street breaches, and I noted at Page 4-92 carrying over to 4-98 -- or I guess at 4-92, you said that the levee crowns on London Avenue were three to six feet below the levee crown for the IHNC east. Do you see that?

GENNARO G. MARINO, PH.D., P.E.   191

A. Yes.

Q. What is the significance of that observation?

A. That the levee crown on the flood side being that much lower in elevation allows that berm to become saturated quicker and create more -- or exacerbate the hydrostatic condition at the wall.

Q. Now, when you say the levee crowns were lower at those locations, you're talking about as a -- as a measure of NAVD 88 or some other measure?

A. Right. I mean, yeah, lower in the source that they -- they would flood quicker because -- because of their elevation.

Q. Well, just to be -- I understand you said that, but lower in what sense? Lower as an absolute measure of -- with respect to a vertical datum?

A. Yes.

Q. All right. By the way, what is the difference between MSL, NGVD and NAVD?

A. MSL, NGVD 29?

Q. Yes, sir.

A. MSL and N- -- NGVD 29 are basically the same datum. And the other datum is -- my understanding is in our area is 1 foot -- 1.05 feet lower.

Q. When you say, "in our area," you're talking

GENNARO G. MARINO, PH.D., P.E.   192

about New Orleans?

A. No, in our area of the project. Where the north and south breach are.

Q. All right. 1.05 feet difference, in your understanding.

A. Yes.

Q. All right. Does your number agree with the number in IPET or ILIT?

A. I think we had a problem with ILIT. I'm sure we'll get to that, but it was very confusing. I mean, we can go back in there and talk about that.

Q. No, let me go -- let me go back to the London Avenue -- the Inner Harbor Navigation Canal versus the London Avenue Canal. So we've established that there's a three to six foot difference in the levee toe according to a vertical datum; right?

A. Yes.

Q. And your testimony is that because of the difference in the levee toe, water would tend to exert hydrostatic pressure earlier on the London Avenue canal than it would on the Inner Harbor Navigation Canal in connection with the potential creation of tension cracks; right?

A. Well, if -- if you think about it, if the

GENNARO G. MARINO, PH.D., P.E.   193

berm becomes -- is saturated or becomes saturated quicker, then you would have that condition exacerbated to a greater condition.

Q. All right. Now, the saturation of the berm is also going to depend on the level of surge; right?

A. Yes.

Q. Have you compared the hydrograph at the Inner Harbor Navigation Canal versus the hydrograph at the London Avenue canal?

A. No. This is a general comment.

Q. But if the surge at the Inner Harbor Navigation Canal were three to six foot higher than the surge at the London Avenue canal at any given point in time, then your saturation would be equal between the two locations; isn't that right?

A. It would depend on the rate. It would depend on the rate.

Q. But --

A. You know, you have -- you have also a berm right adjacent to the canal. You know, the water is right there. Whereas the Inner -- Inner Harbor Navigation Canal, there's a waterfront area that -- that also, up to a certain elevation, requires saturation. So you have sort of in one sense a

GENNARO G. MARINO, PH.D., P.E.          194

1  protected area elevationwise to a certain level.
2      Q.  What is the first time, on the morning of
3  August 29, 2005, at which the berm at the London
4  Avenue canal became saturated?
5      A.  I have no clue.
6      Q.  What is the first time, on the morning of
7  August 29, 2005, at which the berm on the eastern side
8  of the Inner Harbor Navigation Canal became saturated?
9      A.  I don't know.
10     Q.  What time did the London Avenue canal failure
11 occur?
12     A.  I don't remember.  I think I did know at one
13 time, but I don't remember.
14     Q.  If -- if I ask you about the 17th Street
15 canal, would your answers be the same?
16     A.  Yeah.  I mean, this section is basically --
17 the point of this section, basically, is to discuss
18 the damage and compare that to that at the north and
19 south breach.
20     Q.  Right.  But you -- am -- am I correct that
21 you've drawn an inference that a tension crack on the
22 canal side of the Inner Harbor Navigation Canal was
23 less likely to develop than it was at the London
24 Avenue canal because the levee crowns were lower at

GENNARO G. MARINO, PH.D., P.E.          195

1  the London Avenue canal?
2      A.  Well, I made that inference with -- with the
3  assumption that you're talking about the same canal
4  level.  You're making -- you're extrapolating --
5  extrapolating that to different canal levels.
6      Q.  Right.  And if the canal levels were in fact
7  different, then your inference would be incorrect?
8      A.  No.  All I'm saying is that -- no, that's
9  correct.  If the levels were different, that's
10 correct.
11     Q.  All right.  I -- I'm going to keep going.
12 I'm at a good stopping point, but I think I'm going to
13 let the tape tell me when to stop.  All right.  I'm
14 going to move to Chapter 5 of your report.  I've been
15 waiting all day to get there.  Let's start digging in.
16     A.  Okay.
17     Q.  Chapter 5 contains your seepage instability
18 analysis; right?
19     A.  That's correct.
20     Q.  And Chapter 5 contains a number of different
21 tasks that you performed in order to develop your
22 seepage instability analysis; right?
23     A.  Yes.
24     Q.  The first thing you did was to profile the

GENNARO G. MARINO, PH.D., P.E.          196

1  ground surface conditions; right?
2      A.  Yes.
3      Q.  And then after you've profiled the ground
4  surface conditions, you have then created a soil
5  profile; right?
6      A.  Yes.
7      Q.  And after you do a soil profile, the next
8  thing you do is create, in Section 5.3, a -- an
9  analysis for the north breach; is that right?
10     A.  Section 5.3?
11     Q.  No, that's not right.
12     A.  No.  5.22.  5.22.  5.23.
13     Q.  We're flipping through here, and we're not
14 getting anywhere.  Let me just stop you there.  The
15 first two tasks were to create ground surface profile
16 and then to create a soil profile?
17     A.  Right.  Then 5.3 is the -- is where the
18 failure analysis starts.
19     Q.  Right.  Right.  So let's --
20     A.  I'm sorry.  The failure analysis starts at
21 5.6.
22     Q.  Right.  If I'm right 5. -- I thought that 5.3
23 was a strength analysis, is where you began to do soil
24 unit properties; right?  That's at 5-22?

GENNARO G. MARINO, PH.D., P.E.          197

1      A.  5.3.
2      Q.  5.3, and it's at Page 5-22?
3      A.  Yes.
4      Q.  So we understand, you've profiled the ground
5  surface, and then you create your soil layer profile
6  in 5.2; right?
7      A.  Right.
8      Q.  All right.  And then 5.3 is the place at
9  which you populate the soil layers with
10 characteristics of those layers?
11     A.  Yes.
12     Q.  These sections lay the important groundwork
13 for the seepage and stability analysis that you carry
14 out; right?
15     A.  Yes.
16     Q.  If your inputs in Sections 5.1, 5.2 and 5.3
17 are incorrect, you'll derive faulty results; correct?
18     A.  Just like anybody's analysis.
19     Q.  So the answer to my question is "yes"?
20     A.  And it depends on the relative degree.
21     Q.  Well, let's put it this way.  5.1, 5.2 and
22 5.3, the soil characterization, soil properties, those
23 are -- those are important to the results of your
24 seepage and stability analyses; right?

GENNARO G. MARINO, PH.D., P.E.          198

A. For anybody's analysis.

Q. Including your own?

A. Including IPET's, including ILIT's, everybody's.

Q. And yours?

A. Of course. I'm not any exception.

Q. Right. Part of the function of a trier of fact in this case is going to have to be to decide whether your soil characterization, soil properties are better than IPET's and ILIT's; right?

A. Say that again.

Q. Well, your -- your soil characterization, the soil profiles and the soil properties differ in significant respects from IPET and ILIT. Am I right?

A. Yes. Well, I -- obviously significant enough to cause the safety factor to increase 20 percent or so.

Q. And if your soil -- well, if your soil conditions are incorrect and, IPET's -- actually, you just answered that question. I'll withdraw it.

This is work you've done since your September of 2008 deposition; right?

A. Yes.

Q. All right. Let me ask you about the ground

---

GENNARO G. MARINO, PH.D., P.E.          199

surface profile. Why is the ground surface profile relevant to your analysis? 5.1.

A. Because it establishes the ground surface for your various analysis that you do.

Q. Now, directing your attention -- well, you wrote, "There were numerous and unsuccessful and time-consuming attempts to determine site topographic conditions and to obtain other known survey information." What did you mean to say by that?

A. We were frustrated in being able to obtain topo information. We tried a lot of different sources, and we weren't able to get anywhere. We spent a lot of effort on trying to get information in that regard.

Q. All right. Turning to Page 5-6. You wrote that the levee crown -- I'm sorry. In the second paragraph down, you wrote, "The crown elevation was taken at 6.0 feet NAVD 88. By considering the discoloration along the base of the concrete floodwall north and south of the south breach." Do you see that?

A. Yes.

Q. Do you conclude that at the time of Katrina, the crown elevation at the floodwall near the south

---

GENNARO G. MARINO, PH.D., P.E.          200

breach, the levee crown elevation was 6 feet?

A. I mean, that's a kind of an -- an average. I mean, on a -- on a -- I don't think it makes a hell of a lot of difference. It would be 6-1/2, but I think pretty much everybody assumed. This -- I guess this is a little bit conservative.

Q. The 6 -- the 6.0 feet NAVD 88 for the crown elevation was a value you consider reasonable enough to put in your report; right?

A. Yes.

Q. That's the value you took at the base of the floodwall north and south of the south breach, just to be clear about the report?

A. Yes.

Q. I am running out of time, but let me ask you, Figure 5.10 -- take a look at this figure for a minute.

MR. POLLARD: What page is it on?

MR. RAFFMAN: It's just before 5-9.

BY MR RAFFMAN:

Q. All right. This -- this figure shows the pre-Katrina and post-Katrina ground surface elevation through the south breach; right?

A. Yes.

---

GENNARO G. MARINO, PH.D., P.E.          201

Q. And do you see that the pre-Katrina is the blue line; right?

A. Yes.

Q. The post-Katrina is the purple line; right?

A. Yes.

Q. Am I right that there is a place between 30 feet and 55 feet to the east of the former floodwall location at which the post-Katrina ground surface elevation is higher than the pre-Katrina ground surface elevation?

A. Yes.

MR. RAFFMAN: All right. I think now we're going to stop for the next tape.

THE VIDEOGRAPHER: Going off the record at the end of Tape 5 at 15:48.

(A recess was taken from 3:48 p.m. to 4:04 p.m.)

THE VIDEOGRAPHER: Back on record at 16:04:35 on Tape 6.

BY MR. RAFFMAN:

Q. Dr. Marino, we have asked you to look at Figure 5.11 of your report. It appears just before Page 5-11. No, that's not it. It's the location of the available deep borings.

GENNARO G. MARINO, PH.D., P.E.        202

A. 5.11?

Q. Yes.

A. Okay.

Q. Did you -- what does this figure represent?

A. This figure represents a plot of borings that we were -- that were available to us and -- showing their approximate location.

Q. And is this the data that you relied on to form the soil profiles that you provide in your report?

A. Yes.

Q. Did you include any borings taken by the ILIT team within the borings that you relied on?  If you know.

A. I believe so, yes.

Q. Did you rely on soil borings different from those used by the IPET team?

A. I don't know which ones they relied on.

(The Reporter marked the document referred to as Deposition Exhibit 10 for identification.)

BY MR. RAFFMAN:

Q. Can you tell, by looking at Exhibit 10 or from memory, whether you relied on borings different

GENNARO G. MARINO, PH.D., P.E.        203

from those than the IPET team relied on?

A. I think we included all these borings.  Now, I don't know if this is a representation of all the borings they relied on.  It just says that this is a "Boring and CPTU Location Map."  I assume it is.

Q. Do you know whether you relied on borings or boring data that the IPET team did not have?

A. I don't know.

Q. Let me ask you to turn to 5, Figure 5.12, then.  This is your cross-section at the north end of the north breach.  Do you see that?  It's right in your 5 -- Page 5-12.

A. You asked me on 5-12.

MR. POLLARD: He wants you to turn to the chart.  Turn to the next page.  There you go.

BY MR. RAFFMAN:

Q. There it is.  There it is.  All right.  What is Figure 5.12?

A. That would be the cross-section at -- let's see where it is.  That would be shown on Figure 5.11.

Q. What does it represent?

A. It's my interpretation of what the conditions are at the north breach at the -- near the north end.

Q. Is this the soil profile that you used to

GENNARO G. MARINO, PH.D., P.E.        204

carry out your stability analysis of the north breach?

A. Yes.

Q. Does your soil profile for the north breach differ from the soil profile created by IPET?

A. Yes, I'm sure it does.

(The Reporter marked the document referred to as Deposition Exhibit 11 for identification.)

MR. RAFFMAN: I'm handing you what's been marked as Exhibit 11 to your deposition.

Q. Do you recognize Exhibit 11 as the IPET soil profile that relates to the north breach?  I'm referring now specifically to the upper graphic on that page.

A. Yes.

Q. Does your soil profile for the north breach differ from the soil profile used by ILIT?

A. I would say they differ, yes.

Q. All right.  Now, one of the -- one of the features of your soil profile -- let me ask you this question.  Why does your soil profile differ from IPET and ILIT?

A. I think one reason is because they, for some reason, did not use some of the borings on the

GENNARO G. MARINO, PH.D., P.E.        205

waterfront -- or a lot of the borings on the waterfront.  Another reason is these are more general profiles where ours are more specific to location.

Q. One of the main features that appears to me to differ is that there is an area below the western toe of the levee embankment where the fill appears to extend down to a maximum elevation of minus 18 feet.  Do you see that location?

A. Yes.

Q. Would you take a pen and circle the location that you're describing?

A. (Witness complies.)

Q. What --

A. Hold on.

Q. All right.  You've circled this brown indentation on the left side of the flood wall that goes down and digs down into the upper silt and clays of the marsh layer; right?

A. Yes.

Q. What soil sample do you use to derive this lobe?

A. This is -- this is based on the information provided in the Washington Group borings.

Q. All right.  Which borings -- referring back

GENNARO G. MARINO, PH.D., P.E.      206

1  to Figure 5.11. Which borings are you talking about?
2      A. I knew -- I mean, I would have been surprised
3  if you didn't ask about that, but that -- that's based
4  on -- if you look at a lot of the borings that are
5  given from the IPET figure, there's none really in the
6  waterfront area, not that many, and there's
7  considerably more data that's available through the
8  Washington Group at least to a depth of -- some of
9  them go down to 40 or so feet.
10      Q. I want to know what boring on 5.11 you used
11  to derive that lobe.
12      A. It was a combination of borings. I don't
13  know if I can explain it. There are borings that show
14  levee fill at a deep depth, and they they show it
15  as -- they say "levee fill." That was one of the
16  basis for using that. Another basis was I used the --
17  if we were to go back to the as-builts --
18      Q. I'm happy to have you go back to the
19  as-built, but I really would like an answer to my
20  question. I asked what borings did you use to derive
21  that fill, and if you can't answer my question, just
22  say, "I can't answer."
23      A. Well, I'm telling you how I got -- got to
24  that.
25

GENNARO G. MARINO, PH.D., P.E.      207

1      Q. Well, there are borings on 5.1. Can you --
2      A. I told you, I don't remember the number --
3  the boring number.
4      Q. Can you draw a circle around the locations of
5  the borings that you used to derive that? How many
6  borings is it?
7      A. There's probably like three or four borings.
8      Q. All right. How close to the wall -- how far
9  out from the levee wall does your lobe extend? It
10  extends no further than 50 feet; correct?
11      A. That's correct.
12      Q. Looking at Figure 5.11, what's the closest
13  boring to the levee wall on the canal side that you
14  used?
15      A. Repeat that, Mark.
16      MR. POLLARD: Hang on one second. I'm just going
17  to make a vague objection. Are you talking about the
18  closest one that he used to develop the lobe --
19      MR. RAFFMAN: Yes, sir.
20      THE WITNESS: I don't remember the specific
21  borings. I mean, obviously, they're in this area
22  where the lobe is.
23      MR. POLLARD: Give him your best estimate, then.
24      THE WITNESS: I would say I used 81 A and 79 A

GENNARO G. MARINO, PH.D., P.E.      208

1  and 77 A were some of the borings.
2  BY MR. RAFFMAN:
3      Q. When you ascribed a shear strength value to
4  that portion of the levee embankment, that lobe --
5      A. Okay.
6      Q. -- did you use only the values taken from
7  those three samples, or did you take an average of a
8  much larger number of samples?
9      A. That's not how we determine the shear
10  strength. We determine the shear strength as a unit.
11  So this would be a levee embankment unit material.
12      Q. So what you did was you used three samples to
13  determine that this lobe existed, and then once you
14  had determined that, you determined shear strength by
15  using a much larger number of samples to determine the
16  strength as a unit; correct?
17      A. Yes.
18      Q. Now, a levee embankment layer represents --
19      A. Now, samples -- by the way, I don't remember
20  samples strands being given for that particular
21  location. So what I'm saying is that if -- if you
22  look at the report the way it's laid out, it's kind of
23  obvious that what was done was that there were
24  different units of material determined, and then for

GENNARO G. MARINO, PH.D., P.E.      209

1  those particular units, all the data that we could
2  gather were then summarized and used to determine
3  the -- the properties of that unit. And that's true
4  for all the cross-sections.
5      Q. Well, you used a different process to
6  populate the shear strength than you did to
7  characterize the embankment itself; right?
8      A. Yes.
9      Q. So the shear strength of the embankment is
10  based on samples that are taken across the entire
11  levee embankment, whereas the configuration of the
12  embankment is based on only three samples taken
13  nearby?
14      A. Borings.
15      Q. Borings.
16      A. Yes.
17      Q. Correct.
18      A. Approximately three borings.
19      Q. All right. All right. Now, would you agree
20  with me that a negative -- a depth down to minus 18
21  feet is below the level of the water in the canal?
22      A. Yes.
23      Q. And it's below the level at which groundwater
24  would appear if you dug down that deep; right?

GENNARO G. MARINO, PH.D., P.E.        210

A. Yes.  I mean, it would depend on -- if you're talking about water infiltration, I mean, it would depend upon how -- how it was placed and, you know, the Corps used their standards.  I would assume that it was compacted to some level.

Q. Do you have any document -- well, in order to place -- let's be clear.  Levee embankment fill has to be placed; right?  It's not naturally occurring soil?

A. Yes, that's correct.

Q. And in order to place levee embankment fill down to a depth of 18 feet, somebody's going to have to build cofferdams or some other structures in order to get it down there without groundwater infiltration.  Am I right?

A. Well, I mean, I don't know.  You can do it in segments, short segments.  I don't know how it was done.

Q. You didn't look for any documentation to ascertain whether in fact WGI or the Army Corps of Engineers placed levee embankment down to a level of 18 feet?

A. It's not that I -- I didn't look.  I didn't find any information available.

Q. Did you look?

GENNARO G. MARINO, PH.D., P.E.        211

A. Of course.

Q. Because you found it quite unusual to have levee embankment fill placed down below that level; isn't that right?

A. That's correct.

Q. So rather than question the accuracy of the Washington Group one, two or three borings, whether that was in fact levee embankment, you chose to place your levee embankment down to a level that's 18 feet below sea level; right?

A. I used the information that I had.

Q. That was a choice you made?

A. Yes.

Q. Now, directing you to IPET, in IPET's report, do you see a sample that's marked IHBR-1?

MR. POLLARD:  Are we going back to Exhibit 10?

MR. RAFFMAN:  Yes, sir.

MR. POLLARD:  All right.

THE WITNESS:  Yes.

BY MR. RAFFMAN:

Q. Is that the sample that IPET used in order to characterize the soil nearest to the north breach?

A. I have no idea.

Q. All right.  Let me ask you about your

GENNARO G. MARINO, PH.D., P.E.        212

characterization of the south breach.  Am I right that the design cross -- well, let me go back to the north breach for a second.

The three WGI samples you relied upon characterized the soil down to 18 feet as "levee embankment."  Did I understand you right?

A. No.  They found levee embankment down below at that depth, and they had different fill materials above.

Q. What fill materials did they have above?

A. I don't remember exactly what they were.

Q. Could any of them have been sand?

A. There could have been some silty sand.  Could have been.

Q. Your -- your characterization of the profile based on those WGI samples doesn't include any silty sand, does it?

A. Well, that's -- I was going to explain to you that this was more of a three-dimensional analysis that was done in order to assess how this lobe would be configured.  One of the pieces of data that I relied upon was -- if I may now go to it.

Q. All right.  Figure 2.1.  Might that be the --

A. I'm getting there.

GENNARO G. MARINO, PH.D., P.E.        213

Q. All right.

A. Okay.  2.2.  There's a note during the construction that the shell material against the sheet pile on the flood side from 454 plus 40 to 56 plus 20 to be removed and replaced after iWall is complete.  So that silty sand with the shells, you know, using the Corps' own plans, that material was removed in the area next to the -- the sheet pile, and so that's how I came up with that configuration.

Q. Well, now let me ask you, when did WGI take the boring that included the silty sand in the -- in the characterization?

A. They took that in 2002.

Q. And it's your contention, then, that that material would have been replaced after 2002?

A. But that was -- that -- that boring is -- is not up against the wall, and if you look at the stratigraphy of those borings, those -- you would see that the borings are actually outside the toe of the flood side levee because you could see the hydraulic fill that exists in the upper part.

So using that deduction and the information given in -- in the as-built drawings, that's how I came up with the configuration I came up with.

GENNARO G. MARINO, PH.D., P.E.        214

Q. What did you deduce from the as-built drawing that caused you to characterize what the boring said was silty sand as something other than silty sand?

A. I did not deduce that it wasn't silty sand. Okay. What I deduced was that there is a pattern, this lobe pattern which exists going north to south that fits the specifications or the as-built instructions and also includes where the silty materials and shelly materials are above the levee soils that were determined by the Washington Group in their borings.

Q. The plans, the as-built plan was done in 1969; right?

A. That's correct.

Q. The Washington Group boring was done in 2003; right?

A. Right. And what I'm saying is that -- if you look at it in 3D, you can see how those two -- how the borings can be consistent with the instructions given in the 69 plants.

Q. And what you inferred, then, was that at some point after 2003, the silty stand that you did not include in your characterization --

A. No, it's in there.

GENNARO G. MARINO, PH.D., P.E.        215

Q. The silty sand is included? No, of course not.

A. Yeah, it is. At this location, the silty sand is not at this depth. Okay. The silty sand is north of this, and it's -- you know, it's out from the wall.

Q. Well, you've omitted the silty sand from what you've put in here.

A. This is a cross-section that's representative of the north end and not north of the north end.

Q. How do you know the silty sand didn't continue downward? How do you know where the silty sand ended?

A. Well, like I said, I assumed that the Corps did what they said they -- they were going to do. It's an as-built plan. They didn't cross it out and say, "We're not done."

Q. You assumed that the Corps dug cofferdams down to 18 feet and plugged it in with levee embankment fill that you calculated at 722 pounds per square foot?

A. Well, I -- you're now jumping to a whole bunch of other things that I did not --

MR. RAFFMAN: All right. I'll withdraw the

GENNARO G. MARINO, PH.D., P.E.        216

question.

Q. The characterization of the levee embankment that you've done in this 5.12 is based on assumptions you've made about work the Corps did; right?

A. Right. And the boring information.

Q. The boring information tells you that there were silty sand in certain locations that you haven't included; right?

A. I'm saying that if you use more boring information than just those few holes and you use the information about the as-built, there is a consistent picture that comes to view about this material.

Q. The view that comes in as you've described it is the Corps went ahead and placed levee embankment fill down to a level of minus 18 feet; right?

A. That's correct.

Q. But you don't have any documentation of the work that was actually done to carry that out?

A. Other than the boring saying that the levee fill was that -- to that elevation.

Q. And the boring doesn't provide any information except that it says, "LE" at a certain location?

A. It says, "levee fill."

GENNARO G. MARINO, PH.D., P.E.        217

Q. "Levee fill." All right. Your characterization of the south breach is contained at Figures 5.13 and 5.14; correct?

A. Yes.

Q. Does your characterization of the south breach include the Jourdan Avenue canal that was filled in?

A. No. I mean, we're not showing any fill, and I think it's similarly represented in the ILIT and IPET. You don't see any really distinct modeling for that area.

Q. Does the design cross-section of the wall include the Jourdan Avenue drainage canal?

A. Does the design cross-section?

Q. Yes. The design cross-section.

A. You're talking about in 60 something?

Q. Correct.

A. Yes.

Q. And this canal was filled in the 1990's with imported fill. Do you understand that?

A. Yes.

Q. Your seepage instability analysis do not include the imported fill in the Jourdan Avenue canal, do they?

GENNARO G. MARINO, PH.D., P.E.          218

1
2    A. No.
3    Q. Your characterization of the soil at the
4  south breach does not include sand filled excavations
5  resulting from work by the Army Corps contractor on
6  the east bank industrial area, does it?
7    A. I'm not sure about sand fill and that
8  business. So you'd have to show me -- if you have
9  references of that, I'd like to see the references.
10    Q. I understand that, but in any event --
11    A. And also, you know, the references that you
12  have that you mentioned earlier in my deposition about
13  the welds at the north breach, that would be very
14  helpful too. The poor welds.
15    Q. Plaintiffs' counsel didn't supply you with
16  any information about poor welds, did they?
17    A. I haven't seen anything about it, and I --
18  it's not like I haven't read enough of it, and I would
19  think it would have played a part in IPET's analysis
20  if it was important. I didn't see it. I didn't see
21  it in ILIT's analysis. Now it comes up here that
22  there's poor welds. I'm wondering where the hell the
23  weld is coming from.
24    Q. Have you read the report of Mr. Pazos?
25    A. No.

GENNARO G. MARINO, PH.D., P.E.          219

1
2    Q. Just so I've got it -- got it clear about the
3  sand filled excavations, you haven't seen any
4  information about these sand filled excavations I
5  referred to, have you?
6    A. Not specifically of what -- of documentation
7  of these excavations and that there was sand placed in
8  them, no.
9    Q. So therefore, necessarily, your seepage
10  instability analyses did not include sand filled
11  excavations in the analysis; correct?
12    A. That's correct.
13    Q. All right. Now, I want to turn, then, to
14  the --
15    A. By the way --
16    MR. POLLARD: Hang on. No question pending.
17    THE WITNESS: Okay. Sorry.
18  BY MR. RAFFMAN:
19    Q. Actually, why don't I give you the
20  opportunity to augment your prior answer. What else
21  do you want to say?
22    A. Well, it wasn't -- Mark, I was just going to
23  straighten out something for you. I didn't want you
24  to be confused later. Somehow this section here in
25  Figure 15.13 (sic) should be Figure 5.14, and then

GENNARO G. MARINO, PH.D., P.E.          220

1  5.14 should be 5.13.
2    Q. You've transposed the two figures?
3    A. Well, actually, they're the right figures but
4  this one -- they're out of order, basically.
5    Q. Does Figure 5.14 represent the east/west
6  cross-section 2-2?
7    A. Yes.
8    Q. And Figure 5.13 represents cross-section 3-3?
9    A. Yes. But, I mean, this one should be before
10  this one (indicating).
11    Q. I understand, because the 5.14 is actually to
12  the north of 5.13; right?
13    A. Very good.
14    Q. All right. Let's go to this levee embankment
15  value that I alluded to. Referring you to Figure
16  5.42.
17    A. 5.42.
18    Q. It's right near Page 5-64 and 5-66. It
19  should be 5-65.
20    (The witness reviewed the document.)
21    THE WITNESS: 5.42.
22  BY MR. RAFFMAN:
23    Q. You know -- you got it, but before we go
24  there, you mentioned this as-built drawing where there

GENNARO G. MARINO, PH.D., P.E.          221

1  was going to take out some -- take out some shells and
2  put in some -- something else; right?
3    A. Yes.
4    Q. Did you see any evidence in any of the expert
5  reports that you looked at that in fact the failed
6  section of the levee after Katrina evidenced the
7  remains of a wooden plank road or an oyster shell
8  road?
9    A. There was evidence of shells that were from
10  scouring, from flooding and eroding this road out. If
11  you look at the Washington Group report, they talk
12  about the shells being used for this embankment. In
13  terms of a wood plank road, I don't really know
14  anything about a wood plank road.
15    Q. I'm talking now about --
16    A. If you have some data on a wood plank road, I
17  would like to see it because I don't know what you're
18  talking about.
19    Q. You haven't seen any pictures or any other
20  evidence that suggests that embedded within the levee
21  fill embankment were the remains of either a layer of
22  oyster shells or wood or anything else like that?
23    A. No.
24    Q. And if you saw something like that, would it

GENNARO G. MARINO, PH.D., P.E.        222

1  be something you'd be interested in?
2     A.  Of course.
3     Q.  The reason you'd be interested in such a --
4  such evidence is it would necessarily be taken into
5  account in your characterization of the --
6     A.  I want to do an accurate characterization,
7  exactly.  That's why if you look at my profiles,
8  they're a lot more detailed than what the birthday
9  cake ILIT profile is or the IPET profile is.
10    Q.  To be clear, you've created a lot more
11 detail, but the detail --
12    A.  It took a lot of work to get that detail.
13    Q.  Based on a very small number of samples;
14 right?
15    A.  More samples than were used by ILIT and IPET.
16    Q.  But the number of samples you used to
17 create --
18    A.  When I say, "samples," I'm talking about
19 boring.
20    Q.  Boring.
21    A.  You keep saying, "samples," but I mean -- I
22 know you mean borings, but I just want to make that
23 clear.
24    Q.  I'll try to use the right word, but to be

GENNARO G. MARINO, PH.D., P.E.        223

1  clear, the lobe you created is based on a very small
2  number of borings?
3     MR. POLLARD:  Objection.  Argumentative and
4  vague.
5  BY MR. RAFFMAN:
6     Q.  Three borings?
7     A.  It's -- it's a few borings.  That's correct.
8     Q.  All right.  Can you tell me what the error
9  rate is for soil borings?
10    A.  The error rate?
11    Q.  Error rate.
12    A.  What kind of error rate are you talking
13 about?
14    Q.  Is there -- is there an error rate for soil
15 borings?
16    A.  I don't know.  I've never had anybody use
17 that.
18    Q.  And I think you said earlier that
19 characterization of soil is -- involves a considerable
20 amount of judgment?
21    A.  I said that the characterization of soil
22 involves -- when you're talking about characterization
23 of soil, are you talking about the stratigraphy, or
24 are you talking about the soil properties?

GENNARO G. MARINO, PH.D., P.E.        224

1     Q.  No, let me -- let me be clear.  The drawing
2  of a -- a drawing like Figure 5.12 involves a
3  considerable amount of judgment; right?
4     A.  5.12.
5     Q.  It's the drawing of the north breach with the
6  lobe.
7     A.  Okay.  Well, judgment based on the boring
8  information that's available.
9     Q.  So the answer to my question is yes, it
10 involves judgement?
11    A.  Just like any other profile that's drawn by
12 anybody else.
13    Q.  All right.  Your Figure 5.12 -- let me ask
14 you a separate set of questions.  Did you read a
15 report by Robert Bea and Mr. Cobos-Roa?
16    A.  I didn't read it.  I did -- I have a copy of
17 it, and I used some of the photographs from it.  It's
18 a draft copy.  I didn't have a chance to read it.
19    Q.  It's included in your reliance materials;
20 correct?
21    A.  That's correct.  In terms of air photos.
22    Q.  Do you know whether that report contains
23 information on the backfill of holes by Washington
24 Group International?

GENNARO G. MARINO, PH.D., P.E.        225

1     A.  Information?  I -- I tried to find the
2  information.  I couldn't find the reliance documents.
3  Dr. B is the same one that's saying that this marsh
4  layer originally had this very high permeability and
5  under seepage was going to happen throughout the
6  New Orleans area.  So he was a major part of the ILIT
7  report.  I'm not going to say anything about that
8  report until I have a chance to evaluate it.
9     Q.  When you say, "that report," you mean the B
10 and Cobos-Roa report, that report that's included in
11 the materials that were supplied to us by your office
12 as reliance materials?
13    A.  That's correct.  And they were reliance --
14 they were reliance materials for the air photos.
15    Q.  The air photos, but you disregarded the
16 information about the backfill?
17    A.  No, Mark.  I didn't disregard it.  I just
18 didn't have time to look at it.  I looked at it.  I
19 looked at the flow lines, and it looked kind of funny
20 to me.  I didn't go any further than that.  I didn't
21 feel like it was responsible on my part to make
22 comments on a report that I really didn't have a
23 chance to review.
24    Q.  All right.  I want to ask you about this

GENNARO G. MARINO, PH.D., P.E.        226

1  value that's on 5.42 for the levee embankment.  You've
2  taken a -- a shear strength value of 722 pounds per
3  square foot, Page 5.42; right?
4      A.  Page 5.42?
5      Q.  I'm sorry.  Figure 5.42.
6      A.  Okay.
7      Q.  Your value is 722 pounds per square foot?
8      A.  That's correct.
9      Q.  That value corresponds to a value of about
10 .361 tons per square foot; right?
11     A.  Yes.
12     Q.  The value of .361 tons per square foot is
13 reflected on Page 5-23 of your report; right?  Let's
14 flip back there.
15     A.  What page did you say?
16     Q.  5-23.
17     A.  Yes.
18     Q.  All right.  And am I correct that the value
19 you derived of 722 pounds per square foot comes from a
20 total of 13 available unconfined compression and 1
21 vein shear test in the levee fill?
22     A.  That's correct.  That's all the information
23 that was available.  I think it's more than a
24 reasonable number.  I know that ILIT used 900 in some

GENNARO G. MARINO, PH.D., P.E.        227

1  of their numerical work.  So it may be even higher.
2      Q.  But you took -- to be clear, you took an
3  average of 13 samples; right?
4      A.  I didn't take the samples.  These are -- this
5  is information that was testing information that was
6  available to us.  If there's additional testing
7  information that is available to you that you know of,
8  I would appreciate it.
9      Q.  You derived the value of 722 pounds per
10 square foot based on an average of 13 samples; right?
11     A.  That's correct.  Well, no.  No.  I took out a
12 high outlier.  So it's actually -- I took out the
13 most -- the highest strength value because I felt like
14 it was way outside the group.
15     Q.  All right.  You took an average --
16     A.  These don't lean back, do they (indicating)?
17 MR. RAFFMAN:  Off the record.
18 THE VIDEOGRAPHER:  We're going off the record at
19 16:46:42.
20          (A recess was taken from 4:46 p.m.
21          to 4:48 p.m.)
22 THE VIDEOGRAPHER:  Back on record at 16:48:48.
23 BY MR. RAFFMAN:
24     Q.  Now, again, the -- the value you derived is

GENNARO G. MARINO, PH.D., P.E.        228

1  based on an average of a certain number of samples;
2  right?
3      A.  Yes.
4      Q.  And that number of samples is somewhere in
5  12, 13, 14; right?
6      A.  There's 14 samples.
7      Q.  All right.  The values of those samples
8  ranged from .170 to .1598 even after you excluded your
9  high outlier; right?
10     A.  No.  That's the outlier.
11     Q.  The 1.598 is your outlier?
12     A.  Yes.
13     Q.  All right.  What's your next highest value?
14     A.  I don't have it in here.
15     Q.  What was the range of the samples that were
16 reported from which you took the average?
17     A.  Well, it started at 1. -- at .17, and it went
18 to some value.  I don't know what that value is.
19     Q.  .17 is -- equates to about 340 pounds per
20 square foot; right?
21     A.  Not about.  That's exactly right.
22     Q.  All right.  And that is less than half of the
23 value you derived as the average; right?
24     A.  Okay.

