# EXHIBIT 17

Report of Joseph Suhayda

# REPLY EXPERT REPORT OF JOSEPH N. SUHAYDA, PH.D.

## Re. Katrina Canal Breaches Litigation

Prepared by

*Joseph N. Suhayda*

Joseph N. Suhayda, Ph. D.
Coastal Hydrologist
285 Sunset Blvd.
Baton Rouge, LA 70808

September 3, 2009

1.      As set forth in my expert report submitted on August 27, 2008, (see **APPENDIX 1**) I have been retained by counsel for Lafarge North America Inc. to offer my opinions as to the hydrologic factors that affected property in the St. Bernard Parish and the Lower Ninth Ward during Hurricane Katrina. I have reviewed the new reports of plaintiffs' experts Mr. Melvin Spinks, Mr. Gennaro Marino and Mr. Hector Pazos.  I submit this expert report to address certain aspects of the new expert reports of the aforementioned experts. Unless presented in this report, my opinions remain unchanged from my August 27, 2008 report.

## FLOODING OF THE LITIGATION SITES

2.      Mr. Spinks in his June 2009 expert report presents results of computer modeling studies to opine on the sequence of flooding of St. Bernard Parish and the Lower Ninth Ward.  The model included three breaches:  along the Mississippi River Gulf Outlet (MRGO), and the north and south breaches along the Inner Harbor Navigation Canal (IHNC).  In Mr. Spinks' opinion, the computer modeling produced reliable and accurate results, including the time progression of the flooding (Spinks, 2009, p 37).  He based this opinion on the application of the Sobek-1D2D computer model and describes the various features of the model pertaining to the flow of water through urban and rural drainage systems.  Model inputs include the simulation period, ground elevation, rainfall, levee overtopping and breaches, and boundary surge hydrographs.  The results of the modeling indicate the time variation of water depth above ground for the litigation area and the influence of the IHNC breaches as opposed to MRGO breaches.  He presents maps of the depth of water over ground and hydrographs for the litigation sites (Alford – 2423 Deslonde Street; Richardson – 1321 Egania Street; and, Glaser – 8400 W. Judge Perez Drive).  He also provides new times for the merging of flood waters from the MRGO levee breaches and those from the IHNC breaches.

MRGO BREACHES CAUSE CATASTROPHIC FLOODING AT LITIGATION SITES

3.      Mr. Spinks states that "Two major floodwall breaches (failures), identified as the north and south breaches occurred to the hurricane protection system along the IHNC, causing catastrophic flooding of homes and businesses in the Lower Ninth Ward and St. Bernard Parish during Hurricane Katrina" (Spinks 2009, pg 37).  The conclusion that the north and south breaches "caused catastrophic flooding" is contradicted or at least qualified by several assessments of the causes of the flooding, including his own assessment, which indicate that the maximum elevation of flooding in the litigation area was caused by breaches in the levees along the MRGO and not by the IHNC breaches (Spinks 2009, pg 34 and 35; Kok, 2007, pg 46-49). These results – illustrated graphically in the Spinks report – show that without any breaches along the IHNC, the peak flood elevation and water depth at each of the litigation sites would have been the same due solely to the breaches along the MRGO.

4.      The modeling results presented by Mr. Spinks indicates that the major source of water that flooded the litigation sites is from breaches along the MRGO and not the breaches in the IHNC floodwalls.  The flooding related to the breaches in the IHNC floodwalls caused some initial flooding in portions of the Lower Ninth Ward and St. Bernard Parish before the water from the MRGO levee breaches arrived.  The initial IHNC flooding was probably less than Mr. Spinks generates in his modeling because, as discussed below, he chooses unsupported early times for

3

the IHNC breaches, particularly in the case of the south breach.  But by mid-morning on the 29th the litigation area was inundated by water from the breaches in the MRGO levees and water continued to rise for several more hours.  The peak water elevation was reached sometime after noon on August 29th.

TREATMENT OF THE TWO IHNC BREACHES

5.      Mr. Spinks fails to account in his analysis for the fact that the breaches in the IHNC were two separate events, even though his model allowed him to model each breach separately.  The consensus of investigators cited in my previous report is that the north breach preceded the south breach by at least l hour and that the breaches were caused by different mechanisms.  Also, the different sizes and locations of the breaches would have had distinct hydrologic effects on the litigation area.  The Spinks modeling fails to identify the effects of each separate breach and therefore his model fails to allow for separate consideration of the contribution of each of the two breaches to property damage at the litigation sites.

6.      Even though his model does not analyze each beach separately, Mr. Spinks, in his sensitivity analysis, shows that the two breaches could indeed have been analyzed to identify their separate impacts.  The breaches are treated separately in the analysis presented in Appendix I to the Spinks report.  For the sensitivity analysis, Mr. Spinks was able to manipulate the breach times for each breach independently of the other.  For example, Case 2 differs from Case 1 in that the timing of just the south breach is different.  Likewise Cases 3 and 4 differ because the north breach starting times are different.  As shown in Table 2 of Appendix I, Case 1 and 2 produce different values for the flooding in the litigation area at the observational sites.  However, the two IHNC breaches are not properly distinguished in his analysis of the effects of the IHNC breaches on flooding.

MODEL INPUTS

7.      Mr. Spinks has provided results concerning the flooding in the litigation areas based upon the Sobek-1D2D computer model (Spinks, 2009).  Developed by WL-Delft Hydraulics, it is used to compute the flooding associated with flowing water primarily in urban and rural drainage systems (Spinks 2009, pg 13).

8.      The Manning coefficients used by Spinks in his modeling are much lower than those used by IPET for the same land cover types.  For example, IPET used a Manning coefficient for high residential of .14 and for low residential it used .07.  Mr. Spinks used .05 for all residential terrain, which is lower than both figures used by IPET.  The Spinks values were reported as being taken from a standard hydraulic engineering reference, Open Channel Hydraulics by V. Chow, 1959.  However upon checking this reference no source of the Manning's N values used by Spinks could be found.   At deposition, Mr. Spinks was unable to provide a specific source for his Manning coefficients.  The effect of the lower values used by Spinks (as opposed to IPET) would be to over-estimate the speed at which water would flow throughout the Lower Ninth Ward and St. Bernard Parish.

MODEL CALIBRATION

9.      The accuracy and reliability of the modeling also depends upon the degree to which the model is calibrated.  Calibration involves comparing model predictions with observations to assess the success of the model.  The closer the model's predictions are to the observations, the more reliable the model.  No direct measurements of the time history of the elevation of flood waters are available for the area modeled.  The time history data that do exist are indirect and subjective indications of flooding; stopped clocks and eyewitness observations.  These data are compared with the model predictions in Figures 10 and 11 of the Spinks report.  As shown in the Figures, differences of up to 2.5 feet between the data and the predictions occur during the early flooding.  At the low level of flooding occurring at this time, this difference represents an error of about 25%.  A second comparison of data and model predictions is shown in Figure 13 of the report. The data shown are high water marks.  A comparison of the data and the modeling results shows the model predictions to be consistently too high.  For the litigation area, made up of Areas 1 and 2 in the Figure, the predictions are between 2 ft and 7 ft higher than the high water mark data.  These large differences between the predicted and the observed values significantly undermine the assertion that the model produces reliable results.

TIMING OF THE IHNC BREACHES

10.     The timing of the breaches of the levees and floodwalls surrounding St. Bernard Parish and the Lower Ninth Ward is important to accurately describe the initial flooding, which occurred in the litigation area.  The timing and development of the breaches affects the relative contributions of sources of water from each source.  Furthermore, the timing and development of the breaches affect different locations in the affected area differently, based on proximity to the breaches and topography affecting water flow inside the area.

11.     Mr. Spinks indicates the timing of the breaches in the IHNC floodwall and the MRGO levees in Table 1 of his report (Spinks 2009, p. 17).  This Table contains different information about the breach time for each breach from what Mr. Spinks concluded in his earlier report.  The breach start time and breach duration times are 4:00 am and 30 min respectively for the north breach, and 5:30 am and 15 min for the south breach.  These times are inconsistent with, and in some cases contradicted by, the evidence provided by every independent investigation of the IHNC breaches (IPET, ILIT, Team Louisiana), by the MRGO plaintiffs' expert (Kok) and by the barge plaintiffs' other experts Mr. Marino and Mr. Pazos.  All analysts indicate that water entered the Lower Ninth ward by a combination of processes including seepage and overtopping, as well as flow through the IHNC floodwall breaches and the MRGO breaches.  And they provide different explanations for the stages involved in the breaching and the amount of time it took for the breaches to form.

12.     Mr. Spinks removed a reference in his new report to the eyewitness account of Ms. D'Antoinette Marie Johnson which is inconsistent with the breach start time for the north breach. She lived on Deslonde Street about 3 blocks from the north breach on the IHNC and reported water in her house when she woke up which she estimated was at about 6:00 a.m.  She reported seeing water in the street and water toppling over the wall at 6:08 to 6:10 a.m.  The water in the street was higher than her front porch.  The water coming over the wall was in waves and not through a breach.  This eyewitness account is inconsistent with the assumption made by Mr.

Spinks that the floodwall had failed two hours earlier.  Similarly, Mr. Spinks ignored or decided
not to rely on eyewitness reports of other witnesses, e.g., Robert Cornwall, Kenneth Henderson,
Ernest Offray, Thomas Stone, Peter Tufaro, and Marlene Vinsanau (Spinks, Appendix E).  He
does not explain how or why he chose to use certain eyewitness reports while rejecting others.
While it is possible that the north breach in fact occurred as early as 4:00 am, the eyewitness
evidence is far more equivocal and internally contradictory than as portrayed by Mr. Spinks.

13.     Plaintiffs' expert Mr. Marino, after a detailed review of the mechanics of the floodwall
failures, provides opinions that contradict the assumptions of Mr. Spinks about the timing and
breach duration times for the north and south breaches.  Mr. Marino concludes that the "North
Breach occurred at about 6:00 am and the south breach around 6:30 am" (Marino 2009, pg 7-1).
Mr. Spinks modeled the north breach as occurring at 4:00 am, about 2 hours too early according
to Mr. Marino, and the south breach at 5:30 am, about 1 hour too early according to Mr. Marino.
Furthermore, Mr. Marino states that the "North Breach was observed to gradually progress from
north to south", and that "[t]he ultimate failure of the South Breach was evident by a violent rush
of floodwater" (Marino 2009, pg 7-1).  Mr. Spinks assumes that the breaching occurs within a
definite and limited time period of 15 to 30 minutes, although there is little to no discussion in his
report regarding his bases for this opinion.

14.     Plaintiffs' expert Mr. Pazos concludes that the north breach started some flooding at 5:00
am and, after a period of seepage underflow, was fully open sometime about 6:00 to 7:00 am
(Pazos, 2009, pg 45 and 69).  He states that "it is undisputed that the flooding waters going
through the South breach started inundating the 9th Ward at approximately 6:00 am" (Pazos 2009,
pg 45) and that it was some time after this that the floodwalls along the south breach failed
(Pazos, 2009, pg 69).  The Spinks start times are inconsistent with Mr. Pazos' analysis.

SENSITIVITY ANALYSIS

15.     Mr. Spinks concludes that the timing for the north breach is "at or before 4:30 a.m. CDT"
and for the south breach "at or before 6:30 a.m. CDT."  Mr. Spinks provides a sensitivity analysis
performed using the SOBEK model as support for these conclusions.  The sensitivity analysis
involves computing an ||L2|| parameter for each of several locations, using the differences in the
magnitude of this number to determine the "best" breach times, as shown in Table 2 of Appendix
I.  The accuracy of "observed water depth" is as listed in the Table to 0.1 ft.  It is impossible that
eyewitnesses could determine water depths during the hurricane to 0.1 ft accuracy.  Observations
accurate to +/- 0.5 ft or even +/- 1.0 ft would be difficult, particularly since Mr. Spinks conducted
no measurements at the sites of any of the eyewitness observations, and there is no indication that
the relevant depositions and 911 calls provide accurate measurements.  Reliance on pinpoint
accuracy in eyewitness reports must be tempered by the circumstances under which the
observations were made – that is, darkness, hurricane winds, heavy rains, and the exigency of life-
threatening flood conditions.  The inability to pinpoint a prediction within 0.1 ft is shown by the
inclusion of "error bars" in Mr. Spinks' graphical representations of these eyewitness reports, as
seen in Figures 1 to 9 of Appendix I.

16.     The formula for L2 as stated in Mr. Spinks report appears to be incorrect.  The numbers contained in the Table 2 when inserted into the incorrect formula he cites in his report give different values from those that are listed.  The corrected formula is:

$$\|L_2\| = [\ \sum\ (S_i - O_i)^2 \Big/ \sum\ (\ O_i)^2\ ]^{1/2} \qquad (1)$$

Where $S_i$ is the simulated water depth and $O_i$ is the observed water depth.

17.     The effect of the observational errors on Mr. Spinks' calculated values for L2 is not considered in his report.  Including the effects of observational errors on the computed values of L2 is illustrated in Table 1. The Table shows that with the corrected formula, for a 0.5 ft error some values for L2 go up, while others go down.  Using the correct formula, I computed that if the observed water depth at N5 was in error by +0.5 ft, the L2 value would be .582 and for -0.5 ft it would be .443.  If the observation at N5 was in error by +1.0 ft or − 1.0 ft, the L2 values would be .629 and .332 respectively.  In short, the Spinks L2 numbers for each data point and each case contain an error that has not been evaluated.  I estimate the final cumulative L2 values have an error themselves of about 0.2 to 0.4 units, much larger than the differences between the Cases, which are 0.04 to 0.2.  Calculated values of the L2 parameter for other data points are also shown in Table 1.  In summary, my analysis shows that the uncertainty or error in the computed values of L2 and of the cumulative L2 are much larger than the differences between the various Cases, therefore the Cases are statistically indistinguishable.

Table 1. Changes in the L2 values for Case 1 for various errors in the observed water depths.

| Data Pt | Spinks | Eq (1) | Observation Error, ft | | | |
|---|---|---|---|---|---|---|
| | | | +.5 | -.5 | +1 | -1 |
| N5 | .522 | .522 | .582 | .443 | .629 | .332 |
| N11 | .292 | .291 | .205 | .391 | .130 | .507 |
| S5 | 1.068 | 1.08 | .560 | 2.12 | .248 | 5.24 |
| S17 | .363 | .369 | .428 | .298 | .476 | .208 |
| S38 | .645 | .644 | .660 | .628 | .674 | .609 |

18.     The rating numbers shown in Table 2 of Appendix I are not consistently assigned and therefore give a misleading impression as to the relative validity of Case 1 and Case 2.  The criterion used to set the rating number for a data point to 1 was that the simulated condition of being flooded agreed with the observed condition, otherwise the rating number would be set to 0 (Spinks 2009, pg I-2).  Mr. Spinks indicated in his deposition that 0.5 ft of water depth was needed to consider a site as being flooded.  Based upon these criteria, the rating numbers for several data points in Case 1 and Case 2 are incorrect.  For Case 1, the ratings numbers for data points N8, S6 and S24 should be 1 instead of 0, and for data points S7, S31 and S36 should be 0 instead of 1.  For Case 2, the ratings numbers for data points N8, S5, S6, S15, S24, S16, S34 and S36 should be 1 instead of 0.  After making these corrections, the total rating score for Case 1 remains 37, but the total rating number for Case 2 increases to 36.  Comparison of these new values shows that the difference between the rating score for Cases 1 and 2 is insignificant.

19.      Comparing the simulated water depths with the observed depths as identified by Mr. Spinks, it appears that the differences between the two in many cases - N10, S8, S9, S14, S22, S23, S28, S29, S31, S35, S37 and S38 - were over 5 ft.  It also appears the average difference was about 2 ft, more or less.  My calculation is that the root mean square error between the observed water depths and the simulated water depths for Case 1 is 3.73 ft or about 50% of the typical observed or simulated value.  This value is much too large to accept model simulations as accurate or reliable.  Typically FEMA requires an error of no more than +/- 1.5 ft for flood insurance studies (Corps of Engineers 2008, pg 107-111).

20.      Given the uncertainty in the observed water depth data, the large errors associated with the model simulations, the sensitivity of the L2 numbers to errors in the observed water depths, and the differences between the results of the sensitivity tests that are not statistically significant, the breach times in Case 1 are not verified by the sensitivity analysis.  Given that none of the other of the sources cited in the Spinks report agree with the Case 1 breach start times or the model breach times posited by Mr. Spinks, there is significant doubt as to the accuracy and reliability of the determinations of the time progression of the flooding in the Lower Ninth Ward and St. Bernard Parish presented by in the Spinks report.

21.      Kok, (2007), using the same model, produced essentially the same results for the flood patterns and timing of the merging of the IHNC and MRGO flood waters using breach times that are hours later than used by Mr. Spinks.  This can be seen by comparing Figure 9 in the Spinks report - snapshots at 9:00, 9:15 and 9:30, with Kok's 9:00 snapshot in the Figure on page 40 of his report.  The corresponding images show that despite varied breach times, the water still reaches the same level in both simulations.  Thus the model is not capable of discriminating between the IHNC breach timings.

EARLY FLOODING OF THE LOWER NINTH WARD

22.      Mr. Spinks attributes only the early flooding of the litigation sites to the breaches in the IHNC floodwalls (Spinks, pg 35).  Upon examination it is evident that the description of this early flooding is based upon an inaccurate representation of the critical aspects of the IHNC breaching mechanism concerning the initiation and duration of the breaching process, as indicated above.  Mr. Spinks' own documents (see "Development of Breach Time Along the MRGO") admit that "[o]ur model does not model wave overtopping and under-seepage."  The opinions by plaintiffs' own experts Mr. Marino and Mr. Pazos about the breaching process are also in fundamental disagreement with the assumptions made in the Spinks modeling.  Although the new modeling results present a somewhat different description of the timing of the flooding than was previously presented, in the final analysis these new adjusted results suffer from the same deficiencies as does the original work.  It is simply not possible for all of plaintiffs' experts to be correct.

23.      Thus, the opinions of Mr. Spinks regarding the effects of the IHNC breaches on the early morning flooding of the Lower Ninth Ward and the western area of St. Bernard Parish are questionable.  The actual early flooding of the Lower Ninth Ward and St. Bernard Parish is not well documented.  No measurements are available to define what the actual water level time histories in the litigation area were in the early morning.  Only inferred water level and high water mark data (HWM) are available for the area, and these data show substantial differences for a

8

given site at a given time. At the IPET location C-1 the HWM data for the same 6:30 am time shows values of the water elevation from 1.5 ft to 4 ft.  At site C-2 at about 7:30 am time the HWM values range from 1 to about 3 ft.  The modeled water levels indicate a consistent over prediction of the eyewitness and IPET HWM data (Spinks 2009, pg 27 and 29).

24.     Mr. Spinks' conclusion that "The north and south breaches along IHNC floodwall accounted for over 90% of the total flow into the Lower Ninth Ward and St. Bernard Parish before 9:00 am" is doubtful.  Uncertainty in the correct modeling of the overtopping and breaching of the MRGO levee combined with the error in the modeling of the timing of the breaches along the IHNC means that the modeling estimates of the time that flooding from the MRGO influenced any given location in the litigation area is highly uncertain.

