# EXHIBIT 27

Deposition Reda Bakeer

1

```
 1              UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION

 5                                  * NO. 05-4182

 6   PERTAINS TO: BARGES            * Consolidated

 7                                  * SECTION "K(2)"

 8   Boutte v. Lafarge      05-5531 *

 9   Mumford v. Ingram      05-5724 * JUDGE DUVAL

10   Lagarde v. Lafarge     06-5342 *

11   Perry v. Ingram        06-6299 * MAG. WILKINSON

12   Benoit v. Lafarge      06-7516 *

13   Parfait Family v. USA  07-3500 *

14   Lafarge v. USA         07-5178 *

15    *  *  *  *  *  *  *  *  *  *  *

16

17          Deposition of REDA M. BAKEER, PH.D.,

18   P.E., given at Chaffe McCall, LLP, 2300 Energy

19   Centre, 1100 Poydras Street, New Orleans,

20   Louisiana 70163-2300, on September 10th, 2009.

21

22

23   REPORTED BY:

24          JOSEPH A. FAIRBANKS, JR., CCR, RPR

25          CERTIFIED COURT REPORTER #75005
```

**2**

1  APPEARANCES:
2  REPRESENTING THE BARGE PSLC:
3       WIEDEMANN & WIEDEMANN
4       (BY:  KARL WIEDEMANN, ESQUIRE)
5       821 Baronne Street
6       New Orleans, Louisiana 70113
7       504-581-6180
8  - AND -
9       BRIAN A. GILBERT, P.L.C.
10      (BY:  BRIAN A. GILBERT, ESQUIRE)
11      821 Baronne Street
12      New Orleans, Louisiana 70113
13      504-885-7700
14
15  REPRESENTING LAFARGE NORTH AMERICA:
16      GOODWIN PROCTOR, L.L.P.
17      (BY:  MARK S. RAFFMAN, ESQUIRE)
18      (BY:  JOHN ALDOCK, ESQUIRE)
19      (BY:  KIRSTEN ROBBINS, ESQUIRE)
20      901 New York Avenue, NW
21      Washington, D.C. 20001
22      202-346-4000
23  - AND -
24
25

**4**

EXAMINATION INDEX

EXAMINATION BY:                    PAGE

MR. WIEDEMANN ...............................6

EXHIBIT INDEX

EXHIBIT NO.                         PAGE
Exhibit Bakeer 1 ...........................14
Exhibit Bakeer 2 ...........................14
Exhibit Bakeer 3 ...........................14
Exhibit Bakeer 4 ...........................14
Exhibit Bakeer 5 ...........................14
Exhibit Bakeer 6 ...........................15

**3**

1       CHAFFE, MCCALL, L.L.P.
2       (BY:  ROBERT FISHER, ESQUIRE)
3       2300 ENERGY CENTRE
4       1100 Poydras Street.
5       New Orleans, Louisiana 70163-2300
6       504-585-7000
7  - AND -
8       SUTTERFIELD & WEBB
9       (BY:  DANIEL A. WEBB, ESQUIRE)
10      650 Poydras Street, Suite 2715
11      New Orleans, Louisiana 70130
12      504-598-2715
13
14  ALSO PRESENT:
15      PETER KEELEY
16      JOHN SHELONKO
17
18  VIDEOGRAPHER:
19      GEORGETTE RINKUS (HART VIDEO)
20
21
22
23
24
25

**5**

STIPULATION
        IT IS STIPULATED AND AGREED by and
among counsel for the parties hereto that the
deposition of the aforementioned witness may be
taken for all purposes permitted within the
Louisiana Code of Civil Procedure, in
accordance with law, pursuant to notice;
        That all formalities, save reading
and signing of the original transcript by the
deponent, are hereby specifically waived;
        That all objections, save those as to
the form of the question and the responsiveness
of the answer, are reserved until such time as
this deposition, or any part thereof, is used
or sought to be used in evidence.


                        *   *   *



        JOSEPH A. FAIRBANKS, JR., CCR, RPR,
Certified Court Reporter in and for the State
of Louisiana, officiated in administering the
oath to the witness.

6

1      REDA M. BAKEER, PH.D., P.E.
2   4624 Pike Drive, Metairie, Louisiana 70003, a
3   witness named in the above stipulation, having
4   been first duly sworn, was examined and
5   testified on his oath as follows:
6   EXAMINATION BY MR. WIEDEMANN:
7      Q.   Dr. Bakeer, we met before the
8   deposition.  My name is Karl Wiedemann.  I'm
9   here today to take your deposition.
10      You've given depositions before.
11      A.   I did.
12      Q.   On how many occasions, sir?
13      A.   Probably couple of occasions.
14      Q.   On two occasions --
15      A.   Two.
16      Q.   -- perhaps?
17      A.   Yes.
18      Q.   Okay.  So that you know, I'm going to
19   attempt to frame my questions in proper English
20   and hope that you understand them.  If you do
21   not, please let me know and I'll be glad to
22   rephrase.
23      We have to try not to step on each
24   other's responses and questions, so please
25   allow me to finish my questions before you

7

1   begin your answer, and the court reporter is
2   going did like us better as well.
3      On the two previous occasions that you
4   gave depositions, were they in connection --
5   well, were you tendered as an expert in these
6   cases?
7      A.   That is correct.
8      Q.   Okay.  And well, let's start with the
9   first case.  Were you hired by a defendant in
10   that case?
11      A.   Um -- yes.
12      Q.   Okay.  And who was the defendant?
13      A.   It was, um -- a daiquiri store at --
14   there was an incident of someone tripping on a
15   curb and incurred some personal injury and they
16   were suing the daiquiri store for damages.
17      Q.   And you were hired by the defendant
18   and tendered as an expert in what?
19      A.   Geotechnical engineering and soil
20   mechanics.
21      Q.   And how did your expertise in soil
22   mechanics relate to this case?
23      A.   It's a settlement issue related -- the
24   curb settled, and whether that curb has settled
25   due to negligence or was it due to the

8

1   settlement naturally occurring due to the
2   consolidations of the soil.  So it was a
3   settlement-related area.
4      Q.   Yes, sir.  And did that case end up
5   going to trial?
6      A.   That's correct.
7      Q.   Okay.  And you testified in court as
8   well?
9      A.   I did.
10      Q.   Okay.  Which court was it?
11      A.   It was the New Orleans.
12      Q.   Civil District?
13      A.   Civil District Court.
14      Q.   Approximately what year?
15      A.   Early 2000, 2001, something like that.
16      Q.   And I believe you've given at least
17   another deposition.
18      A.   I did give more than -- actually, I
19   can remember now there was a third case.  And
20   they were all settlement-related issues.
21      Q.   I see.
22      A.   Soil mechanics type issues.
23      Q.   Without putting them in any particular
24   order let's talk about the second one you were
25   referring to.

9

1      A.   Uh-huh.
2      Q.   What type of case was that?
3      A.   That again was a gentleman who got
4   hurt because he fell on his back, and there was
5   again a settlement issue at the site, and
6   the -- there was a request for compensation for
7   damages and so forth, and my testimony was to
8   the effect of the site conditions on the
9   depressions and the variations in the ground
10   elevations.  It was a settlement-related area.
11      Q.   Do you recall in either of those cases
12   which law firm retained you?
13      A.   Um -- it's in my résumé, but I don't
14   remember the names of the firms at this point.
15      Q.   So it something --
16      A.   The only one I remember, that case of
17   the gentleman was Charlie Seemann was the --
18   you may know Charlie Seemann.  He was the
19   attorney.
20      Q.   Was that the first case you told us
21   about?
22      A.   That was the very first?  That was in
23   the eighties.  Late eighties.
24      Q.   In Civil District court.
25      A.   Yeah.  No, the case of Charlie Seemann

10

1   was not in the court.  That didn't go to court.
2   I believe it was arbitration.  It ended up in
3   arbitration.
4       Q.  Okay.  Going back to the first case
5   that did end up in trial in Civil District
6   Court, did you know what the name of the law
7   firm is that retained you?
8       A.  I can dig it up from the paperwork.
9       Q.  And that's in your résumé --
10      A.  It should be in the résumé.
11      Q.  Which is Appendix C.
12      A.  That is correct.
13      Q.  Is that something you could do as we
14  sit here?
15      A.  Absolutely.  That would be Donovan &
16  Lawler Professional Law Corporation, Orleans,
17  and the event was in the year 2001.
18      Q.  And that appears on --
19      A.  Page 73 -- 74, I'm sorry, of my
20  Appendix 74.
21      Q.  -- appendix 74?
22      A.  That's correct.  It would be the third
23  one from the top.  And I believe the other one,
24  the soil settlement in Audubon Park, would be
25  the other case and I was correct it's about

11

1   1988.  That's on Page 73, and it's second item
2   under expert witness.
3       Q.  And Tom Foutz was the attorney that
4   retained you?
5       A.  Tom Foutz was the attorney.  And
6   Charlie Seemann was the attorney on the other
7   side.
8       Q.  Now, Dr. Bakeer, I believe you
9   indicated that you may have also testified in
10  another deposition.  And let me ask you, do you
11  recall whether or not that case went to trail?
12      A.  Unfortunately, no, it did not go to
13  trial because the plaintiff in this case passed
14  away and the case was -- it was a
15  settlement-related issue, and that is existing
16  Fairway -- that's on Page 74, settlement of an
17  existing residence, 102 Fairway Drive.  And it
18  was supposed to be in the Civil District Court
19  in New Orleans, but unfortunately Mr. Renaudin
20  passed away?  It's R-E-N-A-U-D-I-N, and it's
21  doctor.
22      Q.  So I take it that the law firm that
23  retained you was Klein Daigle?
24      A.  That is correct.
25      Q.  Okay.  We'll get back to your CV in a

12

1   moment.  The report that you have provided can
2   be divided into sections, as I understand it.
3           You have, am I right, a 69-page
4   written report?
5       A.  That is correct.
6       Q.  Okay.
7       A.  With the figures.
8       Q.  Right.  With Figures 1 through 76, am
9   I correct?
10      A.  I remember there's seventy something.
11  I'll have to check.  76.  That's correct.
12      Q.  Okay.  And then it's followed by
13  Appendix A which is a list of reviewed
14  documents?
15      A.  That is correct.
16      Q.  And followed by Appendix B which is an
17  analysis of the IHNC I-wall?
18      A.  That is correct.
19      Q.  Okay.  Appendix C is your CV or
20  personal qualifications; is that correct?
21      A.  I'm checking.  That is correct,
22  Appendix C.
23      Q.  And Appendix D is Excerpts from the
24  U.S. Army Corps of Engineers I-wall.  Is that
25  the general design manual?

13

1       A.  No.  The general design manual that
2   probably you're referring to if I understand
3   you correctly is discussed in my Appendix B
4   along with my analysis.
5           These are some excerpts taken from
6   general design memoranda that the Army issued
7   for different flood protection projects, just
8   to show some important statements that were
9   made that pertains to the construction of
10  floodwalls.
11      Q.  I see.  And that would be the
12  conclusion of your report.
13          Within Appendix D, however, there are
14  some letters to attorneys regarding your
15  criticism or for lack of a better word critique
16  of Mr. Pazos and Dr. Marino.
17      A.  I would rather call it review.  It's a
18  review.
19      Q.  A review.
20      A.  Yes.
21      Q.  Fair enough.
22          Okay.  What I'd like to do at this
23  time is to offer as Bakeer number 1 the 69-page
24  portion of his report representing -- which has
25  been identified as the written report, and that

**14**

1  is Bakeer number 1.
2      (Exhibit Bakeer 1 was marked for
3  identification and is attached hereto.)
4      Number 2 are the figures attached to
5  the report, and they Number Figure 1 through
6  76, which is Bakeer 2.
7      (Exhibit Bakeer 2 was marked for
8  identification and is attached hereto.)
9      Bakeer 3 is Appendix A, a list of
10  reviewed documents.
11      (Exhibit Bakeer 3 was marked for
12  identification and is attached hereto.)
13      Appendix B is Dr. Bakeer 's analysis
14  of the IHNC I-wall.  That's Bakeer 4.
15      (Exhibit Bakeer 4 was marked for
16  identification and is attached hereto.)
17      Appendix C is his curriculum vitae or
18  personal qualifications.  That is Bakeer 5.
19      (Exhibit Bakeer 5 was marked for
20  identification and is attached hereto.)
21      And finally, Bakeer 6 is Appendix D,
22  excerpts from the USACE I-wall General Design
23  Memoranda, I believe you said.
24   A.   General design memoranda, that's
25  correct.

**15**

1   Q.   Yeah.  And that is 6.
2      (Exhibit Bakeer 6 was marked for
3  identification and is attached hereto.)
4  MR. RAFFMAN:
5      For the record, also included in
6  Appendix D would be the two additional
7  letters that Dr. Bakeer sent regarding
8  his review of Mr. Pazos' report and
9  Dr. Marino 's report.  Correct?
10   A.   Correct.
11  MR. WIEDEMANN:
12      Correct.
13  MR. RAFFMAN:
14      And I will say for the record I
15  see that Exhibit 2 includes copies
16  that are in black and white.  The
17  copies that were attached to the
18  report are in color.  It may be
19  appropriate to substitute color copies
20  at a certain point.
21  MR. WIEDEMANN:
22      Which would be agreeable.  That's
23  fine.
24  MR. RAFFMAN:
25      May I please review very quickly

**16**

1  Exhibit 4?  I just want to make sure
2  that it's complete.
3  MR. WIEDEMANN:
4      Yes.  (Tendering.)
5  MR. RAFFMAN:
6      Mr. Wiedemann, I believe that
7  Appendix B should also include a
8  certain number of color figures that
9  go along with the analysis.  I'm going
10  to hand some figures across the table
11  and ask whether you have them included
12  somewhere else in the set of exhibits.
13  (Tendering.)
14      They may be in Appendix D.  I can
15  get that, too.
16  MR. WIEDEMANN:
17      Counsel, I can represent to you
18  that I know I've seen them, but if I
19  could find --
20  MR. RAFFMAN:
21      They may be part of what you have
22  in Appendix D.  I'm not sure.  In any
23  event --
24  MR. GILBERT:
25      (Indicating.)

**17**

1  THE WITNESS:
2      Yes.
3  MR. WIEDEMANN:
4      I'm certain that, again, they're
5  going to be the black and whites.
6  MR. RAFFMAN:
7      All right.  We'll replace them
8  with color.  I just want our joint
9  record here to be as clear as it can
10  be.
11  MR. WIEDEMANN:
12      And during a break we'll sit down
13  and make sure we have everything.
14  MR. RAFFMAN:
15      Right.  And I appreciate your
16  indulgence in allowing me to step on
17  your transcript to that extent.  Thank
18  you.
19  EXAMINATION BY MR. WIEDEMANN:
20   Q.   All right.  Now, Dr. Bakeer, by whom
21  are you currently employed?
22   A.   Ardaman & Associates.
23   Q.   Ardaman & Associates?
24   A.   That's correct.
25   Q.   And how long have you been employed by

18

1  Ardaman & Associates?
2      A.   I was -- Ardaman & Associates acquired
3  Gore Engineering in 2008.  So I was working
4  with Gore Engineering at that time.  I was
5  employed by Tulane University before that.
6  I've been Ardaman employee since '08.
7      Q.   I notice in your report at some point
8  that you indicate that the findings in your
9  opinions and conclusions are not representative
10 of Ardaman & Associates.
11     A.   That's correct.
12     Q.   Okay.  And so your work on this case,
13 your investigation is outside of your
14 employment with Ardaman?
15     A.   That is correct.  I was retained
16 before the acquisition of Ardaman.
17     Q.   Okay.  At any time was Gore
18 Engineering retained to investigate --
19     A.   No.
20     Q.   -- this case?
21          When you were retained in this case
22 were you still at Tulane University?
23     A.   Um -- I believe so.  '07, yes.  The
24 program -- the last class graduated in May of
25 '07, so that's about right.  I was still at

19

1  Tulane.
2      Q.   When were you first contacted by
3  representatives of Lafarge to assist in the
4  investigation of this case?
5      A.   I would say around March of '07.
6      Q.   By whom were you contacted?
7      A.   Um -- Mr. Rob Fisher.
8      Q.   To your knowledge, had you ever worked
9  with Mr. Fisher or his law firm Chaffe McCall
10 prior to March of '07?
11     A.   I did one case where I did some
12 analysis and review for a lawsuit, but I wasn't
13 involved in depositions and giving testimony in
14 court on this, but I did some work for them.  I
15 think it's on my résumé, as well.
16     Q.   In fact, other than the three cases
17 that you told us that you gave depositions in,
18 you've been retained as an expert in many
19 others.
20     A.   Correct.
21     Q.   Yeah.
22     A.   That's correct.  I was specifically
23 answering the question of giving a deposition,
24 a formal deposition and testifying in court.
25     Q.   And that's what was asked.

20

1      A.   That's correct.
2      Q.   Does the list of cases under expert
3  witnesses in your CV represent all of the cases
4  in which you have been retained as an expert?
5      A.   I would say to the date when the
6  résumé was written that's correct.
7      Q.   Okay.  When was your CV last updated?
8      A.   It contains my most recent
9  publications, so I would say in, um -- '09,
10 probably.  Early '09.
11     Q.   Have you been retained as an expert
12 witness in any cases since this CV was last
13 updated?
14     A.   I'm working on two lawsuits through
15 Ardaman & Associates at this point.  I just
16 wrote an expert report at this point, but what
17 are the next steps I'm not sure.
18          Let me just highlight something about
19 the many cases here, because those are similar
20 to the case I'm talking about where Ardaman or
21 Gore Engineering was retained to do a soil
22 investigation or an analysis of a residence or
23 a structure that had experienced some problems
24 related to soil mechanics.  The company in this
25 case writes a report.  Whether this report ends

21

1  up being a lawsuit, ends up being as part of
2  a -- you know, the case itself, whether we
3  testify or not, it may end up being an
4  arbitration, it may end up being resolved with
5  the contractor or the owner or whatever.  So
6  that explains those.
7          And occasionally statements are made,
8  but typically a report through the company is
9  written.  So the two cases I'm on right now
10 are -- one involves arbitration and one
11 involves the, um -- a failure of a bulkhead.
12 And those are done through Ardaman &
13 Associates, and I wrote a technical report
14 through the company explaining the consequences
15 or the reasons related to those lawsuits.  How
16 they go -- advance beyond that, that's up to
17 the client at that time.  And that's mostly we
18 see a long list of residences on the north
19 shore and so forth.  These are all similar
20 cases dealt with through Gore Engineering, as
21 an employee with Gore Engineering or a
22 consultant with Gore Engineering at the time,
23 or as an employee with Ardaman & Associates at
24 this time.
25     Q.   So that if I understand you correctly,

22

1   you were retained or your employer was retained
2   as an expert in all of these cases, however not
3   all of them ended up in litigation.
4      A.   That is correct.  That is correct.
5      Q.   What distinguishes this case that
6   brings us here today from those in which
7   Ardaman & Associates or Gore Engineering is
8   involved; why the disclaimer in you're report?
9      A.   What?
10     Q.   What distinguishes this case from
11  those in which Ardaman or Gore Engineering was
12  involved; why the disclaimer in your report?
13     A.   Because I --
14     MR. RAFFMAN:
15          I just object to form.
16          You can answer.
17     A.   Because I was retained personally so,
18  at the time I was not an employee of Ardaman &
19  Associates.  So that contact was made directly
20  to me as Reda Bakeer, not as an employee of
21  Ardaman & Associates.  So I want to say that
22  this is my opinion and not the opinion of the
23  firm that I worked for.
24          No one else has looked at this data at
25  Ardaman, no one else did any analysis on my

23

1   behalf at Ardaman.  Everything you see here is
2   my work and only my work.  So I'm responsible
3   for it but no one else.
4      Q.   Okay.  Whereas the cases listed on
5   appendix -- beginning on Appendix 73 and
6   running through Appendix 75, would all of these
7   cases be through your employment with Ardaman
8   or Gore Engineering?
9      A.   The top case on Appendix 74, that's
10  with the federal court.  I was a neutral expert
11  appointed -- on top of Page 74 --
12     Q.   Yes.
13     A.   -- I was appointed as a neutral expert
14  to look at a patent violation by a contractor
15  against another company.  And I was a neutral
16  expert not working for either side.  My --
17  again, I was as an individual, not through a
18  company.  I was personally appointed from a
19  list submitted to the judge, and my job was to
20  travel around the country, see, inspect sites
21  being constructed and so forth.  So that's --
22  but if you look at the rest, existing
23  residence, existing residence, this would be
24  the typical type of a job done through Gore
25  Engineering where the company drills borings,

24

1   does outside investigation and then writes a
2   report.
3      Q.   I guess a better question would be,
4   besides this case that you're here on today,
5   have you ever been retained as an individual,
6   as Reda Bakeer, prior to your involvement in
7   this case?
8      A.   Number 1 on Page 73, CPM schedule.
9      Q.   Excuse me.  I'm sorry.  Number 1 --
10     A.   Open Page 73, CPM, that's personally.
11  I did this.  Number 2, accident linked; Effect
12  of Construction Induced Vibrations; actually,
13  every -- all cases on 73 I was personally
14  involved.
15          Top one on Page 74.
16     Q.   Uh-huh.
17     A.   Um -- the third one.
18     Q.   Which we talked about, accident
19  related to settlement of a sidewalk.
20     A.   That is correct.  And the one in the
21  middle, metallurgical investigation, the case
22  in 2001; the Fairway Drive that I mentioned,
23  against the Sewerage & Water Board.
24     Q.   Yes.  We have the Mr. Renaudin?
25     A.   Correct.  And you notice that for

25

1   example GEI, that's Gore Engineering,
2   Incorporated; the last one, distressed floor
3   slab, you see GEI number, that's a job that was
4   done in Gore.  So you'll see this echoed in
5   many of them, GEI J7371, this would be a Gore
6   Engineering job.  So my résumé is clear on what
7   I did personally or what I did through a
8   company.
9      Q.   I believe I understand.
10     A.   So when you see the GEI, that's
11  reference to Gore Engineering, Inc.
12     Q.   I notice one that you pointed out was
13  Metallurgical Investigation of Upper Bearing
14  Casting from Buhler Boom Loading Tower Number 3
15  at ADM-Growmark.
16     A.   Uh-huh.  That's correct.
17     Q.   You were hired by the Chaffe McCall
18  law firm?
19     A.   That's correct.
20     Q.   Do you recall who the attorney was
21  that retained you?
22     A.   That's been a while.  Um -- I don't
23  recall the name.
24     Q.   Dr. Bakeer, did any of the cases that
25  you've been retained in, whether retained by --

26

1  whether retained in your capacity as an
2  employee of Gore or Ardaman or Tulane
3  University or individually, have you ever been
4  retained in a case that involved floodwall
5  collapse?
6      A.   Not a floodwall, but bulkheads, which
7  is a similar structure.
8      Q.   Were you ever involved in cases which
9  contained allegations of a barge collision with
10 a floodwall?
11     A.   No.  The investigation with Chaffe
12 McCall involved some marine incident, but was
13 not involving a barge.
14     Q.   That's one that we talked about at
15 ADM-Growmark?
16     A.   That's correct.
17     Q.   Which facility at ADM was that?
18     A.   That's at, um -- it's in --
19     Q.   Paulina?
20     A.   No.  It's upriver in east St. Charles
21 Parish.
22     Q.   Ama?
23     A.   I don't remember the name now.
24     Q.   Tell me about that case, if you would.
25     A.   There was an incident with a ship at a

27

1  dock.  The crane on the ship collided with the
2  crane on the dock.  And that failure took place
3  in the crane on the dock.  And there were claim
4  which caused which; did the crane on the ship
5  hit the crane, or did the crane on the dock hit
6  the crane on the ship?
7      Q.   And what was the area of expertise
8  that you were to be offered?
9      A.   There was a finite element
10 investigation done by others that I was given
11 to review.  That's all my work.  It had nothing
12 to do with metallurgy or metals or whatever.  I
13 was reviewing a finite element study based on
14 my expertise in finite element analysis.
15     Q.   What do you mean by finite element
16 analysis?
17     A.   Finite element analysis is an advanced
18 method that you use to model complicated
19 geometries and soil conditions.  You look at
20 the structure by dividing it into what we call
21 finite elements, or small elements, and these
22 elements will have material properties
23 representing the structure you're modeling, and
24 then you use a computer -- you have to use a
25 computer -- to solve the differential equations

28

1  that you develop for this, from which you can
2  obtain displacement, stresses, strains, um --
3  torsion, moment, this type of analysis.  So
4  basically, it's a modeling tool to model
5  complex geometries and structures.
6      Q.   I see.
7      A.   That was my Ph.D. dissertation.  That
8  was my Master's thesis, as well.  I did finite
9  element work as a graduate student.
10     Q.   So when you pointed out that your
11 involvement had nothing to do really with
12 metallurgy, you're not an expert in the field
13 of metallurgy.
14     A.   No.
15     Q.   And you've never been so offered or
16 retained.
17     A.   No.  And actually, I did not give a
18 deposition or testify in this case.  I only
19 rendered an opinion of a review of reports
20 submitted by others in this case.
21     Q.   Okay.  Let's talk about your formal
22 education.  And I note that you are a
23 registered professional engineer.  And how long
24 have you been so?
25     A.   '96, I believe.  1996.

29

1      Q.   And forgive me some perhaps simpleton
2  questions, but you are a civil engineer, am I
3  correct?
4      A.   That is correct.
5      Q.   Okay.  How does a civil engineer fit
6  in, in the hierarchy of engineering; in other
7  words, how do you differ from a structural
8  engineer?
9      A.   Civil engineer is actually the
10 umbrella.  Structural engineer is a civil
11 engineer.
12     Q.   Okay.
13     A.   Then you have specialties within civil
14 engineering, for example structural engineer,
15 geotechnical engineering or soil mechanics.
16 You could be an environmental engineer, you
17 could be a sanitary engineer, et cetera.  There
18 are disciplines.  Surveying -- it's your
19 specialty of what you do in concentration or in
20 focus on one specific field.  So structural
21 engineer is -- there is also a looser
22 definition of civil engineering or civil
23 engineer is a term used to describe a person
24 who does the planning and drainage and so
25 forth, but the degree you get from a university

30

1    is a degree in civil engineering, which
2    includes all of the above.
3        Q.   I see.  And have you a specialty, do
4    you not?
5        A.   My area of specialty is geotechnical
6    engineering or soil mechanics.
7        Q.   You received your BS in civil
8    engineering, I see, initially in Cairo?
9        A.   That is correct.  I was actually a
10   structural engineer at the time, and I
11   practiced as a structural engineer for three
12   years afterwards.
13       Q.   And at some point you received an MS.
14       A.   That's about 1982 I got my MS.
15       Q.   At Syracuse?
16       A.   At Syracuse University, that's
17   correct.
18       Q.   At what time in your studies did you
19   begin to specialize in the field of
20   geotechnical engineering and soil mechanics?
21       A.   You start from undergraduate.  You
22   start working with geotechnical engineering.
23   The emphasis -- the specialty in university in
24   Cairo where I got my undergraduate degree, you
25   specialize in your senior year in one of three

31

1    different disciplines.  And the focus and the
2    discipline that I went through on areas of
3    structural engineering, concrete, steel and
4    soil mechanics.  So we get extra courses in all
5    of these, and you get more -- it's like a fifth
6    year.  It's actually a fifth year of education,
7    sort of a mini Master's.  So you focus on those
8    areas.
9        On my Master's and Ph.D., my work was
10   all in soil structure interaction.  I was also
11   a TA for soil mechanics, a teaching assistant.
12   So I got more into the soil mechanics and the
13   soil structure interaction.  However, even when
14   I practiced after my graduation between 1976
15   and 1979, I was designing foundations.  So I
16   was involved in the design, analysis of soils,
17   foundations, I would say in 1974.  Since 1974.
18       Q.   And you finally received a Ph.D. from
19   Syracuse in approximately '85?
20       A.   1985.
21       Q.   Are there other degrees or
22   certifications which identify you as a
23   specialist in the field of geotechnical
24   engineering or soil mechanics?
25       A.   If you count my twenty-two years of

32

1    teaching engineering, you know, soil mechanics
2    and foundations at Tulane, I have graduated
3    generations and generations of practicing
4    engineers in the field.  If you look at the
5    list of publications that I have, you can count
6    how many publication I have.  If look at the
7    number of conferences, invited guest
8    speakers -- I teach the levee school for LSU,
9    teaching the people on the levee boards how to
10   design, how to deal with levees and floodwall
11   structures.  Then I'm a P.E., practicing P.E.
12   I'm the Chief Engineer of Ardaman & Associates
13   and geotechnical engineer.  You don't reach to
14   be a chief engineer unless you're competent in
15   your field.
16       Q.   And I certainly appreciate your
17   experience, Dr. Bakeer.  And my question,
18   though, is there some other degree that is
19   provided to you either in your studies gaining
20   your Master's or your Ph.D. which identifies
21   you as a geotechnical engineer or an engineer
22   who specializes in soil mechanics?
23       A.   The highest degree you can get is a
24   Ph.D.  That's the highest degree.  So I have
25   the highest degree.  Being recognized as a

33

1    P.E., that's the way it is.  Louisiana does not
2    distinguish between structural engineering
3    P.E.s geotechnical engineering P.E.s, et
4    cetera.  The State of California, for example,
5    does.  You get a P.E. in geotechnical
6    engineering.  But the State of Louisiana has
7    only one P.E. license.  But you're defined as a
8    geotechnical engineer based on the recognition
9    by your peers, by the awards you receive, by
10   the education you have or the practice you do
11   or by your titles.
12       Q.   I see.  So you could be a P.E. with
13   the same education as yourself but maybe
14   specializing in marine engineering or some
15   other field other than soil mechanics.
16       MR. RAFFMAN:
17           Objection to form.
18           You can answer.
19       A.   You will be a P.E. in mechanical
20   engineering, you will be a P.E. in marine
21   engineering, you will be a P.E. in electrical
22   engineering, chemical engineering, but you
23   won't be a soil mechanics person.
24   EXAMINATION BY MR. WIEDEMANN:
25       Q.   I see.

34

1    A.   It's different.  Civil engineering in
2  Louisiana falls under one umbrella.  Recently,
3  in the late nineties, they split environmental
4  as a separate specification.  However, not many
5  states do that breakdown.  Like I said, the
6  State of California is an example where you
7  have a degree.
8    Q.   Are you licensed in any state other
9  than Louisiana?
10    A.   No.
11    Q.   And have you ever been licensed --
12  well, apparently you were licensed in Egypt, in
13  Cairo.
14    A.   You're still in training at the time.
15  So I worked in Egypt for about three years.
16    Q.   I see.  When did you first obtain your
17  license in Louisiana?
18    A.   I believe in 1996.
19    Q.   And doctor, as I understand it you
20  were at Tulane University from approximately
21  1985 through I believe you said March of -- or
22  May of '07?
23    A.   July of '85 through May -- end of May
24  '07.  That's correct.
25    Q.   What was the arrangement that you had

35

1  with Tulane University when you were retained
2  as an expert witness in the various cases we
3  discussed?
4    MR. RAFFMAN:
5       Objection.
6       You can answer.
7    A.   There is no specific policy.  You
8  write -- at the end of the year you write a
9  statement saying what consultancy you have done
10  and you declare in this whether you used any
11  university resources in your work or you used
12  any of the students on your work and so forth.
13  And you have to sign this sheet annually and
14  you submit it to the university.  That's part
15  of our process.
16  EXAMINATION BY MR. WIEDEMANN:
17    Q.   Were you required to compensate Tulane
18  university for --
19    A.   As long as you do it outside the time
20  of the university.  That's --
21    MR. WIEDEMANN:
22       You want to say something?
23    MR. RAFFMAN:
24       No.  You should continue.  I
25       think answer -- if you want to leave

36

                        the transcript as it is, you're
                        welcome to.
                     MR. WIEDEMANN:
                        That's fine.
EXAMINATION BY MR. WIEDEMANN:
    Q.   Beginning on Page 54 of your
curriculum vitae -- and just so that we're
clear, the numbers appendix, and then the
number following it, that applies to all of the
appendices and are numbered 1 through -- I'm
asking that question very improperly, but what
I want to know is, your appendices are numbered
consecutively 1 through 83 from Appendix A
through D.  Is that true?
    A.   Correct.  I did not differentiate
between Appendix A, B, C, D, I just started
with Number 1, ending at 83, excluding the
figures, which don't have a number.  They have
only a figure number.
    Q.   Correct.  Okay.  And going to Page 54,
you have a number of publications that have
appeared in peer reviewed journals.  Am I
correct?
    A.   That is correct.
    Q.   Identify for me which of these

37

publications involve floodwalls or flood
protection systems.
    A.   Number 2 on the top, cantilever and
gravity retaining walls; Number 3 on the top,
design of gravity retaining walls.  These are
retaining.
        Finite element study of static earth
pressure.  That's use of finite element
modeling static earth pressure.  So that the
first -- the second, third, fourth, fifth, and
then "Field Test of a Geotextile Reinforced
Levee," that was a study for a levee done by
the U.S. Army Corps of Engineers.  It's a flood
protection levee.
    Q.   That's Number 6?
    A.   That would be Number 6.
    Q.   All right.
    A.   The next one, "Field Performance of a
Geogrid Reinforced Embankment," that was also a
flood protection levee.  Um -- pullout shear
test, on the middle of next page.
    Q.   I'm sorry, doctor.  Which one on
Page --
    A.   Bakeer and Sayed and Cates, "Pullout
and Shear Tests on Geogrid Reinforced

38

1  Lightweight Aggregates," that's related to
2  lightweight aggregates used in --
3      Q.  I see.
4      A.  The next one, Napolitano, he's a U.S.
5  Army Corps of Engineers.
6          The list goes on.  I mean, I can go on
7  the list.  There are so many.
8      Q.  Well, and I'm asking you to do so,
9  please.  But you are identifying them from the
10  actual title of the paper.
11      A.  Correct.
12      Q.  Okay.  And so the last one we had was
13  "Pullout and Shear Tests on Geogrid Reinforced
14  Lightweight Aggregates --"
15      A.  Correct.
16      Q.  And then I believe, the next one with
17  Dr. Napolitano?
18      A.  The late Mr. Napolitano.  He passed
19  away.
20      MR. RAFFMAN:
21          Objection.  I think you missed
22      one, Karl.  I'm sorry.
23      MR. GILBERT:
24          I can't really hear.
25  EXAMINATION BY MR. WIEDEMANN:

39

1      Q.  Doctor, going back to the top of
2  Page 55, again we're looking for journal -- or
3  works that you have participated in which
4  involve floodwalls or flood protection systems.
5      A.  Um --
6      Q.  Beginning at the top of 55.
7      A.  Again, the -- Number 7 from the top
8  relates to it.  Number 8 relates to that.  The
9  first one on top of Page 56.  The fourth one
10  from the bottom on 56.
11      Q.  "Dynamic Earth Pressure with Various
12  Gravity Wall Movements?"
13      A.  Correct.  The second one from the
14  bottom on 56; Page 57, the third one from the
15  top.
16      Q.  Which is "Finite Element Analysis of
17  Earth Reinforced Embankments?"
18      A.  That's correct.  The Page 58,
19  Number 5, Soil/Geosynthetic Interface.
20      Q.  And you're referring to --
21      A.  Bakeer and Abdel-Rahman, "A General
22  Model for Soil/Geosynthetic Interface."
23      Q.  Yes.
24      A.  The one at the bottom on Page 58
25  involves retaining walls and earth pressures;

40

1  embankments, the top one on Page 59, Class C
2  Prediction.
3      Q.  The first one on 59?
4      A.  That's correct.
5          Third one from the top, gravity walls;
6  Number 6, retaining walls; the one on the
7  bottom on Page 59, finite element
8  investigation.
9      Q.  Would you repeat that, Dr. Bakeer?
10      A.  The last article on the bottom of
11  Page 59 entitled "Finite Element Investigation
12  of Geotextile Reinforced Embankment."
13      Q.  Thank you.
14      A.  The second one from the bottom on Page
15  60, field and numerical evaluation of a
16  full-scale; the second one from the bottom,
17  entitled field and numerical evaluation.
18          The Technical Reports, the first one.
19      Q.  "Finite Element Analysis of A
20  Geotextile Reinforced Embankment?"
21      A.  That is correct.  The third one from
22  the -- actually, the last three on Page 61.
23  That's the software for the design of levees
24  that were developed, um -- at Tulane University
25  TUSPIN.  This is a software that we developed

41

1  for the New Orleans District for use in design
2  of levees, the finite element software.
3      Q.  You're referring to the New Orleans
4  District of the Army Corps of Engineers?
5      A.  That is correct.
6          The one in Number 7 relates to shield
7  tests.
8      Q.  Page 62?
9      A.  Page 63, I'm sorry.
10          Then that's the list of publications.
11          Then you have presentations that I've
12  given.
13      Q.  Let's limit it to the publications at
14  this point.  You have divided the publications
15  into journals and fully reviewed publications.
16          Can you tell me the difference?
17      A.  There are publications which are the
18  periodical.  That's what I'm referring to as a
19  journal, which is a periodical that comes on a
20  regular basis every month, every two months,
21  every year, whatever.  That's a periodical that
22  has a regular series of issues.
23          There are publications that are fully
24  reviewed with the same standards as those of
25  the journals but they appear in special

42

1  publications.  It would be like a book or a
2  special publication related to a given topic;
3  for example, the American Society of Civil
4  Engineers does this as part of their
5  conferences, meetings, at the end of the year
6  they want to the put a special publication on
7  the area of, and that's when you either submit
8  it on your own or you're invited to put a paper
9  in one of those publications.  Those are still
10  reviewed according to the same standard as a
11  journal, but it's not a periodical.
12      Q.   I see.  And so those would appear
13  under your fully reviewed publications.
14      A.   There was a full process, that's
15  correct, and review.
16          My purpose was to distinguishing
17  between a conference where you submit the paper
18  and publish it, and a conference where there's
19  a full review or there is a publication.  Some
20  conferences, for example, don't have
21  proceedings as well, so there's no review
22  process for it.
23      Q.   Now, of the articles or publications
24  that you've referenced as involving flood
25  protection systems or floodwalls, can you point

43

1  to those which may have some relevance to
2  I-walls embedded in earthen levees?
3      A.   The earth pressure concepts used to
4  design I-walls are discussed in any of the
5  retaining wall, gravity wall -- these are the
6  concepts that you use to design an I-wall.
7          The levees design, the soil
8  properties, the geometry you get is done by the
9  same methodologies used for a floodwall or an
10  I-wall.  But to say specifically a paper
11  focused on an I-wall?  None of those have an
12  I-wall as the focus.  But the principles are
13  the same.
14      Q.   Could you describe for me any
15  involvement you have ever had with the design
16  of an I-wall system?
17      A.   I designed several --
18      Q.   Tell me.
19      A.   -- for U.S. Army Corps of Engineers.
20  I've designed I-walls on the London Avenue
21  canal, Pump Station Number 4W.  I designed
22  I-walls on the hurricane protection levee on
23  the west bank.  I did analysis of I-walls for
24  different engineering firms when they do levee
25  crossings -- I'm sorry, pipeline crossings, not

44

1  levee -- pipeline crossings or excavations or
2  any work near those, I analyze those as an
3  employee of Gore Engineering or of Ardaman &
4  Associates.  So I was involved in many flood
5  protection designs.
6      Q.   Okay.  Going back, you referenced
7  first the London Avenue Canal near Pumping
8  Station 4W?
9      A.   That's a new pump station that was
10  never built.
11      Q.   I see.
12      A.   4 is an existing pump station.  4W was
13  an addition to 4, but Hurricane Katrina hit
14  before they were able to build 4W.  It was an
15  expansion of the existing pumping station.
16      Q.   When was this?
17      A.   I would say that's around 2004, maybe
18  '03, '04, something like that.
19      Q.   And that was during your employment
20  with Gore?
21      A.   I did this as a consulting engineer
22  with Gore, that's correct.
23      Q.   Do you know whether -- well, let me
24  ask you this:  Were those walls that you helped
25  to design erected prior to Hurricane Katrina?

45

1      A.   For 4W, no.  As I said, it wasn't
2  built.
3      Q.   I see.  So that the design that you
4  did was never actually constructed --
5      A.   That is correct.
6      Q.   -- at London Avenue.
7      A.   But we did review the existing pump
8  station, we designed new walls and T-walls for
9  that station, but they were not built, that's
10  correct.
11      Q.   And they were T-walls, you say?
12      A.   They were I-walls and T-walls.
13      Q.   And you next told me about the
14  hurricane protection levee on the west bank.
15      A.   Yes.
16      Q.   Approximately when were you involved?
17      A.   That's post-Katrina.  That was '06.
18      Q.   And you were working at that time
19  again for Gore Engineering?
20      A.   That was done as a Gore Engineering,
21  that's correct.
22      Q.   And tell me about what your
23  involvement was in the design of the
24  floodwalls.
25      A.   You do analysis.  You use a computer

12 (Pages 42 to 45)

46

1  program, you develop a soil strength diagram,
2  you develop the density -- wet density
3  diagrams, you use the soil properties, you
4  develop, based on the elevations and grades
5  provided by the design firm that's designing
6  the overall pump station or the levee, and you
7  perform the analysis.
8      Q.  So who actually retained Gore
9  Engineering, was it the Corps of Engineers?
10     A.  This job particular job was done for a
11 company called PBS&J.
12     Q.  PBS&J.  Who I take it contracted with
13 the Corps of Engineers?
14     A.  They have their contract with the
15 Corps of Engineers.  That's correct.
16     Q.  You told me about a third instance in
17 which you were involved in the design of
18 floodwalls, I-walls, and it's not coming to me.
19 Where was it?
20     A.  It's not incident, it's not one.  It's
21 multiple cases where there were crossings,
22 excavations, anything -- work done near an
23 existing floodwall, the Army Corps of Engineers
24 requires that the owner or their engineers
25 submit an evaluation of the impact of their

47

1  construction on the existing floodwall, levee
2  or whatever flood protection structure.  So you
3  go through an analyses to assess the stability
4  of the structure with the construction assumed
5  taking place in the vicinity.
6      Q.  And on these multiple occasions in
7  which you've assisted in the design of flood
8  protection systems, was this all after Katrina?
9      A.  Some before and some after.  And
10 again, I want to correct the word.  You said
11 design.  That's not a design, that's an
12 assessment, that's an evaluation.  You're
13 studying the impact of your actions or
14 construction on an existing structure.  So
15 you're not designing the structure.
16     Q.  Before Hurricane Katrina, on how many
17 occasions were you involved in either the
18 evaluation, the assessment of the design of
19 I-wall structures in south Louisiana?
20     A.  I have to go back to my records to
21 give you numbers.  I don't -- many times.  Many
22 times.  I mean, I worked, for example, on the
23 SELA projects, the SELA projects, the urban
24 drainage system in the City of New Orleans and
25 Jefferson Parish.  I can give you the Lapalco

48

1  structure there.  There's the Lapalco
2  intersection.  Um -- there were several
3  drainage canals that were involved in this, so
4  there's a lot of work that was involved with
5  them but I can't give you an exact number on
6  those.
7      Q.  Were you ever involved in any way with
8  assessments or evaluations on the east bank of
9  the Industrial Canal?
10         MR. RAFFMAN:
11             Apart from this case?
12         MR. WIEDEMANN:
13             Yes.
14         MR. RAFFMAN:
15             Sorry.
16     A.  No.  Apart from this case, no.
17 EXAMINATION BY MR. WIEDEMANN:
18     Q.  You referenced the fact that you were
19 retained on several occasions for excavation
20 type projects.  Were you ever retained for any
21 assessments or evaluations for excavations
22 being done on the East Bank Industrial Area?
23     A.  No.
24     Q.  Prior to Hurricane Katrina, were you
25 ever retained by anyone to do an evaluation or

49

1  an assessment of flood walls at the 17th Street
2  Canal?
3      A.  I was approached, but I did not do it.
4      Q.  And the same question as to the
5  Orleans Avenue Canal?
6      A.  The Orleans, I've mentioned I worked
7  on the 4W.
8      Q.  And that was before Katrina.  Right
9  before Katrina.
10     A.  That is correct.
11     Q.  And what about the London Avenue
12 Canal?
13     A.  That's the London Avenue Canal.
14     Q.  I'm sorry.  I said the Orleans first.
15     A.  I'm sorry.  I thought you said
16 Orleans?  Okay.  Then no, the 4W is on the
17 London Avenue Canal.  No.  I did not work on
18 the Orleans Canal.
19     Q.  Okay.
20     A.  Sorry.
21     Q.  And again, and I believe you've said
22 this, but have you ever done any work prior to
23 Katrina with regard to the flood protection
24 system at the Inner Harbor Navigational Canal?
25     A.  No.

50

1      (Brief recess.)
2    EXAMINATION BY MR. WIEDEMANN:
3      Q.  Dr. Bakeer, during the break it was
4    brought the my attention that you are fasting
5    due to religious reasons.
6      A.  That's correct.
7      Q.  Okay.  And you know, I want to let you
8    know that this potentially could go seven
9    hours.  So I'm urging you if at any time you
10   feel as though you can't continue to let us
11   know, because we are relying on the fact that
12   you were going to be able to supply us answers
13   to the questions we ask.
14     A.  I'm doing fine so far.
15     Q.  Okay.  Is that fair enough?
16     A.  That's fair.
17     Q.  Thank you.  Back to your curriculum
18   vitae.  In addition to the journal articles and
19   the peer reviewed publications you also cite
20   several technical reports.  And I note that
21   many of them are reports to the U.S. Army Corps
22   of Engineers.
23     A.  That's correct.
24     Q.  Okay.  And could you please tell me
25   about that, how you came to write technical

51

1    reports to the U.S. Army Corps of Engineers.
2      A.  This was funded research, to do
3    research work for the Army Corps of Engineers.
4    I worked with the Corps on multiple projects
5    over the years as a faculty at Tulane
6    University.
7      Q.  I see.  So you would be approached
8    directly by a representative of the Corps of
9    Engineers to assist?
10     A.  Um -- there are different ways, and
11   that varies from one case to the other.  You
12   write a proposal for the Army Corps of
13   Engineers, it's reviewed and then it's approved
14   for funding.  And in other cases you're
15   approached by a manager to submit the proposal,
16   or it's what they call, um -- broad agency
17   announcement.  Broad agency announcement.
18   That's the name.  So you can apply under the
19   broad agency announcement.
20     Q.  And as an example, you provided to us
21   as having some relation to floodwalls or flood
22   protection systems the first one under
23   Technical Reports, "Finite Analysis of a
24   Geotextile Reinforced Embankment."
25      Tell me about that, please.

52

1      A.  That's correct.  I was involved with
2    the very first geotextile reinforced
3    embankment.  Embankments used for flood
4    protection are typically built of earthen
5    materials, clays in general.
6       Geotextiles are fabrics made of
7    plastics used to reinforce levees.  And they
8    could allow you to build some levees in areas
9    where the soil conditions are very poor.
10      This was an experimental study done by
11   the Corps of Engineers and actually a couple of
12   the papers that I also mentioned are related to
13   discussion of this particular field study.
14   Then we perform finite element analyses to
15   obtain some additional data to back up what
16   came out from the field study.  So that was --
17     Q.  And again, we talked about finite
18   element analyses, and basically computer
19   programs to study or test the efficacy of, in
20   this case, a geotextile reinforced embankment?
21     A.  It could be used as a design tool, and
22   it was used in this particular case to
23   supplement information from the field test.
24   The field study yielded some data, the data was
25   deficient in some areas, so we needed to

53

1    supplement this data with a numerical analysis,
2    which was the finite element in this case.
3      Q.  And further down you referenced a
4    computer program TUSPIN?
5      A.  TUSPIN; Tulane University SPIN.
6      Q.  Tell me about TUSPIN.
7      A.  Based on their experience with our
8    work on the finite element analyses, um -- they
9    wanted to have the capability of performing
10   their own finite element analyses using their
11   own software.  So I was funded one more time by
12   the Corps of Engineers to develop a software
13   package.  My coauthor on this was my Ph.D.
14   student.  So this was his Ph.D. dissertation,
15   as a matter of fact.
16      Then they asked for two interface
17   programs to enter the data and one to plot the
18   outputs.  So these are the two software that
19   you see, as in TUPREP, that's the preparation
20   software, and the PLOT is the one that plots
21   the outputs.
22     Q.  Do you have any knowledge as to
23   whether or not the Corps of Engineers ever put
24   into use the program that you and Mr. or Ms.
25   Tavassoli developed?

54

1    A.   They used it for very limited basis,
2  they did not use it much.  They used the close
3  form solutions that they have.
4    Q.   Okay.  Now, you told me that you were
5  first contacted in this case by Mr. Rob Fisher
6  in I believe March of '07?
7    A.   I believe that's correct.
8    Q.   Okay.  Was your retention in this case
9  in writing?
10    A.   Um -- I believe we corresponded.  I
11  gave them my rates and hourly rate to work on
12  the case.
13    Q.   What is your hourly rate, doctor?
14    A.   $175 per hour.
15    Q.   And just to get this out of the way,
16  how much have you billed to Lafarge and/or its
17  attorneys in this case thus far?
18    A.   About one twenty-five.
19    Q.   A hundred and twenty-five thousand?
20    A.   Yeah.
21    Q.   Other than yourself, has anyone else
22  assisted you in the preparation of your report
23  and the reliance materials?
24    A.   No.  I collected all the information
25  myself, I typed a report myself, and I

55

1  performed the analysis myself.
2    Q.   Consequently, the entire $125,000
3  represents billing by you at the rate of $175
4  an hour.
5    A.   It includes my other miscellaneous
6  expenses.
7    Q.   Travel and such.
8    A.   (Nods affirmatively.)
9    Q.   When you were retained in March of
10  '07, what were you tasked to do?
11    A.   I was asked to look at the two
12  specific failures that occurred on the east
13  bank -- as a matter of fact, I believe I was
14  tasked with evaluating the southern breach in
15  particular.  The north breach, I looked at it
16  at that time, too, but my task was to look at
17  the southern breach.
18    Q.   On the first page of your report you
19  say that the report represents -- and this is
20  second full paragraph -- the report represents
21  my views as a registered professional civil
22  engineer in Louisiana specializing in
23  geotechnical engineering (soil mechanics) and
24  foundation design, including design of levees
25  and floodwalls, and as a former university

56

1  professor.
2    Do you anticipate being called to
3  offer expert opinions in any other fields other
4  than those you have designated in your report?
5    A.   No.
6    Q.   At the time that you were retained,
7  were you told that you were being retained or
8  engaged to defend Lafarge North America?
9    A.   That's correct.
10    Q.   Prior to March of '07, had you ever
11  been engaged in any way by Lafarge North
12  America?  To your knowledge.
13    A.   I bought cement from them.
14    Q.   Initially when you were retained, were
15  you told that there was an allegation of a
16  barge breaching the eastern floodwall, first of
17  all at the southern breach?
18    A.   That is correct.
19    Q.   What were you told about that?
20    A.   I was told that there was a claim that
21  the barge was involved with the southern
22  breach.
23    Q.   Before March of '07, had you ever
24  personally inspected the east bank floodwall at
25  the IHNC?

57

1    A.   Yes.  I did, around October, November
2  of '05.
3    Q.   Okay.  Tell me about how that came
4  about.
5    A.   Um -- I was here by myself, my family
6  was away since the hurricane, so Tulane
7  University was closed, Gore Engineering was
8  closed at that time, we did not have any
9  business, and I -- as a scientist, as an
10  engineer, I had interest in seeing what
11  happened with the storm, so I visited the sites
12  just to see what happened, how did it happen,
13  try to -- just out of curiosity, like a
14  scientific curiosity, but not really sniffing
15  for evidence or looking around or -- I just
16  visited the site.  It was a casual visit, not a
17  very formal visit.
18    Q.   Okay.  You said October of November of
19  '05.  Was it only one occasion?
20    A.   That particular site, yes.
21    Q.   Yes.
22    A.   Yes.  I visited it after I was engaged
23  on the lawsuit.  But not before.
24    Q.   We're talking before --
25    A.   No, before that was the only visit

58

1  that I made to the site.
2      Q.  And it was either in October or
3  November.
4      A.  Correct.
5      Q.  In any event, after Hurricane Rita?
6      A.  Correct.  I was out of state until
7  after Hurricane Rita, so definitely was after
8  Rita.
9      Q.  Doctor, were you evacuated for
10 Hurricane Katrina?
11     A.  Yes, I was.
12     Q.  In what part of town do you live, sir?
13     A.  In Metairie.
14     Q.  Did you ever provide an opinion prior
15 to March of '07 that the barge caused the
16 breach in the east side floodwall of the IHNC?
17     A.  No.
18     Q.  When you presented to the IHNC in
19 October or November of '05, did you see the
20 barge?
21     A.  From a distance.  I didn't really go
22 all the way down.  I toured the area.  You
23 know, the area was pretty much sealed, and it
24 wasn't -- you can't trespass in that area.
25 From just a distance off the bridge I could

59

1  see.
2      Q.  You could see that the barge was in
3  the neighborhood on the other side of the flood
4  protection system?
5      A.  From Claiborne Avenue you could see
6  that.
7      Q.  Did it ever occur to you that the
8  barge had caused the south breach?
9      A.  I've seen the news reports, so I was
10 aware there was a barge in the area, not even
11 being to the site.  I've seen the news reports
12 that was broadcast during Katrina and Rita
13 showing the barge and all the stuff, so I was
14 aware of its presence.  Um -- that's all I knew
15 about it at that time.  Whether the barge
16 caused -- again, from a scientific viewpoint,
17 you have to look at the causes, and you study
18 the case to see that.  But don't rule out
19 anything when you see things in the area.
20     So at that point I didn't have any
21 opinion, I didn't have anything.  I was just
22 casual driving around looking at the area,
23 looking what happened with the different
24 floodwall systems.  As I said, I was involved
25 in some of the designs, I know how they are

60

1  designed, I wanted to see what happened with
2  those.  But again, not really very high
3  scrutiny for those.
4      Q.  So you were not retained by anyone,
5  you were there as a curious scientist.
6      A.  Absolutely.
7         That same thing for the 17th, the
8  London, I just drove by.  I didn't go
9  particularly for the IHNC.  Like I said, I
10 drove around the area in my spare time.
11     Q.  And you were interested in the
12 floodwalls as you had been involved in design
13 of similar floodwalls?
14     A.  Correct.  Something you've seen,
15 something you've designed, something you've
16 seen in the videotapes that was played during
17 the storm.  It's my city, it's my town, I'm
18 just interested.
19     Q.  Once again, though, you were never
20 involved in design or evaluation or assessment
21 of the flood control system at the Inner Harbor
22 Navigational Canal.
23         MR. RAFFMAN:
24             Objection.  Asked and answered.
25             Vague as to time.

61

1      A.  No.
2  EXAMINATION BY MR. WIEDEMANN:
3      Q.  Now, you were, you say, on the
4  Claiborne Avenue bridge?
5      A.  I drove around both.  I came from
6  the -- Florida Avenue was closed, I drove
7  around St. Claude, I drove around this.  I came
8  actually from the 510.  I just drove the area
9  in general.  But not -- specifically been into
10 the site by the wall, the answer is no.  I did
11 not look at the wall at that time in close
12 distance.
13     Q.  Did you ever stop and get out of your
14 vehicle during this inspection?
15     A.  No.
16     Q.  Did you take any photographs?
17     A.  No.
18     Q.  So when you were there at the IHNC in
19 October or November of '05, you had not ruled
20 out the fact that the barge may have caused the
21 breach of the levees.
22         MR. RAFFMAN:
23             Objection.  Asked and answered.
24             You can answer.
25     A.  I didn't even think about it.  Like I

**62**

1   said, I was just driving around.  I did not
2   consider causes or mechanisms at that time.
3         Keep in mind that entering that area
4   was not that easy.  You actually had to have
5   special clearances to enter.
6       Q.   Do you know Dr. Bob Bea?
7       A.   I don't know him personally, but I
8   know of him.
9       Q.   You know of him.
10      A.   Yes.  We never met.
11      Q.   You didn't have any conversations with
12  him in October or November of '05?
13      A.   No.
14      Q.   Now, doctor, you have provided me with
15  a list of reviewed -- not me, but us -- with a
16  list of reviewed documents.  And I've gone
17  through it, and I don't see any witness
18  statements or depositions.
19        Have you reviewed any witness
20  statements or depositions?
21      A.   I've read some of them in reports that
22  are listed on that list, but I did not read any
23  full depositions or -- you know, that wasn't my
24  task.  My task was to look at the soils, look
25  at the mechanisms of the failure, but not to

**63**

1   look at expert witnesses.  I was not asked to
2   do that.
3       Q.   Well, I'm not talking about expert
4   witnesses.
5       A.   I'm sorry.  I should say eyewitness.
6       Q.   Yes.  Fact witnesses, eyewitness?
7       A.   I was not asked to do any review of
8   those, no.
9       Q.   So is it true to say that the depos
10  don't appear, the only testimony you may have
11  reviewed would be contained in other reports of
12  other agencies or witnesses, experts?
13      A.   Correct.  They would be parts of the
14  reports listed on my list here where I got
15  information, or eyewitnesses.
16      Q.   You never read the deposition of
17  Ernest Edwards, for example?
18      A.   Not the full deposition, no.
19      Q.   Had you read any of his testimony?
20      A.   I've read some in the records, like I
21  said, but I have to be reminded of what exactly
22  the sections, because I may or may not have
23  read that particular section.
24      Q.   What portion, if any, did you read of
25  Mr. Villavaso's deposition and/or statement?

**64**

1       A.   Um -- I've read the section where he's
2   describing seeing something at the north breach
3   and seeing the water coming in, being dark in
4   the morning and rainy, the section when he
5   discusses calling 911, the section where he's
6   calling about losing power, he asked them to
7   cut off power.  That's my recollection of,
8   um -- of what I've seen.
9       Q.   So basically the paragraph that
10  appears in your report is the testimony that
11  you read?
12      A.   I would say maybe another paragraph or
13  two, but not the full testimony.
14      Q.   Did you read any testimony from either
15  a statement or a deposition of Mr. Arthur
16  Murph?
17      A.   I've seen sections or excerpts from
18  his testimony in Cushing 's report that I
19  reviewed.  I looked at Cushing 's report.
20  Dr. Cushing.  And he's got some excerpts, and I
21  would say that my knowledge of the eyewitnesses
22  is limited to paragraphs here and there, but
23  not the full testimonies.
24      Q.   So your answer would be the same as to
25  Sidney Williams?

**65**

1       A.   I would give the same answer to any
2   eyewitness.
3       Q.   To any factual witness.
4       A.   That's correct.
5       Q.   At the time of your engagement by
6   Mr. Fisher, what materials were provided to you
7   to review.  Just at that time --
8       A.   Nothing.
9       Q.   -- initially.
10      A.   Nothing. I was tasked of collecting my
11  own information, digging out the information.
12  All I was handed at that time are two aerial
13  photographs, one before '05 and one after '05.
14  Those are the only two material documents that
15  I got.
16      Q.   And those photographs appear in your
17  grouping of figures.
18      A.   I believe so.  I believe it's -- they
19  were aero data, my recollection.
20      Q.   Might I suggest to you Figure 76?
21      A.   I think it's the last figure in the
22  packet.  You're correct.  And actually, some of
23  the sketches shown in the report are actually
24  blowups of some of those sections from those
25  two photographs.

17 (Pages 62 to 65)

66

1    Q.   So what was the other photograph
2  besides 76?
3    A.   This is the pre-Katrina, and if you
4  flip one page back --
5    Q.   Right.
6    A.   -- you will see again some
7  enlargements.  There was another -- a
8  post-Katrina which I probably used it
9  somewhere.  If you look at Figure 65, I have
10  the full image of 65.  This is only a section
11  taken of 65.  And that's pretty much what I had
12  originally from the group.  But you can see
13  that I relied a lot on information that I
14  collected myself.
15    Q.   Uh-huh.  And these were provided to
16  you by Mr. Fisher's office?
17    A.   That's correct.
18    Q.   And initially, what was the initial
19  job you were supposed to do, were you supposed
20  to go out to the IHNC?
21    A.   I wasn't instructed to do any specific
22  proceed.  I developed my own procedure of how
23  to approach this.  All I was asked to
24  investigate the probable, possible, most likely
25  cause of that failure at that location,

67

1  specifically the southern breach.
2    Q.   Okay.  Let's talk about exactly how
3  you set about to do what you were tasked to do.
4  You reference in your report many computer
5  programs that were used, I take it, to do a
6  finite elemental analysis.  Is the true?
7    A.   I did not do finite element analysis
8  for this case, no.
9    Q.   No?  But in any event, you used
10  several computer programs that are all through
11  your report, actually.  Can you, as you sit
12  here today, tell me which computer programs you
13  used?
14    A.   Correct.  If you flip to the appendix
15  I can help you with this easily.
16        Can I just say something?
17    Q.   Certainly.
18    A.   Because I think you asked a question
19  but you jumped to another question.  How did I
20  approach this?  I did not start with computer
21  programs.
22    Q.   Okay.  Let me back up slightly, if you
23  don't mind.
24    A.   Absolutely.
25    Q.   You raise a good point.  And what I

68

started to ask you was how you set to go about
doing the task which you were assigned to do.
    A.   Correct.  That was my understanding of
the question, then you jumped to the computer.
    Q.   I did.  Sorry.
    A.   So the way I approached this is you
first approach it with a clean mind of not
ruling anything, not making an opinion.  You're
not -- this is your approach to a research
problem.  Like I do research?  You start
selecting information first.
        So the first thing is gleaning the
available information, libraries, Internet,
published information.  I spent quite a good
time reading the IPET, the ILIT, the Team
Louisiana reports, collecting this information.
And from there, I started focusing -- I read --
I wouldn't claim that I read the six thousand
pages of IPET.  I mean, I read most of it, but
not the six thousand pages.
        So I focused on some specific aspects
relating to the IHNC more than I would focus on
the other areas, but I did read the analysis,
for example, of all the floodwalls.  Then
started looking at what happened at this site

69

and what happened at the other site.  And then
start looking at the procedure to move on with
conclusions, or forming some opinion first
before you reach a conclusion.
        Then once you formed an opinion, start
investigating this hypothesis, see if it works
or it doesn't work.  That's when you move into
the analysis phase.  That's when you started
using computer programs to see what you reach.
        So basically, it's a methodological
process; you go step by step by first gleaning
the information, then you move into formulating
some hypotheses, you examine the hypotheses,
and then you see which one of them would work.
    Q.   So if I understand you correctly, you
first formed an opinion --
    A.   No.  I may have said the word opinion,
but I meant, and I correct myself; I said
hypotheses.  Not an opinion.
    Q.   Okay.  So you formed an hypothesis,
and then you attempted to confirm it with field
tests, perhaps, and with computer programs.
    A.   No field tests.  I only performed
analyses.  And, actually, you examine the
hypothesis and see if it's -- and what answers

70

1  you get from your analysis, that's correct.
2      Q.  And your hypothesis was formed after
3  having reviewed IPET, ILIT and Team Louisiana
4  reports.
5      A.  If you want to discuss the hypotheses,
6  what I went through is I took the Army Corps of
7  Engineers procedure for design and evaluation
8  of existing I-walls, and I followed this
9  procedure step by step.  That's the hypothesis
10  I reached, not relying on ILIT and IPET.  ILIT
11  and IPET provided me with information such as
12  soil information, soil borings, cone
13  penetrometer, observations -- cone
14  penetrometer, photographs, all this information
15  needs to be examined.  You look at the
16  photograph, you glean something from a
17  photograph.  You examine what ILIT photograph,
18  you examine the IPET photograph.  You collect
19  all this information, but the hypotheses that I
20  performed is let me go step by step according
21  to the design analysis procedure used by the
22  Corps of Engineers to design a floodwall and
23  see if this floodwall at that location
24  satisfies the requirements or not.  And that's
25  when I reached the conclusion that this wall

71

1  was insufficient and deficient.
2      Q.  Okay.  And I appreciate that,
3  Dr. Bakeer, but in any event my question was
4  pretty simple, and it is whether or not you had
5  formed your hypothesis after having reviewed
6  the IPET, ILIT and Team Louisiana reports.
7      A.  And my answer is no, I did not form an
8  opinion, I formed -- I collected information I
9  used to do my analysis.  But I did not form a
10  hypothesis based on IPET or ILIT.  The answer
11  is no.
12      Q.  And once again, doctor, I'm not trying
13  to split hairs, but the question really
14  involves more of a chronology.  I'm not saying
15  that you relied on exclusively IPET, ILIT or
16  Team Louisiana, but your hypotheses was
17  developed after having read those reports.
18      A.  If you phrase it this way, then the
19  answer is correct.  I read the reports and then
20  I went through the analysis afterwards; that's
21  correct.
22      Q.  Doctor, I need to back up because I
23  frankly forgot to ask you something.
24          When you initially went out to the
25  IHNC in October or November of 2005, you

72

1  indicated that you also went to other breach
2  locations that are on other outfall canals.
3      A.  That's correct.
4      Q.  Okay.  Where did you go?
5      A.  17th and London Avenue Canal.
6      Q.  And once again, did you actually get
7  out of your vehicle at those locations?  Or --
8  did you get out of your vehicle at those
9  locations?
10      A.  I don't recall going out of the
11  vehicle.  I just drove around.
12      Q.  Did you take any photographs?
13      A.  No.
14      Q.  And again, that was true at the IHNC,
15  no photographs.
16      A.  That is correct.
17      Q.  All right.  At any time during October
18  or November of 2005 when you were a curious
19  scientist, did you take any photographs?
20      A.  That's -- no, I did not.
21      Q.  Have you ever inspected the Lafarge
22  facility at the IHNC?
23      A.  No.
24      Q.  Were you aware when you were retained
25  in March of '07 that the barge which ended up

73

1  at -- the ING 4727 which ended up in the
2  neighborhood had been moored at the Lafarge
3  facility?
4      A.  I was told that it was moored at the
5  Lafarge facility.
6      Q.  Were you aware that there were other
7  barges moored there, as well?
8      A.  That is correct.
9      Q.  Okay.  What significance, if any, do
10  you draw from the fact that only one of the
11  seven barges broke loose?
12          MR. RAFFMAN:
13              Objection.
14  EXAMINATION BY MR. WIEDEMANN:
15      Q.  If any.
16      A.  I can't answer the question.  I mean,
17  I -- could have been one, could have been two,
18  could have been three, it just happened that
19  it's one.  I mean, I don't have --
20      Q.  Were you aware that the barges that
21  remained moored were loaded barges as opposed
22  to the one which broke away which was an empty?
23      A.  I'm aware of this fact when I reviewed
24  documents, but not at the time.
25      Q.  From your review of documents?

74

1      A.   From my review of the documents,
2  that's correct.
3      Q.   Do you place any significance or draw
4  any inference from that fact?
5          MR. RAFFMAN:
6              Objection.
7      A.   Again, I want to focus on my
8  involvement here.  I'm an expert in soil
9  mechanics.  I'm an expert in the stability of
10  the wall.  Why the barge got loose, how the
11  barge got loose, I would rather that you direct
12  questions to the marine architects, to people
13  who have expertise in this field.
14  EXAMINATION BY MR. WIEDEMANN:
15      Q.   Fair enough.  And that's why I'm
16  asking you these questions.
17          So let's talk about that.  You don't
18  intend to offer any opinions whatsoever with
19  regard to mooring practices or with regard to
20  the vessel 's movement across the IHNC or any
21  movement whatsoever of the vessel.
22      A.   Only when it comes to basic laws of
23  physics and science.  When you look at it from
24  that angle.  But how does it make a turn and
25  why would it go in this direction or that?

75

1  That's beyond my expertise and I'm not here to
2  testify on this.
3      Q.   Right.  And in that particular case
4  you would defer to other experts such as
5  Dr. Cushing, for example?
6      A.   Whoever did the work, absolutely.
7      Q.   And that would be true with regard to
8  meteorology?
9      A.   That is correct.  That's not my area
10  of expertise.
11      Q.   Marine engineering?
12      A.   Correct.
13      Q.   Hydrology?
14      A.   Basic knowledge of hydrology.  But I'm
15  not going to, you know, claim to be an expert.
16  But I've studied hydrology.  I studied open
17  water channel flow, all this.  I have the basic
18  knowledge that you need to be a P.E., BSC,
19  Ph.D.
20      Q.   Does the field of hydrology factor
21  into your opinions whatsoever?
22      A.   Open channel flow?  Absolutely, there
23  are some issues with the water flow.
24      Q.   I believe you said that you would give
25  opinions as to the barge 's movement only as

76

1  regards the basic laws of physics.
2      A.   Correct.
3      Q.   Okay.  Well, from a practical
4  standpoint, what opinions do you expect to give
5  regarding the barge 's movement?
6      A.   Basically, by reviewing the reports
7  that I've read regarding the weather
8  conditions, currents, et cetera, the direction
9  of the wind, the direction of the current in
10  the channel would tell you which direction the
11  barge has moved.  That's the limit to what I'm
12  using from those records.  Beyond that, again
13  it goes outside my area of expertise.
14      Q.   To what extent, Dr. Bakeer, have you
15  personally consulted with the other experts
16  retained by Lafarge in this case?
17      A.   Very minimal.  I only read the
18  records.  I did not talk to them one on one.
19      Q.   To any of them.
20      A.   I spoke with them on short, brief -- I
21  met with them couple of times at the attorneys'
22  offices, just to know one another, but
23  communicating over the phone from New Orleans
24  or visiting with them, no.
25      Q.   Uh-huh.  Specifically, who did you

77

1  speak to directly?
2      A.   Dr. Cushing.
3      Q.   Uh-huh.
4      A.   Dooley.  I mean, I spoke with those --
5  Daggett.  I spoke with them briefly, but not
6  really in depth or, like I said, one on one.  I
7  asked for some photographs from Dr. Cushing
8  because I didn't have the originals.  He
9  forward them to me.  That's the limit.  But
10  mainly my communication was on very brief
11  occasion with Dr. Cushing.  That's the only
12  one.
13      Q.   Dr. Bakeer, does your report contain
14  all of the bases and reasons for your opinions?
15      A.   After I received the reliance material
16  from Dr. Marino I had some additional review of
17  this which goes beyond this report.  Other than
18  this reliance material, my conclusions are the
19  same and my conclusions are all contained in my
20  present report.
21      Q.   Well, as we have noted earlier, you do
22  have a review of Dr. Marino 's report.  Are you
23  saying that upon receiving the reliance
24  materials you intended to update --
25      A.   I may do that.

78

1    Q.   -- that review?
2    A.   I may do that, but not at this point.
3  I wasn't asked to do anything further, but,
4  um -- I received the reliance after I wrote
5  this report.
6    Q.   And after you wrote the review of
7  Dr. Marino.
8    A.   I meant to say the letter.  That's
9  correct.  That's what I mean to say.
10    Q.   Okay.  Is there anything that you
11  relied on in producing your report which is not
12  referenced in your reliance materials?
13    A.   I don't believe so.  I'm just trying
14  to remember if any -- no, I don't think so.
15    Q.   Dr. Bakeer, has all of the work that
16  you've done regarding the breaches of levees in
17  the New Orleans area been done for Lafarge and
18  its attorneys?
19    A.   For the breaches?  Yes.
20    Q.   Uh-huh.  For the breaches anywhere.
21    A.   That is correct.  That's the only work
22  I've done related to the breaches.
23        I gave presentations on the breaches,
24  so I did review the other breaches and I gave
25  presentation -- as I mentioned earlier, I'm one

79

1  of the instructors for the levee school at LSU
2  for the levee boards.  And I gave two sets of
3  lectures, workshops on discussing the different
4  failures throughout the New Orleans protection
5  system.  So in the process of doing this I did
6  review data, but I did not do analysis.  That's
7  the big difference.  I did not do my own
8  analysis of the other breaches.  But I reviewed
9  the published data related to all the other
10  breaches.
11    Q.   And presented a talk.
12    A.   Multiple times.  And it's actually
13  available on the website for LSU.
14    Q.   It is.
15    A.   Yes.
16    Q.   Can you identify that for me?
17    A.   It's called The Levee School.
18    Q.   The website.  Do you know?
19    A.   Um --
20    Q.   You said LSU?
21    A.   It's LSU.  You can find it.
22    Q.   Yeah.  And once again, the levee
23  school is for the various levee boards,
24  districts?
25    A.   As you may be aware, the DOTD now,

80

1  Louisiana Department of Transportation, is in
2  charge of the levee boards.  It comes under the
3  Louisiana Department of Transportation.  So the
4  Louisiana Department of Transportation gave a
5  grant to LSU to develop this levee school to
6  educate members of the levee boards of what a
7  levee system.  You may be aware that the
8  members of a levee board are not necessarily
9  engineers, Corps of Engineers employees and so
10  forth, so we have average citizens.  So the
11  idea is to educate them on the process.
12    Q.   And The Levee School is conducted
13  where?
14    A.   At LSU.
15    Q.   In Baton Rouge?
16    A.   In Baton Rouge on the campus, that's
17  correct.
18    Q.   And you said that your -- that it was
19  on the website.  Is there a transcript of your
20  talk or an outline of your discussion?
21    A.   Actually, the Power Point presentation
22  is there, and I believe they have a webcast.
23  You can actually see it.
24    Q.   Okay.  We started to identify the
25  various computer programs that you used in your

81

1  analysis.  Can we return to that?  And I'm
2  simply looking at this point for a
3  comprehensive list of those programs that you
4  may have used.
5    A.   Correct.  And I'm pointing you to the
6  Appendix B.
7    Q.   Appendix B.  Okay.
8    A.   Okay.  And Appendix B contains the
9  discussion of my analyses, as well as a review
10  of the present guidelines from U.S. Army Corps
11  of Engineers for design of I-walls.
12    Q.   Uh-huh.
13    A.   And which is called the HSDRRS-DG,
14  Hurricane and Storm Damage Risk Reduction
15  System, DG, design guidelines.  And if you flip
16  to Page 13 you will see on the top the program
17  CWAL S-H-T, CWALSHT spelled C-W-A-L-S-H-T.
18  This program is used to analyze I-walls and
19  also what's called anchored walls.
20    Q.   Anchored walls?
21    A.   Anchored.  Correct.
22    Q.   Uh-huh.
23    A.   The next page, Page 14, Slope
24  Stability Program Based on MVD Method of
25  Planes.  That's Mississippi Valley Division.

82

1  MVD.  And MOP is Method of Planes.  That's the
2  acronym for this method.
3       And you see in this discussion with my
4  initials in front of it the program Stability
5  with Uplift, FS004.
6       Q.   Yes.
7       A.   That's the standard program used by
8  the New Orleans District to analyze levees,
9  I-walls, et cetera.
10      That's -- then the Spencer's
11  procedure, if you continue on this same page,
12  14, the Spencer 's procedure under -- again,
13  after my initials, it says I performed the
14  analysis using a program called Slope/W.
15      Q.   Yes.
16      A.   Okay?  And just to point out, those
17  are the main three programs that I used, but I
18  did some additional analysis using spread
19  sheets that I personally developed.  It's not a
20  public domain, it's a spread sheet that I
21  wrote.
22      Q.   I see.  With regard to the three
23  programs, did you personally operate these
24  programs?  Or did you retain anyone to assist
25  you?

83

1       A.   I've used them for years and years and
2  years myself.  I can tell you where the errors
3  are on those programs and where the typos are.
4       Q.   For example, the New Orleans District
5  uses Stability and Uplift FS004.  That was in
6  use before Hurricane Katrina.
7       A.   That is correct.
8       Q.   Uh-huh.
9       A.   That's an old software.  And CWALSHT,
10  as well, that's an old software, it's been
11  around for years.
12      Q.   Okay.  In layman's terms, what does
13  the HSDRRS-DG 07 program do?
14      A.   Um -- this is not a program.  It's
15  design guidelines.
16      Q.   Design guidelines.
17      A.   Basically, if you travel through my
18  chapter, my Appendix B, that's basically
19  excerpts taken from it.  If you start at Item
20  Number 2 on Page 13.
21      Q.   Yes.
22      A.   That's how it reads at the U.S. Army
23  Corps of Engineers manual.  It says U.S. Army
24  Corps of Engineers I-wall Design Criteria.
25  That's just a reference I'm giving it.

84

1  Item 3.2 -- you see I jump to 3.2, because
2  that's the number in the Corps' own document.
3       Q.   Pertaining to I-wall.
4       A.   That correct.  So it's Criteria Number
5  3.2, and it's the I-wall design, and the steps,
6  if you follow them one by one, that's what the
7  Army is asking you to do or perform to design
8  or analyze an existing wall.  Any comments you
9  see in italics preceded with my initials RMB,
10  that's my own comment on that article or that
11  item of the Corps.  So anything in regular
12  face, bold face, that's the Corps of Engineers
13  writing.  Anything you see in this chapter or
14  appendix underscored is something I felt was
15  worth noting.
16      Q.   Uh-huh.  Okay.  So the italics are
17  your comments and the underscores are just for
18  emphasis.
19      A.   It's just for emphasis, that's
20  correct.
21      Q.   All right.  Now, these guidelines --
22  design guidelines are dated 2007?
23      A.   Correct.
24      Q.   Uh-huh.  So --
25      A.   And let me just make one correction

85

1  here.
2       Q.   Go right ahead.
3       A.   The geotechnical chapter, which is
4  chapter 3, was updated in '08.  May '08.  So
5  the original report -- that's why when you see
6  in my referencing it, I'm referencing it as
7  07/08.  The original document was introduced in
8  '07, the update was done in '08.  Only for the
9  geotechnical chapter.
10      Q.   Now, elsewhere in your report you
11  reflect that the -- at least the east side of
12  the IHNC floodwall was originally retrofitted
13  with I-walls in approximately 1966?
14      A.   '66, '68.  Something like that, yes.
15      Q.   Okay.  Can you tell me the dates that
16  this process was performed on the 17th Street
17  Canal?
18      A.   The 17th was performed much more
19  recently.  That was a more recent.  I don't
20  recall, but I believe it's in the late
21  eighties, early nineties, if I remember
22  correctly.
23      Q.   And what about the London Avenue?
24      A.   The London was also a new one.  About
25  the same time.

86

1   Q.   Eighties, nineties?
2   A.   Yeah.
3   Q.   And the Orleans canal?
4   A.   It's a little bit older, but I believe
5   it's still newer than the -- and again, when
6   you say retrofitted, it's not actually
7   retrofitted.  It's an enlargement.  It's
8   actually increasing the flood protection level
9   by increasing it, by adding an I-wall.
10   Q.   Well, it's my understanding that the
11   I-wall, a sheet pile is driven into the levee
12   to a certain depth and then capped with a
13   concrete cap.  Is that true?
14   A.   That is correct.  To increase the
15   protected heights.
16   Q.   And in some cases earth was added to
17   the existing levee in advance of the driving of
18   the sheet pile.
19   A.   Correct.  To meet the design criteria
20   in terms of grades.
21   Q.   Right.  Were there differences in the
22   design guidelines between 1966 and the later
23   enlargements done at the 17th Street Canal and
24   at the London canal?
25   A.   Um -- there was some issues with the

87

1   elevations, the reference datum that was used.
2   But the concept of the design was pretty much
3   the same, did not change much.  The only
4   serious update was in '06.  There was an issued
5   update in '06 following Hurricane Katrina, and
6   then followed by HSDRRS which came up in '07,
7   '08.  So the main difference I would say is the
8   flood elevation.  But the philosophy of design
9   didn't change.
10   Q.   What was the difference in the
11   elevation?
12   A.   The elevations we used in the sixties
13   was what's called the MSL, mean sea level,
14   which assumed zero water in the elevation.
15       Then there was an introduced system
16   which is called the NGVD 29.  The NGVD 29 was
17   based on what's called the local mean sea level
18   or LMSL.  LMSL accounts for the water level
19   within the locale where the analysis is done.
20   Meaning that MSL is assuming a global zero,
21   whereas NGVD is not a global zero, it's a local
22   zero level.
23   Q.   Let me understand this.
24   A.   Uh-huh.
25   Q.   Back in the sixties a simple MSL was

88

used.  Mean sea level.
    A.   Correct.
    Q.   And you've saying that that was a
global mean sea level.
    A.   Correct.
    Q.   Not taking into account the particular
water elevations and terrain in the local area.
    A.   Correct.
    Q.   So this NGVD 29 --
    A.   Correct.
    Q.   -- was established?
    A.   Correct.
    Q.   Is there some benchmark you can
provide me, the difference between NGVD 29 and
MSL; is there a number?
    A.   I can guide you to some discussions in
my report to this, and also there's a tabular
form which tells you specifically the
differences, but in a nutshell it's about two
feet difference between NGVD 29 and MSL.  But
that particular table, you'll see it on Page 36
of my report, it says Geodetic and Mean Sea
Level Adjustments on IHNC Benchmark located on
east wall of IHNC.  That table is taken from
Team Louisiana.  It varies throughout the area

89

also.  If you read the text that goes with
this, it varies throughout the New Orleans
area.  There are couple of issues involved, for
example, with the subsidence in the area and
the rise of the sea level.
    Q.   So consequently, the NGVD 29 is more
dynamic than the MSL; is that true?
    A.   That's not correct.
    Q.   No?
    A.   That's not correct.  It's -- the word
dynamic means it's a variable, the benchmark
itself is moving.  No, it varies from one area
to the other, but it's not dynamic at the
locale.
    Q.   I see.
    A.   The problem with NGVD 29 was that
again it required further adjustments down the
line.  It was further adjustment later on.
    Q.   And that was in --
    A.   NAVD88.
    Q.   88.
    A.   That's correct.  For newer adjustment
in 04-65, that's the latest one.  There's a
difference between 88 and 88 04 -- 2004.65.
    Q.   So would you say that in discussing

90

1 the elevation of floodwalls there is a gold
2 standard that's used currently by the Army
3 Corps of Engineers and scientists such as
4 yourself?
5     A.   According to the Army HSRDS
6 guidelines, NAVD88 (2004.65) is the standard
7 that should be used.
8     Q.   Yet, in your report you consistently
9 use the various -- well, you use MSL and
10 NAVD88.
11     A.   Because when you review the multiple
12 documents available you're going to see all
13 three references mentioned by three different
14 authors of three different agencies.  So I
15 wanted to give you all of them with the
16 conversion.  And I may have even had one or two
17 typos.  I noticed that.
18     Q.   Yeah.
19     A.   That's --
20     Q.   And, because in the various reports,
21 IPET, ILIT, Team Louisiana and your own and
22 Dr. Marino's, everyone is using a different
23 standard.
24     A.   Not standard.  We're using a
25 difference reference.

91

1     Q.   Difference reference.
2     A.   That's correct.  And again, like I
3 said, the older -- or the change in the, um --
4 reference datum, you can see that when a
5 document is 1966 it could be in a different
6 reference datum than a document in the eighties
7 and the seventies.  So that's the reason for
8 why, you know, I used the MSL which the
9 original as-built reference and then
10 transferred this information to the other.
11     Q.   Fair enough.  In general terms, is
12 there a difference in the design of the east
13 bank flood wall at IHNC and the flood walls on
14 the 17th Street Canal?
15     A.   The design is function of the soil
16 properties and the grades at each site.  So
17 while the two structures may look alike, but
18 they are definitely difference in design.  But
19 the concept used to design them is the same.
20     Q.   Are the flood walls in the 17th Street
21 Canal closer together than the flood walls in
22 the Inner Harbor Navigational Canal?
23     A.   That's correct.
24     Q.   Okay.  They were constructed later,
25 the 17th Street Canal.  Were the piles driven

92

deeper in the 17th Street Canal?
    A.   They were about 23-foot sheet piles.
That's about the equivalent to the 19, 20 feet
in the IHNC.  They were not much different.
    Q.   Were the sheet piles embedded into the
concrete cap to the same extent in the 17th
street canal and the IHNC?
    A.   About the same, yeah.  I don't have
all the details in front of me, but --
    Q.   We're talking in general terms.
    A.   In general terms, they were similar,
yeah.
    Q.   Uh-huh.  Would that also be true when
comparing the IHNC and the London Avenue Canal?
        MR. RAFFMAN:
            Objection.
    A.   In what terms?
EXAMINATION BY MR. WIEDEMANN:
    Q.   In general terms, was the design and
the construction of the I-wall system at the
London Avenue Canal similar to the one at the
IHNC?
    A.   You have to split your question into
two.
    Q.   Okay.

93

    A.   Design may have been the same.  I
can't tell you if Contractor A and Contractor B
build it to the same standards.
    Q.   Understood.
    A.   So I can't answer the construction
issue.
    Q.   Well, but the design was similar.
    A.   Probably not in terms of the tools
that were used for the design.  But the
methodology of the design, the spirit, was
pretty much the same.  The methodology is the
same, but for example if you look at the IHNC
it is likely that they either used hand
calculations or they used the program called
CANT, can't, to design the wall.
    Q.   Can't?
    A.   Can't.  C-A-N-T.  Cantilever.  It's an
abbreviation of the word cantilever.  C-A-N-T.
Can't.  And the newer walls were designed with
an older version of CWALSHT.  The latest
version on the market now released by the Corps
of Engineers is the '06.  So there were older
versions in the eighties that were used by
other engineers.  So you have to go back and
see how it was designed, which software and how

24  (Pages 90 to 93)

94

1  it was done.  So the mechanics may differ but
2  the methodology is the same.
3      Q.   What about the footprint of the
4  earthen levee, and when you compare that at the
5  IHNC on the east wall with the 17th Street
6  Canal, is the dimensions of the footprint of
7  the earthen levee the same?
8      A.   Comparable.  I can't -- I don't
9  remember the numbers on the 17th at this point.
10  If you have the numbers you can help me with
11  them, I can answer.  I know the IHNC pretty
12  well, but the 17th I don't really remember.
13  But I believe the elevations were similar,
14  close, but not -- so I would say typically with
15  going with slopes of 1:3 on either side.  So
16  the footprint at the end should be almost the
17  same if you're going from elevation, say here's
18  the ground surface and here's the top of the
19  levee, you go 1:3, so the footprint is function
20  of differential in elevation.  So the footprint
21  may be larger because you have a higher
22  differential elevation.  That depends on your
23  grades.
24      Q.   In connection with your investigation,
25  you also investigated breaches at 17th Street

95

1  Canal?
2      A.   I reviewed the information available,
3  but like I said before I did not perform any
4  analysis personally on any of these breaches.
5      Q.   No field testing --
6      A.   No.
7      Q.   -- and field inspections at 17th?
8      A.   Visited the site casually.  Again,
9  like I said, walked the site, just looked
10  around.  But that happened -- I mean in the
11  original visits I made in October were just
12  driving around.  But I stopped at the 17th
13  Canal and London, personally, later on, maybe
14  in '06, '07, something like that.
15      Q.   And you reviewed photographs of the
16  damage at both 17th Street and London Avenue
17  with regards to your investigation of the IHNC
18  breaches.
19      A.   To the extent of what I needed for my,
20  you know, like I said, presentations, review,
21  et cetera, I did.
22      Q.   Speaking about your factor of safety
23  based analysis that you reference on Page 6 of
24  your report --
25      A.   6?

96

1      Q.   Yes.
2      A.   Uh-huh.
3      Q.   I have to admit to getting somewhat
4  confused by this.  And you reference several
5  different methods of analysis that may be
6  employed.  And I want to know, which one did
7  you ultimately decide on?
8      A.   I think I can remove this confusion by
9  telling you it's a factor of safety based
10  analysis not a one factor of safety.  There are
11  several factors of safety --
12      Q.   Right.
13      A.   -- that you need to look at.  And all
14  of them should meet a certain requirement.  So
15  when you use the Method of Planes, you
16  calculate a factor of safety against global
17  stability failure.  When you use the Spencer's
18  method, you calculate a factor of safety.  They
19  are not the same.  When you use CWALSHT, you're
20  calculating a factor of safety.  When you do a
21  seepage analysis you calculate another safety
22  factor.  So if you have four different factors
23  of safety, four of them are above unity and one
24  of them is below, you still get failure.
25  That's what it means.

97

1      Q.   I see.
2      A.   So it's a factor of safety based
3  analysis, but it's not the factor of safety.
4      Q.   Right.  And so consequently, you may
5  use the several methods to analyze one
6  particular project.
7      A.   But these methods are for different
8  stability conditions.  So they're not -- and
9  actually, you're required by the Corps
10  guidelines now to use both the Spencer's and
11  the Method of Planes for your analysis.  But
12  the C wall sheet analysis is a completely
13  different analysis.
14      Q.   And that is by virtue of the Hurricane
15  and Storm Damage Risk Reduction System Design
16  Guidelines, right?
17      A.   Even before that.  You were required,
18  if you flip into the analysis of the original
19  design, you will see that there was a global
20  stability analysis, but it was only done by the
21  Method of Planes, and there was also the earth
22  pressure type analysis which was done by CANT
23  or by hand or by CWALSHT, but the Spencer is
24  the only new introduction after the, um --
25  hurricane.

98

1    Q.   After Hurricane Katrina.
2    A.   Correct.
3    Q.   Okay.  And doctor, I believe you've
4  said this, the program FS004 came into
5  existence after the construction of the east
6  bank flood wall.  Is that true?
7    A.   I believe so.  I believe it came up,
8  the newer version -- there was an older -- I
9  know a lot of people who work at the Corps of
10  Engineers so my information is just discussions
11  with them.  There were older versions that were
12  out there, but that formal program came after
13  based on that date.  That's the 86 version.
14  There's a good chance, too, is that some of the
15  analysis for global stability may have been
16  done by hand, as well.  Using the Method of
17  Plane but doing it by hand.
18    Q.   Okay.  Doctor, in your report you have
19  relied on the opinions of other experts to some
20  extent that we've talked about, Dr. Cushing,
21  Dr. Daggett, Dr. Dooley, Suhayda, is that true?
22    A.   Not really the opinion in my analysis.
23  My analysis was my own analyses, it had nothing
24  to do with any -- I did not use any parameters
25  provided by anyone.  I just, in my conclusions

99

1  I used some support information to support my
2  conclusions based on what they had given me.
3  But no input from them.
4    Q.   Okay.  And my question to you is,
5  other than those you mentioned, Cushing,
6  Daggett, Dooley, Suhayda, was there anyone else
7  that you relied on, for lack of a better word,
8  in producing your report?
9    A.   No.  No.
10    Q.   I take it that you have reviewed, like
11  you did Dr. Marino 's report, the report of
12  other Lafarge witnesses in this case?  Reports.
13    A.   Pazos' report is the one --
14    Q.   You reviewed Mr. Pazos' report?
15    A.   Yes.
16    Q.   Dr. Marino's report?
17    A.   That's correct.
18    Q.   Have you reviewed Dr. Cushing?
19    A.   I did.
20    Q.   Okay.  And Dr. Daggett?
21    A.   I think they're all part of his final
22  report.  They're appendices.  I reviewed that
23  final report, yes.
24    Q.   Uh-huh.  Mr. Dooley?
25    A.   Correct.

100

1    Q.   And what about Suhayda?
2    A.   I don't believe.
3    Q.   No?
4    A.   I didn't see his work.
5    Q.   And in your review of those reports,
6  did you see anything that you disagree with or
7  would like to change?
8    A.   Talking about.
9    Q.   The Lafarge experts.
10    A.   Again, I only took information.  If
11  anything that I used here, then I agree with
12  the information.  Anything else, it's not
13  really in my area of expertise so I did not
14  really -- I cannot make comments on the
15  accuracy or correctness of it, that's not my
16  area.
17    Q.   So if you've not mentioned it in your
18  written materials, then it's simply not
19  relevant in your mind to your analysis.
20    A.   It's not relevant to my analysis.
21  It's relevant to the case?  That's not my call.
22    Q.   But to your analysis.
23    A.   To my analysis, no.
24    Q.   Now, at any time during your study,
25  did you have occasion to establish a timeline

101

1  for the breaches in the Inner Harbor
2  Navigational Canal?
3    A.   After the analysis was over.  Before
4  the analysis, um -- no specific, other than
5  what I saw in some reports.
6    Q.   Okay.  And so is it necessary to your
7  analysis to have a specific timeline?
8    A.   If you want to bias your analysis you
9  do that, you go with a preset notion that I
10  want it to be at six o'clock or seven o'clock
11  or eight o'clock and I set up my analysis to
12  show that.  To me, that's the bad science.
13    Q.   So at the end of your analysis you
14  least left established in your own mind some
15  timeline for the breaches that occurred on the
16  east bank of the IHNC.
17    A.   If you imagine this is an XY curve,
18  and you go from your result on this side, this
19  result on this side, see where they coincided
20  on the curve, and that's what you read and say
21  then you have that timeline.  So the timeline
22  is established from the analysis, not the other
23  way around.
24    Q.   At what time do you believe the north
25  breach occurred?

102

1    A.   I would say between 5:00 and 6:00 a.m.
2    in the morning.
3    Q.   And at what time do you believe the
4    south breach began?
5    A.   I would say probably in the
6    neighborhood of maybe 6:00 to 7:00 a.m. in the
7    morning.  And again, it depends on the
8    initiation of the breach or the final breach.
9    That's the timeline.
10    Q.   And you feel comfortable with that
11    hour time period?
12    A.   Assuming that the hydrographs for the
13    water levels in the IHNC is correct, and I
14    assume it's published in well documented, peer
15    reviewed reports, if those hydrographs are
16    correct, based on the water levels that my
17    analysis show -- like I said, you can imagine
18    the XY curve, you go from my water level you
19    read the time, you can see what the time is.
20    That's how I reached that time.
21    Q.   Did you do a similar exercise for the
22    breaches that occurred at London Avenue?
23    A.   That wasn't my scope, and that wasn't
24    something I was interested in.  No.
25    Q.   Is that something that you could

103

1    determine by doing a similar analysis as you
2    did?
3    A.   If there were hydrographs available
4    and we know what the water level based on the
5    analysis that caused the failure, you could
6    pretty much get some idea.  Not exact, but
7    idea.  Keep in mind that water levels in the
8    channel are not necessarily very accurate in
9    measurements to the inch or whatever.  These
10    hours and all that stuff are rough estimates.
11    So you can get a window where you say it
12    happened between so-and-so, but telling you it
13    happened at 5:05 or 6:45 is impossible.
14    Q.   And you're referring specifically to
15    the IHNC?
16    A.   No, I'm giving you a different -- just
17    for any incident.  I'm saying to give you an
18    exact time, if I make this, I'm a liar.  I
19    wouldn't do it.  I wouldn't tell you it's
20    happening exactly at -- that, to me, is voodoo
21    science.
22    Q.   And so I assume from your answer that
23    you were also not tasked with developing a
24    timeline for the breaches at 17th Street Canal.
25    A.   That's correct.

104

Q.   And you've not done so?
A.   That's correct.
Q.   In general terms, do you believe that
the breaches at 17th Street Canal occurred at
the same time before or after the IHNC?
    MR. RAFFMAN:
        Objection.
A.   I don't remember those numbers.  I've
seen them in the reports.  My -- you know, I
can go back and dig it out.  But at this point,
I don't know.
EXAMINATION BY MR. WIEDEMANN:
Q.   And the same would be true for London
Avenue?
A.   Correct.  But you have to distinguish
between these channels one and another.  I
mean, the water levels vary in these channels.
These are not connected to the MRGO or
connected to GIWW, the IHNC is.  There are
different water levels, different effects of
the storm on the waters in these canals.
    And also you're trying to compare
failures that developed under different
mechanisms.  These mechanisms vary from one
site to another.  So not all of them failed for

105

the same reasons.  Some common reasons, but not
all of them, necessarily.
    (Lunch break.)
EXAMINATION BY MR. WIEDEMANN:
Q.   Dr. Bakeer, before the break we were
talking briefly about the IPET, ILIT and Team
Louisiana reports.  And I would like to ask you
simply, is there anything that you disagree
with -- let's start with the IPET report --
that you patently disagree with, either the
methodology or the conclusions achieved by
IPET?
    MR. RAFFMAN:
        I'll object to the question.
    MR. WIEDEMANN:
        Certainly.
    MR. RAFFMAN:
        I think it's -- I'll object and
    you can go ahead and answer.
A.   In general, I'm in agreement with it.
I may have a few, you know, comments.  For
example, they did not run the Method of Planes,
which was the original design method as a
check.  I didn't see checks.  They may have
done it, but it's not posted.

106

1    There was some typos that I can pick
2  up, but in general I think I'm satisfied with
3  the IPET report.
4  EXAMINATION BY MR. WIEDEMANN:
5    Q.  And what about the ILIT report?
6    MR. RAFFMAN:
7      I make the same objection.
8    MR. WIEDEMANN:
9      Make it continuing.
10    MR. RAFFMAN:
11      Well, I'll make it every time.
12  It's lot of material.
13      But go ahead and answer.
14  EXAMINATION BY MR. WIEDEMANN:
15    Q.  Well, let me back you up a second.
16    You read those reports.
17    A.  As I said, the majority of them, but
18  not each.  There were sections that I did not
19  go into.  The hydraulics and the storm models
20  and stuff like that.  I just breezed through
21  them but not in full.
22    Q.  And I would anticipate, however, that
23  you if you saw something that you felt was a
24  study that used the wrong methodology or a
25  conclusion that you felt was patently wrong you

107

1  would point that out.  Wouldn't you?
2    A.  From a geotechnical viewpoint.
3    Q.  Correct.
4    A.  Correct.
5    Q.  And that's a good point, we can limit
6  it to the geotechnical aspects of those
7  reports.
8    A.  That is correct.
9    Q.  Do you have any disagreement with
10  ILIT?
11    A.  I have some disagreement with some of
12  their conclusions, that is correct.
13    Q.  Can you be more specific?
14    A.  I think a lot of the people who read
15  the report, including myself, disagree with
16  some of the higher permeability that were
17  assigned in some of the seepage analysis that
18  ILIT performed.  I would have some reservation
19  on some of the numbers performed.
20    Q.  Do you have an opinion as to why they
21  may have come up with improper figures?
22    MR. RAFFMAN:
23      Objection.
24    A.  I can't answer on their behalf.  I
25  don't think -- I mean, they were doing an

108

academic type analysis, and scientists
sometimes disagree.  And they may have a
philosophy or have data that they may have
used.
EXAMINATION BY MR. WIEDEMANN:
  Q.  Can you say specifically what it is
that you disagree with, with the soil
permeability studies in ILIT?
  A.  Basically, the higher permeabilities
assigned to the marsh material.  Some
literature, or most of the literature, suggests
that you would have lower permeability than
what was assigned in this.
  Q.  For example, in your own analysis,
what literature did you use to establish the
degree of permeability?
  A.  I did not run seepage analysis using
any permeability, so I don't have any seepage
analysis done.  I have only seepage analysis
done with other methods that don't require the
permeability calculations.
  Q.  So just in your review you felt that
that may have been one figure that they used
that led them to an improper conclusion?
    MR. RAFFMAN:

109

      Objection.
    MR. WIEDEMANN:
      Certainly.
  A.  Whatever input you use in your'
analysis is going to impact the output of your
analysis.
EXAMINATION BY MR. WIEDEMANN:
  Q.  From a geotechnical standpoint, do you
have any disagreement with the Team Louisiana
report?
  A.  There wasn't much in terms of
geotechnical analysis that I would make any
comments.  There were a lot of other areas that
you can use.  They did some analysis on the
stopped clocks and stuff like that, there was
some descriptions of the failures, but from a
geotechnical viewpoint there wasn't much for me
to comment on.
  Q.  Now, I'd like to talk to you about
what significance you imparted to eyewitness
testimony in this case.  You said that you had
reviewed portions of testimony that was
contained in these various reports and other
expert reports.
  A.  That is correct.

110

1    Q.   Okay.  Did you, as a scientist, give
2  credibility to some witness testimony more so
3  than others?
4       MR. RAFFMAN:
5          Objection.
6    A.   No, I don't weigh the background of
7  the individual in looking at the information.
8  But again, my information is based on analysis
9  and science, it's not a subjective type
10  analysis.  When you rely on eyewitness or
11  people's opinions and stuff like that, that
12  becomes a subjective analysis.  And my analyses
13  are basically focused on objective analytical
14  analysis.
15  EXAMINATION BY MR. WIEDEMANN:
16    Q.   For example, on Page 33 of your
17  report, in the first full paragraph, you state,
18  based on eyewitness reports, the first breach
19  of the IHNC east bank occurred near Florida
20  Avenue bridge.
21       Who were you referring to when you say
22  based on eyewitness reports?
23    A.   I don't remember the exact names, but,
24  um -- there were several eyewitnesses in that
25  area that, um -- reported seeing water in that

111

1  area around that time.  In addition to this --
2  these same words or times were referred to in
3  the ILIT and the IPET and the others.  So --
4    Q.   Do you have, as you sit here today,
5  any knowledge as to where those eyewitness
6  reports came from, from which other study?
7    A.   From the other studies?  No.  I know I
8  can tell you the ones that I've seen in the --
9  like the Cushing report and so forth.  And if I
10  see them I can remember the names but I don't
11  have a recollection of names.  But the reports
12  that, similar to IPET, ILIT and Team Louisiana,
13  did not refer to names, as I remember.
14    Q.   So I take it that you assume that
15  these eyewitness reports are true when you make
16  this statement.
17    A.   Yes.
18    Q.   Now, if you would turn to Page 46 of
19  your report, in the last -- well,
20  second-to-last sentence of the page, this
21  should explain the eyewitness reports of some
22  early flooding near the area of Florida Avenue
23  before the development of the full breach and
24  flooding.
25       Do you know as you sit here today who

112

1  you're referring to when you discuss those
2  eyewitness reports?
3    A.   I think that was the pump station
4  operator who reported some water coming in
5  early in that area.  Mr. Villavaso, if I'm
6  correct.
7    Q.   And I take it that again in your
8  analysis you assumed these reports to be true
9  in reaching your conclusions.
10       MR. RAFFMAN:
11          Objection.
12    A.   You have to define the section where
13  you're referring to assuming something is
14  correct or incorrect.  What are you referring
15  to exactly?
16  EXAMINATION BY MR. WIEDEMANN:
17    Q.   Well, you obviously rely on these
18  eyewitness reports about early flooding at the
19  Sewerage & Water Board.
20    A.   This is an observation.  This is just
21  an observation.  But my timelines are based on
22  my analyses, not based on eyewitnesses.  This
23  is just an observation to support what
24  conclusion I reach.
25    Q.   So you make no credibility call as to

113

1  the truth of these statements that you're
2  pulling from other reports?
3    A.   I'm assuming that if someone reported,
4  an eyewitness or a report, that this person was
5  under oath and reported the truth.  So I don't
6  have any reason to doubt something that someone
7  said, so I took it for that.
8    Q.   Yet, on Page 50, when talking about --
9  in the second full paragraph, when talking
10  about an account of an eyewitness you seem to
11  take issue with the truth of this statement.
12       MR. RAFFMAN:
13          Objection.  Go ahead.
14  EXAMINATION BY MR. WIEDEMANN:
15    Q.   Is that true?
16    A.   I take issue with the statement
17  because it's illogical statement.
18    Q.   And what is the basis of your opinion
19  that that's an illogical statement?
20    A.   Because it describes an event which I
21  believe what he is saying, he's saying what he
22  has seen, but what he has seen is not what he
23  thinks he saw.  In my opinion, what he saw is
24  not what he's describing.  What he saw was the
25  failure of the wall.  That's my own

114

1  interpretation of his statement.  And I concur
2  with the words he said, because he says I
3  couldn't tell you I seen a whole barge.  What
4  appeared to be a metal.  His own words are weak
5  in describing what he has seen.  So in his own
6  words he didn't know what he saw.
7       Q.   I would ask you to assume that
8  Mr. Villavaso did in fact see a barge.
9       A.   That's a hypothetical.
10      Q.   It is.
11      A.   Okay.  But it doesn't make sense to
12  see a barge on the north breach.
13      Q.   I understood you opinion.  And you've
14  stated your opinion, but I'm asking you to
15  assume hypothetically that Mr. Villavaso did in
16  fact see a barge on the east side of the Inner
17  Harbor Navigational Canal at 6:00 o'clock in
18  the morning on August the --
19      A.   I cannot accept an illogical
20  hypothesis.  It has to be a logical.
21      Q.   So you cannot accept the fact that
22  Mr. Villavaso did in fact see what he said he
23  saw.
24      A.   No, he saw what he saw.  It's exactly
25  what he said.  And I agree with what he said,

115

1  but I don't believe he saw a barge.  Read the
2  words carefully.  It doesn't say I saw a barge.
3       Q.   Well, let's go back to that.  Are
4  these the only words that you read of
5  Mr. Villavaso's testimony?
6       A.   Did you see any inclusion of any other
7  statements?
8       Q.   No.
9       A.   I did not include any other
10  statements.  Show me other statement and I will
11  comment on it.
12      Q.   The extent of the testimony of
13  Mr. Villavaso that you have read is included in
14  your report.
15      A.   I read segments, like I said, and I --
16  those are the segments -- this is part of the
17  segments that I read.
18      Q.   So didn't you in fact, Dr. Bakeer,
19  make a credibility call on Mr. Villavaso?
20      A.   Absolutely not.  Absolutely not.
21      Q.   Explain.
22      A.   I'm saying the man saw what he saw,
23  and I say that he describe it exactly the way
24  he saw it.  And his words are not conclusive,
25  definite words.  I never questioned his

116

1  credibility, I never questioned his integrity
2  and I believe he was telling the truth under
3  oath.
4       Q.   And I just want to be clear, although
5  you did not include any other language you have
6  not read his entire testimony.
7       A.   As I said before, no.  I read only
8  excerpts from his report.
9       Q.   And that would be true of each and
10  every eyewitness and fact witness in this case.
11      A.   That is correct.
12      Q.   You have not read the entire testimony
13  of any of them.
14      A.   That is correct.
15      Q.   Well, since we're there already let's
16  move on and let me ask you, you have opined,
17  have you not, that it is impossible for the
18  barge to have breached the east side of the
19  Inner Harbor Navigational Canal flood wall.  Is
20  that true?
21      A.   Which -- you talking about the entire
22  wall?
23      Q.   Well, let's start with the north
24  breach.  You have stated, have you not, in your
25  report, that it is impossible for the barge to

117

1  have produced that breach.
2       A.   Correct.  Based on the Lafarge dock
3  being south of the north breach, it is
4  illogical to sail against the current and the
5  prevailing wind to reach the north breach.
6       Q.   In reaching that conclusion, have you
7  not taken the opinions of others?
8       A.   I took the calculations and analytical
9  and the science contained in reports by others,
10  not hearsay statements made by others.
11      Q.   Understood.  You have taken other
12  experts' opinions --
13      A.   Not opinions.
14      Q.   -- and adopted them.  Is that true?
15      A.   Not opinions.  I took data furnished
16  by others.
17      Q.   Are you confident that you had all
18  data necessary to make the determination that
19  the barge could not have crossed the Industrial
20  Canal to the east side on the morning of
21  August 29th?
22           MR. RAFFMAN:
23               Objection.  You're referring to
24           the north breach now right?
25           MR. WIEDEMANN:

**118**

```
 1        Right.
 2       MR. RAFFMAN:
 3        All right.  Fair enough.
 4    A.  Correct.  Based on the documents that
 5  I reviewed to date, I haven't seen anything
 6  that tells me that the barge was even present
 7  in the north breach area.
 8  EXAMINATION BY MR. WIEDEMANN:
 9    Q.  Dr. Bakeer, what physical evidence
10  would you expect there to be if the barge had
11  actually made contact with the floodwall at the
12  north breach?
13    A.  At the north breach?
14    Q.  Yes.
15    A.  Again, that's a hypothetical that I
16  don't agree with, that the barge would have
17  made it to the north breach.
18    Q.  Well, I understand.  And as an expert
19  I'm entitled to ask you hypotheticals.  And I
20  would ask again, what physical evidence would
21  you expect there to be with regard to, number
22  one, the barge, number two, the flood wall?
23    A.  You would see damage on the barge
24  itself, and you would see signs of damage on
25  the wall that indicates that the wall was
```

**119**

```
 1  impacted by the barge with enough sufficient
 2  force to fail the wall.  You don't see either
 3  one.
 4    Q.  You indicate -- and give me a moment
 5  to find it -- on Page 12 of your report, in the
 6  final paragraph, you're talking about the
 7  concrete cap of the flood wall.
 8    A.  The one at the bottom or you're
 9  talking about --
10    Q.  The one at the bottom.  Yes.
11    A.  Yes.
12    Q.  It begins while the concrete cap adds
13  to the longitudinal I-wall stiffness --
14    A.  Page 12 of the report?  Or the
15  appendix.
16    Q.  Of the report.
17    A.  I don't see it.
18    Q.  I'm sorry.  At the bottom.  The last
19  paragraph, while the --
20    A.  Oh.  I got you.
21    Q.  Okay?
22    A.  I got you.  It's the one before last.
23  Okay.  Yeah.
24    Q.  You go on to say that primarily the
25  cap is for esthetics and to protect the steel
```

**120**

```
 1  sheet piles against corrosion.  You also say it
 2  forms an additional water barrier by sealing
 3  any vertical gaps between the individual steel
 4  sheet piles.
 5        And my question to you is, if the cap
 6  is compromised, does that in turn compromise
 7  the sealing capacity between the vertical gaps
 8  in the sheet pile?
 9       MR. RAFFMAN:
10        Objection.
11    A.  It depends on your definition of
12  compromised.  In what manner?
13  EXAMINATION BY MR. WIEDEMANN:
14    Q.  Crushed.
15    A.  Crushed?
16    Q.  Yes.
17       MR. RAFFMAN:
18        Same objection.
19    A.  It would reduce the protected height,
20  but it's not going to compromise necessarily
21  the wall.  It would be a function of failure,
22  but not necessarily a failure.
23  EXAMINATION BY MR. WIEDEMANN:
24    Q.  Can you please explain the
25  distinction.
```

**121**

```
 1    A.  Distinction is you lost the height
 2  that was crushed, you reduced the protective
 3  height, but you did not compromise the
 4  structural integrity of the wall.  As a matter
 5  of fact, you can take the cap and the wall will
 6  be standing by itself.  You don't need the cap
 7  for anything.
 8    Q.  So with regard to the north breach,
 9  it's your opinion that a tension crack
10  formed --
11    A.  That's correct.
12    Q.  -- between the deeper driven sheet
13  pile and the shallower driven sheet pile.
14    A.  That's incorrect.
15    Q.  Straighten me out.  What's your
16  opinion?
17    A.  A tension crack develops between the
18  wall first and the surrounding soil on the
19  flood side.  That's the definition of a tension
20  crack.
21    Q.  Uh-huh.  And you believe that that
22  tension crack developed at the seam of two
23  piles, one driven deeper and one driven
24  shallower?
25    A.  That's again incorrect.  The tension
```

122

1  crack developed along the length of the entire
2  flood wall, not -- what you're talking about is
3  a tear or a separation between the sheet pile,
4  the old one and the new one.  That's a
5  different -- that's different than tension
6  cracks.
7      Q.  You're not referring to that as a
8  tension crack?
9      A.  That's the way it's defined.
10     Q.  That's a tearing.
11     A.  That's a structural failure.  A
12 tension crack is a soils related phenomenon
13 that relates to cohesive soils, when they
14 either develop a tension crack between adjacent
15 soil particles or with an interfacing surface
16 such as a sheet pile wall.
17     Q.  What came first, the tear or the
18 tension crack?
19     A.  The tension crack would developed
20 immediately after the water starts rising.  You
21 can see that from the studies done by the Corps
22 of Engineers, that a tension crack would
23 develop as the wall starts to bend away under
24 the water pressure.  That develops a gap in the
25 distance between the wall itself and the soil

123

1  that used to be in contact with it.  As this
2  pressure increases, puts more pressure own the
3  wall, that could develop a tear.
4      Q.  This leads me to another question that
5  I started to ask you earlier.  The distance
6  between the opposing flood walls in the 17th
7  Street Canal is narrower than it is in the
8  Industrial Canal, isn't it?  Isn't that so?
9      A.  You're talking about the two opposing
10 walls?
11     Q.  Yes.
12     A.  Correct.  It's a drainage canal versus
13 an industrial canal.
14     Q.  Outfall canal versus a navigational
15 canal.
16     A.  That's correct.
17     Q.  And my question to you is whether or
18 not the force exerted on the walls would be
19 greater in the 17th Street Canal or in the
20 Industrial Canal given water heights of the
21 same level.  In other words, the same level
22 against the wall.
23     A.  Fluid mechanics laws tells you that
24 the pressure in water increases in all
25 direction equally as long as you have the same

124

1  water, meaning it has the same density and,
2  basically it's gamma water times the height.
3  And that's an all around pressure.  If you dive
4  in water, there's a pressure around you that's
5  equal to the depth of water times the column of
6  water above you as a diver.  So if you have the
7  same water height, the same pressure.  So it's
8  irrelevant of how wide is the channel or how
9  big or how long.
10     Q.  That's what I was looking for.
11     A.  No.  It's a hydrostatic pressure.
12     Q.  Okay, and I'm going back now not
13 necessarily with regard to the north breach but
14 with regard to the south breach.  What physical
15 evidence would you expect to see at the south
16 breach with respect to the wall if the barge
17 had made contact with it?
18     A.  You saw the physical evidence in the
19 photographs shown at the point of entry of the
20 barge.  You got the smashed up concrete top and
21 the bent barge and the scratch marks at the
22 bottom of the barge.  That's exactly what you
23 expect to see.  That's the point of entry which
24 is the southern end of the southern breach.
25     Q.  So your position is that the barge

125

1  only made contact with the south end of the
2  south breach.
3      A.  That's the logical conclusion you
4  could reach.  That's where the water pushing
5  the barge into the wall, it made it into the
6  neighborhood after it passed over the top of
7  the wall.  That's exactly what took place.
8      Q.  Have you considered the eyewitness
9  testimony of Mr. Terry Adams?
10     A.  I've seen Mr. Terry Adams or at least
11 excerpts from his testimony.
12     Q.  Once again, you haven't read his --
13     A.  Absolutely.  I didn't read the whole
14 record.
15     Q.  And did you give any significance to
16 the excerpt of testimony that you read in your
17 report?
18     A.  What excerpts are you exactly
19 referring to?
20     Q.  Well, whatever you read.
21     A.  Whatever I read, they didn't add
22 anything to my conclusions.  My conclusions are
23 based on analytical calculations that I
24 performed, supported by the evidence that I've
25 seen, supported by the conclusions reached by

126

1   experts in the field, all reached the same
2   conclusion.  So I didn't need any additional
3   input.
4       Q.   You agree that the south breach
5   initiated at its north end; is that true?
6       A.   Not at the south end.  It's at the
7   apex of the northern segment of the southern
8   breach.
9       Q.   Which is what we all refer to as the
10  bow out.
11      A.   If you'd like to, that's another way
12  to describe it.  The fanning or the bow shape.
13  The center of it, that's typically the point of
14  initiation of the breach.
15      Q.   And you've provided a photograph.  Let
16  me locate it.
17          Have you got it?  Which one are you
18  looking at, doctor?
19      A.   I'm waiting for you.
20      Q.   Okay.
21      A.   You looking at the full plan of the
22  breach?  Maybe this one, Figure 50?
23      Q.   50, yeah.  Let's see.  One of them
24  identifies the apex.  I can't seem to locate
25  it.

127

1          MR. RAFFMAN:
2              Mr. Wiedemann, maybe we can help
3          move it along.  Try 46.
4          MR. WIEDEMANN:
5              Let's see.  Dead on.  Thanks.
6   EXAMINATION BY MR. WIEDEMANN:
7       Q.   Figure 46 of your report is an aerial
8   view of the east bank south breach and the east
9   bank north breach?
10      A.   It's the east bank south breach.
11  Figure 46.  East bank south breach.
12      Q.   Okay.  46 you're looking at, okay.
13      A.   Unless you're looking for a different
14  diagram.
15      Q.   No, that's fine.  That's fine.
16          What you refer to as the main bow
17  is -- begins at the north end of the south
18  breach, am I correct?
19      A.   That's correct.  It's also defined as
20  the north segment.  That's the limits of the
21  north segment.
22      Q.   What is your explanation for how this
23  main bow developed?
24      A.   I want to take you a little bit from
25  that figure to see -- look at Figure 60.  And I

128

also would want you to flip to look at Figure
61.  That should answer your question.  This
flood wall experienced several tilted, bowed
states of distress throughout its length.  This
is not limited to those failures.  You had
multiple failures that were initiated
throughout the length.  Some of them were
incipient failure condition, some of them
caused tilting, and three of them failed.  So
if you look at this, you're going to see that
the wall is not a straight line alignment
anymore.  You've got multiple bows throughout
the length of it.  And some of them extend
beyond the limit of the point of entry of the
barge.  It goes beyond the southern end of the
southern breach.  We already know that the
barge entered the ninth ward, so that's not --
have nothing to do with the barge.  That wall
was catastrophically about to fail throughout
its entire length.
    Q.   Are you aware, Dr. Bakeer, of any
other bows, bow outs, that are of the grand
scale of the one at the Inner Harbor
Navigational Canal?
    A.   You talking about the southern breach.

129

    Q.   Yes.
    A.   That's probably one of the largest, if
not the largest.  That's correct.  There are
tilted walls of longer distances, or similar
distance, you can also look at them -- I can
guide you.  On the MRGO, for example, you can
see the size of the breach on MRGO, and that's
a considerable length.  But the wall did not
fail completely.  But that tells you that, yes,
you can compromise soils strength over a given
distance.  That length depends on the local
conditions at that site.  So the size of the
breach is function of the conditions and the
limits of the breach defined where changes in
the conditions take place.
        I can't find that figure, but I will
find it for you.
        You can see Figure 32, you can see the
size of the failed wall, at Citrus Back Levee.
That tells you how much of it -- again, you can
see how big is this.
        If you flip further you're going to
see -- I believe I have a photograph of the,
um -- MRGO somewhere.  But anyway, all these
are relatively large.  The word catastrophic

130

1  failure is what defined those breaches,
2  specifically the ones you refer to all day
3  today, the London Avenue Canal, the 17th Canal
4  and the IHNC, they were catastrophic not just
5  because of the size, because of they hit
6  populated area.  But it doesn't mean -- if you
7  go look at the FP system throughout, you're not
8  going to see smaller.  You may see larger even,
9  longer failures, in other places, but they did
10  not cause catastrophic consequences in flooding
11  of residential neighborhoods.
12      Q.  How do you explain the fact that the
13  concrete cap is basically eliminated in the
14  entire south breach?
15      A.  That's very easy to explain.
16          MR. RAFFMAN:
17              Objection.  I think you've
18          mischaracterized, but -- the question
19          mischaracterizes the evidence.  But I
20          think the witness understands.  You
21          can go forward.
22      A.  That's very easy to explain.
23  EXAMINATION BY MR. WIEDEMANN:
24      Q.  Please do.
25      A.  If you -- again, I'm stepping on the

131

1  concrete area, but I practiced concrete for
2  three years, to tell you what happens if you
3  are spreading a sheet pile.  The sheet pile is
4  nothing but an accordion, if you think about it
5  as a folded sheet.  That folded sheet becomes
6  straight when it's folded back.  If you look at
7  the original length of the breach -- look at my
8  arrow that says north segment.  That tells you
9  the original length of the wall.  If you take
10  the cord which represents the spread of the
11  sheet piles in the back, that cord is longer
12  than the original length.  So the length is
13  between the two arrowheads showing north
14  segment.  The cord is longer, so when you
15  stretch that accordion, you have to break the
16  concrete that's on the top.  There is no doubt
17  that this is going to take place.
18      Q.  Now, you found, am I right, no
19  physical evidence of the barge pushing against
20  the north end of the south breach?
21      A.  I don't see any evidence that could
22  lead to me to this conclusion.  I did not see
23  any evidence.
24      Q.  And you -- well, you disagree with
25  Mr. Pazos on this point.

132

1      A.  I do disagree with Mr. Pazos.
2      Q.  And point that out in your -- you
3  called it, I'm sorry, a review --
4      A.  A review.
5      Q.  -- of Mr. Pazos.
6      A.  That is correct.  Again, to elaborate
7  on your question a little bit further, if you
8  look at the south segment, you don't see the
9  amount of distress in the concrete because it's
10  a smaller segment.
11      Q.  On the southern -- oh, I see.  South
12  segment of the south breach.
13      A.  So you don't see the extent of the
14  spreading and disintegration of the concrete.
15  You see less, but you still see some damage.
16          (Brief recess.)
17  EXAMINATION BY MR. WIEDEMANN:
18      Q.  Are you aware, Dr. Bakeer, of any
19  testimony regarding scraping noises heard on
20  the morning of August 29th, near and around the
21  east bank flood wall?
22      A.  I read items indicating boom sounds,
23  scraping sounds, stuff, et cetera, yes.
24      Q.  Have you -- do you attribute any
25  significance to these reports?

133

1      A.  Absolutely.  That's the sound of the
2  wall failing.  You imagine a steel concrete
3  structure, massive, of that size, being pushed
4  down by the water 160 feet into the
5  neighborhood, what would you expect to hear?  I
6  tested concrete.  I tested steels in the lab.
7  I can tell you what kind of boom you hear when
8  you test concrete.
9      Q.  Okay.  When did you d that type of
10  testing?
11      A.  Pardon?
12      Q.  When did you do that type of testing?
13      A.  As a graduate student.
14      Q.  And was it for the purpose of
15  determining the noise made upon crashing --
16      A.  No, it's just an observation.
17      Q.  We got to work on this.
18          What was the nature of the study that
19  you were doing as a grad student regarding
20  crushing of concrete?
21      A.  It was a study for the effect of water
22  content on the concrete mix, as part of a
23  graduate course that I took.
24      Q.  And where was this?
25      A.  Syracuse University.

134

1    Q.   You don't intend to offer any
2  testimony in this case regarding the sounds
3  that may have been heard in the Lower Ninth
4  Ward?
5    A.   I wouldn't have brought it up unless
6  you asked me the question.  That's when I had
7  to answer your question.
8    Q.   I understand.  And I guess what I'm
9  asking you is, because you do make conclusions
10 about a number of things that appear to be
11 outside of what you intend to testify about.
12   A.   If I intended to, I would have put it
13 in my report.
14   Q.   Okay.  Fair enough.
15       Did you review the report of
16 Dr. Robert Bartlett?
17   A.   Um -- I read a review.  I read the
18 report, actually, as part of Dr. Cushing 's
19 report.
20   Q.   Oh, Dr. Cushing --
21   A.   It's an appendix in his report.
22   Q.   And do you -- or do you disagree with
23 Mr. Bartlett's findings regarding --
24       MR. RAFFMAN:
25           Objection.

135

1    A.   Regarding what?
2  EXAMINATION BY MR. WIEDEMANN:
3    Q.   Regarding anything.  I mean, you read
4  his report, you issued reviews of several other
5  experts, and I'm just wondering, do you have
6  any criticism, review of his --
7    A.   His --
8        MR. RAFFMAN:
9            My same objection.  I think
10       there's confusion in the record.
11   A.   His analysis, his report, his
12 testimony or his information is not relevant to
13 my analysis.  My analysis is geotechnical in
14 nature.  What he said or didn't say is not
15 affecting my conclusions.
16 EXAMINATION BY MR. WIEDEMANN:
17   Q.   You reference in your report, and in
18 the supplemental materials, as well, that there
19 were other collisions that morning or that day
20 between barges and flood walls.  And you attach
21 some photographs.
22       Did you ever actually go out and look
23 at these sites where these other collisions --
24 or allisions had happened?
25   A.   No.

136

1    Q.   Did you at any time inspect the flood
2  walls where the collisions were to have
3  occurred?
4    A.   No.
5    Q.   So you're basing this on the
6  photographs that you've observed?
7    A.   Correct.  Reviewing reports discussing
8  this.
9    Q.   And specifically, you point to I
10 believe one in the MRGO.  Is that correct?
11   A.   There is one photo of a -- I believe
12 it's one on Bayou Bienvenue.
13   Q.   Bayou Bienvenue.  4?
14   A.   Yes.
15   Q.   And another in the MRGO, if I'm not
16 mistaken?
17   A.   This is -- you're talking about Figure
18 66?
19   Q.   Yes.
20   A.   Yeah.  That's MRGO.  That's New
21 Orleans East levee.  Yeah.
22   Q.   Okay.  Do you have any knowledge as to
23 whether this barge is similar to ING 4727 in
24 its makeup, its construction?
25   A.   I did not go through this analysis,

137

1  no.
2    Q.   Do you have any idea as to the nature
3  of the forces which were exerted on this barge
4  in New Orleans East as it approached the flood
5  wall?
6    A.   That's outside my area of expertise.
7  I did not go into that.
8    Q.   Likewise, you made no calculations
9  regarding the force that the barge would have
10 exerted on the wall because that was a hypothet
11 you couldn't accept.  Correct?
12       MR. RAFFMAN:
13           Objection.  You're now talking
14       about the barge in the IHNC?
15       MR. WIEDEMANN:
16           That's right.  And I'm asking
17       specifically --
18       MR. RAFFMAN:
19           No, I understand.  Just for the
20       record, maybe the witness didn't
21       understand.  I understood your prior
22       lines of questions to apply to barges
23       in 66 to 72.  I guess the record will
24       reflect what it reflects.  Maybe I
25       should have objected to those

138

1   questions, as well.  But go ahead and
2   ask your question again.  I'm sure the
3   witness will answer it.
4       A.   My analysis focused on the
5   geotechnical aspects of the stability of the
6   wall.  There are others who are calculating the
7   forces.  They're calculating the impact load,
8   they are doing analysis of the concrete and
9   steel.  And like I said, this is not my area,
10  this is not what I'm interested in doing.  I'm
11  not going to budge into some area outside my
12  area of expertise.  This is observation.  I'm
13  saying there are similar incidents that shows
14  the damage and shows the barge next to the
15  damage.  That's all I'm saying.  But I'm not
16  implying any calculations or analysis in this
17  regard.
18      Q.   Yet you conclude, do you not,
19  Dr. Bakeer, that it's impossible for the barge
20  to have contributed to the breach?
21      A.   Again, you're referring to the north
22  breach or the south breach or the breach or
23  what?
24      Q.   Either one, but north breach.
25      A.   Based on a completely set of evidence.

139

1   You have to look at the entire scenario.  You
2   cannot take one case and say one person saw it
3   so that's it.  You have to look at the analysis
4   and whether the analysis leads you to a
5   conclusion that is scientifically acceptable or
6   not.
7       Q.   So when you included the photographs
8   of other barges making contact with flood
9   walls, your purpose was to show what?
10      A.   To show that there were incidents of
11  other walls being impacted by barges, and they
12  caused some cosmetic damage.
13      Q.   And you did not know at the time that
14  you included these pictures what type of barge
15  this was, what the length was, the width, the
16  draft, whether it was a load or an empty, did
17  you?
18          MR. RAFFMAN:
19              Objection.  It would help if you
20          referred specifically to the barge in
21          either 66 or 72 or both so we're
22          clear.
23  EXAMINATION BY MR. WIEDEMANN:
24      Q.   Well, we will start with Figure 66.
25  When you included this picture for the

140

purpose of showing that other barges had made
contact with flood walls and done cosmetic
damage, did you know what the length of this
barge was?
    A.   Nope.
    Q.   Did you know the width of it?
    A.   No.
    Q.   What its draft may have been?
    A.   No.
    Q.   Was it empty or loaded?
    A.   No.
    Q.   So really, the only thing that you had
was the photograph to --
    A.   Right.  But if it's loaded it would
have been worse than an empty barge.  So -- but
again, this is not my area.  I don't want to
make comments on that.  It's like showing
Diagram 67.  That's an illustration of a tree.
Are you asking me why there was a tree there?
    Q.   No, I'm not.  But you make a
conclusion, doctor --
    A.   I made a conclusion based on 67, as
well.
    Q.   Well, and on 72, you've got another
photograph --

141

    (Off the record.)
EXAMINATION BY MR. WIEDEMANN:
    Q.   You've got another photograph of a
barge sitting on top of a -- I guess a flood
wall.  Is that true?
    A.   That's correct.  That's Bayou
Bienvenue.
    Q.   Bayou Bienvenue.
    A.   That's correct.
    Q.   And again, do you know whether or not
this barge was the same or different than IHNC
4727?
        MR. RAFFMAN:
            Objection.
    A.   I give you the same answer.  No.
EXAMINATION BY MR. WIEDEMANN:
    Q.   And you don't know whether it was
empty or loaded or what the length was, what
the width was?
    A.   Correct.  But the point of this
photograph, if you look at it you will see
where the breach is.
    Q.   All right.
    A.   The breach is on the right-hand side
of the photograph.  The barge is on the

142

1    left-hand side of the photograph.  And you can
2    see that the wall that was breached, which is
3    identical, was breached on the right-hand side
4    without the need of a barge.
5        Q.   And I just need to be clear on this,
6    Dr. Bakeer, because you make a very definitive
7    statement that it was impossible for the barge
8    to have caused either the north or the south
9    breach.  Okay?
10       My question to you is, do you believe
11   it's impossible for an empty barge, 200 x
12   35 feet, 200 in length x 35 feet in width,
13   could not do damage to the flood wall
14   sufficient enough to cause a breach in the
15   flood control system?
16       A.   It did cause that damage that you see
17   at the southern end of the southern breach
18   where it made it's entry.  That's --
19       Q.   That's not my question.
20       A.   That's it.
21       Q.   That's not my question.
22       MR. WIEDEMANN:
23            Joe, can you read it back, if you
24       wouldn't mind?
25            (Whereupon the previous question was

143

1    read back.)
2        A.   As I see from the situation there that
3    the flood wall is failing on its own without
4    the need of a barge.  That's where I reached
5    the conclusion that it is not.
6    EXAMINATION BY MR. WIEDEMANN:
7        Q.   I understand -- sorry about that.
8            Let me try it from a different angle.
9    Because you're saying it's impossible, and I
10   understand because of the law of physics and
11   the wind direction.  I'm asking you if a
12   200-foot long x 35-foot wide hopper barge such
13   as the ING 4727 is capable of inflicting enough
14   damage upon the flood wall in order to cause a
15   breach in the flood control system.
16       A.   It's a function of the water level,
17   it's function of the point of impact, it's
18   function of the type of contact it's going to
19   make, the angle it's going to make, the
20   momentum, the waves, the wind, et cetera.
21   You're asking me to answer a question that has
22   100 million possibilities in it with either a
23   yes or no.  I will not give you a yes or no on
24   a question like that.  You have to give me a
25   specific question that says, going with that

144

1    force, going with that momentum, in that
2    direction, with this ankle, with, with, with,
3    with.  Then you go could go this way.  But I
4    can't answer a very general question with a yes
5    or no.
6        Q.   So I take it from your answer that
7    your statement that it's impossible is more
8    related to the fact of wind direction and wave
9    direction.
10       A.   You have to read the sentence in its
11   entire context.  You can't take a sentence by
12   itself and make a conclusion on it, so I have
13   to know exactly what you're referring to.  But
14   if it's related to the north breach, then yes,
15   it is impossible.  And it's based on the wind
16   and the current.  That is correct.
17       Q.   And not based on the size and the
18   momentum and speed and direction of the barge
19   making contact with the wall.
20       A.   That is correct.  That's my statement.
21   The possibility is related to the north breach,
22   that is correct.  In the south breach, I concur
23   that it made contact with the wall at the
24   southern end of the southern breach.
25       Q.   Okay.  In your report, and it's

145

1    Section 4.0 at Page 61, you are listing the
2    several reaches why the Barge ING 4727 did not
3    cause the IHNC east bank I-wall failures, and
4    then you've subdivided it into categories.  And
5    the first one is no investigative panel found
6    any involvement by the Barge ING 4727 with the
7    IHNC east bank breaches.
8            What investigative panels are you
9    referring to?
10       A.   If you continue on to the next
11   sentence, investigation teams including ILIT,
12   ASCE, IPET, Team Louisiana.
13       Q.   What is ASCE?
14       A.   American Society of Civil Engineers.
15       Q.   Do you assign any degree of
16   significance to the reasons that you found the
17   barge didn't cause the failures; in other
18   words, is Number 1 any more important than
19   Number 2 or Number 3?
20       MR. RAFFMAN:
21            Objection.
22       A.   I would say in Item Number 3, that's
23   my priority.
24   EXAMINATION BY MR. WIEDEMANN:
25       Q.   Uh-huh.

146

1   A.   And then Item Number 4.
2   Q.   Then 4, you said?
3   A.   Correct.
4   Q.   Okay.  So Number 3 you stated was your
5   priority, or what you felt was more important,
6   that soil conditions at IHNC were similar to
7   other breach site where no barge was present?
8   A.   That's correct.
9   Q.   Okay.  And what about the soil
10  conditions at other breach sites were similar?
11  Describe that.
12  A.   Similar being poor conditions, not
13  necessarily similar.
14  Q.   Poor conditions?
15  A.   Poor conditions or poor soils.  But
16  each site had a different mechanism of failure
17  associated with this particular condition.  So
18  the similarity is, there was always a poor soil
19  condition, but from different aspects.
20  Q.   How did you affirm that the soil
21  conditions were poor at the breach sites?
22  A.   If you look at the soil borings, if
23  you look at the cone penetrometer, if look at
24  the investigations done, you will reach this
25  conclusion.

147

1   Q.   And you go on further, Dr. Bakeer, and
2   you say that -- I'm sorry.  You went further
3   and you said Number 4 would be second in
4   importance.
5   A.   Correct.
6   Q.   Okay.  That the sheet piles at IHNC
7   east bank I-wall and other breaches were too
8   short.  You're referring, of course, to the
9   shorter lengths that were used back in the
10  sixties at that location.
11  A.   That is correct.  And if it's -- if
12  you added to the word and other breaches, you
13  would have prevented a lot of these cases from
14  developing if you had longer sheet piles.
15        And again, let me just elaborate one
16  quick elaboration on this.  If you notice,
17  those are the areas of expertise, that's why I
18  give them the most weight.  That's where my
19  analysis backs up these two objects.
20  Q.   Doctor, in your report you also make
21  reference to excavations and borrow pits that
22  may have been undertaken at the East Bank
23  Industrial Area by Washington Group
24  International?
25  A.   That is correct.  I had some limited

148

information at the time on this, and I refer to
it in the report.
   Q.   Would you please tell me what your
opinion is with regard to the contribution made
by the excavations and/or the borrow pits
performed by Washington Group on the East Bank
Industrial Area to the breaches, either north
or south?
   A.   The question of the placement of fill
in the excavations plays a role in the flow of
water and the possibility of allowing some
seepage to take place in areas where either a
granular backfill, that is, sand, or what the
Corps refers to as semi-compacted fill in these
excavations.  Those would have higher
permeabilities than what the tests would
suggest as indicated by a normal boring done
outside excavation areas.
       The second issue with all the work
done in that area is the vibrations, lowering
of water table to keep a dry excavation -- the
process to do an excavation is you need to have
a dry bottom so your workers could go down,
your equipment could go down.  When you lower
the water table you're causing problems to the

149

area.  It causes area settlements in the area.
       The vibrations do to pile driving,
sheet pile driving, extraction, as you move the
sheet pile, sheet piles in excavations tend to
move.  That could also impact the wall if it's
close enough.  So it depends on the distance,
it depends on how the construction was done for
that reason.  But since I don't have records,
full records, I cannot make very conclusive,
and that's where I left it at this, without
going to very elaborate discussion.
   Q.   In your opinion, do the excavations,
and I'm limiting to excavations, coincide in
any way with either the north or the south
breach, to your knowledge?
   A.   There were some excavations in both
areas.  There were excavations in other areas
outside the breaches, as well.  But there was
some distinctive conditions at these two sites
in particular, both on the protected side and
as well as the EBIA area.  You see very unique
conditions in those.  When I looked at the data
further, what was made available for me, I can
see some peculiar conditions at those
particular two areas.

150

1    Q.  Uh-huh.  You seem to indicate in your
2  report that there was some scarcity of proper
3  borings to review.  Is that correct?
4    A.  Correct.  You have to also refer to
5  where the borings are made so you can identify
6  why this number.  There may be borings made
7  outside the breached areas which would be
8  irrelevant in the analysis of the breach.
9    Q.  Uh-huh.  I think that you point in
10  your report to the fact that there is in
11  particular a scarcity of U-type borings.
12    A.  Correct.
13    Q.  Uh-huh.  And in a perfect world, what
14  distance would you like to be able to review
15  the borings, you know, as dictated by the Corps
16  of Engineers?  I mean, what is the proper
17  distance?
18    A.  Those are two different questions.  As
19  dictated by the Corps of Engineers, or what I
20  would like to see?
21    Q.  Well, I think we're all in that
22  position.
23    A.  These are two questions.
24    Q.  Yeah.  Okay.  What you would like to
25  see.

151

1    A.  It depends on the importance of the
2  structure.  That's what's called risk-based
3  analysis.  If you read, there's a full volume
4  in the Corps of Engineers IPET study that looks
5  at risk and risk-based design.  That's where
6  you decide on the number and the amount of
7  borings, the sampling, the number of samples to
8  be tested.  It's a science.
9    Q.  And the types of borings.
10    A.  And the types of borings.  If you're
11  looking for structures, for example, the city
12  building code tells you if you have ten
13  thousand square feet of building you need one
14  boring.  You need two borings if you have
15  fifteen thousand square feet.  So it's
16  importance, the nature of the structure, the
17  variability of the soils, et cetera.  So you
18  need more than just, you know, give you one
19  quick answer.  But the number in the Corps of
20  Engineers manual is 500-foot spacing.
21    Q.  Uh-huh.  And in this case, you did not
22  even have that --
23    A.  You have some --
24    Q.  -- to review?
25    A.  No.  There were some borings that were

152

used and they were within the areas of the
breaches.  That's what I used.
    Q.  Uh-huh.  But they were not at the
dictated 500-foot intervals.
    A.  You understand that the breaches
were -- one of them was less than 500 feet, so
you can't squeeze two borings in that area.
The other one is 800 feet, so you barely can
get one.
    Q.  Uh-huh.
    A.  So.
    Q.  And were they of the type that you
would like to have seen?  You indicated that
general borings are not given as much weight as
U-type borings; right?
    A.  You used exact words what I used.
They're not given the exact weight.  But they
are not ignored.
    Q.  Right.
    A.  So you could use them, but you have to
understand what you're getting from them before
you interpret the data coming from the G
borings.  The U borings are more reliable than
the G borings for different reasons.
    Q.  Are you going to -- can you testify to

153

a degree of certainty that the excavations
and/or borrow pits made on the East Bank
Industrial Area contributed in any way to the
south breach?
    A.  No.  I will make a statement that the
conditions as revealed by the investigations
done during the work on the EBIA site shows
that these two areas were more vulnerable than
the rest of the retaining wall and made them
more susceptible to failure.  But the details
of what went on in that site, I don't have that
information.  I did not reveal this
information.
    Q.  And that's true, I think you just
said, but as to the north breach, as well.
    A.  That's correct, for the north and the
south breach.
    Q.  Yeah.  You also discuss in your report
a drainage canal which existed on Jourdan
Avenue at some point in time.
    A.  Correct.
    Q.  What is your understanding of the
depth and width of this -- and length of this
drainage canal?
    A.  The length is pretty much runs from

154

the southern breach all way to near the north
end of the north breach. That's pretty much
the length of that canal. The width of it is a
typical width. You know, it should be
shallower at the beginning. It's a gravity
line. It's a gravity flow. So you're going to
have a higher bottom, and it would get deeper
as you go towards the north.

Q. Uh-huh. Having never seen it and
never seen a photograph of it, is it a ditch or
a canal?

A. If you look at the cross-sections you
can actually get that from it.

Q. Okay.

A. But it's called the Jourdan Canal.
But what's a ditch and what's a canal? It's
just a layman's language whether I use the word
ditch. Ditch is a shallower canal.

Q. Right. You were going to direct me to
something in which I could see its location?

A. You could see that in, um -- actually
my review of Marino's work, you're going to
see -- I don't think I have it in this bunch.
But I thought I did.

Q. Okay. Not important.

155

A. But anyway.

Q. At some point in time the Jourdan
Canal was filled.

A. Correct.

Q. And what's your understanding of when
that occurred?

A. Um -- I believe in the seventies.
That's my understanding. Sometime in the
seventies. Maybe early eighties. But I think
at the end of the seventies.

Q. Are you going to testify with any
degree of certainty that the Jourdan Canal fill
project contributed in any way to the south
breach?

MR. RAFFMAN:
Objection.

A. My analysis did not consider the fill
material or the fill type. So my analysis
stand on its own as saying the existing soil
conditions were weak enough to cause the
failure, without the need for a canal on either
side.

EXAMINATION BY MR. WIEDEMANN:

Q. No matter what the type of fill was.

A. It would have exacerbated or -- caused

156

the seepage issue to be more acceptable if you
had used granular fill or poorly compacted
material, you used shell -- all this, yes,
would impact the seepage concerns. And by the
way, there is also a canal on the other side of
the wall, within the limits of the southern
breach, or a little ditch, that's already been
also filled on the backside.

Q. What is your understanding of when
that canal was filled?

A. It was filled and reactivated. As a
matter of fact, it was used by the Washington
Group to drain that area. There is also a
perpendicular ditch or canal -- again, depends
on your definition of the size of a ditch or a
canal -- that goes perpendicular to the wall at
the exact southern alignment of the southern
breach. You can see it in the aerial
photographs.

Q. Uh-huh. And approximately how far
from the toe of the earthen levee would you say
that canal was?

MR. RAFFMAN:
Objection.

A. Roughly twenty, thirty feet.

157

EXAMINATION BY MR. WIEDEMANN:

Q. Uh-huh. Is this something that you
ever actually personally observed, or you're
looking at this from aerial photographs?

A. If you again go back to these
cross-sections which Dr. Marino reproduced from
the Corps of Engineers, you're going to see the
canal or the swale at Stations 27, 28, 29 and
go on -- this triangular or trapezoidal
depression you see on the flood side of the
wall is a ditch or a canal. Now, if you go
also look at the aerial photographs, you will
be able to see that perpendicular canal. Also,
when you look at WGI work you will see that
they were referring to that they were using a
drainage ditch that parallelled the flood wall
and then leading into the canal. So there's
enough evidence to show there was something
there.

Q. So if I'm understanding your testimony
correctly, it is your opinion that the fill
projects on either side of the wall, as well as
the borrow pits and the excavations that were
done by WGI, made conditions favorable for
levee failure. Is that what you're saying?

158

1    A.   It just depends on your word
2  favorable.  It's unfavorable, in my opinion.
3  Made it worse, if any.  If it's not -- if you
4  look at the, um -- the Corps requirements for
5  backfilling this, and if you review the
6  documents pertaining to how the file was
7  placed, there was a big dispute on this and
8  there was a litigation at that point.  It shows
9  that there was not really any quality assurance
10 or quality control process used to place the
11 fill back in the excavations.  And that would
12 be a concern in this case.
13    Q.   Given the fact that they had fill on
14 both sides and excavations and such, is it your
15 opinion that the wall could have still been
16 made -- could have still been constructed to
17 withstand the forces that were exerted on it
18 during Katrina had they driven the pilings
19 deeper?
20    A.   Correct.  The key word, you said it at
21 the end, longer sheet pile.  Absolutely.
22    Q.   And did you in your analysis conclude
23 to what level they would have had to have been
24 driven in order not to fail?
25    A.   Correct.  If you actually look at my

159

1  analysis in Appendix B, you will see.
2    Q.   Appendix B?
3    A.   B, I believe.  B like boy.
4    Q.   Yes.
5    A.   You will see under the conditions --
6  and I'll tell you which table to go to -- Table
7  D-3 on Appendix Page 35, Appendix 35.
8    Q.   Yes.
9    A.   Okay.  If look at this table, this is
10 the analysis done by the CWALSHT which is your
11 standard program -- oh, the likes use a program
12 similar to CWALSHT to determine the pile tip
13 elevation.  Using a factor of safety of 1, with
14 the water conditions at the IHNC at elevation
15 11-1/2 in the area of the north breach -- I'm
16 looking at the last four before the as-built.
17 You see the as-built at the bottom?
18    Q.   Yes.
19    A.   The four items above it, EBNB refers
20 to the north breach, EBSB refers to the south
21 breach.
22    Q.   Right.
23    A.   The F and S following the name are the
24 two methods of analysis recommended by the
25 Corps using CWALSHT.  One of them is called the

160

1  fixed methodology and the other one is called
2  the sweep method.  So that's the only
3  difference.  They should converge to about the
4  same answer, sometimes they don't.  As you can
5  see, that using a factor of safety of 1, which
6  means that the wall is about to fail, you have
7  that tip elevation at -8 MSL.  In other words,
8  at water level of 11-1/2, this wall is about to
9  fail.
10    Q.   Uh-huh.
11    A.   At the area of the north breach.  At
12 the area of the south breach, when the water
13 level is at elevation 15 MSL, you need a deeper
14 tip elevation than -8.
15       The second item, if you flip back two
16 tables back, Tables D-2a, D-2b, these are the
17 Method of Planes analysis and the Spencer's
18 analysis, you will see that there's a critical
19 failure surface that's detected by those
20 methods.  The critical failure surface in all
21 of the analysis hovered around -15 to -18,
22 which tells you that the tip of the sheet pile
23 should have been deeper than -18 which is the
24 deepest number you have here --
25    Q.   Uh-huh.

161

1    A.   -- so you'd prevent any deep-seated
2  failure.  So in other words, you need higher
3  factor of safety than actually the numbers you
4  see here you need to attain with a tip
5  penetration no less than -17 or -18.  And
6  according to U.S. Army Corps of Engineers
7  design, if you review my chapter here, they
8  recommend if you have a marsh stratum that you
9  extend the sheet pile tip below the end of the
10 marsh stratum, which ends at about -17.  So
11 accordingly, the tip of the sheet pile -- the
12 last piece of evidence is, you can ask the
13 Corps about when they put the Florida Avenue
14 bridge, the I-wall next to the existing I-wall,
15 the new I-wall, the tip was at -25.
16    Q.   Uh-huh.
17    A.   Which tells that you that you need
18 more tip penetration.  So there's enough data
19 that supports my conclusion.
20    Q.   Didn't the -- you brought up a
21 question.  Didn't the I-wall at the Florida
22 complex also connect to a T-wall?
23    A.   It connected at the end to a T-wall.
24 It connected to an I-wall to its right.  If
25 you're looking from the Ninth Ward, there's

162

1   another I-wall that extends towards the Florida
2   Avenue bridge, and then there's a road that
3   goes -- there's a sheet pile a goes under the
4   road, Surekote Road, and then at the end by the
5   Florida Avenue bridge there is a T-wall at the
6   end, but still continues with I-walls.  But you
7   don't see in photographs, it's under the
8   roadway.  And there's also another I-wall going
9   north.
10      Q.   Okay.  I've sort of been avoiding this
11  one, but I guess it's time to jump in.  You
12  said in your report that there was a great
13  degree of variation in the flood wall height
14  along the east bank of the Industrial Canal.
15      A.   Correct.
16      Q.   Wave talked previously about mean sea
17  level and the other one NAVD88 I believe it
18  was.
19      A.   NGVD 29 and NAVD88.
20      Q.   And NGVD 29 and NAVD88?
21      A.   Correct.
22      Q.   Okay.  Which reference data would you
23  like to use?
24      A.   I use what the Corps of Engineers
25  mandates, NAVD88 for the new designs.  To

163

1   analyze an old structure I use whatever datum
2   was used at the time.
3       Q.   How do you go about establishing the
4   actual floodwall height using NAVD88?
5       A.   You have to have a benchmark installed
6   in the ground.  And from that benchmark you
7   establish the elevation of that benchmark, and
8   then you tie up with a survey the top of the
9   wall to that particular benchmark.
10      Q.   Uh-huh.  So it's a typical survey with
11  a surveying tripod and --
12      A.   Geodetic survey.
13      Q.   Geodetic survey, right.
14           And there is also another test that's
15  used, isn't there?  A LIDAR?
16      A.   The LIDAR.
17      Q.   And those were both done post-Katrina?
18      A.   LIDAR was 2000.
19      Q.   2000.  Okay.
20      A.   That's pre-Katrina.
21      Q.   But there's some degree a fallibility
22  in LIDAR, isn't there?
23      A.   LIDAR would have an error.
24      Q.   And why is that, doctor?
25      A.   It's the precision of the equipment,

164

1   and also the vegetation.  Any protrusions on
2   the ground make --
3       Q.   The topical --
4       A.   LIDAR is a laser.
5       Q.   I see.
6       A.   It's a laser beam.  So basically
7   anything that intercepts the laser beam would
8   give a false reading or give higher ground.
9       Q.   In 2000, what was the highest
10  elevation of the flood wall on the east bank?
11      A.   The LIDAR was done from the ground,
12  not from the top of the wall.  That was done
13  for the land side toe.  That's the LIDAR data,
14  but not for the top of the wall.
15      Q.   I see.  Not for top of the wall.
16      A.   Correct.
17      Q.   Are you aware of any surveys that were
18  done prior to Katrina that would reveal how
19  high the top elevation of the flood wall was?
20      A.   I didn't have such information.
21      Q.   There is some post-Katrina.
22      A.   Correct.
23      Q.   Okay.  And what in your opinion is the
24  variation in the height of the floodwall on the
25  east bank?

165

1       A.   You can look at the Figure 63 in the
2   report.
3       Q.   Figure 63.  Yes.
4       A.   If I take you on a trip explaining
5   this thing --
6       Q.   Please.
7       A.   -- if you start from the left, that's
8   about Station 60.  60+00, that's the station
9   number -- each station is about 100 feet apart.
10  So 60+00, that's the Florida Avenue side.  And
11  if you go all the way to Station 0, that's the
12  end on the other side.  If you see the blue
13  line, that blue line indicates the top of the
14  wall at that time at the different locations
15  where it was surveyed.  So each point here
16  showing a survey point.  And the line drawn in
17  between is an interpretation of or just a
18  straight linear variation between two
19  consecutive pointes.
20           If you recall, I answered your
21  question about an I-wall attached to a new
22  well.  If you look at the right-hand side
23  you'll see some points with two additional
24  points underneath them on the right-hand side.
25  That's the wall that's going south-north

166

1  followed by a relatively high wall segment.
2  That's the new segment that was built as part
3  of the Florida Avenue complex.  You see its top
4  is about elevation 14 plus.
5      Q.  Right.
6      A.  And then you get the gap, which is the
7  north breach.  And if you continue along this
8  blue line you see the variation in the flood
9  line, you can see now that the floodwall was
10  lower within the limits of the southern breach
11  which is the 812 feet break, then it was again
12  much higher as you go further south towards
13  Claiborne Avenue.  So that tells you where the
14  variations of the flood wall are.
15      That's NAVD, and that was done in '05
16  survey, after Katrina.
17      Q.  Okay.  The height of 15 feet was
18  established by the Corps as MSL; is that
19  correct?
20      A.  That is correct.
21      Q.  Mean sea level.
22      A.  That's correct.
23      Q.  With room for subsidence of about a
24  foot, to fourteen feet.
25      A.  That should have been the final design

167

1  of fourteen, that's correct.
2      Q.  Yeah.  But this is MSL, is that
3  correct?
4      A.  The 15 is MSL.
5      Q.  MSL, right.  And consequently the 14.
6      A.  Correct.
7      Q.  So I'm curious because this uses
8  NAVD88, and you told me earlier that there's a
9  difference of approximately a foot and a
10  half --
11      A.  Two.
12      Q.  -- to two feet.  Right?
13      A.  Two plus, sometimes, depends.
14      Q.  So it seems to me, and there might be
15  a simple answer to this, that the items that
16  reflect the height of the wall post-Katrina
17  were using a different datum than the Corps of
18  Engineers 14 feet.  No?
19      A.  I didn't get the question.
20      Q.  Well, the height of the wall is
21  established using NAVD88.  Right?  The height
22  of the wall.
23      A.  In this particular survey, it's based
24  on NAVD88, that's correct.
25      Q.  Uh-huh.

168

1      A.  If you add two feet to the 13, you get
2  about 15 again.  And actually, it could have
3  been a little overbuilt.  And again, the
4  accuracy of surveys may not be that -- to the
5  tenth of an inch or one inch difference.  So
6  the wall would put you back again at 15.  If
7  you go from 13 to 12 -- 13 plus 2 gives you
8  about 15.  Again, you see that the higher wall
9  is at elevation 16, not 15.
10      Q.  Okay.
11      (Brief recess.)
12  EXAMINATION BY MR. WIEDEMANN:
13      Q.  Dr. Bakeer, I have a few more
14  questions for you.  And I might tend to go from
15  topic to topic, and I'm going to try to tell
16  you where I'm going.  So if I don't, please
17  correct me.
18      To your knowledge, was there any other
19  object in the IHNC during Katrina that could
20  have impacted with the north or south breaches
21  between Florida Avenue and the locks on the
22  south?
23      A.  I have no knowledge of that.
24      Q.  Do you know if there is any other
25  object that ended up on the land side of the

169

1  flood wall opposite either breach other than
2  the barge?
3      A.  Um -- not on the land side, no.
4      Q.  Can you give me your understanding of
5  the difference between your expertise and your
6  goal in this case and your opinions between you
7  and Dr. Cushing, for example?
8      MR. RAFFMAN:
9      Objection.
10      Go ahead and answer.
11      A.  My involvement with this litigation is
12  related to the geotechnical aspects of the
13  failures and the diagnostics of the cause of
14  the failure of the wall from a geotechnical
15  viewpoint.  My understanding, I don't know what
16  Dr. Cushing's tasks are, but reading through
17  his report he had several issues discussed in
18  his report, wind, hydrology, direction of wind,
19  the back load on the retaining and on the
20  floodwall, et cetera.  But I can't say what
21  exactly his goal or his direction.
22      Q.  What about Dr. Daggett?
23      A.  Again, I've seen his report, and I've
24  seen it as part of Dr. Cushing's submittal.
25  But I don't know what his mission or what his

170

1   instructions were.
2       Q.   We talked about the fill of the
3   excavations on the East Bank Industrial Area
4   and on the canals, the Jourdan Avenue Canals on
5   either side of the floodwall.  Back when the
6   sheet piles were actually driven into the east
7   bank earthen levees, there was a requirement,
8   was there not, that there be fill placed on top
9   of the earthen levees?
10      A.   Correct, to bring it to grade.
11      Q.   To bring it to grade.
12      A.   Correct.
13      Q.   Are you aware of what type of fill was
14  used?
15      A.   According to the general design
16  memorandum for that particular project, it
17  should have been a clayey soil free of organic
18  trees, roots, et cetera.  That's the typical
19  standard from the U.S. Army Corps of Engineers.
20      Q.   And do you have any reason to believe
21  that wasn't the case?
22      A.   I haven't seen the quality control
23  construction records to indicate what was used.
24  I don't have access to this information.
25      Q.   Uh-huh.  In your experience, is that

171

1   something that would exist, that you could
2   review?
3       A.   Correct.  There would be submittals.
4   There would be submittals based on the material
5   that was used and where it came from.  You can
6   actually look at the U.S. Army Corps of
7   Engineers GDM, and you'll see actually the
8   designation of the borrow pit where the
9   material came from.  There should be a record.
10      Q.   But in any event, that's not something
11  you have had access to or you have reviewed.
12      A.   No.
13      Q.   You wouldn't think that the sheet pile
14  was embedded into sand material, do you?  Back
15  in 1966?
16      A.   Um --
17          MR. RAFFMAN:
18              Objection.
19      A.   The entire length or the tip of the
20  sheet pile or what?
21  EXAMINATION BY MR. WIEDEMANN:
22      Q.   Well, you told me that it was filled
23  to bring it up to grade.
24          MR. RAFFMAN:
25              Objection.

172

EXAMINATION BY MR. WIEDEMANN:
    Q.   And what I'm curious to is whether or
not you believe that sand may have been used to
bring it up to grade rather than the proper
fill material you described.
        MR. RAFFMAN:
            I object to the question.  The
        confusion between two different
        projects.
            You can answer if you understand
        the question.
    A.   The answer to your question, if I
understand it correctly, you're referring to
the fill that was used to reshape the levee
back to shape.
EXAMINATION BY MR. WIEDEMANN:
    Q.   Correct.
    A.   Okay.  No, I wouldn't say that this
was the case here.  The likelihood that it was
used is low, but again in the absence of
records there's no different answer for this.
    Q.   Along the entire structure of the east
bank flood wall, do you believe that the tips
of the sheet pile were embedded in sand?
    A.   No.  There may be some sands that were

173

artificially placed in that area but the
natural soils at that site are either natural
marsh, peat type soils, soft clays,
interdistributary clays, it's basically mostly
cohesive soil.  You may see some silts which
maybe have some characteristics like sand,
silts could exhibit some characteristics like
sands, but pure sands, geologically, no.
    Q.   And you've said earlier that typically
back then they would have been driven to
approximately -8.
    A.   They should have been driven to -8.
    Q.   Okay.  Do you have any reason to
believe that they were not?
    A.   I measured the sheet pile myself that
was exhumed or pulled from the northern breach
area.  I measured it myself with a tape and it
was twenty feet.
    Q.   And you thus concluded that it had not
been driven to -8?
    A.   No.  The total length of the sheet
pile is 20 feet.  If your top is at 12, then
your tip should be at -8.  8 plus 12 is 20.  So
based on this it confirms -- again, it's three,
four sheet piles.  Did they drive them all to

174

1  -8?  You need the records.
2      Q.  Uh-huh.  And once again, that's
3  something that you have not had the opportunity
4  or the access to review.
5      A.  It wasn't available for me to review.
6      Let me just make one comment on this
7  quickly.
8      Q.  Please.
9      A.  That there was a statement in the GDM
10  that indicated there's no need for an armor or
11  protection against erosion as the material was
12  cohesive that was used to reshape the levee.
13  So that supports the argument that they used a
14  clay.  But whether they have done it or not --
15  but that's in the GDM.  If you read the GDM
16  you'll see the statement.
17      Q.  And it's further indication to you
18  that the proper fill material was used.
19      A.  Assuming that it was built to specs.
20  Correct.
21      MR. RAFFMAN:
22          For clarity 's sake, referring to
23      the soil that's placed on top of the
24      existing levee at the time the flood
25      wall was built.

175

1      MR. WIEDEMANN:
2          Correct.  To bring it up to
3      grade.
4      MR. RAFFMAN:
5          All right.  Thank you.
6      A.  Correct.  That was my impression when
7  I answered, too.
8  EXAMINATION BY MR. WIEDEMANN:
9      Q.  On Page 26 of your report --
10      A.  Yes, sir.
11      Q.  -- you discuss consolidation
12  settlements versus regional area consolidation
13  settlements.  Can you describe the difference
14  for me?
15      A.  There are three categories of
16  settlement that would impact a given area.
17  Settlement is nothing but a process that takes
18  place as the clays compress or consolidate,
19  squeezing water out from the clays, reducing
20  its void ratio.  As the clay compresses, or
21  consolidates, that results on the lowering of
22  the soils above it which is realized as
23  settlement.  Settlement in any structure is a
24  natural phenomenon.  The three categories
25  basically are, when you put fill on your own

176

1  site, you want to build a house, you put fill,
2  the site is going to settle under the weight of
3  that fill.  That's a local.  That's related to
4  your particular lot but you're not impacting
5  your neighbors in the process.
6      There's a regional settlement that is
7  affected by the activities going on.  For
8  example, the New Orleans pumps the water,
9  Kenner pumps water, Jefferson Parish, you're
10  lowering the groundwater table, that's causing
11  some regional settlement.
12      Then there is global settlement.  The
13  entire ground is moving downwards, the sea
14  levels are rising, so you're going -- you're
15  racing against two opposing trends.  And that
16  all causes problems with your structures, it
17  causes problems with your benchmarks, as well.
18  Because when you measure the top of a
19  benchmark, this benchmark tomorrow may not be
20  at the same location.  It may also start
21  sinking.  So that casts doubts about some of
22  the surveys done at different times.
23      So basically these are the three
24  different categories of consolidation
25  settlement.

177

1      Q.  I see.  And your point in describing
2  these is to show that there are other reasons
3  for the subsidence that has occurred on the
4  flood wall.
5      A.  Correct.  And I mention in my report
6  in another segment, I don't know if it's on
7  this page or a different page, that the pumping
8  activities at that pump station all the way at
9  the north contributed some settlement in that
10  region.  It caused area settlement by lowering
11  the water table in the north.
12      Q.  On the next -- on the following page,
13  27, you get into a discussion of the
14  differences or examples of short-term loading
15  and long-term loading.  And I think I
16  understand that in flood stage it is something
17  that is going to be short-term and is going to
18  apply forces against the flood walls.  Is that
19  correct?
20      A.  Yes.
21      Q.  And long-term loading is what occurs
22  on a daily basis to the flood walls, not in the
23  flood stage.
24      MR. RAFFMAN:
25          Objection.

45 (Pages 174 to 177)

178

1    You can answer.
2    A.  That's correct.  There are two cases
3  of loading, which is a case that's a short-term
4  duration, that's a quick condition.
5    Q.  Right.
6    A.  Typically during construction is one.
7  A flood case is one.  And earthquake is a case.
8  All these are short-term.
9    A long-term is the wall over its
10  design life under normal conditions would also
11  be seen.
12    So that's a short-term and the
13  long-term.  There's loading and strength.  The
14  loads -- not just the loads, the soils strength
15  are also short-term and long-term strength.
16    Q.  And it is your opinion, is it not,
17  Dr. Bakeer, that the east bank flood wall
18  experienced both long-term and short-term
19  loading conditions?
20    A.  Correct.  Based on its age, based
21  on -- time of construction, yes.  It has seen
22  several variations.
23    Q.  Would you agree that the IHNC flood
24  walls were experience short-term loading on far
25  fewer occasions than, for example, the 17th

179

1  Street Canal flood walls?
2    A.  Fewer?
3    Q.  Fewer.  And let me clarify.  In other
4  words, if -- you know, in a rainy May in New
5  Orleans, isn't it true that the outfall canals
6  would be filled more often than the Industrial
7  Canal or Inner Harbor Navigational Canal?
8    MR. RAFFMAN:
9    Objection.
10    A.  You're still draining the IHNC, but
11  anyway, the elevation in the water, that's a
12  very short duration, you would have what you
13  call a flash flood, which is what you're
14  referring to.  You're going to have a flash
15  flood.  Did I understand your question?
16  EXAMINATION BY MR. WIEDEMANN:
17    Q.  I believe so.  And that's what I'm
18  asking you, is the 17th Street Canal subjected
19  to short-term loading from water from flooding
20  more often than is the walls of the Inner
21  Harbor Navigational Canal?
22    A.  The repetition of the load is -- I
23  don't see how it's -- even if I accept your
24  argument, yes maybe you're going to have some
25  rise, but how much is the rise?  Again, small

180

1  event of rain is not going to cause it to do
2  more.  The outfall canals, because of the pump
3  stations are upstream, yes, you build up not
4  like the Jefferson.  Jefferson is the opposite
5  system.
6    Q.  By the lake, right.
7    A.  Correct.  Because they have pump
8  stations at the downstream case.  But at the
9  end you're connected to a huge water body which
10  is Lake Pontchartrain.  Lake Pontchartrain at
11  the end is connected to through Lake Borgne and
12  to the Gulf of Mexico.  The water elevation in
13  the lake is hovering around 1, plus 1 all the
14  time.  So you don't have a long period.  The
15  repeated load is not going to be an issue in
16  this case, if that's what you're leading to.
17    Q.  Well, I'm not.  I'm simply asking
18  whether or not it's true that more often times
19  in the 17th Street Canal you would have water
20  pressing against both walls than you would in
21  the Industrial Canal.  Is that a fact?
22    A.  Sure.
23    Q.  Okay.
24    A.  Why not?
25    Q.  Am I correct that it is your opinion

181

1  that the levee heights at the east side of the
2  Industrial Canal were not adequate due to
3  incorrect or outdated data and further due to
4  subsidence?
5    A.  Mainly subsidence.  There are some
6  errors and some, you know, changes in
7  references that was done during the eighties
8  when the Corps switched from MSL to NGVD.  The
9  decision was made locally in the district to
10  continue using NGVD instead of MSL without
11  making any changes.  So some walls were built
12  based on MSL.  Some walls were built based on
13  NGVD, assuming that MSL is the same as NGVD,
14  which is incorrect.
15    Q.  Uh-huh.
16    A.  There is some difference.  But the
17  main -- or the main concern with the north
18  breach and the south breach are the soil
19  conditions there and the lower ground locally
20  within those two particular areas due to the
21  subsoil conditions and the environment in these
22  areas.
23    Q.  Okay.  Moving on to -- we've
24  referenced it a few times, but it's a
25  hydrograph.

182

1    A.   That's Figure 18?
2    Q.   18?
3    A.   I believe so.
4    Q.   Yes.  And this hydrograph was produced
5  by whom?
6    A.   This was taken from the IPET, but it's
7  actually obtained from different sources.  As
8  you can see, the sources are listed.  Different
9  gauges.  Different locations.
10   Q.   Uh-huh.
11   A.   You will see a similar hydrograph also
12 in the Team Louisiana with some of the
13 predictions or estimates made by Team Louisiana
14 analytically.
15   Q.   Do you accept this hydrograph that was
16 produced by IPET?
17   A.   You can see there are some glitches,
18 but in general I would accept it.
19   Q.   I'd like to ask you, at 6:15 a.m., in
20 your reading of this hydrograph, what was the
21 water level in the IHNC?
22   A.   Again, you have to consider that this
23 is not a very accurate measure, but it would be
24 around 6:15, 6:30, you said?
25   Q.   6:15.

183

1    A.   It would be around elevation 13.
2  Somewhere between 13 and 12.5.  I'm sorry,
3  11.5.  Somewhere, depending on which gauge.
4  The closest gauge would be the IHNC lock staff
5  which is the triangular points.  But you see
6  another point which is slightly higher which is
7  the IHNC dock digital pictures.  So it is
8  somewhere in that range.
9    Q.   Did you believe at 6:15 a.m. the
10 levees on the east side of the IHNC were being
11 overtopped?
12   A.   Splashed.
13   Q.   Splash over.
14   A.   It was splashing over.  There's no
15 doubt it was splashing over.  You're
16 approaching -- if you again go back to my
17 survey diagram which I believe is, we discussed
18 this, the survey that I referred to, it's
19 Figure 63.  Again I visit this figure.  You
20 notice that the top of the wall is non uniform,
21 meaning that the top of the wall varied.  You
22 will see a depression or a bowl in the area of
23 the 18 -- 812-foot break.  You see that the
24 wall actually has lower elevation.  And if you
25 continued this trend that you see from those

184

points to the left and to the right, you expect
that the wall in the area of the southern
breach may have lower than the rest of the wall.  So
you may have some early overtopping in low
parts of the wall, but you can definitely have
splashing over throughout.  So that low areas
will experience.  Again, you see another low
point all the way down.  So you will see those
localized overtopping.  But predominantly at
that hour you will see splashing over.
   Q.   Splash over.  And what is your
definition of overtopping?
   A.   Overtopping is a sustained height of
water above the top of the wall.  That's an
overtopping.  That's a Corps of Engineers
definition.  They like to call splashing as
localized where it goes in and out, you see
water coming in but not continuously flowing
over the top of the wall.  That's the Corps'
definitions.
   Q.   Now I note, and you alluded to Figure
63, it seems that the actual measurable heights
don't seem to vary more than about a foot.
Would you agree?
   A.   Yeah.  That's correct.

185

   Q.   Would you expect that --
   A.   A foot and a half.  I mean, not
necessarily, because you see you got 14 -- you
have a point at 14, and in the middle of the
southern breach you may have as low as 12-1/2.
So you're talking about a foot and a half in
that area.
   Q.   And that was leading to my question.
        Would you expect that it would be a
variation of greater than a foot?
   A.   Slightly, yeah.  You may have more
than a foot, yeah.
   Q.   In your opinion, would this have been
a noticeable height difference?
   A.   Over a distance of 4,200 feet?
   Q.   Well, if you were to go out and stand
in the area of the 812-foot break prior to the
destruction of it --
   A.   I believe you are local and you heard
what the inspections of levees and flood walls
was done.
   Q.   Well, and again I ask you, do you
think it would have been a noticeable height
difference?
   A.   With the geodetic survey or the likes,

186

1   yes, you could see the difference.  But
2   eyeballing it, I think you need a good trained
3   engineer who would look at it and make a note
4   on that.
5         One of the issues is to see premature
6   splashing or flooding in areas, then it's
7   reported and that's where a correction is being
8   made.  When you start seeing seepage, this is
9   what should be done and that's how we notice
10  it.  But over 4,200 feet distance, it's very
11  difficult to see these variations unless you
12  really run a survey and note it.
13     Q.  Dr. Bakeer, are you aware of any
14  reports of underseepage, evidence of
15  underseepage occurring along Jourdan Avenue
16  prior to Hurricane Katrina?
17     A.  I've heard some word here and there
18  about some ponding, but nothing really.  I
19  didn't see any real reports that document it.
20  But there was some mention in some of the
21  reports I reviewed that some people reported
22  ponding in some of the areas.
23     Q.  You are aware, are you not, that that
24  was a problem that occurred at 17th Street
25  Canal in the years leading up to Hurricane

187

1   Katrina?
2      A.  That is correct.  And it was not
3   addressed at that time, and it still was a
4   lingering problem after Hurricane Katrina.
5      Q.  All right.  And Page 35, I think
6   you've already addressed this, but you
7   indicated in the last paragraph, middle way
8   down, therefore there are some inconsistencies
9   in the IPET data since post-Katrina geodetic
10  surveys show that the flood wall top varied
11  between elevation +12.5, +13 NAVD88 or +15 to
12  plus 15.5 feet MSL.
13        Again, this is something that you
14  attribute the inconsistencies to the difference
15  between MSL and NAVD88?
16     A.  How it was converted by different
17  people at different times from one unit to the
18  other.  But if the wall design grade should
19  have been at 15, why would it have been built
20  at 15.5?  So the variation of 2 to 2-1/2 feet
21  may not be throughout the area, there might be
22  some errors in some of the benchmarks, there
23  might have been some errors, but I don't
24  believe that you're going to build a wall
25  higher than what your contract says.  So.

188

1   That's the 15-1/2 that I'm referring to.  That
2   tells me that the wall was actually higher than
3   the time it was built, if you take the
4   conversion as is.
5      Q.  Okay.  Moving on to Page 38, you,
6   indicate at the bottom of the first paragraph
7   the number of borings -- therefore, the number
8   of borings made does not meet the present
9   requirement and some unforeseen subsoil
10  conditions may not have been detected.
11        And my question to you is, did the
12  borings made meet the requirements of the Corps
13  at the time of construction?
14     A.  Um --
15     Q.  Do you know?
16     A.  There was no written specific -- they
17  use larger spacing than 500 feet.  It was as
18  high as 1000, sometimes 2000 feet.  The 17th
19  Canal was the same issue; there were no borings
20  made at the top of the 17th Street Canal.  The
21  top of the slope.  So there were some
22  recognized standards, but I'm not sure they
23  were met throughout the flood protection system
24  in the city.
25     Q.  Okay.  Now, on Page 40 there seems to

189

1   be a problem, at least with my copy of your
2   report.  There's -- it begins, based on this,
3   and it does not conclude.
4      A.  Figure 63 shows the results?  You said
5   39?
6      Q.  40.
7      A.  Yeah.  But the end says Figure 63
8   shows that's the end of 39, then says the
9   results of survey.  Unless --
10     Q.  Well, I don't know, maybe it's my
11  copy.  At the bottom of the page it begins
12  based on this, and does not conclude.  Let me
13  see?
14        MR. RAFFMAN:
15           (Tendering.)  I'm just referring
16        you to the top of Page 41 where I
17        believe the sentence may continue.
18     MR. WIEDEMANN:
19           Man, I'm missing that for some
20        reason.
21     MR. WEBB:
22           Me, too.
23     THE WITNESS:
24           I think it depends on the
25        printer.

190

EXAMINATION BY MR. WIEDEMANN:

   Q.   Right.  Okay.  So it should read, based on this difference much greater settlements must have occurred within the breached segment under the weight of the preexisting fill.  These settlements resulting in lower elevations observed in Figures 25, 26 and 63.

      We might just pull out this page in our exhibit copy and replace it.

   MR. RAFFMAN:

      That would be fine.  We'll replace it with a clean copy.

   (Off the record.)

   MR. RAFFMAN:

      We will get a replacement for 41 and straighten it out.

EXAMINATION BY MR. WIEDEMANN:

   Q.   Are you of the opinion -- at the north breach, are you of the opinion that there was a faulty weld between the adjoining segments of I-walls with different tip penetration?

   A.   I looked at the wall as they were exhumed at that location, and there were some photographs of them.  These are rusty, poor

191

shape.  I cannot make an assessment about welding.  I'm not a structural engineer or a metallurgist to make the assessment.  But it looked to me like the old wall was in much poorer condition than the new wall next to it.

   Q.   On Page 59 of your report, the first full sentence at the top of the page:  Based on the hydrographs shown in Figure -- oops, sorry.

   A.   Again, my pages may differ than yours, because I print on my personal printer which may differ.

   Q.   I see.  Well, let me ask you, it's a pretty simple question, you wrote, Based on the hydrographs shown in Figure 18, the water level in the IHNC overtopped the flood wall by as much as 2.5 feet of water.  Consequently, the pressure on the wall may have increased by 11 fold to about 12,500 pounds per foot of wall.

      In your opinion, what time did this occur?

   A.   That's when the over, full overtopping took place.  That's when you have an elevation 17MSL.  That's when the entire floodwall has seen that pressure.

   Q.   Based on the hydrograph which you have

192

relied on, what time do you believe that that would have occurred?

   A.   That would be around probably seven, eight, maybe around nine o'clock.

   (Off the record.)

   MR. WIEDEMANN:

      Okay.  We have asked all of our questions, doctor, and with that we tender the witness.

   MR. RAFFMAN:

      Thank you very much.  I have no questions.  We will read and sign, please.

193

WITNESS' CERTIFICATE

      I, REDA M. BAKEER, Ph.D., P.E., do hereby certify that the foregoing testimony was given by me, and that the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

_____    _____

DATE SIGNED      REDA M. BAKEER, Ph.D., P.E.

_____ Signed with corrections as noted.

_____ Signed with no corrections noted.

DATE TAKEN:  September 10th, 2009

194

1       REPORTER'S CERTIFICATE
2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3   Certified Court Reporter in and for the State
4   of Louisiana, do hereby certify that the
5   aforementioned witness, after having been first
6   duly sworn by me to testify to the truth, did
7   testify as hereinabove set forth;
8          That said deposition was taken by me
9   in computer shorthand and thereafter
10  transcribed under my supervision, and is a true
11  and correct transcription to the best of my
12  ability and understanding.
13         I further certify that I am not of
14  counsel, nor related to counsel or the parties
15  hereto, and am in no way interested in the
16  result of said cause.
17
18
19
20
21
22
23      _____
24      JOSEPH A. FAIRBANKS, JR., CCR, RPR
25      CERTIFIED COURT REPORTER #75005

REDA BAKEER, PH.D.                                                                 9/10/2009

Page 1

## A

**abbreviation** 93:18
**Abdel-Rahman** 39:21
**ability** 194:12
**able** 44:14 50:12 150:14
  157:13
**absence** 172:20
**absolutely** 10:15 60:6
  67:24 75:6,22 115:20
  115:20 125:13 133:1
  158:21
**academic** 108:1
**accept** 114:19,21 137:11
  179:23 182:15,18
**acceptable** 139:5 156:1
**access** 170:24 171:11
  174:4
**accident** 24:11,18
**accordion** 131:4,15
**account** 88:6 113:10
**accounts** 87:18
**accuracy** 100:15 168:4
**accurate** 103:8 182:23
**achieved** 105:11
**acquired** 18:2
**acquisition** 18:16
**acronym** 82:2
**ACTION** 1:4
**actions** 47:13
**activities** 176:7 177:8
**actual** 38:10 163:4
  184:22
**Adams** 125:9,10
**add** 125:21 168:1
**added** 86:16 147:12
**adding** 86:9
**addition** 44:13 50:18
  111:1
**additional** 15:6 52:15
  77:16 82:18 120:2
  126:2 165:23
**addressed** 187:3,6
**adds** 119:12
**adequate** 181:2
**adjacent** 122:14
**adjoining** 190:21

**adjustment** 89:18,22
**adjustments** 88:23 89:17
**ADM** 26:17
**administering** 5:24
**admit** 96:3
**ADM-Growmark** 25:15
  26:15
**adopted** 117:14
**advance** 21:16 86:17
**advanced** 27:17
**aerial** 65:12 127:7
  156:18 157:4,12
**aero** 65:19
**affirm** 146:20
**affirmatively** 55:8
**aforementioned** 5:4
  193:8 194:5
**age** 178:20
**agencies** 63:12 90:14
**agency** 51:16,17,19
**aggregates** 38:1,2,14
**agree** 100:11 114:25
  118:16 126:4 178:23
  184:24
**agreeable** 15:22
**AGREED** 5:2
**agreement** 105:20
**ahead** 85:2 105:19
  106:13 113:13 138:1
  169:10
**ALDOCK** 2:18
**alignment** 128:11 156:17
**alike** 91:17
**allegation** 56:15
**allegations** 26:9
**allisions** 135:24
**allow** 6:25 52:8
**allowing** 17:16 148:11
**alluded** 184:21
**Ama** 26:22
**America** 2:15 56:8,12
**American** 42:3 145:14
**amount** 132:9 151:6
**analyses** 47:3 52:14,18
  53:8,10 69:24 81:9
  98:23 110:12 112:22

**analysis** 12:17 13:4
  14:13 16:9 19:12 20:22
  22:25 27:14,16,17 28:3
  31:16 39:16 40:19
  43:23 45:25 46:7 51:23
  53:1 55:1 67:6,7 68:23
  69:8 70:1,21 71:9,20
  79:6,8 81:1 82:14,18
  87:19 95:4,23 96:5,10
  96:21 97:3,11,12,13,18
  97:20,22 98:15,22,23
  100:19,20,22,23 101:3
  101:4,7,8,11,13,22
  102:17 103:1,5 107:17
  108:1,14,17,19,19
  109:5,6,12,14 110:8,10
  110:12,14 112:8 135:11
  135:13,13 136:25 138:4
  138:8,16 139:3,4
  147:19 150:8 151:3
  155:17,18 158:22 159:1
  159:10,24 160:17,18,21
**analytical** 110:13 117:8
  125:23
**analytically** 182:14
**analyze** 44:2 81:18 82:8
  84:8 97:5 163:1
**anchored** 81:19,20,21
**and/or** 54:16 63:25
  148:5 153:2 193:6
**angle** 74:24 143:8,19
**ankle** 144:2
**announcement** 51:17,17
  51:19
**annually** 35:13
**answer** 5:13 7:1 22:16
  33:18 35:6,25 61:10,24
  64:24 65:1 71:7,10,19
  73:16 93:5 94:11
  103:22 105:19 106:13
  107:24 128:2 134:7
  138:3 141:15 143:21
  144:4,6 151:19 160:4
  167:15 169:10 172:10
  172:12,21 178:1
**answered** 60:24 61:23

  165:20 175:7
**answering** 19:23
**answers** 50:12 69:25
**anticipate** 56:2 106:22
**anymore** 128:12
**anyway** 129:24 155:1
  179:11
**apart** 48:11,16 165:9
**apex** 126:7,24
**apparently** 34:12
**appear** 41:25 42:12
  63:10 65:16 134:10
**APPEARANCES** 2:1
**appeared** 36:22 114:4
**appears** 10:18 64:10
**appendices** 36:10,12
  99:22
**appendix** 10:11,20,21
  12:13,16,19,22,23 13:3
  13:13 14:9,13,17,21
  15:6 16:7,14,22 23:5,5
  23:6,9 36:8,13,16 67:14
  81:6,7,8 83:18 84:14
  119:15 134:21 159:1,2
  159:7,7
**applies** 36:9
**apply** 51:18 137:22
  177:18
**appointed** 23:11,13,18
**appreciate** 17:15 32:16
  71:2
**approach** 66:23 67:20
  68:7,9
**approached** 49:3 51:7,15
  68:6 137:4
**approaching** 183:16
**appropriate** 15:19
**approved** 51:13
**approximately** 8:14
  31:19 34:20 45:16
  85:13 156:20 167:9
  173:11
**arbitration** 10:2,3 21:4
  21:10
**architects** 74:12
**Ardaman** 17:22,23 18:1

REDA BAKEER, PH.D.

9/10/2009

18:2,6,10,14,16 20:15
20:20 21:12,23 22:7,11
22:18,21,25 23:1,7 26:2
32:12 44:3
**area** 8:3 27:7 30:5 42:7
48:22 58:22,23,24
59:10,19,22 60:10 61:8
62:3 75:9 76:13 78:17
88:7,25 89:3,4,12
100:13,16 110:25 111:1
111:22 112:5 118:7
130:6 131:1 137:6
138:9,11,12 140:16
147:23 148:7,20 149:1
149:1,1,21 152:7 153:3
156:13 159:15 160:11
160:12 170:3 173:1,17
175:12,16 177:10
183:22 184:2 185:7,17
187:21
**areas** 31:2,8 52:8,25
68:23 109:13 147:17
148:12,18 149:17,17,25
150:7 152:1 153:8
181:20,22 184:6 186:6
186:22
**argument** 174:13 179:24
**armor** 174:10
**Army** 12:24 13:6 37:13
38:5 41:4 43:19 46:23
50:21 51:1,3,12 70:6
81:10 83:22,23 84:7
90:2,5 161:6 170:19
171:6
**arrangement** 34:25
**arrow** 131:8
**arrowheads** 131:13
**Arthur** 64:15
**article** 40:10 84:10
**articles** 42:23 50:18
**artificially** 17:3
**ASCE** 145:12,13
**asked** 19:25 53:16 55:11
60:24 61:23 63:1,7
64:6 66:23 67:18 77:7
78:3 134:6 192:7

**asking** 36:11 38:8 74:16
84:7 114:14 134:9
137:16 140:19 143:11
143:21 179:18 180:17
**aspects** 68:21 107:6
138:5 146:19 169:12
**assess** 47:3
**assessment** 47:12,18
49:1 60:20 191:1,3
**assessments** 48:8,21
**assign** 145:15
**assigned** 68:2 107:17
108:10,13
**assist** 19:3 51:9 82:24
**assistant** 31:11
**assisted** 47:7 54:22
**associated** 146:17
**Associates** 17:22,23 18:1
18:2,10 20:15 21:13,23
22:7,19,21 32:12 44:4
**assume** 102:14 103:22
111:14 114:7,15
**assumed** 47:4 87:14
112:8
**assuming** 87:20 102:12
112:13 113:3 174:19
181:13
**assurance** 158:9
**as-built** 91:9 159:16,17
**attach** 135:20
**attached** 14:3,4,8,12,16
14:20 15:3,17 165:21
**attain** 161:4
**attempt** 6:19
**attempted** 69:21
**attention** 50:4
**attorney** 9:19 11:3,5,6
25:20
**attorneys** 13:14 54:17
76:21 78:18
**attribute** 132:24 187:14
**Audubon** 10:24
**August** 114:18 117:21
132:20
**authors** 90:14
**available** 68:13 79:13

90:12 95:2 103:3
149:23 174:5
**Avenue** 2:20 43:20 44:7
45:6 49:5,11,13,17 59:5
61:4,6 72:5 85:23
92:14,21 95:16 102:22
104:14 110:20 111:22
130:3 153:20 161:13
162:2,5 165:10 166:3
166:13 168:21 170:4
186:15
**average** 80:10
**avoiding** 162:10
**awards** 33:9
**aware** 59:10,14 72:24
73:6,20,23 79:25 80:7
128:21 132:18 164:17
170:13 186:13,23
**a.m** 102:1,6 182:19 183:9

---

**B**

**B** 4:6 12:16 13:3 14:13
16:7 36:16 81:6,7,8
83:18 93:2 159:1,2,3,3
**back** 9:4 10:4 11:25 39:1
44:6 47:20 50:17 52:15
66:4 67:22 71:22 87:25
93:24 104:10 106:15
115:3 124:12 129:19
131:6,11 142:23 143:1
147:9 157:5 158:11
160:15,16 168:6 169:19
170:5 171:14 172:15
173:10 183:16
**backfill** 148:13
**backfilling** 158:5
**background** 110:6
**backs** 147:19
**backside** 156:8
**bad** 101:12
**Bakeer** 1:17 4:9,10,11,12
4:13,14 6:1,7 11:8
13:23 14:1,2,6,7,9,11
14:13,14,15,18,19,21
15:2,7 17:20 22:20
24:6 25:24 32:17 37:24
39:21 40:9 50:3 71:3

76:14 77:13 78:15
105:5 115:18 118:9
128:21 132:18 138:19
142:6 147:1 168:13
178:17 186:13 193:3,11
**bank** 43:23 45:14 48:8
48:22 55:13 56:24
91:13 98:6 101:16
110:19 127:8,9,10,11
132:21 145:3,7 147:7
147:22 148:6 153:2
162:14 164:10,25 170:3
170:7 172:23 178:17
**barely** 152:8
**barge** 2:2 26:9,13 56:16
56:21 58:15,20 59:2,8
59:10,13,15 61:20
72:25 74:10,11 75:25
76:5,11 114:3,8,12,16
115:1,2 116:18,25
117:19 118:6,10,16,22
118:23 119:1 124:16,20
124:21,22,25 125:5
128:15,17,18 131:19
136:23 137:3,9,14
138:14,19 139:14,20
140:4,15 141:4,11,25
142:4,7,11 143:4,12
144:18 145:2,6,17
146:7 169:2
**barges** 1:6 73:7,11,20,21
135:20 137:22 139:8,11
140:1
**Baronne** 2:5,11
**barrier** 120:2
**Bartlett** 134:16
**Bartlett's** 134:23
**based** 27:13 33:8 46:4
53:7 71:10 81:24 87:17
95:23 96:9 97:2 98:13
99:2 102:16 103:4
110:8,18,22 112:21,22
117:2 118:4 125:23
138:25 140:22 144:15
144:17 167:23 171:4
173:24 178:20,20

REDA BAKEER, PH.D.                                                      9/10/2009

Page 3

181:12,12 189:2,12 190:3 191:7,13,25
**bases** 77:14
**basic** 74:22 75:14,17 76:1
**basically** 28:4 52:18 64:9 69:10 76:6 83:17,18 108:9 110:13 124:2 130:13 164:6 173:4 175:25 176:23
**basing** 136:5
**basis** 41:20 54:1 113:18 177:22
**Baton** 80:15,16
**Bayou** 136:12,13 141:6,8
**Bea** 62:6
**beam** 164:6,7
**Bearing** 25:13
**began** 102:4
**beginning** 23:5 36:6 39:6 154:5
**begins** 119:12 127:17 189:2,11
**behalf** 23:1 107:24
**believe** 8:16 10:2,23 11:8 14:23 16:6 18:23 25:9 28:25 34:18,21 38:16 49:21 54:6,7,10 55:13 65:18,18 75:24 78:13 80:22 85:20 86:4 94:13 98:3,7,7 100:2 101:24 102:3 104:3 113:21 115:1 116:2 121:21 129:23 136:10,11 142:10 155:7 159:3 162:17 170:20 172:3,23 173:14 179:17 182:3 183:9,17 185:19 187:24 189:17 192:1
**benchmark** 88:13,23 89:11 163:5,6,7,9 176:19,19
**benchmarks** 176:17 187:22
**bend** 122:23
**Benoit** 1:12

**bent** 124:21
**best** 194:11
**better** 7:2 13:15 24:3 99:7
**beyond** 21:16 75:1 76:12 77:17 128:14,15
**bias** 101:8
**Bienvenue** 136:12,13 141:7,8
**big** 79:7 124:9 129:21 158:7
**billed** 54:16
**billing** 55:3
**bit** 86:4 127:24 132:7
**black** 15:16 17:5
**blowups** 65:24
**blue** 165:12,13 166:8
**board** 24:23 80:8 112:19
**boards** 32:9 79:2,23 80:2 80:6
**Bob** 62:6
**body** 180:9
**bold** 84:12
**book** 42:1
**boom** 25:14 132:22 133:7
**Borgne** 180:11
**boring** 148:17 151:14
**borings** 23:25 70:12 146:22 150:3,5,6,11,15 151:7,9,10,14,25 152:7 152:14,15,23,23,24 188:7,8,12,19
**borrow** 147:21 148:5 153:2 157:23 171:8
**bottom** 39:10,14,24 40:7 40:10,14,16 119:8,10 119:18 124:22 148:23 154:7 159:17 188:6 189:11
**bought** 56:13
**Boutte** 1:8
**bow** 126:10,12 127:16,23 128:22
**bowed** 128:3
**bowl** 183:22

**bows** 128:12,22
**boy** 159:3
**breach** 55:14,15,17 56:17,22 58:16 59:8 61:21 64:2 67:1 72:1 101:25 102:4,8,8 110:18 111:23 114:12 116:24 117:1,3,5,24 118:7,12,13,17 121:8 124:13,14,16,24 125:2 126:4,8,14,22 127:8,9 127:10,11,18 128:16,25 129:7,13,14 130:14 131:7,20 132:12 138:20 138:22,22,22,24 141:22 141:24 142:9,14,17 143:15 144:14,21,22,24 146:7,10,21 149:15 150:8 153:4,15,17 154:1,2 155:14 156:7 156:18 159:15,20,21 160:11,12 166:7,10 169:1 173:16 181:18,18 184:3 185:5 190:20
**breached** 116:18 142:2,3 150:7 190:5
**breaches** 1:4 78:16,19,20 78:22,23,24 79:8,10 94:25 95:4,18 101:1,15 102:22 103:24 104:4 130:1 145:7 147:7,12 148:7 149:18 152:2,5 168:20
**breaching** 56:16
**break** 17:12 50:3 105:3,5 131:15 166:11 183:23 185:17
**breakdown** 34:5
**breezed** 106:20
**BRIAN** 2:9,10
**bridge** 58:25 61:4 110:20 161:14 162:2,5
**brief** 50:1 76:20 77:10 132:16 168:11
**briefly** 77:5 105:6
**bring** 170:10,11 171:23

172:4 175:2
**brings** 22:6
**broad** 51:16,17,19
**broadcast** 59:12
**broke** 73:11,22
**brought** 50:4 134:5 161:20
**BS** 30:7
**BSC** 75:18
**budge** 138:11
**Buhler** 25:14
**build** 44:14 52:8 93:3 176:1 180:3 187:24
**building** 151:12,13
**built** 44:10 45:2,9 52:4 166:2 174:19,25 181:11 181:12 187:19 188:3
**bulkhead** 21:11
**bulkheads** 26:6
**bunch** 154:23
**business** 57:9

**C**
**C** 10:11 12:19,22 14:17 36:16 40:1 97:12
**Cairo** 30:8,24 34:13
**calculate** 96:16,18,21
**calculating** 96:20 138:6 138:7
**calculations** 93:14 108:21 117:8 125:23 137:8 138:16
**California** 33:4 34:6
**call** 13:17 27:20 51:16 100:21 112:25 115:19 179:13 184:16
**called** 46:11 56:2 79:17 81:13,19 82:14 87:13 87:16,17 93:14 132:3 151:2 154:15 159:25 160:1
**calling** 64:5,6
**campus** 80:16
**canal** 1:4 43:21 44:7 48:9 49:2,5,12,13,17,18,24 60:22 72:5 85:17 86:3 86:23,24 91:14,21,22

REDA BAKEER, PH.D.

9/10/2009

91:25 92:1,7,14,21 94:6
95:1,13 101:2 103:24
104:4 114:17 116:19
117:20 123:7,8,12,13
123:14,15,19,20 128:24
130:3,3 153:19,24
154:3,11,15,16,18
155:3,12,21 156:5,10
156:14,16,22 157:8,11
157:13,17 162:14 179:1
179:7,7,18,21 180:19
180:21 181:2 186:25
188:19,20
**canals** 48:3 72:2 104:21
170:4,4 179:5 180:2
**CANT** 93:15 97:22
**cantilever** 37:3 93:17,18
**cap** 86:13 92:6 119:7,12
119:25 120:5 121:5,6
130:13
**capability** 53:9
**capable** 143:13
**capacity** 26:1 120:7
**capped** 86:12
**carefully** 115:2
**case** 7:9,10,22 8:4,19 9:2
9:16,20,25 10:4,25
11:11,13,14 18:12,20
18:21 19:4,11 20:20,25
21:2 22:5,10 23:9 24:4
24:7,21 26:4,24 28:18
28:20 48:11,16 51:11
52:20,22 53:2 54:5,8,12
54:17 59:18 67:8 75:3
76:16 99:12 100:21
109:21 116:10 134:2
139:2 151:21 158:12
169:6 170:21 172:19
178:3,7,7 180:8,16
**cases** 7:6 9:11 19:16 20:2
20:3,12,19 21:9,20 22:2
23:4,7 24:13 25:24
26:8 35:2 46:21 51:14
86:16 147:13 178:2
**Casting** 25:14
**casts** 176:21

**casual** 57:16 59:22
**casually** 95:8
**catastrophic** 129:25
130:4,10
**catastrophically** 128:19
**categories** 145:4 175:15
175:24 176:24
**Cates** 37:24
**cause** 66:25 130:10
142:14,16 143:14 145:3
145:17 155:20 169:13
180:1 194:16
**caused** 27:4 58:15 59:8
59:16 61:20 103:5
128:9 139:12 142:8
155:25 177:10
**causes** 59:17 62:2 149:1
176:16,17
**causing** 148:25 176:10
**CCR** 1:24 5:22 194:2,24
**cement** 56:13
**center** 126:13
**Centre** 1:19 3:3
**certain** 15:20 16:8 17:4
86:12 96:14
**certainly** 32:16 67:17
105:16 109:3
**certainty** 153:1 155:12
**CERTIFICATE** 193:1
194:1
**certifications** 31:22
**Certified** 1:25 5:23
194:3,25
**certify** 193:4 194:4,13
**cetera** 29:17 33:4 76:8
82:9 95:21 132:23
143:20 151:17 169:20
170:18
**Chaffe** 1:18 3:1 19:9
25:17 26:11
**chance** 98:14
**change** 87:3,9 91:3 100:7
**changes** 129:14 181:6,11
193:6
**channel** 75:17,22 76:10
103:8 124:8

**channels** 104:16,17
**chapter** 83:18 84:13 85:3
85:4,9 161:7
**characteristics** 173:6,7
**charge** 80:2
**Charles** 26:20
**Charlie** 9:17,18,25 11:6
**check** 12:11 105:24
**checking** 12:21
**checks** 105:24
**chemical** 33:22
**chief** 32:12,14
**chronology** 71:14
**cite** 50:19
**citizens** 80:10
**Citrus** 129:19
**city** 47:24 60:17 151:11
188:24
**civil** 1:4 5:6 8:12,13 9:24
10:5 11:18 29:2,5,9,10
29:13,22,22 30:1,7 34:1
42:3 55:21 145:14
**Claiborne** 59:5 61:4
166:13
**claim** 27:3 56:20 68:18
75:15
**clarify** 179:3
**clarity** 174:22
**class** 18:24 40:1
**Claude** 61:7
**clay** 174:14 175:20
**clayey** 170:17
**clays** 52:5 173:3,4
175:18,19
**clean** 68:7 190:13
**clear** 17:9 25:6 36:8
116:4 139:22 142:5
**clearances** 62:5
**client** 21:17
**clocks** 109:15
**close** 54:2 61:11 94:14
149:6
**closed** 57:7,8 61:6
**closer** 91:21
**closest** 183:4
**coauthor** 53:13

**code** 5:6 151:12
**cohesive** 122:13 173:5
174:12
**coincide** 149:13
**coincided** 101:19
**collapse** 26:5
**collect** 70:18
**collected** 54:24 66:14
71:8
**collecting** 65:10 68:16
**collided** 27:1
**collision** 26:9
**collisions** 135:19,23
136:2
**color** 15:18,19 16:8 17:8
**column** 124:5
**come** 107:21
**comes** 41:19 74:22 80:2
**comfortable** 102:10
**coming** 46:18 64:3 112:4
152:22 184:18
**comment** 84:10 109:18
115:11 174:6
**comments** 84:8,17
100:14 105:21 109:13
140:17
**common** 105:1
**communicating** 76:23
**communication** 77:10
**compacted** 156:2
**company** 20:24 21:8,14
23:15,18,25 25:8 46:11
**Comparable** 94:8
**compare** 94:4 104:22
**comparing** 92:14
**compensate** 35:17
**compensation** 9:6
**competent** 32:14
**complete** 16:2
**completely** 97:12 129:9
138:25
**complex** 28:5 161:22
166:3
**complicated** 27:18
**comprehensive** 81:3
**compress** 175:18

REDA BAKEER, PH.D.                                                                                    9/10/2009

**compresses** 175:20
**compromise** 120:6,20
  121:3 129:10
**compromised** 120:6,12
**computer** 27:24,25 45:25
  52:18 53:4 67:4,10,12
  67:20 68:4 69:9,22
  80:25 194:9
**concentration** 29:19
**concept** 87:2 91:19
**concepts** 43:3,6
**concern** 158:12 181:17
**concerns** 156:4
**conclude** 138:18 158:22
  189:3,12
**concluded** 173:19
**conclusion** 13:12 69:4
  70:25 106:25 108:24
  112:24 117:6 125:3
  126:2 131:22 139:5
  140:21,22 143:5 144:12
  146:25 161:19
**conclusions** 18:9 69:3
  77:18,19 98:25 99:2
  105:11 107:12 112:9
  125:22,22,25 134:9
  135:15
**conclusive** 115:24 149:9
**concrete** 31:3 86:13 92:6
  119:7,12 124:20 130:13
  131:1,1,16 132:9,14
  133:2,6,8,20,22 138:8
**concur** 114:1 144:22
**condition** 128:8 146:17
  146:19 178:4 191:5
**conditions** 9:8 27:19
  52:9 76:8 97:8 129:12
  129:13,15 146:6,10,12
  146:14,15,21 149:19,22
  149:24 153:6 155:20
  157:24 159:5,14 178:10
  178:19 181:19,21
  188:10
**conducted** 80:12
**cone** 70:12,13 146:23
**conference** 42:17,18

**conferences** 32:7 42:5,20
**confident** 117:17
**confirm** 69:21
**confirms** 173:24
**confused** 96:4
**confusion** 96:8 135:10
  172:8
**connect** 161:22
**connected** 104:18,19
  161:23,24 180:9,11
**connection** 7:4 94:24
**consecutive** 165:19
**consecutively** 36:13
**consequences** 21:14
  130:10
**consequently** 55:2 89:6
  97:4 167:5 191:16
**consider** 62:2 155:17
  182:22
**considerable** 129:8
**considered** 125:8
**consistently** 90:8
**consolidate** 175:18
**Consolidated** 1:6
**consolidates** 175:21
**consolidation** 175:11,12
  176:24
**consolidations** 8:2
**constructed** 23:21 45:4
  91:24 158:16
**construction** 13:9 24:12
  47:1,4,14 92:20 93:5
  98:5 136:24 149:7
  170:23 178:6,21 188:13
**consultancy** 35:9
**consultant** 21:22
**consulted** 76:15
**consulting** 44:21
**contact** 22:19 118:11
  123:1 124:17 125:1
  139:8 140:2 143:18
  144:19,23
**contacted** 19:2,6 54:5
**contain** 77:13
**contained** 26:9 63:11
  77:19 109:23 117:9

**contains** 20:8 81:8
**content** 133:22
**context** 144:11
**continue** 35:24 50:10
  82:11 145:10 166:7
  181:10 189:17
**continued** 183:25
**continues** 162:6
**continuing** 106:9
**continuously** 184:18
**contract** 46:14 187:25
**contracted** 46:12
**contractor** 21:5 23:14
  93:2,2
**contributed** 138:20
  153:3 155:13 177:9
**contribution** 148:4
**control** 60:21 142:15
  143:15 158:10 170:22
**converge** 160:3
**conversations** 62:11
**conversion** 90:16 188:4
**converted** 187:16
**copies** 15:15,17,19
**copy** 189:1,11 190:10,13
**cord** 131:10,11,14
**Corporation** 10:16
**Corps** 12:24 37:13 38:5
  41:4 43:19 46:9,13,15
  46:23 50:21 51:1,3,4,8
  51:12 52:11 53:12,23
  70:6,22 80:9 81:10
  83:23,24 84:2,11,12
  90:3 93:21 97:9 98:9
  122:21 148:14 150:15
  150:19 151:4,19 157:7
  158:4 159:25 161:6,13
  162:24 166:18 167:17
  170:19 171:6 181:8
  184:15,19 188:12
**correct** 7:7 8:6 10:12,22
  10:25 11:24 12:5,9,11
  12:15,18,20,21 14:25
  15:9,10,12 17:24 18:11
  18:15 19:20,22 20:1,6
  22:4,4 24:20,25 25:16

25:19 26:16 29:3,4
  30:9,17 34:24 36:15,20
  36:23,24 38:11,15
  39:13,18 40:4,21 41:5
  42:15 44:22 45:5,10,21
  46:15 47:10 49:10 50:6
  50:23 52:1 54:7 56:9
  56:18 58:4,6 60:14
  63:13 65:4,22 66:17
  67:14 68:3 69:18 70:1
  71:19,21 72:3,16 73:8
  74:2 75:9,12 76:2 78:9
  78:21 80:17 81:5,21
  83:7 84:4,20,23 86:14
  86:19 88:2,5,8,10,12
  89:8,10,22 91:2,23 98:2
  99:17,25 102:13,16
  103:25 104:2,15 107:3
  107:4,8,12 109:25
  112:6,14 116:11,14
  117:2 118:4 121:11
  123:12,16 127:18,19
  129:3 132:6 136:7,10
  137:11 141:6,9,20
  144:16,20,22 146:3,8
  147:5,11,25 150:3,4,12
  153:16,21 155:4 158:20
  158:25 162:15,21
  164:16,22 166:19,20,22
  167:1,3,6,24 168:17
  170:10,12 171:3 172:17
  174:20 175:2,6 177:5
  177:19 178:2,20 180:7
  180:25 184:25 187:2
  193:7 194:11
**correction** 84:25 186:7
**corrections** 193:6,13,15
**correctly** 13:3 21:25
  69:15 85:22 157:21
  172:13
**correctness** 100:15
**corresponded** 54:10
**corrosion** 120:1
**cosmetic** 139:12 140:2
**counsel** 5:3 16:17 194:14
  194:14

REDA BAKEER, PH.D.                                                              9/10/2009

**count** 31:25 32:5
**country** 23:20
**couple** 6:13 52:11 76:21 89:3
**course** 133:23 147:8
**courses** 31:4
**court** 1:1,25 5:23 7:1 8:7 8:10,13 9:24 10:1,1,6 11:18 19:14,24 23:10 194:3,25
**CPM** 24:8,10
**crack** 121:9,17,20,22 122:1,8,12,14,18,19,22
**cracks** 122:6
**crane** 27:1,2,3,4,5,5,6
**crashing** 133:15
**credibility** 110:2 112:25 115:19 116:1
**criteria** 83:24 84:4 86:19
**critical** 160:18,20
**criticism** 13:15 135:6
**critique** 13:15
**crossed** 117:19
**crossings** 43:25,25 44:1 46:21
**cross-sections** 154:12 157:6
**crushed** 120:14,15 121:2
**crushing** 133:20
**curb** 7:15,24,24
**curiosity** 57:13,14
**curious** 60:5 72:18 167:7 172:2
**current** 76:9 117:4 144:16
**currently** 17:21 90:2
**currents** 76:8
**curriculum** 14:17 36:7 50:17
**curve** 101:17,20 102:18
**Cushing** 64:18,19,20 75:5 77:2,7,11 98:20 99:5,18 111:9 134:18 134:20 169:7
**Cushing's** 169:16,24
**cut** 64:7

**CV** 11:25 12:19 20:3,7 20:12
**CWAL** 81:17
**CWALSHT** 81:17 83:9 93:20 96:19 97:23 159:10,12,25
**C-A-N-T** 93:17,18
**C-W-A-L-S-H-T** 81:17

**D**

**d** 4:1,6 12:23 13:13 14:21 15:6 16:14,22 36:14,16 133:9
**Daggett** 77:5 98:21 99:6 99:20 169:22
**Daigle** 11:23
**daily** 177:22
**daiquiri** 7:13,16
**damage** 81:14 95:16 97:15 118:23,24 132:15 138:14,15 139:12 140:3 142:13,16 143:14
**damages** 7:16 9:7
**DANIEL** 3:9
**dark** 64:3
**data** 22:24 52:15,24,24 53:1,17 65:19 79:6,9 108:3 117:15,18 149:22 152:22 161:18 162:22 164:13 181:3 187:9
**date** 20:5 98:13 118:5 193:8,11,25
**dated** 84:22
**dates** 85:15
**datum** 87:1 91:4,6 163:1 167:17
**day** 130:2 135:19
**Dead** 127:5
**deal** 32:10
**dealt** 21:20
**decide** 96:7 151:6
**decision** 181:9
**declare** 35:10
**deeper** 92:1 121:12,23 154:7 158:19 160:13,23
**deepest** 160:24
**deep-seated** 161:1

**defend** 56:8
**defendant** 7:9,12,17
**defer** 75:4
**deficient** 52:25 71:1
**define** 112:12
**defined** 33:7 122:9 127:19 129:14 130:1
**definite** 115:25
**definitely** 58:7 91:18 184:5
**definition** 29:22 120:11 121:19 156:15 184:12 184:16
**definitions** 184:20
**definitive** 142:6
**degree** 29:25 30:1,24 32:18,23,24,25 34:7 108:16 145:15 153:1 155:12 162:13 163:21
**degrees** 31:21
**density** 46:2,2 124:1
**Department** 80:1,3,4
**depending** 183:3
**depends** 94:22 102:7 120:11 129:11 149:6,7 151:1 156:14 158:1 167:13 189:24
**deponent** 5:10
**depos** 63:9
**deposition** 1:17 5:4,14 6:8,9 8:17 11:10 19:23 19:24 28:18 63:16,18 63:25 64:15 194:8
**depositions** 6:10 7:4 19:13,17 62:18,20,23
**depression** 157:10 183:22
**depressions** 9:9
**depth** 77:6 86:12 124:5 153:23
**describe** 29:23 43:14 115:23 126:12 146:11 175:13
**described** 172:5
**describes** 113:20
**describing** 64:2 113:24

114:5 177:1
**descriptions** 109:16
**design** 12:25 13:1,6 14:22,24 31:16 32:10 37:5 40:23 41:1 43:4,6 43:7,15 44:25 45:3,23 46:5,17 47:7,11,11,18 52:21 55:24,24 60:12 60:20 70:7,21,22 81:11 81:15 83:15,16,24 84:5 84:7,22 86:19,22 87:2,8 91:12,15,18,19 92:19 93:1,7,9,10,15 97:15,19 105:23 151:5 161:7 166:25 170:15 178:10 187:18
**designated** 56:4
**designation** 171:8
**designed** 43:17,20,21 45:8 60:1,15 93:19,25
**designing** 31:15 46:5 47:15
**designs** 44:5 59:25 162:25
**destruction** 185:18
**details** 92:9 153:10
**detected** 160:19 188:10
**determination** 117:18
**determine** 103:1 159:12
**determining** 133:15
**develop** 28:1 46:1,2,4 53:12 80:5 122:14,23 123:3
**developed** 40:24,25 53:25 66:22 71:17 82:19 104:23 121:22 122:1,19 127:23
**developing** 103:23 147:14
**development** 111:23
**develops** 121:17 122:24
**DG** 81:15
**diagnostics** 169:13
**diagram** 46:1 127:14 140:18 183:17
**diagrams** 46:3

REDA BAKEER, PH.D.                                                                                      9/10/2009

**dictated** 150:15,19 152:4
**differ** 29:7 94:1 191:9,11
**difference** 41:16 79:7
    87:7,10 88:14,20 89:24
    90:25 91:1,12,18 160:3
    167:9 168:5 169:5
    175:13 181:16 185:14
    185:24 186:1 187:14
    190:3
**differences** 86:21 88:19
    177:14
**different** 13:7 31:1 34:1
    43:24 51:10 59:23 79:3
    90:13,14,22 91:5 92:4
    96:5,22 97:7,13 103:16
    104:20,20,23 122:5,5
    127:13 141:11 143:8
    146:16,19 150:18
    152:24 165:14 167:17
    172:8,21 176:22,24
    177:7 182:7,8,9 187:16
    187:17 190:22
**differential** 27:25 94:20
    94:22
**differentiate** 36:15
**difficult** 186:11
**dig** 10:8 104:10
**digging** 65:11
**digital** 183:7
**dimensions** 94:6
**direct** 74:11 154:19
**direction** 74:25 76:8,9,10
    123:25 143:11 144:2,8
    144:9,18 169:18,21
**directly** 22:19 51:8 77:1
**disagree** 100:6 105:8,10
    107:15 108:2,7 131:24
    132:1 134:22
**disagreement** 107:9,11
    109:9
**discipline** 31:2
**disciplines** 29:18 31:1
**disclaimer** 22:8,12
**discuss** 70:5 112:1
    153:18 175:11
**discussed** 13:3 35:3 43:4

169:17 183:17
**discusses** 64:5
**discussing** 79:3 89:25
    136:7
**discussion** 52:13 80:20
    81:9 82:3 149:11
    177:13
**discussions** 88:16 98:10
**disintegration** 132:14
**displacement** 28:2
**dispute** 158:7
**dissertation** 28:7 53:14
**distance** 58:21,25 61:12
    122:25 123:5 129:5,11
    149:6 150:14,17 185:15
    186:10
**distances** 129:4
**distinction** 120:25 121:1
**distinctive** 149:19
**distinguish** 33:2 104:15
**distinguishes** 22:5,10
**distinguishing** 42:16
**distress** 128:4 132:9
**distressed** 25:2
**district** 1:1,2 8:12,13
    9:24 10:5 11:18 41:1,4
    82:8 83:4 181:9
**districts** 79:24
**ditch** 154:10,16,18,18
    156:7,14,15 157:11,16
**dive** 124:3
**diver** 124:6
**divided** 12:2 41:14
**dividing** 27:20
**Division** 81:25
**dock** 27:1,2,3,5 117:2
    183:7
**doctor** 11:21 34:19 37:22
    39:1 54:13 58:9 62:14
    71:12,22 98:3,18
    126:18 140:21 147:20
    163:24 192:8
**document** 84:2 85:7 91:5
    91:6 186:19
**documented** 102:14
**documents** 12:14 14:10

62:16 65:14 73:24,25
    74:1 90:12 118:4 158:6
**doing** 50:14 68:2 79:5
    98:17 103:1 107:25
    133:19 138:8,10
**domain** 82:20
**Donovan** 10:15
**Dooley** 77:4 98:21 99:6
    99:24
**DOTD** 79:25
**doubt** 113:6 131:16
    183:15
**doubts** 176:21
**downstream** 180:8
**downwards** 176:13
**Dr** 6:7 11:8 13:16 14:13
    15:7,9 17:20 25:24
    32:17 38:17 40:9 50:3
    62:6 64:20 71:3 75:5
    76:14 77:2,7,11,13,16
    77:22 78:7,15 90:22
    98:20,21,21 99:11,16
    99:18,20 105:5 115:18
    118:9 128:21 132:18
    134:16,18,20 138:19
    142:6 147:1 157:6
    168:13 169:7,16,22,24
    178:17 186:13
**draft** 139:16 140:8
**drain** 156:13
**drainage** 29:24 47:24
    48:3 123:12 153:19,24
    157:16
**draining** 179:10
**draw** 73:10 74:3
**drawn** 165:16
**drills** 23:25
**drive** 6:2 11:17 24:22
    173:25
**driven** 86:11 91:25
    121:12,13,23,23 158:18
    158:24 170:6 173:10,12
    173:20
**driving** 59:22 62:1 86:17
    95:12 149:2,3
**drove** 60:8,10 61:5,6,7,8

72:11
**dry** 148:21,23
**due** 7:25,25 8:1 50:5
    181:2,3,20
**duly** 6:4 194:6
**duration** 178:4 179:12
**DUVAL** 1:9
**dynamic** 39:11 89:7,11
    89:13
**D-2a** 160:16
**D-2b** 160:16
**D-3** 159:7
**D.C** 2:21

────────────
                **E**
**E** 4:1,1,6,6
**earlier** 77:21 78:25 123:5
    167:8 173:9
**early** 8:15 20:10 85:21
    111:22 112:5,18 155:9
    184:4
**earth** 37:7,9 39:11,17,25
    43:3 86:16 97:21
**earthen** 43:2 52:4 94:4,7
    156:21 170:7,9
**earthquake** 178:7
**easily** 67:15
**east** 26:20 48:8,22 55:12
    56:24 58:16 85:11
    88:24 91:12 94:5 98:5
    101:16 110:19 114:16
    116:18 117:20 127:8,8
    127:10,11 132:21
    136:21 137:4 145:3,7
    147:7,22 148:6 153:2
    162:14 164:10,25 170:3
    170:6 172:22 178:17
    181:1 183:10
**eastern** 1:2 56:16
**easy** 62:4 130:15,22
**EBIA** 149:21 153:7
**EBNB** 159:19
**EBSB** 159:20
**echoed** 25:4
**educate** 80:6,11
**education** 28:22 31:6
    33:10,13

REDA BAKEER, PH.D.                                                                 9/10/2009

Page 8

| | | | |
|---|---|---|---|
| **Edwards** 63:17 | 22:18,20 26:2 44:3 | **entire** 55:2 116:6,12,21 | 131:21,23 138:25 |
| **effect** 9:8 24:11 133:21 | **employees** 80:9 | 122:1 128:20 130:14 | 157:18 161:12 186:14 |
| **effects** 104:20 | **employer** 22:1 | 139:1 144:11 171:19 | **exacerbated** 155:25 |
| **efficacy** 52:19 | **employment** 18:14 23:7 | 172:22 176:13 191:23 | **exact** 48:5 103:6,18 |
| **Egypt** 34:12,15 | 44:19 | **entitled** 40:11,17 118:19 | 110:23 152:16,17 |
| **eight** 101:11 192:4 | **empty** 73:22 139:16 | **entry** 124:19,23 128:14 | 156:17 |
| **eighties** 9:23,23 85:21 | 140:10,15 141:18 | 142:18 | **exactly** 63:21 67:2 |
| 86:1 91:6 93:23 155:9 | 142:11 | **environment** 181:21 | 103:20 112:15 114:24 |
| 181:7 | **ended** 10:2 22:3 72:25 | **environmental** 29:16 | 115:23 124:22 125:7,18 |
| **either** 9:11 23:16 32:19 | 73:1 168:25 | 34:3 | 144:13 169:21 |
| 42:7 47:17 58:2 64:14 | **ends** 20:25 21:1 161:10 | **equal** 124:5 | **EXAMINATION** 4:3 |
| 93:13 94:15 105:10 | **Energy** 1:18 3:3 | **equally** 123:25 | 6:6 17:19 33:24 35:16 |
| 119:2 122:14 138:24 | **engaged** 56:8,11 57:22 | **equations** 27:25 | 36:5 38:25 48:17 50:2 |
| 139:21 142:8 143:22 | **engagement** 65:5 | **equipment** 148:24 | 61:2 73:14 74:14 92:18 |
| 148:7,12 149:14 155:21 | **engineer** 28:23 29:2,5,8 | 163:25 | 104:12 105:4 106:4,14 |
| 157:22 169:1 170:5 | 29:9,10,11,14,16,17,21 | **equivalent** 92:3 | 108:5 109:7 110:15 |
| 173:2 | 29:23 30:10,11 32:12 | **erected** 44:25 | 112:16 113:14 118:8 |
| **elaborate** 132:6 147:15 | 32:13,14,21,21 33:8 | **Ernest** 63:17 | 120:13,23 127:6 130:23 |
| 149:11 | 44:21 55:22 57:10 | **erosion** 174:11 | 132:17 135:2,16 139:23 |
| **elaboration** 147:16 | 186:3 191:2 | **error** 163:23 | 141:2,16 143:6 145:24 |
| **electrical** 33:21 | **engineering** 7:19 18:3,4 | **errors** 83:2 181:6 187:22 | 155:23 157:1 168:12 |
| **element** 27:9,13,14,15,17 | 18:18 20:21 21:20,21 | 187:23 | 171:21 172:1,16 175:8 |
| 28:9 37:7,8 39:16 40:7 | 21:22 22:7,11 23:8,25 | **ESQUIRE** 2:4,10,17,18 | 179:16 190:1,18 |
| 40:11,19 41:2 52:14,18 | 25:1,6,11 29:6,14,15,22 | 2:19 3:2,9 | **examine** 69:13,24 70:17 |
| 53:2,8,10 67:7 | 30:1,6,8,20,22 31:3,24 | **establish** 100:25 108:15 | 70:18 |
| **elemental** 67:6 | 32:1 33:2,3,6,14,20,21 | 163:7 | **examined** 6:4 70:15 |
| **elements** 27:21,21,22 | 33:22,22 34:1 43:24 | **established** 88:11 101:14 | **example** 25:1 29:14 33:4 |
| **elevation** 87:8,11,14 90:1 | 44:3 45:19,20 46:9 | 101:22 166:18 167:21 | 34:6 42:3,20 47:22 |
| 94:17,20,22 159:13,14 | 55:23 57:7 75:11 | **establishing** 163:3 | 51:20 63:17 68:24 75:5 |
| 160:7,13,14 163:7 | **engineers** 12:24 32:4 | **esthetics** 119:25 | 83:4 89:4 93:12 105:22 |
| 164:10,19 166:4 168:9 | 37:13 38:5 41:4 42:4 | **estimates** 103:10 182:13 | 108:14 110:16 129:6 |
| 179:11 180:12 183:1,24 | 43:19 46:9,13,15,23,24 | **et** 29:17 33:3 76:8 82:9 | 151:11 169:7 176:8 |
| 187:11 191:22 | 50:22 51:1,3,9,13 52:11 | 95:21 132:23 143:20 | 178:25 |
| **elevations** 9:10 46:4 87:1 | 53:12,23 70:7,22 80:9,9 | 151:17 169:20 170:18 | **examples** 177:14 |
| 87:12 88:7 94:13 190:7 | 81:11 83:23,24 84:12 | **evacuated** 58:9 | **excavation** 48:19 148:18 |
| **eliminated** 130:13 | 90:3 93:22,24 98:10 | **evaluating** 55:14 | 148:21,22 |
| **embankment** 37:19 | 122:22 145:14 150:16 | **evaluation** 40:15,17 | **excavations** 44:1 46:22 |
| 40:12,20 51:24 52:3,20 | 150:19 151:4,20 157:7 | 46:25 47:12,18 48:25 | 48:21 147:21 148:5,10 |
| **embankments** 39:17 | 161:6 162:24 167:18 | 60:20 70:7 | 148:15 149:4,12,13,16 |
| 40:1 52:3 | 170:19 171:7 184:15 | **evaluations** 48:8,21 | 149:17 153:1 157:23 |
| **embedded** 43:2 92:5 | **English** 6:19 | **event** 10:17 16:23 58:5 | 158:11,14 170:3 |
| 171:14 172:24 | **enlargement** 86:7 | 67:9 71:3 113:20 | **excerpt** 125:16 |
| **emphasis** 30:23 84:18,19 | **enlargements** 66:7 86:23 | 171:10 180:1 | **excerpts** 12:23 13:5 |
| **employed** 17:21,25 18:5 | **enter** 53:17 62:5 | **evidence** 5:15 57:15 | 14:22 64:17,20 83:19 |
| 96:6 | **entered** 128:17 | 118:9,20 124:15,18 | 116:8 125:11,18 |
| **employee** 18:6 21:21,23 | **entering** 62:3 | 125:24 130:19 131:19 | **excluding** 36:17 |

REDA BAKEER, PH.D.                                                                    9/10/2009

**exclusively** 71:15
**Excuse** 24:9
**exercise** 102:21
**exerted** 123:18 137:3,10
  158:17
**exhibit** 4:8,9,10,11,12,13
  4:14 14:2,7,11,15,19
  15:2,15 16:1 173:7
  190:10
**exhibits** 16:12
**exhumed** 173:16 190:24
**exist** 171:1
**existed** 153:19
**existence** 98:5
**existing** 11:15,17 23:22
  23:23 44:12,15 45:7
  46:23 47:1,14 70:8
  84:8 86:17 155:19
  161:14 174:24
**expansion** 44:15
**expect** 76:4 118:10,21
  124:15,23 133:5 184:1
  185:1,9
**expenses** 55:6
**experience** 32:17 53:7
  170:25 178:24 184:7
**experienced** 20:23 128:3
  178:18
**experimental** 52:10
**expert** 7:5,18 11:2 19:18
  20:2,4,11,16 22:2 23:10
  23:13,16 28:12 35:2
  56:3 63:1,3 74:8,9
  75:15 109:24 118:18
**expertise** 7:21 27:7,14
  74:13 75:1,10 76:13
  100:13 137:6 138:12
  147:17 169:5
**experts** 63:12 75:4 76:15
  98:19 100:9 117:12
  126:1 135:5
**explain** 111:21 115:21
  120:24 130:12,15,22
**explaining** 21:14 165:4
**explains** 21:6
**explanation** 127:22

**extend** 128:13 161:9
**extends** 162:1
**extent** 17:17 76:14 92:6
  95:19 98:20 115:12
  132:13
**extra** 31:4
**extraction** 149:3
**eyeballing** 186:2
**eyewitness** 63:5,6 65:2
  109:20 110:10,18,22
  111:5,15,21 112:2,18
  113:4,10 116:10 125:8
**eyewitnesses** 63:15 64:21
  110:24 112:22

---

### F

**F** 159:23
**fabrics** 52:6
**face** 84:12,12
**facility** 26:17 72:22 73:3
  73:5
**fact** 19:16 48:18 50:11
  53:15 55:13 61:20 63:6
  73:10,23 74:4 114:8,16
  114:21,22 115:18
  116:10 121:5 130:12
  144:8 150:10 156:12
  158:13 180:21
**factor** 75:20 95:22 96:9
  96:10,16,18,20,22 97:2
  97:3 159:13 160:5
  161:3
**factors** 96:11,22
**factual** 65:3
**faculty** 51:5
**fail** 119:2 128:19 129:9
  158:24 160:6,9
**failed** 104:25 128:9
  129:19
**failing** 133:2 143:3
**failure** 21:11 27:2 62:25
  66:25 96:17,24 103:5
  113:25 120:21,22
  122:11 128:8 130:1
  146:16 153:10 155:21
  157:25 160:19,20 161:2
  169:14

**failures** 55:12 79:4
  104:23 109:16 128:5,6
  130:9 145:3,17 169:13
**fair** 13:21 50:15,16 74:15
  91:11 118:3 134:14
**FAIRBANKS** 1:24 5:22
  194:2,24
**Fairway** 11:16,17 24:22
**fallibility** 163:21
**falls** 34:2
**false** 164:8
**family** 1:13 57:5
**fanning** 126:12
**far** 50:14 54:17 156:20
  178:24
**fasting** 50:4
**faulty** 190:21
**favorable** 157:24 158:2
**federal** 23:10
**feel** 50:10 102:10
**feet** 88:20 92:3 133:4
  142:12,12 151:13,15
  152:6,8 156:25 165:9
  166:11,17,24 167:12,18
  168:1 173:18,22 185:15
  186:10 187:12,20
  188:17,18 191:16
**fell** 9:4
**felt** 84:14 106:23,25
  108:22 146:5
**fewer** 178:25 179:2,3
**field** 28:12 29:20 30:19
  31:23 32:4,15 33:15
  37:11,18 40:15,17
  52:13,16,23,24 69:21
  69:23 74:13 75:20 95:5
  95:7 126:1
**fields** 56:3
**fifteen** 151:15
**fifth** 31:5,6 37:10
**figure** 14:5 36:19 65:20
  65:21 66:9 108:23
  126:22 127:7,11,25,25
  128:1 129:16,18 136:17
  139:24 165:1,3 182:1
  183:19,19 184:21 189:4

**189:7 191:8,14
figures** 12:7,8 14:4 16:8
  16:10 36:18 65:17
  107:21 190:7
**file** 158:6
**fill** 148:9,14 155:12,17
  155:18,24 156:2 157:21
  158:11,13 170:2,8,13
  172:5,14 174:18 175:25
  176:1,3 190:6
**filled** 155:3 156:8,10,11
  171:22 179:6
**final** 99:21,23 102:8
  119:6 166:25
**finally** 14:21 31:18
**find** 16:19 79:21 119:5
  129:16,17
**findings** 18:8 134:23
**fine** 15:23 36:4 50:14
  127:15,15 190:12
**finish** 6:25
**finite** 27:9,13,14,15,17
  27:21 28:8 37:7,8
  39:16 40:7,11,19 41:2
  51:23 52:14,17 53:2,8
  53:10 67:6,7
**firm** 9:12 10:7 11:22
  19:9 22:23 25:18 46:5
**firms** 9:14 43:24
**first** 6:4 7:9 9:20,22 10:4
  19:2 34:16 37:10 39:9
  40:3,18 44:7 49:14
  51:22 52:2 54:5 55:18
  56:16 68:7,11,12 69:3
  69:11,16 110:17,18
  121:18 122:17 145:5
  188:6 191:6 194:5
**Fisher** 3:2 19:7,9 54:5
  65:6
**Fisher's** 66:16
**fit** 29:5
**fixed** 160:1
**flash** 179:13,14
**flip** 66:4 67:14 81:15
  97:18 128:1 129:22
  160:15

REDA BAKEER, PH.D.                                                                                    9/10/2009

**flood** 13:7 37:1,13,20
　39:4 42:24 44:4 47:2,7
　49:1,23 51:21 52:3
　59:3 60:21 86:8 87:8
　91:13,13,20,21 98:6
　116:19 118:22 119:7
　121:19 122:2 123:6
　128:3 132:21 135:20
　136:1 137:4 139:8
　140:2 141:4 142:13,15
　143:3,14,15 157:10,16
　162:13 164:10,19 166:8
　166:14 169:1 172:23
　174:24 177:4,16,18,22
　177:23 178:7,17,23
　179:1,13,15 185:20
　187:10 188:23 191:15
**flooding** 111:22,24
　112:18 130:10 179:19
　186:6
**floodwall** 26:4,6,10
　32:10 43:9 46:23 47:1
　56:16,24 58:16 59:24
　70:22,23 85:12 118:11
　163:4 164:24 166:9
　169:20 170:5 191:23
**floodwalls** 13:10 37:1
　39:4 42:25 45:24 46:18
　51:21 55:25 60:12,13
　68:24 90:1
**floor** 25:2
**Florida** 61:6 110:19
　111:22 161:13,21 162:1
　162:5 165:10 166:3
　168:21
**flow** 75:17,22,23 148:10
　154:6
**flowing** 184:18
**Fluid** 123:23
**focus** 29:20 31:1,7 43:12
　68:22 74:7
**focused** 43:11 68:21
　110:13 138:4
**focusing** 68:17
**fold** 191:18
**folded** 131:5,5,6

**follow** 84:6
**followed** 12:12,16 70:8
　87:6 166:1
**following** 36:9 87:5
　159:23 177:12
**follows** 6:5
**foot** 166:24 167:9 184:23
　185:2,6,10,12 191:18
**footprint** 94:3,6,16,19,20
**force** 119:2 123:18 137:9
　144:1
**forces** 137:3 138:7
　158:17 177:18
**foregoing** 193:4
**forgive** 29:1
**forgot** 71:23
**form** 5:12 22:15 33:17
　54:3 71:7,9 88:18
**formal** 19:24 28:21
　57:17 98:12
**formalities** 5:8
**formed** 69:5,16,20 70:2
　71:5,8 121:10
**former** 55:25
**forming** 69:3
**forms** 120:2
**formulating** 69:12
**forth** 9:7 21:19 23:21
　29:25 35:12 80:10
　111:9 194:7
**forward** 77:9 130:21
**found** 131:18 145:5,16
**foundation** 55:24
**foundations** 31:15,17
　32:2
**four** 96:22,23 159:16,19
　173:25
**fourteen** 166:24 167:1
**fourth** 37:10 39:9
**Foutz** 11:3,5
**FP** 130:7
**frame** 6:19
**frankly** 71:23
**free** 170:17
**front** 82:4 92:9
**FS004** 82:5 83:5 98:4

**full** 42:14,19 55:20 62:23
　63:18 64:13,23 66:10
　106:21 110:17 111:23
　113:9 126:21 149:9
　151:3 191:7,21
**fully** 41:15,23 42:13
**full-scale** 40:16
**function** 91:15 94:19
　120:21 129:13 143:16
　143:17,18
**funded** 51:2 53:11
**funding** 51:14
**furnished** 117:15
**further** 53:3 78:3 89:17
　89:18 129:22 132:7
　147:1,2 149:23 166:12
　174:17 181:3 194:13

## G

**G** 152:22,24
**gaining** 32:19
**gamma** 124:2
**gap** 122:24 166:6
**gaps** 120:3,7
**gauge** 183:3,4
**gauges** 182:9
**GDM** 171:7 174:9,15,15
**GEI** 25:1,3,5,10
**general** 12:25 13:1,6
　14:22,24 39:21 52:5
　61:9 91:11 92:10,11,19
　104:3 105:20 106:2
　144:4 152:14 170:15
　182:18
**generations** 32:3,3
**gentleman** 9:3,17
**geodetic** 88:22 163:12,13
　185:25 187:9
**Geogrid** 37:19,25 38:13
**geologically** 173:8
**geometries** 27:19 28:5
**geometry** 43:8
**GEORGETTE** 3:19
**geotechnical** 7:19 29:15
　30:5,20,22 31:23 32:13
　32:21 33:3,5,8 55:23
　85:3,9 107:2,6 109:8,12

　109:17 135:13 138:5
　169:12,14
**geotextile** 37:11 40:12,20
　51:24 52:2,20
**Geotextiles** 52:6
**getting** 96:3 152:21
**GILBERT** 2:9,10 16:24
　38:23
**give** 8:18 28:17 47:21,25
　48:5 65:1 75:24 76:4
　90:15 103:17 110:1
　119:4 125:15 141:15
　143:23,24 147:18
　151:18 164:8,8 169:4
**given** 1:18 6:10 8:16
　27:10 41:12 42:2 99:2
　123:20 129:10 152:14
　152:17 158:13 175:16
　193:5,7
**gives** 168:7
**giving** 19:13,23 83:25
　103:16
**GIWW** 104:19
**glad** 6:21
**glean** 70:16
**gleaning** 68:12 69:11
**glitches** 182:17
**global** 87:20,21 88:4
　96:16 97:19 98:15
　176:12
**go** 10:1 11:12 16:9 21:16
　38:6 47:3,20 50:8
　58:21 60:8 66:20 68:1
　69:11 70:20 72:4 74:25
　85:2 93:24 94:19 101:9
　101:18 102:18 104:10
　105:19 106:13,19
　113:13 115:3 119:24
　130:7,21 135:22 136:25
　137:7 138:1 144:3,3
　147:1 148:23,24 154:8
　157:5,9,11 159:6 163:3
　165:11 166:12 168:7,14
　169:10 183:16 185:16
**goal** 169:6,21
**goes** 38:6 76:13 77:17

89:1 128:15 156:16
  162:3,3 184:17
**going** 6:18 7:2 8:5 10:4
  16:9 17:5 36:20 39:1
  44:6 50:12 72:10 75:15
  90:12 94:15,17 109:5
  120:20 124:12 128:10
  129:22 130:8 131:17
  138:11 143:18,19,25
  144:1 149:11 152:25
  154:6,19,22 155:11
  157:7 162:8 165:25
  168:15,16 176:2,7,14
  177:17,17 179:14,24
  180:1,15 187:24
**gold** 90:1
**good** 67:25 68:14 98:14
  107:5 186:2
**GOODWIN** 2:16
**Gore** 18:3,4,17 20:21
  21:20,21,22 22:7,11
  23:8,24 25:1,4,5,11
  26:2 44:3,20,22 45:19
  45:20 46:8 57:7
**grad** 133:19
**grade** 170:10,11 171:23
  172:4 175:3 187:18
**grades** 46:4 86:20 91:16
  94:23
**graduate** 28:9 133:13,23
**graduated** 18:24 32:2
**graduation** 31:14
**grand** 128:22
**grant** 80:5
**granular** 148:13 156:2
**gravity** 37:4,5 39:12 40:5
  43:5 154:5,6
**great** 162:12
**greater** 123:19 185:10
  190:3
**ground** 9:9 94:18 163:6
  164:2,8,11 176:13
  181:19
**groundwater** 176:10
**group** 66:12 147:23
  148:6 156:13

**grouping** 65:17
**guess** 24:3 134:8 137:23
  141:4 162:11
**guest** 32:7
**guide** 88:16 129:6
**guidelines** 81:10,15
  83:15,16 84:21,22
  86:22 90:6 97:10,16
**Gulf** 180:12

**H**

**H** 4:6
**hairs** 71:13
**half** 167:10 185:2,6
**hand** 16:10 93:13 97:23
  98:16,17
**handed** 65:12
**happen** 57:12
**happened** 57:11,12
  59:23 60:1 68:25 69:1
  73:18 95:10 103:12,13
  135:24
**happening** 103:20
**happens** 131:2
**Harbor** 49:24 60:21
  91:22 101:1 114:17
  116:19 128:23 179:7,21
**HART** 3:19
**hear** 38:24 133:5,7
**heard** 132:19 134:3
  185:19 186:17
**hearsay** 117:10
**height** 120:19 121:1,3
  124:2,7 162:13 163:4
  164:24 166:17 167:16
  167:20,21 184:13
  185:14,23
**heights** 86:15 123:20
  181:1 184:22
**help** 67:15 94:10 127:2
  139:19
**helped** 44:24
**hereinabove** 194:7
**hereto** 5:3 14:3,8,12,16
  14:20 15:3 194:15
**hierarchy** 29:6
**high** 60:2 164:19 166:1

188:18
**higher** 94:21 107:16
  108:9 148:15 154:7
  161:2 164:8 166:12
  168:8 183:6 187:25
  188:2
**highest** 32:23,24,25
  164:9
**highlight** 20:18
**hired** 7:9,17 25:17
**hit** 27:5,5 44:13 130:5
**hope** 6:20
**hopper** 143:12
**hour** 54:14 55:4 102:11
  184:10
**hourly** 54:11,13
**hours** 50:9 103:10
**house** 176:1
**hovered** 160:21
**hovering** 180:13
**HSDRRS** 87:6
**HSDRRS-DG** 81:13
  83:13
**HSRDS** 90:5
**huge** 180:9
**hundred** 54:19
**hurricane** 43:22 44:13
  44:25 45:14 47:16
  48:24 57:6 58:5,7,10
  81:14 83:6 87:5 97:14
  97:25 98:1 186:16,25
  187:4
**hurt** 9:4
**hydraulics** 106:19
**hydrograph** 181:25
  182:4,11,15,20 191:25
**hydrographs** 102:12,15
  103:3 191:8,14
**hydrology** 75:13,14,16
  75:20 169:18
**hydrostatic** 124:11
**hypotheses** 69:13,13,19
  70:5,19 71:16
**hypothesis** 69:6,20,25
  70:2,9 71:5,10 114:20
**hypothet** 137:10

**hypothetical** 114:9
  118:15
**hypothetically** 114:15
**hypotheticals** 118:19

**I**

**idea** 80:11 103:6,7 137:2
**identical** 142:3
**identification** 14:3,8,12
  14:16,20 15:3
**identified** 13:25
**identifies** 32:20 126:24
**identify** 31:22 36:25
  79:16 80:24 150:5
**identifying** 38:9
**ignored** 152:18
**IHNC** 12:17 14:14 56:25
  58:16,18 60:9 61:18
  66:20 68:22 71:25
  72:14,22 74:20 85:12
  88:23,24 91:13 92:4,7
  92:14,22 93:12 94:5,11
  95:17 101:16 102:13
  103:15 104:5,19 110:19
  130:4 137:14 141:11
  145:3,7 146:6 147:6
  159:14 168:19 178:23
  179:10 182:21 183:4,7
  183:10 191:15
**ILIT** 68:15 70:3,10,10
  70:17 71:6,10,15 90:21
  105:6 106:5 107:10,18
  108:8 111:3,12 145:11
**illogical** 113:17,19
  114:19 117:4
**illustration** 140:18
**image** 66:10
**imagine** 101:17 102:17
  133:2
**immediately** 122:20
**impact** 46:25 47:13
  109:5 138:7 143:17
  149:5 156:4 175:16
**impacted** 119:1 139:11
  168:20
**impacting** 176:4
**imparted** 109:20

REDA BAKEER, PH.D.                                                              9/10/2009

Page 12

implying 138:16
importance 147:4 151:1
  151:16
important 13:8 145:18
  146:5 154:25
impossible 103:13
  116:17,25 138:19 142:7
  142:11 143:9 144:7,15
impression 175:6
improper 107:21 108:24
improperly 36:11
inch 103:9 168:5,5
incident 7:14 26:12,25
  46:20 103:17
incidents 138:13 139:10
incipient 128:8
include 16:7 115:9 116:5
included 15:5 16:11
  115:13 139:7,14,25
includes 15:15 30:2 55:5
including 55:24 107:15
  145:11
inclusion 115:6
inconsistencies 187:8,14
Incorporated 25:2
incorrect 112:14 121:14
  121:25 181:3,14
increase 86:14
increased 191:17
increases 123:2,24
increasing 86:8,9
incurred 7:15
indicate 18:8 119:4
  150:1 170:23 188:6
indicated 11:9 72:1
  148:17 152:13 174:10
  187:7
indicates 118:25 165:13
indicating 16:25 132:22
indication 174:17
individual 23:17 24:5
  110:7 120:3
individually 26:3
Induced 24:12
indulgence 17:16
industrial 48:9,22

117:19 123:8,13,20
  147:23 148:7 153:3
  162:14 170:3 179:6
  180:21 181:2
inference 74:4
inflicting 143:13
information 52:23 54:24
  63:15 65:11,11 66:13
  68:11,13,14,16 69:12
  70:11,12,14,19 71:8
  91:10 95:2 98:10 99:1
  100:10,12 110:7,8
  135:12 148:1 153:12,13
  164:20 170:24
ING 73:1 136:23 143:13
  145:2,6
Ingram 1:9,11
initial 66:18
initially 30:8 56:14 65:9
  66:18 71:24
initials 82:4,13 84:9
initiated 126:5 128:6
initiation 102:8 126:14
injury 7:15
Inner 49:24 60:21 91:22
  101:1 114:16 116:19
  128:23 179:7,20
input 99:3 109:4 126:3
inspect 23:20 136:1
inspected 56:24 72:21
inspection 61:14
inspections 95:7 185:20
installed 163:5
instance 46:16
instructed 66:21
instructions 170:1
instructors 79:1
insufficient 71:1
integrity 116:1 121:4
intend 74:18 134:1,11
intended 77:24 134:12
interaction 31:10,13
intercepts 164:7
interdistributary 173:4
interest 57:10
interested 60:11,18

102:24 138:10 194:15
interface 39:19,22 53:16
interfacing 122:15
International 117:24
Internet 68:13
interpret 152:22
interpretation 114:1
  165:17
intersection 48:2
intervals 152:4
introduced 85:7 87:15
introduction 97:24
investigate 18:18 66:24
investigated 94:25
investigating 69:6
investigation 18:13 19:4
  20:22 24:1,21 25:13
  26:11 27:10 40:8,11
  94:24 95:17 145:11
investigations 146:24
  153:6
investigative 145:5,8
invited 32:7 42:8
involve 37:1 39:4
involved 19:13 22:8,12
  24:14 26:4,8,12 31:16
  44:4 45:16 46:17 47:17
  48:3,4,7 52:1 56:21
  59:24 60:12,20 89:3
involvement 24:6 28:11
  43:15 45:23 74:8 145:6
  169:11
involves 21:10,11 39:25
  71:14
involving 26:13 42:24
IPET 68:15,19 70:3,10
  70:11,18 71:6,10,15
  90:21 105:6,9,12 106:3
  111:3,12 145:12 151:4
  182:6,16 187:9
irrelevant 124:8 150:8
issue 7:23 9:5,10 11:15
  93:6 113:11,16 148:19
  156:1 180:15 188:19
issued 13:6 87:4 135:4
issues 8:20,22 41:22

75:23 86:25 89:3
  169:17 186:5
italics 84:9,16
item 11:1 83:19 84:1,11
  145:22 146:1 160:15
items 132:22 159:19
  167:15
I-wall 12:17,24 14:14,22
  43:6,10,11,12,16 47:19
  83:24 84:3,5 86:9,11
  92:20 119:13 145:3
  147:7 161:14,14,15,21
  161:24 162:1,8 165:21
I-walls 43:2,4,20,22,23
  45:12 46:18 70:8 81:11
  81:18 82:9 85:13 162:6
  190:22

**J**

Jefferson 47:25 176:9
  180:4,4
job 23:19,24 25:3,6
  46:10,10 66:19
Joe 142:23
JOHN 2:18 3:16
joint 17:8
JOSEPH 1:24 5:22
  194:2,24
Jourdan 153:19 154:15
  155:2,12 170:4 186:15
journal 39:2 41:19 42:11
  50:18
journals 36:22 41:15,25
JR 1:24 5:22 194:2,24
judge 1:9 23:19
July 34:23
jump 84:1 162:11
jumped 67:19 68:4
J7371 25:5

**K**

Karl 2:4 6:8 38:22
Katrina 1:4 44:13,25
  47:8,16 48:24 49:8,9,23
  58:10 59:12 83:6 87:5
  98:1 158:18 164:18
  166:16 168:19 186:16

REDA BAKEER, PH.D.

9/10/2009

Page 13

187:1,4
**KEELEY** 3:15
**keep** 62:3 103:7 148:21
**Kenner** 176:9
**key** 158:20
**kind** 133:7
**KIRSTEN** 2:19
**Klein** 11:23
**knew** 59:14
**know** 6:18,21 9:18 10:6
  16:18 21:2 32:1 36:12
  44:23 50:7,8,11 58:23
  59:25 62:6,7,8,9,23
  75:15 76:22 79:18 91:8
  94:11 95:20 96:6 98:9
  103:4 104:9,11 105:21
  111:7,25 114:6 128:16
  139:13 140:3,6 141:10
  141:17 144:13 150:15
  151:18 154:4 168:24
  169:15,25 177:6 179:4
  181:6 188:15 189:10
**knowledge** 19:8 53:22
  56:12 64:21 75:14,18
  111:5 136:22 149:15
  168:18,23
**K(2)** 1:7

———————————

**L**

**L** 5:1
**lab** 133:6
**lack** 13:15 99:7
**Lafarge** 1:8,10,12,14
  2:15 19:3 54:16 56:8
  56:11 72:21 73:2,5
  76:16 78:17 99:12
  100:9 117:2
**Lagarde** 1:10
**lake** 180:6,10,10,11,13
**land** 164:13 168:25
  169:3
**language** 116:5 154:17
**Lapalco** 47:25 48:1
**large** 129:25
**larger** 94:21 130:8
  188:17
**largest** 129:2,3

**laser** 164:4,6,7
**late** 9:23 34:3 38:18
  85:20
**latest** 89:23 93:20
**law** 5:7 9:12 10:6,16
  11:22 19:9 25:18
  143:10
**Lawler** 10:16
**laws** 74:22 76:1 123:23
**lawsuit** 19:12 21:1 57:23
**lawsuits** 20:14 21:15
**layman's** 83:12 154:17
**lead** 131:22
**leading** 157:17 180:16
  185:8 186:25
**leads** 123:4 139:4
**leave** 35:25
**lectures** 79:3
**led** 108:24
**left** 101:14 149:10 165:7
  184:1
**left-hand** 142:1
**length** 122:1 128:4,7,13
  128:20 129:8,11 131:7
  131:9,12,12 139:15
  140:3 141:18 142:12
  153:23,25 154:3 171:19
  173:21
**lengths** 147:9
**letter** 78:8
**letters** 13:14 15:7
**let's** 7:8 8:24 28:21 41:13
  67:2 74:17 105:9 115:3
  116:15,23 126:23 127:5
**levee** 32:8,9 37:12,12,14
  37:20 43:22,24 44:1
  45:14 46:6 47:1 79:1,2
  79:17,22,23 80:2,5,6,7
  80:8,12 86:11,17 94:4,7
  94:19 129:19 136:21
  156:21 157:25 172:14
  174:12,24 181:1
**levees** 32:10 40:23 41:2
  43:2,7 52:7,8 55:24
  61:21 78:16 82:8 170:7
  170:9 183:10 185:20

**level** 86:8 87:13,17,18,22
  88:1,4,23 89:5 102:18
  103:4 123:21,21 143:16
  158:23 160:8,13 162:17
  166:21 182:21 191:14
**levels** 102:13,16 103:7
  104:17,20 176:14
**liar** 103:18
**libraries** 68:13
**license** 33:7 34:17
**licensed** 34:8,11,12
**LIDAR** 163:15,16,18,22
  163:23 164:4,11,13
**life** 178:10
**lightweight** 38:1,2,14
**likelihood** 172:19
**likes** 159:11 185:25
**Likewise** 137:8
**limit** 41:13 76:11 77:9
  107:5 128:14
**limited** 54:1 64:22 128:5
  147:25
**limiting** 149:13
**limits** 127:20 129:14
  156:6 166:10
**line** 89:18 128:11 154:6
  165:13,13,16 166:8,9
**linear** 165:18
**lines** 137:22
**lingering** 187:4
**linked** 24:11
**list** 12:13 14:9 20:2 21:18
  23:19 32:5 38:6,7
  41:10 62:15,16,22
  63:14 81:3
**listed** 23:4 62:22 63:14
  182:8
**listing** 145:1
**literature** 108:11,11,15
**litigation** 22:3 158:8
  169:11
**little** 86:4 127:24 132:7
  156:7 168:3
**live** 58:12
**LLP** 1:18
**LMSL** 87:18,18

**load** 138:7 139:16
  169:19 179:22 180:15
**loaded** 73:21 140:10,14
  141:18
**loading** 25:14 177:14,15
  177:21 178:3,13,19,24
  179:19
**loads** 178:14,14
**local** 87:17,21 88:7
  129:11 176:3 185:19
**locale** 87:19 89:14
**localized** 84:9,17
**locally** 181:9,19
**locate** 126:16,24
**located** 88:23
**location** 66:25 70:23
  147:10 154:20 176:20
  190:24
**locations** 72:2,7,9 165:14
  182:9
**lock** 183:4
**locks** 168:21
**logical** 114:20 125:3
**London** 43:20 44:7 45:6
  49:11,13,17 60:8 72:5
  85:23,24 86:24 92:14
  92:21 95:13,16 102:22
  104:13 130:3
**long** 17:25 21:18 28:23
  35:19 123:25 124:9
  143:12 180:14
**longer** 129:4 130:9
  131:11,14 147:14
  158:21
**longitudinal** 119:13
**long-term** 177:15,21
  178:9,13,15,18
**look** 23:14,22 27:19 32:4
  32:6 55:11,16 59:17
  61:11 62:24,24 63:1
  66:9 70:15 74:23 91:17
  93:12 96:13 127:25
  128:1,10 129:5 130:7
  131:6,7 132:8 135:22
  139:1,3 141:21 146:22
  146:23,23 154:12

REDA BAKEER, PH.D.                                                                9/10/2009

157:12,14 158:4,25
159:9 165:1,22 171:6
186:3
**looked** 22:24 55:15
64:19 95:9 149:22
190:23 191:4
**looking** 39:2 57:15 59:22
59:23 68:25 69:2 81:2
110:7 124:10 126:18,21
127:12,13 151:11 157:4
159:16 161:25
**looks** 151:4
**loose** 73:11 74:10,11
**looser** 29:21
**losing** 64:6
**lost** 121:1
**lot** 48:4 66:13 98:9
106:12 107:14 109:13
147:13 176:4
**Louisiana** 1:2,20 2:6,12
3:5,11 5:6,24 6:2 33:1
33:6 34:2,9,17 47:19
55:22 68:16 70:3 71:6
71:16 80:1,3,4 88:25
90:21 105:7 109:9
111:12 145:12 182:12
182:13 194:4
**low** 172:20 184:4,6,7
185:5
**lower** 108:12 134:3
148:24 166:10 181:19
183:24 184:3 190:7
**lowering** 148:20 175:21
176:10 177:10
**LSU** 32:8 79:1,13,20,21
80:5,14
**Lunch** 105:3
**L.L.P** 2:16 3:1

**M**
**M** 1:17 4:1 6:1 193:3,11
**MAG** 1:11
**main** 82:17 87:7 127:16
127:23 181:17,17
**majority** 106:17
**makeup** 136:24
**making** 68:8 139:8

144:19 181:11
**man** 115:22 189:19
**manager** 51:15
**mandates** 162:25
**manner** 120:12
**manual** 12:25 13:1 83:23
151:20
**March** 19:5,10 34:21
54:6 55:9 56:10,23
58:15 72:25
**marine** 26:12 33:14,20
74:12 75:11
**Marino** 13:16 15:9 77:16
77:22 78:7 99:11 157:6
**Marino's** 90:22 99:16
154:22
**MARK** 2:17
**marked** 14:2,7,11,15,19
15:2
**market** 93:21
**marks** 124:21
**marsh** 108:10 161:8,10
173:3
**massive** 133:3
**Master's** 28:8 31:7,9
32:20
**material** 27:22 65:14
77:15,18 106:12 108:10
155:18 156:3 171:4,9
171:14 172:5 174:11,18
**materials** 52:5 54:23
65:6 77:24 78:12
100:18 135:18
**matter** 53:15 55:13
121:4 155:24 156:12
**McCall** 1:18 3:1 19:9
25:17 26:12
**mean** 27:15 38:6 47:22
68:19 73:16,19 77:4
78:9 87:13,17 88:1,4,22
95:10 104:17 107:25
130:6 135:3 150:16
162:16 166:21 185:2
**meaning** 87:20 124:1
183:21
**means** 89:11 96:25 160:6

**meant** 69:18 78:8
**measurable** 184:22
**measure** 176:18 182:23
**measured** 173:15,17
**measurements** 103:9
**mechanical** 33:19
**mechanics** 7:20,22 8:22
20:24 29:15 30:6,20
31:4,11,12,24 32:1,22
33:15,23 55:23 74:9
94:1 123:23
**mechanism** 146:16
**mechanisms** 62:2,25
104:24,24
**meet** 86:19 96:14 188:8
188:12
**meetings** 42:5
**members** 80:6,8
**memoranda** 13:6 14:23
14:24
**memorandum** 170:16
**mention** 177:5 186:20
**mentioned** 24:22 49:6
52:12 78:25 90:13 99:5
100:17
**met** 6:7 62:10 76:21
188:23
**Metairie** 6:2 58:13
**metal** 114:4
**metallurgical** 24:21
25:13
**metallurgist** 191:3
**metallurgy** 27:12 28:12
28:13
**metals** 27:12
**meteorology** 75:8
**method** 27:18 81:24 82:1
82:2 96:15,18 97:11,21
98:16 105:22,23 160:2
160:17
**methodological** 69:10
**methodologies** 43:9
**methodology** 93:10,11
94:2 105:11 106:24
160:1
**methods** 96:5 97:5,7

108:20 159:24 160:20
**Mexico** 180:12
**middle** 24:21 37:21
185:4 187:7
**million** 143:22
**mind** 62:3 67:23 68:7
100:19 101:14 103:7
142:24
**mini** 31:7
**minimal** 76:17
**miscellaneous** 55:5
**mischaracterized** 130:18
**mischaracterizes** 130:19
**missed** 38:21
**missing** 189:19
**mission** 169:25
**Mississippi** 81:25
**mistaken** 136:16
**mix** 133:22
**model** 27:18 28:4 39:22
**modeling** 27:23 28:4
37:9
**models** 106:19
**moment** 12:1 28:3 119:4
**momentum** 143:20 144:1
144:18
**month** 41:20
**months** 41:20
**moored** 73:2,4,7,21
**mooring** 74:19
**MOP** 82:1
**morning** 64:4 102:2,7
114:18 117:20 132:20
135:19
**move** 69:2,7,12 116:16
127:3 149:3,5
**moved** 76:11
**movement** 74:20,21
75:25 76:5
**Movements** 39:12
**moving** 89:12 176:13
181:23 188:5
**MRGO** 104:18 129:6,7
129:24 136:10,15,20
**MSL** 87:13,20,25 88:15
88:20 89:7 90:9 91:8

160:7,13 166:18 167:2
167:4,5 181:8,10,12,13
187:12,15
**multiple** 46:21 47:6 51:4
79:12 90:11 128:6,12
**Mumford** 1:9
**Murph** 64:16
**MVD** 81:24 82:1

**N**

**N** 4:1,1,1,6 5:1
**name** 6:8 10:6 25:23
26:23 51:18 159:23
**named** 6:3
**names** 9:14 110:23
111:10,11,13
**Napolitano** 38:4,17,18
**narrower** 123:7
**natural** 173:2,2 175:24
**naturally** 8:1
**nature** 133:18 135:14
137:2 151:16
**NAVD** 166:15
**NAVD88** 89:20 90:6,10
162:17,19,20,25 163:4
167:8,21,24 187:11,15
**navigational** 49:24 60:22
91:22 101:2 114:17
116:19 123:14 128:24
179:7,21
**near** 44:2,7 46:22 110:19
111:22 132:20 154:1
**necessarily** 80:8 103:8
105:2 120:20,22 124:13
146:13 185:3
**necessary** 101:6 117:18
**need** 71:22 75:18 96:13
121:6 126:2 142:4,5
143:4 148:22 151:13,14
151:18 155:21 160:13
161:2,4,17 174:1,10
186:2
**needed** 52:25 95:19
**needs** 70:15
**negligence** 7:25
**neighborhood** 59:3 73:2
102:6 125:6 133:5

**neighborhoods** 130:11
**neighbors** 176:5
**neutral** 23:10,13,15
**never** 28:15 44:10 45:4
60:19 62:10 63:16
115:25 116:1 154:9,10
**new** 1:19 2:6,12,20 3:5
3:11 8:11 11:19 41:1,3
44:9 45:8 47:24 76:23
78:17 79:4 82:8 83:4
85:24 89:2 97:24 122:4
136:20 137:4 161:15
162:25 165:21 166:2
176:8 179:4 191:5
**newer** 86:5 89:22 93:19
98:8
**news** 59:9,11
**NGVD** 87:16,16,21 88:9
88:14,20 89:6,16
162:19,20 181:8,10,13
181:13
**nine** 192:4
**nineties** 34:3 85:21 86:1
**ninth** 128:17 134:3
161:25
**Nods** 55:8
**noise** 133:15
**noises** 132:19
**non** 183:20
**Nope** 140:5
**normal** 148:17 178:10
**north** 2:15 21:18 55:15
56:8,11 64:2 101:24
114:12 116:23 117:3,5
117:24 118:7,12,13,17
121:8 124:13 126:5
127:9,17,20,21 131:8
131:13,20 138:21,24
142:8 144:14,21 148:7
149:14 153:15,16 154:1
154:2,8 159:15,20
160:11 162:9 166:7
168:20 177:9,11 181:17
190:19
**northern** 126:7 173:16
**note** 28:22 50:20 184:21

186:3,12
**noted** 77:21 193:13,15
**notice** 5:7 18:7 24:25
25:12 147:16 183:20
186:9
**noticeable** 185:14,23
**noticed** 90:17
**noting** 84:15
**notion** 101:9
**November** 57:1,18 58:3
58:19 61:19 62:12
71:25 72:18
**number** 13:23 14:1,4,5
16:8 24:8,9,11 25:3,14
32:7 36:9,17,18,19,21
37:3,4,15,16 39:7,8,19
40:6 41:6 43:21 48:5
83:20 84:2,4 88:15
118:21,22 134:10
145:18,19,19,22 146:1
146:4 147:3 150:6
151:6,7,19 160:24
165:9 188:7,7
**numbered** 36:10,12
**numbers** 36:8 47:21 94:9
94:10 104:8 107:19
161:3
**numerical** 40:15,17 53:1
**nutshell** 88:19
**NW** 2:20

**O**

**O** 4:1 5:1
**oath** 5:25 6:5 113:5
116:3
**object** 22:15 105:14,18
168:19,25 172:7
**objected** 137:25
**objection** 33:17 35:5
38:21 60:24 61:23
73:13 74:6 92:16 104:7
106:7 107:23 109:1
110:5 112:11 113:13
117:23 120:10,18
130:17 134:25 135:9
137:13 139:19 141:14
145:21 155:16 156:24

169:9 171:18,25 177:25
179:9
**objections** 5:11
**objective** 110:13
**objects** 147:19
**observation** 112:20,21
112:23 133:16 138:12
**observations** 70:13
**observed** 136:6 157:3
190:7
**obtain** 28:2 34:16 52:15
**obtained** 182:7
**obviously** 112:17
**occasion** 57:19 77:11
100:25
**occasionally** 21:7
**occasions** 6:12,13,14 7:3
47:6,17 48:19 178:25
**occur** 59:7 191:20
**occurred** 55:12 101:15
101:25 102:22 104:4
110:19 136:3 155:6
177:3 186:24 190:4
192:2
**occurring** 8:1 186:15
**occurs** 177:21
**October** 57:1,18 58:2,19
61:19 62:12 71:25
72:17 95:11
**offer** 13:23 56:3 74:18
134:1
**offered** 27:8 28:15
**office** 66:16
**offices** 76:22
**officiated** 5:24
**oh** 119:20 132:11 134:20
159:11
**okay** 6:18 7:8,12 8:7,10
10:4 11:25 12:6,12,19
13:22 18:12,17 20:7
23:4 28:21 29:5,12
36:20 38:12 44:6 49:16
49:19 50:7,15,24 54:4,8
57:3,18 67:2,22 69:20
71:2 72:4 73:9 76:3
78:10 80:24 81:7,8

REDA BAKEER, PH.D.                                                              9/10/2009

82:16 83:12 84:16
85:15 91:24 92:25 98:3
98:18 99:4,20 101:6
110:1 114:11 119:21,23
124:12 126:20 127:12
127:12 133:9 134:14
136:22 142:9 144:25
146:4,9 147:6 150:24
154:14,25 159:9 162:10
162:22 163:19 164:23
166:17 168:10 172:18
173:13 180:23 181:23
188:5,25 190:2 192:7
**old** 83:9,10 122:4 163:1
191:4
**older** 86:4 91:3 93:20,22
98:8,11
**once** 60:19 69:5 71:12
72:6 79:22 125:12
174:2
**ones** 111:8 130:2
**oops** 191:8
**open** 24:10 75:16,22
**operate** 82:23
**operator** 112:4
**opined** 116:16
**opinion** 22:22,22 28:19
58:14 59:21 68:8 69:3
69:5,16,17,19 71:8
98:22 107:20 113:18,23
114:13,14 121:9,16
148:4 149:12 157:21
158:2,15 164:23 178:16
180:25 185:13 190:19
190:20 191:19
**opinions** 18:9 56:3 74:18
75:21,25 76:4 77:14
98:19 110:11 117:7,12
117:13,15 169:6
**opportunity** 174:3
**opposed** 73:21
**opposing** 123:6,9 176:15
**opposite** 169:1 180:4
**order** 8:24 143:14
158:24
**organic** 170:17

**original** 5:9 85:5,7 91:9
95:11 97:18 105:23
131:7,9,12
**originally** 66:12 85:12
**originals** 77:8
**Orleans** 1:19 2:6,12 3:5
3:11 8:11 10:16 11:19
41:1,3 47:24 49:5,6,14
49:16,18 76:23 78:17
79:4 82:8 83:4 86:3
89:2 136:21 137:4
176:8 179:5
**other's** 6:24
**outdated** 181:3
**outfall** 72:2 123:14 179:5
180:2
**outline** 80:20
**output** 109:5
**outputs** 53:18,21
**outs** 128:22
**outside** 18:13 24:1 35:19
76:13 134:11 137:6
138:11 148:18 149:18
150:7
**overall** 46:6
**overbuilt** 168:3
**overtopped** 183:11
191:15
**overtopping** 184:4,9,12
184:13,15 191:21
**owner** 21:5 46:24
**o'clock** 101:10,10,11
114:17 192:4

---

**P**

**P** 5:1
**package** 53:13
**packet** 65:22
**page** 4:3,8 10:19 11:1,16
23:11 24:8,10,15 36:6
36:20 37:21,23 39:2,9
39:14,18,24 40:1,7,11
40:14,22 41:8,9 55:18
66:4 81:16,23,23 82:11
83:20 88:21 95:23
110:16 111:18,20 113:8
119:5,14 145:1 159:7

175:9 177:7,7,12 187:5
188:5,25 189:11,16
190:9 191:6,7
**pages** 68:19,20 191:9
**panel** 145:5
**panels** 145:8
**paper** 38:10 42:8,17
43:10
**papers** 52:12
**paperwork** 10:8
**paragraph** 55:20 64:9,12
110:17 113:9 119:6,19
187:7 188:6
**paragraphs** 64:22
**parallelled** 157:16
**parameters** 98:24
**Pardon** 133:11
**Parfait** 1:13
**Parish** 26:21 47:25 176:9
**Park** 10:24
**part** 5:14 16:21 21:1
35:14 42:4 58:12 99:21
115:16 133:22 134:18
166:2 169:24
**participated** 39:3
**particles** 122:15
**particular** 8:23 46:10
52:13,22 55:15 57:20
63:23 75:3 88:6,21
97:6 146:17 149:20,25
150:11 163:9 167:23
170:16 176:4 181:20
**particularly** 60:9
**parties** 5:3 194:14
**parts** 63:13 184:5
**passed** 11:13,20 38:18
125:6
**patent** 23:14
**patently** 105:10 106:25
**Paulina** 26:19
**Pazos** 13:16 15:8 99:13
99:14 131:25 132:1,5
**PBS&J** 46:11,12
**peat** 173:3
**peculiar** 149:24
**peer** 36:22 50:19 102:14

**peers** 33:9
**penetration** 161:5,18
190:22
**penetrometer** 70:13,14
146:23
**people** 32:9 74:12 98:9
107:14 186:21 187:1
**people's** 110:11
**perfect** 150:13
**perform** 46:7 52:14 84:7
95:3
**Performance** 37:18
**performed** 55:1 69:23
70:20 82:13 85:16,18
107:18,19 125:24 148:6
**performing** 53:9
**period** 102:11 180:14
**periodical** 41:18,19,21
42:11
**permeabilities** 108:9
148:16
**permeability** 107:16
108:8,12,16,18,21
**permitted** 5:5
**perpendicular** 156:14,16
157:13
**Perry** 1:11
**person** 29:23 33:23
113:4 139:2
**personal** 7:15 12:20
14:18 191:10
**personally** 22:17 23:18
24:10,13 25:7 56:24
62:7 76:15 82:19,23
95:4,13 157:3
**pertaining** 84:3 158:6
**pertains** 1:6 13:9
**PETER** 3:15
**phase** 69:8
**phenomenon** 122:12
175:24
**philosophy** 87:8 108:3
**phone** 76:23
**photo** 136:11
**photograph** 66:1 70:16
70:17,17,18 126:15

REDA BAKEER, PH.D.                                                                    9/10/2009

129:23 140:13,25 141:3
  141:21,25 142:1 154:10
**photographs** 61:16
  65:13,16,25 70:14
  72:12,15,19 77:7 95:15
  124:19 135:21 136:6
  139:7 156:19 157:4,12
  162:7 190:25
**phrase** 71:18
**physical** 118:9,20 124:14
  124:18 131:19
**physics** 74:23 76:1
  143:10
**Ph.D** 1:17 6:1 28:7 31:9
  31:18 32:20,24 53:13
  53:14 75:19 193:3,11
**pick** 106:1
**picture** 139:25
**pictures** 139:14 183:7
**piece** 161:12
**Pike** 6:2
**pile** 86:11,18 120:8
  121:13,13 122:3,16
  131:3,3 149:2,3,4
  158:21 159:12 160:22
  161:9,11 162:3 171:13
  171:20 172:24 173:15
  173:22
**piles** 91:25 92:2,5 120:1
  120:4 121:23 131:11
  147:6,14 149:4 170:6
  173:25
**pilings** 158:18
**pipeline** 43:25 44:1
**pit** 171:8
**pits** 147:21 148:5 153:2
  157:23
**place** 27:2 47:5 74:3
  125:7 129:15 131:17
  148:12 158:10 175:18
  191:22
**placed** 158:7 170:8 173:1
  174:23
**placement** 148:9
**places** 130:9
**plaintiff** 11:13

**plan** 126:21
**Plane** 98:17
**Planes** 81:25 82:1 96:15
  97:11,21 105:22 160:17
**planning** 29:24
**plastics** 52:7
**played** 60:16
**plays** 148:10
**please** 6:21,24 15:25
  38:9 50:24 51:25
  120:24 130:24 148:3
  165:6 168:16 174:8
  192:13
**plot** 53:17,20
**plots** 53:20
**plus** 166:4 167:13 168:7
  173:23 180:13 187:12
**point** 9:14 15:20 18:7
  20:15,16 30:13 41:14
  42:25 59:20 67:25 78:2
  80:21 81:2 82:16 94:9
  104:10 107:1,5 124:19
  124:23 126:13 128:14
  131:25 132:2 136:9
  141:20 143:17 150:9
  153:20 155:2 158:8
  165:15,16 177:1 183:6
  184:8 185:4
**pointed** 25:12 28:10
**pointes** 165:19
**pointing** 81:5
**points** 165:23,24 183:5
  184:1
**policy** 35:7
**ponding** 186:18,22
**Pontchartrain** 180:10,10
**poor** 52:9 146:12,14,15
  146:15,18,21 190:25
**poorer** 191:5
**poorly** 156:2
**populated** 130:6
**portion** 13:24 63:24
**portions** 109:22
**position** 124:25 150:22
**possibilities** 143:22
**possibility** 144:21 148:11

**possible** 66:24
**posted** 105:25
**post-Katrina** 45:17 66:8
  163:17 164:21 167:16
  187:9
**potentially** 50:8
**pounds** 191:18
**power** 64:6,7 80:21
**Poydras** 1:19 3:4,10
**practical** 76:3
**practice** 33:10
**practiced** 30:11 31:14
  131:1
**practices** 74:19
**practicing** 32:3,11
**preceded** 84:9
**precision** 163:25
**Prediction** 40:2
**predictions** 182:13
**predominantly** 184:9
**preexisting** 190:6
**premature** 186:5
**preparation** 53:19 54:22
**presence** 59:14
**present** 3:14 77:20 81:10
  118:6 146:7 188:8
**presentation** 78:25 80:21
**presentations** 41:11
  78:23 95:20
**presented** 58:18 79:11
**preset** 101:9
**pressing** 180:20
**pressure** 37:8,9 39:11
  43:3 97:22 122:24
  123:2,2,24 124:3,4,7,11
  191:17,24
**pressures** 39:25
**pretty** 58:23 66:11 71:4
  87:2 93:11 94:11 103:6
  153:25 154:2 191:13
**prevailing** 117:5
**prevent** 161:1
**prevented** 147:13
**previous** 7:3 142:25
**previously** 162:16
**pre-Katrina** 66:3 163:20

**primarily** 119:24
**principles** 43:12
**print** 191:10
**printer** 189:25 191:10
**prior** 19:10 24:6 44:25
  48:24 49:22 56:10
  58:14 137:21 164:18
  185:17 186:16
**priority** 145:23 146:5
**probable** 66:24
**probably** 6:13 13:2
  20:10 66:8 93:8 102:5
  129:2 192:3
**problem** 68:10 89:16
  186:24 187:4 189:1
**problems** 20:23 148:25
  176:16,17
**procedure** 5:6 66:22
  69:2 70:7,9,21 82:11,12
**proceed** 66:22
**proceedings** 42:21
**process** 35:15 42:14,22
  69:11 79:5 80:11 85:16
  148:22 158:10 175:17
  176:5
**PROCTOR** 2:16
**produced** 117:1 182:4,16
**producing** 78:11 99:8
**professional** 10:16 28:23
  55:21
**professor** 56:1
**program** 18:24 46:1 53:4
  53:24 81:16,18,24 82:4
  82:7,14 83:13,14 93:14
  98:4,12 159:11,11
**programs** 52:19 53:17
  67:5,10,12,21 69:9,22
  80:25 81:3 82:17,23,24
  83:3
**project** 97:6 155:13
  170:16
**projects** 13:7 47:23,23
  48:20 51:4 157:22
  172:9
**proper** 6:19 150:2,16
  172:4 174:18

REDA BAKEER, PH.D.                                                                    9/10/2009

**properties** 27:22 43:8
46:3 91:16
**proposal** 51:12,15
**protect** 119:25
**protected** 86:15 120:19
149:20
**protection** 13:7 37:2,14
37:20 39:4 42:25 43:22
44:5 45:14 47:2,8
49:23 51:22 52:4 59:4
79:4 86:8 174:11
188:23
**protective** 121:2
**protrusions** 164:1
**provide** 58:14 88:14
**provided** 12:1 32:19
46:5 51:20 62:14 65:6
66:15 70:11 98:25
126:15
**PSLC** 2:2
**public** 82:20
**publication** 32:6 42:2,6
42:19
**publications** 20:9 32:5
36:21 37:1 41:10,13,14
41:15,17,23 42:1,9,13
42:23 50:19
**publish** 42:18
**published** 68:14 79:9
102:14
**pull** 190:9
**pulled** 173:16
**pulling** 113:2
**pullout** 37:20,24 38:13
**pump** 43:21 44:9,12 45:7
46:6 112:3 177:8 180:2
180:7
**pumping** 44:7,15 177:7
**pumps** 176:8,9
**pure** 173:8
**purpose** 42:16 133:14
139:9 140:1
**purposes** 5:5
**pursuant** 5:7
**pushed** 133:3
**pushing** 125:4 131:19

**put** 42:6,8 53:23 134:12
161:13 168:6 175:25
176:1
**puts** 123:2
**putting** 8:23
**P.E** 1:18 6:1 32:11,11
33:1,5,7,12,19,20,21
75:18 193:3,11
**P.E.s** 33:3,3
**P.L.C** 2:9

---

## Q

**qualifications** 12:20
14:18
**quality** 158:9,10 170:22
**question** 5:12 19:23 24:3
32:17 36:11 49:4 67:18
67:19 68:4 71:3,13
73:16 92:23 99:4
105:14 120:5 123:4,17
128:2 130:18 132:7
134:6,7 138:2 142:10
142:19,21,25 143:21,24
143:25 144:4 148:9
161:21 165:21 167:19
172:7,11,12 179:15
185:8 188:11 191:13
**questioned** 115:25 116:1
**questions** 6:19,24,25
29:2 50:13 74:12,16
137:22 138:1 150:18,23
168:14 192:8,12
**quick** 147:16 151:19
178:4
**quickly** 15:25 174:7
**quite** 68:14

---

## R

**racing** 176:15
**RAFFMAN** 2:17 15:4,13
15:24 16:5,20 17:6,14
22:14 33:16 35:4,23
38:20 48:10,14 60:23
61:22 73:12 74:5 92:15
104:6 105:13,17 106:6
106:10 107:22 108:25
110:4 112:10 113:12

117:22 118:2 120:9,17
127:1 130:16 134:24
135:8 137:12,18 139:18
141:13 145:20 155:15
156:23 169:8 171:17,24
172:6 174:21 175:4
177:24 179:8 189:14
190:11,15 192:10
**rain** 180:1
**rainy** 64:4 179:4
**raise** 67:25
**range** 183:8
**rate** 54:11,13 55:3
**rates** 54:11
**ratio** 175:20
**reach** 32:13 69:4,9
112:24 117:5 125:4
146:24
**reached** 70:10,25 102:20
125:25 126:1 143:4
**reaches** 145:2
**reaching** 112:9 117:6
**reactivated** 156:11
**read** 62:21,22 63:16,19
63:20,23,24 64:1,11,14
68:17,18,19,23 71:17
71:19 76:7,17 89:1
101:20 102:19 106:16
107:14 115:1,4,13,15
115:17 116:6,7,12
125:12,13,16,20,21
132:22 134:17,17 135:3
142:23 143:1 144:10
151:3 174:15 190:2
192:12
**reading** 5:8 68:15 164:8
169:16 182:20
**reads** 83:22
**real** 186:19
**realized** 175:22
**really** 28:11 38:24 57:14
58:21 60:2 71:13 77:6
94:12 98:22 100:13,14
140:12 158:9 186:12,18
**reason** 91:7 113:6 149:8
170:20 173:13 189:20

**reasons** 21:15 50:5 77:14
105:1,1 145:16 152:24
177:2
**recall** 9:11 11:11 25:20
25:23 72:10 85:20
165:20
**receive** 33:9
**received** 30:7,13 31:18
77:15 78:4
**receiving** 77:23
**recess** 50:1 132:16
168:11
**recognition** 33:8
**recognized** 32:25 188:22
**recollection** 64:7 65:19
111:11
**recommend** 161:8
**recommended** 159:24
**record** 15:5,14 17:9
125:14 135:10 137:20
137:23 141:1 171:9
190:14 192:5
**records** 47:20 63:20
76:12,18 149:8,9
170:23 172:21 174:1
**Reda** 1:17 6:1 22:20 24:6
193:3,11
**reduce** 120:19
**reduced** 121:2
**reducing** 175:19
**Reduction** 81:14 97:15
**refer** 111:13 126:9
127:16 130:2 148:1
150:4
**reference** 25:11 67:4
83:25 87:1 90:25 91:1
91:4,6,9 95:23 96:4
135:17 147:21 162:22
**referenced** 42:24 44:6
48:18 53:3 78:12
181:24
**references** 90:13 181:7
**referencing** 85:6,6
**referred** 111:2 139:20
183:18
**referring** 8:25 13:2

---

JOHNS PENDLETON COURT REPORTERS                                          800 562-1285

REDA BAKEER, PH.D.                                                                9/10/2009

Page 19

39:20 41:3,18 103:14
110:21 112:1,13,14
117:23 122:7 125:19
138:21 144:13 145:9
147:8 157:15 172:13
174:22 179:14 188:1
189:15
**refers** 148:14 159:19,20
**reflect** 85:11 137:24
167:16
**reflects** 137:24
**regard** 49:23 74:19,19
75:7 82:22 118:21
121:8 124:13,14 138:17
148:4
**regarding** 13:14 15:7
76:5,7 78:16 132:19
133:19 134:2,23 135:1
135:3 137:9
**regards** 76:1 95:17
**region** 177:10
**regional** 175:12 176:6,11
**registered** 28:23 55:21
**regular** 41:20,22 84:11
**reinforce** 52:7
**reinforced** 37:11,19,25
38:13 39:17 40:12,20
51:24 52:2,20
**relate** 7:22
**related** 7:23 20:24 21:15
24:19 38:1 42:2 52:12
78:22 79:9 122:12
144:8,14,21 169:12
176:3 194:14
**relates** 39:8,8 41:6
122:13
**relating** 68:22
**relation** 51:21
**relatively** 129:25 166:1
**released** 93:21
**relevance** 43:1
**relevant** 100:19,20,21
135:12
**reliable** 152:23
**reliance** 54:23 77:15,18
77:23 78:4,12

**relied** 66:13 71:15 78:11
98:19 99:7 192:1
**religious** 50:5
**rely** 110:10 112:17
**relying** 50:11 70:10
**remained** 73:21
**remember** 8:19 9:14,16
12:10 26:23 78:14
85:21 94:9,12 104:8
110:23 111:10,13
**reminded** 63:21
**remove** 96:8
**Renaudin** 11:19 24:24
**rendered** 28:19
**repeat** 40:9
**repeated** 180:15
**repetition** 179:22
**rephrase** 6:22
**replace** 17:7 190:10,13
**replacement** 190:16
**report** 12:1,4 13:12,24
13:25 14:5 15:8,9,18
18:7 20:16,25,25 21:8
21:13 22:8,12 24:2
54:22,25 55:18,19,20
56:4 64:10,18,19 65:23
67:4,11 77:13,17,20,22
78:5,11 85:5,10 88:17
88:22 90:8 95:24 98:18
99:8,11,11,13,14,16,22
99:23 105:9 106:3,5
107:15 109:10 110:17
111:9,19 113:4 115:14
116:8,25 119:5,14,16
125:17 127:7 134:13,15
134:18,19,21 135:4,11
135:17 144:25 147:20
148:2 150:2,10 153:18
162:12 165:2 169:17,18
169:23 175:9 177:5
189:2 191:6
**reported** 1:23 110:25
112:4 113:3,5 186:7,21
**reporter** 1:25 5:23 7:1
194:3,25
**REPORTER'S** 194:1

**reports** 28:19 40:18
50:20,21 51:1,23 59:9
59:11 62:21 63:11,14
68:16 70:4 71:6,17,19
76:6 90:20 99:12 100:5
101:5 102:15 104:9
105:7 106:16 107:7
109:23,24 110:18,22
111:6,11,15,21 112:2,8
112:18 113:2 117:9
132:25 136:7 186:14,19
186:21
**represent** 16:17 20:3
**representative** 18:9 51:8
**representatives** 19:3
**representing** 2:2,15
13:24 27:23
**represents** 55:3,19,20
131:10
**reproduced** 157:6
**request** 9:6
**require** 108:20
**required** 35:17 89:17
97:9,17
**requirement** 96:14 170:7
188:9
**requirements** 70:24
158:4 188:12
**requires** 46:24
**research** 51:2,3 68:9,10
**reservation** 107:18
**reserved** 5:13
**reshape** 172:14 174:12
**residence** 11:17 20:22
23:23,23
**residences** 21:18
**residential** 130:11
**resolved** 21:4
**resources** 35:11
**respect** 124:16
**responses** 6:24
**responsible** 23:2
**responsiveness** 5:12
**rest** 23:22 153:9 184:3
**result** 101:18,19 194:16
**resulting** 190:6

**results** 175:21 189:4,9
**retain** 82:24
**retained** 9:12 10:7 11:4
11:23 18:15,18,21
19:18 20:4,11,21 22:1,1
22:17 24:5 25:21,25,25
26:1,4 28:16 35:1 46:8
48:19,20,25 55:9 56:6,7
56:14 60:4 72:24 76:16
**retaining** 37:4,5,6 39:25
40:6 43:5 153:9 169:19
**retention** 54:8
**retrofitted** 85:12 86:6,7
**return** 81:1
**reveal** 153:12 164:18
**revealed** 153:6
**review** 13:17,18,19 15:8
15:25 19:12 27:11
28:19 42:15,19,21 45:7
63:7 65:7 73:25 74:1
77:16,22 78:1,6,24 79:6
81:9 90:11 95:20 100:5
108:22 132:3,4 134:15
134:17 135:6 150:3,14
151:24 154:22 158:5
161:7 171:2 174:4,5
**reviewed** 12:13 14:10
36:22 41:15,24 42:10
42:13 50:19 51:13
62:15,16,19 63:11
64:19 70:3 71:5 73:23
79:8 95:2,15 99:10,14
99:18,22 102:15 109:22
118:5 171:11 186:21
**reviewing** 27:13 76:6
136:7
**reviews** 135:4
**right** 12:3,8 17:7,15,20
18:25 21:9 37:17 49:8
66:5 72:17 75:3 84:21
85:2 86:21 96:12 97:4
97:16 117:24 118:1,3
131:18 137:16 140:14
141:23 152:15,19
154:19 159:22 161:24
163:13 166:5 167:5,12

REDA BAKEER, PH.D.                                                                                      9/10/2009

167:21 175:5 178:5
  180:6 184:1 187:5
  190:2
**right-hand** 141:24 142:3
  165:22,24
**RINKUS** 3:19
**rise** 89:5 179:25,25
**rising** 122:20 176:14
**risk** 81:14 97:15 151:5
**risk-based** 151:2,5
**Rita** 58:5,7,8 59:12
**RMB** 84:9
**road** 162:2,4,4
**roadway** 162:8
**Rob** 19:7 54:5
**ROBBINS** 2:19
**Robert** 3:2 134:16
**role** 148:10
**room** 166:23
**roots** 170:18
**Rouge** 80:15,16
**rough** 103:10
**Roughly** 156:25
**RPR** 1:24 5:22 194:2,24
**rule** 59:18
**ruled** 61:19
**ruling** 68:8
**run** 105:22 108:17
  186:12
**running** 23:6
**runs** 153:25
**rusty** 190:25
**R-E-N-A-U-D-I-N** 11:20
**résumé** 9:13 10:9,10
  19:15 20:6 25:6

**S**

**s** 2:17 5:1 14:13 15:9
  64:18,19 74:20 75:25
  76:5 77:22 82:12 99:11
  134:18 159:23 174:22
**safety** 95:22 96:9,10,11
  96:16,18,20,21,23 97:2
  97:3 159:13 160:5
  161:3
**sail** 117:4
**sake** 174:22

**samples** 151:7
**sampling** 151:7
**sand** 148:13 171:14
  172:3,24 173:6
**sands** 172:25 173:8,8
**sanitary** 29:17
**satisfied** 106:2
**satisfies** 70:24
**save** 5:8,11
**saw** 101:5 106:23 113:23
  113:23,24 114:6,23,24
  114:24 115:1,2,22,22
  115:24 124:18 139:2
**Sayed** 37:24
**saying** 35:9 71:14 77:23
  88:3 103:17 113:21,21
  115:22 138:13,15 143:9
  155:19 157:25
**says** 82:13 83:23 88:22
  114:2 131:8 143:25
  187:25 189:7,8
**scale** 128:23
**scarcity** 150:2,11
**scenario** 139:1
**schedule** 24:8
**school** 32:8 79:1,17,23
  80:5,12
**science** 74:23 101:12
  103:21 110:9 117:9
  151:8
**scientific** 57:14 59:16
**scientifically** 139:5
**scientist** 57:9 60:5 72:19
  110:1
**scientists** 90:3 108:1
**scope** 102:23
**scraping** 132:19,23
**scratch** 124:21
**scrutiny** 60:3
**sea** 87:13,17 88:1,4,22
  89:5 162:16 166:21
  176:13
**sealed** 58:23
**sealing** 120:2,7
**seam** 121:22
**second** 8:24 11:1 37:10

39:13 40:14,16 55:20
  106:15 113:9 147:3
  148:19 160:15
**second-to-last** 111:20
**section** 1:7 63:23 64:1,4
  64:5 66:10 112:12
  145:1
**sections** 12:2 63:22
  64:17 65:24 106:18
**see** 8:21 13:11 15:15
  21:18 23:1,20 25:3,4,10
  28:6 30:3,8 33:12,25
  34:16 38:3 42:12 44:11
  45:3 51:7 53:19 57:12
  58:19 59:1,2,5,18,19
  60:1 62:17 66:6,12
  69:6,9,14,25 70:23
  80:23 81:16 82:3,22
  84:1,9,13 85:5 88:21
  89:15 90:12 91:4 93:25
  97:1,19 100:4,6 101:19
  102:19 105:24 111:10
  114:8,12,16,22 115:6
  118:23,24 119:2,17
  122:21 124:15,23
  126:23 127:5,25 128:10
  129:7,18,18,21,23
  130:8,8 131:21,22
  132:8,11,13,15,15
  141:21 142:2,16 143:2
  149:21,24 150:20,25
  154:20,21,23 156:18
  157:7,10,13,14 159:1,5
  159:17 160:5,18 161:4
  162:7 164:5,15 165:12
  165:23 166:3,8,9 168:8
  171:7 173:5 174:16
  177:1 179:23 182:8,11
  182:17 183:5,22,23,25
  184:7,8,10,17 185:3
  186:1,5,11,19 189:13
  191:12
**seeing** 57:10 64:2,3
  110:25 186:8
**Seemann** 9:17,18,25
  11:6

**seen** 16:18 59:9,11 60:14
  60:16 64:8,17 104:9
  111:8 113:22,22 114:3
  114:5 118:5 125:10,25
  152:13 154:9,10 169:23
  169:24 170:22 178:11
  178:21 191:24
**seepage** 96:21 107:17
  108:17,18,19 148:12
  156:1,4 186:8
**segment** 126:7 127:20,21
  131:8,14 132:8,10,12
  166:1,2 177:6 190:5
**segments** 115:15,16,17
  190:21
**SELA** 47:23,23
**selecting** 68:11
**semi-compacted** 148:14
**senior** 30:25
**sense** 114:11
**sent** 15:7
**sentence** 111:20 144:10
  144:11 145:11 189:17
  191:7
**separate** 34:4
**separation** 122:3
**September** 1:20 193:25
**series** 41:22
**serious** 87:4
**set** 16:12 67:3 68:1
  101:11 138:25 194:7
**sets** 79:2
**settle** 176:2
**settled** 7:24,24
**settlement** 7:23 8:1 9:5
  10:24 11:16 24:19
  175:16,17,23,23 176:6
  176:11,12,25 177:9,10
**settlements** 149:1 175:12
  175:13 190:4,6
**settlement-related** 8:3
  8:20 9:10 11:15
**seven** 50:8 73:11 101:10
  192:3
**seventies** 91:7 155:7,9,10
**seventy** 12:10

REDA BAKEER, PH.D.                                                                9/10/2009

**Sewerage** 24:23 112:19
**shallower** 121:13,24
     154:5,18
**shape** 126:12 172:15
     191:1
**shear** 37:20,25 38:13
**sheet** 35:13 82:20 86:11
     86:18 92:2,5 97:12
     120:1,4,8 121:12,13
     122:3,16 131:3,3,5,5,11
     147:6,14 149:3,4,4
     158:21 160:22 161:9,11
     162:3 170:6 171:13,20
     172:24 173:15,21,25
**sheets** 82:19
**shell** 156:3
**SHELONKO** 3:16
**shield** 41:6
**ship** 26:25 27:1,4,6
**shore** 21:19
**short** 76:20 147:8 179:12
**shorter** 147:9
**shorthand** 194:9
**short-term** 177:14,17
     178:3,8,12,15,18,24
     179:19
**show** 13:8 101:12 102:17
     115:10 139:9,10 157:18
     177:2 187:10
**showing** 59:13 131:13
     140:1,17 165:16
**shown** 65:23 124:19
     191:8,14
**shows** 138:13,14 153:7
     158:8 189:4,8
**side** 11:7 23:16 58:16
     59:3 85:11 94:15
     101:18,19 114:16
     116:18 117:20 121:19
     141:24 142:1,3 149:20
     155:22 156:5 157:10,22
     164:13 165:10,12,22,24
     168:25 169:3 170:5
     181:1 183:10
**sides** 158:14
**sidewalk** 24:19

**Sidney** 64:25
**sign** 35:13 192:12
**Signed** 193:11,13,15
**significance** 73:9 74:3
     109:20 125:15 132:25
     145:16
**signing** 5:9
**signs** 118:24
**silts** 173:5,7
**similar** 20:19 21:19 26:7
     60:13 92:11,21 93:7
     94:13 102:21 103:1
     111:12 129:4 136:23
     138:13 146:6,10,12,13
     159:12 182:11
**similarity** 146:18
**simple** 71:4 87:25 167:15
     191:13
**simpleton** 29:1
**simply** 81:2 100:18
     105:8 180:17
**sinking** 176:21
**sir** 6:12 8:4 58:12 175:10
**sit** 10:14 17:12 67:11
     111:4,25
**site** 9:5,8 57:16,20 58:1
     59:11 61:10 68:25 69:1
     91:16 95:8,9 104:25
     129:12 146:7,16 153:7
     153:11 173:2 176:1,2
**sites** 23:20 57:11 135:23
     146:10,21 149:19
**sitting** 141:4
**situation** 143:2
**six** 68:18,20 101:10
**sixties** 87:12,25 147:10
**size** 129:7,12,19 130:5
     133:3 144:17 156:15
**sketches** 65:23
**slab** 25:3
**slightly** 67:22 183:6
     185:11
**slope** 81:23 188:21
**slopes** 94:15
**Slope/W** 82:14
**small** 27:21 179:25

**smaller** 130:8 132:10
**smashed** 124:20
**sniffing** 57:14
**Society** 42:3 145:14
**soft** 173:3
**software** 40:23,25 41:2
     53:11,12,18,20 83:9,10
     93:25
**soil** 7:19,21 8:2,22 10:24
     20:21,24 27:19 29:15
     30:6,20 31:4,10,11,12
     31:13,24 32:1,22 33:15
     33:23 43:7 46:1,3 52:9
     55:23 70:12,12 74:8
     91:15 108:7 121:18
     122:15,25 146:6,9,18
     146:20,22 155:19
     170:17 173:5 174:23
     181:18
**soils** 31:16 62:24 122:12
     122:13 129:10 146:15
     151:17 173:2,3 175:22
     178:14
**Soil/Geosynthetic** 39:19
     39:22
**solutions** 54:3
**solve** 27:25
**somewhat** 96:3
**sorry** 10:19 24:9 37:22
     38:22 41:9 43:25 48:15
     49:14,15,20 63:5 68:5
     119:18 132:3 143:7
     147:2 183:2 191:8
**sort** 31:7 162:10
**sought** 5:15
**sound** 133:1
**sounds** 132:22,23 134:2
**sources** 182:7,8
**south** 47:19 59:8 102:4
     117:3 124:14,15 125:1
     125:2 126:4,6 127:8,10
     127:11,17 130:14
     131:20 132:8,11,12
     138:22 142:8 144:22
     148:8 149:14 153:4,17
     155:13 159:20 160:12

166:12 168:20,22
     181:18
**southern** 55:14,17 56:17
     56:21 67:1 124:24,24
     126:7 128:15,16,25
     132:11 142:17,17
     144:24,24 154:1 156:6
     156:17,17 166:10 184:2
     185:5
**south-north** 165:25
**so-and-so** 103:12
**spacing** 151:20 188:17
**spare** 60:10
**speak** 77:1
**speakers** 32:8
**Speaking** 95:22
**special** 41:25 42:2,6 62:5
**specialist** 31:23
**specialize** 30:19,25
**specializes** 32:22
**specializing** 33:14 55:22
**specialties** 29:13
**specialty** 29:19 30:3,5,23
**specific** 29:20 35:7 55:12
     66:21 68:21 101:4,7
     107:13 143:25 188:16
**specifically** 5:10 19:22
     43:10 61:9 67:1 76:25
     88:18 103:14 108:6
     130:2 136:9 137:17
     139:20
**specification** 34:4
**specs** 174:19
**speed** 144:18
**spelled** 81:17
**Spencer** 82:12 97:23
**Spencer's** 82:10 96:17
     97:10 160:17
**spent** 68:14
**SPIN** 53:5
**spirit** 93:10
**Splash** 183:13 184:11
**Splashed** 183:12
**splashing** 183:14,15
     184:6,10,16 186:6
**split** 34:3 71:13 92:23

REDA BAKEER, PH.D.                                                                 9/10/2009

**spoke** 76:20 77:4,5
**spread** 82:18,20 131:10
**spreading** 131:3 132:14
**square** 151:13,15
**squeeze** 152:7
**squeezing** 175:19
**St** 26:20 61:7
**stability** 47:3 74:9 81:24
   82:4 83:5 96:17 97:8
   97:20 98:15 138:5
**staff** 183:4
**stage** 177:16,23
**stand** 155:19 185:16
**standard** 42:10 82:7
   90:2,6,23,24 159:11
   170:19
**standards** 41:24 93:3
   188:22
**standing** 121:6
**standpoint** 76:4 109:8
**start** 7:8 30:21,22 67:20
   68:10 69:2,5 83:19
   105:9 116:23 139:24
   165:7 176:20 186:8
**started** 36:16 68:1,17,25
   69:8 80:24 123:5
**starts** 122:20,23
**state** 5:23 33:4,6 34:6,8
   58:6 110:17 194:3
**stated** 114:14 116:24
   146:4
**statement** 35:9 63:25
   64:15 111:16 113:11,16
   113:17,19 114:1 115:10
   142:7 144:7,20 153:5
   174:9,16
**statements** 13:8 21:7
   62:18,20 113:1 115:7
   115:10 117:10
**states** 1:1 34:5 128:4
**static** 37:7,9
**station** 43:21 44:8,9,12
   44:15 45:8,9 46:6
   112:3 165:8,8,9,11
   177:8
**stations** 157:8 180:3,8

**steel** 31:3 119:25 120:3
   133:2 138:9
**steels** 133:6
**step** 6:23 17:16 69:11,11
   70:9,9,20,20
**stepping** 130:25
**steps** 20:17 84:5
**stiffness** 119:13
**STIPULATED** 5:2
**stipulation** 6:3
**stop** 61:13
**stopped** 95:12 109:15
**store** 7:13,16
**storm** 57:11 60:17 81:14
   97:15 104:21 106:19
**straight** 128:11 131:6
   168:18
**straighten** 121:15 190:17
**strains** 28:2
**stratum** 161:8,10
**street** 1:19 2:5,11 3:4,10
   49:1 85:16 86:23 91:14
   91:20,25 92:1,7 94:5,25
   95:16 103:24 104:4
   123:7,19 179:1,18
   180:19 186:24 188:20
**strength** 46:1 129:10
   178:13,14,15
**stresses** 28:2
**stretch** 131:15
**structural** 29:7,10,14,20
   30:10,11 31:3 33:2
   121:4 122:11 191:2
**structure** 20:23 26:7
   27:20,23 31:10,13 47:2
   47:4,14,15 48:1 133:3
   151:2,16 163:1 172:22
   175:23
**structures** 28:5 32:11
   47:19 91:17 151:11
   176:16
**student** 28:9 53:14
   133:13,19
**students** 35:12
**studied** 75:16,16
**studies** 30:18 32:19

108:8 111:7 122:21
**study** 27:13 37:7,12
   52:10,13,16,19,24
   59:17 100:24 106:24
   111:6 133:18,21 151:4
**studying** 47:13
**stuff** 59:13 103:10
   106:20 109:15 110:11
   132:23
**subdivided** 145:4
**subjected** 179:18
**subjective** 110:9,12
**submit** 35:14 42:7,17
   46:25 51:15
**submittal** 169:24
**submittals** 171:3,4
**submitted** 23:19 28:20
**subsidence** 89:4 166:23
   177:3 181:4,5
**subsoil** 181:21 188:9
**substitute** 15:19
**sufficient** 119:1 142:14
**suggest** 65:20 148:17
**suggests** 108:11
**Suhayda** 98:21 99:6
   100:1
**suing** 7:16
**Suite** 3:10
**supervision** 194:10
**supplement** 52:23 53:1
**supplemental** 135:18
**supply** 50:12
**support** 99:1,1 112:23
**supported** 125:24,25
**supports** 161:19 174:13
**supposed** 11:18 66:19,19
**sure** 16:1,22 17:13 20:17
   138:2 180:22 188:22
**Surekote** 162:4
**surface** 94:18 122:15
   160:19,20
**surrounding** 121:18
**survey** 163:8,10,12,13
   165:16 166:16 167:23
   183:17,18 185:25
   186:12 189:9

**surveyed** 165:15
**surveying** 29:18 163:11
**surveys** 164:17 168:4
   176:22 187:10
**susceptible** 153:10
**sustained** 184:13
**SUTTERFIELD** 3:8
**swale** 157:8
**sweep** 160:2
**switched** 181:8
**sworn** 6:4 194:6
**Syracuse** 30:15,16 31:19
   133:25
**system** 43:16 47:24
   49:24 59:4 60:21 79:5
   80:7 81:15 87:15 92:20
   97:15 130:7 142:15
   143:15 180:5 188:23
**systems** 37:2 39:4 42:25
   47:8 51:22 59:24
**S-H-T** 81:17

**T**

**T** 4:1,6 5:1,1
**TA** 31:11
**table** 16:10 88:21,24
   148:21,25 159:6,6,9
   176:10 177:11
**tables** 160:16,16
**tabular** 88:17
**take** 6:9 11:22 46:12
   61:16 67:5 72:12,19
   99:10 111:14 112:7
   113:11,16 121:5 127:24
   129:15 131:9,17 139:2
   144:6,11 148:12 165:4
   188:3
**taken** 5:5 13:5 66:11
   83:19 88:24 117:7,11
   182:6 193:25 194:8
**takes** 175:17
**talk** 8:24 28:21 67:2
   74:17 76:18 79:11
   80:20 109:19
**talked** 24:18 26:14 52:17
   98:20 162:16 170:2
**talking** 20:20 57:24 63:3

REDA BAKEER, PH.D.                                                                9/10/2009

92:10 100:8 105:6
113:8,9 116:21 119:6,9
122:2 123:9 128:25
136:17 137:13 185:6
**tape** 173:17
**task** 55:16 62:24,24 68:2
**tasked** 55:10,14 65:10
67:3 103:23
**tasks** 169:16
**Tavassoli** 53:25
**teach** 32:8
**teaching** 31:11 32:1,9
**Team** 68:15 70:3 71:6,16
88:25 90:21 105:6
109:9 111:12 145:12
182:12,13
**teams** 145:11
**tear** 122:3,17 123:3
**tearing** 122:10
**technical** 21:13 40:18
50:20,25 51:23
**tell** 26:24 41:16 43:18
45:22 50:24 51:25 53:6
57:3 67:12 76:10 83:2
85:15 93:2 103:19
111:8 114:3 131:2
133:7 148:3 159:6
168:15
**telling** 96:9 103:12 116:2
**tells** 88:18 118:6 123:23
129:9,20 131:8 151:12
160:22 161:17 166:13
188:2
**ten** 151:12
**tend** 149:4 168:14
**tender** 192:9
**tendered** 7:5,18
**Tendering** 16:4,13
189:15
**tension** 121:9,17,19,22
121:25 122:5,8,12,14
122:18,19,22
**tenth** 168:5
**term** 29:23
**terms** 83:12 86:20 91:11
92:10,11,17,19 93:8

104:3 109:11
**terrain** 88:7
**Terry** 125:9,10
**test** 37:11,21 52:19,23
133:8 163:14
**tested** 133:6,6 151:8
**testified** 6:5 8:7 11:9
**testify** 21:3 28:18 75:2
134:11 152:25 155:11
194:6,7
**testifying** 19:24
**testimonies** 64:23
**testimony** 9:7 19:13
63:10,19 64:10,13,14
64:18 109:21,22 110:2
115:5,12 116:6,12
125:9,11,16 132:19
134:2 135:12 157:20
193:4,6
**testing** 95:5 133:10,12
**tests** 37:25 38:13 41:7
69:22,23 148:16
**text** 89:1
**Thank** 17:17 40:13
50:17 175:5 192:11
**Thanks** 127:5
**thereof** 5:14
**thesis** 28:8
**thing** 60:7 68:12 140:12
165:5
**things** 59:19 134:10
**think** 19:15 35:25 38:21
61:25 65:21 67:18
78:14 96:8 99:21
105:18 106:2 107:14,25
112:3 130:17,20 131:4
135:9 150:9,21 153:14
154:23 155:9 171:13
177:15 185:23 186:2
187:5 189:24
**thinks** 113:23
**third** 8:19 10:22 24:17
37:10 39:14 40:5,21
46:16
**thirty** 156:25
**thought** 49:15 154:24

**thousand** 54:19 68:18,20
151:13,15
**three** 19:16 30:11,25
34:15 40:22 73:18
82:17,22 90:13,13,14
128:9 131:2 173:24
175:15,24 176:23
**tie** 163:8
**tilted** 128:3 129:4
**tilting** 128:9
**time** 5:13 13:23 18:4,17
21:17,22,24 22:18
30:10,18 34:14 35:19
45:18 50:9 53:11 55:16
56:6 57:8 59:15 60:10
60:25 61:11 62:2 65:5
65:7,12 68:15 72:17
73:24 85:25 100:24
101:24 102:3,11,19,19
102:20 103:18 104:5
106:11 111:1 136:1
139:13 148:1 153:20
155:2 162:11 163:2
165:14 174:24 178:21
180:14 187:3 188:3,13
191:19 192:1
**timeline** 100:25 101:7,15
101:21,21 102:9 103:24
**timelines** 112:21
**times** 47:21,22 76:21
79:12 111:2 124:2,5
176:22 180:18 181:24
187:17
**tip** 159:12 160:7,14,22
161:4,9,11,15,18
171:19 173:23 190:22
**tips** 172:23
**title** 38:10
**titles** 33:11
**today** 6:9 22:6 24:4
67:12 111:4,25 130:3
**toe** 156:21 164:13
**told** 9:20 19:17 45:13
46:16 54:4 56:7,15,19
56:20 73:4 167:8
171:22

**Tom** 11:3,5
**tomorrow** 176:19
**tool** 28:4 52:21
**tools** 93:8
**top** 10:23 23:9,11 24:15
37:3,4 39:1,6,7,9,15
40:1,5 81:16 94:18
124:20 125:6 131:16
141:4 163:8 164:12,14
164:15,19 165:13 166:3
170:8 173:22 174:23
176:18 183:20,21
184:14,19 187:10
188:20,21 189:16 191:7
**topic** 42:2 168:15,15
**topical** 164:3
**torsion** 28:3
**total** 173:21
**toured** 58:22
**Tower** 25:14
**town** 58:12 60:17
**trail** 11:11
**trained** 186:2
**training** 34:14
**transcribed** 194:10
**transcript** 5:9 17:17 36:1
80:19
**transcription** 193:5
194:11
**transferred** 91:10
**Transportation** 80:1,3,4
**trapezoidal** 157:9
**travel** 23:20 55:7 83:17
**tree** 140:18,19
**trees** 170:18
**trend** 183:25
**trends** 176:15
**trespass** 58:24
**trial** 8:5 10:5 11:13
**triangular** 157:9 183:5
**trip** 165:4
**tripod** 163:11
**tripping** 7:14
**true** 36:14 63:9 67:6
72:14 75:7 86:13 89:7
92:13 98:6,21 104:13

REDA BAKEER, PH.D.

9/10/2009

111:15 112:8 113:15 116:9,20 117:14 126:5 141:5 153:14 179:5 180:18 193:7 194:10
**truth** 113:1,5,11 116:2 194:6
**try** 6:23 57:13 127:3 143:8 168:15
**trying** 71:12 78:13 104:22
**Tulane** 18:5,22 19:1 26:2 32:2 34:20 35:1,17 40:24 51:5 53:5 57:6
**TUPREP** 53:19
**turn** 74:24 111:18 120:6
**TUSPIN** 40:25 53:4,5,6
**twenty** 156:25 173:18
**twenty-five** 54:18,19
**twenty-two** 31:25
**two** 6:14,15 7:3 15:6 20:14 21:9 41:20 53:16 53:18 55:11 64:13 65:12,14,25 73:17 79:2 88:19 90:16 91:17 92:24 118:22 121:22 123:9 131:13 147:19 149:19,25 150:18,23 151:14 152:7 153:8 159:24 160:15 165:18 165:23 167:11,12,13 168:1 172:8 176:15 178:2 181:20
**type** 8:22 9:2 23:24 28:3 48:20 97:22 108:1 110:9 133:9,12 139:14 143:18 152:12 155:18 155:24 170:13 173:3
**typed** 54:25
**types** 151:9,10
**typical** 23:24 154:4 163:10 170:18
**typically** 21:8 52:4 94:14 126:13 173:9 178:6
**typos** 83:3 90:17 106:1
**T-wall** 161:22,23 162:5
**T-walls** 45:8,11,12

**U**

**U** 5:1 152:23
**Uh-huh** 9:1 24:16 25:16 66:15 76:25 77:3 78:20 81:12,22 83:8 84:16,24 87:24 92:13 96:2 99:24 121:21 145:25 150:1,9 150:13 151:21 152:3,10 154:9 156:20 157:2 160:10,25 161:16 163:10 167:25 170:25 174:2 181:15 182:10
**ultimately** 96:7
**um** 7:11,13 9:13 18:23 19:7 20:9 21:11 24:17 25:22 26:18 28:2 37:20 39:5 40:24 48:2 51:10 51:16 53:8 54:10 57:5 59:14 64:1,8 78:4 79:19 83:14 86:25 91:3 97:24 101:4 110:24,25 129:24 134:17 154:21 155:7 158:4 169:3 171:16 188:14
**umbrella** 29:10 34:2
**undergraduate** 30:21,24
**underneath** 165:24
**underscored** 84:14
**underscores** 84:17
**underseepage** 186:14,15
**understand** 6:20 12:2 13:2 21:25 25:9 34:19 69:15 87:23 118:18 134:8 137:19,21 143:7 143:10 152:5,21 172:10 172:13 177:16 179:15
**understanding** 68:3 86:10 153:22 155:5,8 156:9 157:20 169:4,15 194:12
**understands** 130:20
**understood** 93:4 114:13 117:11 137:21
**undertaken** 147:22
**unfavorable** 158:2
**unforeseen** 188:9

**unfortunately** 11:12,19
**uniform** 183:20
**unique** 149:21
**unit** 187:17
**UNITED** 1:1
**unity** 96:23
**university** 18:5,22 26:3 29:25 30:16,23 34:20 35:1,11,14,18,20 40:24 51:6 53:5 55:25 57:7 133:25
**update** 77:24 85:8 87:4,5
**updated** 20:7,13 85:4
**Uplift** 82:5 83:5
**Upper** 25:13
**upriver** 26:20
**upstream** 180:3
**urban** 47:23
**urging** 50:9
**USA** 1:13,14
**USACE** 14:22
**use** 27:18,24,24 37:8 41:1 43:6 45:25 46:3 53:24 54:2 83:6 90:9,9 96:15,17,19 97:5,10 98:24 108:15 109:4,14 152:20 154:17 159:11 162:23,24 163:1 188:17
**uses** 83:5 167:7
**U-type** 150:11 152:15
**U.S** 12:24 37:13 38:4 43:19 50:21 51:1 81:10 83:22,23 161:6 170:19 171:6

**V**

**v** 1:8,9,10,11,12,13,14
**Vague** 60:25
**Valley** 81:25
**variability** 151:17
**variable** 89:11
**variation** 162:13 164:24 165:18 166:8 185:10 187:20
**variations** 9:9 166:14 178:22 186:11
**varied** 183:21 187:10

**varies** 51:11 88:25 89:2 89:12
**various** 35:2 39:11 79:23 80:25 90:9,20 109:23
**vary** 104:17,24 184:23
**vegetation** 164:1
**vehicle** 61:14 72:7,8,11
**version** 93:20,21 98:8,13
**versions** 93:23 98:11
**versus** 123:12,14 175:12
**vertical** 120:3,7
**vessel** 74:20,21
**vibrations** 24:12 148:20 149:2
**vicinity** 47:5
**VIDEO** 3:19
**VIDEOGRAPHER** 3:18
**videotapes** 60:16
**view** 127:8
**viewpoint** 59:16 107:2 109:17 169:15
**views** 55:21
**Villavaso** 112:5 114:8,15 114:22 115:13,19
**Villavaso's** 63:25 115:5
**violation** 23:14
**virtue** 97:14
**visit** 57:16,17,25 183:19
**visited** 57:11,16,22 95:8
**visiting** 76:24
**visits** 95:11
**vitae** 14:17 36:7 50:18
**void** 175:20
**volume** 151:3
**voodoo** 103:20
**vulnerable** 153:8

**W**

**waiting** 126:19
**waived** 5:10
**walked** 95:9
**wall** 39:12 43:5,5 61:10 61:11 70:25 74:10 84:8 88:24 91:13 93:15 94:5 97:12 98:6 113:25 116:19,22 118:22,25,25 119:2,7 120:21 121:4,5

REDA BAKEER, PH.D.                                                        9/10/2009

121:18 122:2,16,23,25
123:3,22 124:16 125:5
125:7 128:3,11,18
129:8,19 131:9 132:21
133:2 137:5,10 138:6
141:5 142:2,13 143:3
143:14 144:19,23 149:5
153:9 156:6,16 157:11
157:16,22 158:15 160:6
160:8 162:13 163:9
164:10,12,14,15,19
165:14,25 166:1,14
167:16,20,22 168:6,8
169:1,14 172:23 174:25
177:4 178:9,17 183:20
183:21,24 184:2,3,5,14
184:19 187:10,18,24
188:2 190:23 191:4,5
191:15,17,18
**walls** 37:4,5 39:25 40:5,6
44:24 45:8 49:1 81:19
81:20 91:13,20,21
93:19 123:6,10,18
129:4 135:20 136:2
139:9,11 140:2 177:18
177:22 178:24 179:1,20
180:20 181:11,12
185:20
**want** 16:1 17:8 22:21
35:22,25 36:12 42:6
47:10 50:7 70:5 74:7
96:6 101:8,10 116:4
127:24 128:1 140:16
176:1
**wanted** 53:9 60:1 90:15
**ward** 128:17 134:4
161:25
**Washington** 2:21 147:23
148:6 156:12
**wasn't** 19:12 45:1 58:24
62:23 66:21 78:3
102:23,23 109:11,17
170:21 174:5
**water** 24:23 64:3 75:17
75:23 87:14,18 88:7
102:13,16,18 103:4,7

104:17,20 110:25 112:4
112:19 120:2 122:20,24
123:20,24 124:1,2,4,5,6
124:7 125:4 133:4,21
143:16 148:11,21,25
159:14 160:8,12 175:19
176:8,9 177:11 179:11
179:19 180:9,12,19
182:21 184:14,18
191:14,16
**waters** 104:21
**wave** 144:8 162:16
**waves** 143:20
**way** 33:1 48:7 54:15
56:11 58:22 68:6 71:18
101:23 115:23 122:9
126:11 144:3 149:14
153:3 154:1 155:13
156:5 165:11 177:8
184:8 187:7 194:15
**ways** 51:10
**weak** 114:4 155:20
**weather** 76:7
**WEBB** 3:8,9 189:21
**webcast** 80:22
**website** 79:13,18 80:19
**weigh** 110:6
**weight** 147:18 152:14,17
176:2 190:5
**welcome** 36:2
**weld** 190:21
**welding** 191:2
**went** 11:11 31:2 70:6
71:20,24 72:1 147:2
153:11
**west** 43:23 45:14
**wet** 46:2
**we'll** 11:25 17:7,12
190:12
**we're** 36:7 39:2 57:24
90:24 92:10 116:15
139:21 150:21
**we've** 98:20 181:23
**WGI** 157:14,24
**whatsoever** 74:18,21
75:21

**white** 15:16
**whites** 17:5
**wide** 124:8 143:12
**width** 139:15 140:6
141:19 142:12 153:23
154:3,4
**Wiedemann** 2:3,3,4 4:5
6:6,8 15:11,21 16:3,6
16:16 17:3,11,19 33:24
35:16,21 36:3,5 38:25
48:12,17 50:2 61:2
73:14 74:14 92:18
104:12 105:4,15 106:4
106:8,14 108:5 109:2,7
110:15 112:16 113:14
117:25 118:8 120:13,23
127:2,4,6 130:23
132:17 135:2,16 137:15
139:23 141:2,16 142:22
143:6 145:24 155:23
157:1 168:12 171:21
172:1,16 175:1,8
179:16 189:18 190:1,18
192:6
**WILKINSON** 1:11
**Williams** 64:25
**wind** 76:9 117:5 143:11
143:20 144:8,15 169:18
169:18
**window** 103:11
**withstand** 158:17
**witness** 5:4,25 6:3 11:2
17:1 20:12 35:2 62:17
62:19 65:3 110:2
116:10 130:20 137:20
138:3 189:23 192:9
193:1 194:5
**witnesses** 20:3 63:1,4,6
63:12 99:12
**wondering** 135:5
**word** 13:15 47:10 69:17
89:10 93:18 99:7
129:25 147:12 154:17
158:1,20 186:17
**words** 29:7 111:2 114:2
114:4,6 115:2,4,24,25

123:21 145:18 152:16
160:7 161:2 179:4
**work** 18:12 19:14 23:2,2
27:11 28:9 31:9 35:11
35:12 44:2 46:22 48:4
49:17,22 51:3 53:8
54:11 69:7,14 75:6
78:15,21 98:9 100:4
133:17 148:19 153:7
154:22 157:14
**worked** 19:8 22:23 34:15
47:22 49:6 51:4
**workers** 148:23
**working** 18:3 20:14
23:16 30:22 45:18
**works** 39:3 69:6
**workshops** 79:3
**world** 150:13
**worse** 140:15 158:3
**worth** 84:15
**wouldn't** 68:18 103:19
103:19 107:1 134:5
142:24 171:13 172:18
**write** 35:8,8 50:25 51:12
**writes** 20:25 24:1
**writing** 54:9 84:13
**written** 12:4 13:25 20:6
21:9 100:18 188:16
**wrong** 106:24,25
**wrote** 20:16 21:13 78:4,6
82:21 191:13

---
**X**

**x** 4:1,1,6,6 142:11,12
143:12
**XY** 101:17 102:18

---
**Y**

**yeah** 9:25 15:1 19:21
54:20 79:22 86:2 90:18
92:8,12 119:23 126:23
136:20,21 150:24
153:18 167:2 184:25
185:11,12 189:7
**year** 8:14 10:17 30:25
31:6,6 35:8 41:21 42:5
**years** 30:12 31:25 34:15

REDA BAKEER, PH.D.                                                    9/10/2009

51:5 83:1,1,2,11 131:2
186:25
**yielded** 52:24
**York** 2:20

**Z**

**zero** 87:14,20,21,22

**$**

**$125,000** 55:2
**$175** 54:14 55:3

**#**

**#75005** 1:25 194:25

**0**

**0** 165:11
**03** 44:18
**04** 44:18 89:24
**04-65** 89:23
**05** 57:2,19 58:19 61:19
62:12 65:13,13 166:15
**05-4182** 1:5
**05-5531** 1:8
**05-5724** 1:9
**06** 45:17 87:4,5 93:22
95:14
**06-5342** 1:10
**06-6299** 1:11
**06-7516** 1:12
**07** 18:23,25 19:5,10
34:22,24 54:6 55:10
56:10,23 58:15 72:25
83:13 85:8 87:6 95:14
**07-3500** 1:13
**07-5178** 1:14
**07/08** 85:7
**08** 18:6 85:4,4,8 87:7
**09** 20:9,10

**1**

**1** 4:9 12:8 13:23 14:1,2,5
24:8,9 36:10,13,17
145:18 159:13 160:5
180:13,13
**1:3** 94:15,19
**10th** 1:20 193:25

**100** 143:22 165:9
**1000** 188:18
**102** 11:17
**11** 191:17
**11-1/2** 159:15 160:8
**11.5** 183:3
**1100** 1:19 3:4
**12** 119:5,14 168:7 173:22
173:23
**12,500** 191:18
**12-1/2** 185:5
**12.5** 183:2 187:11
**13** 81:16 83:20 168:1,7,7
183:1,2 187:11
**14** 4:9,10,11,12,13 81:23
82:12 166:4 167:5,18
185:3,4
**15** 4:14 160:13,21 166:17
167:4 168:2,6,8,9
187:11,19
**15-1/2** 188:1
**15.5** 187:12,20
**16** 168:9
**160** 133:4
**17** 161:5,10
**17MSL** 191:23
**17th** 49:1 60:7 72:5
85:16,18 86:23 91:14
91:20,25 92:1,6 94:5,9
94:12,25 95:7,12,16
103:24 104:4 123:6,19
130:3 178:25 179:18
180:19 186:24 188:18
188:20
**18** 160:21,23 161:5 182:1
182:2 183:23 191:14
**19** 92:3
**1966** 85:13 86:22 91:5
171:15
**1974** 31:17,17
**1976** 31:14
**1979** 31:15
**1982** 30:14
**1985** 31:20 34:21
**1988** 11:1
**1996** 28:25 34:18

**2**

**2** 4:10 14:4,6,7 15:15
24:11 37:3 83:20
145:19 168:7 187:20
**2-1/2** 187:20
**2.5** 191:16
**20** 92:3 173:22,23
**200** 142:11,12
**200-foot** 143:12
**2000** 8:15 163:18,19
164:9 188:18
**20001** 2:21
**2001** 8:15 10:17 24:22
**2004** 44:17
**2004.65** 89:24 90:6
**2005** 71:25 72:18
**2007** 84:22
**2008** 18:3
**2009** 1:20 193:25
**202-346-4000** 2:22
**23-foot** 92:2
**2300** 1:18 3:3
**25** 161:15 190:7
**26** 175:9 190:7
**27** 157:8 177:13
**2715** 3:10
**28** 157:8
**29** 87:16,16 88:9,14,20
89:6,16 157:8 162:19
162:20
**29th** 117:21 132:20

**3**

**3** 4:11 14:9,11 25:14 37:4
85:4 145:19,22 146:4
**3.2** 84:1,1,5
**32** 129:18
**33** 110:16
**35** 142:12,12 159:7,7
187:5
**35-foot** 143:12
**36** 88:21
**38** 188:5
**39** 189:5,8

**4**

**4** 4:12 14:14,15 16:1

44:12,13 136:13 146:1
146:2 147:3
**4W** 43:21 44:8,12,14
45:1 49:7,16
**4,200** 185:15 186:10
**4.0** 145:1
**40** 188:25 189:6
**41** 189:16 190:16
**46** 111:18 127:3,7,11,12
**4624** 6:2
**4727** 73:1 136:23 141:12
143:13 145:2,6

**5**

**5** 4:13 14:18,19 39:19
**5:00** 102:1
**5:05** 103:13
**50** 113:8 126:22,23
**500** 152:6 188:17
**500-foot** 151:20 152:4
**504-581-6180** 2:7
**504-585-7000** 3:6
**504-598-2715** 3:12
**504-885-7700** 2:13
**510** 61:8
**54** 36:6,20
**55** 39:2,6
**56** 39:9,10,14
**57** 39:14
**58** 39:18,24
**59** 40:1,3,7,11 191:6

**6**

**6** 4:5,14 14:21 15:1,2
37:15,16 40:6 95:23,25
**6:00** 102:1,6 114:17
**6:15** 182:19,24,25 183:9
**6:30** 182:24
**6:45** 103:13
**60** 40:15 127:25 165:8
**60+00** 165:8,10
**61** 40:22 128:2 145:1
**62** 41:8
**63** 41:9 165:1,3 183:19
184:22 189:4,7 190:8
**65** 66:9,10,11
**650** 3:10

REDA BAKEER, PH.D.

**66** 85:14 136:18 137:23
  139:21,24
**67** 140:18,22
**68** 85:14
**69-page** 12:3 13:23

---
**7**
---

**7** 39:7 41:6
**7:00** 102:6
**70003** 6:2
**70113** 2:6,12
**70130** 3:11
**70163-2300** 1:20 3:5
**72** 137:23 139:21 140:24
**73** 10:19 11:1 23:5 24:8
  24:10,13
**74** 10:19,20,21 11:16
  23:9,11 24:15
**75** 23:6
**76** 12:8,11 14:6 65:20
  66:2

---
**8**
---

**8** 39:8 160:7,14 173:11
  173:12,20,23,23 174:1
**800** 152:8
**812** 166:11
**812-foot** 183:23 185:17
**821** 2:5,11
**83** 36:13,17
**85** 31:19 34:23
**86** 98:13
**88** 89:21,24,24

---
**9**
---

**901** 2:20
**911** 64:5
**96** 28:25