# EXHIBIT 30

Deposition of Robert Bartlett

1

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF LOUISIANA

3

4   IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION

5                                  * NO. 05-4182

6   PERTAINS TO: BARGES            * Consolidated

7                                  * SECTION "K(2)"

8   Boutte v. Lafarge      05-5531 *

9   Mumford v. Ingram      05-5724 * JUDGE DUVAL

10  Lagarde v. Lafarge     06-5342 *

11  Perry v. Ingram        06-6299 * MAG. WILKINSON

12  Benoit v. Lafarge      06-7516 *

13  Parfait Family v. USA  07-3500 *

14  Lafarge v. USA         07-5178 *

15    *  *  *  *  *  *  *  *  *  *  *

16

17         Deposition of ROBERT D. BARTLETT,

18  P.E., given at Chaffe McCall, LLP, 2300 Energy

19  Centre, 1100 Poydras Street, New Orleans,

20  Louisiana 70163-2300, on July 21st, 2009.

21

22

23  REPORTER BY:

24          JOSEPH A. FAIRBANKS, JR., CCR, RPR

25          CERTIFIED COURT REPORTER #75005

2

APPEARANCES:
REPRESENTING THE BARGE PSLC:
    BRIAN A. GILBERT, P.L.C.
    (BY:  BRIAN A. GILBERT, ESQUIRE)
    821 Baronne Street
    New Orleans, Louisiana 70113
    504-885-7700

REPRESENTING LAFARGE NORTH AMERICA:
    CHAFFE, MCCALL, L.L.P.
    (BY:  DEREK WALKER, ESQUIRE)
    2300 ENERGY CENTRE
    1100 Poydras Street.
    New Orleans, Louisiana 70163-2300
    504-585-7000

REPRESENTING AMERICAN CLUB:
    MONTGOMERY, BARNETT, BROWN, READ,
    HAMMOND & MINTZ, L.L.P.
    (BY:  RONALD J. KITTO, ESQUIRE)
    3200 Energy Centre
    1100 Poydras Street
    New Orleans, Louisiana 70163
    504-585-3200
VIDEOGRAPHER: LORRI HART FABRE (HART VIDEO)

3

E X A M I N A T I O N   I N D E X

EXAMINATION BY:           PAGE

MR. WALKER  ...............................5

E X H I B I T   I N D E X

EXHIBIT NO.           PAGE
Exhibit 1  .................................40
Exhibit 1A  ................................56
Exhibit 1B and 1C ..........................78
Exhibit 1D  ................................78
Exhibit 3  .................................95
Exhibit 4  .................................95
Exhibit 2  ................................101

4

S T I P U L A T I O N
    IT IS STIPULATED AND AGREED by and
among counsel for the parties hereto that the
deposition of the aforementioned witness may be
taken for all purposes permitted within the
Louisiana Code of Civil Procedure, in
accordance with law, pursuant to notice;
    That the formalities of reading,
signing, filing, sealing and certification are
hereby specifically waived;
    That all objections, save those as to
the form of the question and the responsiveness
of the answer, are reserved until such time as
this deposition, or any part thereof, is used
or sought to be used in evidence.

* * *

    JOSEPH A. FAIRBANKS, JR., CCR, RPR,
Certified Court Reporter in and for the State
of Louisiana, officiated in administering the
oath to the witness.

5

    ROBERT D. BARTLETT, P.E.
2617 Edenborn Avenue, Suite D, Metairie,
Louisiana 70002, a witness named in the above
stipulation, having been previously sworn and
reminded of his oath, was examined and
testified on his oath as follows:
EXAMINATION BY MR. WALKER:
    Q.  Good afternoon, Mr. Bartlett.
    A.  Good afternoon.
    Q.  You've gone through a deposition
numerous times before, haven't you?
    A.  Yes.
    Q.  Just for the record I'd like to review
some of the standard rules.  You're not under
the influence of any drug, alcohol or any
prescription medicine that would impair your
ability to understand my questions or give me
answers to my questions?
    A.  No.
    Q.  Have you met with anybody prior to
today 's deposition to prepare for it?
    A.  Just Mr. Gilbert for a few moments.
    Q.  Today?
    A.  We didn't prepare, we just visited
today.  Friday, I believe it was, we met at my

6

1  office.
2      Q.   Is that the first time you met with
3  Mr. Gilbert face to face?
4      A.   It may have been.
5      Q.   And the purpose of Friday 's meeting
6  was to prepare for this deposition?
7      A.   Um -- to talk about the report in
8  general.
9      Q.   Had you submitted any drafts of the
10 report to Mr. Gilbert prior to issuing your
11 final reports of 2008 and 2009?
12     A.   I don't recall.  Probably.
13         MR. GILBERT:
14             Objection.  Drafts aren't
15         discoverable, and I don't know that
16         any questions about it are.
17 EXAMINATION BY MR. WALKER:
18     Q.   But you never met with him to discuss
19 those drafts?
20     A.   That's correct.
21     Q.   Did you meet with anybody else on what
22 I'll call the plaintiff's team other than
23 Mr. Gilbert, such as Mr. Wiedemann,
24 Mr. Pollard, Mr. Khorrami, anybody else?
25     A.   Yes.

7

1      Q.   Who did you meet with?
2      A.   Mr. Wiedemann.
3      Q.   Was that the same time as these
4  meetings with Mr. Gilbert or a separate time?
5      A.   That was probably over a year ago.
6      Q.   Is it fair to say that was the initial
7  meeting that you had on this case?
8      A.   Probably, yes.
9      Q.   And what was the purpose of that
10 meeting?
11     A.   Just to discuss the scope of what work
12 we might do.
13     Q.   And what was the scope as you
14 understood it?
15     A.   That on the south breach of the
16 floodwall on the Inner Harbor Navigational
17 Canal there were some rebars that had been
18 bent, and so the question was what if any
19 significance could we glean from our
20 observation of those rebars?
21     Q.   Okay.  And that was it; that was
22 extent of your instruction, so to speak?
23     A.   I believe so.
24     Q.   Did it expand from that at any time?
25     A.   A little bit, as we thought that there

8

1  was, um -- information that was related to that
2  in some way.
3      Q.   All right.  So I'm clear, it was
4  related to the southern breach and the rebars.
5  Correct?
6      A.   Well, I think it had to do with
7  anything that we could learn from the -- from
8  the floodwall.  I don't remember the
9  conversation exactly.  It was what started the
10 report.  So we were asked to look at any
11 evidence that we, um -- anything that would
12 have documented the physical evidence in this
13 case with regards to the floodwall and give him
14 any interpretation that was possible from that
15 evidence.
16     Q.   Did you understand that Mr. Wiedemann
17 represented plaintiffs suing Ingram and/or
18 Lafarge and/or companies related to the barge?
19     A.   I think I would have understood that
20 that was one of the parties involved.
21     Q.   So in the midst of what you're
22 describing to me your task was, was it to
23 determine whether or not in your opinion the
24 barge had something to do with the rebar and/or
25 the floodwall?

9

1      A.   Well, I don't know that I would use
2  that terminology.  I mean, the description that
3  I gave earlier is about as much as I can recall
4  from the conversation.  Um -- the comments at
5  the meeting, that meeting, was less to do with
6  guidance and direction and scope as opposed to
7  just generally here's the floodwall in the
8  Inner Harbor Navigation Canal, is there
9  anything that you can tell us from the
10 evidence -- from the photographs of the
11 evidence that we have?
12     Q.   Now, your report is dated June 27th,
13 2008.  Does that give you a frame of reference
14 of when this meeting was?
15     A.   I would have thought that it would
16 have been a few months before that.
17     Q.   And is that when you were hired?
18     A.   Um -- I would say that's about the
19 time, yes.
20     Q.   Okay.  Go ahead.  Sorry.
21         Do you need to take a break or
22 something?
23     A.   No.
24     Q.   So a few months before would have been
25 early 2008, late 2007.

10

1    A.   Possibly.
2    Q.   Well, between August 29, 2005, when
3  the hurricane hit and sometime in early 2008,
4  did you have any involvement with any
5  consulting, any investigation, any opinion or
6  anything having to do with Hurricane Katrina in
7  a professional sense?
8    A.   Well, um -- I think I understand what
9  you might be getting at.  We had started
10  working with Mr. O'Dwyer who, because of his
11  involvement in the case, Mr. Pazos and I wound
12  up visiting both the barge in place in the
13  Ninth Ward and also after the barge pieces were
14  salvaged and put on display in that warehouse
15  off of the Industrial Canal.
16    Q.   Okay.  So if we start from the other
17  end, then, post-hurricane at some point you
18  were hired by Mr. O'Dwyer?
19    A.   Correct.
20    Q.   Okay.  What were his instructions when
21  you were hired by him?
22    A.   I don't remember any specific
23  instructions.  We were trying to gain any
24  information we could, and information was
25  being, as you may recall, destroyed or changed

11

1  rapidly in the haste of putting things back
2  together, so we were trying to document and
3  record as much as we could.
4    Q.   When you say we, who are you referring
5  to?
6    A.   Mr. O'Dwyer and the people that I work
7  with.
8    Q.   Does we include Mr. Pazos?
9    A.   Mr. Pazos I know was working for
10  Mr. O'Dwyer.  Yes.
11    Q.   Were you hired before or after Rita?
12    A.   After.
13    Q.   So is it accurate that you never went
14  out to the Ninth Ward and specifically to the
15  barge prior to Rita?
16    A.   That's correct.
17    Q.   How soon after Rita do you recall
18  personally visiting the barge?
19    A.   Um -- I would say it was several
20  months.
21    Q.   And did you go alone or with Mr. Pazos
22  or Mr. O'Dwyer?
23    A.   I think I went with somebody from my
24  office.
25    Q.   Did you ever go to the Ninth Ward and

12

to the barge with Mr. Pazos?
    A.   I don't believe I was at the barge
with Mr. Pazos until it was salvaged.  So we
met -- I don't have the date in front of me,
and I don't have it in my report, the date when
the barge was, um -- raised on the rubber
bladders, air bladders.  So it was about that
time or a few months before that.  My
involvement with Mr. O'Dwyer immediately prior
to that was coming up with a salvage method so
that the barge didn't have to be, um -- cut up
into a million pieces.
    Q.   Drawn and quartered.
    A.   So to speak.
    Q.   Did you come up with such a plan?
    A.   My recollection was yes, we found a
barge salvage company and tried to connect them
with the owner of the barge to give them an
option other than to just merely scrap the
barge.
         That was not the method that was used,
by the way.  They later called in the people
with the rubber bladders and rolled the barge.
    Q.   Okay.  I'd like to discuss a little
bit your education and professional

13

qualifications.  Remind me what university you
attended.
    A.   I have a bachelor of science in
mechanical engineering from Tulane University,
1979.  I have a master's of science in
metallurgical engineering from Ohio State
University, 1981.
    Q.   Do you have any other degrees of any
type?
    A.   No.
    Q.   Have you published any professional
works or studies?
    A.   None that would relate to this stuff.
A thesis is technically considered a
publication, but it's not relevant to this.
    Q.   So no peer reviewed publications with
respect to metallurgy?
    A.   That's correct.
    Q.   According to your report and your
qualifications area of it, career summaries, et
cetera, it says that your area of expertise is
analysis in fracture mechanics?
    A.   That's one of our areas of expertise,
yes.
    Q.   Well, why don't you tell me, what do

14

1   you consider your area?  And it's you who's
2   going to be testifying, not your company, so
3   what specifically do you represent yourself to
4   be an expert in?
5        A.   Well, if you have our profile in front
6   of you, there are multiple areas that have to
7   do with -- starting with stress analysis and
8   things like corrosion, mechanical equipment and
9   welding.
10       Q.   All right.  Well, let's look at that.
11  It says professional memberships: American
12  Society of Mechanical Engineers.  Right?
13       A.   Yes.
14       Q.   ASM International?
15       A.   Yes.
16       Q.   That stands for what?
17       A.   Well, used to stand for American
18  Society of Metals.
19       Q.   Okay.  American Welding Society?
20       A.   Yes.
21       Q.   And National Association of Corrosion
22  Engineers.
23       A.   Correct.
24       Q.   Those are the organizations that you
25  belong to.

16

1        A.   There are elements of a floodwall --
2   it's a brittle material, concrete, that is
3   reinforced with steel.
4        Q.   So what elements of it are encompassed
5   by a mechanical engineer?
6        A.   Well, we didn't look at the -- we
7   didn't take into consideration, for example,
8   the strength of the concrete.  In evaluating
9   the strength of the wall, we purely looked at
10  the strength of metallic rebar.  And in our
11  conclusion that the deformation of the rebar
12  couldn't have been due to hydrostatic force, it
13  had to have been due to another force.
14       Q.   So is it fair to say that the
15  application of your education and expertise in
16  this case pertains to the metal rebar and how
17  it was deflected or bent?
18       A.   Yes.
19       Q.   Okay.
20       A.   That certainly is -- that certainly is
21  the basis for a lot of our conclusions.  There
22  may be other conclusions that rely on other
23  interpretations.
24       Q.   Well, are there any other areas of
25  expertise that you believe that you will be

15

1        A.   Yes.
2        Q.   And they all pertain to metal,
3   metallurgy --
4        A.   Yes.
5        Q.   -- or mechanical engineering, right?
6        A.   Correct.
7        Q.   What does the field of mechanical
8   engineering encompass?  And you can give me a
9   broad --
10       A.   The design of, um -- design of
11  equipment, design of components that are
12  mechanical, or stress analysis, the, um --
13  failure analysis, which is one of the things
14  that we do a lot of.  It would be one of the
15  areas of mechanical engineering.
16       Q.   Failure analysis of metals?
17       A.   Failure analysis of components that
18  require stress analysis, for example.
19       Q.   Such as what?
20       A.   Well, machinery or, um -- components,
21  any material that a mechanical engineer may
22  use.
23       Q.   Well, is a wall a component of the
24  type that a mechanical engineer would be
25  qualified to make a determination on?

17

1   offered in at the trail of this matter, other
2   than mechanical engineering and metallurgy?
3        A.   No.
4        Q.   Is there any other area in your report
5   other than the rebar that you're going to offer
6   an opinion on that you qualify for as a
7   mechanical engineer or metallurgist?
8        A.   Well, I mean, you have our conclusions
9   in front of you.
10       Q.   I do.
11       A.   So the conclusions are the areas or
12  those items upon which we will -- or for which
13  we will offer opinion.
14       Q.   So is a mechanical engineer qualified
15  to speak to hydrostatic pressure?
16       A.   Yes.
17            (Off the record.)
18  EXAMINATION BY MR. WALKER:
19       Q.   How so, could you explain that to me?
20       A.   Fluid mechanics is an area of
21  mechanical engineering.
22       Q.   Fluid mechanics.
23       A.   Yes.
24       Q.   And that has to do with the movement
25  and effects of liquids?

18

1    A.  It can.  It involves any behavior or
2  property, pressures, momentum, having to do
3  with liquids.  So mechanical engineers handle
4  fluid mechanics issues.
5    Q.  How about did you conduct any tests,
6  any studies with respect to impact or contact?
7    A.  No.  Other than the, um -- spacing,
8  for example spacing of rebar.  So our studies
9  would have been related to the rebar, rebar
10  spacing, the scratches on the hull.  But
11  sometimes when people say studies I think they
12  mean physical testing.
13    Q.  Well, do you have an opinion or a
14  conclusion in your report based on your
15  inspections and the information you reviewed as
16  to whether or not the barge 4727 contacted the
17  floodwall?
18    A.  Only to the extent that we report them
19  in our conclusions.  And, um --
20    Q.  Well, I'm not clear about the tie in
21  of your conclusions to the body of your report.
22  That's why I asked, other than the fact that
23  you conclude that the barge went over the
24  floodwall at some point based on the
25  consistency or uniformity of the rebar

19

1  scratches on the underside of the barge as they
2  relate to the remnants of the rebar --
3    A.  Yep.
4    Q.  -- do you have any other opinion
5  regarding the barge and any contact with any
6  portion of the floodwall?
7    A.  Yes.  We have a discussion where we
8  comment on the -- where we quantify the forces
9  and the loads required to fold a rebar to a
10  tight radius, which would be called a plastic
11  hinge, and the forces that are available from
12  hydrostatic pressure to do that, and whether
13  they are sufficient, um -- and as compared to
14  the forces required to do that, to fold over a
15  bar.  So that was -- the basis of one of our
16  conclusions, is that the force necessary to
17  fold a rebar over, very simply, is too much for
18  hydrostatic pressure.  With the spacing --
19  proper spacing of the scratches on the bottom
20  of the barge, it would indicate that the rebars
21  were folded over by the barge.
22    Q.  Right.  In other words, the water
23  didn't push the rebars over, the barge did.
24    A.  That's number one, and number two is
25  that the water didn't -- the force of the water

20

on the floodwall, on the top three feet of the
floodwall, was not enough to fold the bars
over.
   Q.  Okay.  And what is a stress analysis
and fracture mechanics?
   A.  Are you looking at my profile?
   Q.  Yes.
   A.  Well, stress analysis would be the
field that allowed us to do plastic hinge
calculations as we just talked about.  What is
the force required to fold a bar over until it
starts to bend plastically.
          Fracture mechanics has to do with once
a crack begins.
   Q.  Once a crack begins, what happens to
the crack --
   A.  How it grows --
   Q.  -- and the structure?
   A.  How it gross with each cycle, how much
load is required to cause it to grow, um -- to
completion, until final failure of the object.
   Q.  Now, how do you normally evaluate
stresses leading to failure?
   A.  Could you be more specific?  The
rebar, for example?

21

   Q.  Well, I'm reading out of your own
report.  You talk about you normally evaluate
stresses leading to failure, and I'm asking you
how you do that.
   A.  Well, if it were a cyclical stress,
for example, we would -- we would calculate the
number of load cycles required to cause a
fracture to propagate a certain distance, or a
distance enough that what's left -- that the
metal that's left is small enough that the
residual load is able to cause final fracture.
So that would be a classic case of a fatigue
fracture.
   Q.  Did you make any such calculations or
studies or analyses in this case?
   A.  No.  There was no -- there were no
fractures that we investigated here.  This was
just bending of the bar.
   Q.  And when we speak of fractures, you're
speaking of fractures on metal components?
   A.  Yes.  That's correct.
   Q.  So the cracks that we as laypeople can
see in photographs of the floodwall, for
instance, that's not something that you
analyzed or studied in this case.

22

1    A.   Only to the extent that it's -- as a
2  brittle material we understand that the brittle
3  material will fail on certain fracture plains.
4  It has a certain angle to the fracture.  So,
5  for example, looking at the floodwall in the
6  south end of the south breach, Figure 5 --
7    Q.   Figure 5 to your attachments to your
8  report, right?
9    A.   Correct.  There is -- just below the
10 arrow there's -- at that point on the floodwall
11 there's a fracture surface that is at a
12 45 degree angle, roughly, to the face of the
13 floodwall.  And that angle is consistent with
14 what we would expect from the fracture of a
15 brittle material.
16    Q.   So what you found there is nothing
17 more remarkable than the normal fracture and
18 fracture planes of concrete.
19    A.   Correct.
20    Q.   You didn't reach any conclusion
21 regarding how those fractures occurred.
22    A.   Well, except that if the wall were --
23 if that crack occurred because the wall were
24 pulled, I would expect the fracture plane to be
25 perpendicular to the face, to the protected

23

1  side face of the floodwall.  So the fact that
2  the fracture is at a 45-degree angle to the
3  face of the floodwall would indicate that the
4  force was perpendicular to the face.
5    Q.   So again, giving it an layperson's
6  perspective, the forces that you believe were a
7  applied to cause the horizontal fracture at a
8  45-degree angle were forces that were coming
9  from the canal toward the land side.
10    A.   Correct.
11    Q.   And what that force was you don't have
12 an opinion on.
13    A.   That's correct.
14    Q.   And I take it you didn't use any
15 computer models in this case to reach any of
16 your conclusions.
17    A.   Probably not in the sense that you're
18 thinking about.  Just spreadsheet type programs
19 the help us do some of the mathematical
20 calculations.
21    Q.   Did you use any finite element
22 analysis?
23    A.   No.
24    Q.   When would you use that?
25    A.   If the shape of the object that we

24

1  were trying to evaluate was so complicated that
2  equations didn't exist for that object.
3    Q.   Did you use any string gauges or load
4  cells or dynamics data acquisition equipment?
5    A.   No.
6    Q.   Have you used those in the past to
7  determine the cause of failure?
8    A.   Yes.
9    Q.   And you didn't feel those were
10 required in this case to determine the cause of
11 failure.
12    A.   Well, it's not so much that, it's that
13 those pieces of equipment are used when we can
14 instrument a exemplar piece of equipment to
15 learn about how it is -- how it's loaded, and
16 how it experiences stress based on loads, or
17 to, um -- to note which type of loads occur,
18 um -- as the equipment is used.
19    Q.   Well, I think you earlier said that,
20 as a for instance, the hydrostatic pressure did
21 not cause the bending of the rebars.
22    A.   Correct.
23    Q.   You concluded that primarily, if I
24 understand your report correctly, based on a
25 visual observation of the underside of the

25

1  barge, the spacing of those scratches and the
2  spacing of the rebar in place, so you conducted
3  no further study of the hydrostatic loads or
4  pressures that could have been exerted by the
5  waters in the Industrial Canal against that
6  rebar.
7    A.   No, I don't think that's correct.  On
8  the bottom of Page 5 and the top of Page 6,
9  that's where we do our calculations where we,
10 um -- where we estimate the forces required to
11 bend the rebar.  So it wasn't just -- I'm sorry
12 if it appears that way, but it wasn't just an
13 eyeball estimate.
14    Q.   I'm sorry.  Where did you say that
15 was?
16    A.   We're on the bottom of Page 5, the top
17 of Page 6.
18    Q.   Okay.
19    A.   This is a discussion that has to do
20 with the calculation of the forces necessary to
21 cause the plastic deformation of the --
22    Q.   Our pages aren't the same, but if you
23 tell me -- I thought it was somewhere else that
24 I read it.  So it's in your discussion
25 portion --

