# EXHIBIT 31

Deposition of Austin Dooley

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES

CONSOLIDATED LITIGATION

PERTAINS TO:  BARGE              : CIVIL ACTION

                                 : No. 05-4182

                                 : and consolidated

Boutte v Lafarge      05-5531 : Cases

Mumford v Ingram      05-5724 :

Lagarde v Lafarge     06-5342 : SECTION "K" (2)

Perry v Ingram        06-6299 :

Benoit v Lafarge      06-7516 : JUDGE STANWOOD R.

Parfait Family v USA 07-3500 : DUVAL, JR.

Lafarge v USA         07-5178 :

Weber v Lafarge       08-4459 : MAGISTRATE JOSEPH C.

                                 : WILKINSON, JR.

-----------------------------X


Wednesday, August 5, 2009

– – –

    Videotaped oral deposition of AUSTIN L. DOOLEY,

PH.D., taken at the offices of Goowin Procter,

901 New York Avenue, N.W. Washington, D.C., beginning

at 10:15 a.m., before Nancy J. Martin, a Registered

Professional Reporter, Certified Shorthand Reporter

License No. 9504.

A P P E A R A N C E S:                    2

REPRESENTING BARGE PLAINTIFFS:

    KHORRAMI PLLARD & ABIR LLP
    444 South Flower Street
    33rd Floor
    Los Angeles, California  90071
    (213) 596-6000
    dpollard@kpalawyers.com
    BY:  DYLAN POLLARD, ESQ.

        -AND-

    LAW OFFICE OF RICHARD T. SEYMOUR, PLLC
    1150 Connecticut Avenue, N.W.
    Suite 900
    Washington DC 20036-4129
    (202) 862-4320
    rick@rickseymourlaw.net
    BY:  RICHARD T. SEYMOUR, ESQUIRE


REPRESENTING LAFARGE NORTH AMERICA, INC.:

    GOODWIN PROCTER
    901 New York Avenue, N.W.
    Washington, DC 20001
    (202) 346-4444
    mraffman@goodwinprocter.com
    krobbins@goodwinprocter.com
    BY:  MARK S. RAFFMAN, ESQUIRE
         KIRSTEN V.K. ROBBINS, ATTORNEY AT LAW

ALSO PRESENT:
    JOHN SHELONKO
    PETER KEELEY
    CHARLES CUSHING
    LARRY DAGGETT
    MARK GUENTHER, LEGAL VIDEOGRAPHER

---

                I N D E X          3

WITNESS:  AUSTIN L. DOOLEY, PH.D.

QUESTIONED BY:                PAGE:
    MR. POLLARD               6
              - - -



              E X H I B I T S

NUMBER        DESCRIPTION       MARKED FOR ID
1     Dooley SeaWeather Analysis,       20
      Inc., Expert Report, 45 pages
2     Diagram, Figure 15, Southern      38
      portion of IHNC, 1 page

---

            DEPOSITION SUPPORT INDEX          4

DIRECTION TO WITNESS NOT TO ANSWER
Page   Line




REQUEST FOR PRODUCTION OF DOCUMENTS
Page   Line

---

        AUSTIN L. DOOLEY, PH.D.          5
                 - - -

        (It is hereby stipulated and
agreed among counsel that sealing,
certification, and filing are waived; and
that all objections, except as to the
form of the question, are reserved until
the time of trial.)
                 - - -

        THE VIDEOGRAPHER:  Good morning.  This is the
video deposition of Austin Dooley taken on August 5,
2009 beginning at 10:15:09 in the case of Katrina
Canal Breaches, Mumford vs. Lafarge, North America.
Case No. 05-4182 in the United States District Court
for the Eastern District of Louisiana.  This
deposition is being taken at the law offices of
Goodwin & Procter in Washington D.C.  The court
reporter today is Nancy Martin of Veritext reporting
of New York.  I'm the videographer, Mark Guenther,
also with Veritext.
        Would the attorneys present please introduce
themselves and who they represent.
        MR. POLLARD:  My name is Dylan Pollard.  I
represent the plaintiffs.
        MR. SEYMOUR:  Richard Seymour.  I represent the

AUSTIN L. DOOLEY, PH.D.          6

1  plaintiffs.
2      MR. RAFFMAN:  My name is Mark Raffman.  I'm with
3  Goodwin & Procter.  I represent Lafarge North America.
4  With me today is Kirsten Robbins also of Goodwin &
5  Procter.  In attendance at the deposition are John
6  Shelonko and Peter Keeley of Lafarge North America and
7  Charles Cushing and Larry Daggett, who are experts in
8  the case.
9      THE VIDEOGRAPHER:  Would the court reporter,
10  please swear the witness.
11          AUSTIN L. DOOLEY, Ph.D.,
12          having been first duly sworn,
13          was examined and testified as follows:
14              EXAMINATION
15  BY MR. POLLARD:
16      Q.  Good morning, Dr. Dooley.
17      A.  Good morning, sir.
18      Q.  Would you please state and spell your full
19  name for the record.
20      A.  My name is Austin, A-u-s-t-i-n, L, last name
21  Dooley, D-o-o-l-e-y.
22      Q.  I'm going to address you as Dr. Dooley during
23  the course of the deposition.  Is that all right?
24      A.  Thank you.

AUSTIN L. DOOLEY, PH.D.          7

1      Q.  My name is Dylan Pollard, as I just
2  introduced myself, I'm one of the attorneys that
3  represents the plaintiffs in this case.  We're here to
4  take your deposition this morning.  Do you understand
5  generally what's going to happen this morning?
6      A.  Yes, sir.
7      Q.  Have you given your deposition testimony on
8  previous occasions?
9      A.  Yes, I have.
10      Q.  Approximately how many times?
11      A.  Depositions, in the course of my career,
12  perhaps 15 times.
13      Q.  Okay.  And looking through the report that
14  Lafarge's counsel produced to me prior to the
15  deposition today, specifically on Page 40 of that
16  report, I assume you have a copy of that in front of
17  you.  Is that correct?
18      A.  Yes, I do.
19      Q.  On Page 40 of the report, you have listed
20  approximately 20 matters that you've been involved in
21  from 2002 to 2009.  Do you see that?
22      A.  Yes, sir.
23      Q.  All right.  Do you have an estimate as to how
24  many of those matters involved you giving actual

AUSTIN L. DOOLEY, PH.D.          8

1  deposition testimony?
2      A.  Depositions, New Carissa, Colmar, Caledonia
3  Star, Prestige, Maritime Antalya, and Union Pacific.
4      Q.  Okay.  Since you've given at least six
5  depositions in the last --
6      A.  Oh, I think Genmar Hector was also a
7  deposition in that case.
8      Q.  So you're --
9      A.  I'm sorry.  One more.  Detyens v. Reliable.
10      Q.  Okay.  Is that it?
11      A.  I think so.
12      Q.  Okay.  Are you generally familiar with the
13  deposition process and how we are going to proceed
14  this morning?
15      A.  Everyone is a little bit different, but I
16  think I have the general understanding of it, yes,
17  sir.
18      Q.  Well, I'll just state a couple key things.
19  Your testimony is, you understand, under penalty of
20  perjury.  You understand that?
21      A.  Yes, sir.
22      Q.  We need to make an effort to not talk over
23  each other today so that we have a clear record.  The
24  reason I say that is even though the deposition is

AUSTIN L. DOOLEY, PH.D.          9

1  being videoed, the official record of the deposition
2  is the transcript, and if we talk over each other, it
3  muddles the transcript and makes it messy.  So from
4  time to time we'll err, but if you allow me to
5  completely finish my question before you begin your
6  answer, that will allow for a clean proceeding.  Will
7  you do that?
8      A.  I will try, sir.
9      Q.  All right.  Very well.  You'll have an
10  opportunity to review the transcript at some later
11  point.  You can make changes, but if you make
12  significant changes to the transcript, it could affect
13  your credibility if the case proceeds to trial.  Do
14  you understand that?
15      A.  Yes.  Yes, sir.
16      Q.  Dr. Dooley, what is the name of your company?
17      A.  Dooley Sea Weather Analysis, Inc.
18      Q.  Where is that based?
19      A.  City Island.  Bronx, New York.
20      Q.  How long has that company been in existence?
21      A.  About 15 years.  15 years this coming
22  February.
23      Q.  Has it always been in existence at that
24  location in the Bronx?

AUSTIN L. DOOLEY, PH.D.        10

A. In the Bronx on City Island, yes.

Q. Can you describe generally what the business purpose of your company is?

A. Purpose of my company is to provide meteorological and oceanographic consulting work to parties in the maritime industry. My business ranges from offering teaching. I have offered courses to shipping companies. I have a contract teaching at the United States Merchant Marine Academy. I've taught contract companies -- contract teaching at MITAGS. I've also done a few other teaching efforts here or there as part of the company. The other part of the work is the research weather related events dealing with the maritime industry and some business ashore as well.

Q. Now, I've had a chance to take a look at your C.V., which is beginning on Page 36 of your report, and it appears to me as though you've done significant work as a maritime arbitrator?

A. Yes, sir.

Q. Do you continue to do that today?

A. Yes, I do.

Q. Can you tell me generally how you're selected to be a maritime arbitrator?

AUSTIN L. DOOLEY, PH.D.        11

A. Yes, I can.

Q. Please do.

A. Basically, the parties involved in the matter will review the list of members of the society of maritime arbitrators. If they find someone with the experience or background in the subject matter of the case, they will then go ahead and nominate that individual. The individual then makes a disclosure statement and discloses all kinds of conflicts or possible conflicts that may exist, and it's up to the parties then to either accept or not reject that particular panel member.

Q. As of today, how many matters have you arbitrated in the last 10 years?

A. I think I have appointments on more than 100. With regards to issued awards, I think it's in my resume. I think I show 40-plus published awards over my arbitration career.

Q. Do you keep a list of the cases in which you've served as an arbitrator?

A. I do. It's also available from the Society of Maritime Arbitrators Award service, which provides a complete record of all cases and a printout of the decisions of all the panels.

AUSTIN L. DOOLEY, PH.D.        12

Q. Is that information that's available to the general public?

A. Yes, it is. You can get it off of Lexis Nexis or WestLaw.

Q. Aside from any arbitration work that you do for the society of maritime arbitrators, do you do any other arbitration work for other organizations or entities?

A. Well, the society is not -- for example --

Q. It's not like AAA?

A. Exactly. It's not like AAA. It does not administer cases. It's simply a society of arbitrators. The appointments are ad hoc, basically. The society will then publish the awards from New York arbitrators, but all of my appointments have come through SMA publications.

Q. When you serve as an arbitrator on any of these matters that you've just discussed with me, do you actually have testimony presented to you in some sort of a conference room or a courtroom or some other form like that?

A. Yes, sir. Some are on documents only and some are live witnesses.

Q. And, on occasion, are some of the live

AUSTIN L. DOOLEY, PH.D.        13

witnesses expert witnesses?

A. Some are, yes, sir.

Q. Are you ever asked, in the course and scope of your duties as an arbitrator, to evaluate meteorological testimony?

A. I have been on matters dealing with what we call speed claims. That's a situation where a vessel's speed is influenced by the weather that it encounters on the voyage and in which case either the vessel may make its contracted speed or it may not. I have served as an arbitrator on those types of cases, yes, sir.

Q. Is it accurate for me to say that your work as an arbitrator has required you to render decisions on maritime issues that go beyond meteorological issues?

A. Definitely.

Q. Okay. Now, Dr. Dooley, can you tell me approximately what percentage of your current business is providing testimony and/or research analysis for litigation matters?

A. I'd say probably 75, 80 percent.

Q. Would you say that that has generally been the percentage since you went into business with,

AUSTIN L. DOOLEY, PH.D.                14

1  Dooley SeaWeather Analysis, 15 years ago?
2      A.  Some years more; some years less.
3      Q.  But currently it's 75 to 80 percent?
4      A.  I would say that's a rough number, yes.
5      Q.  That's held true for how many of the last
6  years?
7      A.  Well, my business is divided up into -- well,
8  I'd say the last couple years -- for at least the last
9  three or four years.  2004 was probably the lowest.
10     Q.  Aside from this case, have you ever
11  previously done work for Lafarge North America?
12     A.  No.
13     Q.  Apart from this case, have you ever
14  previously done work for Goodwin & Procter?
15     A.  No.
16     Q.  Apart from this case, to your knowledge, have
17  you ever previously done work for any attorneys,
18  whether it be for the plaintiff or the defense, that
19  are involved in this case?
20     A.  As I said, Goodwin & Procter, I can't recall
21  of any work with them.  The -- I believe there's a law
22  firm in New Orleans that's involved in this case.
23     Q.  Chaffe McCall?
24     A.  Yeah.  Chaffe McCall.  There may have been

AUSTIN L. DOOLEY, PH.D.                15

1  something there.  I don't know.  I don't remember.
2  But, otherwise, certainly I don't know the name of
3  your firm nor of your colleagues.  So I don't believe
4  any work was done for your firms.
5      Q.  Have you ever previously been hired to
6  measure and/or otherwise research hurricane weather
7  conditions?
8      A.  Yes, I have.
9      Q.  And on how many occasions?
10     A.  Estimating from that list on page -- if we
11  just focus on that list on page --
12     Q.  Page 40?
13     A.  40.  Going down the list.  Detyens v.
14  Reliable was a hurricane.  Colmar was a tropical
15  storm, and Union Pacific was a hurricane, just on that
16  page.
17     Q.  Okay.  What was the scope of the work you
18  were asked to perform on the Detyens case?
19     A.  Detyens is basically to research Hurricane
20  Hugo and how it affected Charleston, South Carolina.
21     Q.  Who hired you?
22     A.  A law firm.  Well, the client was the --
23  whoever the law firm's client was, but I worked for a
24  law firm in Charleston, South Carolina.  That was my

AUSTIN L. DOOLEY, PH.D.                16

1  contact point.  I can't remember.
2      Q.  Was any component of the work you did on that
3  case to analyze collisions between vessels and
4  structures or vessels and vessels?
5      A.  It was a matter of flooding and wind damage
6  to a dry dock.
7      Q.  Did you render a report in that case?
8      A.  I believe I did, yes.
9      Q.  What do you recall about the work that you
10  did on Great America v. Colmar?  Was that a case
11  involving a tropical storm?
12     A.  That was a case of cargo damage in a
13  warehouse.  Pallets of coffee were damaged by flooding
14  water.  The water resulted from tropical rainstorm --
15  or tropical storm and passed over Miami and deposited
16  several inches in a low lying area where the warehouse
17  was located.
18     Q.  Do you recall whether you rendered a report
19  in that case?
20     A.  Yes, I do.
21     Q.  By the way, just going back to the question I
22  asked you, to which you answered 75 to 80 percent of
23  your business is litigation related, of that, do you
24  have a breakdown as to how often you are employed by

AUSTIN L. DOOLEY, PH.D.                17

1  the plaintiff versus the defendant?
2      A.  No, I don't keep that record.
3      Q.  Can you give me an estimate?
4      A.  I can ballpark it.  I'd say out of that
5  situation, probably -- well, for example, take the New
6  Carissa case.  In one case, New Carissa's situation
7  was a ship run aground off the coast of Oregon.  In
8  that case -- in the first matter of the New Carissa, I
9  was working for the defendants, who were the ship
10  owners.  In the second matter, as I understood the
11  case, the ship owners were then suing the federal
12  government.  So in that case, I was working for the
13  plaintiffs.  So very often there's cross-complaints in
14  cases.  There's situations where in some of the
15  maritime arbitrations, there's counter claims.  So
16  whether it's the plaintiffs or the respondents, it's
17  hard to say, but usually it's whoever has a question
18  about the weather who is the person that calls me, be
19  that the claimant or the respondent.
20     Q.  Other than the answer you just gave me, you
21  can't further distill that down to percentages, or can
22  you?
23     A.  It would really be unfair to give you a
24  percentage because, as I said, if I render an opinion

AUSTIN L. DOOLEY, PH.D.          18

1  on speed claims, it's usually the charterer that makes
2  that claim.  Well, as an expert, if I'm evaluating log
3  books and things like that, which makes up a good bulk
4  of my business.  I'm evaluating log books.  Sometimes
5  the charterer will give me those; sometimes the owner
6  will give them to me.  If it's a charterer, then the
7  charterer of the speed claim would be the claimant and
8  the owner would be the defendant.
9      Q.  Hold up for a quick second.  Define "speed
10 claim" for me again.
11     A.  Again, that's the case where a chartered
12 vessel does not satisfy the contract obligations and
13 time is lost, and time is equal to money.  So the
14 parties are looking for damages in the contract.
15     Q.  And those are cases that don't usually
16 involve a meteorological component to them?
17     A.  Oh, yes, they do.
18     Q.  How so?
19     A.  Because the speed of the ship is dependent
20 upon the weather.  So very often I will render a
21 report, the matter is negotiated and settled based on
22 the report that I issue.  So to say who hires me more,
23 it's my philosophy and my business practice is whoever
24 calls first.
25

AUSTIN L. DOOLEY, PH.D.          19

1      Q.  Okay.  Then moving down to the last entry on
2  Page 40, which was Union Pacific Railroad vs. Dunham
3  Price Marine, that was another case you indicated
4  involved a hurricane?
5      A.  Yes, sir.
6      Q.  What do you recall about the work you were
7  asked to do on that case?
8      A.  I was asked to research Hurricane Rita and
9  its impact on Lake Charles, Louisiana.
10     Q.  Did you render a report in that case?
11     A.  Yes, I did.
12     Q.  Is that matter, to your knowledge, still in
13 active litigation?
14     A.  I believe the part of the matter that I was
15 involved in, as I understand it, is finished.  It was
16 in -- it went to court in March and a jury verdict was
17 issued.
18     Q.  In looking at -- again, at Page 40 --
19         By the way, what have we been doing with
20 respect to the reports?  Are we just attaching the
21 reports as exhibits?  Is that the course?
22     MR. RAFFMAN:  We have typically attached the
23 report as an exhibit to the deposition.  In this case,
24 it's 40 pages.  It's not going to kill a lot of tress.
25

AUSTIN L. DOOLEY, PH.D.          20

1      MR. POLLARD:  We can easily do that.  I don't
2  have a clean copy.  Can we mark a clean copy at some
3  point as Exhibit A?  There we go.
4         (The Reporter marked the document
5          referred to as Deposition
6          Exhibit 1 for identification.)
7      MR. RAFFMAN:  If you don't mind using numbers
8  instead of letters.
9      MR. POLLARD:  That's fine.  Exhibit 1.
10     Q.  We'll move onto the work you did in this case
11 in just a quick moment.  The last question I want to
12 ask you about Page 40 is which of these cases, looking
13 at this list, involved you giving testimony at a trial
14 or an arbitration proceeding as opposed to merely a
15 deposition?
16     A.  Testimony at trial or arbitration
17 proceedings.  Sly Fox, the New Carissa, Carla, Colmar,
18 Sealand Express, Cornfield, Discovery -- or Discover,
19 Maher v. Spearin, Crane v. Spirtis, Romantica, Outtrim
20 v. Kelley, and Union Pacific.
21     Q.  Would it be accurate for me to say that in
22 every case in which you gave what would be equivalent
23 of trial testimony, whether it was in a courtroom or
24 at an arbitration, that you also would have given a
25

AUSTIN L. DOOLEY, PH.D.          21

1  deposition in that case?
2      A.  Usually in arbitrations, there's no
3  depositions.
4      Q.  Okay.  Because you only marked off seven or
5  eight cases, ones that you gave a deposition.
6      A.  Right.  In arbitration there are no
7  depositions.  It's direct testimony or reports.  In
8  the federal court cases or the state court cases,
9  there may or may not be deposition.  These are the
10 ones -- that's the available list for testimony in
11 deposition for the past five years.
12     Q.  Thank you.  I want to shift to asking
13 you some questions about your work on this case.
14 That's the reason we're here today, basically.
15     A.  Yes.
16     Q.  Can you tell me, Dr. Dooley, when you started
17 your work on this case?
18     A.  I was initially contacted in -- sometime in
19 September of 2005.
20     Q.  Contacted by who?
21     A.  By an attorney by the name of Mr. Jim
22 Shirley.  He was with Holland & Knight at the time.
23     Q.  Did he indicate his purpose for contacting
24 you?

AUSTIN L. DOOLEY, PH.D.          22

A. He told me that he was getting ready to fly down to New Orleans and to look at something that Katrina had been involved in and that he wanted to put me on notice that he wanted to use my services at some point in the future.

Q. Okay. When he made his initial contact with you, did he describe in any more detail than what you've just told me what the nature of your involvement would be?

A. I think what he said was that there's a barge down there, and he wants to go down and take a look at the barge, the barge that had been reported in the newspapers all that weekend and throughout that week.

Q. Okay. Did you go down and meet him?

A. No.

Q. At some point in time, did you go down to New Orleans to take a look at the barge?

A. I saw the barge in March of 2006.

Q. Where was the barge in March of 2006?

A. It was largely cut up at the time. All that was left I think was the bottom and the -- I think the fiberglass covers were there as well.

Q. Where was it when you observed it?

A. It was on land in the lower Ninth Ward.

AUSTIN L. DOOLEY, PH.D.          23

Q. It was actually in the lower Ninth Ward, just cut up into its component parts?

A. They were still cutting it up. Yes. They were that day that we were there. They were cutting.

Q. At what point in time in your involvement in this case did you come to be hired by Lafarge North America?

A. Somewhere between that October -- September, October phone call from Mr. Shirley, Goodwin & Procter came into the case, and at that point, my contacts came through Goodwin & Procter.

Q. And did they formally retain you at that time? Did you have an agreement that you were just going to work for an hourly basis?

A. I don't sign those kind of contracts. If people want to hire me, they hire me. If they don't want to hire me, they don't hire me. Mr. Shirley may have called me, but if Mr. Raffman, said "No thanks," that would have been fine too.

Q. Let me ask you this. From that time, September, October of '05 through to the present, do you have an accounting of how many hours you've worked on this case?

A. I have not issued an invoice recently. I'm

AUSTIN L. DOOLEY, PH.D.          24

trying to remember when the last time I issued an invoice, but the actual hours -- I don't know exactly what the hours are now.

Q. Well, give me your best estimate.

A. Total?

Q. Yes.

A. From then to now? The work comes in spurts. I'd say about three weeks, three to four weeks of work. Good solid work.

Q. 40-hour weeks or longer?

A. I don't have a 9:00 to 5:00 job. It's solid work. It's working until late at night, weekends included.

Q. All right. So I assume you keep your actual time at some place or in some method?

A. In some method, yes. I have a spreadsheet.

Q. And you invoice Lafarge for that time; correct?

A. My policy in my company is invoice when there's a work product done. I would have invoiced on this report, but since it was so close to the deposition, I just figured I'll wait until the deposition is over and invoice everything at the same time.

AUSTIN L. DOOLEY, PH.D.          25

Q. Let me ask the question a little bit differently. How much time went into the preparation of the report, Exhibit 1?

A. Quite a bit. Writing it, researching it, reading the hurricane center report on Katrina, analyzing the wind speeds from the model, reviewing other reports. So I would think just, again, putting everything together, it's a good solid two weeks' worth of work. Just the writing part.

Q. Do you have -- let me ask it this way. How much have you billed Lafarge to date for your work for them?

A. I think so far it's been about, I'd say -- including expenses, I'd say it's probably about 15,000 to 20,000.

Q. What are your expenses on the case?

A. Travel. Trip to New Orleans, hotel here to Washington, train to New Orleans. Data is relatively inexpensive. But there was some data that we had to buy, but I think the client paid directly.

Q. How many times have you been to New Orleans in relation to your work on this case?

A. Just the once.

Q. You took the train down there?

AUSTIN L. DOOLEY, PH.D.                26
A.  No.  From New York to here.
Q.  Okay.  Do you intend to do any additional
work on this case between now and the time of trial?
A.  It depends on what Mr. Raffman asks me to do.
Q.  Well, as you sit here today, is there
anything else that you think should be done that you
haven't done yet?
A.  There's only one thing that I think, if I was
to be asked to do additional work, that I would do.
Q.  What is that?
A.  To research the -- one of the weather
observations that's given in the NHC report and see if
I can find a direction for that observation.
Q.  What specific weather observation are you
referring to in the NHC report?
A.  There's an observation made from the NASA
facility near New Orleans.  It was somewhere well to
the east of the IHNC.  They reported a high wind, but
I'd like to see if I could find the direction that
corresponds to that.  It may or may not exist.  I
haven't seen it reported anywhere in the literature.
So it makes me think that perhaps this is just an
anemometer reading and not a directional, you know,
observation of direction, but if I was to do anything

AUSTIN L. DOOLEY, PH.D.                27
additional, I would do that.
Q.  Towards that end, what would you do to try
and track down the directional reading?
A.  Contact the facility directly.
Q.  And what light would you expect the facility
to be able to shed on wind direction?
A.  It would be data point, and we'd have that
data point to compare to the model output.
Q.  All right.  Now, Dr. Dooley, when you were
hired as an expert in this case by Lafarge, were you
given any specific instructions as to the type of work
you were to perform?
A.  Basically to -- my instructions were to
analyze the wind conditions in the New Orleans area,
particularly in the area of the IHNC and comment on
those wind conditions as they affected this case.
Q.  How did Lafarge convey that instruction to
you -- or those instructions to you?
A.  In that March meeting?  I was asked to just
kind of prepare an overall view of Katrina for that
meeting and report what I had found to date and
basically just report on the weather, on the wind.
Q.  Well, your report does more than just report
on the wind.  You get into significant detail with

AUSTIN L. DOOLEY, PH.D.                28
respect to how the wind may have affected the movement
of the barge at issue in this case; correct?
A.  That's correct.
Q.  At what point in time were you given
instructions with respect to performing your analysis
on the barge specifically?
A.  The first instruction that I got was after
the IPET report came out.  I was asked to look at the
statement regarding the 100 knot winds broadside to
the barge.  So then I was asked to comment on that.
The second part of the assignment was, after
reviewing the reports from Ocean Oil and Marino
Engineering, which were fairly recently.
Q.  You're referring to the plaintiff's experts
reports?
A.  Yes, sir.
Q.  You were given those reports and given some
instruction with respect to them?
A.  To -- I was asked to look at their comments
regarding the wind and render my opinion on their
comments.
Q.  Were you asked to rebut their opinion with
respect to their comments?
A.  I was asked to render my opinion.

