# EXHIBIT 32

Deposition of Arthur Murph

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION

                                         * NO. 05-4182

PERTAINS TO: BARGES            * Consolidated

                                         * SECTION "K(2)"

Boutte v. Lafarge      05-5531 *

Mumford v. Ingram      05-5724 * JUDGE DUVAL

Lagarde v. Lafarge     06-5342 *

Perry v. Ingram        06-6299 * MAG. WILKINSON

Benoit v. Lafarge      06-7516 *

Parfait Family v. USA 07-3500 *

Lafarge v. USA        07-5178 *

  *  *  *  *  *  *  *  *  *  *  *



(V O L U M E  I)

Deposition of ARTHUR LEE MURPH, JR.,

given at the Law Offices of Bruno & Bruno, 855

Baronne St., New Orleans, LA 70113, on December

17th, 2007.


REPORTED BY:

JOSEPH A. FAIRBANKS, JR., CCR, RPR

CERTIFIED COURT REPORTER #75005

Page 2

1  APPEARANCES:
2  REPRESENTING THE PLAINTIFFS:
3      BRUNO & BRUNO
4      (BY:  JOSEPH M. BRUNO, ESQUIRE)
5      855 Baronne Street
6      New Orleans, Louisiana 70113
7      504-525-1335
8  - and -
9      WIEDEMANN & WIEDEMANN
10     (BY:  LAWRENCE D. WIEDEMANN, ESQUIRE)
11     821 Baronne Street
12     New Orleans, Louisiana 70113
13     504-581-6180
14  - and -
15     BRIAN A. GILBERT, P.L.C.
16     (BY:  BRIAN A. GILBERT, ESQUIRE)
17     821 Baronne Street
18     New Orleans, Louisiana 70113
19     504-885-7700
20  - and -
21     LAW OFFICE OF PATRICK J. SANDERS
22     (BY:  PATRICK J. SANDERS, ESQUIRE)
23     3123 Ridgelake Drive, Suite B
24     Metairie, Louisiana 70002
25     504-834-0646

Page 3

1  REPRESENTING THE AMERICAN CLUB:
2      MONTGOMERY, BARNETT, BROWN, READ,
3      HAMMOND & MINTZ, L.L.P.
4      (BY:  PHILIP S. BROOKS, JR., ESQUIRE)
5      3200 Energy Centre
6      1100 Poydras Street
7      New Orleans, Louisiana 70163
8      504-585-3200
9
10  REPRESENTING WASHINGTON GROUP INTERNATIONAL
11     STONE PIGMAN WALTHER WITTMANN, L.L.C.
12     (BY:  CARMELITE M. BERTAUT, ESQUIRE)
13     (BY:  HEATHER LONIAN, ESQUIRE)
14     546 Carondelet Street
15     New Orleans, Louisiana 70130
16     504-581-3200
17
18  REPRESENTING LAFARGE NORTH AMERICA:
19     CHAFFE, MCCALL, L.L.P.
20     (BY:  DEREK A. WALKER, ESQUIRE)
21     (BY:  ROBERT B. FISHER, JR., ESQUIRE)
22     2300 Energy Centre
23     1100 Poydras Street
24     New Orleans, Louisiana 70163-2300
25     504-585-7000

Page 4

1  - and -
2      GOODWIN PROCTOR, L.L.P.
3      (BY:  MARK S. RAFFMAN, ESQUIRE)
4      (BY:  JOHN D. ALDOCK, ESQUIRE)
5      901 New York Avenue, NW
6      Washington, D.C. 20001
7      202-346-4000
8
9  REPRESENTING NEW YORK MARINE & GENERAL
10  INSURANCE COMPANY:
11     SUTTERFIELD & WEBB
12     (BY:  DANIEL A. WEBB, ESQUIRE)
13     650 Poydras Street, Suite 2715
14     New Orleans, Louisiana 70130
15     504-598-2715
16
17  REPRESENTING ZITO:
18     MOULEDOUX, BLAND, LEGRAND & BRACKETT,
19     L.L.C.
20     (BY:  WILLIAM C. EMORY, ESQUIRE)
21     701 Poydras Street, Suite 4250
22     New Orleans, Louisiana 70130
23     504-595-3000
24
25

Page 5

1  REPRESENTING ORLEANS LEVEE DISTRICT:
2      MCCRANIE, SISTRUNK, ANZELMO, HARDY,
3      MAXWELL & MCDANIEL
4      (BY:  ANDRE LAGARDE, ESQUIRE)
5      3445 N. Causeway Boulevard, Suite 800
6      Metairie, Louisiana 70002
7      504-831-0946
8
9  REPRESENTING JEFFERSON PARISH:
10     BURGLASS & TANKERSLEY
11     (BY:  MONICA M. WALDRON-BURGLASS,
12     ESQUIRE)
13     5213 Airline Drive
14     Metairie, Louisiana 70001
15     504-836-2220
16
17  REPRESENTING PORT OF NEW ORLEANS:
18     DAIGLE, FISSE & KESSENICH, PLC
19     (BY:  KIRK N. AURANDT, ESQUIRE)
20     (VIA TELECONFERENCING)
21     227 Highway 21, Madisonville,
22     Louisiana 70447
23     985-871-0800
24
25

Page 6

1  ALSO PRESENT:
2      DON HAYCRAFT, ESQ.
3      AARON RIVES, ESQ.
4      PETER KEELEY
5      JOHN SHELONKO
6
7  VIDEOGRAPHER:
8      GILLEY DELORIMIER (DEPO-VUE)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1          S T I P U L A T I O N
2      IT IS STIPULATED AND AGREED by and
3  among counsel for the parties hereto that the
4  deposition of the aforementioned witness may be
5  taken for all purposes permitted within the
6  Federal Rules of Civil Procedure, in accordance
7  with law, pursuant to notice;
8      That all formalities, save reading
9  and signing of the original transcript by the
10 deponent, are hereby specifically waived;
11     That all objections, save those as to
12 the form of the question and the responsiveness
13 of the answer, are reserved until such time as
14 this deposition, or any part thereof, is used
15 or sought to be used in evidence.
16
17
18              *  *  *
19
20
21
22     JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23 Certified Court Reporter in and for the State
24 of Louisiana, officiated in administering the
25 oath to the witness.

Page 7

1      E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:              PAGE
4
5  MR. WIEDEMANN ............................  11
6  MS. BERTAUT  .............................  87
7  MR. WALKER  .............................  121
8  MR. BRUNO  ..............................  138
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1      MR. GILBERT:
2          Brian Gilbert, Lawrence Wiedemann
3      and Patrick Sanders, barge plaintiffs
4      subgroup litigation committee
5      representing the plaintiffs in this
6      action.
7      MR. BRUNO:
8          Joseph Bruno, plaintiffs liaison
9      counsel.
10     MR. BROOKS:
11         Philip Brooks representing The
12     American club.
13     MS. BERTAUT:
14         Carmelite Bertaut for Washington
15     Group.
16     MR. LAGARDE:
17         Andre Lagarde for the Orleans
18     Levee District.
19     MR. EMORY:
20         Bill Emory here for Zito.
21     MS. WALDRON:
22         Monica Waldron for Jefferson
23     Parish.
24     MS. LONIAN:
25         Heather Lonian for Washington

Page 10

1    Group.  Aaron Rives, Emmett, Cobb,
2    Waits & Henning.  I'm observing,
3    involved in an affiliated action.
4
5        MR. WEBB:
6        Dan Webb, New York Marine.
7        MR. RAFFMAN:
8        Mark Raffman, Goodwin Proctor,
9    Lafarge North America.
10       MR. WALKER:
11       Derek Walker and Rob Fisher,
12   Chaffe, McCall for Lafarge North
13   America.
14       MR. HAYCRAFT:
15       Also appearing Don Haycraft, in
16       another action Ingram Barge Company.
17       ARTHUR LEE MURPH, JR.
18   105 Berkley Drive, New Orleans, Louisiana
19   70131, a witness named in the above
20   stipulation, having been first duly sworn, was
21   examined and testified on his oath as follows:
22       MR. WIEDEMANN:
23       Anybody object to the usual
24   stipulation?
25       MR. GILBERT:

Page 11

1        That's fine.
2        MR. WIEDEMANN:
3        Hearing no objection, the
4    reporter has so recorded.
5    EXAMINATION BY MR. WIEDEMANN:
6    Q.  Would state your full name please,
7    sir?
8    A.  Arthur --
9        MR. WALKER:
10       Before we start, Joe, is there
11   something in the case management order
12   we should show about, any usual
13   stipulation or something different
14   than the usual stipulation?
15       MR. BRUNO:
16       No, I'm not aware of it.  I think
17   we've all been comfortable with the
18   usual stipulations in the past.
19       MR. WALKER:
20       Okay.
21       MS. BERTAUT:
22       The CMO does have a provision for
23   conduct at the depositions, but I
24   don't know that it's inconsistent with
25   the usual stipulations.

Page 12

1        MR. BRUNO:
2        Right.  We're not required to
3    stipulate, but if we do we do.
4        MR. WALKER:
5        Okay.
6    EXAMINATION BY MR. WIEDEMANN:
7    Q.  Would you state your full name,
8    Mr. Murph?
9    A.  Arthur Lee Murph, Jr.
10   Q.  And how old are you, sir?
11   A.  Fifty-seven.
12   Q.  And where do you presently live?
13   A.  105 Berkeley Drive, New Orleans.
14   Q.  And with whom do you live at that
15   address?
16   A.  My wife and daughter.
17   Q.  What is your wife's name?
18   A.  Jeanne Murph.
19   Q.  And your daughter?
20   A.  Ariana Church.
21   Q.  How old is she?
22   A.  Fifteen.
23   Q.  The Berkeley Street address is -- do
24   you own that or buying it or rent it or what?
25   A.  It's mine.  My own.

Page 13

1    Q.  Okay.  You purchased that when?
2    A.  Oh, I don't know, a couple of years
3    ago.
4    Q.  After Hurricane Katrina?
5    A.  Yes.
6    Q.  Can you tell us your Social Security
7    number?
8    A.  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.
9    Q.  Prior to living at the Berkley Street
10   address which I understand you purchased after
11   Hurricane Katrina -- is that correct?
12   A.  Yes.
13   Q.  Where did you live before that?
14   A.  On Jourdan Avenue.
15   Q.  And what the address on Jourdan
16   Avenue?
17   A.  Um -- damn, I can't even remember the
18   address.  Um --
19   Q.  1739?  Does that ring a bell?
20   A.  That's it.
21   Q.  Okay.  And how long did you live at
22   1739 Jourdan?
23   A.  Maybe ten years or so, I don't know.
24   I can't remember.
25   Q.  Did you own that house at Jourdan

Page 14

```
 1  Avenue?
 2      A.  Yes.
 3      Q.  All right.  And could you describe the
 4  house for me?  By that, I mean was it a single,
 5  one-story house?
 6      A.  It was a one-story.
 7      Q.  Was it on a slab?
 8      A.  Yes.
 9      Q.  And you purchased it ten years --
10  approximately ten years before Hurricane
11  Katrina?
12      A.  Somewhere along there.
13      Q.  And by whom were you employed at the
14  time of the hurricane?
15      A.  Brice Building Company.
16      Q.  What was your job capacity?
17      A.  A carpenter.
18      Q.  And how long had you been employed by
19  them?  Approximately.
20      A.  About twelve years.
21      Q.  Okay.  Who are you employed by now?
22      A.  Same people.
23      Q.  Same people?  So you've been employed
24  with -- twelve years before Hurricane Katrina,
25  and you're still employed by them?
```

Page 15

```
 1      A.  Yep.
 2      Q.  In the capacity as a carpenter?
 3      A.  Carpenter foreman now.
 4      Q.  Carpenter foreman?  Where are they
 5  located?
 6      A.  They're on, um -- Causeway Boulevard.
 7  Executive Tower, 301 Causeway.
 8      Q.  Is your wife employed?
 9      A.  Not right now.
10      Q.  Was she employed at the time of the
11  hurricane?
12      A.  Yes.
13      Q.  Where at?
14      A.  She worked for Dr. Fisherman.
15      Q.  Dr. Fishman?
16      A.  Uh-huh.
17      Q.  As a receptionist or a nurse or --
18      A.  She was a nurse.
19      Q.  She's a graduate nurse?
20      A.  Yep.
21      Q.  Do you know from where?  Where did she
22  study nursing?
23      A.  In Wisconsin.
24      Q.  Okay.  Are you originally from New
25  Orleans?
```

Page 16

```
 1      A.  No.
 2      Q.  Where is your home originally?
 3      A.  Tallulah, Louisiana.
 4      Q.  And your wife is from Wisconsin?
 5      A.  Madison.
 6      Q.  All right.  Did y'all meet here in New
 7  Orleans or --
 8      A.  Yes.
 9      Q.  She was nursing here?
10      A.  Yes.
11      Q.  Okay.  And how long have y'all been
12  married?
13      A.  Probably about six, seven years.
14  We've been together for thirty.
15      Q.  You are married now six or seven
16  years?
17      A.  (Nods affirmatively.)
18      Q.  But you've been together --
19      A.  It might be longer than that, I don't
20  know.
21      Q.  -- approximately thirty years?
22      A.  Yes.
23      Q.  What is your educational background;
24  how far did you go in school?
25      A.  11th grade.
```

Page 17

```
 1      Q.  In Tallulah?
 2      A.  No, in New Orleans.
 3      Q.  In New Orleans?
 4      A.  Uh-huh.
 5      Q.  So you came to New Orleans as a child?
 6      A.  Uh-huh.
 7      Q.  Okay.  And you finished the 11th grade
 8  where?
 9      A.  At Kennedy.
10      Q.  Did you have any training after
11  leaving Kennedy school?
12      A.  I went to Delgado.
13      Q.  Okay.  Is that where you learned
14  carpentry?
15      A.  No, just out in the field.
16      Q.  Okay.  But Delgado, what were you --
17      A.  Auto mechanic, small engines.
18      Q.  Did you ever work as an auto mechanic?
19      A.  No.
20      Q.  Since you left school, either at
21  Kennedy or Delgado, what type of work have you
22  done besides your work with Birch?
23      A.  Brice.
24      Q.  Brice, I'm sorry.  Okay.
25      A.  I'm a carpenter.
```

Page 18

```
 1    Q.  Has that been your occupation --
 2    A.  That's it.
 3    Q.  -- since you finished school?
 4    A.  (Nods affirmatively.)
 5    Q.  Have you always been with them?
 6    A.  No.  I was a soldier before that.
 7    Q.  You were in the military?
 8    A.  Yeah.
 9    Q.  How long were you in the military?
10    A.  Three years.
11    Q.  What branch?
12    A.  Army.
13    Q.  And during what period of time?
14    A.  '68 to '70.
15    Q.  So you were in the Vietnam period?
16    A.  Yep.
17    Q.  Did you serve in Vietnam?
18    A.  Yes.
19    Q.  For how long?
20    A.  A year.
21    Q.  You left the military in 1970?
22    A.  December 10th.
23    Q.  Okay.  Did you receive any wounds or
24  any --
25    A.  No.
```

Page 19

```
 1    Q.  -- problem in Vietnam?
 2    A.  No.
 3    Q.  Did you receive any awards, medals?
 4    A.  Regular medals that they give you.
 5    Q.  Combat?
 6    A.  Yes.
 7    Q.  You were honorably discharged in '70?
 8    A.  Yes.
 9    Q.  All right.  What rank did you have in
10  the service?
11    A.  D-4.  Spec 4.
12    Q.  Since you separated from the military
13  in 1970 have you retained any connection with
14  the military, reserve or anything?
15    A.  No.
16    Q.  When you got out, that was it.
17    A.  That was it.
18    Q.  Now, at the time of Hurricane Katrina,
19  you were living at the 1739 Jourdan Avenue
20  residence, is that right?
21    A.  Yes.
22    Q.  And who was there with you?  Before
23  the hurricane I'm talking about, your wife and
24  your daughter?
25    A.  How you mean?
```

Page 20

```
 1    Q.  Well, before the hurricane came, you
 2  all were living on Jourdan Avenue?
 3    A.  Yes.
 4    Q.  Was it your wife and daughter living
 5  there?
 6    A.  Yes.
 7    Q.  Or was anybody else living with you?
 8    A.  I had some friends stayed in the back.
 9    Q.  So you had a single-family dwelling?
10    A.  Yes.
11    Q.  And then what was in the back?
12    A.  A lil efficiency.
13    Q.  Was it attached to the same residence?
14    A.  No.
15    Q.  It was a separate --
16    A.  Separate.
17    Q.  Okay.  And was that a one-story or a
18  two-story?
19    A.  One-story.
20    Q.  It was on a slab?
21    A.  Yes.
22    Q.  And how many people lived in the --
23    A.  One.
24    Q.  Who was that?
25    A.  Um --
```

Page 21

```
 1    Q.  At the time.
 2    A.  One of my sister's boyfriend's.
 3    Q.  Do you know what his name was?
 4    A.  I can't remember his name.  My wife
 5  keep up with all that.
 6    Q.  You don't remember his first name or
 7  his last name?
 8    A.  Dray.
 9    Q.  D-R-A-Y?
10    A.  Something like that.
11    Q.  Okay.  And he rented from you?
12    A.  Yes.
13    Q.  Okay.  Dray was the only one that
14  occupied the efficiency?
15    A.  Yes.
16        MR. WALKER:
17            I'd like to pose an objection at
18        this stage.  Larry, you're leading him
19        and you're also interrupting his
20        questions.  If you would ask him a
21        question, allow him to answer without
22        leading him.
23        MR. WEBB:
24            And I can't hear either one of
25        you.
```

1    MR. SANDERS:
2        He can lead the witness if he
3    wants under the usual stipulations.
4    MR. WIEDEMANN:
5        I can't cure that problem but you
6    could maybe move a little closer.
7    MR. WEBB:
8        Speak up.
9    EXAMINATION BY MR. WIEDEMANN:
10    Q.  Did anyone live in the efficiency
11   other than Dray who you've identified?
12    A.  No.
13    Q.  Who lived in the main residence, the
14   single-family residence?
15    A.  Me and my wife and my daughter.
16    Q.  No one else lived with y'all?
17    A.  No.
18    Q.  Okay.  And tell me, before the
19   hurricane -- well, let's talk about the day
20   before the hurricane, the 28th, which is a
21   Sunday.
22    A.  Yes.
23    Q.  Were you and your wife and your
24   daughter at the residence?
25    A.  For a while.

1    Q.  Okay.  Tell me what happened with
2   regard to your wife and your daughter.
3    A.  I brought her to a hotel.
4    Q.  Where did you take them?
5    A.  The Hyatt.
6    Q.  And did you check in at the Hyatt?
7    A.  I checked them in.  They checked
8   themselves in.
9    Q.  Did you go with them to the Hyatt?
10    A.  I brought them there.
11    Q.  Okay.  Did you check in?
12    A.  No.
13    Q.  Okay.  When you took your wife and
14   your child to the Hyatt in New Orleans, was it
15   your intention to stay there?
16    A.  Sure.
17    Q.  Okay.  And why did you not stay there?
18    A.  Because I went back for the dog.
19    Q.  Okay.  What time did you take your
20   wife and your daughter to the hotel?
21    A.  It was in the evening.
22    Q.  Do you remember approximately when?
23    A.  I can't remember exactly what time.
24    Q.  Was it dark?
25    A.  No, it was daylight.

1    Q.  Was that a Sunday -- Sunday evening?
2    A.  Yes.
3    Q.  It was daylight, but you don't
4   remember the time.
5    A.  No, I don't remember the exact time.
6    Q.  And -- but when you got to the hotel,
7   did you register or did your wife register?
8    A.  My sister registered.
9    Q.  She was with you?
10    A.  No.  She worked there.
11    Q.  Oh, okay.  So she preregistered your
12   family?
13    A.  Yep.
14    Q.  And what's your sister's name?
15    A.  Doris.
16    Q.  What's her last name?
17    A.  Murph.
18    Q.  So Doris was working at the hotel, and
19   she arranged for you to be admitted?
20    A.  Yes.
21    Q.  Did you all use a credit card to pay
22   for the hotel?
23    A.  No.  She worked for the hotel.
24    Q.  Okay.  So you got -- because of her
25   employment you got a room at no charge?

1    A.  Yes.
2    Q.  Okay.  Did you bring clothing to the
3   hotel?
4    A.  My wife did.
5    Q.  For you and your wife and the
6   daughter?
7    A.  For everybody.
8    Q.  Okay.  And you didn't stay after you
9   dropped them off.
10    A.  No.
11    Q.  And why was that?
12    A.  Because I went back to the house for
13   the dog.
14    Q.  Before going to the hotel, did you
15   bring your dog with you?
16    A.  No.
17    Q.  Why not?
18    A.  Just didn't -- who let's dogs in
19   hotels?
20    Q.  And when you got to the hotel, did you
21   find that there was some other provision for
22   animals?
23    A.  I saw people had animals.
24    Q.  Okay.  And did you inquire whether you
25   could bring your animal?

Page 26

1    A.  I figured I could.  Everybody else had
2  a dog up there.
3    Q.  With what kind -- did you have one dog
4  or more?
5    A.  One dog.
6    Q.  What kind of dog was it?
7    A.  A pit bull.
8    Q.  What's the dog 's name?
9    A.  Gebora.
10    Q.  Gebora?
11    A.  Gebora.
12    Q.  And you went back to get Gebora to
13  bring to the hotel?
14    A.  Yes.
15    Q.  And do you remember when time you went
16  back or what time you arrived at your house?
17    A.  I went -- no.
18      MR. WALKER:
19        Objection.
20  EXAMINATION BY MR. WIEDEMANN:
21    Q.  Was it daylight when you got back to
22  your house on Jourdan Avenue, do you recall?
23    A.  No, I sure don't.
24    Q.  Okay.  Did you have a watch at that
25  time --

Page 27

1    A.  Yes.
2    Q.  -- on you?  But you don't recall the
3  time you got back to the house.
4    A.  No.
5    Q.  Okay.  Did you go alone when you went
6  back to the house?
7    A.  No.
8    Q.  Somebody was with you?
9    A.  Somebody brought me back, because I
10  dropped my car.
11    Q.  When you went to the Hyatt, you left
12  your car?
13    A.  No.  I put it on higher ground.
14    Q.  Okay.  And who was the person that
15  went with you?
16    A.  Felton.
17    Q.  What's his first name?
18    A.  Felton.
19    Q.  Do you know his last name?
20    A.  Bracy.
21    Q.  All right.  So before you went to --
22  well, let me ask you this:  When you left
23  Jourdan Avenue, you drove your wife and your
24  daughter to the hotel?
25    A.  Right.

Page 28

1    Q.  And was he with you?
2    A.  Nope.
3    Q.  Okay.  So after you left the hotel,
4  you met him somewhere?
5    A.  Yes.
6    Q.  Where at?
7    A.  On Paris Avenue.
8    Q.  He lived on Paris Avenue?
9    A.  No.
10    Q.  Okay.  Well, what was the relationship
11  between you and Felton?
12    A.  Friend.
13    Q.  Friends?  Okay.  Why did you go to
14  Paris Avenue?
15    A.  To drop the car off on higher ground.
16    Q.  Okay.  Did you have a place where you
17  could drop your car?
18    A.  Yes.
19    Q.  Where at?
20    A.  On Paris Avenue.  By a friend of
21  mine 's.  I don't know the address.
22    Q.  Okay.  But it was somebody's house.
23    A.  Yes.
24    Q.  Okay.  Do you know the name?
25    A.  It was Mike's cousin.

Page 29

1    Q.  Who is Mike?
2    A.  A friend.
3    Q.  Okay.  So it's a friend of a friend.
4    A.  Right.
5    Q.  But you don't know --
6    A.  I knowed them, but -- just as a
7  friend.
8    Q.  Okay.  Do you know Mike 's last name?
9    A.  Um -- Mimmet.
10    Q.  So had you been in touch with Mike
11  about leaving your car on Paris Avenue?
12    A.  No.  I was in touch with Sean.  That
13  was the guy 's name.
14    Q.  Okay.  Sean was the one that had a
15  house on Paris?
16    A.  (Nods affirmatively.)
17    Q.  Is that correct?
18    A.  That's his sister.
19    Q.  All right.  So in any event, before
20  you went to the Hyatt, had you made
21  arrangements --
22    A.  Yes.
23    Q.  -- to put your car an Paris Avenue?
24    A.  Yes, I did.
25    Q.  Okay.  And that was made through Mike

Page 30

1  or Sean?
2      A.  Right.  It was made through Sean.
3      Q.  Okay.  How many cars did you have at
4  that time?
5      A.  Two.
6      Q.  What type of cars?
7      A.  A truck and a car.
8      Q.  Okay.  Did you bring both of them to
9  Paris Avenue?
10     A.  Yes.
11     Q.  Okay.  Was that after you dropped your
12 wife off and your child?
13     A.  Before.
14     Q.  Okay.  So before going to the Hyatt
15 you had taken your car and your truck to Paris
16 Avenue?
17     A.  My truck.
18     Q.  Okay.  And then after you went to the
19 Hyatt, you took your car to Paris Avenue.
20     A.  Right.
21     Q.  And you met your friend who drove you
22 back home.
23     A.  Right.
24     Q.  Do you recall what time you arrived at
25 home on Jourdan Avenue?

Page 31

1      A.  No, I sure don't.
2      Q.  All right.  Was it still daylight or
3  was it dark?
4      A.  I don't know.  It was raining.
5      Q.  It was raining at that time?
6      A.  Yep.
7      Q.  Had you been following the weather;
8  were you aware of what the weather situation
9  was?
10     A.  Yes.  Yes, I was.
11     Q.  When you went back to Jourdan Avenue,
12 after dropping off your car and your truck, was
13 it your intention to return to the Hyatt?
14     A.  Yes.
15     Q.  How did you plan on getting back to
16 the Hyatt since your truck and your car were
17 now at Paris Avenue?
18     A.  Felton.
19     Q.  Where did Felton live?
20     A.  In the Lower Ninth Ward.
21     Q.  Did he live near you on Jourdan
22 Avenue?
23     A.  Yes.
24     Q.  Did he live on Jourdan Avenue?
25     A.  No.

Page 32

1      Q.  Where did he live, on what street?
2      A.  I can't think of the name of the
3  street, but he stayed in the Lower Ninth Ward.
4      Q.  And what was your situation with
5  Felton; what was your understanding as to what
6  was going to happen?
7      A.  He was going to pick me up, bring me
8  back to the Hyatt.
9      Q.  Was he going to stay at the Hyatt?
10     A.  No.
11     Q.  And Felton, is he related to you or --
12     A.  He's a real good friend.
13     Q.  Okay.  Where did he work at?
14     A.  He work offshore.
15     Q.  Offshore?  For whom, do you know?
16     A.  He was working for Lykes, I think.
17 Lykes Lines.
18     Q.  Okay.  Do you know where he is now?
19     A.  At home.
20     Q.  He's still in the Ninth Ward?
21     A.  No.  He's, um -- let me see.  Yeah.
22 That's the Ninth Ward, but not the Lower Ninth.
23     Q.  Do you know what street he lives on?
24     A.  Clouet.
25     Q.  That's off of the Chef Highway?

Page 33

1      A.  Yeah.
2      Q.  So he dropped you off at your house,
3  and he went where?
4      A.  I guess he went back home.
5      Q.  And he was supposed to pick you up?
6      A.  Right.
7      Q.  Did you have a time arranged when he
8  would pick you up?
9      A.  No.  He said he'd be back.
10     Q.  Okay.  He didn't say any specific
11 time.
12     A.  No.
13     Q.  Did you have a cellphone at that time?
14     A.  Yes.
15     Q.  Did Felton have a cellphone?
16     A.  No.
17     Q.  Did he have a house phone?
18     A.  Yes.
19     Q.  All right.  Did you talk to him after
20 he dropped you off at Jourdan Avenue?
21     A.  No.
22     Q.  Did he call you?
23     A.  No.
24     Q.  Did you call your wife at the hotel?
25     A.  No, she called me.

1    Q.  She called you?
2    A.  (Nods affirmatively.)
3    Q.  When did she call you?  Do you recall
4  what time?
5    A.  No.
6    Q.  What was the purpose of her call?
7    A.  What was taking me so long?
8    Q.  And what did you tell her?
9    A.  Waiting on Felton.
10    Q.  Did he ever return?
11    A.  No.
12    Q.  Did you ever hear from him after he
13  dropped you off?
14    A.  Every day.
15    Q.  Huh?
16    A.  No, I didn't hear from him that night.
17    Q.  He didn't call you back?
18    A.  No.
19    Q.  Or you didn't call him.
20    A.  No.
21    Q.  Okay.  So you were stuck at Jourdan
22  Avenue?
23    A.  Right.
24    Q.  You had no transportation?
25    A.  No.

1    Q.  Was there anyone at the house or in
2  the efficiency when you returned?
3    A.  No.
4    Q.  You were the sole occupant.
5    A.  Me and the dog.
6    Q.  You and the dog?  Okay.  Were there
7  people in the houses around you that you knew?
8    A.  I have no idea.
9    Q.  You don't know.
10    A.  No.
11    Q.  Okay.  When you got home after Felton
12  let you off, did you ever talk to your wife
13  about your inability to get back down to the
14  hotel?
15    A.  No.  I just stood there.
16    Q.  All right.  Did you talk to your wife
17  at all throughout the evening of the 28th and
18  the morning of the 29th?
19    A.  Yes.
20    Q.  How many times did you talk to her?
21    A.  I have no idea.
22    Q.  All right.  Y'all were communicating
23  throughout the evening and the morning?
24    A.  Yes.
25    Q.  All right.  Were you reporting to her

1  what was going on at the house?
2    A.  Yes.
3    Q.  And was she inquiring of you what was
4  happening with you at the house?
5    A.  Nothing.  I was just sitting there.
6    Q.  All right.  There was a point in time
7  when the lights in the house went off?
8    A.  Yes.
9    Q.  When was that?
10    A.  I don't know what time it was, but the
11  television went off and then I was in the dark.
12    Q.  All right.  So did the television and
13  the lights go off at the same time?
14    A.  Yes.
15    Q.  And do you recall what time that was?
16    A.  No, unh-unh.
17    Q.  You didn't check the time on your
18  watch or --
19    A.  No.  It was just dark.
20    Q.  It was after dark, because everything
21  was black.
22    A.  Right.
23    Q.  So the lights and the television went
24  off about the same time?
25    A.  Yes.

1    Q.  What about the street lights on
2  Jourdan Avenue?
3    A.  I don't know.  I couldn't see the
4  street lights.
5    Q.  Okay.  So you don't know whether the
6  street lights were on or not.
7    A.  No.
8    Q.  At any point in time on the evening of
9  the 28th, did you ever go out from your house
10  to look at the surrounding area?
11    A.  Yes.
12    Q.  Did you go out more than once?
13    A.  No, I just went out once.
14    Q.  What did you go out -- for what
15  purpose?
16    A.  To go to the garage and turn on --
17  start the generator.
18    Q.  Okay.  And do you recall what time
19  that was?
20    A.  No.
21    Q.  You had a generator in the garage?
22    A.  Yes, I did.
23    Q.  Was it gasoline driven?
24    A.  Yes.
25    Q.  And you had gasoline on hand?

