# EXHIBIT 33

Deposition of Sidney Williams (Feb. 2008)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION

                                * NO. 05-4182

PERTAINS TO: BARGES             * Consolidated

                                * SECTION "K(2)"

Boutte v. Lafarge       05-5531 *

Mumford v. Ingram       05-5724 * JUDGE DUVAL

Lagarde v. Lafarge      06-5342 *

Perry v. Ingram         06-6299 * MAG. WILKINSON

Benoit v. Lafarge       06-7516 *

Parfait Family v. USA   07-3500 *

Lafarge v. USA          07-5178 *

  *   *   *   *   *   *   *   *   *   *   *



(V O L U M E   I)

       Deposition of SIDNEY WILLIAMS, given

at Chaffe McCall, L.L.P., 2300 Energy Centre,

1100 Poydras Street, New Orleans, Louisiana

70163-2300, on February 19th, 2008.


REPORTER BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

Page 2

1  APPEARANCES:
2  REPRESENTING THE PLAINTIFFS:
3        WIEDEMANN & WIEDEMANN
4        (BY:  LAWRENCE D. WIEDEMANN, ESQUIRE)
5        821 Baronne Street
6        New Orleans, Louisiana 70113
7        504-581-6180
8  - and -
9        BRIAN A. GILBERT, P.L.C.
10        (BY:  BRIAN A. GILBERT, ESQUIRE)
11        821 Baronne Street
12        New Orleans, Louisiana 70113
13        504-885-7700
14
15  REPRESENTING THE AMERICAN CLUB:
16        MONTGOMERY, BARNETT, BROWN, READ,
17        HAMMOND & MINTZ, L.L.P.
18        (BY:  KENNETH GELPI, ESQUIRE)
19        3200 Energy Centre
20        1100 Poydras Street
21        New Orleans, Louisiana 70163
22        504-585-3200
23
24
25

Page 3

1  REPRESENTING WASHINGTON GROUP INTERNATIONAL:
2        STONE PIGMAN WALTHER WITTMANN, L.L.C.
3        (BY:  CARMELITE M. BERTAUT, ESQUIRE)
4        546 Carondelet Street
5        New Orleans, Louisiana 70130
6        504-581-3200
7
8  REPRESENTING LAFARGE NORTH AMERICA:
9        CHAFFE, MCCALL, L.L.P.
10        (BY:  DEREK A. WALKER, ESQUIRE)
11        (BY:  ROBERT B. FISHER, JR., ESQUIRE)
12        2300 Energy Centre
13        1100 Poydras Street
14        New Orleans, Louisiana 70163-2300
15        504-585-7000
16  - and -
17        GOODWIN PROCTOR, L.L.P.
18        (BY:  MARK S. RAFFMAN, ESQUIRE)
19        (BY:  JOHN ADCOCK, ESQUIRE, VIA TELE)
20        901 New York Avenue, NW
21        Washington, D.C. 20001
22        202-346-4000
23
24
25

Page 4

1  REPRESENTING NEW YORK MARINE & GENERAL
2  INSURANCE COMPANY:
3        SUTTERFIELD & WEBB
4        (BY:  DANIEL A. WEBB, ESQUIRE)
5        650 Poydras Street, Suite 2715
6        New Orleans, Louisiana 70130
7        504-598-2715
8
9  REPRESENTING ZITO:
10        MOULEDOUX, BLAND, LEGRAND & BRACKETT,
11        L.L.C.
12        (BY:  WILLIAM C. EMORY, ESQUIRE)
13        701 Poydras Street, Suite 4250
14        New Orleans, Louisiana 70130
15        504-595-3000
16
17  REPRESENTING ORLEANS LEVEE DISTRICT:
18        MCCRANIE, SISTRUNK, ANZELMO, HARDY,
19        MAXWELL & MCDANIEL.
20        (BY:  THOMAS ANZELMO, ESQUIRE)
21        (BY:  MARK HANNA, ESQUIRE)
22        3445 N. Causeway Boulevard, Suite 800
23        Metairie, Louisiana 70002
24        504-831-0946
25

Page 5

1  REPRESENTING JEFFERSON PARISH:
2        BURGLASS & TANKERSLEY
3        (BY:  MONICA M. WALDRON-BURGLASS,
4        ESQUIRE)
5        5213 Airline Drive
6        Metairie, Louisiana 70001
7        504-836-2220
8
9  REPRESENTING MRGO PSLC:
10        BRUNO & BRUNO
11        (BY:  SCOTT L. JOANEN, ESQUIRE)
12        855 Baronne Street
13        New Orleans, Louisiana 70113
14        504-525-1335
15
16  REPRESENTING NEW ORLEAN SEWERAGE & WATER BOARD:
17        CHRISTOVICH & KEARNEY, L.L.P.
18        (BY:  NICK DIETZEN, ESQUIRE)
19        601 Poydras Street, Suite 2300
20        New Orleans, Louisiana 70130
21        504-561-5700
22
23
24
25

Page 6

```
 1   REPRESENTING THE UNITED STATES OF AMERICA:
 2      UNITED STATES DEPARTMENT OF JUSTICE,
 3      TORTS BRANCH, CIVIL DIVISION
 4      (BY:  KARA MILLER, ESQUIRE, VIA TELE)
 5      P.O. Box 888
 6      Benjamin Franklin Station
 7      Washington, D.C. 20044
 8      202-616-4289
 9
10   ALSO PRESENT:
11      DON HAYCRAFT, ESQ.
12      JOHN EMMETT, ESQ.
13      KATE CASWELL, ESQ.
14      RYAN M. MALONE, ESQ.
15      NEHA PATEL (VIA TELE)
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1          S T I P U L A T I O N
 2      IT IS STIPULATED AND AGREED by and
 3   among counsel for the parties hereto that the
 4   deposition of the aforementioned witness may be
 5   taken for all purposes permitted within the
 6   Federal Rules of Civil Procedure, in accordance
 7   with law, pursuant to notice;
 8          That the formalities of reading,
 9   signing, sealing, filing and certification are
10   hereby specifically waived;
11          That all objections, save those as to
12   the form of the question and the responsiveness
13   of the answer, are reserved until such time as
14   this deposition, or any part thereof, is used
15   or sought to be used in evidence.
16
17
18              *  *  *
19
20
21
22      JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23   Certified Court Reporter in and for the State
24   of Louisiana, officiated in administering the
25   oath to the witness.
```

Page 7

```
 1      E X A M I N A T I O N   I N D E X
 2
 3   EXAMINATION BY:            PAGE
 4
 5   MR. WALKER  ...........................  9
 6   MS. BERTAUT  ...........................  87
 7       E X H I B I T   I N D E X
 8
 9   EXHIBIT NO.               PAGE
10   Exhibit 1  ...........................  23
11   Exhibit 2  ...........................  27
12   Exhibit 3  ...........................  80
13   Exhibit 4  ...........................  85
14   Exhibit 5  ...........................  99
15
16
17
18
19
20
21
22
23
24
25
```

Page 9

```
 1          SIDNEY WILLIAMS
 2   4564 Candy Lane, Lilburn, Georgia 30047, a
 3   witness named in the above stipulation, having
 4   been first duly sworn, was examined and
 5   testified on his oath as follows:
 6   EXAMINATION BY MR. WALKER:
 7      Q.  Mr. Williams, can you hear me?
 8      A.  Yes, sir.
 9      Q.  You're going to have to try and speak
10   up.  I know you're not feeling well but
11   everyone here wants to hear what you have to
12   say.  All of us are entitled to ask you
13   questions.  Probably only a few of us will ask.
14   The shorter and more focused your answers, the
15   quicker we'll get done with this.  I know you
16   want to try and get out and you're not feeling
17   well.
18      A.  Uh-huh.
19      Q.  If I ask you anything that you don't
20   understand or that's unclear, just ask me to
21   repeat it.  I'll be happy to.
22      A.  Okay.
23      Q.  We prefer that you not guess.  If
24   you're guessing, let me know you're guessing.
25   We want to know the facts the way you remember
```

Page 10

1  them, the way you saw them, the way you
2  observed them, the way you heard them.
3     A.  Uh-huh.
4     Q.  Also, try and let me finish my
5  question because this gentleman is taking down
6  what everybody says, and if you talk on top of
7  me or I talk on top of you he can't take us
8  both down at the same time.
9     A.  I understand.
10    Q.  All right?
11    A.  Uh-huh.
12    Q.  You under that you're under oath?
13    A.  Yes, sir.
14    Q.  Have you ever given a deposition
15  before?
16    A.  No.
17    Q.  Have you ever testified in trial?
18    A.  No, sir.
19    Q.  This is the same thing.  If you were
20  unable to come to a trial, we could actually
21  take what you say here today and present it to
22  the judge as your testimony as if you were
23  sitting in front of him.
24    A.  Uh-huh.
25    Q.  So everything you say we expect to be

Page 11

1  accurate and truthful.  You understand?
2     A.  Yes, sir.
3     Q.  Are you represented by an attorney?
4     A.  Yes, sir.
5     Q.  And who is that?
6     A.  Brian Gilbert.
7     Q.  And how long has he represented you?
8     A.  Since Katrina.
9     Q.  Okay.  And Do you have a signed
10  contract with him?
11    A.  Yes, sir.
12    Q.  Okay.  Do you have a signed contract
13  with any other lawyers?
14    A.  No, sir.
15    Q.  Have you ever had any other lawyer
16  represent you since Katrina?
17    A.  No, sir, not to my knowledge.
18    Q.  Have you met with any other lawyer who
19  helped you with any advice, counsel or any
20  forms or anything like that?
21    A.  No, sir.
22    Q.  Okay.  Where are you presently living?
23    A.  In Georgia, Lilburn, Georgia.
24    Q.  I'm sorry.  What was the name of it?
25    A.  Lilburn.

Page 12

1     Q.  Little burns?
2     A.  Uh-huh.
3     Q.  That's a town?
4     A.  Yes.
5     Q.  Is it a suburb of Atlanta?
6     A.  Yes.
7     Q.  How long have you been there?
8     A.  Since Katrina.  I haven't been at that
9  address since Katrina.  When we first went out
10  there I was living in a hotel.
11    Q.  You evacuated to Atlanta?
12    A.  Yes.
13    Q.  Okay.  And you've been living in the
14  Atlanta area since that time.
15    A.  Yes, sir.
16    Q.  Are you employed?
17    A.  No, sir.
18    Q.  Have you been employed anytime since
19  Katrina?
20    A.  No, well, I came back here, I was
21  working on the river.  They had us living on
22  the ships, but I didn't have the
23  transportation, and the guys, you know,
24  sometimes they would bring you to the ship
25  where we was working, sometimes they would.

Page 13

1  You know, didn't work out so I just went back
2  home.  Wasn't no sense in, you know, staying up
3  here and wasn't able to get to the ship we were
4  working on, you know, every day, so.
5     Q.  And when you say ship, S-H-I-P?
6     A.  Yeah.
7     Q.  You were working offshore?
8     A.  Yeah, Uh-huh.  We would unload the
9  cargo off the ships, yeah.
10    Q.  Okay.  So you were working as a
11  longshoreman?
12    A.  Well, we was doing that type of work,
13  Uh-huh.
14    Q.  So you weren't offshore working on the
15  oil rigs.
16    A.  Unh-unh.
17    Q.  You were working on land --
18    A.  Right, off the docks.
19    Q.  -- off-loading ocean going vessels?
20    A.  Yeah.
21       MR. GILBERT:
22          Wait a minute.  Let him finish
23       his question completely before you
24       start to speak because he's got to
25       take it all down.

