# EXHIBIT 34

Deposition of Sidney Williams (Oct. 2008)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION

| | | |
|---|---|---|
| PERTAINS TO: BARGE | | CIVIL ACTION NO. 05-4182 |
| BOUTTE V. LAFARGE | 05-5531 | AND CONSOLIDATED CASES |
| MUMFORD V. INGRAM | 05-5724 | SECTION "K"(2) |
| LAGARDE V. LAFARGE | 06-5342 | JUDGE STANWOOD |
| PERRY V. LAFARGE | 06-6299 | R. DUVALL, JR. |
| BENOIT V. LAFARGE | 06-7516 | MAG. |
| PARFAIT FAMILY V. USA | 07-3500 | JOSEPH C. WILKINSON, JR. |

Deposition of SIDNEY WILLIAMS, 3600 Dante Street, New Orleans, Louisiana 70118, taken in the offices of CHAFFE MCCALL, LLP, 1100 Poydras Street, Suite 2300, New Orleans, Louisiana 70163, on Thursday, October 9th, 2008.

```
                                          Page 2
 1  APPEARANCES:
 2
 3  WIEDEMANN & WIEDEMANN
 4  (BY: KARL WIEDEMANN, ESQUIRE)
 5  821 Baronne Street
 6  New Orleans, Louisiana 70113
 7     ATTORNEY FOR BARGE PLAINTIFFS
 8
 9  BRUNO & BRUNO
10  (BY: SCOTT L. JOANEN, ESQUIRE)
11  855 Baronne Street
12  New Orleans, Louisiana 70113
13     ATTORNEY FOR MRGO PSLC
14
15  U.S. DEPARTMENT OF JUSTICE
16  TORTS BRANCH
17  CIVIL DIVISION
18  (BY: TAHEERAH K. EL-AMIN, ESQUIRE)
19  (TELEPHONICALLY)
20  Room 8095 North
21  1331 Pennsylvania Avenue N.W.
22  Washington, D.C. 20530
23     ATTORNEYS FOR DEPARTMENT OF JUSTICE
24
25
```

```
                                          Page 3
 1  APPEARANCES (CONTINUED):
 2
 3  LAW OFFICES OF LABORDE & NEUNER
 4  (BY: LAURA ROUGEAU, ESQUIRE)
 5  1001 West Pinhook Road
 6  Lafayette, Louisiana 70505
 7     ATTORNEY FOR OLD
 8
 9  MONTGOMERY BARNETT, LLP
10  (BY: RONALD J. KITTO, ESQUIRE)
11  1100 Poydras Street
12  Suite 3300
13  New Orleans, Louisiana 70163
14     ATTORNEY FOR AMERICAN CLUB
15
16  DUPLASS, ZWAIN, BOURGEOIS, MORTON, PFISTER & WEINSTOCK
17  (BY: RYAN M. MALONE, ESQUIRE)
18  3838 North Causeway Boulevard
19  Suite 2900
20  Metairie, Louisiana 70002
21     ATTORNEY FOR EJLD, LBLD
22
23
24
25
```

```
                                          Page 4
 1  APPEARANCES (CONTINUED):
 2
 3  SUTTERFIELD & WEBB
 4  (BY: DANIEL A. WEBB, ESQUIRE)
 5  650 Poydras Street
 6  Suite 2715
 7  New Orleans, Louisiana 70130
 8     ATTORNEY FOR LAFARGE
 9
10  BURGLASS & TANKERSLEY
11  (BY: RICHARD C. PAVLICK, ESQUIRE)
12  5213 Airline Drive
13  Metairie, Louisiana 70001
14     ATTORNEY FOR JEFFERSON PARISH
15
16  GOODWIN PROCTER, LLP
17  (BY: JOHN D. ALDOCK, ESQUIRE)
18  901 New York Avenue, NW
19  Washington, DC 20001
20     ATTORNEY FOR LAFARGE
21
22
23
24
25
```

```
                                          Page 5
 1  APPEARANCES (CONTINUED):
 2
 3  CHAFFE MCCALL, LLP
 4  (BY: DEREK A. WALKER, ESQUIRE)
 5  1100 Poydras Street
 6  Suite 2300
 7  New Orleans, Louisiana 70163
 8     ATTORNEY FOR LAFARGE NORTH AMERICA
 9
10
11  ALSO PRESENT:
12
13  PETER KEELEY
14  JOHN SHELONKO
15
16
17
18
19
20
21
22
23  REPORTED BY:
24     CERI-ANNE WEBSTER, CCR, RPR
25     Certified Court Reporter
```

Page 6

1          E X A M I N A T I O N   I N D E X
2
3   EXAMINATION BY:           PAGE:
4   MR. WALKER                  9
5   MR. JOANEN                152
6
7
8
9
10
11          E X H I B I T   I N D E X
12
13  EXHIBITS:              PAGE:
14   1                       15
15   2                       18
16   3                       36
17   4                       49
18   5                       56
19
20
21
22
23
24
25

Page 7

1              S T I P U L A T I O N
2
3     IT IS STIPULATED AND AGREED by and among
4   counsel for the parties hereto that the deposition of
5   the aforementioned witness is hereby being taken under
6   the Federal Rules of Civil Procedure, for all
7   purposes, in accordance with law;
8       That the formalities of reading and signing are
9   specifically not waived;
10      That the formalities of sealing, certification,
11  and filing are specifically waived;
12      That all objections, save those as to the form of
13  the question and the responsiveness of the answer, are
14  hereby reserved until such time as this deposition, or
15  any part thereof, may be used or sought to be used in
16  evidence.
17
18              * * * *
19
20
21  CERI-ANNE WEBSTER, Certified Court Reporter, in and
22  for the State of Louisiana, officiated in
23  administering the oath to the witness.
24
25

Page 8

1              SIDNEY WILLIAMS,
2   3600 Dante Street, New Orleans, Louisiana 70118, after
3   having been first duly sworn by the above-mentioned
4   Court Reporter, did testify as follows:
5   EXAMINATION BY MR. WALKER:
6       Q.  Mr. Williams, do you remember that we took
7   your deposition months ago?
8       A.  February.
9       Q.  Do you remember that?
10      A.  Yes.
11      Q.  Do you remember you were placed under oath
12  at that time --
13      A.  Yes, sir.
14      Q.  -- sworn to tell the truth?
15      A.  Yes, sir.
16      Q.  Do you remember?
17      A.  Uh-huh (affirmative response.)
18      Q.  The exact date of your deposition was
19  February 19th, 2008?
20      A.  Yes.
21      Q.  Have you read the transcript of your
22  deposition?
23      A.  Months ago.
24      Q.  So it was sent to you and you read it?
25      A.  Yeah.  It was months ago.

