# EXHIBIT 37

Report of Robert Bartlett

June 27, 2008

Mr. Lawrence D. Wiedemann
Wiedemann & Wiedemann
Attorneys and Counsellors at Law
821 Baronne Street
New Orleans, LA 70113

      Subject:   **Evaluation of IHNC Floodwall, Eastbank Breaches**
                   **BARTLETT** Project No. 1046

Dear Mr. Wiedemann;

We have completed our evaluation of the IHNC floodwall and ING4727 barge.

---

## BACKGROUND INFORMATION

---

Background information was provided through numerous conversations with Mr. Hector Pazos, Ray Helmer and during several inspections of the barge and floodwall as well as through review of the following documents which are listed with their corresponding document control number (DCN):

June 27, 2008
**Wiedemann & Wiedemann**
Page 2

| DCN | Description |
|-----|-------------|
| 1 | Deposition of Mr. William Villavasso dated December 18, 2007 with exhibits, |
| 2 | US Army Corps of Engineers - Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System - (IPET Report, with technical appendices), |
| 3 | As-Built Drawing, I.H.N.C. East and West Levee and Citrus Back Levee Capping Floodwall, 1983, |
| 4 | "The Failure of the New Orleans Levee System during Hurricane Katrina," Team Louisiana Report, |
| 5 | "Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005," Final Report, July 31, 2006, by Independent Levee Investigation Team, |
| 6 | Photographs and various information from New Orleans Hurricane Protection Projects Data website (HTTPS://IPET.WES.ARMY.MIL/), |
| 7 | Documents produced by LaFarge, North America (Bates Numbers LNA001066–LNA001390), |
| 8 | Declaration of Dr. Robert Glenn Bea, dated April 16, 2006, |
| 9 | Photos taken by Mr. Hector Pazos of Ocean-Oil Expert Witness, Inc., |
| 10 | Various photographs of barge ING4727 and IHNC Levee Breaches produced by Mr. Ashton O'Dwyer and Mr. Lawrence Wiedemann, |
| 11 | Photographs taken by Getty Images, Inc., |
| 12 | Photographs taken by Attorney Robert Evans, |
| 13 | Photographs produced by Ingram Barge Co. |

Hurricane Katrina made landfall on the morning of August 29, 2005 as a category 3 storm. The resulting wind and storm surge caused numerous levee breaches throughout the Greater New Orleans area. After the passage of the storm, it was discovered that a hopper barge had traversed the eastern floodwall of the Inner Harbor Navigation Canal (IHNC, also known as the Industrial Canal), between the N. Claiborne Avenue bridge and the Florida Avenue bridge. After the water subsided, the barge was resting approximately at the intersection of Jourdan Avenue and N. Roman St. in the 9th Ward neighborhood of New Orleans. During Hurricane Rita, new flood water re-floated the barge, but it remained in the same neighborhood.

June 27, 2008
**Wiedemann & Wiedemann**
Page 3

There were two distinct breaches in the eastern floodwall between these two bridges. The northern breach was near the Florida Avenue bridge and was approximately 180 feet wide (IPET Volume IV, Appendix 9, Page IV-9-12). The southern breach was approximately 793 feet wide (IPET Volume IV, Appendix 9, page IV-9-13). It is believed that the barge entered the 9th Ward through the southern breach (ILIT Report, Figure 6.20, page 6-36). The IHNC runs in a general north-south direction, connecting the Mississippi river to Lake Ponchartrain and the Intercoastal Waterway.

Mr. William Villavasso was the chief operator of Pumping Station No. 5 in August of 2005. Pumping Station No. 5 is approximately located at Florida Blvd. and the Industrial Canal, near where the north breach of the eastern floodwall occurred. Mr. Villavasso was on duty at the station when Katrina struck, and has been deposed on his observations during Katrina. In his deposition he states:

> [page 64] "...I am watching the water, it's getting more intense splashing over the wall. Then I heard like an explosion. Boom. And I heard the explosion, I said what – what could that be? I am still looking in that direction. And then I seen the levee wall partially – sections, it's – The levee walls are like in sections. I saw it tumble over (indicating). A couple of sections looked like they tumbled over. And I am looking real good, I am squinting my eyes because it's raining, too. Imagine it was still dark, but I could see that. Because it looked like a mouth with a tooth out. That's what went through my mind. And then I seen what appear to be metal structure like a barge, only the tip of it. Couldn't tell you I seen a whole barge, because I didn't. I – That's what I seen."

> [page 68] "After I seen that wall break, I seen massive amounts of water pouring through the wall, which [sic] a lot of street flooding. I mean, the water was really coming through. Water elevations start coming up real high. My first response was to run in the station, call Central Control and tell them to drop out the power, because we have high voltage, 6,600 volts going through that station, and we have what you call motor pits. And when water gets in there, that's it for us. We could get electrocuted to death. So I'd told them to drop us out."

During the Villavaso deposition, [p. 148] Mr. Treeby reported that the Central Station log book indicates that the call from Station No. 5 to shut off the power came at 6:10 AM on the morning of August 29, 2005 (the log book for Station 5 was lost in the resulting flood, according to the Villavasso deposition).

June 27, 2008
**Wiedemann & Wiedemann**
Page 4

The hopper barge, ING4727, which was owned by Ingram Barge Company, was docked at the LaFarge North America Terminal prior to and at the time that Hurricane Katrina made landfall on August 29, 2005. The LaFarge terminal is located at 2315 France Street, which is on the west side of the IHNC near the Florida Avenue bridge (USCG MISLE Incident Investigation Activity Number 2516389).

Wiedemann & Wiedemann, Attorneys and Counsellors at Law and Brian Gilbert Law desired a review of our observations of this barge, and the other evidence listed above for the purpose of evaluating the involvement of this barge in these particular floodwall failures.

---

| OBSERVATIONS |
| --- |

**As-Built Drawings of Floodwall**

An as-built drawing of the floodwall provided by the U.S. Army Corps. of Engineers (Dwg. H-4-25157) is included as Appendix A. The two details from this drawing which apply to the subject section of the IHNC floodwall are shown on the referenced drawing as "Typical Wall Section" and "Section A-A". These details were re-drawn by Bartlett Engineering and attached to this report as Appendix B, drawings 1046_01_-1 and 1046_02_-0. The "Typical Wall Section" detail shows that the vertical reinforcing bars (rebars) were No. 6 (i.e. - 3/4" diameter), and passed through holes in the upper end of the sheet piling. The "Typical Wall Section" detail also states that the sheet piling was Z 27. The "Section A-A" detail prescribes that the holes through which the vertical rebars were passed were on 9 inch centers.

**North Breach**

The north breach of the eastern floodwall was located in the vicinity of the Florida Avenue bridge and New Orleans Sewerage and Water Board Pumping Station No. 5 (Figure 1). The northern end of the sheet pile floodwall appears to have separated at one of the watertight joints in the concrete (Figure 2). Pumping Station No. 5 can been seen in the background of this figure. This end of the sheet pile wall was displaced some distance from its normal location and appears to have rotated approximately 270 degrees (Figure 3, arrow 1). At the southern end of the north breach, the sheet pilings were still interlocked with the intact wall (Figure 3, arrow 2).

**Southern End of South Breach**

The barge came to rest on the protected side of the floodwall near the southern end of the south breach (Figure 4, background). A portion of the floodwall in this area is partially leaning towards the protected side of the levee (Figure 4). At the southern end of the south breach, approximately 3 feet of the upper portion of the concrete floodwall separated from the lower portion (Figure 4, arrow 1). The concrete below this fracture has cracks, but the concrete pieces do not appear to have

June 27, 2008
**Wiedemann & Wiedemann**
Page 5

separated from the sheet pile (Figure 4, arrow 2). The horizontal fracture extends several feet past a vertical watertight joint in the concrete cap of the floodwall (Figure 4, arrow 3). This horizontal fracture is also aligned with a construction joint chamfer in the floodwall (Figure 4, arrow 4) that is at the location identified as a construction joint in the "Typical Wall Section" of USACE Dwg. H-4-25157. This location coincides with the location where the wall transitions between the upper tapered portion of the wall and the lower rectangular section (Figure 5).

