# EXHIBIT 39

Deposition of Wade Ragas

1

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF LOUISIANA

3

4   IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION

5                                  * NO. 05-4182

6   PERTAINS TO: BARGES            * Consolidated

7                                  * SECTION "K(2)"

8   Boutte v. Lafarge      05-5531 *

9   Mumford v. Ingram      05-5724 * JUDGE DUVAL

10  Lagarde v. Lafarge     06-5342 *

11  Perry v. Ingram        06-6299 * MAG. WILKINSON

12  Benoit v. Lafarge      06-7516 *

13  Parfait Family v. USA  07-3500 *

14  Lafarge v. USA         07-5178 *

15   *  *  *  *  *  *  *  *  *  *  *

16

17          Deposition of WADE R. RAGAS, PH.D.,

18  MAI, given at Chaffe McCall, LLP, 2300 Energy

19  Centre, 1100 Poydras Street, New Orleans,

20  Louisiana 70163-2300, on September 3rd, 2009.

21

22

23  REPORTED BY:

24          JOSEPH A. FAIRBANKS, JR., CCR, RPR

25          CERTIFIED COURT REPORTER #75005

**2**

```
1  APPEARANCES:
2  REPRESENTING THE BARGE PSLC:
3      BRIAN A. GILBERT, P.L.C.
4      (BY:  BRIAN A. GILBERT, ESQUIRE)
5      821 Baronne Street
6      New Orleans, Louisiana 70113
7      504-885-7700
8  - AND -
9      WIEDEMANN & WIEDEMANN
10     (BY:  KARL WIEDEMANN, ESQUIRE)
11     821 Baronne Street
12     New Orleans, Louisiana 70113
13     504-581-6180
14
15 REPRESENTING LAFARGE NORTH AMERICA:
16     CHAFFE, MCCALL, L.L.P.
17     (BY:  CHARLES BLANCHARD, ESQUIRE)
18     (BY:  ROBERT FISHER, ESQUIRE)
19     2300 ENERGY CENTRE
20     1100 Poydras Street.
21     New Orleans, Louisiana 70163-2300
22     504-585-7000
23 - AND -
24
25
```

**3**

```
1      GOODWIN PROCTOR, L.L.P.
2      (BY:  MARK S. RAFFMAN, ESQUIRE)
3      901 New York Avenue, NW
4      Washington, D.C. 20001
5      202-346-4000
6  - AND -
7      SUTTERFIELD & WEBB
8      (BY:  DANIEL A. WEBB, ESQUIRE)
9      650 Poydras Street, Suite 2715
10     New Orleans, Louisiana 70130
11     504-598-2715
12
13 ALSO PRESENT:
14     PETER KEELEY
```

**4**

EXAMINATION INDEX

EXAMINATION BY:                    PAGE

MR. GILBERT ................................6
MR. BLANCHARD ............................115

EXHIBIT INDEX

EXHIBIT NO.                      PAGE
Exhibit 1   ................................6
Exhibit 2 IN GLOBO ........................91

**5**

STIPULATION
IT IS STIPULATED AND AGREED by and among counsel for the parties hereto that the deposition of the aforementioned witness may be taken for all purposes permitted within the Louisiana Code of Civil Procedure, in accordance with law, pursuant to notice;
That all formalities, save reading and signing of the original transcript by the deponent, are hereby specifically waived;
That all objections, save those as to the form of the question and the responsiveness of the answer, are reserved until such time as this deposition, or any part thereof, is used or sought to be used in evidence.

* * *

JOSEPH A. FAIRBANKS, JR., CCR, RPR, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

6

1        WADE R. RAGAS, PH.D., MAI
2   3017 Harvard Avenue, Suite 204, Metairie,
3   Louisiana 70006, a witness named in the above
4   stipulation, having been first duly sworn, was
5   examined and testified on his oath as follows:
6   EXAMINATION BY MR. GILBERT:
7        Q.  Dr. Ragas, I introduced myself a
8   moment ago.  My name is Brian Gilbert.  I
9   represent the plaintiffs in this action.
10        And I don't even need to go through
11   with you the routine of have you ever given a
12   deposition before.  I'm just going to assume
13   that you know what to do and that if you don't
14   understand my question you'll stop me and if
15   you want to take a break you'll stop me.
16        A.  Yes, sir.
17        Q.  Okay.  At the outset, let's go ahead
18   and mark and attach the entire report and
19   reliance materials as Ragas 1.
20        All right.  And I'm going to give this
21   to you.
22        (Exhibit 1 was marked for
23   identification and is attached hereto.)
24        A.  Yes, sir.
25   EXAMINATION BY MR. GILBERT:

7

1        Q.  Okay.
2        A.  This appears to be my report as
3   submitted, with the caveat that Mr. Gilbert has
4   pointed out that he thinks there may or may not
5   be a page missing or duplicated, and if there
6   is and I discover such today I'll certainly
7   address it right away.
8        Q.  And I'm going to represent to you that
9   it's a page of the three photographs that go
10   along with your appraisals of either Deslonde
11   or Egania, I'm not sure which.  Well, it would
12   actually have to be Egania because Deslonde is
13   a lot.  So it's Egania.
14        A.  Uh-huh.
15        Q.  I'm not going to belabor the issue of
16   your qualifications as an expert but I do want
17   to ask you, what areas of expertise are the
18   basis for your being proffered as an expert in
19   this case?  What areas of expertise are the
20   basis?
21        A.  Well, among the things in which I have
22   some expertise include real estate valuation,
23   in which I hold credentials as an MAI, an SRA,
24   and I have done extensive teaching and
25   publishing and work.

8

1        Also, um -- I am knowledgeable on
2   things involving environmental or so-called
3   negative externalities and how they affect
4   property values and have testified as an expert
5   oven issues involving that in a number of
6   different jurisdictions.
7        I bring some local expertise in terms
8   of economic conditions and how they may affect
9   property values and have published for about
10   thirty years analyses of property value trends
11   and economic information here.
12        So I would think those are the three
13   primary areas.  There may be something further
14   that is not right now jumping out at me, and I
15   will add to that if I hear from a question an
16   issue I didn't address.
17        Q.  Understood.  Okay.  In Section 1 of
18   your report, you -- it's the section entitled
19   Qualification, and you've got eight paragraphs
20   numbered there.  Are all of the contents of
21   those photographs still accurate as we sit here
22   today?
23        A.  They are.
24        Q.  Is there anything missing that you
25   think should have been added?

9

1        A.  No, sir.
2        Q.  Nothing that needed to be subtracted?
3        A.  Not that I'm aware of.  You have a
4   complete vita that appears in the report with
5   reference from those pages and I think occurs
6   on pages numbered 13 through 32, which should
7   meet federal standards.
8        Q.  And you were anticipating my next
9   question.  I wanted to ask you, are all the
10   contents of your curriculum vitae accurate as
11   we sit here today?
12        A.  They are.  You know, I always have
13   something in process, so there could be some in
14   process items that have happened since the
15   issue dated of this report, but this report is
16   very recent so I wouldn't anticipate that there
17   is anything of substance that's not addressed
18   here.
19        Q.  All right.  Well, let me just jump
20   into what might be the only other aspect of
21   your qualifications that we may touch on today.
22   You've listed, beginning on Page 30, court
23   testimony.  I believe this would be over the
24   last four years.
25        A.  Yes, sir.

3  (Pages 6 to 9)

10

1   Q.   Okay.
2   A.   Maybe longer.
3   Q.   Maybe longer.
4   A.   Uh-huh.
5   Q.   But you've been testifying as an
6   expert longer than that, haven't you?
7   A.   I think the first trial I testified in
8   is 1979 or '80.
9   Q.   All right.  In the areas of property
10  valuation, local economic conditions,
11  environmental or negative externality, have you
12  ever failed to qualify as an expert?
13  A.   No.
14  Q.   Have you ever had your opinion limited
15  by a court order in any of these areas?
16  A.   By a court order?
17  Q.   Yes.
18  A.   Not that I'm aware of.
19  Q.   All right.  Are you aware of any cases
20  in which your testimony or opinions have been
21  stricken or limited by the court?
22  A.   Nothing comes to mind, no.
23  Q.   Were you an expert in the Murphy Oil
24  case?
25  A.   Yes.

11

1   Q.   Turner versus Murphy Oil?
2   A.   Yes.
3   Q.   Did the Court somehow alignment or
4   narrow your opinions in that case?
5   A.   No.  In that matter -- it's sort of
6   curious.  Actually, in that particular case we
7   never ended up in a courtroom --
8   Q.   Understood.
9   A.   -- with me testifying.  And my
10  analyses in that case were the basis of
11  voluntary settlement offers.  While I had
12  separately looked at the issues of what were
13  the claims that were supportable by the Murphy
14  Oil spill, I don't believe I ever testified in
15  court because we never got that far.
16  Q.   You did a declaration in connection
17  with the fairness hearing, didn't you?
18  A.   Yes.
19  Q.   Okay.  And this was after the class
20  was certified that you did this declaration?
21  A.   Probably.
22  Q.   Okay.  What did you do in that case,
23  did you do individual evaluations of the
24  properties?
25  A.   No.  In that instance, we never got

12

far enough to do individual analyses.  I did,
instead, by geographic area, a look at what the
maximum possible, in my opinion, damages were
that could possibly be attributed to the oil
spill and arrived at a formulaic structure, by
geography, by house type and property type,
that would allow them to make settlement
offers.  That analyses has been reviewed by
others and not found wanting, and in fact an
extensive hearing was scheduled originally in
courts in London that was not -- did not go
forward because they found that basically my
findings were acceptable.  So no, I don't end
up doing individual ones, the bulk of those
properties are settled using approach --
finally, the Court's settlement structure
doesn't differ materially from what I
recommended.
    Q.   How did you differentiate, in that
case, damage from exposure to oil as opposed to
damage from any other cause?
    A.   Well, in that particular matter, um --
my actual statistical findings in that matter
that are never -- never go all the way to
court, don't actually show that there's any

13

substantial damage to property values due to
the oil once a cleanup has occurred.  But they
do show that in the time period immediately
after the event there's some temporary damages.
And those damages were not able to be measured
from market facts, instead they had to be
measured by analogy, which is certainly not my
preferred way to do things.  We looked at the
largest diminution in value that had ever
occurred in St. Bernard due to an economic
event and saw what that magnitude had been.  We
looked at the literature for other oil and/or
other externality events.  I looked at the
largest court findings that seemed to be
analogous to this situation.  We looked at cost
to cure.  And based on cost to cure, the
portions of that cure which were going to
happen due to flooding no matter what, and what
that residual then might be if Murphy had hot
engaged in the cure themselves.
    So I looked at it three ways.  None of
those were actual studies at the time the
settlement offer is created.  None of those are
actual studies of the values on the ground,
because there was no market in the first six to

14

1  eight months after Katrina.  To argue that
2  there's a market that's active I find to be an
3  extraordinary position.  Later, I do look at
4  market facts, and they actually show that
5  property once cured restored itself to the
6  former values almost exactly that existed in
7  the pre-hurricane St. Bernard housing market.
8      Q.  Okay.  And that's true for restoration
9  of both water and oil damage --
10     A.  It is.
11     Q.  -- or just one or the other?
12     A.  Both.  Both.
13     Q.  Okay.  I should have asked you, who
14  retained you in that case, the plaintiffs or
15  the defendants?
16     A.  Who retained me in that matter was
17  Murphy Oil Corporation.
18     Q.  Okay.  How did you correlate these
19  other events such as the economic event that
20  you talked about and the others that you
21  alluded to, to arrive at diminution values?
22     A.  Well, first, we were looking at what
23  the maximum impact had been.  I have a data
24  file that I have built over many, many years
25  which is -- covers half or more of the parcels

15

1  in St. Bernard and Orleans Parish.  So I could
2  look at what actually happened on the ground
3  due to the economic events of the oil bust and
4  ascertain the extent to which there was or was
5  not a diminishment.  So I had data there that
6  gave me one measure of a maximum damage.
7      Then, on the literature, well, there
8  is an extensive literature on environmental
9  externalities and I compiled eighty or so
10  articles looking at those issues, and satisfied
11  myself that the maximum likely damage was about
12  14 percent of the original property value with
13  the upper limit of that damage not which had
14  occurred but the maximum that I could imagine
15  could have occurred.  And Murphy made the
16  decision, rather -- and its insurers, rather
17  than trying to wait a year or a year and a half
18  to have an adequate data set, to go forward
19  with a settlement structure which ran in
20  parallel with their cleanup structure because
21  they felt under CERCLA they just had to get the
22  cleanup done immediately, and the result was
23  they decided to offer settlement terms which
24  were consistent with the maximum possible loss,
25  which did turn out to be higher than the actual

16

1  numbers.
2      Q.  Did you do any individual appraisals
3  in that case?
4      A.  I appraised a couple of hundred
5  commercial assets in that case --
6      Q.  Okay.
7      A.  -- and arrived at what their value was
8  before the storm.  I was not asked to value
9  them after the storm, I was asked to arrive at
10  values pre-storm and did that.
11     Q.  Did you feel that your analysis in
12  that case would have been more accurate with
13  post-storm appraisal?
14     A.  If we had the luxury of waiting a year
15  and a half to two years for the housing market
16  to stabilize and have adequate data, then we
17  would have -- it wouldn't have been done by
18  analogy, it could have been done by actual
19  compared sales and individual appraisals.  But
20  that was not the facts of the situation in that
21  instance.
22     Q.  All right.  Of these cases that you've
23  listed here, can we go through and tell us
24  which cases you represented plaintiffs and in
25  which cases you represented defendants?  And

17

1  let's do one by one.
2      Cousin or cousin versus Realty
3  Ventures?
4      A.  Cousins versus Realty Ventures.  I
5  represent plaintiff in that matter.
6      Q.  Who was Cousins?
7      A.  Cousins is a property owner who had
8  lost the use of a building, and it was a case
9  involving lost business profits.
10     Q.  So that was a commercial property
11  owner and not an individual.
12     A.  Commercial property.
13     Q.  Okay.
14     A.  Now, you'll have to bear, my memory --
15     Q.  I understand.
16     A.  I haven't done the exercise you've
17  just asked me to do.  I can't recall doing this
18  exercise in a prior deposition --
19     Q.  Uh-huh.
20     A.  -- so I will do the best I can.
21     Q.  That's all I can ask.
22     A.  All right.
23     Q.  Lafourche Levee Basin District versus
24  Texaco.
25     A.  The defendant there, Texaco.  And the

18

1 issue at hand was the extent to which there
2 were value diminishments in wetland areas that
3 could or could not be ascribed to former
4 actions of Texaco.
5    Q.   All right.  Number 3, Plaintiffs
6 versus Browning-Ferris Industries and New
7 Orleans S&WB.
8    A.   I represented defendant in that
9 matter, and that was Browning-Ferris
10 Industries.  They were being sued along with
11 the New Orleans Sewerage & Water Board.  I only
12 represented Browning-Ferris.  And the issue at
13 hand were individual property owners in
14 St. Bernard over whether or not their property
15 had suffered a diminution in value due to the
16 operation of a legally permitted solid waste
17 disposal facility that had somehow affected
18 their property value.
19    Q.   Did you find that that did affect
20 their property values?
21    A.   Did a fairly rigorous look at
22 single-family housing transactions in the area
23 and found that no, the solid waste disposal
24 site did not appear to have done that; however,
25 the New Orleans Sewerage & Water Board had

19

1 numerous violations and was a noxious emitter
2 of both smells and a trucking use, and, um --
3 and it is quite possible that their, um --
4 issues did affect that.
5    Q.   What about Hoy versus Texaco?
6    A.   This again is Texaco being sued by a
7 landowner over --
8    Q.   You represented Texaco?
9    A.   I did.
10    Q.   Okay.
11    A.   -- over issues involving the loss of
12 value of wetlands and the cost to cure damages
13 to wetlands.
14    Q.   Did you find in that case that your
15 client owed anything to the plaintiff?
16    A.   I found there was some diminution, but
17 it was in the market value of the wetlands
18 which were under five hundred dollars an acre.
19    Q.   So it wasn't relative -- you didn't
20 relate it to any conduct on the part of the
21 defendant.
22    A.   No, I didn't say that.
23    Q.   Okay.
24    A.   I said that I did find that there was
25 a diminishment in value, but that the

20

1 underlying value of the property that was
2 diminished was worth less than five hundred
3 dollars an acre.  There was a claim in the case
4 for forty thousand plus, if I remember right,
5 involving cost to cure, and I didn't find any
6 corollary support for a value of wetlands in
7 the forty thousand an acre range.
8    Q.   Number 5:  Maynard versus Jefferson
9 Parish.  Who did you represent?
10    A.   This was the property owner.
11    Q.   Okay.
12    A.   They had a parcel that was being taken
13 by Jefferson Parish, and part of the use
14 remaining in the parcel was being restricted.
15 This is a batture parcel in Jefferson Parish,
16 it was the source of a 30-year-long litigation.
17 I rendered findings toward the end of the
18 litigation period that indicated in my view
19 that the restrictions on the batture the parish
20 had imposed had diminished the value of the
21 Maynard tract.
22    Q.   Okay.  Isaac and Christina --
23    A.   Versus U.S. Department of Interior?
24    Q.   Uh-huh.
25    A.   That is a regulatory taking dispute in

21

1 which the U.S. Government, by action of their
2 regulatory powers for wetland permits,
3 precluded the development of a parcel that had
4 achieved -- was zonable and developable under
5 Jefferson Parish laws.  I represented the
6 property owners, and that went all the way to,
7 eventually, Federal Circuit Court of Claims.
8    Q.   Okay.  Aviation Board versus Franklin
9 Southland Printing.
10    A.   I represented defendant in that
11 matter.  The Aviation board was expanding their
12 runway at New Orleans International and their
13 taxiway.  They did not take defendant's
14 property, but what happened was that they piled
15 mud eight feet high next to the defendant's
16 property that caused settlement.  The defendant
17 was a high-quality printing firm that needed
18 extraordinarily precise registration of
19 expensive printing equipment.  So I found that
20 there was a damage to the operation of the firm
21 and a lost business income.
22    Q.   Okay.  Let's go to Number 8, West
23 Jefferson Levee District versus Dr. and
24 Mrs. Zaslow.  Who did you represent?
25    A.   The Zaslow interests, defendant in

22

1  that matter, were the subject of a taking.  And
2  the taking was a levee that crossed their
3  property, and I valued the land taken and the
4  severance damages for the remainder.
5      Q.  Okay.  Saden versus Kirby.
6      A.  Again, a taking case -- excuse me.
7  That's not correct.  This is actually a
8  property owner being sued by other property
9  owners over the pattern of rainfall and water
10  from rainfall on their property.  There's a
11  corollary suit that involves the New Orleans
12  Levee Board or the sewer and water board, and I
13  was representing property owner in that matter.
14      Q.  Who is the property owner?  Which
15  name?
16      A.  I think it's Kirby.
17      Q.  Is the property owner?
18      A.  Yeah, I believe that's right.  But I'm
19  not sure of that.  I believe Kirby is the
20  property owner.
21      Q.  Okay.  Number 10.
22      A.  Crepel versus the U.S. Environmental
23  Protection Agency is, again, a regulatory
24  action, in this case involving the Bayou aux
25  Carpes tract and about sixty-four property

23

1  owners who were denied all future development
2  rights in perpetuity by the U.S. Government
3  without compensation, and I represented the
4  property owners.
5      Q.  Okay.  How about Number 11?  You
6  represented Coast Quality; right?
7      A.  Yes, sir, I did.  That case goes all
8  the way to the Supreme Court, if I remember
9  right.  And the West Jefferson Levee District
10  placed a levee alignment which denied
11  development rights to Coast Quality and created
12  a significant severance damage, and I did
13  valuation and reviews of other people's work in
14  that case.
15      Q.  Newport LTD versus Sears.
16      A.  I represented Sears Roebuck.  They
17  were being sued over breach of contract for a
18  lease they had done a Letter of Intent on for a
19  regional distribution center, and I looked at
20  the impact of the Sears facility being present
21  or not on a proposed but never built industrial
22  property.
23      Q.  And what were your findings?
24      A.  I found that the damages to the
25  Newport facility were modest.  And I think in

24

1  that matter the Court disagreed with me and
2  awarded larger damages.  In many of these other
3  cases the Court rulings are actually relatively
4  close to my findings.
5      Q.  Okay.
6      A.  The next one, Jefferson Highway
7  District in Kenner versus Marie Krantz was the
8  taking of the front of what was then a race
9  track, the Jefferson Downs, and I did
10  valuations of the taking and severance damages
11  to Jefferson Downs for Ms. Krantz.
12      Q.  You worked for Ms. Krantz.
13      A.  I did.
14      Q.  Okay.  Understood.  And your findings
15  were in her favor?
16      A.  Well, it was a taking, there was no
17  question about that.
18      Q.  Okay.
19      A.  The issue was the quantum, and there
20  was severance damages and the Court ruled from
21  the bench in my favor at the end of trial.
22      Q.  Let me ask you about how you evaluate
23  damage or diminution in a takings case.  Do you
24  look at all causes for diminution of the
25  property?

25

1      A.  I look at the -- all causes?  If it's
2  a taking that involves governmental action,
3  then I look at the value of the parcel taken.
4  Then if due to the taking there's a
5  diminishment in future use of the property, I
6  determine if I think such diminution occurred
7  or not.  If there is a diminution, then I
8  attempt to measure it and whether it's
9  temporary or permanent.
10      Q.  All right.  Let me ask the question a
11  different way.  When you put an initial
12  valuation on the property to first determine
13  its market value, do you use the same factors
14  in that process as you used in this case?
15      A.  Yeah.  I do an opinion of market value
16  in accordance with the Uniform Standard of
17  Professional Appraisal Practice, yes.
18      Q.  Okay.  So you would look at, say, past
19  flood damage to the house that may be not
20  repaired, you would look at termite damage, you
21  would look a hedonic -- or let me say market
22  perceptions of the value of that house.  And
23  I'm just naming a few things that you've
24  reported relative to this case.
25      A.  You shifted and you're asking me about

26

1  specifically residential property in an
2  instance of flooding damages and the issue I
3  would look at to establish the value as
4  damaged?
5      Q.   No.  Then I need to clarify my
6  question.  Would you look at factors other than
7  the location, for example, or the -- factors
8  other than the taking itself in reaching a
9  value of the property whose owner you
10  represent?
11         MR. BLANCHARD:
12              I have to object on relevance
13         grounds.  You're asking him now about
14         expropriation actions that have
15         nothing to do with the issues in this
16         case.
17              Subject to the objection you can
18         answer if you can.
19      A.   It's a question.  I'm having a little
20  trouble understanding your point --
21         MR. GILBERT:
22              Yeah, I'm actually not trying to
23         ask him that question.  I'm trying to
24         frame the question a different way.
25      A.   And I'm trying to respond.

27

1  EXAMINATION BY MR. GILBERT:
2      Q.   Yeah.  I understand.
3      A.   I am trying to respond.
4         MR. GILBERT:
5              And I agree with you that my
6         question has been confusing.
7  EXAMINATION BY MR. GILBERT:
8      Q.   What I wanted to ask is, in a takings
9  case you at some point in the process in your
10  analysis have to put a pre-taking value on the
11  property, correct?
12      A.   Yes.
13      Q.   What factors do you take into
14  consideration specifically?  As opposed to
15  generally accepted factors in the industry,
16  what specific factors do you take into account?
17      A.   I'm going to do it just like I would
18  do any other valuation.
19      Q.   Okay.
20      A.   And it will have to meet the standards
21  of the appropriate comparables, the appropriate
22  income and expense information, cost
23  information that I would use in doing any other
24  opinion of market value --
25      Q.   Okay.

