UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION<br><br>PERTAINS TO: BARGE<br><br>Boutte v. Lafarge      05-5531<br>Mumford v. Ingram    05-5724<br>Lagarde v. Lafarge    06-5342<br>Perry v. Ingram        06-6299<br>Benoit v. Lafarge      06-7516<br>Parfait Family v. USA 07-3500 | CIVIL ACTION<br><br>Case No.: 05-4182<br>And consolidated cases<br><br>SECTION "K" (2)<br><br>Hon. Stanwood R. Duval, Jr.<br>Magistrate Judge Joseph C. Wilkinson, Jr. |

### LNA'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Lafarge North America Inc. ("LNA") submits this statement of material facts not genuinely in dispute to accompany its motion for summary judgment.

**Geography – The Inner Harbor Navigation Canal**

1. The Lafarge North America cement terminal ("LNA Terminal") is located on the west side of the Inner Harbor Navigation Canal ("IHNC"). The terminal is located in an "inset" away from the main channel of the IHNC, as shown on **Attachment A1**.
   *Reference*
   *Exh. 1, Cushing Report at 15, Fig. 8.*

2. On the morning of August 29, 2005, two breaches occurred in the floodwall on the east side of the IHNC.
   *References*
   *Exh. 1, Cushing Report at 80, Fig. 52.*
   *Exh. 2, Marino Report at 4-5, Photo 4.4.*
   *Exh. 14, Spinks 2009 Dep. 38.*

3. The "North Breach" occurred just south of the Florida Avenue Bridge, at a location to the north and east of the Lafarge Terminal and on the opposite side of the IHNC from the terminal, as shown on **Attachments A2 and A3**.

*References*
Exh. 1, Cushing Report at 80, Fig. 52.
Exh. 2, Marino Report at 4-5, Photo 4.4.

4. The "South Breach" occurred closer to the Claiborne Avenue Bridge, at a location to the south and east of the Lafarge Terminal and on the opposite side of the IHNC from the terminal, as shown on **Attachments A2 and A3**.
*References*
Exh. 1, Cushing Report at 80, Fig. 52.
Exh. 2, Marino Report at 4-5, Photo 4.4.

**Barge ING 4727**

5. Prior to the arrival of Hurricane Katrina, the unloaded Barge ING 4727 was moored at the LNA Terminal on the west side of the IHNC.
*References*
Exh. 1, Cushing Report at 26.
Exh. 12, Pazos Report at 7-8.

6. Barge ING 4727 was a hopper barge with no motor or other means of self-propulsion. Therefore, Barge ING 4727 required an external force to propel it from the west side to the east side of the IHNC. The only forces that could potentially have moved the Barge ING 4727 away from the LNA Terminal and across the canal to the location of the breach sites during Hurricane Katrina were (a) wind, (b) waves and/or (c) current.
*References*
Exh. 6, Pazos Dep. 99-100 (barge "cannot move on its own" except for "wind conditions or currents"; barge requires "an external force" to move it).
Exh. 8, Marino 2009 Dep. 111 (admitting that in order for barge to move from one place to the other, something – wind or water – has to move it).
Exh. 10, Green 2008 Dep. 70-71 (agreeing that barge was "dumb," meaning not self-propelled, and if not subject to moorings, will float with wind or current).
Exh. 5, Green 2009 Dep. 125 (barge was "at the mercy of the winds and current").
Exh. 5, Green 2009 Dep. 127 (barge was "dumb" and had no mode of power).
Exh. 5, Green 2009 Dep. 210 (barge movement could be affected by waves).
Exh. 31, Dooley Dep. 37-38 (forces that could potentially impact the movement of the barge were "the wind, the water movement, and the waves").

LIBW/1718664.4

7. The Barge ING 4727 was 23 feet high from top to bottom (including hatch covers).
    *References*
    *Exh. 6, Pazos Dep. 102 ("23 feet, approximately").*
    *Exh. 8, Marino 2009 Dep. 65 (barge height is 23 feet).*

8. On the morning of August 29, 2005, the unloaded Barge ING 4727 had a draft of no more than approximately one-and-a-half feet.
    *References*
    *Exh. 6, Pazos Dep. 100 (barge draft of 1 foot, 5 inches).*
    *Exh. 8, Marino 2009 Dep. 65-66 and Exh. 2, Marino Report at 2-34 (unloaded draft is 1.5 feet).*
    *Exh. 10, Green 2008 Dep. 75-76 (barge's light draft is 1 foot, 4.5 inches – the remainder of the barge is above water).*
    *Exh. 12, Pazos Report at 9 (barge light draft is 1 foot, 5 inches, but suggesting that draft may have been 2 feet, 5 inches due to water in the voids).*

9. As a result of its unloaded condition, the barge was sticking up over 20 feet above the surface of the water.
    *References*
    *Exh. 6, Pazos Dep. 103-04 (barge sticking up out of water "in excess of twenty feet").*
    *Exh. 8, Marino 2009 Dep. 66 (barge was unloaded, and sticking up over 20 feet).*

