RECEIVED
U.S. DISTRICT COURT
EAST DISTRICT OF LA

2007 AUG 28 AM 11: 41

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ENTERGY NEW ORLEANS, INC, ENTERGY LOUISIANA, L.L.C., ENTERGY SERVICES, INC., ENTERGY CORPORATION, AND HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY | CIVIL ACTION NO.<br><br>SECT **07 - 4608** |
| VERSUS | MAGISTRATE |
| THE UNITED STATES OF AMERICA | **SECT. K MAG. 2** |

### COMPLAINT

Plaintiffs ENTERGY NEW ORLEANS, INC., ENTERGY LOUISIANA, L.L.C., ENTERGY SERVICES, INC., ENTERGY CORPORATION, AND HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY, as and for their Complaint in this action respectfully allege the following:

### *INTRODUCTION*

Beginning on August 29, 2005 following Hurricane Katrina's landfall, Greater New Orleans experienced catastrophic flooding caused not by the natural forces of the storm, but by the faulty design, construction and maintenance of waterways, levees and floodwalls for which the United States Army Corps of Engineers was responsible pursuant to federal law. East of the City of New Orleans, as Lake Borgne crested with the storm surge, the man-made structures funneled and poured salt water into the marshes and wetlands of South Louisiana and into the

-2-

developed areas of St. Bernard, Plaquemines and Orleans Parishes. In addition to the homes and business that were inundated with these waters, many elements of the area's critical utility infrastructure were damaged or destroyed: the natural gas pipelines that serviced New Orleans were infiltrated and filled with salt water; electric transmission and distribution facilities in Gentilly, New Orleans East, the Ninth Ward, St. Bernard and Plaquemines Parishes were flooded and, in some cases, washed away; and numerous other utility assets were decimated. As a result, the residents of these areas were left without utility services for an extended period. They have also faced higher utility rates necessitated by the unprecedented repair and restoration as well as the diminished population of ratepayers among whom the utilities' operating costs must be shared. Entergy Corporation, its subsidiaries that serve Orleans, Plaquemines and St. Bernard Parishes and Entergy's shared services subsidiary bring this action to recover for the damages to their fixed assets, past and future business opportunity, and operating income occasioned by the wrongful conduct of the Army Corps of Engineers. Entergy's insurer, Hartford Steam Boiler and Inspection and Insurance Company, joins the suit as subrogee to a portion of the damages.

## *PARTIES*

1. Plaintiffs Entergy New Orleans, Inc. ("ENOI"), Entergy Louisiana, L.L.C. ("ELL"), Entergy Services, Inc., ("ESI"), and Entergy Corporation ("EC"), together, " the Entergy Companies", bring this suit in the interests of public utility ratepayers in the Greater New Orleans area, as well as in the Entergy Companies' business interests, to recover for damages caused to the Entergy Companies by the Army Corps of Engineers ("Corps") through the faulty design, construction and maintenance of the Mississippi River Gulf Outlet ("MRGO") and other structures. These damages drove ENOI into bankruptcy proceedings, now concluded, and have made it necessary for ENOI and ELL to raise utility rates in order to continue to deliver services to their customers in Orleans, St. Bernard and Plaquemines Parishes.

2. Plaintiff Entergy Corporation is incorporated under the laws of the State of Delaware, with its principal place of business and its principal Louisiana business establishment in the Parish of Orleans, State of Louisiana.

3. Plaintiff Entergy New Orleans, Inc., a wholly owned subsidiary of Entergy Corporation, is a Louisiana corporation with its registered office and corporate domicile in the Parish of Orleans. ENOI is a regulated public utility that provides utility services in Orleans Parish with its principal place of business in the Parish of Orleans.

4. Plaintiff Entergy Louisiana, L.L.C. is a Texas L.L.C. with its principal place of business in the Parish of Jefferson, Louisiana. ELL, which is a wholly owned subsidiary of Entergy Corporation, is a regulated public utility providing services in the State of Louisiana outside the Parish of Orleans.

