UNITED STATE DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| IN RE: KATRINA CANAL BREACHES * | |
| CONSOLIDATED LITIGATION        * | CIVIL ACTION |
|                                * | |
|                                * | NO. 05-4182 |
| PERTAINS TO:  BARGE            * | and consolidated cases |
|                                * | |
|                                * | SECTION "K" (2) |
| *Boutte v. LaFarge*       05-5531    * | |
| *Mumford v. Ingram*       05-5724    * | |
| *Lagarde v. LaFarge*      06-5342    * | JUDGE |
| *Perry v. Ingram*         06-6299    * | STANWOOD R. DUVAL, JR. |
| *Benoit v. LaFarge*       06-7516    * | |
| *Parfait Family v. USA*   07-3500    * | MAG. |
| *LaFarge v. USA*          07-5178    * | JOSEPH C. WILKINSON, JR. |

**BARGE PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
ZITO'S MOTION FOR SUMMARY JUDGMENT**

MAY IT PLEASE THE COURT:

Zito's motion reveals precisely why summary judgment cannot be granted. There exists a material issue as to whether Lafarge Asst. Terminal Manager Edward Busch notified Zito of the release of ING 4727, and/or requested its removal. Zito tenders to the Court the conflicting evidence, and tacitly asks the Court to disregard Mr. Busch's testimony as non-credible. Zito precludes itself from summary judgment.

**FACTS**

Lafarge North America was at all times pertinent the owner and operator of a cement distribution facility bearing municipal address 2315 France Road, New Orleans, Louisiana. Lafarge's France Road facility consists, inter alia, of cement silos, and a wharf or dock on the western side of the Inner Harbor Navigation Canal between the Florida Avenue and S. Claiborne Avenue Bridges. The eastern bature of Inner Harbor

Navigation Canal between the Florida Avenue and S. Claiborne Avenue Bridges is bounded on its landward side by a floodwall located between the canal and the Lower Ninth Ward neighborhood.

Lafarge North America, Inc. was at all times pertinent party to a Transportation Agreement with Ingram Barge Company. At all times pertinent, Ingram Barge Company was the owner of a 200 foot inland hopper barge designated ING 4727.

During the week of August 25, 2005, Lafarge North America, at its France Road facility, was experiencing a stockout condition relative to H-Grade cement. (***In Globo Exhibit 1***, emails describing stockout condition). Lafarge was during the week of August 25, 2005 due to receive two Ingram barges loaded with H-Grade cement at its West Lake facility (near Lake Charles, Louisiana), but had these barges, ING 4727 and ING 4725, diverted to its France Road facility in New Orleans, Louisiana.[1] Rachael Burnett Mays, Lafarge's barge scheduler, rendered the following deposition testimony in EDLA Civil Action No. 05-4419:[2]

> Q. And the reason I'm asking is, because in this
> case, there was a change of 4727, which
> originally was going to Westlake to New Orleans,
> and you sent e-mails with regard to that change.
> You saw those?
> A. Okay. But I did not have the authority to make
> the change.
> Q. Well, who gave you the authority to change the
> delivery, let's say, of 4727 from Westlake to
> New Orleans?
> A. I don't recall.
> Q. Well, would your e-mails help you with that?
> A. I can look at them, but I do not recall who gave
> me the instruction.
> Q. Would the e-mails refresh your memory as to who
> gave you the instruction?
> A. If they specifically say in the e-mail.

---

[1] **Plaintiffs' Exhibit 1 *In Globo***, email communications describing Lafarge stockout condition;
[2] **Plaintiffs' Exhibit 7**, Deposition of Rachael Burnett Mays, pp. 32 – 35.

