EDWARD BUSCH                                                                    MINIDEP by Kenson

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE      *   CIVIL ACTION
COMPLAINT OF INGRAM       *
BARGE COMPANY, AS OWNER   *   NO. 05-4419
OF THE ING4727,           *      C/W 05-4237
PETITIONING FOR           *      C/W 05-5531
EXONERATION FROM OR       *      C/W 05-5724
LIMITATION OF LIABILITY   *   SECTION "C" (2)
                          *
*  JUDGE HELEN G.         *
                          *   BERRIGAN
                          *
                          *   MAG. JUDGE, JOSEPH
                          *   WILKENSON, JR.
                          *

* * * * * * * * * * * * * * *

Deposition of Edward Busch taken at the
law offices of Chaffe McCall, located at 1100
Poydras Street, Suite 2300, New Orleans,
Louisiana 70163, beginning on the 14th day of
November, 2006.

Reported by:
Peter Caruso, CCR-CVR
Certified Court Reporter

---

APPEARANCES:

Representing the Plaintiffs,
   Ethel Mumford, et al:

   WIEDEMANN & WIEDEMANN
   Attorneys at Law
   By: Lawrence D. Wiedemann, Esq.
   821 Baronne Street
   New Orleans, Louisiana 70113

   LAW OFFICE OF BRIAN A. GILBERT
   Attorneys at Law
   By: Brian A. Gilbert, Esq.
   3232 Edenborn Avenue
   Metairie, Louisiana 70002

   MR. PATRICK J. SANDERS, ESQ.
   Attorney at Law
   3316 Ridgelake Drive
   Metairie, Louisiana 70002

Representing the Plaintiffs,
   The Parfait Family, et al:

   LAW OFFICES OF ASHTON R. O'DWYER, JR.
   Attorneys at Law
   By: Ashton R. O'Dwyer, Jr., Esq.
   365 Canal Street
   Suite 2670
   New Orleans, Louisiana 70130

Representing the Plaintiffs:

---

Representing the Plaintiffs,
   Marie Benoit, et al:

   MAPLES & KIRWAN, LLC
   Attorneys at Law
   By: Carlos Zelaya, II, Esq.
   902 Julia Street
   New Orleans, Louisiana 70113

Representing Joseph C. Domino, Inc.
   and Unique Towing, Inc.:

   EMMETT, COBB, WAITS & HENNING
   Attorneys at Law
   By: John F. Emmett, Esq.
   1515 Poydras Street
   Suite 1950
   New Orleans, Louisiana 70112

Representing Joseph C. Domino, Inc.:

   HARRIS & RUFTY, L.L.C.
   Attorneys at Law
   By: Jill Willhoft, Esq.
   650 Poydras Street
   Suite 2710
   New Orleans, Louisiana 70130

Representing Lafarge North America, Inc.:

   CHAFFE, McCALL, L.L.P.
   Attorneys at Law
   By: Robert B. Fisher, Jr., Esq.
      Derek Walker, Esq.
      Thomas Forbes, Esq.

---

Representing New York Marine and
General Insurance Company:

   SUTTERFIELD & WEBB, L.L.C.
   Attorneys at Law
   By: Daniel A. Webb, Esq.
   650 Poydras Street
   Suite 2715
   New Orleans, Louisiana 70130

Representing American Owners Mutual
   Protection and Indemnity Association:

   MONTGOMERY, BARNETT, BROWN & READ,
   HAMMOND & MINTZ
   Attorneys at Law
   By: Philip S. Brooks, Jr., Esq.
   1100 Poydras Street
   New Orleans, Louisiana 70163

Representing Board of Commissioners,
   Port of New Orleans:

   DAIGLE, FISSE & KESSENICH
   Attorneys at Law
   By: Jonathan H. Sandoz, Esq.
   P. O. Box 5350
   Covington, Louisiana 70434-5350

Representing Lafarge North America, Inc.:

   GOODWIN PROCTOR, LLP
   Attorneys at Law
   By: Mark Raffman, Esq.
   901 New York Avenue

EDWARD BUSCH

MINIDEP by Kenson

## EXAMINATION INDEX

Caption. . . . . . . . . . . . . . . . . . . . . . . .1

Appearances. . . . . . . . . . . . . . . . . . .2,3,4

Stipulation. . . . . . . . . . . . . . . . . . . . .6

Examination:

    By Mr. Wiedemann . . . . . . . . . . . . . . . . .7

Reporter's Page. . . . . . . . . . . . . . . . . . .118

Certificate. . . . . . . . . . . . . . . . . . . . .119

Witness' Certificate . . . . . . . . . . . . . . . .120

Corrections/Changes Page . . . . . . . . . . . . . .121

- 5 -

S T I P U L A T I O N

It is stipulated and agreed to, by and
between counsel, that the perpetuation deposition
of Edward Busch, is hereby taken, pursuant to
Notice, for all purposes, under the rules of the
Louisiana Code of Civil Procedure;

    That the parties hereto waive all formalities
in connection with the taking of this deposition,
except that of reading and signing; and

    That all objections, except those as to the
form of the question and/or the responsiveness of
the answer, are reserved until the time of the
trial of this case.

* * * * *

    Peter Caruso, Certified Court Reporter,
officiated in administering the oath to the
herein witness.

- 6 -

**EDWARD BUSCH**  MiniDep by Kenson

| | |
|---|---|

1     Edward Busch, after having been
2 first duly sworn by the reporter to tell the
3 truth, the whole truth, and nothing but the
4 truth, was examined and testified as follows:
5     MR. WALKER:
6        Derek Walker will be defending this
7     deposition, representing Lafarge and Mr.
8     Busch.
9     MR. WIEDEMANN:
10       Make the usual stipulation?
11     MR. WALKER:
12       Yes.
13     MR. WIEDEMANN:
14       And you want to reserve the right to
15     read and sign?
16     MR. WALKER:
17       Yes, sir.
18     E X A M I N A T I O N
19 BY MR. WIEDEMANN:
20   Q. Would you state your full name, please,
21 sir?
22   A. Edward L. Busch, B-u-s-c-h.
23   Q. And where do you live, Mr. Busch?
24   A. 409 Magnolia Lane, Slidell, Louisiana.
25   Q. What's the ZIP?

- 7 -

1 MR. WIEDEMANN:
2     Off the record.
3     (Discussion off the record.)
4 BY MR. WIEDEMANN:
5   Q. American Sugar. And what do you do at
6 American Sugar?
7   A. I'm a planner coordinator for the
8 maintenance department.
9   Q. Planner coordinator. And how long have
10 you been with American Sugar?
11   A. Roughly, five months.
12   Q. And your previous employer was Lafarge?
13   A. Yes, sir.
14   Q. And how long were you with Lafarge?
15   A. Roughly, four years.
16   Q. And your job at Lafarge when you left was
17 what?
18   A. Assistant Terminal Manager. They call it
19 a TOA.
20   Q. And how long did you work for them, for
21 four years?
22   A. Yes, sir.
23   Q. And why did you leave Lafarge?
24   A. Better opportunity.
25   Q. And you left them when, after the

- 9 -

1   A. 70461.
2   Q. 61?
3   A. Yes, sir.
4   Q. And how old are you, sir?
5   A. 54.
6   Q. And what is your educational background?
7   A. High school and a small amount of
8 college.
9   Q. Where did you go to high school?
10   A. Baltimore.
11   Q. Baltimore. And what college did you go
12 to?
13   A. There was a community college, Dundalk
14 Community College.
15   Q. And that's in Baltimore?
16   A. Yes, sir.
17   Q. And are you married, sir?
18   A. Yes, sir.
19   Q. Children?
20   A. Yes.
21   Q. How many?
22   A. Three.
23   Q. And by whom are you presently employed?
24   A. Domino Sugar, American Sugar.
25   Q. American Sugar.

- 8 -

1 hurricane?
2   A. About five months ago, yes, sir.
3   Q. You were with Lafarge at the time of
4 Hurricane Katrina?
5   A. Yes, sir.
6   Q. And you were then the assistant terminal
7 manager?
8   A. Yes, sir.
9   Q. And the terminal manager was whom?
10   A. Dennis Millon.
11   Q. How do you spell his last name?
12   A. M-i-l-l-o-n.
13   Q. Is he still with the company?
14   A. I have no idea, sir.
15   Q. And you live in Slidell?
16   A. Uh-huh (affirmative response).
17   Q. Prior to Hurricane Katrina, you were at
18 the -- the terminal manager at the Lafarge plant
19 on the Industrial Canal?
20   A. Assistant terminal manager.
21   Q. Assistant terminal manager?
22   A. Yes, sir.
23   Q. Is that where you worked on a day-by-day
24 basis?
25   A. Yes, sir.

- 10 -

EDWARD BUSCH                                    MINIDEP by Kenson

1      Q.  And for the four years you were there,
2  you were always the terminal manager or -- the
3  assistant terminal manager, or did you start off
4  with a different position?
5      A.  I was hired as the assistant terminal
6  manager.
7      Q.  Tell me, as the assistant terminal
8  manager what means of contact do you have with
9  the other Lafarge offices and facilities?  Do you
10  have e-mail, faxes?  How do you communicate back
11  and forth?
12      A.  When it's necessary to communicate with
13  those folks, we communicate by phone, by e-mail
14  and by fax.
15      Q.  So you have faxing and e-mailing
16  capacity?
17      A.  We did before the storm.
18      Q.  Up until Katrina you had that facility?
19      A.  Yes.
20      Q.  And you had telephone?
21      A.  They were working on the telephones and
22  the computer lines, the IT lines in the plant
23  prior to the storm.  So the computers were down
24  and telephone was sketchy, at best.  It was in
25  and out.

- 11 -

1      Q.  Before the hurricane?
2      A.  Yes, sir.  We were in the process of --
3  we built a new office building and we were in
4  the process of moving when the storm came.
5      Q.  But how long before Hurricane Katrina
6  were you having problems with faxing, e-mailing
7  and telephone?
8      MR. WALKER:
9          Objection.  That wasn't his
10          testimony.
11  BY MR. WIEDEMANN:
12      Q.  You can answer.  Well, let me go back,
13  because maybe I didn't hear you correctly.
14          Was the e-mail working before the
15  hurricane?
16      A.  Just prior to the hurricane, no, sir.
17      Q.  How long before the hurricane?  How many
18  days?
19      A.  It probably -- I couldn't give you a
20  specific time, but we were experiencing
21  communications problems for, for a long period of
22  time.
23      Q.  Was the e-mail non-functional for some
24  period of time?
25      A.  Yes, sir.

- 12 -

1      Q.  And was it a week or two weeks, or give
2  me some parameters?
3      A.  It was probably at least a week.
4      Q.  So for at least a week before Hurricane
5  Katrina you didn't have e-mail service, or
6  reliable --
7      A.  Reliable --
8      Q.  -- service?
9      A.  -- e-mail service.
10      Q.  Was that true also for your faxing
11  capacity?
12      A.  For the most part, yes, sir.
13      Q.  Same period of time?
14      A.  Yes.
15      Q.  And what about your telephone service?
16      A.  Well, that was in and out.  That was
17  another one undependable.
18      Q.  So for the same period of time basically
19  your telephone, faxing, e-mail service was
20  unreliable?
21      A.  Yes, sir.
22      Q.  And your telephone service, was that from
23  a land line, or did you have cell phone
24  capability?
25      A.  We had land lines and cell phones.

- 13 -

1      Q.  But the land line was not working
2  correctly?
3      A.  Correct.
4      Q.  The cell phones, did you have two-way
5  communication, I mean that you could talk back
6  and forth?  I mean, two-way radio facility?
7      A.  Yes, sir.
8      Q.  And that two-way radio facility was
9  through what service?
10      A.  Nextel, I believe it was.
11      Q.  So could you have two-way radio service
12  with various Lafarge offices?
13      A.  No, sir.  Our use of the Nextel phones
14  was primarily for the in-house contacting the
15  employees and each other.
16      Q.  So the Nextel service, although it was
17  operable, was only limited to in-house use?
18      A.  It wasn't limited.  It's just the way we
19  were using it.
20      Q.  So you wouldn't use it to call, let's
21  say, Joppa?
22      A.  Not necessarily, no.
23      Q.  Hm?
24      A.  Not necessarily, no.
25      Q.  Could you call Joppa?

