UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  KATRINA CANAL BREACHES     CIVIL ACTION
CONSOLIDATED LITIGATION

NO. 05-4182

"K" (2)


PERTAINS TO:  BARGE                JUDGE DUVAL


MAG. WILKINSON


BOUTTE V. LAFARGE        05-5531
MUMFORD V. INGRAM        05-5724
LAGARDE V. LARFARGE      06-5342
PERRY V. INGRAM          06-6299
BENOIT V. LAFARGE        06-7516
PARFAIT FAMILY V. USA    07-3500
LAFARGE V. USA           07-5178


DEPOSITION OF JENNIFER MILLER ARNOLD,
61 Graham Drive, Mayfield, Kentucky 42066,
taken in the offices of Chaffe, McCall, 2500
Energy Centre, 1100 Poydras Street, New
Orleans, Louisiana 70163, on Tuesday, June 11,
2008.

APPEARANCES:

        BRIAN A. GILBERT LAW OFFICE
        (BY: BRIAN A. GILBERT, ESQ.)
        821 Baronne Street
        New Orleans, Louisiana 70113
                ATTORNEY FOR THE PLAINTIFFS (BARGE)


        PATRICK J. SANDERS LAW OFFICE
        (BY: PATRICK J. SANDERS, ESQ.)
        Suite 100
        3200 Ridgelake Drive
        Metairie, Louisiana 70002
                ATTORNEY FOR THE PLAINTIFFS (BARGE)


        LAW OFFICES OF JOSEPH M. BRUNO
        (BY: SCOTT JOANEN, ESQ.)
        855 Baronne Street
        New Orleans, Louisiana 70113
                PLAINTIFF LIAISON COUNSEL

          STONE PIGMAN WALTHER WITTMANN
          (BY: HEATHER LONIAN, ESQ.)
          546 Carondelet Street
          New Orleans, Louisiana  70130-3588
                ATTORNEYS FOR WASHINGTON GROUP
                INTERNATIONAL, INC.

        UNITED STATES DEPARTMENT OF JUSTICE
        (BY: KEITH LIDDLE, ESQ.)
        Post Office Box 888
        Benjamin Franklin Station
        Washington, D.C. 20004
                ATTORNEY FOR UNITED STATES OF
                AMERICA

        BURGLASS & TANKERSLEY
        (BY: LUCIE THORNTON, ESQ.)
        5213 Airline Drive
        Metairie, Louisiana 70001
                ATTORNEYS FOR JEFFERSON PARISH

APPEARANCES CONTINUED:

    MCCRANIE, SISTRUNK
    (BY: DARCY E. DECKER, ESQ.)
    Suite 800
    3445 North Causeway Blvd.
    Metairie, Louisiana 70002
        ATTORNEYS FOR ORLEANS LEVEE DISTRICT

    DAIGLE, FISSE & KESSENICH
    (BY: KIRK N. AURANDT, ESQ.)
    227 Highway 21
    Madisonville, Louisiana 70447
        ATTORNEYS FOR PORT OF NEW ORLEANS

    MOULEDOUX, BLAND, LEGRAND & BRACKETT
    (BY: C. WILLIAM EMORY, ESQ.)
    Suite 4240 One Shell Square
    701 Poydras Street
    New Orleans, Louisiana  70139
        ATTORNEYS FOR ZITO

    MONTGOMERY, BARNETT, BROWN, READ, HAMMOND
    & MINTZ
    (BY: RONALD J. KITTO, ESQ.)
    3200 Energy Center
    New Orleans, Louisiana 70163
        ATTORNEYS FOR THE AMERICAN CLUB

    CHAFFE, MCCALL LLP
    (BY: DEREK WALKER, ESQ.
        GEOFF GARBER, ESQ.
        KRISTEN GRESHAM, ESQ.)
    2300 Energy Center
    New Orleans, Louisiana 70163
        ATTORNEYS FOR LAFARGE NORTH AMERICA

    GOODWIN PROCTER  LLP
    (BY: MARK S. RAFFMAN, ESQ.
    901 New York Avenue NW
    Washington, D.C. 20001
        ATTORNEYS FOR LAFARGE NORTH AMERICA

APPEARANCES CONTINUED:

        SUTTERFIELD & WEBB
        (BY: DANIEL A. WEBB, ESQ.)
        650 Poydras Street
        Suite 2715
        New Orleans, Louisiana 70130
                ATTORNEYS FOR NY MAGIC

        DUPLASS, ZWAIN, BOURGEOIS PFISTER &
        WEINSTOCK
        (BY: PHILIP WATSON, ESQ.)
        3838 North Causeway Blvd.
        Suite 2900
        Metairie, Louisiana 70002
                ATTORNEYS FOR LAKE BORGNE LEVEE
                DISTRICT

REPORTED BY:  ROGER D. JOHNS, RMR, CRR, CSR
                Certified Court Reporter,
                State of Louisiana

S T I P U L A T I O N

It is stipulated and agreed by and between

counsel for the parties hereto

that the deposition of the aforementioned

witness is hereby being taken under the

Federal Rules of Civil Procedure, for all

purposes, in accordance with law;

That the formalities of reading and

signing are specifically not waived;

That the formalities of certification and

filing are specifically waived;

That all objections, save those as to the

form of the question and the responsiveness of

the answer, are hereby reserved until such

time as this deposition, or any part thereof,

may be used or sought to be used in evidence.

