1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
                             *
IN RE:                       *       Civil Action
                             *       No. 05-4419
    INGRAM BARGE COMPANY,     *
    ET AL.                    *       Section "C"
                             *
* * * * * * * * * * * * * *   New Orleans, Louisiana
                                     June 4, 2007
```

NON-JURY TRIAL,
EXCERPT; TESTIMONY OF BARRY BOUDREAUX,
BEFORE THE HONORABLE HELEN G. BERRIGAN,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

```
For the Group A Claimants:    Wiedemann & Wiedemann
                              By:  LAWRENCE D. WIEDEMANN, ESQ.
                              821 Baronne Street
                              New Orleans, Louisiana 70113

                              Law Office of Brian A. Gilbert
                              By:  BRIAN A. GILBERT, ESQ.
                              821 Baronne Street
                              New Orleans, Louisiana 70113

                              Patrick J. Sanders, Attorney at
                                Law
                              By:  PATRICK J. SANDERS, ESQ.
                              3123 Ridgelake Drive, Suite B
                              Metairie, Louisiana 70002


For Ingram Barge Company:     Liskow & Lewis
                              By:  DON K. HAYCRAFT, ESQ.
                              By:  S. GENE FENDLER, ESQ.
                              701 Poydras Street, Suite 5000
                              New Orleans, Louisiana 70139
```

APPEARANCES (Cont'd.):


For Joseph C. Domino, Inc.          Emmett, Cobb, Waits & Henning
and Unique Towing, Inc.:            By:  JOHN F. EMMETT, ESQ.
                                    1515 Poydras Street, Suite 1950
                                    New Orleans, Louisiana 70112


                                    Harris & Rufty, LLC
                                    By:  JILL S. WILLHOFT, ESQ.
                                    650 Poydras Street, Suite 2710
                                    New Orleans, Louisiana 70130


For Lafarge North America           Sutterfield & Webb, LLC
and Group B:                        By:  DANIEL A. WEBB, ESQ.
                                    650 Poydras Street, Suite 2715
                                    New Orleans, Louisiana 70130


                                    Goodwin Procter L.L.P.
                                    By:  JOHN ALDOCK, ESQ.
                                    By:  MARK RAFFMAN, ESQ.
                                    901 New York Avenue, NW
                                    Washington D.C. 20001


For American Steamship              Montgomery, Barnett, Brown, Read,
Owners Mutual Protection &           Hammond & Mintz, LLP
Indemnity Association:              By:  PHILIP S. BROOKS, JR., ESQ.
                                    3200 Energy Centre
                                    1100 Poydras Street
                                    New Orleans, Louisiana 70163


For Zito Fleeting, Inc.:            Mouledoux, Bland, Legrand &
                                     Brackett
                                    By:  ANDRE J. MOULEDOUX, ESQ.
                                    By:  C. WILLIAM EMORY, ESQ.
                                    701 Poydras Street, Suite 4250
                                    New Orleans, Louisiana 70139


For Parfait Family:                 Ashton R. O'Dwyer, Jr., Attorney
                                      At Law
                                    By:  ASHTON R. O'DWYER, JR., ESQ.
                                    6034 St. Charles Avenue
                                    New Orleans, Louisiana 70118

3

```
APPEARANCES (Cont'd.):


Court Audio Operator:          Bonnie G. Hebert


Transcriptionist:              Dorothy Bourgeois
                               c/o U.S. District Court
                               500 Poydras Street, Room C151
                               New Orleans, Louisiana 70130
                               (504) 589-7721
```

```
Proceedings recorded by electronic sound recording,

transcript produced by transcription service.
```

**I N D E X**

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Barry Boudreaux | 5 | 14 | -- | -- |

| EXHIBITS: | Marked | Received |
|---|---|---|
| No. 353 Zito Dispatch Orders | 13 | 14 |
| No. 354 Zito Dispatch Report | 13 | 14 |

1                        P R O C E E D I N G S

2                       (Monday, June 4, 2007)

3                        *   *   *   *   *

4              EXCERPT; TESTIMONY OF BARRY BOUDREAUX ONLY

5                        *   *   *   *   *

6              THE COURT:  Mr. Haycraft.

7              MR. HAYCRAFT:  Ingram calls Barry Boudreaux to the

8    witness stand.

