UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE          *   CIVIL ACTION

COMPLAINT OF INGRAM BARGE     *

COMPANY, AS OWNER OF THE      *   NO. 05-4419

ING4727, PETITIONING FOR      *       C/W 05-4237

EXONERATION FROM OR           *       C/W 05-5531

LIMITATION OF LIABILITY       *       C/W 05-5724

                              *   SECTION "C" (2)

                              *

                              *   JUDGE HELEN G. BERRIGAN

                              *

                              *   MAG. JUDGE JOSEPH C.

                              *   WILKINSON, JR.


        The deposition of MS. RACHEL (BURNETT) MAYS,

taken by the Group A Plaintiffs pursuant to Notice on

Friday, the 26th day of January, 2007, at the hour of

2:42 p.m., at the offices of West Kentucky Reporting

Service, 222 Kentucky Avenue, Suite 5, in the City of

Paducah, County of McCracken, State of Kentucky, before

me, Christy Miller, RPR, CSR (IL), Notary Public in and

for the State of Kentucky at Large, to be used for all

purposes allowed under the Federal Rules Of Civil

Procedure.


**********************************************************

Registered Professional Reporters

        WEST KENTUCKY REPORTING SERVICE, INC.

                Certified Shorthand Reporters

**********************************************************

                    A P P E A R A N C E S
FOR THE GROUP A PLAINTIFFS:
            MR. LAWRENCE D. WIEDEMANN
            of the law firm of
            WIEDEMANN & WIEDEMANN
            81 Baronne Street
            New Orleans, LA 70113
FOR GROUP B PLAINTIFFS, INGRAM BARGE COMPANY:
            MR. DON K. HAYCRAFT
            of the law firm of
            LISKOW & LEWIS
            One Shell Square
            701 Poydras Street, Suite 5000
            New Orleans, LA 70139-5099


FOR LAFARGE N.A., INC.:

            MR. MARK S. RAFFMAN
            of the law firm of
            GOODWIN PROCTOR
            901 New York Avenue, N.W.
            Washington, D.C. 20001


FOR THE DOCK BOARD (via telephone):

            MR. JONATHAN SANDOZ
            of the law firm of
            DAIGLE, FISSE & KESSENICH
            P.O. Box 5350
            Covington, LA 70434-5350


FOR UNIQUE TOWING & JOE C. DOMINO, INC. (via
telephone):
            MR. JASON R. KENNEY
            of the law firm of
            EMMETT, COBB, WAITS & HENNING
            1515 Poydras Street, Suite 1950
            New Orleans, LA 70112

I N D E X

RACHEL (BURNETT) MAYS              Direct        Cross

      By Mr. Wiedemann:           4, 115

      By Mr. Haycraft:                          100

CERTIFICATE OF REPORTER:  123

E X H I B I T S

| Number | Description | Page |
|--------|-------------|------|
| Ex. 1 | E-mail 8/17/05, LNA 119 | 40 |
| Ex. 2 | E-mail 8/17/05, LNA 120 | 45 |
| Ex. 3 | E-mail 8/16/05, LNA 115 & 116 | 48 |
| Ex. 4 | E-mail 8/23/05, LNA 128 | 60 |
| Ex. 5 | E-mail 8/22/05, LNA 125 & 126 | 63 |
| Ex. 6 | E-mail 8/29/05, LNA 278 | 70 |
| Ex. 7 | E-mail 8/29/05, LNA 147 | 75 |
| Ex. 8 | Gov. Kathleen Blanco's State of Emergency Proclamation No. 48 KBB 2005 | 86 |
| Ex. 9 | Transportation Agreement | 87 |
| Ex. 10 | E-mail 8/26/05, LNA 279 | 98 |
| Ex. 11 | E-mail 9/1/05, LNA 284, 285 | 99 |

The witness, MS. RACHEL (BURNETT) MAYS,
after first having been duly sworn, testified as
follows:

DIRECT EXAMINATION BY MR. WIEDEMANN:

MR. RAFFMAN:  Mr. Wiedemann, before you
begin, Ms. Mays is here today voluntarily.  We
did not require a subpoena.  You have
represented that the statutory witness fee will
be proffered.  And so on that basis, we'll go
forward.  Thank you.

MR. WIEDEMANN:  Let the record reflect that
Mrs. Mays's deposition is being taken for any
and all purposes permitted by the Federal Rules
of Civil Procedure, that all objections, except
those as to the form of the question, will be
waived until such time as the deposition is
sought to be offered in any judicial proceeding.
You are frowning.  Do you disagree with that?

MR. RAFFMAN:  No.  I agree.  I usually use
the word "reserved," but the concept is the
same.

Q.   Okay.  And, Ms. Mays, you have the right to read
and sign the deposition after it is transcribed
by the court reporter.  And you can't change
black to white, but you can make -- if she has

some -- something that you see is incorrect, you
can correct it.  Or you can waive that.  That's
up to you and whatever advice you might get from
counsel.  Do you want to reserve that right, or
do you want to wait until the end of the
deposition and make that decision?

    MR. RAFFMAN:  We'll wait until the end of
the deposition to decide whether to waive read
and sign.

    MR. WIEDEMANN:  Just remind me at the end
so that we -- we'll determine whether you are
going to read and sign.

    MR. RAFFMAN:  You should assume we will
read and sign, unless we say otherwise at the
end.

BY MR. WIEDEMANN:

Q.  For the record, Mrs. Mays, your name up until
    fairly recently was Rachel Burnett; is that
    correct?

A.  Yes, it was.

Q.  And you were married when?

A.  2004 August.

Q.  It hasn't been that recently.  2004, okay.  So,
    actually, at the time in question I'm talking
    about --

A.   I was Mays.

Q.   -- you were married, but still using your maiden
     name in your job with Lafarge?

A.   On the e-mail, yes.  It was -- I mean, like it
     was still Rachel Burnett.

Q.   Okay.  So anytime that appears Rachel Burnett,
     that is you?

A.   That's me.

        MR. RAFFMAN:  And, if I may, it will go
     easier for both of you if, Mrs. Mays, you will
     allow him to finish his question before you
     answer.  And I apologize for not getting that
     done sooner.

Q.   Would you tell us where you live, your address?

A.   3420 Sierra Drive.

Q.   And where is that?

A.   West Paducah.

Q.   West Paducah, Kentucky, huh?

A.   Yes.

Q.   Are you a native of this area?

A.   Pretty much, yes.

Q.   Born and raised here?

A.   No.

Q.   Where are you from originally?

A.   I was born in Holmstead, Florida.  I have lived

in North Vernon, Indiana; Cameron, Missouri; and

then we were -- my father was transferred here.

Q.   Most people move to Holmstead later on.  Okay.

You are presently employed?

A.   Yes.

Q.   By whom?

A.   Tennessee Valley Towing.

Q.   And Tennessee Valley Towing is located where?

A.   Paducah.

Q.   Okay.  And your job with Tennessee Valley

Towing?

A.   Dispatcher.

Q.   How long have you been with them?

A.   Since October of 2005.

Q.   And prior to October of 2005, you were working

for Lafarge; is that correct?

A.   Correct.

Q.   And how long did you work for Lafarge?

A.   I started there in '99.  And -- '99, 2000.

Q.   And then you quit there in October of 2005?

A.   Yes.

Q.   Why did you leave Lafarge?

A.   I left because there was discussion that my job

was going to have to relocate, and I wasn't

interested in moving.

Q.   You would have had to move to another city?

A.   Yes.

Q.   Okay.  Your job with Lafarge from '99 on was in
     what capacity?

A.   There were a couple of years where I was in the
     barge distribution side of it.  There were a
     couple years that I worked as a human resource
     assistant and then went back to the distribution
     part.

Q.   Tell me what the barge distribution job would
     entail.

         MR. RAFFMAN:  I'll object as to form.
     Vague as to time.

Q.   You can answer.

A.   I was a barge scheduler.  And I would just
     schedule the loading of barges at the Joppa
     terminal to various -- to all the other
     terminals within the distribution group.

Q.   So you would not only -- you would schedule
     loadings not only at Joppa, but --

A.   No.  They loaded at Joppa for the other
     terminals.

Q.   So you would be scheduling loading in Joppa?

A.   Right.  Barge loading in Joppa.

Q.   Okay.  And where is Joppa with relationship to

Paducah?

A.   About 35 miles from here.

Q.   And that's on the Mississippi?

A.   No.

Q.   It's on the --

A.   Ohio.

Q.   Ohio, okay.  And what was your title as barge
     distribution -- in barge distribution?

A.   I was barge scheduler.  That was my title.

Q.   Now, did you have other employees working for
     you?

A.   No.

Q.   Did you have a corporate title?

          MR. RAFFMAN:  Objection.  Vague.

Q.   Assistant vice president, vice president?  Any
     corporate title?

A.   Did I have one?

Q.   Yeah.

A.   No.  I was barge scheduler.

Q.   When did you stop being a barge distribution --
     in that capacity?

A.   The barge scheduler is --

Q.   Scheduler, yeah.

A.   -- is in the distribution.  It's part of that
     group.

Q.   Okay.  How long were you in that capacity as a
     barge scheduler?

A.   The entire time that I was in distribution when
     I first started, and then I left.  I went to
     human resources.  I was the HR assistant.  Then
     when I went back to the distribution department,
     I was the barge scheduler again.

Q.   So when you went into human resources?

A.   Uh-huh.

Q.   Did you have a job title in that position?

A.   Human resource assistant.

Q.   Assistant to what?

A.   The human resource manager.

Q.   And who was the human resource manager?

A.   Linda Paul.

Q.   And did she have a corporate title?

A.   She was just the human resource manager.

Q.   And what were you doing in August of 2005?

A.   I was barge scheduler.

Q.   Scheduler, okay.  And you held that job until
     you left in October of 2005?

A.   Yes.

Q.   And as a barge scheduler, to whom would you
     report?  Who was your immediate superior?

          MR. RAFFMAN:  Objection.  Vague as to time.

Q.   When he objects to form, you can -- you answer
     the question.

          MR. RAFFMAN:  I don't know if you want to
     specify a particular time you are talking about
     or if you want her to give you all the various
     iterations.  It's up to you.

Q.   You were a barge scheduler when you left in 2005
     in October; is that right?

A.   Yes.

Q.   So who was your immediate superior in the barge
     scheduling capacity in October?

A.   In October, it was AJ Guthrie.

Q.   AJ Guthrie?

A.   Uh-huh.

Q.   And what was Mr. Guthrie's position?

A.   He is the area distribution -- or he was at that
     time the area distribution manager.

Q.   And was he in -- also in Paducah or in the
     vicinity?

A.   He was located in Nashville, Tennessee.

Q.   Okay.  Mr. Guthrie would be in the home office
     in Nashville?

          MR. RAFFMAN:  Objection.

Q.   Is that right?

          MR. RAFFMAN:  Objection.

MR. HAYCRAFT:  Can we go off the record a
second?

(Off-the-record discussion.)

Q.  AJ Guthrie was in Nashville, and that's where
you would deal with him, in Nashville?

A.  No.  I was in Joppa.

Q.  I know, but he was in -- his office was in
Nashville?

A.  Yes.

Q.  And what did Lafarge have in Nashville?  What
kind of operation?

A.  I don't know.  I was -- I never went to the
office there.

Q.  Well, you have no knowledge of what kind of
office?  Was it a regional office?  Was it a --

A.  They have -- Nashville Lafarge has a terminal in
Nashville.  I believe they had a sales office in
Nashville.  But I don't know.  I have never went
to AJ's office, so I don't know.

Q.  So as a person in charge of area distribution,
Mr. Guthrie would be in charge of what area?

A.  I couldn't answer for that.  I just know that I
reported to him.  But that was, you know,
towards the end of my time with Lafarge.

Q.  And before coming here for the deposition today,

did you review any materials?

A.   I reviewed materials, and you had sent me a fax.

Q.   You reviewed the materials that I had sent to
     you?

A.   Yes, I reviewed the materials you sent me.

Q.   Did you review any other materials?

         MR. RAFFMAN:  You can answer.

A.   Yes.

Q.   What else did you review in preparation for the
     deposition?

A.   I just reviewed some e-mails.

Q.   Tell me basically what you reviewed that you can
     recall.

A.   Just e-mails that I had written.

Q.   About what?

A.   The e-mails that you had sent -- faxed to me, I
     reviewed those and reviewed other e-mails that I
     had sent.

Q.   And the other e-mails that you had sent
     concerned -- other than the ones that I sent to
     you concerned what?

         MR. RAFFMAN:  I'm going to object.  I'm
     going to allow her to answer this one more
     question.  I think at a certain point, you do
     begin to trench on counsel's work product and on

the discussions between counsel and client.  And
so I'm going to -- allow the one question, and
then I'm going to start instructing.

Q.   Ms. Mays, are you represented by counsel here
today?

A.   Yes.

Q.   You engaged counsel to represent you?

A.   Yes.

Q.   And who did you engage to represent you?

A.   Mr. Raffman.

Q.   And had you ever met him before?

A.   No.

Q.   And did you engage him as your personal
attorney?

A.   Personal attorney?  Yes.  He's representing me.

Q.   And representing you in what capacity?

A.   Here today.

Q.   Well, you are no longer employed by Lafarge; is
that correct?

A.   Correct.

Q.   He's not representing you insofar as your
present employment?

         MR. RAFFMAN:  Objection.

Q. Is he?

         MR. RAFFMAN:  The answer has been -- the

question is vague.  The witness has answered

your questions about representation in

connection with the deposition.  I think it's

time to move on.

Q.  Well, I think it's very significant that this

lady is not employed by Lafarge.  She is

employed by a different company.  And I think

I'm entitled to know what kind of representation

she claims to have to plead a privilege.

     MR. RAFFMAN:  I'll answer the question.

She's represented by me for purposes of this

deposition.  Even were the case otherwise,

Lafarge is entitled to a privilege under Upjohn

vs. United States in connection with discussions

that it has with current or former employees

about matters that are within the scope of their

employment.

     MR. WIEDEMANN:  You made your --

Q.  Did you contact counsel to represent you, or did

counsel contact you?

