EARL SMITH

MiniDep by Kenson

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE    *    CIVIL ACTION
COMPLAINT OF INGRAM    *
BARGE COMPANY, AS OWNER   *    NO. 05-4419
OF THE ING4727,      *    C/W 05-4237
PETITIONING FOR      *    C/W 05-5531
EXONERATION FROM OR    *    C/W 05-5724
LIMITATION OF LIABILITY   *    SECTION "C" (2)
          *
*   JUDGE HELEN G.
         *      BERRIGAN
         *
         *      MAG. JUDGE, JOSEPH
         *      WILKENSON, JR.
         *

* * * * * * * * * * * * * *

Deposition of Earl Smith taken at the
law offices of Chaffe McCall, located at 1100
Poydras Street, Suite 2300, New Orleans,
Louisiana 70163, beginning on the 14th day of
November, 2006.

Reported by:
Peter Caruso, CCR-CVR
Certified Court Reporter

---

APPEARANCES:

Representing the Plaintiffs,
   Ethel Mumford, et al:

WIEDEMANN & WIEDEMANN
Attorneys at Law
By: Lawrence D. Wiedemann, Esq.
821 Baronne Street
New Orleans, Louisiana 70113

LAW OFFICE OF BRIAN A. GILBERT
Attorneys at Law
By: Brian A. Gilbert, Esq.
3232 Edenborn Avenue
Metairie, Louisiana 70002

MR. PATRICK J. SANDERS, ESQ.
Attorney at Law
3316 Ridgelake Drive
Metairie, Louisiana 70002

Representing the Plaintiffs,
   The Parfait Family, et al:

LAW OFFICES OF ASHTON R. O'DWYER, JR.
Attorneys at Law
By: Ashton R. O'Dwyer, Jr., Esq.
365 Canal Street
Suite 2670
New Orleans, Louisiana 70130

Representing the Plaintiffs:

---

Representing the Plaintiffs,
Marie Benoit, et al:

MAPLES & KIRWAN, LLC
Attorneys at Law
By: Carlos Zelaya, II, Esq.
902 Julia Street
New Orleans, Louisiana 70113

Representing Joseph C. Domino, Inc.
   and Unique Towing, Inc.:

EMMETT, COBB, WAITS & HENNING
Attorneys at Law
By: John F. Emmett, Esq.
1515 Poydras Street
Suite 1950
New Orleans, Louisiana 70112

Representing Joseph C. Domino, Inc.:

HARRIS & RUFTY, L.L.C.
Attorneys at Law
By: Jill Willhoft, Esq.
650 Poydras Street
Suite 2710
New Orleans, Louisiana 70130

Representing Lafarge North America, Inc.:

CHAFFE, McCALL, L.L.P.
Attorneys at Law
By: Robert B. Fisher, Jr., Esq.
     Derek Walker, Esq.
     Thomas Forbes, Esq.

Representing New York Marine and
General Insurance Company:

SUTTERFIELD & WEBB, L.L.C.
Attorneys at Law
By: Daniel A. Webb, Esq.
650 Poydras Street
Suite 2715
New Orleans, Louisiana 70130

Representing American Owners Mutual
   Protection and Indemnity Association:

MONTGOMERY, BARNETT, BROWN & READ,
HAMMOND & MINTZ
Attorneys at Law
By: Philip S. Brooks, Jr., Esq.
1100 Poydras Street
New Orleans, Louisiana 70163

Representing Board of Commissioners,
   Port of New Orleans:

DAIGLE, FISSE & KESSENICH
Attorneys at Law
By: Jonathan H. Sandoz, Esq.
P. O. Box 5350
Covington, Louisiana 70434-5350

Representing Lafarge North America, Inc.:

GOODWIN PROCTOR, LLP
Attorneys at Law
By: Mark Raffman, Esq.
901 New York Avenue

---

EARL SMITH

MiniDep by Kenson

## EXAMINATION INDEX

Caption. . . . . . . . . . . . . . . . . . . . . . . . . . .1

Appearances. . . . . . . . . . . . . . . . . . . . . .2,3,4

Stipulation. . . . . . . . . . . . . . . . . . . . . . .6

Examination:

    By Mr. Wiedemann . . . . . . . . . . . . . . . . . .7

    By Mr. Emmett. . . . . . . . . . . . . . . . . .147

    By Mr. Haycraft. . . . . . . . . . . . . . . . .154

Reporter's Page. . . . . . . . . . . . . . . . . . . .161

Certificate. . . . . . . . . . . . . . . . . . . . . . .162

Witness' Certificate . . . . . . . . . . . . . . . . .163

Corrections/Changes Page . . . . . . . . . . . . . . .164

- 5 -

## STIPULATION

It is stipulated and agreed to, by and
between counsel, that the perpetuation deposition
of Earl Smith, is hereby taken, pursuant to
Notice, for all purposes, under the rules of the
Louisiana Code of Civil Procedure;

    That the parties hereto waive all formalities
in connection with the taking of this deposition,
except that of reading and signing; and

    That all objections, except those as to the
form of the question and/or the responsiveness of
the answer, are reserved until the time of the
trial of this case.

* * * * *

    Peter Caruso, Certified Court Reporter,
officiated in administering the oath to the
herein witness.

- 6 -

**EARL SMITH**

MINIDEP by Kenson

1         Earl Smith, after having been first
2 duly sworn by the reporter to tell the truth, the
3 whole truth, and nothing but the truth, was
4 examined and testified as follows:
5       MR. WIEDEMANN:
6         Usual stipulations.
7       MR. FORBES:
8         Yes.
9       MR. WIEDEMANN:
10         And does he want to read and sign?
11       MR. FORBES:
12         Yes, we reserve the right to read
13 and sign.
14        E X A M I N A T I O N
15 BY MR. WIEDEMANN:
16     Q.  Would you state your full name, please,
17 sir?
18     A.  Earl James Smith, Senior.
19     Q.  And your address, Mr. Smith?
20     A.  6761 Downman Road, New Orleans,
21 Louisiana.
22       MR. WEBB:
23         I can barely hear you down here,
24       sir.
25 BY MR. WIEDEMANN:

         - 7 -

1     Q.  And how long have you lived at that
2 address?
3     A.  Two and a half years.
4     Q.  Continuously?
5     A.  Yes.
6     Q.  You weren't displaced at all during
7 Hurricane Katrina?
8     A.  Yes, I was.
9     Q.  And where did you go to when you were
10 displaced?
11     A.  Alabama.
12     Q.  Was your home flooded?
13     A.  Yes.
14     Q.  How much water did you have?
15     A.  It settled at four and a half feet.
16     Q.  And was your neighborhood in that area
17 similarly flooded?
18     A.  Yes.
19     Q.  And that was an area that was basically
20 flooded totally; is that correct?
21     A.  Repeat that for me, please.
22     Q.  Every house in that area was flooded?
23     A.  Yes, in my area.  Yes.
24     Q.  And how long were you in Alabama?
25     Approximately.

         - 8 -

1     A.  About two weeks.
2     Q.  And are you married, sir?
3     A.  Yes.
4     Q.  What is your wife's name?
5     A.  Katherine Smith.
6     Q.  With a "C," C-a-t-h --
7     A.  "K."
8     Q.  "K"?
9     A.  "K."
10     Q.  And you have children?
11     A.  Yes.
12     Q.  How many?
13     A.  Four.
14     Q.  Is this your only marriage?
15     A.  No.
16     Q.  You were married before then?
17     A.  Yes.
18     Q.  Are the four children from your marriage
19 with Katherine?
20     A.  No.
21     Q.  From a prior marriage?
22     A.  Yes.
23     Q.  And you have custody of the four
24 children?
25     A.  No.

         - 9 -

1     Q.  Who is your prior wife?
2     A.  Jacqueline Smith.
3     Q.  And Jacqueline has possession of the four
4 children?
5     A.  Two of them.
6     Q.  Who has the other two?
7     A.  They're by someone before Jacqueline.
8     Q.  You were married previous to Jacqueline?
9     A.  No, I wasn't married.  Just had two kids.
10     Q.  Okay.  And who was the mother of the two
11 children?
12     A.  Dianne Page.
13     Q.  So you had two children by Dianne Page
14 and two children by Jacqueline Smith?
15     A.  Yes.
16     Q.  And your marriage to Jacqueline ended in
17 divorce?
18     A.  Yes.
19     Q.  And where at, Orleans Parish?
20     A.  Yes.
21     Q.  And where is Jacqueline now?
22     A.  Alabama.
23     Q.  Is that her home?
24     A.  Yes.
25     Q.  Where at in Alabama?

         - 10 -

EARL SMITH

1   A.  Union Town.
2   Q.  Do you know her address?
3   A.  No.
4   Q.  What about Dianne Page?
5   A.  Union Town, Alabama.
6   Q.  Is that where you're from?
7   A.  Yes.
8   Q.  Do you have family in Union Town?
9   A.  Yes.
10  Q.  Your mother and father?
11  A.  Mother.
12  Q.  Mother.  What's your mother's name?
13  A.  Martha J. Smith.
14  Q.  Margaret?
15  A.  Martha.
16  Q.  Martha.  I'm sorry.
17  Q.  What's her last name?
18  A.  Smith.
19  Q.  Is that the mother of Jacqueline, or is
20  that -- that's your mother?
21  A.  My mother, yes.
22  Q.  What is your education, Earl?
23  A.  High school diploma, high school
24  graduate.
25  Q.  Where did you go to high school?
                    - 11 -

1   A.  Robert C. Hatch High.
2   Q.  Robert C. Hatch?
3   A.  Yes.
4   Q.  Was that in Union?
5   A.  Union Town.
6   Q.  How did you come to come to New Orleans?
7   A.  Excuse me?
8   Q.  After high school.  When did you come to
9   New Orleans?
10  A.  After high school.
11  Q.  For what reason?
12  A.  To do construction.
13  Q.  Do you have a particular trade in the
14  construction industry?
15  A.  Yes.
16  Q.  What is it?
17  A.  Welding.
18  Q.  Did you go to some welding school in high
19  school?
20  A.  After high school.
21  Q.  After high school.  Were you in the
22  military?
23  A.  No.
24  Q.  When you came to New Orleans, you went
25  into the construction business with whom?
                    - 12 -

1   A.  CCW, Incorporated.
2   Q.  What kind of company is that?
3   A.  It's a construction company.
4   Q.  When you were doing welding?
5   A.  Yes.
6   Q.  And after CCW, Incorporated, who did you
7   work for?
8   A.  Lafarge.
9   Q.  So you had only two employers in the
10  New Orleans area?
11  A.  Yes.
12  Q.  And when did you go to work for Lafarge?
13  A.  1989.
14  Q.  And did you work for Lafarge continually
15  from 1989 until Hurricane Katrina?
16  A.  Well, no.  I left, I left and went back
17  to Alabama.  Well, they had a Lafarge up in the
18  area, in Demopolis, which was twenty miles from
19  my hometown, so I went over there for three years
20  and came back.
21  Q.  So you stayed with Lafarge, although you
22  didn't stay in New Orleans?
23  A.  Right.
24  Q.  So from 1989 until Hurricane Katrina you
25  worked for Lafarge either locally at another
                    - 13 -

1   facility?
2   A.  Yes.
3   Q.  And you came back to the New Orleans area
4   when?
5   A.  I think it was in August.  I'm not sure.
6   October.
7   Q.  August or October of what, 2000 and what?
8   A.  This year -- last year.
9   Q.  Katrina was in August of 2005.
10  A.  Okay.  It had to be October, 'cause -- it
11  had to be two months, late October.
12  MR. 1WEBB:
13      I'm sorry.  Was the question when he
14      returned from the Demopolis job?
15  MR. WIEDEMANN:
16      When did he return to New Orleans,
17      yeah.
18  BY MR. WIEDEMANN:
19  Q.  You said you went --
20  A.  Two months after the hurricane.
21  Q.  Oh, okay.  So you left New Orleans and
22  you went to another Lafarge facility and you
23  didn't return here until after Hurricane Katrina?
24  A.  No.  I left, I left -- after the
25  hurricane I went to Alabama then.  I went to
                    - 14 -

**EARL SMITH**

MiniDep by Kenson

| | |
|---|---|
| 1 another one of their facilities and worked about | 1 supervisor? |
| 2 a month over there. Then I came back to | 2    A. Well, when I came back, I was -- I came |
| 3 New Orleans. | 3 back with the people that was working under me as |
| 4    Q. What was your job with Lafarge before you | 4 maintenance supervisor, so I got back at the same |
| 5 left New Orleans? | 5 time as the other guys. |
| 6    A. Before the hurricane, right before the | 6    Q. When did you leave the facility on the |
| 7 hurricane? | 7 Industrial Canal, when was the last time you were |
| 8    Q. Yes. | 8 there? |
| 9    A. Maintenance supervisor. | 9    A. I don't understand. |
| 10    Q. As a maintenance supervisor, did you have | 10    Q. Before Hurricane Katrina. |
| 11 other people under you? | 11    A. Before the hurricane? |
| 12    A. Yes. | 12    Q. Yes. |
| 13    Q. How many? | 13    A. That Saturday before hurricane. |
| 14    A. Seven. | 14    Q. On that Saturday, which would have been |
| 15    Q. And they would be maintenance employees? | 15 the 27th; is that correct? |
| 16 They would do maintenance work? | 16    A. I don't know exactly. |
| 17    A. Yes, everyone in there did basically the | 17    Q. What time on Saturday did you leave the |
| 18 same jobs. I was over everybody that was under | 18 Lafarge facility? |
| 19 me. | 19    A. Between twelve and one, I would say. |
| 20    Q. Were there different tradesmen in the | 20    Q. Between twelve and one? |
| 21 seven? | 21    A. Yes. |
| 22    A. Well, we -- the newer guys didn't operate | 22    Q. Did the seven people underneath you leave |
| 23 the -- certain things, but basically everybody | 23 as well? |
| 24 had pretty much to do with every job that was | 24    A. There wasn't seven working that day. |
| 25 needed. | 25    Q. How many were there working? |
| - 15 - | - 17 - |

| | |
|---|---|
| 1    Q. And besides you as the maintenance | 1    A. Two plus -- two plus a guy up front |
| 2 supervisor, what were the other supervisory | 2 loading trucks. |
| 3 employees at Lafarge? | 3    Q. There were two maintenance people |
| 4    A. I don't understand. | 4 underneath you working and two loading trucks? |
| 5    Q. Well, you're a maintenance supervisor. | 5    A. One loading trucks. |
| 6 Was there a production supervisor, a general | 6    Q. One loading trucks, okay. And who were |
| 7 supervisor? What was the management structure? | 7 the two working underneath you, the two |
| 8    A. Well, maintenance supervisor, assistant | 8 maintenance people? |
| 9 manager and the manager. | 9    A. There was also a barge unloading, so |
| 10    Q. Who was the assistant manager? | 10 everybody did everything. So the maintenance |
| 11    A. Ed Busch. | 11 people is also the barge unloading people. |
| 12    Q. Was he your superior? | 12    Q. Okay. |
| 13    A. He was my supervisor. | 13    A. Louis Robinson. |
| 14    Q. And who was the general manager? | 14    Q. Is he still with the company? |
| 15    A. Dennis Millon. | 15    A. No. |
| 16    Q. Dennis? | 16    Q. R-o-b-i-n-s-o-n? |
| 17    A. Millon. | 17    A. Yes. |
| 18    Q. Millon? | 18    Q. Where is he located? Do you know? |
| 19    A. And was Dennis Millon the -- and Ed Busch | 19    A. No. |
| 20 in those positions prior to Hurricane Katrina? | 20    Q. He left with you on Saturday? |
| 21    A. Yes. | 21    A. Yes. |
| 22    Q. But you weren't here prior to Hurricane | 22    Q. Do you know where he went to? |
| 23 Katrina? I mean, immediately before. | 23    A. No. |
| 24    A. No. | 24    Q. Who was the other worker besides Louis |
| 25    Q. Who had your job as the maintenance | 25 Robinson? |
| - 16 - | - 18 - |

**EARL SMITH**

MINIDEP by Kenson

| | |
|---|---|
| 1   A.   Roland Johnson. | 1   A.   Yes. |
| 2   Q.   Roland Johnson? | 2   Q.   To whom? |
| 3   A.   (Witness nods head affirmatively.) | 3   A.   I don't know his wife. |
| 4   Q.   And has Roland Johnson returned? | 4   Q.   What was Louis Robinson's job title? |
| 5   A.   No. | 5   A.   Just a maintenance person and barge |
| 6   Q.   Do you know where he is? | 6 unloader. |
| 7   A.   Alabama, last time I talked to him. | 7   Q.   That was -- he'd be listed as a |
| 8   Q.   Whereabout in Alabama? | 8 maintenance person, is that right, or a barge |
| 9   A.   Montgomery. | 9 unloader?  What is -- |
| 10   Q.   Do you know where he's working? | 10   A.   Yes. |
| 11   A.   I think he's a policeman now, or that's | 11   Q.   Huh? |
| 12 what he was last time I talked to him. | 12   A.   Everybody do everything, so whatever you |
| 13   Q.   The last time in Montgomery? | 13 want to call them. |
| 14   A.   Yes. | 14   Q.   And what about Roland Johnson? |
| 15   Q.   And you don't know where Robinson is? | 15   A.   He was the same, everybody was the same. |
| 16   A.   No. | 16   Q.   Darryle Evans was the same? |
| 17   Q.   Was Robinson married? | 17   A.   He was a truck loader. |
| 18   A.   He was at one time.  I don't -- I mean, | 18   Q.   And how would he load trucks? |
| 19 we hadn't talked about it in a long time, but he | 19   A.   Well, everything is computerized, where |
| 20 was when he first came. | 20 you just press the buttons and let the truck, the |
| 21   Q.   How long did he work for Lafarge? | 21 spout down in the bulk truck, and you put down |
| 22   A.   Eleven years. | 22 what weight you want to put on it and load them |
| 23   Q.   And you don't know why he didn't come | 23 that way. |
| 24 back? | 24   Q.   So it's all done automatically? |
| 25   A.   No. | 25   A.   Right. |
| - 19 - | - 21 - |

| | |
|---|---|
| 1   Q.   Did Robinson and Johnson lose their | 1   Q.   So on this day, that is on the Saturday |
| 2 places where they were living in the hurricane? | 2 before you knocked off, these were the people, |
| 3   A.   Yes. | 3 Louis Robinson, Roland Johnson, Darryle Evans and |
| 4   Q.   Who was the other man that was -- you say | 4 Mr. Busch who were at the plant? |
| 5 loading trucks, I believe? | 5   A.   Yes. |
| 6   A.   Yes. | 6   Q.   Was anybody else there?  Was the general |
| 7   Q.   Who was he? | 7 manager there? |
| 8   A.   Darryle Evans. | 8   A.   No. |
| 9   Q.   Evans? | 9   Q.   Dennis Millon? |
| 10   A.   Yes. | 10   A.   No, I didn't see him. |
| 11     MR. HAYCRAFT: | 11   Q.   He wasn't there on that Saturday? |
| 12       Darryle Evans? | 12   A.   I didn't see him. |
| 13     THE WITNESS: | 13   Q.   So Ed Busch would have been the headman |
| 14       Yes. | 14 at the plant on Saturday? |
| 15 BY MR. WIEDEMANN: | 15   A.   Yes. |
| 16   Q.   And did Darryle return? | 16   Q.   And you would have been the second in |
| 17   A.   Yes. | 17 charge? |
| 18   Q.   He's back working for Lafarge? | 18   A.   Yes. |
| 19   A.   Yes. | 19   Q.   Who made the decision to leave on |
| 20   Q.   Did he lose his home in the hurricane? | 20 Saturday at 12:00 or 1:00 o'clock? |
| 21   A.   Yes. | 21   A.   Well, Ed told us to tie the barge down |
| 22   Q.   And where does Darryle live?  Do you | 22 and get everything ready for the hurricane, and |
| 23 know? | 23 they had to finish a barge that Saturday, so that |
| 24   A.   No. | 24 was the purpose of coming in,  and tie down |
| 25   Q.   Is he married? | 25 everything, secure everything, and put it, |
| - 20 - | - 22 - |

