1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4   RE:  IN THE MATTER OF THE COMPLAINT  *   CIVIL ACTION
    OF INGRAM BARGE COMPANY, AS OWNER    *   No. 05-4419
5   OF THE ING4727, PETITIONING FOR      *
    EXONERATION FROM OR LIMITATION OF     *   Section C(2)
6   LIABILITY                            *
                                         *   June 4, 2007
7   * * * * * * * * * * * * * * * * * * * *

8

9              NONJURY TRIAL BEFORE THE
               HONORABLE HELEN G. BERRIGAN
10             UNITED STATES DISTRICT JUDGE

11                 TESTIMONY OF

12             DAVID SCOTT CASTAING

13

14  APPEARANCES:

15  For Group A Claimants         Wiedemann & Wiedemann, PLC
    (Ethel Mumford, et al)        (BY:  LAWRENCE WIEDEMANN, ESQ.)
16                                4240 Canal Street
                                  New Orleans, LA 70190-0648
17
                                  Law Office of Brian Gilbert, PLC
18                                (BY:  BRIAN ARTHUR GILBERT, ESQ.)
                                  821 Baronne Street
19                                New Orleans, LA 70113

20                                PATRICK J. SANDERS, ESQ
                                  3200 Ridgelake Drive
21                                Suite 100
                                  Metairie, LA 70002
22

23  For Ingram Barge Company      Liskow & Lewis
                                  (BY: SHERMAN GENE FENDLER, ESQ.
24                                    DON KELLER HAYCRAFT, ESQ.)
                                  701 Poydras Street
25                                Suite 5000
                                  New Orleans, LA 70139-5099

Case 2:05-cv-04182-SRD-JCW   Document 19347-10   Filed 11/02/09   Page 2 of 34
Case 2:05-cv-04182-SRD-JCW   Document 693-1   Filed 07/13/2007   Page 2 of 34

2

1  <u>APPEARANCES CONTINUED</u>:

2

3  For Joseph C. Domino, Inc.     Emmett, Cobb, Waits & Henning
       and Unique Towing, Inc.     (BY:  JOHN F. EMMETT, ESQ.)
4                                  1515 Canal Street
                                   Suite 1950
5                                  New Orleans, LA 70112

6                                  Abbott Simses & Kuchler
                                   (BY:  JILL S. WILLHOFT, ESQ.)
7                                  400 Lafayette Street
                                   Suite 200
8                                  New Orleans, LA 70130

9  OFFICIAL COURT RECORDER:       BONNIE HEBERT
                                   500 Poydras Street, B-406
10                                 New Orleans, Louisiana 70130
                                   (504) 589-7778
11

12  Proceedings recorded by electronic sound recording.

13  Transcription produced by transcription service.

14

15                        I N D E X

16                                                  <u>Page</u>

17
DAVID SCOTT CASTAING
18     Direct Examination by Mr. Emmett              3

19     Cross-Examination by Mr. Haycraft            19

20     Cross-Examination by Mr. Gilbert             20

21     Redirect Examination by Mr. Emmett           29

22     Recross-Examination by Mr. Gilbert           30

23     Direct Examination by Mr. Gilbert            31

24     Cross-Examination by Mr. Haycraft            33

25

Case 2:05-cv-04182-SRD-JCW   Document 19347-10   Filed 11/02/09   Page 3 of 34
Case 2:05-cv-04182-SRD-JCW   Document 18947-1   Filed 07/13/2009   Page 3 of 34

3

1                    <u>PROCEEDINGS</u>

2          **MR. EMMETT:**  Domino and Unique would call David Scott

3   Castaing.

4          (WHEREUPON, **DAVID SCOTT CASTAI**NG, having been duly

5   sworn, testified as follows.)

6          **THE DEPUTY CLERK:**  Please be seated.  State your name

7   for the record and spell it for us.

8          **THE WITNESS:**  David Scott Castaing, C-A-S-T-A-I-N-G.

9                  **DIRECT EXAMINATION**

10  BY MR. EMMETT:

11  Q    Good afternoon, Mr. Castaing.

12  A    Good afternoon.

13  Q    Can you tell us where you reside?

14  A    124 Rue Holiday, Slidell, Louisiana.

15  Q    And who did you work for?

16  A    Joseph C. Domino, Incorporated.

17  Q    What do you do for Joseph C. Domino, Incorporated?

18  A    Dispatcher.

19  Q    As a dispatcher, what is it that you do?

20  A    I take job requests from customers, dispatching to the

21  boats in our fleet.

22  Q    How long have you worked for Domino?

23  A    A little over 12 years.

24  Q    And how long have you been a dispatcher?

25  A    Twelve years.

Case 2:05-cv-04182-SRD-JCW   Document 1656-7   Filed 07/13/2009   Page 4 of 34

1  **Q**   What business is Joseph C. Domino in?  What do they do?

2  **A**   Marine towing.

3  **Q**   Do they own boats?

4  **A**   No.

5  **Q**   Do they operate boats?

6  **A**   No, just agent/broker.

7  **Q**   Agent or broker for --

8  **A**   No.  They are agent for -- for the boats that work in our

9  fleet.

10 **Q**   What is Unique Towing?

11 **A**   That's one of the companies that we found work for.

12 **Q**   How many boats does Unique have?

13 **A**   One.

14 **Q**   What's the name of the boat?

15 **A**   REGINA H.

