1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4   RE:  IN THE MATTER OF THE COMPLAINT  *   CIVIL ACTION
    OF INGRAM BARGE COMPANY, AS OWNER   *   No. 05-4419
5   OF THE ING4727, PETITIONING FOR     *
    EXONERATION FROM OR LIMITATION OF    *   Section C(2)
6   LIABILITY                            *
                                         *   June 5, 2007
7   * * * * * * * * * * * * * * * * * * *

8

9             NONJURY TRIAL BEFORE THE
             HONORABLE HELEN G. BERRIGAN
10           UNITED STATES DISTRICT JUDGE

11                TESTIMONY OF

12            RAYMOND JOSEPH GRABERT

13

    APPEARANCES:
14

15  For Group A Claimants        Wiedemann & Wiedemann, PLC
    (Ethel Mumford, et al)        (BY:  LAWRENCE WIEDEMANN, ESQ.)
16                                4240 Canal Street
                                  New Orleans, LA 70190-0648
17
                                  Law Office of Brian Gilbert, PLC
18                                (BY:  BRIAN ARTHUR GILBERT, ESQ.)
                                  821 Baronne Street
19                                New Orleans, LA 70113

20                                PATRICK J. SANDERS, ESQ
                                  3200 Ridgelake Drive
21                                Suite 100
                                  Metairie, LA 70002
22

23  For Ingram Barge Company     Liskow & Lewis
                                  (BY: SHERMAN GENE FENDLER, ESQ.
24                                    DON KELLER HAYCRAFT, ESQ.)
                                  701 Poydras Street
25                                Suite 5000
                                  New Orleans, LA 70139-5099

Case 2:05-cv-04182-SRD-JCW   Document 19347-11   Filed 11/08/09   Page 2 of 41
Case 2:05-cv-04182-SRD-JCW   Document 18947-11   Filed 07/13/2009   Page 2 of 41

2

1   APPEARANCES CONTINUED:

2

3   For Joseph C. Domino, Inc.        Emmett, Cobb, Waits & Henning
        and Unique Towing, Inc.       (BY:  JOHN F. EMMETT, ESQ.)
                                      1515 Canal Street
4                                     Suite 1950
                                      New Orleans, LA 70112
5
                                      Abbott Simses & Kuchler
6                                     (BY:  JILL S. WILLHOFT, ESQ.)
                                      400 Lafayette Street
7                                     Suite 200
                                      New Orleans, LA 70130
8

9   OFFICIAL COURT RECORDER:          BONNIE HEBERT
                                      500 Poydras Street, B-406
10                                    New Orleans, Louisiana 70130
                                      (504) 589-7778
11

12   Proceedings recorded by electronic sound recording.

13   Transcription produced by transcription service.

14

15

16                          I N D E X

17

18                                                  Page
     RAYMOND GRABERT
19        Direct Examination by Mr. Emmett            3

20        Cross-Examination by Mr. Fendler           16

21        Cross-Examination by Mr. Weidemann         17

22        Redirect Examination by Mr. Emmett         40

23

24

25

Case 2:05-cv-04182-SRD-JCW   Document 19347-11   Filed 07/13/2009   Page 3 of 41

```
 1                         PROCEEDINGS
 2          MR. EMMETT:  Domino and Unique will call Raymond
 3   Grabert.
 4          (WHEREUPON, RAYMOND GRABERT, having been duly sworn,
 5   testified as follows.)
 6          THE DEPUTY CLERK:  Please be seated, state your full
 7   name for the record and spell it for us.
 8          THE WITNESS:  My name is Raymond Joseph Grabert,
 9   Junior.  R-A-Y-M-O-N-D, G-R-A-B-E-R-T.  Junior.
10                      DIRECT EXAMINATION
11   BY MR. EMMETT:
12   Q    Mr. Grabert, can you tell us what you do for a living?
13   A    I'm a captain on the river, a tugboat captain.  Pushboat.
14   Q    Who do you work for?
15   A    Boulet Towing.
16   Q    How long have you been with Boulet Towing?
17   A    Since February of this year.
18   Q    And prior to that, who did you work for?
19   A    Unique Towing.
20   Q    What did you do for Unique Towing?
21   A    Tugboat captain, pushboat captain.
22   Q    What boat did you work for?
23   A    REGINA H.
24   Q    How long have you been a captain aboard the REGINA H?
25   A    The past five years.
```

1   Q   Are you still aboard the vessel?

2   A   Yes, sir.

3   Q   What type of vessel is the REGINA H?

4   A   It's a 800-horsepower pushboat, push barges.

5   Q   What kind of work does the boat do?

6   A   Fleet and barges.  Push barges in the waterways.

7   Q   Who owned the vessel back in August of 2005?

8   A   Charles Heck.

9   Q   Charles Heck is a corporation or an individual who owns

10  the boat?

11  A   It's an individual.  I think.  Charles Heck.

12  Q   All right.  You worked for Unique Towing.

13  A   Right.

14  Q   That was on your paycheck?

15  A   He was the owner.

16  Q   Of Unique Towing?

17  A   Yeah, Unique.

18  Q   Does Unique own any barges?

19  A   No, sir.

20  Q   Operate any wharf facilities of any kind?

21  A   No, sir.

22  Q   Why are you no longer with Unique Towing?

23  A   Because they sold the company in February of this year.

24  Q   What Coast Guard licenses do you have, sir?

25  A   Operator limits, 50-ton vessel license.

1   **Q**   How long have you had that license?

2   **A**   Since '84.

3   **Q**   Any actions ever taken against your license by the United

4   States Coast Guard?

5   **A**   No, sir.

6   **Q**   Did Unique work through a company, a broker?

7   **A**   Yes, sir.

8   **Q**   And who was that?

9   **A**   Domino, Joseph C. Domino.

10   **Q**   How did the boat get its work assignments?

11   **A**   They called me on a cell phone.  Well, the customer called

12   them, I guess, and I -- we got a cell phone call from them,

13   Domino.

14   **Q**   Let's talk about August of 2005.  When did you first learn

15   that a hurricane might be coming to the New Orleans area?

16   **A**   I seen it on TV, I guess, a couple of days before that,

17   before the accident or wherever the shift was done at -- I

18   can't remember the name of it.  The company.

