# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| | * |
| | * |
| IN RE: KATRINA CANAL BREACHES | * |
| CONSOLIDATED LITIGATION | *   CIVIL ACTION |
| | * |
| | *   NO. 05-4182 |
| PERTAINS TO:   BARGE | *   and consolidated cases |
| | * |
| *Boutte v. Lafarge_*          05-5531 | *   SECTION "K" (2) |
| *Mumford v. Ingram*        05-5724 | * |
| *Lagarge v. Lafarge*        06-5342 | * |
| *Perry v. Ingram*            06-6299 | * |
| *Benoit v. Lafarge*          06-7516 | *   JUDGE |
| *Parfait Family v. USA*     07-3500 | *   STANWOOD R. DUVAL, JR. |
| *Lafarge v. USA*             07-5178 | * |
| | *   MAG. JOSEPH C. WILKINSON, JR. |
| | * |
| | * |

## BARGE PLAINTIFFS' OPPOSITION TO LNA'S MOTION FOR SUMMARY JUDGMENT

## I.      <u>INTRODUCTION</u>

Lafarge is not entitled to summary judgment, for three primary reasons.  <u>First</u>, Lafarge does not meet its burden of proof on the issue of whether the Barge moved across the IHNC prior to the North and South breaches.  Lafarge does not - and legally cannot - overcome the substantial body of factual proof that the barge was seen and heard to cause both eastern IHNC floodwall breaches.  Indeed, for Lafarge to prevail, this Court must affirmatively find that every eyewitnesses supporting Plaintiffs' theory – which exceed 30 in number – all lack credibility. Lafarge provides no basis on which action made be taken. Indeed, Lafarge's experts - who posit that it is impossible that the barge breached the floodwall - cannot accurately, completely or legally refute the Plaintiffs' eyewitnesses and experts who testify to a wholly different set of facts causing and constituting the eastern IHNC floodwall failures.

 <u>Second</u>, Lafarge also does not meet its burden establishing that the Barge did not cause the North and South breaches.  As an initial point, Lafarge does not meet the standard of proof prescribed by the *Pennsylvania* Rule, which obliges Lafarge to completely negate ING 4727 as a potential cause of the floodwall breaches and damages.   Lafarge's experts' inadequately supported statements that Plaintiffs have failed to establish that the Barge cause the breaches fail to meet Lafarges affirmative obligation of demonstrating that the barge "could not have caused" the breaches, as is required under applicable law. Even if the Pennsylvania Rule does not apply, however, the conclusions of Lafarge's expert, Dr. Cushing, that the impact by the Barge could not have caused the North and South breaches is a disputed issue of fact.  In addition to the existence of significant evidence placing Dr. Cushing's analysis and conclusions in dispute, common sense dictates that the impact of the Barge could be a contributing factor of the breaches of the North and South floodwalls.  This inference -- which Plaintiffs are entitled under

applicable summary judgment standards -- in and of itself mandates denial of Defendant's Motion.

Third, Lafarge fails in demonstrating that ING 4727 was not a substantial factor in the flooding that inundated the entire area between the IHNC and Paris Road, or that any differentiable contribution from MRGO caused any of these damages.  Under the applicable law, Lafarge is responsible for all such damages because ING 4727 was, at least, a substantial factor in their occurrence.

The standards governing Summary Judgment afford the Court virtually certain guidance in this instance.  Summary Judgment must be denied.

## II.      STATEMENT OF THE EVIDENCE

### A.      Before the Hurricane

At the time of Hurricane Katrina, Lafarge had no written hurricane preparation plan, in violation of standard practices and Coast Guard requirements.[1]  It had a one-page "New Orleans Terminal Hurricane Preparation Checklist" that consists mostly of blank space ("Name of Hurricane: _____") and contains a few very elementary precautions ("Cable all barges to shore," etc.),[2] but this fell far short of the requirements of a written hurricane preparation plan, and was in any event no longer in effect by the time of Hurricane Katrina.[3]

The Lafarge France Road terminal lacked communications, and had disabled its equipment receiving weather reports, due to an ongoing construction project, and Lafarge did nothing to remedy this defect during the 2005 hurricane season, not even when a possibility emerged that New Orleans was in a zone that Hurricane Katrina might reach.  Edward Busch,

---

[1] Plaintiffs' Exhibit 36, Deposition of Lafarge Fed. R. Civ. P. 30(b)(6) designee, Area Distribution Supervisor Edward VanderMuelen; Plaintiffs' Exhibit 37, Deposition of LNA Area Safety Advisor Jennifer Arnold Tr. 11, lines 13-15.
[2] Plaintiffs' Exhibit 92, Lafarge "Hurricane Preparation Checklist."
[3] See note 1.

Lafarge's Assistant Terminal Manager, testified:[4]

> Q. So you had access to meteorological and weather reporting at the Industrial Canal facility on the 27th?
> A. No, sir.
>
>           *                       *                    *
>
> Q. It was out for at least a month before Hurricane Katrina?
> A. Yes, sir.

Public information was available as early as Friday, August 26, 2005, and thereafter, advising of the nature and approach of Hurricane Katrina,[5] but Lafarge did not notify its personnel before Saturday, August 27, of the increased risk or provide any instructions as the predicted track of Hurricane Katrina focused more tightly on the New Orleans area.[6]   The personnel working at the Lafarge France Road terminal dock did not receive notice of hurricane Katrina's approach until around 9:00 a.m. on Saturday, August 27, 2005, in the form of phone calls from employees' family members.[7]   Around 9:00 or 10:00 A.M. on that day, Lafarge Safety Manager Jennifer Arnold called Mr. Busch.  He described the conversation: "She was more not telling me about the storm, she was calling to ask if our employees, how many employees we had at the plant, what we were doing, how long we were going to be there, and basically said do what you got to do to get that plant tied up, locked up, and get the hell out of there."[8]   He testified that he told her he had "released the barge," but no further details were discussed.  He explained that she had no experience with barges.[9]   Mr. Busch did not inform the Safety Director, or any other Lafarge official, that the terminal's weather reporting service had been

---

[4] Plaintiffs' Exhibit 38, Deposition of Lafarge North America Asst. Terminal Manager, Edward Busch, Tr. 105-107, 111.
[5] Plaintiffs' Exhibit 60, Proclamation of State of Emergency by Gov. Kathleen Blanco (48 KBB 2005); Plaintiffs' Exhibit 61, National Hurricane Center Advisories and tracking maps; Plaintiffs' Exhibit 62, Impact Weather Advisories.
[6] Plaintiffs' Exhibit 38, Deposition of Edward Busch, Tr. 18, lines 12-25; Tr. 19 line 18 to Tr. 20 line 12.
[7] Plaintiffs' Exhibit 38, Deposition of Edward Busch, Tr. 43.
[8] *Id.*, Tr. 56 lines 14-20.
[9] *Id.*, Tr. 56 line 21 to Tr. 58 line 2.

disabled.[10]

Lafarge proceeded on Friday, August 26, 2005 to unload Barge ING 4727, continuing overnight despite the prior issuance of governmental and weather service warnings of the impending storm, and completing the unloading at 9:00 a.m. on Saturday, August 27, 2005.[11] This left it with an unloaded barge that because of its above-water "sail" was obviously much more susceptible to winds, in a situation in which winds could reasonably be expected to be high.[12]

Zito further states that it had issued an e-mail notification that its fleet would close.[13]  If so, Lafarge could not have received the message because of the communications blackout at the Lafarge facility[14] and its decision to operate "blind" in the midst of hurricane season and the known risk that Hurricane Katrina might hit New Orleans.

Lafarge did not make a reasonable effort to remove the unloaded Barge ING 4727 from the IHNC and get it out of harm's way.  It did not make timely arrangements with defendant Zito, while Zito was still open, to remove the barge.  If it had done so, the barge could have been removed.  Mr. Boudreaux testified in the trial of the limitation action that if Zito had been notified of a desire to move Barge ING 4727 out of the IHNC and fleet it, this would have been possible. [15]

Instead, Lafarge waited until the Barge ING 4727 was empty, and asserts that then it tried to make any arrangements to remove the barge.  After unloading Barge ING 4727, Lafarge Assistant Manager Busch testified, he telephoned Zito to have the barge picked up.  Busch

---

[10] *Id.*, Tr. 106 line 25 to Tr. 107 line 9.
[11] Plaintiffs' Exhibit 63, Lafarge North America Barge Unloading Report; Plaintiff's Exhibit 36, Deposition of Lafarge Fed. R. Civ. P. 30(b)(6) designee, Lafarge Area Distribution Manager Edward VanderMuelen, Tr. 105.
[12] Plaintiffs' Exhibit 29, Deposition of Maritime Expert, Don Green, Tr. 45.
[13] Plaintiffs' Exhibit 95, Deposition of Zito Manager, Barry Boudreaux, Tr. 56-58.
[14] Plaintiffs' Exhibit 38, Deposition of Edward Busch, Tr. 13, 18.
[15] Plaintiffs' Exhibit 39, EDLA Civil Action 05-4419 Record Doc. 788, Trial Transcript of testimony by Barry Boudreaux, p. 26, lines 9 – 15.

claims to have left a voice mail message without speaking to a live person.[16]   Zito denies receiving any such call, denies voicemail capability exists such that Mr. Busch could have left a message, and has provided an automated telephone system log reflecting the absence of a call from Mr. Busch.[17]

To avoid damage to its dock in the event of a hurricane surge, Lafarge decided to unmoor the unloaded Barge ING 4727 from the dock, and switch the two barges around.  It called Unique Towing but did not ask it to remove the unloaded, high-risk Barge 4727 from the IHNC.[18]   It simply asked Unique Towing to switch the two barges around so that the loaded Barge 4745 would be next to the dock and the unloaded Barge 4727 would be outboard.

Lafarge did not instruct Unique Towing to remove the empty Barge ING 4727 from the IHNC.[19]   On Saturday, August 27, 2005 at approximately 2:25 p.m., The REGINA H tug boat arrived at the Lafarge France Road facility.   Unique Towing employee, Raymond Grabert, Captain of the REGINA H (the vessel that made the turnaround maneuver which moved ING 4727 outboard of ING 4745), testified that he would have taken the empty 4727 out of the Industrial Canal on the 27th if he had been requested to do so.[20]

Lafarge did not instruct Unique Towing to secure the resulting outboard Barge ING 4727 to the dock, in violation of Lafarge's own, admittedly inoperative, Terminal Hurricane Preparation Checklist.[21]

---

[16] Plaintiffs' Exhibit 38, Deposition of Lafarge Asst. Terminal Mgr. Edward Busch, Tr. 36.

[17] Zito Motion for Summary Judgment Exhibits B (Deposition of Barry Boudreaux), M (Discovery responses of Lafarge North America), N (Nextel invoice of calls by Ed Busch), and O (Daily Calling Log of Zito).

[18] Plaintiffs' Exhibit 30, Deposition of Raymond Grabert, Captain of the REGINA H, Tr. 70 line 11 to Tr. 71 line 1; Tr. 72 line 24 to Tr. 73, line 11.

[19] Plaintiffs' Exhibit 38, Deposition of Lafarge Asst. Terminal Manager Edward Busch, Tr. 61, lines 11-14.

[20] Plaintiffs' Exhibit 32,  Deposition of Lafarge Maintenance Supervisor, Earl Smith, page 71; Plaintiffs' Exhibit 33, Deposition of Unique Towing deckhand Eric Thigpen, Tr. 26-27, 44-45.

[21] Plaintiffs' Exhibit 31, Deposition of Lafarge Terminal Attendant Louis Robin, Tr. 40, line 20 to Tr. 41, line 2; Plaintiffs' Exhibit 40, USDC EDLA C.A. No. 05-1149, Record Doc. 701, trial testimony of Eric Thigpen, p. 9, lines 5 - 14.

Lafarge abandoned its facility on Saturday, August 27, and made no arrangement for anyone to monitor the barges it had left in the IHNC.[22]

Lafarge did not instruct any towing company to station a tug in the IHNC to monitor the barges it had in the IHNC, to ensure that none would become loose and endanger lives and property.

There was a height differential of about eight feet above water level between the empty Barge ING 4727 and the loaded Barge ING 4745.  Lafarge asserts that it moored these barges together with three single strands of rope (single part lines).[23]  Even if such a mooring had occurred, this would have violated the United States Coast Guard Sector New Orleans Hurricane Plan (mooring lines to be doubled up) and regulatory standards of maritime care.[24]  Lafarge did not perform or request any mooring of the Barge ING 4727 to the dock (per its own Hurricane Checklist "cable all barges to shore"), and did not perform or request any examination or strengthening of any connection such as would increase the moorings affixed to ING 4727. Domino was not instructed to modify, or even to check, the moorings between the two barges.[25]

Unique Towing's deck hand saw three single strands of two-inch line connecting Barge 4727 and Barge 4745, two ropes at the ends and one at an angle in the middle.[26]

There is no evidence of anyone coming to this facility after the REGINA H left, prior to the hurricane.

