**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
| | * | |
| IN RE:  KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | **CIVIL ACTION** |
| | * | |
| | * | **NO. 05-4182** |
| **PERTAINS TO:  BARGE** | * | **and consolidated cases** |
| | * | |
| | * | **SECTION "K"  (2)** |
| *Boutte v. Lafarge*          05-5531 | * | |
| *Mumford v. Ingram*       05-5724 | * | |
| *Lagarde v. Lafarge*       06-5342 | * | **JUDGE** |
| *Perry v. Ingram*            06-6299 | * | **STANWOOD R. DUVAL** |
| *Benoit v. Lafarge*         06-7516 | * | **JR.** |
| *Parfait Family v. USA*   07-3500 | * | |
| *Lafarge v. USA*            07-5178 | * | |
| *Weber v. Lafarge*         08-4459 | * | **MAG.** |
| | * | **JOSEPH   C.   WILKINSON,** |
| | | **JR.** |

## BARGE PLAINTIFFS OBJECTIONS TO, AND CONTROVERSION OF, LAFARGE NORTH AMERICA, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS

## AND

## STATEMENTS OF DISPUTED MATERIAL FACT

**NOW COME** Barge Plaintiffs, through undersigned counsel, who submit the following in opposition to Lafarge North America's Motion for Summary Judgment:

**CONTENTS:**

A.     Controversion of Lafarge's Statement of Undisputed Material Facts;

B.     Plaintiffs' Statement of Undisputed Material Facts Omitted by Lafarge.

# A.   CONTROVERSION OF LAFARGE'S STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

♦   ***Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 1:***

**Lafarge's Statement of Undisputed Material Fact No. 1:**

The Lafarge North America cement terminal ("LNA Terminal") is located on the west side of the Inner Harbor Navigation Canal ("IHNC"). The terminal is located in an "inset" away from the main channel of the IHNC, as shown on Attachment A1. Reference , Exh. 1, Cushing Report at 15, Fig. 8.

***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 1:***

***Admitted*** that LNA Terminal is located on the west side of the Inner Harbor Navigation Canal.

***Controverted*** that the facility is on an "inset" or "away from the canal." The facility is located on a turning basin which is not "away from the canal," but which is part of the canal. *Plaintiffs' Exhibit 29, Deposition of Donald Green, pp. 155, line 21 – 157, line 1. ("Do you agree that the Lafarge terminal is a protected slip? No, sir, I do not agree.")*

---

[1] Plaintiffs' cite proof in this Controversion in the form of a number of eyewitness accounts of wind direction, of effects of wind on waves and water, of the presence of barge ING 4727 at the breach sites, of the presence of ING 4727 loose in the IHNC on the day before Katrina, of sounds associated with the barge making contact with and/or breaching the eastern IHNC floodwall, as well as opinions of Barge Plaintiffs' experts and other experts to the effect that the barge moved to the locations of and caused the eastern IHNC floodwall breaches. Each of these citations of proof may controvert more than one Statement, or controvert additional Statements where explicit repetition of this proof is absent. This is done intentionally, for ease of consumption and to avoid redundancy. These citations are, therefore, globally adopted and intended to controvert any and all of Lafarge's Statements of Undisputed Material Fact where they logically apply.

♦   ***Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 2:***

**Lafarge's Statement of Undisputed Material Fact No. 2:**

> On the morning of August 29, 2005, two breaches occurred in the floodwall on the east side of the IHNC. <u>References</u>  Exh. 1, Cushing Report at 80, Fig. 52. Exh. 2, Marino Report at 4-5, Photo 4.4. Exh. 14, Spinks 2009 Dep. 38.

***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 2:***

> ***Admitted*** that two breaches occurred in the floodwall on the east side of the IHNC on the morning of August 29, 2005.  However, Barge Plaintiffs do not endorse any of Lafarge's or its experts assertions as to the cause(s) of the breaches.  Lafarge relies upon the accuracy of Cushing's opinion to as to the reason(s) for any breaches of the eastern IHNC floodwall on the morning of August 29, 2005.  Plaintiffs dispute Mr. Cushing's data, proof, methods, inferences, calculations, and conclusions.  Plaintiffs' experts' disagree with LNA's experts' description of events, inferences, data, and conclusions affecting any theory as to the manner in which the eastern IHNC floodwall breaches occurred. Plaintiffs' fact witnesses and eyewitnesses contradict LNA's experts' description of events, inferences, data, and conclusions as to the manner in which the eastern IHNC floodwall breaches occurred.   Plaintiffs contend that barge ING 4727 caused both breaches.

> - Lafarge's experts' conclusions are premised upon the assumption that the barge broke from its berth during Katrina. Whether the barge broke loose during Katrina, or before, is subject of eyewitness accounts and sworn testimony

placing the barge on the eastern side of the IHNC on the morning and mid-afternoon of Sunday, August 28, 2005, therefore subjecting it to forces in addition to and earlier than those during Katrina.

> Barge Plaintiffs' Compendium of Proof No. 1, **LOCATIONS OF ING 4727 ON AUGUST 28 AND 29, 2009,** and sources referenced therein.

- Tidal movement on Sunday, August 28, 2005 was capable of moving the barge to a location north of the North Breach before the North Breach occurred.

> Plaintiffs' Exhibit 59, Declaration of Cmdr. (Ret.) Don Green.

- Lafarge asserts that the wind was blowing only in directions that would keep ING 4727 in its berth, and that therefore, it is impossible for the barge to have traveled to the eastern IHNC floodwall breach locations. Water was observed splashing over the eastern IHNC floodwall, from west to east, at times when water in the IHNC was below the top of the floodwall, at which times Lafarge asserts that wind was not blowing from west to east, and therefore, that it is *impossible* that the barge could have been located so as to cause the breaches. South-to-north wind was observed in Chalmette, west of Paris Road, at a time when Lafarge asserts that wind direction was from north to south. Unpowered vessels in the Intracoastal Waterway were observed being blown from west to east at times at which Lafarge asserts that wind was not blowing from west to east. "Prevailing wind" was not the only force motivating ING 4727; ING 4727 could move in directions other than "prevailing wind."

4

> *Barge Plaintiffs' Compendium of Proof No. 7,* **OBSERVATIONS OF WIND DIRECTION   INCONSISTENT WITH LAFARGE'S ASSERTIONS** *and sources referenced therein.*

- Lafarge asserts that wave forces in the IHNC could not have motivated the barge to the locations of the North or South Breach, and inaccurately cites data in support of this assertion.  Barge Plaintiffs possess proof of wave forces significantly greater than those which Lafarge represents to have been in existence.

> *Barge Plaintiffs'  Compendium of Proof No. 6,* **COMPENDIUM OF EVIDENCE ON WAVE HEIGHTS IN THE IHNC,** *and sources referenced therein.*

- Barge Plaintiffs possess physical proof of barge impact at the North and South breach locations.  Markings on the barge, and on the eastern IHNC floodwall, as well as documented damage patterns, demonstrate barge impact.

> *Barge Plaintiffs'  Compendium of Proof No. 2,* **PHYSICAL EVIDENCE OF BARGE IMPACT** *and sources referenced therein.*

- Barge Plaintiffs possess proof that impact by or contact with ING 4727 would cause the eastern IHNC floodwall failures observed at their locations.

> *Barge Plaintiffs'  Compendium of Proof No. 4,* **ING 4727's ABILITY TO EXERT SUFFICIENT FORCE TO CAUSE THE EASTERN IHNC FLOODWALL BREACHES - IMPACT LOADS ASSERTED BY BARGES ON STATIONARY STRUCTURES***, and sources referenced therein.*

- Regardless of what motivated the barge, Plaintiffs possess proof that it was seen and heard at and caused the eastern IHNC floodwall breaches.

Please see Barge Plaintiffs' Compendium of Proof No. 3, **SOUNDS IDENTIFIED WITH BARGE CONTACT WITH THE EASTERN IHNC FLOODWALL,** and sources referenced therein.

Barge Plaintiffs' Compendium of Proof No. 1, **LOCATIONS OF ING 4727 ON AUGUST 28 AND 29, 2009,** and sources referenced therein.

Barge Plaintiffs' Compendium of Proof No. 2, **PHYSICAL EVIDENCE OF BARGE IMPACT** and sources referenced therein.

Plaintiffs' Exhibit 47, Report and Attachments of Hector Pazos, pp. 69 - 70;

♦   <u>***Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 3:***</u>

**Lafarge's Statement of Undisputed Material Fact No. 3:**

The "North Breach" occurred just south of the Florida Avenue Bridge, at a location to the north and east of the Lafarge Terminal and on the opposite side of the IHNC from the terminal, as shown on **Attachments A2 and A3**. <u>References</u> Exh. 1, Cushing Report at 80, Fig. 52. Exh. 2, Marino Report at 4-5, Photo 4.4.

<u>***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 3***</u>:

***Admitted,*** *in part*, to the limited extent that the "North Breach" occurred just south of the Florida Avenue Bridge, at a location to the north and east of the Lafarge Terminal and on the opposite side of the IHNC from the terminal…  However, Plaintiffs do not stipulate to the authenticity, admissibility or accuracy of attachments A2 or A3.

Barge Plaintiffs reiterate their *Response to Lafarge's Statement of Undisputed Material Fact No. 2.*

♦      ***Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 4:***

**Lafarge's Statement of Undisputed Material Fact No. 4:**

The "South Breach" occurred closer to the Claiborne Avenue Bridge, at a location to the south and east of the Lafarge Terminal and on the opposite side of the IHNC from the terminal, as shown on **Attachments A2 and A3**. References Exh. 1, Cushing Report at 80, Fig. 52. Exh. 2, Marino Report at 4-5, Photo 4.4.

***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 4:***

**Admitted,** *in part*, to the limited extent that The "South Breach" occurred closer to

the Claiborne Avenue Bridge, at a location to the south and east of the Lafarge Terminal

and on the opposite side of the IHNC from the terminal…

Barge Plaintiffs reiterate their *Response to Lafarge's Statement of Undisputed*

*Material Fact No. 2.*

♦      ***Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 5:***

**Lafarge's Statement of Undisputed Material Fact No. 5:**

Prior to the arrival of Hurricane Katrina, the unloaded Barge ING 4727 was moored at the LNA Terminal on the west side of the IHNC.  References Exh. 1, Cushing Report at 26. Exh. 12, Pazos Report at 7-8.

***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 5:***

**Controverted,** as to any implication or inference that ING 4727 was properly or

adequately moored.  *Please see Barge Plaintiffs Compendium of Proof No. 1.*

♦      ***Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 6:***

**Lafarge Statement of Uncontested Material Fact No. 6:**

Barge ING 4727 was a hopper barge with no motor or other means of self-propulsion. Therefore, Barge ING 4727 required an external force to propel it from the west side to the east side of the IHNC. The only forces that could potentially have moved the Barge ING 4727 away from the LNA Terminal and across the canal to the location of the breach sites during Hurricane Katrina were (a) wind, (b) waves and/or (c) current. References Exh. 6, Pazos Dep. 99-100 (barge "cannot move on its own" except for "wind conditions or currents"; barge requires "an external force" to move it). Exh. 8, Marino 2009 Dep. 111 (admitting that in order for barge to move from one place to the other, something – wind or water – has to move it). Exh. 10, Green 2008 Dep. 70-71 (agreeing that barge was "dumb," meaning not self-propelled, and if not subject to moorings, will float with wind or current). Exh. 5, Green 2009 Dep. 125 (barge was "at the mercy of the winds and current"). Exh. 5, Green 2009 Dep. 127 (barge was "dumb" and had no mode of power). Exh. 5, Green 2009 Dep. 210 (barge movement could be affected by waves). Exh. 31, Dooley Dep. 37-38 (forces that could potentially impact the movement of the barge were "the wind, the water movement, and the waves").

### Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 6:

**Admitted** that the barge was subject to forces of wind and current, though the Statement is **immaterial** in light of Plaintiffs' proof that ING 4727 was at the breach locations, at the times, that Lafarge states that it could not be. Lafarge contends that these forces were such that it was *impossible* for the barge to travel to the breach locations before the breaches occurred. Plaintiffs' **controvert** Lafarge's assertions as to the precise nature, direction, timing and strength of these forces, as well as their potential for motivating the barge. *Please see Response to Lafarge's Statement of Uncontested Material Fact No. 2, above.*

### ♦   Plaintiffs' Admission of  Lafarge's Statement of Undisputed Material Fact No. 7:

**Lafarge's Statement of Undisputed Material Fact No. 7:**

The Barge ING 4727 was 23 feet high from top to bottom (including hatch covers). References Exh. 6, Pazos Dep. 102 ("23 feet, approximately"). Exh. 8, Marino 2009 Dep. 65 (barge height is 23 feet).

***<u>Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 7</u>***:

> ***Admitted.***

♦   ***<u>Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 8:</u>***

**Lafarge's Statement of Undisputed Material Fact No. 8:**

> On the morning of August 29, 2005, the unloaded Barge ING 4727 had a draft of no more than approximately one-and-a-half feet. <u>References </u>Exh. 6, Pazos Dep. 100 (barge draft of 1 foot, 5 inches). Exh. 8, Marino 2009 Dep. 65-66 and Exh. 2, Marino Report at 2-34 (unloaded draft is 1.5 feet). Exh. 10, Green 2008 Dep. 75-76 (barge's light draft is 1 foot, 4.5 inches – the remainder of the barge is above water). Exh. 12, Pazos Report at 9 (barge light draft is 1 foot, 5 inches, but suggesting that draft may have been 2 feet, 5 inches due to water in the voids).

***<u>Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 8</u>***:

> ***Controverted***, because Ingram Barge Company expert Ed Shearer reported that the draft would depend on the weight of the vessel, and that there was residual cement in the hold, and that the draft was therefore between one and four feet.  This report was relied upon by Lafarge experts, Ryan and Strouse.

