# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| **IN RE: KATRINA CANAL BREACHES** | * | |
| **CONSOLIDATED LITIGATION** | * | **CIVIL ACTION** |
| | * | |
| | * | **NO. 05-4182** |
| | * | **and consolidated cases** |
| **PERTAINS TO: BARGE** | * | |
| | * | **SECTION "K" (2)** |
| *Boutte v. Lafarge*      **05-5531** | * | |
| *Mumford v. Ingram*      **05-5724** | * | |
| *Lagarde v. Lafarge*      **06-5342** | * | **JUDGE** |
| *Perry v. Ingram*      **06-6299** | * | **STANWOOD R. DUVAL, JR.** |
| *Benoit v. Lafarge*      **06-7516** | * | |
| *Parfait Family v. USA*      **07-3500** | * | **MAGISTRATE** |
| *Weber v. Lafarge*      **08-4459** | * | **JOSEPH C. WILKINSON, JR.** |

# LAFARGE NORTH AMERICA INC.'S REPLY MEMORANDUM IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................. 1

I.    LEGAL STANDARDS ............................................................................................ 3

II.   IT IS SCIENTIFICALLY IMPOSSIBLE FOR THE BARGE TO HAVE BEEN
      RESENT AT THE SITE OF EITHER BREACH AT THE TIME WHEN THE
      REACH OCCURRED ............................................................................................. 5

      A.    LNA's Evidence ............................................................................................ 5

      B.    Plaintiffs' Evidence ...................................................................................... 8

            1.    Purported Barge Presence in IHNC on Sunday Morning August 28 ....... 8

            2.    Purported Eyewitness Evidence of Wind Direction ............................... 10

            3.    Daily Tidal Flow ............................................................................... 12

            4.    Waves/meteotsunami" ........................................................................ 13

            5.    Sounds Heard By Witnesses .............................................................. 15

            6.    Eyewitness Accounts ......................................................................... 16

            7.    Expert Evidence ............................................................................... 18

III.  THE BARGE COULD NOT HAVE CAUSED THE FAILURE OF THE
      DEEPLY-ANCHORED SHEET PILE .................................................................. 19

      A.    LNA's Evidence ......................................................................................... 19

      B.    Plaintiffs' Argument and Evidence .............................................................. 21

            1.    The Pennsylvania Rule ...................................................................... 21

            2.    Effect of Barge Impact ..................................................................... 24

IV.   PLAINTIFFS WOULD HAVE SUSTAINED THE SAME DAMAGES
      WITHOUT THE IHNC BREACHES .................................................................. 26

      A.    LNA's Evidence ......................................................................................... 16

B.    Plaintiffs' Arguments ........................................................................27

        1.    The *Dillon* Principle and Cases Applying It ...........................................27

        2.    The Inevitable MRGO Flooding ...........................................................29

CONCLUSION.................................................................................................30

## **TABLE OF AUTHORITIES**

**CASES:**                                                                                          **Page**

*Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963 (7th Cir. 1983) ........................................27

*Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994)...................................................................................5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................................3

*Bach v. Trident S.S. Co.*, 920 F.2d 322 (5th Cir. 1991) ...................................................................5

*Barker v. Norman*, 651 F.2d 1107 (5th Cir. 1981) ...........................................................................4

*Bright v. G B Bioscience, Inc.,* 305 Fed. App'x 197 (5th Cir. 2008)..................................4, 16, 18

*Butler v Ensco Offshore Co.*, 2009 U.S. Dist. LEXIS 27198
    (E.D. La. Mar. 27, 2009).....................................................................................................23

*Candies Towing Co. v. MV B & C Eserman*, 673 F.2d 91
    (5th Cir. 1982)......................................................................................................................22

*Carney v. Lone Star Life Ins. Co.*, 540 So. 2d 415 (La. App. 1989)...............................................29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................................................................3

*Dillon v. Twin State Gas & Electric Co.*, 163 A. 111 (N.H. 1932) ............................26, 27, 28, 30

*Dixon v. International Harvester Co.*, 754 F.2d 573 (5th Cir. 1985) ......................................27, 28

*Dotson v. Clark Equip. Co.*, 783 F.2d 586 (5th Cir. 1986).............................................................18

*Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) ....................................29

*Evans v. McKinney Marine, Inc.*, No. 96-0132,
    1997 U.S. Dist. LEXIS 2148 (E.D. La. Feb 21, 1997) ...........................................................5

*Evergreen Int'l S.A. v. Marinex Constr. Co.*, 477 F. Supp. 2d 681
    (D.S.C. 2007)........................................................................................................................23

*First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)......................................4, 15

*Follett v. Jones*, 481 S.W.2d 713 (Ark. 1972) .................................................................................27

*Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528
    (5th Cir. 1994)................................................................................................................28, 30

*Gosnell v. United States*, 262 F.2d 559 (4th Cir. 1959)....................................................21

*Harris v. Ill. Cent. R.R.*, 58 F.3d 1140 (6th Cir. 1995)....................................................27

*Hornsby v. Bayou Jack Logging*, 902 So.2d 361 (La. 2005).........................................29

*In re Chavin*, 150 F.3d 726 (7th Cir. 1998) ......................................................................5

*In re Complaint of Nautilus Motor Tanker Co.*, 85 F.3d 105  (3d Cir. 1996) ...............21

*In re Ingram Towing Co.*, No. 93-3311, 1995 U.S. Dist. LEXIS 15034
    (E.D. La. Oct. 11, 1995) (Duval, J.).........................................................................5, 18

*In re Katrina Canal Breaches Consol. Litig.*, 258 F.R.D. 128
    (E.D. La. 2009) ...............................................................................................................29

*In re Katrina Breaches Consol. Litig.*, 2009 U.S. Dist. LEXIS 72288
    (E.D. La. Apr. 15, 2009) ...............................................................................................29

*In re Mid-South Towing Co.*, 418 F.3d 526 (5th Cir. 2005) ........................................5, 23

*Kampen v. American Isuzu Motors, Inc.* 157 F.3d 306 (5th Cir. 1998)........................4, 19

*Kennedy-Fagan v. Estate of Graves*, 993 So. 2d 255 (La. App. 2008) .........................27

*Kesinger v. Herrington*, 381 F.3d 1243 (11th Cir. 2004) ............................................4, 17

*Lancaster v. Norfolk & W. Ry. Co.*, 773 F.2d 807 (7th Cir. 1985) ...................26, 27, 28

*Leonard v. Dixie Well Service & Supply, Inc.*, 828 F.2d 291 (5th Cir. 1987) ...............5

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) ...................................... passim

*Love v. Motiva Enters.*, No. 08-30996,  2009 WL 3334610
    (5th Cir. Oct. 16, 2009)..................................................................................................15

*Marcoux v. Van Wyk*, 572 F.2d 651 (8th Cir. 1978)......................................................28

*Marshall v. East Carroll Parish Hospital Serv. Dist.*, 134 F.3d 319
    (5th Cir. 1998)...................................................................................................................4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)......................3

*Michaels v. Avitech, Inc.*, 202 F.3d 746 (5th Cir. 2000) ...............................................19

*Molden v. Ga. Gulf Corp.*, 465 F. Supp. 2d 606 (M.D. La. 2006).......................4, 17, 18

iv

*Perez-Trujillo v. Volvo Car Corp.*, 137 F.3d 50 (1st Cir. 1998)................................................18

*Perkins v. Entergy Corp.*, 782 So. 2d 606 (La. 2001)..................................................................29

*Ralston Purina Co. v. Hobson*, 554 F.2d 725 (5th Cir. 1977)........................................4, 5, 17, 18

*Saden v. Kirby*, 660 So. 2d 423 (La. 1995)..................................................................................29

*Seshadri v. Kasraian*, 130 F.3d 798 (7th Cir. 1997)......................................................................4

*Sievers v. Beechcraft Mfg. Co.*, 497 F. Supp. 197 (E.D. La. 1980) ............................................4, 5

*Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*,
  320 F.3d 838 (8th Cir. 2003) ..............................................................................................23

*St. Dep't of Transp. & Dev. v. Dietrich*, 555 So. 2d 1355 (La. 1990) .........................................28

*Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254 (5th Cir. 2002)....................................4, 16, 18, 19

*Standard Oil Co. of N.J. v. S. Pac. Co.*, 268 U.S. 146 (1925) ......................................................29

*Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360
  (5th Cir. 2006).....................................................................................................................23

*The Pennsylvania,* 86 U.S. 125 (1873) ........................................................................................21

*Tokio Marine & Fire Ins. Co. Ltd. v. Flora MV*, 235 F.3d 963 (5th Cir. 2001)...........................23

*United States v. Filson*, No. 08-51141, 2009 WL 3334607
  (5th Cir. Oct. 16, 2009).....................................................................................................4, 5

*Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560 (11th Cir. 1991)...................................27

*Willis v. Amerada Hess Corp*, 379 F.3d 32 (2d Cir. 2004)...........................................................21

*Wm. G. Roe & Co. v. Armour & Co.*, 414 F.2d 862 (5th Cir. 1969) .............................................29

## RULES AND REGULATIONS

33 C.F.R. § 6.14 ..........................................................................................................................23
33 C.F.R. § 6.19-1.......................................................................................................................23
33 C.F.R. § 162(b)(3)(ii).............................................................................................................23
33 C.F.R. § 162.75(b)(3)(ii)........................................................................................................23

## <u>OTHER AUTHORITIES</u>

*Dobbs Law of Remedies* § 8.1(2) (2d ed. 1993).............................................................30

James M. Fischer, *Understanding Remedies* § 1 (1999) ...............................................30

Industrial Canal Breach Litigation, <u>www.bargecase.com</u> ...............................................9

United States Geological Survey, *Most Destructive Known Earthquakes on Record in the World (Earthquakes with 50,000 or More Deaths)*, available at <u>http://earthquake.usgs.gov/earthquakes/world/most_destructive.php</u> .....................................14

Restatement (Second) of Torts § 431..............................................................................28

Restatement (Second) of Torts § 432..............................................................................28

# INTRODUCTION

Lafarge North America Inc. ("LNA") moved for summary judgment on three narrow and well-defined grounds.  <u>First</u>, LNA showed that it is scientifically impossible for the barge to have been at the breach sites at the time the breaches occurred, because the prevailing winds (and any waves and current) would not have propelled it there at that time.  <u>Second</u>, LNA showed that it is scientifically impossible for contact between the barge and the concrete cap of the floodwall to have caused the failure of the deeply anchored sheet pile, because the barge would puncture or crack the cap rather than causing the sheet pile to deflect.  <u>Third</u>, LNA showed that flooding from the MRGO breaches would have reached the same levels at plaintiffs' properties within a few hours even if the IHNC breaches had never occurred, effectively extinguishing their damages claim.  LNA based its motion on the undisputed facts as reflected primarily in the testimony of ***plaintiffs' own experts***.[1]

