**United States 5th Circuit Court of Appeals Reports**

---

IN RE MUNICIPAL BOND REPORTING ANTITRUST LIT., 672 F.2d 436 (5th Cir. 1982)

IN RE MUNICIPAL BOND REPORTING ANTITRUST LITIGATION.

MUNITRAD SYSTEMS, INC., PLAINTIFFS-APPELLANTS, v. STANDARD AND POOR'S CORPORATION, ET AL., DEFENDANTS-APPELLEES.

No. 80-2013.

United States Court of Appeals, Fifth Circuit.

April 5, 1982.

Rehearing Denied May 3, 1982.

**Page 437**

[EDITORS' NOTE:  THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]

**Page 438**

Marion J. Craig, III, Earnest Langley, Hereford, Tex., Alioto & Alioto, Joseph M. Alioto, San Francisco, Cal., for plaintiffs-appellants.

Marshall M. Searcy, Jr., Dallas, Tex., for defendants-appellees.

Appeal from the United States District Court for the Northern District of Texas.

Before POLITZ and RANDALL, Circuit Judges, and PARKER[fn*], District Judge.

[fn*] Chief Judge of the Middle District of Louisiana, sitting by designation.

POLITZ, Circuit Judge:

[1] Munitrad Systems, Inc. instituted this antitrust action in the Northern District of Texas in July, 1975. Following an initial severance and transfer of the claim against Brenton W. Harries,[fn1] the two cases were consolidated with a third[fn2] and the action proceeded in the Northern District of Texas. After more than four years of discovery, the defendants sought summary judgment. With no indication of a need for further discovery,[fn3] the motions were heard and granted. Munitrad appeals, challenging

**Page 439**

the use of the summary judgment vehicle, maintaining that genuine factual disputes exist regarding the defendants' efforts at monopolization and the damages it suffered. The plaintiff also complains of the trial court's conclusion that the suit was not timely filed. For the reasons assigned, we affirm.

[2] Munitrad Systems, Inc., incorporated in Texas in May of 1970, was conceived as a computerized on-line information retrieval system. The service was designed to provide information to one discrete part of the national investment community, the secondary municipal bond market.[fn4] When Munitrad was formed, information pertinent to the secondary bond market was provided daily by Standard & Poor's *The Blue List of Current Municipal Offerings (The Blue List), The Bond Buyer,* and *The Munifacts Wire Service,* in combination with financial information in major

daily newspapers and in major periodicals. In addition, security and bond dealers disseminated information on a daily, in-house basis.**[fn5]**

[3] The business of providing municipal securities data to the financial community is a wide open field with virtually no barriers to entry. Furnishing such information generally is not a capital intensive enterprise. In this case, Munitrad entered the arena with only a minimum amount of capitalization, seeking to provide a speedier, computerized on-line information service, making data changes throughout the course of the trading day. By comparison, *The Blue List,* published every business day, only contains information submitted prior to 3:00 p. m. Eastern Standard Time of the preceding day. As a general proposition, the same limitations apply to all print publications. The variant Munitrad offered was the course of day adjustments and updates.

[4] In a not unusual approach to beginning a new business, Munitrad priced its service on a "loss leader" basis in the fall of 1970. Munitrad began operating at a loss; it continued to operate at a loss in 1970, into 1971, through a reorganization in the fall of 1971, and until it ceased doing business sometime thereafter.

[5] In April of 1971, Standard & Poor's inaugurated its *Blue List Retrieval System,* a computerized on-line access connection to *The Blue List* information base, which furnishes data similar to that provided by Munitrad. In seven years of operation, the service generated sufficient net profits in three years to offset the net losses during the other four.

[6] Munitrad's antitrust complaint alleged that the defendants, Standard & Poor's Corporation, its president Brenton W. Harries, and The Blue List Publishing Company, Inc., entered into an unlawful combination to restrain its business dealings with the intention to eliminate it as a competitor, in violation of section 1 of the Sherman Act, **15 U.S.C. § 1**. This assertion, however, has been abandoned.**[fn6]** In addition, Munitrad claimed that the defendants monopolized the municipal bond reporting industry and employed illegal tactics, by virtue of their monopoly position, to eliminate a competitor in contravention of section 2 of the Sherman Act, **15 U.S.C. § 2**. Damages in excess of 60 million dollars were sought.

