**United States 4th Circuit Court of Appeals Reports**

U.S. v. LENTZ, 524 F.3d 501 (4th Cir. 2008)

UNITED STATES of America, Plaintiff-Appellee, v. Jay E. LENTZ,

Defendant-Appellant.

No. 06-4691.

United States Court of Appeals, Fourth Circuit.

Argued: January 30, 2008.

Decided: May 12, 2008.

Appeal from the District Court, T.S. Ellis, III, Senior District Judge.

**Page 502**

[EDITORS' NOTE:  THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
**Page 503**

[EDITORS' NOTE:  THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
**Page 504**

[EDITORS' NOTE:  THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
**Page 505**

[EDITORS' NOTE:  THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
**Page 506**

**ARGUED:** Meghan Suzanne Skelton, Assistant Federal Public Defender, Office of the Federal Public Defender, Baltimore, Maryland, for Appellant. Erik Russell Barnett, Assistant United States Attorney, David Brian Goodhand, Office of the United States Attorney, Alexandria, Virginia, for Appellee. **ON BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Alexandria, Virginia, Amy L. Austin, Office of the Federal Public Defender, Richmond, Virginia, for Appellant. Chuck Rosenberg, United States Attorney, Patricia M. Haynes, Assistant United States Attorney, Eric J. Heimann, Special Assistant United States Attorney, Office of the United States Attorney, Alexandria, Virginia, for Appellee.

Before MICHAEL, TRAXLER, and KING, Circuit Judges.

Affirmed by published opinion. Judge TRAXLER wrote the opinion, in which Judge MICHAEL and Judge KING joined.

OPINION

TRAXLER, Circuit Judge:

Jay Lentz appeals his conviction for interstate kidnapping resulting in the death of his ex-wife, Doris Lentz, in violation of the Federal Kidnapping Act, **18 U.S.C.A. § 1201**(a) (West 2000 & Supp. 2007). For the following reasons, we affirm.
**Page 507**

I.

Viewed in the light most favorable to the government, the evidence adduced at trial established the following. Jay Lentz and Doris Lentz

were married in 1989, and their only daughter, Julia, was born in 1991. By all accounts, the marriage was acrimonious and the couple separated in 1993. Lentz continued to live in the marital home in Fort Washington, Maryland. Doris moved into a secured apartment building in Arlington, Virginia, where she asked the apartment manager to lock the pass key to her apartment in a safe to keep it away from Lentz and paid extra to be able to park underground.

The Lentz divorce was finalized in 1995, but disputes over the division of marital assets as well as the custody and support of Julia remained unresolved. In February 1996, Doris testified at a contempt proceeding that Lentz had been abusive and threatening to her, both verbally and physically. Doris had also told friends and acquaintances that Lentz had physically abused her in the past, that she was afraid he would try to kill her, and that he had recently threatened her in person and by telephone. Friends had also observed bruises on Doris in the past, as did a Prince George's County Police officer responding to a domestic assault call at the Lentz home in August 1991.

In March 1996, the family court ordered garnishment of Lentz's wages to meet his child support obligations. According to Lentz's coworkers, Lentz was angry when his office manager told him that the garnishment order would be immediately processed. Lentz also told two of his coworkers that he would kill Doris before he would let her have custody of Julia. In addition to child support obligations, Lentz was also ordered to pay Doris approximately $30,000, as well as half of the proceeds from the anticipated sale of the marital home and several thousand dollars in attorney fees. A follow-up hearing regarding these and other issues was scheduled for April 24, 1996.

The story of Doris's kidnapping and death begins approximately one week prior to this scheduled hearing. On Tuesday, April 16, Lentz arrived at Doris's apartment in Virginia to pick up Julia for a week-long visit with his parents in Indiana. Unbeknownst to Lentz, Doris had arranged for her friend Jennifer Rigger to secretly observe the exchange in the apartment building lobby. Ms. Rigger overheard Lentz tell Doris that Julia would be returning from Indiana on the following Tuesday, April 23. The original plan was for Lentz to take Julia to her day care in Arlington on Wednesday morning, where Doris would pick her up.

On Saturday, April 20, however, Lentz left a recorded telephone message asking Doris to pick up Julia on Tuesday night, April 23, between 7:30 p.m. and 8:00 p.m., at his home in Maryland. Lentz also volunteered to help Doris pay a babysitter on Wednesday if needed — a stark contrast to the threatening messages left by Lentz regarding financial matters on prior occasions. Doris, in turn, told several people that she was to pick up Julia on April 23, although she was surprised to have learned that Lentz had not accompanied Julia on the trip to Indiana.

On Monday, April 22, Lentz contacted his real estate agent, Ms. Diane Ives, and asked her to remove the lockbox key from the front door of his home because he was planning to do some interior painting. Ms. Ives arrived at the Lentz home the following morning, April 23, and removed the lockbox key as requested. She also changed the computer listing to alert other agents that the home was unavailable to be shown until Saturday. While at the home, Ms. Ives noticed a blue tarp in the foyer of **Page 508** the home, but no painting supplies. Lentz also arranged to temporarily stop mail delivery at the home as of April 24.

At 3:47 p.m. on the afternoon of April 23, Lentz left another recorded telephone message for Doris, telling her that he was "back now." At 6:15 p.m., Jennifer Rigger called Doris at her home and they talked for about 40 minutes. At 6:55 p.m., Doris told Ms. Rigger that she had to leave to pick up Julia at Lentz's home by 7:30 p.m. so Lentz would not be angry. Doris was never seen or heard from again.

Telephone records reveal that two three-minute telephone calls were placed from the home of Lentz's mother in Indiana to Lentz's home in Maryland at 10:09 p.m. and 10:51 p.m. on the evening of April 23. A third

six-minute call was placed from Lentz's home to his mother's home a few minutes after midnight. At 6:14 a.m. the following morning, Lentz left a recorded message on Doris's telephone, stating that he had spoken with his mother in Indiana and that Julia's flight would be rescheduled "again" from Saturday to Thursday night. However, when the message was left, Lentz and Doris were scheduled to attend the family court status hearing only hours later to discuss the ongoing issues of support and custody. The following morning, Doris did not appear at the April 24 hearing and Lentz returned home. A telephone call was placed to his home from his mother's home that morning that lasted approximately twelve minutes. Several hours later, Lentz arrived at his place of employment, disheveled and with bags under his eyes.

Airline records reveal that Lentz scheduled Julia's return flight from Indiana for Saturday, April 27. However, on Wednesday, April 24, Lentz's mother changed the reservation to reflect a return date of Thursday, April 25. No reservation was ever made for a return flight on Tuesday, April 23, as Lentz had represented to Doris both in person and by telephone.

Doris was reported missing by her employer on April 25. When interviewed by police officers on April 25 and 26, Lentz said that he last saw Doris on April 16 when he picked up Julia for the trip to Indiana, and that he last spoke to Doris on April 23, between 5:00 p.m. and 6:00 p.m., when he told Doris that Julia would be returning on Thursday evening. However, by this time Lentz had left Doris the early-morning recorded message on April 24 concerning the purported "Saturday-to-Thursday" change in Julia's flight. The government would later argue that this was an important misstep on Lentz's part; the message would have been unnecessary had Lentz already related this schedule change to Doris on Tuesday evening, as he claimed to the authorities, as well as unnecessary if he expected to see Doris a few hours later at the scheduled hearing.

On Sunday, April 28, just before midnight, Lentz left a voice mail message with the police claiming that, upon further reflection, he realized that he had last spoken with Doris at 6:50 p.m. on April 23. In the interim, a "Missing" poster distributed in Lentz's neighborhood and various news broadcasts had publicized that Doris was last heard from around 7:00 p.m. on April 23, as related by Ms. Rigger.**[fn1]**

On Saturday, April 27, the real estate agent, Ms. Ives, stopped by the Lentz home and noticed that a 1 foot x 3 foot portion of the carport pavement had been

**Page 509**

freshly painted, but that no interior painting had been done. She also observed that a piece of wallpaper had been torn from the wall facing into the living room, approximately 8-10 feet inside the home.

On Sunday, April 28, Doris's car was found in a parking lot in a high-crime area of Washington, D.C., approximately eight miles from the Lentz home and on the normal route taken by Doris between her apartment and his home. The woman who reported the abandoned car told officers that she first saw it on April 24. The doors were unlocked, the keys were on the floor, and Doris's purse was on the console in plain view, containing her driver's license, credit cards, $2.91, and a $400.00 check payable to Doris. The driver's seat had been pushed back as far as possible to accommodate a tall driver such as Lentz, who is six feet tall. Doris was just over five feet tall. The interior of the vehicle was dirty and there was mud in the trunk. The passenger seat and carpet were stained with Doris's blood, but there was no blood on the driver's side of the vehicle. Both floor mats and Julia's car seat were missing. There was also a small spot of blood on the passenger seat that matched Lentz's DNA. According to the testimony of Doris's friends, Doris purchased the car after she and Lentz separated and, because she feared him, would never have let Lentz inside her car. Adult- and child-size umbrellas were also present in the car. A friend of Doris's who had ridden in the vehicle on the evening of April 22 testified that Doris's vehicle was immaculately clean at that time and there were no umbrellas in the vehicle. There was, however, evidence that it was raining heavily on the

evening of April 23, indicating that Doris was traveling to Lentz's home to pick up Julia and took the umbrellas for her and Julia to use. Doris's body has never been found, but there is no dispute that she is dead.

On Monday, April 29, Ms. Ives returned to the Lentz home to replace the key in the lockbox. When she entered the home, she noticed that the blue tarp had been removed, but still no interior painting had been done. The small painted area in the carport, however, had expanded to more than double the previous size. In the interim, police officers watching the Lentz home had observed Lentz washing the pavement of the carport with a garden hose.

