```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION

     CONSOLIDATED LITIGATION        * NO. 05-4182

 5                                  * Consolidated

     PERTAINS TO: BARGES            * SECTION K(2)"

 6                                  *

     Boutte v. Lafarge       05-5531 * JUDGE DUVAL

 7   Mumford v. Ingram       05-5724 *

     Lagarde v. Lafarge      06-5342 * MAG.WILKINSON

 8   Perry V. Ingram         06-6299 *

     Benoit v. Lafarge       06-7516 *

 9   Parfait Family v. USA   07-3500 *

     Lafarge v. USA          07-5178 *

10   Weber v. Lafarge        08-4459 *

        * * * * * * * * * * * * * * **

11

12

13

14

15           Deposition of WILLIAM JASON WEISS,

16   Ph.D., taken in the above-entitled cause,

17   pursuant to the following stipulation, before

18   Dawn H. Hymel, Certified Court Reporter, at

19   the offices of Chaffe McCall, L.L.P., 2300

20   Energy Centre, 1100 Poydras Street, New

21   Orleans, Louisiana, on Tuesday, the 1st of

22   September, 2009, commencing at 10:31 a.m.

23

24

25
```

```
 1    APPEARANCES:
 2    Appearing on Behalf of Barge Plaintiffs:
 3        PATRICK J. SANDERS, ESQ.
          Attorney at Law
 4        3123 Ridgelake Drive
          Suite B
 5        Metairie, Louisiana  70002
                  -and-
 6        LAW OFFICES OF BRIAN A. GILBERT
          BY:  BRIAN A. GILBERT, ESQ.
 7        821 Baronne Street
          New Orleans, Louisiana  70113
 8
 9
      Appearing on Behalf of Lafarge North America,
10    Inc.:
11        GOODWIN PROCTER, LLP
          BY:  MARK S. RAFFMAN, ESQ.
12            KIRSTEN V.K. ROBBINS, ESQ.
          901 New York Avenue, N.W.
13        Washington, D.C.  20001
                  -and-
14        SUTTERFIELD & WEBB, LLC
          BY:  DANIEL WEBB, ESQ.
15        650 Poydras Street
          Suite 2715
16        New Orleans, Louisiana  70130
17
18    REPORTED BY:
19        DAWN H. HYMEL
          Certified Court Reporter #81016
20
21
22
23
24
25
```

1                      I N D E X

2                                            PAGE

3    EXAMINATION BY:

4         Mr. Sanders                        4

5         Mr. Gilbert                        32

6

7

8                    E X H I B I T S

9

10   Weiss 1         Liu-Weiss, LLC Report        6

11   Weiss 2         List of Transcripts          6

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              S T I P U L A T I O N

 2           It is stipulated and agreed by and

 3      between all parties that this deposition is

 4      hereby being taken for all purposes pursuant

 5      to the Federal Rules of Civil Procedure.

 6           All formalities, with the exception of

 7      the reading and signing of the deposition by

 8      the witness, are waived.

 9           All objections, except those as to the

10      form of the question and the responsiveness of

11      the answer, are reserved until the deposition

12      is used or sought to be used in evidence.

13                     -0-

14           WILLIAM JASON WEISS, Ph.D., 237 Pawnee

15      Drive, West Lafayette, Indiana, 47906, after

16      having been duly sworn, testified as follows:

17      EXAMINATION BY MR. SANDERS:

18      Q.   First off, Mr., is it Wiess or Weiss?

19      A.   Weiss.

20      Q.   Weiss.  My name is Pat Sanders and I

21      represent victims of the flood in the Lower

22      Ninth Ward.  We're here to take your

23      deposition in connection with, it's commonly

24      referred to as the barge case.

