# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| IN RE:  KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO:  BARGE | * | and consolidated cases |
| | * | |
| | * | SECTION "K"  (2) |
| *Boutte v. Lafarge* | 05-5531 | * | |
| *Mumford v. Ingram* | 05-5724 | * | |
| *Lagarde v. Lafarge* | 06-5342 | * | JUDGE |
| *Perry v. Ingram* | 06-6299 | * | STANWOOD R. DUVAL |
| *Benoit v. Lafarge* | 06-7516 | * | JR. |
| *Parfait Family v. USA* | 07-3500 | * | |
| *Lafarge v. USA* | 07-5178 | * | |
| *Weber v. Lafarge* | 08-4459 | * | MAG. |
| | * | JOSEPH C. WILKINSON, JR. |
| | * | |
| | * | |

## MEMORANDUM IN SUPPORT OF MOTION TO STRIKE, EXCLUDE AND/OR LIMIT TESTIMONY, OPINIONS, FINDINGS AND CONCLUSIONS OF WILLIAM JASON WEISS, Ph.D.

## I.  BACKGROUND

Persons present in the Lower Ninth Ward during Katrina report "boom" sounds immediately preceding or simultaneous with the sudden and violent first appearance of massive amounts of floodwater washing through the neighborhood.[1]  Persons who report having seen

---

[1] "By that time I got midway in the driveway, I heard a big boom sound."   "Okay.  What happened immediately after that?"  "The water came." *Exhibit A, Barge Plaintiffs' Compendium of Proof No. 3 - Sounds Identified With Barge Contact With Eastern IHNC Floodwall; Exhibit B, Deposition of Lower Ninth Ward resident Arthur Murph, p. 191 – 193, describing sound before flooding.*

ING 4727 impact the eastern IHNC floodwall report "boom" sounds at the instants in which they saw the barge strike the wall.[2]  This sound is likened by some, suspicious that the government detonated the floodwall to re-direct storm surge, to that of an explosion.[3]  On the other hand, one

---

"It sound like I heard it hit something hard.  Boom.  By then I stand by the gate.  When I looked at the gate, here it come." "Then where did you go from the gate after you heard –" "I just standing there.  When I left the gate, I ran." "Why did you run?" "Man, a big 'ole tidal wave coming down the street."  ***Exhibit A; Exhibit C**, Deposition of Lower Ninth Ward resident Andrew Sartin, pp. 45 – 52, describing before flooding.*

A.   You are right, 1725 Jourdan Avenue. Q I think there was an upstairs/downstairs she described? A    Yeah, we stayed upstairs….Q.  All right.  At some point you heard some booms, right?  A.  I heard a boom about one or two times…Q    Before you heard the booms, what was the water like in the neighborhood?   The water was low.  After I heard the booms then the water rise up the steps.  ***Exhibit A;  Exhibit D**, Deposition of Lower Ninth Ward resident Anthony Dunn, pp. 15, 23 - 27.*

"When I got down in the garage, I heard boom, boom, boom, and then the water came in." ***Exhibit A;  Exhibit E**, February 19, 2008 Deposition of Lower Ninth Ward resident Dolores St. Cyr – Butler, pp. 17, 31 – 34, 117 – 118*

[2] A.   Yeah.  Well, when the transformer blows, it's a distinctive noise.  It makes like more of a firecracker sound.  But the sound I heard when I heard the wall break was like an explosion.  It was a deeper boom.  ***Exhibit A; Exhibit F**, Deposition of Sewerage and Water Board Pump Operator Wm. Villavasso,  pp. 118 – 119, describing sounds associated with his observation of a barge at the time and location of the North Breach.*

Q.  What did you see and hear?  A.  I heard a boom, a loud boom, I was coming up out the roof.  When I got on the roof, I looked; just had the second boom occurred, I seen the barge out there against that wall, rocking hitting the wall.  ***Exhibit G**, Deposition of Lower Ninth Ward Resident, Sidney Williams.*

"I seen something on the water that really looked like an ark to me.  I was like that's real funny.  And I didn't – I didn't know it was a barge until I heard it hit.  And when it hit it sounded empty.  And that's what made me realize that it was a barge, the sound of it." ***Exhibit A; Exhibit H**, Deposition of Lower Ninth Ward resident Terry Adams*, p. 80, lines 1 – 9.

