# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| IN RE: KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| | * | and consolidated cases |
| PERTAINS TO: BARGE | * | |
| | * | SECTION "K" (2) |
| *Boutte v. Lafarge* 05-5531 | * | |
| *Mumford v. Ingram* 05-5724 | * | |
| *Lagarde v. Lafarge* 06-5342 | * | JUDGE |
| *Perry v. Ingram* 06-6299 | * | STANWOOD R. DUVAL, JR. |
| *Benoit v. Lafarge* 06-7516 | * | |
| *Parfait Family v. USA* 07-3500 | * | MAGISTRATE |
| *Weber v. Lafarge* 08-4459 | * | JOSEPH C. WILKINSON, JR. |

## LAFARGE NORTH AMERICA INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY BY HECTOR PAZOS

Defendant Lafarge North America Inc. ("LNA") moves to exclude expert opinion testimony by Hector Pazos, a naval architect and marine engineer whom plaintiffs have designated to testify about "eastern IHNC floodwall breach causation." Doc. 18390 at 19-20. Mr. Pazos' testimony on breach causation fails to meet the standards for reliability set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), because his opinions are not grounded in scientific methodology, but rather are based on rank speculation, flawed reasoning, unsupported inferences, insufficient data, and other similar defects. Accordingly, Mr. Pazos' testimony should be excluded from the June 2010 bench trial.[1]

---

[1] The June 2010 trial is a bench trial, not a jury trial. *See* Docs. 19112, 19201. Though the Fifth Circuit and this Court have stated that the *Daubert* safeguards "are not as essential" in the context of a bench trial, *see Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000); *Thompson v. Rowan Cos.*, No. 06-3218, 2007 WL 724646 (E.D. La. March 6, 2007), such motions may still be granted in a bench trial. *E.g., Johnson v. Big Lots Stores, Inc.*, No. 04-3201, 05-6627, 2008 WL 1930681, *20 (E.D. La. April 29, 2008) (excluding expert on grounds that opinion was unreliable due to flawed methodology). Regardless, this Court requested *Daubert* briefing in the same order setting the non-jury trial for June 2010 (Doc. 19201 at 2).

Mr. Pazos proffers testimony on the following subjects: (a) the supposed transit of the Barge ING 4727 from the LNA Terminal to the site of the North Breach and South Breach, (b) the supposed impact of the barge on the floodwall, and (c) the supposed process by which the barge created "gaps" between the floodwall and the canal-side soil, allowing water to seep under the wall and cause the wall to fail.[2]  These opinions should be excluded.  First, Mr. Pazos' opinions regarding the transit of the barge are unsupported by ***any*** scientific analysis, and indeed Mr. Pazos did not even consider the scientific data that would have been germane to such an analysis.  Second, Mr. Pazos' opinions regarding the supposed barge impact on the wall are based on demonstrably false assumptions about the forces acting on the barge and the geometry of the floodwall.  Third, Mr. Pazos' opinion that the barge caused the "gaps" that he identified as responsible for the floodwall failures is unsupported by any scientific methodology or analysis or even expertise on the part of Mr. Pazos, and in any event fails to consider, much less rule out, the formation of such gaps without involvement by a barge.[3]

---

[2] Mr. Pazos' expert report also covers such diverse subjects as maritime regulation, rope strength, mooring practices, and coastal hydrology.  With respect to "maritime regulation," any testimony from Mr. Pazos to the effect that LNA's conduct violated a maritime statute or regulation is inadmissible expert "legal opinion."  *See, e.g., Butler v Ensco Offshore Co.*, No. 07-1700, 2009 U.S. Dist. LEXIS 27198 (E.D. La. Mar. 27, 2009).  LNA has moved to exclude similar testimony by Donald Green, and incorporates those arguments by reference here.  Though a *Daubert* motion would be justified as to many of Mr. Pazos' other opinions, LNA has elected leave them for cross-examination at trial.

[3] Well after the deadline for expert reports and rebuttal reports had passed, and after LNA had moved for summary judgment, Mr. Pazos submitted a "declaration" containing several new opinions, which LNA moved to strike.  Doc. 19352, Exh. 87 (Declaration); Doc. 19379 (LNA motion to strike).  Though the Court found LNA's motion to strike "moot" insofar as it concerned LNA's summary judgment motion, Doc. 19426, the Court's comments from the bench suggested that Mr. Pazos would not be permitted to offer these new opinions at trial.  Because several opinions in the new declaration, including those regarding a supposed "meteotsunami," would be inadmissible under *Daubert*, LNA addresses them briefly below.  However, if the Court were to rule that Mr. Pazos will be allowed to testify about the subjects newly included in his untimely declaration, LNA would seek to supplement its *Daubert* briefing.

**ARGUMENT**

**I.  LEGAL STANDARDS UNDER RULE 702 AND DAUBERT**

Under *Daubert*, the trial judge "must ensure that any and all scientific testimony admitted is not only relevant, but reliable."  509 U.S. at 589.  Thus, scientific testimony must have "a grounding in the methods and procedures of science" and involve "more than subjective belief or unsupported speculation."  *Id.* at 590.  The *Daubert* Court identified several factors that can be used to assess scientific testimony, including whether the testimony: (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has an acceptable known or potential rate of error and standards controlling its operation; and (4) is generally accepted within the relevant scientific community.  *Id.* at 593-94.  The purpose is to ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir. 2003).

