# EXHIBIT 5

Appendix D to Report of Robert Bea

**APPENDIX D**

**REVIEWS OF JULY 2009 EXPERT REPORTS BY MARINO ENGINEERING ASSOCIATES, MR. HECTOR PAZOS, AND CIVILTECH ENGINEERING**

1.      Appendix D is divided into three sections. Section I provides a summary of my review and critique of the expert report written by Marino Engineering Associates, Inc. (MEA) titled "Failure Investigation of The North and South Breaches Along the IHNC During Hurricane Katrina, St. Bernard Parish, New Orleans, LA" dated July 1, 2009. Section II provides a summary of my review and critique of the expert report written by Mr. Hector Pazos titled "Barge Case – Katrina Levee Breaches, Civil Action No. 05-4419, OOEW Job No. 1450" dated June 29, 2009. Section III provides a summary of my review and critique of the expert report written by CivilTech Engineering, Inc. (CTE) titled "Hurricane Katrina August 2005 analysis of Flooding of the Lower Ninth Ward and St. Bernard Parish New Orleans, Louisiana dated June 2009. Section IV summarizes the major conclusions reached as a result of my review of these two expert reports. The following table of contents will serve as a guide to help reading Appendix D.

## TABLE OF CONTENTS

**REVIEW AND CRITIQUE OF MEA EXPERT REPORT** ...................................................... 2

**REVIEW AND CRITIQUE OF PAZOS EXPERT REPORT** ............................................. 16

**REVIEW AND CRITIQUE OF CTE EXPERT REPORT** .................................................. 21

**SUMMARY OF REVIEWS OF MEA, PAZOS, AND CTE EXPERT REPORTS**.............. 23

# REVIEW AND CRITIQUE OF MEA EXPERT REPORT

2.      The following summarizes major concerns with the MEA lateral stability – failure analyses of the North and South Breaches.

- For 10 of 23 lateral stability ('failure') analyses, MEA assumes a partial gap (to elevation –5 feet, NAVD 88) between the levee soils and the floodwall sheet piling on the IHNC (water side). This partial gap assumption is based on a MEA misinterpretation of results from USACE E99 floodwall tests. This misinterpretation of the E99 floodwall tests is detailed later in this Appendix. For these MEA stability analyses, the result is an underestimate of the surge lateral forces and an overestimate of the stability factors-of-safety (FOS).

- The presence and associated hydraulic effects of the East Bank Industrial Area (EBIA) poorly backfilled excavations immediately adjacent to the North and South Breaches are not included in MEA stability analyses. MEA has the background information that identifies the locations and backfill characteristics of these EBIA excavations. This omission results in important underestimates of the hydraulic destabilizing forces, associated seepage effects on the soil strength properties, and overestimates of the stability FOS.

- The presence and hydraulic effects of the buried infilled Jourdan Canal immediately adjacent to the protected side of the floodwall at the Lower 9th Ward is not included in the MEA stability analyses. This results in underestimates of the hydraulic destabilizing forces, associated seepage effects on the soil strength properties, and overestimates of the stability FOS.

- The hurricane surge destabilizing hydrostatic uplift effects associated with the underlying saturated permeable marsh layers blanketed with the overlying less permeable levee and fill soils are not included in MEA lateral stability analyses. This results in significant underestimates of the hydraulic destabilizing forces and overestimates of the stability FOS

- Even though MEA discusses and details the surge and waves overtopping erosion trenches on the protected sides of the floodwalls, the effects on floodwall and sheet piling supporting characteristics are not included in the MEA stability analyses. This results in overestimates of the soil support - stabilizing forces and stability FOS.

- The MEA stability analyses are based on primitive analyses of soil strength characteristics involving an assembly and aggregation of different soil sampling and testing techniques. MEA fails to make appropriate corrections to laboratory test results to recognize in situ stress and strain conditions appropriate for the specific limit equilibrium lateral stability analyses used by MEA. MEA fails to use modern 'Normalized Soil Properties' methods appropriate for the lateral stability analyses used by MEA. Even though the data has been published, there is no evidence that MEA used the in situ soil strength test data that has been gathered at the breach locations. Generally, the soil strength characterizations developed by MEA result in overestimates of soil stabilizing forces and stability FOS.

