UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | * * * * * * | CIVIL ACTION  NO. 05-4182 and consolidated cases |
| PERTAINS TO: BARGE | * * | SECTION "K" (2) |
| *Boutte v. Lafarge*  05-5531 | * | |
| *Mumford v. Ingram*  05-5724 | * | |
| *Lagarde v. Lafarge*  06-5342 | * | JUDGE |
| *Perry v. Ingram*  06-6299 | * | STANWOOD R. DUVAL, JR. |
| *Benoit v. Lafarge*  06-7516 | * | |
| *Parfait Family v. USA*  07-3500 | * | MAGISTRATE |
| *Weber v. Lafarge*  08-4459 | * | JOSEPH C. WILKINSON, JR. |

**LAFARGE NORTH AMERICA INC.'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
BY GENNARO MARINO**

Defendant Lafarge North America Inc. ("LNA") moves to exclude expert opinion testimony by Gennaro Marino, a geotechnical engineer designated by the plaintiffs to testify about the "nature and causes of the IHNC wall breaches." Doc. 18390 at 20. Dr. Marino opined that the Barge ING 4727 must have caused the North Breach and South Breach because he could not identify another likely cause through the geotechnical stability and seepage analyses that he performed. This testimony is unreliable and inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), because Dr. Marino's "process of elimination" did not eliminate all potential causes and because he used flawed data in his analysis. Thus, this testimony should be excluded from the June 2010 bench trial.[1]

---

[1] The Court's case management orders (Docs. 19112, 19201) call for *Daubert* briefing notwithstanding that the June 2010 trial is a bench trial, not a jury trial. *See Johnson v. Big Lots Stores, Inc.*, No. 04-3201, 05-6627, 2008 WL 1930681, *20 (E.D. La. April 29, 2008) (excluding expert from bench trial grounds that opinion was unreliable due to flawed methodology). All non-*Daubert* objections to Dr. Marino's testimony are reserved.

1

**ARGUMENT**

**I. LEGAL STANDARDS UNDER RULE 702 AND DAUBERT**

This motion is governed by the same legal standards discussed in detail in LNA's motion to exclude the expert causation testimony of Hector Pazos, incorporated here by reference. Doc. 19437. Of particular note for this motion are cases providing that expert analysis is unreliable where the expert's opinions are based on erroneous information, or where there is "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Paz v. Brush Eng. Materials, Inc.,* 555 F.3d 383 (5th Cir. 2009).

**II. DR. MARINO'S CAUSATION TESTIMONY SHOULD BE EXCLUDED.**

Dr. Marino was retained by the plaintiffs in this case to conduct "an investigation of the cause(s) of the two floodwall failures along the Inner Harbor Navigation Canal."[2] Dr. Marino testified that he used a "process of elimination" to conclude that the barge caused both the North Breach and South Breach.[3] Dr. Marino's testimony does not satisfy *Daubert* and Rule 702. First, his "process of elimination" is unreliable because it fails to consider or eliminate all potential non-barge causes of the floodwall failures, and omits direct analysis of whether the barge could have been the cause, as he infers. Second, Dr. Marino carried out his "process of elimination" in an unreliable manner by using artificially-inflated input values for his seepage and stability analyses – specifically, the strength parameters for the soil layers and soil profile characteristics needed to perform those analyses. Finally, Dr. Marino's work lacks any other indicia of reliability that might conceivably qualify it for admission under *Daubert*.

---

[2] *See* Exhibit 2 to LNA's Motion for Summary Judgment (Doc. 19309) ("LNA SJ Exh."), Marino Report at 1-1. For the convenience of the Court and the parties, LNA refers to the summary judgment exhibits previously submitted to the Court, rather than submitting them again in connection with this motion. At the Court's request, LNA will re-submit any or all of these exhibits.

[3] LNA SJ Exh. 8, Marino 2009 Dep. 34-35, 152 (describing "process of elimination" in which he finds "no other likely causes" and infers the barge caused the floodwall failures).