GENNARO G. MARINO, PH.D., P.E.        229

1      Q.  So --
2      A.  So, I mean, if -- you can also look at it
3  this way, Mark, is that I didn't take the low outlier
4  out.  I only took the high outlier out.
5      Q.  I guess what I'm trying to get at,
6  Dr. Marino, is that there's a considerable variation
7  in the values for the samples in this layer; right?
8      A.  I would say that that's -- I'm not -- I mean,
9  to me, from my experience, I'm not surprised.
10     Q.  When you average values, you tend to arrive
11 at a value that is higher than the lowest and lower
12 than the highest; right?
13     A.  Somewhere in there.
14     Q.  By definition, you --
15     A.  I mean, you would take a look at the samples
16 too.  I mean, if there's something unusual about some
17 of the samples, you might discard those as well.
18     Q.  Am I right that the only source of soil
19 geometry data is the in situ cone test as shown in
20 ILIT?
21 MR. POLLARD:  Objection.  Vague.  Lacks
22 foundation.
23 THE WITNESS:  I -- I --
24 MR. POLLARD:  Hang on.  Let me state the

GENNARO G. MARINO, PH.D., P.E.          230

1  objection before you answer.
2          Objection.  Vague and lacks foundation.
3          THE WITNESS:  Can you repeat the question?
4  BY MR. RAFFMAN:
5          Q.  Am I right that the only source of soil
6  geometry data is the in situ cone test as seen in the
7  ILIT reports?
8          MR. POLLARD:  Same objections.
9          THE WITNESS:  Soil geometry data.  I don't
10  understand that.
11  BY MR. RAFFMAN:
12          Q.  All right.  You did not use the in situ cone
13  test shown in the ILIT report, did you?
14          A.  I wouldn't -- I used them, but not for the
15  purposes of strength.
16          Q.  You're aware that the design cross-section of
17  the levee embankment is 500 pounds per square foot?
18          A.  I'm sorry.  I was tangled up here.  Could you
19  say that again.
20          Q.  You're aware that the design cross-section of
21  the levee embankment is 500 pounds per square foot?
22          A.  Design cross-section --
23          Q.  Yes.
24          A.  -- of the levee embankment --

GENNARO G. MARINO, PH.D., P.E.          231

1          Q.  Was 500 pounds per square foot?
2          A.  I don't understand the question.
3          Q.  Well, maybe I'm using the word wrong.
4          A.  I think you're saying the strength?
5          Q.  The design strength.  The design strength of
6  the levee embankment layer is 500 pounds per square
7  foot; correct?
8          A.  Okay.  I -- I believe -- and I haven't looked
9  at it.  But I think I've read that instability
10  analyses that were done during the period of design
11  that a 500 pound per square foot value was used.  To
12  me, that doesn't really mean that that was the value
13  that was achieved.  I don't know how that relates
14  to -- in design, you would use a lower value to be
15  conservative.  Here we're looking at a forensic
16  analysis, and we want to be as accurate as we can.  A
17  design engineer would look at it that way.
18          Q.  Does the Army Corps of Engineers have
19  specifications for the strength of levee fill?  Do you
20  know?
21          A.  I -- I know that they have target values and
22  that they use -- for example, I have a project in
23  Mississippi.  It's a levee project, and they did an
24  assessment of strength with compaction levels to

GENNARO G. MARINO, PH.D., P.E.          232

1  ensure that they had enough compaction in the material
2  to reach a minimum of a certain strength.  So if
3  your -- if your compaction requirements are higher
4  than that and those are the minimum compaction
5  requirements, you're likely to have much higher actual
6  in situ values.
7          Q.  If a person familiar with the Army Corps of
8  Engineers, practices in the New Orleans area, were to
9  testify that the ordinary practice of the Army Corps
10  of Engineers in that area was to use levee fill with a
11  strength of somewhere in the 400 to 500 pounds per
12  square foot range, do you have any basis in anything
13  you've experienced to disagree with that expert?
14          A.  I would disagree with it if it is a design
15  value that you're talking about because the design
16  value is not what the value in the field is.
17          Q.  I'm talking about the practice of the Corps.
18  Do you have any basis to disagree that the practice of
19  the Corps was to use --
20          A.  I fundamentally -- I fundamentally disagree
21  with that interpretation.
22          Q.  Based on what?
23          A.  Based on the fact that I just explained to
24  you, that those are design parameters.  They're the

GENNARO G. MARINO, PH.D., P.E.          233

1  design values.  They're not the values as they are in
2  the field when the material is compacted.
3          Q.  Well, is it common practice for the Army
4  Corps of Engineers to exceed design parameters?
5          A.  I would say, as a prudent design engineer,
6  you want to use not the maximum levee value.  You want
7  to use a lower bound value that you can rely on.  I
8  mean, Mark, you have to realize there's a difference
9  between design approach and what reality exists.
10  It's not the same thing.  I've had to have these
11  conversations with other engineers about, you know, if
12  we're doing a forensic analysis, don't take a design
13  approach.  Well, this is conservative.  Well, that's
14  not actually what happened.
15          Q.  Well, let me ask you a question about being
16  conservative.  Am I right that a place along a wall is
17  going to fail at the weakest link?
18          A.  What kind of wall in what kind of conditions?
19          Q.  Let's say you've got variations in the
20  strength of soil along the wall.  All right?
21          A.  Okay.
22          Q.  I'm going to ask you to assume that the
23  variations are over sufficient enough length, be it a
24  panel or two panels or five panels, that it could

GENNARO G. MARINO, PH.D., P.E.     234

1  matter to the failure.  All right?  Can you make that
2  assumption?
3     A.  You're saying there's enough variation
4  that -- in the soil that you would have a failure?
5     Q.  Well, what I'm saying is that if there's
6  variation in the soil of a particular length, you
7  would expect to have the failure at the place where
8  the soil is the weakest?
9     A.  If you had other uniform conditions.
10    Q.  All right.  So when you have variation in the
11 samples that you analyze and when you average them,
12 what you're doing is you're diminishing the force of
13 the weakest of those samples.  Isn't that true?
14    A.  You know, it depends on how localized the
15 condition is, and if you're talking about a massive
16 failure, you're going to get more averaging that
17 occurs.  So, you know, if you're looking at a design
18 approach, that's a different story.
19    Q.  Well, I'm actually asking --
20    A.  If you're looking at a design approach, I
21 would lend -- tend towards being more conservative,
22 and I would tend to use a lower variation.  Okay.
23 Because I want to be more on the safe side.  If I'm
24 looking at a forensic job and I'm trying to figure out

GENNARO G. MARINO, PH.D., P.E.     235

1  what I think is actually there, okay, then I'm going
2  to use more of an average value.
3     Q.  Well, when you have a variation of samples
4  and you average them, aren't you raising the value of
5  the weakest link?  Isn't that true?
6     A.  You know, there's a lot of -- there's a lot
7  of things that go into soil strength and the type of
8  test that's being done and the nature of the material
9  and, you know, I've seen a lot of lines drawn through
10 plots which show data on both sides.  You know, I
11 don't think I'm alone on thinking about it this way.
12       If you want to take more of a novel approach
13 in saying that the weakest link theory in terms of
14 soil strength -- I don't know if you can go that way,
15 but you can if you want to.  I wouldn't go that way.
16    Q.  Well, all right.  I'm just asking about the
17 effect of -- of an averaging process.
18    A.  I understand.
19    Q.  Speaking of lines drawn through plots, don't
20 you expect to see a line that carries the sigma of
21 0.23 as you move down the soil profile?
22    MR. POLLARD:  Objection.  Vague.
23    THE WITNESS:  Yeah.  You'd have to -- what do you
24 mean?

GENNARO G. MARINO, PH.D., P.E.     236

1  BY MR. RAFFMAN:
2     Q.  All right.  Am I right that the over burden
3  increases the strength of the soil underneath it?
4     A.  It's related to the preconsolidation
5  pressure.
6     Q.  Right.  And is there a relationship between
7  the depth of the soil and the shear strength?
8     A.  In general.
9     Q.  Is that relationship expressed on a line that
10 carries a value of 0.23 and that is often referred to
11 as "sigma"?
12    A.  I -- I guess you could say .23.  There's --
13 you could use other numbers as well.
14    Q.  Do your strength profiles conform to the 0.23
15 number?
16    A.  I think -- I think I use 0.22.
17    Q.  All right.  Look at Figure 5.16, please.  Do
18 you see this figure?
19    A.  Yes.
20    Q.  What does it represent?
21    A.  It's a plot of available strength data for a
22 layer that I've designated as "USC."
23    Q.  All right.  Before I move on, the WGI samples
24 that you referred to earlier as characterizing the

GENNARO G. MARINO, PH.D., P.E.     237

1  levee embankment, were they UU samples, UCT samples,
2  vein shear or some other kind of sample?
3     A.  The Washington Group samples?
4     Q.  The sample you referred to to characterize
5  the borings -- the borings.
6     A.  These were samples -- they weren't -- they
7  weren't tests.  Okay.  They were samples derived from
8  the ground, I believe, using a cylinder sampler.
9     Q.  And the characterization of the material in
10 the sample was based on visual inspection by the
11 testing person; correct?
12    A.  By the geologist.
13    Q.  By -- by whoever tested the material?
14    A.  Inspected the material.
15    Q.  Whoever inspected it.  All right.  Back to
16 5.16.  Am I right that the zero represents the depth
17 from the height -- the -- the top of the levee?
18    A.  No.
19    Q.  What does zero represent?
20    A.  That's -- that's the ground surface.  The
21 typical definition of what depth is.
22    Q.  All right.  Ground surface.  And -- and for
23 Figure 5.16, where is the ground surface?
24    A.  At zero.

GENNARO G. MARINO, PH.D., P.E.        238

1
2   Q. Okay. Does any portion of this Figure 5.16
3   encompass borings or tests taken in the layer you've
4   characterized "levee embankment"?
5   A. That would be contrary to it being in this --
6   in this ground.
7   Q. So your answer to my question is "no"?
8   A. Right.
9   Q. Would the same answer be true for Figure
10  5.17?
11  A. Yes.
12  Q. Where in your report did you create a table
13  like Figure 5.16 and 5.17 for the levee embankment
14  samples so that we could see what you used and how you
15  plotted the data?
16  A. I didn't think it was relevant to have a plot
17  like that for the levee embankment. So I didn't -- I
18  didn't produce one. I didn't make one.
19  Q. Am I right that the value of 722 pounds per
20  square foot in the levee embankment will affect the
21  shear strength of the layers underneath the
22  embankment?
23  A. Say that again.
24  Q. When you choose a value of 722 pounds per
25  square foot, instead of the 500 pounds per square foot

GENNARO G. MARINO, PH.D., P.E.        239

1
2   that IPET chose, that value -- that higher value will
3   exert a higher over burden pressure on the layers
4   underneath; correct?
5   A. No. I don't know what the strength has to do
6   with that.
7   Q. Well, does the strengths of the marsh layer,
8   for instance, depend in part on the weight of the over
9   burdened layers on top of it?
10  A. Are you talking about density?
11  Q. I'm talking about shear strength.
12  A. Well, weight and shear strength aren't the
13  same thing.
14  Q. All right. Well, let me ask the question a
15  different way. Will the shear strength of the marsh
16  layer be the same regardless of whether the value for
17  the levee embankment is 722 pounds per square foot or
18  500 pounds per square foot?
19  A. It makes no difference.
20  Q. It makes no difference. The over burden on
21  top of the marsh layer will not have a consolidating
22  value on the marsh layer? Answer my question, and
23  then we'll stop.
24  A. That's -- no, it will.
25  Q. It will. And does that consolidating value

GENNARO G. MARINO, PH.D., P.E.        240

1   have an impact on the shear strength of the layer?
2   A. Yeah.
3   THE VIDEOGRAPHER: Going off the record at the
4   end of Tape 6 at 17:07:40.
5   (A recess was taken from 5:07 p.m.
6   to 5:25 p.m.)
7   THE VIDEOGRAPHER: Back on record. Tape 7 at
8   17:25:56.
9   MR. RAFFMAN: All right. We have -- for the
10  record, we have tried to ascertain the source of the
11  three boring samples that Dr. Marino relied on for
12  that lobe at the north breach. We're told that the
13  results appear somewhere in the Washington Group
14  reports that are referenced at Page 5-9 of
15  Dr. Marino's report. These Washington Group materials
16  were not included among Dr. Marino's reliance
17  materials, and, therefore, we've not had an
18  opportunity to examine them, and, therefore, we will
19  reserve all our rights in that regard.
20  Q. Let me move on, then, but before I do, the
21  weight of the soil in the levee embankment level will
22  affect the shear strength of the lower levels; right?
23  A. When you say, "lower levels," what do you
24  mean?
25

GENNARO G. MARINO, PH.D., P.E.        241

1
2   Q. Well, marsh level, for example?
3   A. Yeah. If you have an embankment, weight on
4   it is going to increase the shear strength and
5   decrease the permeability.
6   Q. Okay. So by using a value of 722 pounds per
7   square foot, the effect of using that value instead of
8   using the value of 500 pounds per square foot is to
9   increase the shear strength of the marsh layer and
10  decrease the permeability; right?
11  A. No.
12  Q. Have I just used the wrong word again?
13  A. I don't know what you're talking about.
14  Q. All right. If the weight of the levee
15  embankment layer were 500 pounds per square foot
16  instead of 722 pounds per square foot --
17  A. They're not weights.
18  Q. What do you call the pounds per square foot
19  value? What is that about?
20  A. The values I think you're talking about are
21  strength.
22  Q. Does the strength of the layer have a
23  relationship to the weight of the layer?
24  A. Say that again.
25  Q. Does the strength of the layer have a

GENNARO G. MARINO, PH.D., P.E.          242

1  relationship to the weight of the layer or vice versa?
2      A.  There's not an exact correlation between the
3  two, but, I mean, in general, that's true.
4      Q.  All right.  So you would expect soil that has
5  a 722 pounds per square foot value to exhibit
6  characteristics that would increase the strength of
7  the Marsh layer above what it would be if that same
8  upper soil had a 500 pound value?
9      A.  So you're trying to say indirectly that the
10  strength -- if I understand you correctly, that the
11  strength is an inference of the density.  So that if
12  you're assuming a strength is too high, then you're
13  saying that the density is too high; is that right?
14      Q.  I guess that's my question for you.
15      A.  I don't know.  I mean, I guess.
16      Q.  Okay.  Let me ask you some questions about
17  Section 5.4 of your report.  My hour is going late.
18  Does Section 5.4 of your report relate to your
19  interpretation of the E-99 tests in the Atchafalya --
20  east Atchafalaya Basin?
21      A.  You're talking about Figure 5.32?  Is that
22  what you're saying?
23      Q.  I'm referring to Section 5.4 and Figure 5.32.
24  Do you see that?

GENNARO G. MARINO, PH.D., P.E.          243

1      A.  Yes.
2      Q.  Does your diagram Section 5.32 measure the
3  slope indicator on the protected side of that flood
4  wall?
5      A.  It doesn't measure a slope indicator, no.
6      Q.  What does it reflect?
7      A.  It measures -- it reflects deflections in the
8  wall.
9      Q.  Do you agree that the piezometer readings
10  during these tests showed hydrostatic processes that
11  developed all the way to the tips of the sheet piles?
12      A.  I remember them saying that the piezometers
13  weren't operating properly and that they had to
14  actually assume a groundwater table value on the dry
15  side.
16      (The Reporter marked the document
17      referred to as Deposition Exhibit 12
18      for identification.)
19      MR. RAFFMAN:  This will be Exhibit 12.
20      Q.  I'll ask you to turn to -- before I ask you
21  to turn anywhere, do you recognize Exhibit 12 as a
22  report of the E-99 sheet pile wall field load test
23  report?
24      A.  Yes.

GENNARO G. MARINO, PH.D., P.E.          244

1      Q.  Is that the same test that you are referring
2  to in your Section 5.4?
3      A.  Yes.
4      Q.  Turn to Page 7, please.  In the middle of the
5  page there's a paragraph that's headed "Piezometer
6  Readings."  Do you see that?
7      A.  Yes.
8      Q.  It says, "All of the flood side and some of
9  the land side piezometer data obtained by the
10  contractor surveyor during the test are considered
11  unreliable."  Do you see that?
12      A.  Yeah.  That's what I was referring to.
13      Q.  I understand.  The third sentence down says,
14  "The flood side piezometer readings made at station
15  100 plus 75 on 3 September, 1985 indicated that the
16  flood side piezometric level in the foundation above
17  the tip of the sheet pile was near the ponded water
18  level."  Do you see that?
19      (The witness reviewed the document.)
20      THE WITNESS:  Yes.
21  BY MR. RAFFMAN:
22      Q.  So that sentence reflects that the piezometer
23  readings -- or that piezometer readings showed
24  hydrostatic processes developing all the way to the

GENNARO G. MARINO, PH.D., P.E.          245

1  tips of the sheet piles?
2      A.  That's correct.
3      Q.  Now, do you know one way or the other whether
4  tension cracks between the flood side soil and the
5  sheet pile were in fact observed in the Inner Harbor
6  Navigation Canal between the north and south breach
7  after Hurricane Katrina?
8      A.  You're asking me if I know if there were, at
9  the breach sites, gaps that formed at the north and
10  south breach?
11      Q.  No, I'm not.  Let me try to go back a couple
12  of steps.  The E-99 test involves a phenomenon in
13  which a gap forms under hydrostatic pressure between
14  the sheet pile and the canal side levee soil; right?
15      A.  Yes.
16      Q.  Do you know whether such gaps were observed
17  in the area between the north breach and the south
18  breach, the unfailed area between the north and south
19  breach after Hurricane Katrina?
20      A.  I think I remember seeing an area where there
21  looked like there was some slumping adjacent to a
22  section between the north and south breach.
23      Q.  Do you know whether anyone has concluded that
24  a tension crack -- strike that.

GENNARO G. MARINO, PH.D., P.E.        246

Would it surprise you to learn that a tension crack between the flood side soil and the sheet pile was in fact observed in the unfailed section of wall between the north and south breach?

A. I wouldn't be surprised if there were some -- you know, a tension crack.

Q. So it wouldn't surprise you if hydrostatic pressure on the wall during Katrina was in fact sufficient to deflect the wall in that manner even on unfailed sections not impacted by the barge?

A. I would say there would be some deflection, and there could be some gap forming.

Q. All right. With respect to groundwater conditions, Section 5.5 of your report, can you describe briefly what the relevance of your groundwater analysis is to your stability and seepage analysis?

A. Can you repeat that question.

Q. What's the relevance of your conclusions regarding groundwater in Section 5.5 to the seepage and stability analysis that you did?

A. Basically, this section was to identify a freatic surface on both the flood side and the protection side of -- of the levee.

GENNARO G. MARINO, PH.D., P.E.        247

Q. "Freatic" refers to what?

A. The groundwater table elevation.

Q. Freatic, then, with reference to seepage studies is the place at which seepage would begin to initiate?

A. No. That's -- it's just the groundwater table.

Q. All right. Is there anything about the groundwater table that drives your conclusions regarding seepage or stability?

A. Is there anything about -- well, I mean, I think it's important that you have to have a groundwater table location in order to do -- to start your analysis. I think that's clearly depicted and -- and discussed in the report.

MR. POLLARD: I think he's asking you to explain why it's important.

Is that right?

MR. RAFFMAN: Yes.

MR. POLLARD: Okay. Explain to him why groundwater is important.

THE WITNESS: Well, in terms of the stability analysis, it would have to do with the -- the amount of hydrostatic pressure that would be against the wall

GENNARO G. MARINO, PH.D., P.E.        248

in either direction. In terms of stability analysis, it would have something to do with the ability to generate more pressures over time both on the north and south breach sides. I would say -- I'm sorry. I'm sorry. The east -- the protection and flood side, the location of the -- of the groundwater table, but more so on the flood side.

BY MR. RAFFMAN:

Q. Does the water level in a monitoring well or a boring depend on the water level in the Inner Harbor Navigation Canal, assuming that the water level -- assuming that the monitoring well's on the canal side of the wall?

MR. POLLARD: Objection. Vague.

THE WITNESS: I would say it depends -- you know, it depends on the -- how quickly the variation and what the variation is. And their location to the shoreline.

BY MR. RAFFMAN:

Q. All right. You wrote at Page 5-53 that "no seepage along the levee was observed," and there were a number of eyewitnesses who indicated that there was no evidence of seepage. Do you see that?

A. Yes.

GENNARO G. MARINO, PH.D., P.E.        249

Q. Have you read the deposition of any witnesses who said they saw seepage?

A. I don't know of any witnesses.

Q. If you were provided with the deposition testimony of witnesses who said they did in fact see seepage along that side of the canal before the storm, would you consider that relevant to your analysis?

A. I -- I would have to look at it.

Q. You have not read the deposition either Kendrick Pounds or Mr. or Mrs. Alford or Mr. Weaver; correct?

A. Kendrick Pounds, I did. I don't remember seeing anything in there that was distinct to me that there was seepage.

Q. All right. Well, maybe we'll find it and come back to it. Let me ask you about seepage in your analysis at the north breach. In Table 5.1 -- it's the next page here -- you have assigned the levee embankment soils a vertical and horizontal permeability of 1 E to the minus 7 per second; correct?

A. Yes.

Q. By the way, do you know whether the levee embankment soils were compacted or were semi-compacted

GENNARO G. MARINO, PH.D., P.E.      250

soils?

MR. POLLARD: Objection. Overbroad.

BY MR. RAFFMAN:

Q. I'm talking about the levee embankment soils in the east side of the Inner Harbor Navigation Canal.

MR. POLLARD: Protected side or the canal side?

MR. RAFFMAN: Either or both.

THE WITNESS: I -- I based -- I don't know. I would -- I think they were semi-compacted, but I'm not sure about that.

BY MR. RAFFMAN:

Q. What value, in terms of pounds per square foot, is normally associated with semi-compacted soils?

A. It depends on the material. There's a -- you know, it depends on the type of material we're talking about.

Q. All right. Do you assume that the vertical and horizontal permeability of the soils are the same in your soil property values?

A. In some cases.

Q. For which soil layers or sublayers?

A. I mean, I think you can see it in this table (indicating). Waterfront material was assumed to have

GENNARO G. MARINO, PH.D., P.E.      251

the same horizontal permeability as the vertical. The upper silts and clays, because there's some vard materials, varied in the vard materials or the interbedded materials, and a higher horizontal permeability was assumed, and then the others, which were more homogenous, a ratio of 1 was assumed.

Q. You've assigned a different horizontal permeability to certain layers that have peat in them?

A. Yeah. Depending upon the -- the amount of finds described intermixed with -- with the soil -- or with the peat, that's correct.

Q. That's because you found that fibrous peats are anisotropic?

A. Well, if they're innerbedded like they are, I would say so. If we're talking about a mass, a soil mass where there's innerbedding, like, for example, Sublayer 2, that's true.

Q. You would agree that there's a high degree of permeability anisotropic -- pardon my pronunciation -- in fibrous peats?

A. There can be.

Q. Now, if a material has a higher horizontal permeability than a vertical permeability, might that affect seepage?

GENNARO G. MARINO, PH.D., P.E.      252

A. It depends on the direction of flow. I mean, if you're considering horizontal flow, that's -- that's true. You would have to get -- the seepage would have to come down in order -- and intersect that level vertically first in order to be able to go horizontal.

Q. In what soil layer did the flow of water around the bottom of the sheet pile occur in the failure scenario that you have identified for the south breach?

A. It looks like it's the tip of -- the sheet pile is near the interface of the upper silts and clays and the -- the marsh.

REPORTER MARTIN: The what? Marsh?

THE WITNESS: Marsh.

BY MR. RAFFMAN:

Q. If I understand your failure scenario correctly, what happens is the soil -- I'm sorry. The water at that location is -- how many feet below the surface of the levee toe is the water acting on the bottom of the sheet pile?

A. How many feet below --

Q. How many feet below?

A. -- the levee toe is the what?

GENNARO G. MARINO, PH.D., P.E.      253

Q. Water acting on the bottom of the sheet pile and going around the bottom of the sheet pile underneath?

A. So you're asking it starts at the toe of -- of the sheet pile.

Q. Right. Which is about 18 to 20 feet below the surface of the soil; right?

A. That's correct.

Q. So on the other side of the levee, the water is percolating under the bottom of the toe at a level that's about 18 to 20 feet below the levee top on the protected side; right?

A. That's correct.

Q. And what's happening under that toe is that the water is -- is doing what?

A. It -- it's going on the protection side, and then there is a development of pore pressure, and there can be either severe erosion or it could also create sort of like a blowout. Isolate a blowout.

Q. The same effect that could happen if you create a hydrostatic tension gap that goes all the way to the bottom of the sheet pile; right?

A. Well, the only problem with that is you would have the tendency of the sheet pile to stay up against

GENNARO G. MARINO, PH.D., P.E.     254

1     the protection side because you don't have an upper
2     force that -- that tips the sheet pile upwards, which
3     allows the water to come around.  If you notice, there
4     are no other failures where -- I think I've said this
5     many times, but where the sheet pile has actually come
6     out of the ground.
7        Q.  The -- the question is not about the sheet
8     pile.  The question is about the water effect under
9     the sheet pile.
10        A.  And I'm trying to give you a basis of why I
11     don't believe that's the case.  My basis is that I
12     believe that the wall is translating in.  It's not
13     kicking up when you have the hydrostatic head alone.
14        Q.  Instead of causing the top of the wall to
15     crack, the barge has instead pushed the entire length
16     of the sheet pile in to allow water to percolate down
17     to the bottom of the sheet pile toe; correct?
18        A.  Okay.  I was talking about your other
19     question.  Are we talking about a different question
20     now?
21        Q.  I'm just reacting to the way you answered my
22     question.  In order for the barge to move the bottom
23     of the sheet pile enough to allow water to percolate,
24     the barge impact on the upper part of the wall has to

GENNARO G. MARINO, PH.D., P.E.     255

1     have its effect felt all the way to the bottom of the
2     wall; right?
3        A.  Yes.
4        Q.  All right.  Now, regardless of what caused
5     the separation and movement of the sheet pile at the
6     bottom of the wall, once the water is down there doing
7     it's dirty work, the work that the water is doing is
8     the same regardless of what causes the wall to move?
9        A.  And that's what you're not getting.  I'm not
10     saying that.
11        Q.  No?  Okay.
12        A.  What I'm saying is that with the hydrostatic
13     gap, the pressures are greater at the bottom, which
14     create -- which actually press the sheet pile wall up
15     against the back side soil.  So you mitigate that
16     condition.  In fact, if you look at some of the model
17     studies, I mean, they don't talk about -- you don't
18     see anything where there's this wash-out condition.
19        Q.  So what you're saying, then, is the
20     difference is the barge impact has caused the bottom
21     of the soil to deflect inward instead of simply lean?
22        A.  The bottom of the soil, no.
23        Q.  The bottom of the sheet pile.
24        A.  It's the -- yeah.  There's a separation on

GENNARO G. MARINO, PH.D., P.E.     256

1     the -- on the protection side that's significant that
2     allows that water to come up around.
3        Q.  Have you modeled the separation on the
4     protection side that you -- have you done any
5     calculations or -- or models of the separation of the
6     sheet pile on the protection side?
7        A.  No.
8        Q.  Now, as a geotechnical engineer, one of your
9     areas of expertise is in the interaction between
10     structures and soils; right?
11        A.  Yes.
12        Q.  Modeling the movement of the bottom of the
13     sheet pile on the protected side is something that
14     would be in your area of expertise?
15        A.  Yes.
16        Q.  But you've not done it in this case?
17        A.  No.  To me, it seems like -- in my opinion,
18     that's the most logical scenario for what happened.
19        Q.  And if you had modeled it, you could prove
20     it?
21        A.  I believe so.
22        Q.  But you haven't done it?
23        A.  You can't model everything.
24        Q.  Let me ask a couple of other things you

GENNARO G. MARINO, PH.D., P.E.     257

1     didn't do.  You have not calculated or analyzed
2     whether this wall would have failed at a water level
3     higher than 12-1/2 feet, have you?
4        A.  No.  I think I took it at the top of the
5     wall.
6        Q.  You have not performed a stability analysis
7     using CWLSHT, C-W-L-S-H-T, have you?
8        MR. POLLARD:  Objection.  Vague.
9        THE WITNESS:  No.
10        MR. POLLARD:  Do you know what he means by
11     CWLSHT?
12        THE WITNESS:  Yes.
13     BY MR. RAFFMAN:
14        Q.  You have not performed a local stability
15     analysis using a faulty weld, have you?
16        A.  No.  I did -- I would like to go back a
17     little bit on the CWLSHT in that I did look at passive
18     pressures and active pressures in some rough
19     calculations, and there wasn't any problem with that.
20        Q.  You didn't perform a combined seepage
21     instability analysis, did you?  The analyses you did
22     were separate; correct?
23        A.  I didn't think it was necessary because we
24     don't have any effect on the passive side.

GENNARO G. MARINO, PH.D., P.E.      258

1    Q. And, therefore, you didn't do that analysis,
2    did you?
3        A. Exactly.
4        Q. You didn't consider the effect of scour
5    trenches on stability because you assumed that the
6    breaches occurred before overtopping; right?
7        MR. POLLARD: Objection. Argumentative.
8        THE WITNESS: That's true, but even if it had the
9    scour, I think there's a sufficient safety factor
10   present.
11   BY MR. RAFFMAN:
12       Q. But you think that without actually doing the
13   calculations to prove it?
14       A. That's correct.
15       Q. You didn't use the method of planes for your
16   stability analysis; correct?
17       A. No.
18       Q. You did use the method of planes?
19       A. No, I didn't. I wouldn't use it.
20       Q. All right.
21       A. I don't think it's appropriate.
22       Q. Why do you think the method of planes is not
23   appropriate?
24       A. Because it's an old method that the Corps of

GENNARO G. MARINO, PH.D., P.E.      259

1    Engineers has used for years, and it's -- it's not --
2    it's antiquated methodology.
3        Q. You chose to use the Spencer's Method instead
4    of the method of planes?
5        A. Yes.
6        Q. Have you seen any critique by the National
7    Academy of Science, or any other organization
8    suggesting that the method of planes should be used in
9    addition to Spencer's Method in evaluating the failure
10   of the Inner Harbor Navigation Canal floodwalls?
11       A. I haven't seen. If you would like to supply
12   that to me, I would be glad to look at it.
13       Q. You did not take any new soil samples;
14   correct?
15       A. No.
16       Q. Did you take any new soil samples?
17       A. No.
18       Q. Did your stability analysis include the
19   parameters given by the CPT tests taken by the Army
20   Corps of Engineers?
21       A. No.
22       Q. Did you review the hurricane storm damage
23   risk reduction system design guidelines of the Army
24   Corps of Engineers?

GENNARO G. MARINO, PH.D., P.E.      260

1        A. I don't believe, no.
2        Q. The organization I was talking about earlier
3    is the National Research Council. Have you seen
4    anything from the National Research Council
5    recommending that planar sliding services be
6    investigated, not just circular?
7        A. Yes, but I'd like to comment that we did look
8    at all kinds of failure surfaces. It wasn't just --
9    if you know anything about the Spencer Method, you can
10   use various surface configurations, and we tried a
11   lot. This is -- what we -- what we have are the
12   critical failure services using either Modified Bishop
13   or Spencer Method.
14       Q. Am I right that the critical failure surfaces
15   that you found in your analyses were in layers that
16   were below the marsh layer?
17       A. I don't think that's exactly correct.
18       Q. All right. In what layers did you find
19   critical failure services at the north breach and the
20   south breach?
21       A. They extend into the -- the lower silt and
22   clay materials, but they include -- I mean, you know,
23   it's a circular failure plane. So it includes all the
24   materials that are encompassed within this -- the

GENNARO G. MARINO, PH.D., P.E.      261

1    failure plane.
2        Q. Of course, but the bottom of the circle is
3    below the marsh layer; right?
4        A. Yes.
5        Q. The bottom of the circle -- all right.
6    That's all. Your analysis of the failure at the north
7    breach disagrees with the results of IPET, ILIT and
8    Team Louisiana; correct?
9        A. I don't know if Team Louisiana did their own
10   stability analysis. They -- I didn't see any
11   stability analysis that they did. They basically just
12   went along with ILIT pretty much. That's my
13   understanding.
14       Q. And concluding that the barge caused the
15   failure at the north breach, your analysis disagrees
16   with every other forensic investigation of this
17   question, what caused the breach?
18       A. Of the ones that I'm aware, yes.
19       Q. The same thing is true at the south breach.
20   In concluding that the barge caused the breach of the
21   floodwall at the south breach, your analysis disagrees
22   with IPET, ILIT, Team Louisiana and every other
23   forensic investigation that you've seen?
24       A. Those are the ones -- I would say every one

GENNARO G. MARINO, PH.D., P.E.          262

1  that I've seen.  That's correct.
2      Q.  Now, your -- your seepage analysis is based
3  on the selection of permeability factors that you made
4  for the marsh layer and the other layers; right?
5      A.  Yes.
6      Q.  If the permeability factors that you chose
7  are wrong, then your seepage analysis doesn't stand,
8  does it?
9      A.  Well, it's just like a comment made by the
10  Corps of Engineers of the ILIT report that their
11  seepage values, their permeabilities were wrong, and
12  that's why they're showing under seepage when they
13  don't believe there's under seepage.  It's the same
14  argument.  So...
15      Q.  If you've chosen permeability values that are
16  too low, there's a chance that your seepage analysis
17  will under count the possibility of seepage?
18      A.  That's correct.
19      Q.  Let me ask you to look at Page 5-71.  At 5-71
20  you allude to the presence of sandy waterfront fill in
21  Section 3-3 through the south part of the south
22  breach; right?
23      A.  What do you mean "allude" to it?
24      Q.  You -- well, the very bottom of the page,

GENNARO G. MARINO, PH.D., P.E.          263

1  your report says, "There is sandy waterfront fill in
2  Section 3.3 through the south part of the south
3  breach"?
4      A.  Right.
5      Q.  And you wrote, "This results in early
6  saturation and a rapid change in total head"?
7      A.  That's correct.
8      Q.  But you've nevertheless concluded, based on
9  your analysis, that even with early saturation and a
10  rapid change in total head, the seepage is not
11  sufficient to affect the failure of the floodwall at
12  that location?
13      A.  Exactly.
14      Q.  On what do you base your characterization of
15  sandy waterfront fill at the location represented in
16  Section 3-3 of your model?
17      A.  Basically, the waterfront borings that exist.
18      REPORTER MARTIN:  The what boring?
19      THE WITNESS:  Waterfront borings.
20      REPORTER MARTIN:  Both?
21      MR. RAFFMAN:  Waterfront.
22      THE WITNESS:  Waterfront borings.
23  BY MR. RAFFMAN:
24      Q.  Does the deeper failure plane that you

GENNARO G. MARINO, PH.D., P.E.          264

1  conclude is the critical plane --
2      A.  Of which --
3      Q.  Well, I believe, if I'm not mistaken, you've
4  concluded that the critical failure plane, the lowest
5  failure plane for the north breach is -- let me have
6  you --
7      A.  What do you mean by "deeper"?
8      Q.  Well, below the marsh layer.  Let's be clear.
9  For the north breach, what is the lowest failure
10  plane?
11      A.  There's only one failure plane.  I mean, the
12  plane is not just --
13      Q.  In what layer does -- in what layer?
14      A.  It fails in the -- well, I mean, it goes
15  through layers up to the bottom clay layer.
16      Q.  The bottom clay layer for north breach.
17  What's the lowest layer involved in your failure
18  analysis for the south breach?
19      A.  Hold on a second.
20      (The witness reviewed the document.)
21      THE WITNESS:  It's the bottom clay layer for the
22  north breach.
23  BY MR. RAFFMAN:
24      Q.  All right.  Bottom clay layer for both

GENNARO G. MARINO, PH.D., P.E.          265

1  breaches; right?
2      A.  Yes.
3      Q.  Does the -- do the values that you chose as
4  inputs for soil density affect the -- whether the
5  failure plane is a deeper or a shallower failure
6  plane?
7      A.  It could.
8      Q.  If the over burden weighs more than you would
9  expect to see failure in a deeper plane because the
10  over burden will differentially affect the strength of
11  the layers immediately underneath; right?
12      A.  I would have to run an analysis to make sure
13  about that.
14      Q.  Okay.  What borings resulted in your
15  characterizations of permeability, if any?
16      A.  The borings that I've listed that I've shown
17  on the -- let's see.  I mean, you've seen this report.
18  So you should know --
19      Q.  5.11; is that right?
20      A.  Yes.
21      Q.  Did you average the boring values to arrive
22  at permeability factors?
23      A.  There -- there aren't any as -- as was done
24  by other investigators that I know of.  All that was

GENNARO G. MARINO, PH.D., P.E.         266

1  available, except for a few permeability tests for
2  other than the marsh layer, were based on
3  characterizations of the soil.  For the marsh layer,
4  there was some test data that the Corps supplied,
5  which we relied on, or I relied on, and it's given
6  in -- I'll show you where that is.  5.25.
7      Q.  All right.  For what purpose did you use
8  CLARA?
9      A.  We used it for some of the -- all the
10  three-dimensional analyses and some of the two
11  dimensional analyses.
12     Q.  Why did you use that program?
13     A.  Because it had unique feature of doing three
14  dimensional analysis.
15     Q.  Why did you consider three dimensional
16  analysis useful?
17     A.  Because as we know, the failure at the north
18  breach wasn't a broad failure.  It yielded at the
19  north end.  If it yielded at the north end and it was
20  a localized failure, you would expect a localized soil
21  failure if it was from soil.  Do you understand what
22  I'm saying?
23     Q.  That's your answer, that you would expect a
24  localized soil failure if it was from soil?