25.     In the end, the depth of the initial flooding is generally only a fraction of the peak flood depth at the litigation sites.  At the Alford site, Mr. Spinks reports a water depth from the IHNC only of 11.7 ft while the peak depth from all sources is 15.3 ft. For the Richardson site he says the IHNC depth is 5.9 ft versus a maximum from all sources of 9.5 ft and for the Glaser site the initial depth is 3.7 ft versus a maximum from all sources of 10.9 ft.  Even if accurate, these numbers only refer to the depth of water above the ground and not the depth of water over the first floor of the building, so the depth of water over the floor would have been less, depending on the elevation of the floor.

## WAVE ACTION IN THE IHNC

26.     Mr. Marino and Mr. Pazos provide opinions concerning the height and direction of waves that occurred in the IHNC during Hurricane Katrina.  Their opinions about waves heights as high as 20 ft and waves reflecting from the IHNC floodwalls were based upon suppositions and interpretations of eyewitnesses, and did not include any hindcasts of the actual conditions. Review of the hindcasts performed by the U.S. Army Corps of Engineers, based upon detailed hydrodynamic modeling, determined that the wave heights in the IHNC at the location of the breaches were about a 1 to 2 ft (IPET 15-390).  These waves during the time period of the breaching were propagating along the IHNC parallel to the floodwall.  The extreme wave height values and direction of propagation referred to by Mr. Marino and Mr. Pazos resulted from the misinterpretation of eyewitness accounts, and are incorrect.

27.     Mr. Pazos in his expert report presents statements regarding the magnitude and direction of wave action in the IHNC (Pazos, 2009).  These statements are based upon citing a naval architecture manual that indicates that "the reflection of wind waves from barriers such as floodwalls can produce waves of incredible steepness (steepness ratio as high as 1.2)" and "these composite waves, also called cross waves can develop crests normal to the obstruction at right angles to the incoming waves" (Pazos, pg 40).  He also states that "this superposition can result in gigantic waves that rise suddenly, in an area or region that was relatively smooth only a few seconds before" (Pazos, pg 41).  Mr. Pazos speculates that "it is quite possible that the barge ING 4727 was forced to heave, coming down on the upper portions of the concrete panels that have been tilted,…." (Pazos, pg 41).  He did not invoke any methodology to quantify the wave heights in the IHNC during Katrina, even though such quantification could have been carried out (and was carried out by IPET).

28.     Mr. Marino's expert report cites several different values for the wave heights in the IHNC. He cites values of "over 1 foot to spurious waves up to about 20 ft along the IHNC" based upon his interpretation of eyewitness accounts (Marino, pg 3-14),  He also cites an IPET report of waves having a height of 1.3 ft within the IHNC lock (Marino, pg 3-14) and an ASCE report citing 4 ft waves (Marino, pg 3-14).  During his deposition he says that the exceptional wave described came from the pump station manager, Mr. Villavaso (Marino 2008, pgs 146 & 147). Again, there is no scientific support for any of these statements.

**WAVE CONDITIONS IN THE IHNC**

29.     The wave action that occurred in the IHNC during Katrina was from two sources.  One source was waves propagating into the canal from Lake Borgne to the east and from Lake Pontchartrain to the north.  Waves were also generated within the canal by winds blowing along and across the canal.  Detailed analysis of both types of waves, as presented below, shows that waves were only 2 to 3 ft in height at most, and could not have been as high as alleged by Mr. Marino and Mr. Spinks.

30.     The IPET analysis of the storm waves generated in the IHNC during Katrina involved two separate methodologies.  The analysis of waves entering the IHNC from Lake Pontchartrain and Lake Borgne were based upon the STWAVE model (IPET, pg IV-14-1).  The waves actually in the IHNC near the breach areas were analyzed using COULWAVE computer model (IPET, pg IV-15-1).

31.     Waves entering the IHNC from the lakes were modeled with the "narrow-fetch" version of STWAVE.  Maximum wave height along the MRGO/GIWW entrance to the IHNC from the east and along the northern portion of the IHNC down to its southern end showed two patterns: a rapid damping of longer period waves that are entering the canals from the Gulf on the east and Lake Pontchartrain on the north and a growth of waves due to local wind generation along the canals. This pattern appeared to be consistent with photographic evidence at the southern end of the IHNC. Waves entering the MRGO/GIWW from relatively open waters of Lake Borgne decayed rapidly from almost 3 ft to about 1.2 ft within about one-half mile. However, the winds for the entire 0600-to-1100 UTC (1:00-to-6:00 a.m. CDT) timeframe on the 29th are relatively well aligned with the axis of the MRGO/GIWW; consequently local wave generation created wave heights of over 4 ft in the vicinity of the GIWW/MRGO – IHNC intersection during peak wind conditions at 1030 UTC (5:30 a.m. CDT) of about 80 knots out of the east. These waves are quite short with peak periods in the range of 3.5 to 4.0 sec.

32.     A modified version of STWAVE was also run in this same area, due to the large spatial extent of the region being modeled.  Results from the STWAVE runs showed that the primary source of wave energy incident upon the floodwalls along the Lower Ninth Ward came from waves reflected back to the east side of the canal from the west side.  Due to all the irregularities along the west side of the IHNC and the range of types of slopes and materials, it is difficult to estimate the reflection coefficient for this area with much certainty.  Sensitivity tests showed that for coefficients of energy reflection in the 50 percent to 80 percent range, maximum wave heights

of approximately 2 to 3 ft would be incident on the Lower Ninth Ward floodwalls (IPET, pg IV-227).

33.     The IPET analysis of wave action in the IHNC was also based upon the COULWAVE model (IPET, pg IV-15-01).  The COULWAVE (Cornell University Long and Intermediate Wave) model was developed to simulate nearshore wind wave prediction, with particular focus on capturing the movement of the shoreline, i.e. runup and inundation.  The fundamental assumption of the Boussinesq equations is that the wavelength to water depth ratio is large; thus, the model is meant to study shallow water waves.  Applications for which COULWAVE has proven very accurate include wave evolution from intermediate depths to the shoreline, including parameterized models for wave breaking and bottom friction.

34.     The results of the COULWAVE analysis were presented in several figures and graphs (IPET IV-15-39).  At 04:30 CDT (09:30 UTC), the wave height in the GIWW is near 3.4 ft, and wave heights near the Florida Avenue Bridge are close to 0.6 ft.  By 05:30 CDT (10:30 UTC), the significant wave height at the end of the GIWW has grown to 4.1 ft.  At this time more wave energy was able to turn into the southern reach of the IHNC, such that the significant wave height near the Florida Avenue Bridge is 1 ft.  These waves propagated along the axis of the IHNC and not perpendicular to the floodwall at the locations of the breaches. The IPET analysis involved detailed modeling and never showed any wave heights of exceptional or spurious nature.

35.     The eyewitness report of Mr. Villavaso refers to water in the IHNC in the 3:00 to 4:00 am time period splashing over the floodwall.  He also reported a "wave of water just gushing down the Industrial Canal" (Villavaso, pg 129).  This wave was a single event and was not described as repeating storm waves.  Mr. Villavaso acknowledges his estimate of the height of the bore was just approximate.  He refers to it as a "high wall of water" (Villavaso, pg 189).  However, he does not report that this "wave" overtopped the floodwall.  It was propagating along the canal and not perpendicular to the canal, and would not have produced a reflected wave.

36.     The ASCE (2007) report refers to wave action in the Industrial Canal that impacted the levees lining the western side of the canal, causing overtopping into portions of the Gentilly and Bywater neighborhoods.  These waves were actually propagating away from the floodwalls that were breached on the eastern bank of the IHNC.

37.     In light of the detailed calculations referred to above and the misinterpretation of wave information from governmental reports and eyewitnesses, it is evident that the wave action in the IHNC at the location of the east bank breaches was maximum during the early morning of August 29th.  At this time, the wave height was a maximum of between 2 and 3 ft.  Furthermore, these waves were propagating southward along the IHNC and not toward the IHNC east bank floodwalls.  It was not until several hours later on August 29th that the wind waves generated within the IHNC that would have been directed against the east bank floodwalls.

**SUMMARY OF CONCLUSIONS**

38.     Floodwater modeling results, including the results of the Spinks modeling effort, are consistent in showing that the flooding in the Lower Ninth Ward and St. Bernard Parish would

have reached essentially the same maximum water level on August 29, 2005 even if the IHNC floodwall breaches had not occurred, due to the flooding from the much larger levee breaches along Reach 2 of the MRGO.

39.  As reflected in the modeling results, the only difference between the two scenarios (i.e., including the IHNC breaches versus including MRGO breaches only) is that when the IHNC breaches are included, some of the floodwaters are shown to arrive at some locations earlier than in the MRGO only scenario.  The difference is no more than a few hours, however.  The modeling shows that by the afternoon of August 29, 2005, every location would have reached the maximum floodwater level regardless of whether the IHNC breaches had occurred.

40.    Floodwater modeling does not have the capability to establish the times of the north and south breaches along the IHNC.  In particular, the uncertainty associated with witness observations of timing and depth of flooding overwhelms the ability of a model to establish with any degree of precision what time either breach took place.  Thus, for instance, a proper statistical analysis of "Case 1" and "Case 2" in the Spinks sensitivity analysis shows they are statistically indistinguishable from each other.  The model does not and cannot establish that the south breach was more likely to have occurred at 5:30 am than at 7:00 am, as Mr. Spinks concludes.

41.    The Spinks modeling effort is subject to several additional flaws and deficiencies that degrade its usefulness as a predictor of flood depths and timing.  For instance, the model fails to distinguish or separate flooding from the north breach as opposed to the south breach.  In addition, the model employs surface roughness coefficients which tend to overestimate the speed at which water traveled over the ground in the affected area.

42.    The conclusions about wave heights and wave action expressed in the reports of Mr. Pazos and Mr. Marino are not supported by any valid scientific analysis (or even by any scientific analysis of any kind), and are incorrect.  As shown by the detailed reconstruction carried out by the IPET team, waves in the IHNC below the Florida Avenue Bridge were on the order of 1 ft up to 2-3 ft, and traveled predominantly in a north-to-south direction during the relevant time period.

# REFERENCES

DEPOSITIONS

D'Antoinette Marie Johnson, deposition on December 11, 2007.

Marino Deposition, September 12, 2008.

Villavaso Deposition, December 18, 2007

Melvin Spinks Deposition, August 14, 2009


TECHNICAL REPORTS AND DATA

Chow, V. T., Open-Channel Hydraulics, McGraw-Hill, 1959.

Coastal Engineering Research Center, Shore Protection Manual, Volume I, Department of the Army, 1984.

Google maps website for spatial information

Independent Levee Investigation Team, Investigation of the Performance of the New Orleans Flood Protection Systems, Final Report, July 31, 2006.

Kok, M., M. Aalberts, B. Maaskant, and L. De Wit, Polder Flood Simulations for Greater New Orleans, Delft University of Technology, July 30, 2007

Marino, G., Failure Investigation of the North and South Breaches along the IHNC during Hurricane Katrina, St. Bernard parish, New Orleans, LA, July 1, 2009.

Pazos, H., Expert Report, June 29, 2009.

Spinks, M., Hurricane Katrina August 2005 – Analysis of flooding of the Lower Ninth Ward and St. Bernard Parish, New Orleans, Louisiana, June 2009.

Spinks, M., Hurricane Katrina August 2005 – Analysis of flooding of the Lower Ninth Ward and St. Bernard Parish, New Orleans, Louisiana, September 2008.

Team Louisiana, The Failure of the New Orleans Levee System during Hurricane Katrina, Report to Secretary Johnny Bradberry, La. Dept. of Transportation and Development, December 18, 2006.

U. S. Army Corps of Engineers, Performance Evaluation of the New Orleans and Southeast Louisiana, Hurricane Protection System,  Vol. IV – The Storm, March 26, 2007.

U. S. Army Corps of Engineers, Performance Evaluation of the New Orleans and Southeast Louisiana, Hurricane Protection System,  Vol. VI – The Performance – Interior Drainage and Pumping, March 26, 2007.

U. S. Army Corps of Engineers, Flood Insurance Study: Southeast Parishes, Louisiana, Intermediate Submission 2, Offshore Water Levels and Waves, January 9, 2008.

**APPENDIX 1**

# HYDROLOGIC ANALYSIS OF FLOODING
# OF THE
# ST. BERNARD POLDER
# DURING HURRICANE KATRINA

Joseph N. Suhayda, Ph. D.
April 13, 2009

# ANALYSIS OF HYDROLOGIC FACTORS
# AFFECTING PROPERTY DAMAGE
# IN THE PLAINTIFF PROPOSED CLASS
# DURING HURRICANE KATRINA

**In Re. Katrina Canal Breaches Consolidated Litigation (BARGE)**
**United States District Court for the Eastern District of Louisiana**
**Docket No. 05-4182**

Prepared by

*Joseph N. Suhayda*

Joseph N. Suhayda, Ph. D.
Coastal Hydrologist
285 Sunset Blvd.
Baton Rouge, LA 70808

August 27, 2008

2

**TABLE OF CONTENTS**

Page

1. INTRODUCTION...........................................................................................................  3
   1.1. HYDROLOGIC ISSUES RAISED BY PLAINTIFF.............................  3
        1.1.1. Melvin Spinks..........................................................................  3
        1.1.2. John Kilpatrick........................................................................  4
   1.2. CHARACTERISTICS OF CLASS AREA..........................................  4

2. HURRICANE KATRINA ....................................................................  5
   2.1. WINDS..........................................................................................  6
   2.2. RAINFALL.....................................................................................  7
   2.3. SOURCES OF WATERS....................................................................  7
   2.4. TIMING OF BREACHES.................................................................  8
        2.4.1. Eyewitness Reports.................................................................  8
        2.4.2. Breaches along MRGO levee.................................................  9
        2.4.3. North Breach.........................................................................  9
        2.4.4. South breach..........................................................................  10
        2.4.5. Timing of Breaches – Summary.............................................  10
   2.5. FLOW OF WATER..........................................................................  11
   2.6. WAVES...........................................................................................  11
   2.7. SUMMARY OF MULTIPLE CAUSES OF DAMAGE TO BUILDINGS...  12

3. LIMITATIONS OF PLAINTIFF'S FLOOD MODELING...............................  12
   3.1. SOBEK COMPUTER MODEL...........................................................  13
   3.2. NEGLECTED HYDROLOGIC PROCESSES.......................................  13
   3.3. INACCURATE TIMING OF BREACHES...........................................  14
   3.4. INACCURACY OF CALIBRATION .................................................  15
   3.5. UNRELIABILITY OF MODELING RESULTS....................................  16

4. ANALYSIS OF CLASS HYDROLOGIC ISSUES.......................................  16
   4.1. BUILDING DAMAGE CAUSED BY FLOODING..............................  16
   4.2. FLOODING CAUSED BY BREACHES IN INDUSTRIAL CANAL
        FLOODWALLS.................................................................................  17
   4.3. DEPTH OF FLOODING....................................................................  18
   4.4. HYDROLOGIC DAMAGE CRITERIA.............................................  19

5. SUMMARY OF CONCLUSIONS..............................................................  19

6. REFERENCES..........................................................................................  21

7. APPENDIX................................................................................................  23

8. FIGURES..................................................................................................  25

# 1. INTRODUCTION

The purpose of this report is to present opinions concerning the hydrologic processes that affected property within the plaintiffs' designated class area during Hurricane Katrina. The hydrologic processes causing property damage in the class area are analyzed, and the plaintiffs' expert opinions are reviewed and examined. The analysis focuses on the many factors causing damage to property in the class area, including winds, rainfall, waves, flowing water and rising water, and shows that the statements made by the plaintiffs' experts about the role of the breaches in the Industrial Canal in causing property damage in the class area are incomplete, inconsistent, and inaccurate. These experts' statements do not accurately convey the fact that Hurricane Katrina produced a complex variety of hydrologic processes in the class area that affected property, and that these processes were highly variable over the class area. They also fail to accurately portray the limitations and errors in the computer modeling results which were applied to assessing damage to property. The analysis presented in this report concludes that each property in the class area was affected by a unique set of wind, wave, rainfall, rising water, flowing water, and maximum water depth factors. There is, therefore, no validity to the assertion that the cause or extent of property damage within the class area is a "common" issue for all class members. To the contrary, the cause and extent of property damage, including damage caused by flooding, is an individual issue.

The opinions expressed herein are based upon a careful review and analysis of data and information from many sources, and my experience in working on hydrologic problems in southern Louisiana. The materials examined for technical information included expert reports, technical articles, governmental reports and legal documents. I visited the proposed class area on several occasions, during which time I examined the various hydrologic features of the site. Finally, my opinions are also based upon my 30 years professional experience in analyzing hydrologic processes in southern Louisiana. The various reference materials used for this report are presented in the REFERENCES section of this report.

## 1.1.   HYDROLOGIC ISSUES RAISED BY PLAINTIFF

Plaintiffs' experts have provided statements and opinions on several issues pertaining to the role of the Industrial Canal breaches in causing property damage in the plaintiff designated class area. In this section these statements are briefly reviewed and summarized. Overall it is the opinion of plaintiff that property damage in the class area resulted from flooding caused by two separate breaches in the Industrial Canal (Plaintiffs' Motion, 2008, p 2).

### 1.1.1   Melvin Spinks

Mr. Spinks in his expert report presents results of computer modeling studies to opine on the timing and magnitude of the flooding of St. Bernard Parish and the Lower Ninth Ward. He also references relationships between the depth of flooding and damage to individual buildings.

4

The model included three breaches; along the Mississippi River Gulf Outlet (MRGO), and the north and south breaches along the Industrial Canal. Although the north and south breaches were modeled as separate events, the modeling study considered only their combined impact.

In Mr. Spinks' opinion, the computer modeling produced reliable and accurate results, including the time progression of the flooding (Spinks, 2008, p 29). He based this opinion on the application of the Sobek-1D2D computer model and describes the various features of the model pertaining to the flow of water through urban and rural drainage systems. Model inputs include the simulation period, ground elevation, rainfall, levee overtopping and breaches, and surge hydrographs.

The results of the modeling indicate the time variation of water depth above ground for class area and the influence of the Industrial Canal breaches as opposed to MRGO breaches. He presents maps of the depth of water over ground for class area and presents tables to correlate the damage to various types of buildings.

1.1.2.  John Kilpatrick

Mr. Kilpatrick in his affidavit addresses the issue of whether or not, from a real estate analysis and appraisal perspective, this case can best be treated as a class action. He also discusses the damage to personal property with respect to class versus individual assessment of damages. He states that damage from hurricane Katrina and levee failures provide common elements across the class in terms of the types of damage and causes of damage (Kilpatrick Affidavit, p3). Further, Mr. Kilpatrick states that the depth of flooding of the class has been mapped and provides evidence relevant to determining the extent and cause of damages (Kilpatrick Affidavit, p5). He cites a Corps of Engineer report as a rationale for area wide evaluations of flood damage based upon depths of flooding (Kilpatrick Affidavit, p6). Mr. Kilpatrick indicates that he has obtained maps that purport to show the extent of the flooding that was the chief cause of the damages (Kilpatrick Affidavit, p12).