7 (Pages 22 to 25)

26

1   A.  If you want to follow along, I have a
2   spare.  (Tendering.)
3   Q.  I've got it.  So it's the --
4   A.  In the discussion --
5   Q.  -- middle portion of your discussion.
6   A.  Right.  It starts with the second
7   paragraph of the discussion section.
8   Q.  "In order to determine the loads?"
9   A.  Correct.
10  Q.  Okay.  All right.  And basically, what
11  this analysis concludes is that, as we stated
12  earlier, the barge bent the rebar and not the
13  water pressure.
14  A.  Correct.
15  Q.  And we're not talking about exposed
16  rebar, we're talking about a three-foot
17  concrete cap in which the rebar was located?
18  A.  Correct.  So our point there is that
19  the force necessary to bend the rebar is
20  greater than the force of a bare rebar, because
21  there's concrete there.  And so the concrete
22  provides some stability, some support for the
23  rebar.  So our numbers of the force required to
24  bend the rebar are smaller than loads that were
25  exerted on the rebar because the load had to

27

1   break the concrete.  So these are low end
2   estimates which prove that the water force was
3   not enough to cause this damage.
4   Q.  The damage being the bending of the
5   rebars.
6   A.  Thank you.  Yes.  The folding over of
7   the rebars to a tight radius.
8   Q.  I think I know your answer, but the
9   rebar was exposed at the time that the barge
10  went over it for the scratches to have appeared
11  on the underside of the barge.
12  A.  Correct.
13  Q.  Do you know how the concrete cap -- or
14  do you have an opinion as to how the concrete
15  cap was caused to be missing or was not in
16  place?
17  A.  That really is the area that's dealt
18  with by the other experts that I'm working
19  with.
20  Q.  Okay.  And do you understand their
21  conclusions in that regard, or have those been
22  shared with you?
23  A.  A little bit.  I've looked over their
24  reports, um -- briefly.
25  Q.  And what do you understand their

28

1   opinions and conclusions are regarding that
2   three-foot cap?
3   A.  I believe Mr., um -- Mr. Malino.
4   MR. GILBERT:
5       Marino.
6   THE WITNESS:
7       Marino.  Thank you.
8   A.  Mr. Marino talks about the bars being
9   bent toward the protected side of the
10  floodwall.
11  EXAMINATION BY MR. WALKER:
12  Q.  You said the barge.  Is that what you
13  meant?
14  A.  I'm sorry.  The rebars being folded
15  toward the protected side of the floodwall.
16      In another part of his report there
17  was something else about the barge floating up
18  on top of the, um -- floodwall or pushing
19  southward on the floodwall.  And I don't recall
20  what Mr. Pazos said about that.
21  Q.  Did you see -- you went out on several
22  occasions and personally inspected the
23  floodwall; right?
24  A.  Um -- I don't believe we did.
25  Q.  Okay.  You never personally inspected

29

1   the floodwall.  Your conclusions are based on
2   the photographs.  Is that correct?
3   A.  I think that -- I'm pretty sue that's
4   correct.  I think that we were not -- were not
5   allowed to access the floodwall at the time
6   that we were looking at the barge.  We were not
7   interested in the floodwall.  We were working
8   with Mr. O'Dwyer at the time and our direction
9   was not to look at that.  So at the time we
10  became involved with this case through
11  Mr. Wiedemann and through Mr. Gilbert, at that
12  point we had only photographs to rely on.
13  Q.  And you never took it upon yourself or
14  felt it was necessary to do a personal
15  inspection.
16  A.  Well, like I'm saying, at the time it
17  wasn't available to us.
18  Q.  Well, now we're -- was it not
19  available to you at any subsequent point in
20  time?
21  A.  At the time that I think we started to
22  talk to Mr. Wiedemann, that this floodwall had
23  been demolished and was in the process of being
24  rebuilt.
25  Q.  Do you know the weight of the barge in

30

1  a light condition?
2      A.  Um -- I don't have that number off the
3  top of my head.
4      Q.  Do you know the dimensions of the
5  barge?
6      A.  It's, um -- roughly 35 x 200.  It
7  draws about a foot and a half.  So we can
8  calculate the weight quickly if we wanted.
9      Q.  As you stated earlier, Mr. Marino and
10  others have the opinion that the barge at some
11  point in time, due to some force or mechanism
12  or other, actually rested on the concrete cap
13  and hinged on it, if you will.
14      A.  (Nods affirmatively.)
15      Q.  Did you find any evidence --
16  photographic evidence of that mechanism?
17      A.  We didn't look for that.  So we didn't
18  evaluate the evidence for that information.
19      Q.  Well, in reviewing the photographs and
20  information that you did inspect, and you have
21  a list of many, did see any evidence consistent
22  with a 200 x 35-foot barge resting on top of
23  the floodwall?
24      MR. GILBERT:
25          Let me object.  This examination

31

1          goes beyond the scope of his report.
2      A.  I would have to say that that's an
3  area that would require an area of, um -- of
4  engineering that is, um -- would require an
5  understanding of soils and foundations of the
6  floodwall, so that -- and we hadn't reviewed
7  the evidence for that to make that kind of
8  determination.  And that clearly is the area of
9  either Mr. Pazos or Mr. Marino.
10      Q.  You have nothing to do with soil
11  mechanics?
12      A.  Correct.
13      Q.  Now, going back to your CV a second,
14  you talk about project Number 353.  It's an
15  incident of the striking of the Sunshine Bridge
16  and docks.  You recall it?
17      A.  Yes.  Is that King, LeBlanc & Bland?
18  Yes.
19      Q.  I don't remember.
20      A.  352?
21      Q.  353, unless I misspoke.
22      A.  It might have blurred on yours.
23  That's okay.  I know exactly what you're
24  talking about.
25      Q.  And that was a case of a barge

32

1  striking the pilings of the Sunshine Bridge?
2      A.  Yes.
3      Q.  Okay.  Was it one barge or more than
4  one?
5      A.  I don't know if at the time it hit the
6  Sunshine Bridge it was one or more barges.  It
7  was a, um -- it was multiple barges at the time
8  it broke away from the shore wire.
9      Q.  Was it a 200 x 35 hopper barge?
10      A.  Approximately.
11      Q.  And it broke away from upriver of the
12  Sunshine Bridge and floated down and struck the
13  pilings?
14      A.  Correct.
15      Q.  Did it strike the fenders or the
16  pilings?
17      A.  I thought that the fender was a
18  collection of pilings.  My recollection was
19  around the pier of the Sunshine Bridge is a
20  picket of pilings that are used to construct a
21  fender.
22      Q.  Were those pilings creosote or some
23  other kind of material?
24      A.  They were, um -- they were creosote
25  coated.

33

1      Q.  Okay.  Was there any concrete
2  associated with any of the damage that this
3  barge caused?
4      A.  Um -- I feel like there might have
5  been a scratch on the piling of the, um --
6  Sunshine Bridge.  But realize, our involvement
7  was the instant that the barge broke away.  So
8  we happened to make a trip out onto the river
9  at some point to look at that, um -- but it
10  wasn't my job to study that damage.
11      Q.  Do you recall if the barge was loaded
12  or empty?
13      A.  I don't recall.
14      Q.  Do you recall if it was high water,
15  which is the normal time for barges to break
16  away?
17      A.  It was definitely high water.
18      Q.  Do you recall if the river current was
19  over 5 miles an hour?
20      A.  My recollection was it was closer to 6
21  knots.
22      Q.  And as far as you can remember, there
23  was -- a scratch was the extent of damage to
24  the concrete piling.
25      A.  Correct.  Because it had to plow

34

1  through all of the wood fender first.
2      Q.   Uh-huh.  Did you provide an opinion
3  then or do you have one today regarding the
4  force or momentum which that barge required to
5  cause the damage it did to the fenderring or
6  pilings at the Sunshine Bridge?
7      A.   No, it was not an area of our study.
8      Q.   And you testified about the kevel in
9  that case, right?
10     A.   Correct.
11     Q.   So basically, metallurgical analysis
12 was really what you focused on?
13     A.   That's correct.
14     Q.   Okay.  Have you looked at the kevels
15 on the barge 4727?
16     A.   I was not able to get access to that.
17 And so I did not, no.  The answer is no.
18     Q.   You haven't seen any photographs that
19 show you the kevels on the barge?
20     A.   No.  My recollection was I asked --
21 because I remember it involved the break away
22 of a barge.  So I remember asking -- at the
23 time when I was working with Mr. O'Dwyer I
24 asked if the -- what had broken in order for
25 the barge to, um -- become adrift.  And the

35

1  recollection -- my recollection was I was told
2  that none of the kevels had failed, that it was
3  a mooring line that had parted.  But I was
4  never able to get the mooring line.
5      Q.   Would you have liked to have seen the
6  mooring line?
7      A.   Yes.
8      Q.   Would they have been helpful in your
9  analysis and study of this case?
10     A.   When I was working for Mr. O'Dwyer,
11 yes.
12     Q.   In what sense would they have assisted
13 you?
14     A.   In that we could have looked at the,
15 um -- whether they were defective or, um --
16 whether they were not defective.  And so
17 defective in size or defective in damage, um --
18 and then the form of the failure.
19     Q.   Have you provided consultation or
20 reports or testimony regarding the failure of
21 ropes or cables?
22     A.   Wire ropes, yes, and synthetic fiber
23 ropes, yes.  But not --
24     Q.   I'm sorry.  Go ahead.
25     A.   But not natural fiber ropes.

36

     Q.   Is polypropylene a synthetic fiber?
     A.   Yes.
     Q.   So you provided expertise in the past
regarding the tensile strength, the breakage or
the circumstances under which a polypropylene
rope has broken.
     A.   I don't recall if it was a
polypropylene.  It was, um -- it was a webbed
sling.  And like I say, we weren't involved
with that at all in this case, but it was a
webbed sling.
     Q.   And I think you also said --
     A.   So we did testing measuring load
required to cause failure, and then we looked
at the way that the fibers fractured based on
whether it was previously damaged or just an
overload fracture on the fiber.
          I'm sorry.  I didn't mean to interrupt
you, but I was just trying to finish that.
     Q.   It's all right.  You said also that
you had done similar studies for wire cable?
     A.   We do a lot of wire rope failure
evaluation cases.
     Q.   Okay.  Are those normally related to
fleeting, fleeting facilities and mooring of

37

vessels?
     A.   It can be.  Um -- towing, tug to barge
breakaways, um -- lifting equipment or crane
wire ropes.  You know, any place a wire rope
would be used.  Rigging, standing rigging for
example.
     Q.   Have you been involved in any prior
cases involving hurricane or heavy weather
relating to a break away?
     A.   Only the Number 352 case that you
talked about with the failed kevel.
     Q.   Have you been involved in any prior
cases involving heavy weather or hurricanes and
any kind of structural failure?
     A.   Yes.
     Q.   What case was that?
     A.   Well, it's not so much a failure, but
we do -- we routinely do design of structures,
buildings and tanks and such that have to do
with either wind load or seismic load.
     Q.   But you haven't been involved in any
litigation as a result of that, or issued any
reports for litigation.
     A.   Not that I recall.
     Q.   I was curious about Project 728.  You

**38**

1   testified or gave a deposition and the jury
2   held against you because it was Mother's Day.
3   Could you explain that to me?
4       A.   Well, yes.  It was, um -- this was the
5   Entergy case, and the expert for Mr. Martin --
6   St. Martin, his expert contradicted himself 37
7   times on the stand, um -- when Mr. Galvez
8   cross-examined him, changed his story
9   repeatedly.  At the end of the case,
10  Mr. St. Martin, the attorney for the plaintiff,
11  had -- it was clear he had no technical basis
12  for his opinion that the fire was started by
13  Entergy, but he stood in front of the jury and
14  he said, ladies and gentlemen of the jury,
15  today is Mother 's Day.  I'm asking you to do
16  right by these mothers.  And they said, well,
17  Entergy's got plenty of money, we'll just give
18  them some money.
19      Q.   So Mother 's Day trumped metallurgy or
20  whatever expertise you were providing.
21      A.   Right.  Right.
22      Q.   Have you ever testified in a case
23  involving fracture or breaking of concrete?
24      A.   Not where it was the key ingredient.
25  We've been involved in cases where there were

**39**

1   fires, so things fall over, or the concrete
2   spalls, so that there's damage to concrete.
3   But that's it.
4       Q.   Have you been involved either during
5   your university studies or subsequently in any
6   tests done on concrete?
7       A.   Only in witnessing concrete -- tests
8   of concrete cores on occasion.  And I'm trying
9   to remember what the reason was why we wanted
10  to witness the testing of the concrete cores.
11      Q.   Ropes have tensile strength.  Concrete
12  has what kind of strength?
13      A.   Compressive strength.
14      Q.   And have you ever witnessed any
15  compressive strength tests?
16      A.   Yes.
17      Q.   Until failure?
18      A.   Yes.
19      Q.   And what happens when the concrete
20  fails?
21      A.   Well, it fractures.  It, um --
22  develops diagonal fractures, and there's kind
23  of a shearing or a splitting of the cylinder.
24      Q.   Any noise associated with that?
25      A.   Yes.

**40**

Q.   What kind of noise?
A.   Kind of a boom.
Q.   And that's from pressure.
A.   It's from the release of energy and
the sudden movement of the part.
Q.   Have you ever not qualified as an
expert?
A.   No.
Q.   Have you ever had a Daubert motion
filed against you?
A.   Many.
Q.   And you've survived those filings?
A.   Yes.
Q.   Okay.  Has your testimony ever been
limited in any way?
A.   No.
Q.   All right.  Let's go to Page 1 of your
June 27, 2008 report, a copy of which I'll mark
with your deposition.  It says that you met
with Pazos and Helmer.  Could you tell me who
Helmer is?  It's the true first page, like an
introduction.
        (Exhibit 1 was marked for
identification and is attached hereto.)
A.   Mr. Helmer was a, um -- was an

**41**

engineer that was involved with this project at
one point that I remember talking to over the
telephone.  And I don't remember much more than
that.
EXAMINATION BY MR. WALKER:
Q.   Yeah.  I've read his report and I
don't see how it's germane to your opinion at
all.  Can you --
A.   I don't remember the content of his
report.
Q.   Okay.  So looking over the listing of
materials, your 1 through 13, you don't even
list his report there.  So I assume you didn't
use his report, any information gleaned from
his report or conversations with him, as a
basis for your opinions.
A.   Probably not.
Q.   You say you also met with Mr. Pazos.
How many times did you meet with him?
A.   Two or three, when he would be in
town.
Q.   When was the last time you met with
him?
A.   When we went to see the barge at the,
um -- at the warehouse where it was flipped

42

1    over.
2        Q.   So about a year and a half ago or so?
3        A.   Oh, it was more than a year and a half
4    ago.  It was --
5        Q.   Okay.
6        A.   It was probably 2007.  It might have
7    been earlier than that.
8        Q.   So at that time you hadn't written
9    your report yet.
10       A.   That's correct.
11       Q.   And do you know that he had already
12   written a report at the time?  Did he share
13   that with you?
14       A.   I know that Mr. Pazos was
15   constructing -- or he was collecting his
16   information, um -- on an ongoing basis.
17       Q.   Did he share his views with you
18   regarding any of his opinions in this case?
19       A.   We discussed at length, back and
20   forth, our opinions.  But as I sit here, I
21   don't remember what his opinions -- what they
22   were at the time that we discussed them.
23       Q.   Have you met with Mr. Marino or
24   Mr. Spinks?
25       A.   No.

43

1        Q.   Have you talked with them over the
2    phone?
3        A.   Mr. Marino, yes.  Mr. Spinks I've
4    never talked to.
5        Q.   And what was the nature of your
6    discussions with Mr. Marino?
7        A.   I don't remember the content.  I
8    just -- I feel like we talked over the phone,
9    but I don't remember the content.
10       Q.   Does anybody in this case, that you
11   have talked to, have the opinion that the barge
12   by virtue of its impact with the wall knocked
13   the wall down?
14       A.   I don't know the answer to that.
15       Q.   Does anybody in this case based on
16   your conversations with them have the opinion
17   that the failure of the wall was due to
18   hydrostatic pressure acting upon soil that had
19   been weakened due to seepage?
20       A.   I think that there's somebody offering
21   one of every opinion, if I had to guess.  I
22   feel like I've seen, um -- discussions about --
23   at various times about the damage to the
24   floodwall being, um -- other than a barge, or
25   due to the barge, or other causes.  But that

44

1    was not something that we investigated.  We
2    didn't review that information.  That was
3    something that Mr. Pazos, for example, would
4    have done, that type of analysis -- evaluation.
5        Q.   Based on your analysis and evaluation,
6    do you have an opinion as to whether or not the
7    barge hit the wall at any point in time or in
8    any location?
9        A.   Well, I think that, um -- yes, I think
10   as our -- if you look at our conclusions, I
11   think our fourth conclusion, the cited
12   information-- and by this we're talking about
13   all the facts and our interpretation of the
14   facts, in the fourth paragraph -- the cited
15   information is compelling evidence that the
16   damage to the south end of the south breach of
17   the IHNC east floodwall was due to an impact by
18   the ING 4727.
19       Q.   Okay.  We'll come back to that.  You
20   have some photographic evidence of that that
21   you'll show me; right?
22       A.   These are the photographs that are in
23   our report.
24       Q.   Right.  I'll come back to those more
25   in detail.  I notice that in Conclusion Number

45

1    3 -- and I've numbered them.  You have five of
2    them; right?
3        A.   Correct.
4        Q.   In Number 3 you talk about indicative
5    of damage being caused by contact.  Right?
6        A.   Correct.
7        Q.   In Number 4 you talk about more likely
8    than not due to an impact.  Correct?
9        A.   Correct.
10       Q.   Are contact and impact synonymous?
11       A.   Um -- in the context of this
12   conclusion, yes.  So I should have used contact
13   in the fourth conclusion.  That would have been
14   an equivalent statement for our intent.
15       Q.   Well, is there a difference in your
16   view as an expert between contact and impact?
17       A.   It depends on the context of the
18   usage.
19       Q.   In this case, did the barge in your
20   opinion contact the wall?
21       A.   Well, so that's an area that other
22   experts are dealing with.  That has to do with
23   the, um -- um -- the force that the barge could
24   imply against the wall.
25       Q.   Well, but it's your words.  You said

46

1  indicative of damage being caused by contact.
2       So in your opinion was there contact?
3    A.  There was contact, yes.
4    Q.  Okay.  And in your opinion, was there
5  impact as you state in Number 4?
6    A.  Like I say, the barge touched the
7  wall.  It obviously had to touch the wall in
8  order for the bars to fold over, in order for
9  the barge to have scrape marks on the bottom,
10 in order for the fracture shape in the wall to
11 have taken the shape that it did.  So whether
12 it was a touch or a contact or how hard it
13 contacted, we didn't --
14   Q.  Or an impact.
15   A.  Or an impact -- whichever of those
16 words, we didn't try to quantify that.  Our
17 point was that the, um -- the evidence we have
18 can make a statement that we can support here.
19   Q.  So is it that you don't know whether
20 it was a contact, an impact, a striking, a
21 blow, a touch, or that they're synonymous?
22   A.  I'm saying that that's, um -- the
23 exact nature of the contact between the barge
24 and the wall is the subject of other experts'
25 evaluations.  And it's not something that we're

47

1  doing.  We're not trying to estimate the force
2  that the barge -- with which the barge struck
3  the wall, we're just showing that barge went
4  over those rebars --
5    Q.  And I'm sorry, but is that the contact
6  you're referring to, the barge bending the
7  rebars?
8    A.  Well, there's two; there's the barge
9  bending the rebars, and there is also the shape
10 of the knockout in the wall that matches the
11 shape of the barge.
12   Q.  Specifically, of the, um -- bilge.
13   A.  Correct.  The turn of the bilge.
14   Q.  The turn of the bilge.  All right.
15      Have you reviewed any reports by
16 Donald Green?
17   A.  I have not, no.
18   Q.  Any deposition of his?
19   A.  No.
20   Q.  Any testimony given in any of the
21 trials already taken place in this Katrina
22 debacle?
23   A.  Possibly, but none that I recall.
24   Q.  You didn't attend any of the Robinson
25 trial?

48

1    A.  No.
2    Q.  All right.  Looking at your
3  conclusions, your first is hydrostatic pressure
4  could not cause a fracture -- hydrostatic
5  pressure alone would be insufficient to cause
6  the fracture features.  Correct?
7    A.  Correct.
8    Q.  And when you're talking about fracture
9  features, again, are you talking about the
10 rebar or the concrete?
11   A.  The concrete.
12   Q.  In a 45-degree horizontal.
13   A.  Correct.
14   Q.  Now, do you have an opinion as to
15 whether those fractured features could be
16 caused and are consistent with the concrete
17 fracturing as a result of the tilting of the
18 wall?
19   A.  Um --
        MR. GILBERT:
20          I'm going to object.  This is
21      going so far beyond the scope of his
22      report.
23          But you can answer.
24   A.  Would you ask your question again?