AUSTIN L. DOOLEY, PH.D.                29
Q.  And did you do that?
A.  Yes, I did.
Q.  Are your opinions all contained in your
report, Exhibit 1?
A.  Yes, sir.
Q.  There are no other opinions that you intend
to render at the time of trial?
A.  None at this time.
Q.  After the IPET report came out and you were
given certain instructions with respect to the barge
at issue in this case, how were those instructions
conveyed to you?
A.  I believe by telephone.
Q.  Is that to say you were never given written
instructions as to how you were to perform your work?
A.  I don't believe I ever got a letter telling
me what to do.  We would have meetings, and
discussions would be held, and I would be asked to
take on an assignment.
Q.  Did you take notes of that discussion?
A.  No.
Q.  Were you ever instructed to, during the
course of your work on this case, read or evaluate
eyewitness testimony?

AUSTIN L. DOOLEY, PH.D. 30

1
2     A. I have not seen the depositions. The only
3 comments from eyewitnesses that I saw were in some of
4 the expert reports.
5     Q. Are you referring to Cushing's report?
6     A. No. There were some there, but most of
7 what I saw were in the Pazos, the Ocean Oil report.
8     Q. Did you think it was important, when you were
9 doing your meteorological analysis, to check that
10 analysis and/or reconcile that analysis with
11 eyewitness accounts?
12     A. That's important to do, of course. But in
13 this particular case, I did not do that.
14     Q. Why not?
15     A. Because I wanted to be sure that I relied on
16 the science and scientifically collected and gathered
17 data.
18     Q. During the course of your work on this case,
19 did you come into knowledge that some of the
20 eyewitness testimony given in this case may have been
21 at odds with your findings?
22     A. I've been told that, yes, sir.
23     Q. You've been told that by who?
24     A. Through the discussions that we've had
25 regarding the case.

AUSTIN L. DOOLEY, PH.D. 31

1
2     Q. Have you made any effort to reconcile that?
3     A. No.
4     Q. Why not?
5     A. Well, I had my findings. I had the results.
6 My findings are the result of my research and
7 reviewing all the various different peer reviewed
8 articles and hurricane center reports on Katrina.
9 I've evaluated the science behind those. I've
10 evaluated the location of this particular storm with
11 regards to Katrina's path, and I feel confident that
12 my answers are correct.
13     Q. Is the converse of that that you feel
14 confident that the eyewitnesses are incorrect?
15     A. I feel that the eyewitnesses probably said
16 what they thought they had seen, which people
17 sometimes do, but at the end of the day, I feel that
18 my position, that my findings with regard to wind
19 speed and direction are consistent with the
20 scientifically collected data.
21     Q. And by extension, therefore, the eyewitnesses
22 are wrong?
23     A. I didn't say that they're wrong. I said that
24 they were reporting what they think they saw.
25     Q. Well, that's just a euphemism for they were

AUSTIN L. DOOLEY, PH.D. 32

1 incorrect, isn't that true?
2     MR. RAFFMAN: I think -- I'll let you answer. Go
3 ahead and answer the question.
4     But I think your questions are beginning to
5 get vague. I think you ought to specify which
6 eyewitnesses you're talking about and then ask for
7 whether the eyewitness is wrong or not instead of
8 doing it generally. Some of the eyewitnesses may be
9 correct. Such as Don McCrosky and others.
10     THE WITNESS: As I said, my findings are what
11 they are. They're in the report. They're based on
12 the scientific analysis of the system, and I feel that
13 those are the numbers that I would go with.
14 BY MR. POLLARD:
15     Q. Okay. One of the eyewitness.
16     By the way, I like to start generally and go
17 specifically.
18     MR. RAFFMAN: Right. I just think it's not a
19 fair -- it begins to get unfair.
20 BY MR. POLLARD:
21     Q. One of the eyewitnesses of importance to this
22 case is a gentleman by the name of William Villavaso.
23 Have you heard of him?
24     A. Yes.
25

AUSTIN L. DOOLEY, PH.D. 33

1
2     Q. Do you know where he claims to have been at
3 the time when he made observations with respect to
4 vessels in the IHNC?
5     A. I understand that he was at the pump house.
6     Q. Where is the pump house located?
7     A. Right towards the north end of the IHNC near
8 the Florida Avenue bridge, I believe, on the north
9 side of the entrance to that bridge.
10     Q. And do you have an understanding that
11 Mr. Villavaso, in the early morning hours of
12 August 29, 2005, claims he saw a barge bumping up
13 against the north end of the IHNC flood wall?
14     MR. RAFFMAN: Objection.
15     You can answer.
16     THE WITNESS: I understand that's what he said he
17 saw, yes, sir.
18 BY MR. POLLARD:
19     Q. Have you come into any information or do you
20 have any opinion as to the accuracy of his
21 observations?
22     A. I have an opinion on the wind conditions that
23 existed at the time. I have an opinion as to whether
24 or not those wind conditions could have moved the
25 barge from its position on the western side to the

AUSTIN L. DOOLEY, PH.D.                 34

1  eastern side.  Whether or not Mr. Villavaso actually
2  saw the barge, I have -- I don't know what the
3  gentleman saw, but I have an opinion as to the weather
4  conditions as the cause of that event.
5      Q.  Well, let me ask this to you in the form of a
6  hypothetical.  If Mr. Villavaso did in fact see a
7  barge or other vessel bumping up against the north
8  side of the IHNC flood wall, that would be at odds
9  with your conclusions as to wind direction and what
10  effect that would have had on vessels going from the
11  west to the east?
12      MR. RAFFMAN:  Objection to the question.
13      THE WITNESS:  If he said that he saw it, his
14  report would be at odds with my findings.
15  BY MR. POLLARD:
16      Q.  To your knowledge, aside from the barge,
17  4727, at issue in this case, are you aware of any
18  other vessels that were within the IHNC at the time
19  Katrina came or made landfall?
20      A.  The only -- I understand there were some
21  other barges alongside the dock as well, but the only
22  one that I've been focusing on has been the barge of
23  interest.
24      Q.  I should have asked the question a little bit

AUSTIN L. DOOLEY, PH.D.                 35

1  differently.  Are you aware of any other unmoored
2  vessels in the IHNC other than Barge 4727?
3      A.  I do not know of any.
4      Q.  Do you have any opinion as to what it was
5  Mr. Villavaso saw if not a barge?
6      A.  No, I do not.
7      Q.  Are you aware of an eyewitness by the name of
8  Terry Adams?
9      A.  I've heard of that name, yes, sir.
10      Q.  Where have you heard of that name?
11      A.  In our discussions regarding the conditions.
12      Q.  You haven't specifically evaluated the
13  deposition testimony of Mr. Adams?
14      A.  No, I have not.
15      Q.  Do you have an understanding as to the
16  general subject matter of Mr. Adams's testimony?
17      A.  I know -- I don't have a general
18  understanding.  I -- well, if you could give me some
19  specifics, I'll tell you if I know that.
20      Q.  Okay.  Well, assume that Mr. Adams, in the
21  early morning hours of August 29, 2005, was up on his
22  roof looking west towards the Lafarge facility and
23  testifies that he saw a barge collide with the flood
24  wall around the area of the south breach, early

AUSTIN L. DOOLEY, PH.D.                 36

1  morning hours meaning anywhere from 4:00 to 6:00 a.m.
2  How do you reconcile that observation with your
3  analysis that you performed in this case?
4      MR. RAFFMAN:  Objection.  Characterization.
5      You can answer.
6      THE WITNESS:  I can answer.
7      Well, if that's what Mr. Adams -- if that's
8  what he said he saw, all I can say is that if it was
9  the barge of interest, which was on the western side,
10  the wind would not have allowed that barge to move
11  from the western side to the eastern side that early
12  in the morning.
13  BY MR. POLLARD:
14      Q.  Are there any other forces aside from wind
15  that could have affected the movement of the barge of
16  interest?
17      A.  Generally or this specific case?
18      Q.  Let's start generally, and then we'll go
19  specifically.  Generally?
20      A.  Well, any object that floats in the water
21  would be susceptible to the motion of the water.
22  Likewise, the motion of the water is susceptible to
23  the wind.  So you would have wind driven currents.
24  You would also have, due to the hydraulic nature of

AUSTIN L. DOOLEY, PH.D.                 37

1  the water bodies here, you'd have some currents coming
2  in that area.  You'd also have some waves.  So the
3  barge would be susceptible, not just to the wind, but
4  to these other factors as well.
5      Q.  When you say wind driven currents, do you
6  mean to say or to describe a force other than mere
7  wind?
8      A.  Yes.  Basically what I'm saying is these
9  currents, due to the hydraulic nature with MRGO and
10  the GIWW, the water coming in from the Gulf of Mexico,
11  that wind is driving that water into that body.  Once
12  they get into the body, they meander about
13  accordingly.  So if the barge was there, it would be
14  susceptible to those forces.
15      Q.  So it would be susceptible to wind?
16      A.  Yes.
17      Q.  Also wind driven current?
18      A.  Well, in the sense that I've just described.
19      Q.  In the sense that you just described.  Then
20  wave action?
21      A.  Wave action, yes, sir.
22      Q.  What other forces would potentially impact
23  the movement of the barge?
24      A.  Environmental forces.  Those would be the

AUSTIN L. DOOLEY, PH.D.          38

1
2  ones I just mentioned.
3      Q.  Mention them again for me just for clarity.
4      A.  The ones you just ran down.  The wind, the
5  water movement, and the waves.
6      Q.  Any other forces that you're aware of that
7  could have potentially impacted movement of the barge?
8      A.  Well, of course the barge is tied up.  So its
9  movement is restrained by the lines.  The
10 configuration of the body of water.  We have that
11 slip-type behavior, the notch, so to speak, on the
12 western side.  So the configuration surrounding the
13 boundary, these types of things.
14     Q.  The configuration that surrounded the
15 boundaries, are you referring to the buildings?
16     A.  What I mean is the notch-type environment.
17 If you looked on the overhead of the IHNC, the Lafarge
18 terminal was in that cut-out, so to speak.  There's a
19 notch, and I believe at the end of that there is also
20 some type of structure extending out over the -- out
21 over the waterway.
22     MR. POLLARD:  We'll mark this next in order.
23 This is Page 22 from the Cushing expert report.
24     (The Reporter marked the document
25     referred to as Deposition

AUSTIN L. DOOLEY, PH.D.          39

1
2      Exhibit 2 for identification.)
3      MR. POLLARD:  Why don't you take a look at this.
4      (The witness reviewed Exhibit No. 2.)
5  BY MR. POLLARD:
6      Q.  When you testified about the notch, you're
7  referring to the indentation where the barges are
8  parked that's depicted on Page 22?
9      A.  Yes, sir.  I wouldn't say "parked."
10     Q.  Okay.  What term would you use?
11     A.  Moored.
12     Q.  Moored.  By the way, Dr. Dooley, do you have
13 an opinion as to why the barge broke free of its
14 mooring?
15     A.  Why it broke free.  It broke sometime during
16 the day, which means, obviously, the lines gave way.
17     Q.  What is your understanding as to when the
18 barge broke free?
19     A.  That, I don't really know.
20     Q.  Do you assume, for purposes of the
21 conclusions that you reach in your report, that the
22 barge stayed in the approximate position in which it
23 was moored or in that approximate location until such
24 time as the winds shifted and started to flow from
25 west to east?

AUSTIN L. DOOLEY, PH.D.          40

1
2      MR. RAFFMAN:  Objection to the way the question
3  is framed.
4      If you understand the question, you can
5  answer it.
6      THE WITNESS:  Can you restate that a little bit?
7  BY MR. POLLARD:
8      Q.  Would you show me the exhibit.
9      A.  Sure.
10     Q.  I'm circling the barge at issue in this case.
11 Do you see that?  (Indicating)
12     A.  Yes, sir.
13     Q.  Do you agree that's the barge at issue in
14 this case?
15     A.  I agree that's what you circled.
16     Q.  Okay.  Do you assume, for purposes of the
17 conclusions that you reach or that you describe in
18 your report, that the barge at issue remained in that
19 approximate location until such time as the wind
20 shifted from west to east?
21     MR. RAFFMAN:  I think it's an unfair question.
22     But go ahead.
23     THE WITNESS:  Well, again, you have to come back
24 to what my report is.  The first thing that I did is I
25 analyzed the wind direction.  The second thing I did

AUSTIN L. DOOLEY, PH.D.          41

1
2  is I looked at the IPET report.  The IPET report said
3  100 mile-per-hour wind broadside to the barge, and I
4  evaluated whether or not that could have happened, and
5  the third thing that I did is I looked at the analyzed
6  location of the barge according to the Pazos and
7  Marino reports, where Pazos has the barge at the north
8  breach between, I believe, 4:00 and 5:00 o'clock in
9  the morning, and Marino then comments on the wind
10 directions.
11     So my report never makes any assumptions
12 about what happens to the barge.  I'm simply talking
13 about wind conditions as they occurred on the morning
14 of the 29th.  What happened to the barge is someone
15 else's problem, not mine.
16     MR. POLLARD:  Let's take a quick break.
17     THE WITNESS:  Okay.
18     THE VIDEOGRAPHER:  We're going off the record at
19 11:06:10.
20     (A recess was taken from 11:06 a.m. to
21     11:18 p.m.)
22     THE VIDEOGRAPHER:  Back on record.  Tape 2 of the
23 video deposition of Dr. Austin Dooley.
24 BY MR. POLLARD:
25     Q.  Dr. Dooley, right before we broke, I was

AUSTIN L. DOOLEY, PH.D.          42

1  asking you questions about Exhibit 2, which is the
2  graphic exhibit that's right in front of you, which
3  depicts the area of interest in this case. I want to
4  ask you a question. If the barge happened to be at
5  some other location other than in the notch directly
6  adjacent to the Lafarge facility prior to the first
7  reading that you found where there was a westerly
8  wind, does that impact any of your conclusions?
9       MR. RAFFMAN: Objection. Vague.
10          You can answer.
11      THE WITNESS: Again, I have to bring you back to
12  what my report talked about, the wind direction. So
13  where the barge was is independent of my analysis of
14  wind directions and speeds in the IHNC that morning.
15  With regards to the 100 knot wind speed acting
16  broadside to a barge on the western side as indicated
17  in the IPET report, basically there was never 100 knot
18  or 100 mile-per-hour wind speed on the western side of
19  the IHNC to have impacted a barge. With regards to my
20  comments on the Ocean Oil or the Marino Engineering
21  evaluations of wind directions, the -- that -- the
22  location of the barge would have no impact on those
23  decisions either. My work was based on the scientific
24  analysis of the reports from verifiable sources, and
25

AUSTIN L. DOOLEY, PH.D.          43

1  those were my conclusions, sir.
2       Q. What is the significance to you of the
3  reference to the 100 knot wind speed reading in the
4  IPET report?
5       A. The significance to me is that was this a
6  value that could have been reached, and my answer was
7  no.
8       Q. Conclusively, no?
9       A. Conclusively, no, according to my findings.
10      Q. And is it your testimony here today that
11  there could not have been micro bursts of 100 miles
12  per hour within the IHNC?
13      A. The evaluations of the three-second gust that
14  you see in my report in Table 6 Charlie, or 6C, that
15  is a derivation of the gust contained within the
16  winds. The normal gust factor in a hurricane is about
17  1.53, and those are the values that I applied. That
18  is a three-second gust, which basically allows for
19  that type of an event.
20      Q. Can you have or do you know of hurricanes in
21  which there are aggregations of multiple but
22  independent three-second gusts in quick succession
23  from each other?
24      A. Well, three second gust is a random

AUSTIN L. DOOLEY, PH.D.          44

1  phenomena. If you're going to get a three-second
2  gust, it's going to be of roughly 1.5, three times the
3  mean wind speed.
4       Q. Let's turn to your report. We'll start going
5  through your findings. I need you to explain some
6  things to me. If you'll turn to Page 1 of the report,
7  the Executive Summary.
8       A. Yes, sir.
9       Q. You indicate at the last sentence of
10  Paragraph 2 that the area of interest, the IHNC, was
11  not within the area of Katrina's maximum winds. Do
12  you see that?
13      A. Yes, sir.
14      Q. Would you tell me what the significance of
15  that particular observation is to you?
16      A. Well, it gives a sense of scope of hurricane
17  Katrina. We know it as one of the greatest storm
18  devastations affecting the gulf coast, and people talk
19  about the high winds. Well, the high winds were
20  confined -- the exceedingly high winds of Katrina were
21  confined to the eastern side or the dangerous
22  semi-circle of the storm. That area did not pass over
23  New Orleans.
24      Q. Well, how far away from New Orleans did that

AUSTIN L. DOOLEY, PH.D.          45

1  area pass in terms of miles?
2       A. If you look on Page 19 and 20, particularly
3  Graphic 1-A, which is a map of the blowup of Graphic 1,
4  which is Katrina's maximum wind contours in knots.
5  And what we see is that the highest winds, the 100 and
6  higher knot wind speeds, all occurred on the eastern
7  side, out over that body of water near those islands
8  east of New Orleans. I don't have a scale.
9       Q. You don't have an estimate as to how many
10  miles away from the IHNC area that was?
11      A. I can make an estimate.
12      Q. Make an estimate.
13      A. It's about, for the IHNC -- I'd say the high
14  winds -- Katrina's maximum winds were located on the
15  eastern side of the track, and from the IHNC, that was
16  approximately something around 30 to 60 miles. Maybe
17  more; maybe less.
18      Q. 30 to 60 miles away from the IHNC?
19      A. Yes, sir.
20      Q. So are you trying to -- are you saying that
21  the winds that would have impacted the IHNC were not
22  all that bad? Is that what you're trying to say?
23      A. I'm saying that they were not the maximum
24  winds within Hurricane Katrina.

AUSTIN L. DOOLEY, PH.D.          46

Q. But they were still strong. You agree with that?

A. I have shown the values in Tables 6B and C.

Q. And distilling those values down to a layperson's description as to the strength of the wind, you would agree with me that those values are strong; correct?

A. They were greater than 64 knots, which is hurricane status. Hurricane winds.

Q. And you agree that -- or do you agree that those winds were at least in part, if not fully, responsible for causing Barge 4727 to break away from its moorings?

A. I don't know what caused the barge to break away from its moorings, sir.

Q. You don't -- you don't have any opinion as to whether wind was any sort of causative factor?

A. I have no opinion. I have not done that analysis.

Q. Okay. Have you made any effort, in the course of your analysis, to reconcile your interpolations of wind speed with the mechanics of how the barge broke away from its moorings?

A. Can you -- I -- I don't quite understand your

AUSTIN L. DOOLEY, PH.D.          47

question.

Q. Well, part of your conclusions are interpolations; is that correct?

A. Yes, sir.

Q. Okay. And why don't you define what -- what you mean, because you've used that term in your report. What do you mean when you say, "interpolations"?

A. Well, we have values at grid points. The barge was not at the grid point. So we must evaluate a value at the location of the barge, depending upon the values upon the grid point, and that process is interpolation.

Q. Okay. And I think what you're -- you're trying to say is there was no data collection point or official data collection point in the IHNC?

A. The only -- the only point that we have are the four surrounding grid points shown in the map in my report.

Q. Those aren't in the IHNC or immediately adjacent to it, are they?

A. They surround it. If I could refer you to the map on Page 22. Nothing exactly in the -- that portion of the IHNC. We have B up there in the MRGO

AUSTIN L. DOOLEY, PH.D.          48

portion of it, just at the turn.

Q. And do you have any factual knowledge as to how far away from the IHNC the closest grid point that's depicted on Page 22 was?

A. I've done those measurements, but I've -- right now I -- I can't remember what they -- what that answer is.

Q. Can you give me an estimate just based upon your -- all the hours you spent on this report?

A. Between A and C, it is three miles. Between B and D, it's three miles, nautical miles, because C is at 29.95, and A is at 30.0. So that's about three miles. So the distance from E to B would probably be about a mile and a half.

Q. And what -- and if you would describe for me what the importance of these miscellaneous grid points are in your interpolations.

A. Well, those are the values from the hindcast that I consulted in obtaining wind directions. So that's the value of those grid points.

Q. And are you saying that there were wind measurements taken from each of these grid points at regular intervals?

A. There were calculations of wind directions

AUSTIN L. DOOLEY, PH.D.          49

and speed made at those grid points at regular intervals.

Q. And at any point in time, to your knowledge, did the collection of data at any of these grid points fail?

A. The --

MR. RAFFMAN: Objection.

THE WITNESS: The grid points here that we're looking at, A, B, C and D, are values obtained from a numerical hindcast of the wind field surrounding Katrina.

BY MR. POLLARD:

Q. Define what you mean when you say, "numerical hindcast."

A. That is given in my report, starting on Page 6, where I talk about the MMS hindcast study conducted by Oceanweather, Inc.

Q. All right.

A. And the hindcast is the numerical calculation of the wind field surrounding the storm based upon collection of data which can consist of surface reports, airplane reports, satellite measurements of wind speed, buoy reports and other station reports.

Q. Can you -- can you distill that last

AUSTIN L. DOOLEY, PH.D.          50

1
2  explanation down to a -- into layman's language any
3  further than what you've already done?
4      A.  Well, the -- what happens is the --
5      Q.  You get a lot of information from a lot of
6  different sources?
7      A.  Yes, sir.
8      Q.  You try to piece all that together to project
9  what would have been going on --
10     A.  Well, it's not a projection.  We know --
11 again, my report is based upon science.  So we -- we
12 must look at the scientific facts of the case, look at
13 the quantifiable and evaluative reports.  We have --
14 you mentioned before -- you mentioned witness reports.
15 Those reports are coming from people probably of the
16 most devastating event that has ever hit their lives.
17 They're in the middle of high winds.  They're in the
18 middle of driving rain.  They're in the middle of
19 rising water.  They really are so confused.  But --
20     Q.  And do you -- let me just ask you a question
21 on that point.  Do you discount their observations
22 because of those factors?
23     A.  Well, those are factors that have to be taken
24 into consideration when evaluating them.  But to reach
25 my conclusions, what I did is I relied upon the

AUSTIN L. DOOLEY, PH.D.          51

1
2  science of the case.  I relied upon the observations
3  as defined through official observing sites or sites
4  that were reliable and deemed reliable and used within
5  the hindcast study.
6      Q.  And just so we're clear, there were no such
7  sites in or immediately adjacent to the IHNC?
8      A.  The closest one that I found and was able to
9  use was up at the Lakefront Airport, which was about 4
10 to 4.2 miles away.
11     Q.  And were you aware that the data collection
12 point at that airport failed at 6:53 a.m. Central time
13 on August 29?
14     A.  Yes, I make mention of that in my report.
15     Q.  What happened?
16     A.  The anemometer stopped functioning.
17     Q.  Why?
18     A.  I can only assume it was due to some type of
19 a -- consequences of the hurricane.  Either the power
20 supply was lost or the instrument itself somehow or
21 another malfunctioned.
22     Q.  Okay.  And in scientific terms, what was the
23 net effect of that failure?
24     A.  Well, what it did, it deprived us of a
25 continuing observation point, but we had good data up

AUSTIN L. DOOLEY, PH.D.          52

1
2  until that time.
3      Q.  And no data after it?
4      A.  No data from that Lakefront Airport that was
5  recorded, yes, sir.
6      Q.  Okay.  And given the failure of that data
7  point, how did that affect the model, if at all?
8      A.  Well, again, that was -- that's one of the --
9  one of the data point that goes into the model.  There
10 are many others, and the model results have to be
11 consistent with all of the reports from the other
12 stations that may or may not have been immediately
13 there as close as Lakefront but were still within the
14 Louisiana/Mississippi region.
15     Q.  When you talk about an MMS study, define the
16 term for the record.
17     A.  MMS, of course, is the government agency, the
18 Mineral Management Service, and they contracted with
19 Oceanweather, Inc. to do a hindcast on the winds,
20 waves and currents in the Northern Gulf of Mexico in
21 Hurricane Katrina.
22     Q.  And Oceanweather, Inc. is -- why don't you
23 describe to me your relationship with Oceanweather,
24 Inc.  It looked like you have some sort of partnership
25 or synergistic relationship with that company.

AUSTIN L. DOOLEY, PH.D.          53

1
2      A.  Oceanweather, Inc. is an independent company
3  located in Cos Cob, Connecticut.  My company is
4  located in City Island in the Bronx.  I have done
5  research work with Oceanweather in other cases.  They
6  are the -- what I feel is the world's leading experts
7  in hindcast of tropical cyclones, and so to analyze
8  the wind field, knowing that so many stations failed
9  and electricity failed throughout the area, I went to
10 look for their hindcast of -- of Katrina.
11     Q.  Did you actually assist in the hindcast study
12 of Katrina, or did you only look at their data?
13     A.  I looked at their data.
14     Q.  You didn't try to re-create it on your own?
15     A.  Well, I evaluated the model compared to other
16 observations and, of course, a -- a comparison of that
17 data would have been from the hurricane research
18 division, which I make note of in my report.
19     Q.  All right.  Do you know who commissioned them
20 to do the hindcast?
21     A.  Who is "them," sir?
22     Q.  I'm sorry.
23     A.  Who do you mean by "them"?
24     Q.  Yeah, the company in Connecticut.
25     A.  OWI.