1    A.   Yes.
2    Q.   And the generator that you had in the
3  garage, that would run what?
4    A.   That would turn on the lights and the
5  refrigerator.
6    Q.   Okay.  So how long after the lights
7  went out, or the electricity, that you went out
8  to turn on the generator?
9    A.   Almost immediately.
10   Q.   But you don't know what time
11  that was.
12   A.   No.
13   Q.   Did you get a chance -- did you
14  actually start the generator?
15   A.   No.
16   Q.   You did not?
17   A.   No.
18   Q.   Why not?
19   A.   I just didn't start it.  I was just
20  walking around outside looking.
21   Q.   Your purpose in going to the garage
22  was to start the generator.
23   A.   Right.
24   Q.   You have what, just a starter or you
25  had to crank it?

1    A.   You had to crank it.
2    Q.   And you didn't get to do that.
3    A.   No.
4    Q.   Okay.  And why did you not get to do
5  it?  Did you just decide not to or what?
6    A.   No, I was hooking it up.  It was just
7  in the garage.  It wasn't set up to operate
8  anything.
9    Q.   Okay.  So you had to make some
10  connections.
11   A.   Right.
12   Q.   And you hadn't yet done that?
13   A.   No.
14   Q.   Where was your dog when you went out?
15   A.   Right there with me.
16   Q.   At any point in time, did you go out
17  and check the levee or the wall across the
18  street from you?
19   A.   Early that day.
20   Q.   Was it daylight when you went out
21  there?
22   A.   Yes, it was.
23   Q.   Do you know what time it was?
24   A.   No.
25   Q.   Why did you go out to check?

1    A.   I wanted to see how high the water
2  was.
3    Q.   And that was after you got home in the
4  evening?
5    A.   No.  That was before I brought my
6  wife.
7    Q.   Okay.  So that was earlier in the day.
8    A.   Yes.
9    Q.   And you don't know what time it was,
10  but it was before you took your wife and your
11  daughter to the Hyatt.
12   A.   Right.
13   Q.   And where did you go to check --
14   A.   To the levee.
15   Q.   Did you go up on the levee?
16   A.   Yes, I did.
17   Q.   On the levee, they have --
18   A.   A wall.
19   Q.   -- a concrete wall?
20   A.   Uh-huh.
21   Q.   Did you go up to the wall?
22   A.   Yep.
23   Q.   Were you standing on the wall?
24   A.   No.
25   Q.   Okay.  You were up where you could see

1  the water?
2    A.   Right.
3    Q.   And what was the situation?
4    A.   It was high.
5    Q.   Yeah?
6    A.   Very high.
7    Q.   Tell me, how high was it?
8    A.   Up to the top.
9    Q.   Okay.  Was it --
10   A.   Splashing over.
11   Q.   It was splashing over?  Was it running
12  over, so to speak?
13   A.   Unh-unh.
14   Q.   It wasn't overtopping.
15   A.   No.
16   Q.   What was causing it to splash over?
17   A.   The wakes of the water.
18   Q.   The wind?
19   A.   The wind blowing it.
20   Q.   Okay.  All right.  And what was the
21  reason to go up there to check it?
22   A.   To see how high the water was.
23   Q.   Okay.  In the period of time that you
24  had lived there, seven or eight years before
25  Hurricane Katrina, had you ever had any

1  flooding in the streets or --
2      A.  No.
3      Q.  But what was -- what concerned you to
4  check it on this particular occasion?
5      A.  Because it was talking about the
6  categories.
7      Q.  Okay.  The category of the hurricane.
8      A.  Right.
9      Q.  You went up one time?
10     A.  That's it.
11     Q.  Okay.  And after you checked the water
12  in the Industrial Canal, what did you do then,
13  did you go back to the --
14     A.  Went back to the house.
15     Q.  Did you start your generator?
16     A.  No.
17     Q.  What happened?
18     A.  Because I didn't need no generator, I
19  had lights.
20     Q.  You had lights in the house?
21     A.  Yeah.
22     Q.  At the time -- when you went out to
23  check the generator, that's before the lights
24  went out, right?
25     A.  The lights went out the night.

1      Q.  Okay.  This was earlier in the day.
2      A.  Before I brought my wife to the Hyatt.
3      Q.  All right.  Okay.  So after that, you
4  took your wife and your child to the Hyatt and
5  you came back.
6      A.  Yes.
7      Q.  Okay.  Now, after the lights went out,
8  what did you do?
9      A.  Went outside to get the generator set
10  up.
11     Q.  Again?  This was the second time you
12  went?
13     A.  No.
14     Q.  That was the first time.
15     A.  It was the only time.
16     Q.  Okay.  And that's when you -- was
17  that -- when you went out to check the
18  generator, you had to hook it up, but you
19  didn't do that.
20     A.  Right.
21     Q.  Okay.  And what happened when you went
22  out there to check it up after the lights went
23  out?
24     A.  Nothing.  I just heard some noises.
25     Q.  What kind of noise did you hear?

1      A.  I don't know.  Scraping sound.
2      Q.  And where was the scraping sound
3  coming from?
4      A.  From the front of the house.
5      Q.  And the front of the house was on
6  Jourdan Avenue, facing the canal?
7      A.  Right.
8      Q.  So was the scraping sound coming from
9  the direction of the canal?
10     A.  Yes.
11     Q.  Did you know what was causing the
12  scraping sound?
13     A.  No.
14     Q.  Did it cause you some concern at that
15  time?
16     A.  Yes, it did.
17     Q.  Was it -- can you describe what the
18  scraping sound was?
19     A.  No, it just sound like something was
20  rubbing and banging.
21     Q.  And how long did you hear this
22  scraping, banging sound?
23     A.  I don't know.  I was inside.  My house
24  got shutters all around it.
25     Q.  Well, you said you went out to check

1  the generator.
2      A.  Right.
3      Q.  Did you hear the scraping, banging
4  sound before you went outside?
5      A.  No.
6      Q.  All right.  When you went outside to
7  the shed, is that when you heard it?
8      A.  No, when I went out to the garage.
9      Q.  To the garage I meant.  Yeah.  Okay.
10     A.  Yeah.  That's when I heard it.
11     Q.  And did it continue after you first
12  heard it when you were out by the generator?
13     A.  Yes.
14     Q.  How long did you hear it scraping and
15  banging?
16     A.  All the time I was outside.
17     Q.  About how long a period of time was
18  that?
19     A.  It wasn't very long, I don't think.
20     Q.  Okay.  When you went back inside, did
21  you -- could you hear it?
22     A.  No.
23     Q.  Okay.  Did you at any point in time
24  when you were out there, when you heard the
25  scraping, banging, did you realize what it was?

Page 46

1    A.  No.
2    Q.  Okay.  Could you describe what it
3 sounded like to you as far as --
4       MR. WALKER:
5          Objection.
6 EXAMINATION BY MR. WIEDEMANN:
7    Q.  You're the one that heard it.  And I
8 just want to know what you thought it sounded
9 like.
10       MR. WALKER:
11          He told us what it sounded like.
12          Asked and answered.
13 EXAMINATION BY MR. WIEDEMANN:
14    Q.  Can you tell us what it sounded like?
15    A.  Just scraping and banging.
16    Q.  Did the scraping and banging stop at
17 any time when you were outside?
18    A.  No.
19       MR. WALKER:
20          Objection, asked and answered.
21 EXAMINATION BY MR. WIEDEMANN:
22    Q.  Did you ever hook up the generator?
23       MR. WALKER:
24          Objection, asked and answered.
25 EXAMINATION BY MR. WIEDEMANN:

Page 47

1    Q.  You can answer.
2    A.  No.
3    Q.  What did you do after you went out to
4 check on the generator and went back to the
5 house after hearing the scraping and banging?
6    A.  I didn't go back to the house when I
7 heard the noise.
8    Q.  What happened?
9    A.  I went to the front of the house.
10    Q.  For what?
11    A.  The see what the noise was.
12    Q.  And what did you see?
13    A.  Nothing but water.
14    Q.  When you say you went to the front of
15 the house, that's the part --
16    A.  I was in the water at the front of the
17 house.  I never got the front.
18    Q.  So you were at the shed where the
19 generator -- generator is?
20    A.  Right.
21    Q.  And you heard the scraping, banging,
22 and you started toward the front of the house?
23    A.  Right.
24    Q.  How long -- how far is it from the
25 shed to the front of the house?

Page 48

1    A.  I guess about a hundred feet.
2    Q.  Okay.
3       MS. BERTAUT:
4          I'm sorry.  I didn't hear that.
5       THE WITNESS:
6          About a hundred feet.
7 EXAMINATION BY MR. WIEDEMANN:
8    Q.  So you were walking from the shed
9 toward Jourdan Avenue?
10    A.  Right.
11    Q.  All right.  In the period of time that
12 you were walking in the direction of Jourdan
13 Avenue, did the scraping and banging stop?
14    A.  No.
15    Q.  And how far did you get from the front
16 of the house?
17    A.  About midway.
18    Q.  About fifty feet from the shed?
19    A.  Right.
20    Q.  And then what happened?
21    A.  Water started to come down the street.
22    Q.  And the water was coming from where?
23 From what direction?
24    A.  North, I guess.
25    Q.  Huh?

Page 49

1    A.  I guess it was coming from north.
2    Q.  Well, the house faces the --
3    A.  Right.  It came from the right side of
4 the house.
5    Q.  And the right side of the house would
6 be what?
7    A.  If I'm coming up the drive, going up
8 the driveway, it would be to my right.  And
9 Jourdan Avenue would be in front of me.
10    Q.  Okay.  And the water was coming up
11 your drive?
12    A.  Right.  It was coming down the street.
13    Q.  Okay.  And describe what you saw as
14 the water was coming toward you.
15    A.  Nothing.  I hauled ass to the back
16 door.
17    Q.  Well, I mean, obviously -- I want you
18 to describe what you saw that made you --
19    A.  A lot of water coming.
20    Q.  All right.  Was it coming fast or
21 slow?
22    A.  Yeah, it was coming fast.
23    Q.  So that you -- what did you do then,
24 when you saw -- when you were fifty feet from
25 the front of your house?

Page 50

1   A.  Turned around and went back in the
2   house.
3   Q.  Okay.  And your dog was with you?
4   A.  Yep.
5   Q.  And when you got in the house, what
6   did you do?
7   A.  Panicked.
8   Q.  Well, what caused you to panic?  You
9   were --
10  A.  The rising water.
11  Q.  Okay.  Tell me how -- after you saw it
12  coming down the drive, what happened as you got
13  into the house?
14  A.  Nothing.  I just stood there, me and
15  the dog set on the sofa.
16  Q.  When you got in the house, did you go
17  in through the front door?
18  A.  No.
19  Q.  What door did you use?
20  A.  Went through the back door.
21  Q.  Okay.  So there's a door in the back
22  that you can enter the house?
23  A.  Right.
24  Q.  And when you got into the house, tell
25  me what happened with regard to the water that

Page 51

1   you had seen coming down the driveway.
2   A.  When I saw the water coming down the
3   driveway, I went back to the house.
4   Q.  Okay.  And you went in the house?
5   A.  I went in the house.
6   Q.  And then what happened?
7   A.  I come back out.
8   Q.  For what reason?
9   A.  To get an ax.
10  Q.  Okay.  And the ax was where?
11  A.  In the garage.
12  Q.  Okay.  And where -- when you came out
13  of the back of the house, what was the water
14  level at that point in time?
15  A.  It was about -- I don't know.  I
16  guess -- it was still moving fast.  I didn't
17  really check for no height.
18  Q.  And so you went to get an ax for what
19  purpose?
20  A.  Chop a hole in the roof.
21  Q.  And did you get an ax?
22  A.  Yes.
23  Q.  And did you go back in the house?
24  A.  Yes.
25  Q.  And did you chop a hole?

Page 52

1   A.  Yes, I did.
2   Q.  Where at?
3   A.  In the roof.
4   Q.  I mean for what part of the house?
5   A.  Right in the middle of the house.
6   Q.  Okay.  And could you get into the --
7   when you say the roof, was there an attic?
8   A.  You got an attic, yes.
9   Q.  There was an attic between the roof
10  and the ceiling?
11  A.  Yes.  Right.
12  Q.  All right.  So you chopped a hole in
13  to attic?
14  A.  Yes.
15  Q.  And did you get into the attic?
16  A.  I was in the attic.  I chopped a hole
17  in the roof.
18  Q.  Okay.  So you first chopped a hole in
19  the ceiling, I guess, right?
20  A.  No.
21  Q.  No?
22  A.  I had stairs pull down in the hallway.
23  Q.  Okay.  All right.  So you have a stair
24  that gives you access to --
25  A.  Right.

Page 53

1   Q.  -- to the --
2   A.  To the attic.
3   Q.  To the attic.  So you pulled the
4   stairs down and you went to the attic.
5   A.  Right.
6   Q.  And the hole you chopped was in the
7   roof, then.
8   A.  Right.
9   Q.  Was the attic high enough for you to
10  stand up in?
11  A.  You can stand, but you'd have to bend
12  a little bit.
13  Q.  Okay.  And when you chopped the hole
14  in the attic, what did you do at that point in
15  time?
16  A.  Nothing, I just stood there and
17  waited.  Looked at the water in the house.
18  Q.  And what was -- as you were in the
19  attic, when you said you were waiting for the
20  water, what was --
21  A.  I wasn't waiting, I was just looking.
22  Q.  What was happening with the water
23  coming in?
24  A.  It was just coming in slow.
25  Q.  Was it gradually rising?

Page 54

1    A.  Slowly.
2    Q.  Okay.  Where was it when you got in
3  the attic?
4    A.  It was just wetting the floors.
5    Q.  Are the floors in your house, are they
6  off the ground?
7    A.  No, it was on the ground.  Around six
8  inches from the ground.
9    Q.  Okay.  All right.  So when you got
10  into the attic and chopped -- how long did you
11  stay in the attic?
12    A.  I didn't stay up there long.
13    Q.  Why is that?
14    A.  Because I got back down and see what
15  was going on, check my furnitures and all that.
16  It didn't do no good.
17    Q.  So you got down and checked your
18  furniture and then you went back in the attic?
19    A.  No.  Got -- set out there with the
20  dog.
21    Q.  And what happened?
22    A.  Nothing.  The water just got higher.
23    Q.  And where did you go when the water
24  got higher?
25    A.  Back to the attic.

Page 55

1    Q.  Okay.  When you went outside, was it
2  continuing to rise?
3    A.  Yeah.  It was still flowing.  It was
4  moving fast.
5    Q.  All right.  What caused you to go back
6  into the attic the second time?
7    A.  I ain't had nothing else to do.
8    Q.  Well, was the water getting to a level
9  that you were concerned?
10    A.  I was concerned when the water was
11  coming down the street.
12    Q.  All right.  How long -- the second
13  time you went in the attic, how long did you
14  stay in the attic?
15    A.  Long enough to cut a hole.
16    Q.  Okay.  Well, you said you went up
17  there originally, you cut a hole, and then you
18  went back down.
19    A.  Right.
20    Q.  Did you cut another hole?
21    A.  No, that's the only time I cut the
22  hole, when I went up there that first time when
23  I told you.
24    Q.  Okay.  How long did you stay in the
25  attic?

Page 56

1    A.  Not long.  To when?
2    Q.  The second time you went in the attic.
3    A.  Until the storm came, I guess.  I
4  don't know.  I stood up there.
5    Q.  Can you give me an estimate of how
6  long?
7    A.  I don't know.  I didn't have a watch.
8  I was just up there until the storm came.
9  Until I got out of it.
10    Q.  You remained in the attic -- when did
11  you get out of the attic?
12    A.  That night, I guess.  Yeah.  At night.
13  I guess it was that night.  It was dark.  Or
14  either that morning.
15    Q.  You're not sure?
16    A.  No, I don't know what time it was.
17    Q.  Okay.  You never had your watch at
18  that time?
19    A.  Yes.
20    Q.  But you never checked the time?
21    A.  I couldn't see it.
22    Q.  Did you remain in the attic for a
23  couple of hours or --
24    A.  Yeah.  I stood there until the water
25  got higher.

Page 57

1    Q.  Did it eventually come into the attic?
2    A.  Yes.
3    Q.  And how high are the ceilings in your
4  house?
5    A.  Eight foot.
6    Q.  So at some point in time the water had
7  risen in your house to the ceiling?
8    A.  It "ris" to the ceiling, yes, it did.
9    Q.  Do you recall what time that was?
10    A.  Shoot, I don't know.
11    Q.  Do you recall, as you were in the
12  attic, as the water rose to the ceiling, did
13  you get on the roof?
14    A.  No.  I just looked out.
15    Q.  Looking out of the attic?
16    A.  Out the roof.  Out the hole.
17    Q.  What could you see when you looked out
18  the hole?
19    A.  The water was higher.  It was up to
20  the edge of the roof.
21    Q.  As you got looking out the roof from
22  the attic?
23    A.  Right.
24    Q.  So how high would that be?
25    A.  The water was about eight feet, I

1 guess.
2     Q.  At that point in time?
3     A.  Right.
4     Q.  How long after you had seen the water
5 coming down the driveway --
6     A.  Oh, I don't know.  But -- I don't
7 know.  I guess a few hours or so, I don't know.
8     Q.  Okay.  So when you looked out of the
9 attic hole that you had cut --
10    A.  Right.
11    Q.  -- you could see the water up to your
12 roof level?
13    A.  Right.
14    Q.  Which would be eight feet?
15    A.  Right.  Or better.
16    Q.  Or better?  And you were looking -- as
17 you were looking out of the hole, you were
18 looking in what direction?
19    A.  To the left side of the house.
20    Q.  Would that be where the levee is or --
21    A.  No, that would be to where the
22 driveway is.
23    Q.  Okay.  Could you see the wall from
24 where you were?
25    A.  What wall?

1     Q.  The wall along the Industrial Canal.
2     A.  I don't know.  I didn't look that way.
3     Q.  Okay.  Did you at some point in time
4 get out of the house?
5     A.  Yeah.
6     Q.  How?
7     A.  Swam.
8     Q.  Swam to where?
9     A.  Next door.
10    Q.  And was that a two-story house?
11    A.  Yes.
12    Q.  And do you know what time you swam to
13 the other house?
14    A.  No.
15    Q.  When you swam over there, why did you
16 swim over to the other house?  Was that because
17 it was a higher house, or what was the reason?
18    A.  No, because I saw a barge on the front
19 of the house.
20    Q.  When did you see a barge in the front
21 of the house?
22    A.  When I turned around and looked and I
23 seen this wall, I didn't know what it was at
24 first.
25    Q.  And where was the barge when you first

1 saw it?
2     A.  On the front of the house.
3     Q.  In the front of your house?
4     A.  Right.
5     Q.  When you saw the barge, was it -- had
6 it hit your house?
7     A.  It was on it.
8     Q.  It was on your house?
9     A.  Right.
10    Q.  On what part of your house?
11    A.  The front.
12    Q.  Did you hear it when it hit the house
13 before?
14    A.  No.
15    Q.  When you got up and looked out the
16 attic, did you see the barge?
17    A.  I saw it then.
18    Q.  Uh-huh.  And what did you see where
19 the barge had come from, could you see?
20    A.  No.  The wind was blowing hard.
21    Q.  Okay.  All right.  And the barge was
22 on the front of your house?
23    A.  Right.
24    Q.  Okay.  And then what happened?
25    A.  I tied an extension cord around me and

1 jumped in the water and swam next door.
2     Q.  Okay.  So the reason you swam out from
3 your house was because of the barge?
4     A.  Yeah.
5     Q.  Was the barge -- it was on top of your
6 house?  Was it moving?
7     A.  I don't know if it was moving or not.
8 It was just there.
9     Q.  Was it daylight when you saw it?
10    A.  No, it was dark.
11    Q.  Okay.  Did you see the barge before it
12 was on your house?
13    A.  No.
14    Q.  Did you see it at any time after it
15 was on your house?
16        MR. WALKER:
17            Objection, vague as to time.
18 EXAMINATION BY MR. WIEDEMANN:
19    Q.  You said you saw it -- when you were
20 looking out the roof you saw it on part of your
21 house.
22    A.  Right.
23        MR. WALKER:
24            Objection, asked and answered.
25 EXAMINATION BY MR. WIEDEMANN:

1    Q.   What part of your house was it on?
2    A.   The front.
3    Q.   That would be -- had it intruded into
4  your house in any way?
5    A.   I don't know right then.
6    Q.   Okay.  All right.  And had you heard
7  the barge -- other than the scraping, banging
8  that you heard, had you heard it after that?
9        MR. WALKER:
10           Objection, asked and answered.
11  EXAMINATION BY MR. WIEDEMANN:
12    Q.   Go ahead.  Did you hear anything after
13  that?
14    A.   No.
15    Q.   Was the first time that you saw the
16  barge when you looked out of the roof?
17    A.   Right.
18        MR. WALKER:
19           Objection, asked and answered
20        three times.
21  EXAMINATION BY MR. WIEDEMANN:
22    Q.   You don't know what time that was.
23        MR. WALKER:
24           Objection, asked and answered.
25    A.   No.

1  EXAMINATION BY MR. WIEDEMANN:
2    Q.   And after you saw it, you put a cord
3  around yourself?
4    A.   Yes.
5    Q.   And you swam --
6    A.   Next door.
7    Q.   Next door?  Is that across the street
8  or next door?
9    A.   Next door, right on the side of my
10  house.
11    Q.   To the right of you?
12    A.   To the left.
13    Q.   Left?  And whose house was that?
14    A.   Um -- I can't think of her name.  It
15  was one of my friends that she was renting.
16    Q.   Was renting the house next door?
17    A.   Yes.
18    Q.   You can't think of their name.
19    A.   No.
20    Q.   How many people were there in the
21  house next door?
22    A.   Four.
23    Q.   And do you know any of their names at
24  this point in time?
25    A.   I can't think of them people name.  I

1  never did deal with them.
2    Q.   Okay.  So they were renting next door
3  to you.
4    A.   Right.
5    Q.   And you knew them before then, before
6  the hurricane.
7    A.   Yeah.
8    Q.   Okay.
9    A.   Just found your neighbors.
10    Q.   And you went there because of what
11  reason?
12    A.   The water was higher than my house.
13    Q.   Okay.  And what was the purpose of the
14  cord you put on?
15    A.   The water was moving fast, I didn't
16  want to get washed out in the canal.
17    Q.   Did you have -- did you have the cord
18  attached to something?
19    A.   To the roof.  To the rafters on the
20  inside the roof.
21    Q.   Okay.  So you had enough cord to
22  enable you to get --
23    A.   A hundred foot.
24    Q.   -- to get to your neighbor's house?
25    A.   Yes.

1        MR. WALKER:
2           Let me pose an objection here,
3        Larry.  You mischaracterized his
4        testimony.  In answer to your
5        questions earlier, he said he did not
6        know what the scraping sound was from,
7        and you characterized your question
8        now as it was from the barge, which is
9        a mischaracterization of his
10        testimony.
11  EXAMINATION BY MR. WIEDEMANN:
12    Q.   When you got to the -- swam to your
13  neighbor's house, did you -- how did you get
14  into the house?
15    A.   Through a window on the top floor.
16    Q.   On the second floor?
17    A.   Right.
18    Q.   And there were people there?
19    A.   Yes.
20    Q.   How many?
21    A.   Four.
22    Q.   Okay.  And did you talk to them about
23  what had happened at that point in time?
24    A.   What you mean?
25    Q.   Well, I mean, you had heard these

1 noises and you swam over to their house, there
2 was water rising. Did you all talk about what
3 was going on?
4    A.  Yeah.
5    Q.  Huh?
6    A.  Yeah.
7    Q.  Did y'all talk about what was the
8 probable cause of what happened?
9    A.  No.
10       MR. WALKER:
11          Objection.
12 EXAMINATION BY MR. WIEDEMANN:
13    Q.  Did they give you any information that
14 you didn't already have?
15    A.  No. He just asked me how I got there.
16    Q.  And how long did you stay in the house
17 next door?
18    A.  Until we got rescued.
19    Q.  And how were you rescued?
20    A.  A friend come down the street with a
21 boat and picked us up.
22    Q.  And who was that?
23    A.  I can't think of his name. He's just
24 a fellow in the neighborhood with a boat.
25    Q.  Okay. And when was that? It was

1 daylight?
2    A.  It was the day after -- it was after
3 the hurricane.
4    Q.  Was it the next day on the 29th?
5    A.  Yes.
6    Q.  Do you remember what time it was?
7    A.  No.
8    Q.  Now, did you at any time hear -- after
9 you heard this scraping, banging sound, did you
10 hear any other sounds other than that before
11 you saw the water coming?
12    A.  Nothing but the wind blowing hard.
13    Q.  Okay. Did you hear -- before the
14 water came down your driveway, did you hear a
15 boom, like a boom or an explosion like?
16    A.  I don't think I heard -- I don't
17 believe.
18    Q.  Okay.
19       MR. WIEDEMANN:
20          Can we take a break for just a
21       minute?
22       (Off the record.)
23 EXAMINATION BY MR. WIEDEMANN:
24    Q.  Mr. Murph, I know that these events
25 took place back in 2005 and your memory is

1 maybe not as good as we would expect, or -- it
2 wouldn't be any better for me, either, but did
3 you -- at some point in time were you
4 represented by the Cochran firm in your
5 personal case?
6    A.  I wasn't represented by nobody that I
7 know of.
8    Q.  Were you represented by Mr. Joe
9 Guidry?
10    A.  I don't even know no Joe Guidry.
11    Q.  Did you give a statement to the
12 Cochran firm or Mr. Joe Guidry about the events
13 leading up to the hurricane?
14    A.  Not that I can remember.
15    Q.  Let me show you a transcription of a
16 statement taken on January 25th, 2006.
17       MR. WALKER:
18          Do you have copies for all of us?
19       MR. SANDERS:
20          No.
21       MR. WALKER:
22          Can we make copies?
23       MR. WIEDEMANN:
24          Sure.
25       (Off the record.)

1 EXAMINATION BY MR. WIEDEMANN:
2    Q.  Mr. Murph, let me show you what
3 purports to be a copy of a statement --
4       MR. WALKER:
5          Let me make an objection for the
6       record. First of all, it's not a copy
7       of a statement, it's excerpts of a
8       statement. We have no idea who
9       transcribed it or under what
10       circumstances, and we object to the
11       fact that it was only provided to us
12       now. We've just made copies and
13       haven't really had a chance to review
14       it.
15       MR. WIEDEMANN:
16          We also have a transcription of
17       the statement.
18       MR. SANDERS:
19          Verbal.
20       MR. WALKER:
21          So you have something more than
22       the excerpts; is that what you're
23       saying?
24       MR. GILBERT:
25          Let me just state for the record

1   that this is excerpts intended not to
2   offend without knowing the terms of
3   any confidentiality agreements between
4   Mr. Murph and Lafarge, if any.
5   MS. BERTAUT:
6       Well, I'm going to --
7   MR. WALKER:
8       Who made the determination that
9   it was not offensive or a breach of
10  confidentiality agreement between
11  Mr. Murph, Lafarge and --
12  MR. GILBERT:
13      This is not my deposition.
14  MR. HAYCRAFT:
15      Whose is it?
16  MR. GILBERT:
17      I don't have to answer that
18  question who made the determination.
19  MS. BERTAUT:
20      Well --
21  MR. WALKER:
22      Well, you just made a
23  representation on the record.
24  MR. GILBERT:
25      It's by way of explanation as to

1   why it's excerpts.  If it's a legally
2   sufficient explanation for you, that's
3   good.  If it satisfies your curiosity,
4   then that's good, too.
5   MR. WALKER:
6       What I'm asking, if you can
7   answer, is did you create this or was
8   it created by whoever provided it to
9   you?
10  MR. GILBERT:
11      I'm going to assert the right to
12  withhold attorney work product.  I'm
13  on the record here in a deposition,
14  and that's not an appropriate question
15  of a non deponent.
16  MR. WALKER:
17      My objection stands.  And it's
18  not only with respect to the potential
19  breach of the confidentiality
20  agreement between Mr. Murph and
21  Lafarge.
22  MS. BERTAUT:
23      I join in the objection.  If
24  you're going to show the witness a
25  statement that he's alleged to have

1   made here, I think it's incumbent upon
2   you to show the gentleman the complete
3   statement that he made and not these
4   bits and pieces.  And you're
5   apparently attempting to refresh his
6   recollection, and I think the witness
7   is entitled to a complete copy of
8   whatever it is he said that day.  So I
9   have a problem with you showing the
10  witness this statement.
11  MR. GILBERT:
12      Right.  Well, we believe this is
13  sufficient to refresh his recollection
14  concerning matters that are relevant
15  in this deposition.
16  MS. BERTAUT:
17      I understand that.  I still note
18  the objection.
19  MR. GILBERT:
20      This is not his deposition
21  testimony.  This is just simply a
22  memorialization of something he said
23  earlier.
24  MS. BERTAUT:
25      I understand that.  But under the

1   rules, if you're going to show the
2   witness a statement to refresh his
3   recollection, he's entitled to a
4   complete copy of the statement.
5   MR. SANDERS:
6       Let's move on.
7   MR. WIEDEMANN:
8       Let the record reflect that all
9   counsel has a copy of the statement.
10  MR. WEBB:
11      Let the record reflect that all
12  counsel do not have copies of the
13  statement.  They have copies of the
14  excerpts, Mr. Wiedemann.  If you're
15  going to say it, say I correctly,
16  please.
17  MR. SANDERS:
18      Let's move on.
19  MR. WIEDEMANN:
20      All counsel have been furnished a
21  copy of the excerpts of Statement of
22  Arthur Murph, including Mr. Webb,
23  prior to showing the statement to the
24  witness.
25  MR. WALKER:

Page 74

```
 1          Sorry, Larry, but we want to make
 2    another objection or statement for the
 3    record, and that is that we don't --
 4    as I said earlier, I don't know the
 5    circumstances under which this
 6    purported statement was given, but if
 7    it was with respect to a potential or
 8    actual representation that Mr. Murph
 9    was obtaining from Mr. Guidry or
10    anybody at that firm, it gets into
11    aspects of attorney/client privilege
12    which Mr. Murph has not waived, and I
13    don't see that he has consulted any
14    counsel present with respect to that
15    potential waiver and a knowing waiver
16    on his part of the protections that
17    he's afforded.
18    MR. GILBERT:
19          And Lafarge doesn't have standing
20    to assert that privilege.  There's no
21    privity between Mr. Murph and Lafarge.
22    MR. WEBB:
23          Counsel you're dead wrong.  All
24    the members of the bar have a
25    responsibility to uphold the code of
```

Page 75

```
 1    professional responsibility.  And if
 2    Mr. Guidry did violate the
 3    attorney/client privilege, then we're
 4    all duty bound to report that to the
 5    Office of Disciplinary Counsel, which
 6    I intend to do.
 7    MR. SANDERS:
 8          Okay.  It's out.  Let's go
 9    forward.
10    MR. WIEDEMANN:
11          Okay.  Let's get on with it.
12    Y'all finished?
13    MR. WALKER:
14          Yeah.  But my statement has
15    something to do beyond that, and that
16    is that you're going to ask Mr. Murph
17    questions regarding a statement which
18    he's going to respond to under oath,
19    and he think he has the right to
20    consult the attorney who provided you
21    this to determine whether he should,
22    knowingly, and if he does, that he
23    does so knowingly, waive or
24    potentially waive an attorney/client
25    privilege.
```

Page 76

```
 1    MR. GILBERT:
 2          He's never been deprived of that
 3    right.  He's been free to consult that
 4    attorney at any time he wants, and as
 5    far as way know he has.  We don't know
 6    whether he has or hasn't.
 7    MR. WIEDEMANN:
 8          Okay.  Y'all finished?
 9    EXAMINATION BY MR. WIEDEMANN:
10    Q.   Mr. Murph, you have in front of you a
11    excerpt of a Statement of Arthur Murph taken on
12    January 25th, 2006, by Richard J. Guidry (RJG).
13    A.   Uh-huh.
14    Q.   Do you recall giving a statement to
15    Mr. Guidry?
16    A.   I don't think I need to talk about
17    this until and unless I talk to my attorney and
18    see if it's okay to for me to say anything else
19    about this here.
20    Q.   Who is your attorney?
21    A.   Mr -- my memory ain't that good.  I
22    got a card in my pocket.  What's that name
23    that's on there?  (Tendering.)
24    Q.   It's --
25    MR. WIEDEMANN:
```

Page 77

```
 1          He has given me a card that says
 2          Richard J. Richthofen, Jr., 303 South
 3          Broad Street, New Orleans 70119.
 4    A.   Uh-huh.
 5    EXAMINATION BY MR. WIEDEMANN:
 6    Q.   My question, Mr. Murph, is not about
 7    the statement itself.  Do you recall giving a
 8    statement?
 9    A.   No.
10    Q.   Do you recall having your statement
11    transcribed on a machine?
12    A.   No.
13    Q.   Do you recall ever going to the office
14    of Richard J. Guidry or the office of the
15    Cochran Firm?
16    A.   No.
17    Q.   You are going to speak to your
18    attorney about this statement?
19    A.   Right.
20    Q.   You understand that your deposition in
21    regard to the statement will have to be, that
22    part of the deposition, rescheduled at a later
23    time once you have talked to the attorney.  You
24    understand that?
25    A.   That's fine.
```

1    Q.  Okay.  And that you will probably
2  receive another subpoena to appear for another
3  deposition, which will be related to the
4  statement, assuming your attorney has no
5  objection or doesn't have a legitimate
6  objection.  You understand that?
7    A.  Right.  Yes.
8    Q.  Okay.  Mr. Murph, following Hurricane
9  Katrina, did you meet with any attorneys other
10  than the ones that we've mentioned concerning
11  the damage to your property?
12    A.  I'm going to have to check on that
13  with my lawyer, too.
14    Q.  You're going to check with your
15  lawyer --
16    A.  Right.
17    Q.  -- concerning meeting with attorneys
18  after the hurricane?
19    A.  Yes.
20    Q.  Did you at some point in time
21  following the hurricane make some financial
22  arrangement or settlement with any companies
23  regarding your house?
24    A.  No.  I've been compensated for my
25  losses.