Page 14

1  EXAMINATION BY MR. WALKER:
2     Q.  Like were you off-loading ships at
3  Napoleon Avenue wharf and Harmony Street and
4  things like that?  Is that what you mean?
5     A.  Yes, sir.
6     Q.  What's your age?
7     A.  49.
8     Q.  What's your date of birth?
9     A.  1/28/59.
10    Q.  Okay.  And had you worked as a
11 longshoreman before?
12    A.  I used to work on the oil rig, years
13 ago.
14    Q.  On the what?
15    A.  I used to work on the oil rig years
16 ago.
17    Q.  Okay.  On an oil rig, you said.
18    A.  Uh-huh.
19    Q.  Do you know what a longshoreman is?
20 That's the person who loads or unloads cargo
21 from ships?
22    A.  Yeah.
23    Q.  Have you done that job before?
24    A.  Yes, sir.
25    Q.  Okay.  So you've worked in and around

Page 15

1  the river previously?
2     A.  Yeah.
3     Q.  Okay.  What employers have you worked
4  for around the river?
5     A.  Um -- Pacorini.
6     Q.  Pacorini?
7     A.  Uh-huh.
8     Q.  That's a stevedoring company?
9     A.  Yeah.
10    Q.  Okay.  What did you do when you worked
11 with them?
12    A.  I was a forklift operator in the
13 barge.
14    Q.  So you would get in the barge with the
15 forklift and lift the cargo up so it could be
16 hoisted up?
17    A.  No, they would unload the cargo off
18 the ship and send it to the barge, and I would
19 just stack it in the barge.
20    Q.  So you would rearrange the cargo
21 inside the barge --
22    A.  Yes.
23    Q.  -- that was off-loaded from a ship.
24    A.  Yes, sir.
25    Q.  Was this a hopper barge?

Page 16

1     A.  Yeah, some, you know.
2     Q.  What other kinds of barges are you
3  familiar with?
4     A.  Box ones.
5     Q.  Those are two hundred feet?
6     A.  I'm not sure how many feet it were.
7     Q.  Were they covered or uncovered?
8     A.  Covered.
9     Q.  And did you work for anybody else on
10 the river?
11    A.  No.
12    Q.  How long did you work for Pacorini?
13    A.  About twenty years, off and on.
14    Q.  Okay.  Twenty years off and on, on the
15 river, loading and off-loading barges, right?
16    A.  Yes, sir.
17    Q.  Did you ever work for Maritrans?
18    A.  Maritrans.  Yeah.  I'm sorry.  They
19 took over -- I mean Pacorini took over
20 Maritrans.  I'm sorry.  I forgot about that.
21    Q.  Was that within that 20-year time
22 period or in addition to it?
23    A.  No.  In that time period.
24    Q.  Okay.  So you're pretty familiar with
25 barges, aren't you?

Page 17

1     A.  Yes, sir.
2     Q.  You know what a light barge is?
3     A.  A light barge?  No.
4     Q.  Do you know what an empty barge is?
5     A.  Yeah.
6     Q.  And a loaded barge?
7     A.  Uh-huh.
8     Q.  Do they look differently in the water?
9     A.  Yes, sir.
10    Q.  All right.  What does a loaded barge
11 look like versus an empty barge?
12    A.  It sets down in the water.
13    Q.  Have you ever been on the dock when
14 barges bang into each other or bang the dock or
15 the vessel hits up against the barge?
16    A.  Yes, sir.
17    Q.  You've seen that quite a bit in your
18 twenty years I bet, huh?
19    A.  Yes, sir.
20    Q.  And you know the movement of an empty
21 barge versus a loaded barge?
22    A.  Yes, sir.
23    Q.  Have you ever seen barges break away
24 from a dock?
25    A.  Not to my knowledge.  No, I never seen

1  any break away.
2      Q.  But you have seen and heard barges
3  strike each other, strike the dock, or be hit
4  by a vessel?
5      A.  No, sir.
6      Q.  I thought you just told me you have.
7      A.  I done seen them slam up against the
8  docks, yeah.
9      Q.  You've seen that.
10     A.  Yeah.
11     Q.  Okay.  Were those both loaded and
12 empty?
13     A.  Where they both loaded or empty?
14     Q.  In other words, have you seen loaded
15 barges hit against the dock, and empty barges
16 hit against the dock?
17     A.  Yes, sir.
18     Q.  All right.  Where were you living at
19 the time of the hurricane?
20     A.  1720 Tennessee Street.
21     Q.  That's in the Ninth Ward, correct?
22     A.  Yes, sir.
23     Q.  And who owned that property?
24     A.  Gloria Guy.
25     Q.  Gloria Guy?

1      A.  Uh-huh.
2      Q.  How is she related to you?
3      A.  She's not.  She was my landlord.
4      Q.  She was your landlord.
5      A.  Uh-huh.
6      Q.  Did she live there, also?
7      A.  Yes.  She did.
8      Q.  Did you all live together?
9      A.  Yes.
10     Q.  Okay.  So she was your landlord and --
11     A.  She was renting rooms.
12     Q.  Okay.
13     A.  Uh-huh.
14     Q.  So you didn't live with each other,
15 you lived in the same residence.
16     A.  Right.
17     Q.  Who did you live with, if anybody?
18     A.  With myself.
19     Q.  Okay.  Would you describe the property
20 at 1720 Tennessee for me?
21     A.  It's a -- it was a five bedroom low
22 house, set low, set up on pillars.
23     Q.  One-story or two-story?
24     A.  One-story.
25     Q.  One-story, five bedroom.  Each of the

1  bedrooms were rented out?
2      A.  Yes, sir.
3      Q.  And Gloria lived in one of them?
4      A.  Yes, sir.
5      Q.  How long did you live there?
6      A.  Ooh, about -- about ten years.
7      Q.  And before living on Tennessee Street,
8  where did you live?
9      A.  I lived on -- with my mother on Reynes
10 Street.
11     Q.  Is that also in the Ninth Ward?
12     A.  That's also in the Ninth Ward.
13     Q.  Do you remember the address.
14     A.  1708.
15     Q.  Okay.  Was your mother living at the
16 time of the hurricane?
17     A.  No, sir.
18     Q.  The property at 1708 Reynes, who did
19 that belong to?
20     A.  To my mother.
21     Q.  When she passed away, what happened to
22 that property?
23     A.  My sister and them were living there,
24 but they lost it.
25     Q.  Your sister was living there at the

1  time of the hurricane?
2      A.  No.  Unh-unh.  She lost it before
3  then.
4      Q.  Okay.
5      A.  Uh-huh.
6      Q.  So when you say she lost it, you mean
7  financially?
8      A.  Financially.
9      Q.  Okay.  So at the time of the hurricane
10 you had nothing to do with 1708 Reynes?
11     A.  No, sir.
12     Q.  And how long did you live at that
13 address?
14     A.  About fifteen, twenty years, something
15 like that.
16     Q.  Okay.  And before that?
17     A.  Before that, I was living on St. Ann
18 and Dorgenois.
19     Q.  Is that in the Ninth Ward?
20     A.  No, that's in the Seventh Ward.
21     Q.  Okay.  So you lived the bulk of your
22 adult life in the Ninth Ward, is that fair?
23     A.  Yes, sir.
24     Q.  At the time of the hurricane, were you
25 working with Pacorini?

1    A.   Yes, sir.
2    Q.   Okay.
3    A.   Uh-huh.
4    Q.   And did you work primarily on the
5    river?  On the riverfront?
6    A.   On the riverfront.  Alabo Street
7    wharf.
8    Q.   Alabo Street?
9    A.   Uh-huh.
10   Q.   Had you ever worked any barges in the
11   Industrial Canal?
12   A.   No, sir.
13   Q.   I'm going to show you a photograph.
14        Do you recognize that as a barge?
15   A.   Yes.
16   Q.   Is that the type of barges you used to
17   work on?  I know that's a funny angle.
18   A.   Yes.
19   Q.   Would you consider that a hopper
20   barge?  Do you know what that's called?
21   A.   No.
22   Q.   What would you call that, just a
23   regular barge?
24   A.   A barge, uh-huh.
25   Q.   But that's the type and size of barge

1    that you customarily worked?
2    A.   Yes, sir.
3    Q.   I'll mark that as Exhibit 1 in
4    connection with your testimony.
5         MR. WIEDEMANN:
6             I'm going to object as to
7         relevancy.
8         (Exhibit 1 was marked for
9    identification and is attached hereto.)
10   EXAMINATION BY MR. WALKER:
11   Q.   Could you give me your educational
12   background, how far did you go in school?
13   A.   8th grade.
14   Q.   8th grade.  Have you ever been
15   arrested?
16   A.   DUIs.
17   Q.   All right.  I'd like to talk about the
18   hurricane.  And when I say the hurricane, I'm
19   referring to Katrina.
20   A.   Yes, sir.
21   Q.   Do you remember what you did on the
22   Saturday before the hurricane?  And you can
23   start with were you working that day or not?
24   A.   No.  No, sir.  I wasn't.
25   Q.   What were you doing, what preparations

1    if any, what do you remember?
2    A.   Well, I didn't make any preparations.
3    We didn't have the money to leave, you know.
4    We got, you know, stuff for the house, food.
5    But I'm going to be honest, I can't remember
6    every detail I did the day before.
7    Q.   Okay.  So but you remember buying some
8    food --
9    A.   Yeah.
10   Q.   -- basically?
11        Did you own a car?
12   A.   No.
13   Q.   Did you look into evacuating?
14   A.   No.
15   Q.   Did you think about evacuating?
16   A.   No.
17   Q.   How did you make the decision to stay
18   versus to leave?
19   A.   Well, we never leave for a hurricane,
20   because we never get any, you know.  We didn't
21   expect this thing to come.
22   Q.   And who is we?
23   A.   Everybody in the house.  You know, a
24   lots of people, you know, stays.  I mean, I
25   usually have people come over when they

1    supposed to have a storm.  I would have -- we
2    would have the only lights, you know, around.
3    Q.   How about Sunday; you remember Sunday
4    any better?  Do you know what you did?
5    A.   No.  I'm not sure.
6    Q.   All right.  Were you listening to the
7    radio or watching TV?
8    A.   Probably was watching TV.  That's what
9    I mostly did when I was home, you know.
10   Q.   Did you know that there was the
11   potential that the hurricane would come and
12   that there were some evacuations orders?
13   A.   I had people calling me and telling me
14   about it, you know.  But I had no way out and
15   had no money.  You know, like I said, just took
16   my chances.
17   Q.   Okay.  So you were aware of the
18   evacuation orders and the potential of the
19   hurricane coming but made the decision to
20   stay --
21   A.   Yes, sir.
22   Q.   -- is that right?
23   A.   (Nods affirmatively.)
24   Q.   And you said there were I think four
25   other people in that home, in that residence

Page 26

1  with you?
2      A.  Yeah.  Three.
3      Q.  Gloria Guy --
4      A.  Gloria Guy, Antonio and his wife, and
5  a neighbor and her son came over at the last
6  minute.
7      Q.  What were their names?
8      A.  Inez and Calvin Piccadilly.
9      Q.  Piccadilly?
10     A.  Yeah.  I believe that's their last
11 name.
12     Q.  And you said Tony and something?
13     A.  And Natasha.
14     Q.  What's their last name?
15     A.  Guy.
16     Q.  So they're related --
17     A.  To Gloria.  Yeah.
18     Q.  So you were all together the Sunday or
19 at some point when the hurricane hit?
20     A.  Yes, sir.
21     Q.  All right.  I'm going to show you a
22 map we'll mark as Exhibit 2.  And could you to
23 the best of your ability show me where 1720
24 Tennessee Street is?  First, tell me what are
25 the closest cross streets, do you remember?