Page 9

1       Q.  Did you return it to your attorneys?
2       A.  No.
3       Q.  So you kept the copy?
4       A.  Yes, sir.
5       Q.  Did they send it to you to sign and return
6   to them or just to read it?
7       A.  Just to read.
8       Q.  Do you remember if you were asked to read
9   and sign it at the end of your deposition?
10      A.  I don't remember.
11      Q.  When it was sent to you, it was sent to
12  Atlanta or someplace in New Orleans?
13      A.  It was in New Orleans.
14      Q.  Where do you live today?
15      A.  3600 Dante Street.
16      Q.  How long have you lived there?
17      A.  About four months.
18      Q.  Before that, where did you live?
19      A.  In Georgia.
20      Q.  So four months ago, you moved from Georgia
21  back to New Orleans?
22      A.  Yes, sir.
23      Q.  Are you employed?
24      A.  I do a little work here and there; odd jobs.
25      Q.  So you are not working for any company?

Page 10

```
 1       A.  Company, no.  I had worked for P&J
 2  Construction about a week and a half, and that was at
 3  the end of the job.  So, I mean, until they get
 4  something else, no, I'm not working for a company now.
 5       Q.  When you read this deposition transcript,
 6  that is what it is called when it is sent back to you,
 7  did you find that anything was wrong; that you had
 8  said anything incorrectly or the reporter reported
 9  something incorrectly or there was a misunderstanding
10  by you of any questions or anything like that?
11       A.  Nothing I recognized.
12       Q.  Were you told you were entitled to make
13  corrections?
14       A.  No.
15       Q.  You weren't told that?
16       A.  No.
17       Q.  I will tell you here today that you can go
18  through your deposition and that if you find that
19  there is something that you said that you don't
20  believe to be true or that you don't believe to be
21  correct, you are entitled to correct it.  You have
22  that opportunity.
23       A.  Okay.
24       Q.  That is part of why we are here today
25  because I happen to think -- I think you will agree
```

Page 11

```
 1  with me that there are lots of things incorrect in
 2  your deposition?
 3       A.  You think so?
 4       Q.  I think so.  That is the exercise we will go
 5  through.
 6       A.  Okay.
 7       Q.  Have you been told you are going to testify
 8  at the trial?
 9       A.  No.
10       Q.  Do you know there may be a trial in this
11  case --
12       A.  I understand.
13       Q.  -- in front of a federal judge.  We may have
14  to go through this a third time in front of a judge --
15       A.  Okay.
16       Q.  -- do you understand that?
17       A.  I understand.
18          MR. WEBB:
19             You need to wait until he stops his question
20          because I can barely hear you start off and when
21          he is talking and you are talking, I can't hear a
22          word you are saying.  Okay?
23          THE WITNESS:
24             Okay.
25  BY MR. WALKER:
```

Page 12

```
 1       Q.  Try and speak up as much as possible for
 2  everyone's benefit.  Who did you meet with today
 3  before this deposition?
 4       A.  I went to my attorney office.  They asked a
 5  few questions.
 6       Q.  Who did you meet with?
 7       A.  I think his name were Pat.
 8       Q.  Pat Sanders?
 9       A.  I don't know his last name.
10       Q.  Did you meet with anybody else?
11       A.  No.
12       Q.  That was today?  This morning before this
13  deposition?
14       A.  Yes.
15       Q.  Have you met with anybody else prior to
16  today regarding this deposition?
17       A.  No.
18       Q.  Did you talk to anybody by phone about this
19  deposition today?
20       A.  No.
21       Q.  Did anybody tell you what to say today?
22       A.  No.
23       Q.  Did anybody tell you what questions I might
24  ask you?
25       A.  No.
```

Page 13

```
 1       Q.  The questions Mr. Sanders asked you today
 2  weren't questions sort of to prepare you for what you
 3  might hear from me today?
 4       A.  No.
 5       Q.  Did he tell you the subject matter of what
 6  we would discuss today?
 7       A.  No.
 8       Q.  Were the questions about this deposition?
 9       A.  No.
10       Q.  Did the questions have anything to do with
11  this case?
12       A.  No.
13       Q.  So you went there this morning to wait for
14  your turn today?
15       A.  No.  I didn't go there just to wait for my
16  turn.  I had a few things I -- I needed to ask him.
17  Well, Bryan Gilbert -- which he wasn't there.  I
18  talked with Pat.
19       Q.  But those things -- and you are entitled to
20  the privacy of the conversation with your attorney --
21  didn't have anything to do with this deposition today?
22       A.  No, sir.
23       Q.  The things that Mr. Sanders discussed with
24  you likewise had nothing to do with today?
25       A.  No, sir.
```

Page 14

1   Q.  So you are telling me that since February
2  19th, 2008, when we took your deposition, you have had
3  no discussions with anybody about the contents of that
4  deposition or about the deposition today?
5   A.  No.
6   Q.  That is right?
7   A.  That is right.
8   Q.  What was the address of the house where you
9  were at the time of the hurricane?
10   A.  1720 Tennessee.
11   Q.  And Tennessee is the second Street in the
12  9th Ward parallel to Jourdan Avenue, right?
13   A.  Yeah.  From Jourdan Avenue.
14   Q.  Do you remember the two cross streets?
15   A.  Derbigny and -- between Derbigny and Roman
16  on Tennessee.
17   Q.  It goes Claiborne, Derbigny, Roman, correct?
18   A.  Correct.
19   Q.  I was wrong.  I said -- or maybe you
20  misunderstood what I am saying.  I want to make sure
21  the record is clear.  We are going to attach a map to
22  make sure.  The streets Jourdan, Deslonde, Tennessee?
23   A.  Yeah.  If you -- starting from Jourdan
24  Deslonde, Tennessee.
25   Q.  So there is no confusion, it can be

Page 15

1  considered the second one from Jourdan but it is
2  really the third street in the neighborhood?
3   A.  Yeah.
4      MR. WALKER:
5      We have done this partially before but for
6    facility of our questions today, I will mark as
7    Exhibit 1 in connection with your deposition a
8    map of the neighborhood.
9        (Exhibit 1 is marked for
10          identification.)
11  BY MR. WALKER:
12   Q.  I will just ask you, if you would, to mark
13  an X on that map where the house was?
14      MR. WIEDEMANN:
15      (Views documents.)
16      THE WITNESS:
17      (Views documents.)
18  BY MR. WALKER:
19   Q.  Here is Tennessee.  Here is Derbigny, and
20  here is Roman.  Somewhere in between.  You see where
21  Roman -- that map doesn't go all the way through.
22   A.  Right.  Roman doesn't go all the way
23  through.
24   Q.  I thought you said -- there is Derbigny
25  right here.  (Indicating.)  Was it closer to Derbigny

Page 16

1  or Roman?
2   A.  It was closer to Derbigny.
3   Q.  So it would be somewhere in this area?
4  (Indicating.)
5   A.  Yeah.  About that.  (Indicating.)
6      MR. WIEDEMANN:
7      Would you like to make the X, Counsel?
8      THE WITNESS:
9      I don't want to make the X.  I don't want to
10    be wrong.
11  BY MR. WALKER:
12   Q.  This is Roman here, right?  (Indicating.)
13   A.  I understand.
14   Q.  So somewhere between Roman and Derbigny,
15  closer to Derbigny.  I will make the X; just an
16  approximation.  Somewhere around there? (Indicating.)
17   A.  Yeah.  Somewhere around there.
18  (Indicating.)
19   Q.  Now, the house next to you, would you
20  describe that to me?
21   A.  The house next to me, they had a house on
22  each side of me.
23   Q.  Describe the one closer to North Derbigny.
24   A.  It was a white house with an addition on the
25  back of it.