The vertical rebar projecting from the fractured concrete floodwall were deformed from their original straight shape. Many of the vertical rebars were sharply bent at the location where they exited the concrete fracture surface (Figure 6, arrow, and Figure 7, arrow 1). By scaling objects in the photos, the curved lengths of some of the tightly bent rebars were observed to be approximately 2 to 3 inches. Their bend angle was uniform; and their bend radius was uniform, small and sharply bent towards the protected side of the floodwall.

The fracture of the wall exposed the smaller horizontal reinforcing bars (Figure 5, arrow and Figure 7, arrow 2). These small horizontal bars were observed to have similar bends where they exited the concrete as was observed with the vertical bars. Both the vertical and horizontal rebars are visible in Figure 7. Also visible in Figure 7 are the location tops of the sheet pilings with respect to the fracture surface (arrow 3). A portion of the horizontal fracture surface was observed to be smooth, horizontal and flat in Figure 7.

The outline of the fracture where the fracture transitioned from horizontal to vertical has a somewhat rounded corner as observed in Figure 7 and Figure 4.

### Barge Observations

The barge was salvaged using a mutually agreed upon protocol. The barge was lifted in place using air bags so the bottom of the hull could be examined before salvaging. The barge was then cut into smaller sections and placed in a covered warehouse in the inverted position so the bottom could be more thoroughly observed. The bottom of the barge had scratches on its under side (Figures 8, 9, and 10). Some of these scratches were at the top of the turn of the bilge (Figure 9, arrow). Most of the scratches were somewhat uniformly spaced approximately 8 to 10 inches apart. Some larger spaces up to 16 inches were also observed. In Figure 11, six scratches (5 spaces) are observed over a distance of 40 inches. Some of the observed scratches extended three fourths of the length of the barge. The scratches were not perfectly straight, but rather, had a slight curve or arc as they extended across the bottom of the barge (Figure 10, arrow).

June 27, 2008
**Wiedemann & Wiedemann**
Page 6

| DISCUSSION |
| --- |

The southern end of the south breach has a partially upright portion of the floodwall with uniformly bent reinforcing bars exposed as seen in Figures 5, 6, and 7. Because these bars were evenly bent at a sharp angle towards the protected side of the floodwall, this indicates that they were likely bent over by a large, flat object.

In order to determine the loads necessary to cause the observed deformation of the rebar, the concepts of the "yield moment" and a "plastic hinge" were used. The "yield moment" is that bending moment which causes only the outer fibers of a member to begin to "yield." The "plastic moment" is that bending moment which causes permanent stretching of the entire cross section of the member. When a bar is bent to a radius that is only several times its diameter, it is nearly a plastic hinge. For the purpose of this "plastic hinge" evaluation, these rebars can be considered to be 3/4 inch diameter non-work hardening material with a yield strength of 36000 psi. For such a round bar the ratio of the plastic moment to the yield moment has been mathematically determined to be 1.7 (i.e. - the plastic moment is 1.7 times the yield moment). [Ref: "Roark's Formulas for Stress and Strain." Roark & Young, 6th Ed., P. 66]. Since the moment due to an applied load increases linearly with distance from the load, and because of this relationship between yield moment and plastic moment, the distance from the plastic hinge to the point where load was applied was determined to be 2.4 times the distance from the plastic hinge to the point on the rod where the permanent bend ends. By determining the location of the applied load and knowing the moment required to cause a "plastic hinge" the force required to create the observed bend can be calculated. For the condition where the distance from the start of the bend to the point where the bar is straight (i.e. - not permanently bent) is between 2 and 3 inches as cited above, the force required to bend the bars as observed would be 520 and 350 lbs., respectively.

For comparison, the maximum hydrostatic force on the top three feet of a 9 inch long flood wall section which has water to the top of the flood wall would be 212 lbs. If the construction joint at that elevation had zero strength so that this horizontal force were resisted only by the two vertical rebars in that 9 inch section (one flood side and one protected side rebar) the force per rebar would be 106 lbs. per rebar. The available hydrostatic force alone is, therefore, insufficient to cause the observed bending of the rebar.

The flat surface of the concrete fracture plane seems to be at the location of the construction joint identified on the USACE as-built drawings (Figure 4, arrow 1). This construction joint was 3 ft. below the top of the wall. This would indicate that the wall was struck within 36 inches of the top of the wall. The smoothness of the horizontal fracture surface in Figure 7 likely indicates that the upper tapered portion of the wall was constructed after the lower section. The fact that the wall fractured at this location demonstrates that when the impact occurred, the wall foundation had sufficient strength to resist the force required to cause the fracture, rather than fall over.

June 27, 2008
**Wiedemann & Wiedemann**
Page 7

The horizontal bars that were also bent at the southern-most edge of the fracture indicate that the cause of the fracture of the wall at this location had a shape that extended vertically up at least to the top of the floodwall (Figures 4, 5, and 7). The shape of the striking object is further identified by the fact that the fractured area extended across the vertical watertight joint as shown in Figure 4, arrow 3. A fracture in one wall panel would not be expected to continue across a vertical joint into the next wall panel unless the cause of the fracture also transcended the vertical joint. Crack propagation would be expected to either halt or become offset at the joint. An example of a cause that would transcend the vertical joint would be the turn of the bilge of a barge as it strikes these two adjacent wall panels.

The unique contour of the fracture in the southern corner of the fractured area (Figure 7) has a profile similar to the bottom corner of a barge. The non-straight fracture in the panel at the south end of the south break provides information about the loading that caused this fracture. Considering that the concrete in the area of this curved fracture has similar properties in all directions, then fractures will tend to form and grow along the plane of greatest tensile stress. Hydrostatic loading on the floodwall would not cause a "plane of greatest tensile stress" which had the shape of the observed fracture. The concave curved fracture shape indicates that the fracture was caused by contact with a foreign object.

The scratches on the bottom of the barge are spaced at intervals that agree with the 9 inch design spacing of the vertical rebars in one face of the floodwall, (as described in the "as built"drawings of the floodwall) assuming the barge traveled in a somewhat straight path through the wall at a slight angle off perpendicular to the live of the wall. Some of the scratches on the bottom of the barge extended approximately three-fourths the length of the barge.

The reason the barge did not travel through the floodwall at the north breach could be related to the water depth at the time of impact. According to eye-witness testimony, at the time of the barge impact at the north breach (early AM of August 29, 2005), water was not yet continuously overtopping the floodwall. If the barge impacted lower on the floodwall, the toughness of the sheetpile reinforced portion of the wall, would have reduced the likelihood that a barge strike would be able to make a large clean penetration.

Testimony also indicated that the "corner" of the barge impacted the floodwall at the north breach area. This would mean that the force of the barge impact would have been absorbed by a narrower portion of the wall, and therefore damaged a smaller section of the wall causing it to look like "...a mouth with a tooth out" as described by Mr. Villavasso.

June 27, 2008
**Wiedemann & Wiedemann**
Page 8

---

| **CONCLUSIONS** |
| --- |

Hydrostatic pressure alone would be insufficient to cause the fracture features and rebar deformations observed at the south end of the south breach of the IHNC 4727 east floodwall.

The locations of the scratches on the bottom of the ING 4727 are consistent with the spacing of the exposed, bent vertical rebars at the south end of the south breach of the IHNC east floodwall.