28

1      A.   -- to arrive at what it's worth
2  before.  The before value will be the
3  conditions of the property that existed before
4  the taking, since you were using a taking
5  context, or before the environmental event
6  occurred.
7      Q.   Now my question was understood.  Thank
8  you.
9      A.   Okay.  Fine.
10      Q.   Thank you.  All right.  Let's go to
11  Chevron Pipeline versus Riley.
12      A.   Um -- in that instance I represented
13  Chevron.  There was a pipeline right-of-way
14  dispute involving the renewal of a -- no, wait.
15  I misspeak.  No, I misspeak.  I represented the
16  Rileys and a group of other property owners in
17  Plaquemines Parish.  This is the Empire
18  Terminal and all pipelines emanating from the
19  Empire Terminal in Plaquemines.  The Riley
20  family ends up, after thirty years of
21  litigation, to become the owner of the property
22  due to an illegal taking by the New Orleans
23  Levee Board.  They then go to court seeking
24  restitution from Chevron for the placement of a
25  large scale petrochemical facility on their

29

1  land without their approval.  I testify on
2  behalf of the Rileys and many others about what
3  the land values are and what would be just
4  compensation to them for the use of their
5  property for this purpose.
6      Q.   Okay.
7      A.   And the next one?
8      Q.   Yeah.  Let's go to the next one.
9      A.   Monteleone versus Pontchartrain Levee
10  District is a taking where the State of
11  Louisiana and the Pontchartrain Levee District
12  place a levee across the middle of a portion of
13  land that Monteleone interests believed to be
14  developable.  I did a value of both the land
15  taken by the levee and the extent to which
16  there were severance damages that accrued to
17  them for lack of future development on their
18  property.
19      Q.   So you worked for Monteleone, et al?
20      A.   I did.
21      Q.   Who did you work for in the next case,
22  16?
23      A.   Um --
24      Q.   Various claimants --
25      A.   Yeah, I know.  I know.  I'm trying to

30

1  answer you.  I just have to search a little bit
2  which case that is.  I'm not sure.  I really --
3  I'm having trouble right now remembering -- I
4  think I worked for the various plaintiff
5  parties there.
6      Q.   Okay.
7      A.   And this case settles before we get to
8  trial.  I'm not even sure I got to deposition.
9  I think reports were issued, and just before
10  deposition I think we reached settlement is
11  what the parties did.  But I worked for, in
12  that instance, if I recall right, a group of
13  plaintiff parties.
14     Q.   All right.  How about in the next
15  case, Tessier; who did you represent?
16     A.   Um -- Tessier, et al versus Moffatt is
17  a dispute among partners, and I represented
18  Moffatt and his partners in that matter.  And
19  it was a dispute about the fair distribution of
20  profits and income from a medical office
21  building in Jefferson Parish.
22     Q.   Claimants versus Joslyn Industries.
23  Who did you represent?
24     A.   In that instance it's Joslyn
25  Industries.  It's an environmental litigation

31

1  of a site that almost made it to Superfund
2  status and what was just compensation for land
3  value diminishments.  My findings in that
4  matter that were land value diminishments
5  extended out only a short distance from the
6  facility.  The Court ruled that that was
7  correct, and then there were some land value
8  diminishments involving property that was close
9  to the fence line of that operation.
10     Q.   How about Claimants versus IMC Global;
11  who did you represent?
12     A.   IMC Global is who I represented.  They
13  had had a tragic explosion that melted the
14  parking lot at the facility and caused
15  significant damage in the town.  I was asked to
16  value, in a model sense, what were the likely
17  damages that the real estate had suffered in
18  Sterlington, which is a small rural community.
19  And I did that work and that went to deposition
20  in Houston, and that matter settled shortly
21  thereafter.
22     Q.   Terrebonne School Board versus
23  Columbia Gas.
24     A.   Um -- in that instance it was Columbia
25  Gas Pipeline.

32

1      Q.   Uh-huh.
2      A.   They were being sued by the Terrebonne
3  Parish School Board alleging that the actions
4  of the pipeline had done damage to their
5  property and seeking restitution for, um --
6  curing the damages.
7      Q.   All right.  Let me jump --
8      A.   Okay.
9      Q.   Let's go to 26, the Gaylord explosion.
10  Did you represent the plaintiffs or the
11  defendant?
12     A.   I was retained after the matter was
13  well underway by the Gaylord Chemical firm and
14  other defendants associated with Gaylord
15  Chemicals.
16     Q.   What were your findings in that?
17     A.   I did an extensive valuation analysis
18  of the city of Bogalusa, and the facts on the
19  ground argued that land value and property
20  value diminishments had generally not occurred
21  in that instance.  Um -- and the property
22  damages did not become part of the settlement
23  matters in that trial.
24     Q.   Okay.  We've already talked about
25  Murphy Oil.  It's that Murphy Oil case?

33

1      A.   Yes.
2      Q.   Same one, Turner versus Murphy Oil?
3      A.   It is.
4      Q.   All right.  Are any of these other
5  cases cases where it's alleged that there's
6  property damage or diminution of property value
7  due to a catastrophic event?
8          (Whereupon Peter Keeley entered the
9  deposition in progress.)
10     A.   Yes.
11  EXAMINATION BY MR. GILBERT:
12     Q.   Which ones?
13     A.   Catastrophic -- it depends on what you
14  mean by catastrophic.  They're environmental
15  events, but I don't know that they're -- I
16  don't know how to define what is catastrophic.
17     Q.   A casualty rather than a taking or a
18  business dispute.
19     A.   Yes.  In Number 28, Historic
20  Restoration and its partners own a hotel on
21  Convention Center Boulevard in which mold and
22  water leakages were found to be occurring, and
23  there's a multi-year litigation there that's
24  drawing to a close involving what damages have
25  occurred to the value of the hotel -- well, to

34

1  the lost business profits in the hotel and to
2  the cost to cure.
3      Q.  Who do you represent?
4      A.  The various partners versus the
5  construction companies.  I represent the
6  ownership group.
7      Q.  Boy, I just lost that one.  What
8  number is that?
9      A.  That's Number 28.
10     Q.  So you represent the hotel.
11     A.  The hotel and its partners.
12     Q.  All right.
13     A.  Then in the St. Charles Land versus
14 British Petroleum --
15     Q.  Uh-huh.
16     A.  -- there is an item under seal right
17 now that I really don't think I can discuss.
18     Q.  Well, I'm not going to ask you to.
19     A.  But at any rate it involves
20 environmental matters.
21     Q.  Who do you represent?
22     A.  St. Charles Airline Land, the property
23 owner.
24     Q.  What about the DOTD case?
25     A.  Yeah.  That is a taking in which

35

1  there's severance damages, and the possibility
2  that we now have higher risk in some ways of
3  operating a facility.  But it's not an
4  environmental case, per se.
5      Q.  All right.  Foregone business profits,
6  that's not a --
7      A.  No.  It's not.
8      Q.  Okay.  Let's see.  These are all
9  antitrust cases.
10     A.  Antitrust, and then there's business
11 income and loss cases.
12     Q.  Okay.  Do you keep any statistics of
13 how frequently you represent individual
14 property owners?  I don't mean to say
15 represent, but advocate or serve as expert on
16 behalf of individual property owners as opposed
17 to the other party?
18     A.  The word advocate troubles me.  And I
19 try to be an objective third party, as I think
20 the trier of fact expects me to be.
21     Q.  Retained by.
22     A.  I don't know.
23     Q.  Okay.
24     A.  I mean, you just saw that I'm on both
25 sides.

36

1      Q.  Well, I see this.  I'm just asking if
2  you keep any statistics.
3      A.  Here's how I do my cases: I interview
4  the counsel before I agree to accept a case.  I
5  go through with counsel their theory of the
6  case, the elements of damage they think are
7  present.  I then consult my files and what I
8  believe to be likely or not likely in the
9  matter, and I let them know whether I'm willing
10 to do the work or I'm not.  So I don't really
11 care whether -- which side.  I care about being
12 on the side where I think that it is
13 appropriate for me to render an opinion.
14     Q.  I understand.  You want to maintain
15 objectivity.
16     A.  That's what I'm paid to do.
17     Q.  And my question is whether you keep
18 any statistics of --
19     A.  No.
20     Q.  -- whether you work for --
21         MR. BLANCHARD:
22             Asked and answered.
23     A.  I'm sorry.  I didn't mean to cut you
24 off.  I'm sorry.
25 EXAMINATION BY MR. GILBERT:

37

1      Q.  That's okay.  Is it correct that you
2  keep no such statistics as I was asking you
3  about in my prior question?
4      A.  Correct.  I keep no such statistics.
5      Q.  Okay.  All right.  Let's look at the
6  body of the report itself.  Let's start on Page
7  2, Section 2, Assignment and Assertions,
8  Number 9.
9          That just describes in general fashion
10 what it is that you're to do in this case;
11 correct?
12     A.  Yes.
13     Q.  Is there anything else that you've
14 been asked to do in this case?
15     A.  I believe Item 2, Paragraph 9 to 11
16 are a complete statement.
17     Q.  Okay.  And that is accurate as of the
18 present?
19     A.  I believe to be, that's correct.
20     Q.  Okay.  Is there anything else that you
21 intend to do in this case that is not
22 encompassed within 9 through 11?
23     A.  I don't specifically address in
24 through 11 comments that you may seek from me
25 or that I may tender regarding other expert

38

1   testimony in this case.  Um --
2        MR. BLANCHARD:
3             Are you finished?
4        THE WITNESS:
5             Not quite.
6        A.  And so I would reserve the right that
7   I may render some views regarding other expert
8   reports.
9   EXAMINATION BY MR. GILBERT:
10       Q.  Have you been asked to do so by your
11  principals?
12       A.  I've had discussions with principals
13  about other expert reports.  I have not drafted
14  any written comments.  But I would be willing
15  to share any views that I have with you today.
16       Q.  Is there anything else that you
17  believe that you need to do in order to render
18  the most accurate opinion possible as we sit
19  here today?
20       A.  I believe I have done the work that I
21  was asked to do at this time.
22       Q.  You think your opinion is as accurate
23  as it can be as we sit here today?
24       A.  I think it is an accurate opinion.
25       Q.  As accurate as it can be?

39

1        A.  When you ask for perfection in a world
2   that is full of imperfections I'm always
3   hesitant to argue that it is perfect work.
4        Q.  Granted that it may not be perfect,
5   and that's why I'm not asking you if it's
6   perfect.  I'm asking you if you believe that it
7   is as accurate as it can be.
8        A.  I believe it is accurate and meets the
9   standard of accuracy that are generally
10  accepted.
11       Q.  All right.
12           Paragraph 11:  You've been instructed
13  of the likelihood of three varying methods in
14  evaluating the property damages in this matter.
15  And you say that you've been instructed by
16  counsel that these three are likely to be
17  implemented by the Court.
18           Do you have any reason to agree or
19  disagree that that's the case?
20       MR. BLANCHARD:
21            Objection.  Calls for a legal
22            conclusion.
23       A.  And I have no basis to, um -- have any
24  different opinion.  Those are fairly
25  all-inclusive, but, um -- and the word

40

1   instructed is probably -- should be the word
2   informed in all likelihood.  But --
3   EXAMINATION BY MR. GILBERT:
4        Q.  Did you instruct your principals as to
5   what the likely methods would be that the Court
6   would use to assess property damage in this
7   case?
8        A.  I'm sure we had a general discussion
9   about what I had seen in the past.  But I'm not
10  an attorney and not in a position to say what
11  the Court will or will not do in this matter.
12       Q.  I appreciate that.  So you're not
13  advocating for any of these particular methods.
14       A.  No.
15       Q.  You don't believe that the Court is
16  obligated to impose any of these particular
17  methods.
18       MR. BLANCHARD:
19            Objection.  Calls for a legal
20            conclusion.
21       A.  I agree with the objection.  I'm not
22  in a position to speak for what the Court
23  should or should not do.
24  EXAMINATION BY MR. GILBERT:
25       Q.  I just want to clarify that.

41

1           Let's look at Section III,
2   Complicating Damage Measurement Issues.
3           Would you agree that Items 1, 2 and 3,
4   that you include in Paragraph Number 12 also
5   call for legal conclusions?
6        A.  They may.  From the view of an
7   appraiser or from the view of a person with
8   knowledge of remediation of physical damages
9   due to this flooding event we've all
10  experienced here, I think these are an accurate
11  statement of measurement issues.
12       Q.  Would you agree that the extent of
13  damages which would have occurred from any one
14  of the sources of flood water given sufficient
15  time for that source to reach a water depth
16  equilibrium is something for a Court to decide?
17       A.  Well, the Court obviously will be --
18  they're the trier of fact, they will make
19  determination.  All I can do is provide my
20  opinions about damages issues within the limits
21  of my knowledge.
22       Q.  Is it your role in this assignment to
23  determine the extent of damages which would
24  have occurred from any one of the sources of
25  floodwater given sufficient time for that

42

1  source to reach a water depth equilibrium?
2      A.  I have not tendered an opinion or an
3  attempt, yet, to measure the damages that are
4  attributable to varying water depths or from
5  source of water.  That is not part of the
6  opinion I rendered here.  And I have indicated
7  that to do that, you'll find in Items 13 and
8  14, there are a variety of other items that
9  have to also be considered.  And then you will
10 find in Paragraph 23 and Paragraph 22 and
11 Paragraph 24 that there are other complicating
12 factors that have to all be measured to be able
13 to identify the effects of any one of those
14 components.
15     Q.  Is it within your expertise to
16 quantify those factors and measure them and
17 implement them?
18     A.  With sufficient data, yes.
19     Q.  Okay.  Where would that data come from
20 in order to make it sufficient?
21     A.  You would ordinarily have engineering
22 reports on the cost to cure that could be
23 assigned back to various sources of damage.
24 You would have reports on the amount of water
25 and where it came from at specific locations,

43

1  so you could look at the extent to which any
2  water depth issues were there.  You would have
3  to know the duration, though, of any one source
4  of water because it may be that the duration of
5  one source is so brief as to have a negligible
6  effect overall on damages that would have
7  occurred anyway within a short period of time
8  from the initial beginning of damages.  So the
9  duration of water from various sources would
10 have to be known, as well as the source.
11     Q.  All right.  Whether damage would have
12 occurred anyway, that's not a -- that's not a
13 conclusion that you could reach, is it?
14     A.  Well, I think a hydrologist can show
15 the sources of water, possibly, and the
16 relative depths over time.  And that would
17 allow one to see whether or not a water
18 emanating from one source versus another, how
19 long it might have been present.  And it may
20 have done a damage, but it may have done a
21 damage for a period of two or three hours, and
22 then we have an extensive damage period
23 measured in weeks rather than in hours from
24 another source.
25     Q.  But that's not an analysis that you

44

1  would conduct, correct?
2      A.  I can certainly do a present value
3  analysis, if I'm asked to, of the relative
4  impacts of the loss of the use and utility of a
5  property for a few hours versus its long-term
6  loss and utility.
7      Q.  Well, I'm not asking you about loss of
8  use.  I'm not asking about loss of use over a
9  particular time period.  What I'm asking you is
10 whether -- you've just testified a moment ago
11 that this type of data would come from an
12 engineer.  Correct?
13     A.  I testified it would come from several
14 sources.  I think I mentioned engineers, I
15 mentioned hydrologists.  I mean, there would be
16 several experts involved in providing the data.
17 I have the mathematical skills to try and
18 undertake an analysis if it were warranted.
19 And in doing that one would have to look at the
20 relative time that a property is exposed to the
21 source of any damage.
22     Q.  What data you would get from an
23 engineer or hydrologist, which is a type of
24 engineer from my understanding, you would have
25 to rely on somebody external to you for that

45

1  information, correct?
2      A.  I'd rely upon them for cost and
3  duration and source information.  I'm perfectly
4  capable of talking that information and then
5  trying to organize it into an analysis of the
6  effect on value.
7      Q.  Okay.  Now, taking that information
8  and using it to differentiate the different
9  sources of damage, is that something you would
10 do or is that something that an engineer would
11 do?
12     A.  Well, if the engineer has already
13 rendered opinions about the types of damages
14 and costs, and the hydrologist has rendered
15 opinions, I can render an opinion dealing with
16 the relative impacts on value.  But if we're
17 dealing with very, very short time periods,
18 they become so small as to not perhaps be
19 measurable, they become incidental.
20     Q.  Let me rephrase the question.
21     If there is a piece of property that
22 may have been damaged by several different
23 sources, you do not do the initial
24 quantification of which damage arises from
25 which source, do you?

46

1    A.   No, I would want construction
2  engineering expert to look at individual
3  properties to make a determination of, if they
4  can, the source of the damage and the nature of
5  the damage and a likely cost to cure the
6  damage, um -- to respond to your specific
7  example.
8    Q.   You do not do that, the construction
9  engineer and the other people that you've just
10 identified do that; correct?
11   A.   Yes.
12   Q.   You do not do that.
13   A.   No, I don't.
14   Q.   That is not within your expertise.
15   A.   Right.
16   Q.   Okay.  Thank you.
17       All right.  I confess that I do not
18 understand some of what you say in the next
19 paragraph, Number 13.  Can you explain
20 paragraph 13 to me in layman's terms?
21   A.   Well, 13 is saying that if you're
22 going to measure cumulative cost to repair, I'm
23 identifying the sorts of components you'd have
24 to know about to be able to do that, and I'm
25 asserting the only way to do that is one

47

1  property at a time.  And that doing that in
2  some statistical model -- at one point you
3  started to use the word hedonics in a question
4  here.  To do some form of statistical or
5  hedonic modeling process I think is not
6  appropriate and that you have to deal with a
7  very rich set of information specific to one
8  property at a time.
9    Q.   And that is essentially what your
10 opinion was in the class certification
11 discovery phase of this proceeding, correct?
12   A.   It is.
13   Q.   That it's appropriate to do individual
14 appraisals of properties.
15   A.   It is.
16   Q.   Okay.  And that it is possible to
17 measure damage to individual properties.
18 Correct?
19       MR. BLANCHARD:
20          Objection.  Vague.
21          Based on what?
22       MR. GILBERT:
23          Based on the contrasting
24       situation of it is impossible to do
25       it.

48

EXAMINATION BY MR. GILBERT:
  Q.   It is possible to do it as opposed to
impossible to do it, correct?
       MR. BLANCHARD:
          Objection. vague.
          If you can answer it --
  A.   I'll try.  It is possible when there's
sufficient physical evidence still left for the
experts to work with.
EXAMINATION BY MR. GILBERT:
  Q.   Okay.
  A.   So there could be circumstances where
the asset no longer exists and no one has
sufficient information to do an accurate
measurement.
  Q.   Okay.  So in that instance, is it
impossible to put a value on the loss?
  A.   It would be very difficult to arrive
at a reasonable estimate.
       Impossible?  We fortunately live in an
era where there's lots of aerial photography
that goes back over time.  So there may be
other records that are kept, maybe not by the
property owner but by former insurers or others
who dealt with the property.  So I've rarely

49

encountered something where it's impossible.  I
have encountered in the past where it was very
hard to do, complicated to do, but impossible
is, um -- may not be the case.
  Q.   Okay.  All right.  In Number 14, it's
the next paragraph, your second sentence -- and
I don't mean to parse the sentences out, and
I'm not suggesting that this is the only thing
you said in 14, it just happens to be the only
thing that a question occurs to me about.
  A.   Yes, sir.
  Q.   Any damages measurement methodology
must be able to accurately differentiate
between damages caused by negligent breach of
duty and those caused independently through
Hurricane Katrina and damages caused by act of
others who are not defendants.  Each cause of
damage must be separately measurable.
       That requires conclusions of law, does
it not?
  A.   It is -- if we are to assign -- it
would be up to the trier of fact as to what
information they feel is covered by the law,
but if one is to identify the extent to which a
damage is caused by a specific defendant

50

1   party -- I notice when you read it you left out
2   after the word of duty "by a defendant," then
3   to do that --
4       Q.   Correct.  Sorry.
5       A.   -- you would have to be able to
6   measure the damages caused by any one party,
7   including damages which are acts of God or acts
8   of others.
9       Q.   Is that something that's within your
10  expertise to do?
11      A.   What I have explained is if you have
12  sufficient engineering, construction
13  information and hydrology information, and it's
14  sufficiently property specific, then it may be
15  possible to --
16      Q.   Is it within -- sorry.
17      A.   If you supply me sufficient data, my
18  belief is we can arrive at valuations that
19  attempt to parse relative impacts.  But those
20  impacts will have to take into account duration
21  if we have overlapping impacts.  If something
22  is damaged the same way more than once, and one
23  impact is quite short and near term in nature
24  and the other is very pervasive in a nature,
25  then the pervasive one is going to be the party

51

1   who would have been responsible for the bulk of
2   the damage.
3       Q.   So you have to know whether a
4   defendant owed a duty.  Correct?
5       A.   Owed a duty.  I think I need to be
6   instructed by those competent to make that
7   determination of whether a defendant owed a
8   duty.
9       Q.   That would be a court of law, wouldn't
10  it?
11      A.   In all likelihood.
12      Q.   You'd need to know whether there was a
13  breach of that duty.
14      A.   I need to know whether or not they are
15  a party who is held responsible for some
16  portion of the damage.
17      Q.   That's something a Court would decide;
18  correct?
19      A.   It would.
20      Q.   You need to know whether they're
21  negligent in their breach of duty; correct?
22      A.   For me to measure the damage I don't
23  have to know if they're negligent or not.
24      Q.   Well, for you to differentiate source
25  of damage you have to know if a party is

52

1   negligent, don't you?
2       A.   I have know whether they're a party
3   which to which damages should be attributed.
4   And if that means they have to be found to be
5   negligent in terms of the Court's standards, if
6   that's the Court's standard, then yes, I'd have
7   to know that.
8       Q.   So you need a judgment from the Court
9   before you can do that part of your analysis,
10  correct?
11          MR. BLANCHARD:
12              Objection.  That's again calling
13          for legal conclusion.
14      A.   The analysis can be done as long as
15  I'm given guidance of who are the various
16  parties.
17  EXAMINATION BY MR. GILBERT:
18      Q.   Well, what I'm trying to --
19      A.   The Court ruling will simply indicate
20  the extent to which if you did the analysis and
21  I have ten sources of damage for a property and
22  the Court could -- and I have estimated to what
23  degree, if any, those various source is created
24  damages, it would be up to the Court then to
25  decide of those damages which ones they find to

53

1   be due to negligence and to be recoverable
2   claims.  So work can be done whether the
3   Court's ruled or not ruled.  It would be up to
4   the Court to decide what portions of those
5   damages they find are assignable to a
6   particular party.
7       Q.   In order to do the work that you
8   describe in Paragraph 14, the excerpts that I
9   just read to you -- with the unintentional
10  omission, I did not mean to omit the phrase by
11  a defendant -- in order to do that you must
12  make legal conclusions, is that correct?
13      A.   I don't know if they're legal
14  conclusions.  I've listed in my Items 22 to 24
15  elements of damage which could reasonably have
16  occurred to properties and may have occurred or
17  not occurred to the two properties at hand.  I
18  think that is a fairly inclusive list that I've
19  generated on Items 22 to 24.  If there is
20  something further, I would be open to it, but I
21  think these are elements of damage.  And I
22  think they are items that are measurable if
23  there's sufficient data available.
24      Q.   Do you have an opinion as to, let's
25  take the Egania Street property only by way of

54

1  example.
2      A.  Uh-huh.
3      Q.  Do you have an opinion as to the
4  percentage of damage caused by differing
5  sources, if there were differing sources?
6      A.  I have not issued any opinion
7  regarding percentage distribution of damages on
8  Egania Street.  I have seen hydrologic work
9  that might be part of what would be needed to
10  make some determination at a future date, but I
11  have not issued or made any attempt to measure
12  those damages.
13      Q.  And that's not within your area of
14  expertise to do so, is it?
15      A.  It is once the facts would be supplied
16  by appropriate other supporting experts.
17      Q.  Would it be appropriate before or
18  after the Court has rendered judgment?
19      A.  I don't think the Court renders --
20      MR. BLANCHARD:
21          Objection.  Calls for a legal
22      conclusion.
23          Go ahead.
24      A.  I can do the work as long as you give
25  me -- I have fourteen elements of damage right

55

1  now.  And if you give me sufficient engineering
2  cost, hydrology information on those fourteen
3  specific to an individual property, I can make,
4  I think, a reasonable effort at assigning
5  relative damages to those components.
6      MR. GILBERT:
7          I think counsel's objection makes
8      my point.
9      MR. BLANCHARD:
10          Well, then, continue on, Brian.
11  EXAMINATION BY MR. GILBERT:
12      Q.  Let's look at Number 15.  When there
13  are multiple defendants or other negligent
14  parties as alleged by the plaintiff's pleadings
15  in this case, the allocation of liability must
16  be specific to each defendant and their acts.
17      All right.  First of all, what other
18  negligent parties are you referring to?
19      A.  Well, it's possible that one could
20  find the U.S. Army Corps of Engineers or the
21  federal government in some way responsible for
22  damages.  I understood that there had been a
23  construction dredging firm that had been a
24  party to this litigation who may or may not
25  have been a negligent party.  I don't know if

56

1  there are other negligent parties or not.  I
2  don't know whether any city agencies would
3  somehow find that they had a responsibility
4  here, or state agencies.
5      Q.  Have you read the complaints filed by
6  the plaintiffs in this case?
7      A.  I have glanced at some of them.  I
8  don't think I've made any exhaustive effort to
9  look at all the complaints in this matter.
10      Q.  Okay.  Do you understand that the
11  plaintiffs in this case have sued only entities
12  that handled the barge ING 4727?
13      A.  In the suit we're now involved in for
14  this deposition, yes.
15      Q.  Does this statement from Number 15
16  apply actually to a different lawsuit?
17      A.  Well, if it turns out that there are
18  multiple sources of damage, then it will be up
19  to the trier of fact to decide whether or not
20  all or part of any damages accrue to any one
21  defendant and whether defendants in other suits
22  share liability with defendants in this suit.
23      Item 15 is my non-lawyer attempt at
24  simply pointing out to the reader that there
25  could be multiple negligent -- allegedly

57

1  negligent parties in this matter, and if that's
2  the case then it may be that there is an
3  allocation of liability.
4      Q.  Would you explain that statement, the
5  allocation of liability must be specific to
6  each defendant and their acts?
7      A.  Well, if you have water, for example,
8  emanating from multiple sources and the source
9  of each water involves facilities owned or
10  operated by different parties, then it would
11  strike me that it's likely that we would have
12  damages that are accruing from multiple sources
13  and that are the responsibility or could be the
14  responsibility of multiple parties.
15      Q.  That statement requires -- that
16  statement is based on a legal conclusion, isn't
17  it?  (Indicating.)
18      A.  And I have made clear that I am not
19  asserting this as a matter of fact.  It is my
20  opinion that ordinarily, in the cases I have at
21  least encountered in the past where there's
22  more than one defendant party, that there is
23  some allocation of responsibilities for the
24  cumulative damages.
25      Q.  You don't actually know what the law

58

1  requires the Court to do as far as allocation
2  of liability in this case, do you?
3      A.  I have no legal opinion on what
4  actions the Court must -- would take in this
5  matter or what set of legal precedents they
6  will conclude they need to follow.
7      Q.  Okay.  Let's go on to Factual
8  Materials Reviewed and Compensation, Number 16.
9      A.  Yes, sir.
10     Q.  I have inspected the Ninth Ward east
11 and west of the Industrial Canal as well as
12 St. Bernard Parish on many occasions.
13         Your inspection of the west of the
14 Industrial Canal, how is that relevant at this
15 time in this case?
16     A.  Well, it has the same extensive, um --
17 length of canal frontage on the west side as on
18 the east side of the canal, and if there were
19 something about the canal itself or about
20 perceptions of flood risk in the market in the
21 future, you would expect it to affect both
22 sides of the canal.  They're both the same
23 basic construction of walls, they both are
24 similar in length, they both are subject to the
25 same tidal surge.  So I felt it was good to

59

1  look at east and west to see whether I
2  discerned any real differences.  And my
3  conclusion that was I don't believe there are
4  in terms of perceived flood risk, but I have
5  focused all comparable activity on parcels east
6  of the canal.
7      Q.  How did you determine whether there
8  was a perceived flood risk?
9      A.  Well, I have simply looked to see
10 whether there's differences in-housing prices
11 that would suggest a pattern of concern on the
12 part of the market where prices are very
13 different in magnitudes from what they were
14 before the storm after the storm.  I concluded
15 that wasn't necessary in this case as part of
16 my opinion, that it wasn't an item I had to
17 rely upon to meet the requirements of this
18 case, so I don't opine further on that issue in
19 this case.
20     Q.  So perception of flood risk is not a
21 factor in this case.
22     A.  I don't believe so.
23     Q.  Okay.  It's in your report.  But
24 that's something that shouldn't be?
25     A.  No.