10. This "sail area" made the barge particularly susceptible to being moved in the direction of the prevailing wind.
    *References*
    *Exh. 6, Pazos Dep. 102 (unloaded condition is relevant because it creates "exposed surface to the wind action").*
    *Exh. 6, Pazos Dep. 104 ("wind is the predominant item" acting on the barge).*
    *Exh. 5, Green 2009 Dep. 45 (agreeing that barge has a "large sail area" and that "the greater the sail area, the more susceptible to wind").*
    *Exh. 5, Green 2009 Dep. 127 (agreeing that "with a sail area of the type that the barge had, the wind affects the movement of that barge").*
    *Exh. 5, Green 2009 Dep. 211 (due to sail area, the wind had a greater impact on the barge).*
    *Exh. 4, Cushing Dep. 238 (wind was "dominant" force acting on the barge).*

### Hurricane Katrina – Winds

11. Weather data, particularly involving winds, is important to analyze wind loads on the barge and potential barge movement in the IHNC during the relevant time period.
    <u>References</u>
    Exh. 8, Marino 2009 Dep. 71 (Q: "The weather data helps you to assess what in fact the wind loads were on the barge in the IHNC at the time of the failure; correct?" A: "Yes.").
    Exh. 1, Cushing Report at 77-81 (analyzing wind data and noting its importance for barge movement).
    Exh. 15, Spinks 2009 Dep. 169 (Q: "Would you agree with me it's better in carrying out a scientific study of meteorology to rely on meteorologic data to the extent the data is available?" A: "Clearly you want to gather the data from where it's available at.").

12. According to Buys Ballot's law, hurricane winds in the northern hemisphere blow counterclockwise around the center (or "eye") of the hurricane. Thus, the direction of the prevailing wind at a given time and location during a hurricane can be determined by comparing that location to the location of the eye of the storm at that same time.
    <u>References</u>
    Exh. 1, Cushing Report at 35-36 ("counterclockwise circulation around the center").
    Exh. 1, Cushing Report at 35 (prevailing wind direction can be determined by reference to location of center of storm).
    Exh. 6, Pazos Dep. 107-08 ("the hurricane in the Gulf of Mexico have a counterclockwise rotation").
    Exh. 6, Pazos Dep. 117 (agreeing that "hurricane winds swirl counterclockwise along the storm eye").
    Exh. 12, Pazos Report at 37 (noting the "counterclockwise rotation of the winds").
    Exh. 14, Spinks 2008 Dep. 61 ("counterclockwise" rotation of wind).

13. The track of Hurricane Katrina was to the east of New Orleans and the IHNC, along the path described in **Attachment B**. The center of the storm was located to the east of New Orleans and the IHNC throughout the duration of the storm.
    <u>References</u>
    Exh. 16, Spinks Report at 8, Fig. 1 (showing track of Hurricane Katrina).
    Exh. 1, Cushing Report at 39, Fig. 24 (same).

4

*Exh. 7, Dooley Report at 16, Map 2 (close-up view of storm track near New Orleans).*

*Exh. 7, Dooley Report at 35 (storm center passed to the east of New Orleans).*

14. At all times prior to 7:30 a.m. on the morning of August 29, 2005, the eye of Hurricane Katrina was at a latitude to the south of New Orleans and the IHNC.
    *References*
    *Exh. 28, Plaintiffs' Response to Request for Admissions No. 6.*
    *Exh. 5, Green 2009 Dep. 119-120 (at 6:00 am, the storm was South-Southeast of New Orleans).*
    *Exh. 14, Spinks 2008 Dep. 60 (storm made landfall at Buras, LA around 6:10 in the morning).*
    *Exh. 7, Dooley Report at 16, Map 2 (showing position of storm center was south-southeast of New Orleans at these times).*

15. The eye of Hurricane Katrina did not pass through the latitude of New Orleans and the IHNC until after 8:00 a.m. on the morning of August 29, 2005.
    *References*
    *Exh. 6, Pazos Dep. 118-19 ("Hurricane Katrina's eye passed to the east of New Orleans about 8:30 a.m. central daytime on 29 August 2005.") (reading from report and adopting statement).*
    *Exh. 12, Pazos Report at 37 (providing time of passage).*
    *Exh. 7, Dooley Report at 16-17 (eye of Hurricane Katrina did not pass latitude of New Orleans until 8:54 a.m.).*

16. As Hurricane Katrina approached New Orleans and the IHNC from the south, the prevailing winds in the IHNC blew first from east to west, then from northeast-to-southwest, and then from north-to-south until the storm eye reached the latitude of the IHNC, and only after that from west to east.
    *References*
    *Exh. 8, Marino 2009 Dep. 74 (Q: "Do you accept IPET's conclusion that, during the storm, winds came first from the east, then the northeast, then the north, then the northwest, and finally from the west?" A: "I guess in general, yes.").*
    *Exh. 10, Green 2008 Dep. 56 (winds between 4:00 a.m. and 6:00 a.m. blew "from either the northeast or due from the north").*
    *Exh. 31, Dooley Dep. 67-74 (prevailing direction was mostly out of the northeast, and any type of downdrafts, swirls or eddies would have moved in the downwind direction from the northeast toward the southwest).*
    *Exh. 4, Cushing Dep. 80 (winds blew "from an easterly direction to a westerly direction" during early morning hours on August 29).*

>   *Exh. 1, Cushing Report at 80, Fig. 52 (showing wind direction as a function of time).*
>   *Exh. 7, Dooley Report at 35 (prevailing winds turned from easterly to northerly to westerly as Katrina moved along its track).*

17. Prior to 7:45 am on August 29, 2005, Hurricane Katrina's prevailing winds included no component blowing across the IHNC from the LNA Terminal toward the east bank of the IHNC.