5.  Plaintiff Entergy Services, Inc. is a Delaware corporation with its principal place of business in Louisiana. It is a wholly owned subsidiary of Entergy Corporation, and provides services to the regulated operating companies, including parties ENOI and ELL.

6.  Plaintiff Hartford Steam Boiler Inspection and Insurance Company ("Hartford") is a foreign insurer organized under the laws of the State of Connecticut, qualified to do and doing business in the State of Louisiana. Hartford was one of the Entergy Companies' excess insurers and is subrogated in part to the Entergy Companies' claims asserted herein, and in particular to part of EC's claim for losses sustained by ENOI.

7.  Defendant the United States of America is a sovereign government amenable to suit in accordance with the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq., the Suits in Admiralty Act, 46 U.S.C. § 30901 et seq., and the Public Vessels Act, 46 U.S.C. § 31101 et seq., for damages caused by the United States Army Corps of Engineers, a division of the United States government under the direct jurisdiction of the Department of the Army.

## *JURISDICTION*

8.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b) (Defendant United States).

9.  Additionally, the Court has jurisdiction over this matter pursuant to the Admiralty Extension Act, 46 U.S.C. § 30101, which extends federal admiralty jurisdiction to harm caused by vessels upon land.

## *VENUE*

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this district, and

also because a substantial part of the property that is the subject of the action is situated in this district.

## *EXHAUSTION OF ADMINISTRATIVE REMEDIES*

11. The Entergy Companies presented their administrative claims in writing to the Corps as provided under federal law on February 28, 2007, and a period of at least six months has expired since the filing of the claims. Thus, the cause or controversy asserted herein is ripe for judicial resolution.

12. Moreover, Plaintiffs reserve the right to contest the legal necessity of filing an administrative claim and/or pursuing administrative remedies, and Plaintiffs expressly plead the futility doctrine against any administrative exhaustion requirement, that is, that Corps has made it clear that it does not intend to resolve any such claims as those asserted herein through its administrative claims process, which are in any case inadequate as depriving Plaintiffs of their rights under the United States Constitution.

## *FACTUAL BACKGROUND*

13. MRGO is a deep water navigable waterway constructed under the authority of the River and Harbor Act of 1956, Public Law 455, 84th Congress, 2nd Session.

14. MRGO was designed and constructed by the Corps in the 1950's and early 1960's; MRGO is approximately 76 miles long and runs generally in a northwest direction from Breton Sound in the Gulf of Mexico through the parishes of St. Bernard and Plaquemines to New Orleans, where it connects with the Gulf Intracoastal Waterway ("GIWW") and the Inner Harbor Navigational Canal ("IHNC"), known locally as the Industrial Canal.

15. MRGO, intended as an aid to navigation and commerce, enables ships from ports East of the Mississippi River to head North to New Orleans at Breton Sound, East of the mouth

of the Mississippi, at a savings of sixty miles. MRGO also provides an alternative to the Mississippi River.

16. The Corps' original plans provided for MRGO to have a depth of 36 feet and a bottom width of 500 feet. The navigation channel was to extend from the Industrial Canal in eastern New Orleans approximately six miles eastward as part of the GIWW. The channel was then to turn southeast approximately 60 miles to Chandeleur Island. From Chandeleur Island, the project channel was to increase gradually to a bottom width of 600 feet and a depth of 38 feet in the Gulf of Mexico. Prospective jetties were to be provided at the channel entrance.

17. Construction on MRGO began in March 1958. An interim channel with dimensions of 36 feet by 250 feet (bottom width) was opened to traffic in July 1963. Enlargement to project dimensions was completed in January 1968.

18. The Corps was authorized to modify the project in August 1969 to include foreshore protection along the banks of the channel. This foreshore protection was completed along the North bank of MRGO and for 13 miles along the South bank from Bayou Bienvenue to the end of the leveed reach; however, foreshore protection was indefinitely deferred on the South bank from Bayou Bienvenue to the Industrial Canal.

19. The Corps has always been responsible for the maintenance of MRGO. This ongoing responsibility included dredging the bottom of the waterway to remove deposited soil and silt and to maintain MRGO's original design depth of 36 feet. Silting has remained a problem for MRGO since 1957, when the first ship to navigate it ran aground and was stuck for two days.