Q. Okay. Let me show you an e-mail, which is -- it's going to be easy to find it. They are in numerical order. LNA 119. Do you see that? And in that you said, "I have worked my magic and have the ING 4727 and ING 4745 scheduled to depart on the M/V YEAGER Thursday, Friday timing. ETA, estimated time of arrival, to New Orleans, Louisiana, of 8/26." Do you see that?
A. Yes.
Q. One barge -- and it goes on in the last paragraph to say, "One barge was supposed to be for New Orleans, Louisiana, and one for Westlake. Do you want to keep the split or send both to New Orleans?" And that is sent to AJ Guthrie and Dennis Millon, M-i-l-o-n (sic), and a copy to Brad Adkins; is that correct?
A. That's what it says.
Q. Well, who is Mr. Millon?
A. It's Dennis Millon.
Q. Millon, okay. It is French.
A. And he was the terminal manager at the New Orleans facility at that time.
Q. The terminal manager at Reserve?
A. New Orleans.
Q. New Orleans facility?
A. New Orleans terminal.
Q. Okay. And where was that located?
A. New Orleans.
Q. I mean, do you know the location on the river?
A. (Witness moves head from side to side.)
Q. No? Okay. Is he still with the company?
A. I don't know.
Q. You don't know. Okay. And Brad Adkins is who?
A. At this particular time, he was the salesman in the New Orleans area.
Q. Is he still with the company?
A. I don't know.
Q. But in reading it, it seems to imply -- and I don't mean to put words in your mouth, but that you had arranged to change these barges; is that correct?
MR. RAFFMAN: Objection. You can answer.
A. It doesn't say that I was going to do anything.
Q. You said, "I have worked my magic and have the ING 4727 and ING 4745 scheduled to depart." That would be depart from Joppa; is that correct?
A. Right. I had scheduled them to depart Joppa.
Q. And you anticipated they would arrive in New Orleans 8/26; is that correct?
A. That's what it says.

> Q. And the M/V YEAGER was whose vessel? Do you know?
> A. I couldn't tell you.
> Q. You don't know? Okay. You see, one barge was supposed to be for New Orleans and one for Westlake. Do you see that?
> A. Yes.
> Q. Okay. And you asked, "Do you want to split them for both of them to go to New Orleans?" And you were saying -- Brad was saying he thought both should go to New Orleans. So was it Brad's decision as to where they went?
> A. I don't recall. I don't recall.

Hurricane Katrina entered the Gulf on August 25, 2005. On Friday (5:00 a.m.), August 26, 2005, The National Hurricane Center included New Orleans in the potential three day track area of Hurricane Katrina. At 11:00 a.m., Friday, August 26, 2005, The National Hurricane Center again included New Orleans in the potential three day track area of Hurricane Katrina.[3] On Friday, August 26, 2005 Zito Fleeting, Inc. delivered the barges, ING 4727 and 4745 to the Lafarge France Road facility.[4]  Both barges were loaded with cement.

Upon delivery, the ING 4727 was moored to the dock.  ING 4745 was moored abreast and outboard of ING 4727, by means of lines from ING 4745 to the dockside ING 4727. Shortly after delivery at about noon on August 26, 2005, Lafarge commenced unloading the dockside ING 4727.  On that same day, August 26, 2005, at or near 4:30 p.m., Governor Kathleen Babineaux Blanco declared a State of Emergency (Proclamation 48 KBB 2005, **Plaintiffs' Exhibit 3**) which stated in part:

> "Hurricane Katrina poses an imminent threat, carrying severe storms, high winds and torrential rain that may cause flooding and damage to private property…and threaten the

---

[3] **Plaintiffs' Exhibit 2**, National Weather Service tracking maps.
[4] **Plaintiffs' Exhibit 8**, Zito Invoice.

> safety and security of the citizens of the State of Louisiana."
>
> and
>
> "Pursuant to the Louisiana Homeland Security and Emergency assistance Act, R.S. 29:721, *et seq.*, a state of emergency is declared to exist in the state of Louisiana as Hurricane Katrina poses an imminent Threat. Carrying severe storms, high winds, and torrential rains that may cause flooding and damage to private property and public facilities, and threaten the safety and security of the citizens of the State of Louisiana." (Exhibit 364).

National Hurricane Center advisories on August 26, 2005 predicted Katrina's potential track. NHC Advisories No. 13 (11:30 a.m., Friday, August 26, 2005 – New Orleans within potential strike zone); No. 14 (5:00 p.m., August 26, 2005 - landfall within 100 miles of New Orleans); and No. 15 (8:00 p.m., Friday August 26, 2005 – New Orleans in the path of Hurricane Katrina). At 11:00 p.m. on Friday, August 26, 2005, The National Hurricane Center predicted Hurricane Katrina to strike New Orleans.[5] Impact Weather advisories stated: <u>Advisory 13</u> (Friday 8:44 a.m./Aug. 26) Our confidence in land forecast is only fair; <u>Advisory 14</u> (Friday 2:32 p.m./Aug. 26) Storm surge could be 12-15 feet; <u>Advisory 15</u> (Friday 8:33 p.m./Aug. 26) "Models are now quite concentrated around the mouth of the MississippiRiver…winds could be 130-140 mph with surge of 12-15 feet.