- 14 -

EDWARD BUSCH

## Page 15

1    A.  We could have, yes.
2    Q.  Could you call Reserve?
3    A.  You know --
4    Q.  Well, there's a Lafarge facility in
5  Union, is there not?
6    A.  Yes, sir.
7    Q.  Could you call Union?
8    A.  It was an operating telephone, you know.
9    Q.  Okay.
10   A.  We could have called anyone.
11   Q.  And it wasn't just that it was restricted
12  to in-house, that's what you used it for; is that
13  right?
14   A.  Yes, sir.
15   Q.  But you could use it to reach other
16  facilities?
17   A.  Yeah.
18   Q.  Hm?
19   A.  Yes, sir.
20   Q.  When did you first learn that there was
21  some hurricane preparation to be instituted?
22       MR. WALKER:
23          Object to the form.  By the way, Mr.
24       Busch, if there's a question that you
25       want Mr. Wiedemann to rephrase or repeat

## Page 16

1  or you don't understand, you can
2  certainly ask him to repeat it.
3       THE WITNESS:
4          Would you repeat the question,
5       please?
6  BY MR. WIEDEMANN:
7    Q.  Yes.  My question is:  Did you receive
8  instructions from someone in the Lafarge
9  hierarchy to take some action regarding the
10  impending hurricane, or was that done locally?
11       MR. WALKER:
12          Same objection.
13       THE WITNESS:
14          I don't understand what you're
15       asking me.
16  BY MR. WIEDEMANN:
17   Q.  Well, what I'm asking you is:  If I'm at
18  home, I'm the one responsible for determining
19  what I do relative to my house.  If I'm in the
20  service, somebody else determines what happens.
21  And usually in corporations there's a level of
22  superior people and inferior people.  I want to
23  know what happened to bring about any type of
24  consideration for the impending hurricane.
25       MR. WALKER:

## Page 17

1          Same objection.
2       THE WITNESS:
3          I did not receive any phone calls
4       from any superiors that morning.
5  BY MR. WIEDEMANN:
6    Q.  I'm not talking about that morning.  What
7  morning are you talking about?
8    A.  The Saturday morning.
9    Q.  Which is the 27th?
10   A.  If you say so, sir.
11   Q.  Did you have any communications with
12  management prior to the 27th?
13       MR. WALKER:
14          Objection as to any specific subject
15       matter.
16       MR. WIEDEMANN:
17          Well, I've been asking him about
18       Hurricane Katrina for the last ten
19       minutes, and I'm not talking about the
20       1902 hurricane or the 1905 hurricane.
21       MR. WALKER:
22          Well, it's actually really hard to
23       tell from your questions unfortunately.
24       So if you ask a specific question --
25       MR. WIEDEMANN:

## Page 18

1          Well, if you want me to
2       complete, every time I'm talking about
3       Hurricane Katrina.  Okay?
4       MR. WALKER:
5          Okay.
6       MR. WIEDEMANN:
7          Unless otherwise mentioned.
8       MR. WALKER:
9          Unless you understand the question,
10      don't answer it.
11  BY MR. WIEDEMANN:
12   Q.  Before the 27th, did you receive any
13  communication from anyone at Lafarge concerning
14  hurricane preparations?
15   A.  No, sir.
16   Q.  So as far as you knew nobody in the
17  Lafarge North America made any effort to
18  communicate with you or your local facility to
19  advise you about any precautions to be taken?
20       MR. WALKER:
21          Objection as to the form.  And you
22       can only answer as to what you know about
23       yourself.
24       THE WITNESS:
25          No one contacted me.

EDWARD BUSCH                                                    MINIDEP by Kenson

1  BY MR. WIEDEMANN:
2      Q.  Okay.  Well, did anyone contact the
3  terminal manager?
4      A.  I don't know what conversations he had
5  with anyone.
6      Q.  Well, is it your testimony that the
7  terminal manager, if he received communications
8  from Lafarge about doing something, he would not
9  tell you about it?
10         MR. WALKER:
11             Objection.  That's not his
12         testimony.
13         THE WITNESS:
14             I didn't communicate with the
15         terminal manager concerning the hurricane
16         prior to the hurricane.
17  BY MR. WIEDEMANN:
18      Q.  Okay.  So you had no communication with
19  Lafarge prior to the hurricane?
20      A.  No, sir.
21      Q.  You had no communication with your
22  general manager -- your terminal manager
23  concerning the hurricane at any time?
24      A.  No, sir.
25      Q.  Did you have any communication with the
                        - 19 -

1  people working under you concerning the
2  hurricane?
3      A.  Just discussions about the storm and the
4  general direction it was moving.
5      Q.  With whom?
6      A.  With the people at the plant, the people
7  that report to me.
8      Q.  Discussions about what?  Just about the
9  weather, as what was happening?
10      A.  Just about the weather and what was
11  happening.  Up until that time, the storm was
12  going to Florida.
13      Q.  So prior to the 27th, no discussion was
14  made between you and the terminal manager,
15  between you and Lafarge, and any other, any other
16  facility and no discussion was made between you
17  and your workers concerning hurricane
18  preparation?
19         MR. WALKER:
20             Objection.  That wasn't your prior
21         question, so       that's not his prior
22         testimony.
23         MR. WIEDEMANN:
24             I believe I can ask another
25         question.
                        - 20 -

1      MR. WALKER:
2          That's not what you did.  What you
3      constantly do is you recite a prior
4      answer --
5      MR. WIEDEMANN:
6          Read the question.
7      MR. WALKER:
8          -- and change it --
9      MR. WIEDEMANN:
10          Read the question back, please.
11      MR. WALKER:
12          -- in your next question.  You're
13      now asking about hurricane preparation.
14      MR. WIEDEMANN:
15          Your objection is to the form of the
16  question.
17          (There was a readback.)
18  BY MR. WIEDEMANN:
19      Q.  Mr. Busch, as I understand your
20  testimony, you had no discussion with anyone at
21  any Lafarge facility, including your general
22  manager - terminal manager.  You had no
23  discussion with your employees prior to the 27th
24  with regard to hurricane preparation.
25      A.  No.  I had a discussion with the
                        - 21 -

1  employees at the terminal.  But no one else.
2      Q.  What kind of discussion did you have
3  with the employees concerning hurricane
4  preparation prior to the 27th?
5      A.  It wasn't a discussion about hurricane
6  preparation.  It was a discussion about the
7  weather.  Straight up.  At that time the
8  hurricane was projected to go into the panhandle
9  of Florida like so many other ones have done.  So
10  there wasn't a mad rush at that time to make any
11  preparations for a direct hit.
12      Q.  When was your discussion with the
13  employees about the weather?
14         MR. WALKER:
15             Objection.  Asked and answered.
16  BY MR. WIEDEMANN:
17      Q.  You can answer it.
18      A.  Days prior to the actual storm as we saw
19         the weather
20  reports and the bits and pieces that was coming
21  around about the storm.  We had discussions.  But
22  like I say, they were just that, discussions.
23      Q.  Were there any discussions about
24  hurricane preparation at your facility?
25      A.  No, sir.
                        - 22 -

EDWARD BUSCH                                          MINIDEP by Kenson

**- 23 -**

```
 1      MR. WALKER:
 2          Are you still talking about prior to
 3 August 27th?
 4      MR. WIEDEMANN:
 5          I just asked him -
 6 BY MR. WIEDEMANN:
 7   Q. Whose responsibility was it to institute
 8 any hurricane protection that might be needed?
 9   A. In the absence of a plant manager,
10 myself.
11   Q. Well, let's start with the terminal
12 manager. Does he have a responsibility?
13   A. Sir, I work for him. He doesn't work for
14 me.
15   Q. Did the terminal manager have a
16 responsibility for hurricane preparation?
17   A. He was not at the terminal. So no he did
18 not.
19   Q. Where was he?
20   A. He was on vacation.
21   Q. When did he go on vacation?
22   A. The week before.
23   Q. So what day did he leave on vacation?
24   A. I have no idea what day he left. I just
25 know he was on vacation prior to the week of the
```

**- 24 -**

```
 1 storm.
 2   Q. So he was gone for a week before Saturday
 3 the 27th?
 4   A. No. He was gone at least three days
 5 before then.
 6   Q. And where did he go?
 7   A. I don't know.
 8   Q. Did he leave because of the storm?
 9   A. No, sir.
10   Q. He went on a vacation, but you don't know
11 where he went?
12   A. I just --
13      MR. WALKER:
14          Objection. Asked and answered.
15 BY MR. WIEDEMANN:
16   Q. You can answer it.
17   A. I didn't discuss his vacation plans with
18 him, no, sir.
19   Q. Did you know how to reach him?
20   A. The only way I could was with the Nextel
21 phone and I never was able to get a hold of him.
22   Q. You tried to reach him?
23   A. With the radio, yes, sir.
24   Q. With the Nextel radio?
25   A. Yes, sir.
```

**- 25 -**

```
 1   Q. And you couldn't reach him?
 2   A. Uh-uh (negative response).
 3   Q. What did you attempt to reach him about?
 4   A. Different issues with the -- at the
 5 plant.
 6   Q. Like what?
 7   A. The communications equipment, having a
 8 contractor come in on Saturday, things of that
 9 sort.
10   Q. Anything else you talked to him about on
11 the two-way radio?
12   A. I never --
13      MR. WALKER:
14          Objection.
15 BY MR. WIEDEMANN:
16   Q. Hm?
17      MR. WALKER:
18          Mis-characterizes his testimony.
19 BY MR. WIEDEMANN:
20   Q. You can answer it.
21   A. I never talked to him.
22   Q. Oh, you could never get him on the phone?
23   A. No.
24   Q. So you wanted to talk to him about the
25 communication problem?
```

**- 26 -**

```
 1      MR. WALKER:
 2          Objection. Asked and answered.
 3 BY MR. WIEDEMANN:
 4   Q. You can answer it.
 5   A. I wanted to talk to him about several
 6 issues at the plant, and that being one of them,
 7 yes.
 8   Q. Well, you mentioned the communication
 9 problem. What other problems did you want to
10 talk to him about?
11   A. The day-to-day operation of the terminal,
12 of barges, you know, schedules, different things
13 that if he's available we discuss, if he's not
14 available, I take care of it.
15   Q. So you wanted to talk to him about
16 schedules of employees or --
17   A. Yes, sir.
18   Q. Were you having a problem with scheduling
19 employees?
20   A. No, sir. Just --
21   Q. But in any event, you were not able to
22 get him on the phone during the three-day period
23 preceding the 27th when he was on vacation?
24   A. Correct.
25   Q. Did you call anybody else to say, I can't
```

EDWARD BUSCH                                                  MiniDep by Kenson

1  reach the terminal manager to ask him about this
2  communication problem and employee problem? Did
3  you call anybody else?
4      A. No, sir. I had no employee problem
5  issues.
6      Q. Is there someone else -- well, let me go
7  back. Who does the terminal manager report to?
8      A. I believe the man's name is A.J. Guthrie.
9      Q. And -- A.J. Duffy?
10     A. Guthrie.
11     Q. Guthrie. Oh, yeah, I know. And Mr.
12 Guthrie is where?
13     A. I think he's based in Kansas.
14     Q. So Mr. Guthrie would be one that if the
15 terminal manager was there, he would talk to if
16 he had a problem?
17     A. I don't know who the terminal manager
18 would talk to, sir. That wasn't --
19     Q. Well, since he was gone you were the
20 terminal manager, were you not, you were the
21 person in charge?
22     A. Yes, sir.
23     Q. And so you don't know who you would call
24 for information --
25     A. If I had to get in touch with somebody at

                        - 27 -

1  the terminal, yes, sir, or somebody higher than
2  the plant manager, Mr. Guthrie would be the
3  person I would have contacted.
4      Q. And when you -- without communication
5  ability or compromised communication ability and
6  you couldn't reach the terminal manager, did you
7  call Mr. Guthrie to say, you know, We got a
8  hurricane coming and I don't have any -- I don't
9  have any reliable communication ability, did you
10 call him about that?
11     A. No, sir.
12     Q. Why not?
13     A. I didn't feel there was anything he could
14 do for me where he was.
15     Q. Well, why did you call Mr. Guthrie when
16 he was out on vacation and talk to him about -- I
17 mean, the terminal manager, why did you call him?
18 He was out on vacation.
19     A. Professional courtesy.
20     Q. Just to let him know you were having a
21 problem?
22        MR. WALKER:
23            Objection. Mis-characterizes his
24        testimony.
25 BY MR. WIEDEMANN:

                        - 28 -

1      Q. Hm?
2      A. I never said I was having a problem.
3      Q. Oh. All right. The faxing and e-mail
4  and telephone difficulties were precipitated by
5  construction that was going on?
6      A. Yes, sir.
7      Q. Because you were building a new what?
8      A. Office building.
9      Q. And did you call anybody in charge of the
10 job about this problem?
11     A. That's why I was going there on Saturday
12 morning, was to meet the contractor who was
13 installing that stuff.
14     Q. So the reason that you were going in on
15 the 27th, on the morning of the 27th, was to meet
16 with the contractor?
17     A. Yes, sir.
18     Q. Had you talked to him about it before?
19     A. Yes, sir.
20     Q. But you never reported it to anyone in
21 the Lafarge --anyone at Lafarge other than the
22 contractor?
23        MR. WALKER:
24            Objection. Mis-characterizes his
25        testimony.

                        - 29 -

1 BY MR. WIEDEMANN:
2      Q. Is that correct?
3      A. I didn't call the contractor to report a
4  problem. The contractor was working on putting,
5  installing a new communication system in the new
6  office building, and because of the phone traffic
7  that comes in and out during the course of a
8  weekday, the best time to make any connections or
9  try to make any connections in the building would
10 have been on the weekend.
11     Q. So I understand it, the only one who knew
12 about this problem was you as the temporary
13 terminal manager; is that correct?
14     A. No, sir, it's not correct.
15     Q. Who knew about it?
16     A. The terminal manager knew that we were
17 having problems with the phones.
18     Q. He knew that before he left?
19     A. Yes, sir.
20     Q. And he left without solving that problem?
21     A. That's why the contractors were there.
22     Q. Who else knew about it?
23     A. I know he knew and I knew, and who he
24 told about the problem, I wasn't privy to any of
25 the conversations he had.