*   *   *   *

ROGER D. JOHNS, RDR, CRR, Certified Court

Reporter for the State of Louisiana,

officiated in administering the oath to the

witness.

I N D E X

                                              PAGE

LNA-0000706 to 722......................... 19

EXAMINATION BY MR. SANDERS:................. 7

EXAMINATION BY MR. EMORY:.................. 51

                    JENNIFER MILLER ARNOLD,

61 Graham Drive, Mayfield, Kentucky 42066,

after being duly sworn, did testify as

follows:

          MR. GILBERT:

              I have a request and I am making

          it probably on behalf of Dan Webb

          also, I can barely hear.  It's not

          you.  It's me.  He can barely hear.

          It's him.  If you could just -- Thank

          you.

          THE WITNESS:

              Sure.

EXAMINATION BY MR. SANDERS:

     Q.   Miss Arnold, my name is Pat Sanders

and I represent some of the claimants in this

case on behalf of the barge people.

          The address you just gave the

Court Reporter, is that your home address?

     A.   Yes.

     Q.   Is that the correct address for your

home?

     A.   Yes.

     Q.   Okay.  What is your business

address?

A.   It's also the same.  I office from
my home, but I'm rarely there.

Q.   What, you work out of your home?

A.   Uh-huh (affirmatively).

Q.   Okay.  We're here to take your
deposition.  Have you ever given a deposition
before?

A.   Yes.

Q.   In connection with what?

A.   Worker's compensation claims.

Q.   Approximately how many times?

A.   Two or three.

Q.   Okay.  Were all those cases worker's
compensation claims?

A.   Yes.

Q.   And I would venture to say what's
going to happen today is probably what
happened in those depositions:  People are
going to ask questions, and we ask that you
give your answers as concisely as possible.
It's okay to say you don't remember if you
don't remember.  It's okay to say you don't
know if you don't know.

You understand that you just swore
to tell the truth?

A.   Yes.

Q.   Ma'am, could you give us your date
of birth?

A.   November 22nd, 1971.

Q.   I am not going to ask you your
Social Security number because I view that as
very private, but some of these questions are
general background questions that have been
asked of all people.  I don't want you to be
offended by me asking the questions.

          Do you have any military
background?

A.   No.

Q.   What's your educational level?

A.   I have a Bachelor's of Science in
occupational safety and health from Ray State
University.

Q.   Okay.  I understand you may take
seminars and classes periodically?

A.   Sure.

Q.   Do you have any type of license or
 --

A.   No.

Q.   Okay.  Have you ever been convicted
of any crimes?

A.   No.

Q.   Do you have any particular training, whether it be seminars or classes, regarding maritime safety?

A.   No.

Q.   In connection with this case, have you given a statement to anyone?  And you know what I mean by a statement?  Whether they might have recorded --

A.   No.

Q.   -- a session?  Have you signed any written statements?

A.   No.

Q.   Okay.  Could you tell us your employment history starting with the present and going back?  And just approximately how long did you work at each place.

A.   Okay.  From -- I began with Lafarge as an area safety advisor in the River Region, River business unit, beginning in February of 2005.  Prior to that I worked as a safety person for Celanese Chemicals from December of 2000 until I started with Lafarge.  And prior to that I worked for SKW Metals and Alloys/C. C. Metals and Alloys.  Began in June of '94

until December of 2000.

Q.   Okay.  With regard to the employment at these other places, did any of those places have marine terminals?

A.   Yes.  C. C. Metals did.

Q.   Okay.  And in connection with your job duties did you oversee safety at that terminal?

A.   We unloaded raw materials from that facility and I did from the standpoint of we did have ocean inspections, a couple of Federal ocean inspections there.

Q.   But did your job title involve overseeing safety at the terminal?

A.   I was safety for the plant.  My primary -- My primary objective is to make sure that everyone doesn't -- no one gets injured, that everyone is safe.

Q.   That involves people at the dock?

A.   We didn't have a formal dock per se.  It was a very informal.  We just brought a barge in attached to a pier and unloaded.

Q.   Did it involve safety of the handling of barges?

A.   No.

Q.   Okay.  Was that a different safety
person?

A.   We didn't move or handle the
barges.  It was done by someone else.

Q.   Did that company moor the barges?

A.   Yes.

Q.   Tie it up?

A.   Yes.

Q.   Okay.  With regard to your duties as
area safety advisor for Lafarge, would you
tell us, what is your job description?  What
does it involve?

A.   I am assisting terminals, sales
offices, and a plant in implementation of
safety standards.  I assist with training.
Any questions that they may have from a safety
perspective, try to assist them in those in
whatever way possible, and just general
safety.  Keeping people safe so that they
don't get injured on the job.

Q.   Okay.  So is it fair to say that you
do inspections of terminals or facilities?

A.   I do -- I am involved in the
auditing process, yes.

Q.   What is the auditing process?

A.   We have -- They began a new auditing
process when I started, and there are a set of
questions and we go through and audit the
facility based on those questions.

Q.   And does the audit in essence
involve inspections?

A.   Yes.

Q.   Does it involve an assessment of
risks?

A.   Yes.

Q.   Does it involve an audit or an
assessment of policies and procedures in
place?

          MR. RAFFMAN:

            Objection.

            Go ahead, you can answer.

          THE WITNESS:

            Yes.