9              THE COURT:  All right.

10                       *   *   *   *   *

11             **BARRY JOHN BOUDREAUX, WITNESS, SWORN**

12                       *   *   *   *   *

13                      DIRECT EXAMINATION

14   BY MR. HAYCRAFT:

15   Q.   Good afternoon, Mr. Boudreaux.  By whom are you employed?

16   A.   Intercoastal Marine & Repair.

17   Q.   And what relationship do you have with Zito Fleeting, LLC?

18   A.   I'm the Executive Vice President.

19   Q.   I'm sorry, I didn't hear you.

20   A.   Executive Vice President.

21   Q.   All right.  And were you at Zito Fleeting Algiers Fleet on

22   Saturday August 27th?

23   A.   No, I was not.

24   Q.   In 2005?

25   A.   No, I was not.

Boudreaux - Direct                                          6

1   Q.   Okay.  What location were you located at on Saturday

2   August 27th?

3   A.   I was at our Mile 105 facility, which is in Jefferson.

4   Q.   Is that the Huey P. Long Fleet?

5   A.   The Huey P. Long Fleet.

6   Q.   Okay.  Who was the day dispatcher at Zito Fleeting at

7   Algiers during the morning hours of August 27th, 2005?

8   A.   The dispatching is out of Huey P. Long Fleet for both

9   facilities but it was Chad Washclear (phonetic).

10  Q.   Okay.  And what is the phone number for Zito's dispatch?

11  A.   It's 504 --

12  Q.   To reach Zito's dispatch.

13  A.   It's 504-835-8531.

14  Q.   Okay.  Now, in August 2005 what was the commercial

15  relationship between Zito Fleeting and Ingram Barge Company?

16  A.   Zito Fleeting is a vendor of Ingram Barge.

17  Q.   And what did Zito do for Ingram Barge in that?

18  A.   We provided fleeting and shipping services.

19  Q.   Okay.  What extent if any did Ingram control the

20  activities of Zito Fleeting?

21  A.   They did not.

22  Q.   Who controlled the activities of Zito Fleeting?

23  A.   Zito Fleeting, LLC.

24  Q.   For the Zito fleet boats; who directs their movements?

25  A.   Zito dispatch.

1   Q.    The M/V LOCK MASTER on August 2005; where was that boat

2   located?

3   A.    That boat was located at the Algiers Fleet.

4   Q.    Okay.  Under what arrangement was that boat at the Zito

5   Algiers fleet?

6   A.    That boat was fully found chartered from Ingram Barge to

7   Zito Fleeting, LLC.

8   Q.    Who directed the movements of the LOCK MASTER in August

9   2005?

10  A.    Zito Fleet dispatch.

11  Q.    I'm going to show you what the claimants have identified

12  and has been -- we have to move it into evidence, but it was

13  Boudreaux Exhibit 1 to your deposition and it's identified as

14  Claimant's Exhibit 353.  And if you look in that big blue book,

15  turning to Page 353, could you tell the Court what Exhibit 353

16  is?

17  A.    (Witness examines document.)  It's the Zito dispatch,

18  dispatch orders that's generated by the dispatchers themselves.

19  Q.    Is that a company record of Zito Fleeting?

20  A.    Yes.

21  Q.    And on the page that Exhibit 353 starts with, I've

22  highlighted an entry down towards the bottom just to get to it,

23  to cut to the chase.  What does that dispatch log entrance

24  show?

25  A.    It shows on 8/24 at 1435, by -- it's a little fuzzy on

Boudreaux - Direct                                    8

1    there but I think it says Ed.

2    Q.    Could that be Ed?

3    A.    Ed with Lafarge ordered the ING 4745-4727; ordered for

4    arrival.  So, when it arrived at our facility it was on order

5    to go to Lafarge Cement.

6    Q.    Okay.  And so, that was a job order that came from what

7    source?