     MR. RAFFMAN:  Objection.

Q.  You can answer.

     MR. RAFFMAN:  I'm going to instruct her not

to answer the question about discussions between

her and her lawyer.

        MR. WIEDEMANN:  Well, if you instruct

her --

        MR. RAFFMAN:  It is improper.  She's

instructed not to answer.

        MR. WIEDEMANN:  Well, if you instruct her

not to answer, we are going to have to file a

motion.  And that would mean that we are going

to have to come back and take her deposition

concerning that issue, and she will not be paid

by us for that.

        MR. RAFFMAN:  I don't think that you are

going to have to come back to talk about what

she talked about with her lawyer.

Q.    I didn't ask her what she talked about with her

      lawyer.  I asked her, did she contact the

      attorney, or did the attorney contact her?  That

      has nothing to do with privilege between the

      attorney and the client -- alleged client.

        MR. RAFFMAN:  I disagree, but I'll consider

your question, and we'll move on.

Q.    Did you contact Mr. Raffman or somebody from his

      office concerning representation of you?

        MR. RAFFMAN:  You just asked that question,

and I'm instructing her not to answer.  Asking

it again isn't going to give a different

instruction.

Q.   Did Mr. Raffman or anybody from his office

contact you about representing you at the

deposition?

        MR. RAFFMAN:  Same instruction.

Q.   Had you ever met Mr. Raffman or anybody from his

office prior to this scheduling of this

deposition?

        MR. RAFFMAN:  You can answer that question.

A.   No.

Q.   Did you know of their existence?

        MR. RAFFMAN:  You can answer that question.

Unless I tell you not to answer, you can answer.

A.   No.

Q.   Did you know of their involvement in this

litigation?

A.   No.

Q.   Did you have any way of knowing how to contact

them when your deposition was scheduled?

        MR. RAFFMAN:  Let me -- the question is

vague.  When -- why don't you give a date when

the deposition was scheduled.  I think the

deposition was -- I think that -- if you want --

Q.   Prior to the time we spoke on the telephone --

do you recall that, when I asked you about

giving your deposition?

A.   Yes.

Q.   That was several weeks ago?

A.   Yes.

Q.   I sent you an e-mail enclosing some --

A.   A fax.

Q.   -- a fax enclosing some of your -- your e-mails;
     is that correct?

A.   Correct.

Q.   At that time when I spoke to you on the
     telephone, you didn't tell me that anyone
     represented you, did you?

A.   No.

Q.   And you agreed to give your deposition; is that
     right?

A.   Yes.

Q.   Up until that time, did you know who -- when you
     were talking to me and reviewing e-mails I sent
     you, did you know who Mr. Raffman or any of the
     people in his office were?

A.   Yes.

Q.   How did you know?

A.   Telephone contact.

Q.   At the time you talked to me, you knew who they
     were?

       MR. RAFFMAN:  You can answer that.

A.   Yes.

Q.   When had they contacted you?

A.   I don't recall a date or a time.

Q.   How long before I contacted you?

A.   Several days after.

Q.   And did you meet with anybody, or did you talk
on the telephone?

A.   Telephone.

Q.   Have you met with anybody personally concerning
this deposition?

A.   Yes.

Q.   With who?

A.   Mr. Raffman.

Q.   When?

       MR. RAFFMAN:  You can answer.

A.   Yesterday.

Q.   That's the first time you met him?

A.   Yes.

Q.   And you met with him yesterday to prepare for
your deposition?

A.   Yes.

Q.   And at the present time, you are not an employee
of Lafarge?

A.   No.

Q.   And you have not been an employee of Lafarge
     since October 2005?

A.   Correct.

Q.   And did you agree with any fee arrangement with
     Mr. Raffman or his office?

A.   No.

Q.   So you have no financial obligation vis-a-vis
     your involvement in this litigation?

A.   No.

Q.   You know that you are not a party defendant?

A.   Excuse me?

Q.   You know that you are not a party defendant?
     Nobody claims that you did anything wrong.

A.   Okay.

Q.   Are you aware of that?

A.   Okay.  If you say so.

Q.   You are not a named party in this litigation.

A.   Okay.

Q.   Is that your understanding?

A.   Uh-huh.

Q.   And you understand that you have no financial
     exposure in this case?

A.   Correct.

Q.   Now, did you give a written statement to anyone?

A.   No.

Q.   Did anyone take a recorded statement?

A.   No.

Q.   Have you ever given a written statement to
     anyone concerning your involvement with Lafarge
     before Hurricane Katrina or after Hurricane
     Katrina?

A.   What do you mean by "written statement"?

Q.   Well, let me explain.  I know you have sent
     e-mails, and you did in-house communication.
     You know, I understand that.  A statement would
     be if someone asked you to record or someone
     would write down your recollection of any events
     that might be involved in this case.

A.   No.

Q.   So you haven't done that?

A.   No.

Q.   And you appeared here today voluntarily without
     a subpoena?

A.   Correct.

Q.   And that was in compliance with my request; is
     that right?

A.   Yes.

Q.   For which we are appreciative.  Okay?

A.   Okay.

Q.   Now, let me ask you -- just give me one second.

Just so we'll -- you'll have a copy of what I --

     MR. HAYCRAFT:  Do you have a copy for me?

     MR. WIEDEMANN:  I don't have another copy.

This is Ingram --

     MR. HAYCRAFT:  I recognize the document.

It looks like you gave her a stack of stuff.

     MR. WIEDEMANN:  Well, yeah.  The first

thing I'm talking about is the Ingram Barge

agreement.  I made a copy for me.  I didn't --

you don't have yours?

     MR. HAYCRAFT:  No, I don't.

Q.   Did you review this agreement in your meeting

with Mr. -- excuse me.  In your meeting

yesterday or in any conversations, did you

review this document?

     MR. RAFFMAN:  You can answer that.

A.   I saw it.

Q.   In the last few days?

A.   Just yesterday.

Q.   Okay.  What were you requested to discuss in

regard to the contract?

     MR. RAFFMAN:  Objection.  I'm going to

instruct her not to answer that question.

Q.   Is there anything in the contract that is

significant to you in relation to your

employment with Lafarge?

     MR. HAYCRAFT:  I object to the form of that question.

Q.  You can answer.

A.  I have never seen the agreement before.

Q.  You didn't see the agreement until yesterday?

A.  Correct.

Q.  Okay.  And the -- in the agreement, which is dated -- let's see when it was dated -- December 14th, 2004 -- and, for the record, it bears the IBCO, which is Ingram Barge Company, 001 through 00- -- it should be --

     MR. HAYCRAFT:  It should be 005.

Q.  Well, I have got 002.  I only have two pages.

     MR. HAYCRAFT:  Just on behalf of Ingram, I have got to object to you asking her any questions about the content or any paragraphs of this several-page contract that she's never seen before.

     MR. WIEDEMANN:  She said she saw it yesterday.

Q.  Did you not?

A.  I didn't review it.  I saw it.

     MR. HAYCRAFT:  She saw it, not reviewed it.

Q.  Okay.  You'll see in the contract that I'm

talking about the front page, which is the one

I'm concerned with, it says, "Attention:  Rachel

Burnett, barge scheduler," on the contract.  Do

you see that?

A.   Yes.

Q.   What is the significance of that?  In other

words, they designate certain people.  Going

across to the left, J.E. Gene Shiver, sales

manager.  Who is he?  Do you know?

A.   I don't know.  I guess he's the sales manager

for Ingram.

Q.   Okay.  And the next box is Mr. Jay Darlington,

traffic coordinator, barge.  Is he also with

Ingram, that you know of?

          MR. HAYCRAFT:  Objection.

Q.   Or do you know?

A.   He's with Lafarge.

Q.   He's with Lafarge?  And where is he located as a

traffic coordinator?

A.   He was located in Lee Summit, Missouri.

Q.   And he was a traffic coordinator with relation

to what area of traffic as --

A.   Barge.

Q.   But, I mean, is there a geographical area, or is

it just the entire barge operation?

A.   For the River Region.  He was located in the
     River Region office.  So he was the traffic
     coordinator for the River Region.

Q.   And that would include the Mississippi River
     down to New Orleans and south and west?

A.   That was part of it.

Q.   And did he have a corporate title?

A.   He was traffic coordinator of barge.  That was
     his title.

Q.   Okay.  And then you are listed as Rachel
     Burnett, barge scheduler; is that correct?

A.   That's what it says.

Q.   Do you know why your name and Mr. Darlington's
     name was listed on the contract in 2004?

          MR. RAFFMAN:  Foundation.  You can answer.

A.   No.

Q.   Would it be that this would be so that Ingram
     would know who to contact with regard to traffic
     coordination and barge scheduler?

          MR. RAFFMAN:  Objection.  Form.  You can
     answer, if you know.

A.   I can't answer.

Q.   Okay.  Did you know before the contract was
     executed that your name was listed on that
     contract as barge scheduler?

A.   No.

Q.   The first time you found out was yesterday?

A.   I didn't even see it on there yesterday.  The

     first time is right now.

Q.   Okay.  But that is your e-mail address that's

     listed on that Rachel Burnett at lafarge-na.com?

A.   It was my e-mail address.

Q.   It's changed since you left there?

A.   Yes.

Q.   And the e-mail address for Mr. Darlington?  Is

     he still with the company?

A.   No.

Q.   Where is he?

A.   I don't know.

Q.   Okay.  But that was his e-mail address at the

     time that the contract was executed?

A.   Yes.

Q.   Okay.  Now, as a barge coordinator, you -- I

     guess it's -- am I using the wrong term?

     "Coordinator" or "scheduler," which is it?

A.   I was the scheduler.

Q.   That's what this calls you, barge scheduler.

     And you already testified -- and I don't want to

     be repetitious, but you were scheduling what was

     loading of barges at Joppa?

A.    That was part of my responsibility, yes.

Q.    Did you have any responsibility to scheduling
      the loading of barges in -- at the Lafarge
      facility on the intercoastal, or we call it the
      Industrial Canal in New Orleans?

            MR. RAFFMAN:  It assumes facts not in
      evidence.

            MR. WIEDEMANN:  What facts are not in
      evidence?

            MR. RAFFMAN:  That they loaded barges at
      that facility.

            MR. WIEDEMANN:  Unloaded barges.

Q.    Did you have any affiliation with -- as a
      scheduler with the Lafarge facility on the
      Industrial Canal in New Orleans?

A.    Any communication with them or --

Q.    Well --

A.    Did I have anything to do with the unloading?

Q.    Did you have anything -- as a barge scheduler,
      you handled the loading of barges at Joppa; is
      that correct?

A.    Correct.

Q.    And that was the source of -- insofar as oil
      field cement which came from Joppa; is that
      correct?

A.   Correct.

Q.   Okay.  And from Joppa, it would go down the
     Mississippi to whatever area of distribution was
     taking place; is that correct?

A.   Correct.

Q.   Did you have -- once it left Joppa, did you have
     anything to do with coordinating the transit of
     the loaded barges and the unloading of the
     loaded barges?

A.   I tracked the barges until they reached the
     destination.

Q.   So you would track barges loaded in Joppa, and
     you would track it until it gets to wherever it
     is going to be unloaded.  And then do you track
     it back to wherever it goes from there?

A.   It would depend on the barge.

Q.   Okay.  But you would be tracking, not only the
     loading of barges, you would be tracking the
     voyage of the barge to the site of unloading; is
     that correct?

A.   Correct.

Q.   And would you then track what would happen to
     the barge once it was unloaded?

A.   It would depend on what type of barge it was.

Q.   Well, let's talk about oil field cement barges.

Barges like the -- you know the 4727 in this

case?  Are you familiar with it?

A.   I have heard about it.

Q.   Ingram 4727.  What?

A.   I have heard of the barge.

Q.   And how would you describe that barge?  It's a

hopper barge?  It's what kind of barge?

A.   I couldn't answer that.

Q.   You are indicating it depends on the barge.  I'm

just trying to figure out what --

A.   Lafarge loaded different types of barges.

Q.   Okay.  So what type of barges would you track?

A.   All of them.

Q.   No matter what type it was?

A.   Track them to their destination.

Q.   In this case, if a barge was going from Joppa to

the Lafarge plant in -- on the Industrial Canal,

you would track it to that location?

A.   I would track the barge until it arrived at its

destination.

Q.   And after it arrived at its destination and was

unloaded, who would track it from that point?

A.   It would depend on what type of barge it was as

to whether it was a Lafarge barge or from

another carrier.  If it was a Lafarge barge,

then I would track it back to Joppa.

Q.  Okay.  But if it is an Ingram Barge, you would
    track it -- if it is loaded at Joppa, you would
    track it to its point of delivery?

A.  Until it arrived at its destination.

Q.  And after it was unloaded, who would be tracking
    it at that point?  You didn't track it --

A.  I don't know.

Q.  You don't know?  Okay.  So in the case of Ingram
    barges, you would only track it from the loading
    facility in Joppa to the delivery site, in this
    case on the Industrial Canal?

A.  It would depend on the type of the barge.  There
    was all different types of contracts.  It would
    depend on the barge.

Q.  Well, let's talk about 4727, which you have
    e-mails concerning.  Is this the type of barge
    that you tracked from Joppa to its delivery site
    at the Lafarge facility in New Orleans?

A.  I tracked it from Joppa to its destination.

Q.  And in tracking the barge, the barges -- Ingram
    barges, what would you -- who would you report
    that to?  What would you be tracking it for?

A.  It was tracked for Lafarge purposes.

Q.  And did it have to do with scheduling or

billing, or what was the purpose of tracking?

A.   We tracked all barges from the time they left
     Joppa until they reached their destination.

Q.   And how did you track them?  By what means?

A.   Which barge are we going to talk about?

Q.   You said you tracked all barges from when they
     left Joppa to their point of destination.

A.   Right.

Q.   And my question was, what was your method of
     tracking them?

A.   I had several methods.  It would depend on what
     barge it was and where it was going.

Q.   What kind of methods did you have, in general?

A.   We could track by phone.  We could track by web
     sites.  It depended on the carrier or where the
     barge was going.