EARL SMITH

MINIDEP by Kenson

1  whatever, put it across the other side of the
2  floodwall before they close the floodwall and
3  leave.
4  Q.  And Ed Busch told you that?
5  A.  Yes.
6  Q.  Now, tell me what kind of communication
7  facilities that they have at the Industrial Canal
8  facility.  By that I mean,
9  e-mail, faxes, telephones, how did you all
10  communicate with other people within the company
11  or with barge companies.
12  A.  Mostly telephone.
13  Q.  Telephone?
14  A.  (Witness nods head affirmatively.)
15  Q.  You had no e-mail capacity?
16  A.  Well, I'm not sure.
17  Q.  That's not something --
18  A.  I never used it.  We -- I'd call.
19  Q.  Did it have a fax?
20  A.  Yes.
21  Q.  Do you know the fax number?
22  A.  No.
23  Q.  Do you know what the telephone number
24  was?
25  A.  Yes.

- 23 -

1        Do you want it from the witness, or
2        do you want the real names?
3        MR. WIEDEMANN:
4            Well, give me the real name.
5        MR. FORBES:
6            Gaskin, G-a-s-k-i-n.
7  BY MR. WIEDEMANN:
8    Q.  And what was Annette's job?
9    A.  Well, to handle paperwork and make the
10  calls they needed.
11    Q.  And Annette wasn't there that day?
12    A.  No.
13    Q.  On Saturday?
14    A.  No.
15    Q.  Do you know why she wasn't there?
16    A.  No.
17    Q.  Nobody has told you why she -- did she
18  ordinarily work on Saturday?
19    A.  No.
20    Q.  So it would have been her day off?
21    A.  Yes.
22    Q.  Did you all work generally on Saturday
23  and Sunday?
24    A.  If we needed the cement, we would, yes.
25    Q.  If you needed to load or unload barges,

- 25 -

1    Q.  What was it?
2    A.  504-943-5777.
3    Q.  Did they have any personnel people on the
4  job on that Saturday?
5    A.  No.
6    Q.  Do they have people who work in the
7  office to operate the fax machine and the
8  telephone on ordinary days?
9    A.  On ordinary days?
10    Q.  Uh-huh (affirmative response).
11    A.  Yes.
12    Q.  And who?  More than one or one?
13    A.  One.
14    Q.  And it's a female or male?
15    A.  Female.
16    Q.  What's her name?
17    A.  Annette Gibbon.
18    Q.  Annette?
19    A.  I'm sorry.  Annette -- what's her name?
20  Let me think.  I can't think of her last name
21  now.
22    A.  Griffin?  Griffin, I'm sorry.
23    Q.  Griffin?
24    A.  Yes.
25        MR. FORBES:

- 24 -

1  you would work on weekends?
2    A.  Yes.
3    Q.  But the office people like Ms. Griffin
4  [sic], or the office person would not be there?
5    A.  No.
6    Q.  Who would handle the paperwork if you
7  were working on a Saturday or a Sunday?
8    A.  What do you mean by paperwork?
9    Q.  I assume if you're loading a barge you
10  have to record how much you loaded, if you're
11  unloading a barge you'd have to record how much
12  you're unloading, you'd have to identify the
13  barges that come in or go out, you'd have to
14  identify the vessels that bring them in and out,
15  those kind of things.  Who does that?
16  MR. FORBES:
17        Object to the form.  Just --
18        THE WITNESS:
19            Well, we would turn the paperwork
20        in, I mean, report the paperwork -- I
21        mean, report what was -- went on that
22        Monday, as far as how much cement was in
23        the silo or how much we put into it.
24  BY MR. WIEDEMANN:
25    Q.  Who would prepare that paperwork on the

- 26 -

**EARL SMITH**

1 weekends?
2     A. Well, we get gauges after, whoever
3 unloading the barge.
4     Q. And what kind of paperwork do you fill
5 out?
6     A. Barge reports.
7     Q. Like what? What is a barge report
8 contain?
9     A. When the barge came in, the type cement
10 was on it, whether we unloaded it or not, or how
11 much we unloaded off, the start and stop time.
12     Q. So you would identify the barge?
13     A. Yes.
14     Q. You would identify what the load that was
15 loaded or unloaded constituted?
16     A. Yes.
17     Q. And what did you call that report that
18 would identify the barge? I assume it would show
19 when it's loaded, the time it's loaded; is that
20 correct?
21     A. Yes.
22     Q. And what would you call that document?
23     A. Barge report.
24     Q. Would you make a report for each barge?
25     A. Yes.

- 27 -

1     Q. And so that on a weekend, would one
2 particular person prepare the barge report or
3 would there be more than one?
4     A. Well, whoever was unloading the barge
5 would do it, the person that was operating the
6 unloading.
7     Q. So there wasn't one particular person to
8 do that?
9     A. Whoever's on the barge. I mean, if we're
10 running two shifts, so whoever was on the barge,
11 that's who would do the barge report.
12     Q. And would the vessel that's bringing the
13 load in and taking a load out, would they sign
14 off on that, or how would --
15     A. No.
16     Q. It would only be strictly a report by
17 Lafarge?
18     A. Yes.
19     Q. Let me show you a document previously
20 identified as LNA-105, which is entitled a "Barge
21 Unloading Report," and it's dated 8/26/05. Is
22 that what you're talking about?
23     A. Yes.
24     Q. And whose handwriting, can you identify
25 the handwriting on this report, which is 105?

- 28 -

1     A. It looks like Eric Pittman's.
2     Q. Eric Pittman?
3     A. Uh-huh (affirmative response).
4     Q. What is Eric Pittman's job?
5     A. Unload barges and maintenance, same the
6 rest.
7     Q. But he wasn't there on the 27th?
8     A. No.
9     Q. So Eric Pittman would have signed this?
10 Is this his --entirely in his handwriting?
11     A. I don't know. It looks that way.
12     Q. Huh?
13     A. It looks that way. I'm not sure.
14     Q. Okay. And is there a barge loading
15 report that is filled out similar to this?
16     A. Barge loading?
17     Q. Well, this is an unloading.
18     A. We don't load barges.
19     Q. You don't load barges?
20     A. No.
21     Q. This facility only unloads barges?
22     A. Right.
23     Q. So this is the only document that would
24 pertain to what's done insofar as the Lafarge
25 facility is concerned?

- 29 -

1     A. As far as unloading the barge, yes.
2     Q. Well, you hesitated. Are there other
3 documents besides this unloading report that's
4 filled out?
5     A. No. I just wanted to make sure that you
6 understood that that's what I was talking about,
7 just that one.
8     Q. You don't know of any other document that
9 would be prepared concerning a barge that has
10 been unloaded?
11     A. No.
12     Q. Hm?
13     A. No.
14     Q. No document is generated by the automated
15 system, a computer document?
16     A. Of the barge being unloaded, or --
17     Q. Well, it's only an unloading facility.
18     A. Yes. Let's see. I'm trying to think. I
19 don't remember.
20     Q. You can't think of any other?
21     A. (Witness shakes head negatively.)
22     Q. And this is, this is a handwritten
23 document with regard to what happened vis-à-vis
24 Ingram Barge 4727 on the 26th, and at that time
25 Mr. Pittman was there; is that correct?

- 30 -

EARL SMITH

**- 31 -**

1    A. Yes.
2    Q. And what time did -- who else was there
3 on the 26th besides Mr. Pittman and the people
4 you named? Was the same crew there? You meant
5 Louis Robinson, Roland Johnson, Darryle Evans,
6 were they there on the 26th?
7    A. During the time this was done?
8    Q. Yeah.
9    A. We have two shifts, so there would be
10 other guys on the shift with Eric.
11    Q. There would -- this, on the 26th, the
12 shift would run from what to what?
13    A. Four a.m. to 4 p.m. and 4 p.m. to 4 a.m.
14    Q. So there was a different shift on the
15 26th that went off at 4 p.m.?
16    A. (Witness reviewing document.) They would
17 have went off at 4 a.m.
18    Q. They would have worked from 4 p.m. until
19 4 a.m.?
20    A. Yes.
21    Q. And your crew would have come on at 4
22 a.m.?
23    A. Yes.
24    Q. And did you have a full crew when you
25 came on on a Saturday?

**- 32 -**

1    A. Yes.
2    Q. The ones that --
3    A. Well, not a full crew. James -- there's
4 another guy. There's usually four on each shift,
5 so one guy wasn't there.
6    Q. Who wasn't there?
7    A. James Louis.
8    Q. Why was James Louis not there?
9    A. Because we had enough guys to unload the
10 barge. That's like overtime. It's not regular's
11 work pay.
12    Q. So was Mr. Louis purposely not called in
13 because of overtime?
14    A. I don't know.
15    Q. Well, why did you say because it was
16 overtime?
17    A. Well, during when overtime, when they
18 have -- during overtime three peoples is what you
19 need for to unload a barge. You don't need a
20 whole crew for to unload the barge.
21    Q. And who determined that? Is that
22 something that automatically happens, that three
23 people come in instead of four, or is it
24 something that somebody has to do?
25    A. It depend on what all going on other than

**- 33 -**

1 that barge or what problem it was having the day
2 before. So it would be, somebody in management
3 would ask who wanted to work or would request
4 who he will need to work that day.
5    Q. So it's your understanding that Louis was
6 told that he wasn't needed?
7    A. I don't know.
8    Q. Well, I mean, was he not there because it
9 was Saturday overtime, or some other reason?
10    A. I don't know. All I know is I was asked
11 to work and I came out.
12    Q. Well, Louis works under you; is that
13 right?
14    A. Yes.
15    Q. Did you ask Mr. Busch why Louis wasn't
16 there?
17    A. No, I didn't.
18    Q. You have no knowledge of why he was not
19 there?
20    A. No.
21    Q. So where does -- where is Mr. Louis, is
22 he still working?
23    A. No.
24    Q. Do you know where he is?
25    A. No.

**- 34 -**

1    Q. Did he lose his house, or place where he
2 lived?
3    A. Yes.
4    Q. Do you know whether he's in the state or
5 out of state?
6    A. No, I don't.
7    Q. It's L-e-w-i-s or L-o-u --
8    A. Yes.
9    Q. -- i-s?
10    A. L-e-w.
11    Q. L-e-w-i-s?
12    A. L-e-w.
13    Q. So you had three people instead of four;
14 is that correct?
15    A. Yes.
16    Q. And who had -- on the shift before that,
17 that Mr. Pittman -- what is Mr. Pittman's first
18 name?
19    A. Eric.
20    Q. Eric?
21    A. Yes.
22    Q. How many people did he have on his crew?
23    A. Four, I think.
24    Q. Four. He had his normally -- did he have
25 the same job you had?

EARL SMITH

MINI DEP By Kenson

| | |
|---|---|
| 1   A. No. | 1   A. No. |
| 2   Q. Who was the maintenance foreman? | 2   Q. Did Pittman and Sturges lose their houses |
| 3   A. I was. I was the maintenance supervisor. | 3   in the flood? |
| 4   We didn't have a maintenance foreman. | 4   A. Pittman did. |
| 5   Q. Well, you're the maintenance supervisor - | 5   Q. What about Sturges? |
| 6   - | 6   A. He had some damage, but he didn't lose |
| 7   A. Yes. | 7   it. |
| 8   Q. -- but you don't work -- you didn't work | 8   Q. So you came on on Saturday at 4 a.m.? |
| 9   two shifts, did you? | 9   A. Yes. |
| 10   A. No. | 10   Q. And your crew came on at 4 a.m.? |
| 11   Q. Well, did they have a maintenance | 11   A. Yes |
| 12   supervisor on when, when this crew was on? | 12   Q. Although you were short one man from your |
| 13   A. No. | 13   normal crew? |
| 14   Q. Huh? | 14   A. Yes. |
| 15   A. No. | 15   Q. Did you come in, you and your crew, come |
| 16   Q. Why not? | 16   in just automatically at 4 a.m., or were you |
| 17   A. Most of the maintenance was done during | 17   called in? |
| 18   the daytime, and just most of the barge unloading | 18   A. We was told the day before, the Friday. |
| 19   at night. | 19   Q. By whom? |
| 20   Q. So your crew would primarily be engaged | 20   A. Ed Busch. |
| 21   in maintenance? | 21   Q. So did Ed Busch gather you all to tell |
| 22   A. My crew? Barge and maintenance? Yes. | 22   you were going to come the next day? |
| 23   Q. I thought you said most of the loading | 23   A. He went around telling people we need -- |
| 24   and unloading took place at night? | 24   I mean, after the news with -- well, what they |
| 25   A. No, that was mostly unloading, only to | 25   do, they ask, and if there aren't enough |
| - 35 - | - 37 - |

| | |
|---|---|
| 1   go, to at night. I mean, we just -- most of | 1   volunteers, then they just pick some to work, |
| 2   the maintenance was done during the day and | 2   come in and work, finish the barge. |
| 3   unloading barges. At night, they were just | 3   Q. So, they asked you on the day -- you went |
| 4   unloading barges. | 4   off at 4 p.m. the day before, huh? |
| 5   Q. And who was in Mr. Pittman's crew? | 5   A. Yes. |
| 6   A. Ed Sturges -- Ed, Eric. | 6   Q. Did they talk to you and your crew at 4 |
| 7   Q. You need two more? | 7   p.m. on the 26th, on the Friday the day before? |
| 8   A. Yeah. They had so many, I can't -- I | 8   A. Yes. |
| 9   can't think of -- | 9   Q. And he was -- when you say he was trying |
| 10   Q. So there would be four that were on on | 10   to see who wanted to come in, was he just talking |
| 11   the 26th? | 11   to you and your crew? |
| 12   A. Yes. | 12   A. Yes. |
| 13   Q. And three were on on the -- Saturday, the | 13   Q. And the reason he was talking to you all |
| 14   following day? | 14   is that that would be time-and-a-half overtime? |
| 15   A. Yes. | 15   A. I don't understand your question. |
| 16   Q. And where is Eric Pittman? Do you know? | 16   Q. On Saturday you're working overtime? |
| 17   A. Yes. | 17   A. Yes. |
| 18   Q. Where. | 18   Q. And what are you paid overtime? |
| 19   A. He's working now. | 19   A. Time-and-a-half. |
| 20   Q. He's working for Lafarge | 20   Q. And so, how many people was he asking on |
| 21   A. Yes. | 21   the afternoon of Friday -- how many people was he |
| 22   Q. What about Sturges? | 22   asking to work on Saturday? |
| 23   A. Yes. | 23   A. Well, normally he only asks three, but I |
| 24   Q. What about the other two that you can't | 24   don't -- I know he asked me. I don't know how |
| 25   name, are they still at Lafarge? | 25   many, did he get to everybody, but I know he |
| - 36 - | - 38 - |

**EARL SMITH**

MINDEP by Kenson

1  asked me.

2  Q.  But only three came in?

3  A.  Yes, plus the loader, yes.

4  Q.  Huh?

5  A.  Yes, plus the loader.

6  Q.  And who was the loader?

7  A.  Darryle Lee Evans, the truck loader.

8  Q.  Darryle Evans came in as well, huh?

9  A.  Right

10  Q.  Was this a typical Saturday, that you

11  have Mr. Busch bring in three people in the crew?

12  A.  Yes.

13  Q.  That's because of the overtime situation?

14  A.  Well, we needed to finish the barge.

15  Q.  You needed to finish the barge that's

16  described in this document, 105?

17  A.  Yes, that barge coming in.

18  Q.  Did you have to do any maintenance?

19  A.  Yes, I did.

20  Q.  Well, on the afternoon of the Friday

21  before you knocked off -- at somewhere around 4

22  p.m.; is that correct?

23  A.  Yes.

24  Q.  -- Mr. Busch told you he needed three

25  people to come in the following day in addition

- 39 -

1  to Mr. Evans; is that correct?

2  A.  Yes.

3  Q.  And Evans would be operating some piece

4  of equipment?

5  A.  Loading trucks.

6  Q.  So were you loading trucks on that, on

7  Saturday?

8  A.  Was I loading, or was --

9  Q.  No.  Were trucks being loaded at the

10  Lafarge facility?

11  A.  Yes.

12  Q.  What time did you finish loading --

13  unloading 4727?

14  A.  About ten something, I think.

15  Q.  Mr. VanderMeulen, whose deposition we

16  took the other day, said that the 4727 was

17  finished unloading at 9 a.m. on Saturday, the

18  27th.

19  A.  It's possible.  I mean, I don't wear a

20  watch, so it's possible.