16 **Q**   And who owns Unique Towing?

17 **A**   Charles Heck.

18 **Q**   Do you have other boats that work through Domino?

19 **A**   Yes.

20 **Q**   How many total did you have in August 2005?

21 **A**   I believe then it was five.

22 **Q**   Who was your boss back in August of 2005?

23 **A**   Gerald McNeill, the president.

24 **Q**   Had he been the president the whole time you were there?

25 **A**   Yes.

1   **Q**   Let me ask you some questions about the scope of your

2   authority with Domino.  Can you hire or fire personnel who work

3   for Domino?

4   **A**   No.

5   **Q**   Do you negotiate contracts for Domino?

6   **A**   No.

7   **Q**   Did you set the prices that Domino charts for the work

8   done by the vessels?

9   **A**   I don't -- I don't have the final authority on that, no.

10  **Q**   Who does?

11  **A**   At that time, it would have been Gerald McNeill.

12  **Q**   Do you pay the bills for Domino?

13  **A**   No, I don't.

14  **Q**   Do you have authority to sign checks?

15  **A**   No, I don't.

16  **Q**   How are you paid?

17  **A**   Salary.

18  **Q**   Do you receive a bonus based upon the profitability of the

19  company?

20  **A**   No.

21  **Q**   Do you have any ownership interest at all in Domino?

22  **A**   No.

23  **Q**   Do you -- tell me about your work schedule.  Do you work

24  full-time or do you work in shifts?  How does that work?

25  **A**   It's full-time.  We're on call.  We're in the office,

1   regular office hours, during the day; and in the evening, we

2   rotate on on-call basis.  Like, every other night, we're on

3   call.

4   **Q**    And who were the other dispatchers back in August of 2005

5   that you rotated with?

6   **A**    That would be Gerald and Patrick McNeill.

7   **Q**    Who is Patrick McNeill?

8   **A**    Gerald's son.

9   **Q**    Are you familiar with the REGINA H?

10  **A**    Yes.

11  **Q**    Can you describe that vessel for me?

12  **A**    The vessel is an 800-horsepower pushboat.

13  **Q**    What types of work does it do?

14  **A**    It pushes barges.

15  **Q**    In what geographic area does it push barges?

16  **A**    Lower Mississippi River, Gulf Coast, Intercoastal

17  Waterway.

18  **Q**    Do you do something else for Domino other than just

19  dispatch vessels?

20  **A**    I also am the vessel compliance officer.

21  **Q**    For what program are you the vessel compliance officer?

22  **A**    It's for the -- it's for the Domino policies and

23  procedures that comply with the AWORCP, responsible carrier

24  program.

25  **Q**    What's AWORCP?

Case 2:05-cv-04182-SRD-JCW   Document 696-7   Filed 07/13/2007   Page 7 of 34

1   **A**   It's the American Waterways Operators Responsible Carrier

2   Program.

3   **Q**   Does Domino belong to that program?

4   **A**   Yes.

5   **Q**   For how long has it been part of the program?

6   **A**   I want to say we were implemented into the responsible

7   carrier program in January of '04, if I'm not mistaken.

8   **Q**   In your role as the AWORCP compliance officer, do you

9   periodically inspect the vessels that work for Domino?

10   **A**   Yes, I do.

11   **Q**   How often do you do that?

12   **A**   It's on a quarterly basis.  Everything is quarter of the

13   year, I just go onboard and inspect the boats.

14   **Q**   What's the purpose of your inspections?

15   **A**   To be sure that the boats are in compliance with the

16   Domino -- Joseph C. Domino's policies and procedures as well as

17   the AWORCP program.

18   **Q**   Did you conduct quarterly inspections of the REGINA H

19   beginning in January 2004, when the responsible carrier program

20   was implemented, up through August 2005?

21   **A**   Yes.

22   **Q**   Did you ever find any deficiency with respect to that

23   vessel?

24   **A**   No.

25   **Q**   Do you recall when the last inspection was prior to the

1    hurricane, Hurricane Katrina?

2    A    It would have been July, the July before the storm.

3    Q    Sir, if you look next to you, you will see a booklet

4    that's marked Trial Exhibits Volume II.  It should be on the

5    side there.  I want to refer you to what's been introduced into

6    evidence as Exhibit 204.  Specifically, I'm interested -- if

7    you can flip over to page number -- what's marked DOM0102.

8    It's Section 1.46, "Rigging Requirements, Maintenance

9    Inspection."  Are you familiar with that, sir?

10   A    Uh-huh.

11   Q    Can you see it?

12   A    Yes.

13   Q    Do you know what this type of rigging is and what it's

14   used for?

15   A    Yes.

16   Q    In this policy and procedure of Joseph C. Domino, is there

17   a requirement that the REGINA H carry the rigging as listed on

18   this page?

19   A    Yes.

20   Q    Can you generally tell us what this rigging, which is

21   listed in Section 1.2, was used for by an inland towboat like

22   the REGINA H?

23   A    That's for putting their tow together for their barges in

24   tow.

25   Q    Now, as of your last inspection in July of 2005, can you

1    tell us whether or not there were at least three sets of

2    rigging of the type described in the manual aboard the vessel?

3    A    Yeah.  The REGINA H's rigging on board very much exceeded

4    the three sets that's required.

5    Q    You have a recollection of having seen that rigging aboard

6    the vessel?