19   **Q**   Of Lafarge?

20   **A**   Lafarge assignment.

21   **Q**   So you knew about the hurricane before you went to

22   Lafarge?

23   **A**   Yes, sir.

24   **Q**   You keep logs on your vessel?

25   **A**   Yes, sir.

1  **Q**    If you will look on your table there, I think you will see

2  a Trial Exhibits Volume II.  And if you will look at tab No. 1,

3  which is Exhibit 201, can you identity those as the logs of

4  your vessel for August 27?

5  **A**    What page is that?

6  **Q**    Do you see that?  Let me show it to you.

7  **A**    Thank you.

8  **Q**    Do you know what those are?

9  **A**    Yes, sir.

10  **Q**    What are they?

11  **A**    Those are logs for the REGINA H.

12  **Q**    Who were the crew members aboard the vessel that day?

13  **A**    Myself.  The pilot was Gary Dufrene.  My two deckhands

14  were Mark Templet and Eric Thigpen.

15  **Q**    All right, sir.  Is that the ordinary number of crew

16  carried aboard the vessel?

17  **A**    Yes, sir.

18  **Q**    Were there any problems with the vessel, its gear, or

19  equipment that day on August 27?

20  **A**    No, sir.

21  **Q**    Did you carry rigging aboard the vessel?

22  **A**    Yes, sir.

23  **Q**    What type of rigging did you carry?

24  **A**    Ropes, barge wires to make up tows, rachets, slings

25  shackles.  You know, a lot of rigging.

1    **Q**    All right, sir.  If you will turn in your book there --

2    well, let me ask you another question first.  What are soft

3    lines?

4    **A**    It's a 2 1/2-inch to 3-inch line.  It can be anywhere from

5    50 to 100 feet long.

6    **Q**    Did you have any of those on your boat on August 27?

7    **A**    Yes, sir.

8    **Q**    How many, approximately?

9    **A**    20, maybe.

10    **Q**    Now, in working aboard the vessel, is there some sort of

11    policy or procedure that you had?

12    **A**    Yeah.  We had a policy and procedure manual to go by for

13    Domino.

14    **Q**    If you would turn to tab 4 in that book, sir.

15    **A**    I got it.

16    **Q**    Can you identify those as the policies and procedure?

17    **A**    Yes, sir.

18    **Q**    Did you have a copy of that aboard the vessel?

19    **A**    Yes, sir.

20    **Q**    On August 27?

21    **A**    Yes, sir.

22    **Q**    How did you get that manual?

23    **A**    It was give -- it was gave to us by -- Domino's office

24    gave it to us.

25    **Q**    When you got the manual, did you read it?

Case 2:05-cv-04182-SRD-JCW   Document 19347-11   Filed 11/02/09   Page 8 of 41
Case 2:05-cv-04182-SRD-JCW   Document 8934-7   Filed 07/13/2009   Page 8 of 41

8

1   A    Yes, sir.

2   Q    On August 27, were you familiar with the manual?

3   A    Yes, sir.

4   Q    Let's take a look of some sections of the manual, if we

5   can.  If you will turn to page DOM102.  If you look on the

6   bottom of the 1st page, you will see a DOM00014.  You've got to

7   go back about 100 pages.

8            THE COURT:  What was the number again?

9            MR. EMMETT:  DOM102.

10  BY MR. EMMETT:

11  Q    You got that, Captain?

12  A    I'm having a trouble finding them.  All right.  Yes, sir.

13  Thank you, sir.

14  Q    Are you familiar with this section of the manual?

15  A    Yes, sir.

16  Q    And it lists the rigging that you are required to carry

17  aboard the vessel, does it not?

18  A    Yes, sir.

19  Q    These items of rigging -- face wires, 35-foot wires,

20  65-foot wires, 36-inch steamboat ratchet, and 1-inch doughnut

21  wires, what are those used for?

22  A    Face wires are used to connect the barge to the -- the

23  boat to the barges.  The 35-foot to 65-foot wires are used to

24  connect the barges together to make couplings in between them

25  to push them.

1          Also, those -- the ratchets and the doughnut wires
2   are used for rigging the barges together.
3   Q    Are those used to moor barges to a dock?
4   A    No, sir.
5   Q    What about mooring one barge to another barge that's
6   already at a dock?
7   A    Well, if the stationary rigging would count, you know, as
8   that, we use -- sometime use that to connect barges together.
9   Q    All right, sir.  Are these items ever supplied to the
10  customer?
11  A    Not unless asked.
12  Q    In your experience, how frequently were you asked to
13  supply rigging to a customer?
14  A    Not very often.  It was unlikely, you know, to be asked.
15  You know, it's kind of rare.  Really rare.
16  Q    Now, this section of the manual requires that you have at
17  least three sets of rigging aboard the vessel of the type
18  listed here on this page.  How many sets of rigging did you
19  carry aboard of this type on August 27?
20  A    At least ten, maybe more.
21  Q    All right.
22  A    So three sets.
23  Q    Was the rigging in good condition?
24  A    Yes, sir.
25  Q    Now, the soft lines that you told us about, where were

Case 2:05-cv-04182-SRD-JCW   Document 19347-11   Filed 11/03/09   Page 10 of 41
Case 2:05-cv-04419-HGB-JCW   Document 699-1   Filed 07/13/2009   Page 10 of 41

10

1    they stored aboard the vessel?

2    A    We have a rigging rack on the first deck behind the

3    vessel.  We carry them there.  And we also carry them in the

4    front hull of the vessel.

5    Q    The soft lines aboard the vessel, were they in good

6    condition? bad condition?

7    A    Good condition.

8    Q    All right, sir.  Let's talk about the job at Lafarge if we

9    can.  And if you will -- in your book, you may want to refer to

10   your logs.  There's tab 1 in that book, the first five pages.

11              THE COURT:  As I said yesterday, remember we are not

12   going to get into negligence issues.

13              MR. EMMETT:  Yes, Your Honor.

14              THE COURT:  Just privity.

15   BY MR. EMMETT:

16   Q    And, Captain, I just want you to briefly describe for us

17   the job at Lafarge.  How did you get this work assignment?

18   A    Scott Castaing, the dispatcher for Domino, told them to

19   call me on his cell phone.