Lafarge's rope expert, D. Philip Skaer II, testified that he examined "[t]en or twelve ropes,"[27] and that not all were relevant.  "Some of them were not germane to the thing, they just

---

[22] Plaintiffs' Exhibit 32, Deposition of Lafarge Maintenance Supervisor Earl Smith, p. 54, lines 20-23.
[23] Plaintiffs' Exhibit 32,  Deposition of Lafarge Maintenance Supervisor Earl Smith, Tr. 71; Plaintiffs' Exhibit 33, Deposition of Unique Towing deckhand Eric Thigpen, Tr. 26-27, 44-45.
[24] Plaintiff's Exhibit 59, Declaration of Cmdr. (Ret.) Don Green, Tr. 69.
[25] Plaintiffs' Exhibit 38, Deposition of Lafarge Asst. Terminal Mgr. Edward Busch, Tr. 81 lines 3-7, 11-14.
[26]  Plaintiffs' Exhibit 33,  Deposition of Unique Towing deckhand Eric Thigpen, Tr. 25 line 1 to Tr. 27 line 13.
[27] Plaintiffs' Exhibit 34, July 15, 2009 Deposition of D. Philip Skaer II, Tr. 23, lines 9-11.

pulled in all the ropes they could.  So some were just pieces of trash that were up there."[28]  Mr. Skaer described photographs he had seen of ropes lying on the dock.[29]  He stated that that he had no personal knowledge which ropes had been used to connect Barge ING 4727 to Barge ING 4745, but relied on counsel for defendant to tell him which ropes were used.[30]  Lafarge showed him photographs, and Mr. Skaer initially said that he saw photographs of ropes hanging from the barge,[31] but ultimately stated that he had not seen any photographs showing how the ropes were tied to the two barges: "Q.   And did you review any photos of how the ropes were tied to the various barges?   A.   No, because they had already broken, so I wouldn't be sure how they had."[32]  Mr. Skaer relied on defense counsel to tell him which ropes in the photographs had been used to connect Barge ING 4727 to Barge ING 4745.[33]  Exhibit 6 to the deposition is a diagram prepared by Tom Forbes, one of Lafarge's attorneys.[34]

Exhibit 6 to the Skaer deposition is marked "Counsel Work Product" in the lower right corner, and had not previously been produced in this litigation.[35]  It stated that rope D #6 is the remnant of the line between the two barges at the bow, that was attached to Barge ING 4745.  It states "Nothing found – (possibly D #4?)" next to the bow of Barge ING 4727 where a line to Barge ING 4745 would have been attached.  It states "[D # 13] we have" at the stern of Barge ING 4745 where a line to Barge ING 4727 would have been attached.  It states "Ingram has" and appears to say "remnant" at the stern of Barge ING 4727 where a line to Barge ING 4745 would have been attached.  The spring line appears on Exhibit 6 to have been connected to each barge at the first mooring post behind the stern mooring post, not at an angle, and Exhibit 6 says at that

---

[28] *Id.*, Tr. 22 line 24 to Tr. 23 line 2.
[29] *Id.*, Tr. 25 lines 8-13.
[30] *Id.*, Tr. 23 line 12 to Tr. 24 line 4.
[31] *Id.*, Tr. 24 line 5 to Tr. 25 line 7.
[32] *Id.*, Tr. 25 lines 14-17.
[33] *Id.*, Tr. 26 line 22 to Tr. 27 line 4.
[34] *Id.* Tr. 63 lines 14-23; Tr. 77 line 23 to Tr. 78 line 7.  A copy of the diagram is attached as Plaintiffs' Exhibit 85.
[35] Declaration of Brian A. Gilbert, Plaintiffs' exhibit 64.

point "Ingram has both remnants."  Exhibit 6 shows one line still attached to Barge ING 4727 at the bow on the side away from Barge ING 4745, *i.e.*, the side that had previously been alongside the dock, and states at that location: "D 4 found here on 9/11."

Defendant has never produced any photographs showing how the ropes laid between Barge ING 4727 and Barge ING 4745 were fastened to the two barges, if they were fastened.[36] None of defendants' expert reports mention any inspection while any of the lines or line remnants between Barge ING 4727 and Barge ING 4745 were still fastened to either barge. When plaintiffs inspected the Barge 4727 in the Lower Ninth Ward on February 23, 2006, none of the ropes formerly connecting Barge ING 4727 to Barge ING 4745 were still attached.[37]

Lafarge Manager Ed Busch, called Joe Domino, Inc./Unique Towing on the morning of Saturday, August 27, 2005 to have the empty Barge ING 4727 moved outboard of the Barge ING 4745.  Busch did not request any mooring of the Barge ING 4727 to the dock, or any examination or strengthening of any connection between other services such as would increase the moorings affixed to ING 4727.  Domino was not instructed to modify, or even to check, the moorings between the two barges.[38]

Although Lafarge employee Earl Smith testified that extra line was left out for Unique Towing to use, Unique Towing personnel saw no such line.[39]  Lafarge did not authorize Unique Towing to use the extra lines it carried on its vessel, to secure the Barge 4727 more effectively.[40]

**B.**     **Position and Movement of the Barge Before the North Breach**

---

[36] Declaration of Brian A. Gilbert, Plaintiffs' exhibit 64.

[37] Declaration of Brian A. Gilbert, Plaintiffs' exhibit 64.

[38] Plaintiffs' Exhibit 38, Deposition of Lafarge Asst. Terminal Manager Edward Busch,  Tr. 81 lines 3-7, 11-14.

[39] Plaintiffs' Exhibit 32, Deposition of Earl Smith, Tr.100; Plaintiffs' Exhibit 33, Deposition of Deckhand, Eric Thigpen, p. 40-41 (found only one used "Mardi Gras" line).

[40] Plaintiffs' Exhibit 30, Deposition of Earl Grabert, Captain of the REGINA H, Tr. 44 line 23 ("we keep rigging on the vessel"); Tr. 57 lines 4-9 ("Q. If they had told you to put additional lines either from the light barge to the full barge or from one of the barges to the dock, or both barges to the dock, would you have recorded that and listed what you used?  A. Yes, sir, I sure would have.").

Defendants' expert reports concluding that the Barge ING 4727 could not have moved across the IHNC prior to the North breach or the South breach are based on the assumptions that the barge could not have become loose before 9:00 A.M. on Monday, August 29, 2005, and that there was not enough wind or waves to move the barge to the East side of the IHNC before 9:00 A.M. on Monday, August 29, 2005.[41]   These assumptions are placed in dispute by evidence in the record.

Lafarge's investigative agency, Centanni, interviewed two witnesses who saw the barge in the IHNC on Sunday afternoon, August 28, 2005.  Gertrude LeBlanc was interviewed and secretly tape-recorded[42] by Lafarge's investigator on July 31, 2006.[43]  She told Centanni that she and the persons with her saw the barge in the IHNC on Sunday morning, August 28, 2005, as

---

[41] Plaintiffs' Exhibit __, Cushing Report at p. 78 ("Taking note of the orientation of the wind vector on the canal, the earliest the barge could have been pushed into the canal by the wind, without interference from the Namasco gantry, would have been in the 0900 (9:00 AM) to 1000 (10:00 AM) timeframe.  It is also worthwhile to note that this is the time when the wind would have had the first chance to act on the barge without the barge being sheltered in the lee of the silos and warehouses on the wharf. Of course, the breaches had already occurred by this time."); Plaintiffs' Exhibit __, August 6, 2009 Deposition of Charles Cushing, Tr. 179, lines 6-17 ("Q. . . . You state in your report the earliest time that the barge could have crossed -- based on your calculations and assumptions, the earliest time the barge could have crossed from the west bank to the east bank of the Inner Harbor Navigational Canal; isn't that right?  A.  I'm saying that it couldn't have crossed over before 9:00 o'clock.  It would have to be sometime after 9:00 clock."); Plaintiff's Exhibit __, August 14, 2009 Deposition of Robert Bea, Tr. 225 line 10 to Tr. 226 line 22 ("Q Dr. Bea, you testified just a moment ago that it would not have been possible for a barge to have caused the North Breach or the South Breach under any conditions.  Do I have it right, under any conditions?  A   No.  Q   Okay. Could a barge have caused the damage that you observed on the North Breach?  A   No.  Q   No?  A   No.  Q   No. A   And I documented the reason why.  Q   Tell me the reasons.  A   The reasons concern our forensic engineering studies of the development of the North Breach.  Those studies converge on a primary causative element related to the discussed/identified seepage, hydraulic effects and lateral instability effects.  Other information in the vicinity of North Breach lead to the conclusion that the barge wasn't there and couldn't have been there.  And so the barge does not enter my expert opinion as a causative/contributing/ participating element in the case of North Breach.  Q Would it be fair to say that your answers to Mr. Raffman's question mean that once you have already ruled the barge out of consideration it could not possibly have caused any damage?  A   At the North Breach?  Q   Yes.  A   That is correct.  Q   Okay. Is your answer the same with respect to the South Breach?  A   Yes, for very similar reasons.").
[42] Centanni's interview practices were described by Magistrate Judge Wilkinson in his April 21, 2008 Order on Motion (Doc. # 12605), which stated at pp. 5-6: "Lafarge admits that its investigators, who took the recorded statements by telephone, did not tell the interviewees that they were being recorded. None of the sample redacted transcripts provided to me by plaintiffs, Plaintiff's Exh. F, indicate that any interviewee asked whether the conversation was being recorded. Thus, plaintiffs do not allege that the investigators lied to any interviewees concerning recordation. The transcripts also reveal, and Lafarge does not deny, that the investigators identified themselves only as working for Centanni Investigative Agency, and did not state that they were working for Lafarge or the barge interests, or for attorneys for those parties."
[43] Plaintiffs' Exhibit 24, October 21, 2009 Affidavit of Gertrude LeBlanc and two photographs; Plaintiffs' Exhibit 25, transcript of July 31, 2006 Centanni interview by Robert Garcia.

they were on the Claiborne Avenue Bridge crossing the IHNC.  The barge was near the East side, the Lower Ninth Ward side, between the Claiborne Avenue and Florida Avenue bridges. Centanni statement at 2-3.  Ms. LeBlanc's October 21, 2009 Affidavit stated that she saw the barge next to the East floodwall for the Lower Ninth Ward, between the Claiborne Avenue and Florida Avenue bridges, between 11:00 A.M. and Noon on Sunday, August 28, 2005.  She stated that it was nowhere near the docks on the Upper Ninth Ward side of the IHNC.  She described the barge as "a big, long, rectangular barge with sharp corners and a round top."  She stated in ¶ 11: "When I returned after Katrina, it appeared that the same barge was sitting in my backyard. I live near the breach by Claiborne Avenue.  I could not see anything about the barge in my yard that looked any different from the barge I saw in the canal on the Sunday before the storm."  Her interview with Centanni investigator Robert Garcia was attached to the Declaration, and she stated that she told the truth in the interview.  An attached photograph of the Barge ING 4727 in the Lower Ninth Ward bears the handwritten note: "That is the barge I saw on Sunday Gertrude LeBlanc."

Centanni interviewed and recorded Frazier Tompkins on September 12, 2007.  He stated that he saw an unattended barge by itself in the IHNC on Sunday, August 28, 2005, "just sitting there."  He thought it was moored.  Mr. Tompkins has provided a declaration, which states in pertinent part: "On August 28, 2005, at approximately 10:30 - 11 :00 a.m., I went from my home to my church, the Third Church of God in Christ, located at 1432 Flood Street, New Orleans. When I arrived at the church, no one was there and I proceeded on Claiborne Avenue heading towards New Orleans to check the water level in the Industrial Canal. As I crossed the Claiborne Avenue bridge, I looked down to my right to see the water level in the Industrial Canal. I was surprised to observe a single barge on the east side of the canal without any tug in attendance.

The barge was in the vicinity of Derbigny, Roman and Prieur streets on the east side of the canal."[44]

Dr. Cushing explained his underlying assumption as to the timing of the movement of the barge, when he calculated its possible impact: "This report used the wind velocity and direction that occurred at 8:00 AM on the morning of 29 August, 2005.  The values for this time were used because it was the only wind that blew in the direction of the levee at a time before the National Weather Service issued a report that the Industrial Canal levee was breached."[45]  His Appendix D states: "The value for wind velocity was based on data collected at the New Orleans Lakefront Airport (call sign KNEW) among other locations and interpolated by Oceanweather, Inc. for various locations around New Orleans."[46]   In point of fact, another of defendant's experts reported that the anemometer at Lakefront Airport had failed before 8:00 A.M.[47]  Dr. Cushing's wind speed and direction at 8:00 A.M. on August 29, 2005 are set out in his Appendix C, at p. C-17.[48]  He used the lowest figure, for 30-minute wind speeds.[49]

Dr. Cushing did not factor into his calculations the information gained by Lafarge's investigators in 2006 and 2007 that the barge was already adrift in the IHNC, by the East floodwall, on Sunday morning, August 28, 2005, and that it did not have to wait almost 24 hours to move there.

Dr. Cushing set forth his underlying assumption as to the direction of the wind: that it would not have varied at the surface from the prevailing winds high in the atmosphere:[50]

> In a hurricane, the prevailing winds closely follow isobar lines around the eye of the storm in a counterclockwise direction.  The winds at a specific location

---

[44] Plaintiffs' Exhibit 22, Affidavit of Frazier Tompkins; Plaintiffs' Exhibit 23, Centanni transcript of the interview.
[45] Plaintiffs' Exhibit __, Cushing Appendix F, p. F-10.
[46] Plaintiffs' Exhibit __, Cushing Appendix D, p. D-1.
[47] Plaintiffs' Exhibit __, Dooley Report at p. 34.
[48] Plaintiffs' Exhibit __, Cushing Appendix C, p. C-17.
[49] Plaintiffs' Exhibit __, Cushing Appendix D, pp. D-2, D-3.
[50] Plaintiffs' Exhibit __, Cushing Report, p. 77.

do not deviate very far from the prevailing wind direction.  Hurricane winds are not erratic and they do not rapidly or frequently change direction.  Instead, they gradually change direction as the hurricane's eye changes position with respect to the location in question.

There is substantial eyewitness evidence that surface wind directions varied substantially from time to time, and did not conform to defendant's experts' assumptions of slowly changing wind directions in strict conformity to the prevailing winds high in the atmosphere.[51]

Dr. Cushing further stated his assumption that the only waves in the IHNC would have been small waves of a maximum 2-foot height, traveling in the same direction as the prevailing winds, and thus would not have been a factor moving the barge towards a breach or imparting velocity to it.[52]  He summarized this factor: "Waves in the IHNC were created by the wind, were relatively small and acted in the same direction as the wind.  Thus, any waves in the IHNC would not have been able to propel the barge in any direction other than the direction in which the wind was blowing."[53]

There is eyewitness evidence that waves in the IHNC exceeded Dr. Cushing's estimated maximum of 2 feet, and that there was a large, 20-foot wave that traveled down the IHNC from the Florida Avenue Bridge towards the Claiborne Avenue bridge.[54]

Dr. Cushing also did not factor the tide into his calculations.  The October 29, 2009 Declaration of plaintiffs' expert, retired Coast Guard Commander Don Green, states that he had reviewed local tide records, that tidal movement means a tidal current, and that even a small tidal current would have been sufficient to move the barge.  He concluded:[55]

       7. Given the fact that:

---

[51] Compendium # 7, Eyewitness Testimony on Wind Directions.
[52] Plaintiffs' exhibit __, Cushing Report, pp. 78-79.
[53] *Id.*, p. 79.
[54] Compendium # 6, Eyewitness Testimony on Waves in the IHNC.
[55] Plaintiffs' Exhibit 59, October 29, 2009 Declaration of Don Green.

a) The barge was floating loose in the canal for at least 18 hours, and probably longer before Hurricane Katrina made landfall;

b) The barge's movement would be affected by all environmental conditions including wind, wave and tidal currents during the time it was loose;

c) Witnesses saw the barge on the east side of IHNC

Any opinion which says the barge could not have floated from the west side of IHNC to east side IHNC is incorrect or speculative.