> *Plaintiffs' Exhibit 66, Report of Shearer & Associates,*
> *Date:February 15, 2007*
> *To: Liskow &Lewis*
> *Page 1-"The lightship draft is approximately 1'-4' based on a light ship weight of approximately 291 short tons." Page 2-"There was some residual cargo left in the hopper."*

♦   ***<u>Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 9:</u>***

**Lafarge's Statement of Undisputed Material Fact No. 9:**

> As a result of its unloaded condition, the barge was sticking up over 20 feet above the surface of the water.  <u>References </u>Exh. 6, Pazos Dep. 103-04 (barge sticking up out of water "in excess of twenty feet"). Exh. 8, Marino 2009 Dep. 66 (barge was unloaded, and sticking up over 20 feet).

*__Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 9__:*

**Controverted.** Please see *Plaintiffs' Controversion of Lafarge's Undisputed Material Fact No 8*, above.

♦ **__Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 10:__**

**Lafarge's Statement of Undisputed Material Fact No. 10.**

This "sail area" made the barge particularly susceptible to being moved in the direction of the prevailing wind. References Exh. 6, Pazos Dep. 102 (unloaded condition is relevant because it creates "exposed surface to the wind action"). Exh. 6, Pazos Dep. 104 ("wind is the predominant item" acting on the barge). Exh. 5, Green 2009 Dep. 45 (agreeing that barge has a "large sail area" and that "the greater the sail area, the more susceptible to wind"). Exh. 5, Green 2009 Dep. 127 (agreeing that "with a sail area of the type that the barge had, the wind affects the movement of that barge"). Exh. 5, Green 2009 Dep. 211 (due to sail area, the wind had a greater impact on the barge). Exh. 4, Cushing Dep. 238 (wind was "dominant" force acting on the barge).

*__Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 10__:*

**Admitted,** but only insofar as the sail area made the barge susceptible to movement by wind; The Statement is nonetheless immaterial, in light of the fact that regardless of what motivated the barge, Plaintiffs possess proof that it was located at and caused the eastern IHNC floodwall breaches.

For the reason of its immateriality, Plaintiffs **object** to the Statement, without waiver of the right to controvert it, as follows.

**Controverted** that "prevailing wind" was the only motivating force, or that ING 4727 could only move in the direction of "prevailing wind."

*Plaintiffs' Exhibit 29, June 25, 2009 Deposition of Cmdr. (Ret.) Don Green,*

- *p. 36* (*"So I can't say with certainty that at the Lafarge facility the wind was blowing from the northeast at 68 miles an hour as reflected in the Lakefront weather observations.");
- *p. 45* ("But we don't know -- no one knows what the direction of the wind was coming from when the first line failed, or they didn't -- I don't think based on my experience of having lines fail, they don't fail uniformly.");
- *p. 123* ("We have a witness -- what's his name -- at the power station saying it hit up at the northern end and then it eventually ended -- if that's the same barge, that it drifted back and forth or whichever, but it was at the mercy of winds and current for some time.");
- *p. 210* (Q.  Okay.  What else would affect the movement of a barge in a confined area like the Industrial Canal between the Florida Avenue Bridge and the Claiborne Bridge?  Would wind shifting?  A.   Yes.   Q.   Would tornadoes?   A.  Yes.  Q.  Would waves?  A.  Yes.  Q.  Would deflection and reflection of waves?   A.   Yes.   Q.   All of that would cause -- have an effect
upon the movements of a floating vessel?   A.   Yes.)

Further ***controverted*** in light of evidence of wind traveling in directions other than

that asserted by Lafarge to be prevailing wind direction.

Further ***controverted*** in light of evidence of the barge's presence within the IHNC

on the day before Katrina, thus subjecting it to forces in addition to and other than those

during Katrina.  Such forces include tidal current.

*Plaintiffs' Compendia of Proof Nos. 1 and 7, concerning Wind Direction, and Location of the Barge.  Please also see; Declaration of Cmdr. (Ret.) Don Green, Declaration of Genarro Marino, and Declaration of Hector Pazos.;*

♦       ***Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 11:***

**Lafarge's Statement of Undisputed Material Fact No. 11:**

Weather data, particularly involving winds, is important to analyze wind loads on the barge and potential barge movement in the IHNC during the relevant time period. <u>References</u> Exh. 8, Marino 2009 Dep. 71 (Q:  "The weather data helps you to assess what in fact the wind loads were on the barge in the IHNC at the time of the failure; correct?"  A: "Yes."). Exh. 1, Cushing Report at 77-81 (analyzing wind data and noting its importance for barge movement). Exh. 15, Spinks 2009 Dep. 169 (Q: "Would  you  agree  with  me  it's  better  in  carrying  out  a  scientific  study  of

meteorology to rely on meteorologic data to the extent the data is available?"  A: "Clearly you want to gather the data from where it's available at.").

***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 11:***

***Admitted***, in part, that weather data is relevant, but only subject to Lafarge's expert conclusions being derived from all weather and water conditions affecting the barge at the altitude and elevation of its locations within the IHNC, as reflected by weather gathering sources, and all eyewitness accounts.

However, as all eyewitness accounts appear to have been disregarded by Lafarge's experts, in order to avoid any proof which contradicts their assertions as to the *impossibility* of the barge's presence at the breach locations when the breach occurred,  any implication that wind effects are accurately and completely known or cited by Lafarge or its experts are ***controverted***, in accord with the proof cited in the *Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 2.*

♦    ***Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 12:***

**Lafarge's Statement of Undisputed Material Fact No. 12:**

According to Buys Ballot's law, hurricane winds in the northern hemisphere blow counterclockwise around the center (or "eye") of the hurricane.  Thus, the direction of the prevailing wind at a given time and location during a hurricane can be determined by comparing that location to the location of the eye of the storm at that same time.  References Exh. 1, Cushing Report at 35-36 ("counterclockwise circulation around the center"). Exh. 1, Cushing Report at 35 (prevailing wind direction can be determined by reference to location of center of storm). Exh. 6, Pazos Dep. 107-08 ("the hurricane in the Gulf of Mexico have a counterclockwise rotation"). Exh. 6, Pazos Dep. 117 (agreeing that "hurricane winds swirl counterclockwise along the storm eye"). Exh. 12, Pazos Report at 37 (noting the "counterclockwise rotation of the winds"). Exh. 14, Spinks 2008 Dep. 61 ("counterclockwise" rotation of wind).

*Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 12:*

     *Controverted* that Buys-Ballots law accounts exclusively, entirely or accurately for surface winds at pertinent times in the IHNC between the Florida Avenue and N. Claiborne Avenue bridges.  Witnesses observed and report wind effects emanating from directions at times other than and contrary to the directions and times which Lafarge's experts contend to have been the case.  Lafarge's experts appear to have disregarded these witness accounts.

     *Barge Plaintiffs' Compendium of Proof No. 7, concerning Wind Direction.*

♦     *Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 13:*

**Lafarge's Statement of Undisputed Material Fact No. 13:**

     The track of Hurricane Katrina was to the east of New Orleans and the IHNC, along the path described in **Attachment B**.  The center of the storm was located to the east of New Orleans and the IHNC throughout the duration of the storm. References Exh. 16, Spinks Report at 8, Fig. 1 (showing track of Hurricane Katrina). Exh. 1, Cushing Report at 39, Fig. 24 (same). Exh. 7, Dooley Report at 16, Map 2 (close-up view of storm track near New Orleans). Exh. 7, Dooley Report at 35 (storm center passed to the east of New Orleans).

*Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 13:*

     *Admitted***, in part,** only to the extent that the center of the storm was located to the east  of New Orleans and the IHNC throughout the duration of the storm's immediate effects on New Orleans and the IHNC area.

     *Controverted***,** to whatever extent that the Statement states or implies that the effects of  Hurricane Katrina were limited to the "center of the storm," or that the effects of the

storm would not vary according to the distance from the center, size and shape of the center, presence or absence of meteorological phenomena other than "prevailing winds," at any times at which the storm produced effects in New Orleans and/or the IHNC.

The Statement is also *immaterial* in light of proof that the barge was at the eastern IHNC floodwall breach locations at the times at which they occurred, but without waiver of the right to controvert the Statement.

Please see proof cited in response to Lafarge's Statement of Uncontested Material Fact No. 2.

♦   ***Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 14:***

**Lafarge's Statement of Uncontested Material Fact No. 14:**

> At all times prior to 7:30 a.m. on the morning of August 29, 2005, the eye of Hurricane Katrina was at a latitude to the south of New Orleans and the IHNC. Uunderline{References} Exh. 28, Plaintiffs' Response to Request for Admissions No. 6. Exh. 5, Green 2009 Dep. 119-120 (at 6:00 am, the storm was South-Southeast of New Orleans). Exh. 14, Spinks 2008 Dep. 60 (storm made landfall at Buras, LA around 6:10 in the morning). Exh. 7, Dooley Report at 16, Map 2 (showing position of storm center was south-southeast of New Orleans at these times).

***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 14:***

> ***Controverted.***   Lafarge *falsely represents* the contents and extent of Plaintiffs'

Response to Request for Admissions No. 6, *Plaintiffs' Exhibit 89,* which actually states:

> ***RESPONSE TO REQUEST FOR ADMISSION NO. 6:***

> *Admitted, as of 5:30 A.M.*

*Admitted, that the center of Hurricane Katrina was East of New Orleans prior to 8:00 A.M.*

*Plaintiffs can neither admit nor deny the request as to whether the center of Hurricane Katrina was South of New Orleans at the times between 5:30 A.M. and 8:00 A.M. because, in spite of a reasonably diligent search for the precise location of the center of Katrina at these times, plaintiffs have not yet found a map or plot or other data showing the latitude of the center during these times.*

*Plaintiffs are continuing to search for a map or plot or other data showing this information, and will supplement this response if they obtain this information.*

Further **controverted** because Lafarge **falsely** **represents** the statements of Plaintiffs' experts who, did **_not_** testify in accord with Lafarge's Statement of Undisputed Material Fact No. 14, that "[a]t all times prior to 7:30 a.m. on the morning of August 29, 2005, the eye of Hurricane Katrina was at a latitude to the south of New Orleans and the IHNC."   Don Green testified that **at 6:00 am**, the storm was South-Southeast of New Orleans and   Melvin Spinks testified that the storm made landfall at Buras, LA **around 6:10** in the morning.

Please see *Plaintiffs' Exhibit 61 , National Weather Service National Hurricane Center tracking maps of 4:00 a.m. C.D.T. and 10:00 a.m. C.D.T. August 29, 2005.*

Further, Plaintiffs **object** to the Statement as immaterial in light of proof that ING 4727 was located at and caused the eastern IHNC floodwall breaches, without waiver of the right to controversion.

♦   ***Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 15:***

**Lafarge's Statement of Undisputed Material Fact No. 15:**

The eye of Hurricane Katrina did not pass through the latitude of New Orleans and the IHNC until after 8:00 a.m. on the morning of August 29, 2005.  References Exh.

6, Pazos Dep. 118-19 ("Hurricane Katrina's eye passed to the east of New Orleans about 8:30 a.m. central daytime on 29 August 2005.") (reading from report and adopting statement). Exh. 12, Pazos Report at 37 (providing time of passage). *Exh. 7, Dooley Report at 16-17 (eye of Hurricane Katrina did not pass latitude of New Orleans until 8:54 a.m.).*

**Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 15:**

**Controverted**, to the extent that Lafarge asserts or implies (Lafarge Memorandum In Support of Motion for Summary Judgment, p. 4, Section 3, Paragraph 1, Sentence 2) that "the direction of the prevailing wind at a given time and location during a hurricane can be determined by comparing that location to the location of the eye of the storm at the same time."  Plaintiffs possess contradictory proof in the form of first-hand accounts of persons exposed to Katrina's winds *at ground level* who have testified that the wind was not traveling in the direction of the prevailing wind as Lafarge contends.  Plaintiffs possess additional proof in the form of testimony from persons who observed the wind's effects on waves in the IHNC and vessels in the ICWW, which contradict Lafarge's assertions about wind direction and timing.  Further, Plaintiffs possess sworn accounts that the barge was adrift in the IHNC on the day before Katrina, and therefore subject to wind and/or current in addition to and other than those during Katrina on Monday, August 29, 2005.

Please see *Barge Plaintiffs' Compendia of Proof Nos*. 1,6, and 7 *concerning Wind, Waves and Locations at which the barge was observed. Please also see Exhibit 59, Declaration of Don Green.*   Please also see *Plaintiffs' Controversion of Lafarge's Statement of Undisputed Fact No. 2* and proof cited therein.


◆    **Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 16:**

**Lafarge's Statement of Undisputed Material Fact No. 16:**

As Hurricane Katrina approached New Orleans and the IHNC from the south, the prevailing winds in the IHNC blew first from east to west, then from northeast-to-southwest, and then from north-to-south until the storm eye reached the latitude of the IHNC, and only after that from west to east. <u>References</u> Exh. 8, Marino 2009 Dep. 74 (Q: "Do you accept IPET's conclusion that, during the storm, winds came first from the east, then the northeast, then the north, then the northwest, and finally from the west?"  A: "I guess in general, yes."). Exh. 10, Green 2008 Dep. 56 (winds between 4:00 a.m. and 6:00 a.m. blew "from either the northeast or due from the north").Exh. 31, Dooley Dep. 67-74 (prevailing direction was mostly out of the northeast, and any type of downdrafts, swirls or eddies would have moved in the downwind direction from the northeast toward the southwest).Exh. 4, Cushing Dep. 80 (winds blew "from an easterly direction to a westerly direction" during early morning hours on August 29). Exh. 1, Cushing Report at 80, Fig. 52 (showing wind direction as a function of time). Exh. 7, Dooley Report at 35 (prevailing winds turned from easterly to northerly to westerly as Katrina moved along its track).