If nothing else, plaintiffs' opposition demonstrates their full realization that a reasonable factfomder could never find in their favor based on the evidence adduced during the first four years of this litigation.  Unable to support their claims based on the dozens of witnesses identified on their final witness list, plaintiffs inject declarations from two ***new witnesses*** long

---

[1] LNA's Statement of Undisputed Material Facts ("SMF") cites plaintiffs' expert reports and depositions nearly twice as many times as LNA's own experts.  Rather than accept what their experts wrote and said, however, plaintiffs attempt to controvert the incontrovertible through evasion and obfuscation.  *See* "Barge Plaintiffs Objections to, and Controversion of, Lafarge North America's Statement of Undisputed Material Facts and Statements of Disputed Material Fact" ("PSMF").  For instance, rather than simply admit that the IHNC east floodwall breached in two places on the morning of August 29, 2005, plaintiffs supply several pages of argument on matters irrelevant to that basic fact.  PSMF ¶ 2, at 3-6.  Rather than admit the locations of the North and South Breaches ***as depicted by their own expert***, plaintiffs refuse to stipulate to the "authenticity, admissibility, or accuracy" of their expert's depiction of the breach areas as recorded by satellite photograph.  PSMF ¶ 3, at 6 (referring to Marino Report at 4-5, Photo 4.4); *see also* LNA Reply Exh. 1, Bakeer Report Exhibits, Fig. 1.  Rather than admit the time that the eye of Hurricane Katrina passed through the latitude of New Orleans, as attested by their own expert, plaintiffs "controvert" a different set of facts having nothing to do with the passage of the eye of the storm.  PSMF ¶ 15, at 15-16.  These three examples suffice to show why the Court should ignore plaintiffs' "objections to" and "controversion of" LNA's statement of undisputed facts.  Rather than burden the Court with a point-by-point response to plaintiffs' prolix submission, LNA will be prepared to address any or all of plaintiffs' attempted "controversions" at oral argument as may interest the Court.

known to plaintiffs but never included on their witness list or even identified to plaintiffs' own experts.  Likewise, lacking any scientific explanation in their existing case as to how the barge could have made its way across the canal against the prevailing hurricane-force winds, plaintiffs are forced to rely on a *new theory* that the barge broke away a full day before the hurricane arrived and moved across the canal as a result of *tidal flow* – a concept not mentioned even once in any of plaintiffs' expert reports or depositions.  Indeed, plaintiffs have so little faith in their own experts' reports and conclusions that they considered it necessary to submit new and untimely declarations from *every one of their causation experts* in response to LNA's motion.[2]

Even so, plaintiffs fail to generate a genuine fact dispute.  The new material presented in plaintiffs' expert declarations consists of sheer conclusory speculation unsupported by any scientific analysis and refuted by the underlying data.  *All* of the scientific data and analysis regarding the forces capable of moving the barge, and *all* of the scientific data and analysis regarding the potential effect of a barge impact on the floodwall, compels a ruling in favor of LNA's motion.  To the extent plaintiffs' new expert materials have anything relevant to say on those key issues, they support LNA's motion.[3]  Ultimately, plaintiffs are forced to rely on equivocal testimony from purported eyewitnesses, but that evidence is simply insufficient to support a verdict in the face of the incontrovertible scientific proof.

For these and many other reasons addressed below, plaintiffs' opposition papers fail to create a *genuine* dispute of material fact as to any of LNA's three summary judgment grounds. There is no *genuine* dispute that the prevailing hurricane winds acting on the barge during the

---

[2] Needless to say, these belated expert declarations and fact witness affidavits are a blatant violation of multiple scheduling orders put in place by this Court.  LNA is moving to strike them.  Nevertheless, as we show below, even these newly-minted expert and fact declarations do not suffice to save plaintiffs' claims.

[3] *See, e.g.,* Pl. Exh. 43 at 4, ¶ 9 (Marino declaration stating that "[a] scientific study by IPET" showed wind direction of "North-Northeast to South-Southwest from 5 a.m. to 9 a.m." – *i.e.,* *not* in the direction of the east IHNC floodwall); Pl. Exh. 51 at 2, ¶ 7 (Bartlett declaration stating that he agrees with LNA's expert that a barge strike "would cause only localized damage" in the form of "fracture of the concrete portion of the flood wall," not the sheet pile).

critical early morning hours of August 29 would not have permitted it to be present at either the North Breach or the South Breach at the time each breach occurred.  There is no *genuine* dispute that contact by the barge with the concrete cap of the floodwall could not have caused the failure of the deeply-embedded sheet pile.  And there is no *genuine* dispute that plaintiffs' properties would have been flooded to the same level on the same day by the MRGO breaches.

## I.    LEGAL STANDARDS

As plaintiffs appear to recognize (at 22-23), summary judgment is appropriate where no reasonable factfinder could find for the opposing party.  *See* Lafarge North America Inc.'s Memorandum of Law in Support of Motion for Summary Judgment ("LNA Mem.") at 18-21.[4] Plaintiffs immediately err, however, by relying on a series of pre-1986 cases to suggest that summary judgment is disfavored as a "lethal weapon."  Pl. Mem. at 21-22.  To the contrary, the Supreme Court has held that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' Fed. Rule Civ. Proc. 1."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Thus, in *Little v. Liquid Air Corp.*, the Fifth Circuit held that the Supreme Court's "summary judgment 'trilogy'"[5] had "made it clear that our earlier approach to Rule 56 was wrong-headed because it was simply inconsistent with the plain language of the rule."  37 F.3d 1069, 1075 (5th Cir. 1994).

Beyond that, plaintiffs do not (and cannot) dispute many applicable legal principles that govern the outcome of LNA's motion.  For instance, though plaintiffs argue that the court cannot weigh evidence or make credibility determinations (Pl. Mem. at 23-24, 34-35), they appear to

---

[4] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.").

[5] *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita*, 475 U.S. 574 (1986).

agree (at 35) that courts may disregard testimony that is impossible.[6]  Similarly, while plaintiffs

assert (at 23-25) that the court should not resolve reasonable disputes over factual inferences,

they take no issue with the rule providing that courts are not required or allowed to draw

unreasonable inferences in deciding a motion for summary judgment.[7]  Nor do plaintiffs take

serious issue with authorities providing that courts are not required to accept testimony that is

equivocal or vague,[8] or that is "too incredible to be accepted by reasonable minds,"[9] or that

consists of nothing more than "conclusory, unsupported assertions."[10]

     Plaintiffs argue, however, that these rules fly out the window when the opposing party

presents "direct evidence" as opposed to "circumstantial evidence." Pl. Mem. at 35.  That

assertion is plainly incorrect.  In *Ralston Purina Co. v. Hobson*, the Fifth Circuit held that the

trial court had properly disregarded testimony from the plaintiff about the cause of his chickens'

deaths because it was "manifestly at variance with the laws of nature and the physical facts."

554 F.2d 725, 729 (5th Cir. 1977).  In *Kesinger v. Herrington*, the court refused to credit the

account of an eyewitness to a shooting because it was unbelievable in light of the physical and

other evidence, and thus held that summary judgment was required.  381 F.3d 1243, 1249-50

(11th Cir. 2004).  And just last month, in *United States v. Filson*, No. 08-51141, 2009 WL

3334607 (5th Cir. Oct. 16, 2009), the Fifth Circuit rejected direct evidence in the form of

---

[6] *See, e.g.*, *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729 (5th Cir. 1977); *Molden v. Ga. Gulf Corp.*, 465 F. Supp. 2d 606, 613-14 (M.D. La. 2006); LNA Mem. at 18-19.

[7] *See, e.g.*, *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1077 (5th Cir. 1994); *Barker v. Norman*, 651 F.2d 1107, 1127 (5th Cir. 1981); *Sievers v. Beechcraft Mfg. Co.*, 497 F. Supp. 197, 200 (E.D. La. 1980); LNA Mem. at 20-21.

[8] *See, e.g.*, *Bright v. G B Bioscience, Inc.*, 305 Fed. App'x 197, 203-04 (5th Cir. 2008); *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 271-72 (5th Cir. 2002); LNA Mem. at 19.

[9] *See, e.g.*, *Barker*, 651 F.2d at 1127; *Kesinger v. Herrington*, 381 F.3d 1243 (11th Cir. 2004); *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997); LNA Mem. at 19.

[10] *See, e.g.*, *Kampen v. American Isuzu Motors, Inc.* 157 F.3d 306, 318 (5th Cir. 1998); *Marshall v. East Carroll Parish Hospital Serv. Dist.*, 134 F.3d 319, 324 (5th Cir. 1998); LNA Mem. at 19-20.

affidavits from opposing parties, finding them "discredit[ed]" by other evidence.  *Id.* at *6.[11]  In short, summary judgment is warranted whenever the evidence – be it direct or circumstantial – would not permit a reasonable factfinder to reach a different result.

Plaintiffs argue that summary judgment is disfavored on causation.  Pl. Mem. at 24-25.  To the contrary, the Fifth Circuit has time and again affirmed summary judgment on causation.  *Little*, 37 F.3d at 1075; *Bach v. Trident S.S. Co.*, 920 F.2d 322, 327 (5th Cir. 1991); *Ralston*, 554 F.2d at 729.[12]  Finally, plaintiffs' attempted reliance on the evidentiary presumption set forth in the "Pennsylvania Rule" (at 25) does not affect the summary judgment calculus because, as the Fifth Circuit has held, "presumptions become superfluous [when] the parties have introduced evidence to dispel the mysteries that give rise to the presumptions," as is the case here.  *In re Mid-South Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005); *see below* at 21-24 (discussing other reasons why the Pennsylvania Rule does not apply).

## II.   IT IS SCIENTIFICALLY IMPOSSIBLE FOR THE BARGE TO HAVE BEEN PRESENT AT THE SITE OF EITHER BREACH AT THE TIME WHEN THE BREACH OCCURRED.

### A.   LNA's Evidence

LNA's first ground for summary judgment relies on two simple and unassailable scientific realities.  *First*, the barge required an external force to move it from the LNA Terminal

---

[11] In arguing that "direct evidence" must always be accepted, plaintiffs rely on *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994), and similar cases.  As noted in another case that plaintiffs cite, *In re Chavin*, 150 F.3d 726, (7th Cir. 1998), these cases "have been sharply criticized."  *Id.* at 728.  The court in *Chavin* also noted, and plaintiffs appear to accept (at 36-37), that *Adams* and these other cases – including the Fifth Circuit's decision in *Leonard v. Dixie Well Service & Supply, Inc.*, 828 F.2d 291 (5th Cir. 1987) – do ***not*** deny the "thoroughly orthodox proposition" that "the trial judge may not permit the jury to accept testimony that is contrary to a law of nature" or that otherwise qualifies as "utterly implausible."  150 F.3d at 728.  The Fifth Circuit's rulings in *Ralston* and *Filson*, among other cases, confirm that conclusion.