**Page 440**

[7]             *Propriety of Summary Judgment*

[8] Rule **56** of the Federal Rules of Civil Procedure directs that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See, e.g., Volyrakis v. M/V Isabelle,* **668 F.2d 863** (5th Cir. 1982); *Ortego v. Union Oil Co. of California,* **667 F.2d 1241** (5th Cir. 1982); *Murphy v. Georgia-Pacific Corp.,* **628 F.2d 862** (5th Cir. 1980); *Cubbage v. Averett,* **626 F.2d 1307** (5th Cir. 1980); *Keiser v. Coliseum Properties, Inc.,* **614 F.2d 406** (5th Cir. 1980). While in considering a motion for summary judgment, a court must inspect the entire record and draw all reasonable inferences in favor of the party opposing the motion, *see AT&T v. Delta Communications Corp.,* **590 F.2d 100** (5th Cir.), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979), the nonmoving litigant is required to bring forward "significant probative evidence" demonstrating the existence of a triable issue of fact. *Ferguson v. National Broadcasting Co., Inc.,* **584 F.2d 111**, **114** (5th Cir. 1978).

[9] Even in antitrust actions, although sparingly used, summary judgment may be appropriate. *See, e.g., Mid-West Paper Products Co. v. Continental Group,* **596 F.2d 573** (3d Cir. 1979). The mere

allegations of a contract, a combination, or a conspiracy, for the purpose of restraining trade or commerce, and resulting damages, once rebutted, will not withstand summary judgment. *Solomon v. Houston Corrugated Box Co., Inc.,* 526 F.2d 389 (5th Cir. 1976). It is now established that "simply because a suit is brought under the antitrust laws does not foreclose a summary judgment." *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1112 (5th Cir. 1979). *See, e.g., Pan-Islamic Trade Corp. v. Exxon,* 632 F.2d 539 (5th Cir. 1980); *Daniels v. All Steel Equipment, Inc.,* 590 F.2d 111 (5th Cir. 1979); *Scranton Constr. Co. v. Litton Industries Leasing Corp.,* 494 F.2d 778 (5th Cir. 1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975). *See also First Nat'l Bank v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). In short, the requirements of Rule 56 are no less applicable in antitrust actions. Indeed, a strong argument can be made, in an appropriate case, for the particular applicability of the summary procedure in antitrust litigation.[fn7]

[10] Munitrad maintains that summary judgment was improper because discovery was still ongoing. We find no merit in this contention for several reasons: the record reflects extensive discovery, spanning more than four years; a Rule 56(f) request for additional discovery was not made; and counsel for Munitrad advised the court that the motions had been met and the matter was ready for argument. We conclude that the summary judgment vehicle was available, which brings into focus the issue of the correctness of the disposition regarding the claimed monopoly and damages.

[11]                    *Monopoly and the Market*

[12] Munitrad submits that the evidence developed during the discovery process revealed the exercise of monopoly power by *The Blue List* and *The Blue List Retrieval System* over the relevant market. From this linchpin, Munitrad suggests that it has raised a viable, triable issue of monopolization, proscribed by section 2 of the Sherman Act.

**Page 441**

[13] An analysis of section 2 monopolization requires a division of the subject into "two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historical accident." *United States v. Grinnel Corp.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966). The complainant bears the burden of producing evidence establishing the existence of a monopoly.

> To succeed in claiming monopolization, a plaintiff must show the defendant has achieved a monopoly, or, for attempt, demonstrate a "dangerous probability of success." *Yoder Bros. Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1366-1369 (5th Cir. 1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977).

[14] *H & B Equip. Co., Inc. v. International Harvester Co.,* 577 F.2d 239, 242 (5th Cir. 1978).