Julia's babysitter, Marilyn Sauder, testified that Lentz called her on Sunday evening and said that he told Doris that Julia was not returning on April 23 due to a ticketing mix-up and that Doris should not come, but that she came anyway. In addition, a neighbor of Lentz, Elizabeth Arneson, testified that she observed Doris's car in the Lentz driveway at 4:30 a.m. on a morning during the week that Doris disappeared. Although Ms. Arneson could only pinpoint the date as sometime between April 22 and April 26, she testified that she remembered seeing the car and thought it strange because Doris always parked on the driveway, left the car running, and waited for Julia to come out. According to Ms. Arneson, Doris told her that she did not want to be in the house alone with Lentz because she did not feel safe.

In the months following Doris's disappearance, Doris's mother visited Julia at Lentz's home and noticed that the carpet was very clean or new as compared to her previous visits. For his part, Lentz obtained a court order suspending his child support payments and the garnishment order and, upon selling the marital home, moved to Indiana.

Lentz was subsequently indicted by the grand jury for interstate kidnapping resulting in death of Doris Lentz, in violation

**Page 510**

of **18 U.S.C.A. § 1201**(a). The superseding indictment specifically charged that:

> On or about April 23, 1996, the defendant, JAY E.
> LENTZ, did knowingly, and unlawfully seize, confine,
> inveigle, decoy, kidnap and abduct and hold Doris
> Lentz to stop her from pursuing an ongoing divorce
> proceeding, and did willfully transport and cause
> Doris Lentz to be transported in interstate commerce,
> from Arlington County, Virginia, in the Eastern
> District of Virginia, to Fort Washington, Maryland,
> and the actions of JAY E. LENTZ resulted in the death
> of Doris Lentz.

J.A. 78. The case has since had an extended procedural history, both in the district court and before this court.

The first appeal to us involved an interlocutory appeal from the district court's pretrial decision to exclude hearsay statements made by Doris to friends and acquaintances about Lentz's threats to harm her. *See United States v. Lentz*, 58 Fed. Appx. 961 (4th Cir. 2003) (unpublished) ("*Lentz I*"). We affirmed by a split decision and the case proceeded to trial. *See id.*

In July 2003, a jury convicted Lentz of the charged offense and imposed a life sentence. However, the district court found that the evidence was insufficient to support the jury's conclusion that Lentz had held Doris against her will for an appreciable period of time, as required by the applicable statute, and entered a judgment of acquittal under Rule **29**(a) of the Federal Rules of Criminal Procedure. In the alternative, the district court granted Lentz a new trial because unadmitted, prejudicial information had found its way into the jury room during deliberations. On appeal, we reversed the judgment of acquittal, finding that the evidence was sufficient to support the holding element, but affirmed the grant of a new trial, and remanded for retrial. *See United States v. Lentz*, **383 F.3d 191** (4th Cir. 2004) ("*Lentz II*").

In March 2006, the case was retried before a different district judge. As before, the government's theory of the case was that Lentz planned to kill Doris while Julia was visiting his parents in Indiana in order to avoid his financial obligations to Doris and gain full custody of Julia. He scheduled Julia's flight for a return date of Saturday, April 27th, but told Doris that Julia would be returning on Tuesday, April 23rd. Doris planned to pick up Julia at the day care after work on Wednesday, April 24th. However, Lentz later called Doris and asked her to pick up Julia on the evening of April 23rd. By doing so, he tricked Doris into traveling from her home in Virginia to his home in Maryland with the false representation that Julia would be there waiting to be picked up. Upon her arrival at his home in Maryland, Lentz then lured Doris inside the home, held her against her will, and killed her. He wrapped Doris's bleeding body in the blue tarp, placed her body in her car, and drove the car to an unknown location where he disposed of the body. He then abandoned Doris's car in a high-crime area of Washington, D.C., with keys and wallet in plain view, hoping to tempt a passerby to steal the items and, thereby, manipulate the situation to look as though the person with the car and/or her wallet was the murderer and that Doris had been the victim of a carjacking and robbery.

Lentz's defense centered upon the theory that Doris was not scheduled to pick up Julia that night and never arrived in Maryland, but rather was the victim of a random carjacking and robbery. As support, the defense relied upon the fact that the police found a letter marked "hand-delivered" for Lentz inside the front door of Doris's apartment, along with items she

**Page 511**

would normally take to work in the mornings, arguing that had she intended to go to Lentz's home that evening she would have taken the letter and hand-delivered it then. As pointed out by the government, however, Doris was also scheduled to see Lentz the following morning at the family court hearing and, given her normal practice, was not likely to have sought to interact with Lentz at his home about such matters.

At the conclusion of the retrial, the newly impaneled jury again convicted Lentz and he was sentenced to life imprisonment. This appeal followed.

II.

Lentz's first challenge to his conviction arises from the claim that a supplemental jury instruction given by the district court in response to a question received from the jury during its deliberations constructively amended the indictment.

A.

The **Fifth** Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury. . . ." U.S. Const. Amend. **V**. After the indictment is "returned[,] its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, **361 U.S. 212**, **216**, **80 S.Ct. 270**, 4 L.Ed.2d 252 (1960). Thus, the "court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Id.* at 217, **80 S.Ct. 270**. If a constructive amendment is found, the error is fatal and reversible per se. *See id.* at 219, **80 S.Ct. 270**; *see also United States v. Foster*, **507 F.3d 233**, **242** (4th Cir. 2007).

"A constructive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented to the grand jury." *United States v. Floresca*, **38 F.3d 706**, **710** (4th Cir. 1994) (en banc). Constructive amendments of an indictment are regarded "as fatal variances because `the indictment is altered to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment.'" *Foster*, **507 F.3d at 242** (quoting *United States v. Randall*, **171 F.3d 195**, **203** (4th

Cir. 1999)). In *Stirone*, for example, the Supreme Court held that a constructive amendment had occurred because the indictment charged the defendant with unlawfully interfering with interstate commerce in violation of the Hobbs Act based upon the defendant's interference with sand shipments, but the district court instructed that it could also convict based upon evidence allowed regarding future interstate steel shipments. *See Stirone*, **361 U.S. at 219**, **80 S.Ct. 270**. Thus, the defendant was tried and convicted of a charge not contained in the indictment and of which there was no notice.

Similarly, in *Floresca*, we held that a constructive amendment had occurred where the defendant was charged with violating a specific subsection of the criminal statute at issue, but the jury was instructed that it could convict if it found the defendant guilty under a different subsection of the statute. The court's instruction "was more than just a misstatement of the law applicable to the indicted offense; it stated a distinct, unindicted offense." *Floresca*, **38 F.3d at 710** (footnote omitted). And, in *Randall*, we found a constructive amendment where the indictment charged that the defendant carried a gun while

**Page 512**

distributing illegal drugs, but the jury was instructed that it could convict if it found that the defendant carried a gun based upon the uncharged predicate offense of possession with intent to distribute. *See Randall*, **171 F.3d at 210**. Again, the crime of conviction was different from the crime of indictment.

B.

Here, Lentz was indicted for kidnapping resulting in death, in violation of § 1201(a), which required the government to prove as essential elements: (1) that the victim was seized, confined, inveigled, decoyed, kidnapped, abducted or carried away; (2) that the victim was held; (3) that the victim was transported interstate; and (4) that death resulted. *See Lentz II*, **383 F.3d at 199**; *see also United States v. Higgs*, **353 F.3d 281**, **313** (4th Cir. 2003). With regard to the third element, the language of the superceding indictment charged that Lentz "did willfully transport and cause Doris Lentz to be transported in interstate commerce, *from Arlington County, Virginia . . . to Fort Washington, Maryland[,]*" J.A. 78 (emphasis added), a theory of the case that the government has steadfastly pursued.

At the conclusion of the evidence, the district court read the charge as specifically indicted to the jury, including the allegation that Lentz had transported Doris in interstate commerce from Virginia to Maryland. The court also read the text of § 1201(a), and provided a recitation of the elements the government was required to prove beyond a reasonable doubt to convict. In providing instruction on the element of "interstate commerce," the district court defined the term as "commerce or travel *between one state and another state*" and advised that "a person is transported in interstate commerce whenever that person moves or travels *across state lines*" or moves or travels *from one state to another state*." J.A. 2985 (emphasis added). The district court, however, neglected to inform the jury that the District of Columbia is considered a state for purposes of such movement "across state lines".

Lentz's constructive amendment claim arises from a supplemental instruction that was given after some confusion arose on the part of the jury regarding the "interstate commerce" element of the offense. During its deliberations, the jury returned the following question to the court:

"Does Doris's car moving from VA to DC constitute the legal requirements of interstate commerce *since the Dist[rict] of Columbia is not a state?*"

J.A. 3001 (emphasis added).

Because the District of Columbia is, by statute, considered the same as a state for purposes of interstate commerce, the district court proposed to simply answer the question affirmatively. *See* **18 U.S.C.A. § 10** (West

2000) ("The term `interstate commerce', as used in [Title 18], includes
commerce between one State, Territory, Possession, or the District of
Columbia and another State, Territory, Possession, or the District of
Columbia."). The defense agreed that the kidnapping offense does not
require proof of a specific route allegation and that the District of
Columbia is considered a state for purposes of interstate commerce.
However, the defense argued that because the indictment charged
"interstate commerce, from Arlington County, Virginia . . . to Fort
Washington, Maryland," J.A. 78, the government was required to prove that
Lentz willfully caused Doris to be transported in interstate commerce
directly from Virginia to Maryland, *i.e.*, "across state lines" or "from
state to state" specifically. The defense also argued that the
supplemental instruction would constructively amend the

**Page 513**

kidnapping charge because it would allow the jury to convict Lentz even
if it believed that Doris traveled only from Virginia to the District of
Columbia, without ever entering the state of Maryland.