25      Have you ever given a deposition before?
```

1    A.    I have not.

2    Q.    Okay.  Well, what's going to happen is

3    it's a question and answer session.  I'm going

4    to ask the questions first.  Provide us the

5    answers as best you can.  If you don't know an

6    answer, it's okay to say "I don't know".  If

7    you don't remember, it's okay to say "I don't

8    remember".  I ask you not to guess or

9    speculate.  If so, will you please tell me

10   that you're guessing.

11         Do you understand you just swore to tell

12   the truth?

13   A.    Yes.

14   Q.    Okay.  Now, would you give us your full

15   name and address?

16   A.    William Jason Weiss, 237 Pawnee Drive,

17   West Lafayette, Indiana, 47906.

18   Q.    Okay.  Now, I have here your report and a

19   list of additional transcripts.  Is that your

20   report that you did in this case?

21   A.    Yes, this appears to be my report.

22   Q.    Okay.  Do you need a copy --

23   A.    Yes.

24   Q.    -- to refer to?

25   A.    Yes.

1    Q.    We're going to attach a copy.  Have we

2    been doing it Weiss 1 or 1?

3           MR. RAFFMAN:

4                 We need to go Weiss 1.  Okay.  Would

5    you mind terribly if --

6           MR. SANDERS:

7                 What?

8           MR. RAFFMAN:

9                 -- if the witness refers to the

10   document that you've marked as Weiss 1?

11          MR. SANDERS:

12                Oh.  Hand it back here.  Okay.

13   Weiss 1 is the report that you looked at.

14          MR. RAFFMAN:

15                Thank you.

16   BY MR. SANDERS:

17   Q.    Also, we've been provided a list of

18   what's called additional deposition

19   transcripts reviewed by Dr. W. Jason Weiss,

20   and are these the additional depositions that

21   you've reviewed, which has been supplied by

22   Mr. Raffman?

23   A.    Yes, these are.

24          MR. SANDERS:

25                We'll attach this as Weiss No. 2.

1    Weiss 2.

2    BY MR. SANDERS:

3    Q.   Okay.  First, let me just ask some

4    background questions.  By whom are you

5    employed?

6    A.   I am employed by Purdue University, but

7    in this case I'm not representing Purdue

8    University, I'm representing Liu-Weiss, LLC.

9    Q.   And what is Liu-Weiss, LLC?

10   A.   It's a private consulting firm.

11   Q.   Okay.  When did it start?

12   A.   It started in, I believe, 2006 or 2007.

13   Q.   Okay.  What does it do, the consulting

14   firm?

15   A.   It typically is involved in the

16   development of educational materials or other,

17   other review of reports, for example, this

18   case.

19   Q.   Is this the first case of the Liu-Weiss,

20   LLC?

21   A.   It is.

22   Q.   And since such time, have you taken on

23   any other cases?

24   A.   I have not.

25   Q.   Okay.  Could you briefly give us the

1   extent of your education?

2   A.   I have a bachelor's degree in

3   architectural engineering from Penn State

4   University.  I have a master's in civil

5   engineering and a Ph.D. in civil engineering

6   from Northwestern University.

7   Q.   Okay.  What is an acoustical engineer?

8   Have you ever heard the term?

9   A.   There are people who would classify

10  themselves as acoustical engineers, and this

11  could be really anything from the person who

12  sets up sound in your house would classify

13  themselves as an acoustical engineer, people

14  who work in mechanical engineering who have a

15  specialty in acoustics may classify themselves

16  as an acoustical engineer.

17  Q.   So there's no particular degree that you

18  could get in school or --

19  A.   I'm not aware of every potential degree

20  possibility that's out there, but I know that

21  people typically will get a degree in a

22  specialty with maybe an emphasis in acoustics.

23  Q.   Okay.  And did you do that?

24  A.   I did not.

25  Q.   Okay.  All right.  Have you ever been

1    qualified as an acoustics expert in a legal

2    case?

3    A.    Since this is my first legal case, no.

4    Q.    But I understand from your resume' that

5    you do work in connection with sounds and

6    concrete.

7    A.    Yes.

8    Q.    Is that correct?

9    A.    That is.

10   Q.    Could you give us an overview of that?

11   A.    The majority of my research deals with

12   concrete materials and how they perform and

13   how they fail, and acoustic analysis is one of

14   the techniques that I use to characterize

15   those failures.

16   Q.    The acoustic analysis, what does that

17   involve?  Does that involve in a lab?

18   A.    The field would be referred to as

19   acoustic emission, and it's really the study

20   of the generation and classification of those

21   sounds, so --

22   Q.    But, I mean, have you ever gone out,

23   let's say, on behalf of a municipality and

24   monitored a bridge for possible failure or

25   acoustic emissions, things of that nature?

     1    A.    In my personal work, I have not gone out

     2    to monitor bridge to failure, but there are

     3    people who will do that type of work with

     4    acoustic emission.

     5    Q.    So the, I hate to -- Can I summarize that

     6    the extent of your work is in a lab?

     7    A.    The majority of work that I deal with is

     8    in a laboratory setting.

     9    Q.    Have you ever done any analyses outside

    10    of the lab of any bridges, walls, flood walls,

    11    anything of that nature?

    12    A.    As it relates to acoustics, I would say

    13    no.

    14    Q.    And the tests, is it fair to say, I've

    15    looked at these YouTube things you referred

    16    to, is that the type of tests and analysis you

    17    do in your work?

    18    A.    I would have to say the types of testing

    19    that are shown there are relatively

    20    straightforward tests that are sort of easy to

    21    understand, a cylinder in a machine that's

    22    being compressed.  The tests that we would do

    23    would typically involve many more sensors and

    24    would typically involve more control over the

    25    testing that's being done.

1   Q.   With regard to sensors, let's say, could

2   you run us through one scenario that you've or

3   test you've done in the past, like, how big

4   was the piece of concrete, where were the

5   sensors put, things of that nature?

6   A.   Yeah, simple tests that we may look at

7   would be a piece of concrete tested in pure

8   tension, so the size of the sample would be

9   roughly three inches by four inches maybe in

10   cross-section, maybe a foot or 16 inches long,

11   something, so about the size of a loaf of

12   white bread, something like that.  And we

13   would have sensors mounted on that sample.

14   There's usually a coupling agent between the

15   sample and the sensor to allow sound

16   transmission, and we would listen for the

17   sounds as that's being -- that material is

18   being tested.  During the testing process, you

19   will frequently hear quite a few sounds being

20   generated, because it's a progressive

21   approach.  We also will, on the sensors, we

22   will actually record the sounds that are being

23   generated, and many times we'll also amplify

24   those, because we're not only interested in

25   the audible range, but we're also interested

1    in the subaudible range.

2    Q.   What's the largest piece of concrete that

3    you've done analysis on?

4    A.   Acoustic emission analysis?

5    Q.   Correct.

6    A.   It's hard for me to say definitively that

7    this is the largest samples, but the largest

8    ones that I can think of would be beams,

9    reinforced beams that were approximately three

10   feet long.  Does that --

11   Q.   By what diameter?

12   A.   They would likely have been, and again, I

13   could provide actual dimensions if you'd want

14   those, but --

15   Q.   You're estimating?

16   A.   -- I'm estimating that they were about

17   six inches wide and maybe eight or ten inches

18   deep.

19   Q.   Okay.  Now, the sensors that are attached

20   in these analyses, are they actually like

21   little microphones that are stuck on the

22   concrete and you listen for the emissions

23   or --

24   A.   What I would say as it relates to the

25   sensors, you could think of them as little

1    microphones, but they're actually something

2    called a piezoelectric transducer, and what

3    they tend to do is convert a vibration into a

4    sound wave.

5    Q.   So they convert a vibration into a sound

6    wave?

7    A.   Into an energetic wave, displacement

8    wave.

9    Q.   Okay.  Do all vibrations make a sound?

10   A.   No.  As I had mentioned before, there are

11   audible and subaudible vibrations.

12   Q.   Okay.  Who retained you for this case?

13   A.   Could you explain the term "retained"?

14   Q.   Hired you.

15   A.   Hired me.  That would be Goodwin Procter.

16   Q.   Okay.  And who was the person you were

17   first contacted by?

18   A.   I believe that it was Mark Raffman and

19   Ms. Sarah Kiest (phonetic).  I believe both

20   were on the --

21   Q.   And throughout your duties in this case,