[3] ***Exhibit A; Exhibit I**, ABC News interview of Lower Ninth Ward resident Joe Edwards describing boom and flooding. (Please see Exhibit 53, Plaintiffs' Opposition to Lafarge's Motion for Summary Judgment.)*

"Was it a single boom that you heard?"  "No.  It came on like -- impact sounded like explosion, but it kept dragging." ***Exhibit A; Exhibit J**, Deposition of Lower Ninth Ward Resident Michael Bickham,  pp. 63-65, 77 – 78, describing sound before flooding.*

witness draws distinctions between the sound of explosives detonating and the sound he heard in the Lower Ninth Ward.[4]   Witnesses also describe the sound as "empty," relate that the sound "shook the house,"  and  equate it with the sound of a barge striking the Judge Seeber Bridge (N. Claiborne Avenue Bridge) over the IHNC in 1991, or the sound of a "wreck."[5]

Lafarge hopes to offer proof that the sounds the Lower Ninth Ward residents report was concrete breaking – not the ING 4727 striking the eastern IHNC floodwall.  Lafarge has also insinuated through a number of depositions of persons living near the 17th Street and London Avenue Canals - where there were no barges - that sounds these persons claim to have heard during Katrina can be equated with sounds heard in the Lower Ninth Ward.  Lafarge North America, Inc. has retained and listed as an expert witness civil engineer William Jason Weiss,

---

"Why do you believe the barge is responsible?" "Because what I thought was an explosion at the time during the hurricane and what I learned later on down the line is that there was no actual explosion.  It was what I heard.  It was the barge running through that wall."  **Exhibit A; Exhibit K**, *Deposition of Lower Ninth Ward resident Christopher Weaver, p. 140, describing sound before flooding.*

[4] e.g., **"It did not sound like a -- I know a sound from an explosion, and I know a sound from something hitting. "Boom," something hit." **Exhibit A; Exhibit L**, *Deposition of Lower Ninth Ward resident Kevin McFarland, p. 91, describing sound before flooding.* (Mr. McFarland's answer on p. 92 is that he had not ever heard concrete breaking without a person doing something to it.)

[5] "And when it hit it sounded empty."  **Exhibit H**, *Deposition of Lower Ninth Ward resident Terry Adams*, p. 80, lines 1 – 9.

"I heard -- let me tell you what I heard. It was strange.  I heard a boom.  Yes, I did hear boom." "Lots of people had got killed when a barge ran into the Claiborne Bridge.  It was almost like that same sound.  It was kind of like impact, kind of."  **Exhibit A; Exhibit M**,  *Excerpts of April 29, 2009 Deposition of Lower Ninth Ward resident Arthur M. Anderson, III, pp. 61 – 62, comparing sound heard during Katrina to sound of prior barge collision with N. Claiborne Ave. Bridge.*

"It didn't sound like no explosion.  It just sound like a wreck, you know?"  **Exhibit N**, *Statement of Arthur Murph.*

Ph.D., a fledgling forensic consultant whose sole opinions – such as they are – are that when concrete breaks, it makes a sound, and that therefore, because people reported sounds near the 17th and London Avenue Canals, where there were no barges, ING 4727 did not make the sounds reported in the Lower Ninth Ward.  This is spurious impressionism, but not science.  In fact, science does not even govern or guide his efforts.  His sole conclusion is based on an utter absence of inquiry or analysis directed to the salient circumstances of the sounds reported, or the things and substances potentially having caused these sounds.  He does not know what sounds resulted when the eastern IHNC floodwall was breached, does not know what an empty barge sounds like when it contacts a stationary object, and admits that there is no scientific correlation between sounds reported by Lower Ninth Ward residents and those in the areas of the 17th Street and London Avenue Canals.  Nevermind that Dr. Weiss has never been proffered as a forensic expert in litigation before; this is not an assured impediment to qualification of a rightly experienced and competent expert.  Dr. Weiss, however, is not even a novice in the very field of study - if one exists - for which Lafarge proffers him here.  Dr. Weiss' testimony and opinion are probative of exactly nothing.  His deposition and report are attached, as *Exhibit O* and *Exhibit P*, respectively.

## II.  LEGAL STANDARD AND ANALYSIS

### A.  *Threshold Considerations - the Court's Evidentiary Gatekeeping Function*

"Before the Court can embark on analysis of an expert's qualifications and the methodology used, the Court must first make a threshold determination under Rule 702 that the proffered expert testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Under Rule 702, an expert must "bring to the jury more than the lawyers can offer in argument." *Eymard v. Pan American World Airways,* 795 F.2d 1230,

1233 (5th Cir. 1986). *In Re Vioxx Products Liability Litigation*, 414 F. Supp.2d 574,(E.D.La. 2006).

     **1.**    **Scope of Dr. Weiss' Study:**  Dr. Weiss was assigned the objective-oriented task of rendering a conclusion that breaking concrete causes a sound.  He was not asked to analyze what caused any sounds that persons reported, just to convey the platitude that breaking concrete makes a sound. "Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 is in effect a codification of the United States Supreme Court's opinion in *Daubert v. Merrel Dow Pharmaceuticals,* 509 U.S. 579 (1993). In *Daubert,* the Supreme Court held that trial courts should serve as the gatekeeeper for expert testimony and should not admit such testimony without first determining that the testimony is both "reliable" and "relevant." *Id.* at 589." *In Re Vioxx Products Liability Litigation*, 414 F. Supp.2d 574,(E.D.La. 2006). "Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert,* 509 U.S. at 593.  *Id.*  Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)." *Id.*

14

```
11  Q.  2007.  Okay.  And what were you asked to
12  do?
13  A.  Well, the call basically described, this
14  is, we're looking at a flood wall that's
15  failed and we're looking for people who have
16  an expertise in failure of these types.  I
17  mentioned that a flood wall failing is not
18  necessarily something that, you know, is
19  exactly what I do.  And then I was told that
20  the real thing that or the expertise that I
21  was asked to bring to the table was related to
22  what that would sound like during failure and
```

    23   what type of acoustic activity we may expect
    24   from the failure of a wall of that type.
    25   Q.   But since you've never done any work with

                              15
    1    flood walls, your opinion as to what it would
    2    sound like is based on what?
    3    A.   Based on my experience with testing
    4    materials.
    5    Q.   And that's the materials which you said,
    6    the biggest being three feet by --
    7    A.   Right, the sample which I believe we said
    8    was three foot by eight inches by six inches.