Federal Rule of Evidence 702 was modified in response to the *Daubert* decision to provide that expert testimony is admissible "if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  The four *Daubert* factors remain relevant under Rule 702 as a "non-exclusive checklist" for assessing the reliability of expert testimony.  Comments to Fed. R. Evid. 702.  Other relevant factors include:

- whether the expert's testimony grows out of work conducted "independent of the litigation" as opposed to work developed specifically for litigation, *id.*;

- "whether the expert has adequately accounted for obvious alternative explanations," *id.* (citing *Claar v. Burlington N.R.R.,* 29 F.3d 499 (9th Cir. 1994)); and, conversely;

3

● "whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion," *id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). *See also, e.g.*, *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004) (*Daubert* factors are a "starting point" for assessing reliability); *Voth v. State Farm Fire & Cas. Ins. Co.*, No. 07-4393, 2009 WL 411459 (E.D. La. Feb. 17, 2009) (Duval, J.) (*Daubert* reliability analysis).

The Fifth Circuit has made clear that "the party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method and, therefore, are reliable." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). Such a showing "requires some objective, independent validation of the expert's methodology," as opposed to the expert's mere "assurances that he has utilized generally accepted scientific methodology." *Id.* Moreover, "[t]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354-55 (5th Cir. 2007).

Under *Daubert* and Rule 702, "a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Moore*, 151 F.3d at 278 (citation omitted).[4] In *Moore*, the en banc Fifth Circuit affirmed the exclusion of "speculative [expert] testimony" regarding causation that had "no scientific support" in the relevant scientific literature. *Id.* at 279. In *Vargas v. Lee*, 317 F.3d 498 (5th Cir. 2003), the Fifth Circuit reversed a jury verdict

---

[4] *See also Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (testimony must be "grounded in the methods and procedures of science" and "more than subjective belief or unsupported speculation") (quoting *Daubert*, 509 U.S. at 590).

because the expert's causation testimony was based on nothing more than two inconclusive studies and the expert's anecdotal experiences.  *Id.* at 501-02.

Expert testimony is inadmissible where it utilizes faulty input data and/or a flawed process for analyzing the data.  For instance, in *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383 (5th Cir. 2009), the Fifth Circuit affirmed the exclusion of plaintiff's causation expert because the expert had based his opinions on erroneous information and did not support his conclusion with references in the scientific literature.  Likewise, expert testimony is subject to exclusion when the expert's conclusions do not flow from the scientific data under consideration. As the Supreme Court stated in *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997), "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Id.* at 146.  In case of doubt, the four *Daubert* factors are often employed to assess whether the expert testimony is based in legitimate science as opposed to something else.[5]

## II.  MR. PAZOS' CAUSATION TESTIMONY SHOULD BE EXCLUDED.

Hector Pazos is a naval architect and marine engineer who was originally retained in 2005 by Ashton O'Dwyer, counsel for the *Parfait Family* plaintiffs.[6]  Mr. Pazos is a litigation expert; over the course of his career providing expert witness services to lawyers, Mr. Pazos has handled "in the neighborhood of 1200 litigation cases."[7]  In this case, Mr. Pazos opined, among

---

[5] *Paz,* 555 F.3d at 390 (court relied on absence of evidence that diagnosis has been "tested or peer reviewed" to affirm exclusion of testimony); *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 279 (5th Cir. 1998) (expert's opinion "had not been tested" and "had not been subjected to peer review or publication" and "the potential rate of error had not been determined or applied" and it "had not been generally accepted in the scientific community").

[6] *See* Exhibit 6 to LNA's Motion for Summary Judgment (Doc. 19309) ("LNA SJ Exh."), Deposition of Hector Pazos ("Pazos Dep.") at 49.  For the convenience of the Court, LNA refers the Court to the depositions and expert reports manually submitted in connection with its summary judgment motion, using the same exhibit numbers here. At the Court's request, LNA will re-submit any such exhibits for purposes of this motion.

[7] *Id.* at 19; *see* comments to Rule 702 (reliability factors include "[w]hether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purpose of testifying") (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995)).

5

other things, that: (1) hurricane conditions (primarily wind) caused the Barge ING 4727 to travel

from the LNA Terminal to the site of the North Breach and then the South Breach; (2) the barge

impacted the floodwall with sufficient force to deflect the wall and create gaps between the

buried sheet pile and the canal side soil; and (3) these barge-created gaps caused the failure of

the floodwall at both the North Breach and South Breach.  None of these three opinions can

withstand the scrutiny required by *Daubert* and Rule 702.

### A.  Mr. Pazos' Testimony About the Movement of the Barge is Inadmissible.

Mr. Pazos opined that the barge "drifted across the IHNC, probably changing a few

degrees of heading several times and also, at time, developing speeds up to 5 or 6 [feet per

second]."[8]  According to Mr. Pazos, "wind [was] the predominant item" acting on the barge

during this time.[9]  Thus, Mr. Pazos expressly opined that the barge was "drifting ***due to wind*** and

impacted the floodwall, initiating the North breach," and that the "drift of the barge towards the

floodwall" was "due to the wind" at the South Breach as well.[10]

A ***scientific*** analysis of wind speed and direction during Hurricane Katrina would have

started with the available meteorological data from the National Hurricane Center and similar

sources, showing the time and track of Hurricane Katrina and the counterclockwise direction of

its hurricane winds as it passed to the east of New Orleans.[11]  The IPET Report and other

independent reports concerning Hurricane Katrina all relied on the available meteorological data

---

[8] LNA SJ Exh. 12, Report of Hector Pazos ("Pazos Report") at 47.