- The MEA 2-dimensional (2D) stability analyses are based on circular slide plane analyses that have been demonstrated not to be appropriate in these soil conditions and for these types of analyses. The failure surfaces assumed by MEA result in overestimates of soil stabilizing forces and stability FOS.

- The MEA stability analyses address a limited range in surge water levels - 11.2 feet to 12.5 feet based on the premise that the breaches develop between 6:00 am and 6:30 am (CDT). There is ample information available to indicate that the flooding of the Lower 9th Ward began well before 6:00 am.  For the South Breach that experienced significant surge and wave overtopping prior to breaching (e.g. 2 feet above top of floodwall), this assumption results in underestimates of the surge destabilizing lateral forces at the South Breach and an associated overestimate of the stability FOS.

- The MEA analyses address 3-dimensional (3D) effects at the North Breach. These analyses require assumptions regarding effective width and shape of the initiating failure surfaces. Without objective information to indicate either the width or shape of the initiating failure surfaces, very narrow widths (30 feet and 60 feet) and circular – elliptical failure surfaces are assumed. The narrow width assumption is based on presumed sheet pile tearing breach initiation at the north end of the North Breach. The combined effects of these assumptions are to overestimate soil resistance at the presumed time of failure and an overestimate in the associated stability FOS.

3.        MEA concludes the floodwall at the locations of the North Breach and South Breach is stable for surge water elevations of + 11.2 feet to + 12.5 feet (all elevations referenced here are NAVD 88).  Bea and Cobos-Roa conclude the floodwall was not stable for a surge water elevation of + 9 feet to + 10 feet (North Breach) and + 12 feet to + 14 feet (South Breach). These divergent conclusions result primarily from different characterizations of the floodwall performance including those of the floodwall and sheet piling (e.g. gap development and effects) and those of the soils supporting the floodwall and sheet piling (e.g. soil profiles, soil properties,

failure surfaces, hydraulic effects).  As discussed below, the characterizations employed by MEA are inaccurate and flawed, resulting in substantial overestimates of floodwall stability.

4.        MEA concludes that if the floodwall is stable for the surge water levels of + 11.2 feet to + 12.5 feet (elevations based on deductions from eyewitness reports that indicated failures develop between 6:00 and 6:30 am), and based on the eyewitness testimony, that the ING 4727 cargo barge initiated both the North and South Breaches. MEA does not perform or provide any quantitative analyses demonstrating that the barge was capable of initiating or propagating either the North Breach or the South Breach.

5.        Bea and Cobos Roa conclude that the floodwalls are not stable for water levels of + 9 feet to + 10 feet (North Breach) and + 12 feet to + 14 feet (South Breach), that these conditions are corroborated with the reported and recorded flooding in the immediate vicinity of the breaches (IPET and Team Louisiana investigations), and that the physical evidence indicates the ING 4727 barge must have been a victim of the breaches, not a cause. This is the same conclusion reached by IPET, ILIT, Team Louisiana, and the National Institute of Standards and Technology forensic engineering investigations. The analytical procedures and processes used by Bea and Cobos Roa to assess development of the North Breach and South Breach have been validated with analyses of the breach that developed at the 17th Street Canal (Bea 2008). These analyses have particular importance because they involve a very similar floodwall in a very similar geologic – geotechnical setting and with very similar exacerbating factors (e.g. canal dredged to depth and location intersecting the underlying marsh layers, overturned tree whose rootball hole exposed the underlying marsh layers thereby facilitating hydraulic effects).  Results from the quantitative analytical models to evaluate hydraulic effects and lateral stability were

5

corroborated with video camera photographs and measurements of local canal water levels during Hurricane Katrina (Bea 2008).

6.       The following summarizes major concerns with the MEA seepage – failure analyses of North and South Breaches:

- MEA characterizations of soil layering (geometry, topology) are very different at the North Breach site as compared with ILIT, IPET, Team Louisiana, and Bea and Cobos Roa. As shown below, at the North Breach location, MEA's characterization unjustifiably included an 'unusual lobe' of low permeability – hydraulic conductivity levee construction soil penetrating to approximately –18 feet on the protected side, effectively cutting off the underlying Marsh soils from hydraulic effects and thereby affecting the seepage results (pressures, water transmission, hydraulic gradients).