### A. Dr. Marino's Process of Elimination Did Not Eliminate All Causes.

Dr. Marino admitted that he "back[ed] into" his conclusion that the barge caused the IHNC floodwall failures by "eliminat[ing] all the other causes."[4] Dr. Marino did not study the barge's transit from the LNA Terminal, and professed ignorance about how the barge might have arrived at the site of either the North Breach or the South Breach.[5] Nevertheless, Dr. Marino concluded that the barge must have caused the breaches because he found "no other likely causes."[6] Under *Daubert* and Rule 702, it is proper to ask whether an expert "has adequately accounted for obvious alternative explanations." Comments to Rule 702 (citing *Claar v. Burlington N.R.R.,* 29 F.3d 499 (9th Cir. 1994)). If not, then the expert opinion "is based on insufficient information," and "the analysis is unreliable." *Paz,* 555 F.3d at 388; *Michaels v. Avitech*, 202 F.3d 746, 753 (5th Cir. 2000) (evidence "would likely have been inadmissible at trial under *Daubert* because it failed to exclude other causes").

Here, Dr. Marino's process of elimination failed to account for non-barge conditions that other experts, including Mr. Pazos on behalf of the plaintiffs, identified as having been involved in causing the IHNC floodwall failures. At the North Breach, for instance, Dr. Marino concluded that there was a tear in the steel sheet pile and opined that this would have required "significant force on the floodwall," which he then attributed to the barge.[7] However, the evidence from Mr. Pazos and others showed that there was a faulty weld in the sheet pile at this

---

[4] LNA SJ Exh. 8, Marino 2009 Dep. at 166 (Q: "Well, the fact of the barge hitting a wall is something you back into after you eliminated all the other causes; isn't that right?" A: "That's correct.").

[5] LNA SJ Exh. 8, Marino 2009 Dep. at 105-07 (admitting he does not know how the barge got to the north breach); *id.* at 142 (Q: "So again, as with the north breach, you can't explain how or why the barge got from one place to the next?" A: "That's correct."); *id.* at 111 (Q: "But to be clear, the information you have does not include any explanation of how the barge got from one place to the other; right?" A: I don't know how many times I have to say it, Mark. That's true. You've said it maybe four, five times already.").

[6] LNA SJ Exh. 8, Marino 2009 Dep. at 34-35.

[7] LNA SJ Exh. 2, Marino Report at 4-16; LNA SJ Exh. 8, Marino 2009 Dep. at 114.

location that made it a point of particular weakness.[8] Dr. Marino did not appear even to know about the existence of this faulty weld,[9] and thus he did not eliminate or even analyze hydrostatic pressure on this weak area as a potential cause of the rip in the sheet pile.[10] In a similar vein, Dr. Marino opined that "gaps" or "tension cracks" between the steel sheet pile and the canal-side soil formed due to barge impact rather than hydrostatic pressure,[11] but admitted he did not perform calculations to analyze or rule out the formation of gaps or tension cracks under hydrostatic pressure, as found by every other investigation to study the issue.[12] Finally, despite evidence that sand-filled excavations near the site of the breaches had led to increased opportunities for seepage at those areas,[13] Dr. Marino failed to include sand-filled excavations in his analysis.[14] Thus, Dr. Marino did not carry out a true "process of elimination."

Courts reject expert testimony under *Daubert* and Rule 702 where the expert fails to support his conclusions with a rigorous scientific analysis, including a "process of elimination"

---

[8] *See, e.g.,* LNA SJ Exh. 6, Pazos Dep. at 152-54 (faulty weld made this "one of the weakest points on the wall"); LNA SJ Exh. 3, Bakeer Report at 45-46 and LNA SJ Reply Exh. 1, Appendices to Bakeer Report at Figs. 41-45 (describing Dr. Bakeer's personal examination of the sheet pile and documenting the "significantly rusted and corroded" condition of older sheet pile that compromised "their interlocking capability" and caused the weld to fail).

[9] LNA SJ Exh. 8, Marino 2009 Dep. at 218 ("I'm wondering where the hell the weld is coming from").