GENNARO G. MARINO, PH.D., P.E.         267

1      A.  Right.  So in order to analyze that, we had
2  to use a software that could accommodate a
3  three-dimensional analysis.
4      Q.  Is the SLOPE/W software something you could
5  not use for that purpose?
6      A.  GeoStudio software does not have 3D analysis.
7      Q.  All right.  I want to ask you the -- the
8  reasons why your analysis departed from -- from IPET.
9  Let me just see if I understand.  For one thing, you
10  used the higher strength for the levee embankment than
11 IPET used; right?
12     A.  I don't know if that played a big role
13 because the failure surface is actually below that.
14 So I don't even know if that plays a part.  So, you
15 know, pounding on whether the levee embankment
16 strength is different than what IPET used, I don't
17 know if that makes a difference.  I don't think it
18 does.
19     Q.  When you compared your results to IPET, am I
20 right that for the most part, the adjustments you made
21 had the effect of increasing the strength of the soil?
22     A.  You know, I never went through and directly
23 compared.  I know that the marsh layer is higher, at
24 least under the embankment than IPET, and I know that

GENNARO G. MARINO, PH.D., P.E.         268

1  our toe is probably similar to ILIT, which ILIT
2  commented on IPET's toe strengths being too low.
3      Q.  I asked you specifically about IPET.
4      A.  Yeah, I know.  I just went on because I
5  figured you were going to ask me anyway.  Actually, I
6  was saving you time.
7      Q.  As we sit here today, can you think of any
8  parameters that you changed from IPET in the direction
9  other than to provide additional strength for the
10 soil?
11     A.  I -- I really didn't compare the numbers.  I
12 went about this in an independent way and took the
13 information and plotted my own soil property
14 information.
15     Q.  You compared your work to IPET; isn't that
16 right?
17     A.  No.
18     Q.  You -- you certainly looked at the IPET
19 report in your Section 6 to express your disagreement
20 with their analysis; right?
21     A.  That's correct.  But I didn't -- I didn't
22 go -- I didn't compare their soil strengths.
23     Q.  Well, in every respect, you've concluded that
24 IPET used strengths that -- well, IPET used parameters

GENNARO G. MARINO, PH.D., P.E.         269

1  that resulted in too little stability; right?
2      A.  Yeah.  I mean, we -- we couldn't, based on
3  the information available, really figure out how they
4  got numbers they got, and there's something funny
5  about that analysis, and I really don't know -- it
6  just wasn't consistent.  For example, if you look
7  to -- you try -- they say they use certain strengths,
8  but then if you use those strengths, you can't get
9  their safety factors.
10     Q.  Well, you said at Page 6-32 that you had to
11 adjust the soil strength to reproduce IPET's results;
12 isn't that right?
13     A.  Right.  Exactly.
14     Q.  And one of the adjustments that you had to
15 make at the south breach was you had to use higher
16 soil strength parameters to reproduce the safety
17 factors that IPET generated; isn't that right?
18     A.  I don't know if that's a correct
19 interpretation.
20     Q.  Well, let's read what you wrote and see.
21     A.  I think you didn't understand what we were
22 trying -- I was trying to say here.  I could try -- we
23 can go through a number of questions if you'd like.
24     MR. POLLARD:  Yeah.  Wait until he asks you a

GENNARO G. MARINO, PH.D., P.E.        270

1  question.
2  BY MR. RAFFMAN:
3      Q. Let me ask you the question.  On Page 6-35,
4  you wrote in the bottom -- the last sentence of the
5  middle paragraph, "It is unknown why higher soil
6  strength parameters have to be used to reproduce the
7  IPET safety factors for the south breach."  Do you see
8  that?
9      A. Yes.
10      Q. So in attempting to reproduce the safety
11  factors for the south breach, you had to plug in
12  higher soil strengths parameters; right?
13      A. I could have saved you time.  You didn't --
14  you didn't understand that.
15      Q. All right.  What did you write there, then?
16  I read what you wrote.  Tell me what you meant.
17      A. Okay.  First of all, a little background.  If
18  you -- if you look at -- I believe that we have it in
19  here somewhere because I saw it last night.  Here
20  (indicating).  If you look at Figure 6.17, you'll see
21  that -- that their characterization of the soils are
22  kind of strange that are given in this box.  For the
23  marsh, they're saying they started at a minimum
24  strength of zero and got a maximum strength of 1,000

GENNARO G. MARINO, PH.D., P.E.        271

1  PSF.  Okay.  I don't understand that.
2      And then the -- the material below, same
3  thing.  But if you look in the report, they give you
4  different values that they used.  Okay.  They used
5  values under -- let's just say the embankment that
6  were higher than values at the toe.  Okay.  If you
7  plug in those values, Mark, you can't get their safety
8  factors.  Okay.  So we said, "Okay.  What do we have
9  to do in order to achieve the same safety factors?"
10  So what we did is we took a ratio of these two values
11  to see -- to see how we could get the same safety
12  factor as them.
13      And what I'm saying is that that sentence is
14  that we had to plug in higher values to get their
15  safety factors, higher strength values.  I hope I
16  explained that.  I know it's kind of hard to
17  understand.
18      Q. No, I think I did understand it.
19      A. Very good.
20      Q. That if you went with their safety -- if you
21  went with their strength values and you carried the
22  analysis all the way through using their --
23      A. (Nods head.)
24      Q. No?  You had to plug in higher strength

GENNARO G. MARINO, PH.D., P.E.        272

1  values to get their safety factors; right?
2      A. Yeah, because we couldn't understand how they
3  could get the values they got.  I mean, if -- if you
4  used the values they said they used and you plugged
5  them in, you don't get the same safety factor.
6      Q. The safety factor would be lower?
7      A. Right.  For the south.
8      Q. For the south.
9      A. But if you use the same assumptions for the
10  south breach at the north breach, the safety factor
11  would be higher.  So there's something -- I don't --
12  there's inconsistency -- inconsistency in the results.
13      Q. So you found a defect in IPET's soil analysis
14  that somehow escaped all of the various review teams
15  that looked it over; right?
16      A. I can't understand it.  That's all I'm
17  saying.
18      Q. All right.
19      A. Okay?  I mean, we tried to find the output
20  and input for those analyses.  If you have them, I'd
21  be glad to have them.  But we -- we couldn't come up
22  with the same values.
23      Q. At Page 6-15, you evaluated the ILIT scenario
24  of which you have a gap created by the lateral

GENNARO G. MARINO, PH.D., P.E.        273

1  deflection of the sheet pile.
2      A. Did you say --
3      Q. 6-15.
4      A. Page 6-15?
5      Q. Yeah.
6      A. Okay.
7      Q. You talked about source of seepage from flow
8  along a gap created by the bilateral deflection of the
9  sheet pile.  Do you see that?
10      A. Yes.
11      Q. And now turning you to Page 6-16, you wrote
12  in the middle paragraph, "MEA determined that if the
13  gap width is smaller than 2-1/2 inches and the gap is
14  not developed from the levee crown all the way to the
15  marsh layer, the water flow that passes through the
16  gap would be ignorable."  Do you see that on
17  Page 6-16?
18      (The witness reviewed the document.)
19      THE WITNESS:  Yes.
20  BY MR. RAFFMAN:
21      Q. Does that mean that if the gap width is
22  larger than 2-1/2 inches and the gap is developed from
23  the levee crown all the way to the marsh layer, the
24  water flow passing through the gap would be something

69 (Pages 270 to 273)

GENNARO G. MARINO, PH.D., P.E.        274

potentially significant?

A.  I would say no, this is just -- it says, "ignorable."  So it may not be significant even with a larger gap.

Q.  All right.  You wrote that the iWall is not designed for barge impacts.  Am I right?

A.  Yes.

Q.  Have you seen examples of other walls at which barges impacted the walls during Hurricane Katrina.

A.  Did I see -- say that again.  I'm sorry.

Q.  Examples of other walls that were impacted by barges during Hurricane Katrina.

A.  I saw a few, yes.

MR. RAFFMAN:  Let me show you what's been marked as Exhibit 13.

(The Reporter marked the document referred to as Deposition Exhibit 13 for identification.)

THE WITNESS:  Okay.

BY MR. RAFFMAN:

Q.  Do you recognize these pictures as showing locations where barges impacted flood walls during Hurricane Katrina?

GENNARO G. MARINO, PH.D., P.E.        275

A.  Yes.

Q.  Do you see that the barge has impacted the tops of some of those walls; right?

A.  That's correct.

Q.  Would you agree with me that the damage sustained by those walls is not the kind of damage that you infer the barge created at the Inner Harbor Navigation Canal floodwall?

A.  That's correct.  Like I said, I mean, you have different -- different loading conditions, different flooding conditions, different travel situations.  I know one of these is a T wall, which has a much greater resistance.  At least one of these.  I'm not sure if this other one is or not.  It might be this last one, also a T wall.

Q.  Well, you don't know, do you?

A.  Well, I did have one of my staff look last night.  This one particularly says it's a T wall, but I -- but I thought we were talking about this last one, Figure 14-111 over the phone, and this one also is a T wall.

Q.  14-111 is a T wall?

A.  That's my understanding.

Q.  And you're saying that if you had a T wall,

GENNARO G. MARINO, PH.D., P.E.        276

you will not --

A.  I'm saying it has more resistance.

Q.  But you haven't calculated how much more?

A.  No.

Q.  You would agree with me that the barge damage to those walls looks nothing like the damage you infer to have taken place at the Inner Harbor Navigation Canal?

A.  That's correct.

Q.  You wrote at Page 7-2 that the ING4727 was the only -- well, 7-2, "ING4727 is the only unmoored vessel in the Inner Harbor Navigation Canal."  You wrote that.

A.  You said Page 7 --

Q.  7-2, at the top.

A.  I believe so.

MR. RAFFMAN:  Let me show you two photos that will be marked together as Exhibit 14 to your deposition.

(The Reporter marked the document referred to as Deposition Exhibit 14 for identification.)

BY MR. RAFFMAN:

Q.  Do you see in Exhibit 14 a vessel of some

GENNARO G. MARINO, PH.D., P.E.        277

kind that has washed up on the western shore of the Inner Harbor Navigation Canal at some point after the floodwall has been -- has been breached?

MR. POLLARD:  Objection.  Overbroad.  Lacks foundation.

THE WITNESS:  I see a vessel on the -- on the back -- I guess that's a vessel.  I'm not sure what that is.  It's a mat -- or I don't know what that is.

BY MR. RAFFMAN:

Q.  Have you ever seen a picture showing or depicting this object that appears to have washed up on a berm directly opposite from the north breach?

A.  I saw on a photograph a black spot, but I didn't know what it was.  I didn't have a close-up of it.  In this picture, I can't really tell what exactly it is either.

Q.  As you sit here today, you don't know what that object is?

A.  No.

Q.  And you don't know how it got there?

A.  No.

Q.  And you don't know when it got there?

A.  No.

MR. RAFFMAN:  All right.  Let's go -- let's go

GENNARO G. MARINO, PH.D., P.E.        278

1  GENNARO G. MARINO, PH.D., P.E.        278
2  off the record.  Actually, let's stay on the record if
3  we have -- how much more time?
4      THE VIDEOGRAPHER:  One minute.
5      MR. RAFFMAN:  Off the record.
6      THE VIDEOGRAPHER:  Going off the record at
7  18:26:17.
8          (A recess was taken from 6:26 p.m.
9          to 6:29 p.m.)
10     THE VIDEOGRAPHER:  Back on record 18:29:14.
11 BY MR. RAFFMAN:
12     Q.  Would you say that the floodwall on the east
13 side of the Inner Harbor Navigation Canal was in a
14 weakened state just immediately prior to Hurricane
15 Katrina?
16     A.  Are you talking about the north or the south?
17     Q.  Any part.
18     A.  Obviously, it had been loaded, you know.  So
19 it is in a more weakened state.
20     Q.  What accounts for the weakened state of the
21 wall?
22     A.  Lower safety factor.
23     Q.  What accounts for the lower safety factor?
24     A.  Water against the wall.
25     Q.  Water from the Hurricane Katrina storm surge?

GENNARO G. MARINO, PH.D., P.E.        279

1  GENNARO G. MARINO, PH.D., P.E.        279
2      A.  Yes.
3      Q.  Is there anything else that would lead you to
4  conclude the wall on the east side of the canal was in
5  a weakened state on the morning of Katrina?
6      A.  That's the -- I have a little trouble with
7  the term "weakened."  Okay?  I don't know how to
8  answer really weakened.  I mean, if there's more load
9  on the wall as the surge level goes up.
10     THE VIDEOGRAPHER:  Counsel, we're out of tape.
11 Change tape?
12     MR. RAFFMAN:  Yeah.  I thought that's what we
13 were going to do.
14     THE VIDEOGRAPHER:  Going off the record at
15 18:30:47.  End of Tape 7.
16     MR. RAFFMAN:  Sorry.
17         (A recess was taken from 6:30 p.m.
18         to 6:31 p.m.)
19     THE VIDEOGRAPHER:  Back on record 18:31:36.
20 BY MR. RAFFMAN:
21     Q.  All right.  I have just a small series of
22 questions about the -- something you wrote at the end
23 of -- of Chapter 5.  At the end of Chapter 5 on
24 Page -- I think it's 5-95?
25     A.  -93?  It's the last paragraph.

GENNARO G. MARINO, PH.D., P.E.        280

1  GENNARO G. MARINO, PH.D., P.E.        280
2      Q.  Yeah.  The last paragraph of Chapter 5 talks
3  about it's not likely that the barge was drawn into
4  the breach.  Do you see that?
5      A.  Yes.
6      Q.  I want to ask you about that.
7      A.  Okay.
8      Q.  You wrote that "It's not likely the barge was
9  drawn into the breach because its inconsistent with
10 impact noises that people heard before the flooding";
11 right?
12     A.  That's correct.
13     Q.  So you've inferred that those noises must
14 have been the barge; right?
15     A.  Right.
16     Q.  And if those noises were not the barge, then
17 your inference wouldn't apply; right?
18     A.  That particular inference.
19     Q.  Right.  Okay.  Now, you wrote that "If the
20 barge was moving southward, it would have flowed into
21 the lower Ninth Ward somewhere along the 850 foot
22 breach if it was already open"; right?
23     A.  Right.
24     Q.  And on what did you base that statement?
25     A.  Because I believe that the intersection for

GENNARO G. MARINO, PH.D., P.E.        281

1  GENNARO G. MARINO, PH.D., P.E.        281
2  the collision at the south end was southward and that
3  the -- that the port of the barge came through that
4  breach.  So if you have a direction that's fairly
5  southward and is going into the end this way, that
6  means you have to be coming in this direction if --
7  if -- how do I explain that.  That means you have to
8  be coming in -- in that direction based on the damage
9  conditions.  Okay.  (Indicating)
10         If the breach has already gone and you're
11 running close to the edge of the breach, there --
12 how -- how would it flow -- how would it not flow into
13 the canal?
14     Q.  Well, have you seen the report of Charles
15 Cushing in which he has the barge floating in an
16 oblique angle southward --
17     A.  I don't agree with -- based on the damage
18 conditions, I don't agree with that.
19     Q.  Which damage conditions are you referring to?
20     A.  I'm talking about the damage conditions on
21 the wall, and the damage conditions that I know on the
22 barge.
23     Q.  Well, you didn't model the barge movement,
24 did you?
25     A.  No.

GENNARO G. MARINO, PH.D., P.E.          282

1  Q. You're not an expert with respect to vessel
2  movement; right?
3  A. No.
4  Q. You've never modeled vessel movement or
5  opined on vessel movement in any prior case; right?
6  A. No.
7  Q. You don't know the wind force or the current
8  force acting on the barge; right?
9  A. No.
10 MR. POLLARD: Objection. Asked and answered.
11 BY MR. RAFFMAN:
12 Q. All right. But you wrote that if the barge
13 was moving southward, it would have flowed into the
14 lower Ninth Ward somewhere along the 850 foot breach
15 before reaching the south end; right?
16 A. Right. And we're talking about near field
17 movements. We're not talking about from -- we're not
18 talking about trying to figure out how it got down to
19 the south breach.
20 Q. But you're talking now about the barge should
21 have gone through the breach before it reached the end
22 and sheared off the wall. Isn't that what you're
23 saying?
24 A. Yes.

GENNARO G. MARINO, PH.D., P.E.          283

1  Q. And that last inference is something that's
2  beyond your review of the damage to conclude that the
3  barge was moving south when it caused the damage;
4  right?
5  A. I didn't understand that.
6  Q. Well, I'll withdraw the question.
7  As a soil scientist, as a forensic scientist,
8  you've reviewed the damage and you've concluded the
9  barge was moving south when it caused that damage;
10 right?
11 A. I wouldn't say -- I'm not a soils scientist.
12 I'm a forensic engineer. I've done numerous damage
13 evaluations. You know, I've -- I've done lots of work
14 on soil structure interaction, and from the damage
15 conditions, it's my opinion that that barge went
16 through in a south direction at the south end of the
17 south breach.
18 Q. That's the conclusion you drew. It was
19 moving south when it --
20 A. Yes.
21 Q. -- hit the wall there?
22 A. Yes.
23 Q. Anything else --
24 A. Southward.

GENNARO G. MARINO, PH.D., P.E.          284

1  Q. It was moving southward, not necessarily due
2  south?
3  A. Right.
4  Q. It was moving in a southerly direction as we
5  said?
6  A. Yes.
7  Q. All right. Anything beyond your conclusion
8  that it was moving in a southerly direction when it
9  made that impact is either inference or speculation?
10 A. Well, I mean, in the near field, it would
11 have to be going in the south direction.
12 Q. But the inference that you draw that,
13 therefore, it cannot have been drawn through the
14 breach, it cannot have occurred after the breach,
15 there -- that inference is something that --
16 A. I mean, if you're talking about some distance
17 from the breach, yeah.
18 Q. All right. Has any court ever limited or
19 rejected your opinion?
20 A. No.
21 Q. Has any judge refused to qualify you as an
22 expert?
23 A. No.
24 Q. What's the total amount of money that you

GENNARO G. MARINO, PH.D., P.E.          285

1  have billed for your work on this matter through your
2  invoice of July 6, 2009?
3  A. I guess you could tell me. You have it in
4  front of you. So -- I don't know the exact number.
5     (The Reporter marked the document
6     referred to as Deposition Exhibit 15
7     for identification.)
8  MR. RAFFMAN: I'll show you what's been marked as
9  Exhibit 15 to your deposition.
10 Q. Can you now give me the number?
11 A. Yes. $526,927.37.
12 MR. RAFFMAN: That concludes my questions. Thank
13 you very much, Dr. Marino.
14 THE WITNESS: It's a pleasure.
15 MR. POLLARD: I have nothing further.
16 THE VIDEOGRAPHER: We're going off record at the
17 end of the deposition at 18:38:51.
18     (Witness excused.)
19     - - -
20     (At 6:38 p.m., proceedings were adjourned.)
21     - - -

GENNARO G. MARINO, PH.D., P.E.     286

CERTIFICATE

- - -

I hereby certify that the witness was duly sworn
and that the deposition is a true record, to the best
of my ability, of the testimony given by the witness.


_____

NANCY J. MARTIN, RPR, CSR




(The foregoing certification of this transcript
does not apply to any reproduction of the same by any
means, unless under the direct control and/or
supervision of the certifying reporter.)

- - -

---

GENNARO G. MARINO, PH.D., P.E.     288

- - - - - - - - -

E R R A T A

- - - - - - - - -

| PAGE | LINE | CHANGE |
| --- | --- | --- |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |
| - - - | - - - | - - - - - - - - - - |

DATE:

---

GENNARO G. MARINO, PH.D., P.E.     287

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully
and make any necessary corrections. You should state
the reason in the sheet for any corrections that are
made.

After doing so, please sign the errata sheet and
date it.

You are signing same subject to the changes you
have noted on the errata sheet, which will be attached
to your deposition.

It is imperative that you return the original
errata sheet to the deposing attorney within thirty
(30) days of receipt of the deposition transcript by
you.  If you fail to do so, the deposition transcript
may be deemed to be accurate and may be used in court.

---

GENNARO G. MARINO, PH.D., P.E.     289

ACKNOWLEDGMENT OF DEPONENT

I, _ _ _ _ _ _ _ _ _ _ _ _, do hereby
certify that I have read the foregoing
pages _ _ _ to _ _ _and that the same is a
correct transcription of the answers given
by me to the questions therein propounded,
except for the corrections or changes in
form or substance, if any, noted in the
attached Errata Sheet.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

DATE                 SIGNATURE


Subscribed and sworn to before me this
_ _ _ _ _ _ day of _ _ _ _ _ _ _ _ _ _,
200_.

My commission expires:_ _ _ _ _ _ _ _ _


_ _ _ _ _ _ _ _ _ _ _ _ _
Notary Public

**A**

**ability** 10:6 248:3 286:6
**ABIR** 3:3
**able** 24:14 28:21 53:8,9
  83:17 114:12 122:12
  136:23 199:11,13 252:6
**abrupt** 113:22
**absolute** 147:2,4,6
  191:15
**Absolutely** 88:25
**Academy** 259:8
**accentuated** 78:11
**accept** 15:15 24:19 25:15
  56:17 74:13 91:19
  121:6,9,12 122:20
**accommodate** 133:6
  267:3
**account** 26:23 42:16,18
  42:20 43:19 44:6,10,15
  44:17 119:18 222:6
**accounts** 16:20,23 27:3
  33:23 34:4,16 40:13
  41:23 100:24 101:5
  168:5 172:9 278:20,23
**accuracy** 211:7
**accurate** 65:3 222:7
  231:17 287:16
**accurately** 10:7
**achieve** 271:10
**achieved** 231:14
**ACKNOWLEDGME...**
  289:3
**acquire** 152:23
**acquires** 153:3,16
**acting** 76:4 155:8 252:21
  253:2 282:9
**action** 1:5 70:10 105:7
  105:20,25 106:5,9,12
  108:23 155:6 167:13
**activate** 152:22
**activates** 149:5 150:10
  150:12
**active** 257:19
**Activity** 5:23
**acts** 69:10
**actual** 24:7 66:12 121:14
  179:13,16 232:6

**Adams** 107:24 108:9,13
  108:16 109:9,10,25
  110:9
**add** 62:14 101:16
**added** 61:8,20 62:10,16
  63:9 132:6 183:24
**adding** 34:16
**addition** 65:6 87:9
  101:24 178:13 259:10
**additional** 28:7 32:21
  33:2,3 62:2 227:7
  268:10
**adjacent** 51:19 52:2,24
  53:13 67:4 124:14
  193:21 245:22
**adjoining** 130:17
**adjourned** 285:21
**adjust** 269:12
**adjustments** 267:21
  269:15
**aerial** 49:19
**affect** 53:25 54:3 96:10
  164:16 238:20 240:23
  251:25 263:12 265:5,11
**afternoon** 175:22
**agency** 91:7,11,16
**ago** 24:14 29:24 41:14
  92:25 108:15
**agree** 12:18 24:16 31:22
  38:9,12 50:3 59:11
  61:16 66:16,17 76:22
  83:8 94:22 95:10 99:6
  129:18 132:10 135:5
  136:5 137:2 148:3
  152:22 153:2,15 175:17
  176:19 182:2 184:8
  185:5 186:22 192:8
  209:20 243:10 251:19
  275:6 276:6 281:17,18
**agreed** 7:3 39:9
**ahead** 29:25 103:19
  146:19 190:9 216:15
**aided** 105:19
**air** 224:22 225:15,16
**airport** 71:25 72:5 74:19
  75:5
**alcohol** 10:5

**Aldock** 2:7 8:3
**Alford** 249:11
**alignment** 183:21 184:4
  184:9,10
**allow** 118:9 254:17,24
**allowed** 144:17 160:8
**allows** 93:17 118:8
  142:24 145:18 191:5
  254:4 256:3
**allude** 262:21,24
**alluded** 220:16
**alternative** 124:21
**America** 2:2 7:13 8:2,5
**amount** 49:20 54:7 56:25
  59:21 61:20 62:17 63:8
  63:8 74:10 102:3
  117:12,17 133:5 144:21
  149:23 151:11 153:6,11
  153:13 162:3 169:16,17
  223:21 224:4 247:24
  251:10 284:25
**amounts** 168:24 169:2,7
**amplify** 56:8
**analogy** 104:6
**analyses** 13:5 37:20,22
  37:22 126:16 197:25
  219:10 231:11 257:22
  260:16 266:11,12
  272:21
**analysis** 27:24 32:4,14
  32:17 33:19 34:9,10,12
  34:25 35:16,19,21,22
  36:3,6 37:8,13,14 39:5
  39:12,18,21 40:9,17,22
  41:2 48:9 54:2,15,18
  63:3,5,17 64:15 70:12
  73:5 76:14 78:23,24
  79:4,8 86:13 89:23
  91:3,4 100:13 101:10
  105:25 106:19 110:14
  110:15,17,18 114:12
  117:17 124:3,6 144:14
  148:18 151:17 152:3,4
  154:12 164:17,19
  175:19,21 176:24
  187:20 195:19,23
  196:10,19,21,24 197:14

  197:19 198:2 199:3,5
  204:2 212:20 217:23
  218:19,21 219:11
  231:17 233:13 246:17
  246:18,22 247:15,24
  248:2 249:8,18 257:7
  257:16,22 258:2,17
  259:19 261:7,11,12,16
  261:22 262:3,8,17
  263:10 264:19 265:13
  266:15,17 267:4,7,9
  268:21 269:6 271:23
  272:14
**analyze** 148:13 234:12
  267:2
**analyzed** 54:20 165:12
  257:2
**and/or** 286:19
**Angeles** 3:5
**angle** 156:14,19,21
  281:16
**anisotropic** 251:14,20
**answer** 6:2 9:15 35:9
  36:21 40:10 41:6,13
  43:3 56:7 70:5 78:12
  79:13,15 87:14 88:18
  88:21 93:7 95:14 99:23
  104:24 105:20 114:22
  118:19 146:19 150:5
  172:2 180:8 181:8
  197:20 206:20,22,23
  219:20 224:10 230:2
  238:7,9 239:22 266:24
  279:8
**answered** 20:16 109:3,4
  185:21 198:21 254:22
  282:11
**answering** 70:11 175:17
  182:17
**answers** 20:25 21:3,11
  22:15 23:3 194:16
  289:8
**antiquated** 259:3
**anybody** 147:6 223:17
  224:13
**anybody's** 197:19 198:2
**anymore** 21:15

**anyway** 268:6
**apart** 175:9 183:2
189:21
**apologize** 28:6 65:10
**apparently** 67:8
**appear** 45:17 209:25
240:14
**appears** 17:18 35:4,5
58:25 62:10 106:3
158:2 201:23 205:5,7
277:12
**appendix** 14:8,9 42:15
43:20,23 44:2 74:5,7
**applicability** 88:11
**applicable** 87:4,8
**applied** 87:10 88:15
**apply** 85:10 92:17 93:23
280:17 286:18
**appreciate** 227:9
**appreciation** 87:22
**approach** 39:2 156:19
233:10,14 234:19,21
235:13
**approached** 156:22
157:7,11
**appropriate** 258:22,24
**appropriately** 32:12
**approved** 28:5
**approximate** 64:22
202:8
**approximately** 58:13
98:23 145:6,11,14
146:12 150:8 160:17
178:23 209:19
**April** 49:19 50:4,8
**architect** 97:16
**area** 41:17 46:6 52:22,22
55:4 61:12 69:14 70:7
78:10 82:10,14 85:24
85:25 87:24 88:8,9
90:20 97:20,25 98:9,18
102:5 106:15 107:17,21
110:23 116:19 118:17
118:24 134:6 137:18
141:20 149:18 168:25
169:3 170:2 181:7
191:24,25 192:3 193:23

194:2 205:6 206:7
207:22 213:9 217:12
218:6 225:7 232:9,11
245:18,19,21 256:15
**areas** 15:13 33:2,4 49:21
51:15,16,19,23,25 53:7
53:13 63:6 64:3,11
87:8,11 88:14 95:22
172:3 256:10
**argument** 262:15
**Argumentative** 25:8
223:4 258:8
**arithmetic** 120:13
**Army** 5:14 52:15 53:15
65:7 89:18 90:2 91:18
91:19 92:6 210:20
218:5 231:19 232:8,10
233:4 259:20,24
**arrive** 34:17 54:15 107:3
229:11 265:22
**arrived** 105:6,14,18
112:2
**arrives** 33:19
**arrow** 50:23 51:3
**arrows** 73:3,5,7,7,9,10
**Arthur** 26:18,20,23
171:15,18,19 172:14
**articles** 90:14
**ascertain** 147:16 210:20
240:11
**ascribe** 41:16 42:4
**ascribed** 208:4
**aside** 153:14
**asked** 9:2 18:14 19:20,25
28:7 41:9 47:6 56:6
65:11 72:19 87:17
89:25 90:18 102:8
105:12,17,24 108:22
112:16 122:9 123:7
127:16 144:12 146:8
150:4 173:8 201:22
203:14 206:21 268:4
282:11
**asking** 28:22 56:22 70:8
78:9 112:11 118:3
122:11 134:8 135:24
148:12 154:15 234:20

235:17 245:9 247:17
253:5
**asks** 122:10 269:25
**aspects** 41:6,11 86:4,21
87:23 88:3
**assess** 71:18,20 76:10
212:21
**Assessing** 70:6
**assessment** 231:25
**assigned** 249:19 251:8
**associated** 165:8 250:14
**Associates** 9:7
**assume** 9:23 23:13 38:16
52:7,9 73:14 76:20
111:8 136:3 161:14
203:6 210:5 233:23
243:15 250:19
**assumed** 17:10 200:6
215:15,19 250:25 251:6
251:7 258:6
**assuming** 15:6 23:17,22
76:3 242:13 248:12,13
**assumption** 161:16,18
161:20 195:4 234:3
**assumptions** 78:24 83:16
83:18,19 216:4 272:10
**as-built** 58:4,6 60:11,12
60:12 64:2 206:20
213:24 214:2,8,13
215:17 216:12 220:25
**as-builts** 206:18
**Atchafalaya** 242:21
**Atchafalaya** 242:20
**attached** 43:15 287:10
289:12
**attempting** 270:11
**attempts** 199:8
**attention** 189:25 199:6
**attorney** 2:7 287:13
**attorneys** 7:20
**attributable** 183:1
**attribute** 46:17 139:11
179:25 180:25
**audible** 89:6
**augment** 219:20
**August** 1:13 7:11 10:9,23
22:10 23:22,25 42:17

50:8 117:23 174:12
194:4,8
**authoritative** 91:7,21
**available** 68:4 79:6
128:3 201:25 202:7
206:8 210:24 224:9
226:21,24 227:7,8
236:22 266:2 269:4
**Avenue** 1:16 2:4 3:9
18:10,14,24 22:11
41:24 42:21 44:22 64:2
64:18,19 80:3,10,21
129:5,15,19,23 135:8,8
135:17,17 136:13
190:20,23 192:14,15,21
193:10,14 194:5,11,25
195:2 217:7,14,24
**average** 39:3,3 200:3
208:8 227:4,11,16
228:2,17,24 229:11
234:12 235:3,5 265:22
**averaging** 234:17 235:18
**aware** 74:12 85:19 97:16
121:25 164:10 230:17
230:21 261:19
**a.m** 1:16 10:23 11:15
15:23 47:19,20 72:2,6
75:11,21,21 84:6,7 99:6
99:10,15 100:9,12,14
101:9 145:4,10 149:2

---

**B**

**B** 4:8 5:2 225:4,10
**back** 9:3 18:17 27:5
43:10 47:21 77:14 84:8
96:15 101:2 109:22
113:8 118:10 125:11
138:15 139:6,22 140:15
142:25 143:8 144:17
145:18,24,24 146:11
147:4 149:7,10,17,19
149:25 151:2,16 155:25
157:6 160:3,22 162:8
163:14,16,20 164:20
166:12 171:23 173:21
178:19 183:23 192:12
192:13 201:19 205:25

206:18,19 211:17 212:3
226:15 227:17,23
237:16 240:8 245:12
249:17 255:16 257:17
277:8 278:10 279:19
**backfill** 224:24 225:17
**background** 92:4 270:18
**backside** 142:25
**backward** 155:2 156:17
163:22
**back-and-forth** 123:12
**back-end** 147:3,7
**bad** 177:13
**band** 182:11,22
**bang** 89:7
**banging** 167:14 184:16
**bangs** 152:20
**bank** 5:10 218:6
**barge** 1:5 3:2 31:19 32:9
32:13,14 33:15,20 34:6
34:17,24 41:21 42:5
45:2,10 46:2,8,9,13,18
46:18,25 47:8 65:16,22
65:25 66:3,6,10,18 67:5
67:15,23 68:25 69:17
69:19,24,25 70:6,13,16
70:25 71:18,21 76:4,5
76:10,13,17,23 92:20
93:5 97:19,23,24 98:8,8
98:17 102:4,12 104:19
105:2,3,6,13,18 106:4
106:13,16,20,25 107:13
107:17,20 108:3,9,25
110:2,5,7,12,19,25
111:3,10,17,25 112:4,9
113:19 114:2,15,21
115:8,17,18 116:9
118:12,13,14,20,24
119:20,23 120:9,10,18
120:21 121:14,23
122:22,25 124:16
126:10,20,23 129:11,13
129:14,18,23 134:20,24
135:4,5 136:4,6,15,21
136:24 137:3,12 139:20
140:11,16,19,22,23
141:3,5,12 142:3,8,11

142:14,15,18 143:11,17
144:5,13,23 145:4,7,12
145:16 146:7,9 147:17
147:21 148:3 149:3
150:7,9,14,18 151:3
152:5,10,22,23 153:3
153:15,25 154:6,7,12
154:20 155:6,8,8,13,14
155:17 156:4,9,13,21
156:24 157:10,14 158:4
158:6,22 159:21 160:15
160:19,22 161:3,14,15
161:19 162:20,24 163:5
163:22 166:5,8,11,16
167:4,12 168:2,7 169:3
169:6,10,15,22 170:4,5
170:8 171:7,20 173:23
174:5,15,21,24 175:2,3
175:10 178:10,12,16
179:2,7 180:2 181:4,10
184:13,22,24 185:4,6
185:12,15 186:9,22
188:16 246:11 254:16
254:23,25 255:21
261:15,21 274:7 275:3
275:8 276:6 280:3,8,14
280:16,20 281:3,15,22
281:23 282:9,13,21
283:4,10,16
**barges** 67:7 119:21
274:10,14,24
**base** 187:9 199:20
200:12 263:15 280:24
**based** 10:14 11:23 13:10
25:20 34:3 37:4 60:12
63:3 72:23 78:17 79:3
79:5 82:24,25 98:25
99:24 100:8,23 101:5
101:12 109:9 116:19
147:20 184:16 205:23
206:4 209:11,13 212:17
216:4 222:14 223:2
224:8 227:11 228:2
232:23,24 237:11 250:9
262:3 263:9 266:3
269:3 281:8,17
**bases** 29:8

**basic** 37:3,6 131:20
**basically** 16:2 27:25 32:6
32:10 38:25 55:3 76:11
85:9 88:15 97:4 98:2
116:18 163:16 184:3
191:22 194:17,18 220:5
246:23 261:12 263:18
**Basin** 242:21
**basis** 10:13 12:24 13:3
67:20 82:17 100:7
110:8 206:17,17 232:13
232:19 254:11,12
**Bea** 224:16
**Beaches** 4:18
**beams** 86:24,24,25
**began** 15:22 70:12 125:3
168:9 196:24
**beginning** 1:16 7:12
107:12 108:24 109:25
154:10 187:17
**begins** 113:13
**behalf** 7:22
**believe** 10:20 14:4,16
17:21 40:14 54:3 59:3
61:13 63:11 92:20 98:4
134:20,24 144:15 146:4
146:19,20,21 151:25
152:15 163:13 169:5,22
172:19 176:15 177:24
181:7 202:16 231:9
237:9 254:12,13 256:22
260:2 262:14 264:4
270:19 276:17 280:25
**belong** 112:22 113:5
139:24
**bend** 46:21
**bending** 47:10 142:4
167:2,20 178:2,7
181:18,20,21 190:10
**bends** 178:9
**beneath** 165:23
**Benoit** 1:8
**bent** 46:15 131:5 183:16
184:9
**berm** 191:5 193:2,5,20
194:4,8 277:13
**Bernard** 4:20

**best** 12:13 30:24 207:24
286:5
**better** 140:15 183:25
185:18 198:11
**beyond** 133:5 283:3
284:8
**big** 267:13
**bigger** 188:25
**bilateral** 273:9
**billed** 285:2
**birthday** 39:2 222:9
**Bishop** 260:13
**bit** 138:22 147:15 172:18
200:7 257:18
**black** 60:15,18 61:4,17
62:7 277:14
**blessed** 28:5
**blew** 170:16
**block** 87:10 170:12
**blocks** 170:16,19 171:2,7
**blow** 76:23 155:19 156:4
**blowing** 72:12,16,21
75:24 76:21
**blown** 171:2,6
**blowout** 253:20,20
**blue** 201:3
**boat** 153:3
**boom** 41:17,20,25 42:5
44:18,21,24 45:4,7,9,12
45:21 46:7,11,17,24
47:8 89:7 121:18,20,22
122:25
**booms** 47:4
**boom-type** 44:13
**boring** 203:6,8 206:11
207:4,14 213:12,17
214:3,16 216:6,7,10,20
216:22 222:20,21 224:8
240:12 248:11 263:19
265:22
**borings** 201:25 202:6,13
202:14,17,25 203:3,5,7
204:25 205:2,24,25
206:2,5,13,14,21 207:2
207:6,7,8,22 208:2
209:15,16,19 211:8
213:19,20 214:12,20

222:23 223:3,7,8,10,16
237:6,6 238:3 263:18
263:20,23 265:15,17
**borrowed** 128:7
**bottom** 19:8 21:21 49:18
104:21 120:6,18 122:8
135:20 142:23 163:22
174:19,19 175:2 178:3
180:14 252:9,22 253:2
253:3,11,23 254:18,23
255:2,7,14,21,23,24
256:13 261:3,6 262:25
264:16,17,22,25 270:5
**bound** 233:8
**boundary** 73:16
**Boutte** 1:6
**bow** 141:9,18 142:7
143:16 144:2 148:10
149:22 161:2 166:24
167:7 178:19 188:3,25
189:5,13
**bowing** 185:17
**bow-like** 187:12,15
**box** 270:23
**breach** 15:14 35:2,3,8,13
35:17 36:8 37:15 42:21
42:21 44:25 46:15,22
47:3,11 49:21 53:14,14
53:21,21,24,25 54:12
54:12,22,23 61:12 64:3
64:6,10,18,18 76:7,16
76:17,24 94:25 95:2
96:11 98:22 99:6,15
100:20 101:4 105:2,3,7
105:14,19,24 106:13,20
107:4,13,21 108:10
109:3,11 110:3,5,6,8,12
110:19 112:2,6 113:14
113:24 114:20 118:16
118:21 123:17,21 126:8
128:4 135:19 138:4
140:8,12,17,20,23,25
141:2,6,16 142:10
143:11 145:4,8,13,13
145:17 146:22 147:18
147:22 148:10,11
149:14,18 150:6,7

156:25 157:3,8,11
158:2 161:2 166:24
167:8 168:8,12,18,24
169:3,4 173:24 174:6
177:19 178:18,21
180:12 181:14 182:7,11
182:23 183:10,15
184:22,25 186:19
190:12,16,17 192:4
194:20 196:10 199:21
200:2,13,24 203:12,24
204:2,4,13,17 211:23
212:2,4 217:3,7 218:4
218:13 224:6 240:13
245:7,10,11,18,19,20
245:23 246:5 248:5
249:18 252:11 260:20
260:21 261:8,16,18,20
261:21,22 262:23 263:4
264:6,10,17,19,23
266:19 269:16 270:8,12
272:11,11 277:13 280:4
280:9,22 281:4,10,11
282:15,20,22 283:18
284:15,15,18
**breached** 95:22 277:4
**breaches** 1:3 7:13 13:13
13:13 33:16 34:23 37:8
37:9,10 41:25 42:2
47:25 54:2 58:6 59:7
68:6 92:14,17,19 93:9
126:21,24 127:14
190:21 258:7 265:2
**break** 47:16 80:25 96:2
107:25 108:3,6 125:6
**breakages** 94:21
**breakaway** 67:15,24
**breakfast** 24:14
**breaking** 101:19 102:12
102:13 122:14,23
**breaks** 103:3
**Brian** 128:8
**bridge** 18:10,14,16,16,19
18:25 19:16 20:9 22:11
64:19 80:3,4,9,10,21
81:2 129:5,15,20,20,21
129:23,24 135:8,8

**briefly** 13:20 139:23
246:16
**broad** 266:19
**broadside** 141:10,20
150:12 155:6
**broadsiding** 167:13
**broke** 86:24
**brought** 50:21 106:12
**brown** 205:16
**bucket** 22:14,21
**build** 210:13
**built** 58:9 60:25
**bulged** 116:19
**bunch** 215:24
**burden** 236:3 239:3,20
265:9,11
**burdened** 239:9
**burst** 44:14
**bus** 158:4,6
**business** 218:8