1.2.  CHARACTERISTICS OF CLASS AREA

The proposed class area is bounded by the Industrial Canal floodwall on the west, Paris Road on the East, the Mississippi River on the South, and is bounded on the north by the Public Belt or other Railway adjacent to and immediately north of Florida Avenue, and the east-west channel or canal extending from the aforesaid railway to Paris Road (Florida Walk canal and Forty Arpent Canal) (Plaintiff's Motion, 2008, p 2). This is an area roughly 2 miles in the north-south direction by 5 miles in the east-west direction. Important to flow of water in this area are the physical characteristics of the land that control the movement of the water. These characteristics include the land cover, the topography, and the drainage system.

The plaintiff designated class area contains a variety of land use types that affected the flow of flood water. This area contains a mixture of residential, commercial and undeveloped lands of varying elevation. These differences were included in a detailed analysis of the flooding

of St. Bernard Parish and the Lower Ninth ward by the Interagency Performance Evaluation Team (IPET) in Volume VI of their report. The IPET analysis indicates that rather that being uniform, the class area is primarily composed of two different land use types: non-vegetated urban and vegetated urban. Therefore different sections of the class areas have distinct hydrologic properties. Buildings, fences and other structures can act as barriers to the flow of water. Where buildings are close together water is channelized to flow between the buildings and this accelerates the velocity of the water and increases its damage potential. Individual buildings and rows of building were scattered throughout the class area creating a complex network of flow paths for flood waters and complex pattern of potential flood damage.

Topographic data for the proposed class area has been based primarily upon LIDAR data. The data show that the ground elevations in the proposed class boundary area range from several feet above sea level to several feet below sea level. The highest ground has an elevation above 6 ft and is located near the Mississippi River. The lowest ground is located in the northern part of the proposed class boundary area and has an elevation below – 6 ft. A major topographic feature of hydrologic significance is a railroad embankment that runs westward from Paris Road along the St. Bernard Highway and then curves northward just to the west of Alexander Avenue until it reaches the 40 Arpent levee. The embankment is very narrow, about 25 ft in width, but it is about 4 to 5 feet above the ground level and continuous. Thus it is a very important topographic feature that limits the movement of water in the east- west direction. Also imposed upon the general topography is elevation difference associated with individual residential lots and streets. It is this topography, the local topography, that controls the runoff of rainwater from individual residential lots and the initial movement of flood waters.

The drainage system in the proposed class area has been described in detail in the IPET report. The class area is composed of the Lower Ninth Ward Basin in Orleans Parish (IPET, p VI-40), and in Pump Drainage Area 1 ) in St. Bernard Parish (IPET, pVI-46). The class area was divided into 26 sub-basins. Sub-basin boundaries correspond to storage areas used in IPET analysis. Four pump stations were included in the analysis for the Lower Ninth Ward and Area 1 (IPET, p VI-4-21). Storm water drainage is through channels that convey rainwater to the pump stations where it is pumped out of the area.

## 2. HURRICANE KATRINA

Katrina was a powerful hurricane that caused widespread damage and loss of life. It was the costliest and one of the five deadliest hurricanes to ever strike the United States. In this section the storm history and meteorological characteristics are briefly reviewed. In order to understand the actual factors causing damage to buildings in the class area, it is necessary to identify all of the factors in the storm that could cause damage to property, in addition to flooding from the Industrial Canal breaches. The storm created factors that affected the buildings in the case area including wind, rainfall, waves, and flowing water. Furthermore the flooding itself

6

resulted from water from several sources, with the breaches along the Industrial Canal playing a minor role in determining maximum height of the flooding.

The modeling of the flooding of St. Bernard Parish and the Lower Ninth Ward has been the subject of several recent studies. The most comprehensive study was performed by IPET and included modeling of Hurricane Katrina and the flooding and damage caused by the storm (IPET, Vol. IV). Kok, et al (2007) provided a separate analysis of the flooding based upon the Sobek model. A review of this modeling was conducted by Dalrymple (2007 ). Finally, an overview of the flooding caused by Katrina has been presented by Wooten ( 2007 ). The studies by Dalrymple and Wooten presented multiple sources of water that impacted the proposed class area in addition to the two breaches along the Industrial Canal.

## 2.1.   WINDS

Katrina became a Category 3 hurricane with 100 kt winds at 0700 CDT in the morning of August 27th, about 365 n mi southeast of the mouth of the Mississippi River. Accompanying the intensification and the subsequent deterioration of the inner eyewall was a significant expansion of the wind field on 27 August. Katrina nearly doubled in size on 27 August, and by the end of that day tropical storm-force winds extended up to about 140 n mi from the center. Katrina strengthened from a low-end Category 3 hurricane to a Category 5 in less than 12 h, reaching an intensity of 145 kt by 0700, on 28 August. Katrina attained its peak intensity of 150 kt at 1300 August about 170 n mi southeast of the mouth of the Mississippi River. The wind field continued to expand on 28 August, and by late that day tropical storm-force winds extended out to about 200 n mi from the center, and hurricane-force winds extended out to about 90 n mi from the center, making Katrina not only extremely intense but also exceptionally large. The hurricane then made landfall, at the upper end of Category 3 intensity with estimated maximum sustained winds of 110 kt, near Buras, Louisiana at 610 on August 29. Katrina continued on a northward track, with its center to the east of the New Orleans area, and made its final landfall near the mouth of the Pearl River at the Louisiana/Mississippi border, still as a Category 3 hurricane with an estimated intensity of 105 kt. Katrina weakened rapidly after moving inland over southern and central Mississippi, becoming a Category 1 hurricane by 1300 on August 29.

The winds over the class area have been reconstructed by analyzing wind observations and using computer models, and are presented in the IPET report. The IPET data shows that at 4:00 AM on August 29, the wind over the class area was from the northeast and was already at a speed of 50 to 55 kts (58 to 63 mph) (IPET, p IV-2-46). This is before any flooding was reported in the class area. By 7:00 AM, the winds over the class area were out of the northeast and had increased to 70 to 75 kts (80 to 86 mph) (IPET, p IV-2-47)). At 10:00 on the 29th, the wind over the class area was 55 to 60 kts (63 to 69 mph) out of the northwest (IPET, p IV-2-48). Thus hurricane strength winds were affecting buildings in the class area before and during the period of the flooding.

7

## 2.2.   RAINFALL

Hurricane rainfall over the class area was substantial. The total amount of rainfall varied from about 10.5 inches in the eastern side of the proposed class area to about 11.5 inches on the western side (IPET, p VI-4-14). Rain started falling in the class area in the evening of August 28th, and reached 1 inch per hour in the early morning of the 29th. The rain continued throughout the morning and afternoon of August 29th, averaging about .8 inches per hour for over 10 hours (IPET, p VI-4-15).

## 2.3.   SOURCES OF WATER

A precise description of the flooding of the plaintiff designated class area is complex because there were multiple sources of the flood waters that entered the area. No single source is responsible for the flood timing, flow of water or flooding depth. In the IPET study a detailed analysis of the flooding of  St. Bernard Parish and the Lower Ninth Ward was conducted and provides the best source of information about the flooding of the proposed class area.

Numerous hydraulic elements were included in the IPET analysis. There were 13 breaches and overtopping locations identified as affecting St. Bernard Parish and the Lower Ninth Ward, totaling about 39,000 feet in length (IPET, p VI-4-22). The analysis indicated that breaches accounted for only about 63% of the inflow of water into St. Bernard Parish, with wave overtopping accounting for about 28% and rainfall about 8%. The analysis also included the operation of nine pump stations.

The modeling by Mr. Spinks indicates that the primary sources of the water that flooded the class area were the breaches in the levee along MRGO. A similar study by Kok ( 2007) also indicated that the primary source of water was the breaches along MRGO (Kok, p 46).

Another source of water that flooded the class area was wave overtopping of floodwalls and levees (IPET, pVI-4-22) and under-seepage (ILIT, p 6-18).

In this case, the plaintiffs focus on two breaches in the Industrial Canal floodwall. As just noted, these were not the only sources of water that flooded the class area, nor even the primary sources insofar as maximum water levels were concerned. Furthermore, these two breaches were separate events with separate consequences. For persons living near the northern breach, that breach is the one of significance. By contrast, the south breach will be more significant to persons living in the immediate vicinity of that breach and subjected to water flowing through it. The relative contributions of the two breaches varied depending on location within the proposed class area. Because the two breaches were separate events, the relative contribution of each breach would need to be evaluated in determining causation of damage.

The relative contribution of these two sources of water, and of other various sources of water, depends in part on the timing and development of the various breaches.

8

## 2.4.   TIMING OF BREACHES

The timing of the breaches of the levees and floodwalls surrounding St. Bernard Parish and the Lower Ninth Ward is important to accurately describe the initial flooding which occurred in the class area. The timing and development of the breaches affects the relative contributions of sources of water. Furthermore, the timing and development of the breaches affects different locations in the proposed class area differently based on proximity to the breaches and topography affecting water flow inside the area.

Sources of information regarding the timing and development of the breaches include the IPET, ILIT, and Team Louisiana reports, and eyewitness reports.

### 2.4.1. Eyewitness Reports

Several residents in the Lower Ninth Ward remained during the storm and were eyewitnesses to the flooding. Their reports provide direct observations of many critical aspects of the breaching of the floodwalls along the IHNC. However, due account must be taken for the circumstances under which the observations were made – that is, darkness, hurricane winds, heavy rains, and the exigency of life-threatening flood conditions. Accounts concerning the times at which events occurred are also not all consistent and are subject to interpretation. Civil twilight did not occur until 6:11 a.m. and dawn was not until 6:36 a.m. on August 29, according to the U. S. Naval Observatory. Therefore, eyewitness accounts concerning estimates of times before there was any ambient light may be questionable and it would be incorrect to regard their accounts about the specific times at which particular events occurred as established facts.

Ms. D'Antoinette Marie Johnson lived on Deslonde St, about 3 blocks from the north breach on the IHNC. She reported water in her house when she woke up which she estimated was at about 6:00 a.m. She reported seeing water in the street and water toppling over the wall at 6:08 to 6:10 a.m. The water in the street was higher than her front porch. The water coming over the wall was in waves.

Mr. Kendrick Pounds lived in the back of the building that Ms. Johnson lived in. He said was awakened by Ms. Johnson at 5:50 a.m. and was told there was water in the house. He ran to the house door, looked outside and saw cars floating. He saw two holes in the floodwall. Water started coming over the floodwall about 5:58 a.m. He also got on the roof and saw water coming over the floodwall along the Industrial Canal.

Mr. Andrew Sartin lived on North Roman St., about 7 blocks from the south breach. He reported that before daylight it was raining and blowing hard. After daylight the rains and wind seemed to increase. He heard a noise like a big crash between 6:00 and 6:30 a.m. from the area of Southern Scrap, near the northern breach. He then saw a wave of water coming down the street. About 5 to 15 minutes later he heard a second noise, louder than the first, from the Claiborne Avenue side of his house. Water then came down Roman Street from Jourdan Avenue, carrying cars and houses with it. He estimated this would have been about 6:15 to 6:45 a.m.

Terry Adams lived on Deslonde Street, about 1/2 block from the north breach. He woke up about 5:00 a.m. and noticed that the carpet on the floor of his house was wet. He looked outside and noticed water coming over and under the wall at Jordan Avenue and Law Street, the site of the north breach. He got on his roof between 5:30 and 6:00 a.m. at not quite daylight. From the roof he said he could see the wall at the Claiborne Avenue bridge and saw water coming over and under the wall. But the wall wasn't breached at this time.

William Villavasso was working at Pump Station 5 the morning of August 29th. He started seeing rain intensifying, the winds picking up and water splashing over the levee along the Industrial Canal. He estimated the mount of splashing was from 3 to 5 feet. The splashing water flowed into the street. He heard a sound like an explosion, and then saw the levee walls in sections. He saw a couple sections of the wall tumble over, and then massive amounts of water pouring through the wall, with a lot of street flooding. He advised central control to drop the power to the station. IPET reported that the power was turned off at 5:30 a.m. ( IPET, p IV-194).

2.4.2.  Breaches along MRGO Levee

In the IPET report the development of the breaches of the levees along the MRGO considered both waves and still water overtopping (IPET, pp IV-240 to IV-242). The report describes in detail the breaching at four different locations along the levee. At Location 1, the northern most location, wave overtopping occurred about 6:00 a.m. and persisted for 4 hr, however no still water overtopping occurred at this site. At Location 2, further south, waves began to substantially overtop the levee around 5:30 a. m. and at 6:30 the mean water level began to overtop the levee crest. Considerable erosion of the levees occurred. At Location, 3 near the mid point along the levee, waves began overtopping at 5:30 and mean water overtopped at 6:00 a.m. At the southern end of the levee, Location 4, wave overtopping occurred between 6:30 to 9:30 a.m., with no overtopping by still water.

Team Louisiana reported waves from Lake Borgne began to break on the levees along MRGO (Team La., p 63). The Forty Arpent levee protecting the Lower Ninth ward area was overtopped by 0830, according to this report (Team La., p 64).

Kok (2007) in his modeling of the flooding uses 5:00 a.m. to 8:30 a.m. for the development of various breaches along MRGO (Kok, p 38).

2.4.3.  North Breach

The IPET report concludes that the north breach was the likely source of the early flooding of the Ninth Ward (IPET, p V-53). This conclusion was based upon an analysis of the stability of the floodwall at that location which indicated the wall failed before it was overtopped. The water was reported as rising as early as 5:00 a.m. (IPET, p V-53).

10

The ILIT study indicates that the north breach occurred at approximately 7:30 to 7:45 a.m. (ILIT, p 6-6). They also indicate that overtopping and under-seepage occurred at this site and that the under-seepage caused the failure of the floodwall (ILIT, p 6-18). ILIT attributes the early influx of water in the Lower Ninth Ward to underseepage flows. (ILIT, p. 6-16).

Team Louisiana reported that at approximately 6:00 a.m. levees and floodwalls along the IHNC were overtopped, beginning on the south end (Team La., p 66). Water that poured over the floodwalls began to scour trenches on the back side of the walls (Team La., p 66). They report that the north breach occurred about 7:30 a.m. or a little later (Team La., p 67). They concluded that the north breach was caused by under-seepage and overtopping.

Kok (2007) specifies a time for the development of north breach of 7:00 to 7:30 a.m. (Kok, p 38).

2.4.4.  South Breach

The IPET report concluded that the south breach was caused by overtopping and erosion of the soils along the back side of the flood wall (IPET, p V-55). According to IPET, overtopping did not start until about 7:00 a.m. and the peak storm surge in the IHNC was not reached until 9:00 a.m.(IPET, p V-53). Therefore IPET concluded the south breach would have occurred sometime between 7:00 and 9:00 a.m.

The ILIT study indicates that the south breach occurred at approximately 7:30 to 7:45 a.m.(ILIT, p 6-6). They also indicate that overtopping and under-seepage occurred at this site and that the under-seepage caused the failure of the floodwall (ILIT, p 6-18).

Team Louisiana reported that at approximately 6:00 a.m. levees and floodwalls along the IHNC were overtopped, beginning on the south end (Team La., p 66). Water that poured over the floodwalls began to scour trenches on the back side of the walls (Team La., p 66). They report that the south breach occurred at 7:30 a.m. (Team La., p67).

In the Kok (2007) study, the modeling is based upon 7:00 to 7:30 a.m. as the timing for the development of south breach.

2.4.5.  Timing of Breaches - Summary

There is a general consensus that the Industrial Canal north breach occurred before the south breach, and that both breaches were fully developed by 7:45 a.m. on the morning of August 29. The IPET, ILIT and Team Louisiana investigators all concluded that, at least at the south breach site, storm surge waters overtopped the floodwall before or concurrent with the occurrence of the south breach. As discussed above, this conclusion is consistent with eyewitness accounts taken after the investigative reports were prepared. Plaintiffs' expert Mr. Spinks is alone in concluding that the south breach occurred at 5:30 a.m. This was before the storm surge

11

overtopped the floodwall crest elevation and long before dawn or even civil twilight provided light by which any events could have been seen.

For present purposes, it is enough to note that variations in the timing and progression of the various breaches have a differential impact on the contributions of the breaches at different locations in the proposed class area.

## 2.5.    FLOW OF WATER

The flow of flood water creates lateral forces on buildings distinct from the vertical forces associated with inundation. The magnitude of these lateral forces depends on the speed and direction of the flowing water. Thus, lateral forces are largest during the periods of time when flood waters are rising, and not at the time of maximum flood elevation, when the water has stopped rising. The impact of the flowing water on buildings is different from rising water, tending to push the building sideways and damaging vertical surfaces facing the flow. Inundation creates vertical forces on a building and tends to lift the building off its foundation. Whereas the elevation of the flood water at any on time is nearly a constant, the velocity of flow is highly variable over the class area. Factors affecting the velocity of the flood waters include the land roughness, the proximity to breaches (with lateral forces greater in the immediate vicinity of the breaches), and the presence of nearby buildings. Flowing water can also transport debris with can be an additional cause of damage to individual buildings. Thus individual buildings in the class area were subjected to differing degrees of damage caused by flowing water.

## 2.6.    WAVES

The strong winds associated with Hurricane Katrina created storm waves that raised the height of the water, overtopped floodwalls and eroded levees. Waves would also differentially affect buildings in the class area. Once flood and rainwater water inundated a portion of the proposed class area, from whatever source, surface waves would have been generated in these areas and these waves would have increased the height and velocity of the water potentially creating an additional hydrologic cause of damage to buildings that would have varied at different locations. The height of the storm waves depends upon the depth of water, the open water fetch and the wind speed, all of which were changing in the proposed class area throughout the storm period. For the proposed class area the fetch at a site would be the distance from the site to the nearest levee or floodwall in an upwind direction.

To illustrate the variability of the wave heights within the class area a wave hindcast was made for representative wind speeds and fetches. Assuming a water depth above ground of 10 ft , the waves produced by hurricane wind speeds of 65 and 80 mph for various fetches is given in Table 1 based upon the methodology recommended in the Shore Protection Model. (Note that the wave heights for the 80 mph wind vary from 1.1 ft at a fetch distance 500 ft to a wave height of 2.7 ft at a fetch of 400 ft.)

12

Table 1.  Significant wave heights in the class area during Hurricane Katrina for a water depth of 10 ft.

| Fetch | 65 mph | 80 mph |
|-------|--------|--------|
| 500 ft | .85 ft | 1.1 ft |
| 1000 | 1.1 | 1.5 |
| 2000 | 1.6 | 2.0 |
| 4000 | 2.1 | 2.7 |
| 8000 | 2.7 | 3.5 |
| 16000 | 3.3 | 4.0 |

The waves in the proposed class area would have varied throughout the area as the wind speed, wind direction, and the water depths in the class area changed. Furthermore, buildings located near levees and floodwall would have been subjected to much smaller wave heights than buildings further away.  Also, buildings sheltered by other buildings located upwind would have experienced reduced wave action.  Therefore wave action, a hydrologic cause of damage during hurricanes, would have varied greatly throughout the proposed class area.