49

EXAMINATION BY MR. WALKER:
1    Q.  Yeah.  Would you agree or disagree
2  that the fracture features that you identified
3  and opined would not be caused by hydrostatic
4  pressure could be caused by the simple collapse
5  of the wall?
6    A.  Well, it depends on which fractures
7  you're talking about.  We didn't -- we didn't
8  concern ourselves with any of the fractures
9  more than 15 or 20 feet away from the south end
10 of the south breach.
11   Q.  Okay.
12   A.  So at that point, the portion of the
13 wall below the fracture was somewhat intact.
14 It obviously had some cracks in them, but
15 nowhere near the damage of the other walled
16 section.  So we didn't concern ourselves -- we
17 didn't look at the other sections of the wall
18 that did have damage due to the wall moving,
19 stretching, leaning over and such.
20   Q.  Those that you're referring to at the
21 southern end of the southern breach -- which
22 are the 45-degree horizontal fracture, correct?
23   A.  Correct.
24   Q.  Is it your opinion that they could not

50

1  have been caused by the wall simply -- when it
2  collapsed, when it fell over?
3      A.   Well, so that -- the problem is that
4  that part of the wall didn't fall over, it
5  didn't collapse, it leaned, um -- a portion of
6  it leaned a little bit, a portion of it, um --
7  leaned just a degree or a few degrees.
8      Q.   Okay.  At one point the wall was a
9  semi-uniform monolith, right?  Of rebar
10  reinforced concrete.
11     A.   Yes.
12     Q.   Okay.  And it separated and broke.
13 Panels of it did, right?
14     A.   Correct.
15     Q.   Is it your testimony that the
16 separation or breaking of one panel from
17 another would not have the potential to cause
18 the 45-degree horizontal fracture that you
19 identify in this photograph at this location?
20     A.   That's correct.
21     Q.   That is your opinion.
22     A.   Yes.
23     Q.   So it's your opinion that that
24 45-degree horizontal fracture was caused by
25 some type of external pressure.

51

1      A.   An externally applied load, yes.
2      Q.   And that it was not a hydrostatic
3  load.
4      A.   That's correct.  And we say that for a
5  variety of reasons, one of which -- the most
6  important of which is that the rebars that are
7  sticking out of that fracture are also bent at
8  a sharp angle.
9      Q.   But we're talking about the concrete
10 45-degree, not the rebar, right?
11     A.   Well, we're talking about that area of
12 the fracture.
13     Q.   Okay.  Well, is it possible to
14 differentiate the rebar from the 45-degree
15 fracture?  Or are you saying they happened in
16 unison -- and maybe I've been misunderstanding
17 you.  Is what you're saying that when the barge
18 came over and bent the rebar, that's when the
19 fracture occurred as well?
20     A.   I think that that's likely the case,
21 but that's an area of examination by other
22 experts.
23     Q.   But that's more than likely, in your
24 opinion, the cause of that fracture -- and I
25 have been misunderstanding you.  I thought were

52

1  referring to a frontal impact at that location
2  causing that 45-degree fracture.  And that's
3  incorrect on my part.
4      A.   No, I think that that's an example of
5  the type of contact that would cause what we
6  see here, and that is that, um -- a contact
7  from the front.
8      Q.   Well, I'm confused.  I thought you
9  agreed with both.
10          Is it fracture that occurred as a
11 result of the barge laying down and coming over
12 the rebars, as a result of that weight and
13 pressure the concrete fracturing at a 45-degree
14 angle?  Or is it the result of a frontal impact
15 at that location?
16     A.   Well, I think that we have to get our,
17 um -- maybe we should get our terms correct, or
18 in agreement.  When you kept referring to the
19 45-degree horizontal fracture, I was using that
20 as -- in the context of an area of the fracture
21 of the floodwall.  The fracture that we're
22 looking at -- or the -- there's a horizontal
23 surface, and that horizontal surface is flat.
24 It's, um -- it doesn't tilt from the front to
25 the back of the floodwall, it's flat.  And it's

53

1  somewhat in agreement with what would have been
2  a construction joint during the pouring of the
3  wall.
4      Q.   That construction joint at the time it
5  was built would be vertical.
6      A.   No, it would be horizontal.
7      Q.   Okay.  So is it part of the top or cap
8  of the wall?
9      A.   It's right at the transition between
10 the tapered top and the straight sided section
11 of the wall.  There's a construction joint
12 right there, and that is called out in our
13 drawing 104601-1, and there's a line at
14 elevation 12.0 that is labeled CJ.
15     Q.   It's Appendix A?  Or Appendix B?
16     A.   Probably.
17     Q.   Typical wall section?
18     A.   Appendix B.
19     Q.   Appendix B.
20     A.   Isn't a typical wall section that we
21 redrew.
22     Q.   Right.  All right.  And so just
23 repeating --
24     A.   Go ahead.  I'm sorry.
25     Q.   Yeah.  Show me or repeat what you were

14 (Pages 50 to 53)

54

1  indicating.
2       A.  At Elevation 12.0, EL 12.0 --
3       Q.  Right.
4       A.  -- there's a construction joint right
5  there that's offered as on option for the
6  contractor to use.  We believe that he more
7  than likely did build the wall that way, based
8  on the fracture of the cement -- of the
9  concrete, with somewhat of a smooth flat
10 surface at approximately or at that elevation.
11      Q.  All right.  Let's look at your report
12 that we've marked as Exhibit 1.  And let's
13 looks at Exhibit B and I'll ask you to make
14 some markings here with this red pen.
15         So if you would, mark in red the
16 construction joint that you're talking about is
17 that line there.  Is that right?
18      A.  Correct.
19      Q.  Okay.  And from the construction joint
20 to the top is approximately three feet?
21      A.  Yes.
22      Q.  Okay.  Could you put an ellipsis or
23 whatever you call it?
24      A.  (Witness complies.)
25      Q.  And beneath this construction joint

55

1  you see the beginnings of the sheet pile
2  correct?  It's within the concrete?
3       A.  Let's make sure.
4       Q.  It says here, top of existing sheet
5  piling.
6       A.  Yes.  Thank you.
7       Q.  All right.  So that three-foot area
8  that you've marked above the construction joint
9  is unreinforced concrete?
10      A.  No.
11      Q.  Okay.  That's where the rebars were
12 exposed?
13      A.  The, um -- the horizontal fracture
14 shown in the photographs is at the elevation
15 12.0 feet as shown on the drawing.
16      Q.  Right.  And from 12.0 to 15 you have a
17 cap, right?
18      A.  Correct.
19      Q.  Is there any rebar in that cap?
20      A.  Yes.
21      Q.  And that's the rebar you were
22 referring to in your report and photographs
23 that were bent down, right?
24      A.  Correct.
25      Q.  All right.  Let's mark that as 1A

56

1  since it's contained within Exhibit 1.
2          (Exhibit 1A was marked for
3  identification and is attached hereto.)
4  EXAMINATION BY MR. WALKER:
5       Q.  And following it, so I understand your
6  testimony, this construction joint fracture, is
7  there a way to demonstrate it on this diagram?
8       A.  (Witness complies.)  So I am going o
9  put a series of red dots upon -- on that line.
10      Q.  Okay.  So the fracture occurred right
11 at the joint.
12      A.  A portion of the fracture occurred
13 right at the joint.  And then it turned upwards
14 at the very south end of the south breach.
15      Q.  And when you say upwards, into the
16 concrete cap?
17      A.  Correct.
18         (Brief recess.)
19 EXAMINATION BY MR. WALKER:
20      Q.  All right.  Conclusion number 2 is
21 locations of the scratches are consistent with
22 the spacing of the exposed rebars.
23         We've talked about that; right?
24      A.  Yes.
25      Q.  Okay.  Conclusion 3:  The features of

57

1  the damage at the south end are indicative of
2  damage caused by contact from the barge.
3          When you say the features, would you
4  refresh my memory what you're talking about
5  there.
6       A.  We're talking about, um -- the shape
7  of the missing section of the wall matching the
8  profile of, um -- the, um -- barge.
9       Q.  Okay.  So we haven't talked about that
10 yet.  So that's the feature that you're
11 referring to in Conclusion Number 3.
12      A.  Correct.
13      Q.  So you're making a correlation between
14 a missing piece of the wall and the bilge turn
15 of the barge.
16      A.  Correct.
17      Q.  Number 4:  You say the cited
18 information -- I believe you're referring o
19 everything that you've said.
20      A.  Correct.
21      Q.  -- is compelling evidence that the
22 damage to the south end of the south breach was
23 due to an impact with the barge.
24      A.  Correct.
25      Q.  And that's what we've been talking

58

1  about at length, which is the barge going over
2  and bending the rebar and the 45-degree
3  horizontal fracture.
4      A.   Well, primarily two things, the rebar
5  is being folded over, bent to a sharp radius on
6  the horizontal portion of the fracture which is
7  at that elevation 12 feet that we identified on
8  I think it's Exhibit 1A, and also the curvature
9  of the fracture curving upwards towards the top
10 edge of the floodwall, and then the fact that
11 the fracture jumps across the two panels in an
12 alignment.
13     Q.   So it goes from one joint to another.
14     A.   Correct.
15     Q.   And --
16     A.   One panel to another.
17     Q.   One panel to another.  Each panel has
18 the joint at the same height --
19     A.   Correct.
20     Q.   -- right?
21     A.   Yes.
22     Q.   And how are they joined to each other
23 from one panel to another?
24     A.   I believe the only joint is a weather
25 strip, a plastic strip.

59

1      Q.   So when you say that the fracture goes
2  from one panel to another, what do you mean?
3      A.   So that fracture obviously can't run
4  from one panel into the next panel, so what
5  that indicates is that the item that caused the
6  fracture in the southernmost panel, it's bottom
7  elevation was close to the bottom elevation of
8  the thing that caused the horizontal fracture
9  in the second southernmost fractured panel.
10     Q.   Are you saying that -- and in how many
11 panels did you see this fracture?
12     A.   Well, we're only talking about the
13 southernmost panel and the second to
14 southernmost panel.  Those are the only panels
15 that we looked at.
16     Q.   Those are the only panels that you
17 inspected in this fashion.
18     A.   Correct.
19     Q.   Photographically.
20     A.   Photographically, yes.
21     Q.   And I'm having a hard time
22 comprehending it, so bear with me.
23          Are you saying that each of these two
24 panels had a fracture at the same joint
25 location and so you conclude from that that the

60

1  cause of the fractures was the same, that in
2  fact it's one continuing fracture?
3      A.   It indicates that, yes.  It indicates
4  that there was -- whatever caused the fracture
5  to have an elevation of 12 feet on the
6  southernmost panel was -- that that thing
7  continued over to the second to southernmost
8  panel.  That's all we're saying.
9      Q.   And at that location that you've shown
10 me in 1A which is the 12-foot location --
11     A.   Yes.
12     Q.   -- that is the joint between the cap
13 and the wall or monolith, right?
14     A.   Correct.
15     Q.   You would agree with me that that is
16 intrinsically a weaker location.
17     A.   Absolutely.
18     Q.   And that regardless of the cause or
19 mechanism, that is the most likely fracture
20 area.
21     A.   As long as the strike -- the thing
22 that hits the wall is there or above.
23     Q.   And if I understand it correctly, you
24 have two panels with this joint joined by,
25 um -- I forgot what you told me joins the two

61

1  panels there.
2      A.   It's a -- I think it's a PVC weather
3  strip.  I've heard people use various terms.
4      Q.   Water stop?  Elastomeric material?
5      A.   Yes.
6      Q.   These panels are installed separately,
7  do you know, and known joined?
8      A.   My understanding is that they're
9  poured one at a time, and the weather -- the
10 water stop is installed and the concrete is
11 poured around half of the weather stop, and
12 then the adjacent panel is poured.
13     Q.   And what's the condition of the
14 weather stop between these two panels,
15 separated or joined?
16     A.   It's one piece.  It's one piece of
17 weather stop.  It has a bulb in the middle --
18 the ones I've seen have a bulb in the middle
19 with a bulb on each end.
20     Q.   I'm sorry.  I meant in this -- in your
21 photograph, what's the condition of the weather
22 stop?
23     A.   We didn't look at that.
24     Q.   So you don't know -- are the two
25 panels still together?

**62**

1   A.   We didn't look at that.  There's a
2  rotation between the panels.  So there's going
3  to be some separation between the two panels.
4   Q.   That's figure 4 that you looked at
5  primarily?
6   A.   You can see some of the rotation
7  obviously in Figure 5.  In Figure 4, arrow
8  number 3 would be an example where you can see
9  a rotation between the two adjacent monoliths
10  causing separation in the area where you would
11  find that water stop.
12   Q.   All right.  Your fifth conclusion is
13  that the evidence of the south breach confirms
14  Villavaso 's observations regarding the north
15  breach.
16       You made no inspection of any
17  photographs regarding the north breach?
18   A.   No.  We have photographs of the north
19  breach here.  We've looked at photographs of
20  the north --
21   Q.   Photographs only.
22   A.   Correct.
23   Q.   Based in the photographs alone, you
24  did not reach any opinion or conclusion
25  regarding the barge and any involvement it may

**63**

1  or may not have had with the north breach.
2   A.   That's correct.
3   Q.   So you had to rely on testimony of an
4  individual Mr. Villavaso to confirm the
5  plausibility, as you say, that what he saw was
6  a barge based on the damage that you observed
7  at the north breach.
8   A.   I think everything you said was
9  correct except you probably meant to say south
10  breach as the last -- based on the damage that
11  we saw at the south breach.  Unless you want to
12  ask it again.  And the answer to that is yes,
13  if you made the last two words south breach.
14   Q.   You saw no damage at the north breach
15  that would lead you to believe that a barge had
16  anything to do with that damage; correct?
17   A.   We did not see -- that's correct.
18   Q.   To make the jump, so to speak, that
19  the barge was somehow involved with the north
20  breach, to corroborate Villavaso 's testimony,
21  you had to --
22       MR. GILBERT:
23       I'm going to object.
24  EXAMINATION BY MR. WALKER:
25   Q.   -- you had to look at the south breach

**64**

1  damage.  Is that what you're telling me?
2   A.   Correct.
3   Q.   And all that you could do was confirm
4  the plausibility of this testimony, right?
5   A.   That's correct.
6   Q.   And if I understand that correctly,
7  because you conclude that it's more likely than
8  not, in your words, that a barge did something
9  at the south end, you're saying that, well,
10  Mr. Villavaso may have seen a barge at the
11  north end although I have no objective evidence
12  that I've seen in the photographs or otherwise
13  to confirm that.  But because it was here it
14  might have been there.  Is that far?
15   A.   That's somewhat of a restatement.  I
16  hope you don't mind if I give more weight to
17  the way that I phrase it in my report.  But I
18  think you have the basic concept.
19   Q.   Okay.  All right.  Let's go the Page 2
20  of your report.  You have 13 items that you
21  reviewed?  Declaration of Dr. Robert Bea,
22  Number 8.  I don't see any reference to it in
23  your report.
24       Did you use it for any particular
25  purpose?

**65**

1   A.   Not that I recall.
2   Q.   Okay.  And Number 9, photos given to
3  you by Hector Pazos or taken by Pazos, are
4  those contained in your report or are there
5  some other photos that are not part of your
6  report?
7   A.   I'm sure that there were many, many
8  photographs provided by Mr. Pazos.  I suspect
9  they're the same photographs that, um -- he
10  provided to you.  They were provided to me
11  prior to June 27th of 2008.
12   Q.   You still have copies of these?
13   A.   I'm sure I do.
14   Q.   Have you given them to Mr. Gilbert?
15   A.   Not that I know of.
16   Q.   But the photographs that you relied on
17  or that support your opinions you've included
18  in your report?
19   A.   Yes.  The ones the I think are most
20  illustrative.
21   Q.   But there are many others that you
22  didn't include.
23   A.   I wouldn't say many.  Of course,
24  Mr. Pazos' photographs cover everything
25  relating to Katrina that he came across.  So,

66

1   um -- there may be a hundred -- a hundred, two
2   hundred of his photographs that were in some
3   way relevant.
4       Q.   All right.  Number 10 is various
5   photographs produced by O'Dwyer and Wiedemann.
6       Do you have those photographs?
7       A.   Absolutely.  I have all these
8   photographs.
9       Q.   But you have not given those to
10  Mr. Gilbert?
11      A.   Um -- I don't think I gave Mr. Gilbert
12  any photographs yet.
13      Q.   Photographs by Getty Images.  Did you
14  use any of those?
15      A.   Those I think would have been images
16  that were downloaded, and I don't recall.  If
17  we didn't reference them in the report then we,
18  um -- let's see.  There was a satellite -- not
19  a satellite, an aerial photograph that might
20  have been a Getty image.  But anyway -- so,
21  um -- oh, if it's referenced in the report.
22  And we typically footnoted where we got each
23  photograph.  I don't see any Getty photographs.
24      Q.   I don't think you refer to them.
25  Then.

67

1       Then you talk about Robert Evans'
2   photographs.  Where did you get those?
3       A.   Probably from Mr., um -- Mr. O'Dwyer.
4       Q.   And again, those as well as the last
5   ones which are produced by Ingram, you didn't
6   provide copies of those to Mr. Gilbert at any
7   time in the last month or so.
8       A.   That's correct.  There was, um -- I
9   feel like there was a request from this firm to
10  produce three things that I had referenced in
11  my report, I remember one of them was
12  Dr. Bea 's, Number 8.  So anything that was
13  requested at that time we copied and produced.
14  But -- and I don't recall which of these images
15  you requested.
16      Q.   All right.  Your narrative talks about
17  numerous levee breaches occurring throughout
18  New Orleans as a result of Hurricane Katrina.
19      Do you know how many of those levee
20  breaches involve a barge?
21      A.   No.
22      Q.   Do you know how many barges broke away
23  during Hurricane Katrina?
24      A.   No.
25      Q.   Would it surprise you to learn that

68

1   fifteen hundred or more barges broke away
2   during Hurricane Katrina?
3       A.   It wouldn't surprise me, but it's
4   quite a large number.  Larger than I would have
5   expected.
6       Q.   Have you studied any of the other
7   numerous breaches resulting from Hurricane
8   Katrina?
9       A.   We began to look at the 17th Street
10  Canal and also the London Avenue Canal, um --
11  when we started working with Mr. O'Dwyer, but
12  since that point have not.
13      Q.   So you have no basis to compare the
14  cause or failure mechanisms as between and
15  amongst any of the levee breaches.
16      A.   That's correct.
17      Q.   And you use the word traverse, the
18  barge traversed the eastern floodwall.  What
19  does that mean?
20      A.   The scratches on the bottom of the
21  barge that are length wise on the barge
22  indicate that the barge traveled over the wall
23  and the direction that it traveled over the
24  floodwall.
25      Q.   Not through it but over it, as

69

1   indicated by the rebar.
2       A.   Well, over that -- the fracture at
3   12-foot elevation.
4       Q.   Right.
5       A.   So it traveled over the fractured
6   floodwall at the time when the rebars were
7   exposed.
8       Q.   Now, speaking of that, you can refer
9   to photographs if you need to, the scratches on
10  the underside of the barge caused by the rebar
11  don't go the entire 200 or so foot length of
12  the underside, do they?
13      A.   That's correct.
14      Q.   Okay.  Did you make a chart or a
15  diagram of where they start and stop both bow
16  to stern and port to starboard?
17      A.   Um -- we have -- we've referenced in
18  the report that they're, as I recall, three
19  quarters of the way back.  So that I know that
20  there are photographs that show that the
21  scratches start at the turn of the bilge on the
22  bow and they have a sort of a sweeping pattern,
23  and they go -- some go about a half, some go
24  about three quarters of the way back on the
25  barge.  And then we couldn't see evidence of

70

1   them after that.
2       Q.   So does that -- is that an indication
3   to you that that portion of the barge which
4   we'll call the bow, where the scratches start,
5   was the portion that went over the wall first?
6       A.   Yes.
7       Q.   And then at the stern, there's a
8   quarter to a half of that underside where
9   scratches don't appear.
10      A.   That's correct.
11      Q.   And would that indicate to you that
12  that's because the stern of the barge was
13  raised over the, um -- rebar so that it did not
14  come in contact with it as it went over?
15      A.   That would certainly be, um -- one
16  evaluation.  We didn't do the chain of events
17  evaluation in this.  But that -- as you asked
18  me the question, that would be one scenario
19  that would seem plausible.
20      Q.   Now, you state several places that the
21  sheet pile floodwall appears to have separated
22  at the watertight joints.
23          That's what we were talking about
24  earlier, that elastomeric joint?
25      A.   Yes.

71

1       Q.   Is there any particular significant in
2   your opinion to that separation that you state
3   occurred at several locations?
4       A.   No.
5       Q.   That's just the result of the wall,
6   um -- tilting or failing?
7       A.   It's a result of the failure of the
8   wall, yes.
9       Q.   That separation is not something that
10  occurred first to allow seepage or something
11  that would then cause the walls to separate; is
12  that right?
13      A.   Well, that's an area of evaluation
14  that we didn't cover.  You know, whether the
15  seepage caused washout on the protected side of
16  the floodwall, I mean, all that discussion,
17  that's not something that we addressed at all.
18      Q.   But in your view, the joint separation
19  is something that occurs after and is not the
20  incipient cause of the other chain of events.
21          MR. GILBERT:
22              I object.  He just said that they
23          didn't study that.  You're asking for
24          opinion that is outside the scope of
25          what he was charged with studying and

72

1   what he wrote about in his report.
2       It's out of bounds.
3   EXAMINATION BY MR. WALKER:
4       Q.   I'm asking you, and I assume you can
5   answer it.
6       A.   I can't answer it.  Because I know
7   that there's a great deal of discussion about
8   that, and how you would establish which
9   happened first and which happened last, and
10  it's not an area that we gathered information
11  or researched or studied or evaluated, so it's
12  not something that I'm prepared to answer at
13  this point because I don't have any information
14  to use as a basis.
15      Q.   What is it you're not prepared to
16  answer?
17      A.   Whether the separation of the
18  watertight joints preceded or followed or had
19  anything to do with the failure of the
20  floodwall.
21      Q.   Well, I thought you already answered
22  that, and then I asked a follow-up question
23  that you couldn't answer.
24      A.   I'm sorry.
25      Q.   I thought your answer was that, yes,

73

1   in your opinion the separation of the
2   watertight joints would have occurred later as
3   a result of the tilting or failure of the wall.
4           You want to read that back?
5       A.   It will certainly occur as a result of
6   the failure of the wall.  But the watertight
7   joints will certainly occur as the wall leans,
8   fails, stretches, because it is the weakest
9   part of the wall.  But whether there was also
10  failure of those joints that preceded the
11  failure of the wall is really the question.
12      Q.   Do you have any opinion as to how one
13  of these joints could have separated?
14          MR. GILBERT:
15              I'm going to object.  You're
16          asking him to formulate an opinion
17          here on the spot that is beyond the
18          scope of what he's being proffered to
19          do.  His opinions are contained in his
20          report.  You're wanting to examine him
21          about what is not in here.
22      A.   Okay.  I apologize, but having gone
23  through that, could you just ask your question
24  again?
25  EXAMINATION BY MR. WALKER:

74

1    Q.   Do you have an opinion as to how the
2   watertight joint separation could have
3   occurred?
4    A.   No.  Preceding the failure of the
5   wall.
6    Q.   Now, you said the sheet piles rotated,
7   is that right?
8    A.   Yes.
9    Q.   What caused that rotation in your
10  opinion?
11   A.   Um -- we didn't have an opinion on
12  that.  It could have been the force that caused
13  the fracture or it could have been force from
14  an adjacent panel, or it could have been water
15  pressure or a combination of all of those.  And
16  I would expect it to have varied with every
17  section of the wall.
18   Q.   Which photograph shows the rotation?
19   A.   By rotation, it might also be
20  interpreted as tilt, starting in Figure 4 --
21  well, actually, starting in Figure -- starting
22  in Figure 2 there's a piece of the sheet pile
23  that's leaning.  Figure 3 there's sort of a
24  twist of the sheet pile.
25   Q.   All right.  Let's go through it.