AUSTIN L. DOOLEY, PH.D.          54

1
2  Q. Yes.
3  A. It's commissioned -- first, we got -- I got
4  two sets of data from OWI. The first report was in
5  2005. Okay. That was superseded by another report in
6  2006, and that was the MMS report, and that report was
7  commissioned by MMS.
8  Q. For what purpose?
9  A. As I said, for MMS to have an understanding
10 of the winds and waves and currents on the Northern
11 Gulf of Mexico.
12 Q. All right. Let's turn back to your executive
13 summary, which we started talking about. The first
14 sentence of Paragraph 3 indicates, "Analysis indicates
15 that the maximum wind speed in the IHNC ranged between
16 75 and 79 knots and occurred between 0730 and 0745
17 Central Daylight Time on August 29." Do you see that?
18 A. Yes, sir.
19 Q. Did you mean to say, "maximum sustained wind
20 speed" there?
21 A. That's what it should be, yes, sir.
22 Q. Okay. You then go on to say, "At no time
23 during the passage of Katrina across the area did
24 sustained winds at the IHNC reach 100 miles per hour."
25 Do you see that?

AUSTIN L. DOOLEY, PH.D.          55

1
2  A. Yes, sir.
3  Q. And the area that we're talking about in that
4  sentence is the IHNC?
5  A. Yes, sir. Confined within those four grid
6  points.
7  Q. Okay.
8  A. A, B, C and D.
9  Q. That were depicted on the page we were just
10 looking at?
11 A. Yes, sir.
12 Q. Let's identify the page for the record.
13 MR. RAFFMAN: Try 21 -- 22.
14 THE WITNESS: Yes. Map 3 on Page 22.
15 BY MR. POLLARD:
16 Q. Page 22, Map 3. Dr. Dooley, will you
17 describe for me any and all efforts or undertakings
18 that you made to conclusively rule out the existence
19 of sustained wind speeds of 100 miles per hour in the
20 subject area.
21 A. Yes. If you take a look at Section 5 on
22 Page 17.
23 Q. I'm there.
24 A. Section 5 is titled "WIND SPEED REPORTS IN"
25 the "NEW ORLEANS AREA." These values in Table 4 are

AUSTIN L. DOOLEY, PH.D.          56

obtained from the NHC, National Hurricane Center,
official report on Katrina, and you see the sustained
speed in knots listed there in the column, and you can
see the values at that range. The maximum value is
84. The table continues on Page 18, and you see there
after "Belle Chase, 68." So we have a collection of
observations of maximum sustained speeds. These
values are then analyzed by the hurricane research
division, HRD, and the graphic on Page 9, produced by
that government agency, is then produced analyzing the
graphic on Page 19 -- I'm sorry if I said "Page 9"
before. Analyzing the graphic on Page 19 is the
results in the blowup shown on Page 20, which is
"GRAPH 1A."
     There, if you follow the contours, you'll see
in the lower left-hand corner the wind speed in knots,
70 knots, and the next interval is the dotted line
indicating 75 knots, and the next contour inward
toward the track line, you'll see 80 knots. Following
those lines, those contours up to the IHNC area, you
can see that the maximum sustained wind speed as
analyzed by the hurricane research division -- and
this is all that they do is analyze the wind speeds
around Katrina -- show the wind speeds to be somewhere

AUSTIN L. DOOLEY, PH.D.          57

between 70 and 80 knots.
Q. Which translates into -- into a greater
number in miles per hour; right?
A. 1.15, yes, sir.
Q. So 80 to 92 miles per hour?
A. Something like that, yes. I think that's
what I said in my report there in the paragraph on top
of page Graphic 1A, 80 to 92 miles per hour. So those
were the maximum wind field in the area.
Q. Okay. Now, is the significance of the
sustained maximum wind speeds being less than
100 miles per hour, in your mind, linked only to this
conclusion in the IPET report? It mentions 100 miles
per hour, or is there some other significance to it?
A. That's the only significance that I have.
Q. Okay. So are you saying that had there been
maximum sustained winds of at least 100 miles per hour
in the IHNC, then you could conceivably come up with a
model where the barge could be moved from west to
east?
A. Well, there's two components that are needed
for the IPET assumption.
Q. IPET?
A. IPET.

AUSTIN L. DOOLEY, PH.D.                58

Q. I-P-E-T.

A. The IPET assumption, and one is that the wind be broadside to the barge, as I read that report. So I would have to -- have to qualify the wind in both direction and speed, and with regards to both of those criteria being met, that did not happen.

Q. Do you know why the IPET report only discussed this circumstance of the barge being broadsided with 100 miles per hour wind?

A. No, sir.

Q. Are you aware of any other type of movement mechanic that could conceivably move the barge from west to east?

A. Well, we talked about those before.

Q. We talked about waves.

A. And we talked about currents.

Q. And currents. We did talk about currents.

A. And I've given you that list.

Q. Okay. Did IPET discuss currents?

A. I don't recall.

Q. Do they discuss waves?

A. I did not focus on that area. I'm sure they must have, but, again, my study was on the wind.

Q. All right. Going down to the fourth

---

AUSTIN L. DOOLEY, PH.D.                59

paragraph of your executive summary. We're back to Page 1. Last sentence, "The wind had no westerly component, relative to the IHNC, until this time" -- I guess "this time," you're referring to 7:42 Central Daylight Time in the previous sentence?

A. That's correct, sir.

Q. And then your last sentence says, "The wind did not blow fully out of the west (relative to the IHNC) until between 1015 and 1030 CDT." So that conclusion implies to me that you have conclusively ruled out any western component, whether it be sustained or some sort of a microburst situation; is that correct?

A. I'm talking about the sustained wind speed, sir.

Q. Okay. All right. So do you specifically exclude what we referred to previously as a microburst, or you described as a "random three-second burst"?

A. Well, those high winds would be embedded within the sustained flow, and they're accounted for in the calculations. Whatever direction component they may have locally, they would be embedded within the predominant flow and tend to move overall in the

---

AUSTIN L. DOOLEY, PH.D.                60

direction of the predominant flow.

Q. When you talk about "predominant flow," are you referring to prevailing winds?

A. Yes, sir.

Q. And when we talk about prevailing winds in the context of a hurricane, what are we talking about? Where are those winds located? They're at stratospheric level; right?

A. Well, a hurricane has three depth -- three dimensional structure, and the wind speeds that we're talking about here are 10 meter winds, wind speeds that are determined at a height of 10 meters.

Q. Would you agree with me generally that wind flow during a hurricane is unpredictable?

A. No, sir.

Q. You believe it's predictable?

A. Yes, sir.

Q. Do you believe that wind flow over a particular area is affected in any way by its topography, natural topography?

A. Yes, sir.

Q. How about artificial topography, such as structures?

A. Yes, sir.

---

AUSTIN L. DOOLEY, PH.D.                61

Q. In what way does natural topography affect wind flow?

A. Well, the natural topography would introduce some degradation of the speed due to friction so that it would turn the currents a little bit more. So we have a situation like that.

Q. And when you say, "turn the currents" --

A. Or turn the winds.

Q. Turn the winds. Make the wind go in some other direction than the prevailing direction; correct?

A. No. You have to be careful. It's not going to turn the wind 180 degrees opposite to the prevailing wind direction. That's not going to happen.

Q. I said in some other direction. I didn't say the opposite direction. I said it's -- well, it's going to modify the direction of the wind; correct?

A. It's going to be -- it's going to adjust the direction, but in this particular case, those factors are taken into consideration.

Q. How do you take those factors into consideration?

A. Well, in this report, what we can do is we

---

16 (Pages 58 to 61)

AUSTIN L. DOOLEY, PH.D.          62

1  can take a look at the Lakefront values.  When you
2  look at the Lakefront direction, you can see
3  throughout the morning of the 29th, up until the time
4  the anemometer stopped reporting, we had all north
5  easterly winds.  So we're looking at -- we're looking
6  at wind directions there.  We can compare that to the
7  model, and we can see that things are consistent.
8       Q.  Do you know how high the flood wall on the
9  east side of the IHNC was?
10      A.  Exactly how high, no, sir.
11      Q.  Just roughly?
12      A.  I had heard that it's something between 12
13  and 13 feet, but I don't know.
14      Q.  It's since been rebuilt, obviously, but at
15  the time, you believe it was 12 to 13 feet?
16      MR. RAFFMAN:  Objection to --
17      THE WITNESS:  I have no scientific basis upon
18  which to base the height of the flood wall because I
19  did not measure it.
20      MR. POLLARD:  It's too late, Mark.  He's already
21  testified.  You can state your objection.
22      MR. RAFFMAN:  I'll make my objection that the
23  question was not clear, when we're talking about the
24  height of the flood, whether we're talking about the

AUSTIN L. DOOLEY, PH.D.          63

1  top of the flood wall as measured by NEVD 88 or
2  whether we're talking about the height of a concrete
3  monolith above the levy top or any other measure by
4  which that would be evaluated.  I don't think the
5  witness meant to testify that we had a 12-foot
6  monolith, but that's why I made my objection.
7       MR. POLLARD:  Okay.
8       Q.  Does that impact your -- your estimate of the
9  height of the flood wall?
10      A.  Yeah.  I have no accurate measurement of how
11  high it is.  I know there was a flood wall on the east
12  side.
13      Q.  If a wind is blowing easterly, meaning from
14  east to west -- is that correct, when I say,
15  "easterly"?  Do I have that portion right?
16      A.  Yes, sir.
17      Q.  East to west.  It comes into contact with a
18  12 to 13 feet or whatever high flood wall.  That flood
19  wall is going to have some impact on the direction of
20  the wind; correct?
21      A.  Well, it's -- it's going to introduce a -- a
22  momentary adjustment, but, again, the wind flow is
23  determined by the overall pressure pattern, and once
24  you get downstream of that structure, you're -- you're

AUSTIN L. DOOLEY, PH.D.          64

1  back in the dominant flow again --
2       Q.  Okay.
3       A.  -- the prevailing wind direction.
4       Q.  Well, let's break it down a little bit.  It's
5  going to introduce some interruption to the wind flow.
6  You agree with that?
7       A.  Well, it's going to introduce -- it's not
8  going to introduce an interruption on the eastern side
9  that's going to affect something that's perhaps a
10  1,000 to 1,500 to 2,000 feet on the other side of the
11  IHNC.
12      Q.  We're not there yet.  Okay?  We'll get to
13  that point.  You agree with me that the flood wall is
14  going to introduce an eruption of some nature?
15      A.  Of some nature.  Minor.
16      Q.  You say, "momentary."  Are you able to
17  quantify the exact time of the interruption?
18      A.  No, sir.
19      Q.  And, by the way, is that analysis within the
20  purview of your expertise?
21      A.  Aerodynamics is not something that I do.
22      Q.  I assume, though, that you have some general
23  familiarity with aerodynamics as it impacts wind
24  analysis?

AUSTIN L. DOOLEY, PH.D.          65

1       A.  Yes, sir.
2       Q.  Okay.  So if, hypothetically, wind is coming
3  into contact with a 12- to 13-foot structure, it seems
4  to me that, at least momentarily, because you'll give
5  me "momentarily" -- that was your word -- will cause
6  some sort of an updraft as the wind comes into contact
7  with the flood wall?
8       MR. RAFFMAN:  Objection to -- objection.  I'm
9  sorry.  Faulty hypothetical.
10      Go ahead.
11      THE WITNESS:  It's going to introduce turbulence
12  into the atmosphere which is accounted for in the
13  three-second gust.
14  BY MR. POLLARD:
15      Q.  What happens on the canal side of the flood
16  wall as the wind is hitting the flood wall from the
17  east?
18      A.  Where?
19      Q.  Directly to -- directly to the west of the
20  flood wall.
21      A.  How far?
22      Q.  Can you quantify what the distance would be
23  that you would expect to see some sort of impact as a
24  result of the wind hitting the flood wall?

AUSTIN L. DOOLEY, PH.D.          66

A. Can I quantify it?  No, sir.

Q. Well, let's say within -- for purposes of my hypothetical, within 500 feet?

A. Once I get out to a distance of 500 feet in a situation like this, I would expect that the wind would reestablish itself in the prevailing wind direction.

Q. Are you familiar with the phenomenon known as a "downdraft"?

A. Downdraft, yes, sir.

Q. And define that for me, if you would.

A. Downdraft is basically a -- wind that falls from a cloud base and moves towards the surface, and on hitting the surface, it then turns outwards.

Q. How about a "swirl"?  Does that have any significance, that term?

A. A swirl?

Q. Yes.

A. I can have a visual image of a swirl.  If I apply that to the wind, I can think of turbulent -- turbulent eddies.

Q. Turbulent eddies?

A. Yes.

Q. What is an "eddie"?

---

AUSTIN L. DOOLEY, PH.D.          67

A. A swirl.

Q. Okay.  We'll use it interchangeably.  So as a meteorologist, are there occasions when you would service a downdraft, a swirl or an eddie that would cause wind to be moving in directions other than the prevailing wind direction?

MR. RAFFMAN: Objection.  Form.

THE WITNESS: Well, usually when you get a downdraft of the type that you're talking about, it would be in a -- it would be in a condition where the prevailing wind is of a magnitude less than the downdraft so that the swirl or eddie would extend into the air flow some distance against the prevailing flow.  So you asked me to picture a situation where that might happen, and that's the situation that I've imagined.

BY MR. POLLARD:

Q. Do you know whether or not there were downdrafts, swirls or eddies in existence during Katrina inside of the IHNC?

A. I know that the prevailing wind direction was mostly out of the northeast; that the winds were 70 to 80 knots, that any type of downdrafts or -- that may have occurred would have been blown with that

---

AUSTIN L. DOOLEY, PH.D.          68

prevailing wind direction; that such conditions would have been momentary, and that if momentary, would have eventually moved in the downwind direction.

Q. And define "momentary."

A. Well, we're talking about three-second gusts here.

Q. So, again, that brings me back to my question, which I'm not -- not quite sure you answered, which is -- I'll ask it again.  I don't mean to be repetitive.  Are you aware of any circumstances in which the downdraft direction is other than in the direction of the prevailing wind?

MR. RAFFMAN: Objection.  Asked and answered.  I think it's -- I'll leave it at that.

THE WITNESS: I should answer?

BY MR. POLLARD:

Q. Yeah, you can answer.

A. My opinion, what happened here is that the prevailing winds would carry any of those winds with it in a downwind direction.

Q. In a northeasterly direction?

A. No.  No, not in a northeast.  From the northeast toward the southwest.

Q. Okay.  Now, Dr. Dooley, is it within your

---

AUSTIN L. DOOLEY, PH.D.          69

expertise as a meteorologist to model the possible effects that these wind perturbations -- is that the right term to use?

A. It's a good word.

Q. Okay.  I did a little bit of studying before the deposition.  All right.  The wind perturbations, which would include the downdrafts, the eddies, the swirls, what we've been talking about, is there a way to model that?

A. With regards to those types of turbulent motions, that's where the gust factors come into consideration.  To account for those factors within -- as being embedded within the dominant prevailing wind direction.  Can you model convective activity at each individual grid point, no.

Q. It's not possible to do it, or no one did it?

A. The state of the art of these types of microscale convective models, I have seen some in -- in the literature where people talk about these types of things.  Whether anybody did it for Katrina, I do not know.

Q. And you never did it?

A. I never did it.

Q. Now, you mentioned to me a few pages ago in

AUSTIN L. DOOLEY, PH.D.          70

this deposition that you would expect to see some
turbulence at the surface level.  Do you recall that?
You mentioned turbulence?

A.  In reply to your question about the wall.

Q.  Generally speaking, do you expect to see some
sort of wind turbulence at the surface level, meaning
at levels less than 10 meters high?

A.  Yes.

Q.  And define what type of turbulence you would
expect to see and how it would manifest itself on the
wind direction.

A.  Well, you'd see the interaction of the wind
with whatever structures it may have encountered.  So
you'd see some turbulence, and nevertheless, whatever
particle or debris that may have been lifted by that
turbulence will eventually be carried with the
prevailing wind direction.

Q.  So you're not aware of any circumstance or
circumstances wherein turbulence could result in a
vessel moving in a direction against the prevailing
winds?

A.  As I mentioned before, it depends upon the
bank -- the difference in speed or magnitude of the
two vectors.  If the turbulence is greater and of

AUSTIN L. DOOLEY, PH.D.          71

longer lasting than the prevailing wind, you might get
some movement, but in this situation, we had a
continuous wind from the northeast and momentary
eddies or turbulence that may have been sent up, but
overall, anything set in motion by that turbulence
would have eventually moved in the direction of the
prevailing winds.

Q.  What type of circumstances would you have to
see in order to get turbulence that is greater or
longer lasting than the prevailing winds?  Give me an
example.

A.  An example would be a mid afternoon
thunderstorm on a calm day, much like today, where
convective activity has caused a thunderstorm to
develop.  The thunderstorm develops.  Particles start
to fall from the cloud, and downdrafts develop.  They
turn upon hitting the surface and they spread out, and
there's a very weak inflow against that, and that's
the type of situation that I would envision happening
to cause a downdraft to go against the prevailing
wind.  I don't see that here.

Q.  Did you make any conclusive and affirmative
effort to rule that out in this case?

A.  Well, we know what the wind speeds were

AUSTIN L. DOOLEY, PH.D.          72

throughout the approach of Katrina that morning.  As I
said in the report, we see wind speeds increasing
gradually throughout the morning, getting up into that
maximum range that I reported.  So I don't see any --
any down burst like that occurring long enough to
propel an object from the western side of the IHNC all
the way over into the northeast direction, directly
opposite to the prevailing wind direction.  I don't
see that.

Q.  Okay.  Does your report expressly rule out
that possibility?

A.  Turbulence is -- is -- those types of
turbulent eddies are not discussed in my report.  I
think I might make a mention or two of prevailing wind
direction.

(The witness reviewed the document.)

THE WITNESS:  And on Page 8 where I talk about
the prevailing wind direction within the storm.  But,
otherwise, I did not address that issue.

BY MR. POLLARD:

Q.  At some point in your report, you indicated
that -- and specifically on Page 10, fourth bullet
heading, that "No tornadoes were reported in the
New Orleans area or anywhere in Louisiana on

AUSTIN L. DOOLEY, PH.D.          73

August 29."  Do you see that?

A.  Yes, sir.

Q.  What is the significance of that observation
to your report as a whole?

A.  Well, that's a weather phenomenon that is
sometimes associated with tor- -- with hurricanes.
Usually, we find them on the right-hand side, and
tornadoes have been known to make landfall or touch
during hurricanes, and that is a -- a microscale
phenomenon within the larger scale flow of the
hurricane, and tornadoes might very well be a
phenomenon that -- such as what you're describing.

Q.  Are you saying that, because there was an
absence of tornadoes during Katrina on August 29, that
there was an absence of other lesser phenomena such as
microswirls or eddies?

MR. RAFFMAN:  I'll object to the question as
vague.

THE WITNESS:  What I'm saying is that no
tornadoes were reported in the New York -- New Orleans
area.  That does not discount the presence of
turbulence, but as I've already testified, turbulence
is embedded within the prevailing wind direction and
would move ultimately with -- in the direction of

AUSTIN L. DOOLEY, PH.D.          74

the -- of the net force, which is downwind.

BY MR. POLLARD:

Q. Unless you had a circumstance, the likes of which you described, with a thunderstorm on a calm day?

A. Well, again, what I just described in the example that you've given me is exactly what I said. The prevailing wind on that calm day is zero. So the down burst from the thunderstorm would spread outward in whatever direction it may very well intend to. Usually, you'll see it go out on the leading edge, perhaps as much as 180 degrees.

Q. Can you think of any wind phenomena that would have been present over the IHNC on August 29, 2005 that would have created some sort of a vacuum effect over the IHNC?

MR. RAFFMAN:  Are you talking about at any time?

BY MR. POLLARD:

Q. Well, let me -- let me limit it from 12:00 a.m. to approximately 9:00 a.m.

A. And where would this vacuum have been?

Q. At any portion of the actual canal ranging from the western wharf, which is Lafarge's facility, to the eastern flood wall.  Let me also limit it

AUSTIN L. DOOLEY, PH.D.          75

north -- you know, to the north.  The same boundaries we're talking about, the Florida Avenue bridge to the north, Claiborne Avenue bridge to the south.

A. I can't -- given the circumstances of Katrina, given the existing pressure field, giving the -- given the results of the model studies, given the results of all of the other literature that I've reviewed in preparing this study, I can't -- I cannot imagine such an event as you've described.

Q. You can't imagine the effect of the wind hitting the flood wall from the east moving west creating any sort of a vacuum effect on the canal side of the flood wall?

A. There -- there is no vacuum that develops. There may be some turbulence as the wind whips around the corner, but there is no vacuum that develops.

Q. Okay.  All right.

A. There is atmosphere.

Q. Okay.  So maybe "vacuum" is the wrong word. You used the word "turbulence"?

A. Right.

Q. Is there any other word that would describe a wind-related effect on the canal side other than "vacuum" or "turbulence" that you can think of?

AUSTIN L. DOOLEY, PH.D.          76

A. Well, I wouldn't use the word "vacuum."  I would use the word "turbulence," and the word we used before was "eddies."

Q. Okay.  Now, are you aware that on the Lafarge side of the canal, the western side where their concrete facility was, there were structures there?

A. Yes, sir.

Q. And one of the structures is a cement silo?

A. Yes, sir.

Q. Actually, I think there's more than one.  I think there's two.

A. Yes, sir.  I've seen them there.

Q. In your analysis, did the presence of those structures on the western side of the canal impact your wind analysis in any way?

A. With regards to the prevailing wind directions over the canal, since those structures were on the leeward side of the canal, meaning the side toward which the wind was blowing, until it turned into kind of a westerly component, those structures would have no impact on the wind blowing from the northeast toward the southwest across the IHNC.

Q. Are you saying that they wouldn't deflect any of the wind back towards the IHNC in a westerly

AUSTIN L. DOOLEY, PH.D.          77

direction?

A. They would deflect -- they would have some buffering effect.  There would likely be some type of an intensification of the wind on the upwind side and some diminution of the wind on the downwind side.  But then as the wind passed over and around that structures, the wind would resume and go back to its prevailing wind direction.

Q. Okay.  Do you make any calculations as to how long it would take the barge to travel from west to east with the westerly wind?

A. No, sir.

Q. Now, you indicate on Page 1 of your executive summary, second paragraph from the bottom, last sentence of that paragraph, "At any time during the exposure to Katrina prior to about 1100 o'clock August 29, winds could not have blown the barge toward the north since the system passed east of the IHNC." Do you see that?

A. Yes, sir.

Q. Where do you derive that 11:00 o'clock time for that conclusion?

A. Look at the Table 6 alpha.

Q. Which is on page?

AUSTIN L. DOOLEY, PH.D.          78

A. It starts on Page 23, and we want to go to Page 24, and you see the wind directions at Point Echo, which is the interpolated position, and you'll see that after 11:00 o'clock is when the wind takes on a direction from 268, 265, 262. So that's now coming slightly south of west.

Q. Which line are you referring to on the chart. Page 25?

A. Go to the left-hand column. Do you see 1100, sir?

MR. RAFFMAN: Page 24.

THE WITNESS: I'm sorry. Page 24.

BY MR. POLLARD:

Q. Okay.

A. Go up to 1100, one, two, three, four, five -- fifth from the bottom. Look on the right-hand column, and you see the change in direction with time, and it's after 11:00 o'clock that the winds in the area now are coming slightly south of west.

Q. Dr. Dooley, take me through all of the steps that you went through to eliminate the possibility of west to east movement prior to 11:00 o'clock. You can reference the chart and any entry in the chart prior to 11:00 o'clock that supports that contention.

---

AUSTIN L. DOOLEY, PH.D.          79

MR. RAFFMAN: I'm going to make an objection to the way you framed the question because what he's eliminated prior to 11:00 o'clock is something different from what you said.

BY MR. POLLARD:

Q. Okay. You can still answer the question.

A. Okay. What I did -- we're referring now to that last -- that sentence that we're talking about in the executive summary.

Q. Correct. The sentence I just read most recently.

A. Right. That's an analysis of the change of wind direction with time, and to think of a situation where the wind takes on a component towards the north, the wind would have to come from something south of 270. So looking down the column of time and comparing that to the wind direction in the right-hand column of Table 6 alpha, 11:00 o'clock is the time.

Q. And again, I think you're assuming, for purposes of that conclusion, that the barge was located in some location to the west of the north breach; is that correct? You can take a look at Exhibit 2.

A. Thank you. I will do that.

---

AUSTIN L. DOOLEY, PH.D.          80

(The witness reviewed the document.)

MR. RAFFMAN: Objection.

THE WITNESS: What I'm talking about here is the wind direction taking on a northerly component, blowing from south of west towards the north.

BY MR. POLLARD:

Q. And what -- what degrees correspond with wind that's moving in a northerly direction?

A. Anything that has a direction that ranges between 270 around through 360 and around through 090. So in that -- anywhere, basically, from west to north to east. So if you're moving in that direction, you're moving -- you have a northerly component.

Q. Okay. Take a look at the entry for 0815. That's 8:15 Central Daylight Time on Page 24.

A. Yes, sir.

Q. Describe for me what that line of data tells us.

A. That tells us that the direction of the wind was from the direction 358.63. So it was blowing towards the south.

Q. Okay.

A. But for something to have a northerly component, it would have to move towards that range of

---

AUSTIN L. DOOLEY, PH.D.          81

direction that I gave you just a minute ago.

Q. Which we don't see until which time?

A. We don't see that until after 1100.

Q. All right. 276 is not considered to have any sort of a northerly component, 276.38?

A. Well, the wind coming from 276, it comes -- it comes from the north and is moving towards the south. To move -- as I said in my report, you'll see that at -- at around 10- -- where did I see that? 276 comes from six degrees north of west.

Q. That's essentially a westerly wind?

A. Yes, sir.

MR. POLLARD: Okay. Let's let the videographer change the tape. We'll move on to our next area afterwards.

THE VIDEOGRAPHER: We're going off the record at the end of Tape 2 in the video deposition of Dr. Austin Dooley.

(A recess was taken from 12:16 p.m. to 12:35 p.m.)