1    Q.  By whom?
2    A.  I have to talk with my lawyer about
3  that, too.
4    Q.  So you don't want to talk about --
5    A.  No.
6    Q.  Wait let me just put it on the record.
7  You don't want to talk about who compensated
8  you for your home following the accident?
9    A.  No.
10    Q.  Following the hurricane, I should say.
11    A.  Right.
12    Q.  So we'll be clear, you don't want to
13  talk about meeting with attorneys following the
14  hurricane concerning your property damage or
15  your claim.  Is that correct?
16    A.  Yes.
17    Q.  You don't want to talk about whether
18  you received any settlement funds from the
19  damage to your house or to yourself following
20  the hurricane.
21    A.  Right.
22    Q.  And you don't want to talk about the
23  statement that I have shown you, or the
24  excerpts of a statement, dated January 25,
25  2006, is that correct?

1    A.  Yes.
2    Q.  Those are three things that you are
3  going to check with your attorney to determine
4  whether or not you can answer questions
5  concerning those inquiries.
6    A.  Right.
7    Q.  And your attorney is going to be the
8  attorney that you gave me the card from?
9    A.  Yes.
10    Q.  And you are going to get an opinion
11  from the attorney, is that correct?
12    A.  Yes.
13    Q.  And when do you expect you will talk
14  to him, what time frame are we talking about?
15  A week, two weeks?
16    A.  I'm going to try to get in touch with
17  him today.
18    Q.  Okay.  Well, I just want to give you
19  some leeway, because I know you got to work and
20  whatever.
21    A.  Right.
22    Q.  But would two weeks be a sufficient
23  time for you to --
24    A.  I think so.
25    Q.  Okay -- to get an opinion from him.

1    A.  Right.
2    Q.  Concerning those three aspects.
3    A.  Yes.
4    Q.  Okay.  Has anyone -- any attorney told
5  you not to testify in this case?
6    A.  I'm going to have to talk with my
7  attorney on that, too.
8    Q.  So you're going to have to talk to him
9  about that.  That's the fourth thing.
10    A.  Right.
11    Q.  About whether any attorney instructed
12  you not to answer questions concerning your
13  property or the other -- the four areas of
14  inquiry we talked about.
15    A.  Right.
16    Q.  Okay.  Did you at some time sign an
17  agreement with anybody, a confidentiality
18  agreement, not to discuss what happened to you,
19  your family or your property in Hurricane
20  Katrina?
21    A.  That's the fifth thing.
22    Q.  Okay.  So you're not going to talk
23  about any confidentiality agreement.
24    A.  No.
25    Q.  Okay.  Now, Mr. Murph, you purchased

1  the property on Jourdan Avenue from
2  Mrs. Shirley Priestly and others, is that
3  correct?
4      A.  Yes.
5      Q.  And let me show you a cash sale of the
6  property to your wife Jeanne A. Church and
7  Arthur L. Church, Jr., which is dated --
8          MR. GILBERT:
9              That's not what it says.  It's to
10             Jeanne A. Church Murph and Arthur L.
11             Murph, Jr.
12 EXAMINATION BY MR. WIEDEMANN:
13     Q.  Which is dated January 21, 2005.  And
14 the statement from the U.S. Department of
15 Housing and Urban Development.
16         You recall that purchase?  This is
17 Jeanne A. Church Murph and Arthur L. Murph,
18 Jr., as purchasers.  Do you recall that?
19     A.  Somewhat.
20     Q.  Well, this sale agreement contains the
21 signature of Arthur L. Murph, Jr.  Is that your
22 signature?
23     A.  Yes, it is.
24     Q.  And it contains the signature of
25 Jeanne A. Church Murph.  Is that the signature

1  of your wife?
2      A.  Yes.
3      Q.  All right.  So is that not the
4  agreement that you and she signed regarding the
5  property on Jourdan Avenue?
6      A.  Yes, it is.
7      Q.  And you purchased it from the
8  Priestlies, is that correct?
9      A.  Right.
10     Q.  And did you not, at the time of the
11 purchase of the property, execute a second
12 mortgage for $18,000 on the property?
13     A.  Um -- I can't recall.
14     Q.  Let me show you the statement from the
15 U.S. Department of Housing and Urban
16 Development which reflects proceeds from second
17 mortgage $18,680.  Do you recall that?
18     A.  Somewhat.
19     Q.  Well, let me show you, if I might, the
20 promissory note dated January 21, 2005, the
21 same date as the Act of Sale, for $18,680
22 signed by your wife and yourself.
23         You recognize those signatures?
24     A.  Yes.
25     Q.  Did you not execute a promissory note

1  in favor of the Priestlies?
2      A.  I'm going to have to get back with you
3  with my lawyer about all this, because I don't
4  know what it's leading to.  We going to leave
5  that alone.  I'll discuss it with my attorney.
6      Q.  You're going to discuss with your
7  attorney whether or not you can talk about your
8  purchase of property?
9      A.  Yep.
10     Q.  All right.  Have you spoken to any
11 attorneys since you were subpoenaed to testify
12 in this case?
13     A.  Mine.
14     Q.  You spoke to the gentleman whose card
15 you showed us?
16     A.  Yes.
17     Q.  And without telling me what you talked
18 about, did he tell you not to appear here and
19 testify today?
20     A.  No, he didn't.
21     Q.  Did you tell him that you were
22 subpoenaed to testify concerning the Hurricane
23 Katrina matter?
24     A.  Yes.
25     Q.  Did you tell him about any things that

1  you had transacted before or after Hurricane
2  Katrina?
3      A.  We talked -- you'll be able to talk
4  with him when I get back with him.
5      Q.  Well, what I want to know is, when you
6  got the subpoena that you knew you were coming
7  here to talk under oath about Hurricane Katrina
8  and how it affected you and what you knew, did
9  you discuss that with your attorney?
10     A.  Yes.
11     Q.  Did he tell you not to appear here and
12 not to testify?
13     A.  No, he didn't.
14     Q.  Did he say that you should assert any
15 kind of privilege?
16     A.  (Shakes head negatively.)
17     Q.  Huh?
18     A.  No.
19     Q.  So before coming here today, even
20 though you talked to your attorney, you were
21 not advised not to assert any privilege that
22 you might have here.
23     A.  He said if I had any problem with
24 anything and any questions, to tell them to get
25 with my attorney, and that's what I'm doing.

Page 86

1    Q.  Did you talk to any other attorneys in
2  the last sixty days regarding this matter?
3    A.  No.
4    Q.  So the only attorney that you've
5  talked to in the last sixty days was the
6  attorney whose card you showed us earlier?
7    A.  Right.
8    Q.  And that is -- that's been your
9  attorney since Hurricane Katrina?
10   A.  You'll have to talk with him about
11 that.
12   Q.  Huh?
13   A.  That's been my attorney.
14   Q.  Okay.
15   MR. GILBERT:
16       Is anybody going to traverse on
17   anything that's been done already?
18   MS. BERTAUT:
19       I have a question.  Is that what
20   you're asking?
21   MR. GILBERT:
22       Yes.
23   MS. BERTAUT:
24       Uh-huh.
25   MR. WIEDEMANN:

Page 87

1       We'll tender the witness subject
2    to advices from his attorney as to
3    what if any limitation he's going to
4    assert, and we'll reschedule the
5    deposition upon that advice, which I
6    understand from him we should -- from
7    the witness we should have in two
8    weeks.  And I'll follow up with the
9    attorney to find out what their
10   position is.
11 EXAMINATION BY MS. BERTAUT:
12   Q.  Mr. Murph, my name is Carmelite
13 Bertaut and I represent one of the parties in
14 this litigation.  I'm going to just ask you a
15 few questions.  If you have any -- if you can't
16 hear me, let me know.  I would ask you to speak
17 up, because I had to -- I had some difficulty
18 and I want to make sure I hear everything that
19 you have to say.
20   A.  Okay.
21   Q.  Mr. Murph, other than your daughter
22 Ariana, do you have any other children?
23   A.  Yes.
24   Q.  What other children?
25   A.  I got two sons.

Page 88

1    Q.  And how old are they?
2    A.  Oh, 39 and 28, somewhere around that
3  area.
4    Q.  At the time of Katrina, they were not
5  living with you?
6    A.  No.
7    Q.  And what are their names?  The
8  39-year-old, let's start with him.
9    A.  Same as mine; Arthur, III.
10   Q.  And the 28-year-old?
11   A.  Ryan.
12   Q.  Ryan?
13   A.  Ryan Ralph Smith.
14   Q.  Is it possible that you purchased 1739
15 Jourdan Avenue in January, 2005?
16   A.  I don't know when I purchased that
17 place.
18   Q.  Do you have ID on you today, sir, a
19 drivers' license?
20   A.  Yes, I do.
21   Q.  Can you take it out for us and tell
22 us --
23   A.  Sure.  Do you want it?
24   Q.  Well, I'm going to ask you what
25 address does it have on it for you.

Page 89

1    A.  105 Berkley.
2    Q.  And you got that license after the
3  storm?
4    A.  Yes.
5    Q.  Well, before you lived at 1739 Jourdan
6  Avenue, where did you live?
7    A.  In Pineville.
8    Q.  Okay.  And that's Pineville,
9  Louisiana?
10   A.  Yes, it is.
11   Q.  Where did you live in Pineville?
12   A.  On Brice Street.
13   Q.  Brice.  Is that B-R-I-C-E?
14   A.  Right.
15   Q.  And how long did you live on Brice
16 Street in Pineville?
17   A.  I can't remember.
18   Q.  Are we talking months, years?
19   A.  Months.
20   Q.  Months.  Did you own the house on
21 Brice Street?
22   A.  No.
23   Q.  Were you still working for -- is it
24 Brice Construction?
25   A.  Same as the street.

Page 90

1    Q.  Were you working for Brice in the
2  Pineville area?
3    A.  No, I wasn't.
4    Q.  Were you commuting every day into the
5  Greater New Orleans area?
6    A.  I wasn't working then.  I was just
7  there with my family.
8    Q.  And I take it by your family you mean
9  your wife?
10    A.  And my daughter.
11    Q.  And your daughter.  Was there some
12  business reason for you to be in Pineville?
13    A.  I didn't have nowheres else to go.
14    Q.  Now, when you were living in
15  Pineville, was that before Katrina?
16    A.  No.
17    Q.  That was after Katrina.
18    A.  Yes.
19    Q.  Okay.  My question, and maybe I --
20  maybe I misunderstood you.  I asked you where
21  you lived before you lived at 1739 Jordan
22  Avenue.
23    A.  Before 1739 Jordan Avenue?
24    Q.  Yes, sir.
25    A.  I can't recall the street that I was

Page 91

1  staying on.
2    Q.  Can you recall any addresses before
3  1739 Jordan Avenue?
4    A.  I stayed in, um -- in the Treme area.
5    Q.  In the Treme?
6    A.  Right.
7    Q.  And when you lived in Treme, where did
8  you live?  What street?
9    A.  In an apartment.
10    Q.  And what street was that on?
11    A.  I think Governor Nichols.
12    Q.  And when you lived on Governor
13  Nichols, you were working at Brice?
14    A.  Yes.
15    Q.  Did you ever live in Franklinton?
16    A.  No.  Not that I know of.  Franklinton?
17  No.
18    Q.  Is the only address in the Lower Nine
19  that you have lived at 1739 Jordan Avenue?
20    A.  In the Ninth Ward?
21    Q.  Well, I was talking about the Lower
22  Ninth Ward, but let me rephrase the question.
23        Other than 1739 Jordan Avenue, have
24  you lived at any other addresses in the --
25    A.  Yes.

Page 92

1    Q.  -- Lower Ninth Ward?
2    A.  Yes.
3    Q.  Okay.  Where else have you lived, sir?
4    A.  On Jordan Avenue.
5    Q.  A different number?
6    A.  Yes.
7    Q.  And what number was that?
8    A.  17 -- next door to the house I was
9  staying in.
10    Q.  Excuse me again?
11    A.  Next door to the other house.
12    Q.  Okay.
13    A.  To 1739.  1743 or something like that.
14    Q.  1743 Jordan?
15    A.  I think so.
16    Q.  And when did you live at 1743 Jordan?
17    A.  I don't know.  I don't keep up with
18  all these times, I just stay and go.
19    Q.  1743 Jordan Avenue, did you own that
20  house?
21    A.  No.
22    Q.  Your were renting?
23    A.  Yes.
24    Q.  Do you know who your were renting
25  from?

Page 93

1    A.  I can't remember his name.
2    A.  It was a man?
3    A.  Yes.
4    Q.  Let me ask you -- 1739, now.  Switch.
5  We're at 1739 Jordan Avenue.
6    A.  Right.
7    Q.  That house faced the Industrial Canal?
8    A.  Yes.
9    Q.  What was across Jourdan Avenue?  Was
10  there a structure across Jourdan Avenue from
11  1739?
12    A.  A levee.
13    Q.  A levee.  So there were no houses on
14  the other side of the street?
15    A.  No.
16    Q.  No buildings of any sort.
17    A.  None.
18    Q.  Okay.  Now, I'm going to ask you about
19  1743 Jourdan --
20    A.  Right.
21    Q.  -- the rental property that you lived
22  in.
23        Was there any structure across the
24  Jourdan Avenue from that house?
25    A.  No.

Page 94

1    Q.   So if you stood either on 1739 or 1743
2   and looked at the canal, you would have no
3   structures between you.
4    A.   You'd see a levee.
5    Q.   Other than 1739 and 1743 Jourdan
6   Avenue, did you live at any other locations in
7   the lower Ninth Ward?
8    A.   No, unh-unh.
9    Q.   The Berkley address that you gave us,
10  is in the east?
11   A.   No.
12   Q.   Where is that?
13   A.   It's on the other side of the river in
14  Algiers.
15   Q.   The time that you spent at 1743
16  Jourdan Avenue, was that months or years?
17   A.   I think about a year, I don't know.  I
18  can't remember.
19   Q.   Did you move from 1743 to 1739?
20   A.   Yes.
21   Q.   Okay.  Back in 2005, before the storm,
22  when you worked for Brice did you come home
23  every night or did you have to travel?
24   A.   Yeah I come home every night.
25   Q.   Again, before Katrina, now, what was

Page 95

1   your work schedule, was it five days a week?
2    A.   Yes.  Sometimes six.
3    Q.   The carpentry work that you do, can
4   you describe for us, is that commercial,
5   residential?
6    A.   Commercial.
7    Q.   Are you a finishing carpenter?
8    A.   Everything.
9    Q.   So you come in after the building is
10  up and finish off the inside?
11   A.   No.  We bring it out the ground and
12  take it until you move in.
13   Q.   In the period of time that you lived
14  in the two addresses on Jourdan Avenue, did you
15  ever have any street flooding on Jourdan Avenue
16  prior to Katrina?
17   A.   No.
18   Q.   You talked about moving your car up on
19  Paris Avenue, your car and your truck.  Do you
20  remember?
21   A.   Yes.
22   Q.   Had you done that prior to Katrina, on
23  any occasion prior to Katrina, moved your
24  vehicles to Paris Avenue to avoid flooding?
25   A.   It never flood around there.

Page 96

1    Q.   So you never had moved to Paris
2   Avenue?
3    A.   Just that one time.
4    Q.   While you were living on Jourdan
5   Avenue, did you go through any other tropical
6   storms or hurricanes?
7    A.   The one that they had on the TV, but
8   it wasn't never like this one here.
9    Q.   Was that Tropical Storm Cindy?
10   A.   Cindy, Rita, I guess, I don't know.  A
11  bunch of storms.
12   Q.   Okay.  Well, the storm that you're
13  thinking about on the television, was that
14  before Katrina?
15   A.   Whatever storm they had before the
16  time that I was staying there, I went through
17  them.
18   Q.   You don't recall any of the names?
19   A.   No.
20   Q.   Did you ever have any damage to your
21  home in the prior storms?
22   A.   No.
23   Q.   Okay.  Prior to the time the water
24  came down the street when Katrina hit, did you
25  notice any wind damage to your house --

Page 97

1    A.   No.
2    Q.   -- from -- and what was the finish on
3   your house?
4    A.   Brick.
5    Q.   To enter your home, the 1739 Jourdan
6   Avenue home, did you have to go up any steps?
7    A.   One.
8    Q.   And do you know the size of your
9   property at 1739 Jourdan Avenue, the land
10  itself?
11   A.   I can't remember that.
12   Q.   The garage that you talked about, this
13  was an attached -- a garage attached to the
14  house?
15   A.   No, it wasn't.  It was separate.
16   Q.   Do you ever have an occasion to walk
17  up toward the levee, toward the floodwall prior
18  to the day before Katrina hit?
19   A.   Yes.
20   Q.   Okay.  On what occasions would you do
21  that?
22   A.   Just walk up there to look.
23   Q.   Okay.  Now, again we're not talking
24  about the Sunday of Katrina; is that right?
25   A.   Come again?

1     Q.  I'm referring to prior to Katrina, not
2  that Sunday of Katrina.  Did you walk up to
3  look at the floodwall and over it?
4     A.  All the time.
5     Q.  All the time.  Okay.  Was this a
6  regular thing you would do?
7     A.  No, I used to cut the levee.
8     Q.  You would cut the levee?
9     A.  Yes.
10     Q.  Who would -- were you hired to do
11  that?
12     A.  No.
13     Q.  Okay.  Why would you do that?
14     A.  To make the front of my house look
15  good.
16     Q.  When did you start -- or when was the
17  first time you cut the levee?
18     A.  Oh, soon as I moved in the house.
19  Ms. priestly used to cut it, so I kept it up.
20     Q.  How much of the levee would you cut
21  when you would cut it?
22     A.  As wide as the front of my house and
23  from the street to the levee where it goes up,
24  right in the turn.
25     Q.  So you would just cut the levee -- the

1  grass on the levee immediately in front of your
2  house.
3     A.  Right.
4     Q.  And how often would you do that?
5     A.  Every time I cut my grass.
6     Q.  Did you keep your property up?
7     A.  Yes.
8     Q.  So how frequently would you cut your
9  grass?
10     A.  Every week.
11     Q.  Did you have any trouble cutting the
12  grass on the levee?
13     A.  No.
14     Q.  Did you see any water ponding or
15  accumulating on the levee?
16     A.  No.
17     Q.  Did you see any drainage problems
18  associated with the levee in front of your
19  house?
20     A.  No.
21     Q.  Do you know, when was the last time
22  before Katrina hit that you would have cut the
23  levee?
24     A.  No.  Unh-unh.  I can't remember.
25     Q.  Do you know where the drains were

1  around your house?
2     A.  Yes.
3     Q.  Where were they in terms of your --
4  1739 Jourdan Avenue?
5     A.  One was on -- across the street from
6  me directly in front of my house on the levee
7  side.
8     Q.  That's the same one, right?  On the --
9     A.  That's the only one.
10     Q.  Did you keep that levee -- that drain
11  clear?
12     A.  Yes.
13     Q.  Would that be part of your grass
14  cutting?
15     A.  Yes.
16     Q.  Do you know at the time Katrina hit
17  whether that drain was clear?
18     A.  No, I sure don't.
19     Q.  Did you cut the levee when you were
20  living next door at 1743 Jourdan, as well?
21     A.  No.
22     Q.  Now, when you would go toward the
23  floodwall and the Industrial Canal, did you
24  ever have occasion to look on the other side of
25  the floodwall, between the floodwall and the

1  canal itself?
2     A.  Yes.
3     Q.  What did you see when you would look
4  there?
5     A.  Nothing but the canal.
6     Q.  Did you ever see any activity going on
7  between the floodwall and the canal itself?
8     A.  What kind of activity?
9     Q.  That's what I'm asking you.
10     A.  No.
11     Q.  No?
12     A.  No, nothing but boats passing.
13     Q.  Were there any businesses located on
14  the canal side of the floodwall in the area of
15  your house?
16     A.  Not directly in front of my house, but
17  off to the left they had a business.
18     Q.  And what business was that, do you
19  know?
20     A.  Something about the rodents.  Rodent
21  control or something.
22     Q.  And was that on the canal side of the
23  levee?
24     A.  Yes.
25     Q.  Were you aware of any work that was

1  being done in and around the Industrial Canal
2  near your house?
3      A.  Work on what?
4      Q.  Near the Industrial Canal area,
5  between Jourdan Avenue and the water.
6      A.  They had some people working on the
7  other side.
8      Q.  Okay.  The other side of what?
9      A.  The levee.
10     Q.  What do you know about that work?
11     A.  They just was digging all the time.
12     Q.  When was this?
13     A.  All the time, looked like.
14     Q.  Okay.  When you say all the time, can
15 you be more specific?
16     A.  Most of the time I look out there when
17 I be cutting grass or throwing horse shoes,
18 they have people working.
19     Q.  When you say digging, how were they
20 digging?
21     A.  I guess they was making the canal
22 wider, I don't know what they doing over
23 there.
24     Q.  Do you know the names of any of the
25 companies --

1      A.  No.
2      Q.  -- that were involved?  Let me finish
3  the question.
4          Do you know the names of any of the
5  companies involved in the work that was being
6  done?
7      A.  No, I sure don't.
8      Q.  Did you know anybody who was doing any
9  work in that area?
10     A.  No.
11     Q.  Now, when you say digging, can you
12 describe how they were digging?
13     A.  They was digging in the water.
14     Q.  Digging with shovels, digging with
15 machines?
16     A.  With an excavator.  With a machine.
17     Q.  What kind of machine?
18     A.  An excavator.
19     Q.  Was there one of them?
20     A.  I don't know.
21     Q.  Do you know how many?
22     A.  Maybe two.
23     Q.  Other than an excavator, did you see
24 any other machines in that area?
25     A.  No, unh-unh.

1      Q.  And when did you see this work being
2  done?
3      A.  It was being done all the time.
4  That's what I say, I don't know if they were
5  dredging or what.
6      Q.  Well, where were they excavating?
7      A.  Along the -- on the other side of the
8  levee, down in the water.
9      Q.  In the water?
10     A.  In the water.
11     Q.  Are we talking about -- I'm trying to
12 understand the period of time that this work
13 took place.  Are we talking about days, weeks,
14 months?  Can you tell me?
15     A.  Weeks, I guess, months.  They always
16 was over there.
17     Q.  Did you see this work being done when
18 you were standing in front of your house on
19 Jourdan Avenue?
20     A.  No.
21     Q.  Did you have to walk up the levee in
22 order to be able to see it?
23     A.  Yes.
24     Q.  Could you see it if you -- how far up
25 the levee did you have to go before you could

1  see this work being done?
2      A.  All the way to the top.
3      Q.  Okay.  All right.  So you had to get
4  to the top and look down?
5      A.  Get to the top and look over.
6      Q.  Look over.  Did you ever see any
7  trucks in the area of your house and the
8  Industrial Canal?
9      A.  No, unh-unh.
10     Q.  Without going up the levee and looking
11 over, was there any way that you could tell
12 that work was ongoing on any given day on the
13 canal side of the floodwall?
14     A.  Yes.
15     Q.  How could you tell?
16     A.  You can see the boom of the excavator
17 sticking up in the sky.
18     Q.  Any other way you could tell?
19     A.  No, not unless you went up there.
20     Q.  Did you ever have any complaints about
21 the work that was being done on the canal side
22 of the levee?
23     A.  No.
24     Q.  In connection with your yard work, did
25 you ever have an occasion to dig into your

Page 106

1 yard, for flowers or any kind of landscaping?
2    A.  Yes.
3    Q.  Did you ever have problems with water
4 seepage when you would do that?
5    A.  No.
6    Q.  And where would this be, would this be
7 the front or the back of your property?
8    A.  The back.
9    Q.  Who is your supervisor at Brice?
10    A.  Steve Huffman.
11    Q.  Steve Huffman?
12    A.  Yes.
13    Q.  H-O-F-F-M-A-N?
14    A.  Yes.  H-U.
15    Q.  H-U.
16       MR. GILBERT:
17          Carmelite, is your question who
18       is or who was?
19       MS. BERTAUT:
20          Who is.
21 EXAMINATION BY MS. BERTAUT:
22    Q.  Is that what you answered me, who is
23 your supervisor?
24    A.  Yes.
25    Q.  Do you know if Brice did any work

Page 107

1 around the Industrial Canal prior to Katrina?
2    A.  I don't know.  Not around my house.
3    Q.  Not around your house.  Okay.
4       Was it your wife's intention to stay
5 on Jourdan Avenue for the storm?
6    A.  No.
7    Q.  She was always intending to go to the
8 Hyatt?
9    A.  I don't know if she was intending to
10 go to the Hyatt, but he wasn't planning on
11 staying there.
12    Q.  When you walked up the levee -- now,
13 I'm going back on the Sunday of Katrina.  When
14 you walked up the levee and looked at the canal
15 before you brought your wife to the Hyatt, did
16 the level of the water alarm you?
17    A.  A little bit.
18    Q.  Had you ever seen it that high before?
19    A.  No.
20    Q.  When you walked up the levee and
21 looked at the level of the water, did you see
22 anything in the water --
23    A.  No.
24    Q.  -- in the immediate area?
25    A.  (Shakes head negatively.)

Page 108

1    Q.  Okay.  Now, I want to direct your
2 attention to the time when you returned to your
3 house --
4    A.  Right.
5    Q.  -- after you dropped your wife off.
6       At some point did it begin to rain?
7    A.  Yes, it did.
8    Q.  Do you know when in the time line it
9 began to rain?
10    A.  It looked like it might have been
11 raining all day that day.
12    Q.  When you lost your power and the
13 lights went out --
14    A.  Right.
15    Q.  -- was it raining at that point?
16    A.  Yes.
17    Q.  Was it raining hard?
18    A.  I don't know.  The wind was blowing
19 real hard.
20    Q.  To get from your house to your garage
21 that night, to get to the generator, were you
22 under a covered walkway?
23    A.  No.
24    Q.  Did you get wet going into the garage?
25    A.  Yes.

Page 109

1    Q.  Was there any standing water in your
2 yard?
3    A.  A little bit.
4    Q.  Was it over the tops of your shoes?
5    A.  No.
6    Q.  Did you notice any trees down or
7 debris in your yard at that point?
8    A.  No.
9    Q.  To get to the garage you went out your
10 back door?
11    A.  Yes.
12    Q.  Are there steps down in the back?
13    A.  One.
14    Q.  Okay.  And is your garage raised?
15    A.  No.
16    Q.  So were there any steps to get into
17 the garage?
18    A.  No.
19    Q.  The water that was in your backyard,
20 was it up to the step?
21    A.  No.
22    Q.  Could you tell me the two cross
23 streets that 1739 was situated on on Jourdan
24 Avenue?
25    A.  What you mean?

Page 110

1    Q.  Are you between N. Derbigny and N.
2  Roman?
3    A.  Yes.
4    Q.  Was 1739 closer to N. Derbigny or N.
5  Roman?
6    A.  N. Roman.
7    Q.  Do you know how many houses from the
8  corner of N. Roman and Jourdan Avenue your
9  house was?
10   A.  One double.
11   Q.  So that one double would have been to
12  your right?
13   A.  Yes.
14   Q.  When you stood on your front and saw
15  the water coming down Jourdan --
16   A.  I wasn't standing on the front.
17   Q.  Oh.  Where were you, inside?
18   A.  I was coming down the driveway.
19   Q.  When you were standing in your
20  driveway and you looked to your right and you
21  saw the water coming --
22   A.  No.
23   Q.  Okay.  Tell me.
24   A.  I looked ahead and the water was
25  coming.  You look to the right you'd be looking

Page 111

1  at the house.
2    Q.  Okay.  So you saw the water on the
3  street looking straight ahead?
4    A.  Right.
5    Q.  At that point in time, did you notice
6  anything unusual about the levee?
7    A.  No.
8    Q.  Did you look at the levee?
9    A.  No.
10   Q.  Okay.  So what you saw was the water.
11   A.  Yes.
12   Q.  What was the visibility like at that
13  moment?
14   A.  It was dark.
15   Q.  Was it raining?
16   A.  Yes.
17   Q.  Raining hard?
18   A.  It was a blowing rain, like.
19   Q.  Was it coming down in sheets?
20   A.  Off and on, I guess.
21   Q.  Well, I'm interested when you're
22  standing in the driveway.  Was it coming down
23  in sheets?
24   A.  I don't know.  I was looking at the
25  water.