Page 27

1      (Exhibit 2 was marked for
2  identification and is attached hereto.)
3      A.  Derbigny was the closest to us.  We
4  like about three houses off the corner of
5  Derbigny.
6  EXAMINATION BY MR. WALKER:
7      Q.  Okay.  You see here's N. Claiborne
8  Avenue?
9      A.  Yeah.
10     Q.  Here's Florida Avenue.  So Tennessee
11 is right here; is that right?
12     A.  Yeah.
13     Q.  Is that Tennessee?
14     A.  Yeah. Derbigny?  Yeah.  That's
15 Tennessee.  N. Derbigny.
16     Q.  All right.  And here's Tonti?
17     A.  We got to be right up in here
18 somewhere.
19     Q.  Here's Tennessee, right?
20     A.  Uh-huh.
21     Q.  So you said you were three houses off
22 of --
23     A.  Derbigny.  Three houses off.
24     Q.  All right.  So do you want to mark an
25 X somewhere where you believe or you recall

Page 28

1  your residence to be?
2      A.  I couldn't say exactly on this map.
3      Q.  Okay.  Here's Tonti, right?
4      A.  Yeah.
5      Q.  Do you recognize that?
6      A.  This is Rocheblave.
7      Q.  Rocheblave?  Were you closer to --
8      A.  Closer to Rocheblave.
9      Q.  Closer to Rocheblave?
10     A.  Yeah.  That would be right here.
11     Q.  Yeah, but that's not Tennessee.
12     A.  This is Tennessee.  This is Derbigny.
13     Q.  This is Tennessee right here.
14     A.  I wasn't across Tonti, though.
15     Q.  Okay.  Go ahead and mark an X as close
16 as you can figure on this map --
17     MR. WIEDEMANN:
18         I'm going to object to the form.
19     He's having trouble seeing.  He's told
20     you where the address is, where it's
21     located.
22 EXAMINATION BY MR. WALKER:
23     Q.  We understand this an is an estimate.
24         You said three houses off the corner
25 of Tennessee?

Page 29

1      A.  Not three houses off the corner of
2  Tennessee.  I lived on Tennessee.
3      Q.  All right.  Three houses off the
4  corner of --
5      A.  Derbigny.
6      Q.  Is that right?  Okay.  So go ahead and
7  mark an X as close as you can.
8      A.  I'm going to put it right there.
9      Q.  Okay.  I'll circle that.  And what was
10 the address again?
11     A.  1720.
12     Q.  1720 Tennessee.  All right.
13         Did your house --
14     MR. GILBERT:
15         Did we say Derbigny Street, which
16     is right down here?  You're showing
17     him Dorgenois, counsel.
18     MR. WALKER:
19         No, I wasn't showing him
20     anything.
21 EXAMINATION BY MR. WALKER:
22     Q.  Um -- counsel is right.  You may have
23 looked at this as a D.  Derbigny is down here
24 close to Claiborne Avenue.
25         Was the house close to Claiborne or

1  close to Florida?
2      A.  Close to Claiborne.  One block off of
3  Claiborne.
4      Q.  Okay.  Then it's down here, not up
5  here; is that correct?
6      A.  Yeah.
7      Q.  Okay.  So do you want to mark an X?
8      A.  I don't want to keep marking --
9      Q.  All right.  Well, this is incorrect,
10 right?
11     A.  That's incorrect.
12     Q.  All right.  So we'll -- so you were
13 approximately a block off of -- a block and
14 three houses off of Claiborne Avenue.
15     A.  I was three houses across Derbigny
16 from Claiborne.
17     Q.  Okay.  On Tennessee.
18     A.  On Tennessee.
19     Q.  All right.  Well, I tell you what,
20 I'll mark an X, and you tell me if that's a
21 fair approximation of where your house stood at
22 the time.
23     A.  Yeah.  That's about --
24     Q.  Okay.  This is not exact.  We're just
25 trying to get an idea.  When you walked out of

1  your front door, did you face the Industrial
2  Canal?
3      A.  It's a side door.  When I walked out
4  and seen the water --
5      Q.  Okay.  Just I'm talking on just a
6  regular day.
7      A.  A regular day?
8      Q.  Yeah.
9      A.  Side door.  I always used the side
10 door.
11     Q.  And that side door faced what?
12     A.  The driveway.
13     Q.  And where did that side door face?
14     A.  Towards Claiborne.
15     Q.  Okay.  And where did the front door of
16 the house face?
17     A.  Tennessee Street.
18     Q.  Towards the Industrial Canal or
19 towards the south?
20     A.  Towards Arabi.
21     Q.  Towards Arabi.  So if you walked out
22 the front door your back would be toward the
23 Industrial Canal.
24     A.  My back would be towards the
25 Industrial Canal.

1      Q.  Okay.  Was there any house behind you
2  that faced the Industrial Canal?
3      A.  Yeah.  On Deslonde.
4      Q.  Okay.  And what neighbors were those?
5  Do you remember their name?
6      A.  I don't know.  I wasn't neighborly.
7      Q.  Okay.  Did you own a cellphone at the
8  time of the hurricane?
9      A.  No.
10     Q.  Did you own a phone?  Did you have a
11 land line?
12     A.  Yeah.  Yes.
13     Q.  Do you remember the phone number?
14     A.  Oh, no.
15     Q.  Did you make any calls or receive any
16 calls before the hurricane on the Saturday or
17 Sunday?
18     A.  Did I make any calls?  I may have.
19 I'm not sure.
20     Q.  Did you call 911 at any time?
21     A.  No.
22     Q.  Did you call any police or sheriff's
23 department?
24     A.  No.
25     Q.  Did you call any Coast Guard or rescue

1  or anybody like there?
2      A.  No.
3      Q.  All right.  On Sunday, you said you
4  watched TV, but you don't remember doing any
5  specific preparations.
6      A.  No.
7      Q.  Well, what do you remember happening
8  on Sunday as the hurricane approached New
9  Orleans?
10     A.  I don't remember.  I don't remember.
11     Q.  Well, did you go to sleep on Sunday?
12     A.  I went to sleep.  Yeah.  I went to
13 sleep.
14     Q.  About what time did you go to sleep?
15     A.  About ten, eleven o'clock, something
16 like that.
17     Q.  What was the weather like when you
18 went to sleep?
19     A.  Calm.
20     Q.  I'm sorry.
21     A.  Calm.
22     Q.  Calm?  Okay.  Was it raining?
23     A.  Yeah.
24     Q.  Okay.  What was the wind like?
25     A.  It wasn't no powerful wind.

Page 34

1    Q.   And you still had electricity?  Power
2  was on in the house?
3    A.   Yeah, around that time.
4    Q.   Okay.  All right.  When did you wake
5  up?  Or did you wake up?
6    A.   About with 2:30, 3:00 in the morning.
7    Q.   Okay.  And what woke you up?  Or why
8  did you wake up?
9    A.   The lights went out.
10    Q.   I'm sorry.
11    A.   Light went out.
12    Q.   Around 2:30, 3:00 in the morning the
13  lights went out?
14    A.   Uh-huh.
15    Q.   And was that the power to your house
16  or to the entire neighborhood?
17    A.   No.  That was the power to my house.
18  Because I had a generator.
19    Q.   You're going to have to speak up.
20    A.   I had a generator.  And the water had
21  done got to it.
22    Q.   Had gotten to it?
23    A.   Uh-huh.
24    Q.   So around 2:30, that would have been
25  Monday a.m., right?

Page 35

1    A.   A.m.  Yeah.
2    Q.   You woke up because the power went
3  out.
4    A.   Uh-huh.
5    Q.   Had your generator been operating
6  before?
7    A.   Yeah.  It was operating.
8    Q.   And why did you have the generator on?
9    A.   Because we didn't have electric.
10    Q.   Okay.  So you didn't have an
11  electrical feed from the city.
12    A.   No.
13    Q.   You used your own generator for your
14  own power?
15    A.   Yes, sir.
16    Q.   Is that a gasoline-powered --
17    A.   Gasoline.
18    Q.   Okay.  And you woke up because
19  sometime around 2:30 the water had caused your
20  generator to shut down?
21    A.   Yes, sir.
22    Q.   Where was the generator located?
23    A.   In the backyard.
24    Q.   Okay.  What size generator, do you
25  remember?

Page 36

1    A.   It was 3500.
2    Q.   Okay.  3500 is probably three and a
3  half to four feet high?
4    A.   No.  Unh-unh.  It ain't no four foot
5  high.  It might be about two, two and a half
6  feet high, something like that.
7    Q.   Was that a Home Depot, Lowe's type of
8  generator?
9    A.   Pep Boy.
10    Q.   Pep Boy?  Okay.  When you woke up and
11  the lights were out, did you go out to check
12  the generator?
13    A.   I opened the door.  I couldn't get out
14  because they had water out there.
15    Q.   Okay.  Your door opens to the outside?
16    A.   To the out, yeah.
17    Q.   And you couldn't get out because the
18  water was pressing against the door?
19    A.   No.  Not that it was pressing against.
20  I wasn't going out there in that water.
21    Q.   How many feet of water did you see?
22    A.   It must have been -- it was up to my
23  top stair, so about two feet of water.
24    Q.   So you didn't go out to the generator,
25  you saw the water, you knew that's what

Page 37

1  had affected the generator?
2    A.   Yeah.
3    Q.   Okay.  And could you describe the
4  house to me in terms of the number of steps up
5  to your porch or to your front door or to the
6  side door that you used?
7    A.   I didn't understand.
8    Q.   Could you describe the house to me in
9  terms of the number of steps up to your front
10  door?
11    A.   It was three stairs.
12    Q.   Three stairs?
13    A.   Yeah.
14    Q.   Okay.  So if you're standing on the
15  street level, three stairs and you're at your
16  front door?
17    A.   Yeah.
18    Q.   Okay.  Was the water up to the level
19  of your --
20    A.   Door sill?
21    Q.   -- of your door sill?
22    A.   Yeah.
23    Q.   Was it above the door sill level?
24    A.   It started, you know, but it -- it
25  wasn't like, you know -- it was pouring in yet.

Page 38

1    Q.  It was not pouring in.
2    A.  No.
3    Q.  It was oozing in?
4    A.  Seeping.
5    Q.  Seeping?  Okay.  Could you see that it
6  continued to rise?
7    A.  No, I didn't -- I couldn't see.
8  Continually, no.
9    Q.  All right.  So tell us what you did.
10  You saw that the generator had shut the power
11  down, water was up to the level you described.
12      What did you do?
13    A.  Well, we started putting the tools in
14  the attic.
15    Q.  I'm sorry.  Who is we?
16    A.  Me and Tony and Calvin.
17    Q.  How did you get together with them?
18  You were asleep, you woke up because the
19  generator --
20    A.  Everybody woke up.
21    Q.  Okay.  Y'all used the same generator?
22    A.  Yeah.
23    Q.  Okay.
24    A.  It was power to the whole house.
25    Q.  Did you wake them up or did someone

Page 39

1  wake you up, or did y'all kind of just end up
2  together?
3    A.  When I come up and I got up and went
4  in the living room, they was coming towards the
5  living room.  And we heard a knock on the door,
6  that was Calvin and his mother.
7    Q.  And what did you do?
8    A.  We headed for the attic.
9    Q.  And this would be the attic of the
10  first floor of a one-story house --
11    A.  Yes.
12    Q.  -- so it would basically be the
13  roof -- the pitched roof area?
14    A.  Pitched roof, yeah.
15    Q.  Okay.  And how did you get to the
16  attic, was there a pull down stair?
17    A.  We had a stepladder.
18    Q.  Did you get into the attic?
19    A.  Yes, sir.
20    Q.  All of you?
21    A.  All of us.
22    Q.  How long a time between the time that
23  you woke up and the time that you got into the
24  attic?
25    A.  It wasn't more than about ten minutes.