Page 17

1   Q.  A white house with an addition on the back;
2  like a camelback you mean?
3   A.  Something like that.
4   Q.  How about the house on the other side?
5   A.  It was a yellow house; low-set house; house
6  sitting low.
7   Q.  That would be the house next to you
8  closer --
9   A.  To Roman.
10   Q.  -- to Roman?  How about the houses across
11  the street from you?  What were they like?
12   A.  They had a single-story house with maybe a
13  six-foot iron gate.  They had another single-story
14  house; kind of a long porch.
15   Q.  Long porch?
16   A.  Yeah.  They had a house on the corner; might
17  have been closed-in porch design around it.
18   Q.  At the time of the hurricane, you got on the
19  roof, as I recall.  Is that right?
20   A.  Yeah.
21   Q.  Was that the roof of your house on
22  Tennessee?
23   A.  The roof of the house I was living in.
24   Q.  Was that a one story or two story?
25   A.  One story.

Page 18

1  Q. And you moved from that roof to a second
2  roof; then a third roof. Is that right?
3  A. Yes, sir.
4  Q. Where was the third roof you moved to?
5  A. It was closer to Derbigny.
6  Q. Still on Tennessee?
7  A. Still on Tennessee, yeah. Then there was
8  another house on the corner of Derbigny and Tennessee.
9  Q. So the house that you ended up on, the third
10 roof, was the house on the corner of Derbigny and
11 Tennessee?
12 A. No. Before the corner house.
13 Q. Just before the corner?
14 A. Yeah.
15 Q. One from the corner?
16 A. Uh-huh (affirmative response.)
17 Q. Was that a one story or two-story house?
18 A. One story.
19    MR. WALKER:
20    I will show you a photograph that we will
21    mark this as Exhibit 2.
22       (Exhibit 2 is marked for
23       identification.)
24 BY MR. WALKER:
25 Q. And this is Claiborne, right?

Page 19

1  A. (Views documents.) Uh-huh (affirmative
2  response.)
3    MR. WIEDEMANN:
4    (Views documents.)
5  BY MR. WALKER:
6  Q. This is Jourdan. This is Deslonde and this
7  is Tennessee. This would be Derbigny. So you are
8  saying that house was right on -- one from this
9  corner. Is that right? (Indicating.)
10 A. This is Derbigny? (Indicating.)
11 Q. Right.
12 A. Yeah. They had a corner house. They had
13 another house, and the house next to me was my house.
14 Q. Right. But the one that -- the third roof
15 that you ended up was one from the corner --
16 A. One from the corner.
17 Q. -- right? It would have been right around
18 here, right? (Indicating.)
19 A. Not on that side of the street.
20 Q. What side of the street?
21 A. It would be on the side of the street I
22 lived on.
23 Q. So you lived on this side of the street?
24 (Indicating.)
25 A. This --

Page 20

1  Q. The court reporter is not going to
2  understand this and that. The front door of your
3  house when you walked out, did you face the levee
4  or did you face --
5  A. If I walked out the front door of my house,
6  it faced Tennessee.
7  Q. Did it face in this direction towards the
8  levee or in that direction towards --
9  A. No. It didn't face across the levee. It
10 faced towards St. Bernard.
11 Q. Your house was on this side of the street?
12 (Indicating.)
13 A. Uh-huh (affirmative response.)
14 Q. Right?
15 A. Yeah.
16 Q. So the house that you went to would have
17 been in this area right where this little white house
18 with the green roof is in this photograph?
19 (Indicating.)
20 A. Yeah.
21 Q. Is that right? I will put an X in this
22 area. (Indicating.) Is that fair?
23 A. Okay.
24 Q. We are saying your house would have been
25 more towards the center of that block. Is that right?

Page 21

1  A. No. Not more towards the center. It wasn't
2  but a house between this house and my house.
3  Q. So where would it be? Here? Is that more
4  accurate? Here? (Indicating.)
5  A. Why would it be there when the first X is
6  here where the house I supposedly had wind up on.
7  Then they had a house right in between this house and
8  my house and the house in between.
9  Q. So around here. (Indicating.) Is that
10 fair?
11 A. Yeah.
12 Q. As the first X, we will label it as -- what
13 is the address?
14 A. 1720.
15 Q. 1720?
16 A. Tennessee.
17 Q. Tennessee. This other one -- we will mark
18 this third house. That is the third house you went to
19 as this house. Okay? (Indicating.)
20 A. Okay.
21 Q. Now, this third house that you went to, did
22 it have an addition or camelback or something like
23 that?
24 A. No.
25 Q. Was there a house with an addition or a

Page 22

1 camelback behind it?
2   A.  Not to my knowledge that I can remember.
3 Behind that house, I couldn't remember.
4   Q.  Well, think back.  Do you find that your
5 memory is better close to when something happened than
6 a long time after it?
7   A.  I think it may be better, yeah.  I think it
8 may be better.
9   Q.  Do you remember that the hurricane was in
10 August of 2005?
11   A.  Yeah.  I can remember the hurricane.
12   Q.  You are going to have to speak up.
13   A.  I can remember the hurricane.
14   Q.  You remember it was August 29th, 2005?
15   A.  Yeah.
16   Q.  Do you remember talking to an investigator
17 in March of 2006?
18   A.  I remember talking to an investigator.  Now,
19 I do not remember what I said to him.
20   Q.  Do you expect you told him the truth?
21   A.  Not if I don't remember what I said.
22   Q.  That is not what I'm asking you.  When
23 somebody asks you questions about something, do you
24 tell them the truth?
25   A.  Yeah.

Page 23

1   Q.  Do you expect that when this gentleman came
2 to you and asked you questions, that you told him the
3 truth?
4   A.  I don't know because I wasn't in a right
5 state of mind.
6   Q.  Really?
7   A.  No.
8   Q.  What kind of state of mind were you in?
9   A.  I was terrified from this storm and it took
10 me some time to get over it.  I mean --
11   Q.  Did you lie to anybody else?
12   A.  Lie.  I wouldn't say it was lying.
13   Q.  Did you tell him the truth?
14   A.  I don't know.
15   Q.  Have you read the transcript of what you
16 told him?
17   A.  I have seen it and what I read, it is not
18 even believable to me.
19   Q.  Really?
20   A.  Really.  I can't believe I said them things
21 that is on the transcript.
22   Q.  Do you have a parole officer?
23   A.  Do I have a parole officer?
24   Q.  Yes.
25   A.  I had one in Georgia.