The features of the damage at the south end of the south breach of the IHNC east floodwall are indicative of damage being caused by contact from the ING 4727.

The cited information is compelling evidence that the damage to the south end of the south breach of the IHNC east floodwall was due, more likely than not, to an impact by the ING 4727.

The evidence demonstrating that the ING 4727 created a breach at the south end of the IHNC east floodwall confirms the plausibility of the testimony by Mr. Villavaso that he observed a barge create the initial damage to the north breach of the IHNC east floodwall.

---

| **CLOSING** |
| --- |

We respectfully request to reserve the right to review our findings and conclusions should new information become available.


Sincerely,
**BARTLETT ENGINEERING**



 Robert D. Bartlett, P.E.
Principal Engineer

wi1046_bodyq-ber.wpd

Evaluation IHNC Floodwall
**Wiedemann & Wiedemann**
BARTLETT Project No. 1046



Figure 1

Reference:
Taken from IPET Report, Volume V, Figure 14-29, Page V-14-32

Evaluation IHNC Floodwall
**Wiedemann & Wiedemann**
BARTLETT Project No. 1046



Figure 2

Reference:
Taken from IPET Report, Volume V, Figure 14-32, Page V-14-35

Evaluation IHNC Floodwall
**Wiedemann & Wiedemann**
BARTLETT Project No. 1046



Figure 3   <u>Note</u>: The detached portion of the sheep pile wall was partially buried during emergency
repair work.

Reference:
Taken from ILIT Report, Figure 6.46, Page 6-58

Evaluation IHNC Floodwall
**Wiedemann & Wiedemann**
BARTLETT Project No. 1046



Figure 4

Reference:
https://ipet.wes.army.mil/Post-Katrina/Photographs/Lake Pontchartrain LA and Vicinity/
IHNC - Inner Harbor Navigation Canal/Photographs originals/IHNC-2005.10 (Oct) 06
Sills_Vroman/New Orleans_10_06 103.JPG

Evaluation IHNC Floodwall
**Wiedemann & Wiedemann**
BARTLETT Project No. 1046



Figure 5

Reference:
https://ipet.wes.army.mil/Post-Katrina/Photographs/Lake Pontchartrain LA and Vicinity/
IHNC - Inner Harbor Navigation Canal/Photographs originals/IHNC-2005.10 (Oct) 06
Sills_Vroman/New Orleans_10_06 102.JPG

Evaluation IHNC Floodwall
**Wiedemann & Wiedemann**
BARTLETT Project No. 1046



Figure 6

Referenced:
Provided by Mr. Ashton O'Dwyer

Evaluation IHNC Floodwall
**Wiedemann & Wiedemann**
BARTLETT Project No. 1046



Figure 7

Reference:
https://ipet.wes.army.mil/Post-Katrina/Photographs/LakePontchartrainLAand
Vicinity/9th Ward/Photographs originals/2005.10 (Oct) 04/P1010042.JPG

Evaluation IHNC Floodwall
**Wiedemann & Wiedemann**
BARTLETT Project No. 1046



Figure 8

Reference:
Photo courtesy of Hector Pazos.

Evaluation IHNC Floodwall
**Wiedemann & Wiedemann**
BARTLETT Project No. 1046



Figure 9

Reference:
Photo courtesy of Hector Pazos.

Evaluation IHNC Floodwall
**Wiedemann & Wiedemann**
BARTLETT Project No. 1046



Figure 10

Reference:
Photo courtesy of Hector Pazos.

Evaluation IHNC Floodwall
**Wiedemann & Wiedemann**
BARTLETT Project No. 1046



Figure 11

Reference:
"Bates No. LNA001110", furnished by Lafarge, North America.





Appendix A





Appendix B



PROTECTED SIDE

FLOOD SIDE

EL. 15.0

6"

#4

Note: spacing of vertical rein-
forcing shall be curved at the
existing utility crossings to miss
the utility. the number of vertical
reinforcing bars shall not be re-
duced.

EL. 12.0    C.J.

#4 spaced to pass
thru same hole as
#6 on floodside.

Top of existing
sheet piling EL. 11.5±

#4,18" pass thru
handling holes in
sheet piling.

Levee Crown EL. 9.0

#6 spaced to pass thru
holes in existing sheet pilings.

C.J. El. 8.5 or 9.0
See note

Note: The wall may be constructed using
one of the two const jts shown.
One of the jts may be deleted at
the contractor's option. If the top
C.J. is not used — the concrete
shall not be installed above EL 12.0 until
all concrete below EL 12.0 is placed.
The bottom joint may be located
anywhere from El 8.5 to El 9.0
If m——— jts is deleted the conns.
shall be chamfered to have a dummy joint.

EL. 7.0

Burn hole in existing sheet
piling, see sketch.

—12"—|—12"—

¢ Existing Z 27 sheet piling

—2'-0"—

## TYPICAL WALL SECTION
## STA 1—61S TO 56+18±
### Scale: 3/4"=1'-0"

| Bartlett ENGINEERING 2617 EDENBORN AVE., SUITE D METAIRIE, LA 70002-7047 | GILBERT / WIEDEMANN | DWG. No. 1046_01_-1 |
|---|---|---|
| | IHNC FLOODWALL & ING 4727 BARGE | Rev. DATE 6/25/08 |
| | REDRAW OF DWG. H-4-25157 Det. | RRB 6/27/08 |



Top of existing sheet piling. approx El 11.5±

₵ Interlock

₵ 2"⌀ holes to pass reinforcing steel thru existing steel piling

A

El 7'4±"  A

9"  9"

4½"  4½"

4½"

Note: Elevation of holes vary from Sta 1+72S to Sta 1+61S.

## ELEVATION



2"⌀ hole

₵Interlock

## SECTION A—A
## DETAIL OF HOLES TO BE
## BURNED IN EXISTING SHEET PILING
Scale: 1"=1'-0"

| Bartlett ENGINEERING 2617 EDENBORN AVE., SUITE D METAIRIE, LA 70002-7047 | GILBERT / WIEDEMANN | DWG. No. 1046_02_-0 |
|---|---|---|
| | IHNC FLOODWALL & ING 4727 BARGE | Rev. DATE  06/25/2008  RPB 6/27/08 |
| | REDRAW OF DWG. H-4-25157 Det. | |



Appendix C



**ROBERT D. BARTLETT, P.E.**
**METALLURGICAL ENGINEER**
**NEW ORLEANS, LOUISIANA**

**EDUCATION**          M.S. Metallurgical Engineering
                       The Ohio State University, Columbus, Ohio

                       B.S. Mechanical Engineering
                       Tulane University, New Orleans, Louisiana

**PROFESSIONAL**       American Society of Mechanical Engineers
**MEMBERSHIPS**        ASM International
                       American Welding Society
                       National Association of Corrosion Engineers

**PROFESSIONAL**       Registered Professional Metallurgical and Mechanical Engineer in
**REGISTRATION**       Louisiana   Registration No. 23491
                       Registered Professional Mechanical and Metallurgical Engineer in Florida
                       Registration No. PE 0048018

## CAREER SUMMARY

Mr. Bartlett has provided metallurgical, mechanical and welding engineering services to the marine, petrochemical and power industry since February of 1990.  As principal engineer for Bartlett Engineering, Mr. Bartlett has followed his belief that failure analysis requires the evaluation of the whole system.  His metallurgical engineering and equipment design experience allows a broad consideration of failure mechanisms.  His equipment designs also benefit from his widespread experience studying equipment failures.

Prior to this, as co-owner of a welding and machine shop, Mr. Bartlett acquired extensive experience in the design and fabrication of ASME Code process equipment and boilers.