60

1      Q.  It doesn't need to be?
2      A.  It is an element that could be.
3      Q.  Okay.
4      A.  It could be an item that could under
5  some circumstances.  I'm simply not finding it,
6  a change in perception of flood risk, so
7  therefore that element's impact on value is
8  zero.
9      Q.  As far as this case.
10     A.  As far as this case is concerned.
11     Q.  Okay.  All right.
12         (Off the record.)
13 EXAMINATION BY MR. GILBERT:
14     Q.  All right.  Let's go to Section 19 on
15 Page 4, that measuring property value before an
16 event and measuring post-event valuation, while
17 separately measuring multiply causal a
18 correlated impacts on property valuation levels
19 as well as changes in value over time is among
20 the most complex evaluation analyses.  I --
21 meaning you, Dr. Ragas -- have found no
22 published research purporting to measure
23 separately diverse, simultaneous causes in
24 value diminishment.  I've applied the available
25 data and my experience in a comprehensive

61

1  manner to identify valuation impact, if any, in
2  an objective manner.
3         Does that -- am I correct in inferring
4  from that that you developed a method where you
5  are unable to find research that describe a
6  method for doing this?
7      A.  Um -- I have not found published
8  research dealing with an analogous situation to
9  this one where you actually can see someone
10 else's study looking at measuring this many
11 sources of damage simultaneously.
12     Q.  So there's no concise set of
13 instructions somewhere as to how to do this.
14     A.  No, sir.
15     Q.  And you had to come up with something
16 on your own.
17     A.  I had to use my experience and
18 training to arrive at what I think is
19 reasonable.
20     Q.  Can you tell us, tell me, tell the
21 court reporter and everybody in the room, how
22 you developed your method and what your method
23 is.
24     A.  Well, the method -- the only part of
25 it we've executed so far is I have measured

62

1  value of property before the storm event, value
2  of the property after the storm event without
3  repair, value of the property after the storm
4  event if repaired or as repaired, and I have
5  sought to value land at several points in time,
6  as well, both before and after the event.  So I
7  have generated the changes in value that have
8  occurred and why they occurred.  I have not
9  rendered any opinion in this report on how one
10 would distribute any changes in value or some
11 measure of damages, if there is a damage, to
12 various sources.
13     Q.  All right.  The why they occurred.
14 Would it make sense to ask you about that now,
15 or would it make sense to ask you about that in
16 connection with the individual properties?
17     A.  Why don't we go to individual
18 properties for that discussion.  How about
19 that?
20     Q.  Got you.  Let's jump to Number 21.
21 The depth of floodwater at each individual
22 property, extent of accompanying wind damage to
23 the specific property, rain-caused damage,
24 duration of the flooding event by property and
25 individual living area elevations all

63

1  collectively create a wide range of damage
2  outcomes and costs to repair for each property
3  in addition the to the physical variations in
4  building components by property.
5       You did not actually factor into your
6  opinions or your analysis all of these
7  variables that you describe here, did you?
8     A.  I have measured value of property
9  before and after the event and value of
10 property as repaired, or if it was repaired.  I
11 have not rendered an opinion at this time on
12 what -- a quantum, a magnitude of damage for
13 each property, or how I would -- or a
14 distribution of the damages by source.
15     Q.  Understood.  Let's go to Number 22.
16 Public awareness of the lack of hurricane
17 protection after Katrina's damage to locations
18 within this class area should increase
19 household perception of the risk of future
20 repeated losses.
21       Now, that necessarily relies on an
22 assumption, does it not, that --
23     A.  I'm listening to you.
24     Q.  Yeah.  I'm just framing my question.
25 That relies to some extent on an assumption

64

1  that the flooding within this class area was
2  due to levee and floodwall failures as opposed
3  to levee or floodwall breaches caused by a
4  barge.
5     A.  I don't think I've said that at all.
6     Q.  I'm asking, that's all.
7     A.  What I'm saying is, there have been
8  published studies done by the most reputable of
9  insurance-related analysts in the world.
10 There's a published study from Risk
11 Management -- RMS, I think it's Risk Management
12 System -- Risk Management Solutions, who does
13 large amount of work in the insurance industry
14 who has specifically looked at the Katrina
15 event, and I included it in my discovery
16 response, that argues in a rather compelling
17 way that changes that are happening in both sea
18 level, frequency of storms, and the extent to
19 which levees assumed heights that may or may
20 not now look to be appropriate for Category 3
21 or 4 storms, have all changed the actual risk
22 that this market is exposed to.  And gradually,
23 the public is becoming aware of the extent of
24 change, which is why there's a push here for
25 Category 5 levees rather than Category 3

65

1  levees.  So my point here in Item Number 22 is
2  that as the public realizes that they're
3  exposed to risk they didn't think they had,
4  ordinarily in an economic and a marketplace of
5  buyers and sellers, when you change their
6  perception of future risk they either have to
7  get higher rates of return to offset that risk
8  or they push down the price of that asset.
9  That has not yet seemingly happened here.  I am
10 not seeing evidence yet of that having
11 occurred.  But ordinarily, in a marketplace you
12 would expect to see this happen.
13     Q.  Is it correct that this fits within an
14 hedonic model of property valuation?
15     A.  It wouldn't need to be in a hedonic
16 model.  It could fit in any valuation analysis
17 if one can ascertain factually that there's
18 some diminishment in value only explainable by
19 a change in risk perceptions.  But at this time
20 I'm not finding that Item 22 is actually
21 present in the two properties at hand in the
22 discussion today.
23     Q.  Okay.  Is it customary for you to
24 consider perception of risk in evaluating
25 property diminution or property loss?

66

1    A.  It comes up.  It isn't something that
2   comes up with great frequency.  Example:  When
3   I looked at the printing firm who now had dirt
4   piled eight feet high next to their facility
5   and we ran vibration tests, it became clear
6   that a printer looking to occupy this special
7   use property in the future was going to have to
8   take this risk of vibration into account, and
9   subsidence, because they were getting a higher
10  throwaway rate, higher numbers of jobs were not
11  registering right, having to be thrown away,
12  which is very, very expensive.
13       So this kind of thing happens in
14  settings other than just flood; it happens
15  wherever what people thought was right about
16  the future in a location turns out to not be
17  right.
18       Q.  So the only data you've seen so far
19  suggests that this is just not happening in the
20  class area.
21       A.  I have no evidence of it.  And we
22  don't have a class area, but I have no evidence
23  of it happening in the area east of the
24  Industrial Canal or, for that matter, within
25  the data for the Metropolitan New Orleans area

67

1   at this time.  And it's not happening, as best
2   I can tell, in the Houston market either from
3   just a casual looking at that market since the
4   storm.
5       Q.  Is there anything that you have the
6   expertise or qualifications that allow you to
7   attribute this non -- the fact that this is a
8   non factor to these markets?
9       A.  Causation in statistics is a difficult
10  burden.  There are statistical models that will
11  give you close to proof of causation.  But they
12  require a lot of data, they require usually a
13  fairly lengthy time period, and most
14  statistical models tell you things vary
15  together, but they don't give you a definitive
16  causation.
17       Q.  Let me ask the question in a more
18  primitive way.
19       A.  All right.
20       Q.  Are you able to posit any opinion or
21  theory as to why it is that people in the New
22  Orleans metropolitan area just seem not to
23  care?
24       A.  Well, I think that's a whole different
25  subject of discussion in my deposition.

68

1       Q.  I'm not talking about laissez faire
2   or --
3       A.  And I don't know they don't care, I
4   think what's occurred is they have -- I'm
5   sorry, we're both talking at once.
6       Q.  I know.  I apologize.  I was trying to
7   modify the question a little bit.  Why it's
8   affecting the market.
9       A.  That would suggest the public views
10  this event as not being likely to occur again
11  in a reasonable time period.  And I have had
12  many people tell me that Category 4 and 5
13  storms like Katrina, or Camille are a
14  once-in-forty-year event, and that if it's
15  happened right now then it probably won't happen
16  again for forty years, by which time they may
17  be dead so it's not really their problem.
18       And is that a hope in the future for
19  good luck?  I guess it might be.  But at any
20  rate, you asked for a possible explanation.  I
21  have given you my best guess.
22       Q.  Understood.  All right.  Let's go to
23  Section 23 which is also on Page 4.
24       A.  Uh-huh.  Yes.
25       Q.  You recite a list of many simultaneous

69

1   sources from which physical damage to
2   plaintiffs' properties arise.
3       Is it your position that all of these
4   sources had impact on Egania and Deslonde?
5       A.  It is -- looking at the list, um -- I
6   don't know of a tree damage cause or electrical
7   pole falling cause of damage which is my
8   Item 7.  I'm not aware of a water mobilized
9   debris damage where a vehicle or something
10  large would float into the building causing
11  damage.
12       Q.  Like a barge?
13       MR. BLANCHARD:
14          Objection.
15       A.  I'm not aware of any item that makes
16  contact with this property, and so -- and I'm
17  not aware -- I am not aware of whether there
18  was vandalism that occurred to either of the
19  two subject properties.  I don't know of that.
20  So that's Item 11.
21  EXAMINATION BY MR. GILBERT:
22       Q.  Okay.
23       A.  So Items 7, 8 and 11 I am not aware of
24  those being elements of damage at these two
25  specific properties, but they could be elements

70

1  of damage for other properties quite close to
2  them.
3     Q.   Are the others elements that you are
4  aware of?
5     A.   I think the others would be likely
6  candidates.  I don't know about Item 3, in
7  terms of wind damage.  I saw that there is an
8  insurance payment made for wind damage on one
9  or both of those properties, and that would say
10 that Item 3 is relevant.
11    Q.   Okay.  Can you explain Number 12,
12 which is the next item in Section 23 and exists
13 at the top of Page 5 -- explain it and relate
14 it to Egania and Deslonde properties, if you
15 would?
16    A.   The paragraph actually addresses three
17 separate issues and perhaps would be more
18 understandable if it had not been commingled.
19 My primary point of the paragraph is that it is
20 well established in the housing finance
21 literature that periods of economic recession
22 when those recessions are severe can affect
23 property values in an adverse way, cause values
24 to decline.  We are now entering a period of
25 substantial economic distress and property

71

1  values are beginning to decline rather broadly
2  in the New Orleans market.  So if you are
3  modeling the value of a property, or you're
4  drying to identify the value of a property at a
5  time when this price decline is happening for
6  economic reasons, that has to be taken into
7  account and not attribute to it as if it's a
8  damage due to some earlier event.  It's a
9  reduction in value happening now from things
10 unrelated to the damage event.
11    The other items in that paragraph are,
12 again, reiterating that I think to do this work
13 you need to do it one property at a time.  And
14 then I am reminding the reader that while this
15 is a twelfth item of damage, my Paragraph 22
16 talks about risk perception changes and that
17 would be a 13th element of damage if that were
18 occurring.
19    Q.   Okay.  We've already discussed your
20 Paragraph 22.
21    A.   We have.
22    Q.   And is it fair to paraphrase our
23 testimony as referring to as recession all of
24 these other factors that you talk about in 12?
25    A.   Yes.  And that event, according to the

72

1  U.S. Government, begins in January of 2008, and
2  here locally perhaps it begins by the middle of
3  2008, so one would have to be concerned as you
4  move to do valuations beyond June of 2008 that
5  there is some risk that you're partly measuring
6  value change due to the recession.
7     Q.   Did you find in your analysis that the
8  recession affected the values of the Deslonde
9  or Egania Street properties?
10    A.   On the evaluation dates that I have
11 chosen, my conclusion is it had not.
12    Q.   Thank you.
13       In 24 you state that the payment of
14 federal flood insurance, federal Road Home
15 funds, FEMA/federal property elevation funds,
16 FEMA/federal property demolition funds, and
17 grants from the State of Louisiana public
18 agencies all mitigate the damage costs not
19 recovered by the plaintiff households.
20       What do you mean by that?
21    A.   These households have received
22 payments from a variety of sources for which
23 they did not pay a premium or price to receive
24 those payments, and they've received payments
25 on flood insurance in which they did make

73

1  payments themselves, and therefore that is a
2  benefit they earned.  But they have also
3  received federal Road Home funds which are a
4  transfer from the U.S. Government to these
5  households not based upon any prior payments or
6  purchases of services they made.  Similarly,
7  they may have received grant funds from other
8  public agencies or from the State of Louisiana
9  which are provided to them because of the
10 flooding event but not because of any actions
11 on the part of the household.
12    Q.   You don't take any position as to
13 whether that -- these factors support any
14 offset or credit to any liable defendant for
15 the values of these houses, do you?
16       MR. BLANCHARD:
17          Objection.  Calls for a legal
18       conclusion.
19       MR. GILBERT:
20          That's what I want to find out.
21    A.   I don't have a legal conclusion.  I
22 have tabulated for the trier of fact, as best I
23 can tell, the sources of any revenues received
24 by either of these property owners, and I
25 relied upon the records that these property

74

1   owners supplied in the course of discovery do
2   that.  But as to how the Court will treat those
3   monies is a decision of the trier of fact or a
4   jury, not me.
5       Q.  Did your principal in this case
6   instruct you to perform that calculation?
7       A.  I actually brought the issue up --
8       Q.  Okay.
9       A.  -- and felt that it was a part of the
10  overall economic benefits and/or damages that
11  these households had to deal with, and that it
12  is important when I have done any other type of
13  insurance-related item we would always look at
14  mitigating issues and to what degree mitigation
15  had occurred and the sources of mitigation, so
16  I thought that in this instance we should at
17  least know what mitigation might be.
18      Q.  In order to obtain FEMA money, is the
19  homeowner at any point in time required to make
20  any sort of payment to anyone?
21              MR. BLANCHARD:
22                  Objection.  Calls for a legal
23                  conclusion.
24      A.  I honestly don't know if there is any
25  fee of any kind for processing paperwork that

75

1   FEMA charges the owner.
2   EXAMINATION BY MR. GILBERT:
3       Q.  That wasn't the question.  You
4   testified that FEMA money and the Road Home
5   funds come without the homeowner having paid
6   premiums; is that correct?
7       A.  Yes.
8       Q.  Do you know whether or not the
9   homeowner paid anything else at any point in
10  time in his or her life to become entitled to
11  receive FEMA funds?
12      A.  The entitlement accrued to citizens of
13  the United States.  So that would suggest that
14  if -- they may have been a tax paying entity as
15  a citizen of the United States.  But it was a
16  decision of the U.S. Government unrelated to
17  what tax payments they had or had not made in
18  the past to award them additional support.  And
19  I think the Congressional action is fairly
20  clear the awards were not tied to what taxes
21  were received, they were tied to the extent to
22  which the federal government wished to mitigate
23  damages that had occurred here due to Katrina
24  or Rita.
25      Q.  But you don't take any position as to

76

1   whether receipt of these types of funds
2   alleviates any liability on the part of a
3   defendant; correct?
4               MR. BLANCHARD:
5                   Objection.  Calls for a legal
6                   conclusion.
7       A.  I agree.  And I'm not rendering a
8   legal opinion.
9   EXAMINATION BY MR. GILBERT:
10      Q.  That's what I want to make sure of.
11          We're at the point now of going
12  through the appraisals.
13      A.  I have the appraisals are present in
14  Addendums D and E of this report.  D deals with
15  1321 Egania Street, E deals with 2423 Deslonde.
16      Q.  Which would you like to discuss first?
17      A.  No preference, sir.
18      Q.  All right.  Well, let's do Egania.
19  All right.  Let me just ask you, on Page 5,
20  Paragraph 26, is there a mistake in that
21  paragraph?
22      A.  There may be.  Would you be specific
23  what you're pointing to?
24      Q.  Yeah.  August 27th, 2005, you valuate
25  it at 89,000 for the structure and 10,300 for

77

1   the land.
2       A.  Yes.  The 10,300 is within the 89,000.
3   The 89,000 is not a structure value, it's the
4   value of the house and the lot.
5       Q.  All right.
6       A.  And within that value is 10,300 for
7   the lot.
8       Q.  All right.  The mistake I'm wondering
9   about is as of August 30th, 2007, the total
10  value that you attribute is $140,000.  But at
11  December 31, 2007, just a few months later,
12  it's down to 45,000.  I think you're meaning a
13  different year.
14      A.  Yes.  You're right.  And I was trying
15  to do -- really, it's a hypothetical that I've
16  created in terms of values.
17      Q.  What year you did actually mean for B?
18      A.  B is the value of the building.  And
19  let me look at the report so we get this
20  straight.  All right?
21      Q.  Yeah.  Because I was confused.
22      A.  That's what you're asking me, and what
23  did I do?
24      Q.  I think you may have meant a different
25  year, but we'll see.

78

1   A.   No, I did mean to do B as of
2   October 30, 2007, as if it had not been
3   repaired at all.
4   Q.   October 30?
5   A.   It should read -- on the bottom of
6   that report, the date that's on the report --
7   Q.   I'm lost.
8   A.   -- the report for 1321 Egania Street,
9   that is the $45,000 opinion, which is B, there
10  is a mistake.
11  Q.   Okay.
12  A.   And I'm saying that it should read
13  October 30, 2007, is what it should read.
14  Q.   Okay.
15  A.   It's not an error in the value.
16  Q.   Got you.
17  A.   It is a hypothetical value that says
18  if you engaged in no repair, what was the
19  building worth before repair as of October 30,
20  2007?
21      The C one is a hypothetical value.  It
22  says, if you fully repaired the building by
23  August of 2007, what would it have been worth?
24  And that is $140,000.
25  Q.   Okay.

79

1   A.   The actual repairs don't get completed
2   until May or June of 2008, and, um -- so that's
3   why I used the term hypothetical.
4   Q.   All right.  You do several appraisals
5   on each property and you discuss these
6   properties in your actual report.  And I'm
7   going to suggest to you that you are in a
8   better position to determine how we discuss
9   these things, whether we base our discussion on
10  the appraisals or around your findings, because
11  I think we're going to be looking at two papers
12  at one time, and I'd like to ask you what is
13  the most efficient way in your mind for us to
14  have you explain these to me.
15  A.   I think the way to proceed might be
16  first to discuss my opinion about what was the
17  value of the Egania Street property before the
18  hurricane.
19  Q.   Okay.
20  A.   And that is the opinion of August 27,
21  2005 predating the hurricane, of $89,000.
22  Q.   All right.  Can you get me to that
23  appraisal?
24  A.   I can.
25  Q.   Because they all look the same to me.

80

1   A.   I understand.  Let me count pages.  I
2   see your problem.
3   Q.   Yeah.
4   A.   Go ten pages in.  Let's try ten pages
5   in, and you'll get something that looks like
6   this.  And the bottom will be 89 --
7   Q.   We're there.
8   A.   We're there.  Okay.
9   Q.   That's the first appraisal?
10  A.   That is -- I'm trying to do them
11  chronologically for you, thinking that may be
12  the way that will make the most sense.
13  Q.   Thank you.  It does.  Thank you.  I
14  think it will.
15  A.   Okay.  Now, so what would you like me
16  to do with that appraisal for you?
17  Q.   I would like you to explain how you
18  reached that value for me.
19  A.   All right.  You will find on the
20  second page of the form, Page 2 of 6 --
21  Q.   Okay.
22  A.   -- at the bottom left is a conclusion
23  of value of $89,000 as of August 27, 2005.
24  Q.   Okay.
25  A.   You're nodding meaning you see that.