    *References*
    *Exh. 2, Marino Report at 3-11 (winds remained "essentially parallel" to IHNC before 9:00 a.m.).*
    *Exh. 31, Dooley Dep. 59 (wind had no westerly component (from the west) until 7:42 a.m.).*
    *Exh. 31, Dooley Dep. 93, 97 (wind did not move the barge from west to east during the 4:00 to 5:00 a.m. time frame ascribed to northern breach).*
    *Exh. 31, Dooley Dep. 36 ("the wind would not have allowed that barge to move from the western side to the eastern side that early in the morning") (referring to time of south breach occurrence).*
    *Exh. 1, Cushing Report at 45, 78 (winds prior to 8:00 a.m. had no cross-canal component).*
    *See also Exh. 4 Cushing Dep. 179-80 ("I'm saying that it couldn't have crossed over before 9:00 o'clock. It would have had to be sometime after 9:00 clock. ... I believe my reliance on the facts, that is, the wind direction, to be correct.").*
    *Exh. 4, Cushing Dep. 236-37 (impossible for wind to move barge out of LNA terminal "notch" before 9:00 a.m., because wind would have carried barge into Namasco terminal gantry shed before that time).*
    *Exh. 31, Dooley Report at 35 ("up until 7:42 am CDT, the wind direction would push the barge toward the dock").*

18. Plaintiffs provided no meteorologic data or analysis or evidence to support any contrary theory regarding wind direction or barge movement.

    *References*
    *Exh. 6, Pazos Dep. 129 ("I review some meteorologic data, but I didn't either memorize the source or cover it recent to analyze it.").*
    *Exh. 6, Pazos Dep. 130 (Q: "You haven't cited a single piece of data about turbulence at this location in your report, have you?" A: "Because I'm not interested.").*
    *Exh. 6, Pazos Dep. 131 ("Don't need any meteorologic data").*
    *Exh. 6, Pazos Dep. 132 (asked whether he had reviewed meteorologic data showing a south-to-north wind direction, Pazos responds, "I do not remember because I didn't concentrate in this activity").*
    *Exh. 6, Pazos Dep. 143 (Q: "You can tell me what the weather conditions were in the Inner Harbor Navigation Canal at 4:30 in the morning on August 29th?" A:*

> *"The type of weather conditions requires to elaborating wind force, direction at different elevations and the turbulence create by surrounding structures like the bridge. So I'm absolutely sure I can do it, but not right now." Q: "And you haven't studied it." A: "I have not developed an investigation.").*
>
> *Exh. 6, Pazos Dep. 150-51 (asked whether he had an opinion about the prevailing direction of the wind at the time the barge supposedly contacted the wall at the site of the north breach, Pazos responds, "[a]bsolutely no").*
>
> *Exh. 8, Marino 2009 Dep. 76 (admitting that at the time of the north breach, the barge would have had to be going in a direction "other than the direction of the wind").*
>
> *Exh. 9, Marino 2008 Dep. 147-48 (Q: "You didn't consider wind in connection with the north breach because the wind wasn't blowing in the direction of the wall at that time, right?" A: "Right.").*
>
> *Exh. 8, Marino 2009 Dep. 105-06 (admitting he does not know how the barge got to the north breach and has done no studies or calculations or literature review to shed light on how it got there).*
>
> *Exh. 8, Marino 2009 Dep. 142 (Q: "So again, as with the north breach, you can't explain how or why the barge got from one place to the next?" A: "That's correct.").*

**Hurricane Katrina – Current**

19. The IHNC below the Florida Avenue Bridge was a "closed system" in the sense that the lock at its southern end prevented the flow of water to or from the Mississippi River. Therefore, when Hurricane Katrina storm surge reached this part of the IHNC, it filled up without generating appreciable currents.

    *References*
    *Exh. 11, Mosher Dep. 171 (end of IHNC was closed off; lock gates were closed).*
    *Exh. 6, Pazos Dep. 104 ("Current is very insignificant because the current needs to flow in order to exist. And the locks were closed, so the flow – the flow was very limited or local ...").*
    *Exh. 1, Cushing Report at App. B at B25-26 (water was "filling the bathtub" with no appreciable currents).*

20. It is possible to undertake scientific modeling of the effect of current on a barge during a storm event. LNA has performed such modeling, the results of which show that current could not have moved the barge from the LNA Terminal to either breach site until after both breaches occurred. Plaintiffs have performed no such modeling or provided evidence to the contrary.