20. After its completion in 1965, use of MRGO increased only until 1978, when, at its peak, MRGO carried 9.4 million tons of cargo and other goods. Subsequently, fleets were

replaced with larger vessels with drafts too deep for MRGO, and several terminals along the IHNC were closed. In 2004, only 226 deepwater ships passed through the channel, an average of slightly more than four ships per week, carrying only 1.3 million tons of cargo, roughly equal to tonnage figures from 1963, when MRGO first opened. By 2005, MRGO had become a seldom used relic.

### *MRGO'S FAULTY DESIGN, CONSTRUCTION AND MAINTENANCE*

21. MRGO's design was flawed in two fatal respects: First, the Corps failed to take account of the waterway's inherent and known capacity to funnel rapidly accelerated, hurricane driven storm surges, thereby increasing the force and even height of a storm surge against populated areas.

22. Second, the Corps failed to take account of the destruction of wetlands that it knew or should have know would be caused by the construction of MRGO and also by consequent salt water intrusion into wetlands, thereby erasing a natural buffer against storm surge and exacerbating the funnel effect of MRGO's faulty design.

23. Additionally, the Corps failed to maintain MRGO properly, especially in the Corps' failure to conduct proper dredging, which would have reduced MRGO's funnel effect.

24. The Corps also failed to implement bank stabilization measures along MRGO and the GIWW, to minimize erosion induced by saltwater intrusion and also by the force of waves from passing vessels.

### *THE CORPS' BREACHES OF ITS DUTIES IN THE DESIGN, CONSTRUCTION AND MAINTENANCE OF MRGO*

25. On September 25, 1951, the Corps submitted a report to Congress ("MRGO Authorization Report") with its recommendations for construction of MRGO. This report

contained a letter from the former Corps Chief of Engineering stating that the proposed MRGO would be connected to the IHNC by its own separate canal running parallel to the GIWW.

26.     The Corps deviated from the parameters of the proposed MRGO Authorization Report and connected MRGO into the existing GIWW.

27.     The Corps thus deepened and widened the GIWW from the point of connection to the IHNC, thereby increasing the hydrologic load upon MRGO.

28.     The MRGO Authorization Report also recommended that the exact location of the MRGO outlet should be determined only after complete studies of sand movement, wave action and local currents were made in cooperation with the Beach Erosion Boards, and that the outlet should be moved if a more suitable location were available.

29.     The Corps failed to conduct studies of such possible route alternatives, including alternatives that might have been less destructive to the coastal wetlands.

30.     The Corps' design, construction, operation and maintenance of MRGO violated the River and Harbor Act of 1945, P.L. 69-44, 50 Stat. 40 (March 2, 1941) ("MRGO Planning Law"), which required the Corps to coordinate with the State of Louisiana, through its Governor or his/her designee as an "affected state" in the investigation and planning stages of MRGO.

31.     The Corps likewise failed to heed the MRGO Planning Law's mandate to coordinate the Corps' investigation and planning of MRGO with the United States Department of the Interior.

32.     The Corps' design, construction, operation and maintenance of MRGO violated the Fish and Wildlife Coordination Act ("FWCA"), 46 U.S.C. § 662, which requires any federal agency proposing to impound, divert or control a waterway or body of water to coordinate such a

project with the Fish and Wildlife Service and to consult with the states involved as a prerequisite to implementing the project; both of which the Corps failed to do.

33. In 1958, the Department of the Interior prepared a draft preliminary report for the Corps ("Fish and Wildlife Report") pursuant to the FWCA, noting the Corps' failure to permit fish and wildlife conservation agencies to study the project.

34. The 1958 Fish and Wildlife Report expressly noted the harmful effects of MRGO upon existing water circulation patterns, thereby upsetting natural salinity levels and threatening the marsh's ecosystem.