At no pertinent times did Lafarge monitor weather data, US Coast Guard advisories, or advisories of local authorities, due to an ongoing construction project at the Lafarge France Road facility which affected communications. Lafarge Manager, Ed

---

[5] **Plaintiffs' Exhibit 2**, National Weather Service tracking maps.

Busch testified in deposition:[6]

> Q. So you had access to meteorological and weather reporting at the Industrial Canal facility on the 27th?
> A. No, sir.

Lafarge was advised that the hurricane was coming only by employees' relatives phoning the facility at about 9:00 a.m. on Saturday, August 27, 2005. Lafarge Manager, Ed Busch testified:

> A. It was at that time we started getting phone calls from the relatives or the families of the people that were at the plant and we were informed that the storm had changed directions, that the projected course was directly towards us.
> Q. So that at some time around 9 a.m. the families of some of your workers were calling to tell you that the hurricane was coming your way?
> A. Yes, sir.
> Q. That's the first notification you had?
> A. That's the first notification I had that morning.
> Q. And that was prior to any notification from anybody at Lafarge?
> A. There was no notification from anybody at Lafarge.[7]

> Q. So prior to the 27th, you received no meteorological information on your service?
> A. No, sir.
> Q. Did you report that to anybody in Lafarge?
> A. The terminal manager was aware of the situation. He's the one that instructed the contractors to remove the dish to install the new roof.[8]

> Q. It was out for at least a month before Hurricane Katrina?
> A. Yes, sir.[9]

---

[6] **Plaintiffs' Exhibit 4,** Deposition of Edward Busch, p. 105.
[7] **Plaintiffs' Exhibit 4,** Deposition of Edward Busch, p. 43.
[8] **Plaintiffs' Exhibit 4**, Deposition of Edward Busch, p. 106.
[9] **Plaintiffs' Exhibit 4**, Deposition of Edward Busch, p. 111.

Lafarge continued to unload the barge, ING 4727 finally completing unloading operations on Saturday, August, 27, 2005, at about 9:00 a.m. After unloading, the deck of the ING 4727 compared to the ING 4745 was about 8 feet higher.[10]

After unloading ING 4727, Lafarge Manager Ed Busch testified, he telephoned Zito Fleeting, Inc. to have the barge picked up. Busch claims to have left a voice mail message. Zito Fleeting, Inc. denies receiving any such call, denies voicemail capability exists such that Mr. Busch could have left a message, and has provided an automated telephone system log reflecting the absence of a call from Mr. Busch.[11] Zito issued email notification that the fleet would close, but Lafarge did not receive it due to the communication blackout at the Lafarge facility.[12] Mr. Boudreaux testified in trial that had Zito been notified of a desire to fleet ING 4727, this would have been possible.[13]

Ed Busch then called Joe Domino, Inc./Unique Towing to have the empty ING 4727 moved outboard of the ING 4745. Bush did not request any other services such as would increase the moorings affixed to ING 4727.

> Q. Did he ask you to ask you to do anything else other than turn the two barges around and secure the loaded barge to the dock?
> A. No.
> Q. Did he ask that additional lines be brought?
> A. No.
> Q. Did he ask that any rigging be left aboard?
> A. No.
> Q. Did he ask that anything be done with respect to the lines between the two barges?

---

[10] **Plaintiffs' Exhibit 9**, the deposition of Earl Smith, pp. 16, et seq. provides an informative narration of these and other salient events concerning the events of Saturday, August 27, 2005.
[11] **Zito Motion for Summary Judgment Exhibits B** (Deposition of Barry Boudreaux), **M** (Discovery responses of Lafarge North America), **N** (Nextel invoice of calls by Ed Busch), **O** (Daily Calling Log of Zito) to Zito's Motion for Summary Judgment;
[12] **Zito Motion for Summary Judgment Exhibit D**, Deposition of Ed Busch.
[13] **Barge Plaintiffs' Exhibit 6,** EDLA Civil Action 05-4419 Record Doc. 788, Trial Transcript of testimony by Barry Boudreaux, p. 26, lines 9 – 15

> A. No.[14]
>
> Q. And what instruction did he give you about Lafarge?
> A. They told me to go to Lafarge
> Q. They had a loaded barge and an empty barge on the dock. He wanted me to turn the two barges and put the loaded back on the dock.
>
> Q. Now, did he ask you to bring any additional lines?
> A. No, sir.
> Q. Did he ask you to do anything with respect to the lines between the two barges?
> A. No, sir.[15]