                        - 30 -

**Peter Caruso & Associates (504) 432-3656**
P.O. Box 10741, Jefferson, Louisiana 70181

EDWARD BUSCH                                              MiniDep by Kenson

1    Q. But you never told anyone besides the
2  contractor?
3         MR. WALKER:
4             Asked and answered. Objection.
5         THE WITNESS:
6             I don't understand. I didn't tell
7         the contractor we had a problem. The
8         contractor was there to finish up the new
9         construction to get that problem
10        straightened out.
11 BY MR. WIEDEMANN:
12   Q. My question, Mr. Busch, is, you never
13 told -- you couldn't get the terminal manager to
14 talk to him about it, you called the contractor,
15 did you talk to anybody else about the problem at
16 Lafarge?
17   A. I don't --
18        MR. WALKER:
19            Objection. Mis-characterizes his
20        testimony. It's been asked and answered.
21
22 BY MR. WIEDEMANN:
23   Q. What was your answer?
24   A. No, sir.
25   Q. Was the construction at a different

                    - 31 -

1  building than the one you previously occupied?
2    A. Yes, sir.
3    Q. And how come the facility was not -- the
4  communication facility was not working at the old
5  building?
6    A. Because the construction had gotten to
7  the point where the communication systems were
8  being moved and all of this came about when the
9  storm came in. We were moving into the building
10 Thursday and Friday and it went under water
11 Monday.
12   Q. So you were going on the morning of the
13 27th to the Lafarge facility to meet with the
14 contractor?
15   A. Yes, sir.
16   Q. And who was that?
17   A. I don't remember his name. They -- there
18 was several contractors in there, and I don't
19 remember who the contractor was.
20   Q. You don't remember the man you met with?
21   A. No, sir, I didn't -- I don't.
22   Q. Well, now, when you went in on the
23 morning of the 27th, what time did you go in?
24   A. I arrived at the plant approximately 7
25 a.m.

                    - 32 -

1    Q. Was this your normal work time?
2    A. No, sir.
3    Q. Huh?
4    A. No, sir.
5    Q. So you went in specifically to meet with
6  the contractor?
7    A. Yes, sir.
8    Q. And when you got in at 7 a.m., you met
9  with the contractor?
10   A. Yes, sir.
11   Q. Did you meet with anybody else?
12   A. Later on that day the employees at the
13 dock.
14   Q. On the morning of the 27th, did you not
15 call Ingram to pick up their empty barge, 41 --
16 4724 -- 4727, I'm sorry?
17        MR. WALKER:
18            Object to the form.
19        MR. HAYCRAFT:
20            Object. Lack of foundation.
21 BY MR. WIEDEMANN:
22   Q. You can answer it.
23   A. The morning of the 27th I did call Ingram
24 to have them pick up the ING-4727.
25   Q. And what time did you call them?

                    - 33 -

1    A. Approximately nine o'clock.
2    Q. And why did you call them at 9 a.m. on
3  the 27th?
4    A. Because the barge was finished and that
5  was normal operating procedures to release the
6  barge.
7    Q. Was it customary for you as the assistant
8  terminal manager to release the barges?
9    A. Yes, sir.
10   Q. And when a barge is empty, you release it
11 to the carrier?
12   A. Release it to the fleeting service that
13 brought the barge in, and Zito happened to be the
14 one that brought that barge, that particularly
15 barge in.
16   Q. And had you had experience previously
17 with Ingram barges?
18   A. Yes, sir.
19   Q. Your company had a contract with Ingram?
20   A. I suppose they did, sir.
21   Q. Well, were there Ingram barges coming in
22 and out of the Lafarge facility?
23   A. Yes, sir.
24   Q. On a regular basis?
25   A. Yes, sir.

                    - 34 -

EDWARD BUSCH                                          MINIDEP by Kenson

1    Q.  And your company, that is Lafarge, did
2  not have vessel facility to take barges in or out
3  of the facility, isn't that so?
4    A.  I don't know what you're --
5    Q.  You did not -- Lafarge at the Industrial
6  Canal did not own vessels that would take barges
7  in and out of the facility?
8    A.  No, sir.
9    Q.  You depended on the companies that were
10  bringing in cement to arrange to pick up their
11  barges when they were available?
12    MR. WALKER:
13      Object --
14    THE WITNESS:
15      Yes.
16    MR. WALKER:
17      -- to the form.
18  BY MR. WIEDEMANN:
19    Q.  And you would -- would it be you that
20  would call all the time when a barge was ready?
21    A.  No, sir.
22    Q.  Because Mr. Smith testified earlier today
23  that he called sometimes?
24    A.  Yes, sir.
25    Q.  And that there was a list of numbers in a
                      - 35 -

1  cab of -- I forget the piece of equipment that
2  had who you were to call from the various
3  companies?
4    A.  Yes, sir.
5    Q.  And you would call Zito?  Is that who you
6  called?
7    A.  For that particular barge, yes, sir.
8    Q.  Did you always call Zito, or did you
9  sometimes call Ingram directly?
10    A.  No.  If Zito brought the barges in, we
11  called Zito.
12    Q.  And how did you know you were to call
13  Zito to pick up Ingram barges?
14    A.  Because Zito brought the barge in.
15    Q.  And when you called Zito at 9 a.m. on the
16  morning of the 27th, who did you speak to?
17    A.  I didn't speak to anyone.  I got an
18  answering machine.
19    Q.  And was that something that was
20  frequently done, you got the answering machine?
21    MR. WALKER:
22      You can answer.
23    THE WITNESS:
24      Not frequently, but from time to
25      time we would get an answering machine
                      - 36 -

1  with all the fleets if they went out to
2  lunch or had to go to the bathroom or
3  whatever.
4  BY MR. WIEDEMANN:
5    Q.  So it was not unusual for you to leave a
6  message on the answering machine?
7    MR. WALKER:
8      Objection.  Mis-characterizes his
9      testimony.
10    MR. O'DWYER:
11      On behalf of my clients, I'm calling
12      for production of whatever written record
13      exists of the phone call having been made
14      reflecting the time of call, the duration
15      of the call, and the number to which the
16      call was placed.
17  BY MR. WIEDEMANN:
18    Q.  It was -- I don't know whether you
19  answered my question or not, but is it -- was it
20  not -- it was not unusual that you would call a
21  company like Zito and leave a message for them to
22  pick up a barge?
23    MR. WALKER:
24      Objection.  Mis-characterizes his
25      testimony.
                      - 37 -

1  BY MR. WIEDEMANN:
2    Q.  You can answer it.
3    A.  From time to time we did get the
4  answering machines, and it was just a fact of
5  life, and it wasn't surprising with what else was
6  going on with the weather.
7    Q.  What message did you leave with Zito?
8    A.  I gave him the time, the date, and the
9  number of the barge and told him it was -- had
10  finished, you know, this is the time the barge
11  finished, and it's released and ready to be
12  picked up.
13    Q.  Did you expect them to pick it up after
14  you left a message?
15    MR. WALKER:
16      Objection.
17    THE WITNESS:
18      Yes.
19  BY MR. WIEDEMANN:
20    Q.  Did you expect them to pick it up before
21  the storm arrived?
22    MR. WALKER:
23      Same objection.
24    THE WITNESS:
25      No.
                      - 38 -

EDWARD BUSCH                                        MINIDEP by Kenson

1  BY MR. WIEDEMANN:
2     Q.  Why were you calling them on the 27th?
3     A.  To release the barge as we do.
4     Q.  Well, you just said you knew about the
5  weather conditions.  What did you expect to
6  happen?
7     A.  I expected to release the barge, and I
8  didn't expect anyone to pick it up.
9     Q.  You called them and you didn't expect
10 them to pick it up?
11    A.  No, sir.
12    Q.  What did you expect to happen when you
13 left the message?
14    A.  I didn't expect them to pick it up right
15 away.  Our past practice with all the fleets, and
16 Zito included, is that the barge has, they have a
17 tendency to leave barges back there for long
18 periods of time.  And call -- just making that
19 call does not necessarily get you prompt service
20 on getting the barge removed.
21    Q.  Did you attempt to reach them by your
22 cell phone?
23    A.  I don't know if it was a cell phone or if
24 I was in one of the trailers and used the land
25 line.  I don't remember which line was used.
                           - 39 -

1     Q.  Did you only make one telephone call?
2     A.  To Zito?
3     Q.  Yes.
4     A.  Yes, sir.
5     Q.  Did Zito ever call you back?
6     A.  No, sir.
7     Q.  Did you ever call Zito back on some
8  other --
9     A.  No, sir.
10    Q.  -- by some other method?
11    A.  No, sir.
12    Q.  Prior to the time you had the problem
13 with your communications, did you e-mail and fax
14 companies like Zito?
15    A.  Not to my knowledge, sir.
16    Q.  You never sent e-mails or faxes to any
17 company --
18    A.  Me, personally?  No, sir, I did not.
19        MR. WALKER:
20           Objection.  Asked and answered.
21 BY MR. WIEDEMANN:
22    Q.  Did somebody in your office send e-mails
23 or faxes?
24    A.  Prior to the storm, not to my knowledge.
25    Q.  Now, after 9 a.m., what time did you meet
                           - 40 -

1  with your employees at the Industrial Canal
2  facility?
3         MR. WALKER:
4            Objection.  Facts not in evidence.
5  BY MR. WIEDEMANN:
6     Q.  When he objects, you can answer the
7  question.  That has nothing to do with this
8  deposition.
9     A.  Okay.  The employees and I met around
10 eight o'clock.  I was with the contractor for a
11 short period of time and walked back to the dock
12 to see the progress on the barge.
13    Q.  What did you tell the employees about the
14 barges, the two Ingram barges that were there?
15    A.  Well, I didn't tell them anything about
16 the Ingram barges per se.  The barge that they
17 were unloading, that they had finished unloading,
18 they were pulling equipment out and putting tops
19 on, just like normal.
20    Q.  So as far as you were concerned, on the
21 morning of the 27th everything was normal and you
22 weren't making any preparations at all for a
23 possible hurricane?
24        MR. WALKER:
25           Objection.  You asked him about a
                           - 41 -

1         meeting with employees at 8 a.m.
2  BY MR. WIEDEMANN:
3     Q.  You can answer.
4     A.  At 8 a.m., no, we didn't -- we weren't
5  making preparation for any storms.
6     Q.  Well, you said you met with the employees
7  after 9 -- 9 a.m., did you --
8     A.  No, sir.
9     Q.  -- were you --
10    A.  I said I met with the employees at 8 a.m.
11    Q.  And at 8 a.m. on the morning of the 27th
12 you did not discuss anything with them about
13 hurricane preparations?
14        MR. WALKER:
15           Objection.  Asked and answered.
16 BY MR. WIEDEMANN:
17    Q.  Hm?  Is that correct?
18    A.  (no response.)
19    Q.  Did you meet with them at any time after
20 the eight o'clock meeting to discuss with them
21 any possible need for hurricane protection?
22    A.  Yes, sir.
23    Q.  When was that?
24    A.  That was approximately at nine o'clock.
25    Q.  Was that before or after you called Zito?
                           - 42 -

EDWARD BUSCH                                                      MiniDep by Kenson

1       A.  It was in the same time period.  I don't
2  know if it was -- if I had talked to, or if I had
3  called Zito before then.  It was at that time we
4  started getting phone calls from the relatives or
5  the families of the people that were at the plant
6  and we were informed that the storm had changed
7  directions, that the projected course was
8  directly towards us.
9       Q.  So that at some time around 9 a.m. the
10  families of some of your workers were calling to
11  tell you that the hurricane was coming your way?
12      A.  Yes, sir.
13      Q.  That's the first notification you had?
14      A.  That's the first notification I had that
15  morning.
16      Q.  And that was prior to any notification
17  from anybody at Lafarge?
18      A.  There was no notification from anybody at
19  Lafarge.
20      Q.  What was said at the meeting at nine
21  o'clock?
22      A.  That one of the gentlemen who -- that was
23  at the dock, his wife called and said that she
24  was -- had watched -- was watching the weather
25  channel and the storm had changed directions.  At

                            - 43 -

1  called to release the barges back out.
2       Q.  And that had been going on for a long
3  period of time?
4       A.  It had been going on since before I got
5  there.
6       Q.  Four years?
7       A.  Yes, sir.
8       Q.  And so for four years when a barge was
9  released, you would call Zito and they would pick
10  it up?
11      A.  Whoever was handling the barges, it would
12  be Zito or Turn Services or whoever the barge
13  companies were, or the fleeting services were,
14  and they changed around quite often.
15      Q.  But insofar as the four years that you
16  were there, insofar as an Ingram barge, you would
17  call Zito?
18      A.  No, sir.  Zito did not get the Ingram
19  barges that came to us.  I can't tell you exactly
20  when it started, but they started picking up the
21  barges and bringing them to us from another fleet
22  further up the river.
23      Q.  For how long a period of time?
24      A.  Probably two years.
25      Q.  Did anyone at Ingram ever tell you that

                            - 45 -

1  that time, we turned the radio on, and I think it
2  was my pickup truck, and started listening to the
3  weather reports, and at that point we started
4  making preparations, because at that point, the -
5  - we didn't know where the storm was going.
6       Q.  And that was after nine o'clock on the
7  27th?
8       A.  Yes, sir.
9       Q.  And what did you tell the employees to do
10  based upon what the relatives had told you and
11  what you heard on the radio?
12      A.  We were to get all the loose equipment
13  and all the equipment off the dock.  We had to
14  finish closing up a barge and getting the
15  equipment out of the barge.  Normal operations,
16  while they were closing up the barge, I started
17  going through and closing up the buildings and
18  silos and making everything on the other side of
19  the wall safe.
20      Q.  Now, who established the procedure for
21  releasing barges, Ingram barges, how did you
22  become aware of that?
23      A.  When I came to work there and we unloaded
24  the first barge, the barges that were brought in,
25  whoever brought the barges in, that's who you

                            - 44 -

1  you shouldn't call Zito to pick up their barges?
2       A.  No, sir.  They actually told us not to
3  call them, to call Zito to pick up their barges.
4       Q.  When was that?
5       A.  Right after Zito started handling their
6  barges.
7       Q.  And who called Ingram -- who called from
8  Ingram and told Lafarge not to call them but to
9  call Zito?
10      A.  No one from Ingram called us.  We called
11  Ingram to release a barge and they told us, "Call
12  Zito and release it back to Zito because they
13  brought the barge to you.  We don't handle the
14  barges any longer."
15      Q.  So that was two -- approximately two
16  years before?
17      A.  Yes, sir.
18      Q.  So you had been instructed by Ingram
19  approximately two years before not to call them
20  but to call Zito to get their barges picked up?
21      A.  Yes, sir.
22      Q.  So on the 27th when you called at 9 a.m.,
23  you were following the instructions from Ingram
24  to call Zito; is that correct?
25      A.  Yes, sir.