EXAMINATION BY MR. SANDERS:

Q.   Does your job involve monitoring of
safety policy and procedures?

A.   Sure.  Yes.

Q.   And does your job involve
enforcement of policy and procedures within
the company?

A.   No.  Enforcement is an HR issue.

Q.   Okay.  So if somebody is violating a safety rule --

A.   I'll ask that they follow the rule.

Q.   Okay,?

A.   But as far as punishment or anything like that, that's handled through Human Resources.

Q.   Okay.  If someone violates a safety policy or rule, do you issue any type of written documentation to the facility?

A.   No.

Q.   It's just verbal?

A.   Uh-huh (affirmatively).

Q.   Okay.  Do you prepare safety policies for the facilities?

A.   Sometimes, yes.  It depends.

Q.   Mr. Guthrie has told us that Lafarge has a company-wide operational procedure policy in that the terminals or facilities have site specific --

A.   Yes.

Q.   -- policies and procedures.

    MR. RAFFMAN:

       You have to let him finish and

then you can answer.

THE WITNESS:

Oh, sorry.

EXAMINATION BY MR. SANDERS:

Q.   Is that correct?

A.   Yes.

Q.   He said that because it's hard for
the reporter to type down two people --

A.   Two people at a time.

Q.   So do you review the site specific
policies and procedures of the terminals?

A.   During an audit, yes.

Q.   Okay.  With regard to the policies
and procedures specific to any facility, do
you ever prepare them?

A.   Site specific policies?  Yes.
Some.

Q.   Okay.  Have you prepared any
policies or procedures for the New Orleans
facility?  Prior to the storm.

A.   No.

Q.   Okay.  After the storm?

A.   Yes.

Q.   What exactly was prepared?

A.   New employee safety training.

Lock-out/tag-out.  And I developed a training

matrix, not just for them specifically, but

for all the terminals as far as the training

requirements under OSHA and under Lafarge.

Q.   Okay.  So we've got a safety

program, I think you said the first item?

What was it?

A.   A new employee safety training.

Q.   Okay.  Was that a written manual?

A.   It's a written document.

Q.   Okay.  What areas of safety were

addressed?

A.   All the requirements that OSHA

requires for a new employee to have training

on and any Lafarge-specific requirements.

Q.   Did any of those requirements

involve mooring?

A.   No.

Q.   Okay.  Was that document supposed to

be in place before the storm?

A.   I didn't write it until afterward.

Q.   Did Lafarge require its facilities

to have a safety manual in existence prior to

the storm?

A.   Yes.

Q.   But this facility did not?  Is that correct?

A.   They had safety manuals, yes.

Q.   They had a safety manual?

A.   They had several safety manuals.

Q.   What safety manuals did they have?

A.   The distribution facilities have a set of 30 some-odd binders that address bloodborne pathogens, fall protection, CPR and first aid, lock-out/tag-out, all of the OSHA requirements.

Q.   Okay.  Anything regarding mooring?

A.   No.

Q.   Anything regarding instructions for unloading or loading barges?

A.   No.

Q.   Anything regarding the arrival of barges?

A.   No.

Q.   Okay.  I'm talking about policies and procedures.

A.   Right.

Q.   Okay.  Would you agree, ma'am, as a safety advisor that policies and procedures should be in writing?

A.   Yes.

Q.   And why is that?

A.   Well, in auditing, if a procedure is not in writing you can't prove that it exists.

Q.   Okay.

A.   Although we have some leeway in some of our auditing as practices, the practices exist, we can allow for practices that are not written.

Q.   And doesn't authoring written policies and procedures give notice to persons who read it of the policies and procedures?

A.   Yes.

Q.   Does it ensure consistency?

A.   Yes.

Q.   Okay.  Do you know of any policy or procedures manual regarding -- this is at the Lafarge facility prior to the storm -- which involved diagrams of tie-off mooring procedures?

A.   No.  They're not included in the safety binders.

Q.   Do you know of any that existed at the New Orleans facility prior to the storm?

MR. RAFFMAN:

Objection.

Go ahead and answer.

THE WITNESS:

Any of what existing?

EXAMINATION BY MR. SANDERS:

Q.   Any diagram of tie-off mooring procedures.

A.   No, that wouldn't be in my -- my safety binders that I would be looking at, no.  There may have been from a distribution standpoint.

Q.   Okay.  Have you seen this document, which is marked LNA-0000706 to 722?

A.   Did I look at that yesterday?  I looked at one document yesterday with Mark that I had not seen, and I am not -- I think this may be it.

Q.   You're not sure whether that's it, or are you sure?

MR. GILBERT:

Off the record.

(Whereupon a discussion was held off the record.)

EXAMINATION BY MR. SANDERS:

Q.   Ma'am, you can't look to the

attorney.

      MR. RAFFMAN:

       You have to answer the question.

      THE WITNESS:

       I don't know because I didn't

  examine it that closely.

EXAMINATION BY MR. SANDERS:

   Q.  That's fine.  It's okay to say you

don't know.  So you looked at a document

yesterday.  Was it only one document?

   A.  I believe so.

   Q.  To me you sound unsure.  Are you

unsure?

   A.  I may have looked at a second one,

but I don't even recall what that was.  They

were documents I wasn't familiar with.

   Q.  So you had not seen these documents

before yesterday?

   A.  No.

   Q.  Was this in a meeting with your

attorney?

   A.  Yes.

   Q.  And this involved preparation for

the deposition?

   A.  Yes.

Oh, there was a second document.
I remember it specifically.