8    A.    Lafarge Cement.

9    Q.    Okay.  And that August 24 would be the date that the job

10   order from Lafarge came to Zito Fleeting?

11   A.    Correct.

12   Q.    Okay.  We have already -- it's already in the record, the

13   barge movement from your fleet to Lafarge, so we won't go into

14   that.  But let me ask you this question:  Does Zito Fleeting

15   have any record of a job order from Lafarge on Saturday August

16   27th, 2005?

17   A.    No.

18   Q.    Okay.  Have you examined the job orders in the company

19   records of Zito Fleeting?

20   A.    Yes.

21   Q.    Okay, and if you could turn to Exhibit 354, which is the

22   next tab in the big binder there.

23   A.    (Witness examines document.)

24   Q.    And if you could just use that document; what is this

25   document called at Zito?

Boudreaux - Direct                                              9

1   A.    The dispatch report.

2   Q.    Okay.  Would this, would the dispatch report for any

3   particular day reflect job orders received by the Zito

4   dispatch?

5   A.    This is the actual movement in the jobs that was taking

6   place.

7   Q.    Was the preceding exhibit where job orders would be

8   recorded?

9   A.    Correct.

10  Q.    Okay.  Well, if you could turn to 353 then, and tell us

11  whether any job orders were received on Saturday August 27th,

12  2005 at Zito Fleeting relative to work for the Zito Algiers

13  fleet?

14  A.    (Witness examines document.)

15  Q.    And maybe a more direct question is --

16  A.    No.

17  Q.    Then the follow up question would be:  What does the

18  dispatch log reflect, what does Exhibit 353 reflect, with

19  regard to the last date in which Zito received a job order for

20  barge movement in that time frame, August 26, 27 and 28th,

21  2005?

22  A.    I'm sorry, I don't understand the question.

23  Q.    Well, if I represent to you that that Thursday is August

24  24th -- or excuse me, August 25th and Friday is August 26th and

25  Saturday is August 27th; what date do the Zito records show the

1  last job order was to be carried out, based on the dispatch

2  log?

3  A.    The 26th.

4  Q.    Okay.  The dispatch number that you gave us earlier in

5  your testimony, 835-8531, if the individual dials that number

6  or dialed that number in August of 2005; would they receive a

7  -- would they get to an answering machine or a voice mail

8  system?

9  A.    No.

10 Q.    Okay.  Do you remember Saturday August 27th, 2005?

11 A.    I remember parts of it, yes.

12 Q.    Yes.  If Zito had gotten a job order to go through the

13 locks into the canal for a new job being ordered on Saturday

14 August 27th, could Zito have fulfilled that order?

15 A.    I can't actually answer that question under the terms at

16 all.  At that time, no, we could not have done it with the jobs

17 that we had in front of us.  No, we could not have.

18 Q.    Okay.  At Zito Fleet and specifically the Algiers location

19 and for that matter the Huey P. Long fleet location; where was

20 the --

21        MR. HAYCRAFT:  Well, let me start over again.

22 BY MR. HAYCRAFT:

23 Q.    At Zito Algiers fleet was Ingram the only customer of Zito

24 Fleeting?

25 A.    No.

Boudreaux - Direct                                    11

1   Q.   Okay.  How many other customers are there, that you have

2   their barges fleeted at any given time in that rough August

3   2005 time period?

4   A.   I would have to look at the logs for that day, but Zito is

5   a public fleet and we're open to all barge lines.

6   Q.   Okay.  So, is it fair to say that Ingram is not your only

7   customer?

8   A.   They are not our only customer.

9   Q.   Okay.  And in advance of Hurricane Katrina, in particular,

10  which company, the barge companies that had barges at your

11  fleet or your company, Zito Fleeting; which company is

12  responsible for the security of the mooring at Zito fleet?

13  A.   Zito Fleeting, LLC.

14  Q.   Does Zito have any expectation that barge owners of barges

15  that are in your fleet are going to come and check the

16  moorings?

17  A.   No.

18  Q.   Are you familiar with the service agreement between Zito

19  and Ingram that was in effect in August of 2005?