Q.   Okay.  And did you not have a system to track
     barges?

A.   What do you mean, a system to track --

Q.   Well, like a GPS or a similar type system.

A.   No.

Q.   It was all done by reports from the various
     towing companies or facilities?  Is that the way
     it would work?

A.   I don't know if a facility would have anything

to do with it.

Q.   Where would your information come from?

A.   Phone calls or web sites.

Q.   Now, did you, as a barge scheduler with Lafarge,
     have the authority to change a barge's
     destination?

A.   Did I have the authority to change?

Q.   Uh-huh.

A.   No.

Q.   Okay.  If a barge was going to be changed after
     leaving Joppa and it is changed from going to
     one location to another, that would not be your
     job?

          MR. RAFFMAN:  Objection.  Form.

A.   No.  I did not have the authority to change
     destinations.

Q.   And the reason I'm asking is, because in this
     case, there was a change of 4727, which
     originally was going to Westlake to New Orleans,
     and you sent e-mails with regard to that change.
     You saw those?

A.   Okay.  But I did not have the authority to make
     the change.

Q.   Well, who gave you the authority to change the
     delivery, let's say, of 4727 from Westlake to

New Orleans?

A.   I don't recall.

Q.   Well, would your e-mails help you with that?

A.   I can look at them, but I do not recall who gave
me the instruction.

Q.   Would the e-mails refresh your memory as to who
gave you the instruction?

A.   If they specifically say in the e-mail.

Q.   Okay.  Let me show you an e-mail, which is --
it's going to be easy to find it.  They are in
numerical order.  LNA 119.  Do you see that?
And in that you said, "I have worked my magic
and have the ING 4727 and ING 4745 scheduled to
depart on the M/V YEAGER Thursday, Friday
timing.  ETA, estimated time of arrival, to New
Orleans, Louisiana, of 8/26."  Do you see that?

A.   Yes.

Q.   One barge -- and it goes on in the last
paragraph to say, "One barge was supposed to be
for New Orleans, Louisiana, and one for
Westlake.  Do you want to keep the split or send
both to New Orleans?"  And that is sent to AJ
Guthrie and Dennis Millon, M-i-l-o-n (sic), and
a copy to Brad Adkins; is that correct?

A.   That's what it says.

Q.   Well, who is Mr. Millon?

A.   It's Dennis Millon.

Q.   Millon, okay.  It is French.

A.   And he was the terminal manager at the New
     Orleans facility at that time.

Q.   The terminal manager at Reserve?

A.   New Orleans.

Q.   New Orleans facility?

A.   New Orleans terminal.

Q.   Okay.  And where was that located?

A.   New Orleans.

Q.   I mean, do you know the location on the river?

A.   (Witness moves head from side to side.)

Q.   No?  Okay.  Is he still with the company?

A.   I don't know.

Q.   You don't know.  Okay.  And Brad Adkins is who?

A.   At this particular time, he was the salesman in
     the New Orleans area.

Q.   Is he still with the company?

A.   I don't know.

Q.   But in reading it, it seems to imply -- and I
     don't mean to put words in your mouth, but that
     you had arranged to change these barges; is that
     correct?

         MR. RAFFMAN:  Objection.  You can answer.

A.   It doesn't say that I was going to do anything.

Q.   You said, "I have worked my magic and have the

     ING 4727 and ING 4745 scheduled to depart."

     That would be depart from Joppa; is that

     correct?

A.   Right.  I had scheduled them to depart Joppa.

Q.   And you anticipated they would arrive in New

     Orleans 8/26; is that correct?

A.   That's what it says.

Q.   And the M/V YEAGER was whose vessel?  Do you

     know?

A.   I couldn't tell you.

Q.   You don't know?  Okay.  You see, one barge was

     supposed to be for New Orleans and one for

     Westlake.  Do you see that?

A.   Yes.

Q.   Okay.  And you asked, "Do you want to split them

     for both of them to go to New Orleans?"  And you

     were saying -- Brad was saying he thought both

     should go to New Orleans.  So was it Brad's

     decision as to where they went?

A.   I don't recall.  I don't recall.

Q.   Well, it wouldn't be your decision?

A.   No.  I did not have the authority to make any

     changes.

Q.   So that -- since you were corresponding to AJ
     Guthrie, Dennis Millon, and Brad Adkins, would
     it be correct that one of those had that
     authority?

A.   That would be correct.

Q.   One of them would have the responsibility to
     divert one barge or more from one location to
     another?

A.   One of those three.

Q.   And in this -- in this document, LNA 119, you
     were estimating the arrival on 8/26, August
     26th?

A.   That's what it says.

Q.   How did you determine the estimated time of
     arrival?  Was that part of your job or --

A.   It was estimated based on when it would depart
     Joppa.  You just add seven days.

Q.   So you knew from experience --

A.   It's a seven-day trip from Joppa to New Orleans.

Q.   So this is the 17th, and you were anticipating
     it would arrive in six days?

          MR. RAFFMAN:  Objection.

Q.   Excuse me.  I'm sorry.  You're right.  It would
     be nine days?

A.   Depending on when it left.

Q.   Well, you are saying it would depart on Thursday
     or Friday.  Do you know when that was in
     relation to the e-mail of 8/17?

A.   No.

Q.   Okay.  Well, at that time, obviously, whatever
     information you had, you were anticipating the
     arrival on the 26th of August?

A.   That's what the e-mail says.

Q.   And that would be at the Lafarge facility in New
     Orleans?

A.   No.  That would be at the fleet.

Q.   Okay.  And that would be at the Ingram fleet?

     MR. HAYCRAFT:  Objection to the form.  Lack
     of foundation.

Q.   What fleet would it be going to?

A.   Whatever fleet the boat took it to.

Q.   Do you know where it was going?

A.   I don't know what fleet they were going to take
     it to.

Q.   Who would determine what fleet it was going to,
     or did you have a regular fleet where Ingram
     barges went?

     MR. RAFFMAN:  Objection.  Form.  You can
     answer.

A.   Once it left Joppa, if this was an Ingram barge,

it would go to whatever fleet they said for it
to go to.

Q.   "They" would be Ingram?

A.   The dispatcher.

Q.   Well, who was the dispatcher?  The dispatcher
for whom?

A.   Ingram.

Q.   I thought you told me that you would track a
barge, like the 4727, from its loading in Joppa
to its ultimate destination, its unloading?

A.   I did not say that.  I said I track the barge
from Joppa to its destination.

Q.   Okay.  So its destination in your -- from your
understanding, would be the destination
determined by the Ingram dispatcher?

     MR. HAYCRAFT:  Objection to form.
Mischaracterizes her former testimony.

A.   I track the barge from Joppa to its destination.
I don't have anything to do with where it goes
when it gets down there.

Q.   Okay.  Well, who makes that decision --

A.   I don't know.

Q.   -- as to its destination?

A.   I don't know.

Q.   Well, where did you anticipate it was going to

arrive?  When you said ETA to New Orleans of

8/26, where did you think it was going to go?

A.   New Orleans.

Q.   To where?

A.   New Orleans.

Q.   Well, I mean, New Orleans covers a lot of

distance on the river.  Where did you think it

was going to go?

A.   It was going to arrive in a fleet in New

Orleans.

Q.   And who would determine which fleet it would

arrive in?  Would you determine --

A.   I can't answer that.

Q.   You wouldn't determine that?

A.   No.

Q.   That would be out of your hands?

A.   That's correct.

Q.   Would anybody in Lafarge determine that, as to

what fleet it would go into?

A.   I can't answer that.

Q.   Do you know of your own knowledge of anybody

that would make that determination?

A.   No.

Q.   Okay.  Do you know that that determination would

not be made by a Lafarge employee?

A.   I cannot answer that.

     MR. WIEDEMANN:  All right.  I want to offer

into evidence that Exhibit 119 -- that e-mail,

I'm sorry, as No. 1.  I'll make it Mays -- well,

maybe we should use Burnett 1 since that's what

the name is on those.  Burnett 1 for purposes of

identification.

     (Group A Plaintiffs' Deposition Exhibit No.

1 marked for identification by the reporter.)

Q.   Now, let me show you another -- if you might,

it's 120.  They are in numerical order.  So do

you have 120?

A.   Yes.

Q.   All right.  This is an e-mail of 8/17/2005.  And

that's the same date as the last e-mail; is that

correct?

A.   Yes.

Q.   Okay.  And this is an e-mail issued by you?

A.   That's what it says.

Q.   Okay.  And it goes to John Haverkamp and Mike

Meeker.  Who are those people?

A.   They were located in Joppa.  They were truck

loaders.

Q.   Truck loaders, do you mean working at the

Lafarge facility loading trucks?

A.   At Joppa.

Q.   At Joppa?

A.   Yes.

Q.   So they were two people in charge of loading

     trucks?

A.   They loaded trucks at Joppa.

Q.   Okay.  And who is Barney Barnes, Rich Corzine,

     Nancy A. Jennings?  And we know Jay Darlington.

     You mentioned him earlier.  Who are those folks?

A.   Barney Barnes, I don't remember what his title

     was.  Rich Corzine was the shipping supervisor.

     Nancy Jennings was in accounting.

Q.   Okay.  And you said, "Needing to reconsign this

     'H' barge" -- referring to Ingram 4727 -- "from

     Westlake to New Orleans.  Please let me know

     when you have it done."  Is that correct?

A.   That's what it says.

Q.   So you're suggesting, as the scheduler, that

     there was a need to transfer 4727 to Westlake.

     And who would make the decision to do that in

     the group that you sent this to?

          MR. RAFFMAN:  Objection to form.  You can

     answer.

A.   You want to know who in that e-mail group said

     to reconsign this barge?

Q.   Yeah.

A.   I couldn't tell you.  I don't know.

Q.   But, obviously, you couldn't reconsign the
     barge?

A.   No.

Q.   So it had to be someone in this group that
     you're corresponding with that would reconsign
     the barge.  Is that not so?

          MR. RAFFMAN:  Objection to form.  I think
     you are misusing the word "reconsign," but go
     ahead.  See if you can answer.

          MR. WIEDEMANN:  I'm using the word that she
     used.

Q.   You are not making the decision to reconsign
     4727?

A.   No.

Q.   But you are telling them, "Please let me know
     when you have it done," that is, reconsigned
     4727 from Westlake to New Orleans.  And who --
     is it not true that one of these people in the
     group that you were writing to would make that
     happen?

A.   No.

Q.   Why would you be writing to them?

A.   This was in regards to the internal -- I don't

even know what it is called anymore.  The truck

loaders have to put barges into a system.  And

they had to -- they have to put in the

destination of the barges.  That's why that

e-mail was sent to the truck loaders.

Q.   But you know that 4727 was reconsigned from

Westlake to New Orleans; is that correct?

A.   That is what this e-mail says.

Q.   Who caused it to be reconsigned?

A.   I cannot answer that.

Q.   Would it be somebody with Lafarge?

A.   Somebody within Lafarge reconsigned the barge.

Q.   Okay.  But you don't know who did that?

A.   No.  I don't recall.

Q.   You don't know whether it was one of these

people?

A.   I will tell you it is not one of those people.

Q.   Okay.  But you didn't copy anybody else with

this?

A.   That's correct.  That's what it says, no.

Q.   Would you not, in writing e-mails as a

scheduler, copy the people who would make the

decisions that you weren't able to make?

     MR. RAFFMAN:  Objection.

A.   What are you asking?

Q.   Well, if you can't do something like a
     reconsignment of a barge, then you would have to
     write to the -- if you wanted to have it
     reconsigned or suggested it be reconsigned, you
     would have to send the e-mail to the person who
     would have the authority to do that?

          MR. RAFFMAN:  Objection.  You can answer.

Q.   Would you not?

A.   I don't understand what you are talking about.

Q.   Well --

A.   It's not making any sense, what you are saying.

Q.   If a barge is going to Westlake and -- from
     Joppa to Westlake and it is going to be changed
     at -- reconsigned to New Orleans, someone in
     Lafarge makes that decision; is that right?

A.   That's correct.

Q.   And someone in Lafarge has to know that the
     barge has to be -- reconsignment should be
     considered.  Isn't that so?

A.   Okay.

Q.   Is that correct?

A.   Correct.

Q.   Well, how do they get that information?  From
     whom?

A.   I can't answer that question.

          MR. WIEDEMANN:  Okay.  I'm going to offer

     120, LNA 120 as Burnett 2 for purposes of

     identification.

          (Group A Plaintiffs' Deposition Exhibit No.

     2 marked for identification by the reporter.)

Q.   Am I correct that -- Ms. Burnett, I'm going to

     call you Ms. Burnett, if you don't mind?

A.   That's fine.

Q.   I don't want to offend your husband or offend

     you in any way, but I have been seeing Rachel

     Burnett so long, I don't know what else to call

     you.

A.   That's fine.

Q.   If you want me to call you something else, let

     me know.  Okay?  Look at 115.  And this is an

     e-mail by you on the day before, on the 16th of

     August 2005; is that correct?

A.   That's what it says.

Q.   And this -- without putting words in your mouth,

     I guess it is a synopsis of your scheduling or

     tracking barges; is that correct?

          MR. RAFFMAN:  Objection.

Q.   How would you describe it?

A.   The subject says it is "terminal inventory."

Q.   Okay.  Of where barges are?  Is that what it is?

A.   I don't see any barges.  It mostly talks
     about the -- it talks about the inventory levels
     at the terminals.

Q.   Okay.  But on the next page, which is a
     continuation of that, at the top of the page, it
     says, "The barges in transit to Cairo should be
     there by the weekend and will then have to be
     built into" -- what's SB?

A.   Southbound.

Q.   -- "southbound tow."  That would mean that they
     had already left Joppa and would be made into a
     tow in Cairo, Illinois?

A.   That's what it says.

Q.   All right.  And that indicates, also, that 4727
     was headed -- is headed for Westlake.  And 1615
     ST is what?

A.   Short tons.

Q.   Okay.  In transit to Cairo --

          MR. HAYCRAFT:  Can we go off the record?