21  Q.  You wouldn't disagree with that?

22  A.  No.

23  Q.  And you all had come on at 4 a.m.?

24  A.  Yes.

25  Q.  And by sometime between 9:00 and 10:00,

- 40 -

1  4727 was finished being unloaded.

2  A.  Yes.

3  Q.  Did they have any other barges to unload

4  at that time?

5  A.  What's you're asking, whether we're going

6  to unload any more that day?

7  Q.  Was there any -- yeah.  Were there any

8  other barges to be unloaded that day?

9  A.  No.

10  Q.  Why not?

11  A.  We wanted to finish that barge.  We

12  needed that cement at the time.

13  Q.  You needed the cement?

14  A.  Yes.

15  Q.  For what.

16  A.  To load trucks.

17  Q.  And where were the trucks going?

18  A.  Different location, Haliburton or

19  wherever, Fouchon.

20  Q.  The trucks were delivering cement

21  primarily for use in the oil offshore industry?

22  A.  Yes.

23  Q.  So it had been going to down to Fouchon

24  and south, south of Houma and places like that?

25  A.  Yes.

- 41 -

1  Q.  So you needed the cement from 4727 and

2  that's why you completed the unloading on that

3  morning?

4  A.  Yes.

5  Q.  There was another barge there, another

6  Ingram barge, was there not?

7  A.  Yes.

8  Q.  And you remember the number of that

9  barge?

10  A.  Not exactly, no.

11  Q.  But you didn't unload that barge?

12  A.  No.

13  Q.  When -- on 4 p.m. the day before when Mr.

14  Busch talked to you, did he say anything to you

15  about what you all were going to do the following

16  day, the following morning other than unload

17  4727?

18  A.  No.

19  Q.  Did he tell you that there was going to

20  be any hurricane preparation the next morning?

21  A.  When he came out that morning.

22  Q.  Hm?

23  A.  He told us that morning that he came out,

24  Saturday.

25  Q.  But on Friday when you were knocking off

- 42 -

**EARL SMITH**

1 and he was preparing the crew to bring in the
2 next morning, he didn't say anything about the
3 hurricane?
4    A. I didn't hear him.
5    Q. Hm?
6    A. I didn't hear him say anything.
7    Q. He didn't say anything about hurricane
8 preparation?
9    A. I don't remember until that Saturday
10 morning.
11    Q. And he spoke to you. Did he speak to the
12 other crew members?
13    A. That Friday or Saturday, which day?
14    Q. On Friday.
15    A. I don't know what he talked to them
16 about, no.
17    Q. Well, he had to tell -- did you all work
18 every Saturday, or was it on a selective basis?
19    A. Only if we needed to work.
20    Q. So, he would have to tell you whether you
21 were coming in on Saturday?
22    A. Yes.
23    Q. And when he talked to you on Friday, he
24 didn't tell you anything other than it was a
25 normal Saturday morning to unload barges and do
- 43 -

1 whatever you had to do?
2    A. He told us to come in and finish
3 unloading the barge.
4    Q. He didn't say anything about, about
5 hurricane preparations?
6    A. I don't remember.
7    Q. If he had told you that, would you
8 remember it?
9    A. If he had told me?
10    Q. Hm?
11    A. I don't -- I don't remember -- I mean, I
12 don't know if I would have or not. If he would
13 have told me that a hurricane was coming in, I
14 might have, but I'm not sure.
15    Q. But you can't say that he told you
16 anything about the hurricane, about hurricane
17 preparation on Friday afternoon when he told you
18 all to come in?
19    A. No, I can't say.
20    Q. Did you think it was anything other than
21 an ordinary day for which you would be paid time
22 and a half?
23    A. Rephrase that for me, please?
24    Q. When he told you were going to work the
25 next day, or Saturday, did -- it was your
- 44 -

1 understanding that it was just a normal overtime
2 day, or was there anything extraordinary?
3    A. No, just a normal day.
4    Q. When you came in at 4 a.m. on Saturday,
5 that's what time you would start?
6    A. Yes.
7    Q. Would you clock in, there's a clock you
8 use?
9    A. Yes, there was.
10    Q. It's a clock that you put a card in?
11    A. Yes.
12    Q. So every worker that works clocks in and
13 clocks out?
14    A. Yes.
15    Q. Now when you got in at 4 a.m., did all
16 the crew come in together, or about the same
17 time?
18    A. About.
19    Q. And was Mr. Busch there when you got
20 there?
21    A. No, I think he came a little later.
22    Q. He didn't arrive at the same time as the
23 crew?
24    A. No.
25    Q. And did you all start at 4 a.m.?
- 45 -

1    A. Yes.
2    Q. And what did you all do at 4 a.m.?
3    A. Well, the guys -- when I first came in,
4 Darryle Evans had a problem with the silo, so I
5 went over and worked on the silos. And the rest
6 of the guy went and start unloading the barge.
7    Q. What kind of problem was Evans having
8 with the silo?
9    A. Well, you load the cement through the top
10 of the silo, so at the bottom is where it come
11 out and go into the air-slides to go to the
12 conveyor belt to transfer to the front tanks
13 -- one of the load-out tanks, is what they call
14 them. And he had a rock there that were covering
15 the slide, that I had to break up in order for
16 the material to flow down the slide.
17    Q. So when you got there, you were in
18 charge? Busch wasn't there?
19    A. Right.
20    Q. And you -- did you tell your crew
21 anything about any hurricane preparations, or did
22 you tell them just to go ahead and start
23 unloading the barge that you knew you had to
24 unload?
25    A. Just unload the barge.
- 46 -

1    Q.  And to unload the barge, what would they
2  do?
3    A.  They got a glass building that one guy
4  sit in and operate the barge, and another guy
5  would get in on the bobcat and bush the cement up
6  to the -- toward the end of the barge, has to get
7  low enough for them to push.
8    Q.  The fellow in the glass-enclosed piece of
9  equipment, what is that?  It's a suction?
10   A.  Yes, that's where he control the suction
11 pipe.
12   Q.  So he actually sucks the cement out of
13 the barge into the silo?
14   A.  Yes.
15   Q.  And another worker keeps pushing to keep
16 the supply to the suction, too; is that right?
17   A.  When the cement -- only when the cement
18 is low enough for to push it with the bobcat.
19   Q.  Okay.  All right.  And you said something
20 about manipulating the barge.  Does the fellow in
21 the glass-enclosed booth have anything to do with
22 moving that barge?
23   A.  Well, the unloaded stuff is on a track
24 with wheels and they move it down, back and
25 forth.

                        - 47 -

1    Q.  The unloader, you mean that's what --
2    A.  Right,
3    Q.  -- what you mean this worker is in?
4    A.  Yes.
5    Q.  And what do you call -- who was that,
6  that was in the unloader?
7    A.  Louis was out there.
8    Q.  And the unloader moved on a track on the
9  dock?
10   A.  Yes.
11   Q.  So the barge is -- stays in place?
12   A.  Yes.
13   Q.  It's moored to the dock?
14   A.  Yes.
15   Q.  And the only -- you don't move the barge,
16 you move the piece of equipment on the track; is
17 that right?
18   A.  Yes.
19   Q.  To get in position to suck?
20   A.  Yes.
21   Q.  Do you have any equipment at the Lafarge
22 facility as to move the barge forward or
23 backwards or change its position?
24   A.  We had cables at one time, but we don't,
25 we don't use them now.

                        - 48 -

1    Q.  You had cables that would operate off of
2  a spool of some sort?
3    A.  Yes.
4    Q.  So that you could move the barge up and
5  down?
6    A.  Yes.
7    Q.  You don't use those anymore?
8    A.  No, not when they put unloader on tracks.
9    Q.  Okay.  When you got in at 4 a.m., you
10 were the superior person on the plan at that
11 time?
12   A.  Yes.
13   Q.  Did you tell your crew anything about
14 hurricane preparation?
15   A.  No.
16   Q.  Had you been given any instructions about
17 hurricane preparation prior to going to work at 4
18 a.m. on Saturday?
19       MR. FORBES:
20           Object to the form.  You're talking
21       about information about the hurricane
22       or --
23       MR. WIEDEMANN:
24           I think I said instructions.
25           Instructions don't come over the

                        - 49 -

1      television.
2          MR. FORBES:
3              Okay.
4          THE WITNESS:
5              No.
6  BY MR. WIEDEMANN:
7    Q.  Nobody told you about a meeting of
8  Lafarge people in Nashville on the 26th?
9          MR. HAYCRAFT:
10         MR. FORBES:
11             Object to the form.
12         MR. WIEDEMANN:
13             I mean, I got the wrong company.
14         You're right.  You're right.  Okay.  We
15         haven't taken their depositions yet.
16 BY MR. WIEDEMANN:
17   Q.  So you had no information transmitted to
18 you by anyone when you arrived on -- at 4 a.m. on
19 Saturday?
20   A.  No, I didn't.
21   Q.  So you never told your workers anything
22 about, we're going to have to do something to
23 prepare for the hurricane?
24   A.  No.
25   Q.  And Mr. Busch came in approximately when,

                        - 50 -

EARL SMITH                                                    MINIDEP by Kenson

1  if you remember?
2      A. I don't remember. I was working on the
3  silo.
4      Q. Does he have to clock in as well?
5      A. I don't think so. I'm not sure.
6      Q. Can you give me an estimate of when came
7  in?
8      A. Not exactly.
9      Q. Well, you indicated that the barge was
10 unloaded, was finished being unloaded at 9:00, or
11 between 9:00 and 10:00 on Saturday; is that
12 correct?
13     A. Yes.
14     Q. Had Mr. Busch arrived while you were
15 still unloading the barge, or had the barge being
16 finished unloading?
17     A. I didn't see him when he come in. I was
18 still on the silo.
19     Q. When Mr. -- let me go back for a minute.
20 Mr. Busch, does he have a cell phone or any type
21 of phone or radio that he communicates with
22 anybody from Lafarge?
23     A. Yes.
24     Q. What would kind of -- how does he
25 communicate with the other Lafarge facilities or

                        - 51 -

1      A. Yes.
2      Q. And how would you know the number where
3  to call him?
4      A. Well, we have the two -- the Nextel, we
5  just -- I just two-way or whatever.
6      Q. Hm?
7      A. I just two-way him or whatever. And I
8  also had the number. I don't remember what the
9  number is now.
10     Q. So you had a Nextel, too?
11     A. Yes.
12     Q. So you could two-way him from the
13 facility?
14     A. Yes.
15     Q. And could you do that on a 24-hour basis?
16     A. You mean, do I have permission to call
17 him on a 24-hour basis?
18     Q. Yes.
19     A. Yes.
20     Q. Let's say somebody got hurt, who would
21 you call?
22     A. I would call Ed.
23     Q. On his Nextel?
24     A. Yes. And his home phone.
25     Q. And what's his home phone number?

                        - 53 -

1  with barge companies?
2      A. I got to say I don't know.
3      Q. Well, you indicated he had something
4  - some kind of electronic device. What --
5      A. We had a Nextel phone, but I don't how he
6  communicate with them.
7      Q. He has a Nextel phone?
8      A. Yes.
9      Q. Do you know what his number is?
10     A. No.
11     Q. No?
12     A. (Witness shakes head negatively.)
13     Q. If you had a problem at the facility, how
14 would you get in touch with somebody?
15     A. Somebody in the facility?
16     Q. No, outside of the facility.
17     A. By phone.
18     Q. So you have a telephone at the facility?
19     A. Yes.
20     Q. And who do you call if you have a problem
21 if you're the only man there?
22     A. I would call Ed Busch.
23     Q. And you would call him on what?
24     A. Nextel.
25     Q. On his cell phone.

                        - 52 -

1      A. I don't remember.
2      Q. Where did he live at that time?
3      A. Slidell.
4      Q. Did he lose any home as a result of the
5  hurricane?
6      A. No.
7          MR. O'DWYER
8              Excuse me. Can I ask counsel for
9          Lafarge if they have produced any
10         documentation that would show the amount
11         of product on hand at the facility before
12         the unloading of the 4727 commenced, and
13         what the capacity of the trucks are? Do
14         we have that in documentation?
15 BY MR. WIEDEMANN:
16     Q. So when Mr. Busch came in on Saturday
17 morning -- well, let me ask you. Was it Saturday
18 morning?
19     A. Yes, it was still morning.
20     Q. And you all, according to your testimony,
21 knocked off between twelve and one. So he was
22 there before, before that time?
23     A. Yes.
24     Q. When he got there, did -- that morning,
25 on Saturday morning, did he give you any

                        - 54 -

EARL SMITH

1  instructions about hurricane preparation?
2     A.  Yes.
3     Q.  When he first got there, or after he was
4  there for a while, or what?
5     A.  I don't know.  I just know when he saw
6  me.  I don't know how long he had been there when
7  he called me.
8     Q.  What did he tell you relative to
9  hurricane preparation?
10    A.  To move everything from the -- from the
11 side of the dock where the canal was to the other
12 side of the floodwall and tie down the barges and
13 secure them.
14    Q.  And had you tied down and secured barges
15 on previous occasions relative to weather?
16    A.  Yes.
17    Q.  And at the time of this, that's on
18 Saturday, you had two Ingram barges at the
19 facility, did you not?
20    A.  Yes.
21    Q.  You had one loaded and one unloaded?
22    A.  Yes.
23    Q.  That's 4727, which is on this document
24 105, and you also had another barge, 47 -- but
25 you know you had another Ingram barge?
- 55 -

1  started at 12:00, 12:20 on the 26th and you
2  finished apparently around, between 9 and 10:00
3  on the 27th on 4727; is that right?
4     A.  Yes.
5     Q.  And it takes that long to unload a barge
6  like 4727?
7     A.  It all depend on how the cement go off or
8  whether you have a problem with the unloading
9  system.
10    Q.  What's the normal period to unload a
11 barge?
12    A.  It's depending on how much cement it has
13 on it, also.
14    Q.  Well, I was assuming they have the same
15 amount of cement.  I believe in this case it's
16 16 -- 1,615 tons?
17    A.  I would say between 12 to 16 hours, if no
18 problems.
19    Q.  And do you know why the five barges, non-
20 Ingram barges had not been unloaded?
21    A.  No.  Well, we didn't need the cement at
22 the time.  We needed the H-cement at the time.
23    Q.  You needed what?
24    A.  The H-cement at the time on the Ingram
25 barges.  That's the cement we needed.
- 57 -

1     A.  Yeah.
2     Q.  And you had some other barges as well,
3  did you not?
4     A.  Yes.
5     Q.  How many other barges?
6     A.  Five.
7     Q.  Where they loaded or unloaded?
8     A.  Loaded.
9     Q.  How long had they been loaded?
10    A.  I don't recall.
11    Q.  Well, they were loaded when you came in
12 on the 27th, on Saturday?
13    A.  Yes.
14    Q.  Were they loaded when you went off on
15 Friday?
16    A.  Yes.
17    Q.  How long had they been there -- three
18 days? four days? five days?
19    A.  I don't know exactly how many days.
20    Q.  But you would have loading document,
21 unloading document?
22    A.  You only filled those out when you were
23 getting ready to load the barge -- unload the
24 barges, that's when you fill those out.
25    Q.  And it takes, according to this you
- 56 -

1     Q.  What is H-cement?
2     A.  It's an oil well-type cement.
3     Q.  So the reason you unloaded the Ingram
4  barge is because you had a shortage of H-cement;
5  is that right?
6     A.  Right.
7     Q.  Did you know that Ingram -- excuse me,
8  that Lafarge had been fined a $170,000 for short
9  falling the oil industry with cement?
10    A.  No.
11       MR. FORBES:
12          Object to the form of the question.
13 BY MR. WIEDEMANN:
14    Q.  You weren't told about that?
15    A.  No.
16    Q.  But you know that, that there was a need
17 on -- at this time, that is on Friday and
18 Saturday for H-cement?
19    A.  Yes.
20    Q.  Which is oilfield cement?
21    A.  Yes.
22    Q.  The other barges would have had what kind
23 of cement?
24    A.  I don't know whether it would have been
25 "A" or Joppa Type I.  I'm not sure exactly which
- 58 -

EARL SMITH                                    MINDER by Kenson

1 one, but it would have been Type I barges -- Type
2 I cement it would have been.
3    Q. Your said "A" or "Joppa"?
4    A. Joppa.
5    Q. That's from the Joppa plant?
6    A. Type I.
7    Q. Huh?
8    A. Yes. That would have been Type I cement.
9    Q. But I understand that 4727 came from
10 Joppa?
11    A. It's a different type cement.
12    Q. All right. But, I mean, Joppa has more
13 than one type of cement?
14    A. Yes.
15    Q. And what is the "H" type of cement when
16 you say it's an "oilfield cement"?
17    A. It's what they use on the oil rigs.
18    Q. What's the difference between "A" and
19 "H"?
20    A. Well, "A" is also an oil well type, but
21 they use "H" more.
22    Q. And what about the Joppa type?
23    A. That's for slabs or something like that.
24    Q. For general usage?
25    A. Right.

- 59 -

1    Q. The "H" is a primary oil field usage and
2 "A" is also used some?
3    A. Yes.
4    Q. So the reason that you delayed the, or
5 that the emptying of the five barges was delayed
6 behind the emptying of the Lafarge -- I mean the
7 Ingram barges -- barge was because of the need
8 for H-cement?
9    A. Yes.
10    Q. How did you come to know that there was a
11 need for H-cement?
12    A. Well, when you gauge the silos, if the
13 silo's low, then the truck driver -- I mean, the
14 loader have the trucks on the list to be loaded,
15 then that's how we know what type.
16    Q. So the "H" silo was low on cement?
17    A. Yes.
18    Q. And there were trucks to be loaded?
19    A. Yes.
20    Q. And the trucks were going to go various
21 ports where they could ship it to oil field
22 companies?
23    A. Yes.
24    Q. How many trucks were there waiting to be
25 loaded?

- 60 -

1    A. I don't know that. They don't actually
2 be on the plant -- I mean on the yard being --
3 they would be on a sheet and they would know
4 which one's coming in, or how many loads they
5 have for difficult customers. It's not like they
6 would be lined up out in the yard.
7    Q. There would be a sheet. What do you call
8 that?
9    A. A log sheet.
10    Q. At Lafarge?
11    A. Yes.
12    Q. And that's what it's called, a log sheet?
13    A. Yes.
14    Q. For trucks coming in?
15    A. Yes.
16    Q. Tell me how that works. A truck comes
17 in, they -- you all give them, or they give you a
18 sheet, or what?
19    A. Well, they call in the orders -- the
20 customer calls in the order and the truck loader
21 writes down how many loads you need or whatever,
22 and that's how they determine how many loads
23 that's going to go out that day.
24    Q. But you have to keep something to bill
25 the company?