7    A    Oh, absolutely.

8    Q    Now, does the vessel also carry soft lines?

9    A    Yes.

10   Q    And on your inspection on July 2005, did you observe any

11   soft lines aboard the vessel?

12   A    Yes.

13   Q    What are soft lines?

14   A    Soft lines?  What are soft lines?

15   Q    Yes.

16   A    Rope.  On board that particular vessel could be a

17   2-to-3-inch-diameter rope.

18   Q    How much of the 2-to3-inch-diameter rope did they have

19   aboard in July of 2005?

20        MR. GILBERT:  Your Honor, I'm going to object because

21   this has nothing to do with the voyage that it set out to do

22   when it was to sent to Lafarge on 8/27.

23        MR. EMMETT:  Well, Your Honor --

24        MR. GILBERT:  The law does not contemplate how it was

25   equipped in July but how it was equipped when it started its

Case 2:05-cv-04182-SRD-JCW   Document 19347-10   Filed 11/03/09   Page 10 of 34
Case 2:05-cv-04182-SRD-JCW   Document 698-1   Filed 07/13/2007   Page 10 of 34

10

1    voyage.

2              **THE COURT:**  But inference is going to be drawn.

3    Overruled.  Go ahead.  I understand that.  It goes to the

4    weight of the evidence, not the admissibility.  Go ahead.

5    **BY MR. EMMETT:**

6    **Q**    Go ahead, sir.  Do you remember the question?

7    **A**    Yeah.  How much -- how much rope was on board?

8    **Q**    Yes, sir.

9    **A**    At least, I would say, a minimum of a dozen.

10   **Q**    Now, this rigging that's listed here in the manual and

11   those soft lines, are those supplied to customers and left

12   aboard barges that Domino is no longer working with?

13   **A**    No.  Only -- only if the customer requests that we leave

14   extra -- extra lines, we will leave extra lines.

15   **Q**    How often does that happen?

16   **A**    It's very seldom.

17   **Q**    Once Domino has finished towing a vessel, what does it do

18   with this rigging?

19   **A**    With that rigging, the hard rigging?

20   **Q**    Yes, the hard rigging.

21   **A**    It's picked up off the barges and put back on the boat.

22   **Q**    What about any soft lines that the REGINA H uses in

23   working with a barge?  When they are finished with the barge,

24   what happens to the soft lines?

25   **A**    The soft lines belongs to the vessel.  It goes back onto

Case 2:05-cv-04182-SRD-JCW    Document 19347-1    Filed 07/13/09    Page 11 of 34
Case 2:05-cv-04419-HGB-JCW    Document 698    Filed 07/13/2009    Page 11 of 34

11

1    the vessel.

2    **Q**    Let me take you back, if I can, sir, to August 27, 2005,

3    which I will represent to you was the Saturday before the

4    hurricane.  All right?

5    **A**    Okay.

6    **Q**    Who was the dispatcher on duty that day?

7    **A**    That would be me.

8    **Q**    And where were you working out of that Saturday?

9    **A**    I was working out of my home.

10   **Q**    How do you get phone calls that are directed to Domino at

11   your house?

12   **A**    The office line, the Domino line, is forwarded to my cell

13   phone.

14   **Q**    Now, what time did you go on duty that Saturday?

15   **A**    I was on duty -- I went on duty -- would have been 4:00 at

16   the close of office hours Friday the day before.

17   **Q**    Now, that Saturday morning, were you aware of a

18   hurricane --

19   **A**    Yes.

20   **Q**    -- possibly coming to New Orleans?

21   **A**    Yes.

22   **Q**    Now, did you get a call from Lafarge North America that

23   morning for Domino to do a job?

24   **A**    Yes.

25   **Q**    And what time did you get the call, if you know?

1    **A**    It was 10:00 a.m.

2    **Q**    Who called you?

3    **A**    Mr. Busch.

4    **Q**    And who did he work for?

5    **A**    Lafarge.

6    **Q**    Had you done business with Lafarge before?

7    **A**    Yes.

8    **Q**    What did he ask Domino to do?  Mr. Busch.

9    **A**    He asked me to send a -- if I had a vessel available to go

10   to his dock and flip the two barges at his dock around and

11   re-secure -- re-secure the load to the dock where the empty

12   barge was on the outside of the load.

13   **Q**    Let me see if I understand.  He told you that there was an

14   empty barge against the dock --

15   **A**    Correct.

16   **Q**    -- and then there was a loaded barge outboard of that?

17   **A**    Correct.

18   **Q**    And he wanted those flipped around so that the loaded

19   barge was against the dock?

20   **A**    Correct.

21   **Q**    Did he ask you to do anything else other than turn the two

22   barges around and secure the loaded barge to the dock?

23   **A**    No.

24   **Q**    Did he ask that any additional lines be brought?

25   **A**    No.

1   **Q**   Did he ask that any rigging be left aboard?

2   **A**   No.

3   **Q**   Did he ask that anything be done with respect to the lines

4   between the two barges?

5   **A**   No.

6   **Q**   Has Domino done this job in the past?

7   **A**   Yes.

8   **Q**   Any problems in the past that you can recall?

9   **A**   No.

10  **Q**   And what did you say to Mr. Busch in response to his

11  request that you send a vessel to turn the barges around?

12  **A**   That I would have one to do the job.

13  **Q**   Did he ask you to call him back at the completion of the

14  job?

15  **A**   No.