20   Q    And what instruction did he give you about Lafarge?

21   A    Told me to go to Lafarge.  They had a loaded barge and an

22   empty barge on the dock.  He wanted me to turn the two barges

23   around and put the loaded barge back on the dock.

24   Q    Had you done that type of job before?

25   A    Many-a-times.

 1  **Q**    At Lafarge?
 2  **A**    Some -- some at Lafarge, yes, sir.
 3  **Q**    Anything unusual about this job he was asking you to do?
 4  **A**    No, sir.
 5  **Q**    Now, did he ask you to bring any additional lines?
 6  **A**    No, sir.
 7  **Q**    Did he ask you to do anything with respect to the lines
 8  between the two barges?
 9  **A**    No, sir.
10  **Q**    All right.  According to your log, you left to begin this
11  job at 1330 hours on August 27.  Is that right, sir?
12  **A**    Yes, sir.
13  **Q**    Now, who was on duty --
14  **A**    I was on duty --
15  **Q**    -- to get this job at Lafarge?
16  **A**    Sir?
17  **Q**    Who was on duty when you did this job at Lafarge?
18  **A**    On the vessel?
19  **Q**    Yes.
20  **A**    Myself, and Eric Thigpen was the deckhand.
21  **Q**    What about the pilot, Dufrene; and the other deckhand,
22  Templet?
23  **A**    No.  They were sleeping, both of them.
24  **Q**    All right.  And according to the log, you went through the
25  Industrial Canal lock and you got to Lafarge at 1425; is that

Case 2:05-cv-04182-SRD-JCW   Document 18947-11   Filed 07/13/2009   Page 12 of 41

1    right?

2    **A**    (No response).

3    **Q**    Is that right, sir?

4    **A**    Yes, sir.

5    **Q**    All right.  When you got to Lafarge, was anybody there?

6    **A**    No, sir.

7    **Q**    How did you go about effecting the turnaround of the two

8    barges?

9    **A**    Well, when I got there, I put a line on my vessel.  From

10   the center of my boat, which is called a head bitt, you put a

11   line on the barges and the middle of a barge.

12            **THE COURT:**  Let me stop you for a second.  I don't

13   think we need to do this part.

14            **MR. EMMETT:**  Okay.  All right.

15            **THE COURT:**  Keep moving forward.

16            **MR. EMMETT:**  Very good, Judge.

17   BY MR. EMMETT:

18   **Q**    Did you add any lines between the two barges?

19   **A**    No, sir.

20   **Q**    Why not?

21   **A**    Because they was tied good enough.

22   **Q**    Who made the decision not to add any lines between the two

23   barges?

24            **THE COURT:**  We are not getting into --

25            **MR. EMMETT:**  It may go to privity and knowledge, Your

 1  Honor.
 2          THE COURT:  Okay.
 3  BY MR. EMMETT:
 4  Q    Who made the decision not to add any lines between the two
 5  barges?
 6  A    I did.
 7  Q    Did you call anybody about the job --
 8  A    No, sir.
 9  Q    -- other than Mr. Castaing?
10  A    No, sir.
11  Q    Did you speak to Mr. Heck, the owner of Unique?
12  A    No, sir.
13  Q    Why not?
14  A    Because we don't have to.  I mean, we did our job, then we
15  call Domino back and tell them we finished the job.
16  Q    All right.  What about -- who is Gerald McNeill?
17  A    He's the owner of Joseph C. Domino.
18  Q    Did you talk to him that day about the job?
19  A    No, sir.
20  Q    Now, when the job got finished, did you call somebody?
21  A    Called Scott Castaing.
22  Q    And what did you tell Scott Castaing?
23  A    I told him we all finished with the job.
24  Q    Did you tell him anything about the lines that were used
25  to secure the loaded barge to the dock?

Case 2:05-cv-04182-SRD-JCW   Document 19347-11   Filed 11/03/09   Page 14 of 41
Case 2:05-cv-04182-SRD-JCW   Document 695-1   Filed 07/13/2009   Page 14 of 41

14

1   **A**   No, sir.

2   **Q**   Did you tell him anything about the lines between the two

3   barges?

4   **A**   No, sir.

5   **Q**   Did you tell him anything about nobody being at Lafarge?

6   **A**   No.

7   **Q**   Let's talk about your authority with the company.  Are you

8   the head captain or were you the head captain of the REGINA H

9   in August 2005?

10  **A**   At the time I'm on a vessel, I am.  But the head captain

11  is Michael Luke, Richard Luke.

12  **Q**   Was Mr. Luke aboard the vessel when you did the job at

13  Lafarge?

14  **A**   No, sir.

15  **Q**   Did you speak to him at all about this job at Lafarge?

16  **A**   No, sir.

17  **Q**   Is there any reason why you didn't call him?

18  **A**   No, sir.  We don't never do that.

19  **Q**   Okay.  You hire people to work aboard the vessel?

20  **A**   No, sir.

21  **Q**   Do you negotiate contracts on behalf of Unique Towing?

22  **A**   No, sir.

23  **Q**   Do you set the prices that are charged?

24  **A**   No, sir.

25  **Q**   Do you pay any of the bills that Unique has?

1   **A**   No, sir.

2   **Q**   Do you sign any checks for Unique?

3   **A**   No, sir.

4   **Q**   How do you get paid, sir?

5   **A**   By check.

6   **Q**   Are you paid by the month? the day? the week? salary?  How

7   are you paid?

8   **A**   By the day.

9   **Q**   Do you get paid when you don't work?

10   **A**   No, sir.

11   **Q**   Do you receive a bonus if the company does well?

12   **A**   No, sir.

13   **Q**   And what shift do you work, sir?

14   **A**   We work 12-hour shifts in a day.  You know, it depends on

15   how we work.

16   **Q**   How much days are you on?  How many days are you off?

17   **A**   14 and 7.  We work a schedule.

18   **Q**   All right, sir.  Let's go back to the manual, if we can,

19   for a minute.  That's tab 4.  The page I want you to go to is

20   DOM140.  Are you familiar with this section of the manual,

21   Captain?

22   **A**   Yes, sir.

23   **Q**   Were you familiar with it back on August 27?