8. Further, based on my 23 years of experience and training in the Coast Guard, even a small movement of tidal water would be sufficient to move an unloaded barge in the direction of the outgoing tide. It is plausible that the outgoing tide would have carried a loose barge in the IHNC to a point North of the North breach by late Sunday night, August 28, 2005, or early Monday morning, August 29, 2005.

## C.    Eyewitness Testimony to the North Breach

William Villavasso worked for the Sewerage and Water Board for 23 years, and was the Chief Operator of Pump Station Five at Florida Avenue and the Industrial Canal.[56] He consistently testified many times in his deposition that he saw the tip of a barge sticking out of the floodwall.  He was never asked whether he saw anything above the former height of the tumbling floodwall.  His first response was typical of the others: "And then I seen what appear to be metal structure like a barge, only the tip of it.  Couldn't tell you I seen a whole barge, because I didn't."[57]  He testified that he saw the tip simultaneously with the floodwall falling down: "When it fell down, it splashed and I seen massive amounts of water and I seen   something that appeared to be a barge protruding, the tip protruding through the wall."[58]  He testified that he could only see a limited amount: "Q.   Well, you said something that I am very curious about.  You said it was sticking out of the wall.  A.   The tip.  Q.   All right.  A.   It was a tip of what

---

[56] Plaintiffs' Exhibit __.   December 18, 2007 Deposition of Mr. Villavasso, Tr. 24 line 9 to Tr. 25 line 13.
[57] *Id.*, Tr. 64 lines 21-24.
[58] *Id.* Tr. 71, lines 5-9.

appeared to be a barge sticking -- protruding from the wall.  Q.   Okay.  A.   Not much.  Q.   I understand.  A.   But a little."[59]  Looking at a drawing, he said: "Yeah, this is the side of the barge.  But I didn't see any of this (indicating).  This was -- I couldn't see any of that.  All I could see was the top part of the tip of it protruding like maybe it was on an angle.  What appeared to be a barge."[60]  He testified that he could not see if there was a rake on what he saw.[61]  He could not see if it was on a slant or straight, "only the tip of it."[62]  He saw it "towards the top" but could only see about a foot of it, adding: "If you're trying to ask me did I see it from top to bottom, no, I couldn't see that. . . . I could only see a tip of it at the top.  Now, if that was a foot or how – I couldn't measure the distance.  I don't really know."[63]  He testified that he could not say that the tip was moving: "Q.   This thing, whatever it was you saw.  A.   No, I never seen it come through. I seen the tip of it. That's all I seen.  Q.   All right.  Now, did it move?  A.   No.  Q.   This thing that you saw?  A.   No.  I seen the tip -- I seen the wall fall, I seen the tip of it, and that was it.  I never seen it come through or anything else."[64]  "Q.   Okay.  But whatever it was, you didn't see it move?  A.   No.  I only seen the tip of it.  And  after that, all I seen was water."[65]  He testified that he heard a couple of booms that did not sound like transformers, and described what he saw right after the second booming sound: "I looked over to that way, the wall start tumbling down and I seen what appeared to be a barge tip, tip of it from the door, from the doorway."[66]  He saw a 20-foot wall of water going down the canal "[c]oming from Southern Scrap towards the Florida Bridge, coming that way, going towards the Claiborne Bridge," "[i]nto the canal," and testified: "It was during the wall break.  When it reached that point, that's when I

[59] Id., Tr. 81, lines 12-22.
[60] Id., Tr. 85, lines 2-8.
[61] Id., Tr. 86, lines 2-5.
[62] Id., Tr. 86, lines 9-16.
[63] Id., Tr. 89 lines 3-20.
[64] Id., Tr. 97, lines 6-16.
[65] Id., Tr. 98, lines 14-17.
[66] Id., Tr. 128, lines 12-24.

heard a boom, the wall broke, I seen the tip of what appeared to be a barge and the water rushing."[67]   He described it again: "Yeah, the ball of water is coming down this way; water is flowing over the side of the canal wall; and when it reached down to the end where I heard a boom, I seen – what happened, I don't know, but when I heard the boom, you could see this part of the wall tumble down and I seen to appear to be part of a -- something steel.  Q.  The tip of something?  A.  Steel."[68]

Mr. Villavasso responded to further questions with consistent answers: "No, I was just drawing that as an illustration of a wall.  Now, I don't -- It wasn't center where it hit.  The bridge was here (indicating) and this is where it hit and broke (indicating).   And I seen the top part where it appears to be a piece of steel, what appeared to be a barge to me, and it was like from maybe a foot, foot and a half, two feet at the most.  I don't know.  But that's all I seen.  And it didn't -- it protruded not through the wall, but where you can see on an angle like. EXAMINATION BY MR. WALKER: Q.  And this foot or foot and a half -- foot or two feet is what you could see from top to bottom?  A.  Yeah.  That's all I could see.  It was raining and it was dark, the wind was blowing like hell.  That's all I could see.  Q.  So you could see two feet of this object and nothing -- you couldn't see anything above five, six, -  A.  No.  Q.   -- ten, fifteen feet?  A.  Nope.  All I seen was water."[69]

Mr. Villavasso was then asked a series of questions about what else he could see: whether he was able to see the color of the steel, or could read words painted on the tip, or could read the name of the company, whether it was a tank barge, whether it was a hopper barge, whether it carried a dangerous-cargo flag, whether he could see crew on it, whether the barge had a cover,

---

[67] *Id.*, Tr. 186 line 23 to Tr. 187 line 18.
[68] *Id.*, Tr. 191 lines 12-25.
[69] *Id.*, Tr. 202 line 6 to Tr. 203 line 7.

whether it was an open barge, its width, whether it had any piping, and the like.[70]

Mr. Villavasso was never asked if he could see the height of the barge above the floodwall.

### D.   Position and Movement of the Barge Before the South Breach

Retired Coast Guard Commander Don Green stated further in his Declaration:[71]

> 9. If the barge were North of the North breach by that time, a large wave of the type described by Mr. Villavasso would reasonably have carried the barge South with some velocity to the point of the North breach, and the momentum would reasonably have then carried it farther South to the point of the South breach, losing some of its velocity but still moving faster than barges normally move in slow water.

Many residents of the Lower Ninth Ward heard the progress of the barge as it traveled from the site of the North Breach to the site of the South Breach, in the form of sounds of a massive object scraping and grinding against the floodwall as it progressed.  *See* Barge Plaintiffs' Compendium of Proof #3, "Sounds Identified With Barge Contact With The Eastern IHNC Floodwall."  In all, 25 residents spoke of hearing these sounds.

### E.   Eyewitness Testimony to the South Breach

Terry Mark Adams testified that he was at his home at 2604 Deslonde Street at the time of the hurricane.  When he arose at about 5:00 A.M. on Monday, August 29, 2005, and put his feet on the floor, the carpet was wet.  He gathered some things, and between 5:30 A.M. and 6:00 A.M. knocked out a wind vent and climbed onto his roof.[72]  It was nearly daylight, and he could see the levee.[73]  The levee is "not a half a block" from his house.[74]  A Google map of his

---

[70] *Id.*, Tr. 203 line 8 to Tr. 204 line 18.
[71] Plaintiffs' Exhibit 59, October 29, 2009 Declaration of Don Green.
[72] Plaintiffs' Exhibit __ - Deposition of Terry Adams, Tr. 12 line 25 to Tr. 15 line 12; Tr. 16 line 14 to Tr. 18 line 12; Tr. 18 line 19 to Tr. 20 line 5.
[73] *Id.*, Tr. 20 line 18 to Tr. 21 line 20.
[74] *Id.*, Tr. 22, lines 19-23.

location shows the levee is just a short block away from his house.[75]   The photograph in Dr. Cushing's Report, p. 46, Figure 28, does not show any view from the site of Mr. Adams' house to the levee; it shows a picture that appears to be across the IHNC and showing a structure on the far side, "taken by the IHNC lock staff at 0747 (7:47 AM) during Hurricane Katrina."[76]   The time of the photograph is two hours after the time described by Mr. Adams.   He could see the levee and floodwall as far as the Florida Avenue Bridge on one side, and the Claiborne Avenue Bridge on the other.[77]   He saw a "big old object" in the water, then heard a bang and saw the barge coming through the wall.   The water rose about 12 feet in seconds after he saw the barge coming through the wall, and he described the aftermath.[78]   He testified that, when the barge was still in the IHNC, five or six blocks away, he could see about four feet of the barge sticking out over the flood wall.[79] Thus, contrary to Defendant's assertion, Mr. Adams did not testify that the Barge only suck up four feet above the wall, but rather, that this was only as much of the Barge as he could see.   Mr. Adams was not asked whether he could see any particular features on the barge, to give a better gauge of his estimate of the vertical scope of what he could see.

## F.   Impact of the Barge

Appendix 17 to IPET Report Volume IV ("The Storm") (Final), is titled "Consideration of Wind-Induced Barge Motions and Associated Forces in the Inner Harbor Navigation Canal."[80]   It stated its purpose as providing preliminary information that could be coupled with more detailed information later on the question whether the barge could have broken a floodwall:

> This appendix addresses the issue of whether the barge that traversed from the Inner Harbor Navigation Canal (IHNC) through the flood wall to the Lower

---

[75] Plaintiffs' Exhibit __ - Declaration of Michael Forman, Exhibit T.
[76] Plaintiffs' Exhibit __, p. 46 of the Cushing Report.
[77] Plaintiffs' Exhibit __ - Deposition of Terry Adams, Tr. 23 lines 11-20.
[78] *Id.*, Tr. 25 line 4 to Tr. 27 line 8.
[79] *Id.*, Tr. 82 lines 2-12.
[80] Plaintiffs' Exhibit 65.

Ninth Ward could have been a cause of the levee failure in this area or whether the barge was simply transported through the levee subsequent to its failure. The analysis presented below develops a method for calculating forces acting on the wall due to a freely floating barge. However, uncertainty remains due to lack of requisite necessary information.

Appendix 17, p. IV-17-1.  The Appendix concluded that with a wind speed of 100 miles per hour at anemometer level 30 feet above the surface,[81] a lightly loaded barge defined as having a four-foot draft[82] would reach terminal velocity of 8.24 feet per second fairly quickly, and would impact a floodwall with an impact momentum of 537,120 pounds per second, and that the impact energy would be 2.21 million foot pounds.  Appendix 17, p. IV-17-12.  The actual Barge ING 4727 had an unloaded draft of from 1 foot to 4-1/2 feet.[83]

Dr. Cushing concluded that the barge could not have caused a breach in the floodwall because he calculated a far lower impact momentum and far lower impact energy than IPET had calculated.[84]   He considered three scenarios:  "Scenario 1 involves the corner of the barge striking the center of one of the 30' long concrete panels comprising the stem of the floodwall."[85]  "Scenario 2 involves the corner of the barge striking the joint between two panels on the floodwall stem."[86]  "Scenario 3 is similar to Scenario 1, except instead of the center panel being pushed backward and rotating the two adjacent panels, the center panel cracks due to the impact."[87]  For these three scenarios, Dr. Cushing set forth a chart of the impact momentum and impact energy:

The below table contains the maximum force and moment placed on the flood wall

---

[81] *Id.*, p. IV-17-3.

[82] The Appendix defines a "lightly loaded barge" as having a draft of 4 feet.  *Id.*, p. IV-17-11.

[83] Dr. Cushing's Report states from the builder's specifications that the draft of Barge ING 4727 unloaded would have been 1 foot 4 inches.  Cushing Report at 23.  This page is attached as Plaintiffs' Exhibit __.

[84] His calculations were set forth in Appendix F ("Barge Impact Analysis") to his Report.  This is attached as Plaintiffs' Exhibit __.

[85] *Id.*, p. F-5.

[86] *Id.*, p. F-7.

[87] *Id.*, p. F-8.

panels for the three collision scenarios. Detailed descriptions of how these figures were obtained can be found in calculations attached to this appendix (Attachment F-1).

| Case 1, Collision Scenario: | Maximum Expected Force | Maximum Expected Moment |
|---|---|---|
| 1 | 103.29 k | 542.3 k-ft |
| 2 | 65.24 k | 188.3 k-ft |
| 3 | 46.1 k | 66.6 k-ft |

Note: k = kilopound (kip) = 1000 lb.
Table F-2: Expected force and flood wall moments created by impact loading.

These results contrast sharply with the IPET calculations that even a barge with a four-foot draft would impact a floodwall with an impact momentum of 537,120 pounds per second, and that the impact energy would be 2.21 million foot pounds.[88]

There is evidence that a loose barge striking or rocking against a concrete structure can cause a great deal of damage. The National Institute of Standards and Technology, Technology Administration, U.S. Department of Commerce, has published Technical Note 1746, "Performance of Physical Structures in Hurricane Katrina and Hurricane Rita: A Reconnaissance Report" (June 2006). This study explained that "a five-story parking structure located in the eastern-most part of Biloxi, experienced no apparent structural collapse from storm surge directly, but did experience partial collapse of the southwest corner due to the rocking motion of the floating barge moored alongside it."[89] The U.S. 90 bridge over the Pascagoula River was displaced because of barge strikes on its footings: "Storm surge in the eastern part of the state caused several barges to break loose from their moorings and strike the eastbound lanes of the US-90 bridge, causing misalignment of the superstructure spans (over four feet to the north, see Figure 4-49) and tipping of piers. The damage required the complete replacement of six spans

---

[88] Plaintiffs' Exhibit 65, IPET Appendix 17, p. IV-17-12.
[89] Plaintiffs' Exhibit 56, NIST Technical Note 1746, p. 43.