***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 16***:

***Controverted.***  Water was observed splashing over the eastern IHNC floodwall, from west to east, at times when water in the IHNC was below the top of the floodwall, at which times Lafarge asserts that wind was not blowing from west to east.  South-to-north wind was observed in Chalmette, west of Paris Road, at a time when Lafarge asserts that wind direction was from north to south.     Unpowered vessels in the Intracoastal Waterway were observed being blown and drifting from west to east at times at which Lafarge asserts that wind was not blowing from west to east.     Plaintiffs possess proof that ING 4727 was adrift in the IHNC during the day on Sunday, August 28, 2005, thus obviating Lafarge's experts' assertions which rely upon any premised that the barge was in its berth until Monday morning.  Further, the Statement is ***immaterial***, in light of proof that the barge was at the locations of the eastern IHNC floodwall breaches at the times that they occurred, regardless of what motivated the barge there.

Please see *Plaintiffs' Response to Lafarge's Statement of Uncontested Material Fact No. 2*, and proof cited therein. *Barge Plaintiffs' Compendium of Proof No. 7,* ***OBSERVATIONS OF WIND DIRECTION INCONSISTENT WITH LAFARGE'S ASSERTIONS*** *and sources referenced therein.*

♦    ***Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 17:***

**Lafarge's Statement of Undisputed Material Fact No. 17:**

> Prior to 7:45 am on August 29, 2005, Hurricane Katrina's prevailing winds included no component blowing across the IHNC from the LNA Terminal toward the east bank of the IHNC.   References Exh. 2, Marino Report at 3-11 (winds remained "essentially parallel" to IHNC before 9:00 a.m.). Exh. 31, Dooley Dep. 59 (wind had no westerly component (from the west) until 7:42 a.m.). Exh. 31, Dooley Dep. 93, 97 (wind did not move the barge from west to east during the 4:00 to 5:00 a.m. time frame ascribed to northern breach). Exh. 31, Dooley Dep. 36 ("the wind would not have allowed that barge to move from the western side to the eastern side that early in the morning") (referring to time of south breach occurrence). Exh. 1, Cushing Report at 45, 78 (winds prior to 8:00 a.m. had no cross-canal component). See also Exh. 4 Cushing Dep. 179-80 ("I'm saying that it couldn't have crossed over before 9:00 o'clock.  It would have had to be sometime after 9:00 clock. … I believe my reliance on the facts, that is, the wind direction, to be correct."). Exh. 4, Cushing Dep. 236-37 (impossible for wind to move barge out of LNA terminal "notch" before 9:00 a.m., because wind would have carried barge into Namasco terminal gantry shed before that time). Exh. 31, Dooley Report at 35 ("up until 7:42 am CDT, the wind direction would push the barge toward the dock").

*Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 17:*

> ***Controverted.***   Water was observed splashing over the eastern IHNC floodwall, from west to east, at times when water in the IHNC was below the top of the floodwall, at which times Lafarge asserts that wind was not blowing from west to east.  South-to-north wind was observed in Chalmette, west of Paris Road, at a time when Lafarge asserts that wind direction was from north to south.  Unpowered vessels in the Intracoastal Waterway were observed being blown and drifting from west to east at times at which Lafarge asserts

that wind was not blowing from west to east.  Plaintiffs possess proof that ING 4727 was

adrift in the IHNC during the day on Sunday, August 28, 2005, thus obviating Lafarge's

experts' assertions which rely upon any premised that the barge was in its berth until

Monday morning.  Further, the Statement is ***immaterial***, in light of proof that the barge was

at the locations of the eastern IHNC floodwall breaches at the times that they occurred,

regardless of what motivated the barge there.

Please see *Plaintiffs' Response to Lafarge's Statement of Uncontested Material

Fact No. 2*, and proof cited therein.


♦ ***Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 18:***

**Lafarge's Statement of Undisputed Material Fact No. 18:**

Plaintiffs provided no meteorologic data or analysis or evidence to support any contrary theory regarding wind direction or barge movement. References Exh. 6, Pazos Dep. 129 ("I review some meteorologic data, but I didn't either memorize the source or cover it recent to analyze it."). Exh. 6, Pazos Dep. 130 (Q: "You haven't cited a single piece of data about turbulence at this location in your report, have you?"  A:  "Because I'm not interested."). Exh. 6, Pazos Dep. 131 ("Don't need any meteorologic data"). Exh. 6, Pazos Dep. 132 (asked whether he had reviewed meteorologic data showing a south-to-north wind direction, Pazos responds, "I do not remember because I didn't concentrate in this activity"). Exh. 6, Pazos Dep. 143 (Q: "You can tell me what the weather conditions were in the Inner Harbor Navigation Canal at 4:30 in the morning on August 29th?"  A: "The type of weather conditions requires to elaborating wind force, direction at different elevations and the turbulence create by surrounding structures like the bridge.  So I'm absolutely sure I can do it, but not right now."   Q: "And you haven't studied it."  A: "I have not developed an investigation."). Exh. 6, Pazos Dep. 150-51 (asked whether he had an opinion about the prevailing direction of the wind at the time the barge supposedly contacted the wall at the site of the north breach, Pazos responds, "[a]bsolutely no"). Exh. 8, Marino 2009 Dep. 76 (admitting that at the time of the north breach, the barge would have had to be going in a direction "other than the direction of the wind"). Exh. 9, Marino 2008 Dep. 147-48 (Q: "You didn't consider wind in connection with the north breach because the wind wasn't blowing in the direction of the wall at that time, right?"  A: "Right."). Exh. 8, Marino 2009 Dep. 105-06 (admitting he does not know how the barge got to the north breach and has

done no studies or calculations or literature review to shed light on how it got there). Exh. 8, Marino 2009 Dep. 142 (Q: "So again, as with the north breach, you can't explain how or why the barge got from one place to the next?"  A: "That's correct.").

***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 18:***

***Controverted.***  Water was observed splashing over the eastern IHNC floodwall, from west to east, at times when water in the IHNC was below the top of the floodwall, at which times Lafarge asserts that wind was not blowing from west to east.  South-to-north wind was observed in Chalmette, west of Paris Road, at a time when Lafarge asserts that wind direction was from north to south. Unpowered vessels in the Intracoastal Waterway were observed being blown and drifting from west to east at times at which Lafarge asserts that wind was not blowing from west to east.  Plaintiffs possess proof that ING 4727 was adrift in the IHNC during the day on Sunday, August 28, 2005, thus obviating Lafarge's experts' assertions which rely upon any premised that the barge was in its berth until Monday morning.

Further, the Statement is ***immaterial***, in light of proof that the barge was at the locations of the eastern IHNC floodwall breaches at the times that they occurred, regardless of what motivated the barge there.

Please see *Plaintiffs' Response to Lafarge's Statement of Uncontested Material Fact No. 2*, and proof cited therein.

♦    ***Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 19:***

**Lafarge's Statement of Undisputed Material Fact No. 19:**

The IHNC below the Florida Avenue Bridge was a "closed system" in the sense that the lock at its southern end prevented the flow of water to or from the

Mississippi River.  Therefore, when Hurricane Katrina storm surge reached this part of the IHNC, it filled up without generating appreciable currents.  <u>References</u> Exh. 11, Mosher Dep. 171 (end of IHNC was closed off; lock gates were closed). Exh. 6, Pazos Dep. 104 ("Current is very insignificant because the current needs to flow in order to exist. And the locks were closed, so the flow – the flow was very limited or local …"). Exh. 1, Cushing Report at App. B at B25-26 (water was "filling the bathtub" with no appreciable currents).

## ***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 19:***

Plaintiffs' ***object*** to the Statement on the grounds of vagueness and ambiguity,  in that it incorporates and is premised upon the phrase "*appreciable* currents," with no objective or mutually accepted definition of any threshold below which current is not appreciable,  and  without  differentiation  between  the  effects  of  appreciable  and inappreciable current.  Plaintiffs' further object in that current is undefined, in that current, as used herein by Lafarge, may or may not include tidal forces, waves observed by eyewitnesses, wave reflection and/or deflection, wind-driven water, water entering the IHNC from the ICWW, MRGO  or Lake Ponchartrian, or other movement of water. Subject to and without waiver of the objection, and without waiver of the right to controversion:

***Admitted*** that the IHNC-Mississippi River lock closed at 4:00 a.m. on Sunday, August 28, 2005.  Further, in light of the area being a "closed system," it is virtually certain that the only large object adrift in the span of the IHNC between the Florida Avenue and N. Claiborne Avenue bridges on the morning of Monday, August 29, 2005 was the barge ING 4727.  Lafarge denies, and plaintiffs accept, that no other barges broke away from the Lafarge terminal, which is the only location where barges were present within this span from the time that the IHNC lock closed through the times of the eastern

IHNC floodwall breaches.  No other large objects adrift at these times and locations have been identified by Lafarge or any other entity.

> Please see *Plaintiffs' Exhibit 26, excerpts of Deposition of Reed Mosher  p. 261, line 23 – p. 262, line 19.* (Q.      In your investigation of the Inner Harbor Navigation Canal in connection with the IPET report and your expert report, 2 did you ever become aware of any other vessel or object that was in the water at the time of Katrina? MR. RAFFMAN:  Objection.  Form.  THE WITNESS:  No. BY MR. SEYMOUR: Q.     By "in the water," I mean inside the canal.  A.     No, I don't remember, no. Q.     If there had been another vessel or a large object, would you have been likely to learn of it during the investigation?  A.   If it was another large object and if it was in that region where the failures were, I would probably have been told about that.  But I don't remember any – I    don't know of any notification that there was  another thing floating around out there.")

> Please also see *Barge Plaintiffs'  Compendium of Proof No. 1,* **LOCATIONS OF ING 4727 ON AUGUST 28 AND 29, 2009,** *and sources referenced therein,* concerning sightings of the barge adrift within this span of the IHNC on Sunday, August 28, 2005, after the IHNC lock closed, and on Monday, August 29, 2005, in association with the occurrences of the North and South Breaches of the eastern IHNC floodwall.

♦   *Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 20:*

**Lafarge's Statement of Undisputed Material Fact No. 20:**

> It is possible to undertake scientific modeling of the effect of current on a barge during a storm event.  LNA has performed such modeling, the results of which show that current could not have moved the barge from the LNA Terminal to either breach site until after both breaches occurred.  Plaintiffs have performed no such modeling or provided evidence to the contrary. References Exh. 1, Cushing Report at 85 & App. B (analysis of wind and currents, including work by hydrologist Larry Daggett, shows that "the barge did not exit the IHNC [terminal] basin until after the breaches had occurred"). Exh. 15, Spinks 2009 Dep. 14 (plaintiffs' hydrologist reviewed Dr. Daggett's appendix and found nothing particularly objectionable). Exh. 1, Cushing Report at 166-68 (currents did not flow toward north or south breach and "were very nearly zero" prior to breaching). Exh. 4, Cushing Dep. 124 ("[I]n this particular case, what we found was that the winds were strong and the

currents were negligible."). Exh. 4, Cushing Dep. 238 (barge "would not have been significantly influenced by any slight currents that existed in the canal"). Exh. 4, Cushing Dep. 261 ("[T]he currents would have had a negligible effect."). Exh. 8, Marino 2009 Dep. 281 (Q: "You didn't model the barge movement, did you?"  A: "No). Exh. 15, Spinks 2009 Dep. 31-32 ("We have not done any hydrodynamic studies of the waters within the Industrial Canal.") (also agreeing such studies could be done).

### *Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 20:*

*Controverted*, as a *false representation* of Mr. Spinks' testimony.

*Barge Plaintiffs' Exhibit 41, Declaration of Melvin Spinks, P.E., p.8, para. 32 and p 9, para. 33.* ("…a gross mischaracterization of my testimony.")

*Controverted*, in light of Cmdr. (Ret.) Don Green's testimony that current is a force affecting movements of ING 4727.

*Plaintiffs' Exhibit 29, June 25, 2009 Deposition of Cmdr. (Ret.) Don Green, p. 210.* (Q.  Okay.  What else would affect the movement of a barge in a confined area like the Industrial Canal between the Florida Avenue Bridge and the Claiborne Bridge? Would wind shifting?  A.  Yes.  Q.  Would tornadoes?   A.  Yes.  Q.  Would waves?  A.  Yes.  Q.  Would deflection and reflection of waves?  A.  Yes.  Q. All of that would cause -- have an effect upon the movements of a floating vessel? A.  Yes.)

*Controverted*, because Lafarge's theory that the barge could not have moved from its berth to the breach locations – which theory is controverted – is necessarily premised upon the assumption that the barge broke loose during Katrina and/or its effects, and not before, which is contrary to Plaintiffs' proof.

*Plaintiffs' Exhibit 29, June 25, 2009 Deposition of Cmdr. (Ret.) Don Green, p. 210, lines 1-5* (Q.  So if Mr. Villavaso saw it sometime between
4 and 6, it could have broken loose sometime the day before?  A.   It could have --
you're right.  I don't know  when it broke away.)\

Please see Barge Plaintiffs Compendium of Proof Nos. 6 and 8, concerning waves and current.

Please see *Exhibit 59, Declaration of Cmdr. (Ret.) Don Green.*

***Controverted***, in that both Dr. Robert Bea and the IPET have opined affirmatively as to the plausibility of ING 4727 having caused the eastern IHNC floodwall breaches, and therefore, the plausibility of the barge's presence at the times and locations of the breaches before they occurred.

> *Plaintiffs' Exhibit 65, IPET, March 26, 2007; Vol. IV, "The Storm - Findings and Lessons Learned" p. IV-261. ("Barge impacts in high-wind/high-wave situations have the potential to inflict consequential damage to floodwalls.")*

> *Plaintiffs' Exhibit 55, video of Robert Bea. ("...and in fact, in the Ninth Ward, it (the barge) played a role in the disaster of unfolding of the levee under the excessive forces from the colliding barge.")*

***Controverted.***  Plaintiffs have conducted modeling which shows that forces acting on the barge could and would bring it into contact with the eastern IHNC floodwall, and cause it to fail.