[12] The Fifth Circuit in *Little* explained, "Our cases have sometimes stated in dicta that summary judgment is generally not appropriate in certain types of cases ... That dicta is essentially empty chatter, however, inasmuch as we have never reversed a district court's entry of summary judgment solely because it involved a particular class of allegations.  In any event, we reject any suggestion that the appropriateness of summary judgment can be determined by such case classification." *Little*, 37 F.3d at 1075 n.14.  This Court has also repeatedly granted summary judgment on causation.  *See, e.g., In re Ingram Towing Co.*, No. 93-3311, 1995 U.S. Dist. LEXIS 15034 (E.D. La. Oct. 11, 1995) (Duval, J.); *Evans v. McKinney Marine, Inc.*, No. 96-0132, 1997 U.S. Dist. LEXIS 2148 (E.D. La. Feb 21, 1997), *aff'd*, 127 F.3d 34 (5th Cir. 1997); *Sievers v. Beechcraft Mfg. Co.*, 497 F. Supp. 197, 203-04 (E.D. La. 1980).

to any other location in the IHNC.  *Second*, the external forces acting on the barge during the early morning hours of August 29 – principally the sustained winds generated by the approaching hurricane – would necessarily have moved the barge away from the east IHNC floodwall, rather than toward the floodwall, both before and at the times when the breaches occurred.

In support of the first point, that external forces were required, LNA relied mainly on the testimony of plaintiffs' own experts (SMF ¶ 6), and it is one of the few points plaintiffs admit (albeit grudgingly) (*see* PSMF ¶ 6).

In support of the second point, that the required external forces were absent, LNA relied in the first instance on fundamental scientific principles concerning the behavior of the prevailing winds and wind-driven waves during a hurricane event.  One of those incontrovertible principles is Buys Ballots law, which holds that hurricane winds swirl counterclockwise around the center of a hurricane in the northern hemisphere.  SMF ¶ 12.  Another scientific principle is that wind-driven waves travel in the direction of the prevailing wind, and diminish in strength as they are reflected off a surface.  SMF ¶¶ 24, 25.[13]

Buys Ballots law, together with the undisputed meteorological data concerning Hurricane Katrina's passage, proves that it is impossible for the barge to have been present when the North Breach and South Breach occurred.  The meteorological data cited by both plaintiffs' experts and defendants' experts, as well as the independent IPET study and other studies, show that Hurricane Katrina passed on a north-south axis to the east of New Orleans, and that the center of the storm did not pass through the latitude of New Orleans until after 8:00 a.m. on the morning

---

[13] Although plaintiffs contest the application of these principles to this case, they do not controvert the existence of these fundamental principles.  PSMF ¶¶ 12, 24, 25.

of August 29, 2009.  SMF ¶¶ 13, 15.[14]  Thus, applying Buys Ballots law to these facts, the powerful counterclockwise hurricane winds swirling around the center of the storm in the IHNC blew first from the east, then from the north-northeast, and then from the north as the eye of the hurricane approached the latitude of New Orleans.[15]  All of the meteorological data taken during the storm, from official hindcast data and from measuring stations close to the IHNC alike, confirm what  Buys Ballots law shows:  ***the hurricane winds prior to 7:45 a.m. on the morning of August 29 would not have allowed the barge to be present at the east floodwall of the IHNC***, let alone exert a force on the wall.[16]

In all of plaintiffs' proof, which encompasses their original July 2009 expert reports, depositions of each of their experts, and now five new and untimely expert declarations, plaintiffs have not cited one single scrap of meteorological data – whether by hindcast or by meteorological measurement – which shows that the hurricane winds had a component in the IHNC (or at any nearby location) that could have moved the barge to the east IHNC floodwall, or even permitted it to be present at that location, at any time before 7:45 a.m. on the morning of August 29.[17]  By that time, of course, the breaches had already occurred.  SMF ¶¶ 17, 28-30.

---

[14] Plaintiffs purport to controvert each of these points without actually doing so.  *See* PSMF ¶¶ 13, 15.

[15] *See* LNA Reply Exh. 2, IPET Report at IV-17 ("winds first from the east, then northeast, then north, then northwest, and finally from the west");  LNA Exh. 8, Marino 2009 Dep. at 74 (Q: "Do you accept IPET's conclusion that, during the storm, winds came first from the east, then the northeast, then the north, then the northwest and finally from the west?"  A: "I guess in general, yes.").

[16] The meteorological data are collected in the report of Austin Dooley, LNA's expert meteorologist.  LNA Exh. 7.  Among the data cited and relied upon by Dr. Dooley are (a) the report of the National Hurricane Center concerning Hurricane Katrina (*id.* at 9-10); (b) the official hindcast report on Hurricane Katrina prepared for the United States Department of the Interior (*id.* at 21); and (c) observation reports taken from Lakefront Airport near the IHNC (*id.* at 34) and from other locations (*id.* at 17-18).  It was on the basis of this overwhelming collection of data that Dr. Dooley reached the conclusion that "up until 0742 CDT, the wind direction would push the barge toward the dock."  LNA Exh. 7, Dooley Report at 35.  *See* LNA Exh. 31, Dooley Dep. at 59 ("wind had no westerly component" until 7:42 a.m.).  Dr. Dooley is the only meteorological expert designated to testify in this case.  Although plaintiffs identified a meteorologist named Ed Roy on a preliminary witness list (Doc. 17806 at 20-21), they later dropped him, presumably because his testimony would not be helpful to them.  *See* Doc. 18390.

[17] *See, e.g.*, LNA Exh. 2, Marino Report at 3-11 (winds remained "essentially parallel" to IHNC before 9:00 a.m.); LNA Exh. 8, Marino 2009 Dep. 76 (admitting that at time of North Breach, barge would have had to be going in a direction "other than in the direction of the wind"); LNA Reply Exh. 3, New Orleans Lakefront Airport weather data, Exhibit B to Green 2009 Dep. (wind from northeast or north at all relevant times); LNA Exh. 10,

LNA's simple point, thus, is that winds – admitted by plaintiffs' experts to be the "predominant" force acting on the barge (SMF ¶ 10) – could not possibly have moved the barge to the site of the breaches at any time before the breaches had already occurred, and indeed would have moved the barge in the opposite direction if it had somehow been free.[18]

### B.    Plaintiffs' Evidence

No reasonable factfinder could rule in plaintiffs' favor based on the evidence they cite in their opposition.  Indeed, plaintiffs' emphasis on previously-unlisted fact witnesses and new expert declarations underscores their failure to develop a viable theory of the case despite having had over four years to do so.  Even if plaintiffs' untimely submissions are considered, neither they nor any other evidence plaintiffs cite suffices to create a genuine issue of material fact.

### 1.    Purported barge presence in IHNC on Sunday morning August 28.

The centerpiece of plaintiffs' opposition is their reliance on two new fact witnesses, Frazier Tompkins and Gertrude LeBlanc, who purportedly saw the barge in the IHNC on Sunday morning, August 28.  Pl. Mem. at 9-10, 26-27, 30, Compendium #1.  Though plaintiffs' counsel have been in possession of recorded statements by these two witnesses since early 2008 (*see* Doc. 12605), they apparently did not consider the witnesses' accounts sufficiently credible or important to include the witnesses on the plaintiffs' April 2009 final witness list (Doc. 18390), or even to provide the witnesses' accounts to their own experts.[19]  Instead, plaintiffs relied on the accounts of three other witnesses on their list – Michael Bickham, Andrew Sartin, and Arthur

---

Green 2008 Dep. 56 (winds between 4:00 a.m. and 6:00 a.m. blew "from either the northeast or due from the north").  As these citations show, to the extent plaintiffs' experts considered meteorological data they agreed with the conclusions of LNA's experts and independent studies regarding wind direction.  *See also* SMF ¶ 18.

[18] Nor could current or waves have moved the barge to the breach sites.  Because waves predominantly move in the direction of the prevailing wind, SMF ¶¶ 24, 25, waves could not have moved the barge upwind from the LNA terminal to the east floodwall.  And current was "very insignificant" in the IHNC, as plaintiffs' expert Mr. Pazos attested (LNA Exh. 6, Pazos Dep. at 104) and LNA's analysis showed (LNA Exh. 1 at B-25).  Plaintiffs' opposition supplies no evidence that current or wind-generated waves moved the barge across the IHNC.

[19] *See, e.g.*, LNA Exh. 12, Pazos Report at 3-7 (listing documents reviewed); *id.* at 9-28 (extractions of testimony Pazos considered relevant).

Murph – who testified that they viewed the IHNC on August 28 and did ***not*** see the barge in the canal.[20]

Moreover, plaintiffs' own expert evidence shows why it is impossible, or at least highly implausible, for the barge to have been present on the east side of the IHNC on Sunday morning August 28.  Plaintiffs' experts repeatedly opined that the barge broke free under the influence of high winds during Katrina or just hours before Katrina made landfall, not on Sunday morning, when the storm was still far away.[21]  Indeed, plaintiffs' expert Don Green opined that the barge required "sustained winds [of] approximately 36 mph" to break from its moorings.[22]  However, meteorological data taken in the IHNC by the Army Corps lockmaster shows that on Sunday morning August 28, the winds in the IHNC ***never exceeded sixteen miles per hour***.[23]  Thus, the conditions on Sunday morning, August 28, were insufficient to have caused the barge to break away according to plaintiffs' own expert conclusions.

Most importantly, however, the theory of a barge breakaway on Sunday August 28 is simply immaterial to LNA's motion.  Regardless of when or how the barge broke away, it is undisputed that the unloaded barge was highly susceptible to the influence of hurricane winds.  *See*, *e.g.*, Pl. Mem. at 4; SMF ¶ 10; PSMF ¶ 10.  The undisputed meteorological data from official hindcasts and from observations in the vicinity of the IHNC confirm that those hurricane

---

[20] *See* LNA Reply Exh. 4, Sartin Dep. at 36-38, 66-67 (Sartin walked on the levee and Claiborne Street bridge on Sunday around 7:30 p.m. but did not see the barge until "days later"; "[w]hen I looked off that bridge, all you see is water"); LNA Reply Exh. 5, Bickham Dep. at 54-55, 81 (Bickham visited the levee after midnight on Sunday, but "didn't see the barge"); LNA Exh. 32, Murph Dep. at 61, 107 (Murph visited levee on Sunday of Katrina and looked at the canal but did not see anything in the water; did not see the barge until it was "on [his] house").

[21] LNA Exh. 29, Green Report at 7 ¶ 5.1 (cause of breakaway "was most likely the combination of hurricane force winds and rising water levels in advance of Hurricane Katrina"); LNA Exh. 6, Pazos Dep. at 104 (breakaway was due to wind force on the side of the barge).  This is also what plaintiffs' counsel has told the public.  *See* www.bargecase.com (visited Nov. 4, 2009) ("As anticipated, the barge was unable to sustain the storm that hit the coast of Louisiana with winds upwards of 100 miles per hour and eventually broke away from its moorings.  The barge headed straight for the eastern Industrial Canal Floodwall, allegedly causing it to breach on impact.").