[15] Monopoly is in essence the power to fix prices and exclude competition. *See, e.g., United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The relevant market establishes the backdrop against which to measure economic power. It necessarily follows that "defining the product and geographic markets is a threshold requirement under § 2." *Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 276 (5th Cir. 1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). *See*

*Heatransfer Corp. v. Volkswagenwerk, A.G.,* [553 F.2d 964](#) (5th Cir. 1977), *cert. denied,* [434 U.S. 1087](#), 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Yoder Bros., Inc. v. California-Florida Plant Corp.,* [537 F.2d 1347](#) (5th Cir. 1976), *cert. denied,* [429 U.S. 1094](#), 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); *Sulmeyer v. Coca Cola Co.,* [515 F.2d 835](#) (5th Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed. 341 (1976).

[16] There is no question that the relevant geographic market for the dissemination of information about municipal securities is the entire United States. Munitrad defined the product and market as: "The day-to-day commercial publishing of advertising of municipal securities within the secondary market for such securities within the United States."

[17] In offering its definition of the relevant market, Munitrad attempts to exclude the in-house municipal securities information systems established and run by dealers. In addition, Munitrad seeks to characterize Standard & Poor's start-up of *The Blue List Retrieval System* as reactive to its own electronic operations, purportedly which threatened *The Blue List*'s near-monopoly over the municipal bond information market.

[18] The limitation of the parameters of the relevant market as suggested by Munitrad fails to give due accord to the significance of elasticity of supply and demand in antitrust evaluations. High elasticity of supply in the municipal bond information industry is indicated by the record. Entry costs are low and few meaningful barriers to information start-up exist. Thus, it seems apparent that if *The Blue List* or *The Blue List Retrieval System* attempted to exact monopoly prices for the marketed information, other publishers would be encouraged to enter the field, dealers would expand in-house and inter-house communications, and readily available alternatives would be sought out.

[19] The record also reflects significant elasticity of demand in this information market. Several publications or data processing networks can and do serve as reasonably available and interchangeable media for advertising municipal bond offerings. Advertisers may place their listings in the major dailies, such as *The Wall Street Journal.* They have access to *The Bond Buyer* as well as electronic distribution systems. In light of the Supreme Court's holding in *du Pont,* in order to demonstrate a triable issue of monopoly, Munitrad was obliged to offer evidence establishing that the alternatives were not

**Page 442**

reasonable substitutes for the defendant's services.[fn8] This was not done.

[20] Munitrad attempts to define a submarket for electronic, computerized, municipal securities advertising, under the aegis of *Brown Shoe Co. v. United States,* [370 U.S. 294](#), [82 S.Ct. 1502](#), 8 L.Ed.2d 510 (1962). In doing so, Munitrad depicts *The Blue List* as controlling monopoly power over the bond information print market and *The Blue List Retrieval System* as extending that control to the electronic data processing medium. Munitrad urges us to accept a rather circumscribed view of the municipal securities advertising market which was rejected by the district court. We are unpersuaded.

[21] Munitrad contends that its on-line computer information service offered a competitive challenge to *The Blue List,* which resulted in the creation of *The Blue List Retrieval System.* The evidence in the record belies this contention. As early as 1964, defendant Harries publicly announced the idea of a computerized *Blue List.* The technological advances, required to make this feasible and economical, were completed by 1969, but other business factors occasioned a delay in the inauguration of the service. When Munitrad began operating in late 1970, efforts

already were underway to offer information through *The Blue List Retrieval System* with its well-established data base. However, it still was not certain that a sufficient market existed for this new, computerized service product.

[22] Munitrad's principal sales feature was the capacity to enter changes in its bond listings during the course of the trading day. It is upon this capability that Munitrad urges us to distinguish it from the rest of the municipal securities information industry and construct an electronic submarket for the purposes of its Sherman Act claim. We are not persuaded that this course-of-the-day-update variant is enough to render Munitrad's mode of information dissemination sufficiently distinct from the methods of dissemination employed by the bond print and wire media, which existed before its entry into the field. The record demonstrates that the enhancement of the currency, or sheer immediacy, of information, beyond that available in the daily print publications, is not greatly significant in the secondary municipal bond market.**[fn9]**

[23] We further note that customers apparently consider the printed data and the electronic system information to be reasonably interchangeable products. Such a consumer perspective tends to negate Munitrad's suggestion of an identifiable submarket in the information industry — the boundaries of which may be charted by scrutinizing the "public recognition of the submarket as a separate economic entity," *Brown Shoe Co. v. United States,* **370 U.S. at 325**, **82 S.Ct. at 1523** — for in "some cases the best perspective may be obtained by looking at another reasonably sensitive gauge of what is going on in the marketplace — the perceptions of those who trade in the market." L. Sullivan, *supra* note 8, § 16, at 58.