   The government took a more pragmatic view of the question, pointing out
that because the evidence at trial had demonstrated that Doris likely
traveled from her home in Virginia to Lentz's home in Maryland *through*
the District of Columbia, the jury was simply unsure of what effect, if
any, that route would have "since the Dist[rict] of Columbia is not a
state." J.A. 3001. Accordingly, the government requested that the
district court either answer the question "yes," or specifically instruct
the jury, in accordance with **18 U.S.C.A. § 10**, that the District of
Columbia is considered a state for purposes of interstate travel.

   Having heard the respective arguments, the district court opted to
provide the jury with a supplemental instruction reiterating that the
government must prove interstate commerce and repeating the original
instructions given with regard to that element, including that
transportation in interstate commerce is satisfied "whenever that person
moves or travels across state lines or moves or travels from one state to
another state." J.A. 3024. The court then clarified the definition of
interstate commerce in accordance with the statute, adding that:

  [W]here I said that "commerce" or "interstate
  commerce" means commerce or travel between one state
  or another, I tell you further now that "interstate
  commerce" as used here includes commerce between one
  state, territory, possession or the District of
  Columbia and another state, territory, possession or
  the District of Columbia.

J.A. 3025. The court further instructed the jury that it should consider
the supplemental instruction "together with all of the other instructions
that I have previously given you," J.A. 3027, and dismissed the jury for
further deliberations.

                                C.

   The key inquiry in this appeal is to determine whether the supplemental
instruction resulted in the crime of conviction differing from the crime
charged in the indictment. *See Foster*, **507 F.3d at 242-43**. We are
satisfied that it did not.

   To the extent Lentz continues to argue that the language of the
indictment required proof of travel *directly* from Virginia to Maryland,
by a route that avoided the District of Columbia, we reject such a narrow
reading. *See United States v. Brown*, **330 F.3d 1073**, **1078** (8th Cir. 2003)
(finding no variance in indictment charging interstate kidnapping from
Texas to Arkansas because it "reasonably encompassed a route passing
through Oklahoma" and, "in any event, . . . fully and fairly apprised"
the defendant of the charges against him). Here, the indictment charged
that Doris traveled from Arlington, Virginia, where her home was
located, to Fort Washington, Maryland, where Lentz's home was located,
but does not allege or require that the path of travel encompass a direct
crossing of the Virginia/Maryland line.

Lentz's claim that the indictment was constructively amended because the supplemental instruction advised the jury that it could convict if it believed that Doris only traveled from Virginia into the District of Columbia, where she was abducted, held, and ultimately killed, is not supported by the language of the supplemental instruction given. Even if we assume that such an instruction would constitute a constructive amendment, a point we need not decide, the district court did

**Page 514**

not instruct the jury that it could convict if it found that Doris only traveled from Virginia to the District of Columbia or that the jury need not find that Doris ever traversed the Maryland border at all. The jury was instructed that the indictment charged travel from Virginia to Maryland, and that "a person is transported in interstate commerce whenever that person moves or travels *across state lines* or moves or travels *from one state to another state*." J.A. 2985 (emphasis added). The supplemental instruction clarified the district court's earlier instruction with a more accurate definition of "interstate commerce," advising that travel across "state lines" for purposes of interstate commerce includes travel encompassing the District of Columbia and eliminating any confusion over whether Doris had to have moved or traveled *directly* across a purely state-to-state border. At no point, however, did the trial court vary the terms of the indictment as read to the jury, change the elements of the kidnapping offense charged, instruct the jury that it could convict on the kidnapping charge if it found that Doris never arrived in Maryland, or otherwise instruct the jury that it could convict based upon a set of facts different from those set forth in the indictment as read. On the contrary, the district court instructed the jury that it must consider the supplemental instruction on interstate commerce in conjunction with those given previously, which would include the reading of the charge precisely as indicted.

This brings us to Lentz's actual claim, which is that the supplemental instruction *could have* been interpreted by the jury as license to convict Lentz of kidnapping if the jury believed that Lentz only tricked Doris into traveling from Virginia into the District of Columbia. However, when the indictment, evidence, instructions, and arguments are viewed in their totality, the belief that the jury would have interpreted the supplemental instruction in such a fashion is too implausible a basis upon which to rest a determination of constructive amendment.

First, Lentz's argument is grounded in the initial speculation that the jury had rejected the government's theory of the kidnapping and arrived instead at an alternative theory that was unsubstantiated by evidence, never alluded to in argument, and not mentioned in the instructions. We find this far-fetched at best. The government's evidence revealed that Doris left her home immediately after telling a friend that she was leaving for Lentz's home in Maryland to pick up Julia, an intention fully consistent with the recorded messages left by Lentz on Doris's telephone and statements Doris had made to others about her plans. Testimony from Lentz's realtor, neighbor, and baby-sitter indicated that Doris arrived at Lentz's home as planned, and that she was held and murdered there. The government's theory and argument about how the crime occurred has never wavered and there is nothing in the record upon which the jury could have rested a belief that Lentz instead tricked Doris into meeting him somewhere in the District of Columbia, where he abducted, held, and murdered her.

We likewise find no indication from the language of the jury's question that it had arrived at such an unsubstantiated version of the facts. For example, the jury did not inquire as to whether Doris's car moving from Virginia to the District of Columbia would alone suffice to convict of the indicted offense or whether it must find that Doris arrived at Lentz's home in order to convict. Rather, the jury inquired as to whether Doris's car moving from Virginia to the District of Columbia would meet "the legal requirements of interstate commerce

**Page 515**

*since the Dist[rict] of Columbia is not a state*." J.A. 3001 (emphasis added).

We think it far more likely that the jury's question was born not from

the jury's decision to pursue an unsubstantiated and unargued theory of how and where Lentz killed Doris, but rather from the fact that it had been presented with evidence that Doris's route of travel from Virginia to Maryland involved an intervening crossing of the District of Columbia borders with those states *and* that the jury was paying attention to the instruction on interstate commerce, which by its literal terms, required travel "across state lines" or "from one state to another state."**[fn2]** J.A. 2985. Thus, contrary to Lentz's claim on appeal, the jury's question does not indicate that it had concocted a version of the facts which involved Lentz tricking Doris into traveling from her home in Virginia to the District of Columbia, where he abducted and killed her, but rather that it was concerned, given the prior instruction on "interstate commerce," that Doris's travel from Virginia, *through* the District of Columbia, to Maryland (which was supported by the evidence) might not meet "the legal requirements of interstate commerce since the Dist[rict] of Columbia is not a state." J.A. 3001. The jury was correctly informed by the district court that Lentz was charged with "willfully transport[ing] and caus[ing] Doris Lentz to be transported in interstate commerce from Arlington County, Virginia . . . to Fort Washington, Maryland," J.A. 78, and that the District of Columbia may be considered a state when evaluating interstate travel. The evidence and arguments of the government were fully consistent with the charge set forth in the indictment. And, while the district court's initial definition of "interstate commerce" in conjunction with the testimony regarding Doris's normal route to Lentz's home through the District of Columbia, lent itself to some confusion as to whether the "interstate commerce" requirement had been met as initially defined, the supplemental instruction remedied any such confusion.

To conclude, we fail to see how the district court's narrow, supplemental instruction could have been reasonably interpreted by the jury as license to convict Lentz based upon a set of facts for which no evidence or argument was offered. And we see no reason to believe that the jury did not understand the specifics of the indicted offense, or that it failed to follow the instructions as given. Because we are satisfied that the supplemental instruction did not result in the jury convicting Lentz "of a crime other than that charged in the indictment," *Randall*, **171 F.3d at 203** (internal

**Page 516**

quotation marks omitted), Lentz is not entitled to relief from his conviction on this basis.

III.

Lentz next raises a series of challenges to the district court's denial of his pretrial motions to suppress testimony of a fellow inmate about a murder-for-hire plot pursued by Lentz while he was awaiting retrial on the kidnapping charge, as well as recorded conversations he had with his defense counsel about the plot.

A.

The murder-for-hire plot was first brought to the attention of the district court on May 19, 2005, when the government filed an *ex parte* pleading advising that Christopher Jackmon, a former inmate with Lentz at the Northern Neck Regional Jail (NNRJ), had come forward and disclosed that Lentz was pursing a plot to kill certain witnesses and one or both of the prosecutors who had been involved in Lentz's first trial. While an independent team of prosecutors and agents were investigating the allegation, Lentz abruptly cancelled a scheduled meeting with a government agent who had intended to pose as a hit man recommended by Jackmon to Lentz. When Jackmon notified the authorities that this was done immediately after Lentz spoke with his defense counsel, Frank Salvato, by telephone, the authorities made arrangements to obtain recordings of the conversations from the NNRJ, which, for security reasons, routinely records all outgoing telephone calls made by its inmates. In the *ex parte* filing, the government sought to disclose the substance of the recorded telephone conversations, which included a discussion about the murder-for-hire plot, to the prosecutors and investigators involved in the kidnapping prosecution.**[fn3]** Following a

hearing, the district court ruled that the government must share the motion with the defense and allow them an opportunity to investigate the matter. Lentz, in turn, filed motions to suppress all statements and derivative evidence resulting from his conversations with Jackmon, including the recorded telephone conversations he had with Salvato.