22   have you ever dealt with any other attorneys?

23   A.   I've also dealt with Ms. Robbins.

24   Q.   Anybody else?

25   A.   There was also one other gentleman and

1    his name is escaping me.

2    Q.   If you don't -- If you don't know, it's

3    okay.

4    A.   I could look it up.  It was almost

5    eighteen months ago.

6    Q.   Okay.  And you were first retained in

7    about when?

8    A.   I believe it was the winter or fall of

9    2007, or winter or spring, I'm sorry, not

10   fall, of 2007.

11   Q.   2007.  Okay.  And what were you asked to

12   do?

13   A.   Well, the call basically described, this

14   is, we're looking at a flood wall that's

15   failed and we're looking for people who have

16   an expertise in failure of these types.  I

17   mentioned that a flood wall failing is not

18   necessarily something that, you know, is

19   exactly what I do.  And then I was told that

20   the real thing that or the expertise that I

21   was asked to bring to the table was related to

22   what that would sound like during failure and

23   what type of acoustic activity we may expect

24   from the failure of a wall of that type.

25   Q.   But since you've never done any work with

1   flood walls, your opinion as to what it would

2   sound like is based on what?

3   A.   Based on my experience with testing

4   materials.

5   Q.   And that's the materials which you said,

6   the biggest being three feet by --

7   A.   Right, the sample which I believe we said

8   was three foot by eight inches by six inches.

9   Q.   All right.  Did you meet with

10  Mr. Raffman, I take it, during the course of

11  your duties?  Did you meet with any attorneys?

12  A.   I believe that the only time we've

13  actually met is this week.

14  Q.   Okay.

15  A.   But as I mentioned before, I met with

16  someone else who was standing in for him at

17  one point.

18  Q.   Okay.  Now, what were you provided to

19  review in connection with your tasks?

20  A.   The information that I was provided is

21  attached in the report, Weiss 1, which are the

22  depositions and segments of the Bakeer and

23  Cushing reports.

24  Q.   I think I know the answer, but I just

25  have to ask.  Were you provided any

1  photographs?

2  A.   I believe there were two photographs, but

3  I believe there were also photographs as a

4  part of the reports that I looked at.

5  Q.   Photographs as part of the Cushing

6  report?

7  A.   I believe so.

8  Q.   You're not certain?

9  A.   I'm not certain.  They were a part of a

10 report and I believe it was the Cushing.

11 Q.   Were they photographs that were separate

12 from the report, meaning --

13 A.   As I mentioned, there were two separate

14 photographs.

15 Q.   Okay.  What were they photographs of?

16 A.   They were photographs of the wall after

17 it had collapsed.  There was an aerial view.

18 Q.   Okay.  Were you provided any recordings

19 of sounds?

20 A.   I was not provided any recordings.

21 Q.   Other than the deposition transcripts,

22 were you provided any other transcripts of any

23 nature?

24 A.   I don't believe so.

25 Q.   Okay.  And I'm sorry if I asked this, but

1    what were you asked to do?  I mean, it

2    originally started out with regard to wall

3    failure, but then it became more --

4          MR. RAFFMAN:

5              Objection.  Mischaracterizes.

6              Go ahead and answer the question.

7    A.   Okay.  Essentially the discussion was to

8    characterize what this wall would sound like

9    during failure.

10   BY MR. SANDERS:

11   Q.   Okay.  Was that the only thing you were

12   asked to do?  Were there any other opinions

13   that you were asked to provide, let's say,

14   that you were unable to provide?

15   A.   Can you provide me an example of --

16   Q.   Did they say, can you provide us with an

17   opinion whether each person in a deposition

18   heard the wall failing for whatever reason?

19         MR. RAFFMAN:

20             Objection.  You can answer.

21   A.   I guess I'm not a hundred percent sure I

22   understand the question, but I'll try to --

23   I'll try to answer what I believe I

24   understand.  The question was really, what

25   would a wall like this sound like when it was

1    failing, what noises may we expect to hear,

2    and then I was asked to review the

3    depositions, and just review those

4    depositions.

5    BY MR. SANDERS:

6    Q.    Okay.  Was there anything else you were

7    asked to do that's not contained in your

8    report?

9    A.    That's not contained in the report, no.

10   Q.    Okay.  Were you asked to, in connection

11   with today's deposition, were you asked to say

12   anything in particular?

13   A.    No.

14   Q.    Were you asked not to say anything in

15   particular?

16   A.    No.

17   Q.    Were you asked to avoid saying or

18   discussing any topics?

19   A.    No.

20   Q.    Okay.  Now, just some more general

21   background.  The flood wall at issue, are you

22   familiar with the size of the wall?

23   A.    I've seen a drawing of the dimensions of

24   the size.  I'm familiar with that.

25   Q.    What about the material that it was

1    comprised of?

2    A.   I am -- I'm familiar with the general

3    class of material, but I've not physically

4    inspected that material or reviewed a mixture

5    proportion of that material.

6    Q.   What is the general class of material?

7    A.   It's general concrete and a general steel

8    sheet piling in the wall.

9    Q.   But they have several different types of

10   concrete; am I correct?

11   A.   There are several -- Well, there are many

12   different varieties of concrete.

13   Q.   Okay.  And with regard to the steel,

14   there's many different varieties of steel; is

15   that correct?

16   A.   There are many different classifications

17   of steel, so when I, when I say that the

18   materials in general, we're dealing with a

19   normal strength concrete and we're dealing

20   with a fairly typical steel.

21   Q.   Okay.  How far down was the flood wall

22   embedded in the soil in the Industrial Canal

23   area?

24   A.   I don't know the answer exactly.  I

25   believe it was on the order of 15 to 25 feet.

1   Q.   Okay.  Do you know what the soil or

2   material makeup was where this flood wall was

3   embedded?

4   A.   Regarding the soil, I'm not a

5   geotechnical engineer and I did not

6   investigate the properties of the soil.

7   That's beyond the scope of, I believe, what I

8   was asked to look at.

9   Q.   Were you aware of any preexisting damage

10  to the flood wall prior to Hurricane Katrina?

11  A.   No, I'm not aware of any preexisting

12  damage.

13  Q.   Now, how about the barge, what was the

14  size of the barge?

15  A.   From my recollection, the barge was on

16  the order of maybe 200 feet.

17  Q.   Okay.  Was it empty or full at the time

18  of Hurricane Katrina?

19  A.   It's my understanding that the barge in

20  question was empty at the time.

21  Q.   Now, in your report, acoustic emissions,

22  let's see --

23  A.   Are we on Page 2?

24  Q.   Yeah.  The second sentence says, a part

25  of this release of energy can be related to

1    the generation of sound or acoustic events.

2         But I think we also went over the fact

3    that it can or cannot be.  Is that fair to

4    say?

5    A.   I think that would be a little bit of a

6    mischaracterization.  A portion is always

7    going to be related to different aspects of

8    what happens when a material fails, so as that

9    material fails, there is a release of energy.

10   That energy can be released and can become

11   evident in different, in different ways, and

12   there's a whole science that studies the

13   temperature that's changed in the material

14   when that energy is released.  Here we're

15   talking specifically about sound that could be

16   generated.

17   Q.   A release of energy may cause a sound; am

18   I correct?

19   A.   It may cause a sound, yes.

20   Q.   A release of energy may not cause a

21   sound; is that correct?

22   A.   It depends on the size of energy that's

23   released, the amount of energy that's

24   released, and the material that we're dealing

25   with.

1    Q.    Is there always a sound when there is a

2    release of energy?

3         MR. RAFFMAN:

4              Objection.  Vague.

5    A.    Well, again, we've got to go back to the

6    fact that there are audible and subaudible

7    sounds.

8    BY MR. SANDERS:

9    Q.    Okay.

10   A.    All right.  The release of energy, that

11   energy is going somewhere.  Is it a sound

12   that's detectable?  It's not always

13   detectable.  It depends on the size of the

14   flaw that's being generated.

15   Q.    Okay.  Good point.  Let me rephrase it

16   then.  When there's a release of energy, it

17   may result in an audible sound; is that

18   correct?

19   A.    That is correct.  It may result in an

20   audible sound.

21   Q.    And when there's a release of energy, it

22   may not result in an audible sound; is that

23   correct?

24        MR. RAFFMAN:

25             Objection.