                              17
    7    A.   Okay.  Essentially the discussion was to
    8    characterize what this wall would sound like
    9    during failure.

                              51
    8    Q.   Were you asked in this case to examine
    9    the acoustic emissions of any contact between
    10   a 200-by-35 foot steel constructed hopper
    11   barge and the Industrial Canal flood wall?
    12   A.   I was not asked to do that.

He was not asked to consider any sounds ING 4727 could cause.  He was not asked to account

for any of the knocking, grinding or scraping sounds Lower Ninth Ward residents report hearing

at the eastern IHNC floodwall during a short period preceding the flooding.[6]  He was not asked

to account for any boom heard at the instant that witnesses reported seeing the barge contact the

floodwall.  He was not asked to perform any forensic analysis, but merely for a conclusion.

    **2.**      **Dr.Weiss' Opinion:**  Opinions can differ, yet it is hardly a matter of scientific

opinion that when concrete breaks a sound is emitted.  Though according to his testimony, Dr.

---

[6] "A screeching noise.  It was like a  knocking.  Maybe about -- and I might be a little off with the time -- it was a little after 3:00, I think.  I started hearing that noise." ***Exhibit Q***, *Deposition of Lower Ninth Ward resident Towanda Schexnayder, p. 42, lines 6 – 10, describing sound before flooding.*

"And I heard a big scraping sound, you know?" ***Exhibit N***, *Statement of Arthur Murph.*

Weiss was asked to characterize this sound, he cannot.   Neither can he draw it much into correlation with any sounds reported by persons near the eastern Industrial Canal floodwall during Katrina.[7]  Dr. Weiss states that when a concrete cylinder is subject to compression testing in a laboratory setting, its failure makes a sound.[8]  He supports this with videos of such testing found on YouTube, and his personal observation of this type of testing on an approximately 3'x16"x8" concrete slab.[9]  Nothing in this case is fairly represented by generic laboratory tests of which Dr. Weiss is aware in which concrete cylinders or small concrete slabs are crushed by a hydraulic press. By contrast, at issue in this litigation are sounds related by witnesses and associated with contact between ING 4727 and the eastern IHNC floodwall, versus sounds reported at breach locations where there were no barges.

                                                              31
   2  Q.  Are you going to give any opinion that
   3  the sounds generated in those videos are like
   4  the sound of the flood wall failing in the
   5  Industrial Canal, or are they just examples to
   6  show that concrete failing can make a sound?
   7     MR. RAFFMAN:
   8       Objection.
   9  A.  I would say that they're examples that
 10  show that when concrete fails, a sound is
 11  generated.
 12  BY MR. SANDERS:
 13  Q.  Okay.  But you're not saying that's what
 14  a flood wall sounds like when it fails; is
 15  that correct?
 16  A.  Since they're not flood walls that are
 17  being tested, that's not what I'm saying.

                                                              52
   3  Q.  How is your opinion helpful to a court in
   4  this case to understand the facts of this
   5  case?
   6     MR. RAFFMAN:

---

[7] **Exhibit O**, 53:15 - 57:2.
[8] **Exhibit O**, 28:33, 30:12.
[9] **Exhibit O**, 10:15, 28:17, 29:2-5, 77:20, 78:20.

7        I'll make the same objection, but
8    you're welcome to give an answer.
9    A.  It's my -- My report has stated that when
10   concrete materials fail, they make a sound.
11   BY MR. GILBERT:
12   Q.   And is that the sole purpose of your
13   report is to state that when concrete
14   materials fail, they make a sound?
15   A.   That is a --
16       MR. RAFFMAN:
17          I'll make an objection, but go
18   ahead.
19   BY MR. GILBERT:
20   Q.   I think that's a legitimate question.  Go
21   ahead.
22   A.   A large portion of this report is dealing
23   with the concept that when materials fail,
24   they will generate a sound, and that sound is
25   something that will and can be audible.


                                    53
1    .  Okay.  You don't know what the failure of
2    the Industrial Canal's flood wall sounded
3    like, do you?
4        MR. RAFFMAN:
5           Objection.
6    A.   Specifically, I was not there, so I did
7    not hear it, but as I've mentioned, the
8    failure of concrete will make a sound as it
9    fails, so I have familiarity with what
10   concrete sounds like when it fails, but as
11   you've said, could I repeat that sound that
12   was generated?  I can't, because I was not
13   there and I did not hear that sound myself.