[9] LNA SJ Exh. 6, Pazos Dep. at 104.

[10] LNA SJ Exh. 12, Pazos Report Attachment #1 at 2 (North Breach) (emphasis added); Pazos Report at 52 (South Breach).  Mr. Pazos also ascribed a minor role in the barge transport to wave action in the IHNC.  *See* LNA SJ Exh. 12, Pazos Report at 51.

[11] Mr. Pazos admitted that the hurricane passed to the east of the city, and that the hurricane's winds flowed counterclockwise around its center.  LNA SJ Exh. 6, Pazos Dep. at 108 (wind direction at any specific location is based on movement of hurricane eye and counterclockwise rotation of wind around the eye); LNA SJ Exh. 12, Pazos Report at 37 (hurricane passed east of New Orleans with winds blowing counterclockwise around center).

in forming their conclusions.[12]  Plaintiffs' other experts – apart from Mr. Pazos – agreed that a scientific analysis of wind conditions during Katrina would involve consideration of meteorological data.[13]  LNA's experts also stressed the importance of the meteorological data in forming scientific conclusions about the effect of Hurricane Katrina's winds on the barge.[14]

Mr. Pazos, however, did not even consider, much less analyze, the available meteorological data.  Instead, he said he was "not interested" in what the data had to offer, and thus "didn't concentrate in this activity."[15]  Yet, lacking a grounding in meteorological data, Mr. Pazos freely admitted that it is ***"impossible to predict"*** the course of the barge across the canal – in his own words, it is "***pure guessing***."[16]  Thus, Mr. Pazos' opinion that hurricane winds caused the barge to move across the IHNC to cause the North Breach and then the South Breach lacks any "ground[ing] in the methods and procedures of science," but instead, by his own admission, constitutes nothing more than "subjective belief or unsupported speculation" of the type that *Daubert* rejects.  *Paz,* 555 F.3d at 388; *see also Moore,* 151 F.3d at 276 (en banc Fifth Circuit

---

[12] *See, e.g.,* Exh. 1, ILIT Report at 2-1, 2-4-2-5 and Figs. 2.1, 2.2, 2.8, 2.9; LNA SJ Exh. 20, Team Louisiana Report at 26-27; Exh. 2, Excerpts from IPET Report Volume IV, The Storm, IV-13-IV-17, IV-46-IV-63.

[13] LNA SJ Exh. 15, Spinks 2009 Dep. at 169 (Q: "Would you agree with me it's better in carrying out a scientific study of meteorology to rely on meteorologic data to the extent the data is available?"  A: "Clearly you want to gather the data from where it's available at."); LNA SJ Exh. 8, Marino 2009 Dep. at 71 (Q: "The weather data helps you assess what in fact the wind loads were on the barge in the IHNC at the time of the failure; correct?"  A: "Yes.")

[14] LNA SJ Exh. 31, Dooley Dep. at 50-51, 102-03 ("[M]y report is based on science" from "observations as defined through official observing sites or sites that were reliable and deemed reliable and used within the hindcast study"); LNA SJ Exh. 4, Cushing Dep. at 164 ("I didn't calculate the wind. The wind is – the wind is clearly stated as a fact."); LNA SJ Exh. 19, Bea Dep. at 73-74 ("early information coming out of the IPET investigation" regarding wind direction and timing showed the wind did not blow the barge to the north breach).

[15] LNA SJ Exh. 6, Pazos Dep. at 129 (reviewed "some meteorologic data" but did not "analyze it"); *id.* at 130 ("not interested" in data about "turbulence at this location"); *id.* at 131-32 ("Don't need any meteorologic data"; "I didn't concentrate in this activity"); *id.* at 143 ("I have not developed an investigation" regarding "wind force, direction at different elevations and … turbulence"); *id.* at 150-51 ("[a]bsolutely no" opinion about prevailing wind direction at time of North Breach).  Mr. Pazos submitted an untimely declaration asserting that "local data applicable to the area of the IHNC of interest for Sunday, August 28, 2005 and Monday, August 29, 2005 does not exist."  Doc. 19352, Exh. 87 at 3, ¶ 5.  Such an assertion ignores, among other things, the Lakefront Airport data cited by plaintiffs' expert Gennaro Marino and other scientists.  *See,* LNA SJ Exh. 2, Marino Report at 3-1; Doc. 19352, Exh. 43 at 3.

[16] LNA SJ Exh. 6, Pazos Dep. 123-24 (emphasis added); *see also* LNA SJ Exh. 1, Cushing Report at 129-30, 144 (Pazos ignored meteorological data and principles in his transport analysis; had he considered the meteorological data, he would have come to the opposite conclusion).

affirmed exclusion of causation expert in toxic tort case because expert had no data regarding

level of toluene exposure and causation of injury at any level); *Watkins v. Telsmith, Inc.*, 121

F.3d 984, 992 (5th Cir. 1997) (court affirmed exclusion of expert because "[a]lthough he claimed

experience in analyzing stresses and the appropriate safety factors in cable wires, [the expert] did

not perform any such calculations").[17]

 Instead of scientific analysis, Mr. Pazos relies on selected gleanings from supposed

eyewitness accounts to support his opinion that the barge transited the IHNC and caused the