FIGURE 5.12   EAST-WEST CROSS-SECTION 1-1 AT THE NORTH END OF THE NORTH BREACH

6

This 'unusual lobe' of soil effectively cuts-off the underlying saturated – permeable marsh layers from water and hydraulic pressure transmission from the IHNC. Review of the available soil boring and in situ testing information in this location was not able to identify the location, presence and seepage – hydraulic conductivity of this 'unusual lobe' of soil. Experience with excavations at this location (Bea and Cobos Roa 2008, Bea and Morris 2009) indicate that a sheet pile cofferdam would have to be constructed to allow placement of levee soils to such a depth. This investigation did not disclose documentation of any such construction during construction of the floodwall at the Lower 9th Ward, and there is no indication that levee soils were placed there at any time thereafter.

As shown in the following figures, MEA introduces some similar 'pockets' of low permeability soil below the bottom of the sheetpiling used in the seepage model at the South Breach. There is no documentation to indicate the reasons for the assumptions concerning the presence or characteristics of these 'pockets' of soil. This study failed to identify any of the soil borings cited by MEA that identified such 'pockets' of soils at these locations. The MEA characterizations of soil layering at both the North Breach and South Breach locations results in major underestimation of the seepage and other associated hydraulic effects.



FIGURE 5.46 GEOSTUDIO 2D SEEPAGE MODEL FOR THE NORTH PART OF THE SOUTH BREACH



**SOUTH**

FIGURE 5.47 GEOSTUDIO 2D SEEPAGE MODEL FOR THE SOUTH PART OF THE ~~NORTH~~ BREACH (NAVD88)

- The MEA characterizations of soil properties (e.g. soil horizontal and vertical permeability) are very different compared with ILIT, IPET, Team Louisiana, and Bea and Cobos Roa investigations. Very low values of horizontal permeability are assigned by MEA to the critical underlying saturated – high hydraulic pressure conductivity marsh layers. The permeabilities assigned to these layers are in the "Impervious" category of

8

soils (see Appendix C for more details). Even though these materials are highly anisotropic, MEA generally assigns equal horizontal and vertical permeability to these marsh materials . MEA uses single values of hydraulic conductivity parameters to deduce the seepage and hydraulic conductivity performance characteristics and does not investigate the range of plausible soil properties as they influence the performance of the floodwalls. The values of permeability assigned by MEA to the buried marsh – swamp layers seemingly are based on uncorrected laboratory test results that are not useful for determination of in situ horizontal permeabilities of these soils. Recent in situ test data gathered by the USACE in 2007 in these buried marsh layers show that these layers have very high hydraulic pressure conductivity characteristics (see Appendix C for more details on this very important point). This published in situ test data in these buried marsh layers are not cited nor used in the MEA analyses. The combined effect of the MEA soil properties characterizations are significant underestimates of hydraulic effects – seepage, soil weakening, and uplift pressures.

- MEA does not include presence or effects of the poorly backfilled (sand) EBIA excavations (flood side) or infilled Jourdan Canal (protected side). These omissions result in major underestimates of seepage and other associated hydraulic effects.

- MEA bases its conclusions regarding seepage and hydraulic effects on 2 dimensional seepage analyses. Published journal papers show large underestimates of hydraulic effects are associated with the 2D seepage analyses at this and other similar locations; 3D seepage analyses indicate substantially greater hydraulic gradients and pressures than those determined using 2D analytical methods. The MEA 2D seepage analyses result in significant underestimates of seepage and other associated hydraulic effects.

- The MEA documentation of seepage analyses does not clearly define how the tension gaps between the sheetpiling and soils on the floodside of the floodwalls were modeled. The analysis results shown in the report figures identify a "6-inch gap". It is not clear that the gap, as analyzed by MEA, extends to the bottom of the sheetpiling – and intersects the underlying saturated marsh layers. Given the large and deep 'unusual lobe' of low permeability levee soils on the floodside of the North Breach and the 'pockets' of low permeability soils at and below the bottom of the sheetpiling at the South Breach it is not clear what effects – if any – the tension gap has on the seepage – hydraulic pressures since the 'unusual lobe' and 'pockets' of relatively impermeable soil in MEA's analysis effectively cuts off hydraulic pressures and water transmission through the underlying marsh layers.