[10] LNA SJ Exh. 8, Marino 2009 Dep. at 116 (Q: "Have you done any calculations to rule out the possibility that a faulty weld failed under a hydrostatic load?"  A:  "I haven't done those calculations, no."); *id.* at 134 (admitting that hydrostatic pressure from rising water could "create torque at the connection between the deeper and shallower sheet pile" where the faulty weld occurred); *id.* at 124 (Q:  "Your stability analysis, when you concluded that the wall was stable enough to withstand the storm surge, you didn't factor in a sheet pile tear and a progressive washout into that analysis; right?"  A:  "That's correct.").

[11] LNA SJ Exh. 8, Marino 2009 Dep. at 159 (Q:  "What you're saying is that a similar gap formed here, but not from hydrostatic pressure?"  A: "That's correct."  Q: "You're saying that instead of hydrostatic pressure at this wall, you had a barge creating a gap?"  A: "That's correct.").

[12] LNA SJ Exh. 8, Marino 2009 Dep. at 127 (admitting that opinions regarding formation of tension cracks due to hydrostatic pressure "are not supported by any calculations"); LNA SJ Exh. 18, ILIT Report at 6-10-6-11 (South Breach) and 6-17-6-18 (North Breach); LNA SJ Reply Exh. 2, IPET Report at V-68.

[13] Exh. 1, Excerpts of Bea Report App. B at 24-44 (locations of sand-filled excavations near IHNC breaches); LNA SJ Exh. 8 ,Marino 2009 Dep. at 212 (admitting "[t]here could have been some silty sand" at North Breach).

[14] LNA SJ Exh. 8, Marino 2009 Dep. at 53-54 (admitting that "seepage pressures are greater" if there is sand in an excavation, but he has not analyzed a soil profile that includes sand filled excavations at either breach); *id.* at 219 (seepage analysis did not include sand-filled excavations); *id.* at 161 (admitting that if seepage around the sheet pile tip occurred without a barge, then failure could occur without a barge).

4

that does not eliminate potential causes. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court upheld the district court's rejection of an expert's conclusion that a tire was defective based on a purported process of elimination (*i.e.*, that the tire was defective in the absence of two physical signs of abuse), finding that the expert could not validly have ruled out abuse based on the methodology he employed. *Id.* at 144-46, 154-55.[15] In *Watkins v. Telsmith, Inc.,* 121 F.3d 984 (5th Cir. 1997), and again in *Guy v. Crown Equip. Co.*, 394 F.3d 320 (5th Cir. 2004), the Fifth Circuit upheld the exclusion of expert testimony regarding the feasibility of an alternative design because the expert did not go through the process of identifying a specific alternative (*Guy*, 394 F.3d at 327), or did not show that the alternative would have prevented the plaintiff's accident (*Watkins*, 121 F.3d at 992). These cases stand squarely for the proposition that an expert must rigorously apply the process he has undertaken, rather than omitting important components as Dr. Marino did.[16]

Dr. Marino's "process of elimination" is particularly suspect because he could have directly determined whether the barge was even capable of causing the floodwall breaches – that is, to directly prove (or disprove) the conclusion that he ultimately "back[ed] into" – but he chose not to complete those direct analyses during the discovery period. The direct method of proof would have studied whether the barge could have caused a deflection of the steel sheet pile embedded in the soil, which Dr. Marino conceded was necessary in order to cause a floodwall

---

[15] That the expert himself vouched for the methodology was found to be insufficient: "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 157 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

[16] *See Watkins v. Telsmith, Inc.*, 121 F.3d at 984, 992 (5th Cir. 1997) ("Although he claimed experience in analyzing stresses and the appropriate safety factors in cable wires, Williams did not perform any such calculations."); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000) (causation testimony properly excluded where expert did not systematically rule out all other possible causes).

failure.[17]  In his September 2008 deposition, Dr. Marino announced that he "plan[ned] to" analyze "how far the floodwall would deflect when hit by the barge."[18]  However, in his August 2009 deposition, Dr. Marino reported that this analysis "never got finished," and that he had performed no quantitative analysis to determine whether the barge was capable of causing either breach.[19]  Dr. Marino did not resume his work on these calculations until well after the time to serve rebuttal reports had passed.  *See* Fed. R. Civ. P. 26(a)(2)(C)(ii).[20]  In *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999), the Fifth Circuit rejected the analysis of an expert who purported to apply a "process of elimination" to conclude that an accident caused the plaintiff's fibromyalgia, finding that the analysis was "unacceptable" in the absence of scientific evidence showing a direct causal link.  *Id.* at 313.  Dr. Marino's failure to carry out a direct analysis is another reason why his indirect "process of elimination" is unreliable.  *See Joiner,* 522 U.S. at 146 (rejecting extrapolation to "unfounded conclusion").[21]