**C**

**C** 1:10 2:1 3:1
**cake** 39:2 222:10
**calcu** 151:22
**calculate** 62:22
**calculated** 114:2 117:12
126:20,23 127:2 151:11
151:15 157:13 215:21
257:2 276:4
**calculation** 62:25 154:4
160:15 166:2,7
**calculations** 31:15,18,23
32:3,9,13 70:15 79:14
106:18,24 107:7 116:12
116:15 117:15 127:6,11
127:17,20,23 144:20,24
148:5,6 169:9,13 256:6
257:20 258:14
**California** 3:5
**call** 136:18 153:8 241:18
**called** 74:8 113:22 165:3
**calls** 99:3 100:4,24 101:6
**canal** 1:3 5:22 7:12 10:10
10:19,24 11:19 12:7
13:2,8,17 14:3,20 15:3
15:9,17 23:21 33:7

41:18,24 42:21 43:24
44:7,19,22 48:2,10,18
52:5,12,17 53:3,14
55:24 59:7 63:7 72:11
72:12,17,21,22 73:19
78:16 80:24 81:9 82:14
82:22 83:11 92:18 93:2
93:20,24 94:4,7,22 96:3
99:19 100:12,17 101:9
107:9 119:22 137:20
157:6 165:16,23 186:20
188:4,10,17,25 192:14
192:15,22,23 193:9,10
193:13,14,21,23 194:5
194:9,11,16,23,23,25
195:2,4,6,7 207:14
209:22 217:7,14,20,24
245:7,15 248:12,13
249:7 250:6,7 259:11
275:9 276:9,13 277:3
278:13 279:4 281:13
**canals** 89:24
**canoe** 153:3
**cap** 47:10 127:7,8 150:15
169:4,6
**capable** 35:17 36:7
**capacity** 93:14
**capture** 128:12
**captured** 37:18
**carefully** 28:5 287:3
**carried** 63:17 169:23
170:5,15 271:22
**carries** 235:21 236:11
**carry** 197:14 204:2
216:19
**carrying** 190:22
**case** 7:12,13 9:13 17:14
29:6,20 30:17 48:3
49:5,8 55:12,23 63:2
68:20 86:20 90:8,10,18
90:25 91:5 94:20 96:7
97:5,6,9 118:5 119:15
164:9 179:20 184:12
198:9 254:12 256:17
282:6
**cases** 1:6 92:2 250:22
**casualties** 96:22

**casualty** 90:21
**caught** 36:25
**cause** 62:16 95:23 114:7
  114:13,17 117:13
  119:18 127:8 129:24
  149:15 154:8 155:2,22
  157:14 160:9 174:4
  198:17
**caused** 32:15 33:15,20
  34:17,23 50:4,14 92:21
  106:4 113:17,19 114:3
  114:21 115:10 117:20
  124:24 137:13 141:9,11
  145:4 149:15 152:10
  160:3 161:8 174:5
  178:17 185:3 187:14,21
  188:2,6,16 214:3 255:5
  255:21 261:15,18,21
  283:4,10
**causes** 33:22 34:5,21,22
  35:5 93:14 98:4 145:23
  155:18 166:13,24,25
  167:2 180:20 255:9
**causing** 35:17 36:7 152:5
  254:15
**cease** 183:6,9
**cell** 177:22,24
**central** 134:5
**Centre** 2:10
**certain** 19:7 31:15 62:16
  63:12 96:8 153:11
  193:24 194:2 216:8,23
  228:2 232:3 251:9
  269:8
**certainly** 268:19
**CERTIFICATE** 286:2
**certification** 7:4 85:6
  286:17
**Certified** 1:17
**certify** 286:4 289:6
**certifying** 286:20
**CHAFEE** 2:10
**Chaffe** 8:7
**chance** 42:24 67:20
  224:19 225:9,24 262:17
**chances** 136:6
**change** 15:7 263:7,11

279:11 288:5
**changed** 143:10 268:9
**changes** 287:9 289:10
**channel** 164:3
**channels** 164:7
**chapter** 36:15,19 37:3,7
  37:12,17 38:7 39:17,20
  39:20,23 49:16 77:4
  195:15,18,21 279:23,23
  280:2
**characteristics** 153:14
  197:11 242:7
**characterization** 197:23
  198:10,13 212:2,16
  213:13 214:24 216:3
  217:3,6 218:3 222:6,7
  223:20,22,23 237:10
  263:15 270:22
**characterizations** 265:16
  266:4
**characterize** 209:8
  211:23 214:3 237:5
**characterized** 121:13
  212:6 238:4
**characterizing** 236:25
**Charles** 3:17 281:14
**chart** 109:15,18 203:15
**choice** 211:13
**choose** 238:24
**chose** 211:9 239:2 259:4
  262:7 265:4
**chosen** 262:16
**circle** 50:20 131:8 138:24
  205:11 207:5 261:3,6
**circled** 131:12 139:10,19
  205:16
**circuit** 158:15
**circular** 260:7,24
**circumstances** 47:7 86:6
**cite** 119:6
**cited** 77:15,24
**CIVIL** 1:5
**CJ** 58:22
**Claiborne** 18:10,14,24
  22:11 64:19 135:8,17
**claim** 15:19
**CLARA** 266:9

**clarify** 9:20,22 27:20
**clay** 260:23 264:16,17,22
  264:25
**clays** 205:18 251:3
  252:14
**clear** 26:11 50:10 67:14
  98:12 110:20 111:16
  121:10 123:4 171:18
  182:20 186:4 189:13
  200:14 210:8 219:2
  222:11,24 223:2 224:2
  227:3 264:9
**clearly** 100:2,3 247:15
**climbs** 117:14
**clocks** 99:2
**close** 13:11 45:24 49:22
  50:5,15 72:15,15
  113:13 132:25 207:9
  281:11
**closer** 52:23
**closest** 207:13,19
**close-up** 277:15
**clue** 67:11,13 194:6
**Cobos-Roa** 224:16
  225:11
**cofferdams** 210:13
  215:19
**coiling** 185:17
**collapsed** 108:5
**colleague** 9:6
**collided** 173:25
**collision** 47:5 141:8,10
  141:10,17,20,23,24
  142:7 147:17,22 149:13
  150:9,11,12,17 151:3,8
  152:17,18,21 162:20,23
  162:24,25 163:2 166:24
  184:17 281:2
**collisions** 166:20 167:3
  181:6
**combination** 110:17
  206:13
**combined** 257:21
**come** 96:15 103:10
  129:14,19 149:25 161:9
  169:3 171:20 249:17
  252:5 254:4,6 256:3

272:22
**comes** 14:7 42:14 103:15
  156:14 172:17 216:13
  216:14 218:21 226:20
**comfortable** 117:18
  175:17
**coming** 21:19 22:5 70:10
  72:6,10 78:8 80:23
  154:11 171:16 218:23
  281:6,8
**comment** 92:17,24
  106:15 193:11 260:8
  262:10
**commented** 268:3
**comments** 49:11 93:3
  225:23
**commission** 289:22
**common** 233:4
**communications** 97:14
**compacted** 210:6 233:3
  249:25
**compaction** 231:25
  232:2,4,5
**compare** 194:19 268:12
  268:23
**compared** 94:9 160:7
  170:19 188:21 193:8
  267:20,24 268:16
**complete** 151:6 213:6
**completed** 49:12 114:11
**completely** 184:7
**complex** 167:9
**complies** 51:2 131:11
  163:3,6 205:13
**component** 72:14
**Compound** 140:13
**compression** 226:21
**compressive** 180:15
**concentrating** 132:25
**conceptual** 163:19
**concerning** 68:4
**conclude** 33:15 34:23
  78:14 83:21 94:19,20
  95:3,8 111:15 124:21
  182:21 184:24 187:25
  188:16 199:24 264:2
  279:4 283:3

**concluded** 15:2 25:19
76:17 77:11 83:10
100:20 105:6 110:21
111:15 116:9 124:3
145:3,7,8 165:21 180:4
188:8 245:24 263:9
264:5 268:24 283:9
**concludes** 83:7 99:14
285:13
**concluding** 12:24 261:15
261:21
**conclusion** 15:8 29:3
33:20 34:17 50:7 54:10
54:16 63:18 74:13
78:25 82:12 99:15
100:23 101:4 107:8
124:8 152:5 283:19
284:8
**conclusions** 30:19 32:23
39:23 97:23 98:16
117:18 119:14 154:11
154:17 180:6 246:20
247:10
**concrete** 86:24 87:10,10
88:19 89:3 98:5 117:3
117:9,21,21 127:7
130:9,18,23 131:3,10
138:19,20,21 139:7
142:4 179:8 181:3,9,11
181:15 184:20 190:7
199:20
**condition** 88:15 132:2
161:22,23 167:18
180:24 181:2 185:13
186:23 189:12 191:7
193:3 234:16 255:17,19
**conditions** 36:12,14,19
36:23,23,24 37:4 38:20
38:22 68:5,8,9,12,13,18
68:19,24 69:4,6 71:17
73:16,18,20 77:23
87:11,13 90:12 92:15
128:18 137:18 167:11
188:21,23 196:2,5
198:20 199:9 203:23
233:19 234:10 246:15
275:11,12 281:9,18,19

281:20,21 283:16
**conducted** 34:3 88:24
90:23 91:3 108:18
**cone** 229:20 230:7,13
**conference** 87:7
**confident** 32:23 117:18
**confidently** 28:21
**configuration** 209:12
213:10,25
**configurations** 260:11
**configured** 212:22
**conform** 236:15
**confused** 65:9 146:4
219:24
**confusing** 192:11
**connected** 123:2,3
138:16
**Connecticut** 3:9
**connection** 42:2 44:24
47:25 52:24 93:9,11,13
93:17 94:2,4,6,11,13
95:21 96:12 124:12
133:2 134:12 143:7
165:19 192:23
**connections** 137:21
**consequence** 179:2,5
181:10
**conservative** 200:7
231:16 233:14,17
234:22
**consider** 24:25 91:7 98:9
98:18 108:2 146:14
168:22 200:9 249:8
258:5 266:16
**considerable** 12:19
153:17,19 223:20 224:4
229:7
**considerably** 206:8
**consideration** 24:5 73:17
**considered** 29:12 77:9
129:2 244:11
**considering** 54:6 63:23
199:19 252:3
**consistent** 46:5,8 64:16
124:25 134:6 167:15
214:20 216:12 269:7
**consolidated** 1:4,6

**consolidating** 239:21,25
**constitute** 59:25
**constitutes** 59:12
**constructed** 91:9
**construction** 58:19,22,25
59:4,5,11,17,18,23,25
60:18,21 61:21 63:9
87:6 91:13,20 113:23
117:9 183:17 213:4
**contact** 97:24 98:8,17
104:24 129:15,19
156:15
**contain** 29:4,8 36:2,5
**contained** 117:3 137:21
217:3
**contains** 27:18 195:18,21
224:23
**contention** 51:9 213:15
**contents** 128:13
**continue** 19:6 99:12,13
130:7 215:13
**continued** 3:1 70:21
**continues** 20:8,15,24
21:9,20 22:2,13 44:2
**continuing** 20:6
**continuous** 16:3 182:3
183:7,10
**contours** 60:13,13,14,19
61:4,7
**contractor** 52:16,17
53:16,19 218:5 244:11
**contrary** 238:5
**contribution** 160:24
**control** 286:19
**conversations** 175:8
233:12
**copied** 112:17 128:7
**copy** 81:18 82:4,5 84:15
84:19 112:19 131:9
224:17,19
**cord** 80:3,9,20 81:2
**corner** 67:10 104:18
112:9 129:5,8 135:19
135:20 167:12 174:24
**Corp** 89:18 90:2
**Corps** 5:14 52:16 53:15
65:7 91:17,18,19,25

92:6,23,25 93:6,8 99:25
210:5,20 213:8 215:15
215:19 216:5,15 218:5
231:19 232:8,10,18,20
233:5 258:25 259:21,25
262:11 266:5
**correct** 25:4,9,17 26:15
26:21 34:14 35:18
37:11 39:15,18,25
44:23 46:15 47:24
48:15,19,25 49:2,4,7,9
49:10,14,15 52:10,18
52:19 53:21,22 54:24
58:7 60:15 61:2,5,9
62:8,12,13 64:7,8,19,20
65:5,14,25 66:21,25
67:8 70:22 71:22 72:17
72:20,22 74:19 75:23
84:17 90:17 92:16
96:20,24 97:15 100:10
100:15,19,22 101:10
103:22 106:21,22 107:4
107:5,10,11 108:19
110:24 111:8 113:25
119:5 120:3,8,20
121:16 124:7 125:23
126:2,6,8,9,11,13,14,17
126:18,22,24,25 127:4
127:5,9,10,24 129:25
130:2 132:6 133:3,11
142:13 145:5,10 150:15
150:16,19 151:4,5,14
151:19 156:18 159:16
159:19,22 161:4,5,19
162:18 165:11,18,20,25
166:14 177:3 178:23
181:11,12 182:9,11,15
182:16,18 183:7 187:4
194:21 195:10,11,20
197:18 207:11,12
208:17 209:18 210:10
211:6 214:15 216:17
217:4,18 219:11,12
223:8 224:21,22 225:14
226:9,19,23 227:12
231:8 237:12 239:4
245:3 249:12,22 251:12

253:9,14 254:18 257:23
258:15,17 259:15
260:18 261:9 262:2,19
263:8 268:22 269:19
275:5,10 276:10 280:12
289:8
**corrections** 287:4,5
289:10
**correctly** 56:18 84:18
88:7 145:16 242:11
252:19
**correlation** 242:3
**corresponds** 226:10
**Council** 260:4,5
**counsel** 7:4 218:15
279:10
**count** 262:18
**counter** 107:2,10
**couple** 13:12,16 27:9,9
65:15 171:8 245:12
256:25
**course** 38:21 40:25
134:14 198:7 211:2
215:2 222:3 261:3
**court** 1:1 7:14,17,18 8:8
9:25 56:11 71:7 284:19
287:16
**CPT** 259:20
**CPTU** 203:6
**crack** 86:11 127:13
139:9,19 165:10,13,15
165:16,23 194:22
245:25 246:3,7 254:16
**cracking** 44:13 45:3,7,9
**cracks** 127:18 138:19,20
138:20,25 139:7,10
192:24 245:5
**create** 69:10 94:14
134:11 139:7 144:22
149:4 157:15 164:23
191:6 196:9,16,17
197:6 222:18 238:12
253:20,22 255:15
**created** 38:10 89:2
139:19 152:3 163:25
166:5 178:7 196:5
204:5 222:11 223:2

272:25 273:9 275:8
**creates** 139:5
**creating** 22:3 95:4
138:15 159:7,21
**creation** 161:10 192:23
**credence** 171:22 172:6,7
172:13
**credible** 82:22 172:10
**credit** 83:12,14 173:10
**credited** 173:11,19,20
**crisp** 186:4
**critical** 260:13,15,20
264:2,5
**critique** 259:7
**cross** 212:3 215:17
**cross-section** 139:25
203:11,20 215:10
217:13,15,16 220:7,9
230:17,21,23
**cross-sections** 209:5
**crown** 57:18,21 58:10,14
58:16,19 62:12 190:24
191:4 199:17,18,25
200:2,8 273:15,24
**crowns** 190:23 191:8
194:25
**crushed** 171:14
**CSR** 286:12
**cube** 104:9,10
**current** 84:19 282:8
**curriculum** 84:16,19
**curvature** 180:13 181:5
**Cushing** 3:17 73:2,8
175:6,9 281:15
**Cushing's** 13:21 67:18
175:19 176:6
**cut** 19:15 23:5,19
**cutting** 23:11
**CWLSHT** 257:8,12,18
**cylinder** 237:9
**C-W-L-S-H-T** 257:8

---

**D**

**D** 2:7 4:1 5:1
**damage** 33:8,9,10,14,24
33:25 34:5,16 37:9
76:15 86:6,8,10,14,16

87:16 98:2,3,5,11,11,12
98:13 110:15,16,16
137:11 142:15 171:14
174:14,21,23 175:5
179:16,17 181:9 187:18
194:19 259:23 275:6,7
276:6,7 281:8,17,19,20
281:21 283:3,4,9,10,13
283:15
**dampen** 78:7
**dampened** 78:11
**Dan** 8:5
**DANIEL** 2:18 3:18
**darkness** 121:7
**dash** 163:18
**data** 25:20 29:12,14 37:6
38:3,6 64:23 71:12,16
71:20,24 74:7,18 75:4
75:12,13,16,17,20 77:8
77:15 79:4 99:3 100:3
101:6 177:7 202:9
203:8 206:8 209:2
212:22 221:17 229:20
230:7,10 235:11 236:22
238:15 244:10 266:5
**date** 26:2 287:8 288:25
289:15
**datum** 191:16,23,23
192:17
**day** 24:13 28:10 195:16
289:19
**days** 28:8,12,24 287:14
**DC** 2:4 3:10
**debond** 180:21
**debonding** 178:2,24
180:14,18 181:17 190:7
**decibel** 45:23,25
**decide** 172:9 198:9
**decided** 17:3
**decrease** 241:5,10
**deduce** 214:2,5
**deduced** 214:6
**deduction** 213:23
**deemed** 287:16
**deep** 86:23 104:16
201:25 206:15 209:25
**deeper** 132:3,5,9,17,23

133:22 134:12 263:25
264:8 265:6,10
**defect** 93:23 272:14
**defer** 73:19 76:9 97:18
97:22 98:7
**define** 33:17 56:3
**definitely** 47:4
**definition** 168:23,23
229:15 237:22
**deflect** 149:15 155:2,10
155:22 157:15 246:10
255:22
**deflected** 185:13
**deflection** 36:24 167:21
178:17,22 185:14 187:3
187:7,11,14 188:3
246:12 273:2,9
**deflections** 95:5,9 243:8
**deformation** 32:22 76:15
180:24 181:2 188:12,19
189:3
**deformed** 183:22
**degree** 119:3 121:8
156:14 193:4 197:21
251:19
**degrees** 72:7
**delaminated** 130:17
**demonstrate** 36:7 52:20
**demonstrates** 35:16
**density** 239:10 242:12,14
265:5
**departed** 39:10 267:9
**departure** 66:15,17
**depend** 73:3,5 83:15
193:6,17,17 210:2,4
239:8 248:11
**depending** 59:20,21
251:10
**depends** 59:14 62:18
137:16 153:6,6,7 156:6
197:21 234:15 248:16
248:17 250:16,17 252:2
**depicted** 247:15
**depicting** 277:12
**depicts** 138:2 162:16
186:18
**DEPONENT** 289:3

**deposing** 287:13
**deposition** 1:15 4:15 5:8
  6:1 7:11,15 8:18,19
  9:10,14 11:4,7 14:6,11
  16:6,10 17:22,23 18:3,7
  19:4 23:14 29:23 30:7
  30:13,21,24 42:11 56:6
  80:16 81:15 84:10,12
  105:5,23 107:25 108:14
  108:16,17,20 109:8,8,9
  109:16,19,20 122:2,5
  123:11 125:20 143:12
  143:14,22 171:19
  172:15,17,21 173:4,12
  173:15 198:23 202:21
  204:8,11 218:12 243:18
  249:2,5,10 274:19
  276:20,22 285:7,10,18
  286:5 287:3,11,14,15
**depositions** 16:25 17:3
  17:10 31:9 99:2 100:24
  101:6
**depth** 104:6,10,12 114:8
  206:9,15 209:21 210:12
  212:9 215:5 236:8
  237:17,22
**depths** 104:16
**Derek** 2:13 8:6
**derive** 197:18 205:21
  206:12,21 207:6
**derived** 127:23 226:20
  227:10,25 228:24 237:8
**describe** 21:21 22:2
  81:22 89:2,5,9,11
  111:25 116:17 246:16
**described** 113:12 150:22
  152:7 157:16 166:21
  171:19 185:5 187:18
  216:14 251:11
**describes** 171:15
**describing** 45:3 89:8
  205:12
**description** 4:9 5:3 45:18
  100:5 106:2 108:23
  114:25
**descriptions** 42:9
**design** 58:2,3 91:13,20

91:22 93:22 212:3
  217:13,15,16 230:17,21
  230:23 231:6,6,11,15
  231:18 232:15,16,25
  233:2,5,6,10,13 234:18
  234:21 259:24
**designated** 236:23
**designed** 89:17,21 93:6
  274:7
**detail** 222:12,12,13
**detailed** 168:4 175:6
  222:9
**details** 58:5 65:16 97:18
  148:13 177:17
**determination** 12:13
**determine** 39:4 70:15
  73:20 122:12 127:7,12
  136:24 166:3 199:8
  208:10,11,14,16 209:3
**determined** 110:16
  208:15,15,25 214:11
  273:13
**determining** 37:19 39:6
**develop** 194:24 195:22
  207:19
**developed** 243:12 273:15
  273:23
**developing** 154:11
  244:25
**development** 40:9
  253:18
**diagram** 243:3
**differ** 38:14 54:16
  198:14 204:5,18,19,22
  205:6
**difference** 61:17,19 73:7
  73:15 102:9 160:10
  170:22 191:19 192:5,16
  192:20 200:5 233:9
  239:19,20 255:21
  267:18
**differences** 38:23
**different** 11:24 38:17,18
  45:12 64:4 73:2 86:5
  87:4,23 88:3 89:9,10
  103:11 109:16 115:23
  153:5,19 155:11 166:23

167:5,10,18,22 180:5,6
  184:6 189:12,20,22
  195:6,8,10,21 199:12
  202:17,25 208:25 209:6
  212:9 234:19 239:15
  251:8 254:20 267:17
  271:5 275:11,11,12,12
**differentially** 265:11
**digging** 195:16
**digs** 205:18
**dimensional** 266:12,15
  266:16
**diminishing** 234:13
**direct** 178:25 181:4
  189:25 286:19
**directed** 59:24
**directing** 199:6 211:15
**direction** 6:2 69:11,20
  71:13 72:24 73:4 75:6
  75:10,22 76:18,18,22
  107:2,9 114:16 141:14
  152:24 153:4,5,16,20
  154:22,25 156:17
  174:10,11,13 184:21,23
  184:25 248:2 252:2
  268:9 281:4,6,8 283:17
  284:5,9,12
**directly** 109:22 140:19
  143:4 156:9 267:23
  277:13
**dirty** 255:8
**disagree** 95:5 175:12
  179:15 232:14,15,19,21
**disagreement** 268:20
**disagrees** 261:8,16,22
**discard** 229:18
**discoloration** 199:20
**discovered** 187:18
**discuss** 194:18
**discussed** 88:19 140:5
  181:6 247:16
**discussion** 172:19,20
**dislodge** 117:14,21
**displace** 114:6 154:8
**displaced** 130:17 184:20
**displacement** 133:7
  138:11,12 141:11

142:23 149:16 158:21
  166:25 188:12,19 189:2
  189:14
**displacements** 132:25
  133:4
**disregard** 225:18
**disregarded** 225:16
**distance** 12:19 89:14
  150:23 170:9,11 284:17
**distill** 109:18
**distinct** 32:10 39:6
  217:11 249:14
**distinctly** 189:19,22
**distinguish** 122:13,21
  189:16
**distorts** 110:10
**distribute** 104:10
**distribution** 104:5
**District** 1:1,2 7:14,15
**document** 4:22 5:4,5
  11:6 14:10 18:2,21
  20:12,21 21:4 22:23
  23:7 30:6 42:10,23,24
  43:4,11,13,16 60:7
  63:19 65:18 80:15
  81:14 82:15 84:11
  107:22 112:13 116:22
  119:10 122:4 144:10
  162:13 190:4 202:20
  204:7 210:7 220:21
  243:17 244:20 264:21
  273:19 274:18 276:21
  285:6
**documentation** 52:11
  53:18 210:19 216:18
  219:6
**documents** 6:7 225:3
**doing** 21:18,22 32:17
  70:13 71:2,4 79:14
  86:13 233:13 234:13
  253:16 255:7,8 258:13
  266:14 287:7
**downward** 215:13
**dpollard@kpalawyers...**
  3:6
**Dr** 9:5,6,12 10:9 13:21
  29:19 40:23 47:24 49:4

61:15 62:14 67:18 73:2
73:8 84:9 98:20 154:19
162:10 175:6,9,19
176:6 178:16 182:21
185:24 201:22 225:4
229:7 240:12,16,17
285:14
**draft** 27:22 65:24 66:13
66:13 224:19
**drafting** 112:15
**draftsman** 112:16
**drainage** 217:14
**dramatic** 143:15 144:2
**draw** 30:13 50:20,22
66:22 79:10 125:15
157:23 167:23 207:5
284:13
**drawing** 57:11 112:18
113:4,5,7 116:20 214:2
220:25 224:2,3,6
**drawings** 57:7 213:24
**drawn** 51:3 100:9 136:21
169:17,20 171:9 194:22
224:12 235:10,20 280:3
280:9 284:14
**dream** 125:5
**drew** 79:19 177:3 283:19
**drive** 128:7,10,12,13,15
128:16,25 129:24
**driven** 129:22 163:22
**drives** 247:10
**driving** 155:14
**drove** 38:23 135:4
**drugs** 10:5
**dry** 243:15
**due** 95:10 97:7 181:17
284:2
**dug** 209:25 215:19
**duly** 8:11 286:4
**DUVAL** 1:9
**dwebb@cwslaw.com**
2:17
**Dylan** 3:6 7:22 81:17
**dynamic** 102:13 103:2,6
103:9
**D.C** 1:16 7:17

**E**
**E** 2:1,1 3:1,1 4:1,8 5:1,2
249:21 288:3
**earlier** 30:13 39:8 64:13
65:7 69:16 84:20 88:18
116:16 120:5 139:23
152:7,9 157:19 192:21
218:12 223:19 236:25
260:3
**earliest** 128:3
**early** 263:6,10
**earthquake** 152:12
**earthquakes** 86:9
**easier** 43:8 85:7 116:21
**east** 4:19 5:10 10:10,23
11:18,22 12:25 13:7,17
14:2 15:9,11,16,22
23:21 33:6 42:21 43:24
44:6,21 72:12,17,22
74:14 137:20 158:4
168:20 188:9 189:23
190:24 201:8 218:6
242:21 248:6 250:6
278:12 279:4
**eastern** 1:2 7:14 137:15
194:8
**eastward** 130:16
**east/west** 220:6
**easy** 151:22 154:16,17
**edge** 171:10 178:18
281:11
**editorial** 28:12
**education** 87:25
**Edwards** 4:16 17:18,23
18:7,9,13 26:7,15
**effect** 53:10 69:25 81:7
96:25 151:15 164:19
178:12 235:18 241:7
253:21 254:9 255:2
257:25 258:5 267:22
**effects** 98:11,12,13
178:13
**effort** 199:14
**eight** 79:22 80:25
**either** 12:23 35:17 36:8
49:13 53:13,20 54:21
54:22 62:22 103:15

110:4 126:20,24 127:3
221:22 248:2 249:10
250:8 253:19 260:13
277:17 284:10
**elastomeric** 94:17,21
95:5,9 96:2,10,11
**element** 73:15
**elevation** 10:22 12:4
13:23 15:2 39:5 57:15
57:18,20 58:2,3,14,15
63:24 80:3,7,9,20 81:2
166:18 191:5,13 193:24
199:18,25 200:2,9,23
201:10,11 205:8 216:21
247:3
**elevations** 4:13 10:14,15
13:21 14:2,21 39:4
64:14
**elevationwise** 194:2
**eliminate** 34:5
**eliminated** 166:12
**elimination** 33:24 34:2,8
34:8,18,19 110:14
152:6
**embankment** 95:20,24
120:6 205:7 208:5,12
208:19 209:8,10,12,13
210:8,11,21 211:4,9,10
212:7,8 215:21 216:3
216:15 220:15 221:13
221:22 226:2 230:18,22
230:25 231:7 237:2
238:4,13,17,20,22
239:17 240:22 241:3,15
249:20,25 250:5 267:11
267:16,25 271:6
**embayment** 50:12 51:5,6
**embedded** 88:17 132:9
221:21
**embedment** 94:8 132:4,5
**empty** 106:25
**encompass** 238:3
**encompassed** 260:25
**ended** 215:14
**ends** 94:25 190:10
**energy** 2:10 60:9 103:6,8
114:17 154:21,22,25

155:3,18 156:16
**engineer** 27:23 231:18
233:6 256:9 283:13
**engineering** 5:20,21 9:7
31:15,18,23 32:2,8,13
35:16,22 36:6 87:6
88:3
**engineers** 5:14 28:3
52:16 53:15 89:19 90:2
91:17,19,19,25 92:6
210:21 231:19 232:9,11
233:5,12 259:2,21,25
262:11
**ensure** 232:2
**enter** 173:23 174:4
**entered** 184:24
**entering** 78:3 184:22
**entire** 15:9,11 23:14 25:6
64:17 133:20 137:15
144:15 148:19 209:11
254:16
**entirely** 167:17
**entitled** 4:22 91:20
**entries** 26:3 109:18
**entry** 25:25 26:17
**equal** 98:19 193:15
**equally** 93:24
**equals** 46:7 47:8
**equate** 121:22
**equates** 228:20
**equilibrium** 34:10,12
39:21 40:8 76:14 91:4
**Ernest** 4:15 17:18,23
26:7,7,15
**erode** 142:25
**eroding** 143:8 221:11
**erosion** 144:17,22
149:19 163:14 253:19
**errata** 287:7,10,13
289:12
**error** 223:9,11,12,13,15
**errors** 66:25
**escaped** 272:15
**ESQ** 2:7,13,18 3:6
**ESQUIRE** 2:6 3:11
**essentially** 33:19 34:23
141:12 167:18

**established** 192:15
**establishes** 199:4
**establishing** 99:11
**estimate** 62:22,23 63:5
    64:9 98:23,25 207:24
**estimated** 63:13 82:8
**estimating** 65:3
**estimation** 62:25 92:14
**ethics** 85:16
**evaluate** 24:23 25:15
    39:21 68:13 70:4 90:2
    92:5 225:9
**evaluated** 39:17 90:6,10
    96:17 97:6,9 272:24
**evaluating** 73:18 86:14
    86:15 98:5 259:10
**evaluation** 14:17 40:7
**evaluations** 283:14
**event** 22:9 59:13 72:16
    218:10
**events** 16:6,14 24:8
    26:21 149:2 150:6
**everybody** 111:23 200:6
**everybody's** 198:5
**evidence** 48:6 106:19
    125:24 130:6 140:6
    164:10 175:3,10 186:24
    221:5,10,21 222:5
    248:24
**evidenced** 221:7
**evidences** 139:19
**evident** 179:22
**exacerbate** 164:19 191:7
**exacerbated** 193:4
**exact** 24:15 242:3 285:5
**exactly** 13:12 26:5 73:14
    83:25 114:22 128:13
    156:12 166:6 212:12
    222:8 228:22 258:4
    260:18 263:14 269:14
    277:16
**examination** 8:14 33:13
**examinations** 33:10
**examine** 240:19
**examined** 8:12
**example** 26:8 86:21
    128:22 170:20 178:6

184:5 231:23 241:2
    251:17 269:7
**examples** 274:9,13
**excavation** 49:20 50:10
    53:3,7
**excavations** 50:4,8,14,21
    51:4,10,14 52:4,12,17
    53:13,20,23 54:11,21
    164:12,15 218:4 219:3
    219:4,7,11
**exceed** 233:5
**exception** 198:7
**exceptional** 105:7 106:4
    106:8,12
**excessively** 93:16
**excited** 185:25
**exclude** 92:25
**excluded** 228:9
**excused** 285:19
**exemplary** 161:22
**exert** 101:22 103:2
    133:20 134:11,15,18,24
    156:10 192:20 239:3
**exerted** 104:20 118:20
    154:22 155:3,24
**exerting** 134:9
**exerts** 103:13,21
**exhibit** 11:3,7 14:6,11
    17:24 18:3 27:6,9 30:2
    30:7,12,12,14,15,16
    42:11,14,14 43:12,15
    80:14,16 81:13,15
    84:10,12,15 122:3,5
    202:21,24 204:8,11,12
    211:17 242:6 243:18,20
    243:22 274:17,19
    276:19,22,25 285:7,10
**exhume** 127:3
**exhumed** 160:12,13
    189:10,14,22
**exist** 28:13 83:7,9 172:10
    263:18
**existed** 13:13 134:25
    160:7 208:14
**existence** 94:3
**existing** 60:13,14
**exists** 137:23 213:22

214:7 233:10
**expand** 99:23
**expect** 8:6 27:19 29:5
    59:17 104:15,19 133:9
    133:13,15 169:15 234:8
    235:21 242:5 265:10
    266:21,24
**expected** 32:7
**experience** 88:18 96:25
    98:4 119:21 229:10
**experienced** 232:14
**expert** 4:10 5:20 11:4
    24:19,23 27:2 48:6
    70:24 94:20,23 95:3,8
    95:11 96:21 98:10
    99:14,16 172:6 179:12
    221:5 232:14 282:2
    284:23
**expertise** 69:14 70:8
    73:13 78:10,14,19
    87:25 97:21 106:16
    110:23 118:18,25
    256:10,15
**experts** 99:7
**expires** 289:22
**explain** 36:21 53:2 55:5
    60:9 110:7 142:11
    159:5 163:15 167:3
    177:4 206:14 212:19
    247:17,21 281:7
**explained** 141:7 232:24
    271:17
**explanation** 110:11
    111:9,17
**expound** 95:16
**express** 268:20
**expressed** 236:10
**extend** 205:8 207:10
    260:22
**extends** 207:11
**extra** 85:12,14 103:21
    104:2 112:18,22 113:7
    139:24 189:13
**extraordinary** 149:23
**extrapolating** 195:5,6
**extreme** 188:21,23
**eyewitness** 15:21 31:9

107:16
**eyewitnesses** 24:17 168:5
    248:23
**E-99** 5:14 242:20 243:23
    245:13

**F**
**fabricated** 151:23
**fact** 13:15 23:18 24:8
    25:13 39:9 71:21 73:18
    78:15 80:24 87:5,22
    101:15 116:5 119:19,24
    132:24 137:3 152:19
    164:21 166:11 167:19
    170:8 173:19 174:25
    177:10 187:19 188:24
    195:7 198:9 210:20
    211:9 221:6 232:24
    245:6 246:4,9 249:6
    255:17
**factor** 14:25 124:5
    198:17 258:10 271:13
    272:6,7,11 278:22,23
**factors** 38:17,19 262:4,7
    265:23 269:10,18 270:8
    270:12 271:9,10,16
    272:2
**facts** 25:21 166:9,10
    172:10
**fail** 52:23 53:5 55:18,19
    56:13 64:12 93:23
    133:16 149:8 155:13
    233:18 287:15
**failed** 61:12 90:24 91:5
    92:14 98:14 116:13
    117:25 125:17 126:7,13
    132:8 137:14 169:23
    221:6 257:3
**failing** 45:8 151:7
**fails** 89:3 118:7 264:15
**failure** 4:17 5:22 15:14
    34:25 41:2 48:9 55:23
    55:25 56:3,4,14,21,23
    56:24 68:10 71:22
    87:11,13 88:19,23
    90:11,15 92:12,13,21
    93:22 95:18 97:2,7

100:6 113:13,17,18,23
123:21 124:9 125:3
133:25 134:7 135:2,3
142:17,19 146:23,25
152:5 159:23 160:4
161:18 170:21,23,25
171:5 186:23 187:21
188:6,8,17 194:11
196:19,21 234:2,5,8,17
252:10,18 259:10 260:9
260:13,15,20,24 261:2
261:7,16 263:12,25
264:5,6,10,12,18 265:6
265:6,10 266:18,19,21
266:22,25 267:14
**failures** 32:15 33:20
34:18 93:18 126:16
128:17 161:21 170:23
188:9,15,22 189:23
254:5
**fair** 9:22 25:2 33:16
55:13,13 79:11 85:24
86:17 88:4,11 109:23
126:5 127:23 140:14
180:21 186:9
**fairly** 72:25 115:2 281:4
**fall** 129:25
**falling** 22:3 156:17
**familiar** 41:23 232:8
**Family** 1:9
**far** 12:15 148:9,20,23
152:18 157:6 179:9,10
182:19 207:9
**fashion** 88:13
**fast** 22:5 114:2,20
**faulty** 115:23 116:2,6,13
197:18 257:16
**feature** 266:14
**features** 204:21 205:5
**feel** 28:21 32:24 70:10
91:23 106:15 111:14
117:18 164:25 225:22
**feeling** 104:12
**feet** 11:17 12:25 14:3,20
15:4,8 49:22 50:5,15,22
58:10,16 59:2 62:8,11
62:15,16 64:2,17 65:22

65:25 66:7,19 77:12,12
78:3,15,15,20 79:2,3
80:4,10,21,25 81:9 94:8
100:13 101:9 102:3,4,5
119:25 120:3,4,7,10,23
121:5,13 143:16,24
144:3 148:4,24,25
149:3 150:8,18 166:18
168:7 169:12,17 170:14
171:7 187:3,4,5 190:24
191:24 192:5 199:19
200:2,8 201:8,8 205:8
206:10 207:11 209:22
210:12,22 211:10 212:6
215:20 216:16 252:20
252:23,24 253:7,12
257:4
**felt** 15:13 32:19 104:16
164:25 227:14 255:2
**fibrous** 251:13,21
**field** 5:15 232:17 233:3
243:23 282:17 284:11
**figure** 4:13 5:10 14:23
54:25 57:5,6,8,19 58:5
60:4,6 61:10 66:22,23
67:2,16 73:10,24 75:14
112:11,11,12,19,21
116:23 139:22,23
142:21 161:24 162:10
163:17,17 169:25
173:21 180:10 185:10
185:11 200:17,17,22
201:23 202:5,6 203:10
203:19,21 206:2,6
207:13 212:24 219:25
219:25 220:6,9,16
224:3,14 226:6 234:25
236:18,19 237:24 238:2
238:9,13 242:22,24
269:4 270:21 275:21
282:19
**figured** 268:6
**figures** 5:12,17 55:2
60:10,11 74:4 217:4
220:3,4
**files** 128:14
**filing** 7:4