## 2.7.   SUMMARY OF MULTIPLE CAUSES OF DAMAGE TO BUILDINGS

Based upon the information presented above, it is evident that during Hurricane Katrina buildings in the proposed class area were subjected to numerous hydrologic related causes of damage. The various causes of damage include winds, rainfall, waves, flowing water, rising water, and debris. Flood waters were only one hydrologic factor associated with the storm.

Although the Industrial Canal breaches were among the sources of water, their contribution to the flooding and damage was not uniform or "common" across the class area.  To begin, it is clear that the maximum depth of flooding in the class area was primarily the result of water entering St. Bernard Parish and the Lower Ninth Ward from breaches in the levees along MRGO, and not from the breaches along the Industrial Canal.  Water from the breaches along the Industrial Canal caused high flow velocities near the breaches, but these effects were localized and not uniform.  The Industrial Canal breaches were two separate events with separate consequences which varied by location within the class area.  Water from the breaches contributed to rising water during the initial stages of the flooding, but again their ultimate contribution varied.

## 3. LIMITATIONS OF PLAINTIFF'S FLOOD MODELING

The plaintiffs have provided results concerning the flooding in the class area based upon a computer model, as reported by Mr. Spinks (Spinks, 2008). The particular features of this modeling have been described above. According to the Spinks report, the modeling provides critical information for the evaluation of flood damage as a class based upon the spatial

distribution of the depth of flooding over the class area. These results, plus the damage assessment methodology referenced in Mr. Spinks report, provide the technical information that is said to be needed for evaluation of damage to buildings in the class area (Kilpatrick report). In this section the limitations of the modeling are reviewed for factors that would affect the accuracy and reliability of the results as a basis evaluating the damage to buildings in the proposed class area.

## 3.1.   SOBEK COMPUTER MODEL

The Sobek-1D2D computer model was used to develop the hindcasts of flood elevation and the depth of flooding for the class area. The model is not a hurricane surge forecasting model. Developed by WL-Delft Hydraulics, it is used to compute the flooding associated with flowing water primarily in rivers. The Delft organization has a separate model that is used for hurricane surge forecasting. The U. S. Army Corps of Engineers uses the ADCIRC hurricane surge simulation model, which analyzes flooding over the large area affected by the hurricane (IPET, p IV-5-1). The Corps modeling includes the effects of the hurricane winds and waves on the flooding. The use of a non-hurricane hydrodynamic model to simulate hurricane flooding is unreliable.

## 3.2.   NEGLECTED HYDROLOGIC PROCESSES

The hydrologic processes ignored in the Sobek modeling are listed below. In light of the actual processes involved in the hurricane storm and their effects on property in the class area, these neglected factors limit the accuracy and reliability of the modeling results. The Sobek modeling fails to include the following factors;

1. The amount of water that entered the class area as a result of overtopping of floodwalls and levees by waves.
2. The effect of the surcharged internal water on the initial spreading of floodwaters in the class area.
3. The influence of buildings that would have altered the flow velocity and direction of flood waters.
4. The effect of surface features such as houses and streets in terms of the model elevation and roughness, on flow velocity in the class area (including surface features such as berms that are not included in the input data but that would have affected the channeling of water).
5. The effect of hurricane winds on the water and property in the proposed class area.
6. The amount of water entering the class area as a result of seepage below or through levees or flood control structures.
7. The magnitude and effect of wind generated storm waves on the velocity and height of water.
8. The elevation and types structures in the class area.
9. Surface wind waves.

The hydrologic processes neglected in the modeling create serious limitations on the ability to treat the complexity of impact of Hurricane Katrina on property in the class area and

properly assess the various causes of damage. Not including wave overtopping in the analysis ignores waves as a source of water for flooding, when it clearly was a factor. Neglecting the effects of waves on the velocity and height of water in the class area is a fundamental error. Waves have long been recognized by FEMA as an important cause of damage to buildings. Buildings are important in limiting the flow of flood waters, and also in their ability to redirect and concentrate the flow of flood waters that would affect other buildings. Surface features such as houses and streets control also limit flow by providing friction resistance.

The neglect of hurricane winds in the modeling means that currents in the class area will only be driven by gravity. It also eliminates any ability to assess the effects of hurricane winds on buildings in the class area. Although seepage is a minor source of water in terms of the maximum flooding that occurred, it has been found by at least some investigators to have played an important role in the initial flooding associated with the north breach. Knowledge of the elevation and types of structures in the class area is essential to determining the flood damage, as indicated in Mr. Spinks report and Mr. Kilpatrick's report.

## 3.3.    INACCURATE TIMING OF BREACHES

Mr. Spinks indicates the timing of the IHNC north and south breaches to the floodwall that flooded the Lower Ninth Ward was a major consideration in his study (Spinks, p 16). After reviewing eyewitness reports and the information contained in the IPET, ILIT and Team Louisiana reports, Mr. Spinks presents the timeline of the floodwall breaches his Table 1. Table 1 is reproduced below. The north breach is indicated to start at 4:00 a.m. and the south breach at 5:30 a.m.

**Table 1. Levee Breaches along IHNC and MRGO**

| Location | Description | Type | Failure Width | Before Breach Elevation | After Breach Elevation | Time Breach Start |
|----------|-------------|------|---------------|-------------------------|------------------------|-------------------|
| 1 | IHNC North | I-Wall | 180 ft | 13.1 ft | 1 ft | 4:00 a.m. |
| 2 | IHNC South | I-Wall | 793 ft | 13.1 ft | 1 ft | 5:30 a.m. |
| 3 | MRGO Overtopping / Breach | Levees | Various Sections along MRGO Levee | Varies | Varies | 5:30 a.m. |

Mr. Spinks' timing of the north breach is wrong, or at best not established by the evidence, for several reasons. He incorrectly cites an eyewitness report that is the basis for his early timeline. He says Ms. Johnson reported water in her house when she woke up at 4:15 to 4:45 a.m. In fact Ms. Johnson indicated she woke up about 6:00 a.m. He also incorrectly renders the report of flooding by Mr. Villavasso. He says that Mr. Villavasso heard an explosion and experienced massive flooding after 3:00 a.m. In fact Mr. Villavasso saw water coming over floodwall at 3:00 a.m. He saw the walls tumble and massive amounts of flood water at a later time, as late as

shortly before 5:30 a.m. Mr. Spinks indicates Mr. Terry Adams reported that the carpet in his house was wet when he got up at 5:00 a.m., and he did say this. However, Mr. Adams also said that this time he saw water coming over and under the floodwall at Jordan Avenue and Law Street, the site of the north breach. Based on these statements it appears the wall had not failed at this time.

Mr. Spinks incorrectly describes the results present by IPET concerning the north breach. He quotes a statement that from Volume IV of the IPET report that indicates floodwater began entering the Lower Ninth Ward prior to 5:30 a.m. and possibly as early as 4:30 a.m., and that "These early times suggest that the water entered through one or both of the breaches in the IHNC floodwall". However, it is clear in an early section of the report that no definite conclusion had been reached and that more analysis was needed to clarify the sequencing of the two breaches. Early flooding of the Lower Ninth Ward can just as well be explained as a result of water coming under and over the floodwall at the north breach until as late as about 5:30 a.m. Thus the Spinks timing of the north breach of 4:00 a.m. is not correct or at least not established.

The timing of the south breach used in the Spinks modeling is also incorrect in light of all the evidence. A detailed analysis of the failure of the floodwall at the south breach by IPET indicated it failed because overtopping eroded the soil behind the wall. IPET concluded that overtopping did not start until about 7:00 a.m. and the peak storm surge in the IHNC was not reached until about 9:00 a.m. Therefore all of the investigative teams conclude that the south breach occurred no earlier than 7:00 a.m., about 90 minutes to 2 hours later than Spinks assumed.

The water level conditions specified along the boundary of the model were based upon extrapolations of observed hydrographs. The observed hydrographs in the Industrial Canal – which form a part of Spinks' analysis (Figure 7) should correlate to the actual timing of the breaches in the sense that the breaches themselves would affect the water levels in the Industrial Canal, particularly after a catastrophic failure such as the south breach. The hydrograph referenced by Spinks, however, shows that the water in the Industrial Canal continued to rise -- at the same rate -- for at least two hours after 5:30 a.m. This hydrograph does not reflect any sort of catastrophic breach at or around that time, as is assumed in the Spinks modeling approach. To be valid, the modeling must match the actual timing of the breaches. However, as indicated above, the timing of the breaches along the Industrial Canal used in the modeling have no support in the data sources. None of the available analyses place the northern breach as early as 4:00 a.m. on the 29th. Also, none place the southern breach as early as 5:30 a.m. Those breach times are inconsistent with the surge hydrograph observations referenced by Spinks in his report.

## 3.4.   INACCURACY OF CALIBRATION

The accuracy and reliability of the modeling also depends upon the degree to which the model is calibrated. Calibration involves comparing model predictions with observations to assess the success of the model. No direct measurements of the time history of the elevation of flood waters are available for the area modeled. The time history data that do exist are indirect and subjective indications of flooding; stopped clocks and eyewitness observations. These data

16

are compared with the model predictions in Figure 9 of the Spinks report. As shown in the Figure, at sites C1 and C2 differences between the data and the predictions of up to 2.5 feet occur during the early flooding. At the low level of flooding occurring at this time, this represents and error of about 25 %.

A second comparison of data and model predictions is shown in Figure 11 of the report. The data shown are high water marks. Comparing the data and the modeling results shows the model predictions to be consistently too high. For the class area, made up of Areas 1 and 2 in the Figure, the predictions are generally about 2 ft too high. This consistent overprediction of flood depths, when compared to measured levels, is particularly egregious because the measured levels will also take into account wave-driven water that is not included in the model. Where waves were involved in establishing the observed high water marks, the variance between modeled results and actual results would be even more severe.

3.5.    UNRELIABILITY OF MODELING RESULTS

Given the neglect of several essential hydrologic processes, the large error contained in the timing of the north and south breaches, and the large errors contained in the calibration, the modeling results provide by Spinks are not a reliable or accurate basis for assessing source or extent of the flooding or damage to buildings in the class area caused by Hurricane Katrina.

## 4.  ANALYSIS OF CLASS HYDROLOGIC ISSUES

The existing data, official governmental reports and modeling indicate that properties in the class area were subjected to a variety of hydrologic processes that varied in time during the storm, and, at any one time, varied over the class area. Thus each building in the class area was subjected to a distinct combination of storm winds, rainfall, waves, rising water, flowing water and debris, and maximum flood depth. These separate factors each had an effect on individual buildings that depended upon the location of the building within the class area, its proximity to the various sources of flooding, the local land cover, local drainage, flow paths of water surrounding the building, and the initial elevation of the building.

This section of the report provides a detailed analysis of the hydrologic issues pertaining to the proposed class area.

4.1.    BUILDING DAMAGE CAUSED BY FLOODING

Plaintiffs assert that property damage in the class area resulted from flooding caused by breaches in the Industrial Canal (Plaintiffs' Motion, 2008, p 2). This is incorrect. A careful examination of the impact of the Hurricane Katrina on the class area shows that buildings were subject to a variety of storm related factors including winds, rainfall and waves. Winds and rainfall affected the buildings in the class area for hours before any flooding occurred. Wind

17

speeds were of hurricane force before 7:00 AM on the 29th. This is before any significant flooding occurred in the class area. By 9:00 AM on the 29th, before many locations in the class area would have had appreciable flooding, all the buildings in the class would have been subjected to hours of hurricane wind forces. Several residents reported wind damage occurring during the hurricane (Offray, p 73 & 74; Reed, p 20; Jones, p 23; Berryhill, p 37; Mumford, p 89, 90 & 100; Koch, p 126-134 & 149-150; Richardson, p 19, 80 & 135; Harris, p 79).

Rainfall fell onto the wind affected buildings for hours before breaches occurred. This rainfall would have had damaging effects on buildings already damaged by winds. Testimony by class representatives provides examples of this phenomenon (Reed, p 19; Riche, p 86 & 87; Mumford, p 89 & 90).

Storm waves generated within the class area by the storm winds existed and caused lateral force on buildings. These forces would have affected the buildings at a height above the still water elevation at any one location and time.

Flowing water in the class area would affect buildings by causing lateral forces. The flow velocity and forces on a building would be highest near the north and south breaches and would decrease with distance away from the breaches. Water flow would also be concentrated and accelerated by the presence of presence of other buildings surrounding the building. The forces associated with flowing water would occur during the rising of the flood waters, before the maximum flooding occurred. Debris carried by the flowing water would have added to the effect of the flowing water. Again, several eyewitness reported the sideways movement of floating buildings and the presence and effects of floating debris on buildings in the class area (Sartin, p 54 & 55; Adams, p 26 & 29; Villavasso, p 59 & 68; Johnson, p 45, 46 & 52; Jones, p 29 & 30; Williams, p 57-60 & 74-75; Murph, p 49, 64, & 149; Berryhill, p 37; Pounds, p 31, 48, 49, 55 & 116; Harris, p 84).

There were, moreover, multiple sources of flooding, including not only the separate north and south breaches along the Industrial Canal, but also the MRGO breaches, overtopping and seepage, and other sources detailed in the IPET, ILIT, and Team Louisiana reports.

Given the documented occurrence of multiple storm related factors affecting the class area it is clear that flood waters were not the only factor affecting buildings in the class area and that flood damage was not the common cause of damage.

4.2.    FLOODING CAUSED BY BREACHES IN INDUSTRIAL CANAL FLOODWALLS

Plaintiffs assert that damage from Hurricane Katrina and levee failures provide common elements across the class in terms of the types of damage and causes of damage (Kilpatrick Affidavit, p3). Plaintiffs also identify as common the effects of breach related flooding in the affected area (Kilpatrick Affidavit, p3).

The major sources of water that flooded the class area is from breaches along the MRGO and not the breaches in the Industrial Canal floodwalls. In other words, the maximum elevation reached by the flood waters would have been essentially the same as was observed if the Industrial Canal Breaches would not have occurred. The flooding related to the breaches in the Industrial Canal caused some initial flooding in portions of the class area (though much less than Mr. Spinks generates by choosing unsupported early times for the Industrial Canal breaches). But by 10:00 AM the class area was inundated by water from the breaches in the MRGO levees and water continued to rise for several more hours. Maximum water elevation was reached sometime after noon on the 29th .

Plaintiffs' contention that flooding resulting from Industrial Canal breaches was a common effect also fails to acknowledge that the breaches were two separate events. The consensus is that north breach preceded the south breach by several hours. Furthermore there is evidence that the breaches were caused by different mechanisms. Also, the different sizes and locations of the breaches would have had different and distinct hydrologic effects on the buildings in the class area.

Taken together these facts indicate the Industrial Canal breaches were not identical in their character nor did they have a common effect on the flooding and buildings in the class area. The Spinks model fails to take the separate breaches into account, and fails to allow for separate consideration of the contribution of each of the two breaches. This failure constitutes another reason why the model cannot possibly assess property damage on a "common" basis across the proposed class.

## 4.3.   DEPTH OF FLOODING

A key element in the argument for class treatment of the damage occurring in St. Bernard Parish and the Lower Ninth Ward was the availability of maps that purport to show the extent of the flooding that was the chief cause of the damages (Kilpatrick Affidavit, p12). These maps are not specified, but if they are of similar character to the maps provided by Spinks, they portray flood depth above ground. The depth above ground is the difference between the water elevation and the ground elevation. Both of these elevations are subject to large errors associated with the topographic data used in the model and the inaccuracy of the flood elevation hindcasts. The flood depth is not common or uniform over the class area, nor does it represent the various causes of damage affecting buildings in the class area. Flood depth over ground does not account for the damage associated with winds, rainfall, waves and flowing water. And the greatest depth of flooding over ground level is the result of the breaches along MRGO, which were responsible for the maximum depth of water.

In light of the evidence it is clear that the depth of water above ground is not related to all of the damage caused by Hurricane Katrina to the buildings in the class area and the values provided by modeling are subject to large errors.

19

## 4.4.    HYDROLOGIC DAMAGE CRITERIA

A major discrepancy is contained in the plaintiff expert reports regarding the relationship between flooding and property damage. Mr. Kilpatrick states that the depth of flooding of the class has been mapped and provides evidence relevant to determining the extent and cause of damages (Kilpatrick Affidavit, p5). He also cites a Corps of Engineers report as a rationale for area wide evaluations of flood damage based upon depths of flooding (Kilpatrick Affidavit, p6).

The maps provided by Mr. Spinks show the temporal and spatial variations in the flooding in the class area. The parameter provided by Mr. Spinks is the depth of flooding over ground. Variations in this value over the class are provided. Also provided by Mr. Spinks are tables and graphs relating the water depth at a building to the percent damage for 2 different types of buildings; one story and two stories. He indicates, for reference purposes, that damage estimates for homes and businesses in the class can be ascertained using depth damage curves provided by the U. S. Army Corps of Engineers in a 2003 report.

The tables referred to by plaintiffs that relate the water depth and damage are not useable with the data provided by Mr. Spinks nor are they the correct information to be used for hurricane flooding. The depth specified in the Corps report and needed to use the graphs is the depth of flooding over first floor of the building. This definition of the flood depth is indicated in the Spinks report. This depth value is not the same as the depth of water over ground. In order to use the referenced tables, the elevation of the first floor of a particular building would be required. Thus the damage assessment referenced is by its essential feature, building specific, and would require the elevations of the first floor of each building to be assessed for damage.

In a discussion with Mr. David Moser, Chief Economist with the Corps Institute of Water Resources, he indicated the data referenced in the Spinks report was not appropriate for salt water flooding of long duration. The methodology used by the U. S. Army corps of Engineers for calculating flood damage for Hurricane Katrina was also based upon the depth of flooding above the first floor of the building (IPET, pVII-23). Damages from flooding were calculated based upon depth-damage relationships developed by a panel of building and construction experts that related to salt water flooding with a duration greater than 2 days (IPET, p VII-23).

Based upon the methodology referenced by the plaintiff, the proper depth of flooding, i.e. the depth over the first floor, has not been mapped and therefore the referenced methodology does not provide a basis for class area evaluations. Rather the methodology for assessing flood damage is properly based upon the first floor elevation of each individual building being evaluated.

## 5.  SUMMARY OF CONCLUSIONS

Based upon a careful review of existing technical data, reported field observations, the application of standard hydrologic analytical methods, and my personal experience analyzing coastal hydrologic and flooding processes for over 30 years, it is my opinion that:

1) The proposed class area was subjected to a wide variety of storm related processes during Hurricane Katrina including winds, rainfall, waves, and flood water that varied with location and time. The effect of these hydrologic processes on individual buildings in the class area depended upon their proximity to levees and floodwalls, the ground elevation, time during the storm, the rate of rise of water, the velocity of flow, and the maximum elevation of the flood waters.