75

1   Figure 2, you said.  Could you circle where you
2   mean that it's rotated?
3    A.   So, the sheet -- the axis of the sheet
4   pile appears to be leaning here.
5    Q.   So that's the axis that you've
6   indicated with in arrow.
7    A.   Correct.
8    Q.   So by rotating, you men tilt.
9    A.   Yes.
10   Q.   Okay.
11   A.   It was -- the term rotate was not my
12  preferred term, it was a term that had been
13  used by other people who were writing about
14  this at the time that we were --
15   Q.   We're look at Figure 3.  What do you
16  call that, then?
17   A.   That's -- again, that's a rotation or
18  a tilt.  It was -- I think that probably the
19  word rotation was applied because the sheet
20  pile had gone so far past its original position
21  that it had inverted and started to come around
22  again.  The word rotation seemed more
23  appropriate than tilt.
24   Q.   You would agree that for Figure 3
25  rotation would seem more appropriate than for

76

Figure 2 where tilt or leaning would be more
appropriate.
    A.   Yes.
    Q.   Okay.  And I'm sorry.  Did you say
what caused the tilt?
    A.   That was not an area that we were
asked to investigate.
    Q.   What caused the rotation that you see
in Figure 3?
    A.   Again, um -- it's not an area that we
were asked to investigate.  I mean I can offer
an opinion, but once the sheet pile is free and
separated from its soil and any form of
support, that then the hydraulic forces would
be able to cause a twist like this.  But that
was not something that we investigated.
    Q.   In other words, tumbling due to the
force of the water.
    A.   Correct.
    Q.   I'm trying to help Brian with the non
technical terms here.
        MR. GILBERT:
            Well, I did ask you to pose some
        objectionable questions.  Thank you
        for obliging.

77

EXAMINATION BY MR. WALKER:
    Q.   You say at the southern end the
pilings were still interlocked.  Do you recall
that?
    A.   That is true.  Yes.
    Q.   What does that indicated to you, that
the pilings were still interlocked?
    A.   It's just an observation.  We're just
trying to, um -- catalog our observations.
    Q.   It has no significance or effect on
your opinion one way or the other --
    A.   Um --
    Q.   -- regarding the forces exerted on the
wall?
    A.   Not a strong effect.  It -- it tells
us that the -- at that portion of the wall,
the, um -- the forces were not large enough to
cause separation of the piles.
    Q.   Okay.  And are you referring to the
southern end of the southern breach?
    A.   Yes.
    Q.   Is there a photograph that you have
that would show us that?
    A.   And let's mark, as Exhibit 1B, Figure
2 that we've been referring to that shows the

78

1  axis, and as 1C, Figure 3, that shows the
2  rotation.  Okay?
3       (Exhibit 1B and 1C were marked for
4  identification and are attached hereto.)
5       A.   The piles that are still interlocked
6  at the southern end of the south breach as
7  shown in Figure 4.
8  EXAMINATION BY MR. WALKER:
9       Q.   Which we will mark as 1D.
10      (Exhibit 1D was marked for
11 identification and is attached hereto.)
12      A.   And other than just showing that the
13 piles are still separated, I don't know how
14 else to indicate that on our illustration.
15 EXAMINATION BY MR. WALKER:
16      Q.   Which arrow shows the, um --
17      A.   Well, all of the piles that are
18 visible in that photograph are still
19 interlocked.
20      Q.   Right.  What do you mean by piles?
21      A.   The sheet piles.
22      Q.   Okay.  So you mean the steel
23 accordion-like sheet piles --
24      A.   Correct.
25      Q.   -- are still interlocked to each other

79

1  at their joints.
2       A.   Yes.
3       Q.   And those are joints that kind of fit
4  like Legos, right; one goes inside the other
5  basically?
6       A.   Yes.  It's a bulb and a hook.
7  (Indicating.)
8       Q.   All right.  What's a chamfer?
9       A.   Chamfer.
10      Q.   Chamfer.
11      A.   That's a bevel on something to knock
12 off a sharp edge.
13      Q.   You say that the fracture extends
14 several feet and is aligned with the
15 construction joint chamfer.  Is that right?
16      A.   Correct.
17      Q.   Could you show me that?
18      A.   The, um -- the best place to see that
19 would be on I believe you have it marked
20 Exhibit 1A.
21      Q.   Okay.
22      A.   And right at elevation 12.0, the upper
23 construction joint, there's sort of a V-shaped
24 notch on each side of the concrete -- you see
25 right at 12 there's sort of a V?

80

     Q.   Right.
     A.   Okay.  Well, so each side of the V is
a chamfer.
     Q.   You better point that out to me.
Where's the V that I'm supposed to be looking
at?
     A.   I'm going to draw red lines that are
the extension of the V.
     Q.   Okay.  So the V is what forms the
joint between the upper three-foot section and
the bottom section that has the sheet pile.
     A.   Well, it doesn't form the joint, it
trims out the edge so that you're not trying to
pour and make a flat joint.
     Q.   Okay.  Now, based on the angle, if you
will, of the bent rebar, can you tell the angle
of the wall at the time that the rebar was
bent?
     A.   Um -- you mean the amount that the
wall was leaning?
     Q.   If it was leaning.  Was it straight
up, was it leaning 10 degrees, 30 degrees?
     A.   No.
     Q.   Now you go into a discussion of loads,
yelled moment, plastic hinge.  All of that

81

technical discussion is simply to indicate that
the rebar was bent in your opinion by the barge
and not by hydrostatic pressure.
     A.   Yes.
     Q.   And when you mean hydrostatic pressure
you don't mean on some naked steel rebar, you
mean the rebar within the concrete cap.
     A.   Correct.
     Q.   So what you're referring to is the
action of the hydrostatic pressure against the
three-foot cap, in your opinion, was
insufficient to push the concrete cap such that
it would have bent the rebar.
     A.   Yes.
     Q.   Because we would have -- okay.  I know
you did some math, but how is it that you
determined the amount of hydrostatic pressure
on that three-foot cap at any given point in
time?
     A.   Well, we just assumed that the water
was -- the water level was at the top of the
cap.  And it's a fairly simple calculation,
knowing the density of water, to calculate the
pressure on the -- on a wall that has water on
one side.

21 (Pages 78 to 81)

82

1   Q.   Is that pressure influenced by the
2   amount of water?  If you have a 3 x 3 body of
3   water pushing on this cap as opposed to the
4   entire Industrial Canal body of water, does
5   that make a difference?
6       A.   Um -- that was a great -- it is a good
7   question, but no, it doesn't.  So the water
8   could be a quarter of an inch deep or thick on
9   the face of the wall, or it could be a mile
10  wide or more, and the hydrostatic pressure on
11  the face of the wall is going to be the same.
12      Q.   That would be in a vacuum, correct?
13  All other things being equal, the hydrostatic
14  pressure that you calculated is what you say,
15  but would agree that depending on the soil
16  characteristics and the depth of the sheet pile
17  the hydrostatic pressure may or may not be
18  impacted?
19      A.   No, I don't think the soil will have
20  any bearing on it.  And there doesn't need to
21  be a vacuum.  I mean, we're assuming that the
22  water level is even with the top of the pile,
23  um -- and the soil bearing doesn't have an
24  effect.
25      Q.   So in your opinion, the consistency

83

1   and firmness, if you will, of the soil into
2   which the sheet pile is embedded and is holding
3   up this concrete cap bears no relevance to the
4   effect of the hydrostatic pressure on that cap.
5       A.   That doesn't affect the hydrostatic
6   pressure on the top three feet of the
7   floodwall.  The condition of the soil, um --
8   doesn't affect that.
9       Q.   Well, would it affect the hydrostatic
10  pressure on any other portion of the wall any
11  differently than on the three-foot cap?
12      A.   No.
13      Q.   All right.  Let's talk about that
14  conclusion on the, um -- of the bilge turn.
15  Can you show me the photograph or photographs
16  that lead you to the conclusion that the barge
17  struck the wall at the southern end of the
18  southern breach, if I remember correctly, with
19  the turn of the bilge.
20      A.   That would be our Figure 7.
21      Q.   Okay.  And I'm correct that it's at
22  the southern end of the southern breach?
23      A.   That's correct.
24      Q.   So Figure 7 which we'll mark 1E, you
25  have they arrows there.  What do those three

84

1   arrows mean?
2       A.   The first arrow, arrow Number 1, shows
3   the rebar coming up from the lower portion of
4   the floodwall monolith, being folded over --
5       Q.   Okay.
6       A.   -- to a tight radius.  The second
7   arrow shows the curved knockout in the wall
8   that is consistent with what would be expected
9   to be the shape of the turn of the bilge of the
10  barge.  And Number 3, I think, is probably just
11  reference to show where the top of the sheet
12  piles are relative to that construction joint.
13      Q.   All right.  Look at Arrow 2.  Maybe
14  it's my photograph is darker than yours.  Can I
15  see it?
16      A.   Sure.
17      Q.   Yeah.  Could you circle for me or
18  indicate in some better form exactly what are
19  the demarcations of this turn of the bilge
20  impact that you see there.
21      A.   So it's this curvature.  And I'll
22  trace it there.
23      Q.   So you're paralleling the curvature.
24      A.   Yes.
25      Q.   So let's just mark that with a line,

85

1   "curvature."  Is that --
2       A.   Sure.
3       Q.   So it's your impression, based on this
4   paragraph, that the floodwall at that location
5   has an impact that comports with the shape and
6   size of the turn of the bilge.
7       A.   Approximately.
8       Q.   You didn't see this wall personally;
9   right?
10      A.   Correct.
11      Q.   You derived this from this photograph.
12      A.   Yes.
13      Q.   Do you derive it from any other source
14  of information?
15      A.   Not that I know of.  This photograph
16  and other photographs.  This one was
17  illustrative of the point.
18      Q.   Of the same thing.
19      A.   Yes.
20      Q.   Did you obtain any information
21  regarding this from anybody else?
22      A.   No.
23      Q.   So as far as you know, your
24  description of this photograph is the genesis
25  of the turn of the bilge fitting with this

86

1   impact.
2       A.   Do you mean did I hear anybody else
3   say that?
4       Q.   Uh-huh.
5       A.   No.  I have not.
6       Q.   You came up with this, is the bottom
7   line.
8       A.   Yes.  Well, that I know of.  I don't
9   know that I came up with it.
10      Q.   Somebody else might have found it
11  independently, you haven't heard about I.
12      A.   Correct.
13      Q.   As far as you know, this is your
14  theory and your conclusion, and there's no
15  other information that you have seen that led
16  you to this.
17      A.   Correct.
18      Q.   As far as you can tell from this
19  photograph, was there actually a piece of
20  concrete or pieces of concrete that were
21  removed as a result of this impact?
22      A.   I believe so.  And that would be the
23  piece that's missing as a result of the shape
24  of that notch.
25      Q.   So this is the end of the impact area

87

1   as far as you're concerned.
2       A.   Yes.
3       Q.   Do you have any opinion regarding the
4   size of that impact area?
5       A.   Um -- only in that it, um -- started
6   here and went at least -- approximately over
7   the, um -- adjacent panel.
8       Q.   Each panel is approximately how long?
9   Or how wide?
10      A.   I don't think I have -- I don't have
11  that in my report.  I believe they were
12  approximately twenty feet.
13      Q.   So are you saying that this impact
14  zone was 40 feet?
15      A.   No.  Um -- so if each monolith is
16  fifteen to twenty feet and this is about eight
17  feet from the end, that means we're a little
18  over twenty to a little under thirty that we
19  identify as having features consistent with
20  contact with a flat surface --
21      Q.   Right.
22      A.   -- that resembles the bottom of the
23  barge.
24      Q.   To make that conclusion you needed to
25  be aware what the turn of the bilge looked

88

1   like; right?
2       A.   Yes.
3       Q.   And you saw that in pictures, or did
4   you actually see it on the barge itself?
5       A.   Well, we saw the actual barge.
6       Q.   Okay.  And what's the length of the
7   turn of the bilge?
8       A.   Well, it's, um -- we have photographs
9   here.
10      Q.   What photographs?
11      A.   When you say -- I'm sorry.  The length
12  of the turn of the bilge?
13      Q.   Uh-huh.
14      A.   You mean -- maybe you mean -- it
15  was -- well, the barge is 35 feet wide,
16  roughly, by 200 feet long.  So the length of
17  the turn of the bilge would be 200 feet.
18      Q.   All right.  That's my question
19  precisely.  It's your understanding that the
20  turn of the bilge runs the entire length of the
21  barge, 200 feet.
22      A.   Right.
23      Q.   Okay.  Does it run the width of the
24  barge, as well?
25      A.   We maybe used a little bit of, um -- a

89

1   loose term.  In referring to the curvature at
2   the plating of the bow with the bottom, and we
3   refer to that as turn of the bilge also.  So
4   that's -- we're saying that both of those we
5   describe as turn of the bilge.
6       Q.   So the entire two hundred feet and the
7   entire 35 feet --
8       A.   Correct.
9       Q.   -- are the turn of the bilge.  Or
10  could be -- could comprise the turn of the
11  bilge.
12      A.   We're using that term to describe
13  that.
14      Q.   Okay.  Can you tell me where on the
15  barge there's any evidence of any striking
16  consistent with your photograph which we've
17  marked as 1E?
18      A.   We did not see any dents or such that
19  would be indicative of that.  But typically,
20  the corner of a barge where the turn of the
21  bilge on the side of the barge meets the, um --
22  the turn of the bilge if we can call it that on
23  the front of the barge, there's a corner piece
24  there that's usually very stout and very
25  robust.

90

1    Q.   I would suspect you went right to that
2  corner to see if you could find any impact or
3  dent, and you did not.
4    A.   Correct.
5    Q.   So just to be clear, your conclusion
6  that this impact was based -- or was caused due
7  to the striking of the turn of the bilge is
8  based on the photograph only and what you see
9  in the photograph and not on any physical
10  evidence found on the barge or elsewhere.
11    A.   It's correct that we looked for that,
12  but we did not see that.  And so our statement
13  is that that knockout is indicative of damage.
14  So we're not saying anything more than that.
15    Q.   And you don't know when that damage
16  was caused.
17    A.   That's correct.
18    Q.   You don't have a photograph of the
19  barge profile, do you?  Amongst your --
20    A.   No.
21    Q.   I'm going to show you a photograph
22  that's amongst those that you've identified as
23  Robert Evans', I believe.
24        Do you recognize that photograph?
25    A.   Yes.

91

1    Q.   That's shows the turn of the bilge,
2  doesn't it, down here on the front?
3    A.   Yes.
4    Q.   On the foreground where the yellow
5  line is, and then all the way down the side of
6  the barge, right?
7    A.   Yes.
8    Q.   Okay.  From here to here, from just
9  those two corners?
10    A.   Yes.  Correct.  Well, actually, even
11  lower than that.
12    Q.   Okay.  Why don't you --
13    A.   Well --
14    Q.   But this is approximate.  So the turn
15  is actually what you're saying is further
16  below.
17    A.   Right.  (Indicating.)  Figure 9 --
18  it's not a good angle to show the radius, but
19  it is the very bow most portion of the barge.
20    Q.   If I showed you something like this,
21  you can see --
22    A.   Yes.
23    Q.   -- the turn itself.  Right?
24    A.   Yes.
25    Q.   So the turn of the bilge is this

92

1  rounded area?
2    A.   Yes.
3    Q.   Okay, which is actually in the
4  photograph that I showed you first from Evans
5  not visible because it's underneath the barge.
6  It's right where it turns.
7    A.   Yes.  It's right at the very bottom
8  edge of the barge.
9    Q.   And do you know the dimensions of the
10  barge in terms of its height?
11    A.   I don't have the exact dimension, but
12  I would expect it to be about twelve, fourteen
13  feet.
14    Q.   From where to where?
15    A.   From the very bottom plate to the
16  deck.
17    Q.   To the deck.  And then you add the
18  coaming and the covers?
19    A.   Correct.
20    Q.   Another ten, twelve feet?
21    A.   The coaming is probably about four
22  feet and the covers are maybe another six;
23  yeah, ten.
24    Q.   So ten plus twelve you said?
25    A.   Twelve or fourteen.

93

1    Q.   Okay.  So you have about 22 feet from
2  the deepest part of the barge to the top of the
3  cover.
4    A.   Yes.
5    Q.   And it's your testimony, or based on
6  your opinion, that the turn of the bilge caused
7  the damage on Photograph 1E, correct?
8    A.   Yes.
9    Q.   So at that point in time,
10  approximately 20 to 22 feet of the barge would
11  have been above the impact point.
12    A.   Yes.  You said --
13    Q.   I'm sorry.
14    A.   Um -- oh, yes.  20 or 22 feet would be
15  above the lowest part of the impact point.
16    Q.   Right.  This impact point on the wall,
17  can you determine at what height of the wall
18  that occurred?  And you can use as a reference
19  point, to help me, the concrete cap.  We know
20  there's three feet of concrete cap.
21    A.   So the, um -- it's somewhere between
22  two feet and three feet below the top of the
23  cap.  We know that the barge, or the item that
24  pushed down on these bars, was able to push
25  down on the bars, so at least it reached down

94

1  to that depth of three feet below the top of
2  the cap.
3      Q.  So three feet below the top of the cap
4  is at the joint.
5      A.  Correct.
6      Q.  So it's your understanding or opinion
7  that the impact of the turn of the bilge was
8  right around the joint or, in other words,
9  about three feet below the top of the cap.
10     A.  It was in the top three feet of the
11 floodwall.
12     Q.  Okay.  Meaning that if this barge was
13 light and riding on the water that the water
14 level was at that three feet below the top of
15 the cap location.
16     A.  Correct.  So it was our understanding
17 that the barge was, um -- at the time it was
18 moored, prior to the hurricane, was unloaded,
19 and that it was drawing about a foot and a
20 half.
21     Q.  And drawing a foot and a half means
22 that there was a foot and a half of the barge
23 below water?
24     A.  Yes.
25     Q.  Okay.  Let's mark a couple of these

95

1  that we've referred to.
2          Okay.  What number is that?  Which one
3  is that?
4      A.  You showed me this drawing.
5      Q.  Right. I showed you that.
6      A.  And it was on the next page at the
7  top.
8      Q.  This?
9      A.  Yes.
10     Q.  Okay.  All right.
11         MR. WALKER:
12             Let's mark this one photograph as
13         Exhibit 3.
14         (Exhibit 3 was marked for
15     identification and is attached hereto.)
16         MR. WALKER:
17             And the other photograph which is
18         Page 3 of Group 5 of Pazos'
19         photographs as Exhibit 4.
20         (Exhibit 4 was marked for
21     identification and is attached hereto.)
22 EXAMINATION BY MR. WALKER:
23     Q.  You say that a concaved, curved
24 fracture shape indicates it was caused by
25 contact.  What does that mean?

96

1      A.  Just drawing a line from the top of
2  the floodwall in Figure 7 down at an angle, the
3  fracture doesn't follow a straight line, it
4  follows a concave shape.
5      Q.  So it's this curvature that you drew
6  on Exhibit 1E.
7      A.  Correct.
8      Q.  And in your opinion, that can't be
9  caused by hydrostatic pressure.
10     A.  Yes.  That's correct.
11     Q.  Now, you talked I believe about the
12 north breach area, and you say that the barge
13 did not travel through the floodwall there
14 because of the water depth at the time of
15 impact.  Right?
16     A.  That's a possibility, yes.
17     Q.  Okay.  I thought you told me earlier
18 that you had no opinion regarding any impact at
19 the northern breach area.
20     A.  That we have, um -- that we have no
21 physical evidence that demonstrates contact by
22 the barge.
23     Q.  Okay.  So when you're talking about
24 this impact that you're saying the barge did
25 not travel through, you're talking about this

97

1  potential plausible impact observed by
2  Villavaso.
3      A.  Correct.
4      Q.  And you're saying that the barge
5  didn't travel through at that potential
6  plausible point because of the depth at the
7  time of impact.  What does that mean?
8      A.  What we're saying there is that if the
9  water level was lower earlier, when the barge
10 approached the floodwall, that the barge would
11 have struck the floodwall lower also.  And the
12 floodwall has mother toughness -- when you go
13 just a little bit below that construction joint
14 you start to encounter the interlocked sheets
15 piles, which would be able to handle absorption
16 of the energy of a contact much better.
17     Q.  Do you have any information or opinion
18 regarding the level of the water at the time of
19 Villavaso 's observations?
20     A.  No.
21     Q.  Have you seen any photographic or
22 other evidence of any contact below the cap or
23 three-foot mark in the northern breach area?
24     A.  I do have photographs of scrape marks
25 on the wall, and I believe that they were below

98

1  the construction joint.  And those scrape marks
2  I would expect to have also been caused by the
3  barge because that is ordinarily dry land in
4  front of the floodwall.
5      Q.   Do you know when those photographs
6  were taken of those scrape marks?
7      A.   No.
8      Q.   Do you know how much activity had been
9  undertaken at the floodwall at the time those
10  photographs were taken?
11     A.   Probably a lot.
12     Q.   Okay.  And did those scrape marks
13  appear fresh to you?
14     A.   They -- I wasn't making a comment
15  about freshness.  They were rusty colored, and
16  they were not what I would have expected from,
17  for example, a vehicle which would have been
18  working in the area because they were too
19  straight.
20     Q.   And this is based on observing the
21  photographs.
22     A.   Correct.
23     Q.   You've not been out there yourself to
24  see this at the time.
25     A.   I have not seen that.  Strict him

99

1  photographs, that's correct.
2      Q.   And you haven't been able to make any
3  correlation as between any physical evidence on
4  the barge and those scratch marks on the wall.
5      A.   No, but I would not expect there to
6  be.  If we're just talking about a scrubbing
7  off a little bit of rust or a little -- even
8  iron for that matter, I would not have expected
9  that to have left a mark that would persist
10  given the amount of time after -- that went by
11  before we were able to go look at the barge.
12     Q.   Other than the scratch marks, did you
13  see any evidence anywhere along the floodwall
14  from the northern breach to the southern breach
15  of any impact points, dents, fractures,
16  anything like that, that you attribute to
17  barge?
18     A.   No.
19     Q.   Would you have expected, if the barge
20  was moving down the wall, bumping from the
21  northern breach to the southern breach, to see
22  some evidence of impacts?
23     A.   On the wall or the barge?
24     Q.   Let's start with the wall.  For
25  instance, on the concrete cap.