THE VIDEOGRAPHER: Back on record, Tape 3 at 12:35.

BY MR. POLLARD:

Q. I have some relatively random follow-up

---

21 (Pages 78 to 81)

AUSTIN L. DOOLEY, PH.D.          82

1
2   questions that I'm going to ask before I get to asking
3   you questions about your conclusions that are at the
4   end of your report.  I was looking at your website,
5   and it indicates on your website that you're a weather
6   consul-- that you offer weather consultant services
7   and training with respect to risks to marine
8   operations from unknown or unexpected weather
9   conditions?
10      A.  Yes.
11      Q.  Do you recall that portion of your website?
12      A.  Yes, sir.
13      Q.  When you're referring to "unknown or
14  unexpected weather conditions," what specifically are
15  you referring to?
16      A.  Well, the atmosphere.  Storms.  Mid-latitude
17  storms, tropical storms, thunderstorms, situations
18  like that.
19      Q.  What type of training do you -- do you offer
20  as part of your consulting services?
21      A.  Lectures.  For example, last week I -- I
22  conducted a training exercise through my company with
23  the NOAA Commissioned Corp officers.  They have a
24  requirement for their licensing to take a course in
25  meteorology.  So I conducted a course, together with

AUSTIN L. DOOLEY, PH.D.          83

1
2   one of my colleagues from the Merchant Marine Academy
3   through the -- what's called a GMAT school at Kings
4   Point and instructed the officers on meteorology, gave
5   them a test on Saturday, and they all passed.
6           Other times I've gone on board -- the most
7   unique example was I went on board a cruise ship and
8   worked with the watch officers of the cruise ship for
9   a week and basically reviewed the basic principles of
10  meteorology and marine weather.  I've also taught at
11  the Maritime Institute of Technology in graduate
12  studies.  That's the company that I had the contact
13  with through the cruise ship, but I've also taught in
14  a shore based course here in Maryland.
15          I've also provided lectures and seminars to
16  tugboat companies and to tanker companies.  So those
17  are the types of trainings that I do.
18      Q.  Okay.
19      A.  In addition to that, I also teach
20  contractors, Dooley SeaWeather, with the maritime
21  administration, at the United States Merchant Marine
22  Academy.  So I am an adjunct faculty member there.
23      Q.  Okay.  Does any of your training or
24  consulting services go towards issues of mooring
25  vessels?

AUSTIN L. DOOLEY, PH.D.          84

1
2       A.  No, sir.  I don't instruct people on
3   operational navigation or operational ship practices,
4   no.
5       Q.  You instruct them on how to deal with various
6   meteorological events?
7       A.  What I teach is "This is what a hurricane is.
8   These are the dangers that it represents.  So these
9   are the things that you should be aware of in your
10  shipboard activities."
11      Q.  Is one of the dangers that you train your
12  customers or your clients or however you would
13  describe them, your students, on is the dangers of
14  breakaway vessels?
15      A.  That certainly is a topic of discussion in
16  terms of being prepared for high winds and those types
17  of conditions, yes.
18      Q.  And when you teach courses or make lectures
19  on that particular area, do you have prepared
20  syllabuses or syllabi on materials on that -- on that
21  specific subject matter?
22      A.  On breakaways?
23      Q.  Breakaways and the effect that wind can have
24  on breakaways?
25      A.  We mostly deal with that in a fashion

AUSTIN L. DOOLEY, PH.D.          85

1
2   comparable to what we discussed before with regards to
3   the downdraft in an ambient -- in a quiet, still
4   atmosphere.  So that's where that would be discussed.
5       Q.  Okay.  It would be discussed, but what, if
6   any, materials or textbooks or otherwise would be used
7   with just students?
8       A.  The textbook that I use is The Atmosphere by
9   Lutgens and Tarbucks.
10      Q.  The name of the book is "The Atmosphere"?
11      A.  Yes, sir.  It's probably the most used
12  undergraduate book in the field, and there's some
13  reference made to gust front situations, and those are
14  the things that I -- I use in the presentation.
15      Q.  All right.  Is there some reference in that
16  book also to downdrafts and eddies --
17      A.  Oh, yes.
18      Q.  -- as distinct from gust front?
19      A.  Well, downdraft and eddies -- downdrafts are
20  the phenomena that would produce the gust front.
21      Q.  Aside from -- do you teach directly out of
22  The Atmosphere?  In other words, do you assign your
23  students, "Read from this textbook, and we're going to
24  discuss it"?
25      A.  I give them the chapter, and then I give the

AUSTIN L. DOOLEY, PH.D.          86

1  lecture on the chapter.  Then I hope that they study
2  the chapter and pass the test.
3      Q.  What other materials, if any, do you use with
4  your students or consultants on this issue?
5      A.  On this issue, I usually will include some
6  reference to discussion, at least, to situations that
7  I've investigated where downdrafts have occurred.
8      Q.  Have you ever taught your students or
9  conveyed information to anyone who has hired you, if
10 they're not your students, whatever you would call
11 those people, your clients, on the effects of
12 downdrafts and gust front in a hurricane scenario?
13     A.  In a hurricane scenario.  What we describe
14 within the hurricane are the prevailing wind
15 directions, the gust situations that may develop and
16 the general flow about the low pressure center, the
17 counter clockwise and inward flow about -- in the
18 tropical system in the northern hemisphere.  Those are
19 the features that we usually talk about in class.  Of
20 course, mentioning that there can be thunderstorms
21 within a tor-- within a hurricane.
22     Q.  By the way, I'm sorry for asking you to do
23 this, but where is Table 6C in your report?
24     A.  On Page 27.

AUSTIN L. DOOLEY, PH.D.          87

1      Q.  Which of the entries in Table 6C indicates
2  that the highest three-second interpolated gust was
3  at 95.82 knots?
4      A.  That's on Page 28.  And if you look at the
5  0730 entry, eighth line down.
6      Q.  Okay.  And at that point in time, at least as
7  far as the IHNC was concerned, the eye of Katrina was
8  at least 90 minutes away; correct?
9      A.  The eye of Katrina, throughout the whole
10 morning, was to the east of Katrina.  At 0700, if you
11 look at -- the eye of Katrina was to the east of the
12 IHNC, and if you look at the map on Page 16, Map 2,
13 you'll see the plotted position taken from the best
14 track as rendered by the National Hurricane Center at
15 0700 Central Daylight Time.  You'll see that it is --
16 the eye of Katrina is to the south and east of the
17 inner harbor navigation canal.
18     Q.  At what time was the eye of Katrina parallel
19 to the IHNC?
20     A.  My calculations of that are shown on Page 17,
21 in the top paragraph, and I found that passing the
22 latitude of the area of interest at around 0854.
23     Q.  Okay.  Approximately 90 minutes later?
24     A.  Yes, sir.

AUSTIN L. DOOLEY, PH.D.          88

1      Q.  And you didn't find that the -- the strength
2  of the three-second bursts or gusts, as you called
3  them, increased as the eye approached the IHNC --
4      A.  Well --
5      Q.  -- at least moved parallel to the IHNC?
6      A.  Well, if you look at combined Pages 27
7  through 28, you'll see that the change in the
8  three-second gusts from the morning into the time that
9  Katrina passed parallel or to the due east of the
10 IHNC, and then towards the bottom of the page, you'll
11 see the winds, the three-second gust, as Katrina moved
12 away from the IHNC.  So you'll see that there was an
13 increase through the morning.
14     Q.  Now, is there a way for your interpolation
15 model -- is that the correct term, "interpolation
16 model"?  I want to make sure I use the correct term.
17     A.  Well, the values on the right-hand column on
18 page -- in Table 6 alpha B and C are all interpolated
19 values.
20     Q.  Okay.  Is there a way for you to interpolate
21 whether there are multiple three-second gusts within a
22 particular time frame?
23     MR. RAFFMAN:  Objection.  Vague question.
24        You can answer.

AUSTIN L. DOOLEY, PH.D.          89

1      THE WITNESS:  What -- what the calculation of the
2  three-second gust is if you --
3  BY MR. POLLARD:
4      Q.  Let me rephrase the question because I think
5  it was a little bit vague.  I want it to be a clean
6  question.  So between the 0730 and 0745 -- we're
7  looking on Page 28.
8      A.  Yes, sir.
9      Q.  You've got what you indicated to be
10 interpolated strengths of gusts between 95.82 knots
11 and 94.98 knots; is that correct?
12     A.  Yes, sir.
13     Q.  My question is how many of those gusts would
14 you expect to see within that 15-minute period, and is
15 there a way to even measure the number?
16     A.  The -- the value of the three-second gust is
17 obtained by the multiplication factor, as given on
18 Page 22.  So the three-second gust is 1.53 times the
19 sustained wind speed.  That approximates what you're
20 going to see in the environment as the maximum burst
21 over a three-second period.  How many of those
22 phenomena may occur within any 90 -- 30-minute period
23 or 45-minute period or 90-minute period, I have not
24 seen anything in the literature that attempts to

AUSTIN L. DOOLEY, PH.D.                90

1
2   describe that.
3       Q.  Well, let me ask it a little bit of a
4   different way.  You're not saying that there was only
5   one three-second burst of a strength of 95.82 knots
6   between 7:30 and 7:45, are you?
7       A.  That is correct.
8       Q.  As far as how many such bursts existed, if
9   any, are you saying there's no way to calculate that?
10      A.  I did not make those calculations.
11      Q.  Is there a way to do it?
12      A.  At this time, I don't know.
13      Q.  Okay.  And is the reason you don't know
14  because no one has ever attempted to do it, or is it
15  just a mathematical problem that someone would have to
16  be commissioned to solve?
17      A.  Such a small micro scale phenomena is an area
18  of extensive meteorological research.  So I don't know
19  what the -- I haven't seen anything in the literature
20  that addresses that issue.  So I would have to
21  research has somebody done this.
22      Q.  You didn't do it, and you're not aware of
23  anyone who did it with respect to the IHNC in Katrina?
24      A.  That is correct, sir.
25      Q.  Now, I'm not limiting this next question to

AUSTIN L. DOOLEY, PH.D.                91

1
2   the IHNC, but I'm wondering if, in the course of
3   preparing your report and in the course of doing your
4   research, are you aware of or did you come across any
5   other data that was collected by ships in the open sea
6   as -- as Katrina approached Louisiana or the gulf
7   coast that would suggest that the wind directions were
8   shifting rapidly?  By "rapidly," I mean they were
9   moving in multiple directions within a 15- or
10  30-minute period of time.
11      MR. RAFFMAN:  Object to the question as vague.
12          But go ahead.
13      THE WITNESS:  I didn't see any of that
14  information.  The data would be there, and then
15  evaluation could be made to determine whether or not
16  that happened.
17  BY MR. POLLARD:
18      Q.  Okay.  Would it be relevant to your analysis
19  in this case to have access to data that was taken
20  from ships in the open sea as opposed to land based
21  data collection points?
22      A.  That data is considered in the hindcast model
23  run by OWI so that they look at the reports both from
24  the buoys and the cement stations that are located in
25  the Gulf of Mexico.  They take that into consideration

AUSTIN L. DOOLEY, PH.D.                92

1
2   in doing the iterations of the model to -- to resolve
3   the final output of the model.  So those -- those
4   values are taken into consideration, yes, sir.
5       Q.  What experience, if any, do you have in the
6   area or the discipline of wave analysis?
7       A.  I have done wave analysis.
8       Q.  When you say you've "done wave analysis,"
9   give me a little bit more detail.
10      A.  My Ph.D. dissertation was on the -- verifying
11  the accuracy of a numerical wave model versus
12  satellite observations.  I have done reports in the
13  past where the wave height fields were -- were
14  calculated, where the time line history of wave
15  heights were compared to the situation in question.
16  So I have done hindcasting of waves, yes, sir.
17      Q.  And was a wave analysis at all important, and
18  if so how, to your conclusions reached in this report?
19      A.  Again, on my report, it discusses the wind,
20  and a wind field would be used to do the wave
21  analysis, but I was -- I did not do a wave analysis in
22  this particular case.  Others did, as I saw wave
23  analysis in some of the IPET report, but I did not do
24  that.
25      Q.  You're familiar with the term "storm

AUSTIN L. DOOLEY, PH.D.                93

1
2   surge" --
3       A.  Yes.
4       Q.  -- as it relates to hurricanes?
5       A.  Yes, sir.
6       Q.  And you know there was a storm surge in
7   effect during Katrina which affected the area at issue
8   in this case?
9       A.  Yes, sir.
10      Q.  Were the effects of that storm surge at all
11  relevant to your analysis on whether the barge could
12  have moved from west to east?
13      A.  My analysis was based upon the wind
14  conditions.  The movement of the -- of the water I did
15  not do.
16      Q.  Okay.  All right.  So I think what you're
17  trying to tell me is you're not willing -- willing to
18  say it was impossible for the barge to move from west
19  to east as a result of factors other than wind?
20      A.  What I'm saying, sir, is that if that barge
21  moved from west to east at 4:00 o'clock in the
22  morning, as I found in some of the reports, between
23  4:00 and 5:00 in the morning, it was not the wind, in
24  my opinion, that did that.
25      Q.  Do you, Dr. Dooley, rule out wave action as

24  (Pages 90 to 93)

AUSTIN L. DOOLEY, PH.D.          94

1  causing such a movement if it did happen?
2      A.  In -- on Page 32 of my report, there's a
3  graphic showing wave conditions, applying the basic
4  understanding of -- of wind generated waves to the
5  situation.  Any waves that may have been produced
6  within the IHNC in this time period would have flowed
7  with the direction of the dominant wind or the
8  prevailing wind.  So wave action would have largely
9  been from the north towards the south that morning.
10 So I -- I do not see this barge moving from the
11 southeast to the northeast into the direction of the
12 wind, and basis the question you just asked me, could
13 the waves have done this.  Independent of the wind, my
14 answer would be no.
15     Q.  When you make that conclusion, do you take
16 into consideration at all the phenomena of wave
17 reflection?
18     A.  Wave reflection is important, depending upon
19 the type of surface that the waves hit.  As the waves
20 hit, they lose energy.  So the reflected height is not
21 as great as the incident height.  They may interfere
22 with incoming waves and increase in height slightly,
23 but that tends to be standing wave rather than a
24 propagating wave.  As a consequence, an object would

AUSTIN L. DOOLEY, PH.D.          95

1  move up and down.  Those waves may propagate, then,
2  further into the upstream direction, but again,
3  they've lost energy again.  So they would very quickly
4  dissipate.
5          So I can't see reflected waves from the
6  western side propelling a barge all the way to the
7  eastern side.
8      Q.  Okay.  Did you indicate that -- that
9  explanation inside of your report, or was that just
10 something that you were explaining in response to my
11 question?
12     A.  The latter, sir.
13     Q.  At the time of trial, if you're called as a
14 witness, are you going to render opinions with respect
15 to whether waves could have -- or would not have been
16 able to explain the movement of the barge in any
17 fashion within the IHNC?
18     A.  If you ask me that question, I will render an
19 answer.
20     Q.  On Page 33, there's a table in the middle of
21 the report.  You took this table out of the Marino
22 report?
23     A.  Yes, sir.
24     Q.  And you see that there are various points in

AUSTIN L. DOOLEY, PH.D.          96

1  the second column on speed where there's "ND" or no
2  data?
3      A.  Yes, sir.
4      Q.  Okay.  And is it your understanding that the
5  reason there's no data here was because the -- there
6  was some sort of failure of the data collection, i.e.,
7  the Lakefront Airport thermometer failure?
8      A.  Anemometer.
9      Q.  Anemometer.  I'm sorry.
10     A.  That's what I gleaned from the Marino
11 Engineering report.
12     Q.  Did you do independent -- did you make an
13 independent inquiry to determine whether that failure
14 did, in fact, occur?
15     A.  That's shown on Page 34, Table 8.
16     Q.  Okay.  When you do your interpolations as are
17 contained in this report, do you use a computer
18 program?
19     A.  In this particular case, I measured the
20 distances between the points, measured the distances,
21 set up an interpolation scheme on a spreadsheet, and
22 then boot forward.  So there's no program.
23     Q.  So there's no proprietary software that you
24 used that you plug numbers into and it gave you an

AUSTIN L. DOOLEY, PH.D.          97

1  interpolation?
2      A.  No.  It's straight linear interpolation.
3      Q.  Define linear interpolation for a non-math
4  person such as myself.
5      A.  Straight line values.
6      Q.  Okay.  Let's move -- well, I'm sorry.  Before
7  we get to your summary of findings, which will be the
8  last area that we discuss today, I want to ask you,
9  Dr. Dooley, if you have an opinion as to how, if at
10 all, the barge traversed the canal from west to east?
11     A.  My report is based upon the wind, and what I
12 can say is that basis, the parameters that I examined,
13 the barge did not move to the northern breach because
14 of the wind.  I do not understand the correct timing
15 of the southern breach.  So I can't explain what
16 happened to the southern breach.  Others may take this
17 wind information and coordinate all that with timing
18 values, but in terms of the northern breach, it did
19 not occur because of the wind blowing the barge from
20 the west towards the east.
21     Q.  Are you saying that at some point in time,
22 the barge was blown by wind from the west to the east?
23     A.  Well, I'm saying that at some point in time,
24 if the barge was on that western side of the IHNC and

AUSTIN L. DOOLEY, PH.D.          98

then we found it on the eastern side of the morning
after Katrina, somehow it moved from west to east.
That could be a result of all of the forces that we
talked about before. Certainly, wind is one of them.
    Q. Okay.
    A. I can't deny that.
    Q. But are you affirmatively stating that wind
was the most important force in moving the barge?
    A. No, because I have not done any of the
studies on the other forces. I have only looked at
the wind.
    Q. Okay. And do you have any opinion as to the
time that the barge moved from east to west -- I'm
sorry. Strike that.
        Do you have any opinion as to the time the
barge moved from west to east?
    A. Again, my results show the turning of the
wind past 015, which is the direction of the IHNC,
occurred I think at 0742 that morning. So the first
time it took on a west to east component was after
that wind passed that northern -- northerly direction
of the IHNC. But whether or not that means that's
when the barge moved, I -- I don't know.
    Q. Well, in your report on Page 33, you state

---

AUSTIN L. DOOLEY, PH.D.          99

that the table, or at least you're referring to
Marino's "table indicates that at no time was there a
westerly wind between 3:00 and 9:00 AM." You're not
taking that harsh of a position today in this
deposition? You're saying that there was a turning of
the wind at 7:42; correct?
    A. Let me look at this for a second, please.
        (The witness reviewed the document.)
        THE WITNESS: All I'm saying is what this table,
that paragraph, which I believe the paragraph that
you're referring to is the paragraph beneath the
table. Is that right, sir?
BY MR. POLLARD:
    Q. Yes.
    A. And what I'm saying is reading this table,
this table, not my data, but this table shows that
between 3:00 and 9:00 a.m., the wind was parallel to
the orientation of the IHNC. That's all I'm saying in
that paragraph.
    Q. Okay. But earlier in your report, on Page 1
you indicate that the wind did not blow fully out of
the west. You used the term "fully" -- out of the
west until between 10:15 and 10:30. When you say
that, are you also saying that the barge could not

---

AUSTIN L. DOOLEY, PH.D.          100

have, based on your understanding of how -- how the
wind would have affected an object such as a barge,
moved from west to east prior to 10:15 and 10:30,
because there wouldn't have been enough of a forceful
westerly wind to accomplish that?
    A. No. I'm not saying anything about the --
about the effect of -- forces produced by the wind on
the barge. What I'm saying is that the -- according
to my calculations, between 7:30 and 7:45 that morning
is when the wind turned sufficiently so that it was
now coming from the western side of the barge rather
than the eastern side of the barge. What would have
happened between the forces generated by that wind and
the barge, that is a matter for the dynamicist.
    Q. Okay. All right. Let's turn to Page 35 of
your report, which is the summary of your findings.
You have eight findings here -- or eight summaries.
So is this the extent of the findings that you intend
to offer at the time of trial on -- on this case?
    A. Unless I'm given additional research between
now and trial, which I don't think will happen, this
will be my final report for trial.
    Q. As of today, you have eight conclusions or
eight findings?

---

AUSTIN L. DOOLEY, PH.D.          101

    A. Yes, sir.
    Q. All right. Let me take you down to Finding
No. 8. Over the course of the deposition, we've
talked about most of the things in Findings 1 through
7. So I want to go to 8.
    A. Yes, sir.
    Q. You say in the first sentence here,
"Observation data confirms that there were no westerly
winds in the IHNC until sometime after 0653 CDT
(instruments stopped recording at that time)." What
"observation data" are you referring to?
    A. Lakefront Airport.
    Q. And, again, just for clarity's sake -- just
for clarity's sake, I'm not aware of any official
observation point inside the IHNC. Are you?
    A. No, sir.
    Q. There's no National Weather Service
accredited data collection point there?
    A. There's none that I know of.
    Q. Okay. And when you say, "observation data,"
you are, are you not, excluding eyewitnesses?
    A. Again, this goes back to the statement that I
made earlier this morning that my study is based upon
the science and analysis of the official unbiased

26 (Pages 98 to 101)

AUSTIN L. DOOLEY, PH.D.          102

1  reports, and that's why I refer to the term
2  "observation data," which is primarily -- that
3  sentence refers exactly to Table 8 on Page 34.
4        Eyewitness accounts -- as I said before,
5  people are in the middle of great distress.  There is
6  wind.  There is waves.  There are rain.  There's
7  things happening about them.  I based my findings --
8  not that those people should be made light of, but
9  this study is based upon the science and the
10 observations from calibrated stations.
11       Q.  Well, how would you go about, as a scientist,
12 reconciling or meshing eyewitness accounts with hard
13 signs to make sure that you get the most accurate
14 report possible?
15       MR. RAFFMAN:  Objection.  Assumptions -- making
16 unfound assumptions.
17       But go ahead and answer the question.
18       THE WITNESS:  Well, sometimes individuals
19 involved in an event report what they see.  Sometimes,
20 due to personal distress, they report what they think
21 they saw.  I mean, that's fairly common.  It's up to
22 the scientist to base the conclusions on data that can
23 be documented and that fit into the laws of science.
24 In this particular case, a low pressure center,

AUSTIN L. DOOLEY, PH.D.          103

1  northern hemisphere, counterclockwise rotating winds,
2  wind speed increasing as you near the center of the
3  storm, precipitation events, cloud pattern events, and
4  if observer's observations do not fit in the model of
5  the hurricane, then you must exclude them.
6  BY MR. POLLARD:
7        Q.  But that was beyond the scope of what you did
8  for this report?
9        A.  I based my report on the scientific studies
10 done, reviewing the -- as you see the bibliography,
11 some of the -- some of the peer reviewed work, some of
12 the research by the NH- -- NHC and by the HRD and by
13 Oceanweather and by examining values observed during
14 Katrina.
15       Q.  I think that's a nice way of saying you
16 didn't take into account the eyewitnesses?
17       A.  I did not take into account the eyewitnesses.
18       Q.  Okay.  Did you do any studies -- or did you
19 look into whether or not there was any thunderstorm
20 activity or other convective areas within the bands
21 surrounding the iWall?
22       A.  Surrounding the iWall.  If you look on
23 Page 34, the last column -- the last two columns -- or
24 three columns, I'm sorry.  So you see the -- No. 65

AUSTIN L. DOOLEY, PH.D.          104

1  there.  As you come down, you see 65.  Underneath the
2  first "WW" column,
3        Q.  I'm going -- underneath the first WW column,
4  yes, I see 65.
5        A.  And if you come down the page.  So 65 is
6  heavy rain.
7        Q.  Right.
8        A.  If you come down the page, then you see a 10
9  further down the page.
10       Q.  I see it.
11       A.  Okay.  That means a mist.  Come down below
12 that, you see a 44.
13       Q.  What does the 10 signify?
14       A.  Mist.
15       Q.  Mist?
16       A.  Yeah.
17       Q.  That doesn't sound too bad.  That sounds
18 calm.
19       A.  And then if you come down into the column
20 where it says, "44," that indicates fog and reduced
21 visibility.  That is what we call the present weather.
22 So as I look at these observations from Lakefront, the
23 report of heavy rain bands during the morning of
24 in- -- period of interest on the 29th was not in the

AUSTIN L. DOOLEY, PH.D.          105

1  area of interest.
2        Q.  And you reached that conclusion solely by
3  evaluating the numbers in the first WW column?
4        A.  Each number corresponds to a particular
5  weather type, as defined previously by the -- by the
6  National Weather Service and international agreement.
7  So the code figure 44 indicates fog and reduced
8  visibility.
9        Q.  Okay.  And what do the second and third WW
10 columns signify?
11       A.  The second dominant weather during the
12 period, and the third is the next dominant weather
13 period.
14       Q.  Is that unusual, from a meteorological
15 observation standpoint, that you would not see
16 thunderstorm activity ancillary to an approaching
17 hurricane?
18       A.  No.  You would -- you would see a
19 thunderstorm activity within a hurricane, and then you
20 would see periods where there is no thunderstorm
21 activity in a hurricane.  Then you might very well see
22 thunderstorm activity again.  In this particular case,
23 in the immediate area of the IHNC, it didn't occur
24 that morning.