Page 112

1    Q.  The 1743 Jourdan Avenue that you used
2  to live at, the rental, is that to your left or
3  to your right?
4    A.  To the right.
5    Q.  So is that the double between you and
6  N. Roman?
7    A.  Yes.
8    Q.  The house that you swam to was to your
9  left?
10   A.  Yes.
11   Q.  Do you know the number of Jourdan
12  Avenue that house is?
13   A.  No.  It I guess it must -- no, not
14  really.
15   Q.  Is 1743 demolished?
16   A.  It's gone.
17   Q.  It's gone.  And the house that you
18  swam to, is it gone, too?
19   A.  It's gone.
20   Q.  Did you ever see any ads for witnesses
21  as to the levee breaches?
22   A.  Not really.
23   Q.  Did you ever answer any ads for
24  witnesses?
25   A.  No.

Page 113

1    Q.  The excerpts that Mr. Wiedemann showed
2  you, the document that he showed you, had you
3  ever seen that document before today?
4    A.  No.
5    Q.  Were you shown anything before today?
6    A.  No.
7    Q.  Did you meet with lawyers right before
8  coming here today?
9    A.  No.  Just mine.
10   Q.  You met with your lawyer Mr. Guidry?
11   A.  Not today, yesterday.
12      MR. BRUNO:
13         Not today.  Obviously sometime in
14      the past.
15      MR. GILBERT:
16         That's not what --
17      MR. WEBB:
18         That's not what he's testified to
19      earlier.
20      MR. GILBERT:
21         That's a leading question.
22  EXAMINATION BY MS. BERTAUT:
23   Q.  Did you meet with lawyers today, prior
24  to coming into this room?
25   A.  No.

Page 114

1    Q.  No.  Other than your lawyer who
2  represents you, have you met with any lawyers
3  in this -- who are now in this room prior to
4  today?
5    A.  I'm going to have to -- I can't answer
6  that.
7    Q.  You can't answer that because that's
8  something you want to talk to your lawyer
9  about?
10    A.  Right.
11    Q.  And I'm sorry.  I may have
12  misunderstood.  What is the name of the lawyer
13  you're going to check with?
14    A.  I can't get his name out right but you
15  can read his card.  He got one of them funny
16  names.  First name Richard.
17    Q.  Richard Richthofen?
18    A.  Yes.
19    Q.  Do you have any pictures of your house
20  after the damage done in the storm?
21    A.  No.
22    Q.  Did you have any insurance on your
23  house?
24    A.  Which one?
25    Q.  1739 Jourdan.

Page 115

1    A.  I had insurance.
2    Q.  Did you file a lawsuit for coverage or
3  for payments from your insurance company?
4    A.  No.
5    Q.  Did you make a Road Home claim?
6    A.  No, unh-unh.
7    Q.  Did you ever fill out any forms to
8  make a claim against the government?
9    A.  No.
10    Q.  Do you know what a Form 95 is?
11    A.  No.
12    Q.  Have you ever heard that term?
13    A.  No.
14    Q.  Let me just have one minute.  I think
15  I may be done.
16        Mr. Murph, I was not clear, when you
17  were taken by boat from the house next door to
18  you, what day was that?
19    A.  That was Monday.
20    Q.  This was Monday?  And from that house,
21  where were you taken by the boat?
22    A.  To the bridge.
23    Q.  That's the Claiborne bridge?
24    A.  Yes.
25    Q.  Did you spend some time on the bridge?

Page 116

1    A.  A couple of hours.
2    Q.  When you first arrived on the
3  Claiborne bridge, was it daylight?
4    A.  Yes.
5    Q.  Could you see your house from the
6  bridge?
7    A.  Yep.
8    Q.  What did you see?
9    A.  Water and the house.
10    Q.  Did you look at the canal?
11    A.  It all looked the same because the
12  water had done leveled off.  It was just a big
13  lake.
14    Q.  So you couldn't tell where the
15  Industrial Canal levee was?
16    A.  No.
17    Q.  Looking toward the Industrial Canal, I
18  guess looking north when you're standing on the
19  Claiborne bridge on that day --
20    A.  Right.
21    Q.  -- could see any of the levee or
22  floodwall of the Industrial Canal?
23    A.  Yeah, you could.  You could see the
24  brick part sticking up out the water.
25    Q.  And from the Claiborne bridge, where

Page 117

1  did you go next?
2    A.  To the St. Claude bridge.
3    Q.  Do you know Carolyn Berryhill?
4    A.  Carolyn Berryhill?  No.
5    Q.  How about Diane Berryhill?
6    A.  No.  That might have been the chicks
7  that was in the place.  No, I don't -- them
8  names don't ring no bells.
9    Q.  Okay.  And then when you were on the
10  St. Claude bridge, from there where did you go?
11    A.  To the Hyatt.
12    Q.  You met up with your wife?
13    A.  Yes.
14    Q.  And that would have been what day?
15    A.  That was the day of -- I guess -- that
16  was the day after the hurricane.
17    Q.  Okay.  Is that Monday or Tuesday?
18    A.  That's Tuesday, I think.
19    Q.  Tuesday.  So did you spend the night
20  on one of these two bridges?
21    A.  No.  I spent the night in that
22  two-story house.
23    Q.  When you got -- back up a minute.
24  When you got to the two-story house, swimming
25  to the two-story house, was it daylight?

Page 118

```
 1    A.  It was dark.
 2    Q.  It was dark?
 3    A.  Right.
 4    Q.  Was it dark before dawn on Monday?
 5    A.  You talking about when I got to the
 6  house?
 7    Q.  When you got to the house.
 8    A.  It was that night, I guess, or early
 9  in the morning.  I don't know what time it was.
10    Q.  But that was on Monday.
11    A.  Monday or Sunday, I don't know.
12    Q.  What I'm trying to understand is how
13  long you stayed at 1739 Jourdan Avenue on
14  the -- looking out through the roof.
15    A.  I don't know.  It was late that night.
16  I don't know what time it was, though.
17    Q.  Okay.  When you say that night, I'm
18  just confused whether you're talking Sunday
19  night into Monday morning or --
20    A.  Somewhere along there.  I don't know
21  if it was Sunday night or Monday morning.
22    Q.  By dawn on Tuesday, do you know where
23  you were?
24    A.  Heading towards the Hyatt.
25    Q.  You had not gotten to the Hyatt by
```

Page 119

```
 1  dawn on Tuesday?
 2    A.  Dawn.  What you mean dawn, noon or
 3  afternoon?
 4    Q.  When did you arrive on Tuesday?
 5    MR. BRUNO:
 6        By dawn she means early morning
 7      hours.  Okay?
 8    A.  No, it was in the evening.
 9  EXAMINATION BY MS. BERTAUT:
10    Q.  I'm sorry.
11    A.  It was in the afternoon.  I don't know
12  if it was --
13    Q.  Is it your appreciation that you were
14  never represented by Mr. Guidry?
15    A.  No.
16    Q.  No, that's not your understanding?
17    A.  No, I never been represented by
18  Mr. Guidry.
19    Q.  Do you have a copy of any statement
20  that you may have given anyone who came to talk
21  to you about what happened during Katrina?
22    A.  No.
23    Q.  Would you like a copy of that?
24    A.  I got -- I had one just a while ago.
25    Q.  The one that Mr. Wiedemann gave you?
```

Page 120

```
 1    A.  Right.
 2    Q.  When you were in your attic looking
 3  out through the hole in the roof, could you
 4  tell the direction the water was flowing in?
 5    A.  Run that by me again.
 6    Q.  When you were standing in your
 7  attic --
 8    A.  Right.
 9    Q.  -- looking out through the roof, could
10  you see any direction specific direction the
11  water was moving in?
12    A.  It was moving to the left.
13    Q.  So that would be toward the Claiborne
14  bridge?
15    A.  Yes.
16    Q.  And in that time, it was raining?
17    A.  Yep.
18    Q.  Coming down harder?
19    A.  It was just blowing.
20    Q.  Blowing.  Did you have any occasion to
21  see any trees pulled up that night?
22    A.  No.
23    Q.  Thanks, Mr. Murph.  I don't have any
24  other questions.
25    A.  You're welcome.
```

Page 121

```
 1        (Brief recess.)
 2      MS. BERTAUT:
 3          I just want to clarify that we
 4        will reserve our rights to renotice or
 5        to participate in a deposition should
 6        it be renoticed again in order to
 7        delve into the areas that the witness
 8        has declined to answer.
 9      MR. LAGARDE:
10          Andre Lagarde for the Orleans
11        Levee District.  No questions for the
12        witness today, but same issue as
13        Ms. Bertaut, reserving our rights if
14        and when we reconvene after the
15        privilege issues are resolved.
16  EXAMINATION BY MR. WALKER:
17    Q.  Mr. Murph, my name is Derek Walker and
18  I represent Lafarge North America.  I just have
19  a couple of questions to help me understand
20  your testimony today.
21        What time was it, to the best of your
22  recollection, when you left your house with
23  your wife and daughter and went to the Hyatt?
24    A.  It was in the evening.  I don't know
25  exactly what time it was.  It was in the
```

Page 122

1  afternoon, though.
2     Q.  So, did you have lunch that day?
3     A.  No.
4     Q.  Do you remember if it was after
5  lunchtime that you left?
6     A.  I can't recall.  It's been a while.
7     Q.  What car did you drive to the Hyatt?
8     A.  My wife's.
9     Q.  And what kind of car is that?
10    A.  She got a Chevy.  A 2001 Cavalier.
11    Q.  And you had previously taken another
12  car to Paris Avenue?
13    A.  A truck.
14    Q.  Okay.  And you had already taken it
15  there earlier that day?
16    A.  Right.
17    Q.  What route did you take to go to the
18  Hyatt?  Do you remember what streets you took,
19  which way you went there?
20    A.  Not really.  I just drove on the
21  ground.
22    Q.  Do you remember if you went over the
23  Claiborne Avenue bridge?
24    A.  Yeah.  You got to go over the
25  Claiborne Avenue bridge.

Page 123

1     Q.  Okay.  Did you ever get on I-10?
2     A.  No.  It was on the ground.
3     Q.  Did you take Claiborne to Canal?
4     A.  No.  I went St. Claude, I think.
5  Yeah.  I think I used St. Claude.  I went to
6  St. Claude.
7     Q.  And when you went back to Jourdan
8  Avenue, to your home, later that day, if I
9  understand you correctly, you first went to
10  Paris Avenue?
11    A.  Run that to me again.
12    Q.  Okay.  When you went back to get your
13  dog --
14    A.  Right.
15    Q.  -- okay?  You don't remember what time
16  you left the hotel.
17    A.  No.
18    Q.  Were you there a couple of hours,
19  would you say?
20    A.  No, unh-unh.  I didn't stay there long
21  at all.  Just long enough to drop them off.
22    Q.  Okay.  Walk me through again.  You
23  went from the hotel to where?
24    A.  To a friend of -- to Sean's house.  A
25  friend of mine.

Page 124

1     Q.  And that's on Paris Avenue?
2     A.  Right.
3     Q.  How did you get there?
4     A.  In my wife's car.
5     Q.  Okay.  So you drove yourself to Paris
6  Avenue.
7     A.  Right.
8     Q.  Okay.  And then you left that car at
9  Paris Avenue?
10    A.  Right.
11    Q.  Okay.  At your friend's house?
12    A.  Right.
13    Q.  And you mentioned two names, Mike and
14  Deshawn; is that right?
15    A.  Mike is Sean 's cousin.  They kin to
16  each other some kind of way or another.
17    Q.  And Sean is a woman?
18    A.  No, it's a fella.
19    Q.  It's a man.  Okay.  Mike and Sean.
20  Two males.
21    A.  Right.
22    Q.  At whose house did you leave your car?
23    A.  At Sean 's.
24    Q.  Okay.  And who drove you from there to
25  Jourdan Avenue?

Page 125

1     A.  Sean did.
2     Q.  Okay.  Where does Felton come into the
3  picture?
4     A.  That's a friend of mine.  He stay
5  around my house.
6     Q.  Okay.  But he didn't drive you from
7  Paris Avenue.
8     A.  No.
9     Q.  So Sean drove you to Jourdan Avenue
10  much.
11    A.  Right.
12    Q.  And did he just levee and go back
13  home?
14    A.  Right.
15    Q.  So he just dropped you off.
16    A.  Right.
17    Q.  And Felton was going to take you back
18  to the Hyatt.
19    A.  Right.
20    Q.  Had you already called him to let him
21  know you were coming back and ask him if he
22  could drive you to the hotel?
23    A.  No.  Me and him had been together
24  earlier that evening.
25    Q.  Okay.  You'd seen him at the Hyatt?

Page 126

1    A.  No.
2    Q.  Okay.  You had been earlier together
3  in your neighborhood.
4    A.  Right.
5    Q.  Okay.  And what had you told him to
6  let him know this?
7    A.  No.  He came to my house.
8    Q.  Before or after you --
9    A.  Before that.
10    Q.  Before you went to the Hyatt.
11    A.  Before I took and moved all the
12  vehicles.
13    Q.  Okay.
14    A.  And he know he was supposed to come
15  back and get me.
16    Q.  So you already knew you were coming
17  back?
18    A.  Yeah.
19    Q.  Well, when did you find out that you
20  could keep dogs at the Hyatt?
21    A.  When I dropped my wife off.
22    Q.  Okay.  But you already arranged with
23  Felton to bring you back?
24    A.  No.  Me and Felton met by Sean 's.
25    Q.  Okay.

Page 127

1    A.  We set there and we drank a couple of
2  beers.
3    Q.  All right.  And so did Felton go back
4  with you and Sean?  Or did he drive himself
5  back?
6    A.  Felton drove hisself.
7    Q.  So you and Sean went in one car and
8  Felton went in his own car.
9    A.  Went in another one.  Right.
10    Q.  But while you were at Sean 's drinking
11  a couple of beers, you asked Felton if he could
12  take you back to the Hyatt letter that day.
13    A.  Right.
14    Q.  Is that right?
15    A.  Yes.
16    Q.  Okay.  Well, what route did you take
17  from Paris Avenue to your home at Jourdan
18  Avenue with Sean?
19    A.  Took the Interstate.
20    Q.  Took the Interstate?
21    A.  Yeah.  I think so.
22    Q.  Well, where did you exit the
23  Interstate?
24    A.  We got down at, um -- at Louisa I
25  think that is.  Louisa.  You go around the

Page 128

1  bend.  Got down to Louisa.
2    Q.  And then where did you go from Louisa?
3  How did you enter the Ninth Ward?
4    A.  Over the blue bridge.
5    Q.  Is that the St. Claude bridge?
6    A.  No, that's the --
7    Q.  I mean Florida?
8    A.  That's the Florida Avenue bridge.
9    Q.  And then you went down what streets in
10  the --
11    A.  Jourdan.
12    Q.  Okay.  So you came down Jourdan
13  towards your house.
14    A.  Right.
15    Q.  Did you see anything up on the canal
16  at that time?
17    A.  No.
18    Q.  Any boats, barges, anything like that?
19    A.  I wasn't really looking for anything
20  in the canal.
21    Q.  But you were on the passenger side of
22  the car, right?
23    A.  Yes.
24    Q.  So you would have been facing the
25  Industrial Canal side, right?

Page 129

1    A.  That's the side I would be sitting on,
2  yes.
3    Q.  And you didn't see anything in the
4  canal that caused you any concern, did you?
5    A.  No.  We were just riding and talking.
6    Q.  And those boats ride pretty high up in
7  the canal when you're down below, don't they?
8    A.  If the water is like it was, it would
9  have.  But on a regular day it would be down,
10  just in the canal.
11    Q.  But that day you already knew the
12  water was way high --
13    A.  Yes.
14    Q.  -- because you had seen it earlier in
15  the day, right?
16    A.  Yes.
17    Q.  So if there had been boat in the
18  canal, it would have been way up high and you
19  would have seen it, wouldn't you?
20    A.  Yeah.
21    Q.  And you didn't see any boat or barge
22  as you drove down.
23    A.  No.
24    Q.  All right.  So Sean dropped you off at
25  your home, is that right?

Page 130

1    A.  Yes.
2    Q.  Now, just approximately, if you can
3  tell me, how many hours had it been since you
4  had left earlier that day with your wife and
5  daughter?
6    A.  I don't know.  I have no idea.
7    Q.  More than three, less than three?
8    A.  If I told you any amount of time I'd
9  be lying to you.  I really don't know.
10   Q.  I understand.
11       Earlier, when you went to the levee
12  before you took your wife and daughter, you
13  said that the water was very high in the canal
14  and you saw it splashing over.  Is that right?
15   A.  Right.
16   Q.  When you came back from the Hyatt, was
17  it still splashing over or was it now spilling
18  over into the neighborhood?
19   A.  I don't know.  I didn't really pay it
20  no mind then.
21   Q.  As you drove down Jourdan Avenue,
22  could you see any standing water?
23   A.  No.  It just had the blowing rain,
24  that's it.
25   Q.  Was it nighttime yet?

Page 131

1    A.  Yeah.
2    Q.  But it was blowing rain.
3    A.  Yes, sir.
4    Q.  Do you know where -- in what direction
5  the wind was blowing from?
6    A.  It was blowing from the right side of
7  my house to the left side.  It was blowing
8  toward the Claiborne bridge.
9    Q.  So from Florida Avenue toward
10  Claiborne?
11   A.  Yes.
12   Q.  Now, is Felton 's last name Bercy?
13   A.  Yes.
14   Q.  B-E-R-C-Y?
15   A.  Yes.
16   Q.  Do you have a phone number for him?
17   A.  I don't know it, but I have it.  The
18  number I got in my phone, you can't get him.
19   Q.  Okay.  Did you make any preparations
20  in your house for the incoming storm?
21   A.  What kind of preparations?
22   Q.  Did you put up plywood in your
23  windows?
24   A.  No, I had storm shutters all the way
25  around my house.

Page 132

1    Q.  Did you prepare those storm shutters?
2    A.  They were down.
3    Q.  Meaning that all your windows were
4  shuttered closed?
5    A.  They were all the way down.
6    Q.  So once you were in the house you
7  couldn't see out, could you?
8    A.  You don't know if it's daylight or
9  dark.
10   Q.  So all these times that you testified
11  in answer to Mr. Wiedemann's questions that you
12  came in and out of the house, when you were in
13  the house you couldn't see anything outside.
14   A.  No.
15   Q.  The only time you could see anything
16  was when you were in your driveway or two and
17  from your shed or garage, right?
18   A.  I'd have to be outside.
19   Q.  Now, is your garage the same as your
20  shed or are those two different buildings?
21   A.  It's two different buildings.
22   Q.  So you have a garage, a shed, and also
23  an efficiency apartment?
24   A.  Right.
25   Q.  Three structures in your back?

Page 133

1    A.  No.  No shed.  The garage is the shed.
2    Q.  That's what I thought.
3        So you have a garage which is a shed.
4  That's one building.
5    A.  Right.  That's the garage.
6    Q.  And then you have an apartment.
7    A.  Right.
8    Q.  Okay.  Or you had.
9    A.  Right.
10   Q.  The front of your house faced Jourdan
11  Avenue?
12   A.  Front of my house is on Jourdan
13  Avenue.
14   Q.  Right.  Is on Jourdan Avenue.
15   A.  Right.
16   Q.  Did you have a porch?
17   A.  Yes.
18   Q.  And the side door that you testified
19  you went in and out of, how far back from the
20  front of your house was that?
21   A.  It's not a side door, it's a back
22  door.
23   Q.  Back door.
24   A.  Right.
25   Q.  So that would be directly --

Page 134

1    A.   Behind the house.
2    Q.   -- in the backyard?
3    A.   Right.
4    Q.   And what did you have behind your
5  house, did you have a neighbor facing Tennessee
6  Street?
7    A.   Tennessee Street?
8    Q.   I mean Deslonde?
9    A.   How you mean?
10    Q.   Did you have a neighbor directly
11  behind you?
12    A.   Yes.
13    Q.   And do you know who that was, their
14  name?
15    A.   That was my sister's boyfriend.
16    Q.   Your sister's boyfriend?
17    A.   Right.  Dray.
18    Q.   I'm sorry?
19    A.   Dray.
20    Q.   What's his last name?
21    A.   I don't know.
22    Q.   And he was staying at that house?
23    A.   He was staying in a little efficiency
24  in the back.
25    Q.   In your efficiency?

Page 135

1    A.   Yes.
2    Q.   Okay.  Did you have a neighbor behind
3  you?
4    A.   He was my neighbor behind me.
5    Q.   Did you have a house behind you?
6    A.   No.
7    Q.   Were there any tall trees in your
8  backyard or in the backyards next to you?
9    A.   Yes.
10    Q.   And in whose backyard?
11    A.   It was in the people that stay in the
12  double next to me.
13    Q.   Next to you toward?
14    A.   In the two-story.
15    Q.   Toward Claiborne?
16    A.   Right.
17    Q.   Their house faced Jourdan, also?
18    A.   Jourdan Avenue.
19    Q.   And they had a tall tree in their
20  backyard?
21    A.   Right.
22    Q.   No, you said that your house is a
23  one-story house, is that right?
24    A.   Right.
25    Q.   And how tall would you say the peak of

Page 136

1  your roof was?
2    A.   From the ground to the very top?
3    Q.   Yes.
4    A.   I'd say about sixteen, seventeen feet,
5  maybe.
6    Q.   At the that you were in the attic
7  before you tied the extension cord around you
8  to swim away, the water had risen to the height
9  of your attic?  Is the right?
10    A.   It was at the -- it was right even
11  with the gutter.
12    Q.   And you had eight foot ceilings?
13    A.   Right.
14    Q.   Plus I think you said a couple of
15  steps up to your porch?
16    A.   One.
17    Q.   One step up to your porch?
18    A.   One step into the house.
19    Q.   Into the house.  Well, was the porch
20  on the ground or did you have any steps going
21  up to the porch before --
22    A.   The porch is two inches off from the
23  drive -- off from the carport.
24    Q.   Okay.  Now, on your drive back from the
25  Hyatt to Jourdan Avenue with -- from Paris

Page 137

1  Avenue, back to Jourdan Avenue, what was the
2  weather conditions?
3    A.   The wind was blowing, and raining.
4    Q.   Was it dark and stormy?
5    A.   I was dark and the wind was just
6  blowing.
7    Q.   And did you see any standing water
8  around the Paris Avenue area or as you got on
9  or off I-10?
10    A.   No.
11    Q.   Mr. Murph, you know that you're under
12  oath here today; right?
13    A.   Right.
14    Q.   Same as if you were in Court in front
15  of a judge or jury?
16    A.   Right.
17    Q.   And you've told the truth today,
18  haven't you, to the best of your recollection?
19    A.   Yes, I have.
20    Q.   And everything that you said here
21  today is as you remembered living it?
22    A.   Yes.
23    Q.   And the things that you saw, that
24  you've stated here today, is as you remember
25  seeing them?

Page 138

1    A.  Yes.
2    Q.  Okay.  Thank you, Mr. Murph.  That's
3 all I have.
4 EXAMINATION BY MR. BRUNO:
5    Q.  Mr. Murph, my name is Joe Bruno.  And
6 I represent plaintiffs, people who are filing
7 suit against some of the good people in this
8 room.  I'd like to ask you some questions.  And
9 I know you've been here for a long time and I
10 appreciate your patience --
11    A.  Right.
12    Q.  -- in putting up with us.  What I'd
13 like to talk about first is the period of time
14 before Katrina.  All right?  Before the storm.
15 Okay?
16    A.  Uh-huh.
17    Q.  When you first moved to Jourdan.  Can
18 you remember that?
19    A.  No.
20    Q.  All right.  I believe you told us this
21 morning that you had lived on that street for
22 about ten years?
23    A.  Somewhere along there, I guess.
24    Q.  About that.  I know -- I'm not asking
25 you to pinpoint the time, but it's about ten

Page 139

1 years?
2    A.  Yes.
3    Q.  All right.  Can you remember a time
4 when there were businesses in operation on the
5 water side of that floodwall when you lived on
6 Jourdan?
7    A.  Just the time they been working all
8 the time.
9    Q.  I didn't understand that.
10    A.  They always worked on the other side
11 of the levee.
12    Q.  Okay.  By that -- well, let me make
13 sure that you understand my question.
14    A.  Right.
15    Q.  Do you remember any companies who had
16 businesses located on the other side of that
17 floodwall, on wharves or other things that were
18 in the water, on the water side of the levee?
19    A.  No.
20    Q.  Okay.  All right.  But I believe then
21 what you're telling me is, and tell me if I'm
22 wrong, but that during the entire time that you
23 lived on Jourdan there was always some kind of
24 construction activity on the other side of that
25 wall.

Page 140

1    A.  Right.
2    MS. BERTAUT:
3       Object to the form of the
4 question.
5    MR. BRUNO:
6       What's wrong with the form?
7    MS. BERTAUT:
8       Misstates the testimony.
9    MR. BRUNO:
10       That's not a form objection.
11 EXAMINATION BY MR. BRUNO:
12    Q.  Anyway, can you remember during that
13 period of time, that approximate ten years,
14 ever having walked up to the wall to kind of
15 peak over the other side to see what kind of
16 work was going on over there?
17    A.  Yes.
18    Q.  Okay.  Can you describe for us the
19 kind of work activity that you saw going on on
20 the other side of that wall?
21    A.  Yes.
22    Q.  What did you see?
23    A.  I think they was dredging the canal,
24 to make it deeper.
25    Q.  Uh-huh.  All right.  What kinds of

Page 141

1 equipment did you see in use?
2    A.  Excavator.
3    Q.  An excavator?
4    A.  And big backhoes digging in the water.
5    Q.  Digging being old holes?
6    A.  I don't know if he was digging holes,
7 but he was digging in the water.
8    Q.  He was digging something.
9    A.  Right.
10    Q.  Okay.  All right.  Now, can you
11 remember whether during this span of time,
12 about ten years, did you ever see construction
13 people on the land side of the floodwall, in
14 other words, in front of your house?
15    A.  No.
16    Q.  Are you familiar with that logo that
17 the United States Army Corps of Engineers has
18 on their helmets, they've got the castle?
19    A.  Right.
20    Q.  You know what I'm talking about?
21    A.  Exactly.
22    Q.  Did you ever see fellows with that
23 logo on their helmet or on their clothes
24 walking around on the land side of the
25 floodwall by your house?

Page 142

```
 1    A.  Sometimes.
 2    Q.  Sometimes?
 3        MR. LAGARDE:
 4           Objection to form.
 5        Clarification, Joe.  You talking pre
 6    or post-storm?
 7        MR. BRUNO:
 8           All of these questions were
 9        pre-storm.
10        MR. LAGARDE:
11           Thank you, Joe.
12        MR. BRUNO:
13           I made that, I thought, very
14        clear.  But I'll do it again.
15    EXAMINATION BY MR. BRUNO:
16    Q.  We're talking about before the storm.
17    A.  Right.
18    Q.  Before Katrina ever came, or you
19    thought it was coming.
20    A.  Right.
21    Q.  I know I'm testing your memory, but
22    can you give me some sense of how often you
23    would see these fellows with the castles on
24    their helmet in the area in front of your
25    house?
```

Page 143

```
 1    A.  They don't normally be there all the
 2    time.  Just every now and then.
 3    Q.  Every now and then?
 4    A.  Right.
 5    Q.  Mr. Murph, you ever take walks along
 6    the levee near that floodwall?
 7    A.  Yes.
 8    Q.  Can you remember ever observing any
 9    puddling of water on the levee side or the land
10    side of that floodwall while you were taking
11    your walks?
12    A.  On my side of the wall?
13    Q.  Yeah.
14    A.  No.
15    Q.  Nothing like that?
16    A.  Every now and then it might rain a
17    little, they might have a little water going
18    down the drain.  The drain was on the levee
19    side.
20    Q.  Okay.  All right.  And I know that
21    every walk might have been different, but was
22    there some sort of regular route that you might
23    take if you chose to take a walk along the
24    levee, along the wall there?
25    A.  No.
```

Page 144

```
 1    Q.  All right.  Is this something you did
 2    very regularly, that is, take a little walk
 3    along that wall?
 4    A.  No.
 5    Q.  All right.  I take it that you would
 6    drive occasionally up and down Jourdan Avenue.
 7    A.  Every day.
 8    Q.  Every day.  And would you go -- would
 9    your route take you to the right?  Or I think
10    that would be north.  Would that be north --
11    A.  Yeah.
12    Q.  -- if you turn right?
13        Would your ride ever take you that
14    way?
15    A.  It all depends on where I was going.
16    Q.  Okay.  All right.  Did you ever notice
17    any puddling or pooling of water when it wasn't
18    raining along that floodwall?
19    A.  No.
20    Q.  Okay.  All right.  Now, let's talk
21    about the storm.
22    A.  Okay.
23    Q.  Okay?  Hurricane Katrina.  When you
24    got back to the house, to pick up the dog --
25    A.  Right.
```

Page 145

```
 1    Q.  Okay?  And I know that this may have
 2    been asked a couple hundred times, but I just
 3    want to see if I can clarify it.  Was it -- the
 4    sun still out --
 5    A.  No.
 6    Q.  -- or was it dark?
 7    A.  It was dark.
 8    Q.  It was dark.  Okay.  All right.  And
 9    did you watch a little TV?
10    A.  A lil bit.
11    Q.  That night?  Okay.  Do you remember
12    any of the shows you might have saw --
13    A.  No.
14    Q.  -- that night?
15    A.  (Shakes head negatively.)
16    Q.  I imagine you were listening to the
17    news.  Were you listening to the news?
18    A.  I don't know.
19    Q.  Well, were you interested in what was
20    going on with that storm?
21    A.  Yes.
22    Q.  Okay.  And from time to time, did the
23    broadcast bulletins on the TV about what was
24    going on with the storm?
25    A.  Probably.
```

1    Q.  Probably.  Okay.  All right.
2        At some point did you ever get tired
3  and maybe want to go to sleep?
4    A.  No, I don't think.
5    Q.  No?
6    A.  No.
7    Q.  So you just -- tell me how you
8  occupied your time.
9    A.  Just sit there with the dog.
10   Q.  Watching the TV set?
11   A.  Until it went off.
12   Q.  All right.  So you watched the TV
13  until it stopped working.
14   A.  Right.
15   Q.  Is that right?
16   A.  Right.
17   Q.  Okay.  Now, I'm sort of curious.  What
18  made you believe that Paris Road was safer for
19  your car than the Lower Nine?
20   A.  Paris Avenue.
21   Q.  Paris Avenue, I'm sorry.
22   A.  I used to stay in the 7th Ward.
23   Q.  Okay.  But I mean, what about you
24  staying in the 7th Ward made you believe that
25  it was a safer place to put your car than where

1  your house was?
2    A.  Because when Betsy came it didn't get
3  wet there.
4    Q.  Okay.  All right.  So you were in the
5  Lower Nine during Betsy?
6    A.  No.  I was in the St. Bernard Project.
7    Q.  Okay.  So it's because -- well, let me
8  ask you this:  Did you have some sense that the
9  Lower Nine would flood again in this hurricane?
10   A.  Yeah.  Sure.
11   Q.  Why did you feel that way?
12   A.  It flooded for Betsy.
13   Q.  Okay.  So the mere fact that it
14  flooded in Betsy made you feel like it probably
15  was going to flood again.
16   A.  Oh, yeah.
17   Q.  Well, can you maybe help me understand
18  why you waited until late Sunday to leave if
19  you had a concern that it might flood in the
20  Lower Nine?
21   A.  Because I knew Felton was going to
22  come back.
23   Q.  Well, I mean when you decided to leave
24  with the wife and your child.
25   A.  Well, I was looking at the news on the

1  television.
2    Q.  Okay.  Well, hadn't they been saying
3  for a couple of days to evacuate the city?
4    A.  No.
5    Q.  When is the first time that you heard
6  or saw anybody say anything about you need to
7  leave the city because of the hurricane?
8    A.  Oh, me and my friends, we talked about
9  it.
10   Q.  Was that -- what day of the weekend
11  was that?
12   A.  I don't know.
13   Q.  All right.  Who made the final
14  decision to leave?  You?
15   A.  I did.
16   Q.  You did?  Not your wife?
17   A.  Oh.  And her, too.
18   Q.  Her, too.
19   A.  Right.
20   Q.  It was your wife, wasn't it?
21   A.  Right.
22   Q.  I know better.
23       Now, I know it's hard to remember time
24  and what you were doing over that span of time,
25  but at the point where you decided to get the

1  ax and put a hole in your roof, why did you
2  decide to do that?
3    A.  Because I know if water was coming
4  down the street as fast as it was it was going
5  to get high real quick.
6    Q.  Can you help me understand why you
7  felt like it was going to get high quick?
8    A.  Because it was coming down the
9  driveway fast.
10   Q.  All right, sir.  The water was moving
11  very fast?
12   A.  Real fast.
13   Q.  Okay.  All right.  But after you made
14  the hole, you came down again.
15   A.  Right.
16   Q.  So I gather you felt like the danger
17  wasn't quite as bad as it was before?
18   A.  No, I just wanted to check out things
19  downstairs.
20   Q.  Now, whenever it was that you saw this
21  big thing, which you may have described as a
22  barge, I don't even remember, what caused you
23  to look in that direction?
24   A.  I don't know, just peeping up looking
25  around.