Page 40

1    Q.  Okay.  And did you have water in your
2  house when you got into the attic?
3    A.  They had a lill bit.
4    Q.  When you say a little bit, are we
5  talking inches, feet?
6    A.  Well, when I seen the water seeping
7  in, I didn't stay there to measure the water or
8  anything.  You know, I mean, we moved as quick
9  as we could.
10    Q.  But you didn't try to get out of the
11  neighborhood or out of the house.
12    A.  No.  Unh-unh.  There was no way for us
13  to get out.
14    Q.  And why is that?
15    A.  I don't see how we could.
16    Q.  Because of the water in the area?
17    A.  Because of the water.
18    Q.  So you made it to the attic sometime
19  between 2:35, 2:40, 3:00 in the morning?
20    A.  I would say it was after 3:00.
21    Q.  Okay.  I thought you woke up at 2:30.
22    A.  Maybe I woke up at 2:30.  I said
23  between 2:30 and 3:00 I got up.  I'm not sure
24  what time it was.  It could have been 3:30.
25    Q.  All right.  So sometime between 2:30

Page 41

1  and 3:30 you made it up to your attic.
2    A.  Yeah.
3    Q.  Okay.  And what did you see, what did
4  you hear, during the time you were in the
5  attic?
6    A.  Well, when we was making the hole, I
7  heard a bang, a big old loud sound, you know.
8  I mean, we had done got a hole in there, Calvin
9  went up, he pulled me up, and me and him both
10  was helping to pull the other two when I heard
11  two more bangs.  But I was looking over -- when
12  I heard the first bang we got on the roof.  I
13  looked around.  ==That's when I seen the barge==
14  ==hit the wall, bounced off -- the water was real==
15  ==rough -- and it hit the wall again.==
16    Q.  Okay.  Let me back you up and go
17  through this slowly.  How did you make a hole
18  in the attic?
19    A.  I had a, um -- a pick, a maul, a crow
20  bar.
21    Q.  Okay.  So you made a hole in the
22  attic.
23    A.  (Nods head affirmatively.)
24    Q.  And why did you think it was necessary
25  the make a hole in the attic?

1    A.  Well, they had water started coming
2  in.  It wasn't flowing in.
3    Q.  But there was enough water in your
4  house to cause you concern -- let me finish --
5  to cause you concern that you were going to
6  have to get out through the attic.
7        MR. WIEDEMANN:
8            Object to the form of the
9            question.  He hasn't said anything
10           about water.
11   A.  Yeah.
12 EXAMINATION BY MR. WALKER:
13   Q.  Is that right?
14   A.  They didn't have enough water to cause
15 me to go in the attic.  I'm just saying, when I
16 seen the water coming in the house, well, I
17 figured that was the best thing to do.
18   Q.  Right.
19   A.  I mean, we couldn't go out.  Why stay
20 in the house?  And it was a good thing we
21 didn't stay in the house and not go in the
22 attic.
23   Q.  I understand.  If you have an inch of
24 water in your house, is it normal for you to go
25 up to the attic and knock a hole in the

1  ceiling?
2    A.  No, it's not normal.
3    Q.  Okay.  So that's why I'm asking.
4  Something caused you to go in you attic and
5  knock a hole through the roof.
6        How much water did you have in your
7  house?
8    A.  Might have been frightened.
9    Q.  I'm sorry?
10   A.  Could have been frightened.  You know
11 how things work.  You know, I mean, you got a
12 sense of humor.  You know what I mean?  You can
13 feel something going to happen, you know, you
14 got to do what you can.
15   Q.  So how much water was in your house at
16 the time that -- let me finish my question.
17       How much water was in your house at
18 the time that you knocked a hole in the roof?
19   A.  I can't -- I couldn't tell you that.
20 I wasn't there with a tape measure measuring
21 the water that was coming in and how high it
22 was.
23   Q.  But you knocked a hole in the roof so
24 you could escape the house, right?
25   A.  Exactly.

1    Q.  And you didn't go through a window and
2  you didn't go through a door, so there was
3  enough water to cause you concern that the only
4  way out would be through the roof, right?
5        MR. WIEDEMANN:
6            That's argumentative.  I object
7            to the form of the question.
8        MR. GILBERT:
9            It's badgering.
10 EXAMINATION BY MR. WALKER:
11   Q.  Well, let me ask, did you go through a
12 window?
13   A.  No, I didn't go through the window.  I
14 went through a hole in the roof.
15   Q.  Right.  Did this house have windows?
16   A.  Yeah it had windows.
17   Q.  But you didn't think that you could
18 escape through a window.
19   A.  If that's the case, I could have went
20 out my door.
21   Q.  Right.  The only way out was through
22 the roof, right?
23   A.  Through the roof.
24   Q.  Okay.  And after you got on the roof,
25 you heard this sound, right?

1    A.  Two more loud sounds.
2    Q.  After you got on the roof.
3    A.  After I got on the roof.
4    Q.  Okay.  Did any of the other people you
5  were with hear the sound?
6    A.  Yeah.
7    Q.  Who heard it?
8    A.  Everybody I was with.
9    Q.  How do you know they heard it?
10   A.  They ain't deaf.
11   Q.  I mean, did you talk you about it?
12   A.  Yeah, we talked about it.
13   Q.  Okay.  So you got on the roof and you
14 heard this sound.  Describe it again to me.
15 You heard one bang?
16   A.  Boom.
17   Q.  Okay.
18   A.  And we heard it two more times.  Boom.
19 Now, I'm looking at the time.  I can see that
20 barge in that canal doing this here, boom,
21 slamming up against the wall.
22   Q.  Okay.  You heard one boom.  Right?
23   A.  Yeah.  I was coming out through the
24 hole at that time.
25   Q.  Okay.  And then you heard another

Page 46

```
 1   boom?
 2       A.   And another one.
 3       Q.   Okay.  So you heard a total of three.
 4       A.   Yes, sir.
 5       Q.   You heard the first one.  How much
 6   time until you heard the second one?
 7       A.   It wasn't but a few seconds.
 8       Q.   Okay.  And how much time until you
 9   heard the third one?
10       A.   It wasn't but a few seconds.
11       Q.   Okay.  Who was the first one on the
12   roof?
13       A.   Calvin.
14       Q.   And who was second one on the roof?
15       A.   Me.
16       Q.   Okay.  When you were on the roof, did
17   you hear the boom?
18       A.   Yes, sir.
19       Q.   Okay.  Just you and Calvin were on the
20   roof?
21       A.   Yeah.  We was the first two on the
22   roof.  He went up first, then he pulled me up,
23   and then we pulled Tony up, pulled his mama and
24   Gloria up.
25       Q.   Who was on the roof when you heard the
```

Page 47

```
 1   first boom?
 2       A.   Calvin went up first.
 3       Q.   Right.  Who was on the roof when you
 4   heard the first boom?
 5       A.   Calvin was on the roof.
 6       Q.   Okay.  He was the only one on the
 7   roof.
 8       A.   Yeah.
 9       Q.   Okay.  So when you heard the first
10   boom, you were still in the attic.
11       A.   Yeah.
12       Q.   Okay.  So you couldn't have seen the
13   barge when you heard the first boom, could you?
14       A.   I seen the barge the second two.
15       Q.   All right.  But my question was, you
16   couldn't have seen it when you heard the first
17   boom, right?  Because you were still in the
18   attic.
19       A.   No.  I was still in the attic.
20       Q.   But I thought earlier you said you had
21   seen it.
22       A.   I told you I seen it the second two
23   booms.  I seen the barge slamming into the
24   wall.
25       Q.   All right.  You just told me that you
```

Page 48

```
 1   heard the first boom and then it was a couple
 2   of seconds to the second boom.
 3       A.   I was on the roof then.
 4       Q.   Okay.  A couple of seconds we're
 5   talking, boom, boom?  Is that how quickly it
 6   went?
 7       A.   Yes, sir.
 8       Q.   All right.  So you're saying between
 9   the first boom when you were in the attic and
10   the second boom, you managed to get out on the
11   roof --
12       A.   The hole is right there.  It don't
13   take long to pull a person right there.
14       Q.   Okay.  So you got out on the roof and
15   you were on the roof when you heard the second
16   boom, right?
17       A.   Yes, sir.
18       Q.   Okay.  And so what did you do when you
19   heard that second boom?
20       A.   What did I do?
21       Q.   Yeah.
22       A.   I didn't do anything.  Nothing I could
23   do.
24       Q.   Well, did you look anywhere?
25       A.   I'm looking, yeah.  I'm looking.  I'm
```

Page 49

```
 1   watching the barge.
 2       Q.   Well, you didn't know it was a barge
 3   until you heard the boom, did you?
 4       A.   When I heard the first boom, no, I
 5   didn't know what it was.
 6       Q.   All right.
 7       A.   When I got on the roof and I'm looking
 8   around and I heard the second boom, I'm looking
 9   into the water.  I'm watching this barge slam
10   into the wall.
11       Q.   That's when you heard the
12   second boom.
13       A.   Yeah.
14       Q.   And then you heard a third boom that
15   followed it?
16       A.   That followed it.
17       Q.   And in two or three seconds again?
18       A.   In seconds?
19          MR. GILBERT:
20             Objection.
21   EXAMINATION BY MR. WALKER:
22       Q.   Was is two or three seconds, four
23   seconds, five seconds?
24       A.   A couple of seconds.
25       Q.   Okay.  Is a couple two?
```

Page 50

1    A.   A couple is two.
2    Q.   Okay.  I'm just curing your lawyer's
3  objection.
4         When you saw the barge after the
5  second boom, what side of the canal was it?
6    A.   What you mean what side of the canal?
7    Q.   Was the barge in the Ninth Ward?
8      MR. GILBERT:
9           You mean what side of the
10  floodwall?
11    A.   It was in the water.  It wasn't on
12  this side of the wall.
13  EXAMINATION BY MR. WALKER:
14    Q.   When you say this side --
15    A.   It wasn't on the land side.
16    Q.   So when you heard the first boom, the
17  barge was on the canal side of the floodwall?
18    A.   It was still in the water.
19    Q.   Uh-huh.  And when you heard the second
20  boom, was it still in the canal side of the
21  water?
22    A.   Still in the water.
23    Q.   Okay.  And then what did you see?
24    A.   When I heard the third one, it was
25  still in the water.