Page 24

1   Q.  Did you lie to him?
2   A.  Lie to her?
3   Q.  Her?
4   A.  No.
5   Q.  Why did you have a parole officer?
6   A.  Because I was caught under the influence of
7 alcohol.  I pleaded guilty to it.  They assigned me a
8 probation officer, however you want to put it.
9   Q.  Who is Jennifer?
10   A.  That is a girl I know.
11   Q.  Is she related to Ernest?
12   A.  I don't know Ernest.
13   Q.  How is Jennifer related to you?
14   A.  She is not.  A friend.
15   Q.  Do you remember going to a grocery store in
16 Georgia and having somebody else have beer in the car
17 and you were stopped for DUI?
18   A.  Yeah.
19   Q.  Remember that?
20   A.  I remember being stopped for DUI having
21 someone else in the car drinking, yeah.
22   Q.  Who was in the car?
23   A.  A guy named Richard.
24   Q.  What girl was in the car?
25   A.  Latasha.

Page 25

1   Q.  You haven't told me that before, have you?
2   A.  No.  I don't remember telling you that
3 before.
4   Q.  But it is true, right?
5   A.  It is true.
6   Q.  You were fined $1,300; you had to pay for
7 that, right?
8   A.  Yeah.  About that.
9   Q.  You haven't told me that before either, have
10 you?
11   A.  I don't remember telling you that.
12   Q.  But it is true?
13   A.  It is true.
14   Q.  You had 13 months probation and 40 hours of
15 community service because of that, right?
16   A.  Yes, sir.
17   Q.  You have never told me that but it is true,
18 right?
19   A.  It is true.
20   Q.  You didn't tell us that in your deposition
21 in February?
22   A.  I don't remember telling you that.
23   Q.  Isn't that right that you were concerned in
24 Georgia and had a discussion with the judge about the
25 affect this DUI might have on your job when you

Page 26

1 returned back to New Orleans?
2   A.  No.  I don't remember having that discussion
3 with no judge.
4   Q.  Do you remember that it was your son and
5 your daughter-in-law that you took to the grocery
6 store.  They were drinking beer.  They gave you the
7 DUI because of an open-container charge?
8   A.  I remember having two people in the car and
9 I got the DUI because they were drinking.  I remember
10 that.
11   Q.  Do you remember telling the judge that you
12 were concerned about this because of your job in New
13 Orleans.  He said, "Well, I know that.  I understand
14 that.  But that is something you have to take up with
15 your probation officer."  Do you remember that?
16   A.  No.  No.  I didn't actually talk to the
17 judge.  The attorney did.
18   Q.  Did the attorney tell you that is what the
19 judge had said?
20   A.  No.
21   Q.  Is Jennifer's last name Frezel?
22   A.  Frezel.  Something like that.
23   Q.  And Gloria Guy keeps calling her Fraizer,
24 right, instead of Frezel?
25   A.  I don't know.  I don't know how she

Page 27

1 pronounce her name.
2   Q.  You are not aware that she mispronounces her
3 name?
4   A.  No.  Because I like may be saying it wrong.
5   Q.  How is Gloria Guy related to you?
6   A.  She was landlord and friend.
7   Q.  Were you ever married to her?
8   A.  No, sir.
9   Q.  Your landlord and your friend?
10   A.  Yeah.
11   Q.  Do you find her to be an honest person?
12   A.  Yeah.
13   Q.  Do you think she would tell the truth if
14 asked questions?
15   A.  I think she would.
16   Q.  How about Jennifer?  Do you find she is an
17 honest person?
18   A.  Yeah.  To my knowledge.
19   Q.  If she were asked questions, she would tell
20 the truth?
21   A.  I can't speak for Jennifer.  Actually, I
22 mean, you asked me a question about Gloria.  I find
23 her an honest person.  I mean, I have never had
24 Jennifer to lie to me.  She could have.  I mean, I
25 can't say she is an honest person that someone else

Page 28

1 would ask her a question.  I can't answer that.
2   Q.  These things that I have just gone through
3 about the probation officer, your fine in Georgia, and
4 Jennifer, and the mispronunciation of her name, these
5 were all things that were told to the investigator in
6 March of 2006 when he talked to Jennifer and Gloria.
7 Those were all true things that were told to him,
8 right?
9   A.  Yeah.  So far.
10   Q.  So you are saying that you selectively lied
11 to him.  You told him some true things and some lies?
12   A.  I don't remember -- like I said, I don't
13 remember.  Because I told him a lot of things was
14 true.  I don't know what I said to the investigator.
15 I can't tell you.  Some of the things you brought up
16 were true.  That is all I can answer about that.
17   Q.  Now, isn't it true that the house you were
18 on that we marked with an X that you floated to or
19 went to the third roof had a camelback addition that
20 fell?
21   A.  No, sir.
22   Q.  That was a --
23   A.  It wasn't the third roof.
24   Q.  What roof was it?
25   A.  The second roof.

Page 29

1   Q.  It had an addition, right?
2   A.  Yes, sir.
3   Q.  That addition fell?
4   A.  Yes.
5   Q.  Before that addition fell, you couldn't see
6 the levee, could you?
7   A.  Before that addition fell?
8   Q.  Right.
9   A.  Not off of that roof.
10   Q.  From that roof, you could not see the levee?
11   A.  No.
12   Q.  How long were you on that roof?
13   A.  Maybe an hour.
14   Q.  So by the time you got off that roof, the
15 9th Ward was basically flooded?
16   A.  Yeah.
17   Q.  You didn't know at that time why or how your
18 neighborhood had become flooded?
19   A.  Well, no, I didn't know how at that time.
20   Q.  In other words, you didn't see anything or
21 hear anything up until that time when the neighborhood
22 was already flooded --
23   A.  No.
24   Q.  -- to let you know how this all had
25 happened?

Page 30

```
 1      A.  I heard and seen something.
 2      Q.  When did you see and hear something?
 3      A.  When I first come out the hole of my roof,
 4  the house I was living in.
 5      Q.  What did you see and hear?
 6      A.  I heard a boom, a loud boom I was coming up
 7  out the roof.  When I got on the roof, I looked; just
 8  had the second boom occurred, I seen the barge out
 9  there against that wall rocking hitting the wall.
10      Q.  Nothing was blocking your sight, right?
11      A.  No, sir.
12      Q.  Is there any reason you didn't tell the
13  investigator that?
14      A.  Like I said, I don't know what all I told
15  the investigator.
16      Q.  Well, is there anything difficult about a
17  question did you see a barge and the answer no?
18      A.  Repeat that.
19      Q.  Is there anything difficult about the
20  question did you see the barge and answering no?
21      A.  I seen the barge.
22      Q.  My question is:  Is there anything difficult
23  about that question?
24      A.  Difficulty?
25      Q.  Yes.
```