## STRESS ANALYSIS AND FRACTURE MECHANICS

Mr. Bartlett can ordinarily evaluate the stresses leading to failure using conventional engineer hand calculations.  When more exact results or some form of additional documentation are required, Mr. Bartlett is proficient in the use of computer modeling with finite element analysis (FEA), or prototype testing using strain gages and load cells or dynamic data acquisition equipment.

Mr. Bartlett then utilizes his understanding of fracture mechanics to evaluate stress cycle scenarios as potential failure modes.  He utilizes his fractographic experience to incorporate information contained on fracture surfaces (when they are available) into his fracture analyses.



**BARTLETT ENGINEERING**
**Page 2**

## VIBRATIONS

Mr. Bartlett has utilized computerized data acquisition and data reduction techniques to measure the severity and frequency spectrums of vibrations. He has used this information together with mathematical models to identify resonant systems, and to recommend corrective action.

## CORROSION

Mr. Bartlett has a broad base of knowledge of corrosion forms and mechanisms in aqueous and high temperature environments. His experience covers such areas as corrosion of marine vessels; process corrosion of stainless steel, high nickel alloys and other corrosion resistant materials; chloride and caustic stress corrosion cracking of austenitic stainless steels; micro biologically induced corrosion; wear assisted corrosion; cavitation assisted corrosion; and crevice corrosion. His involvement has ranged from detection and monitoring to determination of modes of attack to assisting in the selection of alternate materials, coatings, or fabrication methods. He has experience with the behavior of many alloys and non-metallic materials in various environments.

## ENGINES AND MECHANICAL EQUIPMENT

Mr. Bartlett has performed failure analyses of engines which required evaluation of turbochargers and their bearings, pistons, connecting rods, clutches, bolting, gaskets, firing and timing, lubrication and sludge accumulation. He has designed and performed failure analyses of gear and chain drive systems. He has performed gear inspections and evaluation of gear failures and tooth wear.

Mr. Bartlett has repaired and maintained centrifugal, piston, vane, gear, and variable capacity piston type hydraulic pumps. He has also performed trouble shooting repair, and modification of hydraulic systems.

## BOILERS, STEAM EQUIPMENT, AND HEAT EXCHANGERS

Mr. Bartlett has experience with the construction and care of boilers. He has diagnosed the cause of failure of boiler drums, tube sheets, tubes, and refractory; and has specified repair procedures or corrective action. He has performed performance evaluations of boilers and measured tube wall temperatures during operation. In one case, he utilized this information to modify the design of a boiler to improve its efficiency.

Mr. Bartlett has designed steam drums and a unique drum internal used in low pressure steam drums requiring 99.98% quality steam. He has also designed in-line steam separators, turbine exhaust steam surface condensers, feed water heaters with constant steam side velocity, and activated carbon absorbers. Mr. Bartlett has designed filter separators, compressor interstage knock-out pots, and in-line strainers. Mr. Bartlett also performs design and trouble shooting of steam lines with expansion joints, and steam trap systems.



**BARTLETT ENGINEERING**
**Page 3**

## FIRE CAUSE AND ORIGIN SUPPORT

Mr. Bartlett frequently provides metallurgical support regarding fire cause and origin investigations involving engines, hydrocarbon piping and equipment, pumps, motors and electrical wiring.

## BOLTED GASKETED JOINTS

Mr. Bartlett has designed and performed trouble shooting of flanged joints and quick opening closures on pressure vessel and piping. He has designed gasketless joints and joints which use O-rings, compressed fiber material, spiral wound gaskets, metal jacketed and plain metal gaskets. He has assisted boiler and vessel manufacturers with the diagnosis of flange leakage, and has utilized his experience in piping flexibility and flange design to demonstrate the validity of his theories of cause of leakage.

## WELDING METALLURGY, PROCEDURE CERTIFICATION AND TROUBLE SHOOTING

Mr. Bartlett has written welding procedures for alloyed steels, stainless and heat resisting steels, high nickel alloys, titanium, copper, aluminum, and cast iron. His welding procedures emphasize productivity, and ease of obtaining sound welds. Mr. Bartlett has diagnosed and devised creative solution to fabrication problems associated with the welding of uncommon materials used in the fabrication of process equipment. He has dealt with such problems as distortion, hot cracking, and embrittlement. He has also developed pre and post weld heat treatment sequences for alloys with high hardenability. Mr. Bartlett was certified by the American Welding Society as a Certified Welding Inspector (CWI) although he does not currently maintain his certification.

Mr. Bartlett has utilized metallographic techniques to confirm the presence of suspected hydrogen cold cracking in a weldment. He was also able to identify the source of hydrogen leading to the failure, and recommend revisions to the welding procedure to avoid reoccurrence.

## INSTRUCTIONAL COURSES AND MANUALS

Mr. Bartlett has trained draftsmen, designers, and construction associates in the practices and techniques of equipment design and construction. During his tenure as Quality Control Manager for a pressure vessel shop, he developed methods for the control and checking of revisions for multiple page drawings. He also worked on the development of a "Drafting Standards Manual," and supervised the revision of the company Quality Control Manual. He has designed layouts for advertisements and presentations, and has worked with graphic artists and typographers to develop finished proofs.



**BARTLETT ENGINEERING**
**Page 4**

Mr. Bartlett has also trained welders in machine setting and operation, and manual welding techniques. He has also developed a seminar/hands-on demonstration titled "The Physics of Welding," and a lecture titled "The Fundamentals of Fatigue and Fracture Mechanics" which he presents pro bono to local engineering students.

## DESIGN AND REPAIR OF WELD FABRICATED ITEMS

Mr. Bartlett has a strong background in the design of pressure vessels, process equipment, and machinery with particular emphasis on clad or solid alloy components that require both welding and machining. He has lofted complex shapes for large diameter piping such as reducing mitered elbows, and pipe saddles. Mr. Bartlett has analyzed large diameter piping, pressure vessel and tank shells for stresses resulting from pipeline settlement, thermal expansion, wind or seismic loads. He is familiar with the procedures of the construction industry with regard to the construction of structures and plant facilities. He has utilized this knowledge in his designs to facilitate the installation and use of process equipment.

## LIFTING EQUIPMENT AND RIGGING

Mr. Bartlett is familiar with the construction and failure modes of wire rope, crane booms, and crane pedestals. He has specified the test procedure and supervised the testing of large diameter wire rope. He has designed overhead crane components, repaired electric hoists, and managed the maintenance and repair of hydraulic cranes. He is familiar with the selection and maintenance of wire rope systems, the design of slings, lifting bridles, spreader bars, and padeyes. He has specified rigging procedures for handling and moving a variety of heavy equipment.

## NON-DESTRUCTIVE TESTING

Mr. Bartlett has been involved in a number of projects related to the non-destructive examination of metallic components. He is well versed with non-destructive techniques such as radiographic testing, magnetic particle testing, ultrasonic examination, field hardness testing, liquid penetrant testing, and halide leak testing. He has extensive experience with these processes as applied to boilers, pressure vessels, tanks, heat exchangers, gears and forgings. He is familiar with the applicable Codes and standards such as ASME Sections I, II, V, VIII, and XI, the National Board Inspection Code, API-650 and 620, and SNT-TC-1A, and selected state codes. He has performed visual inspection of pressure vessels and boilers, and has visually inspected welds of a variety of processes and materials. He is familiar with surface and subsurface welding defects, their causes and prevention.

Mr. Bartlett has inspected galvanized coatings and recommended curative procedures to improve its surface finish. He has used the Equotip Hardness tester to measure the hardness of weld heat affected zones on production welds, and to determine if the hardness of boiler tube ends were within acceptable limits for rolling.