81

1   Q.   I see it.
2   A.   Okay.  In terms of what I did, I
3   looked for six comparable sales --
4   Q.   Okay.
5   A.   -- and they are presented three on
6   that page, and you turn about another six more
7   pages, it is the page following Page 6 of 6,
8   and those are the additional comparables.
9   Q.   Okay.
10  A.   So I'm going to be discussing on Page
11  2 of 6 the comparables, and also on this page
12  now before you, which together there are six
13  comparable sales.
14  Q.   So that's how you arrive at the
15  $89,000 value.
16  A.   I did.
17  Q.   Okay.
18  A.   And I did it looking for sales that
19  are -- and those sales are all displayed by
20  map, I believe -- there are photos of them as
21  there are in most reports, and you go back a
22  few more pages and you'll find a comparable
23  map.
24  Q.   Okay.
25  A.   Now, let me briefly describe the

82

1   process and we will find it repeats.
2       Q.   Okay.
3       A.   Okay?  The methodology repeats.
4       Q.   Understood.
5       A.   I did an inspection of the Egania
6   property, I measured it and provided a drawing
7   of it in this report that I believe to be
8   factually accurate.  I did in the inspection a
9   listing of what I thought were the physical
10  conditions of the Egania Street property.  Now,
11  while there I asked questions about a few items
12  in the renovated property which I were not sure
13  about were true about the pre-renovated
14  property.  And it is my impression before the
15  storm the property had vinyl floors and some
16  carpet, after the storm it is Mexican ceramic
17  tile; that before the storm it had somewhat
18  older appliances in it, and after the storm it
19  has all new appliances and new cabinetry; and
20  that other than that, fundamentally the
21  structure is alike, that there has not been an
22  addition to the structure; that it was a raised
23  cottage about a foot and half to two feet off
24  the ground before, and as best I can tell the
25  footings that are there today are the footings

83

1   that were there before the storm; that it is a
2   one-story structure today and it was a
3   one-story structure before the storm.
4           I made a judgment that I felt the best
5   way to describe the condition of the subject
6   property before the storm was average, not
7   superior, not inferior, just typical of the
8   neighborhood, average.  Based upon those
9   parameters, I then went looking for comparables
10  and I found six.
11          I did adjustments on those comparables
12  based upon my determination of what were
13  reasonable adjustment factors to use for this
14  specific locale, and they are described in my
15  report on Page 7, Item Number 32.
16          If you look in my base report, Page 7,
17  Item 32, you will find a table in which I have
18  stated the adjustment factors I found
19  appropriate for this property and for the
20  Deslonde property.  And I have tried to be
21  rather uniform in my treatment of adjustments
22  on both.  I can discuss the adjustments if you
23  wish and how I came to them, if you'd like, now
24  or not.
25      Q.   Let me just ask you if there's a

84

1   mistake in Number 32, and if so whether it
2   affects your analysis.
3       A.   What's that?
4       Q.   After payment of all insurances --
5   last sentence in 32.  After payment of all
6   insurances, the Road Home proceeds, the
7   property owner has 18,500 in equity, 107,000
8   house in Algiers plus lot on Egania for
9   11,500 --
10      A.   It should be the lot on Deslonde.
11      Q.   Deslonde.
12      A.   I'm sorry.  You're correct.  I missed
13  that.
14      Q.   That's all right.
15      A.   Sorry.  You're right.
16      Q.   That's okay.
17      A.   Okay.
18      Q.   I'm confused.
19      A.   But I'm happy if the errors are of
20  that type rather than something more serious.
21      Q.   Okay.
22      A.   All right.  So again, I am telling you
23  that I arrived at objective criteria for
24  adjustments, I believe I have a basis for each
25  adjustment, and then uniformly applied them so

85

1   that I'm not simply changing my mind from
2   appraisal to appraisal in a way that seemingly
3   alters outcomes quite substantially.
4       Q.   Can you explain the adjustments?
5       A.   Yes.  There's a size adjustment on
6   Page 7 which says that in general I used $25 a
7   foot for pre-Katrina additional living area.
8   This is not additional bathrooms or kitchen,
9   this is simply making the house a little
10  bigger.  And I think that's I think indicative
11  of a depreciated value in the market for living
12  area alone.  The $35 number is after Katrina,
13  and it's indicative of a property that's had
14  renovation done to it, and it is an adjustment
15  again for living area, not for additional
16  bedrooms or baths.  And then the last is my
17  best judgment of when it's a damaged asset,
18  it's a shell building that's been gutted, the
19  contributory value of additional square footage
20  of shell building, not of additional plumbing
21  in the shell building, of about $10 a foot.
22          And I've done a large number of
23  property valuations since the storm, and I
24  think for this geography these are reasonable.
25      Q.   Okay.  So that the adjustment for

86

1  living space is a downward adjustment?
2      A.   It depends on the difference between
3  the subject property and the comparable.  If
4  the comparable is bigger, then I adjust it
5  down.  If the comparable is smaller, I adjust
6  up.  The idea is to adjust the comparables so
7  that they're like the subject.
8      Q.   Okay.  So in this case you made
9  adjustments per comparable.
10     A.   Yes.  I did.
11     Q.   Okay.
12     A.   Adjustment --
13     Q.   And that's to make them comparable.
14     A.   To make them similar.  Adjustments
15  that were done to help make the physical
16  attributes be reflective in the prices for
17  similar property.
18     Q.   Okay.
19     A.   Yeah.
20     Q.   So it's not actually a size
21  adjustment, it's a value per square foot
22  adjustment.
23     A.   Well, but what it is accounting for
24  and how it's usually referred to in the
25  appraisal profession is we're trying to make

87

1  the sizes similar --
2      Q.   Okay.
3      A.   -- by making the square footages
4  similar.  By adjusting to make the square
5  footages similar.
6      Q.   By adjusting the price per square
7  foot.
8      A.   Yes.
9      Q.   Okay.
10     A.   No.  I'm taking the price per square
11  foot -- I'm taking the value a square foot of
12  additional vacant building contributes and
13  multiplying it by the difference in square
14  footage between the comparable and the subject.
15  So for example, to help crystallize that, if
16  you go back to that appraising form that we had
17  where the 89,000 is on the bottom --
18     Q.   Uh-huh.
19     A.   -- and you look at the first
20  comparable, 2217 St. Maurice, what you would
21  see is, gee, they're almost the same size.
22  Halfway down the grid it says gross living
23  area.  The subject is 1,485 feet, the
24  comparable is 1397.  They're 88 feet
25  difference.  I multiplied 25 times 88 and that

88

1  2,200.
2      Q.   Understood.
3      A.   That's how it's normally done in an
4  appraisal that you have actually ascertained an
5  appropriate adjustment for size and then that
6  is applied to the difference in square footage.
7      Q.   So this is standard practice, this is
8  not something you developed and implemented
9  specifically because you're doing an appraisal
10  of a property that's timed, you know, years
11  before the actual appraisal is done.
12     A.   Everything here is being done in the
13  way I would have done it if I was doing it at
14  the date of this appraisal.
15     Q.   Okay.
16     A.   No abnormal, special conditions.
17     Q.   This is industry standard?
18     A.   Well, there's no such thing as
19  industry standard, but I think most appraisers
20  looking at this would say, sure, that's how
21  people usually do this work.
22     Q.   Okay.
23     A.   Okay?
24     Q.   Okay.
25     A.   And I do the same then, I look at the

89

1  market for appreciation, I made a judgment of
2  4 percent a year, I look at prices for lots and
3  I'm -- now, I am adjusting for -- I will adjust
4  for living area differences, and usually when
5  I've done that I feel I've already picked up a
6  large part of the differences in lot changes,
7  if the house gets bigger.  But one could have
8  done a little more with adjusting those
9  comparables for very small differences in lot
10  sizes.  These are not very big differences in
11  lot sizes overall here.
12         Then I have adjusted specifically for
13  whether it had central air or not.  The subject
14  had central air.  Some of these comparables are
15  window units.
16         I've adjusted specifically for whether
17  it had sort of a porch/deck area.  The subject
18  has a little concrete porch to the back of the
19  first floor.  So I've awarded some additional
20  value for that.
21         And then if the comparable had the
22  seller paying fees, then I adjust for that.
23         I have provided you today with, and I
24  believe -- no?
25         MR. BLANCHARD:

90

```
 1          No, go ahead.  I'm just --
 2     THE WITNESS:
 3          These MLS pages?
 4     MR. BLANCHARD:
 5          You can provide --
 6     THE WITNESS:
 7          With the individual comparables
 8     that you have?  I think otherwise --
 9     MR. BLANCHARD:
10          Sure, go ahead.
11     A.  You got them, I thought.  I thought
12 you had reproduced -- it should start with
13 something -- no, that's the other appraisal.
14          Well, I have today for you MLS pages,
15 and I can produce those to you, that go with
16 each of these properties.  All right?
17     THE WITNESS:
18          And we probably would need to
19     make more copies.  We had talked about
20     that yesterday.
21 EXAMINATION BY MR. GILBERT:
22     Q.   These are the MLS entries for each of
23 these comparables?
24     A.   Every comparable I have I a supplying
25 the MLS pages on them.
```

91

```
 1     Q.  All right.
 2     A.  And I do it for both land and
 3 building.
 4     Q.  Let's go ahead and --
 5     A.  I don't know that it's useful to go
 6 through every one of them for you, but that's
 7 your decision.
 8     Q.  I don't think I intend to.
 9     A.  Okay.
10     Q.  But I am going to attach them and
11 we'll call them 2 in globo.
12          (Exhibit 2 IN GLOBO was marked for
13 identification and is attached hereto.)
14     A.  Yes.  So I have supplied the factual
15 support for why I'm saying that certain things
16 are true about the properties.  That is what
17 I'm doing.
18     Q.  All right.  Let me ask you, in blanket
19 fashion --
20     A.  Yes.
21     Q.  -- are any of the other appraisals you
22 did not standard due to the fact that you're
23 trying to go back in time and/or capture
24 certain snapshots in time of these properties?
25     A.  No, sir.  I did every one of them the
```

92

```
 1 way we would normally have done that at that
 2 point in time.  We've used the same adjustment
 3 factors throughout, so that there's as little
 4 variations in judgment as possible from one to
 5 the next.  Um -- and the methodology we've
 6 applied is virtually identical to all.
 7     Q.  So -- I'm just going to pick a range,
 8 a random date.
 9     A.  Yes.
10     Q.  There may not even be a date that you
11 used.  If you want to put a value on the
12 property as of October 2nd, 2006, you'll do
13 comparables from then.
14     A.  Yes.
15     Q.  And that's how you arrive at your
16 values.
17     A.  Yes, sir.
18     Q.  And that's what you've done in each
19 instance here.
20     A.  It is.
21     Q.  So that I think it kind of alleviates
22 the need to go through each of these
23 appraisals.
24     A.  And that is why I gave you a summary
25 at the front of each addendum.
```

93

```
 1     Q.  Okay.
 2     A.  So that you could see what the result
 3 is that I'm getting.
 4     Q.  I didn't necessarily understand it.
 5     A.  But I can discuss the summary, and
 6 that may be much less painful than trying to
 7 discuss each individual report.
 8     MR. BLANCHARD:
 9          Why don't you just wait for him
10     to ask a question.
11     THE WITNESS:
12          Okay.  Yes, I'm sorry.  Fine.
13 EXAMINATION BY MR. GILBERT:
14     Q.  And by summary, is this what you're
15 referring to?
16     A.  No, sir.  You go to the beginning of
17 the addendum itself, the very front of the
18 addendum.
19     Q.  Okay.  So the document entitled 1321
20 Egania evaluations is the summary.
21     A.  Yes, sir.
22     Q.  Okay.  I understand.
23          All right.  I want to go back to your
24 report, then, in connection with your
25 discussion of these properties, and I just want
```

94

1  to ask you a few questions.
2         For Egania Street, how do restoration
3  or rebuilding or construction costs, however
4  you want to term them, how do they affect your
5  overall valuation of the property?  Or the loss
6  sustained by that property?
7      A.  Well, in the instance of Egania
8  Street, what we did, I did, um -- a, um --
9  value for the property as of August 30, 2007 --
10     Q.  Okay.
11     A.  -- of $140,000.  And there is a report
12  here with a cost approach in it that considers
13  all of the costs of renovation, and the
14  comparables we have used are comparables that
15  were renovated and are of a similar quality to
16  the Egania Street property.  I have not used
17  properties that were extraordinarily better or
18  worse.  I have tried to choose sales that I
19  thought were quite similar to Egania Street in
20  terms of quality.  And then I did a standard
21  comparable sales analysis on those properties
22  to arrive at an estimated value which turned
23  out to be $140,000, and I have five comparable
24  sales from the neighborhood to support that.
25     Q.  How do these costs affect the

95

1  valuation of the damage to the property?
2         MR. BLANCHARD:
3             Objection.
4             Subject to that you can answer.
5      A.  I'm not sure I know how to answer
6  that.  How do these costs affect the
7  valuation --
8  EXAMINATION BY MR. GILBERT:
9      Q.  Or do they?
10     A.  Well, this is what the property is
11  worth on Egania as repaired.  And you have
12  values of what the property was worth before
13  the storm.  And I have given you what the costs
14  of repair is.  I don't know that the difference
15  between before and after storm values is any
16  measure of damage at all.  So I don't think I
17  have a measure of damage, um -- at this point,
18  um -- for Egania Street.  I have given you what
19  it was worth before, what it's worth after with
20  repairs, and what it was worth after without
21  repairs.
22     Q.  Did you have a measure of damage for
23  Deslonde Street?
24     A.  On Deslonde Street, I have what the
25  property was worth before, what the property is

96

1  worth as a vacant site after, and what the
2  property is worth after it is repaired if it
3  were rebuilt, if they had chosen to rebuild.
4         I don't think there is any simple
5  subtraction of one number from another that is
6  a damage number because there may be funds
7  being used to pay for damages or repairs such
8  as wind insurance or Road Home monies that may
9  represent part of the funds those households
10  had available to rebuild.
11        Further, if I were to try to measure
12  damages, um -- the issues that would arise
13  would be those I've already enumerated.
14  Damages from what source are we talking about?
15  And I've given you fourteen sources.  I've not
16  tried to parse or identify what sources were
17  present and the extent to which any one of them
18  contributed.
19        Now, what I know about this is that
20  the time period involving flooding from any of
21  the wall breaches is rather brief before the
22  water levels are higher from other sources than
23  they were from the breaches.
24     Q.  What do you consider brief?
25     A.  Periods of, um -- probably three to

97

1  four hours.  I have a graphic that comes from I
2  think an expert you tendered in this matter.  I
3  think it's from, um -- from CivilTech
4  Engineering, and I have a graphic that looks at
5  each location with a line indicating the
6  relative water depths and time that that
7  occurred, and in an attempt to identify a
8  source for that water --
9      Q.  Which scenario is that?  Is that all
10  causes?
11     A.  Is that all causes?  This seems to
12  have on it IHNC and MRGO.  I don't know that
13  that is all causes.
14     Q.  All right.  Let me ask you this:  What
15  time do you attribute the flooding before any
16  other water came, the flooding of the
17  Industrial Canal?
18        MR. BLANCHARD:
19            Objection.  Vague.
20        MR. GILBERT:
21            Well, it's really just a
22  reflection of what he testified a
23  second ago.  I'm just asking him to
24  clarify that.
25        MR. BLANCHARD:

98

1      Well, but it's still vague
2    because there are separate breaches.
3    I mean, are you talking about both
4    breaches, one breach?  You got to
5    clarify.
6    EXAMINATION BY MR. GILBERT:
7      Q.   Do you distinguish breaches, Dr.
8    Ragas?
9      A.   I do, actually.  I think which breach
10   makes a difference, because we have fast moving
11   water in some places and otherwise we don't and
12   the damages are probably different.  And it is
13   possible to differentiate breaches as I
14   appreciated it from the work that CivilTech has
15   done.
16     Q.   Do you differentiate the north breach
17   from the south breach on the Industrial Canal?
18     A.   I believe that you must.  I do.  The
19   breaches happened at different times, they're
20   in different locations.
21     Q.   Okay.
22     A.   They're going to affect property
23   differently.
24     Q.   All right.  What is your appreciation
25   of how long and at what depth property near the

99

1    north breach sat in water that came from the
2    Industrial Canal before any other water came?
3      MR. BLANCHARD:
4          Are we specifically talking about
5          the Deslonde Street property now?
6          Objection.  Vague.
7    EXAMINATION BY MR. GILBERT:
8      Q.   Do you express opinions about the
9    property in this report other than Deslonde and
10   Egania?
11     A.   No.
12     Q.   So your statements up through --
13     A.   Well, when you say express opinions on
14   other properties, I have explained throughout
15   the report element of damage and factors that
16   would affect value and methodology issues that
17   are true whether we're looking at Deslonde and
18   Egania or other properties.  The damage numbers
19   I have expressed or the values I have expressed
20   are only involving Deslonde and Egania.
21     Q.   But when you're talking about
22   separation of causes, you're not talking about
23   just Egania and Deslonde, are you?
24     A.   The issues would be the same for other
25   property located close to either of those

100

1    properties.
2      Q.   Right.  With respect to the north
3    breach, is there an address that you could
4    identify that you think is fair for the purpose
5    of our discussion here for me to ask you how
6    long and how much water is present at that
7    address before the property has sustained
8    significant or measurable damage?
9      MR. BLANCHARD:
10         Objection.  Vague.
11     MR. GILBERT:
12         Do you want to make it more
13         specific?
14     MR. BLANCHARD:
15         Your question was vague.
16     MR. GILBERT:
17         Repeating it doesn't make it so.
18   EXAMINATION BY MR. GILBERT:
19     Q.   Can you answer the question?
20     A.   If I rely upon the CivilTech
21   Engineering estimates, if those are correct --
22   and I have not the expertise to render a
23   judgment about how correct they are, but if
24   they're correct, the north breach, as best I
25   can deal tell from reading the record of

101

1    various depositions, occurs first.  And the
2    north breach appears to have occurred somewhere
3    in the vicinity of 4:00 to 4:30 a.m. in the
4    morning, under the CivilTech analysis.  It
5    appears that the south breach occurs somewhere
6    in the vicinity of 5:30 a.m. in the morning.
7    On the CivilTech hydrograph, the water depth
8    that is at 2423 Deslonde by 5:30 or thereabout
9    in the morning, is somewhat over four feet,
10   approaching five feet.  My actual work that I
11   have done on any number of properties would say
12   once you have two to three feet of water in the
13   property the bulk of the soft damage that is
14   going to occur, that is to the sheetrock,
15   insulation, flooring, appliances, cabinetry,
16   the bulk of that damage has in fact begun to
17   occur.
18        It appears that the hydrograph shows a
19   increase in water depth occurring from around
20   5:30 in the morning at that 4 to 5-foot depth
21   measured in the street to a 10 to 12-foot depth
22   by roughly 10:00 in the a.m. in the morning.  I
23   assume that that depth on the chart shows that
24   water from the MRGO began to arrive starting at
25   10:00 a.m.  So somewhere between -- at the

102

1    10:00 a.m. point in time it is plausible that
2    the water depth, at least if I understand what
3    I'm reading on the CivilTech hydrograph, that
4    up to a depth of water perhaps as high as 11
5    feet had happened through combination of the
6    north and south breaches.
7        Q.   All right.  Let me stop you and ask
8    you there.  In colloquial terms, as of ten
9    o'clock, Deslonde Street is toast; correct?
10            MR. BLANCHARD:
11              Objection.
12       A.   Well, Deslonde Street, if it does
13   not -- if it is not moved by the floodwaters --
14   if it's moved by the floodwaters of the north
15   breach, Deslonde has suffered irreversible
16   damages from the water surge from the north
17   breach, if that's the source of water that
18   takes it off its foundation.  At which point
19   that -- as you refer to it, toast, the bulk of
20   the value of Deslonde Street has been lost by
21   the rapid moving water between 4:30 a.m. and
22   5:30 a.m. if it is being carried along by
23   floodwaters from the north breach.  I have no
24   way to know that as I sit here.
25       Q.   Let's suppose that it isn't carried

103

1    away.  Let's suppose that it stays affixed to
2    its foundation, but there's still 10 to 12 feet
3    of water right there.  What's your opinion
4    about the loss of value to that house --
5        A.   Well, the --
6        Q.   -- as ten o'clock?
7        A.   -- the damages to the house that have
8    occurred by ten o'clock would require, if it
9    has not been moved off its footings by the
10   water at that time, would leave it as a shell
11   building.  As a shell building there is a
12   residual value to the wood studs, the rafters,
13   and those buildings are subsequently renovated,
14   in many instances.  So if it's not been moved
15   off its footings and it has its structural
16   integrity still, then it's a shell building.
17   And shell buildings by the thousands have been
18   renovated in this market.  So it has lost a
19   substantial part of its value, not all of its
20   value.
21       Q.   If it was the opinion of an engineer
22   that saline content in the water to which any
23   house was exposed had an effect on the wood
24   frame of the house, would that be useful
25   information to you in arriving at a conclusion?

104

1        A.   No.
2        Q.   Okay.
3        A.   I have heard that opinion from early
4    on when the storm damage first occurred, but
5    the reality has been that both federal
6    authorities, state and local authorities have
7    concluded that allowing the rebuilding of homes
8    that were exposed to saltwater is permissible,
9    and not stopped, and that there may be
10   necessity to replace all electrical outlets and
11   wiring that was exposed to the saltwater, and
12   all mechanical systems, but the argument that
13   the wood studs are irreversibly damaged because
14   they were exposed to saltwater is certainly not
15   shared by tens of thousands of households and
16   contractors who have engaged in renovation all
17   over the flooded areas.
18       Q.   Were you able to identify these
19   federal studies and state studies concerning
20   the saltwater exposure?
21       A.   I didn't say study.  They have not
22   prohibited those redevelopments.  Neither FEMA
23   or federal agencies or state agencies have said
24   that they view rebuilding houses that were
25   exposed to saltwater as being improper or not

105

1    to be allowed because they pose a health or
2    safety issue.  City government agencies have
3    specifically allowed rebuilding and not
4    required the removal of those studs.  And that
5    has been true in every parish that I'm aware of
6    that had saltwater.
7        Q.   So you infer from the fact that they
8    don't disallow it that there's some -- there
9    there's no scientific basis for saying that
10   saltwater has a negative impact on its frames?
11       A.   It my affect the longevity of the
12   utility of the wood.  There might be -- I don't
13   know that.
14       Q.   All right.
15       A.   But as far as it prohibiting it from
16   being structurally sound, I will defer to the
17   judgment of all these different safety and
18   building and permit offices who have tried to
19   determine what they should or shouldn't allow.
20       Q.   All right.  As of ten o'clock -- well,
21   what you're looking at where the mixing of the
22   water begins around ten o'clock, is that true
23   only on Deslonde or is that the entire Lower
24   Ninth Ward area?
25       A.   Well, I don't know about being able to

**106**

1  make a statement about the entire Lower Ninth.
2  The hydrographs that I have cover Deslonde and
3  Egania.
4  Q.  All right.  What time is it when the
5  water is mixing at Egania Street?
6  A.  Egania Street, that occurs also on
7  this hydrograph at about ten o'clock in the
8  morning.
9  Q.  Okay.  How much water is there at
10  10:00?
11  A.  At 10:00, there's only six feet of
12  water at Egania Street.  That's as measured in
13  the street.
14  Q.  Okay.?
15  A.  The house is about a foot and a half
16  to two feet off of the ground, so it's under
17  four feet of water in the house at the point
18  where this surge of water from the MRGO under
19  this model occurs.
20  Q.  Do you find that what was spent on
21  repairing the house is commensurate with that
22  depth of flooding in the house?
23  A.  Yes.
24  Q.  Okay.  All right.  There is something
25  I didn't understand.  And this may be very

**107**

1  trivial, I just want to make sure I understand
2  it.  This is Section 35 of your report, Page 8:
3  A.  Yes.
4  Q.  Make it right.  Habitat for Humanity.
5  And individuals have chosen to build new and
6  substantially more expensive homes, et cetera,
7  et cetera.
8  What's the significance of that
9  statement in your evaluation?
10  A.  Well, I observed that the Alford
11  family made a decision to relocate to the west
12  bank of Orleans Parish in Algiers and to buy an
13  existing house there.  And I was looking to see
14  whether there was any reason that they couldn't
15  have renovated back to livable -- built a
16  livable house at the site of the lot they
17  owned.  They had the financial resources, it is
18  my view, from the various sources of funds that
19  were available to them to rebuild on the lot
20  they own, and I was looking to see whether that
21  decision was shared by other people.  And there
22  has actually been a fair amount of rebuilding
23  activity, and actually rebuilding that's rather
24  expensive in cost and quality not far from the
25  Deslonde property.

**108**

1  Q.  So your point is that they could have
2  gotten a Make It Right house if they wanted.
3  A.  Or they could have had any number of
4  choices other than Make It Right, but clearly
5  that was available to them.  If they provided a
6  lot, the Make It Right Foundation was looking
7  for people who wanted to rebuild.
8  Q.  Got you.
9  A.  And in that case they paid very, very
10  little for an incredibly valuable home.
11  Q.  Okay.  You do some calculations of
12  total equity post-Katrina as to these
13  properties.
14  How is that significant in this case?
15  A.  I was curious, looking at the economic
16  impacts that these households have suffered, to
17  understand what their financial condition was
18  before versus what their financial condition
19  appears to be now.  So on Page 9 you have what
20  I think is a factual statement, based on my
21  market value, at least, of what their equity
22  was in the house on Deslonde before the storm.
23  Q.  Okay.
24  A.  If it was worth 47,000, their debt was
25  30,000 or less, they had 17,000 in equity.

**109**

1  Conversely, I looked at what they received in
2  insurance and Road Home payments, which is
3  about 148,000, the uses of funds, they paid off
4  an existing mortgage, they purchased the house
5  in Algiers, there's an 11,000-dollar amount of
6  money I don't know where it went, I'm assuming
7  it was spent on costs but I don't know that,
8  and so they have -- they've spent the money
9  they got, and in return what do they own?
10  Without debt a lot on Deslonde and the house in
11  Algiers, for 118,500 in equity versus 17,000
12  being their position before the storm.  So I
13  believe the storm created a lot of heartache
14  and distress and disruption for that household,
15  but in a financial sense it's been a rather
16  rewarding outcome.
17  Q.  Is it your contention that the
18  occupants of 2423 Deslonde suffered no damages
19  related to property in light of this
20  calculation you've done?
21  MR. BLANCHARD:
22  Objection.  Calls for a legal
23  conclusion.
24  Subject to that you can answer.
25  A.  Yeah.  I didn't say there were no

110

1   damages.  I said that the damages that I can
2   ascertain they have experienced have all been
3   paid for already by other sources of funds.
4   That's what this calculation shows.  And that
5   today they're financially better off than they
6   were.
7       (Brief recess.)
8   EXAMINATION BY MR. GILBERT:
9       Q.   All right.  Let's go to 43.
10      A.   Yes.
11      Q.   Your statement, thus, to the extent it
12  relates to flooding, the subjected parcels'
13  damages would have been the same if IHNC
14  breaches had never occurred.
15          You don't know that, do you?
16      A.   Well, I think I do know that.
17      Q.   How do you know that?
18      A.   Well, even using the CivilTech
19  hydrograph, if you don't have the IHNC
20  flooding, you still by ten o'clock in the
21  morning would have water at a 10 to 12-foot
22  depth.  And that's true for both of the subject
23  properties.  By 10:00 in the morning, one is at
24  11.7 feet, and at that point it is MRGO water
25  that is present, and the other is at 6 feet by

111

1   10:00, and from that point forward it's MRGO
2   water making it go higher.  So I think I'm
3   factually correct.
4       Q.   So to the extent that that constitutes
5   a speculative hypothetical analysis, so does
6   your statement.  Correct?
7       A.   I don't see where I'm speculative
8   hypothetical.  I'm saying, if the CivilTech
9   analysis is correct, then the water depth that
10  would have occurred on these properties, even
11  if the IHNC flooding had never occurred, would
12  have been similar to the maximum water depths
13  that have occurred.  And that is consistent
14  with the results from the CivilTech hydrograph.
15      Q.   I think we're missing each other.
16      A.   Okay.
17      Q.   If the CivilTech hydrograph is just a
18  computer model of one hypothetical scenario --
19  okay?  If is it just a hypothetical scenario of
20  one model --
21      A.   Yes, I understood.
22      Q.   Okay -- then your statement is also
23  hypothetical and is based strictly on that
24  model, correct?
25      A.   I have indicated in 43 that if one

112

accepts the CivilTech analysis --
    Q.   Okay.
    A.   Okay?
    Q.   Okay.
    A.   So yes, and to that degree my
conclusion at the moment is reliant upon that,
I have not seen other models producing similar
results for this location.
    Q.   Okay.  You then say, even if one
accepts the CivilTech analysis that the water
from the IHNC reached one or more of the
subject properties first, the only difference
would have been a few hours of use of the
property.
        Is it your position that that is the
measure of damage that these property owners
suffered?
    A.   Well, I think in terms of loss to
them, it is the loss to them measured at 6:00
a.m. in the morning to 10:00, a time period of
three or four hours in which the water that
they are receiving may have originated from
somewhere along the IHNC versus the long-term
damage to their property from water depths that
go enormously higher and stay for weeks?  I

113

think that the -- and particularly when that
damage would have occurred even if the breach
had not happened on the IHNC.  So I think
they're experiencing a short-term disruption in
the value of their property which would have
occurred any way in the results that actually
unfolded in this flood.
    Q.   Is it your position that the only loss
they sustained is this few hours of loss of
use?
    A.   Yes.
    Q.   Okay.
    A.   The other damages would have occurred
anyway.
    Q.   That requires a legal conclusion,
doesn't it?
    A.   A legal conclusion?
    Q.   As to what the effect of subsequent
injury is upon a tort victim.  Doesn't it?
    A.   I can't render an opinion about the
terms you're using.  But in terms of the
physical damage to the property, the physical
damage to the property from the MRGO water
starting at ten o'clock would have been the
same as the damage from the south breach of the

29 (Pages 110 to 113)

**114**

1  IHNC.
2      Q.   The question whether what would or
3  could have happened is relevant, it's actually
4  a legal question, isn't it?
5      A.   It may be.  I'm saying practically,
6  the results are the same.
7      Q.   Have your principals, that is
8  attorneys for Lafarge, gone through this report
9  with you?
10     A.   Yes.
11     Q.   Have they disagreed with any of the
12  premises or conclusions that you reach here?
13     A.   I'm not aware of a disagreement, but
14  the report isn't predicated on whether they
15  like it or they don't, it's simply my views.
16     Q.   Have they told you that they disagree
17  with any of the data that you use?
18     A.   No.  I've had no statements from them
19  that they disagree with data I rely upon.
20     Q.   Have they told you they disagree with
21  any of the potential causes of loss that you
22  consider?
23     A.   Not that I'm aware of.  They may
24  disagree.  They haven't shared that with me.
25     Q.   That's all I have.