LIBW/1718664.4

*References*
Exh. 1, Cushing Report at 85 & App. B (analysis of wind and currents, including work by hydrologist Larry Daggett, shows that "the barge did not exit the IHNC [terminal] basin until after the breaches had occurred").
Exh. 15, Spinks 2009 Dep. 14 (plaintiffs' hydrologist reviewed Dr. Daggett's appendix and found nothing particularly objectionable).
Exh. 1, Cushing Report at 166-68 (currents did not flow toward north or south breach and "were very nearly zero" prior to breaching).
Exh. 4, Cushing Dep. 124 ("[I]n this particular case, what we found was that the winds were strong and the currents were negligible.").
Exh. 4, Cushing Dep. 238 (barge "would not have been significantly influenced by any slight currents that existed in the canal").
Exh. 4, Cushing Dep. 261 ("[T]he currents would have had a negligible effect.").
Exh. 8, Marino 2009 Dep. 281 (Q: "You didn't model the barge movement, did you?" A: "No).
Exh. 15, Spinks 2009 Dep. 31-32 ("We have not done any hydrodynamic studies of the waters within the Industrial Canal.") (also agreeing such studies could be done).

**Hurricane Katrina – Waves**

21. It is possible, through scientific means, to determine wave heights during a storm event at a given location.
    *References*
    Exh. 6, Pazos Dep. 112 ("I'm a hydrodynamicist. ... Yes, you can develop height of a wave based on wind by not just a little formula, it's a sophisticated analysis.").
    Exh. 15, Spinks 2009 Dep. 32 (scientific processes exist to study wave heights in the Inner Harbor Navigation Canal).
    Exh. 17, Suhayda Report at 9-10 (discussing modeling of wave heights).

22. The Interagency Performance Evaluation Task Force ("IPET") conducted a scientific study and concluded that wave heights in the IHNC during Hurricane Katrina reached 1 foot before 5:30 a.m. CDT on August 29, 2005, and 2-3 feet after that.
    *References*
    Exh. 15, Spinks 2009 Dep. 22 (IPET conducted a scientific analysis of wave heights in the IHNC on August 29).
    Exh. 15, Spinks 2009 Dep. 17-21 (accepting and crediting IPET analysis that waves in the IHNC were less than one foot before 5:30 in the morning and two to three feet after 5:30 in the morning).
    Exh. 4, Cushing Dep. 134 (Waves in IHNC were "small surface waves ... on the order of a couple of feet, two feet").

*Exh. 12, Pazos Report at 37 (reviewing IPET's study and noting that waves associated with the surge "decay rapidly, and within less than a mile have been reduced to about 1.2 feet").*

*Exh. 12, Pazos Report at 39-40 (quoting IPET's study at IV-227, which states that "[s]imilar to waves entering the MRGO/GIWW, these waves [entering the IHNC] decay rapidly and within less than a mile have been reduced to about 1.2 feet" and also noting that the maximum waves in the IHNC during Katrina occurred at 9:30 a.m.).*

23. Plaintiffs did not perform any calculations regarding wave heights in the IHNC.
    *References*
    *Exh. 6, Pazos Dep. 123-24 ("[I]t's impossible to predict without making a very detailed analysis of the waves, the reflecting waves, the location of the wind, the direction of the wind – so it's pure guessing").*

    *Exh. 6, Pazos Dep. 151 (asked whether he had an opinion about the prevailing direction of waves at the time the barge supposedly contacted the wall at the north breach, Pazos response was "[a]bsolutely no").*

    *Exh. 6, Pazos Dep. 163 (Q: "Have you done any calculations to support the conclusion that you've got eight to ten foot waves in the Inner Harbor Navigation Canal?" A: "Not in this specific case, but I have done it in other occasions. ... I didn't try to do it in this case.").*

    *Exh. 6, Pazos Dep. 175 (Q: "Have you done any modeling of waves or wave heights in the Inner Harbor Navigation Canal." A: "No.").*

    *Exh. 6, Pazos Dep. 175 (Q: "When you say eight to ten foot waves in the canal, have you done any calculations to support those numbers in this case?" A: "Not in this case. I have done it in other cases.").*

    *Exh. 15, Spinks 2009 Dep. 21-22 (rejecting the idea of 20-foot waves based on "the science that I've read and studied" in the IPET report).*

24. Wind-activated waves tend to propagate in the direction of the prevailing wind.
    *References*
    *Exh. 31, Dooley Dep. 94 ("Any waves that may have been produced within the IHNC in this time period would have flowed with the direction of the dominant wind or the prevailing wind. So wave action would have largely been from the north towards the south that morning.").*

    *Exh. 1, Cushing Report at 79 ("Another important property of wind-generated waves is that they travel in the same direction as the prevailing wind").*

    *Exh. 1, Cushing Report at 46 Fig. 28 (photograph of waves in the IHNC at 7:47 a.m.).*

    *Exh. 15, Spinks 2009 Dep. 23 (matter of "common sense" that waves travel with prevailing wind).*

25. Waves reflecting off a surface have less energy than "incoming" waves approaching that same surface.

9

*References*

Exh. 31, Dooley Dep. 94-95 ("As the waves hit, they lose energy. ... [T]hey would very quickly dissipate. So I can't see reflected waves from the western side propelling a barge all the way to the eastern side.").