35. In failing to take into account such environmental matters in the design, construction and maintenance of MRGO, the Corps violated the Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.*, the Water Resources Development Act of 1990, 33 U.S.C. §§ 2316 and 2317, the National Environmental Policy Act, 42 U.S.C. § 4332(C), and the Louisiana State and Local Coastal Resources Management Act, La. Rev. Stat. Ann. 49:244.21 *et seq.*

36. Moreover, in the conduct of its dredging operations on MRGO, which similarly failed to take into account environmental impact, the Corps violated 33 C.F.R. §§ 336.1(c)(4), 320.4(b), 337.5 and 338.2.

37. Indeed, the Corps has had abundant information to indicate that MRGO in fact aggravated the risk of flooding in New Orleans and surroundings, including the flooding caused by Hurricane Betsy in 1965 and the Corps' own report thereon, and various other studies, including that of Sherwood Gagliano in 1970, and data from the National Oceanic and Atmospheric Administration in 1972, a report from the National Weather Service in 1979, a study from the National Hurricane Center in 1998; the Corps finally acknowledged MRGO's

shortcomings in 1998 and adopted a coastal restoration plan calling for MRGO's eventual closure (but in the end failing to do so).

### *THE CORPS' BREACHES OF ITS DUTIES WITH RESPECT TO THE DESIGN, CONSTRUCTION AND MAINTENANCE OF OTHER NAVIGABLE WATERWAYS*

#### *The Inner Harbor Navigational Canal*

38. On June 6, 1918, construction began on a deep water canal between the Mississippi River and Lake Pontchartrain, the Inner Harbor Navigational Canal ("IHNC") (locally known as the "Industrial Canal").

39. Upon information and belief, from the outset of the project, the Corps' contractors acknowledged problems with slope stability of the parallel dikes on either side of the canal.

40. Nevertheless, the Corps through its agents increased the size of the canal to a minimum depth of 30 feet at low water, with a minimum bottom width of 450 feet and a minimum channel width of 300 feet, roughly double the original size of the original design. The Corps increased these dimensions again when new wharves were constructed.

41. Later, the Corps undertook to demolish the East Bank Industrial Area of the IHNC—a 32 acre site located between Florida Avenue and Claiborne Avenue and extending from the canal to the floodwall. In so doing, the Corps, through its agents, undertook to remove salvage, debris, and other materials from the IHNC.

42. The Corps, through its agents, undertook extensive excavation and subsurface activity, thereby undermining the integrity of the eastern shoreline of the IHNC abutting the Lower Ninth Ward of Orleans Parish, and ultimately contributing to the flooding caused in those areas by Hurricane Katrina.

*St. Bernard Parish*

43. The banks of waterways adjacent to St. Bernard Parish, including MRGO and the 40 Arpent Canal, had subsided significantly since their initial construction.

44. Independent studies concluded that a known and foreseeable change in elevation caused and contributed to their failure in St. Bernard Parish. The responsibility for the failure of these systems lies, in whole or in part, with the Corps.

*Gulf Intracoastal Waterway*

45. Initially authorized in 1914, the Gulf Intracoastal Waterway ("GIWW") was completed by the Corps in 1949 as a navigation canal between New Orleans and Corpus Christi, Texas.

46. However, in 1944, under the authority of the Corps, the GIWW was rerouted to pass through the southern part of the IHNC.

47. The Corps' diversion created the first shallow channel through the wetlands that would enhance the hurricane surge impact from Lake Borgne into New Orleans.

### *THE CORPS' BREACHES OF ITS DUTIES WITH RESPECT TO THE DESIGN, CONSTRUCTION AND MAINTENANCE OF OTHER STRUCTURES*

*AND NOW, pleading in the alternative, Plaintiffs aver as follows:*

*Lake Pontchartrain and Vicinity Hurricane Protection Project*

48. Most of the levee and/or I-wall structures that surround the New Orleans metropolitan area were constructed, in part, under the authority of the Lake Pontchartrain, Louisiana and Vicinity Hurricane Protection Project ("Lake Pontchartrain Project").

49. Congress first authorized construction of the Lake Pontchartrain Project in the Flood Control Act of 1965 to provide hurricane protection to areas around Lake Pontchartrain; the Corps was responsible for project design and construction.