By early afternoon on Saturday, August 27, 2009, all Lafarge personnel abandoned the France Road Facility.[16] On Saturday, August 27, 2005 at approximately 2:25 p.m., The REGINA H arrived at the Lafarge France Road facility. Nobody was present at the facility when the REGINA H arrived.[17] The REGINA H topped the barges around by pulling the ING 4727 and 4745 away from the dock as a package (moored together). The Captain then turned the package 180 degrees and replaced the two (2) vessels in their original berth with the loaded ING 4745 now moored to the dock, and the empty ING 4727 moored outboard of and only to the 4745, using only two one-part 2-inch polypropylene lines, and a single one-part 1.5 inch polypropylene line.

> Q. I want to show you your deposition. We're on page 44, line 14. I'm just going to ask you to read the question at line 14 and the answer which follows beginning on line 16.
> A. 14?

---

[14] **Plaintiffs' Exhibit 10**, EDLA C.A. No. 05-1149, Record Doc. 698, p. 11, line 22 – p. 13, line 5; trial testimony of David Scott Castaing

[15] **Plaintiffs' Exhibit 11**, EDLA C.A. No. 05-1149, Record Doc. 699, p. 10, lines 20-24, p. 11, lines 5 - 9; trial testimony of Raymond Grabert.

[16] **Plaintiffs' Exhibit 9**, deposition of Earl Smith.

[17] **Plaintiffs' Exhibit 11**, EDLA C.A. No. 05-4419, Record Doc. 699, p. 12, lines 5-6, testimony of Raymond Grabert.

> Q. Yeah. Here's the question and this is the answer.
> A. It says:
>> "Q. And would you put four parts between two barges?
>> "A. Common sense, most of the time, in all fleets anywhere, you just don't put loads and empties together. That's why, because it's too hard to put parts between them.[18]

Zito never arrived to retrieve the barge. No one knows whether Ed Busch actually called Zito or not, whether he called a wrong number or not, whether Zito's system actually does go to voicemail or not, nor whether Zito know that the barge was released for pickup, because there is nothing but Zito's and Lafarge's directly conflicting account of the salient events.

Because ING 4727 was left at Lafarge, it broke free of its moorings and went adrift in the IHNC. During Katrina, the barge collided in two locations with the eastern Industrial Canal floodwall, causing two breaches and billions of Dollars in damage to persons and property between the IHNC and Paris Road. How this occurred is explained in great detail in the Barge Plaintiffs' Opposition to Lafarge's Motion for Summary Judgment, incorporated and adopted herein by reference.

## LAW

Summary judgment is not only an instrument of "just, speedy and inexpensive" resolution, but also a "lethal weapon" capable of "overkill." *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123 (5th Cir. 1978) (*quoting Albatross Shipping Corp. v. Stewart*, 326 F.2d 208, 211 (5th Cir. 1964); *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967)). As such, summary judgment should only be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

---

[18] **Plaintiffs' Exhibit 12**, EDLA C.A. No. 05-1149, Record Doc. 701, p. 13, line 23 – p. 14, line 8; trial testimony of REGINA H Deckhand Eric Thigpen.

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"The movant has the burden of showing that there is no genuine issue of [material] fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex Corp., supra,* at 325. "The party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly carried its burden." *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982). However, if the moving party satisfies its burden, "the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial." *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id*.; (quoting *Anderson, supra,* at 248). An issue is "genuine" if it is real and substantial, as opposed to merely formal, pretended, or a sham. *Id.*

"A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *Anderson, supra, at* 248. However, the "court's role at the summary judgment stage is not to weigh the evidence or determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial." *Pylant v. Hartford Life & Accident Ins. Co.*, 497 F.3d 536, 538 (5th Cir. 2007); *Anderson, supra,* at 249. If the record presents factual issues, the court must not decide them, it must deny the motion and proceed to trial. *Environmental Defense Fund*

*v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981). "The issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Pylant, supra,* at 538 (*citing First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S. Ct. 1575; 20 L. Ed. 2d 569 (1968)).