                            - 46 -

**EDWARD BUSCH**

1    Q.  Now, did you hear back from Zito at any
2  time after the nine o'clock call?
3    A.  No, sir.
4    Q.  Do you know how Zito communicates from
5  prior experience?
6      MR. WALKER:
7        Objection.  Communicates with whom?
8      MR. WIEDEMANN:
9        With the moon.
10     MR. WALKER:
11       That's fine, then, if you can answer
12     that.
13  BY MR. WIEDEMANN:
14    Q.  Do you know how they communicate with the
15  moon?
16    A.  I don't know how they communicate with
17  the moon, sir.
18    Q.  Do you know how Zito communicates --
19     MR. SANDERS:
20       Well, we're not going to finish
21     today if he keeps up.
22  BY MR. WIEDEMANN:
23    Q.  -- with their customers like yourself, or
24  their clients?
25    A.  Normal day-to-day operation:  You call

- 47 -

1    Q.  When did you learn of the expected storm
2  surge?
3    A.  From the radio.
4    Q.  And when was that?
5    A.  Earlier that morning, after the eight
6  o'clock, between eight, nine, ten, eleven
7  o'clock.
8    Q.  Why did you call Joe Domino?
9    A.  Because I wanted to get that empty
10  barge --
11    Q.  My question, so you'll understand it is,
12  why did you call Joe Domino instead of Zito or
13  ABC company, why did you call Joe Domino?
14    A.  I called Zito and got an answering
15  machine.
16    Q.  I understand.  You called Joe Domino to
17  make a turnaround?
18    A.  Yes, sir.
19    Q.  Why did you call Joe Domino as opposed to
20  somebody else?
21    A.  Because they're a tug company that we've
22  used in the past.
23    Q.  And that's who you would call if you
24  needed a turnaround, or needed something done for
25  your company?

- 49 -

1  Zito, you get a person, you tell them that their
2  barge is being released, or you leave a message
3  on their answering machine, and when they get
4  somebody back in the turn basin or channel, they
5  pick up the barge, it disappears, and with or
6  without us being there.
7    Q.  And they don't send you an e-mail or a
8  fax?
9    A.  No, sir.
10    Q.  And they don't call you back?
11    A.  No, sir.
12    Q.  After the meeting at nine o'clock with
13  your employees, did you have any other meetings
14  with your employees?
15    A.  No, sir, we were busy pulling.
16    Q.  What time did you leave the facility?
17    A.  Somewhere between 12:30 and 1:00 o'clock.
18    Q.  And did you not at some point in time
19  call Joe Domino to come to your facility to make
20  a turnaround?
21    A.  Yes, sir.
22    Q.  Why did you call Joe Domino?
23    A.  The empty barge on the inside of the dock
24  with the expected storm surge was -- would have
25  lent itself to a real --

- 48 -

1    A.  One of the tugs, yes.
2    Q.  What other companies do that?
3      MR. WALKER:
4        Do what?  For clarification.
5      MR. WIEDEMANN:
6        Top around, top around the barges or
7      do something at the facility.
8      MR. WALKER:
9        Do something at the facility
10     means nothing --
11     MR. WIEDEMANN:
12       Yes.
13     MR. WALKER:
14       -- to me.
15     MR. WIEDEMANN:
16       Well, I know it might mean --
17     MR. WALKER:
18       So if you have a specific question,
19     ask the question.
20     MR. WIEDEMANN:
21       Answer the question.
22     MR. WALKER:
23       Don't answer the question until you
24     understand it and it's clarified.
25     MR. WIEDEMANN:

- 50 -

EDWARD BUSCH                                                MINIDEP by Kenson

1    You understand the question?
2    MR. WALKER:
3       Do you understand what "do something
4    at the facility" means?
5    MR. WIEDEMANN:
6       That's not the question.
7    MR. WALKER:
8       That is the question.  You want to
9    have it read back?
10   MR. WIEDEMANN:
11      If you want to stay here till
12   midnight.
13   MR. WALKER:
14      You'd be surprised what your
15   question sounds like when you listen to
16   them.
17 BY MR. WIEDEMANN:
18   Q.  Tell us every towing company that you use
19 to come in and top around barges or move barges
20 at your request.
21   A.  Pearl River, Taco (phonetic), Turn
22 Services.  The tugs that -- and I'm drawing a
23 blank, one of the other fleets that we used.
24   Q.  Alario?
25   A.  Alario is one of them.

                    - 51 -

1    I'm going to object and have it
2    clarified.
3    MR. SANDERS:
4       It only matters whether the witness
5    understands the question.
6    MR. WALKER:
7       If it's unintelligible, I'll object.
8    MR. EMMETT:
9       You want to take a break?
10   MR. WIEDEMANN:
11      Yeah, sure.
12      (At this time, a break was taken.)
13 BY MR. WIEDEMANN:
14   Q.  When you had the meeting with the
15 employees at the Lafarge plant, the first one was
16 at eight o'clock; is that correct?
17   A.  Yes, sir.
18   Q.  And then you had another meeting at
19 around nine o'clock; is that correct?
20   A.  It wasn't a meeting.  I never left the
21 dock.  It was a discussion that was going on.  We
22 were doing different things.  When I say "I never
23 left the dock," I never -- I didn't leave them
24 alone very long.  I had gone out into the --
25 around the wall to close up some of the outlying

                    - 53 -

1    Q.  ABC?
2    A.  Yes, sir.
3    Q.  Did you all have a contract with Joe
4 Domino?
5    A.  No, sir.
6    Q.  So you can call anybody of these
7 companies to pick -- to come and turn around
8 barges?
9    A.  Yes, sir.
10   Q.  Did you call Zito from time to time?
11   MR. WALKER:
12      I assume you mean to turn around
13   barges?
14   MR. WIEDEMANN:
15      No.  I means something else.
16   MR. WALKER:
17      Well, then, we have to guess what
18   you mean once again.  And I'm asking the
19   witness not to guess, as I'm sure you
20   would want him not to speculate.
21   MR. SANDERS:
22      The objections are objections as to
23   form.  Said.
24   MR. WALKER:
25      If the question is unintelligible,

                    - 52 -

1 buildings and left instructions for them to do
2 things while in my absence.  And I came back a
3 few minutes later and they were doing it.
4    Q.  So when did you hear about the surge, at
5 what time?
6    A.  It was during the course of the morning.
7 Like I said, we had -- it was either my truck or
8 someone else's truck, we had the door open and we
9 were listening to the weather report.
10   Q.  And so what did you -- after you heard
11 this surge, this problem with a surge, what did
12 you tell the employees at that point in time?
13   A.  At that point in time I told them we
14 needed to secure the area for a storm.
15   Q.  And you mentioned picking up loose items
16 and --
17   A.  Yes, sir.
18   Q.  -- things like that; is that right?
19   A.  Yes, sir.
20   Q.  Now, you called at some point in time
21 after meeting with the employees at -- about nine
22 o'clock is when you called Zito; is that correct?
23 Or was it before your meeting with the employees?
24   A.  No.  It was during the same period of
25 time.  And I need to clarify something.  You

                    - 54 -

EDWARD BUSCH                                    MINIDEP by Kenson

1  asked a question earlier that -- when you asked
2  me if I had talked with any of my superiors or
3  someone from Lafarge and I told you no, that
4  wasn't so. I talked to one of our safety
5  directors, had a phone conversation with her --
6  or several phone conversations, as a matter of
7  fact.
8      Q. When did you learn that?
9      A. When did I learn that? It was --
10     Q. Yeah, we just took a break. Did somebody
11 tell you about that?
12     A. Somebody actually jumped on me for
13 overlooking it, and it wasn't intentional. I
14 was -- I didn't think of her as a superior
15 because I don't report to the Safety Department.
16 And I would not have -- I would not have called
17 her, she called me.
18     Q. Who reminded you of that?
19     A. The gentleman that was sitting in that
20 chair (indicating).
21        MR. O'DWYER:
22            Mr. Webb.
23        THE WITNESS:
24            Yes.
25 BY MR. WIEDEMANN:

                    - 55 -

1      Q. And who was the safety director that
2  called you?
3      A. Jennifer Arnold.
4      Q. And where is she located?
5      A. I think she's in Paducah, Kentucky.
6      Q. And what did she call you about?
7      A. The storm.
8      Q. So she was calling you from Paducah,
9  Kentucky, at what time?
10     A. Around the same time, about nine, ten
11 o'clock, something like that.
12     Q. And she was calling to tell you what
13 about the storm?
14     A. She was more not telling me about the
15 storm, she was calling to ask if our employees,
16 how many employees we had at the plant, what we
17 were doing, how long we were going to be there,
18 and basically said do what you got to do to get
19 that plant tied up, locked up, and get the hell
20 out of there.
21     Q. Did you tell Ms. Arnold that you had
22 called Zito in accordance with your usual policy
23 to pick up the Ingram barge?
24     A. I believe my discussion with her was that
25 I had released the barge. We finished the barge,

                    - 56 -

1  I'd released it, and that we were in the process
2  of tying barges off and tying covers down.
3      Q. Did you tell her that you had called Zito
4  in accordance with your usual policy concerning
5  Ingram barges?
6      A. I believe I answered that, sir. I told
7  her that I had released the barge that we had
8  unloaded.
9      Q. Did you tell her that you had released
10 the barge to Ingram?
11     A. I don't know if I mentioned Ingram's name
12 directly, but --
13     Q. Did she ask you what was going on with
14 the barge?
15     A. No, sir.
16     Q. Did she ask you when they were going to
17 pick it up?
18     A. No, sir.
19     Q. Did she suggest anything for you to do to
20 further the process of getting the barge picked
21 up?
22     A. No, sir.
23     Q. Were you not concerned that you had an
24 empty barge and a full barge at your dock?
25     A. This person has no -- as far as I know,

                    - 57 -

1  has no experience with barges. She's the safety
2  director.
3      Q. That wasn't my question. I'm asking you,
4  were you not concerned with the fact that you had
5  an empty barge, Ingram barge, and a full Ingram
6  barge at your dock?
7      A. Oh, I'm sorry. I thought you were asking
8  if she was concerned.
9      Q. Ask your counsel. Maybe he understands.
10
11        MR. WALKER:
12            I did, but I can't answer. I would
13        have otherwise.
14        THE WITNESS:
15            The concern was having it against
16        the dock knowing the possibilities of the
17        storm surge.
18 BY MR. WIEDEMANN:
19     Q. So you then -- when was it that you
20 called Joe Domino? Was it before or after you
21 talked to Jennifer Arnold?
22     A. I really don't remember which
23 conversation happened first.
24     Q. Did she suggest that you get someone to
25 turn the barges around?

                    - 58 -

EDWARD BUSCH

MINIDEP by Kenson

1    A.  No, sir.
2    Q.  Whose decision was that?
3    A.  That was mine.
4    Q.  Why didn't you call Zito?
5    A.  I called Zito and got an answering
6  machine.
7    Q.  No.  I'm talking about to turn around the
8  barges.
9    A.  I called Zito to release the barges and
10  there was an answering machine.  They would have
11  come and picked the barge up if I'd have -- if
12  they were going to come and turn it.
13    Q.  Were you able to get Joe Domino on the
14  phone?
15    A.  Yes, sir.
16    Q.  And Joe Domino was able to get Unique on
17  the phone?
18    A.  Unique?  I don't know who he got on the
19  phone.
20    Q.  Well, do you know whose vessel came out?
21    A.  No, sir.  I called Domino Towing.
22    Q.  Were you there when it came out?
23    A.  No, sir.
24    Q.  You weren't there when the REGINA H came
25  out?