Q.   Do you remember the titles of these
documents?

A.   No.  The one looked something
similar to that and the other was a checklist,
both of which I had never seen before.

Q.   Okay.  So the document I just showed
you, had you ever seen this document before
today?  This is LNA-706 to 722.

A.   That one could be it that he showed
me yesterday.  It looked something similar to
that.

Q.   So before yesterday, though, --

A.   No.

Q.   -- you had never seen this document?

A.   No.

Q.   Okay.

A.   No, it appeared to be a Distribution
document.

Q.   Okay.  Are there any documents that
Lafarge uses to advise the facilities as to
what policies and procedures they should have
in place?

MR. RAFFMAN:

Objection, vague.

EXAMINATION BY MR. SANDERS:

Q.   Do you understand the question?

A.   From a safety perspective I do.

Q.   What document is that?

A.   We have Lafarge -- Prior -- At the
point in time that we're talking about, there
were Lafarge North America written policies,
safety policies.

Q.   Say that again, the title?

A.   Lafarge North America safety
policies.  There was a Lafarge North America
guidance document for various safety
procedures.

Q.   Is that given to each facility?

A.   It's available on the Internet.

Q.   Okay.  And does that document have
requirements that each facility prepare site
specific documents?

A.   Yes.

Q.   What documents are the sites
supposed to prepare for their own facilities?

A.   Well, in relation to safety, they
have documents for lock-out/tag-out,
bloodborne pathogens, the various general

industry standards that they're required to

meet.

    Q.   Does it involve anything regarding

dock procedures?

    A.   No.

    Q.   Mooring or tying up barges?

    A.   No.

    Q.   Loading or unloading barges?

    A.   No.

    Q.   Okay.  So in an audit process, you

would only audit facilities as to site

specific and company safety policies?

    A.   Right.

    Q.   Nothing involving those areas of

handling barges that we just discussed?

    A.   No.

    Q.   Okay.  Who would audit the

facilities as to the existence or

non-existence of site specific policies and

procedures regarding the handling of barges?

    A.   I am not sure.

    Q.   Okay.  Do you know what department

that would be in Lafarge?

    A.   I believe that would be handled by

Distribution.

Q.    Okay.  Would that be Mr. Guidry's
department?

A.    Not necessarily.  It could be the
Barge Optimization Group.

Q.    And who's head of that group?

A.    Ed Vandermeulen.

Q.    All right.  I'm going to show you a
document entitled "New Orleans Terminal,
hurricane preparation checklist".  It's marked
at the bottom LNA-00113.

MR. SANDERS:

Do we have to say all the zeros,
or can we just say 113?

MR. RAFFMAN:

113 is fine with me.

EXAMINATION BY MR. SANDERS:

Q.    Had you ever seen that document
before?

A.    Just yesterday.  And not before
then.

Q.    All right.  So you had no hand in
the implementation of this document?

A.    No.

Q.    No hand in the enforcement or
auditing process of this document?

A.   No.

Q.   Okay.  You might get off easy
today.

          Does your office deal in any way
with the implementation of policies or
procedures regarding the movement of barges?

A.   No.

Q.   And that would involve the movement
for weather conditions.

A.   No.

Q.   I'm going to direct your attention
to the time right before the storm.  The storm
occurred August 29th, 2005.

A.   Uh-huh (affirmatively).

Q.   That's when it hit New Orleans.  Did
you have any conversations at the New Orleans
facility with anyone regarding storm
preparations?

A.   I did at the time of Hurricane
Dennis.

Q.   And that was before Hurricane
Katrina?

A.   Yes.

Q.   About how long before?

A.   I don't recall.

Q.    What was the -- What was discussed?

A.    I asked my boss, who is not at that site, if there were hurricane evacuation procedures and he told me yes, that the sites handle development of those themselves.  And so I asked Dennis Millon -- told him that I understood that he had hurricane procedures, but I wanted to know who made the decision as to when the evacuation would take place; and he told me that he was the one who made that decision.

Q.    Now, you started in February of 2005.

A.    Yes.

Q.    And Hurricane Dennis happened apparently between February, 2005 and August, 2005?

A.    Yes.

Q.    Okay.  So was it your concern for the safety of the employees?

A.    Yes.

Q.    You weren't concerned, nor was it your responsibility to be concerned, about vessels at the dock?

A.    Not necessarily.  My concern was to

make sure that they had done all the
preparation that their in-house procedure,
their location procedure would require them to
do as far as securing whatever that their
procedure required them to secure and to get
them evacuated and out of the facility.

Q.   Would securing the facility involve
securing barges?

A.   I don't know.  That's their site
specific policy.

Q.   Okay.  So correct me if I am wrong.
You called and talked to Mr. Millon to make
sure they abided by their hurricane procedures
in place?

A.   I emailed Dennis Millon at the time
of Hurricane Dennis and asked if -- told him
that I understood he had a procedure and would
he -- would -- who made the decision as to
when the evacuation took place.

Q.   What was the procedure?  Had you
ever seen it?

A.   No.

Q.   Was it in writing?

A.   I don't know.

Q.   Okay.  Did you ask what it was?

A.   No.

Q.   Okay.  Was that a single
conversation with Mr. Millon?

A.   It was an email with him.

Q.   Oh, an email.  Sorry.  Other than
that single email, were there any other
emails?

A.   Not with Dennis, no.

Q.   Anybody else?

A.   No.  I believe the conversation was
with my boss, as I already stated.

Q.   Okay.  Is it fair to say that during
your employment prior to Hurricane Katrina,
you haven't seen any hurricane plan utilized
by the New Orleans facility?