20  A.   Yes.

21  Q.   I'll represent to you that Paragraph 16A of that contract

22  says that Zito will do barge movements and loading or unloading

23  at facilities with reasonable dispatch.  Are you aware of that

24  term in that contract?

25  A.   Yes, I am.

Boudreaux - Direct                                          12

1    Q.   Is that a term in other contracts that you are a party to?

2    A.   I'm not party to any other contracts at this time.

3            MR. WIEDEMANN:  May it please Your Honor, the

4    contract speaks for itself, and if he's going to try and

5    compare it --

6            THE COURT:  Well, and that's, so far, nothing

7    objectionable.

8            MR. HAYCRAFT:  Okay.

9    BY MR. HAYCRAFT:

10   Q.   From your point of view at Zito, what do you have to do to

11   fulfill that term of the contract in terms of speed?

12           MR. WIEDEMANN:  Objection.  May it please Your Honor,

13   the contract speaks for itself.

14           THE COURT:  That's okay.  Overruled.

15           Go ahead.

16           THE WITNESS:  Reasonable dispatch is 24 to 48 hours.

17   BY MR. HAYCRAFT:

18   Q.   Okay.  And if during the term of this contract, has that

19   been Zito's goal that it wishes to fulfill for this particular

20   customer?

21   A.   Yes.

22   Q.   On 354, Exhibit 354, if you could turn to the third page

23   of that document.

24   A.   (Witness complies.)

25   Q.   What is written there in the center of the page?

1   A.   (Witness examines document.)  "Fleet close 12:00 due to

2   any incoming traffic, hurricane preparations."

3   Q.   And what date is that?

4   A.   That's the 8/27/05.

5   Q.   Okay.  Was Zito in a position to take on new job orders on

6   Saturday August 27th?

7   A.   We were completing the orders that were already assigned

8   to us at that time.

9   Q.   Okay.  So, if there are invoices to Ingram in Zito's

10  records that are for work done on Saturday or Sunday, what

11  would those -- what type of work would those invoices

12  represent?

13  A.   They would represent shifting the barges in the harbor

14  during the preparation for this.

15  Q.   Okay.

16  A.   Closing the fleets.

17  Q.   So, those would be barges that were already on route?

18  A.   Barges on route, the barges on our list that had to come

19  back to us.

20          MR. HAYCRAFT:  I tender the witness.

21          THE COURT:  Domino.

22          MR. HAYCRAFT:  Oh, by the way I would move Exhibits

23  353 and 354 into evidence.  That was -- Your Honor's ruling was

24  conditional on the declarant presenting the --

25          THE COURT:  The explanation.

1          MR. HAYCRAFT:  The explanation for the document.

2          THE COURT:  Okay.  All right, those come in.

3          MR. EMMETT:  No questions, Your Honor.

4          THE COURT:  All right.

5          MR. HAYCRAFT:  Thank you, Your Honor.

6          THE COURT:  Anything from Group A?

7          MR. WIEDEMANN:  Yes, Your Honor.

8                    *    *    *    *    *

9                    CROSS-EXAMINATION

10   BY MR. WIEDEMANN:

11   Q.   Mr. Boudreaux, you said in the contract that you have with

12   Ingram; you interpret that to give you a period of time to pick

13   up a barge a day or two; is that correct?

14   A.   The general rule of thumb?

15   Q.   Yes.

16   A.   Reasonable dispatch is 24 to 48 hours.

17   Q.   Who prepared the contract?

18   A.   It was prepared by Ingram Barge Line, as well as us.

19   Q.   Well, why didn't you put 24 or 48 hours?  Why did you put

20   reasonable dispatch and the other language?  Did Ingram put

21   that in there?

22   A.   Yes, they did.

23   Q.   And you signed it?

24   A.   Yes, I did.

25   Q.   You didn't insist that they put in that you had to pick it

Boudreaux - Cross                                    15

1    up in 24 or 48 hours?