          (Off-the-record discussion.)

Q.   But, in any event, 4727 and 4745, which were the
     two barges at the Lafarge facility at the time
     of Hurricane Katrina, were destined to go to
     separate locations, one to Westlake and one to
     New Orleans, as of the time of this e-mail on

the 16th of August?

     MR. HAYCRAFT:  I'll have to object as to form.  You said the two barges at Lafarge.  There were seven barges at Lafarge.  So it assumes facts not in evidence.

Q.  The two Ingram barges that were at Lafarge are 4727 and 4745 at the time of Hurricane Katrina.  There were five other barges not belonging to Ingram.  But, in any event, we're not talking about the five barges.  We are talking about the transition from Joppa to Cairo, Illinois.  And at that time, when they were in transit, they were headed to two different locations?

     MR. HAYCRAFT:  Object to the form.

Q.  Is that correct?

A.  That's what this e-mail says.

Q.  All right.  Okay.  And at that time -- so that -- let me go back for a second.  Was that after this e-mail on the 16th when these -- you were expecting these barges -- or at the time of this e-mail, you were expecting these barges which were in transit to Cairo to be going to two different locations; is that correct?

A.  That is what the e-mail says.

Q.  Okay.  And that information came from where?

A.   I can't answer that.

Q.   And what is a Mid-South Gulf Coast Terminal

     inventory?  That's what your subject is.

A.   I can't answer that, sir.

Q.   You don't recall?

A.   I don't recall.

Q.   Yeah, okay.  But all of these people that you

     copied this to were Lafarge employees?

A.   Yes.

Q.   And am I not correct, about this time, there was

     a problem in transporting barges from Joppa, was

     there not?

A.   I don't know what your question is.

Q.   Was there not a problem in the river insofar as

     getting barges from Joppa down to New Orleans,

     the New Orleans area?

A.   I don't know where you are going with this, but

     I can't answer that.  I don't know.

         MR. WIEDEMANN:  I am going to offer the 115

     and 116 Lafarge as Burnett 3 for purposes of

     identification.

         (Group A Plaintiffs' Deposition Exhibit No.

     3 marked for identification by the reporter.)

         MR. RAFFMAN:  Off the record.

         (Off-the-record discussion.)

Q.   What is meant by the trip information that's
     reflected -- that is a reflection of the BLEs?
     What is the BLEs?

A.   What are you looking at?

Q.   I'm looking at 130.

A.   Oh, this man was giving us instructions on
     software.  It is a new barge software.  And I
     couldn't tell you what BLE stood for.

Q.   So it wasn't being used at that time?  It was
     being investigated?

A.   They were trying to get it to work.

Q.   You do not recall about this time -- I'm talking
     about the 16th or 17th or thereabout -- that
     there was a constriction in the river that was
     interfering with barges being transported?

A.   I do not recall.

Q.   Let me show you 128, which is an e-mail of yours
     of 8/23/2005.  And it says 4727 inadvertently
     dropped at the wrong fleet.  I have contacted
     Ingram's gulf dispatcher, and he's going to get
     it moving as soon as possible.  Ingram 4745 --
     what is "DN 156 LM"?

A.   Down 156 on the lower Mississippi.

Q.   Okay.  That's the mile marker?

A.   156, yeah.  That's where the barge was.

Q.   Its estimated time of arrival at the New Orleans

     fleet was 8/23; is that correct?

A.   That's what it says.

Q.   Now, how did 4727 inadvertently get dropped off

     at the wrong fleet, which I understand is at

     Westlake, according to --

         MR. RAFFMAN:  Objection.  Foundation and

     assumes facts not in evidence.

         MR. HAYCRAFT:  I object to the leading of

     it.

Q.   You can answer.

A.   I can't answer.

Q.   Okay.  Well, you don't have a recollection of

     this e-mail?

A.   Just from what I'm reading right now.

Q.   Well, apparently, 4727 -- what does it mean that

     it was inadvertently dropped off at the wrong

     fleet?

A.   Exactly what it said.  It was dropped at the

     wrong fleet.

Q.   What was the wrong fleet?

A.   I don't know.

Q.   Where was it supposed to be dropped?

A.   I don't know.

Q.   How do you know it was dropped at the wrong

fleet?

A.   Because that's what I wrote there.

Q.   So you knew at the time that it was dropped at

     the wrong fleet; is that correct?

A.   If I read this e-mail, I wrote that it was

     inadvertently dropped at the wrong fleet.

     That's what I wrote.

Q.   But you don't know which fleet it was dropped

     at?

A.   No.

Q.   Do you know who was responsible for

     inadvertently dropping the 4727 at the wrong

     fleet?

A.   No.

Q.   Huh?

A.   No, I do not know who was responsible.

Q.   Well, from your experience as a dispatcher --

     not a dispatcher.  I should say as a scheduler,

     what -- who would be in charge of delivering the

     barges -- Ingram barges to the proper fleet?

A.   You are asking me to assume and speculate

     something that I can't answer.

Q.   I'm not asking you to speculate.  I'm asking you

     to tell me from your experience.

A.   I cannot answer that.

Q.   Were there other occasions when Ingram barges
     were dropped at the wrong fleet?

A.   I cannot answer that.

Q.   You don't know about it?

A.   Not to my knowledge.

Q.   This was the first occasion that you know of?

A.   I cannot answer that.

Q.   Okay.  And you are sending this e-mail to Robert
     Bobo and Guthrie and Carrie Jenks, Dennis Millon
     and Jay Darlington; is that correct?

A.   That's what the e-mail says.

Q.   Okay.  But, in any event, apparently at that
     point in time, the barges were scheduled to be
     delivered to Ingram, at least the 4745 on 8/23,
     August 23?

          MR. RAFFMAN:   Objection.

A.   You said delivered to Ingram?

Q.   Well, delivered to the New Orleans fleet.  What
     did you mean by New Orleans fleet?

A.   It says that it is estimated to arrive at the
     New Orleans fleet at 8/23.

Q.   And what is the New Orleans fleet?

A.   Sir, I don't recall.

Q.   Well, whose fleet would it be?

A.   I cannot answer that.

Q.   Well, if you track the barges to -- from Joppa
     to the point of delivery, you don't know what
     fleets they stop at?

A.   No.

Q.   So when you are talking about the wrong -- the
     fleet that 4745 was being delivered to, you
     don't know?

A.   You said 4745?

Q.   4745, yes.

A.   4745 is still in transit, according to this
     e-mail.

Q.   But your estimated arrival at the New Orleans
     fleet is 8/23?

A.   That's what the e-mail says.

Q.   That's six days before the hurricane.

A.   When was the hurricane?

Q.   The 29th.

A.   Okay.

Q.   Is that correct?

A.   It says it was estimated to arrive.  I cannot
     tell you when it arrived.

Q.   And you can't tell us what fleet it would be put
     into?

A.   No, I cannot.

Q.   Would it be an Ingram fleet -- excuse me, a

Lafarge fleet?

A.   I cannot answer that question.

Q.   Did you-all fleet barges?

A.   I cannot answer that question.

Q.   Why not?

A.   I wasn't in New Orleans.  I was in Joppa.  I
     cannot answer.

Q.   You are tracking the barges from Joppa to the
     delivery site; is that correct?

A.   I track them from Joppa to the destination.  I
     do not know what fleet the barges are placed in.

Q.   And who tells you what the destination is in the
     case of Ingram barges?

A.   The destination would be on the web site.

Q.   On the web site?

A.   The destination fleet would be on Ingram's web
     site.

Q.   In other words, Ingram would decide what the
     destination was?

A.   I can't answer that.  The destination is on the
     web site.  That's all I can tell you.

Q.   And so if you look at the web site, it would be
     Ingram's web site which would say where the
     barge was supposed to be delivered?

A.   It would have destination on there and that the

barge had arrived.

Q.   Okay.  And did you look at those Ingram sites,
     web sites?

A.   Yes, I did.

Q.   For what purpose?

A.   I tracked the barge on the web site.

Q.   But in tracking these barges, at the time, you
     don't know where they were -- where or what --

A.   I cannot recall the destination fleet that these
     barges were dropped into.

Q.   But Ingram's web site -- and that would be
     called what, the web site you are talking about?

A.   It's ingrambarge.com.  That's all I can tell
     you.

Q.   So you would know where -- at the time of
     this -- I'm not talking about right now, but at
     the time of this document, 8/23/2005, you would
     know where that barge delivery site was from
     Ingram's web site?

A.   It would be on the web site where the barge was
     delivered to.

Q.   Okay.  And so that's the way you would know that
     in tracking the barge, it has been delivered to
     where Ingram wanted it delivered?

         MR. HAYCRAFT:  Objection to form.

        MR. RAFFMAN:  Objection.

A.   It arrived at its destination.

Q.   Well, who determines the destination?

A.   I can't answer that.

Q.   Did Lafarge determine the destination of the

barge?

A.   I cannot answer that question.

Q.   To your knowledge, did Lafarge determine the

destination of an Ingram barge?

        MR. HAYCRAFT:  Objection to form.

        MR. RAFFMAN:  Objection.

A.   All I can tell you is that the web site would

tell me where the -- that the barge had arrived

at its destination.  I can't tell you what the

fleet name was.  I can't tell you who decides

that.

Q.   You said it's Ingram's web site?

A.   It is on Ingram's web site as to what -- that

the barge had arrived.

Q.   Well, Lafarge has a contract with Ingram to

deliver -- to deliver Ingram -- excuse me, to

deliver Lafarge product to certain places.

Isn't that so?

A.   I have not read the contract.

Q.   So who would be in charge of determining where

        -- with Lafarge, who would have the knowledge of

        where barges are supposed to be delivered?

A.   I can't answer that.

Q.   All right.  So at the time of August 23, you

        knew what the delivery site was by looking at

        the Ingram web site?

A.   That is correct.

Q.   And that would tell you that Ingram -- that

        Lafarge has completed its delivery of the Ingram

        barge to where it is supposed to go; is that

        right?

             MR. RAFFMAN:  Objection.

A.   You said that Lafarge had completed its

        delivery?

Q.   Lafarge tracks the barge to or from Joppa to its

        point of delivery; is that correct?

A.   Okay.

Q.   And what is the reason why you track it?

A.   So we know where the barge is.

Q.   For what purpose?

A.   Inventory purposes.

Q.   Inventory to know what?  To know what amount of

        product has been delivered, or -- is that what

        it is?

A.   The amount of product is tracked in that barge

as to when it will arrive so that it will be
available for the customer.

Q.   Okay.  And so you want to know when it has
arrived at the designated delivery site so that
you have completed your obligation of delivery
of the product to Ingram?

          MR. RAFFMAN:  Objection.

          MR. HAYCRAFT:  Join.

A.   We didn't deliver the product to Ingram.

Q.   What I'm saying is -- my question may be
confusing.  You are tracking on behalf of
Lafarge to follow the -- your product that is
being transported from Joppa to some delivery
site; is that correct?

A.   Correct.

Q.   Okay.  So when -- and you want to know when it
reaches the delivery site, because that
completes your delivery of the product, does it
not?

          MR. RAFFMAN:  Objection.

A.   It says that the barge has arrived at its
destination.

Q.   And that Ingram -- I mean, that Lafarge has
completed its obligation of delivering the
product?

                    MR. RAFFMAN:  Objection.

A.    I don't know what you are saying there.

Q.    Well, what are you tracking it for?

A.    Inventory, so the barge can be unloaded.

Q.    So are you then tracking it to see that it is
      unloaded?

A.    No.  I don't have anything to do with the barge
      being unloaded.

Q.    Does anybody from Ingram have anything to do --
      excuse me, Lafarge have anything to do with
      tracking the unloading of the barge?

A.    I can't answer that.

Q.    Well, if it is a product that you-all make in
      Joppa -- let's say it is oil field cement, and
      you want to get it to your -- from Joppa to a
      plant of Lafarge's in the New Orleans area, in
      this case, the Industrial Canal; is that
      correct?

A.    Okay.

Q.    How do you know when your product has been
      successfully delivered to your plant in New
      Orleans?

A.    I told you that I look at the web site to know
      that it has arrived.  I don't have anything to
      do with the barge once it has arrived.

Q.   Okay.  And you don't know where the point of
     arrival is?

A.   It is at -- it is wherever was noted on the web
     site as to what fleet the barge was in.

Q.   Well, how do you know when your product gets to
     your plant on the Industrial Canal?

A.   I don't have anything to do with that, sir.

Q.   Does somebody else have something to do with
     that?

A.   I can't sit here and assume that.

     MR. WIEDEMANN:  I'm going to offer the LNA
     128 as Burnett 4 for the purposes of
     identification.

     (Group A Plaintiffs' Deposition Exhibit No.
     4 marked for identification by the reporter.)

     MR. RAFFMAN:  Depending on how much you
     need to go, Larry, we're 90 minutes in.  I might
     suggest a five-minute break, if you think you
     are going to go for very long.

     MR. WIEDEMANN:  That's fine.

     (Recess.)

Q.   Ms. Burnett, you do not recall a constriction in
     delivery of barges from Joppa to New Orleans at
     some point in time in August?

A.   I do not recall.

Q.   Do you not recall that Lafarge suffered 170,000

     in shortfall deliveries at that time?

A.   I don't know anything about that.

Q.   You did not receive an e-mail reflecting a

     shortfall in delivery to the oil field industry?

A.   I do not recall.

Q.   All right.  Let me show you an e-mail.  If

     you'll look at 125, do you see that e-mail which

     was copied to you on 8/22/2005 -- it's 125 --

     from Brad Adkins to Jay Darlington copied to AJ

     Guthrie, Carrie Jenks, Roger Hall, and Bill

     Carruthers?  Those are all employees of Lafarge,

     are they not?

         MR. RAFFMAN:  I'm going to object to your

     characterization of the e-mail at the top of

     this page.  You can answer that question.

A.   Those were Lafarge employees.

Q.   And when you say -- or he says and copied to

     you, "There is a chance we will run out of

     cement this week, but it appears that until

     inventories increase, we will be out or about to

     run out for the next four weeks or longer.