- 61 -

1    A. Well, a Bill of Lading is when you load
2 the truck, you get the Bill of Lading that shows
3 how much -- shows all the information on the
4 truck and the cement.
5    Q. So you would have Bills of Lading in the
6 company records?
7    A. There would have been, yes.
8    Q. For the trucks you load?
9    A. Yes.
10    Q. And what do you prepare for the other
11 than the -- do you prepare any document other
12 than the unloading document, 105, for the billing
13 of customers for unloading barges?
14    A. Can you repeat the question, again?
15    A. Do you prepare any other document? You
16 unload the barge and you prepare this unloading
17 document --
18    A. Right.
19    Q. -- 105? Now you have to bill the
20 customer, or you have to pay the customer for
21 delivering the cement. Do you prepare some
22 document that has to do with the financial end of
23 the process?
24    A. Well, that would be Annette. Annette
25 would do that; we wouldn't do it. We just --

- 62 -

**EARL SMITH**

MINI DEP by Kenson

1  Q. So Annette would prepare some document?
2  A. Right.
3  Q. Did you all load trucks that Saturday
4  morning?
5  A. Yes.
6  Q. Do you have any idea how many trucks you
7  loaded?
8  A. No.
9  Q. So you all were there not only to unload
10  the 4727, but also to load trucks to ship cement
11  to various points for the oil industry?
12  A. Well, Darryle was, yes.
13  Q. Well, I mean, the reason that the plant
14  was open that morning was to unload 4727 and to
15  load trucks that were taking cement to the oil
16  field?
17  A. Yes.
18  Q. Do you have any idea how many trucks you
19  loaded?
20  A. No.
21  Q. But that would be shown on the Bills of
22  Lading that you mentioned?
23  A. Yeah.
24  Q. Do you know what time they stopped
25  loading trucks?

- 63 -

1  all the barges and take all the mobile equipment
2  and everything as far as welding machines and
3  stuff on the other side of the floodwall.
4  Q. Did he tell you how to secure the barges?
5  A. Yes.
6  Q. What did he tell you to do?
7  A. Well, he had told us before about the --
8  they put in new pilings, which we didn't have
9  before, and they're taller. So when you get the
10  barges close as you can to the dock, you tie it
11  off onto the barge, the rope on the barge, make a
12  few loops around the -- the piling and then tie
13  it onto the dock.
14  Q. Which barges were in which position as he
15  told you to tie them up?
16  A. Well, the empty barge was against the
17  dock, and they had a loaded barge on the outside
18  of that one.
19  Q. And that's the way they were when you
20  tied them up?
21  A. Yes.
22  Q. And you tied the empty barge to the dock?
23  A. Yes.
24  Q. How many lines did you tie to the dock?
25  A. Three.

- 65 -

1  A. No.
2  Q. Do you know what time Darryle -- was it
3  Darryle Evans, left the plant?
4  A. No. He was there when I left.
5  Q. He was still there loading trucks when
6  you left?
7  A. Yes.
8  Q. And you have no idea when he stopped
9  work?
10  A. No.
11  Q. But there would be card that he would
12  have to punch out when he left?
13  A. Yes.
14  Q. When you finished unloading 4727 between
15  9 and 10:00, whenever it was, Mr. Busch was not
16  there; is that correct?
17  A. No. He was there.
18  Q. He was there?
19  A. Yes.
20  Q. When you finished unloading the barge?
21  A. Yeah.
22  Q. What did he tell you to do with regard to
23  the barge?
24  A. When we finished the -- when we finished
25  the barge, we had to secure everything -- secure

- 64 -

1  Q. From where?
2  A. At least three. From the barge to the
3  dock.
4  Q. Was there -- my question is: Where
5  were -- you said three lines. Was there a bow
6  line?
7  A. Yes.
8  Q. Was there a stern line?
9  A. Yeah.
10  Q. And was there a line in the middle?
11  A. There could have been one or two in the
12  middle, I'm not sure, because the way -- some
13  barges have more than one place to tie them to.
14  Q. So you don't know whether you tied three
15  or four?
16  A. No.
17  Q. But it was a maximum of four?
18  A. There was a minimum of three. I don't
19  know. I mean, yeah, a maximum of four, yeah.
20  Q. And what kind of line or rope did you use
21  to moor the empty to the dock?
22  A. Two-inch.
23  Q. And what do you call --
24  A. Braided.
25  Q. Huh?

- 66 -

**EARL SMITH**

MiniDep by Kenson

| | |
|---|---|
| **Page 67** | **Page 69** |

**- 67 -**

1    A. A two-inch braided line.
2    Q. What color was it?
3    A. Blue.
4    Q. You didn't have any Mardi Gras line?
5    A. I don't recall. If a barge come in and
6 they have lines already on it, if they're in good
7 shape we leave them on and just add lines. But
8 if they're bad, we would replace them.
9    Q. Well, did you use blue line or did you
10 use Mardi Gras line?
11    A. We tied onto it with blue line. I don't
12 know whether they had a Mardi Gras line on it or
13 not.
14    Q. Who did the typing off?
15    A. Louis and myself.
16    Q. I thought Louis -- now tell me how you
17 tied the -- were the ropes already on the -- the
18 lines already on the barge when you tied it up?
19    A. Yes.
20    Q. So somebody had tied the barge before you
21 did?
22    A. Right.
23    Q. It was tied up when it was being
24 unloaded?
25    A. Yes.

**- 69 -**

1    Q. So did you have to change any lines
2 because they were worn?
3    A. One or two of them. I'm not sure.
4    Q. You mean, one or two lines out of the
5 three or four you had to change?
6    A. Yes, yes.
7    Q. Because they were worn?
8    A. Yes. Well, not necessarily worn. Our
9 line, the line they got us is braided, thick 2-
10 inch line, so if -- whether it was worn or just
11 old, we will change it.
12    Q. What did you do with the lines that you
13 changed, that you took off?
14    A. Either threw them up on the deck or put
15 them along the side. They probably would have
16 been up on that barge.
17    Q. So how many did you change?
18    A. One or two. I'm not sure.
19    Q. So there should have been one or two
20 lines on the dock that you took off on Saturday
21 morning?
22    A. Between the dock and the deck or the
23 barge, because if they're not our lines, we
24 don't -- we just use the blue line.
25    Q. But the ones that you took off because

**- 68 -**

1    Q. So you didn't have to tie anything when -
2 - on the empty barge?
3    A. Well, you adjust the barges after -- you
4 adjust the ropes after the barge come up. You
5 keep the barge tied tight to the dock, and as you
6 unload cement on it, often the barges rise up, so
7 you have to keep adjusting the lines.
8    Q. So when you got on at 4 a.m., the lines
9 on the barge that was being unloaded, 4727, were
10 already tied off?
11    A. Yes.
12    Q. Did you add any lines?
13    A. We changed a line or two. I'm not sure.
14    Q. Why did you change a line or two?
15    A. If they -- like I said, if the line don't
16 look like it's going to hold, and after we was
17 told that we had to secure it, then we go with
18 the best lines. If you got a bad line, or a line
19 that's not heavy or newer as the ones we got,
20 we'll replace it.
21    Q. So my question is: When you came on at 4
22 a.m., the empty barge was already tied off. Was
23 it tied off with blue line?
24    A. Some of it. It might have had one. I'm
25 not sure. Maybe one.

**- 70 -**

1 they looked worn, where did you put them, on the
2 dock?
3    A. Or on the deck if they was ours, or there
4 was a blue one that was worn or something.
5    Q. Well, were -- the lines on the dock,
6 were they your lines or were they the barge
7 lines?
8    A. If they were blue, they were ours. If
9 they was another color, they might have been
10 somebody else's.
11    Q. Well, were they blue when you came on at
12 4 a.m. in the morning?
13    A. One was. I'm not sure how many. I don't
14 remember.
15    Q. And you know you took one off. Was it a
16 blue line?
17    A. No, this -- I'm not sure.
18    Q. And you left it on the dock or on the
19 barge?
20    A. Yes.
21    Q. How was -- how was the light barge, that
22 is the 4727, moored to the full barge?
23    A. Bow, stern and the middle.
24    Q. With blue lines?
25    A. I don't recall which color they were.

EARL SMITH

MINDE by Kenson

**Page 71**

1  Q.  And how high was the light barge with
2  relation to the full barge, what was the height
3  difference?
4      A.  One end was about 8 feet above.
5      Q.  So the light barge would be 8 feet above
6  the full barge?
7      A.  On one end.
8      Q.  And on the other end?
9      A.  It would be a lot lower.
10     Q.  Like, what?
11     A.  Maybe 3, 4 feet.  I'm not sure.
12     Q.  Why would there be a difference between
13 the one end as opposed to the other?
14     A.  Because cement was on the end that was
15 lowest, it still had cement on it.  That was the
16 cement we was taking off.
17     Q.  You're talking about after you unloaded
18 the 4727 --
19     A.  Both of them would have been up high.
20     Q.  Both of them?
21     A.  Both ends.
22     Q.  So there would be an 8 foot difference on
23 either end after you unloaded it?
24     A.  Yes.
25     Q.  As you were unloading 4727 and there was
                - 71 -

**Page 72**

1  difference in the height between it and the full
2  barge, did you all have to adjust the lines?
3      A.  Yes.
4      Q.  Who did that?
5      A.  Louis and -- whoever was unloading the
6  barge, Louis and Roland.
7      Q.  And you said there was how many lines
8  between the full barge and the light barge?
9      A.  Three.
10     Q.  Huh?
11     A.  Three.
12     Q.  Were they all blue lines?
13     A.  I don't recall.
14     Q.  When Mr. Busch came on, did he tell you
15 to do anything with regard to the lines between
16 the barges?
17     A.  Not in that -- I don't know.  Well, we
18 knew -- anytime we got bad weather, we will put
19 more lines on, or we have to adjust them or
20 change lines if they were bad.
21     Q.  Well, did you have any more lines?
22     A.  Yes.
23     Q.  Where?
24     A.  On the dock.
25     Q.  All the lines you had were on the dock?
                - 72 -

**Page 73**

1      A.  What you mean by "all the lines"?
2  Explain that to me.
3      Q.  Hm?  Any lines that you would have had on
4  the 26th -- or the 27th, I'm sorry, were on the
5  dock?
6      A.  The ones that we were replacing them
7  with?
8      Q.  Uh-huh (affirmative response).
9      A.  Yes.
10     Q.  If you had any left over, they would be
11 on the dock?
12     A.  Yes.
13     Q.  Had you ever been given any instruction
14 about mooring a light barge to a full barge
15 because of the differential in height?
16     A.  No, I can't remember that.
17     Q.  Hm?
18     A.  No.  Most of the time when we unload the
19 barge, I mean somebody come get them, come get
20 the barges.
21     Q.  So you were not given any instructions
22 that you transmitted to your workers about doing
23 anything different when you were mooring a light
24 barge to a full barge?
25     A.  That day, or in general?
                - 73 -

**Page 74**

1      Q.  In general.
2      A.  Well, the same as we do on other barges,
3  tie them up as tight as we can with the ropes.
4      Q.  So your instructions are to tie the light
5  barge to the loaded barge as tight as you can?
6      A.  Yes.  Well, you only let off the slack
7  that you need when you're unloading, so they're
8  pretty close after you finish loading them
9  anyway.
10     Q.  So what were you told to do relative to
11 the light and the heavy barges in mooring them on
12 this morning, on the Saturday morning?
13     A.  We're just told to secure the barges.
14     Q.  Tight?
15     A.  Well, that's what we always do, is tight,
16 yeah.
17     Q.  And how do you allow for any change in
18 the level of the water, or the change in the
19 level of the barges?
20     A.  You're talking about tying them to the
21 dock, or tying them to each other?
22     Q.  Tying them to one another.
23     A.  Well, both -- well, if you tied them --
24 the slack that you have in the rope when you tie
25 them together, it's not like it's going to be
                - 74 -

EARL SMITH

1 holding them butted up together, you're going to
2 have a little slack in them, so that's what we
3 done.
4    Q. How much slack would you have in between
5 the two barges?
6    A. It all depends on how close the barge was
7 together during the time you tied it.
8    Q. Well, how do you determine if the barge
9 is too far or too close? How do you change that?
10    A. If -- depending on where the barge on the
11 outside, inside anyway. If you are -- you can
12 also take a barge and pull it in with the rope if
13 the water's shallow.
14    Q. How much slack would you have in the rope
15 between the full barge and the light barge?
16    A. Depending on how close you can get them
17 together. I mean --
18    Q. Well, how close were they together on
19 that morning, on Saturday?
20    A. I would say maybe two feet, maybe about 2
21 foot.
22    Q. So how much slack would that give you?
23    A. If the barge is butted up together, about
24 2 foot.
25    Q. And there's an 8-foot difference in
- 75 -

1 height?
2    A. Yeah.
3    Q. And on the -- did you make any -- were
4 you instructed to do any special thing regarding
5 how the light barge was moored to the dock?
6    A. Yes.
7    Q. What?
8    A. Well, we was told to tie it off to the
9 dock and they was going to -- Ed had called
10 someone to come and swap -- turn the barges
11 around.
12       MR. O'DWYER:
13          We're going to take a break.
14       MR. WIEDEMANN:
15          Yeah, okay.
16          (At this time, a break was taken.)
17 BY MR. WIEDEMANN:
18    Q. Mr. Smith, going back to the morning of
19 the 27th, you indicated to me that you and -- was
20 it Louis that was with you? Who was the one that
21 was working with you on the barges?
22    A. Louis and Roland.
23    Q. James Louis?
24    A. No. Louis Robinson.
25    Q. Oh, Louis Robinson. Okay. All right.
- 76 -

1 Was it just the two of you that were working on
2 the barges on that morning?
3    A. Roland --
4       MR. FORBES:
5          Object to the form he just said
6 three --
7       MR. WIEDEMANN:
8          Okay. Well --
9       MR. FORBES:
10          -- names.
11       MR. WIEDEMANN:
12          -- I didn't hear him if he said
13 three.
14 BY MR. WIEDEMANN:
15    Q. Were there three of you working on it?
16    A. Yes.
17    Q. There was Louis Robinson?
18    A. Yes.
19    Q. And who was the other one?
20    A. Roland Johnson.
21    Q. Roland Johnson, okay. What were the
22 three of you all doing when you were pulling with
23 the barges on that morning?
24       MR. FORBES:
25          Object to the form.
- 77 -

1 BY MR. WIEDEMANN:
2    Q. After they were -- after it was empty?
3    A. Tying down covers on them and tying the
4 barges together.
5    Q. Now, the 4727 which had been empty was
6 the inside barge; is that right?
7    A. Yes.
8    Q. Did you do anything to change the way
9 that the two barges were tied together?
10    A. We changed one of the ropes on it, one or
11 two of them. I'm not sure which ones.
12    Q. And why did you change one or two ropes
13 on the two barges as they were moored together?
14    A. The rope was -- it was -- either we added
15 a rope or changed one if -- if the rope was bad
16 or looked older, worn or something.
17    Q. Is that something you would do on a
18 regular basis?
19    A. Yes.
20    Q. Wasn't something unusual?
21    A. No.
22    Q. And did you have extra rope on hand?
23    A. Yes.
24    Q. And where was it kept?
25    A. On the dock.
- 78 -

**EARL SMITH**

1   Q. So whatever you did vis-á-vis the two
2 barges, if you changed one rope -- you don't
3 remember whether it was one or two, or do you
4 remember if you changed any between the two
5 barges?
6   A. I know we changed one or two. I'm not
7 sure.
8   Q. And that was -- that was done -- it
9 wasn't unusual to do that? You weren't doing
10 anything new?
11   A. No.
12   Q. And did you personally change the rope or
13 did somebody else?
14   A. Louis and I was on those that barge, on
15 those two particular barge, yes.
16   Q. And do you know who changed the rope?
17 Was it you or him?
18   A. Well, we both would have to change it,
19 one on each barge.
20   Q. So one of you would have to be on one
21 barge and one would have to be on the other
22 barge?
23   A. Well, that's the way we usually do it,
24 yes.
25   Q. And you were on the empty or the full?

- 79 -

1   A. I was on the full.
2   Q. And he was on the empty?
3   A. Yes.
4   Q. And as I understand it, the two barges at
5 that point were approximately 2 feet apart?
6   A. That's about how much slack might have
7 been in the rope. Barges moved in and out
8 together, so I don't know how far it was when we
9 got on it.
10   Q. Well, how far was it -- what was the
11 distance between the two barges? I'm talking
12 about side by side, not height.
13   A. Well they're tied up close together, you
14 just let off
15 -- as you let the rope off, when the barge come
16 up - you're asking me after the barge was
17 completely unloaded, or --
18   Q. Well, when the barge -- after 4727 was
19 unloaded --well, let's talk about before. Did
20 you fool with the ropes before 4727 was unloaded?
21   A. No.
22   Q. So while it was being unloaded, 4727 was
23 tied to the dock and the full barge was outboard
24 of the 4727?
25   A. Yes.

- 80 -

1   Q. Right?
2   A. Yes.
3   Q. And whatever had been done with those had
4 been done by the other crew; isn't that so? I'm
5 talking about mooring them to the dock and
6 mooring them to one another.
7   A. Yes.
8   Q. So as the rigging, or as the mooring
9 existed until the barge was empty, you all didn't
10 do anything? I mean, vis -- with regard to the
11 ropes?
12   A. Well, they would loosen the rope as the
13 barge come up.
14   Q. And who did that?
15   A. It would have to be Louis and Roland,
16 whoever was out there unloading the barges.
17   Q. So they would have to loosen the ropes
18 between the empty barge -- or the barge that was
19 being emptied and the full barge?
20   A. Yes.
21   Q. Would they have to do anything with
22 regard to the ropes on the dock?
23   A. Yes. When the barge come up, it goes up
24 a great deal higher than the dock, so you also
25 would have loosened off on that one.