16  **Q**   Is this an unusual or routine job that Domino might

17  perform for a customer?

18  **A**   For shifting at a -- the dock --

19  **Q**   Yes, sir.

20  **A**   -- it's routine.

21  **Q**   Now, did you call your supervisor, Mr. McNeill, and notify

22  him of this job?

23  **A**   No.

24  **Q**   Why not?

25  **A**   It's -- why not?  It's just why I was on call.  Basically.

1   I was dispatcher.  I dispatched the job.  There was no need to

2   call Mr. McNeill to let him know I was doing another job.

3   Q    And what about the owner of Unique, Mr. Heck?  Did you

4   call him to tell him that "We have this job coming in from

5   Lafarge"?

6   A    No.

7   Q    Why not?

8   A    Because we just don't call the boat owners every time we

9   have a job for the boat.

10  Q    Did you make any record of your discussion with

11  Mr. Busch --

12  A    No.

13  Q    -- that morning?

14  A    Well, just only on my worksheet.

15  Q    All right.  Let me direct you in that book that you have,

16  if I could, to what's been introduced into evidence as

17  Exhibit 203.  And if you will, sir, tell us what that is.

18  A    That's the -- that's the worksheet, dispatch sheet.

19  Q    Whose handwriting is this?

20  A    That's mine.

21  Q    What's the date of this sheet?  Look down at the bottom.

22  A    Okay.  August -- that would be August 27 through 28 of

23  2005.

24  Q    And what information is reflected on this sheet?

25  A    That's the job in -- the jobs I received and the orders I

Case 2:05-cv-04182-SRD-JCW   Document 19347-11   Filed 07/13/09   Page 15 of 34
Case 2:05-cv-04419-HCB-JCW   Document 698-1   Filed 07/13/2009   Page 15 of 34

15

1   get from the customers for that weekend.

2   Q    Now, if you would look approximately -- can you tell us

3   that that relates to the Lafarge job?

4   A    Yes, the Lafarge job.  I received at 10:00 a.m. by Ed

5   Busch and report to Lafarge for a swap-out.

6   Q    Is there any other record that you made, other than this

7   dispatcher's log, of your telephone call?

8   A    No.

9   Q    All right, sir.  What vessel did you dispatch to Lafarge

10  that day?

11  A    The REGINA H.

12  Q    About what time did you dispatch the vessel to report to

13  Lafarge?

14  A    I would have to -- I would have to refer at --

15  Q    Maybe if you could take a look at Exhibit 201, which are

16  the logs of the REGINA H for August 27, maybe that will clue

17  you in as to what time you might have dispatched them.  Do you

18  have that book in front of you?

19  A    Yes.

20  Q    Flip to 201.  And just to try to speed this along, it's --

21          THE COURT:  It's actually Exhibit 1 in the book.

22          MR. EMMETT:  I think it's tab 1, but it's marked --

23          THE COURT:  Yes, go back to tab 1.

24          THE WITNESS:  Tab 1?

25          THE COURT:  Yeah.  He's looking for 201.

Case 2:05-cv-04182-SRD-JCW   Document 19347-10   Filed 11/03/09   Page 16 of 34
Case 2:05-cv-04419-HGB-JCW   Document 698-7   Filed 07/13/2009   Page 16 of 34

16

1  **BY MR. EMMETT:**

2  **Q**   The third page of that exhibit appears to be the log that

3  deals with the Lafarge job, and it shows that they departed

4  base mile 94 at 1330 hours.  And the previous sheet indicates

5  that they finished the prior job for Kirby at about 1215 in the

6  afternoon.  Do you see that, sir?

7  **A**   Yes.

8  **Q**   Does that help you tell us when you might have dispatched

9  the REGINA H?

10 **A**   When he was released, looks like on the -- when he was

11 released from the Kirby job at 12:15, the captain would have

12 called me to tell me he was finished with that job; and at the

13 time I would have dispatched the next job, which at that time

14 was the Lafarge job.

15 **Q**   Okay.  How did you dispatch the vessel?  How did you call

16 them?

17 **A**   Oh, by a cell phone.

18 **Q**   Does the boat have a cell phone?

19 **A**   Yes.

20 **Q**   Who did you talk to aboard the vessel?

21 **A**   I talked to Captain Raymond Grabert.

22 **Q**   How long has Captain Grabert worked for Unique Towing, if

23 you know?

24 **A**   I'm not sure.

25 **Q**   Do you know him personally?

Case 2:05-cv-04182-SRD-JCW   Document 19347-10   Filed 11/03/09   Page 17 of 34
Case 2:05-cv-04419-HGB-JCW   Document 698-1   Filed 07/13/2009   Page 17 of 34

17

1   A    Yes.

2   Q    And how much experience does he have in operating a boat

3   like the REGINA H?

4   A    Captain Raymond?  In excess of 20, maybe over 25, years.

5   Q    What did you tell Captain Raymond about the job at

6   Lafarge?

7   A    I told him to report to Lafarge and there will be a load

8   and an empty at the dock, with the load on the outside of the

9   empty, and to swap them around -- flip them around and put the

10  load to the dock and secure the load to the dock.

11  Q    What did he tell you?

12  A    He said okay.

13  Q    Did you hear from him again that day?

14  A    When he finished.

15  Q    And how did they contact you?

16  A    Telephone.

17  Q    And looking at the logs, page 3, does it refresh your

18  memory as to when he may have called you?