24   **A**   Yes.

25   **Q**   Now, this deals with hurricane preparedness.

Case 2:05-cv-04182-SRD-JCW   Document 19347-11   Filed 07/13/2009   Page 16 of 41
Case 2:05-cv-04182-SRD-JCW   Document 699-1   Filed 07/13/2009   Page 16 of 41

16

1    **A**    Yes.

2    **Q**    Is that right?  Now, Item 2 says, "Add additional rigging

3    if necessary."  And the question to you, Captain, is:  As the

4    captain of the vessel who works with this manual, does that

5    item 2 require you to add rigging to barges that you are

6    leaving at a dock?

7    **A**    No, sir.

8    **Q**    What does it require you to do?

9    **A**    It requires me to add barges to that I have in custody at

10   the time of the storm.

11   **Q**    Did you have the ING4727 in your custody at the time of

12   the storm?

13   **A**    No, sir.

14           **MR. EMMETT:**  Captain, thank you very much.

15               Tender the witness, Your Honor.

16           **THE COURT:**  Anything from Ingram?

17           **MR. FENDLER:**  May I just ask you -- I just have two

18   questions, Your Honor.

19           **THE COURT:**  Yes.

20                        **CROSS-EXAMINATION**

21   **BY MR. FENDLER:**

22   **Q**    Captain Grabert, I'm Gene Fendler and I represent Ingram.

23   Just two questions.  On that day when you were at Lafarge North

24   America, were you taking any instructions from Ingram Barge

25   Company?

1   **A**     No, sir.

2   **Q**     And after you completed your task or during the process of

3   shipping the barges, did you report to Ingram Barge Company?

4   **A**     No, sir.

5           **MR. FENDLER:**  Thank you.  No further questions, Your

6   Honor.

7           **THE COURT:**  Anything from Group A?

8           **MR. WEIDEMANN:**  Yes.

9                          **CROSS-EXAMINATION**

10  BY MR. WEIDEMANN:

11  **Q**     Mr. Grabert, in working with Unique back in 2005,

12  particularly in August, you were dispatched on a day-by-day

13  basis by Joseph Domino; is that correct?

14  **A**     Yes, sir.

15  **Q**     And they would assign you to what jobs you would go to?

16  **A**     Yes, sir.

17  **Q**     And even if you got a call in, say from a customer, it

18  would have to go through Domino, would it not?

19  **A**     Yes.

20  **Q**     You wouldn't deal directly with a customer if a customer

21  calls you because maybe you did a job for him before.  You

22  would refer it to Domino, and Domino would make the assignment.

23  **A**     Right.  I would have to call the office first.

24  **Q**     Because Domino got a commission out of it.

25  **A**     Right.

Case 2:05-cv-04182-SRD-JCW   Document 19347-11   Filed 07/13/2009   Page 18 of 41
Case 2:05-cv-04182-SRD-JCW   Document 699-11   Filed 07/13/2009   Page 18 of 41

18

1    **Q**    And Domino provided you-all with fuel at a fuel dock?

2    **A**    It depend.

3    **Q**    And when they do, they deduct that from what you-all get

4    after deducting their commission from your work; is that

5    correct?

6    **A**    I really don't know about that, sir.

7    **Q**    Okay.  All right.  But, in any event, on a day-by-day

8    basis, you get assignments from Joe Domino, and that's --

9    that's the only source of your work; is that correct?

10   **A**    Yes, sir.

11   **Q**    You don't get any assignments on a day-by-day basis from

12   Mr. Heck, the owner.

13   **A**    No, sir.

14   **Q**    Do you have the ability to call Mr. Heck from the vessel

15   if you have a problem?

16   **A**    Yes, sir.

17   **Q**    You have his cell phone or his number?

18   **A**    I have his cell phone number.

19   **Q**    And do you call him day by day while you are on the job

20   when you have problems or difficulties or --

21   **A**    If I have a problem, I'll phone him.

22   **Q**    All right.  You would call him or would you call Joe

23   Domino, or -- or maybe either?

24   **A**    Well, either one.  Depends, you know --

25   **Q**    All right.

1   **A**   -- on the situation.

2   **Q**   So sometimes if you had a problem, you would call Domino;

3   sometimes you would call Heck.

4   **A**   Yes, sir.

5   **Q**   And you could get advice from either one, similar advice.

6   **A**   Yeah.

7   **Q**   You say you were aware of the Domino manual.  It's

8   Exhibit 345.

9       **THE COURT:**  Can I let him -- can he use the one in

10  Volume II?  Because it's more accessible.

11       **MR. WEIDEMANN:**  Yes, he can use it.

12       **THE COURT:**  Okay.  It's Exhibit 4 in that book.  He's

13  got it.

14       **MR. WEIDEMANN:**  He has a copy of it.

15       **THE COURT:**  You may need it.

16  **BY MR. WEIDEMANN:**

17   **Q**   Captain Grabert, I'm talking about -- well, first let me

18  ask you:  Are you aware that in working for Joseph Domino --

19  and that's the only one you-all work for, isn't it --

20   **A**   Yes, sir.

21   **Q**   -- insofar as going out on jobs?

22   **A**   Yes, sir.

23   **Q**   You were exclusively dispatched by Domino and nobody else.

24   **A**   Nobody but Domino.

25   **Q**   And did you know that the Domino manual, that is, their

1   policy and procedures manual, you were required to follow it or

2   they could cancel your -- the contract that you had.  Is that

3   correct?

4   A    Well, I read it and I would proceed by it.

5   Q    And not only did they require that you follow it, but they

6   also had inspections made of your vessel and their other

7   vessels on a regular basis; is that right?

8   A    That's correct.

9   Q    How often would they inspect your vessel?

10  A    I think every three months they would come out.

11  Q    And who would make the inspection?

12  A    Scott Castaing.

13  Q    And the -- in the manual, on page 16, which I think is the

14  second or third page -- you see it there?  "Introduction"?