(about 300 linear feet)."[90]

###### G.   The Public Investigations Did Not Exclude the Barge as a Cause of Either Breach

Dr. Reed Mosher of the Corps of Engineers, who was in charge of Volume V of the IPET Report, admitted in his deposition that it appeared the barge had struck part of the floodwall at the South breach, and that there was evidence on the barge that it had scraped against a floodwall.[91]   He said that the barge had not yet been ruled out as the cause: "And the barge being the cause of the failure is eventually yet to be ruled out as the cause because of the other strong evidence of the other causes of the failure."[92]

Dr. Mosher admitted that in the other instances of barges coming into contact with floodwalls in Katrina, the barges may have hit embankments that absorbed some of the force of the impact, with the walls only bearing part of the force, and said he would have to look into those examples further.[93]   He admitted that a barge punched through one of the floodwalls along the MRGO, making a hole the size of its width.[94]   He did not make any detailed examination of that site.   That wall is a T-wall, which is stronger than an I-wall such as was used in the IHNC, and the barge was "stuck like a cork" in the wall.[95]   He did not look to see "whether a gap had been created between the canal side soil and the wall when the barge punched through."[96]   He did not know if anyone had looked for such a gap, but testified that he expected a gap would have been formed, "possibly not very deep," but such a gap can cause the failure of the wall and even a "very small" gap, such as that caused by a one-inch displacement at the top of the wall, can start the process of failure in motion: "I mean, even an inch of displacement at the top of the

---

[90] Plaintiffs' Exhibit 57, p. 116.
[91] Plaintiffs' Exhibit 26, July 22, 2009 Deposition of Reed Mosher, Tr. 90 line 23 to Tr. 91 line 6.
[92] *Id.*, Tr. 91 lines 15-20.
[93] *Id.*, Tr. 92 lines 12- 24.
[94] *Id.*, Tr. 92 line 25 to Tr. 94 line 17.
[95] *Id.*, Tr. 94 line 14 to Tr. 96 line 12.
[96] *Id.*, Tr. 94, lines 18-24.

wall with a gap between would lead to that, the beginning of hydrostatic cracking down the wall."[97]

Dr. Mosher testified that, if the barge was traveling perpendicular to the wall but a corner of the barge hit the wall, the force at the point of impact could be larger than the entire water load on the wall.[98] "And what would be -- it could be greater than the water load or it could be somewhere close to what the water load would be. At that particular point, it's going to be much higher than any water load at that point. That's why we don't see water punching through a wall where you might see the structure punching through the wall."[99] Dr. Mosher added: "In -- in general terms, I would think that, you know, **the wall would not do a very good job of resisting the barge**."[100] (Emphasis supplied.)

Dr. Bea testified that he did not know of anyone in the Team Louisiana group who had the responsibility of analyzing the effect of the barge.[101] No one on the Independent Levee Investigation Team had the responsibility of making such an analysis.[102] Indeed, Dr. Bea testified that that the goal of their investigation was to establish a finding relating to geotechnical engineering, and that if the barge had been a cause of the failure of the North or South breach, that would interfere with the goals of the investigation.[103]

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is not only an instrument of "just, speedy and inexpensive" resolution, but also a "lethal weapon" capable of "overkill." *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123 (5th Cir. 1978) (*quoting Albatross Shipping Corp. v. Stewart*, 326 F.2d 208, 211 (5th

---

[97] *Id.*, Tr. 96 line 19 to Tr. 98 line 6.
[98] *Id.*, Tr. 126 line 24 to Tr. 128 line 16.
[99] *Id.*, Tr. 128 lines 4-11.
[100] *Id.*, Tr. 129, lines 2-4.
[101] Plaintiffs' Exhibit __, September 14, 2009 Deposition of Robert Bea, Tr. 71 lines 1-8.
[102] *Id.*, Tr. 69 lines 18-25.
[103] *Id.*, Tr. 219 line 4 to Tr. 220 line 24.

Cir. 1964); *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967)).   Summary judgment should only be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"The movant has the burden of showing that there is no genuine issue of [material] fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex Corp.,* 477 U.S. at 325.   "In order for summary judgment to be granted, the facts and inferences must point so strongly and overwhelmingly in favor of one party, that the Court believes that reasonable men could not arrive at a contrary verdict." *Hall v. Diamond M Co.*, 732 F.2d 1246, 1250 (5th Cir. 1984).   Indeed, "the movant is held to a stringent standard." *Davidson v. Stanadyne, Inc.*, 718 F.2d 1334, 1340 (5th Cir. 1983) ("Before summary judgment will be granted it must be clear what the truth is").

"The party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly carried its burden." *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982).   However, if the moving party satisfies its burden, "the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial." *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001).

"A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Pylant v. Hartford Life & Accident Ins. Co.*, 497 F.3d 536, 538 (5th Cir., 2007); *Anderson,* 477 U.S. at 248.   "The issue of material fact

required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *See Pylant*, 497 F.3d at 538 (*citing First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). "Indeed, even if the moving party comes forward with an abundance of evidence supporting its theory of the case, the nonmoving party may nevertheless defeat the motion by countering with evidence of its own, which, if credited by the fact-finder, would entitle the nonmoving party to a verdict in its favor." *See International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. Tex. 1991).

Importantly, the "court's role at the summary judgment stage is not to weigh the evidence or determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial." *See Pylant*, 497 F.3d 536, 538 (5th Cir. 2007); *Anderson,* 477 U.S. at 249. "In reviewing the evidence, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes[.]" *See International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991). "In deciding whether a fact issue has been created, [the court] must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *See Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000); *LeMaire v. Louisiana*, 480 F.3d 383, 387 (5th Cir. 2007). Thus, "so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion." *International Shortstop*, 939 F.2d at1264.

Moreover, "[s]ummary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts."

*See Martin v. John W. Stone Oil Distributor, Inc.*, 819 F.2d 547, 548 (5th Cir. 1987).   "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Id*.

## IV.   STANDARDS RELATING TO DEFENDANT'S SUMMARY JUDGMENT BURDEN REGARDING CAUSATION PRECLUDE DEFENDANT'S INSTANT MOTION AS A MATTER OF LAW

As a general rule, challenging the issue of causation by way of summary judgment is disfavored, as "[t]he issue of causation is generally a question of fact to be determined at trial." *See Tidewater Marine v. Sanco Int'l*, 1997 U.S. Dist. LEXIS 13778, 17-16 (E.D. La. Sept. 3, 1997) (citing *Gavagan v. United States*, 955 F.2d 1016, 1019 (5th Cir. 1992); *Cheek v. Williams-McWilliams Co., Inc.*, 697 F.2d 649, 652 (5th Cir. 1983)). As such, "[the] Court should only decide the issue of causation on summary judgment if the allegation is 'so frivolous and obviously impossible so as to fall short of presenting a genuine issue of material fact.'" *See Tidewater Marine*, 1997 U.S. Dist. LEXIS 13778, 17-16; *Bommarito v. Penrod Drilling Corp.*, 929 F.2d 186, 188 (5th Cir. 1991) (explaining that a court should take the question of causation away from a jury only in the "complete absence of facts to support" liability). [104]

However, summary judgment on the issue of causation is necessarily precluded as a matter of law where, as is the case here, the moving party seeks to disprove causation by challenging the credibility of direct eyewitness testimony. *See e.g. Perez-Trujillo v. Volvo Car Corp.*, 137 F.3d 50, 53-54, 56 (1st Cir., 1998) (concluding that "eyewitness testimony from Pagan [that the airbag deployed prior to the accident] could not be dismissed as incredible without resorting to impermissible factfinding").   Indeed, applicable Supreme Court authority precludes a trial court from making determinations regarding the credibility of direct eyewitness

---

[104] Questions of negligence and causation in admiralty cases are treated as fact questions. *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1353 (5th Cir. 1988).

testimony, even on purported "implausibility" grounds, in the confines of a motion for summary judgment.  *See Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir., 1994) ("the Supreme Court in *Matsushita*, 475 U.S. at 587, authorized an inquiry on summary judgment into the 'implausibility' of inferences from <u>circumstantial evidence</u>, . . . <u>not</u> an inquiry into the credibility of <u>direct evidence</u>.").

Even putting this issue aside, the impropriety of Defendant's instant motion is further compounded by the fact that the issue of Defendant's burden on causation implicates the Pennsylvania Rule.  In maritime collision cases, the "[Pennsylvania] rule allocates the burden of proof [on causation], transferring it to the party in violation of a statute or regulation.  *See Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. La. 1991).  When invoked, "[t]he Pennsylvania rule applies a higher standard of proof" [*In re Quality Marine Servs.*, 2005 U.S. Dist. LEXIS 9201, 7 (E.D. La. 2005)], which "imposes a heavy burden" on the defendant.  *See Pennzoil*, 943 F.2d at 1472;  *Candies Towing Co. v. M/V B & C Eserman*, 673 F.2d 91, 94 (5th Cir., 1982) ("where a vessel is guilty of a statutory violation, the defaulting ship must show 'not merely that her fault might not have been one of the causes, or that it probably was not, <u>but that **it could not have been**</u>.'").   Significantly, as the issue of whether Defendant engaged in a statutory violation is a question reserved for the trier of fact, the presence of this issue alone requires the denial of Defendant's instant Motion.  *See e.g. Dover Barge Co. v. Tug "Crow"*, 2009 U.S. Dist. LEXIS 67970, at 17 (S.D.N.Y. July 30, 2009) (concluding that "the motion for summary judgment is denied … because whether the Pennsylvania Rule applies turns on the jury's findings [on whether the defendant committed a statutory violation].")

Thus, based on the forgoing issues alone, Defendant's instant Motion must be denied as a

matter of law.

**V.     DEFENDANT HAS NOT MET ITS BURDEN ENTITLING IT TO SUMMARY JUDGMENT ON THE ISSUE OF WHETHER THE BARGE MOVED ACROSS THE IHNC PRIOR TO THE NORTH AND SOUTH BREACHES**

**A.     A Material Issue of Disputed Fact Exists On The Issue Of Whether the Barge Moved Across the IHNC Prior to The North And South Breaches**

1.   Facts in Dispute Demonstrate that the Barge Was Present at the Location of the North Breach

Contrary to Defendant's claim, there is substantial evidence placing in dispute Defendant's assertion – which is driven purely by expert modeling and hypothesis – that Barge ING 4727 could not have been present at the location of the North breach at the time that the floodwall was breached.

As an initial point, Defendant's broad assertion that it was impossible for the Barge to travel to the Eastern side of the IHNC due to motivational forces preventing the Barge from leaving the Lafarge dock is disputed by eyewitness interviews conducted by Defendant itself.  As discussed above, Lafarge's investigative agency, Centanni, interviewed two witnesses who saw the barge in the IHNC on Sunday afternoon, August 28, 2005.  The first witness, Gertrude LeBlanc attested that she saw the barge in the IHNC on Sunday morning, August 28, 2005, while she was on the Claiborne Avenue Bridge crossing the IHNC.  *Plaintiffs' Exh. 24* (October 21, 2009 Affidavit of Gertrude LeBlanc).  According to her account, the Barge was near the East side (the Lower Ninth Ward side), between the Claiborne Avenue and Florida Avenue Bridges. *Plaintiffs' Exh. 25* ( LeBlanc Statement to Centanni , at 2-3).  Ms. LeBlanc's October 21, 2009 Affidavit stated that she saw the Barge next to the East floodwall for the Lower Ninth Ward, between the Claiborne Avenue and Florida Avenue bridges, between 11:00 A.M. and Noon on Sunday, August 28, 2005. *See Plaintiffs' Exh. 24.*  Frazier Tompkins, the second witness, stated

that on Sunday, August 28, 2005, he saw an unattended barge by itself in the vicinity of Derbigny, Roman and Prieur streets on the east side of the canal. (*Plaintiffs' Exhibit 23*. Centanni transcript of Tompkins interview).  Significantly, despite the fact such eyewitnesses statements were obtained by Defendant, both Defendant and Defendant's experts have omitted **<u>completely</u>** any consideration of such eyewitness statements from their analysis on this issue.

In addition to this eyewitness testimony, this fact is further supported by a total of 21 different people that have been identified as having perceived sounds, such as booms, explosions, grinding and metallic screeching on the Eastern side of the IHNC on the day in question between the time period of 3:00a.m. and 7:00 a.m.  (*Barge Plaintiffs' Compendium of Proof No. 3 Re: Sounds Identified with the Barge Contact with the Eastern IHNC Floodwall*). While Defendant claims that this testimony must be discounted by its claim that such noises were heard in other locations, this fact standing alone is incapable of depriving Plaintiffs of their right to draw an inference from such witness testimony that such noises were attributable to the Barge striking the eastern wall of the IHNC floodwall.  Indeed, this Court cannot even evaluate the significance of such witness statements describing the noises which they heard, absent live testimony within the confines of trial.  *See Richardson v. Oldham*, 12 F.3d 1373, 1379 (5th Cir., 1994).

More to the point, Plaintiffs also proffer the direct eyewitness testimony of the William Villavasso – an individual who routinely observed barges on the INHC during his 23 years working for the Sewerage and Water Board – who testified repeatedly at deposition that he personally witnessed the tip of a barge impact and cause the Northern floodwall breach. (*Plaintiffs' Exhibit 35*.  December 18, 2007 Deposition of William Villavasso, 24:9 – 25:13, 64:21-24, 71:5-9, 81:12-22, 85:2-8, 86:2-5, 86:9-16, 89:3-20, 97: 6-16, 98:14-17, 128:2-24,

186:23 -187:18, 191:12-25, 202:6-203:7, 203:8 – 204:18.).    Defendant baldly argues that Mr. Villavasso's testimony is not plausible because "the object [he] allegedly saw was sticking up out of the water only one to four feet above the top of the floodwall."   (Deft. Mem. at 13). However, this argument is disingenuous, as Mr. Villavasso's testimony repeatedly refers to the fact he only saw what he perceived was the tip of the barge protruding from the floodwall, not to the height of the barge above the water.   *See id.*   Thus, even if this Court could evaluate the substance or credibility of Mr. Villavasso's testimony within this Motion – which it cannot – Defendant provides no basis for concluding that Mr. Villavasso's testimony is implausible.