> *Exhibit 43, Sworn Declaration of Genarro Marino, particularly Section G, including all subsections of Section G, and exhibits cited therein.*

***Controverted*** and immaterial, because regardless of what motivated the barge, Plaintiffs possess proof that it was located at and caused the eastern IHNC floodwall breaches.  Witnesses will testify that they saw and heard the barge cause the breaches. *Please see Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 2, and references therein.*

♦      ***Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 21:***

**Lafarge's Statement of Undisputed Material Fact No. 21:**

It is possible, through scientific means, to determine wave heights during a storm event at a given location.   References Exh. 6, Pazos Dep. 112 ("I'm a hydrodynamicist. … Yes, you can develop height of a wave based on wind by not just a little formula, it's a sophisticated analysis."). Exh. 15, Spinks 2009 Dep. 32 (scientific processes exist to study wave heights in the Inner Harbor Navigation Canal). Exh. 17, Suhayda Report at 9-10 (discussing modeling of wave heights).

***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 21:***

***Controverted***, to the extent that Plaintiffs are called upon to endorse the accuracy or validity of Lafarge's experts' methods, data, calculations or conclusions as to wave height.

***Controverted,*** to the extent that Lafarge's ***incomplete representation*** to this Court of the IPET findings as to wave height (in LNA Stmt UMF No. 22), have any bearing on Lafarge's Statement of Undisputed Material Fact No. 21.

Further, Plaintiffs ***object*** in light of the said ***false statement,*** without waiver of the right to controvert.

***Controverted*** and immaterial in light of the fact that regardless of what motivated the barge, Plaintiffs possess proof that it was located at and caused the eastern IHNC floodwall breaches.

♦      ***Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 22:***

**Lafarge's Statement of Undisputed Material Fact No. 22:**

The Interagency Performance Evaluation Task Force ("IPET") conducted a scientific study and concluded that wave heights in the IHNC during Hurricane Katrina reached 1 foot before 5:30 a.m. CDT on August 29, 2005, and 2-3 feet after that. References Exh. 15, Spinks 2009 Dep. 22 (IPET conducted a scientific analysis of wave heights in

the IHNC on August 29). Exh. 15, Spinks 2009 Dep. 17-21 (accepting and crediting IPET analysis that waves in the IHNC were less than one foot before 5:30 in the morning and two to three feet after 5:30 in the morning). Exh. 4, Cushing Dep. 134 (Waves in IHNC were "small surface waves … on the order of a couple of feet, two feet"). Exh. 12, Pazos Report at 37 (reviewing IPET's study and noting that waves associated with the surge "decay rapidly, and within less than a mile have been reduced to about 1.2 feet"). Exh. 12, Pazos Report at 39-40 (quoting IPET's study at IV-227, which states that "[s]imilar to waves entering the MRGO/GIWW, these waves [entering the IHNC] decay rapidly and within less than a mile have been reduced to about 1.2 feet" and also noting that the maximum waves in the IHNC during Katrina occurred at 9:30 a.m.).

### _Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 22:_

Plaintiffs **object** to the **incomplete and misleading** assertions in Lafarge's Statement of Undisputed Material Fact No. 22.  Lafarge asserts that the IPET concludes that wave heights in the IHNC were no greater than 2 – 3 feet.  Lafarge does not directly cite the IPET report to corroborate this assertion.  Instead, Lafarge attempts to attribute the assertion not to the IPET, but to other sources' reactions to IPET.  The IPET does not strictly say what Lafarge claims that it does.

Appendix 14 to the IPET Report, Volume IV ("The Storm") (Final) is entitled "Detailed-Scale STWAVE Modeling."[2]  The Appendix states at p. IV-14-6:

> In the IHNC, runs with the "narrow-fetch" version of STWAVE were used to estimate wave conditions along the canal.  Figure 14-1 shows the line of maximum wave height along the MRGO/GIWW entrance to the IHNC from the east; and Figure 14-2 shows the line of maximum wave height along the northern portion of the IHNC down to its southern end.  In both cases, two patterns are evident: a rapid damping of longer period waves that are entering the canals from the Gulf on the east and Lake Pontchartrain on the north and a growth of waves due to local wind generation along the canals.  As seen in Figure 14-2, estimates of the latter process appear to be consistent with photographic evidence at the southern end of the IHNC.

(Emphasis supplied.)

Figure 14.1 shows that the model estimates that waves about 2.8 feet in height entered the IHNC from the MRGO/GIWW entrance, and the text combined with Figure 14.2 can reasonably

---

[2] Appendix 14 to IPET Volume IV (Final) is Exhibit __.

be read as showing that the model estimates that local winds drove wave heights within the IHNC to as high as 8.5 feet at one end, with photographic evidence of waves as high as 3.5 feet at the other.

IPET Technical Appendix 15 shows on p. IV-15-39 the Boussinesq model calculations:

- that near the site of the North Breach (12000 on the grid), wave heights <u>in the IHNC</u> at 0630 UTC (1:30 A.M. CDT) were close to 2 feet;

- that near the site of the North Breach (12000 on the grid), wave heights <u>in the IHNC</u> at 0930 UTC (4:30 A.M. CDT) were close to 3 feet; and

- that near the site of the North Breach (12000 on the grid), wave heights <u>in the IHNC</u> at 1030 UTC (5:30 A.M. CDT) were close to 4 feet.

Therefore, it is ***admitted*** that IPET studied wave height, but ***controverted*** that the conclusions Lafarge urges are accurate and complete recitations of the IPET's findings.

It is **controverted** that wave heights reached 1 foot before 5:30 a.m. CDT on August 29, 2005, and 2-3 feet after that.   Waves were actually higher.    Prior to the Northern Breach, Sewerage and Water Board Pump Operator William Villavasso observed waves four to five feet high and intensifying, and a wave that he described as "twenty feet" high and moving from north to south.

*Plaintiffs' Exhibit 35, Deposition of Wm. Villavasso, p. 184, lines 8 – 19.* (Q.   Now, you also testified that, I believe, the first time that you went up and  made an observation from this door, you saw water splashing over the floodwall four to five feet high and in wave forms.  Is that correct?     A. Right.    Q.   When you went out the second time, just before you saw the wall break, were you still seeing these four to five foot waves, or was the water coming over?   A.  Intensifying, yeah.  Intensifying.)

*Plaintiffs' Exhibit 35, Deposition of Wm. Villavasso, p. 186, line 19 – p. 191, line 25.*  (Well, I seen a wall of water.  When  I said 20 feet, I was just estimating that's what it may have been.  Coming from Southern   Scrap

towards the Florida bridge, coming that  way, going towards the Claiborne bridge.)

Please see Barge Plaintiffs' *Compendium #6 of Evidence on Wave Heights in the IHNC.*

Further, the assertion is ***controverted*** and immaterial in light of the fact that regardless of what motivated the barge, Plaintiffs possess testimonial, documentary, and physical proof that it was located at and caused the eastern IHNC floodwall breaches.

♦      ***Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 23:***

**Lafarge's Statement of Undisputed Material Fact No. 23:**

> Plaintiffs did not perform any calculations regarding wave heights in the IHNC. <u>References</u> Exh. 6, Pazos Dep. 123-24 ("[I]t's impossible to predict without making a very detailed analysis of the waves, the reflecting waves, the location of the wind, the direction of the wind – so it's pure guessing"). Exh. 6, Pazos Dep. 151 (asked whether he had an opinion about the prevailing direction of waves at the time the barge supposedly contacted the wall at the north breach, Pazos response was "[a]bsolutely no"). Exh. 6, Pazos Dep. 163 (Q:  "Have you done any calculations to support the conclusion that you've got eight to ten foot waves in the Inner Harbor Navigation Canal?"  A:  "Not in this specific case, but I have done it in other occasions. … I didn't try to do it in this case."). Exh. 6, Pazos Dep. 175 (Q: "Have you done any modeling of waves or wave heights in the Inner Harbor Navigation Canal."  A:  "No."). Exh. 6, Pazos Dep. 175 (Q:  "When you say eight to ten foot waves in the canal, have you done any calculations to support those numbers in this case?"  A:  "Not in this case.  I have done it in other cases."). Exh. 15, Spinks 2009 Dep. 21-22 (rejecting the idea of 20-foot waves based on "the science that I've read and studied" in the IPET report).

*Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 23:*

***Admitted***, but nonetheless ***immaterial*** in light of witness accounts of waves in the IHNC.

Whether Plaintiffs conducted a wave height study is also immaterial in light of IPET findings

described in **PLAINTIFFS COMPENDIUM OF EVIDENCE #6 ON WAVE HEIGHTS IN**

**THE IHNC.**   This statement is also ***immaterial*** because regardless of what motivated the barge,

be it waves or other forces, Plaintiffs possess proof that the barge was located at and caused the eastern IHNC floodwall breaches.

◆   *Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 24:*

**Lafarge's Statement of Undisputed Material Fact No. 24:**

> Wind-activated waves tend to propagate in the direction of the prevailing wind.
> *References Exh. 31, Dooley Dep. 94 ("Any waves that may have been produced within the IHNC in this time period would have flowed with the direction of the dominant wind or the prevailing wind. So wave action would have largely been from the north towards the south that morning."). Exh. 1, Cushing Report at 79 ("Another important property of wind-generated waves is that they travel in the same direction as the prevailing wind"). Exh. 1, Cushing Report at 46 Fig. 28 (photograph of waves in the IHNC at 7:47 a.m.). Exh. 15, Spinks 2009 Dep. 23 (matter of "common sense" that waves travel with prevailing wind).*

*Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 24:*

**Admitted,** that wind-activated waves "tend to" propagate in the direction of the prevailing wind, subject to the limitation that the phrase "tend to" does not denote or imply any condition between the time of the breakaway of ING 4727 and the occurrence of the eastern IHNC floodwall breaches whereby waves **only** propagated in the direction of prevailing winds during Katrina. Further, the admission is subject to the limitation that prevailing winds are not the only winds affecting the barge. The statement is nonetheless **immaterial** in light of the fact that regardless of what motivated the ING 4727, Plaintiffs possess proof it was located at and caused the eastern IHNC floodwall breaches.

Please see **Plaintiffs Compendium of Evidence #6 on Wave Heights in the IHNC.**

♦     *Plaintiffs' Controversion of Lafarge's Statement of Undisputed*
      *Material Fact No. 25:*

**Lafarge's Statement of Undisputed Material Fact No. 25**:

> Waves reflecting off a surface have less energy than "incoming" waves approaching
> that same surface. <u>References</u> Exh. 31, Dooley Dep. 94-95 ("As the waves hit, they
> lose energy. … [T]hey would very quickly dissipate.  So I can't see reflected waves
> from the western side propelling a barge all the way to the eastern side."). Exh. 4,
> Cushing Dep. 240-43 ("We considered reflective waves ... When the wave then
> reflects, it has lost its driving force, and it diminishes.  It quickly dissipates."). Exh.
> 1, Cushing Report at 79 ("Reflected waves lose energy when reflection takes
> place."). Exh. 15, Spinks 2009 Dep. 23-24 (reflected waves have less energy).

*Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 25:*

**Admitted,** though ***immaterial*** in light of the fact that regardless of what motivated

the barge, Plaintiffs possess proof that it was located at and caused the eastern IHNC

floodwall breaches.  Further, plaintiffs note the wave estimated by Wm. Villavasso as

being twenty (20) feet height, which he observed move north to south through the IHNC

immediately prior to hearing a loud sound, and observing the tip of a barge between

sections of compromised floodwall at the North Breach location.

Please  see  ***PLAINTIFFS  COMPENDIUM  OF  EVIDENCE  #6  ON  WAVE***

***HEIGHTS IN THE IHNC.***


♦     *Plaintiffs' Controversion of Lafarge's Statement of Undisputed*
      *Material Fact No. 26:*

**Lafarge's Statement of Undisputed Material Fact No. 26:**

> It is possible to apply scientific principles to determine the effect of waves on a free-
> floating barge.  LNA has applied such principles, including performing calculations,
> the results of which show that waves could not have moved the barge from the LNA
> terminal across the canal to either breach site.  <u>References</u> Exh. 1, Cushing Report at
> 79 (wind-generated waves, which were the only waves present in the IHNC during

Hurricane Katrina, "could not possibly move any floating object in a direction counter to the wind"). Exh. 1, Cushing Report at 79 (reflected wave "can never have as much energy as the primary wave, and can never force a floating object in the direction from which the primary wave is coming"). Exh. 1, Cushing Report at 164 (calculations show pitching motion of barge in waves in IHNC would involve maximum vertical motion of slightly more than one foot).

### *Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 26:*

Plaintiffs **object** to the compound nature of the statement.

It is **controverted** that any calculations or study performed by LNA to "determine" the effect of waves on a free floating barge are accurate or admissible, and it is **controverted** that waves could not have moved the barge to either breach site. ING 4727 was seen adrift in the IHNC on Sunday, August 28, 2005. Therefore the barge was subject to forces in addition to and distinct from those in play during Katrina on the morning of Monday, August 29, 2005, and may not have moved during Katrina from the LNA Terminal, but from another location in the IHNC. Further, the statement is **controverted** and immaterial in light of the fact that regardless of what motivated the barge, Plaintiffs possess proof that it was located at and caused the eastern IHNC floodwall breaches.

♦   ### *Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 27:*

### Lafarge's Statement of Uncontested Material Fact No. 27:

Plaintiffs have performed no such calculations showing the effect of waves on the barge or how waves could have moved the barge across the canal. References *Exh. 6, Pazos Dep. 186-87 (Q: "Now, have you done any calculations to show what the pitch of the barge would be in a five or a ten or an eight foot wave?" A: "Not in this case."). Exh. 6, Pazos Dep. 228 (Q: "Have you done any calculation about how large a wave would be needed to pitch the end of the barge up high enough to get it above the floodwall at that time of morning?" A: "I didn't do any calculations, but I*

*can do it if you want me to.").  Exh. 8, Marino Dep. 107 (Q: "And you've done no literature review or studies or scientific calculations to support a – a conclusion that waves in the Inner Harbor Navigation Canal operated with a predominant force or direction counter to the prevailing wind; is that correct?"  A:  "That's correct.").*

### *Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 27:*

It is ***admitted*** that Plaintiffs performed no such study, however, it is also ***immaterial.***   ING 4727 was seen adrift in the IHNC on Sunday, August 28, 2005. Therefore the barge was subject to forces in addition to and distinct from those in play during Katrina on the morning of Monday, August 29, 2005, and may not have moved during Katrina from the LNA Terminal, but from another location in the IHNC.  Further, to the extent that the statement posits that the barge could not have been at the breach locations when the breaches occurred, it is ***controverted*** and immaterial in light of the fact that regardless of what motivated the barge, Plaintiffs possess proof that it was located at and caused the eastern IHNC floodwall breaches.