[22] LNA Exh. 29, Green Report at 9 ¶ 5.12.

[23] LNA Exh. 1, Cushing Report, App. B at B-10.

9

winds blew from the east as the storm approached, and later from the northeast and the north, during the hours preceding the two IHNC breaches.[24]  Indeed, the meteorological data cited in Dr. Marino's report and in his new declaration show that as of 3:00 a.m., before either breach occurred, the prevailing wind was *from the northeast*.[25]  Such a wind would have pushed the barge in the direction of the LNA dock, and away from the site of the breaches, even if the barge had somehow been present in the IHNC before that time.  Therefore, even if the barge had been in the canal the day before, it was scientifically impossible for the barge to have been at the breach locations when the breaches occurred.

    2.  <u>Purported eyewitness evidence of wind direction</u>.

    Lacking any support in science or meteorological data, plaintiffs rely on testimony from a handful of individuals about supposed "surface wind directions" during the storm.  Pl. Mem. at 11-12, 28-29, Compendium #7.[26]  However, not one of these lay witnesses was in possession of instruments capable of measuring the speed and direction of the wind.  Their non-scientific, impressionistic recollections do not even begin to raise a genuine dispute in the face of the undisputed scientific data from meteorological measuring devices and programs that recorded the storm's progress and the conditions it created.  Indeed, it was on the basis of this very sort of scientific data that Dr. Marino attested in his new declaration that the winds in the IHNC were

---

[24] *See* LNA Exh. 7, Dooley Report at 23-28, 30; LNA Exh. 1, Cushing Report at 80 Fig. 52; LNA Exh. 5, Green 2009 Dep. at 209; LNA Reply Exh. 3, Green 2009 Dep. Exh. B (New Orleans Lakefront Airport weather data); LNA Reply Exh. 2, IPET IV-2-43-IV-2-51 (showing the direction of the winds on August 29, 2005); LNA Exh. 10, Green 2008 Dep. at 56.

[25] LNA Exh. 2, Marino Report at 3-11 (winds remained "essentially parallel" to IHNC before 9:00 a.m.); Pl. Exh. 43,Marino Decl. at 4, ¶ 9 ("the wind direction (North-Northeast to South-Southwest) from 5 a.m. to 9 a.m.").  *See also* LNA Exh. 5, Green 2009 Dep. at 209; LNA Reply Exh. 3, Green 2009 Dep. Exh. B at LNA 10743 (Lakefront Airport data show sustained winds from the northeast at 46 mph at 12:01 a.m. on August 29).

[26] Plaintiffs imply, without support, that LNA's data concerning "prevailing winds high in the atmosphere" does not relate to winds at the ground surface.  To the contrary, the sustained wind data is taken from "surface winds" observed or estimated for the "standard meteorological height" of 10 m (33 ft), and the observed wind data from Lakefront Airport and other locations likewise concerns surface winds.  LNA Exh. 7, Dooley Report at 4, 34.

blowing from the "north-northeast to south-southwest" in the critical 5:00 a.m. to 9:00 a.m. time period on the morning of August 29.  Pl. Exh. 43, Marino Decl. at 4, ¶ 9.

Moreover, the individual lay witness testimony that plaintiffs cite supports LNA's position.  One of the witnesses, Capt. James Hall, rode out the storm at a dock in the Gulf Intracoastal Waterway.[27]  He testified that on the morning of August 29, the wind at his location blew from an ***easterly direction*** – that is ***"out of the east"*** – until ***"after the eye wall had passed***."[28]  Other witnesses cited by the plaintiffs similarly testified to wind directions that would not have permitted the barge to move across the canal.[29]

The remaining witnesses cited by plaintiffs do not raise a genuine issue about the direction of the prevailing wind during Hurricane Katrina.  Several of these witnesses said they were standing in or near a building or other structure, and thus would not have been able to observe the "free stream wind" as opposed to the stream in the immediate vicinity of a building, which is altered by the presence of the building.[30]  The remaining witnesses did not testify about wind direction at all, but rather only about water splashing over the walls, which plaintiffs' own

---

[27] LNA Reply. Exh. 6, Hall Dep. at 19-22 & Exhibits 3 and 4.

[28] LNA Reply Exh. 6, Hall Dep. at 69-70 (emphasis added).  Plaintiffs omitted this portion of Capt. Hall's testimony from their memorandum and exhibits.  Pl. Mem. at 29 & Compendium #7 at 3.

[29] Dennis Martinez, for instance, testified that the winds "were coming from the east" during the early morning hours of August 29.  LNA Reply Exh. 7, Martinez Dep. at 34.  Andrew Sartin testified to wind blowing in an east-to-west orientation.  Pl. Exh. 19 at 40-43; Pl. Exh. 20, Sartin Dep. Exh. 1.

[30] For instance, Dennis Martinez was inside a building observing local wind conditions on the immediate exterior of the building, and Mr. Sartin was on the porch of his house.  LNA Reply Exh. 7, Martinez Dep. at 22, 24, 36; LNA Reply Exh. 4, Sartin Dep. at 39-40.  Dr. Cushing explained, in discussing testimony by Mr. Villavasso about a door having come off its hinge, that the wind in the immediate vicinity of a building "is not the free stream wind."  *See* LNA Exh. 4, Cushing Dep. at 147-48.  Despite this, Mr. Pazos writes in his new declaration that the Villavasso testimony about the door hinge means the wind must have been blowing "from the northwest" when he opened the door.  Pl. Exh. 87 at 12.  Mr. Pazos did not draw such an inference from Mr. Villavasso's deposition in preparing his July 2009 report.  LNA Exh. 12, Pazos Report at 9-10.  Moreover, it is impossible for the barge to have approached the North Breach from the northwest, as Mr. Pazos now suggests, because the site of the North Breach is sheltered from such an approach.  *See* LNA Exh. 2, Marino Report at 4-7, Photo 4.6 (approach blocked by diagonal floodwall extension that remained standing); LNA Reply Exh. 1, Bakeer Report Exhibits, Figs. 1, 27, 28 (same).

experts have attributed to reflected waves in the canal.[31]  In sum, plaintiffs have no evidence that

Hurricane Katrina's prevailing winds behaved in any manner other than what the laws of nature

and the established meteorological data show.[32]

      3.  <u>Daily tidal flow</u>.

      Plaintiffs next assert – for the first time ever – that an outgoing "tidal current" could have

moved the barge from the LNA terminal to the site of the North Breach on Sunday August 28 or

early Monday August 29.  Pl. Mem. at 12, 29.  This assertion, based solely on a new declaration

by Donald Green, does not raise a genuine issue of fact about the movement of the barge.[33]

      Mr. Green speculates, based on "local tide records" ***at other locations***, that there could

have been a tidal flow out of the IHNC basin on August 28 or early August 29.[34]  However, the

undisputed record evidence concerning water flows ***in the IHNC*** shows that Mr. Green's

conclusory speculation fails to raise a genuine fact dispute.  In particular, Appendix B to Dr.

Cushing's report provides an actual record of water levels in the IHNC basin on August 28 and

early August 29 as determined by the Army Corps lockmaster.  LNA Exh. 1, Cushing Report at

B-10.  That data shows that the measured water levels in the INHC basin on August 28 and 29,

as shown by the "IHNC Lock Canal Gauge," continued to ***rise or remain steady*** during every

single hourly period from 1:00 a.m. on August 28 through the arrival of Hurricane Katrina.  *Id.*

Because the IHNC was a"closed system" in which the Florida Avenue Bridge was the only place

---

[31] Compendium #7 at 1 (citing Bickham, Villavasso, Murph, and Adams); LNA Exh. 12, Pazos Report at 40-41 (suggesting presence of "gigantic waves" due to "wave reflection and superposition").

[32] In a last desperate attempt to raise a fact dispute about the prevailing wind direction, plaintiffs include a new declaration from Mr. Pazos opining that there might have been "tornadoes, wind shear, microbursts and squall line activity."  Pl. Exh. 87 at 14.  Previously, plaintiffs had denied that Mr. Pazos is being offered as an expert in meteorology.  LNA Exh. 6, Pazos Dep. at 111 ("He's not being offered as a meteorological expert.").  Regardless, to the extent that Mr. Pazos relies on data rather than pure conjecture, the data prove him wrong.  *See* Pl. Exh. 87, NOAA Report Appendix C at C-1 (no tornadoes reported in Louisiana during Katrina).

[33] Mr. Green is not designated as an expert in the area of tidal flow or barge movement.  *See* Doc. 18390 at 19 (plaintiffs' final witness list designating Mr. Green as an expert in the areas of "marine vessel operations, maritime regulations, seamanship, safe operating practices, mooring, maritime hurricane precautions, to testify concerning negligence and unseaworthiness causing breakaway of ING 4727").

[34] Pl. Exh. 59 at 1 (referring to tide records at Paris Road Bridge, New Canal Station, and Martello Castle).

for water to come in or go out, SMF ¶ 19, these rising water levels in the IHNC basin prove that there was ***no tidal flow*** out of the IHNC basin, as Mr. Green speculates in his new declaration.

Moreover, even if there had been evidence of a tidal flow out of the IHNC (which there is not), the record refutes Mr. Green's conclusory assertion – made with no scientific analysis or underlying support – that "even a small movement of tidal water would be sufficient to move an unloaded barge" to "a point north of the North [B]reach by late Sunday night or early Monday morning."  Pl. Exh. 59 at 2, ¶ 8.  In particular, modeling by LNA's experts showed that storm surge currents in the IHNC were not sufficient to move the barge anywhere.[35]

Finally, "tidal flow" is immaterial in any event.  It is undisputed that wind was the predominant force acting on the barge.  *See above* at 5-8.  Thus, even assuming the barge had somehow been delivered by tidal flow to a location "north of the North Breach" at some point on August 28, as plaintiffs' new theory of the case posits, the barge could not have remained there once Hurricane Katrina's heavy winds began to blow in the IHNC.  Instead, based on the wind direction shown by the scientific data and attested to by plaintiffs' own experts, the barge would have been blown back toward the LNA Terminal by winds blowing from the northeast.[36]

4.  Waves / "meteotsunami"

Unable to show that hurricane winds delivered the barge to either breach site, plaintiffs unveil yet another brand new concept in their opposition papers – the "meteotsunami."  Pl. Mem.

---

[35] LNA Exh. 1, Cushing Report at 85 & App. B.  Plaintiffs' expert hydrologist Mr. Spinks testified that he found nothing particularly objectionable about LNA's modeling of currents in the IHNC.  LNA Exh. 15, Spinks 2009 Dep. at 14.  Although Mr. Spinks now disavows that testimony, Pl. Exh. 41 at 8 ¶ 32, he notably does not take issue with the substance of LNA's modeling of storm surge currents.