[24] We perceive the pertinent product market to involve the communication of municipal securities data via the print or electronic media. The evidence developed simply does not support a more narrow description. As a consequence, summary judgment in favor of the defendants on the section 2 Sherman Act claim of monopolization

**Page 443**

was in order.**[fn10]** Similarly, the record discloses that Munitrad failed to raise a triable issue of fact regarding its claim that the defendants attempted to monopolize the business of disseminating information about and in the secondary municipal bond market. *See, e.g., Aviation Specialties, Inc. v. United Technologies Corp.,* **568 F.2d 1186**, **1192** (5th Cir. 1978) ("Establishing a violation of Section 2 requires showing an intent on the defendants' part to bring about a monopoly and a dangerous probability of success.") (citations omitted).

[25] *Damages*

[26] Munitrad cites *Bigelow v. RKO Radio Pictures, Inc.,* **327 U.S. 251**, **66 S.Ct. 574**, 90 L.Ed. 652 (1946), for the general proposition that the proof of damages required in an antitrust suit is less than that required in other civil actions. We agree. However, mere allegations will not suffice to withstand summary judgment. It is imperative that the fact of the damage causing injury be established.

[27] In its original complaint, Munitrad estimated its damages to have exceeded sixty million dollars. This projection was revised to eight to thirteen million dollars in answers to interrogatories. Finally, on the basis of calculation of its expert witness, Vincent LoCasio, Munitrad suggests that a jury could have awarded damages in the amount of six and one-half million dollars. Our review of the record, however, inexorably leads to the conclusion that Munitrad did not establish a triable issue of the *fact* of injury, or of its cause. *See Terrell v. Household Goods Carriers' Bureau,* **494 F.2d 16** (5th Cir.

1974).**[fn11]**

[28] There is a dearth of evidence that Munitrad's demise was a result of anything other than unfortunate business decisions by its management and substantial under-capitalization. The record does establish that *The Blue List Retrieval System* was in competition with Munitrad. Munitrad claims that the competition was unfair and that this occasioned its failure, but an unsubstantiated claim of this nature provides an insufficient base on which to withstand a motion for summary disposition. Legitimate competition cannot anchor an antitrust action, *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* **429 U.S. 477**, **97 S.Ct. 690**, 50 L.Ed.2d 701 (1977).

[29] Munitrad did not marshall sufficient probative evidence of the fact of its damage by virtue of the defendants' alleged antitrust violations. Further, Munitrad did not meet its burden to adduce sufficient, probative evidence of the amount of its damage. *Cf. Keener v. Sizzler Family Steak Houses,* **597 F.2d 453** (5th Cir. 1979); *Kestenbaum v. Falstaff Brewing Corp.,* **575 F.2d 564** (5th Cir. 1978), *cert. denied,* **440 U.S. 909**, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979). In short, this appears to be "one of those cases, not unfamiliar in treble-damage litigation, where injury resulting from normal business hazards is sought to be made redressable by casting the affair in antitrust terms." *Poller v. Columbia Broadcasting System, Inc.,* **368 U.S. 464**, **474**, **82 S.Ct. 486**, **491**, 7 L.Ed.2d 458 (Harlan, J., dissenting). The motion for summary judgment was entered appropriately.

[30] Having reached these conclusions, we do not address the issue of limitations.

**Page 444**

[31] The judgment of the district court is AFFIRMED.

[fn1] The action against Harries was first transferred to the Southern District of New York pursuant to **28 U.S.C. § 1406**.