The district court thereafter conducted a three-day evidentiary hearing into the matter and issued two separate and comprehensive opinions, granting in part and denying in part Lentz's motion to suppress the testimony of Jackmon regarding his conversations with Lentz, *see United States v. Lentz*, **419 F.Supp.2d 794** (E.D.Va. 2005), and denying Lentz's motion to suppress the evidence of his telephone conversations with Salvato, *see United States v. Lentz*, **419 F.Supp.2d 820** (E.D.Va. 2005).

B.

The factual findings of the district court pertaining to Lentz's conversations with
**Page 517**
Jackmon and Salvato about the murder-for-hire plot are exhaustively set forth in the district court's published opinions. For our purposes, an abbreviated version of the most salient points will suffice.

In November 2004, Jackmon was serving a 245-month sentence arising out of a drug trafficking and supervised release violation and had been transferred on a writ by AUSA Jonathan Fahey to the NNRJ for a debriefing in an unrelated investigation of drug trafficking. Upon his arrival, Jackmon was assigned to the same housing unit ("C Pod") of the NNRJ as Lentz, who was awaiting retrial on the kidnapping charges, and the two men struck up a conversation. The district court found that "Jackmon was not transferred to NNRJ to act as an agent for the government in connection with the *Lentz* case. Nor was Jackmon placed in Lentz's pod at the government's behest, direction, or influence; the proximity of the two was wholly a matter of coincidence." *Lentz*, **419 F.Supp.2d at 801**. Jackmon was, however, an experienced jailhouse informant and, given the lengthy sentence he was facing, he was hopeful that Lentz might volunteer information to him about the kidnapping charge. His hopes were realized shortly thereafter.

On November 19, 2004, Jackmon was debriefed in the unrelated drug trafficking matter and told his lawyer that he had acquired information about the Lentz case. Jackmon's lawyer passed this information to AUSA Steve Mellin, who was the prosecutor in the Lentz case at the time, but it was met with little interest. AUSA Mellin initially declined to meet with Jackmon, and nothing was said or done to imply that the government was particularly interested in what Jackmon had to say or that the government was interested in Jackmon obtaining any information from Lentz. Although Jackmon's counsel apparently conveyed to Jackmon that he might be rewarded for obtaining information or creating a conflict for Lentz's counsel (who had represented Jackmon in the past), and Jackmon made exaggerated statements to his family that he would be obtaining information about the Lentz case for the government, the district court found no evidence that any government agent had encouraged Jackmon to do any of these things.

Undeterred, Jackmon continued his efforts to obtain a meeting with AUSA Mellin about Lentz's case. Jackmon's efforts were successful, and he met with AUSA Mellin and FBI Special Agent Bradley Garrett on December 2 and December 16. During the meetings, Jackmon told the authorities that Lentz had referred to Doris as a "bitch" and "high-priced whore," had been involved in two altercations with her, and said he could not control his anger towards her. In addition, Lentz said that he had made a mistake by forgetting to pull up the car seat in Doris's car to adjust it to her shorter height after he drove it on the night of the murder and by failing to use bleach on the blood in the car. Jackmon also related that Lentz had lowered his head and turned red when the Scott Peterson verdict was announced. According to the district court's findings:

   [Agent] Garrett and AUSA Mellin listened to the
   information Jackmon provided and gave him two

instructions. First, they instructed Jackmon that he
should be only a "listening post." In other words,
Jackmon was told that he should not directly solicit
any information from Lentz or ask questions about
Lentz's case. Yet, if Lentz wished to speak about his
case, without prompting from Jackmon, Jackmon
certainly was free to listen. And Jackmon could report
that information back to the government, but he was
not instructed that

**Page 518**

he was under an obligation to do so. The instruction
to be a listening post was repeated two or three times
to ensure that Jackmon understood. Second, Agent
Garrett told Jackmon that he could "personalize" the
conversation. In other words, he could talk with Lentz
about "subjects of common interest" — *e.g.*, family,
children, or the difficulties of being locked-up — but
he could not engage Lentz in any conversations about
his case.

*Id.* at 804-05. The district court further found that "AUSA Mellin made no
promises of leniency to Jackmon in exchange for the information tendered"
and "[a]ny `hope' Jackmon had of a reduction of his lengthy sentence in
exchange for information he might be able to provide in the *Lentz* case
was not encouraged by the government and entirely the product of
Jackmon's own optimistic hope." *Id.* at 805. Indeed, after the second
meeting with Jackmon, AUSA Mellin "had no intention of calling Jackmon to
testify in the *Lentz* case" and "gave Jackmon no assurances that he would
be used in Lentz's retrial." *Id.*

  On December 29, 2004, however, the conversations between Lentz and
Jackmon took a serious turn to the alleged plot to kill witnesses that
had testified against Lentz at his first trial and one or more of the
prosecutors involved. According to Jackmon,

  Lentz approached him and told him that his trial was
  being continued . . . because his attorney, Mr.
  Salvato, was also involved in a trial for the murder
  of a female government witness that conflicted with
  the trial schedule originally set in his case. When
  Jackmon expressed disapproval of an attempt to murder
  a witness, saying the situation was "f_____ up," Lentz
  disagreed, saying "this is combat." Lentz, who
  mistakenly believed that Jackmon had not yet been
  convicted, asked Jackmon if he would pay $10,000 to
  have a key witness killed if he could avoid his twenty
  year sentence. Jackmon responded that "crack-heads"
  would kill a witness for as little as $2,000 or
  $3,000. When Lentz heard this, he responded, "I wish I
  had known that a few years back."

*Id.* at 808-09. Lentz expressed a specific interest in killing Julia's
babysitter, Marilyn Sauder, who had testified that Lentz told her Doris
had come to see him on the night she disappeared, and George Stevens, who
had testified that Doris had asked him to accompany her to pick up Julia
on one occasion because she was afraid Lentz might hurt her. Lentz asked
Jackmon if he knew someone who could help him and Jackmon offered to
contact a person named "Mike." Lentz assured Jackmon that the murders
could not be traced back to them because their incarceration would give
them "plausible deniability" and, at Jackmon's request, wrote the
definition of "plausible deniability" on a piece of paper that Jackmon
later turned over to the authorities. J.A. 3100.

  On December 30, 2004, Jackmon called Agent Garrett and advised him that
Lentz was attempting to arrange the murders and had asked him for the
name of someone who might do the job. This got Agent Garrett's attention
and he told Jackmon to get "as much detail as you can get" and
"suggest[ed] that Lentz could even end up telling Jackmon where he dumped
Doris's body." *Lentz*, **419 F.Supp.2d at 810** (internal quotation marks
omitted).

Over the course of the next week, Jackmon and Lentz had several
follow-up conversations about the murder-for-hire plot. Jackmon told
Lentz that he had arranged for "Mike" to meet with Lentz at the jail and
Lentz related to Jackmon his developing thoughts about the best way to
proceed.

**Page 519**

Lentz also told Jackmon that he had decided to merely threaten Marilyn
Sauder (the babysitter) and to murder Diane Ives (the real estate agent)
and a prosecutor instead, going so far as to offer descriptions of how
this might be accomplished. Lentz also gave Jackmon a note containing
personal information about Ives, which Jackmon turned over to the
authorities. Also during this time period, Lentz arrived at the mistaken
belief, based upon a newspaper article about a murder in Springfield
(where Jackmon was from), that Jackmon had arranged to murder a witness
in his own case. In the meantime, the government made arrangements to
send an undercover agent to pose as the hit man "Mike" and meet with
Lentz at the jail.

On January 10, 2005, however, Lentz placed a series of three collect
calls to Salvato, his attorney, between 9:39 a.m. and 10:26 a.m., during
which he discussed the plot. As noted earlier, the NNRJ records all
telephone calls placed by inmates. With the exception of calls placed to
the Federal Public Defender's Office, a recorded message is played before
each call stating that the call is subject to monitoring and recording.
When the recipient of the call answers, a second recording is played
stating that the call is from a correctional facility and is subject to
monitoring and recording.

The substance of the recorded conversations between Lentz and Salvato
is set forth in detail in the district court's opinion. By way of
summary, Lentz called Salvato to ask questions designed to determine
"whether Jackmon could be trusted regarding Lentz's possible use of a hit
man to murder witnesses and perhaps a prosecutor prior to his forthcoming
retrial." *Lentz*, **419 F.Supp.2d at 825**. When Salvato pressed Lentz about
the reasons for his inquiry, Lentz confessed that Jackmon might be able
to help Lentz hire a hit man "in case Lentz needed something like that to
happen in his case." *Id.* at 824 (internal quotation marks and alterations
omitted).

Salvato, who knew Jackmon and his reputation as an informant, was
clearly upset by Lentz's activities and asked Lentz if he was serious.
Lentz assured him that he was serious, replying that "he was sitting in
the bowels of hell, that he was at the end of his rope, and that he's
gotta do what he's gotta do to survive." *Id.* at 824-25 (internal
quotation marks and alterations omitted). Salvato warned Lentz that
Jackmon was setting him up and advised Lentz to immediately cease contact
with Jackmon and cancel the scheduled meeting with the "hit man," who
Salvato warned would be a federal agent. When Salvato warned Lentz that
"this is going to end up destroying you at trial," Lentz responded, "Like
the babysitter and the real estate lady and some of that shit didn't?"
J.A. 1058. Although Lentz was initially reluctant to abandon his plan, he
ultimately relented and cancelled the scheduled meeting with the "hit
man" shortly after speaking with Salvato.

C.