```
1    A.   Again, I would say that it's related to

2    the size of the damage that we're talking

3    about.  We can talk about the measurement of

4    cracks that are as small as ten microns that

5    would not have a substantial amount of energy

6    associated with them typically and the sound

7    that's generated would likely be subaudible.

8    If we're talking about something that's much

9    larger, we would expect a much larger sound.

10   But the typical rule of thumb is that the

11   energy that's released is related to the

12   surface area that's created in the material.

13   BY MR. SANDERS:

14   Q.   So it may or may not cause an audible

15   sound; is that correct?

16        MR. RAFFMAN:

17             Same objection.  I think he's

18   answered it, but go ahead.

19   BY MR. SANDERS:

20   Q.   I just want to know, when there's a

21   release of energy, is there always an audible

22   sound?

23        MR. RAFFMAN:

24             Same objection.

25   A.   Again, I would go back to classifying it
```

1    as it depends on the size of the energy that's

2    released.  It depends on the size of the

3    damage, the size of the failure.

4    BY MR. SANDERS:

5    Q.    Wait.  Let's say it's a huge object,

6    okay, let's say, I don't know, a flood wall.

7    If there's a release of energy, if there's a

8    failure of a flood wall, will it always cause

9    an audible sound?  Do you know?

10   A.    There are cases where I could possibly

11   imagine a very slow progressive failure, on

12   the order of hundreds of years, that may not

13   cause an audible sound.

14   Q.    Okay.  So whether a release of energy is

15   audible is a factor of many variables; am I

16   correct?  The amount of energy released being

17   one of them?

18   A.    That is correct.  The sound that is

19   generated is dependent upon the amount of

20   energy that goes into making that sound.

21   Q.    What other variables affect whether a

22   sound is audible?

23   A.    How that sound is dissipated as it moves

24   through the material.  The timing of the crack

25   propagation will likely have an impact.

1    Q.   And would the material have an impact,

2    the type of material?

3    A.   Can you explain what you mean by type?

4    Are we dealing -- I guess -- Maybe I can ask

5    for you to clarify.

6    Q.   I'm talking about in general terms, not

7    just about a flood wall.

8    A.   Is concrete different than steel?

9    Q.   Yes.

10   A.   They are going to provide you different

11   sounds.

12   Q.   Okay.

13   A.   One concrete compared to another, they're

14   generally in the same type.

15   Q.   And let me ask you this, about whether a

16   sound is audible or not, what does that mean?

17   I mean, isn't that more in the eyes of or the

18   ears of the person who heard it?  I can

19   imagine where something, if I got my ear to

20   this table, I might hear something that I

21   don't hear sitting two feet away when it

22   cracks.  Can you maybe enlighten us on that?

23        MR. RAFFMAN:

24            Objection.  You can answer.

25   BY MR. SANDERS:

1   Q.   You don't have to worry what he says.

2   A.   Okay.  Your question, I believe, is that

3   the sound and its proximity to the receiver,

4   and there is going to be a difference between

5   the sound that is heard when you're at a

6   different distance from the failure.

7   Q.   Okay.  Again, not just with flood walls,

8   but with any audible sound, we've discussed

9   the release of energy, I guess the amount

10  being a factor; am I correct?

11  A.   That is correct, the amount of energy --

12  I mean, maybe if I said this a little bit

13  differently.  The acoustic sound that is

14  generated is essentially a displacement, and

15  the area under a displacement versus time

16  curve is the energy, so the more energy that's

17  there, the bigger the acoustic wave is going

18  to be or the displacement wave is going to be.

19  Q.   Oh, so we got the amount of energy

20  released is a factor, correct?

21  A.   Yes.

22  Q.   Okay.  The timing or the quickness of the

23  energy release is a factor; is that correct?

24  A.   It would be a factor.

25  Q.   Okay.  The material failing, whether it

1    be concrete or wood or steel, that would be a

2    factor?

3    A.    That would be a factor.

4    Q.    Okay.   The proximity of where the event

5    occurred to where someone heard it would be a

6    factor?

7         MR. RAFFMAN:

8              Objection.

9    BY MR. SANDERS:

10   Q.    Is that correct?

11   A.    That is correct, that is a factor.

12   Q.    And would also any obstacles --

13   A.    Well, can I clarify that?   That's a

14   factor in what is heard, not in what is

15   released.

16   Q.    Okay.   Gotcha.

17   A.    Because obviously -- Okay.

18   Q.    And would, also, between any obstacles or

19   the topography between an event and where a

20   person was be a factor in what was heard by

21   the listener?

22   A.    To answer that question, I would say

23   anything that would dissipate that sound in

24   between would obviously be a factor.

25   Q.    Okay.   Let's say in a neighborhood, a

1    typical neighborhood, what would dissipate a

2    sound?  Would buildings?

3         MR. RAFFMAN:

4              Objection.

5    A.   I would guess I would go back to this, a

6    sound is traveling as a wave, and anything

7    that stops that wave or deflects that wave is

8    going to have an impact on the

9    characteristics.

10   BY MR. SANDERS:

11   Q.   So if the wave hit a building, that would

12   affect the sound?

13   A.   That could affect the sound.

14   Q.   If a wave hit a tree, that could affect

15   the sound?

16   A.   That could affect the sound.

17   Q.   Okay.  These tests on the YouTube in your

18   report, did you do any of those tests?

19   A.   The video of those tests are not tests

20   that I have done in the video, but they are

21   tests that I am familiar with, the types of

22   tests I'm very familiar with, because I've

23   seen many cylinders break, many beams break.

24   Q.   Do you know who performed those tests in

25   the videos?

1    A.   I do not.

2    Q.   Okay.  And the YouTube videos -- Well,

3    first off, if a judge or jury doesn't know

4    what YouTube is, would you tell us your

5    impression of what YouTube is?

6    A.   They are videos that are posted online.

7    Q.   Okay.  Are there any standards of who can

8    post, what can be posted, things of that

9    nature?

10        MR. RAFFMAN:

11            Objection.

12   A.   I -- I don't know.  I've never posted

13   anything myself.

14   BY MR. SANDERS:

15   Q.   Is it fair to say that the videos on that

16   site range from comedy types, satire to

17   scientific videos, any number of things?

18   A.   There's a wide variety of things that are

19   posted on that site.

20   Q.   Now, the videos you refer to -- Well, let

21   me refer you to Video No. 1.  Are you -- Did

22   they discuss in that video the circumstances

23   of the test, meaning what was being tested,

24   what type of material, how much force was

25   applied, was it a downward force, lateral

1    force, anything like that?

2    A.   I -- I -- To qualify this, I would have

3    to say that I have not reviewed these videos

4    in the recent, --

5    Q.   Okay.

6    A.   -- so I'm going off of memory from a

7    longer time ago.  Some of those you can

8    actually see the force, there are needles on

9    the machines in the background, but I don't

10   recall which video would have had that or the

11   description.  The tests are of concrete

12   cylinders being tested in compression.

13   Q.   Okay.  If I were to ask you, how is that

14   like a flood wall failing, what would you say?

15   A.   What the idea of the videos is is to show

16   the level of sound that can be created when a

17   concrete sample fails, so that's the analogy

18   that's trying to be drawn there is the level

19   of sound.  For example, if five students are

20   in a laboratory, they will be shocked when the

21   sound was created.  Even if I know the sound

22   is coming, I may hear the popping of the

23   concrete being tested, but it's still

24   startling when you hear the sound, and that's

25   sound on a very small sample compared to what

1    we're talking about.

2    Q.   Are you going to give any opinion that

3    the sounds generated in those videos are like

4    the sound of the flood wall failing in the

5    Industrial Canal, or are they just examples to

6    show that concrete failing can make a sound?

7         MR. RAFFMAN:

8              Objection.

9    A.   I would say that they're examples that

10   show that when concrete fails, a sound is

11   generated.

12   BY MR. SANDERS:

13   Q.   Okay.  But you're not saying that's what

14   a flood wall sounds like when it fails; is

15   that correct?

16   A.   Since they're not flood walls that are

17   being tested, that's not what I'm saying.

18   Q.   I just have to ask.  I think I know the

19   answer, but --

20        MR. SANDERS:

21             Can we take a break for a minute?

22        MR. RAFFMAN:

23             Yes.

24             (A recess was taken).

25             (Whereupon, Mr. Sanders left the

1    deposition due to illness).

2    EXAMINATION BY MR. GILBERT:

3    Q.   Let's go back on the record.  Mr. Weiss,

4    I'm going to backtrack a little bit and I'm

5    going to apologize for doing so, but I think

6    that there's a reason to.

7         Could you open your report to Page 7?

8    It's a copy of your CV.  All right.  What I

9    want to understand is, based upon what I see

10   here in terms of your education, positions

11   held, let's just limit it to that at this

12   point, what experience do you have evaluating

13   the acoustics of concrete failures?

14        MR. RAFFMAN:

15             Objection.

16        MR. GILBERT:

17             You're going to object.  I

18   understand.

19        MR. RAFFMAN:

20             Do you want him to answer that

21   question based on his experience or based

22   solely on the entries under education and

23   positions held?

24   BY MR. GILBERT:

25   Q.   I'll tell you what, let's open your whole

1    experience, your whole history to being fuel

2    to answer that question.

3        What makes you an expert in the area of

4    examining the acoustics of concrete failures?

5    A.    I would say that I have examined the

6    acoustics of concrete failures.  I've written

7    papers on the acoustics that are generated

8    during the failure of concrete materials.

9    Q.    All right.  Okay.  So you've examined it

10   and you've written papers on it?

11   A.    I have also taken a short course on

12   acoustic emission.

13   Q.    All right.  Let's -- Let's -- How did you

14   get into the area of studying the acoustics of

15   concrete failure?

16   A.    While I was doing my Ph.D., one of the

17   projects that I worked on was related to the

18   acoustics of concrete failure.

19   Q.    What was -- Your Ph.D. was Prediction of

20   Early-Age Shrinkage Cracking in Concrete

21   Elements.  Okay.  And so what, you just

22   developed an interest in the field while doing

23   this?

24   A.    As I mentioned, I was working on another

25   project that was dealing with the acoustics of

1    concrete as it failed.

2    Q.    Okay.  And so that, so your Ph.D.

3    research, that was the genesis of your entry

4    into the field of acoustics relative to

5    concrete failure; is that correct?

6    A.    No.  To go back and reclassify what I

7    just said, while I was doing my Ph.D. --

8    Q.    Yeah, let's do it so I understand it.

9    A.    I separate -- I worked on a project that

10   was not necessarily in my Ph.D., but it was a

11   project that was publishable, was published,

12   and it was dealing with the acoustics of

13   concrete failure.

14   Q.    Okay.  That's a little vague.  What was

15   your Ph.D., what was your thesis?  Your thesis

16   was what's listed right here, correct?

17   A.    Correct.

18   Q.    And that is not necessarily a project

19   dealing with the acoustics of concrete,

20   correct?

21   A.    That is correct.

22   Q.    But in the course of developing this

23   thesis, you did some work or something dealing

24   with the acoustics of concrete failure; is

25   that correct?

1    A.   Well, as I've said, I was working on a

2    separate project at the time that was dealing

3    with --

4    Q.   What is the separate project?

5    A.   The project --

6    Q.   Let's -- Let's -- Let's be very specific,

7    okay.  You know, I understand the answers that

8    you've given so far, but I want the specifics

9    as opposed to -- You tell me what special --

10   what separate project were you working on?

11       MR. RAFFMAN:

12           Before you answer the question, I

13   will ask that, Mr. Gilbert, that you allow the

14   witness to finish the answers to the questions

15   you've already asked.

16           Please go ahead and answer the

17   question.

18   A.   The separate project could be described

19   in publications four and five that are dealing

20   with the -- Actually, let me -- number five,

21   number eight, dealing with use of acoustic

22   emission to describe the failure of a

23   reinforced concrete beam while that beam is

24   undergoing testing and undergoing corrosion.

25   BY MR. GILBERT:

1    Q.    Okay.  So what's -- The research you were

2    doing on, what did you say, five and eight,

3    you were doing at the same time as your thesis

4    and there's some connection?

5    A.    I -- There's -- They were at the same

6    time.  I don't -- I'm not sure what you mean

7    by connection.

8    Q.    Well, I asked you how you got into the

9    area of studying the acoustic properties of

10   concrete failure and you told me that there

11   was some separate project going on while you

12   were doing your thesis, and that's the extent

13   of your answer that I understand.  I don't

14   understand the rest of your answer.

15        MR. RAFFMAN:

16            Objection.

17   A.    As I've said, there's projects that you

18   work on while you're a graduate student.  This

19   is not specifically work that is in my Ph.D.

20   thesis, but this is work that I worked on

21   while I was a graduate research assistant.

22   BY MR. GILBERT:

23   Q.    So your Ph.D. has nothing whatsoever to

24   do with acoustics, the acoustic properties of

25   concrete breakage, correct?