                                    53
15   Q.   Do you know how many decibels that sound
16   would be at any particular distance from the
17   concrete failure?
18   A.   Specifically, I cannot say, because
19   there's no measurement of that sound that
20   I've -- I haven't seen any records of that
21   sound.  I will make mention of the fact that
22   when we test small samples, as I mentioned
23   before, they're well over a hundred decibels.

24  Q.  Is the loudness of the sound a function
25  of the surface that has been compromised when

54

1  a concrete fails?
2  A.  The more energy that's released, the more
3  energy that's going to go into that sound, and
4  the energy is related to the surface area
5  that's created, so the size of the, of the
6  crack, for example, is related to the sound.
7  Q.  Do you know how much surface area was
8  created when the north breach of the
9  Industrial Canal flood wall occurred?
10  A.  An exact calculation I have not done, but
11  it could be estimated based on the size of the
12  wall.
13  Q.  Okay.  What was your estimate?
14  A.  Well, you know the dimensions of the
15  wall, so it's larger than what we're talking
16  about with small samples.  It's a bigger
17  sample.
18  Q.  Did you arrive at a number in conducting
19  your study?
20  A.  I did not arrive at a number.  I
21  specifically have mentioned that I cannot
22  quantify that sound because it's difficult to
23  determine which cracks would have formed at
24  the time of the breach, which cracks would
25  have been there preexisting, which ones would

55

1  have come after the fact.
2  Q.  And is the same true of the southern
3  breach, that you don't know how much surface
4  area was created at the time of the failure?
5  A.  As I've said, a specific number isn't
6  something I could give you.
7  Q.  Did you arrive at a nonspecific number?
8  A.  I don't know how to answer that question.
9  Q.  Okay.  Well, you said you couldn't give a
10  specific number.  Can you give any number, an
11  estimate of how much surface area was created
12  at the time of the, at the occasion of the
13  southern breach of the Industrial Canal flood
14  wall?
15  A.  It would only be speculation, so I can't

16  do that.
17  Q.   Okay.  But you haven't done that in the
18  course of performing your analysis, correct?
19      MR. RAFFMAN:
20          Done that meaning quantify the
21  surface area?
22      MR. GILBERT:
23          Correct, estimate or quantify
24  specifically or as an estimate.
25  A.   At various times I thought about the

                                    56
1   size, but I have not quantified it and placed
2   it.

                                    56
13  Q.   What can you say about the sound of the
14  southern breach of the Industrial Canal flood
15  wall other than it made a sound?
16  A.   About the characteristic of the sound?
17  I --
18  Q.   Anything.
19  A.   It made a sound, and that sound could be
20  attributed to several different things, and
21  one of those things would be the material
22  failure.
23  Q.   Could one of those things be impact with
24  a 200-by-35 foot barge or contact from a
25  200-by-35 foot barge?

                                    57
1   A.   It is possible that that could be one of
2   the sounds.

                                    59
2    Okay.  Well, let's assume the barge was
3   present.  Okay.  Let's assume that the rate
4   is, oh, I don't know, an inch a second.
5   A.   Again, I --
6   Q.   Would it make a sound?
7   A.   I would assume -- I would say that a
8   sound is definitely possible.  I would assume
9   that there would be a sound.
10  Q.   What would that sound sound like?
11  A.   I don't know what that sound would sound
12  like.
13  Q.   Would it be loud?

14  A.  I don't know what that sound would sound
15  like.  I would imagine something at an inch
16  per second, but that's speculation.

69

7  Q.  You reach no conclusion, do you, as to
8  whether the barge made the sound?
9  A.  I believe I've already said I don't have
10  a conclusion on whether the barge is present
11  or made the sound.

70

15  Q.  So is there any scientific correlation
16  between the boom sounds on the London Avenue
17  Canal and 17th Street Canal and the boom
18  sounds on the Industrial Canal?
19  A.  No, because even the fact, boom sounds
20  is, as we've described, it's a very generic
21  term.[10]

Dr. Weiss' testimony can be excluded based solely upon the threshold inquiry whether it

will assist the trier of fact to understand the evidence or to determine a fact in issue.  He does not

afford anything useful or relevant to consider in determining the role of sound in the Lower

Ninth Ward witnesses' accounts of the eastern IHNC floodwall failures, or sound's proper role in

the body of proof to be put before the Court.

## B.  Secondary Considerations - Methodology and Qualifications

1.      **Dr. Weiss' Education and Experience:**      Dr. Weiss became interested in

acoustic emissions of failing materials while preparing his Ph.D. thesis on another topic.[11]  He

---

[10] Originally, Dr. Weiss concluded his report (***Exhibit P*** at pp. 4 - 5) saying that because persons near the London Avenue and 17th Street Canal reported boom sounds, and because there was no barge in the London Avenue or 17th Street Canals, the boom sounds at the Industrial Canal were not caused by ING 4727.  He had little choice but to abandon this tenuous reasoning and conclusion during his deposition at 63:7 - 69:18, conceding that the barge could have caused the boom sounds.

has performed no field analysis of the acoustics of failing concrete, and has no practical experience germane to the issues in this case beyond his presence in a laboratory during compression testing of concrete unrelated to this litigation. He observed that when the concrete broke during laboratory compression testing, it made a sound. Dr. Weiss' background is illustrated in the following passages from his deposition.