North Breach and South Breach.  The bulk of Mr. Pazos' expert report consists of "extractions"

from various witness depositions and the "conclusions" he draws from them (typically, repetition

of what the witness said, only with an added spin from Mr. Pazos).[18]  For instance, from the

deposition of William Villavasso (and nothing more), Mr. Pazos concludes that it is a "very

likely scenario that barge ING 4727 made contact with the floodwall and initiated the failure of

the levee, which resulted in the North Breach."[19]  Similarly, from the testimony of three

---

[17] To the extent that Mr. Pazos' conclusions about the transit of the barge involve waves or wave action (*see* LNA SJ Exh. 6, Pazos Report at 51), his opinions are similarly defective.  Scientific data and analytical methods were available to determine the height and direction of waves in the IHNC.  *See, e.g.*, LNA SJ Exh. 21, IPET Report at IV-4, IV-14-1, IV-15-36.  Mr. Pazos, however, failed to carry out *any* scientific analysis of wave conditions in the IHNC.  LNA SJ Exh. 6, Pazos Dep. at 163 (Q:  "Have you done any calculations to support the conclusion that you've got eight to ten foot waves in the Inner Harbor Navigation Canal?"  A:  "Not in this specific case, but I have done it in other occasions. … I didn't try to do it in this case."); *id.* at 175 (Q:  "Have you done any modeling of waves or wave heights in the Inner Harbor Navigation Canal."  A:  "No.. … Q:  "When you say eight to ten foot waves in the canal, have you done any calculations to support those numbers in this case?"  A:  "Not in this case.  I have done it in other cases.").  Without any scientific analysis whatsoever, Mr. Pazos opines in his untimely declaration that a 20-foot "meteotsunami" conveyed the barge from the North Breach to the South Breach.  Doc. 19352, Exh. 87 at 17.  But, as plaintiffs' expert hydrologist, Melvin Spinks, opined:  "I have no reason to believe there were 20-foot waves, based on the science that I've read and studied."  LNA SJ Exh. 15, Spinks 2009 Dep. at 21.  Mr. Pazos has provided no scientific basis to conclude that formation of a 20-foot "meteotsunami" in an area such as the IHNC was even possible, much less that it occurred (and somehow escaped the notice of all but a solitary witness whose account constitutes the sole basis for Mr. Pazos' speculation).

[18] *See* LNA SJ Exh. 12, Pazos Report at 9-28, 41-42.

[19] LNA SJ Exh. 12, Pazos Report at 10.  This Court has noted the weakness of any such inference, given what Mr. Villavasso reported about his own poor eyesight and the visibility conditions in the IHNC at the time.  Doc. 18552 at 21 (quoting Villavasso testimony that his "vision was obscured by rain and darkness" and "not a clear focused picture").  Mr. Pazos, playing the role of an advocate rather than a disinterested expert, omits these passages from his "extractions."  LNA SJ Exh. 12, Pazos Report at 9-10.

witnesses who heard "boom" noises that he says were "most probably created by the barge

contacting the floodwall," Mr. Pazos concludes that there is "no doubt that the barge ING 4727

caused the South breach."[20]  This is not *science*.[21]  Rather, Mr. Pazos has done *no scientific*

*analysis of weather conditions in the IHNC* that could contribute to an understanding of how

the barge could arrived at the floodwall to cause either of the breaches, and his opinions on that

subject based on selected witness extracts are simply not based on science.  *Vargas*, 317 F.3d at

501-02 (expert's observation that patients reported fibromyalgia after trauma was not sufficient

to support conclusion that trauma *caused* fibromyalgia).[22]

     The same is true of Mr. Pazos' subjective interpretation of photographs of floodwall

damage, which are contradicted by plaintiffs' other causation expert, Dr. Marino.  For example,

Mr. Pazos opines that a vertical crack in the floodwall near the North Breach must have been

caused by the barge, while Dr. Marino disagrees and says the crack was caused by torsion and

twisting.[23]  Similarly, Mr. Pazos opines that the barge "scraped away the concrete along the

monolith" in a photograph that Mr. Marino, reviewing the same photograph, says "is not the

---

[20] LNA SJ Exh. 12, Pazos Report at 13.  Mr. Pazos neglects to mention or address the testimony of witnesses in the vicinity of other breaches, such as the London Avenue Canal and 17th Street Canal breaches, who also heard "boom" noises even though no barge was present at those breaches.  *See* Doc. 19309-2 at 14 & Exh. 25 (deposition excerpts from witnesses to other breaches).  In light of this evidence, Mr. Pazos' inference as to the cause of the "boom" sounds near the IHNC is nothing more than speculation.  *See* LNA SJ Exh. 15, Spinks Dep. at 139 ("I can't speculate as to what that noise was."); *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) ("analytical gap between the data and the opinion proffered" is grounds for exclusion).

[21] LNA SJ Exh. 8, Marino 2009 Dep. at 78-79 ("obvious" that "inferences you draw from witness observations" are "based on something other than scientific analysis of the data").

[22]  Mr. Pazos' speculation about meteorological conditions is not aided by his untimely declaration speculating that local winds could have been "at variance to so-called prevailing winds," based solely on his "experience as a sailor, mariner and naval architect."  Doc. 19352, Exh. 87 at 12, ¶¶20-21.  This is uninformed guesswork, not science.  *See Vargas v. Lee*, 317 F.3d 498, 502 (5th Cir. 2003) (doctor's personal experience insufficient to support theory).