7.      MEA and Bea and Cobos-Roa do not develop comparable seepage (hydraulic gradient) FOS for comparable conditions. MEA concludes that there are no important seepage effects present at times of development of the North Breach and the South Breach. Bea and Cobos Roa conclude there are very important seepage – hydraulic pressure effects present at the time of development of the North Breach (hydraulic gradients exceed unity) and significant similar effects present at the time of development of the South Breach. The differences in results from these two sets of analyses are due to differences in the 'input characterizations' used to perform the seepage – hydraulic effects analyses. These different input characterizations include soil layering and geometry, soil hydraulic conductivity, the tension gaps, the backfilled EBIA excavations and infilled Jourdan Canal, and 2D versus 3D hydraulic conductivity and seepage analyses.  The input characterizations by Bea and Cobos-Roa, reflected in their peer-reviewed work, are more accurate and valid, and yield more reliable results.

8.       In properly reporting and understanding development of the North Breach and the South Breach it is important to recognize that a breach can take several hours to develop and the development involves multiple 'modes of failure'. In the case of the North Breach, the forensic engineering evidence developed by Bea and Cobos Roa indicate that the breach likely was initiated by seepage – hydraulic uplift effects that as differential deformations developed in the supporting soils, the vertical water stops connecting the concrete floodwall panels opened admitting large quantities of surge flood water. As the process continued, the tearing of the sheet piling at the north end of the North Breach could have been initiated. As the process further developed, the hydraulic lateral and vertical forces destabilized this particular section of the floodwall (due to reduced cross section and toe elevation of supporting soil levee), resulted in the dramatic final and apparently very rapid flipping of the floodwall and sheet piling.  The forensic engineering analyses developed by Bea and Cobos Roa indicate a similar process developed later at the South Breach with reduced effects from seepage and no tearing of the sheet piling interlocks. No barge impact or impacts were required to initiate these breaches.

9.       MEA addresses analyses of the results from the full-scale floodwall test performed by the USACE in the Achafalaya Basin in 1985 identified as the E99 test. Based on the measured deformations of the experimental floodwall, MEA concludes that no 'tension' crack opens between the sheet piling and the supporting soils. MEA fails to realize that these 'slope indicator' measurements were performed on the protected side and are in front of and not behind the floodwall – the measured deformations can not be used to determine relative movements between the soils and sheetpiling on the tension or water side of the experimental floodwall.

Most important, MEA ignores the measured data from piezometers that were embedded in the soils on the protected and unprotected sides of the floodwall sheet piling. These piezometer measurements showed that hydrostatic pressures developed along the sheet piling for substantial loadings all the way to the tips of the sheet piling. As indicated by the following quotation from the original E99 test report, the water pressures at the tips of the sheet piling were equal to the head of water on the floodside of the experimental floodwall: "*The floodside piezometer readings made at Sta 100+75 on 3 September 1985 indicated that the floodside piezometric level in the foundation above the tip of the sheet pile was near the ponded water level (el 14.5). Therefore, for test wall analysis purposes, it was assumed that the floodside piezometric level was equal to the ponded water level (head) and that the landside piezometric level was between el 4.0 and 5.0.*" (Jackson 1988). These elements have been addressed in a discussion by Bea and O'Reilly which is in press in the peer reviewed ASCE Journal of Geotechnical Engineering. The MEA incorrect analysis of the E99 floodwall load test data leads to a similar incorrect analysis of the surge water lateral loadings exerted on the floodwalls at the Lower 9th Ward during Hurricane Katrina – for the 'partial gap' analyses (assumed gap to –5 foot elevation) the hydrostatic forces are substantially under-estimated and the associated lateral stability factors of safety for given water levels are over-estimated in MEA's analysis.