---

[17] *E.g.*, LNA SJ Exh. 8, Marino 2009 Dep. at 254-55 (admitting that "in order for the barge to move the bottom of the sheet pile enough to allow water to percolate, the barge impact on the upper part of the wall has to have its effect felt all the way to the bottom of the wall").

[18] LNA SJ Exh. 9, Marino 2008 Dep. at 100-01 (Q:  "Did you evaluate as part of your analysis how far the floodwall would deflect when hit by the barge?"  A: "No.") (adding that he "plan[ned] to" undertake that analysis); *id.* at 37-38 (describing "hydrodynamic load analysis" to come up with "a potential force range that would impact the wall").

[19] LNA SJ Exh. 8, Marino 2009 Dep. at 31-32 ("Would you agree with me that there are no such engineering calculations [related to barge impact on floodwall] in the report that you issued in 2009?"  A: "Yes … That analysis never got finished."); *id.* at 256 (admitting he could have modeled movement of the bottom of the sheet pile on the protected side but he did not do it because "you can't model everything"); *id.* at 35-36 (admitting his report "doesn't contain any load impact analysis" and "doesn't contain any other quantitative forensic engineering analysis to demonstrate that the ING 4727 was capable of causing either breach"); *id.* at 127 (admitting he did not calculate the barge impact force, or whether an impact with the concrete cap would cause the cap to shear off rather than pulling the wall from the soil); *id.* at 157 (Q:  "And you haven't calculated whether the momentum of the barge was sufficient to cause the wall to deflect and create this gap in the manner you've described?"  A: "Right.").

[20] In fact, those calculations are still "underway" and Dr. Marino's untimely declaration included only ***portions of incomplete calculations***.  Doc. 19352, Exh. 43. at 3, ¶ 5 & Attachment F.  Moreover, those calculations reflect that Dr. Marino is using an input assumption of a "100 mph wind impacting barge broadside" (*i.e.*, from west to east).  Like Mr. Pazos' similar calculation, there is no meteorlogical data or other support for such an assumption.  Thus Dr. Marino's untimely impact analysis would have to be excluded on *Daubert* grounds even if it were considered.

[21] Exh. 2, Bea Report App. D at 5 (Dr. Marino "does not perform or provide any quantitative analyses demonstrating that the barge was capable of initiating or propagating either the North Breach or the South Breach."); LNA SJ Exh. 1, Cushing Report at 148 ("Without an accurate barge impact analysis, it is not known how Dr. Marino reached his conclusion that the two breaches along the IHNC were caused by the barge.").

### B.  Dr. Marino's Seepage and Stability Analyses Used Faulty Input Data.

The centerpiece of Dr. Marino's work – and the reason why he needed three extra months to produce it (*see* Doc. 18130 at 1) – is the geotechnical "failure analysis" contained in Chapter 5 of his report.  There, Dr. Marino carried out seepage and stability analyses to conclude that there was "essentially no effect of underseepage" and that "the floodwall had more than adequate integrity" to retain its stability during Hurricane Katrina.[22]  These analyses depend on input data characterizing the soil profile (section 5.2) and soil unit properties (including soil shear strength) (section 5.3) that Dr. Marino used to run his computer models.  As Dr. Marino admitted, if the input data used in these analyses was faulty, then the analyses are unreliable.[23]

The soil underlying the IHNC floodwall is akin to a "layer cake" of different soil layers.  The "soil profile" is the layout of the various soil layers, and the "soil properties" represent data concerning the composition of each of the layers.  Dr. Marino's input data regarding the soil profile and soil properties materially departed from the input data used to construct the physical model employed in similar seepage and stability analyses contained in the IPET and ILIT Reports.[24]  As Dr. Marino conceded, these differences in input data were "significant enough to cause the safety factor to increase 20 percent or so" in his analyses beyond the results of the independent IPET and ILIT investigations, and thus to drive his conclusion that neither seepage nor soil instability could have caused the wall to fail, contrary to the conclusions reached by the

---

[22] LNA SJ Exh. 2, Marino Report at 5-66 (North Breach), 5-93 (South Breach).