**fill** 51:23 52:4,17 53:3,12
53:20,23 54:11 62:2,4
205:7 206:15,16,22
210:8,11 211:4 212:9
212:11 213:22 215:21
216:16,21,25 217:2,9
217:21,24 218:7 221:22
226:22 231:20 232:11
262:21 263:2,16
**filled** 50:8 51:10,20
52:13,20 54:21 164:12
164:15,22 217:8,20
218:4 219:3,4,10
**final** 70:3 158:6 180:23
180:25
**finally** 74:16
**find** 64:4 67:3 80:12
128:5 177:7 187:20
210:24 225:2,3 249:16
260:19 272:20
**finds** 251:11
**fine** 43:2 52:8 56:20
84:24 136:19 163:2
**finger** 51:6
**finish** 9:15 146:19
**finished** 32:4 40:10
87:14
**finite** 73:15,15 148:12
**firm** 7:16 8:3 27:23
**first** 8:11 9:14 18:19 19:3
23:14 26:2,4,15 28:11
31:11,12 32:17 42:23
43:4,12 47:16 74:14
77:23 96:17 112:5
124:9,17,20 143:22
158:12 194:3,7 195:25
196:16 252:6 270:18
**fits** 214:8
**five** 62:7,11,15,16 67:7
111:20 233:25
**fixed** 96:19 132:2
**flat** 104:8
**flexibility** 133:6 149:11
**flip** 226:15
**flipping** 196:14
**floating** 171:16 281:15
**flood** 54:8,22 55:14

125:17 126:13,16,21
127:12,17,19 130:9,23
131:10 135:7 136:7
155:13,15 159:11 191:4
191:12 205:17 213:5,21
243:4 244:9,15,17
245:5 246:3,24 248:6,8
274:24
**flooding** 26:21 51:20
100:21 146:5,5,21,23
147:3,8,19 149:8 150:7
165:4 168:8,14,17,22
168:23 171:11 221:11
275:12 280:10
**floodwall** 4:13 14:21,22
31:20 33:10,14 34:16
44:25 49:22 50:5,16,18
50:22 51:19 52:2,5,13
52:18 53:4,15 55:6,9
56:14 58:2,3,6,9,10,15
58:18 59:2,6 60:25
61:22 63:10,25 64:14
64:16,17 65:4,12 68:9
72:12,13 89:18,21 90:3
90:7,15 91:21 93:2,19
97:2,7 98:14 114:6,16
116:17 117:22 120:5
137:15 165:17 170:22
178:20 186:19,23 187:3
187:18 188:22 199:20
199:25 200:13 201:8
261:22 263:12 275:9
277:4 278:12
**floodwalls** 32:15 91:8,14
92:22 95:19 159:14
160:8,11 169:23 259:11
**Floor** 3:4
**Florida** 64:18 80:3,9,21
107:25 129:5,15,19,23
135:8,16 136:13
**flow** 57:7 76:10 95:22
170:2,6 225:20 252:2,3
252:8 273:8,16,25
281:12,12
**flowed** 280:20 282:14
**Flower** 3:4
**flowing** 96:4 108:5

**focused** 121:10
**following** 56:7,7 149:2
  150:5
**follows** 8:12
**foot** 44:11 63:14 66:13
  66:13 77:6,6 79:22
  86:12 106:25 124:13,13
  124:17,18 191:24
  192:16 193:13 215:22
  226:4,8,11,13,20
  227:11 228:21 230:18
  230:22 231:2,8,12
  232:13 238:20,25,25
  239:17,18 241:7,8,15
  241:16,18 242:6 250:14
  280:21 282:15
**force** 14:18 59:22,23,24
  68:24 69:16,19,20 76:4
  94:14 106:3 107:9
  114:6,10,13 115:14,16
  115:17,18 118:20
  126:23 127:2 129:24
  134:11 137:17 138:14
  139:12 144:16 153:5,12
  153:17,19 155:14,21,23
  155:23,25 156:11
  158:22 160:23 174:6
  178:7 234:13 254:3
  282:8,9
**forces** 94:15,15 102:16
  142:24 143:2 160:25
  167:22 174:3,3 188:14
  190:18
**foregoing** 286:17 289:6
**forensic** 35:15,22 36:6
  86:13 90:19 126:4
  231:16 233:13 234:25
  261:17,24 283:8,13
**forensics** 86:17
**form** 7:5 127:13,18
  144:17 159:24 202:10
  289:11
**formation** 187:12,15
**formed** 95:9 124:23
  159:9,18 245:10
**former** 201:8
**forming** 29:12 129:2

173:8 246:13
**forms** 245:14
**forward** 77:19
**found** 77:25 81:11 91:24
  99:7 211:3 212:8
  251:13 260:16 272:14
**foundation** 229:23 230:3
  244:17 277:6
**foundations** 171:2,7
**four** 24:11 111:20 207:8
**fourth** 63:23
**four-foot** 101:15,20
**four-step** 150:21
**frame** 24:22 100:9
**frames** 149:11
**frame-by-frame** 148:18
**freatic** 246:24 247:2,4
**Friday** 1:13
**front** 44:15 78:19 122:3
  131:8 140:4 149:17,18
  159:8,15 162:11 163:18
  163:18 285:5
**frustrated** 199:11
**full** 82:8 174:19
**function** 55:6 183:6,9,11
  183:12 198:8
**fundamentally** 232:21
  232:21
**funded** 87:3
**funny** 225:20 269:5
**further** 13:24 15:18
  19:19 45:18,20 207:11
  225:21 285:16

---

**G**

**G** 1:15 4:2,11 7:1 8:1,10
  9:1 10:1 11:1 12:1 13:1
  14:1 15:1 16:1 17:1
  18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1
  26:1 27:1 28:1 29:1
  30:1 31:1 32:1 33:1
  34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1
  42:1 43:1 44:1 45:1
  46:1 47:1 48:1 49:1
  50:1 51:1 52:1 53:1

54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1

207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1
**gap** 118:8 127:12 143:6
  144:17 157:15 159:7,8
  159:14,17,21,24 160:9
  160:11 166:4 245:14
  246:13 253:22 255:14
  272:25 273:9,14,14,17
  273:22,23,25 274:5
**gaps** 94:21 95:9,19
  124:23 127:18 245:10
  245:17
**gather** 125:25 209:3
**gauge** 12:3,12,16,20
**Genaro** 5:6
**general** 24:22,22 33:23
  38:11 40:23 55:21
  64:22 66:9 69:13,23
  74:17 86:20 88:10
  106:14 149:12 193:11
  205:3 236:9 242:4

**generally** 24:16 39:9
69:11 72:6 81:22
128:14,16
**generate** 248:4
**generated** 73:11 74:2
94:11 106:4 269:18
**generic** 39:3
**Gennaro** 1:15 4:2,11 7:1
7:11 8:1,10 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1

148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1

289:1
**geologist** 237:13
**geometry** 229:20 230:7
230:10
**GeoStudio** 267:7
**geotechnical** 56:11 62:21
62:24 86:19 256:9
**Gerald** 5:6
**germane** 71:16 156:19
176:24
**gesture** 9:25
**getting** 32:11 97:25
149:10 168:20,21
196:15 212:25 255:10
**Gilbert** 128:8
**give** 9:13 25:23 42:24
43:8 50:24 57:3 133:2
146:11 187:20 207:24
219:19 254:11 271:4
285:11
**given** 9:3 24:18 42:9
58:15 62:15 75:14
153:4,16 172:10 177:16
193:14 206:6 208:21
213:24 214:20 259:20
266:6 270:23 286:6
289:8
**gives** 102:5 115:6 132:5
153:12
**giving** 26:8 100:7 175:24
**glad** 259:13 272:22
**glanced** 8:21,23 9:10
**glancing** 155:19,24
156:2,3,4
**glitches** 28:13
**go** 18:17 24:20 27:5
29:25 38:5,8 57:6
58:14 77:14 84:2
101:17 103:19 104:11
108:9 109:21 114:24
116:20 118:8 139:22
140:4,15,19 146:19
148:17,18 150:23 162:2
163:16 172:3 173:21
177:12 189:21 190:9
192:12,13,13 203:16
206:10,18,19 212:3,23

220:15,24 225:21 235:8
235:15,16 245:12 252:6
257:17 268:23 269:24
277:25,25
**goes** 205:18 253:22
264:15 279:9
**going** 14:5 17:22 18:6
27:5 28:15 30:13 32:24
37:25 42:15 43:7,8
47:17 48:22 49:16,17
50:19,20 55:18 56:5
57:5,10 60:5,6 62:19
66:18 68:2 70:23 76:18
77:3 79:23 80:25 81:12
81:24 84:4 87:20 96:15
105:10 108:20 111:12
120:9,23 125:7,14
130:4,5,7,12 131:7
145:19 146:6 147:2
148:4 149:25 152:23
153:4,8,11,16 155:2
156:10,16 158:15,18
162:4 193:6 195:12,12
195:13,15 198:9 201:13
201:15 207:17 210:12
211:17 212:19 213:6
215:16 219:22 221:2
225:6,8 227:19 233:18
233:23 234:17 235:2
240:4 241:4 242:18
253:3,17 268:6 278:6
279:13,14 281:5 284:12
285:17
**good** 7:10 24:19 32:20
37:24 47:15 101:3
125:6 170:20 176:11
195:13 220:14 271:20
**Goodwin** 2:3 7:16 8:2
**Goowin** 1:15
**gospel** 24:20,21
**gradual** 138:3
**grain** 52:8
**Gramall** 9:5,6 40:23
**graph** 40:18
**graphic** 204:14
**greater** 13:12 53:11 63:8
94:13,14 174:5 184:11

187:8 188:25 193:4
255:14 275:14
**greatest** 138:7 180:12
**grinding** 167:14
**ground** 21:22 86:4,5,7
134:4 137:14 160:24
161:3,7,9 196:2,4,16
197:5 198:25 199:2,4
200:23 201:9,10 237:9
237:21,23,24 238:6
254:7
**groundwater** 36:22
209:24 210:14 243:15
246:14,17,21 247:3,7
247:10,14,22 248:7
**groundwork** 197:13
**group** 128:24 205:24
206:9 211:8 214:11,16
221:12 224:25 227:15
237:4 240:14,16
**Guenther** 3:19 7:19
**guess** 56:3 69:13 74:17
83:9 93:4 95:15 104:6
104:6 106:14 125:4
136:17 161:20 178:15
185:9 190:5,22 200:6
229:6 236:13 242:15,16
277:8 285:4
**guidelines** 259:24
**guy** 26:5,9 172:16 177:22
177:24
**guys** 175:6
**guy's** 17:20 26:7

**H**

**H** 4:8 5:2 55:4
**half** 8:22,23 63:15 115:7
145:14,15 146:10
148:11 151:10,12
160:14 228:23
**hand** 14:5 44:12 105:10
105:12
**handed** 42:13 84:9
**handing** 204:10
**Hang** 42:22 158:11
207:17 219:16 229:25
**happen** 169:10 225:6

253:21
**happened** 25:9 32:2 46:6
94:24,24,25 111:11,25
112:16 140:22 141:6
147:8,11 233:15 256:19
**happening** 44:21 138:13
253:15
**happens** 24:18 93:16
99:15 252:19
**happy** 206:19
**Harbor** 5:22 10:10,18,24
11:19 12:6 13:7 14:3
14:20 15:3,9,17 23:20
33:6 41:18 44:19 48:2
48:10,17 55:24 59:7
63:7 72:11 73:19 78:16
80:24 81:8 82:14,22
83:11 92:18 93:2,20,24
94:4,7,22 96:3 99:18
100:11,17 101:8 107:8
137:20 186:19 188:4,10
188:17,24 192:14,22
193:9,12,22 194:9,23
245:6 248:11 250:6
259:11 275:8 276:8,13
277:3 278:13
**hard** 128:7,10,12,13,15
128:16,25 152:10
271:17
**harder** 188:15
**Harik** 71:6,9
**head** 47:12 65:13 139:14
139:15 179:6 254:14
263:7,11 271:24
**headed** 244:6
**headings** 44:3
**hear** 89:4
**heard** 17:20 41:25 42:6
44:13 65:2 70:20 89:13
89:14 90:20 94:16,18
115:22 116:2 121:17,19
122:12,22 152:20
167:14 280:10
**hearing** 44:18
**heavy** 22:5
**Hector** 175:8
**height** 11:14,15,18 63:25

64:6,10,11 65:22 94:12
173:25 237:18
**heights** 14:19 77:5,11
78:2 79:2,7,18 82:9
**hell** 200:4 218:22
**helpful** 32:14,24 218:14
**helps** 71:18,20 89:8
173:18
**hesitating** 69:22
**he'll** 43:5
**high** 78:20 81:10 96:9
102:5,5 103:21 121:2
143:17,18 144:4,6,12
166:15 225:5 227:13
228:10 229:5 242:13,14
251:19
**higher** 13:19,22,22 45:23
45:25 95:20 96:5,6
120:18 132:13 193:13
201:10 227:2 229:12
232:4,6 239:2,3 251:5
251:23 257:4 267:11,24
269:16 270:6,13 271:7
271:15,16,25 272:12
**highest** 227:14 228:14
229:13
**highlighter** 50:25
**hit** 93:5 112:9 115:8
116:9 120:9,18 121:15
124:17 134:20 137:11
152:10,11 166:16 168:2
185:4 283:22
**hits** 101:25 120:22
145:17 153:22,23
**hitting** 104:19 135:11,13
136:6 153:10 166:8,11
167:12 181:10
**hold** 66:20 96:21 135:18
205:15 264:20
**hole** 163:8,10,12,13,24
164:6,11,14,21,23
**holes** 216:11 224:24
**homes** 152:10
**homogenous** 251:7
**hope** 57:13 271:16
**horizontal** 103:3 179:21
179:23,25 180:13

249:20 250:20 251:2,5
251:8,23 252:3,7
**hour** 8:22,23 20:10 115:7
145:14,15 146:10
151:10,13 160:14
242:18
**hours** 24:11
**houses** 170:16,19 171:2,6
171:8,13
**hundred** 169:12,17
**hung** 60:23
**hurricane** 24:17 52:6
78:2 89:17 90:3,7,11,12
90:15,24 91:4,13 92:15
128:4 129:22 158:3
164:16 176:16,20,23,23
177:11 245:8,20 259:23
274:10,14,25 278:14,25
**hydraulic** 52:23 96:12
143:7 213:21
**hydrodynamic** 102:7,11
**hydrograph** 10:16,18
11:12,16,23 12:5,10
100:18 101:13 193:8,9
**hydrologist** 83:10,14,15
83:17
**hydrostatic** 95:4,10
101:22 102:8,17 103:12
103:22 116:14 117:12
117:20 118:7 127:12,18
139:14,15 159:15,18,20
159:24 188:2 191:7
192:21 243:11 244:25
245:14 246:8 247:25
253:22 254:14 255:13
**hypothetical** 70:13 95:13
**H*Wind** 74:8
**H-a-r-e-k** 71:9

**I**

**ice** 104:9,10
**ID** 4:9 5:3
**idea** 16:2 24:19 110:22
115:6 211:24
**identification** 11:8 14:12
18:4 30:8 42:12 80:17
81:16 84:13 122:6

202:22 204:9 243:19 274:20 276:23 285:8
**identified** 31:4 252:10
**identify** 11:2 29:11 246:23
**ignorable** 273:17 274:4
**IHBR-1** 211:16
**IHNC** 4:14,19 5:10 15:22 32:15 42:7 45:16 55:4 71:17,21 75:7,10 75:22 76:22 78:4,7 79:23 125:18 127:13,19 189:23,23 190:24
**ILIT** 39:14,18 41:5,6,11 165:19 192:9,10 198:15 202:13 204:18,23 217:10 222:10,16 225:7 226:25 229:21 230:8,14 261:8,13,23 262:11 268:2,2 272:24
**ILIT's** 198:4,11 218:21
**Illinois** 86:23
**illustration** 112:15 163:19
**immediately** 47:8 124:13 163:8 265:12 278:14
**impact** 31:19 32:9,14 36:3 41:19,20,21 42:5,7 44:25 45:10 46:18 59:13,15,16,18 70:2 71:2,4,18 96:18 97:24 98:8,17 106:3 110:19 112:7 113:12,16,18,19 114:11 118:13,23 121:22 122:22 126:20 126:23 127:7 137:17 139:20 142:21 143:6,11 143:17 144:5,13,16,23 146:7 149:4 154:12 155:18 158:22 160:15 166:5 167:21 174:3,6 175:4,11 179:2,13,17 181:4 240:2 254:25 255:21 280:10 284:10
**impacted** 112:4 118:15 246:11 274:10,13,24 275:3

**impacting** 47:2
**impacts** 274:7
**impairs** 10:6
**impart** 114:17 154:7
**imparted** 68:25 69:19
**imparts** 69:16
**imperative** 287:12
**important** 86:14 104:13 119:14 197:13,24 218:20 247:13,18,22
**imported** 217:21,24
**impose** 69:20
**impossibility** 83:12
**impossible** 83:14
**imprecise** 65:2
**imprecision** 46:24
**impromptu** 172:19
**improvement** 60:20
**inched** 18:19
**inches** 13:17 273:14,23
**incident** 106:3
**incidents** 123:2
**inclination** 156:7 160:3 184:6
**inclined** 160:9,9
**include** 40:7 111:17 136:12 154:12 165:9 202:13 212:17 214:24 217:7,14,24 218:4 219:10 259:19 260:23
**included** 16:16 71:13 74:5,7 75:4 117:8 203:3 213:12 215:2 216:9 224:20 225:11 240:17
**includes** 5:23 37:19 54:21 68:8 82:18 214:9 260:24
**including** 136:11 198:3,4 198:4
**Incomplete** 95:12
**inconsistency** 272:13,13
**inconsistent** 280:9
**incorrect** 67:16 182:13 182:16 195:8 197:18 198:20
**increase** 198:17 241:4,9

242:7
**increases** 236:4
**increasing** 267:22
**indent** 174:23
**indentation** 205:17
**independent** 49:9 268:13
**INDEX** 6:1
**indicate** 112:21
**indicated** 51:5 244:16 248:23
**indicates** 49:20 110:18 177:13
**indicating** 50:12 53:19 57:22 73:8 75:2 112:12 112:24 113:2 115:14 131:13 149:20 167:20 179:18 185:20 220:11 227:17 250:25 270:21 281:9
**indication** 41:19,21 46:3 184:21 185:16
**indicator** 243:4,6
**Indirect** 179:4,5
**indirectly** 69:3 242:10
**induced** 70:2 132:20 133:3 143:6 178:10
**industrial** 218:6
**infamous** 176:4,5
**infer** 46:2,25 131:18 275:8 276:7
**inference** 44:5 45:10 46:7 47:7 123:4,8 177:2 194:22 195:3,8 242:12 280:17,18 283:2 284:10,13,16
**inferences** 79:10,19 125:15 157:23 158:9 167:23
**inferred** 214:22 280:13
**inferring** 44:17
**infiltration** 210:3,14
**information** 13:9,19 29:11 36:11,15 37:3 42:8 63:11 66:8,9 68:4 72:23 79:6 87:2,7,9 111:13,14,16 126:4 128:17,19,25 148:14

164:13 175:5 199:10,12 199:14 205:23 210:24 211:12 213:23 216:6,7 216:11,12,23 218:16 219:4 224:9,24 225:2,3 225:17 226:23 227:6,6 227:8 268:14,15 269:4
**Ingram** 1:7,8
**ING4727** 35:17 36:7 106:4 119:19 158:3 276:11,12
**initiate** 135:2,3 142:17 142:19 247:6
**Inner** 5:21 10:10,18,24 11:19 12:6 13:7 14:2 14:19 15:3,9,17 23:20 33:6 41:18 44:19 48:2 48:10,17 55:24 59:7 63:6 72:11 73:19 78:16 80:24 81:8 82:14,22 83:11 92:18 93:2,20,24 94:4,7,22 96:3 99:18 100:11,17 101:8 107:8 137:20 186:19 188:4,10 188:17,24 192:14,22 193:8,12,22,22 194:9 194:23 245:6 248:11 250:6 259:11 275:8 276:8,13 277:3 278:13
**Inneragency** 14:17
**innerbedded** 251:15
**innerbedding** 251:17
**input** 28:3 272:21
**inputs** 197:17 265:5
**inside** 51:5 170:9
**inspect** 126:7
**inspected** 126:10 237:15 237:16
**inspection** 237:11
**instability** 144:22 152:4 195:18,23 217:23 219:10 231:10 257:22
**instance** 25:23 104:18 138:17 172:13 239:8
**instances** 55:20 146:24 159:10 160:2
**instant** 44:14

**instantaneously** 145:23
**instructions** 214:9,20
  287:2
**instrumental** 95:4
**intact** 131:23,24
**integrity** 132:13,13
**intentionally** 29:18
**interaction** 69:15 88:14
  256:10 283:15
**interbedded** 251:5
**interested** 222:2,4
**interesting** 184:17
**interface** 252:13
**intermixed** 251:11
**International** 224:25
**interpretation** 75:12,16
  75:17 77:8 90:20 98:13
  99:2 180:21 203:23
  232:22 242:20 269:20
**interpreted** 75:19
**interrupt** 158:8
**intersect** 252:5
**intersection** 280:25
**intervening** 109:7
**interview** 173:10
**introduce** 7:20 12:21
**investigated** 260:7
**investigation** 4:17 90:19
  261:17,24
**investigations** 33:8,9
**investigators** 265:25
**invoice** 285:3
**involved** 264:18
**involves** 88:2 223:20,23
  224:3,11 245:13
**inward** 255:22
**in-rush** 169:11,20
**IPET** 13:4,6,15,25 14:7
  14:16,16,16,18 15:6,13
  38:10,14,19,24 39:9,10
  39:21,25 40:3,13,17,22
  41:2 42:15 43:9 65:8
  65:13 74:5,6,10 77:15
  77:24 79:25 80:2,8,19
  81:4,7 82:8 148:7
  192:9 198:15 202:18
  203:2,8 204:5,12,22

206:6 211:15,22 217:11
  222:10,16 239:2 261:8
  261:23 267:9,12,17,20
  267:25 268:4,9,16,19
  268:25,25 269:18 270:8
**IPET's** 74:13 198:4,11
  198:20 211:15 218:19
  268:3 269:12 272:14
**Isolate** 253:20
**Issam** 71:6
**issued** 31:3,24 36:10
**issues** 86:19 88:10
**Italian** 30:10,12
**IV** 14:8 40:13 42:14
  77:24 80:2
**IV-34** 5:4
**IV-4** 5:5
**IV-7-23** 4:23
**IV-7-25** 4:23
**IV-7-27** 4:23
**iWall** 213:6 274:6
**i-k** 71:10
**I-s-s-a-m** 71:9
**I-10** 12:3

---

## J

**J** 1:16 286:12
**Jerry** 172:2
**job** 234:25
**John** 2:7 3:15 8:3,4
**joins** 178:19
**joint** 58:20,22,25 59:4,5
  59:9,12,17,18,19,24,25
  95:23 96:2,5,5,11
  113:23 133:2 138:10,12
  183:17
**joints** 94:17,21 95:5,9,23
  96:10 117:9 138:7
**Jordan** 63:25
**JOSEPH** 1:10
**Jourdan** 217:7,14,24
**journal** 48:15,18 49:6
**Jr** 1:9,10 5:9
**judge** 1:8 284:22
**judgement** 224:11
**judgment** 223:21 224:4,8
**July** 285:3

**jumping** 215:23
**junction** 132:8,17
**June** 5:24 29:20 84:16

---

## K

**K** 1:7
**Katrina** 1:3 7:12 52:6
  63:24 78:2 128:4,18
  135:11,13 164:16,22
  176:17,23 199:24 221:7
  245:8,20 246:9 274:11
  274:14,25 278:15,25
  279:5
**Keeley** 3:16 8:4
**keep** 30:14 158:18 186:3
  187:5 195:12 222:22
**Kendrick** 249:11,13
**Kentucky** 175:24,25
**KHORRAMI** 3:3
**kickback** 142:23 143:7
  149:16 164:3
**kicking** 254:14
**kind** 8:21 28:14 66:9
  67:17 70:9 87:2 128:21
  134:24 136:8 142:14,18
  144:20 200:3 208:23
  223:13 225:20 233:19
  233:19 237:3 270:23
  271:17 275:7 277:2
**kinds** 45:12 70:11 260:9
**Kirsten** 2:7 8:3
**knew** 67:14 80:6 177:10
  206:3
**knocked** 129:20,21
**knocking** 160:23 179:8
  181:11
**know** 12:17 13:10,18
  16:22 17:5 20:7 22:4
  23:13 24:2,2,10,12
  28:10,24 36:24 39:3
  42:6,8,8 43:5 45:13,14
  45:14,15 51:12,24 52:4
  52:9,21 53:12 58:14
  59:5 62:2,3,18 64:20
  67:12,13,22 73:4,10,11
  74:2,6 76:25 78:20
  79:12,20 80:7 82:19

84:20 85:14 89:5 92:10
  92:12 93:4,4,7,7,10
  94:24 97:20 98:20 99:8
  99:10,20,20,25 100:4
  105:2 111:12,19 112:14
  113:6 114:22 117:16
  118:13,14 122:17
  123:11 128:13,14
  133:24 135:22 136:13
  137:10,17,19 147:23
  148:17,20 151:9,10,23
  151:24 154:3 156:2,21
  156:24 157:6,10 158:9
  158:13 159:24 163:12
  165:3 166:9 168:15
  172:10,18,24 173:6
  174:8,11 175:14 176:7
  176:11 178:12 181:23
  181:25 184:14 185:24
  188:20 189:4,18 193:20
  193:21 194:10,13
  202:15,19 203:4,7,9
  206:11,14 210:4,16,17
  213:7 215:6,12,13
  218:11 220:24 221:14
  221:18 222:23 223:17
  224:23 226:25 227:8
  228:19 231:14,21,22
  233:12 234:15,18 235:7
  235:10,11,15 239:5
  241:13 242:16 245:4,9
  245:17,24 246:7 248:16
  249:4,24 250:9,17
  257:11 260:10,23
  261:10 265:19,25
  266:18 267:13,15,16,18
  267:23,24,25 268:5
  269:6,19 271:17 275:13
  275:17 277:9,15,18,21
  277:23 278:18 279:7
  281:21 282:8 283:14
  285:5
**knowing** 78:10 135:4
  188:14
**known** 199:9
**knows** 13:12 111:23
**krobbins@goodwinpr...**

2:6

**L**

**LA** 4:21
**lack** 78:13
**lacks** 229:22 230:3 277:5
**Lafarge** 1:6,7,8,9,10 2:2
  7:13,25 8:5,6
**Lagarde** 1:7
**laid** 208:23
**Lake** 77:25 78:8 79:22
**Lakefront** 74:18 75:5,12
  75:13
**land** 51:4 144:23 244:10
**landward** 183:16
**large** 45:3 50:11 51:6
  63:7 91:12 119:20,23
  160:2
**largely** 152:6
**larger** 102:5 153:12
  208:9,16 273:23 274:5
**late** 60:22 99:10 147:11
  147:13 242:18
**lateral** 153:8 158:22
  187:3,11,14 188:3
  272:25
**launched** 143:17 144:5
**law** 2:7 3:8 7:16 128:7
**lawyer** 172:17 173:5
**lawyers** 17:13 48:3 49:13
  49:14 99:4
**lay** 197:13
**layer** 165:6 197:6 205:19
  208:19 221:22 225:5
  229:8 231:7 236:23
  238:3 239:7,16,21,22
  240:2 241:9,15,22,23
  241:25 242:2,8 252:8
  260:17 261:4 262:5
  264:9,14,14,16,17,18
  264:22,25 266:3,4
  267:24 273:16,24
**layers** 39:3,5 197:10,11
  238:21 239:3,9 250:23
  251:9 260:16,19 262:5
  264:16 265:12
**LE** 216:23

**lead** 279:3
**leads** 123:17
**lean** 227:17 255:22
**leaning** 138:22
**learn** 80:8 246:2
**leave** 69:25
**leaving** 153:14
**led** 173:9
**left** 52:2 67:9 131:2,15
  140:12,16,22 162:3
  205:17
**LEGAL** 3:19
**leisure** 17:17
**lend** 234:22
**length** 20:25 64:17
  135:23 137:15,20 182:3
  233:24 234:7 254:16
**lengths** 137:21,22
**let's** 11:2 18:17 26:11
  54:25 60:24 62:5 68:18
  71:24 77:16 79:18
  80:14 84:2 102:19,21
  112:10,10 123:4 135:15
  137:25 139:22 140:8
  156:3,14 162:2 163:16
  163:17 171:18,25 173:7
  180:10 181:13 182:20
  186:3 189:21,24 195:16
  196:20 197:22 203:20
  210:8 220:15 226:14
  233:20 264:9 265:18
  269:21 271:6 277:25,25
  278:2
**levee** 20:2 55:16 57:18
  57:21 58:10,14,19
  60:18,20,21,25 61:5,8
  61:21,22 62:6,10,12
  63:9 89:17,21,24 90:3,7
  90:15 91:21 96:6 120:6
  158:5 189:11,15 190:23
  190:24 191:4,8 192:17
  192:20 194:25 199:17
  200:2 205:7 206:15,16
  207:10,14 208:5,12,19
  209:12 210:8,11,21
  211:4,9,10 212:6,8
  213:21 214:10 215:20

216:3,15,20,25 217:2
  220:15 221:7,21 226:2
  226:22 230:18,22,25
  231:7,20,24 232:11
  233:7 237:2,18 238:4
  238:13,17,20 239:17
  240:22 241:14 245:15
  246:25 248:22 249:19
  249:24 250:5 252:21,25
  253:10,12 267:11,16
  273:15,24
**levees** 91:8,13,20 92:14
**level** 12:13,14 13:16
  15:16 45:23,25 57:4
  68:16 96:9 97:5 99:18
  100:11,16,17 101:8,12
  101:16 103:13,17,21
  114:13 166:15,19,20
  167:4 193:6 194:2
  195:5 209:22,24 210:6
  210:21 211:4,10,11
  216:16 240:22 241:2
  244:17,19 248:10,11,12
  252:6 253:11 257:3
  279:9
**levels** 13:7 68:8 127:12
  127:17 195:6,7,10
  231:25 240:23,24
**license** 1:17 84:21,25
  85:3,5,7,9,11
**LIDAR** 64:23 65:2,6
**light** 106:25
**lights** 19:14
**limit** 34:9,12 39:21 40:8
  76:14 91:4
**limited** 63:12 65:4 102:3
  284:19
**line** 6:3,8 18:11,17 19:19
  20:20 23:6 35:5 60:18
  61:17,17 62:7 93:15
  163:18 185:11,13 201:3
  201:5 235:21 236:10
  288:5
**lines** 18:20 19:25 21:7
  61:4,7 225:20 235:10
  235:20
**link** 233:18 235:6,14

**list** 17:6,17,18 29:16
  66:11,12 69:24 85:23
**listed** 265:17
**listen** 171:14
**literature** 106:24 107:6
**litigation** 1:4 48:7,11
**little** 11:25 15:18 38:2
  51:6 146:3 147:15
  172:18 188:15 200:7
  257:18 269:2 270:18
  279:6
**LLP** 3:3
**load** 5:15 35:19,21 36:3
  62:19 70:9,9,13,15,24
  71:3,5 116:14 118:23
  133:9,17,19,20 134:15
  134:16 243:23 279:8
**loaded** 278:18
**loading** 36:12,14,18 37:4
  134:6 167:11,18 275:11
**loads** 70:2,6,7 71:18,21
**lobe** 205:22 206:12
  207:10,19,23 208:5,14
  212:21 214:7 223:2
  224:7 240:13
**local** 257:15
**localized** 146:25 234:15
  266:21,21,25
**located** 130:24
**locating** 81:18
**location** 45:19 59:22
  62:15 67:8,15,18,19
  76:6 90:4 103:25
  115:23 116:6,6,10
  121:15 129:16 133:10
  134:16 136:25 141:13
  148:21 149:3 153:22,23
  154:2 164:11 167:16
  169:15 175:11 179:17
  182:3,6,11 184:17
  187:15 190:16,17 201:9
  201:24 202:8 203:6
  205:4,9,11 208:22
  215:4 216:24 247:14
  248:7,18 252:20 263:13
  263:16
**locations** 95:17 126:12

126:17 127:4 167:22
191:9 193:16 207:5
216:8 274:24
**lock** 12:6 100:17
**lockmaster** 10:19
**lockmaster's** 12:5,10
100:18 101:13
**log** 100:5
**logical** 256:19
**logs** 52:15 53:19
**London** 41:24 42:21
43:24 44:7,21 94:13
190:20,23 192:14,15,21
193:10,14 194:4,11,24
195:2
**long** 20:9 35:4 88:17
89:14 103:20 145:12
146:8 159:23 165:12
187:4
**longer** 32:7 106:12
**look** 10:25 12:12 24:21
25:24 26:2 34:22 36:11
40:12,16,21 41:5,11
42:16 60:5,6 62:5
66:22 71:24 79:24
81:20,21,24 105:25
107:19,23 112:10
127:25 129:14 131:3
138:10,18 142:21
157:18 161:21,24 166:6
171:23 174:17 176:3
180:5,10 181:13 183:22
183:25 185:9,10 187:16
189:24 200:17 201:22
206:5 208:23 210:19,23
210:25 213:18 214:19
221:12 222:8 225:19
229:3,16 231:18 236:18
249:9 255:17 257:18
259:13 260:8 262:20
269:7 270:19,21 271:4
275:18
**looked** 13:9,20,20 25:19
40:19,24 41:2 110:15
110:16 118:6 125:15
177:11,17 221:6 225:19
225:20,20 231:9 245:22

268:19 272:16
**looking** 11:24 19:12
23:15 33:25 63:4 76:13
79:5 87:11,12 91:25
98:2 169:25 180:11
188:18,19 202:24
207:13 231:16 234:18
234:21,25
**looks** 129:11,13 131:5
171:13 252:12 276:7
**Los** 3:5
**loss** 123:24
**lot** 85:7 86:7,12 87:4,25
98:3,4 99:21,24 117:15
123:11 176:8 177:5,7
187:22 199:12,14 200:5
205:2 206:5 222:9,11
222:13 235:7,7,10
260:12
**lots** 283:14
**loud** 44:13 45:14,22
**Louisiana** 1:2 2:11,16
7:15 41:10,12 84:25
85:4,10,14 89:22,24
90:7 261:9,10,23
**love** 142:20
**low** 51:19,23 54:5 80:20
229:4 262:17 268:3
**lower** 14:3,20 16:24
19:15 45:5 46:6 67:9
81:8 82:10 123:17
129:4,7 140:18,20,24
170:9 191:5,8,11,15,15
191:24 194:25 229:12
231:15 233:8 234:23
240:23,24 260:22 272:7
278:22,23 280:21
282:15
**lowest** 229:12 264:5,10
264:18
**L.L.C** 2:15

---

## M
**MAGISTRATE** 1:10
**magnitude** 70:7 137:16
**main** 205:5
**Maine** 84:21

**maintain** 23:23 55:8,11
55:14
**major** 174:23 225:7
**majority** 28:23 88:12
**making** 83:18 185:15
195:5
**man** 26:18
**manager** 119:3
**manager's** 106:2 108:23
109:24
**manifestations** 159:11
**manner** 105:14,19
155:10 157:15 246:10
**Manual** 87:6
**Map** 203:6
**mapping** 86:8,10 87:16
**marine** 96:18,22 97:10
**Marino** 1:15 4:2,11 5:6
5:20 7:1,11 8:1,10,16
9:1,6,12 10:1,9 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1,19 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1,24
48:1 49:1,4 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1,15 62:1,14
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1,9 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1

115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1,19 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1,10
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1,15 177:1
178:1,16 179:1 180:1
181:1 182:1,21 183:1
184:1 185:1,24 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1,22
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1,7 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1,12
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1

256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1,14 286:1 287:1 288:1 289:1
**Marino's** 240:16,17
**mark** 2:6 3:19 7:19,25 8:16 21:5 30:2 39:7 80:11,14 81:12 107:24 111:5,20 112:23 117:7 133:23 183:23 190:3 207:16 219:22 225:18 229:4 233:9 271:8
**marked** 4:9 5:3 11:2,3,6 14:6,10 17:23 18:2 26:3 30:6 42:10,13 58:22 65:21,24 80:15 81:14 84:10,11 122:4 163:9 202:20 204:7,10 211:16 243:17 274:16 274:18 276:19,21 285:6 285:9
**marsh** 165:6 205:19 225:4 239:7,15,21,22 241:2,9 242:8 252:14 252:15,16 260:17 261:4 262:5 264:9 266:3,4 267:24 270:24 273:16 273:24
**Martin** 1:16 7:17 30:3 252:15 263:19,21 286:12
**Masonry** 87:5
**mass** 251:16,17
**massive** 146:5 168:24 169:2,6,10,16,20 234:16
**mat** 277:9
**match** 99:16 175:2
**material** 38:14 39:11

52:8 53:19 143:8 158:5 160:2 208:12,25 213:4 213:8,16 216:13 232:2 233:3 235:9 237:10,14 237:15 250:16,17,25 251:23 271:3
**materials** 52:24 53:8,9 54:4 96:12 142:25 165:7,7 212:9,11 214:10,10 224:20 225:12,13,15 240:16,18 251:4,4,5 260:23,25
**matter** 97:3 116:5 151:7 234:2 285:2
**maximum** 205:8 233:7 270:25
**McCall** 2:10 8:7
**mea** 79:7 273:13
**mean** 24:12,13,21 26:8 28:23,25 32:16 33:18 34:7 36:22,24 38:5,6 39:2 42:7 45:13,15,17 52:19 56:4 65:19 69:7 69:23,24 75:24 78:18 79:12,13,21 80:23 82:16 83:16 86:12 89:4 89:6 92:20 93:5,5 102:3,15 104:23,24 112:7 114:10 115:16 117:15 120:2 132:11 134:18 136:13,13 137:10 138:9 146:17 151:9,22,23 153:21 154:17 156:2,8 159:2,3 163:15 166:7 168:15 170:20,21 172:16 174:16,22 176:6 179:17 181:23 183:11,13,20 184:14 185:8 189:3,17 190:14 191:11 192:11 194:17 199:10 200:3,4 206:3 207:22 210:2,3 210:16 217:9 220:10 222:22,23 225:10 229:3 229:9,16,17 231:13 233:9 235:25 240:25 242:4,16 247:12 250:24