2) Flood waters were not the only factor affecting buildings in the class area and flood damage was not the common cause of damage to buildings.

3) The north and south breaches on the Industrial Canal breaches were not the primary cause of flooding in the class area nor did they have a common hydrologic effect on the buildings in the class area. The effect of these two breaches, vis-à-vis each other and as compared with the other breaches and sources of water that affected the class area, cannot be evaluated on a common basis across the proposed class.

4) The depth of flood water above ground is not related to many of the causes of damage to buildings in the class area during Hurricane Katrina and it not an adequate hydrologic basis for assessing hydrologic damage to property.

5) Modeling of the depth of the depth of the flood water in the class area was subject to large errors and provided unreliable results.

6) The relationship between flood depth and damage referenced by plaintiff is based upon the depth of flooding above the first floor of the building, and not the depth of water over ground, hence the data needed to assess flood damage has not been mapped.

7) The hydrologic causes of damage to individual buildings in the class area, especially the depth of flooding over the first floor, were site specific, and therefore there was no uniformity or commonality to the causes of flood damage to buildings throughout the class area.

8) I reserve the right to modify my conclusions in the case that new or additional information becomes available in the future.

## 6. REFERENCES

LEGAL DOCUMENTS

Plaintiff's Motion to certify the Class and Subclasses, to appoint class council, and to approve Plaintiff's Proposed Trial Plan, Document 13166, Filed 5/15/2008.

Class Action Complaint, Document 1, Filed 11/14/2005.

Depositions

Andrew Sartin, deposition on April 11, 2008.

Arthur T. Murph, deposition on December 17, 2007.

D'Antoinette Marie Jiohnson, deposition on December 11, 2007.

Daketa Johnson, deposition on April 9, 2008.

Ernest Joseph Offray, deposition on February 19, 2008.

Ethel Mae Coleman Mumford, deposition on August 5, 2008.

Herman Koch, deposition on August 8, 2008.

James R. Reed, deposition on February 28, 2008.

Jimmie Donnell Harris, deposition on August 4, 2008.

Josephine Richardson, deposition August 11, 2008.

Kendrick Ray Pounds, December 11, 2007.

Michael Joseph Riche, deposition on August 6, 2008.

Sally Ann Sheppard Susan Oster Jones, deposition on April 2, 2008.

Sidney Williams, deposition on February 19, 2008.

Terry Mark Adams, deposition on November 13, 2006.

William Joseph Villavasso, deposition on December 18, 2007.

TECHNICAL REPORTS AND DATA

Coastal Engineering Research Center, Shore Protection Manual, Volume I, Department of the Army, 1984.

Google maps website for spatial information

Independent Levee Investigation Team, Investigation of the Performance of the New Orleans Flood Protection Systems, Final Report, July 31, 2006.

Knabb, R., J. Rhome and D. Brown, Tropical Cyclone Report – Hurricane Katrina 23-30 Au8gust 2005, National Hurricane Center, 20 December 2005.

Kok, M., M. Aalberts, B. Maaskant, and L. De Wit, Polder Flood Simulations for Greater New Orleans, Delft University of Technology, July 30, 2007

Team Louisiana, The Failure of the New Orleans Levee System during Hurricane Katrina, Report to Secretary Johnny Bradberry, La. Dept. of Transportation and Development, December 18, 2006.

U. S. Army Corps of Engineers, Performance Evaluation of the New Orleans and Southeast Louisiana, Hurricane Protection System, Vol. IV – The Storm, March 26, 2007.

U. S. Army Corps of Engineers, Performance Evaluation of the New Orleans and Southeast Louisiana, Hurricane Protection System, Vol. V – The Performance – Levees and Floodwalls, June 1, 2006.

U. S. Army Corps of Engineers, Performance Evaluation of the New Orleans and Southeast Louisiana, Hurricane Protection System, Vol. VI – The Performance – Interior Drainage and Pumping, March 26, 2007.

U. S. Army Corps of Engineers, Performance Evaluation of the New Orleans and Southeast Louisiana, Hurricane Protection System, Vol. VII – The Consequences, March 26, 2007.

U. S. Naval Observatory, Sun and Moon Data for One Day, August 29, 2005.

Wooten, R. Lee, Sources of Water in the St. Bernard and New Orleans East Basins During Hurricane Katrina, Document 8286-17, GEI Consultants, August 29, 2007.

# 7. APPENDIX

## 7.1. PROFESSIONAL QUALIFICATIONS AND PUBLICATIONS

Professional Qualifications

Resume is attached to this report.

List of publications in the past 10 years

Suhayda, J. N. Barrier shoreline feasibility study, Phase 1, Steps A-K and Final Report, Louisiana Department of Natural Resources, March, 1999.

Suhayda, J. N., M. Alawady, and V. Aravamuthan.  Hydrologic modeling of the Barataria-Terrebonne estuary, Barataria-Terrebonne National Estuaries Program, July, 2000.

Suhayda, J. N. and C. Willson.  Climatological and hydrologic conditions and trends in the upper Pontchartrain basin, Lake Pontchartrain Basin Foundation, August , 2000.

Suhayda, J. N., et al, Wetland Nourishment Module, Louisiana Coastal Area Study, Department of Natural Resources, State of Louisiana, August, 2003.

Suhayda, J. N., et al, Predicting Land Building in the Mississippi Delta, Louisiana Coastal Area Project, Department of Natural Resources, State of Louisiana, June 30, 2004.

Suhayda, J.N., et al, The Direct Impact of the MRGO on Hurricane Storm Surge, URS Report to the La. Department of Natural Resources, February 2006.

Suhayda, J. N., et al, Interaction of Hurricanes and Coastal Landscape features, URS report to the U. S. Army Corps of Engineers, August 7, 2007.

## 7.2. EXPERT TESTIMONY AND DEPOSITIONS DURING THE LAST FOUR YEARS

I was an expert for the defendant in the case of Harry Bourg Corp. v. Exxon Mobil Corp., et al. I was deposed on June 7, 2005.

I was an expert for the defendant in the case of the Harvey Term Litigation, Civil District Court for the Parish of Orleans No. 01-8708.  I was deposed in 2005. I did not testify

I was an expert in the case of 4 C's v. Columbia Gulf.  I was deposed on August 27, 2006

I was an expert in the case of Turner, et al, vs. Murphy Oil USA, Inc. I was deposed in 2006.

24

## 7.3. COMPENSATION

Compensation was based upon an hourly rate of $ 300/hr.

25

# 8. FIGURES



26

Figure 1.  Shows the ground elevation in the region bounded by the St. Bernard hurricane protection system.





Regional Area

Figure 2. Shows detailed ground elevation in the proposed class area.





Local Area Detail



Figure 3. Shows ground elevation along sections A-A' and B-B'. Section locations are indicated in Figure 2.



# APPENDIX 2

PROFESSIONAL QUALIFICATIONS AND PUBLICATIONS

Professional Qualifications

Resume is attached to this report.

List of publications in the past 10 years

Suhayda, J. N. Barrier shoreline feasibility study, Phase 1, Steps A-K and Final Report, Louisiana Department of Natural Resources, March, 1999.

Suhayda, J. N., M. Alawady, and V. Aravamuthan.  Hydrologic modeling of the Barataria-Terrebonne estuary, Barataria-Terrebonne National Estuaries Program, July, 2000.

Suhayda, J. N. and C. Willson.  Climatological and hydrologic conditions and trends in the upper Pontchartrain basin, Lake Pontchartrain Basin Foundation, August, 2000.

Suhayda, J. N., et al, Wetland Nourishment Module, Louisiana Coastal Area Study, Department of Natural Resources, State of Louisiana, August, 2003.

Suhayda, J. N., et al, Predicting Land Building in the Mississippi Delta, Louisiana Coastal Area Project, Department of Natural Resources, State of Louisiana, June 30, 2004.

Suhayda, J.N., et al, The Direct Impact of the MRGO on Hurricane Storm Surge, URS Report to the La. Department of Natural Resources, February 2006.

Suhayda, J. N., et al, Interaction of Hurricanes and Coastal Landscape features, URS report to the U. S. Army Corps of Engineers, August 7, 2007.

Suhayda, J.N., et al, USACE/FEMA Southeast Louisiana Joint Surge Study, Independent Technical Review, Report to U. S. Army Corps of Engineers, October 15, 2007.

Suhayda, J.N., et al, Computation of Storm Surge using Two 50 Year Future Projections of the Coastal Louisiana Landscape, Louisiana Coastal Area Project, Department of Natural Resources, State of Louisiana, June 2008.

Suhayda, J.N., et al, City of Morgan City, Appeal of FEMA's 2008 Preliminary DFIRMS, Shaw E&I report to Federal Emergency Management Agency, February 2009.

EXPERT TESTIMONY AND DEPOSITIONS DURING THE LAST FOUR YEARS

I was an expert for the defendant in the case of Harry Bourg Corp. v. Exxon Mobil Corp., et al. I was deposed on June 7, 2005. I did not testify.

I was an expert for the defendant in the case of the Harvey Term Litigation, Civil District Court for the Parish of Orleans No. 01-8708.  I was deposed in 2005. I did not testify

I was an expert in the case of 4 C's v. Columbia Gulf.  I was deposed on August 27, 2006. I did not testify.

I was an expert in the case of Turner, et al, vs. Murphy Oil USA, Inc. I was deposed in 2006. I did not testify.

COMPENSATION

Compensation was based upon an hourly rate of $ 300/hr.

**RESUME**

**PERSONAL DATA**                                                                April 1, 2009

Name:      Joseph Nicholas Suhayda
Born:      February 23, 1944
           Flint, Michigan
Marital Status:   Married, 2 children
Address:          285 Sunset Blvd.
                  Baton Rouge, LA 70808
                  (225) 766-1460

**EDUCATION**

California State University, Northridge, California, 1966, B.S. (Physics), cum laude
University of California, San Diego, Scripps Institution of Oceanography, La Jolla, California, 1972, Ph.D.
(Physical Oceanography)

**EXPERIENCE**

|          |          |
|----------|----------|
| 1966 -1971 | Graduate Research Assistant, Scripps Institution of Oceanography |
| 1971 - 1975 | Asst. Professor, Coastal Studies Institute, LSU |
| 1975 - 1978 | Assoc. Professor, Coastal Studies Institute, LSU |
| 1978 - 1985 | Associate Professor, Department of Civil Engineering, LSU |
| 1985- 1986 | Associate Professor, Research, Ports and Waterways Institute, LSU |
| 1986 - 2002 | Associate Professor, Department of Civil Engineering, LSU |
| 1995-1998 | Associate Director, Louisiana Water Resources Research Institute, LSU |
| 1995-1998 | Director, Natural Systems Engineering Laboratory, LSU |
| 1995-1999 | Senior Project Engineer, Hydraulics and Hydrology Branch, New Orleans District, U. S. Army Corps of Engineers (part time) |
| 1999 - 2002 | Director, Louisiana Water Resources Research Institute, LSU |
| 2002 | Retired from Louisiana State University |
| 1976 - present | Coastal Oceanographic Consultant |
| 2005 - 2007 | Coastal Oceanographer, URS Corp., Baton Rouge, LA |
| 2007 - 2008 | Coastal Oceanographer, Taylor Engineering, Baton Rouge, LA |
| 2008 - 2009 | Asst. Director, CLEAR, Louisiana State University |
| 2009 - Present | Interim Director, Hurricane Center, Louisiana State University |

**HONORS AND AWARDS**

Bachelor of Science Degree, Physics, Cum Laude, 1966
Best Paper Award, 2nd Place, Gulf Coast Association of Geological Societies, 1974
Sigma Xi
Who is Who in the South and Southwest, Marques Who's Who, Inc., 16th Edition, 1979
Who's Who in Technology Today, J. Dick & Company, 3rd Edition, 1981
American Men and Women of Science, Bowker Co., 17th Edition, 1989
Teacher of the Year, Dept. of Civil Engineering, LSU, 1993
Coastal Stewardship Award, Coalition to Restore Coastal Louisiana, 2008.

**TEACHING ACTIVITIES**

Courses Taught

MrSc 4170 - Physical Oceanography
MrSc 7122 - Gravity Waves in Shallow Water
MrSc 7123 - Shore Dynamics

MrSc 8000 - Thesis Research
MrSc 8900 - Advanced Reading
C.E. 2200 - Fluid Mechanics
C.E. 2250 - Hydraulics Laboratory
C.E. 2450 - Statics
C.E. 3200 - Hydraulics
C.E. 3300 - Geotechnical Engineering
C.E. 4320 - Coastal Engineering
C.E. 4780 - Special Topics in Civil Engineering (Marine Geotechnics)
C.E. 7325 - Marine Geotechnology
C.E. 7700 - Special Topics in Civil Engineering (Marine Geotechnics)
C.E. 7700 - Special Topics in Civil Engineering (Gravity Waves)
C.E. 7700 - Special Topics in Civil Engineering (Sediment Transport)
C.E. 8000 - Thesis Research
C.E. 9000 - Dissertation Research

New Courses Developed

MrSc 7122 - Gravity Waves in Shallow Water
C.E. 4320 - Coastal Engineering
C.E. 7325 - Marine Geotechnics

Continuing Education
Geotechnical and Geo-Acoustic Properties of Marine Sediments, U.S. Naval Oceanographic Office, 1982.
Professional Development Hours Courses – Baton Rouge Chapter of the ASCE, La Dept. of Natural Resources

Graduate Student Supervision

| Student Name | Dept. | Degree | Date Received | Committee |
|---|---|---|---|---|
| Hart, William | MrSc | Ph.D. | 1976 | Member |
| Tubman, Michael | MrSc | M.S. | 1978 | Chair |
| Pettigrew, Neal | MrSc | M.S. | 1978 | Chair |
| Wells, John | MrSc | Ph.D. | 1978 | Member |
| White, Mary | MrSc | M.S. | 1978 | Chair |
| Goyert, Craig | MrSc | Ph.D. | 1978 | Member |
| Conlon, Dennis | MrSc | Ph.D. | 1979 | Member |
| Johnston, Steve | MrSc | M.S. | 1979 | Member |
| Pamukcu, Sibel | CE | M.S. | 1981 | Chair |
| Nikaktar, Behnam | CE | M.S. | 1981 | Chair |
| Naghavi, Babak | CE | M.S. | 1982 | Member |
| Wegener, Kevin | CE | M.S. | 1982 | Member |
| Eisenberg, Susan | CE | M.S. | 1982 | Member |
| Alston, Sarah | CE | M.E. | 1982 | Member |
| Jones, Lynn | CE | M.E. | 1982 | Member |
| Madden, Mary | CE | M.E. | 1982 | Member |
| Holtman, Steven | CE | M.E. | 1982 | Member |
| Van Olst, Robert | CE | M.E. | 1982 | Member |
| Thomas, Calvin | CE | M.S. | 1983 | Member |
| Smith, Don | MrSc | M.S. | 1984 | Chair |
| Mastin, Gary | EE | Ph.D. | 1983 | Member |
| Pamukcu, Sibel | CE | Ph.D. | 1985 | Chair |
| Mansoor, Alkazim | CE | M.S. | 1985 | Chair |
| Mericas, Dean | CE | Ph.D. | 1986 | Member |
| Sonnefeld, Dave | GEOL | M.S. | 1985 | Member |
| MacGregor, Keith | AgEng | Ph.D. | 1985 | Member |
| Shim, Taebo | MrSc | Ph.D. | 1985 | Member |

| Eversull, Andrew | CE | M.E. | 1985 | Member |
|---|---|---|---|---|
| Lugo, Alexis | MrSc | Ph.D. | 1987 | Member |
| Severs, Tom | CE | M.S. | 1986 | Member |
| Chan, Adrian | CE | Ph.D. | 1989 | Member |
| Barbe, Donald | CE | Ph.D. | 1990 | Member |
| deLima, Dario | CE | Ph.D. | 1990 | Member |
| Sarieddine, H. | CE | M.S. | 1988 | Member |
| Kim, Sungeon | CSC | M.S. | 1988 | Chair |
| Chen, Yie Ruey | CE | M.S. | 1990 | Member |
| Guidry, Bryan | CE | M.S. | 1990 | Chair |
| Aravamuthan, V. | CE | Ph.D. | 1994 | Chair |
| Susanto, Dwi | ES | M.S. | 1992 | Chair |
| Bhattaru, Krishna | ES | M.S. | 1993 | Chair |
| Zhang, Zhongjie | CE | Ph.D. | 1994 | Member |
| Naveen, Chandra | CE | M.S. | 1994 | Chair |
| White, Mary | DOCS | Ph.D. | 1996 | Member |
| Zhang, Qi | ES | M.S. | 1998 | Chair |
| Liao, Bingxuan | ES | M.S. | 1997 | Chair |
| Brevil, Sylvie | ES | M.S. | 1994 | Chair |
| Knecher, Gerald | Geol | Ph.D. | 1994 | Member |
| Cherukuri, Raj | Geog | M.S. | 1994 | Member |
| Blahnik, Ted | MrSc | M.S. | 1997 | Member |
| Voisin-Bender, Cathy | ES | Ph.D. | 1997 | Chair |
| Mashriqui, Hassan | CEE | Ph. D. | 2003 | Chair |
| Martin, Jay | MrSc | Ph.D. | 2000 | Member |
| Capps, Steve | CEE | M.S. | 2001 | Member |
| Inniss, Lorna | DOCS | Ph. D. | 2002 | Member |

**Titles of Student Theses and Dissertations Completed**

| Title | Type | Date |
|---|---|---|
| Tubman, M.,  The Interaction of Surface Waves and a Linear Viscoelastic Sea Floor | M.S. Thesis | Aug., 1978 |
| Pettigrew, N., Infragravity Waves in the Nearshore Zone | M.S. Thesis | June, 1978 |
| White,M., Analysis of Island Wave Shadows | M.S. Thesis | Dec., 1977 |
| Pamukcu, S., Classification of Bottom Sediments Using a Dynamic Penetrometer | M.S. Thesis | Dec., 1982 |
| Nikaktar, B., Viscoelastic Properties of Marine Sediments | M.S. Thesis | Dec., 1982 |
| Mansoor, A., Classification of Marine Sediments using an Instrumented Dynamic Penetrometer | M.S. Thesis | June, 1985 |
| Pamukcu, S., Low Strain Shear Measurements of Soft Sediments Using Triaxial Vane | Ph.D. Disst. | June, 1986 |
| Guidry, B., Use of the Piezocone Penetrometer in Estimating Future Land Subsidence | M.S. Thesis | May, 1988 |
| Kim, S., Prediction of Flooding on Louisiana Coast | M. S. Thesis | June, 1989 |

| | | |
|---|---|---|
| Susanto, D., Hurricane Coastal Flooding Simulation Model in Louisiana Using Geographic Information System | M.S. Thesis | May, 1992 |
| Bhattaru, K., Modeling Subsidence Note of Louisiana Coast Using In-situ Soil Testing Methods | M.S. Thesis | Aug., 1994 |
| Naveen, C., Effect of Cementation on Consolidation Properties of Clay | M.S. Thesis | Dec., 1994 |
| Zhang, Q., On the Mechanisms of Submarine Slope Instability on the Modern Huang He (Yellow River) Delta, China | M. S. Thesis | Aug., 1993 |
| Brevil, S., Wave Damping over Cohesive Sediment Beds in Wetlands | M. S. Thesis | Dec., 1994 |
| Aravamuthan, V., A Two Dimensional Vertically Integrated Moving Boundary Hydrodynamic Model in Curvilinear Coordinates. | Ph. D. Disst. | Dec., 1994 |
| Voisin, C. F., Coastal Restoration Using Pipeline Conveyed Sediments | Ph. D. Disst. | Dec., 1997 |
| Liao, B., Numerical Modeling of Shallow-Water Wave Interaction with Coastal structures | M. S. Thesis | Dec., 1997 |
| Mashriqui, H., Modeling of Atchafalaya Delta | Ph. D. Disst. | June, 2003 |