100

A.   It would depend on how far the barge
went going back and forth against the wall.
     Q.   You mean how much impetus it got?
     A.   Yeah.  How much of a running start it
got before it touched.  And, um -- remembering
or recalling the scratches, they were somewhat
continuous, which would indicate to me the
barge was not losing contact and reestablishing
contacted with the wall, so I would not expect
shock loads there.  And like I say, I would not
have expected that kind of a contact to have
left a mark on the barge.
     Q.   So whatever made the scratches that
you see on the wall in your opinion was some
kind of continuous motion.
     A.   A drag, yes.
     Q.   A drag.  And you didn't see any
evidence on the wall of any potential contact
from the barge coming back and forth and
hitting the wall, as you said, with a running
start.
     MR. GILBERT:
          Asked and answered.
     A.   Correct.
EXAMINATION BY MR. WALKER:

101

     Q.   And I assume you didn't see any such
evidence on the barge itself either.
     A.   Correct.
     Q.   Well, let's talk about this salinity
report, your second report which I've marked as
Exhibit 2.
          You relied on the Aurora Environmental
Consultants report dated August 10, 2006,
right?
          (Exhibit 2 was marked for
identification and is attached hereto.)
     A.   Oh.  Do you have a spare copy?
EXAMINATION BY MR. WALKER:
     Q.   (Tendering.)
     A.   Thank you very much.  Yes.  That's
correct.
     Q.   That Aurora Environmental report is
long after Katrina and long after Rita, too,
right?
     A.   Um -- I would have expected that to
be, yes.
     Q.   So the answer is yes, right?
     A.   Yes.
     Q.   So any findings of theirs regarding
salinity, corrosion, evidence of water damage,

102

1  et cetera, you can't differentiate as between
2  Rita and Katrina, can you?
3      MR. GILBERT:
4          Objection.  They didn't render
5      any findings as to corrosion.  You're
6      basing this question upon your prior
7      question which was whether the testing
8      occurred long after, and we don't
9      really have any definition on the
10     record of what long after means.  The
11     report itself from Aurora
12     Environmental is dated and contains
13     information as to when it was
14     conducted, and that should govern your
15     question.  Otherwise, object to the
16     form.
17          You can answer.
18     A.  Would you do me a favor, Mr. Walker,
19  ask that question again?
20  EXAMINATION BY MR. WALKER:
21     Q.  The report does not and cannot
22  differentiate between its findings as to
23  whether they were caused by Hurricane Rita
24  floodwaters or Hurricane Katrina floodwaters,
25  can it?

103

1      A.  Um -- I would -- I'm relying on their
2  expertise, but I would not have expected them
3  to be able to differentiate that.
4      Q.  Who asked you for this report?
5      A.  Mr. Gilbert.
6      Q.  And why?
7      A.  He asked if there was a, um -- if
8  there would be an effect on the, um -- metallic
9  components, on salt coating or salinity,
10  residual salt left over after the floodwaters
11  had receded if indeed the floodwaters were
12  salt.
13     Q.  Were the floodwaters salty?
14     MR. GILBERT:
15         Object.  He's not an
16     environmental engineer.  He didn't do
17     the salinity testing.  It's beyond the
18     scope of this report.
19  EXAMINATION BY MR. WALKER:
20     Q.  Do you know?
21     A.  Um -- I don't know specifically what
22  the salinity was.  We were, um -- I would have
23  expected there to be some salt, um --
24     Q.  So --
25     A.  -- in the water.

104

1      Q.  I'm sorry.  So is your report a
2  hypothetical?
3      A.  Excuse me.
4      Q.  So is your report then a hypothetical
5  based on the possibility of the water being
6  salty?
7      A.  No.  We're saying that there was salt
8  deposited as a result of the water that entered
9  the, um -- entered the area.  And we're basing
10  that on the Aurora Environmental study which,
11  um -- came to that conclusion.
12     Q.  Do you know if Lake Pontchartrain is
13  brackish?
14     A.  Yes, it is.  I do know.
15     Q.  Bayou Bienvenue; do you know if it's
16  brackish?
17     A.  I don't know Bayou Bienvenue, but,
18  um --
19     Q.  How about the Industrial Canal, is it
20  brackish?
21     A.  The Industrial Canal will likely be,
22  um -- brackish -- it depends on how you define
23  brackish -- but there will be some salt.  I
24  would maybe expect more salinity in the
25  Industrial Canal, but it doesn't matter.

105

1      Q.  Do you know if the waters of the MRGO
2  are brackish?
3      A.  I would expect the water of the MRGO
4  to be more -- have a higher salinity than Lake
5  Pontchartrain or the Inner Harbor Navigational
6  Canal, but, um -- but I don't -- I didn't form
7  an opinion on that.
8      Q.  My next question was, you don't have
9  an opinion as to where any of the waters came
10  from that Aurora Environmental found had left
11  salt deposits.
12     A.  Correct.
13     Q.  All this report really says is that
14  salt deposits can exacerbate or accelerate
15  damage in particularly metal components.
16     A.  I think that that's a pretty good
17  summary, yes.
18     Q.  What does that conclusion have to do
19  with this case, to your knowledge?
20     MR. GILBERT:
21         That actually calls for a legal
22     conclusion.
23     A.  I don't know.  I was just asked to,
24  um -- to perform this evaluation.
25  EXAMINATION BY MR. WALKER:

106

1    Q.   And you don't know the condition of
2  those homes prior to Aurora Environmental 's
3  study, do you?
4    A.   I think it's reasonable to assume that
5  they did not have salt on their metallic
6  surfaces prior to the, um -- prior to the
7  inundation of the area by the water after
8  Katrina --
9    Q.   If you live in --
10    A.   -- and Rita.
11    Q.   If you live in the Ninth Ward you
12  would not expect any salt from any spray or any
13  ambient humidity?
14    A.   There will always be salt spray in the
15  water -- in air that's near bodies of water
16  that have salt in them, but I would not expect
17  that salt spray to penetrate the wall cavities
18  and, um -- and to reach deep inside of houses.
19  And also the amount of the salt is going to be
20  less.
21    MR. WALKER:
22        I think those are all the
23    questions I have.  Thank you.
24    MR. GILBERT:
25        Nothing here.

107

1        WITNESS' CERTIFICATE
2
3        I, ROBERT D. BARTLETT, P.E., do
4  hereby certify that the foregoing testimony was
5  given by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10  _____  _____
11  DATE SIGNED        ROBERT D. BARTLETT, P.E.
12
13  _____ Signed with corrections as noted.
14
15  _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN: July 21st, 2009

108

REPORTER'S CERTIFICATE
    I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
Certified Court Reporter in and for the State
of Louisiana, do hereby certify that the
aforementioned witness, after having been first
duly sworn by me to testify to the truth, did
testify as hereinabove set forth;
    That said deposition was taken by me
in computer shorthand and thereafter
transcribed under my supervision, and is a true
and correct transcription to the best of my
ability and understanding.
    I further certify that I am not of
counsel, nor related to counsel or the parties
hereto, and am in no way interested in the
result of said cause.


_____
JOSEPH A. FAIRBANKS, JR., CCR, RPR
CERTIFIED COURT REPORTER #75005

ROBERT D. BARTLETT                                                    7/21/2009

Page 1

| A |
| --- |
**ability** 5:17 108:12
**able** 21:11 34:16 35:4
  76:15 93:24 97:15 99:2
  99:11 103:3
**Absolutely** 60:17 66:7
**absorption** 97:15
**accelerate** 105:14
**access** 29:5 34:16
**accordion-like** 78:23
**accurate** 11:13
**acquisition** 24:4
**acting** 43:18
**action** 1:4 81:10
**activity** 98:8
**actual** 88:5
**add** 92:17
**addressed** 71:17
**adjacent** 61:12 62:9
  74:14 87:7
**administering** 4:24
**adrift** 34:25
**aerial** 66:19
**affect** 83:5,8,9
**affirmatively** 30:14
**aforementioned** 4:4
  107:8 108:5
**afternoon** 5:8,9
**ago** 7:5 42:2,4
**agree** 49:2 60:15 75:24
  82:15
**agreed** 4:2 52:9
**agreement** 52:18 53:1
**ahead** 9:20 35:24 53:24
**air** 12:7 106:15
**alcohol** 5:15
**aligned** 79:14
**alignment** 58:12
**allow** 71:10
**allowed** 20:9 29:5
**ambient** 106:13
**AMERICA** 2:9
**American** 2:17 14:11,17
  14:19
**amount** 80:19 81:17 82:2
  99:10 106:19

**analyses** 21:15
**analysis** 13:22 14:7
  15:12,13,16,17,18 20:4
  20:8 23:22 26:11 34:11
  35:9 44:4,5
**analyzed** 21:25
**and/or** 8:17,18,24 107:6
**angle** 22:4,12,13 23:2,8
  51:8 52:14 80:15,16
  91:18 96:2
**answer** 4:13 27:8 34:17
  43:14 48:24 63:12 72:5
  72:6,12,16,23,25
  101:22 102:17
**answered** 72:21 100:23
**answers** 5:18
**anybody** 5:20 6:21,24
  43:10,15 85:21 86:2
**anyway** 66:20
**apologize** 73:22
**appear** 70:9 98:13
**APPEARANCES** 2:1
**appeared** 27:10
**appears** 25:12 70:21
  75:4
**Appendix** 53:15,15,18
  53:19
**application** 16:15
**applied** 23:7 51:1 75:19
**approached** 97:10
**appropriate** 75:23,25
  76:2
**approximate** 91:14
**approximately** 32:10
  54:10,20 85:7 87:6,8,12
  93:10
**area** 13:20,21 14:1 17:4
  17:20 27:17 31:3,3,8
  34:7 45:21 51:11,21
  52:20 55:7 60:20 62:10
  71:13 72:10 76:6,10
  86:25 87:4 92:1 96:12
  96:19 97:23 98:18
  104:9 106:7
**areas** 13:23 14:6 15:15
  16:24 17:11

**arrow** 22:10 62:7 75:6
  78:16 84:2,2,7,13
**arrows** 83:25 84:1
**asked** 8:10 18:22 34:20
  34:24 70:17 72:22 76:7
  76:11 100:23 103:4,7
  105:23
**asking** 21:3 34:22 38:15
  71:23 72:4 73:16
**ASM** 14:14
**assisted** 35:12
**associated** 33:2 39:24
**Association** 14:21
**assume** 41:13 72:4 101:1
  106:4
**assumed** 81:20
**assuming** 82:21
**attached** 40:24 56:3 78:4
  78:11 95:15,21 101:11
**attachments** 22:7
**attend** 47:24
**attended** 13:2
**attorney** 38:10
**attribute** 99:16
**August** 10:2 101:8
**Aurora** 101:7,17 102:11
  104:10 105:10 106:2
**available** 19:11 29:17,19
**Avenue** 5:2 68:10
**aware** 87:25
**axis** 75:3,5 78:1

| B |
| --- |
**B** 3:6 53:15,18,19 54:13
**bachelor** 13:3
**back** 11:1 31:13 42:19
  44:19,24 52:25 69:19
  69:24 73:4 100:2,19
**bar** 19:15 20:11 21:18
**bare** 26:20
**barge** 2:2 8:18,24 10:12
  10:13 11:15,18 12:1,2,6
  12:11,17,18,20,23
  18:16,23 19:1,5,20,21
  19:23 25:1 26:12 27:9
  27:11 28:12,17 29:6,25
  30:5,10,22 31:25 32:3,9

33:3,7,11 34:4,15,19,22
  34:25 37:2 41:24 43:11
  43:24,25 44:7 45:19,23
  46:6,9,23 47:2,2,3,6,8
  47:11 51:17 52:11 57:2
  57:8,15,23 58:1 62:25
  63:6,15,19 64:8,10
  67:20 68:18,21,21,22
  69:10,25 70:3,12 81:2
  83:16 84:10 87:23 88:4
  88:5,15,21,24 89:15,20
  89:21,23 90:10,19 91:6
  91:19 92:5,8,10 93:2,10
  93:23 94:12,17,22
  96:12,22,24 97:4,9,10
  98:3 99:4,11,17,19,23
  100:1,8,12,19 101:2
**barges** 1:6 32:6,7 33:15
  67:22 68:1
**BARNETT** 2:18
**Baronne** 2:5
**bars** 20:2 28:8 46:8
  93:24,25
**Bartlett** 1:17 5:1,8 107:3
  107:11
**based** 18:14,24 24:16,24
  29:1 36:15 43:15 44:5
  54:7 62:23 63:6,10
  80:15 85:3 90:6,8 93:5
  98:20 104:5
**basic** 64:18
**basically** 26:10 34:11
  79:5
**basing** 102:6 104:9
**basis** 16:21 19:15 38:11
  41:16 42:16 68:13
  72:14
**Bayou** 104:15,17
**Bea** 64:21 67:12
**bear** 59:22
**bearing** 82:20,23
**bears** 83:3
**began** 68:9
**beginnings** 55:1
**begins** 20:14,15
**behavior** 18:1

ROBERT D. BARTLETT

7/21/2009

Page 2

**believe** 5:25 7:23 12:2
16:25 23:6 28:3,24
54:6 57:18 58:24 63:15
79:19 86:22 87:11
90:23 96:11 97:25
**belong** 14:25
**bend** 20:12 25:11 26:19
26:24
**bending** 21:18 24:21
27:4 47:6,9 58:2
**beneath** 54:25
**Benoit** 1:12
**bent** 7:18 16:17 26:12
28:9 51:7,18 55:23
58:5 80:16,18 81:2,13
**best** 79:18 108:11
**better** 80:4 84:18 97:16
**bevel** 79:11
**beyond** 31:1 48:22 73:17
103:17
**Bienvenue** 104:15,17
**bilge** 47:12,13,14 57:14
69:21 83:14,19 84:9,19
85:6,25 87:25 88:7,12
88:17,20 89:3,5,9,11,21
89:22 90:7 91:1,25
93:6 94:7
**bit** 7:25 12:25 27:23 50:6
88:25 97:13 99:7
**bladders** 12:7,7,23
**Bland** 31:17
**blow** 46:21
**blurred** 31:22
**bodies** 106:15
**body** 18:21 82:2,4
**boom** 40:2
**bottom** 19:19 25:8,16
46:9 59:6,7 68:20
80:11 86:6 87:22 89:2
92:7,15
**bounds** 72:2
**Boutte** 1:8
**bow** 69:15,22 70:4 89:2
91:19
**brackish** 104:13,16,20
104:22,23 105:2

**breach** 7:15 8:4 22:6
44:16 49:11,22 56:14
57:22 62:13,15,17,19
63:1,7,10,11,13,14,20
63:25 77:20 78:6 83:18
83:22 96:12,19 97:23
99:14,14,21,21
**breaches** 1:4 67:17,20
68:7,15
**break** 9:21 27:1 33:15
34:21 37:9
**breakage** 36:4
**breakaways** 37:3
**breaking** 38:23 50:16
**Brian** 2:3,4 76:20
**Bridge** 31:15 32:1,6,12
32:19 33:6 34:6
**Brief** 56:18
**briefly** 27:24
**brittle** 16:2 22:2,2,15
**broad** 15:9
**broke** 32:8,11 33:7 50:12
67:22 68:1
**broken** 34:24 36:6
**BROWN** 2:18
**build** 54:7
**buildings** 37:19
**built** 53:5
**bulb** 61:17,18,19 79:6
**bumping** 99:20

─────────

### C

**cable** 36:21
**cables** 35:21
**calculate** 21:6 30:8 81:23
**calculated** 82:14
**calculation** 25:20 81:22
**calculations** 20:10 21:14
23:20 25:9
**call** 6:22 54:23 70:4
75:16 89:22
**called** 12:22 19:10 53:12
**calls** 105:21
**canal** 1:4 7:17 9:8 10:15
23:9 25:5 68:10,10
82:4 104:19,21,25
105:6

**cap** 26:17 27:13,15 28:2
30:12 53:7 55:17,19
56:16 60:12 81:7,11,12
81:18,22 82:3 83:3,4,11
93:19,20,23 94:2,3,9,15
97:22 99:25
**career** 13:20
**case** 7:7 8:13 10:11 16:16
21:12,15,25 23:15
24:10 29:10 31:25 34:9
35:9 36:10 37:10,16
38:5,9,22 42:18 43:10
43:15 45:19 51:20
105:19
**cases** 36:23 37:8,13
38:25
**catalog** 77:9
**cause** 20:20 21:7,11 23:7
24:7,10,21 25:21 27:3
34:5 36:14 48:4,5
50:17 51:24 52:5 60:1
60:18 68:14 71:11,20
76:15 77:18 108:16
**caused** 27:15 33:3 45:5
46:1 48:16 49:4,5 50:1
50:24 57:2 59:5,8 60:4
69:10 71:15 74:9,12
76:5,8 90:6,16 93:6
95:24 96:9 98:2 102:23
**causes** 43:25
**causing** 52:2 62:10
**cavities** 106:17
**CCR** 1:24 4:22 108:2,24
**cells** 24:4
**cement** 54:8
**Centre** 1:19 2:12,21
**certain** 21:8 22:3,4
**certainly** 16:20,20 70:15
73:5,7
**CERTIFICATE** 107:1
108:1
**certification** 4:9
**Certified** 1:25 4:23
108:3,25
**certify** 107:4 108:4,13
**cetera** 13:21 102:1

**Chaffe** 1:18 2:10
**chain** 70:16 71:20
**chamfer** 79:8,9,10,15
80:3
**changed** 10:25 38:8
**changes** 107:6
**characteristics** 82:16
**charged** 71:25
**chart** 69:14
**circle** 75:1 84:17
**circumstances** 36:5
**cited** 44:11,14 57:17
**Civil** 1:4 4:6
**CJ** 53:14
**classic** 21:12
**clear** 8:3 18:20 38:11
90:5
**clearly** 31:8
**close** 59:7
**closer** 33:20
**CLUB** 2:17
**coaming** 92:18,21
**coated** 32:25
**coating** 103:9
**Code** 4:6
**collapse** 49:5 50:5
**collapsed** 50:2
**collecting** 42:15
**collection** 32:18
**colored** 98:15
**combination** 74:15
**come** 12:15 44:19,24
70:14 75:21
**coming** 12:10 23:8 52:11
84:3 100:19
**comment** 19:8 98:14
**comments** 9:4
**companies** 8:18
**company** 12:17 14:2
**compare** 68:13
**compared** 19:13
**compelling** 44:15 57:21
**completion** 20:21
**complicated** 24:1
**complies** 54:24 56:8
**component** 15:23

JOHNS PENDLETON COURT REPORTERS

800 562-1285

**components** 15:11,17,20
  21:20 103:9 105:15
**comports** 85:5
**comprehending** 59:22
**compressive** 39:13,15
**comprise** 89:10
**computer** 23:15 108:9
**concave** 96:4
**concaved** 95:23
**concept** 64:18
**concern** 49:9,17
**concerned** 87:1
**conclude** 18:23 59:25
  64:7
**concluded** 24:23
**concludes** 26:11
**conclusion** 16:11 18:14
  22:20 44:11,25 45:12
  45:13 56:20,25 57:11
  62:12,24 83:14,16
  86:14 87:24 90:5
  104:11 105:18,22
**conclusions** 16:21,22
  17:8,11 18:19,21 19:16
  23:16 27:21 28:1 29:1
  44:10 48:3
**concrete** 16:2,8 22:18
  26:17,21,21 27:1,13,14
  30:12 33:1,24 38:23
  39:1,2,6,7,8,10,11,19
  48:10,11,16 50:10 51:9
  52:13 54:9 55:2,9
  56:16 61:10 79:24 81:7
  81:12 83:3 86:20,20
  93:19,20 99:25
**condition** 30:1 61:13,21
  83:7 106:1
**conduct** 18:5
**conducted** 25:2 102:14
**confirm** 63:4 64:3,13
**confirms** 62:13
**confused** 52:8
**connect** 12:17
**consider** 14:1
**consideration** 16:7
**considered** 13:14