AUSTIN L. DOOLEY, PH.D.          106

1
2     Q.  Do you know if any of the hindcast
3  information that you evaluated is -- is confirmatory
4  of what you just told me, that there was not
5  thunderstorm activity in the area?
6     A.  Well, the -- the hindcast model that I
7  examined looked at the pressure field and the wind
8  reports.  It would -- taking those pressure field and
9  wind reports, precip events would not show up in the
10  model.
11     Q.  Okay.  Dr. Dooley, I think we're just about
12  done.  I want to go over a couple items of my notes
13  and pop this CD in that contains the hindcast data,
14  and I may have a couple questions to ask you on that,
15  and then we'll be completing this.
16     A.  Okay.
17     MR. POLLARD:  Thanks.
18     MR. RAFFMAN:  Do you want to go off the record?
19     MR. POLLARD:  Yes.  Let's go off the record.
20     THE VIDEOGRAPHER:  We're going off the record at
21  13:14:45.
22     (A recess was taken from 1:14 p.m.
23     to 1:19 p.m.)
24     THE VIDEOGRAPHER:  Back on record at 13:19:29.
25  BY MR. POLLARD:

AUSTIN L. DOOLEY, PH.D.          107

1
2     Q.  Dr. Dooley, we're just about done here.  The
3  hindcast study, that was done in this case by
4  Oceanweather, Inc.?
5     A.  Yes, sir.
6     Q.  And it was commissioned or otherwise ordered
7  by MMS?
8     A.  As I understand it, yes.
9     Q.  And MMS is the client of Oceanweather, Inc.?
10     A.  Yes, sir.
11     Q.  Do you have any idea of how much this study
12  costs to perform?
13     A.  No, sir.
14     Q.  You don't have any range?
15     A.  No.  The contract between MMS and
16  Oceanweather, no.  No, I do not.  I had to buy the
17  data from Oceanweather.
18     Q.  What data did you have to buy from
19  Oceanweather?
20     A.  The first data was the 2005 report -- well, I
21  didn't buy it -- was the 2005 report, and the second
22  set of data where the refined values at the four
23  closest grid points.
24     Q.  What does that data cost?
25     A.  The first $3,000 and the four grid point

AUSTIN L. DOOLEY, PH.D.          108

1  values were $500.
2     Q.  In total or per grid point?
3     A.  Total.
4     MR. POLLARD:  All right.  I don't have anything
5  further, Mark.
6     MR. RAFFMAN:  I don't have any questions for the
7  witness.  We will read and sign.
8     THE VIDEOGRAPHER:  Going off the record at
9  13:20:59.
10     (Witness excused.)
11                  - - -
12     (At 1:20 p.m., proceedings were concluded.)
13                  - - -

AUSTIN L. DOOLEY, PH.D.          109
CERTIFICATE
                 - - -

    I hereby certify that the witness was duly sworn
and that the deposition is a true record, to the best
of my ability, of the testimony given by the witness.


_____

NANCY J. MARTIN, RPR, CSR



    (The foregoing certification of this transcript
does not apply to any reproduction of the same by any
means, unless under the direct control and/or
supervision of the certifying reporter.)
                 - - -

AUSTIN L. DOOLEY, PH.D.        110
INSTRUCTIONS TO WITNESS

    Please read your deposition over carefully
and make any necessary corrections. You should state
the reason in the sheet for any corrections that are
made.
    After doing so, please sign the errata sheet and
date it.
    You are signing same subject to the changes you
have noted on the errata sheet, which will be attached
to your deposition.
    It is imperative that you return the original
errata sheet to the deposing attorney within thirty
(30) days of receipt of the deposition transcript by
you.  If you fail to do so, the deposition transcript
may be deemed to be accurate and may be used in court.

AUSTIN L. DOOLEY, PH.D.        112
ACKNOWLEDGMENT OF DEPONENT

    I, _ _ _ _ _ _ _ _ _ _ _, do hereby
certify that I have read the foregoing
pages _ _ _ to _ _ _and that the same is a
correct transcription of the answers given
by me to the questions therein propounded,
except for the corrections or changes in
form or substance, if any, noted in the
attached Errata Sheet.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
DATE              SIGNATURE

Subscribed and sworn to before me this
_ _ _ _ _ _ day of _ _ _ _ _ _ _ _ _ _,
200_.

My commission expires:_ _ _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _
Notary Public

AUSTIN L. DOOLEY, PH.D.        111
- - - - - - - - -
E R R A T A
- - - - - - - - -
PAGE   LINE        CHANGE
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
- - -  - - -       - - - - - - - - - -
DATE:

## A

**AAA** 12:11,12
**ability** 109:6
**ABIR** 2:3
**able** 27:7 51:8 64:17
    95:17
**absence** 73:15,16
**Academy** 10:10 83:2,22
**accept** 11:12
**access** 91:19
**accomplish** 100:6
**account** 69:13 103:17,18
**accounted** 59:22 65:13
**accounting** 23:23
**accounts** 30:11 102:5,13
**accredited** 101:19
**accuracy** 33:20 92:11
**accurate** 13:14 20:22
    63:11 102:14 110:16
**ACKNOWLEDGME...**
    112:2
**acting** 42:16
**action** 1:5 37:21,22
    93:25 94:9
**active** 19:14
**activities** 84:10
**activity** 69:15 71:15
    103:21 105:17,20,22,23
    106:5
**actual** 7:25 24:3,15
    74:23
**ad** 12:14
**Adams** 35:9,14,21 36:8
**Adams's** 35:17
**addition** 83:19
**additional** 26:3,10 27:2
    100:21
**address** 6:23 72:20
**addresses** 90:20
**adjacent** 42:7 47:22 51:7
**adjunct** 83:22
**adjust** 61:20
**adjustment** 63:23
**administer** 12:13
**administration** 83:21
**aerodynamics** 64:22,24
**affect** 9:13 52:7 61:2

64:10
**affirmative** 71:23
**affirmatively** 98:8
**afternoon** 71:13
**agency** 52:17 56:11
**aggregations** 43:22
**ago** 14:2 69:25 81:2
**agree** 40:13,15 46:2,7,11
    46:11 60:14 64:7,14
**agreed** 5:4
**agreement** 23:14 105:7
**aground** 17:8
**ahead** 11:8 32:4 40:22
    65:11 91:12 102:18
**air** 67:14
**airplane** 49:23
**airport** 51:9,12 52:4 96:8
    101:13
**allow** 9:5,7
**allowed** 36:11
**allows** 43:19
**alongside** 34:22
**alpha** 77:24 79:19 88:19
**ambient** 85:3
**America** 2:13 5:13 6:4,7
    14:12 16:11 23:8
**analysis** 3:10 9:18 13:21
    14:2 28:6 30:9,10,10
    32:13 36:4 42:14,25
    46:20,22 54:14 64:20
    64:25 76:14,16 79:13
    91:18 92:6,7,8,17,21,21
    92:23 93:11,13 101:25
**analyze** 16:4 27:15 53:7
    56:24
**analyzed** 40:25 41:5 56:9
    56:23
**analyzing** 25:7 56:11,13
**ancillary** 105:17
**and/or** 13:21 15:7 30:10
    109:19
**anemometer** 26:24 51:16
    62:5 96:9,10
**Angeles** 2:5
**answer** 4:2 9:7 17:21
    32:3,4 33:15 36:6,7
    40:5 42:11 43:7 48:8

68:16,18 79:7 88:25
    94:15 95:20 102:18
**answered** 16:23 68:10,14
**answers** 31:12 112:7
**Antalya** 8:4
**anybody** 69:21
**Apart** 14:14,17
**appears** 10:19
**applied** 43:18
**apply** 66:21 109:18
**applying** 94:4
**appointments** 11:16
    12:14,16
**approach** 72:2
**approached** 88:4 91:6
**approaching** 105:17
**approximate** 39:22,23
    40:19
**approximately** 7:11,21
    13:20 45:17 74:21
    87:24
**approximates** 89:20
**arbitrated** 11:15
**arbitration** 11:19 12:6,8
    20:15,17,25 21:7
**arbitrations** 17:16 21:3
**arbitrator** 10:20,25
    11:21 12:18 13:5,12,15
**arbitrators** 11:6,23 12:7
    12:14,16
**area** 16:17 27:15,16
    35:25 37:3 42:4 44:11
    44:12,23 45:2,11 53:9
    54:23 55:3,20,25 56:21
    57:10 58:23 60:20
    72:25 73:22 78:19
    81:15 84:19 87:23
    90:17 92:6 93:7 97:9
    105:2,24 106:5
**areas** 103:21
**art** 69:18
**articles** 31:8
**artificial** 60:23
**ashore** 10:15
**aside** 12:6 14:11 34:17
    36:15 85:21
**asked** 13:4 15:19 16:23

19:8,9 26:10 27:20
    28:9,11,20,23,25 29:19
    34:25 67:15 68:14
    94:13
**asking** 21:13 42:2 82:2
    86:23
**asks** 26:5
**assign** 85:22
**assignment** 28:12 29:20
**assist** 53:11
**associated** 73:7
**assume** 7:17 24:15 35:21
    39:20 40:16 51:18
    64:23
**assuming** 79:20
**assumption** 57:23 58:3
**assumptions** 41:11
    102:16,17
**atmosphere** 65:13 75:19
    82:16 85:4,8,10,22
**attached** 19:23 110:10
    112:11
**attaching** 19:21
**attempted** 90:14
**attempts** 89:25
**attendance** 6:6
**attorney** 2:18 21:22
    110:13
**attorneys** 5:21 7:3 14:18
**August** 1:13 5:11 33:12
    35:22 51:13 54:17 73:2
    73:15 74:15 77:18
**Austin** 1:15 3:2 5:1,11
    6:1,12,21 7:1 8:1 9:1
    10:1 11:1 12:1 13:1
    14:1 15:1 16:1 17:1
    18:1 19:1 20:1 21:1
    22:1 23:1 24:1 25:1
    26:1 27:1 28:1 29:1
    30:1 31:1 32:1 33:1
    34:1 35:1 36:1 37:1
    38:1 39:1 40:1 41:1,23
    42:1 43:1 44:1 45:1
    46:1 47:1 48:1 49:1
    50:1 51:1 52:1 53:1
    54:1 55:1 56:1 57:1
    58:1 59:1 60:1 61:1

62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1,19
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1
**available** 11:22 12:2
21:11
**Avenue** 1:16 2:9,15 33:8
75:3,4
**Award** 11:23
**awards** 11:17,18 12:15
**aware** 34:18 35:2,8 38:6
51:11 58:12 68:11
70:19 76:5 84:9 90:22
91:4 101:15
**A-u-s-t-i-n** 6:21
**a.m** 1:16 36:2 41:20
51:12 74:21,21 99:18

**B**

**B** 3:8 47:25 48:12,14
49:10 55:8 88:19
**back** 16:22 40:23 41:22
42:12 54:12 59:2 64:2
68:8 76:25 77:8 81:22
101:23 106:24
**background** 11:7
**bad** 45:23 104:18
**ballpark** 17:5
**bands** 103:21 104:24
**bank** 70:24
**barge** 1:5 2:2 22:11,13
22:13,18,19,20 28:3,7
28:11 29:11 33:12,25
34:3,8,17,23 35:3,6,24
36:10,11,16 37:4,14,24
38:7,8 39:13,18,22
40:10,13,18 41:3,6,7,12

41:14 42:5,14,17,20,23
46:13,15,24 47:11,12
57:20 58:4,9,13 77:11
77:18 79:21 93:11,18
93:20 94:11 95:7,17
97:11,14,20,23,25 98:9
98:14,17,24 99:25
100:3,9,12,13,15
**barges** 34:22 39:7
**base** 62:19 66:14 102:23
**based** 9:19 18:22 32:12
42:24 48:9 49:21 50:11
83:14 91:20 93:13
97:12 100:2 101:24
102:8,10 103:10
**basic** 83:9 94:4
**basically** 11:4 12:14
15:20 21:15 27:14,23
37:9 42:18 43:19 66:13
80:12 83:9
**basis** 23:15 62:18 94:13
97:13
**beginning** 1:16 5:12
10:18 32:5
**begins** 32:20
**behavior** 38:11
**believe** 14:22 15:4 16:9
19:15 29:14,17 33:8
38:19 41:8 60:17,19
62:16 99:11
**Belle** 56:7
**beneath** 99:12
**Benoit** 1:8
**best** 24:5 87:14 109:5
**beyond** 13:16 103:8
**bibliography** 103:11
**billed** 25:12
**bit** 8:16 25:2,5 34:25
40:6 61:6 64:5 69:6
89:6 90:3 92:9
**blow** 59:9 99:22
**blowing** 63:14 76:20,22
80:6,21 97:20
**blown** 67:25 77:18 97:23
**blowup** 45:4 56:14
**board** 83:6,7
**bodies** 37:2

**body** 37:12,13 38:10
45:8
**book** 85:10,12,16
**books** 18:4,5
**boot** 96:23
**bottom** 22:22 77:15
78:17 88:11
**boundaries** 38:15 75:2
**boundary** 38:13
**Boutte** 1:6
**breach** 35:25 41:8 79:23
97:14,16,17,19
**Breaches** 1:3 5:13
**break** 41:16 46:13,15
64:5
**breakaway** 84:14
**breakaways** 84:22,23,24
**breakdown** 16:25
**bridge** 33:8,9 75:3,4
**bring** 42:12
**brings** 68:8
**broadside** 28:10 41:3
42:17 58:4
**broadsided** 58:10
**broke** 39:13,15,15,18
41:25 46:24
**Bronx** 9:20,25 10:2 53:4
**buffering** 77:4
**buildings** 38:15
**bulk** 18:4
**bullet** 72:23
**bumping** 33:12 34:8
**buoy** 49:24
**buoys** 91:24
**burst** 59:20 72:6 74:10
89:21 90:5
**bursts** 43:12 88:3 90:8
**business** 10:3,7,15 13:20
13:25 14:8 16:24 18:5
18:24
**buy** 25:21 107:16,18,21

**C**

**C** 1:10 2:1 46:4 48:11,12
49:10 55:8 88:19
**calculate** 90:9
**calculated** 92:14

**calculation** 49:20 89:2
**calculations** 48:25 59:23
77:10 87:21 90:10
100:10
**Caledonia** 8:3
**calibrated** 102:11
**California** 2:5
**call** 13:8 23:10 86:11
104:22
**called** 23:19 83:3 88:3
95:14
**calls** 17:19 18:25
**calm** 71:14 74:5,9 104:19
**canal** 1:3 5:13 65:16
74:23 75:13,24 76:6,15
76:18,19 87:18 97:11
**career** 7:12 11:19
**careful** 61:13
**carefully** 110:3
**cargo** 16:13
**Carissa** 8:3 17:7,9 20:18
**Carissa's** 17:7
**Carla** 20:18
**Carolina** 15:21,25
**carried** 70:17
**carry** 68:20
**case** 5:12,14 6:9 7:4 8:8
9:14 11:8 13:10 14:11
14:14,17,20,23 15:19
16:4,8,11,13,20 17:7,7
17:9,12,13 18:12 19:4,8
19:11,24 20:11,23 21:2
21:14,18 23:7,11,24
25:17,23 26:4 27:11,17
28:3 29:12,24 30:13,18
30:20,25 32:23 34:18
36:4,18 40:10,14 42:4
50:12 51:2 61:21 71:24
91:19 92:22 93:8 96:20
100:20 102:25 105:23
107:3
**cases** 1:6 11:20,24 12:13
13:12 17:15 18:16
20:13 21:6,9,9 53:5
**causative** 46:18
**cause** 34:5 65:6 67:6
71:21

**caused** 46:15 71:15
**causing** 46:13 94:2
**CD** 106:13
**CDT** 59:10 101:10
**cement** 76:9 91:24
**center** 25:6 31:8 56:2
  86:17 87:15 102:25
  103:3
**Central** 51:12 54:17 59:5
  80:16 87:16
**certain** 29:11
**certainly** 15:3 84:15 98:5
**CERTIFICATE** 109:2
**certification** 5:5 109:17
**Certified** 1:17
**certify** 109:4 112:5
**certifying** 109:20
**Chaffe** 14:24,25
**chance** 10:17
**change** 78:18 79:13
  81:15 88:8 111:5
**changes** 9:12,13 110:9
  112:9
**chapter** 85:25 86:2,3
**Characterization** 36:5
**Charles** 2:23 6:8 19:10
**Charleston** 15:21,25
**Charlie** 43:15
**chart** 78:8,24,24
**chartered** 18:12
**charterer** 18:2,6,7,8
**Chase** 56:7
**check** 30:9
**circled** 40:15
**circling** 40:10
**circumstance** 58:9 70:19
  74:4
**circumstances** 68:11
  70:20 71:9 75:5
**City** 9:20 10:2 53:4
**CIVIL** 1:5
**Claiborne** 75:4
**claim** 18:3,8,11
**claimant** 17:20 18:8
**claims** 13:8 17:16 18:2
  33:2,12
**clarity** 38:3

**clarity's** 101:14,15
**class** 86:20
**clean** 9:7 20:3,3 89:6
**clear** 8:24 51:6 62:24
**client** 15:23,24 25:21
  107:9
**clients** 84:12 86:12
**clockwise** 86:18
**close** 24:22 52:13
**closest** 48:4 51:8 107:23
**cloud** 66:14 71:17 103:4
**coast** 17:8 44:19 91:7
**Cob** 53:3
**code** 105:8
**coffee** 16:14
**colleagues** 15:4 83:2
**collected** 30:16 31:20
  91:5
**collection** 47:16,17 49:5
  49:22 51:11 56:7 91:21
  96:7 101:19
**collide** 35:24
**collisions** 16:4
**Colmar** 8:3 15:15 16:11
  20:18
**column** 56:4 78:10,17
  79:17,18 88:18 96:2
  103:24 104:3,4,20
  105:4
**columns** 103:24,25
  105:11
**combined** 88:7
**come** 12:16 23:7 30:19
  33:19 40:23 57:19
  69:12 79:16 91:4 104:2
  104:6,9,12,20
**comes** 24:8 63:18 65:7
  81:7,8,11
**coming** 9:22 37:2,11
  50:15 65:3 78:6,20
  81:7 100:12
**comment** 27:16 28:11
**comments** 28:20,22,24
  30:3 41:9 42:21
**commission** 112:22
**commissioned** 53:19
  54:3,7 82:23 90:16

  107:6
**common** 102:22
**companies** 10:9,11 83:16
  83:16
**company** 9:17,21 10:4,5
  10:13 24:20 52:25 53:2
  53:3,24 82:22 83:12
**comparable** 85:2
**compare** 27:9 62:7
**compared** 53:15 92:15
**comparing** 79:17
**comparison** 53:16
**complete** 11:24
**completely** 9:6
**completing** 106:15
**component** 16:3 18:17
  23:3 59:4,12,23 76:21
  79:15 80:5,14,25 81:6
  98:21
**components** 57:22
**computer** 96:18
**conceivably** 57:19 58:13
**concerned** 87:8
**concluded** 108:13
**conclusion** 57:14 59:11
  77:23 79:21 94:16
  105:3
**conclusions** 34:10 39:21
  40:17 42:9 43:2 47:3
  50:25 82:3 92:18
  100:24 102:23
**conclusive** 71:23
**conclusively** 43:9,10
  55:18 59:11
**concrete** 63:3 76:7
**condition** 67:11
**conditions** 15:8 27:15,17
  33:22,24 34:5 35:12
  41:13 68:2 82:9,14
  84:17 93:14 94:4
**conducted** 49:18 82:22
  82:25
**conference** 12:21
**confident** 31:11,14
**configuration** 38:10,12
  38:14
**confined** 44:21,22 55:5

**confirmatory** 106:3
**confirms** 101:9
**conflicts** 11:10,11
**confused** 50:19
**Connecticut** 2:9 53:3,24
**consequence** 94:25
**consequences** 51:19
**consideration** 50:24
  61:22,24 69:13 91:25
  92:4 94:17
**considered** 81:5 91:22
**consist** 49:22
**consistent** 31:19 52:11
  62:8
**consolidated** 1:4,6
**consul** 82:6
**consultant** 82:6
**consultants** 86:5
**consulted** 48:20
**consulting** 10:6 82:20
  83:24
**contact** 16:2 22:7 27:5
  63:18 65:4,7 83:12
**contacted** 21:19,21
**contacting** 21:24
**contacts** 23:11
**contained** 29:4 43:16
  96:18
**contains** 106:13
**contention** 78:25
**context** 60:7
**continue** 10:22
**continues** 56:6
**continuing** 51:25
**continuous** 71:4
**contour** 56:19
**contours** 45:5 56:16,21
**contract** 10:9,11,11
  18:13,15 107:15
**contracted** 13:11 52:18
**contractors** 83:20
**contracts** 23:16
**control** 109:19
**convective** 69:15,19
  71:15 103:21
**converse** 31:13
**convey** 27:18

conveyed 29:13 86:10
coordinate 97:18
copy 7:17 20:3,3
corner 56:17 75:17
Cornfield 20:19
Corp 82:23
correct 7:18 24:19 28:3,4
   31:12 32:10 46:8 47:4
   59:7,14 61:12,19 63:15
   63:21 79:11,23 87:9
   88:16,17 89:12 90:7,24
   97:15 99:7 112:7
corrections 110:4,5
   112:9
correspond 80:8
corresponds 26:21 105:5
Cos 53:3
cost 107:24
costs 107:12
counsel 5:4 7:15
counter 17:16 86:18
counterclockwise 103:2
couple 8:19 14:9 106:12
   106:14
course 6:24 7:12 13:4
   19:22 29:24 30:12,18
   38:8 46:22 52:17 53:16
   82:24,25 83:14 86:21
   91:2,3 101:4
courses 10:8 84:18
court 1:1 5:14,17 6:10
   19:17 21:9,9 110:16
courtroom 12:21 20:24
covers 22:23
Crane 20:20
created 74:16
creating 75:13
credibility 9:14
criteria 58:7
cross-complaints 17:14
cruise 83:7,8,13
CSR 109:12
current 13:20 37:18
currently 14:4
currents 36:24 37:2,6,10
   52:20 54:10 58:17,18
   58:18,20 61:6,8

Cushing 2:23 6:8 38:23
Cushing's 30:5
customers 84:12
cut 22:21 23:3
cutting 23:4,5
cut-out 38:18
cyclones 53:7
C.V 10:18

**D**

D 3:1 48:12 49:10 55:8
Daggett 2:24 6:8
damage 16:6,13
damaged 16:14
damages 18:15
dangerous 44:22
dangers 84:8,11,13
data 25:19,20 27:8,9
   30:17 31:20 47:16,17
   49:5,22 51:11,25 52:3,4
   52:6,9 53:12,13,17 54:4
   80:18 91:5,14,19,21,22
   96:3,6,7 99:17 101:9,12
   101:19,21 102:3,23
   106:13 107:17,18,20,22
   107:24
date 25:12 27:22 110:8
   111:25 112:14
day 23:5 31:17 39:16
   71:14 74:6,9 112:18
Daylight 54:17 59:6
   80:16 87:16
days 110:14
DC 2:10,15
deal 84:5,25
dealing 10:14 13:7
debris 70:16
decisions 11:25 13:15
   42:24
deemed 51:4 110:16
defendant 17:2 18:9
defendants 17:10
defense 14:19
define 18:10 47:6 49:14
   52:15 66:12 68:5 70:10
   97:4
defined 51:3 105:6

Definitely 13:18
deflect 76:24 77:3
degradation 61:5
degrees 61:14 74:13 80:8
   81:11
deny 98:7
dependent 18:20
depending 47:12 94:19
depends 26:5 70:23
depicted 39:8 48:5 55:9
depicts 42:4
DEPONENT 112:2
deposing 110:13
deposited 16:16
deposition 1:15 4:1 5:11
   5:16 6:6,24 7:5,8,16
   8:2,8,14,25 9:2 19:24
   20:6,16 21:2,6,10,12
   24:23,24 35:14 38:25
   41:23 69:7 70:2 81:18
   99:6 101:4 109:5 110:3
   110:11,14,15
depositions 7:12 8:3,6
   21:4,8 30:2
deprived 51:24
depth 60:10
derivation 43:16
derive 77:22
describe 10:3 22:8 37:7
   40:17 48:16 52:23
   55:17 75:23 80:18
   84:13 86:14 90:2
described 37:19,20
   59:19 74:5,7 75:10
describing 73:13
description 3:9 46:6
detail 22:8 27:25 92:9
determine 91:15 96:14
determined 60:13 63:24
Detyens 8:10 15:14,19
   15:20
devastating 50:16
devastations 44:19
develop 71:16,17 86:16
develops 71:16 75:15,17
Diagram 3:12
difference 70:24

different 8:16 31:7 50:6
   79:5 90:4
differently 25:3 35:2
dimensional 60:11
diminution 77:6
direct 21:8 109:19
direction 4:2 26:14,20,25
   27:7 31:19 34:10 40:25
   42:13 58:6 59:23 60:2
   61:11,11,15,17,18,19
   61:21 62:3 63:20 64:4
   66:8 67:7,22 68:2,4,12
   68:13,21,22 69:15
   70:12,18,21 71:7 72:8,9
   72:16,19 73:24,25
   74:11 77:2,9 78:6,18
   79:14,18 80:5,9,10,13
   80:20,21 81:2 94:8,12
   95:3 98:19,22
directional 26:24 27:4
directions 41:10 42:15
   42:22 48:20,25 62:7
   67:6 76:18 78:3 86:16
   91:7,9
directly 25:21 27:5 42:6
   65:20,20 72:8 85:21
discipline 92:6
discloses 11:10
disclosure 11:9
discount 50:21 73:22
Discover 20:19
Discovery 20:19
discuss 58:20,22 85:24
   97:9
discussed 12:19 58:9
   72:14 85:2,4,5
discusses 92:19
discussion 29:21 84:15
   86:7
discussions 29:19 30:24
   35:12
dissertation 92:10
dissipate 95:5
distance 48:14 65:23
   66:5 67:14
distances 96:21,21
distill 17:22 49:25