Page 150

1    Q.   Okay.  All right.  So in essence, you
2  were looking around, and then you saw this big
3  thing.
4    A.   Right.
5    Q.   When you first saw it, was it moving
6  or was it stationary?
7    A.   I don't know.  I don't know if it was
8  moving or it was standing still.  It was so
9  big --
10   Q.   How close to you was this thing?
11   A.   About from here to that wall.
12   Q.   All right.  That's about twenty feet?
13   A.   I guess.  About twenty.
14   Q.   No?
15   A.   Whatever.
16   Q.   About that.  Okay.
17        Do you know whether or not this big
18  thing was in contact with your house?
19   A.   Yeah.
20   Q.   How do you know?
21   A.   Because I looked at it.  I was in the
22  hole in the roof and I looked at the barge
23  right there.
24   Q.   And all of this occurred when it was
25  dark outside.

Page 151

1    A.   Right.
2    Q.   Can you give me some sense of how much
3  time passed between the time the lights went
4  out and you saw this big thing next to your
5  house?
6    A.   It was a long time.
7    Q.   It was a long, long time?
8    A.   It was a long time.
9    Q.   Hours?
10   A.   Oh, yeah.  Yeah, it was hours.  For
11  sure.  How many, I don't -- I have no idea.
12   Q.   Okay.  And then you swam over to the
13  neighbor 's house?
14   A.   Yes.
15   Q.   And the water was high?
16   A.   Yeah.
17   Q.   All right.  Get any sleep that night?
18   A.   No.
19   Q.   That's all I've got.  Thank you.
20   A.   You're welcome.
21       MR. WALKER:
22          I'd like add something for the
23       record before you go off.  As counsel
24       for WGI noted, we make the same
25       observation that we reserve any

Page 152

1  questioning of Mr. Murph with respect
2  to any other issues which may arise
3  surrounding the statement in the event
4  that he's brought to testify again.
5       MR. WIEDEMANN:
6          Just for the record, there's more
7       than just the statement.  He gave five
8       instances of things he was going to
9       check with his attorney.
10      MR. WALKER:
11         Correct.  Thank you.  We reserve
12      our rights with respect to each and
13      every one of those and any other
14      matters that may come up in the
15      examination of Mr. Murph.
16         Thank you very much, Mr. Murph.
17   A.   That's it?
18      MR. SANDERS:
19         Yeah.
20         (Whereupon the deposition was
21      recessed for the day.)

Page 153

1       WITNESS' CERTIFICATE
2
3       I, ARTHUR LEE MURPH, JR., do hereby
4  certify that the foregoing testimony was given
5  by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10  _____   _____
11  DATE SIGNED        ARTHUR LEE MURPH, JR.
12
13  _____  Signed with corrections as noted.
14
15  _____  Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN:  December 17th, 2007

```
                                         Page 154
 1         REPORTER'S CERTIFICATE
 2         I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
 3  Certified Court Reporter in and for the State
 4  of Louisiana, do hereby certify that the
 5  aforementioned witness, after having been first
 6  duly sworn by me to testify to the truth, did
 7  testify as hereinabove set forth;
 8         That said deposition was taken by me
 9  in computer shorthand and thereafter
10  transcribed under my supervision, and is a true
11  and correct transcription to the best of my
12  ability and understanding.
13         I further certify that I am not of
14  counsel, nor related to counsel or the parties
15  hereto, and am in no way interested in the
16  result of said cause.
17
18
19
20
21
22
23  _____
24  JOSEPH A. FAIRBANKS, JR., CCR, RPR
25  CERTIFIED COURT REPORTER #75005
```

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION

                                              * NO. 05-4182

PERTAINS TO: BARGES            * Consolidated

                                              * SECTION "K(2)"

Boutte v. Lafarge       05-5531 *

Mumford v. Ingram       05-5724 * JUDGE DUVAL

Lagarde v. Lafarge      06-5342 *

Perry v. Ingram         06-6299 * MAG. WILKINSON

Benoit v. Lafarge       06-7516 *

Parfait Family v. USA   07-3500 *

Lafarge v. USA          07-5178 *

  * * * * * * * * * * *



(V O L U M E  II)

Deposition of ARTHUR LEE MURPH, JR.,
given at Chaffe McCall, L.L.P., 2300 Energy
Centre, 1100 Poydras Street, New Orleans,
Louisiana 70163-2300, on January 28th, 2008.


REPORTED BY:

JOSEPH A. FAIRBANKS, JR., CCR, RPR

CERTIFIED COURT REPORTER #75005

Page 156

1  APPEARANCES:
2  REPRESENTING THE PLAINTIFFS:
3      WIEDEMANN & WIEDEMANN
4      (BY:  LAWRENCE D. WIEDEMANN, ESQUIRE)
5      821 Baronne Street
6      New Orleans, Louisiana 70113
7      504-581-6180
8  - and -
9      BRIAN A. GILBERT, P.L.C.
10     (BY:  BRIAN A. GILBERT, ESQUIRE)
11     821 Baronne Street
12     New Orleans, Louisiana 70113
13     504-885-7700
14 - and -
15     LAW OFFICE OF PATRICK J. SANDERS
16     (BY:  PATRICK J. SANDERS, ESQUIRE)
17     3123 Ridgelake Drive, Suite B
18     Metairie, Louisiana 70002
19     504-834-0646
20
21
22
23
24
25

Page 157

1  REPRESENTING THE DEPONENT:
2      RICHTHOFEN & ASSOCIATES, L.L.C.
3      (BY:  RICHARD J. RICHTHOFEN, JR.,
4      ESQUIRE)
5      303 S. Broad St., 3rd Floor
6      New Orleans, Louisiana 70119
7      504-899-7949
8
9  REPRESENTING THE AMERICAN CLUB:
10     MONTGOMERY, BARNETT, BROWN, READ,
11     HAMMOND & MINTZ, L.L.P.
12     (BY:  PHILIP S. BROOKS, JR., ESQUIRE)
13     3200 Energy Centre
14     1100 Poydras Street
15     New Orleans, Louisiana 70163
16     504-585-3200
17
18 REPRESENTING WASHINGTON GROUP INTERNATIONAL
19     STONE PIGMAN WALTHER WITTMANN, L.L.C.
20     (BY:  CARMELITE M. BERTAUT, ESQUIRE)
21     546 Carondelet Street
22     New Orleans, Louisiana 70130
23     504-581-3200
24
25

Page 158

1  REPRESENTING LAFARGE NORTH AMERICA:
2      CHAFFE, MCCALL, L.L.P.
3      (BY:  DEREK A. WALKER, ESQUIRE)
4      (BY:  ROBERT B. FISHER, JR., ESQUIRE)
5      2300 Energy Centre
6      1100 Poydras Street
7      New Orleans, Louisiana 70163-2300
8      504-585-7000
9  - and -
10     GOODWIN PROCTOR, L.L.P.
11     (BY:  MARK S. RAFFMAN, ESQUIRE)
12     (VIA TELEPHONE)
13     901 New York Avenue, NW
14     Washington, D.C. 20001
15     202-346-4000
16
17 REPRESENTING NEW YORK MARINE & GENERAL
18 INSURANCE COMPANY:
19     SUTTERFIELD & WEBB
20     (BY:  DANIEL A. WEBB, ESQUIRE)
21     650 Poydras Street, Suite 2715
22     New Orleans, Louisiana 70130
23     504-598-2715
24
25

Page 159

1  REPRESENTING ZITO:
2      MOULEDOUX, BLAND, LEGRAND & BRACKETT,
3      L.L.C.
4      (BY:  WILLIAM C. EMORY, ESQUIRE)
5      701 Poydras Street, Suite 4250
6      New Orleans, Louisiana 70130
7      504-595-3000
8
9  REPRESENTING ORLEANS LEVEE DISTRICT:
10     SUTTON LAW FIRM
11     (BY:  CHARLES E. SUTTON, JR., ESQUIRE)
12     2101 N. Highway 190, Suite 105
13     Covington, Louisiana 70433
14     985-249-5991
15 - AND -
16     MCCRANIE, SISTRUNK, ANZELMO, HARDY,
17     MAXWELL & MCDANIEL
18     (BY:  KASSIE L HARGIS, ESQUIRE)
19     3445 N. Causeway Boulevard, Suite 800
20     Metairie, Louisiana 70002
21     504-831-0946
22
23
24
25

2 (Pages 156 to 159)

Page 160

1  REPRESENTING JEFFERSON PARISH:
2      BURGLASS & TANKERSLEY
3      (BY:  MONICA M. WALDRON-BURGLASS,
4      ESQUIRE)
5      5213 Airline Drive
6      Metairie, Louisiana 70001
7      504-836-2220
8
9  REPRESENTING PORT OF NEW ORLEANS:
10     DAIGLE, FISSE & KESSENICH, PLC
11     (BY:  KIRK N. AURANDT, ESQUIRE)
12     227 Highway 21, Madisonville,
13     Louisiana 70447
14     985-871-0800
15
16  ALSO PRESENT:
17     DON HAYCRAFT, ESQ.
18     AARON RIVES, ESQ.
19     PETER KEELEY
20     JOHN SHELONKO
21     JESSICA SULLIVAN, ESQ. (VIA TELEPHONE)
22
23
24
25

Page 161

1     E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:                PAGE
4
5  MR. GILBERT  ............................ 169
6  MR. RICHTHOFEN .......................... 258
7  MS. BERTAUT  ............................ 259
8  MR. GILBERT  ............................ 281
9  MR. WALKER  ............................. 285
10  MR. GILBERT  ............................ 289
11  MR. RICHTHOFEN .......................... 289
12     E X H I B I T   I N D E X
13
14  EXHIBIT NO.                    PAGE
15  Exhibit 1(a) ............................ 225
16  Exhibit 2(a) ............................ 242
17  Exhibit 3(a) ............................ 245
18  Exhibit 4(a) ............................ 246
19  Exhibit 5(a) ............................ 248
20  Exhibit 6(a) ............................ 252
21  Exhibit 7(a) ............................ 252
22  Exhibit 8(a) ............................ 257
23
24
25

Page 162

1        S T I P U L A T I O N
2      IT IS STIPULATED AND AGREED by and
3  among counsel for the parties hereto that the
4  deposition of the aforementioned witness may be
5  taken for all purposes permitted within the
6  Federal Rules of Civil Procedure, in accordance
7  with law, pursuant to notice;
8      That all formalities, save reading
9  and signing of the original transcript by the
10  deponent, are hereby specifically waived;
11      That all objections, save those as to
12  the form of the question and the responsiveness
13  of the answer, are reserved until such time as
14  this deposition, or any part thereof, is used
15  or sought to be used in evidence.
16
17
18            *  *  *
19
20
21
22      JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23  Certified Court Reporter in and for the State
24  of Louisiana, officiated in administering the
25  oath to the witness.

Page 163

1      ARTHUR LEE MURPH, JR.
2  105 Berkley Drive, New Orleans, Louisiana
3  70131, a witness named in the above
4  stipulation, having been first duly sworn, was
5  examined and testified on his oath as follows:
6      MR. RICHTHOFEN:
7          I'm sorry.  If I may, I'm here
8      for the sole purpose of just
9      representing Mr. Murph 's interests.
10      And before we begin, I'd request from
11      Lafarge that any confidentiality
12      agreement, any settlement agreement
13      that may or may not exist, that
14      Mr. Murph be allowed to discuss the
15      fact that there is and the terms
16      therein inasmuch as has been released
17      through the discovery process to the
18      plaintiffs' counsel.
19      MR. WALKER:
20          Derek Walker on behalf of
21      Lafarge.  Let me first indicate that
22      this is a continuation of a prior
23      deposition.  You're aware of that.
24      MR. RICHTHOFEN:
25          Yes.

Page 164

```
 1    MR. WALKER:
 2        Okay. Secondly, with respect to
 3    a waiver, Lafarge does of the agree to
 4    waive any of the terms of the
 5    confidential agreement nor the
 6    settlement agreement. The redacted
 7    settlement agreement has been
 8    produced, the document speaks for
 9    itself, and Lafarge does not waive the
10    terms of that document.
11    MR. GILBERT:
12        All right. And I'm going to join
13    in Mr. Richthofen 's request, and I'm
14    going to specifically, for the record,
15    cite to the language in the
16    confidentiality portion of the
17    agreement which says that the Murphs
18    agreed that in the event they should
19    be compelled by legal process, and I
20    believe that would include a subpoena,
21    to reveal the terms of this receipt
22    and release and settlement agreement,
23    they shall first obtain the written
24    permission of Lafarge North America,
25    Inc., New Jourdan, LLC., and New
```

Page 165

```
 1    Berkley, LLC, which permission shall
 2    not be unreasonably withheld. Now, if
 3    there are representatives here of
 4    these entities and there is no reason
 5    to withhold that, I would join in
 6    Mr. Richthofen 's request that
 7    Mr. Murph be allowed to speak about
 8    the terms of the settlement.
 9    MR. WALKER:
10        Well, again, on behalf of
11    Lafarge, Lafarge will not waive the
12    confidentiality terms of the agreement
13    to allow Mr. Murph to discuss the
14    terms of the agreement. The agreement
15    speaks for itself as unredacted, Judge
16    Wilkinson has a complete and
17    unredacted version, and he can make a
18    determination beyond any that can be
19    made here today if you wish the bring
20    the matter up to the judge, other than
21    to have Mr. Murph and Lafarge will
22    acknowledge the existence of this
23    agreement. Other than that, the terms
24    and conditions and other items that
25    are not self-evident from the document
```

Page 166

```
 1    itself we do not waive. As far as New
 2    Jourdan and Berkeley, we do not
 3    represent them.
 4    MR. GILBERT:
 5        Okay. We acknowledge our
 6    understanding of what you've just said
 7    and we do reserve rights to bring this
 8    matter and any other matters ancillary
 9    to this to the Court 's attention to
10    be addressed on the merits, if
11    necessary.
12        And what I'm going to do now is
13    I'm going to ask, if there are any
14    other entities here who are parties to
15    the settlement agreement, if they will
16    give their consent. If there are any
17    other representatives of any of the
18    other entities that are parties to
19    this agreement, I'm asking if they
20    would speak up for the record and
21    either give their consent or refuse.
22    MR. WALKER:
23        Specifically, which entities?
24    MR. GILBERT:
25        Let the record reflect that
```

Page 167

```
 1    there's utter silence in the room
 2    right now and that no other
 3    representative of any other entity
 4    that has responded to our request.
 5    MR. WALKER:
 6        Specifically, you're talking
 7    about New Jourdan and Berkley.
 8    MR. GILBERT:
 9        New Jourdan, Berkley -- there are
10    a number of entities that are named in
11    this settlement agreement as to whom
12    there's purportedly been a settlement
13    with the Murph family.
14    MR. WALKER:
15        I think for clarity of the record
16    you should name them, because I don't
17    think your characterization is
18    necessarily correct. So New Jourdan,
19    New Berkley, and what other entities
20    are you referring to?
21    MR. GILBERT:
22        On Page 4 of the settlement
23    agreement there is an agreement that
24    the Murphs agreed to indemnify and
25    hold harmless New Jourdan, LLC and its
```

Page 168

1  assignee and well as any other
2  released party as defined in Section 2
3  below.  And in Section 2.1, there's
4  language whereby the Murphs do release
5  and forever discharge Lafarge North
6  America, Ingram Barge Company, New
7  Jourdan, LLC, New Berkley, LLC, their
8  assigns, representatives, insurers, et
9  cetera.
10     And so I'm asking today if there
11  are any other entities that are party
12  to this agreement who will give
13  permission.
14  MR. WEBB:
15     Counsel, I'm Dan Webb.  I do not
16  represent New Jourdan, LLC.  I
17  represent New York Marine General
18  Insurance Company.  With respect to
19  New Jourdan, LLC, this is the first
20  request that it is aware of, and I can
21  pass it on to its principals, but I
22  have no idea what position its
23  principals would take.
24  MR. GILBERT:
25     Who are the principals of New

Page 169

1  Jourdan, LLC?
2  MR. WEBB:
3     Don't know.
4  MR. GILBERT:
5     Well, let's go for forward and
6  let's see what we can accomplish.
7  EXAMINATION BY MR. GILBERT:
8     Q.  Mr. Murph, I introduced myself a few
9  minutes ago.  My name is Bryan Gilbert.  I
10  represent residents of the Lower Ninth Ward,
11  parts of St. Bernard Parish in a lawsuit that's
12  been filed against companies that might be
13  responsible for a barge breaking the Industrial
14  Canal floodwall and causing flooding.  Those
15  allegations are not proven, but it is what we
16  allege.
17     You began your deposition
18  December 17th, 2007, if you recall, and there
19  are a few reasons for bringing you here today.
20  By way of explanation, let me just say it's to
21  clarify some matters that we began to talk
22  about in that earlier session, to speak about
23  some matters that you were unsure whether you
24  could talk about without first getting advice
25  of counsel, and to continue the deposition into

Page 170

1  other topics that we didn't get a chance to get
2  into because of the various obstacles that we
3  needed to contend with during the first
4  session.
5     Have you had a chance to consult an
6  attorney about the matters that you expressed
7  concern about in your first deposition?
8     A.  Yes.
9     Q.  And who would that be?
10     A.  Mr. Richthofen.
11     Q.  And has he given you advice?
12     A.  Some.
13     Q.  Okay.  Have you had sufficient
14  consultation or advice to go forward and answer
15  questions that we were beginning to explore
16  with you during that last session?
17     A.  Yes, I have.
18     Q.  I'm sorry?
19     A.  Yes.
20     Q.  Yes, he has?  You have to speak out
21  loud because the court reporter is taking
22  everything down, a nod or a head shake -- we're
23  not on video.
24     (Whereupon the deponent conferred with
25  counsel off the record.)

Page 171

1  MR. WALKER:
2     Before you answer, Mr. Murph, let
3  me respond to your initial statement
4  with a couple of statements and
5  objections.  Number one, as noted
6  earlier this is a continuation of
7  Mr. Murph 's prior deposition;
8  therefore, as a continuation those
9  attorneys who were questioning the
10  witness at the time are the ones who
11  properly should be proceeding with any
12  additional questions.  And I don't
13  believe, Mr. Gilbert, that you were
14  the attorney on behalf of the
15  plaintiffs group who was questioning;
16  therefore, we object to your
17  questioning the witness and any change
18  in the attorneys with respect to the
19  continuing deposition.
20     Secondly, you stated that you
21  intend to go into areas that were
22  previously covered.  And to the extent
23  that you do that, we're noting an
24  objection at this time.  There are
25  five limited areas that were reserved

Page 172

```
 1        for this continuing deposition.
 2        MR. GILBERT:
 3             And just to respond to that, I
 4        think that's a misimpression on
 5        Lafarge's part.
 6   EXAMINATION BY MR. GILBERT:
 7     Q.  Okay.  Have you received advice and
 8   counsel such that you're able to answer
 9   questions today about the topics that we were
10   beginning to explore during the last session?
11     A.  Yes.
12     Q.  Okay.  I'm just going to ask that -- I
13   think maybe Mr. Richthofen already asked you,
14   I'm just going to ask you to speak loud so that
15   everybody around the table can hear, especially
16   me.
17        Rather than rehash everything, I want
18   to clarify a few things and ask a few more
19   questions based on some gaps in the testimony.
20   You testified that you went to the Hyatt that
21   afternoon, and that your sister Doris Murph
22   works there.
23     A.  Yes.
24     Q.  What was her job there?
25        MR. WALKER:
```

Page 173

```
 1        Objection.  Not part of the five
 2        areas that we agreed and that were
 3        reserved for this deposition.
 4        MR. GILBERT:
 5             Okay.  Can we just agree to leave
 6        the standing objection -- continuing
 7        objection on the record rather than
 8        disrupting the examination and
 9        corrupting the record?
10        MR. WALKER:
11             No, I think what's probably more
12        proper is to interrupt the deposition
13        and bring this matter to Judge
14        Wilkinson, because our position is
15        that any attempt on your part to
16        either go over old testimony or, as I
17        assume y'all also attempt to do later,
18        get into the statement and the
19        confidentiality agreements, unduly
20        prejudice Lafarge if anything is put
21        on the record, and would annoy, harass
22        and potentially embarrass either the
23        deponent or Lafarge as an interested
24        party, and under Rule 30 we are
25        compelled to bring the matter to the
```

Page 174

```
 1        Court 's attention, and it's the Court
 2        who should decide.
 3   EXAMINATION BY MR. GILBERT:
 4     Q.  What was Doris' job at the Hyatt at
 5   that time?
 6        MR. WALKER:
 7             Objection.
 8     A.  Security.
 9   EXAMINATION BY MR. GILBERT:
10     Q.  Security?  Did she have anything to do
11   with registering guests there?
12     A.  Nope.
13     Q.  Okay.  Do you know what room your
14   family was assigned to at the Hyatt?
15     A.  No.
16     Q.  Okay.  Okay.  You testified earlier
17   that you made a number of -- well, that there
18   were a number of phone calls between you and
19   your wife that evening.  And we're talking
20   about the evening of Sunday, August 28th.  Do
21   you recall those phone calls?
22        MR. WALKER:
23             Sorry.  Note the continuing
24        objection.
25   EXAMINATION BY MR. GILBERT:
```

Page 175

```
 1     Q.  You can answer.
 2     A.  No.
 3     Q.  You don't recall the phone calls?
 4     A.  No.
 5     Q.  Do you recall that phone calls even
 6   occurred?
 7     A.  Yeah.
 8     Q.  Okay.  What phone were you on when
 9   those phone calls happened?
10        MR. WALKER:
11             Asked and answered.
12   EXAMINATION BY MR. GILBERT:
13     Q.  Were you on a cellphone?
14     A.  Yes.
15     Q.  Do you still have that cellphone?
16     A.  No.
17     Q.  Do you remember the cellphone number
18   of that phone?
19        MR. WALKER:
20             Asked and answered.
21     A.  No.
22   EXAMINATION BY MR. GILBERT:
23     Q.  Do you recall what provider you had?
24     A.  It wasn't my phone.
25     Q.  Whose phone was it?
```

Page 176

1    A.  It was the neighbor's phone.
2    Q.  The neighbor's phone?  And so when you
3  spoke -- is it Jeanne or Jeanie?
4    A.  Jeanie.
5    Q.  When you spoke with Jeanie that
6  evening, each time you spoke with her you were
7  on the neighbor 's phone?
8    A.  I can't remember.
9    Q.  Okay.  Did you speak to her at all on
10  your own phone that evening?
11    A.  Yes.
12    Q.  Okay.  And that would have been the
13  cellphone or a land line?
14    A.  Cellphone.
15    Q.  Okay.  Do you remember the service
16  provider you used to use?
17    A.  Nextel.
18    Q.  Nextel?  Was that a phone provided to
19  you through work or was that something you
20  subscribed to?
21    A.  Yes.
22    Q.  Through work?
23    A.  Yes.
24    Q.  And that's Brice Construction?
25    A.  Yes.

Page 177

1    Q.  Okay.  You didn't have to pay the
2  bills for that Nextel phone, did you?
3    A.  No.
4    Q.  You don't have copies of those bills,
5  do you?
6    A.  No.
7    Q.  Okay.  Do you remember last time we
8  had asked you if you remembered giving a
9  statement?
10    A.  Yes.
11        MR. WALKER:
12          Objection.
13  EXAMINATION BY MR. GILBERT:
14    Q.  Do you remember giving a statement?
15    A.  No.
16    Q.  Okay.  Have you had a chance to read
17  over the statement?
18    A.  Yes.
19    Q.  Does it reflect your observations as
20  to the topics the statement deals with?
21        MR. WALKER:
22          Objection.  There's no testimony
23        that Mr. Murph has reviewed the
24        statement.  If you're referring to the
25        redacted version, which is

Page 178

1  objectionable on numerous grounds,
2  then make sure you clarify for the
3  record that you're referring to the
4  redacted version.
5        MR. GILBERT:
6          I'm showing this to counsel, a
7        multi-paged document entitled Excerpts
8        of Statement of Arthur Murph taken
9        January 25th, 2006 by RJG.
10        (Tendering.)
11  EXAMINATION BY MR. GILBERT:
12    Q.  Have you seen this document?
13    A.  Yes.
14    Q.  Have you had a chance to look through
15  it?
16    A.  Yes.
17    Q.  Okay.  Does it help to refresh your
18  memory?
19        MR. WALKER:
20          Objection.
21    A.  Somewhat.
22  EXAMINATION BY MR. GILBERT:
23    Q.  Okay.  I want to direct you to Page 4
24  of the excerpts.
25        MR. WALKER:

Page 179

1          Well, let me note an objection to
2        the use of a redacted statement.
3        Mr. Murph is entitled to review the
4        statement.  And any use of a redacted
5        statement is unfair to Mr. Murph and
6        inappropriate, and we will object and
7        we will stop the deposition and ask
8        Judge Wilkinson to rule on the
9        inappropriate use of the statement to
10        attempt to refresh a witness'
11        recollection under circumstances where
12        the witness has made no statement that
13        he requires any refreshing of his
14        recollection, and therefore, without
15        the need to refresh recollection the
16        use of a statement is incorrect and
17        inappropriate.
18        MR. GILBERT:
19          All right.  Let me clarify.  Is
20        it Lafarge's position that it would be
21        appropriate to use the complete
22        version of this statement in this
23        deposition?
24        MR. WALKER:
25          We're not taking a position one

Page 180

1 way or the other on that. We're
2 telling you that the use of a redacted
3 statement is inappropriate,
4 particularly where the witness has
5 made no statement that he requires any
6 refreshing of his recollection as to
7 his prior testimony under oath.
8 MR. GILBERT:
9      And I'm just going to respond to
10 that by clarifying my understanding.
11 And it's not my deposition, but my
12 understanding that the statement has
13 been redacted to the extent necessary
14 so as to not violate the terms of the
15 confidentiality agreement that Lafarge
16 a few minutes ago asserted that it
17 would not waive or give permission to
18 Mr. Murph to deviate from.
19 MR. WALKER:
20      That's immaterial because the
21 statement is subject to privilege. It
22 was given by Mr. Murph, as you the
23 barge plaintiffs state in answers to
24 interrogatories, to his attorney, an
25 attorney with whom he has certain

Page 181

1 protections and privileges to which
2 he's entitled. Therefore, the use of
3 that statement is incorrect.
4 EXAMINATION BY MR. GILBERT:
5      Q.  Mr. Murph, do you have any objection
6 to --
7 MR. WEBB:
8      And further, on behalf of New
9 York Marine, I'm going to reiterate
10 the position that I took at the
11 earlier part of this deposition, that
12 if you proceed forward with this I
13 fully intend to report the attorney
14 who took the statement and has
15 breached the attorney/client
16 privilege, and possibly others, to the
17 Office of Disciplinary Counsel.
18 MR. RICHTHOFEN:
19      For clarity, to my knowledge
20 Mr. Murph has not asserted a breach of
21 confidentiality, which would be his
22 right to do with all respect to
23 counsel. And I don't know that
24 Mr. Murph has. In my conversations
25 with him, he has not, in fact, as of

Page 182

1 yet done that. And furthermore, in
2 speaking with Mr. Murph, it's my
3 position -- in speaking with him, and
4 in assisting him to speak before the
5 individuals here, that Mr. Murph has
6 read over the said statement and has
7 indicated to me, as I'm sure he will
8 to you, that it is consistent with
9 that which he has already testified to
10 and that the events are fairly
11 consistent with what he said happened.
12 MR. WALKER:
13      When you say the statement, you
14 mean the redacted version.
15 MR. RICHTHOFEN:
16      That is correct, sir. The
17 statement that counsel is arguing
18 about here today.
19 MR. WALKER:
20      So he stands by his prior
21 deposition and sees nothing
22 inconsistent in the redacted
23 statement. Is that what he's told
24 you?
25 MS. BERTAUT:

Page 183

1      I'm going to object.
2 MR. GILBERT:
3      Yeah. Objection. Objection.
4 EXAMINATION BY MR. WALKER:
5      Q.  Is that what he's told you?
6 MS. BERTAUT:
7      I have an objection to make
8 before the question is answered,
9 Derek. We're here for a continuation
10 deposition. First of all, Lafarge and
11 Lafarge's insurer has no standing to
12 assert an attorney/client privilege of
13 the witness. The witness is
14 represented by counsel, so Lafarge and
15 their insurers or any other party here
16 has no right to assert any privilege
17 that's between Mr. Murph and his
18 counsel of record, and he should be
19 allowed to state whatever privilege he
20 wants at that time. Secondly, this
21 isn't -- this is inappropriate
22 questioning. Mr. Walker is not
23 questioning the witness now, or the
24 witness' lawyer. We should proceed
25 with the deposition. I understand

Page 184

```
 1    it's an excerpt of the statement, but
 2    so is the settlement agreement.  So we
 3    don't have full documents of either of
 4    these things.  We've brought this
 5    gentleman back who's not a party to
 6    this litigation, and we've got a room
 7    full of lawyers.  Talk about
 8    annoyance, harassment of the other
 9    parties here, let this independent
10    witness give the testimony that he
11    knows to be true and let's move on.
12    Y'all went to make -- you want to make
13    challenges to Disciplinary Counsel,
14    Mr. Webb?  This is the second time
15    you've alleged that.  Please go ahead
16    and do it, but let's get this witness
17    in and out of here, tell his story and
18    move on, because now this is
19    harassment of the rest of us sitting
20    in the room.
21         MR. WALKER:
22            So you had an objection?
23         MS. BERTAUT:
24            I have an objection, that's
25         correct, to Lafarge interrupting the
```

Page 185

```
 1    witness asserting privileges that they
 2    know they have no right to make.
 3         MR. WEBB:
 4            Counsel, I am by no stretch of
 5         the imagination attempting to assert a
 6         privilege.  What I'm staying, as an
 7         officer of the court, is that I see
 8         what is an apparent breach of an
 9         attorney/client relationship, and as
10         such, not only myself, but you,
11         counselor, are duty bound to so
12         report.
13         MS. BERTAUT:
14            Thank you, Mr. Webb.  I
15         appreciate the tutorial.
16         MR. GILBERT:
17            May I ask the witness a question
18         now?
19         MR. WEBB:
20            Certainly.
21    EXAMINATION BY MR. GILBERT:
22    Q.  You've read over these excerpts of
23    your statement.
24    A.  Yes.
25    Q.  Is there anything confidential in
```

Page 186

```
 1    here?
 2    A.  I don't know who wrote that thing or
 3    where it come about from, but some of that
 4    stuff I don't know nothing about.
 5    Q.  Is there anything confidential in
 6    here?
 7    A.  Not to me.
 8    Q.  Okay.
 9         MR. GILBERT:
10            Then I think that your objection
11         is obviated now.
12    EXAMINATION BY MR. GILBERT:
13    Q.  You testified in the earlier
14    deposition, earlier part of the deposition,
15    that before you went to the Hyatt you went and
16    peered over the floodwall to see how high the
17    levee was.
18         Do you remember saying that?
19    A.  Yes.
20    Q.  Okay.  Did you go look after you came
21    back from the Hyatt, also?
22    A.  No.
23    Q.  Okay.  So you only went and looked
24    that one time?
25    A.  Right.
```

Page 187

```
 1    Q.  Which was before you took your wife to
 2    the Hyatt?
 3    A.  Yes.
 4    Q.  Okay.  Mr. Murph, I'm going to let you
 5    answer this question in your own words:  I want
 6    to make sure that this is strictly your
 7    perception of what took place.  You came back
 8    from the Hyatt.  What happened?  Tell us what
 9    went on.
10         MR. WALKER:
11            Objection.  Asked and answered,
12         and way beyond the five areas to which
13         this deposition is limited.
14         MR. GILBERT:
15            Okay.  For the record, we did not
16         agree to limit this deposition.  This
17         is a discovery deposition.  This is
18         about getting facts out on the record.
19         This is not about cherrypicking what
20         Mr. Murph is going to have on the
21         record.  This is a discovery
22         deposition.  We're not in trial.
23         We're not limited by the rules that
24         apply at trial.  This is a discovery
25         deposition.  The only reason to object
```

Page 188

1      is because you don't want the facts on
2  the record.  We're going to proceed.
3  EXAMINATION BY MR. GILBERT:
4      Q.  You got back from the Hyatt.  What
5  went down?  Just take us through the rest of
6  the day in your own words.
7      A.  I'm just sitting in the house, and
8  then the water and the storm and the flood --
9      Q.  Wait.  Can you -- I just need you to
10 speak up in full sentences so that we can get
11 that all in the record.
12      MR. RICHTHOFEN:
13          Take your time.
14 EXAMINATION BY MR. GILBERT:
15     Q.  Yeah, take your time and just tell
16 your story.
17     A.  I came from the Hyatt, I went home to
18 get the dog, the water came, I went in the
19 attic, chopped me a hole, looked out, God knows
20 what time it was and all I saw was a barge
21 sitting on the house.
22     Q.  How many times did you go into the
23 attic?
24     A.  I don't know.  I can't remember.
25     Q.  Okay.  So you went one time -- the

Page 189

1  first time you went up, you didn't chop a hole,
2  right?
3      A.  Yeah.
4      Q.  You chopped a hole the first time you
5  went up?
6      A.  Yes.
7      Q.  And then you came down a couple times
8  to see what was going on inside the house?
9      A.  Yes.
10     Q.  All right.  Let's go back to when
11 you're in the driveway.  Okay?  When you're
12 going to hook up the generator and get it
13 started.
14     A.  Right.
15     Q.  That's when things started getting
16 hairy, right?
17     A.  Yes.
18     Q.  All right.  You testified that you
19 heard a scraping sound coming from the
20 direction of the canal.
21     A.  Yes.
22     Q.  Okay.  And in your statement --
23 excerpts of your statement on Page 5, which I'm
24 going to show you, I'm just going to ask you to
25 just take a look at the line that I'm pointing

Page 190

1  to and just read that so that everyone knows
2  what you're looking at.
3      A.  I heard a big boom scraping sound, you
4  know, and it was just -- I don't know what's
5  this noise thing they got here.
6      Q.  Wait.  Could you say it louder so I
7  can --
8      A.  I heard a big scraping sound and, you
9  know, and it was just a -- I say it was -- what
10 the hell is this?
11         (Whereupon the deponent conferred with
12 counsel off the record.)
13     A.  I say what the hell is this?  And then
14 I heard a big -- that's me and the dog outside
15 on the garage.
16 EXAMINATION BY MR. GILBERT:
17     Q.  All right.  I'm going to ask you to go
18 to the next line which I'm pointing at and let
19 you read out loud so that everybody else can
20 follow along.  Read it in a loud voice so
21 everybody can hear you.
22         MR. WALKER:
23             Just to be clear on my prior
24         objection, since I've made several --
25         MR. GILBERT:

Page 191

1          It's continuing.
2          MR. WALKER:
3              -- no, since there is no
4          testimony by Mr. Murph that anything
5          he stated in his prior deposition is
6          inconsistent with what's in this
7          statement, or that he had any
8          misrecollection or has any reason to
9          refresh his recollection, the use of a
10         statement to refresh his recollection
11         is improper.
12         MR. GILBERT:
13             Thank you.
14 EXAMINATION BY MR. GILBERT:
15     Q.  You ran read that.
16     A.  So I headed toward the garage.  I
17 leave the front of the house to see what's
18 going -- what the noise was.  By that time I
19 got midway in the driveway, I heard a big boom
20 sound.  And, you know, boom.  And I saw -- now
21 what the hell is this?  And I started walking a
22 little bit quicker towards the front because --
23 the front of my driveway.  It's a long
24 driveway.  My garage is in the backyard by the
25 apartment, you know.  And we heard the sound in

Page 192

1  the back.
2      Q.  Okay.  Can you explain what you mean
3  when you say a big boom sound.
4      A.  Just a noise.
5      Q.  Well, I mean, I can make a noise
6  rapping on the table.  Would you call that a
7  boom?
8      A.  No.
9      Q.  Could you describe the boom sound?
10     A.  It just was a boom -- with the wind
11 blowing and everything, it just was a loud
12 noise.
13     Q.  Okay.  Was it a high pitched noise, a
14 low pitched noise?  What can you remember?  Why
15 don't you tell me everything about the noise
16 that you can remember.
17     A.  It was just a noise, a loud noise
18 outside.
19     Q.  Could you feel the noise?
20     A.  I wasn't feeling anything.  I was
21 trying to get out of there.
22     Q.  Do you know -- did you notice whether
23 or not the noise echoed?
24     A.  No.
25     Q.  No, you did not notice?

Page 193

1      A.  I don't know if the noise echoed or
2  not.
3      Q.  Okay.  If you had to say how loud the
4  noise was by comparing it to any other noise
5  you've ever heard in your life, how loud would
6  you say the boom was?
7      A.  About as loud a noise it was making
8  when the wind was blowing.
9      Q.  As loud a noise as the wind?
10     A.  Yeah.
11     Q.  But did it sound like wind?
12     A.  No, it didn't sound like no wind, it
13 sound like a loud noise.
14     Q.  Okay.  How many times did you hear
15 that noise?
16     A.  Just that once when I was going up
17 towards -- going up the driveway.
18     Q.  Okay.  What happened immediately after
19 that?
20     A.  The water came.
21     Q.  Okay.  And is that the water that you
22 testified earlier was coming from the right
23 side of your house?
24     A.  Right.
25     Q.  Okay.  Okay.  You said that you had

Page 194

1  chopped a hole in the attic about the middle of
2  the house.
3      A.  Right.
4      Q.  When you say the middle of the house,
5  you mean middle from front to back or back to
6  front, that way in the middle, or middle from
7  side to side?
8      A.  Middle from back to front.
9      Q.  Was the hole on any particular side of
10 your house or was it right in the center?
11     A.  On the left side.
12     Q.  I say again.
13     A.  It was on the left side of the house.
14     Q.  So if you look out the hole, what can
15 you see?
16     A.  Sky.  And the houses.
17     Q.  Okay.  But you're looking in a
18 direction left from your house?  Is that
19 correct?
20     A.  No, I looked to the left -- yeah, to
21 the left side.
22     Q.  Could you see the Claiborne bridge if
23 you're looking out the hole?
24     A.  Yes.
25     Q.  Could you see the floodwall if you're

Page 195

1  looking out the hole?
2      A.  Yes.
3      Q.  Okay.  When you chopped the hole, that
4  was before or after the boom?
5      A.  That was before the boom.
6      Q.  What did the floodwall look like
7  before the boom?
8      A.  It was a regular wall.
9      Q.  How much water was there before the
10 boom?
11     A.  Just rainwater.
12     Q.  Were you scared?
13     A.  Yep.
14     Q.  Have you ever been in the military?
15     A.  Yes.
16     Q.  Did you ever serve overseas?
17     A.  Yes.
18     Q.  During combat?
19     A.  Yes.
20     Q.  Where?
21     A.  Vietnam.
22     Q.  I'll show you on Page 12 of your
23 statement -- I'll show you -- indicate a
24 paragraph around just beyond the middle of the
25 page where you said, I'm a Vietnam veteran and,

Page 196

1  look, I was not scared in Nam.
2       Is that true, you weren't scared then?
3     A.  Not like the storm I wasn't.
4     Q.  Okay.  We all know you saw the barge
5  on your house.
6     A.  Right.
7     Q.  Did you see the barge moving at any
8  time?
9     A.  No.
10    Q.  Did you see it knock down any other
11 houses?
12    A.  No.
13    Q.  Did anybody tell you whether or not it
14 knocked down other houses?
15    A.  No.
16    Q.  At some point did you climb up on the
17 barge?
18    A.  Yes.
19    Q.  When did you do that?
20    A.  The next day, after the storm.
21    Q.  What did you do when you were up
22 there?
23    A.  Wrote my name on it.
24    Q.  Okay.  Did you write your phone number
25 or any other information?

Page 197

1     A.  No.  Just my name.
2     Q.  And it said just Arthur Murph?
3     A.  Arthur L. Murph.
4     Q.  Okay.  Why did you do that?
5     A.  So they know I been on it.
6     Q.  What did you use to write with?
7     A.  A nail.
8     Q.  A nail?
9     A.  Yep.
10    Q.  Okay.  Can you describe what condition
11 the barge was in when you were standing on it?
12    A.  It was a regular barge.  It was in --
13 just barge condition, I guess.  It wasn't bent
14 up.  It's steel.
15    Q.  Did you look down in it?
16    A.  Yes.
17    Q.  What did you see?
18    A.  Some gray stuff.
19    Q.  How much gray stuff?
20    A.  Not much, whatever was left in there I
21 guess they couldn't get out.
22    Q.  Did you ever call 911?
23    A.  Yes.
24    Q.  What phone did you use?
25    A.  My neighbor 's.

Page 198

1     Q.  Their land line or their cellphone?
2     A.  Cellphone.
3     Q.  Did you ever use your phone to call
4  911?
5     A.  I might have.  I don't know if my
6  phone was working then, but I called 911 off a
7  phone.  I can't remember which one.
8     Q.  Do you know your neighbor's name?
9     A.  Joyce.
10    Q.  What's Joyce's last name?
11    A.  I don't know.
12    Q.  Do you know of any photographs of the
13 barge touching your house?
14    A.  Do what?
15    Q.  Do you know if there are any
16 photographs of the barge touching your house?
17    A.  Probably so.
18    Q.  Do you know who took them?
19    A.  Probably everybody that was in the
20 area.
21    Q.  Do you have any?
22    A.  No.
23    Q.  Did you get interviewed by any news
24 crew or anything like that?
25    A.  I didn't get interviewed -- no,

Page 199

1  unh-unh.  I talked to people, but I didn't get
2  no interviews.
3     Q.  Joyce is the neighbor that lived just
4  to the right of you, correct?
5     A.  To the left.
6     Q.  Lived to the left of you?
7     A.  Yes.
8     Q.  Is that where you swam to?
9     A.  Yes.
10    Q.  You don't know who Joyce 's phone
11 provider is, do you?
12    A.  No.
13    Q.  Do you know where that barge came
14 from?
15    A.  Out the canal, I guess.
16    Q.  Did you see it come out the canal?
17    A.  No.
18    Q.  Do you think that boom you heard had
19 anything to do with the barge?
20    A.  I don't know if it had or it hadn't.
21 I can't say.  I didn't see it.
22    Q.  Mr. Murph, when was the first time
23 that you saw this document that we've referred
24 to as Excerpts of Statement of Arthur Murph?
25    A.  In my lawyer's office.

Page 200

1    Q.   Did you get a copy in the mail in July
2 of '07?
3    A.   No.
4    Q.   When we started back in December you
5 said that you wanted to meet with your
6 attorneys concerning any testimony you might
7 give -- or meet with your attorney
8 Mr. Richthofen about any testimony you might
9 give in deposition about any meetings with any
10 attorneys concerning damage to your house.
11        Were y'all able to discuss that, you
12 and Mr. Richthofen?
13        MR. RICHTHOFEN:
14             You can answer.
15    A.   Yes.
16 EXAMINATION BY MR. GILBERT:
17    Q.   Okay.  Are you able to testify today
18 as to meetings that you may have had with
19 attorneys concerning the damage to your house?
20        (Whereupon the deponent conferred with
21 counsel off the record.)
22    A.   I met with attorneys and I settled my
23 damage claims.
24 EXAMINATION BY MR. GILBERT:
25    Q.   Okay.  All right.  I'm going to show

Page 201

1 you a document marked -- labeled Receipt,
2 Release and Settlement Agreement with
3 Reservation of Rights.  Do you recognize the
4 document?  Take a look at every page.
5        (Off the record.)
6 EXAMINATION BY MR. GILBERT:
7    Q.   Mr. Murph, during the break did you
8 have a chance to review the document that I
9 handed to you?
10    A.   Yes, I did.
11    Q.   Do you recognize it?
12    A.   Yes.
13    Q.   Is this your signature at the back of
14 the document on the page that is marked
15 LNA000704?
16    A.   Yes, it is.
17    Q.   And do you remember signing it?
18    A.   Yes.
19    Q.   Okay.  And is this also your
20 signature, as well, on the page marked LNA705?
21    A.   Yes.
22    Q.   You recall signing both of these?
23    A.   Yes.
24    Q.   What is this document?
25    A.   That's an agreement.

Page 202

1    Q.   And are you making an agreement in
2 this document?
3    A.   You got the paper in your hand, just
4 read it.  I can't talk about that.  Everybody
5 here got a copy, I'm pretty sure.  Just look at
6 it and you'll see.
7    Q.   So you're not able to talk about
8 what's in this document?
9    A.   No.
10    Q.   Who has told you that you can't talk
11 about what's in this document?
12    A.   Nobody told me not to talk about it.
13    Q.   What's the reason that you're not able
14 to talk about it?
15    A.   Because it's got stuff in it that's
16 confidential.
17        MR. RICHTHOFEN:
18             At this time my client would
19        assert that he can, pursuant to the
20        opening statements here where we asked
21        permission from Lafarge to discuss the
22        agreement and they refused, but he
23        will indicate that that is the
24        settlement agreement settling his
25        property damage and that since the

Page 203

1        document is self-evidencing it -- the
2        best evidence of its own terms, that
3        he would refer to that, that anyone
4        who has a copy of that produced in
5        discovery could refer to that for
6        questions regarding the actual terms
7        and conditions, it's in the document,
8        and so not to prejudice Mr. Murph and
9        his confidentiality agreement with
10        Lafarge.
11        MR. GILBERT:
12             Okay.
13 EXAMINATION BY MR. GILBERT:
14    Q.   Let me ask you this:  Where were you
15 when you signed this document?
16    A.   In this building.
17    Q.   Who was present?
18    A.   A couple or few people.
19    Q.   Who?  What are the names?
20    A.   Oh, I can't remember their names.
21    Q.   Are they people that are here today?
22    A.   Yes.
23    Q.   Can you indicate which ones they are?
24    A.   The two right here. (Indicating.)
25    Q.   Okay.  You just pointed to Derek

Page 204

1  Walker.  Who else did you just point to?
2      A.   And the man sitting to his left.
3      Q.   The man wearing a red patterned tie
4  with a pen in his hand; Robert Fisher?
5      A.   No.  I said to his left.
6      MR. WALKER:
7          Why don't you just have them
8          raise their hand or something.
9      MR. GILBERT:
10         Okay.  Well, I mean, if the
11         attorneys would agree to raise their
12         hands if they were present, if they're
13         the attorneys that Mr. Murph is
14         talking about right now, let the
15         record reflect who was present.
16         All right.  Nobody is
17         volunteering any information.
18  EXAMINATION BY MR. GILBERT:
19     Q.   Mr. Murph --
20     MS. BERTAUT:
21         Wait.  Mr. Fisher just raised his
22         hand.
23     MR. GILBERT:
24         Okay.  Let the record reflect
25         Mr. Fisher raised his hand.

Page 205

1  EXAMINATION BY MR. GILBERT:
2      Q.   Were there any other persons present
3  when you signed this agreement?
4      A.   Yes.
5      Q.   Who?
6      A.   (Indicating.)
7      Q.   Well, Mr. Walker, Mr. Fisher --
8      A.   That's it.
9      Q.   Just those two?
10     A.   That's all I can remember.
11     Q.   So it was just those two and you --
12     MR. RICHTHOFEN:
13         You need to clarify.  Speak
14         louder so he can hear you.  If you can
15         remember, try to tell him how many
16         people were there.
17     A.   That's all I can remember, those two
18  right now.
19  EXAMINATION BY MR. GILBERT:
20     Q.   Okay.  Was your wife present?
21     A.   Yes.
22     Q.   Was somebody named Parker Harrison
23  present?
24     A.   If they signed that paper, they was.
25     Q.   Do you have any independent

Page 206

1  recollection of that person being there?
2      A.   Yes.  If they signed that paper they
3  was there.
4      Q.   Okay.  So everybody who signed the
5  paper was there?
6      A.   Was there.  Uh-huh.
7      Q.   That's a yes?
8      A.   Yes.
9      Q.   Okay.  All right.  Let me ask you
10  some -- all right.  You say that the
11  document -- it says what it says and everybody
12  sees it and all, and what it says to me is that
13  it's a settlement agreement with Lafarge.
14         Is that correct; is that your
15  understanding of it?
16     A.   Yes.
17     Q.   How did this settlement come about?
18  And by that I mean how did you come into
19  contact with Lafarge?
20     A.   The barge.
21     Q.   Okay.  Did you call them?  Did they
22  call you?  Did you go visit them?  Did they go
23  visit you?  That's the sort of question I'm
24  asking.
25     A.   I called.

Page 207

1      Q.   You called them?
2      A.   Yes.
3      Q.   You did personally?
4      A.   Yes.
5      Q.   Do you know the number that you
6  called?
7      A.   No.
8      Q.   Do you know what office at Lafarge you
9  called?
10     A.   No.
11     Q.   Did you call Lafarge locally, did you
12  call Lafarge at one of their national
13  headquarters or what did you do?
14     A.   I can't remember.
15     Q.   Okay.  How did you get the number for
16  Lafarge?
17     A.   Off the barge.  I took the barge
18  Number and I --
19     Q.   How did you get the phone number for
20  Lafarge?
21     A.   Out the telephone book.
22     Q.   You say you got the number off
23  the barge.  You mean the Number ING 4727?
24     A.   Yes.
25     Q.   Okay.  Did you know what ING 4727

Page 208

1 meant at that time?
2    A.  No.
3    Q.  Okay.  Was Lafarge the first call you
4 made to talk about what had happened?
5    A.  No.  I can't remember who.
6    Q.  I'm sorry?
7    A.  I called a couple numbers.  I was
8 searching for it.
9    Q.  Okay.  And both those numbers you
10 called, that was Lafarge, or was it some other
11 company?
12    A.  Like I say, I was searching for who
13 the barge was for.
14    Q.  Did you ever call Ingram?
15    A.  I may have.
16    Q.  But you don't remember for certain?
17    A.  No.
18    Q.  Okay.  Who did you speak with at
19 Lafarge?
20    A.  I can't remember that name.
21    Q.  Did the person come speak with you
22 personally, or was it only on the telephone?
23    A.  Only on the phone.
24    Q.  Did Lafarge send you any letters,
25 anything in the mail?

Page 209

1    A.  No.
2    Q.  Okay.  Do you know when it was that
3 you made that call to Lafarge, how long after
4 the storm?
5    A.  I guess a couple of weeks, a couple of
6 days, I don't know, I can't remember.
7    Q.  Do you remember where you were when
8 you made that call?  Were you in New Orleans?
9    A.  No.
10    Q.  Where were you?
11    A.  Pineville.
12    Q.  Pineville?
13    A.  Yeah.
14    Q.  Okay.  What did you tell them when you
15 made that call?
16    A.  I just asked them if they miss a
17 barge.
18    Q.  Did you tell them what had happened?
19    A.  Yes.
20    Q.  What did you tell them?
21    A.  It's on my house.
22    Q.  Did you tell them how it got there?
23    A.  I don't know how it got there.  I know
24 it was on my house.
25    Q.  But did you tell them any --

Page 210

1    A.  No.
2    Q.  -- version of how it got there?
3    A.  Just asked them if they're missing a
4 barge.
5    Q.  And what did they tell you?
6    A.  They're missing a few barges.
7    Q.  Okay.  All right.  So after you had
8 that conversation -- what else took place
9 during that conversation that you can remember?
10    A.  Nothing.  We talked back and forth.
11    Q.  Okay.  What did they say to you?
12    A.  They didn't say anything.  We just
13 talked.
14    Q.  Do you know if they made a recording
15 of that conversation?
16    A.  I have no idea.
17    Q.  Did they ask you if they could?
18    A.  I can't remember that.
19    Q.  Okay.  What's the next time you spoke
20 with somebody from any of the companies about
21 the barge?
22    A.  I guess the date that's on that paper.
23    Q.  On this paper in my hand, the receipt
24 and release?
25    A.  I guess.  Right.

Page 211

1    Q.  Did you speak with anybody before you
2 signed this receipt and release, anybody from
3 any of the companies or any of their attorneys?
4       (Whereupon the deponent conferred with
5 counsel off the record.)
6    A.  Some of these questions you asked me I
7 really can't say nothing about because it's
8 going to put me in a situation here.
9    Q.  Okay.  Well, without asking you what
10 was spoken about, can you tell me who you spoke
11 to?
12    A.  No.
13    Q.  No?
14    A.  No, I can't remember who I spoke to.
15    Q.  Okay.  Are any of the people you spoke
16 to in this room?  Do you recognize any of the
17 people in this room as people you spoke to?
18    A.  No, because like I say, I talked to
19 them over the phone.
20    Q.  Okay.  Did you ever have any personal
21 meetings with anybody from Ingram?
22    A.  I don't know.
23    Q.  I'm sorry?
24    A.  I don't know if they was from Ingram
25 or who they was from.

Page 212

1    Q.  Did you ever have any conversations
2  with any lawyers from Ingram?
3    A.  Only the people that you got on that
4  paper.
5    Q.  Okay.  So -- you've mentioned
6  Mr. Fisher and Mr. Walker.  Those are the only
7  attorneys that you can remember speaking with
8  on behalf of the barge?
9    A.  So far, yes.
10    Q.  Okay.  Did you ask for Lafarge to
11  compensate you?
12    A.  I asked for to repair my house or put
13  me in something else.
14    Q.  Okay.  And do you remember when that
15  was that you asked for that?
16    A.  Probably the first time we talked over
17  the phone.
18    Q.  Okay.  I'm getting the impression that
19  you spoke a number of times over the phone.
20    A.  Oh, yeah.
21    Q.  Did they make a recording of any of
22  those phone calls?
23    A.  I have no idea.
24    Q.  Do you remember them ever asking you
25  permission to make a recording of any of the

Page 213

1  phone calls?
2    A.  I don't think.
3    Q.  Okay.  Did you ever at some point meet
4  with them and give them a statement?
5    A.  No.
6    Q.  Did you tell them how the barge got on
7  your house?
8    A.  I don't know how it got on the house.
9    Q.  But did you tell them the story of
10  what took place that night?
11    A.  No, I told them, you got a barge on my
12  house and somebody need to do something about
13  it.
14    Q.  You saw the barge after the storm on
15  your house, right?
16    A.  Right.
17    Q.  Was it on anybody else's house, in
18  addition to your house?
19    A.  It just was in the water.  The water
20  was -- it was higher than the houses.
21    Q.  All right.  My question is, could you
22  see that the barge had caused damage to anyone
23  else's house other than your own?
24    A.  It may have.
25    Q.  Okay.  Are you under the impression

Page 214

1  that it did?
2    A.  I wasn't really worried about other
3  people's houses.  I was just worried about my
4  house.
5    Q.  Do you know of anybody else that
6  called Lafarge and said, hey, this barge is on
7  my house?
8    A.  No.
9    Q.  Or called anybody and said, hey, this
10  barge is on my house?
11    A.  No.
12    Q.  Do you know of anybody else that
13  Lafarge had any agreement with because the
14  barge was on that person's house?
15    A.  No.
16    Q.  Do you know anybody else that Lafarge
17  or Ingram or anybody settled with because of
18  the barge other than you?
19    A.  No.
20    Q.  Okay.  Do you know who New Jourdan,
21  LLC is?
22    A.  No.
23    Q.  Do you know who New Berkley, LLC is?
24    A.  No.
25    Q.  Do you know who Daniel Webb is?  Do

Page 215

1  you recognize the attorney who just looked up?
2  He's looking at me right now.
3    A.  If his name Daniel Webb, yeah.
4    Q.  Yeah?  When have you spoken with him
5  before?
6    A.  I never spoke with him at all I don't
7  think.
8    Q.  Okay.  But you recognize him?
9    A.  Yeah, from the last deposition.
10    Q.  Okay.  Anytime before then have you
11  seen him?
12    A.  No.
13    Q.  Okay.  Who did you settle with?
14    A.  The people that's on that paper.
15    Q.  Did you understand that at the time?
16    A.  Yes.
17    Q.  Did you understand that you were
18  settling with Lafarge and with Ingram and with
19  their insurers and with New Jourdan and New
20  Berkley?
21    A.  If that's what they got on that paper.
22    Q.  Did you understand that at the time?
23    A.  If I signed it, I must have.
24    Q.  But you don't know who New Jourdan is?
25    A.  I don't know who New Jourdan is.

Page 216

1    Q.   But you settled with them.
2    A.   Yes.
3    Q.   Okay.  Do you know why New Jourdan 's
4  name is on here?  On this release agreement?
5    A.   No.
6    Q.   Do you know why New Berkley is on this
7  release agreement?
8    A.   No.
9    Q.   Do you know why Ingram is on this
10  release agreement?
11    A.   No.
12    Q.   The agreement shows that you signed it
13  on February 9th, 2006.  Did you know on that
14  date of a lawsuit going on against any of these
15  companies?
16    A.   No.
17    Q.   The date you signed this, that wasn't
18  the first time you met with Mr. Walker and Mr.
19  Fisher, correct?
20    A.   I think it is.
21    Q.   But had you spoken with them before?
22    A.   I may have, I don't know.
23    Q.   Did any lawyers for Lafarge give you
24  any advice?
25    A.   No.

Page 217

1    Q.   Did any lawyer give you any advice
2  concerning this agreement?
3    A.   No.
4    Q.   What about Mrs. Murph, did she go get
5  advice from any lawyer concerning this
6  agreement?
7    A.   She may have.  I don't know.
8    Q.   Did any lawyer ever explain to you
9  what every one of these paragraphs and
10  sentences meant in this agreement and what --
11  how it might affect your rights by signing it?
12    A.   I don't know.  They may have.
13    Q.   They may have, but you don't remember?
14    A.   I don't remember.
15    Q.   Did you tell Lafarge or any of their
16  attorneys or anybody acting on behalf of
17  Lafarge or Ingram or any of the parties that
18  you settled with, did you tell them what you
19  wanted this settlement to say?
20    A.   No.
21    Q.   Did anybody acting on your behalf tell
22  them what you wanted this settlement to say?
23    A.   No.
24    Q.   Did you get to look at this before you
25  signed it --

Page 218

1    A.   Yes.
2    Q.   -- or just that day?
3    A.   Yes.
4    Q.   How soon before -- when did you get to
5  see a copy of it before signing it?  How long
6  before you signed it?
7    A.   The same day.
8    Q.   The same day?  Did you take it to a
9  lawyer that day and say, hey, what do you think
10  about it?
11    A.   No.
12    Q.   Why not?
13    A.   For what?
14    Q.   Well -- so I interpret your answer to
15  mean that you didn't think that there was any
16  reason to see a lawyer.
17    A.   No.
18    Q.   Is that correct?
19    A.   Yes.
20    Q.   Did you trust that the lawyers that
21  were putting this together were going to
22  protect you?
23    A.   I don't know.
24    Q.   You don't know whether you did?
25    A.   No.