Page 51

1    Q.   Okay.  And then what did you see?
2  Anything else?  Did you turn away?
3    A.   Well, what I seen, the water just
4  rised in seconds.  We was in water -- houses
5  went to floating off.
6    Q.   Uh-huh.  And what happened to the
7  barge?
8    A.   I didn't even look no more.  I mean, I
9  wasn't sitting there watching the barge, you
10  know.  I wasn't like bird watching on the roof.
11  What I did, I just start praying.  When I seen
12  the houses started floating away I just started
13  praying.
14    Q.   So you heard the two booms and then
15  saw water rushing into the neighborhood.
16    A.   Rushing in.
17    Q.   Okay.  You didn't see the barge knock
18  down the wall, did you?
19    A.   No, sir.
20    Q.   You didn't see the barge hit the wall,
21  did you?
22    A.   I seen the barge hit the wall.
23    Q.   You're sure.
24    A.   I'm sure.  Positive.
25    Q.   And was this an empty barge or a

Page 52

1  loaded barge?
2    A.   Sir, to be honest, I do not know.
3    Q.   You do not know.
4    A.   But I can look over into that water,
5  the water was rough, and I could see that barge
6  rocking, hitting that wall.  I don't know if
7  they had something in it or not.
8    Q.   Ten years on the riverfront, or twenty
9  actually, and you can't tell me if that was a
10  loaded or empty barge?
11    A.   No, sir.
12    Q.   Okay.  But you remember seeing it.
13    A.   I remember seeing it.
14    Q.   What was the color?
15    A.   It was rusty.
16    Q.   Any markings on it?
17    A.   I couldn't tell.
18    Q.   And as you sit here today under oath,
19  you're telling us that you saw the barge hit
20  the wall.
21      MR. WIEDEMANN:
22           I object to the repetitious -- he
23           said that at least twenty times
24           already.  The barge hit the wall.
25           Second, third time.

Page 53

1  EXAMINATION BY MR. WALKER:
2    Q.   Is the right?
3    A.   I seen the barge hit the wall.
4    Q.   What part of the barge hit the wall?
5    A.   The barge came in on an angle.  This
6  is the wall.  The barge in the river rocking,
7  bang, bang.  (Indicating.)  Now what part of
8  the wall I don't know.  I don't know what
9  you're looking for.
10    Q.   No, I didn't ask you what part of the
11  wall.  I asked you what part of the barge.
12    A.   It came in on an angle.  The front of
13  the barge.  It might have been the back of the
14  barge.  It wasn't the side of the barge.
15    Q.   So it wasn't a corner.
16    A.   The corner, yeah.  If they go in on an
17  angle, it sure can't -- the flat straight
18  across can't hit it like that.
19    Q.   Well, that's why I'm asking.
20    A.   It's got to be a corner if it's going
21  in hitting the wall on an angle.
22    Q.   Looking at Exhibit 1, which is a
23  barge, is this like what you saw?
24      MR. WIEDEMANN:
25           I'm going to object to the form

1    of the question.  That's not a picture
2    of the barge.
3       A.  That's a corner.  That's a corner.  If
4  they go in on an angle, it ain't but a corner
5  going hit the wall.
6  EXAMINATION BY MR. WALKER:
7       Q.  So that's what you saw was a corner
8  hit the wall?
9       A.  I seen it going on a angle hitting the
10 wall.
11      Q.  I understand.
12      A.  On an angle.  I'm just telling you
13 what I seen.
14      Q.  And I'm just trying to understand what
15 you've seen.  Did you see a corner hit the
16 wall?
17      A.  I seen a barge hit the wall from an
18 angle.
19      Q.  Okay.  So are you saying you don't
20 know what portion of the barge hit the wall?
21      A.  I just told you what I seen.
22      Q.  And you don't know if it was the front
23 or the back.
24      A.  No, sir.
25      Q.  When you first lost power and were

1  concerned about the generator, did you ever
2  look outside to see how the water was getting
3  into the neighborhood?
4       A.  No, sir.  I mean --
5       Q.  Did you ever see water coming over the
6  floodwall?
7       A.  I did not look.
8       Q.  When you first came on the roof right
9  after that first bang, did you see the barge
10 actually go over the floodwall?
11      A.  No, I did not see the barge go over.
12 I seen the barge go into the wall, not over it.
13      Q.  So you saw it go into the wall.
14 Right?
15      A.  Hitting the wall.  That's the only way
16 it was going hit it, if it go into the wall.
17      Q.  Okay.  At what height did it hit the
18 wall?
19      A.  I don't know.  I don't know.
20      Q.  Well, was it the top of the wall, the
21 middle of the wall?
22      A.  I really don't know.  I didn't have a
23 camera to be precise, you know.  I don't know.
24      Q.  All right.  Well, you seem to remember
25 that it was at an angle.

1       A.  It was easy to remember.
2       Q.  Okay.  So how much of the wall could
3  you see?
4       A.  You couldn't see much of the wall.
5       Q.  Because there was water in the
6  neighborhood?
7       A.  Yes.
8       Q.  Okay.
9       A.  I mean, it wasn't covering the wall.
10      Q.  How high up was the water --
11      A.  I really couldn't tell you that.
12      Q.  Let me finish.  How high was up was
13 the water on the Ninth Ward side of the wall
14 when you looked, when you heard the boom?
15      A.  How high was the water on the Ninth
16 Ward side of the wall?  I don't know.
17      Q.  A foot below the top?  Two feet below
18 the top?
19      A.  I don't know.  I really don't know.
20      Q.  How was the barge riding in the water?
21      A.  The water was rough.  It was rocking.
22 Rocking. (Indicating.)
23          MR. GILBERT:
24             Let the record reflect that he's
25          making a rocking motion with his hand.

1  EXAMINATION BY MR. WALKER:
2       Q.  All right.  What did you do after?
3  You said you didn't keep looking at the --
4       A.  Because the house floated off.  All we
5  could do was pray.  The house drifted off, ran
6  into the house next door.  Our house started
7  falling apart.  We jumped off of that roof onto
8  another roof.  From that roof to another roof
9  we're we stayed nine and a half hours.  It
10 wasn't -- I don't think that concern was on
11 anybody mind to keep watching the wall and if
12 the barge came over the wall and all of this
13 and how high the water was.  I don't think --
14 wasn't nobody think -- you know, minor to that.
15      Q.  I'm just asking you --
16      A.  I mean, this was a tragic.  Tragic,
17 you know.
18      Q.  I'm just asking you to give me your
19 best recollection of your observations.  Right?
20      A.  I understand.
21      Q.  Okay.  And you remember what we said
22 at the beginning, you're under oath --
23      A.  Yes, sir.
24      Q.  -- you're telling the truth --
25      A.  Nods affirmatively.

Page 58

1    Q.  -- and I'm just asking you to tell me
2  what you remember.  Right?
3        MR. WIEDEMANN:
4            He's already answered that, that
5        he knew he was under oath, he knew
6        like he was in court, and he knew he
7        had to tell the truth.  You don't have
8        to keep warning him.
9        MR. WALKER:
10           Thank you for your summary.
11       MR. WIEDEMANN:
12           Well, you told him that at the
13       beginning.
14       MR. WALKER:
15           Okay.
16  EXAMINATION BY MR. WALKER:
17   Q.  You got into the attic, y'all punched
18  a hole through.  How long were you personally
19  in the attic before you went up to the roof?
20   A.  Maybe about ten, fifteen minutes.
21   Q.  All right.  And I'm sorry.  You said
22  your residence started floating away?
23   A.  Started floating off.
24   Q.  Okay.  In what direction?
25   A.  Towards Derbigny Street.

Page 59

1    Q.  So towards Claiborne Avenue?
2    A.  Towards Claiborne.
3    Q.  Okay.  And you decided to jump off to
4  the roof of another house?
5    A.  When it ran into the house next door.
6  We had no choice but the jump off onto that
7  roof.
8    Q.  Okay.  All five of you?  Were there
9  five of you?  Is that right?
10   A.  All five -- wait.  Six of us.
11   Q.  Okay.  I'm sorry to beat a dead horse.
12  I want to make sure we have them all.  It's
13  you --
14   A.  Gloria, Tony, his wife, Calvin and his
15  mama.
16   Q.  That's six.  Okay.
17       And you remained on that roof for nine
18  and half hours, you said?  Is that --
19   A.  The third roof.  We remained on there
20  for about nine and a half hours.
21   Q.  Okay.  So I'm sorry.  You went onto
22  this roof and then onto another roof?
23   A.  Yes, sir.  That was because the second
24  house started falling apart.
25   Q.  How long were you on that second

Page 60

1  house?
2    A.  Maybe a couple of hours.
3    Q.  Okay.  And how did you end up on the
4  third roof?
5    A.  That house floated and started falling
6  apart.
7    Q.  And so you floated into another house?
8    A.  Into another house.
9    Q.  Was there anybody else on that roof
10  that you ended up on?
11   A.  No.  They had people in their attic,
12  their house was drifting up Tennessee Street,
13  falling -- breaking in half.  They was grabbing
14  hold of tree branches pulling theyself up.
15   Q.  And you said earlier that you didn't
16  pay any attention to the barge anymore.  So you
17  didn't see the barge --
18   A.  No.
19   Q.  Didn't see where it ended up or
20  anything like that?
21   A.  No.
22   Q.  When did you next see the barge?
23   A.  It was a while later, man.  It must
24  have been about six months, maybe.  If it was
25  that long I'm not sure.

Page 61

1    Q.  So back in the neighborhood when it
2  was dry and sitting there.
3    A.  (Nods head affirmatively.)
4    Q.  So that night and the next day and
5  next day after that, you didn't see the barge
6  again.
7    A.  No.  I wasn't nowhere around.  I was
8  at the dome then.
9    Q.  Okay.  All right.  Well, tell me how
10  you were rescued, how you got out of the Ninth
11  Ward.
12   A.  They had a guy by the name of All
13  Night Shorty came in a boat, rescued us off of
14  that third roof, brought us to the Claiborne
15  bridge.
16   Q.  Was it daytime when he rescued you or
17  night?
18   A.  It was night.  It was nighttime.
19   Q.  You said you spent some nine hours on
20  that roof?
21   A.  On the third roof, yeah.  Where he
22  rescued us.
23   Q.  So if it was night, it was night of
24  Monday?  Is that what you're saying?
25   A.  I really don't remember.  I'm going be

Page 62

1  honest with you.  I don't remember.  I remember
2  what happened.  I can't telling you every
3  detail.  I don't remember what day it was, how
4  many hours I was there, I'm just estimating a
5  time.  I know who saved us, where they brought
6  us.  Coast Guard didn't help us.  They wouldn't
7  even come through there with they boats.  If it
8  wasn't for that man and another guy they would
9  had more dead bodies than that.
10     Q.  So All Night Shorty picked you up, all
11  six of you, off the third roof you estimate
12  after about nine hours of being on that roof,
13  and took you to the Claiborne Avenue bridge?
14     A.  Yes, sir.
15     Q.  All right.  And what -- tell me what
16  happened after that.  How did you get out of
17  the Claiborne Avenue area?
18     A.  Coast Guards came through there, made
19  him come and get us off the Claiborne bridge
20  and bring us to the St. Claude Street bridge
21  where they put us on the Army trucks.
22     Q.  And where did they take you?
23     A.  They took us to the schools on St.
24  Claude, and from there to the Superdome, and we
25  stayed in there four days.

Page 63

1     Q.  All right.  And how did you end up in
2  Atlanta?
3     A.  Well, they took us from the dome on
4  buses.  They took us from the dome on buses to
5  Texas.  We got to Texas, we were there about
6  three -- about maybe three or four days, and
7  Gloria daughter found her on the website.  A
8  pastor and his wife brought us to Atlanta.
9     Q.  Now, I'm sorry, I know I asked you
10  this, I forgot the answer: Are you presently
11  working?
12     A.  No.
13     Q.  And you haven't been employed since
14  the hurricane, is that -- except for the time
15  you came back --
16     A.  That's it.
17     Q.  Right.  Okay.  You just haven't been
18  able to find a job in Atlanta, is that it?
19     A.  Well, I'm going to be honest with you.
20  This may not be the law, but don't -- ain't
21  nobody -- ain't no state wanted us from New
22  Orleans.  I mean, this is something you hear.
23  Ain't nobody wanted to give nobody no jobs.
24     Q.  But you're physically and mentally
25  able to work.