Page 31

```
 1      A.  No.
 2      Q.  It is an easy question?
 3      A.  Yes.
 4      Q.  It is an easy question to answer truthfully
 5  yes or no, right?
 6      A.  Yes.
 7      Q.  You would have no reason to deceive the
 8  investigator and tell him something that was untrue,
 9  would you?
10      A.  No.
11      Q.  Gloria would have no reason to lie to him
12  either, right?
13      A.  Shouldn't.
14      Q.  Nor would Jennifer, right?
15      A.  Shouldn't.
16      Q.  All you are telling him is what you saw and
17  heard, right?
18      A.  Yes.
19      Q.  Are you under any medication or drugs or
20  alcohol today as we sit here?
21      A.  No.
22      Q.  "Is Sidney there?  Yes."  Who was that that
23  just said Sidney?
24      A.  I don't know.
25      Q.  Doesn't sound like Jennifer?
```

Page 32

```
 1      A.  I can't catch the voice.
 2      Q.  "Sidney?  Yeah.  Yeah.  How you doing?  The
 3  investigator's on the phone.  Tell her I got it.  All
 4  right."  Do you recognize those voices?
 5      A.  Yeah.  Me and Jennifer and Gloria.
 6      Q.  You, Jennifer, and Gloria, right?
 7      A.  Uh-huh (affirmative response.)
 8      Q.  You haven't heard this tape before?
 9      A.  No, sir.
10      Q.  You haven't read what was on this tape, or
11  you said you did read that --
12      A.  I read some of the recording.
13      Q.  You recognize your voice?
14      A.  Yeah.
15      Q.  "Hello?  Yeah.  Yeah.  How you doing?  Is
16  this Sidney Williams?  How you doing?  All righty.
17  Uh, my name's Robert Garcia.  Uh-huh.  And I spoke
18  with, uh, with, uh, with your wife, Gloria.  Right.
19  And, uh, also to Jennifer.  And um what we're doing is
20  investigating the -- levee breaches over there in the
21  9th Ward."  Anything hard about that question or
22  statement?  Did you understand what he said?
23      A.  Yeah.
24      Q.  Would you have any reason to lie to him?  He
25  has told you what he is investigating, right?
```

Page 33

```
 1      A.  Yeah.  I heard him.
 2      Q.  "And, uh, we're just trying to talk with --
 3  with any residents that may have been out there during
 4  the time of Hurricane Katrina that might -- Oh, yeah,
 5  we was there -- that might have seen or heard
 6  anything, and -- and, uh, just trying to find out
 7  what -- what really happened out there."  What really
 8  happened out there.  That is all he was asking you to
 9  say, right?
10      A.  Uh-huh (affirmative response.)
11      Q.  Did you tell him what really happened out
12  there in answer to his questions?
13      A.  Like I said, I talked with him.  I didn't
14  remember what I said to him.
15      Q.  My question is:  Did you tell him what
16  really happened?
17      A.  I told him something if he talked with me.
18      Q.  Did you tell him what really happened?
19      A.  I don't know how to explain this to you.
20  Like I said, we went through a lot out there in that
21  storm.  What I told him, I don't remember because that
22  really put us through, I mean, some devastating
23  things.  What I told this guy I don't know.  I don't
24  know if I lied to him.  I don't know if I told him the
25  truth.  I don't know what I told him.
```

Page 34

1   Q. Do you know if you are lying today?
2   A. No. I know I am not lying today.
3   Q. You know today?
4   A. I know today.
5   Q. How do you know that?
6   A. I'm in the right state of mind.
7   Q. Did you discuss what happened to you all
8   with Gloria and Jennifer?
9   A. What you mean?
10  Q. Did you all talk about your experiences,
11  what you saw, what you heard before the hurricane?
12  A. No. I don't recall us talking to each other
13  about what we went through. I mean, we all on the
14  roof together and Jennifer wasn't.
15  Q. You were on there with Gloria and who else?
16  A. Gloria, her son Tony, his wife Latasha,
17  Calvin, and his mother Inez.
18  Q. All five or six of --
19  A. Six.
20  Q. -- you went through the same experience,
21  right?
22  A. Yeah.
23  Q. You didn't talk with each other about what
24  you had seen or what you had heard? So each of you
25  independently has their own appreciation of what

Page 35

1   happened, right?
2   A. Yeah.
3   Q. What Gloria says is what she saw and what
4   she heard, right?
5   A. Yeah. I imagine.
6   Q. You said that you know her to be an honest
7   person?
8   A. Yes, sir.
9   Q. So if she said she didn't see a barge, you
10  would think she is telling the truth, right?
11  A. I would think she would.
12  Q. She talked to this investigator that day
13  too, didn't she, before you did?
14  A. I imagine she did.
15  Q. You remember that?
16  A. I remember talking to him. I remember
17  talking to him.
18  Q. My question is: Do you remember Gloria
19  talked to him that day too?
20  A. I don't remember Gloria talking to him.
21  Q. You haven't read her transcript of the
22  interview?
23  A. I had no idea she had one or not.
24  Q. Whatever she said, you have no idea what she
25  said that day?

Page 36

1   A. No, sir.
2   Q. I will give you a copy of your transcript
3   from your deposition -- sorry. Your interview.
4       MR. WALKER:
5          We will mark it as Exhibit 3.
6              (Exhibit 3 is marked for
7              identification.)
8   BY MR. WALKER:
9   Q. To make it easier, I will give you the full
10  transcript of the telephone conversation which
11  included Gloria Guy, Jennifer Frezel, and yourself.
12  We will mark it as Exhibit 3. That way you can read
13  along with me. Okay?
14  A. (Views documents.)
15  Q. I will represent to you that that is what is
16  on this tape that we heard. You can see where we can
17  pick that up.
18      MR. WIEDEMANN:
19         (Views documents.)
20  BY MR. WALKER:
21  Q. If you will turn to page 22?
22      MR. WEBB:
23         Page numbers are at the top.
24      MR. WALKER:
25         Off the record.