**BARTLETT ENGINEERING**
**Page 5**



**PUBLICATION:**    R.D. Bartlett, "The Sulfidation of Zinc Oxide"
                    MS Thesis, The Ohio State  University, Columbus, Ohio, 1981.


**PRESENTATION:**   "Identifying Causes of Failures in High Speed Rotating Assemblies"
                    Gulf South Compressor Conference, Baton Rouge, LA, 1995.


**COURSES:**        (Offered through Rike Services, Inc.)
                    "Metallurgy in the Oil Field"
                    "Design of ASME VIII Pressure Vessels"
                    "Fabrication, Inspection, and Maintenance of Pressure Vessels"
                    "Failure Analysis"
                    "Welding Inspection"



Appendix D



**Trial  Testimony**
as of August 24, 2007
Robert D. Bartlett
page 1

**Bartlett Project No. 191**          **Client:   Philip T. Hagar**
Attorney for Plaintiff
Representing:  Felix J. Mix, Jr.

Felix J. Mix, Jr.                         24th Judicial Court
      vs.                        Parish of Jefferson
Green Bull Ladder, Inc. et al.        State of Louisiana
                                          No. 425-353
                                          Division "E"

- Injuries by Mr. Mix. - Retained by plaintiff's attorney.
- Deposed and testified regarding design and operation of subject ladder.
- Case decided in favor of Green Bull Ladder, Inc.

**Bartlett Project No. 352**          **Client:   King, LeBlanc & Bland, L.L.P.**
Attorney: David Bland
Representing:  Weber Marine, Inc.

Conagra, Inc. d/b/a                    Unites States District Court
Peavey Barge Lines                     Easter District of Louisiana
      vs.                        No. 92-1019
Weber Marine, Inc.                     Section A, Magistrate 4

- Peavey Barge broke away from Weber Marine mooring and struck Sunshine Bridge in Louisiana and other docks.
- Deposed and testified regarding equipment failure which led to break away.
- Judge decided faulty kevel on barge caused break away.
- Judgement for damages was approximately 60% Peavey/40% Weber.



**Trial  Testimony**
as of August 24, 2007
Robert D. Bartlett
page 2

**Bartlett Project No. 508**          **Client:   Borrello, Huber & Dubuclet**
                                       Attorney: Peter Holmes
                                       Representing:  United Parcel Service

Marlon Deciur, et al                   Civil District Court
          vs.                          Parish of Orleans
United Parcel Service                  State of Louisiana
                                       No. 97-8139
                                       Division G

-   Mr. Holmes was injured in auto accident which he attributed to contact by a UPS truck.
-   Testified regarding the nature of a smudge which was thought to be UPS brown paint.
-   Judge decided in favor of UPS accepting our results that the smudge was indeed UPS paint
    which   established the sequence of events in the accident.


**Bartlett Project No. 500**          **Client:   Electro-Coal Transfer**
                                       Attorney: Andre Mouledoux
                                       Representing: Barge CCT-169,  in  rem  and  Commercial
                                              Barge Line, LLC and Electro-Coal Transfer,
                                              in personam

     IPSCO, Inc.                       Unites States District Court
          vs.                          Eastern District of Louisiana
Barge CCT-169, in rem and              Civil Action
Commercial Barge Line, LLC             Case Number 00-2588
and Electro-Coal Transfer,
in personam

-Barge sank almost one day after being loaded at Electro-Coal.
-Reported and deposed regarding the hull fractures and corrosion observed.
-Judge decided in favor of Electro-Coal accepting our results that led to the conclusion that the barge
  was not seaworthy.



**Trial  Testimony**
as of August 24, 2007
Robert D. Bartlett
page 3

| | |
|---|---|
| **Bartlett Project No. 677** | **Client:   Murphy Rogers & Sloss** |
| | Attorney: Robert Murphy |
| | Representing:  M/V Ming Longevity, et al |
| | |
| Lawrence Keys | United States District Court |
| vs | Eastern District of Louisiana |
| M/V Ming Longevity, et al | Civil Action  No. 01-2447 |
| | Section "S" (5) |

- Mr. Keys claimed that a lash rid came loose due to its corroded condition.
- Deposed and testified regarding corrosion of galvanized coatings.
- Case decided in favor of Mr. Keys.

| | |
|---|---|
| **Bartlett Project No. 681** | **Client: Weiss & Eason, L.L.P.** |
| | Attorney: Mr.Greg Weiss |
| | Representing: HANO |
| | |
| Donna L. Rivers, et al. | Civil District Court for the Parish of Orleans |
| vs. | State of Louisiana |
| Housing Authority of | No. 99-386 c/w 99-3314 |
| New Orleans, et al. | Div./Sec. B-15 |

- Clog in gas water heater vent pipe led to water heater re-breathing flue gas, and the accumulation of carbon monoxide in the apartment in which it was located.
- Deposed and testified regarding the mode and cause of irrelevant corrosion on the flue pipe, the flame chemistry of carbon monoxide generation, and the accumulation rate of carbon monoxide in a living space.
- Judge awarded plaintiffs less than requested.  Decision reflected acceptance of our evaluation of the facts.



**Trial  Testimony**
as of August 24, 2007
Robert D. Bartlett
page 4

**Bartlett Project No. 728**          **Client: Entergy Legal Services**
                                      Attorney: Mr. Louis Leonard Galvis
                                      Representing: Entergy Corporation and Entergy Louisiana, Inc.

Wilfred Chaisson, Jr.                 32nd Judicial District Court
Rosalee Chaisson,                     Parish of Terrebonne
Individually, and on behalf           State of Louisiana
of their minor child, Nicholas        No. 134761
Chaisson, Chris Chaisson,             Division "B"
Wilfred Chaisson, Sr., and Mary
Chaisson
        vs.
Entergy Corporation and
Entergy Louisiana, Inc.

        Consolidated with

Raymond and Carolyn                   32nd Judicial District Court
Leonard, Individually and on          Parish of Terrebonne
behalf of their child,                State of Louisiana
Chris Leonard                              No. 136652
        vs.                           Division "B"
Entergy Corporation and
Entergy Louisiana, Inc.

- A house fire at the Chaisson house resulted in the deaths of the children listed in the suit.
- Deposed and presented trial testimony via video tape regarding the absence of arcing and the absence of high temperature effects on the copper component proposed by plaintiff's fire cause and origin expert to be the cause and origin of this fire.  Plaintiff's metallurgist agreed no arcing occurred, and temperature of the copper contact opined to be the fire origin did not exceed 700 F.
- Jury awarded $4.9 million dollars to plaintiffs because it was Mother's Day.



## Trial Testimony
as of August 24, 2007
Robert D. Bartlett
page 5

| | |
|---|---|
| **Bartlett Project No. 810** | **Client: Water King Inc.** |
| (Deposition was also required.) | Attorney: Mr. Steve Ramos |
| | Representing: Water King Inc. |

| | |
|---|---|
| AIG Industries Inc. | 15th Judicial District Court |
| vs. | No. 20024874 Division I |
| Water King Inc. | Before Judge Thomas Duplatier |
| | Parish of Lafayette Louisiana |

- Retained by Plaintiff Attorney.
- Al George Inc. fabricated a water treatment skid and shipped it to Africa without completing the required non-destructive testing.
- Testified about cost to complete the testing which had not been performed.


| | |
|---|---|
| **Bartlett Project No. 716** | **Client: Frilot Partridge, Kohnke & Clements, LC** |
| (Deposition was also required.) | Attorney: Miles Clements |
| | Representing: Chevron U.S.A, Inc. |

| | |
|---|---|
| Chevron, U.S.A., Inc. | Civil Action |
| vs. | No. 03-2027 |
| Aker Maritime, Inc., | Section "M" |
| Technip Offshore Engeering Inc. | Magistrate (2) |
| Technip Offshore Moorings, Inc. | Judge Peter Beer |
| Technip Offshore, Inc., | Magistrate |
| Oceaneering International, Inc., | Joseph C. Wilkinson, Jr. |
| LSS-Lone Star-Houston, Inc., | |
| Tech OFCO (F/K/A Oriental | |
| Fasteners Industry Co., Ltd.) | |
| and NDE Quality Systems, Inc. | |

- Retained by Plaintiff Attorney.
- Bolt supplier substituted alternate blot grade which was defective due to weakness of the inferior specification.  Fabricators' quality control system did not detect substitution of grade other than what was ordered.
- Testified about cost to complete the testing which had not been performed.
- Jury awarded 98%+ damages in favor of plaintiff.