**115**

1  EXAMINATION BY MR. BLANCHARD:
2      Q.   I just have a couple of follow-ups.
3           Mr. Ragas, in response to
4  Mr. Gilbert 's questioning concerning damages
5  to the two properties at issue, your testimony
6  was that in your opinion the damages to these
7  two properties was in effect the loss of use of
8  the properties for a few hours during the
9  morning of Hurricane Katrina, is that correct?
10     A.   That's correct.
11     Q.   And this would have been loss of use
12  of the property during four hours during a
13  Category 3 hurricane, is that correct?
14     A.   That's correct.
15     Q.   So is it fair to say that in your
16  opinion the value of that loss of use of a few
17  hour period during a Category 3 Hurricane
18  Katrina is zero?
19     A.   Zero or an immeasurably small number.
20  MR. GILBERT:
21           Okay.  Well, I missed my chance
22  to object but I would have objected
23  calling for legal conclusions.
24  MR. BLANCHARD:
25           That's all the questions I have.

**116**

WITNESS' CERTIFICATE

         I, WADE R. RAGAS, Ph.D., MAI, do
hereby certify that the foregoing testimony was
given by me, and that the transcription of said
testimony, with corrections and/or changes, if
any, is true and correct as given by me on the
aforementioned date.


_____    _____
DATE SIGNED         WADE R. RAGAS, Ph.D., MAI

_____ Signed with corrections as noted.

_____ Signed with no corrections noted.

DATE TAKEN:  September 3rd, 2009

**117**

REPORTER'S CERTIFICATE
         I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
Certified Court Reporter in and for the State
of Louisiana, do hereby certify that the
aforementioned witness, after having been first
duly sworn by me to testify to the truth, did
testify as hereinabove set forth;
         That said deposition was taken by me
in computer shorthand and thereafter
transcribed under my supervision, and is a true
and correct transcription to the best of my
ability and understanding.
         I further certify that I am not of
counsel, nor related to counsel or the parties
hereto, and am in no way interested in the
result of said cause.


_____
JOSEPH A. FAIRBANKS, JR., CCR, RPR
CERTIFIED COURT REPORTER #75005

WADE RAGAS, PH. D.                                                                    9/3/2009

Page 1

## A

**ability** 117:12
**able** 13:5 42:12 46:24
  49:13 50:5 67:20
  104:18 105:25
**abnormal** 88:16
**accept** 36:4
**acceptable** 12:13
**accepted** 27:15 39:10
**accepts** 112:1,10
**accompanying** 62:22
**account** 27:16 50:20
  66:8 71:7
**accounting** 86:23
**accrue** 56:20
**accrued** 29:16 75:12
**accruing** 57:12
**accuracy** 39:9
**accurate** 8:21 9:10 16:12
  37:17 38:18,22,24,25
  39:7,8 41:10 48:14
  82:8
**accurately** 49:13
**achieved** 21:4
**acre** 19:18 20:3,7
**act** 49:16
**action** 1:4 6:9 21:1 22:24
  25:2 75:19
**actions** 18:4 26:14 32:3
  58:4 73:10
**active** 14:2
**activity** 59:5 107:23
**acts** 50:7,7 55:16 57:6
**actual** 12:23 13:22,24
  15:25 16:18 64:21 79:1
  79:6 88:11 101:10
**add** 8:15
**added** 8:25
**addendum** 92:25 93:17
  93:18
**Addendums** 76:14
**addition** 63:3 82:22
**additional** 75:18 81:8
  85:7,8,15,19,20 87:12
  89:19
**address** 7:7 8:16 37:23

100:3,7
**addressed** 9:17
**addresses** 70:16
**adequate** 15:18 16:16
**adjust** 86:4,5,6 89:3,22
**adjusted** 89:12,16
**adjusting** 87:4,6 89:3,8
**adjustment** 83:13,18
  84:25 85:5,14,25 86:1
  86:12,21,22 88:5 92:2
**adjustments** 83:11,21,22
  84:24 85:4 86:9,14
**administering** 5:24
**adverse** 70:23
**advocate** 35:15,18
**advocating** 40:13
**aerial** 48:21
**affect** 8:3,8 18:19 19:4
  58:21 70:22 94:4,25
  95:6 98:22 99:16
  105:11
**affixed** 103:1
**aforementioned** 5:4
  116:8 117:5
**agencies** 56:2,4 72:18
  73:8 104:23,23 105:2
**Agency** 22:23
**ago** 6:8 44:10 97:23
**agree** 27:5 36:4 39:18
  40:21 41:3,12 76:7
**AGREED** 5:2
**ahead** 6:17 54:23 90:1,10
  91:4
**air** 89:13,14
**Airline** 34:22
**al** 29:19 30:16
**Alford** 107:10
**Algiers** 84:8 107:12
  109:5,11
**alignment** 11:3 23:10
**alike** 82:21
**alleged** 33:5 55:14
**allegedly** 56:25
**alleging** 32:3
**alleviates** 76:2 92:21
**allocation** 55:15 57:3,5

57:23 58:1
**allow** 12:7 43:17 67:6
  105:19
**allowed** 105:1,3
**allowing** 104:7
**alluded** 14:21
**all-inclusive** 39:25
**alters** 85:3
**AMERICA** 2:15
**amount** 42:24 64:13
  107:22 109:5
**analogous** 13:15 61:8
**analogy** 13:7 16:18
**analyses** 8:10 11:10 12:1
  12:8 60:20
**analysis** 16:11 27:10
  32:17 43:25 44:3,18
  45:5 52:9,14,20 63:6
  65:16 72:7 84:2 94:21
  101:4 111:5,9 112:1,10
**analysts** 64:9
**and/or** 13:12 74:10
  91:23 116:6
**answer** 5:13 26:18 30:1
  48:6 95:4,5 100:19
  109:24
**answered** 36:22
**anticipate** 9:16
**anticipating** 9:8
**antitrust** 35:9,10
**anyway** 43:7,12 113:14
**apologize** 68:6
**appear** 18:24
**APPEARANCES** 2:1
**appears** 7:2 9:4 101:2,5
  101:18 108:19
**appliances** 82:18,19
  101:15
**applied** 60:24 84:25 88:6
  92:6
**apply** 56:16
**appraisal** 16:13 25:17
  79:23 80:9,16 85:2,2
  86:25 88:4,9,11,14
  90:13
**appraisals** 7:10 16:2,19

47:14 76:12,13 79:4,10
  91:21 92:23
**appraised** 16:4
**appraiser** 41:7
**appraisers** 88:19
**appraising** 87:16
**appreciate** 40:12
**appreciated** 98:14
**appreciation** 89:1 98:24
**approach** 12:15 94:12
**approaching** 101:10
**appropriate** 27:21,21
  36:13 47:6,13 54:16,17
  64:20 83:19 88:5
**approval** 29:1
**area** 12:2 18:22 54:13
  62:25 63:18 64:1 66:20
  66:22,23,25 67:22 85:7
  85:12,15 87:23 89:4,17
  105:24
**areas** 7:17,19 8:13 10:9
  10:15 18:2 104:17
**argue** 14:1 39:3
**argued** 32:19
**argues** 64:16
**argument** 104:12
**arises** 45:24
**Army** 55:20
**arrive** 14:21 16:9 28:1
  48:18 50:18 61:18
  81:14 92:15 94:22
  101:24
**arrived** 12:5 16:7 84:23
**arriving** 103:25
**articles** 15:10
**ascertain** 15:4 65:17
  110:2
**ascertained** 88:4
**ascribed** 18:3
**asked** 14:13 16:8,9 17:17
  31:15 36:22 37:14
  38:10,21 44:3 68:20
  82:11
**asking** 25:25 26:13 36:1
  37:2 39:5,6 44:7,8,9
  64:6 77:22 97:23

WADE RAGAS, PH. D.                                                9/3/2009

Page 2

**aspect** 9:20
**asserting** 46:25 57:19
**Assertions** 37:7
**assess** 40:6
**asset** 48:13 65:8 85:17
**assets** 16:5
**assign** 49:21
**assignable** 53:5
**assigned** 42:23
**assigning** 55:4
**assignment** 37:7 41:22
**associated** 32:14
**assume** 6:12 101:23
**assumed** 64:19
**assuming** 109:6
**assumption** 63:22,25
**attach** 6:18 91:10
**attached** 6:23 91:13
**attempt** 25:8 42:3 50:19
   54:11 56:23 97:7
**attorney** 40:10
**attorneys** 114:8
**attributable** 42:4
**attribute** 67:7 71:7 77:10
   97:15
**attributed** 12:4 52:3
**attributes** 86:16
**August** 76:24 77:9 78:23
   79:20 80:23 94:9
**authorities** 104:6,6
**aux** 22:24
**available** 53:23 60:24
   96:10 107:19 108:5
**Avenue** 3:3 6:2
**average** 83:6,8
**Aviation** 21:8,11
**award** 75:18
**awarded** 24:2 89:19
**awards** 75:20
**aware** 9:3 10:18,19
   64:23 69:8,15,17,17,23
   70:4 105:5 114:13,23
**awareness** 63:16
**a.m** 101:3,6,22,25 102:1
   102:21,22 112:20

**B**

**B** 4:7 77:17,18 78:1,9
**back** 42:23 48:22 81:21
   87:16 89:18 91:23
   93:23 107:15
**bank** 107:12
**barge** 2:2 56:12 64:4
   69:12
**BARGES** 1:6
**Baronne** 2:5,11
**base** 79:9 83:16
**based** 13:16 47:21,23
   57:16 73:5 83:8,12
   108:20 111:23
**basic** 58:23
**basically** 12:12
**Basin** 17:23
**basis** 7:18,20 11:10
   39:23 84:24 105:9
**bathrooms** 85:8
**baths** 85:16
**batture** 20:15,19
**Bayou** 22:24
**bear** 17:14
**becoming** 64:23
**bedrooms** 85:16
**began** 101:24
**beginning** 9:22 43:8 71:1
   93:16
**begins** 72:1,2 105:22
**begun** 101:16
**behalf** 29:2 35:16
**belabor** 7:15
**belief** 50:18
**believe** 9:23 11:14 22:18
   22:19 36:8 37:15,19
   38:17,20 39:6,8 40:15
   59:3,22 81:20 82:7
   84:24 89:24 98:18
   109:13
**believed** 29:13
**bench** 24:21
**benefit** 73:2
**benefits** 74:10
**Benoit** 1:12
**Bernard** 13:10 14:7 15:1
   18:14 58:12

**best** 17:20 67:1 68:21
   73:22 82:24 83:4 85:17
   100:24 117:11
**better** 79:8 94:17 110:5
**beyond** 72:4
**big** 89:10
**bigger** 85:10 86:4 89:7
**bit** 30:1 68:7
**BLANCHARD** 2:17 4:6
   26:11 36:21 38:2 39:20
   40:18 47:19 48:4 52:11
   54:20 55:9 69:13 73:16
   74:21 76:4 89:25 90:4
   90:9 93:8 95:2 97:18
   97:25 99:3 100:9,14
   102:10 109:21 115:1,24
**blanket** 91:18
**board** 18:11,25 21:8,11
   22:12,12 28:23 31:22
   32:3
**body** 37:6
**Bogalusa** 32:18
**bottom** 78:5 80:6,22
   87:17
**Boulevard** 33:21
**Boutte** 1:8
**Boy** 34:7
**breach** 23:17 49:14
   51:13,21 98:4,9,16,17
   99:1 100:3,24 101:2,5
   102:15,17,23 113:2,25
**breaches** 1:4 64:3 96:21
   96:23 98:2,4,7,13,19
   102:6 110:14
**break** 6:15
**Brian** 2:3,4 6:8 55:10
**brief** 43:5 96:21,24 110:7
**briefly** 81:25
**bring** 8:7
**British** 34:14
**broadly** 71:1
**brought** 74:7
**Browning-Ferris** 18:6,9
   18:12
**build** 107:5
**building** 17:8 30:21 63:4

   69:10 77:18 78:19,22
   85:18,20,21 87:12 91:3
   103:11,11,16 105:18
**buildings** 103:13,17
**built** 14:24 23:21 107:15
**bulk** 12:14 51:1 101:13
   101:16 102:19
**burden** 67:10
**business** 17:9 21:21
   33:18 34:1 35:5,10
**bust** 15:3
**buy** 107:12
**buyers** 65:5

**C**

**C** 78:21
**cabinetry** 82:19 101:15
**calculation** 74:6 109:20
   110:4
**calculations** 108:11
**call** 41:5 91:11
**calling** 52:12 115:23
**Calls** 39:21 40:19 54:21
   73:17 74:22 76:5
   109:22
**Camille** 68:13
**canal** 1:4 58:11,14,17,18
   58:19,22 59:6 66:24
   97:17 98:17 99:2
**candidates** 70:6
**capable** 45:4
**capture** 91:23
**care** 36:11,11 67:23 68:3
**Carpes** 22:25
**carpet** 82:16
**carried** 102:22,25
**case** 7:19 10:24 11:4,6,10
   11:22 12:20 14:14 16:3
   16:5,12 17:8 19:14
   20:3 22:6,24 23:7,14
   24:23 25:14,24 26:16
   27:9 29:21 30:2,7,15
   32:25 34:24 35:4 36:4
   36:6 37:10,14,21 38:1
   39:19 40:7 49:4 55:15
   56:6,11 57:2 58:2,15
   59:15,18,19,21 60:9,10

WADE RAGAS, PH. D.                                                                    9/3/2009

74:5 86:8 108:9,14
**cases** 10:19 16:22,24,25
  24:3 33:5,5 35:9,11
  36:3 57:20
**casual** 67:3
**casualty** 33:17
**catastrophic** 33:7,13,14
  33:16
**Category** 64:20,25,25
  68:12 115:13,17
**causal** 60:17
**causation** 67:9,11,16
**cause** 12:21 49:17 69:6,7
  70:23 117:16
**caused** 21:16 31:14
  49:14,15,16,25 50:6
  54:4 64:3
**causes** 24:24 25:1 60:23
  97:10,11,13 99:22
  114:21
**causing** 69:10
**caveat** 7:3
**CCR** 1:24 5:22 117:2,24
**center** 23:19 33:21
**central** 89:13,14
**Centre** 1:19 2:19
**ceramic** 82:16
**CERCLA** 15:21
**certain** 91:15,24
**certainly** 7:6 13:7 44:2
  104:14
**CERTIFICATE** 116:1
  117:1
**certification** 47:10
**certified** 1:25 5:23 11:20
  117:3,25
**certify** 116:4 117:4,13
**cetera** 107:6,7
**Chaffe** 1:18 2:16
**chance** 115:21
**change** 60:6 64:24 65:5
  65:19 72:6
**changed** 64:21
**changes** 60:19 62:7,10
  64:17 71:16 89:6 116:6
**changing** 85:1

**charges** 75:1
**Charles** 2:17 34:13,22
**chart** 101:23
**Chemical** 32:13
**Chemicals** 32:15
**Chevron** 28:11,13,24
**choices** 108:4
**choose** 94:18
**chosen** 72:11 96:3 107:5
**Christina** 20:22
**chronologically** 80:11
**Circuit** 21:7
**circumstances** 48:12
  60:5
**citizen** 75:15
**citizens** 75:12
**city** 32:18 56:2 105:2
**Civil** 1:4 5:6
**CivilTech** 97:3 98:14
  100:20 101:4,7 102:3
  110:18 111:8,14,17
  112:1,10
**claim** 20:3
**claimants** 29:24 30:22
  31:10
**claims** 11:13 21:7 53:2
**clarify** 26:5 40:25 97:24
  98:5
**class** 11:19 47:10 63:18
  64:1 66:20,22
**cleanup** 13:2 15:20,22
**clear** 57:18 66:5 75:20
**clearly** 108:4
**client** 19:15
**close** 24:4 31:8 33:24
  67:11 70:1 99:25
**Coast** 23:6,11
**Code** 5:6
**collectively** 63:1
**colloquial** 102:8
**Columbia** 31:23,24
**combination** 102:5
**come** 42:19 44:11,13
  61:15 75:5
**comes** 10:22 66:1,2 97:1
**commensurate** 106:21

**comments** 37:24 38:14
**commercial** 16:5 17:10
  17:12
**commingled** 70:18
**community** 31:18
**companies** 34:5
**comparable** 59:5 81:3,13
  81:22 86:3,4,5,9,13
  87:14,20,24 89:21
  90:24 94:21,23
**comparables** 27:21 81:8
  81:11 83:9,11 86:6
  89:9,14 90:7,23 92:13
  94:14,14
**compared** 16:19
**compelling** 64:16
**compensation** 23:3 29:4
  31:2 58:8
**competent** 51:6
**compiled** 15:9
**complaints** 56:5,9
**complete** 9:4 37:16
**completed** 79:1
**complex** 60:20
**complicated** 49:3
**complicating** 41:2 42:11
**components** 42:14 46:23
  55:5 63:4
**comprehensive** 60:25
**computer** 111:18 117:9
**concern** 59:11
**concerned** 60:10 72:3
**concerning** 104:19 115:4
**concise** 61:12
**conclude** 58:6
**concluded** 59:14 104:7
**conclusion** 39:22 40:20
  43:13 52:13 54:22
  57:16 59:3 72:11 73:18
  73:21 74:23 76:6 80:22
  103:25 109:23 112:6
  113:15,17
**conclusions** 41:5 49:19
  53:12,14 114:12 115:23
**concrete** 89:18
**condition** 83:5 108:17,18

**conditions** 8:8 10:10
  28:3 82:10 88:16
**conduct** 19:20 44:1
**confess** 46:17
**confused** 77:21 84:18
**confusing** 27:6
**Congressional** 75:19
**connection** 11:16 62:16
  93:24
**consider** 65:24 96:24
  114:22
**consideration** 27:14
**considered** 42:9
**considers** 94:12
**consistent** 15:24 111:13
**Consolidated** 1:6
**constitutes** 111:4
**construction** 34:5 46:1,8
  50:12 55:23 58:23 94:3
**consult** 36:7
**contact** 69:16
**content** 103:22
**contention** 109:17
**contents** 8:20 9:10
**context** 28:5
**continue** 55:10
**contract** 23:17
**contractors** 104:16
**contrasting** 47:23
**contributed** 96:18
**contributes** 87:12
**contributory** 85:19
**Convention** 33:21
**Conversely** 109:1
**copies** 90:19
**corollary** 20:6 22:11
**Corporation** 14:17
**Corps** 55:20
**correct** 22:7 27:11 31:7
  37:1,4,11,19 44:1,12
  45:1 46:10 47:11,18
  48:3 50:4 51:4,18,21
  52:10 53:12 61:3 65:13
  75:6 76:3 84:12 100:21
  100:23,24 102:9 111:3
  111:6,9,24 115:9,10,13

JOHNS PENDLETON COURT REPORTERS                                      800 562-1285

WADE RAGAS, PH. D.                                                                    9/3/2009

115:14 116:7 117:11
**corrections** 116:6,13,15
**correlate** 14:18
**correlated** 60:18
**cost** 13:15,16 19:12 20:5
   27:22 34:2 42:22 45:2
   46:5,22 55:2 94:12
   107:24
**costs** 45:14 63:2 72:18
   94:3,13,25 95:6,13
   109:7
**cottage** 82:23
**counsel** 5:3 36:4,5 39:16
   117:14,14
**counsel's** 55:7
**count** 80:1
**couple** 16:4 115:2
**course** 74:1
**court** 1:1,25 5:23 9:22
   10:15,16,21 11:3,15
   12:25 13:14 21:7 23:8
   24:1,3,20 28:23 31:6
   39:17 40:5,11,15,22
   41:16,17 51:9,17 52:8
   52:19,22,24 53:4 54:18
   54:19 58:1,4 61:21
   74:2 117:3,25
**courtroom** 11:7
**courts** 12:11
**Court's** 12:16 52:5,6
   53:3
**cousin** 17:2,2
**Cousins** 17:4,6,7
**cover** 106:2
**covered** 49:23
**covers** 14:25
**create** 63:1
**created** 13:23 23:11
   52:23 77:16 109:13
**credentials** 7:23
**credit** 73:14
**Crepel** 22:22
**criteria** 84:23
**crossed** 22:2
**crystallize** 87:15
**cumulative** 46:22 57:24

**cure** 13:16,16,17,20
   19:12 20:5 34:2 42:22
   46:5
**cured** 14:5
**curing** 32:6
**curious** 11:6 108:15
**curriculum** 9:10
**customary** 65:23
**cut** 36:23

---
### D
**D** 4:1,7 76:14,14
**damage** 12:20,21 13:1
   14:9 15:6,11,13 21:20
   23:12 24:23 25:19,20
   31:15 32:4 33:6 36:6
   40:6 41:2 42:23 43:11
   43:20,21,22 44:21 45:9
   45:24 46:4,5,6 47:17
   49:18,25 51:2,16,22,25
   52:21 53:15,21 54:4,25
   56:18 61:11 62:11,22
   62:23 63:1,12,17 69:1,6
   69:7,9,11,24 70:1,7,8
   71:8,10,15,17 72:18
   95:1,16,17,22 96:6
   99:15,18 100:8 101:13
   101:16 104:4 112:16,24
   113:2,22,23,25
**damaged** 26:4 45:22
   50:22 85:17 104:13
**damages** 12:3 13:4,5
   19:12 22:4 23:24 24:2
   24:10,20 26:2 29:16
   31:17 32:6,22 33:24
   35:1 39:14 41:8,13,20
   41:23 42:3 43:6,8
   45:13 49:12,14,16 50:6
   50:7 52:3,24,25 53:5
   54:7,12 55:5,22 56:20
   57:12,24 62:11 63:14
   74:10 75:23 96:7,12,14
   98:12 102:16 103:7
   109:18 110:1,1,13
   113:13 115:4,6
**DANIEL** 3:8
**data** 14:23 15:5,18 16:16

42:18,19 44:11,16,22
   50:17 53:23 60:25
   66:18,25 67:12 114:17
   114:19
**date** 54:10 78:6 88:14
   92:8,10 116:8,11,25
**dated** 9:15
**dates** 72:10
**dead** 68:17
**deal** 47:6 74:11 100:25
**dealing** 45:15,17 61:8
**deals** 76:14,15
**dealt** 48:25
**debris** 69:9
**debt** 108:24 109:10
**December** 77:11
**decide** 41:16 51:17 52:25
   53:4 56:19
**decided** 15:23
**decision** 15:16 74:3
   75:16 91:7 107:11,21
**declaration** 11:16,20
**decline** 70:24 71:1,5
**defendant** 17:25 18:8
   19:21 21:10,16,25
   32:11 49:25 50:2 51:4
   51:7 53:11 55:16 56:21
   57:6,22 73:14 76:3
**defendants** 14:15 16:25
   32:14 49:17 55:13
   56:21,22
**defendant's** 21:13,15
**defer** 105:16
**define** 33:16
**definitive** 67:15
**degree** 52:23 74:14 112:5
**demolition** 72:16
**denied** 23:1,10
**Department** 20:23
**depends** 33:13 86:2
**deponent** 5:10
**deposition** 1:17 5:4,14
   6:12 17:18 30:8,10
   31:19 33:9 56:14 67:25
   117:8
**depositions** 101:1