Exh. 4, Cushing Dep. 240-43 ("We considered reflective waves ... When the wave then reflects, it has lost its driving force, and it diminishes. It quickly dissipates.").

Exh. 1, Cushing Report at 79 ("Reflected waves lose energy when reflection takes place.").

Exh. 15, Spinks 2009 Dep. 23-24 (reflected waves have less energy).

26. It is possible to apply scientific principles to determine the effect of waves on a free-floating barge. LNA has applied such principles, including performing calculations, the results of which show that waves could not have moved the barge from the LNA terminal across the canal to either breach site.

*References*

Exh. 1, Cushing Report at 79 (wind-generated waves, which were the only waves present in the IHNC during Hurricane Katrina, "could not possibly move any floating object in a direction counter to the wind").

Exh. 1, Cushing Report at 79 (reflected wave "can never have as much energy as the primary wave, and can never force a floating object in the direction from which the primary wave is coming").

Exh. 1, Cushing Report at 164 (calculations show pitching motion of barge in waves in IHNC would involve maximum vertical motion of slightly more than one foot).

27. Plaintiffs have performed no such calculations showing the effect of waves on the barge or how waves could have moved the barge across the canal.

*References*

Exh. 6, Pazos Dep. 186-87 (Q: "Now, have you done any calculations to show what the pitch of the barge would be in a five or a ten or an eight foot wave?" A: "Not in this case.").

Exh. 6, Pazos Dep. 228 (Q: "Have you done any calculation about how large a wave would be needed to pitch the end of the barge up high enough to get it above the floodwall at that time of morning?" A: "I didn't do any calculations, but I can do it if you want me to.").

Exh. 8, Marino Dep. 107 (Q: "And you've done no literature review or studies or scientific calculations to support a – a conclusion that waves in the Inner Harbor Navigation Canal operated with a predominant force or direction counter to the prevailing wind; is that correct?" A: "That's correct.").

10

**The Floodwall Breaches on the IHNC**

28. The North Breach occurred no later than 6:00 a.m. on August 29, 2005. The North Breach was approximately 215 feet in length.
    *References*
    *Exh. 12, Pazos Report at 8, 37.*
    *Exh. 1, Cushing Report at 103-04.*
    *Exh. 2, Marino Report at 3-16.*
    *Exh. 16, Spinks Report (2009) at App. I.*
    *Exh. 13, Bea Report at 56-57.*
    *Exh. 27, Bakeer Dep. 101-02.*

29. The South Breach occurred no later than 7:30 a.m. on August 29, 2005. The South Breach was more than 800 feet in length.
    *References*
    *Exh. 12, Pazos Report at 8, 37.*
    *Exh. 1, Cushing Report at 114.*
    *Exh. 2, Marino Report at 3-16.*
    *Exh. 16, Spinks Report (2009) at App. I.*
    *Exh. 13, Bea Report at 56-57.*
    *Exh. 27, Bakeer Dep. 102.*

30. Both the North Breach and the South Breach had already occurred before the prevailing winds came to include any component blowing from the direction of the LNA Terminal toward the east bank of the IHNC.
    *References*
    *Exh. 1, Cushing Report at 104 (at the time of the north breach, "the wind was blowing with a significant component to the east"; "this wind prevented the barge from moving to the north breach site").*
    *Exh. 1, Cushing Report at 114 ("it is clear that the [south] breach had to have occurred before the winds had a west-to-east component").*
    *Exh. 2, Marino Report at 3-11 (winds were "essentially parallel" to canal before 9:00 a.m.).*

**Floodwall Design and Potential Barge Impact**

31. The floodwalls on the IHNC were "I-walls" comprised of a twenty-foot-long steel sheet pile driven into an earthen levee and subsoil to a depth of approximately seventeen feet and capped by a six-foot concrete monolith (cap). The concrete monolith was poured

11

in two segments, the first encasing the top of the sheet pile and the second extending three feet above the top of the sheet pile. The upper "pour" consisted of three feet of concrete and reinforcing bar ("rebar") extending above the sheet pile. The floodwall had a horizontal construction joint between the two "pours" of concrete. A schematic of the floodwall, including the concrete cap and the construction joint between the two pours of concrete, is attached as **Attachment C.**

*References*
*Exh. 11, Mosher Dep. 28-29 ("It was ... what we called an I-wall, which is essentially a sheet pile wall with a concrete header section sticking above the ground.").*
*Exh. 8, Marino 2009 Dep. 58-59 (floodwall had a six-foot concrete monolith, with a construction joint three feet below the top of the monolith).*
*Exh. 9, Marino 2008 Dep. 46-47 (agreeing that "the fundamental principle is that in order for a wall to resist a load it needs to have some sort of anchor somewhere so that when the load is exerted the wall can push back" and that "embedment depth" is one way to do that).*
*Exh. 12, Pazos Report at 35 (floodwall "is a flexible cantilever (I type) structure) embedded in a soil of soft saturated clay").*
*Exh. 12, Pazos Report at 35-36 (sheet pile extends 5 feet into the 8 foot wall).*
*Exh. 2, Marino Report at Fig. 2.3 (dimensions of I-wall).*
*Exh. 2, Marino Report at 2-23 (describing two pours of concrete on monoliths).*
*Exh. 1, Cushing Report at 29-30 & Fig. 21 (describing sheet pile I-wall).*
*Exh. 37, Bartlett Report App. A & B (schematic of floodwall and concrete cap)*