50. The Corps' design and construction of the Lake Pontchartrain Project was faulty from the beginning in several respects.

51. In designing and constructing the Lake Pontchartrain Project, the Corps based its overall design specifications on the 1959 U.S. Weather Bureau 1-in-100 years Standard Project Hurricane ("SPH"), which was contradictory to Congress' mandate to protect from a 1-in-200 to 1-in-300 year hurricane.

52. Additionally, in designing and constructing the Lake Pontchartrain Project, the Corps intentionally and/or negligently with wanton and reckless disregard for the consequences of its actions used the National Geodetic Vertical Datum of 1929 ("NGVD29"), which was no longer equal to local mean sea level ("LMSL"), and failed to use data for the superimpositions of hurricane surge and wave height from a 1950's era oceanographic analysis instead.

53. When the Corps adopted design specifications for the Lake Pontchartrain Project in 1965, it was on notice that zero NCVD29 was already between 1.3 and 1.6 feet below LMSL at different parts of the system, and, thus, the floodwalls were negligently constructed too low by at least this margin. The Corps nonetheless continued to use the outdated NCVD29 data.

54. Additionally, in 1984, the Corps intentionally and/or negligently with wanton and reckless disregard for the consequences of its actions abandoned the Barrier Plan, which had been approved by Congress, but implemented the High Level Plan, despite its many known defects and its rejection by Congress, taking no action to compensate for this change of plans

with respect to the floodwalls along the IHNC, leaving them at considerably lower height than safety designs called for.

55. Additionally, the Corps intentionally and/or negligently with wanton and reckless disregard for the consequences of its actions implemented defective design and construction criteria by utilizing defective fill material in the construction of the structural supports of the Lake Pontchartrain Project area without sheet pile cutoff, concrete armoring or similar features to prevent erosion, undercutting, collapse or failure.

### *THE CORPS' BREACHES OF ITS DUTIES CAUSED DAMAGES TO THE ENTERGY COMPANIES*

56. On August 29, 2005, a tidal surge from Hurricane Katrina rushed from the Gulf of Mexico through MRGO and collided at the nexus of the GIWW and the MRGO with another storm surge from Lake Borgne, combining to flood New Orleans East, portions of Gentilly, the Ninth Ward, Plaquemines and St. Bernard Parishes.

57. Eyewitness accounts, as well as scientific studies, indicate that MRGO caused the flooding of large portions of the New Orleans metropolitan area. The flawed design, poor construction, and inadequate repair and maintenance of MRGO—as well as the resulting destruction of the protective adjoining wetlands—was the overriding factor in causing the flooding. But for the fault of the Corps, the severe flooding would not have occurred.

58. In November 2005, an in-depth field investigation—funded by the National Science Foundation and conducted by teams from the University of California at Berkley and from the American Society of Civil Engineers—concluded that MRGO was a prime culprit in Katrina's unprecedented inundation of New Orleans and its environs.

59. The Corps' own commissioned evaluation on the Louisiana hurricane protection system—conducted by the Interagency Performance Evaluation Task Force ("IPET")—recently

found that the majority of flooding of the Lower Ninth Ward and St. Bernard Parish resulted from overtopping and from two breaches along the IHNC, precisely where experts had predicted that MRGO's funnel effect would concentrate its force.

60. The Corps' IPET consultants stated that flow through MRGO must be dramatically reduced or eliminated, either by a permanent closure or by a structure that would eliminate the hydraulic connectivity.

61. As detailed below, the Entergy Companies had substantial assets located in the areas that were directly flooded by Katrina's storm surge as funneled through MRGO (within the "MRGO footprint"). These assets were damaged, lost or totally destroyed.

62. In addition, the Entergy Companies had assets outside the MRGO footprint, such as large parts of the Entergy Companies' interconnected gas system, which were nevertheless destroyed or damaged by the flooding.

63. Hartford, as the Entergy Companies' insurer, has paid $69.5 million for a portion of the losses of assets owned by ENOI.