In deciding whether a fact issue has been created, the court must view the facts, evidence, and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000); *LeMaire v. Louisiana*, 480 F.3d 383, 387 (5th Cir. 2007). "In reviewing the evidence, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion." *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991). "Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts." *Martin v. John W. Stone Oil Distributor, Inc.*, 819 F.2d 547, 549 (5th Cir. 1987). "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Id*. "Indeed, even if the moving party comes forward with an abundance of evidence supporting its theory of the case, the nonmoving party may nevertheless defeat the motion by countering with evidence of its own, which, if credited by the fact-finder,

would entitle the nonmoving party to a verdict in its favor." *International Shortstop, Inc., supra,* at 1264.

## ARGUMENT

In its favor, Zito cites a telephone system that admits no callers to voicemail without first reaching a live person, an automated telephone system log from which no one has identified a call from Ed Busch, and a Nextel invoice that fails to prove that Busch used his phone to call Zito's main telephone number. Lafarge cites countervailing proof in the form of Ed Busch's testimony that he phoned Zito, Jennifer Arnold's testimony that Ed Busch told her on August 28, 2005, as he was about to leave the facility, that he had called to have the barge picked up, though she does not specifically recall him identifying Zito as the recipient of that call,[19] and Earl Smith's testimony that Ed Busch told him that he called to release the barge.[20]

Which, if any, of the foregoing is true requires the trier of fact to evaluate the credibility of the witnesses, weigh the evidence, and resolve factual disputes. The point need not be belabored that the Court may not undertake such deliberations upon a motion for summary judgment, so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor. *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991). Whether Zito is liable to the Barge Plaintiffs depends upon who is to be believed, Zito or Ed Busch. Summary judgment must be denied.

---

[19] **Plaintiffs' Exhibit 5,** deposition of Jennifer Arnold, pp. 32 – 33.
[20] **Plaintiffs' Exhibit 9**, deposition of Earl Smith, pp. 108 – 109.

## CONCLUSION

The Barge Plaintiffs and Court are caught in the crossfire of contrary assertions by Zito and Lafarge as to whether Ed Busch called Zito to have ING 4727 removed from the Lafarge facility. The ultimate trier of fact must decide who is truthful and whose proof is more compelling in order to resolve the factual dispute. Only then can Zito's liability to the Barge Plaintiffs be determined.

November 1, 2009.

                      Respectfully submitted,

                      **s/Brian A. Gilbert** (21297)
                      Law Office Of Brian A. Gilbert, P.L.C.
                      821 Baronne Street
                      New Orleans, Louisiana 70113
                      Telephone: (504) 885-7700
                      Telephone: (504) 581-6180
                      Facsimile: (504) 581-4336
                      e-mail: bgilbert@briangilbertlaw.com

                      Shawn Khorrami (CA SBN #14011)
                      Dylan Pollard (CA SBN # 180306)
                      Matt C. Bailey (CA SBN #218685)
                      Khorrami, Pollard & Abir, LLP
                      444 S. Flower Street, 33rd Floor
                      Los Angeles, California 90071
                      Telephone: (213) 596-6000
                      Facsimilie: (213) 596-6010
                      e-mail: Skhorrami@kpalawyers.com;
                              Dpollard@kpalawyers.com;
                              Mbailey@kpalawyers.com

                      Lawrence D. Wiedemann.(13457)
                      Karl Wiedemann (18502)
                      Karen Wiedemann (21151)
                      Wiedemann & Wiedemann

821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 581-6180
Facsimile: (504) 581-4336
e-mail: lawrence@wiedemannlaw.com;
karl@wiedemannlaw.com;
karen@wiedemannlaw.com

Patrick J. Sanders (18741)
3316 Ridgelake Drive
Suite 100
Metairie, LA 70002
Telephone: 504-834-0646
e-mail: pistols42@aol.com

Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C. 20036-4129
Voice: 202-862-4320
Cell: 202-549-1454
Facsimile: 800-805-1065 and 202-828-4130
e-mail: rick@rickseymourlaw.net

Lawrence A. Wilson (N.Y.S.B.A. #2487908)
David W. Drucker (N.Y.S.B.A. #1981562)
Wilson, Grochow, Druker & Nolet
Woolworth Building
233 Broadway, 5th Floor
New York, NY 10279-0003
Telephone: (212) 608-4400
Facsimile: (212) 227-5159
e-mail: lwilson@wgdnlaw1.com;
ddruker@wgdnlaw1.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing document has been served upon counsel of record, by United States Mail, postage prepaid and properly addressed, facsimile, and/or ECF upload, this 2d day of November, 2009.

\s\Brian A. Gilbert