- 59 -

1    A.  No, sir.
2    Q.  Do you know who owns the REGINA H?
3    A.  No, sir.
4    Q.  You didn't have any trouble getting Joe
5  Domino, did you?
6    A.  I called, they answered the phone.
7    Q.  So what did you tell Joe Domino?
8    A.  I had a barge -- I had a barge, an empty
9  barge against my dock with a load sitting on the
10  outside, I needed it turned around and the loaded
11  barge put against my dock.
12    Q.  And did they tell you they were coming
13  out?
14    A.  Yes, sir.
15    Q.  And you left before they got there?
16    A.  Yes, sir.
17    Q.  And so you left the facility in charge of
18  whom?
19    A.  I left the facility, had Earl Smith, who
20  was a supervisor, and two of the hourly employees
21  with him.
22    Q.  When you called Joe Domino -- let me show
23  you the Unique Towing, Inc., daily log, which
24  shows that the REGINA H went to your facility at
25  2:25 on the 27th to do a turnaround.  You see

- 60 -

1  that?
2    A.  Yes, sir.
3    Q.  You weren't there when the turnaround was
4  made?
5      MR. WALKER:
6          Asked and answered three times?
7  BY MR. WIEDEMANN:
8    Q.  Is that correct, at 2:25?
9    A.  No, sir.
10    Q.  When you talked to Joe Domino, did you
11  ask him to take out the empty barge that you had
12  requested Zito to take out?
13    A.  No, sir.
14    Q.  Why not?
15    A.  The tugboat companies that come in there,
16  I don't know whether or not they have a fleeting
17  service, and normal operation is, a tugboat will
18  not take a barge unless it has a destination.
19  There was no way I can have destination for it
20  without having talked to Zito.  So I couldn't
21  send that barge out with anyone, because I didn't
22  know where it was going to go.
23    Q.  Are there not fleeting operations all
24  over the Mississippi near your facility?
25    A.  Sir, if -- the barge belonged to Ingram

- 61 -

1  and Zito.
2    Q.  Are you not aware that Ingram uses the
3  Algiers facility?  Are you not aware of that?
4    A.  I don't know what Ingram does.  I don't -
5  - I'm not a part of Ingram.  Zito was the people
6  -- was the barge company that I had to deal with.
7    Q.  In any event, when you talked to Joe
8  Domino at -- what time was it?
9    A.  It was sometime in the morning, ten,
10  nine, ten o'clock.
11    Q.  You did not request them to take out the
12  empty barge?    MR. WALKER:
13          Objection.  Asked and answered
14      twice.
15      THE WITNESS:
16          No, sir.
17  BY MR. WIEDEMANN:
18    Q.  If you had requested them to take out the
19  empty barge, you would have had to pay?  That is,
20  Lafarge, your company would have had to pay for
21  the transportation of the barge; is that correct?
22    A.  If we'd requested -- anything we request
23  we had to pay for.
24    Q.  But if Zito comes in, and Zito has to
25  deal directly with Ingram; is that right?

- 62 -

**Peter Caruso & Associates (504) 432-3656**
P.O. Box 10741, Jefferson, Louisiana 70181

EDWARD BUSCH                                    MiniDep by Kenson

1    A.  No, sir.  We're paying for the barge
2  movement in and out.
3    Q.  You pay Zito to move the barge in and
4  out?
5    A.  That's part of the contract that -- the
6  way I understand it.
7    Q.  Did anyone call you when the REGINA H got
8  to the Lafarge facility?
9    A.  No, sir.
10    Q.  Did you leave any instructions with Mr.
11  Smith who was
12  -- was he now in charge
13    A.  He was the lone supervisor at the dock.
14    Q.  And did you leave any message with him to
15  call you to let you know whether or not Zito had
16  picked up the barge, or what was going on at the
17  facility?
18    A.  No.  Mr. Smith and Mr. Lewis and Mr.
19  Johnson were instructed to finish tying down the
20  tops on the barges and make sure that everything
21  else was ship-shape and get as much stuff across
22  the levee as we could get and go home.
23    Q.  But there was nobody there to supervise
24  them, either you as the, the head man at the
25  facility at that time; is that correct?

                         - 63 -

1    A.  Mr. Smith was the supervisor.
2    Q.  But you were his superior?
3    A.  Yes, sir.
4    Q.  And you left and left him and the other
5  workers in charge of doing what they thought was
6  necessary?
7    A.  No.  They -- the majority of the work had
8  been completed.  They were down to the point of
9  tying covers down, and --
10    Q.  Had they finished --
11    MR. WALKER:
12       Have you finished your answer?
13    THE WITNESS:
14       Yes, sir.
15  BY MR. WIEDEMANN:
16    Q.  Had they finished tying the barges to the
17  dock before you left?
18    A.  All except for the barge that got turned
19  around, and the Domino people did that.
20    Q.  Domino people did what?
21    A.  They secured the barge that had the empty
22  on the outside to the dock once the barge was
23  turned.
24    Q.  The empty was turned to the outside?
25    A.  Yes, sir.

                         - 64 -

1    Q.  And the loaded barge was tied to the --
2  was then tied to the dock; is that right?
3    A.  Yes, sir.
4    Q.  As they were moored previously -- that
5  is, between themselves they remained the same?
6    A.  I don't understand what you're saying
7  now.
8    Q.  Well, the light barge was moored to the
9  loaded barge?
10    A.  Yes, sir.
11    Q.  And Domino came in and turned them
12  around?
13    A.  Correct.
14    Q.  Did they do anything with regard to the
15  mooring between the two barges?
16    A.  Not to my knowledge.  They weren't
17  instructed to.
18    Q.  Did you expect them to?
19    A.  No.
20    Q.  So the only thing they did was turn the
21  barges and tie them -- tie the loaded barge to
22  the dock as the empty had been tied before?
23    A.  Yes, sir.
24    Q.  Were you there when that was done?
25    MR. WALKER:

                         - 65 -

1       Objection.  Asked and answered four
2       times.
3  BY MR. WIEDEMANN:
4    Q.  Were you there when that was done?
5    A.  No, sir.
6    Q.  So you were not there to inspect to see
7  whether it was done properly?
8    A.  No, sir, I was not there.
9    Q.  Before you left, did you inspect the
10  mooring or the rigging between the light barge
11  and the loaded barge?
12    A.  I looked at it.  I did not climb out onto
13  the barge.  I was doing other things.  I was
14  cutting ropes and dragging them off the dock, but
15  I did look at the rigging.  The same folks that
16  rigged everything else, rigged that, too.
17    Q.  When you looked at the rigging, were you
18  satisfied that the rigging between the two barges
19  was adequate?
20    A.  If I would've had or not, I would have
21  changed it.
22    Q.  It was your responsibility, if you saw
23  something that you thought was inadequate to see
24  that it was changed?
25    A.  Yes, sir.

                         - 66 -

EDWARD BUSCH                                         MINIDEP by Kenson

1    Q. Now you say you were "cutting the rope."
2  Where did you get rope from?
3    A. We have a spool of rope. Because we
4  handle so many barges, we buy 600-foot spools of
5  rope.
6    Q. Where did you buy the spool of rope from?
7    A. Shipyard Supply.
8    Q. How long before it was used on this
9  particular occasion?
10   A. I have no idea. It was a new roll of
11 rope.
12   Q. You'd have records for when it was
13 purchased?
14   A. I couldn't tell you what they have
15 records of. Most of that stuff went under water.
16   Q. And what color was the rope?
17   A. It was blue.
18   Q. So all the rope that you used on these --
19 rigging these two barges was blue?
20   A. Not necessarily. If the ropes were in
21 good condition and they were of another origin,
22 they may have been used. But the ropes that we
23 cut and pulled up and the ones that were attached
24 to the dock, to the first barge, they were blue.
25   Q. So you were satisfied before you left
                        - 67 -

1  that the rigging between the two barges was
2  adequate?
3    A. Yes, sir.
4    Q. And it was rigged with the 2-inch rope?
5    A. Yes, sir.
6    Q. When rope like this is purchased, is it
7  purchased through the local office or through
8  some central office?
9    A. It's purchased through -- we call up and
10 say, "Bring me a roll of rope."
11   Q. Now, are you aware of the New Orleans
12 terminal hurricane preparation checklist?
13   A. Yes, sir.
14   Q. It's identified as 113?
15   A. Yes, sir.
16   Q. And you've seen that before?
17   A. Uh-huh (affirmative response).
18   MR. WALKER:
19       You have to say yes.
20   THE WITNESS:
21       Yes. I'm sorry.
22   MR. O'DWYER:
23       For the record, we had previously
24   made a request for the Tier I hurricane
25   protection plan, or heavy weather plan or
                        - 68 -

1  equivalent. It hasn't been produced yet.
2  Can it be produced today? The one that
3  was identified by the --
4    MR. WALKER:
5        No.
6    MR. O'DWYER:
7        -- commodities manager?
8    MR. WALKER:
9        No.
10 BY MR. WIEDEMANN:
11   Q. You see that document, Mr. Busch?
12   A. Yes, sir.
13   Q. That is the hurricane checklist that was
14 in force and effect at the time of Hurricane
15 Katrina?
16   A. Yes, sir.
17   Q. And it was not changed prior to Hurricane
18 Katrina?
19   A. No, sir.
20   Q. Who prepared that checklist?
21   A. Myself and the terminal manager at the
22 time.
23   Q. And when did you prepare it?
24   A. 2002, late 2002, 2003.
25   Q. And it was not changed as it exist in
                        - 69 -

1  front of you prior to Hurricane Katrina?
2    A. No, sir.
3    Q. And to your knowledge it hasn't been
4  changed since Hurricane Katrina?
5    A. The form itself, no, sir.
6    Q. The hurricane checklist requires that the
7  barges be moored to the dock by cable, does it
8  not?
9    A. Yes, sir, that's what it says.
10   Q. And that's what you and the -- and your
11 superior decided was the way to do it?
12   A. Due to the condition of the dock at the
13 time, yes.
14   Q. Is that approved when you and the plant
15 superintendent or whatever you call him, when you
16 all make or promulgate something like that, is it
17 approved by the Safety Department of Lafarge?
18   A. I don't know where it went.
19   Q. Hm?
20   A. I don't know where it went once it was
21 produced. I know there was a copy of it hanging
22 on the bulletin board in the hallway.
23   Q. So if an employee wanted to find out how
24 to moor a barge during a hurricane, that's what
25 he would see?
                        - 70 -

**EDWARD BUSCH**

1   A.  Yes, sir.
2   Q.  Who helped you in 2002 prepare that
3 document?
4   A.  Rod Higdon.
5   Q.  What's his last name?
6   A.  Higdon, H-i-g-d-o-n.
7   Q.  Is he still with the company?  Do you
8 know?
9   A.  No, sir.
10   Q.  And you don't know whether or not when
11 you prepare a checklist it's sent to any other
12 safety office or safety director to -- for
13 approval?
14       MR. WALKER:
15            Asked and answered.
16       THE WITNESS:
17            I don't know whether -- who it was
18       sent to, whether it was sent.  It was not
19       part of my responsibility to move this up
20       the chain.
21 BY MR. WIEDEMANN:
22   Q.  Whose responsibility was it?
23   A.  That would have been the plant manager.
24   Q.  Now, if you all made this hurricane
25 protection checklist, why was it never changed if
                    - 71 -

1 there was some need for change?
2   A.  I don't know, sir.  That's a question to
3 be answered by the person who probably would have
4 changed it.  I did not -- I was not asked to
5 change it, so I did not get involved in the
6 changing of it.
7   Q.  So although you participated in preparing
8 it, since the terminal manager never asked you to
9 do anything else, you didn't see any reason to
10 change it?
11   A.  I wasn't involved in, in making changes
12 to existing procedures.  Once they were in, I
13 followed the procedures as closely as I could,
14 when it was practical.  And like I say, this
15 was -- this procedure was put in place before the
16 changes that were made at the dock.
17   Q.  And so -- I thought you said you followed
18 the procedures, and 113 is the only written
19 procedure that was on the bulletin board, wasn't
20 it?
21   A.  I followed it as closely as I could.
22 With the changes that were made to the dock,
23 the -- we didn't have the plastic poles in place.
24 The dock was steel beams sitting on top of a
25 piling.  And at that time, the cables were used
                    - 72 -

1 because the chaffing -- the rope rubbing back and
2 forth on the steel beam would chaff the rope.
3 Once the poles were put in, then the practice of
4 wrapping the rope around the poles and then down
5 to the -- so that there was no chaffing on the
6 rope, and as the barges rose, they could actually
7 pop the rope off and lend -- let themselves have
8 longer lines.
9   Q.  But you never, you or the terminal
10 manager never got around to changing the written
11 directions --
12   A.  I never --
13   Q.  -- to the employees?
14   A.  I never saw any changes.
15   Q.  And as I understand it, Mr. Busch, there
16 was no line from the empty barge to the shore; is
17 that correct?
18       MR. WALKER:
19            At what point in time?
20       MR. O'DWYER:
21            Any point in time.
22       MR. WIEDEMANN:
23            At the -- on the 27th, after the
24       turnaround.  I don't know what time it
25       was.  I'll take a guess if you want me
                    - 73 -

1       to.
2       MR. WEBB:
3            It's on the log.
4       MR. WIEDEMANN:
5            2:25.
6       MR. WEBB:
7            You don't have to guess.  It's on
8       the log.
9       MR. WEBB:
10            You remember?
11       THE WITNESS:
12            Yeah.
13       MR. WEBB:
14            Okay.
15       MR. WIEDEMANN:
16            Well, I'm just trying to be
17       specific.  It was a cloudy day, probably
18       daylight.  Is that enough that it makes
19       it clear enough?
20       MR. WALKER:
21            It's your deposition.
22       MR. WIEDEMANN:
23            Yeah, okay.   Well, it doesn't seem
24       to be.  It seems like you think it's
25       yours.
                    - 74 -

EDWARD BUSCH

1    MR. WALKER:
2        I'm just trying to make it make some
3    sense for the entire body.
4    MR. WIEDEMANN:
5        Okay.
6    THE WITNESS:
7        Since I was not there after the
8    barges were turned, I couldn't testify
9    what was on that barge.
10   BY MR. WIEDEMANN:
11       Q.  When you left before the turnaround was
12   made, there was no line from the empty, which was
13   on the inside to the dock, was there?
14       A.  Yes, there was.  That's how it was tied
15   to the dock.
16       Q.  Before you turned it around, there were
17   no lines on the full barge to the dock?
18       A.  No, sir.
19       Q.  The only lines were the lines from the
20   empty to the dock and from the -- between the two
21   barges?
22       A.  Yes, sir.
23       Q.  And you were satisfied with that
24   arrangement?  You said you inspected it.
25       A.  Yes, sir.