A.   No.

Q.   Okay.  Had you been to the New
Orleans facility prior to Hurricane Katrina?

A.   Twice.

Q.   To clarify, have you ever seen any
hurricane plan utilized by the New Orleans
facility prior to Hurricane Katrina?

A.   No.

Q.   And your answer to whether you had
been to the facility was "no"?

A.   Yes, I have been there twice.

Q.   Oh.  And when was that?

A.   My first visit was with my boss in February, I believe the week of Valentine's day, and it was a general meeting of all the people at the terminal and a general look-over of the terminal.

Q.   There was no formal inspection or anything like that?

A.   No.

Q.   Was it more of a way to introduce you to everybody?

A.   A way to introduce me to the facility, because I had several facilities that he took me to to meet all the different people that I'd be working with.

Q.   When was the next visit?

A.   The next visit was not the immediate work week before Katrina, but the work week before that.

Q.   And why did you go?

A.   I go -- I came to all three of my terminals that I am responsible for in Louisiana trying to make an assessment of what their needs may be that I think that I can

help them with from a safety perspective.

Q.   Who did you see when you went
there?

A.   Dennis Millon, Annette Gaskin, Ed
Bush, and several of the terminal employees.

Q.   What were their needs?

A.   Well, they were getting ready to
move their office from a trailer to their new
office building.  They were, if I recall
correctly, waiting on phone and Internet
service to move to the new building.  I
determined that -- that I would come back the
week -- a week or two weeks after Katrina hit
and I would help them organize, get all of
their documents from a safety perspective
organized in their new office building and we
would go through them and see what we needed.

Q.   Was their Internet and phone out at
the time?

A.   At the --

Q.   Facility?

A.   At the trailer, no.  But in the new
office, yes.

Q.   Okay.  Did you discuss anything
regarding Hurricane Katrina or its approach?

A.   No, because it wasn't in the Gulf I
don't believe at that point in time.

Q.   Okay.  Did you review any safety
policy or procedures manuals?

A.   Not at that time.  We just reviewed
the fact that we needed to get them moved and
get them organized in the new building.

Q.   But they did have safety policy and
procedure manuals --

A.   Yes.

Q.   -- at that facility?

A.   Yes.

Q.   Okay.  From the date of that visit
to the storm, did you have any conversations
with anyone at the facility about the storm?

A.   Yes.

Q.   Who and when?

A.   I spoke to Ed Bush on the Saturday
morning and afternoon before the storm.

Q.   Can you tell us, did you call him?
What was said?

A.   I called Ed on the morning --
Saturday morning and told him that -- asked
him what they were doing in preparation for
the storm.  That I could not reach Dennis.

Did he know where Dennis was.  And he said
Dennis had been on vacation and that they were
taking all the preparation steps for the
storm, they were securing the facility and
that they would be evacuating.  I asked him to
call me to let me know when they had completed
everything and would be evacuating so that I
knew that they were gone.

     Q.   Okay.  Did he call you?

     A.   Yes.  He called me that afternoon
and explained to me that they were -- they had
completed all of their preparations.  He had
called to have a barge picked up and that
there was an employee that was still in the
facility loading a truck and that he would be
loaded -- he would be out in the next 15
minutes and lock the gate behind him.

     Q.   Had Mr. Bush left by this time?

     A.   He was on his way out at that point.

     Q.   Did he mention anything about how
the barges were tied up?

     A.   No.

     Q.   And did you ask him?

     A.   No.  That's not my area of
expertise.

Q.   Regarding the barge that he had
called to be picked up, did he say anything
about when he expected it to be picked up?

A.   No.

Q.   Did he say who he called?

A.   I believe he did, but I don't
recall.

Q.   If I say the word "Zito Fleeting",
would that jog your memory?

A.   Not for that point in time, no.

Q.   Okay.  Ingram Barge Lines?

A.   Not for that point in time, no.

Q.   Did he say, with regard to any
particulars, what was done at the facility in
preparation for the storm?

A.   Not that I can recall.  He may have,
but I don't remember.

Q.   Okay.  Did he express to you any
concerns about anything at the facility
regarding the storm?

A.   Not at the facility, no.

Q.   About any of the vessels?

A.   No.

Q.   Did he expect for that barge to be
picked up before the storm?

A.   He didn't say.

Q.   Okay.  After that conversation when he called you the second time and said everything was secure, when was the last time you spoke to Mr. Bush?

A.   That was the last time I spoke to him.

Q.   Okay.  Did you speak to Mr. Bush at any time after the storm about the barge breakaway?

A.   I don't recall speaking to him, no.

Q.   Did you speak to Mr. Millon about the barge breakaway?

A.   No.  I honestly don't know who told me about the barge breakaway.  I don't recall who would have told me.

Q.   Was there any type of investigation done by Lafarge that you're aware of concerning the barge breakaway?

A.   Not that I am aware of.  We investigate, we do root cause analysis on -- from my perspective on safety incidents. Other groups, the Distribution Group probably would have been responsible for initiating a root cause analysis.

Q.   Explain to me what a root cause analysis is.

A.   In the Safety Department for safety or injury-related incidents, we use the DNV root cause analysis method to investigate injuries and potential injuries to employees.