2    A.    No, I did not.

3    Q.    And they didn't insist on that?

4    A.    No, they did not.

5    Q.    Did you have a contract with Ingram before this contract?

6    A.    Yes, there was a contract, I believe, dated in the '90s.

7    Q.    Okay.  And am I correct that Zito Fleeting, in spite of

8    its contract with Ingram, does not own any vessels; is that

9    correct?

10   A.    They do not own them but they fully bound charter them.

11   Q.    Okay.  But the contract with Zito says that you cannot

12   subcontract for vessels?

13   A.    It says no subcontracting, yes.

14   Q.    So, in essence, the operation that you have with the

15   vessels that you contract with is in violation of your contract

16   with Ingram?

17   A.    Ingram is fully aware of my agreements.

18   Q.    Yes.

19   A.    And no one has objected.

20   Q.    Okay.  And you have a vessel that you charter from Ingram,

21   do you not, the LOG MASTER?

22   A.    The Motor Vessel LOCK MASTER?

23   Q.    LOCK MASTER, I'm sorry.

24   A.    That was at the time of the hurricane, yes.

25   Q.    Yes.

```
                          Boudreaux - Cross                      16
```

1    A.    It was chartered.

2    Q.    And that vessel was owned by Ingram?

3    A.    Owned by Ingram Barge.

4    Q.    And it was crewed by Ingram?

5    A.    Crewed by Ingram Barge.

6    Q.    And it was operated out of your fleet?

7    A.    Operated under our direction out of Algiers fleet.

8    Q.    And your agreement with Ingram in regard to that vessel

9    with Mr. Sehrt was verbal; was it not?

10   A.    It was verbal.

11   Q.    You have no written agreement?

12   A.    Not to my knowledge.

13   Q.    Okay.  And did Zito dispatch the vessels themselves?

14   A.    Yes.

15   Q.    Okay.  And on the 27th of August there are no entries on

16   the log?

17   A.    No entries on what log?

18   Q.    On the 27th.

19   A.    Is that the dispatch report that you're talking about?

20   Q.    No, the log where you're -- I'm speaking about the log

21   which is Boudreaux 1.  I don't know that you have it there in

22   front of you.

23          THE COURT:  We'll see to it.

24          Mr. Haycraft, do you know what number?

25          MR. HAYCRAFT:  Number 353.

Boudreaux - Cross                                          17

1          THE COURT:   Number 353.

2    BY MR. WIEDEMANN:

3    Q.   On Number 353 it has nothing for entry.  This is the log

4    of where jobs are performed, I believe?

5    A.   This is the orders, when calls are made in for jobs to be

6    performed.

7    Q.   Yes.

8    A.   Yes, sir.

9    Q.   And there's nothing at all after the 25th -- I mean,

10   excuse me after the 26th at 1635?

11   A.   No, sir.

12   Q.   Is that right?

13   A.   Correct.

14   Q.   And why is that?

15   A.   Because there was no calls for orders.

16   Q.   And during the period of time in Exhibit 354 there are 30

17   jobs on the 25th and 26th involving Ingram barges; is that not

18   correct?

19   A.   I would have to count them.

20   Q.   It's a large number, in any event?

21   A.   Okay.

22   Q.   Yes, sir?

23   A.   Correct.

24   Q.   So, your fleet does a tremendous amount of business with

25   Ingram?

Boudreaux - Cross                    18

1   A.    We do a fair amount, correct.

2   Q.    And you have to guarantee them a certain amount of space?

3   A.    I have to guarantee them some fleeting spaces, yes.

4   Q.    Forty vessels?  Forty?

5   A.    Forty fleeting spaces between the three locations.

6   Q.    Okay.  And do you know on the 27th whether you had open

7   spaces that were due to Ingram?

8   A.    Not off the top of my head.

9   Q.    Can you say at this time if a vessel -- if an Ingram barge

10  was taken out of Lafarge, that you had no place for it, or not?

11  A.    No, I did not say that.

12  Q.    Okay.  And you were taking in barges on the 27th, were you

13  not?

14  A.    I was taking barges in that was already factored into us

15  to secure for the storm.