     There are only three barges of Class H moving.

         "I think we need to investigate a charter

     boat for the gulf.  It will only be a matter of

time before Class A and Type 1 inventories will
be critical.  I know this will be an expensive
venture, but we are negotiating volumes for
2006.  And Lafarge needs to show customers that
we can supply them."  Have you got a copy of
this?

A.   No.

Q.   But it shows you at the bottom --

A.   It shows where he forwarded my e-mail.

Q.   Huh?

A.   He forwarded my e-mail.  I was not copied.  If
you look on the carbon copy line, I was not
copied.

Q.   Do you know why Lafarge, on August 22nd, was
contemplating a very expensive procedure of
transporting cement by vessels in the gulf as
opposed to barges in the Mississippi?

     MR. RAFFMAN:  Foundation.

Q.   Do you know why that was so?

A.   I can't answer that.

Q.   But you don't know that they got fined -- or not
fined, as you say.  They were assessed 170,000
for shortfall and delivery of oil field cement?

     MR. RAFFMAN:  Objection.  Asked and
answered.

Q.   You are not aware of that?

A.   I'm not aware.

Q.   Who proposed using those boats in the gulf to

     transport your product?

A.   I can't --

          MR. RAFFMAN:  Objection.  Foundation.

A.   I can't answer.

Q.   Do you know why the -- that suggestion was made?

          MR. RAFFMAN:  Foundation.

A.   I can't answer that.

Q.   You don't know?

A.   I do not know.

Q.   And you don't recall the constriction in the

     transportation in the Mississippi?

A.   I do not recall.

          MR. WIEDEMANN:  I'm going to offer 125 as

     Burnett 5 for purposes of identification.

     That's a two-page document.

          (Group A Plaintiffs' Deposition Exhibit No.

     5 marked for identification by the reporter.)

Q.   Ms. Burnett, let me get these in order so I

     don't get myself confused and confuse you.  Look

     at 278, LNA 278.  That's an e-mail from you on

     August 29, 2005, to Barney Barnes.  And I

     believe -- did we identify his position?

A.  I can't recall what his title was.

Q.  Okay.  He was with Lafarge?

A.  Correct.

Q.  And we already talked about Mr. Darlington and
    Mr. Guthrie as employees of Lafarge?

A.  Correct.

Q.  Okay.  Now, in this document, you say, "I'm
    giving Ingram the okay to come to Joppa within
    the next 45 minutes to an hour to tie down and
    inspect all their barges in our fleet.  David
    Williams stated that there has been a change in
    the storm direction and high winds may now be
    headed our way.  I'll notify the Buttry to be on
    the lookout for them."  What is the Buttry?

A.  It was the tug at Joppa.

Q.  Okay.  Why would they have to be on standby?

A.  To take -- to go around the fleet there at
    Joppa.

Q.  To accommodate Mr. Williams to go around the
    fleet?

A.  Right.

Q.  And Buttry was owned by Lafarge?

A.  No.

Q.  Was it at least --

A.  I don't know the particulars.  I just know that

Lafarge didn't own it.

Q.   But it was a barge that would be used in the
     fleet, in the Lafarge fleet of the operation?

A.   It was a tugboat.

Q.   Well, I said barge.

A.   Tug.

Q.   A tugboat that would be used in the Lafarge
     fleet in Joppa?

A.   Correct.

Q.   Okay.  Now, who is Mr. Williams, David Williams?

A.   I couldn't tell you.

Q.   Is he an Ingram employee?

A.   From the e-mail, he would be.

Q.   Okay.  And did Mr. Williams call you?

A.   He would have had to have called me.

Q.   You didn't call him?

A.   No.

Q.   You would have no reason to call him?

A.   I don't know him.

Q.   Okay.  And on the basis of this, do you have an
     independent recollection of this e-mail and the
     events leading up to it?

A.   No.

Q.   But it reflects that Mr. Williams wanted to come
     check, inspect the Ingram barges in the Lafarge

fleet; is that correct?

A.   That's what the e-mail says.

Q.   All right.  And you were sending an e-mail to
     your people so that they would be alerted that
     he was coming out and to provide the Buttry to
     him to do whatever he had to do?

A.   That's what this e-mail says.

Q.   Okay.  Did he tell you what he was going to do
     besides inspect the barges because of fear of
     weather?

          MR. HAYCRAFT:  Object to the form.

A.   It would just be what I put in that e-mail.

Q.   Okay.  At the time -- at this time on the 29th,
     you-all did not know what happened to 4727 and
     4745 Ingram in New Orleans?

A.   I can't recall that.

Q.   Okay.  I'll show you some e-mails that indicate
     that, but --

A.   Okay.

Q.   -- in any event, but is it -- was it -- was it
     something that happened from time to time that
     Ingram would come out or request to come out and
     check their barges at the Lafarge facility or at
     some other facility?

A.   I can't answer that.

Q.   You don't recall?

A.   I do not recall.

Q.   But if they called to come check the barges, you
     would notify the people at -- to let them do it?

A.   Only if I was contacted.

Q.   Someone from Lafarge contacted you with regard
     to this Williams request?

         MR. RAFFMAN:  Objection.

A.   Did someone from Lafarge contact me?  That's
     what you just asked?

Q.   Yeah.  Did somebody contact you?

A.   Well, from reading this e-mail, David Williams
     contacted me.

Q.   How would David Williams, an Ingram employee,
     know to contact you, except from the -- your
     name being on the contract?

         MR. HAYCRAFT:  Object to the form.  Calls
     for speculation.

A.   I can't answer that.

Q.   So you had the authority to authorize Mr.
     Williams to go out and check the barges?

A.   I had no authority.

Q.   Well, that's why I asked you a minute ago, did
     you do this on your own, or did someone at
     Lafarge authorize you to do it?

MR. RAFFMAN:  Objection.

A.   It says that I have given him the okay that he
could come out there.  The e-mail is notifying
the river that the gentleman is coming out
there.  That's all I did.  So based on this, he
would ask, is it okay for me to come out there.

Q.   So would that then be correct that if anyone
from Ingram called you to check the barges,
their barges in your fleet, that you would
automatically do so in your job?

A.   No.  I don't have the authority.  The e-mail was
sent to the shipping manager.

Q.   Okay.  So you would -- you were not making the
decision.  You were telling the Lafarge people
who you sent this to that -- to expect Mr.
Williams, and it would be that decision as to
what he could do or not do?

A.   That's what the e-mail says.

Q.   Okay.  All right.  Did you hear back from Mr.
Williams or from any of the people you copied
what Mr. Williams did when he went out to the
fleet on the 29th of August?

A.   I can't answer that.

Q.   You don't know?

A.   No.

Q.   No one from Lafarge told you what he did when he
     went out there?

          MR. HAYCRAFT:  Objection.  Assumes facts
     not in evidence.

A.   No.

Q.   Did anyone from Ingram tell you what he did?

A.   No.

Q.   Did Mr. Williams tell you what he did?

A.   No.

Q.   Did the crew of the Buttry tell you what he did?

A.   No.

Q.   As far as you were concerned, unless one of the
     people you copied with your e-mail expressed
     some reservation, Mr. Williams was authorized to
     do whatever he wanted to do?

A.   I can't answer that.

Q.   Well, was there any restriction placed on him,
     that you know of?

A.   I can't answer that.

Q.   There's no other e-mail, that you know of,
     relating to that incident?

A.   Not that I'm aware of.

Q.   You never got any reply from any of the Lafarge
     people with regard to the e-mail?

A.   No.

MR. WIEDEMANN:  I'm going to offer LNA 278

as Burnett 6 for purposes of identification.

(Group A Plaintiffs' Deposition Exhibit No.

6 marked for identification by the reporter.)

Q.   Were you ever contacted by anyone regarding the

breakaway barge, that is 4727?

A.   What do you mean "contacted"?

Q.   Did you ever receive an e-mail or some

communication about that?

A.   It's possible.

Q.   Let's look at 147, which is an e-mail by you on

August 29 to Carrie Jenks, Jay Darlington, AJ

Guthrie.  Who is Michael --

A.   Bayda.

Q.   -- Bayda?  Who is he?

A.   I'm wanting to say he was the sales manager.

I'm not quite sure of his title.

Q.   All right.  You're reflecting that Ingram's 4727

H, Ingram is reporting this barge at New Orleans

at the New Orleans, Louisiana, dock.  You are

talking about the Lafarge dock when you say New

Orleans, Louisiana, dock?

MR. HAYCRAFT:  NOLA dock.

THE WITNESS:  Yes.

MR. WIEDEMANN:  Yes.

Q.   Is that what you mean by that?  Or tell me what
     it means.

A.   I would say that that's what I was meaning
     there.

Q.   Okay.  However, they could have shifted it to
     Algiers before the storm.  What is Algiers?

A.   That is a fleet in New Orleans.

Q.   Did you ever hear of the Zito Fleeting, LLC, or
     Zito Fleeting, Inc.?

A.   I have heard of Zito before.

Q.   Is that not one of the fleets where delivery was
     made of Ingram barges?

A.   I can't answer that.

Q.   Okay.  So when you say we shipped it to
     Algiers -- you say, "However, they could have
     shipped it to Algiers before the storm," are you
     talking about the Zito fleet in Algiers?

A.   Zito?  It says Algiers.

Q.   Yeah.  But you know that the Zito fleet was a
     fleet authorized by Ingram, do you not?

A.   No.  I can't answer that.

Q.   When I asked you about Zito before --

A.   I have heard of Zito.

Q.   Well, in what way?

A.   I have heard of that fleet down there.  There

are several fleets in the New Orleans area.

Q.   You have heard of Zito fleet in connection with

     what?

A.   It is part of the industry, part of the river

     industry.

Q.   You don't know the connection between Zito and

     Ingram?

A.   No.

Q.   You don't know that Ingram had a contract with

     Zito regarding fleeting of barges?

A.   No.

Q.   You have never seen that contract?

A.   No.

Q.   Okay.  You say Ingram is reporting this barge at

     the Lafarge dock.  Who told you that?

A.   I can't answer that.

Q.   But, in any event, on the 29th when you sent

     this e-mail, which is LNA 147, which is the same

     date as your e-mail about Mr. Williams checking

     the fleet in Joppa, you did not know where 4727

     was?

A.   I can't answer that.

Q.   Well, this doesn't show that you had no

     knowledge of where it was?

A.   You are asking me to assume something that I

can't go back in time and answer that.

Q.   Did you know where it was?

A.   Did I know where what was?

Q.   4727 on the 27th -- on the 29th.

A.   According to this e-mail, I'm stating that,
     "Ingram is reporting this barge at New Orleans
     dock.  However, they could have shifted it to
     Algiers before the storm.  Won't be able to
     verify until Ingram or Lafarge employees return
     to the office in the gulf."

Q.   Why did you speculate that -- or conclude that
     they could have shifted it to Algiers before the
     storm?

          MR. RAFFMAN:  Objection.

Q.   You can answer.

A.   It was a speculation.

Q.   Because you knew that Ingram had shifted barges
     to the Algiers fleet before?

A.   No.

Q.   Where did you get Algiers from?

A.   It is a speculation that that is one of the
     fleets it could be in.

Q.   So you thought that they would have shifted it
     to one of the fleets before the storm?

          MR. RAFFMAN:  Objection.

A.   I didn't think anything.  I speculated.

Q.   Did anybody tell you any of this information, or

     was that something you concluded on your own?

A.   The first sentence says, "Ingram is reporting

     this barge at New Orleans dock."

Q.   Who at Ingram told you it was at the New Orleans

     dock?

A.   I cannot answer that.  I do not recall.

Q.   Do you know who they were reporting it to?

A.   I cannot answer that.

Q.   So on August the 29th, according to what you

     recorded, Ingram didn't know that its barge 4727

     was not at the dock, that is the Lafarge dock;

     is that correct?

         MR. HAYCRAFT:  Object to the form.

A.   All I can say is that my e-mail states that

     Ingram is reporting this barge at New Orleans

     dock.

Q.   Okay.  So although you don't remember, you

     wouldn't have written something like that down

     unless the information had come to you from a

     source that you accepted?

A.   It says, "Ingram is reporting."  I cannot give

     you a name.  I do not know who I spoke with.

Q.   But you know that somebody at Ingram has

reported that to you or to someone who reported
it to you; is that --

A.   That's what the e-mail says.

Q.   You wouldn't write that in there of just your
own imagination?

A.   No.

      MR. WIEDEMANN:  Okay.  I'm going to offer
into evidence LNA 147 as Burnett 7 for the
purposes of identification.

      (Group A Plaintiffs' Deposition Exhibit No.
7 marked for identification by the reporter.)

Q.   When you were working as a scheduler before
October -- up until October of 2005, which was
after the hurricane; is that correct?

A.   Yes.

Q.   The hurricane was August 29th, 2005.  So you
were the scheduler at Lafarge in August of 2005?

A.   Correct.

Q.   Okay.  Did you have communications with Ingram
as a scheduler on a day-by-day basis or on a
regular basis?

      MR. RAFFMAN:  Objection.

A.   I had contact with Ingram dispatchers.

Q.   And tell me a little bit about what kind of
contact you would have with dispatchers from

Ingram.

A.    Scheduling and ordering barges.

Q.    Scheduling in what way?  I mean, what would you
      be doing?  Scheduling barges to do what?

A.    To load at Joppa.

Q.    So you would contact Ingram dispatchers to get
      barges to go to Joppa that you needed?

A.    Based on the contract that had been put in place
      the year before.  They knew they were supposed
      to provide a certain many barges.  I would
      contact, ask for my barges for that month or for
      that week.

Q.    What dispatchers would you contact to facilitate
      the barges that you needed?

A.    The main dispatcher that I spoke with was John
      Parks.

Q.    And John Parks was -- he was a dispatcher with
      Ingram.  Where at?

A.    In Nashville.

Q.    And that's the one you would call if you needed
      barges to go to Joppa; is that correct?

A.    I would contact him and let him know what my
      requirements were for loading at Joppa.

Q.    And it would be up to him to send the barges?

A.    He would provide the barges.

Q.   Okay.  And what about the transmission of barges
     from Joppa to whatever the destination would be?
     Would you contact them regarding that?