- 81 -

1   Q. So they'd have to loosen both the barge -
2 - the ropes that tie the two barges together and
3 the ropes that are on the dock?
4   A. Yes.
5   Q. Did you have anything to do with what was
6 done as the barges were being unloaded?
7   A. No.
8   Q. And that would have been two of your
9 subordinates?
10   A. Yes.
11   Q. That would be Louis Robinson and Roland
12 Johnson?
13   A. Yes.
14   Q. Now at some point in time you were
15 working on the problem with the silo; is that
16 right?
17   A. Yes.
18   Q. You indicated that at some point you
19 called, or someone called to have the two vessels
20 turned around, the two barges?
21   A. Yes.
22   Q. Who made that decision?
23   A. Well, Ed Busch told me that he made the
24 call.
25   Q. And do you know why he made the call, or

- 82 -

1  decided to turn the two barges around?
2      A.  Yes.  If the water had came up high
3  enough, the empty barge is only like 2 or 3 foot
4  out of water, so it could have came up on the
5  dock and damaged the dock or the barge by sit --
6  when it come up, sitting on top of those pilings.
7  So it could have either damaged the dock with the
8  barge or damage the barge with the pilings.
9      Q.  When Mr. Busch came on, did he instruct
10  you and your coworkers to do anything with regard
11  to how the barges were rigged to one another or
12  how they were rigged to the dock?
13      A.  He had us to tie the barges up and make
14  loops, like three loops around the piling, so if
15  the water came up high enough the barge would
16  give, the ropes would slip off the piling as they
17  come up and let the barge have slack.
18      Q.  And had you ever done that before?
19      A.  Yes.
20      Q.  When?
21      A.  Well, actually we had cables before.
22  Before they put the pilings there, we had cable.
23  I don't think we had hurricane with barges there
24  before or since then, or before then.
25      Q.  And what were you told -- who told you

- 83 -

1  about this looping the rope around the pilings?
2      A.  Ed Busch.
3      Q.  And how did he describe that?
4      A.  He was telling us that if you wrapped the
5  rope around the pilings a couple of times, three
6  wraps -- we make three loops around it, and as
7  the barge come up, the loops would slide off the
8  pilings because they're slick pilings.  So that
9  way the barge couldn't -- it wouldn't hold the
10  barge down and pop the ropes  either.
11      Q.  And did he tell you what that was called?
12      A.  I don't remember if he did.  He just told
13  us how to do it.
14      Q.  And it's your testimony that you had done
15  that before?
16      A.  No.  We had cables before.
17      Q.  Okay.  And when did you stop using
18  cables?
19      A.  When they redid the dock and put the
20  taller pilings there.
21      Q.  Let me show you what has been identified
22  as LNA-113, the New Orleans terminal hurricane
23  preparation checklist.  Have you seen that
24  before?
25      A.  (Witness reviewing document.)  Yes.

- 84 -

1      Q.  How did you see that?
2      A.  The other day, yesterday.
3      Q.  You mean the first time that you saw this
4  hurricane preparation checklist was yesterday?
5      A.  Some things on it, yes.
6      Q.  Well, did you see it -- I'm asking you,
7  did you see this document at any time before
8  yesterday?
9      A.  Not that one, no.
10      Q.  Where did you see it at?
11      A.  Yesterday at the meeting.
12      Q.  At what meeting?
13      A.  At the terminal.
14      Q.  Huh?
15      A.  At the terminal, New Orleans.
16      Q.  At the terminal, Lafarge terminal?
17      A.  Yes.
18      Q.  And who was there?
19      A.  Mr. Thomas.
20      Q.  And that's the first time that you were
21  ever shown a hurricane preparation checklist?
22      A.  We had one before but it wasn't -- that's
23  not exactly the one it was.  I don't remember it
24  being that way.
25      Q.  Why did they show you the one I have

- 85 -

1  here, LNA-113, if it wasn't the one you saw
2  before?
3      A.  I don't know.
4      Q.  Hm?
5      A.  Don't know.
6      Q.  What was different about the one that you
7  saw before and this one?
8      A.  To cable all barges.
9      Q.  Uh-huh (affirmative response).
10      A.  We don't use the cables anymore.  I don't
11  remember the rope being wrapped around the wheels
12  on it.
13      Q.  Hm?
14      A.  Wrapped on.
15      MR. WIEDEMANN:
16          Well, I will call for production of
17      any other hurricane preparation checklist
18      that the defendant, Lafarge, has, and the
19      prior testimony that this document was
20      never changed by the witness who appeared
21      at the 30(B)6 on behalf of Lafarge, Mr. -
22      - I believe that was Mr. VanderMeulen.
23      Is there any other document contrary to
24      the testimony of the 30(B)(6) witness?
25      MR. FORBES:

- 86 -

EARL SMITH

1    To the best of our knowledge, no.
2    This is it.
3    MR. WIEDEMANN:
4        So this is the only document that
5    this witness could have seen insofar as
6    the hurricane checklist?
7    MR. FORBES:
8        That's correct.
9 BY MR. WIEDEMANN:
10   Q.  Well, Mr. Smith, since this, according to
11 counsel, is the only document, well, how did you
12 see another document?
13   A.  I don't remember the ropes.  I mean,
14 where you wrap the ropes -- where they're saying
15 to wrap the ropes around the wheels, put chauks
16 under them, wood chauks.
17   Q.  Where about where it says -- what about
18 where it says "cable all barges to shore"?
19   A.  We used to put cables on them, yeah.
20   Q.  You used to put cables until when?
21   A.  Until they redid the dock and we was able
22 to do it a different way.
23   Q.  Have you ever seen any document that
24 changed the hurricane preparation checklist from
25 cables to anything else?

- 87 -

1    A.  I don't remember.
2    Q.  But you were shown this document when you
3 met at the plant yesterday or the day before; is
4 that right?
5    A.  Yes.
6    Q.  What were you told about the document?
7 Were you told that --
8    MR. FORBES:
9        Objection.  Privilege.
10   MR. WIEDEMANN:
11       No.
12   MR. SANDERS:
13       He's not part of management.
14   MR. WIEDEMANN:
15       He's a worker.  You don't represent
16 him.
17 BY MR. WIEDEMANN:
18   Q.  What were you told?
19   A.  About this (indicating)?
20   Q.  Yes.
21   A.  Well, have I seen it before.
22   MR. FORBES:
23       Objection.  Objection.  We represent
24 Mr. Smith.
25   MR. WIEDEMANN:

- 88 -

1    You don't represent Mr. Smith.  He's
2 a laborer.  He's not in management.  You
3 represent --
4    MR. FORBES:
5        He's a supervisor with the plant,
6 maintenance supervisor.
7    MR. WIEDEMANN:
8        You're instructing him not to
9 answer?
10   MR. FORBES:
11       Yes.
12   MR. SANDERS:
13       Let's go forward, but can you call
14 the magistrate?  MR. HAYCRAFT:
15       Hold on.  Let's go off the record.
16       (Discussion off the record.)
17   MR. WIEDEMANN:
18       Do you all agree that he is a
19 supervisory employee as he is so
20 testifying today?  Do you all agree that
21 he is a supervisory employee?
22   MR. FORBES:
23       Our position is, we're representing
24 him at the deposition, we're allowed to
25 instruct him not to answer on the basis

- 89 -

1 of privilege.
2    MR. WIEDEMANN:
3        And it's your basis that he is a
4 supervisory employee?
5    MR. FORBES:
6        We're not stipulating to that.
7    MR. SANDERS:
8        Just go call him.
9    MR. FORBES:
10       It speaks for itself.
11   MR. SANDERS:
12       Let's call.
13   MR. WIEDEMANN:
14       He's either a supervisory employee
15 or he's not.
16   MR. SANDERS:
17       Let him get that answer to the
18 judge.
19       (Discussion off the record.)
20   MR. FORBES:
21       We're not going to stipulate that
22 his answers are binding on Lafarge --
23   MR. WIEDEMANN:
24       Well, if he's not binding on -- it's
25 your contention that his answers are not

- 90 -

1 binding on Lafarge under any
2 circumstances; is that correct?
3 MR. SANDERS:
4 Well, are you indirectly saying he
5 can answer the question?
6 MR. WALKER:
7 No, what we're saying is, you can go
8 call the magistrate. He's here as a fact
9 witness who had conversations with
10 counsel in preparation for this
11 deposition, and in this deposition he's
12 represented. So he's not going to answer
13 your question unless instructed by the
14 magistrate.
15 MR. RAFFMAN:
16 Not only that, but under Upjohn
17 versus United States, counsel for a
18 corporation is allowed to communicate
19 with lower level employees for the
20 purpose of learning information relevant
21 to the representation pursuant to the
22 corporation's attorney-client privilege.
23 So that information is privileged for two
24 different reasons. We're not
25 stipulating, nor are we allowing him to

- 91 -

1 answer.
2 BY MR. WIEDEMANN:
3 Q. Mr. Smith, who else was present at this
4 conference?
5 A. Mr. -- Mr. Raffman.
6 Q. Mr. Raffman?
7 A. Yes.
8 Q. Was somebody there from Lafarge?
9 A. No.
10 Q. Who arranged the meeting?
11 A. I got a call -- well, I got the call from
12 Annette to tell me I had to be there today --
13 yesterday.
14 Q. Annette, the lady in the office?
15 A. Yeah.
16 Q. And what did she tell you what was the
17 meeting going to be about?
18 A. She didn't.
19 Q. Hm?
20 A. I don't know. She just told me I needed
21 to be there.
22 Q. She didn't tell you what it was going to
23 be about, hm?
24 A. No.
25 Q. Were you shown anything at the meeting

- 92 -

1 besides the New Orleans terminal hurricane
2 checklist?
3 A. No.
4 Q. That's the only thing you were shown?
5 A. That's the only thing I remember.
6 MR. FORBES:
7 If you're asking what -- if you're
8 asking, counsel, what he used to prepare
9 himself for the deposition, I can tell
10 you.
11 MR. WIEDEMANN:
12 Hm? All right.
13 MR. FORBES:
14 His statement, which has already
15 been produced, and the checklist that you
16 have, which is 113, and the barge
17 unloading report.
18 BY MR. WIEDEMANN:
19 Q. So according to what counsel has said,
20 you were not shown any other hurricane
21 checklists; is that correct?
22 A. No, not yesterday. Wait a minute. When
23 are you talking about, yesterday?
24 Q. This document I got here. Yeah,
25 yesterday.

- 93 -

1 A. No.
2 Q. Have you ever seen any other hurricane
3 checklists?
4 A. I've seen one, but I don't remember the
5 rope tying on there.
6 Q. Well, when you're a supervisor of
7 maintenance, did you show the people under you a
8 checklist as to what they're supposed to do in a
9 hurricane situation?
10 A. No. They've been doing it -- most of the
11 guys have been there a long time, so we've been
12 doing it the same way all the time.
13 Q. So you have never instructed your
14 subordinates what the Lafarge has set forth for
15 hurricane checklists; is that correct?
16 A. No, I haven't.
17 Q. Have you ever seen anything that -- in
18 writing from Lafarge that says -- pertaining to
19 hurricane preparation that says anything other
20 than using cables to shore, have you ever seen
21 anything in writing other than this document?
22 A. I don't remember.
23 Q. You can't say that you've seen another
24 document?
25 A. No.

- 94 -

**EARL SMITH**

MINIDEP by Kenson

| | |
|---|---|
| 1 | Q. Now, there were five other barges at this |
| 2 | facility, were there not? |
| 3 | A. Yes. |
| 4 | Q. And how were those barges secured to one |
| 5 | another? |
| 6 | A. Three to four ropes on each barge. |
| 7 | Q. Who secured them? |
| 8 | A. Louis, myself and Roland. |
| 9 | Q. Hm? |
| 10 | A. Louis, Roland and myself. |
| 11 | Q. And when did you secure those barges? |
| 12 | A. The same day, Saturday. |
| 13 | Q. Those five barges came in that day? |
| 14 | A. No. |
| 15 | Q. When did they come in? |
| 16 | A. Different days. |
| 17 | Q. How long before Saturday? |
| 18 | A. I don't know. |
| 19 | Q. But there would be documents concerning |
| 20 | their arrival at the facility? |
| 21 | A. I don't know that either. |
| 22 | Q. So were these barges full? |
| 23 | A. Yes. |
| 24 | Q. And they were all the same height? |
| 25 | A. Not exactly, no. |

- 95 -

| | |
|---|---|
| 1 | Q. What would be the differential between |
| 2 | the height? |
| 3 | A. It could be inches to a foot. |
| 4 | Q. At most? |
| 5 | A. Yes. |
| 6 | Q. Not 8 feet? |
| 7 | A. No. |
| 8 | Q. And is it your testimony that you went on |
| 9 | these five barges and put ropes on them? |
| 10 | A. Between the three of us, somebody was on |
| 11 | one of them, yes. |
| 12 | Q. Hm? |
| 13 | A. I can't tell who's on all five of them, |
| 14 | but I was on some of the barges. |
| 15 | Q. So it was either you and Johnson and -- |
| 16 | you and Johnson -- what was the other one, |
| 17 | Robinson, that went on the three? |
| 18 | A. Robinson, yes. |
| 19 | Q. Did the three of you go on those barges? |
| 20 | A. Yes. |
| 21 | Q. Before you went on the barges, how were |
| 22 | they tied together? |
| 23 | A. When the barges come in, most of them |
| 24 | have two ropes on them. |
| 25 | Q. Two ropes. From where to where? |

- 96 -

| | |
|---|---|
| 1 | A. Some of them might have cables. It |
| 2 | depend on who brought the barges in. Sometime |
| 3 | they leave cables on them and sometimes they have |
| 4 | ropes. |
| 5 | Q. So when they came in, you think they |
| 6 | might have had cables? |
| 7 | A. Some of them might have. I'm not sure. |
| 8 | Q. Who took the cables off? |
| 9 | MR. FORBES: |
| 10 | Objection to the form of the |
| 11 | question. |
| 12 | THE WITNESS: |
| 13 | I don't know if there were cables. |
| 14 | BY MR. WIEDEMANN: |
| 15 | Q. Well, how many ropes did you put on the |
| 16 | five barges, you and Johnson and Robinson? |
| 17 | A. Well, on all the barges we make sure |
| 18 | there was at least three ropes but not four. |
| 19 | Q. How many extra ropes did you put on them? |
| 20 | A. I don't recall. |
| 21 | Q. Well, I mean, did you put one or two or |
| 22 | three? How many? |
| 23 | A. On which barge? I mean -- |
| 24 | Q. I'm talking about the five barges. You |
| 25 | said you went out and you all put more ropes on |

- 97 -

| | |
|---|---|
| 1 | them. I want to know how many ropes you put on |
| 2 | the barges? |
| 3 | A. I don't know. It's depending on how |
| 4 | many -- which ones had cables, if there was |
| 5 | cables, or which one had two ropes or three ropes |
| 6 | on them. |
| 7 | Q. So if they had cables, you didn't put any |
| 8 | ropes on them? |
| 9 | A. Yes. We still would put ropes on them. |
| 10 | Q. Where did you get the ropes from? |
| 11 | A. The dock. |
| 12 | Q. How many ropes did you have on that dock? |
| 13 | A. We had a roll of rope, plus extra ropes. |
| 14 | Q. Where did you get the roll of rope from? |
| 15 | A. We had the rope there already. |
| 16 | Q. The roll of rope? |
| 17 | A. Yeah. |
| 18 | Q. You had a roll of rope on the dock? |
| 19 | A. Yes. |
| 20 | Q. How long had it been there? |
| 21 | A. I don't know for sure. More than a few |
| 22 | days, for sure. |
| 23 | Q. What happened to the roll of rope after |
| 24 | you all left? |
| 25 | A. We left it somewhere on the dock. |

- 98 -

**EARL SMITH**

**— 99 —**

1    Q.  Still on the roll?
2    A.  Yes.
3    Q.  Was it blue rope?
4    A.  Yes.
5    Q.  Was it delivered in anticipation of the
6  hurricane?
7        MR. FORBES:
8            Objection.  Object to the form of
9        the question.
10  BY MR. WIEDEMANN:
11   Q.  You can answer.
12   A.  Well, we always have extra rope because
13  sometime when rope -- when barges come in.  So
14  when a barge comes in and have bad rope or not
15  enough rope, we have extra rope for that.
16   Q.  But my question was:  On this occasion,
17  did they order this roll of rope because of the
18  approaching hurricane?
19   A.  I don't know.
20       MR. FORBES:
21           Asked and answered.
22  BY MR. WIEDEMANN:
23   Q.  Well, do you know exactly when it
24  appeared?
25   A.  No, I don't.

**— 100 —**

1    Q.  Do you know where it came from?
2    A.  No, I don't.
3    Q.  Was any left over when you finished tying
4  the five barges and the two barges?
5    A.  Yes.
6    Q.  How much?
7    A.  I'm not sure.  Probably -- I'm not sure.
8        MR. EMMETT:
9            I'm sorry.  You're not sure of what?
10       THE WITNESS:
11           How much rope.
12       MR. EMMETT:
13           How much was left?
14       THE WITNESS:
15           Yes.
16  BY MR. WIEDEMANN:
17   Q.  What did you do with the left over rope?
18   A.  We left it on the dock.
19   Q.  And that was before you left at 12 or
20  1:00?
21   A.  Yes.
22   Q.  So how much rope did you have left on the
23  dock?
24   A.  I don't know.
25   Q.  Was it on the roll or was it loose?

**— 101 —**

1    A.  There was some loose and some pieces that
2  were cut, plus some that was on the roll.
3    Q.  So when left at 12 or 1:00, the rope was
4  still there? Extra rope.  Hm?
5    A.  Yes.
6    Q.  And when you left at 12 or 1:00, you just
7  left it on the dock?
8    A.  Yes.
9    Q.  I thought you were told to put everything
10  away that might blow off?
11   A.  Well, if they were going to swap the
12  barges around, they might have needed more rope
13  or something.  I don't know.  We don't take the
14  rope off the dock.
15   Q.  Were you there when the vessel came into
16  swap the barges around?
17   A.  No.
18   Q.  Did you -- were you aware that Mr. Busch
19  had called Ingram to pick up the barge?
20       MR. HAYCRAFT:
21           Object to the form of the question.
22       THE WITNESS:
23           Well, he told me had called someone
24       to switch the barges around and they had
25       released the barge.