19  A    At 1500 -- 1500, the barge is secured to part light-boat.

20  Q    Did he tell you anything about how many barges were at the

21  Lafarge facility that afternoon?

22  A    No.  He just called and said he was finished at Lafarge.

23  Q    Did he tell you anything about whether any Lafarge

24  personnel were present?

25  A    No.

Case 2:05-cv-04182-SRD-JCW   Document 19347-1   Filed 07/13/09   Page 18 of 34
Case 2:05-cv-04419-HCD-JCW   Document 698   Filed 07/13/2009   Page 18 of 34

18

1  **Q**    Did he tell you anything about the mooring lines that were

2  available at Lafarge to secure the loaded barge to the dock?

3  **A**    No.

4  **Q**    Did he tell you anything about the mooring lines that were

5  in use to secure the two barges together?

6  **A**    No.  Just that he was finished.

7  **Q**    Now, later in the day, did the boat go do another job?

8  **A**    I believe the boat did one -- one more job after that one.

9  **Q**    And then when did the boat go after the next job?

10  **A**    He went to the Harvey canal.

11  **Q**    Why did they go into the Harvey Canal?

12  **A**    To tie the boat up for the storm.

13  **Q**    Were you in contact with them during this whole period of

14  time about the impending storm and them seeking safe refuge?

15  **A**    Oh, he -- after they did the Waterman job, he told me he

16  was going into the Harvey Canal and shutting the boat down.

17  **Q**    And based on your role as the compliance officer, is that

18  a proper and responsible thing to do under the manual?

19  **A**    Yes.  Seek safe harbor.

20  **Q**    When is the next time you heard anything about this job at

21  Lafarge after Captain Grabert called you at 1500 on the 27th of

22  August?

23  **A**    The next time I heard about the job?

24  **Q**    Yes, sir.  Anything about this job.

25  **A**    I was informed about the levee maybe a week, two weeks,

Case 2:05-cv-04182-SRD-JCW   Document 19347-10   Filed 11/03/09   Page 19 of 34
Case 2:05-cv-04419-HGB-JCW   Document 698-1   Filed 07/13/2009   Page 19 of 34

19

1    after the storm.

2           **MR. EMMETT:**  I have no further questions.  Tender the

3    witness.

4           **THE COURT:**  Anything from Ingram?

5           **MR. HAYCRAFT:**  Yes, Your Honor.  I'll take it.

6                          **CROSS-EXAMINATION**

7    **BY MR. HAYCRAFT:**

8    **Q**    Do you have the two black binders, two thin ones?

9    **A**    Yes.

10   **Q**    Exhibit 202 is tab No. 2 in the Unique/Domino exhibit

11   book.  Do you see that, sir?

12   **A**    Is that Volume II?

13   **Q**    Yes, Volume II.

14           **THE COURT:**  Volume II, tab 2.

15           **THE WITNESS:**  Tab 2.

16   **BY MR. HAYCRAFT:**

17   **Q**    And turning to tab 2, Exhibit 202, Domino invoiced Lafarge

18   for the barges on Saturday, August 27?

19   **A**    Yes, sir.

20   **Q**    Just look at Exhibit No. 5 --

21           **THE COURT:**  Volume I now.

22   **BY MR. HAYCRAFT:**

23   **Q**    -- in Volume I at your table.  That's the same document?

24   **A**    It appears to be.

25           **MR. HAYCRAFT:**  That's all I have.  Thank you.

1            **THE COURT:**  All right.  Group A?

2                      **CROSS-EXAMINATION**

3 BY MR. GILBERT:

4 **Q**    Mr. Castaing, how long have you been the dispatcher at

5 Domino?

6 **A**    Twelve years.

7 **Q**    Twelve years.  And is that the position that you started

8 on when you hired on at Domino?

9 **A**    I'm sorry?

10 **Q**    Did you hire on at Domino as the dispatcher or were you

11 promoted to that job?

12 **A**    I was hired on as dispatcher.

13 **Q**    Okay.  Do you have any right to make any decisions as to

14 what jobs Domino takes and brokers out to its vessels when a

15 customer calls in asking for service?

16 **A**    When I'm on call.

17 **Q**    Say again?

18 **A**    When I'm on call, yes.

19 **Q**    So you decide whether or not this is a job that we're

20 going to take?

21 **A**    Yes.

22 **Q**    Okay.  What instructions do you give the vessel crew when

23 you broker out a job to a vessel?

24 **A**     I give the orders that I receive from my customer to the

25 captain.

Case 2:05-cv-04182-SRD-JCW   Document 19347-1   Filed 07/13/09   Page 21 of 34
Case 2:05-cv-04419-HGB-JCW   Document 698   Filed 07/13/2009   Page 21 of 34