15  A    This paper here?

16  Q    Yeah.

17       THE COURT:  Toward the bottom of the page.  It's

18  DOM00016.

19  BY MR. WEIDEMANN:

20  Q    It says DOM0016.

21  A    Oh, I've got to get back...

22       THE COURT:  It's near the front.

23  BY MR. WEIDEMANN:

24  Q    It's the second or third page in the manual.

25  A    Okay.  16?  0016?

1  Q    Yes.

2  A    Yes.

3  Q    In the first paragraph, 2.1, it says, "The owner.

4  Responsibility for compliance with all Joseph C. Domino, Inc.,

5  policies and procedures.  Responsible for all training outlined

6  in the elements of the procedures.  Responsible for ensuring

7  all crew members follow Joseph C. Domino, Inc., policies and

8  procedures.  Maintaining communication with Joseph C. Domino on

9  all aspects of their respective vessels."  Are you aware of

10 that?

11 A    Yes, sir.

12 Q    And, of course, the owner is not on the vessel, Mr. Heck;

13 is that right?

14 A    No.

15 Q    So that obligation falls upon you as the captain, when you

16 are on duty, to keep Joseph C. Domino advised of any problems

17 that you have that arise during the day.

18 A    Yes.

19 Q    And you would call Domino concerning those and sometimes

20 you would call Mr. Heck.

21 A    Yes.

22 Q    Okay.  And then Domino would give you advice as to what to

23 do to solve a particular problem?

24 A    Right.

25 Q    Now, also in the Joseph Domino policy and procedures

 1    manual -- let me get it.  140, which is in the back.  It's
 2    0014, down at the bottom, DOM0014.
 3              **THE COURT:**  140 or 14?
 4              **MR. WEIDEMANN:**  14, I'm sorry.  Yeah, 140.
 5    BY MR. WEIDEMANN:
 6    **Q**    You have that?
 7    **A**    Yes, sir.
 8    **Q**    And the next page is 141.
 9    **A**    Yes, sir.
10    **Q**    It's entitled, "Hurricane Response Procedures."  You see
11    that?
12    **A**    Yes, sir.
13    **Q**    And it's down in the -- on page 140 in bold, it says,
14    "Never leave safe harbor before notifying Joseph C. Domino,
15    Inc."
16    **A**    Yes, sir.
17    **Q**    You see that?
18    **A**    Yes, sir.
19    **Q**    And then on the next page, 141, it describes the safe
20    harbors for hurricanes, and the Industrial Canal is not one of
21    the safe harbors listed on Joe Domino's safe harbor description
22    in the procedures manual; is that correct?
23    **A**    Right.
24    **Q**    Hum?
25    **A**    Yes.

1    **Q**    Oh.  So you knew at the time that -- since you reviewed

2    this manual that this particular area was not considered by

3    Joseph Domino, who you-all were required to follow, this was

4    not considered to be a safe harbor?  In a hurricane.

5    **A**    Not in an hurricane, no.

6    **Q**    And you-all knew -- you knew that a hurricane was coming

7    and was imminent?

8    **A**    Yes.

9    **Q**    Did you talk to the dispatcher?  When he dispatched you,

10   was he aware that there was a hurricane coming?

11   **A**    We never spoke about it, but I'm pretty sure he did know.

12   I mean, it's speculation, but...

13   **Q**    In any event, when you went to the Lafarge facility on the

14   27th, the two barges, the two Ingram barges that you were going

15   to turn around, were, to your knowledge, in a body of water

16   that was not a safer harbor according to your procedure manual

17   from Joe Domino.

18   **A**    Right.

19   **Q**    When you got to Lafarge, was there anybody there?

20   **A**    Nobody.

21   **Q**    And let me ask you -- this is Exhibit 346, Captain

22   Grabert, and I think it's in your book.  It may be easier.  I'm

23   sorry.

24   **A**    Yes, I have it.

25          **THE COURT:**  It's Exhibit 1.  You got it?

1    **THE WITNESS:**  I have it.

2    BY MR. WEIDEMANN:

3    Q    It's -- you got it?  December 12.

4    A    Yes, sir, I got it.

5    Q    Okay.  And this shows what -- this is your log; is that

6    correct?

7    A    Yes, sir.

8    Q    Is this in your handwriting?

9    A    Yes, sir.

10   Q    Okay.  And it starts that you were at the base at 1330,

11   which would be 2:30 -- excuse me.  That would be -- yeah, 2:30

12   in the afternoon.

13   A    1:30, sir.

14   Q    1:30.  I'm sorry.  You're right.  Excuse my addition.

15   1:30 you departed the base at Mile 94.  And you had -- you made

16   a note because apparently Mr. Castaing had told you what barges

17   you were going to turn around.

18   A    Yes, sir.

19   Q    And you put down 4727 and 4745.  So when you left the

20   base, he told you what barges you were going out to turn

21   around.

22   A    Yes, sir.

23   Q    And then at 1400 you arrived at the Industrial Canal Lock

24   light boat; is that correct?

25   A    Yes, sir.

Case 2:05-cv-04182-SRD-JCW   Document 19347-11   Filed 11/03/09   Page 25 of 41
Case 2:05-cv-04419-HGB-JCW   Document 699-1   Filed 07/13/2007   Page 25 of 41

25

1   **Q**     "At L boat"?

2   **A**     Yes, sir, light boat.

3   **Q**     And then you entered the locks at 1405 to 1415, and

4   apparently, you cleared eastbound at 1415.

5   **A**     Yes, sir.

6   **Q**     So it took you 10 minutes to get through the locks.

7   **A**     Yes, sir.

8   **Q**     And then coming -- after that, you arrived at the Lafarge

9   facility at 1425.  Is that right?

10  **A**     Yes, sir.

11  **Q**     And then at 1500 you were westbound.  So you were there

12  from 1425 to 1500.

13  **A**     Yes, sir.

14  **Q**     45 minutes.

15  **A**     Yes, sir.

16  **Q**     And then you were westbound back towards the locks.

17  **A**     Yes, sir.

18  **Q**     And you cleared the locks at 1700.  Is that --

19  **A**     Yes, sir.

20  **Q**     Is that right?

21  **A**     1700, yes, sir.

22  **Q**     And then you arrived back at your base at 1715, which was

23  at Mile 94.  What is that?

24  **A**     That's Waterman's fleet.

25  **Q**     And where is the Zito fleet with regard to the Waterman

1    fleet?

2    **A**    I'm not sure, but maybe 2 miles up the river.