In short, based on applicable summary judgment standards (by which this Court is bound), these eyewitnesses statements – standing alone – place in dispute the hypothesis of Defendant's experts that Barge ING 4727 could not have been present at the location of the North breach at the time that the floodwall was breached.

However, in addition to the forgoing, there is also substantial evidence placing in dispute Defendant's expert modeling hypothesis that motivational forces prevented Barge ING 4727 from leaving the Lafarge dock until after the North and South breaches occurred.

As an initial point, it is material that Defendant's expert modeling is predicated upon the material assumption that the ING 4727 was moored at the Lafarge facility at the time Katrina reached the IHNC.   However, as all inferences must be drawn in favor of Plaintiffs, the fundamental premise of Defendant's entire scientific argument   necessarily fails.   This is especially true insofar as the direct eyewitness testimony Gertrude LeBlanc and Frazier Tompkins directly contradict this premise. (*see infra*).

Putting this material defect aside, there are at least seven (7) eyewitnesses who have testified   that surface/local wind directions varied substantially, and did not conform to

defendant's experts' assumptions. Such testimony includes:

- Observations of water splashing over the eastern IHNC floodwall, from west to east, at times when water in the IHNC was below the top of the floodwall, at which times Lafarge asserts that wind was not blowing from west to east.

- Observations of wind blowing Southeast to Northwest in the Lower Ninth Ward at a time when Lafarge asserts that it was from the Northeast.

- Observations of South-to-north wind in Chalmette, west of Paris Road, at a time when Lafarge asserts that wind direction was from north to south.

- Observations of unpowered vessels in the Intracoastal Waterway being blown from west to east at times at which Lafarge asserts that wind was not blowing from west to east.

*Barge Plaintiffs' Compendium Of Proof No. 7 Re: Wind Direction.*

Additionally, the daily tide is a well-known phenomenon, however, and Lafarge's experts also did not take it into account in their modeling. Donald Green, a retired Coast Guard Commander, consulted the tide tables and found it plausible that tidal current could have carried the barge up to the Florida Avenue Bridge by Sunday night or early Monday morning. (*Plaintiffs' Exhibit 59*, Green Decl., at ¶ 8). Moreover, while Defendant claims that its hypothetical modeling proves that waive height was insufficient to move the Barge, this is disputed by the direct eyewitness testimony of William Villavasso, who testified that he saw a 20-foot wall of water going down the canal which immediately preceded the impact of what he testified was the tip of a barge breaking through the floodwall at the location of the Northern breach. (*Plaintiffs Exh 35.* Villavasso Depo, at 186:23-187:18). As attested by Plaintiff's marine engineer/naval architect expert, Hector Pazos, a "solitary wave" or a "wave train" may be generated by a storm surge through what is referred to as a Meteotsunami. This entails the displacement of water comes from low atmospheric pressure within the center of a depression that causes tropical cyclones. (*Plaintiffs' Exhibit 87*, Decl. of Hector Pazos at ¶29-30). As

explained by Mr. Pazos, this description is consistent with the facts attested to by Mr. Villavasso. *Id*.

In sum, Plaintiffs have presented a substantial body of direct eyewitness evidence which places into dispute Defendant's expert driven hypothesis that Barge ING 4727 could not have been present at the location of the North breach at the time that the floodwall was breached. As this Court may not evaluate such evidence, or engage in credibility determinations in the confines of this Motion, Defendant's motion for summary judgment must be denied on this issue.

> 2. <u>Facts in Dispute Demonstrate that the Barge Was Present at the Location of the South Breach</u>

Contrary to Defendant's claim, there is also substantial evidence placing in dispute Defendant's assertion that Barge ING 4727 could not have been present at the location of the South breach at the time that the floodwall was breached.

Indeed, as previously discussed, the Defendant's broad assertion that it was impossible for the Barge to travel to the Eastern side of the IHNC due to motivational forces preventing the Barge from leaving the Lafarge dock is disputed by eyewitness interviews conducted by Defendant itself. Statements given to Defendant's investigator by both Gertrude LeBlanc (*Plaintiffs' Exh. 24 and 25*), and Frazier Tompkins (*Plaintiffs' Exhibit 23*) reflect that both individuals viewed a barge on the east side of the IHNC on Sunday, August 28, 2005 – the day before both the North and South breaches occurred. Again, despite the fact such eyewitnesses statements were obtained by Defendant, both Defendant and Defendant's experts have omitted **<u>completely</u>** any consideration of such eyewitness statements from their analysis on this issue.

Similarly, this eyewitness testimony is further supported by a total of 21 different people that have been identified as having perceived sounds, such as booms, explosions, grinding and

metallic screeching on the Eastern side of the IHNC on the day in question between the time period of 3:00a.m. and 7:00 a.m.  (*Barge Plaintiffs' Compendium of Proof No. 3 Re Sounds Identified with the Barge Contact with the Eastern IHNC Floodwall*).  Again, contrary to Defendant's claim, this testimony may be discounted by the Court, as this Court cannot evaluate the significance of such witness statements describing the noises which they heard, absent live testimony within the confines of trial. *See Richardson v. Oldham*, 12 F.3d 1373, 1379 (5th Cir., 1994).

Plaintiffs also proffer the direct eyewitness testimony of Lower Ninth Ward resident Terry Adams who testified at deposition that he personally witnessed the Barge impact and cause the Southern floodwall breach.  Adams, who had evacuated to the roof of his home at 2604 Deslonde Street between 5:30 A.M. and 6:00 A.M. on Monday, August 29, 2005, witnessed the Barge impact and break through the floodwall from about five blocks away.  (*Plaintiffs' Exhibit 18*,  Deposition of Terry Adams, at 12:25-15:12; 16-14-18:12; 18:19-20:5; 20:18-21:20; 22:19-23; 25:4-27:8; 82:2-12.).  Like Mr. Villavasso, Defendant asserts that Mr. Adam's testimony is not plausible because Adams was five blocks away, and similar to Mr. Villivasso, testified he could only see four feet of the barge above the floodwall.  Deft. Mem. at 13-14.  As with Mr. Villavasso, Defendant distorts Mr. Adams testimony, as Mr. Adams did not testify that the Barge only suck up four feet above the wall, but rather, that was only as much of the Barge as he could see. (*Plaintiffs' Exhibit 18*,Deposition of Adams, at 82:2-12).  Thus, even if this Court could evaluate the substance or credibility of Mr. Adam's testimony within this Motion – which it cannot – Defendant provides no basis for concluding that Mr. Adams's testimony is implausible. Similarly, and for the same reasons, Defendant improperly claims that this court should disregard the testimony of two other eyewitnesses, Arthur Murph and Sidney Williams, both of whom also

rendered statements that they witnessed the Barge impact and penetrate the floodwall as the location or the Southern breach. (*Plaintiffs' Exhibit 1, October 9, 2008 Deposition of Sidney Williams*, at 25-26, 60:6-11, 81-82, 67:8-19; *Plaintiffs' Exhibit 21*, Arthur Murph's January 25, 2006 recorded statement to Attorney Richard Joseph Guidry; *Plaintiffs' Exhibit 14*, Deposition of Arthur Murph, at 191-193.).[105]

Thus, based on applicable summary judgment standards (by which this Court is bound), these eyewitnesses statements – standing alone – place in dispute the hypothesis of Defendant's experts that Barge ING 4727 could not have been present at the location of the South breach at the time that the floodwall was breached.

However, in addition to the forgoing, there is also substantial evidence placing in dispute Defendant's expert modeling hypothesis that motivational forces prevented Barge ING 4727 from leaving the Lafarge dock until after the North and South breaches occurred.

As discussed above, Defendant's expert modeling is predicated upon the faulty assumption that the ING 4727 was moored at the Lafarge facility at the time Katrina reached the IHNC. Again, this assumption necessarily fails, not only because all inferences must be drawn in favor of Plaintiffs, but because the direct eyewitness testimony Gertrude LeBlanc, Frazier Tompkins, William Villavasso, Terry Adams, Arthur Murph and Sidney Williams placing the Barge on the eastern side of the IHNC prior to the North and South breaches all directly contradict this premise. (*see infra*).

Putting this material defect aside, Defendant's expert hypothesis that all motivational forces prevented the Barge from leaving the Lafarge dock prior to the North and South Breaches

---

[105] Lafarge no doubt intends to challenge the credibility of Mr. Murph based on his subsequent deposition testimony that varied from his statement. There is an extensive backstory here relating to Lafrage's subsequent settlement with Mr. Murph that will have to be fleshed out at trial, but Plaintiffs have significant evidence to challenge the authenticity of any subsequent inconsistent statement by Arthur Murph.

is placed in dispute by at least seven (7) eyewitnesses who have testified that surface/local wind directions varied substantially, and did not conform to defendant's experts' assumptions.  (*Barge Plaintiffs' Compendium of Proof No. 7 Re: Wind Direction*).

Even then, Defendant's contention that waive height on the IHNC were insufficient to move the Barge is placed in dispute by **(1)** the direct eyewitness testimony of William Villavasso, who testified that he saw a 20-foot wall of water going down the canal (*Plaintiffs' Exh 35.* , Villavasso Depo, at 186:23-187:18), **(2)** the testimony of marine engineer and naval architect Hector V. Pazos, P.E. regarding meteotsunami (*Plaintiffs' Exhibit 87*, Decl. of Hector Pazos at ¶29-30), and **(3)** the testimony of Donald Green regarding tide currents.  (*Plaintiffs' Exhibit 59*, Green Decl., at ¶ 8).

 In sum, Plaintiffs have presented a substantial body of direct eyewitness evidence which places into dispute Defendant's expert driven hypothesis that Barge ING 4727 could not have been present at the location of the South breach at the time that the floodwall was breached.  As this Court may not evaluate such evidence, or engage in credibility determinations in the confines of this Motion, Defendant's Motion for Summary Judgment must be denied on this issue.

**B.    Defendant's Effort to Leverage its Own Experts' Theories and Conclusions as Proving the Plaintiff's Evidence and the Testimony of over 30 Eyewitnesses are "Implausible" Necessarily Fails as a Matter of Law**

Defendant wrongly asserts that it is entitled to summary judgment because the evidence proffered by Plaintiffs on causation is implausible or "at variance with the laws of nature"  *See Motion*, at 1; 18.  To advance this argument, Defendant uses its own experts' theories and conclusions to leverage this Court to systematically **(1)** disregard the testimony of numerous eyewitnesses, all of whom either viewed or heard the Barge on the East side of the IHNC

(immediately adjacent to the Lower Ninth Ward)  prior to the North and South breaches (*Motion*, at, 13-14), and (**2**) disregard the conclusions of Plaintiffs' expert witnesses, claiming that their conclusions were worthless because they (**1**) took such witness testimony into account in rendering their opinions, and (**2**) did not undertake the same analysis or reach the same conclusions as Defendant's own experts.  *See Motion*, at 14-16.  This line of reasoning necessarily fails on multiple levels, as it would entail that this Court undertake various forms of analysis precluded in the confines of a summary judgment motion as a matter of law.

1. <u>Defendant's MSJ Theory Requires That The Court Make Impermissible Credibility Determinations</u>

First and foremost, for Defendant to prevail on its impossibility argument, this Court must affirmatively find that every eyewitnesses supporting Plaintiffs' theory – which exceed 30 in number – all lack credibility.  Indeed, such eyewitness testimony is a material impediment to Defendant's scientific hypothesis that Barge ING 4727 could not have been present at the location of the South breach because this hypothesis fails if: (**1**) eyewitnesses viewed Barge ING 4727 on the East side of the IHNC the day before the North and South breaches occurred, (**2**) witnesses heard Barge ING 4727 hitting the floodwall on the east side of the IHNC immediately prior to the floodwall breaches, (**3**) witnesses viewed Barge ING 4727 impact the floodwall at the locations of the North and South breach, (**4**). eyewitnesses dispute Defendant's hypothesis regarding the direction and uniformity of surface/local wind directions and (**5**) eyewitnesses dispute Defendant's hypothesis regarding wave height.

However, this Court cannot engage in such credibility determinations.  Indeed, as held by the Fifth Circuit, "[c]redibility determinations have no place in summary judgment proceedings" and as such, "[t]he non-movants' summary judgment evidence must be taken as true."  *See Richardson v. Oldham*, 12 F.3d 1373, 1379 (5th Cir., 1994); *See also Anderson v. Liberty Lobby*,

*Inc.*, 477 U.S. 242, 255 (1986) ("[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Defendant claims – and wrongfully so – that this Court is entitled to disregard all thirty-plus proffered eyewitness' testimony on the grounds of "implausibility."  This assertion fails as a matter of law on several grounds:

**First**, the rule cited by Defendant regarding implausibility is inapplicable to direct eyewitness testimony, as "the Supreme Court in *Matsushita*, 475 U.S. at 587, authorized an inquiry on summary judgment into the 'implausibility' of inferences from **circumstantial evidence**, . . . **not** an inquiry into the credibility of **direct evidence**."  *See Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir., 1994);  *McLaughlin v. Liu*, 849 F.2d 1205, 1207 (9th Cir. 1988) (same); *Fraser & Wise, P.C. v. Primarily Primates*, 966 F. Supp. 63, 70 (D. Mass. 1996) ("when 'the non-moving party presents **direct evidence** refuting the moving party's motion for summary judgment, the court must accept that evidence as true.'").

Thus, as Plaintiffs' proffered eyewitness testimony is direct evidence negating Defendant's claim that Barge ING 4727 could not have traveled away from the Lafarge facility until after the North and South breaches occurred[106] [*School Dist. No. 1J Multnomah County v. Acands, Inc.*, 1991 U.S. Dist. LEXIS 18474 (D. Or. Dec. 6, 1991) ("Direct evidence is direct proof of a fact, such as the testimony of an eye witness.")], this Court may not properly rule on the credibility of such testimony in the confines of a summary judgment motion.  Indeed, as the proffered eyewitness testimony of the barge impacting the floodwalls, standing alone, may prove causation as to the North and South breaches, any issue as to credibility is necessarily reserved for the trier of fact.  *See e.g. Perez-Trujillo v. Volvo Car Corp.*, 137 F.3d 50, 53-54, 56 (1st Cir.,

---

[106] In fact, Plaintiffs' provered evidence consists of eyewitness testimony actually witnessing the North and South breaches.  However, this was not the issue framed by Defendant in its instant Motion.