♦ ### *Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 28:*


### Lafarge's Statement of Undisputed Material Fact No. 28:

The North Breach occurred no later than 6:00 a.m. on August 29, 2005.  The North Breach was approximately 215 feet in length. Underline References Exh. 12, Pazos Report at 8, 37. Exh. 1, Cushing Report at 103-04. Exh. 2, Marino Report at 3-16. Exh. 16, Spinks Report (2009) at App. I. Exh. 13, Bea Report at 56-57. Exh. 27, Bakeer Dep. 101-02.


### *Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 28:*

Plaintiffs ***object*** to the compound nature of the Statement.

Plaintiffs **admit** that the approximate length of the North Breach was 215 feet *after the breach was fully developed*, after initiation by ING 4727, but **controvert** that the breach time is conclusively established.  Plaintiffs' possess testimonial proof which attributes many different times to the sounds associated with the North Breach and/or the impact of ING 4727 against the eastern IHNC floodwall, as well as testimony establishing that witnesses were mortally frightened, subject to extreme circumstances, and explicitly uncertain about the times of salient events.   Many of these accounts are in conflict.

See Plaintiffs Compendium of Proof No. 3 concerning **SOUNDS IDENTIFIED WITH BARGE CONTACT WITH THE EASTERN IHNC FLOODWALL** for testimony as to some of the varying times reported.

> Please see *Plaintiffs' Exhibit 35, Deposition testimony of Wm. Villavasso, p. 146, line 25 – 148, line 18*.  ( Q.  And what is your -- again, your best estimate of that lapse of time between the time the wall broke and the time you then went to tell them to turn off the power?        A.  Now, you asking me about to estimate, but I am unsure of how -- how much time elapsed. Q.  We all understand you don't -- didn't have a stopwatch.    A.  Yeah.      Q.  There were a lot of things happening.       A.  Right.  I would say -- I don't  know.  After I seen all of that happen and   seen the water, the maximum amount of water
> coming through, I don't know if that lasted    minutes or seconds.  I really -- It's hard to   say.      Q.  Do you think that lapse was as long   as half an hour?    A.  Oh, no.  The lapse when I seen the    wall break and me calling Central?     Q.  Yes.  A.  No.      Q.  So that wasn't as much as a half  hour?    A.  No. Q.  And you have told Mr. Bruno this, I believe, and others, that a good record of when you called for the power to be shut down would be in the log of the Central Station? A. That's correct.          Q.   Okay.  Now, that time, we have seen it and I will just represent this to you, and so I am asking you to assume it, was 6:10 A.M.   on the morning of August 29th.    MR. ERNST:  What's on that log?      MR. TREEBY: What's on that log says 6:10 A.M.  when they got the call and shut off   the power. THE WITNESS:  Well, that's what time it was.

> Please see *Plaintiffs' Exhibit 68, an excerpt of the Sewerage and Water Board Central Control Log* reflecting power shutdown at 6:10 a.m. on August 29, 2005.

> Please also see *Plaintiffs' Exhibit 41, Declaration of Melvin Spinks*, *paragraph 12*, containing the opinion that the North Breach occurred at or before 4:30 a.m.

It is possible that the S&WB log reflects the time that the entry was made, but not the time Mr. Villavasso called to cut power.  It also does not account for the time Mr. Villavasso waited before making the call to Central Control to cut the power.  The trier of fact will be permitted to reach conclusions or inferences based upon the weight or reliability attributed to the conflicting testimony and documentary proof, when arriving at any potential finding as to when the North Breach occurred.

See *Plaintiffs' Exhibit 48, July 20, 2009 Deposition of Hector Pazos, P.E., page 83, line 18 – page 85, line 13*, in which Mr. Pazos describes the sequential failure of the components at the North Breach.  The underseepage and sliding of components Mr. Pazos describes "happens for a period of time" – p. 85, line 2 – before full development of the breach.

Lafarge's investigator, Centanni Investigative Services, took clocks from abandoned homes in efforts to pinpoint the breach times, under the assumption that the clocks stopped when exposed to flooding.  The clocks stopped at a wide range of times, on unknown dates, and for unknown reasons.  Please see *Plaintiffs' Exhibit 69, charts Lafarge produced representing the times displayed by stopped clocks which Centanni appropriated from Lower Ninth Ward residences after Katrina.*

♦       ***Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 29:***

**Lafarge's Statement of Undisputed Material Fact No. 29:**

The South Breach occurred no later than 7:30 a.m. on August 29, 2005.  The  South Breach was more than 800 feet in length. <u>References </u>Exh. 12, Pazos Report at 8, 37. Exh. 1, Cushing Report at 114. Exh. 2, Marino Report at 3-16. Exh. 16, Spinks Report (2009) at App. I. Exh. 13, Bea Report at 56-57. Exh. 27, Bakeer Dep. 102.

**_Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 29:_**

Plaintiffs **_object_** to the compound nature of the Statement.

Plaintiffs **_admit_** that the length of the South Breach exceeded 800 feet _after the breach was fully developed_, after initiation by ING 4727, but **_controvert_** that the breach time is conclusively established.  Plaintiffs' possess testimonial proof which attributes many different times to the sounds associated with the South Breach and/or the impact of ING 4727 against the eastern IHNC floodwall, as well as testimony establishing that witnesses were mortally frightened, subject to extreme circumstances, and explicitly uncertain about the times of salient events.   Many of these accounts are in conflict.

See Plaintiffs Compendium of Proof No. 3 concerning **_SOUNDS IDENTIFIED WITH BARGE CONTACT WITH THE EASTERN IHNC FLOODWALL_** for testimony as to some of the varying times reported.

Please also see _Plaintiffs' Exhibit 48 , Deposition of Hector Pazos, P.E., p. 84, line 14 – p. 92, line 22_, which testimony, like that concerning the Northern Breach, describes a sequential process taking place over time.  After the barge exerts force on the floodwall, the passage of time and seepage combine to cause the full development of the failure, and thus, the breach.  It is not instantaneous.

Lafarge's investigator, Centanni Investigative Services, took clocks from abandoned homes in efforts to pinpoint the breach times, under the assumption that the clocks stopped when exposed to flooding.  Please see _Plaintiffs' Exhibit 69, charts Lafarge produced representing the times displayed by stopped clocks which Centanni appropriated from Lower Ninth Ward residences after Katrina._

♦ ***Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 30:***

**Lafarge's Statement of Undisputed Material Fact No. 30:**

Both the North Breach and the South Breach had already occurred before the prevailing winds came to include any component blowing from the direction of the LNA Terminal toward the east bank of the IHNC. References Exh. 1, Cushing Report at 104 (at the time of the north breach, "the wind was blowing with a significant component to the east"; "this wind prevented the barge from moving to the north breach site"). Exh. 1, Cushing Report at 114 ("it is clear that the [south] breach had to have occurred before the winds had a west-to-east component"). Exh. 2, Marino Report at 3-11 (winds were "essentially parallel" to canal before 9:00 a.m.).

***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 30:***

***Controverted.*** Water was observed splashing over the eastern IHNC floodwall, from west to east, at times when water in the IHNC was below the top of the floodwall, at which times Lafarge asserts that wind was not blowing from west to east. South-to-north wind was observed in Chalmette, west of Paris Road, at a time when Lafarge asserts that wind direction was from north to south. Unpowered vessels in the Intracoastal Waterway were observed being blown and drifting from west to east at times at which Lafarge asserts that wind was not blowing from west to east. Plaintiffs possess proof that ING 4727 was adrift in the IHNC during the day on Sunday, August 28, 2005, thus obviating Lafarge's experts' assertions which rely upon any premised that the barge was in its berth until Monday morning. Further, the Statement is ***immaterial***, in light of proof that the barge was at the locations of the eastern IHNC floodwall breaches at the times that they occurred, regardless of what motivated the barge there.

Please see *Plaintiffs' Response to Lafarge's Statement of Uncontested Material Fact No. 2*, and proof cited therein. *Barge Plaintiffs'  Compendium of Proof No. 7*, **OBSERVATIONS OF WIND DIRECTION INCONSISTENT WITH LAFARGE'S ASSERTIONS** *and sources referenced therein.*

♦      ***Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 31:***

**Lafarge's Statement of Undisputed Material Fact No. 31:**

The floodwalls on the IHNC were "I-walls" comprised of a twenty-foot-long steel sheet pile driven into an earthen levee and subsoil to a depth of approximately seventeen feet and capped by a six-foot concrete monolith (cap).   The concrete monolith was poured in two segments, the first encasing the top of the sheet pile and the second extending three feet above the top of the sheet pile.   The upper "pour" consisted of three feet of concrete and reinforcing bar ("rebar") extending above the sheet pile.  The floodwall had a horizontal construction joint between the two "pours" of concrete.    A schematic of the floodwall, including the concrete cap and the construction joint between the two pours of concrete, is attached as **Attachment C.**

*References Exh. 11, Mosher Dep. 28-29 ("It was … what we called an I-wall, which is essentially a sheet pile wall with a concrete header section sticking above the ground.").Exh. 8, Marino 2009 Dep. 58-59 (floodwall had a six-foot concrete monolith, with a construction joint three feet below the top of the monolith).Exh. 9, Marino 2008 Dep. 46-47 (agreeing that "the fundamental principle is that in order for a wall to resist a load it needs to have some sort of anchor somewhere so that when the load is exerted the wall can push back" and that "embedment depth" is one way to do that). Exh. 12, Pazos Report at 35 (floodwall "is a flexible cantilever (I type) structure) embedded in a soil of soft saturated clay"). Exh. 12, Pazos Report at 35-36 (sheet pile extends 5 feet into the 8 foot wall). Exh. 2, Marino Report at Fig. 2.3 (dimensions of I-wall). Exh. 2, Marino Report at 2-23 (describing two pours of concrete on monoliths). Exh. 1, Cushing Report at 29-30 & Fig. 21 (describing sheet pile I-wall). Exh. 37, Bartlett Report App. A & B (schematic of floodwall and concrete cap)*

***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 31:***

***Controverted.***   The sheet pile depths were not uniform. Further, the sheet pile was driven to depths significantly different than "approximately seventeen feet."

Please see *Plaintiffs' Exhibit 48, July 20, 2009 Deposition of Hector Pazos, pp. 56, line 17 – p. 57, line 3* (A.  Okay.  Item Number 1, the sheet piling in the north breach is composed of two sizes, one is 23 feet deep and the other is 35 feet deep. This location is clearly a discontinuity, a structural discontinuity, and  this is the location where the failure is noticeable to the south of this location while there was no failure to the north of the location.  And in order to create a failure, because the water at the time was relatively low, it has to be an external force pushing in the concrete pilings.  This is Item Number 1.)

Please see *Plaintiffs' Exhibit 42, June 2009 report of Marino Engineering Associates, p. 2-23.* ("The as-built plan and profile in the vicinity of the South Breach are shown in Figures 2.11 and 2.12. As in the North Breach area, Z-27 sheetpiling has been installed up to Elevation +11.5 ft to -8.0 ft ", or 1.5 ft higher than depicted in the design drawings.

♦     *Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 32:*

**Lafarge's Statement of Undisputed Material Fact No. 32:**

The floodwall derived its strength from the supporting soils into which the sheet pile was embedded and anchored.  Accordingly, the failures that occurred at the North Breach and South Breach required a failure in the soil into which the steel sheet pile was sunk.  The floodwall failed when it lost the support of the soils on the protected side of the floodwall.  References Exh. 11, Mosher Dep. 17 ("The wall was founded in a levee, which is made up of soil, and the principal resisting forces to any loads that are applied to the wall were resisted by the soils that the wall was setting in, and so that it's a classical soil-structure interaction problem."). Exh. 6, Pazos Dep. 201 (Q: … And so in order for the wall to do its job, it needs to have support in the soil on the protected side, right?"  A:  "Yes."). Exh. 8, Marino 2009 Dep. 55 (Q:  "[I]n a flood stage, you need to have the sheet pile provide resistance in the soil and then below the levee; isn't that right?"  A:  "Yes."). Exh. 8, Marino 2009 Dep. 55 (Q: "And if you're going to fail the sheet pile, you've got to fail the soil; isn't that right?"  A:  "I haven't thought of all instances of whether that's true or not, but I would say in general, it's true."). Exh. 9, Marino 2008 Dep. 40 (Q: "And in order to fail the floodwall, you have to have some failure of the soil."   A:  "Yes."). Exh. 1, Cushing Report at 51 (sheetpiling requires "passive soil pressure to resist overturning forces").

*Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 32:*

Plaintiffs' ***object*** to Lafarge's Statement of Undisputed Material Fact No. 32 as an incomplete, skewed, inaccurate and misleading characterization of Plaintiffs' experts' opinions.  Without waiver of the right to controvert LNA's Statement, Plaintiffs respond as follows.

***Controverted.***  Plaintiffs' experts conclude that ING 4727's contact with the eastern IHNC floodwall, and the loads translated thereto, affected the integrity of the floodwall, embedding soil and sheetpile, causing failure.  This mechanism did not occur without the influence of  ING 4727.

Please see *Plaintiffs' Exhibit 43, Declaration of Gennaro Marino, p. 5*, describing page 178 of his deposition testimony that the effects of water were induced by the barge.