[36] LNA Exh. 10, Green 2008 Dep. at 56 (admitting wind was from northeast or north from 4 to 6 a.m.); Pl. Exh. 43 at 9 (wind from north-northeast to south-southwest); LNA Exh. 5, Green 2009 Dep. at 209; LNA Reply Exh. 3, Green 2009 Dep. Exh. B (Lakefront Airport data showing wind blowing from northeast at 12:01 a.m. on August 29); LNA Exh. 7, Dooley Report at 23-28, 30; LNA Exh. 1, Cushing Report at 80 Fig. 52.  *See above* at nn.16,17 (collecting references to meteorological data).

at 12, 29-30, Compendium #6.  This is Mr. Pazos' word for the freak 20-foot wave that William

Villavasso purports to have observed moving southward in the IHNC.  Pl. Exh. 87 at 17.

Mr. Pazos' theory of a 20-foot "meteotsunami" lacks any basis in science.  Plaintiffs'

expert hydrologist, Melvin Spinks, opined: "I have no reason to believe there were 20-foot

waves, based on the science that I've read and studied."[37]  A twenty-foot storm wave, had it

occurred, would have been a remarkable event, to say the least.[38]  Yet, according to Mr. Pazos, a

20-foot high meteotsunami struck New Orleans during Hurricane Katrina and somehow evaded

detection by any of the many existing water level gauges, and escaped the notice of every citizen

of New Orleans except for a lone Sewage and Water Board employee whose vision was

admittedly "fuzzy."[39]  This is exactly the kind of unsupported speculation that courts refuse to

credit in ruling on summary judgment motions.  *See, e.g.*, *Little*, 37 F.3d at 1077.[40]

Apart from the concept of a "meteotsunami," plaintiffs do not contend that the barge was

moved by waves from the LNA Terminal to the floodwall, and thus there is no genuine dispute

of fact about waves in connection with the transit of the barge.[41]

---

[37] LNA Exh. 15, Spinks 2009 Dep. at 21.

[38] For instance, a thirty-foot wave in the Indian Ocean killed over 200,000 people in 2004.  United States Geological Survey, *Most Destructive Known Earthquakes on Record in the World (Earthquakes with 50,000 or More Deaths)*, available at http://earthquake.usgs.gov/earthquakes/world/most_destructive.php, (last visited November 5, 2006).

[39] LNA Exh. 24, Villavasso Dep. 211.

[40] At the risk of dignifying Mr. Pazos' theory with more attention than it merits, his theory is impossible for each of the following reasons, among others:  (1) storm surge hydrographs showed a steady rise in water levels through the early morning hours of August 29, not a sudden twenty-foot rise (*see, e.g.*, LNA Exh. 2, Marino Report Fig. 3.4); (2) the "obstruction" posed by the Florida Avenue Bridge would have caused such a wave to break before it reached the IHNC basin (LNA Exh. 8, Marino Dep. at 80-81); and (3) a twenty-foot wave, if it existed, would have been fourteen feet higher than the six-foot floodwall, and thus could not have pushed the barge (with a draft of approximately 1.5 feet) into the wall instead of over it (*see* SMF ¶¶ 8, 31) (barge draft, floodwall height).

[41] Plaintiffs' "compendium of proof #6" provides a long and opaque discussion about the meaning of IPET's conclusions regarding wave heights, which were in the range of two to three feet.  SMF ¶ 22; LNA Exh. 21, IPET Report at IV-4.  Plaintiffs' brief does not rely on this material, apparently recognizing that it is immaterial whether the waves were 2-3 feet high or somewhat higher than that, as they argue.  As noted above, plaintiffs admit that waves in the IHNC would have tended to propagate in the direction of the wind, and reflected waves would be less powerful than incoming waves.  PSMF ¶¶ 24, 25.

5. Sounds heard by witnesses

As predicted in LNA's opening brief (at 14, 36-37), plaintiffs rely on the testimony of witnesses who heard booms, explosions and other sounds on the morning of August 29. Pl. Mem. at 16, 27, 30-31, Compendium #3.[42] Plaintiffs infer that these sounds, heard at various times and in varying numbers, must all have been caused by the barge striking the floodwall. But plaintiffs do not dispute that witnesses at *other breaches* where no barge was present heard similar sounds in connection with those breaches, particularly "boom" sounds of the type overwhelmingly described by the Lower Ninth Ward witnesses.[43] The fact that witnesses in the Lower Ninth Ward heard "boom" sounds, just like witnesses at other breaches, does not give rise to an inference that the barge was responsible for those sounds. Contrary to plaintiffs' argument (at 31), the Court need not "discount[]" the testimony of these witnesses in order to grant LNA's motion; instead, it can accept that the witnesses heard noises, but refuse plaintiffs' unwarranted inference about what those noises represent. *See First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968) (summary judgment appropriate where evidence is not susceptible of opposing party's interpretation); *Love v. Motiva Enters.*, No. 08-30996, 2009 WL 3334610, at *3 (5th Cir. Oct. 16, 2009) (refusing to infer sexual orientation of supervisory employee who stated that "men did not like her because she was gay or female"); *Little*, 37 F.3d at 1077 (refusing to infer that "nasal fatigue" was cause of failure to smell gas from decedent's failure to evacuate).

---

[42] By far the predominating description of the sounds heard by these residents is a "boom." Of the twenty-one witnesses identified in plaintiffs' Compendium #3, fifteen witnesses used the word "boom" and no other word was used more than once.

[43] *See* LNA Exh. 26, Weiss Report at 4 (listing witnesses who heard "boom" sounds at 17th Street and London Avenue Canals); LNA Exh. 21, IPET Report at IV-7-3, IV-7-27 (witness accounts of "boom" sounds at other canals); LNA Exh. 25 (excerpts of testimony by witnesses who heard "boom" sounds at other canals).

6. Eyewitness accounts

Finally, plaintiffs rely on the accounts of a tiny handful of purported eyewitnesses to the breaches.  In the case of the North Breach, the sole purported eyewitness is William Villavasso.  Pl. Mem. at 13-16, 27-28.  At the South Breach, plaintiffs primarily rely on the testimony of Terry Adams, and secondarily on Arthur Murph and Sidney Williams.  Pl. Mem. at 16-17, 31-33.

Although plaintiffs quote these witnesses' testimony at length, they do not address the reasons why this testimony is simply insufficient to permit a reasonable factfinder to rule in plaintiffs' favor – that it is equivocal at best, and in any case is scientifically impossible.  As discussed in detail in LNA's opening brief, Mr. Villavasso admitted that it was dark and rainy and he was not wearing his glasses (which he needed for distance vision) and, moreover, he *"couldn't tell what it was" that he saw that night.  See* LNA Mem. at 28-29 (citing testimony) (emphasis added).  Similarly, Mr. Adams admitted that his vantage point was many blocks away, and that it was dark and raining at the time.  *See* LNA Mem. at 34.[44]  Photographic evidence confirms it was impossible for Mr. Adams to have seen what he purports to have seen.[45]  Such equivocal testimony is not sufficient to avoid summary judgment, particularly given the overpowering scientific evidence that the barge simply could not have been present.  *Bright v. GB Bioscience Inc.*, 305 Fed. App'x 197, 203-04 (5th Cir. 2008) (vague and equivocal testimony fails to raise a genuine issue of material fact); *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 271-72 (5th Cir. 2002) ("equivocal and ill-supported testimony is simply insufficient to preclude summary judgment"); *see* LNA Mem. at 19.

---

[44] Mr. Murph testified he did not see the barge strike the floodwall, and Mr. Williams gave a recorded statement denying he had seen the barge strike the wall.  LNA Mem. at 35-36.

[45] LNA Exh. 1, Cushing Report at 46, Fig. 28 (photograph taken at 7:47 a.m. and showing lack of visibility).  Plaintiffs argue that this photograph was taken "two hours after the time described by Mr. Adams" (Pl. Mem. at 17), but that just proves LNA's point.  The photograph was taken after daybreak, while it was *dark* at the time described by Mr. Adams – hence, the visibility in the photograph is greater than what Mr. Adams would have experienced.

16

Moreover, if one accepts the testimony of Mr. Villavasso and Mr. Adams at face value, then what they said they saw cannot have been the ING 4727. Mr. Villavasso described the object he saw as sticking up above the top of the floodwall "maybe a foot, foot and a half, two feet at the most" from "top to bottom."[46] Similarly, Mr. Adams testified that he could see "about four feet of that barge sticking out there over the … flood wall."[47] Because the floodwall is no more than six feet high from the levee soil to the top of the wall (SMF ¶ 31), and because the barge was sticking out of the water no less than twenty feet (SMF ¶ 9), and because the water level must have been no lower than the bottom of the wall for the barge to make (alleged) contact with the wall, it necessarily follows that the barge, if it had been present, would have been sticking up over the wall *no less than fourteen feet* and probably more than that. That is simply not the object that Mr. Villavasso and Mr. Adams described.

For these reasons, there is no merit to plaintiffs' argument (at 34-37) that granting summary judgment would require an impermissible credibility determination. Courts can, and regularly do, grant summary judgment in the face of testimony that is contrary to the laws of nature or that is otherwise simply too incredible to be believed. That is what the court did in *Ralston*, where the plaintiff testified that his chickens did what "chickens do not do" (554 F.2d at 729); in *Molden v. Ga. Gulf Corp*., 465 F. Supp. 2d 606, 613-14 (M.D. La. 2006), where plaintiffs' testimony about their injuries was insufficient to overcome scientific evidence regarding their level of exposure could not cause physical harm; and in *Kesinger*, 381 F.3d 1243, where the court in a police shooting case disregarded eye witness testimony that was inconsistent

---

[46] LNA Exh. 24, Villavasso Dep. at 202-03. Plaintiffs falsely assert that Mr. Villavasso "was never asked if he could see the height of the barge above the floodwall" (Pl. Mem. at 16, 28). In fact, Mr. Villavasso was asked whether "this foot or foot and a half-foot or two feet is what you could see from top to bottom" and he answered, "Yeah. That's all I could see. It was raining and it was dark, the wind was blowing like hell. That's all I could see." LNA Exh. 24, Villavasso Dep. at 202-03.