[fn2] Under **28 U.S.C. § 1407**, Munitrad's claims against Standard & Poor's, The Blue List Publishing Co., and Harries were consolidated in the Northern District of Texas with *DeGolyer v. Standard & Poor's Corp.,* CA-3-76-1256-C. The appeal from the *DeGolyer* case is decided simultaneously herewith. **672 F.2d 433** (5th Cir.).

[fn3] "Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit . . . discovery to be had or may make such other order as is just." Fed.R.Civ.P. **56**(f).

[fn4] The primary market involves distribution into the hands of the public. Trading between dealers bears the secondary market appellation.

[fn5] Typically, a dealer will first attempt to market securities through its offices around the country. Issues which cannot be moved swiftly into the primary market become candidates for the secondary market.

[fn6] The defendants argue that Munitrad did not offer any response to support its conspiracy claim in the trial court and, therefore, elected to forego its section 1 allegation. A review of the record supports the defendants' position. Moreover, we

note that neither Munitrad's principal brief nor its reply brief contain argument setting forth its contentions, and accompanying reasons, with respect to a section 1 complaint, as required by Federal Rule of Appellate Procedure **28**(a)(4). Thus, this matter is considered as waived. *See Volyrakis v. M/V Isabelle,* **668 F.2d 863**, **865** n. 1 (5th Cir. 1982); *Larkin v. United Ass'n of Journeymen,* **338 F.2d 335**, (1st Cir. 1964), *cert. denied,* 380 U.S. 975, 85 S.Ct. 1337, 14 L.Ed.2d 270 (1965).

[fn7] Citing our *Solomon* decision, our colleagues of the Seventh Circuit observed in *Lupia v. Stella D'Oro Biscuit Co., Inc.,* **586 F.2d 1163**, **1167** (7th Cir. 1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979), that:

> the very nature of antitrust litigation would encourage summary disposition of such cases when permissible. Not only do antitrust trials often encompass a great deal of expensive and time consuming discovery and trial work, but also, . . . the statutory private antitrust remedy of treble damages affords a special temptation for the institution of vexatious litigation . . . . If a trial would serve no useful purpose, summary judgment is proper. *Solomon v. Houston Corrugated Box Co., Inc.,* **526 F.2d 389**, **393-94** (5th Cir. 1976).

[fn8] Relying on the Supreme Court's *du Pont* opinion, we phrased cross-elasticity of demand as "the responsiveness of the consumer to price changes among products which are reasonably interchangeable." *Spectrofuge Corp. v. Beckman Instruments, Inc.,* **575 F.2d at 277** n. 75. "Supply also has its elasticity and cross-elasticity among interchangeable products." L. Sullivan, *Handbook of the Law of Antitrust* § 16, at 58 (1977). "Cross-elasticity of supply (sometimes called supply substitutability) looks at competition from the production end instead of the consumer end . . . ." *Spectrofuge,* **575 F.2d at 280** n. 79.

[fn9] This perception is borne out by evidence which suggests that one of the reasons that *The Blue List* did not proceed immediately with a computerized operation, when it became possible from a technological standpoint, was skepticism concerning the demand for any type of a computer service, even one without the added cost of the continuous data update feature.

[fn10] Munitrad's allegations that it was driven from business because of *The Blue List Retrieval System*'s predatory pricing, indicative of monopoly power, are without evidentiary support. The harsh reality is that Munitrad's pricing scheme was instituted before *The Blue List Retrieval System* began and Munitrad's cost to its consumers was less than its' rival. That *The Blue List Retrieval System* was backed by the corporate weight of Standard & Poor's, which provided the extensive data base attractive to customers and allowed it to sustain start-up losses, does not constitute an antitrust violation.

[fn11] "The distinction between the fact of damage and the amount of damage is especially important in a case such as the one *sub judice* in which the injury to plaintiff may have been attributable to several factors, not all of which can be the basis for liability on the part of the defendant." *Terrell v. Household Goods Carriers' Bureau,* **494 F.2d at 20**. Only when the crucial causal link between the actions of the defendant and the plaintiff's damage has been demonstrated may the plaintiff "enter the more uncertain realm of evaluating the portion of the injury

that may be attributable to the defendant's wrongful conduct."
*Id.*

Copyright © 2009 Loislaw.com, Inc. All Rights Reserved