We begin with Lentz's challenge to the district court's ruling on his
motion to suppress Jackmon's testimony regarding the murder-for-hire
plot, as well as the "plausible deniability" note, which the government
sought to introduce as evidence of Lentz's consciousness of guilt. *See
United States v. Young*, **248 F.3d 260**, **272** (4th Cir. 2001) ("[E]vidence of
witness intimidation is admissible to prove consciousness of guilt if it
is both related to the offense charged and reliable."); *United States v.
Van Metre*, **150 F.3d 339**, **352** (4th Cir. 1998) ("A defendant's attempt to
threaten an adverse witness indicates his consciousness that his case is
a weak or unfounded

**Page 520**

one; and from that consciousness may be inferred the fact itself of the
cause's lack of truth and merit." (internal quotation marks omitted)).
Lentz asserts that introduction of the evidence of his conversations with

Jackmon violated his **Sixth** Amendment right to counsel because Jackmon deliberately elicited the incriminating statements from him while acting as an agent for the government. We review the district court's underlying factual findings regarding the motions to suppress for clear error and its legal conclusions de novo. *See United States v. Seidman*, **156 F.3d 542**, **547** (4th Cir. 1998).

In *Massiah v. United States*, the Supreme Court held that a defendant's **Sixth** Amendment right to counsel is violated when the government "deliberately elicit[s]" incriminating evidence from an accused "after he hat[s] been indicted and in the absence of his counsel," and introduces those statements against him at trial. **377 U.S. 201**, **206**, **84 S.Ct. 1199**, 12 L.Ed.2d 246 (1964); *see also United States v. Henry*, **447 U.S. 264**, **270-71**, **100 S.Ct. 2183**, 65 L.Ed.2d 115 (1980) (holding that the use of testimony by a fellow inmate who is a paid informant acting under the instructions of government agents violates the **Sixth** Amendment right to counsel). "However, `the mere presence of a jail-house informant who had been instructed to overhear conversations and to engage a criminal defendant in some conversations [is] not necessarily . . . unconstitutional.'" *Harker v. Maryland*, **800 F.2d 437**, **444-45** (4th Cir. 1986) (quoting *Henry*, **447 U.S. at 276**, **100 S.Ct. 2183** (Powell, J. concurring)). The court must look at all of the circumstances to determine whether the informant's actions are "fairly `attributable to the government.'" *Thomas v. Cox*, **708 F.2d 132**, **136** (4th Cir. 1983) (quoting *Henry*, **447 U.S. at 270**, **100 S.Ct. 2183**).

Here, the district court allowed the government to introduce Lentz's statements and the note Lentz gave to Jackmon prior to December 30, 2004 (which included their initial conversation about the murder-for-hire plot), but excluded all statements and the note Lentz gave to Jackmon on and after December 30, 2004. At the conclusion of the evidentiary hearing, the district court found that:

> the government did not initiate the contact with Lentz. Jackmon's placement in C Pod was purely a matter of happenstance and was not at the direction or prompting of the government. Further, once Jackmon was placed in C Pod, the government did not instruct Jackmon to strike up conversations with Lentz; at the outset, Lentz clearly volunteered information about the facts of his case and Jackmon began collecting this information on his own initiative. Indeed, AUSA Mellin and [Agent] Garrett did not even know that Jackmon had been brought to the Eastern District of Virginia by AUSA Fahey. Nor was Jackmon ever offered any form of payment, whether in the form of monetary reward or a reduction in sentence, in exchange for collecting information about Lentz.

*Lentz*, **419 F.Supp.2d at 812**. Thus, the district court found that Jackmon was not a government agent prior to his meeting with AUSA Mellin and Agent Garrett.

The district court then examined the two meetings granted to Jackmon by AUSA Mellin and Agent Garrett in early December and found insufficient evidence that the instructions Jackmon received in those meetings rendered him a government agent thereafter. Until December 30, the district court found, Jackmon had simply been told that he could act as a "listening post" and personalize conversations with Lentz by bringing up matters of common interest, but that he could not bring up or

**Page 521**

otherwise elicit information about Lentz's kidnapping case. *See Harker*, **800 F.2d at 444-45** (holding that fellow inmate was not acting as a government agent as he was not paid, was not acting under the instructions or solicitations of the government, was responding to a general request for information, and was given no promises); *Thomas*, **708 F.2d at 133** (holding that there was no agency relationship where the fellow inmate initiated the contact with the authorities and was advised "to listen for but not elicit information").

With regard to statements and information gained *after* Jackmon alerted Agent Garrett to the murder-for-hire scheme on December 30, however, the district court found that the relationship between Jackmon and the government changed as of that conversation. Agent Garrett advised Jackmon that he should get as much information as he could about the murder-for-hire plot and suggested that Jackmon might learn where Doris's body was located. These instructions, the district court held, had the effect of making Jackmon a government agent, rendering "Jackmon's attempts to elicit information from Lentz . . . fairly attribut[able] to the government" and, therefore, inadmissible at trial. *Lentz*, **419 F.Supp.2d at 815**.

On appeal, Lentz argues that the district court should have also excluded the conversations that occurred prior to December 30. Having reviewed the record, we find no clear error in the district court's findings of fact and agree with its conclusions of law regarding the admissibility of this evidence. The instructions AUSA Mellin and Agent Garrett gave to Jackmon prior to December 30 did not render Jackmon a government agent or make his activities fairly attributable to the government. Although Jackmon was finally granted an audience with the authorities involved in the Lentz case, he was specifically advised on two separate occasions that he could only be a listening post and must not elicit information about Lentz's kidnapping case. AUSA Mellin made no promises, expected nothing, and had no intention of using Jackmon at the retrial. Nor did the authorities take any steps to place Jackmon in closer proximity to Lentz in the hopes of obtaining more or better incriminating evidence. At best, Jackmon had been an informant for the government in prior unrelated cases and hoped to be the same for the Lentz case, but there was no showing "that such cooperation extended in any manner to the investigation" of Lentz, rendering his prior actions irrelevant to the question of whether he was acting as such with regard to Lentz. *See United States v. Love*, **134 F.3d 595**, **604** (4th Cir. 1998); *cf. United States v. Birbal*, **113 F.3d 342**, **346** (2d Cir. 1997) (rejecting argument that plea agreement, which required informant to provide the government with any information in his possession relating to criminal activity, made him a "roving" government agent for other cases). The district court also found as a factual matter that Jackmon did not deliberately elicit incriminating statements from Lentz prior to December 30, a finding that we also cannot say was clearly erroneous based upon the record. Accordingly, we affirm the district court's decision denying Lentz's motion to exclude Jackmon's testimony regarding the conversations the two men had prior to December 30 and the "plausible deniability" note that Lentz gave to Jackmon prior to that date.

D.

We next turn to the district court's denial of Lentz's motion to suppress the recorded telephone conversations between Lentz and Salvato. Lentz asserts that this evidence should have been excluded because
<span style="color:red">**Page 522**</span>
it was derived from the *Massiah* violation and because it was a protected attorney-client communication. In the alternative, Lentz argues that the district court abused its discretion in refusing to exclude the evidence as unduly prejudicial and, barring that, in failing to include additional excerpts from the recordings under the rule of completeness.

1.

We begin with Lentz's claim that the district court erred in admitting the recordings because they are derivative evidence, or fruit of the poisonous tree, obtained as a result of the discussions Jackmon had with Lentz about the murder-for-hire plot while acting as a government agent. We review the district court's factual findings for clear error and its application of the "fruit of the poisonous tree" doctrine *de novo*, viewing the evidence in the light most favorable to the prevailing party below. *See United States v. Najjar*, **300 F.3d 466**, **476** (4th Cir. 2002).

Derivative evidence, or "fruit of the poisonous tree" is evidence that "has been come at by exploitation of [an] illegality . . . instead [of] means sufficiently distinguishable to be purged of the primary taint."

*Wong Sun v. United States*, **371 U.S. 471**, **488**, **83 S.Ct. 407**, 9 L.Ed.2d 441 (1963) (internal quotation marks omitted). Thus, evidence "need [not] be suppressed if it is somehow attenuated enough from the violation to dissipate the taint." *Najjar*, **300 F.3d at 477**. There is no "`per se' or `but for' rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with [the constitutional violation]." *United States v. Ceccolini*, **435 U.S. 268**, **276**, **98 S.Ct. 1054**, 55 L.Ed.2d 268 (1978) (internal quotation marks omitted).

> [A] direct, unbroken chain of causation is necessary, but not sufficient to render derivative evidence inadmissible. To determine whether the fruit is no longer poisonous, we consider several factors, including: 1) the amount of time between the illegal action and the acquisition of the evidence; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct. What suffices to dissipate the taint from derivative evidence depends on the specific facts and circumstances of each case and therefore, is particularly amenable to resolution by the district court.

*Najjar*, **300 F.3d at 477** (internal citations omitted); *see also United States v. Gray*, **491 F.3d 138**, **155** (4th Cir. 2007).

As noted above, Lentz initially approached Jackmon about the murder-for-hire plot on December 29, 2004, *before* Jackmon began to act as a government agent. Statements elicited by Jackmon from Lentz after December 29, 2004, were suppressed because he had been given license to do so by Agent Garrett when advised of the plot. It was at this point that the government, concerned not only about the kidnapping case, was presented with the separate duty of investigating new and ongoing criminal activity. Obviously, the government was not precluded from investigating the new criminal activity or otherwise acting to protect its intended victims, but because Agent Garrett instructed Jackmon to learn as much as he could, statements made by Lentz to Jackmon about the plot thereafter were not admissible in his kidnapping retrial.