```
 1   A.   My Ph.D. has to do with the prediction of

 2   shrinkage cracking and fracture mechanics of

 3   concrete slabs.

 4   Q.   Is that a yes or a no?

 5   A.   Maybe you'd need to rephrase the

 6   question.

 7   Q.   Does your Ph.D. thesis have anything to

 8   do with the acoustic properties of concrete

 9   failure?

10   A.   My thesis does not contain information on

11   the acoustic response of concrete.

12   Q.   So that's a no?

13   A.   Correct, that is a no.

14   Q.   Do you teach any classes?

15   A.   I do.

16   Q.   Do you teach any classes on acoustics?

17   A.   I teach a class that deals with

18   non-destructive tests, and one of the tests

19   that we deal with is acoustic emission.

20   Q.   What is the class called?

21   A.   The class is on --

22   Q.   What is the class called?

23   A.   CE 597.

24   Q.   Not the code, what is the name of the

25   class?
```

1    A.    I would have to look up the official

2    university name, but it's dealing with

3    modeling of heterogeneous materials.

4    Q.    This is a class you teach and you don't

5    know the name of as you sit here today?

6    A.    I know that it's CE 597 is the course

7    code and I would have to look to get you the

8    exact title as it's written in the -- as it's

9    written on the students' transcripts.

10   Q.    What's the subject matter of the class?

11   A.    It's dealing with the modeling of

12   heterogeneous materials and the use of

13   non-destructive techniques to understand those

14   materials.

15   Q.    What is heterogeneous material?

16   A.    A material that's a composite made up of

17   more than one thing.

18   Q.    What does that have to do with acoustic

19   emissions of concrete failure?

20   A.    Concrete is a heterogeneous material,

21   it's a composite material, it's made up of

22   cement paste and aggregates.  That's what it

23   has to do with that.

24   Q.    What does -- So the acoustic emission of

25   concrete failure is one of the subjects that

1    you teach in this, in this class that you've

2    designated by its course code number?

3    A.    Could you repeat the question?

4    Q.    Do you teach your students about acoustic

5    emissions associated with concrete failures in

6    your class?

7    A.    We discuss the use of acoustic emission,

8    and concrete is one example of a material that

9    we would discuss.

10   Q.    Do you teach them how to use concrete

11   emission to evaluate the concrete failure?

12         MR. RAFFMAN:

13             Objection.

14   BY MR. GILBERT:

15   Q.    I'm sorry.  Acoustic emission.  You can

16   answer.

17   A.    We go through a paper that describes the

18   acoustic response of a material as it's

19   failing and we discuss what types of events

20   are generated, how those events are

21   characterized, and how those are used to

22   describe the failure of that material.

23   Q.    How long is a course?  Is it a regular

24   semester?

25   A.    It's a regular semester.

1   Q.   How much time do you spend on going over

2   the acoustic characteristics of concrete

3   failure?

4   A.   The time spent in the course, it is a 15

5   week course, and we generally will spend

6   between one week and two weeks dealing with

7   acoustic emission.

8   Q.   Okay.  How long do you spend dealing with

9   acoustic emissions of concrete failures?  The

10  course -- Back up a little bit then.  The

11  course concerns materials other than concrete,

12  right, any --

13  A.   Correct.

14  Q.   -- any heterogeneous materials, right?

15  A.   Right.

16  Q.   Okay.  How long do you spend dealing, of

17  the time that you spend, one or two weeks you

18  spend dealing with acoustic emission, how much

19  of that time is spent dealing with the

20  acoustic emissions of concrete failures?

21  A.   The time in that course would be a third

22  to half of the time.  A third to half of the

23  time deals with the basics of acoustic

24  emission, a third to half of the time would

25  deal with other materials, and a third to half

1    of the time would deal with the failure of

2    concrete.

3    Q.    Okay.  So a third to a half of one or two

4    weeks?

5    A.    That is correct.

6    Q.    Okay.  Do you teach any other -- I'm

7    sorry.

8    A.    Go ahead.

9    Q.    Well, I want to let you finish your

10   answer, if you had something to add.

11   A.    No.

12   Q.    Do you teach any other classes concerning

13   acoustic emissions?

14   A.    I will briefly introduce acoustic

15   emission in an undergraduate class, but it's

16   for a very short duration.  I will also use

17   acoustic emission in the class that I teach

18   called CE 530, Properties and Production of

19   Concrete, where we'll talk about concrete

20   failure.

21   Q.    You say will, you mean future tense?

22   A.    No, I mean when it's taught.

23   Q.    Do you teach this class presently?

24   A.    This semester, no.  I teach this class on

25   an annual basis.

1    Q.    Okay.  So you taught this class last

2    school year?

3    A.    Yes.

4    Q.    Okay.  And as far as, as far as any

5    connection that class has with acoustic

6    emissions, it's strictly an introductory type

7    of treatment since it's undergrad?

8         MR. RAFFMAN:

9             Objection.

10   BY MR. GILBERT:

11   Q.    Is that a fair understanding of what you

12   said?

13   A.    Which class are we discussing right now?

14   Q.    The two additional classes that you said

15   were undergraduate classes.

16   A.    The undergraduate course would be very

17   preliminary introductory.

18   Q.    Okay.

19   A.    The other, which is a senior level

20   undergraduate/graduate class, would be mostly

21   describing the sounds that are generated as

22   concrete fails.

23   Q.    Okay.

24   A.    And it's mostly in the description of the

25   mechanical response of concrete.

1    Q.    Okay.  So you are not a full-time

2    professor at this time, correct?

3    A.    I am a full-time professor at this time.

4    Q.    But you also run your own business,

5    correct?

6    A.    I -- Yes, I also have a consulting

7    business.

8    Q.    Okay.  Which do you spend more time on?

9    A.    Professor.

10    Q.    Okay.  Who else has your consulting

11    business consulted for besides the parties in

12    this case?

13    A.    We are -- Most of the other work that I

14    deal with deals with short courses or training

15    sessions.

16    Q.    Can I ask you again, who else have you

17    consulted for?

18    A.    There will be a project coming up that's

19    for the Precast Concrete Association.

20    Q.    Who else besides that and the parties in

21    this case?

22    A.    I don't believe anyone else at the

23    current time.

24    Q.    Okay.  Did this company exist at the time

25    you were first contacted in connection with

1    this case?

2         MR. RAFFMAN:

3              Referring to Liu-Weiss?

4         MR. GILBERT:

5              Liu-Weiss.

6    A.   Liu-Weiss was created to do this, this

7    case.

8    BY MR. GILBERT:

9    Q.   Okay.  That's what I thought.  Who is

10   Liu?

11   A.   That would be my wife.

12   Q.   Okay.  Is she also an engineer?

13   A.   She is also an engineer.

14   Q.   Did she do any work in this case?

15   A.   She has not done any work in this case.

16   Q.   She didn't contribute in any way to your

17   report; is that correct?

18   A.   She did not contribute to the report.

19   Q.   Has she read the report?

20   A.   I believe she's read the report for

21   grammatical, but I would have to, I would have

22   to double-check with her if she read it or

23   not --

24   Q.   Okay.

25   A.   -- for grammatical.

1    Q.    So inferring from your answer, she has

2    not given you any feedback on any of your

3    scientific conclusions?

4    A.    This is not -- She does not study

5    concrete.

6    Q.    So the answer is no, she has not?

7    A.    I don't believe so.

8    Q.    Okay.  Has anybody given you any

9    feedback, any other person that you would

10   consider an expert in your field, has anybody

11   else given you any feedback on the scientific

12   premises or conclusions in your report,

13   Exhibit 1?

14   A.    No.  It has been reviewed obviously by

15   Mr. Raffman and the staff at Goodwin and

16   Procter.

17   Q.    To your knowledge, it's been reviewed

18   only by attorneys?

19   A.    To my understanding, yes.

20   Q.    Okay.  If I use the phrase forensic

21   analysis, do you know what I mean?

22   A.    I know the field, and I'm assuming we're

23   talking about forensic analysis as it relates

24   to this as opposed to medical or other.

25   Q.    Correct.  Okay.  Have you done any

1   forensic analysis of any structural concrete

2   failures after the failure has occurred?

3   A.   I'm not a structural engineer, --

4   Q.   I understand.

5   A.   -- so --

6   Q.   All right.  Let me rephrase the question.

7        MR. RAFFMAN:

8             Would you let him finish his answer?

9   BY MR. GILBERT:

10  Q.   Well, go ahead.

11  A.   Maybe you can rephrase.

12  Q.   I think your attorney wants you to finish

13  your answer.

14       MR. RAFFMAN:

15            No, if he was finished, then I

16  apologize.

17       MR. GILBERT:

18            It's okay.

19  BY MR. GILBERT:

20  Q.   Have you done forensic acoustic emission

21  analysis following failure of any concrete

22  structure other than in this case?

23  A.   No.

24  Q.   And I don't just mean as a litigation

25  consultant or anything, I mean in any context.

1    A.   Then I'd like you to expand on the

2    question.

3    Q.   All right.  Have you ever been asked to

4    examine the failure of a concrete object by

5    examining the acoustic properties of this

6    failure by anyone other than a party in this

7    case?

8         MR. RAFFMAN:

9              Objection.

10   A.   I guess the reason I'm -- it's difficult

11   for me to answer your question is a lot of the

12   research that we do will be using acoustic

13   emission to understand the failure of a

14   material, so I guess that's where I'm --

15   BY MR. GILBERT:

16   Q.   Okay.  I can rephrase it if you want me

17   to.

18   A.   Sure.

19   Q.   Okay.  The study that you do is mostly

20   before a failure occurs, it's hypothetical,

21   correct?

22   A.   I wouldn't characterize it as either one

23   of those.  It's a physical sample typically.

24   Q.   All right.

25   A.   And it's typically a sample before,

1    during, and after the failure.

2    Q.   Okay.  But these are -- But as

3    Mr. Sanders had asked you earlier, these are

4    all in the lab, correct?

5    A.   Yes, the majority of work that I do is in

6    the lab.

7    Q.   All right.  Well, there's a majority.  So

8    the minority is in the field?

9    A.   I would have to go back and check.  The

10   majority is in the lab.  I know that I have

11   taken the acoustic emission equipment out into

12   the field, into another lab setting to do

13   larger samples, but the majority is in the

14   field, or in the lab, I'm sorry.

15   Q.   All right.  I'm trying to make it as

16   simple as possible.  I really am.  Has anybody

17   ever hired you to go on site following a

18   concrete object failure and render any

19   opinions or conclusions?

20   A.   To go on site after a failure, no.

21   Q.   Has anybody ever supplied you with

22   material after a failure for you to conduct

23   the test in a lab and render opinions or

24   conclusions about that failure?

25   A.   After a failure, no, obviously with the

 1    exception of what we're talking about here.

 2    Q.   So this is the first time, in this case?

 3    A.   For what you just described, this would

 4    be the first time.

 5    Q.   Okay.  What have you done in the lab

 6    relative to this case?

 7    A.   Nothing in the lab relative to this case.

 8    Q.   What have you done in the field relative

 9    to this case?

10    A.   Nothing in the field relative to this

11    case.

12    Q.   Have you ever been to the site of the

13    Industrial --

14    A.   I have not.

15    Q.   Let me get the entire sentence.  Have you

16    ever been to the site of any of the Industrial