8

```
 7   Okay.  What is an acoustical engineer?
 8   Have you ever heard the term?
 9   A.   There are people who would classify
10   themselves as acoustical engineers, and this
11   could be really anything from the person who
12   sets up sound in your house would classify
13   themselves as an acoustical engineer, people
14   who work in mechanical engineering who have a
15   specialty in acoustics may classify themselves
16   as an acoustical engineer.
17   Q.   So there's no particular degree that you
18   could get in school or --
19   A.   I'm not aware of every potential degree
20   possibility that's out there, but I know that
21   people typically will get a degree in a
22   specialty with maybe an emphasis in acoustics.
23   Q.   Okay.  And did you do that?
24   A.   I did not.
25   Q.   Okay.  All right.  Have you ever been
```

9

```
 1   qualified as an acoustics expert in a legal
 2   case?
 3   A.   Since this is my first legal case, no.
```

33

```
 3   What makes you an expert in the area of
 4   examining the acoustics of concrete failures?
 5   A.   I would say that I have examined the
 6   acoustics of concrete failures.  I've written
 7   papers on the acoustics that are generated
 8   during the failure of concrete materials.
 9   Q.   All right.  Okay.  So you've examined it
10   and you've written papers on it?
```

---

[11] *Exhibit O*, Deposition of Wm. Jason Weiss, pp. 33-37.

11  A.  I have also taken a short course on
12  acoustic emission.
13  Q.  All right.  Let's -- Let's -- How did you
14  get into the area of studying the acoustics of
15  concrete failure?
16  A.  While I was doing my Ph.D., one of the
17  projects that I worked on was related to the
18  acoustics of concrete failure.

37

7  Q.  Does your Ph.D. thesis have anything to
8  do with the acoustic properties of concrete
9  failure?
10  A.  My thesis does not contain information on
11  the acoustic response of concrete.
12  Q.  So that's a no?
13  A.  Correct, that is a no.

9

10  Could you give us an overview of that?
11  A.  The majority of my research deals with
12  concrete materials and how they perform and
13  how they fail, and acoustic analysis is one of
14  the techniques that I use to characterize
15  those failures.
16  Q.  The acoustic analysis, what does that
17  involve?  Does that involve in a lab?
18  A.  The field would be referred to as
19  acoustic emission, and it's really the study
20  of the generation and classification of those
21  sounds, so --
22  Q.  But, I mean, have you ever gone out,
23  let's say, on behalf of a municipality and
24  monitored a bridge for possible failure or
25  acoustic emissions, things of that nature?

10

1  A.  In my personal work, I have not gone out
2  to monitor bridge to failure, but there are
3  people who will do that type of work with
4  acoustic emission.
5  Q.  So the, I hate to -- Can I summarize that
6  the extent of your work is in a lab?
7  A.  The majority of work that I deal with is
8  in a laboratory setting.

9   Q.   Have you ever done any analyses outside
10   of the lab of any bridges, walls, flood walls,
11   anything of that nature?
12   A.   As it relates to acoustics, I would say
13   no.

12

2   What's the largest piece of concrete that
3   you've done analysis on?
4   A.   Acoustic emission analysis?
5   Q.   Correct.
6   A.   It's hard for me to say definitively that
7   this is the largest samples, but the largest
8   ones that I can think of would be beams,
9   reinforced beams that were approximately three
10   feet long.  Does that --
11   Q.   By what diameter?
12   A.   They would likely have been, and again, I
13   could provide actual dimensions if you'd want
14   those, but --
15   Q.   You're estimating?
16   A.   -- I'm estimating that they were about
17   six inches wide and maybe eight or ten inches
18   deep.

48

15   Q.   All right.  I'm trying to make it as
16   simple as possible.  I really am.  Has anybody
17   ever hired you to go on site following a
18   concrete object failure and render any
19   opinions or conclusions?
20   A.   To go on site after a failure, no.

60

9   A.   I don't have any experience with barges
10   impacting a concrete wall.
11   Q.   How about anything impacting a concrete
12   wall?  Do you have experience with anything
13   impacting a concrete wall?
14   A.   Impact noise is not where my expertise
15   is, so no.
16   Q.   Okay.  What about the sound that falling
17   concrete makes, is that one of your areas of
18   expertise?
19   A.   I typically don't measure falling
20   concrete, so I wouldn't -- I wouldn't say

21   that's something that -- I wouldn't say that's
22   something that I deal with, something I've
23   measured.  It's not something that's an area
24   of expertise of mine.