[23] *See* LNA SJ Exh. 12, Pazos Report at 42 and LNA SJ Exh. 6, Pazos Dep. at 167 and Exh. 3, Pazos Dep. Exh. 10 (barge caused vertical crack); LNA SJ Exh. 8, Marino 2009 Dep. at 138-40, 179, 181 (torsion and twisting caused same crack); *see* LNA SJ Exh. 1, Cushing Report at 140, Fig. 102 (similar vertical cracks observed at breaches where there was no barge).

consequence of the barge hitting the wall and knocking the concrete off."[24]  Mr. Pazos did no *scientific* analysis to support his opinion that the floodwall damage in these photographs was caused by the barge, as opposed to some other cause, as found by Dr. Marino.[25]  The only conclusion that can be drawn from Mr. Pazos' review of the photographs is that his analysis is unscientific, wholly subjective, and therefore unreliable under the *Daubert* framework.  *See Moore,* 151 F.3d at 278 (en banc) ("Under the regime of *Daubert*, a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.") (citation omitted).

Mr. Pazos' conclusions regarding the transit of the barge lack any of the hallmarks of scientific evidence that would help it qualify for admission under *Daubert.*  For instance, Mr. Pazos has never once subjected any of his conclusions – not in this case, nor in any of the other 1200 litigation cases he has handled – to publication in a peer-reviewed, scholarly journal.  *See Daubert*, 509 U.S. at 593-94; *Paz,* 555 F.3d at 390 (court relied on absence of evidence that diagnosis has been "tested or peer reviewed" to affirm exclusion).[26]  Similarly, in contrast to the accepted meteorological data on which he might have based his analysis, Mr. Pazos has not shown that his opinions regarding the wind-driven transit of the barge can be tested, or are based on generally-accepted scientific methodology, or have any ascertainable (let alone acceptable) rate of error.  *See Daubert*, 509 U.S. at 593-94; *Moore,* 151 F.3d at 279 (expert's opinion "had

---

[24] LNA SJ Exh. 6, Pazos Dep. at 193-94 & Exh. 12 (second photo) (barge "scraped away the concrete"); LNA SJ Exh. 8, Marino 2009 Dep. at 181 (barge did not cause concrete damage in same photo).  In fact, Mr. Pazos' theory about damage from multiple barge contacts is contrary to the supposed eyewitness account of Terry Adams, on whom Mr. Pazos relies, and who said he only saw the barge make one contact and then pass through the floodwall. Compare LNA SJ Exh. 12, Pazos Report at 43 (gaps) with LNA SJ Exh. 23, Adams Dep. at 25 (single contact).

[25] LNA SJ Exh. 6, Pazos Dep. at 194 (Q:  "Have you done any calculations to establish how much energy the barge would need to impart to the wall to scrape all the concrete off the wall in the way that you've suggested?"  A:  "No. I can do it.").

[26] LNA SJ Exh. 6, Pazos Dep. at 29-30 (asked whether any of the hundreds of articles he has written had ever been published in a peer-reviewed scholarly journal, Pazos said: "No, I don't know what you are referring to.").

LIBW/1724440.3

not been tested" and "had not been subjected to peer review or publication" and "the potential rate of error had not been determined or applied" and it "had not been generally accepted in the scientific community").[27]  Mr. Pazos' opinions regarding the transit of the barge are unscientific, unreliable, and inadmissible under *Daubert* and Rule 702.

   **B.  Mr. Pazos' Testimony About Supposed Barge Impact is Inadmissible.**

   In his expert report, Mr. Pazos provides an "impact calculation" in which he purports to derive the force of the barge that was transferred to the floodwall under the conditions imposed by Hurricane Katrina.[28]  Mr. Pazos concludes that these forces caused the floodwall to deflect, opening gaps between the steel sheet pile and the canal-side soil.[29]  Although Mr. Pazos' impact calculations bear some of the trappings of scientific analysis and opinion, his calculations are based on demonstrably false assumptions that render them unreliable and inadmissible.

   The first false assumption built into Mr. Pazos' impact calculations concerns the speed and direction of the wind acting on the barge.  In setting forth the assumptions underlying his calculations, Mr. Pazos states that "[s]ince the wind velocity that existed locally at the times that the barge reached the floodwall is not known, for the purpose of these calculations an average wind velocity of 100 mph … will be used."[30]  Mr. Pazos assumes, without any justification, that the direction of this 100 mph wind is "predominant from west to east."[31]  Mr. Pazos supplies ***no***

---

[27] *See also Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 536 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir. 2006) (expert testimony properly excluded where expert did not conduct any scientific tests or experiments, did not produce or rely upon any studies, and relied on "basic polymer science" that did not bridge gap between basic principles and his complex conclusions).

[28] LNA SJ Exh. 12, Pazos Report at 40 & Attachment #5.

[29] LNA SJ Exh. 12, Pazos Report at 69-71.

[30] LNA SJ Exh. 12, Pazos Report Attachment #5 at 4.  Gusts were not included in this analysis.  *Id.* at 13.