10.      The methods Bea and Cobos Roa have used to determine the 'effective' soil shear strengths are detailed in the refereed journal publications by Seed et al (2007, 2008), Bea (2008), Bea and Cobos-Roa (2008), and Bea, Storesund, and Cobos-Roa (2008). Modern 'normalized soil properties' characterization methods are used that are applicable to both the effective stress Finite Element Analysis and total stress limit equilibrium analytical models. These methods were also applied by Brandon, Vroman, and Duncan in their report to the USACE titled "Evaluation

of 17th St. Canal DSS (Direct Simple Shear) data" (part of the USACE documentation accompanying the report on the 17th Street Canal Safe Water Levels). Determination of the effective shearing strength of the soil is dependent on the analysis method (total stress or effective stress which takes into account pore water pressure changes), the methods used to 'sense' the soil shear strength properties (in situ testing and laboratory tests performed on samples retrieved from soil boring – coring). These factors were addressed by the American Society of Civil Engineers Hurricane Katrina External Review Panel (2006, 2007) and by National Research Council (NRC) Committee on New Orleans Regional Hurricane Protection Projects (2006). The analyses performed by MEA have not been founded on these important concepts.

11.      Initially, in the analysis of lateral stability of the flood protection structures performed by Bea and Cobos Roa, it was assumed that there were no significant effects on lateral stability of the flood protection structure associated with hydraulic uplift pressures developed in the marsh layers under the flood protection structures. Seepage analyses were performed to determine the potential for blow-out initiated failures. Lateral stability analyses were performed to determine the potential for lateral stability initiated failures. Initially, 'coupled' analyses (seepage and stability) were not performed. As understanding developed further, validated lateral stability analyses were performed that included the hydraulic uplift pressures. As a result of the revised analyses that accounted for the hydraulic uplift pressures determined from the hydraulic conductivity seepage analyses, the stability analyses were able to develop close agreements between recorded and reported water levels in the 17th Street Canal and at the Lower 9th Ward at the time of the initiation of the breaches. Summaries of results from this additional work have been published in several peer reviewed conference and journal papers (Bea 2008; Bea and

13

Cobos-Roa 2008, Cobos-Roa and Bea 2008).   See details provided in Appendix C for more details. It is important to note that none of the MEA analyses have been published in peer reviewed conference or journal publications.

12.        Initially, the hydraulic conductivity seepage and pressure effects developed from the analyses of development of the breach at the 17th Street Canal and at the Lower 9th Ward  by Bea and Cobos Roa were based on two-dimensional (2D) finite element analyses. Subsequently, this work was extended to three-dimensional (3D) finite element analyses (Cobos-Roa and Bea 2008). This additional work included additional studies of the North and South Breaches at the Lower 9th Ward (Cobos-Roa and Bea 2009). The additional work has been documented in two peer reviewed journal publications and has shown that the two-dimensional hydraulic conductivity analyses tend to substantially underestimate seepage and hydraulic pressure effects (figures shown below). These findings have been corroborated by other investigators (e.g. Money 2006). Computed hydraulic gradients determined for the North and South Breaches at the Lower 9th Ward increased by 30% to 50%, respectively (Cobos-Roa and Bea 2009; see Appendix C for more details). As shown by the results summarized in the following figures, the vertical hydraulic gradients at the North Breach were clearly able to cause 'blowout' of the soils at this location very early the morning of August 29, 2005 (e.g. 4:30 am). The hydraulic gradients at the South Breach, while considerably lower, were significant in helping reduce the lateral stability of the floodwall at this location (hydraulic gradients in excess of 0.5 are deemed unacceptable by USACE for stability of levees).



2D and 3D hydraulic gradients for the North Breach



2D and 3D hydraulic gradients for the South Breach.