[23] LNA SJ Exh. 8, Marino 2009 Dep. at 197 (Q: "If your inputs in sections 5.1, 5.2 and 5.3 are incorrect, you'll derive faulty results; correct?"  A: "Just like anybody's analysis."); *see Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354-55 (5th Cir. 2007) (reliability analysis "applies to all aspects of an expert's testimony" including "the facts underlying the expert's opinion").

[24] LNA SJ Exh. 8, Marino 2009 Dep. at 39 (Q: "[Y]our physical model departed from the IPET physical model in material ways that affected the results of the analysis?"  A: "Yes."  Q:  "And the same is true for the ILIT physical model; correct?"  A:  "Yes.").

independent investigations.[25]  As noted in the comments to Rule 702, "when an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied."  Such concerns are abundant here, where Dr. Marino has generated a singular conclusion that eminent independent researchers, publishing in peer-reviewed journals, did not reach in studying this very same question.

In fact, Dr. Marino's stability and seepage analyses rest on a mischaracterization of the soil profile, particularly in the vicinity of the North Breach.  There, Dr. Marino's report shows a lobe of high-strength and low-permeability "levee embankment" material extending down to a depth of 18 feet on the canal side of the floodwall.[26]  In this respect, Dr. Marino's soil profile differs dramatically from the soil profiles used in the IPET and ILIT Reports, neither of which include this deep lobe of levee embankment material.[27]  Dr. Marino conceded that it was "quite unusual" to have levee embankment soil placed to that depth, but nevertheless made a "choice" to assume the soil had been placed there.[28]  Dr. Marino said that he based this decision on "a few borings" by Washington Group International (Nos. 77A, 79A, and 81A).[29]  Those very borings, however, show that the relevant soil was ***permeable sand and silt***, not "levee embankment."[30]  Thus, Dr. Marino substituted high-strength and low-permeability levee embankment for the

---

[25] LNA SJ Exh. 8, Marino 2009 Dep. at 198 (Q:  "Well, your – your soil characterization, the soil profiles and the soil properties differ in significant respects from IPET and ILIT.  Am I right?"  A:  "Yes.  Well, I – obviously significant enough to cause the safety factor to increase 20 percent or so."); *see also* LNA SJ Exh. 19, Bea Dep. at 126 (safety factors depend on soil characterization).

[26] LNA SJ Exh. 2, Marino Report at Fig. 5.12.

[27] LNA SJ Exh. 8, Marino 2009 Dep. at 203-05; Exh. 3, Marino 2009 Dep. Exh. 11 (IPET soil profile).

[28] LNA SJ Exh. 8, Marino 2009 Dep. at 211.

[29] LNA SJ Exh. 8, Marino 2009 Dep. at 205, 207-08, 223.

[30] Exh. 4, Excerpts from Washington Group International Boring Logs for Nos. 77A, 79A, and 81A; Exh. 5, Bea Supp. Analyses at 2-3 & Fig. 2 (noting that Boring 81A, the one closest to the North Breach, shows that a "permeable deposit extends down to about elevation -20 ft" near the canal side levee toe and classifies this material as "shell with silty sand," not levee embankment).

permeable sand and silt shown in his own source document.[31] This substitution by Dr. Marino caused his seepage and stability analyses to generate different results from what a proper characterization would have yielded.[32] Dr. Marino's reliance on erroneous and artificially-inflated assumptions about the characteristics of the underlying soils renders his report unreliable. *Paz*, 555 F.3d at 389 (affirming exclusion of causation expert who based his conclusions on erroneous information and without support in scientific literature).