252:2 255:18 260:23 262:24 264:8,12,15 265:18 269:3 272:4,20 273:22 275:10 279:8 284:11,17
**meaning** 139:15 150:20
**means** 45:22 56:24 115:17 257:11 281:6,7 286:19
**meant** 16:11 62:3 106:14 167:6 270:17
**measure** 64:9,13 191:10 191:10,16 243:3,6
**measured** 64:6
**measures** 243:8
**mechanics** 35:19,21 69:15
**mechanism** 131:20 133:24 135:4 170:24,25 171:6
**medication** 10:5
**memory** 202:25
**mentioned** 118:22 164:18 218:12 220:25
**merely** 126:3 177:2
**met** 8:17
**metaphorically** 140:10
**meteorlogic** 71:16 73:18
**meteorologist** 73:20
**method** 73:15 258:16,19 258:23,25 259:4,5,9,10 260:10,14
**methodology** 154:10 259:3
**middle** 58:18 81:25 82:3 82:7 116:19 158:23 166:25 171:5 180:12 244:5 270:6 273:13
**mile** 148:11
**mind** 24:22 56:24 100:5 102:15 117:17 119:22 135:22 187:5
**mine** 86:8 87:3,22 88:9
**mines** 85:25 86:19
**minimum** 232:3,5 270:24
**mining** 86:4 87:21

**minus** 205:8 209:21 216:16 249:21
**minute** 28:9 102:21 148:18 161:12 200:18 278:4
**minutes** 151:7,8,8
**missed** 34:11
**Mississippi** 231:24
**misspoke** 167:5
**Misstates** 109:12
**mistaken** 264:4
**mistakes** 92:2,3,6,10,24 93:8
**mitigate** 255:16
**model** 37:19,21,23 38:2,3 38:9,9,12,13,13,14,20 38:22 39:9,10,10,15 73:10,14 74:3 255:17 256:24 263:17 281:23
**modeled** 256:4,20 282:5
**modeling** 32:23 87:9 217:11 256:13
**models** 32:11,11 256:6
**Modified** 260:13
**moment** 62:5 68:19 92:25 93:13 94:10,10 94:15 103:17,20
**momentum** 118:14 142:16,18 152:23 153:4 153:7,11,13,16,25 154:7,20 156:6 157:10 157:14
**Monday** 42:17 175:22
**money** 284:25
**monitoring** 248:10,13
**monolith** 93:12 117:3,21 124:17,17 131:16
**monoliths** 117:9 118:9
**months** 52:5
**moored** 67:23
**morning** 7:10 8:7,21 10:23 19:17 22:10 23:22,25 24:9 25:5,10 25:11 26:13 42:17 76:8 100:2,21 107:15 117:22 174:12 194:3,7 279:5
**motion** 135:6 139:11

**motor** 110:25
**move** 69:11 96:15 103:11
　107:2 111:3,4 155:9
　195:15 235:22 236:24
　240:21 254:23 255:9
**moved** 44:13 144:18
**movement** 86:4,5,7
　97:19 143:15,23 144:2
　159:6 162:16 255:6
　256:13 281:23 282:3,5
　282:6
**movements** 282:18
**moves** 141:13 155:25
**moving** 44:10 123:21
　138:14 142:3 152:24
　168:19 280:20 282:14
　283:4,10,20 284:2,5,9
**mraffman@goodwinp...**
　2:5
**MSL** 191:19,20,22
**Mumford** 1:7 7:13
**Murph** 26:18,20,24
　171:18
**Murph's** 171:15,19
　172:14

**N**

**N** 2:1 3:1 4:1 5:1 191:22
**name** 8:16 17:20 26:7,18
　73:14
**names** 16:16 17:6,17,18
**Nancy** 1:16 7:17 286:12
**narrow** 104:15,20
**national** 85:6 259:7
　260:4,5
**naturally** 210:9
**nature** 92:15 97:23 98:8
　235:9
**naval** 97:16
**Navation** 5:22
**NAVD** 63:25 191:10,19
　199:19 200:8
**navigation** 10:10,19,24
　11:19 12:7 13:8,17
　14:3,20 15:3,9,17 23:21
　33:7 41:18 44:19 48:2
　48:10,17 55:24 59:7

63:7 72:11 73:19 78:16
　80:24 81:8 82:14,22
　83:11 92:18 93:2,20,24
　94:4,7,22 96:3 99:18
　100:12,17 101:9 107:8
　137:20 186:20 188:4,10
　188:17,24 192:14,22
　193:9,13,23 194:9,23
　245:7 248:12 250:6
　259:11 275:9 276:8,13
　277:3 278:13
**near** 129:5 164:11,14
　199:25 203:24 220:19
　244:18 252:13 282:17
　284:11
**nearby** 209:14
**nearest** 211:23
**necessarily** 66:15 144:25
　144:25 145:2 155:7
　219:9 222:5 284:2
**necessary** 78:14 150:6
　257:24 287:4
**need** 9:14,25 17:19 24:23
　48:22,24 49:3 55:15
　56:8 57:6 72:20 83:4,8
　120:17 142:15,18 149:2
　166:7,10
**needed** 127:3
**needs** 10:2 134:16 149:3
　149:4,6,8
**negative** 209:21
**neglect** 125:4
**neighbor** 124:18
**neighborhood** 138:14
　143:16 144:3 145:9,24
　152:11 169:11 170:16
　173:23 178:8
**nestled** 171:12
**nestles** 171:8
**net** 177:7
**never** 13:25 25:14 32:4
　48:9 53:18 97:9 111:12
　113:6 156:10 223:17
　267:23 282:5
**nevertheless** 23:23 263:9
**new** 1:16 2:4,11,16 4:20
　7:18 125:20 192:2

225:7 232:9 259:14,17
**NGVD** 191:19,20,22
**night** 26:12,21 72:24
　270:20 275:19
**nine** 79:22 80:25
**Ninth** 16:24 19:15 45:5
　46:6 82:10 123:17
　140:18,20,24 169:24
　170:9 280:21 282:15
**nodding** 47:12 65:13
**Nods** 179:6 271:24
**noises** 280:10,13,16
**non-optimum** 57:2
**normally** 85:12 250:14
**north** 2:2 4:18 7:13 8:2,5
　35:2,13 37:14 53:13,21
　53:24 54:12,22 58:6
　64:3,5,10,18 72:6,10,13
　74:15 75:25 76:6,16,17
　98:22 99:14 100:25
　105:2,3,6,14,18,24
　106:13,20 107:4,13,21
　108:10 109:3,11 110:3
　110:5,6,8,12,19 112:2,6
　112:6 113:13,23,24
　118:16,20 123:16,21
　125:3 126:8 128:3
　132:2,12,23 134:5
　135:18 138:4 140:6,12
　140:16,19,23 141:17
　142:10 145:4,12 147:17
　148:9 149:13 150:6
　156:25 166:24 168:19
　170:3,6 171:11 177:19
　178:17,20,23 179:9,10
　181:7 184:5 192:4
　194:19 196:10 199:21
　200:13 203:11,12,24,24
　204:2,4,13,17 211:23
　212:3 214:7 215:6,11
　215:11,11 218:13
　220:13 224:6 240:13
　245:7,10,18,19,23
　246:5 248:4 249:18
　260:20 261:7,16 264:6
　264:10,17,23 266:18,20
　266:20 272:11 277:13

278:16
**northeast** 72:7,11,14
　74:15
**northern** 131:22 136:12
　141:8 142:7 148:10
　149:14 152:18 161:2
　167:7,7,11
**northwest** 74:15
**Notary** 289:25
**notation** 43:24 57:14
**note** 159:9 180:13
　181:17 213:3
**noted** 60:15 190:21
　287:10 289:11
**notes** 175:15
**notice** 185:11 187:17
　254:4
**noticed** 8:25 11:24 13:20
　72:24
**noticing** 188:20
**novel** 235:13
**number** 4:9 5:3 25:25
　28:12 45:12 67:9 78:24
　86:3,5,22 121:4 192:8,9
　195:21 207:3,4 208:9
　208:16 222:14,17 223:3
　226:25 228:2,5 236:16
　248:23 269:24 285:5,11
**numbers** 12:10 66:20
　77:18 236:14 268:12
　269:5
**numerical** 78:24 79:7
　227:2
**numerous** 199:7 283:13
**N.W** 1:16 2:4 3:9

**O**

**object** 121:3 129:6,7,10
　277:12,19
**objection** 15:24 25:8
　68:15,21 95:12 109:4
　109:12 140:13,14
　168:10 182:24 207:18
　223:4 229:22 230:2,3
　235:23 248:15 250:3
　257:9 258:8 277:5
　282:11

**objections** 7:5 230:9
**objective** 25:21
**oblique** 103:16 155:24
   156:4 281:16
**obscured** 121:7
**observation** 78:21 79:5
   82:25 83:3 133:24
   136:14 191:3
**observations** 12:16,20
   12:21 16:7,14 24:25
   76:12 78:17 79:6,10,20
   125:3 136:15
**observed** 46:5 93:25
   125:5 134:6 149:17
   175:2 181:9 188:9
   245:6,17 246:4 248:22
**observing** 24:8
**obstruction** 81:3
**obstructions** 78:7 79:21
**obtain** 199:9,11
**obtained** 38:17,19
   244:10
**obvious** 79:13,15 185:8
   186:6 208:24
**obviously** 24:4 25:10
   32:16 62:18 69:8 91:23
   92:3,9,12 99:17 104:23
   150:24 153:9 167:25
   168:20 177:8 198:16
   207:22 278:18
**occasion** 25:14
**occur** 44:24 98:22
   132:21 149:2 150:18
   151:3 161:19 165:3
   194:12 252:9
**occurred** 25:11 94:25
   100:2,3 115:2,13
   144:16 145:9 146:5,22
   160:4 178:13 184:16
   258:7 284:15
**occurring** 22:9 44:18
   133:9,19 146:24 167:4
   210:9
**occurs** 151:12 169:11
   234:18
**offer** 27:19 29:5
**office** 3:8 128:8 225:12

**offices** 1:15
**official** 82:5
**Oh** 176:4
**okay** 14:23 18:8,22 19:9
   19:18,22 20:2,13,22
   21:12,13 22:12 27:25
   29:2 40:21 43:17 46:3
   46:10,11 47:14 56:9,24
   57:23 65:15 72:24
   74:22 76:13 77:21
   85:22 86:24 87:2 88:6
   98:2 99:21 100:3
   102:23 105:22 107:23
   109:14 110:5 111:13
   116:23 119:11 120:12
   130:14 133:25 144:11
   146:4,21,22,23 149:14
   150:3 159:6,7 162:14
   168:19 173:13 174:22
   176:11,14 185:10,12,23
   186:5,16 189:24 195:17
   202:4 208:6 213:3
   214:6 215:5 219:17
   224:8 226:7 228:25
   231:9 233:22 234:23
   235:2 237:8 238:2
   241:6 242:17 247:21
   254:19 255:12 265:15
   270:18 271:2,5,7,9,9
   272:20 273:7 274:21
   279:7 280:7,19 281:9
**old** 258:25
**old-fashioned** 176:13
**omitted** 215:8
**once** 29:24 114:20
   152:22 153:3,15 169:22
   208:14 255:7
**ones** 17:7 202:19 261:19
   261:25
**ongoing** 70:18
**open** 44:14 280:22
**openings** 164:3,4,7
**operated** 107:9
**operating** 243:14
**operator** 107:14
**opine** 90:18 106:16
   179:12

**opined** 282:6
**opining** 106:12
**opinion** 25:6 29:12
   105:13,18 107:13
   108:24 110:2 116:5
   124:25 140:11 142:7
   143:11 151:2 160:4
   168:9 187:21 256:18
   283:16 284:20
**opinions** 27:18 29:5,9,13
   32:25 127:21,22 129:2
   173:9
**opportunity** 48:12 67:3
   173:16 188:7 219:20
   240:19
**opposed** 122:15
**opposite** 277:13
**optional** 59:3
**oral** 1:15
**orange** 185:11
**order** 55:11,14 56:13
   63:13,14 78:6 107:3
   111:3,11 115:6 120:24
   124:16 134:15 135:2,3
   142:14 154:19 155:13
   195:22 210:7,11,13
   211:22 212:21 220:5
   247:14 252:5,6 254:23
   267:2 271:10
**ordinary** 232:10
**organization** 87:3 259:8
   260:3
**organized** 37:2
**orientation** 75:25 155:7
   185:5
**orientations** 167:22
**origin** 163:12
**original** 113:9 287:12
**originally** 225:5
**originated** 45:19
**Orleans** 2:11,16 4:20
   125:20 192:2 225:7
   232:9
**outlier** 227:13 228:10,11
   228:12 229:4,5
**outlined** 185:19
**output** 272:20

**outside** 69:23 89:14
   118:24 163:9 213:20
   227:15
**outward** 144:18
**Overbroad** 68:21 250:3
   277:5
**oversight** 49:9
**overtop** 10:11
**overtopped** 21:10
**overtopping** 11:21 13:23
   15:22 16:3 20:2,7,10,17
   23:24 25:5,6,11 160:5
   258:7
**overtops** 118:10
**oyster** 221:8,23
**o'clock** 11:20,22 15:23
   19:16 22:9 23:21,24
   24:7,8 25:5,10,11 75:11
   75:21,21 76:7,7 98:24
   99:6,15 147:19 148:25

**P**

**P** 2:1,1 3:1,1 162:21
   163:9
**pace** 158:19
**page** 4:3,14 5:4,5,11,13
   5:24 6:3,8 14:7,9,18
   15:6 16:5 18:6,13,20
   19:6,8,10,10,12,19,19
   19:25 20:6,19 21:7,24
   22:6,16 26:2,4 31:12
   34:21 42:15,17 43:20
   43:23 44:3,6 49:18,18
   49:23 50:23 63:20
   65:16,19,21 67:17 72:3
   72:3 74:21,24,24 75:19
   77:3,5,16,16,17 80:20
   81:25 82:3,7 105:13,23
   105:25 107:23 119:6,8
   122:2 128:2 130:3,4,4,7
   139:2,10 143:21 157:21
   162:12 174:17,19
   177:18,20 180:11
   186:13 190:21 197:3
   199:16 200:19 201:24
   203:13,16 204:15
   220:19 226:4,5,14,16

240:15 244:5,6 248:21
249:19 262:20,25
269:11 270:4 272:24
273:5,12,18 276:11,15
279:24 288:5
**pages** 4:12,16,21,24 5:7
5:9,16,18,19 43:9,15,23
77:20 108:21 289:7
**panel** 93:16 112:5,5
115:5,5,20 124:20
130:18 131:3,3,23,24
131:25 133:4 134:17,19
134:21 136:3,4,7,21
137:14 139:24,25 140:2
178:23 181:9 184:7
233:25
**panels** 93:12 133:4,6,9
133:17 135:7,16,24
137:3,7,10,19 180:14
233:25,25
**paper** 80:13 153:3
**paragraph** 31:11 35:6
63:23 77:23 82:8
158:24 174:20 199:18
244:6 270:6 273:13
279:25 280:2
**parallel** 50:18 72:15
75:10,22,24 76:21
103:16 156:5,10,13
167:19
**parameters** 232:25
233:5 259:20 268:9,25
269:17 270:7,13
**paranoid** 172:18,18
**pardon** 46:24 251:20
**Parfait** 1:9
**Parish** 4:20
**parked** 18:18,24 19:7
**part** 12:6 28:4,20 34:7
54:17 77:4 78:6 81:8
88:21 104:20 115:19,20
119:24 122:17 124:9
136:12,12 141:8 142:3
158:2 167:7,7,11,13
175:4 198:8 213:22
218:19 225:7,22 239:8
254:25 262:22 263:3

**particular** 55:23 91:11
95:17 136:6,21 159:25
177:6 208:21 209:2
234:7 280:18
**particularly** 63:7 91:12
275:19
**parts** 180:14
**pass** 85:16
**passed** 184:13 185:7
186:9
**passes** 273:16
**passing** 273:25
**passive** 257:18,25
**pattern** 189:4 214:6,7
**patterns** 32:22 33:25
76:15 86:6,14,16 98:2
188:12,13,19,20
**Pazos** 66:11,14,16,16
97:13,14,18,22 98:7,19
98:20 175:8 218:24
**peat** 251:9,12
**peats** 251:13,21
**peeled** 130:8,22 131:9,15
**peer** 48:15 49:5
**pen** 50:20 131:8 162:19
162:22 205:11
**pending** 219:16
**penetrate** 165:13,23
166:4
**people** 41:17 49:13 90:20
125:5 180:5 280:10
**percent** 46:4,4,12 198:17
**percolate** 254:17,24
**percolating** 253:11
**perform** 37:20,22 54:18
70:15 126:15 257:21
**performance** 14:17 40:7
57:2
**performed** 48:5 73:6
127:11,16 195:22 257:7
257:15
**performing** 31:14,19
**period** 54:6 78:3 146:14
165:4 231:11
**permeabilities** 262:12
**permeability** 54:5 225:5

241:5,10 249:21 250:20
251:2,6,9,20,24,24
262:4,7,16 265:16,23
266:2
**permit** 47:7
**perpendicular** 154:22
155:9 183:16,19,21
184:4,9
**Perry** 1:8
**person** 45:13,23 136:23
232:8 237:12
**personally** 16:19
**persons** 49:11
**pertaining** 42:20
**PERTAINS** 1:5
**peruse** 17:16,19
**Peter** 3:16 8:4
**phenomena** 46:5,8 134:7
136:5 146:6 166:6
**phenomenon** 245:13
**phone** 177:22,24 275:21
**photo** 49:25 51:18 57:8
67:10 112:12 127:25
128:6 129:4 130:9,13
130:21 131:19 137:25
138:2 157:18,18,21,25
158:2 161:24 163:7
176:3,4,16,19,22
177:15,19 178:18 179:7
179:13 180:11 183:14
183:25 184:18,18
186:11,18
**photograph** 49:19
130:25 157:24 177:5,8
177:14 184:11 185:18
187:2 277:14
**photographic** 130:6
**photographs** 31:10 37:8
98:13 128:20 175:7,14
185:19 224:18
**photos** 5:19 125:15,16
174:20 175:15 224:22
225:15,16 276:18
**phrased** 146:3
**physical** 37:19,21,23
38:2,3,9,9,12,13,13,20
38:22 39:8,10,10,14

78:20 159:11 175:3
**Ph.D** 1:15 4:2,11 5:7 7:1
8:1,10 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1

166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1
**pick** 17:6
**picture** 116:24 121:10
131:4,19 177:10 179:22
180:6 183:23 216:13
277:11,16

**pictures** 55:3 221:20
274:23
**piece** 152:14
**pieces** 212:22
**piezometer** 243:10 244:6
244:10,15,23,24
**piezometers** 243:13
**piezometric** 244:17
**pile** 5:15 52:25 55:6,15
55:18,24 56:2 93:12,15
94:9 104:22 112:18,22
113:3,7,17,19 114:3,7
115:10,20,22,24 116:3
116:7 123:16 124:5,8
124:13,13,22 125:4
126:7 127:3,19 130:6,8
130:17,22 131:5,9,14
131:15,21,22 132:3,6,8
132:9,17,18,22,23
133:22 134:3,13 137:5
137:5,13,22,22 139:25
141:11 142:24 143:8
149:5,6,19,22 158:22
159:7 160:11,13,19,22
160:23 161:3,6,9,11,13
161:15 163:14,19,22,23
164:5 182:2,4,6,10,22
183:6,9 189:14,22
213:5,9 243:23 244:18
245:6,15 246:3 252:9
252:13,22 253:2,3,6,23
253:25 254:3,6,9,10,17
254:18,24 255:6,15,24
256:7,14 273:2,10
**piled** 36:24
**piles** 243:12 245:2
**piping** 95:23
**place** 15:23 26:21 37:12
63:16 77:22 97:10
111:3,10,18 141:2
142:11 146:9 158:6
162:20,23 163:4,4,9,24
164:6,11,15,21,23
182:22 197:9 201:7
210:8,11 211:9 233:17
234:8 247:5 276:8
**placed** 158:5 210:4,9,21

211:4 216:15 219:7
**places** 15:3 94:9 168:3
173:25 174:7
**plagiarize** 27:12
**plagiarized** 27:11
**plaintiffs** 3:2 7:23,24
17:13 48:2 49:13,14
99:4,7 218:15
**plan** 214:13 215:17
**planar** 260:6
**plane** 260:24 261:2
263:25 264:2,5,6,11,12
264:13 265:6,7,10
**planes** 258:16,19,23
259:5,9
**plank** 221:8,14,15,17
**plans** 60:12,12 64:3
213:8 214:13
**plants** 214:21
**plausibility** 68:13
**plausible** 82:13 83:22
**play** 39:6 54:17 164:19
**played** 218:19 267:13
**plays** 267:15
**please** 7:20 9:19 27:21
71:8 95:7 112:25
127:15 135:13 162:10
236:18 244:5 287:3,7
**pleased** 50:13
**pleasure** 285:15
**PLLARD** 3:3
**PLLC** 3:8
**plot** 202:6 236:22 238:16
**plots** 235:11,20
**plotted** 238:15 268:14
**plug** 270:12 271:8,15,25
**plugged** 215:20 272:5
**plus** 213:5,5 244:16
**point** 19:7 20:3,8 22:10
28:17 52:20 59:12,14
59:16,25 61:10,11
63:16 66:14,17 93:10
93:15 95:16 132:9,11
132:18 133:8,17,21
134:15,16 137:4 149:7
151:6 182:7 187:4
188:18 190:14,15

193:15 194:18 195:13
214:23 277:3
**pointed** 184:18 189:19
**points** 12:3 67:19
**Pollard** 3:6 7:22,22
15:24 16:8,10 18:11
25:8 28:17 42:22 43:3
43:11 48:24 57:8,21
68:15,21 71:10 81:19
81:22 82:2,5 95:12
109:12,15 119:8 135:10
139:2 140:13 158:11,17
159:5 168:10,13 172:2
177:20 182:15,24
186:13,15 200:19
203:15 207:17,24
211:17,19 219:16 223:4
229:22,25 230:9 235:23
247:17,21 248:15 250:3
250:7 257:9,11 258:8
269:25 277:5 282:11
285:16
**ponded** 51:15,25 244:18
**Pontchartrain** 78:8
79:22
**Pontchatrain** 77:25
**poor** 218:14,16,22
**populate** 197:10 209:7
**pore** 253:18
**port** 281:3
**portion** 130:16 131:22
138:21 149:14 156:15
160:21 168:19 178:3,25
179:2 181:3 208:5
238:2
**portions** 64:12 178:9
**position** 80:4,6 113:8,9
**possibility** 95:15 116:13
117:19 118:4 122:13
152:19 262:18
**possible** 13:19 24:6
125:2
**possibly** 26:24 27:3 37:5
83:7,9 112:5
**post** 63:24
**post-Katrina** 200:23
201:5,9

potential 33:22 94:15
192:23
potentially 71:19 274:2
pound 231:12 242:9
pounding 267:16
pounds 215:21 226:3,8
226:20 227:10 228:20
230:18,22 231:2,7
232:12 238:19,24,25
239:17,18 241:6,8,15
241:16,18 242:6 249:11
249:13 250:13
pour 23:19
pouring 23:11 123:17
Poydras 2:11,15
practice 232:10,18,19
233:4
practices 232:9
preceding 43:9,14,22
precise 124:17 179:2,14
precisely 122:11
preconsolidation 236:5
predict 166:10
predominant 76:4 85:24
86:18 107:9 177:25
predominantly 88:8
preface 28:14
prefaced 132:24
preliminary 4:17 9:4
29:19,22 30:17,20 31:4
31:12 36:10 144:14
premise 182:15
preparation 8:18 29:23
173:9
prepared 4:10 109:21
presence 110:7 262:21
present 3:14 7:20 16:23
59:6 61:2 88:23 167:15
169:10 180:13 258:11
presented 151:17
press 255:15
pressure 95:4,10 101:22
101:24 102:4,6,8,8,12
102:13,18 103:2,6,12
103:12,22 104:5,9,14
104:15,18,20 117:13,20
118:8 132:6,15,16

134:10,10 159:15,18,21
181:21 188:2 192:21
236:6 239:3 245:14
246:9 247:25 253:18
pressures 53:11 54:7
102:11 248:4 255:14
257:19,19
pretty 22:5,5 119:22
137:6,8 167:9 200:6
261:13
prevailing 69:11,21
107:3,10
prevent 55:8
preview 38:3
previous 90:18,18 130:4
185:19
previously 114:24
pre-existing 60:16,17
61:5,21 62:6
pre-Katrina 200:23
201:2,10
primarily 156:5
primary 141:8,17,23,24
142:6 147:17,22 149:4
149:13 150:9,12,17
151:3,8 152:21 153:22
154:2 162:20,25 163:2
181:6
printed 177:8,16
prior 51:20 56:5 60:21
65:10 67:15,23 92:15
99:10,11 105:5 135:10
135:13 146:6,25 158:3
160:4 164:22 172:21
185:14 219:20 278:14
282:6
privy 164:13
probability 136:8
probably 108:15 112:4
116:21 120:23 207:8
268:2
probe 79:19
problem 94:10 103:9
112:15 133:23 192:10
253:24 257:20
procedure 9:14
proceed 158:13

proceedings 285:21
process 33:24 34:2,8,8
34:18,19 35:12 110:13
141:16 150:21 152:6
209:6 235:18
processes 243:11 244:25
Procter 1:15 2:3 7:16 8:2
produce 238:18
produced 29:19 175:14
PRODUCTION 6:7
Professional 1:17
professor 71:6
profile 54:17,20 64:24
195:25 196:6,8,16,17
197:6 199:2,2 203:25
204:4,5,13,17,18,21,22
212:16 222:10,10
224:12 235:22
profiled 196:4 197:5
profiles 63:4 198:14
202:10 205:4 222:8
236:15
program 74:7 266:13
progress 114:20 149:6
progression 114:25
134:4
progressive 123:20
124:6,9
project 32:18 92:5 177:6
192:3 231:23,24
promise 27:12 149:25
pronunciation 251:20
proper 27:2
properly 243:14
properties 196:25
197:23 198:10,14 209:4
223:25
property 250:21 268:14
proposition 77:24
propounded 289:9
protected 23:20 96:4
163:8,10 194:2 243:4
250:7 253:13 256:14
protection 54:8 55:9
62:4 89:18 90:3,11,15
90:24 91:5,13 246:25
248:6 253:17 254:2

256:2,5,7
protective 95:19
prove 256:20 258:14
proves 136:14
provide 55:15 106:19
202:10 216:22 268:10
provided 10:16 40:17,22
49:11 66:9 75:18 175:7
205:24 249:5
provides 37:3,7 68:4
providing 48:6
prudent 233:6
PSF 271:2
public 31:9 289:25
publications 31:10 84:23
84:24 85:21,23 86:3
87:18,21 88:12
publish 87:5
published 48:9,14,18
49:5 85:25 86:18 88:8
88:10 90:14
pull 161:3
pulled 9:2,2 115:10
137:13 160:19 161:6
pulling 127:8
pump 106:2 107:14
108:22 109:24 119:3
purely 48:5
purple 201:5
purport 110:9
purports 83:13 108:9
purpose 48:6,10 55:5
70:21 266:8 267:6
purposes 55:7 64:15
126:4,4 230:16
pursuant 100:18
push 101:20
pushed 103:7 254:16
pushing 143:4 178:7
180:20
put 28:6 38:6 43:9 62:4
83:24 122:3 132:15
142:15 151:24,25 152:2
156:3 160:13 162:19
171:22 172:6 197:22
200:10 215:9 221:3
putting 28:8 172:5

| | | | |
|---|---|---|---|
| **P.E** 1:15 4:2,11 5:7 7:1 | 169:1 170:1 171:1 | **qualifications** 98:20 | **Raffman** 2:6 4:4 7:25,25 |
| 8:1,10 9:1 10:1 11:1 | 172:1 173:1 174:1 | **qualified** 35:10 | 8:15,16 11:10 14:5,15 |
| 12:1 13:1 14:1 15:1 | 175:1 176:1 177:1 | **qualify** 35:7 284:22 | 16:4,9,12 17:21 18:5,12 |
| 16:1 17:1 18:1 19:1 | 178:1 179:1 180:1 | **quantitative** 35:15,22 | 18:23 20:14,23 21:6 |
| 20:1 21:1 22:1 23:1 | 181:1 182:1 183:1 | 36:6 | 22:25 23:9 25:12 28:19 |
| 24:1 25:1 26:1 27:1 | 184:1 185:1 186:1 | **quarter** 19:16 20:16,19 | 29:25 30:4,11 42:13 |
| 28:1 29:1 30:1 31:1 | 187:1 188:1 189:1 | **question** 7:6 9:15,19,23 | 43:2,7,14,18 47:14,23 |
| 32:1 33:1 34:1 35:1 | 190:1 191:1 192:1 | 28:14 35:9 43:6 48:23 | 49:2 57:9,24 60:8 |
| 36:1 37:1 38:1 39:1 | 193:1 194:1 195:1 | 56:7,13,22 62:20,21 | 63:21 65:20 68:17,22 |
| 40:1 41:1 42:1 43:1 | 196:1 197:1 198:1 | 72:20 78:12 79:15,20 | 71:11 80:12,18 81:12 |
| 44:1 45:1 46:1 47:1 | 199:1 200:1 201:1 | 86:17 87:17 88:18 95:7 | 81:17,21,24 82:3,6,20 |
| 48:1 49:1 50:1 51:1 | 202:1 203:1 204:1 | 105:12,17,24 108:22 | 84:2,9,14 95:25 108:7 |
| 52:1 53:1 54:1 55:1 | 205:1 206:1 207:1 | 118:3 119:18 122:9,11 | 109:17 112:20 116:25 |
| 56:1 57:1 58:1 59:1 | 208:1 209:1 210:1 | 123:7 127:15 130:21 | 119:9,12 122:7 125:6 |
| 60:1 61:1 62:1 63:1 | 211:1 212:1 213:1 | 140:15 145:3 146:3,17 | 125:13 135:12 139:4 |
| 64:1 65:1 66:1 67:1 | 214:1 215:1 216:1 | 150:4 157:22 172:5 | 140:14 144:9,19 158:15 |
| 68:1 69:1 70:1 71:1 | 217:1 218:1 219:1 | 178:15 180:8 181:8 | 158:18 159:13 162:2,9 |
| 72:1 73:1 74:1 75:1 | 220:1 221:1 222:1 | 182:16,18 183:14 | 162:15 168:11,16 172:4 |
| 76:1 77:1 78:1 79:1 | 223:1 224:1 225:1 | 185:22 197:20 198:21 | 177:21,23 182:19 183:3 |
| 80:1 81:1 82:1 83:1 | 226:1 227:1 228:1 | 204:22 206:21,22 211:7 | 186:14,17 190:8 200:20 |
| 84:1 85:1 86:1 87:1 | 229:1 230:1 231:1 | 216:2 219:16 224:10 | 200:21 201:13,21 |
| 88:1 89:1 90:1 91:1 | 232:1 233:1 234:1 | 230:4 231:3 233:16 | 202:23 203:17 204:10 |
| 92:1 93:1 94:1 95:1 | 235:1 236:1 237:1 | 238:7 239:14,22 242:15 | 207:20 208:3 211:18,21 |
| 96:1 97:1 98:1 99:1 | 238:1 239:1 240:1 | 246:19 254:8,9,20,20 | 215:25 219:18 220:23 |
| 100:1 101:1 102:1 | 241:1 242:1 243:1 | 254:23 261:18 270:2,4 | 223:6 227:18,24 230:5 |
| 103:1 104:1 105:1 | 244:1 245:1 246:1 | 283:7 | 230:12 236:2 240:10 |
| 106:1 107:1 108:1 | 247:1 248:1 249:1 | **QUESTIONED** 4:3 | 243:20 244:22 247:20 |
| 109:1 110:1 111:1 | 250:1 251:1 252:1 | **questioner** 20:6,8,15,24 | 248:9,20 250:4,8,12 |
| 112:1 113:1 114:1 | 253:1 254:1 255:1 | 21:2,9,12,17,20 22:2,13 | 252:17 257:14 258:12 |
| 115:1 116:1 117:1 | 256:1 257:1 258:1 | 22:18,20 23:2,4 122:10 | 263:22,24 264:24 270:3 |
| 118:1 119:1 120:1 | 259:1 260:1 261:1 | **questions** 27:7 28:22 | 273:21 274:16,22 |
| 121:1 122:1 123:1 | 262:1 263:1 264:1 | 37:25 41:4,9 43:3 | 276:18,24 277:10,25 |
| 124:1 125:1 126:1 | 265:1 266:1 267:1 | 49:17 57:11 68:2 70:8 | 278:5,11 279:12,16,20 |
| 127:1 128:1 129:1 | 268:1 269:1 270:1 | 70:11 77:2 78:9 79:18 | 282:12 285:9,13 |
| 130:1 131:1 132:1 | 271:1 272:1 273:1 | 86:15,16 104:25 125:14 | **rain** 121:7 |
| 133:1 134:1 135:1 | 274:1 275:1 276:1 | 148:12 158:14 172:2 | **raining** 21:13 |
| 136:1 137:1 138:1 | 277:1 278:1 279:1 | 176:8,10,12 224:15 | **raising** 235:5 |
| 139:1 140:1 141:1 | 280:1 281:1 282:1 | 242:17 269:24 279:22 | **random** 136:5 |
| 142:1 143:1 144:1 | 283:1 284:1 285:1 | 285:13 289:9 | **range** 81:9 82:9,13,18 |
| 145:1 146:1 147:1 | 286:1 287:1 288:1 | **quick** 81:19 | 83:23 228:16 232:13 |
| 148:1 149:1 150:1 | 289:1 | **quicker** 53:8,10 191:6,12 | **ranged** 228:9 |
| 151:1 152:1 153:1 | **p.m** 125:9,10 162:6,7 | 193:3 | **ranging** 99:9 |
| 154:1 155:1 156:1 | 201:17,18 227:21,22 | **quickly** 248:17 | **rapid** 263:7,11 |
| 157:1 158:1 159:1 | 240:6,7 278:8,9 279:17 | **quite** 153:5 211:3 | **rapidly** 115:2 |
| 160:1 161:1 162:1 | 279:18 285:21 | | **rate** 193:17,18 223:10,11 |
| 163:1 164:1 165:1 | | **R** | 223:12,13,15 |
| 166:1 167:1 168:1 | **Q** | **R** 1:8 2:1 3:1 288:3,3 | **ratio** 251:7 271:11 |

**reach** 78:6 79:23 180:6
    232:3
**reached** 12:4 78:2
    119:14 127:21 282:22
**reaching** 282:16
**reacting** 254:22
**read** 17:9 23:13,17 28:25
    29:2 42:24 43:4,4,11,19
    48:22 57:14 105:11
    108:13,16,21 109:22
    123:8,10,13 130:5
    143:22 144:9 157:25
    158:8,12 172:24 173:2
    173:15 189:18 218:18
    218:24 224:15,17,19
    231:10 249:2,10 269:21
    270:17 287:3 289:6
**reading** 15:25 19:3 56:12
    56:17 100:8 108:11
    109:9,16
**readings** 243:10 244:7
    244:15,24,24
**reads** 48:22
**realize** 28:9 233:9
**realized** 28:12 177:10
**really** 8:20 24:18 67:3
    69:14,22 70:6 73:21
    78:11 79:24 87:15
    98:20 108:24 134:16
    148:13 176:25 187:17
    188:5 206:6,20 217:11
    221:14 225:23 231:13
    268:12 269:4,6 277:16
    279:8
**reason** 56:10 64:21
    122:10,14 136:20 155:5
    155:5 175:12 176:15
    186:8 187:25 204:24,25
    205:3 222:4 287:5
**reasonable** 44:5 200:9
    226:25
**reasons** 29:9 267:9
**rebar** 46:15,19,20,21
    47:9,10 142:4 167:2
    175:2,10 183:16 184:3
    184:9 185:4 186:9
**recall** 120:25 173:18

**receipt** 287:14
**received** 99:3
**recess** 47:19 84:6 125:9
    162:6 201:17 227:21
    240:6 278:8 279:17
**reciprocal** 85:11
**reciprocity** 85:6
**recognize** 11:4 14:18
    30:16 42:20 84:15
    204:12 243:22 274:23
**recollection** 173:8
**recommending** 260:6
**reconstruct** 112:3
**reconstruction** 96:22
**record** 26:11 47:17,21
    71:10 84:3,4,8 125:7,11
    162:2,4,8 177:5 182:20
    201:15,19 227:18,19,23
    240:4,8,11 278:2,2,5,6
    278:10 279:14,19
    285:17 286:5
**records** 71:25 72:5
**red** 61:7,17 129:6,6,6,7
**redirect** 153:5,19
**reduction** 259:24
**refer** 33:3 49:25 56:5
    57:6
**refereed** 48:18 49:6
**reference** 9:2,3 26:6 67:4
    67:6,21 77:15 81:11
    92:8 128:23 187:19
    247:4
**referenced** 240:15
**references** 29:17 63:6
    218:9,9,11
**referred** 11:7 14:11 18:3
    30:7 42:11 47:9 51:16
    80:16 81:15 84:12 92:7
    92:9 94:17 122:5
    202:21 204:8 219:5
    236:11,25 237:5 243:18
    274:19 276:22 285:7
**referring** 16:8 17:13
    18:11 25:25 26:17 33:4
    33:9 40:18 43:22 46:14
    50:14 57:21 73:23
    85:20 119:24 157:19

165:6 174:18 204:14
    205:25 220:16 242:24
    244:2,13 281:19
**refers** 44:6 107:17 247:2
**reflect** 61:19 179:7 243:7
**reflected** 36:15 81:5
    226:14
**reflects** 164:6 179:13
    184:10 187:2 243:8
    244:23
**refrain** 28:22
**refresh** 173:7
**refresher** 9:13
**refused** 284:22
**regard** 98:16 199:15
    240:20
**regarding** 36:11 91:8,21
    97:19,23 98:7 110:2
    126:16 144:21 246:21
    247:11
**regardless** 54:10 154:13
    185:3 239:16 255:5,9
**regards** 152:17
**Registered** 1:16
**reinforced** 86:25
**reject** 27:2
**rejected** 26:23 284:20
**relate** 38:19 68:24 92:22
    242:19
**related** 31:19 40:6 51:14
    68:5 69:8 79:6 86:3,7
    87:21 88:14 89:23
    108:2 128:14,17,23
    190:6 236:5
**relates** 98:5 204:13
    231:14
**relating** 86:19
**relationship** 69:5 236:7
    236:10 241:23 242:2
**relative** 75:6,9,22 156:7
    197:21
**releases** 103:8
**relevance** 68:19 246:16
    246:20
**relevant** 17:11 40:4
    148:14 199:3 238:16
    249:8