## RESEARCH ACTIVITIES

Patents

#5,178,489 Hydrodynamic Control System

Contracts

1.     a.     Title and Sponsor:  "Coastal Dynamics," Office of Naval Research
          b.     Duration:  7 years, 1972-79
          c.     Co-principal Investigators & Collaborators:  Dr. James M. Coleman
          d.     Funding Level:  $300,000

2     a.     Title and Sponsor:  "Mass Movement of Submarine Sediments, Mississippi Delta," U.S. Geological Survey
          b.     Duration:  4 years, 1975-79
          c.     Co-principal Investigators & Collaborators:  Dr. James M. Coleman and Dr. Thomas Whelan
          d.     Funding Level:  $120,000

3.     a.     Title and Sponsor:  "Prediction of Surf Zone Characteristics," Office of Naval Research
          b.     Duration: 1 year, 1979-80
          c.     Co-principal Investigators & Collaborators:  None
          d.     Funding Level:  $l8,191

4.     a.     <u>Title and Sponsor</u>:  "Image Processing Equipment," National Science Foundation
        b.     <u>Duration</u>: 1 year, 1979-80
        c.     <u>Co-principal Investigators & Collaborators</u>:  Dr. Charles Harlow, Dr. Charles Whitehurst and Dr. Jack Hill
        d.     <u>Funding Level</u>:  $23,228

5.     a.     <u>Title and Sponsor</u>:  "Drift Under Waves and Winds," Office of Naval Research
        b.     <u>Duration</u>:  2 years, 1979-8l
        c.     <u>Co-principal Investigators & Collaborators</u>:  None
        d.     <u>Funding Level</u>:  $4l,000

6.     a.     <u>Title and Sponsor</u>:  "Advanced Studies in Pollution Detecting," Environmental Protection Agency
        b.     <u>Duration</u>: 1 year, 1980-8l
        c.     <u>Co-principal Investigators & Collaborators</u>:  Dr. Marty E. Tittlebaum
        d.     <u>Funding Level</u>:  $150,000

7.     a.     <u>Title and Sponsor</u>:  "Dynamic Properties of Marine Sediments," Office of Naval Research
        b.     <u>Duration</u>:  Continuing, 1980-8l
        c.     <u>Co-principal Investigators & Collaborator</u>:  Dr. M. T. Tumay
        d.     <u>Funding Level</u>:  $l07,74l

8.     a.     <u>Title and Sponsor</u>:  "Classification of Bottom Sediments Using an Instrumented Penetrometer," U.S. Naval and Oceanographic Office
        b.     <u>Duration</u>:  12 months, 198l-82
        c.     <u>Co-principal Investigators & Collaborators</u>:  None
        d.     <u>Funding Level</u>:  $45,000

9.     a.     <u>Title and Sponsor</u>:  "Core Analysis," U.S. Naval Oceanographic Office
        b.     <u>Duration</u>:  6 months, 1983
        c.     <u>Co-principal Investigators & Collaborators</u>:  None
        d.     <u>Funding Level</u>:  $9,300

l0.     a.     <u>Title and Sponsor</u>:  "Hurricane Flooding Prediction," Cameron Parish Police Jury
        b.     <u>Duration</u>:  12 months, 1984-85
        c.     <u>Co-principal Investigators & Collaborators</u>:  None
        d.     <u>Funding Level</u>:  $7l,500

11.     a.     <u>Title and Sponsor</u>:  "Maritime Support Group, Port Capital Outlay Evaluation," Louisiana State Legislature
        b.     <u>Duration</u>:  12 months 1985-86
        c.     <u>Co-principal Investigators & Collaborators</u>:  V. Behrhorst and A. Ashar
        d.     <u>Funding Level</u>:  $50,000

12.     a.     <u>Title and Sponsor</u>:  "Outer Continental Shelf Development and Potential Habitat Alteration, Task 9 - Subsidence," Minerals Management Service
        b.     <u>Duration</u>:  27 months, 1985-86
        c.     <u>Co-principal Investigators & Collaborators</u>:  None
        d.     <u>Funding Level</u>:  $34,245

13.     a.     <u>Title and Sponsor</u>:  "Mud Underflow Dynamics Study, Huang He Delta, Gulf of Bo Hai, China," Office of Naval Research

6

    b.    <u>Duration</u>:  24 months, 1986-87
    c.    <u>Co-principal Investigators & Collaborators</u>:  Dr. D. Prior and Dr. W. Wiseman
    d.    <u>Funding Level</u>:  $400,000

14.    a.    <u>Title and Sponsor</u>:  "Estimation of Maintenance Dredging, South Pass Bulk Terminal," Louisiana State Department of Transportation
    b.    <u>Duration</u>:  4 months, 1986-87
    c.    <u>Co-principal Investigators & Collaborators</u>:  Dr. C. Adams
    d.    <u>Funding Level</u>:  $45,200

15.    a.    <u>Title and Sponsor</u>:  "Master Plan for Port of Iberia," Port of Iberia
    b.    <u>Duration</u>:  6 months, 1987
    c.    <u>Co-principal Investigators & Collaborators</u>:  Jan Andreassen
    d.    <u>Funding Level</u>:  $55,000

16.    a.    <u>Title and Sponsor</u>:  "Modification - Sea Level and Subsidence," Mineral Management Service
    b.    <u>Duration</u>:  10 months, 1987
    c.    <u>Co-principal Investigators & Collaborators</u>:  None
    d.    <u>Funding Level</u>:  $12,485

17.    a.    <u>Title and Sponsor</u>:  "Mud Underflow Dynamics Study, Huang He Delta, Gulf of Bo Hai, China," Office of Naval Research
    b.    <u>Duration</u>:  12 months, 1988-89 (continuation)
    c.    <u>Co-principal Investigators & Collaborators</u>:  Dr. D. Prior and Dr. W. Wiseman
    d.    <u>Funding Level</u>:  $80,000

18.    a.    <u>Title and Sponsor</u>:  "Marsh Deterioration," U.S. Geological Survey
    b.    <u>Duration</u>:  60 months, 1988-93
    c.    <u>Co-principal Investigators & Collaborators</u>:  Dr. Harry Roberts
    d.    <u>Funding Level</u>:  $489,656

19.    a.    <u>Title and Sponsor</u>:  "Morphostratigraphic Framework and Processes of Subsidence," U.S. Geological Survey
    b.    <u>Duration</u>:  60 months, 1988-93
    c.    <u>Co-principal Investigators & Collaborators</u>:  Dr. Harry Roberts
    d.    <u>Funding Level</u>:  $912,390

20.    a.    <u>Title and Sponsor</u>:  "Master Plan for Port of Natchitoches," Natchitoches Port Commission
    b.    <u>Duration</u>:  12 months, 1988-89
    c.    <u>Co-principal Investigators & Collaborators</u>:  Dr. Vernon Behrhorst
    d.    <u>Funding Level</u>:  $40,000

21.    a.    <u>Title and Sponsor</u>:  "Water Level Statistics for Design of Transportation Facilities in Coastal Louisiana," Louisiana Transportation Research Center
    b.    <u>Duration</u>:  24 months, 1990-92
    c.    <u>Co-principal Investigator</u>:  Dr. M. Alawady
    d.    <u>Funding Level</u>:  $123,000

22.    a.    <u>Title and Sponsor</u>:  "Hydrologic Model of the Barataria-Terrebonne Estuary," National Estuaries Program, EPA

        b.      <u>Duration</u>:  36 months, 1992-95
        c.      <u>Co-principal Investigator</u>:  Dr. M. Alawady
        d.      <u>Funding Level</u>:  $357,000

23.      a.      <u>Title and Sponsor</u>:  "Erodability of Cohesive Sediments in Wetlands," U.S. Army Corps of Engineers
        b.      <u>Duration</u>:  36 months, 1992-95
        c.      <u>Co-principal Investigator</u>:  Dr. P. Kemp, Roel Boeman
        d.      <u>Funding Level</u>:  $195,000

24.      a.      <u>Title and Sponsor</u>:  "Leachability and Structural Integrity of Cement-based Phosphogypsum Stabilization Blocks," Gulf Coast Hazardous Substance Research Center
        b.      <u>Duration</u>:  12 months, 1994-95
        c.      <u>Co-principal Investigators</u>:  C. Chen, R. Seals, R. Malone
        d.      <u>Funding Level</u>:  $41,556

25.      a.      <u>Title and Sponsor</u>:  "Development of a Long Term Water and Sediment Distribution Plan for the Lower Atchafalaya River," Morgan City, Louisiana
        b.      <u>Duration</u>:  12 months, 1994-95
        c.      <u>Co-principal Investigators</u>:  P. Kemp, I. Van Heerden
        d.      <u>Funding Level</u>:  $45,000

26.      a.      <u>Title and Sponsor</u>:  "Bonnet Carre Overland Flow of Diverted Water," Lake Pontchartrain Basin Foundation
        b.      <u>Duration</u>:  12 months, 1994-95
        c.      <u>Co-principal Investigator</u>:  None
        d.      <u>Fund Level</u>:  $8,118

27.      a.      <u>Title and Sponsor</u>:  "Bayou Lafourche Siphons," Bayou Lafourche Freshwater
        b.      <u>Duration</u>:  9 months, 1994-95
        c.      <u>Co-principal Investigator</u>:  P. Kemp
        d.      <u>Funding Level</u>:  $24,502

28.      a.      <u>Title and Sponsor</u>:  "Hydrologic Modeling of Coastal Restoration Projects," Louisiana Department of Natural Resources
        b.      <u>Duration</u>:  18 months, 1995-96
        c.      <u>Co-principal Investigator</u>:  None
        d.      <u>Funding Level</u>:  $79,947

29.      a.      <u>Title and Sponsor</u>:  "Hurricane Threat Assessment," Calcasieu Parish Police
        b.      <u>Duration</u>:  5 months, 1995
        c.      <u>Co-principal Investigator</u>:  None
        d.      <u>Funding Level</u>:  $10,000

30.      a.      <u>Title and Sponsor</u>:  "Barrier Island Plan," Louisiana Department of Natural
        b.      <u>Duration</u>:  36 months, 1995-98
        c.      <u>Co-principal Investigator</u>:  None
        d.      <u>Funding Level</u>:  $ 139,145

31.      a.      <u>Title and Sponsor</u>:  "Hydraulics Consultation," U. S. Army Corps of Engineers, New Orleans District

|     | b. | Duration: 24 months, 1995-97 |
|     | c. | Co-principal Investigator: None |
|     | d. | Funding Level: $ 52,431 |

32. a. Title and Sponsor: "Development of the No-Action Scenarios for the Barataria/Terrebonne and Pontchartrain Basins," Louisiana Universities Marine Consortium
    b. Duration: 9 months, 1996-97
    c. Co-principal Investigator: None
    d. Funding Level: $ 20,000

33. a. Title and Sponsor: "Shell MARS Pipeline Restoration," Louisiana Department
    b. Duration: 6 months, 1996
    c. Co-principal Investigator: James Stone
    d. Funding Level: $ 61,525

34. a. Title and Sponsor: "Bonnet Carre Freshwater Diversion Project," Lake Pontchartrain Basin Foundation
    b. Duration: 3 months, 1996-97
    c. Co-principal Investigator: James Stone
    d. Funding Level: $ 10,000

35. a. Title and Sponsor: "Hurricane Flood Forecasting for Southeastern Louisiana," Louisiana Office of Emergency Preparedness
    b. Duration: 12 months, 1996-97
    c. Co-principal Investigator: None
    d. Funding Level: $ 111,452

36. a. Title and Sponsor: "Hydraulics Consultation," U. S. Army Corps of Engineers, New Orleans District
    b. Duration: 24 months, 1997-99
    c. Co-principal Investigator: None
    d. Funding Level: $ 58,480

37. a. Title and Sponsor: "Evaluation of River Diversion Projects," Louisiana Universities Marine Consortium
    b. Duration: 7 months, 1997-98
    c. Co-principal Investigator: Vibhas Aravamuthan
    d. Funding Level: $ 95,182

38. a. Title and Sponsor: "Hurricane Flood Forecasting," Louisiana Office of Emergency Preparedness
    b. Duration: 12 months, 1997-98
    c. Co-principal Investigator: Vibhas Aravamuthan
    d. Funding Level: $ 94,435

39. a. Title and Sponsor: "Mapping Future Wetlands in the Louisiana Coast," Louisiana Universities Marine Consortium
    b. Duration: 12 months, 1997-98
    c. Co-principal Investigator: Qi Zhang
    d. Funding Level: $ 39,911

40. a. Title and Sponsor: "Coastal Information Archive," Louisiana Governor's Office, Coastal Activities

|   |    |                                                                                                                                      |
|---|----|--------------------------------------------------------------------------------------------------------------------------------------|
|   | b. | <u>Duration</u>: 6 months, 1998                                                                                                      |
|   | c. | <u>Co-principal Investigator</u>: Qi Zhang                                                                                            |
|   | d. | <u>Funding Level</u>: $ 40,337                                                                                                        |
| 41. | a. | <u>Title and Sponsor</u>: "Climatological and Hydrologic Conditions and Trends in the Upper Pontchartrain Basin," Lake Pontchartrain Basin Foundation |
|   | b. | <u>Duration</u>: 6 months, 1999                                                                                                       |
|   | c. | <u>Co-principal Investigator</u>: Clint Willson                                                                                       |
|   | d. | <u>Funding Level</u>: $ 36,512                                                                                                        |
| 42. | a. | <u>Title and Sponsor</u>: "Coastal System Modeling: Linkage Between Landloss and Hydrologic Processes," Board of Regents, State of Louisiana |
|   | b. | <u>Duration</u>: 6 months, 1999                                                                                                       |
|   | c. | <u>Co-principal Investigator</u>: Shea Penland, Denise Reed and Paul Richards                                                         |
|   | d. | <u>Funding Level</u>: $ 119,983                                                                                                       |
| 43. | a. | <u>Title and Sponsor</u>: "Development of Complex Projects," Coastal Wetlands Planning, Protection and Restoration Act                 |
|   | b. | <u>Duration</u>: 12 months, 1999                                                                                                      |
|   | c. | <u>Co-principal Investigator</u>: None                                                                                                |
|   | d. | <u>Funding Level</u>: $ 8,163                                                                                                         |
| 44. | a. | <u>Title and Sponsor</u>: "Completion of Lower Atchafalaya Reevaluation," USACE                                                       |
|   | b. | <u>Duration</u>: 24 months, 1999-2001                                                                                                 |
|   | c. | <u>Co-principal Investigator</u>: Paul Kemp and John Day                                                                              |
|   | d. | <u>Funding Level</u>: $ 260,801                                                                                                       |
| 45. | a. | <u>Title and Sponsor</u>: "Brown Marsh," Louisiana Department of Natural Resources                                                    |
|   | b. | <u>Duration</u>: 12 months, 2001-2002                                                                                                 |
|   | c. | <u>Co-principal Investigator</u>: Paul Kemp and John Day                                                                              |
|   | d. | <u>Funding Level</u>: $ 260,801                                                                                                       |
| 46. | a. | <u>Title and Sponsor</u>: Louisiana Water Resources Research Institute, USGS                                                          |
|   | b. | <u>Duration</u>: 12 months. 2001-2002                                                                                                 |
|   | c. | <u>Co-principal Investigator</u>: None                                                                                                |
|   | d. | <u>Funding Level</u>: $ 68,000                                                                                                        |
| 47. | a. | <u>Title and Sponsor</u>: Louisiana Water Resources Research Institute, USGS                                                          |
|   | b. | <u>Duration</u>: 12 months. 2002-2003                                                                                                 |
|   | c. | <u>Co-principal Investigator</u>: None                                                                                                |
|   | d. | <u>Funding Level</u>: $ 74,000                                                                                                        |
| 48. | a. | <u>Title and Sponsor</u>: Technical Assistance for Louisiana Rural Watershed Issues, Mississippi Water Resources Research Institute   |
|   | b. | <u>Duration</u>: 24 months                                                                                                            |
|   | c. | <u>Co-principal Investigator</u>: Nedra Korevec                                                                                       |
|   | d. | <u>Funding Level</u>: $18,500                                                                                                         |
| 49. | a. | <u>Title and Sponsor</u>: Health Excellence Fund, Louisiana Board of Regents                                                          |
|   | b. | <u>Duration</u>: 60 months                                                                                                            |
|   | c. | <u>Co-principal Investigator</u>: None                                                                                                |
|   | d. | <u>Funding Level</u>: $40,000                                                                                                         |
| 50. | a. | <u>Title and Sponsor</u>: Hurricane Sheltering in Hospitals: Phase I, Jefferson Parish Emergency Management Department                |
|   | b. | <u>Duration</u>: 24 months, 2001-2003                                                                                                 |

|   |   |   |
|---|---|---|
| | c. | Co-principal Investigator:  Marc Levitan, D. Nikitopoulos, & Ivor van Heerden |
| | d. | Funding Level: $100,000 |

51. a. Title and Sponsor: Hydrodynamic Simulation Modeling Effort to Assist DNR in the Management and Operations of the Davis Pond Diversion Project
    b. Duration: 12 months 2001-2002
    c. Co-principal Investigator: G.P. Kemp, H.S. Mashriqui & V. Aravamuthan
    d. Funding Level: $74,809

52. a. Title and Sponsor: Professional Services, Framework Development Team, University of Louisiana at Lafayette
    b. Duration: 12 months 2002-2003
    c. Co-principal Investigator: None
    d. Funding Level: $19,500

53. a. Title and Sponsor: Reduction of Land Building Prediction Uncertainty, University of Louisiana at Lafayette
    b. Duration: 4 months 2004
    c. Co-principal Investigator: None
    d. Funding Level: $5,000

54. a. Title and Sponsor: Coastal Louisiana Ecosystem Assessment and Restoration Louisiana State University
    b. Duration: 24 months 2006
    c. Co-principal Investigator: None
    d. Funding Level: $57,000

55. a. Title and Sponsor: Independent Technical Review, Joint Coastal Surge Study, U. S. Army Corps of Engineers
    b. Duration: 24 months 2006
    c. Co-principal Investigator: None
    d. Funding Level: $70,000