**consistency** 18:25 82:25
**consistent** 22:13 30:21
  48:16 56:21 84:8 87:19
  89:16
**Consolidated** 1:6
**construct** 32:20
**constructing** 42:15
**construction** 53:2,4,11
  54:4,16,19,25 55:8 56:6
  79:15,23 84:12 97:13
  98:1
**Consultants** 101:8
**consultation** 35:19
**consulting** 10:5
**contact** 18:6 19:5 45:5
  45:10,12,16,20 46:1,2,3
  46:12,20,23 47:5 52:5,6
  57:2 70:14 87:20 95:25
  96:21 97:16,22 100:8
  100:11,18
**contacted** 18:16 46:13
  100:9
**contained** 56:1 65:4
  73:19
**contains** 102:12
**content** 41:9 43:7,9
**context** 45:11,17 52:20
**continued** 60:7
**continuing** 60:2
**continuous** 100:7,15
**contractor** 54:6
**contradicted** 38:6
**conversation** 8:9 9:4
**conversations** 41:15
  43:16
**copied** 67:13
**copies** 65:12 67:6
**copy** 40:18 101:12
**cores** 39:8,10
**corner** 89:20,23 90:2
**corners** 91:9
**correct** 6:20 8:5 10:19
  11:16 13:18 14:23 15:6
  21:21 22:9,19 23:10,13
  24:22 25:7 26:9,14,18
  27:12 29:2,4 31:12

  32:14 33:25 34:10,13
  42:10 45:3,6,8,9 47:13
  48:6,7,13 49:23,24
  50:14,20 51:4 52:17
  54:18 55:2,18,24 56:17
  57:12,16,20,24 58:14
  58:19 59:18 60:14
  62:22 63:2,9,16,17 64:2
  64:5 67:8 68:16 69:13
  70:10 75:7 76:19 78:24
  79:16 81:8 82:12 83:21
  83:23 85:10 86:12,17
  89:8 90:4,11,17 91:10
  92:19 93:7 94:5,16
  96:7,10 97:3 98:22
  99:1 100:24 101:3,16
  105:12 107:7 108:11
**corrections** 107:6,13,15
**correctly** 24:24 60:23
  64:6 83:18
**correlation** 57:13 99:3
**corroborate** 63:20
**corrosion** 14:8,21 101:25
  102:5
**counsel** 4:3 108:14,14
**couple** 94:25
**course** 65:23
**Court** 1:1,25 4:23 108:3
  108:25
**cover** 65:24 71:14 93:3
**covers** 92:18,22
**crack** 20:14,15,16 22:23
**cracks** 21:22 49:15
**crane** 37:3
**creosote** 32:22,24
**cross-examined** 38:8
**curious** 37:25
**current** 33:18
**curvature** 58:8 84:21,23
  85:1 89:1 96:5
**curved** 84:7 95:23
**curving** 58:9
**cut** 12:11
**CV** 31:13
**cycle** 20:19
**cycles** 21:7

**cyclical** 21:5
**cylinder** 39:23

---

### D

**D** 1:17 3:1,6 5:1,2 107:3
  107:11
**damage** 27:3,4 33:2,10
  33:23 34:5 35:17 39:2
  43:23 44:16 45:5 46:1
  49:16,19 57:1,2,22 63:6
  63:10,14,16 64:1 90:13
  90:15 93:7 101:25
  105:15
**damaged** 36:16
**darker** 84:14
**data** 24:4
**date** 12:4,5 107:8,11,25
**dated** 9:12 101:8 102:12
**Daubert** 40:9
**Day** 38:2,15,19
**deal** 72:7
**dealing** 45:22
**dealt** 27:17
**debacle** 47:22
**deck** 92:16,17
**Declaration** 64:21
**deep** 82:8 106:18
**deepest** 93:2
**defective** 35:15,16,17,17
**define** 104:22
**definitely** 33:17
**definition** 102:9
**deflected** 16:17
**deformation** 16:11 25:21
**degree** 22:12 50:7
**degrees** 13:8 50:7 80:22
  80:22
**demarcations** 84:19
**demolished** 29:23
**demonstrate** 56:7
**demonstrates** 96:21
**density** 81:23
**dent** 90:3
**dents** 89:18 99:15
**depend** 100:1
**depending** 82:15
**depends** 45:17 49:7

ROBERT D. BARTLETT                                                                 7/21/2009

Page 4

104:22
**deposited** 104:8
**deposition** 1:17 4:4,14
  5:10,21 6:6 38:1 40:19
  47:18 108:8
**deposits** 105:11,14
**depth** 82:16 94:1 96:14
  97:6
**DEREK** 2:11
**derive** 85:13
**derived** 85:11
**describe** 89:5,12
**describing** 8:22
**description** 9:2 85:24
**design** 15:10,10,11 37:18
**destroyed** 10:25
**detail** 44:25
**determination** 15:25
  31:8
**determine** 8:23 24:7,10
  26:8 93:17
**determined** 81:17
**develops** 39:22
**diagonal** 39:22
**diagram** 56:7 69:15
**difference** 45:15 82:5
**differentiate** 51:14 102:1
  102:22 103:3
**differently** 83:11
**dimension** 92:11
**dimensions** 30:4 92:9
**direction** 9:6 29:8 68:23
**disagree** 49:2
**discoverable** 6:15
**discuss** 6:18 7:11 12:24
**discussed** 42:19,22
**discussion** 19:7 25:19,24
  26:4,5,7 71:16 72:7
  80:24 81:1
**discussions** 43:6,22
**display** 10:14
**distance** 21:8,9
**DISTRICT** 1:1,2
**docks** 31:16
**document** 11:2
**documented** 8:12

**doing** 47:1
**Donald** 47:16
**dots** 56:9
**downloaded** 66:16
**Dr** 64:21 67:12
**drafts** 6:9,14,19
**drag** 100:16,17
**draw** 80:7
**drawing** 53:13 55:15
  94:19,21 95:4 96:1
**Drawn** 12:13
**draws** 30:7
**drew** 96:5
**drug** 5:15
**dry** 98:3
**due** 16:12,13 30:11 43:17
  43:19,25 44:17 45:8
  49:19 57:23 76:17 90:6
**duly** 108:6
**DUVAL** 1:9
**dynamics** 24:4

---

**E**

**E** 3:1,1,6,6
**earlier** 9:3 24:19 26:12
  30:9 42:7 70:24 96:17
  97:9
**early** 9:25 10:3
**east** 44:17
**eastern** 1:2 68:18
**Edenborn** 5:2
**edge** 58:10 79:12 80:13
  92:8
**education** 12:25 16:15
**effect** 77:10,15 82:24
  83:4 103:8
**effects** 17:25
**eight** 87:16
**either** 31:9 37:20 39:4
  101:2
**EL** 54:2
**elastomeric** 61:4 70:24
**element** 23:21
**elements** 16:1,4
**elevation** 53:14 54:2,10
  55:14 58:7 59:7,7 60:5
  69:3 79:22

**ellipsis** 54:22
**embedded** 83:2
**empty** 33:12
**encompass** 15:8
**encompassed** 16:4
**encounter** 97:14
**energy** 1:18 2:12,21 40:4
  97:16
**engineer** 15:21,24 16:5
  17:7,14 41:1 103:16
**engineering** 13:4,6 15:5
  15:8,15 17:2,21 31:4
**engineers** 14:12,22 18:3
**entered** 104:8,9
**Entergy** 38:5,13
**Entergy's** 38:17
**entire** 69:11 82:4 88:20
  89:6,7
**environmental** 101:7,17
  102:12 103:16 104:10
  105:10 106:2
**equal** 82:13
**equations** 24:2
**equipment** 14:8 15:11
  24:4,13,14,18 37:3
**equivalent** 45:14
**ESQUIRE** 2:4,11,20
**establish** 72:8
**estimate** 25:10,13 47:1
**estimates** 27:2
**et** 13:20 102:1
**evaluate** 20:22 21:2 24:1
  30:18
**evaluated** 72:11
**evaluating** 16:8
**evaluation** 36:23 44:4,5
  70:16,17 71:13 105:24
**evaluations** 46:25
**Evans** 67:1 90:23 92:4
**events** 70:16 71:20
**evidence** 4:15 8:11,12,15
  9:10,11 30:15,16,18,21
  31:7 44:15,20 46:17
  57:21 62:13 64:11
  69:25 89:15 90:10
  96:21 97:22 99:3,13,22

100:18 101:2,25
**exacerbate** 105:14
**exact** 46:23 92:11
**exactly** 8:9 31:23 84:18
**examination** 3:3 5:7 6:17
  17:18 28:11 30:25 41:5
  49:1 51:21 56:4,19
  63:24 72:3 73:25 77:1
  78:8,15 95:22 100:25
  101:13 102:20 103:19
  105:25
**examine** 73:20
**examined** 5:5
**example** 15:18 16:7 18:8
  20:25 21:6 22:5 37:6
  44:3 52:4 62:8 98:17
**Excuse** 104:3
**exemplar** 24:14
**exerted** 25:4 26:25 77:13
**Exhibit** 3:8,9,10,11,12
  3:13,14,15 40:23 54:12
  54:13 56:1,2 58:8
  77:24 78:3,10 79:20
  95:13,14,19,20 96:6
  101:6,10
**exist** 24:2
**existing** 55:4
**expand** 7:24
**expect** 22:14,24 74:16
  92:12 98:2 99:5 100:9
  104:24 105:3 106:12,16
**expected** 68:5 84:8 98:16
  99:8,19 100:11 101:20
  103:2,23
**experiences** 24:16
**expert** 14:4 38:5,6 40:7
  45:16
**expertise** 13:21,23 16:15
  16:25 36:3 38:20 103:2
**experts** 27:18 45:22
  46:24 51:22
**explain** 17:19 38:3
**exposed** 26:15 27:9
  55:12 56:22 69:7
**extends** 79:13
**extension** 80:8

ROBERT D. BARTLETT                                                                      7/21/2009

**extent** 7:22 18:18 22:1
    33:23
**external** 50:25
**externally** 51:1
**eyeball** 25:13

**F**

**FABRE** 2:25
**face** 6:3,3 22:12,25 23:1
    23:3,4 82:9,11
**facilities** 36:25
**fact** 18:22 23:1 58:10
    60:2
**facts** 44:13,14
**fail** 22:3
**failed** 35:2 37:11
**failing** 71:6
**fails** 39:20 73:8
**failure** 15:13,16,17 20:21
    20:23 21:3 24:7,11
    35:18,20 36:14,22
    37:14,17 39:17 43:17
    68:14 71:7 72:19 73:3
    73:6,10,11 74:4
**fair** 7:6 16:14
**FAIRBANKS** 1:24 4:22
    108:2,24
**fairly** 81:22
**fall** 39:1 50:4
**Family** 1:13
**far** 33:22 48:22 64:14
    75:20 85:23 86:13,18
    87:1 100:1
**fashion** 59:17
**fatigue** 21:12
**favor** 102:18
**feature** 57:10
**features** 48:6,9,15 49:3
    56:25 57:3 87:19
**feel** 24:9 33:4 43:8,22
    67:9
**feet** 20:1 49:10 54:20
    55:15 58:7 60:5 79:14
    83:6 87:12,14,16,17
    88:15,16,17,21 89:6,7
    92:13,20,22 93:1,10,14
    93:20,22,22 94:1,3,9,10

94:14
**fell** 50:2
**felt** 29:14
**fender** 32:17,21 34:1
**fenderring** 34:5
**fenders** 32:15
**fiber** 35:22,25 36:1,17
**fibers** 36:15
**field** 15:7 20:9
**fifteen** 68:1 87:16
**fifth** 62:12
**figure** 22:6,7 62:4,7,7
    74:20,21,22,23 75:1,15
    75:24 76:1,9 77:24
    78:1,7 83:20,24 91:17
    96:2
**filed** 40:10
**filing** 4:9
**filings** 40:12
**final** 6:11 20:21 21:11
**find** 30:15 62:11 90:2
**findings** 101:24 102:5,22
**finish** 36:19
**finite** 23:21
**fire** 38:12
**fires** 39:1
**firm** 67:9
**firmness** 83:1
**first** 6:2 34:1 40:21 48:3
    70:5 71:10 72:9 84:2
    92:4 108:5
**fit** 79:3
**fitting** 85:25
**five** 45:1
**flat** 52:23,25 54:9 80:14
    87:20
**fleeting** 36:25,25
**flipped** 41:25
**floated** 32:12
**floating** 28:17
**floodwall** 7:16 8:8,13,25
    9:7 16:1 18:17,24 19:6
    20:1,2 21:23 22:5,10,13
    23:1,3 28:10,15,18,19
    28:23 29:1,5,7,22 30:23
    31:6 43:24 44:17 52:21

52:25 58:10 68:18,24
    69:6 70:21 71:16 72:20
    83:7 84:4 85:4 94:11
    96:2,13 97:10,11,12
    98:4,9 99:13
**floodwaters** 102:24,24
    103:10,11,13
**fluid** 17:20,22 18:4
**focused** 34:12
**fold** 19:9,14,17 20:2,11
    46:8
**folded** 19:21 28:14 58:5
    84:4
**folding** 27:6
**follow** 26:1 96:3
**followed** 72:18
**following** 56:5
**follows** 5:6 96:4
**follow-up** 72:22
**foot** 30:7 69:11 94:19,21
    94:22
**footnoted** 66:22
**force** 16:12,13 19:16,25
    20:11 23:4,11 26:19,20
    26:23 27:2 30:11 34:4
    45:23 47:1 74:12,13
    76:18
**forces** 19:8,11,14 23:6,8
    25:10,20 76:14 77:13
    77:17
**foregoing** 107:4
**foreground** 91:4
**forgot** 60:25
**form** 4:12 35:18 76:13
    80:12 84:18 102:16
    105:6
**formalities** 4:8
**forms** 80:9
**formulate** 73:16
**forth** 42:20 100:2,19
    108:7
**found** 12:16 22:16 86:10
    90:10 105:10
**foundations** 31:5
**four** 92:21
**fourteen** 92:12,25

**fourth** 44:11,14 45:13
**fracture** 13:22 20:5,13
    21:8,11,13 22:3,4,11,14
    22:17,18,24 23:2,7
    36:17 38:23 46:10 48:4
    48:6,8 49:3,14,23 50:18
    50:24 51:7,12,15,19,24
    52:2,10,19,20,21 54:8
    55:13 56:6,10,12 58:3,6
    58:9,11 59:1,3,6,8,11
    59:24 60:2,4,19 69:2
    74:13 79:13 95:24 96:3
**fractured** 36:15 48:15
    59:9 69:5
**fractures** 21:17,19,20
    22:21 39:21,22 49:7,9
    60:1 99:15
**fracturing** 48:17 52:13
**frame** 9:13
**free** 76:12
**fresh** 98:13
**freshness** 98:15
**Friday** 5:25 6:5
**front** 12:4 14:5 17:9
    38:13 52:7,24 89:23
    91:2 98:4
**frontal** 52:1,14
**further** 25:3 91:15
    108:13

**G**

**gain** 10:23
**Galvez** 38:7
**gathered** 72:10
**gauges** 24:3
**general** 6:8
**generally** 9:7
**genesis** 85:24
**gentlemen** 38:14
**germane** 41:7
**getting** 10:9
**Getty** 66:13,20,23
**Gilbert** 2:3,4 5:22 6:3,10
    6:13,23 7:4 28:4 29:11
    30:24 48:20 63:22
    65:14 66:10,11 67:6
    71:21 73:14 76:22

100:22 102:3 103:5,14
  105:20 106:24
**give** 5:17 8:13 9:13 12:18
  15:8 83:17 64:16
**given** 1:18 47:20 65:2,14
  66:9 81:18 99:10 107:5
  107:7
**giving** 23:5
**glean** 7:19
**gleaned** 41:14
**go** 9:20 11:21,25 35:24
  40:17 53:24 64:19
  69:11,23,23,23 74:25
  80:24 97:12 99:11
**goes** 31:1 58:13 59:1
  79:4
**going** 14:2 17:5 31:13
  48:21,22 56:8 58:1
  62:2 63:23 73:15 80:7
  82:11 90:21 100:2
  106:19
**good** 5:8,9 82:6 91:18
  105:16
**govern** 102:14
**great** 72:7 82:6
**greater** 26:20
**Green** 47:16
**gross** 20:19
**Group** 95:18
**grow** 20:20
**grows** 20:17
**guess** 43:21
**guidance** 9:6

**H**

**H** 3:6
**half** 30:7 42:2,3 61:11
  69:23 70:8 94:20,21,22
**HAMMOND** 2:19
**handle** 18:3 97:15
**happened** 33:8 51:15
  72:9,9
**happens** 20:15 39:19
**Harbor** 7:16 9:8 105:5
**hard** 46:12 59:21
**HART** 2:25,25
**haste** 11:1

**head** 30:3
**hear** 86:2
**heard** 61:3 86:11
**heavy** 37:8,13
**Hector** 65:3
**height** 58:18 92:10 93:17
**held** 38:2
**Helmer** 40:20,21,25
**help** 23:19 76:20 93:19
**helpful** 35:8
**hereinabove** 108:7
**hereto** 4:3 40:24 56:3
  78:4,11 95:15,21
  101:11 108:15
**high** 33:14,17
**higher** 105:4
**hinge** 19:11 20:9 80:25
**hinged** 30:13
**hired** 9:17 10:18,21
  11:11
**hit** 10:3 32:5 44:7
**hits** 60:22
**hitting** 100:20
**holding** 83:2
**homes** 106:2
**hook** 79:6
**hope** 64:16
**hopper** 32:9
**horizontal** 23:7 48:12
  49:23 50:18,24 52:19
  52:22,23 53:6 55:13
  58:3,6 59:8
**hour** 33:19
**houses** 106:18
**hull** 18:10
**humidity** 106:13
**hundred** 66:1,1,2 68:1
  89:6
**hurricane** 10:3,6 37:8
  67:18,23 68:2,7 94:18
  102:23,24
**hurricanes** 37:13
**hydraulic** 76:14
**hydrostatic** 16:12 17:15
  19:12,18 24:20 25:3
  43:18 48:3,4 49:4 51:2

81:3,5,10,17 82:10,13
  82:17 83:4,5,9 96:9
**hypothetical** 104:2,4

**I**

**identification** 40:24 56:3
  78:4,11 95:15,21
  101:11
**identified** 49:3 58:7
  90:22
**identify** 50:19 87:19
**IHNC** 44:17
**illustration** 78:14
**illustrative** 65:20 85:17
**image** 66:20
**images** 66:13,15 67:14
**immediately** 12:9
**impact** 18:6 43:12 44:17
  45:8,10,16 46:5,14,15
  46:20 52:1,14 57:23
  84:20 85:5 86:1,21,25
  87:4,13 90:2,6 93:11,15
  93:16 94:7 96:15,18,24
  97:1,7 99:15
**impacted** 82:18
**impacts** 99:22
**impair** 5:16
**impetus** 100:3
**imply** 45:24
**important** 51:6
**impression** 85:3
**inch** 82:8
**incident** 31:15
**incipient** 71:20
**include** 11:8 65:22
**included** 65:17
**incorrect** 52:3
**independently** 86:11
**indicate** 19:20 23:3
  68:22 70:11 78:14 81:1
  84:18 100:7
**indicated** 69:1 75:6 77:6
**indicates** 59:5 60:3,3
  95:24
**indicating** 54:1 79:7
  91:17
**indication** 70:2

**indicative** 45:4 46:1 57:1
  89:19 90:13
**individual** 63:4
**Industrial** 10:15 25:5
  82:4 104:19,21,25
**influence** 5:15
**influenced** 82:1
**information** 8:1 10:24
  10:24 18:15 30:18,20
  41:14 42:16 44:2,12,15
  57:18 72:10,13 85:14
  85:20 86:15 97:17
  102:13
**ING** 44:18
**Ingram** 1:9,11 8:17 67:5
**ingredient** 38:24
**initial** 7:6
**Inner** 7:16 9:8 105:5
**inside** 79:4 106:18
**inspect** 30:20
**inspected** 28:22,25 59:17
**inspection** 29:15 62:16
**inspections** 18:15
**installed** 61:6,10
**instance** 21:24 24:20
  99:25
**instant** 33:7
**instruction** 7:22
**instructions** 10:20,23
**instrument** 24:14
**insufficient** 48:5 81:12
**intact** 49:14
**intent** 45:14
**interested** 29:7 108:15
**interlocked** 77:3,7 78:5
  78:19,25 97:14
**International** 14:14
**interpretation** 8:14
  44:13
**interpretations** 16:23
**interpreted** 74:20
**interrupt** 36:18
**intrinsically** 60:16
**introduction** 40:22
**inundation** 106:7
**inverted** 75:21

ROBERT D. BARTLETT                                                                                          7/21/2009

**investigate** 76:7,11
**investigated** 21:17 44:1
76:16
**investigation** 10:5
**involve** 67:20
**involved** 8:20 29:10
34:21 36:9 37:7,12,21
38:25 39:4 41:1 63:19
**involvement** 10:4,11
12:9 33:6 62:25
**involves** 18:1
**involving** 37:8,13 38:23
**iron** 99:8
**issued** 37:22
**issues** 18:4
**issuing** 6:10
**item** 59:5 93:23
**items** 17:12 64:20

### J

**J** 2:20
**job** 33:10
**joined** 58:22 60:24 61:7
61:15
**joins** 60:25
**joint** 53:2,4,11 54:4,16
54:19,25 55:8 56:6,11
56:13 58:13,18,24
59:24 60:12,24 70:24
71:18 74:2 79:15,23
80:10,12,14 84:12 94:4
94:8 97:13 98:1
**joints** 70:22 72:18 73:2,7
73:10,13 79:1,3
**JOSEPH** 1:24 4:22
108:2,24
**JR** 1:24 4:22 108:2,24
**JUDGE** 1:9
**July** 1:20 107:25
**jump** 63:18
**jumps** 58:11
**June** 9:12 40:18 65:11
**jury** 38:1,13,14