**distilling** 46:5
**distinct** 85:18
**distress** 102:6,21
**District** 1:1,2 5:14,15
**divided** 14:8
**division** 53:18 56:10,23
**dock** 16:7 34:22
**document** 20:5 38:24
  72:17 80:2 99:9
**documented** 102:24
**documents** 4:7 12:23
**doing** 19:20 30:9 32:9
  91:3 92:2 110:7
**dominant** 64:2 69:14
  94:8 105:12,13
**Don** 32:10
**Dooley** 1:15 3:2,10 5:1
  5:11 6:1,12,17,22,23
  7:1 8:1 9:1,17,18 10:1
  11:1 12:1 13:1,19 14:1
  14:2 15:1 16:1 17:1
  18:1 19:1 20:1 21:1,17
  22:1 23:1 24:1 25:1
  26:1 27:1,10 28:1 29:1
  30:1 31:1 32:1 33:1
  34:1 35:1 36:1 37:1
  38:1 39:1,12 40:1 41:1
  41:23,25 42:1 43:1
  44:1 45:1 46:1 47:1
  48:1 49:1 50:1 51:1
  52:1 53:1 54:1 55:1,16
  56:1 57:1 58:1 59:1
  60:1 61:1 62:1 63:1
  64:1 65:1 66:1 67:1
  68:1,25 69:1 70:1 71:1
  72:1 73:1 74:1 75:1
  76:1 77:1 78:1,21 79:1
  80:1 81:1,19 82:1 83:1
  83:20 84:1 85:1 86:1
  87:1 88:1 89:1 90:1
  91:1 92:1 93:1,25 94:1
  95:1 96:1 97:1,10 98:1
  99:1 100:1 101:1 102:1
  103:1 104:1 105:1
  106:1,11 107:1,2 108:1
  109:1 110:1 111:1
  112:1

**dotted** 56:18
**downdraft** 66:10,11,13
  67:5,10,13 68:12 71:21
  85:3,19
**downdrafts** 67:20,24
  69:8 71:17 85:16,19
  86:8,13
**downstream** 63:25
**downwind** 68:4,21 74:2
  77:6
**dpollard@kpalawyers...**
  2:6
**Dr** 6:17,23 9:17 13:19
  21:17 27:10 39:12
  41:23,25 55:16 68:25
  78:21 81:19 93:25
  97:10 106:11 107:2
**driven** 36:24 37:6,18
**driving** 37:12 50:18
**dry** 16:7
**due** 36:25 37:10 51:18
  61:5 88:10 102:21
**duly** 6:13 109:4
**Dunham** 19:3
**duties** 13:5
**DUVAL** 1:9
**Dylan** 2:6 5:23 7:2
**dynamicist** 100:15
**D-o-o-l-e-y** 6:22
**D.C** 1:16 5:17

---

**E**

**E** 2:1,1 3:1,8 48:14 111:3
**earlier** 99:21 101:24
**early** 33:11 35:22,25
  36:12
**easily** 20:2
**east** 26:19 34:12 39:25
  40:20 45:9 57:21 58:14
  62:10 63:12,15,18
  65:18 75:12 77:12,19
  78:23 80:13 87:11,12
  87:17 88:10 93:12,19
  93:21 97:11,21,23 98:3
  98:14,17,21 100:4
**easterly** 62:6 63:14,16
**eastern** 1:2 5:15 34:2

36:12 44:22 45:7,16
  64:9 74:25 95:8 98:2
  100:13
**Echo** 78:4
**eddie** 66:25 67:5,13
**eddies** 66:22,23 67:20
  69:8 71:5 72:14 73:17
  76:4 85:16,19
**edge** 74:12
**effect** 34:11 51:23 74:17
  75:11,13,24 77:4 84:23
  93:7 100:8
**effects** 69:3 86:12 93:10
**effort** 8:23 31:2 46:21
  71:24
**efforts** 10:12 55:17
**eight** 21:6 100:18,18,24
  100:25
**eighth** 87:6
**either** 11:12 13:10 42:24
  51:19
**electricity** 53:9
**eliminate** 78:22
**eliminated** 79:4
**else's** 41:15
**embedded** 59:21,24
  69:14 73:24
**employed** 16:25
**encountered** 70:14
**encounters** 13:10
**energy** 94:21 95:4
**Engineering** 28:14 42:21
  96:12
**entities** 12:9
**entrance** 33:9
**entries** 87:2
**entry** 19:2 78:24 80:15
  87:6
**environment** 38:16
  89:21
**Environmental** 37:25
**envision** 71:20
**equal** 18:14
**equivalent** 20:23
**err** 9:5
**errata** 110:7,10,13
  112:11

**eruption** 64:15
**ESQ** 2:6
**ESQUIRE** 2:11,17
**essentially** 81:12
**estimate** 7:24 17:4 24:5
  45:10,12,13 48:9 63:9
**Estimating** 15:11
**euphemism** 31:25
**evaluate** 13:5 29:24
  47:11
**evaluated** 31:9,10 35:13
  41:4 53:15 63:5 106:3
**evaluating** 18:3,5 50:24
  105:4
**evaluation** 91:15
**evaluations** 42:22 43:14
**evaluative** 50:13
**event** 34:5 43:20 50:16
  75:10 102:20
**events** 10:14 84:6 103:4
  103:4 106:9
**eventually** 68:4 70:17
  71:7
**exact** 64:18
**exactly** 12:12 24:3 47:24
  62:11 74:8 102:4
**EXAMINATION** 6:15
**examined** 6:14 97:13
  106:7
**examining** 103:14
**example** 12:10 17:6
  71:12,13 74:8 82:21
  83:7
**exceedingly** 44:21
**exclude** 59:18 103:6
**excluding** 101:22
**excused** 108:11
**executive** 44:8 54:12
  59:2 77:14 79:10
**exercise** 82:22
**exhibit** 19:24 20:4,7,10
  25:4 29:5 39:2,4 40:8
  42:2,3 79:24
**exhibits** 19:22
**exist** 11:11 26:21
**existed** 33:23 90:8
**existence** 9:21,24 55:18

67:20
**existing** 75:6
**expect** 27:6 65:24 66:6
  70:2,6,11 89:15
**expenses** 25:15,17
**experience** 11:7 92:5
**expert** 3:11 13:2 18:3
  27:11 30:4 38:23
**expertise** 64:21 69:2
**experts** 6:8 28:15 53:6
**expires** 112:22
**explain** 44:6 95:17 97:16
**explaining** 95:11
**explanation** 50:2 95:10
**exposure** 77:17
**Express** 20:19
**expressly** 72:11
**extend** 67:13
**extending** 38:20
**extension** 31:21
**extensive** 90:18
**extent** 100:19
**eye** 87:8,10,12,17,19
  88:4
**eyewitness** 29:25 30:11
  30:20 32:8,16 35:8
  102:5,13
**eyewitnesses** 30:3 31:14
  31:15,21 32:7,9,22
  101:22 103:17,18

**F**

**facility** 26:18 27:5,6
  35:23 42:7 74:24 76:7
**fact** 34:7 96:15
**factor** 43:17 46:18 89:18
**factors** 37:5 50:22,23
  61:21,23 69:12,13
  93:19
**facts** 50:12
**factual** 48:3
**faculty** 83:22
**fail** 49:6 110:15
**failed** 51:12 53:8,9
**failure** 51:23 52:6 96:7,8
  96:14
**fair** 32:20

**fairly** 28:14 102:22
**fall** 71:17
**falls** 66:13
**familiar** 8:13 66:9 92:25
**familiarity** 64:24
**Family** 1:9
**far** 25:14 44:25 48:4
  65:22 87:8 90:8
**fashion** 84:25 95:18
**Faulty** 65:10
**features** 86:20
**February** 9:23
**federal** 17:12 21:9
**feel** 31:11,13,15,17 32:13
  53:6
**feet** 62:14,16 63:19 64:11
  66:4,5
**fiberglass** 22:23
**field** 49:11,21 53:8 57:10
  75:6 85:12 92:20 106:7
  106:8
**fields** 92:13
**fifth** 78:17
**figure** 3:12 105:8
**figured** 24:23
**filing** 5:5
**final** 92:3 100:23
**find** 11:6 26:14,20 73:8
  88:2
**Finding** 101:3
**findings** 30:21 31:5,6,18
  32:11 34:15 43:10 44:6
  97:8 100:17,18,19,25
  101:5 102:8
**fine** 20:10 23:20
**finish** 9:6
**finished** 19:16
**firm** 14:23 15:4,23,25
**firms** 15:5
**firm's** 15:24
**first** 6:13 17:9 18:25 28:8
  40:24 42:7 54:3,4,13
  98:20 101:8 104:3,4
  105:4 107:20,25
**fit** 102:24 103:5
**five** 21:12 78:16
**floats** 36:21

**flood** 33:13 34:9 35:24
  62:9,19,25 63:2,10,12
  63:19,19 64:14 65:8,16
  65:17,21,25 74:25
  75:12,14
**flooding** 16:6,14
**Floor** 2:4
**Florida** 33:8 75:3
**flow** 39:24 59:22,25 60:2
  60:3,15,19 61:3 63:23
  64:2,6 67:14,15 73:11
  86:17,18
**flowed** 94:7
**Flower** 2:4
**fly** 22:2
**focus** 15:12 58:23
**focusing** 34:23
**fog** 104:21 105:8
**follow** 56:16
**Following** 56:20
**follows** 6:14
**follow-up** 81:25
**force** 37:7 74:2 98:9
**forceful** 100:5
**forces** 36:15 37:15,23,25
  38:6 98:4,11 100:8,14
**foregoing** 109:17 112:5
**form** 5:7 12:22 34:6 67:8
  112:10
**formally** 23:13
**forward** 96:23
**found** 27:22 42:8 51:8
  87:22 93:22 98:2
**four** 14:10 24:9 47:19
  55:5 78:16 107:22,25
**fourth** 58:25 72:23
**Fox** 20:18
**frame** 88:23
**framed** 40:3 79:3
**free** 39:13,15,18
**friction** 61:5
**front** 7:17 42:3 85:13,18
  85:20 86:13
**full** 6:19
**fully** 46:12 59:9 99:22,23
**functioning** 51:16
**further** 17:22 50:3 95:3

104:10 108:6
**future** 22:6

**G**

**gathered** 30:16
**general** 8:17 12:3 35:17
  35:18 64:23 86:17
**generally** 7:6 8:13 10:3
  10:24 13:24 32:9,17
  36:18,19,20 60:14 70:6
**generated** 94:5 100:14
**Genmar** 8:7
**gentleman** 32:23 34:4
**getting** 22:2 72:4
**give** 17:4,24 18:6,7 24:5
  35:19 48:9 65:5 71:11
  85:25,25 92:9
**given** 7:8 8:5 20:25 26:13
  27:12 28:5,18,18 29:11
  29:15 30:20 49:16 52:6
  58:19 74:8 75:5,6,7,7
  89:18 100:21 109:6
  112:7
**gives** 44:17
**giving** 7:25 20:14 75:6
**GIWW** 37:11
**gleaned** 96:11
**GMAT** 83:3
**go** 11:8 13:16 20:4 22:12
  22:15,17 32:3,14,17
  36:19 40:22 54:22
  61:10 65:11 71:21
  74:12 77:8 78:2,10,16
  83:24 91:12 101:6
  102:12,18 106:12,18,19
**goes** 52:9 101:23
**going** 6:23 7:6 8:14
  15:14 16:22 19:25
  23:15 34:11 41:18 44:2
  44:3,5 50:9 58:25
  61:13,15,19,20,20
  63:20,22 64:6,8,9,10,15
  65:12 79:2 81:17 82:2
  85:23 89:21 95:15
  104:4 106:20 108:9
**good** 5:10 6:17,18 18:4
  24:10 25:9 51:25 69:5

**Goodwin** 2:14 5:17 6:4,5
14:15,21 23:10,12
**Goowin** 1:15
**government** 17:13 52:17
56:11
**gradually** 72:4
**graduate** 83:11
**GRAPH** 56:15
**graphic** 42:3 45:4,4
56:10,12,13 57:9 94:4
**great** 16:11 94:22 102:6
**greater** 46:9 57:3 70:25
71:10
**greatest** 44:18
**grid** 47:10,11,13,19 48:4
48:17,21,23 49:2,5,9
55:5 69:16 107:23,25
108:3
**Guenther** 2:25 5:19
**guess** 59:5
**gulf** 37:11 44:19 52:20
54:11 91:6,25
**gust** 43:14,16,17,19,25
44:3 65:14 69:12 85:13
85:18,20 86:13,16 87:3
88:12 89:3,17,19
**gusts** 43:23 68:6 88:3,9
88:22 89:11,14

**H**

**H** 3:8
**half** 48:15
**happen** 7:6 58:7 61:16
67:16 94:2 100:22
**happened** 41:4,14 42:5
51:15 68:19 91:16
97:17 100:14
**happening** 71:20 102:8
**happens** 41:12 50:4
65:16
**harbor** 87:18
**hard** 17:18 102:13
**harsh** 99:5
**heading** 72:24
**heard** 32:24 35:10,11
62:13
**heavy** 104:7,24

**Hector** 8:7
**height** 60:13 62:19,25
63:3,10 92:13 94:21,22
94:23
**heights** 92:15
**held** 14:6 29:19
**hemisphere** 86:19 103:2
**high** 26:19 44:20,20,21
45:14 50:17 59:21 62:9
62:11 63:12,19 70:8
84:16
**higher** 45:7
**highest** 45:6 87:3
**hindcast** 48:19 49:11,15
49:17,20 51:5 52:19
53:7,10,11,20 91:22
106:2,6,13 107:3
**hindcasting** 92:16
**hire** 23:17,17,18,18
**hired** 15:6,22 23:7 27:11
86:10
**hires** 18:23
**history** 92:14
**hit** 50:16 94:20,21
**hitting** 65:17,25 66:15
71:18 75:12
**hoc** 12:14
**Hold** 18:10
**Holland** 21:23
**hope** 86:2
**hotel** 25:18
**hour** 43:13 54:24 55:19
57:4,6,9,13,15,18 58:10
**hourly** 23:15
**hours** 23:23 24:3,4 33:11
35:22 36:2 48:10
**house** 33:5,6
**HRD** 56:10 103:13
**Hugo** 15:21
**hurricane** 15:7,15,16,20
19:5,9 25:6 31:8 43:17
44:17 45:25 46:10,10
51:19 52:21 53:17 56:2
56:9,23 60:7,10,15
73:12 84:7 86:13,14,15
86:22 87:15 103:6
105:18,20,22

**hurricanes** 43:21 73:7
73:10 93:4
**hydraulic** 36:25 37:10
**hypothetical** 34:7 65:10
66:4
**hypothetically** 65:3

**I**

**ID** 3:9
**idea** 107:11
**identification** 20:7 39:2
**identify** 55:12
**IHNC** 3:13 26:19 27:16
33:4,7,13 34:9,19 35:3
38:17 42:15,20 43:13
44:11 45:11,14,16,19
45:22 47:17,21,25 48:4
51:7 54:15,24 55:4
56:21 57:19 59:4,10
62:10 64:12 67:21 72:7
74:15,17 76:23,25
77:19 87:8,13,20 88:4,6
88:11,13 90:23 91:2
94:7 95:18 97:25 98:19
98:23 99:19 101:10,16
105:24
**image** 66:20
**imagine** 75:10,11
**imagined** 67:17
**immediate** 105:24
**immediately** 47:21 51:7
52:12
**impact** 19:10 37:23 42:9
42:23 63:9,20 65:24
76:15,22
**impacted** 38:7 42:20
45:22
**impacts** 64:24
**imperative** 110:12
**implies** 59:11
**importance** 32:22 48:17
**important** 30:8,12 92:17
94:19 98:9
**impossible** 93:18
**inches** 16:17
**incident** 94:22
**include** 69:8 86:6

**included** 24:14
**including** 25:15
**incoming** 94:23
**incorrect** 31:14 32:2
**increase** 88:14 94:23
**increased** 88:4
**increasing** 72:3 103:3
**indentation** 39:7
**independent** 42:14 43:23
53:2 94:14 96:13,14
**INDEX** 4:1
**indicate** 21:24 44:10
77:14 95:9 99:22
**indicated** 19:4 42:17
72:22 89:10
**indicates** 54:14,14 82:5
87:2 99:3 104:21 105:8
**indicating** 40:11 56:19
**individual** 11:9,9 69:16
**individuals** 102:19
**industry** 10:7,15
**inexpensive** 25:20
**inflow** 71:19
**influenced** 13:9
**information** 12:2 33:19
50:5 86:10 91:14 97:18
106:3
**Ingram** 1:7,8
**initial** 22:7
**initially** 21:19
**inner** 87:18
**inquiry** 96:14
**inside** 67:21 95:10
101:16
**Institute** 83:11
**instruct** 84:2,5
**instructed** 29:23 83:4
**instruction** 27:18 28:8
28:19
**instructions** 27:12,14,19
28:6 29:11,12,16 110:2
**instrument** 51:20
**instruments** 101:11
**intend** 26:3 29:7 74:11
100:19
**intensification** 77:5
**interaction** 70:13

**interchangeably** 67:3
**interest** 34:24 36:10,17
  42:4 44:11 87:23
  104:25 105:2
**interfere** 94:22
**international** 105:7
**interpolate** 88:21
**interpolated** 78:4 87:3
  88:19 89:11
**interpolation** 47:14
  88:15,16 96:22 97:2,3,4
**interpolations** 46:23
  47:4,9 48:18 96:17
**interruption** 64:6,9,18
**interval** 56:18
**intervals** 48:24 49:3
**introduce** 5:21 61:4
  63:22 64:6,8,9,15 65:12
**introduced** 7:3
**investigated** 86:8
**invoice** 23:25 24:3,18,20
  24:24
**invoiced** 24:21
**involve** 18:17
**involved** 7:21,25 11:4
  14:20,23 19:5,16 20:14
  22:4 102:20
**involvement** 22:10 23:6
**involving** 16:12
**inward** 56:19 86:18
**IPET** 28:9 29:10 41:2,2
  42:18 43:5 57:14,23,24
  57:25 58:3,8,20 92:23
**Island** 9:20 10:2 53:4
**islands** 45:8
**issue** 18:23 28:3 29:12
  34:18 40:10,13,18
  72:20 86:5,6 90:20
  93:7
**issued** 11:17 19:18 23:25
  24:2
**issues** 13:16,17 83:24
**items** 106:12
**iterations** 92:2
**iWall** 103:22,23
**I-P-E-T** 58:2
**i.e** 96:7

**J**

**J** 1:16 109:12
**Jim** 21:22
**job** 24:12
**John** 2:21 6:6
**JOSEPH** 1:10
**JR** 1:9,10
**JUDGE** 1:8
**jury** 19:17

**K**

**K** 1:7
**Katrina** 1:3 5:12 22:4
  25:6 27:21 31:8 34:20
  44:18,21 45:25 49:12
  52:21 53:10,12 54:23
  56:3,25 67:21 69:21
  72:2 73:15 75:6 77:17
  87:8,10,11,12,17,19
  88:10,12 90:23 91:6
  93:7 98:3 103:15
**Katrina's** 31:11 44:12
  45:5,15
**Keeley** 2:22 6:7
**keep** 11:20 17:3 24:15
**Kelley** 20:21
**key** 8:19
**KHORRAMI** 2:3
**kill** 19:25
**kind** 23:16 27:21 76:21
**kinds** 11:10
**Kings** 83:3
**Kirsten** 2:18 6:5
**Knight** 21:23
**knot** 28:10 42:16,18 43:4
  45:7
**knots** 45:5 46:9 54:16
  56:4,17,18,19,20 57:2
  67:24 87:4 89:11,12
  90:5
**know** 15:2,3 24:3 26:24
  33:2 34:3 35:4,18,20
  39:19 43:21 44:18
  46:15 50:10 53:19 58:8
  62:9,14 63:12 67:19,22
  69:22 71:25 75:2 90:12
  90:13,18 93:6 98:24

101:20 106:2
**knowing** 53:8
**knowledge** 14:17 19:13
  30:19 34:17 48:3 49:4
**known** 66:9 73:9
**krobbins@goodwinpr...**
  2:17

**L**

**L** 1:15 3:2 5:1 6:1,12,21
  7:1 8:1 9:1 10:1 11:1
  12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1
  20:1 21:1 22:1 23:1
  24:1 25:1 26:1 27:1
  28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1
  36:1 37:1 38:1 39:1
  40:1 41:1 42:1 43:1
  44:1 45:1 46:1 47:1
  48:1 49:1 50:1 51:1
  52:1 53:1 54:1 55:1
  56:1 57:1 58:1 59:1
  60:1 61:1 62:1 63:1
  64:1 65:1 66:1 67:1
  68:1 69:1 70:1 71:1
  72:1 73:1 74:1 75:1
  76:1 77:1 78:1 79:1
  80:1 81:1 82:1 83:1
  84:1 85:1 86:1 87:1
  88:1 89:1 90:1 91:1
  92:1 93:1 94:1 95:1
  96:1 97:1 98:1 99:1
  100:1 101:1 102:1
  103:1 104:1 105:1
  106:1 107:1 108:1
  109:1 110:1 111:1
  112:1
**Lafarge** 1:6,7,8,9,10
  2:13 5:13 6:4,7 14:12
  23:7 24:18 25:12 27:11
  27:18 35:23 38:17 42:7
  76:5
**Lafarge's** 7:15 74:24
**Lagarde** 1:7
**Lake** 19:10
**Lakefront** 51:9 52:4,13

62:2,3 96:8 101:13
  104:23
**land** 22:25 91:20
**landfall** 34:20 73:9
**language** 50:2
**largely** 22:21 94:9
**larger** 73:11
**Larry** 2:24 6:8
**lasting** 71:2,11
**late** 24:13 62:21
**latitude** 87:23
**law** 2:8,18 5:16 14:22
  15:23,24,25
**laws** 102:24
**layman's** 50:2
**layperson's** 46:6
**leading** 53:6 74:12
**leave** 68:15
**lecture** 86:2
**lectures** 82:21 83:15
  84:18
**leeward** 76:19
**left** 22:22
**left-hand** 56:17 78:10
**LEGAL** 2:25
**lesser** 73:16
**letter** 29:17
**letters** 20:9
**let's** 36:19 41:16 44:5
  54:12 55:12 64:5 66:3
  81:14 97:7 100:16
  106:19
**level** 60:9 70:3,7
**levels** 70:8
**levy** 63:4
**Lexis** 12:4
**License** 1:17
**licensing** 82:24
**lifted** 70:16
**light** 27:6 102:9
**likes** 74:4
**Likewise** 36:23
**limit** 74:20,25
**limiting** 90:25
**line** 4:3,8 56:18,20 78:8
  80:18 87:6 92:14 97:6
  111:5

**linear** 97:3,4
**lines** 38:9 39:16 56:21
**linked** 57:13
**list** 11:5,20 15:11,12,14
  20:14 21:11 58:19
**listed** 7:20 56:4
**literature** 26:22 69:20
  75:8 89:25 90:19
**litigation** 1:4 13:22
  16:24 19:14
**little** 8:16 25:2 34:25
  40:6 61:6 64:5 69:6
  89:6 90:3 92:9
**live** 12:24,25
**lives** 50:16
**LLP** 2:3
**locally** 59:24
**located** 16:18 33:6 45:15
  53:3,4 60:8 79:22
  91:24
**location** 9:25 31:10
  39:23 40:19 41:6 42:6
  42:23 47:12 79:22
**log** 18:3,5
**long** 9:21 72:6 77:11
**longer** 24:11 71:2,11
**look** 10:17 22:3,12,18
  28:9,20 39:3 45:3
  50:12,12 53:10,12
  55:21 62:2,3 77:24
  78:17 79:23 80:15 87:5
  87:12,13 88:7 91:23
  99:8 103:20,23 104:23
**looked** 38:17 41:2,5
  52:24 53:13 98:11
  106:7
**looking** 7:14 18:15 19:19
  20:13 35:23 49:10
  55:10 62:6,6 79:17
  82:4 89:8
**Los** 2:5
**lose** 94:21
**lost** 18:14 51:20 95:4
**lot** 19:25 50:5,5
**Louisiana** 1:2 5:15 19:10
  72:25 91:6
**Louisiana/Mississippi**

  52:14
**low** 16:17 86:17 102:25
**lower** 22:25 23:2 56:17
**lowest** 14:10
**Lutgens** 85:9
**lying** 16:17

---

## M

**MAGISTRATE** 1:10
**magnitude** 67:12 70:24
**Maher** 20:20
**making** 102:16
**malfunctioned** 51:21
**Management** 52:18
**manifest** 70:11
**map** 45:4 47:19,24 55:14
  55:16 87:13,13
**March** 19:17 22:19,20
  27:20
**marine** 10:10 19:4 82:7
  83:2,10,21
**Marino** 28:13 41:7,9
  42:21 95:22 96:11
**Marino's** 99:3
**maritime** 8:4 10:7,15,20
  10:25 11:6,23 12:7
  13:16 17:16 83:11,20
**mark** 2:17,25 5:19 6:3
  20:3 38:22 62:21 108:6
**marked** 3:9 20:5 21:5
  38:24
**Martin** 1:16 5:18 109:12
**Maryland** 83:14
**materials** 84:20 85:6
  86:4
**mathematical** 90:15
**matter** 11:4,7 16:6 17:9
  17:11 18:22 19:13,15
  35:17 84:21 100:15
**matters** 7:21,25 11:14
  12:19 13:7,22
**maximum** 44:12 45:5,15
  45:24 54:15,19 56:5,8
  56:22 57:10,12,18 72:5
  89:21
**McCall** 14:24,25
**McCrosky** 32:10

**mean** 37:7 38:16 44:4
  47:7,8 49:14 53:23
  54:19 68:10 91:8
  102:22
**meander** 37:13
**meaning** 36:2 63:14 70:7
  76:19
**means** 39:16 98:23
  104:12 109:19
**meant** 63:6
**measure** 15:7 62:20 63:4
  89:16
**measured** 63:2 96:20,21
**measurement** 63:11
**measurements** 48:6,23
  49:23
**mechanic** 58:13
**mechanics** 46:23
**meet** 22:15
**meeting** 27:20,22
**meetings** 29:18
**member** 11:13 83:22
**members** 11:5
**mention** 38:3 51:14
  72:15
**mentioned** 38:2 50:14,14
  69:25 70:4,23
**mentioning** 86:21
**mentions** 57:14
**Merchant** 10:10 83:2,21
**mere** 37:7
**merely** 20:15
**meshing** 102:13
**messy** 9:4
**met** 58:7
**meteorological** 10:6 13:6
  13:16 18:17 30:9 84:6
  90:18 105:15
**meteorologist** 67:4 69:2
**meteorology** 82:25 83:4
  83:10
**meter** 60:12
**meters** 60:13 70:8
**method** 24:16,17
**Mexico** 37:11 52:20
  54:11 91:25
**Miami** 16:16