Page 219

1    Q.   Okay.  Who is Harry Holladay?  Let me
2  just show you the Page LNA074.
3    A.   I don't know who Harry Holladay is.
4    Q.   Had you ever spoken with Harry
5  Holladay before this --
6    A.   I may have.
7    Q.   Before this was signed?
8    A.   Probably.
9    Q.   By telephone, in person, by mail?
10    A.   I can't remember.
11    Q.   Did you ever -- and leading up to
12  signing this agreement, did you ever send any
13  mail or receive any mail back and forth --
14    A.   No.
15    Q.   -- concerning this?
16    A.   No.
17    Q.   But you made telephone calls?
18    A.   Not about that.
19    Q.   Not about the settlement?
20    A.   Oh, yeah.
21    Q.   Yes about the settlement?
22    A.   (Nods affirmatively.)
23    Q.   What about any fax, did you get any
24  faxes or send any faxes about the settlement?
25    A.   No.

Page 220

1    Q.  Any E-mails back and forth?
2    A.  Nothing.
3    Q.  Nothing?  The only way y'all ever
4  communicated was by using the telephone?
5    A.  Telephone, yes.
6    Q.  And -- okay.  What telephone would you
7  be using when you made these calls, would that
8  be that Nextel phone, same thing?
9    A.  No, I can't remember that.
10    Q.  Okay.  Well, did you have a land line
11  at the time at your house?
12    A.  I wasn't at my house.  I didn't have a
13  house.
14    Q.  Okay.  You were in Pineville at the
15  time all this was happening?
16    A.  Right.
17    Q.  And was there a land line wherever you
18  were at Pineville?
19    A.  I think they may have had one.
20    Q.  Where were you staying at Pineville?
21    A.  On Brice Street.
22    Q.  Was that an apartment you rented?
23    A.  It was a house.
24    Q.  Y'all rented it?
25    A.  No.  Friend of mine.

Page 221

1    Q.  Okay.  You were staying with a friend?
2    A.  Right.
3    Q.  What's that friend's name?
4    A.  Felton.
5    Q.  Is that the same Felton that you
6  mentioned earlier when we started the
7  deposition --
8    A.  Yes.
9    Q.  -- the one that was supposed to take
10  you back with the dog?
11    A.  Yes.
12    Q.  Okay.  I understand that the
13  settlement says what it says, and you don't
14  have to testify about what it says but what was
15  your understanding as to what you would get out
16  of it by settling with them?
17    A.  I got it.
18    Q.  What's that?
19    A.  I got it.
20    Q.  What was your understanding of what
21  you would get?
22    A.  That's what I'm saying, I got what I
23  got.
24    (The deponent conferred with counsel
25  off the record.)

Page 222

1    MR. RICHTHOFEN:
2    You can say that.  Go ahead.
3    Answer the question.
4    A.  What you saying?
5  EXAMINATION BY MR. GILBERT:
6    Q.  What was your understanding of what
7  you would benefit -- what you would get by
8  settling?
9    A.  Another home.
10    Q.  Another home?
11    A.  (Nods affirmatively.)
12    Q.  Did you get another home?
13    A.  I got compensated.
14    Q.  Did you get another home?
15    A.  Yes.
16    Q.  Is that 105 Berkley?
17    A.  Yes.
18    Q.  Okay.  How did you find that house?
19  Did you use an agent, did you look at ads?
20    A.  No.
21    Q.  How did you find that house?
22    A.  Riding around looking for it.
23    Q.  Okay.  All right.  Did you buy that
24  house yourself?
25    A.  Yes.

Page 223

1    Q.  Okay.  So did you have to come out of
2  your pocket with money to pay for that house?
3  Was that your own money?
4    (Whereupon the deponent conferred with
5  counsel off the record.)
6    A.  I don't think I can discuss that part
7  of it.
8  EXAMINATION BY MR. GILBERT:
9    Q.  Okay.?
10    MR. RICHTHOFEN:
11    Just on behalf of Mr. Murph, I
12    believe that any price that was paid
13    on the property is a matter of public
14    record, and so those documents would
15    evidence exactly, you know, what
16    amounts were paid by him.  In the
17    mortgage and conveyance records that
18    would be available.
19  EXAMINATION BY MR. GILBERT:
20    Q.  Where did you get the money to pay for
21  the house?
22    A.  I don't think I can discuss that
23  either.
24    (Whereupon the deponent conferred with
25  counsel off the record.)

Page 224

1    A.  Yeah.  From the settlement.
2  EXAMINATION BY MR. GILBERT:
3    Q.  Okay.  Were you paid a check?
4       (Whereupon the deponent conferred with
5  counsel off the record.)
6    A.  I was paid.
7  EXAMINATION BY MR. GILBERT:
8    Q.  Did any money go into your bank
9  account from the settlement?
10   A.  No.
11   Q.  How did the money get to you for the
12 settlement?
13   A.  I don't think I can talk that either.
14   Q.  I'm sorry?
15   A.  I don't think I can answer that
16 question.
17   Q.  All right.  Well, let me ask you this:
18 Let me show you a document that I'm going to
19 mark as 1 -- or I don't know where we are,
20 actually, because it would be carried forward
21 from where we were before.  Whatever the next
22 exhibit was.  I don't remember where we left
23 off.  If somebody could figure that out --
24      MR. WIEDEMANN:
25         Make it 1A.

Page 225

1       MR. GILBERT:
2          All right.  We'll call it 1A.
3  EXAMINATION BY MR. GILBERT:
4    Q.  I'm going to ask you to take a look at
5  that, specifically the photocopy of a Crescent
6  Bank & Trust check at the top.  (Tendering.)
7       Have you seen that check before?
8       (Exhibit 1(a) was marked for
9  identification and is attached hereto.)
10   A.  I don't know if I have or not.
11 EXAMINATION BY MR. GILBERT:
12   Q.  Do you have any idea who obtained that
13 check?
14      MR. RICHTHOFEN:
15         For the record, Mr. Murph is
16         observing a check from Crescent Bank &
17         Trust paid to the order of True Title.
18 EXAMINATION BY MR. GILBERT:
19   Q.  Did you ever have that check in your
20 possession?
21   A.  No.
22   Q.  Do you know who went and got that
23 check?
24   A.  No.
25   Q.  Okay.  Did you see that check at any

Page 226

1  time before today?
2    A.  No.
3    Q.  Okay.  Do you have any idea today as
4  we sit here what that check is?
5    A.  A check to True Title.
6    Q.  Right.  But do you know why that check
7  exists?
8       (Whereupon the deponent conferred with
9  counsel off the record.)
10   A.  Yeah.  It's written on there.
11 EXAMINATION BY MR. GILBERT:
12   Q.  Okay.  And you're referring to where
13 it says Purchase of 105 Berkley.
14   A.  Right.
15   Q.  Okay.  And you're not able to explain
16 how this check works into the purchase of the
17 house?
18      (The deponent conferred with counsel
19 off the record.)
20   A.  I don't know.
21 EXAMINATION BY MR. GILBERT:
22   Q.  Okay.  But you did not go obtain this
23 check.
24   A.  No.
25   Q.  Okay.  Did you send somebody to go

Page 227

1  obtain that check?
2    A.  I never sent nobody nowhere.
3    Q.  Do you have any knowledge about how
4  this check came to be?
5    A.  No.
6    Q.  Okay.  We're going to attach it as
7  1(a).
8       MR. RICHTHOFEN:
9          Can I get a copy?
10      MR. GILBERT:
11         Here you go.
12 EXAMINATION BY MR. GILBERT:
13   Q.  Do you remember going to buy 105
14 Berkley on February 9th?  Do you remember going
15 to an Act of Sale?
16      (Whereupon the deponent conferred with
17 counsel off the record.)
18   A.  Yes.
19 EXAMINATION BY MR. GILBERT:
20   Q.  And where was that?  Was that at True
21 Title?
22   A.  Yes.
23   Q.  All right.  I'm going to just show you
24 a copy -- just take a look there.  (Tendering.)
25      MR. WEBB:

19 (Pages 224 to 227)

Page 228

```
 1        Excuse me, counsel.  What's the
 2   source of these documents?
 3        MR. GILBERT:
 4        A subpoena that was served on
 5   True Title, in person, and he produced
 6   on the spot.
 7        MR. WEBB:
 8        When was the subpoena served?
 9        MR. GILBERT:
10        I can't tell you off the top of
11   my head.
12        MR. WEBB:
13        When were the documents received?
14        MR. GILBERT:
15        Last week.
16        MR. WEBB:
17        Why were they not produced to all
18   counsel in this case last week when
19   they were received by you?
20        MR. WALKER:
21        Yeah.  We've never received a
22   copy of the subpoena.
23        MR. GILBERT:
24        Because there wasn't time to
25   upload the subpoena.  He produced on
```

Page 229

```
 1   the spot.  You'll get copies --
 2        MR. WALKER:
 3        But a subpoena request has to be
 4   served on all --
 5        MR. GILBERT:
 6        You'll get copies of all of it.
 7        MR. WEBB:
 8        Counsel, it's totally improper,
 9   though, to subpoena documents weeks
10   before a deposition, for you to
11   receive them and hoard them and
12   produce them at a deposition now and
13   not previously provided them to all
14   counsel.  That is not proper, and you
15   know it.
16        MR. GILBERT:
17        They haven't been hoarded.  What
18   would you like done?
19        MR. WALKER:
20        The problem, Brian, and our
21   objection is, number one, the subpoena
22   should have been severed on all
23   parties at the same time.  And number
24   two --
25        MR. GILBERT:
```

Page 230

```
 1        I think you have copies of all of
 2   this, Dan.
 3        MR. WALKER:
 4        And Number two, we're prejudiced
 5   because we're not properly prepared to
 6   cross-examine the witness at the
 7   deposition.  Therefore we would
 8   reserve all rights to question the
 9   witness with respect to those
10   documents.
11        MR. GILBERT:
12        I have no problem with that.
13   These are public records, as well.  I
14   have no problem with that.  And I do
15   believe that these are documents
16   already in possession of complaining
17   counsel.
18        MR. WALKER:
19        Well, but it's your obligation to
20   have sent the subpoena to all parties.
21        MR. GILBERT:
22        The subpoena is going to be
23   uploaded.  There wasn't time to do it.
24        MR. WEBB:
25        Gonna be doesn't count, Brian.
```

Page 231

```
 1   Okay?
 2        MR. GILBERT:
 3        All right.  You've made your
 4   objection.  That's good.  You've made
 5   your objection.
 6        MR. WEBB:
 7        Well, I'm going to call for, on
 8   the record, the production of any
 9   other documents that you have
10   surreptitiously received by subpoena
11   and have not provided them to counsel.
12        MR. GILBERT:
13        There is nothing surreptitious
14   about it.  You know what?  If you want
15   to take this in the other room and
16   make copies for everybody, I don't
17   care.
18        MR. WEBB:
19        Well, I'd like for you to produce
20   them all now.
21        MR. GILBERT:
22        Here.
23        MR. WEBB:
24        Well, pass them out, please.
25   This is highly improper.
```

Page 232

```
1    MR. GILBERT:
2       Oh, stop pasturing, Webb.
3    MR. WEBB:
4       I'm not posturing.
5    MR. GILBERT:
6       Here.  You want to go make a copy
7    of all this?  You're free to.
8    MR. WEBB:
9       I'd like to look at it before you
10   start asking questions.
11   MR. GILBERT:
12      I'm not going to ask him
13   questions about what you got in your
14   hand.  I'm not going to be asking him
15   questions about anything you haven't
16   already seen.
17   EXAMINATION BY MR. GILBERT:
18   Q.  Do you remember attending this --
19   MR. WEBB:
20      Excuse me.  Are these copies for
21   all counsel?
22   MR. GILBERT:
23      No.  That's my original.
24   MR. WEBB:
25      They look like there are several
```

Page 233

```
1    copies.  That's what I'm trying to
2    find out.
3    MR. GILBERT:
4       Dan, I tell you what --
5    MR. WEBB:
6       May I pass these to all counsel?
7    MR. GILBERT:
8       You can circulate that one copy,
9    but I don't know that there are extra
10   copies there.
11   MR. WEBB:
12      Well, there appears to be.
13   MR. GILBERT:
14      Well, I'm going to have to look
15   at it, okay?  But I'd like to examine
16   the witness.  We can take a break on
17   this.
18   MR. WEBB:
19      I'd like for you to take a break,
20   figure out what documents you received
21   from the subpoena and produced those
22   documents to all counsel here.
23   MR. GILBERT:
24      All right.  I'm going to produce
25   what I'm going to examine this witness
```

Page 234

```
1    on.  Okay?  There's that, which is a
2    download from Secretary of State 's
3    website concerning New Jourdan, LLC.
4       This is a settlement statement
5    reflecting sale of 1739 Jourdan
6    Avenue.  And I have copies for
7    everybody, and that's not something
8    that was gained surreptitiously by a
9    subpoena.
10      I have copies of correspondence
11   from True Title to Harry Holladay at
12   Chaffe McCall.
13      I have copies of a promissory
14   note from the Murph family in favor of
15   the Priestly family.
16      And I have copies of Settlement
17   Statements as to 105 Berkley Drive.
18   Oh, yeah, I do have extras of these.
19      I also have copies of a Buy/Sell
20   Agreement through Prudential Gardner.
21      And I suspect that these
22   documents are nothing new.
23   MR. WALKER:
24      Let me reiterate an objection --
25   MR. GILBERT:
```

Page 235

```
1       Please, reiterate it.
2    MR. WALKER:
3       -- because my objection is not
4    necessarily the same as the insurer's.
5    Number one, you have the obligation
6    under the rules to make sure that
7    everybody receives copies of a
8    subpoena if it's served on a party.
9       Number two, the production of the
10   documents at this time does not cure
11   the prejudice that your failure to
12   produce the subpoena and the attached
13   document return causes to Lafarge in
14   this examination.
15   EXAMINATION BY MR. GILBERT:
16   Q.  Do you recall going to that Act of
17   Sale?
18   A.  Yes.
19   Q.  Was that the same day that you signed
20   the receipt and release?
21   A.  I don't know.  What date they got on
22   there?
23   Q.  Well, this has -- unless I'm mistaken,
24   correct me if I'm wrong, it says February 9th,
25   2006.
```

Page 236

1    (Whereupon the deponent conferred with
2  counsel off the record.)
3    A.  I don't know.  I can't remember.
4  EXAMINATION BY MR. GILBERT:
5    Q.  Do you remember if y'all did that on
6  the same day?
7    A.  I can't remember.
8    Q.  Okay.  When you did the Act of Sale on
9  105 Berkley, did you get a chance to read
10 through everything that you were signing?
11   A.  I'm pretty sure I did.
12   Q.  Did you have an attorney advise you?
13   A.  No.
14   Q.  I see -- I'm going to ask you to jump
15 forward one page into the document called Cash
16 Sale, and I see where it says witnesses, that
17 Harry Holladay was present.
18   A.  (Nods affirmatively.)
19   Q.  Do you recall Mr. Holladay?
20   A.  I think so.
21   Q.  Do you know why he was there?
22   A.  I don't know.
23   Q.  Do you know what he had to do with
24 this sale?
25   A.  Not really.

Page 237

1    Q.  Because you had already settled with
2  Lafarge at that point, hadn't you?
3    A.  I don't think I can --
4    (Whereupon the deponent conferred with
5  counsel off the record.)
6    A.  I don't remember.
7  EXAMINATION BY MR. GILBERT:
8    Q.  Do you know what reason he had for
9  being there?
10   A.  Not really.
11   Q.  Okay.  Did you have any conversations
12 with him?
13   A.  I don't know.  I may have.
14   Q.  But you don't remember?
15   A.  No.
16   Q.  All right.  Let me go back to 1(a) and
17 show you again the check at the top.
18     Do you know whether that was used to
19 pay for the house?  105 Berkley?
20   A.  I don't know.
21   Q.  Do you pay notes on 105 Berkley?
22   A.  No.
23   Q.  Is there a promissory note on 105
24 Berkley?
25   A.  I don't know.

Page 238

1    Q.  You don't know?
2    A.  No.
3    Q.  Did you sign any agreement that you
4  were going to make payments on 105 Berkley?
5    A.  I can't answer that.
6    Q.  You can't answer that?
7    A.  (Nods affirmatively.)
8    Q.  Okay.  Do you own 105 Berkley
9  outright?
10   A.  I may.
11   Q.  Did you borrow any money to pay for
12 105 Berkley?
13   A.  No.
14   Q.  Did you go to any bank or any lender
15 to get money for 105 Berkley?
16   A.  No.
17   Q.  Do you know what a collateral mortgage
18 is?
19   A.  No.
20   Q.  All right.  Let me show you -- I've
21 given this to you as it was produced to me.
22 There's, four pages in, a document called Act
23 of Collateral Mortgage.
24     Do you see that?
25   A.  Yes.

Page 239

1    Q.  Okay.  Is that your signature on Page
2  4 of the Act of Collateral Mortgage?
3    A.  Yes.
4    Q.  Okay.  And is that your wife's
5  signature?
6    A.  Yes.
7    Q.  Okay.  You see at the bottom it says
8  intervenor, and you see Harry Holladay?
9    A.  Yes.
10   Q.  What does that mean to you?
11   A.  I don't know.
12   Q.  Do you know why he signed this?
13   A.  No.
14   Q.  Do you know what this collateral
15 mortgage says?
16   A.  No.  What?
17   Q.  I'm asking if you know.
18   A.  No.
19   Q.  Do you know if this collateral
20 mortgage has any effect on 105 Berkley Drive?
21   A.  No.
22   Q.  Do you know if this collateral
23 mortgage has any effect on the settlement that
24 you reached?
25   A.  No.

Page 240

1    Q.  Did anybody tell you that it did?
2    A.  No.
3    Q.  Did anybody ever tell you that you
4  could not testify in this case?
5    A.  No.
6    Q.  Did anybody tell you that as part of
7  the confidentiality agreement that you couldn't
8  tell people what you saw on August 29th?
9    A.  Nobody -- nope.
10    Q.  I'm sorry?
11    A.  Nope.
12    Q.  Okay.  So have you understood all
13  along that you have been free to discuss what
14  your eyes and ears told you as you were just
15  going through your life on August 29th during
16  the storm?
17    A.  Yes.
18    Q.  Okay.  Let me ask you why at the last
19  deposition were there certain topics that you
20  wouldn't testify about?
21    A.  What topics?
22    Q.  About your statement, about meetings
23  with attorneys after the storm, about the
24  settlement, and, um -- let me just go to
25  Page 81 of the prior deposition, and I'm just

Page 241

1  going to show it to you, and I'll read it at
2  the same time.
3       "Did you at some time sign an
4  agreement with anybody, a confidentiality
5  agreement not to discuss what happened to you,
6  your family or your property in Hurricane
7  Katrina?"
8       And then you say, "That's the fifth
9  thing."  And I think what we mean is that's the
10  fifth thing you need to ask your attorney
11  whether you can testify about.
12       Had anyone told you that you couldn't
13  discuss what happened to you?
14    A.  No.
15    Q.  Okay.  Do you read any part of this
16  settlement document to prohibit you from
17  talking about what happened when you were at
18  your house on August 29th?
19    A.  Everybody know what happened.  I told
20  y'all just a while ago.
21    Q.  Okay.  But my question is whether you
22  have ever been under the impression that this
23  stops you from talking about it.
24    A.  No.
25    Q.  Okay.

Page 242

1       MR. RICHTHOFEN:
2       When Mr. Murph contacted my
3  office after the first deposition he
4  related to me that he was concerned,
5  that he wanted to make sure that he
6  assisted and testified truthfully
7  while at the same time honoring his
8  agreement and terms of the settlement
9  agreement, and that he just wanted
10  clarification on that from me.  And
11  I've instructed him as much as that
12  the agreement is confidential and he
13  can discuss whenever portion he can,
14  and that whatever he saw and heard
15  he's free to testify at will about.
16  EXAMINATION BY MR. GILBERT:
17    Q.  All right.  Well, let me just ask if
18  you recognize this.  And I'm actually going to
19  mark that as 2(a).  And that would be the --
20  let me just finish my sentence.  That would be
21  the cash sale and collateral mortgage, I'll
22  mark and attach as 2(a).
23       Now, I'm sorry --
24       (Exhibit 2(a) was marked for
25  identification and is attached hereto.)

Page 243

1       MR. RICHTHOFEN:
2       You wanted to say something?  Go
3  ahead.
4  THE WITNESS:
5       What's all this got to do with
6  the flood, about who I settled with
7  and what I got?  I thought we coming
8  to talk about a flood, two-day thing.
9  Now we're going into my whole life
10  history.  This ain't got nothing to do
11  with the flood.  My house got tore up,
12  I got compensated for it.
13  MR. GILBERT:
14       Your attorney is going to answer
15  that question for you.
16       (Whereupon the deponent conferred
17  with counsel off the record.)
18  (Off the record.)
19  MR. RICHTHOFEN:
20       Just for the record, I've
21  addressed my client's concerns about
22  the line of questioning.
23  MR. WALKER:
24       That it's totally irrelevant,
25  right?

Page 244

```
 1        MR. RICHTHOFEN:
 2           I've informed him that it does
 3        not in fact have anything to do with
 4        the actual flood, that plaintiffs'
 5        counsel is asking these questions for
 6        a different reason.
 7   EXAMINATION BY MR. GILBERT:
 8     Q.  Now, there's a cover page attached to
 9   it, and I don't know if you're going to
10   recognize that so I'm going to flip it over.
11   But I'm going to ask you if you recognize this
12   Prudential Gardner Agreement to Purchase or
13   Sell, and also direct you to the last page of
14   it where you might see your signature on it.
15   I'll just ask you if you recognize it.
16           (Whereupon the deponent conferred with
17   counsel off the record.)
18   EXAMINATION BY MR. GILBERT:
19     Q.  All right.  Do you recognize that
20   document?  Have you seen it before?
21     A.  Yes.
22     Q.  Is that your signature on it?
23     A.  Yes.
24     Q.  And let me just see here.  All right.
25   We would introduce and attach this as 3(a).
```

Page 245

```
 1   And that's the Prudential Gardner Buy/Sell
 2   Agreement with a fax cover from Jane Hicks, and
 3   it looks like a couple of internal documents
 4   from TJ Real Estate Services, which is True
 5   Title.
 6           (Exhibit 3(a) was marked for
 7   identification and is attached hereto.)
 8   EXAMINATION BY MR. GILBERT:
 9     Q.  All right.  Before I forget,
10   Mr. Murph, on the last page of the agreement,
11   the settlement agreement, there's a document
12   called an affidavit which I'm showing to you
13   which is marked as LNA000705.
14           Is that your signature on it?
15     A.  Yes.
16     Q.  Did you tell anybody what to say in
17   this affidavit?
18     A.  No.
19     Q.  You didn't dictate something to
20   somebody and say, these are my words, put them
21   in an affidavit?
22     A.  No.
23     Q.  How did you come to sign this
24   affidavit?
25     A.  It's part of the settlement agreement.
```

Page 246

```
 1     Q.  Okay.  Did you raise your hand and "I
 2   swear under oath" and all that?
 3     A.  I don't remember.  No, I don't know.
 4   I can't remember if I did or didn't.
 5     Q.  All right.  We're going to attach the
 6   entirety of the settlement agreement, which is
 7   LNA694 through 705 --
 8        MR. RICHTHOFEN:
 9           Which is a redacted --
10        MR. GILBERT:
11           -- which is a redacted copy of
12        it, because that's all we got, as
13        4(a).
14           (Exhibit 4(a) was marked for
15   identification and is attached hereto.)
16   EXAMINATION BY MR. GILBERT:
17     Q.  What happened to 1739 Jourdan Avenue?
18   Do you still own that?
19           (Whereupon the deponent conferred with
20   counsel off the record.)
21     A.  No.
22   EXAMINATION BY MR. GILBERT:
23     Q.  Who owns that now?
24     A.  I don't know.
25     Q.  How did it come to be that you don't
```

Page 247

```
 1   own it anymore?  Did you sell it?  Did you --
 2   what did you do?
 3     A.  I don't know what I did with that
 4   thing.
 5   EXAMINATION BY MR. GILBERT:
 6     Q.  You don't know what happened to 1739,
 7   who owns it?
 8     A.  No.
 9     Q.  Okay.  Did you go to any sale or
10   anything of 1739 Jordan?
11     A.  No.
12     Q.  Did you sign any documents to transfer
13   it to anybody?
14     A.  No.  Not that I know of.
15     Q.  Okay.  When did you buy 1739?
16     A.  I can't remember.
17     Q.  Do you know who Shirley Priestly is?
18     A.  Yes.
19     Q.  Do you know any of Shirley Priestly's
20   children?
21     A.  No.
22     Q.  Do you know Jennifer Fernandez?
23     A.  Yes.
24     Q.  Do you know Wayne Priestly?
25     A.  Yes.
```

Page 248

1    Q.  Okay.
2        (Whereupon the deponent conferred with
3  counsel off the record.)
4    A.  Oh, okay.
5  EXAMINATION BY MR. GILBERT:
6    Q.  Because we're running out of time I'm
7  going to try to -- or at least running out of
8  time before we have to break, I'm going to try
9  and make this quick.
10       Is it correct that when you bought
11  1739 y'all were like 18 and some change short
12  in closing and so they did a second mortgage to
13  y'all?
14   A.  I don't know.  They may have.
15   Q.  All right.  Well, let me ask you --
16  I'm going to show you 5(a) and see if you
17  recognize it.  See if you recognize your
18  signature on it.
19       (Exhibit 5(a) was marked for
20  identification and is attached hereto.)
21   A.  Yes.
22  EXAMINATION BY MR. GILBERT:
23   Q.  What is that document?
24   A.  It's a promissory note.
25   Q.  Okay.  What was -- and it's a -- what

Page 249

1  is the promise contained in that note?
2    A.  I don't know.  It's a price that they
3  got on here.
4    Q.  Well, let me ask you, were you paying
5  notes on 1739?
6    A.  Yes.
7    Q.  Who were you paying them to?
8    A.  The Priestlys.
9    Q.  Okay.  Did you owe anything still at
10  the time of the storm?
11   A.  Yes.
12   Q.  Okay.  When is the last time you've
13  spoken with any of the Priestlys?  And by that
14  I also mean Jennifer Fernandez, any of them.
15   A.  A couple of weeks ago.
16   Q.  Did y'all talk about 1739?
17   A.  No.
18   Q.  When is the last time y'all have
19  spoken about 1739?
20   A.  A couple of weeks ago.
21   Q.  Okay.  You just said you didn't speak
22  about 17 --
23   A.  We didn't speak about it.  I just went
24  there and signed a paper.
25   Q.  What paper did you sign?

Page 250

1    A.  Um -- this promissory note.
2    Q.  Did you sign that a couple of weeks
3  ago?
4        MR. RICHTHOFEN:
5            I think Mr. Murph is alluding to
6        when he met at my office with the
7        Priestlys to extinguish the note.
8        That may be what he's alluding to.
9        There was an extinguishment of the
10       note, and that occurred at my office
11       with the Priestlys.
12  EXAMINATION BY MR. GILBERT:
13   Q.  Is that what you're talking about, a
14  meeting to settle up with them?
15   A.  Right.
16   Q.  All right.  After you bought and moved
17  into 105 Berkley, did you have any more talks
18  with Mr. Lafarge or any of their attorneys?
19  Did you ever speak to them again?
20   A.  No.
21   Q.  Never?
22   A.  No.
23   Q.  What about Mrs. Murph, did she ever
24  hear from any of them?
25   A.  I don't think.  I don't know.