Page 64

1     A.  No, not really.  I suffer with my legs
2  and my feet real bad, you know.
3     Q.  Yeah.  How many doctors --
4     A.  But I can work.
5     Q.  How many doctors have you seen for the
6  suffering of your legs and feet?
7     A.  Well, I done been to, let's see, um --
8  the doctors out there.  When I first went out
9  there I went a lot of times for my stomach,
10  from drinking that water.  I mean, they never
11  really done nothing for us, you know.  I mean,
12  it's like you got to be a resident of Georgia,
13  you know.  I mean, I don't have any money, I
14  don't have no medicine cards or nothing, so.
15     Q.  All right.  Let me back you up.  What
16  doctors have you seen for your legs or your
17  feet?
18     A.  I haven't.
19     Q.  You have not.
20     A.  I have not.
21     Q.  Okay.  What are your complaints for
22  your leg and your feet?
23     A.  Well, I mean if I walk a half a block,
24  my feet go to hurting, they get numb.  I can't
25  stand on them too long.

Page 65

1     Q.  And did this happen before the
2  hurricane?
3     A.  Yeah.  This is something I've been
4  going through but I worked.  I mean, I never
5  used that as an excuse.
6     Q.  Right.
7     A.  But I never -- I ain't even worrying
8  about going out there and try to find a job,
9  because when they build that house back I'll be
10  back here, when my daughter and them move back,
11  get me another job when I get back here.
12     Q.  So the problem with your legs and your
13  feet has nothing to do with the hurricane.  You
14  had before the hurricane.
15     A.  No.  Stomach.
16     Q.  Is that right?  You had that before
17  the hurricane.
18     A.  Yeah.
19     Q.  Okay.  Have you suffered any injury of
20  any type as a result of the hurricane?
21     A.  Yeah.  I suffer with my stomach real
22  bad.
23     Q.  And what is that?
24     A.  I don't know.  You got to ask them
25  doctors out there.

Page 66

```
 1   Q.  Well, have you seen --
 2   A.  They're just giving me pain pills,
 3 that's all.
 4   Q.  Have you seen an doctors --
 5   A.  They put me --
 6   Q.  You have to let me finish my question.
 7      MR. GILBERT:
 8         Well, you have to let him finish
 9      his answer.
10 EXAMINATION BY MR. WALKER:
11   Q.  Have you seen any doctors as a result
12 of the stomach complaints that you have?
13   A.  I just told you yes.
14   Q.  Which ones and where?
15   A.  Henry Town.  Henry Medical.  Um --
16 where else I went?  I went to Henry about
17 twenty times.
18   Q.  And that's in Atlanta?
19   A.  That's in Atlanta.
20   Q.  And what did he prescribe, if
21 anything, for your stomach?
22   A.  I wouldn't even remember the name of
23 the pills, but they're pain pills.  I'm sure
24 they got a record.
25   Q.  Are you taking any of those now?
```

Page 67

```
 1   A.  No.
 2   Q.  How long ago since you took those pain
 3 pills?
 4   A.  It's been about two years.
 5   Q.  Okay.  So your stomach problems have
 6 resolved?
 7   A.  No.
 8   Q.  Well, what is the specific complaint
 9 that you have about your stomach?
10   A.  I suffer with my stomach.
11   Q.  How did the hurricane cause this?
12   A.  Pain.  Probably from the water.
13 Swallowing that water.
14   Q.  What water?  I thought you were --
15   A.  Flood water.  I was in water on my
16 roof.
17   Q.  You were.
18   A.  Yes, sir.
19   Q.  Okay.  I thought you went from one
20 roof to a second roof to a third roof.
21   A.  We still was in water.
22   Q.  Let me finish my question.
23      When the houses crumbled you didn't
24 swim, did you?
25   A.  No.
```

Page 68

```
 1   Q.  You didn't fall in the water, did you?
 2   A.  No.
 3   Q.  You were rescued by All Night Shorty
 4 in a green boat, weren't you?
 5   A.  Yeah.
 6   Q.  So what water are you talking about
 7 that got into your stomach?
 8   A.  They had water -- we was in water on
 9 the roof of the houses.
10   Q.  Which houses?
11   A.  It wasn't but three houses.
12   Q.  Okay, but to this point you haven't
13 told me --
14   A.  We were laying in water.  Laying in
15 water the whole time, on the second roof, third
16 roof, we were in water.  We went in one house
17 to get cover because the rain was tearing us
18 up.  But we was laying in water.
19   Q.  So was this rainwater that was getting
20 you?
21   A.  I don't know if it was rainwater,
22 somebody was dumping water -- we were in water.
23   Q.  Okay.  So you're saying that your
24 stomach complaints, you believe, come from you
25 drinking some water the night that you got out
```

Page 69

```
 1 of your roof, is that right?
 2   A.  That's what I said.
 3   Q.  Okay.  Did you ever have any stomach
 4 problems before the hurricane?
 5   A.  Yeah, I had stomach problems.  But
 6 never --
 7   Q.  Did you --
 8   A.  Go ahead.
 9   Q.  Did you ever see any doctors before
10 the hurricane for your stomach problems?
11   A.  Yes, I have.
12   Q.  Same stomach problems before as after
13 the hurricane; is that right?
14   A.  Same problems?
15   A.  Uh-huh.
16   A.  No.
17   Q.  How are they different?
18   A.  Pain was increased.
19   Q.  Same pain, but worse?
20   A.  Worse.
21   Q.  Any other complaints as a result of
22 the hurricane?
23   A.  Yeah.  I had skin rashes.
24   Q.  Did you see any doctors for your skin
25 rashes?
```

Page 70

1   A.  No.
2   Q.  No?
3   A.  Unh-unh.
4   Q.  Did they resolve themselves?
5   A.  Well, I had brought, um -- some kind
6  of cream.  It was a cream.  I can't remember
7  the name of it.
8   Q.  You don't have the rashes anymore.
9   A.  No.
10   Q.  Anything else?
11   A.  (Shakes head negatively.)  Not that I
12  can think of right now, no.
13   Q.  Okay.
14   A.  Unh-unh.  I don't think.
15   Q.  Have you made any claim against any
16  insurance companies?
17   A.  No.
18   Q.  Have you recovered any money against
19  any insurance companies or anybody else?
20   A.  No.
21   Q.  Have you made any claims for property
22  damage or loss?
23   A.  No.
24   Q.  Did you own any --
25   A.  Excuse me.  Now, with FEMA I put in

Page 71

1  for personal property.
2   Q.  And that would be your furniture and
3  things like that?
4   A.  Yeah.
5   Q.  Okay.  Did you recover anything?
6   A.  Yeah.  They gave me something.
7   Q.  I'm sorry?
8   A.  They gave me something.
9   Q.  Did you make any other claims for
10  furniture or personal property?
11   A.  Just with FEMA.
12   Q.  Okay.  When you went out on the roof
13  after you poked a hole through the roof, were
14  the lights on in the neighborhood?
15   A.  No.
16   Q.  Power had already gone off in the
17  entire Ninth Ward?
18   A.  Yes, sir.
19   Q.  To the best of your estimate, that was
20  somewhere around 2:30, 3:30?
21   A.  Four o'clock, five o'clock.
22   Q.  Well, do you have any idea?
23   MR. WIEDEMANN:
24      Object to the form of the
25      question.  He obviously can't know the

Page 72

1      whole Ninth Ward.  He said his
2      generator went out from 2:00 to 3:30.
3  EXAMINATION BY MR. WALKER:
4   Q.  2:30 to 3:30 you went up through the
5  roof and the lights in the neighborhood were
6  out, correct?
7   MR. WIEDEMANN:
8      Object to the form of the
9      question.
10   A.  I opened the door to check the
11  generator around that time.  That's what I told
12  you.
13  EXAMINATION BY MR. WALKER:
14   Q.  Right.  And my question was, when you
15  went out on the roof were the lights out in the
16  Ninth Ward?
17   A.  Yes, sir.
18   Q.  Okay.?
19   A.  When I checked the generator, it had
20  to have been still out.  Entergy sure didn't
21  come through there and plug everybody in.
22   Q.  Now, earlier we talked about your
23  experience on the riverfront, barges hitting
24  each other and ships and docks.
25      Is it your testimony that the sound

Page 73

1  you heard the night of the hurricane was like a
2  barge hitting a dock or something like that?
3   A.  Yeah.  Banging up against a wall.
4   Q.  Is that right?
5   A.  Yeah.
6   Q.  Have you talked to any newspaper
7  reporters, television reporters, things like
8  that?
9   A.  Not that I can recall.
10   Q.  Anybody made any movies out of you or
11  from your experience or anything like that?
12   A.  No, sir.
13   Q.  Have you ever been married to Gloria
14  Guy?
15   A.  No.
16   Q.  Who are Antonio and Natasha Guy?
17   A.  Who are they?
18   Q.  Uh-huh.
19   A.  Ms. Gloria's son Tony.  Natasha is his
20  wife.
21   Q.  Those are two of the six people that
22  you were with?
23   A.  Yes, sir.
24   Q.  Are they -- how old were they at the
25  time?

Page 74

1    A.  I don't know how old -- exactly how
2  old they are now.
3    Q.  I mean, were they teenagers, young
4  kids?
5    A.  No, they're not lill kids.  They're
6  grown.
7    Q.  Okay.  Now, you said that you went
8  from one roof to the other, to the third, and
9  you saw houses floating away.
10   A.  On Tennessee Street towards Claiborne.
11   Q.  Did any houses break apart?
12   A.  Yeah.  The house broke in half right
13 in front of us.
14   Q.  Did any houses have their roofs torn
15 off or blown off?
16   A.  I don't know.  I wasn't, you know -- I
17 couldn't answer that.
18   Q.  Did any houses move off their
19 foundations?  I guess they must have if they
20 were floating away.
21   A.  Just about every house over there
22 moved off their foundation.
23   Q.  And you said that the first and second
24 house you were on, they crumbled away?
25   A.  The house we lived in, it drifted off,

Page 75

1  started falling apart.  We was lucky enough it
2  ran into the house next door where we was able
3  to get off of it and get onto that roof.  That
4  house floated.  It started falling apart.  We
5  got on the third house.  But every house down
6  there left its foundation.
7    Q.  Now, when you got up on the roof and
8  heard this sound, what were the weather and
9  wind and the rain conditions like?
10   A.  It was raining.
11   Q.  Was it --
12   A.  It was windy.  I mean, it wasn't like
13 a hurricane where you couldn't be on the roof,
14 like wind weren't strong enough to blow you
15 off.
16   Q.  And how was the rain?
17   A.  The rain was running hard.
18   Q.  But it's your testimony that in spite
19 of the rain, you could see as far as the levee?
20   A.  Yes, sir.  By me being on the roof I
21 could see.
22   Q.  All right.  So you got to the
23 Claiborne Avenue bridge when All Night Shorty
24 brought you there, correct?
25   A.  Yes, sir.