Page 37

1          (There is an off-the-record
2          discussion.)
3   BY MR. WALKER:
4   Q. That is the page that starts, "Tell her I
5   got it"?
6   A. Uh-huh (affirmative response.)
7   Q. "SW" stands for Sidney Williams. That is
8   you?
9   A. Uh-huh (affirmative response.)
10  Q. "JF" is for Jennifer and "RG" is Robert
11  Garcia, the investigator. Okay?
12  A. Okay.
13  Q. And if you go down, you see RG it says, "I
14  spoke with, uh, with, uh, with your wife, Gloria?" Do
15  you remember we just heard that on the tape in the
16  middle of the page?
17  A. Yeah.
18  Q. Most of what is on that page, we just heard
19  on the tape, right?
20  A. Uh-huh (affirmative response.)
21  Q. "Oh, man. Man, we got up about 3:30 in the
22  morning." You see that. That is the last entry first
23  line of Sidney Williams, "Oh, man. Man, we got up
24  about 3:30 in the morning." Do you see that?
25  A. Uh-huh (affirmative response.)

```
                                                    Page 38
 1    Q.  That is your voice saying those words?
 2    A.  That is my voice.
 3    Q.  "I went in the kitchen and opened the door
 4  and seen the water about to come in. I got all
 5  everybody together and, uh, we had proceeded to go
 6  into the, uh, washroom where the attic is at and then
 7  we heard a knock on the door and I'm glad I answered
 8  the door. It was the guy next -- lived next door, him
 9  and his momma. She real old." Those were the
10  Bickhams?
11    A.  Yeah. I am not sure how they pronounce they
12  last name. I know who you talking about.
13    Q.  Inez?
14    A.  Inez and Calvin. Uh-huh (affirmative
15  response.)
16    Q.  They came next door?
17    A.  Uh-huh (affirmative response.)
18    Q.  I can play the whole tape for you if you
19  want. I think we agree and you stated under oath this
20  is your voice --
21    A.  Uh-huh (affirmative response.)
22    Q.  -- and the tape goes along with this
23  transcript. Okay?
24    A.  Uh-huh (affirmative response.)
25    Q.  I will read you certain areas of the
```

```
                                                    Page 39
 1  transcript. First of all, you were in Georgia at the
 2  time, right?
 3    A.  Yeah.
 4       MR. WIEDEMANN:
 5       At what time, Counsel?
 6       MR. WALKER:
 7       At the time this conversation took place in
 8  March '06.
 9       THE WITNESS:
10       Right.
11  BY MR. WALKER:
12    Q.  You see the next entry SW it starts with,
13  "Yeah. When we -- right after we got on the roof, we
14  laid down"?
15    A.  Yeah.
16    Q.  Then if you keep reading with me there, it
17  says, "We was there for maybe about 10 minutes before
18  our house decided to float over to the neighbor's
19  house. Then we heard the loud cracking in our roof,
20  so we was able to walk over on the neighbor's roof.
21  Once we got on there, we was there about an hour
22  before we even noticed the barge." Is that right?
23    A.  That is not right. I mean, that is what is
24  in here. That is what is in here.
25    Q.  You are saying that is not true?
```

```
                                                    Page 40
 1    A.  No.
 2    Q.  Then it says, "And how we noticed the barge,
 3  the back addition we was leaning up against starting
 4  going down in the water and made us climb over on the
 5  next house. That is when we seen the barge out there
 6  like it was over the wall, you know. We didn't know
 7  it had done broke the wall. That is what they said,
 8  you know. It didn't to (laughing), it sounded more
 9  like they blew the wall, and that wasn't the worst
10  part of it. That ain't all they did. They, after the
11  wall broke, they opened the floodgates on us. We had
12  water coming on us everywhere, man." It isn't correct
13  what you said to this man -- and we can read it in
14  many, many places -- and we will do that today if you
15  want --
16    A.  I understand.
17    Q.  -- is that you did not see the barge hit the
18  wall? You never saw the wall -- sorry. You never saw
19  the barge bump or hit the wall and that you believed
20  the levee had been blown up. Isn't that correct?
21    A.  Yeah. I could have believed that it was
22  blown, but I did see that barge before I got to this
23  second roof.
24    Q.  You never saw the barge hit the wall?
25    A.  I seen the barge hit the wall.
```

```
                                                    Page 41
 1    Q.  Why would you have told Mr. Garcia four or
 2  five times at least that you never saw the barge hit
 3  the wall and that the barge -- strike that. Why would
 4  you have told him that?
 5    A.  Why would I have told him that?
 6    Q.  Yes.
 7    A.  I guess because I was a confused person at
 8  that time. I know today what I saw.
 9    Q.  What were you confused about?
10    A.  Like I told you before, I wasn't in the
11  right state of mind. I couldn't have been.
12    Q.  Were you seeing a doctor?
13    A.  No. I didn't see a doctor.
14    Q.  Were you --
15    A.  Because in Georgia you don't just go see a
16  doctor unless you got Medicare or some money. You sit
17  there for days. I have done it.
18    Q.  You weren't seeing a doctor, right?
19    A.  No. I went to Social Security. They sent
20  me to a psychiatrist. You all just know what the
21  answer to that would be. They ain't going to say
22  something wrong with you. They don't want to give you
23  no Social Security.
24    Q.  Is it your testimony that you don't answer
25  questions accurately or truthfully because you are not
```

Page 42

1  in the right state of mind?
2    A.  Well, I mean, if I am in the right state of
3  mind, I would have answered truthfully.  I'm not
4  saying I was lying here.  I am only stating that I
5  wasn't myself after that storm for quite some time.
6  That is what I am saying.
7    Q.  But does that mean that you don't tell the
8  truth?
9    A.  No.  That don't mean that.  I just said what
10 it mean or what I meant.
11   Q.  The first time you saw the barge, it was in
12 the neighborhood on Jourdan Avenue in the position
13 that we see it in the photograph basically?
14   A.  No.
15   Q.  Where was it when you say you saw it?
16   A.  It was in the canal, not the neighborhood
17 side but in the canal where they go up and down all
18 the time.
19   Q.  This is when you were already on the roof?
20   A.  When I come up out the hole.
21   Q.  That is when the neighborhood was already
22 flooded?
23   A.  No.  The water -- actually, they had water
24 there but it really rised (sic) after that third boom
25 and the house drifted off.

Page 43

1    Q.  Why would you be on the roof if the
2  neighborhood wasn't flooded?
3    A.  Okay.  We going to go through this step by
4  step.  When I got up that morning, I opened my door.
5  I seen water out there.  I was going to see why was
6  the generator out.  I did not go out there.  The water
7  up to my seal of the door coming in.  We knew there
8  was a storm.  It floods often when they supposed to
9  have a storm or we got some heavy rain and they don't
10 open the sewer lines, we get floods.  I'm not saying
11 that is the reason I went up.  I seen the water.  I
12 had that feeling it was time to go up.  For some
13 reason what made we go up, I don't know.  I know it
14 was a storm coming.  Yes, I was aware of that.  We
15 wasn't taking any chances.  So we went in the attic to
16 make a hole in the roof.
17   Q.  How long did it take you to make a hole in
18 the roof?
19   A.  Maybe 15, 20 minutes.  Maybe a half an hour.
20 I didn't have a watch on to time myself for all of
21 this.
22   Q.  What hour of the night or morning was it?
23   A.  It was between 2:00 and 3:00, something like
24 this when we went up.
25   Q.  So sometime after --

Page 44

1    A.  Only an estimate.
2    Q.  So some time after 3:00, you made a hole in
3  the roof and went out on the roof?
4    A.  Yeah.
5    Q.  And it is your testimony today, that at that
6  time, you saw a barge in the canal?
7    A.  After the second boom, I seen the barge.
8  First boom heard, I was coming up out the hole.  I got
9  on the roof.  I looked over.  I seen the barge.  The
10 second time it hit was right at that wall and the
11 third time I heard noise.
12   Q.  Was that down by Claiborne Avenue that you
13 saw this?
14   A.  No --
15   Q.  Where?
16   A.  -- it wasn't Claiborne Avenue.  It was
17 between Derbigny and Roman.
18   Q.  Close to where the barge ended up in the
19 neighborhood?
20   A.  Close to that area.
21   Q.  Not up by Florida Avenue?
22   A.  No.
23   Q.  So you heard a boom; went through the roof;
24 you saw the barge at the time of the second boom; then
25 you heard a third boom?