**Testified in Deposition ONLY**
as of August 24, 2007
Robert D. Bartlett
page 1

| | |
|---|---|
| **Job No.  JM 704** | **Client:  Law Engineering & Environmental Services/Gautier & Murphy**<br>Representing:  Emmett  J. Calmes |
| Emmett  J. Calmes<br>vs.<br>American Bankers Insurance Co.<br>of Florida, et al. | 24th Judicial District Court<br>Parish of Jefferson<br>State of Louisiana<br>No. 360-394<br>Division H |

- Failure of porch swing hook.
- Retained by plaintiff's attorney.
- Deposed only, case settled prior to trial.
- Results of settlement unknown.

| | |
|---|---|
| **Bartlett Project No. 118** | **Client:  Rike Service/Trade & Development Corp./ Stone Pigman, et al.**<br>Representing:  Trade & Development Corp. |
| Trade & Development Corp.<br>vs.<br>Otis Engineering Corp. | United States District Court<br>Eastern District of Louisiana<br>Civil Action<br>No. 92 - 1574 or 91-20953<br>Section "D" |

- Failure of down hole packer.
- Retained by plaintiff's attorney.
- Deposed only, case settled in favor of Plaintiff prior to trial.



**Testified in Deposition ONLY**
as of August 24, 2007
Robert D. Bartlett
page 2

| | |
|---|---|
| **Bartlett Project No. 232** | **Client:  Greg Perenich**<br>Representing: Everett L. Decker and Carol Decker |
| Everett L. Decker and<br>Carol Decker (wife)<br>vs.<br>WSB, Inc. d/b/a Deeprock<br>Manufacturing Company | U.S. District Court<br>Middle District of Florida<br>Case No. 96-706-CIV-T-21-A |

- Drill operator injury.
- Mr. Decker was injured while operating a Deeprock Drill - Retained by plaintiff's attorney.
- Deposed regarding metallurgical and mechanical aspects of design and operation of drill.
- Case settled prior to trial.

| | |
|---|---|
| **Bartlett Project No. 374** | **Client:  Christovich & Kearney**<br>Representing:  Lincoln-Big 3, Inc. |
| Allen L. Robertson, et al.<br>vs.<br>Victor Equipment Co., et al. | 32nd Judicial District Court<br>Parish of Terrebonne<br>Case No. Z 33257 |

- Oxygen Regulator Failure.
- Mr. Robertson was injured while operating a Victor Regulator which was attached to a
  Lincoln-Big 3, Inc. oxygen cylinder.
- Deposed regarding metallurgical and mechanical aspects of oxygen regulator failures.
- Case settled prior to trial.



**Testified in Deposition ONLY**
as of August 24, 2007
Robert D. Bartlett
page 3

| | |
|---|---|
| **Bartlett Project No. 559** | **Client:  Sher Garner Cahill Richter Klein McAlister & Hilbert, L.L.C.** |
| | Attorney: Mr. Peter Hilbert and Ms. Shea Watkins-Lawrence |
| | Representing: Nabrico, a Division of Trinity Marine Products, Inc. |
| | |
| Angelina Crews | United States District Court |
| vs. | Eastern District of Louisiana |
| Nabrico, A Division of | Section: "R" |
| Trinity Marine Products, Inc. | Civil Action No. 99-3254 (c/w 99-3332) |
| | Magistrate Division: (4) |
| Consolidated With | |
| | |
| Joseph and Mary Billiot | United States District Court |
| vs. | Eastern District of Louisiana |
| Nabrico, A Division of | Section: "R" |
| Trinity Marine Products, Inc. | Civil Action No. 99-3332 |
| | Magistrate Division: (4) |

- Failure of water tight ship hatch led to the death of Mr. Crews and the injury of Mr. Billiot.
- Deposed regarding the adequacy of design of the hatch, and the results of our physical testing of the hatch.
- Case settled with plaintiff receiving a fraction of their original demand from Trinity Marine Products, Inc.



**Testified in Deposition ONLY**
as of August 24, 2007
Robert D. Bartlett
page 4

| | |
|---|---|
| **Bartlett Project No. 623** | **Client: Adams, Hoefer, Holwadel & Eldridge, L.L.C.** |
| | Attorney: Russell Holwadel |
| | Representing: Al-B Inc. |

Bill Egle, Individually                             Twenty-First Judicial District Court
and as Administrator/Tutor                    Parish of Tangipahoa
of his minor children,                            State of Louisiana
Sean Egle and Linzie Egle, and            Division C, 21st JDC
Julie Egle                                             No. 2000-002842 ("C")
                vs.
Adolfo Rodriguez, Vicki
Rodriguez, State Farm Fire
& Casualty Company, and Al-B Inc.


        Consolidated with


Vicki Cieutat Rodriguez,                         Twenty-First Judicial District Court
wife of and Adolfo Rodriguez              Parish of Tangipahoa
                vs.                                    State of Louisiana
Al-B, Inc., Alfred W. Lagman,             Division C, 21st JDC
and  St. Paul Reinsureance                  No. 2000-003711 ("E")
Company Ltd.


- Failure of cargo lift gear box shaft led to collapse of lift and injury of Mr. & Mrs. Rodriguez and
  Mr. Egle who were riding the cargo lift.
- Deposed regarding our metallurgical and mechanical engineering failure analysis.
- Case settled with plaintiffs receiving a fraction of their original demand from insurer of Al-B
  Inc.



**Testified in Deposition ONLY**
as of August 24, 2007
Robert D. Bartlett
page 5

| | |
|---|---|
| **Bartlett Project No. 650** | **Client:  Phelps Dunbar**<br>Attorney: Evan Caffery/Bobby Clotworthy<br>Representing:  The Zurich-American Insurance |
| Intermarine Incorporated and<br>Intermarine De Panama, S.A.<br>vs.<br>The Zurich-American Insurance<br>Company and AON Risk Services<br>of Texas, Inc. | In the District Court of Harris County, Texas<br>270th Judicial District Court<br>Cause No. 2000-61378 |

- Vessel was a oilfield supply boat which had carried hydrochloric acid.
- In 1988, a tank leak resulted in spillage of hydrochloric acid in the bilge.  Five years later the vessel was taken out of service and docked by ABS due to degradation of structural components.
- In 2000, the vessel sank while at the dock.
- Vessel owner claimed the sinking was due to the hydrochloric acid spill 12 years prior.
- Reported and deposed regarding corrosion and corrosion mechanisms.
- Case settled to satisfaction of defendant prior to trial.

| | |
|---|---|
| **Bartlett Project No. 673** | **Client: King LeBlanc & Bland, L.L.P.**<br>Attorney: Beau E. LeBlanc<br>Representing: Lloyd's of London as insurer of AmClyde Engineered Products, Inc. |
| Bollinger Shipyard Lockport,<br>L.L.C., and Boston Old Colony<br>Insurance Company<br>vs.<br>AmClyde Engineered Products,<br>Inc., a/k/a AmClyde Engineered<br>Products Co., Inc., Underwriters<br>at Lloyd's, London | United States District Court<br>East District of Louisiana<br>Civil Action<br>No. 01-0707<br>Section "C" |

- Operator control cab fell off of crane during ocean transit to final destination due to boom bouncing on boom rest.
- Deposed regarding our metallurgical evaluation of the fracture surfaces, our evaluation of the accelerations onboard the crane barge due to sea motions, and our evaluation of vibrations and dynamic conditions which led to the boom motion.
- Case resolved prior to trial on insurance coverage issue.