**depreciated** 85:11
**depth** 41:15 42:1 43:2
   62:21 98:25 101:7,19
   101:20,21,23 102:2,4
   106:22 110:22 111:9
**depths** 42:4 43:16 97:6
   111:12 112:24
**describe** 53:8 61:5 63:7
   81:25 83:5
**described** 83:14
**describes** 37:9
**Deslonde** 7:10,12 69:4
   70:14 72:8 76:15 83:20
   84:10,11 95:23,24 99:5
   99:9,17,20,23 101:8
   102:9,12,15,20 105:23
   106:2 107:25 108:22
   109:10,18
**determination** 41:19
   46:3 51:7 54:10 83:12
**determine** 25:6,12 41:23
   59:7 79:8 105:19
**developable** 21:4 29:14
**developed** 61:4,22 88:8
**development** 21:3 23:1
   23:11 29:17
**differ** 12:17
**difference** 86:2 87:13,25
   88:6 95:14 98:10
   112:12
**differences** 59:2,10 89:4
   89:6,9,10
**different** 8:6 25:11 26:24
   39:24 45:8,22 56:16
   57:10 59:13 67:24
   77:13,24 98:12,19,20
   105:17
**differentiate** 12:19 45:8
   49:13 51:24 98:13,16
**differently** 98:23
**differing** 54:4,5
**difficult** 48:18 67:9
**diminished** 20:2,20
**diminishment** 15:5
   19:25 25:5 60:24 65:18
**diminishments** 18:2 31:3

WADE RAGAS, PH. D.                                          9/3/2009

31:4,8 32:20
**diminution** 13:9 14:21
  18:15 19:16 24:23,24
  25:6,7 33:6 65:25
**dirt** 66:3
**disagree** 39:19 114:16,19
  114:20,24
**disagreed** 24:1 114:11
**disagreement** 114:13
**disallow** 105:8
**discerned** 59:2
**discover** 7:6
**discovery** 47:11 64:15
  74:1
**discuss** 34:17 76:16 79:5
  79:8,16 83:22 93:5,7
**discussed** 71:19
**discussing** 81:10
**discussion** 40:8 62:18
  65:22 67:25 79:9 93:25
  100:5
**discussions** 38:12
**displayed** 81:19
**disposal** 18:17,23
**dispute** 20:25 28:14
  30:17,19 33:18
**disruption** 109:14 113:4
**distance** 31:5
**distinguish** 98:7
**distress** 70:25 109:14
**distribute** 62:10
**distribution** 23:19 30:19
  54:7 63:14
**District** 1:1,2 17:23
  21:23 23:9 24:7 29:10
  29:11
**diverse** 60:23
**document** 93:19
**doing** 12:14 17:17 27:23
  44:19 47:1 61:6 88:9
  88:13 91:17
**dollars** 19:18 20:3
**DOTD** 34:24
**Downs** 24:9,11
**downward** 86:1
**Dr** 6:7 21:23 60:21 98:7

**drafted** 38:13
**drawing** 33:24 82:6
**dredging** 55:23
**drying** 71:4
**due** 13:1,10,18 15:3
  18:15 25:4 28:22 33:7
  41:9 53:1 64:2 71:8
  72:6 75:23 91:22
**duly** 6:4 117:6
**duplicated** 7:5
**duration** 43:3,4,9 45:3
  50:20 62:24
**duty** 49:15 50:2 51:4,5,8
  51:13,21
**DUVAL** 1:9
**D.C** 3:4

---

### E

**E** 4:1,1,7,7 76:14,15
**earlier** 71:8
**early** 104:3
**earned** 73:2
**east** 58:10,18 59:1,5
  66:23
**EASTERN** 1:2
**economic** 8:8,11 10:10
  13:10 14:19 15:3 65:4
  70:21,25 71:6 74:10
  108:15
**effect** 43:6 45:6 103:23
  113:18 115:7
**effects** 42:13
**efficient** 79:13
**effort** 55:4 56:8
**Egania** 7:11,12,13 53:25
  54:8 69:4 70:14 72:9
  76:15,18 78:8 79:17
  82:5,10 84:8 93:20
  94:2,7,16,19 95:11,18
  99:10,18,20,23 106:3,5
  106:6,12
**eight** 8:19 14:1 21:15
  66:4
**eighty** 15:9
**either** 7:10 65:6 67:2
  69:18 73:24 99:25
**electrical** 69:6 104:10

**element** 60:2 71:17 99:15
**elements** 36:6 53:15,21
  54:25 69:24,25 70:3
**element's** 60:7
**elevation** 72:15
**elevations** 62:25
**else's** 61:10
**emanating** 28:18 43:18
  57:8
**emitter** 19:1
**Empire** 28:17,19
**encompassed** 37:22
**encountered** 49:1,2
  57:21
**ended** 11:7
**ends** 28:20
**Energy** 1:18 2:19
**engaged** 13:20 78:18
  104:16
**engineer** 44:12,23,24
  45:10,12 46:9 103:21
**engineering** 42:21 46:2
  50:12 55:1 97:4 100:21
**engineers** 44:14 55:20
**enormously** 112:25
**entered** 33:8
**entering** 70:24
**entire** 6:18 105:23 106:1
**entities** 56:11
**entitled** 8:18 75:10 93:19
**entitlement** 75:12
**entity** 75:14
**entries** 90:22
**enumerated** 96:13
**environmental** 8:2 10:11
  15:8 22:22 28:5 30:25
  33:14 34:20 35:4
**equilibrium** 41:16 42:1
**equipment** 21:19
**equity** 84:7 108:12,21,25
  109:11
**era** 48:21
**error** 78:15
**errors** 84:19
**ESQUIRE** 2:4,10,17,18
  3:2,8

**essentially** 47:9
**establish** 26:3
**established** 70:20
**estate** 7:22 31:17
**estimate** 48:19
**estimated** 52:22 94:22
**estimates** 100:21
**et** 29:19 30:16 107:6,7
**evaluate** 24:22
**evaluating** 39:14 65:24
**evaluation** 60:20 72:10
  107:9
**evaluations** 11:23 93:20
**event** 13:4,11 14:19 28:5
  33:7 41:9 60:16 62:1,2
  62:4,6,24 63:9 64:15
  68:10,14 71:8,10,25
  73:10
**events** 13:13 14:19 15:3
  33:15
**eventually** 21:7
**everybody** 61:21
**evidence** 5:15 48:8 65:10
  66:21,22
**exactly** 14:6
**EXAMINATION** 4:3
  6:6,25 27:1,7 33:11
  36:25 38:9 40:3,24
  48:1,10 52:17 55:11
  60:13 69:21 75:2 76:9
  90:21 93:13 95:8 98:6
  99:7 100:18 110:8
  115:1
**examined** 6:5
**example** 26:7 46:7 54:1
  57:7 66:2 87:15
**excerpts** 53:8
**excuse** 22:6
**executed** 61:25
**exercise** 17:16,18
**exhaustive** 56:8
**Exhibit** 4:9,10,11 6:22
  91:12
**existed** 14:6 28:3
**existing** 107:13 109:4
**exists** 48:13 70:12

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

WADE RAGAS, PH. D.                                                                                          9/3/2009

Page 6

expanding 21:11
expect 58:21 65:12
expects 35:20
expense 27:22
expensive 21:19 66:12
    107:6,24
experience 60:25 61:17
experienced 41:10 110:2
experiencing 113:4
expert 7:16,18 8:4 10:6
    10:12,23 35:15 37:25
    38:7,13 46:2 97:2
expertise 7:17,19,22 8:7
    42:15 46:14 50:10
    54:14 67:6 100:22
experts 44:16 48:9 54:16
explain 46:19 57:4 70:11
    70:13 79:14 80:17 85:4
explainable 65:18
explained 50:11 99:14
explanation 68:20
explosion 31:13 32:9
exposed 44:20 64:22
    65:3 103:23 104:8,11
    104:14,25
exposure 12:20 104:20
express 99:8,13
expressed 99:19,19
expropriation 26:14
extended 31:5
extensive 7:24 12:10
    15:8 32:17 43:22 58:16
extent 15:4 18:1 29:15
    41:12,23 43:1 49:24
    52:20 62:22 63:25
    64:18,23 75:21 96:17
    110:11 111:4
external 44:25
externalities 8:3 15:9
externality 10:11 13:13
extraordinarily 21:18
    94:17
extraordinary 14:3

F

facilities 57:9
facility 18:17 23:20,25

28:25 31:6,14 35:3
    66:4
fact 12:9 35:20 41:18
    49:22 56:19 57:19 67:7
    73:22 74:3 91:22
    101:16 105:7
factor 59:21 63:5 67:8
factors 25:13 26:6,7
    27:13,15,16 42:12,16
    71:24 73:13 83:13,18
    92:3 99:15
facts 13:6 14:4 16:20
    32:18 54:15
factual 58:7 91:14
    108:20
factually 65:17 82:8
    111:3
failed 10:12
failures 64:2
fair 30:19 71:22 100:4
    107:22 115:15
FAIRBANKS 1:24 5:22
    117:2,24
faire 68:1
fairly 18:21 39:24 53:18
    67:13 75:19
fairness 11:17
falling 69:7
family 1:13 28:20 107:11
far 11:15 12:1 58:1 60:9
    60:10 61:25 66:18
    105:15 107:24
fashion 37:9 91:19
fast 98:10
favor 24:15,21
federal 9:7 21:7 55:21
    72:14,14 73:3 75:22
    104:5,19,23
fee 74:25
feel 16:11 49:23 89:5
fees 89:22
feet 21:15 66:4 82:23
    87:23,24 101:9,10,12
    102:5 103:2 106:11,16
    106:17 110:24,25
felt 15:21 58:25 74:9

83:4
FEMA 74:18 75:1,4,11
    104:22
FEMA/federal 72:15,16
fence 31:9
file 14:24
filed 56:5
files 36:7
finally 12:16
finance 70:20
financial 107:17 108:17
    108:18 109:15
financially 110:5
find 14:2 18:19 19:14,24
    20:5 42:7,10 52:25
    53:5 55:20 56:3 61:5
    72:7 73:20 80:19 81:22
    82:1 83:17 106:20
finding 60:5 65:20
findings 12:13,23 13:14
    20:17 23:23 24:4,14
    31:3 32:16 79:10
Fine 28:9 93:12
finished 38:3
firm 21:17,20 32:13
    55:23 66:3
first 6:4 10:7 13:25 14:22
    25:12 55:17 76:16
    79:16 80:9 87:19 89:19
    101:1 104:4 112:12
    117:5
FISHER 2:18
fit 65:16
fits 65:13
five 19:18 20:2 94:23
    101:10
float 69:10
flood 25:19 41:14 58:20
    59:4,8,20 60:6 66:14
    72:14,25 113:7
flooded 104:17
flooding 13:18 26:2 41:9
    62:24 64:1 73:10 96:20
    97:15,16 106:22 110:12
    110:20 111:11
floodwall 64:2,3

floodwater 41:25 62:21
floodwaters 102:13,14
    102:23
floor 89:19
flooring 101:15
floors 82:15
focused 59:5
follow 58:6
following 81:7
follows 6:5
follow-ups 115:2
foot 82:23 85:7,21 86:21
    87:7,11,11 106:15
footage 85:19 87:14 88:6
footages 87:3,5
footings 82:25,25 103:9
    103:15
foregoing 116:4
Foregone 35:5
form 5:12 47:4 80:20
    87:16
formalities 5:8
former 14:6 18:3 48:24
formulaic 12:5
forth 117:7
fortunately 48:20
forty 20:4,7 68:16
forward 12:12 15:18
    111:1
found 12:9,12 18:23
    19:16 21:19 23:24
    33:22 52:4 60:21 61:7
    83:10,18
foundation 102:18 103:2
    108:6
four 9:24 97:1 101:9
    106:17 112:21 115:12
fourteen 54:25 55:2
    96:15
frame 26:24 103:24
frames 105:10
framing 63:24
Franklin 21:8
frequency 64:18 66:2
frequently 35:13
front 24:8 92:25 93:17

WADE RAGAS, PH. D.                                                                9/3/2009

**frontage** 58:17
**full** 39:2
**fully** 78:22
**fundamentally** 82:20
**funds** 72:15,15,16 73:3,7
  75:5,11 76:1 96:6,9
  107:18 109:3 110:3
**further** 8:13 53:20 59:18
  96:11 117:13
**future** 23:1 25:5 29:17
  54:10 58:21 63:19 65:6
  66:7,16 68:18

_____
**G**

**Gas** 31:23,25
**Gaylord** 32:9,13,14
**gee** 87:21
**general** 37:9 40:8 85:6
**generally** 27:15 32:20
  39:9
**generated** 53:19 62:7
**geographic** 12:2
**geography** 12:6 85:24
**getting** 66:9 93:3
**Gilbert** 2:3,4 4:5 6:6,8
  6:25 7:3 26:21 27:1,4,7
  33:11 36:25 38:9 40:3
  40:24 47:22 48:1,10
  52:17 55:6,11 60:13
  69:21 73:19 75:2 76:9
  90:21 93:13 95:8 97:20
  98:6 99:7 100:11,16,18
  110:8 115:4,20
**give** 6:20 54:24 55:1
  67:11,15
**given** 1:18 6:11 41:14,25
  52:15 68:21 95:13,18
  96:15 116:5,7
**glanced** 56:7
**Global** 31:10,12
**globo** 4:11 91:11,12
**go** 6:10,17 7:9 12:11,24
  15:18 16:23 21:22
  28:10,23 29:8 32:9
  36:5 54:23 58:7 60:14
  62:17 63:15 68:22 80:4
  81:21 87:16 90:1,10,15

**frontage** 91:4,5,23 92:22 93:16
  93:23 110:9 111:2
  112:25
**God** 50:7
**goes** 23:7 48:22
**going** 6:12,20 7:8,15
  13:17 27:17 34:18
  46:22 50:25 66:7 76:11
  79:7,11 81:10 91:10
  92:7 98:22 101:14
**good** 58:25 68:19
**GOODWIN** 3:1
**gotten** 108:2
**government** 21:1 23:2
  55:21 72:1 73:4 75:16
  75:22 105:2
**governmental** 25:2
**gradually** 64:22
**grant** 73:7
**Granted** 39:4
**grants** 72:17
**graphic** 97:1,4
**great** 66:2
**grid** 87:22
**gross** 87:22
**ground** 13:24 15:2 32:19
  82:24 106:16
**grounds** 26:13
**group** 28:16 30:12 34:6
**guess** 68:19,21
**guidance** 52:15
**gutted** 85:18

_____
**H**

**H** 4:7
**Habitat** 107:4
**half** 14:25 15:17 16:15
  82:23 106:15
**Halfway** 87:22
**hand** 18:1,13 53:17
  65:21
**handled** 56:12
**happen** 13:18 65:12
  68:15
**happened** 9:14 15:2
  21:14 65:9 68:15 98:19
  102:5 113:3 114:3

**happening** 64:17 66:19
  66:23 67:1 71:5,9
**happens** 49:9 66:13,14
**happy** 84:19
**hard** 49:3
**Harvard** 6:2
**health** 105:1
**hear** 8:15
**heard** 104:3
**hearing** 11:17 12:10
**heartache** 109:13
**hedonic** 25:21 47:5
  65:14,15
**hedonics** 47:3
**heights** 64:19
**held** 51:15
**help** 86:15 87:15
**hereinabove** 117:7
**hereto** 5:3 6:23 91:13
  117:15
**hesitant** 39:3
**high** 21:15 66:4 102:4
**higher** 15:25 35:2 65:7
  66:9,10 96:22 111:2
  112:25
**Highway** 24:6
**high-quality** 21:17
**Historic** 33:19
**hold** 7:23
**home** 72:14 73:3 75:4
  84:6 96:8 108:10 109:2
**homeowner** 74:19 75:5,9
**homes** 104:7 107:6
**honestly** 74:24
**hope** 68:18
**hot** 13:19
**hotel** 33:20,25 34:1,10
  34:11
**hour** 115:17
**hours** 43:21,23 44:5 97:1
  112:13,21 113:9 115:8
  115:12
**house** 12:6 25:19,22 77:4
  84:8 85:9 89:7 103:4,7
  103:23,24 106:15,17,21
  106:22 107:13,16 108:2

**108:22 109:4,10
**household** 63:19 73:11
  109:14
**households** 72:19,21
  73:5 74:11 96:9 104:15
  108:16
**houses** 73:15 104:24
**housing** 14:7 16:15
  18:22 70:20
**Houston** 31:20 67:2
**Hoy** 19:5
**Humanity** 107:4
**hundred** 16:4 19:18 20:2
**hurricane** 49:16 63:16
  79:18,21 115:9,13,17
**hydrograph** 101:7,18
  102:3 106:7 110:19
  111:14,17
**hydrographs** 106:2
**hydrologic** 54:8
**hydrologist** 43:14 44:23
  45:14
**hydrologists** 44:15
**hydrology** 50:13 55:2
**hypothetical** 77:15 78:17
  78:21 79:3 111:5,8,18
  111:19,23

_____
**I**

**idea** 86:6
**identical** 92:6
**identification** 6:23 91:13
**identified** 46:10
**identify** 42:13 49:24 61:1
  71:4 96:16 97:7 100:4
  104:18
**identifying** 46:23
**IHNC** 97:12 110:13,19
  111:11 112:11,23 113:3
  114:1
**III** 41:1
**illegal** 28:22
**imagine** 15:14
**IMC** 31:10,12
**immeasurably** 115:19
**immediately** 13:3 15:22
**impact** 14:23 23:20

50:23 60:7 61:1 69:4
105:10
**impacts** 44:4 45:16 50:19
50:20,21 60:18 108:16
**imperfections** 39:2
**implement** 42:17
**implemented** 39:17 88:8
**important** 74:12
**impose** 40:16
**imposed** 20:20
**impossible** 47:24 48:3,17
48:20 49:1,3
**impression** 82:14
**improper** 104:25
**incidental** 45:19
**include** 7:22 41:4
**included** 64:15
**including** 50:7
**inclusive** 53:18
**income** 21:21 27:22
30:20 35:11
**increase** 63:18 101:19
**incredibly** 108:10
**independently** 49:15
**indicate** 52:19
**indicated** 20:18 42:6
111:25
**indicating** 57:17 97:5
**indicative** 85:10,13
**individual** 11:23 12:1,14
16:2,19 17:11 18:13
35:13,16 46:2 47:13,17
55:3 62:16,17,21,25
90:7 93:7
**individuals** 107:5
**industrial** 23:21 58:11
58:14 66:24 97:17
98:17 99:2
**Industries** 18:6,10 30:22
30:25
**industry** 27:15 64:13
88:17,19
**infer** 105:7
**inferior** 83:7
**inferring** 61:3
**information** 8:11 27:22

27:23 45:1,3,4,7 47:7
48:14 49:23 50:13,13
55:2 103:25
**informed** 40:2
**ING** 56:12
**Ingram** 1:9,11
**initial** 25:11 43:8 45:23
**injury** 113:19
**inspected** 58:10
**inspection** 58:13 82:5,8
**instance** 11:25 16:21
26:2 28:12 30:12,24
31:24 32:21 48:16
74:16 92:19 94:7
**instances** 103:14
**instruct** 40:4 74:6
**instructed** 39:12,15 40:1
51:6
**instructions** 61:13
**insulation** 101:15
**insurance** 64:13 70:8
72:14,25 96:8 109:2
**insurances** 84:4,6
**insurance-related** 64:9
74:13
**insurers** 15:16 48:24
**integrity** 103:16
**intend** 37:21 91:8
**Intent** 23:18
**interested** 117:15
**interests** 21:25 29:13
**Interior** 20:23
**International** 21:12
**interview** 36:3
**introduced** 6:7
**involved** 44:16 56:13
**involves** 22:11 25:2
34:19 57:9
**involving** 8:2,5 17:9
19:11 20:5 22:24 28:14
31:8 33:24 96:20 99:20
**in-housing** 59:10
**irreversible** 102:15
**irreversibly** 104:13
**Isaac** 20:22
**issue** 7:15 8:16 9:15 18:1

18:12 24:19 26:2 59:18
74:7 105:2 115:5
**issued** 30:9 54:6,11
**issues** 8:5 11:12 15:10
19:4,11 26:15 41:2,11
41:20 43:2 70:17 74:14
96:12 99:16,24
**item** 34:16 37:15 56:23
59:16 60:4 65:1,20
69:8,15,20 70:6,10,12
71:15 74:13 83:15,17
**items** 9:14 41:3 42:7,8
53:14,19,22 69:23
71:11 82:11

---

## J

**January** 72:1
**Jefferson** 20:8,13,15
21:5,23 23:9 24:6,9,11
30:21
**jobs** 66:10
**JOSEPH** 1:24 5:22
117:2,24
**Joslyn** 30:22,24
**JR** 1:24 5:22 117:2,24
**JUDGE** 1:9
**judgment** 52:8 54:18
83:4 85:17 89:1 92:4
100:23 105:17
**jump** 9:19 32:7 62:20
**jumping** 8:14
**June** 72:4 79:2
**jurisdictions** 8:6
**jury** 74:4

---

## K

**KARL** 2:10
**Katrina** 1:4 14:1 49:16
64:14 68:13 75:23
85:12 115:9,18
**Katrina's** 63:17
**Keeley** 3:14 33:8
**keep** 35:12 36:2,17 37:2
37:4
**Kenner** 24:7
**kept** 48:23
**kind** 66:13 74:25 92:21

**Kirby** 22:5,16,19
**kitchen** 85:8
**know** 6:13 9:12 29:25,25
33:15,16 35:22 36:9
43:3 46:24 51:3,12,14
51:20,23,25 52:2,7
53:13 55:25 56:2 57:25
68:3,6 69:6,19 70:6
74:17,24 75:8 88:10
91:5 95:5,14 96:19
97:12 102:24 105:13,25
109:6,7 110:15,16,17
**knowledge** 41:8,21
**knowledgeable** 8:1
**known** 43:10
**Krantz** 24:7,11,12
**K(2)** 1:7

---

## L

**L** 5:1
**lack** 29:17 63:16
**Lafarge** 1:8,10,12,14
2:15 114:8
**Lafourche** 17:23
**Lagarde** 1:10
**laissez** 68:1
**land** 22:3 29:1,3,13,14
31:2,4,7 32:19 34:13,22
62:5 77:1 91:2
**landowner** 19:7
**large** 28:25 64:13 69:10
85:22 89:6
**larger** 24:2
**largest** 13:9,14
**law** 5:7 49:19,23 51:9
57:25
**laws** 21:5
**lawsuit** 56:16
**layman's** 46:20
**leakages** 33:22
**lease** 23:18
**leave** 103:10
**left** 48:8 50:1 80:22
**legal** 39:21 40:19 41:5
52:13 53:12,13 54:21
57:16 58:3,5 73:17,21
74:22 76:5,8 109:22

WADE RAGAS, PH. D.                                                              9/3/2009

Page  9

113:15,17 114:4 115:23
**legally** 18:16
**length** 58:17,24
**lengthy** 67:13
**Letter** 23:18
**let's** 6:17 17:1 21:22
  28:10 29:8 32:9 35:8
  37:5,6 41:1 53:24
  55:12 58:7 60:14 62:20
  63:15 68:22 76:18 80:4
  91:4 102:25 103:1
  110:9
**levee** 17:23 21:23 22:2
  22:12 23:9,10 28:23
  29:9,11,12,15 64:2,3
**levees** 64:19,25 65:1
**level** 64:18
**levels** 60:18 96:22
**liability** 55:15 56:22 57:3
  57:5 58:2 76:2
**liable** 73:14
**life** 75:10
**light** 109:19
**likelihood** 39:13 40:2
  51:11
**limit** 15:13
**limited** 10:14,21
**limits** 41:20
**line** 31:9 97:5
**list** 53:18 68:25 69:5
**listed** 9:22 16:23 53:14
**listening** 63:23
**listing** 82:9
**literature** 13:12 15:7,8
  70:21
**litigation** 20:16,18 28:21
  30:25 33:23 55:24
**little** 26:19 30:1 68:7
  85:9 89:8,18 92:3
  108:10
**livable** 107:15,16
**live** 48:20
**living** 62:25 85:7,11,15
  86:1 87:22 89:4
**LLP** 1:18
**local** 8:7 10:10 104:6