32. The floodwall derived its strength from the supporting soils into which the sheet pile was embedded and anchored. Accordingly, the failures that occurred at the North Breach and South Breach required a failure in the soil into which the steel sheet pile was sunk. The floodwall failed when it lost the support of the soils on the protected side of the floodwall.

*References*
*Exh. 11, Mosher Dep. 17 ("The wall was founded in a levee, which is made up of soil, and the principal resisting forces to any loads that are applied to the wall were resisted by the soils that the wall was setting in, and so that it's a classical soil-structure interaction problem.").*
*Exh. 6, Pazos Dep. 201 (Q: ... And so in order for the wall to do its job, it needs to have support in the soil on the protected side, right?" A: "Yes.").*

> Exh. 8, Marino 2009 Dep. 55 (Q: "[I]n a flood stage, you need to have the sheet pile provide resistance in the soil and then below the levee; isn't that right?" A: "Yes.").
> Exh. 8, Marino 2009 Dep. 55 (Q: "And if you're going to fail the sheet pile, you've got to fail the soil; isn't that right?" A: "I haven't thought of all instances of whether that's true or not, but I would say in general, it's true.").
> Exh. 9, Marino 2008 Dep. 40 (Q: "And in order to fail the floodwall, you have to have some failure of the soil." A: "Yes.").
> Exh. 1, Cushing Report at 51 (sheetpiling requires "passive soil pressure to resist overturning forces").

33. It is possible to perform scientific calculations to measure the effect of an impact by an object such as a barge on an I-Wall such as those at the IHNC under the conditions that existed in Hurricane Katrina.

    *References*
    > Exh. 9, Marino 2008 Dep. 38-39 (describing "hydrodynamic load analysis" to come up with "a potential force range that would impact the wall").
    > Exh. 1, Cushing Report at 158-63 & App. D, E, F (setting up and carrying out analysis).

34. LNA's experts performed calculations showing that a barge impact, if it occurred, would cause local damage to the concrete cap but would not affect the steel sheet pile or supporting soil. The Army Corps expert (Mosher) and even plaintiffs' expert (Marino) expressed agreement with this concept.

    *References*
    *LNA's expert*
    > Exh. 1, Cushing Report at 158-63 (carrying out analysis showing that "a barge striking the concrete cap of the floodwall could not cause the sheetpile to fail" but would only create localized damage ("cracking" or a "notch") in the concrete cap, with no effect in the sheet pile below).
    > Exh. 1, Cushing Report at 99 & Figs. 72, 73, 74 ("These photos show that a barge impact with the concrete cap of a floodwall does not cause the floodwall to fail. Rather, the concrete cap gives way and the sheetpile remains intact.").
    > Exh. 1, Cushing Report at 149 ("As calculations show and evidence of other barge impacts prove, a barge or any other object impacting a concrete floodwall will cause the concrete that receives the impact load to crack before the load will cause the entire sheetpiling to overturn or be uprooted (exhumed).").
    > Exh. 1, Cushing Report at 173 ("The barge could not strike the sheetpiling with sufficient energy to cause overturning. In any event, the concrete cap on top of the wall would have cracked before the barge could have affected the anchoring of the sheetpile.").

13

*Exh. 4, Cushing Dep. 254 ("[I]t's just not possible for a barge of this size and – and weight and mass under the wind conditions, even under the worst possible wind conditions, even under the worst possible attitude, under the highest speed that that barge could have been moving in this wind condition to have damaged or toppled this floodwall. It's just not possible.").*

*Exh. 4, Cushing Dep. 253 ("The amount of force you're talking about in this hypothetical is so slight that it's a little bit like a flea landing on the end of a trapeze artist's bar.").*

### Mosher

*Exh. 11, Mosher Dep. 91-92, 267 (referring to "other places where we say barges hit walls" and noting that they "can cause damage to the walls, but it's usually very local damage to the walls"; "punching through" but not "causing collapse").*

*Exh. 11, Mosher Dep. 101-02 (breaches at 17th Street and London Avenue showed "where a crack formed behind the walls [on the canal side] without a barge hitting it").*

*Exh. 11, Mosher Dep. 130-31 (physical features or north breach, including "large movement of a wall" and "cracks that extended below where the actual failure was," "wouldn't have [been] seen" there "if the barge had hit at that location").*

*Exh. 11, Mosher Dep. 145 (location of "potential damage from a barge hitting" the floodwall "doesn't seem to match up to where the primary damage is").*