## COUNT I
## NEGLIGENCE

### *A. Negligence Related to Navigable Waterways*

64. Plaintiffs incorporate and hereby re-allege all preceding paragraphs as if fully set forth herein and further allege as follows:

65. At all relevant times, Defendant United States, through the Corps, was responsible for the design, construction, operation and maintenance of MRGO, the IHNC and the GIWW.

66. Defendant owed a duty to Plaintiffs and to others to refrain from negligent acts and omissions in carrying out Defendant's responsibilities.

67. Defendant breached that duty by negligently designing, constructing, operating and maintaining MRGO, the IHNC and the GIWW.

68. Defendant's breaches of its duties foreseeably and proximately caused, or were the substantial contributing factor in, the widespread destruction and damages caused by MRGO, the IHNC and the GIWW, specifically including the damages suffered by the Entergy Companies.

69. Defendant's negligence was such that were the United States a private person, it would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred — in this case the State of Louisiana.

### *B. Negligence Related to Flood Protection Levees*

70. Plaintiffs incorporate and hereby re-allege all preceding paragraphs as if fully set forth herein and further allege as follows:

71. At all relevant times, Defendant United States, through the Corps, was responsible for the Lake Pontchartrain and Vicinity Hurricane Protection Project.

72. Defendant owed a duty to Plaintiffs and to others to refrain from negligent acts and omissions in carrying out Defendant's responsibilities.

73. Defendant breached that duty.

74. In the alternative that Defendant's breaches of these duties are found to have foreseeably and proximately caused, and been a substantial contributing factor in, the widespread destruction and damages caused within the MRGO footprint, specifically including the damages suffered by Entergy Companies, Defendant is liable to Plaintiffs for the damages arising therefrom.

75. Defendant's negligence was such that were the United States a private person, it would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred — in this case the State of Louisiana.

## COUNT II
## LIABILITY FOR DAMAGES CAUSED BY WORKS ON PROPERTY

### *A. Negligence Related to Navigable Waterways*

76. Plaintiffs incorporate and hereby re-allege all preceding paragraphs as if fully set forth herein and further allege as follows:

77. As the proprietor of MRGO, the IHNC and the GIWW, the Corps had a duty, pursuant to Louisiana Civil Code article 667, to refrain from creating a nuisance. Intentionally defective or negligent, wanton, reckless and illegal construction of MRGO, the IHNC and the GIWW has deprived Entergy Companies of the enjoyment of their property and has destroyed said property.

78. Defendant's negligence was such that were the United States a private person, it would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred — in this case the State of Louisiana.

### *B. Negligence Related to Flood Protection Levees*

79. Plaintiffs incorporate and hereby re-allege all preceding paragraphs as if fully set forth herein and further allege as follows:

80. At all relevant times, Defendant United States, through the Corps, was responsible for the Lake Pontchartrain and Vicinity Hurricane Protection Project.

81. Defendant owed a duty to Plaintiffs and to others to refrain from negligent acts and omissions in carrying out Defendant's responsibilities.

82. Defendant breached that duty.

83. In the alternative that Defendant's breaches of these duties are found to have foreseeably and proximately caused, and been a substantial contributing factor in, the widespread destruction and damages caused within the MRGO footprint, specifically including the damages suffered by the Entergy Companies, Defendant is liable to Plaintiffs for the damages arising therefrom.

84. Defendant's negligence was such that were the United States a private person, it would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred – in this case the State of Louisiana.

## COUNT III
## LIABILITY IN ADMIRALTY

85. Plaintiffs incorporate and hereby re-alleges all preceding paragraphs as if fully set forth herein and further alleges as follows:

86. The Corps' dredging operations exacerbated the storm surge of Hurricane Katrina and thus caused damages to the Entergy Companies by the flooding caused in whole or in part by the Corps' dredging.

87. The Corps' dredging operations occurred on navigable waterways, and the Entergy Companies' damages were caused upon land as a result of the activities of a vessel or vessels, for which the Corps was responsible, on navigable water, thus satisfying the "location" test for maritime jurisdiction.