- 75 -

1    storm surge that you were aware of, you never
2    instructed them to do that?
3        A.  No, I didn't.
4        Q.  Hm?
5        A.  No, I did not.  There was -- I didn't
6    feel it was necessary given that the situation,
7    the other barges, the five barges that were
8    stretched out, they weren't tagged to the shore.
9    All five of those stayed.  The other loaded barge
10   that was tagged to the shore, that was tied the
11   same as the other ones, was still there after the
12   storm.  The only one that didn't stay was the
13   empty, and it was secured as best we could.
14       Q.  Well, my question was:  Before you left,
15   did you tell your subordinates to tie off the
16   outboard barge to the dock?
17       A.  And my answer again is, no, I did not.
18       Q.  Did you give them any instructions
19   whatsoever?
20       A.  Yes, sir, I did.
21       Q.  What did you tell them?
22       A.  "Finish tying down the covers and get the
23   hell out of here."
24       Q.  What experience did they have, to your
25   knowledge, in mooring vessels for hurricane

- 77 -

1    Q.  You didn't see any need to have lines
2    from the outboard barge -- that is, the full
3    barge -- to the dock?
4        A.  No, sir.
5        Q.  You didn't instruct your workers to put
6    lines from the outside barge to the dock?
7        A.  No, sir.
8        Q.  Did you give them any instructions when
9    the turnaround was complete as to what they
10   should do?
11       A.  I had no way of giving them instructions
12   for when the turnaround was done.  We didn't know
13   when the tugboat was going to show up.  We were
14   not given a specific time.  All he told was he
15   would be there, he would turn the barge.
16       Q.  But you knew that the turnaround was
17   going to be done?
18       A.  Yes, sir.
19       Q.  Did you tell your subordinates that once
20   the turnaround was done, that the empty, which
21   would be outboard, should be moored to the dock
22   with lines?
23       A.  No, sir.
24       Q.  Although you knew that there was a
25   hurricane headed towards you and that there was a

- 76 -

1    conditions?
2        A.  Mr. Smith is probably sixteen, seventeen
3    years working at that terminal.  And in that
4    period of time, I'm sure he's seen a considerable
5    amount of storms.
6        Q.  Now you say that the five barges that
7    were at the dock next to the two Ingram barges,
8    they were not moored to the dock; is that right?
9        A.  No, sir.  The first barge was moored to
10   the dock, and everything else was moored off of
11   that.
12       Q.  But there was no mooring -- there was no
13   mooring mooring the outboard barges to the dock?
14       A.  No, sir.
15       Q.  And let me show you a photograph, an
16   aerial photograph that's been marked 368, LNA-
17   368, and that shows the five barges and the
18   remaining Ingram barge.  You see that?
19       A.  Yes, sir.
20       Q.  This was taken after the hurricane?
21       A.  Uh-huh (affirmative response).
22       Q.  And were the five barges in that position
23   when you left?
24       A.  No, sir, they weren't.
25       Q.  What was the difference of the positions?

- 78 -

EDWARD BUSCH                                                          MINIDEP by Kenson

1    A.  The five barges were sitting up against
2  the dock, tied tight.
3    Q.  So, what happened with regard to the
4  mooring of the inside barge to the dock?
5    A.  That's where the lines were allowed to
6  slip free, so that those barges would not break
7  the mooring lines.
8    Q.  And the barges swung to the south, did
9  they not?
10    A.  I don't know where they went.
11    Q.  Well, I mean, you can -- you showed me
12  where they were before?
13    A.  Yeah.  I can see where that's where
14  they're sitting now.
15    Q.  And the barge that broke away is just
16  opposite the barge that's at the dock; is that
17  correct?
18    A.  Yes, sir.
19    Q.  So the way that these five barges were
20  moored, it was intended that the mooring lines to
21  the dock would allow the barges to move out?
22    A.  Not to move out, but to be able to move
23  up.
24    Q.  To give slack in the line?
25    A.  Yes.

- 79 -

1    A.  Yes, sir.
2    Q.  That is, don't fool with the two barges
3  in the middle, but turn them around and fix them
4  as they were fixed before with the change in
5  position?
6    A.  Yes, sir.
7    Q.  Did Lafarge conduct an investigation
8  following the incident with the Ingram barge?
9    A.  There was people that came to the
10  terminal and we sat down and discussed basically
11  the same things that we're discussing now.
12    Q.  Who went to the terminal?
13    A.  There was -- Mr. Guthrie was there and
14  some lawyers and -- I couldn't give you names.  I
15  can't remember what the names were.
16    Q.  And the purpose was to find and determine
17  what had happened?
18    A.  From the way the questions were asked,
19  yes.
20    Q.  Was a report prepared of what happened
21  and how to prevent it?
22    A.  I have no idea.
23    Q.  You've never seen one?
24    A.  No, sir.
25    Q.  Did they question you as to why you left

- 81 -

1    Q.  Do you know whether or not those barges
2  as they moved south struck the other barge?
3    A.  Sir, I wasn't standing there when all
4  this happened.
5    Q.  When you asked Domino to turn around the
6  barges, did you ask them to add more lines?
7    A.  No, sir.  I asked --
8    Q.  What?
9    A.  All right.  What I asked them to do is,
10  when they turned the barges around, to tie the
11  barge that they were putting against the dock in
12  the same fashion that the barges were -- or the
13  barge at the north end of the dock was tied.  So
14  all they had to do was look, and obviously they
15  did what they were told.
16    Q.  So you didn't instruct them to bring any
17  extra line to add to the --
18    A.  No.
19    Q.  -- mooring?
20    A.  We cut the line and set it next to the
21  mooring for the -- when they turned around, to
22  make sure that they had suitable ropes.
23    Q.  So Domino was, in essence, going --
24  instructed, either directly or indirectly, to do
25  what you all had done previously?

- 80 -

1  the facility before the turnaround was completed?
2    A.  Yes, sir.
3    Q.  Hm?
4    A.  Yes, sir.
5    Q.  Did they question why you as the superior
6  supervisor left this in the hands of others?
7    A.  Yes, sir.
8    Q.  Did they question whether or not you
9  should have stayed to inspect to make sure that
10  everything was done as best as could be done?
11    A.  No, sir, they were satisfied with my
12  explanation.
13    Q.  They were satisfied with your explanation
14  that you left, left this area?
15    A.  Yes, sir.
16    Q.  What day did you first return to the
17  facility?
18    A.  I don't know exactly what day it was.  It
19  was --
20    Q.  Did you evacuate?
21      MR. WALKER:
22        Had you finished your answer?
23      THE WITNESS:
24        Well, no, I hadn't.  I'm sorry.  The
25        explanation that they were giving was --

- 82 -

**EDWARD BUSCH**

1    MR. WALKER:
2        No.  He asked you the date you
3    returned.
4    THE WITNESS:
5        Oh, I'm sorry.  The date I returned
6    to the terminal, I don't know what the
7    date was.
8    BY MR. WIEDEMANN:
9    Q.  Did you evacuate because of the storm?
10   A.  Yes, sir.
11   Q.  Did you have damage or flooding to your
12   home?
13   A.  Minimum damage to the home directly.  I
14   had -- trees  all around the house had some, some
15   damage to the house.
16   Q.  What experience did you or the terminal
17   manager have insofar as the preparation of a
18   hurricane checklist?
19   A.  I had helped -- I was a part of the
20   hurricane preparation checklist for another
21   facility in the area, and I don't know what his
22   experience was.  We sat down and went through the
23   things that had to be taken care of before the
24   inclement weather.
25   Q.  What other facility?

                    - 83 -

1    A.  The Lonestar facility.
2    Q.  And you prepared a hurricane checklist?
3    A.  I was instrumental, or I was a part of
4    the preparation of the checklist.
5    Q.  And did it require cabling of the barges
6    to shore?
7    A.  I don't -- that was in '94 or '95.
8    That's been a long time ago.
9    Q.  Is the Lonestar facility still in
10   operation?
11   A.  Yes, sir.
12   Q.  Do you know, or has anyone told you what
13   caused the barge, the Ingram barge, to break
14   loose?
15   A.  No, sir.
16   Q.  Did --
17   A.  Nobody told me actually what caused it to
18   break loose.
19   Q.  Was there any rope left on the loaded
20   barge following the breakaway?
21   A.  When I came to the dock, one of the
22   things that I was told to do was to check out --
23   because no one had been in the facility since
24   the hurricane, I was told to check out the
25   facility for damage.  I left other folks out on

                    - 84 -

1    the dock, out on the barges.  I couldn't tell you
2    how many or if any ropes were left on the barge.
3    I was down, further down into the plant, cross
4    the walk, taking a survey of our buildings and
5    our equipment.
6    Q.  Who inspected the barge, the remaining
7    barge after the breakaway?
8    A.  There was lawyers and surveyors, and
9    there was a bunch of folks there.
10   Q.  Did they take any rope off of the
11   remaining barge?
12   A.  There was rope taken off, yes, sir.
13   Q.  And was it the blue rope?
14   A.  Yes, sir.
15   Q.  Was it broken?
16   A.  Yes, sir.
17   Q.  And how many of the lines had been
18   broken?
19   A.  I was -- I don't remember.  There was a
20   lot of lines around.  There was also a lot of
21   lines that were floating in the water.
22   Q.  So that you knew that there were lines
23   that broke before the Ingram barge got loose?
24   A.  I don't know anything, sir.  All I know
25   is what I saw.  There was broken lines on the

                    - 85 -

1    barge.
2    Q.  Broken lines left on the full barge, the
3    loaded barge?
4    A.  I don't mean they were hooked on the
5    barge.  I mean they were laying on the barge.  I
6    don't know where they came from.  I wasn't there
7    when they were taken off or when they were
8    produced.
9    Q.  But you saw that they were broken?
10   A.  There was broken lines.  Again, there was
11   lines that were floating in the water, that they
12   were obviously old lines.  We sit in a little
13   eddy-type situation back there and a lot of
14   debris comes floating back.
15   Q.  But the broken lines that you saw, were
16   they blue lines like you had used?
17   A.  Some of them were, yes, sir.
18   Q.  And you could see that they were the same
19   size and type of line that you used --
20   A.  They appeared --
21   Q.  -- on the 27th?
22   A.  They appeared to be.
23   Q.  Was there any damage to the bits on the
24   loaded barge?
25   A.  Not that I could see.

                    - 86 -

EDWARD BUSCH                                    MiniDep by Kenson

**- 87 -**

1    Q.  None of them were, as far as you could
2  see, were bent or broken?
3    A.  I wasn't -- I didn't examine the bits. I
4  didn't specifically go out there and look at
5  them, so there was nothing that came to my
6  attention or jumped out at me.
7        MR. O'DWYER:
8            For the record, although we haven't
9        made this request previously, we're
10       making it now.  And that is, for the
11       opportunity to review any photographs or
12       survey reports that were generated in
13       connection with post-Katrina inspection
14       of the loaded barge.  I forget the
15       particular number.  It's an ING barge.  I
16       make that request of Ingram and Lafarge.
17
18  BY MR. WIEDEMANN:
19    Q.  Do you know how long the five barges in
20  the aerial photograph were at the Lafarge
21  facility before the hurricane?
22    A.  No, sir, I don't know offhand.
23    Q.  Do you have any idea?
24    A.  (No response.)
25    Q.  Was it -- were the four barges -- excuse

**- 88 -**

1  me, the five barges, was there any capability of
2  tying them off to the dock -- that is, the
3  outside barges?
4    A.  The dock next door is actually condemned.
5  That dock has -- the corner that is closest to
6  the corner of those barges, they tied some barges
7  up there and it actually drug the cavel off the
8  dock with part of the dock and almost sunk their
9  barge.
10    Q.  So there was no way to tie off the
11  outside barges of the five barges to any, any
12  dock; is that correct?
13    A.  No, sir.
14    Q.  Who owns the facility next to --
15    A.  City of New Orleans, to the best of my
16  knowledge.
17    Q.  And was there any place else in this, in
18  the Lafarge facility for docking these five
19  barges?
20    A.  No, sir.  You're looking at all the
21  docking facilities.
22    Q.  How were the five barges moored to one
23  another?
24    A.  Just tied back and forth with a rope.
25  Normal operation, when you're going to secure

**- 89 -**

1  barges, go from bit to bit and just tie them
2  close, because you're expecting everything to
3  rise at the same rate.
4    Q.  Who owns the facility to the upper right-
5  hand corner?
6        MR. HAYCRAFT:
7            Is that to the north?
8        MR. SANDERS:
9            That's south.
10       THE WITNESS:
11           To the best of my knowledge that
12       belongs to, or the company that's in
13       there is Manasco.  They're a steel
14       distribution center.
15  BY MR. WIEDEMANN:
16    Q.  Where does the Lafarge property end with
17  relation --
18    A.  At the end of the dock.  You're coming
19  straight wouth.
20    Q.  At the end of -- beyond where the Ingram
21  barge is?
22    A.  Yes, sir.
23    Q.  What was your job with Lonestar?
24    A.  I was the -- I started there as a
25  maintenance manager.