Q.   Why?

A.   So that we can prevent future injuries or prevent any from occurring to begin with.

Q.   This process, is it some sort of national standardized process used by large corporations?  Could you enlighten us?

A.   It's one of many.

Q.   Who sponsors it?

A.   DNV.

Q.   And what does that stand for?

A.   I can't remember the name of the company.  It's out of Atlanta.

Q.   Okay.  What is that company do?

A.   They provide safety training, different types of safety training as well as root cause analysis.

Q.   And this is a group that Lafarge is a member of or pays a fee to?

A.   Pays a fee to for training.  I have been through that training.

Q.   I asked you about Mr. Millon and Mr. Bush.  Did you speak to anyone after the barge breakaway or after the storm about the breakaway?

A.   Much later I talked to Ed Vandermeulen and told him.  He asked me about the conversation that I had with Ed.

Q.   Did Mr. Vandermeulen express any concerns about anything?

A.   Not that I recall.

Q.   Did he say why the barge broke away?

A.   No.

Q.   Did you see any emails or any other interoffice communications concerning the barge breakaway and its reasons for?

A.   No.

Q.   That wasn't your area?

A.   No.

Q.   Okay.

A.   Post-storm I was concerned with our people going back in and what they would be exposed to, making sure that they followed CDC guidelines.

Q.    Again, I have to ask this, I think I
know the answer, but after the storm, other
than Mr. Bush and Mr. Millon, did you speak to
any other New Orleans facility personnel about
the barge breakaway?

A.    No, and I don't recall speaking to
Ed or Dennis specifically about the barge
breakaway immediately thereafter.

Q.    I didn't mean to imply you did. I
just remembered asking you about them.  So my
apologies.  Did you visit the facility after
the storm?

A.    Yes.

Q.    When?

A.    Sometime in December.

Q.    Who else was present?

A.    My boss, Dan Thompson; and his boss,
Dave Herman.

Q.    Did you take photographs?

A.    I took some photographs of the
facility.

Q.    Did any of the other gentlemen take
photographs?

A.    I believe Dave Harmon took some
photographs of the facility.

Q.   And Mr. Harmon, what is his
position?

A.   He was at that time the Director of
Safety for North America.

Q.   So this visit was in connection with
your job duties as safety advisor and Mr.
Harmon's duties as Safety Director?

A.   Yes.

Q.   And what exactly did y'all do at the
facility?

A.   We looked at the facility to see
from a safety perspective what things needed
to be addressed in bringing the terminal back
up to par as well as making sure that our
people that were in the process of doing that
were performing the functions safely.

Q.   Were there any concerns regarding
safety as a result of that visit?

A.   No.

Q.   Were any written documents prepared,
safety inspection checklist or anything like
that?

A.   No.

Q.   Okay.  And were there any attorneys
present when you went?

A.   No.

Q.   Were y'all told to go there by any
of the attorneys?

A.   No.

Q.   How long was the facility out of
commission?

A.   I don't know exactly.

Q.   Was it running when you went in
December?

A.   Yes.

Q.   Oh, it was up back in --

A.   Somewhat.  I can't -- I don't
remember if it was fully functional yet or
not.  But I know that it was running on some
level.

Q.   Okay.  When you first called Ed Bush
on that -- I believe it was Saturday, --

A.   Yes.

Q.   -- what time about was that?

A.   I want to say somewhere around 9:00
or 9:30 if I remember correctly.

Q.   Okay.  How did you know to call him
about the storm?

A.   Because I couldn't reach Dennis
Millon.

Q.   But were you watching some news channel or --

A.   Yes.

Q.   -- getting some weather advisory?

A.   Yes, the Internet.

Q.   Okay.  What time did you go -- Did you go to work that morning or you --

A.   No.

Q.   Oh, you work from home.

A.   That was Saturday.

Q.   Yes.  Okay.  Did Mr. Bush tell you anything about the facility's weather service on any of these phone calls?

A.   No.

MR. SANDERS:

Does anybody else have questions?

No?  Let me take a minute.

(Whereupon a discussion was held off the record.)

EXAMINATION BY MR. SANDERS:

Q.   Ma'am, other than this hurricane preparation checklist, which is LNA-113, are you aware of any other type of hurricane preparation policy and procedure manual?

MR. RAFFMAN:

Objection.  It's vague as to

time.

EXAMINATION BY MR. SANDERS:

Q.   Prior to the storm.

A.   No, and I was not aware of that one

at the time --

Q.   Okay.

A.   -- specifically.

Q.   Okay.  Regarding your visit in

December to the facility after the storm, did

you assess environmental hazards?

A.   Environmental from what --

Q.   I thought you mentioned the word

"environmental exposure".  No, I'm sorry.

Did you do any type of assessment, whether it

be environmental --

A.   From an EPA perspective?

Q.   Correct.

A.   No.  I did not have that area of

expertise.

Q.   In connection with any root cause

analysis that you have performed in connection

with your duties, have you ever done one in

connection with injury to a third party

involving a Lafarge employee?

    A.   No.

    Q.   If there was ever an injury to a
third party involving an act of a Lafarge
personnel, would a root cause analysis be
done?

        MR. RAFFMAN:

         Objection.  Speculation.

         Answer if you can,

EXAMINATION BY MR. SANDERS:

    Q.   Well, I take it that DNV has certain
policies and procedures and guidance that they
provide to corporations.  Is that correct?