16  Q.    Yes, but you took -- actually, you took in barges on the

17  27th at 1920 and 2400, both Ingram barges?

18  A.    What was the vessel?

19  Q.    You took in barges at 1900.

20  A.    Okay.

21  Q.    And 2400; midnight and 7:00 on the 27th, you took in

22  Ingram barges?

23  A.    Okay.

24  Q.    Do you recall that?  Do you --

25  A.    I'd have to see the logs.

1    Q.    Okay.

2    A.    I don't recall off the top of my head.

3    Q.    Well, all right.

4    A.    But the boat logs would reflect that.

5    Q.    Well, I'm reading -- I'm looking at what you said in your

6    deposition.

7    A.    Okay.

8    Q.    And now, on the 27th you took in an Ingram barge in the

9    evening.

10   A.    The evening of the 27th?

11   Q.    Right.  And the 28th at 1345 you took in an Ingram barge.

12   Do you want to check your logs?

13   A.    I would like to, please.

14   Q.    I mean, why don't you check them.

15            THE COURT:  What's the exhibit number?

16            THE WITNESS:  Do you have the exhibit number?

17            MR. WIEDEMANN:  It's Exhibit 359.

18            THE COURT:  Exhibit 359?

19            MR. WIEDEMANN:  Yes, Your Honor.

20   BY MR. WIEDEMANN:

21   Q.    Let's start with the 27th.

22   A.    (Witness examines document.)

23   Q.    There were two Ingram barges taken in, one at 1920 and one

24   at 2400.

25            THE COURT:  Is that a question?

1              MR. WIEDEMANN:  Yes.  He said he wanted to check the

2    log.

3              THE COURT:  Okay.  Do you see that?

4              THE WITNESS:  Yes.  I'm reading -- this is the

5    invoices.

6              THE COURT:  Yes.

7              THE WITNESS:  This isn't the actual boat logs.  I was

8    referring to the boat log of the vessel.  You said the Motor

9    Vessel CONNIE Z.

10   BY MR. WIEDEMANN:

11   Q.   No, no.  I didn't say the CONNIE Z.

12   A.   Okay.

13   Q.   I said --

14   A.   I'm sorry.

15   Q.   I'm just saying that barges -- there are records of barges

16   coming into your facility.  Well, let me read your -- maybe if

17   I read from your deposition you might be able to recall it.

18             MR. HAYCRAFT:  I object to this form of the

19   procedure.

20             MR. WIEDEMANN:  Well, I mean I'm trying to --

21             THE COURT:  Well, I'm trying to -- go ahead.  If it

22   gets us faster there, we'll do it this way.  Go ahead.

23             MR. WIEDEMANN:  Okay.

24   BY MR. WIEDEMANN:

25   Q.   You said -- I asked you on Page 108 of your deposition:

1   After that you have Ingram 7530, that's giving those barges to

2   the F.R. BIGELOW, to go where?

3        "I'm not sure of the destination."

4        "So, and that took place from 1945 time-wise to 1820?"

5        "No, that was 1945 to 0130."

6        Is that from your logs?

7   A.   During the deposition I was reading the logs when we were

8   discussing this.

9   Q.   Well, you don't have the logs with you?

10  A.   They were given up for -- they were turned in.

11  Q.   All right.  Well --

12          THE COURT:  Are they exhibits?  Does anybody know?

13  Are the logs in the exhibit book?

14          MR. HAYCRAFT:  Yes, Your Honor.

15          THE COURT:  Well Mr. Wiedemann, do you know to know

16  what vessels they are to ask your question, to make the point

17  that you want to make?  I mean, do we need to have that much

18  detail verified for you to make whatever point you want to

19  make?

20          MR. WIEDEMANN:  Let me see, Judge.

21  BY MR. WIEDEMANN:

22  Q.   Do you have the invoices in front of you?

23  A.   Yes, I have the invoices.

24  Q.   Okay.  Do the invoices pertain to the vessels that I'm

25  talking about, let's talk about the 28th.  There's an entry

Boudreaux - Cross                                    22

1   from 1345 to 1415; and that was the BIGELOW coming in and out?