A.   In regards to what?  Like when it arrived at its
     destination?  Were in transit?

Q.   Well, you say you contacted him to get barges to
     come to Joppa?

A.   Correct.

Q.   Did you contact Mr. Parks or anybody else with
     Ingram on a regular basis regarding when barges
     would be delivered to whatever location it was
     supposed to be delivered?

A.   No.  I looked at the web site.

Q.   You looked at the web site to see what Ingram
     was reporting with regard to their barges?

A.   To the location of a barge.

Q.   So that after the barge is loaded, you would not
     call Mr. Parks --

A.   He would be made aware that it was loaded.

Q.   Huh?

A.   He would be made aware that it was loaded.

Q.   So you would notify Mr. Parks -- is it Park or
     Parks?

A.   Parks.

Q.   Parks, okay.  You would notify Mr. Parks when

you needed barges, and you would notify him when

barges were loaded at Joppa?

A.   Correct.

Q.   And then who would arrange for the

transportation of the barges from Joppa to

whatever their destination was?

A.   If it was an Ingram barge, they would schedule

the barge on one of their boats.

Q.   Okay.  So if it is an Ingram barge leaving

Joppa, Ingram would handle the transportation to

the destination?

A.   They transport their own barges.

Q.   And to whatever destination they desire?

          MR. HAYCRAFT:  Objection to the form.

A.   To the destination that we provided based on the

contract agreement that was made.

Q.   And the -- well, have you looked at the contract

to see what the destination is?

A.   I have not reviewed the contract.

Q.   Okay.  Well, it says in paragraph 7, if you

have -- I'm sorry.  I'm jumping around too much.

Paragraph 7 on the first page, it says the

destination -- the origin is Joppa, Illinois,

Lafarge.  That's No. 6.  The destination is New

Orleans, Louisiana, Lafarge-France Road Wharf;

is that correct?

A.   That's what it says.

Q.   So when you say you would -- all the barges from
     Mr. Parks, you would notify him when the barges
     were loaded and available for transportation to
     their destination; is that correct?

         MR. RAFFMAN:  Objection.  Asked and
     answered.

A.   Correct.

Q.   And the destination, according to the contract
     which you said would be -- the destination that
     you mentioned would be the Lafarge-France Road
     Wharf?

         MR. RAFFMAN:  Objection.  You can answer.

A.   That's what the contract says.

Q.   Now, who has control of the loaded Ingram barges
     after they're loaded at the Joppa Lafarge plant?
     Who has control until they get to the
     destination at Lafarge-France Road Wharf?

A.   I can't answer that.  All I know is that Ingram
     transports their own barges.

Q.   Lafarge doesn't transport them?

A.   We don't have boats.

Q.   So Ingram transports the full barges from
     Lafarge Joppa to the destination, Lafarge-France

Road?

A.    Ingram carries their own barges.

Q.    Okay.  All right.  Are you aware that Ingram,
      under the contract, can delay the transportation
      of barges as they see fit without any penalty?

          MR. HAYCRAFT:  Objection to form.

          MR. RAFFMAN:  Objection.

Q.    Are you aware of that?

A.    I don't know anything about that.

Q.    Let me read something to you.  I'm looking
      for -- am I correct, from your job as scheduler
      that Lafarge had nothing to do with the
      transportation of the loaded barges from Joppa
      to whatever the destination was?

          MR. HAYCRAFT:  Object to the form.

Q.    Is that correct?

A.    Ingram carries their own barges.

Q.    Lafarge had no boats to transport barges?

A.    Correct.

Q.    So that Ingram -- excuse me -- Lafarge would not
      have any input into when a barge is delivered to
      the destination after it leaves the Joppa
      facility; is that correct?

          MR. HAYCRAFT:  Object to the form.

          MR. RAFFMAN:  Object to the form.

A.   Lafarge can request a delivery date or ask for a
     delivery date.

Q.   It can ask for a delivery date; is that correct?

A.   Correct.

Q.   But they have nothing to do with the actual
     delivery of the barges?

          MR. HAYCRAFT:  Object to the form.

A.   Ingram transports the barges, their own barges.

Q.   Right.  And so that's -- the transportation
     aspect is totally out of Lafarge's control?

          MR. HAYCRAFT:  Object to the form.

A.   I can't answer that.  I'm just telling you what
     I know.  Ingram tows their own barges.  That's
     all I know.

Q.   Do you know of any role that Lafarge played in
     transporting the barges after they were loaded
     from Joppa to their destination?  Any role that
     they played in that aspect?

A.   I can't answer that.  Not that I'm aware of.

Q.   Okay.  All right.  As a scheduler, did you do
     anything to check weather with regard to the
     transportation of barges from Joppa to whatever
     the destination is?

A.   Check what?

Q.   Weather?

A.    For weather?

Q.    Weather conditions, yes.

A.    No.

Q.    Did you-all have any weather services at
      Lafarge?

A.    Not that I'm aware of.

Q.    Okay.  You did not -- I'm talking about you
      personally right now.  You did not receive any
      weather reports on a regular basis from an
      outside service or from the National Weather
      Service?

A.    No.

Q.    Do you know whether other people in the employ
      of Ingram -- excuse me -- Lafarge received such
      weather information?

A.    I can't answer that.

Q.    All right.  Well, Lafarge would have no role in
      the physical transportation; is that correct?

           MR. HAYCRAFT:  Object to the form.

           MR. RAFFMAN:  Foundation.

A.    Ingram transported their own barges.

Q.    I'm going to refer you to paragraph 21, which
      speaks of transport of barges.  And it says, "A
      barge loaded with shipper's cargo."  The shipper
      in this case is -- so I'll interpose a transport

of Ingram barges.  "Ingram Barge loaded with
Lafarge's cargo will move only at the
convenience of the carrier," which is Ingram,
"and either singly or with one or more other
craft.

        "Carrier will have the right to shift or
interchange the tow from one to another towing
vessel as frequently as it may find it
convenient to do so, or to procure towage from
any other vessel not owned or operated by the
carrier; to tie off the tow at any point and for
any purpose; and to deviate from its route, and
visit any port whether or not on said route, and
in any order.  Carrier is not bound to transport
any barges containing shipper's cargo in time
for any particular market.

        "If, due to operating conditions, it is
necessary in the judgment of the carrier to
delay the movement of barges while in transit,
carrier reserves the right to do so.  Carrier
makes no representation as to the time which
will elapse between the acceptance of this
agreement until placement at origin, nor between
disputes -- departure of the barge."

        The type is very small and difficult for me

to read.  I have -- "Departure of the barge from

origin and arrival of the barge at destination;

and under no circumstances will carrier be

liable to pay any loss, damage, or expense

incurred by shipper or others by reason of

delay."

     MR. RAFFMAN:  Is there a question, Mr.

Wiedemann?

     MR. WIEDEMANN:  Yes.

Q.  My question is, first of all, you haven't read

this, have you?

A.  No.

Q.  But you realize that Ingram can delay the

delivery of the barges without suffering any

fine or penalty or any contractual obligation.

Do you understand that?

     MR. HAYCRAFT:  Object to the form.

A.  Well, that's what you just read.

Q.  Okay.  And --

     MR. HAYCRAFT:  I object to you asking the

witness to interpret a legal document that she's

never before read until you read it out loud to

her.

     MR. RAFFMAN:  I'll join that objection.

Q.  Were you aware that the Governor of Louisiana on

the 26th of August 2005 declared a state of

emergency and ordered evacuation of the city --

     MR. HAYCRAFT:  Object to the form --

Q.   -- or the state?

     MR. HAYCRAFT:  Object to the form and

assumes facts not in evidence.

A.   He may have.

Q.   She.

A.   She?  Okay.  See, so --

     MR. WIEDEMANN:  Off the record.

     (Off-the-record discussion.)

     MR. RAFFMAN:  The answer to that question

tells you whether the witness was aware one way

or the other.

     MR. WIEDEMANN:  I'm not going -- this is

off the record.

     (Off-the-record discussion.)

Q.   Let me show you a proclamation dated August 26,

2005, from a Kathleen Babineaux Blanco, the

Governor of Louisiana, declaring the state of

emergency.  And my question is, have you seen

that before?

A.   No.

Q.   Were you aware of that fact at Lafarge?

A.   No.

MR. WIEDEMANN:  And I'll mark that as
Burnett 8 for identification.

(Group A Plaintiffs' Deposition Exhibit No.
8 marked for identification by the reporter.)

MR. RAFFMAN:  Off the record.

(Off-the-record discussion.)

MR. WIEDEMANN:  I'm also going to introduce
and file into evidence the transportation
agreement between Ingram and Lafarge, and mark
that as Burnett 9 for purposes of
identification.

MR. HAYCRAFT:  And I object to the offer to
introduce it.  It will be an unobjected to
exhibit at trial.  But as I have noted during
the deposition, I object to your asking this
witness about the contract and its legal
meaning.

MR. WIEDEMANN:  The contract contains
Rachel Burnett, barge scheduler, as a party
encompassed -- not a party to the contract, but
a party encompassed in the contract.  And she
has testified repeatedly that she did not know
the destination, and the destination is
described in the contract -- and that's why I
showed it to her -- which is New Orleans,

Louisiana, or Lafarge Road Wharf.

I'll introduce that as 9.  And I believe we
didn't -- I believe this is a complete copy.  I
think this is the one that we -- you can check
it and see.

MR. HAYCRAFT:  No, it is not.

MR. WIEDEMANN:  Well, we will submit a
complete copy.  I'm only introducing it for the
purposes that we discussed in those paragraphs
that I asked her about, which was in the
document that is attached.  I didn't ask her
anything that is not attached.

(Group A Plaintiffs' Deposition Exhibit No.
9 marked for identification by the reporter.)

BY MR. WIEDEMANN:

Q.   So from a scheduler standpoint, if a barge
should not be delivered or delivery is delayed
due to potential hurricane conditions, would you
have anything to do with the delay after it's
left the Joppa plant?

MR. HAYCRAFT:  Object to the form.

A.   Repeat your question.

Q.   If, in this case, on the 26th, the Governor
declares a state of emergency, and the United
States Weather Bureau and others are reporting a

hurricane headed to New Orleans with

145-mile-an-hour winds and a storm surge of 12

to 15 feet, would you as a scheduler have any

role in making a decision to hold up a barge for

delivery of -- to fleet it or do something else

with it?

       MR. RAFFMAN:  Objection to form.

       MR. HAYCRAFT:  Same.

A.   No.

Q.   Would anybody in Lafarge, that you know, have

that authority or responsibility?

       MR. RAFFMAN:  Objection to form.

A.   I can't answer that.

Q.   Okay.  All right.  Would that be something, from

your experience, that would be within the realm

of Ingram's responsibility?

       MR. HAYCRAFT:  Object to the form.

A.   I can't answer that.

Q.   Okay.  And as I understand it, you did not

know -- I don't want to be repetitious, but you

had -- and, to your knowledge, Lafarge had no

reports of what was going on relative to the

hurricane?

       MR. RAFFMAN:  Objection as to form.

A.   I can only answer for myself.

Q.   Well, you can also answer if you have any

     knowledge concerning anybody else, personal

     knowledge.

A.   I have no other personal knowledge regarding

     anybody else.

Q.   Did you have contact on a regular basis with the

     Lafarge facility on France Road?

A.   What do you mean by "regular"?  Daily, weekly,

     monthly?

Q.   Not daily.  Did you deal with them on a fairly

     regular basis?

A.   I talked to some of the employees there.

Q.   Like who?

A.   Dennis Millon and Annette Gaskin.  I have talked

     to them on several occasions.

Q.   Those are two of the people that -- some of your

     e-mails went to Millon?

A.   Millon, yes.

Q.   And also Gaskin, huh?

A.   I can't recall if I copied her on some, but I

     know Dennis for sure.

Q.   I see Dennis.  So were you aware that in the

     period preceding the hurricane on the 29th,

     according to Mr. -- I can't think of his name --

     Bush -- do you know Mr. Bush?

A.   I know who he is.

Q.   Mr. Bush testified in a deposition that there

     was work going on at Lafarge-France Road for

     some weeks before the 29th -- well, actually,

     the 27th -- so they did not have fax capability,

     e-mail capability, weather information

     capability, that they basically were out of

     communication, except by telephone.

          MR. RAFFMAN:  Objection.  Assumes facts --

Q.   Were you aware of that?

          MR. RAFFMAN:  Sorry.  Objection.  Assumes

     facts not in evidence.  You can answer.

A.   It is possible.

Q.   Huh?

A.   It is possible.  I can't say for sure.  They had

     problems down there before.

Q.   With communication?

A.   Yes.

Q.   Do you know that the problem with the

     communication was -- as Mr. Bush said was in the

     several weeks before the hurricane?

          MR. RAFFMAN:   Objection.

A.   I can't answer that.

Q.   Did you attempt to reach him by e-mail and by

     fax and by -- well, by e-mail and by fax and

weren't successful?

A.   I do not recall.  I can't answer that.

Q.   Let me show you an e-mail.  It is a two-page
     e-mail by you dated -- it is 123.  Well, it is
     actually one page.  I'm sorry.  It is 123.  It
     is dated 8/18/2005.  And you sent that to a
     number of people.  Are all of them with -- the
     people on there, are they all with Lafarge?

A.   They were at the time.

Q.   Yeah.  In fact, Dennis Millon is on there.  He
     was at France Road?

A.   He was the terminal manager at New Orleans.

Q.   Okay.  Who else on there was at France Road?

A.   Nobody.

Q.   Okay.  And in this document, you indicate that
     Ingram 4727 and Ingram 4745, a total of 3,166 --
     is it static tons?

A.   Short.

Q.   -- short tons should arrive at Ingram fleet
     around 8/26.  Do you see that?

A.   I see that.

Q.   Okay.  Did you ever receive a reply from anybody
     at Lafarge or at Ingram suggesting that those
     two barges be held up due to weather?

     MR. HAYCRAFT:  Object to the form.