**— 102 —**

1  BY MR. WIEDEMANN:
2    Q.  He had -- he told you he had released the
3  barge to whom?
4    A.  Well, he said he had released the barge.
5  And normally -- well, what we do is, release the
6  barge to whoever the barge owners are.  Different
7  barges go to different owners.
8    Q.  Did he tell you how he had released the
9  barge?
10   A.  No.
11   Q.  What does it mean to you when a barge is
12  released to the owner?
13   A.  They call up the owner and let them know
14  we're finished with the barge and then they're
15  allowed to pick it up whenever they can.
16   Q.  So is that, is that the procedure when
17  you're finished with a barge, you unload it and
18  you then call the owner and tell them to pick up
19  the barge?
20       MR. HAYCRAFT:
21           Objection to the form of the
22       question.  Misstates his prior testimony.
23
24  BY MR. WIEDEMANN:
25   Q.  You can answer.

EARL SMITH

1    A.  Yes.
2    Q.  And have you dealt with Ingram in the
3 past with their barges?
4    A.  Yes.
5    Q.  Have you personally had an opportunity to
6 call Ingram to pick up a barge?
7    A.  Yes.
8    Q.  Well, who do you call?
9    A.  Well, they have the numbers up in the
10 booth, up in the control booth of everybody that
11 own barges and that's who you call.
12    Q.  Do you know who you called with respect
13 to Ingram?
14    A.  No.
15    Q.  Did you call Ingram directly, or --
16    A.  Yes.
17    Q.  And who would you speak to at Ingram?
18    A.  Whoever answered the phone.  I'm not
19 sure.
20    Q.  So you had a number that went directly to
21 Ingram?
22    A.  Yes.
23    Q.  And that was on the board at Lafarge,
24 Lafarge's office?
25    A.  Yes.

- 103 -

1    Q.  And you've had occasion when a barge has
2 been unloaded to go in that office and call
3 Ingram and say your barge is ready, pick it up?
4    A.  Well, the numbers would be up in the
5 unloading booth.  It wouldn't be up at the
6 office.
7    Q.  Oh, in the unloading booth?
8    A.  Yes.
9    Q.  That's the glass booth; is that what
10 you're talking about?
11    A.  Yes.  The glass booth were you unload the
12 barge, yeah.
13    Q.  So they have a telephone in there or a
14 radio, or what?
15    A.  Yes.  We had a telephone at one time.
16    Q.  So you would call -- you would go up in
17 the booth and call?
18    A.  If I was the one that unloaded the barge
19 I would, yeah.
20    Q.  And would sometimes the operator call?
21    A.  I hadn't talked to one.  I don't know.
22    Q.  So you had authority when the barge was
23 ready to call Ingram, in this case, to pick up
24 their barge?
25    A.  Yes.

- 104 -

1    Q.  And you would call the number in the
2 booth that's posted?
3    A.  Yes.
4    Q.  And there would be a number posted for
5 every barge owner that you -- that you had
6 occasion to unload?
7    A.  Yes.
8    Q.  And as I understand it, Lafarge had no
9 vessels to take barges in and out of the
10 Industrial Canal themselves; is that right?
11    A.  That's right, yes.
12    Q.  And who would come to pick up the Ingram
13 barges after you would call?
14    A.  One of their tugboats.
15    Q.  Do you know what tugboats it would be?
16    A.  No, I don't.
17    Q.  It wouldn't be any particular tug
18 company?
19    A.  It would -- all I know is, Ingram, when
20 we call them -- I mean, they send somebody out or
21 when they're passing through they'll pick up the
22 barge.
23    Q.  So all you know is, from your experience
24 when you're finished with a barge you call Ingram
25 or you call the owner of the barge and tell them

- 105 -

1 to pick it up; is that right?
2    A.  Yes.
3    Q.  And they pick it up and take it out; is
4 that correct?
5    A.  Yes.
6    Q.  How long does it usually take for them to
7 pick up a barge?
8    A.  It could be an hour or so.  It could be a
9 day or two.
10    Q.  Do you know who called Ingram on this
11 day, that is on the 27th?
12    MR. HAYCRAFT:
13       Objection to the form of the
14    question.  Facts not in evidence.
15    MR. FORBES:
16       Same objection.
17 BY MR. WIEDEMANN:
18    Q.  You can answer.
19    A.  No, I don't.
20    Q.  According to the Answers to
21 Interrogatories filed by Ingram --
22    MR. HAYCRAFT:
23       You're talking about Interrogatory
24    No. 20?
25    MR. WIEDEMANN:

- 106 -

MINDJEP by Kenson

| | |
|---|---|
| 1      Number 20, yes. | 1    A.   No. I don't remember him telling me |
| 2    MR. HAYCRAFT: | 2   that. |
| 3      That wasn't directed to Ingram. | 3    Q.   Did he tell you that he expected the |
| 4    MR. WIEDEMANN: | 4   barge to be taken out on that day before you all |
| 5      I mean, to -- I'm sorry -- to | 5   left? |
| 6    Lafarge, to your employer. | 6    A.   Well, he told me that he released the |
| 7   BY MR. WIEDEMANN: | 7   barge and he had somebody -- he was going to have |
| 8    Q.   Answer to Interrogatory No. 23 -- excuse | 8   someone come in and turn it around so the barge |
| 9   me, No. 20, it says "According to Lafarge | 9   would go on the dock. That was the only thing I |
| 10   emergency, Ed Busch, a call was made on August | 10   remember him telling me. |
| 11   27th, 2005, to release the barge over voicemail | 11    Q.   And when you say "he released the barge," |
| 12   to one of Ingram's representatives in | 12   what does that mean to you from your experience |
| 13   New Orleans." You see that, that No. 20? It's | 13   on how you have handled it? |
| 14   at the top. | 14    MR. FORBES: |
| 15    A.   Yeah. | 15      Objection. Asked and answered. |
| 16    Q.   You see that? | 16   BY MR. WIEDEMANN: |
| 17    A.   Yes. | 17    Q.   Hm? |
| 18    MR. FORBES: | 18    A.   That means that Ingram would be coming to |
| 19      Object to the form of the question. | 19   pick up the barge. |
| 20      It's already been explained in the | 20    Q.   You've done that yourself before; is that |
| 21      corporate deposition that Ingram's | 21   right? |
| 22      representatives in New Orleans are the | 22    A.   Yes. |
| 23      fleet that they use. | 23    Q.   Not only with Ingram, but with other |
| 24    MR. WIEDEMANN: | 24   people? |
| 25      Well, are you going to testify for | 25    A.   Yes. |
|       - 107 - |       - 109 - |

| | |
|---|---|
| 1      this witness? | 1    Q.   Let me show you what has previously been |
| 2    MR. FORBES: | 2   identified as LNA-368, which is an aerial |
| 3      I'm just pointing out what the -- | 3   photograph of the plant, and I have to tell you |
| 4      you had asked in the prior deposition | 4   this was obviously -- we can orient you, but it |
| 5      for an explanation of that answer. I'm | 5   was taken after the hurricane and the white, the |
| 6      just informing you what that answer is. | 6   five white barges shown in the photograph have |
| 7   BY MR. WIEDEMANN: | 7   been described as the five barges, and the barge |
| 8    Q.   Do you know that -- do you know that Mr. | 8   at the dockside is the other Ingram barge. You |
| 9   Busch called Ingram to release the barge on the | 9   recognize that? |
| 10   morning of the 27th? | 10    A.   Yeah. I recognize the barge -- I mean |
| 11    A.   Well, he told me he released the barge. | 11   the set up. |
| 12    Q.   And did he tell you he had done that | 12    Q.   And when you left the facility at 12 or |
| 13   around nine o'clock, or when he first got into | 13   1:00, how were those five barges moored to the |
| 14   the office, or into the plant? | 14   dock itself? |
| 15    A.   No, he didn't tell me that. | 15    A.   With three or four ropes tied to the |
| 16    Q.   Did he tell you that Ingram was supposed | 16   dock. |
| 17   to pick up the barge before the storm because it | 17    Q.   From where? |
| 18   was a light barge? | 18    A.   From the barge to the docks on this, what |
| 19    MR. FORBES: | 19   I call the north side of the dock. |
| 20      Object to the form of the question. | 20    Q.   Three or four ropes from the inside barge |
| 21    THE WITNESS: | 21   to the dock? |
| 22      I don't remember him telling me | 22    A.   From the inside barge around the pilings |
| 23      that, no. | 23   to the dock. |
| 24   BY MR. WIEDEMANN: | 24    Q.   So what your testimony is that the inside |
| 25    Q.   Hm? | 25   barge of the five barges was moored by four ropes |
|       - 108 - |       - 110 - |

EARL SMITH

1     to --
2         A.  Three to four.
3         Q.  -- three to four to the pilings at the
4     dock?
5         A.  Around the pilings and to the bits on the
6     dock, yes.
7         Q.  Was there any line tied to any of the
8     other barges that were moored to the dock?
9             MR. FORBES:
10                Object to the form of the question.
11            It's confusing.
12    BY MR. WIEDEMANN:
13        Q.  Do you understand the question?
14        A.  No.  Repeat the question.
15        Q.  There are five barges, one barge is
16    moored to the dock with three or four lines.  My
17    question is:  The outside barge, the second
18    barge, the third barge and the fourth barge, was
19    there any line going to the dock to hold those
20    barges in?
21        A.  No.
22            MR. FORBES:
23                You mean directly from barges other
24            than the one next to the dock?
25            MR. WIEDEMANN:
                    - 111 -

1     the north.  This is the Industrial Canal
2     (indicating).  Were they moored to the north and
3     moored straight up --
4             MR. FORBES:
5                 Objection.  It's a compound
6             question.
7     BY MR. WIEDEMANN:
8         Q.  You can answer the question.
9         A.  They would have been straight up and
10    upside the dock, like this single barge
11    (indicating).
12        Q.  So they would have been -- if this is the
13    north, they would have been moored to the north
14    in the same basic --
15            MR. FORBES:
16                Objection.  You misstated his prior
17            answer.
18    BY MR. WIEDEMANN:
19        Q.  Do you understand that question, Mr.
20    Smith?
21        A.  Yes.  But the barges would have been
22    pushed in against there, tied up along that other
23    barge.
24        Q.  The inside barge would have been flush
25    with the dock --   A.  Right.
                    - 113 -

1             Yes.
2     BY MR. WIEDEMANN:
3         Q.  This facility next to where these five
4     barges are, is that part of Lafarge?
5         A.  No.
6         Q.  So there is no, there is no ability to
7     moor the outside barges to that -- because there
8     is no dock; isn't that so?
9             MR. FORBES:
10                Object to the form of the question.
11    BY MR. WIEDEMANN:
12        Q.  Are there any pilings on the property
13    that is adjacent to where the five barges are?
14        A.  There's a walkway across there, but their
15    pilings would be right on -- wouldn't be in that
16    area.
17        Q.  Does Lafarge ever moor barges at this
18    facility next to Lafarge?
19        A.  Not to my understanding.
20        Q.  When you left on the morning, or excuse
21    me, at 12 to 1:00 on the 27th, were the five
22    barges on the angle that they are as shown in the
23    photograph?
24        A.  No.
25        Q.  Were they moored to the -- it would be to
                    - 112 -

1         Q.  -- just like the other Ingram barge; is
2     that correct?
3         A.  Yes.
4         Q.  And therefore there would have been no
5     angle on the five barges, they would have been in
6     the same position as the other Ingram barge shown
7     in the photograph?
8         A.  Yes.
9         Q.  Do you know how the barges, the five
10    barges got into the position as they are shown
11    after the hurricane?
12        A.  No.  I came back after that.  I don't
13    know if -- it was months after, I mean a couple
14    of months after that.  I don't know how they got
15    out there.
16        Q.  You can see, can you not, that if the
17    Ingram -- the other Ingram barge -- let me go
18    back.  The other Ingram barge was moored directly
19    next to the -- that is, the light barge -- to the
20    Ingram barge we see in the photograph; is that
21    right?
22        A.  Repeat that question.
23        Q.  The Ingram 4727, which broke away, was
24    moored next to the barge that we see in the
25    photograph -- that is, the other Ingram barge?
                    - 114 -

EARL SMITH                                                    MINDEP by Kenson

1       MR. FORBES:
2           Object to the form.  You're
3       referring to which point in time, after
4       they were turned around, before?
5  BY MR. WIEDEMANN:
6       Q.  You can answer.  Do you understand the
7  question?
8       A.  What you're asking me, was that barge
9  tied off to the other barge?
10      Q.  Yes.
11      A.  Yes.
12      Q.  And it was parallel to the other barge --
13  that is, right next to it, I believe you said a
14  foot or two apart; is that right?
15      A.  When we left, yes.
16      Q.  Uh-huh (affirmative response).
17      A.  Yes.  But they was turned around.
18      Q.  So you know -- well, the barge at the
19  dock right now is the full barge; you understand
20  that?
21      A.  Yes.
22      Q.  So the barges, the five barges shown in
23  the photograph apparently shifted to the south at
24  some point in time after --
25      MR. FORBES:
                        - 115 -

1       Objection.
2       MR. WIEDEMANN:
3           -- you all left; is that right?
4       MR. FORBES:
5           There's been no evidence of that.
6       There's been no testimony from that
7       witness -- from this witness or any other
8       about that.
9  BY MR. WIEDEMANN:
10      Q.  You can answer it.  Isn't that so?
11      A.  Rephrase the question again?
12      Q.  When you left, the barges were just like
13  the Ingram barge up against the dock and not to
14  the south, leaning to the south as shown in this
15  picture, was it -- were they not?
16      A.  Yes, they were up against the dock.
17      Q.  So at some time after you left at 12 or
18  1:00, those five barges shifted to the south --
19
20      MR. FORBES:
21          Objection.
22      MR. WIEDEMANN:
23          -- did they not?
24      MR. FORBES:
25          Objection, stating facts not in
                        - 116 -

1       evidence.
2       MR. WIEDEMANN:
3           All right.
4  BY MR. WIEDEMANN:
5       Q.  Isn't that so, sir?
6       A.  I don't know.
7       Q.  Well, how did they get in the position
8  they're in now?
9       A.  I don't know that either.
10      MR. FORBES:
11          Objection.  Already answered.
12  BY MR. WIEDEMANN:
13      Q.  But they're in a different position now
14  than they were when you left at 12 to 1:00?
15      A.  Yes.
16      MR. WIEDEMANN:
17          Let's take a break.
18          (At this time, a break was taken.)
19  BY MR. WIEDEMANN:
20      Q.  Mr. Smith, when you left, you say, at 12
21  to 1:00, had the barges been topped around
22  before?
23      MR. FORBES:
24          He's already answered that one.
25      MR. WIEDEMANN:
                        - 117 -

1           Well, I don't -- pardon me, but I
2           don't remember.
3       MR. FORBES:
4       A couple of times.
5       THE WITNESS:
6           No.
7  BY MR. WIEDEMANN:
8       Q.  You were not there?
9       A.  No.
10      Q.  Your coworker, was he still there?  Do
11  you know?
12      A.  Which one?
13      Q.  You said, I believe it was Darryle Evans,
14  was he --
15      A.  I don't know.
16      Q.  He was there when you left?
17      A.  Right.
18      Q.  Do you know what time he left?
19      MR. FORBES:
20          He's already answered that.  He
21          doesn't know when Evans left.
22      MR. WIEDEMANN:
23          Counsel, if you have an objection to
24          the form of the question, say it.  Okay?
25          You don't have to say what he said unless
                        - 118 -

EARL SMITH

MINI DEP by Kenson

1    you want to tell him something and you
2    can whisper it in his ear.
3    MR. SANDERS:
4         It's an improper objection.
5    MR. WIEDEMANN:
6         Well, you can object to the form of
7    the question.  Okay?
8    MR. FORBES:
9         Well, I object to the form of the
10   question.
11   MR. WIEDEMANN:
12        All right.  But if you want to tell
13   him something, tell him in his ear, or
14   take him outside.  You know, coaching him
15   in front of me is insulting.
16   MR. FORBES:
17        This isn't coaching.  He's already
18   answered the question.
19   MR. SANDERS:
20        It's an improper objection to say
21   anything other than objection to the
22   form.  Anybody that's been an attorney
23   knows that.
24   BY MR. WIEDEMANN:
25   Q.  Have you talked to Mr. Evans since this

- 119 -

1    MR. FORBES:
2         Objection.
3    MR. HAYCRAFT:
4         Object to the form.
5    MR. FORBES:
6         Object to the form as misstating his
7    prior testimony.
8    THE WITNESS:
9         He said that he had released the
10   barge and he had called someone to turn
11   the barges around.
12   BY MR. WIEDEMANN:
13   Q.  When you left at 10 or 1:00 -- noon or
14   1:00, or when Mr. Busch left before you, did he
15   indicate that he expected Ingram to pick up the
16   empty barge?
17   MR. FORBES:
18        Object to the form.
19   THE WITNESS:
20        No, he didn't tell me that.
21   BY MR. WIEDEMANN:
22   Q.  Were you expecting Ingram to pick up the
23   empty barge?    MR. FORBES:
24        Objection.  Object to the form.
25   THE WITNESS:

- 121 -

1    occurrence?
2    A.  Not about this.
3    Q.  So you don't know from the day of the
4    incident or anything afterwards when he left the
5    facility?
6    A.  No.
7    Q.  Do you know what time Mr. Busch left the
8    facility?
9    A.  Maybe between 10 and 11.  I'm not sure.
10   Q.  He left before you?
11   A.  Yes.
12   Q.  And when he left, did he give
13   instructions that someone stay at the facility to
14   check on the barges during the coming days?
15   A.  No.
16   Q.  When he left, did he give you and your
17   coworkers any instructions?
18   A.  Yes.
19   Q.  What instructions did he give you?
20   A.  To move everything, all the loose tools
21   and everything and move the equipment across the
22   floodwall and secure the barges.
23   Q.  Did he tell you anything about his call
24   and expectation that Ingram was going to pick up
25   the empty barge?