21

| | |
|---|---|
| 1 | **Q**   Okay.  Do you give them any additional instruction? |
| 2 | **A**   No. |
| 3 | **Q**   Okay.  Now, I understand you are the compliance officer |
| 4 | with respect to the Domino manual, and I'm wondering if you |
| 5 | have a copy of it up there that you can easily get to as |
| 6 | opposed to me having you flip through that giant back that I've |
| 7 | got. |
| 8 | If you look at tab 4 in Exhibit book 2 -- you have |
| 9 | got a copy of it -- I just wanted to go over a few things with |
| 10 | you in the manual.  Let's look at Section 2.1, which is going |
| 11 | to be -- and if you find it first, let me know, and you can |
| 12 | tell me what page I'm looking for. |
| 13 | **A**   And what are you asking for? |
| 14 | **Q**   I'm sorry.  It's going to be Section -- I believe -- |
| 15 | **MR. EMMETT:**  2.01, DOM0016. |
| 16 | **BY MR. GILBERT:** |
| 17 | **Q**   It's going to be in the front.  I think it's just three |
| 18 | pages in of the Domino manual. |
| 19 | **THE COURT:**  The title is "Introduction"? |
| 20 | **MR. GILBERT:**  "Introduction Chartered-in Company |
| 21 | Personnel." |
| 22 | **BY MR. GILBERT:** |
| 23 | **Q**   Well, let me just -- as the compliance officer, you are |
| 24 | familiar with what's in the manual; correct? |
| 25 | **A**   Not word for word, but I'm pretty familiar with it. |

1  **Q**     You understand what duties you may have under this manual;
2  correct?

3  **A**     Absolutely.

4  **Q**     And you understand what duties this manual might impose
5  upon chartered-in crew; correct?

6  **A**     Correct.

7  **Q**     And those duties include crews to be trained in all
8  elements of the manual; correct?

9  **A**     Correct.

10 **Q**     And as compliance officer, it's up to you to see that the
11 vessel owner actually does that with its crew; correct?

12 **A**     Correct.

13 **Q**     The manual requires the vessel owner to communicate with
14 Domino concerning all aspects of the vessel; correct?

15 **A**     Correct.

16 **Q**     And that would be the REGINA H in this instance; correct?

17 **A**     Right.

18 **Q**     And as compliance officer, it would be your responsibility
19 to see to it that the owner does communicate with Domino
20 concerning all aspects of the vessel; correct?

21 **A**     Correct.

22 **Q**     The manual should be kept on board the power vessel;
23 correct?

24 **A**     Right.

25 **Q**     So that the crew has access to it, so they can refer to

1    it; correct?

2    A    Correct.

3    Q    Is it fair to say that this manual governs the operations

4    aboard the chartered-in vessels?

5    A    Well, it's supposed to.

6    Q    Okay.  And this is a manual promulgated by Domino;

7    correct?

8    A    Right.

9    Q    With respect to the REGINA H, do you know of any sort of

10    additional requirements that Mr. Heck might have placed on his

11    crew?  Or rather, not -- strike that.  Not that he might have

12    but that he did place on his crew.

13    A    No.

14    Q    Okay.  So he relied, to the best of your knowledge, on the

15    Domino manual; correct?

16    A    I'm not -- I'm not sure how he operated his business.

17    Q    But as compliance officer, you would need to, to some

18    extent, know how he operated his business; correct?

19    A    No, no.  I just need to know that the vessel was complying

20    with the Domino policies and procedures.

21    Q    Fair enough.  Where did you see Unique Towing have its

22    business?  What is its place of business?

23    A    Well, he operated through our office.

24    Q    You have the same --

25    A    Joseph C. Domino building.

24

1    **Q**    You had the same address, didn't you?

2    **A**    Correct.

3    **Q**    And you shared the same building; correct?

4    **A**    He is -- his office was on the bottom floor, first floor.

5    **Q**    It's DOMINO's policy, is it not, that it does not supply

6    rigging or soft line, mooring line, to a customer unless

7    requested to do so; correct?

8    **A**    Only if the customer would ask for additional lines, we

9    would leave them.

10   **Q**    Okay.  And did the REGINA H comply with that policy on

11   August 27th when it was dispatched through Lafarge?

12   **A**    With what policy?

13   **Q**    That it is the policy not to leave rigging or soft rope

14   behind for the customer unless the customer simply asked for

15   it.

16   **A**    Right.  The captain's not going to give up his rig and

17   owner's vessel unless asked to do so.

18   **Q**    Have you ever done any work on any of the boats when they

19   are out doing operations?

20   **A**    Doing jobs?

21   **Q**    Yeah.

22   **A**    No.

23   **Q**    Have you ever been present on the boats?

24   **A**    Not since I've been dispatching, except for doing my

25   inspections, quarterly inspections.

1   **Q**    But you don't go out on operations; you don't go out on

2   runs.  Correct?

3   **A**    No.

4   **Q**    Okay.  Is it -- based on your training and experience, is

5   it of any significance to you to hear that there is a loaded

6   barge tied to an empty barge when you receive the call?  Was

7   that of any -- did that cause any concern in your mind?

8   **A**    No.

9   **Q**    And you testified that you did receive the call from

10  Mr. Busch and you knew at the time that it was Mr. Busch.

11  **A**    Yes.

12  **Q**    And you had spoken to him in the past?

13  **A**    Yes.

14  **Q**    Did you ask Mr. Busch, by any chance, whether it was

15  intended that these barges remain at the Lafarge facility

16  through the storm?

17  **A**    No.

18  **Q**    So you didn't know?

19  **A**    No.  I don't know Lafarge's operations.

20  **Q**    If you had asked, do you think you would have found out?

21          **MR. EMMETT:**  Objection, Your Honor:  Speculation.

22          **THE COURT:**  Sustained.

23  **BY MR. GILBERT:**

24  **Q**    Could you have asked?

25  **A**    I'm sorry?

1  **Q**    Could you have asked?

2  **A**    I guess I could have if I wanted to.  I don't understand

3  the question.