3    **Q**    All right.  So if it took you 15 minutes to get from the

4    locks to Waterman, it would take approximately the same time --

5    a little more if you --

6    **A**    Yeah, a little more.

7    **Q**    -- pushing a barge --

8    **A**    Yes, sir, it would.

9    **Q**    -- to get from the locks to the Zito fleet.

10   **A**    Yes, sir.

11   **Q**    And then on the next log, which is the next page, again on

12   the 27th, after you went and made the turnaround, you went and

13   did another job; is that right?

14   **A**    Yes, sir.

15   **Q**    You were shifting eight barges, I believe.  Is that right?

16   **A**    Yes, sir.  We were shifting and building tow.

17   **Q**    So, on the 27th, you continued to work doing the barge

18   work until 2,000 on that -- on that day.

19   **A**    At 2000, yes, sir.

20   **Q**    At 2000.  I said 2,000.

21   **A**    Yes, sir.

22   **Q**    I'm not -- you've got to understand, I'm not a mariner.

23   **A**    Right.

24   **Q**    Now, let me ask you:  Also -- if we can put up --

25          **MR. WEIDEMANN:**  You got the logs for the locks?

1      MR. GILBERT:  367.

2  BY MR. WEIDEMANN:

3  Q    I don't believe this is in the books, but this is -- are

4  you familiar with -- this is the Inner Harbor Navigational

5  Canal lock log.  Have you seen that before?

6  A    No.

7  Q    Are you familiar with it?

8  A    No, sir.

9  Q    Or do you know that they record vessels going in and out

10  of the locks?

11  A    I've never seen it before.

12  Q    Okay.  The locks show vessels going in and out of the

13  locks on the 27th and also on the 28th.

14  A    Yes, sir.

15  Q    You see on the 28th there are a number of -- let's see, a

16  vessels in -- with tow --

17  A    Right.

18  Q    -- going through the locks on the 28th.

19  A    Yes, sir.

20  Q    And there are over 40 that are going through the locks on

21  the 27th.  On the 27th, you can see -- on the 27th, starting at

22  the top, you will see tugs and tows going through the locks on

23  the 27th, and the times are given on the right.  It appears to

24  be a very short time they get through the locks on the 27th for

25  40 tugboats with tows.  Would you dispute that?

1        **MR. EMMETT:**  I object to that question, Your Honor.

2   There's no foundation that this witness can testify as to

3   what's written on this document.  He's never seen it before.

4   It's just now being used as a foil by counsel to ask him to

5   agree with what counsel believes.

6        **THE COURT:**  Yes.  I also think we're getting into the

7   issue of negligence again, and that's not what we're here for.

8        **MR. WEIDEMANN:**  Well, the question --

9        **THE COURT:**  I mean, you're talking about how easy it

10  would have been to take the barge --

11       **MR. WEIDEMANN:**  Right.

12       **THE COURT:**  -- out of the Industrial Canal, and

13  that's the negligence issue.

14       **MR. WEIDEMANN:**  That's correct.

15       **THE COURT:**  That's not what we're here for.  So it's

16  sustained.

17  BY MR. WEIDEMANN:

18  Q   In any event, Captain, it took you a very short time to

19  get through the locks on the occasion of the 27th after you did

20  the turnaround; is that correct?

21       **MR. EMMETT:**  Objection, Your Honor:  Asked and

22  answered.

23       **MR. FENDLER:**  Same objection.

24  BY MR. WEIDEMANN:

25  Q   Is that correct, sir?

1           **THE COURT:**  Answer it again.

2           **THE WITNESS:**  Ma'am?

3           **THE COURT:**  Did it take you a short time to get

4    through the locks?

5           **THE WITNESS:**  Yes, it did.

6           **THE COURT:**  Okay.  Move on, then.

7    **BY MR. WEIDEMANN:**

8    **Q**    If Mr. Castaing or someone else had asked you to take out

9    the empty barge, the empty Ingram barge, would you have done

10   it?

11   **A**    Yes, sir.

12   **Q**    And you could have taken it easily through the Zito fleet

13   going through the locks just like these other boats did on the

14   27th and the 28th; is that right?

15   **A**    Yes, sir, depending on the lock situation.

16   **Q**    But there would be no problem:  If you would have been

17   asked, you would have taken it out?

18   **A**    No, sir, no problem.

19   **Q**    If Joe Domino had asked you, you would have taken it out.

20   If Mr. --

21          **THE COURT:**  Asked and answered.

22          **MR. WEIDEMANN:**  Okay.

23   **BY MR. WEIDEMANN:**

24   **Q**    If Mr. Heck --

25          **THE COURT:**  Asked and answered, Mr. Weidemann.  And

Case 2:05-cv-04182-SRD-JCW   Document 19347-11   Filed 07/13/09   Page 30 of 41
Case 2:05-cv-04182-SRD-JCW   Document 695-7-11   Filed 07/13/2009   Page 30 of 41

30

 1   it's also on the issue of negligence.

 2           MR. WEIDEMANN:  All right.  Thank you.

 3   BY MR. WEIDEMANN:

 4   Q    Now, when you got to the facility, you saw that there was

 5   an empty barge moored to a full barge.

 6   A    Yes, sir.

 7   Q    And the empty was on the inside when you got there.

 8   A    Yes, sir.

 9   Q    And there was no one there when you arrived, that is,

10   nobody at the Lafarge facility.

11   A    No, sir.

12   Q    There's when you arrived there at 1425 on the 27th.

13   A    Right.  No one there.

14   Q    Okay.  And at that point in time, you and your deckhand,

15   Mr. Thigpen, were the ones working.  The other two members of

16   the crew were sleeping.

17   A    Right.

18   Q    But you observed and there was no question in your mind

19   when you got there that there was an empty tied to a loaded

20   barge and there was a differential, I believe, from 6 to 8 feet

21   between the two barges.

22   A    Right.

23   Q    Did that not present a question in your mind about the

24   mooring of these barges vis-à-vis the approaching hurricane?

25           MR. EMMETT:  Objection, Your Honor.  Goes to the

1    issue of negligence, not privity and knowledge.

2            **THE COURT:**  Sustained.

3    **BY MR. WEIDEMANN:**

4    **Q**    You had knowledge of the differential in the two vessels.