1998) (concluding that "eyewitness testimony from Pagan [that the airbag deployed prior to the accident] could not be dismissed as incredible without resorting to impermissible factfinding" and that "the Pagan eyewitness testimony -- standing alone -- represented competent evidence that the air bag in the Perez Volvo had an unsafe defect").

**Second**, contrary to Defendant's assertion, *Ralston Purina Co. v. Hobson,* 554 F. 2d 725 (5th Cir. 1977) is not applicable to the posture of the instant case.  In *Ralston*, JNOV was granted because the only evidence presented was from a single witness – the plaintiff – who offered only his own self-serving testimony. *See Ralston*, 554 F. 2d at 728.   Here, however, many of the challenged eyewitnesses are disinterested from the instant action.  Even putting that issue aside, however, in *Dotson v. Clark Equipment Co.*, 783 F.2d 586 (5th Cir. La. 1986), the Fifth Circuit deemed *Ralston* inapposite where, as is the case here, a plaintiff's testimony was bolstered by the testimony of other witnesses and evidence:

> The record, in fact, convinces us that sufficient evidence was presented to create a jury issue. The **testimony of Dotson's witnesses bolstered his own version of the accident**. Because Clark Equipment presented other witnesses to discredit Dotson's case, resolution of the case required credibility determinations. This renders improper a judgment n.o.v.; "the question of a witness's credibility is the purest of jury issues." *Hindman v. City of Paris, Texas*, 746 F.2d 1063, 1068 (5th Cir.                                                                                      1984).

*See Dotson*, 783 F.2d at 588.

Furthermore, *Ralston* is also inapplicable because the substance of the eyewitness testimony does not rise to the level of being "impossible."  *See Miller v. Butcher Distribs.*, 89 F.3d 265, 267 (5th Cir. La. 1996) ("reasoning that Butcher Distributors misapplies Ralston" as "Miller's testimony was not 'naturally impossible,' as was the case in Ralston.").  Indeed, "the testimony sought to be withheld from the trier of fact must be not just implausible, but utterly implausible in light of all relevant circumstances." *See In re Chavin*, 150 F.3d 726, 728-729 (7th

Cir. Ill. 1998).   Here, the testimony of such witnesses is not impossible, not only because Defendant's impossibility argument was premised on distortions of eyewitness testimony, but also because Defendant's hypothesis that that Barge ING 4727 could not have been present at the locations of the North and South breach at the time that the floodwalls were breached impermissibly draws and inference in Defendant's favor, and in any event, is disputed by substantial evidence.

Finally, *Ralston* is inapplicable where, as is the case here, the challenged testimony at issue goes to the very heart of the case.   As the Fifth Circuit concluded in *Hindman v. Paris*, 746 F.2d 1063 (5th Cir., 1984), this circumstance renders credibility a per se jury question – even in the face of contradictory testimony:

> Although a jury might well have chosen not to believe Whitley's testimony in the face of this contrary evidence, the question of a witness's credibility is the purest of jury issues. Whitley's story, even though contradicted, was enough if the jury believed him. *See Branch v. Chevron International Oil Co.*, 681 F.2d 426, 430-31 (5th Cir.1982) (jury question was presented by plaintiff's testimony describing scene of accident, despite defendant's testimony flatly contradicting plaintiff's description).

*Hindman v. Paris*, 746 F.2d 1063, 1068 (5th Cir., 1984).[107]

Thus, in asking the Court to disregard the substance of the witness affidavits and depositions before it, Defendant necessarily requests that the Court make impermissible witness credibility determinations on material issues relating to causation.  As this Court may not engage

---

[107] For all of these reasons, Defendant's analogy in the following cases also fail. In *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1071 (5th Cir. 1994), the plaintiffs failed to provide "*any evidence*" supporting their theory of recovery.  Likewise, in *Sievers v. Beechcraft Mfg. Co.*, 497 F. Supp. 197, 201 (E.D. La. 1980), the plaintiff was unable "to introduce *any evidence* indicating a causal connection between any alleged defect and the crash" because "the aircraft was totally demolished in the crash."  Unlike these cases, Plaintiff has provided direct eye witness testimony not only establishing that the Barge was on the east side of the IHNC prior to the North and South breaches, but that the Barge impacted the floodwall at these locations.

in such analysis in the confines of a summary judgment motion, Defendant's Motion must be denied.

    2.  <u>Defendant's Theory Requires That The Court Impermissibly Draw Inferences In Defendant's Favor</u>

At the Summary Judgment stage, all justifiable inferences are to be drawn in favor of the nonmovant. *Anderson,* 477 U.S. at 255. Failure of the trial court to adhere to this requirement is grounds for reversal. *See e.g. Davidson v. Stanadyne, Inc.*, 718 F.2d 1334, 1340 (5th Cir. 1983) (holding that grant of Summary Judgment required reversal because "we are unable to conclude that a reasonable jury could not draw conflicting inferences from all of the facts and circumstances of this case as it might be so developed and that none of those inferences would support her theories of recovery.")

Here, the grant of Defendant's instant motion would require the Court to impermissibly draw multiple inferences in Defendant's favor. In fact, Defendant's scientific modeling – like all scientific modeling – is predicated upon a series of material assumptions which Defendant requires be drawn in its favor. For example, as previously discussed, Defendant's claim that its scientific modeling establishes that current, wave and wind conditions prevented the ING 4727 from traversing the canal until after the breaches occurred is dependent upon the material assumption that the ING 4727 was moored at the Lafarge facility at the time Katrina reached the IHNC. Yet, Defendant is not entitled to avail itself to this inference to establish an entitlement to summary judgment, especially where eye witnesses have placed the ING 4727 unmoored, at the east side of the IHNC, opposite the berth at which it was supposedly moored the day before Katrina reached the IHNC. Please see Compendium of Proof No. 1, concerning locations at which the barge was observed on August 28 and 29, 2005 other than the Lafarge Terminal

Similarly, Defendant's modeling also requires the inference that there is absolute uniformity in the direction and timing of all winds, waves and currents.  However, even if the Court were permitted to draw such inferences in Defendant's favor – which it is not – several facts indicate that wind was blowing in a manner different than that described by Defendant, including: **(1)** at least seven (7) eyewitnesses who have testified that surface/local wind directions varied substantially, and did not conform to defendant's experts' assumptions (*Barge Plaintiffs' Compendium Of Proof No. 7 Re: Wind Direction*), **(2)** The direct eyewitness testimony of William Villavasso, who testified that he saw a 20-foot wall of water going down the canal (*Plaintiffs' Exh 35.,* Villavasso Depo, at 186:23-187:18), **(3)** The testimony of marine engineer and naval architect Hector V. Pazos, P.E. regarding meteotsunami (*Plaintiffs' Exhibit 87,* Decl. of Hector Pazos at ¶29-30), and **(4)** The testimony of Donald Green regarding tide currents.  (*Plaintiffs' Exhibit  59*, Green Decl., at ¶ 8).

Thus, as Defendant's summary judgment theory requires that this Court impermissibly draw inferences in defendant's favor on material facts, Defendant's Motion must be denied.

3.   <u>Defendant Cannot Obtain Summary Judgment by Using Its Own Experts'
Opinions to Establish Plaintiffs' Expert Opinions are Implausible</u>

Defendant claims that the conclusions of Plaintiffs' expert witnesses are implausible because Plaintiff's experts took into account eyewitness testimony in rendering their conclusions, and did not undertake the same analysis as Defendant's own experts.   This line of argument fails, as it is well established that summary judgment may not appropriately based on argument that parties' experts use different theories, data and reach different conclusions.   Indeed, "[c]ompeting expert opinions present the 'classic battle of the experts' and it is up to a jury to evaluate what weight and credibility each expert opinion deserves."  *See Phillips v. Cohen*, 400

F.3d 388, 400 (6th Cir. Ohio 2005); *Michaels v. Avitech, Inc.*, 202 F.3d 746, 752 (5th Cir. 2000) (reasoning that "[t]he record evidence … reveals a 'battle of the experts' as to whether the weather conditions made it unreasonable for a pilot to take off that morning" and as such "summary judgment is precluded as to the pilot's decision to fly."); *Green v. United State*s, 2003 U.S. Dist. LEXIS 21871, 7-8 (E.D. La. Dec. 2, 2003) (denying summary judgment where "motion presents the Court with a classic 'battle of experts.'").

Based on this fact, Defendant's effort to leverage its own experts' theories and conclusions as proving Plaintiffs' theories and conclusions are "scientifically impossible" necessarily fails, as this Court may not favor Defendant's theory as being more credible [*See e.g. Phillips v. Cohen*, 400 F.3d 388, 400 (6th Cir., 2005) ("The magistrate judge engaged in an extensive analysis of the parties' expert reports and found Claudy's conclusions more credible. This approach of weighing the credibility of the competing expert reports amounts to improper fact-finding.")], nor may the Court use the fact Plaintiffs rely on a completely different theory as a basis of concluding that Plaintiffs have failed to place the issue of causation in dispute.   See *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 806 (6th Cir., 2000).  As concluded by the Court in *McLean*, this type of analysis constitutes reversible error:

> The district court erred by treating Popp's deposition testimony and the NTSB findings as definitive, whereas they are contradicted by expert testimony and may be challenged at trial. The court thus did not view the evidence in the light most favorable to the plaintiffs in granting summary judgment. Plaintiffs' expert testimony is sufficiently rooted in the available evidence to make out a reasonable theory of causation. Thus, plaintiffs should have been allowed to take their negligence theory to a jury. The judgment of the district court is therefore REVERSED,      and      the      case      is      remanded      for      trial.

*McLean*, 224 F.3d at 806.

Based on these facts, Defendant's effort to analogize this case to *Kampen v. American Isuzu Motors*, 157 F.3d 306, 318 (5th Cir. La. 1998), fails as a matter of law.  Contrary to

Defendant's assertion, Pazos' opinion is not comprised of "conclusory, unsupported assertions," but rather, is bolstered by independent evidence sufficient to support the conclusion that the barge not only moved across the IHNC prior to the North and South breaches, but that the Barge impacted the floodwall at both locations.[108]

## VI.   DEFENDANT HAS NOTMET ITS BURDEN ENTITLING IT TO SUMMARY JUDGMENT AS A MATTER OF LAW ON THE ISSUE OF WHETHER BARGE ING 4727'S IMPACT CAUSED THE NORTH AND SOUTH BREACHES

### A. Defendant Has Failed to Meet the Heavy Burden Under the Pennsylvania Rule of Establishing that the Barge "Could Not Have Been" the Cause of The North and South Breaches

As Defendant's failure to moore the Barge to withstand hurricane conditions constituted a regulatory violation, Defendant must be deemed to bear the burden of proof under the Pennsylvania Rule on the issue of whether Barge ING 4727's impact caused the north and south breaches.   The Pennsylvania Rule states that:

> The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster.   In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, **but that it could not have been**.   Such a rule is necessary to enforce obedience to the mandate of the statute.

*The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).

"The rule of The Pennsylvania concerns … the burden of proof for showing causation[.]"

*See Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir., 1991).

When implicated, "[t]he rule allocates the burden of proof, transferring it to the party in violation

---

[108] Equally inapplicable is *White v. Black & Decker (U.S.) Inc.*, 2004 U.S. Dist. LEXIS 11233 (E.D. La. June 15, 2004), wherein summary judgment was granted for the defendant in a product liability case because the plaintiff failed to demonstrate that his proposed alternative design would not have an adverse effect on the utility of the product.  *See id.*, at 32-34.

of a statute or regulation." *See Pennzoil*, 943 F.2d at 1472.  In so doing, "[t]he Pennsylvania rule applies a higher standard of proof" [*In re Quality Marine Servs.*, 2005 U.S. Dist. LEXIS 9201, 7 (E.D. La. 2005)], which "imposes a heavy burden" on the defendant.  *See Pennzoil*, 943 F.2d at 1472. "In simplest terms, that rule states that where a vessel is guilty of a statutory violation, the defaulting ship must show 'not merely that her fault might not have been one of the causes, or that it probably was not, **but that it could not have been**.'"  *See Candies Towing Co. v. M/V B & C Eserman*, 673 F.2d 91, 94 (5th Cir., 1982). [109]

Even if the question of whether the Pennsylvania Rule applies can be resolved in a motion for summary judgment – which as explained above, it cannot [*Dover Barge Co. v. Tug "Crow"*, 2009 U.S. Dist. LEXIS 67970, at 17 (S.D.N.Y. July 30, 2009) (concluding that "the motion for summary judgment is denied … because whether the Pennsylvania Rule applies turns on the jury's findings [on whether the defendant committed a statutory violation]."))] – the undisputed evidence demonstrates that Defendant violated applicable maritime regulations by evacuating its facility prior to Hurricane Katrina leaving Barge ING 4727 moored with only three single strands (single parts) of rope.  Based thereon, Defendant's effort to establish summary judgment by pointing to the absence of plaintiff's evidence on causation falls woefully short of its heavy burden demonstrating that the Barge "could not have been" the cause of the North and South breaches as is required under the Pennsylvania Rule.

Based thereon, as set forth in detail below, Defendant's instant Motion must be denied.

    1.   The Pennsylvania Rule Applies to this Case

As explained by the court in *Evergreen Int'l, S.A. v. Marinex Constr. Co.*, 477 F. Supp.

---

[109] "Though The Pennsylvania involved a collision, the Pennsylvania rule has been held to apply not only to fact scenarios involving collisions or allisions, but also to 'violations of statutes intended to prevent the injury that actually occurred.'" *In re Quality Marine Servs.*, 2005 U.S. Dist. LEXIS 9201, 8 (E.D. La. 2005).