Please see *Plaintiffs' Exhibit 48, July 20, 2009 Deposition of Hector Pazos, p. 83, line 18 – p. 84, line 25*, describing the occurrence of the North Breach:

> Q.   All right.  So if you'd take me through the process, you start the process by the barge impacting and pushing sections of the    east floodwall across from pumping station   Number 5, initially tumbling over some panels of floodwall.  Is that right? A.   Yes.    Q.   And then next, the barge contacts and pushes eight or nine additional panels before moving away from the floodwall.  Is that right? A.   Yes. Q.   And then next, the impacting and pushing of the floodwall creates gaps or openings, allowing water to penetrate below the ground surface between the sheet pile curtain and the outboard side earthen embankment. Right? A.  Yes.    Q.    And that water is penetrating between the sheet pile curtain and the canal side earthen embankment. Right?    A.  Yes.    Q.  All right.  And then the next thing    that happens is that this gapping develops and   extends to the base of the sheet piles   resulting in seepage of water through the   homogeneous saturated soil.  Right?    A.   Yes.    Q.  And next, as a result of the underseepage of water, you have sliding that   starts to develop in the soil behind the sheet pile on the land side.  Correct?    A.   Yes.

Please see *Plaintiffs' Exhibit 48, July 20, 2009 Deposition of Hector Pazos, p. 87, line 5 – p. 88, line 12*, describing the occurrence of the South Breach:

> Q.   Now, during -- and you go on, that in the 900 feet that the barge has been scraping and impacting and pushing, the floodwall is compressed and the result is seepage flow that increases.  Is that right?       A.   Yes.       Q.   And that seepage

flow is flow similar   to what you've encountered at the north breach,  right?      A.
Yes.      Q.  The seepage is flowing in the gap   between the sheet pile curtain and
the soil on    the protected -- on the canal side of the    levee. I'm sorry.       A.
Yes. And continue inland.      Q.  So the seepage flows through that gap    between
--      A.  Yes.      Q.   -- the sheet pile and the canal side     soil. It flows
underneath the sheet pile    curtain and through onto the backside of the    levee.
Right? A.  Correct. Yes. Q.  And once that seepage is on the backside of the levee,
it weakens the   resistance of the levee to the flow in the canal, am I right? A.  Once
the seepage is started, weakens the entire base of the levee, not only at the end, but
entire.  Create what is called piping.       Q.   So you have a piping that happens in
the soil --      A.  Yes.

◆    _**Plaintiffs' Admission of  Lafarge's Statement of Undisputed
Material Fact No. 33:**_

**Lafarge's Statement of Undisputed Material Fact No. 33:**

It is possible to perform scientific calculations to measure the effect of an impact by an
object such as a barge on an I-Wall such as those at the IHNC under the conditions that
existed in Hurricane Katrina. <u>References</u> Exh. 9, Marino 2008 Dep. 38-39 (describing
"hydrodynamic load analysis" to come up with "a potential force range that would
impact the wall"). Exh. 1, Cushing Report at 158-63 & App. D, E, F (setting up and
carrying out analysis).

_**Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 33:**_

_**Admitted.**_

In fact, Marino Engineering Associates performed these calculations, finding that

contact between ING 4727 and the eastern IHNC floodwall caused the breaches.  Please

see _Plaintiffs' Exhibit 43, Declaration of Genarro G. Marino, Ph.D, P.E., esp. Section G

(including subsections) and all Exhibits._

As well, the IPET Report describes just such calculations, concluding that ING 4727 could

produce the floodwall failures at the North and South breaches.  _IPET, March 26, 2007; Vol. IV,

"The Storm - Findings and Lessons Learned" p. IV-261._  ("Barge impacts in high-wind/high-wave

situations have the potential to inflict consequential damage to floodwalls.") *Exhibit 82, IPET, March 26, 2007, V89 – V102; IPET, Vol. IV, Technical Appendix 17, "Consideration of Wind-Induced Barge Motions and Associated Forces in the Inner Harbor Navigation Canal."* ("… addresses the issue of whether the barge that traversed from the Industrial Navigation Harbor Canal (INHC) through the flood wall to the Lower Ninth Ward could have been a cause of the levee failure in this area or whether the barge was simply transported through the levee subsequent to its failure" … "It is found that the terminal velocity of the barge is achieved rather quickly for the wind speed examined (100 miles per hour) and that for barge conditions in the INHC the momentum and energy impact on the east flood wall depend primarily on the draft of the barge during the event.")

♦   ***Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 34:***

**Lafarge's Statement of Undisputed Material Fact No. 34:**

> LNA's experts performed calculations showing that a barge impact, if it occurred, would cause local damage to the concrete cap but would not affect the steel sheet pile or supporting soil.  The Army Corps expert (Mosher) and even plaintiffs' expert (Marino) expressed agreement with this concept. <u>References  LNA's expert</u> Exh. 1, Cushing Report at 158-63 (carrying out analysis showing that "a barge striking the concrete cap of the floodwall could not cause the sheetpile to fail" but would only create localized damage ("cracking" or a "notch") in the concrete cap, with no effect in the sheet pile below). Exh. 1, Cushing Report at  99 & Figs. 72, 73, 74 ("These photos show that a barge impact with the concrete cap of a floodwall does not cause the floodwall to fail.  Rather, the concrete cap gives way and the sheetpile remains intact."). Exh. 1, Cushing Report at 149 ("As calculations show and evidence of other barge impacts prove, a barge or any other object impacting a concrete floodwall will cause the concrete that receives the impact load to crack before the load will cause the entire sheetpiling to overturn or be uprooted (exhumed)."). Exh. 1, Cushing Report at 173 ("The barge could not strike the sheetpiling with sufficient energy to cause overturning.  In any event, the concrete cap on top of the wall would have cracked before the barge could have affected the anchoring of the sheetpile."). Exh. 4, Cushing Dep. 254 ("[I]t's just not possible for a barge of this size and – and weight and mass under the wind conditions, even under the worst possible wind conditions, even under

the worst possible attitude, under the highest speed that that barge could have been moving in this wind condition to have damaged or toppled this floodwall.  It's just not possible."). Exh. 4, Cushing Dep. 253 ("The amount of force you're talking about in this hypothetical is so slight that it's a little bit like a flea landing on the end of a trapeze artist's bar."). Mosher Exh. 11, Mosher Dep. 91-92, 267 (referring to "other places where we say barges hit walls" and noting that they "can cause damage to the walls, but it's usually very local damage to the walls"; "punching through" but not "causing collapse"). Exh. 11, Mosher Dep. 101-02 (breaches at 17th Street and London Avenue showed "where a crack formed behind the walls [on the canal side] without a barge hitting it"). Exh. 11, Mosher Dep. 130-31 (physical features or north breach, including "large movement of a wall" and "cracks that extended below where the actual failure was," "wouldn't have [been] seen" there "if the barge had hit at that location").Exh. 11, Mosher Dep. 145 (location of "potential damage from a barge hitting" the floodwall "doesn't seem to match up to where the primary damage is"). Marino Exh. 8, Marino 2009 Dep. 59-60 (admitting that construction joint in concrete cap constitutes a point of weakness, and that he would expect the wall to shear at the construction joint if the impact was sufficient). Exh. 8, Marino 2009 Dep. 104 (Q: "All right. So if a pressure on a wall is narrow in scope, you would not expect that pressure to be felt at deep depths?"  A: "Right."  Q: "So, for instance, the pressure of a corner of a barge hitting the top of a wall, you'd expect that pressure to be exerted on a narrow part of the wall rather than translating all the way down to the bottom of the sheet pile?"  A:  Well, obviously.  I mean, it's where there is contact.  I mean, that's a simple answer.").

### *Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 34:*

Plaintiffs' **object** once more to yet *another* instance of seemingly intentional misrepresentation and mischaracterization of Plaintiffs' experts' testimony, nothwithstanding that Lafarge's Statement is **controverted** in its entirety.

Please see *Plaintiffs' Exhibit 43, Declaration of Genarro G. Marino.*

Please see *Plaintiffs' Compendium of Proof No. 4, concerning* **ING 4727's ABILITY TO EXERT SUFFICIENT FORCE TO CAUSE THE EASTERN IHNC FLOODWALL BREACHES - IMPACT LOADS ASSERTED BY BARGES ON STATIONARY STRUCTURES.**

Please see Plaintiffs' *Exhibit 51, Declaration of Robert Bartlett, paragraph 19* ("The MSJ assertion on page 39 claims that the contact by the barge "Could only have resulted in localized damage to the concrete cap...". The portion of the cap that was dislodged or damaged by contact with the barge was localized in that it was no larger than the size of the barge, but that should not be interpreted to mean that the damage that was caused as a result of the contact by the barge was "localized.")

♦   ***Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 35:***

**Lafarge's Statement of Undisputed Material Fact No. 35:**

Plaintiffs' experts did not perform any calculations showing the effect that a barge impact would have on the sheet pile or the supporting soil, as opposed to the concrete cap. <u>References No calculations from Marino regarding cap versus sheet pile</u> Exh. 8, Marino 2009 Dep. 127 (Q: "You haven't done any calculations to determine whether an impact with the concrete cap would cause the cap to shear off rather than pulling the wall from the soil; correct?" A: "That's correct."). Exh. 8, Marino 2009 Dep. 256 (admitting that "modeling the movement of the bottom of the sheet pile on the protected side is something that would be in [his] area of expertise," and that he believes that "if [he] had modeled it, [he] could prove it" occurred, but he did not do it because "you can't model everything"). <u>No impact calculations from Marino</u> Exh. 8, Marino 2009 Dep. 126 (Q: "You haven't calculated the barge impact force at either of the breaches; correct?" A: "That's correct"). Exh. 8, Marino 2009 Dep. 31-32 (Q: "Would you agree with me that there are no such engineering calculations [related to barge impact on floodwall] in the report that you issued in 2009?" A: "Yes … That analysis never got finished."). Exh. 9, Marino 2008 Dep. 100-01 (Q: "Did you evaluate as part of your analysis how far the floodwall would deflect when hit by the barge?" A: "No.") (adding that he "plan[ned] to" undertake that analysis). <u>No calculations to show impact was sufficient to cause breaching</u> Exh. 8, Marino 2009 Dep. 35-36 (Q: "This report doesn't contain any other quantitative forensic engineering analysis to demonstrate that the ING 4727 was capable of causing either breach, does it?" A: "No."). Exh. 8, Marino 2009 Dep. 127 (Q: "You haven't calculated the force that would be needed to exhume the sheet pile at either location; is that correct? A: "That's correct."). Exh. 8, Marino 2009 Dep. 157 (Q: "And you haven't calculated whether the momentum of the barge was sufficient to cause the wall to deflect and create this gap in the manner you've described?" A: "Right."). Exh. 8, Marino 2009 Dep. 34-35 (Marino reached his conclusions about causation by a "process of elimination" in which he finds "no other likely causes" and infers the barge caused the failures). Exh. 8, Marino 2009 Dep. 166 (Q: "Well, the fact of the barge hitting the wall is something you back into after you eliminated all the other causes; isn't that right?" A: "That's correct."). <u>Pazos calculations are limited to force of wind on the barge, not distinction between sheet pile and cap</u> Exh. 6, Pazos Dep. 357 ("I already make calculations … regarding forces developed by wind on the barge that can be transmitted to the seawall."). Exh. 12, Pazos Report at Attachment No. 5 (purporting to provide calculations, but failing to distinguish impact on concrete cap versus sheet pile). Exh. 1, Cushing Report at 143 (noting that Pazos did not analyze wall deflection).

*__Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 35:__*

*__Controverted__*.  Please see Plaintiffs' Exhibit 43, Declaration of Genarro G. Marino,

Ph.D., P.E.

♦   *__Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 36:__*

**Lafarge's Statement of Undisputed Material Fact No. 36:**

> Hurricane Katrina's storm surge caused massive breaches in the earthen levees along Reach 2 of the Mississippi River Gulf Outlet (the "MRGO Breaches").  <u>References</u> Exh. 12, Pazos Report at 37 ("As the eye of the hurricane moved to the Northeast, the counterclockwise rotation of the winds resulted in an elevation of the waters of Lake Borgne, water was pushed against the Earthen Berm/Spoil Banks along the Northeast frontage of the  St. Bernard  protected basin.   This resulted in major erosion and breaching of the EBSB along Reach 2 on the Southwest of the MRGO[.]").

*__Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 36:__*

Plaintiffs' *__object__* to the statement on the grounds of ambiguity and vagueness, in

that "massive" is undefined.  (The breaches of the eastern IHNC floodwall, over 200 feet

and 800 feet in length, were massive.)  Further, plaintiffs *__object__* on the same grounds

because Lafarge does not identify the locations the levees, or the location or number of the

purportedly "massive" MRGO breaches, whether they were along Reach 1 or Reach 2, in

levees  along  the  northern  or  southern  banks  of  the  MRGO,  whether  the  levees  had

vegetation, whether they were composed of spoil material, whether they were intended as

flood  protection  structures,  nor  whether  the  said  MRGO  breaches  are  alleged  to  have

contributed to any flooding at issue in this lawsuit.

Notwithstanding the objection, the Statement is *__controverted,__* in light of Lafarge's

Third Party Claim against the United States and others in the cases composing the Barge

Litigation Track, which Third Party Claims allege that the negligence of third party

Defendants, and those answerable thereto, caused the breaches in the earthen levees along

Reach 2 of the MRGO, and therefore render said Defendants liable for flooding of the areas

at issue in the Barge Litigation.