[47] LNA Exh. 23, Adams Dep. at 82. *See also* LNA Exh. 34, Williams (Oct. 2008) Dep. at 47-48 ("I didn't get to see that much of the barge"; only saw "the top of it"; the "covers").

with the direct physical evidence.[48]  Courts also grant summary judgment in the face of testimony that is equivocal or speculative, as it is here.  *See, e.g.*, *Bright*, 305 Fed. App'x at 203-04 (vague and equivocal); *Stahl*, 283 F.3d at 271-72 (ill-supported and equivocal); *Kampen v. Am. Isuzu Motors, Inc.*, 157 F.3d 306, 318 (5th Cir. 1998) (en banc) ("conclusory unsupported assertions are insufficient to defeat a motion for summary judgment"); LNA Mem. at 19-20.[49]

Finally, there is no merit to plaintiffs' complaint (at 38-40) that LNA's motion asks the Court to draw impermissible inferences in LNA's favor by relying on "scientific modeling" to the detriment of supposed eyewitness testimony.  To the contrary, **science** – including scientific modeling – is a typical basis for granting summary judgment in cases evaluating whether a given event could have caused a given injury.  *See Molden*, 465 F. Supp. 2d at 613-14 (scientific ascertainment of level of plaintiffs' exposure resulted in summary judgment based on causation, despite witness testimony about suffering injury shortly after exposure); *In re Ingram Towing Co.*, No. 93-3311, 1995 U.S. Dist. LEXIS 15034, at *2 (E.D. La. Oct. 11, 1995) (impossible for anyone to have become ill from drinking water); LNA Mem. at 44 & n.123.

7. Expert evidence

Plaintiffs contend (at 39-41) that this case presents a "classic battle of the experts" that is unsuited for summary judgment.  To the contrary, the Fifth Circuit and other courts have

---

[48] Plaintiffs attempt but fail to distinguish *Ralston* (at 36-37).  Plaintiffs cite *Dotson v. Clark Equip. Co.*, 783 F.2d 586, 588 (5th Cir. 1986), but the court there confirmed that summary judgment is proper when the evidence is impossible, as it is here.  Plaintiffs also say that summary judgment is not allowed when the evidence goes to the "heart of the case," but that argument self-evidently fails, since *every* case where the court grants summary judgment involves evidence that goes to the "heart of the case."  *Dotson* also noted that the plaintiff in *Ralston* was self-interested.  *Id.*  But, here, as in *Ralston*, the individuals (Adams, Murph, and Williams) whose self-serving testimony plaintiffs rely on were, in fact, interested parties with claims against the barge at the time they gave the cited testimony.  *See* Doc. No. 226 in No. 05-4419 (Adams); Pl. Exh. 21 (Murph); LNA Exh. 33 at 11 (Williams).  Notably, Mr. Williams, before he was a claimant and an interested party, said that the barge never struck the wall.  LNA Mem. at 35-36; LNA Exh. 35 (Williams interview transcript).

[49] Plaintiffs' reliance on the First Circuit's decision in *Perez-Trujillo v. Volvo Car Corp.*, 137 F.3d 50 (1st Cir. 1998), is misplaced because the court there merely held that the inferences to be drawn from plaintiff's eyewitness accounts that an airbag failed to deploy were sufficient to support a ruling in plaintiff's favor on his product defect claim.  *Id.* at 55-56.

repeatedly held summary judgment is warranted where the "battle" is so one-sided that a reasonable factfinder can only come out one way.  *See*, *e.g.*, *Kampen*, 157 F.3d at 318; *Little*, 37 F.3d at 1077; *Stahl*, 283 F.3d at 271-72.  Plaintiffs' recent and untimely expert submissions, which speculate without any supporting data or analysis about "tidal flow" and a supposed "meteotsunami," drive home this point.  Indeed, in the only Fifth Circuit case cited by the plaintiffs on this issue, *Michaels v. Avitech, Inc.*, 202 F.3d 746 (5th Cir. 2000), the court *affirmed* summary judgment in favor of the defendant, finding that the evidence supplied by plaintiff's expert "lack[ed] any probative value."  *Id.* at 753-54.  So here, plaintiffs' experts have supplied no probative evidence, and there is no genuine "battle."

* * * * *

Having tried time and again to find some theory by which it might be scientifically possible for the barge to have crossed the canal and caused the breaches, the plaintiffs and their experts have come up empty at long last.  Instead, they are forced to rely on strained inferences from equivocal lay testimony.  Such testimony would not permit a reasonable factfinder to find in plaintiffs' favor, given the scientific reality that the barge cannot have been present when the breaches occurred.  In these circumstances, summary judgment is the proper result.

## III.   THE BARGE COULD NOT HAVE CAUSED THE FAILURE OF THE DEEPLY-ANCHORED SHEET PILE.

### A.   LNA's Evidence

LNA's second ground for summary judgment relies on two simple concepts.  *First*, in order for the floodwall to fail in the manner that it did, the buried sheet pile needed to become dislodged from the soil in which it was anchored – to be deflected by the forces acting upon it.  *Second*, an impact from a barge striking the concrete cap of the floodwall would not dislodge or

deflect the anchored steel sheet pile, but rather would result in only localized damage to the concrete cap itself (i.e., "cracking" or a "notch").

LNA supported its first point with the testimony of plaintiffs' own experts, who opined that the failure of the wall required a failure in the underlying soil. SMF ¶ 32. For instance, plaintiffs' expert Hector Pazos opined that the floodwall failures at both the North Breach and the South Breach involved the formation of "gaps" between the sheet pile wall and the canal side soils, cutting the levee in half and allowing water to seep under the wall.[50] Plaintiffs' memorandum acknowledges that this remains their position. Pl. Mem. at 49 ("gaps" led to "complete landward translation and/or torsion of the floodwall"). All of the independent investigations concluded that the failure of the floodwalls was due to failure in the supporting soils, either due to foundation instability or to underseepage, or both.[51]

LNA's second point – that impact from a barge would not cause the embedded sheet pile to dislodge or deflect – relies on a simple physical principle that an object will yield where resistance is weakest. Thus, an impact with the concrete cap would cause the cap to sustain a "notch" or "crack" before the deeply-embedded sheet pile would be dislodged or deflected because the concrete cap was a point of weakness, especially compared to the buried sheet pile. The analogous scenario, as developed by Dr. Cushing, is that of a book sitting on top of a table. LNA Exh. 1, Cushing Report at 150-51, Figs. 104, 105. Pushing on the book will cause the book to move but not the table. Similarly, an impact with the concrete cap will cause the concrete cap to crack, or fracture or even punch through, but it will not cause the underlying sheet pile to move or deflect. Dr. Cushing supported this simple analogy with engineering calculations and

---

[50] LNA Exh. 12, Pazos Report at 49 (describing formation of "gap (separation) between the soil of the levee on the waterside, and the sheet pile" at the North Breach); *id.* at 51 ("gaps" and "seepage" at South Breach).
[51] LNA Reply Exh. 2, IPET Report at V-68; LNA Exh. 18, ILIT Report at 6-10, 6-11, 6-17, and 6-18; LNA Exh. 20, Team Louisiana Report at 67; LNA Exh. 11, Mosher Dep. at 68, 78, 117.

analysis showing that in the case of an impact by a barge, the concrete cap on top of the wall would in fact give way without disturbing the deeply-anchored sheet pile.  LNA Exh. 1, Cushing Report at 158-63.  Plaintiffs' experts did not adduce any contrary evidence or analysis (*see* LNA Mem. at 8-9).[52]  Thus there is no genuine dispute on this issue.

### B.    Plaintiffs' Argument and Evidence

In response to LNA's motion, plaintiffs argue that the "Pennsylvania Rule" requires LNA to show that the barge "could not have" caused the North Breach and the South Breach (Pl. Mem. at 41-46), and that LNA has not met its burden of making such a showing.  (Pl. Mem. at 46-49).  Plaintiffs are wrong on both counts.

### 1.  The Pennsylvania Rule.

The Pennsylvania Rule does not apply to this case.  That rule serves to shift the burden on causation following a collision or other maritime incident to a party that has committed a statutory violation.  *The Pennsylvania*, 86 U.S. 125 (1873).  To invoke the rule, the plaintiff must affirmatively show that the maritime incident was "the physical cause of his damage."  *Gosnell v. United States*, 262 F.2d 559, 563-64 (4th Cir. 1959) ("*The Pennsylvania* rule does not shift the burden of proof on the first issue:  the physical cause of the damage. Such proof is always a part of libellant's case.").  In other words, the plaintiff must show that his or her damage was the result of a maritime collision or incident before he or she can be entitled to the presumption that the statute-violating defendant caused the collision or incident.  *See id.* at 563 (Pennsylvania Rule "does not apply where the physical cause of the damage is not known").[53]  In every case

---

[52] Indeed, Dr. Marino admitted at his deposition that the construction joint in the concrete cap is a "point of weakness" and thus he "would expect the wall to shear at the construction joint" if the force was applied at or above the joint.  LNA Exh. 8, Marino 2009 Dep. at 59-60.

[53] *See also In re Complaint of Nautilus Motor Tanker Co.*, 85 F.3d 105, 114 (3d Cir. 1996) (*The Pennsylvania* Rule is not "intended to increase the likelihood of liability…"); *Willis v. Amerada Hess Corp*, 379 F.3d 32, 42-43 (2d Cir. 2004) (declining to apply the Rule because plaintiff made no showing that vessel's actions were related to his cancer).

cited by the plaintiffs in their brief (at 41-46), the invocation of the Pennsylvania Rule was preceded by the plaintiff's demonstration that his or her damages were caused by the maritime incident under review.  Indeed, in one case plaintiffs cite, *Candies Towing Co. v. MV B & C Eserman*, 673 F.2d 91, 95 (5th Cir. 1982), the court made clear that the Pennsylvania Rule did not apply because the plaintiff's damages resulted from the sinking of a barge, while the alleged statutory violations had occurred in connection with a barge grounding that did not cause those damages.

Here, plaintiffs trace their damages to the North Breach and South Breach of the IHNC floodwall.  But they have not shown that either of those breaches was the result of a maritime collision or incident.  Plaintiffs have not shown that the barge struck the floodwall at the site of the North Breach, or at the point where the South Breach initiated.[54]  Thus, plaintiffs have not even begun to show that their physical damages were the result of a maritime allision or incident. Consequently, plaintiffs have no occasion to invoke the Pennsylvania Rule.

Moreover, plaintiffs have not shown that LNA violated any "statute."  Of the four supposed "regulatory provisions" they cite, two are neither statutes nor regulations and cannot allow for the invocation of the Pennsylvania Rule.  As plaintiffs' expert admits, the two portions of the New Orleans Hurricane Plan cited are only recommendations and not regulatory requirements.  *See* LNA Exh. 29, Green Report at 6 (noting that Appendix 2 is entitled "**RECOMMENDED** PRECAUTIONARY MEASURES FOR BARGES") (emphasis added); *id.* at

---

[54] It is undisputed that the contact between the barge and the concrete cap at the extreme southern end of the South Breach did not initiate the South Breach.  LNA Exh. 2, Marino Report at 4-55 to 4-58 (asserting that breach initiated farther north); LNA Exh. 8, Marino 2009 Dep. at 141; LNA Exh. 6, Pazos Dep. at 243; LNA Exh. 11, Mosher Dep. at 228-29 (referring to LNA Reply Exh. 2, IPET Report, at V-101); LNA Exh. 18, ILIT Report at 6-7; LNA Exh. 20, Team Louisiana Report at 67; LNA Exh. 37, Bartlett Report at 6 (opining that wall held at the southern end of the breach and did not overturn); LNA Exh. 1, Cushing Report at 92; LNA Exh. 4, Cushing Dep. at 245; LNA Exh. 3, Bakeer Report at 56-57; LNA Exh. 27, Bakeer Dep. at 126; LNA Exh. 13, Bea Report at 56.