As the district court found, however, there is "no record evidence . . . to suggest that Jackmon deliberately elicited the statements [that Lentz made to Salvato];

**Page 523**

rather, the evidence convincingly reflects that Lentz made the statements freely and voluntarily." *Lentz*, **419 F.Supp.2d at 832-33**. Nor did Jackmon do anything to encourage Lentz to involve his attorney in the discussions. On the contrary, Lentz contacted Salvato on his own accord and brought up the murder-for-hire plot for the purpose of pursuing his plan to meet with the hit man and arrange the murders; again, a plan that was hatched by Lentz prior to Jackmon becoming an agent for the government. Lentz had sufficient opportunity "to consider carefully and objectively his options and to exercise his free will" in this regard, *Taylor v. Alabama*, **457 U.S. 687**, **691**, **102 S.Ct. 2664**, 73 L.Ed.2d 314 (1982); *see Seidman*, **156 F.3d at 553** (Michael, J., concurring), and he did so voluntarily and without guidance, suggestion, or interference from Jackmon or any other government agent.

To thwart the impact of the obviously voluntary nature of Lentz's telephone calls to Salvato, Lentz presses on appeal an interpretation of the recordings that characterizes his contact as an attempt to seek "the advice of his attorney about how to proceed in the face of Jackmon's unsolicited meddling." *Lentz*, **419 F.Supp.2d at 833**. However, this argument was rejected by the district court as "flatly contradicted by the contents of the telephone calls," *id.*, a finding that is not clearly erroneous. Like the district court, we are satisfied that Lentz's statements to Salvato were not "come at by exploitation of the government's instructions to Jackmon in the murder-for-hire investigation, but rather "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, **371 U.S. at 488**, **83 S.Ct. 407**

(internal quotation marks omitted). Accordingly, we affirm the district court's determination that the conversations between Lentz and Salvato were not inadmissible as evidence improperly derived from the **Sixth** Amendment *Massiah* violation.

2.

Lentz next claims that the district court erred in ruling that the recorded conversations were not protected by the attorney-client privilege. We review the district court's underlying factual findings for clear error and its legal conclusions de novo. *See In re Grand Jury Subpoena*, **341 F.3d 331**, **334** (4th Cir. 2003).

It is [a] well-settled [principle of law] that confidential conversations between a defendant and his counsel generally are protected by the attorney-client privilege, which affords the communications "complete protection from disclosure." *Id.* at 335 (internal quotation marks omitted). However,

> [t]he privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Id.* (quoting *United States v. Jones*, **696 F.2d 1069**, **1072** (4th Cir. 1982) (per curiam)).

In this case, the district court held that Lentz had waived any attorney-client privilege with regard to the communications because he knew they were being recorded and were subject to monitoring by the
<span style="color:red">**Page 524**</span>
NNRJ, destroying any reasonable expectation of privacy in their substance. *See Hawkins v. Stables*, **148 F.3d 379**, **384** n. 4 (4th Cir. 1998) ("[I]mplied waiver occurs when the party claiming the privilege has made any disclosure of a confidential communication to any individual who is not embraced by the privilege."); *Jones*, **696 F.2d at 1072** ("Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege."). With one exception not applicable here, the district court found that "[t]he record convincingly establishes that during the period in question, all outgoing telephone calls from NNRJ were recorded and subject to monitoring by jail officials and that Lentz and his counsel knew this was so." *Lentz*, **419 F.Supp.2d at 823-24**. Relying primarily upon the Eighth Circuit decision in *United States v. Hatcher*, **323 F.3d 666** (8th Cir. 2003), the district court then concluded that this resulted in the destruction of any privilege that would otherwise have existed. *See Lentz*, **419 F.Supp.2d at 828-29**; *Hatcher*, **323 F.3d at 674** (holding that "[t]he presence of [a] prison recording device destroyed the attorney-client privilege . . . [b]ecause the inmates and their lawyers were aware that their conversations were being recorded [and] could not reasonably expect that their conversations would remain private"). In the alternative, the district court found that the crime-fraud exception to the attorney-client privilege applied to the conversation because the primary purpose of the telephone conversations was not to seek legitimate counsel, but rather to corroborate Jackmon's representations and further Lentz's murder-for-hire plot.

On appeal, Lentz encourages us to reject the reasoning of the district court, and the Eighth Circuit decision in *Hatcher*, arguing that the geographical and practical restrictions upon an inmate's ability to speak

privately with his attorney from jail should counsel against a finding
that mere notice that the calls would be recorded constitutes a waiver of
the privilege. However, we need not decide this question because we are
satisfied that, under the crime-fraud exception, the privilege does not
apply in the first instance.

  As found by the district court, the telephone conversations initiated
by Lentz were designed not for the purpose of seeking legitimate counsel
with regard to his current legal situation, but rather to determine
"whether Jackmon could be trusted regarding Lentz's possible use of a hit
man to murder witnesses and perhaps a prosecutor prior to his forthcoming
retrial." *Lentz*, **419 F.Supp.2d at 825**. The conversations therefore
"invite[d] the inference that Lentz was seriously considering a
murder-for-hire plot, and was calling Mr. Salvato to inquire about
Jackmon's reliability with respect to information Jackmon had provided
Lentz about his own case." *Id.* As found by the district court,

>  the contents of the telephone calls, viewed as a
>  whole, leave no doubt that Lentz's primary purpose in
>  calling Mr. Salvato was to discuss Lentz's
>  murder-for-hire plot. Specifically, Lentz sought to
>  corroborate certain things that Jackmon had told him.
>  . . . The conversations . . . leave no doubt that
>  Lentz's purpose in calling Mr. Salvato was to get
>  information that would assist Lentz in the planning
>  and carrying out the murder-for-hire plot.
>
>  In sum, then, Lentz called Mr. Salvato in order to
>  assess the validity of what Jackmon had told him,
>  which would in turn help Lentz decide whether he
>  should continue to trust Jackmon and involve Jackmon
>  in the planning and/or execution of Lentz's
>  murder-for-hire plot. Accordingly, there can be little

**Page 525**
>  doubt that Lentz, in contacting Mr. Salvato, was
>  seeking aid and information from his attorney to
>  further his nascent murder-for-hire plot.

*Id.* at 831. Because the telephone calls were made for the purpose of
furthering, advancing, or promoting Lentz's plan to commit criminal
activity and not, as asserted by Lentz, to seek legitimate legal advice
on how to extricate himself from a murder-for-hire plot hatched by
Jackmon or obtain assistance and assurance that he should cease contact
with the latter, they are not protected by the privilege. To his credit,
Salvato did advise Lentz to extricate himself from the situation and
cease contact with Jackmon, but that advice was anything but what Lentz
was seeking or hoping to get from him.

  To conclude, we are satisfied that the district court's factual
findings are not clearly erroneous and that the district court did not
err in concluding that the conversations were made for the purpose of
committing or furthering the murder-for-hire plot. Because the recordings
fall within the crime-fraud exception to the attorney-client privilege,
we affirm the district court's denial of the motion to suppress on this
basis.

                                  3.

  Lentz next claims that the district court erred in admitting the
telephone calls because they were unduly prejudicial under Rule **403** of
the Federal Rules of Evidence.

  Rule 403 provides that "[a]lthough relevant, evidence may be excluded
if its probative value is substantially outweighed by the danger of
unfair prejudice, confusion of the issues, or misleading the jury, or by
considerations of undue delay, waste of time, or needless presentation of
cumulative evidence." Fed.R.Evid. **403**. "However, the mere fact that the
evidence will damage the defendant's case is not enough — the evidence
must be *unfairly* prejudicial, and the unfair prejudice must
*substantially* outweigh the probative value of the evidence." *United*

*States v. Williams*, **445 F.3d 724**, **730** (4th Cir. 2006) (internal quotation marks and alteration omitted). Evidence is unfairly prejudicial and thus should be excluded under Rule 403 "when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *United States v. Aramony*, **88 F.3d 1369**, **1378** (4th Cir. 1996) (internal quotation marks omitted).

"It is not an easy thing to overturn a Rule 403 ruling on appeal," *United States v. Udeozor*, **515 F.3d 260**, **264** (4th Cir. 2008). Where the evidence is probative, "the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *Aramony*, **88 F.3d at 1378**; *see also Udeozor*, **515 F.3d at 264-65** ("Rule 403 is a rule of inclusion, generally favoring admissibility.") (internal quotation marks omitted). "Indeed, a district court's decision to admit evidence over a Rule 403 objection will not be overturned except under the most extraordinary circumstances, where that discretion has been plainly abused." *Udeozor*, **515 F.3d at 265** (internal quotation marks omitted).

The district court did not abuse its discretion in admitting evidence of the telephone conversations over Lentz's Rule 403 objection. The telephone conversations were undoubtedly prejudicial to Lentz, just as all evidence suggesting guilt is prejudicial to a defendant. However, the evidence was prejudicial for the same reason that it was highly probative — it strongly demonstrated Lentz's consciousness of guilt and resulted from Lentz's independent decision to further his

**Page 526**

murder-for-hire plot by involving his counsel. Nor are we persuaded that Lentz was hindered in his efforts to defend himself against the conversations because of the attorney-client privilege. As the owner of the privilege, Lentz was free to waive the privilege as to any conversations he felt were necessary to explain his words. But he cannot obtain exclusion of otherwise-admissible evidence of an attorney-client communication subject to the crime-fraud exception by broadly claiming that he cannot defend against it without disclosing attorney-client communications.

4.

Lentz's final complaint is that the district court's admission of the recorded conversations as redacted violated the Rule of Completeness, set forth in Federal Rule of Evidence **106**.

Rule 106 provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Fed.R.Evid. **106**. Its purpose "is `to prevent a party from misleading the jury by allowing into the record relevant portions of the excluded testimony which clarify or explain the part already received.'" *United States v. Bollin*, **264 F.3d 391**, **414** (4th Cir. 2001) (quoting *United States v. Wilkerson*, **84 F.3d 692**, **696** (4th Cir. 1996)).