17    Canal flood wall breaches?

18    A.   I have not.

19    Q.   Have you ever been to the site of the

20    17th Street Canal breaches?

21    A.   I have not.

22    Q.   Have you ever been to the site of the

23    London Avenue Canal breaches?

24    A.   I have not.

25    Q.   Have you ever seen photos of the 17th

1   Street Canal breaches?

2   A.   I do not believe that I have.

3   Q.   Have you ever seen photos of the London

4   Avenue Canal breaches?

5   A.   I do not believe that I have.

6   Q.   Were you asked specifically to examine

7   any corroboration between the barge and the

8   failure of the Industrial Canal flood wall?

9        MR. RAFFMAN:

10            Objection.

11  A.   Could you explain what you mean by

12  corroboration?

13  BY MR. GILBERT:

14  Q.   Correlation is the word I think I meant

15  to use.

16        MR. RAFFMAN:

17            Same objection.

18  A.   My expertise is not in barge responses,

19  so --

20  BY MR. GILBERT:

21  Q.   You already testified earlier that you

22  understand the barge dimension is roughly 200

23  feet, correct?

24  A.   Right.  That's my understanding.

25  Q.   Okay.  If I told you that it was 200 feet

1    by 35 feet, would you dispute that?  Would you

2    have any reason to?

3    A.    Without knowing the exact dimension of

4    the barge, no.

5    Q.    All right.  Well, let's assume that it's

6    200-by-35 feet.

7    A.    Okay.

8    Q.    Were you asked in this case to examine

9    the acoustic emissions of any contact between

10   a 200-by-35 foot steel constructed hopper

11   barge and the Industrial Canal flood wall?

12   A.    I was not asked to do that.

13   Q.    Okay.  How can your opinion in this case

14   help a court understand who is liable to the

15   plaintiffs in this case?

16         MR. RAFFMAN:

17             I need to object to that, --

18         MR. GILBERT:

19             Go ahead.

20         MR. RAFFMAN:

21             -- that question.  I think it's a --

22   It's a legal question.  It's an improper

23   question.  I'm not going to instruct him not

24   to answer, though.  I'm not -- Expecting him

25   to understand the issues of liability is a bit

1    of a stretch, Mr. Gilbert, but if you want --

2    BY MR. GILBERT:

3    Q.   How is your opinion helpful to a court in

4    this case to understand the facts of this

5    case?

6         MR. RAFFMAN:

7              I'll make the same objection, but

8    you're welcome to give an answer.

9    A.   It's my -- My report has stated that when

10   concrete materials fail, they make a sound.

11   BY MR. GILBERT:

12   Q.   And is that the sole purpose of your

13   report is to state that when concrete

14   materials fail, they make a sound?

15   A.   That is a --

16        MR. RAFFMAN:

17             I'll make an objection, but go

18   ahead.

19   BY MR. GILBERT:

20   Q.   I think that's a legitimate question.   Go

21   ahead.

22   A.   A large portion of this report is dealing

23   with the concept that when materials fail,

24   they will generate a sound, and that sound is

25   something that will and can be audible.

1   Q.   Okay.  You don't know what the failure of

2   the Industrial Canal's flood wall sounded

3   like, do you?

4        MR. RAFFMAN:

5             Objection.

6   A.   Specifically, I was not there, so I did

7   not hear it, but as I've mentioned, the

8   failure of concrete will make a sound as it

9   fails, so I have familiarity with what

10  concrete sounds like when it fails, but as

11  you've said, could I repeat that sound that

12  was generated?  I can't, because I was not

13  there and I did not hear that sound myself.

14  BY MR. GILBERT:

15  Q.   Do you know how many decibels that sound

16  would be at any particular distance from the

17  concrete failure?

18  A.   Specifically, I cannot say, because

19  there's no measurement of that sound that

20  I've -- I haven't seen any records of that

21  sound.  I will make mention of the fact that

22  when we test small samples, as I mentioned

23  before, they're well over a hundred decibels.

24  Q.   Is the loudness of the sound a function

25  of the surface that has been compromised when

1    a concrete fails?

2    A.   The more energy that's released, the more

3    energy that's going to go into that sound, and

4    the energy is related to the surface area

5    that's created, so the size of the, of the

6    crack, for example, is related to the sound.

7    Q.   Do you know how much surface area was

8    created when the north breach of the

9    Industrial Canal flood wall occurred?

10    A.   An exact calculation I have not done, but

11    it could be estimated based on the size of the

12    wall.

13    Q.   Okay.  What was your estimate?

14    A.   Well, you know the dimensions of the

15    wall, so it's larger than what we're talking

16    about with small samples.  It's a bigger

17    sample.

18    Q.   Did you arrive at a number in conducting

19    your study?

20    A.   I did not arrive at a number.  I

21    specifically have mentioned that I cannot

22    quantify that sound because it's difficult to

23    determine which cracks would have formed at

24    the time of the breach, which cracks would

25    have been there preexisting, which ones would

1    have come after the fact.

2    Q.   And is the same true of the southern

3    breach, that you don't know how much surface

4    area was created at the time of the failure?

5    A.   As I've said, a specific number isn't

6    something I could give you.

7    Q.   Did you arrive at a nonspecific number?

8    A.   I don't know how to answer that question.

9    Q.   Okay.  Well, you said you couldn't give a

10   specific number.  Can you give any number, an

11   estimate of how much surface area was created

12   at the time of the, at the occasion of the

13   southern breach of the Industrial Canal flood

14   wall?

15   A.   It would only be speculation, so I can't

16   do that.

17   Q.   Okay.  But you haven't done that in the

18   course of performing your analysis, correct?

19        MR. RAFFMAN:

20             Done that meaning quantify the

21   surface area?

22        MR. GILBERT:

23             Correct, estimate or quantify

24   specifically or as an estimate.

25   A.   At various times I thought about the

1    size, but I have not quantified it and placed

2    it.

3    BY MR. GILBERT:

4    Q.   Okay.   Was it necessary for you to know

5    the size in order for you to reach any

6    conclusions?

7    A.   The main conclusion was that the size

8    would be bigger than what you would see in a

9    laboratory sample, so you would expect more

10   energy to be released.   I don't know if that

11   answers the question, but that's as close as I

12   can get to.

13   Q.   What can you say about the sound of the

14   southern breach of the Industrial Canal flood

15   wall other than it made a sound?

16   A.   About the characteristic of the sound?

17   I --

18   Q.   Anything.

19   A.   It made a sound, and that sound could be

20   attributed to several different things, and

21   one of those things would be the material

22   failure.

23   Q.   Could one of those things be impact with

24   a 200-by-35 foot barge or contact from a

25   200-by-35 foot barge?

1    A.    It is possible that that could be one of

2    the sounds.

3    Q.    Would that make a sound, that event,

4    contact between an empty 200-by-35 foot barge

5    and the concrete of the Industrial Canal flood

6    wall?

7         MR. RAFFMAN:

8              Objection, incomplete hypothetical.

9    You can answer.

10   A.    I could imagine that that could make a

11   sound.

12   BY MR. GILBERT:

13   Q.    As a person with your experience, aren't

14   you in a position to say definitively that it

15   would make a sound?

16        MR. RAFFMAN:

17             Objection.   Incomplete hypothetical.

18   Go ahead.

19   A.    I think this goes back to what we were

20   discussing earlier, where there are several

21   different things that are going to influence

22   whether a sound is made.   There was a

23   discussion of, you know, if I impact the

24   table, will that make a sound.   It depends

25   upon the rate at which that table is impacted.

1    BY MR. GILBERT:

2    Q.   You don't want to answer this question,

3    do you?

4         MR. RAFFMAN:

5              He is answering.

6    A.   I'm trying my best to answer your

7    question.

8    BY MR. GILBERT:

9    Q.   Do you understand what my question is?

10   A.   Maybe if you wanted to repeat it.

11   Q.   Do you understand what my question is?

12   A.   I believe your question was --

13   Q.   Does it make a sound if a barge makes

14   contact with a flood wall?

15        MR. RAFFMAN:

16             He has answered the question.

17   A.   And I think that I have answered that.

18   BY MR. GILBERT:

19   Q.   Okay.  And the answer is?

20   A.   I said there's a possibility that there's

21   a sound, but it will depend on several

22   different things.

23   Q.   What will it depend on?

24   A.   I mentioned one of the things would be

25   rate.  The other thing would be if a barge is

1    present.

2    Q.   Okay.  Well, let's assume the barge was

3    present.  Okay.  Let's assume that the rate

4    is, oh, I don't know, an inch a second.

5    A.   Again, I --

6    Q.   Would it make a sound?

7    A.   I would assume -- I would say that a

8    sound is definitely possible.  I would assume

9    that there would be a sound.

10   Q.   What would that sound sound like?

11   A.   I don't know what that sound would sound

12   like.

13   Q.   Would it be loud?

14   A.   I don't know what that sound would sound

15   like.  I would imagine something at an inch

16   per second, but that's speculation.

17   Q.   Would it be as loud as -- Well, you've

18   speculated about the surface area exposed at

19   the time of the breach of the north and the

20   south breaches of the Industrial Canal flood

21   wall, correct?

22        MR. RAFFMAN:

23           Objection.  Now he's told you that

24   the surface area of the breach is bigger than

25   a lab sample and we both know it.

1      MR. GILBERT:

2            Are you testifying, Mark?  Come on.

3  A.   The question again?

4  BY MR. GILBERT:

5  Q.   You're not able to speculate about how

6  loud a barge would sound like based on the

7  little bit of information that I've given you

8  in this deposition, correct?

9  A.   I don't have any experience with barges

10 impacting a concrete wall.

11 Q.   How about anything impacting a concrete

12 wall?  Do you have experience with anything

13 impacting a concrete wall?

14 A.   Impact noise is not where my expertise

15 is, so no.

16 Q.   Okay.  What about the sound that falling

17 concrete makes, is that one of your areas of

18 expertise?

19 A.   I typically don't measure falling

20 concrete, so I wouldn't -- I wouldn't say

21 that's something that -- I wouldn't say that's

22 something that I deal with, something I've

23 measured.  It's not something that's an area

24 of expertise of mine.

25 Q.   So it's your testimony that your area of

1    expertise is concrete failure, correct, the

2    acoustic, the acoustic properties of concrete

3    failure, correct?

4    A.    I understand -- Yes, my expertise is in

5    materials failure, specifically related to

6    concrete.

7    Q.    What causes the concrete failure that

8    you, that you -- of the type that you study?

9    If not an impact with something, what would be

10   a cause?

11   A.    I guess I'm not a hundred percent sure I

12   understand the question, but we're dealing

13   with, the causes of the types of failure that

14   we're dealing with, corrosion could be one,

15   the application of a force could be one, the

16   restraint of a volume change could be one.

17   Q.    Application of a force, that could be

18   impact, right?

19   A.    The majority of the work that I deal with

20   deals with what we would consider a static

21   force, and I know that's --

22   Q.    Such as the weight of a building?

23   A.    Such as a slowly applied force typically

24   from a hydraulic actuator, so I say the word

25   static, but it's not -- Static means a slow,