                                              61
7   Q.   What causes the concrete failure that
8   you, that you -- of the type that you study?
9   If not an impact with something, what would be
10   a cause?
11   A.   I guess I'm not a hundred percent sure I
12   understand the question, but we're dealing
13   with, the causes of the types of failure that
14   we're dealing with, corrosion could be one,
15   the application of a force could be one, the
16   restraint of a volume change could be one.
17   Q.   Application of a force, that could be
18   impact, right?
19   A.   The majority of the work that I deal with
20   deals with what we would consider a static
21   force, and I know that's --
22   Q.   Such as the weight of a building?
23   A.   Such as a slowly applied force typically
24   from a hydraulic actuator, so I say the word
25   static, but it's not -- Static means a slow,

                                              62
1   slow moving force as opposed to an impact.
2   Q.   Okay.  What -- Hydraulic actuator, that's
3   part of the test equipment, correct?
4   A.   But that's what's applying the force.
5   Q.   Right.  In real life, what are you trying
6   to, what are you trying to mimic?
7   A.   What would be tried to be simulated by
8   that type of experiment is the application of
9   a force, the application of a force.
10   Q.   Such as weight?
11   A.   A load.
12   Q.   A load?
13   A.   It could be weight.
14   Q.   Okay.
15   A.   Yes.

Dr. Weiss is not qualified to render any scientific opinion concerning any sound at issue

in this litigation.

15

###### 2.        Lack of Relevance - Absence of Analysis, Methodology and Validation:

Dr. Weiss' report contains only generalized information to the effect that failing concrete makes a sound.  According to his report, laboratory failure analysis of a four inch by eight inch concrete cylinder sounds like "a hardback book being slammed on a table."  **Exhibit B**, Weiss Report, p. 2.  His "analysis" consists of the statement that a larger failure will produce a louder sound.

"Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert,* 509 U.S. at 593.  **Id.**  Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)."  **In Re Vioxx Products Liability Litigation**, 414 F. Supp.2d 574,(E.D.La. 2006).

49

5  Q.   Okay.  What have you done in the lab
 6  relative to this case?
 7  A.   Nothing in the lab relative to this case.
 8  Q.   What have you done in the field relative
 9  to this case?
10  A.   Nothing in the field relative to this
11  case.
12  Q.   Have you ever been to the site of the
13  Industrial --
14  A.   I have not.
15  Q.   Let me get the entire sentence.  Have you
16  ever been to the site of any of the Industrial
17  Canal flood wall breaches?
18  A.   I have not.
19  Q.   Have you ever been to the site of the
20  17th Street Canal breaches?
21  A.   I have not.
22  Q.   Have you ever been to the site of the
23  London Avenue Canal breaches?
24  A.   I have not.

25  Q.  Have you ever seen photos of the 17th

50

1  Street Canal breaches?
2  A.  I do not believe that I have.
3  Q.  Have you ever seen photos of the London
4  Avenue Canal breaches?
5  A.  I do not believe that I have.

77

13  Q.  You've conducted no models or simulations
14  of the sound of the Industrial Canal flood
15  wall failures, have you?
16  A.  I have not.
17  Q.  Or the London or 17th Street Canal
18  failures?
19  A.  I have not.

78

19  Q.  Just to be on the safe side then, those
20  YouTube videos don't show any testing of the
21  Industrial Canal flood wall material, do they?
22  A.  No, those -- Well, I -- Not to my
23  understanding.
24  Q.  Okay.
25  A.  I would assume they don't.

79

1  Q.  Okay.
2  A.  They're not intended to show this
3  particular material.  They're intended to
4  provide background information on what
5  concrete sounds like when it fails in a
6  general sense.
7  Q.  Okay.  Did you rely on those videos in
8  reaching any of your conclusions?
9  A.  No.  As I've mentioned, I searched for
10  videos that would describe what my experience
11  would be, would have been in the lab.
12  Q.  Okay.  And it's not your suggestion that
13  those videos reproduced the sound that the
14  failure of the Industrial Canal flood wall
15  made, is it?
16  A.  To reproduce the exact sound, that --
17  That's not at all what I'm saying.  I'm saying

18   this is a sound that is characteristic of
19   concrete when it fails and would be expected,
20   you know, in a -- If a flood wall fails, if a
21   large piece of concrete fails, these are the
22   types of sounds that one could expect to hear.

Dr. Weiss performed no analysis or testing of the materials or structures composing the eastern IHNC floodwall.  Dr. Weiss acquired no data concerning the floodwall or barge, acquired no data concerning the sounds, conducted no laboratory or field work on any floodwall components, performed no acoustic, tensile or other analysis of any thing or material potentially involved in sound emission in the Lower Ninth Ward or the London or 17th Street Canal areas. He was provided no data as to the size or configuration of the breaches, has seen no photos of them, and knows nothing of the mechanics by which they occurred.  He does not know what sounds witnesses reported, and did not attempt to reproduce or even explain these sounds.  He did nothing remotely forensic or scientific, but merely reported his awareness that breaking concrete makes a sound.  His testimony, though supposedly scientific, is devoid of science.

"Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Id.* at 592-93. In *Daubert,* the Supreme Court set forth a nonexclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id.* at 593-95. Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 138 (1999)." ***In Re Vioxx Products Liability Litigation***, 414 F. Supp.2d 574, (E.D.La. 2006).   "A trial judge determining the admissibility of an engineering expert's testimony *may* consider one or more of the specific *Daubert* factors. The emphasis on the word "may" reflects *Daubert*'s description of the Rule 702

inquiry as "a flexible one." 509 U.S., at 594. The *Daubert* factors do *not* constitute a definitive checklist or test, *id.,* at 593, and the gatekeeping inquiry must be tied to the particular facts, *id.,* at 591. Those factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." ***Kumho Tire Co. v. Carmichael*** (97-1709) 526 U.S. 137 (1999).

There is no forensic or other methodology  - because there was no analysis - and therefore, only Dr. Weiss' aloof statement that failing concrete makes a sound.  There nothing but an analytical gap between the data (none) and Dr. Weiss' conclusion.

**3.     Bias - Rejection of Available Witness Accounts:**  In reaching his conclusion, Dr. Weiss inappropriately limited or discounted the testimony of Lower Ninth Ward sound witnesses, apparently assuming that they were all unable to see or hear what their eyes and ears detected.  He does not appear to have regarded 17th or London Avenue "boom" reports with such skepticism.  He did not investigate any further than an uncertain reading of depositions that left him with unclear impressions.

77
10  You haven't spoken personally with any
11  witnesses to any of the sounds, have you?
12  A.  I have not.

71
18  Q.  Yes.  If a witness claims to see the
19  barge making contact with the Industrial Canal
20  flood wall and hearing a boom sound
21  simultaneously with seeing that contact, does
22  that influence your opinion in any way?
23  A.  Well, I guess I would say if someone
24  definitively says, I've seen a barge hitting
25  that wall and I've heard a sound, then I would

72
1  factor that into my opinion.

2  Q.  Did you read depositions of people who
3  said that, just that, just that?
4  A.  I believe there were three depositions
5  that I had seen where people, or read, that
6  people talked about seeing a barge or seeing a
7  barge after the fact, things like that.
8  Q.  Did you read any depositions of anybody
9  who claims to have seen the barge make contact
10  with the flood wall?
11  A.  I believe that there was one deposition
12  that I've read.  There may be -- There may be
13  more, but I believe there was one where there
14  was someone who was mentioning seeing the
15  barge.
16  Q.  Impacting the flood wall or contacting
17  the flood wall?  Because I'm trying to limit
18  the question not to people who saw the barge
19  after the fact, but the people that saw,
20  claimed to have seen the barge having contact
21  with the wall and hearing a boom at that time.
22  That's the limited scope of my question.
23  A.  Yeah, I believe, I believe there was, I
24  believe there was one that was -- Again, with
25  the long listing, I believe there was one.

73

1  Q.  How did those accounts factor into your
2  opinions?
3  A.  Well, they factor in because obviously,
4  you know, people believe, you know, what they
5  see, what they hear, what they touch, but the
6  other thing that factors in is, again, as
7  you've mentioned before, this is an emotional,
8  emotional state.  My understanding is that
9  these are long distances people are looking at
10  this over, it's at the break of dawn for
11  several of these, it's not a nice, sunny day
12  like today, it's obviously in the middle of
13  the storm, so there are obviously -- there are
14  other, you know, there are factors that go
15  into that, as well.
16  Q.  So you're making assumptions about their
17  ability to see what they claim to have seen?
18  A.  Can you -- The word assumptions, I guess,
19  is the word I -- Can you clarify assumptions
20  or use an alternative word and --

21  Q.  You're reaching conclusions about the
22  ability of the people who claim to have seen
23  this to have actually seen this?
24  A.  I'm trying to look at all of the
25  information together and go forward from

74

1  there, so I believe there would be assumptions
2  in every one of these, because not every
3  account says exactly the same.
4  Q.  You're discounting the observations of
5  people who claim to have seen the barge make
6  contact with the flood wall, aren't you?
7  A.  I wouldn't say that they're discounted.
8  I would say that there are many, much less of
9  those, and as I mentioned before, there would
10  be several other factors.  If someone saw, you
11  know, if someone saw that, then they've, you
12  know, then they say -- then they've seen that.
13  I mean, I can't -- It's not in my -- I'm not
14  able to judge what they saw or believe they
15  saw or didn't see.  It's -- I don't know if
16  that answered your question or not.

**4.**     **Selective Review of Irrelevant and Unreliable Information:**     Dr. Weiss states in his

report that he reviewed "segments" of the 2009 reports of Lafarge's proposed experts Reda

Bakeer and Charles Cushing.  Bakeer and Cushing do not address concrete load failure to any

extent sufficient to support Dr. Weiss' conclusions.  Although Dr. Bakeer describes a "tension

crack" in his report's treatment of the North and South Breaches, he defines this tension crack as

a    flood-side    gap    between    the    concrete    monolith    and    earthen    levee.