[31] LNA SJ Exh. 12, Pazos Report Attachment #5 at 14.  In basing his calculation on the "predominant" wind direction, Mr. Pazos admits that any analysis of barge transit and floodwall impact requires input data about the direction and speed of the ***prevailing*** wind.  This admission undermines his attempt to opine about wind-driven barge transit without any basis in the supporting meteorological data.

meteorological data to support the existence of a sustained 100 mph west-to-east wind in the IHNC at *any time* during the storm.  To the contrary, according to the National Hurricane Center report on Hurricane Katrina, which Mr. Pazos accepts as an authoritative source,[32] not one official or unofficial reporting station in the New Orleans area reported a sustained wind speed of 100 mph during Hurricane Katrina.[33]  Moreover, Mr. Pazos has no basis to assume a wind direction that was "predominant from west to east" at a time when the storm was south of the city, and the counterclockwise flow of the hurricane winds was from east-to-west, *contrary* to the predominant direction assumed by Mr. Pazos.[34]

The case law makes clear that expert analysis is not reliable and not admissible where, as here, it is based on flawed and improper assumptions.  In *Rosado v. Deters,* 5 F.3d 119, 124 (5th Cir. 1993), the Fifth Circuit held that an accident reconstruction expert's opinion was properly excluded where "he could not independently establish the necessary physical and mathematical bases for his opinion."  Here, Mr. Pazos' opinion is worse than the one excluded in *Rosado* because the evidence – including sources acknowledged by Mr. Pazos himself – shows that his assumptions are not merely lacking in support, but in fact are simply wrong.  *See also Paz*, 555 F.3d at 389 (expert testimony based on incorrect assumption properly excluded).

Another defect in Mr. Pazos' impact analysis is his assumption that a barge impact, if it occurred, would cause the steel sheet pile to deflect, rather than "punching through" the concrete cap and leaving the sheet pile intact.  As part of his impact analysis, Mr. Pazos assumed that the

---

[32] LNA SJ Exh. 6, Pazos Dep. at 116.

[33] Exh. 4, R. Knabb, J. Rhome, and D. Brown, *Tropical Cyclone Report – Hurricane Katrina* (National Hurricane Center, 20 December 2005) at 8, 29-30 (sustained winds in New Orleans area "likely remained weaker than Category 3 strength"; highest reported sustained wind was 60 knots); *see also* LNA SJ Exh. 2, Marino Report 3-1, 3-11 (maximum wind speed of 86 mph).

[34] *See, e.g.*, LNA SJ Exh. 7, Dooley Report; LNA SJ Exh. 2, Marino Report at 3-11 (winds remained "essentially parallel" to IHNC before 9:00 a.m.); LNA SJ Reply Exh. 3, New Orleans Lakefront Airport weather data, Exh. B to Green 2009 Dep. (wind from northeast or north at all relevant times).

steel sheet pile would deflect inland upon impact by the barge.[35]  Mr. Pazos did not analyze, however, whether a barge impact with the top of the floodwall would or even could have caused the sheet pile to deflect, as opposed to simply cracking or shearing the top of the concrete cap without causing the embedded sheet pile to move.[36]  Without conducting such an analysis, Mr. Pazos could not conclude, with any degree of scientific validity, that a barge impact was capable of deflecting the sheet pile wall in the manner that he suggests.[37]

Mr. Pazos' failure to conduct a proper analysis of whether a barge impact could have caused the wall to fail in the manner that he says it did renders his impact analysis unreliable. The case law makes clear that expert testimony is not admissible where the expert fails to undertake necessary analytical steps.  In *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354-55 (5th Cir. 2007), the Fifth Circuit held that expert testimony was properly excluded where the studies cited in the expert's opinion did not support the conclusions drawn by the expert. Similarly, in *Burleson* , 393 F.3d at 586-87, the Fifth Circuit upheld the exclusion of an expert's "radiation hot spot" theory because the expert did not establish that plaintiff suffered a harmful level of exposure and the expert had "failed to conduct a dose assessment."  Here, similar to the flawed causation analyses in those cases, Mr. Pazos has not conducted a proper analysis of

---

[35] LNA SJ Exh. 12, Pazos Report Attachment #5 at 14 (calculating impact based on assumed floodwall deflection).

[36] LNA SJ Exh. 1, Cushing Report at 143 (noting Pazos failure to analyze this issue); LNA SJ Exh. 12, Pazos Report Attachment #5 (failing to analyze this issue); LNA SJ Exh. 8, Marino 2009 Dep. at 59-60 (noting that construction joint constitutes a point of weakness); Exh. 5, Bea Report App. D at 20 ("Notably, although Mr. Pazos performed calculations to estimate the forces acting on the floodwall due to barge contact with the wall (Attachment #5), his report does not conclude that the barge impact was sufficient to dislodge the soil on the opposite side of the wall and cause it to translate back into the neighborhood.").

[37] In fact, such an analysis, if he had carried it out, would have shown that a barge impact was not capable of causing a deflection in the sheet pile as opposed to a crack in the cap.  *See* LNA SJ Exh. 1, Cushing Report at 149.