## REVIEW AND CRITIQUE OF PAZOS EXPERT REPORT

13.       Mr. Pazos relies primarily on eyewitness testimony which he cites in his expert report and "extractions" from other studies of the North Breach and South Breach. In one of those extractions (page 28, F. Comments Regarding the Declaration and the DVD of Dr. Robert Glenn Bea, Doc. #22) Mr. Pazos states:

*"On page 49 of his declaration, Dr. Bea's questions…"what came first; the barge or the breach?" but, later on, in a speech recorded on video (DVD) Dr. Bea blames the barge for breaking the IHNC East floodwall and flooding the Ninth Ward. The DVD was apparently made in the field during Dr. Bea's visit to the site where the barge was aground. In his*

16

*recorded speech, he uses the following words: "Barges broke loose from its moorings and*

*run into levees, unfolding the levee under excessive forces from the colliding barge"."*

This attempted characterization of my work and conclusions is inaccurate and incomplete in the

following respects.

- Mr. Pazos fails to inform the reader that the video was made during the morning of October 2, 2005, the date of my first field examination of the breaches at the Lower 9th Ward.   The Declaration that Mr. Pazos references was written on September 17, 2007. Thus the video was not made "later on" – but, rather, much earlier than the Declaration. As detailed in the cited September 2007 Declaration, the intensive and extensive forensic engineering investigations conducted following the video (almost 2 years later) had clearly shown that the ING 4727 barge was a "victim of the South Breach – not a cause."

- The only "role" evidenced by my forensic engineering investigations, and those performed by other investigators, was that the ING 4727 barge had created localized damage to the floodwall at the south end of the South Breach, where it impacted the wall after it had already failed.  Even though the floodwall had obviously been impacted by the barge at this one location, the barge did not cause general instability of the floodwall at this location – the impact zone was at the south end of the South Breach, not at the center as would be expected if the barge had been involved in development of this very wide breach.

- It is important to note that none of the major forensic engineering investigations (USACE IPET, ILIT, Team Louisiana, National Institute of Standards and Technology) found any evidence of a barge impact zone at the North Breach. Moreover, the forensic engineering investigations did not find any evidence of the obvious signature of a barge impact –

crushed concrete and exposed steel reinforcement at the tops of the concrete panels – at any other location along the entire floodwall.

14.　　　In his Description of the Design of the Floodwall in the Area of the South Breach (Section L, page 35), Mr. Pazos states:

*"As the hydrostatic pressure created by the level of the water in the canal side increases, the materials of the levee are being compressed fairly uniform, including the soil materials supporting the floodwall."*

This is not an accurate portrayal of the effects of the hydrostatic pressures on the soils that support the floodwall. As shown in the following illustration (Finite Element Analyses of the E99 floodwall tests by Oner et al 1997), there are highly 'non-uniform' displacements of the supporting levee soils. The soils supporting the floodwall (concrete panels and sheet piling) experience large horizontal and vertical deformations that invalidate traditional geotechnical engineering 'active' and 'passive' pressure analyses often associated with a cantilevered floodwall subjected to hydrostatic pressures supported by non-moving soils (fixed earth assumption).



Deformations of the floodwall – soil – levee system (Oner et al 1997)

15.      In this same section, Mr. Pazos states:

*"According to IPET (III-439) approximately 3,000 feet of levee in the proximity of the breaches experience some tilt and severe scour but did not fail. Hence, it can be concluded that the development of the two breaches in the locations where the barge contacted the floodwall was a result of the forces imposed to the floodwall by barge ING 4727."*

The major forensic engineering investigations of these failures indicate that the first sentence in this quotation is accurate, in that there were large portions of the levee system that did not fail despite experiencing scour and tilt.  From this, Mr. Pazos infers that something 'unusual' was present at the locations of the North Breach and South Breach to cause breaches at those sites even though other locations did not breach.  Further, contrary to the conclusions reached by the major forensic engineering investigations that the ING 4727 barge was not the 'unusual' causative element at any of the breaches, Mr. Pazos concludes that the forces developed by the

19

ING 4727 barge was the primary cause of the North Breach and South Breach. Notably, although Mr. Pazos performed calculations to estimate the forces acting on the floodwall due to barge contact with the wall (Attachment #5), his report does not conclude that the barge impact was sufficient to dislodge the soil on the opposite side of the wall and cause it to translate back into the neighborhood. Instead, Mr. Pazos concludes that the wall failures developed as follows (Opinion #2, page 69):

> "The impacting and pushing of the floodwall created gaps or openings (allowing water to penetrate below the ground surface), between the sheet pile curtain and the outboard side earthen embankment and then water penetrated into this gap. This effectively cut the supporting embankment in half, and the water pressures applied against the lower sheet pile sections helped to push the inboard half of the embankment as well as the floodwall towards the protected side. Once this gapping began, it then developed rapidly and the gap was extended to the base of the sheet piles. Seepage or flow of water through homogenous saturated soil increased with time (hydrostatic time lag) and with the increase of water level of the IHNC."