In addition to mischaracterizing the soil profile, Dr. Marino used incorrect and artificially high values to characterize the strength parameters of the soils in his analysis. For instance, Dr. Marino employed a shear strength value for levee embankment of 722 pounds per square foot, a value that is higher than every other soil study conducted to date, all of which used values of 500 pounds per square foot or lower.[33] Moreover, Dr. Marino unjustifiably used a simple average of thirteen soil sample values, even though the samples were obtained using varying techniques and thus could not be compared without appropriate adjustments, which Dr. Marino failed to make.[34] In this respect as well, Dr. Marino's use of inflated soil strength characteristics renders his testimony unreliable. *See Paz*, 555 F.3d at 389.

---

[31] As his only justification for this substitution, Dr. Marino said he made a "deduction" that the Corps must have replaced the silty sand with the stronger materials at this location based on a design document from 1969, even though the borings showed the presence of silty sand in 2003, more than thirty years later. LNA SJ Exh. 8, Marino 2009 Dep. at 213-15. As noted by Professor Bea, who exhaustively studied the documentation of the work carried out on the East Bank Industrial Area, Dr. Marino failed to document a basis for the placement of low permeability soils to such depths, and there is no record of their placement. Exh. 2, Bea Report App. D at 6-7.

[32] *See* Exh. 5, Bea Supp. Analyses (underseepage using properly-characterized sandy soil at North Breach yields a contrary result); Exh. 2, Bea Report App. D at 10 ("The input characterizations by Bea and Cobos Roa, reflected in their peer reviewed work, are more accurate and valid, and yield more reliable results.").

[33] LNA SJ Exh. 8, Marino 2009 Dep. at 226; LNA SJ Reply Exh. 1, Bakeer Comments on MEA Report at 22 (noting Marino value is higher than every other study).

[34] LNA SJ Exh. 8, Marino 2009 Dep. at 227-28 (average value from 13 samples used to derive shear strength); LNA SJ Reply Exh. 1, Bakeer Comments on MEA Report at 10-19 (Dr. Marino applied a "simplistic, mathematical average" to data points representing borings taken with different methods from different locations; no validity to this "fruit basket" approach); Exh. 2, Bea Report App. D at 3 (Marino analyses "are based on primitive analyses of soil strength characteristics involving an assembly and aggregation of different soil sampling and testing techniques" without "appropriate corrections to laboratory test results" and without "modern 'Normalized Soil Properties' methods appropriate for lateral stability analyses.").

### C. Dr. Marino's Opinions Lack Indicia of Reliability Under *Daubert*.

As described above, Dr. Marino concluded that the barge must have caused the North Breach and South Breach through a "process of elimination" that did not eliminate all potential causes and that relied on faulty inputs, rendering it unreliable. In addition, Dr. Marino's report bears none of the indicia of reliability that might redeem it under *Daubert* and Rule 702. Thus:

- Dr. Marino's work on the IHNC floodwall failures was carried out purely for litigation and does not grow out of his independent work. Indeed, he has never before designed or evaluated the safety of a hurricane protection levee or floodwall for the Army Corps of Engineers, and has never before conducted a seepage or stability analysis of a hurricane protection system that failed.[35]

- Dr. Marino's work has never been subject to independent oversight, and has never been published in a peer-reviewed or refereed journal.[36]

- Dr. Marino did not visit the failed floodwall for forensic purposes, and did not inspect the barge, the failed sheet pile, or the other failed floodwalls.[37]

---

[35] LNA SJ Exh. 8, Marino 2009 Dep. at 89-91; *see* Comments to Rule 702 (expert testimony that grows out of work conducted "independent of the litigation" more reliable than work developed specifically for litigation). LNA's geotechnical experts, Robert Bea and Reda Bakeer, each have a long history of independent work involving the levees and flood protection structures. LNA SJ Exh. 19, Bea Dep. at 23, 27, 40 (10,000 unpaid hours investigating Katrina levee and floodwall failures, including as leader of ILIT); LNA SJ Exh. 27, Bakeer Dep. at 78-80 (instructor at Louisiana State University "Levee School" to educate Louisiana levee board officials).