**reliable** 24:25
**reliance** 224:20 225:3,13
    225:14,15 240:17
**relied** 29:14,15 38:6 65:7
    65:9 76:11 80:2 100:25
    119:2 202:9,14,19,25
    203:2,5,7 212:5,23
    240:12 266:6,6
**rely** 38:4 65:5,6 73:22
    202:17 233:8
**relying** 35:25 36:18
    136:16
**remain** 131:24
**remaining** 135:23
**remains** 182:3 221:8,22
**remember** 15:25 29:20
    30:21 31:6,20 41:14
    45:4 56:15 67:5 88:21
    105:7,11,20 106:5
    109:8 115:3,4 121:4,5
    123:12 143:18,20 148:7
    152:12 173:3 194:13,14
    207:3,21 208:20 212:12
    243:13 245:21 249:13
**remembered** 84:21
**remembering** 65:10
**removed** 12:3 126:8
    213:6,8
**rendered** 32:25
**repaired** 86:25
**repairing** 86:22
**repeat** 80:11 95:7 127:15
    207:16 230:4 246:19
**rephrased** 146:3
**replaced** 213:6,16
**report** 4:10 5:16 9:4
    10:17,25 11:3,5,12 13:4
    13:6,15,21 14:8,14,25
    16:8,13 24:17,24 27:6,7
    27:10,14,18 28:2,2,4,7
    28:10,13,20,24 29:4,8
    29:11,16,19,22 30:17
    30:20 31:4,12,23 33:12
    33:12 35:16,24 36:2,5
    36:10,15 37:2,7,12,13
    38:5,24 39:17 40:17
    41:5,6,10,12,12 42:15

43:9 45:16 49:12,17
50:23 51:17,18 55:2
63:16 65:17 67:18 68:3
70:3,21 71:12,25 73:22
73:23 74:3 75:18 77:19
80:2 81:4,7 82:21
83:22,24 93:11 106:7,8
107:19 119:6,9 121:19
123:16 128:2,23 141:7
148:7,15 151:18 154:11
154:13,14 159:9,12
160:16 166:17 173:9
174:17 176:7,24 180:3
183:24 187:16 189:18
195:15 200:10,14
201:23 202:11 208:23
211:15 218:24 221:12
224:16,23 225:8,9,10
225:11,11,23 226:14
230:14 238:12 240:16
242:18,19 243:23,24
246:15 247:16 262:11
263:2 265:18 268:20
271:4 281:14
**reported** 16:6,14 26:20
37:17 40:13 67:16
71:25 72:23,25 73:3,8,9
74:18,25 75:5,9 80:9,19
83:21 228:17
**reporter** 1:17,17 7:17
8:8 10:2 11:6 14:10
18:2 30:3,6 42:10
56:11 71:7 80:15 81:14
84:11 122:4 202:20
204:7 243:17 252:15
263:19,21 274:18
276:21 285:6 286:20
**reporting** 7:18 44:10
68:12,14
**reports** 13:25 15:7 31:9
41:17 44:11 76:11 82:8
83:6 107:20 128:20,21
128:22 221:6 230:8
240:15
**represent** 7:21 14:7 55:2
56:6 61:4,7,12 109:2
202:5 203:22 220:6

236:21 237:20
**representation** 203:4
**representative** 15:13
215:10
**represented** 60:9 217:10
263:16
**representing** 2:2 3:2 8:6
14:19
**represents** 58:5 60:19
177:2 185:13 202:6
208:19 220:9 237:17
**reproduce** 269:12,17
270:7,11
**reproduction** 286:18
**REQUEST** 6:7
**require** 70:23
**required** 70:14 114:5
**requirements** 85:13,15
232:4,6
**requires** 55:25 193:24
**research** 99:13 188:7
260:4,5
**reserve** 240:20
**reserved** 7:6
**resistance** 55:15 59:21
275:14 276:3
**respect** 79:9 96:18
191:16 246:14 268:24
282:2
**respects** 198:15
**responds** 18:15
**response** 154:12
**responsible** 225:22
**rest** 123:10 170:8
**resting** 158:6
**result** 93:17 123:24
124:24 143:16,24 144:4
152:3 163:13 165:2
190:17
**resulted** 149:17 158:21
265:15 269:2
**resulting** 63:18 178:2
218:5
**results** 38:15 39:11
56:25 143:6 167:5
197:18,24 240:14 261:8
263:6 267:20 269:12

272:13
**resume** 5:6 85:20
**retained** 101:18
**retaining** 55:9
**retrofit** 87:12
**return** 70:14 287:12
**review** 14:9 15:18 16:19
31:9 34:4 40:3,5 79:25
106:24 107:6 176:7
225:24 259:23 272:15
283:3
**reviewed** 8:17 16:22
18:21 20:12,21 21:4
22:23 23:7 25:20 26:14
28:5,11 29:22 39:25
40:6 43:13,16 48:15
49:5 60:7 63:19 65:18
79:4 82:15 107:22
109:15 112:13 116:22
119:10 144:10 162:13
175:18,21 190:4 220:21
244:20 264:21 273:19
283:9
**reviewing** 41:15
**re-ask** 72:20
**re-wrote** 27:25
**Richard** 3:8,11 7:24
**rick@rickseymourlaw...**
3:11
**right** 9:9 13:13 17:12
19:10,14 21:2,3,9,19,20
22:14,15,19,21 23:4,5
23:17 25:7,13,16,22,24
26:22,25 27:4,5,10,13
29:4,25 30:12,23,25
33:10,22 34:11,13,20
35:3,7,9,10,13 36:2,3
36:12,16,19 37:6,10,15
38:8 39:21 41:2,16,21
42:5 44:9 45:2 46:7
47:6,11 48:7,21 51:3,9
51:18 52:3 53:2 54:23
55:13,16,19 56:10,17
57:10,12,13,17,22
58:11,13,23 59:2,16,20
60:3,5,14,23 61:15
62:14,22,24 63:2,22

65:8,15,22 66:7,14
67:16,22 68:18 69:5,10
69:17,21 71:4,14 72:3
72:14,16,19 73:21 74:6
74:23,25 75:12,15,16
75:19,22,25 76:4,16
77:9,12,14,16,22 78:22
79:16 81:12,19 83:22
84:2,22 85:20 87:19
88:17 89:11 93:3 96:4
96:8,10,14 97:16,22
98:14 99:4,5 100:14,18
100:21,25 101:4,6,20
102:14,24 103:4,8,10
103:13,18 104:9,14,17
105:10 106:5,8,10
107:12 108:18,25 109:5
109:6 110:9,25 111:4,7
111:11,18 112:10
113:12,14,24 114:8,18
115:14 117:7,8,10
119:4,7,13,25 120:7,11
120:13,19,23 121:20
123:5,9,15,18,22,25
124:6,10,14,18 125:16
125:22 126:21 128:4,6
129:14 130:18 131:2,7
131:8,14,18 132:19
133:10,17 134:17,25
135:17,21 136:22 137:2
137:4,25 138:2,16
139:5,22 140:2 141:15
142:2,4,6,14 143:3,5,10
143:14,21,25 144:8
145:19 147:9,12 149:2
149:9 151:8,13,18,20
153:10 154:19 155:3,15
155:20,25 156:9,12,17
156:19,25 157:4,9,12
157:17,19 158:17
159:15 160:16 161:7,17
162:17,19 164:6 165:6
165:10,14,24 166:13,19
166:21,22 167:6,24
168:18 169:2 171:3,9
172:7,11,15,23 173:12
173:21 175:23 176:12

179:8,18 180:5,10,25
181:15,22,24 182:8,14
184:2,24,25 185:3
186:11,18 187:2,9,12
188:11,12 189:2 191:11
191:18 192:5,8,17,24
193:5,6,16,21,22
194:21 195:7,12,14,19
195:23 196:2,6,10,12
196:18,20,20,23,23,25
197:7,8,9,15,25 198:8
198:11,15,23,25 199:16
200:10,22,24 201:3,5,7
201:13 203:12,18
204:20 205:16,19,25
207:9 209:8,20,20,25
210:9,15 211:5,11,19
211:25 212:2,7,24
213:2 214:14,17,18
215:25 216:5,6,9,16
217:2 219:13 220:4,13
220:15,19 221:3 222:15
222:25 223:9 224:4,14
225:25 226:4,11,14,19
227:4,11,16 228:3,6,8
228:10,14,21,22,23,24
229:8,13,19 230:6,13
233:17,21 234:2,11
235:17 236:3,3,7,18,24
237:16,17,23 238:8,19
239:14 240:10,23
241:10,14 242:5,14
245:15 246:14 247:9,19
248:21 249:16 250:19
253:7,8,13,23 255:3,5
256:11 258:7,21 260:15
260:19 261:4,6 262:5
262:23 263:5 264:25
265:2,12,20 266:8
267:2,8,12,21 268:17
268:21 269:2,13,14,18
270:13,16 272:2,8,16
272:19 274:6,7 275:4
277:25 279:21 280:11
280:14,15,17,19,22,23
282:3,6,9,13,16,17
283:5,11 284:4,8,19

**rights** 240:20
**right-hand** 57:19 129:5
  129:7
**rigid** 146:14 153:10
**rip** 124:9,22
**rises** 96:8 103:18
**rising** 19:21 134:9
**risk** 259:24
**Rita** 158:3 176:20,23
  177:11
**road** 221:8,9,11,14,15,17
**Robbins** 2:7 8:3
**Robert** 224:16
**role** 39:6 91:12 267:13
**room** 89:14 111:23
**rooted** 88:13
**rose** 117:22
**rotated** 163:23,23
**rotates** 153:22
**rotational** 138:12
**rough** 257:19
**route** 136:24
**row** 57:11
**RPR** 286:12
**rubber** 96:6 116:18,24
  117:2,13 182:10,22
**rule** 116:12
**ruled** 94:3 117:19 118:3
**ruling** 33:21,21 34:3,3
**run** 32:12 37:22 265:13
**running** 47:15 200:16
  281:11
**runs** 50:17
**rush** 115:9
**rushed** 145:9
**rushing** 138:14 139:12

**S**

**S** 2:1,6 3:1 4:8 5:2
  162:22
**safe** 234:24
**safety** 38:17,18 90:2,6
  198:17 258:10 269:10
  269:17 270:8,11 271:8
  271:10,12,16,21 272:2
  272:6,7,11 278:22,23
**salient** 160:10

**sample** 205:21 211:16,22
  237:3,5,11
**sampler** 237:9
**samples** 208:8,9,13,16,20
  208:21 209:11,13 212:5
  212:17 222:14,16,17,19
  222:22 227:4,5,11
  228:2,5,7,8,16 229:8,16
  229:18 234:12,14 235:4
  236:24 237:2,2,4,7,8
  238:14 240:12 259:14
  259:17
**sand** 52:13,20 53:3,4,7
  53:12,23 54:11,17,21
  164:12,16,22 212:13,14
  212:18 213:7,12 214:4
  214:4,5 215:2,5,5,8,12
  215:14 216:8 218:4,7
  219:3,4,7,10
**sandbags** 163:8,10
**sandy** 262:21 263:2,16
**saturate** 53:8,9
**saturated** 191:6 193:2,2
  194:5,9
**saturation** 193:5,15,25
  263:7,10
**save** 176:8,10
**saved** 270:14
**saving** 268:7
**saw** 9:9 19:20,21 20:7
  21:18 100:6 107:15
  110:6 119:19 121:3,13
  168:2 221:25 249:3
  270:20 274:15 277:14
**saying** 10:13 23:10,16,16
  23:18,23 26:9,12 53:6
  54:13 82:17 88:8 96:15
  111:22,24 115:4 117:24
  117:24 118:2 143:18
  145:15 149:12 153:21
  153:24 159:17,20
  160:19 163:21 164:2
  167:10,14 171:12
  178:24 182:25 195:9
  208:22 214:18 216:10
  216:20 222:22 225:4
  231:5 234:4,6 235:14

242:14,23 243:13
255:11,13,20 266:23
270:24 271:14 272:18
275:25 276:3 282:24
**says** 18:9 19:14,15,21
  20:3,7,8,10,17 21:2,12
  21:12,13,17,20,22 22:4
  22:18,18,19,20,22 23:2
  23:3,4,5 43:24 44:12
  45:7 57:15,18,20 63:23
  73:12 83:14,17 106:12
  108:2 122:16 147:20
  157:25 171:24 175:9
  181:13 187:24 203:5
  216:23,25 244:9,14
  263:2 274:3 275:19
**scan** 42:23
**scenario** 124:21,24
  252:10,18 256:19
  272:24
**school** 158:4
**science** 56:11 83:2,4,8
  259:8
**scientific** 24:24 78:23
  79:3,7 83:12 106:19,23
  107:7
**scientist** 62:24 83:7
  111:9 283:8,8,12
**scientists** 62:22
**scooped** 163:23
**scope** 104:13,15
**scour** 140:6,6 149:17
  159:8 163:14,20 258:5
  258:10
**scoured** 160:6
**scouring** 164:20 221:11
**scrapes** 179:21,23,25
**scraping** 180:2
**scratches** 174:25 175:10
**se** 127:20
**sea** 211:11
**sealing** 7:4
**second** 18:19 42:22
  57:11 64:5 82:8 112:5
  113:3 124:20 141:23,24
  148:4 150:11,17,20
  152:21 158:11 162:23

162:24,25 163:2 167:16
184:17 199:17 207:17
212:4 249:21 264:20
**secondary** 141:9,20,22
150:11 153:23
**seconds** 78:3
**section** 1:7 11:11 29:17
40:13,19 68:3,3 71:14
136:11 179:14 181:5
189:6 194:17,18 196:9
196:11 219:24 221:7
242:18,19,24 243:3
244:3 245:23 246:4,15
246:21,23 262:22 263:3
263:17 268:20
**sections** 27:22 40:4,5,6,8
63:12,12 115:24 116:3
116:7 197:13,17 246:11
**see** 8:6,24 16:14,17 17:7
17:17 18:10,14,20,25
19:6,8,11,12,17,23 20:2
20:4,10,11,18,24 21:3
21:10,11,14,15,24 22:6
22:15,22 23:6 26:2,3
28:25 31:10,15 35:5
40:9 42:18 43:23 44:3
44:9,15 49:22,25 51:7
51:20,25 52:3 57:5,14
57:17,18,25 58:19
67:20 68:6,10 72:8
74:25 75:5,7 77:6 78:4
80:4,12,19 82:7 84:23
88:4 99:20,21,24 105:9
112:2 117:7 119:17
122:17,19,25 125:2
128:8 129:4,7 130:9,10
131:12,14 135:15 138:4
138:7,11,19,20 158:23
162:16 163:7,10,17
171:24 173:7 174:14
175:13 176:6 177:12,17
178:4,20 179:22 180:16
183:17 184:3,5,19
185:12,17,18,20 186:25
187:11 190:25 199:21
201:2 203:12,21 205:9
211:16 213:19,21

214:19 217:11 218:9,20
218:20 221:5,18 235:21
236:19 238:14 242:25
244:7,12,19 248:24
249:6 250:24 255:19
261:11 265:10,18
267:10 269:21 270:8,21
271:12,12 273:10,17
274:12 275:3 276:25
277:7 280:4
**seeing** 18:16 23:18 76:13
83:6 107:17 119:21
171:20 245:21 249:14
**seen** 13:25 14:23 15:21
17:22 25:14 52:11
53:18 83:13 99:9,10,25
107:20 108:9 110:9
111:2 148:5 177:9
218:17 219:3 221:20
230:7 235:10 259:7,12
260:4 261:24 262:2
265:18 274:9 277:11
281:14
**seep** 93:18
**seepage** 32:21 33:7,13,21
34:3,9,15 37:14 39:18
40:8 52:21 53:10,11,25
55:8 76:14 90:23 95:22
110:14,18 124:23
126:15 142:24 143:2,3
145:18,19,22 149:5,6
150:10,12,25 151:6,12
151:16,17 152:4 160:25
161:10,13,14 164:7,23
165:2,3,5,6,8,9 195:18
195:23 197:14,25
217:23 219:9 225:6
246:17,21 247:4,5,11
248:22,24 249:3,7,15
249:17 251:25 252:4
257:21 262:3,8,12,13
262:14,17,18 263:11
273:8
**sees** 78:19 83:5
**segment** 31:16 131:21
132:12,14,16
**segments** 180:15 210:17

210:17
**selection** 262:4
**semi-compacted** 249:25
250:10,14
**send** 50:19
**sense** 38:11 111:5 113:9
122:24 132:12 191:15
193:25
**sent** 17:9,10
**sentence** 130:8,10 159:2
244:14,23 270:5 271:14
**separate** 224:15 257:23
**separated** 182:7,25
**separating** 117:9
**separation** 255:6,25
256:4,6
**September** 8:18 30:20
31:5 37:5 108:18
125:21 143:12,15
198:22 244:16
**sequence** 124:23 144:15
148:19 149:12 150:5
**series** 10:20 26:3 279:21
**services** 5:21 260:6,13,20
**set** 32:10 37:21 224:15
**setting** 38:3
**settlement** 62:17,19,20
**settlements** 63:13
**seven** 148:4
**severe** 164:9 253:19
**Seymour** 3:8,11 7:24,24
**shake** 152:11
**shallower** 132:18 134:12
265:6
**shape** 183:22 189:21
**shattering** 190:7
**shear** 46:20,21 59:18,19
93:14 94:11,14,15
127:8 168:7 208:4,10
208:11,15 209:7,10
226:3,22 236:8 237:3
238:21 239:11,12,15
240:2,23 241:4,9
**sheared** 46:10,13 141:14
163:5 169:3,6 181:15
184:7 282:23
**shearing** 46:19 47:2,9,10

142:3 167:2 185:15
**shears** 150:14
**shed** 106:25
**sheet** 5:15 36:24 52:24
55:6,15,18,24,25 93:12
93:15 94:8 104:22
112:18,22 113:3,7,17
113:19 114:3,7 115:10
115:20,22,24 116:3,7
123:16 124:5,8,13,13
124:22 125:4 126:7
127:3,19 130:6,8,17,22
131:5,9,14,15,21,21
132:3,5,8,9,17,18,22,23
133:22 134:3,12 137:4
137:5,13,21,22 139:25
141:11 142:24 143:8
149:5,6,19,22 158:22
159:7 160:11,13,19,21
160:23 161:3,6,9,10,13
161:15 163:14,19,21,23
164:5 182:2,4,6,10,21
183:6,9 189:14,22
213:4,9 243:12,23
244:18 245:2,6,15
246:3 252:9,12,22
253:2,3,6,23,25 254:3,6
254:8,10,17,18,24
255:6,15,24 256:7,14
273:2,10 287:5,7,10,13
289:12
**sheets** 116:18
**shell** 213:4 221:8
**shells** 213:7 221:2,10,13
221:23
**shelly** 214:10
**Shelonka** 8:4
**SHELONKO** 3:15
**shore** 277:2
**shoreline** 49:21 50:4,15
50:17,21 248:19
**short** 9:13 158:15 162:3
163:19 170:8,10 210:17
**shorter** 64:2 131:25
132:21 146:11
**Shorthand** 1:17
**show** 18:18 56:18 75:20

143:21 173:14 174:20
185:19 187:24 189:5,6
189:8,10 206:14,15
218:8 235:11 266:7
274:16 276:18 285:9
**showed** 13:21 183:25
243:11 244:24
**showing** 134:4 163:17
183:15 202:7 217:9
262:13 274:23 277:11
**shown** 74:11 203:21
229:20 230:14 265:17
**shows** 50:24 52:12
131:20 167:19 200:22
**sic** 219:25
**side** 11:19 12:25 13:7,17
14:2 15:9,11,17,22
21:23 23:20 33:6 52:2
52:3,5,12,18 53:3,14
54:8,9,22 55:9 57:19
62:4 72:21 96:4,13
117:7 118:10 127:19
136:5 142:25 143:9
144:23 149:7,19 160:3
160:6 164:5,8 165:16
165:24 166:8 184:11
186:19 188:3,10 191:4
194:8,23 205:17 207:14
213:5,21 234:24 243:4
243:16 244:9,10,15,17
245:5,15 246:3,24,25
248:6,8,13 249:7 250:6
250:7,7 253:10,13,17
254:2 255:16 256:2,5,7
256:14 257:25 278:13
279:4
**sides** 235:11 248:5
**Sidney** 172:23 173:11
**sigma** 235:21 236:12
**sign** 167:19 287:7
**SIGNATURE** 289:15
**signed** 27:16
**signif** 190:6
**significance** 41:16 191:3
**significant** 49:20 56:25
61:16,19 73:6 114:6,10
119:22 121:18,20

133:16 160:7 190:6
198:15,16 256:2 274:2
274:4
**significantly** 13:16 73:2
132:3 160:9
**signing** 287:9
**silt** 205:18 260:22
**silts** 251:3 252:13
**silty** 212:14,17 213:7,12
214:4,4,5,9,23 215:2,4
215:5,8,12,13 216:8
**similar** 137:11 159:10,10
159:17 268:2
**similarly** 130:16 217:10
**simple** 79:13 104:6,24
159:3
**simply** 79:19 160:19
255:22
**simulated** 86:23
**Simulations** 77:25
**sinusoidal** 185:16
**sir** 179:19 191:21 207:20
211:18
**sit** 108:8 109:23 175:18
268:8 277:18
**site** 59:6 76:6,23 106:13
125:19,21 126:3 140:12
140:17,20,23 148:9,10
178:17 199:8
**sites** 245:10
**situ** 229:20 230:7,13
232:7
**situation** 169:16,18
**situations** 275:13
**six** 148:4 190:24 192:16
193:13
**size** 86:11
**skimming** 43:5
**slide** 139:3
**sliding** 124:24 260:6
**slip** 106:20 107:4
**slope** 32:21 243:4,6
**SLOPE/W** 267:5
**slowly** 108:4,5
**slumping** 245:22
**small** 51:4,15 53:7 57:13
156:15 222:14 223:2

279:21
**smaller** 190:13,16
273:14
**snap** 182:10
**snapped** 182:22
**snow** 21:14,18
**software** 267:3,5,7
**soil** 23:12,20 33:6 36:23
37:13 41:2 54:17,20
55:16,19,25 56:14 57:3
61:20 62:6,10,11,15,15
62:16 63:8,8 88:14
123:24 127:9,19 138:16
140:4 143:3 149:7
150:25 151:16 160:20
163:24 165:16,24
167:20 196:5,8,17,24
197:6,10,23,23 198:10
198:10,13,14,14,19,19
202:10,17 203:25 204:4
204:5,12,17,18,21,22
205:21 210:9 211:23
212:6 218:3 223:10,15
223:20,22,24,25 229:19
230:6,10 233:21 234:5
234:7,9 235:8,15,22
236:4,8 240:22 242:5,9
245:5,15 246:3 250:21
250:23 251:11,16 252:8
252:19 253:8 255:16,22
255:23 259:14,17 265:5
266:4,21,22,25,25
267:22 268:11,14,23
269:12,17 270:6,13
272:14 283:8,15
**soils** 214:11 249:20,25
250:2,5,15,20 256:11
270:22 283:12
**Somebody** 109:17
**somebody's** 210:12
**somewhat** 63:3 149:22
**Soon** 20:8
**sorry** 14:8 16:12 41:12
81:4,17 99:21 105:15
117:3 121:18 129:12
135:14,15 145:7 158:7
161:24 177:21 186:14

196:21 199:17 219:17
226:6 230:19 248:5,6
252:19 274:12 279:16
**sort** 22:13 33:24 49:9
50:22 142:23 155:19
193:25 253:20
**sorts** 128:19
**sound** 41:20 42:7 44:14
44:24 45:4,8,19,20,25
46:11,17,18,24,25 89:2
89:4,5,6,11 121:18,20
121:22 122:13,21,25
**sounds** 41:17,25 42:5
45:12,22 90:20 101:3
146:17
**source** 118:22,23 191:11
229:19 230:6 240:11
273:8
**sources** 86:9 199:13
**south** 3:4 4:18 12:6 35:2
35:8 37:15 44:13 46:15
46:22 47:2,2,11 53:14
53:21,25 54:12,22 58:6
61:12 64:3,5,10,18
75:25 76:24 100:20
112:5 123:21 132:14,16
134:5 137:23 138:3
140:8,25,25 141:2,5,6
141:12,14,16,21 143:11
145:8,13,17 146:22
147:22 148:10 149:14
149:16 150:7,8 157:3,3
157:7,11 158:2,2 159:7
161:2 168:12,18 171:10
173:24 174:6 177:19
178:21 180:12 181:7,14
181:14 182:7,11,23
183:10,15,15 184:6,19
185:14 190:12 192:4
194:20 199:21,21,25
200:13,13,24 212:2
214:7 217:3,6 218:4
245:7,11,18,19,23
246:5 248:5 252:11
260:21 261:20,22
262:22,22 263:3,3
264:19 269:16 270:8,12

272:8,9,11 278:16
281:2 282:16,20 283:4
283:10,17,17,18,20
284:3,12
**southerly** 141:13 174:13
184:22,25 284:5,9
**southern** 46:14,22 47:11
78:6 130:16,18 142:3
152:17,17 167:12,20,21
168:8 169:4 173:24
174:6 184:20
**southward** 185:15
280:20 281:2,5,16
282:14 283:25 284:2
**spalling** 178:3,25 180:15
**speak** 9:25
**speaking** 24:16 30:9
235:20
**specific** 63:6 121:4
128:14 175:4 205:4
207:21
**specifically** 25:25 33:5
97:8 127:16 132:16
181:2 204:14 219:6
268:4
**specifications** 214:8
231:20
**specifics** 123:13 168:6
**specified** 29:16
**speculate** 154:15,17
**speculation** 284:10
**speed** 71:13 75:6 126:20
148:7
**speeds** 72:7
**spell** 71:7
**Spencer** 260:10,14
**Spencer's** 259:4,10
**spent** 199:14
**spilling** 22:14,21
**splashing** 16:2
**spontaneously** 172:3
**spot** 277:14
**spurious** 82:18
**square** 215:22 226:4,8
226:11,13,20 227:11
228:21 230:18,22 231:2
231:7,12 232:13 238:20

238:25,25 239:17,18
241:7,8,15,16,18 242:6
250:13
**St** 4:20
**stability** 32:21 33:5,13
33:21 34:4,11,12,15
37:13 39:5,7 55:8,11,14
89:23 91:3 110:15,17
124:3 126:15 151:17
197:14,25 204:2 246:17
246:22 247:11,23 248:2
257:7,15 258:6,17
259:19 261:11,12 269:2
**stable** 124:4
**stack** 67:7
**staff** 12:12,15,19 40:15
275:18
**stage** 55:14
**stages** 162:16
**stand** 214:23 262:8
**standards** 210:5
**standing** 12:15,19 21:2
130:9,22 131:9
**stands** 14:16,17
**STANWOOD** 1:8
**start** 9:15 30:9 49:18
70:8 100:20 101:2
105:15 124:16 130:4
184:5 195:16 247:14
**started** 20:4,17,17,19
21:17 23:24 32:17,19
147:20 228:18 270:24
**starting** 69:22
**starts** 149:9 196:19,21
253:5
**state** 85:5,10,10 229:25
278:14,19,20 279:5
287:4
**stated** 109:15
**statement** 5:23 136:9
166:9 280:24
**states** 1:1 7:14 53:15
85:8,12 89:18,25 91:18
107:24
**stating** 100:7
**station** 61:13,14,15 62:6
106:2 107:14 108:23

109:24 119:3 244:15
**stations** 61:11,24
**statistic** 136:14,18
**statistical** 136:16
**status** 181:2
**stay** 253:25 278:2
**steel** 98:6
**step** 150:17,20
**steps** 245:13
**sticking** 51:6 58:10,18
106:25 119:25 120:2,4
**stick-up** 66:6,18 120:22
121:12,14
**stiffness** 153:7,8,9
**stipulated** 7:3
**stone** 33:17
**stop** 56:12 64:5 96:6 99:2
111:22 116:24 117:2,6
117:8,13 118:7 195:14
196:15 201:14 239:23
**stopped** 70:13,20
**stopping** 195:13
**stops** 93:18,19,23 94:7
94:16 116:16,17 117:20
117:25
**storm** 16:24 64:7 66:4
68:5 74:14 97:3,4,7
124:4 249:7 259:23
278:25
**story** 234:19
**straighten** 219:23
**strains** 138:6 178:2
**strands** 208:21
**strange** 270:23
**stratigraphy** 213:19
223:24
**Street** 2:11,15 3:4 41:24
94:14 190:21 194:15
**strength** 81:5 132:6
196:24 208:4,11,11,15
208:17 209:7,10 226:3
227:14 230:16 231:5,6
231:6,20,25 232:3,12
233:21 235:8,15 236:4
236:8,15,22 238:21
239:5,11,12,15 240:2
240:23 241:4,9,21,22

241:25 242:7,11,12,13
265:11 267:11,17,22
268:10 269:12,17 270:7
270:25,25 271:16,22,25
**strengths** 239:7 268:3,23
268:25 269:8,9 270:13
**strictly** 76:21
**strike** 58:4 105:15
155:17 245:25
**strikes** 136:4,4 150:14
**striking** 122:15
**strip** 51:4
**stronger** 32:25
**struck** 8:24 9:10 137:3,7
137:14 140:25 141:3,5
**structural** 87:6 93:11
95:17 132:13
**structure** 88:14 90:11
96:19 129:6 283:15
**structures** 210:13 256:11
**struggled** 13:18
**studies** 33:5,7,13 74:11
106:18,23 107:7 247:5
255:18
**study** 71:3,5 90:23
**stuff** 28:25 123:12
**subject** 49:8 68:5 86:3
103:3,4 108:25 127:22
287:9
**Sublayer** 251:18
**sublayers** 250:23
**submitted** 30:17
**Subscribed** 289:18
**subsidence** 62:17 86:8
87:3,3,8,22 88:9,13
**substance** 289:11
**substantial** 61:20 62:3
174:14,16,21,22
**substantially** 54:4
**substantiate** 52:16
**sufficient** 54:7 59:19
93:13 114:16 117:17
129:24 133:5 142:17,19
157:14 165:22 166:3
174:4 233:24 246:10
258:10 263:12
**sufficiently** 114:7 149:15

166:4
**suggest** 168:3
**suggested** 154:8
**suggesting** 259:9
**suggests** 180:18 185:6
  221:21
**Suite** 2:16 3:9
**summaries** 109:21
**summarize** 27:24 39:23
**summarized** 209:3
**summary** 68:4
**Sunday** 26:10,21
**supervision** 286:20
**supplied** 16:25 17:4
  225:12 266:5
**supply** 218:15 259:12
**support** 6:1 107:7
  123:24
**supported** 12:10 95:19
  127:22
**suppose** 161:12
**sure** 9:21 44:8 52:7
  56:20,23 67:25 72:2
  74:23 77:16 81:6 82:17
  91:10 99:23 115:7
  123:13 133:8 137:23
  138:23 151:22 153:21
  163:7 171:12 182:20
  189:18 192:10 204:6
  218:7 250:11 265:13
  275:15 277:8
**surface** 93:14 104:8
  196:2,5,16 197:6 199:2
  199:2,4 200:23 201:9
  201:11 237:21,23,24
  246:24 252:21 253:8
  260:11 267:14
**surfaces** 260:9,15
**surfing** 177:7
**surge** 10:14,15,22 11:15
  68:8 97:3,4,7 99:18
  100:11,16 101:8 124:5
  193:6,12,14 278:25
  279:9
**surprise** 80:8 246:2,8
**surprised** 74:9 206:3
  229:10 246:6

**surround** 137:18
**surrounding** 12:9
**survey** 13:18 199:9
**surveyor** 244:11
**surveys** 98:3
**suspect** 170:3
**sustained** 174:14,21
  275:7
**Sutterfield** 2:15 8:5
**swear** 8:8
**sworn** 8:11 172:14 286:4
  289:18
**swung** 160:22
**system** 61:22 90:24 91:5
  115:21 259:24

---

**T**

**T** 3:8,11 4:8 5:2 163:4
  275:13,16,19,22,23,25
  288:3
**table** 16:5,13,13,17
  25:24 74:24,25,25 75:7
  107:19,24 171:23
  238:12 243:15 247:3,8
  247:10,14 248:7 249:18
  250:24
**take** 10:2,15 15:23 24:4
  25:24 27:6 41:20 42:4
  42:16 43:7 58:2 65:12
  66:16,22 68:18 81:19
  81:21 82:13,21 83:20
  101:2 107:18 117:13
  125:6 127:25 131:7
  134:23 139:2 144:21
  146:10 147:2 153:4,17
  160:18 162:19,21
  165:13 200:17 205:11
  208:8 213:11 221:2,2
  227:5 229:4,16 233:13
  235:13 259:14,17
**taken** 1:15 7:11,15 10:5
  10:18,20 12:5 47:19
  49:19 60:11 64:16
  71:12 73:16 76:5 84:6
  100:16 101:9 125:9
  158:3 162:6 175:16
  176:16,19,22 178:18

187:22 199:19 201:17
  202:13 208:7 209:11,13
  222:5 226:3 227:21
  238:3 240:6 259:20
  276:8 278:8 279:17
**takes** 33:12 87:25
**talk** 87:15 175:24 192:12
  221:12 255:18
**talked** 32:18 97:13
  116:16 190:9 273:8
**talking** 22:8 26:6 35:2,8
  35:20 50:11,11,17
  51:15 54:4 66:10 70:17
  95:17,18 102:10,16,16
  103:23 109:2 120:21,22
  133:3,8,12 134:5
  135:10 138:23,25
  142:22 143:3,4 155:23
  158:10 171:16 181:20
  188:24 189:12 191:9,25
  195:4 206:2 207:18
  210:3 217:17 221:16,19
  222:19 223:13,23,24,25
  232:16,18 234:16
  239:10,11 241:13,20
  242:22 250:5,17 251:16
  254:19,20 260:3 275:20
  278:16 281:20 282:17
  282:18,19,21 284:17
**talks** 280:2
**tangled** 230:19
**tap** 142:20
**tape** 47:15,18,21 84:5
  125:11 162:3,5 195:14
  201:14,16,20 240:5,8
  279:10,11,15
**target** 103:7,8 231:22
**Task** 14:17
**tasks** 195:22 196:16
**teach** 186:3
**team** 14:18 38:10 39:25
  40:12,16,21,25 41:5,10
  41:11,12 202:14,18
  203:2,8 261:9,10,23
**teams** 272:15
**tear** 113:17,20 114:3,7
  114:14,18,21 116:6

123:16 124:5
**teared** 115:9,9
**tearing** 114:5 115:13
  131:20
**technical** 31:10
**tell** 21:21 24:15 28:21
  50:13 73:13 83:17
  86:11 107:19 114:12
  122:16 128:11 146:13
  147:6 158:7 195:14
  202:24 223:9 270:17
  277:16 285:4
**telling** 46:11 78:13,25
  139:18 146:20 206:24
**tells** 100:4 216:7
**temporary** 158:5
**tend** 45:11 172:19
  192:20 229:11 234:22
  234:23
**tended** 173:10
**tendency** 253:25
**tensile** 180:14,18 181:17
**tension** 127:13,17 132:18
  132:20 165:10,13,15,16
  180:19,19 192:24
  194:22 245:5,25 246:2
  246:7 253:22
**tenths** 13:12
**term** 94:18 279:7
**terminal** 76:6
**terminology** 60:24
  170:10
**terms** 26:8 35:19 69:14
  89:9,10 98:11 149:12
  168:22 221:14 224:22
  235:14 247:23 248:2
  250:13
**Terry** 107:24 108:9,13
  108:16 109:9,25
**tertiary** 163:6
**test** 5:15 85:17 102:19,21
  152:14 226:22 229:20
  230:7,14 235:9 243:23
  244:2,11 245:13 266:5
**tested** 237:14
**testified** 8:12 30:19
  105:5 108:17 114:24

118:12 119:2 120:5
121:17,25 126:19
134:20 152:9
**testify** 10:6 28:21 232:10
**testifying** 109:10
**testimony** 15:21 25:15
25:18,19 30:23,24 48:6
56:15,18 65:11 100:9
105:8 106:6 107:14
108:8,21,22 109:13,19
109:21,24,25 110:10,18
113:16 119:3,7,13
120:25 122:18 137:12
143:25 145:25 152:12
171:15,19 172:15
173:12,20 192:19 249:6
286:6
**testing** 227:6,7 237:12
**tests** 86:22 88:19,23
237:8 238:3 242:20
243:11 259:20 266:2
**Thank** 168:13 186:15
190:3 285:13
**theory** 235:14
**thickness** 65:4
**thing** 32:20 61:24 79:9
91:24 114:17 118:19
136:16 139:3 172:22
184:18 190:5 195:25
196:9 233:11 239:13
261:20 267:10 271:4
**things** 28:12 37:16 45:16
87:4 93:10 154:16
186:3 189:15,19 215:24
235:8 256:25
**think** 9:11 15:25 16:10
17:19,20 24:6 38:25
45:11 47:4 51:13,13,14
63:3 65:12 71:10 78:9
78:18 82:23 83:4 85:16
87:19,24,24 89:16
91:12 95:16 96:14
97:25 100:4 102:22
104:3 106:7 107:16
110:4 111:23 116:8
119:20 136:20 140:5
143:13 147:13 148:14

150:4 151:21 152:16,18
154:16 160:21,24
164:18 166:17 167:9
168:4 172:16 173:2
174:9 179:20 180:23
181:5 184:15 185:21
186:6 189:17 192:10,25
194:13 195:13 200:4,5
201:13 203:3 204:24
217:10 218:19 223:19
226:24 231:5,10 235:2
235:12 236:17,17
238:16 241:20 245:21
247:13,15,17 250:10,24
254:5 257:5,24 258:10
258:13,22,23 260:18
267:18 268:8 269:22
271:19 279:24
**thinking** 56:23 92:11
235:12
**third** 18:19 35:5 142:2
167:17 244:14
**thirty** 287:13
**thought** 15:10 25:21
55:20 67:6 102:10
144:14 152:9 183:24
196:23 275:20 279:12
**thousandths** 86:12
**three** 24:14 32:10 43:9
43:14,22 58:25 81:9
152:20 166:20 167:3,5
167:21 168:3,7 190:23
192:16 193:13 207:8
208:8,13 209:13,19
211:8 212:5 223:7
240:12 266:14,16
**three-dimensional**
212:20 266:11 267:4
**three-foot** 82:9,12
**three-stage** 141:15
**thump** 89:12,12,13
**tie** 175:3
**tilt** 184:11,15 185:4
**tilted** 184:13 185:6 186:8
**tilts** 93:16
**time** 7:6 8:20 10:9 11:21
11:24 13:23 15:14