## SERVICE AND PROFESSIONAL ACTIVITIES

Committees within Department of Civil Engineering

Member, Graduate Program Committee, 1992
Member, Geotechnical Group, 1983
Member, Environmental/Water Resources Group, 1980
Member, Promotion Guidelines Committee, 1991
Chairman, Space allocation Committee, 2000

Committees within Louisiana State University

Member, Inter-Departmental Committee on Mechanics, with Mechanical Engineering, 1980-8l
Chairman, Natural Systems Group, Office of Vice-Chancellor for Research and Economic Development, 1995-98
Members, Directors and Chairs Committee, 1999-2022
College Policy Committee, College of Engineering, 2000-2002

Consulting in the Professional Field

Private Industry

1976

Texaco, Environmental Design Data, West Delta Area Block 109
Texaco, Environmental Design Data, Eugene Island Area Block 27/47
McClelland Engineers, East Bay Mudslide Study, East Bay Louisiana

1977

Gulf Research & Development Co., Design Bottom Pressure, South Pass Area Block 49
Pennzoil, Environmental Design Data, South Pass Area Block 78
McClelland Engineers, Design Bottom Pressure and Currents, East Breaks Area Block 160/161
McClelland Engineers, Barge Environmental Design Loads, Lake Pontchartrain Louisiana

1978

McClelland Engineers, Bottom Pressure & Currents Along Pipeline Corridor, WD 109
McClelland Engineers, LOOP Scour Prediction, Grand Isle Area Block 59
Pennzoil, Blowout Crater Wave Effects, High Island Area Block A-563

1979

Texaco, Environmental Design Data, Vermilion Area Block 380
Texaco, Environmental Design Data, Mound Point Area
McClelland Engineers, Design Bottom Pressures, South Pass Area Block 49

1980

Texaco, Environmental Design Data, West Delta Area Block 109
Oceanweather Inc., Environmental Design Data & Loads, Baltimore Canyon Area
Odom Offshore Survey, Environmental Loads, West Cameron Area Block 10
Mobil Research & Development Co., Review of Design Wave Forecasting Procedures
Petro-Marine/Gulf Oil, Oceanographic Design Criteria, Miss. Canyon Area Block 63
Ernest Kistler & Assoc., Extreme Bottom Currents and Instability of Bottom Sediments, South Pass Area Block 55

1981

Texaco, Environmental Design Data, Main Pass Area Block 75
Texaco, Environmental Design Data, South Pass Area Block 37
Gulf Research & Development Co., Environmental Design Data, South Pass Area Block 79
Occidental Petroleum, Environmental Design Data, Main Pass Area Block 74
McClelland Engineers, Design Wave & Bottom Pressure, Ivory Coast
McClelland Engineers, Design Bottom Pressure, South Pass Block 56
McClelland Engineers, Design Bottom Pressure, Main Pass Area Block 76
Grandolfi Engineering, Oceanographic Design Criteria, Eugene Island Area Block 8
Grandolfi Engineering, Oceanographic Design Criteria, Breton Sound Area Block 11
Modjeski & Masters, Storm Discharge 17th St. Canal, New Orleans
Sohio Petroleum Co., Oceanographic Design Criteria, South Pass Area Block 72 & 73

1982

Gulf Oil Exploration & Production Co., Design Bottom Currents, Breton Sound Area Block 52
Gulf Oil Exploration & Production Co., Design Environmental Data, Main Pass Area Block 77
Odom Offshore Surveys, Environmental Design Loads, West Cameron Area Block 4
Texaco, Design Environmental Data, Eugene Island Area Blocks 29 & 227
Texaco, Design Environmental Data, Vermilion Area Blocks 30 & 31
Texaco, Design Environmental Data, High Island Area Blocks A-578, 94, 200 & A-437
Texaco, Design Environmental Data, West Cameron Area Block 547
Texaco, Design Environmental Data, South Marsh Island Area Bk 236
Texaco, Design Environmental Data, Main Pass Area Block 30
Texaco, Design Environmental Data, South Timbalier Island Area Block 200

Texaco, Design Environmental Data, South Pass Area Blocks 45 & 54
Texaco, Bar Migration Forecast, Main Pass Area Block 75
Superior Oil, Design Environmental Data, Main Pass Area Block 100

1983
Texaco, Design Environmental Data, South Marsh Island Area
Texaco, Oceanographic Design Criteria, Main Pass Area Block 209
Texaco, Environmental Design Data, East Cameron Area Block 265
Texaco, Oceanographic Design Criteria, West Cameron Area Block 202
Marathon Oil, Design Environmental Data, West Delta Area Block 79
Sohio, Environmental Design Data, Mississippi Canyon Area Block 20
Coastal Environments Inc., Wave Action and Water Levels, Eden Isles, Louisiana

1984
Texaco, Design Environmental Data, Marsh Island Area Block 239
Texaco, Design Environmental Data, Mobile Area Block 872
Texaco, Design Environmental Data, Eugene Island Area Block 397
Texaco, Design Environmental Data, Matagorda Island Area Block A-4
Texaco, Deep Water Environmental Design Criteria, East Breaks Area
Superior Oil, Design Environmental Data, West Cameron Area Blocks 71, 72, 101 and 102
J. J. Krebbs and Sons, Savannah Rivers Slips Siltation, New Orleans, Louisiana

1985
Texaco, Design Environmental Data, Eugene Island Area Block 342
Texaco, Design Environmental Data, Mobile Area Block 872
Texaco, Design Environmental Data, Vermilion Area Block 57
Texaco, Sea State Forecast, Cameron Area Block 278
McMoRan, Design Environmental Data, South Pass Area Block 45
L. G. Suarez and Assoc., Playa Santa Isabel Oceanographic Study, Puerto Rico

1986
Marathon Oil, Design Environmental Data, West Delta Area Block 79
Waldemar S. Nelson & Co., Wave Action and Sediment Deposition, South Pass Bulk Terminal

1987
Texaco, Environmental Design Data, Green Canyon Area Block 6
Texaco, 25 & 50 Year Environmental Design Data, South Pass Area Block 54

1988
Tenneco Oil Exploration & Production Co., Storm Waves & Bottom Pressures, Main Pass 74
Paragon Engineering, Design Environmental Data, South Pass Area, Block 35
Paragon Engineering, Design Environmental Data, South Pass Area, Block 41

1989
Shell Oil, Shoreline Stabilization Study, Terrebonne, Louisiana
Fugro-McClelland, Design Environmental Data, Main Pass Area 229
Paragon Engineering, Design Environmental Data, South Pass Area, Block 42

1990
Greenhill Petroleum, East Timbalier Island Refurbishment Study, East Timbalier Island   Louisiana
Coastal Environments Inc., Brine Discharge, Lake Salvador, Louisiana

1991
Diamond Shamrock, Environmental Design Data, South Pass Area Block 72

1992

Lee Wilson & Associates, Pipeline Feasibility Study, Nairn, Louisiana

1993
Coastal Engineering and Environmental Consultants, Bayou Perot Channel Impact Assessment, Bourg Louisiana
Chevron Refinery, Tire Breakwater Design and Construction, Pascagoula, Mississippi

1994
Southern Natural Gas, Deepwater Point Shoreline Erosion Study and Protection Alternatives, Mississippi Delta, Louisiana
Picciola and Associates, Fourchon Barge Breakwater Stability Analysis, Fourchon, Louisiana
Picciola and Associates, Backwater Calculations, Terrebonne Parish, Louisiana
Shell Oil, Bayou Trepagnier Hydrology, Norco, Louisiana

1995
Coastal Engineering and Environmental Consultants, Morganza to the Gulf Feasibility Study
Energy Development Corporation, Environmental Design Data, South Pass Area, Block 37

1996
VASTAR, Environmental Design Data, South Pass Area, Block 60
Shell Oil, Bayou Trepagnier Hydrology Briefing, New Orleans Louisiana

1997
PEMEX, Effect of Soft Bottom Sediments on Oceanographic Design Criteria
Brown & Root, Intl., Scour of Bottom Sediments in the Bay of Campeche during Hurricane Roxanne

1999
Fugro-McClelland Marine Geosciences, Inc., Hurricane Wave Conditions, WD 109

2000
Fugro-McClelland Marine Geosciences, Inc., Hurricane Wave Conditions for MP Block 78
Fugro-McClelland Marine Geosciences, Inc., Seafloor Stability Analysis, WD 108

2001
Fugro-McClelland Marine Geosciences, Inc., Wave-Sea Floor Interaction, South Pass 42

2002
Fugro-McClelland Marine Geosciences, Inc., Analysis of Wave-Sea Floor Interaction, SP 73
Fugro-McClelland Marine Geosciences, Inc., Wave-Sea Floor Interaction, Main Pass 73

2003
Fugro-McClelland Marine Geosciences, Inc., Wave-Sea Floor Interaction, South Pass 19
Fugro-McClelland Marine Geosciences, Inc., Wave-Sea Floor Interaction, South Pass 42

2004
Fugro-McClelland Marine Geosciences, Inc., Design Environmental Data for Main Pass 73
Gulf South Pipeline, Magnolia Salt Dome Gas Release
Technical Advisor, HESCO Bastion USA

2005
Fugro-McClelland Marine Geosciences, Inc., Design Environmental Data for Main Pass 60
Technical Advisor, HESCO Bastion USA

2007
Fugro-McClelland Marine Geosciences, Inc., Design Environmental Data for South Pass 56

2008
Fugro-McClelland Marine Geosciences, Inc., Design Environmental Data for West Delta 109
Fugro-McClelland Marine Geosciences, Inc., Wave Sea-Sea Floor Interaction, Mississippi Canyon
Fugro-McClelland Marine Geosciences, Inc., Design Environmental Data for Main Pass 73
Fugro-McClelland Marine Geosciences, Inc., Design Environmental Data for South Pass 49A
Shaw E & I, Morgan City DFIRM Appeal
Lonnie G. Harper & Assoc., Cameron Parish DFIRM Appeal
Neal-Schaffer, City of Bay St. Louis DFIRM Appeal

Governmental Agencies

1979
Naval Coastal Systems Center, Panama City, Florida, Buried Mine Minehunting Systems

1984
Federal Emergency Management Agency, Wave Forecasting Model for Muddy Coasts

1985
Cameron Parish Police Jury, FIRM Revision, Cameron Louisiana

1987
Plaquemines Parish Government, FIRM Revision, Plaquemines La

1991
Terrebonne Parish Government and Environmental Protection Agency, Pipeline Feasibility  Study,
 Terrebonne, Louisiana

1992
Bureau of Marine Resources, State of Mississippi, Belle Fontaine Erosion Study, Belle Fontaine
Mississippi

1993
Executive Assistant for Coastal Activities, Office of Governor, State of Louisiana, CWPPRA Review Panelist

1994
Executive Assistant for Coastal Activities, Office of Governor, State of Louisiana, Technical Advisor
Morgan City Government, Wax Lake Weir Removal

1995
Executive Assistant for Coastal Activities, Office of Governor, State of Louisiana, Bonnet Carre
Freshwater Diversion Project

1996
Office of Emergency Management, State of Louisiana, Hurricane Flood Preparedness

2002
Department of Natural Resources, State of Louisiana, Louisiana Coastal Area, Computer
Modeling

Legal

1974

Wilton P. Strickland, Staurinos vs. City of Dania, Drowning, Dania, Florida

1977
Francis Emmett, Sea/Sirlon vs. Mladinich, Biloxi, Mississippi

1978
Christopher M. Moody, Noto vs. State of Louisiana, Drowning, Grand Isle Louisiana

1983
Risely C. Triche, Heberts vs. Pental Insurance, Vessel Explosion, Lake Verret, Louisiana
Keith Pisarich, FEMA Flood Regulations, Biloxi, Mississippi

1986
J. Lee Wimberly, Bart Boudreaux vs. Teledyne, Injury on Vessel, Church Point, Louisiana

1987
Jerry Jones, Big Diamond vs. Cameron Parish Police Jury, Cameron, Louisiana

1988
Luke A. Petrovich, Plaquemines Parish vs. FEMA, Appeal of FIRMs, Belle Chasse, Louisiana

1989
Doris Falkenheiner, Morgan City vs. Department of Environmental Quality, Baton Rouge, La.

1993
Vinson and Elkins, Seneca Oil, Houston, Texas
Voorhies & Labbe, Zane Barnes, Lafayette, Louisiana

1994
Attorney General, State of Louisiana, Adobe vs State of Louisiana, Lake Arthur Louisiana

1996
Phillips Michael, Guste vs. Shell Oil, Norco, Louisiana – Expert report and deposition

1997
U. S. Department of Justice, United States vs. New Orleans Sewerage and Water Board, New Orleans, Louisiana

1999
Attorney General, State of Louisiana, Plaquemines Parish Government vs State of Louisiana, Tract 87, Louisiana

2000
U. S. Department of Justice, United States vs. New Orleans Sewerage and Water Board, New Orleans, Louisiana
Terrebonne School Board vs the Columbia et al, Expert report, deposition and testimony
David Schell, Sweet Lake Land and Oil Co., and North American Land Co., v. UNOCAL – Expert report

2001
Attorney General, State of Louisiana, Plaquemines Parish Government vs State of Louisiana, Tract 87, Louisiana

Terrebonne Parish School Board vs. Castex Energy, in the 32nd JDC Docket No. 126752.
Jaeger vs Certain Lloyd's at London, et al, in the 24th JDC, Civil Action 538-551- Expert report, deposition and testimony

2002
Attorney General, State of Louisiana, Chevron, Inc., vs. State of Louisiana
B. Boudreaux, Kimball vs. Construction Aggregates – Expert report
D. Lawrence, Smith vs. Trinity Materials – Expert report and deposition
Irving Warshaur, Timothy K. Dunaway vs Louisiana Wildlife and Fisheries Commission – Expert report and deposition

2003
Greg Duplantis, Broussard vs. Hilcorp Energy- Expert report
Bill Keffer, Harvey TERM Litigation - Expert report and deposition

2005
Woody Falgoust, Smithport Planting and Wetland Services vs. Suard Barge Services – Affidavit and deposition
Esteban Herrera, Bourg v. Exxon Mobil, et al - Expert report and deposition

2006
Tom Blum, 4 C's v. Columbia Gulf – Expert report and deposition
George Frilot, Turner, et al, vs. Murphy Oil USA, Inc. – Expert report and deposition

2007
Dick Molin, Lamke vs. Amerigas

2008
Chaffe McCall, Stewart Enterprises vs. RSUI Indemnity –Expert report
Chaffe McCall, Katrina Canal Breaches Consolidated Litigation (BARGE) – Expert report and deposition

Professional Society Memberships

American Geophysical Union
American Association for the Advancement of Science
American Society of Civil Engineers, 1974 to 2002

Louisiana Committee Activities

Coastal Wetland Planning, Protection and Restoration Act, Review panelist for Office of
    Governor, 1993
Department of Natural Resources, State of Louisiana, Louisiana Coastal Area, Framework
    Development Committee Member, 2002

National and Regional Level Committee Activity

National Ocean Survey, Coastal Waves Program Advisory Committee, 1980
Program Committee, Offshore Technology Conference, ASCE, 1976, 1977, 1978, 1979
Editorial Committee, Society of Petroleum Engineers, 1979

International Committee Activities

Canadian Natural Sciences and Engineering Research Council, Laval University, Strategic Grant
Site Visit, 1989.

United Nations, Department of Economic Development, Engineering for Sea Bed Instability
Academia Sinica, Beijing, China.

**PUBLICATIONS**

<u>Book Chapters and Refereed Articles</u>

Suhayda, J. N., J. M. Coleman, L.D. Wright. "Density gradients at river mouths," *Naval Research Reviews*, pp. 9-20, Oct. 1972.

Sonu, C. J., S. P. Murray, S. A. Hsu, J. N. Suhayda and E. Waddell. "Sea breeze and coastal processes," EOS, Amer. Geophys. Union, 54(9):820-833, Sept. 1973.

Suhayda, J. N. "Standing waves on beaches," Journal *of Geophys. Res*., 79(21):3065-307l, July 20, 1974.

Coleman, J. M., J. N. Suhayda, T. Whelan and L. D. Wright. "Mass movement of Mississippi River delta sediments," *Proc. 24th Conf. of Gulf Coast Assoc. Geol. Soc*., pp. 49-68, 1974.

Suhayda, J. N., W. J. Wiseman, S. A. Hsu and C. D. Walters. "Characteristics of the Alaskan Arctic nearshore oceanographic environment," In (J. C. Reed and J. E. Sater, <u>eds</u>.) *The Coast and Shelf of the Beaufort Sea*, pp. 49-63, The Arctic Institute of North America, Arlington, Virginia, 1974.

Roberts, H. H., S. P. Murray and J. N. Suhayda. "Physical processes in a fringing reef system," Journal *of Marine Res.*, 33(2):233-260, 1975.

Whelan, T., J. M. Coleman, H. H. Roberts and J. N. Suhayda. "The occurrence of methane in recent deltaic sediments and its effect on soil stability," Eng. Geol. 14, 55-64, 1976.

Tubman, M. and J. N. Suhayda. "Wave action and bottom movements in fine sediments," Proc. *15th Intl. Conf. on Coastal Engineering, Honolulu*, July 11-17, 1976, Chapter 69, pp. 1168-1183.

Suhayda, J. N. and N. Pettigrew. "Observations of wave height and wave celerity in the surf zone," Journal *of Geophys. Res*., 82(9), 1419-1424, 1977.

Roberts, H. H., S. P. Murray and J. N. Suhayda. "Evidence for strong currents and turbulence in a deep coral reef groove," *Limnology and Oceanography*, 22(1), pp. 152-156, 1977.

Suhayda, J. N. "Surface waves and bottom sediments response," Marine *Geotechnology*, 2:135-146, 1977.

Prior, D. B. and J. N. Suhayda. "Application of infinite slope analysis to submarine sediment instabilities," Mississippi *Delta, Engineering Geology*, 14, 1-10, 1979.

Roberts, H. H., J. M. Coleman and J. N. Suhayda. "Sediment Deformation and Transport on Low-Angle Slopes: Mississippi River Delta," Chp. 7, <u>Thresholds in Geomorphology</u>, George Allen & Enwin (eds.), 498 pp., 1980.

Nikakhtar, B., J. N. Suhayda and M. Tumay. "Classification of submerged sediments by dynamic penetrometer," *2nd European Sympos. on Penetration Testing, Amsterdam*, 24-27 May, 1982.

Coleman, J. M., T. Whelan, J. N. Suhayda and L. Garrison. "Oscillation of Continental Shelf Sediments Caused by Waves," Chapter 3, <u>Dynamic Environment of the Sea Floor</u>, Lexington Books, 502 pp., 1982.

Suhayda, J. N. and H. H. Roberts. "Wave-Current interactions on a shallow reef (Nicaragua, C.A.)," *Coral Reefs*, Vol. 1, 209-214, 1983.

Pamukcu, J., J. N. Suhayda, J. Poplin and M. Tumay. "Dynamic Sediment Properties, Mississippi Delta," *ASCE Specialty Conf., Geotechnical Practice in Offshore Engineering*, April 27-29, 1983.