### K

**Katrina** 1:4 10:6 47:21
65:25 67:18,23 68:2,8

101:18 102:2,24 106:8
**kept** 52:18
**kevel** 34:8 37:11
**kevels** 34:14,19 35:2
**key** 38:24
**Khorrami** 6:24
**kind** 31:7 32:23 37:14
39:12,22 40:1,2 79:3
100:11,15
**King** 31:17
**KITTO** 2:20
**knock** 79:11
**knocked** 43:12
**knockout** 47:10 84:7
90:13
**knots** 33:21
**know** 6:15 9:1 11:9 27:8
27:13 29:25 30:4 31:23
32:5 37:4 42:11,14
43:14 46:19 61:7,24
65:15 67:19,22 69:19
71:14 72:6 78:13 81:15
85:15,23 86:8,9,13
90:15 92:9 93:19,23
98:5,8 103:20,21
104:12,14,15,17 105:1
105:23 106:1
**knowing** 81:23
**knowledge** 105:19
**known** 61:7
**K(2)** 1:7

### L

**L** 4:1
**labeled** 53:14
**ladies** 38:14
**Lafarge** 1:8,10,12,14 2:9
8:18
**Lagarde** 1:10
**Lake** 104:12 105:4
**land** 23:9 98:3
**large** 68:4 77:17
**Larger** 68:4
**late** 9:25
**law** 4:7
**laying** 52:11
**laypeople** 21:22

**layperson's** 23:5
**lead** 63:15 83:16
**leading** 20:23 21:3
**leaned** 50:5,6,7
**leaning** 49:20 74:23 75:4
76:1 80:20,21,22
**leans** 73:7
**learn** 8:7 24:15 67:25
**LeBlanc** 31:17
**led** 86:15
**left** 21:9,10 99:9 100:12
103:10 105:10
**legal** 105:21
**Legos** 79:4
**length** 42:19 58:1 68:21
69:11 88:6,11,16,20
**let's** 14:10 40:17 54:11
54:12 55:3,25 64:19
66:18 74:25 77:24
83:13 84:25 94:25
95:12 99:24 101:4
**levee** 67:17,19 68:15
**level** 81:21 82:22 94:14
97:9,18
**lifting** 37:3
**light** 30:1 94:13
**liked** 35:5
**limited** 40:15
**line** 35:3,4,6 53:13 54:17
56:9 84:25 86:7 91:5
96:1,3
**lines** 80:7
**liquids** 17:25 18:3
**list** 30:21 41:13
**listing** 41:11
**litigation** 37:22,23
**little** 7:25 12:24 27:23
50:6 87:17,18 88:25
97:13 99:7,7
**live** 106:9,11
**LLP** 1:18
**load** 20:20 21:7,11 24:3
26:25 36:13 37:20,20
51:1,3
**loaded** 24:15 33:11
**loads** 19:9 24:16,17 25:3

26:8,24 80:24 100:10
**located** 26:17
**location** 44:8 50:19 52:1
52:15 59:25 60:9,10,16
85:4 94:15
**locations** 56:21 71:3
**London** 68:10
**long** 60:21 87:8 88:16
101:18,18 102:8,10
**look** 8:10 14:10 16:6
29:9 30:17 33:9 44:10
49:18 54:11 61:23 62:1
63:25 68:9 75:15 84:13
99:11
**looked** 16:9 27:23 34:14
35:14 36:14 59:15 62:4
62:19 87:25 90:11
**looking** 20:6 22:5 29:6
41:11 48:2 52:22 80:5
**looks** 54:13
**loose** 89:1
**LORRI** 2:25
**losing** 100:8
**lot** 15:14 16:21 36:22
98:11
**Louisiana** 1:2,20 2:6,14
2:23 4:6,24 5:3 108:4
**low** 27:1
**lower** 84:3 91:11 97:9,11
**lowest** 93:15
**L.L.P** 2:10,19

### M

**M** 3:1
**machinery** 15:20
**MAG** 1:11
**making** 57:13 98:14
**Malino** 28:3
**Marino** 28:5,7,8 30:9
31:9 42:23 43:3,6
**mark** 40:18 54:15 55:25
77:24 78:9 83:24 84:25
94:25 95:12 97:23 99:9
100:12
**marked** 40:23 54:12 55:8
56:2 78:3,10 79:19
89:17 95:14,20 101:5

JOHNS PENDLETON COURT REPORTERS                                                    800 562-1285

ROBERT D. BARTLETT                                                                    7/21/2009

101:10
**markings** 54:14
**marks** 46:9 97:24 98:1,6
  98:12 99:4,12
**Martin** 38:5,6,10
**master's** 13:5
**matches** 47:10
**matching** 57:7
**material** 15:21 16:2 22:2
  22:3,15 32:23 61:4
**materials** 41:12
**math** 81:16
**mathematical** 23:19
**matter** 17:1 99:8 104:25
**McCall** 1:18 2:10
**mean** 9:2 17:8 18:12
  36:18 59:2 68:19 71:16
  75:2 76:11 78:20,22
  80:19 81:5,6,7 82:21
  84:1 86:2 88:14,14
  95:25 97:7 100:3
**Meaning** 94:12
**means** 87:17 94:21
  102:10
**meant** 28:13 61:20 63:9
**measuring** 36:13
**mechanical** 13:4 14:8,12
  15:5,7,12,15,21,24 16:5
  17:2,7,14,21 18:3
**mechanics** 13:22 17:20
  17:22 18:4 20:5,13
  31:11
**mechanism** 30:11,16
  60:19
**mechanisms** 68:14
**medicine** 5:16
**meet** 6:21 7:1 41:19
**meeting** 6:5 7:7,10 9:5,5
  9:14
**meetings** 7:4
**meets** 89:21
**memberships** 14:11
**memory** 57:4
**men** 75:8
**merely** 12:19
**met** 5:20,25 6:2,18 12:4

40:19 41:18,22 42:23
**Metairie** 5:2
**metal** 15:2 16:16 21:10
  21:20 105:15
**metallic** 16:10 103:8
  106:5
**metallurgical** 13:6 34:11
**metallurgist** 17:7
**metallurgy** 13:17 15:3
  17:2 38:19
**metals** 14:18 15:16
**method** 12:10,21
**middle** 26:5 61:17,18
**midst** 8:21
**mile** 82:9
**miles** 33:19
**million** 12:12
**mind** 64:16
**MINTZ** 2:19
**missing** 27:15 57:7,14
  86:23
**misspoke** 31:21
**misunderstanding** 51:16
  51:25
**models** 23:15
**moment** 80:25
**moments** 5:22
**momentum** 18:2 34:4
**money** 38:17,18
**monolith** 50:9 60:13
  84:4 87:15
**monoliths** 62:9
**MONTGOMERY** 2:18
**month** 67:7
**months** 9:16,24 11:20
  12:8
**moored** 94:18
**mooring** 35:3,4,6 36:25
**mother** 38:15,19 97:12
**mothers** 38:16
**Mother's** 38:2
**motion** 40:9 100:15
**movement** 17:24 40:5
**moving** 49:19 99:20
**MRGO** 105:1,3
**multiple** 14:6 32:7

**Mumford** 1:9

**N**

**N** 3:1,1,1,6 4:1
**naked** 81:6
**named** 5:3
**narrative** 67:16
**National** 14:21
**natural** 35:25
**nature** 43:5 46:23
**Navigation** 9:8
**Navigational** 7:16 105:5
**near** 49:16 106:15
**necessary** 19:16 25:20
  26:19 29:14
**need** 9:21 69:9 82:20
**needed** 87:24
**never** 6:18 11:13 28:25
  29:13 35:4 43:4
**New** 1:19 2:6,14,23
  67:18
**Ninth** 10:13 11:14,25
  106:11
**Nods** 30:14
**noise** 39:24 40:1
**non** 76:20
**normal** 22:17 33:15
**normally** 20:22 21:2
  36:24
**north** 2:9 62:14,17,18,20
  63:1,7,14,19 64:11
  96:12
**northern** 96:19 97:23
  99:14,21
**notch** 79:24 86:24
**note** 24:17
**noted** 107:13,15
**notice** 4:7 44:25
**number** 19:24,24 21:7
  30:2 31:14 37:10 44:25
  45:4,7 46:5 56:20
  57:11,17 62:8 64:22
  65:2 66:4 67:12 68:4
  84:2,10 95:2
**numbered** 45:1
**numbers** 26:23
**numerous** 5:11 67:17

68:7

**O**

**o** 3:1 4:1 56:8 57:18
**oath** 4:25 5:5,6
**object** 20:21 23:25 24:2
  30:25 48:21 63:23
  71:22 73:15 102:15
  103:15
**Objection** 6:14 102:4
**objectionable** 76:24
**objections** 4:11
**objective** 64:4
**obliging** 76:25
**observation** 7:20 24:25
  77:8
**observations** 62:14 77:9
  97:19
**observed** 63:6 97:1
**observing** 98:20
**obtain** 85:20
**obviously** 46:7 49:15
  59:3 62:7
**occasion** 39:8
**occasions** 28:22
**occur** 24:17 73:5,7
**occurred** 22:21,23 51:19
  52:10 56:10,12 71:3,10
  73:2 74:3 93:18 102:8
**occurring** 67:17
**occurs** 71:19
**offer** 17:5,13 76:11
**offered** 17:1 54:5
**offering** 43:20
**office** 6:1 11:24
**officiated** 4:24
**oh** 42:3 66:21 93:14
  101:12
**Ohio** 13:6
**okay** 7:21 9:20 10:16,20
  12:24 14:19 16:19 20:4
  25:18 26:10 27:20
  28:25 31:23 32:3 33:1
  34:14 36:24 40:14
  41:11 42:5 44:19 46:4
  49:12 50:8,12 51:13
  53:7 54:19,22 55:11

ROBERT D. BARTLETT                                                    7/21/2009

56:10,25 57:9 64:19
65:2 69:14 73:22 75:10
76:4 77:19 78:2,22
79:21 80:2,9,15 81:15
83:21 84:5 88:6,23
89:14 91:8,12 92:3
93:1 94:12,25 95:2,10
96:17,23 98:12
**once** 20:13,15 76:12
**ones** 61:18 65:19 67:5
**ongoing** 42:16
**opined** 49:4
**opinion** 8:23 10:5 17:6
17:13 18:13 19:4 23:12
27:14 30:10 34:2 38:12
41:7 43:11,16,21 44:6
45:20 46:2,4 48:14
49:25 50:21,23 51:24
62:24 71:2,24 73:1,12
73:16 74:1,10,11 76:12
77:11 81:2,11 82:25
87:3 93:6 94:6 96:8,18
97:17 100:14 105:7,9
**opinions** 28:1 41:16
42:18,20,21 65:17
73:19
**opposed** 9:6 82:3
**option** 12:19 54:5
**order** 26:8 34:24 46:8,8
46:10
**ordinarily** 98:3
**organizations** 14:24
**original** 75:20
**Orleans** 1:19 2:6,14,23
67:18
**outside** 71:24
**overload** 36:17
**owner** 12:18
**O'Dwyer** 10:10,18 11:6
11:10,22 12:9 29:8
34:23 35:10 66:5 67:3
68:11

**P**

**P** 4:1
**page** 3:3,8 25:8,8,16,17
40:17,21 64:19 95:6,18

**pages** 25:22
**panel** 50:16 58:16,17,17
58:23 59:2,4,4,6,9,13
59:14 60:6,8 61:12
74:14 87:7,8
**panels** 50:13 58:11 59:11
59:14,16,24 60:24 61:1
61:6,14,25 62:2,3
**paragraph** 26:7 44:14
85:4
**paralleling** 84:23
**Parfait** 1:13
**part** 4:14 28:16 40:5
50:4 52:3 53:7 65:5
73:9 93:2,15
**parted** 35:3
**particular** 64:24 71:1
**particularly** 105:15
**parties** 4:3 8:20 108:14
**pattern** 69:22
**Pazos** 10:11 11:8,9,21
12:1,3 28:20 31:9
40:20 41:18 42:14 44:3
65:3,3,8,24 95:18
**peer** 13:16
**pen** 54:14
**penetrate** 106:17
**people** 11:6 12:22 18:11
61:3 75:13
**perform** 105:24
**permitted** 4:5
**perpendicular** 22:25
23:4
**Perry** 1:11
**persist** 99:9
**personal** 29:14
**personally** 11:18 28:22
28:25 85:8
**perspective** 23:6
**pertain** 15:2
**pertains** 1:6 16:16
**phone** 43:2,8
**photograph** 50:19 61:21
66:19,23 74:18 77:22
78:18 83:15 84:14
85:11,15,24 86:19

89:16 90:8,9,18,21,24
92:4 93:7 95:12,17
**photographic** 30:16
44:20 97:21
**Photographically** 59:19
59:20
**photographs** 9:10 21:23
29:2,12 30:19 34:18
44:22 55:14,22 62:17
62:18,19,21,23 64:12
65:8,9,16,24 66:2,5,6,8
66:12,13,23 67:2 69:9
69:20 83:15 85:16 88:8
88:10 95:19 97:24 98:5
98:10,21 99:1
**photos** 65:2,5
**phrase** 64:17
**physical** 8:12 18:12 90:9
96:21 99:3
**picket** 32:20
**pictures** 88:3
**piece** 24:14 57:14 61:16
61:16 74:22 86:19,23
89:23
**pieces** 10:13 12:12 24:13
86:20
**pier** 32:19
**pile** 55:1 70:21 74:22,24
75:4,20 76:12 80:11
82:16,22 83:2
**piles** 74:6 77:18 78:5,13
78:17,20,21,23 84:12
97:15
**piling** 33:5,24 55:5
**pilings** 32:1,13,16,18,20
32:22 34:6 77:3,7
**place** 10:12 25:2 27:16
37:4 47:21 79:18
**places** 70:20
**plains** 22:3
**plaintiff** 38:10
**plaintiffs** 8:17
**plaintiff's** 6:22
**plan** 12:15
**plane** 22:24
**planes** 22:18

**plastic** 19:10 20:9 25:21
58:25 80:25
**plastically** 20:12
**plate** 92:15
**plating** 89:2
**plausibility** 63:5 64:4
**plausible** 70:19 97:1,6
**plenty** 38:17
**plow** 33:25
**plus** 92:24
**point** 10:17 18:24 22:10
26:18 29:12,19 30:11
33:9 41:2 44:7 46:17
49:13 50:8 68:12 72:13
80:4 81:18 85:17 93:9
93:11,15,16,19 97:6
**points** 99:15
**Pollard** 6:24
**polypropylene** 36:1,5,8
**Pontchartrain** 104:12
105:5
**port** 69:16
**portion** 19:6 25:25 26:5
49:13 50:5,6 56:12
58:6 70:3,5 77:16
83:10 84:3 91:19
**pose** 76:23
**position** 75:20
**possibility** 96:16 104:5
**possible** 8:14 51:13
**Possibly** 10:1 47:23
**post-hurricane** 10:17
**potential** 50:17 97:1,5
100:18
**pour** 80:14
**poured** 61:9,11,12
**pouring** 53:2
**Poydras** 1:19 2:13,22
**preceded** 72:18 73:10
**Preceding** 74:4
**precisely** 88:19
**preferred** 75:12
**prepare** 5:21,24 6:6
**prepared** 72:12,15
**prescription** 5:16
**pressure** 17:15 19:12,18

ROBERT D. BARTLETT                                                                    7/21/2009

24:20 26:13 40:3 43:18
48:3,5 49:5 50:25
52:13 74:15 81:3,5,10
81:17,24 82:1,10,14,17
83:4,6,10 96:9
**pressures** 18:2 25:4
**pretty** 29:3 105:16
**previously** 5:4 36:16
**primarily** 24:23 58:4
62:5
**prior** 5:20 6:10 11:15
12:9 37:7,12 65:11
94:18 102:6 106:2,6,6
**probably** 6:12 7:5,8
23:17 41:17 42:6 53:16
63:9 67:3 75:18 84:10
92:21 98:11
**problem** 50:3
**Procedure** 4:6
**process** 29:23
**produce** 67:10
**produced** 66:5 67:5,13
**professional** 10:7 12:25
13:11 14:11
**proffered** 73:18
**profile** 14:5 20:6 57:8
90:19
**programs** 23:18
**project** 31:14 37:25 41:1
**propagate** 21:8
**proper** 19:19
**property** 18:2
**protected** 22:25 28:9,15
71:15
**prove** 27:2
**provide** 34:2 67:6
**provided** 35:19 36:3
65:8,10,10
**provides** 26:22
**providing** 38:20
**PSLC** 2:2
**publication** 13:15
**publications** 13:16
**published** 13:11
**pulled** 22:24
**purely** 16:9

**purpose** 6:5 7:9 64:25
**purposes** 4:5
**pursuant** 4:7
**push** 19:23 81:12 93:24
**pushed** 93:24
**pushing** 28:18 82:3
**put** 10:14 54:22 56:9
**putting** 11:1
**PVC** 61:2
**P.E** 1:18 5:1 107:3,11
**P.L.C** 2:3

                Q
**qualifications** 13:1,20
**qualified** 15:25 17:14
40:6
**qualify** 17:6
**quantify** 19:8 46:16
**quarter** 70:8 82:8
**quartered** 12:13
**quarters** 69:19,24
**question** 4:12 7:18 48:25
70:18 72:22 73:11,23
82:7 88:18 102:6,7,15
102:19 105:8
**questions** 5:17,18 6:16
76:24 106:23
**quickly** 30:8
**quite** 68:4

                R
**radius** 19:10 27:7 58:5
84:6 91:18
**raised** 12:6 70:13
**rapidly** 11:1
**reach** 22:20 23:15 62:24
106:18
**reached** 93:25
**read** 2:18 25:24 41:6
73:4
**reading** 4:8 21:1
**realize** 33:6
**really** 27:17 34:12 73:11
102:9 105:13
**reason** 39:9
**reasonable** 106:4
**reasons** 51:5

**rebar** 8:24 16:10,11,16
17:5 18:8,9,9,25 19:2,9
19:17 20:25 25:2,6,11
26:12,16,17,19,20,23
26:24,25 27:9 48:10
50:9 51:10,14,18 55:19
55:21 58:2,4 69:1,10
70:13 80:16,17 81:2,6,7
81:13 84:3
**rebars** 7:17,20 8:4 19:20
19:23 24:21 27:5,7
28:14 47:4,7,9 51:6
52:12 55:11 56:22 69:6
**rebuilt** 29:24
**recall** 6:12 9:3 10:25
11:17 28:19 31:16
33:11,13,14,18 36:7
37:24 47:23 65:1 66:16
67:14 69:18 77:3
**recalling** 100:6
**receded** 103:11
**recess** 56:18
**recognize** 90:24
**recollection** 12:16 32:18
33:20 34:20 35:1,1
**record** 5:13 11:3 17:17
102:10
**red** 54:14,15 56:9 80:7
**redrew** 53:21
**reestablishing** 100:8
**refer** 66:24 69:8 89:3
**reference** 9:13 64:22
66:17 84:11 93:18
**referenced** 66:21 67:10
69:17
**referred** 95:1
**referring** 11:4 47:6
49:21 52:1,18 55:22
57:11,18 77:19,25 81:9
89:1
**refresh** 57:4
**regard** 27:21
**regarding** 19:5 22:21
28:1 34:3 35:20 36:4
42:18 62:14,17,25
77:13 85:21 87:3 96:18

97:18 101:24
**regardless** 60:18
**regards** 8:13
**reinforced** 16:3 50:10
**relate** 13:13 19:2
**related** 8:1,4,18 18:9
36:24 108:14
**relating** 37:9 65:25
**relative** 84:12
**release** 40:4
**relevance** 83:3
**relevant** 13:15 66:3
**relied** 65:16 101:7
**rely** 16:22 29:12 63:3
**relying** 103:1
**remarkable** 22:17
**remember** 8:8 10:22
31:19 33:22 34:21,22
39:9 41:2,3,9 42:21
43:7,9 67:11 83:18
**remembering** 100:5
**Remind** 13:1
**reminded** 5:5
**remnants** 19:2
**removed** 86:21
**render** 102:4
**repeat** 53:25
**repeatedly** 38:9
**repeating** 53:23
**report** 6:7,10 8:10 9:12
12:5 13:19 17:4 18:14
18:18,21 21:2 22:8
24:24 28:16 31:1 40:18
41:6,10,13,14,15 42:9
42:12 44:23 48:23
54:11 55:22 64:17,20
64:23 65:4,6,18 66:17
66:21 67:11 69:18 72:1
73:20 87:11 101:5,5,8
101:17 102:11,21 103:4
103:18 104:1,4 105:13
**Reporter** 1:23,25 4:23
108:3,25
**REPORTER'S** 108:1
**reports** 6:11 27:24 35:20
37:23 47:15

JOHNS PENDLETON COURT REPORTERS                                        800 562-1285

represent 14:3
represented 8:17
**REPRESENTING** 2:2,9
   2:17
request 67:9
requested 67:13,15
require 15:18 31:3,4
required 19:9,14 20:11
   20:20 21:7 24:10 25:10
   26:23 34:4 36:14
researched 72:11
resembles 87:22
reserved 4:13
residual 21:11 103:10
respect 13:17 18:6
responsiveness 4:12
restatement 64:15
rested 30:12
resting 30:22
result 37:22 48:17 52:11
   52:12,14 67:18 71:5,7
   73:3,5 86:21,23 104:8
   108:16
resulting 68:7
review 5:13 44:2
reviewed 13:16 18:15
   31:6 47:15 64:21
reviewing 30:19
riding 94:13
rigging 37:5,5
right 8:3 14:10,12 15:5
   19:22 22:8 26:6,10
   28:23 34:9 36:20 38:16
   38:21,21 40:17 44:21
   44:24 45:2,5 47:14
   48:2 50:9,13 51:10
   53:9,12,22,22 54:3,4,11
   54:17 55:7,16,17,23,25
   56:10,13,20,23 58:20
   60:13 62:12 64:4,19
   66:4 67:16 69:4 71:12
   74:7,25 78:20 79:4,8,15
   79:22,25 80:1 83:13
   84:13 85:9 87:21 88:1
   88:18,22 90:1 91:6,17
   91:23 92:6,7 93:16