**micro** 43:12 90:17
**microburst** 59:13,19
**microscale** 69:19 73:10
**microswirls** 73:17
**mid** 71:13
**middle** 50:17,18,18
  95:21 102:6
**Mid-latitude** 82:16
**mile** 48:15
**miles** 43:12 45:2,11,17
  45:19 48:11,12,12,14
  51:10 54:24 55:19 57:4
  57:6,9,13,14,18 58:10
**mile-per-hour** 41:3
  42:19
**mind** 20:8 57:13
**mine** 41:15
**Mineral** 52:18
**Minor** 64:16
**minute** 81:2
**minutes** 87:9,24
**miscellaneous** 48:17
**mist** 104:12,15,16
**MITAGS** 10:11
**MMS** 49:17 52:15,17
  54:6,7,9 107:7,9,15
**model** 25:7 27:9 52:7,9
  52:10 53:15 57:20 62:8
  69:2,10,15 75:7 88:16
  88:17 91:22 92:2,3,11
  103:5 106:6,10
**models** 69:19
**modify** 61:19
**moment** 20:12
**momentarily** 65:5,6
**momentary** 63:23 64:17
  68:3,3,5 71:4
**money** 18:14
**monolith** 63:4,7
**moored** 39:11,12,23
**mooring** 39:14 83:24
**moorings** 46:14,16,24
**morning** 5:10 6:17,18
  7:5,6 8:15 33:11 35:22
  36:2,13 41:9,13 42:15
  62:4 72:2,4 87:11 88:9
  88:14 93:22,23 94:10

98:2,20 100:10 101:24
104:24 105:25
**motion** 36:22,23 71:6
**motions** 69:12
**move** 20:11 36:11 58:13
59:25 73:25 80:25 81:9
81:15 93:18 95:2 97:7
97:14
**moved** 33:24 57:20 68:4
71:7 88:6,12 93:12,21
98:3,14,17,24 100:4
**movement** 28:2 36:16
37:24 38:5,7,9 58:12
71:3 78:23 93:14 94:2
95:17
**moves** 66:14
**moving** 19:2 67:6 70:21
75:12 80:9,13,14 81:8
91:9 94:11 98:9
**mraffman@goodwinp...**
2:16
**MRGO** 37:10 47:25
**muddles** 9:4
**multiple** 43:22 88:22
91:9
**multiplication** 89:18
**Mumford** 1:7 5:13

## N

**N** 2:1 3:1
**name** 5:23 6:3,20,21,21
7:2 9:17 15:3 21:22
32:23 35:8,10,11 85:10
**Nancy** 1:16 5:18 109:12
**NASA** 26:17
**National** 56:2 87:15
101:18 105:7
**natural** 60:21 61:2,4
**nature** 22:9 36:25 37:10
64:15,16
**nautical** 48:12
**navigation** 84:3 87:18
**ND** 96:2
**near** 26:18 33:7 45:8
103:3
**necessary** 110:4
**need** 8:23 44:6

**needed** 57:22
**negotiated** 18:22
**net** 51:23 74:2
**NEVD** 63:2
**never** 29:15 41:11 42:18
69:23,24
**nevertheless** 70:15
**New** 1:16 2:15 5:19 8:3
9:20 12:15 14:23 17:6
17:7,9 20:18 22:3,18
25:18,19,22 26:2,18
27:15 44:24,25 45:9
55:25 72:25 73:21,21
**newspapers** 22:14
**Nexis** 12:5
**NH** 103:13
**NHC** 26:13,16 56:2
103:13
**nice** 103:16
**night** 24:13
**Ninth** 22:25 23:2
**NOAA** 82:23
**nominate** 11:8
**non-math** 97:4
**normal** 43:17
**north** 2:13 5:13 6:4,7
14:12 23:8 33:7,8,13
34:8 41:7 62:5 75:2,2,4
77:19 79:15,22 80:6,12
81:8,11 94:10
**northeast** 67:23 68:23,24
71:4 72:8 76:23 94:12
**northeasterly** 68:22
**northerly** 80:5,9,14,24
81:6 98:22
**northern** 52:20 54:10
86:19 97:14,19 98:22
103:2
**Notary** 112:25
**notch** 38:11,19 39:6 42:6
**notch-type** 38:16
**note** 53:18
**noted** 110:10 112:10
**notes** 29:21 106:12
**notice** 22:5
**number** 3:9 14:5 57:4
89:16 105:5

**numbers** 20:8 32:14
96:25 105:4
**numerical** 49:11,14,20
92:11
**N.W** 1:16 2:9,15

## O

**object** 36:21 72:7 73:18
91:11 94:25 100:3
**objection** 33:14 34:13
36:5 40:2 42:10 49:8
62:17,22,23 63:7 65:9,9
67:8 68:14 79:2 80:3
88:24 102:16
**objections** 5:6
**obligations** 18:13
**observation** 26:14,15,17
26:25 36:3 44:16 51:25
73:4 101:9,12,16,21
102:3 105:16
**observations** 26:13 33:3
33:21 50:21 51:2 53:16
56:8 92:12 102:11
103:5 104:23
**observed** 22:24 103:14
**observer's** 103:5
**observing** 51:3
**obtained** 49:10 56:2
89:18
**obtaining** 48:20
**obviously** 39:16 62:15
**occasion** 12:25
**occasions** 7:9 15:10 67:4
**occur** 89:23 96:15 97:20
105:24
**occurred** 41:13 45:7
54:16 67:25 86:8 98:20
**occurring** 72:6
**Ocean** 28:13 30:7 42:21
**oceanographic** 10:6
**Oceanweather** 49:18
52:19,22,23 53:2,5
103:14 107:4,9,16,17
107:19
**October** 23:9,10,22
**odds** 30:21 34:9,15
**offer** 82:6,19 100:20

**offered** 10:8
**offering** 10:8
**OFFICE** 2:8
**officers** 82:23 83:4,8
**offices** 1:15 5:16
**official** 9:2 47:17 51:3
56:3 101:15,25
**Oh** 8:7 18:18 85:17
**Oil** 28:13 30:7 42:21
**Okay** 7:14 8:5,11,13
13:19 15:18 19:2 21:5
21:13 22:7,15 26:3
32:16 35:21 39:10
40:16 41:17 46:21 47:6
47:15 51:22 52:6 54:5
54:22 55:7 57:11,17
58:20 59:17 63:8 64:3
64:13 65:3 67:3 68:25
69:6 72:11 75:18,20
76:5 77:10 78:15 79:7
79:8 80:15,23 81:14
83:18,23 85:5 87:7,24
88:21 90:13 91:18
93:16 95:9 96:5,17
97:7 98:6,13 99:21
100:16 101:21 103:19
104:12 105:10 106:11
106:16
**once** 25:24 37:12 63:24
66:5
**ones** 21:6,11 38:2,4
**open** 91:5,20
**operational** 84:3,3
**operations** 82:8
**opinion** 17:25 28:21,23
28:25 33:20,22,23 34:4
35:5 39:13 46:17,19
68:19 93:24 97:10
98:13,16
**opinions** 29:4,7 95:15
**opportunity** 9:11
**opposed** 20:15 91:20
**opposite** 61:14,18 72:9
**oral** 1:15
**order** 38:22 71:10
**ordered** 107:6
**Oregon** 17:8

**organizations** 12:8
**orientation** 99:19
**original** 110:12
**Orleans** 14:23 22:3,18
  25:18,19,22 26:18
  27:15 44:24,25 45:9
  55:25 72:25 73:21
**ought** 32:6
**output** 27:9 92:3
**Outtrim** 20:20
**outward** 74:10
**outwards** 66:15
**overall** 27:21 59:25
  63:24 71:6
**overhead** 38:17
**OWI** 53:25 54:4 91:23
**owner** 18:6,9
**owners** 17:11,12
**o'clock** 41:8 77:17,22
  78:5,19,23,25 79:4,19
  93:21

**P**

**P** 2:1,1
**Pacific** 8:4 15:16 19:3
  20:21
**page** 3:3,13 4:3,8 7:16,20
  10:18 15:11,12,13,17
  19:3,19 20:13 38:23
  39:8 44:7 45:3 47:24
  48:5 49:17 55:9,12,14
  55:16,22 56:6,10,12,12
  56:13,14 57:9 59:3
  72:18,23 77:14,25 78:2
  78:3,9,12,13 80:16
  86:25 87:5,13,21 88:11
  88:19 89:8,19 94:3
  95:21 96:16 98:25
  99:21 100:16 102:4
  103:24 104:6,9,10
  111:5
**pages** 3:11 19:25 69:25
  88:7 112:6
**paid** 25:21
**Pallets** 16:14
**panel** 11:13
**panels** 11:25

**paragraph** 44:11 54:14
  57:8 59:2 77:15,16
  87:22 99:11,11,12,20
**parallel** 87:19 88:6,10
  99:18
**parameters** 97:13
**Parfait** 1:9
**parked** 39:8,9
**part** 10:13,13 19:15
  25:10 28:12 46:12 47:3
  82:20
**particle** 70:16
**Particles** 71:16
**particular** 11:13 30:13
  31:10 44:16 60:20
  61:21 84:19 88:23
  92:22 96:20 102:25
  105:5,23
**particularly** 27:16 45:3
**parties** 10:7 11:4,12
  18:15
**partnership** 52:24
**parts** 23:3
**pass** 44:23 45:2 86:3
**passage** 54:23
**passed** 16:16 77:7,19
  83:5 88:10 98:22
**passing** 87:22
**path** 31:11
**pattern** 63:24 103:4
**Pazos** 30:7 41:6,7
**peer** 31:7 103:12
**penalty** 8:20
**people** 23:17 31:16 44:19
  50:15 69:20 84:2 86:12
  102:6,9
**percent** 13:23 14:4 16:23
**percentage** 13:20,25
  17:25
**percentages** 17:22
**perform** 15:19 27:13
  29:16 107:12
**performed** 36:4
**performing** 28:6
**period** 89:15,22,23,24,24
  91:10 94:7 104:25
  105:13,14

**periods** 105:21
**perjury** 8:21
**Perry** 1:8
**person** 17:19 97:5
**personal** 102:21
**PERTAINS** 1:5
**perturbations** 69:3,7
**Peter** 2:22 6:7
**phenomena** 44:2 73:16
  74:14 85:20 89:23
  90:17 94:17
**phenomenon** 66:9 73:6
  73:11,13
**philosophy** 18:24
**phone** 23:10
**Ph.D** 1:15 3:2 5:1 6:1,12
  7:1 8:1 9:1 10:1 11:1
  12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1
  20:1 21:1 22:1 23:1
  24:1 25:1 26:1 27:1
  28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1
  36:1 37:1 38:1 39:1
  40:1 41:1 42:1 43:1
  44:1 45:1 46:1 47:1
  48:1 49:1 50:1 51:1
  52:1 53:1 54:1 55:1
  56:1 57:1 58:1 59:1
  60:1 61:1 62:1 63:1
  64:1 65:1 66:1 67:1
  68:1 69:1 70:1 71:1
  72:1 73:1 74:1 75:1
  76:1 77:1 78:1 79:1
  80:1 81:1 82:1 83:1
  84:1 85:1 86:1 87:1
  88:1 89:1 90:1 91:1
  92:1,10 93:1 94:1 95:1
  96:1 97:1 98:1 99:1
  100:1 101:1 102:1
  103:1 104:1 105:1
  106:1 107:1 108:1
  109:1 110:1 111:1
  112:1
**picture** 67:15
**piece** 50:8
**place** 24:16

**plaintiff** 14:19 17:2
**plaintiffs** 2:2 5:24 6:2
  7:4 17:14,17
**plaintiff's** 28:15
**please** 5:21 6:11,19 11:3
  99:8 110:3,7
**PLLARD** 2:3
**PLLC** 2:8
**plotted** 87:14
**plug** 96:25
**point** 9:12 16:2 20:4 22:6
  22:17 23:6,11 27:8,9
  28:5 47:11,13,16,17,18
  48:4 49:4 50:21 51:12
  51:25 52:7,9 64:14
  69:16 72:22 78:3 83:4
  87:7 97:22,24 101:16
  101:19 107:25 108:3
**points** 47:10,19 48:17,21
  48:23 49:2,5,9 55:6
  91:21 95:25 96:21
  107:23
**policy** 24:20
**Pollard** 2:6 3:4 5:23,23
  6:16 7:2 20:2,10 32:15
  32:21 33:18 34:16
  36:14 38:22 39:3,5
  40:7 41:16,24 49:13
  55:15 62:21 63:8 65:15
  67:18 68:17 72:21 74:3
  74:19 78:14 79:6 80:7
  81:14,24 89:4 91:17
  99:14 103:7 106:17,19
  106:25 108:5
**pop** 106:13
**portion** 3:13 47:25 48:2
  63:16 74:23 82:11
**position** 31:18 33:25
  39:22 78:4 87:14 99:5
**possibility** 72:12 78:22
**possible** 11:11 69:2,17
  102:15
**potentially** 37:23 38:7
**power** 51:19
**practice** 18:24
**practices** 84:3
**precip** 106:9

**precipitation** 103:4
**predictable** 60:17
**predominant** 59:25 60:2
  60:3
**preparation** 25:3
**prepare** 27:21
**prepared** 84:16,19
**preparing** 75:9 91:3
**presence** 73:22 76:14
**present** 2:20 5:21 23:22
  74:15 104:22
**presentation** 85:14
**presented** 12:20
**pressure** 63:24 75:6
  86:17 102:25 106:7,8
**Prestige** 8:4
**prevailing** 60:4,6 61:11
  61:15 64:4 66:7 67:7
  67:12,14,22 68:2,13,20
  69:14 70:18,21 71:2,8
  71:11,21 72:9,15,19
  73:24 74:9 76:17 77:9
  86:15 94:9
**previous** 7:9 59:6
**previously** 14:12,15,18
  15:6 59:18 105:6
**Price** 19:4
**primarily** 102:3
**principles** 83:9
**printout** 11:24
**prior** 7:15 42:7 77:17
  78:23,24 79:4 100:4
**probably** 13:23 14:10
  17:6 25:15 31:15 48:14
  50:15 85:11
**problem** 41:15 90:15
**proceed** 8:14
**proceeding** 9:7 20:15
**proceedings** 20:18
  108:13
**proceeds** 9:14
**process** 8:14 47:13
**Procter** 1:15 2:14 5:17
  6:4,6 14:15,21 23:10,12
**produce** 85:20
**produced** 7:15 56:10,11
  94:6 100:8

**product** 24:21
**PRODUCTION** 4:7
**Professional** 1:17
**program** 96:19,23
**project** 50:8
**projection** 50:10
**propagate** 95:2
**propagating** 94:25
**propel** 72:7
**propelling** 95:7
**propounded** 112:8
**proprietary** 96:24
**provide** 10:5
**provided** 83:15
**provides** 11:23
**providing** 13:21
**public** 12:3 112:25
**publications** 12:17
**publish** 12:15
**published** 11:18
**pump** 33:5,6
**purpose** 10:4,5 21:24
  54:8
**purposes** 39:20 40:16
  66:3 79:21
**purview** 64:21
**put** 22:4
**putting** 25:8
**p.m** 41:21 81:20,21
  106:22,23 108:13

## Q

**qualify** 58:5
**quantifiable** 50:13
**quantify** 64:18 65:23
  66:2
**question** 5:7 9:6 16:22
  17:18 20:12 25:2 32:4
  34:13,25 40:2,4,21 42:5
  47:2 50:20 62:24 68:9
  70:5 73:18 79:3,7
  88:24 89:5,7,14 90:25
  91:11 92:15 94:13
  95:12,19 102:18
**QUESTIONED** 3:3
**questions** 21:14 32:5
  42:2 82:2,3 106:14

  108:7 112:8
**quick** 18:10 20:12 41:16
  43:23
**quickly** 95:4
**quiet** 85:3
**quite** 25:5 46:25 68:9

## R

**R** 1:8 2:1 111:3,3
**Raffman** 2:17 6:3,3
  19:23 20:8 23:19 26:5
  32:3,19 33:14 34:13
  36:5 40:2,21 42:10
  49:8 55:13 62:17,23
  65:9 67:8 68:14 73:18
  74:18 78:12 79:2 80:3
  88:24 91:11 102:16
  106:18 108:7
**Railroad** 19:3
**rain** 50:18 102:7 104:7
  104:24
**rainstorm** 16:15
**ran** 38:4
**random** 43:25 59:19
  81:25
**range** 56:5 72:5 80:25
  107:14
**ranged** 54:15
**ranges** 10:7 80:10
**ranging** 74:23
**rapidly** 91:8,8
**reach** 39:21 40:17 50:24
  54:24
**reached** 43:7 92:18
  105:3
**read** 29:24 58:4 79:11
  85:23 108:8 110:3
  112:5
**reading** 25:6 26:24 27:4
  42:8 43:4 99:16
**ready** 22:2
**really** 17:24 39:19 50:19
**reason** 8:25 21:15 90:13
  96:6 110:5
**rebuilt** 62:15
**rebut** 28:23
**recall** 14:21 16:10,19

  19:7 58:21 70:3 82:11
**receipt** 110:14
**recess** 41:20 81:20
  106:22
**reconcile** 30:10 31:2 36:3
  46:22
**reconciling** 102:13
**record** 6:20 8:24 9:2
  11:24 17:3 41:18,22
  52:16 55:12 81:17,22
  106:18,19,20,24 108:9
  109:5
**recorded** 52:5
**recording** 101:11
**reduced** 104:21 105:8
**reestablish** 66:7
**refer** 47:23 102:2
**reference** 43:4 78:24
  85:13,15 86:7
**referred** 20:6 38:25
  59:18
**referring** 26:16 28:15
  30:5 38:15 39:7 59:5
  60:4 78:8 79:8 82:13
  82:15 99:2,12 101:12
**refers** 102:4
**refined** 107:22
**reflected** 94:21 95:6
**reflection** 94:18,19
**regard** 31:18
**regarding** 28:10,21
  30:25 35:12
**regards** 11:17 31:11
  42:16,20 58:6 69:11
  76:17 85:2
**region** 52:14
**Registered** 1:16
**regular** 48:24 49:2
**reject** 11:12
**related** 10:14 16:24
**relates** 93:4
**relation** 25:23
**relationship** 52:23,25
**relative** 59:4,9
**relatively** 25:19 81:25
**relevant** 91:18 93:11
**reliable** 8:10 15:15 51:4

51:4
**relied** 30:15 50:25 51:2
**remained** 40:18
**remember** 15:2 16:2
　24:2 48:7
**render** 13:15 16:8 17:25
　18:21 19:11 28:21,25
　29:8 95:15,19
**rendered** 16:19 87:15
**repetitive** 68:11
**rephrase** 89:5
**reply** 70:5
**report** 3:11 7:14,17,20
　10:18 16:8,19 18:22,23
　19:11,24 24:22 25:4,6
　26:13,16 27:22,23,24
　27:24 28:9 29:5,10
　30:5,7 32:12 34:15
　38:23 39:21 40:18,24
　41:2,2,11 42:13,18 43:5
　43:15 44:5,7 47:8,20
　48:10 49:16 50:11
　51:14 53:18 54:4,5,6,6
　56:3 57:8,14 58:4,8
　61:25 72:3,11,14,22
　73:5 81:9 82:4 86:24
　91:3 92:18,19,23 94:3
　95:10,22,23 96:12,18
　97:12 98:25 99:21
　100:17,23 102:15,20,21
　103:9,10 104:24 107:20
　107:21
**reported** 22:13 26:19,22
　72:5,24 73:21
**reporter** 1:17,17 5:18
　6:10 20:5 38:24 109:20
**reporting** 5:18 31:24
　62:5
**reports** 19:21,22 21:8
　25:8 28:13,16,18 30:4
　31:8 41:7 42:25 49:23
　49:23,24,24 50:13,14
　50:15 52:11 55:24
　91:23 92:12 93:22
　102:2 106:8,9
**represent** 5:22,24,25 6:4
**REPRESENTING** 2:2

2:13
**represents** 7:4 84:8
**reproduction** 109:18
**REQUEST** 4:7
**required** 13:15
**requirement** 82:24
**research** 10:14 13:21
　15:7,20 19:9 26:12
　31:6 53:5,17 56:9,23
　90:18,21 91:4 100:21
　103:13
**researching** 25:5
**reserved** 5:7
**resolve** 92:2
**respect** 19:21 28:2,6,19
　28:24 29:11 33:3 82:7
　90:23 95:15
**respondent** 17:20
**respondents** 17:17
**response** 95:11
**responsible** 46:13
**restate** 40:6
**restrained** 38:9
**result** 31:6 65:25 70:20
　93:19 98:4
**resulted** 16:15
**results** 31:5 52:10 56:14
　75:7,8 98:18
**resume** 11:18 77:8
**retain** 23:13
**return** 110:12
**review** 9:11 11:5
**reviewed** 31:7 39:4
　72:17 75:9 80:2 83:9
　99:9 103:12
**reviewing** 25:7 28:13
　31:7 103:11
**re-create** 53:14
**Richard** 2:8,11 5:25
**rick@rickseymourlaw...**
　2:11
**right** 6:24 7:24 9:10 21:7
　24:15 27:10 32:19 33:7
　41:25 42:3 48:7 49:19
　53:19 54:12 57:4 58:25
　59:17 60:9 63:16 69:4
　69:7 75:18,22 79:13

81:5 85:15 93:16 99:13
　100:16 101:3 104:8
　108:5
**right-hand** 73:8 78:17
　79:18 88:18
**rising** 50:19
**risks** 82:7
**Rita** 19:9
**Robbins** 2:18 6:5
**Romantica** 20:20
**roof** 35:23
**room** 12:21
**rotating** 103:2
**rough** 14:5
**roughly** 44:3 62:12
**RPR** 109:12
**rule** 55:18 71:24 72:11
　93:25
**ruled** 59:12
**run** 17:8 91:23

―――――――
**S**
**S** 2:1,17 3:8
**sake** 101:14,15
**satellite** 49:23 92:12
**satisfy** 18:13
**Saturday** 83:5
**saw** 22:19 30:3,7 31:24
　33:12,17 34:3,4,14 35:6
　35:24 36:9 92:22
　102:22
**saying** 37:9 45:21,24
　48:22 57:17 73:14,20
　76:24 90:4,9 93:20
　97:22,24 99:6,10,16,19
　99:25 100:7,9 103:16
**says** 59:8 104:21
**scale** 45:9 73:11 90:17
**scenario** 86:13,14
**scheme** 96:22
**school** 83:3
**science** 30:16 31:9 50:11
　51:2 101:25 102:10,24
**scientific** 32:13 42:24
　50:12 51:22 62:18
　103:10
**scientifically** 30:16 31:20

**scientist** 102:12,23
**scope** 13:4 15:18 44:17
　103:8
**sea** 9:18 91:5,20
**Sealand** 20:19
**sealing** 5:4
**SeaWeather** 3:10 14:2
　83:20
**second** 17:11 18:10
　28:12 40:25 43:25
　77:15 96:2 99:8 105:10
　105:12 107:21
**Section** 1:7 55:21,24
**see** 7:22 26:13,20 34:7
　40:11 43:15 44:13 45:6
　54:17,25 56:3,5,6,16,20
　56:22 62:3,8 65:24
　70:2,6,11,13,15 71:10
　71:22 72:3,5,10 73:2
　74:12 77:20 78:3,5,10
　78:18 81:3,4,9,10 87:14
　87:16 88:8,12,13 89:15
　89:21 91:13 94:11 95:6
　95:25 102:20 103:11,25
　104:2,5,9,11,13 105:16
　105:19,21,22
**seen** 26:22 30:2 31:16
　69:19 76:13 89:25
　90:19
**selected** 10:24
**seminars** 83:15
**semi-circle** 44:23
**sense** 37:19,20 44:17
**sent** 71:5
**sentence** 44:10 54:14
　55:4 59:3,6,8 77:16
　79:9,11 101:8 102:4
**September** 21:20 23:9,22
**serve** 12:18
**served** 11:21 13:12
**service** 11:23 52:18 67:5
　101:18 105:7
**services** 22:5 82:6,20
　83:24
**set** 71:6 96:22 107:22
**sets** 54:4
**settled** 18:22

**seven** 21:5
**Seymour** 2:8,11 5:25,25
**shed** 27:7
**sheet** 110:5,7,10,13
  112:11
**Shelonko** 2:21 6:7
**shift** 21:13
**shifted** 39:24 40:20
**shifting** 91:8
**ship** 17:8,10,12 18:20
  83:7,8,13 84:3
**shipboard** 84:10
**shipping** 10:9
**ships** 91:5,20
**Shirley** 21:23 23:10,18
**shore** 83:14
**Shorthand** 1:17
**show** 11:18 40:8 56:25
  98:18 106:9
**showing** 94:4
**shown** 46:4 47:19 56:14
  87:21 96:16
**shows** 99:17
**side** 33:9,25 34:2,9 36:10
  36:12,12 38:12 42:17
  42:19 44:22 45:8,16
  62:10 63:13 64:9,11
  65:16 72:7 73:8 75:13
  75:24 76:6,6,15,19,19
  77:5,6 95:7,8 97:25
  98:2 100:12,13
**sign** 23:16 108:8 110:7
**SIGNATURE** 112:14
**significance** 43:3,6 44:15
  57:11,15,16 66:17 73:4
**significant** 9:13 10:19
  27:25
**signify** 104:14 105:11
**signing** 110:9
**signs** 102:14
**silo** 76:9
**simply** 12:13 41:12
**sir** 6:18 7:7,23 8:18,22
  9:9,16 10:21 12:23
  13:3,13 19:6 28:17
  29:6 30:22 33:17 35:10
  37:22 39:9 40:12 43:2