Page 251

1    Q.  Okay.  Did Mrs. Murph ever tell you
2  that she'd had a conversation with any of the
3  attorneys from Lafarge?
4    A.  She may have.
5    Q.  But you don't remember for sure
6  whether or not she did or didn't?
7    A.  No.  Right.
8    Q.  She'd be the better person to be able
9  to answer that question?
10   A.  I don't know.
11   Q.  Okay.  Did you ever talk with Jennifer
12  Fernandez about -- let's say in early '06,
13  spring of '06, did you ever talk with Jennifer
14  Fernandez about any calls that she might have
15  gotten from Lafarge or their attorneys?
16   A.  Who is Jennifer Fernandez?
17   Q.  Shirley Priestly's daughter Jennifer.
18   A.  No, unh-unh.
19   Q.  Okay.  All right.  So you testified
20  that you don't know who owns 1739 Jourdan
21  Avenue right now, and in connection with that,
22  I'm going to -- I want to attach --
23       MR. GILBERT:
24           And I'll let all counsel see
25       this, this is going to be 6(a).  This

Page 252

```
 1        is from the City of New Orleans
 2        property database as of today's
 3        date -- or I'm sorry, yesterday's
 4        date, 6:35 p.m.  Circulate it, as long
 5        as it gets back to the court reporter.
 6           (Exhibit 6(a) was marked for
 7    identification and is attached hereto.)
 8        MR. GILBERT:
 9             And in connection with 105
10        Berkley, I'm going to attach the same
11        thing and call it 7(a).  It's from the
12        City of New Orleans property database.
13        It was actually downloaded this
14        morning, dated 1/28, 7:38 a.m.  Send
15        that around, too.
16           (Exhibit 7(a) was marked for
17    identification and is attached hereto.)
18    EXAMINATION BY MR. GILBERT:
19        Q.  In your new neighborhood where you
20    live on Berkley, did any of your other
21    neighbors come from the Lower Ninth Ward after
22    the storm?
23        A.  I have no idea.
24        Q.  Do you know any of the other
25    neighbors?
```

Page 253

```
 1        A.  Yes.
 2        Q.  Okay.  But you don't know whether they
 3    came from the Lower 9?
 4        A.  I don't think there's nobody come from
 5    there.
 6        Q.  All right.  I want to ask you a few
 7    questions about things that we've talked about
 8    earlier.  We've talked about the boom that you
 9    heard.  The boom.
10        A.  Right.
11        Q.  How much time went by after you heard
12    the boom before you saw the barge on your
13    house?  How much time do you think that was?
14        A.  Oh, I don't know.
15        MR. WALKER:
16             Objection.  Asked and answered.
17    EXAMINATION BY MR. GILBERT:
18        Q.  You don't know how much time went by?
19        A.  No.
20        Q.  Do you think it was an hour?
21        A.  No.
22        Q.  Do you think it was less?
23        A.  It was more than an hour.
24        Q.  It was more than an hour between the
25    time you heard the boom and the time you saw
```

Page 254

```
 1    the barge?
 2        A.  Yes.
 3        Q.  After you heard the boom, did you hear
 4    any more of the scraping sound?
 5        A.  No.
 6        Q.  You testified that you were not scared
 7    in Vietnam but you were scared here.  Why?
 8        A.  I know who I was fighting in Vietnam.
 9    I ain't never been in no flood before.
10        Q.  Did the boom scare you?
11        A.  No.
12        Q.  Did the flooding scare you?
13        A.  The water scared me.
14        Q.  All right.  You'd testified that you
15    had already smashed out a hole before you heard
16    the boom.  Is that right?
17        A.  I may have.  I don't know.
18        Q.  You went up to the attic.
19        A.  Right.
20        Q.  All right.  Let me see if I can
21    understand.  You're making the connections on
22    the --
23        A.  Generator.
24        Q.  -- on the generator when you hear the
25    scaping sound and the boom; is that right?
```

Page 255

```
 1        A.  Right.
 2        Q.  Then you go up into the attic.  Is
 3    that right?
 4        A.  Right.
 5        Q.  Had you already cut a hole?  Was the
 6    hole already there?
 7        A.  No, it wasn't no hole there.  I put
 8    the hole there.
 9        Q.  Right.  But had you already put it
10    there at that point?
11        A.  Before the boom?  No.
12        Q.  No.  You put it there after the boom?
13        A.  Right.
14        Q.  Okay.  Did the boom sound to you like
15    the sound of a barge crashing into a floodwall?
16        A.  I don't know how a barge sound
17    crashing into a floodwall.
18        Q.  Okay.  Did you get the impression that
19    that's what it was?
20        MR. WALKER:
21             Objection.  Asked and answered.
22        A.  No.
23    EXAMINATION BY MR. GILBERT:
24        Q.  Huh?
25        A.  No.
```

Page 256

```
 1    Q.  What impression did you have?
 2    A.  I didn't have no impression.  I just
 3 heard a noise and I saw the water and I ran in
 4 the garage.
 5    Q.  Okay.  About what time was it when you
 6 heard the boom?
 7    A.  I don't know.
 8    Q.  You don't know?
 9    A.  No.
10    Q.  Was it dark?
11    A.  Yes.
12    Q.  How long after you heard the boom did
13 it get light?
14    A.  The next day.
15    Q.  Well, but how long?  About how long?
16    A.  Oh.  I don't know how long that was.
17    Q.  I'm sorry?
18    A.  I don't know.
19    Q.  Was it an hour?
20    A.  No.
21    Q.  Was it less, more?
22    A.  It was the next -- it was more.
23    Q.  It was more than an hour?
24    A.  Yes.
25    Q.  Okay.  How many booms did you hear?
```

Page 257

```
 1    A.  Just a bunch of noise I heard.  It
 2 didn't really sound like a boom, it was just --
 3    Q.  Well, how many booms did you hear that
 4 night?  That morning, that night?
 5    MR. WALKER:
 6        Objection.  Asked and answered.
 7    A.  I didn't heard no -- it's just a big
 8 scraping sound.  I just said like a boom, but
 9 it just was a loud noise.
10 EXAMINATION BY MR. GILBERT:
11    Q.  All right.  Could we gather up the
12 exhibits so I could see what I've got?
13    (Off the record.)
14    MR. GILBERT:
15        All right.  We're going to label
16        the excerpts of the statement as 8(a).
17    (Exhibit 8(a) was marked for
18 identification and is attached hereto.)
19    MR. GILBERT:
20        Y'all want to have a break?  You
21        want to eat lunch?
22    MR. WALKER:
23        Do you have more questions?
24    MR. GILBERT:
25        I don't think.  I think we're
```

Page 258

```
 1        going to tender.  Reserve rights but
 2        we're going to tender.
 3    MS. BERTAUT:
 4        I have a few.
 5    MR. WALKER:
 6        We can go as far as we can.  I
 7        don't know when they'll bring the
 8        food.
 9 EXAMINATION BY MR. RICHTHOFEN:
10    Q.  Mr. Murph, this is the second time
11 you've been here, correct?
12    A.  Yes.
13    Q.  This is just for clarity, for the
14 record.  There are about fifteen individuals
15 around the table, at least?
16    A.  About.
17    Q.  Does how does being here with this
18 many people with ties and starched shirts on
19 make you feel?
20    A.  Uncomfortable.
21    Q.  Uh-huh.  Are you nervous?
22    A.  A little bit.
23    Q.  All right.  Has anyone told you how to
24 testify here today?
25    A.  No.
```

Page 259

```
 1    Q.  Has everything you said been an honest
 2 answer to the questions presented to you, as
 3 much as you could answer?
 4    A.  Yes.
 5    Q.  Okay.
 6 EXAMINATION BY MS. BERTAUT:
 7    Q.  Mr. Murph, my name is Carmelite
 8 Bertaut.  We talked the last time --
 9    A.  Right.
10    Q.  -- you were here, on the other
11 deposition.
12        Let me just see if I can understand.
13 At the time Katrina hit, you and your family
14 were living at 1739 Jourdan Avenue?
15    A.  Yes.
16    Q.  And you are now on Berkley Drive?
17    A.  Yes.
18    Q.  Do you recall that you paid
19 approximately $93,000 for the house on Jourdan
20 Avenue when you purchased it?
21    A.  I can't remember.
22    Q.  Okay.  Do you know what you paid for
23 the house on Berkley?
24        (Whereupon the deponent conferred with
25 counsel off the record.)
```

Page 260

1 EXAMINATION BY MS. BERTAUT:
2    Q.  Let ask it this way:  If the public
3 records show that you paid $230,000 for the
4 house on Berkley, does that sound about right?
5    A.  Possibly.
6    Q.  And if the public records show that
7 you and your wife paid approximately $93,400
8 for the house on Jordan Avenue, does that sound
9 about right?
10    A.  Probably.
11    Q.  Okay.  Berkley is a newer house; is
12 that right?
13    A.  Yes.
14    Q.  Than Jourdan was.
15    A.  Right.
16    Q.  Is Berkley a bigger house than
17 Jourdan?
18    A.  Yes.
19    Q.  Okay.  So -- and you moved from a
20 smaller, older house for which you paid $93,400
21 to a larger house that was valued at $230,000
22 since the storm.  Is that right?
23    A.  Yes.
24    Q.  And you signed papers to purchase the
25 Berkley property on the same day that you

Page 261

1 signed a settlement agreement with Lafarge, is
2 that right?
3       MR. RICHTHOFEN:
4          If you remember the date.
5    A.  I can't remember the date but it's
6 something like that.
7 EXAMINATION BY MS. BERTAUT:
8    Q.  Okay.  Are you still paying any notes
9 on Jourdan Avenue, any mortgage payments?
10    A.  No.
11    Q.  When did you quit paying mortgage
12 payments on Jourdan Avenue?
13    A.  After the storm.
14    Q.  Was it about the time that you bought
15 Berkley?
16    A.  Probably.
17    Q.  Are you paying any property tax on
18 Jourdan Avenue?
19    A.  No.
20    Q.  Do you maintain the property on
21 Jourdan Avenue?
22    A.  There ain't no property.
23    Q.  Well, do you cut grass or --
24    A.  No.
25    Q.  When did you acquire the North Roman

Page 262

1 property that's behind Jourdan?
2    A.  Um -- I can't remember what date it
3 was.
4    Q.  Okay.  Did you get that from the
5 Priestlys?
6    A.  No.
7    Q.  That was a separate deal?
8    A.  Yes.
9    Q.  Was there any structure on the North
10 Roman property?
11    A.  No.
12    Q.  Okay.  There never was in the time you
13 owned it?
14    A.  No.
15    Q.  Did you acquire the North Roman
16 property after you acquired Jourdan from the
17 Priestlys?
18    A.  Yes.
19    Q.  Do you know who you purchased the
20 North Roman property from?
21    A.  The City of New Orleans.
22    Q.  Was that through a tax sale or
23 something?
24    A.  I can't -- I don't know -- really know
25 how we did that, but --

Page 263

1    Q.  I'm not certain of the number, but
2 it's the agreement to purchase Berkley, which
3 is someplace perhaps in front of you, I don't
4 know.  Let me see if I can find the number.
5 Maybe your lawyer can help you find it to move
6 this along.  I think it would be 3(a).
7       That shows, if you look, sir, up at
8 the right-hand corner, a date of 12/3/05.
9    A.  Uh-huh.
10    Q.  Does that sound about the time that
11 you and your wife decided to purchase Berkley?
12    A.  Yes.
13    Q.  Were there any other houses that you
14 had put agreements to purchase on other than
15 Berkley after the storm?
16    A.  No.
17    Q.  So 105 Berkley is the only property
18 that you attempted to buy after the storm, is
19 that right?
20    A.  I looked at a bunch of houses, but
21 that's the one that I liked.
22    Q.  Is 105 Berkley the only one you signed
23 papers on the purchase?
24    A.  Yes.
25    Q.  And again, let me see if I understand

Page 264

1  this correctly:  At no time before you signed
2  what has been identified as the agreement with
3  Lafarge, which is 4(a), at no time before you
4  signed that document did you have an attorney
5  representing your interests review that
6  document, is that correct?
7      A.  No.
8      Q.  When you signed the document that's
9  identified as 4(a)--
10     A.  Right.
11     Q.  -- you said it was in this building.
12 Is that right?
13     A.  Right.
14     Q.  Was that signing of the document
15 videotaped?
16     A.  I don't think.
17     Q.  And prior to arriving at the building
18 on the day that you signed the document
19 identified as 4(a), you had never been shown a
20 copy of the document --
21     A.  No.
22     Q.  -- prior to that time.
23         And similarly, when you signed the
24 papers dealing with Berkley which are
25 identified as 2(a), the Act of Sale and the

Page 265

1  Collateral Mortgage, had you ever had those
2  documents looked at by a lawyer before you
3  signed them?
4      A.  No.
5      Q.  Are you making any sort of payments on
6  a note for Berkley?
7      A.  No.
8      Q.  Were you aware that you have a
9  mortgage on -- that obligates you on the public
10 records for Berkley?
11     A.  No.
12     Q.  Is this the first time you're learning
13 of that, sir?
14     A.  Yes.
15     Q.  Why do you believe that you do not
16 currently own Jourdan Avenue -- what is it,
17 1739 Jourdan Avenue?
18     A.  Yes.
19     Q.  Yes.  Why do you believe that you
20 don't currently own it or that you may not
21 currently own that property?
22     A.  Well, I don't know.
23     Q.  Well, let's see.  At the time Katrina
24 hit, you were the owner of the property, is
25 that right?

Page 266

1      A.  Yes.
2      Q.  I think the question that was on the
3  table was, at the time of Katrina you were the
4  owner of 1739 Jourdan --
5      A.  Right.
6      Q.  -- avenue.
7         And I thought you had said earlier
8  today, sitting in the room, that you think you
9  do not any longer own Jourdan Avenue.
10     A.  Right.
11     Q.  And my question to you is, why do you
12 believe that?
13     A.  That was part of the settlement.
14     Q.  But sitting here today, the only
15 document that you believe you signed concerning
16 Jourdan Avenue in connection with the
17 Lafarge/Ingram settlement is what's been
18 identified as 4(a)?
19     MR. HAYCRAFT:
20         Objection to the form of the
21     question.
22     MR. GILBERT:
23         I didn't think Ingram was a
24     party.
25     MR. HAYCRAFT:

Page 267

1         They're not.
2  EXAMINATION BY MS. BERTAUT:
3      Q.  I'll rephrase the question.  Is the
4  only document that you have signed in
5  connection with settlement of your claims the
6  document identified as 4(a)
7         (Whereupon the deponent conferred with
8  counsel off the record.)
9      A.  Run that by me again.
10        (Whereupon the deponent conferred with
11 counsel off the record.)
12 EXAMINATION BY MS. BERTAUT:
13     Q.  Do you want me to repeat the question?
14        Is the only document that you have
15 signed in which you settled claims arising out
16 of the barge and Katrina the document that's
17 been identified and is sitting in front of you
18 as Exhibit 4(a)?
19     A.  Right.
20     Q.  Did Ingram Barge make any payments to
21 you?
22     A.  No.
23     Q.  Did you execute any other agreements
24 with Ingram Barge?
25     A.  No.

Page 268

```
 1    Q.  Do you have any understanding of
 2 whether or not Lafarge has made any promises to
 3 you that they now have to live up to in
 4 connection with the settlement?
 5    A.  I don't know.
 6    Q.  Why do you believe Lafarge made this
 7 settlement with you?
 8    A.  To compensate.
 9    Q.  Has any representative of Lafarge
10 spoken with you since the last deposition?
11    A.  No.
12    Q.  Have you had any contact with Lafarge
13 since February 9, 2006?
14    A.  No.
15    Q.  Okay.  I'm going to ask you now if
16 you'll take a look at the statement that's --
17 and I forget what that number is.  I think
18 that's -- 8(a).  And if I understood what you
19 told us earlier, you have no recollection of
20 giving a statement.  Is that right?
21    A.  Right.
22    Q.  I'm going to ask you to take a look at
23 it a second, 8(a), the document noted as 8(a).
24 You see it purports to be an interview with
25 somebody named Arthur Lee Murph, Jr.?  Do you
```

Page 269

```
 1 see that?
 2    A.  Yes.
 3    Q.  And is that your full name, sir?
 4    A.  Yes.
 5    Q.  And is your date of birth 12/4/1950?
 6    A.  Yes.
 7    Q.  And are you a supervisor for a
 8 construction company?
 9    A.  Yes.
10    Q.  And were you living at 1739 Jourdan
11 Avenue?
12    A.  Yes.
13    Q.  And do you have a daughter?
14    A.  Yes.
15    Q.  And did you bring your family to the
16 Hyatt?
17    A.  Yes.
18    Q.  And would you take look at Page 4.
19    MR. WALKER:
20       Carmelite, I'm going to renew the
21    same objections that I previously made
22    with respect to Brian's questioning on
23    the statement for you, as well.
24    MS. BERTAUT:
25       I understand.
```

Page 270

```
 1    MR. RICHTHOFEN:
 2       Mr. Murph would assert that he
 3    can't remember giving a statement.
 4    MS. BERTAUT:
 5       I understand that.  We're getting
 6    there.
 7 EXAMINATION BY MS. BERTAUT:
 8    Q.  I want you to look at Page 4 where it
 9 says -- the fifth set of words, lines, it says,
10 Arthur in bold, and it says, "Right.  He stayed
11 out on Paris Avenue.  Paris Avenue and
12 Lafreniere.  That's where I dropped my two
13 vehicles off.  That's why they were safe
14 through the flood."
15       Do you see that on the document?
16    A.  Yes.
17    Q.  Now, you dropped your two vehicles off
18 on Paris Avenue and Lafreniere, didn't you?
19    A.  Right.
20    Q.  Let's look at Page 9.  Toward the
21 bottom of the page, Mr. Murph, it's got the
22 initials RJG, and it starts in the middle of a
23 sentence, "swam over to your neighbors
24 Mrs. Moses, who was living there."
25    A.  Right.
```

Page 271

```
 1    Q.  And then it says, Arthur:  "Right.
 2 They had four people in that house, in the
 3 upstairs apartment."
 4       Now, you see that in the statement?
 5    A.  Yes.
 6    Q.  Now, Mr. Murph you swam to a house
 7 with four people in an upstairs apartment,
 8 didn't you?
 9    A.  Yes.
10    Q.  And it goes on.  If you keep looking
11 at Page 9, it says, right after where we just
12 read, it says, RJG:  "Do you know who owns the
13 house that they were living in?"
14       And then it says, Arthur:  "Someone
15 named Rick.  I can't really, um -- a white
16 dude.  I don't really know his name, but we
17 spoke a bunch of times."
18       You see where that is in this
19 document?
20    A.  Yes.
21    Q.  Do you recall speaking to somebody
22 named Rick before Katrina, a white dude that
23 lived close to you?
24    A.  I don't know if that was his real
25 name, but I remember talking to him.
```

Page 272

1    Q.   In other words, Mr. Murph, this
2  statement reflects a whole lot of things and
3  events that are very similar to your
4  experiences the night Katrina hit, is that
5  right?
6    A.   Yes.
7    Q.   This statement on the first page, or
8  the excerpt, the document says -- if you'll
9  look on the first page, it says, taken
10  January 25, 2006, by RJG.
11        Do you recall the day of the week that
12  January 25, 2006 was?
13    A.   No.
14    Q.   Do you know where you were living at
15  that time?
16    A.   In January, 2006?  Not really.
17    Q.   So there are some things that you
18  don't recall about January 25, 2006, involving
19  your whereabouts and what you were doing, is
20  that right?
21    A.   Right.
22    Q.   Is it possible that you in fact did
23  give a statement on January 25, 2006 to someone
24  concerning your Katrina experiences and you
25  simply just don't recall it?

Page 273

1    A.   It may be.  I just don't remember.
2    Q.   Ant would you say that your memory is
3  better today than it was back in January, 2006,
4  about the sequence of events that happened
5  during Katrina?
6    A.   No.
7    Q.   Okay.  You think your memory was
8  better closer in time to Katrina than it is
9  today?
10    A.   My memory's just shot.
11    Q.   It's shot.  Been through a lot in the
12  last two years; is that right?
13    A.   More than two years.
14    Q.   Okay.  I want to point out one other
15  thing and see if this jogs your memory on
16  anything.  January 25, 2006, is just right
17  before -- a few days before -- I can't count
18  right now, but maybe two weeks before you
19  signed papers on February 9, 2006, is that
20  right?
21    A.   I don't know.
22    Q.   Did you ask, when you signed the
23  papers with Lafarge, what duties or obligations
24  you had as a result of signing the papers?
25    A.   No.

Page 274

1    Q.   Did any of the lawyers present explain
2  to you what duties you may have been taking on
3  by signing those papers?
4    A.   No.
5    Q.   When you spoke to Lafarge prior to
6  signing papers, did you ever tell them that you
7  were personally in the house at the time that
8  the barge came to rest on your home?
9    A.   I may have.
10    Q.   Do you know a lawyer by the name of
11  Pat Hand?
12    A.   Who?
13    Q.   Patrick Hand.
14    A.   No.
15    Q.   What is the status of any insurance
16  claim on Jourdan Avenue; did you make a claim
17  on Jourdan Avenue against your insurer?
18    A.   I think, maybe.
19    Q.   Has that been paid off?
20    A.   I think so.
21    Q.   As a result of just coming today and
22  the last time you were here, is it your
23  understanding that you have promised not to
24  disclose or reveal certain events that happened
25  to you on account of the money or settlement

Page 275

1  that you reached with Lafarge?
2        MR. WALKER:
3           Objection, asked and answered.
4        MR. RICHTHOFEN:
5           Do you understand the question?
6        THE WITNESS:
7           Yes.
8  EXAMINATION BY MS. BERTAUT:
9    Q.  Do you understand my question?
10        MR. RICHTHOFEN:
11           You can answer.
12    A.  Repeat that question again.
13  EXAMINATION BY MS. BERTAUT:
14    Q.  Do you understand that you are
15  obligated not to disclose certain events that
16  you know took place on account of the
17  settlement that you reached with Lafarge?
18    A.  Yes.
19    Q.  And do you have any concerns that you
20  might be at risk -- you or your family might be
21  at risk should you violate the terms of that
22  settlement?
23        MR. RICHTHOFEN:
24           Just for clarity, I don't think
25           my client understood the crux of that

Page 276

1    question, which is why I asked him.
2    So I'm going to rephrase it for him if
3    that's okay.
4    MS. BERTAUT:
5        Okay.  Which question are you
6    talking about?  The one about are you
7    afraid about your family?
8    MR. RICHTHOFEN:
9        No, no.  The one before that.
10    Could you read the previously
11    question back, please?
12    MS. BERTAUT:
13        Well, I'll tell you, counsel, I
14    asked him if he understood and he said
15    he did.  Now, if you have an
16    opportunity to question him again, you
17    can, but I'm in the middle of cross
18    right now.
19    MR. WALKER:
20        Well, you said earlier you're
21    trying to get the facts.  Right?  And
22    the fact is based on a very unclear
23    question.
24    MR. GILBERT:
25        If it's based on a

Page 277

1    misunderstanding, we need to get that
2    accurate.
3    MR. RICHTHOFEN:
4        Mr. Murph, is it your
5    understanding that you can't discuss
6    what happened to you because of the
7    confidentiality agreement or you can't
8    discuss the agreement because of the
9    terms of the confidentiality
10    agreement?
11    THE WITNESS:
12        Right.
13    MR. RICHTHOFEN:
14        What's your understanding?  You
15    can't -- you're not allowed to discuss
16    what happened to you with the
17    hurricane, or you're not allowed to
18    discuss the agreement?
19    THE WITNESS:
20        I'm not allowed to discuss the
21    agreement.
22    MS. BERTAUT:
23        That was not my question.
24    MR. RICHTHOFEN:
25        It was the previous -- read the

Page 278

1    question back, please.
2    MR. WEBB:
3        It was a valid interpretation of
4    your question.
5    MR. GILBERT:
6        That was your question, counsel.
7    MR. WALKER:
8        The record is going to show what
9    my question is, gentlemen.
10        (Whereupon the question was
11    read back as follows: "Do you understand that
12    you are obligated not to disclose certain
13    events that you know took place on account of
14    the settlement that you reached with Lafarge?")
15    MS. BERTAUT:
16        That was my question.
17    MR. RICHTHOFEN:
18        Right.  I want to make sure
19    Mr. Murph understood that he's not
20    allowed the discuss the events that
21    took place regarding the settlement
22    agreement, not events that took place
23    in totality of the hurricane and the
24    barge.
25    MS. BERTAUT:

Page 279

1        I understand.
2    MR. WALKER:
3        Which he's already answered for
4    Mr. Gilbert twice.
5    MR. RICHTHOFEN:
6        I'm sorry.  Just for clarity, for
7    my client 's safety, I just want to
8    make sure he understood that and that
9    was the answer that was being given to
10    you.
11 EXAMINATION BY MS. BERTAUT:
12    Q.  Are you concerned that should you
13 break the agreement or violate the terms of the
14 agreement that you or your family might be at
15 risk financially?
16    MR. RICHTHOFEN:
17        You can answer that.
18    A.  I don't know.
19    MR. RICHTHOFEN:
20        No, you can answer that honestly.
21    THE WITNESS:
22        I don't understand what she's
23    saying.
24    MR. WALKER:
25        It's all right.  A lot of us

Page 280

1    don't understand what she's saying
2    either.  You can say that.
3  EXAMINATION BY MS. BERTAUT:
4    Q.  You don't know?  Is that what your
5  answer is?
6    A.  That's what I said, yes.
7    Q.  Do you have any concerns that if
8  Lafarge believes that you broke the terms of
9  the agreement that your house on Berkley might
10 be foreclosed on or lost?
11   A.  Somewhat.  Yes.
12   Q.  Was there ever a time when you
13 believed that Lafarge was responsible for the
14 damage to your house?
15   A.  Only because I saw the barge.
16   Q.  Do you still believe that to be true?
17   A.  Yeah.  It was on the house.
18   Q.  How about Ingram; was there ever a
19 time when you believed Ingram Barge was
20 responsible for the damage to your house?
21   A.  I didn't really care who was
22 responsible, I just wanted to be compensated
23 for my house.
24   Q.  I understand that.  But my question,
25 Mr. Murph, is was there ever a time when you

Page 281

1  believed that Ingram Barge was responsible for
2  the damage to your house?
3    A.  I don't know.  No.  I don't think.
4    Q.  I think that may be all.
5        That's all the questions I have.
6  Thank you.
7        MR. GILBERT:
8        I got a couple.
9  EXAMINATION BY MR. GILBERT:
10   Q.  How long after you heard the scraping
11 sound did the water come?
12       MR. WALKER:
13       Objection.  Asked and answered
14       about four times.
15       MR. GILBERT:
16       No.  It hasn't been asked.
17       MR. WALKER:
18       Yeah.
19       MR. GILBERT:
20       No.  I have not asked that
21       question.
22 EXAMINATION BY MR. GILBERT:
23   Q.  How long after the scraping sound did
24 the water come?
25       MR. WALKER:

Page 282

1        Objection.
2    A.  A lil while.
3  EXAMINATION BY MR. GILBERT:
4    Q.  What's a lil while?  What's that mean?
5    A.  About three, four minutes, I guess.  I
6  don't know.
7    Q.  You're guessing?
8    A.  Yep.
9    Q.  Okay.  How long after the scraping
10 sound did you cut the hole in the attic?
11       MR. WALKER:
12       Objection.  Asked and answered.
13   A.  Soon as I went to the garage and got
14 the ax and chopped the hole.
15 EXAMINATION BY MR. GILBERT:
16   Q.  Okay.  So that's something you did
17 straight away after you heard the scraping?
18   A.  No.  After I saw the water.
19   Q.  All right.  Okay.  About how long
20 after -- how long after you saw the water did
21 you go do the hole?
22   A.  Immediately.
23   Q.  That's something you went and did
24 straight away.
25   A.  Yes.

Page 283

1    Q.  All right.  How long after the
2  scraping was that that you went and did the
3  hole?
4        MR. WALKER:
5        Objection.  Asked and answered?
6    A.  After the water.  After I saw the
7  water.
8  EXAMINATION BY MR. GILBERT:
9    Q.  Do you know how much time went by?
10   A.  No.
11   Q.  Okay.  Did you meet with any attorneys
12 today other than Mr. Richthofen --
13   A.  No.
14   Q.  -- to prepare for giving testimony?
15   A.  No.
16   Q.  You didn't meet with any of the
17 attorneys from Lafarge?
18   A.  No.
19   Q.  Okay.  All right.  That's it.
20       MR. GILBERT:
21       That's all.  I mean, you know --
22       reserving the right to reexamine if
23       anybody else goes.  But I guess we
24       take a break now?
25       MR. RICHTHOFEN:

Page 284

1        But before the break, real quick,
2  I would request that if Mr. Murph
3  is -- if anyone has taken a statement
4  from Mr. Murph with regards to these
5  proceedings, I request that I be
6  furnished a copy of that.
7  MR. GILBERT:
8     Call for production.
9  MR. RICHTHOFEN:
10    Do I have to file that with --
11  MR. WALKER:
12    I didn't hear what you said.
13  MR. GILBERT:
14    Just call for production.
15  MR. RICHTHOFEN:
16    I just -- well, whatever it's
17  called.  If I need to file with
18  court -- I would request that if
19  Mr. Murph has made a statement to
20  anyone here, because we have a copy of
21  a statement, you know, a redacted
22  statement, and under the
23  confidentiality agreement, if he's
24  made a statement to anyone -- if
25  anyone here has taken a statement from

Page 285

1  Mr. Murph that I be furnished a copy
2  of that statement, please.
3  MR. WALKER:
4    Anybody else have any questions?
5  EXAMINATION BY MR. WALKER:
6  Q.  I just have a couple, Mr. Murph.  And
7  if we can get out before lunch you don't have
8  to come back.
9     Do you remember I took your deposition
10  on December 17th, '07, a couple of weeks ago?
11  A.  I can't remember.
12  Q.  Well, you remember in this room, you
13  were here with a bunch of us and I asked you
14  questions?
15  A.  Right.
16  Q.  Maybe that wasn't the right date.
17  MR. WIEDEMANN:
18    It wasn't in this room.  It was
19  in Bruno's office.
20  MR. WALKER:
21    Sorry.  You're right.
22  EXAMINATION BY MR. WALKER:
23  Q.  In Mr. Bruno 's office.
24  A.  Right.
25  Q.  A lot of attorneys asked you

Page 286

1  questions?
2  A.  Yes.
3  Q.  And you remember you were under
4  oath --
5  A.  Yes.
6  Q.  -- like you were today?
7  A.  Right.
8  Q.  And you promised to tell the truth
9  then, and if you didn't remember anything you'd
10  say you didn't remember, and we told you not to
11  guess?
12  A.  Yes.
13  Q.  You remember all that?
14  A.  Yes.
15  Q.  Did you tell the truth that day?
16  A.  Yes.
17  Q.  Did you give us your best recollection
18  of the events of Katrina and how you lived them
19  and what you saw and what you heard?
20  A.  Yes.
21  Q.  And how about today, did you give us
22  your best recollection?
23  A.  As best as I know.
24  Q.  And the first time we took your
25  deposition you didn't need any statement to

Page 287

1  refresh your memory, did you?
2  A.  No.
3  Q.  You remembered things just based on
4  your memory, didn't you?
5  A.  Right.
6  Q.  And the redacted statement you've been
7  shown prior to today 's deposition didn't
8  refresh your memory any better than you had it
9  the first time we took your deposition, did it?
10  A.  No.
11  Q.  So you didn't need that statement to
12  give your testimony truthfully, did you?
13  A.  No.
14  Q.  And you don't remember giving the full
15  statement, do you?
16  A.  No, I don't.
17  Q.  You don't remember what attorney you
18  gave it to or --
19  A.  No.
20  Q.  -- whether he was black or white or
21  where it happened?
22  A.  I have no idea where that come from.
23  Q.  Did you ever give this attorney, and I
24  understand it's a difficult question because
25  you don't remember who it was, any authority to

1  release the statement?
2      A.  I ain't had nothing to give to him for
3  the release.
4      Q.  So you don't remember him calling you
5  or you calling him or there being any exchange
6  between you where you gave him permission to
7  release the statement that you might have given
8  him.
9      A.  No.
10     Q.  And you haven't been shown the
11  statement in its entirety without any omissions
12  or deletions, have you?
13     A.  This statement right here?  I got one
14  from my lawyer.
15     Q.  This same piece of paper.
16     A.  This same piece of paper.
17     Q.  You've never seen the complete version
18  that you signed --
19     A.  No.
20     Q.  -- that doesn't have the omissions.
21     A.  No.
22        (Whereupon the deponent conferred with
23  counsel off the record.)
24        MR. RICHTHOFEN:
25           Say that.

1        (Whereupon the deponent conferred
2        with counsel off the record.)
3  EXAMINATION BY MR. WALKER:
4      Q.  That's all I have.  Thank you, Mr.
5  Murph.
6        MR. GILBERT:
7           Let me just follow-up.
8  EXAMINATION BY MR. GILBERT:
9      Q.  You looked at the statement before
10  giving this deposition, right?
11     A.  Right.
12     Q.  Did it help you remember things?
13     A.  No.
14     Q.  No?  Okay.
15  EXAMINATION BY MR. RICHTHOFEN:
16     Q.  Did you ever sign a version of this
17  statement?
18     A.  I don't think.  I can't remember
19  signing one.
20     Q.  So do you recall giving this
21  statement?
22     A.  No.
23     Q.  Do you recall hiring any attorney to
24  represent you with regards to the barge and the
25  floodwall breach?

1      A.  No.
2      Q.  Okay.  All right.
3        MR. WALKER:
4           Thank you, Mr. Murph.

1            WITNESS' CERTIFICATE
2
3        I, ARTHUR LEE MURPH, JR., do hereby
4  certify that the foregoing testimony was given
5  by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10  _____    _____
11  DATE SIGNED         ARTHUR LEE MURPH, JR.
12
13  _____ Signed with corrections as noted.
14
15  _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN:  January 28th, 2008

Page 292

```
 1          REPORTER'S CERTIFICATE
 2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
 3  Certified Court Reporter in and for the State
 4  of Louisiana, do hereby certify that the
 5  aforementioned witness, after having been first
 6  duly sworn by me to testify to the truth, did
 7  testify as hereinabove set forth;
 8          That said deposition was taken by me
 9  in computer shorthand and thereafter
10  transcribed under my supervision, and is a true
11  and correct transcription to the best of my
12  ability and understanding.
13          I further certify that I am not of
14  counsel, nor related to counsel or the parties
15  hereto, and am in no way interested in the
16  result of said cause.
17
18
19
20
21
22
23  _____
24  JOSEPH A. FAIRBANKS, JR., CCR, RPR
25  CERTIFIED COURT REPORTER #75005
```