Page 76

1    Q.  And could you see -- or did you see
2  the barge from there?
3    A.  I ain't paid no attention.
4    Q.  So the first time you ever saw the
5  barge, you're saying here today, was not from
6  the Claiborne Avenue bridge, right?
7    A.  The first time I saw the barge?
8    Q.  Right.
9    A.  It wasn't from the Claiborne canal?
10   Q.  Right.
11   A.  Wait.  I don't understand.
12   Q.  The first time you ever saw the barge,
13 the night of the hurricane --
14   A.  That was the first time I saw it.
15   Q.  -- was not from the Claiborne Avenue
16 bridge?
17   A.  What you mean not from the Claiborne
18 Avenue bridge?
19   Q.  You went to the Claiborne Avenue
20 bridge when All Night Shorty took you.
21   A.  Yeah.
22   Q.  And it's your testimony today that
23 that's not the first time you ever saw the
24 barge.  You'd seen it before.
25   A.  I didn't even pay attention to it when

Page 77

1  I got to the bridge.  The first time I seen it
2  when I was on my roof, and that was it.  I
3  wasn't looking for the barge afterwards.
4    Q.  On this Exhibit 2 where we marked the
5  approximate location of the house at 1720
6  Tennessee, you told me that the front faced
7  Arabi and the back faced the canal and there
8  was a house behind you, is that right?
9    A.  There was a street behind our house.
10   Q.  And there was a house behind your
11 house.
12   A.  On the next street.
13   Q.  Correct.
14   A.  Yeah.
15   Q.  How many stories was that house?
16   A.  One double.  That's it.
17   Q.  A single-story house you're saying?
18   A.  Single-story.  Yeah.
19   Q.  And were there houses alongside that
20 house?
21   A.  Yes, they had.
22   Q.  Were they single or double stories?
23   A.  I don't remember what, you know, all
24 the houses were.
25   Q.  But it's your testimony that from your

1 roof you had an unobstructed view of the levee?
2     A.  What you mean unobstructed?
3     Q.  You could see the levee from your
4 roof?
5     A.  I could see the levee.  Yes, sir.
6     Q.  There were no houses or trees or
7 anything blocking your view, is that right?
8     A.  There was nothing blocking my view.
9     Q.  And have you ever been of the opinion
10 that what really happened was that someone blew
11 up the levee with dynamite because they were
12 trying to sell property or buy property in the
13 Ninth Ward?
14     A.  No.
15     Q.  That's never been your opinion?
16     A.  That's never been my opinion.
17     Q.  Okay.  Has it ever been your opinion
18 that the barge in fact floated over the levee
19 wall --
20     A.  No.
21     Q.  -- due to the height of the water?
22     A.  No.
23     Q.  That's never been your opinion?
24     A.  No.
25     Q.  Have you ever said something like this

1 to someone:  "Man, I honestly believe that the
2 barge did not break the wall, it couldn't have
3 done that?"
4     A.  No.
5     Q.  You never said something like that?
6     A.  (Shakes head negatively.)
7     Q.  Have you ever filed it an SF 95 form?
8     A.  What is that?
9     Q.  That form that you have there next to
10 you.
11     A.  Not that I can remember.
12     Q.  Whose phone number is (404) 496-91 --
13 I'm sorry, 9913?
14     A.  404?
15     Q.  496-9913.  Do you recognize that phone
16 number?
17     A.  Unh-unh.  (Shakes head negatively.)
18     Q.  Could I see that document you have?
19     A.  (Tendering.)
20     Q.  Thanks.
21         MR. JOAHEN:
22             (Tendering.)
23 EXAMINATION BY MR. WALKER:
24     Q.  All right.  I'm going to show you a
25 document that I'll mark Exhibit 3, which

1 consists of two pages.
2     Is that your signature?
3     (Exhibit 3 was marked for
4 identification and is attached hereto.)
5         MR. WIEDEMANN:
6             To which we object on relevance.
7         MR. GILBERT:
8             And additionally because the
9         attorneys who have filled these out
10         are not present and haven't been given
11         notice.  Robert Caluda is not present,
12         Gerald Maples is not present, we don't
13         represent him in connection with these
14         matters, other attorneys do.
15 EXAMINATION BY MR. WALKER:
16     Q.  You can go ahead and answer.  Is that
17 your signature?
18     A.  Yeah.
19     Q.  Okay.
20         MR. GILBERT:
21             Basically what you're doing is
22         you're about to conduct an ex parte
23         communication as to these issues right
24         here.  So that's the nature of our
25         objection.

1         MR. WALKER:
2             Okay.
3 EXAMINATION BY MR. WALKER:
4     Q.  I'm sorry.  You said that is your
5 signature?
6     A.  Yep.
7     Q.  Do you recall filling this form out?
8     A.  I filled this out -- this is not my
9 handwriting, all of this.
10     Q.  So you signed it but it's not your
11 handwriting?
12     A.  Yes, sir.
13     Q.  Were you living at 2381 Noah's Ark
14 Road in Jonesboro, Georgia?
15     A.  Yes, sir.
16     Q.  And you did live at 1720 Tennessee
17 Street, correct?
18     A.  Yes, sir.
19     Q.  It says here that you're making a
20 claim for a million dollars for property
21 damage.
22     A.  A million dollars.
23     Q.  Is there any basis to that claim?
24     A.  No, sir.  I know this is not my
25 handwriting.

Page 82

```
 1        (Off the record.)
 2   EXAMINATION BY MR. WALKER:
 3      Q.  I'm sorry.  I said a million.  It's a
 4   hundred thousand.  I added an extra zero.  My
 5   fault.
 6      A.  It's still not my writing.  It's my
 7   signature, yes.
 8      Q.  Well, can you tell me how you support
 9   your claim for a hundred thousand dollars of
10   property damage?
11      A.  I tell you, with what we went through,
12   during that storm --
13      Q.  Yeah, but listen to my question.
14   Property damage.
15        MR. WIEDEMANN:
16          Let him finish his answer.
17      A.  Property damage?  I feel to believe we
18   deserve something --
19   EXAMINATION BY MR. WALKER:
20      Q.  I understand.
21      A.  -- you know.
22      Q.  But property damage means your --
23      A.  Now, what I -- my personal property,
24   my bed, my TV.  I understand all that.  I'm
25   just -- I'm giving you my answer.
```

Page 83

```
 1      Q.  Right.  So do you think you had a
 2   hundred thousand dollars worth of property?
 3      A.  I think I'm worth a hundred thousand
 4   or more.
 5      Q.  I'm sorry?
 6      A.  I think I'm worth more than that.
 7      Q.  That's not what the question is.  Did
 8   you have --
 9      A.  No, I did not.
10      Q.  Okay.  Do you have any idea how much
11   value in personal property you had?
12      A.  No.  Sentimental?  You don't have a
13   price on that.
14      Q.  Now, it says that you had personal
15   injuries of fifty-five hundred dollars.
16      A.  Maybe that was some bills the doctors
17   sent to me.  I got a lot of bills.  I can bring
18   you suitcases of bills since I been in
19   Georgia --
20      Q.  But it --
21      A.  -- since Katrina.
22      Q.  Right.  But did you fill this out?  Is
23   that your handwriting, the fifty-five hundred?
24      A.  I probably answered -- I was probably
25   giving him answers and they filled it out for
```

Page 84

```
 1   me and I signed it.  I know I signed it.
 2   But -- you know.
 3      Q.  Do you remember discussing this with
 4   the attorney?  Or an attorney?
 5      A.  No, I didn't discuss this with no
 6   attorney.
 7      Q.  Where did you get the fifty-five
 8   hundred dollar figure from?
 9      A.  I don't know.
10        MR. WIEDEMANN:
11          He just answered he doesn't know
12          whether the attorney -- you're asking
13          him to disclose what he told the
14          attorney?  Which is an attorney/client
15          privilege?
16   EXAMINATION BY MR. WALKER:
17      Q.  I'm going to show you another document
18   and ask you, is that your signature?
19        MR. WIEDEMANN:
20          Same objection.
21      A.  Yes, sir.
22   EXAMINATION BY MR. WALKER:
23      Q.  Okay.  I'll mark that as Exhibit 4
24   this one is dated February 27 of '07.
25          The first one we talked about was
```

Page 85

```
 1   August 24th of '06.  In February of '07 your
 2   property damage decreased from a hundred
 3   thousand to fifteen thousand.
 4          Do you remember that?
 5          (Exhibit 4 was marked for
 6   identification and is attached hereto.)
 7      A.  From a hundred thousand to fifteen
 8   thousand?
 9   EXAMINATION BY MR. WALKER:
10      Q.  You see now that in '07 it's fifteen
11   thousand?  Do you remember that that's a more
12   accurate assessment of your property damage?
13      A.  No.  I don't remember any of that.
14      Q.  You don't remember filling this out?
15      A.  No.
16      Q.  And then it shows that your personal
17   injury went from fifty-five hundred to a
18   hundred thousand.  Do you remember that?
19      A.  Nope.
20      Q.  You don't remember anything about
21   these forms that you filled out?
22      A.  No, sir, I don't.
23      Q.  But it's correct that you were living
24   at 4564 Candy Lane in Georgia?
25      A.  Yes, sir.
```

Page 86

1    Q.   Now, who is Sidney A. Williams, Jr.?
2    A.   Sidney A. Williams, Jr.  I don't know.
3  I don't even have a son.  I have a daughter and
4  her last name not even Williams.
5    Q.   Is this your signature?
6    A.   No.  No.
7    Q.   Have you ever lived at 10810 Golden
8  Court, Baton Rouge, Louisiana?
9    A.   Nope.
10   Q.   Okay.  So you're just Sidney Williams,
11 not, Jr. or anything like that, right?
12   A.   Just Sidney Williams.
13        MR. WIEDEMANN:
14             He said he didn't sign that.
15        MR. JOAHEN:
16             Again, I'd like to -- what you
17        asked him about, I would like to make
18        a record that, again, you've examined
19        an SF 95 form which indicates in
20        Subsection 1 that he's represented by
21        Daniel Becnel.  So you're asking him,
22        for the third time, a witness who you
23        know is represented by another
24        attorney, about communications.  Why
25        you think you can do that I don't

Page 87

1        know, but that's something that those
2        attorneys I'm sure will be taking up
3        with the court.  But I think this
4        witness has a certain rights that can
5        be protected at this point.  And any
6        motions to strike his testimony will
7        likely be heard by the court.
8        MR. WALKER:
9             All right.  Let's take a quick
10        break, and I don't have much more.
11        (Recess.)
12 EXAMINATION BY MS. BERTAUT:
13   Q.   Mr. Williams, my name is Carmelite
14 Bertaut and I represent one of the parties in
15 this lawsuit.  I just have a few questions
16 about the Ninth Ward.
17        Prior to Katrina, were you aware of
18 any construction work being done in the area
19 between the floodwall and the water along
20 Jourdan Avenue?
21   A.   Not that I know of.  No, not to my
22 knowledge.  No.
23   Q.   Are you aware of the term -- do you
24 know what the East Bank Industrial Area means
25 in connection with the Industrial Canal?