Page 45

1    A.  Yeah.
2    Q.  When you heard the second boom, the barge
3  was still in the canal?
4    A.  Yeah.
5    Q.  Could you see the water coming over the
6  flood wall?
7    A.  No.
8    Q.  Was it splashing over?
9    A.  It could have been.
10   Q.  Do you remember seeing that?
11   A.  No.  I don't remember it.
12   Q.  Do you remember seeing it spill over?
13   A.  No.  Only thing I remember seeing is the
14 barge hitting the wall.
15   Q.  Have you seen news clippings from Hurricane
16 Gustav just a couple of months ago?
17   A.  No.  I seen it on the news where the water
18 was like pouring over the wall.
19   Q.  You have seen those?
20   A.  I have seen that.
21   Q.  Did you see anything like that that night?
22   A.  I can't say.  I can't say if I seen that.
23   Q.  Does that mean no, you --
24   A.  That means no.
25   Q.  That means, no, you didn't see it or you

Page 46

1  don't remember, or you are not sure?
2      A.  I don't remember seeing it.
3      Q.  So that means that maybe it happened.  You
4  just don't remember?
5      A.  Exactly.
6      Q.  Do you agree that there were two or three
7  feet of water already in the neighborhood at that
8  time?
9      A.  Yeah.  I agree to that.
10     Q.  Do you know where that water came from?
11     A.  No, sir.
12     Q.  Was it more than three or four feet?
13     A.  It could have been.
14     Q.  So when you made it up to the roof, by that
15 time, you were able to see three or four feet or maybe
16 more of water in the neighborhood and then you started
17 hearing these booms?
18     A.  No.  I heard the boom when I was coming up
19 out through the hole, the first boom.  I was already
20 like halfway out the hole.  When I got on the roof,
21 there was another boom, and then another one.  That is
22 when the water just instantly rised up.
23     Q.  Before it did this instant rising up, there
24 were three or four feet of water and you are not sure
25 where that had come from?

Page 47

1      A.  No.
2      Q.  That is correct?
3      A.  That is correct.
4      Q.  You work for Pacorini as a longshoreman,
5  right?
6      A.  Yes, sir.
7      Q.  You have been around barges all of your
8  life?
9      A.  Yes, sir.  Not all my life.
10     Q.  A long time?
11     A.  Uh-huh (affirmative response.)
12     Q.  You know what an empty barge looks like,
13 right?
14     A.  Yes, sir.
15     Q.  You know what a loaded barge looks like?
16     A.  Yes, sir.
17     Q.  This barge that you saw in the canal, was it
18 loaded or empty?
19     A.  I couldn't determine that.  I couldn't
20 determine that.  It was on the other side of the wall.
21 I didn't get to see that much of the barge.  That is
22 something I couldn't determine whether it was loaded
23 or empty.  I still don't know today if they had
24 something in it or not.
25     Q.  Do you know if it was a barge?

Page 48

1      A.  I know it was a barge.
2      Q.  How do you know it was a barge?
3      A.  Because I know what a barge looks like.
4      Q.  You are telling me you couldn't tell if it
5  was empty or loaded?
6      A.  No, sir.
7      Q.  How much of a barge did you see?
8      A.  I seen the top of it.
9      Q.  When you say "the top," what are you talking
10 about?
11     A.  You got covers and I could see that barge
12 hitting that wall.  I could see those covers.
13     Q.  You could see the covers?
14     A.  Uh-huh (affirmative response.)
15     Q.  Everything else was below the level of the
16 wall?
17     A.  Right.
18     Q.  If you look at the photograph that we have
19 marked as Exhibit --
20         MR. WIEDEMANN:
21         Two.
22 BY MR. WALKER:
23     Q.  -- 2, I will show you one that is a little
24 better.
25         MR. WALKER:

Page 49

1         Let's mark that as Exhibit 4.
2         (Exhibit 4 is marked for
3         identification.)
4         THE WITNESS:
5         (Views documents.)
6         MR. WIEDEMANN:
7         (Views documents.)
8  BY MR. WALKER:
9      Q.  You see the barge there a little bigger;
10 those red things are the covers, right?
11     A.  Yeah.  I see the barge.
12     Q.  Those red things on top are the covers,
13 right?
14     A.  Red things on top are the covers?
15     Q.  This red thing is the cover, right?
16     A.  It is not red.
17     Q.  What color is it?
18     A.  Well, I guess it is like a clearish looking
19 color; like Fiberglas.
20     Q.  Does this barge in Photograph 4 have covers
21 on it?
22     A.  Yeah.
23     Q.  Those are the covers you saw that night of
24 the hurricane?
25     A.  It has covers.  There seem to be covers on

```
                                             Page 50
 1  here.  It is hard to tell from this picture but that
 2  barge had covers on it.
 3      Q.  That is what you could see?
 4      A.  Uh-huh (affirmative response.)
 5      Q.  You couldn't see whether it had a raised bow
 6  or square bow.  You couldn't see the bow at all, could
 7  you?
 8      A.  No.
 9      Q.  That was all below the level of the wall?
10      A.  Yes, sir.
11      Q.  You couldn't see any company name, emblem,
12  number, designation?  That was all below too?
13      A.  Yes, sir.
14      Q.  In your experience on the river, you have
15  seen and heard barges hit docks and wharfs and ships
16  and each other, haven't you?
17      A.  I have seen them.
18      Q.  You have heard them too, right?
19      A.  Yeah.
20      Q.  You know what they sound like hitting each
21  other, hitting docks and wharfs, right?
22      A.  Uh-huh (affirmative response.)
23      Q.  That noise you heard -- those booms you
24  heard that night didn't sound like a barge hitting
25  anything, did it?
```

```
                                             Page 51
 1      A.  Not at the time.  The booms I heard, I mean,
 2  it actually sounded like dynamite, you know, but, I
 3  mean, I am not saying that they blew it.  I'm not
 4  saying that the barge broke the wall.  I seen the
 5  barge hitting the wall.
 6      Q.  Then you saw at some point -- did you see
 7  the wall collapse?
 8      A.  No.
 9      Q.  Did you see the water rush through?
10      A.  No.  I didn't see that.
11      Q.  All you can say is that you heard some booms
12  and then the water rushed up very quickly?
13      A.  I heard some booms.  I seen the barge up
14  against that wall hitting that wall.  After the third
15  boom, the wall -- I mean, the water rised real fast.
16  That is what I am saying.
17      Q.  But in your experience, those booms that you
18  heard sounded more like dynamite, not what you have
19  ever heard of a barge sounds like hitting a dock or
20  wharf or anything like that?
21      A.  That is what it sounded like to me.
22      Q.  Like dynamite?
23      A.  Uh-huh (affirmative response.)
24      Q.  Now, let's go to page 29 of your interview.
25  Do you remember telling the investigator that the
```

```
                                             Page 52
 1  barge floated over the levee?
 2      A.  No.  I don't remember telling him that.
 3      Q.  Look at the last entry of the page that
 4  says, "I think we would have seen it."  This is you
 5  talking.  "I think we would have seen it, but I think
 6  that barge would have floated over that wall.
 7  It didn't -- I don't bel -- I truly honestly believe,
 8  man, that barge did not break that wall.  If it would
 9  have, then, you know, it would have broke the wall
10  be -- be -- after the water got -- before the water
11  got so high.  An empty barge gonna rise with the water
12  mean, a loaded barge gonna sink, you know.  'Cause I
13  load barges.  They sink in water.  They don't float
14  up."  Do you remember telling him this?
15      A.  No.  No.
16      Q.  You don't remember telling him that you
17  believed that the barge simply floated into the
18  neighborhood --
19      A.  No.
20      Q.  -- after the --
21      A.  I couldn't determine what a barge would do.
22  I mean, I'm not saying I didn't say this.  I don't
23  remember saying it.
24      Q.  Do you disagree with that today as you sit
25  here today?  You told me all you saw was the barge hit
```

```
                                             Page 53
 1  the wall.  Then you heard this boom.  The barge could
 2  have floated through after the wall broke, right?
 3      A.  Could have.
 4      Q.  It doesn't mean it broke the wall?
 5      A.  It doesn't mean it broke it.  I'm not saying
 6  it did.
 7      Q.  I understand.  If you look at page 30 in the
 8  middle, right in the middle it says RG, that is
 9  Mr. Garcia, "So you think that levee had broken
10  beforehand possibly?"  Then you say, "Uh, yep."
11  Mr. Garcia says, "Possibly from the dynamite or
12  explosion?"  You say, "Explosion, yeah, broke that
13  wall."  Mr. Garcia then says, "And then the -- and
14  then the" -- you say, "They put that barge there for
15  an excuse or reason.  They say the barge did it, you
16  know."  Do you remember telling him that?
17      A.  No.  I don't remember that.
18      Q.  But that is what it sounded like; some kind
19  of explosion --
20      A.  Yeah.  It did.
21      Q.  -- so it makes sense you would have told
22  him?
23      A.  Like I said, I could have told him that.  I
24  could have told him that.
25      Q.  But as you sit here --
```