**Testified in Deposition ONLY**
as of August 24, 2007
Robert D. Bartlett
page 6

| **Bartlett Project No. 693** | **Client: McAlpine & Cozad** |
|---|---|
| | Attorney: Richard A. Cozad |
| | Representing: Marine Industrial Fabrication |

| Kenneth Tasker, et al | United States District Court |
|---|---|
| vs. | Civil Action |
| Marine Industrial Fabrication | No. 02-2541 |
| | Section "F" |

- Failure of jacking mechanism on rear leg of jack-up lift boat led to boat tipping aft and falling into the water.
- Deposed regarding our metallurgical and mechanical engineering evaluation of the mode and cause of failure.
- Case has not gone to trial as of September, 2003.


| **Bartlett Project No. 701** | **Client: Doyle Harris Davis & Haughey** |
|---|---|
| | Attorney: Steven Harris |
| | Representing: Callidus Technologies (Division of Chicago Bridge & Iron works Co.) |

| BP Exploration and | United States District Court |
|---|---|
| Production, Inc. | Eastern District of Louisiana |
| vs. | Civil Action |
| Callidus Technologies, | No. 02-2318 |
| L.L.C. | Section A |

- Failure of offshore gas flare led to need for replacement and interruption of production.
- Deposed regarding our metallurgical and mechanical engineering failure analysis of the flare components, and our review of the inadequacy of design of the flare separator.
- Case settled prior to trial for less that the original offer by the defendant.



**Testified in Deposition ONLY**
as of August 24, 2007
Robert D. Bartlett
page 7

| | |
|---|---|
| **Bartlett Project No. 729** | **Client: Robert M. Johnston, L.L.C.** |
| | Attorney: Robert M. Johnston |
| | Representing: Trendler Components, Inc. et al |

| | |
|---|---|
| Maxie Freeman | United States District Court |
| vs. | No. 02-2252 |
| Trendler Components, Inc. et al | Section "J", Mag. 5 |

- Bar stool fractured in support tube at toe of weld.  Failure allowed Ms. Freeman to fall.
- Deposed regarding our stress analysis of the failed chair component, fractography of crack surface, welding of failed component, and application of various chair standards.
- Case was settled to the satisfaction of our client.

| | |
|---|---|
| **Bartlett Project No. 850** | **Client: Koerner Law Firm** |
| | Attorney: Louis R. Koerner, Jr. |
| | Representing: Mr. Roger Curol |

| | |
|---|---|
| Roger Curol | Civil Action No.: 05-0830 |
| vs. | Section: "I" |
| AOP Industries, Inc. | The Hon. Lance Africk |
| | Magistrate Division 4 |
| | The Hon. Karen Wells Roby |

- Separation of 2 piece ball valve while under pressure resulted in burns to Mr. Curol.
- Retained by Plaintiff's attorney.
- Testified about mechanism of separation of valve body.



**Testified in Deposition ONLY**
as of August 24, 2007
Robert D. Bartlett
page 8

**Bartlett Project No. 951**          **Client: Montgomery Barnett**
                                      Attorney: Christopher E. Cary
                                      Representing: Western Reman and Remy International

In the matter of the Complaint          Civil Action
of Tug Robert J. Bouchard, Inc.         No. 05 - 1420
as Owner, Bouchard Coastwise            Judge "R" (5)
Management Corp., as owner Pro           Judge Sarah S. Vance
Hac Vice, and Bouchard                   Mag. Alma L. Chasez
Transportation Co., Inc., as owner
Pro Hac Vice and/or Operator
of the Tug Robert J. Bouchard

-   Injury to ship's engineer due to fire ignited by shipboard EMD 645 engine.
-   Evaluation of engine components for mode and cause of failure leading to explosion.
-   Case has not gone to trial as of August, 2007.



Appendix E



## Fee Schedule

**Professional Services**:

    Principal Engineer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $225/hr

    Mechanical Engineer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $150/hr

    Senior Engineering Technician . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $100/hr

    Engineering Assistant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $50/hr

    CAD Draftsperson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $65/hr

**Expenses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Cost x 1.25

**Mileage** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $0.65/mile

**Overtime**:

Hourly fees for overtime services will be 1.3 times those shown above. Overtime is defined as time beyond 10 hours per day per man, or time outside of regular business hours (7:00 AM to 5:30 PM).

**Storage**:

Climate Controlled Storage:  $2.50 per sq. ft. per month
Outdoor Storage:          $1.00 per sq. ft. per month

**Pre-Paid Retainer**:

Projects in which we provide Expert Witness services will require a prepaid retainer. The amount of this retainer will be determined by the extent of services required. We will invoice monthly for services performed to the date of the invoice. All fees must be paid in full prior to our testimony at trial. Unused balance of a prepaid retainer will be refunded upon completion of our services.

Invoices over 30 days past due will be charged a finance fee of 1 ½% per month or the maximum rate allowed by law.

This Fee Schedule is for Professional Services which are not tangible, therefore sales tax is not due. However, R. D. Bartlett, P.E. d.b.a. Bartlett Engineering (Tax I.D. No. 72-1242956) is a sole proprietorship, and as such the IRS requires you to issue a 1099-Misc Form to us for payments for other than tangible property.

revised4/25/07



Appendix F



## Fees and Expenses for Services

| | |
|---|---|
| Invoiced in May: | $30,545.30 |
| Invoiced in June: | $ 7,575.00 |
| Estimate of fees and expenses incurred, but not invoiced: | $10,000.00 |
| Estimated Total: | $48,120.30 |

PLANS FOR

## LAKE PONTCHARTRAIN, LA., AND VICINITY HURRICANE PROTECTION

ORLEANS PARISH, LOUISIANA

H-4-29518

NOTE:
DRAWINGS IN THIS FOLIO
HAVE BEEN REDUCED ONE
HALF THE ORIGINAL SCALE

As Built Drawing

# I. H. N. C. EAST AND WEST LEVEE AND CITRUS BACK LEVEE CAPPING FLOODWALL



**US Army Corps of Engineers**
New Orleans District
1983



(7)

12p

INNER HARBOR Navigation Canal

EAST LEVEE

Levee and FLOOR Wall Capping

(4)

COVER OF 14 PAGES



TYPICAL WALL SECTIONS



No Cover Page

P. 11 of 16



March 16, 2009

Mr. Lawrence D. Wiedemann
Wiedemann & Wiedemann
Attorneys at Law
821 Baronne Street
New Orleans, LA 70113

Subject:   **Evaluation of Effect of Salt Water Wetting**
**BARTLETT** Project No. 1046, Supplement 1

Dear Mr. Wiedemann;

We have completed our evaluation of the effects of the wetting by salt water that occurred after the effects of Hurricane Katrina.

## BACKGROUND INFORMATION

Background information was provided by Bartlett Engineering report of  June 27, 2008 and from review of the following documents:

| DCN | Description |
|-----|-------------|
| 1 | Aurora Environmental Consultants report dated August 10, 2006, |
| 2 | Gulf Engineers & Consultants report dated June, 1996. |

Some of the flooding that occurred as a result of events that occurred during Hurricane Katrina resulted in the wetting of items by high salinity water.