**locale** 83:14
**locally** 72:2
**located** 99:25
**location** 26:7 66:16 97:5
  112:8
**locations** 42:25 63:17
  98:20
**London** 12:11
**long** 43:19 52:14 54:24
  98:25 100:6
**longer** 10:2,3,6 48:13
**longevity** 105:11
**long-term** 44:5 112:23
**look** 12:2 14:3 15:2
  18:21 24:24 25:1,3,18
  25:20,21 26:3,6 37:5
  41:1 43:1 44:19 46:2
  55:12 56:9 59:1 64:20
  74:13 77:19 79:25
  83:16 87:19 88:25 89:2
**looked** 11:12 13:8,12,13
  13:15,21 23:19 59:9
  64:14 66:3 81:3 109:1
**looking** 14:22 15:10
  61:10 66:6 67:3 69:5
  79:11 81:18 83:9 88:20
  99:17 105:21 107:13,20
  108:6,15
**looks** 80:5 97:4
**loss** 15:24 19:11 35:11
  44:4,6,7,8 48:17 65:25
  94:5 103:4 112:18,19
  113:8,9 114:21 115:7
  115:11,16
**losses** 63:20
**lost** 17:8,9 21:21 34:1,7
  78:7 102:20 103:18
**lot** 7:13 31:14 67:12 77:4
  77:7 84:8,10 89:6,9,11
  107:16,19 108:6 109:10
  109:13
**lots** 48:21 89:2
**Louisiana** 1:2,20 2:6,12
  2:21 3:10 5:6,24 6:3
  29:11 72:17 73:8 117:4
**Lower** 105:23 106:1

**luck** 68:19
**luxury** 16:14
**L.L.P** 2:16 3:1

**M**

**M** 4:1
**MAG** 1:11
**magnitude** 13:11 63:12
**magnitudes** 59:13
**MAI** 1:18 6:1 7:23 116:3
  116:11
**maintain** 36:14
**making** 85:9 87:3 111:2
**Management** 64:11,11
  64:12
**manner** 61:1,2
**map** 81:20,23
**Marie** 24:7
**mark** 3:2 6:18
**marked** 6:22 91:12
**market** 13:6,25 14:2,4,7
  16:15 19:17 25:13,15
  25:21 27:24 58:20
  59:12 64:22 67:2,3
  68:8 71:2 85:11 89:1
  103:18 108:21
**marketplace** 65:4,11
**markets** 67:8
**materially** 12:17
**materials** 6:19 58:8
**mathematical** 44:17
**matter** 11:5 12:22,23
  13:18 14:16 17:5 18:9
  21:11 22:1,13 24:1
  30:18 31:4,20 32:12
  36:9 39:14 40:11 56:9
  57:1,19 58:5 66:24
  97:2
**matters** 32:23 34:20
**Maurice** 87:20
**maximum** 12:3 14:23
  15:6,11,14,24 111:12
**Maynard** 20:8,21
**McCall** 1:18 2:16
**mean** 33:14 35:14,24
  36:23 44:15 49:7 53:10
  72:20 77:17 78:1 98:3

**meaning** 60:21 77:12
  80:25
**means** 52:4
**meant** 77:24
**measurable** 45:19 49:18
  53:22 100:8
**measure** 15:6 25:8 42:3
  42:16 46:22 47:17 50:6
  51:22 54:11 60:22
  62:11 95:16,17,22
  96:11 112:16
**measured** 13:5,7 42:12
  43:23 61:25 63:8 82:6
  101:21 106:12 112:19
**measurement** 41:2,11
  48:15 49:12
**measuring** 60:15,16,17
  61:10 72:5
**mechanical** 104:12
**medical** 30:20
**meet** 9:7 27:20 59:17
**meets** 39:8
**melted** 31:13
**memory** 17:14
**mentioned** 44:14,15
**Metairie** 6:2
**method** 61:4,6,22,22,24
**methodology** 49:12 82:3
  92:5 99:16
**methods** 39:13 40:5,13
  40:17
**metropolitan** 66:25
  67:22
**Mexican** 82:16
**middle** 29:12 72:2
**mind** 10:22 79:13 85:1
**missed** 84:12 115:21
**missing** 7:5 8:24 111:15
**misspeak** 28:15,15
**mistake** 76:20 77:8 78:10
  84:1
**mitigate** 72:18 75:22
**mitigating** 74:14
**mitigation** 74:14,15,17
**mixing** 105:21 106:5
**MLS** 90:3,14,22,25

JOHNS PENDLETON COURT REPORTERS                                    800 562-1285

WADE RAGAS, PH. D.                                                                    9/3/2009

**mobilized** 69:8
**model** 31:16 47:2 65:14 65:16 106:19 111:18,20 111:24
**modeling** 47:5 71:3
**models** 67:10,14 112:7
**modest** 23:25
**modify** 68:7
**Moffatt** 30:16,18
**mold** 33:21
**moment** 6:8 44:10 112:6
**money** 74:18 75:4 109:6 109:8
**monies** 74:3 96:8
**Monteleone** 29:9,13,19
**months** 14:1 77:11
**morning** 101:4,6,9,20,22 106:8 110:21,23 112:20 115:9
**mortgage** 109:4
**move** 72:4
**moved** 102:13,14 103:9 103:14
**moving** 98:10 102:21
**MRGO** 97:12 101:24 106:18 110:24 111:1 113:23
**mud** 21:15
**multiple** 55:13 56:18,25 57:8,12,14
**multiplied** 87:25
**multiply** 60:17
**multiplying** 87:13
**multi-year** 33:23
**Mumford** 1:9
**Murphy** 10:23 11:1,13 13:19 14:17 15:15 32:25,25 33:2

**N**

**N** 4:1,1,1,7 5:1
**name** 6:8 22:15
**named** 6:3
**naming** 25:23
**narrow** 11:4
**nature** 46:4 50:23,24
**near** 50:23 98:25

**necessarily** 63:21 93:4
**necessary** 59:15
**necessity** 104:10
**need** 6:10 26:5 38:17 51:5,12,14,20 52:8 58:6 60:1 65:15 71:13 90:18 92:22
**needed** 9:2 21:17 54:9
**negative** 8:3 10:11 105:10
**negligence** 53:1
**negligent** 49:14 51:21,23 52:1,5 55:13,18,25 56:1 56:25 57:1
**negligible** 43:5
**neighborhood** 83:8 94:24
**Neither** 104:22
**never** 11:7,15,25 12:24 12:24 23:21 110:14 111:11
**new** 1:19 2:6,12,21 3:3 3:10 18:6,11,25 21:12 22:11 28:22 66:25 67:21 71:2 82:19,19 107:5
**Newport** 23:15,25
**Ninth** 58:10 105:24 106:1
**nodding** 80:25
**non** 67:7,8
**non-lawyer** 56:23
**normally** 88:3 92:1
**north** 2:15 98:16 99:1 100:2,24 101:2 102:6 102:14,16,23
**noted** 116:13,15
**notice** 5:7 50:1
**noxious** 19:1
**number** 8:5 18:5 20:8 21:22 22:21 23:5 33:19 34:8,9 37:8 41:4 46:19 49:5 55:12 56:15 58:8 62:20 63:15 65:1 70:11 83:15 84:1 85:12,22 96:5,6 101:11 108:3

115:19
**numbered** 8:20 9:6
**numbers** 16:1 66:10 99:18
**numerous** 19:1
**NW** 3:3

**O**

**O** 4:1 5:1
**oath** 5:25 6:5
**object** 26:12 115:22
**objected** 115:22
**objection** 26:17 39:21 40:19,21 47:20 48:5 52:12 54:21 55:7 69:14 73:17 74:22 76:5 95:3 97:19 99:6 100:10 102:11 109:22
**objections** 5:11
**objective** 35:19 61:2 84:23
**objectivity** 36:15
**obligated** 40:16
**observed** 107:10
**obtain** 74:18
**obviously** 41:17
**occasions** 58:12
**occupants** 109:18
**occupy** 66:6
**occur** 68:10 101:14,17
**occurred** 13:2,10 15:14 15:15 25:6 28:6 32:20 33:25 41:13,24 43:7,12 53:16,16,17 62:8,8,13 65:11 68:4 69:18 74:15 75:23 97:7 101:2 103:8 104:4 110:14 111:10,11 111:13 113:2,6,13
**occurring** 33:22 71:18 101:19
**occurs** 9:5 49:10 101:1,5 106:6,19
**October** 78:2,4,13,19 92:12
**offer** 13:23 15:23
**offers** 11:11 12:8
**office** 30:20

**offices** 105:18
**officiated** 5:24
**offset** 65:7 73:14
**oil** 10:23 11:1,14 12:4,20 13:2,12 14:9,17 15:3 32:25,25 33:2
**okay** 6:17 7:1 8:17 10:1 11:19,22 14:8,13,18 16:6 17:13 19:10,23 20:11,22 21:8,22 22:5 22:21 23:5 24:5,14,18 25:18 27:19,25 28:9 29:6 30:6 32:8,24 35:8 35:12,23 37:1,5,17,20 42:19 45:7 46:16 47:16 48:11,16 49:5 56:10 58:7 59:23 60:3,11 65:23 69:22 70:11 71:19 74:8 78:11,14,25 79:19 80:8,15,21,24 81:2,4,9,17,24 82:2,3 84:16,17,21 85:25 86:8 86:11,18 87:2,9 88:15 88:22,23,24 91:9 93:1 93:12,19,22 94:10 98:21 104:2 106:9,14 106:24 108:11,23 111:16,19,22 112:2,3,4 112:9 113:12 115:21
**older** 82:18
**omission** 53:10
**omit** 53:10
**once** 13:2 14:5 50:22 54:15 68:5 101:12
**once-in-forty-year** 68:14
**ones** 12:14 33:12 52:25
**one-story** 83:2,3
**open** 53:20
**operated** 57:10
**operating** 35:3
**operation** 18:16 21:20 31:9
**opine** 59:18
**opinion** 10:14 12:3 25:15 27:24 36:13 38:18,22 38:24 39:24 42:2,6

JOHNS PENDLETON COURT REPORTERS                                          800 562-1285

WADE RAGAS, PH. D.                                                      9/3/2009

Page 11

45:15 47:10 53:24 54:3
54:6 57:20 58:3 59:16
62:9 63:11 67:20 76:8
78:9 79:16,20 103:3,21
104:3 113:20 115:6,16
**opinions** 10:20 11:4
41:20 45:13,15 63:6
99:8,13
**opposed** 12:20 27:14
35:16 48:2 64:2
**order** 10:15,16 38:17
42:20 53:7,11 74:18
**ordinarily** 42:21 57:20
65:4,11
**organize** 45:5
**original** 5:9 15:12
**originally** 12:10
**originated** 112:22
**Orleans** 1:19 2:6,12,21
3:10 15:1 18:7,11,25
21:12 22:11 28:22
66:25 67:22 71:2
107:12
**outcome** 109:16
**outcomes** 63:2 85:3
**outlets** 104:10
**outset** 6:17
**oven** 8:5
**overall** 43:6 74:10 89:11
94:5
**overlapping** 50:21
**owed** 19:15 51:4,5,7
**owned** 57:9 107:17
**owner** 17:7,11 20:10
22:8,13,14,17,20 26:9
28:21 34:23 48:24 75:1
84:7
**owners** 18:13 21:6 22:9
23:1,4 28:16 35:14,16
73:24 74:1 112:16
**ownership** 34:6
**o'clock** 102:9 103:6,8
105:20,22 106:7 110:20
113:24

---

**P**

**P** 5:1

**page** 4:3,9 7:5,9 9:22
37:6 60:15 68:23 70:13
76:19 80:20,20 81:6,7,7
81:10,11 83:15,16 85:6
107:2 108:19
**pages** 9:5,6 80:1,4,4 81:7
81:22 90:3,14,25
**paid** 36:16 75:5,9 108:9
109:3 110:3
**painful** 93:6
**papers** 79:11
**paperwork** 74:25
**paragraph** 37:15 39:12
41:4 42:10,10,11 46:19
46:20 49:6 53:8 70:16
70:19 71:11,15,20
76:20,21
**paragraphs** 8:19
**parallel** 15:20
**parameters** 83:9
**paraphrase** 71:22
**parcel** 20:12,14,15 21:3
25:3
**parcels** 14:25 59:5
110:12
**Parfait** 1:13
**parish** 15:1 20:9,13,15
20:19 21:5 28:17 30:21
32:3 58:12 105:5
107:12
**parking** 31:14
**parse** 49:7 50:19 96:16
**part** 5:14 19:20 20:13
32:22 42:5 52:9 54:9
56:20 59:12,15 61:24
73:11 74:9 76:2 89:6
96:9 103:19
**particular** 11:6 12:22
40:13,16 44:9 53:6
**particularly** 113:1
**parties** 5:3 30:5,11,13
52:16 55:14,18 56:1
57:1,10,14 117:14
**partly** 72:5
**partners** 30:17,18 33:20
34:4,11

**party** 35:17,19 50:1,6,25
51:15,25 52:2 53:6
55:24,25 57:22
**pattern** 22:9 59:11
**pay** 72:23 96:7
**paying** 75:14 89:22
**payment** 70:8 72:13
74:20 84:4,5
**payments** 72:22,24,24
73:1,5 75:17 109:2
**people** 46:9 66:15 67:21
68:12 88:21 107:21
108:7
**people's** 23:13
**perceived** 59:4,8
**percent** 15:12 89:2
**percentage** 54:4,7
**perception** 59:20 60:6
63:19 65:6,24 71:16
**perceptions** 25:22 58:20
65:19
**perfect** 39:3,4,6
**perfection** 39:1
**perfectly** 45:3
**perform** 74:6
**period** 13:3 20:18 43:7
43:21,22 44:9 67:13
68:11 70:24 96:20
112:20 115:17
**periods** 45:17 70:21
96:25
**permanent** 25:9
**permissible** 104:8
**permit** 105:18
**permits** 21:2
**permitted** 5:5 18:16
**perpetuity** 23:2
**Perry** 1:11
**person** 41:7
**PERTAINS** 1:6
**pervasive** 50:24,25
**Peter** 3:14 33:8
**petrochemical** 28:25
**Petroleum** 34:14
**phase** 47:11
**photographs** 7:9 8:21

**photography** 48:21
**photos** 81:20
**phrase** 53:10
**physical** 41:8 48:8 63:3
69:1 82:9 86:15 113:22
113:22
**Ph.D** 1:17 6:1 116:3,11
**pick** 92:7
**picked** 89:5
**piece** 45:21
**piled** 21:14 66:4
**pipeline** 28:11,13 31:25
32:4
**pipelines** 28:18
**place** 29:12
**placed** 23:10
**placement** 28:24
**places** 98:11
**plaintiff** 17:5 19:15 30:4
30:13 72:19
**plaintiffs** 6:9 14:14
16:24 18:5 32:10 56:6
56:11 69:2
**plaintiff's** 55:14
**Plaquemines** 28:17,19
**plausible** 102:1
**pleadings** 55:14
**plumbing** 85:20
**plus** 20:4 84:8
**point** 26:20 27:9 47:2
55:8 65:1 70:19 74:19
75:9 76:11 92:2 95:17
102:1,18 106:17 108:1
110:24 111:1
**pointed** 7:4
**pointing** 56:24 76:23
**points** 62:5
**pole** 69:7
**Pontchartrain** 29:9,11
**porch** 89:18
**porch/deck** 89:17
**portion** 29:12 51:16
**portions** 13:17 53:4
**pose** 105:1
**posit** 67:20
**position** 14:3 40:10,22

---

WADE RAGAS, PH. D.                                                                                    9/3/2009

69:3 73:12 75:25 79:8 109:12 112:15 113:8
**possibility** 35:1
**possible** 12:3 15:24 19:3 38:18 47:16 48:2,7 50:15 55:19 68:20 92:4 98:13
**possibly** 12:4 43:15
**post-event** 60:16
**post-Katrina** 108:12
**post-storm** 16:13
**potential** 114:21
**powers** 21:2
**Poydras** 1:19 2:20 3:9
**practically** 114:5
**practice** 25:17 88:7
**precedents** 58:5
**precise** 21:18
**precluded** 21:3
**predating** 79:21
**predicated** 114:14
**preference** 76:17
**preferred** 13:8
**premises** 114:12
**premium** 72:23
**premiums** 75:6
**present** 3:13 23:20 36:7 37:18 43:19 44:2 65:21 76:13 96:17 100:6 110:25
**presented** 81:5
**pre-hurricane** 14:7
**pre-Katrina** 85:7
**pre-renovated** 82:13
**pre-storm** 16:10
**pre-taking** 27:10
**price** 65:8 71:5 72:23 87:6,10
**prices** 59:10,12 86:16 89:2
**primary** 8:13 70:19
**primitive** 67:18
**principal** 74:5
**principals** 38:11,12 40:4 114:7
**printer** 66:6

**printing** 21:9,17,19 66:3
**prior** 17:18 37:3 73:5
**probably** 11:21 40:1 68:15 90:18 96:25 98:12
**problem** 68:17 80:2
**Procedure** 5:6
**proceed** 79:15
**proceeding** 47:11
**proceeds** 84:6
**process** 9:13,14 25:14 27:9 47:5 82:1
**processing** 74:25
**PROCTOR** 3:1
**produce** 90:15
**producing** 112:7
**profession** 86:25
**Professional** 25:17
**proffered** 7:18
**profits** 17:9 30:20 34:1 35:5
**progress** 33:9
**prohibited** 104:22
**prohibiting** 105:15
**proof** 67:11
**properties** 11:24 12:15 46:3 47:14,17 53:16,17 62:16,18 65:21 69:2,19 69:25 70:1,9,14 72:9 79:6 90:16 91:16,24 93:25 94:17,21 99:14 99:18 100:1 101:11 108:13 110:23 111:10 112:12 115:5,7,8
**property** 8:4,9,10 10:9 12:6 13:1 14:5 15:12 17:7,10,12 18:13,14,18 18:20 20:1,10 21:6,14 21:16 22:3,8,8,10,13,14 22:17,20,25 23:4,22 24:25 25:5,12 26:1,9 27:11 28:3,16,21 29:5 29:18 31:8 32:5,19,21 33:6,6 34:22 35:14,16 39:14 40:6 44:5,20 45:21 47:1,8 48:24,25

50:14 52:21 53:25 55:3 60:15,18 62:1,2,3,22,23 62:24 63:2,4,8,10,13 65:14,25,25 66:7 69:16 70:23,25 71:3,4,13 72:15,16 73:24,25 79:5 79:17 82:6,10,12,14,15 83:6,19,20 84:7 85:13 85:23 86:3,17 88:10 92:12 94:5,6,9,16 95:1 95:10,12,25,25 96:2 98:22,25 99:5,9,25 100:7 101:13 107:25 109:19 112:14,16,24 113:5,22,23 115:12
**proposed** 23:21
**protection** 22:23 63:17
**provide** 41:19 90:5
**provided** 73:9 82:6 89:23 108:5
**providing** 44:16
**PSLC** 2:2
**public** 63:16 64:23 65:2 68:9 72:17 73:8
**published** 8:9 60:22 61:7 64:8,10
**publishing** 7:25
**purchased** 109:4
**purchases** 73:6
**purporting** 60:22
**purpose** 29:5 100:4
**purposes** 5:5
**pursuant** 5:7
**push** 64:24 65:8
**put** 25:11 27:10 48:17 92:11
**P.L.C** 2:3

### Q

**Qualification** 8:19
**qualifications** 7:16 9:21 67:6
**qualify** 10:12
**quality** 23:6,11 94:15,20 107:24
**quantification** 45:24
**quantify** 42:16

**quantum** 24:19 63:12
**question** 5:12 6:14 8:15 9:9 24:17 25:10 26:6 26:19,23,24 27:6 28:7 36:17 37:3 45:20 47:3 49:10 63:24 67:17 68:7 75:3 93:10 100:15,19 114:2,4
**questioning** 115:4
**questions** 82:11 94:1 115:25
**quite** 19:3 38:5 50:23 70:1 85:3 94:19

### R

**R** 1:17 6:1 116:3,11
**race** 24:8
**RAFFMAN** 3:2
**rafters** 103:12
**Ragas** 1:17 6:1,7,19 60:21 98:8 115:3 116:3 116:11
**rainfall** 22:9,10
**rain-caused** 62:23
**raised** 82:22
**ran** 15:19 66:5
**random** 92:8
**range** 20:7 63:1 92:7
**rapid** 102:21
**rarely** 48:25
**rate** 34:19 66:10 68:20
**rates** 65:7
**reach** 41:15 42:1 43:13 114:12
**reached** 30:10 80:18 112:11
**reaching** 26:8
**read** 50:1 53:9 56:5 78:5 78:12,13
**reader** 56:24 71:14
**reading** 5:8 100:25 102:3
**real** 7:22 31:17 59:2
**reality** 104:5
**realizes** 65:2
**really** 30:2 34:17 36:10 68:17 77:15 97:21
**Realty** 17:2,4

WADE RAGAS, PH. D.                                                          9/3/2009

**reason** 39:18 107:14
**reasonable** 48:19 55:4
    61:19 68:11 83:13
    85:24
**reasonably** 53:15
**reasons** 71:6
**rebuild** 96:3,10 107:19
    108:7
**rebuilding** 94:3 104:7,24
    105:3 107:22,23
**rebuilt** 96:3
**recall** 17:17 30:12
**receipt** 76:1
**receive** 72:23 75:11
**received** 72:21,24 73:3,7
    73:23 75:21 109:1
**receiving** 112:22
**recess** 110:7
**recession** 70:21 71:23
    72:6,8
**recessions** 70:22
**recite** 68:25
**recommended** 12:18
**record** 60:12 100:25
**records** 48:23 73:25
**recoverable** 53:1
**recovered** 72:19
**redevelopments** 104:22
**reduction** 71:9
**refer** 102:19
**reference** 9:5
**referred** 86:24
**referring** 55:18 71:23
    93:15
**reflection** 97:22
**reflective** 86:16
**regarding** 37:25 38:7
    54:7
**regional** 23:19
**registering** 66:11
**registration** 21:18
**regulatory** 20:25 21:2
    22:23
**reiterating** 71:12
**relate** 19:20 70:13
**related** 109:19 117:14

**relates** 110:12
**relative** 19:19 25:24
    43:16 44:3,20 45:16
    50:19 55:5 97:6
**relatively** 24:3
**relevance** 26:12
**relevant** 58:14 70:10
    114:3
**reliance** 6:19
**reliant** 112:6
**relied** 73:25
**relies** 63:21,25
**relocate** 107:11
**rely** 44:25 45:2 59:17
    100:20 114:19
**remainder** 22:4
**remaining** 20:14
**remediation** 41:8
**remember** 20:4 23:8
**remembering** 30:3
**reminding** 71:14
**removal** 105:4
**render** 36:13 38:7,17
    45:15 100:22 113:20
**rendered** 20:17 42:6
    45:13,14 54:18 62:9
    63:11
**rendering** 76:7
**renders** 54:19
**renewal** 28:14
**renovated** 82:12 94:15
    103:13,18 107:15
**renovation** 85:14 94:13
    104:16
**repair** 46:22 62:3 63:2
    78:18,19 95:14
**repaired** 25:20 62:4,4
    63:10,10 78:3,22 95:11
    96:2
**repairing** 106:21
**repairs** 79:1 95:20,21
    96:7
**repeated** 63:20
**Repeating** 100:17
**repeats** 82:1,3
**rephrase** 45:20

**replace** 104:10
**report** 6:18 7:2 8:18 9:4
    9:15,15 37:6 59:23
    62:9 76:14 77:19 78:6
    78:6,8 79:6 82:7 83:15
    83:16 93:7,24 94:11
    99:9,15 107:2 114:8,14
**reported** 1:23 25:24
**reporter** 1:25 5:23 61:21
    117:3,25
**REPORTER'S** 117:1
**reports** 30:9 38:8,13
    42:22,24 81:21
**represent** 6:9 7:8 17:5
    20:9 21:24 26:10 30:15
    30:23 31:11 32:10 34:3
    34:5,10,21 35:13,15
    96:9
**represented** 16:24,25
    18:8,12 19:8 21:5,10
    23:3,6,16 28:12,15
    30:17 31:12
**representing** 2:2,15
    22:13
**reproduced** 90:12
**reputable** 64:8
**require** 67:12,12 103:8
**required** 74:19 105:4
**requirements** 59:17
**requires** 49:19 57:15
    58:1 113:15
**research** 60:22 61:5,8
**reserve** 38:6
**reserved** 5:13
**residential** 26:1
**residual** 13:19 103:12
**resources** 107:17
**respect** 100:2
**respond** 26:25 27:3 46:6
**response** 64:16 115:3
**responsibilities** 57:23
**responsibility** 56:3 57:13
    57:14
**responsible** 51:1,15
    55:21
**responsiveness** 5:12

**restitution** 28:24 32:5
**restoration** 14:8 33:20
    94:2
**restored** 14:5
**restricted** 20:14
**restrictions** 20:19
**result** 15:22 93:2 117:16
**results** 111:14 112:8
    113:6 114:6
**retained** 14:14,16 32:12
    35:21
**return** 65:7 109:9
**revenues** 73:23
**reviewed** 12:8 58:8
**reviews** 23:13
**rewarding** 109:16
**rich** 47:7
**right** 6:20 7:7 8:14 9:19
    10:9,19 16:22 17:22
    18:5 20:4 22:18 23:6,9
    25:10 28:10 30:3,12,14
    32:7 33:4 34:12,16
    35:5 37:5 38:6 39:11
    43:11 46:15,17 49:5
    54:25 55:17 60:11,14
    62:13 66:11,15,17
    67:19 68:22 76:18,19
    77:5,8,14,20 79:4,22
    80:19 84:14,15,22
    90:16 91:1,18 93:23
    97:14 98:24 100:2
    102:7 103:3 105:14,20
    106:4,24 107:4 108:2,4
    108:6 110:9
**rights** 23:2,11
**right-of-way** 28:13
**rigorous** 18:21
**Riley** 28:11,19
**Rileys** 28:16 29:2
**risk** 35:2 58:20 59:4,8,20
    60:6 63:19 64:10,11,12
    64:21 65:3,6,7,19,24
    66:8 71:16 72:5
**Rita** 75:24
**RMS** 64:11
**Road** 72:14 73:3 75:4