### Marino

*Exh. 8, Marino 2009 Dep. 59-60 (admitting that construction joint in concrete cap constitutes a point of weakness, and that he would expect the wall to shear at the construction joint if the impact was sufficient).*

*Exh. 8, Marino 2009 Dep. 104 (Q: "All right. So if a pressure on a wall is narrow in scope, you would not expect that pressure to be felt at deep depths?" A: "Right." Q: "So, for instance, the pressure of a corner of a barge hitting the top of a wall, you'd expect that pressure to be exerted on a narrow part of the wall rather than translating all the way down to the bottom of the sheet pile?" A: Well, obviously. I mean, it's where there is contact. I mean, that's a simple answer.").*

35. Plaintiffs' experts did not perform any calculations showing the effect that a barge impact would have on the sheet pile or the supporting soil, as opposed to the concrete cap.

### References

*No calculations from Marino regarding cap versus sheet pile*

*Exh. 8, Marino 2009 Dep. 127 (Q: "You haven't done any calculations to determine whether an impact with the concrete cap would cause the cap to shear off rather than pulling the wall from the soil; correct?" A: "That's correct.").*

Exh. 8, Marino 2009 Dep. 256 (admitting that "modeling the movement of the bottom of the sheet pile on the protected side is something that would be in [his] area of expertise," and that he believes that "if [he] had modeled it, [he] could prove it" occurred, but he did not do it because "you can't model everything").

*No impact calculations from Marino*
Exh. 8, Marino 2009 Dep. 126 (Q: "You haven't calculated the barge impact force at either of the breaches; correct?" A: "That's correct").
Exh. 8, Marino 2009 Dep. 31-32 (Q: "Would you agree with me that there are no such engineering calculations [related to barge impact on floodwall] in the report that you issued in 2009?" A: "Yes ... That analysis never got finished.").
Exh. 9, Marino 2008 Dep. 100-01 (Q: "Did you evaluate as part of your analysis how far the floodwall would deflect when hit by the barge?" A: "No.") (adding that he "plan[ned] to" undertake that analysis).

*No calculations to show impact was sufficient to cause breaching*
Exh. 8, Marino 2009 Dep. 35-36 (Q: "This report doesn't contain any other quantitative forensic engineering analysis to demonstrate that the ING 4727 was capable of causing either breach, does it?" A: "No.").
Exh. 8, Marino 2009 Dep. 127 (Q: "You haven't calculated the force that would be needed to exhume the sheet pile at either location; is that correct? A: "That's correct.").
Exh. 8, Marino 2009 Dep. 157 (Q: "And you haven't calculated whether the momentum of the barge was sufficient to cause the wall to deflect and create this gap in the manner you've described?" A: "Right.").
Exh. 8, Marino 2009 Dep. 34-35 (Marino reached his conclusions about causation by a "process of elimination" in which he finds "no other likely causes" and infers the barge caused the failures).
Exh. 8, Marino 2009 Dep. 166 (Q: "Well, the fact of the barge hitting the wall is something you back into after you eliminated all the other causes; isn't that right?" A: "That's correct.").

*Pazos calculations are limited to force of wind on the barge, not distinction between sheet pile and cap*
Exh. 6, Pazos Dep. 357 ("I already make calculations ... regarding forces developed by wind on the barge that can be transmitted to the seawall.").
Exh. 12, Pazos Report at Attachment No. 5 (purporting to provide calculations, but failing to distinguish impact on concrete cap versus sheet pile).
Exh. 1, Cushing Report at 143 (noting that Pazos did not analyze wall deflection).

15

**The MRGO Levee Breaches**

36. Hurricane Katrina's storm surge caused massive breaches in the earthen levees along Reach 2 of the Mississippi River Gulf Outlet (the "MRGO Breaches").
    *References*
    *Exh. 12, Pazos Report at 37 ("As the eye of the hurricane moved to the Northeast, the counterclockwise rotation of the winds resulted in an elevation of the waters of Lake Borgne, water was pushed against the Earthen Berm/Spoil Banks along the Northeast frontage of the St. Bernard protected basin. This resulted in major erosion and breaching of the EBSB along Reach 2 on the Southwest of the MRGO[.]").*

37. The earthen levees along MRGO Reach 2 protect the same area ("polder") as the floodwalls along the east side of the IHNC.
    *Reference*
    *Exh. 16, Spinks Report (2009) at 10 Fig. 2.*

38. The MRGO breaches inundated St. Bernard Parish and the Lower Ninth Ward with massive flooding on the morning of August 29, 2005.
    *References*
    *Exh. 16, Spinks Report (2009) at 17 (35,200 ft of breaches along MRGO).*
    *Exh. 16, Spinks Report (2009) at 18, Fig. 4 (showing locations of "major levee breaches" along MRGO).*