88. The Corps' negligent dredging operations that caused the flooding complained of herein was potentially disruptive of maritime commerce, and said dredging operations constituted repair or maintenance work on a navigable waterway performed from a vessel, thus satisfying the "connection" test for maritime jurisdiction.

89. The Corps is thus liable to Plaintiffs under the general maritime law of the United States, which extends to damages caused upon land by the Admiralty Extension Act, 46 U.S.C. § 30101.

## THE ENTERGY COMPANIES' DAMAGES

90. The Entergy Companies incorporate and hereby re-allege all preceding paragraphs as if fully set forth herein and further allege as follows:

91. As a result of the Corps' negligent, grossly negligent, reckless, wanton, and/or illegal acts and omissions described herein, the Entergy Companies sustained damage to their property and to their business.

92. As a result of the Corps' conduct, the Entergy Companies sustained loss or damage to property including but not limited to: two power generation plants, 40 substations, 30 miles of gas main pipelines from suppliers, hundreds of miles of gas main pipelines, hundreds of miles of connections from gas mains to customers, electric transmission and distribution lines, office, maintenance and storage buildings, inventory, and vehicles.

93. As a result of the Corps' conduct, the Entergy Companies also sustained: business interruption, economic damages, immediate business losses, long term business losses and relocation costs.

94. The Entergy Companies have thus suffered millions of dollars of uncompensated damages for losses caused by the Corps' wrongful acts and omissions in specific amounts to be proved at trial.

## HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY'S SUBROGATION CLAIM FOR ENTERGY'S MRGO LOSSES

95. Plaintiffs incorporate and hereby re-allege all preceding paragraphs as if fully set forth herein and further allege as follows:

96. Entergy Corporation made claim on its excess policy of insurance for the full value of its limits against Hartford Steam Boiler Inspection and Insurance Company ("Hartford") and has received a settled payment on the claim presented in the amount of SIXTY NINE MILLION FIVE HUNDRED THOUSAND ($69,500,000.00) DOLLARS for losses sustained by ENOI.

97. Hartford is fully subrogated to the claims against the Corps for ENOI's losses herein for Sixty Nine Million Five Hundred Thousand ($69,500,000.00) Dollars.

### PRAYER

WHEREFORE, Plaintiffs demand judgment against Defendant for:

a. Economic and compensatory damages in amounts to be determined at trial;

b. Prejudgment interest as allowed by law;

c. Attorneys fees and costs of litigation pursuant to the Federal Tort Claims Act and/or the Equal Access to Judgment Act;

d. Such other relief to Plaintiffs as is available under Louisiana or federal law; and

e. Such other relief as the Court deems just and equitable.

Respectfully submitted,

O.H. Storey (Arkansas Bar No. 69078)
Marcus V. Brown (La. Bar No. 18817)
Leila A. D'Aquin (La. Bar No. 18884)
ENTERGY SERVICES, INC.
639 Loyola Avenue, Suite 2600
New Orleans, LA 70113
Tel: 504-576-2765
Fax: 504-294-5302

and

Ewell E. Eagan Jr. (La. Bar No. 5239), T.A.
A. Gregory Grimsal (La. Bar No. 6332)
Wendy Hickok Robinson (La. Bar No. 25225)
GORDON, ARATA, MCCOLLAM,
 DUPLANTIS & EAGAN, L.L.P.
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana 70170-4000
Telephone: (504) 582-1111
Fax: (504) 582-1121

By: _____
Leila A. D'Aquin

Attorneys for Plaintiffs, Entergy New
Orleans, Inc., Entergy Louisiana, L.L.C.,
Entergy Services, Inc., and Entergy Corporation

Elisa T. Gilbert, Esq (ETG 5713), T.A.
Brendan R. O'Brien (BO 9033)
GILBERT & GILBERT, LLC
350 Fifth Avenue, Suite 5615
New York, NY 10118-5615

and

Ernest Svenson, Esq. (17164)
THE SVENSON LAW FIRM, LLC
432 Henry Clay Avenue
New Orleans, LA 70118-5724
504-208-5199

By: _____
Ernest Svenson, Esq.

Attorneys for Hartford Steam Boiler
Inspection and Insurance Company