**- 90 -**

1    Q.  And how long were you with them?
2    A.  From '94 to 2001.
3    Q.  And did you have experience with them in
4  mooring barges?
5    A.  Yes, sir.
6    Q.  Any prior experience?
7    A.  Blue Circle Cement in Baltimore.
8    Q.  What was your job with them?
9    A.  I started there as a utility man and
10  worked my way up to maintenance manager there,
11  also.
12    Q.  Have you seen any photographs of the
13  Lafarge facility before the hurricane?
14    A.  Yes, sir.
15    Q.  When?
16    A.  There's aerial photographs taken a few
17  years ago, you know.
18    Q.  Taken for what reason?
19    A.  To be honest with you, I don't know what
20  the reason was, but I do know that they took some
21  aerial photographs.
22    Q.  You've seen some aerial photographs.
23  Have you seen any photographs of the makeup of
24  the barges prior to the hurricane?  Two, I'm
25  talking about the two Ingram barges and the five

EDWARD BUSCH                                    MINIDEP by Kenson

1  other barges.
2      A.  No.
3      Q.  Hm?
4      A.  No, I've never -- I never saw any
5  photographs of those two barges.
6      Q.  Or did you see any photographs of the
7  five barges?
8      A.  I saw the satellite picture when I got a
9  phone call and they asked me if the barges, you
10 know, is it possible -- I was the only one in the
11 area, everybody else had evacuated, and the
12 question was asked, Could I check the satellite
13 picture and see whether or not those barges were
14 loose or if they were still attached to the dock.
15     Q.  And what I mean is, there are no -- not
16 satellite, but no photographs at ground level of
17 the --
18     A.  No, sir.
19     Q.  -- of the barges?
20     A.  No, sir.
21     Q.  Is it not a fact that there were e-mails
22 back and forth in the Lafarge company after the
23 hurricane that indicated that there was -- that
24 they thought that the Ingram barge had been taken
25 to the Algiers fleeting operation?
                  - 91 -

1      A.  Sir, after the hurricane for two weeks I
2  didn't have, or after I came back for two weeks I
3  didn't have electricity in my house, so I didn't
4  see any communications of that type.  And I had
5  -- the best I could get was a phone call once in
6  a while, so I don't know what was going on within
7  the company outside Louisiana.
8      Q.  Who is Mr. John Erbes, E-r-b-e-s?
9      A.  He is A.J. Guthrie's, it would be his
10 superior.
11     Q.  And John Caldwell?
12     A.  Don't know the name.
13     Q.  Let me show you an e-mail dated 8/28 from
14 John Caldwell to Mr. Erbes.  It's on the 257,
15 LNA, and he's asking, "Hope your trip is going
16 well.  Just curious what the emergency plan for
17 New Orleans, Louisiana terminal?  Do you see
18 that?
19     MR. WALKER:
20         Object to these.  Lack of
21 foundation.
22     MR. HAYCRAFT:
23         What was the number again, Larry?
24     MR. O'DWYER:
25         257?
                  - 92 -

1  BY MR. WIEDEMANN:
2      Q.  Can you tell me why they would be
3  inquiring about what the emergency plan is on the
4  day before the hurricane?
5      A.  8/28, that's the day after the hurricane.
6  No.
7      Q.  It's the day before.
8      Q.  Is it?
9      Q.  Yeah.
10     A.  Okay.
11     Q.  The day after you left.
12     A.  Oh, okay.  I don't know what -- why they
13 would be -- I wasn't a part of that conversation
14 or a part of that email, so I couldn't tell you.
15     Q.  Well, was there a hurricane plan in
16 New Orleans?
17     A.  Sir, you've got it there (indicating).
18     Q.  This is it, huh?
19     A.  Yes, sir.
20     Q.  113?
21     A.  Yes, sir.
22     Q.  Well, 113 wasn't followed by your people?
23
24     MR. WALKER:
25         Objection.  Asked and answered.
                  - 93 -

1  BY MR. WIEDEMANN:
2      Q.  Was it?
3      A.  To the best of our ability, excluding the
4  cabling of the barges to the dock.
5      Q.  Well, 113 says you cable the barges to
6  the dock?
7      A.  The barges that were at the dock were
8  tied to the dock.
9      MR. O'DWYER:
10         It doesn't say that.  Excuse me,
11 counsel.  Objection.
12     MR. WEBB:
13         Wait.  Are you objecting to the
14 answer?
15     MR. O'DWYER:
16         I'm objecting to the question that
17 was asked and what the witness said and
18 what the document says.  Read the witness
19 what the document says.
20     MR. WEBB:
21         Why are we wasting time on a
22 document this witness has never even seen
23 before?
24     MR. WIEDEMANN:
25         No, this is --
                  - 94 -

Peter Caruso & Associates (504) 432-3656
P.O. Box 10741, Jefferson, Louisiana 70181

EDWARD BUSCH

| | |
|---|---|
| 1 | MR. O'DWYER: |
| 2 | He prepared it, Counsel. |
| 3 | MR. WIEDEMANN: |
| 4 | He prepared it. |
| 5 | MR. WEBB: |
| 6 | I don't think so. Oh, that |
| 7 | document. What about the other one? |
| 8 | That's what we were dealing with. |
| 9 | MR. SANDERS: |
| 10 | No, we're dealing with this one |
| 11 | (indicating). |
| 12 | BY MR. WIEDEMANN: |
| 13 | Q. With the document you prepared -- |
| 14 | MR. WEBB: |
| 15 | I'll go back to sleep, Larry. |
| 16 | MR. WIEDEMANN: |
| 17 | Okay. |
| 18 | BY MR. WIEDEMANN: |
| 19 | Q. LNA-113 says "Cable all barges to shore." |
| 20 | Isn't that what it said? |
| 21 | A. Yes, sir. |
| 22 | Q. That is the -- that is the safety, or the |
| 23 | emergency plan for hurricanes that Mr. Caldwell |
| 24 | and Mr. Erbes are talking about; is that correct? |
| 25 | MR. WALKER: |

- 95 -

| | |
|---|---|
| 1 | Objection. No foundation. |
| 2 | THE WITNESS: |
| 3 | I don't know what they were talking |
| 4 | about. |
| 5 | BY MR. WIEDEMANN: |
| 6 | Q. Do you know of any other emergency plans |
| 7 | other than that one? |
| 8 | MR. WALKER: |
| 9 | Objection. The document is a |
| 10 | hurricane preparedness checklist, |
| 11 | preparation checklist. |
| 12 | BY MR. WIEDEMANN: |
| 13 | Q. Do you know of any other emergency plan? |
| 14 | A. No, sir. |
| 15 | MR. WALKER: |
| 16 | Same objection. |
| 17 | MR. O'DWYER: |
| 18 | I call for the Tier I hurricane |
| 19 | plan. |
| 20 | MR. SANDERS: |
| 21 | They don't have any. |
| 22 | MR. O'DWYER: |
| 23 | Well, I sure would like to see it so |
| 24 | we can cross-examine the witness with it. |
| 25 | |

- 96 -

| | |
|---|---|
| 1 | MR. SANDERS: |
| 2 | See what? |
| 3 | MR. O'DWYER: |
| 4 | The Tier I hurricane preparation or |
| 5 | heavy weather plan. |
| 6 | MR. SANDERS: |
| 7 | The request you made earlier? |
| 8 | MR. O'DWYER: |
| 9 | That's correct. |
| 10 | MR. SANDERS: |
| 11 | They don't have it. |
| 12 | BY MR. WIEDEMANN: |
| 13 | Q. Are you, are you aware that your company |
| 14 | was being charged with a shortfall delivery of |
| 15 | concrete? Are you aware of that? |
| 16 | MR. WALKER: |
| 17 | Objection. |
| 18 | BY MR. WIEDEMANN: |
| 19 | Q. Are you aware of it? |
| 20 | A. No, sir. |
| 21 | Q. You're not aware that they were charged |
| 22 | $170,000 for shortfall delivery of concrete to |
| 23 | the oil industry? |
| 24 | MR. WALKER: |
| 25 | Objection. |

- 97 -

| | |
|---|---|
| 1 | MR. HAYCRAFT: |
| 2 | Concrete or cement? |
| 3 | MR. WIEDEMANN: |
| 4 | Cement. I call it concrete. |
| 5 | THE WITNESS: |
| 6 | No, sir. |
| 7 | BY MR. WIEDEMANN: |
| 8 | Q. You're not aware of that? |
| 9 | A. I was not aware of it. |
| 10 | Q. You were not aware that they were -- that |
| 11 | the Ingram barge that was unloaded on the 26th |
| 12 | and the morning of the 27th had H-cement? |
| 13 | A. I was aware it had H-cement on it, yes, |
| 14 | sir. |
| 15 | Q. And what is H-cement used for? |
| 16 | A. For the oil well industry. |
| 17 | Q. Let me show you a document that is marked |
| 18 | LNA-268, which indicates -- and this is dated the |
| 19 | day of the hurricane, 8/29, which indicates |
| 20 | "New Orleans and Westlake have incurred 12 oil |
| 21 | well stock-outs with freight concessions paid |
| 22 | upwards of $170,000." You see that? |
| 23 | A. Yes, sir. |
| 24 | Q. Hm? |
| 25 | A. Yes. |

- 98 -

EDWARD BUSCH                                                    MINIDEP by Kenson

1   Q. And you were not aware of that at this
2 time?
3   A. No.
4       MR. WALKER:
5           Asked and answered.
6 BY MR. WIEDEMANN:
7   Q. You were not aware that the reason you
8 were hurrying up to unload the Ingram barge with
9 H-cement was because of the shortfalls in the
10 industry?
11      MR. WALKER:
12          Objection. Mis-characterizes
13      testimony and facts not in evidence.
14 BY MR. WIEDEMANN:
15  Q. You were not aware of that?
16  A. No, sir.
17  Q. Even though your plant is the one that
18 services the oil industry?
19      MR. WALKER:
20          Objection, relating back to the
21      prior incorrect-based question.
22 BY MR. WIEDEMANN:
23  Q. Is that correct?
24  A. That's correct.
25  Q. Is it not a fact they had trucks on the
                    - 99 -

1 morning of the 27th that you were trucking
2 cement, H-cement from the Industrial Canal
3 facility to Fourchon and other ports for
4 distribution in the oil industry?
5       MR. WALKER:
6           Objection. Mis-characterizes
7       testimony.
8       THE WITNESS:
9           It wasn't unusual for us to load
10      Saturday, Sunday, and every other day.
11 BY MR. WIEDEMANN:
12  Q. Is it not a fact on the 27th, which is a
13 Saturday, that you were loading H-cement into
14 trucks for shipment to the oil industry in South
15 Louisiana?
16  A. I don't know where the trucks were going,
17 sir. We were loading trucks, yes.
18  Q. You means as a man in charge of this
19 facility at that time, on the 27th, you didn't
20 know where the trucks that were picking up
21 concrete at your facility were going?
22      MR. WALKER:
23          Objection. Argumentative --
24 BY MR. WIEDEMANN:
25  Q. Is that your testimony?
                    - 100 -

1       MR. WALKER:
2           Argumentative, and it's not
3 concrete.
4       MR. HAYCRAFT:
5           Cement.
6 BY MR. WIEDEMANN:
7   Q. Okay. Well, you understand the
8 difference?
9       MR. WALKER:
10          He does.
11      MR. WEBB:
12          One has rocks and one doesn't.
13      MR. SANDERS:
14          That's right. That's so important.
15      MR. WIEDEMANN:
16          If you all want to play around, we
17 can.
18      MR. WEBB
19          No, Larry, we're not playing games.
20
21 BY MR. WIEDEMANN:
22  Q. Same question: Cement, not concrete.
23 Okay?
24      MR. WALKER:
25          Same objection.
                    - 101 -

1       THE WITNESS:
2           Do I answer it?
3       MR. WALKER:
4           Yes.
5       MR. WIEDEMANN:
6           Yes.
7       MR. WALKER:
8           If it's possible.
9       THE WITNESS:
10          Sir, when I am in the back of the
11      property preparing for a storm, trying to
12      clear the dock, I don't care where those
13      trucks are going up front, I really
14      don't. I had other things to do, and the
15      person up front knew where the trucks
16      were going, and that was all that was
17      really important, is he knew where they
18      were going.
19 BY MR. WIEDEMANN:
20  Q. And do you know, are you familiar with
21 the contract transportation agreement between
22 your company and Ingram?
23      MR. WALKER:
24          Asked and answered. Objection. He
25      asked it about an hour ago.
                    - 102 -

Peter Caruso & Associates (504) 432-3656
P.O. Box 10741, Jefferson, Louisiana 70181

**EDWARD BUSCH**                                    MiniDep by Kenson

| | |
|---|---|

1  MR. WIEDEMANN:
2      I asked him about this contract an
3  hour ago?
4  MR. WALKER:
5      You did.  When it's appropriate,
6  Larry, can we take about a two minute
7  break?
8  MR. WIEDEMANN:
9      Yeah, if you want to take it now.
10  MR. WALKER:
11      Thanks.
12      (At this time a break was taken.)
13  BY MR. WIEDEMANN:
14  Q.  Mr. -- let me find --
15  MR. O'DWYER:
16      For the record, I call for
17  production of the contract between Zito
18  and Ingram and any of their parent
19  subsidiary affiliated or related
20  companies and their insurers.
21  MR. HAYCRAFT:
22      You already did that.
23  MR. WIEDEMANN:
24      We already did that.
25  MR. O'DWYER:

- 103 -

1      Well, did we get them?
2  MR. WIEDEMANN:
3      No.
4  MR. O'DWYER:
5      Oh.
6  MR. WIEDEMANN:
7      We just --
8  MR. O'DWYER:
9      Okay.  Well, I call for production
10  of them again.
11  MR. WIEDEMANN:
12      We sent out a request.
13  BY MR. WIEDEMANN:
14  Q.  Mr. Busch, so that I'm clear, the -- and
15  without being repitious, the $170,000 shortfall
16  assessment was made against New Orleans and
17  Westlake.  And you were the -- an officer at the
18  New Orleans operation and you tell me you don't
19  know anything about that?
20  MR. WALKER:
21      Objection.
22  THE WITNESS:
23      No, sir, I don't.
24  BY MR. WIEDEMANN:
25  Q.  What -- at the time of this occurrence --

- 104 -

1  well, on the 27th, did Lafarge to your knowledge
2  subscribe to any meteorological or weather
3  reporting services?
4      A.  Yes, sir, they did.
5      Q.  And do you know which ones?
6      A.  I don't know the name of the service that
7  we had.
8      Q.  Who subscribed to that?  What department?
9      A.  It was our terminal that subscribed to
10  it.
11      Q.  Your terminal subscribed to -- here in
12  New Orleans?
13      A.  Yes, sir.
14      Q.  And how did you receive that information?
15      A.  By satellite dish.
16      Q.  So it came over the -- over your TV
17  screen?
18      A.  It came over a TV screen when it was in
19  operation, yes, sir.
20      Q.  So you had access to meteorological and
21  weather reporting at the Industrial Canal
22  facility on the 27th?
23      A.  No, sir.
24      Q.  Why not?
25      A.  The satellite, or the system had been

- 105 -

1  disabled.  They were putting a new roof on the
2  building on the dock and that's where that
3  satellite was attached.  They had taken it down,
4  the contractors had taken it down and it had not
5  been reinstalled.
6      Q.  So you had a blackout concerning your
7  meteorological and weather service?
8      A.  Yes, sir.
9      Q.  And so in the absence of that, you got
10  reports from your workers' families?
11  MR. WALKER:
12      Objection.
13  THE WITNESS:
14      Yes, sir.
15  BY MR. WIEDEMANN:
16  Q.  So prior to the 27th, you received no
17  meteorological information on your service?
18      A.  No, sir.
19      Q.  Did you report that to anybody in
20  Lafarge?
21      A.  The terminal manager was aware of the
22  situation.  He's the one that instructed the
23  contractors to remove the dish to install the new
24  roof.
25      Q.  Did you tell Jennifer Arnold on the 27th

- 106 -

EDWARD BUSCH                                                    MINIDEP by Kenson

1  that you had no access to that kind of
2  information?
3      A.  I don't believe I did, sir.
4      Q.  So in the absence of your boss at the
5  facility, you didn't report to anybody that you
6  had no access to this information?
7      A.  The only person I talked to was Ms.
8  Arnold and I don't recall making -- having any
9  kind of conversation to that effect.
10     Q.  Was Lafarge to your knowledge ISO-9000
11 certified?
12     A.  If they were, I didn't have any idea
13 about it.
14     Q.  When did you learn that the Ingram barge
15 had broken away?
16     A.  When I came back to Louisiana.
17     Q.  And how did you learn about it?
18     A.  I really don't remember who told me about
19 it.  It was one, either the plant manager or --
20 Mr. Guthrie.
21     Q.  At the meeting that you mentioned that
22 Mr. Guthrie was attending here locally, were
23 there any employees who were on the facility --
24 at the facility on the 27th, were they present
25 at that meeting?

- 107 -

1      A.  To be honest with you, no.  My memory
2  doesn't serve me well.
3      Q.  Do you know whether or not an operations
4  manual came with the design?
5      A.  Not to my knowledge.
6      Q.  At the meeting that you had with Mr.
7  Guthrie and others, was there a -- what sometimes
8  is called a root cause analysis of the breakaway
9  prepared?  Do you know that term?
10     A.  Yes.
11     Q.  Huh?
12     A.  Yes, sir, I do.
13     Q.  You're familiar with that?
14     A.  Yes.
15     Q.  Was such a document or a -- like that
16 prepared?
17     A.  If there was, I never saw it.
18     Q.  Where have you run across a root cause
19 analysis?
20     A.  In the maintenance profession, we do root
21 cause analysis for equipment failure.  It's not
22 enough to know it failed, you got to know why it
23 failed.
24     Q.  And a root cause analysis generally
25 determines the cause of the failure and a

- 109 -

1      A.  I don't know who -- other than myself, I
2  don't remember who else they talked to.  Just --
3      Q.  You had a meeting with Mr. Guthrie and
4  some other people you said who you didn't know
5  exactly; is that right?
6      A.  Yes, sir.
7      Q.  But my question is:  Were any of the
8  other employees who were on the site on the 27th
9  present?
10     A.  Not with the meeting that I had with
11 them, no, sir.
12     Q.  The construction that was going on at the
13 facility, when did that start?
14     A.  It was going on when I got there in 2002,
15 and it was an ongoing thing.
16     Q.  So it started in 2002?
17     A.  It started before I got there, sir.  I
18 don't know when it started.
19     Q.  And what was the expected time of --
20 expected date of completion?
21     A.  When the office building was completed,
22 then the office at the dock would be completed.
23 We were probably looking at the end of the year.
24     Q.  Do you know who designed the dock at the
25 facility?

- 108 -

1  prevention of the failure in the future; is that
2  correct?
3      A.  Certainly.
4      Q.  You don't know of any root cause analysis
5  that was prepared in this case?
6          MR. WALKER:
7              Asked and answered.
8          THE WITNESS:
9              Not to my knowledge.
10 BY MR. WIEDEMANN:
11     Q.  Did you ever speak with Mike Gordon who
12 came down here concerning the occurrence?
13     A.  The name sounds familiar, yes, sir.
14     Q.  Was he present at the meeting with Mr.
15 Guthrie, or did you meet with him separately?
16     A.  I don't remember when I met Mr. -- met
17 with him specifically.  But like I say, the name
18 sounds familiar.  I do believe I have, I have
19 talked with him.
20     Q.  Did anyone question the fact that the --
21 your boss was absent at the time of this
22 occurrence?
23     A.  They wouldn't have questioned
24     Q.  Huh?
25     A.  They wouldn't -- they didn't question me

- 110 -

**EDWARD BUSCH**

MiniDep by Kenson

1  about it.
2      Q.  How long was the meteorological service
3  inoperable prior to Hurricane Katrina?
4      A.  They were using the contractors for --
5  that were building the building to also do the
6  roofing on that building, so it was at least a
7  month.
8      Q.  It was out for at least a month before
9  Hurricane Katrina?
10     A.  Yes, sir.
11     Q.  What other means of monitoring the
12 weather conditions did, were instituted?
13     A.  Well, when the computers were up and
14 operating, we could go on computers and get
15 weather reports offline.
16     Q.  And when was the last time that the
17 computers were operable referable to the
18 hurricane?
19     A.  The Friday before Thursday they were
20 working.
21     Q.  Were they working on -- you said the
22 Friday before --you were there on Saturday the
23 27th?
24     A.  Yes, sir.
25     Q.  When did they stop working with relation
- 111 -

1  yourself of?
2      A.  No, sir.
3      Q.  You can directly communicate with Union
4  with your two-way radio?
5      A.  You asked me that before, and, yes, sir,
6  we could.
7      Q.  But you never called to see if they could
8  supply you with the weather service?
9          MR. WALKER:
10             Asked and answered.
11         THE WITNESS:
12             No, sir.
13 BY MR. WIEDEMANN:
14     Q.  You indicated in your statement, which is
15 dated October 31, 2005, that the line was secured
16 to the bollard on the dock.  Do you recall that?
17     A.  Which line, sir?
18     Q.  You're speaking of the mooring lines
19 between the dock and the barge?
20     A.  Yes, sir.
21     Q.  And they were tied -- they were secured
22 to the bollards on the dock?
23     A.  Yes, sir.
24     Q.  Were any of the bollards bent or broken -
25 -
- 113 -

1  to the 27th?
2      A.  The computers -- the phone service coming
3  in for the computers, we had a dedicated line, a
4  DSL line, that came in for the computers, and
5  that was in the process of being moved.  Friday
6  night they took the -- those lines down so that
7  they could be moved into the other building.
8  Friday night we had no computer and Monday we had
9  no computer at the plant.
10     Q.  So Friday -- you're talking about the
11 26th or the Friday before that?
12     A.  The Friday -- the 26th.
13     Q.  After the 26th you had no computer
14 service?
15     A.  Correct.
16     Q.  So you couldn't check weather by the
17 computer?
18     A.  No, sir.
19     Q.  Was there any other source of weather?
20     A.  Just the weather reports on the radio.
21     Q.  Does Lafarge have weather service at
22 other facilities such as Union, Louisiana?
23     A.  I have -- I don't know, sir.
24     Q.  Did you call Union to see whether or not
25 they had weather service that you could avail
- 112 -

1      A.  No, sir.
2      Q.  -- following the hurricane?
3          MR. WALKER:
4              Asked and answered.
5  BY MR. WIEDEMANN:
6      Q.  Were any of the ears broken?
7      A.  No, sir.
8      Q.  Do you know what Union, Louisiana's
9  hurricane plan was?
10     A.  No, sir.
11     Q.  Did you or anyone else at the Lafarge
12 ever provide structured training to the employees
13 concerning mooring techniques?
14         MR. WALKER:
15             Object to the term "structured
16 training."
17 BY MR. WIEDEMANN:
18     Q.  Organized training, schooling,
19 publications, videotapes, seminars, mockups,
20 pictures?
21         MR. WIEDEMANN:
22             Does that cover it to your
23 satisfaction?
24         MR. WALKER:
25             It's not my question.
- 114 -

**Peter Caruso & Associates (504) 432-3656**
P.O. Box 10741, Jefferson, Louisiana 70181

EDWARD BUSCH

THE WITNESS:

    There was training on the dock. New employees were trained by the older employees or the more senior employees, and we had safety meetings that revolved around the safe operation of the dock and the equipment on the dock. Part of that was, you know, tying ropes or moving ropes or whatever out on the dock.

BY MR. WIEDEMANN:

    Q. Was there any written procedure other than the hurricane checklist that you know of?

    A. Not that I know of.

    Q. Well, part of that safety procedure was to have access to the weather information, to have access to the e-mail, to have access to faxes, that's part of your safety program, isn't it?

    A. No, sir.

    Q. No?

    A. No. Having access to the weather, you can get access to the weather off of a radio. If the computers go down, if the phone lines go down, they're down. There's nothing I can do about those.

- 115 -

MR. WIEDEMANN:

    That's it.

MR. WEBB:

    Anybody else?

MR. O'DWYER:

    Off the record.

    (Discussion off the record.)

- 117 -

    Q. Did you -- what effort did you take to have -- to keep apprised of the weather conditions in light of the inoperable meteorological service?

    A. During normal operations when the computers were up, I'd use the computer.

    Q. But they were out after Thursday?

    A. Yes, sir.

    Q. Did you have any other -- that service was provided by Lafarge so that you would be kept up on the weather conditions; is that right?

    A. Yes, sir.

    Q. Did you or the terminal manager at any time advise anybody at Lafarge that the meteorological system was inoperable?

    A. I don't know what his communications was with anyone else.

    Q. When did he come back?

    A. I don't know the exact date, but --

    Q. He didn't come back before the hurricane?

    A. No. No. Yes, he did. He came back to evacuate his family.

    Q. But I mean, he didn't come back to the Lafarge facility?

    A. No, sir.

- 116 -

REPORTER'S PAGE

    I, Peter Caruso, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(b) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the Record:

    That due to the interaction in the spontaneous discourse of this proceeding, dashes ( - ) have been used to indicate pauses, changes in thought, and/or talk-overs; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes ( - ) do not indicate that words or phrases have been left out of this transcript;

    That any words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetic)."

Peter Caruso, CVR-CCR

    Certified Court Reporter

- 118 -

CERTIFICATE

This certification is valid only for a transcript

**EDWARD BUSCH**

MiniDEp by Kenson

accompanied by my original signature and original blue stamp on this page.

   I, Peter Caruso, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that Edward Busch, after having been first duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 117 pages;

   That this testimony was reported by me in the Stenographic (voice-writing) method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

   That I am not related to counsel or to the parties herein; am not otherwise interested in the outcome of this matter; and am a valid member in good standing of the Louisiana State Board of Examiners of Certified Shorthand Reporters.


                    Peter Caruso, CCR-CVR
                    Certified Court Reporter
Louisiana License #20088

                    - 119 -

---

CORRECTIONS/CHANGES TO THE DEPOSITION OF:

                    Edward Busch

          Taken: Tuesday, November 14, 2006

Page/Line  Reading              Should Read

          /
          /
          /
          /
          /
          /
          /
          /
          /
          /
          /
          /
          /
          /

                                        - 121 -

---

WITNESS' CERTIFICATE


   I, Edward Busch, do hereby

certify that I have read, or have had read to me,

the foregoing testimony, and it is true and

correct to the best of my ability and

understanding.

(Check one)

Without corrections.

With corrections and/or

additions attached hereto.

Edward Busch

                    - 120 -

**Peter Caruso & Associates (504) 432-3656**
P.O. Box 10741, Jefferson, Louisiana 70181