    A.   As far as DNV is concerned, they
just trained us on how to use their root cause
analysis method.

    Q.   Do they tell you when to do a root
cause --

    A.   No, that's up to the company.

    Q.   Okay.  DNV, do they provide you a
manual on doing the root cause analysis?

    A.   I believe I have one.

    Q.   Okay.  Does it also indicate why a
root cause analysis should be done?  If you
know.

A.   I really don't know.  I -- I have
not looked at that manual in quite some time.

Q.   Do you know the title of that
manual?

A.   No.

Q.   You just refer to it as the DMV
manual?

A.   DNV.

Q.   DNV?

A.   I wouldn't use it for anything.  I
am experienced in root cause analysis, other
methods, and they're all basically the same.

Q.   What do you call the manual?

A.   I don't call it anything because I
don't use it.  They have a chart that I have
 -- that I use to work through the chart --
the root cause analysis itself.

Q.   Is it a binder or a book?

A.   I don't remember.  I use the chart.
It's a poster.

Q.   But you have seen some sort of
manual; is that correct?

A.   I believe they gave us a training
manual.

Q.   Okay.  And can you describe it for

us?

        A.    No.

        Q.    Okay.

        A.    We didn't really use the manual a

whole lot in the training class.  There were

other things presented besides the root cause

analysis at this training.  General safety

information.

        Q.    Okay.  This was in a training

seminar?

        A.    Yes.  And I had the flu.

        Q.    You had the flu?

        A.    At that time.

        Q.    Or you have it now?

        A.    I had the flu at the time I went

through that training session, so I don't

really remember.

        Q.    When was the training session?

Before the storm?

        A.    I don't recall when the training

session was.

        Q.    Okay.  If you were employed in

February of 2005, does that help you remember

when it was?

        A.    Not especially, no.

Q.   And it's DNV?

A.   DNV.

Q.   And you don't know what those
letters mean?

A.   Its -- It's not English I don't
believe.

Q.   Oh, it's a foreign language?

A.   Yeah.  It's a company based out of
Atlanta, Georgia.

Q.   All right.  In preparation for the
storm or after, did you have any conversations
with any representatives of Ingram Barge
Company?

A.   No.

Q.   Zito Fleeting?

A.   No.

Q.   The United States Coast Guard?

A.   No.  Not in relation to the storm.
I had a friend who's employed by Ingram Barge
in Nashville, but it didn't have anything to
do with the storm.

Q.   Okay.  In whole or in part did you
take part in any investigation about the barge
breakaway?

A.   No, I did not.

Q.   Okay.  Are you aware of anyone who
may have knowledge as to the reasons for the
barge breakaway?

A.   I don't know who would have that
knowledge.

Q.   Are you aware of anyone having been
warned, reprimanded or the like by Lafarge as
a result of the breakaway?

A.   No.  If that were done, it would be
confidential information which I wouldn't have
privy to.

Q.   Okay.  Have you heard any rumors
about, from your dealings with Lafarge people,
as to the reasons for the breakaway?

A.   Not for the reasons, no.

Q.   About what then?

A.   Just -- I haven't heard any rumors
about that at all.  I just -- I was told that
 -- by someone, I don't recall, that the barge
did break away, but I have not been told as to
why it would or would not have.

Q.   Okay.  Have you met with any, or
talked to any Lafarge personnel about expected
testimony in this case?

A.   No.

Q.   You have not met with Mr.
Vandermeulen or talked to him on the phone or
anything like that?

A.   As to my testimony?

Q.   Correct.

A.   No.  I gave him the information
before of my conversations with Ed Bush, and
that's it.

Q.   And it's my understanding you never
did talk to Mr. Millon before the storm?

A.   I talked to him on the phone Sunday
night.

Q.   What was that about?

A.   I was finding out where he was and
he was telling me about his concern for his
children.

Q.   Where was he?

A.   He was in Lake Charles at that
point.  He had been on vacation.

Q.   He was on vacation?

A.   In some remote area fishing, I
believe.

Q.   Okay.  Did you discuss anything
about the facility?

A.   I'm sure we did, but I just don't

remember.

        Q.   Okay.  Anything about vessels or
barges?

        A.   No.

        Q.   Was that a single conversation you
had with him before the storm?

        A.   I don't recall -- I'm sure I talked
to him more than once that evening and then on
that Monday, but it was in relation to him
getting his children and his concern for his
children.

        Q.   Is it fair to say you don't remember
any conversation with Mr. Millon before the
storm about the facility or the barges at the
facility?

        A.   We would not have discussed the
barges.  The only thing I would have discussed
with him would have -- I might have told him,
but I don't recall, would be that I had talked
to Ed.

        Q.   Okay.  What did you tell him about
the conversation with Ed?

        A.   I don't remember.

        Q.   Okay.

        A.   I don't -- I don't know.  I feel

that I would have, but I don't remember what I

said.

        Q.   I just --

        A.   He was distraught about his family,

and that was the big topic of conversation.

        Q.   I just have to ask these questions

to find out or find out that you don't know.

        A.   Right.

        Q.   When you talked to Mr. Bush before

the storm on that Saturday, I think you said

you had two conversations?

        A.   Yes.

        Q.   Did you give him any instructions?

        A.   No.

        Q.   Did you tell him to evacuate?

        A.   No.  He said that they had already

made the decision to evacuate and began

preparation to do so.

        Q.   Did you discuss with him the

expected strength or intensity of Hurricane

Katrina?

        A.   No.

        Q.   So let's say in the three or four

days before Hurricane Katrina you had two

conversations with Mr. Bush, and a few

conversations with Mr. Millon about his

children.  Is that accurate?