2   A.   The F.R. BIGELOW.

3   Q.   Okay.  And then, at again on the 28th at the Algiers fleet

4   they're bringing in the product coal?

5   A.   Coal would have been the product in the barge.

6   Q.   Okay.  And then, on the 27th at 1900 -- excuse me, at 1900

7   to 2000, at 2000 there was the product steel brought in; is

8   that correct?

9   A.   The CONNIE Z delivered a barge load of steel, correct.

10  Q.   Okay.  And then again on the 27th and the 31st there was

11  steel brought in, into your fleet by the -- I don't know what

12  the vessel is, T-13808?

13  A.   No, that was the fleeting -- that would have been the

14  invoice for the fleeting charge.

15  Q.   Okay.

16  A.   For the time she was there already.

17  Q.   And then, so there was again on the 28th there's the

18  CONNIE Z coming in with a coal barge at 1345 and 1415; is that

19  correct?

20  A.   No, that's actually the F.R. BIGELOW.

21  Q.   Okay.

22  A.   The CONNIE Z was the assist boat.

23  Q.   Okay.

24  A.   Therefore the BIGELOW was the boat engine.

25  Q.   But as a matter of fact your facility was being utilized

Boudreaux - Cross                                    23

1   on the 27th and the 28th; was it not?

2   A.   No, it was not being utilized for regular business.

3   Q.   But did you not give preferential treatment to Ingram as a

4   customer who had 40 spaces set aside without charge?

5   A.   No, I didn't give preferential treatment.  The barges in

6   question, the two on the 28th, were actual barges that came in

7   with tow boats, the F.R. BIGELOW and the PAT C.  These boats

8   were looking for a safe haven to tie up and they asked me to --

9   if they could tie them in Algiers fleet, and the only way they

10  could make it to the facility in time was to have breakwaters

11  in front of them and they used these barges as breakwaters.

12       We took the equipment because it added additional

13  horsepower to the fleeting facility during the storm, for

14  safety reasons.

15  Q.   Well, I asked you in your deposition on Page 70:  Are you

16  aware that under your contract with Ingram Barge Company dated

17  the 28th of June of 2005 that Zito is obligated to provide

18  priority to Ingram in regard to switching and fleeting of their

19  barges?

20       And your answer was, "Yes."

21       Is that not correct?

22  A.   Correct.

23  Q.   Does Zito have a written hurricane plan?

24  A.   No.

25  Q.   If Ingram called you on a Friday or a Saturday and said

1   they had a barge in a dangerous situation; would you not

2   accommodate them based upon the preferential treatment that you

3   owed them?

4   A.    Under the circumstances that day, the work load that we

5   already had, I couldn't have been able to accommodate them.

6   Q.    Does Zito still have a contract with your company?

7   A.    (No response.)

8   Q.    I mean with Ingram; I'm sorry.

9   A.    Yes, Zito and Ingram have a contract.

10  Q.    Are you telling me that on the 27th, which is a Saturday,

11  your fleet had no more room for any barges?

12  A.    No, I did not say that.

13  Q.    Are you saying that -- well, what are you saying?  If

14  Ingram, who is a preferential customer says, "I want to fleet a

15  barge," you know, and you still had room, what would you tell

16  them?

17  A.    What we do is during the storm and when the timing is

18  coming up, we know the barges that we're picking up and the

19  barges coming to us.  We calculate that into our facility and

20  how we're going to tie and moor our facility safely for the

21  storm.  We close our fleet to incoming barges, any unannounced

22  barges that we know nothing about, anybody's barges.  In this

23  instance that the two barges came in with the line boats; I

24  took the two barges to take the horsepower for the line boats

25  and told them that I would not be responsible for the barges

1    because they were going to be outside of our block system at

2    the time.

3         But it was for the safety of having that additional

4    horsepower which might be around 14,000 to 20,000 extra

5    horsepower at the time and it made sense to bring these boats

6    and barges up to our facility for safety reasons.