A.   I can't recall.

Q.   Would Ingram ever write to you about -- respond
     to your e-mails about holding up barges?

          MR. RAFFMAN:  Objection.  Assumes facts not
     in evidence.

A.   Ingram wasn't copied on this.

Q.   I understand.  But would Ingram ever --

          MR. HAYCRAFT:  Can we take a short break
     just in case this is an emergency?

          MR. WIEDEMANN:  Okay.

          (Off-the-record discussion.)

Q.   Did Ingram ever write to you, call you, or
     communicate with you as the barge scheduler
     about delaying a delivery of barges because of
     any reason?

A.   Not that I can recall.

Q.   Did Ingram at any other time that you can recall
     request to go out and inspect barges as they did
     in Joppa due to inclement weather?

          MR. HAYCRAFT:  Object to the form.  It
     mischaracterizes her former testimony.

A.   I can only say who was contacted by me.  I can't
     answer if they came to Joppa.

Q.   All right.  So -- but it's clear that Mr.
     Williams called you to check the barges at Joppa

because of anticipated bad weather?

A.   That's what the e-mail stated.

Q.   Right.  But it wasn't anticipated bad weather
     like Hurricane Katrina?

          MR. HAYCRAFT:  Object to the form.

A.   The e-mail stated weather at Joppa.  Joppa
     doesn't get hurricanes.

Q.   Did Ingram ever request you -- request, that you
     know of personally, to check barges on other
     occasions?

A.   I can't answer that.

Q.   Do you know a Mr. Cook who works for Ingram?

A.   No.

Q.   Do you know if Mr. Cook came out to Lafarge and
     checked the barges at the France Road facility?

A.   I have nothing to do with what goes on at the
     New Orleans terminal.

Q.   You have never heard anything about that?

A.   No.  I just told you I didn't know who the
     gentleman was.

Q.   You don't even know who Mr. Cook is?

A.   No.

Q.   I might have asked you this, but I don't know --
     did anyone contact you about the breakaway barge
     in New Orleans?

A.   Via e-mail, phone call?

Q.   Any way.

A.   It is possible.

Q.   Do you remember it at this time?

A.   I can't recall.  It's possible.

Q.   How would you communicate with Ingram if you had
     dealings with them?

A.   Phone or e-mail.

Q.   Phone or e-mail?  Okay.  And has Ingram, to your
     knowledge, ever held up delivery of barges
     because of weather?

          MR. HAYCRAFT:  Objection.  Already asked
     and answered.

Q.   You can answer.

A.   Not to my knowledge.

Q.   Okay.  Has Ingram, to your knowledge, ever moved
     a barge or barges for safety reasons due to
     weather or any other problem?

A.   I can't answer that.

          MR. HAYCRAFT:  Objection to form and lack
     of foundation.

Q.   Okay.  Has Lafarge ever taken upon itself to
     hire a tugboat to move a barge to an Ingram
     fleet?

A.   I can't answer that.

Q.   Do you know of any time they have ever done

     that?

A.   I can't answer that.

Q.   Of your own knowledge --

A.   I cannot answer that.  I don't have anything to

     do with the New Orleans terminal.  I can't

     answer that.

Q.   You told me you talked to them on the telephone,

     and you sent them e-mail?

A.   Right.  That doesn't mean that we talked about

     that.  That doesn't have anything to do with my

     job.

Q.   I'm asking of your own knowledge.  As the

     scheduler, do you know of any time that Lafarge

     ever took it upon itself to hire a tugboat to

     move a barge to an Ingram fleet?

         MR. RAFFMAN:  Objection.  Asked and

     answered.

A.   No.

Q.   Do you-all own any tugboats?  Or did you, I

     should say?  And when I say "you," I mean

     Lafarge?

A.   Not to my knowledge.

Q.   Did you-all ever contract for tugs other than

     the one you had in Joppa?

A.   I can't answer that.

Q.   You don't know of any?

A.   Can't answer that.  All I can answer for is what
     went on at Joppa.

Q.   But you don't know of your own knowledge of any
     other occasion?

A.   No.  I can't answer that.

Q.   Do you know why the 4727 was diverted from
     Westlake to Lafarge in New Orleans?

A.   I can't answer that.

Q.   Do you know that it was done because of the
     shortage of oil field cement?

         MR. HAYCRAFT:  Objection.  I object to
     going over old ground that we went into two
     hours ago.

Q.   Do you know that?

A.   It very well could have been.

Q.   Very well could have been?  Okay.  I'm going to
     try to wrap it up quickly.  Let me show you --
     and I'll ask you to look at 279, which is an
     e-mail on 8/26 from Jay Darlington to -- copied
     to you, which says, "Rachel and I have noticed
     that the Ingram barges and Lafarge barges that
     Ingram is towing are not being updated in
     IntelliTrans regarding barge positions and ETAs.

Can you see if the problem is on our end or

Ingram's?"  What is IntelliTrans?

A.    It was a computer program for tracking the

barges.

Q.    And did you determine whether or not Ingram was

at fault in not tracking the barges in regard to

their positions and their ETAs?

        MR. HAYCRAFT:  Object to the form.

A.    I can't answer that question.

Q.    Were you asked to see -- to find out about the

problem?  Do you remember what you found out?

A.    I wasn't asked to find out about the problem.

The e-mail was -- this gentleman is the creator

of the program, and the program was supposed to

be reading off Ingram's web site.  So that's

what he was saying that he was being asked, can

he find out what the problem is.  Because it was

a programming error.  All it was was simply a

barge tracking program.

Q.    So that you would know where barges were

based --

        MR. RAFFMAN:  Is that a question?

        MR. WIEDEMANN:  I can't ask a question if

you make an objection before I ask it.  Do you

want to object before I ask the question?

        MR. RAFFMAN:  Why don't you finish your

    question, and then I'll object.

Q.  My question was, did you or, to your knowledge,

    Mr. Tomlinson determine at which end the problem

    was occurring?

        MR. RAFFMAN:  Objection.

A.  I can't answer.

Q.  Okay.  I'm going to offer 279 as Burnett 10 for

    purposes of identification.

        (Group A Plaintiffs' Deposition Exhibit No.

    10 marked for identification by the reporter.)

Q.  Look at 284.  Do you see that?  That's dated

    September 1, 2005.

A.  That's what it says.

Q.  And that's from you to Mr. Guthrie, Ms. Jenks,

    and Mr. Darlington and others, right?

A.  That's what it says.

Q.  And it says, "Ingram believes the barge in this

    picture to be ING 4727, which was loaded with H"

    -- H is oil field cement?

A.  Correct.

Q.  -- "at Joppa for New Orleans, Louisiana.  They

    are assuming it's empty.  As a filled, it would

    not have ended up where it did if it was

    loaded."  Now, is that something Ingram told

you?

A.   Well, according to this e-mail, it says "they,"

which would infer Ingram.  So it says, "They are

assuming."

Q.   So Ingram was telling you that they were

assuming that the barge in 4727 in the picture

would not have been where it was if it had been

loaded?

     MR. RAFFMAN:  Objection.  You can answer.

Q.   Is that correct?

A.   That's what the e-mail says.

Q.   All right.  Do you know who told you that?

A.   I can't recall.

Q.   Okay.  But it was somebody from Ingram?

A.   That's what the e-mail says.

     MR. WIEDEMANN:  Okay.  I'll offer and

introduce and file into evidence as Burnett 11

the e-mail.  And there is -- excuse me.  It is

284 and 285.  285 is the picture, which is not

very legible, but --

     (Group A Plaintiffs' Deposition Exhibit No.

11 marked for identification by the reporter.)

     MR. WIEDEMANN:  I have no further questions

at this time.  I would just ask if Ms.

Burnett -- Mrs. Burnett is going to read and

sign the deposition or waive that right.

     MR. RAFFMAN:  We'll read and sign.

     MR. WIEDEMANN:  So the court reporter,

where should she send it?

     MR. RAFFMAN:  To me.

     MR. WIEDEMANN:  Huh?

     MR. RAFFMAN:  To me.

     MR. WIEDEMANN:  Send it to counsel.  And he

will get it signed, so that we can get a copy as

soon as possible.  So the ball is in your court.

     MR. RAFFMAN:  Very good.

     MR. HAYCRAFT:  Can we take a short break

before I ask my questions?

     MR. RAFFMAN:  Off the record.

     (Off-the-record discussion.)

CROSS-EXAMINATION BY MR. HAYCRAFT:

Q.  Ms. Burnett, your job title when you were

    working in August of 2005 was River Region barge

    scheduler for Lafarge?

A.  Yes.

Q.  And by "River Region," is that a particular

    geographic area of the United States in which

    Lafarge had cement plants?

A.  They have broken up the United States into

    different regions, and where I was located was

called the River Region.  There was the

southeast region, the Great Lakes Region.  I

don't know what constituted the name.

Q.   Okay.  But your region was the River Region,

correct?

A.   Correct.

Q.   And you can -- as a River Region barge scheduler

for Lafarge, you can tell us about the locations

from which cement cargo would be loaded and then

to which it would be delivered, correct?

A.   Correct.

Q.   And the geographic scope of the River Region

Lafarge operations included a number of

different marine terminals, didn't they?

A.   Correct.

Q.   And those marine terminals included just down in

the Louisiana area, the New Orleans facility at

France Road?

A.   Correct.

Q.   The Westlake facility near Lake Charles?

A.   Correct.

Q.   And the Union facility upriver from New Orleans?

A.   Correct.

Q.   Do you know approximately where -- do you know

that that is in the Donaldsonville area of

Louisiana?

A.   No.

Q.   You just know it to be upriver from New Orleans?

A.   Correct.

Q.   Okay.  And in the River Region, Lafarge also had

marine terminals at Memphis?

A.   Correct.

Q.   Nashville?

A.   Correct.

Q.   Red Rock up in Minnesota?

A.   Correct.

Q.   Owensboro here in Kentucky on the Ohio River?

A.   Correct.

Q.   And Belpre?  Am I pronouncing that right?

A.   Correct.  Yes.

Q.   Where is Belpre?

A.   Ohio.

Q.   Okay.  So in the River Region, Lafarge had

marine terminals at Joppa, Belpre, Memphis,

Nashville, Owensboro, Red Rock, and then down in

Louisiana, New Orleans, Westlake, and Union,

correct?

A.   Also, Louisville.  You left out Louisville.

Q.   In the listing I just gave, I left out

Louisville?

A.   Correct.

Q.   But if you put Louisville in there, that is the
     list of marine terminals that Lafarge operated
     within the region that you were the River Region
     barge scheduler?

A.   Correct.

Q.   You mentioned, I believe, that Lafarge had its
     own barges?

A.   Yes.

Q.   And it also used barges for carrying cement
     cargo that were owned by other transportation
     vendors that Lafarge used in the River Region?

A.   Say that again.

Q.   Let me rephrase it.  That was awkward.  In
     addition to the Lafarge barges that Lafarge used
     for carrying of cargo from one location to the
     other in the River Region area, Lafarge also
     used other transportation vendors, correct?

A.   Correct.

Q.   Now, Mr. Wiedemann has been asking you about
     particular barges and a particular vendor,
     Ingram Barge Company, correct?

A.   Correct.

Q.   But back in August of 2005, when you were the
     River Region barge scheduler for Lafarge, you or

your company used other transportation vendors

to move barges in addition to Ingram, correct?

A.   Correct.

Q.   Just to give some examples.  Memco?

A.   Correct.

Q.   Sunn, S-u-n-n, Logistics?

A.   Yes, correct.

Q.   Can you give me some other transportation

vendors in addition to Ingram besides the one I

just mentioned?

A.   SCF.  They use -- they chartered some of their

barges.

Q.   Okay.

A.   I'm trying to think of some others.  There were

several others.

Q.   Would it be fair to say that at any one time at

any particular marine terminal that we have

just -- that you have just identified that there

would be barges located at the terminal that

were owned by or operated by other

transportation vendors or several transportation

vendors at any one time?

A.   Correct.

Q.   Directing your attention to the days when, as

you have looked at in reviewing the e-mails that

Mr. Wiedemann showed you, the ING 4745 and the
ING 4727 were on their way to the New Orleans
facility, isn't it correct that other
transportation vendors were already or were in
the process of delivering barges to the New
Orleans facility or the Westlake facility or the
Union facility for Lafarge?

     MR. WIEDEMANN:  I'm going to object to the
form of the question.  She has not testified
that she had any knowledge concerning -- if you
understand my question, you can answer, please.

A.  Correct, yes.

Q.  When you, as barge scheduler, would schedule a
barge for loading at Joppa, you would call a
vendor to get a barge to Joppa?

A.  If it wasn't one of Lafarge's, yes.

Q.  All right.  If it was wasn't one of the vendors
that you have already mentioned?

A.  Correct.

Q.  Including Ingram?

A.  Correct.

Q.  And looking at the e-mails that Mr. Wiedemann
showed you, you saw where the ING 4727 in
mid-August was in transit from Joppa to Cairo,
correct?

A.   Correct.

Q.   And then at some point after it originally was
     destined for Westlake, Lafarge reconsigned it to
     go to New Orleans terminal rather than Westlake?
     Did I hear that correctly in the e-mails?

A.   Yes.

Q.   So when it is Lafarge's cargo in one of its
     transportation vendor's barges, Lafarge decides
     whether it is going to go to Owensboro or Red
     Rock or New Orleans or Westlake or Union,
     correct?

A.   Correct.

Q.   Because there are Lafarge cement plants
     connected with those locations that the cargo or
     the cement cargo is meant to supply, correct?

A.   Correct.

Q.   We can look at the e-mails, but if you remember
     from having reviewed them with Mr. Wiedemann, it
     appeared to me that the ING 4727 was loaded
     somewhere at Joppa somewhere in the mid-August
     time frame, correct?

A.   Correct.

Q.   And then sometime in the August 17 or 18 time
     frame, it got -- instead of its destination
     being Westlake near Lake Charles, its

destination was decided to be the New Orleans

facility, correct?