- 120 -

1         Well, I knew -- I mean, when he
2    releases, you -- that's what you call
3    them for, to pick up the barges.
4    BY MR. WIEDEMANN:
5    Q.  That's the purpose of releasing it, for
6    them to pick it up; isn't that so?
7    A.  Yes.
8    Q.  Were any photographs taken of the barges
9    or the moorings before, before you left to your
10   knowledge?
11   A.  Not that I know of.  I don't know.
12   Q.  Were any drawings made of the rigging of
13   the barges?
14   A.  I don't remember.
15   Q.  Not that you know of, hm?
16   A.  Not that I know of.  I haven't seen them.
17   Q.  Did Mr. Busch give any written
18   instructions to you all?
19   A.  Not to me.
20   Q.  And if he gave them, they would go to you
21   to give to your subordinates, wouldn't they?
22   MR. FORBES:
23        Object to the form of the question.
24   THE WITNESS:
25        I don't know that either.

- 122 -

EARL SMITH

MINIDEP by Kenson

BY MR. WIEDEMANN:

2    Q.   Well, if you're the supervisor, does he
3  usually give you instructions to give to your
4  maintenance people, or does he talk to them
5  directly?
6    A.   Depending on who was around at the time,
7  I guess, depending on how important it would be.
8    Q.   Did he release you all at one time?
9    A.   Did he release us at one time?
10    Q.   Yeah.  I mean, there were three of you
11  there in addition to Mr. Evans.  Did he tell you
12  all to leave at one time, or what instructions
13  did he give you relative to the end of your work
14  day?
15    A.   Well, once we finished securing
16  everything, then we were supposed to leave.
17    Q.   And you, of course, punched out when you
18  left, and so did the other workers?
19    MR. FORBES:
20        Object to the form.
21    MR. WIEDEMANN:
22        Is that correct?
23    MR. FORBES:
24        Assumes facts not in evidence.
25    THE WITNESS:

- 123 -

1    A.   No, it's --
2    Q.   It's a walkway?
3    A.   Right.
4    Q.   And that's the way you would go in and
5  out on a normal day?
6    A.   A normal day, like without the floodwall
7  gates being closed?
8    Q.   Uh-huh (affirmative response).
9    A.   No.  You would go through the floodwall.
10    Q.   So the only difference, when the
11  floodwall is up, you have to walk over this
12  walkway to get to your car?
13    A.   Well, the walkway is between two
14  floodwalls and it's right next to the shop.  So
15  if I was going across the wall and I was closer
16  to that ladder, I would go over that ladder.  But
17  when the flood gates are closed, that's the
18  only access you have across the wall.
19    Q.   When you left, were the flood gates
20  closed?
21    A.   Yes.
22    Q.   So you went over the walkway?
23    A.   Yes.
24    Q.   Is the walk at the Lafarge facility today
25  the same -- I know there may have been some

- 125 -

1        I did.
2  BY MR. WIEDEMANN:
3    Q.   Hm?
4    A.   I did.  I mean, it was not like we was
5  lining all up because --
6    Q.   But the policy of Lafarge was, when you
7  finish your day's work, you punch out the card so
8  that they can handle the payroll; isn't that so?
9    A.   Yes.
10    Q.   When you left at 12 or 1:00, how did you
11  leave?  You had your car?
12    A.   Yes, I had a truck.
13    Q.   And where was it parked?
14    A.   On the other side of the floodwall.
15    Q.   And did you have any problem getting to
16  your car at 12 or 1:00?
17    A.   No.  They have a ladder going across the
18  floodwall.
19    Q.   Right.  So there is a means of getting in
20  and out of the inside of the floodwall to the
21  outside of the floodwall, by ladder?
22    A.   Yes.
23    Q.   And the ladder goes up one side and down
24  the other; is that -- I mean, it's not a ladder
25  that just stands against the wall?

- 124 -

1  damage -- but has it been reconstructed the same
2  way it was at the time of this incident?
3    MR. FORBES:
4        Object to the form of the question.
5    It's confusing.  Has there been any
6    change in the dock --
7    MR. WIEDEMANN:
8        That's what I'm asking.
9    MR. FORBES:
10        -- since the storm?
11    THE WITNESS:
12        As far as the floodwall or the dock
13    itself?
14  BY MR. WIEDEMANN:
15    Q.   The dock I'm talking about.  The dock
16  where the Ingram barges were moored and the dock
17  where the five barges were moored, has their been
18  a change in that -- the dock itself and the
19  fittings on the dock?
20    A.   Well, we have some repair along the dock
21  where it was broken off in the far corners.
22    Q.   Well, what I'm trying to find out, Mr.
23  Smith, you indicated that there were some pilings
24  that you all used to tie up to; is that right?
25    A.   Yes.

- 126 -

**EARL SMITH**

MINI DE by Kenson

| | |
|---|---|
| 1      MR. FORBES: | 1      A.  Yes. |
| 2        Objection to form.   Misstates the | 2      Q.  And why do you think that the Ingram |
| 3   prior evidence.  They didn't tie up the | 3 barge broke loose at the time of the hurricane? |
| 4   pilings. | 4      MR. FORBES: |
| 5 BY MR. WIEDEMANN: | 5        Objection to this as improper and |
| 6      Q.  What I'm trying to find out so that we | 6 beyond the scope Phase I. |
| 7 will know, if I go out there some time soon and I | 7      THE WITNESS: |
| 8 look at the wharf, will it look like it looked at | 8        Just a bad hurricane, is all I can |
| 9 the time of the hurricane insofar as the mooring | 9 say. |
| 10 portion of it? | 10 BY MR. WIEDEMANN: |
| 11      A.  Yes. | 11      Q.  What is your understanding as to what |
| 12      Q.  The same things that you moored to at | 12 allowed the barge to break loose? |
| 13 this time before the hurricane are there now? | 13      MR. FORBES: |
| 14 They may have been changed, but they're still the | 14        Same objection.  This is beyond the |
| 15 same? | 15 phase and the scope of Phase I. |
| 16      MR. FORBES: | 16      THE WITNESS: |
| 17        Object to the form. | 17        I don't know. |
| 18 BY MR. WIEDEMANN: | 18 BY MR. WIEDEMANN: |
| 19      Q.  Is that correct? | 19      Q.  Hm? |
| 20      A.  Yes, they're still the same. | 20      A.  I don't know, other than bad hurricane |
| 21      Q.  So that I'll be looking at insofar as how | 21 and the wind just blew it out.  I'm not sure. |
| 22 you would moor vessels similar to the Ingram | 22      Q.  Well, the Ingram barge at the dock stayed |
| 23 barges at that time of Katrina, it would be | 23 where it was, right? |
| 24 basically the same today; is that correct? | 24      A.  Yes. |
| 25      A.  Yes. | 25      Q.  And the other one broke loose, the |
|        - 127 - |        - 129 - |

| | |
|---|---|
| 1      Q.  And what -- are there pilings, is that | 1 outside light barge, right? |
| 2 what you were describing as what you moored the | 2      A.  Yes. |
| 3 inside barge to? | 3      Q.  Do you know what happened to the lines |
| 4      MR. FORBES: | 4 that were putting the -- pulling the two barges |
| 5        object to the form. | 5 together? |
| 6      THE WITNESS: | 6      MR. FORBES: |
| 7        No. | 7        Objection. |
| 8 BY MR. WIEDEMANN: | 8      THE WITNESS: |
| 9      Q.  What? | 9        No. |
| 10      A.  No.  I didn't moor them to the piling. | 10 BY MR. WIEDEMANN: |
| 11 The ropes were wrapped around the piling and tied | 11      Q.  Did Mr. Busch or anybody else tell you |
| 12 to the bit on the dock. | 12 what happened, or why this occurred? |
| 13      Q.  So there's a bit on the dock and there's | 13      A.  No. |
| 14 a piling; is that correct? | 14      Q.  Was there any internal investigation |
| 15      A.  Yes. | 15 about how this happened?  That is, did Lafarge at |
| 16      Q.  And the bits on the dock now and the | 16 the facility get you all together and ask you |
| 17 pilings are similar to what there at the time | 17 what you knew about it? |
| 18 of the hurricane? | 18      A.  I don't know. |
| 19      A.  They're the same. | 19      Q.  Hm? |
| 20      Q.  The same? | 20      A.  I don't remember. |
| 21      A.  Yes. | 21      Q.  You weren't here at that time? |
| 22      Q.  They never took them down? | 22      A.  What time? |
| 23      A.  No. | 23      MR. FORBES: |
| 24      Q.  So they're actually the same as existed | 24        Object to form. |
| 25 before the hurricane? | 25 BY MR. WIEDEMANN: |
|        - 128 - |        - 130 - |

EARL SMITH

MINIDEP by Kenson

1  Q. After the hurricane you were not here?
2  A. No, not right after the hurricane.
3  Q. What I'm asking you, Mr. Smith, is
4  sometimes after an accident happens, people are
5  called together to try and figure out why it
6  happened and how to prevent it from happening in
7  the future. Did any such meeting take place
8  between you and your fellow employees and
9  supervisors about this occurrence?
10  A. I don't remember.
11  Q. You don't remember?
12  A. No
13  Q. It's your testimony that you cannot
14  remember whether or not there was such a meeting?
15  A. Yes, that's my testimony.
16  Q. Did any of you and your fellow employees
17  discuss privately why this happened and how you
18  may have prevented it?
19  A. No.
20  Q. Did any safety person from Lafarge, from
21  somewhere else or from this area come down and
22  investigate the accident to your knowledge?
23  A. I can't remember seeing anybody.
24  Q. Were you interviewed by anyone from
25  Lafarge or by your superiors or by any
- 131 -

1  or read, or was it just them showing you on the
2  job?
3  A. We've had safety meetings, but I don't
4  recall -- I don't remember whether it was the way
5  you asking it.
6  Q. When you have a safety meeting -- well,
7  how often do you have a safety meeting?
8  A. Well, we talk safety just about every
9  morning, but probably a couple of weeks, every
10  two weeks or so.
11  Q. As a matter of fact, the document that I
12  showed you earlier says on the bottom of it, this
13  Document 105 -- 113 says "Safe" and underscored
14  in parenthesis?
15  A. Yes.
16  Q. And that's -- is that what you're talking
17  about when they're talking about safety?
18  A. Well, we --
19  MR. FORBES:
20  Object to the form of the question.
21  MR. WIEDEMANN:
22  He was getting ready --
23  BY MR. WIEDEMANN:
24  Q. You can go ahead and answer.
25  A. What I mean by safety is, we get together
- 133 -

1  governmental agency relative to this occurrence?
2  A. Explain it again.
3  Q. Were you interviewed by any of your
4  supervisors, by somebody from Lafarge or by any
5  governmental agency concerning this matter, such
6  as the Coast Guard, the -- or any governmental
7  agency?
8  A. No.
9  Q. Were you interviewed by anybody from
10  Ingram?
11  A. No.
12  Q. Did you have to fill out any report for
13  the company regarding the incident?
14  A. Any report. No.
15  Q. Tell me what, if any, training you've had
16  relative to the mooring or tying up of vessels or
17  barges at the Lafarge facility?
18  A. Well, whenever you start working --
19  whenever anyone knew come in, they get with the
20  older guys and they show them how things are
21  done, and that's how I learned it, along with
22  some of the tugboat guys.
23  Q. So it's on-the-job training?
24  A. Yes.
25  Q. Did they give you any materials to study
- 132 -

1  in the mornings and find out if anybody see
2  anything that might be unsafe or something we
3  could do to change something to make it safer or
4  anything like that, like things laying around or
5  whatever.
6  Q. So although you do that on a regular
7  basis, when this barge broke loose and went
8  through the floodwall into the Ninth Ward you all
9  didn't discuss it?
10  MR. FORBES:
11  Object to the form of the question
12  and the characterization.
13  BY MR. WIEDEMANN:
14  Q. You can answer it.
15  A. Could you ask the question again?
16  Q. Well, you just indicated to me that you
17  all get together when something happens to
18  determine how to stop it from happening and get
19  safe procedures, and I understand that. And my
20  question to you is that a barge broke loose from
21  your business, went through a wall of the
22  Industrial Canal and into a neighborhood where it
23  smashed a number of houses, and it's your
24  testimony that nobody at Lafarge got together and
25  discussed why this happened and how to prevent it
- 134 -

EARL SMITH                                                          MINDEP by Kenson

| | |
|---|---|
| 1 from happening? | 1    A. No. |
| 2        MR. FORBES: | 2    Q. Have you ever seen the -- Mr. Smith, are |
| 3            Object to the form of the question, | 3 you familiar with the Algiers mooring facility, |
| 4        and object to the characterization and | 4 or the Algiers fleeting facility on the |
| 5        misstatements. | 5 Mississippi? |
| 6 BY MR. WIEDEMANN: | 6    A. No. |
| 7    Q. You can answer the question. | 7    Q. Do you know where the Ingram barges go |
| 8    A. Well, the way we tied the barge off is | 8 when they leave your facility? |
| 9 the way we tie them off when heavy winds and | 9    A. No, I don't. |
| 10 anything else is going on, so we thought that it | 10    Q. You don't have any knowledge of that? |
| 11 was secure, and I don't see how we would have | 11    A. No. |
| 12 discussed how it -- what made it happen, because | 12    Q. And you don't have any knowledge of who |
| 13 I don't really know what made it happen. | 13 brings them in or who takes them out?  By that I |
| 14    Q. So you didn't discuss it at all?  Your | 14 mean, vessels. |
| 15 answer is no? | 15    A. Zito. |
| 16    A. Yes. | 16    Q. Zito is the one that generally or always |
| 17    Q. As I understand it, and I hate to repeat | 17 takes in Ingram barges and takes them out? |
| 18 myself, but --excuse me, but as I understand it, | 18    A. I don't know if they always do it. |
| 19 you had no formal training -- that is, where | 19    Q. But you know that they sometimes do it? |
| 20 people get together and you look at materials and | 20    A. Yes. |
| 21 decide how to do this job insofar as mooring and | 21    Q. And does Domino ever take, Joe Domino |
| 22 how you tie off things?  From what I understand, | 22 ever take Ingram barges in and out? |
| 23 you get that from day-to-day work and seeing | 23    A. Not to my knowledge. |
| 24 barge owners -- I mean, barges and barge vessels; | 24    Q. Does Unique Towing ever take barges in |
| 25 is that right? | 25 and out? |
| - 135 - | - 137 - |
| 1        MR. FORBES: | 1    A. Not to my knowledge. |
| 2            Object to the form. | 2    Q. When the barges were topped around in |
| 3 BY MR. WIEDEMANN: | 3 this case, on the 27th, they were topped around |
| 4    Q. You can answer. | 4 by Unique Towing; are you aware of that? |
| 5    A. Tugboat companies and things like that, | 5    A. Do they have another name? |
| 6 is what you're saying? | 6    Q. Well, Joe Domino is the broker, Unique is |
| 7    Q. Yes. | 7 the owner of the REGINA H.  Have you seen that |
| 8    A. Yes. | 8 vessel before? |
| 9    Q. In other words, your knowledge is picked | 9    A. Domino? |
| 10 up from day-to-day observation of other people; | 10    Q. Yes. |
| 11 is that correct? | 11    A. Yes, I've seen it before. |
| 12        MR. FORBES: | 12    Q. Have you seen the REGINA H? |
| 13            Object to the form. | 13    A. I don't remember that name. |
| 14        THE WITNESS: | 14    Q. And when you all need to have barges |
| 15            What do you mean by "other people"? | 15 topped around or moved -- that is, I'm talking |
| 16 | 16 about Lafarge, who do you all call? |
| 17 BY MR. WIEDEMANN: | 17    A. There's several tugboat companies we |
| 18    Q. Well, when you were working for Lafarge, | 18 would call for that. |
| 19 did they ever have -- send you to a seminar, to a | 19    Q. Which ones, that you know of? |
| 20 school to learn how to tie off barges to the dock | 20    A. Domino's.  I think it's -- might be ABC |
| 21 or to one another? | 21 Turn. |
| 22    A. No. | 22    Q. Have you had an occasion to call to have |
| 23    Q. Have you ever taken any kind of course | 23 barges topped around? |
| 24 through Lafarge or personally concerning how to | 24    A. Yes. |
| 25 tie off barges to the dock or to one another? | 25    Q. And again, they have a list of numbers in |
| - 136 - | - 138 - |

**EARL SMITH**

1   the same place as you indicated before, where you
2   call Ingram?
3       A.  Will I call Ingram?
4       Q.  No.  You told me in the booth they have
5   numbers and a telephone?
6       A.  Yes, we do.
7       Q.  So they also have the companies that you
8   call if you want to have topping, have vessels
9   topped around?
10      A.  Yes.
11      Q.  Let me show you what is a daily log from
12  the REGINA H, dated August 27th, 2005.  And it
13  shows that the -- I'll show it to you.  It shows
14  that the topping around at the Lafarge facility
15  took place at, I believe, 1425?
16      A.  Yes.
17      Q.  Hm?
18      A.  Yes.  I see it.
19      Q.  That's 2:45 -- 2:25.  I'm sorry.  I said
20  2:45. -- 2:25 on the afternoon of the 27th; is
21  that correct?
22      A.  Yes, that's what it says.
23      Q.  You had already left; is that right?
24      A.  Yes.
25      Q.  Who ordered the REGINA H to come in and

- 139 -

1       A.  No.
2       Q.  Are you familiar with the REGINA H?
3       A.  I might have seen it.  Yeah, I seen it a
4   couple of times.
5       Q.  REGINA H is capable of taking empty
6   barges out of the Industrial Canal; is it not?
7           MR. FORBES:
8               Object.
9           THE WITNESS:
10              I don't know.
11          MR. FORBES:
12              Object to the form of the question.
13  BY MR. WIEDEMANN:
14      Q.  Have you ever secured barges at the
15  Lafarge facility in prior hurricanes or in prior
16  storms?
17      A.  Since the hurricane?
18      Q.  No, no, before the hurricane.
19      A.  Yes, I have.
20      Q.  Prior hurricanes?
21      A.  Yes.
22      Q.  Like which one?  What was the last one
23  you can remember?
24      A.  I can't remember the hurricane.
25      Q.  Hm?

- 141 -

1   top around the barges?
2       A.  I don't know, but Ed was the one that
3   told me that he had called someone.  I don't know
4   who he called.
5       Q.  You didn't -- are you sure that he's the
6   one that called?
7       A.  No, I'm not sure that he's the one.
8       Q.  But somebody called from Lafarge?
9       A.  I don't even know if someone called from
10  Lafarge.  I was just saying what Ed told me.
11      Q.  He told you that he called?
12      A.  Yes.
13      Q.  Did he tell you whether or not he had
14  instructed the REGINA H to take out the empty
15  barge when they came in at 2:25 since Ingram had
16  not retrieved this barge?
17          MR. HAYCRAFT:
18              Object to the form.
19          MR. FORBES:
20              Object to the form.
21          THE WITNESS:
22              I don't remember him telling me
23              that.
24  BY MR. WIEDEMANN:
25      Q.  Hm?