4         **MR. EMMETT:**  I objected because he could have asked

5  anything.

6         **THE COURT:**  Well, I know.  So let him answer the

7  question "yes" instead of objecting.  Go ahead.

8  **BY MR. GILBERT:**

9  **Q**    Could you have asked Mr. Busch whether the intention was

10 for the barges to remain at the Lafarge facility through the

11 storm?

12 **A**    I guess I could have.  I could have asked him what he was

13 having for dinner as well.

14 **Q**    Did you know the storm was coming?

15 **A**    Yes.

16 **Q**    Okay.  Did you ever have an impression one way or the

17 other whether the job that the REGINA H performed at Lafarge

18 would have any effect on the way the barges rode out the storm

19 if, in fact, they were to remain there?  Any impression in your

20 mind?

21 **A**    I knew Ed Busch's reasoning why he wanted the barges

22 swapped around.

23 **Q**    What was his reason that you knew?

24 **A**    To have the loaded barge tied to the dock, not hanging on

25 the outside of an empty barge.

1  **Q**    Is one safer than the other?

2  **A**    Oh, absolutely.

3  **Q**    Did Domino provide any information to the REGINA H about

4  the weather on this date, or was it assumed or understood that

5  the REGINA H crew already knew there was a storm coming?

6  **A**    Yes, I believe everyone knew a storm was coming.

7  **Q**    The Domino manual contains a section on the page that is

8  Bates-numbered 00141.  It's page 141 and it's towards the end

9  of the manual, and it's going to be -- it's going to come under

10  Section 7.080 "Hurricane Preparedness," and it looks like it's

11  actually the second page of that 7.080 section.

12  **A**    I'm pretty much familiar with that.  It's pretty cut and

13  dry.

14  **Q**    All right.  The way I understand it -- why don't you tell

15  me what it is here on this -- that's represented on page 141.

16  What are these list of -- what are these lists of items on

17  here?

18  **A**    Which items?

19  **Q**    Well, let's say 11.1.6, New Orleans, Louisiana; and

20  St. Mark's, Florida.  Those are places considered by Domino to

21  be safe harbor during a hurricane; correct?

22  **A**    That's correct.  Well, no, only what the marks -- you have

23  the marks next to them.

24  **Q**    So if there is a mark, it's considered to -- you rank the

25  level of safety; correct?

Case 2:05-cv-04182-SRD-JCW   Document 698-1   Filed 07/13/09   Page 28 of 34

1   A    Yes.  Correct.

2   Q    Do you see that the Industrial Canal -- the Inner Harbor

3   Navigational Canal is not on this list?

4   A    That's right, it's not on this list.

5   Q    Did you know that on August 27, 2005?

6   A    Yes.

7   Q    Okay.  You testified, I believe, that you had been called

8   by Lafarge before to come out and top around or return a load

9   or an empty, but have you ever been called before to do it with

10  a hurricane about two days out?

11  A    I don't recall being asked to do it two days before a

12  hurricane.  I don't think I've been working at Domino with a

13  Category 5 bearing down on New Orleans during my time there.

14  Q    Domino's chartered-in vessels are required to implement

15  this Domino policy book; correct?

16  A    Correct.

17  Q    And it is applicable to the REGINA H as well; correct?

18  A    Correct.

19  Q    And it's applicable to its owner, Unique Towing and/or

20  Richard Heck, whoever you consider its owner?

21  A    Everyone has a copy.

22  Q    And it's applicable to these people as well; correct?

23  A    What people?

24  Q    Richard Heck, I'm sorry.

25  A    Yeah.

1  **Q**    And Unique.

2  **A**    Yeah.

3  **Q**    And they have to follow in order to continue receiving

4  work for Domino; correct?

5  **A**    Yeah, basically.  It would be a part of the responsible

6  carrier program.

7  **Q**    Is it fair to say that Domino's function with respect to

8  the REGINA H is to assign its jobs and govern its operations?

9  **A**    Not to govern its operations, no.

10  **Q**    No?

11  **A**    Just to assign its job.

12  **Q**    Is the manual not all-inclusive of what Domino would have

13  REGINA H do and not do as a safe towboat?

14  **A**    Yes.  That's -- for that, but not to govern its daily

15  business, no.  It's just for the Domino --

16  **Q**    Not its financial operations, but --

17  **A**    Sure.

18  **Q**    -- but it -- it governs its maritime operations; correct?

19  **A**    I'm kind of confused by "governs its maritime operations."

20  Is's just a guideline for them to follow for Domino's policies

21  and procedures.

22          **MR. GILBERT:**  Okay.  That's all I have.

23                    **REDIRECT EXAMINATION**

24  BY MR. EMMETT:

25  **Q**    Mr. Castaing, if Domino has one of the boats leave a line

 1  out at the request of a customer, who pays for the line?

 2  **A**    The customer.  We would bill it on behalf of the owner.

 3  **Q**    Now, you told us that you didn't routinely go on these

 4  vessels for jobs, but do you have experience doing jobs with an

 5  inland towboat or on an inland towboat?

 6  **A**    Yes, I do.

 7  **Q**    What experience do you have with working on inland

 8  towboats?

 9  **A**    Licensed -- licensed captain.

10  **Q**    How many years did you work on an inland towboat?

11  **A**    Since 1978.

12  **Q**    Until you began with Domino?

13  **A**    I'm sorry?