5    **A**    Yes, sir.

6    **Q**    And when you got there, did you observe that the lines

7    between the empty and the full were single lines?

8            **MR. EMMETT:**  Same objection, Your Honor.

9            **THE COURT:**  Mr. Weidemann, we're not here on the

10   negligence issue.

11           **MR. WEIDEMANN:**  Yeah, I understand.

12           **THE COURT:**  We're here on privity.  Privity.

13           **MR. GILBERT:**  Your Honor, if I could just -- he

14   testified that he thought that the moorings were adequate.  He

15   opened the door --

16           **THE COURT:**  I know, and there was no objection.  And

17   I hear an objection now, and so I'm -- I'm not trying to

18   interfere too much in this case other than to try to move it

19   along.

20           **MR. WEIDEMANN:**  But it's a question of knowledge

21   and -- acquired knowledge or knowledge that you should have,

22   and I'm trying to connect.

23           **THE COURT:**  Mr. Weidemann, do it quickly and let's

24   get off.

25

BY MR. WEIDEMANN:

**Q**    Did you see that there were only single lines between the empty and the full?

**A**    Yes.

**Q**    Did you make any report of this as a problem to Domino or to Mr. Heck to seek advice?

**A**    No, sir.

**Q**    Now, you said you had extra lines, that is, soft lines, on the -- on the REGINA H; is that right?

**A**    Yes, sir.

**Q**    But you sent Mr. Thigpen looking for lines; is that right?

**A**    Yes, sir.

**Q**    Why?

**A**    To put more lines between the two barges.

**Q**    Well, if you had lines, why did you send him to look for lines on the dock and elsewhere?

        **MR. EMMETT:**  Objection, Your Honor.  Goes to negligence.

        **THE COURT:**  I'm going to let him do it because I think it's just going to slow us down if we don't.

             But just keep moving fast, Mr. Weidemann.

**A**    Please say the question again, sir.

BY MR. WEIDEMANN:

**Q**    Why did you send Thigpen looking for lines on the dock and on the -- in the area if you had lines available on the

1   REGINA H?

2   A    The ones that are on my vessel belongs to the vessel.  It

3   doesn't belong to the dock.  And if we had to put them out, we

4   got to be charged -- they got to be charged for the extra line.

5   And I wasn't told to put them out.

6   Q    In any event, Mr. Thigpen went on the other barges that

7   were next to the two you were turning around and he found one

8   rope; is that right?

9   A    Yes, sir.

10  Q    Was there any other ropes that he found?

11  A    He never said anything.

12  Q    And where did he put that rope?

13  A    I think he put it on the loaded barge to the dock, but I'm

14  not sure.

15  Q    Okay.  And am I correct that you knew from what

16  Mr. Castaing told you that, when you were dispatched -- or he

17  knew that the two barges were an empty and a full?

18  A    Right.

19  Q    Is that right?

20  A    Yes, sir.

21  Q    He told you that when he told you to go turn around the

22  two barges at Lafarge?

23  A    Yes, sir.

24  Q    So he had knowledge of that?

25  A    Yes, sir.

1      **MR. EMMETT:**  Objection, Your Honor.  These questions
2   are so repetitive.  I object.  He's already answered.
3      **THE COURT:**  I know, but let's -- and, Mr. Weidemann,
4   let's move it forward.  Try not to repeat your question.
5      **MR. WEIDEMANN:**  Okay, Your Honor.  I'll try not to
6   repeat.
7   **BY MR. WEIDEMANN:**
8   **Q**   Did Domino instruct you to bring any additional rigging?
9   **A**   No, sir.
10  **Q**   Were you aware that Governor Blanco, on the 25th, had
11  issued a State of Emergency declaration in the state of
12  Louisiana?
13  **A**   On the 25th?
14  **Q**   Yes.
15  **A**   No, sir.
16  **Q**   The 26th, I'm sorry.  Were you aware of that?  Were you
17  aware of a declaration made by the Governor concerning a state
18  of emergency?
19  **A**   No, sir.
20  **Q**   In the extra rigging that you had, the soft rigging, you
21  could have used except you would have had to bill the customer
22  for it.
23  **A**   Right.
24  **Q**   So it was a question of cost.
25  **A**   Right.

1    **Q**    Did you instruct Mr. Thigpen, Eric Thigpen, to do anything

2    in particular, or did he know what he had to do?

3    **A**    No.  He pretty well knew what he had to do.

4    **Q**    And it is your testimony without being -- that your

5    vessel, that is, the REGINA H, was equipped with soft lines on

6    this day.

7    **A**    Yes, sir.

8    **Q**    You had brought barges in and out of Lafarge's facility

9    previously; is that correct?

10   **A**    Yes, sir.

11   **Q**    And that would have been at the instruction of Joseph

12   Domino?

13   **A**    Right.  Correct.

14   **Q**    And when you would take barges in and out of the Lafarge

15   facility, that is, Ingram barges, would you take them to the

16   Zito fleet or, if you were bringing them in, take them from the

17   Zito fleet?

18   **A**    It depends on where they want me to bring them.

19   **Q**    But the Zito fleet was the fleet used by Ingram, was it

20   not, at that time?

21           **MR. EMMETT:**  Objection:  Lack of foundation, Your

22   Honor.  And relevance.

23           **THE COURT:**  Do you know?

24           **THE WITNESS:**  I really don't.

25           **THE COURT:**  All right.  Mr. Weidemann, let's wrap

1   this up.

2        MR. WEIDEMANN:  Okay.

3   BY MR. WEIDEMANN:

4   Q    And you were -- your employment, that is, your pay, came

5   from Mr. Heck; is that correct?

6   A    Come through Unique Towing.

7   Q    Yeah.  Well, I'm --

8   A    Right.

9   Q    You would get a check from Unique, but Mr. Heck owned

10  Unique.

11  A    Right.

12  Q    Okay.  And you were -- well, you already answered that.

13  I'm sorry.

14        On the REGINA H, you could only communicate by cell

15  phone; is that correct?  You had no fax or e-mail capabilities?

16  A    No, sir.  Just cell phone.

17  Q    And your cell phone you would use to call Joe Domino or

18  call Mr. Heck, if necessary?