2d 681 (D.S.C. 2007), courts have even applied the Pennsylvania Rule to a whole host of rules and regulations, including  violations of customary law [*See Evergreen*, 477 F. Supp. 2d at 689 (citing *Ira S. Bushey & Sons. Inc. v. United States,* 172 F.2d 447 (2d Cir. 1949); The Madison, 250 F. 850 (2d Cir. 1918)), United States Coast Guard regulations [*See id*., (citing *Afran Transport Co. v. The Bergechief*, 274 F.2d 469 (2d Cir. 1960)], and Corps of Engineers building permits and operational regulations. *See* id. (citing *Folkstone Maritime Ltd.*, 64 F.3d 1037; *Florida E. Coast Ry. v. Revilo Corp.*, 637 F.2d 1060, 1064 (5th Cir. 1981); *In re Tug Helen B. Moran, Inc.*, 560 F.2d 527, 529 (2d Cir. 1977).  Based on such authority, the court "decline[d] to narrowly interpret the Rule as requiring a statutory violation before it may be applied" as "the *Pennsylvania* Rule applies more generally where a party has violated a known government-established safety requirement."  *See Evergreen*, 477 F. Supp. 2d at 689.

Here, as discussed above, the undisputed evidence reflects that Lafarge evacuated its facility **(1)** leaving the empty ING 4727 tied outboard and abreast of the fully loaded ING 4745, **(2)** that ING 4727 was *not* cabled to the shore, as required by Lafarge's own Hurricane Preparation Checklist, [110] but rather, tied *only* to ING 4745, and **(3)** that ING 4727 was tied to ING 4745 using only three single strands (single parts) of rope, despite the availability of no fewer than eleven (11) mooring points.  Please see Plaintiffs' Exhibit 94, Report of Don Green. Moreover, when Lafarge abandoned its facility on Saturday, August 27, it made no arrangement for anyone to monitor the barges it had left in the IHNC.[111]  Rather, Lafarge Manager Ed Busch, called Joe Domino, Inc./Unique Towing on the morning of Saturday, August 27, 2005 to have the empty Barge ING 4727 moved outboard of the Barge ING 4745, but did <u>not</u> **(1)** request any mooring of the Barge ING 4727 to the dock (per its own Hurricane Checklist "cable all barges to

---

[110] While LNA contends that its methods for tying barges had changed, this was the only published standard at LNA,
[111] *Plaintiffs' Exhibit 32*, Deposition of Lafarge Maintenance Supervisor Earl Smith, p. 54, lines 20-23.

shore"), or **(2)** instruct Domino to modify, check, or strengthen the moorings between the two barges.[112]

Based on these facts, Lafarge violated numerous regulatory standards, as set forth in the Report of Donald Green, USCG (Retired):

**First**, Lafarge's failure to ensure that the *ING 4727* was adequately moored to withstand the anticipated hurricane force winds of Hurricane Katrina violated the provisions of 33 CFR 162.75 (b)(3)(ii) relating to "Anchoring and Mooring." [113]  *See  Plaintiffs' Exhibit 94, Report of Donald Green*, at 8 (¶5.6).  Based on Green's opinion, "it was [Lafarge's] duty and responsibility to ensure that the barges were secured in such a manner, i.e. doubled up mooring lines, to withstand the expected hurricane force winds and tides of Hurricane Katrina, which they did not do."  *See Id*. (¶5.5).

**Second**, Lafarge's failure to ensure that the *ING 4727* was adequately moored to withstand the anticipated hurricane force winds of Hurricane Katrina violated the provisions 33 CFR 6.19, [114] which proscribed that Lafarge's primary responsibility was to ensure the protection

---

[112] *Plaintiffs' Exhibit 38*, Deposition of Lafarge Asst. Terminal Manager Edward Busch,  Tr. 81 lines 3-7, 11-14.

[113] 33 CFR § 162.75(b)(3), entitled "Anchoring or mooring"  states as follows:

> (i) Vessels or tows shall not anchor or moor in any of the land cuts or other narrow parts of the waterway, except in an emergency, or with permission of the District Commander. Whenever it becomes necessary for a vessel or tow to stop in any such portions of the waterway, it shall be securely fastened to one bank and as close to the bank as possible. This shall be done only at such a place and under such conditions as will not obstruct or prevent the passage of other vessels or tows. Stoppages shall be only for such periods as may be necessary.

> (ii) When tied up individually, all vessels and tows shall be moored by bow and stern lines. Tows shall be secured at sufficiently frequent intervals to insure their not being drawn away form the bank by winds, currents, or the suction of passing vessels. Lines shall be shortened so that the various barges in a tow will be as close together as possible.

> \*\*\*
> (iv) Whenever any vessel or tow is moored to the bank (paragraph (b)(3)(i) of this section) at least one crew member shall always remain on board to see that proper signals are displayed and that the vessel or tow is properly moored at all times.

[114] 33 CFR 6.19-1 states as follows: "Nothing contained in this part shall be construed as relieving the masters,

and security of vessels and waterfront facilities. *See Plaintiffs' Exhibit 94, Report of Donald Green*, at 8 (¶5.7).

**Third**, Lafarge failed to adhere to Appendix 2 of the United States Coast Guard Sector New Orleans Hurricane Plan, given the force of law pursuant to 33 CFR § 6.14-1 (entitled "Safety measures"),[115] which required that mooring lines be doubled up and that special attention be given to barges moored in the proximity of bridges. *See Id.*, at 8 (¶5.8).

**Fourth**, Lafarge failed to adhere to Annex C of the United States Coast Guard Sector New Orleans Hurricane Plan, given the force of law pursuant to 33 CFR § 6.14-1 (entitled "Safety measures"), by failing to determine the special needs and intentions of vessels moored at the facility, failing to determine whether vessels desiring to remain moored at the facility during the hurricane would be allowed to do so and failing to notify the Captain of the Port of the facility's decision. *See Id.*, at 8 (¶5.8). Had such notification taken place, it is clear that the COTP would have been apprised that the ING 4727 was released for pick up and moored with only 3 single part lines. Such notification would have permitted the Port to exercise its obligations under 33 CFR 6.14-2, entitled "Condition of waterfront facility a danger to vessel",[116] to cause the vessel being moved and/or properly secured thus preventing the

---

owners, operators, and agents of vessels or other waterfront facilities from their primary responsibility for the protection and security of such vessels or waterfront facilities."

[115] 33 CFR § 6.14-1, entitled "Safety measures" provides that: "The Commandant, in order to achieve the purposes of this part, may prescribe such conditions and restrictions relating to the safety of waterfront facilities and vessels in port as he finds to be necessary under existing circumstances. Such conditions and restrictions may extend, but shall not be limited to, the inspection, operation, maintenance, guarding, and manning of, and fire-prevention measures for, such vessels and waterfront facilities." See 33 CFR § 6.14-1. "Commandant as used in this part, means the Commandant of the United States Coast Guard." 33 CFR 6.01-1.

[116] 33 CFR 6.14-2, entitled "Condition of waterfront facility a danger to vessel", provides that: "Whenever the captain of the port finds that the mooring of any vessel to a wharf, dock, pier, or other waterfront structure would endanger such vessel, or any other vessel, or the harbor or any facility therein by reason of conditions existing on or about such wharf, dock, pier, or other waterfront structure, including, but not limited to, inadequate guard service, insufficient lighting, fire hazards, inadequate fire protection, unsafe machinery, internal disturbance, or unsatisfactory operation, the captain of the port may prevent the mooring of any vessel to such wharf, dock, pier, or other waterfront structure until the unsatisfactory condition or conditions so found are corrected, and he may, for the

breakaway.  *See Id.*, at 8 (¶5.8).

Based on the forgoing, Defendant acted in violation of applicable regulations and customary law, and as such, Pennsylvania Rule applies to this case.

### 2. Defendant Does Not Establish that the Barge "Could Not Have Been" the Cause of The North and South Breaches

Unlike the situation when the opposing party bears the burden of proof at trial, wherein the moving party need only point out the absence of evidence supporting the essential elements of the opposing party's case, "[w]here … the moving party bears the burden of proof at trial, it must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"  *See International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir., 1991).  Under this standard, "the nonmoving party may … defeat the motion by showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."  *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. Tex. 1991)

Here, Defendant's argument, which is improperly based on a critique of Plaintiffs' lack of evidence (Motion, at 41-45), at best is capable of establishing that the impact of the Barge might not have been a cause in the North and South breaches, rather than the requisite showing "**that it could not have been**" a cause.  *See Candies Towing* , 673 F.2d 91, 94 (5th Cir., 1982).

Significantly, the only affirmative justification proffered by Defendant for the proposition that the impact of Barge ING 4727's could not have caused the North And South breaches was based solely on the hypothetical analysis of defendant's expert, Dr. Cushing, who concluded that "the amount of force that could have been applied by the barge in the conditions present during

---

same reasons, after any vessel has been moored, compel the shifting of such vessel from any such wharf, dock, pier, or other waterfront structure."  *See* 33 CFR 6.14-2

Hurricane Katrina would result only in 'cracking' or a 'notch' in the concrete cap…." (Motion, at 40). However, the fundamental premises of Dr. Cushing's analysis are disputed, precluding Defendant from meeting its burden as a matter of law.

For example, Defendant's modeling analysis regarding wind forces did not take into account evidence of actual wind speed and wind direction, including eyewitness evidence that surface wind speeds were higher and directions were different than the figures calculated by defendants' experts. (See Barge Plaintiffs' Compendium  of Proof No. 7Re: Wind Speed/Direction Inconsistent with Defendant's Assertions). Nor did defendant's experts account for alternating wind phenomena, such as meteotsunami (*Plaintiffs' Exhibit 87*, Decl. of Hector Pazos at ¶29-30).

Similarly, Defendant's modeling analysis regarding wave forces did not take into account evidence of actual waive height, including the direct eyewitness testimony of William Villavasso, who testified that a 20-foot wall of water immediately preceded the impact of what he testified was the tip of a barge breaking through the floodwall at the location of the Northern breach. (*Plaintiffs Exh 35*. Villavasso Depo, at 186:23-187:18). Nor did Defendant's experts account for the impact of tide currents. (*Plaintiffs' Exhibit 59*, Green Decl., at ¶ 8); *See also Barge Plaintiffs' Compendium of Proof No. 4*, ING 4727's Ability to Exert Sufficient Force to Cause The Eastern IHNC Floodwall Breaches / Impact Loads Asserted by Barges on Stationary Structures).

Additionally, Dr. Reed Mosher of the Corps of Engineers, who was in charge of Volume V of the IPET Report, admitted in his deposition that it appeared the barge had struck part of the floodwall at the South breach, and that there was evidence on the barge that it had scraped against a floodwall. (*Plaintiffs' Exhibit 26*, July 22, 2009 Deposition of Reed Mosher, at 90:23 -

91: 6).

This determination, coupled with Mr. Villavasso's testimony regarding the impact at the North breach, are further supported by physical evidence of Barge impact, including evidence of concrete pulverization of the floodwalls at the North and South breaches.   (Barge Plaintiffs' Compendium of Proof No. 2, Physical Evidence of Barge Impact).

Moreover, Defendant's claim that only effect of barge impact would be a crack in the I-wall cap is disputed by the testimony of Dr. Mosher, who admitted that a barge punched through one of the floodwalls along the MRGO, making a hole the size of its width, and that the breach involved a T-wall, which is stronger than an I-wall such as was used in the IHNC. (*Plaintiffs' Exhibit 26*, July 22, 2009 Deposition of Reed Mosher, at 92:25 -94-17, 94:14-96:12).   Indeed, Dr. Mosher testified that "in general terms, I would think that, you know, the wall would not do a very good job of resisting the barge." (*Plaintiffs' Exhibit 26*, July 22, 2009 Deposition of Reed Mosher, at 129:2-4).   Furthermore, Dr. Moser testified that the Corps of Engineers had not yet ruled the Barge out as the cause of the IHNC floodwall failure. (*Plaintiffs' Exhibit 26*, July 22, 2009 Deposition of Reed Mosher, at 91:15-20).

Defendant attempts to misconstrue and re-write this testimony, but in reality, their case is based upon the hindsight conclusions of purported experts, and *their* pronouncements as to eyewitnesses credibility, which, by happenstance or more, either corroborates the conclusions Lafarge's experts were hired to reach, or such witnesses are totally ignored in favor of the predestined expert conclusions.

Based thereon, Defendant by necessity fails to meet the requisite showing "**that it could not have been**" a cause of the North and South breaches.

**B.      Even if the Pennsylvania Rule Does Not Apply, Material Issues of Disputed Fact Exist On The Issue Of Whether Barge ING 4727's Impact Caused The North And South Breaches**

Even if the Pennsylvania Rule does not apply, Defendant is still not entitled to summary judgment, as material issues of disputed fact exist on the issue of whether Barge ING 4727's impact caused the North and South breaches.

Here, in addition to the facts disputed above, Defendant's opinion regarding the cause of the floodwall failures at best presents a battle of the experts.  Indeed, "[c]ompeting expert opinions present the 'classic battle of the experts' and it is up to a jury to evaluate what weight and credibility each expert opinion deserves."  *See Phillips v. Cohen*, 400 F.3d 388, 400 (6th Cir. Ohio 2005).

Specifically, Defendant disputes the strength of the soil into which the sheet pile was embedded.  Genarro Marino, P.E. explains in his Report, Deposition, and Declaration, how he arrived at the conclusion that the soil was not a cause of the North Breach.   See *Plaintiffs' Exhibits 42* (Marino's July 1, 2009 Expert Witness Report) *and 43* (Declaration of Marino).

Moreover, Defendant's claim that impact by the barge could not have caused the breaches is contradicted not only by physical evidence and eyewitness observations, but by Mr. Marino's load impact calculation.  The IPET reached the similar conclusion that contact between the barge and floodwall would result in its failure.

Lafarge contends that seepage and piping of water beneath and behind sheet piling caused the failures.  Hector Pazos, P.E.  explains in his Report  (*Plaintiffs' Exhibit 47*), Deposition  (*Plaintiffs' Exhibit 48*) and Declaration (*Plaintiffs' Exhibit 87*)  that this seepage, piping, and subsequent weakening of the forces anchoring the sheet pile only occurred because of the forces which the barge induced against the floodwall, with the addition of time, thus initiating gaps leading to complete landward translation and/or torsion of the floodwall.