> *Extracts of Third Party Complaint*:  The USCOE acted negligently in its design, construction, inspection, and maintenance of the MR-GO. The USCOE negligently designed and constructed the MR-GO in such a fashion that it acts as a funnel that transmits and magnifies rapidly accelerated, storm-driven surges to the New Orleans area, including throughout the MR-GO. The USCOE also negligently failed to take this effect into account in designing and constructing the MR-GO.  By constructing the MR-GO, the USCOE negligently destroyed extensive areas of wetlands, thus destroying a critical natural buffer for the New Orleans area against storm surges and exacerbating the funneling effect of the MR-GO. Such destruction by the USCOE took or has taken place (a) during construction of the MR-GO, (b) during subsequent ongoing dredging and other activities, and (c) as a result of the effects of the MR-GO, including salt water intrusion and accelerated erosion.   The USCOE negligently failed to properly maintain the depth of the MR-GO channel by failing to properly dredge the channel. The USCOE negligently failed to take appropriate and necessary measures to stabilize or otherwise remediate the areas adversely affected by the MR-GO.  The United States is liable for the negligent or otherwise at-fault conduct of the USCOE under the Suits in Admiralty Act, 46 U.S.C. App. §§ 741 et seq., and/or the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq.   The USCOE's negligence or fault as set forth in Paragraphs 17-28 above was a direct and proximate cause of, and a substantial factor in, the overtopping and breaching of the banks of the MR-GO.)

Further **controverted** as legally and factually ***immaterial*** and ***contrary to the law of***

***intervening causation,*** and ***contrary to the law of joint and several apportionment of***

***damages in maritime cases***, holding that Lafarge can be found liable for all damages of

which ING 4727 was a substantial cause.[3]

---

[3]  In situations in which there is an intervening force that comes into play to produce the plaintiff's injury (or more than one cause of an accident), it has generally been held that the initial tortfeasor will not be relieved of the consequences of his or her negligence unless the intervening cause superceded the original negligence and alone produced the injury. *Arcadian Corporation v. Olin Corporation*, 01-1060 (La.App. 3 Cir. 5/8/02), 824 So.2d 396, 405, *writ denied*, 02-1930 (La. 10/25/02), 827 So.2d 1174; *Mendoza v. Mashburn*, 99-499, p. 16 (La.App. 5 Cir. 11/10/99), 747 So.2d 1159, 1168, *writ denied*, 00-0037 (La. 2/18/00), 754 So.2d 976; *Domingue v. State Department of Public Safety*, 490 So.2d 772, 775 (La.App. 3 Cir. 1986). If the original tortfeasor could or should have reasonably foreseen

♦   ***Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 37:***

**Lafarge's Statement of Undisputed Material Fact No. 37:**

---

that the accident might occur, he or she will be liable notwithstanding the intervening cause. *Id.* In sum, foreseeable intervening forces are within the scope of the original risk, and hence of the original tortfeasor's negligence. *Miller v. Louisiana Gas Service Co.*, 601 So.2d 700, 705 (La.App. 5 Cir.), *writs denied*, 604 So.2d 999, 604 So.2d 1001(1992), *citing* Prosser And Keeton, Law Of Torts (4th ed. 1971) at 273-274, 288. **Adams V. Rhodia,** 2007-2110 (La. 5/21/08); 983 So.2d 798.

"…**Error! Main Document Only.**the general rule is that a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury." *Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979). Cf. The Atlas, 93 U.S. 302, 23 L.Ed. 863 (1876);*

A tortfeasor is not relieved of liability for the entire harm he caused just because another's negligence was also a factor in effecting the injury. "Nor are the damages against him diminished." Restatement, *supra*, § 879, Comment a. FN8.Restatement (Second) of Torts §§ 433A, 875, and 879 (1965 and 1979); T. Cooley, Law of Torts 142-144 (1879); W. Prosser, Law of Torts § 47, pp. 297-299, and § 52, pp. 314-315 (4th ed. 1971).

**Error! Main Document Only.**Like the common law, W. Prosser & P. Keeton, Prosser & Keeton on the Law of Torts § 47 at 328 (1984), the general maritime law has long recognized the concept of joint liability. For example, in The Atlas, 93 U.S. 302, 23 L.Ed. 863 (1876), the Supreme Court held that the insurer of cargo lost in a collision between two vessels caused by the fault of both could recover all of its damages from one vessel. The Court borrowed this rule from the common law, which recognized a plaintiff's right "to sue ... all the wrong-doers, or any one of them, at his election; and it is equally clear, that, if he did not contribute to the disaster, he is entitled to judgment in either case for the full amount of his loss." Id., at 315, 23 L.Ed. at 866; see also The Alabama, 92 U.S. 695, 23 L.Ed. 763 (1876); The George Washington, 76 U.S. 513, 19 L.Ed. 787 (1870); The Juniata, 93 U.S. 337, 23 L.Ed. 930 (1876); The Sterling, 106 U.S. 647, 1 S.Ct. 89, 90, 27 L.Ed. 98 (1882) (describing the joint liability rule in admiralty as "well-established"). Neither the Supreme Court nor the lower courts have ever retreated from the rule of joint liability under maritime law. See, e.g., Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 2756 n. 7, 61 L.Ed.2d 521 (1979); Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 2178, 40 L.Ed.2d 694 (1974); Seal Offshore, Inc. v. American Standard, Inc., 777 F.2d 1042 (5th Cir. 1985); Todd Shipyards Corp. v. Auto Transportation, S.A., 763 F.2d 745, 756 (5th Cir. 1985); Central Rivers Towing, Inc. v. City of Beardstown, Ill., 750 F.2d 565, 575 (7th Cir. 1984). **Simeon v. T. Smith & Son, Inc.,** 852 F.2d 1421 (5th Cir. 1988).

[28] Collision cases provided the context in which joint liability was applied most frequently,[fn9] but the rule of joint liability also has been applied in cases, like Simeon's, involving other maritime fault-based claims. See, e.g., Cooper Stevedoring, 94 S.Ct. at 2178 (commenting that plaintiff longshoreman who slipped while loading vessel "could have proceeded against either The Vessel or [the nonemployer stevedore company, which had created the dangerous condition in loading at a prior port] or both of them to recover full damages for his injury"); Joia v. Jo-Ja Service Corp., 817 F.2d 908 (1st Cir. 1987).[fn10]  *Error! Main Document Only.***Simeon v. T. Smith & Son, Inc.,** 852 F.2d 1421 (5th Cir. 1988).

The earthen levees along MRGO Reach 2 protect the same area ("polder") as the floodwalls along the east side of the IHNC. Reference Exh. 16, Spinks Report (2009) at 10 Fig. 2.

**_Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 37:_**

**_Objection._**   Lafarge continues to skew, misappropriate and **_misrepresent_** Plaintiffs' experts.  Plaintiffs further **_object_** to the Statement as **_misleading_**.  Lafarge's interpretation of Figure 2 is imaginative at best.  The figure to which Lafarge refers does not state that the earthen levees along Reach 2 "protect" anything   Nor does any text associated with Figure 2.  Lafarge insinuates, though selective language in its Statement that the Reach 2 levees have something to do with the Lower Ninth Ward.   While Plaintiffs recognize that much of the _Katrina Canal Breaches Consolidate Litigation_ is based upon the contention that MRGO waters caused the damages between the IHNC and Paris Road, there is no possible interpretation of Mr. Spinks' report or Figure 2 that supports this contention.  Rather, Mr. Spinks says very plainly at _page 9 of his report, Plaintiffs' Exhibit 44,_ that "[d]uring Hurricane Katrina, the Lower Ninth Ward and the St. Bernard Parish west of Paris Road was devastated from the catastrophic failure of the hurricane flood protection system along the INHC floodwall."

Further, Lafarge's Statement, to any extent that it implies that water from Reach 2 played any proximate role in the initial destruction and other damages between the IHNC and Paris Road, is **_contoverted._**  Please see _Plaintiffs' Compendium of Proof No. 8,_ concerning the **_PREEMPTIVE INUNDATION BY IHNC FLOODWATERS_** before any water from MRGO could reach the area.

Please see _Plaintiffs' Exhibit 44, Report of Melvin Spinks p., 37_, stating, "The north and south breaches along the IHNC floodwall accounted for over 90% of the total

flow into the Lower Ninth Ward and St. Bernard Parish before 9:00 a.m. CDT. The floodwaters of the IHNC eventually merged with the floodwaters from MRGO just west and south of Paris Road.

Notwithstanding the fact that Plaintiffs have objected and responded, the Statement is ***immaterial*** in light of the law of apportionment and intervening cause to be applied in this case.  Please see Footnote 3.


♦   ***<u>Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 38:</u>***

**Lafarge's Statement of Undisputed Material Fact No. 38:**

> The MRGO breaches inundated St. Bernard Parish and the Lower Ninth Ward with massive flooding on the morning of August 29, 2005. <u>References</u> Exh. 16, Spinks Report (2009) at 17 (35,200 ft of breaches along MRGO). Exh. 16, Spinks Report (2009) at 18, Fig. 4 (showing locations of "major levee breaches" along MRGO).

***<u>Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 38:</u>***

Yet again, Plaintiffs **object** to the repeated, gross **misstatement** of Melvin Spinks' opinions, due presumably to the likelihood that Lafarge lacks admissible or credible proof supportive of its Statements Nos. 36 through 41.  Melvin Spinks does not espouse the position Lafarge attempts to insinuate upon him, but instead, in *Plaintiffs' Exhibit 41, Declaration of Melvin Spinks*, states on p. 27:  "It is an undisputable fact that the floodwaters from IHNC breaches caused the flooding and substantial damages in the Lower Ninth Ward and St. Bernard Parish *before* floodwaters from the IHNC and MRGO merged near Paris Road."  (Emphasis Mr. Spinks')

Please see *Plaintiffs Compendium of Proof No. 8 concerning the **PREEMPTIVE INUNDATION BY IHNC FLOODWATERS.***   This Compendium provides the

testimony of numerous fact witnesses to establish that flooding was minimal, perhaps from rainwater, until a wall of water was observed traveling west to east.

Plaintiffs also submit *Plaintiffs' Exhibit 70, video of the St. Bernard Parish Courthouse,* in which the arrival of this wall of water heading east along relatively dry land can be plainly observed.

Further, the Statement is ***immaterial*** and ***contrary to law***.  Please see Footnote 3.


◆      ***Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 39:***

**Lafarge's Statement of Undisputed Material Fact No. 39:**

> It is possible, through scientific flood modeling, to determine the level of flooding that would have occurred in the Lower Ninth Ward and St. Bernard Parish even if the IHNC floodwall breaches (the North Breach and South Breach) had not happened. <u>References</u> Exh. 14, Spinks 2008 Dep. 241-42 (Q:  "Among the hypothetical scenarios you created was a hypothetical scenario which assumed that the Inner Harbor Navigation Canal breaches did not occur.  Am I right?"   A:  "Yes, there is a hypothetical example of that."   Q:  "And that hypothetical example might be taken as an illustration of the situation that would have occurred but for the occurrence of the breaches in the Inner Harbor Navigation Canal; right?"   A:  "That's what we refer to as a scenario analysis, yes.").  Exh. 15, Spinks 2009 Dep. 40 (Q:  "One of the things your model is able to do, as reflected in Chapter 4 of your report is to run simulation scenarios that will simulate flooding as if certain breaches had not occurred; right?"   A:  "Correct.").  Exh. 15, Spinks 2009 Dep. 142-44 (explaining scenarios, including one scenario run with MRGO breaches but not IHNC breaches).


***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 39:***

Plaintiffs' ***object***, for the same oft stated reason that Lafarge ***misrepresents*** Mr. Spinks' findings.  Lafarge's Statement is not supported by the citations referenced.

Please note in Lafarge's reference the words "hypothetical," "assumed," "example," "illustration," "model," "analysis," and "simulate."   Please note the absence of the word

"determine" or any variation thereof.  This is because Mr. Spinks did not say that what "would have occurred" can be "determined."  As Mr. Spinks explains in *Plaintiffs' Exhibit 44, Report of Melvin Spinks, p. 32,* and in *Plaintiffs' Exhibit 41, Declaration of Melvin Spinks*, only Scenario One, that in which <u>all known causes</u> of flooding of the area between the IHNC and Paris Road are examined, reflects reality.  Mr. Spinks strenuously disclaims Lafarge's purposeful misrepresentation of his analyses.  Lafarge either ignores or misconstrues the intent of modeling fictional scenarios, which is not to determine what Lafarge contends "would have occured," but to validate the model actually reflective of what did occur.  The IHNC did breach.  So did MRGO.  Mr. Spinks does not arrive at any conclusions based upon isolation or elimination of actual events during Katrina. Please see *Plaintiffs' Exhibit 90, Spinks Delft-Sobek Flood Model Animation – ALL CAUSES.*

Therefore, Plaintiffs **controvert** the Statement that it is possible to model MRGO flooding in the manner posited by Lafarge.  Plaintiffs additionally refer the Court to Footnote 3, the reasons why MRGO flooding is **immaterial** to the Barge Plaintiffs claims, and to Lafarge's defenses to such claims.  Lafarge is not relieved of any liability if their negligence was a substantial factor in causing the Barge Plaintiffs' damages.

♦ <u>**Plaintiffs' Controversion of  Lafarge's Statement of Undisputed Material Fact No. 40:**</u>

**Lafarge's Statement of Undisputed Material Fact No. 40:**

Flood modeling by plaintiffs' expert shows that even if the IHNC North Breach and South Breach had not occurred, the MRGO levee breaches would have flooded the Lower Ninth Ward and St. Bernard Parish to the same maximum level on August 29, 2005. References Exh. 14, Spinks 2008 Dep. 202-03 (MRGO breaches "would have flooded this [Lower Ninth Ward] location to a depth of over 14 feet regardless of the Inner Harbor Navigation Canal breaches"). Exh. 14, Spinks 2008 Dep. 214 ("[D]uring the storm event, the maximum level reached with MRGO's water"). Exh. 15, Spinks 2009 Dep. 147-48 ("[If] you only considered MRGO breaches and overtopping, … at some point in the future this area would have been affected by only MRGO's waters" in both Lower Ninth Ward and St. Bernard Parish). Exh. 15, Spinks 2009 Dep. 206 (water at Richardson home reaches the same maximum level "with or without the IHNC breaches").