8 (explaining that Annex C sets forth a "recommendation").[55]  Thus, the Pennsylvania Rule does

not apply to them.[56]  Nor does either cited Coast Guard regulation apply here.  The first, 33

C.F.R. § 162.75(b)(3)(ii), states that "all vessels and tows shall be moored by bow and stern

lines" and it is undisputed that bow and stern mooring lines were in place.[57]  The second

provision does not even create a duty as to LNA, but rather reminds masters of their "primary

responsibility for the protection … of such vessels" (33 C.F.R. § 6.19-1) and sets out the powers

and discretion of Coast Guard officers to direct the movement of vessels to and from docks (33

C.F.R. § 6.14), without further detail.[58]

Finally, and in any event, the Pennsylvania Rule would not affect the outcome even if it

did apply because, as noted above, "presumptions become superfluous [when] the parties have

introduced evidence to dispel the mysteries that gave rise to the presumptions."  *In re Mid-South

Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005).  Here, both parties have introduced evidence

which establishes, in the final analysis, that LNA is entitled to summary judgment because there

---

[55] Plaintiffs' entire Pennsylvania Rule argument rests solely on the opinions of Mr. Green regarding LNA's alleged violations of various regulations.  Such expert testimony is inadmissible.  *See, e.g., Butler v Ensco Offshore Co.*, 2009 U.S. Dist. LEXIS 27198 (E.D. La. Mar. 27, 2009) (barring expert testimony that a party violated Coast Guard regulations and noting that "[t]he Fifth Circuit has held that experts should be precluded from offering legal opinions.") (citing *Dupre v. Chevron, U.S.A., Inc.*, 20 F.3d 154, 157 (5th Cir. 1994)); *Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (barring expert testimony regarding party's violation of FAA regulations).

[56] Plaintiffs cite (at 42-43) to *Evergreen Int'l S.A. v. Marinex Constr. Co.*, 477 F. Supp. 2d 681, 689 (D.S.C. 2007), for the proposition that violations of provisions other than regulations or statutes may result in invocation of the Pennsylvania Rule.  That district court decision from another circuit does not apply here.  There, the defendant violated safety requirements set forth in a contractual agreement with the U.S. Army Corps of Engineers, and the court held that the contractual obligation was equivalent to similar Army Corps safety regulations.  *Id.* at 689.  *Evergreen* does not allow this Court to extend the Pennsylvania Rule to recommendations set forth in a Hurricane Plan.  *See Tokio Marine & Fire Ins. Co. Ltd. v. Flora MV*, 235 F.3d 963, 967 (5th Cir. 2001) (rule does not apply to provisions that are "suggestive, rather than mandatory").

[57] *E.g.*, LNA Exh. 12, Pazos Report at 66; LNA Exh. 29, Green Report at 7.  The remainder of that section addresses only "tows" and the barge is, of course, not a tow.  33 C.F.R. § 162(b)(3)(ii) ("*Tows* shall be secured …").

[58] Moreover, the Pennsylvania Rule applies only to violations of maritime safety rules, not general statements requiring interpretation.  *See Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 365 (5th Cir. 2006) (the Rule "applies only to violations of statutes that delineate a clear legal duty, not regulations that require judgment and assessment of a particular circumstance.") (citations omitted).  Neither of these provisions sets forth any "clear legal duty," and neither could possibly form a basis for invocation of the Pennsylvania Rule.

is no genuine dispute on the issue of whether a barge impact with the concrete cap can cause the embedded sheet pile to fail.

2. Effect of barge impact

Plaintiffs also err in asserting that LNA has failed to show that the barge could not have caused the wall to fail.  Pl. Mem. at 46-50.  Plaintiffs take issue with Dr. Cushing's analysis (at 46-47), but their quarrels pertain to tangential issues such as "the impact of tide currents" that have no relationship to the thrust of Dr. Cushing's analysis, which is that a barge impact with the concrete cap of the floodwall would have a localized effect at the top of the wall, not in the embedded sheet pile.  Plaintiffs also assert (at 48) that the existence of "concrete pulverization" at the locus of both breaches demonstrates that the barge caused the breaches, but their own experts disagree on what caused the concrete pulverization.[59]  Finally, plaintiffs cite testimony by Dr. Reed Mosher that a barge "punched through" the concrete portion of a floodwall along the MRGO (Pl. Mem. at 48), but Dr. Mosher characterized this as "very local damage to the wall" and not something that "cause[d] the collapse" of the wall.[60]

Indeed, plaintiffs' experts provide their own ample support for Dr. Cushing's analysis.  For instance, referring to the bent rebar and concrete cap damage observed at the far southern end of the South Breach, away from the place where the South Breach initiated, Mr. Bartlett said in his report:  "The fact that the wall fractured at this location demonstrates that when the impact occurred, the wall foundation had sufficient strength to resist the force required to cause the fracture, rather than fall over."[61]  That is precisely the thrust of Dr. Cushing's analysis – that the concrete cap will give way before the embedded sheet pile is disturbed.  Mr. Bartlett's new

---

[59] *See* LNA Mem. at 31 n.74 (contradictory testimony by Pazos and Marino regarding damage at North Breach); LNA Mem. at 38 n.103 (contradictory testimony by Pazos and Marino regarding damage at South Breach).
[60] LNA Exh. 11, Mosher Dep. at 91-92, 267.
[61] LNA Exh. 37, Bartlett Report at 6.

declaration reiterates that "the barge was able to cause the fracture of **the concrete portion** of the flood wall," further driving home Dr. Cushing's point.  Pl. Exh. 51 at 2, ¶ 7 (emphasis added). Dr. Marino's new declaration, meanwhile, provides a visual depiction of the barge's supposed approach to the North Breach and South Breach which shows that, based on the water levels in the IHNC at the time of the supposed impacts, the bottom of the barge would have been above the level of the sheet pile and would only have come into contact with the concrete cap.  Pl. Exh. 43, Marino Decl. Fig.4.  In other words, Dr. Marino's graphic confirms that the barge came into contact with the "book" (the concrete cap) but not the "table" (the sheet pile).[62]  Accordingly, if there is a "battle of the experts" on this issue, as plaintiffs contend (Pl. Mem. at 50), it is a battle in which plaintiffs' experts are mostly fighting on the side of LNA.

That the evidence is all in favor of LNA should not be surprising, given the unanimous results of the many independent investigations to have studied the causes of the IHNC floodwall failures. Although the studies differ about the relative importance of factors such as soil instability and seepage, they all agree on one thing:  **the barge did not cause the floodwall failures**.[63]  Plaintiffs mischaracterize Dr. Mosher's testimony as suggesting that IPET "had not yet … rule[d] out" the barge, when in fact Dr. Mosher clearly testified to the contrary:

> Q:  "And that – if I understood you right, IPET at least briefly considered whether the barge was a cause of the failure?"
> A:  "Right, that's correct."
> Q:  "And rejected that conclusion?"
> A:  "Correct."[64]

---

[62] Plaintiffs contend that Dr. Marino performed a "load impact calculation" (Pl. Mem. at 50), apparently in reference to Dr. Marino's new and untimely declaration.  However, Dr. Marino's analysis did not evaluate whether the concrete cap would yield before the embedded sheet pile would be disturbed, but rather apparently assumed that the concrete cap would remain intact.  *See* Pl. Exh. 43, Marino Decl. Fig.3.

[63] LNA Exh. 18, ILIT Report at 6-10, 6-11, 6-17, and 6-18; LNA Exh. 20, Team Louisiana Report at 67; LNA Reply Exh. 2, IPET Report at V-68; LNA Exh. 11, Mosher Dep. at 68, 78, 117.

[64] LNA Exh. 11, Mosher Dep. at 78.  The portion of the deposition quoted by plaintiffs, read in context, refers to an early stage of the now-completed IPET investigation, before the IPET team had identified the non-barge factors that in fact caused the breaches.  *See id.* at 91-92.  Plaintiffs' reference (at 17-18) to the theoretical exercise

Plaintiffs cite a study by the National Institute of Standards and Technology (Pl. Mem. at 19-20) to argue that barge impacts can damage structures, but that study also specifically concluded that the IHNC breaches were caused by other factors, and that the barge was "drawn through the breach" and only "caus[ed] the concrete I-walls at this end to be broken into smaller pieces."[65]

## IV. PLAINTIFFS WOULD HAVE SUSTAINED THE SAME DAMAGES WITHOUT THE IHNC BREACHES.

### A.   LNA's Evidence

LNA's third ground for summary judgment rests on a simple legal premise and its undisputed application to this case.  The legal premise is that a plaintiff's damages are measured by placing the plaintiff in the position he would have occupied if the defendant had not acted negligently.  This legal rule requires that due account be taken of the plaintiff's circumstances, including the risk or even probability that the plaintiff would have arrived at the same result even if the defendant had not acted tortiously.[66]  The rule is exemplified by the famous case of *Dillon v. Twin State Gas & Electric Co.*, 163 A. 111 (N.H. 1932), in which the plaintiff was "electrocuted by the defendant's negligence on his way down from the bridge he had just jumped off, and was allowed to [recover] damages only for the short time Dillon would have lived if had it not been for the defendant's negligence."[67]

The application to this case is provided by the work of plaintiffs' own hydrology expert, Melvin Spinks, who supplied a scientific modeling analysis of what flooding would have been

---

presented in Appendix 17 of the IPET Report is irrelevant, as that Appendix has nothing to say about a barge impact with the concrete cap versus embedded sheet pile.

[65] Pl. Exh. 81, National Institute of Standards and Technology, *Performance of Physical Structures in Hurricane Katrina and Hurricane Rita: A Reconnaissance Report* (June 2006) at 96; *see id.* at 94 (North Breach likely caused by "foundation instability" or "instability due to rotation"); *id.* at 96 ("rotational failure caused by full outboard pressure and increased cantilever action from the loss of supporting soil along the inboard toe due to overtopping scour").

[66] *See, e.g., Lancaster v. Norfolk & W. Ry. Co.*, 773 F.2d 807, 822 (7th Cir. 1985) ("the damages of the 'eggshell skull' victim must be reduced to reflect the likelihood that he would have been injured anyway, from a nonliable cause, even if the defendant had not injured him.").

[67] *Lancaster*, 773 F.2d at 822.

experienced in the Lower Ninth Ward and St. Bernard Parish if the IHNC breaches had not

occurred.  In presenting these modeling results, Mr. Spinks wrote that even if the IHNC breaches

had never happened, water from the MRGO levee breaches "would have completely inundated

the Lower Ninth Ward and St. Bernard Parish sometime later than what actually happened

during Hurricane Katrina."[68]  The result, thus, is that even if plaintiffs could show that LNA

caused the IHNC floodwall breaches (which they cannot), their damages would be limited to the

three to four hours' difference between the time the IHNC floodwaters arrived and the inevitable

arrival of the floodwaters from the MRGO.