Rule 106 does not, however, "render admissible the evidence which is otherwise inadmissible under the hearsay rules." *Wilkerson*, **84 F.3d at 696**. Nor does it require the admission of "self-serving, exculpatory statements made by a party which are being sought for admission by that same party." *Id.; see also Bollin*, **264 F.3d at 414** ("The fact that some of the omitted testimony arguably was exculpatory does not, without more, make it admissible under the rule of completeness."). We review the trial court's decision to deny admissibility of evidence under Rule 106 for an abuse of discretion. *See Wilkerson*, **84 F.3d at 696**.

Prior to the introduction of the recordings as evidence in this case, the district court carefully and individually considered all excerpts proposed to be included or excluded by both sides, but declined to allow into evidence various self-serving exculpatory statements made by Lentz to Salvato during the conversation as well as various hearsay statements

made by Salvato which were unnecessary to place Lentz's comments in
perspective. Having reviewed the proposed additions and the rulings of the
district court, we are satisfied that the district court did not abuse
its discretion in excluding the omitted portions as they were neither
necessary to avoid misleading the jury or to place the portions admitted
into proper context.

IV.

   Lentz next asserts that the district court abused its discretion in
admitting at trial various hearsay statements of Doris regarding comments
Lentz made to her about the murder trial of O.J. Simpson (the "O.J.
statements"), as well as a missing person poster that was placed in
Lentz's neighborhood the weekend after Doris's disappearance. According
to Lentz, this evidence was unfairly prejudicial and should also have
been excluded under Rule **403** of the Federal Rules of Evidence.

A.

   The O.J. statements consist of a number of statements that Lentz
made to Doris

**Page 527**

about the O.J. Simpson case, as related by Doris to various friends and
acquaintances. For example, Doris told her priest that Lentz told her,
"[i]f O.J. can do it and get away with it, so can I." J.A. 742-43. She
told another pastor that Lentz had "asked her if she was watching the
O.J. trials," J.A. 781, told her that "[t]hese things can happen again,
you know," J.A. 781, and "said that if he did it, there would be no body
because he was too intelligent," J.A. 782. Similarly, Doris told her
friend Jennifer Rigger that Lentz told her "that thing that happened with
O.J. Simpson, that could happen again, that could happen to her, and she
should be careful," J.A. 829.

   Prior to the first trial, the government filed a motion in limine
seeking to introduce the O.J. statements under the
forfeiture-by-wrongdoing exception to the hearsay rule set forth in Rule
**804**(b)(6) of the Federal Rules of Evidence, which provides that hearsay
statements by a declarant are admissible if the defendant engaged or
acquiesced in wrongdoing that was intended to, and actually did result,
in the declarant's unavailability to testify in person. The government
argued that Doris was unavailable to testify regarding Lentz's statements
because Lentz killed her and, therefore, that her statements should be
admitted under the exception.

   The district court denied the motion, finding that the
forfeiture-by-wrongdoing exception did not allow introduction of the
statements and that the statements would in any event be unduly
prejudicial under Rule 403(b). In an unpublished decision, a divided panel
of this court affirmed, but for different reasons. *See Lentz I,*
58 Fed.Appx. at 962-63. Judge Michael affirmed the district court's
exclusion of the statements under Rule 403(b), concluding that the
district court did not abuse its discretion in this regard, and declined
to reach the Rule 804(b)(6) issue. Judge Traxler affirmed the exclusion
of the statements under Rule 804(b)(6), concluding that the rule applies
only in the specific case where the unavailable declarant was expected to
testify. Judge King dissented on both points, expressing his views that
the forfeiture-by-wrongdoing exception of Rule **804**(b)(6) was not so
limited and that the district court abused its discretion in excluding
the O.J. statements because they were "plainly relevant and necessary to
the Government's case; and to the extent that they are prejudicial to
Lentz's defense, that prejudice is entirely self-inflicted." *Id.* at 969.

   After our decision in *Lentz I*, another panel of our court issued a
published decision holding that "Rule 804(b)(6) applies *whenever* the
defendant's wrongdoing was intended to, and did, render the declarant
unavailable as a witness against the defendant, without regard to the
nature of the charges at the trial in which the declarant's statements
are offered." *United States v. Gray,* **405 F.3d 227**, **241** (4th Cir. 2005).
Under this subsequent precedent, the O.J. statements would be
admissible, assuming the district court found by a preponderance of the

evidence that Lentz successfully engaged in wrongdoing that was intended
to procure Doris's unavailability as a witness. Consequently, the
government again moved to introduce the O.J. statements before the
district court on retrial. After concluding that it was not bound by the
decision in *Lentz I*, the district court found, by a preponderance of the
evidence, that Lentz had procured Doris's unavailability, rendering the
forfeiture-by-wrongdoing exception to the hearsay rule applicable, and
the court rejected Lentz's argument that the evidence should be excluded
as unduly prejudicial under Rule 403(b). *See United States v. Lentz*,
**384 F.Supp.2d 934**, **944** (E.D.Va. 2005).
**Page 528**

1.

   Like the district court, we begin our inquiry with Lentz's assertion
that the reconsideration of the district court's exclusion of the O.J.
statements in the first trial was prohibited by the law of the case
doctrine.

   The law of the case doctrine "`posits that when a court decides upon a
rule of law, that decision should continue to govern the same issues in
subsequent stages in the same case.'" *United States v. Aramony*,
**166 F.3d 655**, **661** (4th Cir. 1999) (quoting *Christianson v. Colt Indus.
Operating Corp.*, **486 U.S. 800**, **816**, **108 S.Ct. 2166**, 100 L.Ed.2d 811
(1988)). The mandate rule is a "specific application of the law of the
case doctrine." *United States v. Bell*, **5 F.3d 64**, **66** (4th Cir. 1993)
(internal quotation marks omitted).

   Under the law of the case doctrine, as a practical
   matter, once the "decision of an appellate court
   establishes `the law of the case,'" it "must be
   followed in all subsequent proceedings in the same
   case in the trial court or on a later appeal *unless:*
   (1) a subsequent trial produces substantially
   different evidence, (2) controlling authority has
   since made a contrary decision of law applicable to
   the issue, or (3) the prior decision was clearly
   erroneous and would work manifest injustice."

*Aramony*, **166 F.3d at 661** (alteration omitted) (quoting *Sejman v.
Warner-Lambert Co.*, **845 F.2d 66**, **69** (4th Cir. 1988)); *Sejman*,
**845 F.2d at 68** (noting that the law of the case doctrine is "not an
`inexorable command' but rather a prudent judicial response to the public
policy favoring an end to litigation"). "Although the doctrine applies
both to questions actually decided as well as to those decided by
necessary implication, it does not reach questions which might have been
decided but were not." *Sejman*, **845 F.2d at 69** (internal quotation marks
omitted).

   In the instant case, we find no error in the district court's decision
that revisiting the admissibility of the "O.J. statements" was
appropriate after our remand in *Lentz II*. Given the intervening *Gray*
decision, the principal legal reasoning behind the district court's
decision to exclude those statements as hearsay not admissible under the
Rule 804(b)(6) exception was rejected by published decision of this court
as an erroneous application of the rule. And, because the conviction had
been completely overturned and a new trial granted by us in the interim,
we likewise find no abuse of discretion in the district court's
determination that the Rule 403(b) alternative ruling could be
reconsidered in light of the circumstances at the retrial and anticipated
evidentiary showings. *See Christianson*, **486 U.S. at 817**, **108 S.Ct. 2166**
("A court has the power to revisit prior decisions of its own or of a
coordinate court in any circumstance, although as a rule courts should be
loathe to do so in the absence of extraordinary circumstances."). With
regard to the mandate rule, two judges in *Lentz I* agreed on a judgment
that the O.J. statements should be excluded, but they did not agree on
whether exclusion should rest upon Rule 804(b)(6) or Rule 403(b). In
light of the "exceptional circumstance☐" of a change in controlling
authority with respect to Rule 804(b)(6) after *Lentz I*, the mandate did
not prevent the district court from reconsidering the admissibility of

the statements. *See Aramony*, **166 F.3d at 661**.

2.

Turning to the merits of the Rule 804(b)(6) inquiry, the district court found by "a preponderance of the evidence that Lentz engaged in wrongdoing that was intended, at least in part, to procure Doris'

**Page 529**

unavailability as a witness and that did, in fact, procure her unavailability as a witness." *Lentz*, **384 F.Supp.2d at 944**. The district court's findings are not clearly erroneous and it obviously did not abuse its discretion in ruling consistent with *Gray*.

The Rule 403(b) objection on remand presents a more interesting inquiry. Clearly, there is room for a legitimate difference of opinion on the issue. The judges of this panel previously exhibited that difference of opinion, as have the two district judges who considered the matter below. We, however, review only the most recent decision by the district court on this issue, which found that "while the O.J. statements are indeed damaging to Lentz's case, they are nonetheless `highly probative of Lentz's commission and concealment of Doris' murder'" and deemed it "significant to note that any potential prejudice arising out of the statements is entirely self-inflicted, as `Lentz himself chose to make reference to O.J. Simpson in his threats to Doris.'" J.A. 517 (quoting *Lentz I*, 58 Fed.Appx. at 969). Thus, the district court considered the evidence and agreed with Judge King's previous view regarding the probative value and prejudicial nature of the O.J. statements. We cannot say that the district court abused its discretion in this regard.

B.

Lentz also challenges the district court's denial of his motion to suppress the "Missing" poster that was distributed in Lentz's neighborhood the weekend after Doris disappeared. As noted above, the poster contained a photograph of Doris with a physical description and stated that "Doris disappeared around 7 p.m., Tuesday April 23, 1996 after telling a friend that she was going to Ft. Washington, Maryland to pick up her daughter." J.A. 109. Lentz argues that the district court should have excluded the poster as unduly prejudicial under Rule 403.