```
 1   slow moving force as opposed to an impact.
 2   Q.   Okay.  What -- Hydraulic actuator, that's
 3   part of the test equipment, correct?
 4   A.   But that's what's applying the force.
 5   Q.   Right.  In real life, what are you trying
 6   to, what are you trying to mimic?
 7   A.   What would be tried to be simulated by
 8   that type of experiment is the application of
 9   a force, the application of a force.
10   Q.   Such as weight?
11   A.   A load.
12   Q.   A load?
13   A.   It could be weight.
14   Q.   Okay.
15   A.   Yes.
16   Q.   All right.  And just so I'm clear, you
17   were not asked to study at all the possible
18   sound that a contact between a barge and the
19   Industrial Canal would make, correct?
20        MR. RAFFMAN:
21             Asked and answered.
22   BY MR. GILBERT:
23   Q.   Okay.  Well, that's what I'm trying to
24   get to.  I don't have a photographic memory.
25   A.   I was not asked.
```

1    Q.    You were not asked?

2    A.    I was not asked.

3    Q.    By them, right?

4    A.    (Witness shakes head).  I was not asked.

5    Q.    To do that?

6    A.    Correct.

7    Q.    Okay.  All right.  You made a statement

8    in your report and I'm going to refer you to

9    it, this is on Page 5, and this is where you

10   bring it all together at the end.  It would be

11   unreasonable to infer, from the witnesses who

12   heard 'boom' sounds near the site of the IHNC

13   breaches, that the 'boom' sounds necessarily

14   represent barge impacts.  To the contrary, the

15   fact the boom sounds occurred at other flood

16   wall breaches in the absence of a barge

17   strongly implies the boom sounds at the IHNC

18   breaches occurred without any involvement of a

19   barge.

20        Why do you say that that strongly implies

21   that the boom sounds occurred without any

22   involvement of a barge?

23   A.    The logic behind that is that, to the

24   best of my understanding, the other flood

25   walls, when they failed, created a boom sound

1    and there was not a barge present in those, to

2    the best of my understanding and, therefore,

3    the barge does not necessarily need to be

4    there to generate the sound, and it's not

5    necessary to infer that the barge is present

6    causing the sound.

7    Q.   I guess, I guess where I'm, where I'm

8    trying to direct your attention is the phrase

9    "strongly implies".  I understand not

10   necessarily, but you said strongly implies.

11   And is that meant to be a denial that the

12   sound was caused by a barge?

13   A.   I can't say if a barge, had a barge been

14   there, if a barge would make a sound or not.

15   What I am saying is that you do not need to

16   have the barge there to create the sound.

17   Q.   Okay.  So you don't reach any, any --

18   Let's be sure that we're clear.  You cannot

19   actually reach the conclusion that the barge

20   wasn't involved, can you?

21   A.   No.

22   Q.   You can say it was not necessarily

23   involved, but you can't reach the conclusion

24   that they occurred, that the sounds occurred

25   without the involvement of a barge?

1       MR. RAFFMAN:

2            Objection.

3    A.   Well, what I've said is that the sound

4    can be generated without the involvement of a

5    barge, and that the barge does not need to be

6    there.

7    BY MR. GILBERT:

8    Q.   I understand that much.  You've also said

9    that the boom sounds at other locations

10   strongly imply that the boom sounds at the

11   Industrial Canal occurred without any

12   involvement of a barge.  You've reached a

13   conclusion here that the barge -- that there's

14   a strong implication that the barge was not

15   involved in the boom sounds on the Industrial

16   Canal.

17   A.   Maybe it would be better to say, does not

18   need to be involved.

19   Q.   Okay.  So --

20   A.   I mean, I think the biggest thing that we

21   can take away or that we should say is that

22   the barge does not need to be present for the

23   sound to be generated, and it may be

24   misleading to infer that a sound necessarily

25   corresponds to the barge, because there would

1  be other sounds that are generated.

2  Q.  I don't understand that last statement

3  you made.

4  A.  Well, when the material fails, there

5  would be other sounds that are generated.

6  Q.  Okay.  Understood.

7  A.  So the fact that there is a sound doesn't

8  necessarily infer that there is a barge there.

9  There are other things that can generate

10  sound.

11  Q.  And that is the extent of your

12  conclusion, correct?

13  A.  I would say that that is a conclusion.

14  Q.  You can't go so far as to say that the

15  sound occurred without the involvement of a

16  barge?

17  A.  No, I can't categorically deny that a

18  barge was there.

19  Q.  Okay.

20  A.  But I guess, again, I would go back to

21  say that the generation of a sound does not

22  infer that the barge had to be present.

23  Q.  I understand that.

24  A.  Okay.

25  Q.  I understand that, but you're not in a

1    position to say the barge was not present, are

2    you?

3         MR. RAFFMAN:

4              Objection.  That's the third time

5    you've asked the question.

6         MR. GILBERT:

7              Well, but he keeps reiterating the

8    first part of his conclusion, so I'm going to

9    make the distinction between that and the part

10   that he's --

11        MR. RAFFMAN:

12             Well --

13        MR. GILBERT:

14             Okay?

15   A.   Can you repeat the question?

16   BY MR. GILBERT:

17   Q.   Yeah.  It's not a fair statement, is it,

18   that boom sounds occurring at other flood wall

19   breaches in the absence of a barge strongly

20   imply that boom sounds at the IHNC occurred

21   without involvement of a barge?

22        MR. RAFFMAN:

23             Same objection.

24   A.   Again, I would go back to what I just

25   said, that the barge doesn't necessarily have

1    to be there.

2    BY MR. GILBERT:

3    Q.    Okay.  Your use of the phrase "strongly

4    implies", is that accurate?

5         MR. RAFFMAN:

6              Same objection.

7         MR. GILBERT:

8              That it's been asked and answered?

9    I haven't asked that question.

10   A.    I mean, I guess what I'm saying here is

11   because there are sounds that are generated

12   somewhere else, you cannot infer that a barge

13   was required to make the sounds.

14   BY MR. GILBERT:

15   Q.    I understand.  I am focusing on the

16   "strongly implies" phrase.  Is that

17   scientific?

18        MR. RAFFMAN:

19              He's just -- Go ahead.

20   BY MR. GILBERT:

21   Q.    Is that a scientific conclusion?

22   A.    I guess I don't under -- When you say

23   scientific conclusion, I mean --

24   Q.    Are you a scientist?

25   A.    I'm an engineer.

1    Q.   Is that an engineering conclusion,

2    "strongly implies"?

3    A.   What I'm saying here is that the barge

4    doesn't necessarily have to be present to

5    create the sound.  Maybe if you rephrase it, I

6    can answer it in a different --

7    Q.   You reach no conclusion, do you, as to

8    whether the barge made the sound?

9    A.   I believe I've already said I don't have

10   a conclusion on whether the barge is present

11   or made the sound.

12   Q.   Okay.  All right.  Now, you infer from

13   witnesses who heard boom sounds near the IHNC

14   breaches, I'm sorry, you liken the boom sounds

15   at the IHNC breaches heard by witnesses there

16   to boom sounds heard by witnesses at other

17   locations, correct?

18   A.   Correct.

19   Q.   How do you know -- How do you draw a

20   correlation between the sounds at the two

21   different locations other than by the

22   witnesses' description?

23   A.   It's only the witnesses' description.

24   Q.   And would you agree that the descriptions

25   can be affected by people's vocabulary?

1   A.   Oh, yes.

2   Q.   That description can be affected by

3   people's perceptions based on what other

4   sounds they've heard in their lives?

5   A.   Sure, because that's going to impact the

6   examples that they use to describe those

7   sounds.

8   Q.   Would you -- Would you -- Would you agree

9   that their description is going to be -- is

10  going to have some -- it's going to be

11  reflective of their emotional state?

12  A.   Oh, I would imagine that their emotional

13  state would impact what they're saying they're

14  hearing.

15  Q.   So is there any scientific correlation

16  between the boom sounds on the London Avenue

17  Canal and 17th Street Canal and the boom

18  sounds on the Industrial Canal?

19  A.   No, because even the fact, boom sounds

20  is, as we've described, it's a very generic

21  term.

22       I guess whenever we reach a point that's

23  a stopping point for you, I don't want to

24  interrupt.

25  Q.   Any time.  Any time.  Pat should have

1    said so.  Any time you want to take a break,

2    it's yours.

3    A.    I don't want to find out that you're

4    close to, you know, that you want to move on

5    to a different topic, but if you've got one or

6    two more questions or --

7         MR. GILBERT:

8              Take a break.

9         THE WITNESS:

10              Okay.

11              (A recess was taken).

12    BY MR. GILBERT:

13    Q.    If a witness claims to see the barge

14    making contact with a wall and hears a boom

15    sound at the same time, do you reach any

16    conclusions as to what that means?

17    A.    Can you rephrase that?

18    Q.    Yes.  If a witness claims to see the

19    barge making contact with the Industrial Canal

20    flood wall and hearing a boom sound

21    simultaneously with seeing that contact, does

22    that influence your opinion in any way?

23    A.    Well, I guess I would say if someone

24    definitively says, I've seen a barge hitting

25    that wall and I've heard a sound, then I would

1    factor that into my opinion.

2    Q.   Did you read depositions of people who

3    said that, just that, just that?

4    A.   I believe there were three depositions

5    that I had seen where people, or read, that

6    people talked about seeing a barge or seeing a

7    barge after the fact, things like that.

8    Q.   Did you read any depositions of anybody

9    who claims to have seen the barge make contact

10   with the flood wall?

11   A.   I believe that there was one deposition

12   that I've read.  There may be -- There may be

13   more, but I believe there was one where there

14   was someone who was mentioning seeing the

15   barge.

16   Q.   Impacting the flood wall or contacting

17   the flood wall?  Because I'm trying to limit

18   the question not to people who saw the barge

19   after the fact, but the people that saw,

20   claimed to have seen the barge having contact

21   with the wall and hearing a boom at that time.

22   That's the limited scope of my question.

23   A.   Yeah, I believe, I believe there was, I

24   believe there was one that was -- Again, with

25   the long listing, I believe there was one.