The phrase has nothing to do with cracking concrete.  Dr. Bakeer posits that the North Breach

occurred at two adjoining sections of floodwall due to a weak joint between old and new

sheetpile.  At this location is an elastomeric seal.  It is made of rubber, not concrete.  Dr. Bakeer

states of the North Breach that "[p]arts of the concrete cap were damaged or cracked in extension

as the top of the sheet piles flattened (stretched) when the sheet piles "fanned" or spread

laterally."   Photos of the North Breach do not support Dr. Bakeer's claim that the sheetpile flattened, stretched, fanned, or spread laterally, but do show that the corrugations are uniformly intact.  Please see **Exhibit R**, photos contained in Attachment 1 of the Report of Hector Pazos, Exhibit 47 of Plaintiffs' Opposition to Lafarge's Motion for Summary Judgment.

Dr. Cushing also reports a "tension crack," and states that sheet pile at the South Breach expanded.  He wrote, "[m]ore than half of the concrete floodwall panels had cracked off of the part of the sheetpile that made up the bulge," but this is the functional extent of Dr. Cushing's position on the subject (except to agree that the concrete cap at the South Breach was damaged by ING 4727).  Dr. Cushing imparts information about concrete shattering due to contact with ING 4727 - as a means of supporting his conclusion that the breach already occurred before contact with the barge - but precious little-to-nothing which compensates for Dr. Weiss' absent inquiry and analysis.[12]

" "The subject of an expert's testimony must be `scientific . . .knowledge.'" [*Daubert]* at 589-90, 113 S.Ct. 2786 (notation omitted). The testimony must be "ground[ed] in the methods and procedures of science" and "more than subjective belief or unsupported speculation." [*Daubert]*. at  590, 113 S.Ct. 2786." **Paz v. Brush**, 555 F.3D 383(5th Cir. 2009).   "[a] conclusion without any support is not one based on expert knowledge and entitled to the dignity of evidence"; under Daubert, engineering expert must "show how his conclusion . . . is grounded in — follows from — an expert study of the problem").  **Watkins v. Telsmith**, 121 F3d 984(5th Cir. 1997) (citing **Navarro v. Fuji Heavy Indus**., 117 F.3d 1027(7th Cir. 1997)).

Dr. Weiss did what Lafarge asked.  He rendered the conclusion that breaking concrete causes a sound, and offered his supposition that sounds reported by persons living near the 17th

---

[12] Bakeer's and Cushing's Reports are Exhibits 1 and 3 to Lafarge's Motion for Summary Judgment.

Sreet and London Avenue Canals, where there was no barge, "strongly impl[y]" that ING 4727 did not make the sounds reported in the Lower Ninth Ward.  These conclusions sprang to life unhindered by data, analysis, correlation, or relevance to the issues in this litigation.  "The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. *Moore,* 151 F.3d at 27576." ***In Re Vioxx Products Liability Litigation***, 414 F. Supp.2d 574, (E.D.La. 2006).  Lafarge must now do so.  Otherwise, Dr. Weiss is to be excluded.

## III.  CONCLUSION

Because Dr. Wm. Jason Weiss' conclusions are insufficiently probative or helpful to the Court, because they are irrelevant, and because they are unsupported by any scientific or forensic data, methodology, or validation, Dr. Weiss, his testimony, findings, conclusions, and opinions should be excluded and stricken from the record of this litigation.

Respectfully Submitted,

**/s/Brian A. Gilbert**
Brian A. Gilbert (21297)
BEST KOEPPEL TRAYLOR
2030 St. Charles Avenue
New Orleans, Louisiana 70130
Telephone: (504) 885-7700
Telephone: (504) 598-1000
Facsimile: (504) 524-1024
e-mail: bgilbert@briangilbertlaw.com
bgilbert@bestkoeppel.com (pending)

Lawrence D. Wiedemann.(13457)
Karl Wiedemann (18502)
WIEDEMANN & WIEDEMANN
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 581-6180
Facsimile: (504) 581-4336

e-mail: lawrence@wiedemannlaw.com,
karl@wiedemannlaw.com,

Shawn Khorrami (CA SBN #14011)
Dylan Pollard (CA SBN # 180306)
Matt C. Bailey (CA SBN #218685)
Khorrami, Pollard & Abir, LLP
444 S. Flower Street, 33rd Floor
Los Angeles, California 90071
Telephone: (213) 596-6000
Facsimilie: (213) 596-6010
e-mail:  Skhorrami@kpalawyers.com;
DPollard@kpalawyers.com
Mbailey@kpalawyers.com

Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
Voice: 202-862-4320
Cell:   202-549-1454
Facsimile:  800-805-1065 and 202-828-4130
e-mail: rick@rickseymourlaw.net

Patrick J. Sanders (18741)
Patrick J. Sanders, LLC
3123 Ridgelake Drive
Suite B
Metairie, LA 70002
Telephone: 504-834-0646
e-mail: pistols42@aol.com

## CERTIFICATE OF SERVICE

I CERTIFY that a copy of the above and foregoing has been forwarded to all counsel of record by depositing the same in the U.S. Mail, postage prepaid, and/or via ECF upload, this 30th day of November, 2009.

/s/Brian A. Gilbert