13

whether the supposed contact between the barge and the wall could have caused the wall to deflect in the manner that he suggests.[38]

### C.  Mr. Pazos' Testimony About "Barge-Created Gaps" is Inadmissible.

Mr. Pazos concludes that the floodwall breaches on the IHNC eastern floodwall occurred due to "gaps [that] are created when the floodwall deflects laterally slightly, which allows water to apply additional lateral pressure against the sheet pile and promote underseepage flows."[39] As disclosed in Mr. Pazos' own report, other investigations such as IPET and ILIT also found that hydrostatic gaps (also called tension cracks) played a role in the IHNC floodwall failures.[40]

Mr. Pazos departs from every other investigation, however, by contending that the ***barge*** caused the formation of these "gaps" between the floodwall and the canal-side soils.[41]  Here, Mr. Pazos – who has no training in geotechnical science or soil/structure interactions – is well out of his depth.[42]  That his conclusions regarding the formation of "gaps" depart so radically from

---

[38] *See also Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) (expert opinion that plaintiff would not have suffered injuries if lap belt had not come unlatched during rollover was excluded because expert did not test for forces acting on lap belt at time of accident); *Fairley v. Clarke*, No. 02-2219, 2004 WL 877102, at *5 (E.D. La., April 22, 2004) (Duval, J.) (excluding expert accident reconstruction analysis based on flawed input data and expert's failure to examine vehicle or skid marks).

[39] LNA SJ Exh. 12, Pazos Report at 43, 69; *see also* Pazos Dep. 90-91 (hydrostatic pressure of building flood is conveyed to protected side through gap that allows water to penetrate).

[40] LNA SJ Exh. 12, Pazos Report at 44; LNA SJ Exh. 18, ILIT Report at 6-10-6-11 (South Breach) and 6-17-6-18 (North Breach); LNA SJ Reply Exh. 2, IPET Report at V-68.

[41] LNA SJ Reply Exh. 1, Bakeer Comments on Pazos Report at 3 (Pazos conclusion "contradicts the findings of all of [the] investigations published to date including those by ILIT, IPET, Team Louisiana, NSF, and ASCE."); LNA SJ Exh. 18, ILIT Report at 6-10-6-11 (South Breach) (noting that "the gap begins to open as the storm surge rises near to the top of the floodwall . . . and the increasing lateral push of the rising surge waters finally destabilizes the system. . .") and 6-17-6-18 (North Breach); LNA SJ Reply Exh. 2, IPET Report at V-68.

[42] LNA SJ Reply Exh. 1, Bakeer Comments on Pazos Report at 5 (although Pazos posits a mechanism of failure that is "geotechnical in nature" – *i.e.*, "the creation of gaps, seepage, and soil failure" – he "claims no such expertise"). *See Rosado v. Dieters*, 5 F.3d 119, 124 (5th Cir. 1993) (accident reconstruction expert not qualified to opine and "could not independently establish the necessary physical and mathematical bases for his opinion").

those of established independent geotechnical scientists, publishing in peer-reviewed scientific literature, renders Mr. Pazos' analysis all the more suspect.[43]

Mr. Pazos supplies no analysis or data to support his conclusion that the barge caused the formation of the "gaps" that he says caused the wall to fail. Such discussion is simply absent from his report.[44] Moreover, Mr. Pazos supplies no analysis or data to explain why these gaps would not have formed in the absence of a barge impact, as every other investigation concluded that they did. To the contrary, Mr. Pazos admits that the gap "is the same type of gap found by the [Army Corps of Engineers] to take place by increasing the hydrostatic pressure on the full-scale field test of a 'test section' of a levee and sheet pile supported floodwall in 1985," and that "[t]his is the exact failure mechanism found by the [Corps] in the experimental levees in the Atchafalaya basin in 1985."[45] In other words, as Mr. Pazos admits, the Army Corps' own tests showed that hydrostatic pressure on the floodwall ***would cause the same type of gap to form without involvement of a barge.*** This is exactly what Reed Mosher, lead investigator for IPET, testified in his deposition in this case.[46] Other independent experts reached similar conclusions.[47] As a matter of science, it is clear that gaps can form without involvement by a barge.[48] Mr. Pazos' failure to address, let alone rule out, this alternative explanation for the

---

[43] *See* comments to Rule 702 ("[W]hen an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied.").

[44] *See* LNA SJ Reply Exh. 1, Bakeer Comments on Pazos Report at 2 ("The [Pazos] report contains no geotechnical analyses or calculations to support its speculative findings and conclusions in this regard.").

[45] LNA SJ Exh. 12, Pazos Report at 49-50; *see also* LNA SJ Exh. 6, Pazos Dep. 95-96 (test was "solid proof that seepage occurred and explain[ed] how seepage occurred through gaps" created by "hydrostatic pressure").

[46] LNA SJ Exh. 11, Mosher Dep. at 59-64, 101-02 (gap formed between the sheet pile and canal side soil, splitting the levee in half and depriving it of canal-side soil resistance; gaps formed at multiple locations -- including at the 17th Street Canal -- and no loading from a barge was needed for such a gap to form).

[47] LNA SJ Exh. 18, ILIT Report at 6-10 (describing formation of gap due to hydrostatic pressure).

[48] LNA SJ Reply Exh. 1 Bakeer Comments on Pazos Report at 5-6 ("In fact, no barge impact or contact was needed to create a tension crack between the canal side soil and the floodwall, as numerous studies have shown." ... "Gaps (tension cracks) developed during Hurricane Katrina along the floodside of many I-walls throughout the New

15

formation of gaps between the floodwall and the canal-side soils on the morning of August 29 is a fundamental flaw in his analysis.  *See, e.g.*, *Michaels v. Avitech, Inc.,* 202 F.3d 746, 753 (5th Cir. 2000) (expert analysis was "lack[ing] any rational probative value" due to failure to address alternative causes).