This conclusion 'translates' the fundamental causation of the breaches from the forces exerted by the ING 4727 barge to the ensuing water erosion, seepage, and hydraulic action developed in the soils that support the floodwalls. Mr. Pazos does not produce any quantitative analyses to demonstrate that the forces imposed by the ING 4727 barge are able to directly cause either the North Breach or the South Breach. Mr. Pazos does not produce any quantitative analyses to demonstrate that gapping and seepage did not occur (or could not have occurred) without the intervention of a barge impact on the wall; and the E-99 tests referenced above show that no such intervention is needed to create the sort of tension cracks that Mr. Pazos attributes to the barge.

# REVIEW AND CRITIQUE OF CTE EXPERT REPORT

16.     My review of the CTE report focused primarily on the characterizations of the performance of the MRGO "Reach 2" hurricane flood protection structures adjacent to St. Bernard Parish. CTE defines a total of 35,200 feet of various sections along the "MRGO Levee" (Table 1, page 17) that initiated breaching at 5:30 am. Details are not provided in the CTE report concerning the locations, breach development times, and after breaching elevations of the Reach 2 flood protection structures. The CTE flooding analysis results indicate these details of the MRGO Reach 2 "Levee" performance are very important because the MRGO Reach 2 breaches contribute very significantly to the maximum flooding in the Lower 9th Ward (Figure 15, page 34). CTE relies on the USACE IPET evaluations of the performance of the MRGO Reach 2 hurricane flood protection structures in which the IPET attributes development of the breaches to 'surge overtopping' (IPET 2007). It is important to note that IPET had to 'adjust' the Reach 2 surge hydrographs for Hurricane Katrina to develop interior flooding hydrographs that were in reasonable agreement with the reported flooding. These 'adjusted' IPET surge hydrographs are used in the CTE flooding analyses (Figure 8, page 23).

17.     Based on my extensive forensic engineering analyses of the breaches that developed in the MRGO Reach 2 flood protection structure, the figure below summarizes the predominant types of breaching mechanisms involved (see Appendix B for details). The element of importance to the CTE flooding analyses is associated with the flood-side wave attack induced breaching that developed very early (6:00 am) in these structures (identified as "front-to-back" breaching). My analyses (summarized in Appendix B) indicate that about 45% of the "Levees" breached in this manner. This breaching developed well before surge overtopping of these Reach 2 "Levees" (identified in my analyses as "EBSBs" – Earthen Berm – Spoil Banks – because they

were constructed with uncompacted dredge spoil soils). This distinction is important because it explains how the large 'polder' between the Reach 2 structures and the 40 Arpent levee was able to fill very early during the onset of Hurricane Katrina. When the peak Hurricane Katrina surge arrived, very large amounts of flood water were able to flow through the major breaches that had already developed in the "Levees", quickly overtop the 40 Arpent levee and flow rapidly in great volume into St Bernard Parish and the Lower 9th Ward.



Summary of MRGO Reach 2 breaching mechanisms

## SUMMARY OF REVIEWS OF MEA, PAZOS, AND CTE EXPERT REPORTS

18.    Based on geotechnical engineering analyses, MEA concludes that the North Breach and South Breach did not develop due to insufficient support provided by the soils that supported the floodwalls at these two locations. MEA analyses conclude that there were large 'factors-of-safety' of the floodwall – supporting soil system at the presumed times of failure. Given these results, MEA concludes on the basis of eyewitness testimony that the ING 4727 barge must have caused the North Breach and the South Breach. MEA does not provide any quantitative engineering analyses that are able to show that the ING 4727 barge was actually capable of causing either of the two breaches.