[36] LNA SJ Exh. 8, Marino 2009 Dep. at 48-49; *see Daubert*, 509 U.S. at 593-94 (asking whether opinion "has been subjected to peer review and publication"). Again, this is in contrast to the work of Dr. Bea and the ILIT and IPET teams. LNA SJ Exh. 19, Bea Dep. at 36, 141-42 (work subjected to peer review, published in refereed journals); Exh. 2, Bea Report App. D at 13-14 (peer reviewed conference and journal papers).

[37] LNA SJ Exh. 8, Marino 2009 Dep. at 126; *see Fairley v. Clarke*, No. 02-2219, 2004 WL 877102 at *5 (E.D. La., April 22, 2004) (Duval, J.) (excluding expert accident reconstruction analysis based on flawed input data, and noting that expert did not examine the vehicle or the skid marks). By contrast, LNA's experts personally inspected the barge, failed floodwall, and failed sheet pile. LNA SJ Exh. 13, Bea Report at 10, 22 and Fig. 2 (documenting the locations of multiple field investigations performed by Dr. Bea); LNA SJ Exh. 3, Bakeer Report at 45-46 (describing personal inspection of the sheet pile); LNA SJ Exh. 1, Cushing Report at 87-90 (detailing multiple personal inspections of the failed floodwall and barge); LNA SJ Exh. 4, Cushing Dep. at 14-17, 26.

- Dr. Marino's conclusions contradict the results of all of the independent published and peer-reviewed studies conducted to date regarding the causes of the floodwall failures.[38]

- Dr. Marino's results do not include any attempt to quantify, much less evaluate, the rate of error associated with his work.[39]

The Fifth Circuit has affirmed the exclusion of expert testimony in circumstances just like those presented here. *Paz,* 555 F.3d at 390 (court relied on absence of evidence that diagnosis has been "tested or peer reviewed" to affirm exclusion); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) (en banc) (expert opinion "had not been tested" and "had not been subjected to peer review or publication" and "the potential rate of error had not been determined or applied" and it "had not been generally accepted in the scientific community").

## CONCLUSION

LNA's motion to exclude expert testimony from Gennaro Marino should be granted as set forth above.

---

[38] LNA SJ Exh. 8, Marino 2009 Dep. at 261-62 (conceding his conclusion "disagrees with every other forensic investigation of this question"); Exh. 2, Bea Report App. D at 5 (noting that ILIT, IPET, Team Louisiana, and National Institute of Standards and Technology corroborated Bea analysis but not Marino); LNA SJ Reply Exh. 1, Bakeer Comments on Marino Report at 3 (Dr. Marino "contradicts the findings of all credible investigations published to date including those by ILIT, IPET, Team Louisiana, NSF and ASCE," which included "renowned national scientists" and "were subsequently published in numerous peer-reviewed scientific journals and presented in national and international conferences").

[39] *See* LNA SJ Exh. 8, Marino 2009 Dep. at 223; LNA SJ Exh. 19, Bea Dep. at 224 (noting failure to quantify error rate in Marino report). *See Daubert*, 509 U.S. at 593-94 ("acceptable known or potential rate of error"). In contrast, Dr. Bea has expressly quantified the margin of error in his analysis. LNA SJ Exh. 19, Bea Dep. at 97, 184.

Dated: December 1, 2009	Respectfully submitted,

Robert B. Fisher, Jr., T.A. (#5587)
Derek A. Walker (#13175)
**CHAFFE MCCALL, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA  70163-2300
Telephone:  (504) 585-7000
Facsimile:  (504) 585-7075
Fisher@chaffe.com
Walker@chaffe.com

 /s/ John D. Aldock
John D. Aldock
Richard M. Wyner
Mark S. Raffman
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC  20001
Telephone:  (202) 346-4240
jaldock@goodwinprocter.com
rwyner@goodwinprocter.com
mraffman@goodwinprocter.com


Daniel A. Webb (#13294)
**SUTTERFIELD & WEBB, LLC**
Poydras Center
650 Poydras Street, Suite 2715
New Orleans, LA  70130
Telephone:  (504) 598-2715

***Attorneys for Lafarge North America Inc.***

12

LIBW/1724443.2

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 1, 2009.

        /s/ John D. Aldock