18:19 19:3 23:14 24:7
24:15,18,24 25:6 26:6,9
26:15 28:11 30:24 31:3
31:19 32:18,20 41:14
43:7 47:15 54:6,7 55:3
58:15 62:17 66:3 71:22
75:6 77:5 96:17 98:22
99:6 100:7,9 101:19,23
107:18 108:13 109:4,7
115:3 125:6,19,24
140:22,23 143:12
144:13,21 146:11,14
147:3,7,17,21 148:17
149:10 160:14 162:3
165:2,4,22,22 166:3
168:17 173:17 175:25
176:22 177:9 187:22
193:15 194:3,7,11,14
199:24 200:16 225:19
248:4 268:7 270:14
278:3
**times** 24:3,3,19 75:10,20
86:13 99:9,21,25
111:19,21 148:8 254:6
**time-consuming** 199:8
**timing** 26:3 68:9 101:5
**tip** 160:25 161:10,13,15
244:18 252:12
**tips** 243:12 245:2 254:3
**title** 42:23
**TNV** 26:3
**today** 7:17 8:2 10:7
108:8 109:23,24 152:15
175:18 268:8 277:18
**toe** 145:18,19,22 192:17
192:20 205:7 213:20
252:21,25 253:5,11,15
254:18 268:2,3 271:7
**told** 47:14 110:20,20
139:23 146:10 207:3
240:13
**tons** 226:11,13
**top** 11:19 12:25 14:21
15:8,16 19:11 21:24
22:6,15 42:17 44:11
57:11 59:2 63:24 64:10
64:14,16 65:3,12 77:4

101:18 104:9,19 115:14
115:18 120:6,10 163:5
168:7,21 174:2 181:14
187:6,8 237:18 239:9
239:21 253:12 254:15
257:5 276:16
**topic** 86:18
**topo** 199:12
**topographic** 63:4,11,17
64:23 199:8
**topping** 20:4,18,19 21:23
21:23
**tops** 275:4
**tore** 115:22 116:3
**torn** 131:21,22 183:2
**torque** 132:22 133:10,14
133:16,21 134:11,15,19
134:24
**torsion** 132:21 133:20
138:6,15 139:6
**Torsional** 132:20
**total** 226:21 263:7,11
284:25
**touch** 33:17 44:12
**touched** 174:7
**touchstone** 33:14
**track** 30:4
**trained** 83:10
**training** 87:25 92:4
**trans** 145:23
**transcript** 4:15 5:8 8:17
48:21 108:12 109:22
171:23 172:14,24 173:2
173:10,16,19 186:4
286:17 287:14,15
**transcription** 289:8
**transfer** 142:16 153:25
154:20 155:18
**transferred** 54:8 154:21
156:16
**transient** 76:10
**transit** 97:10
**transited** 106:20
**translate** 145:24 149:23
**translated** 113:8 132:23
**translates** 145:17
**translating** 104:21

254:13
**transposed** 220:3
**travel** 148:4 149:3
  275:12
**traveled** 118:15 157:3
**traveling** 114:3,15 156:4
  156:9,13
**travels** 150:8,18 171:7
**trench** 22:3 23:3,6,12,19
  157:19 158:20,21 160:6
**trenches** 22:4 258:6
**trend** 64:22
**trial** 7:7 29:5
**trick** 146:17
**tried** 199:12 225:2
  240:11 260:11 272:20
**trier** 198:8
**trouble** 81:18 279:6
**truck** 19:8,11,21 21:14
**true** 25:20 26:24 27:3
  35:12 39:14 55:21,22
  61:24 79:9 110:10
  111:20 152:15,16
  161:18,20 172:22 209:4
  234:14 235:6 238:9
  242:4 251:18 252:4
  258:9 261:20 286:5
**truth** 15:7 128:11 146:13
**truthfully** 10:7
**try** 9:18 103:10 158:18
  186:3 222:25 245:12
  269:8,23
**trying** 37:2 87:20 99:12
  122:11 147:16,21
  199:14 229:6 234:25
  242:10 254:11 269:23
  269:23 282:19
**tumbled** 115:4,9 133:25
**tumbles** 140:3
**tumbling** 125:4 134:2
**turn** 11:11 16:5 18:6
  19:10 49:16 54:25 60:4
  77:3,19 112:11 122:2
  130:3,7,12 137:25
  140:8 162:10 177:18
  203:10,15,16 219:13
  243:21,22 244:5

**turned** 21:14 164:14
  177:3
**turning** 21:18 199:16
  273:12
**turns** 135:19
**twice** 190:11
**twist** 115:11 139:9
**twisted** 134:3
**twisting** 138:3,6,11
  139:7,11 178:2,6,8
  181:18,20,21
**twists** 139:6 140:3
**two** 24:14 33:16 49:21
  51:14 55:7 60:10 69:7
  81:9 82:9,12 92:21
  102:9 115:23 116:3,7
  118:9 123:2 134:17,19
  134:21 137:3 174:7
  189:15 193:16 196:16
  211:8 214:19 220:3
  233:25 242:4 266:11
  271:11 276:18
**type** 57:13 88:15 142:21
  235:8 250:17
**types** 45:4 86:13
**typical** 237:22
**typos** 28:25

**U**

**UCT** 237:2
**Uh-huh** 18:15
**uncertainty** 12:9,21
**uncomfortable** 70:11
**unconfined** 226:21
**underground** 52:21
**undermines** 149:7
  150:25
**underneath** 143:3
  150:10 160:25 164:4,24
  168:21 236:4 238:21
  239:4 253:4 265:12
**understand** 9:16,19,23
  10:3 12:7 22:8 23:10
  30:11 37:2 60:24 68:23
  70:5 84:18 87:19 88:7
  89:7 96:14 102:9 104:7
  106:11 109:17 111:11

127:21 143:25 145:16
  153:24 159:4 167:10
  178:16 183:13 186:2,2
  191:14 197:5 212:7
  217:21 218:10 220:12
  230:11 231:3 235:19
  242:11 244:14 252:18
  266:22 267:10 269:22
  270:15 271:2,18,19
  272:3,17 283:6
**understanding** 12:11
  66:10 70:24 92:4
  108:11 185:9 191:23
  192:6 261:14 275:24
**understood** 16:11 123:15
**unfailed** 178:19 245:19
  246:4,11
**uniform** 141:11 189:5,13
  234:10
**unique** 86:2 266:14
**unit** 183:7,10 196:25
  208:11,12,17 209:4
**United** 1:1 7:14 53:15
  89:18,25 91:18
**units** 208:25 209:2
**University** 86:23 175:25
**unknown** 270:6
**unleashing** 145:25
**unloaded** 65:24 66:3
**unlucky** 137:6,8
**unmoored** 276:12
**unreliable** 244:12
**unsuccessful** 199:7
**unusual** 211:3 229:17
**upload** 112:19
**upper** 115:14,16,18,20
  178:3,25 180:15 204:14
  205:18 213:22 242:9
  251:3 252:13 254:2,25
**upwards** 254:3
**USA** 1:9,9
**USC** 236:23
**use** 53:4 54:15,18 64:21
  64:23 82:5 85:6 89:11
  91:23,24 204:25 205:21
  206:21 208:7 216:10,11
  222:25 223:17 230:13

231:15,23 232:11,20
  233:7,8 234:23 235:3
  236:14,17 258:16,19,20
  259:4 260:11 266:8,13
  267:3,6 269:8,9,16
  272:10
**useful** 266:17
**uses** 45:9
**usually** 30:4
**UU** 237:2

**V**

**v** 1:6,7,7,8,8,9,9,10
**vague** 15:24 68:15
  168:10 182:24 207:18
  223:5 229:22 230:3
  235:23 248:15 257:9
**valid** 29:3 83:18 100:6
**value** 15:12,12 200:9,12
  208:4 220:16 226:2,3,8
  226:10,10,13,19 227:10
  227:14,25 228:14,19,19
  228:24 229:12 231:12
  231:13,15 232:16,17,17
  233:7,8 235:3,5 236:11
  238:19,24 239:2,2,16
  239:22,25 241:6,7,8,19
  242:6,9 243:15 250:13
**values** 208:7 228:8 229:8
  229:11 231:22 232:7
  233:2,2 241:20 250:21
  262:12,16 265:4,22
  271:5,6,7,8,11,15,16,22
  272:2,4,5,23
**vantage** 22:10
**vard** 251:3,4
**variation** 11:25 13:6
  66:12 229:7 234:4,7,11
  234:23 235:4 248:17,18
**variations** 12:12 13:10
  13:15 15:16 233:20,24
**varied** 251:4
**varies** 102:20
**various** 85:8 86:4 87:11
  98:3 99:9 199:5 260:11
  272:15
**vary** 59:20,21

vast 74:10
vector 103:3,6,9 155:3
　156:7
vectors 72:25 75:14
vein 226:22 237:3
velocity 114:16 118:12
　143:18 144:7,12
Veritext 7:18,19
versa 242:2
versus 122:22 127:13
　192:15 193:9
vertical 113:3,8 138:19
　138:20 149:22,22
　191:16 192:17 249:20
　250:19 251:2,24
vertically 252:6
vessel 96:18,22 97:10
　276:13,25 277:7,8
　282:2,5,6
viable 152:19
vice 242:2
vicinity 53:20,24,24
　54:12
video 7:11 128:3 175:15
videographer 3:19 7:10
　7:19 8:8 47:17,21 84:4
　84:8 125:7,11 162:4,8
　201:15,19 227:19,23
　240:4,8 278:4,6,10
　279:10,14,19 285:17
Videos 128:20
Videotaped 1:15
view 216:13,14
viewing 12:11
Villavaso 5:9 147:20
Villavasso 110:8 115:4
　119:4 121:2,17,19,25
　122:9,16,20 123:7
Villavasso's 100:5,8
　114:25 119:13,17 121:6
violent 170:2,6,21,23,25
　171:5,9,11
vision 121:7
visit 125:21 126:3,12
visited 125:17,19
visual 12:16 237:11
vitae 84:16,19

Volume 14:8 40:13 42:14
　77:24 80:2,20
vs 7:13
V-11-31 5:12
V-14-102 5:18
V.K 2:7

## W

wait 30:9 135:18 269:25
waiting 28:9 195:16
waived 7:5
Walker 2:13 8:7
walker@chaffe.com
　2:12
wall 5:15 10:10,23 11:14
　11:18,19,22 12:25 15:8
　15:16 20:25 21:19 22:5
　23:11,19,19,21,24 25:4
　34:5 44:14 45:8 46:10
　46:14,21 53:4 57:3
　59:12,13,18 60:18,20
　60:21 63:25 64:6,10,11
　64:12,14 93:5,12,16,22
　94:6 96:9 97:24 98:9
　98:18 101:20,23,23,24
　102:2,13,17 103:13,15
　103:16,18,22,23,25
　104:14,19,20 106:17
　107:14,25 108:3,4,6
　109:2 112:9 114:17
　115:8 116:10 117:14
　118:10,10,13,15,15,20
　118:24 120:7,9,11,18
　120:22 121:2,15 122:14
　122:15,22 123:25 124:4
　124:10 125:17 126:17
　126:21 127:9 130:9,23
　131:10 132:10,15,19
　133:16,20,21 134:9,10
　134:25 135:5,7,7 136:7
　138:3,15,15,21 139:6,6
　139:11,14,16 140:3
　141:9,13,14 142:16
　143:5,18 144:6,18,22
　145:17,17,18,20,22,23
　146:7 149:8,8,15
　150:10,10,13,14 151:2

151:7,16 152:6,10
153:8,9,10,12,15,17
154:2,7,20,21,23 155:2
155:7,9,13,15,17,18,19
155:24,25 156:5,5,7,10
156:11,14,15,16,17,22
156:25 157:7,14 159:15
159:21 160:8 162:16,21
162:23 163:5,19 164:24
165:10,14,15,24 166:4
166:9,11,16 167:4,12
167:19,20 168:2 170:13
174:2,8 175:4,11 178:3
178:8,9,13,17,25 179:3
179:8,13,14,23 180:2
180:19,20 181:4,10,15
183:22 184:4,10,10,12
184:14,16 185:4,6,15
185:17 186:8 187:6,7,8
191:7 205:17 207:9,10
207:14 213:18 215:7
217:13 233:17,19,21
243:5,9,23 246:4,9,10
247:25 248:14 254:13
254:15,25 255:3,7,9,15
257:3,6 275:13,16,19
275:22,23,25 278:21,24
279:4,9 281:21 282:23
283:22
walls 87:10 92:13 93:25
94:12 126:13 159:12,23
274:9,10,13,24 275:4,7
276:7
wall-top 13:6,16 14:2,19
15:2
want 27:7 28:6 34:22
35:7 36:25 42:22 50:10
56:18 60:23 72:2 77:19
84:23 85:21 88:5 92:10
92:22 102:21 111:9,13
112:23 136:18 146:10
161:14,16 173:14 176:8
185:20 186:3 188:5
190:20 206:11 219:13
219:21,23 222:7,23
225:25 231:17 233:7,7
234:24 235:13,16 267:8

280:6
wanted 17:7 74:23 87:21
wants 203:15
Ward 16:24 19:15 45:6
　46:6 82:10 123:18
　140:18,20,24 169:24
　170:9 280:21 282:15
washed 140:5 277:2,12
Washington 1:16 2:4
　3:10 7:16 128:23
　205:24 206:9 211:8
　214:11,16 221:12
　224:24 237:4 240:14,16
washout 123:20,25 124:6
　160:2 166:8
wash-out 255:19
wasn't 56:23 87:7 89:6
　134:19 160:5 165:22
　174:23 175:5 214:5
　219:22 257:20 260:9
　266:19 269:7
watching 115:5
water 12:13,14 19:12,21
　20:2 21:18 23:11,19
　40:22 44:11,12 55:10
　66:6,18 93:17,18,19,23
　94:7,16 95:21 96:4,8
　97:4 100:16 101:8,12
　101:16,18,20 103:13,17
　103:20,21 104:2 107:2
　108:5 111:6 115:10,11
　116:16,17 117:2,2,6,8
　117:13,14,20,22,25
　118:2,7,8,9 119:25
　123:17 134:9 138:14
　139:5,12,15 143:4
　145:9,25 161:6,8 164:4
　165:13,22 166:3,15,19
　166:20 167:4 168:20,21
　168:24 169:2,7,11,16
　169:18,21 170:2,6,15
　171:9 178:7,13 180:20
　180:21 181:22 192:20
　193:21 209:22 210:3
　244:18 248:10,11,12
　252:8,20,21 253:2,10
　253:16 254:4,9,17,24

255:7,8 256:3 257:3
273:16,25 278:24,25
**waterfront** 55:4 193:23
205:2,3 206:7 250:25
262:21 263:2,16,18,20
263:22,23
**wave** 40:22 68:9 69:3,3,6
69:9,14,15 70:10 77:5
77:11,23 78:2,20 79:2,7
79:18 82:8,21 83:11,13
83:20 101:17,19,20,22
101:23,24 102:6,13,15
102:16 103:2,15 105:7
105:15,20,25 106:5,9
106:12 108:23
**waves** 69:10 77:2,15 78:8
78:14 79:22 80:23 81:5
81:8 82:13,18 97:2
101:15 107:8 153:18
**way** 12:23 38:14,15
40:23 48:22 57:3 59:24
67:22 69:13 72:19
103:11 104:21 108:6
112:14 134:3 135:6
146:2 149:21 154:6,8
155:12,17,24 156:2,3
164:4,8 168:3 169:14
171:15,20 176:13
185:15 191:18 197:22
208:20,23 219:15
227:15 229:4 231:18
235:12,15,16 239:15
243:12 244:25 245:4
249:24 253:22 254:22
255:2 268:13 271:23
273:15,24 281:5
**ways** 39:11
**weak** 93:17 132:9,11
**weakened** 278:14,19,20
279:5,7,8
**weakest** 233:18 234:9,14
235:6,14
**weakness** 59:12 60:2
**weather** 40:16 71:20
74:7,18 75:4,16,17,20
**Weaver** 249:11
**Webb** 2:15,18 3:18 8:5,6

**Weber** 1:10
**website** 112:17
**Wednesday** 175:24
**Weedman** 109:4
**week** 29:24
**weigh** 25:14
**weighs** 265:9
**weight** 239:8,12 240:22
241:3,14,23 242:2
**weights** 241:17
**weld** 115:23 116:3,7,13
218:23 257:16
**welds** 218:13,14,16,22
**well's** 248:13
**went** 27:24 28:23 29:24
116:23 140:12,18,23
142:8 157:7 216:15
228:18 261:13 267:23
268:5,13 271:21,22
283:16
**weren't** 174:4 199:13
237:7,8 243:14
**west** 72:13,17,21 74:16
136:12 158:5 186:19
188:3 189:23
**western** 205:6 277:2
**we'll** 38:8 43:9 96:15
103:11 176:12 192:11
239:23 249:16
**we're** 32:6,11,16 37:25
50:10,11 54:4,6 60:5,5
74:24 77:16,22 95:17
95:18 120:21 130:7
142:22 147:2 155:23
158:18 180:11 181:20
188:18,19,20 196:14,14
201:13 215:18 217:9
227:19 231:16 233:13
240:13 250:17 251:16
279:10 282:17,18,18
285:17
**we've** 8:16 33:2 35:24
141:15 162:2 188:20
190:9 192:15 240:18
**WGI** 210:20 212:5,17
213:11 236:24
**white** 21:14,18 50:23

51:4
**wide** 104:11
**widest** 187:4
**width** 273:14,22
**WILKINSON** 1:10
**William** 5:8
**Williams** 172:23 173:4
173:11,19
**wind** 68:8,18,19,24,24
69:6,8,10,12,15,16,20
69:21 70:10,15,24
71:13,16,21 72:10 75:6
75:13,21 76:3,5,19,21
76:23 97:2 105:19
107:3,10 111:6 143:17
144:6,12 153:18 174:10
174:11 282:8
**winds** 72:6 74:14 129:22
**withdraw** 183:14 198:21
215:25 283:7
**withstand** 124:4
**witness** 4:2 6:2 8:9 11:9
14:13 15:25 18:21,22
20:12,13,16,17,18,21
20:22,25 21:3,4,5,10,12
21:13,20,22 22:4,8,14
22:18,19,22,23,24 23:3
23:5,7,8,10,18,23 24:6
25:4,9,13 26:14,17 30:9
33:23 34:4,16 40:12
42:16 43:13,16,17,19
44:6,9,10,18 45:7,8,20
51:2 57:23 60:7 63:19
63:20 65:18,19 68:16
76:11 79:10 82:15,16
83:12,21 95:15 100:24
101:5 107:20,22,23
109:14 110:18 112:13
112:14 116:22,23
119:10,11 131:11
144:10,11 159:6 162:13
162:14 163:3,6 168:14
172:6,23 177:22 182:17
182:25 186:16 190:4,5
205:13 207:21,25
211:20 219:17 220:21
220:22 229:24 230:4,10

235:24 244:20,21
247:23 248:16 250:9
252:16 257:10,13 258:9
263:20,23 264:21,22
273:19,20 274:21 277:7
285:15,19 286:4,6
287:2
**witnesses** 16:16,20,23
24:3,12 25:18 41:24,25
45:5,15,17 89:7 167:14
172:7 249:2,4,6
**witness's** 24:24
**wondering** 218:22
**wood** 221:14,15,17,23
**wooden** 221:8
**word** 23:3 45:9,9 64:21
89:11 222:25 231:4
241:12
**words** 10:2 22:19,20
23:5 34:21 45:4
**work** 31:4,8 32:8,21 33:2
33:3 36:11 37:4 47:24
48:5,14,17 49:4,8 50:24
52:15 53:18 70:17,19
70:23 74:10 86:7 91:20
91:21,25 103:11 118:4
128:24 188:14 198:22
216:5,19 218:5 222:13
227:2 255:8,8 268:16
283:14 285:2
**worked** 175:7
**working** 32:6,11,19
49:13 80:13
**wouldn't** 15:10 24:14,18
34:7 46:4 48:12 54:16
70:3 73:12 74:9 83:16
97:5 108:2 114:12
116:8 128:12 133:13,13
133:15,15 136:8 141:22
147:13 148:22 160:6
164:22 175:13 230:15
235:16 246:6,8 258:20
280:17 283:12
**write** 27:13 28:2 49:19
128:2,6 162:21,22
270:16
**written** 27:23

**wrong** 8:24 9:10 25:7
  56:12 67:19 182:18
  231:4 241:12 262:8,12
**wrote** 28:2 49:23 51:19
  51:21 67:9 68:3 77:4
  114:5 115:13 121:18
  130:15,18 138:2,6
  158:20,23 177:25
  180:22 181:17 183:15
  183:17,19 199:7,16,18
  248:21 263:6 269:21
  270:5,17 273:12 274:6
  276:11,14 279:22 280:8
  280:19 282:13

**X**

**X** 1:11 4:1,8 5:1,2 30:13
  162:19

**Y**

**yeah** 20:16 25:3 73:22
  79:17 83:23 86:12
  102:25 120:24 135:14
  150:23 176:4 177:4,25
  190:14 191:11 194:17
  215:4 235:24 240:3
  241:3 244:13 251:10
  255:25 268:5 269:3,25
  272:3 273:6 279:12
  280:2 284:18
**year** 108:15
**years** 24:14 63:14 119:21
  259:2
**yield** 93:14,14
**yielded** 266:19,20
**yielding** 56:25 134:2
  146:24
**York** 1:16 2:4 7:18
**your's** 112:14

**Z**

**zero** 62:7 237:17,20,25
  270:25

**$**

**$526,927.37** 285:12

**0**

**0.22** 236:17
**0.23** 235:22 236:11,15
**05-4182** 1:5 7:14
**05-5531** 1:6
**05-5724** 1:7
**06-5342** 1:7
**06-6299** 1:8
**06-7516** 1:8
**07-3500** 1:9
**07-5178** 1:9
**08-4459** 1:10

**1**

**1** 4:10,14 5:4,5,11,13,24
  11:3,7 27:6,9 30:12,14
  47:18 136:7,18 150:7
  156:14 191:24 226:21
  228:18 249:21 251:7
**1,000** 135:15,15,16
  270:25
**1,300** 135:18 136:2,3,7
  136:19
**1-1/2** 66:12
**1.05** 191:24 192:5
**1.5** 64:2 65:25
**1.598** 228:12
**1:38** 125:10
**10** 5:10 10:1 202:21,24
  211:17
**10:14** 47:19
**10:14:35** 47:18
**10:33** 47:20
**10:33:17** 47:22
**100** 46:4,4,12 100:1
  135:15 170:14 244:16
**101** 101:1
**102** 102:1
**103** 103:1
**104** 104:1
**105** 105:1
**106** 106:1
**107** 107:1
**108** 108:1
**109** 109:1
**11** 4:10 5:12 11:1 12:4
  204:8,11,12
**11-18** 5:12

**11-19** 5:12
**11-8** 5:10
**11.2** 100:13
**11.8** 101:9 166:18
**11:32** 84:6
**11:32:30** 84:5
**11:47** 84:7
**11:47:43** 84:8
**110** 110:1
**1100** 2:11
**111** 111:1
**112** 112:1
**113** 113:1
**114** 114:1
**115** 105:13 115:1
**1150** 3:9
**116** 116:1
**117** 117:1
**118** 118:1
**119** 119:1 122:8,9
**12** 5:14 12:1 21:7 67:9
  228:6 243:18,20,22
**12-1/2** 65:12 257:4
**12-5** 11:20
**12.5** 12:25 13:11 14:3,20
  15:4,8,11 63:25 64:16
  102:3
**12:49** 125:7,9
**120** 120:1 122:2,8
**121** 121:1
**122** 5:8 122:1
**123** 123:1
**124** 124:1
**125** 125:1
**126** 126:1
**127** 127:1
**128** 128:1
**129** 129:1
**13** 5:17 11:17 13:1 49:19
  50:4 226:21 227:4,11
  228:6 274:17,19
**13:38:37** 125:12
**130** 130:1
**131** 131:1
**132** 132:1
**133** 133:1
**134** 134:1

**135** 135:1
**136** 136:1
**137** 137:1
**138** 138:1
**139** 139:1 143:21
**14** 4:13 5:19 14:1 228:6,7
  276:19,22,25
**14-103** 5:17
**14-108** 5:17
**14-109** 5:17
**14-110** 5:18
**14-111** 275:21,23
**14:37:24** 162:5
**14:50:10** 162:8
**140** 140:1
**141** 141:1
**142** 142:1
**143** 105:23 143:1
**144** 144:1
**145** 145:1
**146** 146:1
**147** 147:1
**148** 108:21 148:1
**149** 108:21 149:1
**15** 5:20 15:1 120:2,4,23
  151:8 187:3,5 285:7,10
**15.0** 57:15
**15.13** 219:25
**15:48** 201:16
**150** 150:1 170:14 171:7
**151** 151:1
**152** 152:1
**153** 153:1
**154** 154:1
**155** 155:1
**156** 156:1
**157** 157:1
**158** 158:1
**159** 159:1
**1598** 228:9
**16** 16:1 19:19
**16:04:35** 201:19
**16:46:42** 227:20
**16:48:48** 227:23
**160** 160:1 187:4
**161** 161:1
**162** 162:1

**163** 163:1
**164** 164:1
**165** 165:1
**166** 166:1
**167** 167:1
**168** 168:1
**169** 169:1
**17** 17:1 228:18,20
**17th** 41:24 94:13 190:21
   194:15
**17:07:40** 240:5
**17:25:56** 240:9
**170** 170:1 228:9
**171** 171:1
**172** 172:1
**173** 173:1
**174** 174:1
**175** 175:1
**176** 176:1
**177** 177:1
**178** 178:1
**179** 179:1
**18** 4:15 18:1 205:8
   209:21 210:12,22
   211:10 212:6 215:20
   216:16 253:7,12
**18:26:17** 278:7
**18:29:14** 278:10
**18:30:47** 279:15
**18:31:36** 279:19
**18:38:51** 285:18
**180** 143:16,24 144:3
   180:1
**181** 181:1
**182** 182:1
**183** 183:1
**184** 184:1
**185** 185:1
**186** 186:1
**187** 187:1
**188** 188:1
**189** 189:1
**19** 19:1 23:6
**190** 190:1
**191** 191:1
**192** 192:1
**193** 193:1

**194** 194:1
**195** 195:1
**196** 196:1
**1960's** 61:8
**1969** 214:14
**197** 197:1
**198** 198:1
**1985** 244:16
**199** 199:1
**1990's** 217:20

_____

**2**

**2** 1:7 2:1 4:13 5:19 14:6
   14:11 47:21 49:16 84:5
   136:7 150:9 185:10
   251:18
**2,400** 148:24,25 149:3
   150:8,18
**2-1** 49:18,23
**2-1/2** 66:13 273:14,23
**2-2** 220:7
**2.1** 212:24
**2.14** 60:6 61:11
**2.15** 66:22 67:16
**2.2** 213:3
**2.3** 54:25 57:5,6 116:23
   117:4
**2.4** 54:25
**2.6** 49:25
**2.75** 94:9
**2.8** 51:18 60:4,5
**2:00** 19:16,16
**2:37** 162:6
**2:50** 162:7
**20** 19:20 20:1 66:19 77:6
   77:12 78:15 79:3
   106:25 119:21,25 120:2
   120:4 124:13,17 151:8
   198:17 213:5 253:7,12
**20-foot** 82:21 83:11,13
   83:20
**200** 200:1 289:20
**20001** 2:4
**2002** 213:14,16
**2003** 214:16,23
**20036-4129** 3:10
**2005** 10:9 22:10 49:20

**50:4,9** 63:24 194:4,8
**2008** 8:18 29:20 30:20
   31:5 32:9 37:5 84:16
   125:22 198:23
**2009** 1:13 5:24 7:12
   31:24 33:12 285:3
**201** 201:1
**202** 2:5 3:10 5:10 202:1
**203** 203:1
**204** 5:12 204:1
**205** 205:1
**206** 206:1
**207** 207:1
**208** 208:1
**209** 209:1
**21** 19:25 21:1
**21-1/2** 66:7
**210** 210:1
**211** 211:1
**212** 212:1
**213** 3:5 213:1
**214** 214:1
**215** 215:1
**216** 216:1
**217** 217:1
**218** 218:1
**219** 219:1
**22** 22:1 102:5
**220** 220:1
**221** 221:1
**222** 222:1
**223** 223:1
**224** 224:1
**225** 225:1
**226** 226:1
**227** 227:1
**228** 228:1
**229** 229:1
**23** 19:25 23:1 43:23
   61:14 65:22 102:4
   236:13
**23-foot** 137:4,21
**230** 230:1
**2300** 2:10
**231** 231:1
**232** 232:1
**233** 65:16 233:1

**234** 65:19,21 234:1
**235** 235:1
**236** 236:1
**2367** 62:5,6
**237** 237:1
**238** 238:1
**239** 239:1
**24** 24:1
**240** 240:1
**241** 241:1
**242** 242:1
**243** 5:14 243:1
**244** 244:1
**245** 245:1
**246** 246:1
**247** 247:1
**248** 248:1
**249** 249:1
**25** 25:1
**250** 250:1
**251** 251:1
**252** 252:1
**253** 253:1
**254** 254:1
**255** 255:1
**256** 256:1
**257** 257:1
**258** 258:1
**259** 259:1
**26** 26:1
**260** 260:1
**261** 261:1
**262** 262:1
**263** 263:1
**264** 264:1
**265** 265:1
**266** 266:1
**267** 267:1
**268** 268:1
**269** 269:1
**27** 27:1 42:15 43:20 44:3
   44:6 61:25
**270** 270:1
**271** 271:1
**2715** 2:16
**272** 272:1
**273** 273:1

**274** 5:17 274:1
**275** 275:1
**276** 5:19 276:1
**277** 277:1
**278** 278:1
**279** 279:1
**28** 28:1 61:25
**280** 280:1
**281** 281:1
**282** 282:1
**283** 283:1
**284** 284:1
**285** 5:20 285:1
**286** 286:1
**287** 287:1
**288** 288:1
**289** 289:1
**29** 10:9,23 22:10 23:22
    23:25 29:1 42:17 61:25
    117:23 174:12 191:20
    191:22 194:4,8

**3**

**3** 3:1 4:15 17:24 18:3
    30:2 36:15,19 37:3
    40:19 68:3,3 77:4
    107:23 150:11 244:16
**3D** 32:11,23 214:19
    267:7
**3,323,600** 4:22
**3-1** 72:2,3
**3-11** 74:21,24 75:19
**3-14** 77:16
**3-17** 77:3
**3-2** 75:14
**3-3** 220:9 262:22 263:17
**3-4** 81:24
**3.1** 16:5,13,13,17 25:24
    26:2 107:19,24
**3.2** 71:14 73:10,24
**3.3** 11:11 263:3
**3.4** 11:12
**3:00** 20:16,19 22:9 23:21
    24:7 25:5,10,11 72:2,5
    75:11,21 76:7
**3:30** 100:2
**3:48** 201:17

**30** 4:17 5:24 30:1 61:24
    201:7 287:14
**30-foot** 135:16
**300** 135:14,14
**31** 31:1 61:13,15
**32** 4:21 32:1
**33** 33:1
**33rd** 3:4
**336** 4:12
**34** 34:1 65:16 80:20
**340** 228:20
**346-4444** 2:5
**35** 35:1 65:16 124:13,18
**35-foot** 137:5,22
**36** 36:1
**361** 226:11,13
**37** 37:1
**38** 38:1
**39** 39:1

**4**

**4** 4:1,17,24 5:18 14:8
    18:17,20 30:3,4,7,12,15
    30:16 37:7 77:6,12
    78:15 79:2 80:20
    125:11 131:19 139:22
    150:14 162:5 177:18
    189:25
**4-1** 130:4
**4-15** 130:7,15
**4-16** 119:6,9
**4-2** 128:2
**4-24** 157:21
**4-3** 142:21
**4-33** 177:21
**4-36** 180:11
**4-4** 82:2,3,7
**4-55** 162:12
**4-58** 174:17
**4-7** 130:21
**4-80** 189:25
**4-84** 186:14
**4-89** 190:2
**4-9-8** 14:7
**4-92** 190:21,22
**4-98** 190:22
**4.1** 80:4,10,21 112:11,11

112:21 127:25 129:4
    139:22
**4.12** 137:25 138:2
**4.14** 176:3
**4.19** 157:18,20,21
**4.2** 161:24 162:10 169:25
    185:11
**4.28** 177:19
**4.3** 163:17
**4.31** 180:10,11
**4.35** 181:13,13
**4.39** 183:25
**4.43** 183:14
**4.66** 186:11
**4.7** 130:9,13 131:19
**4.75** 94:8
**4.8** 131:19
**4:00** 72:2,6 99:15
**4:04** 201:18
**4:30** 99:9
**4:46** 227:21
**4:48** 227:22
**40** 40:1 63:14 206:10
    213:5
**400** 232:12
**41** 41:1
**42** 4:16,22 42:1
**43** 43:1
**44** 44:1
**444** 3:4
**45** 45:1 72:7
**454** 213:5
**46** 46:1
**47** 47:1
**48** 48:1
**49** 49:1

**5**

**5** 4:22 5:1 37:12,17 42:11
    42:14 43:12,15 195:15
    195:18,21 196:23
    201:16 203:10,13
    279:23,23 280:2
**5-11** 201:24
**5-12** 203:13,14
**5-22** 196:25 197:3
**5-23** 226:14,17

**5-53** 248:21
**5-6** 63:20 199:16
**5-64** 220:19
**5-65** 220:20
**5-66** 220:19
**5-71** 262:20,20
**5-9** 200:20 240:15
**5-91** 34:21
**5-95** 279:24
**5.1** 197:17,22 199:3
    207:2 249:18
**5.10** 200:17
**5.11** 201:23 202:2 203:21
    206:2,11 207:13 265:20
**5.12** 203:10,19 216:4
    224:3,5,14
**5.13** 217:4 220:2,9,13
**5.14** 217:4 219:25 220:2
    220:6,12
**5.16** 236:18 237:17,24
    238:2,13
**5.17** 238:10,13
**5.2** 197:7,17,22
**5.22** 196:13,13
**5.23** 196:13
**5.25** 266:7
**5.3** 196:9,11,18,23 197:2
    197:3,9,17,23
**5.32** 242:22,24 243:3
**5.4** 242:18,19,24 244:3
**5.42** 220:17,18,22 226:2
    226:4,5,6
**5.5** 246:15,21
**5.6** 196:22
**5:00** 28:10
**5:07** 240:6
**5:25** 240:7
**50** 50:1 72:7 207:11
**500** 230:18,22 231:2,7,12
    232:12 238:25 239:18
    241:8,15 242:9
**504** 2:12,17
**51** 51:1
**52** 52:1
**53** 53:1
**54** 54:1
**55** 55:1 201:8

**56** 56:1 213:5
**57** 57:1
**58** 58:1
**585-7000** 2:12
**59** 59:1
**596-6000** 3:5
**598-2715** 2:17

_____
**6**

**6** 5:4 6:1 39:17,20 58:10
  58:16 80:16 120:7,10
  200:2,8 201:20 240:5
  268:20 285:3
**6-1/2** 200:5
**6-15** 272:24 273:4,5
**6-16** 273:12,18
**6-32** 269:11
**6-35** 270:4
**6.0** 199:19 200:8
**6.17** 270:21
**6:00** 98:24 99:6,10 100:9
  100:12,14 145:4 147:19
  147:24 148:25
**6:26** 278:8
**6:29** 278:9
**6:30** 100:21 101:5,9
  145:10,25 146:4,6,22
  147:2,9,14,24 148:25
  168:18 174:12 279:17
**6:31** 279:18
**6:38** 285:21
**60** 49:22 50:5,15,22 60:1
  217:17
**60's** 60:22
**61** 61:1
**62** 62:1
**63** 63:1
**64** 64:1
**65** 65:1
**650** 2:15
**66** 66:1
**67** 67:1
**68** 5:9 68:1
**69** 69:1 214:21

_____
**7**

**7** 1:13 5:5 7:1,11 39:20

39:23 42:15 43:20,23
78:3 81:15 105:25
240:8 244:5 249:21
276:15 279:15
**7-2** 276:11,12,16
**7:00** 11:20,22 15:23
  23:24 24:8 147:11
**7:30** 10:12,23 11:15
**70** 70:1
**70130-6111** 2:16
**70163-2300** 2:11
**71** 71:1
**72** 72:1
**722** 215:21 226:3,8,20
  227:10 238:19,24
  239:17 241:6,16 242:6
**73** 73:1
**74** 74:1
**75** 18:7,13,13 75:1
  244:16
**76** 18:6,13,17,20 76:1
**77** 19:10,12,19,25 77:1
  208:2
**78** 20:19 21:7,21 78:1
**782,700** 4:22
**79** 21:24 22:6,16,22 23:6
  79:1 207:25

_____
**8**

**8** 4:4 5:6 8:1 14:9 18:20
  20:20 21:7 78:2,20
  84:10,12,15
**8.1** 29:17
**80** 5:4 80:1
**81** 5:5 81:1 207:25
**82** 82:1
**83** 5:16 83:1
**84** 5:6 84:1
**85** 85:1
**850** 280:21 282:15
**86** 86:1
**862-4320** 3:10
**87** 87:1
**88** 63:25 88:1 191:10
  199:19 200:8
**89** 89:1

_____
**9**

**9** 5:7,8 9:1 14:9 78:2
  122:3,5
**9-5** 4:13
**9.0** 57:18
**9:00** 75:11,21 76:7
**9:15** 1:16
**9:15:36** 7:12
**90** 90:1
**900** 3:9 226:25
**90071** 3:5
**901** 1:16 2:4
**91** 91:1
**911** 99:2 100:4,24 101:6
**92** 92:1
**93** 93:1 279:25
**94** 94:1
**95** 95:1
**9504** 1:17
**96** 96:1
**97** 97:1
**98** 98:1
**99** 99:1