Huh, O., G. Mastin and J. N. Suhayda. "Synthetic Aperture Radar (SAR) Imagery of Storm Induced Seas Around the Goto Islands," Japan, Ocean Hydrodynamics of the Japan and East China Seas, Elsevier, 1984, pp. 347-360.

Suhayda, J. N., L. Kraft, S. Helfrich and J. Marin. "Soil Response to Ocean Waves, Marine Geotechnology," 6(2), 173-203, 1985.

Suhayda, J. N. "Interaction between Surface Waves and Muddy Bottom Sediments," Chapter XVIII, Estuarine Cohesive Sediment Dynamics, Springer-Verlag, 473 pp., 1986.

Pamukcu, S. and J. N. Suhayda. "Evaluation of Shear Modulus for Soft Marine Clays, Mississippi Delta," Strength Testing of Marine Sediments, ASTM STP 883, American Society for Testing and Materials, Philadelphia, 352-362, 1987.

Pamuku, S. and J. N. Suhayda. "High Resolution Measurements of Shear Modulus of Clay using Triaxial Vane Device," In *Developments in Geotechnical Engineering*, Vol. 42, Elsever, Amsterdam, 307-321, 1987.

Suhayda, J. N., D. L. Wright, et. al. "Marine Dispersal and Deposition of Yellow River Silts by Gravity Underflows," *Nature*, 332, 629-632, 1988.

Pamukcu, S. and J. N. Suhayda. "Low Strain Shear Measurements Using Triaxial Vane Device," *ASTM STP 1014*, 203-209, 1988.

Suhayda, J. N. and M. Young. Storm Surge Simulation, Mathl. Comput. Modeling Volume 11, Pergamon Press, pp. 87-95, 1988.

Prior, D. B., J. N. Suhayda, N. Z. Lu, B. D. Bornhold, G. H. Keller, W. J. Wiseman, L. D. Wright and Z. S. Zhang. "Storm Wave Reactivation of Submarine Landslides," *Nature*, 34l, 47-50, 1989.

Wright, L. D., W. J. Wiseman. Z. S. Zhang, B. D. Bornhold, G. H. Keller, D. B. Prior and J. N. Suhayda. "Processes of Marine Dispersal and Deposition of Suspended Silts off the Modern Mouth of the Huanghe (Yellow River)," *Cont. Shelf Research*, 10, 1, 1-40, 1990.

Lu, Z. J. N. Suhayda and D. B. Prior. "Sediment Thixotropy and Submarine Mass Movement, Huanghe Delta, China," *Geo-Marine Letters*, 11(1), 1990.

Kraft, L., J. N. Suhayda, J. Helfrich and J. Martin. "Ocean Wave Attenuation Due to Soft Seafloor Sediment," *Marine Geotechnology*, Vol. 9, 227-242, 1991.

Keller, G., Z. Zhen, Z. Yang, B. D. Bornhold, D. B. Prior, J. N. Suhayda, W. J. Wiseman an dL. Wright. "Mass Physical Properties of Huanghe Delta and Southern Bohai Sea, Near-Surface Deposits, China," *Marine Geotechnology*, Vol. 9, 207-225, 1991.

Zhang, Q. and J. N. Suhayda. "Behavior of marine sediment under storm wave-loading," *Marine Georesources and Geotechnology*, 12, 259-269, 1994.

Suhayda, J. N. "Development of shoreline evolution model and erosion control alternatives," Belle Fontaine, Jackson County, Mississippi: Human History, Geology, and Shoreline Erosion, S. Oivanki, (ed.), *Mississippi Department of Environmental Quality, Office of Geology, Bulletin* 130, 61-121, 1994.

Alawady, M., B. Naghavi and J. N. Suhayda.  "Water level statistics for design of transportation facilities in coastal Louisiana," *Transportation Research Record*, No. 1483, 64-71, 1995.

Bender, C., A. T. Bourgoyne and J. N. Suhayda.  "Estimating break-down pressure of upper marine sediments using soil boring data," *Journal of  Petroleum Science and Engineering*, 14, 101-114, 1996.

Suhayda, J N.  "Modeling impacts of Louisiana barrier islands on wetland hydrology," *Journal of Coastal Research*, 13 (3), 686-693, 1997.

Flowers, G., J. N. Suhayda, J. Clymire, G. McPherson, L. Koplitz and M. Poirrier.  "Impact of industrial effluent diversion on Bayou Trepagnier, Louisiana,"  *Environmental and Engineering Geoscience*, IV (1), 77-91, 1998.

Lugo-Fernandez, H. Roberts and J. N. Suhayda.  "Wave transformation across a Caribbean fringing-barrier coral reef," *Continental Shelf Research*, 18, 1099-1124, 1998.

Conference Proceedings

Suhayda, J. N. "Determining nearshore infragravity wave spectra,"  *Proc. Intern. Symp. on Ocean Wave Measurement and Analysis, New Orleans*, Sept. 1974, pp. 54-63.

Suhayda, J. N., T. Whelan, J. M. Coleman and E. Garrison. "The geochemistry of recent Mississippi River delta sediments:  gas concentration and sediment stability,"  *Preprints, Seventh Annual Offshore Technology Conference, Houston, Texas*, May 5-8, 1975, pp. 71-84.

Suhayda, J. N., H. H. Roberts and S. P. Murray.  " Nearshore processes on a fringing reef," *Third International Ocean Development Conf., Tokyo, Japan*, Aug. 5-8, 1975, Vol. 5, Paper E-l007, pp. 63-75.

Suhayda, J. N., T. Whelan, J. M. Coleman, J. S. Booth and L. E. Garrison.  "Marine sediment instability:  interaction of hydrodynamic forces and bottom sediments,"  *Preprints OTC 2426, 8th Annual Offshore Technology Conference, Houston, Texas*, May 3-6, 1976.

Suhayda, J. N. and H. H. Roberts.  "Wave action and sediment movement on fringing reefs," *Third International Symposium on Coral Reefs, Miami, Florida*, May 3-6, pp. 65-70, 1977.

Roberts, H. H., S.P. Murray and J. N. Suhayda.  "Physical processes in a fore-reef shelf environment,"  *Proc. 3rd International Symposium on Coral Reefs, May 3-6, Miami, Florida*, pp. 507-515, 1977.

Hottman, B., J. N. Suhayda and L. E. Garrison.  "SEASWAB II (Shallow experiment of access storm wave affects on the bottom),"  *Preprint 3169, Tenth Annual Offshore Technology Conference, Houston, Texas*, May 8-11, 1978.

Suhayda, J. N. and D. B. Prior.  "Explanation of submarine landslide morphology by stability analysis and rheological models,"  *Tenth Annual Offshore Technology Conference, Paper 3l7l, Houston, Texas*, pp.1075-l082, May 1978.

Prior. D.B. and J. N. Suhayda.  " Submarine mudslide morphology and development mechanisms,"  *Mississippi Delta, Reprint 3482,1lth Offshore Technology Conference, Houston, Texas*, April 1979.

Prior, D. B., J. N. Suhayda and L. Garrison. "Subaqueous landslides as they affect bottom structures.," Proc. Conf. Port and Ocean Engineering under Arctic Conditions, Trondheim, Norway, July 1979.

Dawson, T. and J. N. Suhayda, "Determination of elastic shear modulus of marine sediments from wave theory and field measurements," *12th Offshore Technology Conference*, May 1980.

Howard, W., J. N. Suhayda and V. Pidgeon, "Predicting surf zone conditions from an offshore buoy system," *International Ocean Engineering Conference, Seattle, Washington*, Sept. 8-l0, 1980.

Suhayda, J. N. "Geophysical data collection and analysis related to offshore construction," *Midcon 80*, November, 1980.

Dawson, T. and J. N. Suhayda, "Correlation of field measurements with elastic theory of seafloor response to surface waves," *13th Annual Offshore Technology Conference*, May, 198l.

Suhayda, J. N., M. Young and X. Ren, "Simulation study on natural and man-made changes in estuarine systems," *Intl. Assoc. of Science and Technology for Development, Santa Barbara*, Nov. 13-15, pp 82-85, 1989.

Suhayda, J. N. "In situ monitoring of seafloor geologic processes," *Marine Engineering Geological Survey for Petroleum Development in Developing Countries, U.N. Symposium, Guangzhou, China*, Nov. 30 - Dec. 6, 1989.

Suhayda, J. N., P. Kemp, J. Peckham and B. Jones. "Restoration of wetlands using pipeline transported sediments," Gulf Coast Section, SEPM, 12th Annual Research Conference, pp. 257-262, December 2-5, 1991.

Roberts, H., S. Penland, A. Bailey and J. N. Suhayda. " Sedimentology, geochemistry and geotechnical properties of two long borings through the Terrebonne holocene delta plain," *Gulf Coast Section, SEPM, 12th Annual Research Conference*, December 2-5, 1991.

Suhayda, J. N., A. Bailey, H. Roberts, S. Penland and G. Keucher, "Subsidence properties of holocene sediments," *S. La., Eighth Symposium on Coastal and Ocean Management New Orleans, Louisiana*, July 19-23, 1993.

Suhayda, J. N., G. Kuecher, N. Chandra, H. Roberts, T. Williams, S. Penland and W. Austin. "Estimate of the consolidation settlement potential of topstratum cyclic sequences in the Terrebonne basin," *CA, Eighth Symposium on Coastal and Ocean Management*, 1993.

Suhayda, J. N. "Coastal erosion analysis of Belle Fountaine area, Jackson County, Miss.," *Eighth Symposium on Coastal and Ocean Management, New Orleans*, 1993.

Suhayda, J. N. "Hydrodynamic control structures, Louisiana Shoreline Erosion Symposium," March 3-5, Grand Isle, LA., 1993.

Bender, C., J. N. Suhayda and A. T. Bourgoyne. "Use of soil borings data for estimating break down pressure of shallow marine sediments," *International Association of Drilling Contractors, Conference*, November 16-17, 1994.

Suhayda, J. N. "Oceanographic design data for South Pass Area Block 47," *Preprints, Eighteenth Annual Offshore Technology Conference, Houston, Texas*, May 6-9, 1996, 9-15.

Bea, R., J. N. Suhayda, Z. Jin and R. Ramos.  "Hurricane wave conditions for design and requalification of platforms in the Bay of Campeche, Mexico," *Proc. Ocean Wave Kinematics, Dynamics and Loads on Structures, ASCE,* April 30-May 1, 1998.

Jin, Z., J. N. Suhayda and C. Valle.  "Effects of soft sea floor on hurricane waves in the Bay of Campeche," *Proc. Offshore Mechanics and Arctic Engineering Conference OMAE '98, Amer. Soc. Of Mechanical Engineers, Lisbon, Portugal*, 5-9 July, 1998.

<u>Technical Reports</u>

Suhayda, J. N. and A. Hect.  Laboratory measurement of wave direction with a linear array. Scripps Inst. Oceanogr., Final Rept. Ref. 70-34, 1970.

Wright, L. D., J. M. Coleman and J. N. Suhayda.  Periodicities in interfacial mixing.  Louisiana State Univ., Coastal Studies Bull. 7, pp. 127-135, Jan. 1973.

Wiseman, W. J., J. M. Coleman, A. Gregory, S. A. Hsu, A. D. Short, C. D. Short, J. N. Suhayda, C. D. Walters and L. D. Wright.  Alaskan arctic coastal processes and morphology.  Louisiana State Univ., Coastal Studies Inst. Tech. Rept. 149,17l pp., 1973.

Stone, J. H., J. N. Suhayda and N. A. Roques.  Oil drift predictions in the region of the superport. In Rept. 4, Louisiana Superport Studies, Tech. Appendices to Recommendation for the Environmental Protection Plan, Chapter 5..

Suhayda, J. N., S. A. Hsu, H. H. Roberts and A. D. Short.  Coastal processes, northeast coast of Brazil.  Louisiana State Univ., Coastal Studies Institute Tech. Rep. 238, 98 pp., 1977.

Suhayda, J. N. and G. F. McHugh.  Prediction of surf zone characteristics.  Final Report, Contract NOOO14-79-C-0342, Office of Naval Research, 66 pp., July, 198l.

Suhayda, J. N.  Measurements of near surface kinematics under waves and winds.  Final Report, Contract NOOO14-79-C-06l8, Office of Naval Research, 52 pp., October, 198l.

Suhayda, J. N., M. Tittlebaum, B. Nikakhtar and K. White. Dynamics of bottom sediment pollutants.  Final Report, Project 807579-0l, EPA, 85 pp., February, 1982.

Suhayda, J. N.  Classification of coastal sediments.  Final Report, Contract NOOO14-80-C-0846, Office of Naval Research, 420 pp., March, 1982.

Suhayda, J. N.  Interaction of surface waves and muddy bottom sediments.  Report No. GE-82/06, Dept. of Civil Engineering, Louisiana State University, 8l pp., October, 1982.

Suhayda, J. N.  Subsidence and Sea Level, Chapter10, Causes of Wetland Loss in the Coastal Central Gulf of Mexico.  OCS Study 87-0120, Mineral Management Service, 1987.

Suhayda, J. N. Barrier shoreline feasibility study, Phase 1, Steps A-K and Final Report, Louisiana Department of Natural Resources, March, 1999.

Suhayda, J. N., M. Alawady, and V. Aravamuthan.  Hydrologic modeling of the Barataria-Terrebonne estuary, Barataria-Terrebonne National Estuaries Program, July, 2000.

Suhayda, J. N. and C. Willson.  Climatological and hydrologic conditions and trends in the upper Pontchartrain basin, Lake Pontchartrain Basin Foundation, August , 2000.

Suhayda, J. N., et al, Wetland Nourishment Module, Louisiana Coastal Area Study, Department of Natural Resources, State of Louisiana, August, 2003.

Suhayda, J. N., et al, Predicting Land Building in the Mississippi Delta, Louisiana Coastal Area Project, Department of Natural Resources, State of Louisiana, June 30, 2004.

Suhayda, J.N., et al, The Direct Impact of the MRGO on Hurricane Storm Surge, URS Report to the La. Department of Natural Resources, February 2006.

Suhayda, J. N., et al, Interaction of Hurricanes and Coastal Landscape features, URS report to the U. S. Army Corps of Engineers, August 7, 2007.

Suhayda, J.N., et al, USACE/FEMA Southeast Louisiana Joint Surge Study, Independent Technical Review, Report to U. S. Army Corps of Engineers, October 15, 2007.

Suhayda, J.N., et al, Computation of Storm Surge using Two 50 Year Future Projections of the Coastal Louisiana Landscape, Louisiana Coastal Area Project, Department of Natural Resources, State of Louisiana, June 2008.

Suhayda, J.N., et al, City of Morgan City, Appeal of FEMA's 2008 Preliminary DFIRMS, Shaw E&I report to Federal Emergency Management Agency, February 2009.

Meeting Presentations

Suhayda, J. N.  Standing waves on beaches.  Transactions, American Geophys. Union, 42(4), April 197l.

Suhayda, J. N.  Short time variations in nearshore wave spectra.  Second Coastal and Shallow Water Research Conf., Gulf Coast Region, Oct.1-2, 1971, Louisiana State Univ., p. 227.

Suhayda, J. N.  Arctic Ocean infra-gravity waves in the nearshore zone.  American Geophys. Union, Dec.10-14, 1973, San Francisco, Calif.

Suhayda, J. N. and N. Pettigrew.  Celerity of surf.  American Geophys. Union, Dec. 12-17, 1974, San Francisco, Calif.

Suhayda, J. N. and L. Ingram.  Utilization of side scan sonar for sea floor classification. SEG/USN Shear Wave and Pattern Recognition Symposium, March 22-23, 1982.

Pamukcu, S., J. K. Poplin, J. N. Suhayda and M. T. Tumay.  Dynamic Properties and Critical State Parameters, Mississippi Delta.  ASCE National Convention, October 16-21, 1983.

Suhayda, J. N.  Interaction Between Surface Waves and Muddy Bottom Sediments, Cohesive Sediments Dynamics Workshop, November 12-14, 1984.

Suhayda, J. N.  Technical Problems in Implementing the National Flood Insurance Program in Louisiana.  Ninth Annual Conference of the Association of Floodplain Managers, New Orleans, Louisiana, April 29, 1985.

Suhayda, J. N.  Environmental Considerations in Port Planning and Construction.  International Program for Port Planning and Management, New Orleans, Louisiana, February10, 1986-94.

Suhayda, J. N. Coping with Hurricane Surges in Coastal Louisiana.  Louisiana Intercoastal Seaway Association, 29th Annual Meeting, Lafayette, Louisiana, March 13, 1986.

Suhayda, J. N.  Creative Engineering Approaches to Wetland Restoration, Louisiana's Environment in the 1990's, DEQ Conference, November 14-16, 1989.

Suhayda, J. N. Effects of Hurricanes on Offshore Oceanography and Geology, American Assoc. of the Advancement of Science, Annual Meeting, New Orleans, Feb. 19, 1990.

Suhayda, J. N., Use of Abandoned Pipelines to Distribute Sediments for Wetland Restoration, How to Design, Fund, and Implement Beneficial Uses of Dredged Material, December 2, 1992, New Orleans, Louisiana.

Suhayda, J. N.  Louisiana Barrier Island and Barrier Shoreline Restoration Workshop, Coalition to Restore Coastal Louisiana, Grand Isles, Louisiana, April, 1995.

Suhayda, J. N., Natural Hazards, National Safety Council, New Orleans, Louisiana, October 19, 1999.

Suhayda, J. N., Community Haven, Southeastern Task Force Leadership Summit, New Orleans, Louisiana, August 20, 2000.

Suhayda, J. N., Community Haven, National Hurricane Conference, Washington, D. C., April 12, 2001.

Suhayda, J. N., National Research Council, Coastal Engineering and Restoration Projects, December 12, 2002, New Orleans, Louisiana.

Suhayda, J. N., Storm Surge Modernization, Post 2002 Hurricane Season Round-Table Discussion, December 17, 2002, Baton Rouge, Louisiana.

Suhayda, J. N., Symposium on Hail, Hurricane and Wildfire Hazards, New Orleans -, Looking a Hurricane Disaster in the Eye, Institute for Business and Home Safety, January 29, 2003, Tampa, Florida.

Suhayda, J. N., Hurricane Flood Prediction and Protection, Tenth Annual Tulane Environmental Conference, April 1-2, 2005, New Orleans, Louisiana.

Suhayda, J. N., Coastal Restoration Using Pipeline Conveyed Sediments, Symposium on the Status of Science in Coastal Restoration, CREST, April 12-13, 2005, Lafayette, Louisiana.

Suhayda, J. N., Hurricane Wetlands Literature Review, Wetlands 2007, August 28-30, 2007, Williamsburg, VA.

Media Interviews

Interviews have been conducted with several different media groups, including; the Morning Advocate, the Times Picayune, the NBC/Discovery Channel, USA Today, Time Magazine, ABC National News, Scientific American Magazine, the New York Times, CNN/ Earth Matters, National Public Radio, Bill Moyer's Now Program, Wall Street Journal, National Geographic Magazine, and CBS National News.