94:8 95:5,10 96:15
   101:9,19,22
**Rita** 11:11,15,17 101:18
   102:2,23 106:10
river 33:8,18
**Robert** 1:17 5:1 64:21
   67:1 90:23 107:3,11
**Robinson** 47:24
robust 89:25
rolled 12:23
**RONALD** 2:20
rope 36:6,22 37:4
ropes 35:21,22,23,25
   37:4 39:11
rotate 75:11
rotated 74:6 75:2
rotating 75:8
rotation 62:2,6,9 74:9,18
   74:19 75:17,19,22,25
   76:8 78:2
roughly 22:12 30:6
   88:16
rounded 92:1
routinely 37:18
**RPR** 1:24 4:22 108:2,24
rubber 12:6,23
rules 5:14
run 59:3 88:23
running 100:4,20
runs 88:20
rust 99:7
rusty 98:15

**S**

s 4:1 5:21 6:5 38:15,19
   62:14 63:20 67:12
   97:19 106:2
salinity 101:4,25 103:9
   103:17,22 104:24 105:4
salt 103:9,10,12,23 104:7
   104:23 105:11,14 106:5
   106:12,14,16,17,19
salty 103:13 104:6
salvage 12:10,17
salvaged 10:14 12:3
satellite 66:18,19
save 4:11

saw 63:5,11,14 88:3,5
saying 29:16 46:22 51:15
   51:17 59:10,23 60:8
   64:9 87:13 89:4 90:14
   91:15 96:24 97:4,8
   104:7
says 13:21 14:11 40:19
   55:4 105:13
scenario 70:18
science 13:3,5
scope 7:11,13 9:6 31:1
   48:22 71:24 73:18
   103:18
scrap 12:19
scrape 46:9 97:24 98:1,6
   98:12
scratch 33:5,23 99:4,12
scratches 18:10 19:1,19
   25:1 27:10 56:21 68:20
   69:9,21 70:4,9 100:6,13
scrubbing 99:6
sealing 4:9
second 26:6 31:13 59:9
   59:13 60:7 84:6 101:5
section 1:7 26:7 49:17
   53:10,17,20 57:7 74:17
   80:10,11
sections 49:18
see 21:23 28:21 30:21
   41:7,24 52:6 55:1
   59:11 62:6,8 63:17
   64:22 66:18,23 69:25
   76:8 79:18,24 84:15,20
   85:8 88:4 89:18 90:2,8
   90:12 91:21 98:24
   99:13,21 100:14,17
   101:1
seen 34:18 35:5 43:22
   61:18 64:10,12 86:15
   97:21 98:25
seepage 43:19 71:10,15
seismic 37:20
semi-uniform 50:9
sense 10:7 23:17 35:12
separate 7:4 71:11
separated 50:12 61:15

70:21 73:13 76:13
   78:13
separately 61:6
separation 50:16 62:3,10
   71:2,9,18 72:17 73:1
   74:2 77:18
series 56:9
set 108:7
shape 23:25 46:10,11
   47:9,11 57:6 84:9 85:5
   86:23 95:24 96:4
share 42:12,17
shared 27:22
sharp 51:8 58:5 79:12
shearing 39:23
sheet 55:1,4 70:21 74:6
   74:22,24 75:3,3,19
   76:12 78:21,23 80:11
   82:16 83:2 84:11
sheets 97:14
shock 100:10
shore 32:8
shorthand 108:9
show 34:19 44:21 53:25
   69:20 77:23 79:17
   83:15 84:11 90:21
   91:18
showed 91:20 92:4 95:4
   95:5
showing 47:3 78:12
shown 55:14,15 60:9
   78:7
shows 74:18 77:25 78:1
   78:16 84:2,7 91:1
side 23:1,9 28:9,15 71:15
   79:24 80:2 81:25 89:21
   91:5
sided 53:10
**Signed** 107:11,13,15
significance 7:19 77:10
significant 71:1
signing 4:9
similar 36:21
simple 49:5 81:22
simply 19:17 50:1 81:1
sit 42:20

ROBERT D. BARTLETT

**six** 92:22
**size** 35:17 85:6 87:4
**sling** 36:9,11
**small** 21:10
**smaller** 26:24
**smooth** 54:9
**Society** 14:12,18,19
**soil** 31:10 43:18 76:13
  82:15,19,23 83:1,7
**soils** 31:5
**somebody** 11:23 43:20
  86:10
**somewhat** 49:14 53:1
  54:9 64:15 100:6
**soon** 11:17
**sorry** 9:20 25:11,14
  28:14 35:24 36:18 47:5
  53:24 61:20 72:24 76:4
  88:11 93:13 104:1
**sort** 69:22 74:23 79:23
  79:25
**sought** 4:15
**source** 85:13
**south** 7:15 22:6,6 44:16
  44:16 49:10,11 56:14
  56:14 57:1,22,22 62:13
  63:9,11,13,25 64:9 78:6
**southern** 8:4 49:22,22
  77:2,20,20 78:6 83:17
  83:18,22,22 99:14,21
**southernmost** 59:6,9,13
  59:14 60:6,7
**southward** 28:19
**spacing** 18:7,8,10 19:18
  19:19 25:1,2 56:22
**spalls** 39:2
**spare** 26:2 101:12
**speak** 7:22 12:14 17:15
  21:19 63:18
**speaking** 21:20 69:8
**specific** 10:22 20:24
**specifically** 4:10 11:14
  14:3 47:12 103:21
**Spinks** 42:24 43:3
**splitting** 39:23
**spot** 73:17

**spray** 106:12,14,17
**spreadsheet** 23:18
**St** 38:6,10
**stability** 26:22
**stand** 14:17 38:7
**standard** 5:14
**standing** 37:5
**stands** 14:16
**starboard** 69:16
**start** 10:16 69:15,21 70:4
  97:14 99:24 100:4,21
**started** 8:9 10:9 29:21
  38:12 68:11 75:21 87:5
**starting** 14:7 74:20,21,21
**starts** 20:12 26:6
**state** 4:23 13:6 46:5
  70:20 71:2 108:3
**stated** 26:11 30:9
**statement** 45:14 46:18
  90:12
**STATES** 1:1
**steel** 16:3 78:22 81:6
**stern** 69:16 70:7,12
**sticking** 51:7
**STIPULATED** 4:2
**stipulation** 5:4
**stood** 38:13
**stop** 61:4,10,11,14,17,22
  62:11 69:15
**story** 38:8
**stout** 89:24
**straight** 53:10 80:21
  96:3 98:19
**Street** 1:19 2:5,13,22
  68:9
**strength** 16:8,9,10 36:4
  39:11,12,13,15
**stress** 14:7 15:12,18 20:4
  20:8 21:5 24:16
**stresses** 20:23 21:3
**stretches** 73:8
**stretching** 49:20
**Strict** 98:25
**strike** 32:15 60:21
**striking** 31:15 32:1
  46:20 89:15 90:7

**string** 24:3
**strip** 58:25,25 61:3
**strong** 77:15
**struck** 32:12 47:2 83:17
  97:11
**structural** 37:14
**structure** 20:18
**structures** 37:18
**studied** 21:25 68:6 72:11
**studies** 13:12 18:6,8,11
  21:15 36:21 39:5
**study** 25:3 33:10 34:7
  35:9 71:23 104:10
  106:3
**studying** 71:25
**stuff** 13:13
**subject** 46:24
**submitted** 6:9
**subsequent** 29:19
**subsequently** 39:5
**sudden** 40:5
**sue** 29:3
**sufficient** 19:13
**suing** 8:17
**Suite** 5:2
**summaries** 13:20
**summary** 105:17
**Sunshine** 31:15 32:1,6
  32:12,19 33:6 34:6
**supervision** 108:10
**support** 26:22 46:18
  65:17 76:14
**supposed** 80:5
**sure** 55:3 65:7,13 84:16
  85:2
**surface** 22:11 52:23,23
  54:10 87:20
**surfaces** 106:6
**surprise** 67:25 68:3
**survived** 40:12
**suspect** 65:8 90:1
**sweeping** 69:22
**sworn** 5:4 108:6
**synonymous** 45:10 46:21
**synthetic** 35:22 36:1

―――――――――
**T**
―――――――――

**T** 3:1,6 4:1,1
**take** 9:21 16:7 23:14
**taken** 4:5 46:11 47:21
  65:3 98:6,10 107:25
  108:8
**talk** 6:7 21:2 29:22 31:14
  45:4,7 67:1 83:13
  101:4
**talked** 20:10 37:11 43:1
  43:4,8,11 56:23 57:9
  96:11
**talking** 26:15,16 31:24
  41:2 44:12 48:8,9 49:8
  51:9,11 54:16 57:4,6,25
  59:12 70:23 96:23,25
  99:6
**talks** 28:8 67:16
**tanks** 37:19
**tapered** 53:10
**task** 8:22
**team** 6:22
**technical** 38:11 76:21
  81:1
**technically** 13:14
**telephone** 41:3
**tell** 9:9 13:25 25:23
  40:20 80:16 86:18
  89:14
**telling** 64:1
**tells** 77:15
**ten** 92:20,23,24
**Tendering** 26:2 101:14
**tensile** 36:4 39:11
**term** 75:11,12,12 89:1,12
  92:10
**terminology** 9:2
**terms** 52:17 61:3 76:21
  92:10
**testified** 5:6 34:8 38:1,22
**testify** 108:6,7
**testifying** 14:2
**testimony** 35:20 40:14
  47:20 50:15 56:6 63:3
  63:20 64:4 93:5 107:4
  107:6
**testing** 18:12 36:13
  39:10 102:7 103:17

ROBERT D. BARTLETT

**tests** 18:5 39:6,7,15
**Thank** 27:6 28:7 55:6
  76:24 101:15 106:23
**theirs** 101:24
**theory** 86:14
**thereof** 4:14
**thesis** 13:14
**thick** 82:8
**thing** 59:8 60:6,21 85:18
**things** 11:1 14:8 15:13
  39:1 58:4 67:10 82:13
**think** 8:6,19 10:8 11:23
  18:11 24:19 25:7 27:8
  29:3,4,21 36:12 43:20
  44:9,9,11 51:20 52:4,16
  58:8 61:2 63:8 64:18
  65:19 66:11,15,24
  75:18 82:19 84:10
  87:10 105:16 106:4,22
**thinking** 23:18
**thirty** 87:18
**thought** 7:25 9:15 25:23
  32:17 51:25 52:8 72:21
  72:25 96:17
**three** 20:1 41:20 54:20
  67:10 69:18,24 83:6,25
  93:20,22 94:1,3,9,10,14
**three-foot** 26:16 28:2
  55:7 80:10 81:11,18
  83:11 97:23
**tie** 18:20
**tight** 19:10 27:7 84:6
**tilt** 52:24 74:20 75:8,18
  75:23 76:1,5
**tilting** 48:17 71:6 73:3
**time** 4:13 6:2 7:3,4,24
  9:19 12:8 27:9 29:5,8,9
  29:16,20,21 30:11 32:5
  32:7 33:15 34:23 41:22
  42:8,12,22 44:7 53:4
  59:21 61:9 67:7,13
  69:6 75:14 80:17 81:19
  93:9 94:17 96:14 97:7
  97:18 98:9,24 99:10
**times** 5:11 38:7 41:19
  43:23

**today** 5:21,23,25 34:3
  38:15
**told** 35:1 60:25 96:17
**top** 20:1 25:8,16 28:18
  30:3,22 53:7,10 54:20
  55:4 58:9 81:21 82:22
  83:6 84:11 93:2,22
  94:1,3,9,10,14 95:7
  96:1
**touch** 46:7,12,21
**touched** 46:6 100:5
**toughness** 97:12
**towing** 37:2
**town** 41:21
**trace** 84:22
**trail** 17:1
**transcribed** 108:10
**transcription** 107:5
  108:11
**transition** 53:9
**travel** 96:13,25 97:5
**traveled** 68:22,23 69:5
**traverse** 68:17
**traversed** 68:18
**trial** 47:25
**trials** 47:21
**tried** 12:17
**trims** 80:13
**trip** 33:8
**true** 40:21 77:5 107:7
  108:10
**trumped** 38:19
**truth** 108:6
**try** 46:16
**trying** 10:23 11:2 24:1
  36:19 39:8 47:1 76:20
  77:9 80:13
**tug** 37:2
**Tulane** 13:4
**tumbling** 76:17
**turn** 47:13,14 57:14
  69:21 83:14,19 84:9,19
  85:6,25 87:25 88:7,12
  88:17,20 89:3,5,9,10,20
  89:22 90:7 91:1,14,23
  91:25 93:6 94:7

**turned** 56:13
**turns** 92:6
**twelve** 92:12,20,24,25
**twenty** 87:12,16,18
**twist** 74:24 76:15
**two** 19:24 41:20 47:8
  58:4,11 59:23 60:24,25
  61:14,24 62:3,9 63:13
  66:1 89:6 91:9 93:22
**type** 13:9 15:24 23:18
  24:17 44:4 50:25 52:5
**typical** 53:17,20
**typically** 66:22 89:19

---

### U

**U** 4:1
**Uh-huh** 34:2 86:4 88:13
**um** 6:7 8:1,11 9:4,18
  10:8 11:19 12:6,11
  15:10,12,20 18:7,19
  19:13 20:20 24:17,18
  25:10 27:24 28:3,18,24
  30:2,6 31:3,4 32:7,24
  33:4,5,9 34:25 35:15,15
  35:17 36:8 37:2,3 38:4
  38:7 39:21 40:25 41:25
  42:16 43:22,24 44:9
  45:11,23,23 46:17,22
  47:12 48:19 50:5,6
  52:6,17,24 55:13 57:6,8
  57:8 60:25 65:9 66:1
  66:11,18,21 67:3,8
  68:10 69:17 70:13,15
  71:6 74:11 76:10 77:9
  77:12,17 78:16 79:18
  80:19 82:6,23 83:7,14
  87:5,5,7,15 88:8,25
  89:21 93:14,21 94:17
  96:20 100:5 101:20
  103:1,7,8,21,22,23
  104:9,11,18,22 105:6
  105:24 106:6,18
**underneath** 92:5
**underside** 19:1 24:25
  27:11 69:10,12 70:8
**understand** 5:17 8:16
  10:8 22:2 24:24 27:20

  27:25 56:5 60:23 64:6
**understanding** 31:5 61:8
  88:19 94:6,16 108:12
**understood** 7:14 8:19
**undertaken** 98:9
**uniformity** 18:25
**unison** 51:16
**UNITED** 1:1
**university** 13:1,4,7 39:5
**unloaded** 94:18
**unreinforced** 55:9
**upper** 79:22 80:10
**upriver** 32:11
**upwards** 56:13,15 58:9
**USA** 1:13,14
**usage** 45:18
**use** 9:1 15:22 23:14,21
  23:24 24:3 41:14 54:6
  61:3 64:24 66:14 68:17
  72:14 93:18
**usually** 89:24

---

### V

**v** 1:8,9,10,11,12,13,14
  79:25 80:2,5,8,9
**vacuum** 82:12,21
**varied** 74:16
**variety** 51:5
**various** 43:23 61:3 66:4
**vehicle** 98:17
**vertical** 53:5
**vessels** 37:1
**VIDEO** 2:25
**VIDEOGRAPHER** 2:25
**view** 45:16 71:18
**views** 42:17
**Villavaso** 62:14 63:4,20
  64:10 97:2,19
**virtue** 43:12
**visible** 78:18 92:5
**visited** 5:24
**visiting** 10:12 11:18
**visual** 24:25
**V-shaped** 79:23

---

### W

**waived** 4:10

ROBERT D. BARTLETT

7/21/2009

Page 14

**Walker** 2:11 3:5 5:7 6:17
17:18 28:11 41:5 49:1
56:4,19 63:24 72:3
73:25 77:1 78:8,15
95:11,16,22 100:25
101:13 102:18,20
103:19 105:25 106:21
**wall** 15:23 16:9 22:22,23
43:12,13,17 44:7 45:20
45:24 46:7,7,10,24 47:3
47:10 48:18 49:6,14,18
49:19 50:1,4,8 53:3,8
53:11,17,20 54:7 57:7
57:14 60:13,22 68:22
70:5 71:5,8 73:3,6,7,9
73:11 74:5,17 77:14,16
80:17,20 81:24 82:9,11
83:10,17 84:7 85:8
93:16,17 97:25 99:4,20
99:23,24 100:2,9,14,18
100:20 106:17
**walled** 49:16
**walls** 71:11
**want** 26:1 63:11 73:4
**wanted** 30:8 39:9
**wanting** 73:20
**Ward** 10:13 11:14,25
106:11
**warehouse** 10:14 41:25
**washout** 71:15
**wasn't** 25:11,12 29:17
33:10 98:14
**water** 19:22,25,25 26:13
27:2 33:14,17 61:4,10
62:11 74:14 76:18
81:20,21,23,24 82:2,3,4
82:7,22 94:13,13,23
96:14 97:9,18 101:25
103:25 104:5,8 105:3
106:7,15,15
**waters** 25:5 105:1,9
**watertight** 70:22 72:18
73:2,6 74:2
**way** 8:2 12:22 25:12
36:15 40:15 54:7 56:7
64:17 66:3 69:19,24

77:11 91:5 108:15
**weakened** 43:19
**weaker** 60:16
**weakest** 73:8
**weather** 37:8,13 58:24
61:2,9,11,14,17,21
**webbed** 36:8,11
**weight** 29:25 30:8 52:12
64:16
**welding** 14:9,19
**went** 11:13,23 18:23
27:10 28:21 41:24 47:3
70:5,14 87:6 90:1
99:10 100:2
**weren't** 36:9
**we'll** 38:17 44:19 70:4
83:24
**we're** 25:16 26:15,16
29:18 44:12 46:25 47:1
47:3 51:9,11 52:21
57:6 59:12 60:8 75:15
77:8 82:21 87:17 89:4
89:12 90:14 97:8 99:6
104:7,9
**we've** 38:25 54:12 56:23
57:25 62:19 69:17
77:25 89:16 95:1
**whichever** 46:15
**wide** 82:10 87:9 88:15
**width** 88:23
**Wiedemann** 6:23 7:2
8:16 29:11,22 66:5
**WILKINSON** 1:11
**wind** 37:20
**wire** 32:8 35:22 36:21,22
37:4,4
**wise** 68:21
**witness** 4:4,25 5:3 28:6
39:10 54:24 56:8 107:1
108:5
**witnessed** 39:14
**witnessing** 39:7
**wood** 34:1
**word** 68:17 75:19,22
**words** 19:22 45:25 46:16
63:13 64:8 76:17 94:8

**work** 7:11 11:6
**working** 10:10 11:9
27:18 29:7 34:23 35:10
68:11 98:18
**works** 13:12
**wouldn't** 65:23 68:3
**wound** 10:11
**writing** 75:13
**written** 42:8,12
**wrote** 72:1

**X**

**x** 3:1,1,6,6 30:6,22 32:9
82:2

**Y**

**yeah** 41:6 49:2 53:25
84:17 92:23 100:4
**year** 7:5 42:2,3
**yelled** 80:25
**yellow** 91:4
**Yep** 19:3

**Z**

**zone** 87:14

**#**

**#75005** 1:25 108:25

**0**

**05-4182** 1:5
**05-5531** 1:8
**05-5724** 1:9
**06-5342** 1:10
**06-6299** 1:11
**06-7516** 1:12
**07-3500** 1:13
**07-5178** 1:14

**1**

**1** 3:9 40:17,23 41:12
54:12 56:1 84:2
**1A** 3:10 55:25 56:2 58:8
60:10 79:20
**1B** 3:11 77:24 78:3
**1C** 3:11 78:1,3
**1D** 3:12 78:9,10
**1E** 83:24 89:17 93:7 96:6

**10** 66:4 80:22 101:8
**101** 3:15
**104601-1** 53:13
**1100** 1:19 2:13,22
**12** 58:7 60:5 79:25
**12-foot** 60:10 69:3
**12.0** 53:14 54:2,2 55:15
55:16 79:22
**13** 41:12 64:20
**15** 49:10 55:16
**17th** 68:9
**1979** 13:5
**1981** 13:7

**2**

**2** 3:15 56:20 64:19 74:22
75:1 76:1 77:25 84:13
101:6,10
**20** 49:10 93:10,14
**200** 30:6,22 32:9 69:11
88:16,17,21
**2005** 10:2
**2006** 101:8
**2007** 9:25 42:6
**2008** 6:11 9:13,25 10:3
40:18 65:11
**2009** 1:20 6:11 107:25
**21st** 1:20 107:25
**22** 93:1,10,14
**2300** 1:18 2:12
**2617** 5:2
**27** 40:18
**27th** 9:12 65:11
**29** 10:2

**3**

**3** 3:13 45:1,4 56:25 57:11
62:8 74:23 75:15,24
76:9 78:1 82:2,2 84:10
95:13,14,18
**30** 80:22
**3200** 2:21
**35** 30:6 32:9 88:15 89:7
**35-foot** 30:22
**352** 31:20 37:10
**353** 31:14,21
**37** 38:6

ROBERT D. BARTLETT                                                    7/21/2009

**4**

**4** 3:14 45:7 46:5 57:17
    62:4,7 74:20 78:7
    95:19,20
**40** 3:9 87:14
**45** 22:12
**45-degree** 23:2,8 48:12
    49:23 50:18,24 51:10
    51:14 52:2,13,19 58:2
**4727** 18:16 34:15 44:18

**5**

**5** 3:5 22:6,7 25:8,16
    33:19 62:7 95:18
**504-585-3200** 2:24
**504-585-7000** 2:15
**504-885-7700** 2:7
**56** 3:10

**6**

**6** 25:8,17 33:20

**7**

**7** 83:20,24 96:2
**70002** 5:3
**70113** 2:6
**70163** 2:23
**70163-2300** 1:20 2:14
**728** 37:25
**78** 3:11,12

**8**

**8** 64:22 67:12
**821** 2:5

**9**

**9** 65:2 91:17
**95** 3:13,14