44:9,14 45:20 46:16
  47:5 50:7 52:5 53:21
  54:18,21 55:2,5,11 57:5
  58:11 59:7,16 60:5,16
  60:18,22,25 62:11
  63:17 64:19 65:2 66:2
  66:11 73:3 76:8,10,13
  77:13,21 78:11 80:17
  81:13 82:12 84:2 85:11
  87:25 89:9,13 90:24
  92:4,16 93:5,9,20 95:13
  95:24 96:4 99:13 101:2
  101:7,17 107:5,10,13
**sit** 26:6
**sites** 51:3,3,7
**situation** 13:8 17:6,7
  59:13 61:7 66:6 67:15
  67:16 71:3,20 79:14
  92:15 94:6
**situations** 17:15 82:17
  85:13 86:7,16
**six** 8:5 81:11
**slightly** 78:7,20 94:23
**slip-type** 38:11
**Sly** 20:18
**SMA** 12:17
**small** 90:17
**society** 11:5,22 12:7,10
  12:13,15
**software** 96:24
**solely** 105:3
**solid** 24:10,12 25:9
**solve** 90:16
**somebody** 90:21
**sorry** 8:10 53:22 56:12
  65:10 78:13 86:23
  96:10 97:7 98:15
  103:25
**sort** 12:21 46:18 52:24
  59:13 65:7,24 70:7
  74:16 75:13 81:6 96:7
**sound** 104:18
**sounds** 104:18
**sources** 42:25 50:6
**south** 2:4 15:21,25 35:25
  75:4 78:7,20 79:16
  80:6,22 81:9 87:17

94:10
**southeast** 94:12
**southern** 3:12 97:16,17
**southwest** 68:24 76:23
**speak** 38:11,18
**speaking** 70:6
**Spearin** 20:20
**specific** 26:15 27:12
  36:18 84:21
**specifically** 7:16 28:7
  32:18 35:13 36:20
  59:17 72:23 82:14
**specifics** 35:20
**specify** 32:6
**speed** 13:8,9,11 18:2,8
  18:10,20 31:19 42:16
  42:19 43:4 44:4 46:23
  49:2,24 54:15,20 55:24
  56:4,17,22 58:6 59:15
  61:5 70:24 89:20 96:2
  103:3
**speeds** 25:7 42:15 45:7
  55:19 56:8,24,25 57:12
  60:11,12 71:25 72:3
**spell** 6:19
**spent** 48:10
**Spirtis** 20:20
**spread** 71:18 74:10
**spreadsheet** 24:17 96:22
**spurts** 24:8
**standing** 94:24
**standpoint** 105:16
**STANWOOD** 1:8
**Star** 8:4
**start** 32:17 36:19 44:5
  71:16
**started** 21:17 39:24
  54:13
**starting** 49:16
**starts** 78:2
**state** 6:19 8:19 21:9
  62:22 69:18 98:25
  110:4
**statement** 11:10 28:10
  101:23
**States** 1:1 5:14 10:10
  83:21

**stating** 98:8
**station** 49:24
**stations** 52:12 53:8 91:24
  102:11
**status** 46:10
**stayed** 39:22
**steps** 78:21
**stipulated** 5:3
**stopped** 51:16 62:5
  101:11
**storm** 15:16 16:12,16
  31:10 44:18,23 49:21
  72:19 92:25 93:6,10
  103:4
**storms** 82:16,17,17
**straight** 97:3,6
**stratospheric** 60:9
**Street** 2:4
**strength** 46:6 88:2 90:5
**strengths** 89:11
**Strike** 98:15
**strong** 46:2,8
**structure** 38:20 60:11
  63:25 65:4
**structures** 16:5 60:24
  70:14 76:7,9,15,18,21
  77:8
**students** 84:13 85:7,23
  86:5,9,11
**studies** 75:7 83:12 98:11
  103:10,19
**study** 49:17 51:5 52:15
  53:11 58:24 75:9 86:2
  101:24 102:10 107:3,11
**studying** 69:6
**subject** 11:7 35:17 55:20
  84:21 110:9
**Subscribed** 112:17
**substance** 112:10
**succession** 43:23
**sufficiently** 100:11
**suggest** 91:7
**suing** 17:12
**Suite** 2:9
**summaries** 100:18
**summary** 44:8 54:13
  59:2 77:15 79:10 97:8

100:17
**superseded** 54:5
**supervision** 109:20
**supply** 51:20
**SUPPORT** 4:1
**supports** 78:25
**sure** 30:15 40:9 58:23
68:9 88:17 102:14
**surface** 49:22 66:14,15
70:3,7 71:18 94:20
**surge** 93:2,6,10
**surround** 47:23
**surrounded** 38:14
**surrounding** 38:12 47:19
49:11,21 103:22,23
**susceptible** 36:22,23
37:4,15,16
**sustained** 54:19,24 55:19
56:3,8,22 57:12,18
59:13,15,22 89:20
**swear** 6:11
**swirl** 66:16,18,20 67:2,5
67:13
**swirls** 67:20 69:9
**sworn** 6:13 109:4 112:17
**syllabi** 84:20
**syllabuses** 84:20
**synergistic** 52:25
**system** 32:13 77:19
86:19

**T**
**T** 2:8,11 3:8 111:3
**table** 43:15 55:25 56:6
77:24 79:19 86:24 87:2
88:19 95:21,22 96:16
99:2,3,10,13,16,17,17
102:4
**Tables** 46:4
**take** 7:5 10:17 17:6
22:12,18 29:20,21 39:3
41:16 55:21 61:23 62:2
77:11 78:21 79:23
80:15 82:24 91:25
94:16 97:17 101:3
103:17,18
**taken** 1:15 5:11,16 41:20

48:23 50:23 61:22
81:20 87:14 91:19 92:4
106:22
**takes** 78:5 79:15
**talk** 8:23 9:3 44:19 49:17
52:15 58:18 60:3,6
69:20 72:18 86:20
**talked** 42:13 58:15,16,17
98:5 101:5
**talking** 32:7 41:12 54:13
55:3 59:15 60:7,12
62:24,25 63:3 67:10
68:6 69:9 74:18 75:3
79:9 80:4
**tanker** 83:16
**tape** 41:22 81:15,18,22
**Tarbucks** 85:9
**taught** 10:10 83:10,13
86:9
**teach** 83:19 84:7,18
85:21
**teaching** 10:8,9,11,12
**Technology** 83:11
**telephone** 29:14
**tell** 10:24 13:19 21:17
35:20 44:15 93:17
**telling** 29:17
**tells** 80:18,20
**tend** 59:25
**tends** 94:24
**term** 39:10 47:7 52:16
66:17 69:4 88:16,17
92:25 99:23 102:2
**terminal** 38:18
**terms** 45:2 51:22 84:16
97:19
**Terry** 35:9
**test** 83:5 86:3
**testified** 6:14 39:6 62:22
73:23
**testifies** 35:24
**testify** 63:6
**testimony** 7:8 8:2,20
12:20 13:6,21 20:14,17
20:24 21:8,11 29:25
30:20 35:14,17 43:11
109:6

**textbook** 85:8,23
**textbooks** 85:6
**Thank** 6:25 21:13 79:25
**thanks** 23:19 106:17
**thermometer** 96:8
**thing** 26:9 40:24,25 41:5
**things** 8:19 18:4 38:13
44:7 62:8 69:21 84:9
85:14 101:5 102:8
**think** 8:7,12,17 11:16,17
11:18 22:11,22,22 25:8
25:14,21 26:7,9,23 30:8
31:24 32:3,5,6,19 40:21
47:15 57:7 63:5 66:21
68:15 72:15 74:14
75:25 76:11,12 79:14
79:20 89:5 93:16 98:20
100:22 102:21 103:16
106:11
**third** 41:5 105:10,13
**thirty** 110:13
**thought** 31:16
**three** 14:10 24:9,9 43:25
44:3 48:11,12,13 60:10
60:10 78:16 103:25
**three-second** 43:14,19
43:23 44:2 59:19 65:14
68:6 87:3 88:3,9,12,22
89:3,17,19,22 90:5
**thunderstorm** 71:14,15
71:16 74:5,10 103:20
105:17,20,21,23 106:5
**thunderstorms** 82:17
86:21
**tied** 38:8
**time** 5:8 9:5,5 18:14,14
21:23 22:17,21 23:6,14
23:21 24:2,16,18,25
25:3 26:4 28:5 29:8,9
33:3,23 34:19 39:24
40:19 49:4 51:12 52:2
54:17,22 59:4,5,6 62:4
62:16 64:18 74:18
77:16,22 78:18 79:14
79:17,19 80:16 81:3
87:7,16,19 88:9,23
90:12 91:10 92:14 94:7

95:14 97:22,24 98:14
98:16,21 99:3 100:20
101:11
**times** 7:11,13 25:22 44:3
83:6 89:19
**timing** 97:15,18
**titled** 55:24
**today** 5:18 6:5 7:16 8:24
10:22 11:14 21:15 26:6
43:11 71:14 97:9 99:5
100:24
**told** 22:2,9 30:22,23
106:4
**top** 57:8 63:2,4 87:22
**topic** 84:15
**topography** 60:21,21,23
61:2,4
**tor** 73:7 86:22
**tornadoes** 72:24 73:9,12
73:15,21
**total** 24:6 108:3,4
**touch** 73:9
**track** 27:4 45:16 56:20
87:15
**train** 25:19,25 84:11
**training** 82:7,19,22
83:23
**trainings** 83:17
**transcript** 9:3,4,11,13
109:17 110:14,15
**transcription** 112:7
**translates** 57:3
**travel** 25:18 77:11
**traversed** 97:11
**tress** 19:25
**trial** 5:8 9:14 20:14,17
20:24 26:4 29:8 95:14
100:20,22,23
**Trip** 25:18
**tropical** 15:15 16:12,15
16:16 53:7 82:17 86:19
**true** 14:6 32:2 109:5
**try** 9:9 27:3 50:8 53:14
55:13
**trying** 24:2 45:21,23
47:16 93:17
**tugboat** 83:16

**turbulence** 65:12 70:3,4
70:7,10,15,17,20,25
71:5,6,10 72:13 73:23
73:23 75:16,21,25 76:3
**turbulent** 66:21,22,23
69:11 72:14
**turn** 44:5,7 48:2 54:12
61:6,8,9,10,14 71:18
100:16
**turned** 76:20 100:11
**turning** 98:18 99:6
**turns** 66:15
**two** 25:9 54:4 57:22
70:25 72:15 76:12
78:16 103:24
**type** 27:12 38:20 43:20
51:18 58:12 67:10,24
70:10 71:9,20 77:4
82:19 94:20 105:6
**types** 13:12 38:13 69:11
69:18,20 72:13 83:17
84:16
**typically** 19:23

**U**

**ultimately** 73:25
**unbiased** 101:25
**undergraduate** 85:12
**underneath** 104:2,4
**understand** 7:5 8:20,21
9:15 19:16 33:5,16
34:21 40:4 46:25 97:15
107:8
**understanding** 8:17
33:10 35:16,19 39:17
54:9 94:5 96:5 100:2
**understood** 17:11
**undertakings** 55:17
**unexpected** 82:8,14
**unfair** 17:24 32:20 40:21
**unfound** 102:17
**Union** 8:4 15:16 19:3
20:21
**unique** 83:7
**United** 1:1 5:14 10:10
83:21
**unknown** 82:8,13

**unmoored** 35:2
**unpredictable** 60:15
**unusual** 105:15
**updraft** 65:7
**upstream** 95:3
**upwind** 77:5
**USA** 1:9,9
**use** 22:5 39:10 51:9 67:3
69:4 76:2,3 85:8,14
86:4 88:17 96:18
**usually** 17:18 18:2,16
21:3 67:9 73:8 74:12
86:6,20

**V**

**v** 1:6,7,7,8,8,9,9,10 8:10
15:14 16:11 20:20,20
20:21
**vacuum** 74:16,22 75:13
75:15,17,20,25 76:2
**vague** 32:6 42:10 73:19
88:24 89:6 91:11
**value** 43:7 47:12 48:21
56:5 89:17
**values** 43:18 46:4,5,7
47:10,13 48:19 49:10
55:25 56:5,9 62:2
88:18,20 92:4 97:6,19
103:14 107:22 108:2
**various** 31:7 84:5 95:25
**vectors** 70:25
**verdict** 19:17
**verifiable** 42:25
**verifying** 92:10
**Veritext** 5:18,20
**versus** 17:2 92:11
**vessel** 13:11 18:13 34:8
70:21
**vessels** 16:4,5,5 33:4
34:11,19 35:3 83:25
84:14
**vessel's** 13:9
**video** 5:11 41:23 81:18
**videoed** 9:2
**videographer** 2:25 5:10
5:19 6:10 41:18,22
81:14,17,22 106:20,24

108:9
**Videotaped** 1:15
**view** 27:21
**Villavaso** 32:23 33:11
34:2,7 35:6
**visibility** 104:22 105:9
**visual** 66:20
**voyage** 13:10
**vs** 5:13 19:3
**V.K** 2:18

**W**

**wait** 24:23
**waived** 5:5
**wall** 33:13 34:9 35:25
62:9,19 63:2,10,12,19
63:20 64:14 65:8,17,17
65:21,25 70:5 74:25
75:12,14
**want** 20:12 21:13 23:17
23:18 42:4 78:2 88:17
89:6 97:9 101:6 106:12
106:18
**wanted** 22:4,5 30:15
**wants** 22:12
**Ward** 22:25 23:2
**warehouse** 16:14,17
**Washington** 1:16 2:10
2:15 5:17 25:19
**watch** 83:8
**water** 16:15,15 36:21,22
36:23 37:2,11,12 38:5
38:10 45:8 50:19 93:14
**waterway** 38:21
**wave** 37:21,22 92:6,7,8
92:11,13,14,17,20,21
92:22 93:25 94:4,9,17
94:19,24,25
**waves** 37:3 38:5 52:20
54:10 58:16,22 92:16
94:5,6,14,20,20,23 95:2
95:6,16 102:7
**way** 16:22 19:20 25:11
32:17 39:12,16 40:2
60:20 61:2 64:20 69:9
72:8 76:16 79:3 86:23
88:15,21 89:16 90:4,9

90:11 95:7 103:16
**weak** 71:19
**weather** 9:18 10:14 13:9
15:7 17:19 18:21 26:12
26:15 27:23 34:4 73:6
82:5,6,8,14 83:10
101:18 104:22 105:6,7
105:12,13
**Weber** 1:10
**website** 82:4,5,11
**Wednesday** 1:13
**week** 22:14 82:21 83:9
**weekend** 22:14
**weekends** 24:13
**weeks** 24:9,9,11 25:9
**went** 13:25 19:17 25:3
53:9 78:22 83:7
**west** 34:12 35:23 39:25
40:20 57:20 58:14 59:9
63:15,18 65:20 75:12
77:11 78:7,20,23 79:22
80:6,12 81:11 93:12,18
93:21 97:11,21,23 98:3
98:14,17,21 99:23,24
100:4
**westerly** 42:8 59:3 76:21
76:25 77:12 81:12 99:4
100:6 101:9
**western** 33:25 36:10,12
38:12 42:17,19 59:12
72:7 74:24 76:6,15
95:7 97:25 100:12
**WestLaw** 12:5
**we'll** 9:5 20:11 36:19
38:22 44:5 64:13 67:3
81:15 106:15
**we're** 7:4 21:15 41:18
49:9 51:6 55:3 59:2
60:11 62:6,6,24,25 63:3
64:13 68:6 75:3 79:8,9
81:17 85:23 89:7
106:11,20 107:2
**we've** 30:24 69:9 101:4
**wharf** 74:24
**whips** 75:16
**WILKINSON** 1:10
**William** 32:23

**willing** 93:17,17
**wind** 16:6 25:7 26:19
  27:7,15,17,23,25 28:2
  28:21 31:18 33:22,24
  34:10 36:11,15,24,24
  37:4,6,8,12,16,18 38:4
  40:19,25 41:3,9,13 42:9
  42:13,15,16,19,22 43:4
  44:4 45:5,7 46:7,18,23
  48:20,22,25 49:11,21
  49:24 53:8 54:15,19
  55:19,24 56:17,22,24
  56:25 57:10,12 58:3,5
  58:10,24 59:3,8,15
  60:11,12,14,19 61:3,10
  61:14,15,19 62:7 63:14
  63:21,23 64:4,6,24 65:3
  65:7,17,25 66:6,7,13,21
  67:6,7,12,22 68:2,13
  69:3,7,14 70:7,12,13,18
  71:2,4,22,25 72:3,9,15
  72:19 73:24 74:9,14
  75:11,16 76:16,17,20
  76:22,25 77:5,6,7,8,9
  77:12 78:3,5 79:14,15
  79:16,18 80:5,8,20 81:7
  81:12 84:23 86:15
  89:20 91:7 92:19,20
  93:13,19,23 94:5,8,9,13
  94:14 97:12,15,18,20
  97:23 98:5,8,12,19,22
  99:4,7,18,22 100:3,6,8
  100:11,14 102:7 103:3
  106:7,9
**winds** 28:10 39:24 43:17
  44:12,20,20,21 45:6,15
  45:15,22,25 46:10,12
  50:17 52:19 54:10,24
  57:18 59:21 60:4,6,8,12
  61:9,10 62:6 67:23
  68:20,20 70:22 71:8,11
  77:18 78:19 84:16
  88:12 101:10 103:2
**wind-related** 75:24
**witness** 3:2 4:2 6:11
  32:11 33:16 34:14 36:7
  39:4 40:6,23 41:17

42:12 49:9 50:14 55:14
  62:18 63:6 65:12 67:9
  68:16 72:17,18 73:20
  78:13 80:2,4 89:2
  91:13 95:15 99:9,10
  102:19 108:8,11 109:4
  109:6 110:2
**witnesses** 12:24 13:2,2
**wondering** 91:2
**word** 65:6 69:5 75:20,21
  75:23 76:2,3,3
**words** 85:22
**work** 10:6,14,20 12:6,8
  13:14 14:12,15,18,22
  15:5,18 16:3,10 19:7
  20:11 21:14,18 23:15
  24:8,10,10,13,21 25:10
  25:12,23 26:4,10 27:12
  29:16,24 30:18 42:24
  53:5 103:12
**worked** 15:24 23:23 83:8
**working** 17:10,13 24:13
**world's** 53:6
**worth** 25:10
**wouldn't** 39:9 76:2,24
  100:5
**writing** 25:5,10
**written** 29:15
**wrong** 31:22,23 32:8
  75:20
**WW** 104:3,4 105:4,10

**X**

**X** 1:11 3:1,8

**Y**

**Yeah** 14:25 53:24 63:11
  68:18 104:17
**years** 9:22,22 11:15 14:2
  14:3,3,7,9,10 21:12
**York** 1:16 2:15 5:19 9:20
  12:15 26:2 73:21

**Z**

**zero** 74:9

**$**

**$3,000** 107:25

**$500** 108:2

**0**

**015** 98:19
**05** 23:22
**05-4182** 1:5 5:14
**05-5531** 1:6
**05-5724** 1:7
**06-5342** 1:7
**06-6299** 1:8
**06-7516** 1:8
**0653** 101:10
**07-3500** 1:9
**07-5178** 1:9
**0700** 87:11,16
**0730** 54:16 87:6 89:7
**0742** 98:20
**0745** 54:16 89:7
**08-4459** 1:10
**0815** 80:15
**0854** 87:23
**090** 80:11

**1**

**1** 3:10,13 20:7,10 25:4
  29:5 44:7 45:4 59:3
  77:14 99:21 101:5
**1A** 56:15 57:9
**1,000** 64:11
**1,500** 64:11
**1-A** 45:4
**1.15** 57:5
**1.5** 44:3
**1.53** 43:18 89:19
**1:14** 106:22
**1:19** 106:23
**1:20** 108:13
**10** 10:1 11:15 60:12,13
  70:8 72:23 81:10 104:9
  104:14
**10:15** 1:16 99:24 100:4
**10:15:09** 5:12
**10:30** 99:24 100:4
**100** 11:16 28:10 41:3
  42:16,18,19 43:4,12
  45:6 54:24 55:19 57:13
  57:14,18 58:10 100:1

**101** 101:1
**1015** 59:10
**102** 102:1
**103** 103:1
**1030** 59:10
**104** 104:1
**105** 105:1
**106** 106:1
**107** 107:1
**108** 108:1
**109** 109:1
**11** 11:1
**11:00** 77:22 78:5,19,23
  78:25 79:4,19
**11:06** 41:20
**11:06:10** 41:19
**11:18** 41:21
**110** 110:1
**1100** 77:17 78:10,16 81:4
**111** 111:1
**112** 112:1
**1150** 2:9
**12** 12:1 62:13,16 63:19
  65:4
**12-foot** 63:6
**12:00** 74:21
**12:16** 81:20
**12:35** 81:21,23
**13** 13:1 62:14,16 63:19
**13-foot** 65:4
**13:14:45** 106:21
**13:19:29** 106:24
**13:20:59** 108:10
**14** 14:1
**15** 3:12 7:13 9:22,22 14:2
  15:1 91:9
**15,000** 25:15
**15-minute** 89:15
**16** 16:1 87:13
**17** 17:1 55:22 87:21
**18** 18:1 56:6
**180** 61:14 74:13
**19** 19:1 45:3 56:12,13

**2**

**2** 1:7 2:1 3:12 39:2,4
  41:22 42:2 44:11 79:24

81:18 87:13
**2,000** 64:11
**20** 3:10 7:21 20:1 45:3
   56:14
**20,000** 25:16
**20001** 2:15
**2002** 7:22
**20036-4129** 2:10
**2004** 14:10
**2005** 21:20 33:12 35:22
   54:5 74:16 107:20,21
**2006** 22:19,20 54:6
**2009** 1:13 5:12 7:22
**202** 2:10,16
**21** 21:1 55:13
**213** 2:5
**22** 22:1 38:23 39:8 47:24
   48:5 55:13,14,16 89:19
**23** 23:1 78:2
**24** 24:1 78:3,12,13 80:16
**25** 25:1 78:9
**26** 26:1
**262** 78:6
**265** 78:6
**268** 78:6
**27** 27:1 86:25 88:7
**270** 79:17 80:11
**276** 81:5,7,10
**276.38** 81:6
**28** 28:1 87:5 88:8 89:8
**29** 29:1 33:12 35:22
   51:13 54:17 73:2,15
   74:15 77:18
**29th** 41:14 62:4 104:25
**29.95** 48:13

---

**3**

**3** 3:1 54:14 55:14,16
   81:22
**3:00** 99:4,18
**30** 30:1 45:17,19 110:14
**30-minute** 89:23 91:10
**30.0** 48:13
**31** 31:1
**32** 32:1 94:3
**33** 33:1 95:21 98:25

**33rd** 2:4
**34** 34:1 96:16 102:4
   103:24
**346-4444** 2:16
**35** 35:1 100:16
**358.63** 80:21
**36** 10:18 36:1
**360** 80:11
**37** 37:1
**38** 3:12 38:1
**39** 39:1

---

**4**

**4** 4:1 51:9 55:25
**4.2** 51:10
**4:00** 36:2 41:8 93:21,23
**40** 7:16,20 15:13,14 19:3
   19:19,25 20:13 40:1
**40-hour** 24:11
**40-plus** 11:18
**41** 41:1
**42** 42:1
**43** 43:1
**44** 44:1 104:13,21 105:8
**444** 2:4
**45** 3:11 45:1
**45-minute** 89:24
**46** 46:1
**47** 47:1
**4727** 34:18 35:3 46:13
**48** 48:1
**49** 49:1

---

**5**

**5** 1:13 5:1,11 55:21,24
**5:00** 24:12 41:8 93:23
**50** 50:1
**500** 66:4,5
**51** 51:1
**52** 52:1
**53** 53:1
**54** 54:1
**55** 55:1
**56** 56:1
**57** 57:1
**58** 58:1
**59** 59:1

**596-6000** 2:5

---

**6**

**6** 3:4 6:1 43:15 49:17
   77:24 79:19 88:19
**6B** 46:4
**6C** 43:15 86:24 87:2
**6:00** 36:2
**6:53** 51:12
**60** 45:17,19 60:1
**61** 61:1
**62** 62:1
**63** 63:1
**64** 46:9 64:1
**65** 65:1 103:25 104:2,5,6
**66** 66:1
**67** 67:1
**68** 56:7 68:1
**69** 69:1

---

**7**

**7** 7:1 101:6
**7:30** 90:6 100:10
**7:42** 59:5 99:7
**7:45** 90:6 100:10
**70** 56:18 57:2 67:23 70:1
**71** 71:1
**72** 72:1
**73** 73:1
**74** 74:1
**75** 13:23 14:4 16:23
   54:16 56:19 75:1
**76** 76:1
**77** 77:1
**78** 78:1
**79** 54:16 79:1

---

**8**

**8** 8:1 72:18 96:16 101:4,6
   102:4
**8:15** 80:16
**80** 13:23 14:4 16:23
   56:20 57:2,6,9 67:24
   80:1
**81** 81:1
**82** 82:1
**83** 83:1
**84** 56:6 84:1

**85** 85:1
**86** 86:1
**862-4320** 2:10
**87** 87:1
**88** 63:2 88:1
**89** 89:1

---

**9**

**9** 9:1 56:10,12
**9:00** 24:12 74:21 99:4,18
**90** 87:9,24 89:23 90:1
**90-minute** 89:24
**900** 2:9
**90071** 2:5
**901** 1:16 2:15
**91** 91:1
**92** 57:6,9 92:1
**93** 93:1
**94** 94:1
**94.98** 89:12
**95** 95:1
**95.82** 87:4 89:11 90:5
**9504** 1:17
**96** 96:1
**97** 97:1
**98** 98:1
**99** 99:1