Page 88

1    A.   No.
2    Q.   Did you ever see any water collecting
3  along the floodwall along Jourdan Avenue?
4    A.   No, I didn't -- I've never went that
5  way.  So.
6    Q.   You don't know anything about Jordan
7  Avenue and any water collection or anything
8  like that.
9    A.   Nothing like that, no.
10   Q.   Okay.  I think that that might be all
11 the questions I have.
12        Did you ever see any water that you
13 thought may have seeped out of the levee as it
14 may have remained along Jourdan Avenue?
15   A.   No, ma'am.
16   Q.   That's all the questions I have.
17 Thank you, sir.
18        MR. WALKER:
19             Does anybody else need to
20        proceed?
21        MR. JOAHEN:
22             I was going to ask some
23        questions, but if you need to go you
24        can go.
25        MR. WALKER:

Page 89

1             No, go ahead if you want.  I
2        haven't relinquished my turn or
3        tendered the witness, but --
4        MR. JOAHEN:
5             No, I can wait till you finish.
6        I don't have any personal problems.
7        MR. WALKER:
8             Brian, let me talk to you and
9        Larry.
10        (Off the record.)
11        MR. GILBERT:
12             Right now I'm instructing
13        Mr. Williams to leave the room.
14             Mr. Williams, can you wait
15        outside for me?
16             (Whereupon the deponent left the
17        room.)
18        MR. GILBERT:
19             And we're ending this deposition
20        now on several grounds, the first of
21        which is that Lafarge has represented
22        to the court that this would be
23        provided.  It has been provided today,
24        but it's been provided in the nature
25        of an ambush.  I have E-mail from

Page 90

1   Mr. Walker stating that this would be
2   provided to me on February 15th, which
3   would have been before Mr. Williams'
4   deposition and he would have been able
5   to review this statement, to which
6   he's absolutely entitled as a client
7   of mine, which has been known by
8   Lafarge since we provided discovery
9   responses identifying Mr. Williams as
10   our client.
11       This entire deposition has been
12   improper, the entire process with
13   Centanni has been improper, the entire
14   meeting that Mr. Walker and I had last
15   Friday was improper, the results of
16   those of that meeting and the
17   following discussions have been
18   improper, Lafarge's conduct with
19   respect to the putative class members,
20   the named plaintiffs and my clients
21   has been improper, and we intend to
22   air all of this before the court, and
23   that's it. We're leaving the
24   deposition now.
25   MR. WALKER:

Page 91

1       On what basis are you adjourning
2   the deposition?
3   MR. GILBERT:
4       I just said it and that's all I
5   have to say.
6   MR. WALKER:
7       You're not entitled to adjourn
8   the deposition.
9   MR. GILBERT:
10       You can continue with the
11   deposition, I've instructed my client
12   to leave.
13   MR. WALKER:
14       We'll call the magistrate.
15   MR. WEBB:
16       With all due respect, he's here
17   pursuant to --
18   MR. GILBERT:
19       You want to call the Magistrate?
20   Go ahead and do it.
21   MR. JOAHEN:
22       I do.
23   MR. WALKER:
24       Yeah.
25   MR. GILBERT:

Page 92

1       Let's get the whole thing on the
2   record.
3   MR. WEBB:
4       He's here due to a court order to
5   testify. Isn't he? Didn't he get
6   subpoenaed? Didn't you produce him
7   pursuant to the subpoena?
8   MR. HAYCRAFT:
9       If you're going to call the
10   magistrate you better get busy.
11   MR. GILBERT:
12       Yeah, I would suggest that you
13   get the magistrate on the phone.
14   We'll air this to the magistrate.
15   We'll tell Wilkinson what y'all have
16   done, too.
17   THE WITNESS:
18       It's not a question of what we've
19   done. It's a question of what right
20   do you have to adjourn the deposition.
21   MR. WIEDEMANN:
22       On the basis of ambush.
23   MR. WALKER:
24       And tell me what Rule of Civil
25   Procedure otherwise defines ambush.

Page 93

1   MR. GILBERT:
2       How about the Rules of
3   Professional Conduct? How about the
4   APA rules, the Louisiana rules?
5   MR. WALKER:
6       Show me where that and anything
7   we've done --
8   MR. GILBERT:
9       Go get the books and I'll show
10   you.
11   MR. WALKER:
12       -- allows you to adjourn this
13   deposition.
14   MR. GILBERT:
15       I don't have the books on me.
16       (Whereupon an attempt was made to
17   contact the magistrate.)
18   MR. WALKER:
19       The fact that you may not like
20   the timing of anything does not allow
21   you to interrupt or adjourn the
22   deposition.
23   MR. GILBERT:
24       The timing has deprived us of our
25   rights and my client's rights to see

Page 94

```
 1    his own statement before he gives
 2    testimony.
 3    MR. WIEDEMANN:
 4        You started his deposition
 5    knowing that you have a statement from
 6    him, knowing that we represent him,
 7    and you don't present the statement
 8    before the deposition starts, you wait
 9    until you're halfway or three quarters
10    of the way through the deposition.
11    MR. GILBERT:
12        And Mr. Walker, you lied to me.
13    You told me you had no statements.
14    MR. WALKER:
15        I absolutely never said that.
16    MR. GILBERT:
17        Yeah, you told me that.  You told
18    me that.
19    MR. WALKER:
20        Incorrect.
21    MR. GILBERT:
22        You told me that on Friday and
23    you told me that on Saturday.
24    MR. WALKER:
25        Incorrect.  But maybe correct.
```

Page 95

```
 1    This is not a statement.  It's not a
 2    statement, it is a transcribed
 3    interview.
 4    MR. WIEDEMANN:
 5        It's not a statement from my
 6    client?
 7    MR. GILBERT:
 8        It's not a recording of a
 9    statement?  It's not a recordation of
10    what my client said?
11    MR. WALKER:
12        It's a recording of an interview
13    with your client.
14    MR. GILBERT:
15        That's a statement.
16    MR. WALKER:
17        And I told you that we had many
18    of those, and I showed you a list that
19    indicated which we had recorded and
20    which we didn't.
21    MR. GILBERT:
22        No.  You told me that y'all had
23    conducted two hundred and some odd
24    interviews --
25    MR. WALKER:
```

Page 96

```
 1        Correct.
 2    MR. GILBERT:
 3        -- and there are no statements.
 4    MR. WALKER:
 5        Correct.  Many of which were
 6    recorded.  That's been repeated to you
 7    ad nauseam.  And in fact --
 8    MR. GILBERT:
 9        This was supposed to be disclosed
10    on February 15th, which you did not
11    do.
12    MR. WALKER:
13        Incorrect.  I showed it to you at
14    lunch on February 15th.
15    MR. GILBERT:
16        Did you a give me a copy of it?
17    MR. WALKER:
18        And I said, let me go back and
19    check it, because this was the first
20    draft I have.
21    MR. GILBERT:
22        No.
23    MR. WALKER:
24        And then we reached an agreement
25    on other issues.
```

Page 97

```
 1    MR. GILBERT:
 2        No.  No.  There was never an
 3    agreement whereby I was waiving
 4    production of this.
 5    MR. WALKER:
 6        I didn't say there was a waiver.
 7    MR. GILBERT:
 8        You sent me an E-mail telling me
 9    you'd give me this on the 15th.  I
10    sent all of y'all countless E-mails
11    telling you that you owe us this
12    disclosure, you owe us what we have
13    sought production of, and I've just
14    been pushed off and pushed off, and
15    now you ambush us with it.  And this
16    is a client of mine.
17    MR. WALKER:
18        Were you at the office yesterday?
19    MR. GILBERT:
20        Yes.
21    MR. WALKER:
22        Well, you didn't answer there.
23    And you told me you weren't at the
24    office.
25    MR. GILBERT:
```

Page 98

```
 1          Yesterday was Monday?  I was at
 2  the office.
 3      MR. WALKER:
 4          I thought you said you weren't
 5  going to be at the office, on Friday,
 6  you were working from home or
 7  something because your computers were
 8  down.
 9      MR. GILBERT:
10          What?  You must be confusing me
11  with somebody else.
12      MR. WIEDEMANN:
13          My office was open yesterday.
14      MR. GILBERT:
15          You must be confusing me with
16  somebody else.  I was at the office
17  until our last phone call, then I left
18  a number of messages for you.
19  (Off the record.)
20      MR. WALKER:
21          We're unable to reach Magistrate
22  Wilkinson's office to obtain a ruling
23  based on argument, if the judge would
24  be willing to give us one.  We
25  disagree with any purported right the
```

Page 99

```
 1  plaintiffs may have for any reasons
 2  they believe that the deposition of an
 3  individual can be adjourned as this
 4  deposition has been, and we believe
 5  that you cannot instruct the witness
 6  not to continue the deposition or
 7  answer questions.  Therefore, if that
 8  is in fact the case, as you've told me
 9  outside of this room, then we would
10  ask that this deposition be continued
11  at a future date, including tomorrow,
12  Thursday or Friday, since Mr. Williams
13  is from out of town and has driven
14  here specifically for the taking of
15  his deposition, because the deposition
16  is clearly not concluded.
17          And in connection with this
18  deposition, we're going to attach as
19  Exhibit 5 a transcription of a
20  March 20th, 2006 recorded telephone
21  conversation with Ninth Ward resident
22  Sidney Williams.
23          (Exhibit 5 was marked for
24  identification and is attached hereto.)
25      MR. GILBERT:
```

Page 100

```
 1          And the Plaintiffs Barge PSLC
 2  objects to the attachment of this
 3  statement as being unlawfully withheld
 4  from us in spite of our legitimate
 5  discovery requests and in light of the
 6  representations of counsel for Lafarge
 7  that no such statements were taken,
 8  and --
 9      MR. WALKER:
10          That's an incorrect statement.
11      MR. GILBERT:
12          Okay.  Counsel for Lafarge says
13  it's an incorrect statement.  In light
14  of Lafarge 's agreement to produce
15  evidence that such a statement was
16  taken.
17      MR. WALKER:
18          I'm sorry?
19      MR. GILBERT:
20          In light of counsel for Lafarge's
21  representations, written
22  representations to me to produce the
23  list of statements or interviews that
24  were taken that was not timely
25  produced, and had it been, according
```

Page 101

```
 1  to when we were told that it was going
 2  be produced, we'd have known about
 3  this and it would not be -- this
 4  deposition would not be taking place
 5  by ambush in derogation of my client's
 6  rights.
 7      MR. WALKER:
 8          That's the statement you made
 9  previously.  So we expect Mr. Williams
10  to appear in the future to answer
11  questions regarding the
12  inconsistencies regarding his
13  testimony under oath today versus what
14  he stated previously.
15      MR. GILBERT:
16          And we object to the testimony of
17  counsel as to whether his testimony is
18  consistent or inconsistent.
19      MR. WEBB:
20          Are you coming back tomorrow or
21  not?
22      MR. WIEDEMANN:
23          No, he's going back to Atlanta
24  tonight.
25      MR. GILBERT:
```

Page 102

```
 1          No.  We want a ruling from the
 2    judge.  We went all of this in front
 3    of the judge.
 4    MR. JOAHEN:
 5          So my understanding is this is
 6    being suspended until we have a ruling
 7    from the court?  Scott Joanen on
 8    behalf of the MRGO PSLC.  We attended
 9    this deposition with the intention of
10    asking questions of the witness.
11    Um -- we have been precluded from
12    doing so by the actions of Mr. Gilbert
13    and Mr. Wiedemann, and the MRGO PSLC
14    believes this is in derogation of the
15    CMO 4 and I believe it's CMO 5 that
16    the barge has been brought under the
17    In Re: Katrina umbrella and strongly
18    objects to the suspension of this
19    deposition based on the grounds
20    enumerated.
21    MR. WIEDEMANN:
22          That's unique in that counsel
23    objected to taking the deposition
24    without the presence of lawyers who
25    represented this individual in a prior
```

Page 103

```
 1    claim.
 2          (Whereupon the deposition was recessed
 3    for the day.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 104

```
 1          REPORTER'S CERTIFICATE
 2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
 3    Certified Court Reporter in and for the State
 4    of Louisiana, do hereby certify that the
 5    aforementioned witness, after having been first
 6    duly sworn by me to testify to the truth, did
 7    testify as hereinabove set forth;
 8          That said deposition was taken by me
 9    in computer shorthand and thereafter
10    transcribed under my supervision, and is a true
11    and correct transcription to the best of my
12    ability and understanding.
13          I further certify that I am not of
14    counsel, nor related to counsel or the parties
15    hereto, and am in no way interested in the
16    result of said cause.
17
18
19
20
21
22
23    _____
24    JOSEPH A. FAIRBANKS, JR., CCR, RPR
25    CERTIFIED COURT REPORTER #75005
```

27 (Pages 102 to 104)