Page 54

1  A.  I don't remember.
2  Q.  As you sit here today if I understand your
3  testimony, your best memory is it sounded like an
4  explosion?
5  A.  Exactly.
6  Q.  It makes sense that you told him that back
7  then that is what it sounded like, right?
8  A.  That is what it sounded like.
9     MR. WALKER:
10    Let's take a five-minute break.
11       (The deposition was then recessed.)
12    MR. WALKER:
13    Back on.
14 BY MR. WALKER:
15  Q.  I am almost done, Mr. Williams.  One thing
16 I'm not clear about based on weather reports and the
17 time that the hurricane came through and things like
18 that is something you said about you went up to the
19 roof, I think, around 4:00 is when you first went out?
20  A.  No.  It was when I first -- when we first
21 got up, it was between and 2:00 and 3:00.  So it
22 wasn't much longer after I opened the door.
23  Q.  That is what I am a little confused.  When
24 you went out to the roof, you said you heard the
25 barge?

Page 55

1  A.  Yeah.
2  Q.  Then you saw it, you said you could see the
3 covers?
4  A.  Uh-huh (affirmative response.)
5  Q.  If you look at our maps and our photographs,
6 you are looking at three or four blocks of distance.
7 I assume there had been some light, some daylight
8 breaking for you to be able to see --
9  A.  To see the barge hit?
10  Q.  Right.
11  A.  Well, I mean, the sky was like unusual, you
12 know.  I mean, it was enough light for me to see that.
13  Q.  That is what I was thinking.
14  A.  It was enough light for me to see that.
15  Q.  For you to see it, it must have been closer
16 to 5:30, 6:00, 6:30?
17  A.  Could have been.  I know I'm not accurate on
18 time.
19  Q.  Makes more sense --
20  A.  I am guessing on the time.
21  Q.  That is why I am trying to walk this through
22 with you.  If you think in terms of what you were
23 seeing and how you could see it for you to be able to
24 see it, there had to be some kind of light.  The time
25 probably has to be somewhere 6:00 --

Page 56

1  A.  It could have been.  It could have been.
2 There was a little light for me to see that.  Then
3 I -- I am used to seeing barges because we be -- when
4 we would work on the river, we out there at night, you
5 know.  I couldn't tell you, you know, about the time.
6 I know I seen -- I know for a fact I seen.  It could
7 have been dawn, you know.
8  Q.  That is what I was thinking.  I didn't want
9 to pin you down to the time but rather what it looked
10 like.  So we don't have to say 6:00, 5:00, 4:00, dawn;
11 it was already light.  That makes more sense, doesn't
12 it, as to when you would have seen this?
13  A.  Yeah.
14    MR. WALKER:
15    I would like to attach a copy of
16 Mr. Williams' interview of March 20th, 2006, to
17 the deposition --
18    MR. WIEDEMANN:
19    That is 5.
20    MR. WALKER:
21    -- as Exhibit 5.  Thank you.  Those are all
22 of the questions I have.  The other attorneys
23 have an opportunity to ask questions.
24       (Exhibit 5 is marked for
25       identification.)

Page 57

1       (The proceedings were concluded.)

Page 58

1          WITNESS' CERTIFICATE
2
3    I, SIDNEY WILLIAMS, read or have had the
4 foregoing testimony read to me and hereby certify that
5 it is a true and correct transcription of my
6 testimony, with the exception of any attached
7 corrections or changes.
8
9
10
11         _____
12              (Witness' Signature)
13
14 Witness: Please sign above and initial appropriate
15 space below.
16
17
18 ----- Signed with corrections as noted.
19 ----- Signed with no corrections noted.
20
21 DATE TAKEN: 10/9/2008
22
23
24
25

Page 59

1          REPORTER'S CERTIFICATE
2
3    I, CERI-ANNE WEBSTER, Certified Court Reporter,
4 do hereby certify that the above-named witness, after
5 having been first duly sworn by me to testify to the
6 truth, did testify as hereinabove set forth;
7    That the testimony was reported by me in
8 shorthand and transcribed under my personal direction
9 and supervision, and is a true and correct transcript,
10 to the best of my ability and understanding;
11    That I am not of counsel, not related to counsel
12 or the parties hereto, and not in any way interested
13 in the outcome of this matter.
14
15
16
17
18
19
20
21
22
23 _____
24 CERI-ANNE WEBSTER(NO. 20004)
25 CERTIFIED COURT REPORTER