Aurora Environmental performed salinity testing of a flooded site at 1329 Egania in the Lower Ninth Ward of New Orleans, Louisiana. The results of this testing revealed that the chloride and salinity levels were much higher than the background levels estimated from areas which Aurora determined were not inundated with flood waters post Hurricane Katrina. The background salinity was 0.2 ppt and the background chloride level was 100 mg per kg. In contrast a soil sample in the front yard of the test site hade a salinity of 3.1 ppt and a chloride level of 1700 mg per kg. Both of these values were approximately fifteen times the background level. A sample of the sludge from inside the rear room of the home on the site had a salinity of 44.9 ppt and a chloride level of nearly 25,000 mg per kg. Both of these values were approximately 225 times the background values.

I understand that you desire a metallurgical evaluation of the effects of salt water wetting on metallic items.

March 16, 2009
**Wiedemann & Wiedemann**
Page 2



---

## DISCUSSION

The rusting of bare steel in the atmosphere is controlled by the availability of moisture. As stated in "Corrosion" (Ref. 2, p365):

> "Moisture can reach a steel surface directly in liquid form as a result of a precipitation process, i.e. rain and dew, but the water vapor that is always present in the air can also, under certain conditions, cause steel to rust at relative humidities well below saturation.

As described in "Corrosion" (Ref. 2, p.3:5), experiments by W. H. Vernon introduced the concept of the "critical humidity":

> Rusting is minimal in pure air of less than 100% relative humidity, but that in the presence of minute concentrations of impurities, such as sulphur dioxide, serious rusting can occur without visible precipitation of moisture once the relative humidity of the air rises above a critical and comparatively low value.
> ...
> Below the critical humidity, rusting is inappreciable, even in polluted air.

Salts on the surface of steel increase the atmospheric corrosion rate by reducing the critical humidity. "Critical humidity" is discussed in "Corrosion and Corrosion Control" (Ref. 3, p. 173) with the observation that:

> In an uncontaminated atmosphere at constant temperature, appreciable corrosion of a pure metal surface would not be expected at any value of relative humidity below 100%.

Continuing evaluation of Vernon's work, "Corrosion" (Ref. 2, p. 3:6) says:

> The presence of moisture in steel above the critical humidity, but below the saturation point, may be caused by an adsorption mechanism or by the presence of deliquescent salts on the surface.

Because of the porous nature of rust, if rusting has occurred due to salts on a steel surface the rust will hold the salts. As explained in "Corrosion" (Ref. 2, p. 3:6):

> Once rusting has begun, the composition of the rust already formed will influence the relative humidity at which further rusting will occur, because rusts formed in polluted atmospheres contain hygroscopic salts.

March 16, 2009
**Wiedemann & Wiedemann**
Page 3



Bartlett
ENGINEERING

Because surface salt contamination lowers the critical humidity, it increases the time during which a surface remains wet. Salt maintains its hygroscopic nature regardless of the composition of the coated surface.

The importance of the time of witness is stated in "Corrosion" (Ref. 3, p. 3 & 6):

> The method by which moisture reaches the surface is probably less important, however, than the length of time during which the steel remains wet.
> ...
> In the presence of chlorides rusting can continue at humidities as low as 40%.

Concealed items inside the walls of flooded houses or in concealed spaces such as nails exposed at the joint between boards do not benefit from the rinsing effect of rain which normally occurs on exterior items. As such, the salt present would continue to cause increased corrosion. The effect would be expected to parallel that observed when salt can be replenished such as near a sea shore. As discussed in "Corrosion" (Ref. 2, p. 3:6):

> As a rule the chloride concentration in the air falls off rapidly with distance inland, but steel rusts at almost incredible rates on surf beaches in the tropics where it is exposed to a continuous spray of sea salts in the surf.

For these reasons, the damage caused by salt water flooding begins with the contamination of the surfaces with salts, but then continues long after the flood waters have receded due to the hygroscopic nature of salt and its ability to lower the critical humidity level.

The salt water flooding would also have a deleterious effect on metallic items not coated with salt water immersion resistant coatings. As explained by Weldon in "Failure Analysis of Paints and coatings" (Ref. 3, p. 210):

> Salts can result in premature corrosion, or blister - type failures. They can be introduced by contaminated pigments or blast cleaning, or by the environment (road salts, acid rain, salt laden sea air, etc.).

> Salt water is much more corrosive to steel than pure water. One of the requirements that must be met for corrosion to occur is a source of an electrolyte. Without dissolved, charged species, the electrical current required for corrosion cannot exist. Inorganic salts are excellent electrolytes.

March 16, 2009
**Wiedemann & Wiedemann**
Page 4



Weldon further discusses the effect of immersion of coatings (Ref. 3, p. 211):

> In addition to premature corrosion, salts can also cause coatings in immersion service to fail dramatically by aiding in the development of liquid-filled blisters. This process is due to the formation of an osmotic cell...[1]

## CONCLUSIONS

The inundation of an area with salt water will coat surfaces that were wetted with salt.

The salts thus deposited will then accelerate corrosion due to the lowering of the critical humidity at which the onset of rapid corrosion commences.

This increased corrosion rate will occur on concealed items which are not able to be rinsed of this surface salt contamination. Examples of such items include, but are not limited to, framing nails, wiring, plumbing pipes and fixtures, sewer and drain pipes, and hurricane straps.

## CLOSING

We have appreciated the opportunity to serve as your mechanical and metallurgical engineering consultant on this project, and look forward to the opportunity to work with you on future projects.

If you have any questions or comments about our background information or our findings or if new information becomes available, please advise us immediately so that we may review our findings and conclusions. We respectfully request to reserve the right to review our findings and conclusions should such new information become available.

Sincerely,
**BARTLETT ENGINEERING**

Robert D. Bartlett, P.E.
Principal Engineer

---

[1]osmotic cell - A phenomenon in which water is drawn through a semi-permeable membrane due to a difference in concentration of, for example, water soluble salts (Ref. 1, p. 15:59).



## References

1. Shreir, L.L. (Ed.). *Corrosion*. London: George Newnes. (1963)

2. Revie, R. Winston, and Herbert H. Uhlig. *Corrosion and Corrosion Control*, 3rd Edition. New York: Wiley-Interscience. (1985)

3. Weldon, Dwight G. *Failure Analysis of Paints and Coatings*. New York, NY: Wiley. (2001)



## Fee Schedule

**Professional Services**:

    Principal Engineer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $225/hr

    Mechanical Engineer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $150/hr

    Senior Engineering Technician . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $100/hr

    Engineering Assistant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $50/hr

    CAD Draftsperson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $65/hr

**Expenses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Cost x 1.25

**Mileage** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $0.65/mile

**Overtime**:

Hourly fees for overtime services will be 1.3 times those shown above.  Overtime is defined as time beyond 10 hours per day per man, or time outside of regular business hours (7:00 AM to 5:30 PM).

**Storage**:

Climate Controlled Storage:  $2.50 per sq. ft. per month
Outdoor Storage:               $1.00 per sq. ft. per month

**Pre-Paid Retainer**:

Projects in which we provide Expert Witness services will require a prepaid retainer.  The amount of this retainer will be determined by the extent of services required.  We will invoice monthly for services performed to the date of the invoice.  All fees must be paid in full prior to our testimony at trial.  Unused balance of a prepaid retainer will be refunded upon completion of our services.

Invoices over 30 days past due will be charged a finance fee of 1 ½% per month or the maximum rate allowed by law.

This Fee Schedule is for Professional Services which are not tangible, therefore sales tax is not due.  However,  R. D. Bartlett, P.E. d.b.a. Bartlett Engineering (Tax I.D. No. 72-1242956) is a sole proprietorship, and as such the IRS requires you to issue a 1099-Misc Form to us for payments for other than tangible property.