JOHNS PENDLETON COURT REPORTERS                                800 562-1285

WADE RAGAS, PH. D.                                                    9/3/2009

84:6 96:8 109:2
**ROBERT** 2:18
**Roebuck** 23:16
**role** 41:22
**room** 61:21
**roughly** 101:22
**routine** 6:11
**RPR** 1:24 5:22 117:2,24
**ruled** 24:20 31:6 53:3,3
**ruling** 52:19
**rulings** 24:3
**runway** 21:12
**rural** 31:18

**S**

**s** 3:2 5:1 115:4
**Saden** 22:5
**safety** 105:2,17
**sales** 16:19 81:3,13,18,19
   94:18,21,24
**saline** 103:22
**saltwater** 104:8,11,14,20
   104:25 105:6,10
**sat** 99:1
**satisfied** 15:10
**save** 5:8,11
**saw** 13:11 35:24 70:7
**saying** 46:21 64:7 78:12
   91:15 105:9 111:8
   114:5
**says** 78:17,22 85:6 87:22
**scale** 28:25
**scenario** 97:9 111:18,19
**scheduled** 12:10
**School** 31:22 32:3
**scientific** 105:9
**se** 35:4
**sea** 64:17
**seal** 34:16
**search** 30:1
**Sears** 23:15,16,20
**second** 49:6 80:20 97:23
**section** 1:7 8:17,18 37:7
   41:1 60:14 68:23 70:12
   107:2
**see** 35:8 36:1 43:17 59:1
   59:9 61:9 65:12 77:25

80:2,25 81:1 87:21
   93:2 107:13,20 111:7
**seeing** 65:10
**seek** 37:24
**seeking** 28:23 32:5
**seemingly** 65:9 85:2
**seen** 40:9 54:8 66:18
   112:7
**seller** 89:22
**sellers** 65:5
**sense** 31:16 62:14,15
   80:12 109:15
**sentence** 49:6 84:5
**sentences** 49:7
**separate** 70:17 98:2
**separately** 11:12 49:18
   60:17,23
**separation** 99:22
**September** 1:20 116:25
**serious** 84:20
**serve** 35:15
**services** 73:6
**set** 15:18 47:7 58:5 61:12
   117:7
**settings** 66:14
**settled** 12:15 31:20
**settlement** 11:11 12:7,16
   13:23 15:19,23 21:16
   30:10 32:22
**settles** 30:7
**severance** 22:4 23:12
   24:10,20 29:16 35:1
**severe** 70:22
**sewer** 22:12
**Sewerage** 18:11,25
**share** 38:15 56:22
**shared** 104:15 107:21
   114:24
**sheetrock** 101:14
**shell** 85:18,20,21 103:10
   103:11,16,17
**shifted** 25:25
**short** 31:5 43:7 45:17
   50:23
**shorthand** 117:9
**shortly** 31:20

**short-term** 113:4
**show** 12:25 13:3 14:4
   43:14
**shows** 101:18,23 110:4
**side** 36:11,12 58:17,18
**sides** 35:25 58:22
**Signed** 116:11,13,15
**significance** 107:8
**significant** 23:12 31:15
   100:8 108:14
**signing** 5:9
**similar** 58:24 86:14,17
   87:1,4,5 94:15,19
   111:12 112:7
**Similarly** 73:6
**simple** 96:4
**simply** 52:19 56:24 59:9
   60:5 85:1,9 114:15
**simultaneous** 60:23
   68:25
**simultaneously** 61:11
**single-family** 18:22
**sir** 6:16,24 9:1,25 23:7
   49:11 58:9 61:14 76:17
   91:25 92:17 93:16,21
**sit** 8:21 9:11 38:18,23
   102:24
**site** 18:24 31:1 96:1
   107:16
**situation** 13:15 16:20
   47:24 61:8
**six** 13:25 81:3,6,12 83:10
   106:11
**sixty-four** 22:25
**size** 85:5 86:20 87:21
   88:5
**sizes** 87:1 89:10,11
**skills** 44:17
**small** 31:18 45:18 89:9
   115:19
**smaller** 86:5
**smells** 19:2
**snapshots** 91:24
**soft** 101:13
**solid** 18:16,23
**Solutions** 64:12

**somebody** 44:25
**somewhat** 82:17 101:9
**sorry** 36:23,24 50:4,16
   68:5 84:12,15 93:12
**sort** 11:5 74:20 89:17
**sorts** 46:23
**sought** 5:15 62:5
**sound** 105:16
**source** 20:16 41:15 42:1
   42:5 43:3,5,10,18,24
   44:21 45:3,25 46:4
   51:24 52:23 57:8 63:14
   96:14 97:8 102:17
**sources** 41:14,24 42:23
   43:9,15 44:14 45:9,23
   52:21 54:5,5 56:18
   57:8,12 61:11 62:12
   69:1,4 72:22 73:23
   74:15 96:15,16,22
   107:18 110:3
**south** 98:17 101:5 102:6
   113:25
**Southland** 21:9
**so-called** 8:2
**space** 86:1
**speak** 40:22
**special** 66:6 88:16
**specific** 27:16 42:25 46:6
   47:7 49:25 50:14 55:3
   55:16 57:5 62:23 69:25
   76:22 83:14 100:13
**specifically** 5:10 26:1
   27:14 37:23 64:14 88:9
   89:12,16 99:4 105:3
**speculative** 111:5,7
**spent** 106:20 109:7,8
**spill** 11:14 12:5
**square** 85:19 86:21 87:3
   87:4,6,10,11,13 88:6
**SRA** 7:23
**St** 13:10 14:7 15:1 18:14
   34:13,22 58:12 87:20
**stabilize** 16:16
**standard** 25:16 39:9
   52:6 88:7,17,19 91:22
   94:20

WADE RAGAS, PH. D.                                                    9/3/2009

Page 15

standards 9:7 27:20 52:5
start 37:6 90:12
started 47:3
starting 101:24 113:24
state 5:23 29:10 56:4
    72:13,17 73:8 104:6,19
    104:23 117:3
stated 83:18
statement 37:16 41:11
    56:15 57:4,15,16 106:1
    107:9 108:20 110:11
    111:6,22
statements 99:12 114:18
States 1:1 75:13,15
statistical 12:23 47:2,4
    67:10,14
statistics 35:12 36:2,18
    37:2,4 67:9
status 31:2
stay 112:25
stays 103:1
Sterlington 31:18
STIPULATED 5:2
stipulation 6:4
stop 6:14,15 102:7
stopped 104:9
storm 16:8,9 59:14,14
    62:1,2,3 67:4 82:15,16
    82:17,18 83:1,3,6 85:23
    95:13,15 104:4 108:22
    109:12,13
storms 64:18,21 68:13
straight 77:20
street 1:19 2:5,11,20 3:9
    53:25 54:8 72:9 76:15
    78:8 79:17 82:10 94:2
    94:8,16,19 95:18,23,24
    99:5 101:21 102:9,12
    102:20 106:5,6,12,13
stricken 10:21
strictly 111:23
strike 57:11
structural 103:15
structurally 105:16
structure 12:5,16 15:19
    15:20 76:25 77:3 82:21

82:22 83:2,3
studies 13:22,24 64:8
    104:19,19
studs 103:12 104:13
    105:4
study 61:10 64:10
    104:21
subject 22:1 26:17 58:24
    67:25 69:19 83:5 86:3
    86:7 87:14,23 89:13,17
    95:4 109:24 110:22
    112:12
subjected 110:12
submitted 7:3
subsequent 113:18
subsequently 103:13
subsidence 66:9
substance 9:17
substantial 13:1 70:25
    103:19
substantially 85:3 107:6
subtracted 9:2
subtraction 96:5
sued 18:10 19:6 22:8
    23:17 32:2 56:11
suffered 18:15 31:17
    102:15 108:16 109:18
    112:17
sufficient 41:14,25 42:18
    42:20 48:8,14 50:12,17
    53:23 55:1
sufficiently 50:14
suggest 59:11 68:9 75:13
    79:7
suggesting 49:8
suggests 66:19
suit 22:11 56:13,22
Suite 3:9 6:2
suits 56:21
summary 92:24 93:5,14
    93:20
Superfund 31:1
superior 83:7
supervision 117:10
supplied 54:15 74:1
    91:14

supply 50:17
supplying 90:24
support 20:6 73:13
    75:18 91:15 94:24
supportable 11:13
supporting 54:16
suppose 102:25 103:1
Supreme 23:8
sure 7:11 22:19 30:2,8
    40:8 76:10 82:12 88:20
    90:10 95:5 107:1
surge 58:25 102:16
    106:18
sustained 94:6 100:7
    113:9
SUTTERFIELD 3:7
sworn 6:4 117:6
System 64:12
systems 104:12
S&WB 18:7

### T

T 4:1,7 5:1,1
table 83:17
tabulated 73:22
take 6:15 21:13 27:13,16
    50:20 53:25 58:4 66:8
    73:12 75:25
taken 5:5 20:12 22:3
    25:3 29:15 71:6 116:25
    117:8
takes 102:18
takings 24:23 27:8
talk 71:24
talked 14:20 32:24 90:19
talking 45:4 68:1,5 96:14
    98:3 99:4,21,22
talks 71:16
tax 75:14,17
taxes 75:20
taxiway 21:13
teaching 7:24
tell 16:23 61:20,20,20
    67:2,14 68:12 73:23
    82:24 100:25
telling 84:22
temporary 13:4 25:9

ten 52:21 80:4,4 102:8
    103:6,8 105:20,22
    106:7 110:20 113:24
tender 37:25
tendered 42:2 97:2
tens 104:15
term 50:23 79:3 94:4
Terminal 28:18,19
termite 25:20
terms 8:7 15:23 46:20
    52:5 59:4 70:7 77:16
    81:2 94:20 102:8
    112:18 113:21,21
Terrebonne 31:22 32:2
Tessier 30:15,16
testified 6:5 8:4 10:7
    11:14 44:10,13 75:4
    97:22
testify 29:1 117:6,7
testifying 10:5 11:9
testimony 9:23 10:20
    38:1 71:23 115:5 116:4
    116:6
tests 66:5
Texaco 17:24,25 18:4
    19:5,6,8
Thank 28:7,10 46:16
    72:12 80:13,13
theory 36:5 67:21
thereabout 101:8
thereof 5:14
thing 49:8,10 66:13
    88:18
things 7:21 8:2 13:8
    25:23 67:14 71:9 79:9
    91:15
think 8:12,25 9:5 10:7
    22:16 23:25 25:6 30:4
    30:9,10 34:17 35:19
    36:6,12 38:22,24 41:10
    43:14 44:14 47:5 51:5
    53:18,21,22 54:19 55:4
    55:7 56:8 61:18 64:5
    64:11 65:3 67:24 68:4
    70:5 71:12 75:19 77:12
    77:24 79:11,15 80:14

WADE RAGAS, PH. D.                                                                                    9/3/2009

85:10,10,24 88:19 90:8
91:8 92:21 95:16 96:4
97:2,3 98:9 100:4
108:20 110:16 111:2,15
112:18 113:1,3
**thinking** 80:11
**thinks** 7:4
**third** 35:19
**thirty** 8:10 28:20
**thought** 66:15 74:16
82:9 90:11,11 94:19
**thousand** 20:4,7
**thousands** 103:17 104:15
**three** 7:9 8:12 13:21
39:13,16 43:21 70:16
81:5 96:25 101:12
112:21
**throwaway** 66:10
**thrown** 66:11
**tidal** 58:25
**tied** 75:20,21
**tile** 82:17
**time** 5:13 13:3,22 38:21
41:15,25 43:7,16 44:9
44:20 45:17 47:1,8
48:22 58:15 60:19 62:5
63:11 65:19 67:1,13
68:11,16 71:5,13 74:19
75:10 79:12 91:23,24
92:2 96:20 97:6,15
102:1 103:10 106:4
112:20
**timed** 88:10
**times** 87:25 98:19
**toast** 102:9,19
**today** 7:6 8:22 9:11,21
38:15,19,23 65:22
82:25 83:2 89:23 90:14
110:5
**told** 114:16,20
**top** 70:13
**tort** 113:19
**total** 77:9 108:12
**touch** 9:21
**town** 31:15
**track** 24:9

**tract** 20:21 22:25
**tragic** 31:13
**training** 61:18
**transactions** 18:22
**transcribed** 117:10
**transcript** 5:9
**transcription** 116:5
117:11
**transfer** 73:4
**treat** 74:2
**treatment** 83:21
**tree** 69:6
**trends** 8:10
**trial** 10:7 24:21 30:8
32:23
**tried** 83:20 94:18 96:16
105:18
**trier** 35:20 41:18 49:22
56:19 73:22 74:3
**trivial** 107:1
**trouble** 26:20 30:3
**troubles** 35:18
**trucking** 19:2
**true** 14:8 82:13 91:16
99:17 105:5,22 110:22
116:7 117:10
**truth** 117:6
**try** 35:19 44:17 48:7 80:4
96:11
**trying** 15:17 26:22,23,25
27:3 29:25 45:5 52:18
68:6 77:14 80:10 86:25
91:23 93:6
**turn** 15:25 81:6
**turned** 94:22
**Turner** 11:1 33:2
**turns** 56:17 66:16
**twelfth** 71:15
**two** 16:15 43:21 53:17
65:21 69:19,24 79:11
82:23 101:12 106:16
115:5,7
**type** 12:6,6 44:11,23
74:12 84:20
**types** 45:13 76:1
**typical** 83:7

---
**U**
---

**U** 5:1
**Uh-huh** 7:14 10:4 17:19
20:24 32:1 34:15 54:2
68:24 87:18
**um** 8:1 12:22 19:2,3
28:12 29:23 30:16
31:24 32:5,21 38:1
39:23,25 46:6 49:4
58:16 61:7 69:5 79:2
92:5 94:8,8 95:17,18
96:12,25 97:3
**unable** 61:5
**underlying** 20:1
**understand** 6:14 17:15
27:2 36:14 46:18 56:10
80:1 93:4,22 102:2
106:25 107:1 108:17
**understandable** 70:18
**understanding** 26:20
44:24 117:12
**understood** 8:17 11:8
24:14 28:7 55:22 63:15
68:22 82:4 88:2 111:21
**undertake** 44:18
**underway** 32:13
**unfolded** 113:7
**uniform** 25:16 83:21
**uniformly** 84:25
**unintentional** 53:9
**United** 1:1 75:13,15
**units** 89:15
**unrelated** 71:10 75:16
**upper** 15:13
**USA** 1:13,14
**use** 17:8 19:2 20:13 25:5
25:13 27:23 29:4 40:6
44:4,8,8 47:3 61:17
66:7 83:13 112:13
113:10 114:17 115:7,11
115:16
**useful** 91:5 103:24
**uses** 109:3
**usually** 67:12 86:24
88:21 89:4
**utility** 44:4,6 105:12

**U.S** 20:23 21:1 22:22
23:2 55:20 72:1 73:4
75:16

---
**V**
---

**v** 1:8,9,10,11,12,13,14
**vacant** 87:12 96:1
**vague** 47:20 48:5 97:19
98:1 99:6 100:10,15
**valuable** 108:10
**valuate** 76:24
**valuation** 7:22 10:10
23:13 25:12 27:18
32:17 60:16,18 61:1
65:14,16 94:5 95:1,7
**valuations** 24:10 50:18
72:4 85:23
**value** 8:10 13:9 15:12
16:7,8 18:2,15,18 19:12
19:17,25 20:1,6,20 25:3
25:13,15,22 26:3,9
27:10,24 28:2 29:14
31:3,4,7,16 32:19,20
33:6,25 44:2 45:6,16
48:17 60:7,15,19,24
62:1,1,3,5,7,10 63:8,9
65:18 71:3,4,9 72:6
77:3,4,6,10,18 78:15,17
78:21 79:17 80:18,23
81:15 85:11,19 86:21
87:11 89:20 92:11 94:9
94:22 99:16 102:20
103:4,12,19,20 108:21
113:5 115:16
**valued** 22:3
**values** 8:4,9 13:1,24 14:6
14:21 16:10 18:20 29:3
70:23,23 71:1 72:8
73:15 77:16 92:16
95:12,15 99:19
**vandalism** 69:18
**variables** 63:7
**variations** 63:3 92:4
**variety** 42:8 72:22
**various** 29:24 30:4 34:4
42:23 43:9 52:15,23
62:12 101:1 107:18

JOHNS PENDLETON COURT REPORTERS                                              800 562-1285

WADE RAGAS, PH. D.                                                          9/3/2009

**vary** 67:14
**varying** 39:13 42:4
**vehicle** 69:9
**Ventures** 17:3,4
**versus** 11:1 17:2,4,23
    18:6 19:5 20:8,23 21:8
    21:23 22:5,22 23:15
    24:7 28:11 29:9 30:16
    30:22 31:10,22 33:2
    34:4,13 43:18 44:5
    108:18 109:11 112:23
**vibration** 66:5,8
**vicinity** 101:3,6
**victim** 113:19
**view** 20:18 41:6,7 104:24
    107:18
**views** 38:7,15 68:9
    114:15
**vinyl** 82:15
**violations** 19:1
**virtually** 92:6
**vita** 9:4
**vitae** 9:10
**voluntary** 11:11

**W**

**WADE** 1:17 6:1 116:3
    116:11
**wait** 15:17 28:14 93:9
**waiting** 16:14
**waived** 5:10
**wall** 96:21
**walls** 58:23
**want** 6:15 7:16 36:14
    40:25 46:1 73:20 76:10
    92:11 93:23,25 94:4
    100:12 107:1
**wanted** 9:9 27:8 108:2,7
**wanting** 12:9
**Ward** 58:10 105:24
**warranted** 44:18
**Washington** 3:4
**wasn't** 19:19 59:15,16
    75:3
**waste** 18:16,23
**water** 14:9 18:11,25 22:9
    22:12 33:22 41:14,15

42:1,4,5,24 43:2,4,9,15
43:17 57:7,9 69:8
96:22 97:6,8,16 98:11
99:1,2 100:6 101:7,12
101:19,24 102:2,4,16
102:17,21 103:3,10,22
105:22 106:5,9,12,17
106:18 110:21,24 111:2
111:9,12 112:10,21,24
113:23
**way** 12:24 13:8 21:6 23:8
25:11 26:24 46:25
50:22 53:25 55:21
64:17 67:18 70:23
79:13,15 80:12 83:5
85:2 88:13 92:1 102:24
113:6 117:15
**ways** 13:21 35:2
**WEBB** 3:7,8
**weeks** 43:23 112:25
**went** 21:6 31:19 83:9
109:6
**west** 21:22 23:9 58:11,13
58:17 59:1 107:11
**wetland** 18:2 21:2
**wetlands** 19:12,13,17
20:6
**we'll** 77:25 91:11
**we're** 45:16 56:13 68:5
76:11 79:11 80:7,8
86:25 99:17 111:15
**we've** 32:24 41:9 61:25
71:19 92:2,5
**wide** 63:1
**WIEDEMANN** 2:9,9,10
**WILKINSON** 1:11
**willing** 36:9 38:14
**wind** 62:22 70:7,8 96:8
**window** 89:15
**wiring** 104:11
**wish** 83:23
**wished** 75:22
**witness** 5:4,25 6:3 38:4
90:2,6,17 93:11 116:1
117:5
**wondering** 77:8

**wood** 103:12,23 104:13
105:12
**word** 35:18 39:25 40:1
47:3 50:2
**work** 7:25 23:13 29:21
31:19 36:10,20 38:20
39:3 48:9 53:2,7 54:8
54:24 64:13 71:12
88:21 98:14 101:10
**worked** 24:12 29:19 30:4
30:11
**world** 39:1 64:9
**worse** 94:18
**worth** 20:2 28:1 78:19,23
95:11,12,19,19,20,25
96:1,2 108:24
**wouldn't** 9:16 16:17 51:9
65:15
**written** 38:14

**X**

**X** 4:1,1,7,7

**Y**

**Yeah** 22:18 25:15 26:22
27:2 29:8,25 34:25
63:24 76:24 77:21 80:3
86:19 109:25
**year** 15:17,17 16:14
77:13,17,25 89:2
**years** 8:10 9:24 14:24
16:15 28:20 68:16
88:10
**yesterday** 90:20
**York** 3:3

**Z**

**Zaslow** 21:24,25
**zero** 60:8 115:18,19
**zonable** 21:4

**$**

**$10** 85:21
**$140,000** 77:10 78:24
94:11,23
**$25** 85:6
**$35** 85:12

**$45,000** 78:9
**$89,000** 79:21 80:23
81:15

**#**

**#75005** 1:25 117:25

**0**

**05-4182** 1:5
**05-5531** 1:8
**05-5724** 1:9
**06-5342** 1:10
**06-6299** 1:11
**06-7516** 1:12
**07-3500** 1:13
**07-5178** 1:14

**1**

**1** 4:10 6:19,22 8:17 41:3
**1,485** 87:23
**10** 22:21 101:21 103:2
110:21
**10,300** 76:25 77:2,6
**10:00** 101:22,25 102:1
106:10,11 110:23 111:1
112:20
**107,000** 84:7
**11** 23:5 37:15,22,24
39:12 69:20,23 102:4
**11,000-dollar** 109:5
**11,500** 84:9
**11.7** 110:24
**1100** 1:19 2:20
**115** 4:6
**118,500** 109:11
**12** 41:4 70:11 71:24
103:2
**12-foot** 101:21 110:21
**13** 9:6 42:7 46:19,20,21
**13th** 71:17
**1321** 76:15 78:8 93:19
**1397** 87:24
**14** 15:12 42:8 49:5,9 53:8
**148,000** 109:3
**15** 55:12 56:15,23
**16** 29:22 58:8
**17,000** 108:25 109:11

WADE RAGAS, PH. D.                                                                          9/3/2009

| | |
|---|---|
| **18,500** 84:7 | **4** 60:15 64:21 68:12,23 |
| **19** 60:14 |    89:2 101:20 |
| **1979** 10:8 | **4:00** 101:3 |
|  | **4:30** 101:3 102:21 |
| **2** | **43** 110:9 111:25 |
| **2** 4:11 37:7,7,15 41:3 | **45,000** 77:12 |
|    80:20 81:11 91:11,12 | **47,000** 108:24 |
| **2nd** 92:12 | **4727** 56:12 |
| **2,200** 88:1 |  |
| **20001** 3:4 | **5** |
| **2005** 76:24 79:21 80:23 | **5** 20:8 64:25 68:12 70:13 |
| **2006** 92:12 |    76:19 |
| **2007** 77:9,11 78:2,13,20 | **5-foot** 101:20 |
|    78:23 94:9 | **5:30** 101:6,8,20 102:22 |
| **2008** 72:1,3,4 79:2 | **504-581-6180** 2:13 |
| **2009** 1:20 116:25 | **504-585-7000** 2:22 |
| **202-346-4000** 3:5 | **504-598-2715** 3:11 |
| **204** 6:2 | **504-885-7700** 2:7 |
| **21** 62:20 |  |
| **22** 42:10 53:14,19 63:15 | **6** |
|    65:1,20 71:15,20 | **6** 4:5,10 80:20 81:7,7,11 |
| **2217** 87:20 |    110:25 |
| **23** 42:10 68:23 70:12 | **6:00** 112:19 |
| **2300** 1:18 2:19 | **650** 3:9 |
| **24** 42:11 53:14,19 72:13 |  |
| **2423** 76:15 101:8 109:18 | **7** |
| **25** 87:25 | **7** 69:8,23 83:15,16 85:6 |
| **26** 32:9 76:20 | **70006** 6:3 |
| **27** 79:20 80:23 | **70113** 2:6,12 |
| **27th** 76:24 | **70130** 3:10 |
| **2715** 3:9 | **70163-2300** 1:20 2:21 |
| **28** 33:19 34:9 |  |
|  | **8** |
| **3** | **8** 21:22 69:23 107:2 |
| **3** 18:5 41:3 64:20,25 70:6 | **80** 10:8 |
|    70:10 115:13,17 | **821** 2:5,11 |
| **3rd** 1:20 116:25 | **88** 87:24,25 |
| **30** 9:22 78:2,4,13,19 94:9 | **89** 80:6 |
| **30th** 77:9 | **89,000** 76:25 77:2,3 |
| **30,000** 108:25 |    87:17 |
| **30-year-long** 20:16 |  |
| **3017** 6:2 | **9** |
| **31** 77:11 | **9** 37:8,15,22 108:19 |
| **32** 9:6 83:15,17 84:1,5 | **901** 3:3 |
| **35** 107:2 | **91** 4:11 |
|  |  |
| **4** |  |

JOHNS PENDLETON COURT REPORTERS                                                        800 562-1285