**Flooding in the Lower Ninth Ward and St. Bernard Parish**

39. It is possible, through scientific flood modeling, to determine the level of flooding that would have occurred in the Lower Ninth Ward and St. Bernard Parish even if the IHNC floodwall breaches (the North Breach and South Breach) had not happened.
    *References*
    *Exh. 14, Spinks 2008 Dep. 241-42 (Q: "Among the hypothetical scenarios you created was a hypothetical scenario which assumed that the Inner Harbor Navigation Canal breaches did not occur. Am I right?" A: "Yes, there is a hypothetical example of that." Q: "And that hypothetical example might be taken as an illustration of the situation that would have occurred but for the occurrence of the breaches in the Inner Harbor Navigation Canal; right?" A: "That's what we refer to as a scenario analysis, yes.").*
    *Exh. 15, Spinks 2009 Dep. 40 (Q: "One of the things your model is able to do, as reflected in Chapter 4 of your report is to run simulation scenarios that will*

16

*simulate flooding as if certain breaches had not occurred; right?" A: "Correct.").*
*Exh. 15, Spinks 2009 Dep. 142-44 (explaining scenarios, including one scenario run with MRGO breaches but not IHNC breaches).*

40. Flood modeling by plaintiffs' expert shows that even if the IHNC North Breach and South Breach had not occurred, the MRGO levee breaches would have flooded the Lower Ninth Ward and St. Bernard Parish to the same maximum level on August 29, 2005.

    *References*
    *Exh. 14, Spinks 2008 Dep. 202-03 (MRGO breaches "would have flooded this [Lower Ninth Ward] location to a depth of over 14 feet regardless of the Inner Harbor Navigation Canal breaches").*
    *Exh. 14, Spinks 2008 Dep. 214 ("[D]uring the storm event, the maximum level reached with MRGO's water").*
    *Exh. 15, Spinks 2009 Dep. 147-48 ("[If] you only considered MRGO breaches and overtopping, ... at some point in the future this area would have been affected by only MRGO's waters" in both Lower Ninth Ward and St. Bernard Parish).*
    *Exh. 15, Spinks 2009 Dep. 206 (water at Richardson home reaches the same maximum level "with or without the IHNC breaches").*

41. Flood modeling by plaintiffs' expert shows that the only difference in flooding resulting from the IHNC breaches is that the water arrived up to five hours earlier on August 29, 2005, than it would have arrived if the IHNC breaches had not occurred.

    *References*
    *Exh. 14, Spinks 2008 Dep. 203 (agreeing that "without the IHNC breaches you would get to the same water level, but just a couple of hours later").*
    *Exh. 14, Spinks 2008 Dep. 203 ("The levee breaches along MRGO would have completely inundated the Lower Ninth Ward and St. Bernard Parish sometime later than what actually happened during Hurricane Katrina.").*
    *Exh. 14, Spinks 2008 Dep. 214-15 (agreeing that "if you add the Inner Harbor Navigation Canal water, you arrive at your maximum depth a couple of hours earlier than if you take away the Inner Harbor Navigation Canal water").*
    *Exh. 15, Spinks 2009 Dep. 146-47 (as of 2:00 pm, the water level is the same for "all causes" as it is for "MRGO levee breaches only" with a "five hour difference" in the Lower Ninth Ward; at the end of the day the scenarios "merge at the same level").*
    *Exh. 15, Spinks 2009 Dep. 149-50 (Q: "Without the IHNC breaches you get to the same water level, but just a couple of hours or a few hours later?" A: "At Location 1 about five hours later. At Location 2 closer to Paris Road where we know the two waters mixed, then about an hour to two hours difference.").*

*Exh. 16, Spinks Report at 34 Figs. 15-16.*
*Exh. 17, Suhayda Report at 11 ¶ 39.*

42. The value associated with five hours' use of property during hurricane conditions, and in the face of a mandatory evacuation order, is zero.

   *Reference*
   *Exh. 39, Ragas Dep. 115 (damage caused by the IHNC breaches was only that of a loss of use of property for a few hours, which would be valued at "zero or an immeasurably small number").*

**Dated: October 2, 2009**                    **Respectfully submitted,**

                                              Robert B. Fisher, Jr., T.A. (#5587)
                                              Derek A. Walker (#13175)
                                              CHAFFE MCCALL, L.L.P.
                                              2300 Energy Centre
                                              1100 Poydras Street
                                              New Orleans, LA 70163-2300
                                              Telephone: (504) 585-7000
                                              Facsimile: (504) 585-7075
                                              Fisher@chaffe.com
                                              Walker@chaffe.com

                                              /s/ John D. Aldock
                                              John D. Aldock
                                              Richard M. Wyner
                                              Mark S. Raffman
                                              GOODWIN PROCTER LLP
                                              901 New York Avenue, N.W.
                                              Washington, DC 20001
                                              Telephone: (202) 346-4240

                                              Daniel A. Webb (#13294)
                                              SUTTERFIELD & WEBB, LLC
                                              Poydras Center
                                              650 Poydras Street, Suite 2715
                                              New Orleans, LA 70130
                                              Telephone: (504) 598-2715

                                              Attorneys for Lafarge North America Inc.

## Certificate of Service

I hereby certify that I have on this 2nd day of October, 2009 served a copy of the foregoing pleading on counsel for all parties to this proceeding, by electronic filing notification.

/s/ John D. Aldock

LIBW/1718664.4