    A.   I had a few conversations with

Dennis on the Sunday evening when the -- I

think the storm was actually hitting at the

time.

    Q.   Okay.  Where was he at this time?

    A.   Lake Charles.

    Q.   And what was discussed when the

storm was hitting?

    A.   Just his concerns for his children

and -- and his getting to them.

    Q.   Where were they at?  Were they in

Lake Charles with him?

    A.   No, his children were in the city.

    Q.   Oh.  Is it fair to say during those

conversations you didn't discuss any Lafarge

business?

    A.   I don't recall specifically what.

    Q.   That's fine.  Do you know what

happened with his children?  Did he eventually

get to the city?

    A.   Yes, he did, after the storm, before

the flooding.

    Q.   Did he pick them up or had they been

moved out?

    A.   No, he picked them up.

    Q.   Okay.  Do you know if he went to the
Lafarge facility?

    A.   No, I don't.  The only thing I know
is that he went to his employee, Annette
Gaskin's funeral home; that's where his
children were, to get them.

         MR. SANDERS:

           Okay.  That's it.  Thank you very
      much.

         MR. EMORY:

           Pat, I have a couple down here.
      Hold on.

         MR. SANDERS:

           Sorry.

         MR. EMORY:

           That's all right.

EXAMINATION BY MR. EMORY:

    Q.   Miss Armstrong, my name is Bill
Emory.  I'm representing Zito.  Just a couple
of follow-up questions.

         When you were trying to reach I
think Dennis and ultimately did speak to Ed on
that Saturday morning, did I understand you

were at home at the time?

A.   Yes.

Q.   Were you calling from your home phone or from a business phone?

A.   I don't remember.  Maybe both.  I really don't remember.

Q.   Do you recall, or do you have the same -- You think it would have been a cell phone or a business phone?

A.   Yes.

Q.   What's that cell phone number?

A.   270 493-6004.

Q.   What's your home phone number?

A.   270 247-3961.

Q.   And it would have been one of the two that you would have called from?

A.   Yes.

Q.   Do you recall when you reached Mr. Bush, did you reach him on his cell phone or one of the land lines?

A.   I don't remember that part.  I remember not being able to reach Dennis and I don't know if I had his cell phone number at that time or if I just called the terminal number.

Q.   Okay.  When Mr. Bush called you back
later that afternoon -- First off, do you
recall what time it was that he called you
back?

A.   I think it was around 12:30 or so.

Q.   Do you recall if he called you on
your cell phone or on your home number?

A.   I don't remember.

Q.   Do you recall if he called from his
cell phone or from one of the terminal
numbers?

A.   I believe he called from his cell
phone, because he had -- was departing the
facility at the time.

Q.   Now, I think you told us, if I
understood -- I am down here, so I might not
have heard correctly, but when you spoke to
him and he told you that he had called to have
the barge picked up, he didn't tell you who he
had spoken to or who he had called?

A.   I think he did, but I don't remember
who it was.  Because I wasn't -- Because I was
new at that time, I wasn't familiar with the
various companies that each terminal deals
with.

Q.    Have you had any subsequent
conversations with Mr. Bush concerning who it
was that he called?

A.    No.

Q.    Do you know from any other source
who it was that he called?

A.    No.

Q.    When you spoke with him that
afternoon, was it your understanding that when
he called whoever he called, he actually spoke
with somebody, or he left a message?

A.    He did not say.

Q.    I wrote down what you said, at least
I tried to, and I think you said he called to
tell you that he had called to have "a barge"
or "the barge" picked up.  Do you know which
barge that was?

A.    No.

Q.    Do you know, was it more than one
barge?

A.    I have no idea.

Q.    You used the term "picked up".  Is
that what he said, or is that just what you're
saying now?  In other words, did he say
"picked up"?  Because I am curious.  Did he

say "shift", "picked up", or do you recall?

    A.   I remember him saying "picked up".

    Q.   Okay.  At any point did he tell you that he had spoken with any company to have any of the barges there shifted within the terminal?

    A.   Not that I recall.

    Q.   You've also told us that you subsequently talked to Ed Vandermeulen concerning your conversation with Mr. Bush. What did you tell him about that conversation?

    A.   I told him basically what I have said today.

    Q.   Okay.  Nothing in addition to what you have already told us?

    A.   No.

        MR. EMORY:

          That's all that I have.  Thank you.

        MR. SANDERS:

          Thank you, ma'am.

            *    *    *

WITNESS'S CERTIFICATE


I, JENNIFER ARNOLD, read or have had the preceding testimony read to me, and hereby certify that it is a true and correct transcription of my testimony, with the exception of any attached corrections or changes.



_____

(Witness' Signature)


_____

DATE SIGNED



DEPONENT PLEASE INITIAL ONE:



_____ Read with no corrections



_____ Read and correction sheet attached

DATE TAKEN:  JUNE 11, 2008

REPORTER'S CERTIFICATE


    I, ROGER D. JOHNS, RMR, RDR, CRR,

Certified Court Reporter, do hereby certify

that the above-named witness, after having

been first duly sworn by me to testify to the

truth, did testify as hereinabove set forth;

that the testimony was reported by me in

shorthand and transcribed under my personal

direction and supervision, and is a true and

correct transcript, to the best of my ability

and understanding; that I am not of counsel,

not related to counsel or the parties hereto,

and not in any way interested in the outcome

of this matter.



                    ROGER D. JOHNS

                CERTIFIED COURT REPORTER

                  STATE OF LOUISIANA