7    Q.   So, you brought barges in for safety reasons?

8    A.   Brought the boats in for safety reasons.

9    Q.   Okay.

10   A.   The barges had to come with the boats.

11   Q.   And my question is:  Are you telling me that your facility

12   was in capacity -- was at capacity and that you couldn't take a

13   barge from Ingram before the storm; is that what you're telling

14   me?

15   A.   No, I'm not saying that it was at capacity.

16   Q.   All right.  Well, let me --

17   A.   I'm saying that we were taking the barges that we knew

18   were announced and were coming to the facility.  We were X'ing

19   out any barges that were not announced because we were blocking

20   the fleet off and tying it up in a fashion for safety reasons.

21   Q.   And so Domino Towing went into the Lafarge facility on the

22   27th to make a turnaround; if they had taken out the empty

23   barge belonging to Ingram and brought it to your facility,

24   would you have had capacity to fleet it under your agreement

25   with Ingram?

Boudreaux - Cross                                    26

1   A.   If it had been early enough in the day that where the

2   block system wasn't complete, we would have considered it.

3   Q.   Well, you were taking barges in on the 27th and the 28th?

4          MR. HAYCRAFT:   Objection, Your Honor, already asked

5   and answered.

6          THE COURT:   Overruled.

7          THE WITNESS:   Yes, barges we knew about.

8   BY MR. WIEDEMANN:

9   Q.   Right.  So, if Domino had called and said:  We're bringing

10  in a barge, or Ingram had called and said:  Domino is going to

11  bring in our barge from the Lafarge facility instead of turning

12  it around; you would have taken it in?

13  A.   The chances are good we would have taken them in.

14  Q.   Because of your relationship with Ingram?

15  A.   Correct.

16  Q.   Thank you.  Do you know or do your records show when the

17  Ingram 5882 was picked up from Lafarge?  Do you have in your

18  records any indication of that?

19  A.   No.

20  Q.   And the reason that I'm asking, there is a 5882 on the

21  list of barges at Lafarge before the hurricane and 5882 is

22  gone.  Do you have a record that it came into your -- it's an

23  Ingram barge?

24  A.   If it was picked up by us, but I never researched any of

25  that.  If it was picked up by us, I'm sure there is a record of

Boudreaux - Cross                                        27

1   it.

2   Q.   But you would be --

3            MR. HAYCRAFT:  Your Honor?

4            THE COURT:  Well, wait up.  Hold on one second.

5            MR. HAYCRAFT:  Just a minute.  I didn't get a chance

6   to object.  I think that question was Mr. Wiedemann testifying

7   and asking him to assume something about the status of the

8   5882.

9            MR. WIEDEMANN:  Well --

10           MR. HAYCRAFT:  But I don't object to the answer that

11  Mr. Boudreaux gave.

12           THE COURT:  Okay.  Well, as you know, everything a

13  lawyer says is not evidence.

14           MR. HAYCRAFT:  Right.  No, I understand that and you

15  know that.

16           MR. WIEDEMANN:  Thank God.

17           THE COURT:  All right.

18           MR. WIEDEMANN:  Thank you, Your Honor.  I have no

19  further questions.

20           THE COURT:  All right.

21           THE WITNESS:  Thank you.

22           THE COURT:  Mr. Haycraft, anything else?

23           MR. HAYCRAFT:  No further questions.

24           THE COURT:  May this witness be excused?

25           MR. HAYCRAFT:  Yes, Your Honor.

Boudreaux - Cross                                        28

1              THE COURT:  May this witness be excused?

2              MR. HAYCRAFT:  Yes.

3              THE COURT:  Okay.  You're excused.  Please don't talk

4    to anybody your testimony though until the case is finished,

5    which will be some time this week.

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  Okay, thank you.

8         (Witness is excused)

9                         *    *    *    *    *

10                  (Excerpt of Testimony is Concluded)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **C E R T I F I C A T E**

       I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceeding in the

above-entitled matter.

**/s/Dorothy M. Bourgeois**                                                    **_8/31/07**
**Dorothy M. Bourgeois**                                                        **Date**