     MR. WIEDEMANN:  I object to the form of the

question.  I think it was actually delivered

to --

Q. You can answer the question.

A. Correct.

Q. You as a River Region barge scheduler for

Lafarge, once it was loaded, your interest was

just in from a scheduling perspective to track

the barge to know where it was at any particular

time, correct?

A. Correct.

Q. And on a daily basis, if you chose, you could

track any number of the barges that have been

loaded at Lafarge and were going to the several

marine terminals for Lafarge that we went over a

few minutes ago, correct?

A. Correct.

Q. If you could give us just an idea of how many

barges in any one month in, say, the summer of

2005 you as the River Region barge scheduler for

Lafarge would be tracking in terms of their

being loaded and then transported to the various

terminals that Lafarge had just -- excuse me --

in the River Region?

A.   It would be anywhere from 1 to 300.

Q.   The contract that -- the transportation
     agreement that Mr. Wiedemann showed you and the
     one that has you identified as a billing address
     in the billing address column, do you remember
     Mr. Wiedemann asking you questions about that
     contract?

A.   Yes.

Q.   Okay.  Did you have anything to do with the
     negotiation of that contract?

A.   No.

Q.   You have already testified that until Mr.
     Wiedemann -- until you saw it yesterday in
     connection with preparation for the deposition
     you had never even -- to your knowledge, you had
     not even seen the contract, correct?

A.   Correct.

Q.   And for the 1 to 300 barges per month that
     Lafarge was moving in the River Region system or
     that Lafarge was tracking the moving of in the
     River Region region, were there -- in addition
     to the Lafarge barges, the other transportation
     vendors' barges, correct?

A.   Correct.

Q.    And did you have knowledge of -- of the
      provisions in each of the contracts with each of
      the transportation vendors for each of the
      origins and destinations?

A.    No.

Q.    Let me direct your attention to Exhibit --
      Burnett No. 5.  Mr. Wiedemann went over part of
      it with you.

            MR. WIEDEMANN:  What is the date?

            MR. HAYCRAFT:  It's Bates LNA 125 and 126.

Q.    Mr. Wiedemann asked you about the e-mail at the
      top of the page.  Do you see that, the top of
      page 125?

A.    Okay.

Q.    Okay.  That e-mail isn't to you or from you, is
      it?

A.    No.

Q.    Okay.  Your e-mail -- that e-mail that you were
      a recipient or transmitter of is at the bottom
      of that page at 125?

A.    Correct.

Q.    And that's an e-mail from you to various people
      within the Lafarge organization?

A.    Correct.

Q.    And you are referring to the ING 4727 and the

4745 in that e-mail?

A.   Correct.

Q.   And you are telling Dennis and Annette something
     about those two barges, aren't you?

A.   Yes.

Q.   Dennis, you mentioned he's the terminal manager
     at the New Orleans terminal?

A.   He was.

Q.   Or the France Road terminal?

A.   He was.

Q.   Back in August of 2005?

A.   Yes.

Q.   And in this e-mail, you state that he and
     Annette Gaskins, who is another employee at that
     same terminal?

A.   She was, yes.

Q.   Are to contact -- are, quote, to contact the
     fleet in order to get these barges scheduled to
     your dock.  Did I read that correctly?

A.   Yes.

Q.   But sitting here today, you don't know what
     fleet you were asking them to contact, correct?

A.   Correct.

          MR. HAYCRAFT:  Let me see the exhibits,
     please.  Thank you.

Q.   Did I understand from your testimony in response
     to questions by Mr. Wiedemann that the folks at
     the -- the Lafarge employees down at the New
     Orleans terminal would not ordinarily contact
     you when they had completed the unloading of a
     barge of cement cargo; is that correct?

A.   Correct.

Q.   And sitting here today, do you have any memory
     of being contacted when the ING 4727 was
     unloaded by the employees at Lafarge?

A.   No.

Q.   On the question of the reconsignment of a barge
     from one delivery point to another, within the
     Lafarge River Region system, although you didn't
     have authority to do the reconsignment on your
     own, you had the -- you received the information
     that a barge was to be reconsigned, and then as
     barge scheduler, you carried out the directive?

A.   Correct.

Q.   I'm looking at what was marked as Burnett
     Exhibit No. 7, LNA No. 147.  And this was an
     e-mail from you to Carrie Jenks; CC: Jay
     Darlington, AJ Guthrie, and Michael Bayda on
     August 29th, 2005?

A.   That's what it says, yes.

Q.   Okay.  And when you say that, quote, "However,
     they could have shifted it to Algiers before the
     storm," end quote, is that -- do I understand
     correctly that you had no knowledge of the
     timing of the unloading or what the particular
     circumstances at the dock were during that
     period of time?

A.   Correct.

Q.   You identified in response to Mr. Wiedemann that
     this was a speculative statement on your part?

A.   Yes.

Q.   And is that, in fact, the case?

A.   Yes.

Q.   Okay.  As River Region barge scheduler, was it
     your job to get barges to the Lafarge location
     at Joppa to be loaded and then to -- for the
     purpose of having those barges get to the
     various marine terminals that we -- that you
     identified earlier in my questions so that
     Lafarge's cement could be distributed in the
     system?

A.   Correct.

Q.   Mr. Wiedemann asked you if you remembered
     speaking with him on the telephone; is that
     correct?

A.   Correct.

Q.   And you did speak with Mr. Wiedemann on the
     telephone a couple, three weeks ago?

A.   At some -- somewhere like that, yes.

Q.   He also sent you a stack of documents to look
     at?

A.   He sent me some e-mails.

Q.   Before this deposition today, have you ever
     talked to me or met with me?

A.   No.

Q.   The Joppa facility, was your office actually
     near or at the Joppa Lafarge facility?

A.   Yes.

Q.   So you saw it on a regular basis over the course
     of your nine years at Lafarge?

A.   Just -- I was not down at the river.  I did not
     see that operation.

Q.   And I just said nine years, but I think you said
     you started in 1999?

A.   Correct.

Q.   So in your five or six years with Lafarge?

A.   Right.

Q.   Is there a wharf at Joppa?  Do you know what I
     mean by "wharf"?

A.   No.

Q.   Is there a dock at Joppa?

A.   Loading dock.

Q.   And barges come alongside the loading dock?

A.   Yes, I think.  I have never spent any time down

     there.

Q.   So you are not involved as a -- you weren't

     involved as a barge scheduler in the actual

     physical activities of loading the barge?

A.   No.

Q.   That is, yes, you weren't involved?

A.   Sorry.  I was not involved.

Q.   And in addition to the loading dock, does

     Lafarge have a fleet in the river -- in the Ohio

     River there at Joppa?

A.   Yes.

Q.   Can you give the Court some idea of the number

     of barges that would be located at any one time

     when you were there at the Joppa fleet for

     Lafarge?

          MR. WIEDEMANN:  I object to the form of the

     question.  She said she was not at the fleet.

Q.   To your knowledge, can you -- if you know, can

     you give us an approximation of how many barges

     would be at the Joppa fleet on the Ohio River at

     any one time?

A.   I can't say.

Q.   Okay.  Fair enough.

        MR. HAYCRAFT:  That's all the questions I

     have.  Thank you.

        MR. WIEDEMANN:  I just have a few.

     REDIRECT EXAMINATION BY MR. WIEDEMANN:

Q.   The transportation agreement with Ingram was

     specific to delivery of cement from Joppa to New

     Orleans Lafarge-France Road; isn't that so?

        MR. RAFFMAN:  Objection.  I think it is

     beyond the scope of the cross, and I object to

     any questions about a document she never saw.

Q.   You can answer the question.

A.   That's what the transportation agreement says

     that you are showing me.

Q.   And so that the only contract that you are aware

     of with Ingram is for them to deliver cement

     from Joppa to the France Road facility; isn't

     that so?

        MR. RAFFMAN:  Objection.

        MR. HAYCRAFT:  Objection to the form.

A.   No.  That is the only contract you are showing

     me.

Q.   Do you know of any other contract?

A.   Lafarge, I'm sure, had other contracts.  But

that's the only one that you are showing me is

for the one to France Road.

Q.   Well, it is the only one that's been produced by

defendants with regard to -- to the relationship

between Ingram and Lafarge.  Do you know of any

other contracts?

A.   No.

MR. RAFFMAN:  I object to the testimony of

Mr. Wiedemann.

Q.   Do you know of any other contract other than the

one that you have been shown today?

A.   That's the only one that I know of.

Q.   The -- I believe you said earlier -- maybe I was

confused -- you didn't know what the River

Region barge scheduler meant; is that correct?

MR. RAFFMAN:  Objection.

Q.   Didn't you say that earlier?

A.   No.  I said the River Region is the region that

I worked in.

Q.   And the region that you worked in included --

did it include Nashville, Memphis, Owensboro?

A.   Yes.

Q.   Okay.  And so that you would handle barges to

other facilities; is that correct?

A.   Yes.

Q.   Huh?

A.   Yes.

Q.   When we're talking about 4727 and 4745, the two
     barges at the Lafarge facility at the time of
     the hurricane, those two barges were in relation
     to the contract that we have shown you before --

          MR. RAFFMAN:  Objection.

Q.   -- were they not?

A.   I can't answer that, because I didn't know
     anything about the contract.

Q.   Okay.  How would barges be -- barges, you
     indicated, would be transported from Joppa by --
     in this case, by Ingram to France Road; is that
     -- or to the destination; is that correct?

A.   What was your question again?

Q.   The barges would be transported, in the case of
     Ingram, by Ingram from Joppa to the destination?

A.   If they are Ingram barges.

Q.   And these were Ingram barges?

A.   Correct.

Q.   And Lafarge has no transportation capabilities?
     You don't have tugboats to transport barges?

          MR. RAFFMAN:  Objection.

A.   We do not have -- as far as I know of, Lafarge
     does not own any boats.

Q.   And when a barge is delivered like 4727 and

     4745 --

          MR. WIEDEMANN:  Off the record.

          (Off-the-record discussion.)

Q.   How would Ingram Barges 4727 -- oh, I forget the

     number now -- the two barges, 4727 and 4545

     (sic)?

          MR. RAFFMAN:  You are close.

Q.   The two barges, okay, that we're talking about,

     how would they be taken away from France once

     they have been emptied?  How would they be taken

     out?

A.   I can't answer that.

Q.   Would Lafarge have anything to do with getting

     the barges out of the Lafarge facility?

          MR. HAYCRAFT:  Object.  Beyond the scope.

A.   I can't answer that.

Q.   Who would have the knowledge of how that's done?

A.   Somebody in New Orleans.

Q.   Okay.  But, to your knowledge, there were no

     Lafarge vessels to take barges out?

A.   To my knowledge, no.

Q.   The only thing that was done at France Road

     would be to unload the barges to transport the

     cement to customers?

A.   I can't answer that.  I would be assuming.

     Because I wasn't down there.  I don't know.

Q.   It is an unloading facility, is it not?

A.   Correct.

Q.   And it unloads barges, and then distributes the

     product to wherever it is supposed to go; is

     that correct?

A.   Correct.

Q.   And it has no -- to your knowledge has no

     vessels there to bring barges in or take barges

     out?

A.   To my knowledge, no.

Q.   And your tracking of the barges vis-a-vis

     Ingram, Ingram barges would be by checking their

     web site; is that correct?

A.   Correct.

Q.   So you would depend on their web site to know

     where their barges were and when they delivered

     and when they left?

A.   Just know when they arrived.  That's all I cared

     about.

Q.   When they arrived at the destination?

A.   At the fleet.

Q.   Well, is it the fleet or the destination?

A.   All I care about is when they get to the -- get

to New Orleans in a fleet somewhere.

Q.    So your only concern is that when they get to
New Orleans they are put into a fleet?

A.    As far as I know, yes.  According to the web
site.

Q.    And that would be done by Ingram?

        MR. HAYCRAFT:  Object to the form.

Q.    In the case of Ingram Barges?

A.    They would have to be the ones updating their
web site.

Q.    But, I mean, physically putting the barges in
the fleet would be done by Ingram or someone
hired by Ingram?

A.    I can't answer that.

Q.    It wouldn't be done by Lafarge?

A.    No.

        MR. WIEDEMANN:  I have no further
questions.

(The deposition was concluded at 5:53 p.m.)



                    _____

                    MS. RACHEL (BURNETT) MAYS


STATE OF KENTUCKY    )


COUNTY OF _____ )

        I certify that this deposition was signed

in my presence by Rachel (Burnett) Mays on the
_____ day of _____, 2007.

IN WITNESS WHEREOF, I have hereunto set
my hand and affixed my seal of office on this
the _____ day of _____, 2007.


_____
Notary Public,
State of Kentucky at Large

My commission expires _____.

                    E R R A T A   S H E E T
DEPOSITION OF:  Rachel (Burnett) Mays
DATE TAKEN:     1/26/07
RE:             Ingram Barge
                Case No. 05-4419


INSTRUCTIONS    After reading the transcript of
your deposition, please note any change or
correction and the reason therefor on this
sheet.  Do not make any marks or notations on
the transcript itself.

PAGE    LINE    CHANGE OR CORRECTION AND REASON

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

I have read the foregoing transcript of my
deposition and, except for any corrections or
changes noted above, I hereby subscribe to the
transcript as an accurate record of the
statements made by me.


_____
Rachel (Burnett) Mays

STATE OF KENTUCKY      )
COUNTY OF McCRACKEN  )   ss

    I, CHRISTY MILLER, RPR, CSR (IL) Notary Public in and for the State of Kentucky at Large, do hereby certify that the above and foregoing is a true, correct and complete transcript of the deposition of MS. RACHEL (BURNETT) MAYS, taken at the time and place and for the purpose set out in the caption hereof; that said witness was duly sworn by me; that said deposition was taken down in stenotype by me and thereafter transcribed; that the appearances were as set out in the caption hereof.

    I further certify that I am neither attorney for, nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto nor financially interested in the action.

    My commission expires September 20, 2007.

    Given under my hand and seal of office on this the 9th day of February, 2007.


                CHRISTY MILLER, RPR, CSR (IL)
                Notary Public
                State of Kentucky at Large