- 140 -

1       A.  I can't remember the hurricane.
2       Q.  Did you not use cable at the time of the
3   last hurricane?
4       A.  The last hurricane?
5       Q.  The last one you participated in.
6       A.  No.
7       Q.  When was that?
8       A.  I don't know what year.
9       Q.  Well, how do you know you didn't use
10  cable?
11      A.  When they put the pilings up, that's when
12  we started using the ropes.
13      Q.  Did they have cable at the Lafarge
14  facility?
15          MR. FORBES:
16              Objection.  When are you talking
17              about?  Anytime?
18          MR. WIEDEMANN:
19              At the time of Katrina.
20          THE WITNESS:
21              I'm not sure.  We have all types of
22              cables, so I'm not sure if we had those.
23
24  BY MR. WIEDEMANN:
25      Q.  So you have all types of cables?

- 142 -

EARL SMITH                                                          MINIDOT by Kenson

1    A. Like lifting cables, for lifting covers
2  and stuff like that.
3    Q. Do you have cable for tying off vessels
4  to one another or vessels to docks?
5    A. I'm not sure.
6    Q. You don't know whether they had them at
7  the time?
8    A. No.
9    Q. You mentioned that there were repairs to
10 the dock, but there has been no change in the
11 piling and the cleats that you tie off to; is
12 that correct?
13   A. Yes.
14   Q. Has there been any other materials
15 changes in the dock that you noticed?
16   MR. FORBES:
17       Object, object to the form, "other
18 material changes."
19   THE WITNESS:
20       Farther down, like on the south end
21 of the dock is all the way down at the
22 corner. A lot of time when they bring
23 barges in it didn't have the big pilings
24 all the way down, they might crumble on
25 the dock a little, so they had the

- 143 -

1        peoples come out and reform that on the
2        south end.
3  BY MR. WIEDEMANN:
4    Q. On the south end going toward the river?
5    A. Right.
6    Q. They put in pilings similar to what you
7  had on the other end?
8    A. No. They replaced the dock where it had
9  been broken off.
10   Q. Did they put in pilings at that point?
11   A. No.
12   Q. Was that as a result of Katrina that this
13 occurred?
14   A. No.
15   Q. What caused it, that end to be broken?
16   A. They didn't have the pilings that were
17 high enough, and the way the wharf is made, it
18 kind of like overhang the side of it. Sometime
19 when the barges come in, when they're spotting
20 them in, they might hit it with the corner of
21 their barge or something.
22   Q. So it sort of damaged that end of the --
23   A. Yes.
24   Q. -- wharf? And it has been repaired, but
25 they don't dock barges there?

- 144 -

1    A. Most of the time we dock -- well, we dock
2  the barges on the north end in the center of the
3  dock, which is where the unloader would be, and
4  then when we finish unloading them either the
5  tugboat will come in and pull them down, or where
6  we got -- whoever on the barge will come out and
7  pick them up.
8        So they bring the barges in and put them
9  on the north end because the water's deeper on
10 the north end, and if you put a loaded barge on
11 the south end, most of the time it gets stuck.
12   Q. So what I'm trying to find out, Mr.
13 Smith, if I go out there and take a picture of
14 the place where the barges are docked on the
15 north end, today, insofar as the mooring part of
16 it, it's the same as it was before the hurricane?
17   MR. FORBES:
18       I think honestly, he's given you the
19 same answer. You've asked him --
20   MR. WIEDEMANN:
21       I just want to make sure --
22   MR. FORBES:
23       -- five or six times.
24   MR. WIEDEMANN:
25       -- because he told me there was some

- 145 -

1        damage to one end, which I don't know
2        about.
3  BY MR. WIEDEMANN:
4    Q. The existing pilings and the existing
5  fittings on the north end are the same as they
6  were at the time of Katrina?
7    A. Yes.
8    MR. WIEDEMANN:
9        I don't know whether we've
10 identified the Unique Towing records, but
11 I want to ask him about, is the daily log
12 of 8/27/05 signed by Raymond Grabert,
13 Jr., and I think it's been identified --
14
15   MR. FORBES:
16       It's already been identified.
17   MR. WIEDEMANN:
18       I think so. I just want to make
19 sure.
20   MR. FORBES:
21       Yes.
22   MR. WIEDEMANN:
23       Okay. I have no further questions.
24   MR. EMMETT:
25       Just one question.

- 146 -

EARL SMITH

MINIDEP by Kenson

EXAMINATION

BY MR. EMMETT:

Q. I'm John Emmett, and I represent Domino and Unique, the company that switched the barges. I want to talk a little bit about the connections between the two barges, the two Ingram barges that were on the south tier. You understand?

A. Yes.

Q. How many lines were between those two barges when you left the facility?

A. Either three or four. I'm not exactly sure.

Q. And you know there was one on the bow and one on the stern connecting the two barges, correct?

A. Yes.

Q. And then there was either one or two somewhere in the middle of the barge?

A. Yes.

Q. Now, how many parts of line were running between the two barges when you left?

A. One.

Q. One part. And this was 2-inch polypropylene line, correct?

- 147 -

A. Yes.

Q. And you were assigned by Mr. Busch, your supervisor, to secure those barges; is that correct?

A. Yes.

Q. In preparation for a hurricane that was anticipated; is that correct?

A. Yes.

Q. When you left the facility at 12 or 1 p.m. on August 27th, were you satisfied that those two barges had been connected and secured together in anticipation of a hurricane?

A. Yes.

Q. Did you have any contact whatsoever with a towing company to come in and move or flipped those barges?

A. No.

Q. Did Mr. Busch identify to you what towing company he had called?

A. I don't remember him telling me.

Q. Do you know what Mr. Busch asked the tug company to do?

A. No, just what he told me, to swap them around. That's all he told me.

Q. Did Mr. Busch say anything to you to

- 148 -

indicate that he expected that the tug company would do anything with the connections between the two barges?

A. No, he didn't tell me.

Q. You were not present when the barges were topped around or flipped so that the load would be up against the dock, correct?

A. Right, I wasn't.

Q. So you don't have any idea what the towing company did when they arrived at the Lafarge facility; is that correct?

A. Correct.

Q. You have not spoken with anybody who has informed you what the towing company did when they arrived; is that correct?

A. That's correct.

Q. When you left the facility, who was still present that Saturday afternoon?

A. Darryle Evans.

Q. Anyone else other than Darryle?

A. I'm not sure whether -- how close the other guys were behind me when we left, Louis and Roland, but we was to leave after we finished.

Q. Did you leave after everything had been finished?

- 149 -

A. Yes.

Q. And Darryle stayed behind to do what, or was he just the last one to leave?

A. He was the truck loader.

Q. Did he continue to load trucks after you left?

A. I don't know.

Q. Was he loading trucks when you left?

A. I don't remember seeing him.

Q. Who locked up the Lafarge facility?

A. It would be the last man to leave the facility.

Q. Everybody has a key? Or it's a padlock, or how do you lock it up?

A. Everybody have keys.

Q. Did you lock up?

A. No. Excuse me. You're talking about the gates to get in, did I lock that up, or --

Q. It's my understanding that there's some sort of an inside area at the Lafarge terminal?

A. Yes.

Q. There's something that's inside, and that that area was locked up and secured before you all left?

A. Well, all the sheds and things were

- 150 -

**EARL SMITH**

1 locked by me, Louis or Roland, but the gate
2 wouldn't be locked until the scale man leave,
3 because that's the only entrance the truck have
4 to come in.
5     Q.   Who is that locked up, not the gates, but
6 the warehouses and such?
7     A.   Either Louis or Roland or myself.
8     Q.   Were they locked up before you left?
9     A.   Yes.
10     Q.   Now, you mentioned that there was some
11 rope that was lying on the dock that was loose
12 rope?
13     A.   Yes.
14     Q.   Do you know how long that rope was?
15     A.   No.
16     Q.   And the spool of rope, you mentioned you
17 left a spool on the dock; correct?
18     A.   Some on the spool, yeah.
19     Q.   Some on the spool.  And you don't recall
20 how much was on the spool, correct?
21     A.   No.
22     Q.   Do you know what became of that spool
23 after you left?
24     A.   No, I don't.
25     Q.   Do you know if it was there after the

- 151 -

1 after about two months, was the loaded Ingram
2 barge still at the facility?  I mean, the one
3 that was tied to the 4727.
4     A.   I don't think so.
5     Q.   So the source of your information that
6 the other six barges at the facility remained at
7 the dock is something you just learned after the
8 hurricane through the grapevine, as it were; is
9 that correct?
10     A.   It was all over the news.
11     Q.   Are you still employed by Lafarge as a
12 maintenance supervisor at the New Orleans
13 terminal?
14     A.   No.
15     Q.   Where do you work now?
16     A.   I'm still at Lafarge.
17     Q.   You're still at Lafarge?
18     A.   Yes.
19     Q.   What do you do for them now?
20     A.   Assistant manager.
21     Q.   So you've been promoted since the
22 hurricane?
23     A.   Yes.
24     Q.   Who is your general manager now?
25     A.   Well, Trae Charbonnet would be.

- 153 -

1 hurricane?
2     A.   No, I don't.
3     Q.   When did you get back working at the
4 New Orleans terminal for Lafarge?
5     A.   About two months later.
6     Q.   Two months later.  Now you gave a
7 statement in this case, did you not, LNA-111 and
8 112?
9     A.   Yes.
10     Q.   I want to just show that to you, and
11 verify for us that that is your statement and
12 your signature?
13     A.   (Witness reviewing document.)  Yes.
14     Q.   I only want to ask you about the last
15 sentence in your statement, sir.  It says "All of
16 the loaded barges remained in place, but sometime
17 during the storm, the Barge ING-4727 broke away
18 from the terminal."  How was it that you know all
19 of the loaded barges remained in place?
20     A.   I could have heard from -- well, I had
21 people that I knew that took pictures of the
22 whole system -- I mean, the whole city and let me
23 know about my house and everything else, and
24 that's where I could have got it from.
25     Q.   When you got back to the Lafarge terminal

- 152 -

1     Q.   And he replaced -- what was the
2 gentleman's name?
3     A.   Dennis Millon?
4     Q.   Yes.  Why did Dennis leave?
5     A.   I don't know.
6     Q.   Does Ed Busch still work there?
7     A.   No.
8     Q.   Did Ed come back after the hurricane?
9     A.   Yes.
10     Q.   Do you know why Ed left the employ of the
11 company?
12     A.   No.
13     Q.   You understood my questions?
14     A.   Yes.
15         MR. EMMETT:
16             Thank you very much.  I tender the
17         witness.
18         MR. HAYCRAFT:
19             We're not done.
20         E X A M I N A T I O N
21 BY MR. HAYCRAFT:
22     Q.   Mr. Smith, I'm Don Haycraft.  I represent
23 Ingram Barge Company.
24         You remember you mentioned calling --
25 that in the booth there are phone numbers?

- 154 -

**EARL SMITH**



1    A.  Yes.
2    Q.  When you call, when you call a barge
3 owner, are you letting them know that the barge
4 has been emptied and it's ready and available for
5 being picked up?
6    A.  Yes.
7    Q.  But you know the barge owner may or may
8 not have that barge picked up in any particular
9 time, don't you?
10   A.  Yes.
11   Q.  It may be there a day, two days, or even
12 more than two or three days, right?
13   A.  Yes.
14   Q.  And you are still keeping the barge at
15 your terminal even though the barge owner hasn't
16 come and picked up the barge, right?
17   A.  Yes.  They would continue to be tied.
18      MR. HAYCRAFT:
19         Thank you.
20      MR. FORBES:
21         Is that it?
22      MR. WIEDEMANN:
23         No.
24         E X A M I N A T I O N
25 BY MR. WIEDEMANN:

- 155 -

1    Q.  You mentioned somebody -- I believe you
2 called him scale man?
3    A.  Yes.
4    Q.  Is that Darryle Evans?
5    A.  Yes, that's the scale man.
6    Q.  And you call him scale man because he
7 operates that piece of equipment?
8    A.  Yes, scale man or truck loader.
9    Q.  Who typed the statement that you signed?
10   A.  I don't recall who did it.
11   Q.  Was it done at Ingram's facility?
12      MR. HAYCRAFT:
13         Objection.
14      MR. FORBES:
15         Objection.
16      THE WITNESS:
17         No.
18 BY MR. WIEDEMANN:
19   Q.  Huh?
20   A.  No.
21   Q.  Was it done by an attorney representing
22 you?
23   A.  Yes.
24   Q.  Who was that?
25   A.  (Indicating.)

- 156 -

1    Q.  Okay.  It was done by the attorney for
2 Lafarge?
3    A.  Yes.
4      MR. FORBES:
5         You said Ingram earlier.
6 BY MR. WIEDEMANN:
7    Q.  Before it was typed, did you provide some
8 copy, or did you speak to them about it?
9    A.  I spoke, yes.
10   Q.  Huh?
11   A.  Did you mean like, spoke to them about
12 it?
13   Q.  Well, did you give them information to
14 prepare it either in rough form, or was it
15 prepared and you just signed it?
16   A.  No, it wasn't.
17   Q.  Now, on this particular occasion, you --
18 well, let me go back.  In answer to Mr.
19 Haycraft's question, you said sometimes barges
20 are picked up a day, sometimes two days later
21 after you call; is that correct?
22   A.  Yes.
23   Q.  But on this particular occasion, there
24 was a hurricane expected to come in and you all
25 in effect were abandoning the facility, were you

- 157 -

1 not?
2      MR. FORBES:
3         Objection.  Object to the form of
4      the question.
5      THE WITNESS:
6         What you mean by "abandoning"?
7 BY MR. WIEDEMANN:
8    Q.  You were -- all of you are were leaving
9 the facility.
10   A.  Yes, after everything was secured, yes.
11   Q.  Right.  And when Mr. Busch called on the
12 morning of the 27th around 9:00 to Ingram to pick
13 up the barge, was that not in anticipation of the
14 hurricane?
15      MR. HAYCRAFT:
16         I object to the form of the
17      question.
18      MR. FORBES:
19         Objection.  Same objection.
20      THE WITNESS:
21         Can you re-ask that question,
22      please?
23 BY MR. WIEDEMANN:
24   Q.  Was it not a fact that when Mr. Busch
25 called on the morning of the 27th at 9:00 to

- 158 -

**EARL SMITH**

1   Ingram he was calling to pick up this empty barge
2   because there was a hurricane coming?
3         MR. HAYCRAFT:
4             Objection.
5         MR. FORBES:
6             Objection.
7         MR. HAYCRAFT:
8             You're asking for what's on somebody
9   else's mind.
10        THE WITNESS:
11            I don't know.
12  BY MR. WIEDEMANN:
13    Q.  Well, you know that in addition to
14  calling Lafarge -- Ingram, he also called Joe
15  Domino to come top around the barges because the
16  hurricane was coming?
17        MR. HAYCRAFT:
18            Objection, form.
19        MR. FORBES:
20            Objection, form.
21  BY MR. WIEDEMANN:
22    Q.  Isn't that so?
23    A.  Well, that's what I was told.
24    Q.  Thank you.  You got a promotion when you
25  came back after the hurricane?

- 159 -

1     A.  Yes.
2     Q.  And did you get a substantial raise?
3     A.  What's considered --
4     Q.  Huh?
5     A.  What's considered a substantial raise?
6     Q.  I guess if I was a Republican I'd
7   consider minimum wage to be substantial.  If I'm
8   a Democrat, I consider $15 to be reasonable.
9     A.  I got a raise --
10    Q.  I'm a Democrat.
11    A.  Yeah, I got a raise.
12    Q.  Okay.
13        (Whereupon, the deposition was concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

- 160 -

REPORTER'S PAGE

I, Peter Caruso, Certified Court Reporter, in and for
the State of Louisiana, the officer, as defined in Rule 28 of the
Federal Rules of Civil Procedure and/or Article 1434(b) of the
Louisiana Code of Civil Procedure, before whom this sworn
testimony was taken, do hereby state on the Record:

That due to the interaction in the spontaneous
discourse of this proceeding, dashes ( -) have been used to
indicate pauses, changes in thought, and/or talk-overs; that same
is the proper method for a Court Reporter's transcription of
proceeding, and that the dashes ( -) do not indicate that words
or phrases have been left out of this transcript;

That any words and/or names which could not be verified
through reference material have been denoted with the phrase
"(phonetic)."

Peter Caruso, CVR-CCR
            Certified Court Reporter

- 161 -

CERTIFICATE

This certification is valid only for a transcript
accompanied by my original signature and original blue stamp on
this page.

I, Peter Caruso, Certified Court Reporter, in and for
the State of Louisiana, as the officer before whom this testimony
was taken, do hereby certify that
Earl Smith, after having been first duly sworn by me upon
authority of R.S. 37:2554, did testify as hereinbefore set forth
in the foregoing 160 pages;

That this testimony was reported by me in the
Stenographic (voice-writing) method, was prepared and transcribed
by me or under my personal direction and supervision, and is a
true and correct transcript to the best of my ability and
understanding;

That I am not related to counsel or to the parties
herein; am not otherwise interested in the outcome of this
matter; and am a valid member in good standing of the Louisiana
State Board of Examiners of Certified Shorthand Reporters.

Peter Caruso, CCR-CVR
                Certified Court Reporter
Louisiana License #20088

- 162 -

**EARL SMITH**

MINIDEP by Kenson

WITNESS' CERTIFICATE

/

/

I, Earl Smith, do hereby

/

certify that I have read, or have had read to me,

/

the foregoing testimony, and it is true and

/

correct to the best of my ability and

/

understanding.

/

(Check one)

/

Without corrections.

/

With corrections and/or

/

additions attached hereto.

/

Earl Smith

- 164 -

- 163 -

Signature                    Date

CORRECTIONS/CHANGES TO THE DEPOSITION OF:

Earl Smith

Taken: Tuesday, November 14, 2006

Page/Line  Reading          Should Read

/

/

/

/

/

/

/

/