14  **Q**    Until you started as a dispatcher?

15  **A**    Correct.

16          **MR. EMMETT:**  Thank you.  Nothing further.

17          **MR. GILBERT:**  One more, Your Honor?

18          **THE COURT:**  All right.

19                          **RECROSS-EXAMINATION**

20  BY MR. GILBERT:

21  **Q**    Mr. Castaing, it's true, isn't it, that other than on

22  August 27 of 2005, in your experience, Joe Domino has never

23  moved an Ingram barge at the request of anybody but Ingram?

24          **MR. HAYCRAFT:**  Objection:  Beyond the scope.

25          **THE COURT:**  That is sustained.  Never mind.  All

1    right.  You may step down.

2                    May he be excused?  Okay.  Please don't talk to

3    anybody about your testimony until the case is completed later

4    this week.  You can talk to your lawyers but nobody else.

5                THE COURT:  How are we doing in terms of progress?

6                MR. EMMETT:  Your Honor, in the interest of not

7    having them recall him under subpoena, I don't mind if they --

8                MR. GILBERT:  One question under direct.

9                THE COURT:  All right.  Hop back up.  Good point.

10   Make it easier.

11                        **DIRECT EXAMINATION**

12   **BY MR. GILBERT:**

13   **Q**    My question, Mr. Castaing, is whether it's true in your

14   experience as a dispatcher at Domino that no one but Ingram --

15   other than on the 27th, no one other than Ingram has ever

16   called for Domino to move an Ingram boat, that this is the

17   first time someone other than Ingram has called to ask Domino

18   to move an Ingram boat?

19   **A**    No.  Well, we called into fleets that we may shift various

20   barge-line barges in different fleets.

21   **Q**    But, in your experience, only Ingram has given you the

22   authority to move an Ingram barge in and out of the canal;

23   right?  Other than this one instance.

24   **A**    Well, I'm still confused.  It's...

25   **Q**    Let me --

1      **MR. GILBERT:**  Your Honor, may I approach?

2      **THE COURT:**  Sure.

3      **MR. GILBERT:**  May I refresh his memory with

4  deposition testimony?

5      **THE COURT:**  Sure.  Sure.  Why don't you give him a

6  page.

7  **BY MR. GILBERT:**

8  **Q**    I'm going to refer you to page 63, and it's going to start

9  at line 21, and read down to Line 24.

10      **THE COURT:**  Read to yourself and see if that

11  refreshes your memory.

12  **BY MR. GILBERT:**

13  **Q**    Page 63, line 24.

14  **A**    Here in my deposition, it says no.

15  **Q**    And you understand the question in your deposition, which

16  is read:  "In your experience, has Joe Domino ever moved an

17  Ingram barge at the request of anybody other than Ingram?"  And

18  your answer was?

19  **A**    "No."

20  **Q**    Is it still no?

21  **A**    Right.

22      **MR. GILBERT:**  Thank you.  That's all.

23      **MR. HAYCRAFT:**  Your Honor, given that question, then

24  I have to follow up on Mr. Gilbert and continuing down the

25  page.

Case 2:05-cv-04182-SRD-JCW   Document 19347-19   Filed 11/09/09   Page 33 of 34
Case 2:05-cv-04419-HGB-JCW   Document 698-7   Filed 07/13/2009   Page 33 of 34

33

                         **CROSS-EXAMINATION**

 1   BY MR. HAYCRAFT:

 2   **Q**    If you would read further down the page, page 63.

 3   **A**    If I can find it.

 4   **Q**    I'll show you my copy.

 5           **MR. HAYCRAFT:**  May I stand next to the witness?

 6           **THE COURT:**  Sure.

 7   BY MR. HAYCRAFT:

 8   **Q**    Question:  "In your experience, has Joe Domino ever moved

 9   an Ingram barge at the request of anybody other than Ingram?"

10   And your answer was:  "No," which was just something read.

11           Continue down to my question and to follow up on

12   Mr. Fisher's question:  "What did you understand the question

13   to mean in terms of moving the Ingram barge?"  And what was

14   your answer on line 12?

15   **A**    "Just to towing it somewhere as it -- from point A to

16   point B."

17   **Q**    And then my follow-up question was:  "You mean from point

18   A to point B?"  And what was your answer?

19   **A**    "From point A to point B."

20   **Q**    And as -- in other words, the question Mr. Gilbert just

21   asked was:  You've only moved a barge from point A to point B

22   when Ingram gives Domino the authority to do that; correct?

23   **A**    Correct.  That's what I was saying when he was talking

24   with the other man is, in fleets, we may be asked to move

 1 | various barge-line barges, shift, but --
 2 | **Q**    For example, at the Lafarge dock, shifting whatever
 3 | company's barges around at the dock, that's something that
 4 | Domino has asked a boat to do?
 5 | **A**    Correct.
 6 |          **MR. HAYCRAFT:**  Thank you.
 7 |                    *  *  *  *  *
 8 |                    **CERTIFICATE**
 9 |
10 |
11 |      I certify that the foregoing is a correct transcript to
12 | the best of my ability and understanding from the electronic
13 | sound recording of the proceeding in the above-entitled and
14 | numbered matter.
15 |
16 |
17 |
18 |
19 | /S/Johnna B. Barron                    July 13, 2007
   | JOHNNA B. BARRON                       DATE
20 |
21 |
22 |
23 |
24 |
25 |