19  A    Right.

20  Q    Did you call either one on the day of the 27th regarding

21  what was going on at Lafarge other -- you mentioned that you

22  spoke to Mr. Castaing.  He dispatched you.  Did you call him

23  when you were leaving?

24  A    Yes.  I called him when I was finished the job.

25  Q    Did he ask anything or did you tell him anything?

1  **A**    No, sir.

2          **MR. EMMETT:**  Your Honor --

3          **THE COURT:**  Asked and answered, Mr. Weidemann.  I'll

4  give you, like, 30 more seconds.  You need to finish.

5          **MR. WEIDEMANN:**  I will talk to my co-counsel and I'll

6  give you...

7          **THE COURT:**  Hi-ho it.

8  **BY MR. WEIDEMANN:**

9  **Q**    What Coast Guard broadcast, if any, did you receive aboard

10  the REGINA H on the 27th as you were working that day?

11  **A**    We wasn't standing by on 16 at the time.

12  **Q**    So you were not listening to the Coast Guard transmissions

13  at that time?

14  **A**    Not that -- not at that time.

15  **Q**    Even though you knew that a hurricane was in the making?

16  **A**    Yes, sir.

17  **Q**    Any reason why you didn't have it on the Coast Guard

18  station?

19  **A**    Well, we was -- I was using both of my radios:  One to

20  work and one to listen for the locks and stuff.

21  **Q**    So the one that you would ordinarily listen to the Coast

22  Guard transmissions, you were listening to the locks?

23  **A**    Yes.

24  **Q**    But when you were at your base at Mile 95, would you then

25  listen to the Coast Guard transmission?

1   **A**   Yes.

2   **Q**   So outside of when you're going through the locks, which

3   we have already seen in your log, you would be listening to

4   Coast Guard transmissions?

5   **A**   Right.

6   **Q**   What did you learn from the Coast Guard broadcast that you

7   heard while you were at Mile 95?

8   **A**   Whereas they had a storm coming.

9   **Q**   Did you learn where it was headed?

10  **A**   I learned from where it was headed off the TV.

11  **Q**   You had TV on -- in the --

12  **A**   Yes, sir.  In the galley of our vessel.

13  **Q**   Okay.  And what channel were you looking at?

14  **A**   I really don't know, man.

15  **Q**   So you had TV on.  You had the Coast Guard transmissions

16  on Channel 16 --

17  **A**   Yes, sir.

18  **Q**   -- coming in when you were not waiting at the locks and

19  while you were in transit or at your base?

20  **A**   Right.

21  **Q**   In the absence of any instructions from the company, from

22  the -- from Unique or from Domino, you would not leave soft

23  lines on the job; is that correct?

24  **A**   No, sir.  Not unless asked.

25  **Q**   But the instructions would come to you either from Domino

1    or Heck since you don't have any direct contact with the

2    customer?

3              MR. EMMETT:  Objection, Your Honor.

4              MR. FENDLER:  Objection:  Asked and answered.

5              THE COURT:  Ad nauseum.

6              MR. WEIDEMANN:  Okay.

7              MR. FENDLER:  Couldn't have said it better, Your

8    Honor.

9              MR. WEIDEMANN:  Well, I apologize for making you

10   nauseated, Your Honor.

11             THE COURT:  Apology accepted.

12                  Captain, when you were -- the circumstances

13   where you contacted Mr. Heck, what would be the sort of

14   situation where you feel like you needed to get in touch with

15   him?

16             THE WITNESS:  In case something happened with the

17   vessel or if we had something wrong, you know.  I wouldn't call

18   Mr. Heck for nothing other than if something was wrong with the

19   vessel.

20             THE COURT:  Something was wrong with the vessel?

21             THE WITNESS:  Yes, ma'am.

22             THE COURT:  Okay.  And if it had to do with the job,

23   you would be calling Domino?

24             THE WITNESS:  I'd call Domino first.

25             THE COURT:  All right.  Redirect?

Case 2:05-cv-04182-SRD-JCW   Document 19347-11   Filed 11/03/09   Page 40 of 41
Case 2:05-cv-04419-HGB-JCW   Document 899-7   Filed 07/13/2009   Page 40 of 41

40

REDIRECT EXAMINATION

1

BY MR. EMMETT:

2

3    Q    On that last point, Captain, Mr. Heck did periodically

4    come aboard your vessel, did he not?

5    A    Yes.

6    Q    What about the times when groceries were brought aboard

7    and crew brought aboard?

8    A    I'd say he brought groceries every now and then, you know,

9    to the boat, and come and see how the crew was making out and

10   how his boat was, you know.

11   Q    Now, when you go through the Industrial Canal lock, is

12   there a difference between going through light boat and with a

13   barge?

14   A    Yes, sir.

15   Q    What's the difference?

16   A    If you have a tow, you have to be put on turn; and if you

17   are light boat, they try to fit you in with another towboat.

18   You know, you get in there quicker if you're light boat.

19   Q    Does it take longer to go through with a tow?

20   A    Yes, sir.

21   Q    Now, you were shown the Domino manual that listed some

22   safe harbors in a hurricane.  Where did you-all go, first of

23   all?

24   A    We went into the Harvey canal at Cody Marine.

25   Q    Now, does that manual apply only to your vessel, as far as

1   you know, and the other Domino vessels?

2   A    Everybody -- all the other vessels do that work for

3   Domino.

4   Q    Does the manual say anything about safe harbor for barges?

5   A    No, sir.

6          **MR. EMMETT:**  Thank you.  That's all I have.

7          **THE COURT:**  All right.  May this witness be excused?

8          **MR. EMMETT:**  Yes.

9          **THE COURT:**  You are excused.  Please don't talk about

10  your testimony to anyone except the attorneys until the case is

11  finished, which is, hopefully, today.

12         **THE WITNESS:**  Okay.  Thank you.

13                          *  *  *  *  *

14

15                          **CERTIFICATE**

16

17      I certify that the foregoing is a correct transcript to

18  the best of my ability and understanding from the electronic

19  sound recording of the proceeding in the above-entitled and

20  numbered matter.

21

22

23

24  /S/Johnna B. Barron                    July 13, 2007

25  JOHNNA B. BARRON                       DATE