Lafarge further claims that the failure mechanics of the North Breach were substantially identical to those at the London Avenue and 17th Street Canal breaches.  The physical evidence and eyewitness testimony demonstrate otherwise, with distinctive physical features found only as

to the eastern IHNC floodwall failures. See *Barge Plaintiffs' Compendium of Proof No. 2 Re: Physical Characteristics Unique to Barge Impact*.

Lafarge ultimately claims that it was *impossible* for ING 4727 to have caused the eastern IHNC floodwall breaches.   This *radical* and polar position, far beyond the spectrum of plausibility in light of first-hand witness testimony, is – it is suggested – tailored not from intellectually honest, accurate and complete consideration of all proof, but out of a specific desire to rebut any presumption afforded by The Pennsylvania Rule, at the expense of Lafarge's experts' credibility.

Simply put, the record contains significant evidence rendering the issue of whether Barge ING 4727's Impact Caused The North and South Breaches disputed issues of fact. For this reason, Defendant's instant Motion must be denied.

## VII.   SUMMARY JUDGMENT ON DAMAGES IS INAPPROPRIATE BECAUSE FLOODING FROM THE MRGO LEVEE BREACH DOES NOT ABSOLVE DEFENDANT OF LIABILITY

Defendant's contention that it is not liable because Plaintiffs' homes would have been inevitably damaged by floodwaters from the MRGO levee breaches is untenable under modern tort theory, Maritime law, and Louisiana state law.  In support of its theory, Defendant relied on a seventy-seven year old New Hampshire state court case, *Dillon v. Twin State Gas & Elec. Co.*, 163 A. 111 (N.H. 1932), as its seminal authority.  In that case, a boy who fell from a bridge was electrocuted after grabbing an electrical wire that the defendant negligently failed to insulate. *Id.* at 111-112.  The New Hampshire court held that if it could be shown that the boy would have sustained a serious injury regardless of the defendant's negligence (*i.e.*, that some injury was an inevitable consequence of the boy's situation without regard to the defendant's negligent acts), the defendant's liability for the boy's lost earning capacity should be calculated in light of his inevitable injury. *Id.* at 115.  This application of the inevitable consequences doctrine follows from the antiquated view that conduct is not a cause-in-fact of harm that would have occurred irrespective of the conduct.[117]

---

[117]     Defendant's citation to *Lancaster v. Norfolk & W. Ry.*, 773 F.2d 807 (7th Cir. Ill. 1985) is equally underwhelming.  The plaintiff in *Lancaster* sued for an intentional tort under the Federal Employer's

### A.   Modern Tort Theory Employs the Substantial Factor Test

Under a modern application of tort theory, this limitation on a defendant's liability for harm caused by inevitable consequences is subject to an exception that permits a finding that a defendant's negligent conduct was a substantial factor in causing the harm, even though there was another force equally capable of producing the harm. *See Restat. 2d of Torts*, § 432.[118]  This rule is exemplified by the classic "two fires" illustration, where the normal spread of either of two negligently set fires would have been sufficient to cause damage to plaintiff's property. *See id*.  Under the "two fires" illustration, it may be found that either tortfeasor or both tortfeasors were a substantial factor in bringing about plaintiff's harm. *See id*.  Additionally, "where two independent fires combine to destroy a piece of property, if either fire could have destroyed the property by itself, there is joint and several liability." *Emcasco Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 528 (5th Cir. 2006).

Indeed, this Court has already used the substantial factor test for causation in cases involving Hurricane Katrina levee failures. *See In re Katrina Canal Breaches Consol. Litig.*, 2009 U.S. Dist. LEXIS 72288, 267-269 (E.D. La. Apr. 15, 2009) (in denying defendants' motion for summary judgment under Louisiana state law, the court stated that "where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident.").  "Whether the defendant's conduct was a substantial factor in bringing about the harm, and thus, a cause-in-fact of the injuries, is a factual question to be determined by the fact finder." *Id*. at 269.  Thus, not only must Defendant's negligent acts be evaluated under the substantial factor test, but summary judgment is inappropriate at this time given the disputed facts as to causation outlined herein.

### B.   Maritime Law Employs the Substantial Factor Test

---

Liability Act, in what the Circuit Court judge described as a "bizarre factual setting." *Id*. at 810.  The Plaintiff suffered from a latent schizophrenic condition which manifested itself due to tortious misconduct by defendant's employees.  The court held that it is desirable in such cases to direct the jury's attention to the issue by an instruction about the apportionment of damages, but refused to reverse the trial court's denial of the requested instruction. *Id*. at 823.

[118]   "Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent; (2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about." *Restat. 2d of Torts*, § 432.

Defendant is also negligent under maritime law,[119] where "a party's negligence is actionable only if it is a legal cause of the plaintiff's injuries.  Legal cause is something more than 'but for' causation, and the negligence must be a 'substantial factor' in the injury."[120] *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992).  "To be a legal cause of a plaintiff's injury, breach of a…duty must be a 'substantial factor' in the injury." *Moore v. Angela MV*, 353 F.3d 376, 383 (5th Cir. 2003).  The maritime rule for negligence liability "allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the incident." *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260 (U.S. 1979); *Coats v. Penrod Drilling Corp.,* 61 F.3d 1113, 1127 (5th Cir. 1995); *Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1452 (5th Cir. 1988).

Once it has been established that multiple tortfeasors were responsible for Plaintiff's loss, defendants' liability to the plaintiff under the general maritime law is joint and several. *Coats,* 61 F.3d at 1128, 1130, n.17; *Simeon,* 852 F.2d at 1455 ("the Supreme Court has never questioned the wisdom of the traditional rule of joint and several liability, nor retreated from the policy behind the rule").  Significantly, joint and several liability alleviates Plaintiffs of the burden of proving Defendant's degree of fault for the harm caused by the flooding, as "the plaintiff can collect his entire judgment from a single defendant, leaving to the defendants allocation of fault among themselves." *Id.* at 1116.  Joint and several liability also exists "in any situation where two or more causes concur to produce harm, even when one cause is an act of God." *Wm. G. Roe & Co. v. Armour & Co.*, 414 F.2d 862, 869 (5th Cir. 1969) ("There is little doubt that the concurrence of a human act and an act of God may in appropriate circumstances give rise to the principle of joint and several liability to the end that the wrongdoer may be held entirely liable.").  Thus, Defendant can be held liable for Plaintiffs' injuries if its negligence was a substantial factor in producing the harm, even if other factors concurred in causing the injury. *See Edmonds, supra*, at 273 n.30.

---

[119] "In order to prove negligence under general maritime law, the plaintiff must demonstrate that: (1) there was a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) injury sustained by the plaintiff, and (4) a causal connection between defendant's conduct and the plaintiff's injury. *Benoit v. L&M Bo-Truc Rentals*, 2002 U.S. Dist. LEXIS 22561 (E.D. La. Nov. 19, 2002) (*citing In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)).

[120] The term "legal cause" is preferred to "proximate cause" in maritime tort law. *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 223, n.8 (5th Cir. 1975).

### C.     Louisiana State Law Employs the Substantial Factor Test

Defendant is also negligent under Louisiana law, which requires the court to inquire whether the defendant's act was a "substantial factor" in the causation of the plaintiff's harm. *Le Jeune v. Allstate Ins. Co.*, 365 So. 2d 471, 477 (La. 1978) ("Louisiana courts use the 'substantial factor' test, which is similar to the 'but-for' test, except that where more than one party's negligence would have cause[d] the collision absent another party's negligence, all are held to be causative."); *Perkins v. Entergy Corp.*, 782 So. 2d 606, 612 (La. 2001) ("The substantial factor test is the preferred test for causation in a negligence case when there are multiple causes").   In fact, this Court previously applied the "substantial factor" test under Louisiana State law in denying a defendant's Motion for Summary Judgment in a Hurricane Katrina levee-breach case:

> where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident…This Court has considered whether each of the multiple causes played so important a role in producing the result that responsibility should be imposed upon each item of conduct, even if it cannot be said definitively that the harm would not have occurred 'but for' each individual cause. Also considered is whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm. Whether the defendant's conduct was a substantial factor in bringing about the harm, and thus, a cause-in-fact of the injuries, is a factual question to be determined by the fact finder.

*In re Katrina Canal Breaches Consol. Litig.,* 2009 U.S. Dist. LEXIS 72288, 267-269 (E.D. La. Apr. 15, 2009) (citations omitted).   Once it has been established that multiple tortfeasors were responsible for Plaintiff's loss, Defendants' liability to the Plaintiffs under Louisiana State law is several, meaning that a joint tortfeasor is only liable for his degree of fault. *La. C.C. Art*. 2323-2324**.**

Thus, Defendant's argument that it is not liable because Plaintiffs' homes would have been inevitably damaged by floodwaters from the MRGO levee breaches fails under all applicable law.   Defendant cannot escape liability by averring that Plaintiffs would have been injured anyway, and must be held liable for its negligence.

### D.     Defendant's Conduct Was A Substantial Factor In Causing Plaintiffs' Injuries

Here, that Defendant's negligence was a "substantial factor" in producing Plaintiffs'

injuries is manifest. *See Restat. 2d of Torts*, § 433.[121]  Consequently, Defendant's allegation that any flooding from the IHNC made no material difference to Plaintiffs' damages, given the inevitable MRGO flooding later that same day is a gross mischaracterization of the evidence. Although water from the MRGO levee breaches was *theoretically capable* of causing the massive flooding in the Lower Ninth Ward and St. Bernard Parish, *in reality*, the maximum level of flooding was achieved through a combination of waters from both the IHNC levee breaches and the MRGO levee breaches.

The contribution of floodwaters is evidenced by Mr. Spinks' 2009 Report ("Spinks Report"), which provides scientific evidence to clarify the flood time sequence and the contributions of flooding of the Lower Ninth Ward and St. Bernard Parish during Hurricane Katrina. *Spinks Decl.*, ¶ 3.  The Spinks Report described a flood simulation computer model used to replicate the water levels in the Lower Ninth Ward and St. Bernard Parish before, during, and after the Hurricane Katrina event. *Spinks Decl.*, ¶ 4.  The flood simulation model labeled as "ALL Causes" in the Spinks Report represented what actually happened during the Hurricane Katrina event. *Spinks Decl.*, ¶ 5.  Although three other flood scenarios were also evaluated, these scenarios were used merely as hypothetical cases in order to understand the flood time sequence and contribution of flows from various sources. *Id.*  The flood simulation model identified as "MRGO Levee Breaches" was a hypothetical case. *Id.*

Significantly, Defendant's *entire* theory that breaches along the MRGO would have caused the same level of flooding, even if the IHNC breaches never occurred, is based on the flood simulation model identified as "MRGO Levee Breaches" - a hypothetical flood scenario that merely reflects what *could have* happened during Hurricane Katrina, rather than the actual scientific facts of the Hurricane Katrina flood event. *Spinks Decl.*, ¶ 9.  Thus, Defendant's theory is completely inaccurate and does not reflect what *actually* occurred during Hurricane Katrina. *See id.*

Moreover, what actually happened during the Hurricane Katrina flooding event is clear

---

[121]    "The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:  (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it; (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (c) lapse of time." *Restat. 2d of Torts*, § 433.

from Mr. Spinks' expert report.   The Spinks Report clearly stated the IHNC North breach occurred at or before 4:30 a.m. CDT and the South breach occurred at or before 6:00 a.m. CDT on Monday, August 29, 2005. *See Exh. B, Spinks Report*, p. 37; *Spinks Decl.*, ¶ 12.   After this time, the North and South breaches along the IHNC floodwall accounted for over 90% of the total water in the Lower Ninth Ward and St. Bernard Parish before 9:00 a.m. CDT. *Spinks Report*, p. 37; *Spinks Decl.*, ¶ 16.   After 9:00 a.m. CDT, the IHNC floodwaters and MRGO floodwaters combined to contribute to the maximum flood levels experienced in the Lower Ninth Ward and St. Bernard Parish during Hurricane Katrina. *Spinks Decl.*, ¶ 15.

**VIII.** <u>**CONCLUSION**</u>

For the foregoing reasons, Barge Plaintiffs pray the Lafarge's Motion for Summary Judgment be denied.

Respectfully submitted,

**s/Brian A. Gilbert, Esq**.(21297)
Law Office Of Brian A. Gilbert, P.L.C.
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 885-7700
Telephone: (504) 581-6180
Facsimile: (504) 581-4336
e-mail: 0=


Shawn Khorrami (CA SBN #14011)
Dylan Pollard (CA SBN # 180306)
Matt C. Bailey (CA SBN #218685)
Khorrami, Pollard & Abir, LLP
444 S. Flower Street, 33rd Floor
Los Angeles, California 90071
Telephone: (213) 596-6000
Facsimilie: (213) 596-6010
e-mail: Skhorrami@kpalawyers.com;
          Dpollard@kpalawyers.com;
          Mbailey@kpalawyers.com


Lawrence D. Wiedemann.(13457)
Karl Wiedemann (18502)
Karen Wiedemann (21151)
Wiedemann & Wiedemann
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 581-6180
Facsimile: (504) 581-4336
e-mail: lawrence@wiedemannlaw.com;
k a r l @ w i e d e m a n n l a w . c o m;
karen@wiedemannlaw.com


Patrick J. Sanders (18741)
3316 Ridgelake Drive
Suite 100
Metairie, LA 70002
Telephone: 504-834-0646
e-mail: pistols42@aol.com

Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C. 20036-4129
Voice: 202-862-4320
Cell: 202-549-1454
Facsimile: 800-805-1065 and 202-828-4130
e-mail: rick@rickseymourlaw.net

Lawrence A. Wilson (N.Y.S.B.A. #2487908)
David W. Drucker (N.Y.S.B.A. #1981562)
Wilson, Grochow, Druker & Nolet
Woolworth Building
233 Broadway, 5th Floor
New York, NY 10279-0003
Telephone: (212) 608-4400
Facsimile: (212) 227-5159
e-mail: lwilson@wgdnlaw1.com;
ddruker@wgdnlaw1.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document has been served upon

counsel of record, by United States Mail, postage prepaid and properly addressed, facsimile,

and/or ECF upload, this 2nd day of November,  2009.

\s\Brian Gilbert, Esq.