### *Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 40:*

Plaintiffs **object.**  Please see Plaintiffs' Exhibit 41, *Declaration of Melvin Spinks, paragraph 36*, for further explanation of this **continuing objection** to Lafarge's **misrepresentation** of his analyses.

The Statement is **controverted.**  Please see *Plaintiffs' Exhibit 41, Declaration of Melvin Spinks, Ph.D, P.E., sections A and B.*  Please also see *Plaintiffs' Compendium of Proof No. 8,* **PREEMPTIVE INUNDATION BY IHNC FLOODWATERS.**

Further, Lafarge's Statement of Undisputed Material Fact No. 40 actually states an **immaterial** assertion, in light of the law referenced by Footnote 3.

♦   ***Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 41:***

**Lafarge's Statement of Undisputed Material Fact No. 41:**

Flood modeling by plaintiffs' expert shows that the only difference in flooding resulting from the IHNC breaches is that the water arrived up to five hours earlier on August 29, 2005, than it would have arrived if the IHNC breaches had not occurred. <u>References</u> Exh. 14, Spinks 2008 Dep. 203 (agreeing that "without the IHNC breaches you would get to the same water level, but just a couple of hours later"). Exh. 14, Spinks 2008 Dep. 203 ("The levee breaches along MRGO would have completely inundated the Lower Ninth Ward and St. Bernard Parish sometime later than what actually happened during Hurricane Katrina."). Exh. 14, Spinks 2008 Dep. 214-15 (agreeing that "if you add the Inner Harbor Navigation Canal water, you arrive at your maximum depth a couple of hours earlier than if you take away the Inner Harbor Navigation Canal water"). Exh. 15, Spinks 2009 Dep. 146-47 (as of 2:00 pm, the water level is the same for "all causes" as it is for "MRGO levee breaches only" with a "five hour difference" in the Lower Ninth Ward; at the end of the day the scenarios "merge at the same level"). Exh. 15, Spinks 2009 Dep. 149-50 (Q:  "Without the IHNC breaches you get to the same water level, but just a couple of hours or a few hours later?"  A: "At Location 1 about five hours later.  At Location 2 closer to Paris Road where we know the two waters mixed, then about an hour to two hours difference."). Exh. 16, Spinks Report at 34 Figs. 15-16. Exh. 17, Suhayda Report at 11 ¶ 39.

***Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 42:***

***Objection,*** as stated *ad nauseum* above.  ***Controverted,*** as stated above.  Please see

*Plaintiffs' Exhibit 41, Declaration of Melvin Spinks, paragraphs 5 – 36.*  Please also see

*Plaintiffs' Compendium of Proof No. 8,* ***PREEMPTIVE INUNDATION BY IHNC***

***FLOODWATERS.***

♦   ***Plaintiffs' Controversion of Lafarge's Statement of Undisputed Material Fact No. 42:***

**Lafarge's Statement of Undisputed Material Fact No. 42:**

The value associated with five hours' use of property during hurricane conditions, and in the face of a mandatory evacuation order, is zero. <u>Reference</u> *Exh. 39, Ragas Dep. 115 (damage caused by the IHNC breaches was only that of a loss of use of property for a few hours, which would be valued at "zero or an immeasurably small number").*

**_Plaintiffs' Response to Lafarge's Statement of Undisputed Material Fact No. 42_**

  **_Controverted_**, in that the Plaintiffs suffered not only the total destruction of immovable property, caused directly and proximately water from the IHNC before the possible and undifferentiated introduction of any water from MRGO hours after the damages were sustained, but also suffered **_deaths, physical injuries, saline pollution, exposure to toxins and metals, mental and emotional pain and anguish, physical pain and anguish, evacuation and displacement, embarrassment and humiliation, stigmatization, loss of dignity, loss of generations of friends and neighbors, loss of income, loss of earning capacity, loss of businesses, loss and destruction of movable property, loss of community and lifestyle, loss of shared identity, loss of home._**

  Please see  _Plaintiffs' Compendium of Proof No. 8,_ **_PREEMPTIVE INUNDATION BY IHNC FLOODWATERS._**

  Finally, Plaintiffs **_object_** to Lafarge's Statement of Undisputed Fact No. 42 as an **_unlawful usurpation_** by Lafarge and Mr. Ragas of the trier of fact's exclusive right to assess and award damages, and as a **_scandalous, outrageous, unconscionable_** and insufferably **_callous expression of indifference._**

## A.   Plaintiffs' Statement of Undisputed Material Facts Omitted by Lafarge

1.    LNA has identified no witness who claims to have seen ING 4727 pass through a preexisting breach of the eastern IHNC floodwall.[4]

2.    LNA has identified no witness who claims to have seen ING 4727 transit the eastern Industrial Canal floodwall without making contact with the eastern Industrial Canal Floodwall.[5]

3.    The eastern IHNC floodwall breaches occurred only at those locations where witness claim to have seen a barge break the floodwall.

4.    The ING 4727 was the only loose vessel known to be in the area between the Florida Avenue bridge and the Claiborne Avenue bridge at the times the eastern IHNC floodwall breaches occurred.

5.    No expert witness identified or listed as a trial witness by Lafarge was present at either of the eastern IHNC floodwall breaches at the times at which they occurred.

6.    No expert witness identified or listed as a trial witness by Lafarge saw the occurrence of either of the eastern IHNC floodwall breaches during Katrina.

7.    No expert witness identified or listed as a trial witness by Lafarge were present in the Lower Ninth Ward during Katrina.

8.    No expert witness identified or listed as a trial witness by Lafarge heard any sounds in the Lower Ninth Ward during Katrina.

---

[4] Exhibit 1, Lafarge North America, Inc.'s Amended Responses To Plaintiffs' Requests For Admissions, Amended Answer to Request No. 2: "Without waiving any objections, LNA admits that at the present time, LNA knows of no person who will testify that he or she witnessed the ING 4727's transition to the eastern side of the eastern IHNC floodwall and who will also testify as to whether or not the barge caused or contributed to any breach of the floodwall."  Lafarge has not subsequently amended this Response.

[5] Plaintiffs will also call witnesses who heard booms at the instant that they saw the barge strike and breach said floodwall.  Plaintiffs will call witnesses who heard grinding, clashing, and scraping noises near the eastern Industrial Canal floodwall followed by booms, and a sudden rush of water where previously there was none.  Plaintiffs will call witnesses who saw that the floodwall was intact before these sounds, and breached after.  Plaintiffs will call witnesses who saw no barge in the neighborhood until after these sounds.

9.    No expert witness identified or listed as a trial witness by Lafarge was present at any of the London Avenue Canal or 17th Street Canal breach locations when these breaches occurred during Katrina.

10.   Lafarge settled with Arthur Murph, a Lower Ninth Ward resident living at the time on Jourdan Avenue, adjacent to the southern breach. The barge landed on Mr. Murph's house.  Mr. Murph claimed in an audio statement that he saw the barge cause the southern breach.  The breach landed on other homes near Mr. Murph's, but he is the only person with whom Lafarge settled.   None of these other homeowners claimed to have seen the barge cause the southern breach.[6]

11.   It is undisputed that Lafarge did not have a current, written hurricane plan, but only an obsolete single page Hurricane Checklist, stating that all barges were to be cabled to shore.[7]

12.   It is undisputed that Lafarge did not use cables to moor the ING 4727

13.   It is undisputed that Lafarge did not cable ING 4727 to the shore.

14.   It is undisputed that Lafarge used only two single-strand 2-inch ropes and one 1.5-inch spring line between  ING 4727 and  ING 4745.[8]

15.   It is undisputed that Lafarge did not notify the vessel master or vessel agent or the Commander of the Port of any intention that ING 4727 remain moored at its facility during the storm.[9]

---

[6] Mr. Murph testified in his deposition that on the day after the storm, he climbed atop the barge and etched his name onto it using a nail, so "they" (presumably, those responsible) would know he'd been there.

[7] Coast Guard Sector New Orleans – Marine Safety Bulletin, Volume V, Issue XXXV, dated August 2005 – This bulletin notified the general maritime industry that Port Condition WHISKEY had been set. The bulletin states: "All vessels operating below the Huey P. Long Bridge are strongly urged to implement these measures". The applicable measure, which applied to the ING 4727 was: "Mooring lines doubled up with due consideration given to the effects of predicted storm surge. Spare mooring lines and/or wires should be readily available" The bulletin further recommended to marine operators: "You are encouraged to review your existing hurricane plan or develop a plan if you do not have one."

[8] Coast Guard Sector New Orleans Hurricane Plan; Enclosure (11) Maritime Hurricane Contingency Port Plan "A Guide to Port Planning and Preparation" Appendix 2- Recommended Precautionary Measures for Barges, Applies to Barges: Moored: "Mooring lines doubled up with due consideration given to the effects of predicted storm surge. Special attention should be paid to barges moored in the proximity of bridges." (Note: The Lafarge facility is located between two (2) major bridges.) "Spare mooring lines and/or wires should be readily available."

[9] Coast Guard Sector New Orleans Hurricane plan, Annex C - promulgated pursuant to Congressional Act - provides for task requirements at port conditions Whiskey, X-Ray, Yankee and Zulu, as set forth therein. Particularly, port condition X-Ray requires that a facility: a) determine the special needs and attentions of vessels moored at the facility; and b) determine whether vessels desiring to remain moored at this facility during the hurricane will be allowed to do so. Notify the vessel master, vessel agent, and the COTP of the facility's decision.

16.     It is undisputed that ING 4727 had been unloaded, and that ING 4745 was full, at the time that ING 4727 was moored by Lafarge.

17.     It is undisputed that the ING 4727  Lafarge moored the empty ING 4727 to no object other than the full ING 4745.[10]

18.     It is undisputed that after unloading, the empty ING 4727 was at least eight feet higher in the water than the loaded ING 4745.

19.     It is undisputed that spare mooring lines or wires owned, purchased or provided by Lafarge were readily available to the crew of the REGINA H when Unique Towing came to top-around the tier containing ING 4727 and ING 4745.  See Footnote 7.

20.     It is undisputed that Lafarge did not ask Joseph C. Domino, Inc. or Unique Towing, Inc.that moorings be added to the ING 4727.  See Footnote 7.

21.     It is undisputed that the moorings by which ING 4727 was berthed at the LNA facility failed to maintain ING 4727 in its berth.

22.     It is undisputed that ING 4727 broke away from its berth at the LNA facility.

23.     Lafarge has not identified any eyewitness who will testify as to the day and time at which ING 4727 went adrift.

23.     It is undisputed that ING 4727 struck and bent rebar built into the eastern Industrial Canal Floodwall at the southern end of the South Breach.[11]

Respectfully submitted,

---

[10] Greater New Orleans Barge Fleeting Association's "Standard of Care & Streamlined Inspection Program Guide Book" – This guide book, although not a requirement for vessels moored in the IHNC, provides a comprehensive guide to the proper, safe and adequate mooring methods for fleet and facility operators. On page 17, the guide advises that moorings from high to low fittings should be avoided if the fitting on the lower barge may allow the line to slip off.

[11] Lafarge North America, Inc., violated the provisions of 33 CFR 162.75 (b)(3)(ii) Anchoring and Mooring: for their failure to ensure that the ING 4727 was adequately moored to withstand the anticipated hurricane force winds of Hurricane Katrina.

Lafarge North America, Inc., violated the provisions of 33 CFR 6.19, Primary responsibility, for their failure to ensure that the ING 4727 was secure and safe at the Lafarge facility.

"The Pennsylvania provides a burden of proof structure for causation in maritime incidents."  *Usinas Siderugicas De Minas v. Scindia Steam*, 118 F.3d 328 (5th Cir. 1997).

"A vessel in violation of a statutory rule designed to prevent collisions bears the burden of showing "not merely that her fault might not have been one of the causes, or that is probably was not, but that it could not have been." *The Pennsylvania*, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873).

___s/Brian A. Gilbert___ (21297)
Law Office Of Brian A. Gilbert, P.L.C.
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 885-7700
Telephone: (504) 581-6180
Facsimile: (504) 581-4336
e-mail: bgilbert@briangilbertlaw.com

Shawn Khorrami (CA SBN #14011)
Dylan Pollard (CA SBN # 180306)
Matt C. Bailey (CA SBN #218685)
Khorrami, Pollard & Abir, LLP
444 S. Flower Street, 33rd Floor
Los Angeles, California 90071
Telephone: (213) 596-6000
Facsimilie: (213) 596-6010
e-mail: Skhorrami@kpalawyers.com;
        Dpollard@kpalawyers.com;
        Mbailey@kpalawyers.com

Lawrence D. Wiedemann.(13457)
Karl Wiedemann (18502)
Karen Wiedemann (21151)
Wiedemann & Wiedemann
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 581-6180
Facsimile: (504) 581-4336
e-mail: lawrence@wiedemannlaw.com;
k a r l @ w i e d e m a n n l a w . c o m;
karen@wiedemannlaw.com

Patrick J. Sanders (18741)
3316 Ridgelake Drive
Suite 100
Metairie, LA 70002
Telephone: 504-834-0646
e-mail: pistols42@aol.com

Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C. 20036-4129
Voice: 202-862-4320

Cell: 202-549-1454
Facsimile: 800-805-1065 and 202-828-4130
e-mail: rick@rickseymourlaw.net

Lawrence A. Wilson (N.Y.S.B.A. #2487908)
David W. Drucker (N.Y.S.B.A. #1981562)
Wilson, Grochow, Druker & Nolet
Woolworth Building
233 Broadway, 5th Floor
New York, NY 10279-0003
Telephone: (212) 608-4400
Facsimile: (212) 227-5159
e-mail: lwilson@wgdnlaw1.com;
ddruker@wgdnlaw1.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document has been served upon counsel of record, by United States Mail, postage prepaid and properly addressed, facsimile, and/or ECF upload, this 2nd day of November,  2009.

\s\_RICHARD SEYMOUR, ESQ.