**B.        Plaintiffs' Arguments**

1. The *Dillon* principle and cases applying it.

Plaintiffs deny that *Dillon* represents the applicable law, characterizing it as "antiquated,"

Pl. Opp. at 50-51, but that assertion is incorrect.  LNA's opening brief (at 46-47) showed that the

*Dillon* principle has been applied in numerous modern cases, including by the Fifth Circuit in

*Dixon v. International Harvester Co.*, 754 F.2d 573, 588-90 (5th Cir. 1985), and has been cited

as a "famous case" in modern tort treatises describing the current state of the law. These modern

cases include decisions rendered under maritime law and Louisiana law, by federal and state

appeals courts alike.[69]  Plaintiffs' brief does not cite or distinguish the Fifth Circuit's opinion in

---

[68]  LNA Exh. 38, Spinks Report (2008) at 26.  In a later version, apparently cognizant of the implications of these results, Mr. Spinks used the word "could" rather than "would."  LNA Exh. 16, Spinks Report (2009) at 33.

[69]  *See, e.g., Lancaster*, 773 F.2d at 822; *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 973 (7th Cir. 1983) (a "ground for reducing [the] damage award" is that "the injury complained of would have occurred anyway, so that accident merely accelerated it"); *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, (11th Cir. 1991) (applying same under maritime law); *Harris v. Ill. Cent. R.R.*, 58 F.3d 1140, (6th Cir. 1995) (plaintiff's lost wages due to industrial accident did not extend to normal retirement age, to the extent that his unrelated heart condition would have prevented him from working that long); *Kennedy-Fagan v. Estate of Graves*, 993 So. 2d 255, 268 (La. App. 2008) (noting "[c]ompensatory damages are designed to place the plaintiff in the position in which he would have been if the tort had not been committed" and therefore limiting damages for wrongful death from the length of time between the wrongful death and the natural death considering her infirmities); *Follett v. Jones*, 481 S.W.2d 713 (Ark. 1972) (liability for wrongful death for injuries caused by a car accident limited to decedent's life expectancy where autopsy showed that decedent had terminal lung cancer).

*Dixon*, nor does it address any of the modern cases cited in LNA's brief, except for one case (*Lancaster*) that they dismiss in a footnote as "underwhelming."[70]

There is, in fact, nothing complicated or out-of-date about the principle set forth in *Dillon*. In application, it merely provides (for example) that a worker who dies of a heart attack shortly after being wrongfully terminated is not entitled to be compensated for lost income as if he would have worked for another forty years.[71]  Courts have applied this principle to cases involving other types of damage, holding, for example, that future damages for a taking are limited to the length of time during which use is reasonably anticipated to be lost, rather than the life expectancy of the owner.[72]  So too here, even if plaintiffs could show a genuine triable issue as to the cause of the IHNC breaches (which they cannot), the undisputed record evidence, principally set forth in the opinions of their own hydrology expert, shows that their damages are limited to a four-hour window before the arrival of the MRGO floodwaters.

Rather than addressing the applicable legal rule, plaintiffs devote most of their attention to discussing the law of causation, and in particular their understanding of the "substantial factor" causation test that they say applies.  Pl. Mem. at 51-53.  But the "substantial factor" test is entirely irrelevant to LNA's argument, which assumes – for purposes of this motion only, and against all of the evidence – that plaintiffs could show the barge caused one or both IHNC breaches, and that this flooding arrived before the MRGO flooding.[73]  LNA's argument is

---

[70] Pl. Mem. at 50-51 n.117 (referring to *Lancaster*, 773 F.2d at 810, 823).  Plaintiffs also fail to address *Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528, 537 (5th Cir. 1994), which holds that the question of whether plaintiff has suffered any damages is appropriate for summary disposition.

[71] *Lancaster*, 773 F.2d at 822; *Dixon v. Int'l Harverster Co.*, 754 F.2d 573, 588-90 (5th Cir. 1985).

[72] *St. Dep't of Transp. & Dev. v. Dietrich*, 555 So. 2d 1355, 1359-60 (La. 1990).  *See also Marcoux v. Van Wyk*, 572 F.2d 651, 653 (8th Cir. 1978) (limiting the measure of damages to that which was the result of the negligence and excluding losses that would have been suffered regardless of plaintiff's negligence).

[73] In fact, plaintiffs cannot satisfy  the "substantial factor" test with regard to whether the barge is a cause-in-fact of either of the breaches.  That test requires plaintiffs to show that the barge was either a but-for cause or was "sufficient" to cause the wall to fail, all on its own.  *See* Restatement (Second) of Torts §§ 431, 432; *see* Pl. Mem. at 51 & n.118 (acknowledging application of Restatement criteria).  Neither of these conditions applies here.

directed at the proper measure of damages, not substantial-factor causation.[74]  The cases cited by plaintiffs recognize that damages and causation are two separate elements of the tort of negligence.[75]  Further, these cases also recognize that the measure of damages is a separate inquiry from the causation of damages.[76]  Yet, plaintiffs fail to cite a single case that even addresses the proper measure of damages.

2.  The inevitable MRGO flooding

Unable to effectively contest application of the correct legal rule, plaintiffs next deride LNA's position as representing a "hypothetical flood scenario" rather than "reality."[77]  This argument, applied to the law of damages, makes no sense at all.  Rather, an assessment of damages is always a "hypothetical" exercise.  By definition, compensatory damages, such as those sought here, place the plaintiff in the position he would have been in if the defendant's allegedly tortious conduct had never occurred.[78]  Such an inquiry, by its very nature, requires a hypothetical assessment of the plaintiff's position in the absence of defendant's tortious act.[79]

---

[74] Plaintiffs also suggest, incorrectly, that if the barge is a cause of the breaches, LNA can be held liable for all of plaintiffs' damages.  Yet, plaintiffs' own cited cases belie that point.  *See Wm. G. Roe & Co. v. Armour & Co.*, 414 F.2d 862, 870 (5th Cir. 1969) (stating that "[s]eparate causes concurring during the same time period to produce injuries subject to rational division, such as the stream pollution cases, do not give rise to joint and several liability"); *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260 n.8 (1979) (finding that the rules of concurrent liability "are inapplicable where the injury is divisible").  *See also, e.g., Saden v. Kirby*, 660 So. 2d 423 (La. 1995) (apportioning damages based on the amount of water added by party's negligence to an existing flood).

[75] *In re Katrina Breaches Consol. Litig.*, 2009 U.S. Dist. LEXIS 72288 at *267-68 (E.D. La. Apr. 15, 2009); *Perkins v. Entergy Corp.*, 782 So. 2d 606, 611 (La. 2001).

[76] *See Wm. G. Roe & Co.*, 414 F.2d at 868 ("the question of the proper measure of damages remains even after liability is established").  *Accord Hornsby v. Bayou Jack Logging*, 902 So.2d 361, 367 n.8 (La. 2005) ("the record reflects that all the elements of negligence were met and the sole remaining issue before us is the measure of damages.").  Further, this Court implicitly recognized in its denial of class certification in this case that the inquiry regarding the measure of damages is separate from the inquiry of causation.  *In re Katrina Canal Breaches Consol. Litig.*, 258 F.R.D. 128, 140 (E.D. La. 2009).

[77] Pl. Mem. at 54-55.

[78] *See, e.g., Carney v. Lone Star Life Ins. Co.*, 540 So. 2d 415, 418-19 (La. App. 1989) ("The best measure of damages for negligence is to place the plaintiff in the position he would have occupied 'but for' the negligence."); *Standard Oil Co. of N.J. v. S. Pac. Co.*, 268 U.S. 146, 155 (1925) (applying admiralty law and noting the "fundamental" purpose of the damages inquiry is to put the owner of damaged property "in as good position pecuniarily as if" defendant had not committed a tort).

[79] "Placement of the plaintiff in the position he would have occupied but for the wrong is, by necessity, an inexact science given the vagaries of proof and the imprecision of forecasting."  James M. Fischer, *Understanding*

That is precisely what Mr. Spinks did when he employed a flood model to demonstrate what would have happened to the plaintiffs if the IHNC floodwall breaches had never occurred.

Mr. Spinks' flood modeling provides clear results showing that the MRGO flooding would have inundated the area to the same maximum levels even if the IHNC breaches had not occurred. Though plaintiffs attempt to avoid this conclusion by providing a new declaration from Mr. Spinks, in which he asserts that this is not what "actually happened,"[80] this declaration and plaintiffs' reliance upon it are irrelevant to the issue of damages.

*Dillon* is directly on point. In that case, there was no dispute about what "actually happened;" it was undisputed that the boy was electrocuted. The only issue in *Dillon* was the "hypothetical" question of what would have happened to the boy if he had not been electrocuted. Again, it was undisputed that he would have died anyway, a short time later, from his fall. His damages were measured by the short interval between what happened in "reality" and the "hypothetical" result if there had been no tort. So too here, it is undisputed that plaintiffs' homes would have been inundated to the same degree, even if the IHNC breaches had not occurred, by waters from the MRGO levee breaches just a few short hours later. It is further undisputed that the value of those extra hours is zero.[81]

Consequently, despite plaintiffs' attempt to obfuscate this simple point, summary judgment is appropriate where, as here, the undisputed facts lead inexorably to the conclusion that the measure of plaintiffs' damages is zero. *See Ginsberg*, 39 F.3d at 537.

## CONCLUSION

LNA's motion to for summary judgment should be granted.

---

*Remedies*, § 1 at 3 (1999); *see also Dobbs Law of Remedies* § 8.1(2) at 361 (2d ed. 1993) ("Damages measurement is not merely a leap in the dark, but it is certainly a leap into the deep dusk of twilight.").

[80] Pl. Exh. 41, Spinks Decl. at 3-4.

[81] SMF ¶ 42; LNA Exh. 39, Ragas Dep. at 115.

Dated: November 9, 2009

Respectfully submitted,

Robert B. Fisher, Jr., T.A. (#5587)
Derek A. Walker (#13175)
**CHAFFE MCCALL, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA  70163-2300
Telephone:  (504) 585-7000
Facsimile:  (504) 585-7075
Fisher@chaffe.com
Walker@chaffe.com

 /s/ John D. Aldock
John D. Aldock
Richard M. Wyner
Mark S. Raffman
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC  20001
Telephone:  (202) 346-4240
jaldock@goodwinprocter.com
rwyner@goodwinprocter.com
mraffman@goodwinprocter.com

Daniel A. Webb (#13294)
**SUTTERFIELD & WEBB, LLC**
Poydras Center
650 Poydras Street, Suite 2715
New Orleans, LA  70130
Telephone:  (504) 598-2715

*Attorneys for Lafarge North America Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 9, 2009.

<u>/s/ John D. Aldock</u>