There is nothing prejudicial or inflammatory in the poster itself or in its language. Alone, it is not prejudicial at all. The poster is prejudicial because, when considered in conjunction with other evidence, it contradicts the story Lentz gave to the police on the Thursday and Friday after Doris disappeared, *i.e.*, that he had last spoken with Doris between 5:00 p.m. and 6:00 p.m. on April 23, 1996, when he told her that Julia had not returned and that she should *not* come to his home in Maryland. If this were true, then Doris would not have told her friend, Jennifer Rigger, at 7 p.m. that she was leaving for Lentz's home to pick up Julia. On the Sunday evening after Doris disappeared — after the poster was disseminated in Lentz's neighborhood — Lentz called the investigating officer's line at 11:57 p.m. and left a voice-mail message that changed the time of his supposed conversation with Doris to 6:50 p.m., but not its substance. Thus, the existence of the poster established an alternative rationale for Lentz's act of changing his story regarding the last time he spoke to Doris — he wanted to conform his story to the facts as known by the police. To that extent the introduction of the poster was prejudicial. For the same reason, however, the poster was highly probative evidence of Lentz's guilt. As noted by the district court, "it is reasonable to infer that a person who has committed a kidnapping and murder might wish to change his story or alibi to coincide with other evidence learned or publicized by law enforcement officers regarding the offense in issue." *Lentz*, **384 F.Supp.2d at 949-50**. We cannot say that the district court abused its discretion in determining that the probative value of the poster outweighed its prejudicial effect in this regard.

**Page 530**

V.

Lentz next argues that the district court abused its discretion in denying his motion for recusal under **28 U.S.C.A. § 455**(a) (West 2006). *See United States v. Cherry*, **330 F.3d 658**, **665** (4th Cir. 2003). Specifically, Lentz argues that the district court prejudged the ultimate issue of his guilt of kidnapping resulting in death because, when reconsidering the forfeiture-by-wrongdoing exception under Rule 804(b)(6) issue, the district court made a determination, by a preponderance of the evidence, that Lentz had caused the unavailability of Doris as a witness. By doing so, Lentz argues, the district court prejudged the ultimate issue of Lentz's guilt or innocence, rendering fair judgment during the trial impossible. Lentz also asserts that the district court's published opinion on the motion in limine demonstrates a lack of impartiality and inappropriate antagonism towards him.

A district court should grant a motion for recusal if the judge's "impartiality might reasonably be questioned." **28 U.S.C.A. § 455**(a). However, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, **510 U.S. 540**, **555**, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). And, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* Even remarks made "that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* The "presiding judge is not . . . required to recuse himself simply because of unsupported, irrational or highly tenuous speculation." *Cherry*, **330 F.3d at 665** (internal quotation marks omitted). "Put simply, the proper test to be applied is whether another with knowledge of all of the circumstances might reasonably question the judge's impartiality." *Id.* (internal quotation marks and alteration omitted).

Here, the district court, in ruling upon the government's motion in limine, made a threshold determination of whether the forfeiture-by-wrongdoing exception to the hearsay rule applied to the otherwise-inadmissible O.J. statements. This required the district court to make a factual determination as to whether the facts established by "a preponderance of the evidence that Lentz engaged in wrongdoing that was intended, at least in part, to procure Doris' unavailability as a witness and that did, in fact, procure her unavailability as a witness." *Lentz*, **384 F.Supp.2d at 944**. He concluded that the facts did sufficiently establish such wrongdoing and admitted the evidence.

In denying the motion to recuse, the district court correctly noted that his previous "ruling merely recited facts and evidence presented against defendant in the first trial which were sufficient to meet the preponderance of the evidence standard applicable to the Rule 804(b)(6) determination. . . . [W]hile some of those facts may reflect adversely on defendant, that is the unavoidable result of many evidentiary rulings adverse to defendant and cannot serve as a basis for recusal under § 455(a)." J.A. 544. Thus, contrary to Lentz's assertion, the district court did not find "Lentz guilty of kidnapping and killing Doris . . . before the evidence [was] presented to the jury." Appellant's Brief at 71. Rather, the district court, using a preponderance of the evidence standard, made the necessary factual findings to determine the evidentiary question before it and, in doing so, did not exhibit such "favoritism

<span style="color:red">**Page 531**</span>

or antagonism [as to] make fair judgment impossible." *Liteky*, **510 U.S. at 555**, 114 S.Ct. 1147. Accordingly, the district court did not abuse its discretion in denying the motion to recuse.

VI.

Lentz's next challenge is to the sufficiency of the evidence to prove the requisite "holding" element of kidnaping under § 1201. We must sustain the guilty verdict if, viewing the evidence in the light most favorable to the government, the verdict is supported by substantial evidence. *See United States v. Burgos*, **94 F.3d 849**, **862** (4th Cir. 1996)

(en banc) (citing *Glasser v. United States*, **315 U.S. 60**, **80**, **62 S.Ct. 457**, 86 L.Ed. 680 (1942)). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.*

   In *Lentz II*, we rejected Lentz's similar claim that the government's evidence was insufficient to prove that he held or otherwise restrained Doris for ransom, reward, or some other reason, holding that "the evidence, though circumstantial, was sufficient to support the jury's determination that, upon Doris's arrival at Lentz's home, Lentz exerted an unlawful physical or mental restraint for an appreciable period against Doris's will." *Lentz II*, **383 F.3d at 202**. The evidence on retrial did not meaningfully differ in this regard. Viewed in the light most favorable to the government, "there was a logical and supporting evidentiary basis for the jury to conclude that Doris was `held' by Lentz after she arrived at [Lentz's] house but before the fatal wounds were inflicted" and, more specifically, that Lentz "either physically forced or lured [Doris] inside" upon her arrival "or otherwise confined her against her will for an appreciable period of time in order to accomplish the purpose of the seizure — her murder and its accompanying benefit to him in the domestic litigation." *Id.* at 203. Accordingly, we find that the holding element is supported by substantial evidence and reject Lentz's appeal on this basis as well.

                                   VII.

   Lentz's final assertion is that facts demonstrating "unaccompanied inveiglement" across state lines cannot be relied upon to establish the jurisdictional requirement that the kidnapping victim be "willfully transported in interstate . . . commerce." **18 U.S.C.A. § 1201**(a)(1).

   As acknowledged by Lentz, we have previously considered and rejected this interpretation of the jurisdictional component of the federal kidnapping statute. *See Lentz II*, **383 F.3d at 200** (holding that the jurisdictional requirement is shown if "the kidnapper `willfully caused unaccompanied travel over state lines'") (quoting *United States v. Wills*, **234 F.3d 174**, **179** (4th Cir. 2000)). We held that "the jury reasonably concluded that Lentz, by telling Doris that Julia had returned from Indiana and arranging for Doris to pick her up from his home on April 23, willfully caused Doris to be transported across state lines from her home in Virginia to his home in Maryland, thereby satisfying the jurisdictional component of the Act." *Lentz II*, **383 F.3d at 200**. Because the evidence on this point is similarly unchanged, Lentz concedes that our precedent in *Lentz II* forecloses his argument, but seeks to preserve the issue for further review. Accordingly, Lentz is not entitled to relief on this basis.

                                   VIII.

   For the foregoing reasons, we affirm the jury's conviction of Lentz for interstate
**Page 532**
kidnapping resulting in the death of Doris Lentz.

   *AFFIRMED*

[fn1] The poster contained a photograph of Doris with a physical description and stated that "Doris disappeared around 7 p.m., TUESDAY April 23, 1996 after telling a friend that she was going to Ft. Washington, Maryland to pick up her daughter." J.A. 109. Those with information were asked to contact the Arlington County Police Department.

[fn2] Specifically, an Arlington County police officer who investigated Doris's disappearance testified that Lentz mentioned that routes Doris typically took would place her traveling between the states via the District of Columbia, in crime-ridden areas, which fit nicely with his pre-meditated plan to make the murder appear to be a random carjacking.

The government, however, did not advocate any specific route of travel nor argue that Lentz might have tricked Doris into stopping in the District of Columbia, where he abducted and killed her. On the contrary, the government consistently argued that Lentz tricked Doris into coming to his home by the representation that Julia was there, held and killed Doris after she arrived at his home in Maryland, transported her bloodied body in her vehicle to dispose of her body in an unknown location, and then abandoned the car in a high crime neighborhood set up in such a fashion (keys and wallet in plain view and doors unlocked) as to encourage an unknowing passerby to take the bait and make it look as though Doris had been carjacked. There was no evidence to support a finding that Doris only traveled from Virginia to the District of Columbia, and to the extent Lentz argued this path of travel in conjunction with his "random crime" theory, the jury obviously rejected the argument as it ultimately concluded that he kidnapped Doris.

[fn3] Given the unusual, but potentially dangerous situation, the government established a team of prosecutors and agents, separate from the kidnapping team, to investigate the murder-for-hire allegations. When Jackmon told the authorities that Lentz cancelled the "hit man" meeting immediately after speaking with Salvato, a third team of prosecutors and agents (the government "taint" team) was assembled to review the telephone recordings and to evaluate whether disclosure of the recordings would violate Lentz's **Sixth** Amendment rights. The "taint" team made the determination that Lentz was soliciting advice from his attorney to further his murder-for-hire plot and, therefore, that the calls were not privileged. The motion was made *ex pane* to alert the district court of the status of the matter and requested permission from the court to disclose the tapes and the transcripts to the kidnapping team and the murder-for-hire team.

Copyright © 2009 Loislaw.com, Inc. All Rights Reserved