```
 1    Q.    How did those accounts factor into your

 2    opinions?

 3    A.    Well, they factor in because obviously,

 4    you know, people believe, you know, what they

 5    see, what they hear, what they touch, but the

 6    other thing that factors in is, again, as

 7    you've mentioned before, this is an emotional,

 8    emotional state.  My understanding is that

 9    these are long distances people are looking at

10    this over, it's at the break of dawn for

11    several of these, it's not a nice, sunny day

12    like today, it's obviously in the middle of

13    the storm, so there are obviously -- there are

14    other, you know, there are factors that go

15    into that, as well.

16    Q.    So you're making assumptions about their

17    ability to see what they claim to have seen?

18    A.    Can you -- The word assumptions, I guess,

19    is the word I -- Can you clarify assumptions

20    or use an alternative word and --

21    Q.    You're reaching conclusions about the

22    ability of the people who claim to have seen

23    this to have actually seen this?

24    A.    I'm trying to look at all of the

25    information together and go forward from
```

1    there, so I believe there would be assumptions

2    in every one of these, because not every

3    account says exactly the same.

4    Q.    You're discounting the observations of

5    people who claim to have seen the barge make

6    contact with the flood wall, aren't you?

7    A.    I wouldn't say that they're discounted.

8    I would say that there are many, much less of

9    those, and as I mentioned before, there would

10   be several other factors.  If someone saw, you

11   know, if someone saw that, then they've, you

12   know, then they say -- then they've seen that.

13   I mean, I can't -- It's not in my -- I'm not

14   able to judge what they saw or believe they

15   saw or didn't see.  It's -- I don't know if

16   that answered your question or not.

17   Q.    Well, it didn't, but it gives me

18   something to chew on.

19          MR. GILBERT:

20              Off the record.

21              (Off-the-record discussion).

22   BY MR. GILBERT:

23   Q.    Do you reach any credibility

24   determinations as to what the witnesses claim

25   to have seen in performing your analysis or

1    reporting your conclusions?

2    A.   My analysis was focused on sounds.   I'm

3    not sure the terms that you're discussing of

4    credibility analysis.

5    Q.   No, that's -- Do you disbelieve any of

6    the people in the depositions that you read?

7    A.   Based on just reading the depositions,

8    it's -- I mean, I -- I can't say that, you

9    know, I can't say that this happened at this

10   time or, you know, from just reading their

11   depositions.

12   Q.   If you assume that the testimony is true

13   and accurate of those who claim to have seen a

14   barge impact a wall and to have heard a boom

15   at the same time, does that affect your

16   conclusions?

17        MR. RAFFMAN:

18             I object to the question.

19   BY MR. GILBERT:

20   Q.   You can always answer.

21   A.   Okay.

22        MR. RAFFMAN:

23             I just think it mischaracterizes

24   what he said about people.

25        MR. GILBERT:

1          It's not based on another question.

2     MR. RAFFMAN:

3          Well, no, it makes an assumption

4     about --

5     MR. GILBERT:

6          I'm asking whether he did.

7     MR. RAFFMAN:

8          And I'm trying very hard to be fair

9     with you.

10    MR. GILBERT:

11         I appreciate it.

12    MR. RAFFMAN:

13         So I'll just object and you can go

14    ahead and answer the question as best you can

15    based on, based on --

16    A.   I'm sorry.  In the last two minutes, can

17    I go back to the question?

18    BY MR. GILBERT:

19    Q.   I understand.  Obviously if the sound

20    that people reported was the sound of a barge

21    making contact with the Industrial Canal flood

22    wall, it would alter your conclusions,

23    correct?

24    MR. RAFFMAN:

25         Objection, but go ahead.

```
1    A.   No, I think the conclusion that I've made

2    is that the sound would be generated whether

3    the barge is present or not.

4    BY MR. GILBERT:

5    Q.   Okay.

6    A.   Sound would be generated whether the

7    barge is present or not.

8    Q.   Okay.  Understood.  Thank you for

9    pointing that out.  You're right.

10        You haven't spoken personally with any

11   witnesses to any of the sounds, have you?

12   A.   I have not.

13   Q.   You've conducted no models or simulations

14   of the sound of the Industrial Canal flood

15   wall failures, have you?

16   A.   I have not.

17   Q.   Or the London or 17th Street Canal

18   failures?

19   A.   I have not.

20   Q.   You're not going to rely on the YouTube

21   videos in giving testimony, are you?

22   A.   I guess I'd like an explanation of the

23   word "rely".  In the legal -- I mean, I

24   understand the English sense.

25   Q.   Are you going to demonstrate those videos
```

1    to anyone during trial?

2        MR. RAFFMAN:

3            Objection.  That's a decision

4    counsel will make in the first instance, but

5    go ahead and answer if you know.

6    A.   I guess we'll go back to that statement

7    that it's, I mean, it's hard for me to say

8    what someone would show at, you know -- My

9    understanding of the reason I've included it

10   in here is to give people a description of

11   what the background of sound generated when

12   concrete fails.  I think most people have a

13   belief or don't think about the fact that

14   sounds are going to be generated when

15   materials fail.

16   BY MR. GILBERT:

17   Q.   Okay.

18   A.   It was to provide a point of reference.

19   Q.   Just to be on the safe side then, those

20   YouTube videos don't show any testing of the

21   Industrial Canal flood wall material, do they?

22   A.   No, those -- Well, I -- Not to my

23   understanding.

24   Q.   Okay.

25   A.   I would assume they don't.

1    Q.    Okay.

2    A.    They're not intended to show this

3    particular material.   They're intended to

4    provide background information on what

5    concrete sounds like when it fails in a

6    general sense.

7    Q.    Okay.  Did you rely on those videos in

8    reaching any of your conclusions?

9    A.    No.  As I've mentioned, I searched for

10   videos that would describe what my experience

11   would be, would have been in the lab.

12   Q.    Okay.  And it's not your suggestion that

13   those videos reproduced the sound that the

14   failure of the Industrial Canal flood wall

15   made, is it?

16   A.    To reproduce the exact sound, that --

17   That's not at all what I'm saying.  I'm saying

18   this is a sound that is characteristic of

19   concrete when it fails and would be expected,

20   you know, in a -- If a flood wall fails, if a

21   large piece of concrete fails, these are the

22   types of sounds that one could expect to hear.

23   Q.    But it's only accurate as to the size of

24   the sample that's being tested on the video,

25   correct?

1    A.   Well, the size will make a difference in

2    the amount of sound that's generated.

3    Q.   Okay.  So that's a yes, so if there's

4    a -- Yes?

5    A.   Yes, I mean, the size of the sample will

6    impact the sound.

7    Q.   Okay.  So the demonstration in the video

8    is only valid as to that particular sample?

9         MR. RAFFMAN:

10            Objection.

11   A.   Well, again, I've tried to say that this

12   is sort of a general background of the sound

13   concrete makes when it fails.

14   BY MR. GILBERT:

15   Q.   All right.  Let me clarify.  I don't mean

16   demonstration in trial.  I mean the

17   demonstration depicted in the video.

18        MR. RAFFMAN:

19            I know what you mean, but there's --

20   You don't want me to go on.  You should go --

21   Go for it.

22        MR. GILBERT:

23            That's all I have.

24        MR. RAFFMAN:

25            All right.  Off the record.

```
 1                    (A recess was taken).

 2            MR. RAFFMAN:

 3                No questions.

 4            (Whereupon, the deposition concluded at

 5        12:15 p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    WITNESS' CERTIFICATE

2

3

4            I, WILLIAM JASON WEISS, Ph.D., do

5    hereby certify that the foregoing testimony

6    was given by me, and that the transcription of

7    said testimony, with corrections and/or

8    changes, if any, is true and correct as given

9    by me on the aforementioned date.

10

11   _____        _____

     DATE SIGNED                  SIGNATURE

12

13

14   _____Signed with corrections as noted.

15

16   _____Signed with no corrections noted.

17

18   DATE TAKEN:  September 1, 2009

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3          This certification is valid only for a

4    transcript accompanied by my original

5    signature and original blue stamp on this

6    page.

7          I, Dawn H. Hymel, Certified Court Reporter

8    in and for the State of Louisiana, as the

9    officer before whom this testimony was taken,

10   do hereby certify that WILLIAM JASON WEISS,

11   Ph.D., after having been duly sworn by me upon

12   authority of R.S. 37:2554, did testify as

13   hereinbefore set forth in the foregoing 81

14   pages; that this testimony was prepared and

15   transcribed by me or under my personal

16   direction and supervision; and is a true and

17   correct transcript to the best of my ability

18   and understanding; that I am not related to

19   counsel or to the parties herein, nor am I

20   otherwise interested in the outcome of this

21   matter.

22

23   _____

     DAWN H. HYMEL, #81016

24   Certified Court Reporter

25