One of the critical inquiries in a *Daubert* analysis is "[w]hether the expert has adequately accounted for obvious alternative explanations."  Comments to Rule 702 (citing *Claar*, 29 F.3d 499).  Here, Mr. Pazos has not accounted for obvious alternative explanations for the existence of gaps between floodwall and canal side soil.  Indeed, Mr. Pazos ***acknowledges*** that ILIT explained the creation of gaps as the result of hydrostatic pressure (not a barge), but Mr. Pazos then opines (without support) that "the same type of gaps can be created and were created by the barge pushing on the floodwall,"[49] There is no ***science*** to support Mr. Pazos' view.[50]  Indeed, Mr. Pazos does not even attempt to prove that the barge is a more likely cause of the gaps than the acknowledged alternative, hydrostatic pressure.[51]

In the circumstances, Mr. Pazos' extrapolation from the existence of "gaps" to the inference that the barge must have caused them is entirely unwarranted.  In *Joiner,* 522 U.S. 136, the Supreme Court held that a trial judge had properly excluded expert causation opinion that extrapolated from animal studies to conclude that exposure to PCBs caused cancer, finding that

---

Orleans HPS due to hydrostatic water pressure without the involvement of a barge. … Development of tension cracks under hydrostatic pressure is a well-known phenomenon . . . and is discussed in detail in the ILIT, IPET, ASCE and Team Louisiana reports" and in the USACE field studies and design guidelines.); LNA SJ Exh. 19, Bea Dep. 88-89 (gap formed "very, very early that morning due to rising surge waters" and thus "[y]ou do not need a barge" to create the gap).

[49] LNA SJ Exh. 12, Pazos Report at 44.

[50] The best Mr. Pazos can muster is that "hydrostatic pressure was low" at 4:30 am when the north breach occurred, LNA SJ Exh. 12, Pazos Report at 47.  Mr. Pazos, however, provides no quantitative analysis of hydrostatic pressure on the wall, nor would he even have been qualified to do so.

[51] Exh. 5, Bea App. D at 20 ("Mr. Pazos does not produce any quantitative analyses to demonstrate that gapping and seepage did not occur (or could not have occurred) without the intervention of a barge impact on the wall; and the E-99 tests referenced above show that no such intervention is needed to create the sort of tension cracks that Mr. Pazos attributes to the barge."); *id.* at 24 (noting Pazos failure to perform quantitative forensic engineering analyses).

16

"[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* at 146; *see also Burleson*, 393 F.3d at 587 (same).  In *Michaels*, the Fifth Circuit refused to infer that the defendant's negligence had caused contamination in an aircraft vacuum pump, where there were "equally plausible" alternative explanations.  202 F.3d at 753. Here, Mr. Pazos had no basis whatsoever to extrapolate from the existence of "gaps" to the theory that they were caused by the barge.

Regarding the North Breach, Mr. Pazos also fails to account for a weak point on the floodwall identified in his own report – specifically, a "field weld of poor quality" at the North Breach.[52]  Mr. Pazos acknowledges that the poor weld and the discontinuity made this "one of the weakest points on the wall," and that the poor quality weld made it possible for the wall to "develop a hinge between the monolith and the sheet piles."[53]  He further admits that a hinge developed between the monolith and sheet piles at the London Avenue Canal, where no barge was present.[54]  Despite the obvious inference that the faulty weld could have led to failure of the wall under hydrostatic loads in the absence of a barge, however, Mr. Pazos has not undertaken any calculations to establish that a barge impact was needed to cause the weld to come undone.[55] In this respect as well, Mr. Pazos has entirely failed to conduct the scientific analysis necessary to support his conclusions.  In short, Mr. Pazos has failed to supply a ***scientific*** basis for his conclusion that the barge had anything to do with the causes of the IHNC floodwall, and his causation opinions should be excluded.

---

[52] LNA SJ Exh. 12, Pazos Report at 48.

[53] LNA SJ Exh. 6, Pazos Dep. at 152-54.  Mr. Pazos did not inspect the exhumed sheet pile, however.  *Id.* at 82.

[54] LNA SJ Exh. 6, Pazos Dep. at 154.

[55] LNA SJ Exh, 6, Pazos Dep. 155-56 (Q: "Have you done any calculations that establish that the weld could not have come undone based on the hydrostatic pressure in the canal, without the barge?"  A:  "No.  I haven't done any calculation, no.  I can do it.").

## CONCLUSION

LNA's motion to exclude the testimony of Hector Pazos should be granted as set forth above.

Dated: December 1, 2009

Respectfully submitted,

Robert B. Fisher, Jr., T.A. (#5587)
Derek A. Walker (#13175)
**CHAFFE MCCALL, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA  70163-2300
Telephone:  (504) 585-7000
Facsimile:  (504) 585-7075
Fisher@chaffe.com
Walker@chaffe.com

 /s/ John D. Aldock
John D. Aldock
Richard M. Wyner
Mark S. Raffman
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC  20001
Telephone:  (202) 346-4240
jaldock@goodwinprocter.com
rwyner@goodwinprocter.com
mraffman@goodwinprocter.com

Daniel A. Webb (#13294)
**SUTTERFIELD & WEBB, LLC**
Poydras Center
650 Poydras Street, Suite 2715
New Orleans, LA  70130
Telephone:  (504) 598-2715

*Attorneys for Lafarge North America Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 1, 2009.

/s/ John D. Aldock       

LIBW/1724440.3