19.    My review of the MEA geotechnical engineering analyses of hydraulic effects and stability of the hurricane flood protection structures at the location of the North Breach and South Breach indicates they are deeply flawed. These flaws have been detailed in this Appendix. Hydraulic effects have been underestimated resulting in significant underestimates in 'demands' (imposed loadings) and overestimates of 'capacities' (resistance provided by supporting soils). In a similar ways, the MEA analyses of stability of the flood protection structures involve important underestimates of 'demands' and overestimates of 'capacities.' The end results are substantial overestimates of the associated factors-of-safety.

20.    The engineering analyses provided by Mr. Pazos are based primarily on 'selected' results he has 'extracted' from other forensic engineering studies of the development of the North Breach and South Breach. Mr. Pazos, a qualified naval architect and marine engineer, does not provide any quantitative engineering analyses showing that the ING 4727 barge was able to exert sufficient impact on the wall to cause the wall to be pushed back into the neighborhood at either the North Breach or South Breach. Instead, based on his assembly of information from

23

other forensic engineering studies and eyewitness testimony, Mr. Pazos concludes that the ING 4727 barge impact created "gaps or openings" which in turn led to "underseepage" and then "sliding" (lateral displacement)of the soil and floodwall (page 69-70, Pazos 2009).  Again, Mr. Pazos fails to provide or perform any quantitative forensic engineering analyses that substantiate his 'inferences' (speculations).

21.      In both cases, MEA and Mr. Pazos rely principally on eyewitness testimony to support their analyses and conclusions regarding the role of the ING 4727 barge in causation of the North Breach and South Breach. The multiple on-site forensic engineering investigations I and others performed in the early days after we were able to gain access to the breach sites (September and October 2005) and the other forensic engineering investigations cited in this Declaration did not develop any similar eyewitness testimony. The very extensive and intensive investigations performed by the USACE IPET and Team Louisiana involved early interviews (September 2005) of some of the same eyewitnesses cited by MEA and Mr. Pazos. These investigations did not document a single eyewitness report of the ING 4727 barge impacting the hurricane flood protection structures during the early morning hours of August 29, 2005. I do not find this surprising given the documented poor visibility (shown by the photographs taken by the IHNC lock master - very poor due to darkness, rain, and distance), acoustic conditions (loud multi-frequency noise due to wind, rain, waves, failing infrastructure components), and physical - psychological conditions (eyesight, hearing, apprehension, panic, beliefs) that existed at the time of initiation of development of the North Breach and later the South Breach. In the early days following the flooding, there were widespread reports that the flood protection structures at the Lower 9th Ward had been "blown up" (Tara Young, *Rumor of levee dynamite persists*, The

Times-Picayune, December 12, 2005). Such intentional breaching of the flood Lower 9th Ward protection structures with explosives have proven not to be true.

22.     I have personally been in such terrifying conditions during my life (e.g. in our home in New Orleans East during the Hurricane Betsy flooding and several times on offshore structures). Given the very extensive multiple forensic engineering investigations that have been conducted during the past 4 years to determine how these breaches developed, it is difficult for me to understand how the activities (features, actions, noises) attributed by the cited eyewitnesses to the ING 4727 barge causation of the North Breach and South Breach could be determined by MEA and Mr. Pazos to provide sufficient reliable evidence to conclude that the ING 4727 barge fundamentally caused these breaches. Other more plausible mechanisms have been developed, validated, and corroborated to explain how and why these breaches developed. The conclusion of these investigations is that the ING 4727 barge was a victim of the breaches, not a cause.

23.     The flooding analyses performed by CTE have been based on the assumption that the MRGO Reach 2 "Levees" breached after overtopping by Hurricane Katrina's surge. This assumption is attributed to the USACE IPET investigations. Later, much more detailed forensic engineering analyses (including those performed by the USACE; e.g. Ebersole 2009) have shown clearly that there was much more than surge overtopping involved in the miserable performance of these hurricane flood protection structures. Early breaching of the man-made earthen flood protection structures was initiated with the large waves that were developed across Lake Borgne. These waves eroded the front sides of the "Levees" and produced "crenellations" in their crests. Thus, the rising surge water and waves were able to breach the "Levees" well before overtopping of the crests with the surge generated by Hurricane Katrina.